# **Exhibit 1**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FINAL ORDER (A) APPROVING POSTPETITION SECOND LIEN FINANCING FOR ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE INC., (B) GRANTING LIENS AND PROVIDING JUNIOR SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) AUTHORIZING THE EFIH SECOND LIEN REPAYMENT, (E) AUTHORIZING ENTRY INTO AND PAYMENT OF FEES UNDER THE COMMITMENT LETTER, AND (F) MODIFYING THE AUTOMATIC STAY**

Upon the motion (the "EFIH Second Lien DIP Motion") of Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc. (together with EFIH, the "Issuer" or the "EFIH Debtors") in the above-captioned chapter 11 cases of the EFIH Debtors (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), seeking entry of an Order (this "Order"), *inter alia*:

(i)        authorizing the Issuer to enter into that certain Second Lien Subordinated Secured Superpriority Debtor-in-Possession Note Purchase Agreement (as amended, restated,

---

[1]     The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on a final basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

supplemented, or otherwise modified from time to time as permitted by this Order, the "EFIH Second Lien DIP NPA"),[2] between Issuer, the purchasers of second lien DIP notes (the "EFIH Second Lien DIP Note Purchasers"), Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "EFIH Second Lien DIP Agent"),[3] and the other agents and entities from time to time party thereto, substantially in the form of Exhibit A annexed to the EFIH Second Lien DIP Motion, to obtain second lien secured postpetition financing (the "EFIH Second Lien DIP Facility") on a junior basis, consisting of (a) Tranche A Notes (as defined in the EFIH Second Lien DIP Motion) of $1,900,000,000 and (b) and Tranche B Notes (as defined in the EFIH Second Lien DIP Motion) payable as the Closing Fee (as defined in the EFIH Second Lien DIP Motion) of $95,000,000;

(ii)    authorizing any other entities, if any, that subsequently commence jointly administered chapter 11 cases and become guarantors under the EFIH Second Lien DIP NPA (the "Guarantors") to enter into the Guarantee (as defined in the EFIH Second Lien DIP NPA);

(iii)    authorizing each of the EFIH Debtors to execute and deliver the EFIH Second Lien DIP NPA, the applicable Security Documents (as defined in the EFIH Second Lien DIP NPA), that certain intercreditor agreement that will be executed in conjunction with the EFIH Second Lien DIP NPA, by and among the EFIH Debtors, Deutsche Bank AG New York Branch, in its capacity as administrative agent and collateral agent under the EFIH First Lien DIP Financing (as defined in the EFIH Second Lien DIP Motion) (the "EFIH First Lien DIP Agent") and the EFIH Second Lien DIP Agent (the "EFIH DIP Intercreditor Agreement"), and the other

---

[2]    Capitalized terms not otherwise defined in this Order shall have the meanings set forth in EFIH Second Lien DIP NPA, the EFIH Second Lien DIP Motion, or in the EFIH Second Lien DIP Documents (as defined below), as applicable.

[3]    As used herein, the term "EFIH Second Lien DIP Agent" refers to Cortland Capital Market Services LLC, as administrative agent under the EFIH Second Lien DIP NPA, Cortland Capital Market Services LLC, as collateral agent under the EFIH Second Lien DIP NPA, or both, as the context requires.

related credit documents (collectively, including the EFIH Second Lien DIP NPA and the Commitment Letter (as defined in the EFIH Second Lien DIP Motion), the "EFIH Second Lien DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the EFIH Second Lien DIP Documents;

      (iv)    granting the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (as defined herein) on account of all obligations owing in connection with the EFIH Second Lien DIP Facility and the EFIH Second Lien DIP Documents, including fees payable under the Commitment Letter incurred through the funding of the EFIH Second Lien DIP Facility, the Prepayment Fee, the Participation Fee, and any other fees payable under the EFIH Second Lien DIP Documents (collectively, the "EFIH Second Lien DIP Obligations");

      (v)    granting to the EFIH Second Lien DIP Agent, for the benefit of itself, any sub-agents, and the EFIH Second Lien DIP Note Purchasers, automatically perfected security interests in and liens upon all of the EFIH DIP Collateral (as defined herein), including, without limitation, all property constituting "cash collateral" (the "EFIH Cash Collateral"), as defined in section 363(a) of the Bankruptcy Code, which security interests and liens shall be subject to the priorities set forth herein;

      (vi)    authorizing and directing the EFIH Debtors to pay the principal, interest, fees, expenses, and other amounts payable and/or reimbursable under the EFIH Second Lien DIP Documents (including the EFIH Second Lien DIP NPA and the Commitment Letter) as such amounts become due, all as described in more detail in the EFIH Second Lien DIP Motion and to the extent provided in, and in accordance with the terms of, the EFIH Second Lien DIP Documents;

(vii)   vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the EFIH Second Lien DIP Documents, as limited pursuant hereto, and this Order;

(viii)   authorizing the EFIH Debtors to use all net cash proceeds of the EFIH Second Lien DIP Facility, in addition to other sources of cash, to consummate the repayment of all principal and accrued but unpaid interest (but without payment of any disputed amounts) due and owing under the EFIH Second Lien Notes (as defined herein) (as further described in the EFIH Second Lien DIP Motion, the "EFIH Second Lien Repayment") and the payment of amounts owed in respect of EFIH's settlement of "make-whole" with respect to the EFIH Second Lien Notes (the "EFIH Second Lien Settlement) to the extent authorized pursuant to an order of the Court approving the EFIH Second Lien Settlement (the "Second Lien Settlement Order");

(ix)   authorizing the EFIH Debtors to use cash collateral and other collateral pursuant to sections 363(c) and 363(e) of the Bankruptcy Code and Rule 4001(b) of the Bankruptcy Rules and the Local Bankruptcy Rules, including Local Bankruptcy Rule 4001-2, on the terms and conditions set forth in this Order;

(x)   authorizing the EFIH Debtors to borrow up to $1.995 billion to provide financing for (i) transaction fees, liabilities and expenses and other administration costs incurred in connection with the negotiation, syndication, documentation (including any engagement or commitment letters), execution, and closing of the EFIH Second Lien DIP Facility, and (ii) payment of amounts related to the EFIH Second Lien Repayment; and

(xi)   authorizing the limitation of the EFIH Debtors' and the EFIH Debtor estates' right to surcharge against or recover from the EFIH DIP Collateral pursuant to section 506(c) and 105(a) of the Bankruptcy Code or any similar principle of law.

The Court having considered the EFIH Second Lien DIP Motion, the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions*, sworn to on April 29, 2014, the exhibits attached thereto, the *Declaration of David Y. Ying in Support of the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., et al., for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* (the "Ying Declaration"), sworn to on May 15, 2014, the EFIH Second Lien DIP Documents (including the Commitment Letter), the evidence submitted or adduced and the arguments of counsel made at the hearing held on June 30, 2014 (the "Hearing"); and notice of the Hearing having been given in accordance with the Bankruptcy Code and the Bankruptcy Rules; and the Hearing to consider the relief set forth in this Order having been held and concluded; and all objections, if any, to the relief requested in the EFIH Second Lien DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the EFIH Debtors and their estates, creditors, and other parties in interest, and is appropriate for the administration and preservation of the value of their estates; and it further appearing that the EFIH Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and after due deliberation and consideration and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING BY THE EFIH DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    Petition Date.  On April 29, 2014 (the "Petition Date"), each of the EFIH Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these Cases.  On June 30, 2014, the Court entered an order approving the joint administration of these Cases on a final basis.

B.    Debtors-in-Possession.  The EFIH Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.    Jurisdiction and Venue.  The Court has jurisdiction over this matter, these proceedings, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter as set forth in this Final Order is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the EFIH Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Bankruptcy Rules to the entry of an Order by the Court in connection with the EFIH Second Lien DIP Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter Orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue for the Cases and the EFIH Second Lien DIP Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    Committee Formation.  On May 13, 2014, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for the District of Delaware (the "U.S. Trustee")

appointed an official committee to represent the interests of unsecured creditors only in the chapter 11 cases of certain affiliates of the EFIH Debtors (the "Appointed Committee"). As of the date hereof, the U.S. Trustee has not appointed a committee of unsecured creditors to represent the interests of unsecured creditors in the Cases (if appointed, a "Creditors' Committee").

        E.     EFIH Prepetition Indebtedness:

        (i)     Prepetition EFIH First Lien Notes. Prior to the Petition Date, the EFIH Debtors: (a) issued (originally and/or in exchanges) the 10.00% Senior Secured First Lien Notes due 2020 (the "EFIH First Lien 2020 Notes"), under that certain Indenture dated as of August 17, 2010 (as amended, modified, or supplemented, the "EFIH First Lien 2020 Notes Indenture"); (b) issued (originally and/or in exchanges) the 6.875% Senior Secured First Lien Notes due 2017 (the "EFIH First Lien 2017 Notes", and, together with the EFIH First Lien 2020 Notes, the "EFIH First Lien Notes," and the holders of such EFIH First Lien Notes, the "Prepetition EFIH First Lien Creditors"), under that certain Indenture dated as of August 14, 2012 (as amended, modified, or supplemented the "EFIH First Lien 2017 Notes Indenture", and, together with the EFIH First Lien 2020 Notes Indenture, the "EFIH First Lien Indentures," and the trustee under the EFIH First Lien Indentures, the "EFIH First Lien Notes Trustee"); and (c) entered into the Security Documents (as defined in the EFIH First Lien Indentures, and collectively with the EFIH First Lien Indentures, the EFIH First Lien Notes, and the Registration Rights Agreements executed in connection therewith, the "EFIH First Lien Documents," and all purported Obligations as defined in and under the EFIH First Lien Documents, the "Prepetition First Lien Obligations").

(ii)    Repayment of Prepetition EFIH First Lien Notes.  On June [___], 2014, the EFIH Debtors consummated the settlement of claims under certain EFIH First Lien Notes (the "Settled First Lien Claims") and repaid the principal and accrued interest of EFIH First Lien Notes held by non-settling Prepetition EFIH First Lien Creditors (but without payment of any disputed amounts).  As a result, the only claims that remain outstanding under the EFIH First Lien Notes are disputed and unliquidated claims subject to the reservation of rights contained in the order approving the EFIH First Lien DIP Financing and the EFIH First Lien Repayment (the "EFIH First Lien DIP Order").

(iii)    Prepetition EFIH Second Lien Notes.  Prior to the Petition Date, the EFIH Debtors (a) issued (originally and/or in exchanges) the 11.00% Senior Secured Second Lien Notes due 2021 (the "EFIH Second Lien 2021 Notes"), under that certain Indenture dated as of April 25, 2011 (as amended, modified, or supplemented, the "EFIH Second Lien Notes Indenture," and, the indenture trustee thereunder, the "EFIH Second Lien Notes Trustee," and the EFIH First Lien Notes Trustee, together with the EFIH Second Lien Notes Trustee, the "Prepetition Secured Notes Trustees" and the EFIH Second Lien Notes Indenture, together with the EFIH First Lien Notes Indentures, the "Prepetition EFIH Secured Indentures"); (b) issued (originally and/or in exchanges) the 11.75% Senior Secured Second Lien Notes due 2022 (the "EFIH Second Lien 2022 Notes", collectively with the EFIH Second Lien 2021 Notes, the "EFIH Second Lien Notes," and the holders of EFIH Second Lien Notes, the "Prepetition EFIH Second Lien Creditors," and the Prepetition EFIH Second Lien Creditors, together with the Prepetition EFIH First Lien Creditors, the "Prepetition EFIH Secured Creditors," and the EFIH Second Lien Notes, together with the EFIH First Lien Notes, the "Prepetition EFIH Secured Notes"), under the EFIH Second Lien Indenture; and (c) entered into the Security Documents (as

defined in the EFIH Second Lien Indenture, and collectively with the EFIH Second Lien Indenture, the EFIH Second Lien Notes, and the Registration Rights Agreements executed in connection therewith, the "EFIH Second Lien Documents," and all purported Obligations as defined in and under the EFIH Second Lien Documents, the "Prepetition Second Lien Obligations," and the Prepetition First Lien Obligations together with the Prepetition Second Lien Obligations, the "Prepetition Secured Obligations").

        (iv)    EFIH Collateral Trust Agreement.  Prior to the Petition Date, the EFIH Debtors entered into the collateral trust agreement (the "EFIH Collateral Trust Agreement") by and among EFIH, and CSC, in its capacity as EFIH First Lien Notes Trustee and Collateral Trustee under the EFIH First Lien Documents and EFIH Second Lien Documents, and Computershare, in its capacity as EFIH Second Lien Notes Trustee, relates to the relative rights and remedies of the Prepetition EFIH First Lien Creditors and the Prepetition EFIH Second Lien Creditors with respect to the collateral securing their respective obligations.

        (v)    Prepetition EFIH Senior Toggle Notes.  Prior to the Petition Date, the Issuers issued (originally and/or in exchanges) the 11.25%/12.25% Senior Toggle Notes due 2018 (the "EFIH Senior Toggle Notes," and the holders of such notes, the "Prepetition EFIH Toggle Note Creditors") under that certain Indenture dated as of December 5, 2012 (as amended, modified, or supplemented, the "EFIH Senior Toggle Notes Indenture," together with a related Registration Rights Agreement, the "EFIH Toggle Notes Documents," and the indenture trustee thereunder, the "EFIH Toggle Notes Trustee," and all purported Obligations as defined in and under the EFIH Toggle Notes Documents, the "Prepetition Toggle Notes Obligations").

Approximately $1.566 billion of EFIH Senior Toggle Notes were outstanding as of the Petition Date.[4]

      (vi)    <u>Settled Second Lien Claims</u>.  Pursuant to the Second Lien Settlement Order, the Court has approved the settlement and compromise of the claims of certain holders of the EFIH Second Lien Notes that are signatories to the Restructuring Support Agreement (as defined in the EFIH Second Lien DIP Motion) and other holders of the EFIH Second Lien Notes that timely elected to participate in the EFIH Second Lien Settlement (collectively, the "<u>Settling EFIH Second Lien Note Holders</u>").  The prepetition claims of the Settling EFIH Second Lien Note Holders (the "<u>Settled Second Lien Claims</u>") that the EFIH Debtors received authority to settle pursuant to the Second Lien Settlement Order have been fully and finally settled and compromised notwithstanding anything to the contrary set forth in this Order.

      (vii)    <u>Rights Reserved With Respect to Prepetition Secured Obligations</u>.  Except with respect to the Settled Second Lien Claims, the EFIH Debtors do not stipulate to the validity or enforceability of the Prepetition Secured Obligations and expressly reserve all rights related thereto, including, for the avoidance of doubt, (a) with respect to any claim for any prepayment, make-whole, or "Applicable Premium" in connection with the EFIH First Lien Repayment (the "<u>EFIH First Lien Makewhole Claims</u>") or the EFIH Second Lien Repayment (the "<u>EFIH Second Lien Makewhole Claims</u>" and, together with the EFIH First Lien Makewhole Claims, the "<u>EFIH Makewhole Claims</u>"), (b) with respect to any default or penalty interest under the EFIH First Lien Documents, EFIH Second Lien Documents, and EFIH Collateral Trust Agreement (including (i) any Additional Interest under and as defined in the EFIH Second Lien Documents and (ii) interest on interest), and (c) with respect to the payment of any professional fees or

---

[4]    As described in the First Day Declaration, the EFIH Debtors also have approximately $2 million of additional unsecured notes outstanding and guarantee approximately $60 million of EFH LBO Notes (as defined in the EFIH Second Lien DIP Motion).

expenses under the EFIH First Lien Documents, EFIH Second Lien Documents, and EFIH Collateral Trust Agreement, and all parties in interest in these Cases reserve rights with respect thereto.

F.    EFIH Debtors' Stipulations Regarding EFIH Senior Toggle Notes.    After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as described herein, the EFIH Debtors stipulate and agree that (paragraph F(i) is referred to herein as the "EFIH Debtors' Stipulations," which are not findings of the Court):

(i)    Validity of Prepetition Toggle Notes Obligations.  The Prepetition Toggle Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Issuer, enforceable in accordance with the terms of the EFIH Senior Toggle Notes Indenture (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (b) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature exist with respect to any of the Prepetition Toggle Notes Obligations and no portion of the Prepetition Toggle Notes Obligations is subject to any challenge or defense, including, without limitation, avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law); and (c) the EFIH Debtors and their estates have no offsets, defenses, claims, objections, challenges, or causes of action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the EFIH Toggle Notes Trustee or EFIH Toggle Note Creditors arising out of, based upon, or related to the EFIH Senior Toggle Notes Indenture, *provided, however,* that the EFIH Debtors fully reserve their rights with respect to any default or penalty interest (including any "Additional Interest" under the EFIH Toggle Notes Documents) or any make-whole premium, prepayment premium, or "Applicable

11

Premium" under and as defined in the EFIH Senior Toggle Notes Indenture and the Prepetition Toggle Notes Obligations.

G.    Findings Regarding Postpetition Financing.

(i)    Request for Postpetition Financing.   The EFIH Debtors seek authority to obtain the EFIH Second Lien DIP Facility on the terms described herein and in the EFIH Second Lien DIP Documents to use all net cash proceeds of the EFIH Second Lien DIP Facility, along with other sources of cash, to consummate the EFIH Second Lien Repayment and the EFIH Second Lien Settlement (as authorized pursuant to the Second Lien Settlement Order).

(ii)    Need for Postpetition Financing.   Entry of this Order is necessary to allow the EFIH Debtors to consummate the EFIH Second Lien Repayment and EFIH Second Lien Settlement and facilitate the transactions necessary under the Restructuring Support Agreement, including the conversion of the EFIH Second Lien DIP Facility into equity in reorganized Energy Future Holdings Corp. on the terms and conditions specified in the EFIH Second Lien DIP Documents upon the effective date of an Acceptable Reorganization Plan (as defined in the Restructuring Support Agreement) (the "Equity Conversion").   The EFIH Debtors do not have sufficient available sources of working capital and financing to consummate the EFIH Second Lien Repayment and consummate the EFIH Second Lien Settlement without the EFIH Second Lien DIP Facility.

(iii)    No Credit Available on More Favorable Terms.   Given their current financial condition, financing arrangements (including the EFIH First Lien DIP Financing), and capital structure, the EFIH Debtors have been unable to obtain incremental debtor in possession financing on a second lien basis from sources other than the EFIH Second Lien DIP Note Purchasers on terms more favorable than the EFIH Second Lien DIP Facility.   The EFIH Debtors

have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The EFIH Debtors have also been unable to obtain financing in a sufficient amount or on adequate terms to satisfy the EFIH Debtors' obligations and enable the EFIH Second Lien Repayment and EFIH Second Lien Settlement solely by having the financing (a) have priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code or (b) be secured by a lien on property of the EFIH Debtors and their estates that is not otherwise subject to a lien. Financing on a postpetition basis is not otherwise available on the terms available under the EFIH Second Lien DIP Facility without granting the EFIH Second Lien DIP Agent, for the benefit of itself and the EFIH Second Lien DIP Note Purchasers, (x) perfected security interests in and liens on (each, as provided herein) all of the EFIH Debtors' existing and after-acquired assets in the priorities set forth in this Order, (y) superpriority claims as set forth in this Order, and (z) the other protections set forth in this Order.

(iv)    Separateness. The EFIH Debtors, the EFIH Second Lien DIP Agent, and the EFIH Second Lien DIP Notes Purchasers hereby acknowledge and agree to the separateness provisions in section 11.20 of the EFIH Second Lien DIP NPA.

H.    Use of Proceeds of the EFIH Second Lien DIP Facility and Repayment of EFIH Second Lien DIP Obligations. As a condition to entry into the EFIH Second Lien DIP NPA and the extension of credit under the EFIH Second Lien DIP Facility, the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers require, and the EFIH Debtors have agreed, that proceeds of the EFIH Second Lien DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the EFIH Second Lien DIP Documents and this Order, (a) to pay transaction costs, fees, liabilities, and expenses, and other administration

costs incurred in connection with the commitment, negotiation, syndication, documentation (including any commitment letters), execution, and closing of the EFIH Second Lien DIP Facility, and (b) to consummate the EFIH Second Lien Repayment and the EFIH Second Lien Settlement.

I.    Section 506(c). In light of the agreement of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers to subordinate their liens and superpriority claims to the Carve Out (as defined below) and the Prepetition Secured Obligations, such persons are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

J.    Good Faith of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers.

(i)    Willingness To Provide Financing. The EFIH Second Lien DIP Note Purchasers have indicated a willingness to provide financing to the EFIH Debtors subject to (a) the entry of this Order, (b) approval of the terms and conditions of the EFIH Second Lien DIP Facility and the EFIH Second Lien DIP Documents, and (c) entry of findings by the Court that (1) such financing is in the best interests of the EFIH Debtors' estates, (2) the EFIH Second Lien DIP Agent and each of the EFIH Second Lien DIP Note Purchasers are extending credit to the EFIH Debtors pursuant to the EFIH Second Lien DIP Documents in good faith, and (3) the EFIH Second Lien DIP Agent's and the EFIH Second Lien DIP Note Purchasers' claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Order and the EFIH Second Lien DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Order or any other order.

(ii)     Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of the EFIH Second Lien DIP Facility and the EFIH Second Lien DIP Documents, and the fees and expenses paid and to be paid thereunder and hereunder, are fair, reasonable, and the best available to the EFIH Debtors under the circumstances, reflect the EFIH Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The EFIH Second Lien DIP Facility was negotiated in good faith and at arms' length among the EFIH Debtors, the EFIH Second Lien DIP Agent, and the EFIH Second Lien DIP Note Purchasers. Credit to be extended under the EFIH Second Lien DIP Facility shall be deemed to have been so allowed, advanced, made, used, or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the EFIH Second Lien DIP Agent and each of the EFIH Second Lien DIP Note Purchasers are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

(iii)     EFIH Second Lien DIP Offering. The EFIH Debtors invited the applicable parties to participate in the EFIH Second Lien DIP Offering (as defined in the EFIH Second Lien DIP Motion) in good faith and such invitation did not constitute a solicitation on a plan of reorganization.

(iv)     EFIH Second Lien Opt-In. The EFIH Debtors invited the Prepetition EFIH Second Lien Creditors to participate in the EFIH Second Lien Settlement (the "EFIH Second Lien Opt-In") in good faith and such invitation did not constitute a solicitation on a plan of reorganization.

K.     Good Cause. The relief requested in the EFIH Second Lien DIP Motion is necessary, essential, and appropriate, and is in the best interests of, and will benefit, the EFIH

Debtors and their estates, creditors, and other parties in interest, as its implementation will, *inter alia,* (a) provide the EFIH Debtors with the necessary liquidity to consummate the EFIH Second Lien Repayment and (b) facilitate the deleveraging of the EFIH Debtors' capital structure through the Equity Conversion.

      L.      <u>Adequate Protection</u>.  No adequate protection of the Prepetition EFIH Secured Creditors is required because (1) the EFIH Second Lien DIP Liens are not priming (a) the liens purportedly securing the Prepetition First Lien Obligations (the "<u>Prepetition First Priority Liens</u>") or (b) the liens purportedly securing the Prepetition Second Lien Obligations (the "<u>Prepetition Second Priority Liens</u>"), (2) (a) the EFIH First Lien Notes have been repaid as authorized by the EFIH First Lien DIP Order and (b) the EFIH Second Lien Notes are being repaid in connection with the EFIH Second Lien Repayment and the EFIH Second Lien Settlement authorized by this Order and the Second Lien Settlement Order, as applicable.  To the extent any adequate protection is necessary with respect to any disputed amounts related to the EFIH Second Lien Repayment, such claims, if any, are oversecured and, therefore, adequately protected to the extent such disputed obligations are allowed.

      M.      <u>Notice</u>.  In accordance with rules 2002, 4001(c) and (d), and 9014 of the Bankruptcy Rules, and the Local Bankruptcy Rules, notice of the Hearing and the relief requested in the EFIH Second Lien DIP Motion has been provided by the EFIH Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d) and proposed counsel thereto; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent

under the Texas Competitive Electric Holdings Company LLC ("<u>TCEH LLC</u>" and, together with Energy Future Competitive Holdings Company LLC ("<u>EFCH</u>") and their subsidiaries, "<u>TCEH</u>") TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% Energy Future Holdings Corp. ("<u>EFH</u>") senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its

capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH First Lien DIP Financing and counsel thereto; (o) the EFIH Second Lien DIP Agent and counsel thereto; (p) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (q) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (r) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; (y) Texas Transmission Investment LLC and counsel thereto; (z) Oncor Electric Delivery Holdings Company LLC and counsel thereto; and (aa) proposed counsel to the Appointed Committee. Notice of the Hearing having been given by the EFIH Debtors in a manner consistent with the Bankruptcy Code and the Hearing having been held by this Court on June 30, 2014; and upon the record at the Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED that:**

1. <u>EFIH Second Lien DIP Facility, EFIH Second Lien Repayment, and Use of Cash Collateral Authorized and Approved.</u> The EFIH Second Lien DIP Motion is granted to the extent set forth in this Order, the EFIH Second Lien Repayment is authorized and approved, the EFIH Debtors are authorized to perform all obligations under the EFIH Second Lien DIP Documents (including the payment of all fees thereunder, including fees under the Commitment

Letter and the Participation Fee incurred through the funding of the EFIH Second Lien DIP Facility), and the EFIH Debtors are authorized to use EFIH Cash Collateral, each subject to the terms and conditions set forth in this Order.

2.     Commitment Letter Authorized and Approved.  The Investment Commitment is hereby approved on the terms set forth in the Commitment Letter.  The EFIH Debtors are authorized and directed to pay the Total Second Lien DIP Commitment Fees, the Closing Fee, the Alternative Transaction Fee (if applicable), the Arrangement Payment, and the Participation Fee, each as incurred as of the funding of the EFIH Second Lien DIP Facility and as set forth in the EFIH Second Lien DIP Motion.  The EFIH Debtors' payment of the Execution Fee (as defined in the EFIH Second Lien DIP Motion) is approved.  The Total Second Lien DIP Commitment Fees, the Closing Fee, the Alternative Transaction Fee (if applicable), the Arrangement Payment, and the Participation Fee, each as incurred through the funding of the EFIH Second Lien DIP Facility, shall be entitled to priority as administrative expense claims under sections 503(b) and 507 of the Bankruptcy Code payable without further order of this Court and paid when due in accordance with the terms of the Commitment Letter without reduction or offset.

3.     Objections Overruled.  All objections to the EFIH Second Lien DIP Motion or entry of the Order, to the extent not withdrawn or resolved, each as set forth in this Order, are hereby overruled.  This Order shall be effective immediately upon its entry.

**EFIH Second Lien DIP Facility Authorization**

4.     Authorization of the EFIH Second Lien DIP Facility.  The EFIH Debtors are expressly and immediately authorized and empowered to execute and deliver the EFIH Second Lien DIP Documents and to incur and to perform the EFIH Second Lien DIP Obligations and all other obligations thereunder in accordance with, and subject to, the terms of this Order and the

EFIH Second Lien DIP Documents, and to deliver all instruments and documents which may be required or necessary or reasonably requested by the EFIH Second Lien DIP Agent for the performance by the EFIH Debtors under the EFIH Second Lien DIP Facility and the creation and perfection of the EFIH Second Lien DIP Liens described in, and provided for by, this Order and the EFIH Second Lien DIP Documents. The EFIH Debtors are hereby authorized and directed to pay, as such become due and without need to obtain further Court approval, in accordance with this Order, the principal, interest, fees, expenses, reimbursement obligations, and other amounts payable or reimbursable by the EFIH Debtors described in the EFIH Second Lien DIP Documents and all other documents comprising the EFIH Second Lien DIP Facility, including, without limitation, agent's fees and each of the fees described in the EFIH Second Lien DIP Motion and the EFIH Second Lien DIP NPA, including the fees payable under the Commitment Letter incurred as of the funding of the EFIH Second Lien DIP Facility, whether or not the transactions contemplated hereby are consummated, in each case to the extent provided for in the EFIH Second Lien DIP Documents. All collections and proceeds, whether ordinary course or otherwise, will be applied as required by this Order and the EFIH Second Lien DIP Documents. Upon execution and delivery, the EFIH Second Lien DIP Documents shall represent valid and binding obligations of the EFIH Debtors, enforceable against each of the EFIH Debtors and their estates in accordance with their terms.

5.     <u>Authorization to Borrow</u>.  Until the DIP Termination Date (as defined herein), and subject to the terms and conditions set forth in the EFIH Second Lien DIP Documents, the EFIH Second Lien DIP Facility, and this Order, the EFIH Debtors are hereby authorized to (a) borrow an aggregate principal amount of up to $1,900,000,000 in Tranche A Notes under the EFIH Second Lien DIP Facility, and any Guarantors are hereby authorized to guarantee such

borrowings and (b) issue $95,000,000 in in Tranche B Notes under the EFIH Second Lien DIP Facility in connection with the payment of the Closing Fee, and any Guarantors are hereby authorized to guarantee such issuance.

6.    <u>Use of EFIH Second Lien DIP Facility Proceeds</u>.  Immediately upon entry of this Order, the EFIH Debtors are authorized to draw upon the EFIH Second Lien DIP Facility only for the purposes specifically set forth in, and subject to the terms and conditions of, this Order and the EFIH Second Lien DIP Documents.

7.    <u>EFIH Second Lien DIP Obligations</u>.  The EFIH Second Lien DIP Obligations shall be enforceable against the EFIH Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in the Cases, any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  On the DIP Termination Date, either (a) the EFIH Second Lien DIP Obligations shall have been subject to the Equity Conversion or (b) if the EFIH Second Lien DIP Obligations shall not have been subject to the Equity Conversion, then the EFIH Second Lien DIP Obligations shall be due and payable, without notice or demand, to the extent provided for under the EFIH Second Lien DIP NPA and the EFIH DIP Intercreditor Agreement and subject to any requirements in the EFIH Second Lien DIP NPA to provide prior notice of acceleration.

8.    <u>Liens Securing EFIH Second Lien DIP Obligations</u>.  To secure the EFIH Second Lien DIP Obligations, effective immediately upon entry of this Order, pursuant to sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code, the EFIH Second Lien DIP Agent, for the benefit of itself, any sub-agents, and the EFIH Second Lien DIP Note Purchasers, is hereby granted the following continuing, valid, binding, enforceable, non-avoidable, and automatically

and properly perfected postpetition security interests and liens (all property identified in clauses (a) and (b) below being collectively referred to as the "EFIH DIP Collateral," and all such liens, the "EFIH Second Lien DIP Liens"), subject to the payment of the Carve Out, the EFIH First Lien DIP Liens (as defined in the EFIH Second Lien DIP Motion), the Prepetition EFIH First Priority Liens, the Prepetition EFIH Second Priority Liens, and the Permitted Prior Liens (as defined herein), and notwithstanding any agreement that may purport to prevent, hinder, or attach obligations with respect to the incurrence of the EFIH Second Lien DIP Liens, including, but not limited to, that certain Investor Rights Agreement (as amended, modified, supplemented, restated, or waived from time to time), dated as of November 5, 2008, entered into by and among Oncor Electric Delivery Company LLC, Oncor Electric Delivery Holdings Company LLC, Texas Transmission Investment LLC, and EFH:

       (a)     Lien on Cash Balances and Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, second-priority security interest in and lien upon all prepetition and postpetition property of the EFIH Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, postpetition intercompany claims of the EFIH Debtors), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in

leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, capital stock and stock equivalents of subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "Unencumbered Property"). Notwithstanding the prior sentence, Unencumbered Property shall in any event exclude the EFIH Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code (other than causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise.

(b)    Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, junior security interest in and lien upon all prepetition and postpetition property of the EFIH Debtors (other than the property described in clause (a) of this paragraph 8, as to which the liens and security interests in favor of the EFIH Second Lien DIP Agent will be as described in such clause), whether existing on the Petition Date or thereafter acquired, that is subject to (i) any valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date, including the other Permitted Liens (as defined in the EFIH Second Lien DIP NPA) and any valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Permitted Prior Liens"), and (ii) the EFIH First Lien DIP Liens.

(c)     <u>No Liens on Excluded Collateral</u>.   Notwithstanding anything to the contrary herein, the EFIH DIP Collateral shall not include any Excluded Collateral (as defined in the EFIH Second Lien DIP NPA).

(d)     <u>Liens Senior to Certain Other Liens</u>.  The EFIH Second Lien DIP Liens shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the EFIH Debtors and their estates under section 551 of the Bankruptcy Code.

9.     <u>EFIH Second Lien DIP Lien Priority</u>.  The EFIH Second Lien DIP Liens are valid, binding, continuing, automatically perfected, non-avoidable, senior in priority, and superior to any security, mortgage, collateral interest, lien, or claim to any of the EFIH DIP Collateral, except that the EFIH Second Lien DIP Liens shall be junior to (a) Permitted Prior Liens, (b) the EFIH First Lien DIP Liens, and (c) the Carve Out.  For purposes of this Order, it shall be an Event of Default if, other than as set forth herein or the EFIH DIP Intercreditor Agreement, the EFIH Second Lien DIP Liens shall be made subject to, or *pari passu* with, any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other EFIH Debtor Successor Case), and/or upon the dismissal of any of the Cases or Successor Cases.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the EFIH Second Lien DIP Liens.

10.     <u>DIP Second Priority Claims</u>.  Upon entry of this Order, the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed junior superpriority administrative expense claims in each of the Cases and any Successor Cases (collectively, the "<u>DIP Second Priority</u>

Claims") for all EFIH Second Lien DIP Obligations: (a) except as set forth herein, with priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against the EFIH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from, and have recourse to, all prepetition and postpetition property of the EFIH Debtors and all proceeds thereof; and (b) which shall at all times be senior to the rights of the EFIH Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law. The DIP Second Priority Claims shall be subject only to the payment of (a) superpriority administrative expense claims granted under the EFIH First Lien DIP Financing, (b) the Prepetition Secured Obligations, and (c) the Carve Out, each to the extent specifically provided for herein and in the EFIH First Lien DIP Order, as applicable.

11.    No Obligation to Extend Credit.    The EFIH Second Lien DIP Agent, the Commitment Parties (as defined in the EFIH Second Lien DIP Motion) and the EFIH Second Lien DIP Note Purchasers shall have no obligation to make any loan or advance under the EFIH Second Lien DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the EFIH Second Lien DIP Documents and this Order have been satisfied in full or waived in accordance with the terms of the EFIH Second Lien DIP Documents.

**The EFIH Second Lien Repayment and EFIH Second Lien Settlement**

12.    The EFIH Second Lien Repayment, as described more fully in the EFIH Second Lien DIP Motion and as set forth in this Order, is hereby approved and shall be in full satisfaction of all principal and interest due and owing under the EFIH Second Lien Notes, the EFIH Second Lien Indenture, and any related documents, and the EFIH Debtors are hereby authorized to consummate the EFIH Second Lien Repayment, *provided, however*, that other than as set forth in the Second Lien Settlement Order, the rights of all parties in interest are preserved with respect to the EFIH Second Lien Makewhole Claims and default or penalty interest (including with respect to Additional Interest and interest on interest) and the payment of fees and expenses and all other amounts under the EFIH Second Lien Documents and the EFIH Collateral Trust Agreement.

13.    The Debtors, collateral trustee under the EFIH Collateral Trust Agreement (the "EFIH Prepetition Collateral Trustee"), EFIH Second Lien Notes Trustee, and Prepetition EFIH Second Lien Creditors are authorized and directed to (a) take all actions reasonably requested by the EFIH Debtors to implement the EFIH Second Lien Repayment and the EFIH Second Lien Settlement and (b) enter into and deliver any instruments, documents, certifications, supplements and agreements that may be reasonably necessary or desirable to implement the EFIH Second Lien Repayment, including any payoff letters and any instruments with respect to the EFIH Second Lien Notes, including, without limitation, that the Borrowers shall pay the proceeds payable to the non-settling Prepetition EFIH Second Lien Creditors under the EFIH Second Lien Repayment, in immediately available funds, to The Depository Trust Company in connection with the consummation of the EFIH Second Lien Repayment for the benefit of the non-settling Prepetition EFIH Second Lien Creditors, and, as promptly as practicable thereafter and without

undue delay, The Depository Trust Company shall repay the EFIH Second Lien Notes held by non-settling Prepetition EFIH Second Lien Creditors and notify the EFIH Prepetition Collateral Trustee and EFIH Second Lien Notes Trustee of such repayment.

14.      The EFIH Second Lien Notes Trustee, following the consummation of the EFIH Second Lien Repayment and the EFIH Second Lien Settlement, shall in its customary manner reduce the EFIH Second Lien Notes, provide to the EFIH Debtors evidence of such reduction, and take any such other customary or reasonable actions in connection with the consummation of the EFIH Second Lien Repayment and EFIH Second Lien Settlement, including, without limitation, acceptance of certain withdrawals via "Deposit or Withdrawal at Custodian" and confirmation of any drawdown submitted to the EFIH Second Lien Notes Trustee by The Depository Trust Company in connection with the consummation of the EFIH Second Lien Repayment and EFIH Second Lien Settlement.

**Use of Cash Collateral**

15.      The EFIH Debtors hereby are authorized to use the EFIH Cash Collateral solely to the extent and for the purposes set forth in this Order and in accordance with the Budget (as defined below); *provided, however*, that use of cash or transfers of cash to any debtor other than the EFIH Debtors shall not be permitted, except to the extent permitted under the Cash Management Order (as defined in the EFIH Second Lien DIP NPA), *provided further, however*, that the foregoing shall not restrict intercompany payments and other transfers of cash collateral in connection with any bankruptcy-related expenses of the EFIH Debtors (including payment of professionals' fees of the EFIH Debtors) to the extent that such payments or other transfers are approved by the Cash Management Order, including, but not limited to, pursuant to any Shared Services Agreement or Tax Sharing Agreement (as defined in the EFIH Second Lien DIP NPA).

**EFIH Second Lien DIP Facility**

16.     <u>Amendments to the EFIH Second Lien DIP Documents</u>.  The EFIH Debtors are hereby authorized to implement, in accordance with the terms of the EFIH Second Lien DIP Documents, (a) any modifications other than modifications to the principal amount, maturity date, or interest rate (including, without limitation, any change to the number or composition of the EFIH Second Lien DIP Note Purchasers) under the EFIH Second Lien DIP Documents without further order of the Court, and (b) any other modifications to the EFIH Second Lien DIP Documents, *provided, however*, that notice of any material modification or amendment to the EFIH Second Lien DIP Documents shall be provided to counsel for the Creditors' Committee, if any, and the U.S. Trustee, each of whom shall have five (5) business days from the date of such notice within which to object, in writing, to such modification or amendment.  If the Creditors' Committee, if any, or the U.S. Trustee timely objects to any material modification or amendment to the EFIH Second Lien DIP Documents, such modification or amendment shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the EFIH Debtors' right to seek approval from the Court of a material modification on an expedited basis.

17.     <u>Budget and Annual Forecast Reporting</u>.  Beginning on the date of entry of this Order, the Issuer will provide the EFIH Second Lien DIP Agent with a statement of cash sources and uses of all free cash flow for the next full three (3) calendar months of the EFIH Debtors (on a consolidated basis) broken down by month (the "<u>Budget</u>"), in the form of the Initial Budget (as defined in the EFIH Second Lien DIP NPA) attached to the EFIH Second Lien DIP Motion as <u>Exhibit C</u>, including the anticipated uses of the EFIH Second Lien DIP Facility for such period, and after such three (3) calendar month period, at the end of each fiscal quarter (or, at the election of the Issuer, at the end of each calendar month or such other earlier period as may be

agreed), an updated Budget for the subsequent three (3)-calendar month period. The borrowing under the EFIH Second Lien DIP Facility is subject to, among other things, the Issuer's delivery of the Initial Budget to the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers. The Issuer will also provide to the EFIH Second Lien DIP Agent, on a monthly basis, a variance report for each calendar month (delivered no later than the end of the subsequent calendar month), (a) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including explanations for all material variances, and (b) certified as to its reasonableness when made by an Authorized Officer of the Issuer. Beginning upon the entry of this Order (and again no later than December 1, 2014 for the business plan and operating budget covering 2015, and no later than December 1, 2015 for the business plan and operating budget covering 2016), the Issuer will provide the EFIH Second Lien DIP Agent with the EFIH Debtors' approved annual business plan and projected operating budget through the EFIH Second Lien DIP Facility's stated maturity date (the "Annual Operating Forecast"), (x) which shall be broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Annual Operating Forecast, and (y) which shall set forth the anticipated uses of the EFIH Second Lien DIP Facility for such period, certified as to its reasonableness when made by an Authorized Officer of the Issuer. Both the Budget and the Annual Operating Forecast shall provide, among other things, for the payment of the fees and expenses relating to the EFIH Second Lien DIP Facility, ordinary course administrative expenses, bankruptcy-related expenses and working capital, and other general corporate needs; *provided, however*, that the Allowed Professional

Fees (as defined in the EFIH First Lien DIP Order) and fees and expenses related to the EFIH Second Lien DIP Facility will be due and payable, and will be paid by the EFIH Debtors, whether or not consistent with the items or amounts set forth in the Initial Budget, the Budget, or the Annual Operating Forecast; *provided, further*, that under no circumstance will the Initial Budget, the Budget, or the Annual Operating Forecast be construed as a cap or limitation on the amount of the Allowed Professional Fees or the fees and expenses related to the EFIH Second Lien DIP Facility due and payable by the EFIH Debtors.

18.    <u>Modification of the Automatic Stay</u>.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Order, including, without limitation, to (a) permit the EFIH Debtors to grant the EFIH Second Lien DIP Liens and the DIP Second Priority Claims, (b) permit the EFIH Debtors to perform such acts as the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers each may request in its sole discretion to assure the perfection and priority of the liens granted herein, (c) permit the EFIH Debtors to incur all liabilities and obligations to the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers under the EFIH Second Lien DIP Documents and this Order, and (d) authorize the EFIH Debtors to make payments, and the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers to retain and apply payments made, in accordance with the terms of this Order.

19.    <u>Perfection of EFIH Second Lien DIP Liens</u>.    This Order shall be sufficient and conclusive evidence of the granting, attachment, validity, perfection, and priority of the EFIH Second Lien DIP Liens granted herein, without the necessity of filing or recording any financing statement, patent filing, trademark filing, copyright filing, fixture filing, mortgage, notice of lien, or other instrument or document, which may otherwise be required under the law or regulation of

any jurisdiction, or the taking possession of, or control over, assets, or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, securities account control agreement, or other similar agreement) to grant, attach, validate, or perfect (in accordance with applicable non-bankruptcy law) the EFIH Second Lien DIP Liens, or to entitle the EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers, and/or other secured parties pursuant to the EFIH Second Lien DIP Documents to the priorities granted herein. Notwithstanding the foregoing, the EFIH Second Lien DIP Agent is authorized, but not required, to file, as it in its sole discretion deems necessary, such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the EFIH Second Lien DIP Liens, and all such financing statements, patent filings, trademark filings, copyright filings, mortgages, notices of lien, and other documents and information shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the EFIH Second Lien DIP Liens. The EFIH Debtors are authorized and directed to execute and deliver promptly upon demand to the EFIH Second Lien DIP Agent all such financing statements, mortgages, notices, and other documents and information as the EFIH Second Lien DIP Agent may reasonably request. The EFIH Second Lien DIP Agent, in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of lien, or similar instrument. In furtherance of the foregoing and without further approval of the Court, each Debtor is (a) authorized to do and perform all acts to make, execute, and deliver all instruments and documents and provide all information and (b)

authorized and directed to pay all fees that may be reasonably required or necessary for the EFIH Debtors' performance hereunder.

20.    <u>Proceeds of Subsequent Financing</u>.    If the EFIH Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in the Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code or in violation of the EFIH Second Lien DIP Documents at any time prior to such time as the EFIH Second Lien DIP Obligations (excluding any Contingent Obligations) have either (a) been subject to the Equity Conversion or (b) indefeasibly paid in full and all Commitments have been terminated, including subsequent to the confirmation of any plan with respect to any or all of the EFIH Debtors and the EFIH Debtors' estates, and such facilities are secured by any EFIH DIP Collateral, then, subject to the terms of the EFIH DIP Intercreditor Agreement, cash proceeds derived from such credit or debt shall be used to the extent necessary to indefeasibly repay in full the EFIH Second Lien DIP Obligations.

21.    <u>Maintenance of EFIH DIP Collateral</u>.    Until such time as all EFIH Second Lien DIP Obligations (excluding any Contingent Obligations) have (a) been subject to the Equity Conversion or (b) been indefeasibly paid in full and all Commitments have been terminated, the EFIH Debtors shall (a) maintain and insure the EFIH DIP Collateral in amounts, for the risks, and by the entities as required under the EFIH Second Lien DIP Documents and (b) maintain the cash management system in effect as of the Petition Date consistent with the Cash Management Order, as modified by any order that may be entered by the Court, to which the EFIH Second Lien DIP Agent has first agreed, or as otherwise required by the EFIH Second Lien DIP Documents, including the EFIH DIP Intercreditor Agreement.

22.    <u>Disposition of EFIH DIP Collateral; Rights of EFIH Second Lien DIP Agent and EFIH Second Lien DIP Note Purchasers</u>.  The EFIH Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the EFIH DIP Collateral other than as permitted in the EFIH Second Lien DIP Documents and the EFIH DIP Intercreditor Agreement (and no consent shall be implied from any action, inaction, or acquiescence by the EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers, or an order of the Court); *provided* that the EFIH Debtors may release liens on the EFIH DIP Collateral solely to the extent permitted by the EFIH Second Lien DIP Documents, including the EFIH DIP Intercreditor Agreement.

23.    <u>DIP Termination Date</u>.  On the DIP Termination Date, (a) either (i) the EFIH Second Lien DIP Obligations shall be subject to the Equity Conversion or (ii) the EFIH Second Lien DIP Obligations shall be immediately due and payable in cash and all Commitments shall terminate and (b) unless (i) the EFIH Second Lien DIP Obligations shall have been subject to the Equity Conversion or (ii) the EFIH Second Lien DIP Obligations (excluding Contingent Obligations) have been indefeasibly paid in full, in cash, all authority to use the EFIH DIP Collateral, including cash collateral, shall cease, *provided, however,* that nothing in this Order shall prevent or hinder the EFIH Debtors from seeking the continued use of EFIH Cash Collateral with the consent of the EFIH First Lien DIP Agent and the EFIH Second Lien DIP Agent in accordance with the provisions of the EFIH First Lien DIP Documents, the EFIH Second Lien DIP Documents, and the EFIH DIP Intercreditor Agreement but without the consent of the EFIH Prepetition Collateral Trustee or Prepetition Secured Notes Trustees to the extent necessary.  For purposes of this Order, the "<u>DIP Termination Date</u>" shall mean the Maturity Date as defined in the EFIH Second Lien DIP NPA.

24.    Events of Default.  The occurrence of an "Event of Default" under the EFIH

Second Lien DIP Documents shall, subject to the terms of the EFIH DIP Intercreditor

Agreement, constitute an Event of Default under this Order, unless waived in accordance with

the EFIH Second Lien DIP Documents and/or the EFIH DIP Intercreditor Agreement.

Notwithstanding anything to the contrary contained herein, in the EFIH First Lien DIP

Documents, in the EFIH Second Lien DIP Documents, or in the EFIH DIP Intercreditor

Agreement, any Event of Default under this Order or the EFIH Second Lien DIP Documents,

other than any Event of Default which cannot be waived without the written consent of each

EFIH Second Lien DIP Purchaser directly and adversely affected thereby or otherwise waived

under the terms of the EFIH DIP Intercreditor Agreement, shall be deemed not to be

"continuing" if the events, act, or condition that gave rise to such Event of Default have been

remedied or cured (including by payment, notice, taking of any action, or omitting to take any

action) or have ceased to exist and the Issuer is in compliance with the EFIH Second Lien DIP

Documents.

25.    Rights and Remedies Upon Event of Default.  Upon the occurrence of an Event of

Default and following the giving of five business days' notice to the EFIH Debtors (the

"Remedies Notice Period") and counsel to the Creditors' Committee, if any, subject to the terms

of the EFIH DIP Intercreditor Agreement, the EFIH Second Lien DIP Agent, on behalf of the

EFIH Second Lien DIP Note Purchasers, may exercise all rights and remedies provided for in the

EFIH Second Lien DIP Documents and may declare (a) the termination, reduction, or restriction

of any further Commitment to the extent any such Commitment remains, (b) all EFIH Second

Lien DIP Obligations to be immediately due and payable, without presentment, demand, protest,

or other notice of any kind, all of which are expressly waived by the EFIH Debtors, and (c) the

termination of the EFIH Second Lien DIP Documents as to any future liability or obligation of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers, but without affecting any of the EFIH Second Lien DIP Liens or the EFIH Second Lien DIP Obligations. During the Remedies Notice Period, the EFIH Debtors may continue to use the EFIH DIP Collateral, including cash collateral, in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales, or transactions with non-Debtor affiliates) that are not in the ordinary course of business; *provided* that nothing in this Order shall limit the ability of the EFIH Debtors to (y) seek the use of EFIH DIP Collateral, including cash collateral, on a nonconsensual basis during the Remedies Notice Period to the extent necessary or (z) challenge whether an Event of Default has occurred and/or is continuing.  Unless the Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, and at all times and in all respects subject to the EFIH DIP Intercreditor Agreement, (a) the EFIH Debtors shall no longer have the right to use or seek to use the EFIH DIP Collateral, including cash collateral, (b) the automatic stay pursuant to section 362 of the Bankruptcy Code, as to all of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers, shall be automatically terminated without further notice to, or order of, the Court, and (c) the EFIH Second Lien DIP Agent, on behalf of itself and the EFIH Second Lien DIP Note Purchasers, shall be permitted to exercise all rights against the EFIH DIP Collateral in accordance with the EFIH Second Lien DIP Documents, the EFIH DIP Intercreditor Agreement, and this Order, and shall be permitted to satisfy the EFIH Second Lien DIP Obligations without further order or application or motion to the Court and without restriction or restraint by any stay under section 362 or 105 of the

Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Court solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, and the EFIH Debtors waive their right to, and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the EFIH Second Lien DIP Agent, on behalf of itself and the EFIH Second Lien DIP Note Purchasers, set forth in this Order or the EFIH Second Lien DIP Documents, *provided, however*, that nothing in this paragraph shall (a) limit the EFIH Debtors' rights with respect to the EFIH Prepetition Collateral Trustee, the Prepetition EFIH Notes Trustees, or the Prepetition EFIH Secured Creditors, including the EFIH Debtors' rights to seek the nonconsensual use of cash collateral and other Prepetition EFIH Collateral to the extent necessary; or (b) impair the rights of the EFIH Debtors to file a motion with the Court seeking approval of replacement financing.

26. <u>Rights of EFIH Second Lien DIP Agent and EFIH Second Lien DIP Note Purchasers Subject to EFIH DIP Intercreditor Agreement.</u> For the avoidance of doubt, all rights and remedies of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers under this Order and the EFIH Second Lien DIP Documents shall be subject to the terms and conditions of the EFIH DIP Intercreditor Agreement.

27. <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order.</u> Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all

of the provisions of this Order are hereafter modified, amended, or vacated by a subsequent order of the Court or any other court, each of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  To the fullest extent permitted under section 364(e) of the Bankruptcy Code, any liens or claims granted to the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers hereunder arising prior to the effective date of any such modification, amendment, or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

28.    <u>DIP and Other Expenses</u>.  Except as set forth below, all fees paid and payable, and costs and/or expenses reimbursed or reimbursable, as set forth in the EFIH Second Lien DIP Documents and/or this Order, by the EFIH Debtors to the EFIH Second Lien DIP Agent, the Advisors (as defined in the EFIH Second Lien DIP NPA), and other parties (if any) as provided in the EFIH Second Lien DIP Documents (including the EFIH Second Lien DIP NPA and the Commitment Letter) are hereby approved.  The EFIH Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the EFIH Second Lien DIP Documents, without the necessity of any further application with the Court for approval or payment of such fees, costs, or expenses.  The EFIH Debtors are authorized and directed within ten (10) calendar days of written demand (together with reasonably detailed supporting documentation) the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication, and administration of the EFIH Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of

the EFIH Second Lien DIP Facility, and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and postpetition fees, charges, and disbursements of legal counsel, financial advisors, and third-party appraisers and consultants advising the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers incurred in connection with the EFIH Second Lien DIP Agent's and the EFIH Second Lien DIP Note Purchasers' participation in, monitoring of, and/or review of issues arising in, the Cases, as provided in the EFIH Second Lien DIP NPA.  Payment of all such fees and expenses shall not be subject to allowance by the Court; *provided, however*, that, other than with respect to professional fees and expenses required to be paid on the Closing Date, the EFIH Debtors shall promptly provide copies of invoices received on account of fees and expenses of the professionals retained as provided for in the EFIH Second Lien DIP NPA, the EFIH Second Lien DIP Documents, and this Order to counsel to the Creditors' Committee, if any, and the U.S. Trustee, and the Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed to be paid, which objections may only be raised within ten (10) calendar days after the EFIH Debtors' receipt thereof.  In the event that within that ten (10) calendar day period, the EFIH Debtors, the U.S. Trustee or counsel to the Creditors' Committee, if any, raises an objection to a particular invoice, (a) the EFIH Debtors shall promptly pay only the fees and expenses not subject to an objection and (b) to the extent any objection is not resolved or withdrawn, the EFIH Debtors shall pay the disputed amounts only upon the entry of an order of the Court resolving such dispute and ordering the EFIH Debtors to pay the disputed amount.   Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers under the EFIH Second Lien DIP Documents and this Order, whether incurred prior to or after

the Petition Date, shall be deemed fully earned, indefeasibly paid, irrevocable, and non-avoidable pursuant to, and in accordance with, the terms of the EFIH Second Lien DIP Documents and, irrespective of any subsequent order approving or denying the EFIH Second Lien DIP Facility or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code. All unpaid fees, costs, and expenses payable under the EFIH Second Lien DIP Documents and this Order to the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers shall be included and constitute part of the EFIH Second Lien DIP Obligations and be secured by the EFIH Second Lien DIP Liens.

29.    Proofs of Claim. The EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to the EFIH Second Lien DIP Agent or the EFIH Second Lien DIP Note Purchasers.

30.    Rights of Access and Information. Without limiting the rights of access and information afforded the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers under the EFIH Second Lien DIP Documents, the EFIH Debtors shall be, and hereby are, required to afford representatives, agents, and/or employees of the EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers, and the Creditors' Committee, if any, reasonable access to the EFIH Debtors' premises and its books and records in accordance with the EFIH Second Lien DIP Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the EFIH Debtors, subject to the terms of the EFIH Second Lien DIP NPA, shall authorize their independent certified public accountants, financial advisors, investment bankers, and consultants

to cooperate, consult with, and provide to the EFIH Second Lien DIP Agent and the Creditors' Committee, if any, all such information as may be reasonably requested from the EFIH Debtors with respect to the business, results of operations, and financial condition of the EFIH Debtors.

31.    Carve Out.

(a)    Carve Out.  As used in this Order, "Carve Out" shall have the meaning provided in the EFIH First Lien DIP Order.  The Carve Out shall function in accordance with the provisions of the EFIH First Lien DIP Order.  For the avoidance of doubt and notwithstanding anything to the contrary herein, the EFIH First Lien DIP Financing, the EFIH First Lien DIP Documents, the EFIH Second Lien DIP Facility, the EFIH Second Lien DIP Documents, the Prepetition EFIH Secured Notes, the EFIH First Lien Documents, the EFIH Second Lien Documents, the EFIH Senior Toggle Notes, the EFIH Toggle Notes Documents, or any other document or source, the Carve Out shall be senior to all liens and claims securing the EFIH First Lien DIP Financing, the EFIH Second Lien DIP Facility, and the Prepetition Obligations (if any), and any and all forms of adequate protection, liens, or claims securing or otherwise relating to the EFIH First Lien DIP Obligations (as defined in the EFIH First Lien DIP Order), the EFIH Second Lien DIP Obligations, the Prepetition Secured Obligations, and the Prepetition Toggle Notes Obligations.  Nothing in this Order, in the EFIH First Lien DIP Order, or otherwise shall be construed to obligate the EFIH Second Lien DIP Agent or EFIH Second Lien DIP Note Purchasers, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person (as defined in the EFIH First Lien DIP Order) or to guarantee that the EFIH Debtors have sufficient funds to pay such compensation or reimbursement.

32.    Limitations on the EFIH Second Lien DIP Facility, the EFIH DIP Collateral, and the Carve Out.  Notwithstanding anything herein to the contrary, the EFIH Debtors shall not

assert or prosecute, and no portion of the proceeds of the EFIH Second Lien DIP Facility, the EFIH DIP Collateral, including EFIH Cash Collateral, or the Carve Out, and no disbursements set forth in the Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (a) incurring Indebtedness except to the extent permitted under the EFIH Second Lien DIP NPA; (b) preventing, hindering, or delaying any of the EFIH Second Lien DIP Agent's and the EFIH Second Lien DIP Note Purchasers' (in the case of each of the foregoing, in their respective capacities as such) enforcement or realization upon any of the EFIH DIP Collateral in accordance with the EFIH DIP Intercreditor Agreement once an Event of Default has occurred and after the Remedies Notice Period; (c) objecting, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of (i) the EFIH Second Lien DIP Obligations or the EFIH Second Lien DIP Liens, or any other rights or interest of the EFIH Second Lien DIP Agent or the EFIH Second Lien DIP Note Purchasers (in the case of each of the foregoing, in their respective capacities as such) or (ii) the Prepetition Toggle Notes Obligations (other than with respect to asserted EFIH Unsecured Makewhole Claims or default or penalty interest (including Additional Interest and interest on interest)) or any other rights or interest of the EFIH Toggle Notes Trustee or EFIH Toggle Notes Creditors (in each case of each of the foregoing, in their respective capacities as such); (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers, the EFIH Toggle Notes Trustee, the EFIH Toggle Notes Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees (in the case of each of the foregoing, in their respective capacities as

such); or (e) asserting, joining, commencing, supporting, investigating, or prosecuting any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Released Parties (as defined herein), arising out of, in connection with, or relating to the EFIH Second Lien DIP Facility, the EFIH Second Lien DIP Documents, the Prepetition Toggle Notes Obligations, the EFIH Senior Toggle Notes Indenture, or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any action arising under the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity and extent of the EFIH Second Lien DIP Obligations, the DIP Second Priority Claims, or the validity, extent, perfection, and priority of the EFIH Second Lien DIP Liens; (iv) any action with respect to the validity and extent of the Prepetition Toggle Notes Obligations (other than with respect to EFIH Unsecured Makewhole Claims or default or penalty interest (including Additional Interest or interest on interest)); (v) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the EFIH Second Lien DIP Liens, the DIP Second Priority Claims, or the Prepetition Toggle Notes Obligations (other than with respect to EFIH Unsecured Makewhole Claims or default or penalty interest (including Additional Interest or interest on interest)) in whole or in part; (vi) appeal or otherwise challenge this Order, the EFIH Second Lien DIP Documents, or any of the transactions contemplated herein or therein; and/or (vii) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the EFIH Second Lien DIP

Agent and the EFIH Second Lien DIP Note Purchasers in respect of their liens and security interests in the EFIH DIP Collateral or any of their rights, powers, or benefits hereunder or in the EFIH Second Lien DIP Documents anywhere in the world.    Any and all claims for fees or expenses incurred by the Creditors' Committee, if any, or by any party in interest in violation of any clause of this paragraph 32 shall not be allowed, treated, or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, and the non-payment of such fees and expenses shall not constitute grounds to deny confirmation of any plan of reorganization for any of the EFIH Debtors.

33.    Payment of Compensation.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the EFIH Second Lien DIP Agent or the EFIH Second Lien DIP Note Purchasers to object to the allowance and payment of such fees and expenses.

34.    Release.  The EFIH Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in the Cases or Successor Cases) and any party acting by, through, or under the EFIH Debtors or their estates, forever and irrevocably (a) release, discharge, waive, and acquit the current or future EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers,  and each of their respective participants and each of their respective affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, and in each case in their capacities as such, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions,

suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the EFIH Second Lien DIP Facility, the EFIH Second Lien DIP Documents, the or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the EFIH Second Lien DIP Obligations, EFIH Second Lien DIP Liens, EFIH Second Lien DIP Facility, as applicable, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the EFIH Second Lien DIP Obligations, the EFIH Second Lien DIP Liens, as applicable.

35.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

36.    <u>Section 506(c) Claims</u>.  No costs or expenses of administration of the Cases or any future proceeding that may result therefrom, which have been or may be incurred in the Cases at any time, shall be charged against the EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers, or any of their respective claims or the EFIH DIP Collateral, pursuant

to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of such persons, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by such persons.

37. <u>No Marshaling/Application of Proceeds</u>. The EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the EFIH DIP Collateral, and proceeds shall be received and applied pursuant to the terms of the EFIH Second Lien DIP Documents notwithstanding any other agreement or provision to the contrary, *provided, however*, that subject to the terms of the EFIH DIP Intercreditor Agreement, nothing herein shall impair the rights of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers with respect to the EFIH DIP Collateral.

38. <u>Noticing to Appointed Committee</u>. The EFIH Debtors shall provide the Appointed Committee with (a) copies of any notices, statements, reports, and forecasts required to be provided to the Creditors' Committee, if any, pursuant to paragraphs 16, 25, 28, and 30 of this Order, and (b) advance notice of any non-material amendments and modifications to the EFIH Second Lien DIP Documents to the extent reasonably practicable. Nothing in this Order (including the Findings of Fact and Conclusions of Law included herein) shall be deemed either to (i) confer standing or a right to be heard upon the Appointed Committee, or (ii) prejudice or limit the Appointed Committee from asserting that it has, or any party's right to contest any assertion by the Appointed Committee that the Appointed Committee has, standing or a right to be heard with respect to any other matter in these Cases.

39. <u>Joint and Several Liability</u>. Nothing in this Order shall be construed to constitute a substantive consolidation of any of the EFIH Debtors' estates, it being understood, however,

that the EFIH Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the EFIH Second Lien DIP Facility and the EFIH Second Lien DIP Documents.

40.    Discharge Waiver.    The EFIH Second Lien DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless (a) the EFIH Second Lien DIP Obligations have been subject to the Equity Conversion or (b) the EFIH Second Lien DIP Obligations have been indefeasibly paid in full and all Commitments have been terminated on or before the effective date of a confirmed plan of reorganization or liquidation.  It shall be an Event of Default if any of the EFIH Debtors shall propose or support any plan of reorganization or liquidation, sale of all or substantially all of the EFIH Debtors' assets, or entry of any confirmation order or sale order unless any such plan of reorganization or liquidation, sale, or confirmation order provides for the Equity Conversion or otherwise provides that the EFIH Second Lien DIP Obligations (excluding any Contingent Obligations) shall be indefeasibly paid in full and all Commitments shall be terminated on or prior to the earlier to occur of the effective date of any such plan of reorganization or liquidation or sale and the DIP Termination Date.

41.    Rights Preserved.

(a)    Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the EFIH Second Lien DIP Agent's or the EFIH Second Lien DIP Note Purchasers' right to seek any other or supplemental relief in respect of the EFIH Debtors; (b) any of the rights of the EFIH Second Lien DIP Agent or any of the EFIH Second Lien DIP Note Purchasers under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request

modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (iv) credit bid the full amount of the EFIH Second Lien DIP Obligations, subject to the terms of the Restructuring Support Agreement; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the EFIH Second Lien DIP Agent or the EFIH Second Lien DIP Note Purchasers.

(b)    Nothing in this Order (including, without limitation, any factual findings herein) shall have any precedential, evidentiary, law of the case, or preclusive effect with respect to any present or future dispute concerning the EFIH Second Lien Makewhole Claims are due or will become due as a result of the EFIH Second Lien Repayment.

42.    <u>No Waiver by Failure To Seek Relief</u>.  The delay or failure of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers to seek relief or otherwise exercise their rights and remedies under this Order and the EFIH Second Lien DIP Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers, or any party in interest, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable EFIH Second Lien DIP Documents or this Order.

43.    <u>Binding Effect; Successors and Assigns</u>.  The EFIH Second Lien DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including, without limitation, the EFIH Second Lien DIP Agent, the EFIH

Second Lien DIP Note Purchasers, any statutory or nonstatutory committees appointed or formed in the Cases (including the Creditors' Committee, if any), and the EFIH Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed for the estate of any of the EFIH Debtors) and shall inure to the benefit of the EFIH Second Lien DIP Agent, the EFIH Second Lien DIP Note Purchasers, and the EFIH Debtors and their respective successors and assigns; *provided, however*, that the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the EFIH Debtors. In determining to make any loan under the EFIH Second Lien DIP NPA or in exercising any rights or remedies as and when permitted pursuant to this Order or the EFIH Second Lien DIP Documents, the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers, in such capacities, (a) shall not be deemed to be in control of the operations of any of the EFIH Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the EFIH Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act (as amended), or any similar Federal or state statute) and (b) shall not owe any fiduciary duty to any of the EFIH Debtors, their creditors, or their estates, or shall not constitute or be deemed to constitute a joint venture or partnership with any of the EFIH Debtors.

44.     No Modification of Order. Subject to the terms of the EFIH DIP Intercreditor Agreement, unless and until either (a) the EFIH Second Lien DIP Obligations shall have been subject to the Equity Conversion or (b) the EFIH Second Lien DIP Obligations (excluding Contingent Obligations) have been indefeasibly paid in full and all Commitments have been

terminated (such payment being without prejudice to any terms or provisions contained in the EFIH Second Lien DIP Facility which survive such discharge by their terms), an Event of Default shall occur if the EFIH Debtors seek or consent to, directly or indirectly, or if there is entered:  (a) without the prior written consent of the EFIH Second Lien DIP Agent, (i) any modification, stay, vacatur, or amendment to this Order, (ii) a priority claim for any administrative expense or unsecured claim against the EFIH Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Second Priority Claims except as specifically provided herein (including, for the avoidance of doubt, the Carve Out) or in the EFIH Second Lien DIP Documents, except with the prior written consent of the EFIH Second Lien DIP Agent, or (iii) any lien on any of the EFIH DIP Collateral with priority equal or superior to the EFIH Second Lien DIP Liens, except as specifically provided herein or in the EFIH Second Lien DIP Documents (including the EFIH DIP Intercreditor Agreement); (b) an order converting or dismissing any of the Cases; (c) an order appointing a chapter 11 trustee in any of the Cases; or (d) an order appointing an examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) in any of the Cases; *provided, however*, that notwithstanding anything to the contrary herein, the EFIH Debtors may seek to use cash collateral on a non-consensual basis pursuant to an order in form and substance acceptable to the EFIH Second Lien DIP Agent (and the EFIH Second Lien DIP Agent's rights in this regard shall be subject to the EFIH DIP Intercreditor Agreement).  No such consent shall be implied by any other action, inaction, or acquiescence of the EFIH Second Lien DIP Agent.

45.    Survival. The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which the Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Order, including the claims, liens, security interests, and other protections granted to the EFIH Second Lien DIP Agent and the EFIH Second Lien DIP Note Purchasers pursuant to this Order and/or the EFIH Second Lien DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Order until, in respect of the EFIH Second Lien DIP Facility, either (x) the EFIH Second Lien DIP Obligations shall have been subject to the Equity Conversion or (y) all the EFIH Second Lien DIP Obligations have been indefeasibly paid in full and all Commitments have been terminated (such payment being without prejudice to any terms or provisions contained in the EFIH Second Lien DIP Facility which survive such discharge by their terms).

46.    Guarantors. Any Subsidiary of the EFIH Debtors that hereafter becomes a debtor in a case under chapter 11 of the Bankruptcy Code in the Court and is or is required to be a Guarantor under the EFIH Second Lien DIP NPA automatically and immediately, upon the filing of a petition for relief for such Subsidiary, shall be deemed to be one of the "EFIH Debtors" hereunder in all respects, and all the terms and provisions of this Order, including those provisions granting security interests in, and Liens on, the EFIH DIP Collateral, and DIP Second Priority Claims in each of the Cases, shall immediately be applicable in all respects to such Subsidiary and its chapter 11 estate, *provided, however*, that for the avoidance of doubt, nothing

in this paragraph or elsewhere in this Order shall require Oncor Electric Delivery Holdings Company LLC or any of its direct or indirect subsidiaries, including Oncor Electric Delivery Company LLC, to be a Guarantor under the EFIH Second Lien DIP NPA.

47.    <u>Order Governs</u>.  In the event of any inconsistency between the provisions of this Order and the EFIH Second Lien DIP Documents (other than the EFIH DIP Intercreditor Agreement), the provisions of this Order shall govern.

48.    <u>Effect of this Order</u>.  This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution thereof.

49.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Order according to its terms.

Wilmington, Delaware
Dated: _____, 2014

_____

**HON. CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit A

**Form of EFIH Second Lien DIP NPA**

**[DRAFT DATED AS OF JUNE 16, 2014, SUBJECT TO CHANGE BASED ON FINALIZATION OF DEFINITIVE DOCUMENTATION BETWEEN THE ISSUERS AND THE PURCHASERS]**

SECOND LIEN SUBORDINATED SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT

Dated as of [_____], 2014

among

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC and EFIH FINANCE INC.,**
as the Co-Issuers,

**The Several Purchasers
from Time to Time Parties Hereto,**

and

**CORTLAND CAPITAL MARKET SERVICES LLC,**
as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

**Page**

SECTION 1.    Definitions. ..................................................................................... 1

    1.1.    Defined Terms ................................................................................ 1
    1.2.    Other Interpretive Provisions ....................................................... 41
    1.3.    Accounting Terms .......................................................................... 41
    1.4.    Rounding ........................................................................................ 42
    1.5.    References to Agreements, Laws, Etc. .......................................... 42
    1.6.    Times of Day .................................................................................. 42
    1.7.    Timing of Payment of Performance ............................................... 42
    1.8.    Currency Equivalents Generally .................................................... 42
    1.9.    Hedging Agreements ...................................................................... 42
    1.10.    Purchasers ..................................................................................... 43

SECTION 2.    Purchase and Sale of Notes .......................................................... 43

    2.1.    Issuance of Notes ........................................................................... 43
    2.2.    Purchase and Sale of Notes; Closing ............................................ 43
    2.3.    Interest ........................................................................................... 46
    2.4.    Repayment of Notes; Purchasers' Evidence of Debt ..................... 47
    2.5.    Representations and Warranties of Purchasers ............................... 48
    2.6.    No Governmental Review .............................................................. 49
    2.7.    Transfer or Resale of the Notes. .................................................... 49
    2.8.    Legends .......................................................................................... 49

SECTION 3.    Fees ............................................................................................... 49

    3.1.    Agent Fees ..................................................................................... 49
    3.2.    PIK Fees ......................................................................................... 49
    3.3.    Closing Fee .................................................................................... 49
    3.4.    Participation Fee ............................................................................ 49

SECTION 4.    Payments ....................................................................................... 50

    4.1.    Voluntary Prepayments .................................................................. 50
    4.2.    Mandatory Prepayments ................................................................ 50
    4.3.    Method and Place of Payment ....................................................... 51
    4.4.    Net Payments ................................................................................. 51
    4.5.    Computations of Interest ............................................................... 54
    4.6.    Limit on Rate of Interest ............................................................... 54
    4.7.    Equity Conversion ......................................................................... 55

SECTION 5.    Conditions Precedent to Funding ................................................. 58

    5.1.    Note Documents ............................................................................ 58
    5.2.    Collateral ....................................................................................... 59
    5.3.    Legal Opinions .............................................................................. 59
    5.4.    Initial Budget ................................................................................. 59

| | | |
|---|---|---|
| 5.5. | Closing Certificates | 60 |
| 5.6. | Authorization of Proceedings of Each Note Party | 60 |
| 5.7. | Fees and Expenses | 60 |
| 5.8. | Representations and Warranties | 60 |
| 5.9. | First Day Orders | 60 |
| 5.10. | Trustees and Examiners | 60 |
| 5.11. | Projections | 60 |
| 5.12. | Patriot Act | 60 |
| 5.13. | Petition Date | 60 |
| 5.14. | No Default | 61 |
| 5.15. | Final Order | 61 |
| 5.16. | Insurance | 61 |
| 5.17. | Second Lien Refinancing | 61 |
| 5.18. | Restructuring Support Agreement | 61 |
| 5.19. | Senior DIP Documents | 61 |
| 5.20. | Second Lien DIP Procedures | 61 |
| 5.21. | Event of Default under Senior DIP Documents | 61 |
| 5.22. | Material Adverse Effect | 61 |
| 5.23. | Approvals | 61 |
| 5.24. | No Restrictions | 61 |
| **SECTION 6.** | **Representations, Warranties and Agreements** | 62 |
| 6.1. | Corporate Status; Compliance with Laws | 62 |
| 6.2. | Corporate Power and Authority | 62 |
| 6.3. | No Violation | 62 |
| 6.4. | Litigation | 63 |
| 6.5. | Margin Regulations | 63 |
| 6.6. | Governmental Approvals | 63 |
| 6.7. | Investment Company Act | 63 |
| 6.8. | True and Complete Disclosure | 63 |
| 6.9. | Financial Condition; Projections; Material Adverse Effect | 63 |
| 6.10. | Tax Matters | 64 |
| 6.11. | Compliance with ERISA | 64 |
| 6.12. | Subsidiaries | 65 |
| 6.13. | Intellectual Property | 65 |
| 6.14. | Environmental Laws | 65 |
| 6.15. | Properties | 65 |
| 6.16. | Final Order | 65 |
| 6.17. | Status of Obligations; Perfection and Priority of Security Interests | 65 |
| 6.18. | Insurance | 66 |
| 6.19. | Labor Matters | 66 |
| 6.20. | Sanctioned Persons; Anti-Corruption Laws; Patriot Act | 66 |
| **SECTION 7.** | **Affirmative Covenants** | 67 |
| 7.1. | Information Covenants | 67 |
| 7.2. | Books, Records and Inspections | 70 |
| 7.3. | Maintenance of Insurance | 71 |
| 7.4. | Payment of Taxes | 71 |

| | | |
|---|---|---|
| 7.5. | Consolidated Corporate Franchises | 71 |
| 7.6. | Compliance with Statutes, Regulations, Etc. | 71 |
| 7.7. | ERISA | 72 |
| 7.8. | Maintenance of Properties | 72 |
| 7.9. | Transactions with Affiliates | 73 |
| 7.10. | End of Fiscal Years; Fiscal Quarters | 74 |
| 7.11. | Additional Guarantors and Grantors | 74 |
| 7.12. | Pledge of Additional Stock and Evidence of Indebtedness | 74 |
| 7.13. | Further Assurances | 74 |
| 7.14. | Bankruptcy Matters | 75 |
| 7.15. | Use of Proceeds | 75 |
| SECTION 8. | Negative Covenants | 76 |
| 8.1. | Limitation on Indebtedness | 76 |
| 8.2. | Limitation on Liens | 80 |
| 8.3. | Limitation on Fundamental Changes | 82 |
| 8.4. | Limitation on Sale of Assets | 83 |
| 8.5. | Limitation on Investments | 85 |
| 8.6. | Limitation on Dividends | 88 |
| 8.7. | Limitation on Prepaying Indebtedness | 92 |
| 8.8. | Limitations on Sale Leasebacks | 92 |
| 8.9. | Liquidity Covenant | 92 |
| 8.10. | Changes in Business | 92 |
| 8.11. | Bankruptcy Provisions | 92 |
| 8.12. | Affiliate Value Transfers | 93 |
| 8.13. | Amendments of Organizational Documents and Oncor TSA Amendment | 93 |
| SECTION 9. | Events of Default | 93 |
| 9.1. | Payments | 93 |
| 9.2. | Representations, Etc. | 93 |
| 9.3. | Covenants | 93 |
| 9.4. | Acceleration Under Other Agreements | 93 |
| 9.5. | ERISA | 94 |
| 9.6. | Note Documents | 94 |
| 9.7. | Judgments | 94 |
| 9.8. | Hedging Agreements | 94 |
| 9.9. | Change of Control | 94 |
| 9.10. | Matters Related to the Cases | 94 |
| 9.11. | Automatic Stay | 95 |
| 9.12. | Status of Final Order | 95 |
| 9.13. | Confirmation of Plan | 96 |
| 9.14. | Application of Proceeds | 96 |
| SECTION 10. | The Agents | 97 |
| 10.1. | Appointment | 97 |
| 10.2. | Delegation of Duties | 97 |
| 10.3. | Exculpatory Provisions | 98 |

| | | |
|---|---|---|
| 10.4. | Reliance by Agents | 99 |
| 10.5. | Notice of Default | 99 |
| 10.6. | Non-Reliance on Administrative Agent, Collateral Agent and Other Purchasers | 100 |
| 10.7. | Indemnification | 100 |
| 10.8. | Agents in its Individual Capacities | 101 |
| 10.9. | Successor Agents | 101 |
| 10.10. | Withholding Tax | 102 |
| 10.11. | Security Documents and Guarantee | 102 |
| SECTION 11. | Miscellaneous | 103 |
| 11.1. | Amendments, Waivers and Releases | 103 |
| 11.2. | Notices | 105 |
| 11.3. | No Waiver; Cumulative Remedies | 106 |
| 11.4. | Survival of Representations and Warranties | 106 |
| 11.5. | Payment of Expenses; Indemnification | 106 |
| 11.6. | Successors and Assigns; Participations and Assignments | 108 |
| 11.7. | Replacements of Purchasers under Certain Circumstances | 112 |
| 11.8. | Adjustments; Set-off | 112 |
| 11.9. | Counterparts | 113 |
| 11.10. | Severability | 113 |
| 11.11. | INTEGRATION | 113 |
| 11.12. | GOVERNING LAW | 114 |
| 11.13. | Submission to Jurisdiction; Waivers | 114 |
| 11.14. | Acknowledgments | 114 |
| 11.15. | WAIVERS OF JURY TRIAL | 115 |
| 11.16. | Confidentiality | 115 |
| 11.17. | Direct Website Communications | 116 |
| 11.18. | USA PATRIOT Act | 117 |
| 11.19. | Payments Set Aside | 117 |
| 11.20. | Separateness | 118 |
| SECTION 12. | Security | 118 |
| 12.1. | Security | 118 |
| SECTION 13. | Limited Nature of Parent Obligations | 121 |
| 13.1. | Limited Nature of Parent Obligations | 121 |

SCHEDULES

| Schedule 1.1(a) | Commitments |
| Schedule 1.1(b) | Excluded Subsidiaries |
| Schedule 1.1(c) | Unrestricted Subsidiaries |
| Schedule 1.1(d) | First Day Orders |
| Schedule 2.2(a) | Purchasers |
| Schedule 6.4 | Litigation |
| Schedule 6.12 | Subsidiaries |
| Schedule 6.15 | Property |
| Schedule 7.9 | Closing Date Affiliate Transactions |
| Schedule 8.1 | Closing Date Indebtedness |
| Schedule 8.2 | Closing Date Liens |
| Schedule 8.4 | Scheduled Dispositions |
| Schedule 8.5 | Closing Date Investments |
| Schedule 11.2 | Notice Addresses |

EXHIBITS

| Exhibit A | Form of Guarantee |
| Exhibit B | Form of Pledge Agreement |
| Exhibit C | Form of Security Agreement |
| Exhibit D | Form of Note Party Closing Certificate |
| Exhibit E | Form of Assignment and Acceptance |
| Exhibit F | Form of Note |
| Exhibit G | Form of Non-U.S. Purchaser Certification |
| Exhibit H | Initial Budget |
| Exhibit 1 | Form of Budget |
| Exhibit J | Form of Final Order |
| Exhibit K | Form of Annual Operating Forecast |
| Exhibit L | Form of Subordination Agreement |
| Exhibit M | Form of Issuance Date Certificate |

SECOND LIEN SUBORDINATED SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT, dated as of [_____], 2014, among ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC, a Delaware limited liability company and a debtor and debtor-in-possession (**"EFIH"**) and EFIH FINANCE INC., a Delaware corporation and a debtor and debtor-in-possession (**"EFIH FINANCE"** and together with EFIH, each a **"Co-Issuer"** and collectively, the **"Co-Issuers"** or the **"Issuer"**) in a case pending under chapter 11 of the Bankruptcy Code, the financial institutions from time to time parties hereto (each a **"Purchaser"** and, collectively, the **"Purchasers"**), and CORTLAND CAPITAL MARKET SERVICES LLC, as Administrative Agent and Collateral Agent.

### RECITALS:

WHEREAS, capitalized terms used and not defined in the preamble and these recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, on April 29, 2014 (the **"Petition Date"**), the Issuer and each of the other Guarantors as of the Closing Date filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (**"Chapter 11"**) in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over the Case from time to time and any Federal appellate court thereof, the **"Bankruptcy Court"**) and commenced cases numbered, with respect to EFIH Finance, 14-11001 and, with respect to EFIH, 14-11008 (each, a **"Case"** and, collectively, together with any case number of each Guarantor, the **"Cases"**), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, in connection with the foregoing, the Issuer has requested that the Purchasers extend credit to the Issuer in the form of $1,900,000,000 in aggregate principal amount of Tranche A Notes;

WHEREAS, in connection with the foregoing, the Issuer shall issue Tranche B Notes in the aggregate principal amount of $95,000,000 in consideration for the Closing Fee (as defined below); and

WHEREAS, the Purchasers are willing to purchase from the Issuer Tranche A Notes upon the terms and subject to the conditions set forth herein;

### AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

SECTION 1.   Definitions.

    1.1.   Defined Terms.

    (a)   As used herein, the following terms shall have the meanings specified in this Section 1.1 unless the context otherwise requires:

**"Acceptable Reinvestment Commitment"** shall mean a binding commitment of the Issuer or any Restricted Subsidiary entered into at any time prior to the end of the Reinvestment Period to reinvest the proceeds of a Prepayment Event.

"**Acceptable Reorganization Plan**" shall mean a Reorganization Plan that either (i) provides for the treatment of the Obligations in accordance with the Restructuring Support Agreement, or (ii) otherwise provides for payment of the Obligations in full in cash.

"**Administrative Agent**" shall mean Cortland Capital Market Services LLC, as the administrative agent for the Purchasers under this Agreement and the other Note Documents, or any successor administrative agent pursuant to Section 10.9.

"**Administrative Agent's Office**" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 11.2, or such other address or account as the Administrative Agent may from time to time notify to the Issuer and the Purchasers.

"**Administrative Questionnaire**" shall have the meaning provided in Section 11.6(b)(ii)(E).

"**Advisors**" shall mean (i) legal counsel advising the Agents, the Purchasers and their Related Parties in connection with their participation in the Cases, limited in the case of legal counsel to one primary counsel for each of the Agents, collectively, and the Purchasers (as of the Closing Date, Emmet, Marvin & Martin, LLP for the Agents, Akin Gump Strauss Hauer & Feld LLP for the Purchasers, and, if necessary, one firm of regulatory counsel in each appropriate specialty for the Purchasers and/or one firm of local counsel in each appropriate jurisdiction for each of the Agent and the Purchasers and, in the case of an actual or perceived conflict of interest where the Person affected by such conflict informs the Issuer of such conflict and thereafter, after receipt of the consent of the Issuer (which consent shall not be unreasonably withheld or delayed), retains its own counsel, another firm of counsel for such affected Person), (ii) other advisors and professionals advising the Initial Commitment Parties and their Related Parties in connection with their participation in the Cases (which, as of the Closing Date, include (a) Cousins, Chipman & Brown LLP, (b) Ernst & Young LLP, (c) Leidos, Inc. and (d) Centerview Partners LLC) and (iii) so long as the Restructuring Support Agreement has not been terminated, legal counsel and professionals advising the Initial Tranche A-3 Note Purchasers in connection with their participation in the Cases, which shall be (a) Fried, Frank, Harris, Shriver & Jacobson LLP, (b) Perella Weinberg Partners LP and (c) Cross & Simon, LLC.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. The terms "controlling" and "controlled" shall have meanings correlative thereto.

"**Affiliate Value Transfer**" shall mean any Investment made in reliance on Section 8.5(c), 8.5(g), 8.5(h), 8.5(i), 8.5(k), 8.5(l), 8.5(m), 8.5(p), 8.5(q), 8.5(t), 8.5(u), 8.5(z), or 8.5(bb), any Disposition made in reliance on Section 8.4(b), or 8.4(g), or any distribution made in reliance on Section 8.6(m), in each case made by the Issuer or any Restricted Subsidiary to an Affiliate thereof (other than the Issuer and the Restricted Subsidiaries), excluding payments, transfers or Dispositions to such Affiliates pursuant to the Shared Services Agreement or the Tax Sharing Agreement.

"**Agent Parties**" shall have the meaning provided in Section 11.17(d).

"**Agents**" shall mean the Administrative Agent and the Collateral Agent.

"**Agreement**" shall mean this Second Lien Subordinated Secured Superpriority Debtor-in-Possession Note Purchase Agreement.

"**Annual Operating Forecast**" shall mean the approved annual business plan and projected operating budget of the Issuer delivered pursuant Section 7.1(d).

"**Applicable Amount**" shall mean, at any time (the "**Applicable Amount Reference Time**"), an amount (which amount may not in any event be less than zero (0)) equal to (a) the sum, without duplication, of:

(i)     50% of Cumulative Consolidated Net Income of the Issuer and the Restricted Subsidiaries for the period from the first day of the first fiscal quarter commencing after the Closing Date until the last day of the then most recent fiscal quarter or fiscal year, as applicable, for which Section 7.1 Financials have been delivered;

(ii)     to the extent not (A) already included in the calculation of Consolidated Net Income of the Issuer and the Restricted Subsidiaries or (B) already reflected as a return of capital or deemed reduction in the amount of such Investment, the aggregate JV Distribution Amount received by the Issuer or any Restricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time;

(iii)     to the extent not (A) already included in the calculation of Consolidated Net Income or (B) already reflected as a return of capital or deemed reduction in the amount of any such Investment, the aggregate amount of all cash repayments of principal received by the Issuer or any Restricted Subsidiary from any Minority Investments or Unrestricted Subsidiaries during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time in respect of loans made by the Issuer or any Restricted Subsidiary to such Minority Investments or Unrestricted Subsidiaries; and

(iv)     to the extent not (A) already included in the calculation of Consolidated Net Income of the Issuer and the Restricted Subsidiaries, (B) already reflected as a return of capital or deemed reduction in the amount of such Investment, or (C) applied to prepay the Senior Term Loan in accordance with Section 4.2(a) of the Senior DIP Agreement (or any similar provision) or the Notes in accordance with Section 4.2(a), the aggregate amount of all Net Cash Proceeds received by the Issuer or any Restricted Subsidiary in connection with the sale, transfer or other disposition of its ownership interest in any Minority Investments or in any Unrestricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Applicable Amount Reference Time;

minus (b) the aggregate amount of Investments made pursuant to Section 8.5(g)(ii)(y), 8.5(h)(iii), 8.5(i)(y) or 8.5(u)(y) following the Closing Date and prior to the Applicable Amount Reference Time.

Notwithstanding the foregoing, in making any calculation or other determination under this Agreement involving the Applicable Amount, if the Applicable Amount at such time is less than zero, then the Applicable Amount shall be deemed to be zero for purposes of such calculation or determination.

"**Applicable Equity Amount**" shall mean, at any time (the "**Applicable Equity Amount Reference Time**"), an amount equal to, without duplication, (a) the amount of any capital contributions made in cash to, or any proceeds of an equity issuance received by the Issuer during the period from and

including the Business Day immediately following the Closing Date through and including the Applicable Equity Amount Reference Time, including proceeds from the issuance of Stock or Stock Equivalents of Issuer or any direct or indirect parent of Issuer (to the extent the proceeds of any such issuance are contributed to the Issuer), but excluding all proceeds from the issuance of Disqualified Stock and amounts received from an Issuer or a Restricted Subsidiary

minus (b) the sum, without duplication, of:

> (i)      the aggregate amount of Investments made pursuant to Section 8.5(g)(ii)(x), 8.5(h)(ii), 8.5(i)(x) or 8.5(u)(x) following the Closing Date and prior to the Applicable Equity Amount Reference Time; and

> (ii)     the aggregate amount of dividends pursuant to Section 8.6(c)(ii)(B)(y) following the Closing Date and prior to the Applicable Equity Amount Reference Time.

"**Applicable Laws**" shall mean, as to any Person, any law (including common law), statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority (including the PUCT and ERCOT), in each case applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Purchaser, (b) an Affiliate of a Purchaser, or (c) an entity or an Affiliate of an entity that administers or manages a Purchaser.

"**Asset Sale Prepayment Event**" shall mean (i) any Disposition of any business units, assets or other property of the Issuer and the Restricted Subsidiaries not in the ordinary course of business (including any Disposition of any Stock or Stock Equivalents of any Subsidiary of the Issuer owned by the Issuer or any Restricted Subsidiary) and (ii) the dividends and distributions of cash proceeds to the Issuer by any Oncor Subsidiary of Net Cash Proceeds from a Disposition by such Oncor Subsidiary. Notwithstanding the foregoing, the term "Asset Sale Prepayment Event" shall not include any transaction permitted by Section 8.4 (other than transactions permitted by Section 8.4(b), Section 8.4(i), Section 8.4(j), Section 8.4(n) and Section 8.4(o), which shall constitute Asset Sale Prepayment Events).

"**Assignment and Acceptance**" shall mean an assignment and acceptance substantially in the form of Exhibit E, or such other form as may be approved by the Administrative Agent.

"**Authorized Officer**" shall mean the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, the Assistant Treasurer, the Controller, any Senior Vice President, with respect to certain limited liability companies or partnerships that do not have officers, any manager, managing member or general partner thereof, any other senior officer of the Issuer or any other Note Party designated as such in writing to the Administrative Agent by the Issuer or any other Note Party, as applicable, and, with respect to any document (other than the solvency certificate) delivered on the Closing Date, the Secretary or the Assistant Secretary of any Note Party. Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Issuer or any other Note Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"**Avoidance Actions**" shall mean the Note Parties' claims and causes of action under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (but excluding causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code).

"**Bankruptcy Code**" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" shall have the meaning assigned in the Recitals hereto.

"**Benefited Purchaser**" shall have the meaning provided in Section 11.8(a).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Budget**" shall mean the Issuer's and the Guarantors' consolidated budget attached hereto as Exhibit H (the "**Initial Budget**") setting forth a statement of cash sources and uses of all free cash flow for the next full 3 calendar months of the EFIH Debtors following the Final Order Entry Date, broken down month by month, including the anticipated uses of the proceeds from the sale of the Notes in such detail as provided in Exhibit H, and after such initial 3 calendar month period, at the end of each fiscal quarter (or, at the election of the Issuer, at the end of each calendar month or such other earlier period as may be agreed), an updated 3 month statement of the matters set forth above for the subsequent 3 month period in similar detail, in each case certified as to its reasonableness when made by an Authorized Officer of the Issuer in the form of Exhibit I.

For the avoidance of doubt, no Budget shall constitute a cap or limitation on the amount of "Professional Fees" (as defined in the Final Order) payable by the EFIH Debtors.

"**Business Day**" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close.

"**Capital Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) by the Issuer and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on a consolidated statement of cash flows of the Issuer.

"**Capital Lease**" shall mean, as applied to the Issuer and the Restricted Subsidiaries, any lease of any property (whether real, personal or mixed) by the Issuer or any Restricted Subsidiary as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of the Issuer; provided, however, that, notwithstanding anything to the contrary in this Agreement or in any other Note Document, any leases that were not capital leases when entered into but are recharacterized as capital leases due to a change in accounting rules after the Closing Date shall for all purposes of this agreement not be treated as Capital Leases.

"**Capitalized Lease Obligations**" shall mean, as applied to the Issuer and the Restricted Subsidiaries at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at such time be required to be capitalized and reflected as a liability on the balance sheet (excluding the footnotes thereto) of the Issuer in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such Capital Lease prior to the

first date upon which such Capital Lease may be prepaid by the lessee without payment of a penalty; provided, however, that, notwithstanding anything to the contrary in this Agreement or in any other Note Document, any obligations that were not required to be included on the balance sheet of the Issuer as capital lease obligations when incurred but are recharacterized as capital lease obligations due to a change in accounting rules after the Closing Date shall for all purposes of this Agreement not be treated as Capitalized Lease Obligations.

"**Carve Out**" shall have the meaning assigned to such term in the Final Order.

"**Case**" and "**Cases**" shall each have the meaning assigned in the Recitals hereto.

"**Cash Management Obligations**" shall have the meaning in the Senior DIP Agreement.

"**Cash Management Order**" shall mean that certain Order (A) Authorizing the Debtors To (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts, (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims, and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority, in form and substance satisfactory to the Required Commitment Parties on a motion by the EFIH Debtors that is in form and substance satisfactory to the Required Commitment Parties, as such order or orders may be extended, amended, supplemented or modified in a manner not materially adverse to the Purchasers.

"**Cash Management Services**" shall mean treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer (including automated clearing house fund transfer services) and other cash management services.

"**Change in Law**" shall mean (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any party with any guideline, request, directive or order issued or made after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" shall mean and be deemed to have occurred if, at any time, (a) Parent shall cease to own directly 100% of the Stock and Stock Equivalents of the Issuer or (b) there is a sale, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Oncor Subsidiaries, taken as a whole.

"**Closing Date**" shall mean the first date following the Final Order Entry Date on which the conditions precedent set forth in Section 5 shall have been satisfied or waived in accordance with Section 11.1 hereof.

"**Closing Fee**" shall have the meaning provided in Section 3.3.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time. Section references to the Code are to the Code, as in effect on the Closing Date, and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"**Co-Issuer**" or "**Co-Issuers**" shall have the meaning provided in the preamble to this Agreement.

"**Collateral**" shall mean all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Security Documents and excluding in all events "Excluded Collateral" (for the avoidance of doubt, subject to the Subordination Agreement, Collateral shall include all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Senior DIP Documents).

"**Collateral Agent**" shall mean, Cortland Capital Market Services LLC, in its capacity as collateral agent for the Secured Parties under this Agreement and the Security Documents, or any successor collateral agent appointed pursuant hereto.

"**Commitment**" shall mean the Tranche A-1 Commitments, Tranche A-2 Commitments and Tranche A-3 Commitments.  The aggregate amount of Commitments outstanding as of the Closing Date is $1,900,000,000.

"**Commitment Letter**" shall mean the commitment letter, dated April 28, 2014, among Parent, the Issuer and the Commitment Parties.

"**Commitment Parties**" shall mean collectively, the Initial Commitment Parties, the Selected Partners, and the Transferee Commitment Parties.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. 1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" shall have the meaning provided in Section 11.17(a).

"**Confidential Information**" shall have the meaning provided in Section 11.16.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof) pursuant to section 1129 of the Bankruptcy Code.

"**Consolidated Net Income**" shall mean, for any period, the net income (loss) of the Issuer and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

      (a)      any after-tax effect of extraordinary losses and gains for such period,

      (b)      Transaction Expenses,

      (c)      the cumulative effect of a change in accounting principles during such period,

      (d)      any after-tax effect of income (or loss) from disposed, abandoned or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations,

(e)    any after-tax effect of gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Issuer,

(f)    any income (or loss) during such period of any Person that is an Unrestricted Subsidiary, and any income (or loss) during such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; provided that the Consolidated Net Income of the Issuer and the Restricted Subsidiaries shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the Issuer or any Restricted Subsidiary during such period,

(g)    solely for the purpose of determining the Applicable Amount, any income (or loss) during such period of any Restricted Subsidiary (other than any Note Party) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its net income is not at the date of determination wholly permitted without any prior governmental approval or an order of the Bankruptcy Court (which has not been obtained) or, directly or indirectly, by the operation of the terms of its Organizational Documents or any agreement, instrument or Applicable Law applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived (in each case, other than restrictions pursuant to this Agreement); provided that Consolidated Net Income of the Issuer and the Restricted Subsidiaries will be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) to the Issuer or any Restricted Subsidiary during such period, to the extent not already included therein,

(h)    effects of all adjustments (including the effects of such adjustments pushed down to the Issuer and the Restricted Subsidiaries) in the Issuer's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition whether consummated before or after the Closing Date or the amortization or write-off of any amounts thereof, net of taxes,

(i)    any net after-tax effect of income (or loss) for such period attributable to the early extinguishment of Indebtedness (other than Hedging Obligations, but including, for the avoidance of doubt, debt exchange transactions),

(j)    any net after-tax effect of any unrealized income (or loss) for such period attributable to Hedging Obligations or other derivative instruments,

(k)    any impairment charge or asset write-off or write-down including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets and investments in debt and equity securities to the extent relating to changes in commodity prices, in each case pursuant to GAAP to the extent offset by gains from Hedging Obligations,

(l)    any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Stock or Stock Equivalents by management of the Issuer or any of its direct or indirect parent companies in connection with the Transactions, and

(m)    accruals and reserves established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance

with GAAP or changes as a result of adoption of or modification of accounting policies during such period.

"**Consolidated Total Assets**" shall mean, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption), after intercompany eliminations, on a consolidated balance sheet of the Issuer and the Restricted Subsidiaries at such date.

"**Contingent Obligation**" shall mean indemnification Obligations and other similar contingent Obligations for which no claim has been made in writing.

"**Contractual Requirement**" shall have the meaning provided in Section 6.3.

"**Conversion Date**" shall have the meaning given to it in Section 4.7(a).

"**Conversion Rate**" shall mean 89.052 shares of Reorganized EFH Common Stock issuable upon conversion per $1,000 principal amount of the Notes.

"**Converted Tranche A-2 Notes**" shall have the meaning given to it in Section 2.2(d).

"**Cumulative Consolidated Net Income**" shall mean, for any period, Consolidated Net Income for such period, taken as a single accounting period. Cumulative Consolidated Net Income may be a positive or negative amount.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Applicable Laws of the United States or other applicable jurisdictions from time to time in effect.

"**Deemed Cash**" shall have the meaning provided in Section 8.4(b).

"**Default**" shall mean, any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"**Default Rate**" shall have the meaning provided in Section 2.3(c).

"**Defaulting Commitment Party**" shall mean any Commitment Party that does not satisfy its obligations in respect of its pro rata portion of the Investment Commitment as set forth in the Commitment Letter.

"**Defaulting Purchaser**" shall mean (i) any Purchaser with respect to which a Purchaser Default is in effect, (ii) any Purchaser who fails to purchase a Note in accordance with Section 2.2(a), or (iii) any Purchaser that fails to fulfill its obligations to sell its Notes in accordance with Sections 2.2(c).

"**Deferred Net Cash Proceeds**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Deferred Net Cash Proceeds Payment Date**" shall have the meaning provided such term in the definition of "Net Cash Proceeds".

"**Designated Non-Cash Consideration**" shall mean the fair market value of non-cash consideration received by the Issuer or any Restricted Subsidiary in connection with a Disposition

pursuant to Section 8.4(b) that is designated as Designated Non-Cash Consideration pursuant to a certificate of an Authorized Officer of the Issuer, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"**DIP Financing Motion**" shall mean the motion of EFIH, in form and substance reasonably satisfactory to the Required Commitment Parties seeking, among other things, entry of the Final Order.

"**Disbursement Account**" shall mean an account designated by the Administrative Agent.

"**Disclosure Statement**" shall mean a Disclosure Statement that is approved by the Bankruptcy Court (provided, however, that with respect to provisions of the Disclosure Statement that relate to the payment of the Notes, such provisions must not be materially adverse to the Purchasers.)

"**Disclosure Statement Order**" shall mean the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and the other solicitation material in respect of the Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof) as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code.

"**Disposition**" shall have the meaning provided in Section 8.4.

"**Disqualified Stock**" shall mean, with respect to any Person, any Stock or Stock Equivalents of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Stock or Stock Equivalents that is not Disqualified Stock), other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale event or similar event shall be subject to the prior repayment in full of the Notes or the Equity Conversion, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, asset sale event or similar event shall be subject to the prior repayment in full of the Notes or the Equity Conversion, in whole or in part, in each case prior to the date that is ninety-one (91) days after the Maturity Date; provided that if such Stock or Stock Equivalents are issued to any plan for the benefit of employees of the Issuer or any of its Subsidiaries or by any such plan to such employees, such Stock or Stock Equivalents shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer (or any direct or indirect parent company thereof) or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; provided, further, that any Stock or Stock Equivalents held by any present or former employee, officer, director, manager or consultant, of the Issuer, any of its Subsidiaries or any of its direct or indirect parent companies or any other entity in which the Issuer or any Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Issuer, in each case pursuant to any stockholders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or any of its Subsidiaries.

"**Dividends**" or "**dividends**" shall have the meaning provided in Section 8.6.

"**Dollars**" and "**$**" shall mean dollars in lawful currency of the United States of America.

"**Domestic Subsidiary**" shall mean each Subsidiary of the Issuer that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"**Effective Date**" means the date of the consummation of the confirmed Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof).

"**EFH Organizational Documents**" shall have the meaning provided in Section 4.7(e)(i).

"**EFIH**" shall have the meaning provided in the preamble to this Agreement.

"**EFIH Debtors**" shall mean the Issuer and the Guarantors.

"**EFIH Organizational Documents**" shall have the meaning provided in Section 4.7(e)(ii).

"**EFIH Unsecured Note Claims**" shall have the meaning assigned to such term in the Restructuring Support Agreement and the Restructuring Term Sheet attached thereto.

"**Eligible Assignee**" shall mean any of the following: (i) a Post-Funding Partner; (ii) a Specified Consultant; (iii) a Selected Partner; (iv) an Affiliate of any Purchaser; (v) a Purchaser; (vi) an Approved Fund; (vii) such other Persons that certify their status as a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act or an "institutional accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act; (viii) a non U.S. persons (within the meaning of Regulation S under the Securities Act) out of the United States; or (ix) such other Person approved by the Issuer.

"**Employee Benefit Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA), other than a Foreign Plan, that is maintained or contributed to by Parent, Issuer or any Subsidiary (or, with respect to an employee benefit plan subject to Title IV of ERISA, any ERISA Affiliate).

"**Environmental Claims**" shall mean any and all actions, suits, proceedings, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or potential responsibility or investigation (other than reports prepared by or on behalf of Parent, the Issuer or any other Subsidiary of Parent (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of Real Estate) or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "**Claims**"), including (i) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release into the environment of Hazardous Materials or arising from alleged injury or threat of injury to human health or safety (to the extent relating to human exposure to Hazardous Materials), or to the environment, including ambient air, indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"**Environmental Law**" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or, with respect to any post-Closing Date requirements of the Note Documents, hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including ambient air,

indoor air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or to human health or safety (to the extent relating to human exposure to Hazardous Materials), or Hazardous Materials.

"**Equity Conversion**" shall have the meaning provided in <u>Section 4.7(a)</u>.

"**Equity Diffusion Sale**" shall have the meaning provided in <u>Section 4.7(c)</u>.

"**ERCOT**" shall mean the Electric Reliability Council of Texas or any other entity succeeding thereto.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time. Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Issuer or any Subsidiary of the Issuer would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**Event of Default**" shall have the meaning provided in <u>Section 9</u>.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and rules and regulations promulgated thereunder.

"**Exchange Rate**" shall mean on any day, with respect to any currency, the rate at which such currency may be exchanged into another currency, which shall be the Historical Exchange Rate on the immediately prior day as determined by OANDA Corporation and made available on its website at http://www.oanda.com/convert/fxhistory; <u>provided</u>, that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if at the time of any such determination, for any reason, no such rate is being quoted.

"**Excluded Collateral**" shall mean (a) Excluded Stock and Stock Equivalents, (b) Excluded Subsidiaries, and (c) (i) property or assets subject to capital leases or purchase money obligations, (ii) other arrangements described in <u>Section 8.1(f)</u> to the extent subject to a Lien, in each case permitted by this Agreement, and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, the applicable Note Party's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other Applicable Law), <u>provided</u>, that immediately upon the repayment of all Indebtedness secured by such Lien, such property shall no longer constitute "Excluded Collateral" and such Note Party shall be deemed to have granted a security interest in all the rights and interests with respect to such property or assets pursuant to the applicable Note Documents, (iii) any assets as to which the Senior Agent and the Issuer have reasonably determined (after giving effect to the effectiveness of the Final Order and confirmed in writing by notice to the Administrative Agent) that the costs or other consequences (including adverse tax consequences) of providing a security interest in such assets is excessive in view of the benefits to be gained thereby by the Purchasers, (iv) any property that would otherwise constitute Collateral to the extent (and only to the extent) that the grant of a security interest therein or perfection of a Lien thereon pursuant to the applicable Note Documents would violate any Applicable Law or regulation (including regulations adopted by Federal Energy Regulatory Commission and/or the Nuclear

Regulatory Commission) applicable to such property, (v) any assets constituting "Excluded Collateral" under the Senior DIP Agreement, and (vi) the Issuer's Avoidance Actions (other than, upon the entry of the Final Order, proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise). "Excluded Collateral" shall not in any event include the Stock or Stock Equivalents issued by Oncor and held by any Note Party.

"**Excluded Stock and Stock Equivalents**" shall mean (i) any Stock or Stock Equivalents with respect to which, in the reasonable judgment of the Senior Agent (confirmed in writing by notice to the Issuer and the Administrative Agent), the cost or other consequences (including any adverse tax or accounting consequences) of pledging such Stock or Stock Equivalents in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (ii) solely in the case of any pledge of Voting Stock of any Foreign Subsidiary or Foreign Subsidiary Holding Company to secure the Obligations, any Stock or Stock Equivalents of any class of such Foreign Subsidiary or Foreign Subsidiary Holding Company in excess of 65% of the outstanding Voting Stock of such class (such percentage to be adjusted upon any Change in Law as may be required to avoid adverse U.S. federal income tax consequences to Parent, the Issuer or any Subsidiary of the Issuer), (iii) any Stock or Stock Equivalents to the extent the pledge thereof would violate any Applicable Law, (iv) in the case of any Stock or Stock Equivalents of any Subsidiary of the Issuer that is not Wholly Owned by the Issuer or any Subsidiary Guarantor at the time such Subsidiary becomes a Subsidiary, any Stock or Stock Equivalents of each such Subsidiary to the extent (A) that a pledge thereof to secure the Obligations is prohibited by any applicable Contractual Requirement (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other Applicable Law or any Organizational Document), (B) any Contractual Requirement prohibits such a pledge without the consent of any other party; provided that this clause (B) shall not apply if (x) such other party is a Note Party or Wholly Owned Subsidiary or (y) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Issuer or any Subsidiary of the Issuer to obtain any such consent)) and for so long as such Contractual Requirement or replacement or renewal thereof is in effect, or (C) a pledge thereof to secure the Obligations would give any other party (other than a Note Party or Wholly Owned Subsidiary) to any contract, agreement, instrument or indenture governing such Stock or Stock Equivalents the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law), (v) the Stock or Stock Equivalents of any Subsidiary of a Foreign Subsidiary, (vi) any Stock or Stock Equivalents of any Subsidiary to the extent that (A) the pledge of such Stock or Stock Equivalents would result in adverse tax or accounting consequences to the Issuer or any Subsidiary as reasonably determined by the Issuer, and (B) such Stock or Stock Equivalents have been identified in writing to the Collateral Agent by an Authorized Officer of the Issuer, (vi) any Stock and Stock Equivalents constituting "Excluded Stock and Stock Equivalents" under the Senior DIP Agreement and (vii) the Stock or Stock Equivalents of any Unrestricted Subsidiary or Immaterial Subsidiary. Notwithstanding the foregoing, the term "Excluded Stock and Stock Equivalents" shall not in any event include the Stock or Stock Equivalents issued by Oncor and held by any Note Party.

"**Excluded Subsidiary**" shall mean (a) each Domestic Subsidiary listed on Schedule 1.1(a) hereto and each future Domestic Subsidiary, in each case, for so long as any such Subsidiary does not constitute a Material Subsidiary, (b) each Domestic Subsidiary that is not a Wholly Owned Subsidiary on any date such Subsidiary would otherwise be required to become a Subsidiary Guarantor pursuant to the requirements of Section 7.11 (for so long as such Subsidiary remains a non-Wholly Owned Restricted Subsidiary), (c) any Foreign Subsidiary Holding Company, (d) each Domestic Subsidiary that is prohibited by any applicable Contractual Requirement, Applicable Law or Organizational Document from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect), (e) each Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary,

(f) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Senior Agent (confirmed in writing by notice to the Issuer and Administrative Agent), the cost or other consequences (including any adverse tax or accounting consequences) of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (g) each Unrestricted Subsidiary, (h) any Foreign Subsidiary, and (i) any Subsidiary to the extent that (A) the guarantee of the Obligations by would result in adverse tax or accounting consequences and (B) such Subsidiaries have been identified in writing to the Collateral Agent by an Authorized Officer of the Issuer. For the avoidance of doubt, Oncor Subsidiaries shall be deemed Excluded Subsidiaries. Notwithstanding the foregoing, the term "Excluded Subsidiary" shall not in any event include any Subsidiary that is a debtor and debtor-in-possession in the Cases.

"**Excluded Taxes**" shall mean, with respect to any Agent or any Purchaser, (a) net income taxes and franchise and excise taxes (imposed in lieu of net income taxes) imposed on such Agent or Purchaser, (b) any Taxes imposed on any Agent or any Purchaser as a result of any current or former connection between such Agent or Purchaser and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising from such Agent or Purchaser having executed, delivered or performed its obligations or received a payment under, or having been a party to or having enforced, this Agreement or any other Note Document), (c) any U.S. federal withholding tax that is imposed on amounts payable to any Purchaser under the law in effect at the time such Purchaser becomes a party to this Agreement (or designates a new lending office other than a new lending office designated at request of the Issuer); provided that this subclause (c) shall not apply to the extent that (x) the indemnity payments or additional amounts any Purchaser would be entitled to receive (without regard to this subclause (c)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such Purchaser (or designation of a new lending office by such Purchaser) would have been entitled to receive in the absence of such assignment or (y) any Tax is imposed on a Purchaser in connection with an interest in any Note or other obligation that such Purchaser was required to acquire pursuant to Section 11.8(a) or that such Purchaser acquired pursuant to Section 11.7 (it being understood and agreed, for the avoidance of doubt, that any withholding tax imposed on a Purchaser as a result of a Change in Law occurring after the time such Purchaser became a party to this Agreement (or designates a new lending office) shall not be an Excluded Tax), (d) any Tax to the extent attributable to such Purchaser's failure to comply with Sections 4.4(d) and (e) (in the case of any Non-U.S. Purchaser) or Section 4.4(h) (in the case of a U.S. Purchaser), and (e) any Taxes imposed by FATCA.

"**Existing Oncor Notes**" shall mean the following notes and debentures issued by Oncor Electric Delivery Company: (i) 6.375% Fixed Senior Notes due 2015, (ii) 5.000% Fixed Senior Notes due 2017, (iii) 6.800% Fixed Senior Notes due 2018, (iv) 5.750% Fixed Senior Notes due 2020, (v) 4.100% Fixed Senior Notes due 2022, (vi) 7.000% Fixed Debentures due 2022, (vii) 7.000% Fixed Senior Notes due 2032, (viii) 7.25% Fixed Senior Notes due 2033, (ix) 7.500% Fixed Senior Notes due 2038, (x) 5.250% Fixed Senior Notes due 2040, (xi) 4.550% Fixed Senior Notes due 2041 and (xii) 5.300% Fixed Senior Notes due 2042.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any current or future Treasury regulations or official administrative interpretations thereof.

"**Fee Letter**" shall mean the fee letter, dated [_____] [__], 2014, among the Issuer and the Agents.

"**Fees**" shall mean all amounts payable pursuant to, or referred to in, Section 3 and the Prepayment Fee.

"**Final Order**" shall mean a final order of the Bankruptcy Court entered in the Cases in form and substance satisfactory to the Required Commitment Parties attached as Exhibit J hereto entered upon the DIP Financing Motion, authorizing and approving on a final basis, among other things, the issuance by the Issuer of the Notes (which shall in any case approve the Second Lien Refinancing with the proceeds of the Notes).

"**Final Order Entry Date**" shall mean the date that the Final Order is entered by the Bankruptcy Court in the Cases.

"**First Day Orders**" shall mean all orders entered or to be entered by the Bankruptcy Court based on the motions identified on Schedule 1.1(d) hereto, which shall each be in form and substance reasonably satisfactory to the Required Commitment Parties, in each case excluding orders, which, by their terms, specifically provide that they do not grant any relief in respect of, or purport to affect the rights, duties or obligations of, the Issuer or any of its Subsidiaries.

"**Fiscal Year**" shall have the meaning provided in Section 7.10.

"**Foreign Asset Sale**" shall have the meaning provided in Section 4.2(c).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Issuer or any of its Subsidiaries with respect to employees employed outside the United States.

"**Foreign Recovery Event**" shall have the meaning provided in Section 4.2(c).

"**Foreign Subsidiary**" shall mean each Subsidiary of the Issuer that is not a Domestic Subsidiary.

"**Foreign Subsidiary Holding Company**" shall mean any Subsidiary that owns no material assets other than equity interest (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more (a) Foreign Subsidiaries and/or (b) other Subsidiaries that own no material assets other than equity interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes) in one or more Foreign Subsidiaries.

"**Fund**" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Issuer notifies the Administrative Agent that the Issuer requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Issuer that the Required Purchasers request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**General Unsecured Claims Against EFH**" shall have the meaning assigned to such term in the Restructuring Support Agreement and the Restructuring Term Sheet attached thereto.

"**Global Notes**" shall mean individually and collectively, each of the Global Notes deposited with or on behalf of and registered in the name of the Administrative Agent or its nominee, substantially in the form of Exhibit F.

"**Governmental Authority**" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank, stock exchange, PUCT or ERCOT.

"**Guarantee**" shall mean the Guarantee made by each Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit A.

"**Guarantee Obligations**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "**Guarantee Obligations**" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Guarantors**" shall mean (a) each Domestic Subsidiary that is a party to the Guarantee on the Closing Date, and (b) each Domestic Subsidiary that becomes a party to the Guarantee on or after the Closing Date pursuant to Section 7.11 or otherwise. For the avoidance of doubt, Parent is not a Guarantor.

"**Hazardous Materials**" shall mean (a) any petroleum or petroleum products spilled or released into the environment, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, for which a release into the environment is prohibited, limited or regulated by any Environmental Law.

"**Hedging Agreements**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or

options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Hedging Obligations**" shall mean, with respect to any Person, the obligations of such Person under Hedging Agreements which are not entered into for speculative purposes (as determined by the Issuer in its reasonable discretion acting in good faith).

"**Holdings**" shall mean Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership, and its successors.

"**Identified Prepayment**" shall mean the payment in cash of the Tranche A-3 Notes in accordance with the Equity Conversion.

"**Immaterial Subsidiary**" shall mean each Subsidiary of the Issuer that is not a Material Subsidiary.

"**Indebtedness**" of any Person shall mean (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability on the balance sheet of such Person, (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all Indebtedness of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) net Hedging Obligations of such Person, (h) without duplication, all Guarantee Obligations of such Person, and (i) Disqualified Stock of such Person; provided that Indebtedness shall not include (i) trade and other ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) amounts payable by and between Parent, the Issuer and any other Subsidiary of Parent in connection with retail clawback or other regulatory transition issues, and (v) any Indebtedness defeased by such Person or by any Subsidiary of such Person. The amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**indemnified liabilities**" shall have the meaning provided in Section 11.5.

"**Indemnified Taxes**" shall mean all Taxes (including Other Taxes) other than (i) Excluded Taxes and (ii) any interest, penalties or expenses caused by an Agent's or Purchaser's gross negligence or willful misconduct.

"**Initial Budget**" shall have the meaning provided in the definition of the term "Budget".

"**Initial Commitment Parties**" shall mean the parties to the Commitment Letter as of April 28, 2014 (other than Parent and Issuer).

"**Initial Tranche A-3 Note Purchasers**" shall mean the Purchasers purchasing Tranche A-3 Notes on the Closing Date pursuant to Section 2.2(a).

"**Interest Payment Date**" shall have the meaning provided in Section 2.3(d).

"**Investment**" shall mean, for any Person: (a) the acquisition (whether for cash, property, services or securities or otherwise) of Stock, Stock Equivalents, bonds, notes, debentures, partnership, limited liability company membership or other ownership interests or other securities of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such sale); (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person) (including any partnership or joint venture); (c) the entering into of any guarantee of, or other contingent obligation with respect to, Indebtedness; or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person; provided that, in the event that any Investment is made by the Issuer or any Restricted Subsidiary in any Person through substantially concurrent interim transfers of any amount through one or more other Restricted Subsidiaries, then such other substantially concurrent interim transfers shall be disregarded for purposes of Section 8.5.

"**Investment Commitments**" shall have the meaning provided in the Commitment Letter.

"**Issuance**" shall mean an issuance of Notes by the Issuer pursuant to Section 2.2(a).

"**Issuance Date Certificate**" shall have the meaning provided in Section 2.2(b).

"**Issuer**" shall have the meaning provided in the preamble to this Agreement.

"**JV Distribution Amount**" shall mean, at any time, the aggregate amount of cash dividends and other cash distributions received by the Issuer or any Restricted Subsidiary from any Minority Investments or any Unrestricted Subsidiary since the Closing Date and prior to such time and only to the extent that neither the Issuer nor any Restricted Subsidiary is under any obligation to repay such amount to such Minority Investments or such Unrestricted Subsidiary.

"**Lien**" shall mean any mortgage, pledge, security interest, hypothecation, collateral assignment, lien (statutory or other) or similar encumbrance (including any conditional sale or other title retention agreement or any lease or license in the nature thereof); provided that in no event shall an operating lease be deemed to be a Lien.

"**Management Investors**" shall mean the directors, management, officers and employees of Parent and its Subsidiaries who are or become investors (directly or indirectly) in Holdings, any of its direct or indirect parent entities or in Parent at any time prior to the first anniversary of Closing Date.

"**Master Agreement**" shall have the meaning provided in the definition of the term "**Hedging Agreement**."

18

"**Material Adverse Effect**" shall mean any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Issuer and its Subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the EFIH Debtors (taken as a whole) to perform their payment obligations under the Note Documents to which they are a party, or the rights and remedies of the Administrative Agent and the Purchasers under the Note Documents other than, in each case, as a result of the events leading up to, and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Effect, and provided that nothing disclosed in any of the following filings by Parent and/or the Issuer: (1) the annual report on Form 10-K for the year ended December 31, 2013, (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of EFIH Debtors provided to the advisors to the Commitment Parties on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Effect.

"**Material Subsidiary**" shall mean, at any date of determination, each Restricted Subsidiary of the Issuer (a) whose total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the most recent Test Period for which Section 7.1 Financials have been delivered were equal to or greater than 2.5% of the Consolidated Total Assets of the Issuer and the Restricted Subsidiaries at such date or (b) whose total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than 2.5% of the consolidated revenues of the Issuer and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Restricted Subsidiaries that are not Material Subsidiaries have, in the aggregate, (x) total assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than 10.0% of the Consolidated Total Assets of the Issuer and the Restricted Subsidiaries at such date or (y) total revenues (when combined with the revenues of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than 10.0% of the consolidated revenues of the Issuer and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP, then the Issuer shall, on the date on which financial statements for such quarter are delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Restricted Subsidiaries as "Material Subsidiaries" so that such condition no longer exists.

"**Maturity Date**" shall mean the earliest to occur of (a) [_____][1]; (b) the effective date of any Reorganization Plan filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (c) the consummation of a sale of all or substantially all of the EFIH Debtors' assets or stock under section 363 of the Bankruptcy Code; (d) the acceleration of the Notes in accordance with the terms of this Agreement and the Subordination Agreement; or (e) the Equity Conversion.

"**Minority Investment**" shall mean any Person (other than a Subsidiary) in which the Issuer or any Restricted Subsidiary owns Stock or Stock Equivalents, including any joint venture (regardless of form of legal entity).

---

[1] 24 months from Closing Date.

"**Moody's**" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"**Mortgage**" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property.

"**Mortgaged Property**" shall mean all Real Estate, if any, with respect to which a Lien for the benefit of the Collateral Agent and the other Secured Parties is granted and perfected pursuant to the terms and conditions of the Final Order.

"**Multiemployer Plan**" shall mean a plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA (i) to which any of the Issuer, any Subsidiary of the Issuer or any ERISA Affiliate is then making or has an obligation to make contributions or (ii) with respect to which the Issuer, any Subsidiary of the Issuer or any ERISA Affiliate could incur liability pursuant to Title IV of ERISA.

"**Narrative Report**" shall mean, with respect to the financial statements for which such narrative report is required, a management's discussion and analysis of the financial condition and results of operations of the Issuer and its consolidated Subsidiaries for the applicable period to which such financial statements relate.

"**Net Cash Proceeds**" shall mean, with respect to any Prepayment Event, (a) the gross cash proceeds and cash equivalents (including payments from time to time in respect of installment obligations, if applicable) received by or on behalf of the Issuer or any Restricted Subsidiary in respect of such Prepayment Event, as the case may be, less (b) the sum of:

(i)      the amount, if any, of all taxes paid or estimated by the Issuer in good faith to be payable by the Issuer or any Restricted Subsidiary in connection with such Prepayment Event,

(ii)     the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (i) above) (x) associated with the assets that are the subject of such Prepayment Event and (y) retained by the Issuer or any Restricted Subsidiary (including any pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction); provided that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such Prepayment Event occurring on the date of such reduction,

(iii)    the amount of any Indebtedness (other than Indebtedness hereunder) secured by a Lien on the assets that are the subject of such Prepayment Event to the extent that the instrument creating or evidencing such Indebtedness requires that such Indebtedness be repaid upon consummation of such Prepayment Event,

(iv)     in the case of any Asset Sale Prepayment Event (other than any Asset Sale Prepayment Event pursuant to Section 8.4(b) and excluding in any event any Disposition by the Issuer or any of its Restricted Subsidiaries of the Stock or Stock Equivalents issued by any Oncor Subsidiary) or Recovery Prepayment Event, the amount of any proceeds of such Prepayment Event that the Issuer or any Restricted Subsidiary has reinvested (or intends to reinvest within the Reinvestment Period, has entered into an Acceptable Reinvestment Commitment prior to the last day of the Reinvestment Period to reinvest or, with respect to any Recovery Prepayment Event, provided an Acceptable Reinvestment Commitment or a Restoration Certification prior to the last

day of the Reinvestment Period) in the business of the Issuer or any Restricted Subsidiary (subject to Section 7.14), including for the repair, restoration or replacement of an asset or assets subject to a Recovery Prepayment Event; provided that any portion of such proceeds that has not been so reinvested within such Reinvestment Period (with respect to such Prepayment Event, the "**Deferred Net Cash Proceeds**") shall, unless the Issuer or any Restricted Subsidiary has entered into an Acceptable Reinvestment Commitment or provided a Restoration Certification prior to the last day of such Reinvestment Period to reinvest such proceeds, (x) be deemed to be Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event occurring on the last day of such Reinvestment Period or, if later, 180 days after the date the Issuer or such Restricted Subsidiary has entered into such Acceptable Reinvestment Commitment or provided such Restoration Certification, as applicable (such last day or 180th day, as applicable, the "**Deferred Net Cash Proceeds Payment Date**"), and (y) be applied to the repayment of Notes in accordance with Section 4.2(a),

(v)    in the case of any Asset Sale Prepayment Event or Recovery Prepayment Event by a non-Wholly Owned Restricted Subsidiary, the *pro rata* portion of the Net Cash Proceeds thereof (calculated without regard to this clause (v)) attributable to minority interests and not available for distribution to or for the account of the Issuer or a Wholly Owned Restricted Subsidiary as a result thereof, and

(vi)    reasonable and customary fees, commissions, expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums and recording charges, transfer taxes, deed or mortgage recording taxes and other customary expenses and brokerage, consultant and other customary fees), issuance costs, discounts and other costs paid by the Issuer or any Restricted Subsidiary, as applicable, in connection with such Prepayment Event, in each case only to the extent not already deducted in arriving at the amount referred to in clause (i) above.

"**Netting Agreement**" shall mean, in respect of Hedging Obligations, a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement.

"**Non-Consenting Purchaser**" shall have the meaning provided in Section 11.7(b).

"**Non-Settling Prepetition Second Lien Obligations Holders**" shall have the meaning assigned to the term "Non-Settling EFIH Second Lien Note Holders" under the Restructuring Support Agreement.

"**Non-U.S. Purchaser**" shall mean any Agent or Purchaser that is not, for United States federal income tax purposes, (a) an individual who is a citizen or resident of the United States, (b) a corporation, partnership or entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust or a trust that has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

"**Note Documents**" shall mean this Agreement, the Subordination Agreement, the Guarantee, the Security Documents, the Fee Letter and any Note issued by the Issuer hereunder.

"**Note Party**" shall mean the Issuer and each of the Subsidiary Guarantors, if any. For the avoidance of doubt, Parent is not a Note Party.

"**Notes**" shall mean the Tranche A-1 Notes, Tranche A-2 Notes, Tranche A-3 Notes and Tranche B Notes, and any Notes issued in substitution therefor pursuant to Section 11.6.

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Note Party arising under any Note Document or otherwise with respect to any Note entered into with the Issuer or any Restricted Subsidiary, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Note Party of any proceeding under the Cases or any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Note Parties under the Note Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Note Documents) include the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Note Party under any Note Document.

"**Oncor**" shall mean Oncor Electric Delivery Holdings Company LLC, a Delaware limited liability company.

"**Oncor Credit Facility**" shall mean the revolving credit agreement, dated as of October 10, 2007, among Oncor Electric, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Citibank, N.A., as syndication agent, and J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Goldman Sachs Credit Partners L.P., Lehman Brothers Inc. and Morgan Stanley Senior Funding, Inc., as joint lead arrangers and bookrunners, as amended, supplemented or otherwise modified from time to time.

"**Oncor Electric**" shall mean Oncor Electric Delivery Company LLC, a Delaware limited liability company.

"**Oncor Subsidiaries**" shall mean Oncor and its Subsidiaries.

"**Oncor Tax Sharing Agreement**" shall mean the Amended and Restated Tax Sharing Agreement, dated November 5, 2008, among Parent, Oncor, Oncor Electric, Texas Transmission Investment LLC and Oncor Management Investment LLC, as amended, supplemented or otherwise modified from time to time.

"**Oncor TSA Amendment**" shall have the meaning in Section 2.3(b).

"**Organizational Documents**" shall mean, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and, if applicable, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall mean any and all present or future stamp, registration, documentary or any other excise, property or similar taxes (including interest, fines, penalties, additions to tax and related expenses with regard thereto) arising from any payment made or required to be made under this Agreement or any other Note Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Note Document.

"**Parent**" shall mean Energy Future Holdings Corp., a Texas corporation.

"**Parent indemnified liabilities**" shall have the meaning provided in Section 11.5(b).

"**Participation Fee**" shall have the meaning set forth in Section 3.4.

"**Patriot Act**" shall have the meaning provided in Section 11.18.

"**Payment Default**" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default under Section 9.1.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Pension Act**" shall mean the Pension Protection Act of 2006, as it presently exists or as it may be amended from time to time.

"**Permitted Acquisition**" shall mean the acquisition, by merger or otherwise, by the Issuer or any Restricted Subsidiary of assets (including assets constituting a business unit, line of business or division) or Stock or Stock Equivalents, so long as (a) such acquisition and all transactions related thereto shall be consummated in accordance with Applicable Law, (b) if such acquisition involves any Stock or Stock Equivalents, such acquisition shall result in the issuer of such Stock or Stock Equivalents and its Subsidiaries becoming a Restricted Subsidiary and a Subsidiary Guarantor, to the extent required by Section 7.11, (c) such acquisition shall result in the Collateral Agent, for the benefit of the applicable Secured Parties, being granted a security interest in any Stock, Stock Equivalent or any assets so acquired, to the extent required by Sections 7.11, 7.12 and/or 7.13, (d) after giving effect to such acquisition, the Issuer and the Restricted Subsidiaries shall be in compliance with Section 7.14, (e) both before and after giving effect to such acquisition, no Default or Event of Default shall have occurred and be continuing and (f) the Issuer shall be in compliance, on a Pro Forma Basis, after giving effect to such acquisition (including any Indebtedness assumed or permitted to exist or incurred pursuant to Section 8.1), with the covenant set forth in Section 8.9.

"**Permitted Holders**" shall mean (a) the Sponsors and (b) the Management Investors.

"**Permitted Investments**" shall mean:

(a)    United States dollars;

(b)    euros or any national currency of any participating member state of the economic and monetary union as contemplated in the Treaty on European Union or such local currencies held by Issuer and its Restricted Subsidiaries from time to time in the ordinary course of business;

(c)    securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government (or any agency or instrumentality thereof the securities of which are

unconditionally guaranteed as a full faith and credit obligation of the U.S. government) with maturities, unless such securities are deposited to defease Indebtedness, of 24 months or less from the date of acquisition;

(d)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(e)     repurchase obligations for underlying securities of the types described in clauses (c) and (d) entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)     commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(g)     marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(h)     investment funds investing 95% of their assets in securities of the types described in clauses (a) through (g) above;

(i)     readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(j)     Indebtedness or preferred stock issued by Persons with a rating of A or higher from S&P or A2 or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(k)     Investments with average maturities of 24 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Permitted Investments shall include amounts denominated in currencies other than those set forth in clauses (a) and (b) above; provided that such amounts are converted into any currency listed in clauses (a) and (b) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"**Permitted Liens**" shall mean:

(a)     Liens for taxes, assessments or governmental charges or claims not yet delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP;

(b)      Liens in respect of property or assets of the Issuer or any Subsidiary of the Issuer imposed by Applicable Law, such as carriers', warehousemen's and mechanics' Liens and other similar Liens, arising in the ordinary course of business or in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity, in each case so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)      Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 9.7;

(d)      Liens incurred or deposits made in connection with workers' compensation, unemployment insurance and other types of social security or similar legislation, or to secure the performance of tenders, statutory obligations, trade contracts (other than for payment of money), leases, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Investments permitted by Section 8.5;

(e)      ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Issuer or any of the Subsidiaries of the Issuer are located;

(f)      easements, rights-of-way, licenses, reservations, servitudes, permits, conditions, covenants, rights of others, restrictions (including zoning restrictions), oil, gas and other mineral interests, royalty interests and leases, minor defects, exceptions or irregularities in title or survey, encroachments, protrusions and other similar charges or encumbrances (including those to secure health, safety and environmental obligations), which do not interfere in any material respect with the business of the Issuer and the Subsidiaries of the Issuer, taken as a whole;

(g)      any exception on the title policies issued in connection with any Mortgaged Property;

(h)      any interest or title of a lessor, sublessor, licensor, sublicensor or grantor of an easement or secured by a lessor's, sublessor's, licensor's, sublicensor's interest or grantor of an easement under any lease, sublease, license, sublicense or easement to be entered into by the Issuer or any Restricted Subsidiary of the Issuer as lessee, sublessee, licensee, grantee or sublicensee to the extent permitted by this Agreement;

(i)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)      Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or banker's acceptance issued or created for the account of the Issuer or any Subsidiary of the Issuer; provided that such Lien secures only the obligations of the Issuer or such Subsidiary in respect of such letter of credit or banker's acceptance to the extent permitted under Section 8.1;

(k)      leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Issuer and the Subsidiaries of the Issuer, taken as a whole;

(l)    Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Issuer or any Subsidiary of the Issuer;

(m)    Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Issuer and the Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(n)    Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(o)    any zoning, land use, environmental or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Issuer and the Subsidiaries of the Issuer, taken as a whole;

(p)    any Lien arising by reason of deposits with or giving of any form of security to any Governmental Authority for any purpose at any time as required by Applicable Law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Issuer or any Subsidiary to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(q)    rights reserved to or vested in any Governmental Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of Applicable Law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(r)    Liens arising under any obligations or duties affecting any of the property, the Issuer or any Restricted Subsidiary to any Governmental Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(s)    rights reserved to or vested in any Governmental Authority to use, control or regulate any property of such person, which do not materially impair the use of such property for the purposes for which it is held;

(t)    any obligations or duties, affecting the property of the Issuer or any Restricted Subsidiary, to any Governmental Authority with respect to any franchise, grant, license or permit;

(u)    a set-off or netting rights granted by the Issuer or any Subsidiary of the Issuer pursuant to any Hedging Agreements or Netting Agreements solely in respect of amounts owing under such agreements;

(v)    subject to the Subordination Agreement, Liens arising under the Senior DIP Documents and/or created pursuant to the Final Order, securing the Senior DIP Obligations; and

(w)    Liens in respect of the Prepetition First Lien Obligations and Prepetition Second Lien Obligations.

"**Permitted Sale Leaseback**" shall mean any Sale Leaseback that does not involve any Stock or Stock Equivalents of any Oncor Subsidiary and that is existing on the Closing Date or consummated by the Issuer or any Restricted Subsidiary after the Closing Date; provided that any such Sale Leaseback consummated after the Closing Date not between (a) a Note Party and another Note Party or (b) a Restricted Subsidiary that is not a Note Party and another Restricted Subsidiary that is not a Note Party is consummated for fair value as determined at the time of consummation in good faith by (i) the Issuer or such Restricted Subsidiary and (ii) in the case of any Sale Leaseback (or series of related Sales Leasebacks) the aggregate proceeds of which exceed $57,500,000, the board of directors of the Issuer or such Restricted Subsidiary (which such determination may take into account any retained interest or other Investment of the Issuer or such Restricted Subsidiary in connection with, and any other material economic terms of, such Sale Leaseback).

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning set forth in the Recitals hereto.

"**PIK Fee**" shall have the meaning provided in Section 3.2.

"**PIK Interest**" shall have the meaning provided in Section 2.3(b).

"**Plan**" shall mean an employee pension benefit plan (other than a Multiemployer Plan), which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by the Issuer, any Subsidiary or ERISA Affiliate or with respect to which the Issuer or any Subsidiary could incur liability pursuant to Title IV of ERISA.

"**Platform**" shall have the meaning provided in Section 11.17(c).

"**Pledge Agreement**" shall mean (a) the Pledge Agreement, entered into by the Note Parties party thereto and the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit B, and (b) any other Pledge Agreement with respect to any or all of the Obligations delivered pursuant to Section 7.12.

"**Post-Acquisition Period**" shall mean, with respect to any Specified Transaction, the period beginning on the date such Specified Transaction is consummated and ending on the last day of the sixth full consecutive fiscal quarter immediately following the date on which such Specified Transaction is consummated.

"**Post-Funding Partners**" shall have the meaning provided in Section 2.2(c)(ii).

"**Preferred Stock**" shall mean any Stock or Stock Equivalents with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"**Prepayment Event**" shall mean any Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Prepayment Fee**" shall have the meaning provided in Section 4.1.

"**Prepayment Tranche A-3 Note Purchasers**" shall mean the Specified Tranche A-3 Note Purchasers having or holding a majority of the outstanding aggregate principal amount of the

Tranche A-3 Notes determined based on the Tranche A-3 Notes held by the Specified Tranche A-3 Note Purchasers immediately prior to the Required Tranche A-3 Note Sale.

"**Prepetition**" shall mean, when used with respect to any agreement or instrument or any claim or proceeding or any other matter with respect of any Note Party, an agreement or instrument that was entered into or became effective, a claim or proceeding that first arose or was first instituted, or another matter that first occurred or, by operation of law, is deemed to have occurred, prior to the Petition Date.

"**Prepetition Debt**" shall mean collectively all Prepetition First Lien Obligations and Prepetition Second Lien Obligations.

"**Prepetition EFH LBO Notes**" shall mean the Prepetition EFH LBO Senior Notes and the Prepetition EFH LBO Toggle Notes.

"**Prepetition EFH LBO Notes Indenture**" shall mean that certain indenture, dated as of October 31, 2007, among Parent, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition EFH LBO Senior Notes**" shall mean the 10.875% Senior Notes due 2017 issued pursuant to the terms of the Prepetition EFH LBO Notes Indenture.

"**Prepetition EFH LBO Toggle Notes**" shall mean the 11.25%/12.00% Senior Toggle Notes due 2017 issued pursuant to the terms of the Prepetition EFH LBO Notes Indenture.

"**Prepetition First Lien 2017 Notes Indenture**" shall mean that certain indenture, dated as of August 14, 2012, among the Issuer and the Prepetition First Lien Trustee, as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition First Lien 2020 Notes Indenture**" shall mean that certain indenture, dated as of August 17, 2010, among the Issuer and the Prepetition First Lien Trustee, as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition First Lien Indentures**" shall mean, collectively, (i) the Prepetition First Lien 2017 Notes Indenture and (ii) the Prepetition First Lien 2020 Notes Indenture.

"**Prepetition First Lien Obligations**" shall mean the "Note Obligations" (as defined in the Prepetition First Lien Indentures).

"**Prepetition First Lien Trustee**" shall mean CSC Trust Company of Delaware, in its capacity as Trustee under each Prepetition First Lien Indenture, and its successors and assigns.

"**Prepetition Second Lien 2021 Notes**" shall mean the 11.00% Senior Secured Second Lien Notes due 2021 issued pursuant to the terms of the Prepetition Second Lien Indenture.

"**Prepetition Second Lien 2022 Notes**" shall mean the 11.75% Senior Secured Second Lien Notes due 2022 issued pursuant to the terms of the Prepetition Second Lien Indenture.

"**Prepetition Second Lien Indenture**" shall mean that certain indenture, dated as of April 25, 2011, among the Issuer and the Prepetition Second Lien Trustee, as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition Second Lien Notes**" shall mean, collectively, the Prepetition Second Lien 2021 Notes and the Prepetition Second Lien 2022 Notes.

"**Prepetition Second Lien Obligations**" shall mean the "Note Obligations" (as defined in the Prepetition Second Lien Indenture).

"**Prepetition Second Lien Trustee**" shall mean, collectively, Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in its capacity as Trustee under the Prepetition Second Lien Indenture, and its successors and assigns.

"**Prepetition Toggle Notes**" shall mean the 11.25%/12.25% unsecured senior toggle notes due 2018 issued pursuant to the terms of the Prepetition Toggle Indenture.

"**Prepetition Toggle Indenture**" shall mean that certain indenture, dated as of December 5, 2012, among the Issuer and UMB Bank, N.A. as trustee, as amended, restated, supplemented or modified from time to time.

"**Prepetition Unexchanged Notes**" shall mean the 9.75% senior notes due 2019 issued pursuant to the terms of the Prepetition Unexchanged Note Indenture.

"**Prepetition Unexchanged Note Indenture**" shall mean that certain indenture, dated as of November 16, 2009, among the Issuer and The Bank of New York Mellon Trust Company, N.A., as trustee, as amended, restated, supplemented or otherwise modified from time to time.

"**Pro Forma Basis**", and "**Pro Forma Effect**" shall mean, with respect to compliance with any test or covenant hereunder, that all Specified Transactions and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such test or covenant: (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction (i) in the case of a Disposition of all or substantially all Stock in any Subsidiary of the Issuer or any division, product line, or facility used for operations of the Issuer or any Subsidiary of the Issuer, shall be excluded, and (ii) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction," shall be included; (b) any retirement or repayment of Indebtedness; and (c) any incurrence or assumption of Indebtedness by the Issuer or any Restricted Subsidiary in connection therewith (it being agreed that if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness as at the relevant date of determination).

"**PUCT**" shall mean the Public Utility Commission of Texas or any successor.

"**Purchaser**" shall have the meaning provided in the preamble to this Agreement.

"**Purchaser Default**" shall mean a Purchaser having (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity.

"**Real Estate**" shall have the meaning provided in Section 7.1(f).

"**Recovery Event**" shall mean (a) any damage to, destruction of or other casualty or loss involving any property or asset or (b) any seizure, condemnation, confiscation or taking (or transfer under threat of condemnation) under the power of eminent domain of, or any requisition of title or use of or relating to, or any similar event in respect of, any property or asset.

"**Recovery Prepayment Event**" shall mean the receipt of cash proceeds with respect to any settlement or payment in connection with any Recovery Event in respect of any property or asset of the Issuer or any Restricted Subsidiary; provided that the term "Recovery Prepayment Event" shall not include any Asset Sale Prepayment Event.

"**Register**" shall have the meaning provided in Section 11.6(b)(iv).

"**Registration Right Agreement**" shall have the meaning provided in Section 4.7(e)(iii).

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Reinvestment Period**" shall mean 15 months following the date of receipt of Net Cash Proceeds of an Asset Sale Prepayment Event or Recovery Prepayment Event.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"**Reorganization Plan**" shall mean a plan of reorganization of the EFIH Debtors in the Cases.

"**Reorganized EFH**" means Parent, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized EFH shall be organized under the laws of the state of Texas.

"**Reorganized EFH Common Stock**" means common stock of the Reorganized EFH, as authorized and with the terms set forth in its certificate of incorporation as in effect on the Effective Date.

"**Required EFIH Unsecured Consenting Creditors**" shall have the meaning assigned to such term in the Restructuring Support Agreement, including the Restructuring Term Sheet attached thereto.

"**Reportable Event**" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the thirty day notice period has been waived.

"**Required Commitment Parties**" shall mean, at any date, at least three (3) Initial Commitment Parties that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the Investment Commitments. The Investment Commitments of a Defaulting

Commitment Party shall be disregarded for purposes of determining Required Commitment Parties at any time.

"**Required Post-Funding Partner Sales**" shall have the meaning provided in Section 2.2(c)(ii).

"**Required Purchasers**" shall mean, at any date, Purchasers managed and/or advised by three or more investment advisors having or holding a majority of the outstanding aggregate principal amount of the Notes. The Notes held by Defaulting Purchasers shall be disregarded for purposes of determining Required Purchasers at any time.

"**Required Rulings**" shall mean a private letter ruling from the Internal Revenue Service to Parent providing (i) the Contribution and the Distribution (in each case, as defined in the Restructuring Support Agreement) qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Code and (ii) each of the other requested rulings set forth in Part IV of the Energy Future Holdings Corp. Pre-Submission Memorandum for Rulings Under Section 368(a)(1)(G) and 355 as set forth in the Restructuring Support Agreement.

"**Required Specified Consultant Sale**" shall have the meaning provided in Section 2.2(c)(iii).

"**Required Tranche A-3 Notes Sale**" shall have the meaning provided in Section 2.2(c)(i).

"**Required Tranche A-3 Notes Sale Purchase Date**" shall have the meaning provided in Section 2.2(c)(i).

"**Required Tranche A-3 Note Purchasers**" shall mean the Purchasers having or holding a majority of the outstanding aggregate principal amount of the Tranche A-3 Notes (disregarding Tranche A-3 Notes held by Defaulting Purchasers).

"**Restoration Certification**" shall mean, with respect to any Recovery Prepayment Event, a certification made by an Authorized Officer of the Issuer or any Restricted Subsidiary, as applicable, to the Administrative Agent prior to the end of the Reinvestment Period certifying (a) that the Issuer or such Restricted Subsidiary intends to use the proceeds received in connection with such Recovery Prepayment Event to repair, restore or replace the property or assets in respect of which such Recovery Prepayment Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (i) 15 months after the date on which cash proceeds with respect to such Recovery Prepayment Event were received and (ii) 180 days after delivery of such Restoration Certification.

"**Restricted Foreign Subsidiary**" shall mean a Foreign Subsidiary that is a Restricted Subsidiary.

"**Restricted Subsidiary**" shall mean any Subsidiary of the Issuer other than an Unrestricted Subsidiary.

"**Restructuring Conditions**" shall mean the Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof) shall have been confirmed by Confirmation Order of the Bankruptcy Court and all of the conditions as to its effectiveness as set forth in such Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof) other than the Equity Conversion of the Notes

contemplated by Section 4.7 of this Agreement shall have been satisfied or waived contemporaneously with the Equity Conversion.

"**Restructuring Support Agreement**" shall mean that certain Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, by and among the Debtors (as defined therein), the Consenting Creditors (as defined therein), the Consenting Interest Holders (as defined therein), and any Permitted Transferee (as defined therein), as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Ruling Request**" shall mean a written request filed by Parent with the Internal Revenue Service that the Internal Revenue Service issue a private letter ruling to Parent with respect to the Required Rulings.

"**S&P**" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"**Sale Leaseback**" shall mean any transaction or series of related transactions pursuant to which the Issuer or any Restricted Subsidiary (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property and intends to use such property for substantially the same purpose or purposes.

"**Scheduled Dispositions**" shall have the meaning provided in Section 8.4(i).

"**SEC**" shall mean the Securities and Exchange Commission or any successor thereto.

"**Second Lien DIP Notes Offering**" shall mean that certain offer made by the Issuers pursuant to a private offering memorandum, dated [June __], 2014 and related offering documents in connection with the offering of the Tranche A-1 Commitments, as each are amended or supplemented.

"**Second Lien Repayment**" shall have the meaning set forth in Section 7.15(c).

"**Second Lien Tender Offer**" shall mean that certain offer, dated May 9, 2014, made by EFIH and EFIH Finance to purchase the Prepetition Second Lien Notes for cash as a voluntary settlement with respect to the obligations of EFIH and EFIH Finance under the Prepetition Second Lien Notes.

"**Section 7.1 Financials**" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 7.1(a) or (b) together with the accompanying officer's certificate delivered, or required to be delivered, pursuant to Section 7.1(c).

"**Secured Parties**" shall mean the Administrative Agent, the Collateral Agent, each Purchaser, and each sub-agent pursuant to Section 10 appointed by the Administrative Agent with respect to matters relating to the Note Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"**Securities Act**" shall mean the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securitization**" shall mean a public or private offering by a Purchaser or any of its Affiliates or their respective successors and assigns of securities or notes which represent an interest in, or

which are collateralized, in whole or in part, by the Notes and the Purchaser's rights under the Note Documents.

"**Security Agreement**" shall mean the Security Agreement entered into by the Issuer, the other grantors party thereto and the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C.

"**Security Documents**" shall mean, collectively, (a) the Security Agreement, (b) the Pledge Agreement, (c) the Final Order, (d)Section 12 of this Agreement, (e) the Subordination Agreement, and (f) each other security agreement or other instrument or document executed and delivered pursuant to Section 7.11, 7.12 or 7.13 or pursuant to any other such Security Documents to secure or perfect the security interest in any or all of the Obligations. The Security Documents (other than the Final Order) shall supplement, and shall not limit, the grant of a Lien on and security interest in the Collateral pursuant to the Final Order.

"**Selected Partners**" shall mean those certain partners to the Commitment Parties listed on Schedule III of the Commitment Letter.

"**Senior Agent**" shall mean Deutsche Bank AG New York Branch, as Administrative Agent and Collateral Agent for the Senior DIP Agreement.

"**Senior DIP Agreement**" shall mean that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of June [__], 2014, among the Issuer, the Senior Agent, and Deutsche Bank Securities Inc., Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley Senior Funding, Inc., Barclays Bank PLC, RBC Capital Markets and Union Bank, N.A., as joint lead arrangers and joint bookrunners, as amended, supplemented or otherwise modified from time to time

"**Senior DIP Documents**" shall mean the "Credit Documents" as defined in the Senior DIP Agreement.

"**Senior DIP Obligations**" shall mean the "Obligations" as defined in the Senior DIP Agreement.

"**Senior Lenders**" shall mean the "Lenders" as defined in the Senior DIP Agreement.

"**Senior Term Loan**" shall mean the 'Term Loans' as defined in the Senior DIP Agreement.

"**Settling Prepetition Second Lien Obligations Holders**" shall have the meaning assigned to the term "Settling EFIH Second Lien Note Holders" under the Restructuring Support Agreement.

"**Shared Services Agreement**" shall mean the Shared Services Agreement, dated on or about April 1, 2014 between EFH Corporate Services Company and EFIH (on behalf of itself and EFIH Finance), as amended, supplemented or otherwise modified from time to time in a manner that is not, in the Issuer's reasonable judgment, adverse, taken as a whole, to the Purchasers (in such capacity) in any material respect.

"**Specified Default**" shall mean any Event of Default under Section 9.1.

"**Specified Consultants**" shall have the meaning provided in Section 2.2(c)(iii).

"**Specified EFH LBO Senior Notes**" shall mean the Prepetition EFH LBO Senior Notes owned by the Purchasers holding the Tranche A-1 Notes (or owned by such Purchasers' affiliates pursuant to which such Purchasers were allocated Tranche A-1 Notes pursuant to the Second Lien DIP Offering) as of the Closing Date and as such Specified EFH LBO Senior Notes may be subsequently Transferred pursuant to Section 11.6(f).

"**Specified EFH LBO Senior Notes Transfer Percentage**" shall mean a fraction (expressed as a percentage), (i) the numerator of which is the aggregate amount of the Tranche A-1 Commitments (EFH LBO Senior) as of the Closing Date allocated on account of the Specified EFH LBO Senior Notes and (ii) the denominator of which is the aggregate amount of the Specified EFH LBO Senior Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the numerator of such fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFH LBO Senior) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFH LBO Senior) pursuant to Section 2.3(b) or 3.2, respectively, the numerator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFH LBO Senior). As of the Closing Date, the Specified EFH LBO Senior Notes Transfer Percentage is [__]%.

"**Specified EFH LBO Toggle Notes**" shall mean the Prepetition EFH LBO Toggle Notes owned by the Purchasers holding the Tranche A-1 Notes (or owned by such Purchasers' affiliates pursuant to which such Purchasers were allocated Tranche A-1 Notes pursuant to the Second Lien DIP Offering) as of the Closing Date and as such Specified EFH LBO Toggle Notes may be subsequently Transferred pursuant to Section 11.6(f).

"**Specified EFH LBO Toggle Notes Transfer Percentage**" shall mean a fraction (expressed as a percentage), (i) the numerator of which is the aggregate amount of the Tranche A-1 Commitments (EFH LBO Toggle) as of the Closing Date allocated on account of the Specified EFH LBO Toggle Notes and (ii) the denominator of which is the aggregate amount of the Specified EFH LBO Toggle Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the numerator of such fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFH LBO Toggle) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFH LBO Toggle) pursuant to Section 2.3(b) or 3.2, respectively, the numerator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFH LBO Toggle). As of the Closing Date, the Specified EFH LBO Toggle Notes Transfer Percentage is [__]%.

"**Specified Toggle Notes**" shall mean the Prepetition Toggle Notes owned by the Purchasers holding the Tranche A-1 Notes (or owned by such Purchasers' affiliates pursuant to which such Purchasers were allocated Tranche A-1 Notes pursuant to the Second Lien DIP Offering) as of the Closing Date and as such Specified Toggle Notes may be subsequently Transferred pursuant to Section 11.6(f).

"**Specified Toggle Notes Transfer Percentage**" shall mean a fraction (expressed as a percentage), (i) the numerator of which is the aggregate amount of the Tranche A-1 Commitments (EFH Toggle) as of the Closing Date allocated on account of the Specified Toggle Notes and (ii) the denominator of which is the aggregate amount of the Specified Toggle Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the numerator of such

fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFIH Toggle) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFIH Toggle) pursuant to Section 2.3(b) or 3.2, respectively, the numerator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFIH Toggle). As of the Closing Date, the Specified Toggle Notes Transfer Percentage is [__]%.

"**Specified Unexchanged Notes**" shall mean the Prepetition Unexchanged Notes owned by the Purchasers holding the Tranche A-1 Notes (or owned by such Purchasers' affiliates pursuant to which such Purchasers were allocated Tranche A-1 Notes pursuant to the Second Lien DIP Offering) as of the Closing Date and as such Specified Unexchanged Notes may be subsequently Transferred pursuant to Section 11.6(f).

"**Specified Unexchanged Notes Transfer Percentage**" shall mean a fraction (expressed as a percentage), (i) the numerator of which is the aggregate amount of the Tranche A-1 Commitments (EFIH Unexchanged) as of the Closing Date allocated on account of the Specified Unexchanged Notes and (ii) the denominator of which is the aggregate amount of the Specified Unexchanged Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the numerator of such fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFIH Unexchanged) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFIH Unexchanged) pursuant to Section 2.3(b) or 3.2, respectively, the numerator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFIH Unexchanged). As of the Closing Date, the Specified Unexchanged Notes Transfer Percentage is [__]%.

"**Specified Tranche A-3 Note Purchaser**" shall have the meaning provided in Section 2.2(c)(i).

"**Specified Transaction**" shall mean, with respect to any period, any Investment, any Disposition of assets, Permitted Sale Leaseback, incurrence or repayment of Indebtedness, dividend, Subsidiary designation or other event that by the terms of this Agreement requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a "Pro Forma Basis".

"**Sponsors**" shall mean any of Kohlberg Kravis Roberts & Co., L.P., KKR Associates, L.P., TPG Capital, L.P. and Goldman, Sachs & Co., and each of their respective Affiliates, but excluding portfolio companies of any of the foregoing.

"**Stated Maturity**" shall mean, with respect to any installment of interest or principal on any series of Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for payment thereof.

"**Stock**" shall mean shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"**Stock Equivalents**" shall mean all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"**Subordination Agreement**" means that certain Subordination and Intercreditor Agreement attached hereto as <u>Exhibit L</u>, dated as of the Closing Date, by and among the Senior Agent, the Administrative Agent, and acknowledged by Issuer, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**Subsidiary**" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time or is a controlling general partner. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Issuer.

"**Subsidiary Guarantor**" shall mean each Guarantor that is a Subsidiary of the Issuer.

"**Superpriority Claim**" shall mean superpriority administrative expense claim with priority over any and all other obligations, liabilities and indebtedness, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.

"**Swap Termination Value**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Purchaser or any Affiliate of a Purchaser).

"**Tax Order**" shall mean that certain Order Authorizing the Debtors To Pay Certain Prepetition Taxes and Fees, in form and substance reasonably satisfactory to the Initial Commitment Parties on a motion by the EFIH Debtors that is in form and substance reasonably satisfactory to the Required Commitment Parties, as such order or orders may be extended, amended, supplemented or modified in a manner not materially adverse in to the Purchasers.

"**Tax Sharing Agreements**" shall mean (i) the Federal and State Income Tax Allocation Agreement among the Members of the Energy Future Holdings Corp. Consolidated Group, dated May 15, 2012 by and among Energy Future Holdings Corp. and the other parties thereto, (ii) the Oncor Tax Sharing Agreement, and (iii) any other tax sharing agreement reasonably acceptable to the Initial Commitment Parties, each as amended, supplemented or otherwise modified from time to time in a manner that is not, in the Issuer's reasonable judgment, adverse, taken as a whole, to the Purchasers in any material respect.

"**Taxes**" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"**Test Period**" shall mean, for any determination under this Agreement, the four consecutive fiscal quarters of the Issuer then last ended and for which Section 7.1 Financials have been or were required to have been delivered.

"**Tranche A Notes**" shall mean the Tranche A-1 Notes, Tranche A-2 Notes and Tranche A-3 Notes.

"**Tranche A-1 Commitments**" shall mean the Tranche A-1 Commitments (EFIH Toggle), Tranche A-1 Commitments (EFIH Unexchanged), Tranche A-1 Commitments (EFH LBO Senior) and Tranche A-1 Commitments (EFH LBO Toggle). The aggregate amount of Tranche A-1 Commitments outstanding as of the Closing Date is $[____].

"**Tranche A-1 Commitments (EFH LBO Senior)**" shall mean, on the date hereof, the amount set forth opposite such Purchaser's name on Schedule 1.1(a) as such Purchaser's "Tranche A-1 Commitment (EFH LBO Senior)". The aggregate amount of Tranche A-1 Commitments (EFH LBO Senior) outstanding as of the Closing Date is $[____].

"**Tranche A-1 Commitments (EFH LBO Toggle)**" shall mean, on the date hereof, the amount set forth opposite such Purchaser's name on Schedule 1.1(a) as such Purchaser's "Tranche A-1 Commitment (EFH LBO Toggle)". The aggregate amount of Tranche A-1 Commitments (EFH LBO Toggle) outstanding as of the Closing Date is $[____].

"**Tranche A-1 Commitments (EFIH Toggle)**" shall mean, on the date hereof, the amount set forth opposite such Purchaser's name on Schedule 1.1(a) as such Purchaser's "Tranche A-1 Commitment (EFIH Toggle)". The aggregate amount of Tranche A-1 Commitments (EFIH Toggle) outstanding as of the Closing Date is $[____].

"**Tranche A-1 Commitments (EFIH Unexchanged)**" shall mean, on the date hereof, the amount set forth opposite such Purchaser's name on Schedule 1.1(a) as such Purchaser's "Tranche A-1 Commitment (EFIH Unexchanged)". The aggregate amount of Tranche A-1 Commitments (EFIH Unexchanged) outstanding as of the Closing Date is $[____].

"**Tranche A-1 Notes**" shall have the meaning provided in Section 2.2(a).

"**Tranche A-1 Notes (EFH LBO Senior)**" shall mean the Tranche A-1 Notes (EFH LBO Senior) issued pursuant to Section 2.2.

"**Tranche A-1 Notes (EFH LBO Senior) Transfer Percentage**" shall mean (i) a fraction (expressed as a percentage), (a) the numerator of which is the aggregate amount of the Specified EFH LBO Senior Notes and (ii) the denominator of which is the aggregate amount of the Tranche A-1 Commitments (EFH LBO Senior) as of the Closing Date allocated on account of the Specified EFH LBO Senior Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the denominator of such fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFH LBO Senior) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFH LBO Senior) pursuant to Section 2.3(b) or 3.2,

respectively, the denominator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFH LBO Senior). As of the Closing Date, the Tranche A-1 Notes (EFH LBO Senior) Transfer Percentage is [   ]%.

"**Tranche A-1 Notes (EFH LBO Toggle)**" shall mean the Tranche A-1 Notes (EFH LBO Toggle) issued pursuant to Section 2.2.

"**Tranche A-1 Notes (EFH LBO Toggle) Transfer Percentage**" shall mean a fraction (expressed as a percentage), (i) the numerator of which is the aggregate amount of the Specified EFH LBO Toggle Notes and (ii) the denominator of which is the aggregate amount of the Tranche A-1 Commitments (EFH LBO Toggle) as of the Closing Date allocated on account of the Specified EFH LBO Toggle Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the denominator of such fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFH LBO Toggle) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFH LBO Toggle) pursuant to Section 2.3(b) or 3.2, respectively, the denominator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFH LBO Toggle). As of the Closing Date, the Tranche A-1 Notes (EFH LBO Toggle) Transfer Percentage is [   ]%.

"**Tranche A-1 Notes (EFIH Toggle)**" shall mean the Tranche A-1 Notes (EFIH Toggle) issued pursuant to Section 2.2.

"**Tranche A-1 Notes (EFIH Toggle) Transfer Percentage**" shall mean a fraction (expressed as a percentage), (i) the numerator of which is the aggregate amount of the Specified Toggle Notes and (ii) the denominator of which is the aggregate amount of the Tranche A-1 Commitments (EFIH Toggle) as of the Closing Date allocated on account of the Specified Toggle Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the denominator of such fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFIH Toggle) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFIH Toggle) pursuant to Section 2.3(b) or 3.2, respectively, the denominator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFIH Toggle). As of the Closing Date, the Tranche A-1 Notes (EFIH Toggle) Transfer Percentage is [   ]%.

"**Tranche A-1 Notes (EFIH Unexchanged)**" shall mean the Tranche A-1 Notes (EFIH Unexchanged) issued pursuant to Section 2.2.

"**Tranche A-1 Notes (EFIH Unexchanged) Transfer Percentage**" shall mean a fraction (expressed as a percentage), (i) the numerator of which is the aggregate amount of the Specified Unexchanged Notes and (ii) the denominator of which is the aggregate amount of the Tranche A-1 Commitments (EFIH Unexchanged) as of the Closing Date allocated on account of the Specified Unexchanged Notes; provided that upon each Required Post-Funding Partner Sale or Required Specified Consultant Sale, the denominator of such fraction shall be reduced by the aggregate amount of Tranche A-1 Notes (EFIH Unexchanged) sold pursuant to any Required Post-Funding Partner Sale or Required Specified Consultant Sale; provided, further, to the extent that PIK Interest or PIK Fees are added to the principal amount of the Tranche A-1 Notes (EFIH Unexchanged) pursuant to Section 2.3(b) or 3.2, respectively, the denominator of such fraction shall be increased by the aggregate amount of any PIK Interest or PIK Fees added to the principal amount of the Tranche A-1 Notes (EFIH Unexchanged). As of the Closing Date, the Tranche A-1 Notes (EFIH Unexchanged) Transfer Percentage is [   ]%.

"**Tranche A-2 Commitments**" shall mean, on the date hereof, the amount set forth opposite such Purchaser's name on Schedule 1.1(a) as such Purchaser's "Tranche A-2 Commitment". The aggregate amount of Tranche A-2 Commitments outstanding as of the Closing Date is $[____].

"**Tranche A-2 Notes**" shall mean Tranche A-2 Notes issued pursuant to Section 2.2.

"**Tranche A-3 Commitments**" shall mean, on the date hereof, the amount set forth opposite such Purchaser's name on Schedule 1.1(a) as such Purchaser's "Tranche A-3 Commitment". The aggregate amount of Tranche A-3 Commitments outstanding as of the Closing Date is $[____].

"**Tranche A-3 Notes**" shall mean Tranche A-3 Notes issued pursuant to Section 2.2.

"**Tranche B Notes**" shall mean Tranche B Notes issued pursuant to Section 2.2.

"**Transaction Expenses**" shall mean any fees, costs, liabilities or expenses incurred or paid by the Issuer or any of their respective Subsidiaries in connection with the Transactions, this Agreement and the other Note Documents and the transactions contemplated hereby and thereby including in respect of the commitments, negotiation, documentation and closing (and post-closing actions in connection with the Collateral) of the Notes.

"**Transactions**" shall mean, collectively, the transactions contemplated by this Agreement to occur on or around the Closing Date (including the entering into and funding hereunder and the preparation and filing of the Cases), the payment of fees, costs, liabilities and expenses in connection with each of the foregoing, and the consummation of any other transaction connected with the foregoing.

"**Transfer**" shall have the meaning provided in Section 11.6(f).

"**Transfer Percentages**" shall mean the Tranche A-1 Notes (EFIH Toggle) Transfer Percentage, the Tranche A-1 Notes (EFIH Unexchanged) Transfer Percentage, the Tranche A-1 Notes (EFH LBO Senior) Transfer Percentage, the Tranche A-1 Notes (EFH LBO Toggle) Transfer Percentage, the Specified Toggle Notes Transfer Percentage, the Specified Unexchanged Notes Transfer Percentage, the Specified EFH LBO Senior Notes Transfer Percentage and the Specified EFH LBO Toggle Notes Transfer Percentage

"**Transferee**" shall have the meaning provided in Section 11.6(d).

"**Transferee Commitment Party**" shall mean a Selected Partner or other Person otherwise consented to by Parent and EFIH that purchases all or a portion of an Initial Commitment Party's portion of an Investment Commitment in accordance with the terms of the Commitment Letter.

"**UCC**" shall mean the Uniform Commercial Code of the State of New York or the State of Texas, as applicable, or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("**SFAS 87**")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market value of the assets allocable thereto.

"**Unit**" shall mean an individual power plant generation system comprised of all necessary physically connected generators, reactors, boilers, combustion turbines and other prime movers operated together to independently generate electricity.

"**Unrestricted Cash**" shall mean, without duplication, all cash and cash equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by Section 8.2(j) and Liens permitted by Sections 8.2(a), 8.2(i) and 8.2(s) and clauses (i) and (ii) of Section 8.2(m)) included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Issuer and the Restricted Subsidiaries as at such date.

"**Unrestricted Subsidiary**" shall mean (a) each of the Oncor Subsidiaries; (b) the Subsidiaries set forth on Schedule 1.1(c) hereto; (c) any Subsidiary of the Issuer that is formed or acquired after the Closing Date; provided that at such time (or promptly thereafter) the Issuer designates such Subsidiary an Unrestricted Subsidiary in a written notice to the Administrative Agent, (d) any Restricted Subsidiary subsequently designated as an Unrestricted Subsidiary by the Issuer in a written notice to the Administrative Agent; provided that in the case of (c) and (d), (i) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the net book value of the investment therein and such designation shall be permitted only to the extent permitted under Section 8.5 on the date of such designation and (ii) no Default or Event of Default would result from such designation after giving Pro Forma Effect thereto, and (e) each Subsidiary of an Unrestricted Subsidiary. The Issuer may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary, and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if (i) to the extent such Subsidiary has outstanding Indebtedness on the date of such designation, immediately after giving effect to such designation, the Issuer shall be in compliance, on a Pro Forma Basis, after giving effect to the incurrence of such Indebtedness, with the covenant set forth in Section 8.9 and (ii) no Default or Event of Default would result from such re-designation. On or promptly after the date of its formation, acquisition, designation or re-designation, as applicable, each Unrestricted Subsidiary (other than an Unrestricted Subsidiary that is a Foreign Subsidiary) shall have entered into a tax sharing agreement containing terms that, in the reasonable judgment of the Required Commitment Parties, provide for an appropriate allocation of tax liabilities and benefits; provided that the tax sharing agreements described in clauses (i) and (ii) of the definition of "Tax Sharing Agreements" as in effect on the date hereof shall be deemed to satisfy such standard.

"**U.S. Purchaser**" shall have the meaning provided in Section 4.4(h).

"**Voting Stock**" shall mean, with respect to any Person, such Person's Stock or Stock Equivalents having the right to vote for the election of directors or other governing body of such Person under ordinary circumstances.

"**Wages Order**" shall mean the "Final Order (a) Authorizing the Debtors to (i) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (ii) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (iii) Continue Employee and Retiree Benefit Programs, and (b) Modifying the Automatic Stay" as in effect from time to time.

"**Wholly Owned**" shall mean, with respect to the ownership by a Person of a Subsidiary, that all of the Stock of such Subsidiary (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person.

1.2.    Other Interpretive Provisions.  With reference to this Agreement and each other Note Document, unless otherwise specified herein or in such other Note Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Note Document shall refer to such Note Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Note Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(g)    All references to "knowledge" or "awareness" of any Note Party or a Restricted Subsidiary thereof means the actual knowledge of an Authorized Officer of a Note Party or such Restricted Subsidiary.

(h)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(i)    Section headings herein and in the other Note Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Note Document.

(j)    For purposes of determining compliance with any one of Sections 8.1, 8.2, 8.4, 8.5, 8.6, and 8.7, in the event that any Lien, Investment, Indebtedness, Disposition, dividend, affiliate transaction, contractual obligation or prepayment of Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Issuer (and the Issuer shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time.

(k)    The Co-Issuers are jointly and severally liable for any and all of the Issuer's obligations under each Note Document.

1.3.    Accounting Terms.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial

41

calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP.

        (b)      Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Specified Transaction occurs, Unrestricted Cash shall each be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis.

        1.4.     Rounding.  Any financial ratios (if any) required to be maintained by the Issuer pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

        1.5.     References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Note Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Note Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

        1.6.     Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

        1.7.     Timing of Payment of Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

        1.8.     Currency Equivalents Generally.  For purposes of determining compliance under Sections 8.4, 8.5 and 8.6 with respect to any amount denominated in any currency other than Dollars (other than with respect to (a) any amount derived from the financial statements of the Issuer and the Subsidiaries of the Issuer or (b) any Indebtedness denominated in a currency other than Dollars), such amount shall be deemed to equal the Dollar equivalent thereof based on the average Exchange Rate for such other currency for the most recent twelve-month period immediately prior to the date of determination.  For purposes of determining compliance with Sections 8.1, 8.2 and 8.5, with respect to any amount of Indebtedness in a currency other than Dollars, compliance will be determined at the time of incurrence or advancing thereof using the Dollar equivalent thereof at the Exchange Rate in effect at the time of such incurrence or advancement.

        1.9.     Hedging Agreements.  For the avoidance of doubt, it is understood that the following Hedging Agreements shall not be deemed to be speculative or entered into for speculative purposes for any purpose of this Agreement and all other Note Documents: (a) any Hedging Agreement intended, at inception or execution, (i) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Issuer or the Restricted Subsidiaries, (ii) for foreign exchange or currency exchange management, (iii) to manage commodity portfolio exposure associated with changes in interest rates or (iv) to hedge any exposure that the Issuer or the Restricted Subsidiaries may have to counterparties under other Hedging Agreements

such that the combination of such Hedging Agreements is not speculative taken as a whole and (b) any Hedging Agreement entered into by the Issuer or any Restricted Subsidiary (in each case, entered into in the ordinary course of business or consistent with past practice) that was intended, at inception or execution, as applicable, thereof, to unwind or offset any Hedging Agreement described in clauses (a) and (b) of this Section 1.9.

      1.10.   Purchasers. The term "Purchaser" includes their respective successors and permitted assignees pursuant to Section 2.2(c) and Section 11.6.

      SECTION 2.  Purchase and Sale of Notes.

      2.1.   Issuance of Notes.

      (a)   General. On or before the Closing Date, Issuer will have authorized the issuance of $1,900,000,000 in aggregate principal amount of Tranche A Notes and the issuance of $95,000,000 in aggregate principal amount of Tranche B Notes, in each case, to the Purchasers named on the signature pages hereto.

      (b)   Form of Global Notes. Upon request of any Purchaser, Notes shall be issued in global form substantially in the form of Exhibit F hereto (including, in each case, the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note" attached thereto and each shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Administrative Agent. The Notes may have notations, legends or endorsements required by law, stock exchange rules or usage. Each Note shall be dated the date of its authentication.

      2.2.   Purchase and Sale of Notes; Closing.

      (a)   Purchase and Sale of Notes. In reliance upon the Purchasers' representations and warranties made in Section 2.5, and subject to the terms and express conditions set forth herein, on the Closing Date, Issuer hereby agrees (i) to issue and to sell to each Purchaser the aggregate principal amount of Tranche A-1 Notes, Tranche A-2 Notes and Tranche A-3 Notes set forth opposite such Purchaser's name on Schedule 2.2(a) hereto, at a purchase price of $0.01 for each $0.01 in the aggregate principal amount of Tranche A-1 Notes, Tranche A-2 Notes and Tranche A-3 Notes, respectively and (ii) to issue to each Purchaser the aggregate amount of Tranche B Notes set forth opposite such Purchaser's name on Schedule 2.2(a), in the aggregate amount of the Closing Fee (the "**Tranche B Notes**"). In reliance upon the representations and warranties of Issuer contained in Section 6, on the Closing Date, and subject to the terms and express conditions set forth herein, each Purchaser hereby agrees to purchase from Issuer (i)(A) the aggregate principal amount of Tranche A-1 Notes (EFIH Toggle) in an amount not to exceed its Tranche A-1 Commitment (EFIH Toggle) as set forth opposite such Purchaser's name on Schedule 1.1(a) hereto (the "**Tranche A-1 Notes (EFIH Toggle)**"), (B) the aggregate principal amount of Tranche A-1 Notes (EFIH Uenxchanged) in an amount not to exceed its Tranche A-1 Commitment (EFIH Unexchanged) as set forth opposite such Purchaser's name on Schedule 1.1(a) hereto (the "**Tranche A-1 Notes (EFIH Unexchanged)**"), (C) the aggregate principal amount of Tranche A-1 Notes (EFH LBO Senior) in an amount not to exceed its Tranche A-1 Commitment (EFH LBO Senior) as set forth opposite such Purchaser's name on Schedule 1.1(a) hereto (the "**Tranche A-1 Notes (EFH LBO Senior)**") and (D) the aggregate principal amount of Tranche A-1

Notes (EFH LBO Toggle) in an amount not to exceed its Tranche A-1 Commitment (EFH LBO Toggle) as set forth opposite such Purchaser's name on Schedule 1.1(a) hereto (the "**Tranche A-1 Notes (EFH LBO Toggle)**" and, together with the Tranche A-1 Notes (EFIH Toggle), Tranche A-1 Notes (EFIH Unexchanged) and Tranche A-1 Note (EFH LBO Senior), the "**Tranche A-1 Notes**") (ii) the aggregate principal amount of Tranche A-2 Notes in an amount not to exceed its Tranche A-2 Commitment as set forth opposite such Purchaser's name on Schedule 1.1(a) hereto (the "**Tranche A-2 Notes**") and (iii) the aggregate principal amount of Tranche A-3 Notes in an amount not to exceed its Tranche A-3 Commitment as set forth opposite such Purchaser's name on Schedule 1.1(a) hereto (the "**Tranche A-3 Notes**"). Each of the Purchasers and Issuer agree that, for federal income tax purposes, the issue price of each Note is equal to its purchase price as set forth on Schedule 2.2(a). The obligations of each Purchaser under this Agreement are several and not joint.

(b)    Closing.[2]

(i)    By no later than the expiration date (the "**Offer Expiration Date**") of the Second Lien DIP Notes Offering, each Purchaser of Tranche A-1 Notes shall deliver the purchase price for its Tranche A-1 Notes in immediately available funds to a designated account of the subscription agent for such offer pursuant to the Issuer's instructions (the "**Subscription Account**").

(ii)    Following the Offer Expiration Date, the Issuer shall deliver (A) a notice to each Purchaser of Tranche A-2 Notes that specifies the aggregate amount of Tranche A-2 Notes to be issued and purchased and instructs each such Purchaser to deliver the purchase price for its Tranche A-2 Notes in immediately available funds to the Subscription Account and (B) a notice to each Purchaser of Tranche A-3 Notes that specifies the aggregate amount of Tranche A-3 Notes to be issued and purchased and instructs each such Purchaser to deliver the purchase price for its Tranche A-3 Notes in immediately available funds to the Subscription Account.

(iii)    The Issuer shall deliver to the Administrative Agent at the Administrative Agent's Office an issuance date certificate in the form of Exhibit M (an "**Issuance Date Certificate**") (or telephonic notice promptly confirmed by delivery of an Issuance Date Certificate) prior to 10:00 a.m. (New York City time) on the date of the proposed Issuance. Such Issuance Date Certificate shall specify (i) the aggregate principal amount of Notes to be issued and purchased and (ii) the date of the Issuance, which must be the Closing Date. Without in any way limiting the obligation of the Issuer to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Issuer.

(iv)    No later than 1:00 p.m. (New York City time), on the date of Issuance specified in the Issuance Date Certificate, the Issuer will cause the funds in the Subscription Account to be delivered directly into the Administrative Agent's Disbursement Account and thereupon all proceeds funded shall be deemed payments made by the Purchasers on account of the Notes for all purposes hereunder and under all other Note Documents (including, without limitation, with respect to the accrual of interest at the interest rate set forth in Section 2.3 herein) and shall be disbursed to the Issuers in accordance with, subject to and to the extent provided in, Section 2.2. The Administrative Agent will make available to the Issuer, by depositing to an account

---

[2] NTD: Funding mechanics subject to further negotiations between the Issuers and the Purchasers.

designated by the Issuer to the Administrative Agent the aggregate of the amounts so made available in Dollars. The Administrative Agent shall be entitled to pay interest, fees, expenses and indemnification amounts as set forth herein which are due and payable to the Agents or Purchasers from amounts on deposit in the Agent's Disbursement Account. The Administrative Agent may, but shall have no obligation to, disburse any amounts in the Disbursement Account to the Issuer before all of the proceeds from each Purchaser are so deposited into the Disbursement Account. It is agreed and understood that the Note Parties shall have no right, title or interest in amounts on deposit in Agent's Disbursement Account.

     (c)     <u>Required Sales</u>.

     (i)     If (1) the Internal Revenue Service shall have denied the Ruling Request or shall have informed Parent or the EFIH Debtors or their counsel, whether orally or in writing, of its decision not to issue one or more of the Required Rulings and (2) the Oncor TSA Amendment has not been approved by the Bankruptcy Court at such time, the Required Commitment Parties shall be entitled to require any Purchaser holding Tranche A-3 Notes, and each Purchaser holding Tranche A-3 Notes agrees, to sell its Tranche A-3 Notes to the Commitment Parties (the "**Required Tranche A-3 Notes Sale**") for a purchase price equal to the sum of (A) the par value of the Tranche A-3 Notes plus accrued and unpaid interest (including any PIK Interest), which amount shall by payable on the date the Required Tranche A-3 Notes Sale is consummated (the "**Required Tranche A-3 Notes Sale Purchase Date**"), (B) in the event such sale is consummated before the payment of the PIK Fee, 10% of the par amount of its Tranche A-3 Notes plus accrued and unpaid PIK Interest, if any (but not, for the avoidance of doubt, any accrued and unpaid interest payable in cash with respect to the Tranche A-3 Notes), which amount shall be payable on the Required Tranche A-3 Notes Sale Purchase Date and (C) if the Issuer shall pay any Prepayment Fee after the Required Tranche A-3 Notes Sale Purchase Date, the pro rata portion of the Prepayment Fee shall be paid by the Issuer to the Purchaser required to sell its Tranche A-3 Notes pursuant to this <u>Section 2.2(c)(i)</u> (the "**Specified Tranche A-3 Note Purchaser**") on the date that any such Prepayment Fee is subsequently paid. The Required Tranche A-3 Notes Sales shall otherwise satisfy the requirements set forth in <u>Section 11.6</u>.

     (ii)     At any time prior to the Maturity Date, the Required Commitment Parties shall be entitled to require the Purchasers holding Tranche A-1 Notes and Tranche A-2 Notes (other than Selected Partners, Post-Funding Partners or Specified Consultants), and the Purchasers holding Tranche A-1 Notes or Tranche A-2 Notes (other than Selected Partners, Post-Funding Partners or Specified Consultants) each hereby agrees, severally and not jointly, to sell its pro rata portion of its Tranche A-1 Notes and Tranche A-2 Notes ("**Required Post-Funding Partner Sales**") to certain partners selected by the Required Commitment Parties (the "**Post-Funding Partners**") for a purchase price not less than the par value of such Tranche A-1 Notes and Tranche A-2 Notes plus accrued and unpaid interest (including PIK Interest) in an amount such that after giving effect to all such Required Post-Funding Partner Sales, the Post-Funding Partners shall not own, in the aggregate, more than $400,000,000 of the principal amount of the Notes, after taking into effect all Notes owned, if any, by the Post-Funding Partners immediately prior to the Required Post-Funding Partner Sale acquired pursuant to this <u>Section 2.2(c)(ii)</u>; <u>provided</u> any Tranche A-1 Notes acquired by the Post-Funding Partners pursuant to this <u>Section 2.2(c)(ii)</u> shall be surrendered and exchanged for Tranche A-2 Notes; <u>provided</u>, <u>further</u>, (A) Tranche A-2 Notes held by Selected Partners and issued pursuant to the Commitments transferred to such Selected Partners in accordance with the Commitment Letter, (B) Tranche A-2 Notes acquired by the Post-Funding Partners pursuant to this <u>Section 2.2(c)(ii)</u> and (C) Tranche A-2 Notes acquired by the Specified Consultants pursuant to <u>Section 2.2(c)(iii)</u>, shall not be required to be sold pursuant to this <u>Section 2.2(c)(ii)</u>. The Required Post-Funding Partner Sales shall otherwise satisfy the

requirements set forth in <u>Section 11.6</u>. Upon the consummation of a Required Post-Funding Sale, the Administrative Agent shall notify the Purchasers of the new Transfer Percentages.

(iii)     At any time prior to the Maturity Date, the Required Commitment Parties shall be entitled to require the Purchasers holding Tranche A-1 Notes and Tranche A-2 Notes (other than Selected Partners, Post-Funding Partners or Specified Consultants), and the Purchasers holding Tranche A-1 Notes or Tranche A-2 Notes (other than Selected Partners, Post-Funding Partners or Specified Consultants) each hereby agrees, severally but not jointly, to sell its pro rata portion of its Tranche A-1 Notes and Tranche A-2 Notes ("**Required Specified Consultant Sales**") to certain consultants selected by the Administrative Agent or the Required Commitment Parties (as specified by such Person, the "**Specified Consultants**") for a purchase price not less than the par value of such Tranche A-1 Notes and Tranche A-2 Notes less interest paid in cash on such Notes in an amount such that after giving effect to all such Required Specified Consultant Sales, the Specified Consultants shall not own, in the aggregate, more than $100,000,000 of the principal amount of the Notes, after taking into effect all Notes owned, if any, by the Specified Consultants immediately prior to the Required Specified Consultant Sales acquired pursuant to this <u>Section 2.2(c)(iii)</u>; <u>provided</u> any Tranche A-1 Notes acquired by the Specified Consultants pursuant to this <u>Section 2.2(c)(iii)</u> shall be surrendered and exchanged for Tranche A-2 Notes; <u>provided, further,</u> (A) Tranche A-2 Notes held by Selected Partners and issued pursuant to the Commitments transferred to such Selected Partners in accordance with the Commitment Letter, (B) Tranche A-2 Notes acquired by the Post-Funding Partners pursuant to <u>Section 2.2(c)(ii)</u> and (C) Tranche A-2 Notes acquired by the Specified Consultants pursuant to this <u>Section 2.2(c)(iii)</u>, shall not be required to be sold pursuant to this <u>Section 2.2(c)(iii)</u>. The Required Specified Consultant Sales shall otherwise satisfy the requirements set forth in <u>Section 11.6</u>. Upon the consummation of a Required Specified Consultant Sale, the Administrative Agent shall notify the Purchasers of the new Transfer Percentages.

(d)     If the Restructuring Support Agreement has been terminated and the Equity Conversion has not been consummated and made effective, the Tranche B Notes shall automatically convert to Tranche A-2 Notes ("**Converted Tranche A-2 Notes**") and, for the avoidance of doubt, interest on the unpaid principal balance of the Converted Tranche A-2 Notes shall bear interest, commencing on the date of such conversion, in accordance with <u>Section 2.3</u>.

2.3.     <u>Interest</u>.

(a)     Issuer shall pay interest on the unpaid principal balance of the Tranche A Notes from the date hereof until fully paid at a rate per annum equal to eight percent (8.0%). Interest payable pursuant to this <u>Section 2.3(a)</u> shall be payable in cash on each Interest Payment Date. For the avoidance of doubt, no interest shall be payable on Tranche B Notes.[3]

(b)     If by July 28, 2014, the Bankruptcy Court has not entered an order approving (i) an amendment to the Oncor Tax Sharing Agreement pursuant to which any payments required to be made to Parent under the Oncor Tax Sharing Agreement are directed to be paid to EFIH or (ii) the assignment of such payments under the Oncor Tax Sharing Agreement to EFIH (collectively, the "**Oncor TSA Amendment**"), Issuer shall pay, at the time, and in the manner set forth in <u>Section 2.3(d)</u> below, additional interest on the unpaid principal balance of the Tranche A Notes from such date until the date the Oncor TSA Amendment is approved by the Bankruptcy Court, at a rate per annum equal to four

---

[3] NTD: Any pre-funded amounts will accrue interest commencing on the date that such funds are required to be funded if the Closing Date occurs.

percent (4.0%), which interest shall be paid in kind (and not in cash) by being added to the principal amount of the Notes on each Interest Payment Date (the "**PIK Interest**"). Upon the addition of any PIK Interest to the principal amount of the Tranche A-1 Notes on any Interest Payment Date, the Administrative Agent shall notify the Purchasers of the new Transfer Percentages.

(c)     If all or a portion of (i) the principal amount of the Notes or (ii) any interest payable on the Notes or any other amount hereunder shall not be paid when due (whether at the stated maturity, by acceleration, in cash, in kind or otherwise), and an Event of Default shall exist as a result of such failure to pay, then upon the giving of written notice by the Administrative Agent (at the direction of the Required Purchasers or, solely with respect to the Tranche A-3 Notes, at the direction of the Required Tranche A-3 Note Purchasers) to the Issuer, such overdue amount shall bear interest at a rate *per annum* (the "**Default Rate**") that are the rates described in Section 2.3(a) and, if applicable, Section 2.3(b) plus 2% from the date of such non-payment to the date on which such amount is paid in full (after as well as before judgment).

(d)     Interest (including PIK Interest) shall be payable quarterly in arrears on the last Business Day (each, an "**Interest Payment Date**") of each fiscal quarter (or portion thereof); provided that, subject to the terms of the Subordination Agreement, interest at the Default Rate shall be payable earlier on demand; provided that, any accrued and unpaid PIK Interest payable pursuant to Section 2.3(b) shall be paid in kind (and not in cash) by being added to the principal amount of the Notes on each Interest Payment Date and the date the Bankruptcy Court enters an order approving the Oncor TSA Amendment.

(e)     All accrued and unpaid interest on the Notes shall be paid in full in cash upon the earlier of (A) the Maturity Date or (B) the payment or prepayment of the outstanding principal amount of the Notes in full or in part or, if payment of the principal amount of the Notes in full is not paid when due, thereafter on demand (including through the Equity Conversion).

2.4.     Repayment of Notes; Purchasers' Evidence of Debt.

(a)     Subject to the Equity Conversion and the terms of the Subordination Agreement, the Issuer shall repay to the Administrative Agent, for the benefit of the applicable Purchasers, on the Maturity Date, the then outstanding Notes.

(b)     Each Purchaser shall maintain on its internal records an account or accounts evidencing the Indebtedness of Issuer to such Purchaser, including the amounts of the Notes made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Issuer, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect Issuer's Obligations in respect of any applicable Notes; and provided further, in the event of any inconsistency between the Register and any Purchaser's records, the recordations in the Register shall govern.

(c)     The Administrative Agent shall maintain the Register pursuant to Section 11.6(b)(iv), and a subaccount for each Purchaser, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Note issued hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Issuer to each Purchaser hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder from the Issuer and each Purchaser's share thereof.

(d)     The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (c) and (d) of this Section 2.4 shall, to the extent permitted by Applicable Law, be

prima facie evidence of the existence and amounts of the obligations of the Issuer therein recorded; provided, however, that the failure of any Purchaser or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Issuer to repay (with applicable interest) the Notes issued by the Issuer to such Purchaser in accordance with the terms of this Agreement.

2.5.    Representations and Warranties of Purchasers. Each Purchaser represents and warrants to the Issuer, as follows:

(a)    No Public Sale or Distribution. Each Purchaser is acquiring the Notes for its own account, for investment purposes, and not with a view to or for sale in connection with any distribution thereof in violation of applicable federal or state securities laws, and such Purchaser does not have a present arrangement or agreement to effect any distribution of the Notes to or through any person or entity.

(b)    Accredited Investor Status. Each Purchaser is either (A) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, (B) an "institutional accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act, or (C) non U.S. persons (within the meaning of Regulation S under the Securities Act) out of the United States. By reason of its own business and financial experience, each Purchaser has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of their respective investments in the Notes and have the capacity to protect its own interests in connection with the purchase of the Notes contemplated hereby and is able to bear the economic risk of the loss of such investment.

(c)    Reliance on Exemptions. Each Purchaser understands that the Notes are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Issuer is relying in part upon the truth and accuracy of, and such Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of such Holder to acquire the Notes.

(d)    Information. Each Purchaser acknowledges that neither the Issuer nor any person representing the Issuer has made any representation to it with respect to the Issuer or the offering of the Notes, other than the representations and warranties of the Issuer contained in Section 6 hereof. Such Purchaser and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Issuer and its Subsidiaries and materials relating to the offer and sale of the Notes hereunder which have been requested by such Purchaser. Such Purchaser and its advisors, if any, have been afforded the opportunity to ask questions of the Issuer. Such Purchaser understands that its investment in the Notes hereunder involves a high degree of risk and that it is able to afford a complete loss of such investment. Such Purchaser has independently evaluated the merits of its decision to acquire the Notes hereunder, and such Purchaser confirms that it has not relied on the advice of any other Purchaser's business and/or legal counsel in making such decision. Such Purchaser understands that nothing in this Agreement or any other materials presented by or on behalf of the Issuer or their Subsidiaries to the Purchaser in connection with the acquisition of the Notes hereunder constitutes legal, tax or investment advice. Such Purchaser has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Notes hereunder. As of the date hereof, such Purchaser is not aware of any conditions or circumstances that would cause any of the Issuer's representations in Section 6 hereof not to be true and correct in all material respects. The foregoing provisions shall not be deemed to be a waiver of any of the rights that a Purchaser may have under this agreement.

2.6.    No Governmental Review.  Each Purchaser understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Notes or the fairness or suitability of the investment in the Notes, nor have such authorities passed upon or endorsed the merits of the offering of the Notes.

2.7.    Transfer or Resale of the Notes.  Each Purchaser understands that: (i) the Notes have not been and are not being registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder or pursuant to an exemption from such registration and (B) offered for sale, sold, assigned or transferred in compliance with the provisions set forth in Section 2.2(c) or Section 11.6 hereunder; and (ii) neither the Issuer nor any other person is under any obligation to register the Notes under the Securities Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder.

2.8.    Legends.  Such Purchaser understands that each Global Note shall bear any legend as required by the "blue sky" laws of any state and a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such Global Note):

THE SECURITIES REPRESENTED BY THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) A TRANSACTION THAT IS EXEMPT FROM REGISTRATION UNDER SAID ACT INCLUDING PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT AND (II) UNLESS OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN ACCORDANCE WITH THE PROVISIONS OF THAT CERTAIN SECOND LIEN SUBORDINATED SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT, DATED [_____], 2014.

SECTION 3.    Fees.

3.1.    Agent Fees.  The Issuer agrees to pay directly to the Agents for its own account the agent fees as set forth in the Fee Letter.

3.2.    PIK Fees.  If the Bankruptcy Court has not entered an order approving the Oncor TSA Amendment by April 29, 2015, the Issuer shall pay on such date a one-time fee equal to ten percent (10%) of the outstanding principal amount of the Notes (the "**PIK Fee**") to the Purchasers, which PIK Fee shall be paid in kind (and not in cash) by being added to the principal balance of the Notes on April 29, 2015.  Following the payment of the PIK Fees, all references in this Agreement to the aggregate principal amount of the Notes shall include any increased principal amount of Notes issued as a result of the payment of the PIK Fees.  Upon the addition of the PIK Fee to the principal balance of the Tranche A-1 Notes, the Administrative Agent shall notify the Purchasers of the new Transfer Percentages.

3.3.    Closing Fee.  On the Closing Date, the Issuer shall pay a fee in an amount equal to $95,000,000 (the "**Closing Fee**") to the Commitment Parties, which fee shall be paid in the form of the Tranche B Notes issued by the Issuer to the Commitment Parties.

3.4.    Participation Fee.  Solely to the extent there are Tranche A-3 Notes issued on the Closing Date, on or prior to the Closing Date, the Issuer shall pay a fee in an amount equal to $11,250,000 (the "**Participation Fee**") in cash to the Initial Tranche A-3 Note Purchasers.

SECTION 4.  Payments.

4.1.    Voluntary Prepayments.  Subject to the terms of the Subordination Agreement, the Issuer shall have the right to prepay Notes, in whole, from time to time on the following terms and conditions: (a) the Issuer shall give the Administrative Agent at the Administrative Agent's Office written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment and the amount of such prepayment, which notice shall be given by the Issuer no later than 1:00 p.m. (New York City time) (x) one Business Day prior to the date of such prepayment and shall promptly be transmitted by the Administrative Agent to each of the relevant Purchasers and (b) any prepayment pursuant to this Section 4.1 shall be accompanied by a prepayment premium of $380,000,000 (the "**Prepayment Fee**") to be allocated ratably for all prepaid Notes; provided, that if a Required Tranche A-3 Notes Sale has occurred prior to any prepayment of the Notes, the Issuer shall pay on such date the ratable amount of such  Prepayment Fee in cash to the Specified Tranche A-3 Note Purchaser. At the Issuer's election in connection with any prepayment pursuant to this Section 4.1, such prepayment shall not be applied to any Note of a Defaulting Purchaser. For the avoidance of doubt, (i) the Identified Prepayment shall not constitute a voluntary prepayment for purposes of this Section 4.1 and shall not include any prepayment premium and (ii) no partial prepayment of the Notes shall be permitted.

4.2.    Mandatory Prepayments.

(a)    Note Prepayments.  Subject to the terms of the Subordination Agreement and Section 4.2(c), following the payment in full in cash of the Senior DIP Obligations, on each occasion that a Prepayment Event occurs, the Issuer shall, within three Business Days after the occurrence of such Prepayment Event (or, in the case of Deferred Net Cash Proceeds, within three Business Days after the Deferred Net Cash Proceeds Payment Date), prepay (subject to Section 9.14 when applicable), Notes in a principal amount equal to 100% of the Net Cash Proceeds from such Prepayment Event. Prior to making such prepayment, the Issuer shall give the Administrative Agent at the Administrative Agent's Office written notice of each Prepayment Event (or the receipt of Deferred Net Cash Proceeds) no later than 1:00 p.m. (New York City time) two Business Days after the occurrence of such Prepayment Event (or the receipt of Deferred Net Cash Proceeds), specifying in such notice the amount of such prepayment and Prepayment Event that has triggered such prepayment.

(b)    Minimum Amount.  No prepayment shall be required pursuant to Section 4.2(a) in the case of any Prepayment Event yielding Net Cash Proceeds of less than $5,000,000 in the aggregate.

(c)    Foreign Net Cash Proceeds.  Notwithstanding any other provisions of this Section 4.2, (i) to the extent that any or all of the Net Cash Proceeds from a Recovery Prepayment Event (a "**Foreign Recovery Event**") of, or any Disposition by, a Restricted Foreign Subsidiary giving rise to an Asset Sale Prepayment Event (a "**Foreign Asset Sale**") are prohibited or delayed by applicable local law from being repatriated to the United States, such portion of the Net Cash Proceeds so affected will not be required to be applied to repay Notes at the times provided in this Section 4.2 but may be retained by the applicable Restricted Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Issuer hereby agreeing to cause the applicable Restricted Foreign Subsidiary to promptly take all actions required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Notes as required pursuant to this Section 4.2 and (ii) to the extent that the Issuer has determined in good faith that repatriation of any of or all the Net Cash Proceeds of any Foreign Recovery Event on any Foreign Asset Sale would have a material adverse tax consequence with respect to such Net Cash

Proceeds, the Net Cash Proceeds so affected may be retained by the applicable Restricted Foreign Subsidiary; provided that, in the case of this clause (ii), on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to Section 4.2(a), (x) the Issuer applies an amount equal to such Net Cash Proceeds to such reinvestments or prepayments as if such Net Cash Proceeds had been received by the Issuer rather than such Restricted Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds had been repatriated (or, if less, the Net Cash Proceeds that would be calculated if received by such Foreign Subsidiary) or (y) such Net Cash Proceeds are applied to the repayment of Indebtedness of a Restricted Foreign Subsidiary.

4.3.    Method and Place of Payment.

(a)    Except as otherwise specifically provided herein, all payments under this Agreement and the Notes shall be made by the Issuer without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Purchasers entitled thereto, not later than 2:00 p.m. (New York City time), in each case, on the date when due and to the extent paid in cash shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by notice to the Issuer, it being understood that written or facsimile notice by the Issuer to the Administrative Agent to make a payment from the funds in the Issuer's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account. All repayments or prepayments of any Notes (whether of principal, interest or otherwise) hereunder and all other payments under each Note Document shall be made in Dollars. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. (New York City time) or, otherwise, on the next Business Day) like funds relating to the payment of principal or interest or fees ratably to the Purchasers entitled thereto.

(b)    Any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

4.4.    Net Payments.

(a)    Any and all payments made by or on behalf of the Issuer or any Guarantor under this Agreement or any other Note Document shall be made free and clear of, and without deduction or withholding for or on account of, any Indemnified Taxes; provided that if the Issuer or any Guarantor or the Administrative Agent shall be required by Applicable Law to deduct or withhold any Indemnified Taxes from such payments, then (i) the sum payable by the Issuer or any Guarantor shall be increased as necessary so that after making all required deductions and withholdings (including deductions or withholdings applicable to additional sums payable under this Section 4.4) the Administrative Agent, the Collateral Agent or any Purchaser, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Issuer or such Guarantor or the Administrative Agent shall make such deductions or withholdings and (iii) the Issuer or such Guarantor or the Administrative Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with Applicable Law. Whenever any Indemnified Taxes are payable by the Issuer or such Guarantor, as promptly as possible thereafter, the Issuer or Guarantor shall send to the Administrative Agent for its own account or for the account of such

51

Purchaser, as the case may be, a certified copy of an original official receipt (or other evidence acceptable to such Purchaser, acting reasonably) received by the Issuer or such Guarantor showing payment thereof.

(b)    The Issuer shall timely pay and shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Purchaser with regard to any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)    The Issuer shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Purchaser within fifteen Business Days after written demand therefor, for the full amount of any Indemnified Taxes imposed on the Administrative Agent, the Collateral Agent or such Purchaser as the case may be, on or with respect to any payment by or on account of any obligation of the Issuer or any Guarantor hereunder or under any other Note Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 4.4) and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth reasonable detail as to the amount of such payment or liability delivered to the Issuer by a Purchaser, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Purchaser shall be conclusive absent manifest error.

(d)    Any Non-U.S. Purchaser that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Issuer is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Note Document shall, to the extent it is legally able to do so, deliver to the Issuer (with a copy to the Administrative Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Issuer or the Administrative Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. A Purchaser's obligation under the prior sentence shall apply only if the Issuer or the Administrative Agent has made a request for such documentation. In addition, any Purchaser, if requested by the Issuer or the Administrative Agent shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Issuer or the Administrative Agent as will enable the Issuer or the Administrative Agent to determine whether or not such Purchaser is subject to backup withholding or information reporting requirements.

(e)    Each Non-U.S. Purchaser with respect to any Note made to the Issuer shall, to the extent it is legally entitled to do so:

(i)    deliver to the Issuer and the Administrative Agent, prior to the date on which the first payment to the Non-U.S. Purchaser is due hereunder, two original copies of (x) in the case of a Non-U.S. Purchaser claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN (together with a certificate substantially in the form of Exhibit G representing that such Non-U.S. Purchaser is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Issuer, any interest payment received by such Non-U.S. Purchaser under this Agreement or any other Note Document is not effectively connected with the conduct of a trade or business in the United States and is not a controlled foreign corporation related to the Issuer (within the meaning of Section 864(d)(4) of the Code)), (y) Internal Revenue Service Form W-8BEN or Form W-8ECI, in each case properly completed and duly executed by such Non-U.S. Purchaser claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax on payments by the Issuer under this Agreement or (z) if a Non-U.S. Purchaser

52

does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Purchaser under any of the Note Documents (for example, in the case of a typical participation or where Non-U.S. Purchaser is a pass through entity) Internal Revenue Service Form W-8IMY and all necessary attachments (including the forms described in clauses (x) and (y) above, as required); and

(ii)    deliver to the Issuer and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Issuer.

If in any such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Non-U.S. Purchaser from duly completing and delivering any such form with respect to it, such Non-U.S. Purchaser shall promptly so advise the Issuer and the Administrative Agent.

(f)    If any Purchaser, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it had received and retained a refund of an Indemnified Tax (including an Other Tax) for which a payment has been made by the Issuer pursuant to this Agreement, which refund in the good faith judgment of such Purchaser, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Issuer, then the Purchaser, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Issuer for such amount (net of all out-of-pocket expenses of such Purchaser, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Purchaser, Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any taxes imposed on the refund) than it would have been in if the payment had not been required; provided that the Issuer, upon the request of the Purchaser, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Issuer (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Purchaser, the Administrative Agent or the Collateral Agent in the event the Purchaser, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority. A Purchaser, the Administrative Agent or the Collateral Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim. Neither the Purchaser, the Administrative Agent nor the Collateral Agent shall be obliged to disclose any information regarding its tax affairs or computations to any Note Party in connection with this clause (f) or any other provision of this Section 4.4.

(g)    If the Issuer determines that a reasonable basis exists for contesting a Tax, each Purchaser or Agent, as the case may be, shall use reasonable efforts to cooperate with the Issuer as the Issuer may reasonably request in challenging such Tax. Each Purchaser and Agent agrees to use reasonable efforts to cooperate with the Issuer as the Issuer may reasonably request to minimize any amount payable by the Issuer or any Guarantor pursuant to this Section 4.4. The Issuer shall indemnify and hold each Purchaser and Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Issuer pursuant to this Section 4.4(g). Nothing in this Section 4.4(g) shall obligate any Purchaser or Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(h)    Each Purchaser with respect to any portion of the Note issued by the Issuer that is a United States person under Section 7701(a)(30) of the Code and Agent (each, a "U.S. Purchaser") shall

deliver to the Issuer and the Administrative Agent two United States Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such Purchaser or Agent is exempt from United States backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete, (iii) after the occurrence of a change in such Agent's or Purchaser's circumstances requiring a change in the most recent form previously delivered by it to the Issuer and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Issuer or the Administrative Agent.

(i)     If a payment made to any Purchaser would be subject to U.S. federal withholding Tax imposed under FATCA if such Purchaser were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), such Purchaser shall deliver to the Issuer and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Issuer or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Administrative Agent and the Issuer as may be necessary for the Administrative Agent and the Issuer to comply with their obligations under FATCA, to determine whether such Purchaser has or has not complied with such Purchaser's FATCA obligations and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this subsection (i), "FATCA" shall include any amendments after the date of this Agreement.

(j)     The agreements in this <u>Section 4.4</u> shall survive the termination of this Agreement and the payment of the Notes and all other amounts payable hereunder.

4.5.    <u>Computations of Interest</u>. Interest on the Note shall be calculated on the basis of a 360-day year for the actual days elapsed.

4.6.    <u>Limit on Rate of Interest</u>.

(a)     <u>No Payment Shall Exceed Lawful Rate</u>. Notwithstanding any other term of this Agreement, the Issuer shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)     <u>Payment at Highest Lawful Rate</u>. If the Issuer is not obliged to make a payment that it would otherwise be required to make, as a result of <u>Section 4.6(a)</u>, the Issuer shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)     <u>Adjustment if Any Payment Exceeds Lawful Rate</u>. If any provision of this Agreement or any of the other Note Documents would obligate the Issuer to make any payment of interest or other amount payable to any Purchaser in an amount or calculated at a rate that would be prohibited by any Applicable Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Issuer to the affected Purchaser under <u>Section 2.3</u>.

(d)     <u>Spreading</u>. In determining whether the interest hereunder is in excess of the amount or rate permitted under or consistent with any Applicable Law, the total amount of interest shall be spread throughout the entire term of this Agreement until its payment in full.

(e)    Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Purchaser shall have received from the Issuer an amount in excess of the maximum permitted by any Applicable Law, then the Issuer shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Purchaser in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Purchaser to the Issuer.

### 4.7.    Equity Conversion.[4]

(a)    General.  On the Effective Date, pursuant to the Reorganization Plan as set forth in clause (i) of the definition of Acceptable Reorganization Plan, upon the receipt by the Administrative Agent of a certificate executed by an officer of Parent certifying the satisfaction or waiver of the Required EFIH Unsecured Consenting Creditors of the Restructuring Conditions and the conditions set forth in Section 4.7(e) (such date, the "**Conversion Date**"), all of the issued and outstanding Notes shall, without any action on the part of the Purchasers thereof, mandatorily convert into shares of Reorganized EFH Common Stock at the Conversion Rate in accordance with the terms and conditions contained in this Section 4.7 (the "**Equity Conversion**").

(b)    Equity Conversion.  Upon satisfaction of the conditions set forth in Section 4.7(e) and in accordance with the Reorganization Plan as set forth in clause (i) of the definition of Acceptable Reorganization Plan, Parent shall issue and deliver an aggregate amount of 177,658,788 shares of Reorganized EFH Common Stock on account of the Notes outstanding as of the Closing Date, plus an additional 89,052 shares of Reorganized EFH Common Stock for each $1.0 million dollars of aggregate principal amount of the Notes outstanding on the Closing Date in excess of $1.995 million, and less 89,052 shares of Reorganized EFH Common Stock for each $1.0 million of aggregate principal amount of the Notes outstanding on the Closing Date less than $1.995 million.  Upon the Equity Conversion, Reorganized EFH shall deliver to the Purchasers in respect of each $1,000.00 principal amount of Notes, a number of shares of Reorganized EFH Common Stock equal to the Conversion Rate, with fractional shares being rounded up or down in accordance with Section 4.7(g).

(c)    Equity Diffusion Right.  Pursuant to the Reorganization Plan as set forth in clause (i) of the definition of Acceptable Reorganization Plan, each holder of a General Unsecured Claim Against EFH may elect to participate in and receive its pro rata share of up to 9% in the aggregate of shares of Reorganized EFH Common Stock to be issued in the Equity Conversion (the "**Equity Diffusion Sale**"); provided, however, that the Equity Diffusion Sale shall not occur and holders of General Unsecured Claims Against EFH shall not have any rights to exercise or participate in the Equity Diffusion Sale if the Required Tranche A-3 Note Sale has occurred in accordance with Section 2.2(c)(i).  If applicable, the Equity Diffusion Sale shall otherwise satisfy the requirements set forth in Section 11.6.

(d)    Representations and Warranties of Parent.  Parent hereby represents and warrants as of the date hereof and will represent and warrant on Conversion Date the following representations and warranties to, and agreements with, the Purchasers, all of which shall survive the execution and delivery of this Agreement and the Equity Conversion and shall be subject to the agreements in the Restructuring Support Agreement:

(i)    Organization and Qualification.  Parent (a) is a duly organized and validly existing corporation in good standing (as applicable) under the laws of the state of Texas and has the corporate power and authority to own its property and assets and to transact the business in

---

[4] NTD: Equity conversion provisions subject to further negotiations between the Issuers and the Purchasers.

which it is engaged, (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect, and (c) is in compliance with all Applicable Laws, except to the extent that the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to result, in a material adverse effect on Parent.

(ii)    <u>Corporate Power and Authority</u>.  Subject to the entry of the Final Order and the terms thereof, Parent has the corporate power and authority to execute, deliver and carry out the terms and provisions of its obligations pursuant to this <u>Section 4.7</u> and has taken all necessary corporate action to authorize the execution, delivery and performance of their obligations pursuant to this <u>Section 4.7</u>.  Parent has duly executed and delivered this Agreement and, subject to the entry of the Final Order and the terms thereof, its obligations pursuant to this <u>Section 4.7</u> constitutes the legal, valid and binding obligation of Parent enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

(iii)    <u>No Violation.</u>  Subject to the entry of the Final Order and the terms thereof, neither the execution, delivery or performance by Parent of its obligations pursuant to this <u>Section 4.7</u> nor the compliance with the terms and provisions of its obligations pursuant to this <u>Section 4.7</u> will (a) contravene any applicable provision of any material Applicable Law (including material Environmental Laws), (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of Parent pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust or other material agreement or instrument to which Parent is a party or by which it or any of its property or assets is bound that remains in effect after the Effective Date other than any such breach, default or Lien that would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect on Parent, or (c) violate any provision of the Organizational Documents of Parent.

(iv)    <u>Authorized and Issued Capital Stock</u>.

(A)    On the Conversion Date, Parent shall provide (out of its authorized but unissued shares or shares held in treasury) sufficient shares of Reorganized EFH Common Stock to satisfy the conversion of the Notes upon the Equity Conversion, which shares of Reorganized EFH Common Stock shall be duly authorized, validly issued, fully paid and non-assessable free and clear from all taxes, charges, Liens, preemptive rights, rights of first offer, rights of first refusal or any other right or arrangement having substantially the same legal or economic effect as any of the foregoing.

(B)    On the Conversion Date, 100,000,000 shares of Reorganized EFH Common Stock shall be issued and outstanding.  Immediately following the consummation of the Equity Conversion, 277,658,788 shares of Reorganized EFH Common Stock shall be issued and outstanding and such shares of Reorganized EFH Common Stock shall be the only issued and outstanding shares of capital stock of Parent as contemplated by the Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof).  Following the Equity Conversion, holders of Notes shall own approximately 64% of the issued and outstanding Reorganized EFH Common Stock on a fully diluted basis, subject to adjustments as described in <u>Section 4.7(b)</u>.

(v)    Governmental and the Third Party Approvals. The issuance and delivery of the shares of Reorganized EFH Common Stock and performance of the Equity Conversion by Parent does not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority or other third party except for consents and approvals either in full force and effect or the failure to obtain would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect on Parent.

(e)    Conditions to Equity Conversion. Consummation of the Equity Conversion shall be subject to the satisfaction prior to or on the Conversion Date of each of the following conditions, each of which conditions may be waived by the Required EFIH Unsecured Consenting Creditors in their sole and absolute discretion:

(i)    In accordance with and solely to the extent as required pursuant to the Restructuring Support Agreement, Parent shall have executed an amended and restated charter, bylaws and other organizational documents as determined by the Required EFIH Unsecured Consenting Creditors  (the "**EFH Organizational Documents**") and such EFH Organizational Documents, as applicable, shall be filed with the Secretary of State of the State of Texas on the Effective Date and shall be consistent with section 1123(a)(6) of the Bankruptcy Code and shall be satisfactory to the Required EFIH Unsecured Consenting Creditors.

(ii)    In accordance with and solely to the extent as required pursuant to the Restructuring Support Agreement, the Issuer shall have executed an amended and restated limited liability company operating agreement, amended and restated bylaws and other organizational documents as determined by the Required EFIH Unsecured Consenting Creditors (the "**EFIH Organizational Documents**") and such EFIH Organizational Documents, as applicable, shall become effective on the Effective Date and shall be consistent with section 1123(a)(6) of the Bankruptcy Code and shall be satisfactory to the Required EFIH Unsecured Consenting Creditors.

(iii)    Parent shall have entered into a Registration Rights Agreement (the "**Registration Rights Agreement**") with each holder of shares of Reorganized EFH Common Stock in form and substance satisfactiory to the EFIH Unsecurd Consenting Creditors.

(iv)    The representations and warranties of Parent contained in Section 4.7(d) shall be true and correct in all respects as of the Conversion Date.

(v)    The Restructuring Support Agreement shall be in full force and effect as of the Conversion Date and shall not have been amended or modified in violation of the Restructuring Support Agreement.

(vi)    The Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be in full force and effect and not subject to a stay.

(vii)    The Bankruptcy Court shall have entered the Confirmation Order, and such order shall be in full force and effect and not subject to a stay.

(viii)    Any and all governmental and third party consents and approvals necessary in connection with the Equity Conversion and the Reorganization Plan shall have been obtained and shall remain in effect except for consents and approvals the failure to obtain would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect on Parent.

(ix)    Subject to and as set forth in the Restructuring Support Agreement, the Required Rulings shall have been obtained and be in full force and effect.

(x)    There shall be no continuing Event of Default under this Agreement.

(xi)    The Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof) shall provide that the Equity Conversion, including the issuance of the shares of Reorganized EFH Common Stock thereunder, will be completed pursuant to the Acceptable Reorganization Plan (as set forth in clause (i) of the definition thereof), which terms of the Equity Conversion will be governed by this Section 4.7 and shall have become, or simultaneous with the issuance of shares of Reorganized EFH Common Stock will become, effective.

(f)    Satisfaction of Notes.  Reorganized EFH's delivery to the Purchasers of shares of Reorganized Common Stock in accordance with this Section 4.7, will be deemed to satisfy in full the obligations under this Agreement.

(g)    Fractional Shares.  Reorganized EFH shall not issue fractional shares of Reorganized EFH Common Stock upon conversion of the Notes. In the event that the conversion of the Notes pursuant to Section 4.7(b) would result in any Purchaser being entitled to receive a number of shares of Reorganized EFH Common Stock that is not an integral multiple of one, fractions of 0.50 and greater will be rounded up to the next higher integral multiple of one and fractions less than 0.50 will be rounded down to the next lower integral multiple of one.  No consideration will be paid in lieu of fractions that are rounded down.

(h)    Taxes. To the extent allowed by the Bankruptcy Court pursuant to section 1146 of the Bankruptcy Code, any issuance and delivery of Reorganized EFH Common Stock in connection with the Equity Conversion shall be made without charge to the converting Purchaser for any documentary, stamp or any similar issue or transfer tax in respect of the issue thereof, and Reorganized EFH shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable in respect of the issuance or delivery of shares of Reorganized EFH Common Stock on conversion of the Notes. Reorganized EFH shall not, however, be required to pay any such tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Reorganized EFH Common Stock in any name other than that of the Purchaser of the Notes converted.

(i)    Transferability.  Subject to the Tax Matters Agreement (as defined in the Restructuring Support Agreement), the shares of Reorganized EFH Common Stock issued in connection with the Equity Conversion will be transferable, subject to compliance with all applicable securities laws, regulatory laws, and the terms of the Required Rulings.

SECTION 5.    Conditions Precedent to Funding.

The initial sale and issuance of the Note pursuant to this Agreement is subject to the satisfaction of the following conditions precedent, except as otherwise agreed between the Issuer and the Required Commitment Parties (and, solely with respect to the condition precedent that the Initial Tranche A-3 Note Purchasers have received fees and Advisors to the Initial Tranche A-3 Note Purchasers have received their reasonable and documented out-of-pocket expenses, each as set forth in Section 5.7, as agreed to by the Required Tranche A-3 Note Purchasers).

5.1.    Note Documents.  The Administrative Agent shall have received:

(a)     this Agreement, executed and delivered by a duly authorized officer of the Issuer, Agent, and each Purchaser; and

(b)     the Pledge Agreement and the Security Agreement, each executed and delivered by a duly authorized officer of each party thereto as of the Closing Date;

(c)     the Subordination Agreement, executed and delivered by a duly authorized officer of each party thereto as of the Closing Date; and

(d)     the Fee Letter, executed and delivered by a duly authorized officer of the Issuer and each Agent.

5.2.    Collateral.

(a)     Subject to the Subordination Agreement, all outstanding Stock and Stock Equivalents of EFIH Finance and Oncor shall have been pledged to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Final Order.

(b)     Subject to the Subordination Agreement, all Indebtedness of the Issuer and each Subsidiary of the Issuer that is owing to the Issuer or a Subsidiary Guarantor (other than indebtedness of a Foreign Subsidiary that is owing to the Issuer or a Subsidiary Guarantor) shall, to the extent exceeding $10,000,000 in aggregate principal amount, shall have been pledged pursuant to the Final Order.

(c)     Subject to the Subordination Agreement, all documents and instruments, including Uniform Commercial Code or other applicable personal property and financing statements, reasonably requested by the Collateral Agent (at the direction of the Required Purchasers) to be filed, registered or recorded to create the Liens intended to be created by any Security Document to be executed on the Closing Date and perfect such Liens to the extent required by, and with the priority required by, such Security Document shall have been delivered to the Collateral Agent (or its bailee or agent) in proper form for filing, registration or recording and none of the Collateral shall be subject to any other pledges, security interests or mortgages, except for Liens permitted hereunder; provided, however, that notwithstanding anything to the contrary contained in this Agreement or in any other Note Document, but without limiting the grant of a Lien on and security interest in the Collateral pursuant to the Final Order and the Security Documents, the EFIH Debtors will not be obligated to enter into any mortgages (including a Mortgage), authorize any fixture filing, enter into any agreement requiring "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction) or to undertake any registration in respect of assets subject to a certificate of title. The Collateral Agent shall have received results of a Uniform Commercial Code search for the jurisdiction of organization of the EFIH Debtors, a federal tax lien search for the jurisdiction of the chief executive office of the EFIH Debtors.

5.3.    Legal Opinions. The Administrative Agent shall have received the executed customary legal opinion (which legal opinion will address customary matters for a debtor-in-possession financing) of Kirkland & Ellis LLP, special New York counsel to the Issuer. The Issuer, the other Note Parties and the Administrative Agent hereby instruct such counsel to deliver such legal opinion.

5.4.    Initial Budget. The Administrative Agent and Commitment Parties shall have received the Initial Budget.

5.5.    Closing Certificates.  The Administrative Agent shall have received a certificate of the Note Parties, dated the Closing Date, substantially in the form of Exhibit D, with appropriate insertions, executed by an Authorized Officer of each Note Party, and attaching the documents referred to in Section 5.6.

5.6.    Authorization of Proceedings of Each Note Party.  The Administrative Agent shall have received (a) a copy of the resolutions of the board of directors, other managers or general partner of each Note Party (or a duly authorized committee thereof) authorizing (i) the execution, delivery and performance of the Note Documents (and any agreements relating thereto) to which it is a party and (ii) in the case of the Issuer, the extensions of credit contemplated hereunder and (b) true and complete copies of the Organizational Documents of each Note Party as of the Closing Date.

5.7.    Fees and Expenses.  The Administrative Agent, Collateral Agent, the Purchasers, Initial Commitment Parties, Commitment Parties and, solely to the extent there are Tranche A-3 Notes issued on the Closing Date, Initial Tranche A-3 Note Purchasers shall have received the fees in the amounts previously agreed in writing (including pursuant to the Commitment Letter and Restructuring Support Agreement) by the Administrative Agent, Collateral Agent, the Purchasers, Initial Commitment Parties, Commitment Parties and, solely to the extent there are Tranche A-3 Notes issued on the Closing Date, Initial Tranche A-3 Note Purchasers to be received on or prior to the Closing Date and all reasonable and documented out-of-pocket expenses (including the reasonable fees, disbursements and other charges of any Advisors) payable by the Note Parties for which invoices have been presented prior to the Closing Date shall have been paid.

5.8.    Representations and Warranties.  On the Closing Date, the representations and warranties made by the Note Parties herein or the other Note Documents, shall be true and correct in all material respects (or in all respects for representations and warranties qualified by materiality or Material Adverse Effect).

5.9.    First Day Orders.  The Required Commitment Parties shall have received evidence of the entry of all First Day Orders, which shall be reasonably satisfactory in form and substance to the Required Commitment Parties, and which First Day Orders shall have been received by the Required Commitment Parties.

5.10.    Trustees and Examiners.  No trustee or examiner with enlarged powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the operations or the business of the EFIH Debtors.

5.11.    Projections.  A base case model, including a statement of cash sources and uses of all free cash flow of the EFIH Debtors for the tenor of the Notes, shall be filed with the Bankruptcy Court.

5.12.    Patriot Act.  The Administrative Agent and the Purchasers shall have received such documentation and information as is reasonably requested in writing at least 5 Business Days prior to the Closing Date by the Administrative Agent about the Issuer and the Subsidiary Guarantors mutually agreed to be required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act.

5.13.    Petition Date.  The Petition Date shall have occurred.

5.14.    No Default. After giving effect to the initial funding under this Agreement and the Second Lien Refinancing, no Default or Event of Default shall have occurred and be continuing.

5.15.    Final Order. The Final Order shall be in full force and effect.

5.16.    Insurance. The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 7.3 and the applicable provisions of the Security Documents and, subject to the terms of the Subordination Agreement, each of which shall be endorsed or otherwise amended to name the Collateral Agent, on behalf of the Secured Parties, as "loss payee" under any casualty insurance policies, and the Secured Parties, as "additional insureds", under any liability insurance policies.

5.17.    Second Lien Refinancing. Substantially concurrently with the initial funding under this Agreement, the Second Lien Refinancing shall have been consummated.

5.18.    Restructuring Support Agreement. The Restructuring Support Agreement shall be in full force and effect, and the Issuers shall be in compliance with the Restructuring Support Agreement in all material respects.

5.19.    Senior DIP Documents. Proceeds of the Senior DIP Agreement, which shall be on the terms set forth in the Restructuring Support Agreement and the aggregate principal amount under the Senior DIP Agreement shall not exceed $5,400,000,000 (with such changes that are not materially adverse to the Purchasers) shall have been used (together with cash on hand) to (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate (unless otherwise directed by the Bankruptcy Court) due and owing under the Prepetition First Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Prepetition First Lien Notes) to Non-Settling EFIH First Lien Note Holders (as defined in the Restructuring Support Agreement) and (ii) repay the Prepetition First Lien Notes held by the holders of the Settling EFIH First Lien Note Holders (as defined in the Restructuring Support Agreement) in accordance with the EFIH First Lien Settlement (as defined in the Restructuring Support Agreement).

5.20.    Second Lien DIP Procedures. The Issuers shall have complied in all material respects with the terms and conditions of the Second Lien DIP Notes Offering.

5.21.    Event of Default under Senior DIP Documents. No Event of Default (as defined therein) under the Senior DIP Documents is existing, which would permit the Senior Lenders to exercise remedies thereunder on a post-petition basis.

5.22.    Material Adverse Effect. Since the Petition Date, no Material Adverse Effect shall have occurred.

5.23.    Approvals. All governmental consents and approvals necessary in connection with the issuance of the Notes and the execution of the Note Documents shall have been obtained and be in full force and effect.

5.24.    No Restrictions. The issuance of Notes shall not violate any Applicable Law and shall not be enjoined, temporarily, preliminarily or permanently.

For purposes of determining compliance with the conditions specified in this Section 5 on the Closing Date, each Agent and each Purchaser that has signed this Agreement shall be deemed to have

consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to such Agent or Purchaser unless the Issuer shall have received notice from such Agent or Purchaser (or from the Administrative Agent on behalf of such Purchaser) prior to the proposed Closing Date specifying its objection thereto, but excluding for the avoidance of doubt any subsequent changes or modifications to such documents or matters made after release of such party's signature page.

SECTION 6.  Representations, Warranties and Agreements.

In order to induce the Purchasers to enter into this Agreement and to purchase the Notes as provided for herein, the Issuer makes on the Closing Date the following representations and warranties to, and agreements with, the Purchasers, all of which shall survive the execution and delivery of this Agreement and the issuance of the Notes:

6.1.    Corporate Status; Compliance with Laws.  The Issuer and each Material Subsidiary of the Issuer that is a Restricted Subsidiary (a) is a duly organized and validly existing corporation or other entity in good standing (as applicable) under the laws of the jurisdiction of its organization and has the corporate or other organizational power and authority to own its property and assets and to transact the business in which it is engaged, (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect, and (c) is in compliance with all Applicable Laws, except to the extent that the failure to be in compliance could not reasonably be expected to result in a Material Adverse Effect.

6.2.    Corporate Power and Authority.  Subject to the entry of the Final Order and the terms thereof, each Note Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Note Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Note Documents to which it is a party. Each Note Party has duly executed and delivered each Note Document to which it is a party and, subject to the entry of the Final Order and the terms thereof, each such Note Document constitutes the legal, valid and binding obligation of such Note Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

6.3.    No Violation.  Subject to the entry of the Final Order and the terms thereof, neither the execution, delivery or performance by any Note Party of the Note Documents to which it is a party nor the compliance with the terms and provisions thereof will (a) contravene any applicable provision of any material Applicable Law (including material Environmental Laws), (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of the Issuer or any Restricted Subsidiary (other than Liens created under the Note Documents or Permitted Liens) pursuant to the terms of any material indenture, loan agreement, lease agreement, mortgage, deed of trust or other material agreement or instrument to which the Issuer or any Restricted Subsidiary is a party or by which it or any of its property or assets is bound, in each case to the extent any such agreement was entered into after the Petition Date (any such term, covenant, condition or provision, a "**Contractual Requirement**") other than any such breach, default or Lien that could not reasonably be expected to result in a Material Adverse Effect, or (c) violate any provision of the Organizational Documents of the Issuer or any Restricted Subsidiary.

6.4.    Litigation.  Other than the Cases, except as set forth on Schedule 6.4, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Issuer, threatened with respect to the Issuer or any of the Restricted Subsidiaries that could reasonably be expected to result in a Material Adverse Effect.

6.5.    Margin Regulations.  Neither the issuance of any Note hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the Board.

6.6.    Governmental Approvals.  Subject to the entry of the Final Order and the terms thereof, the execution, delivery and performance of the Note Documents does not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the Security Documents (and to release existing liens in connection with any repayment of the Indebtedness secured thereby), and (iii) such consents, approvals, registrations, filings or actions the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

6.7.    Investment Company Act.  None of the Note Parties is an "investment company" within the meaning of, and subject to registration under, the Investment Company Act of 1940, as amended.

6.8.    True and Complete Disclosure.

(a)    None of the written factual information and written data (taken as a whole) heretofore or contemporaneously furnished by or on behalf of the Issuer, any of the Subsidiaries of the Issuer or any of their respective authorized representatives to the Administrative Agent and/or any Purchaser on or before the Closing Date (including all such information and data contained in the Note Documents) for purposes of or in connection with this Agreement or any transaction contemplated herein contained any untrue statement of any material fact or omitted to state any material fact necessary to make such information and data (taken as a whole) not materially misleading at such time in light of the circumstances under which such information or data was furnished, it being understood and agreed that for purposes of this Section 6.8(a), such factual information and data shall not include projections or estimates (including financial estimates, forecasts and other forward-looking information) and information of a general economic or general industry nature.

6.9.    Financial Condition; Projections; Material Adverse Effect.

(a)    The Issuer has heretofore furnished to the Purchasers the consolidated balance sheet and statements of earnings, shareholders' equity and cash flows of the Issuer as of and for the fiscal years ended December 31, 2012 and December 31, 2013, reported on by Deloitte & Touche LLP, an independent registered public accounting firm, and the unaudited consolidated balance sheet and statement of earnings, shareholders' equity and cash flows of the Issuer as of and for the fiscal quarters and the portions of the fiscal year ended March 31, 2013, June 30, 2013 and September 30, 2013.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Issuer and its consolidated subsidiaries as of such date and for such period in accordance with GAAP consistently applied (except to the extent provided in the notes thereto).

(b)    The projections, forward-looking statements, estimates and pro forma financial information contained in this Agreement, any other Note Document or any other document, certificate or statement furnished to any Agent or any Purchasers (including, without limitation, each Budget and Annual Operating Forecast) are based upon good faith estimates and assumptions believed by the Issuer

to be reasonable at the time made, it being recognized by the Administrative Agent and the Purchasers that such projections, forward-looking statements, estimates and pro forma financial information are not to be viewed as facts and are subject to material contingencies and assumptions, many of which are beyond the control of the Note Parties, and that actual results during the period or periods covered by any such projections, forward-looking statements, estimates and pro forma financial information may differ materially from the projected results.

      (c)      There has been no Material Adverse Effect since the Petition Date.

      6.10.    <u>Tax Matters</u>.  Except where the failure of which could not be reasonably expected to have a Material Adverse Effect, (a) each of the Issuer and each of the Restricted Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it and has paid all material Taxes payable by it that have become due (whether or not shown on such Tax return), other than those (i) not yet delinquent or (ii) contested in good faith as to which adequate reserves have been provided to the extent required by law and in accordance with GAAP, (b) each of the Issuer and each of the Restricted Subsidiaries has provided adequate reserves in accordance with GAAP for the payment of, all federal, state, provincial and foreign Taxes not yet due and payable and (c) each of the Issuer and each of the Restricted Subsidiaries has satisfied all of its Tax withholding obligations.

      6.11.    <u>Compliance with ERISA</u>.

      (a)      Each Employee Benefit Plan is in compliance with ERISA, the Code and any Applicable Law; no Reportable Event has occurred (or is reasonably likely to occur) with respect to any Plan; no Multiemployer Plan is insolvent or in reorganization (or is reasonably likely to be insolvent or in reorganization), and no written notice of any such insolvency or reorganization has been given to the Issuer or any ERISA Affiliate; no Plan has an accumulated or waived funding deficiency (or is reasonably likely to have such a deficiency); on and after the effectiveness of the Pension Act, each Plan has satisfied the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, and there has been no determination that any such Plan is, or is expected to be, in "at risk" status (within the meaning of Section 4010(d)(2) of ERISA); none of the Issuer or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code; no proceedings have been instituted (or are reasonably likely to be instituted) to terminate or to reorganize any Plan or to appoint a trustee to administer any Plan, and no written notice of any such proceedings has been given to the Issuer or any ERISA Affiliate; and no Lien imposed under the Code or ERISA on the assets of the Issuer or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Issuer or any ERISA Affiliate been notified in writing that such a Lien will be imposed on the assets of Parent, the Issuer or any ERISA Affiliate on account of any Plan, except to the extent that a breach of any of the representations, warranties or agreements in this <u>Section 6.11(a)</u> would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect.  No Plan has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this <u>Section 6.11(a)</u>, be reasonably likely to have a Material Adverse Effect.  With respect to Plans that are Multiemployer Plans, the representations and warranties in this <u>Section 6.11(a)</u>, other than any made with respect to (i) liability under Section 4201 or 4204 of ERISA or (ii) liability for termination or reorganization of such Multiemployer Plans under ERISA, are made to the best knowledge of the Issuer.

      (b)      All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and Applicable Law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not

reasonably be expected to have a Material Adverse Effect. All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.12.    Subsidiaries. Schedule 6.12 lists each Subsidiary of Issuer (and the direct and indirect ownership interest of Issuer therein), in each case existing on the Closing Date. Each Material Subsidiary as of the Closing Date has been so designated on Schedule 6.12.

6.13.    Intellectual Property. Each of the Issuer and the Restricted Subsidiaries has good and marketable title to, or a valid license or right to use, all patents, trademarks, servicemarks, trade names, copyrights and all applications therefor and licenses thereof, and all other intellectual property rights, free and clear of all Liens (other than Liens permitted by Section 8.2), that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such title, license or rights could not reasonably be expected to have a Material Adverse Effect.

6.14.    Environmental Laws. Except as could not reasonably be expected to have a Material Adverse Effect: (a) the Issuer and the Restricted Subsidiaries and all Real Estate are in compliance with all Environmental Laws; (b) the Issuer and the Restricted Subsidiaries have, and have timely applied for renewal of, all permits under Environmental Law to construct and operate their facilities as currently constructed; (c) except as set forth on Schedule 6.4, neither the Issuer nor any Restricted Subsidiary is subject to any pending or, to the knowledge of the Issuer, threatened Environmental Claim or any other liability under any Environmental Law including any such Environmental Claim or, to the knowledge of the Issuer, any other liability under Environmental Law related to, or resulting from the business or operations of any predecessor in interest of any of them; (d) neither the Issuer nor any Restricted Subsidiary is conducting or financing or is required to conduct or finance, any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; (e) to the knowledge of the Issuer, no Hazardous Materials have been released into the environment at, on or under any Real Estate currently owned or leased by the Issuer or any Restricted Subsidiary; and (f) neither the Issuer nor any Restricted Subsidiary has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or, to the knowledge of the Issuer, formerly owned or leased Real Estate or facility.

6.15.    Properties. Except as set forth on Schedule 6.15, the Issuer and the Restricted Subsidiaries have good and indefeasible title to or valid leasehold or easement interests or other license or use rights in all properties that are necessary for the operation of their respective businesses as currently conducted, free and clear of all Liens (other than any Liens permitted by this Agreement) and except where the failure to have such good title, leasehold or easement interests or other license or use rights could not reasonably be expected to have a Material Adverse Effect.

6.16.    Final Order. The Final Order is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral and the proceeds and products thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents.

6.17.    Status of Obligations; Perfection and Priority of Security Interests. The Obligations are, subject to the Carve Out, the Senior DIP Obligations, and the Final Order:

(a)    upon entry of the Final Order, and pursuant to the Final Order, allowed administrative expense claims in the Cases, having priority over any and all administrative expense claims, diminution claims, unsecured claims, and all other claims against each of the Issuer and each other Guarantor or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and effective upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the Bankruptcy Code;

(b)    after entry of the Final Order and pursuant to the Final Order, secured by a valid and perfected Lien with the priority provided in Section 12.1 on all of the Collateral, subject to the Carve Out and the Senior DIP Obligations; and

(c)    notwithstanding the provisions of section 362 of the Bankruptcy Code and subject to the applicable provisions of the Final Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Purchasers shall be entitled to immediate payment of such Obligations in cash (subject to the Equity Conversion) and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Note Documents, the Subordination Agreement, and the Final Order.

6.18.    Insurance. The properties of the Issuer and the Restricted Subsidiaries are insured pursuant to self-insurance arrangements or with insurance companies that the Issuer believes (in the good faith judgment of the management of the Issuer, as applicable) are financially sound and responsible, in at least such amounts (after giving effect to any self-insurance which the Issuer believes (in the good faith judgment of management of the Issuer, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Issuer believes (in the good faith judgment of management of the Issuer, as applicable) is reasonable and prudent in light of the size and nature of its business.

6.19.    Labor Matters. Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against the Issuer or any Restricted Subsidiary pending or, to the knowledge of the Issuer, threatened in writing; and (b) hours worked by and payment made to employees of the Issuer and each Restricted Subsidiary have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters.

6.20.    Sanctioned Persons; Anti-Corruption Laws; Patriot Act. None of the Issuer or any of its Subsidiaries or any of their respective directors or officers is subject to any economic embargoes or similar sanctions administered or enforced by the U.S. Department of State or the U.S. Department of Treasury (including the Office of Foreign Assets Control) or any other applicable sanctions authority (collectively, "**Sanctions**", and the associated laws, rules, regulations and orders, collectively, "**Sanctions Laws**"). Each of the Issuer and its Subsidiaries and their respective directors and officers is in compliance, in all material respects, with (i) all Sanctions Laws, (ii) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "**Anti-Corruption Laws**") and (iii) the Patriot Act and any other applicable terrorism and money laundering laws, rules, regulations and orders. No part of the proceeds of the Notes will be used, directly or indirectly, (A) for the purpose of financing any activities or business of or with any Person or in any country or territory that at such time is the subject of any Sanctions or (B) for any payments to any governmental official or employee, political party, official

of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any Anti-Corruption Law.

## SECTION 7.  Affirmative Covenants.

The Issuer hereby covenants and agrees that on the Closing Date and thereafter, until all the Notes, together with interest, fees and all other Obligations (other than Contingent Obligations), are paid in full (including pursuant to the Equity Conversion):

7.1.    Information Covenants.  The Issuer will furnish to the Administrative Agent (which shall promptly make such information available to the Purchasers in accordance with its customary practice):

(a)     Annual Financial Statements.  As soon as available and in any event on or before the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 90 days after the end of each such fiscal year), (x) the consolidated balance sheet of the Issuer and its consolidated Subsidiaries and (y) if different, the Issuer and the Restricted Subsidiaries; provided, however, that the Issuer will be under no obligation to deliver the financial statements set forth in sub-clause (y) to the extent that the Consolidated Total Assets of the Issuer and its consolidated Subsidiaries do not differ from the Consolidated Total Assets of the Issuer and its Restricted Subsidiaries by more than 2.5%, in each case as at the end of such fiscal year, and the related consolidated statements of operations and cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal years (or, unless the financial statements set forth in sub-clause (y) are not required to be delivered, in lieu of such audited financial statements of the Issuer and the Restricted Subsidiaries, a detailed reconciliation, reflecting such financial information for the Issuer and the Restricted Subsidiaries, on the one hand, and the Issuer and its consolidated Subsidiaries, on the other hand), all in reasonable detail and prepared in accordance with GAAP, and, in each case, (i) except with respect to any such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be qualified as to the scope of audit, (ii) certified by an Authorized Officer of the Issuer as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Issuer and its consolidated Subsidiaries (or the Issuer and the Restricted Subsidiaries, as the case may be) in accordance with GAAP and (iii) accompanied by a Narrative Report with regard thereto.

(b)     Quarterly Financial Statements.  As soon as available and in any event on or before the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) with respect to each of the first three quarterly accounting periods in each fiscal year of the Issuer (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 45 days after the end of each such quarterly accounting period), (x) the consolidated balance sheets of the Issuer and its consolidated Subsidiaries and (y) if different, the Issuer and the Restricted Subsidiaries; provided, however, that the Issuer will be under no obligation to deliver the financial statements set forth in sub-clause (y) to the extent that the Consolidated Total Assets of the Issuer and its consolidated Subsidiaries do not differ from the Consolidated Total Assets of the Issuer and its Restricted Subsidiaries by more than 2.5%, in each case as at the end of such quarterly period and the related consolidated statements of operations for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and the related consolidated statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of

the prior fiscal year (or, unless the financial statements set forth in sub-clause (y) are not required to be delivered, in lieu of such unaudited financial statements of the Issuer and the Restricted Subsidiaries, a detailed reconciliation reflecting such financial information for the Issuer and the Restricted Subsidiaries, on the one hand, and the Issuer and its consolidated Subsidiaries, on the other hand), all of which shall be (i) certified by an Authorized Officer of the Issuer as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Issuer and its consolidated Subsidiaries (or the Issuer and the Restricted Subsidiaries, as the case may be) in accordance with GAAP, subject to changes resulting from audit, normal year-end audit adjustments and absence of footnotes and (ii) accompanied by a Narrative Report with respect thereto.

(c)      Officer's Certificate.  At the time of the delivery of the financial statements provided for in Section 7.1(a) and (b), a certificate of an Authorized Officer of the Issuer to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (i) the calculations required to establish whether the Issuer and its Restricted Subsidiaries were in compliance with the provisions of Section 8.9 as at the end of such fiscal year or period, as the case may be, and (ii) a specification of any change in the identity of the Restricted Subsidiaries and Unrestricted Subsidiaries as at the end of such fiscal year or period, as the case may be, from the Restricted Subsidiaries and Unrestricted Subsidiaries, respectively, provided to the Purchasers on the Closing Date or the most recent fiscal year or period, as the case may be.  At the time of the delivery of the financial statements provided for in Section 7.1(a), a certificate of an Authorized Officer of the Issuer setting forth in reasonable detail the Applicable Amount and the Applicable Equity Amount as at the end of the fiscal year to which such financial statements relate.

(d)      Annual Operating Forecast.  Beginning on the date 60 days after the Final Order Entry Date (and no later than December 1, 2014 for the business plan and operating budget covering the Fiscal Year commencing on January 1, 2015, and no later than December 1, 2015 for the business plan and operating budget covering the Fiscal Year commencing on January 1, 2016), on an annual basis, through the Maturity Date (as set forth in clause (a) of the definition thereof), broken down by month, including, without limitation, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, a line item for total available liquidity for the period of such Annual Operating Forecast, and which shall set forth the anticipated uses of the proceeds from the sale of the Notes, certified as to its reasonableness when made by an Authorized Officer of the Issuer in the form of Exhibit K.

(e)      Notice of Default; Litigation; Other Events.  Promptly after an Authorized Officer of the Issuer or any Restricted Subsidiary obtains knowledge thereof, notice of (i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Issuer proposes to take with respect thereto, (ii) any litigation, regulatory or governmental proceeding pending against the Issuer or any Restricted Subsidiary that could reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect, (iii) the Internal Revenue Service has denied the Ruling Request or notified the Parent or the EFIH Debtors, in writing or orally, of a decision not to issue one or more of the Required Rulings, and (iv) the termination of the Restructuring Support Agreement.

(f)      Environmental Matters.  Promptly after obtaining knowledge of any one or more of the following environmental matters, unless such environmental matters known to the Issuer and the Restricted Subsidiaries would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i)      any pending or threatened Environmental Claim against any Note Party or any Real Estate or any Note Party or any predecessor in interest of the Issuer or any Restricted

Subsidiary or any other Person for which any Note Party is alleged to be liable by contract or operation of law;

       (ii)     any condition or occurrence on any Real Estate that (x) could reasonably be expected to result in noncompliance by any Note Party with any applicable Environmental Law or (y) could reasonably be anticipated to form the basis of any Environmental Claim against any Note Party or any Real Estate;

       (iii)    any condition or occurrence on any Real Estate or any circumstance that could reasonably be anticipated to cause such Real Estate to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Estate under any Environmental Law that would be inconsistent with the present use or operation of such Real Estate; and

       (iv)    the conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, release or threatened release into the environment of any Hazardous Material on, at, under or from any Real Estate.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence, removal or remedial or other corrective action and the response thereto. The term "**Real Estate**" shall mean any interest in land, buildings and improvements owned, leased or otherwise held by any Note Party, but excluding all operating fixtures and equipment.

       (g)     <u>Other Information</u>. Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by the Issuer or any Restricted Subsidiary (other than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8) and copies of all financial statements, proxy statements, notices and reports that the Issuer or any Restricted Subsidiary shall send to the holders of any publicly issued debt of the Issuer and/or any Restricted Subsidiary) in their capacity as such holders (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement) and, with reasonable promptness, such other information (financial or otherwise) as the Administrative Agent on its own behalf or on behalf of any Purchaser (acting through the Administrative Agent) may reasonably request in writing from time to time.

       (h)     <u>Budget and Variance Report</u>. (i) Commencing with the end of the first full fiscal quarter ended after the entry of the Final Order (or, at the election of the Issuer, at the end of each calendar month or such earlier period as may be agreed), the Issuer shall promptly provide an updated Budget for the subsequent 3-month period to the Administrative Agent.

       (ii)     With respect to each calendar month, no later than the end of the subsequent calendar month in each case with respect to the Issuer and its Restricted Subsidiaries, a variance report showing a statement of actual cash sources and uses of all free cash flow for the immediately such preceding calendar month, noting therein all material variances from values set forth for such historical periods in the most recently delivered Budget, including narrative explanations as to any material variances and certified as to its reasonableness when made by an Authorized Officer of the Issuer.

       (i)     <u>Monthly Reporting</u>. As soon as available, but in any event not later than twenty five days after the end of each calendar month, a report detailing (i) any material Dispositions consummated by any Note Party (or the entry into any binding contracts for a material Disposition by any

Note Party), (ii) material developments in connection with any cost savings programs by any Note Party, (iii) the amount of Unrestricted Cash as of the last day of such prior calendar month, and (iv) such other matters as the Required Commitment Parties may reasonably request; provided that, notwithstanding anything to the contrary in this clause (iv) (but without limitation of any other requirement set forth in this Section 7.1), none of the Issuer or any of its Restricted Subsidiaries will be required under this clause (iv) to provide any information to the extent that the provision thereof would violate any attorney-client privilege (as reasonably determined by counsel to the Note Parties), law, rule or regulation, or any contractual obligation of confidentiality binding on the Note Parties or their respective affiliates (provided that (x) the Administrative Agent shall be notified if any such information is being withheld and (y) the Note Parties shall use commercially reasonable efforts to obtain a consent to disclosure to the Administrative Agent of any such information being withheld as a result of any contractual obligation of confidentiality (other than, for purposes of this clause (y), any such information being withheld as a result of attorney-client privilege)).

Notwithstanding the foregoing, the obligations in clauses (a), (b) and (g) of this Section 7.1 may be satisfied with respect to financial information of the Issuer and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of Parent or any direct or indirect parent of Parent or (B) the Issuer's (or Parent's or any direct or indirect parent thereof), as applicable, Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC; provided that, with respect to each of subclauses (A) and (B) of this paragraph, to the extent such information relates to Parent or a parent of Parent, such information is accompanied by consolidating or other information that explains in reasonable detail the differences between the information relating to Parent or such parent, on the one hand, and the information relating to the Issuer and the Restricted Subsidiaries on a standalone basis, on the other hand.

7.2.    Books, Records and Inspections.  The Issuer will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or the Required Purchasers to visit and inspect any of the properties or assets of the Issuer or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the books and records of the Issuer and any such Restricted Subsidiary and discuss the affairs, finances and accounts (including, without limitation, strategic planning, cash and liquidity management and operational and restructuring activities) of the Issuer and of any such Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or the Required Purchasers may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); provided that, excluding any such visits and inspections during the continuation of an Event of Default (a) only the Administrative Agent, whether on its own or in conjunction with the Required Purchasers, may exercise rights of the Administrative Agent and Purchasers under this Section 7.2, (b) the Administrative Agent shall not exercise such rights more than two times in any calendar year and (c) only one such visit shall be at the Issuer's expense; provided further that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) or any representative of any Purchaser may do any of the foregoing at the expense of the Issuer at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Required Purchasers shall give the Issuer the opportunity to participate in any discussions with the Issuer's independent public accountants. Notwithstanding anything to the contrary in this Section 7.2, neither the Issuer nor any Restricted Subsidiary will be required under this Section 7.2 to disclose or permit the inspection or discussion of any document, information or other matter to the extent that such action would violate any attorney-client privilege (as reasonably determined by counsel to the Note Parties), law, rule or regulation, or any contractual obligation of confidentiality binding on the Note Parties or their respective affiliates (provided that (x) the Administrative Agent shall

be notified if any such information is being withheld and (y) the Note Parties shall use commercially reasonable efforts to obtain a consent to such disclosure or action being withheld as a result of any contractual obligation of confidentiality (other than, for purposes of this clause (y), any such information being withheld as a result of attorney-client privilege)).

7.3.    <u>Maintenance of Insurance</u>. The Issuer will, and will cause each Material Subsidiary that is a Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Issuer believes (in the good faith judgment of the management of the Issuer, as applicable) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Issuer believes (in the good faith judgment of management of the Issuer, as applicable) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Issuer believes (in the good faith judgment of management of the Issuer, as applicable) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written reasonable request from the Administrative Agent (following a written request from the Required Purchasers to the Administrative Agent), information presented in reasonable detail as to the insurance so carried. With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent (at the direction of the Required Purchasers) may from time to time require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

7.4.    <u>Payment of Taxes</u>. The Issuer will pay and discharge, and will cause each of the Restricted Subsidiaries to pay and discharge, all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material Lien upon any properties of the Issuer or any Restricted Subsidiary of the Issuer; <u>provided</u> that neither the Issuer nor any such Restricted Subsidiary shall be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings if it has maintained adequate reserves (in the good faith judgment of management of the Issuer) with respect thereto in accordance with GAAP or the failure to pay could not reasonably be expected to result in a Material Adverse Effect.

7.5.    <u>Consolidated Corporate Franchises</u>. The Issuer will do, and will cause each Material Subsidiary that is a Restricted Subsidiary to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect; <u>provided, however</u>, that the Issuer and the Restricted Subsidiaries may consummate any transaction permitted under <u>Section 8.3</u>, <u>8.4</u> or <u>8.5</u>.

7.6.    <u>Compliance with Statutes, Regulations, Etc</u>. The Issuer will, and will cause each Restricted Subsidiary to, comply with all Applicable Laws applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

7.7.  ERISA.

(a)     Promptly after the Issuer or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to have a Material Adverse Effect, the Issuer will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Issuer setting forth details as to such occurrence and the action, if any, that the Issuer or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Issuer, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto: that a Reportable Event has occurred; that an accumulated funding deficiency has been incurred or an application is to be made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code with respect to a Plan; that a Plan having an Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); that a Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); that a proceeding has been instituted against the Issuer or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the PBGC has notified the Issuer or any ERISA Affiliate of its intention to appoint a trustee to administer any Plan; that the Issuer or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to a Plan; or that the Issuer or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

(b)     Promptly following any request therefor, on and after the effectiveness of the Pension Act, the Issuer will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that the Issuer and any of the Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the Issuer and any of the Restricted Subsidiaries or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if the Issuer, any of such Restricted Subsidiaries or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Issuer, the applicable Restricted Subsidiary(ies) or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

(c)     Upon the reasonable request of the Administrative Agent (at the direction of the Required Purchasers), the Issuer shall deliver to the Administrative Agent copies of: (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by the Issuer or any ERISA Affiliate with the Internal Revenue Service with respect to each Plan, (ii) the most recent actuarial valuation report for each Plan, (iii) all notices received by the Issuer or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency and (iv) such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Administrative Agent shall reasonably request.

7.8.  Maintenance of Properties.  The Issuer will, and will cause the Restricted Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition (ordinary wear and tear excepted), except to the extent that the failure to do so could reasonably be expected to have a Material Adverse Effect.

7.9.    <u>Transactions with Affiliates</u>.  The Issuer will conduct, and cause the Restricted Subsidiaries to conduct, all transactions with any of its Affiliates (other than transactions between or among the Issuer and the Restricted Subsidiaries and, between or among the Issuer, the Restricted Subsidiaries and to the extent in the ordinary course or consistent with past practice, Parent and any of its other Subsidiaries, including the Oncor Subsidiaries) on terms that are, taken as a whole, substantially as favorable to the Issuer or such Restricted Subsidiary as it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate; <u>provided</u> that, subject to the Cash Management Order, the Tax Order, the Wages Order and any other orders of the Bankruptcy Court, the foregoing restrictions shall not apply to:

(a)    transactions permitted by <u>Sections 8.5(c)</u> (other than clause (iii) thereof), <u>(k)</u>, <u>(l)</u>, <u>(m)</u>, <u>(p)</u>, <u>(y)</u>, and <u>(aa)</u>, and <u>Section 8.6</u>,

(b)    the Transactions and the payment of the Transaction Expenses,

(c)    the issuance of Stock or Stock Equivalents of the Issuer (or any direct or indirect parent thereof) to the management of the Issuer (or any direct or indirect parent thereof) or any Subsidiary of the Issuer in connection with the Transactions or pursuant to arrangements described in <u>clause (f)</u> of this <u>Section 7.9</u>,

(d)    loans, advances and other transactions between or among the Issuer, any Subsidiary of the Issuer or any joint venture (regardless of the form of legal entity) in which the Issuer or any Subsidiary of the Issuer has invested (and which Subsidiary or joint venture would not be an Affiliate of the Issuer but for the Issuer's or such Subsidiary's Subsidiary ownership of Stock or Stock Equivalents in such joint venture or Subsidiary) to the extent permitted under <u>Section 8</u>,

(e)    payments, advances or loans (or cancellation of loans), employment and severance arrangements and health and benefit plans or agreements between Parent, the Issuer and the other Subsidiaries of Parent and their respective officers, employees or consultants (including management and employee benefit plans or agreements, stock option plans and other compensatory arrangements) in the ordinary course of business,

(f)    payments by the Issuer (and any direct or indirect parent thereof), and the Subsidiaries of Parent pursuant to the Tax Sharing Agreements among the Issuer (and any such parent) and the Subsidiaries of the Issuer to the extent attributable to the ownership or operation of the Issuer and the Subsidiaries of Parent,

(g)    the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, managers, consultants, officers and employees of the Issuer (or, to the extent attributable to the ownership of the Issuer by such parent, any direct or indirect parent thereof) and the Subsidiaries of the Issuer in the ordinary course of business,

(h)    the payment of indemnities and reasonable out-of-pocket expenses incurred by the Sponsors and their Affiliates in connection with services provided to the Issuer (or any direct or indirect parent thereof), or any of the Subsidiaries of the Issuer,

(i)    the issuance of Stock or Stock Equivalents (other than Disqualified Stock) of the Issuer (or any direct or indirect parent thereof) to Parent, any Permitted Holder or to any director, officer, employee or consultant,

(j)      the performance of any and all obligations (including payment obligations) pursuant to the Shared Services Agreement or as disclosed in any Budget approved by the Required Commitment Parties, and

(k)      transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 7.9 or any amendment thereto to the extent such an amendment (together with any other amendment or supplemental agreements) is not adverse, taken as a whole, to the Purchasers in any material respect.

7.10.   End of Fiscal Years; Fiscal Quarters.  The Issuer will, for financial reporting purposes, cause (a) each of its, and the Restricted Subsidiaries' fiscal years to end on December 31 of each year (each a "Fiscal Year") and (b) each of its, and the Restricted Subsidiaries', fiscal quarters to end on dates consistent with such fiscal year-end; provided, however, that the Issuer may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent, in which case the Issuer and the Administrative Agent will, and are hereby authorized by the Purchasers to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

7.11.   Additional Guarantors and Grantors.  Subject to any applicable limitations set forth in the Guarantee, the Security Documents and the Subordination Agreement, the Issuer will cause each direct or indirect Domestic Subsidiary of the Issuer (excluding any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and each other Domestic Subsidiary of the Issuer that ceases to constitute an Excluded Subsidiary to, within 30 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Senior Agent may agree in its reasonable discretion and confirmed in writing by notice from the Senior Agent to the Administrative Agent)), become a Guarantor under the Guarantee, a pledger under the Pledge Agreement and a grantor under such Security Agreement pursuant to (i) the Final Order or (ii) if reasonably requested by the Administrative Agent (at the direction of the Required Purchasers) a supplement to each of the Guarantee, the Pledge Agreement and the Security Agreement.

7.12.   Pledge of Additional Stock and Evidence of Indebtedness.  Subject to any applicable limitations set forth in the Security Documents and the Subordination Agreement, the Issuer will promptly notify the Administrative Agent in writing of any Stock or Stock Equivalents issued or otherwise purchased or acquired after the Closing Date and of any Indebtedness in excess of $10,000,000 that is owing to the Issuer or any Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 7.11) incurred (individually or in a series of related transactions) after the Closing Date, and in each case, if reasonably requested by the Administrative Agent (at the direction of the Required Purchasers), will pledge, and, if applicable, will cause each other Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 7.11), to pledge to the Collateral Agent for the benefit of the Secured Parties, (i) all such Stock and Stock Equivalents (other than any Excluded Stock and Stock Equivalents), pursuant to a supplement to the Pledge Agreement,  and (ii) all evidences of such Indebtedness, pursuant to a supplement to the Pledge Agreement.

7.13.   Further Assurances.

(a)      Subject to the applicable limitations set forth in the Security Documents, the Subordination Agreement, and this Agreement, the Issuer will, and will cause each other Note Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, and other

documents) that may be required under any Applicable Law, or that the Collateral Agent (at the direction of the Required Purchasers) or Required Purchasers may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Issuer and the other Guarantors; provided, however, that notwithstanding anything to the contrary contained in this Agreement or in any other Note Document, but without limiting the grant of a Lien on and security interest in the Collateral pursuant to the Final Order and the Security Documents, the EFIH Debtors will not be obligated to enter into any Mortgage, authorize any fixture filing, enter into any agreement providing "control" as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction) or to undertake any registration in respect of assets subject to a certificate of title.

(b)    Notwithstanding anything herein to the contrary, if the Collateral Agent (at the direction of the Required Purchasers) or Senior Agent (confirmed in writing by notice to the Collateral Agent) determines (taking into account the existence and effect of the Final Order) in its reasonable judgment (confirmed in writing to the Issuer and the Administrative Agent) that the cost or other consequences (including adverse tax and accounting consequences) of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Secured Party thereby, then such property may be excluded from the Collateral for all purposes of the Note Documents.

7.14.    Bankruptcy Matters.

(a)    The Issuer will deliver to the Administrative Agent and its legal counsel copies of all First Day Orders and motions seeking approval of the First Day Orders.

(b)    The Issuer will deliver to the Administrative Agent, and in the case of (iii) below to its legal counsel and legal counsel to the Initial Commitment Parties, as soon as practicable in advance of filing with the Bankruptcy Court (i) the Final Order, (ii) all other proposed material orders and pleadings related to the Notes, and (iii) any plan of reorganization or liquidation and/or any disclosure statement related to such plan.

(c)    The Issuer shall maintain a cash management system in accordance with the Cash Management Order and the Final Order.  The Issuer shall maintain separate cash management deposit accounts from the cash management deposit accounts of its Subsidiaries and Affiliates and shall not commingle any of its Cash or cash equivalents with the Cash and cash equivalents of any such Person.

(d)    The Issuer shall contest, if requested by the Administrative Agent as allowed under the Subordination Agreement, any motion seeking entry of an order, and entry of an order, that is materially adverse to the interests of the Administrative Agent or the Purchasers or their respective material rights and remedies under the Note Documents in any of the Cases.

7.15.    Use of Proceeds. The Issuer shall not, and shall not permit any other Note Party or any Restricted Subsidiary to:

(a)    use the proceeds of the Notes for purposes other than those permitted under this Agreement and contained in the Final Order, as applicable;

(b)    use the proceeds of the Notes for purposes that would violate the provisions of Regulation T, U or X of the Board; and

(c)    use proceeds of the Notes for purposes other than, (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate (unless otherwise directed by the

Bankruptcy Court) due and owing under the Prepetition Second Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Prepetition Second Lien Notes) to Non-Settling Prepetition Second Lien Obligations Holders, (ii) repay the Prepetition Second Lien Notes held by Settling Prepetition Second Lien Obligations Holders in accordance with the EFIH Second Lien Settlement (as defined in the Restructuring Support Agreement), and (iii) repay the Prepetition Second Lien Notes held by Persons that participate in the Second Lien Tender Offer (collectively, the "**Second Lien Repayment**").

SECTION 8.    Negative Covenants.

The Issuer hereby covenants and agrees that on the Closing Date and thereafter, until the Notes, together with interest, fees and all other Obligations (other than Contingent Obligations) are paid in full (including pursuant to the Equity Conversion):

8.1.    Limitation on Indebtedness.    The Issuer will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness.

Notwithstanding the foregoing, the limitations set forth in the immediately preceding paragraph shall not apply to any of the following items:

(a)    Indebtedness arising under (i) the Note Documents (including any interest that is paid-in-kind and thereafter considered principal of the Notes), and (ii) the Senior DIP Documents in a principal amount not to exceed $5,400,000,000 plus all accrued interest, fees and expenses as provided for therein;

(b)    subject to compliance with Section 8.5, Indebtedness of the Issuer or any Restricted Subsidiary owed to the Issuer or any Restricted Subsidiary; provided that all such Indebtedness of any Note Party owed to any Person that is not a Note Party shall be subject to subordination terms reasonably acceptable to the Required Purchasers;

(c)    Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of construction and restoration activities and in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(d)    subject to compliance with Section 8.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Issuer or any other Restricted Subsidiary that is permitted to be incurred under this Agreement (except that a Restricted Subsidiary that is not a Note Party may not, by virtue of this Section 8.1(d) guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 8.1, and (ii) the Issuer in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; provided that (A) if the Indebtedness being guaranteed under this Section 8.1(d) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Purchasers as those contained in the subordination of such Indebtedness, and (B) the aggregate amount of Guarantee Obligations incurred by Restricted Subsidiaries that are not Subsidiary Guarantors under this clause (d) when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Section 8.1(i) and Section 8.1(l), shall not exceed $57,500,000 at any time outstanding;

(e)    Guarantee Obligations (i) incurred in the ordinary course of business (including in respect of construction or restoration activities) in respect of obligations of (or to) suppliers, customers, franchisees, lessors and licensees or (ii) otherwise constituting Investments permitted by Sections 8.5(d), 8.5(g), 8.5(i), 8.5(q), and 8.5(t);

(f)    (i) Indebtedness (including Indebtedness arising under Capital Leases) incurred to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of fixed or capital assets or otherwise in respect of Capital Expenditures, so long as such Indebtedness is incurred within 270 days of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of such fixed or capital assets or incurrence of such Capital Expenditure, (ii) Indebtedness arising under Capital Leases entered into in connection with Permitted Sale Leasebacks, (iii) Indebtedness arising under Capital Leases, other than Capital Leases in effect on the Closing Date and Capital Leases entered into pursuant to subclauses (i) and (ii) above; provided, that the aggregate amount of Indebtedness incurred pursuant to this clause (iii) at any time outstanding shall not exceed $11,500,000 and (iv) any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (i), (ii) or (iii) above; provided that, except to the extent otherwise expressly permitted hereunder, the principal amount thereof does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension;

(g)    Indebtedness outstanding on the Closing Date listed on Schedule 8.1 and the Prepetition Debt and any modification, replacement, refinancing, refunding, renewal or extension thereof; provided that except to the extent otherwise expressly permitted hereunder, in the case of any such modification, replacement, refinancing, refunding, renewal or extension, (i) the principal amount thereof (including any unused commitments) does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension, (ii) the direct and contingent obligors with respect to such Indebtedness are not changed, (iii) no portion of such Indebtedness matures prior to the Stated Maturity of such Indebtedness as in effect as of the Closing Date, and (iv) if the Indebtedness being refinanced, or any guarantee thereof, constituted subordinated Indebtedness, then such replacement or refinancing Indebtedness, or such guarantee, respectively, shall be subordinated to the Obligations to substantially the same extent;

(h)    Indebtedness in respect of Hedging Agreements; provided that such Hedging Agreements are not entered into for speculative purposes (as determined by the Issuer in its reasonable discretion acting in good faith);

(i)    (i)    Indebtedness of a Person or Indebtedness attaching to assets of a Person that, in either case, becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) or Indebtedness attaching to assets that are acquired by the Issuer or any Restricted Subsidiary, in each case after the Closing Date as the result of a Permitted Acquisition; provided that

(x)    such Indebtedness existed at the time such Person became a Restricted Subsidiary or at the time such assets were acquired and, in each case, was not created in anticipation thereof,

(y)    such Indebtedness is not guaranteed in any respect by the Issuer or any Restricted Subsidiary (other than by any such Person that so becomes a Restricted Subsidiary or is the survivor of a merger with such Person or any of its Subsidiaries), and

(z) (A) subject to the Subordination Agreement, the Stock and Stock Equivalents of such Person are pledged to the Collateral Agent to the extent required under Section 7.12 and (B) such Person executes a supplement to each of the Guarantee and the Security Documents (or alternative guarantee and security arrangements in relation to the Obligations reasonably acceptable to the Collateral Agent); provided, further, that the requirements of this subclause (z) shall not apply to any Indebtedness of the type that could have been incurred under Section 8.1(f); and

(ii)    any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (i) above; provided that, except to the extent otherwise expressly permitted hereunder, (x) the principal amount of any such Indebtedness (including any unused commitments) does not exceed the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension, (y) the direct and contingent obligors with respect to such Indebtedness are not changed and (z) if the Indebtedness being refinanced, or any guarantee thereof, constituted subordinated Indebtedness, then such replacement or refinancing Indebtedness, or such guarantee, respectively, shall be subordinated to the Obligations to substantially the same extent; and

provided further that the aggregate amount of Indebtedness incurred under this Section 8.1(i) (A) shall not exceed $57,500,000 at any time outstanding and (B) by Restricted Subsidiaries that are not Subsidiary Guarantors, when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Sections 8.1(d) and 8.1(l), shall not exceed $57,500,000 at any time outstanding;

(j)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business (including in respect of construction or restoration activities) or consistent with past practice or in respect of coal mine reclamation, including those incurred to secure health, safety and environmental obligations in the ordinary course of business (including in respect of construction or restoration activities) or consistent with past practice;

(k)    (i) Indebtedness incurred in connection with any Permitted Sale Leaseback and (ii) any modification, replacement, refinancing, refunding, renewal or extension of any Indebtedness specified in subclause (i) above; provided that, except to the extent otherwise permitted hereunder, (x) the principal amount of any such Indebtedness is not increased above the principal amount thereof outstanding immediately prior to such modification, replacement, refinancing, refunding, renewal or extension except by an amount equal to the unpaid accrued interest and premium thereon plus the reasonable amounts paid in respect of fees and expenses incurred in connection with such modification, replacement, refinancing, refunding, renewal or extension and (y) the direct and contingent obligors with respect to such Indebtedness are not changed;

(l)    additional Indebtedness; provided that the aggregate amount of Indebtedness incurred and remaining outstanding pursuant to this Section 8.1(l) shall not at any time exceed $86,250,000; provided, that the aggregate amount of Indebtedness incurred by Restricted Subsidiaries that

are not Subsidiary Guarantors under this Section 8.1(l), when combined with the total amount of Indebtedness incurred by Restricted Subsidiaries that are not Subsidiary Guarantors pursuant to Sections 8.1(d) and 8.1(i) shall not exceed $57,500,000 at any time outstanding

(m)　　(i) Cash Management Obligations and other Indebtedness in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business and (ii) Hedging Obligations;

(n)　　(i) Indebtedness incurred in the ordinary course of business in respect of obligations of the Issuer or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services, including turbines, transformers and similar equipment and (ii) Indebtedness in respect of intercompany obligations of the Issuer or any Restricted Subsidiary with the Issuer or any Restricted Subsidiary of the Issuer in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(o)　　Indebtedness arising from agreements of the Issuer or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case entered into in connection with Permitted Acquisitions, other Investments and the Disposition of any business, assets or Stock or Stock Equivalents permitted hereunder;

(p)　　Indebtedness of the Issuer or any Restricted Subsidiary consisting of (i) obligations to pay insurance premiums or (ii) take or pay obligations contained in supply agreements, in each case arising in the ordinary course of business (including in respect of construction or restoration activities);

(q)　　Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Issuer (or, to the extent such work is done for the Issuer or its Subsidiaries, any direct or indirect parent thereof) and the Restricted Subsidiaries incurred in the ordinary course of business;

(r)　　Indebtedness consisting of promissory notes issued by any Note Party to current or former officers, managers, consultants, directors and employees (or their respective spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees) to finance the purchase or redemption of Stock or Stock Equivalents of the Issuer (or any direct or indirect parent thereof) permitted by Section 8.6(b);

(s)　　Indebtedness consisting of obligations of the Issuer and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with Permitted Acquisitions or any other Investment permitted hereunder;

(t)　　Indebtedness of the Issuer or any Restricted Subsidiary to Parent or any of its other Subsidiaries in the aggregate amount at any time outstanding not in excess of $11,500,000; and

(u)　　all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (t) above.

For purposes of determining compliance with this Section 8.1, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described clauses (a) through (u) above, the Issuer shall, in its sole discretion, classify and reclassify or later divide, classify or

reclassify such item of Indebtedness (or any portion thereof) and will only be required to include the amount and type of such Indebtedness in one or more of the above paragraph or clauses; provided that all Indebtedness outstanding under the Note Documents will be deemed at all times to have been incurred in reliance only on the exception in clause (a)(i) of Section 8.1.

        8.2.    Limitation on Liens. The Issuer will not, and will not permit the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Issuer or such Restricted Subsidiary, whether now owned or hereafter acquired, except:

        (a)    Liens arising under the Note Documents and/or created pursuant to the Final Order, securing the Obligations;

        (b)    Permitted Liens;

        (c)    Liens securing Indebtedness permitted pursuant to Section 8.1(f); provided that (x) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, restoration, replacement, expansion, installation or improvement (as applicable) of the property subject to such Liens and (y) such Liens attach at all times only to the assets so financed except (1) for accessions to the property financed with the proceeds of such Indebtedness and the proceeds and the products thereof and (2) that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

        (d)    Liens existing on the Closing Date; provided that any Lien securing Indebtedness or other obligations in excess of (x) $5,750,000 individually or (y) $28,750,000 in the aggregate (when taken together with all other Liens securing obligations outstanding in reliance on this clause (e) that are not set forth on Schedule 8.2) shall only be permitted to the extent such Lien is listed on Schedule 8.2;

        (e)    the modification, replacement, extension or renewal of any Lien permitted by clauses (a) through (e) and clause (t) of this Section 8.2 upon or in the same assets theretofore subject to such Lien (or upon or in after-acquired property that is affixed or incorporated into the property covered by such Lien or any proceeds or products thereof) or the modification, refunding, refinancing, replacement, extension or renewal (without increase in the amount or change in any direct or contingent obligor except to the extent otherwise permitted hereunder) of the Indebtedness or other obligations secured thereby (including any unused commitments), to the extent such modification, refunding, refinancing, replacement, extension or renewal is permitted by Section 8.1;

        (f)    Liens existing on the assets of any Person that becomes a Restricted Subsidiary (or is a Restricted Subsidiary that survives a merger with such Person or any of its Subsidiaries) pursuant to a Permitted Acquisition or other permitted Investment, or existing on assets acquired after the Closing Date, to the extent the Liens on such assets secure Indebtedness permitted by Section 8.1(i); provided that such Liens (i) are not created or incurred in connection with, or in contemplation of, such Person becoming such a Restricted Subsidiary or such assets being acquired and (ii) attach at all times only to the same assets to which such Liens attached (and after-acquired property that is affixed or incorporated into the property covered by such Lien), and secure only the same Indebtedness or obligations that such Liens secured, immediately prior to such Permitted Acquisition and any modification, replacement, refinancing, refunding, renewal or extension thereof permitted by Section 8.1(i);

        (g)    Liens securing Indebtedness or other obligations (i) of the Issuer or any Restricted Subsidiary in favor of a Note Party and (ii) of any other Restricted Subsidiary that is not a Note Party in favor of any other Restricted Subsidiary that is not a Note Party;

(h)     Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off);

(i)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 8.5 to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction permitted under Section 8.4, in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(j)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Issuer or any Restricted Subsidiary in the ordinary course of business (including in respect of construction or restoration activities) permitted by this Agreement;

(k)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 8.5;

(l)     any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Issuer or any Restricted Subsidiary;

(m)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any Restricted Subsidiary in the ordinary course of business;

(n)     Liens solely on any cash earnest money deposits made by the Issuer or any Restricted Subsidiary in connection with any letter of intent or purchase agreement permitted hereunder;

(o)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(p)     Liens in respect of Permitted Sale Leasebacks;

(q)     any restrictions on any Stock or Stock Equivalents or other joint venture interests of the Issuer or any Restricted Subsidiary providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such Stock or Stock Equivalents or interest of such Person, if a security interest or other Lien is created on such Stock or Stock Equivalents or interest as a result thereof and other similar Liens;

(r)     Lien and other exceptions to title, in either case on or in respect of any facilities of the Issuer or any Restricted Subsidiary, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business the Issuer and the Restricted Subsidiaries, taken as a whole;

81

(s)    Liens on cash and Permitted Investments (i) deposited by the Issuer or any Restricted Subsidiary in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by the Issuer or any Restricted Subsidiary with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: Netting Agreements, Hedging Agreements and letters of credit supporting Netting Agreements and Hedging Agreements; and

(t)    additional Liens so long as the aggregate amount of obligations secured thereby at any time outstanding does not exceed $5,750,000.

8.3.    Limitation on Fundamental Changes.  Except as permitted by Section 8.4 or 8.5, the Issuer will not, and will not permit the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise consummate the disposition of, all or substantially all its business units, assets or other properties, except that:

(a)    so long as (i) both before and after giving effect to such transaction, no Payment Default or Event of Default has occurred and is continuing or would result therefrom and (ii) after giving effect to such transaction the Issuer shall be in compliance, on a Pro Forma Basis, with the minimum liquidity covenant set forth in Section 8.9, any Subsidiary of the Issuer or any other Person may be merged, amalgamated or consolidated with or into the Issuer; provided that the Issuer shall be the continuing or surviving company;

(b)    so long as no Payment Default or Event of Default has occurred and is continuing, or would result therefrom, any Subsidiary of the Issuer or any other Person (in each case, other than the Issuer) may be merged, amalgamated or consolidated with or into any one or more Subsidiaries of the Issuer; provided that (i) in the case of any merger, amalgamation or consolidation involving one or more Restricted Subsidiaries, (A) a Restricted Subsidiary shall be the continuing or surviving Person or (B) the Issuer shall cause the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Restricted Subsidiary) to become a Restricted Subsidiary, (ii) in the case of any merger, amalgamation or consolidation involving one or more Guarantors, a Guarantor shall be the continuing or surviving Person or the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Guarantor) shall execute a supplement to the Guarantee and the relevant Security Documents, each in form and substance reasonably satisfactory to the Administrative Agent in order to become a Guarantor and pledgor, mortgagor and grantor, as applicable, thereunder for the benefit of the Secured Parties and (iii) Issuer shall have delivered to the Administrative Agent an officers' certificate stating that such merger, amalgamation or consolidation and any such supplements to the Guarantee and any Security Document preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the applicable Security Documents;

(c)    any Restricted Subsidiary that is not a Note Party may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Issuer or any other Restricted Subsidiary;

(d)    the Issuer or any Subsidiary of the Issuer may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any Note Party; provided that the consideration for any such disposition by any Person other than a Guarantor shall not exceed the fair value of such assets;

(e)    any Restricted Subsidiary may liquidate or dissolve if (i) the Issuer determines in good faith that such liquidation or dissolution is in the best interests of the Issuer and is not materially disadvantageous to the Purchasers and (ii) to the extent such Restricted Subsidiary is a Note Party, any assets or business of such Restricted Subsidiary not otherwise disposed of or transferred in accordance with Section 8.4 or 8.5, or in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Note Party after giving effect to such liquidation or dissolution; and

(f)    to the extent that no Payment Default or Event of Default would result from the consummation of such Disposition, the Issuer and the Restricted Subsidiaries may consummate a merger, dissolution, liquidation, consolidation or disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 8.4.

8.4.    Limitation on Sale of Assets. The Issuer will not, and will not permit the Restricted Subsidiaries to, (i) convey, sell, lease, assign, transfer or otherwise consummate the disposition of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired or (ii) consummate the sale to any Person (other than to the Issuer or a Subsidiary Guarantor) any shares owned by it of the Issuer's or any Restricted Subsidiary's Stock and Stock Equivalents (each of the foregoing a "**Disposition**"), except that:

(a)    the Issuer and the Restricted Subsidiaries may sell, transfer or otherwise dispose of (i) obsolete, worn-out, scrap, used, or surplus or mothballed equipment (including any such equipment that has been refurbished in contemplation of such disposition), vehicles and other assets to the extent such assets are not necessary for the operation of the Issuer's and the Restricted Subsidiaries' business, (ii) inventory or goods (or other assets) held for sale in the ordinary course of business, (iii) cash and Permitted Investments, and (iv) assets for the purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Issuer and the Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)    the Issuer and the Restricted Subsidiaries may make Dispositions of assets, excluding any Disposition of accounts receivable except in connection with the Disposition of any business to which such accounts receivable relate, for fair value; provided that (i) to the extent required, the Net Cash Proceeds thereof to the Issuer and the Restricted Subsidiaries are promptly applied to the prepayment of Notes as provided for in Section 4.2(a), (ii) after giving effect to any such Disposition, no Default or Event of Default shall have occurred and be continuing, (iii) the aggregate consideration for all Dispositions made in reliance on this Section 8.4(b), when aggregated with the amount of Permitted Sale Leaseback transactions consummated pursuant to Section 8.4(g), shall not exceed at any time 5.75% of Consolidated Total Assets (determined at the time of each Disposition) for all such transactions consummated after the Closing Date, (iv) with respect to any Disposition pursuant to this clause (b) for a purchase price in excess of $11,500,000, the Person making such Disposition shall receive not less than 75% of such consideration in the form of cash or Permitted Investments; provided that for the purposes of this subclause (iv) the following shall be deemed to be cash ("**Deemed Cash**"): (A) any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Issuer or such Restricted Subsidiary, other than liabilities that are by their terms (1) subordinated to the payment in full of the Obligations in cash (subject to the Equity Conversion) or (2) not secured by the assets that are the subject of such Disposition, that are assumed by the transferee with respect to the applicable Disposition and for which the Issuer and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Person making such Disposition from the purchaser that are converted by such Person into cash (to the extent of the cash received) within 180 days following the closing of the applicable Disposition, (C) any Designated Non-Cash Consideration received by the Person making such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to

this Section 8.4(b) that is at that time outstanding, not in excess of 1.8% of Consolidated Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value and (v) subject to the Subordination Agreement, any non-cash proceeds received in the form of Real Estate, Indebtedness or Stock and Stock Equivalents are pledged to the Collateral Agent (or its bailee or agent) to the extent required under Section 7.12 or 7.13;

(c)    (i) the Issuer and the Restricted Subsidiaries may make Dispositions to the Issuer or any other Note Party and (ii) any Restricted Subsidiary that is not a Note Party may make Dispositions to the Issuer or any other Subsidiary of the Issuer; provided that with respect to any such Dispositions, such sale, transfer or disposition shall be for fair value;

(d)    the Issuer and any Restricted Subsidiary may affect any transaction permitted by Section 8.3, 8.5 or 8.6;

(e)    the Issuer and any Restricted Subsidiary may lease, sublease, license (only on a non-exclusive basis with respect to any intellectual property) or sublicense (only on a non-exclusive basis with respect to any intellectual property) real, personal or intellectual property in the ordinary course of business;

(f)    Dispositions of property (including like-kind exchanges) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case under Section 1031 of the Code or otherwise;

(g)    Dispositions pursuant to Permitted Sale Leaseback transactions in an aggregate amount pursuant to this Section 8.4(g), when aggregated with the amount of Dispositions made pursuant to Section 8.4(b), not to exceed the limitations set forth in Section 8.4(b);

(h)    Dispositions of (i) Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(i)    Dispositions listed on Schedule 8.4 ("Scheduled Dispositions");

(j)    transfers of property subject to a Recovery Event or in connection with any condemnation proceeding upon receipt of the Net Cash Proceeds of such Recovery Event or condemnation proceeding;

(k)    Dispositions of accounts receivable in connection with the collection or compromise thereof;

(l)    Dispositions of power, capacity, heat rate, renewable energy credits, waste by-products, energy, electricity, coal and lignite, oil and other petroleum-based liquids, emissions and other environmental credits, ancillary services, fuel (including all forms of nuclear fuel and natural gas) and other related assets or products of services, including assets related to trading activities or the sale of inventory or contracts related to any of the foregoing, in each case in the ordinary course of business;

(m)    the execution of (or amendment to), settlement of or unwinding of any Hedging Agreement;

(n)    any Disposition of any assets required by any Governmental Authority;

(o)    any disposition of Stock in an Unrestricted Subsidiary (other than an Oncor Subsidiary); and

(p)    Dispositions of any asset between or among the Issuer and/or any Restricted Subsidiary as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (o) above; provided that after giving effect to any such Disposition, to the extent the assets subject to such Dispositions constituted Collateral and subject to the Subordination Agreement, such assets shall remain subject to, or be rejoined to, the Lien of the Security Documents.

Notwithstanding the foregoing, (i) no Disposition of Stock or Stock Equivalents of Oncor by the Issuer or any of its Restricted Subsidiaries shall be permitted and (ii) no Disposition of Stock or Stock Equivalents in any Oncor Subsidiary by the Issuer or any of its Restricted Subsidiaries shall be permitted unless the Net Cash Proceeds thereof are used to first, prepay in full in cash the Senior DIP Obligations (it being understood that the Issuer shall not reinvest or retain such Net Cash Proceeds) and second, prepay the Obligations.

8.5.    Limitation on Investments. The Issuer will not, and will not permit the Restricted Subsidiaries, to make any Investment except, subject to the Cash Management Order, the Tax Order, the Wages Order and any other orders of the Bankruptcy Court:

(a)    extensions of trade credit, asset purchases (including purchases of inventory, fuel (including all forms of nuclear fuel), supplies, materials and equipment) and the licensing or contribution of intellectual property pursuant to joint marketing arrangements or development agreements with other Persons, in each case in the ordinary course of business (including in respect of construction or restoration activities);

(b)    Investments that were Permitted Investments when such Investments were made;

(c)    loans and advances to officers, directors, employees and consultants of the Issuer (or any direct or indirect parent thereof) or any Subsidiary of the Issuer (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances), (ii) in connection with such Person's purchase of Stock or Stock Equivalents of Parent (or any direct or indirect parent thereof; provided that, to the extent such loans and advances are made in cash, the amount of such loans and advances used to acquire such Stock or Stock Equivalents shall be contributed to the Issuer (in cash) and (iii) for purposes not described in the foregoing subclauses (i) and (ii); provided that the aggregate principal amount outstanding pursuant to subclause (iii) shall not exceed $11,500,000 at any one time outstanding;

(d)    Investments (i) existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date as set forth on Schedule 8.5 and any modifications, extensions, renewals or reinvestments thereof and (ii) existing on the Closing Date of the Issuer or any Restricted Subsidiary in the Issuer or any Subsidiary of the Issuer and any modification, extension, renewal or reinvestment thereof, only to the extent that the amount of any Investment made pursuant to this clause (d) does not at any time exceed the amount of such Investment set forth on Schedule 8.5;

(e)    Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business or upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(f)    Investments to the extent that payment for such Investments is made with Stock or Stock Equivalents (other than Disqualified Stock) of the Issuer (or any direct or indirect parent thereof);

(g)    Investments (i) (A) by the Issuer or any Restricted Subsidiary in any Note Party, (B) between or among Restricted Subsidiaries that are not Note Parties, and (C) consisting of intercompany Investments incurred in the ordinary course of business in connection with the cash management operations (including with respect to intercompany self-insurance arrangements) among the Issuer and the Restricted Subsidiaries (provided that any such intercompany Investment in connection with cash management arrangements in a Note Party in a Subsidiary of the Issuer that is not a Note Party is in the form of an intercompany loan or advance and the Issuer or such Restricted Subsidiary complies with Section 7.12 to the extent applicable, and subject in each case to the Cash Management Orders); (ii) by Note Parties in any Restricted Subsidiary that is not a Note Party, to the extent that the aggregate amount of all Investments made on or after the Closing Date pursuant to this subclause (ii), when valued at the fair market value (determined by the Issuer acting in good faith) of each such Investment at the time each such Investment was made, is not in excess of, when combined with, and without duplication, the aggregate amount of Investments made pursuant to the proviso to Section 8.5(h) an amount equal to the sum of (w) $57,500,000 plus (x) the Applicable Equity Amount at such time plus (y) if no Event of Default has occurred and is continuing at the time the Investment is first made, the Applicable Amount at such time plus (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this subclause (z) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made) (subject in each case to the Cash Management Order); and (iii) by Note Parties in any Restricted Subsidiary that is not a Note Party so long as such Investment is part of a series of simultaneous Investments by Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the initial Investment being invested in one or more Note Parties;

(h)    Investments constituting Permitted Acquisitions; provided that the aggregate amount of any such Investment, as valued at the fair market value (determined by the Issuer acting in good faith) of such Investment at the time each such Investment is made, made by the Issuer or any Subsidiary Guarantor in any Restricted Subsidiary that, after giving effect to such Investment, shall not be a Guarantor, shall not cause the aggregate amount of all such Investments made pursuant to this clause (h) (as so valued at the time each such investment is made) to exceed, when combined with, and without duplication of, the aggregate amount of Investments made pursuant to clause (ii) of Section 8.5(g), an amount equal to the sum of (i) $57,500,000 plus (ii) the Applicable Equity Amount at such time plus (iii) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time plus (iv) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this clause (iv) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(i)    Investments in Oncor Subsidiaries, in each case valued at the fair market value (determined the Issuer acting in good faith) of such Investment at the time each such Investment is made,

in an aggregate amount pursuant to this clause (i) that, at the time each such Investment is made, would not exceed the sum of (w) $86,250,000 plus (x) the Applicable Equity Amount at such time plus (y) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time plus (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this subclause (z) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(j)    Investments constituting non-cash proceeds of Dispositions of assets to the extent permitted by Section 8.4;

(k)    Investments made to repurchase or retire Stock or Stock Equivalents of the Issuer or any direct or indirect parent thereof owned by any employee or any stock ownership plan or key employee stock ownership plan of the Issuer (or any direct or indirect parent thereof) in an aggregate amount, when combined with distributions made pursuant to Section 8.6(b), not to exceed the limitations set forth in such Section;

(l)    Investments consisting of dividends permitted under Section 8.6;

(m)    loans and advances to any direct or indirect parent of the Issuer in lieu of, and not in excess of the amount of, dividends to the extent permitted to be made to such parent in accordance with Section 8.6; provided that the aggregate amount of such loans and advances shall reduce the ability of the Issuer and the Restricted Subsidiaries to make dividends under the applicable clauses of Section 8.6 by such amount;

(n)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(o)    Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(p)    advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(q)    Guarantee Obligations of the Issuer or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(r)    Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this Section 8.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)    Investments in Hedging Agreements permitted by Section 8.1;

(t)     Investments consisting of deposits of cash and Permitted Investments as collateral support permitted under Section 8.2;

(u)     other Investments, which, when aggregated with (i) all aggregate principal amounts paid pursuant to Section 8.7 from the Closing Date and (ii) all loans and advances made to any direct or indirect parent of the Issuer pursuant to Section 8.5(m) in lieu of dividends permitted by Section 8.6(c) and (iii) all dividends paid pursuant to Section 8.6(c), shall not exceed an amount equal to (w) $57,500,000 plus (x) the Applicable Equity Amount at the time such Investments are made plus (y) if no Event of Default has occurred and is continuing at the time such Investment is first made, the Applicable Amount at such time plus (z) to the extent not otherwise included in the determination of the Applicable Equity Amount or the Applicable Amount, an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash in respect of any such Investment (which amount referred to in this subclause (z) shall not exceed the amount of such Investment valued at the fair market value of such Investment at the time such Investment was made);

(v)     to the extent constituting Investments, transactions pursuant to the Shared Services Agreement, transactions pursuant to the Tax Sharing Agreements permitted under Section 8.6(d)(i) or transactions disclosed in any Budget approved by the Required Commitment Parties;

(w)     Investments consisting of purchases and acquisitions of assets and services in the ordinary course of business (including in respect of construction or restoration activities);

(x)     Investments in the ordinary course of business consisting of Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practice;

(y)     to the extent constituting Investments, any payments made or obligations acquired pursuant to the Wages Order;

(z)     Investments consisting of Indebtedness permitted by Section 8.1 (but only to the extent such Indebtedness was permitted without reference to Section 8.5) or fundamental changes permitted by Section 8.3;

(aa)     Investments relating to pension trusts; and

(bb)     Investments by Note Parties in any Restricted Subsidiary that is not a Note Party so long as such Investment is part of a series of simultaneous Investments by the Issuer and the Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the intercompany Investment being invested in one or more Note Parties.

8.6.     Limitation on Dividends.  The Issuer will not declare or pay any dividends (other than dividends payable solely in its Stock or Stock Equivalents (other than Disqualified Stock)) or return any capital to its stockholders or make any other distribution, payment or delivery of property or cash to its stockholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Stock or Stock Equivalents or the Stock or Stock Equivalents of any direct or indirect parent now or hereafter outstanding, or set aside any funds for any of the foregoing purposes, or permit any Restricted Subsidiary to purchase or otherwise acquire for consideration (other than in connection with an Investment permitted by Section 8.5) any Stock or Stock Equivalents of the Issuer now or hereafter outstanding (all of the foregoing, "**dividends**"), provided, subject to the Cash Management Order, the Tax Order and the Wages Order:

(a)    the Issuer may (or may pay dividends to permit any direct or indirect parent thereof to) redeem in whole or in part any of its Stock or Stock Equivalents for another class of its (or such parent's) Stock or Stock Equivalents or with proceeds from substantially concurrent equity contributions or issuances of new Stock or Stock Equivalents; provided that (i) such new Stock or Stock Equivalents contain terms and provisions at least as advantageous to the Purchasers, taken as a whole, in all respects material to their interests as those contained in the Stock or Stock Equivalents redeemed thereby and (ii) the cash proceeds from any such contribution or issuance have not otherwise been applied pursuant to the Applicable Equity Amount;

(b)    so long as no Payment Default or Event of Default shall have occurred and is continuing or would result therefrom, the Issuer may (or may pay dividends to permit any direct or indirect parent thereof to) redeem, acquire, retire or repurchase shares of its (or such parent's) Stock or Stock Equivalents held by any present or former officer, manager, consultant, director or employee (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Issuer (or any direct or indirect parent thereof) and any Subsidiaries, so long as such repurchase is pursuant to, and in accordance with the terms of, any stock option or stock appreciation rights plan, any management, director and/or employee benefit, stock ownership or option plan, stock subscription plan or agreement, employment termination agreement or any employment agreements or stockholders' or shareholders' agreement; provided, however, that the aggregate amount of payments made under this Section 8.6(b) do not exceed in any calendar year $11,500,000 (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $17,250,000 in any calendar year); provided, further, that such amount in any calendar year may be increased by an amount not to exceed:

(i)    the cash proceeds from the sale of Stock (other than Disqualified Stock) of the Issuer and, to the extent contributed to the Issuer, Stock of any of the Issuer's direct or indirect parent companies, in each case to present or former officers, managers, consultants, directors or employees (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Issuer (or any of its direct or indirect parent companies) or any Subsidiary of the Issuer that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Stock have not otherwise been applied pursuant to the Applicable Equity Amount; plus

(ii)    the cash proceeds of key man life insurance policies received the Issuer or any Restricted Subsidiary after the Closing Date; less

(iii)    the amount of any dividends or distributions previously made with the cash proceeds described in clauses (i) and (ii) above;

and provided, further, that cancellation of Indebtedness owing to the Issuer or any Restricted Subsidiary from present or former officers, managers, consultants, directors or employees (or their respective Affiliates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees, estates or immediate family members) of the Issuer (or any of its direct or indirect parent companies), or any Subsidiary of the Issuer in connection with a repurchase of Stock or Stock Equivalents of the Issuer or any of its direct or indirect parent companies will not be deemed to constitute a dividend for purposes of this covenant or any other provision of this Agreement;

(c)    so long as no Payment Default or Event of Default shall have occurred and is continuing or would result therefrom, the Issuer may pay dividends on its Stock or Stock Equivalents; provided that the amount of all such dividends paid from the Closing Date pursuant to this clause (c),

when aggregated with (i) all aggregate principal amounts paid pursuant to Section 8.7 from the Closing Date and (ii) (A) all loans and advances made to any direct or indirect parent of the Issuer pursuant to Section 8.5(m) in lieu of dividends permitted by this clause (c) and (B) all Investments made pursuant to Section 8.5(u), shall not exceed an amount equal to (x) $0 plus (y) the Applicable Equity Amount at the time such dividends are paid;

> (d)     the Issuer may make dividends, distributions or loans to any direct or indirect parent company of the Issuer in an amount required for any such direct or indirect parent to pay, in each case without duplication:

>> (i)     foreign, federal, state and local income taxes, to the extent such income taxes are attributable to the income of the Issuer and its Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries; provided that the amount of such payments in any fiscal year does not exceed the amount that Parent and its Subsidiaries are required to pay in respect of foreign, federal, state and local income taxes attributable to the income of the Issuer and its Subsidiaries for such fiscal year;

>> (ii)     (A) such parents' and their respective Subsidiaries' (other than the Oncor Subsidiaries) general operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business and to the extent such costs and expenses are attributable to (1) the ownership or operation of the Issuer and its Subsidiaries (other than the Oncor Subsidiaries) or (2) the ownership and operation of the Oncor Subsidiaries, to the extent that the Oncor Subsidiaries have not reimbursed the Issuer or such direct or indirect parent company of the Issuer for such costs and expenses, (B) any reasonable and customary indemnification claims made by directors or officers of the Issuer (or any parent thereof and such parent's Subsidiaries to the extent such claims are attributable to the ownership or operation of the Issuer and its Subsidiaries) or any Restricted Subsidiary or (C) fees and expenses otherwise due and payable by the Issuer (or any parent thereof and such parent's Subsidiaries to the extent such fees and expenses are attributable to the ownership or operation of the Issuer and its Subsidiaries) or any Restricted Subsidiary and not prohibited to be paid by the Issuer and its Restricted Subsidiaries hereunder;

>> (iii)     franchise and excise taxes and other fees, taxes and expenses required to maintain the corporate existence of any direct or indirect parent of the Issuer;

>> (iv)     to any direct or indirect parent of the Issuer to finance any Investment permitted to be made by the Issuer or any Restricted Subsidiary pursuant to Section 8.5; provided that (A) such dividend shall be made substantially concurrently with the closing of such Investment, (B) such parent shall, immediately following the closing thereof, cause (1) all property acquired (whether assets, Stock or Stock Equivalents) to be contributed to the Issuer or such Restricted Subsidiary or (2) the merger (to the extent permitted in Section 8.5) of the Person formed or acquired into the Issuer or any Restricted Subsidiary, (C) the Issuer shall comply with Section 7.11 and Section 7.12 to the extent applicable and (D) the aggregate amount of such dividends shall reduce the ability of the Issuer and the Restricted Subsidiary to make Investments under the applicable clauses of Section 8.5 by such amount;

>> (v)     customary costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering or acquisition or disposition transaction payable by the Issuer or the Restricted Subsidiaries; and

(vi)    customary salary, bonus and other benefits payable to officers, employees or consultants of any direct or indirect parent company (and such parent's Subsidiaries (other than the Oncor Subsidiaries)) of the Issuer to the extent such salaries, bonuses and other benefits are attributable to (A) the ownership or operation of the Issuer and its Subsidiaries (other than the Oncor Subsidiaries) or (B) the ownership and operation of the Oncor Subsidiaries, to the extent that the Oncor Subsidiaries have not reimbursed the Issuer or such direct or indirect parent company of the Issuer for such payments;

provided that any payments made pursuant to clauses (i), (ii) or (vi) above, to the extent relating to the ownership, operation or income of the Oncor Subsidiaries, shall be made in the form of loans, the terms of which shall require repayment upon receipt by Parent of funds from the Oncor Subsidiaries as reimbursement for such amounts;

(e)    to the extent (if any) constituting dividends, transactions pursuant to the Shared Services Agreement or described in any Budget approved by the Required Commitment Parties;

(f)    to the extent constituting dividends, the Issuer may enter into and consummate transactions expressly permitted by any provision of Section 8.3;

(g)    the Issuer may repurchase Stock or Stock Equivalents of the Issuer (or any direct or indirect parent thereof) deemed to occur upon exercise of stock options or warrants if such Stock or Stock Equivalents represents a portion of the exercise price of such options or warrants, and the Issuer may pay dividends to any direct or indirect parent thereof as and when necessary to enable such parent to effect such repurchases;

(h)    the Issuer may (i) pay cash in lieu of fractional shares in connection with any dividend, split or combination thereof or any Permitted Acquisition and (ii) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms;

(i)    the Issuer may pay any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(j)    the Issuer may pay dividends in an amount equal to withholding or similar Taxes payable or expected to be payable by any present or former employee, director, manager or consultant (or their respective Affiliates, estates or immediate family members) and any repurchases of Stock or Stock Equivalents in consideration of such payments including deemed repurchases in connection with the exercise of stock options;

(k)    the Issuer may make payments described in Sections 7.9(a), 7.9(b), 7.9(e), 7.9(f), 7.9(g), 7.9(h), 7.9(i), 7.9(j) and 8.5(y);

(l)    the Issuer may pay dividends or make distributions in connection with the Transactions, including payments in respect of Parent's and its Subsidiaries' long term incentive plan or in respect of tax gross-ups and other deferred compensation; and

(m)    the Issuer may make loans to, or permit letters of credit to be issued on behalf of, any of its direct or indirect parent companies or such parents' Subsidiaries for working capital purposes so

91

long as made in the ordinary course of business and consistent with past practices and in an amount not to exceed $23,000,000 of which no more than $17,250,000 may be in the form of letters of credit.

Notwithstanding anything to the contrary contained in Section 8 (including Section 8.5 and this Section 8.6), the Issuer will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on or in respect of the Issuer's Stock or Stock Equivalents or purchase or otherwise acquire for cash any Stock or Stock Equivalents of the Issuer or any direct or indirect parent of the Issuer, for the purpose of paying any cash dividend or making any cash distribution to, or acquiring any Stock or Stock Equivalents of the Issuer or any direct or indirect parent of the Issuer for cash from the Permitted Holders, or guarantee any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Stock or Stock Equivalents to or from the Permitted Holders, in each case by means of utilization of the cumulative dividend and investment credit provided by the use of the Applicable Amount or the exceptions provided by Sections 8.5(g), 8.5(h), 8.5(i) and 8.5(u), unless at the time and after giving effect to such payment, no Event of Default has occurred and is continuing.

8.7.    Limitation on Prepaying Indebtedness.  Except as permitted by the terms and conditions set forth in the Acceptable Reorganization Plan, the First Day Orders, the Final Order, any cash collateral order or other order agreed to by the Required Purchasers, or as specifically permitted hereunder, Issuer shall not, and shall not permit the Restricted Subsidiaries to, without the express prior written consent of the Required Purchasers, make any payment or transfer with respect to any Indebtedness incurred or arising prior to the filing of the Cases, whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

8.8.    Limitations on Sale Leasebacks.  The Issuer will not, and will not permit the Restricted Subsidiaries to, enter into or effect any Sale Leasebacks after the Closing Date, other than Permitted Sale Leasebacks.

8.9.    Liquidity Covenant.  The Issuer will not permit Unrestricted Cash to be less than $127,500,000 at any time.

8.10.    Changes in Business.  The Issuer and the Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by the Issuer and the Restricted Subsidiaries, taken as a whole, on the Closing Date and other business activities incidental or reasonably related to any of the foregoing except as required by the Bankruptcy Code or pursuant to the Final Order.

8.11.    Bankruptcy Provisions.  (a) The Issuer shall not, and shall not permit any other Note Party or any other Restricted Subsidiary to, consent to the termination or reduction of the EFIH Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or fail to object to any motion by a party in interest (other than a Purchaser or the Administrative Agent) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Required Purchasers.

(b)    Subject to the Subordination Agreement, the Issuer shall not, and shall not permit any other Note Party or any other Restricted Subsidiary to create or permit to exist any other Superpriority Claim (other than the Carve Out, the Senior DIP Obligations, or the Obligations) or any "claim" (as such word is defined in the Bankruptcy Code) that is pari passu with or senior to the claims of the Secured Parties or any Lien which that is pari passu with or senior to the Liens of the Secured Parties in any of the Cases except (A) with the prior written consent of the Required Purchasers or (B) to the

extent such Lien constitutes Permitted Liens securing Indebtedness or obligations not prohibited by this Agreement.

8.12.    Affiliate Value Transfers. The Issuer will not, and will not permit the Restricted Subsidiaries to, make any Affiliate Value Transfers in an aggregate amount in excess of $57,500,000 for all such Affiliate Value Transfers made from the Closing Date.

8.13.    Amendments of Organizational Documents and Oncor TSA Amendment. The Issuer will not, and will not permit the Restricted Subsidiaries to, amend (i) its Organizational Documents except for amendments that could not reasonably be expected to materially adversely affect the interests of the Purchasers or (ii) the Oncor TSA Amendment, to the extent such agreement is effective, without the prior written consent of the Required Purchasers.

SECTION 9.    Events of Default.

Upon the occurrence of any of the following specified events (each an "**Event of Default**").

9.1.    Payments. The Issuer shall (a) default in the payment when due of any principal of the Notes or (b) default, and such default shall continue for five or more days, in the payment when due of any interest on the Notes or any Fees or any other amounts owing hereunder or under any other Note Document; or

9.2.    Representations, Etc. Any representation, warranty or statement made or deemed made by any Note Party herein or in any other Note Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

9.3.    Covenants. Any Note Party shall:

(a)    default in the due performance or observance by it of any term, covenant or agreement contained in Section 7.1(e)(i), Section 7.5 (solely with respect to the Issuer), Section 7.14 or Section 8; or

(b)    default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 9.1 or 9.2 or clause (a) of this Section 9.3) contained in this Agreement or any other Note Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice by the Issuer from the Administrative Agent (at the direction of the Required Purchasers) or the Required Purchasers; or

9.4.    Acceleration Under Other Agreements. Indebtedness by the Issuer or any Restricted Subsidiary incurred after the Petition Date (other than any Indebtedness described in Section 8.1 or Hedging Obligations) in excess of $43,125,000 in the aggregate for the Issuer and such Restricted Subsidiaries, shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment (other than Hedging Obligations) or as a mandatory prepayment, prior to the stated maturity thereof; provided that this Section 9.4 shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

9.5.    ERISA. (a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; any Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof); an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Plan or to appoint a trustee to administer any Plan (including the giving of written notice thereof); any Plan shall have an accumulated funding deficiency (whether or not waived); the Issuer or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof); (b) there could result from any event or events set forth in clause (a) of this Section 9.5 the imposition of a Lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a Lien, security interest or liability; and (c) such Lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect; or

9.6.    Note Documents.Any Note Document or any material provision thereof shall cease to be in full force and effect (other than pursuant to the terms hereof or thereof) or any Note Party or any Affiliate of any Note Party shall so assert, or any Lien created by any of the Note Documents shall cease to be enforceable; or

9.7.    Judgments. Any judgments that are in the aggregate in excess of $28,750,000 as to any post-petition obligation that is allowed as an administrative expense claim against the EFIH Debtors shall be rendered against the EFIH Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants, in each case, to the extent not paid or covered by insurance provided by a carrier not disputing coverage) or there shall be rendered against the EFIH Debtors a non-monetary judgment with respect to a post-petition event that causes or is reasonably expected to cause a Material Adverse Effect; or

9.8.    Hedging Agreements. Obligations under any Hedging Agreements of the Issuer or any Restricted Subsidiary in excess of $43,125,000 in the aggregate for the Issuer and such Restricted Subsidiaries, shall be declared to be due and payable, prior to the stated maturity thereof; or

9.9.    Change of Control. A Change of Control shall occur; or

9.10.    Matters Related to the Cases.

(i)    any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; or

(ii)    a trustee, receiver, interim receiver, or manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code); or

(iii)    subject to the Subordination Agreement, any other Superpriority Claim (other than the Carve Out or the Obligations or the Senior DIP Obligations) or any "claim" (as such word is defined in the Bankruptcy Code) that is pari passu with or senior to the claims of the Secured Parties or any Lien that is pari passu with or senior to the Liens of the Secured Parties shall be granted in any of the Cases except (A) with the prior written consent of the Required Purchasers or (B) to the extent such Lien constitutes Permitted Liens securing Indebtedness or obligations not prohibited by this Agreement; or

(iv)    the Bankruptcy Court shall enter an order approving any claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation of any Collateral; or

(v)    any EFIH Debtor makes any material payments relating to prepetition obligations (including any "adequate protection" payments) other than in accordance with the First Day Orders, or the Final Order, Section 8.7, an Acceptable Reorganization Plan, or as otherwise agreed to by the Required Purchasers; or

(vi)    the use of cash collateral by the EFIH Debtors shall be terminated and the EIFH Debtors shall not have obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Required Purchasers; or

(vii)    the Note Parties or any of their Subsidiaries, or any person claiming by or through the Note Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or Purchasers, in each case, relating to the Notes; or

(viii)    (1) Any EFIH Debtor shall file a motion or pleading or commence a proceeding that could reasonably be expected to result in an impairment of the Administrative Agent's or any of the Purchasers' material rights or interests in their capacities as such under the Notes or (2) a determination by a court with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; provided, however, that this subclause (viii) will not apply to the termination of use of cash collateral (which shall be exclusively governed by subclause (vi) above); or

(ix)    the Bankruptcy Court shall enter a final non-appealable order that is adverse in any material respect to the interests (taken as a whole) of the Administrative Agent or the Purchasers or their respective material rights and remedies in their capacity as such under the Notes in any of the Cases; provided, however, that this subclause (ix) will not apply to the termination of use of cash collateral (which shall be governed exclusively by subclause (vi) above); or

(x)    any EFIH Debtor shall file any pleading seeking, or otherwise consenting to, or shall support or acquiesce in any other Person's motion as to any matter set forth in Section 9.7, Section 9.8, this Section 9.10 (other than this subclause (x)), Section 9.11, 9.12, or 9.13.

9.11.    Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to (i) any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any equity interest in any of the Oncor Subsidiaries held by any of the EFIH Debtors or (ii) any creditor or party in interest (or the granting of a deed in lieu of foreclosure or the like) on any assets of the EFIH Debtors (other than assets described in clause (i)) that have an aggregate value in excess of $28,750,000; or

9.12.    Status of Final Order. (i) An order shall be entered reversing, supplementing, staying for a period of five (5) Business Days or more, vacating or otherwise amending, supplementing or modifying the Final Order in a manner that is adverse to the interests of the Purchasers, or the Issuer or any Guarantor shall apply for authority to do so, without the prior written consent of the Administrative Agent and the Required Purchasers, (ii) the Final Order shall cease to create a valid and

perfected lien on the Collateral or to be in full force and effect; or (iii) the Issuer or any Guarantor shall fail to comply with the Final Order in any material respect; or

    9.13. <u>Confirmation of Plan</u>.  A plan shall be filed or confirmed in any of the Cases that does not provide for termination of the Commitments hereunder and the indefeasible payment in full of the Obligations (other than Contingent Obligations) (including pursuant to the Equity Conversion) on the effective date of such plan;

    then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, subject in each case to the terms and conditions of the Final Order and the Subordination Agreement, the Administrative Agent may and, upon the written request of the Required Purchasers, shall, by five calendar days' written notice to the Issuer, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Purchaser to enforce its claims against the Issuer, except as otherwise specifically provided for in this Agreement:  declare the principal of and any accrued interest and Fees in respect of any or all Notes and any or all Obligations owing hereunder and under any other Note Document to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Issuer.

    9.14. <u>Application of Proceeds</u>.  Subject to the Carve Out and the Subordination Agreement, during the existence of an Event of Default any Net Cash Proceeds received by the Collateral Agent, any distribution made in respect of any Collateral in any bankruptcy or insolvency proceeding of any Note Party, all proceeds of any sale, collection or other liquidation of any Collateral, including all insurance proceeds received in respect thereof, and all proceeds of any such distribution, and any proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement and/or any other Note Document, promptly as follows:

    (i) First, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent and Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent is entitled to indemnification pursuant to the provisions of any Note Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

    (ii) Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

    (iii) Third, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, pro rata, of interest and other amounts constituting Obligations, in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

    (iv) Fourth, to the payment in full in cash, pro rata, of principal amount of the Obligations and any interest accrued thereon; and

(v)     Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Note Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described of this Section 9.14, the Note Parties shall remain liable, jointly and severally, for any deficiency.

Notwithstanding anything to the contrary contained herein, any Event of Default under this Agreement or similarly defined term under any other Note Document, other than any Event of Default which cannot be waived without the written consent of each Purchaser directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist and the Issuer is in compliance with this Agreement and/or such other Note Document.

SECTION 10. The Agents.

10.1.     Appointment.

(a)     Each Purchaser hereby irrevocably designates and appoints the Administrative Agent as the agent of such Purchaser under this Agreement and the other Note Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Note Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Note Documents, together with such other powers as are reasonably incidental thereto. The provisions of this Section 10 (other than Sections 10.9 and 10.11 with respect to the Issuer) are solely for the benefit of the Agents and the Purchasers, and the Issuer shall not have any rights as a third party beneficiary of such provision. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein or in any other Note Document, any fiduciary relationship with any Purchaser or any agency or trust obligations with respect to any Note Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against such Agent.

(b)     The Administrative Agent and each Purchaser hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent and each Purchaser irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Note Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Note Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein or in any other Note Document, any fiduciary relationship with any of the Administrative Agent or the Purchasers or any agency or trust obligations with respect to any Note Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Note Document or otherwise exist against the Collateral Agent.

10.2.     Delegation of Duties. The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Note Documents by or through agents, sub-agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Neither the Administrative Agent nor the Collateral

Agent shall be responsible for the negligence or misconduct of any agents, sub-agents or attorneys-in-fact selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

10.3.    <u>Exculpatory Provisions</u>.

(a)      No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Note Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) responsible in any manner to any of the Purchasers or any participant for any recitals, statements, representations or warranties made by any of the Issuer, any other Guarantor, any other Note Party or any officer thereof contained in this Agreement or any other Note Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Note Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents, or for any failure of the Issuer, any other Guarantor or any other Note Party to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Purchaser to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of any Note Party or any Affiliate thereof. The Collateral Agent shall not be under any obligation to the Administrative Agent or any Purchaser to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Note Document, or to inspect the properties, books or records of any Note Party.

(b)      Each Purchaser confirms to the Administrative Agent, each other Purchaser and each of their respective Related Parties that it (i) possesses (individually or through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, any other Purchaser or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) purchasing Notes hereunder and under the other Note Documents and (z) in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risks and (iii) has determined that entering into this Agreement and purchasing Notes hereunder and under the other Note Documents is suitable and appropriate for it.

(c)      Each Purchaser acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Note Documents, (ii) that it has, independently and without reliance upon the Administrative Agent, any other Purchaser or any of their respective Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information, as it has deemed appropriate and (iii) it will, independently and without reliance upon the Administrative Agent, any other Purchaser or any of their respective Related Parties, continue to be solely responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take action under, this Agreement and the other Note Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

(i)      the financial condition, status and capitalization of the Issuer and each other Note Party;

98

(ii) the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Note Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Note Document;

(iii) determining compliance or non-compliance with any condition hereunder to the purchase of a Note and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition; and

(iv) the adequacy, accuracy and/or completeness of any information delivered by the Administrative Agent, any other Purchaser or by any of their respective Related Parties under or in connection with this Agreement or any other Note Document, the transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Note Document.

10.4. <u>Reliance by Agents</u>. The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex, electronic mail, or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Issuer), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent. The Administrative Agent may deem and treat the Purchaser specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Note Document unless it shall first receive such advice or concurrence of the Required Purchasers as it deems appropriate and it shall first be indemnified to its satisfaction by the Purchasers against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Note Documents in accordance with a request of the Required Purchasers, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Purchasers and all future holders of the Notes; <u>provided</u> that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Note Document or Applicable Law. For purposes of determining compliance with the conditions specified in <u>Section 5</u> on the Closing Date, each Purchaser that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Purchaser unless the Administrative Agent shall have received notice from such Purchaser prior to the proposed Closing Date specifying its objection thereto.

10.5. <u>Notice of Default</u>. Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received notice from a Purchaser or the Issuer referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Purchasers and the Collateral Agent. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Purchasers; <u>provided</u> that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as is within its authority to take under this Agreement and otherwise as it shall deem advisable in the best

interests of the Purchasers except to the extent that this Agreement requires that such action be taken only with the approval of the Required Purchasers or each of the Purchasers, as applicable.

10.6.    Non-Reliance on Administrative Agent, Collateral Agent and Other Purchasers.  Each Purchaser expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereinafter taken, including any review of the affairs of the Issuer, any other Guarantor or any other Note Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Purchaser.  Each Purchaser represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Purchaser, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Issuer, each other Guarantor and each other Note Party and made its own decision to purchase its Notes hereunder and enter into this Agreement.  Each Purchaser also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Purchaser, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Note Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Issuer, each other Guarantor and each other Note Party.  Except for notices, reports and other documents expressly required to be furnished to the Purchasers by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Purchaser with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Issuer, any other Guarantor or any other Note Party that may come into the possession of the Administrative Agent or Collateral Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

10.7.    Indemnification.  The Purchasers agree to indemnify and hold harmless each Agent, in its capacity as such (to the extent not reimbursed by the Note Parties and without limiting the obligation of the Note Parties to do so), ratably according to their respective portions of the aggregate principal amount of all Notes as of such date (or, if indemnification is sought after the date upon which the Notes shall have been paid in full, ratably in accordance with their respective portions of the Notes in effect immediately prior to such date), in effect on the date on which indemnification is sought, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Notes) be imposed on, incurred by or asserted against such Agent, including all fees, disbursements and other charges of counsel to the extent required to be reimbursed by the Note Parties pursuant to Section 11.5, in any way relating to or arising out of the Commitments, this Agreement, any of the other Note Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing (**SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON**); provided that no Purchaser shall be liable to any Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; provided, further, that no action taken in accordance with the directions of the Required Purchasers (or such other number or percentage of the Purchasers as shall be required by the Note Documents) shall be deemed to

constitute gross negligence or willful misconduct for purposes of this <u>Section 10.7</u>. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur, be imposed upon, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Note Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing (including at any time following the payment of the Notes), this <u>Section 10.7</u> applies whether any such investigation, litigation or proceeding is brought by any Purchaser or any other Person. Without limitation of the foregoing, each Purchaser shall reimburse such Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Note Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Issuer; <u>provided</u> that such reimbursement by the Purchasers shall not affect the Issuer's continuing reimbursement obligations with respect thereto. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; <u>provided</u> in no event shall this sentence require any Purchaser to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Purchaser's *pro rata* portion thereof; and <u>provided</u> <u>further</u>, this sentence shall not be deemed to require any Purchaser to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct (as determined by a final judgment of court of competent jurisdiction). The agreements in this <u>Section 10.7</u> shall survive the payment of the Notes and all other amounts payable hereunder.

       10.8.    <u>Agents in its Individual Capacities</u>. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Issuer, any other Guarantor, and any other Note Party as though such Agent were not an Agent hereunder and under the other Note Documents. With respect to the Notes purchased by it, Agent shall have the same rights and powers under this Agreement and the other Note Documents as any Purchaser and may exercise the same as though it were not an Agent, and the terms "Purchaser" and "Purchasers" shall include each Agent in its individual capacity.

       10.9.    <u>Successor Agents</u>. Each of the Administrative Agent and Collateral Agent may resign at any time by notifying the other Agent, the Purchasers and the Issuer. Upon receipt of any such notice of resignation, the Required Purchasers shall have the right, subject to the consent of the Issuer (not to be unreasonably withheld or delayed), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States or such other Person approved by the Required Purchasers and the Issuer. If no such successor shall have been so appointed by the Required Purchasers and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Purchasers, appoint a successor Agent meeting the qualifications set forth above; <u>provided</u> that if such Agent shall notify the Issuer and the Purchasers that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (x) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Note Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Secured Parties under any of the Note Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (y) all payments,

communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Purchaser directly, until such time as the Required Purchasers with (except after the occurrence and during the continuation of a Default or Event of Default) the consent of the Issuer (not to be unreasonably withheld) appoint successor Agents as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Purchasers may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Note Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Issuer (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Issuer and such successor.  After the retiring Agent's resignation hereunder and under the other Note Documents, the provisions of this Section 10 (including 10.7) and Section 11.5 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

10.10.  Withholding Tax.  To the extent required by any Applicable Law, the Administrative Agent may withhold from any interest payment to any Purchaser an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Purchaser (because the appropriate form was not delivered, was not properly executed, or because such Purchaser failed to notify the Administrative Agent or of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Purchaser shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Issuer (solely to the extent required by this Agreement) and without limiting the obligation of the Issuer to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

10.11.  Security Documents and Guarantee. (a) Agents under Security Documents and Guarantee.  Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents, and specifically authorizes the Administrative Agent or Collateral Agent, as applicable, to enter into the Subordination Agreement. Subject to Section 11.1, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may execute any documents or instruments necessary to in connection with a sale or disposition of assets permitted by this Agreement, (i) release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets, or with respect to which Required Purchasers (or such other Purchasers as may be required to give such consent under Section 11.1) have otherwise consented, (ii) release any Lien encumbering any item of Collateral pursuant to the terms of the Subordination Agreement, (iii) release any Guarantor from the Guarantee, or with respect to which Required Purchasers (or such other Purchasers as may be required to give such consent under Section 11.1) have otherwise consented or (iv) release any Guarantor from the Guarantee pursuant to the terms of the Subordination Agreement.

(b)  Right to Realize on Collateral and Enforce Guarantee.  Anything contained in any of the Note Documents to the contrary notwithstanding, the Issuer, the Agents and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the

Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Purchasers in accordance with the terms hereof and all powers, rights and remedies under the Security Documents and Guarantee may be exercised solely by the Collateral Agent, on behalf of the Secured Parties, and (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Purchaser or Purchasers in its or their respective individual capacities unless Required Purchasers shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

SECTION 11. Miscellaneous.

11.1.    Amendments, Waivers and Releases.  Neither this Agreement nor any other Note Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 11.1. The Required Purchasers may, or, with the written consent of the Required Purchasers, the Administrative Agent and/or the Collateral Agent may, from time to time, (a) enter into with the relevant Note Party or Note Parties written amendments, supplements or modifications hereto and to the other Note Documents for the purpose of adding any provisions to this Agreement or the other Note Documents or changing in any manner the rights of the Purchasers or of the Note Parties hereunder or thereunder or (b) waive in writing, on such terms and conditions as the Required Purchasers or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Note Documents or any Default or Event of Default and its consequences; provided, however, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; and provided, further, that no such waiver and no such amendment, supplement or modification shall:

(i)    forgive or reduce any portion of any Note or extend the final scheduled maturity date of any Note or reduce the stated rate (it being understood that (x) only the consent of the Required Purchasers shall be necessary to waive any obligation of the Issuer to pay interest or principal at the "Default Rate"; provided that any waiver of any obligation of the Issuer to pay interest or principal of the Tranche A-3 Notes at the "Default Rate" shall require the consent of the Required Tranche A-3 Note Purchasers and (y) only the consent of the Required Purchasers shall be necessary to amend Section 2.3(c); provided that any amendment to Section 2.3(c) which affects the Initial Tranche A-3 Note Purchasers disproportionately when compared to the other Purchasers, shall require the consent of the Required Tranche A-3 Note Purchasers), or forgive any portion, or extend the date for the payment, of any interest or Fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Note, or amend or modify any provisions of Section 4.3(a) (with respect to the ratable allocation of any payments only) and 11.8(a) and 11.19 or make any Note, interest, Fee or other amount payable in any currency other than expressly provided herein, in each case without the written consent of each Purchaser directly and adversely affected thereby; provided, that, the Required Purchasers (solely for the purposes of this proviso, the Purchasers holding Tranche A-3 Notes shall be disregarded in determining Required Purchasers at any time) may waive, forgive or reduce the Prepayment Fee (other than the portion of the Prepayment Fee with respect to the Tranche A-3 Notes); provided, further, that (x) if a Required Tranche A-3 Notes Sale has not occurred, only the Required Tranche A-3 Note Purchasers and (y) if a Required Tranche A-3 Notes Sale has occurred, the Prepayment Tranche A-3 Note

Purchasers, may waive, forgive or reduce the portion of the Prepayment Fee with respect to the Tranche A-3 Notes; or

(ii)    amend, modify or waive any provision of this Section 11.1 or reduce the percentages or number of Purchasers advised and/or managed by investment managers specified in the definition of the term "Required Purchasers", consent to the assignment or transfer by the Issuer of their respective rights and obligations under any Note Document to which it is a party (except as permitted pursuant to Section 8.3), in each case without the written consent of each Purchaser directly and adversely affected thereby, or

(iii)    amend, modify or waive any provision of Section 10 without the written consent of the then-current Administrative Agent and Collateral Agent or any other former or current Agent to whom Section 10 then applies in a manner that directly and adversely affects such Person, or

(iv)    release all or substantially all of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement or the Subordination Agreement) or release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement or the Subordination Agreement), in either case without the prior written consent of each Purchaser,

(v)    affect the rights or duties of, or any Fees or other amounts payable to, any Agent under this Agreement or any other Note Document without the prior written consent of such Agent;

(vi)    amend, modify or waive the definition of "Equity Conversion" or any provision of Section 4.7 without the written consent of the Required EFIH Unsecured Consenting Creditors; or

(vii)    amend, modify or waive any provision of Section 2.2(c)(i) without the written consent of the Required Tranche A-3 Note Purchasers.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Purchasers and shall be binding upon the Issuer, the applicable Note Parties, such Purchasers, the Administrative Agent and all future holders of the affected Notes.

In the case of any waiver, the Issuer, the applicable Note Parties, the Purchasers, the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Note Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Purchaser, execute amendments, modifications, waivers or consents on behalf of such Purchaser.

Notwithstanding anything to the contrary herein, no Defaulting Purchaser shall have any right to approve or disapprove any amendment, modification, supplement, waiver or consent hereunder (it being understood that any Notes held or deemed held by any Defaulting Purchaser shall be excluded for a vote of the Purchasers hereunder requiring any consent of the Purchasers, except as expressly provided for by this Agreement).

In addition, notwithstanding the foregoing, (i) the Administrative Agent, the Collateral Agent and the relevant Note Parties may amend, supplement or modify the Security Documents to make such ministerial changes as may be required to effect the provisions of Section 8.2(a) without the consent of any Purchaser so long as such amendments do not adversely affect the Purchasers and (ii) the Administrative Agent, the Collateral Agent and the relevant Note Parties may amend, supplement or modify this Agreement or any of the Security Documents and any other document delivered in connection therewith at the request of the Issuer without the need to obtain the consent of any other Purchaser if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects, or (iii) to cause such any such Security Document or other document to be consistent with this Agreement and the other Note Documents.

Subject to the Subordination Agreement in each case, the Purchasers hereby irrevocably agree that the Liens granted to the Collateral Agent by the Note Parties on any Collateral shall be automatically released (i) in full, upon the Obligations (except for Contingent Obligations) having been paid in full (including pursuant to the Equity Conversion), (ii) upon the sale or other disposition of such Collateral (including as part of or in connection with any other sale or other disposition permitted hereunder) to any Person other than another Note Party, to the extent such sale or other disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Note Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Note Party, upon termination (in accordance with the terms of this Agreement) or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Purchasers (or such other percentage of the Purchasers whose consent may be required in accordance with this Section 11.1), (v) to the extent the property constituting such Collateral is owned by any Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its obligations under the Guarantee (in accordance with the following sentence), (vi) in accordance with the Subordination Agreement, and (vii) as required to effect any sale or other disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Note Documents. Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Note Parties in respect of) all interests retained by the Note Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Note Documents. Additionally, the Purchasers hereby irrevocably agree that the Subsidiary Guarantors shall be automatically released from the Guarantee upon consummation of any transaction resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary or otherwise released pursuant to the Subordination Agreement. The Purchasers hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Subsidiary Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Purchaser.

11.2.    Notices. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Note Document shall be in writing (including by facsimile or other electronic transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)    if to the Issuer, the Administrative Agent or the Collateral Agent to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 11.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)     if to any other Purchaser, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Issuer, the Administrative Agent and the Collateral Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail, when delivered; provided that notices and other communications to the Administrative Agent or the Purchasers pursuant to Sections 2.2, 2.4, and 4.1 shall not be effective until received.

11.3.    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Purchaser, any right, remedy, power or privilege hereunder or under the other Note Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.4.    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Note Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the purchasing of the Notes hereunder.

11.5.    Payment of Expenses; Indemnification.

(a)     Subject to the Subordination Agreement, the Issuer agrees (a) to pay or reimburse the Agents and the Purchasers for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution and delivery of, and any amendment, supplement or modification to, this Agreement and the other Note Documents and any other documents prepared in connection herewith or therewith, the consummation and administration of the transactions contemplated hereby and thereby, any Event of Default or the enforcement or preservation of any rights under this Agreement, the other Note Documents and any such other documents, including the reasonable and documented out-of-pocket Prepetition and post-Petition Date fees, disbursements and other charges of Advisors; (b) to pay, indemnify, and hold harmless the Administrative Agent and each Purchaser from, any and all recording and filing fees and (c) to pay, indemnify, and hold harmless the Agents and the Purchasers and their respective Affiliates, directors, officers, partners, employees, agents or other Related Parties from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of legal counsel, financial advisors, other advisors and professionals, related to the Transactions (including the Cases) or, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Note Documents and any such other documents, including, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such indemnified Person or any of its Related Parties (other than trustees and advisors)) or to any actual or alleged presence, release or threatened release into the environment of Hazardous Materials attributable to the operations of the Issuer, any of the Issuer's Subsidiaries or any of the Real Estate (all the foregoing in this clause (c), collectively, the **"indemnified liabilities") (SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT**

CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON); provided that neither the Issuer nor any other Note Party shall have any obligation hereunder to any Agent or any Purchaser or any of their respective Related Parties with respect to indemnified liabilities to the extent they are resulting from (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties, as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties under the Note Documents, as determined by a final non-appealable judgment of a court of competent jurisdiction or (C) disputes not involving an act or omission of the Issuer or any other Note Party and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or any similar role under the Note Documents.

(b)     Parent agrees to pay, indemnify, and hold harmless the Agents and the Purchasers and their respective Affiliates, directors, officers, partners, employees, agents or other Related Parties from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, including reasonable and documented out-of-pocket fees, disbursements and other charges of legal counsel, financial advisors, other advisors and professionals, related to or arising out of an Acceptable Reorganization Plan or the Equity Conversion or, with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the Plan Restructuring Documents (as defined in the Restructuring Support Agreement) and any such other documents (all the foregoing in this paragraph, collectively, the "**Parent indemnified liabilities**") (SUBJECT TO THE PROVISO BELOW, WHETHER OR NOT CAUSED BY OR ARISING IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE ORDINARY NEGLIGENCE OF THE INDEMNIFIED PERSON); provided that Parent shall not have any obligation hereunder to any Agent or any Purchaser or any of their respective Related Parties with respect to Parent indemnified liabilities to the extent they are resulting from (A) the gross negligence, bad faith or willful misconduct of such indemnified Person or any of its Related Parties, as determined by a final non-appealable judgment of a court of competent jurisdiction, (B) a material breach of the obligations of such indemnified Person or any of its Related Parties under the this Agreement or the Plan Restructuring Documents (as defined in the Restructuring Support Agreement), as determined by a final non-appealable judgment of a court of competent jurisdiction or (C) disputes not involving an act or omission of the Parent and that is brought by an indemnified Person against any other indemnified Person, other than any claims against any indemnified Person in its capacity or in fulfilling its role as an Agent or any similar role under the Note Documents.

The agreements in this Section 11.5 shall survive repayment of the Notes and all other amounts payable hereunder. All amounts payable under this Section 11.5 shall be paid within ten (10) days following written demand of the Issuer together with an invoice relating thereto setting forth such expense in reasonable detail.

No Note Party nor any indemnified Person shall have any liability for any special, punitive, indirect or consequential damages resulting from this Agreement or any other Note Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (except, in the case of the Issuer's obligation hereunder to indemnify and hold harmless the indemnified Persons, to the extent any indemnified Persons is found liable for special, punitive, indirect or consequential damages to a third party). No indemnified Persons shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Note Documents or the transactions contemplated hereby or thereby, except to the

extent that such damages have resulted from the willful misconduct, bad faith or gross negligence of any indemnified Person or any of its Related Parties (as determined by a final non-appealable judgment of a court of competent jurisdiction). This Section 11.5 shall not apply to Taxes.

11.6.    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as expressly permitted by Section 8.3, the Issuer may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Purchaser (and any attempted assignment or transfer by the Issuer without such consent shall be null and void) and (ii) no Purchaser may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 11.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Purchasers and each other Person entitled to indemnification under Section 11.5 and, to the extent expressly contemplated by Section 11.20, the Oncor Subsidiaries) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in clause (b)(ii) below, any Purchaser may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Notes at the time owing to it); provided, however, to extent the Issuer and its legal and tax advisors (in their reasonable business judgment), in consultation with the Commitment Parties and their advisors, determine such assignments may affect or delay any of the transactions, regulatory approvals, or provision of any private letter ruling sought pursuant to or necessary for the consummation of the transactions contemplated by the Restructuring Support Agreement (it being agreed and acknowledged that after regulatory filings are made in respect of the Transactions, the Issuer shall be entitled to provide a notice that any assignment could affect or delay any of the transactions, regulatory approvals, or provision of any private letter ruling sought pursuant to or necessary for the consummation of the transactions contemplated by the Restructuring Support Agreement), such assignment shall require the prior written consent of the Issuer; provided, further, that if the Issuer has not given the Administrative Agent written notice of such determination within seven (7) Business Days after written notice to an Authorized Officer of the Issuer of such assignment, the Issuer is deemed to have determined such assignment does not affect or delay any of the transactions, regulatory approvals, or provision of any private letter ruling sought pursuant to or necessary for the consummation of the transactions contemplated by the Restructuring Support Agreement.

Notwithstanding the foregoing or any other term or condition herein to the contrary, no such assignment shall be made to a natural person.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except (i) in the case of an assignment to a Purchaser, an Affiliate of a Purchaser, an Approved Fund, a Selected Partner, a Post-Funding Partner or Specified Consultant or an assignment of the entire remaining amount of the assigning Purchaser's Commitment or Notes, the amount of the Commitment or Notes of the assigning Purchaser subject to each such assignment shall not be less than, in the case of Notes and Commitments, $5,000,000 and increments of $1,000,000 in excess thereof unless each of the Issuer and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); provided that no such consent of the Issuer shall be required if a Specified Default has occurred

and is continuing with respect to the Issuer; provided, further, that contemporaneous assignments to a single assignee made by Affiliates of Purchasers and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Purchaser's rights and obligations under this Agreement; provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Purchaser's rights and obligations in respect of Commitments or Notes;

(C)     each assignment is made in accordance with all Applicable Laws (including securities laws);

(D)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, which will require the assignee to make the representation and warranties set forth in Section 2.5, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment;

(E)     the assignee, if it shall not be a Purchaser, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent (the "**Administrative Questionnaire**"), such other documentation and information as is reasonably requested by the Administrative Agent under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act and such tax forms as are required to be delivered by Non-U.S. Purchasers or U.S. Purchasers, as the case may be, under Section 4.4;

(F)     the assignee shall deliver to the Issuer and the Commitment Parties a joinder to the Restructuring Support Agreement; and

(G)     notwithstanding any other provision of this Agreement, any assignment (other than assignments to an Affiliate of the assignor) shall not be permitted and shall be null and void *ab initio*, if, assuming the Equity Conversion were to be consummated immediately upon such assignment, such assignee and its Affiliates were to obtain (including any other Notes owned by such assignee and its Affiliates) beneficial ownership of fifty percent (50%) or more of the Reorganized EFH Common Stock.

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 11.6, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Purchaser under this Agreement and the Notes, and the assigning Purchaser thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Purchaser's rights and obligations under this Agreement, such Purchaser cease to be a party hereto but shall continue to be entitled to the benefits of Sections 4.4 and 11.5). Any assignment or transfer by a Purchaser of rights or obligations under this Agreement that does not comply with this Section 11.6 shall be null and void.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Issuer, shall maintain at the Administrative Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Purchasers, and

the Commitments of, and principal amount of the Notes owing to each Purchaser pursuant to the terms hereof from time to time (the "**Register**"). Further, each Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive, and the Issuer, the Administrative Agent, the Collateral Agent and the Purchasers shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Purchaser hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Issuer, the Collateral Agent and any Purchaser, at any reasonable time and from time to time upon reasonable prior notice. This Section shall be construed so that the Notes are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Purchaser and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Purchaser hereunder), the processing and recordation fee referred to in clause (b) of this Section 11.6 (unless waived), a joinder to the Restructuring Agreement (to the extent such assignee is required to delivery such joinder pursuant to Section 11.6(b)(ii)(F)), and any written consent to such assignment required by clause (b)(i) of this Section 11.6, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.

(c)     Any Purchaser may, without the consent of the Issuer, the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Purchaser, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 11.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Purchaser from any of its obligations hereunder or substitute any such pledgee or assignee for such Purchaser as a party hereto.

(d)     Subject to Section 11.16, the Issuer authorizes each Purchaser to disclose to any secured creditor of such Purchaser or assignee (each, a "**Transferee**"), any prospective Transferee and any prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Notes made hereunder any and all financial information (including Projections) in such Purchaser's possession concerning the Issuer and its Affiliates that has been delivered to such Purchaser by or on behalf of the Issuer and its Affiliates pursuant to this Agreement or that has been delivered to such Purchaser by or on behalf of the Issuer and its Affiliates in connection with such Purchaser's credit evaluation of the Issuer and its Affiliates prior to becoming a party to this Agreement.

(e)     The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(f)     Notwithstanding any other provision of this Agreement, each Purchaser holding Tranche A-1 Notes hereby agrees that it will not:

(i)     sell, transfer, assign, pledge or otherwise directly or indirectly dispose of (to "**Transfer**" or, if used as a noun, a "**Transfer**") any interest in such Purchaser's Tranche A-1 Notes (EFIH Toggle) (other than pursuant to a Required Post-Funding Sale or a Required Specified Consultant Sale or a Transfer to such Purchaser's Affiliates) to any Person without the concurrent Transfer to such Person of its Specified Toggle Notes (or Specified Toggle Notes held by such Purchaser's affiliates) in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's Tranche A-1 Notes (EFIH Toggle) Transferred and (B) the Tranche A-1 Notes (EFIH Toggle) Transfer Percentage;

(ii)     Transfer any interest in such Purchaser's Tranche A-1 Notes (EFIH Unexchanged) (other than pursuant to a Required Post-Funding Sale or a Required Specified Consultant Sale or a Transfer to such Purchaser's Affiliates) to any Person without the concurrent Transfer to such Person of its Specified Unexchanged Notes (or Specified Unexchanged Notes held by such Purchaser's affiliates) in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's Tranche A-1 Notes (EFIH Unexchanged) Transferred and (B) the Tranche A-1 Notes (EFIH Unexchanged) Transfer Percentage;

(iii)     Transfer any interest in such Purchaser's Tranche A-1 Notes (EFH LBO Senior) (other than pursuant to a Required Post-Funding Sale or a Required Specified Consultant Sale or a Transfer to such Purchaser's Affiliates) to any Person without the concurrent Transfer to such Person of its Specified EFH LBO Senior Notes (or Specified EFH LBO Senior Notes held by such Purchaser's affiliates) in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's Tranche A-1 Notes (EFH LBO Senior) Transferred and (B) the Tranche A-1 Notes (EFH LBO Senior) Transfer Percentage;

(iv)     Transfer any interest in such Purchaser's Tranche A-1 Notes (EFH LBO Toggle) (other than pursuant to a Required Post-Funding Sale or a Required Specified Consultant Sale or a Transfer to such Purchaser's Affiliates) to any Person without the concurrent Transfer to such Person of its Specified EFH LBO Toggle Notes (or Specified EFH LBO Toggle Notes held by such Purchaser's affiliates) in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's Tranche A-1 Notes (EFH LBO Toggle) Transferred and (B) the Tranche A-1 Notes (EFH LBO Toggle) Transfer Percentage;

(v)     Transfer any interest in such Purchaser's or its affiliates' Specified Toggle Notes to any Person (other than a Transfer to such Purchaser's Affiliates) without the concurrent Transfer to such Person of Tranche A-1 Notes in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's or its affiliates' Specified Toggle Notes Transferred and (B) the Specified Toggle Notes Transfer Percentage;

(vi)     Transfer any interest in such Purchaser's or its affiliates' Specified Unexchanged Notes to any Person (other than a Transfer to such Purchaser's Affiliates) without the concurrent Transfer to such Person of Tranche A-1 Notes in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's or its affiliates' Specified Unexchanged Notes Transferred and (B) the Specified Unexchanged Notes Transfer Percentage;

(vii)     Transfer any interest in such Purchaser's or its affiliates' Specified EFH LBO Senior Notes to any Person (other than a Transfer to such Purchaser's Affiliates) without the concurrent Transfer to such Person of Tranche A-1 Notes in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's or its affiliates' Specified EFH LBO Senior Notes Transferred and (B) the Specified EFH LBO Senior Notes Transfer Percentage; and

111

(viii)    Transfer any interest in such Purchaser's or its affiliates' Specified EFH LBO Toggle Notes to any Person (other than a Transfer to such Purchaser's Affiliates) without the concurrent Transfer to such Person of Tranche A-1 Notes in an aggregate principal amount equal to the product of (A) the principal amount of such Purchaser's or its affiliates' Specified EFH LBO Toggle Notes Transferred and (B) the Specified EFH LBO Toggle Notes Transfer Percentage.

Any Transfer or attempted Transfer of any of the Tranche A-1 Notes, Prepetition Toggle Notes, Prepetition Unexchanged Notes or Prepetition EFH LBO Notes in violation of this Section 11.6(f) shall be void, and the Issuer and Administrative Agent shall not record such Transfer on their books or Register, as applicable, or treat any purported transferee of such Tranche A-1 Notes, Prepetition Toggle Notes, Prepetition Unexchanged Notes or Prepetition EFH LBO Notes, as applicable, as the owner of such shares for any purpose.

11.7.    Replacements of Purchasers under Certain Circumstances.

(a)    The Issuer shall be permitted to replace any Purchaser that (a) requests reimbursement for amounts owing pursuant to Section 4.4, or (b) becomes a Defaulting Purchaser, with a replacement bank or other financial institution; provided that (i) such replacement does not conflict with any Applicable Law, (ii) no Specified Default shall have occurred and be continuing at the time of such replacement, (iii) the Issuer shall repay (or the replacement bank or institution shall purchase, at par) all Notes and other amounts (other than any disputed amounts), pursuant to Section 4.4) owing to such replaced Purchaser prior to the date of replacement, (iv) the replacement bank or institution, if not already a Purchaser, and the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent, (v) the replaced Purchaser shall be obligated to make such replacement in accordance with the provisions of Section 11.6 (provided that the Issuer shall be obligated to pay the registration and processing fee referred to therein) and (vi) any such replacement shall not be deemed to be a waiver of any rights that the Issuer, the Administrative Agent or any other Purchaser shall have against the replaced Purchaser.

(b)    If any Purchaser (such Purchaser, a **"Non-Consenting Purchaser"**) has failed to consent to a proposed amendment, modification, supplement, waiver, discharge or termination that pursuant to the terms of Section 11.1 requires the consent of all of the Purchasers or all Purchasers directly and adversely affected and with respect to which the Required Purchasers shall have granted their consent (or at least 50.1% of the directly and adversely affected Purchasers), then provided no Event of Default then exists, the Issuer shall have the right (unless such Non-Consenting Purchaser grants such consent) to replace such Non-Consenting Purchaser by requiring such Non-Consenting Purchaser to assign its Notes and its Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent (at the direction of the Required Purchasers); provided that:  (a) all Obligations of the Issuer owing to such Non-Consenting Purchaser being replaced shall be paid in full to such Non-Consenting Purchaser concurrently with such assignment, and (b) the replacement Purchaser shall purchase the foregoing by paying to such Non-Consenting Purchaser a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  In connection with any such assignment, the Issuer, Administrative Agent, such Non-Consenting Purchaser and the replacement Purchaser shall otherwise comply with Section 11.6.

11.8.    Adjustments; Set-off.  Subject in each case to the Final Order and the terms of the Subordination Agreement:

(a)    If any Purchaser (a **"Benefited Purchaser"**) shall at any time receive any payment of all or part of its Notes, or interest thereon, or receive any collateral in respect thereof (whether

voluntarily or involuntarily, by set-off, or otherwise) from the Issuer or any of its Affiliates, in a greater proportion than any such payment to or collateral received by any other Purchaser, if any, in respect of such other Purchaser's Notes, or interest thereon, such Benefited Purchaser shall purchase for cash from the other Purchasers a participating interest in such portion of each such other Purchaser's Note, or shall provide such other Purchasers with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Purchaser to share the excess payment or benefits of such collateral or proceeds ratably with each of the Purchasers; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Purchaser, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

      (b)    After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Purchasers provided by Applicable Law, each Purchaser shall have the right, without prior notice to the Issuer, any such notice being expressly waived by the Issuer to the extent permitted by Applicable Law, upon any amount becoming due and payable by the Issuer hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Purchaser or any branch or agency thereof to or for the credit or the account of the Issuer. Each Purchaser agrees promptly to notify the Issuer and the Administrative Agent after any such set-off and application made by such Purchaser; provided that the failure to give such notice shall not affect the validity of such set-off and application.

      11.9.   Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Issuer and the Administrative Agent.

      11.10.   Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

      11.11.   INTEGRATION. THIS WRITTEN AGREEMENT AND THE OTHER NOTE DOCUMENTS REPRESENT THE FINAL AGREEMENT OF THE ISSUER, THE COLLATERAL AGENT, THE ADMINISTRATIVE AGENT AND THE PURCHASERS WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND (1) THERE ARE NO PROMISES, UNDERTAKINGS, REPRESENTATIONS OR WARRANTIES BY THE ISSUER, THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT OR ANY PURCHASER RELATIVE TO SUBJECT MATTER HEREOF NOT EXPRESSLY SET FORTH OR REFERRED TO HEREIN OR IN THE OTHER NOTE DOCUMENTS, (2) THIS AGREEMENT AND THE OTHER NOTE DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES AND (3) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES; PROVIDED THAT THE ISSUER'S CONFIDENTIALITY OBLIGATIONS IN THE COMMITMENT LETTER SHALL REMAIN IN FULL FORCE AND EFFECT. IT IS SPECIFICALLY AGREED THAT THE PROVISION OF THE NOTES HEREUNDER BY THE PURCHASERS SUPERSEDES AND IS IN

SATISFACTION OF THE OBLIGATIONS OF THE AGENT (AS DEFINED IN THE COMMITMENT LETTER) TO PROVIDE THE COMMITMENTS SET FORTH IN THE COMMITMENT LETTER.

11.12. GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

11.13. Submission to Jurisdiction; Waivers. Each party hereto irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Note Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Bankruptcy Court, and to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;

(b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 11.2 at such other address of which the Administrative Agent shall have been notified pursuant to Section 11.2;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction;

(e) subject to the last paragraph of Section 11.5, waives, to the maximum extent not prohibited by Applicable Law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 11.13 any special, exemplary, punitive or consequential damages; and

(f) agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

11.14. Acknowledgments. The Issuer hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Note Documents;

(b) (i) the Notes provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Note Document) are an arm's-length commercial transaction between the Issuer, on the one hand, and the Administrative Agent, the Purchasers and the other Agent on the other hand, and the Issuer and the other Note Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Note Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection

with the process leading to such transaction, the Administrative Agent is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of the Issuer, any other Note Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent nor any other Agent has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Issuer or any other Note Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Note Document (irrespective of whether the Administrative Agent or any other Agent has advised or is currently advising the Issuer, the other Note Parties or their respective Affiliates on other matters) and neither the Administrative Agent or other Agent has any obligation to the Issuer, the other Note Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Note Documents; (iv) the Administrative Agent, each other Agent and each Affiliate of the foregoing may be engaged in a broad range of transactions that involve interests that differ from those of the Issuer and their respective Affiliates, and neither the Administrative Agent nor any other Agent has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) neither the Administrative Agent nor any other Agent has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Note Document) and the Issuer has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Issuer agrees not to claim that the Administrative Agent or any other Agent has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Issuer or any other Affiliates, in connection with the transactions contemplated hereby or the process leading hereto.

(c)     no joint venture is created hereby or by the other Note Documents or otherwise exists by virtue of the transactions contemplated hereby among the Purchasers or among the Issuer, on the one hand, and any Purchaser, on the other hand.

11.15.    WAIVERS OF JURY TRIAL. THE ISSUER, AGENT AND EACH PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

11.16.    Confidentiality. The Administrative Agent, each other Agent and each Purchaser shall hold all non-public information furnished by or on behalf of the Issuer or any Subsidiary of the Issuer in connection with such Purchaser's evaluation of whether to become a Purchaser hereunder or obtained by such Purchaser, the Administrative Agent or such other Agent pursuant to the requirements of this Agreement or in connection with any amendment, supplement, modification or waiver or proposed amendment, supplement, modification or waiver hereto or the other Note Documents ("**Confidential Information**"), confidential in accordance with its customary procedure for handling confidential information of this nature and (in the case of a Purchaser that is a bank) in accordance with safe and sound banking practices and in any event may make disclosure as required or requested by any governmental, regulatory or self-regulatory agency or representative thereof or pursuant to legal process or Applicable Law or (a) to such Purchaser's or the Administrative Agent's or such other Agent's attorneys, professional advisors, independent auditors, trustees or Affiliates, (b) to an investor or prospective investor in a Securitization that agrees its access to information regarding the Note Parties, the Notes and the Note Documents is solely for purposes of evaluating an investment in a Securitization and who agrees to treat such information as confidential, (c) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a Securitization and who agrees to treat such information as confidential, (d) to a nationally recognized ratings agency that requires access to information regarding

the Note Parties, the Notes and Note Documents in connection with ratings issued with respect to a Securitization and (e) to prospective Transferees or to any pledgee referred to in Section 11.6 or to prospective direct or indirect contractual counterparties to any swap or derivative transactions to be entered into in connection with or relating to Notes made hereunder (so long as such Person is advised of and agrees to be bound by the provisions of this Section 11.16 or confidentiality provisions at least as restrictive as those set forth in this Section 11.16); provided that unless specifically prohibited by Applicable Law or court order, each Purchaser, the Administrative Agent and each other Agent shall use commercially reasonable efforts to notify the Issuer of any request made to such Purchaser, the Administrative Agent or such other Agent, as applicable, by any governmental, regulatory or self-regulatory agency or representative thereof (other than any such request in connection with a routine examination of such Purchaser by such governmental regulatory or self-regulatory agency) for disclosure of any such non-public information prior to disclosure of such information; and provided further that in no event shall any Purchaser, the Administrative Agent or any other Agent be obligated or required to return any materials furnished by the Issuer or any Subsidiary of the Issuer.

11.17.   Direct Website Communications.

(a)     The Issuer may, at their option, provide to the Administrative Agent any information, documents and other materials that they are obligated to furnish to the Administrative Agent pursuant to the Note Documents, including, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or Interest Period relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit thereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at 225 W. Washington Street, Suite 2100, Chicago, Illinois 60606; provided that: (i) upon written request by the Administrative Agent, the Issuer shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Purchaser until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Issuer shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Purchaser shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents. Nothing in this Section 11.17 shall prejudice the right of the Issuer, the Administrative Agent, any other Agent or any Purchaser to give any notice or other communication pursuant to any Note Document in any other manner specified in such Note Document.

(b)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Note Documents. Each Purchaser agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Purchaser for purposes of the Note Documents. Each Purchaser agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Purchaser's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(c)    The Issuer further agrees that the Agents may make the Communications available to the Purchasers by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "**Platform**"), so long as the access to such Platform is limited (i) to the Agents, the Purchasers or any bona fide potential Transferee and (ii) remains subject the confidentiality requirements set forth in Section 11.16.

(d)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. In no event shall any Agent or their Related Parties (collectively, the "**Agent Parties**" and each an "**Agent Party**") have any liability to the Issuer, any Purchaser or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Issuer's or any Agent's transmission of Communications through the internet, except to the extent the liability of any Agent Party resulted from such Agent Party's (or any of its Related Parties' (other than trustees or advisors)) gross negligence, bad faith, willful misconduct or material breach of the Note Documents (as determined in a final non-appealable judgment of a court of competent jurisdiction).

(e)    The Issuer and each Purchaser acknowledge that certain of the Purchasers may be "public-side" Purchasers (Purchasers that do not wish to receive material non-public information with respect to the Issuer, the Subsidiaries of the Issuer or their securities) and, if documents or notices required to be delivered pursuant to the Note Documents or otherwise are being distributed through the Platform, any document or notice that the Issuer has indicated contains only publicly available information with respect to the Issuer and the Subsidiaries of the Issuer and their securities may be posted on that portion of the Platform designated for such public-side Purchasers. If the Issuer has not indicated whether a document or notice delivered contains only publicly available information, the Administrative Agent shall post such document or notice solely on that portion of the Platform designated for Purchasers who wish to receive material nonpublic information with respect to the Issuer, the Subsidiaries of the Issuer and their securities. Notwithstanding the foregoing, the Issuer shall use commercially reasonable efforts to indicate whether any document or notice contains only publicly available information.

11.18.    USA PATRIOT Act. Each Purchaser hereby notifies the Issuer that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies each Note Party, which information includes the name and address of each Note Party and other information that will allow such Purchaser to identify each Note Party in accordance with the Patriot Act.

11.19.    Payments Set Aside. To the extent that any payment by or on behalf of the Issuer is made to any Agent or any Purchaser, or any Agent or any Purchaser exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Purchaser in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Purchaser severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so

recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to an overnight rate determined by the Administrative Agent, in accordance with banking industry rules on interbank compensation from time to time in effect.

11.20.  Separateness.

(a)  The Secured Parties hereby acknowledge (i) the legal separateness of the Issuer and the Subsidiaries of the Issuer (other than Oncor Subsidiaries) from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Credit Facility and the noteholders under the Existing Oncor Notes and under the transition bonds have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from  the Issuer and the Subsidiaries of the Issuer (other than the Oncor Subsidiaries), (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and the Subsidiaries of the Issuer (other than the Oncor Subsidiaries), (iv) that the Obligations are obligations and liabilities of the Issuer and the other Note Parties only, and are not the obligations or liabilities of any of the Oncor Subsidiaries, (v) that the Secured Parties shall look solely to the Issuer and the Guarantors and such Persons' assets, and not to any assets, or to the pledge of any assets, owned by any of the Oncor Subsidiaries, for the repayment of any amounts payable pursuant to this Agreement and for satisfaction of any other Obligations, and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Secured Parties for any amounts payable, or any other Obligation, under the Note Documents.

(b)  The Secured Parties hereby acknowledge and agree that the Secured Parties shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver, or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any of the Oncor Subsidiaries, or against any of the Oncor Subsidiaries' assets. The Secured Parties further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the foregoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

SECTION 12. Security.

12.1.  Security.

(a)  Collateral; Grant of Lien and Security Interest.  Subject in all cases to the terms of the Subordination Agreement and in accordance with the terms thereof:

(i)  Pursuant to the Final Order and in accordance with the terms thereof (and subject to the terms and conditions set forth therein), as security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the Obligations, the Issuer hereby assigns, pledges, and grants to the Collateral Agent, for the benefit of the Secured Parties (subject, in each case, to the Carve Out, the Senior DIP Obligations and the terms of the Subordination Agreement):

(A)  a fully-perfected second priority senior security interest in and Lien upon, pursuant to section 364(c)(2) of the Bankruptcy Code, all prepetition and postpetition property of the Issuer, whether existing on the Petition Date or thereafter acquired that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable Liens, including, without limitation, all real and personal property, inventory, plant, fixtures, machinery, equipment, cash, any investment of such cash, accounts receivable, other rights to payment whether arising before or after the Petition Date (including, without limitation, post-petition intercompany claims of the Issuer), deposit accounts, investment property, supporting obligations, minerals, oil, gas, and as-extracted

collateral, causes of action (including those arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), royalty interests, chattel paper, contracts, general intangibles, documents, instruments, interests in leaseholds, letter of credit rights, patents, copyrights, trademarks, trade names, other intellectual property, Stock and Stock Equivalents of Subsidiaries, books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (the "**Unencumbered Property**"); provided that the Unencumbered Property shall exclude the Issuer's Avoidance Actions, but subject only to, and effective upon, entry of the Final Order, shall include any proceeds or property recovered, unencumbered, or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement, or otherwise;

(B)    a fully-perfected junior security interest in and Lien upon, pursuant to section 364(c)(3) of the Bankruptcy Code, all prepetition and postpetition property of the Issuer (other than the property described in clauses (A) and (B) of this Section 12.1(a)(i), as to which the Liens and security interests in favor of the Collateral Agent, for the benefit of the Secured Parties, will be as described in such clauses), whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date, or to any valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Adequate Protection Liens);

provided, that notwithstanding anything to the contrary in this Section 12.1(a)(i), the Collateral shall include all property pledged, mortgaged or purported to be pledged or mortgaged pursuant to the Senior DIP Documents and exclude Excluded Collateral.

(ii)    The security interests and Liens in favor of the Collateral Agent in the Collateral shall be effective immediately upon the entry of the Final Order and subject, only in the event of the occurrence and during the continuance of an Event of Default, to the Carve Out, the terms and conditions set forth in the Final Order, the Senior DIP Obligations, and the Subordination Agreement. Such Liens and security interests and their priority shall remain in effect until the Obligations (except for Contingent Obligation) have been paid in full (including pursuant to the Equity Conversion).

(iii)    Subject only to the Senior DIP Obligations, the Subordination Agreement and prior payment of the Carve Out, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases (as defined in the Final Order) or in any other proceedings related thereto, and no priority claims, are or will be senior to, or pari passu with, any claim of any Secured Party or the Collateral Agent against any Note Party.

(b)    Administrative Priority. Subject to the Senior DIP Obligations, the Subordination Agreement and the entry of the Final Order, the Issuer agrees that its Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims in the Cases or any Successor Cases, ranking on a parity with each other and having priority over all administrative expense claims, diminution claims, unsecured claims, and all other claims against the EFIH Debtors or their estates in any of the Cases and any Successor Cases, existing on the Petition Date or thereafter, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject only to, and upon entry of, the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code,

subject only the Carve Out and the Senior DIP Obligations, to the extent specifically provided for in the Final Order.

(c)     Grants, Rights and Remedies.  The Liens and security interests granted pursuant to Section 12.1(a)(i) hereof and the administrative priority granted pursuant to Section 12.1(b) hereof may be independently granted by the Note Documents and by other Note Documents hereafter entered into. This Agreement, the Final Order, and such other Note Documents supplement each other, and the grants, priorities, rights, and remedies of the Agents and the Secured Parties hereunder and thereunder are cumulative.

(d)     No Filings Required.  The Liens and security interests referred to in this Section 12 shall be deemed valid and perfected by entry of the Final Order, and entry of the Final Order shall have occurred on or before any Note is issued.  The Collateral Agent shall not be required to file or record any financing statements, patent filings, trademark filings, mortgages, notices of Lien, or other instrument or document in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the Final Order or any other Note Document.

(e)     Survival.  Subject to the Subordination Agreement, the Liens, lien priority, administrative priorities and other rights and remedies granted to the Collateral Agent and the Secured Parties pursuant to this Agreement, the Final Order, and the other Note Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the EFIH Debtors (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission, subject to the Subordination Agreement:

(i)     except to the extent of the Carve Out and the Senior DIP Obligations, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Cases or any Successor Cases, or in any other proceedings related thereto, and no priority claims, are or will be superior to or pari passu with any claim of the Collateral Agent and the Secured Parties against the EFIH Debtors;

(ii)     subject to the Carve Out and the Senior DIP Obligations and subject to the terms of the Final Order, the Liens in favor of the Collateral Agent and the Secured Parties set forth in Section 12.1(a)(i) hereof shall constitute valid and perfected second priority Liens and security interests, and shall be superior to all other Liens and security interests, existing as of the Petition Date or thereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Permitted Liens); and

(iii)     the Liens in favor of the Collateral Agent and the Secured Parties set forth herein and in the other Note Documents shall continue to be valid and perfected without the necessity that the Collateral Agent files financing statements or mortgages, takes possession or control of any Collateral, or otherwise perfects its Lien under applicable non-bankruptcy law.

(f)     Subordination Agreement.  Notwithstanding anything herein to the contrary, (i) the obligations of the Issuer under this Agreement, (ii) the lien and security interest granted to Collateral Agent, (iii) the release of Collateral from the Lien granted to Collateral Agent, and (iv) the exercise of any right or remedy by Agents are, in each case, subject to the provisions of the Subordination

Agreement. In the event of any conflict or inconsistency between the provisions of the Subordination Agreement and this Agreement, the provisions of the Subordination Agreement shall control. Notwithstanding any other provision contained herein, physical delivery by any Issuer of Collateral to the Senior Agent shall satisfy any such delivery obligations to the Agents hereunder.

SECTION 13. <u>Limited Nature of Parent Obligations</u>.

13.1.    <u>Limited Nature of Parent Obligations</u>.  Notwithstanding any other provision contained herein to the contrary, Parent is solely executing this Agreement with respect to its representations, warranties, and covenants contained in <u>Section 4.7</u>.  No other provision of this Agreement shall apply to Parent, with the exception of the defined terms set forth in <u>Section 1.1</u> used in <u>Section 4.7</u>, <u>Section 11.1</u> (as such amendments or waivers relate to the representations, warranties, and covenants of Parent contained in <u>Section 4.7</u>), and <u>Sections 11.2</u>,<u>11.4</u>, <u>11.5(b)</u>, <u>11.9</u>, <u>11.10</u>, <u>11.11</u>, <u>11.12</u>, <u>11.13</u>. <u>11.15</u>, <u>11.16</u>, and <u>11.17</u>.  Parent's only obligations with respect to this Agreement are the obligations set forth in <u>Section 4.7</u> and <u>Section 11.5(b)</u>.

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first written above.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC,
as the Issuer


By:_____
    Name:
    Title:


EFIH FINANCE INC.,
as the Issuer


By:_____
    Name:
    Title:


SOLELY FOR THE PURPOSES SET FORTH IN SECTION 13

ENERGY FUTURE HOLDINGS CORP.


By:_____
    Name:
    Title:

[Purchaser Signature Pages]

## Exhibit B

**Form of EFIH DIP Intercreditor Agreement**

**[DRAFT DATED AS OF MAY 21, 2014, SUBJECT TO CHANGE BASED ON FINALIZATION OF DEFINITIVE DOCUMENTATION BETWEEN THE BORROWERS AND COMMITMENT PARTIES AND OTHER CHANGES MADE TO EFFECTUATE THE FIRST LIEN SETTLEMENT AND SECOND LIEN SETTLEMENT CONTEMPLATED IN THE INFORMATION MEMORANDUM DATED MAY 6, 2014]**

---

## INTERCREDITOR AGREEMENT

dated as of [_____], 2014

among

Energy Future Intermediate Holding Company LLC and EFIH Finance Inc.,

Deutsche Bank AG New York Branch,
as First Lien Agent and First Lien Collateral Agent

and

Cortland Capital Market Services LLC,
as Second Lien Agent and Second Lien Collateral Agent

---

TABLE OF CONTENTS

Page

ARTICLE 1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................... 2
    SECTION 1.1    Defined Terms ........................................................ 2
    SECTION 1.2    Rules of Interpretation ............................................ 9
ARTICLE 2.    LIEN SUBORDINATION ............................................................. 11
    SECTION 2.1    [Reserved] ........................................................... 11
    SECTION 2.2    [Reserved] ........................................................... 11
    SECTION 2.3    Priority of Liens .................................................... 11
    SECTION 2.4    Restrictions on Enforcement of Second Liens ......................... 11
    SECTION 2.5    Waiver of Right of Marshalling ...................................... 13
    SECTION 2.6    Discretion in Enforcement of First Liens ............................ 14
    SECTION 2.7    Discretion in Enforcement of First Lien Obligations ................. 14
    SECTION 2.8    Insolvency or Liquidation Proceedings ............................... 15
ARTICLE 3.    OBLIGATIONS AND POWERS OF APPLICABLE COLLATERAL
             AGENT ............................................................................. 16
    SECTION 3.1    Undertaking of the Applicable Collateral Agent ...................... 16
    SECTION 3.2    Release or Subordination of Liens ................................... 17
    SECTION 3.3    Enforcement of Liens ................................................ 17
    SECTION 3.4    Application of Proceeds ............................................. 18
    SECTION 3.5    Powers of the Applicable Collateral Agent ........................... 19
    SECTION 3.6    Documents and Communications ........................................ 19
    SECTION 3.7    For Sole and Exclusive Benefit of Holders of Senior Lien
                   Obligations ......................................................... 20
ARTICLE 4.    OBLIGATIONS ENFORCEABLE BY THE BORROWER ......................... 20
    SECTION 4.1    Release of Liens on Collateral ...................................... 20
    SECTION 4.2    Delivery of Copies to Senior Lien Representatives ................... 21
ARTICLE 5.    PAYMENT SUBORDINATION ......................................................... 21
    SECTION 5.1    Second Lien Obligations Subordinate to First Lien Obligations ....... 21
    SECTION 5.2    Events of Subordination. ............................................ 21
    SECTION 5.3    In Furtherance of Subordination ..................................... 23
    SECTION 5.4    No Commencement of Any Proceeding ................................... 24
    SECTION 5.5    Rights of Subrogation ............................................... 24
    SECTION 5.6    Agreement by the Borrower ........................................... 24
    SECTION 5.8    Obligations Hereunder Not Affected .................................. 24
ARTICLE 6.    PURCHASE RIGHT .................................................................. 25
    SECTION 6.1    Purchase Right. ..................................................... 25
    SECTION 6.2    Trigger Notice. ..................................................... 25
    SECTION 6.3    Purchase Price. ..................................................... 26
    SECTION 6.4    Representations and Warranties. ..................................... 26
    SECTION 6.5    Assignment. ......................................................... 26
ARTICLE 7.    MISCELLANEOUS PROVISIONS ...................................................... 27

i

SECTION 7.1    Amendment ................................................................................. 27
SECTION 7.2    [Reserved] ................................................................................. 28
SECTION 7.3    Further Assurances ..................................................................... 28
SECTION 7.4    Perfection ................................................................................... 29
SECTION 7.5    Successors and Assigns ............................................................. 29
SECTION 7.6    Delay and Waiver ...................................................................... 29
SECTION 7.7    Notices ....................................................................................... 30
SECTION 7.8    Notice Following Discharge of First Lien Obligations ............ 31
SECTION 7.9    Entire Agreement ....................................................................... 31
SECTION 7.10   [Reserved] ................................................................................. 31
SECTION 7.11   [Reserved] ................................................................................. 31
SECTION 7.12   Severability ............................................................................... 31
SECTION 7.13   Headings .................................................................................... 32
SECTION 7.14   Obligations Secured .................................................................. 32
SECTION 7.15   Governing Law .......................................................................... 32
SECTION 7.16   Consent to Jurisdiction ............................................................. 32
SECTION 7.17   Waiver of Jury Trial .................................................................. 32
SECTION 7.18   Counterparts .............................................................................. 33
SECTION 7.19   Effectiveness ............................................................................. 33
SECTION 7.20   [Reserved] ................................................................................. 33
SECTION 7.21   Continuing Nature of this Agreement ....................................... 33
SECTION 7.22   Insolvency ................................................................................. 33
SECTION 7.23   Rights and Immunities of Senior Lien Representatives ........... 33
SECTION 7.24   [Reserved] ................................................................................. 33
SECTION 7.25   Force Majeure ........................................................................... 33

This Intercreditor Agreement (this *"Agreement"*) is dated as of [_____], 2014 and is by and among Energy Future Intermediate Holding Company, LLC, a Delaware limited liability company and a debtor and debtor-in-possession (*"EFIH"*) and EFIH Finance, Inc., a Delaware corporation and a debtor and a debtor-in-possession (*"EFIH Finance"* and together with EFIH, each a *"Co-Borrower"* and collectively, the *"Co-Borrowers"* or the *"Borrower"*) in a case pending under chapter 11 of the Bankruptcy Code, Deutsche Bank AG New York Branch, as First Lien Agent (as defined below) and First Lien Collateral Agent (as defined below) and Cortland Capital Market Services LLC as Second Lien Agent (as defined below) and Second Lien Collateral Agent (as defined below). Capitalized terms used in this Agreement have the meanings assigned to them in the recitals and/or in Article 1 below.

## RECITALS

On April 29, 2014 (the *"Petition Date"*), the Borrower filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (*"Chapter 11"*) in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over the Case from time to time and any Federal appellate court thereof, the *"Bankruptcy Court"*) and commenced cases numbered 14-11001 and 14-11008 respectively (each, a *"Case"* and, collectively, the *"Cases"*), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code.

In connection with the foregoing, the Borrower has requested that lenders extend credit to the Borrower in the form of $5,400,000,000 in aggregate principal amount of term loans pursuant to a Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of the date hereof (the *"First Lien Credit Agreement"*) among the Borrower, the several lenders from time to time party thereto, Deutsche Bank AG New York Branch as administrative agent (in such capacity and together with its successors in such capacity, the *"First Lien Agent"*) and collateral agent (in such capacity and together with its successors in such capacity, the *"First Lien Collateral Agent"*). Pursuant to the First Lien Credit Agreement, the Borrower has entered into (i) a security agreement in favor of the First Lien Collateral Agent, dated as of the date hereof (the *"First Lien Security Agreement"*), and (ii) a pledge agreement in favor of the First Lien Collateral Agent, dated as of the date hereof (the *"First Lien Pledge Agreement"*), in each case for the ratable benefit of the holders of First Lien Obligations.

The Borrower has further requested that lenders acquire notes from the Borrower in an aggregate amount of $1,995,000,000 to be made available to the Borrower pursuant to a Second Lien Subordinated Secured Super-Priority Debtor-in-Possession Note Purchase Agreement dated as of the date hereof (the *"Second Lien Note Purchase Agreement"*) among the Borrower, the several purchasers from time to time party thereto, Cortland Capital Market Services LLC as administrative agent (in such capacity and together with its successors in such capacity, the *"Second Lien Agent"*) and as collateral agent (in such capacity and together with its successors in such capacity, the *"Second Lien Collateral Agent"*). Pursuant to the Second Lien Note Purchase Agreement, the Borrower has entered into (i) a security agreement in favor of the Second Lien Collateral Agent, dated as of the date hereof (the *"Second Lien Security Agreement"*), and (ii) a pledge agreement in favor of the Second Lien Collateral Agent, dated as of the date hereof (the *"Second Lien Pledge Agreement"*), in each case for the ratable benefit of the holders of Second Lien Obligations.

## AGREEMENT

In consideration of the premises and the mutual agreements herein set forth, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

### ARTICLE 1.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION

SECTION 1.1          Defined Terms.  The following terms will have the following meanings:

"*Acceptable Reorganization Plan*" has the meaning set forth in the First Lien Credit Agreement.

"*Act of Required Debtholders*" means, as to any matter at any time:

(1)       prior to the Discharge of First Lien Obligations, a direction in writing delivered to the Applicable Collateral Agent by or with the written consent of the holders of a majority of the sum of:

(a)       the aggregate outstanding principal amount of First Lien Debt; and

(b)       the aggregate unfunded commitments (if any) to extend credit which, when funded, would constitute First Lien Debt; and

(2)       at any time after the Discharge of First Lien Obligations, a direction in writing delivered to the Applicable Collateral Agent by or with the written consent of the holders of Second Lien Debt representing the Required Second Lien Debtholders.

"*Agreement*" has the meaning set forth in the preamble.

"*Applicable Collateral Agent*" means, prior to the Discharge of First Lien Obligations, the First Lien Collateral Agent and thereafter, the Second Lien Collateral Agent.

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"*Business Day*" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City are authorized by law or other governmental actions to close.

"*Capitalized Lease Obligations*" has the meaning set forth in the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable.

"*Collateral*" means all assets or property, now owned or hereafter acquired by the Borrower or any other Loan Party, to the extent such assets or property are pledged or in which a Lien is purported to be pledged, granted, or are required to be pledged under, or secured pursuant to, the Security Documents to the Collateral Agents, together with the proceeds thereof, except:  any properties and assets in which a Collateral Agent is required to release its Liens pursuant to Section 3.2; *provided*, that, if such Liens are required to be released as a result of the sale, transfer or other disposition of any properties or assets of

2

the Borrower, such assets or properties will cease to be excluded from the Collateral if any Loan Party thereafter acquires or reacquires such assets or properties. Collateral shall exclude Excluded Collateral in all events unless the Borrower otherwise consents.

"*Collateral Agents*" means the First Lien Collateral Agent and the Second Lien Collateral Agent.

"*Contingent Obligations*" has the meaning set forth in the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable.

"*covenant default*" has the meaning set forth in Section 5.2.

"*DIP Financing Motion*" has the meaning set forth in the First Lien Credit Agreement.

"*Discharge of First Lien Obligations*" means the occurrence of all of the following:

(1)    termination or expiration of all commitments to extend credit that would constitute First Lien Debt;

(2)    payment in full in cash of the principal of, and interest and premium, if any, on all First Lien Debt; and

(3)    payment in full in cash of all other First Lien Obligations that are outstanding and unpaid at the time the First Lien Debt is paid in full in cash (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities [including cash management obligations] in respect of which no claim or demand for payment has been made at such time).

"*Disqualified Stock*" has the meaning set forth in the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable.

"*EFIH*" has the meaning set forth in the recitals.

"*EFIH Debtors*" has the meaning set forth in the First Lien Credit Agreement.

"*EFIH Finance*" has the meaning set forth in the recitals.

"*Equally and Ratably*" means, in reference to sharing of Liens or proceeds thereof as between holders of Senior Lien Obligations after the repayment of amounts payable to the Collateral Agents under this Agreement and the First Lien Agent (and in the case of Second Lien Obligations, the Second Lien Agent) in accordance with the applicable Senior Lien Document, that such Liens or proceeds:

(1)    will be allocated and distributed in accordance with Section 3.4 first to the Senior Lien Representatives, for the account of the holders of the Senior Lien Debt, ratably in proportion to the principal of, and interest and premium (if any), outstanding forming part of, and Hedging Obligations to the extent constituting Senior Lien Debt pursuant to the terms of, the outstanding Senior Lien Debt when the allocation or distribution is made, and thereafter; and

(2)     will be allocated and distributed in accordance with Section 3.4 (if any remain after payment in full of all of the principal of, and interest and premium (if any), forming part of, and Hedging Obligations to the extent constituting Senior Lien Debt pursuant to the terms of, the outstanding Senior Lien Obligations) to the Senior Lien Representatives, for the account of the holders of any remaining Senior Lien Obligations, ratably in proportion to the aggregate unpaid amount of such remaining Senior Lien Obligations due and demanded (with written notice to the applicable Senior Lien Representative and the Collateral Agents) prior to the date such distribution is made.

"*Event of Default*" has the meaning set forth in the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Collateral*" has the meaning set forth in the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable.

"*Exigent Circumstance*" means an event or circumstance determined by the First Lien Agent in its sole reasonable discretion that materially and imminently threatens the ability of a party to realize upon all or a material portion of the applicable Collateral, such as, without limitation, fraudulent removal, concealment, destruction (other than to the extent covered by insurance), material waste or abscondment thereof.

"*Final Order*" has the meaning set forth in the First Lien Credit Agreement.

"*First Lien*" means a Lien granted by a Security Document to the First Lien Collateral Agent, at any time, upon any Collateral to secure First Lien Obligations.

"*First Lien Agent*" has the meaning set forth in the recitals.

"*First Lien Collateral Agent*" has the meaning set forth in the recitals.

"*First Lien Credit Agreement*" has the meaning set forth in the recitals.

"*First Lien Credit Facilities*" means the Term Loan Facility as defined in the First Lien Credit Agreement.

"*First Lien Debt*" means:

(1)     any Indebtedness that is incurred under the First Lien Credit Agreement;

(2)     Hedging Obligations incurred to hedge or manage interest rate risk with respect to First Lien Debt; *provided* that, pursuant to the terms of the First Lien Documents, such Hedging Obligations are secured by a First Lien on all of the assets and properties that secure the Indebtedness in respect of which such Hedging Obligations are incurred; and

(3)     Cash Management Obligations (as defined in the First Lien Credit Agreement),

in each case, to the extent permitted to be incurred and so secured under the Second Lien Documents (it being agreed that the aggregate principal amount of the Indebtedness in clause (1) shall in no event be less than $5,400,000,000).

"*First Lien Documents*" means the First Lien Credit Agreement and the Security Documents (as defined in the First Lien Credit Agreement).

"*First Lien Lenders*" means the Lenders as defined in the First Lien Credit Agreement.

"*First Lien Obligations*" means Obligations (as defined in the First Lien Credit Agreement) and all other Obligations in respect of First Lien Debt.

"*First Lien Pledge Agreement*" has the meaning set forth in the recitals.

"*First Lien Security Agreement*" has the meaning set forth in the recitals.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the date hereof.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit or reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee Obligations*" has the meaning set forth in the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable.

"*Guarantor*" means each Subsidiary of the Borrower which guarantees the First Lien Debt or Second Lien Debt, as applicable.

"*Hedging Obligations*" has the meaning set forth in the First Lien Credit Agreement.

"*Indebtedness*" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be included as a liability on the balance sheet of such Person, (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) all Indebtedness of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (f) the principal component of all Capitalized Lease Obligations of such Person, (g) net Hedging Obligations of such Person, (h) without duplication, all Guarantee Obligations of such Person, and (i) Disqualified Stock of such Person; *provided* that Indebtedness shall not include (i) trade and other ordinary course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenue, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) amounts payable by and between Parent, the Borrower and any other Subsidiary of Parent in connection with retail clawback or other regulatory transition issues and (v) any Indebtedness defeased by such Person or by any Subsidiary of such Person. The amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination

Value. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

*"Insolvency or Liquidation Proceeding"* means:

(1)     any other case commenced by or against any obligor under any Senior Lien Document under any Bankruptcy Law for the relief of debtors, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of any obligor under any Senior Lien Document, any receivership or assignment for the benefit of creditors relating to any obligor under any Senior Lien Document or any similar case or proceeding relative to any obligor under any Senior Lien Document or its creditors, as such, in each case whether or not voluntary;

(2)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to any obligor under any Senior Lien Document, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)     any other proceeding of any type or nature in which substantially all claims of creditors of any obligor under any Senior Lien Document are determined and any payment or distribution is or may be made on account of such claims.

Notwithstanding the foregoing, the Cases shall not be an Insolvency or Liquidation Proceeding.

*"Interim Fee Order"* has the meaning set forth in the First Lien Credit Agreement.

*"Lien"* shall mean any mortgage, pledge, security interest, hypothecation, collateral assignment, lien (statutory or other) or similar encumbrance (including any conditional sale or other title retention agreement or any lease or license in the nature thereof); *provided* that in no event shall an operating lease be deemed to be a Lien.

*"Loan Party"* means collectively the Borrower and each Guarantor.

*"Obligations"* means any principal, interest (including all interest accrued thereon during the Cases or after the commencement of any other Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the Senior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium, penalties, fees, indemnifications, reimbursements, damages and other liabilities and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

*"Officer"* means, in respect of the Borrower or another Person, the principal executive officer, the principal financial officer, the treasurer, the assistant treasurer or the principal accounting office of the Borrower or such Person, as applicable.

*"Officer's Certificate"* means a certificate signed on behalf of the Borrower by an Officer of the Borrower or on behalf of another Person by an Officer of such Person, that includes:

      (1)     a statement that the Person making such certificate has read such covenant or condition;

      (2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate are based;

      (3)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an opinion of counsel, may be limited to reliance on an Officer's Certificate as to matters of fact); and

      (4)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

*"Oncor"* has the meaning set forth in Section 3.3(b).

*"Oncor Holdings"* has the meaning set forth in Section 3.3(b).

*"Parent"* means Energy Future Holdings Corp., a Texas corporation.

*"Payment Block Notice"* has the meaning set forth in Section 5.2.

*"payment default"* has the meaning set forth in Section 5.2.

*"Permitted Payments"* has the meaning set forth in Section 5.2.

*"Person"* means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or any agency or political subdivision thereof or any other entity.

*"PUCT"* has the meaning set forth in Section 3.3(b).

*"PURA"* has the meaning set forth in Section 3.3(b).

*"Required First Lien Debtholders"* means, at any time, the Required Lenders (as defined in the First Lien Credit Agreement).

*"Required Second Lien Debtholders"* means, at any time, the Required Purchasers (as defined in the Second Lien Note Purchase Agreement).

*"Sale of Collateral"* means any asset sale involving a sale or other disposition of Collateral.

*"Second Lien"* means a Lien granted by a Security Document to the Second Lien Collateral Agent, at any time, upon any Collateral to secure Second Lien Obligations.

*"Second Lien Agent"* has the meaning set forth in the recitals.

*"Second Lien Collateral Agent"* has the meaning set forth in the recitals.

"*Second Lien Debt*" means, any Indebtedness that is incurred under the Second Lien Documents, which shall rank junior in right of payment and of security with respect to the First Lien Debt and was permitted to be incurred and so secured under each applicable Senior Lien Document.

"*Second Lien Documents*" means, collectively, the Second Lien Note Purchase Agreement, the Second Lien Security Agreement, the Second Lien Pledge Agreement and each other Note Document (as defined in the Second Lien Note Purchase Agreement).

"*Second Lien Note Purchase Agreement*" has the meaning set forth in the recitals.

"*Second Lien Obligations*" means Second Lien Debt and all other Obligations in respect thereof.

"*Second Lien Pledge Agreement*" has the meaning set forth in the recitals.

"*Second Lien Security Agreement*" has the meaning set forth in the recitals.

"*Security Documents*" means this Agreement, the First Lien Security Agreement, the Second Lien Security Agreement, the First Lien Pledge Agreement, the Second Lien Pledge Agreement and all other security agreements, pledge agreements, collateral assignments, mortgages, collateral agency agreements, deed of trust or other grants or transfers for security executed and delivered by the Borrower or any other obligor under the First Lien Credit Agreement and the Second Lien Note Purchase Agreement creating (or purporting to create) a Lien upon Collateral in favor of the Collateral Agents for the benefit of the holders of the Senior Lien Obligations, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"*Senior Lien Debt*" means First Lien Debt and Second Lien Debt.

"*Senior Lien Debt Default*" means any event of default (or equivalent thereof) under the terms of any credit agreement, indenture or other agreement governing any Senior Lien Debt, which causes, or permits holders of Senior Lien Debt outstanding thereunder to cause, the Senior Lien Debt outstanding thereunder to become immediately due and payable.

"*Senior Lien Documents*" means the First Lien Documents and the Second Lien Documents.

"*Senior Lien Obligations*" means Second Lien Obligations and First Lien Obligations.

"*Senior Lien Representatives*" means the First Lien Agent and the Second Lien Agent.

"*Stock*" shall mean shares of capital stock or shares in the capital, as the case may be (whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"*Subsidiary*" of any Person shall mean and include (a) any corporation more than 50% of whose Stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency)

is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time or is a controlling general partner. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"*Swap Termination Value*" has the meaning set forth in the First Lien Credit Agreement.

"*Texas Transmission*" has the meaning set forth in Section 3.3(c).

"*UCC*" means the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

SECTION 1.2          Rules of Interpretation.

(a)       All terms used in this Agreement that are defined in Article 9 of the UCC and not otherwise defined herein have the meanings assigned to them in Article 9 of the UCC.

(b)       Unless otherwise indicated, any reference to any agreement or instrument will be deemed to include a reference to that agreement or instrument as assigned, amended, supplemented, amended and restated, or otherwise modified and in effect from time to time or replaced in accordance with the terms of this Agreement.

(c)       The use in this Agreement or any of the other Security Documents of the word "include" or "including," when following any general statement, term or matter, will not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but will be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The word "will" shall be construed to have the same meaning and effect as the word "shall."

(d)       References to "Sections," "clauses," "recitals" and the "preamble" will be to Sections, clauses, recitals and the preamble, respectively, of this Agreement unless otherwise specifically provided. References to "Articles" will be to Articles of this Agreement unless otherwise specifically provided. References to "Exhibits" will be to Exhibits to this Agreement unless otherwise specifically provided.

(e)       Notwithstanding anything to the contrary in this Agreement, any references contained herein to any section, clause, paragraph, definition or other provision of the First Lien Credit Agreement or the Second Lien Note Purchase Agreement (including any definition contained therein), as applicable, shall be deemed to be a reference to such section, clause, paragraph, definition or other provision as in effect on the date of this Agreement; *provided* that any reference to any such section, clause, paragraph or other provision shall refer to such section, clause, paragraph or other provision of the First Lien Credit Agreement or the Second Lien Note Purchase Agreement (including any definition contained therein), as applicable, as amended or modified from time to time if such amendment or modification has been (1) made in accordance with the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable, and (2) if required, approved by an Act of Required Debtholders in a writing delivered to the Senior Lien Representatives and the Collateral Agents.

Notwithstanding the foregoing, whenever any term used in this Agreement is defined or otherwise incorporated by reference to the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, such reference shall be deemed to have the same effect as if such definition or term had been set forth herein in full and such term shall continue to have the meaning established pursuant to the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable, notwithstanding the termination or expiration of the First Lien Credit Agreement or the Second Lien Note Purchase Agreement, as applicable, or repayment of all Obligations evidenced thereby, respectively.

(f)     This Agreement and the other Security Documents will be construed without regard to the identity of the party who drafted it and as though the parties participated equally in drafting it.  Consequently, each of the parties acknowledges and agrees that any rule of construction that a document is to be construed against the drafting party will not be applicable either to this Agreement or the other Security Documents.

(g)     In the event of any conflict between any terms and provisions set forth in this Agreement and those set forth in any other Senior Lien Document, the terms and provisions of this Agreement shall supersede and control the terms and provisions of such other Senior Lien Document  (in each case, other than the Final Order).

(h)     The Co-Borrowers are jointly and severally liable for any and all of the Borrower's obligations under this Agreement.

(i)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(j)     The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Senior Lien Document shall refer to such Senior Lien Document as a whole and not to any particular provision thereof.

(k)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(l)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(m)     Section headings herein and in the other Senior Lien Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Senior Lien Document.

(n)     Unless otherwise expressly provided herein, references to any law, statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such any law, statute, regulation, ordinance, rule, order, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement.

(o)    Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

(p)    When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

ARTICLE 2.    LIEN SUBORDINATION

SECTION 2.1        [Reserved].

SECTION 2.2        [Reserved].

SECTION 2.3        Priority of Liens.  Notwithstanding (1) anything else contained herein or in any other Security Document; (2) the time of incurrence of any First Lien Debt; (3) the order or method of attachment or perfection of any Liens securing any First Lien Debt; (4) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral; (5) the time of taking possession or control over any Collateral; (6) that any Senior Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or (7) the rules for determining priority under any law governing relative priorities of Liens, it is the intent of the parties that:

(a)    the grant of the First Liens pursuant to the First Lien Documents and the grant of the Second Liens pursuant to the Second Lien Documents create two separate and distinct Liens on the Collateral; and

(b)    all Second Liens at any time granted by the Borrower or any other Loan Party will be subject and subordinate to, and made junior in right, priority, operation and effect to, any and all First Liens.

The provisions described in this Section 2.3 are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of First Lien Obligations, the First Lien Agent and the First Lien Collateral Agent.

SECTION 2.4        Restrictions on Enforcement of Second Liens.

(a)    Until the Discharge of First Lien Obligations, the holders of the First Lien Obligations will have, subject to the exceptions set forth below in clauses (1) through (4), the exclusive right to authorize and direct the Applicable Collateral Agent with respect to the Security Documents and the Collateral (including, without limitation, the exclusive right to authorize or direct the Applicable Collateral Agent to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral) and neither the provisions of the Security Documents relating thereto (other than in accordance with this Agreement), nor the Second Lien Agent or any holder of Second Lien Obligations, if any, may, authorize or direct the Applicable Collateral Agent with respect to such matters. Notwithstanding the foregoing, the holders of Second Lien Obligations may direct the Applicable Collateral Agent with respect to Collateral:

(1) without any condition or restriction whatsoever, at any time after the Discharge of First Lien Obligations;

(2) to deliver any notice or demand necessary to enforce (subject to the prior Discharge of First Lien Obligations) any right to claim, take or receive proceeds of Collateral remaining after the Discharge of First Lien Obligations;

(3) as necessary to perfect or establish the priority (subject to First Liens) of the Second Liens upon any Collateral; *provided* that, unless otherwise agreed to by the Applicable Collateral Agent in the Security Documents, the holders of Second Lien Obligations may not require the Applicable Collateral Agent to take any action to perfect any Collateral through possession or control (other than the Applicable Collateral Agent agreeing pursuant to Section 7.4 that the Applicable Collateral Agent agrees to act as agent for the benefit of the holders of Second Lien Debt); or

(4) as necessary to create, prove, preserve or protect (but not enforce) the Second Liens upon any Collateral.

Notwithstanding anything herein to the contrary but subject to the Second Lien Documents, the holders of the Second Lien Obligations, the Second Lien Collateral Agent and/or the Second Lien Agent may enforce, collect or realize on Collateral or exercise any other right or remedy with respect to the Collateral if at least ninety (90) days has elapsed after the date set forth in clause (a) of the definition of Maturity Date in the Second Lien Note Purchase Agreement and the Second Lien Obligations have not been paid in full; *provided* that, any proceeds of Collateral resulting from such actions shall be applied by such holders of Second Lien Obligations, the Second Lien Collateral Agent or the Second Lien Agent, as applicable, pursuant to Section 3.4; *provided* further that, notwithstanding anything herein to the contrary, in no event shall the holders of the Second Lien Obligations, the Second Lien Collateral Agent or the Second Lien Agent take any such actions if the Applicable Collateral Agent shall have commenced any enforcement action, or exercised any rights or remedies, in each case, in good faith and in respect of more than a de minimis portion of the Collateral.

(b) Until the Discharge of First Lien Obligations (including during the Cases or any other Insolvency or Liquidating Proceeding), none of the holders of Second Lien Obligations or the Second Lien Agent will be permitted to:

(1) request judicial relief, in the Cases or any other Insolvency or Liquidation Proceeding or in any other court, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the holders of First Lien Obligations in respect of the First Liens or that would limit, invalidate, avoid or set aside any First Lien or subordinate the First Liens to the Second Liens or grant the Second Liens equal ranking to the First Liens or that could otherwise reasonably be expected to result in an impairment of the First Lien Agent's or any of the First Lien Lenders' rights or interests in their capacities as such under the First Lien Credit Facilities;

(2) oppose or otherwise contest any motion for (A) relief from the automatic stay in order to enforce the First Liens or (B) any injunction against foreclosure or (C) any

enforcement of First Liens made by any holder of First Lien Obligations or the First Lien Agent the Cases or any other Insolvency or Liquidation Proceeding;

(3)     oppose or otherwise contest any lawful exercise by any holder of First Lien Obligations or the First Lien Agent of the right to credit bid First Lien Obligations at any Sale of Collateral in the foreclosure of First Liens;

(4)     oppose or otherwise contest any other request for judicial relief made in any court by any holder of First Lien Obligations or the First Lien Agent relating to the lawful enforcement of any First Lien;

(5)     challenge the validity, enforceability, perfection or priority of the First Liens with respect to the Collateral; or

(6)     oppose or otherwise contest the DIP Financing Motion, the entry of the Interim Fee Order, or the entry of the Final Order or seek to reverse, supplement, stay, vacate, or otherwise modify the Interim Fee Order or the Final Order.

(c)     At any time prior to the Discharge of First Lien Obligations, no payment of money (or the equivalent of money) shall be made from the proceeds of Collateral by the Borrower to the Collateral Agents (other than distributions to the First Lien Collateral Agent in respect of its fees under this Agreement and for the benefit of the holders of First Lien Obligations), the Second Lien Agent or any holder of Second Lien Obligations with respect to Second Lien Obligations (including, without limitation, payments and prepayments made for application to Second Lien Obligations but excluding, to the extent permitted under Section 5.2, any Permitted Payment).  In addition, at any time prior to the Discharge of First Lien Obligations, no payment shall be made to the Collateral Agents (other than distributions to the First Lien Collateral Agent in respect of its fees under this Agreement and for the benefit of the holders of First Lien Obligations), the Second Lien Agent or any holder of Second Lien Obligations with respect to Second Lien Obligations (including, without limitation, payments and prepayments made for application to Second Lien Obligations but excluding, to the extent permitted under Section 5.2, any Permitted Payment) (i) from the proceeds resulting from a Sale of Collateral, (ii) from any proceeds resulting from any enforcement action taken by any holder of Senior Lien Obligations in respect of all or any of the Collateral or (iii) from the proceeds of Collateral in violation of the First Lien Documents.

(d)     All proceeds of Collateral received by the Second Lien Agent or any holder of Second Lien Obligations in violation of Section 2.4(c) will be held by such Person in trust for the account of the holders of First Lien Obligations and remitted to the First Lien Agent upon demand.  The Second Liens will remain attached to and, subject to Section 2.3, enforceable against all proceeds so held or remitted.  All proceeds of Collateral received by the Second Lien Agent or any holder of Second Lien Obligations not in violation of Section 2.4(c) will be received by such Person free from the First Liens.

SECTION 2.5     <u>Waiver of Right of Marshalling.</u>

(a)     Prior to the Discharge of First Lien Obligations, holders of Second Lien Obligations and the Second Lien Agent may not assert or enforce any right of marshalling accorded to a junior lienholder, as against the holders of First Lien Obligations and the First Lien Agent (in their

capacity as senior or priority lienholders) with respect to the Collateral in accordance with the First Lien Documents.

      (b)    Following the Discharge of First Lien Obligations, the holders of Second Lien Obligations and the Second Lien Agent may (subject to the rights of other creditors) assert their right under the UCC or otherwise to any proceeds remaining following a sale or other disposition of Collateral by, or on behalf of, the holders of First Lien Obligations in accordance with the Second Lien Documents.

      SECTION 2.6          Discretion in Enforcement of First Liens.

      (a)    Subject to the last paragraph of Section 2.4(a) and Section 3.3, in exercising rights and remedies with respect to the Collateral, the First Lien Agent may enforce (or refrain from enforcing) or instruct the Applicable Collateral Agent to enforce the provisions of the First Lien Documents and exercise (or refrain from exercising) or instruct the Applicable Collateral Agent to exercise remedies thereunder or any such rights and remedies, all in such order and in such manner as they may determine in the exercise of their sole and exclusive discretion, including in each case without notice, or approval of the Second Lien Collateral Agent, the Second Lien Agent or any holder of Second Lien Obligations:

            (1)    the exercise or forbearance from exercise of all rights and remedies in respect of the Collateral and/or the First Lien Obligations;

            (2)    the enforcement or forbearance from enforcement of any First Lien in respect of the Collateral;

            (3)    the exercise or forbearance from exercise of rights and powers of a holder of shares of stock included in the Collateral to the extent provided in the Security Documents;

            (4)    the acceptance of the Collateral in full or partial satisfaction of the First Lien Obligations; and

            (5)    the exercise or forbearance from exercise of all rights and remedies of a secured lender under the UCC or any similar law of any applicable jurisdiction or in equity.

      SECTION 2.7          Discretion in Enforcement of First Lien Obligations. Without in any way limiting the generality of Section 2.6, the holders of First Lien Obligations and the First Lien Agent may, at any time and from time to time, without the consent of or notice to holders of Second Lien Obligations or the Second Lien Agent, without incurring responsibility to holders of Second Lien Obligations and the Second Lien Agent and without impairing or releasing the subordination provided in this Agreement or the obligations hereunder of holders of Second Lien Obligations and the Second Lien Agent, do any one or more of the following:

            (1)    change the manner, place or terms of payment or extend the time of payment of, or renew or alter, the First Lien Obligations, or otherwise amend or supplement in any manner the First Lien Obligations, or any instrument evidencing the First Lien Obligations or any agreement under which the First Lien Obligations are outstanding;

            (2)    release any Person or entity liable in any manner for the collection of the First Lien Obligations;

(3)     release the First Lien on any Collateral; and

(4)     exercise or refrain from exercising any rights against the Borrower.

SECTION 2.8        Insolvency or Liquidation Proceedings.

(a)     If, in an Insolvency or Liquidation Proceeding, and prior to the Discharge of First Lien Obligations, the holders of First Lien Obligations by an Act of Required Debtholders consent to any order:

(1)     for use of cash collateral;

(2)     approving a debtor-in-possession financing secured by a Lien that is senior to or on a parity with all First Liens upon any property of the estate in such Insolvency or Liquidation Proceeding;

(3)     granting any relief on account of First Lien Obligations as adequate protection (or its equivalent) for the benefit of the holders of First Lien Obligations in the Collateral; or

(4)     relating to a sale of assets of the Borrower that provides, to the extent the assets sold are to be free and clear of Liens, that all First Liens and Second Liens will attach to the proceeds of the sale;

then, the holders of Second Lien Obligations and the Second Lien Agent will not oppose or otherwise contest the entry of such order, so long as none of the holders of First Lien Obligations or the First Lien Agent in any respect opposes or otherwise contests any request made by the holders of Second Lien Obligations or the Second Lien Agent for the grant to the Second Lien Collateral Agent, for the benefit of the holders of Second Lien Obligations and the Second Lien Agent, of a junior Lien upon any property on which a Lien is (or is to be) granted under such order to secure the First Lien Obligations, co-extensive in all respects with, but subordinated (as set forth in Section 2.3) to, such Lien and all First Liens on such property.

(b)     Neither the holders of Second Lien Obligations nor the Second Lien Agent may file or prosecute in any Insolvency or Liquidation Proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral under the Second Liens, except that:

(1)     they may freely seek and obtain relief granting a Second Lien co-extensive in all respects with, but subordinated (as set forth in Section 2.3) to, all Liens granted in such Insolvency or Liquidation Proceeding to, or for the benefit of, the holders of First Lien Obligations; and

(2)     they may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of First Lien Obligations.

# ARTICLE 3.   OBLIGATIONS AND POWERS OF APPLICABLE COLLATERAL AGENT

SECTION 3.1          Undertaking of the Applicable Collateral Agent.

(a)     Subject to, and in accordance with, this Agreement, including without limitation Section 5.3, the Applicable Collateral Agent will for the benefit solely and exclusively of the current and future holders of the applicable Senior Lien Obligations:

(1)     enter into, hold, maintain, administer and enforce the applicable Security Documents to which it is a party, including all Collateral subject thereto, and all Liens created thereunder, perform its obligations under such Security Documents and protect, exercise and enforce the interests, rights, powers and remedies granted or available to it under, pursuant to or in connection with such Security Documents;

(2)     take all lawful and commercially reasonable actions permitted under the applicable Security Documents that it may deem necessary to protect or preserve its interest in the Collateral subject thereto and such interests, rights, powers and remedies;

(3)     deliver and receive notices pursuant to the applicable Security Documents;

(4)     sell, assign, collect, assemble, foreclose on, institute legal proceedings with respect to, or otherwise exercise or enforce the rights and remedies of a secured party (including a mortgagee, trust deed beneficiary and insurance beneficiary or loss payee) with respect to the Collateral under the applicable Security Documents and its other interests, rights, powers and remedies;

(5)     remit as provided in Section 3.4 all cash proceeds received by the Applicable Collateral Agent from the collection, foreclosure or enforcement of its interest in the Collateral under the applicable Security Documents or any of its other interests, rights, powers or remedies;

(6)     execute and deliver amendments to the applicable Security Documents as from time to time authorized pursuant to Section 7.1 accompanied by an Officer's Certificate to the effect that the amendment was permitted under Section 7.1; and

(7)     release any Lien granted to it by any applicable Security Document upon any Collateral if and as required by Section 4.1.

(b)     Each party to this Agreement acknowledges and consents to the undertaking of the Applicable Collateral Agent set forth in Section 3.1(a) and agrees to each of the other provisions of this Agreement applicable to the Applicable Collateral Agent.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Applicable Collateral Agent will not commence any exercise of remedies or any foreclosure actions or otherwise take any action or proceeding against any of the Collateral (other than actions as necessary to prove, protect or preserve (but not enforce) the Liens securing the Senior Lien Obligations) unless and until it shall have been directed by an Act of Required Debtholders, and then only in accordance with the provisions of this Agreement.

(d)     The Applicable Collateral Agent shall be under no obligation to exercise any of its rights or powers under this Agreement or any Security Document at the request or direction of any holder of Senior Lien Debt unless such holders of Senior Lien Debt shall have offered to the Applicable Collateral Agent indemnity or security reasonably satisfactory to it against any loss, liability or expense.

SECTION 3.2          Release or Subordination of Liens.  The Applicable Collateral Agent will not release or subordinate any Lien of the Applicable Collateral Agent or consent to the release or subordination of any Lien of the Applicable Collateral Agent, except:

(a)     (i) as directed by an Act of Required Debtholders or (ii) in the case of any release or subordination that is expressly permitted by each applicable Senior Lien Document, the Applicable Collateral Agent has received an Officer's Certificate certifying that such release or subordination is permitted by each applicable Senior Lien Document;

(b)     as required by Article 4;

(c)     as ordered pursuant to applicable law under a final and nonappealable order or judgment of a court of competent jurisdiction; or

(d)     for the subordination of the Second Liens to the First Liens.

SECTION 3.3          Enforcement of Liens.

(a)     If the Applicable Collateral Agent at any time receives written notice stating that any event has occurred that constitutes a default under any Senior Lien Document entitling the Applicable Collateral Agent to foreclose upon, collect or otherwise enforce its Liens thereunder, the Applicable Collateral Agent will promptly deliver written notice thereof to each Senior Lien Representative.  Thereafter, the Applicable Collateral Agent will await direction by an Act of Required Debtholders and will act, or decline to act, as directed by an Act of Required Debtholders, in the exercise and enforcement of the Applicable Collateral Agent's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Applicable Collateral Agent will act, or decline to act, with respect to the manner of such exercise of remedies as directed by an Act of Required Debtholders.  Unless it has been directed to the contrary by an Act of Required Debtholders, the Applicable Collateral Agent in any event may (but will not be obligated to) take or refrain from taking such action with respect to any default under any Senior Lien Document as it may deem advisable to preserve and protect the value of the Collateral.

(b)     Regulatory approvals may be required in order to enforce the security interests against the Collateral and to dispose of an interest in, or operational control of, the Collateral.

The Collateral includes all of the membership interests of Oncor Electric Delivery Holdings Company LLC ("*Oncor Holdings*"), which are held by EFIH.  Pursuant to the Public Utility Regulatory Act ("*PURA*"), Texas Utilities Code §§39.262(l) and 39.915, an electric utility must obtain prior approval of the Public Utility Commission of Texas ("*PUCT*") of any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery Company LLC ("*Oncor*").  As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings.  Pursuant to PURA

§§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long such approval would take to obtain. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings.

(c)    In addition, pursuant to the terms of an investor rights agreement, among Energy Future Holdings Corp., Oncor Holdings, Oncor and Texas Transmission Investment LLC ("***Texas Transmission***"), the noncontrolling investor in Oncor, any Transfer (as defined therein) of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the Lien on the Collateral, may be limited and give rise to a tag-along right of Texas Transmission to participate in that transfer on a pro rata basis, which may hinder the enforcement of the Lien on the Collateral in a timely manner, if at all.

SECTION 3.4    <u>Application of Proceeds</u>.

If any Collateral is sold or otherwise realized upon by the Applicable Collateral Agent in connection with any foreclosure, collection or other enforcement of First Liens or Second Liens granted to the Collateral Agents in the Security Documents, the proceeds received by the Applicable Collateral Agent from such foreclosure, collection or other enforcement will be distributed by the Applicable Collateral Agent in the following order of application:

FIRST, to the payment of all amounts payable under this Agreement on account of the Collateral Agents' fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Agents, the First Lien Agent or the Second Lien Agent or any of their respective co-trustees or agents in connection with any Security Document reimbursable thereunder to the extent reimbursable thereunder and consistent with Article 3 and the other terms hereof;

SECOND, ratably to the First Lien Agent for application, to the payment of all outstanding First Lien Debt and any other First Lien Obligations that are then due and payable in such order as may be provided in the relevant Senior Lien Documents in an amount sufficient to pay in full in cash all outstanding First Lien Debt and all other First Lien Obligations that are then due and payable (including all interest accrued thereon during the Cases and after the commencement of any other Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the relevant Senior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding);

THIRD, to the Second Lien Agent for application to the payment of all outstanding Second Lien Debt and any other Second Lien Obligations that are due and payable in such order as may be provided in the Second Lien Documents in an amount sufficient to pay in full in cash all outstanding Second Lien Debt and all other Second Lien Obligations that are then due and payable (including all interest accrued thereon during the Cases and after the commencement of any other Insolvency or Liquidation Proceeding at the rate, including any applicable post-default

rate, specified in the Second Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding); and

FOURTH, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to the Borrower, or its successors or assigns, or as a court of competent jurisdiction may direct.

If the Second Lien Agent or any holder of the Second Lien Obligation collects or receives any proceeds in respect of any foreclosure, collection or other enforcement to which it was not entitled pursuant to the terms of the immediately preceding paragraphs, whether during the Cases or after the commencement of any other Insolvency or Liquidation Proceeding or otherwise, the Second Lien Agent or such holder of a Second Lien Obligation, as the case may be, will forthwith deliver the same to the Applicable Collateral Agent to be applied in accordance with the provisions set forth in the immediately preceding paragraphs. Until so delivered, such proceeds will be held by the Second Lien Agent or that holder of the Second Lien Obligation, as the case may be, in trust for the benefit of the holders of the First Lien Obligations. These provisions will not apply to payments received by any holder of Second Lien Obligations if such payments are not proceeds of, or the result of a realization upon, Collateral.

This Section 3.4 is intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Senior Lien Obligations, each Senior Lien Representative and the Collateral Agents.

In connection with the application of proceeds pursuant to Section 3.4, except as otherwise directed by an Act of Required Debtholders, the Applicable Collateral Agent may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

Notwithstanding anything to the contrary contained herein, the payment of all outstanding Second Lien Debt and any other Second Lien Obligations are subject to the payment of the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations per the Final Order.

SECTION 3.5        Powers of the Applicable Collateral Agent.

(a)        The Applicable Collateral Agent is irrevocably authorized and empowered to enter into and perform its obligations and protect, perfect, exercise and enforce its interest, rights, powers and remedies under the Security Documents and applicable law and in equity and to act as set forth in this Article 3 or as requested in any lawful directions given to it from time to time in respect of any matter by an Act of Required Debtholders, as applicable, in accordance with the provisions of this Agreement.

(b)        No Senior Lien Representative or holder of Senior Lien Obligations will have any liability whatsoever to any other holder of the Senior Lien Obligations for any act or omission of the Applicable Collateral Agent.

SECTION 3.6        Documents and Communications.  The Applicable Collateral Agent will permit each Senior Lien Representative and each holder of Senior Lien Obligations upon reasonable written notice from time to time to inspect and copy, at the cost and expense of the party

requesting such copies, any and all Security Documents and other documents, notices, certificates, instructions or communications received by the Applicable Collateral Agent in its capacity as such.

SECTION 3.7        For Sole and Exclusive Benefit of Holders of Senior Lien Obligations.  The Applicable Collateral Agent will accept, hold, administer and enforce all Liens on the Collateral at any time transferred or delivered to it and all other interests, rights, powers and remedies at any time granted to or enforceable by the Applicable Collateral Agent solely and exclusively for the benefit of the current and future holders of current and future Senior Lien Obligations, and will distribute all proceeds received by it in realization thereon or from enforcement thereof solely and exclusively pursuant to the provisions of Section 3.4.

## ARTICLE 4.   RELEASE OF COLLATERAL

SECTION 4.1        Release of Liens on Collateral.

(a)     The Collateral Agents' Liens upon the Collateral will be automatically released:

(1)     in whole, upon (A) payment in full of all outstanding Senior Lien Obligations (including pursuant to the Equity Conversion (as defined in the Second Lien Documents) but excluding Contingent Obligations not due and owing and secured Hedging Obligations and Cash Management Obligations) at the time such debt is paid in full and (B) termination or expiration of all commitments to extend credit under all Senior Lien Documents;

(2)     with respect to any Senior Lien Obligations, upon payment in full of such Senior Lien Debt and all other Senior Lien Obligations (including pursuant to the Equity Conversion (as defined in the Second Lien Documents) but excluding Contingent Obligations not due and owing and secured Hedging Obligations and Cash Management Obligations) in respect thereof that is outstanding, due and payable at the time such Senior Lien Debt is paid in full;

(3)     as to a release of all or substantially all of the Collateral, if (a) consent to the release of that Collateral has been given by the holders of the required aggregate principal amount of First Lien Debt at the time outstanding, as provided for in the applicable First Lien Documents, (b) consent to the release of that Collateral has been given by the holders of the required aggregate principal amount of Second Lien Debt at the time outstanding, as provided for in the applicable Second Lien Documents and (c) the Borrower has delivered an Officer's Certificate to the Collateral Agents certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Senior Lien Document;

(4)     as to a release of less than all or substantially all of the Collateral, if (A) consent to the release of all First Liens on such Collateral has been given by holders of a majority of the aggregate principal amount of First Lien Debt at the time outstanding, as provided for in the First Lien Documents, (B) consent to the release of that Collateral has been given by the holders of the required aggregate principal amount of the Second Lien Debt at the time outstanding, as provided for in the Second Lien Documents and (C) the Borrower has delivered an Officer's Certificate to the Collateral Agents certifying that any such necessary consents have

been obtained and that such release of the Collateral does not violate the terms of any applicable Senior Lien Document;

(5)     as to any Collateral that is sold, transferred or otherwise disposed of by the Borrower in a transaction or other circumstance that is not prohibited by the terms of any applicable Senior Lien Document, at the time of, or immediately prior to, such sale, transfer or other disposition,

and, in each case, upon request of the Borrower, at the Borrower's expense, the Collateral Agents will execute (with such acknowledgements and/or notarizations as are required) any such documents as provided by the Borrower and deliver evidence of such release to the Borrower in the form provided by the Borrower; *provided, however,* to the extent the Borrower requests the Collateral Agents to deliver evidence of the release of the Collateral in accordance with this Section 4.1(a), the Borrower will deliver to the Collateral Agents an Officer's Certificate to the effect that the release of Collateral is permitted by the Senior Lien Documents.

(b)     Other than with respect to any release pursuant to clause (2), (3) or (4) of Section 4.1(a) hereof, each Collateral Agent agrees for the benefit of the Borrower that if it at any time receives:

(1)     an Officer's Certificate stating that (A) the signing Officer has read Article 4 of this Agreement and understands the provisions and the definitions relating hereto, (B) such Officer has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not the conditions precedent in this Agreement and all other Senior Lien Documents, if any, relating to the release of the Collateral have been complied with and (C) in the opinion of such Officer, such conditions precedent, if any, have been complied with; and

(2)     the proposed instrument or instruments releasing such Lien as to such property in recordable form, if applicable;

then it, at the Borrower's expense, will execute (with such acknowledgements and/or notarizations as are required) and deliver such release to the Borrower on or before the later of (x) the date specified in such request for such release and (y) the fifth Business Day after the date of receipt of the items required by this Section 4.1(c) by it.

SECTION 4.2     Delivery of Copies to Senior Lien Representatives. The Borrower will deliver to each Senior Lien Representative a copy of (i) each material Senior Lien Document and (ii) each Officer's Certificate delivered to the Collateral Agents pursuant to Section 4.1(b), together with copies of all documents delivered to the Collateral Agents with such Officer's Certificate.

ARTICLE 5.  PAYMENT SUBORDINATION

SECTION 5.1     Second Lien Obligations Subordinate to First Lien Obligations.The Borrower agrees, and each holder of any First Lien Obligation or Second Lien Obligation also agrees, that the Second Lien Obligations are and shall be subordinate, to the extent and in the manner hereinafter set forth, to the Discharge of First Lien Obligations.

SECTION 5.2     Events of Subordination.Subject to clauses (b) and (c) below, during the Cases or any other Insolvency or Liquidation Proceedings of the Borrower or any Loan Party or their

respective debts, First Lien Obligations shall first be paid in full before the holders of any Second Lien Obligations shall be entitled to receive any payment of all or any of the Second Lien Obligations, and any payment or distribution of any kind (whether in cash, property or securities) that otherwise would be payable or deliverable upon or with respect to the Second Lien Obligations in any such case, proceeding, assignment, marshalling or otherwise (including any payment that may be payable by reason of any other Indebtedness of the Borrower being subordinated to payment of the Second Lien Obligations) shall be paid or delivered directly to the Applicable Collateral Agent for the account of the holders of the First Lien Obligations for application (in the case of cash) to, or as collateral (in the case of non-cash property or securities) for, the payment or prepayment of the First Lien Obligations until the Discharge of First Lien Obligations.

      (b)    Prior to the Discharge of First Lien Obligations, no payment (including any payment that may be payable by reason of any other Indebtedness of the Borrower being subordinated to payment of the Second Lien Obligations) shall be made by or on behalf of the Borrower for or on account of any Second Lien Obligation, and neither the Second Lien Agent nor any holder of any Second Lien Obligation shall take or receive from the Borrower, directly or indirectly, in cash or other property or by set-off or in any other manner, including, without limitation, from or by way of collateral, payment of all or any of the Second Lien Obligations; *provided* that, notwithstanding the foregoing but subject to clause (c) below, the Borrower may make, and the holders of Second Lien Obligations and the Second Lien Agent may receive:

      (1)    regularly scheduled payments of interest on the Second Lien Debt payable in cash at the non-default rate of interest in effect as of the date hereof;

      (2)    payments in kind; and

      (3)    payments on account of indemnities and reimbursement for costs and expenses (including attorney's fees and expenses) to (i) the Second Lien Agent and its Related Parties (as defined in the Second Lien Note Purchase Agreement) and (ii) the holders of the Second Lien Obligations and their Related Parties,

in each case, in accordance with the terms of the Second Lien Documents as of the date hereof (together, the "***Permitted Payments***").

      (c)    The Borrower shall not make, and the holders of Second Lien Obligations and the Second Lien Agent will not receive or collect:

      (1)    Permitted Payments described in Sections 5.2(b)(1) and 5.2(b)(3)(ii), if a default (a "***payment default***") in the payment of principal, premium, interest or any other amounts on the First Lien Debt occurs and is continuing (whether arising from failure to pay on the scheduled payment date, from acceleration or otherwise); or

      (2)    Permitted Payments described in Section 5.2(b)(1), if any other default (a "***covenant default***") occurs and is continuing on the First Lien Debt that has resulted in the holders of the First Lien Debt having the right under the First Lien Documents to accelerate the maturity of the First Lien Debt and the First Lien Agent has delivered a written notice of such default to the Borrower and the Second Lien Agent (each, a "***Payment Block Notice***").

Permitted Payments may be resumed (i) in the case of a payment default, upon the date on which such default is cured or waived and (ii) in the case of a covenant default, the earliest of (x) the date on which such default is cured or waived, (y) one hundred and seventy nine (179) days after the date on which the applicable Payment Block Notice is received by the Second Lien Agent and (z) the date the Second Lien Agent receives notice from the First Lien Agent rescinding such Payment Block Notice. No new Payment Block Notice may be delivered unless and until all Permitted Payments (and any default interest) that have come due have been paid in full.

SECTION 5.3    In Furtherance of Subordination The Borrower authorizes and directs the Applicable Collateral Agent on its behalf to take such action as may be necessary or appropriate to effectuate, as between any holder of First Lien Obligations and the holders of the Second Lien Obligations, the subordination as provided in this Article 5 and appoints the Applicable Collateral Agent its attorney-in-fact for any and all such purposes.

(b)    During the Cases if an Event of Default (as defined in the First Lien Credit Agreement) shall have occurred and is continuing, or any other Insolvency or Liquidation Proceeding commenced by or against the Borrower:

(1)    the Applicable Collateral Agent is hereby irrevocably authorized and empowered (in its own name or in the name of the holders of the Senior Lien Obligations or otherwise), but shall have no obligation, to demand, sue for, collect and receive every payment or distribution referred to in Section 5.2(a) and give acquittance therefor and to file claims and proofs of claim and take such other action (including, without limitation, enforcing any security interest or other lien securing payment of the Second Lien Obligations) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the First Lien Agent or any holder of the First Lien Obligation hereunder; and

(2)    the holders of the Second Lien Obligations shall duly and promptly take such action as the Applicable Collateral Agent may request (A) to collect the Second Lien Obligations for the account of the holders of the First Lien Obligations and to file appropriate claims or proofs or claim in respect of the Second Lien Obligations, (B) to execute and deliver to the Applicable Collateral Agent such powers of attorney, assignments, or other instruments as the Applicable Collateral Agent may request in order to enable the Applicable Collateral Agent to enforce any and all claims with respect to, and any security interests and other liens securing payment of, the Second Lien Obligations, and (C) to collect and receive any and all payments or distributions which may be payable or deliverable upon or with respect to the Second Lien Obligations.

(c)    All payments or distributions upon or with respect to the Second Lien Obligations which are received by the Second Lien Agent or any holder of any Second Lien Obligation contrary to the provisions of this Article shall be received in trust for the benefit of the holders of the First Lien Obligations, shall be segregated from other funds and property held by the Second Lien Agent or such holder of Second Lien Obligations and shall be forthwith paid over to the Applicable Collateral Agent for the account of the holders of the First Lien Obligations in the same form as so received (with any necessary indorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or prepayment of the First Lien Obligations in accordance with the terms of the First Lien Documents.

(d)    The Applicable Collateral Agent is hereby authorized to demand specific performance of the provisions of this Article, whether or not the Borrower shall have complied with any of the provisions hereof applicable to it, at any time when any holder of Second Lien Obligation or the Second Lien Agent shall have failed to comply with any of the provisions of this Article applicable to it. The holders of the Second Lien Obligations and the Second Lien Agent hereby irrevocably waive any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

SECTION 5.4    No Commencement of Any Proceeding Prior to the Discharge of First Lien Obligations, neither the Second Lien Agent nor any holder of any Second Lien Obligation will take, sue for, ask or demand from the Borrower or any Loan Party payment of all or any of the Second Lien Obligations; provided that, the Second Lien Agent and the holders of the Second Lien Obligations may declare the Second Lien Obligations to be due and payable pursuant to the terms of the Second Lien Documents and may take actions pursuant to the last paragraph of Section 2.4(a).

SECTION 5.5    Rights of Subrogation No payment or distribution to the First Lien Agent or any holder of the First Lien Obligations pursuant to the provisions of this Article shall entitle any holder of Second Lien Obligation to exercise any right of subrogation in respect thereof until Discharge of First Lien Obligations.

SECTION 5.6    Agreement by the Borrower The Borrower agrees that it will not make any payment of any of the Second Lien Debt, or take any other action, in contravention of the provisions of this Article.

Each of the Borrower, the Second Lien Agent and the holders of the Second Lien Obligations acknowledge and agree that the Second Lien Debt, subject to the proviso to this Section 5.7, shall be converted into equity interests of Reorganized EFH (as defined in the Second Lien Note Purchase Agreement), at the exit of the EFIH Debtors from the Cases; *provided* that, to the extent that the applicable terms and conditions to conversion are not satisfied (or waived), the Second Lien Obligations shall be payable in cash, but may only be paid in cash after the Discharge of First Lien Obligations, and a refinancing and/or repayment of the Second Lien Debt may only be permitted if such refinancing and/or repayment occurs after the Discharge of First Lien Obligations.

SECTION 5.8    Obligations Hereunder Not Affected All rights and interests of the First Lien Agent and the holders of the First Lien Obligations hereunder, and all agreements and obligations of the holders of the Second Lien Obligations, the Second Lien Agent and the Borrower under this Article, shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of the First Lien Documents or any other agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the First Lien Obligations, or any other amendment or waiver of or any consent to any departure from the First Lien Documents;

(c)      any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to departure from any guaranty, for all or any of the First Lien Obligations;

(d)      any manner of application of collateral, or proceeds thereof, to all or any of the First Lien Obligations, or any manner of sale or other disposition of any collateral for all or any of the First Lien Obligations or any other assets of the Borrower or any of its subsidiaries;

(e)      any change, restructuring or termination of the corporate structure or existence of the Borrower or any of its subsidiaries; or

(f)      any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower (other than payment or performance of the applicable obligation) or a subordinated creditor.

The provisions of this Article 5 shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the First Lien Obligations is rescinded or must otherwise be returned by the First Lien Agent or any holder of First Lien Obligations during the Cases, in any other Insolvency or Liquidation Proceeding, or upon the reorganization of the Borrower or otherwise, all as though such payment had not been made.

## ARTICLE 6.   PURCHASE RIGHT

SECTION 6.1          Purchase Right.

The holders of First Lien Obligations agree that at any time following (a) acceleration of the First Lien Debt in accordance with the terms of the First Lien Documents, (b) the commencement of any action to enforce, collect or realize on Collateral or exercise any other right or remedy with respect to Collateral by the Applicable Collateral Agent or the holders of First Lien Debt or (c) any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code (each, a "*Purchase Event*"), one or more of the holders of Second Lien Obligations may request (in writing) to purchase by way of assignment, and the holders of First Lien Obligations, severally and not jointly, hereby offer the holders of Second Lien Debt the option to purchase by way of assignment of all, but not less than all, of the aggregate amount of the First Lien Obligations outstanding at the time of purchase (any such purchase, a "*First Lien Debt Purchase*";  and the persons effecting such purchase, the "*Purchasing Parties*"); *provided* that (x) at the time of (and as a condition to) any First Lien Debt Purchase all commitments pursuant to First Lien Credit Agreement shall have terminated, (y) any First Lien Debt Purchase shall be effected not later than forty five (45) days following the first date on which a Purchase Event occurs and (z) any First Lien Debt Purchase shall not in any way affect any rights of the holders of First Lien Obligations with respect to indemnification and other obligations of the Borrower under the First Lien Documents that are expressly stated to survive the termination of the First Lien Documents or the repayment of the First Lien Obligations (the "*Surviving First Lien Obligations*").

SECTION 6.2          Trigger Notice.

The First Lien Agent will deliver to the Second Lien Agent at least five (5) Business Days' prior written notice (or, if an Exigent Circumstance exist, such shorter period as is deemed practicable under such

circumstances by the First Lien Agent) of its intention to commence any action to enforce, collect or realize on Collateral or exercise any other right or remedy with respect to Collateral or accelerate the First Lien Obligations (such notice being a "*Trigger Notice*"). If an Exigent Circumstance exists, the First Lien Agent will give the Second Lien Agent the Trigger Notice as soon as practicable and in any event contemporaneously with the taking of such action. Unless an Exigent Circumstance exists, for a period not to exceed five (5) Business Days following delivery of a Trigger Notice from the First Lien Agent to the Second Lien Agent, and at any time following the receipt by the First Lien Agent of a notice from the Purchasing Parties exercising their rights to effectuate a First Lien Debt Purchase pursuant to this Article 6, the holders of First Lien Obligations shall not commence (and if already commenced, shall not further pursue) any action to enforce, collect or realize on Collateral or exercise any other right or remedy with respect to Collateral; *provided*, that, such forbearance shall terminate if the purchase and sale with respect to the First Lien Obligations provided for herein shall not have closed as provided for herein or in the notice provided to the First Lien Agent exercising such right.

SECTION 6.3       Purchase Price.

Without limiting the obligations of the Borrower to the holders of First Lien Obligations under the First Lien Documents with respect to the Surviving First Lien Obligations, on the date of a First Lien Debt Purchase, the Purchasing Parties shall (i) pay to the holders of First Lien Obligations as the purchase price (the "*Purchase Price*") 100% of the amount of all First Lien Obligations (other than unasserted contingent indemnification obligations) then outstanding and unpaid (including principal, interest, default interest, fees, breakage costs and reimbursement of expenses), payable in cash.

SECTION 6.4       Representations and Warranties.

The First Lien Debt Purchase shall be made without representation or warranty of any kind by the holders of First Lien Obligations as to the First Lien Obligations, the Collateral or otherwise and without recourse to the holders of First Lien Obligations, except that the holders of First Lien Obligations shall represent and warrant to the Purchasing Parties: (i) the amount of the First Lien Obligations being purchased, (ii) that the holders of First Lien Obligations own the First Lien Obligations free and clear of any Liens (other than participation interests not prohibited under the First Lien Credit Agreement, in which case the Purchase Price shall be appropriately adjusted so that the Purchasing Parties do not pay amounts in respect of any participation interests that remain in effect) and (iii) that the holders of Fist Lien Obligations have the right to assign the First Lien Obligations in accordance with the First Lien Documents and the assignment is so duly authorized.

SECTION 6.5       Assignment.

The First Lien Debt Purchase shall be made pursuant to assignment documentation in form and substance reasonably satisfactory to the First Lien Agent (with the reasonable and documented cost of such documentation to be paid by the Borrower or, if the Borrower does not make such payment, by the respective purchasers, who shall have the right to obtain reimbursement of same from the Borrower). The Borrower irrevocably consents to any assignment effected to one or more holders of Second Lien Obligations pursuant to this Article 6 for purposes of all First Lien Documents and hereby agrees that no further consent to any such assignment pursuant to this Section from the Borrower shall be required.

## ARTICLE 7.   MISCELLANEOUS PROVISIONS

SECTION 7.1          Amendment.

(a)     No amendment or supplement to the provisions of this Agreement or any other Security Document will be effective without the approval of the First Lien Collateral Agent acting as directed by the required holders of the First Lien Debt, and the Second Lien Collateral Agent, acting as directed by holders of the Second Lien Debt and the Borrower, except that:

(1)     any amendment or supplement that has the effect solely of (i) adding or maintaining Collateral, securing additional Senior Lien Debt that was otherwise permitted by the terms of the Senior Lien Documents to be secured by the Collateral or preserving, perfecting or establishing the priority of the Liens thereon or the rights of the Collateral Agents therein, (ii) curing any ambiguity, defect or inconsistency; (iii) providing for the assumption of a Loan Party's obligations under any Security Document in the case of a merger or consolidation or sale of all or substantially all of such Person's assets; or (iv) making any change that would provide any additional rights or benefits to the holders of Senior Lien Obligations, the Senior Lien Representatives or the Collateral Agents or that does not adversely affect the legal rights under any Senior Lien Document of any holder of Senior Lien Obligations, the Senior Lien Representatives or the Collateral Agents, will, in each case, become effective when executed and delivered by the Borrower and the Collateral Agents;

(2)     no amendment or supplement that reduces, impairs or adversely affects the right of any holder of Senior Lien Obligations:

(A)     to vote its outstanding Senior Lien Debt as to any matter requiring (i) an Act of Required Debtholders or (ii) direction by the Required First Lien Debtholders or the Required Second Lien Debtholders, (or amends the provisions of this clause (2) or the definition of *"Act of Required Debtholders," "Required First Lien Debtholders"* or *"Required Second Lien Debtholders"*),

(B)     to share, in the order of application described in Section 3.4, in the proceeds of enforcement of or realization on any Collateral that has not been released in accordance with the provisions described in Section 4.1, or

(C)     to require that Liens securing Senior Lien Obligations be released only as set forth in the provisions described in Section 4.1,

will become effective without the consent of the requisite percentage or number of holders of Senior Lien Debt so affected under the applicable Senior Lien Documents; and

(3)     no amendment or supplement that imposes any obligation upon any Collateral Agents or any Senior Lien Representative or adversely affects the rights of such Collateral Agent, or any Senior Lien Representative, respectively, in its individual capacity as such will become effective without the consent of such Collateral Agent or such Senior Lien Representative, respectively.

(b)     Notwithstanding Section 7.1(a) but subject to Sections 7.1(a)(2) and 7.1(a)(3), any amendment or waiver of, or any consent under, any provision of this Agreement or any other Security Document that secures First Lien Obligations will apply automatically to any comparable provision of any comparable Second Lien Document without the consent of or notice to any holder of Second Lien Obligations and without any action by the Borrower, or any holder of Second Lien Obligations; *provided* that, no such amendment, waiver or consent shall have the effect of:

(1)     removing assets subject to a Second Lien, except to the extent that a release of such Lien is permitted or required by Section 4.1 and provided that there is a corresponding release of the First Liens on such assets;

(2)     permitting other Liens on the Collateral not permitted under the terms of the Second Lien Documents; or

(3)     providing for or permitting any Sale of Collateral not otherwise permitted hereunder.

(c)     The Applicable Collateral Agent will not enter into any amendment or supplement unless it has received an Officer's Certificate to the effect that such amendment or supplement will not result in a breach of any provision or covenant contained in any of the Senior Lien Documents.

(d)     The holders of Second Lien Obligations and the Second Lien Agent agree that each Security Document that secures Second Lien Obligations (but not also securing First Lien Obligations) will include language substantially to the effect of the following:

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent pursuant to this Agreement, payments to Purchasers in connection with the Notes and the exercise of any right or remedy by such Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of [     ], among Energy Future Intermediate Holding Company LLC, EFIH Finance Inc, Deutsche Bank AG New York Branch as administrative agent and collateral agent under the First Lien Credit Agreement (as defined therein) and Cortland Capital Market Services LLC as administrative agent and collateral agent under the Second Lien Note Purchase Agreement (as defined therein) (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "*Intercreditor Agreement*"). In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement will govern."

; *provided, however*, that if the jurisdiction in which any such Second Lien Document will be filed prohibits the inclusion of the language above or would prevent a document containing such language from being recorded, the Second Lien Agent and the First Lien Agent agree, prior to such Second Lien Document being entered into, to negotiate in good faith replacement language stating that the lien and security interest granted under such Second Lien Document is subject to the provisions of this Agreement.

SECTION 7.2          [Reserved].

SECTION 7.3          Further Assurances.

(a)    The Borrower will do or cause to be done all acts and things that may be required, or that the Collateral Agents from time to time may reasonably request, to assure and confirm that the Collateral Agents hold, for the benefit of the Senior Lien Representatives and holders of Senior Lien Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the date hereof), in each case as contemplated by, and with the Lien priority required under, the Senior Lien Documents.

(b)    Upon the reasonable request of any Collateral Agent or any Senior Lien Representative at any time and from time to time, the Borrower, at its own expense, will promptly execute, acknowledge and deliver such additional security documents, instruments, certificates, notices and other documents, and take such other actions as may be reasonably required, or that such Collateral Agent may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred thereby, in each case as contemplated by the Senior Lien Documents for the benefit of holders of Senior Lien Obligations.

SECTION 7.4    Perfection. Solely for purposes of perfecting the Second Liens of the Second Lien Collateral Agent in any Collateral in the possession or control of the First Lien Collateral Agent (or its agents or bailees) subject of the First Liens including, without limitation, any instruments, goods, negotiable documents, tangible chattel paper, electronic chattel paper, certificated securities, money, deposit accounts and securities accounts, or is otherwise notated with the Lien of the First Lien Collateral Agent, the First Lien Collateral Agent hereby acknowledges that the First Lien Collateral Agent also holds such property (or notations) as agent and bailee for the benefit of the Second Lien Collateral Agent for the benefit of the holders of Second Lien Obligations and the Second Lien Agent.

SECTION 7.5    Successors and Assigns.

(a)    Except as provided in Section 5.2, the Applicable Collateral Agent may not, in its capacity as such, delegate any of its duties or assign any of its rights hereunder, and any attempted delegation or assignment of any such duties or rights will be null and void. All obligations of the Applicable Collateral Agent hereunder will inure to the benefit of, and be enforceable by, each Senior Lien Representative and each present and future holder of Senior Lien Obligations, each of whom will be entitled to enforce this Agreement as a third-party beneficiary hereof, and all of their respective successors and assigns.

(b)    The Borrower may not delegate any of its duties or assign any of its rights hereunder, unless otherwise permitted by the Senior Lien Documents and any attempted delegation or assignment of any such duties or rights will be null and void. All obligations of the Borrower will inure to the sole and exclusive benefit of, and be enforceable by, the Collateral Agents, each Senior Lien Representative and each present and future holder of Senior Lien Obligations, each of whom will be entitled to enforce this Agreement as a third-party beneficiary hereof, and all of their respective successors and permitted assigns.

SECTION 7.6    Delay and Waiver. No failure to exercise, no course of dealing with respect to the exercise of, and no delay in exercising, any right, power or remedy arising under this Agreement or any of the other Security Documents will impair any such right, power or remedy or operate as a waiver thereof. No single or partial exercise of any such right, power or remedy will

29

preclude any other or future exercise thereof or the exercise of any other right, power or remedy. The remedies herein are cumulative and are not exclusive of any remedies provided by law.

        SECTION 7.7      <u>Notices</u>. Any communications, including notices and instructions, between the parties hereto or notices provided herein to be given may be given to the following addresses:

If to the Borrower or a Loan Party:

> 1601 Bryan Street
> Dallas, Texas 75201
> Attention: Legal Department
> Telephone: 214-812-4660
> Facsimile: 214-812-2717

> 1601 Bryan Street
> Dallas, Texas 75201
> Attention: Treasury Department
> Telephone: 214-812-4660
> Email: tony.horton@energyfutureholdings.com
> Email: stacey.dore@energyfutureholdings.com

> <u>with a copy to (which shall not constitute notice):</u>

> Kirkland & Ellis LLP
> 300 N. La Salle Street
> Chicago, Illinois 60654
> Attention: Linda K. Myers, P.C.
> Telephone: (312) 862-2322
> Facsimile: (312) 862-2200

If to the First Lien Agent and the First Lien Collateral Agent:

> Deutsche Bank
> 60 Wall Street (NYC60 - 0266)
> New York. N.Y.  10005-2836
> Attention: Marcus M. Tarkington
> Telephone: 212 250-6153
> Facsimile: 212 553-3080
> Email: marcus.tarkington@db.com

> With a copy to:

> Email: sara.pelton@db.com

Email: Agency.Transactions@DB.com

If to the Second Lien Agent and the Second Lien Collateral Agent:

Cortland Capital Market Services LLC
225 W. Washington St., 21st Floor
Chicago, Illinois 60606
Telephone No.: (312) 564-5072
Telecopier No.: (312) 376-0751
Attention: Ryan Morick and Legal Department
Email: ryan.morick@cortlandglobal.com and
        legal@cortlandglobal.com

All notices and communications will be faxed to the relevant fax number set forth above or mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery, to the relevant address set forth above or, as to holders of Senior Lien Debt, all notices and communications will be sent in the manner specified in the Senior Lien Documents applicable to such holder. Failure to mail a notice or communication to a holder of Senior Lien Debt or any defect in it will not affect its sufficiency with respect to other holders of Senior Lien Debt.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it, except a notice to the First Lien Collateral Agent or First Lien Agent is effective only upon receipt.

SECTION 7.8        Notice Following Discharge of First Lien Obligations. Promptly following the Discharge of First Lien Obligations, the First Lien Agent will provide written notice of such discharge to the Second Lien Collateral Agent and to the Second Lien Agent.

SECTION 7.9        Entire Agreement. This Agreement states the complete agreement of the parties relating to the undertaking of the Applicable Collateral Agent set forth herein and supersedes all oral negotiations and prior writings in respect of such undertaking.

SECTION 7.10        [Reserved].


SECTION 7.11        [Reserved].

SECTION 7.12        Severability. If any provision of this Agreement is invalid, illegal or unenforceable in any respect or in any jurisdiction, the validity, legality and enforceability of such provision in all other respects and of all remaining provisions, and of such provision in all other jurisdictions, will not in any way be affected or impaired thereby.

SECTION 7.13      Headings. Section headings herein have been inserted for convenience of reference only, are not to be considered a part of this Agreement and will in no way modify or restrict any of the terms or provisions hereof.

SECTION 7.14      Obligations Secured. All obligations of the Borrower set forth in or arising under this Agreement will be Senior Lien Obligations and are secured by all Liens granted by the Security Documents.

SECTION 7.15      Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

SECTION 7.16      Consent to Jurisdiction. Each party hereto irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Bankruptcy Court, and to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof;

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth in Section 7.7;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction;

(e)      waives, to the maximum extent not prohibited by applicable law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 7.16 any special, exemplary, punitive or consequential damages; and

(f)      agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

SECTION 7.17      Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 7.18      Counterparts.  This Agreement may be executed in any number of counterparts (including by facsimile or electronic transmission), each of which when so executed and delivered will be deemed an original, but all such counterparts together will constitute but one and the same instrument.

SECTION 7.19      Effectiveness.  This Agreement will become effective upon the execution of a counterpart hereof by each of the parties hereto on the date hereof and receipt by each party of written notification of such execution and written or telephonic authorization of delivery thereof.

SECTION 7.20      [Reserved].

SECTION 7.21      Continuing Nature of this Agreement.  This Agreement, including the subordination provisions hereof, will be reinstated if at any time any payment or distribution in respect of any of the First Lien Obligations is rescinded or must otherwise be returned in the Cases or in any other Insolvency or Liquidation Proceeding or otherwise by any holder of First Lien Obligations or First Lien Agent or any representative of any such party (whether by demand, settlement, litigation or otherwise).  In the event that all or any part of a payment or distribution made with respect to the First Lien Obligations is recovered from any holder of First Lien Obligations or the First Lien Agent in the Cases or any other Insolvency or Liquidation Proceeding or otherwise, such payment or distribution received by any holder of Second Lien Obligations or Second Lien Agent with respect to the Second Lien Obligations from the proceeds of any Collateral at any time after the date of the payment or distribution that is so recovered, whether pursuant to a right of subrogation or otherwise, the Second Lien Agent or that holder of a Second Lien Obligation, as the case may be, will forthwith deliver the same to the Applicable Collateral Agent, for the account of the holders of the First Lien Obligations, to be applied in accordance with Section 3.4.  Until so delivered, such proceeds will be held by the Second Lien Agent or that holder of a Second Lien Obligation, as the case may be, for the benefit of the holders of the First Lien Obligations.

SECTION 7.22      Insolvency.  This Agreement will be applicable during and after the Cases and both before and after the commencement of any other Insolvency or Liquidation Proceeding by or against the Borrower.  The relative rights, as provided for in this Agreement, will continue during and after the Cases and after the commencement of any other Insolvency or Liquidation Proceeding on the same basis as prior to the date of the commencement of any such case, as provided in this Agreement.

SECTION 7.23      Rights and Immunities of Senior Lien Representatives.  The Senior Lien Representatives will be entitled to all of the rights, protections, immunities and indemnities set forth in the Senior Lien Documents, in each case as if specifically set forth herein.  In no event will any Senior Lien Representative be liable for any act or omission on the part of the Borrower or the Applicable Collateral Agent hereunder.

SECTION 7.24      [Reserved].

SECTION 7.25      Force Majeure.  In no event shall the Applicable Collateral Agent be responsible or liable to any holder of Senior Lien Obligations for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts

of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers or representatives as of the day and year first above written.

ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC

By:_____
Name:
Title:


EFIH FINANCE INC.

By:_____
Name:
Title:

35

DEUTSCHE BANK AG NEW YORK, as
Administrative Agent and Collateral Agent
under the First Lien Credit Agreement


By:_____
Name:
Title:


CORTLAND CAPITAL MARKET SERVICES
LLC, as Administrative Agent and Collateral
Agent under the Second Lien Note Purchase
Agreement


By:_____
Name:
Title: