Section 7.04    Trustee's Disclaimer.

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture, it shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05    Notice of Defaults.

If a Default occurs and is continuing and if it is known to the Trustee, the Trustee shall mail or otherwise deliver in accordance with the procedure of DTC to Holders of Notes a notice of the Default within 90 days after it occurs. Except in the case of a Default relating to the payment of principal of or premium, if any, or interest (including Additional Interest, if any) on any Note, the Trustee may withhold from the Holders notice of any continuing Default if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes. The Trustee shall not be deemed to know of any Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is such a Default is received by the Trustee at the Corporate Trust Office of the Trustee.

Section 7.06    Reports by Trustee to Holders of the Notes.

Within 60 days after each May 15, beginning with the May 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee shall mail to the Holders of the Notes a brief report dated as of such reporting date that complies with Trust Indenture Act Section 313(a) (but if no event described in Trust Indenture Act Section 313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The Trustee also shall comply with Trust Indenture Act Section 313(b)(2). The Trustee shall also transmit by mail all reports as required by Trust Indenture Act Section 313(c).

A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to the Issuer and filed with the SEC and each stock exchange on which the Notes are listed in accordance with Trust Indenture Act Section 313(d). The Issuer shall promptly notify the Trustee when the Notes are listed on any stock exchange.

Section 7.07    Compensation and Indemnity.

The Issuer and the Guarantors, jointly and severally, shall pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as the parties shall agree in writing from time to time. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer and the Guarantors, jointly and severally, shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

The Issuer and the Guarantors, jointly and severally, shall indemnify the Trustee for, and hold the Trustee harmless against, any and all loss, damage, claims, liability or expense (including attorneys' fees) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against the Issuer or any of

the Guarantors (including this Section 7.07) or defending itself against any claim whether asserted by any Holder, the Issuer or any Guarantor, or liability in connective with the acceptance, exercise or performance of any of its powers or duties hereunder). The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder. The Issuer shall defend the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misconduct, negligence or bad faith.

The obligations of the Issuer under this Section 7.07 shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee.

Notwithstanding anything to the contrary in Section 4.12 hereof, to secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in clause (6) or (7) of Section 6.01(a) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

The Trustee shall comply with the provisions of Trust Indenture Act Section 313(b)(2) to the extent applicable.

Section 7.08    Replacement of Trustee.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08. The Trustee may resign at any time by giving 30 days prior written notice of such resignation to the Issuer and be discharged from the trust hereby created by so notifying the Issuer. The Holders of a majority in principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing. The Issuer may remove the Trustee if:

(a)    the Trustee fails to comply with Section 7.10 hereof;

(b)    the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(c)    a custodian or public officer takes charge of the Trustee or its property; or

(d)    the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Issuer's expense), the Issuer or the Holders of at least 10% in

027141-0016-11400-Active.12335081

principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; provided, all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

Section 7.09    Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

Section 7.10    Eligibility; Disqualification.

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of Trust Indenture Act Sections 310(a)(1), (2) and (5). The Trustee is subject to Trust Indenture Act Section 310(b).

Section 7.11    Preferential Collection of Claims Against Issuer.

The Trustee is subject to Trust Indenture Act Section 311(a), excluding any creditor relationship listed in Trust Indenture Act Section 311(b). A Trustee who has resigned or been removed shall be subject to Trust Indenture Act Section 311(a) to the extent indicated therein.

ARTICLE 8

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance.

The Issuer may, at its option and at any time, elect to have either Section 8.02 or 8.03 hereof applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

027141-0016-11400-Active.12335081

Section 8.02    Legal Defeasance and Discharge.

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Issuer and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes and Guarantees on the date the conditions set forth below are satisfied ("Legal Defeasance"). For this purpose, Legal Defeasance means that the Issuer shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes and this Indenture including that of the Guarantors (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging the same), except for the following provisions which shall survive until otherwise terminated or discharged hereunder:

(a)    the rights of Holders of Notes to receive payments in respect of the principal of and premium, if any, and interest (including Additional Interest, if any) on the Notes when such payments are due solely out of the trust created pursuant to this Indenture referred to in Section 8.04 hereof;

(b)    the Issuer's obligations with respect to Notes concerning issuing temporary Notes, registration of such Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(c)    the rights, powers, trusts, duties and immunities of the Trustee, and the Issuer's obligations in connection therewith; and

(d)    this Section 8.02.

Subject to compliance with this Article 8, the Issuer may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03    Covenant Defeasance.

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Collateral shall be released from the Lien securing the Notes as provided in Section 10.06 hereof, and the Issuer and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from their obligations under the covenants contained in Sections 4.03, 4.04, 4.05, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.14, 4.15, 4.16, 4.18, 4.19, 4.20 and 4.21 hereof and clauses (3), (4) and (5) of Section 5.01(a), Sections 5.01(c) and 5.01(d) hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied ("Covenant Defeasance"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Issuer may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby. In addition, upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03 hereof, subject to the satisfaction of the conditions set forth in Section 8.04

115

hereof, clauses (3), (4), (5) and (6) of Section 6.01(a) hereof, (solely with respect to Restricted Subsidiaries or groups of Restricted Subsidiaries that are Significant Subsidiaries), clause (7) of Section 6.01(a) hereof (solely with respect to Restricted Subsidiaries or groups of Restricted Subsidiaries that are Significant Subsidiaries), and clauses (8) and (9) of Section 6.01(a) hereof shall not constitute Events of Default.

Section 8.04    <u>Conditions to Legal or Covenant Defeasance</u>.

The following shall be the conditions to the application of either Section 8.02 or 8.03 hereof to the outstanding Notes:

(1)    the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of and premium, if any, and interest (including Additional Interest, if any) due on the Notes on the stated maturity date or on the redemption date, as the case may be, of such principal of or premium, if any, or interest (including Additional Interest, if any) on such Notes and the Issuer must specify whether such Notes are being defeased to maturity or to a particular redemption date;

(2)    in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions,

(a)    the Issuer has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

(b)    since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes shall not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)    no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5)    such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any material agreement or instrument (other than this

116

Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make the deposit required to effect such Legal Defeasance or Covenant Defeasance and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(6)     the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds will not be subject to the effect of Section 547 of the Bankruptcy Code;

(7)     the Issuer shall have delivered to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or any Guarantor or others; and

(8)     the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

Section 8.05     Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions.

Subject to Section 8.06 hereof, all money and Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer or a Guarantor acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium and interest (including Additional Interest, if any), but such money need not be segregated from other funds except to the extent required by law.

The Issuer shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article 8 to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuer from time to time upon the request of the Issuer any money or Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(1) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06     Repayment to Issuer.

Subject to any applicable abandoned property law, any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal, premium and interest on any Note and remaining unclaimed for two years after such principal, and premium and interest has become due and payable shall be paid to the Issuer on its request or (if then held by the Issuer) shall be discharged from such trust; and the Holder of such Note shall thereafter look only to the Issuer for

117

payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, shall thereupon cease.

Section 8.07    Reinstatement.

If the Trustee or Paying Agent is unable to apply any United States dollars or Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Issuer's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; provided that if the Issuer makes any payment of principal, premium and interest on any Note following the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders of Notes.

Notwithstanding Section 9.02 of this Indenture, the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Notes, the Guarantees or any Security Document at any time after the Issue Date without the consent of any Holder to:

(1)    cure any ambiguity, omission, mistake, defect or inconsistency;

(2)    provide for uncertificated Notes of such series in addition to or in place of certificated Notes;

(3)    comply with Section 5.01 hereof;

(4)    provide for the assumption of the Issuer's or any Guarantor's obligations to the Holders;

(5)    make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights under this Indenture of any such Holder;

(6)    add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any Guarantor;

(7)    comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(8)    evidence and provide for the acceptance and appointment under this Indenture of a successor Trustee thereunder pursuant to the requirements thereof;

(9)    to provide for the issuance of Additional Notes or additional debt securities that constitute Required Debt; provided that such Additional Notes or additional debt securities are issued in compliance with the provisions of this Indenture, including those described in Section

118

4.09, and such amendments or supplements are limited to changes necessary or appropriate in order to issue such Additional Notes or additional debt securities under this Indenture;

(10) to provide for the issuance of Exchange Notes or private exchange notes that are identical to Exchange Notes except that they are not freely transferable;

(11) add a Guarantor under this Indenture;

(12) conform the text of this Indenture, the Guarantees, the Notes or any Security Document to any provision of the "Description of the Notes" attached to the Exchange Agreements as Appendix B to the extent such provision in such "Description of the Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Guarantees, the Notes or any Security Document;

(13) make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including, without limitation, to facilitate the issuance and administration of the Notes; provided, however, that (i) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Notes;

(14) mortgage, pledge, hypothecate or grant any other Lien in favor of the Trustee for the benefit of the Holders of the Notes, as security for the payment and performance of all or any portion of the Obligations, in any property or assets; or

(15) provide for the accession or succession of any parties to the Security Documents (and other amendments that are administrative or ministerial in nature) in connection with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of any agreement or action that is not prohibited by this Indenture, including to add any additional secured parties to the extent not prohibited by this Indenture.

Upon the request of the Issuer accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Sections 7.02 and 13.04 hereof, the Trustee shall join with the Issuer and the Guarantors in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise. Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a Guarantor under this Indenture upon execution and delivery by such Guarantor and the Trustee of a supplemental indenture to this Indenture, the form of which is attached as Exhibit D hereto, and delivery of an Officer's Certificate.

Section 9.02    With Consent of Holders of Notes.

Except as provided below in this Section 9.02, the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Notes, the Guarantees and the Security Documents relating to the Notes with the consent of the Required Holders of at least a majority in aggregate principal amount of the outstanding Required Debt (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Required Debt) and, subject to Sections 6.04 and

6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of or premium or interest (including Additional Interest, if any) on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Notes, the Guarantees or the Security Documents relating to the Notes may be waived with the consent of the Required Holders of at least a majority in aggregate principal amount of the outstanding Required Debt (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Required Debt) other than Required Debt beneficially owned by the Issuer or EFIH's Affiliates. Section 2.08 hereof and Section 2.09 hereof shall determine which Notes are considered to be "outstanding" for the purpose of this Section 9.02.

Upon the request of the Issuer accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Required Holders of at least a majority in aggregate principal amount of the outstanding Required Debt as aforesaid, and upon receipt by the Trustee of the documents described in Sections 7.02 and 13.04 hereof, the Trustee shall join with the Issuer in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture.

It shall not be necessary for the consent of the Holders of the Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuer to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Without the consent of each affected Holder of Notes, an amendment or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1) reduce the principal amount of such Notes whose Holders must consent to an amendment, supplement or waiver;

(2) reduce the principal of or change the fixed final maturity of any such Note or alter or waive the provisions with respect to the redemption of such Notes (for the avoidance of doubt, the provisions contained in and relating to Section 3.08, Section 3.09, Section 4.10 and Section 4.14 hereof are not redemptions of Notes);

(3) reduce the rate of or change the time for payment of interest on any Note;

(4) waive a Default in the payment of principal of or premium, if any, or interest on the Notes, except a rescission of acceleration of the Notes by the Required Holders of at least a majority in aggregate principal amount of the outstanding Required Debt and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in this Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5) make any Note payable in money other than that stated therein;

(6)    make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders to receive payments of principal of or premium, if any, or interest on the Notes;

(7)    make any change in these amendment and waiver provisions;

(8)    impair the right of any Holder to receive payment of principal, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(9)    make any change to or modify the ranking provisions of this Indenture or the Notes that would adversely affect the Holders; or

(10)    except as expressly permitted by this Indenture, modify the Guarantees of any Significant Subsidiary in any manner adverse to the Holders of the Notes.

In addition, without the consent of at least a majority in aggregate principal amount of the Required Debt then outstanding, an amendment, supplement or waiver may not modify any Security Document relating to the Notes or the provisions of this Indenture dealing with the Security Documents or application of trust moneys in any manner materially adverse to the Holders other than in accordance with this Indenture and the Security Documents. Without the consent of at least $66^2/_3\%$ in aggregate principal amount of the Required Debt then outstanding, no amendment, supplement or waiver may modify the Security Documents to release all or substantially all of the Collateral securing the Notes. Without the consent of at least a majority in aggregate principal amount of the Required Debt then outstanding, no amendment, supplement or waiver may modify the Security Documents to release less than all or substantially all of the Collateral securing the Notes.

Section 9.03    Compliance with Trust Indenture Act.

Every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental indenture that complies with the Trust Indenture Act as then in effect.

Section 9.04    Revocation and Effect of Consents.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective. Except as provided in the last paragraph of Section 9.02 hereof, an amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement, or waiver. If a record date is fixed, then, notwithstanding the preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only such Persons, shall be entitled to consent to such amendment, supplement, or waiver or to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

Section 9.05    Notation on or Exchange of Notes.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of a Issuer Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06    Trustee to Sign Amendments, etc.

The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Issuer may not sign an amendment, supplement or waiver until the Board of Directors approves it. In executing any amendment, supplement or waiver, the Trustee shall be entitled to receive and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 13.04 hereof, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and any Guarantors party thereto, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03 hereof). Notwithstanding the foregoing, no Opinion of Counsel shall be required for the Trustee to execute any amendment or supplement adding a new Guarantor under this Indenture.

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01    Equal and Ratable Sharing of Collateral by Holders of Junior Lien Debt.

(a)    Notwithstanding:

(1)    anything contained in the Collateral Trust Agreement or in any other Security Document;

(2)    the time of incurrence of any Series of Junior Lien Debt;

(3)    the order or method of attachment or perfection of any Liens securing any Series of Junior Lien Debt;

(4)    the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Junior Lien upon any Collateral;

(5)    the time of taking possession or control over any Collateral;

(6)    that any Junior Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7)    the rules for determining priority under any law governing relative priorities of Liens,

027141-0016-11400-Active.12335081

all Junior Liens granted at any time by EFIH shall secure, equally and ratably, all present and future Junior Lien Obligations.

(b)     Section 10.01(a) hereof is intended for the benefit of, and shall be enforceable as a third party beneficiary by, each present and future holder of Junior Lien Obligations, each present and future Junior Lien Representative and the Collateral Trustee as holder of Junior Liens.

Section 10.02    Ranking of Liens.

(a)     Notwithstanding:

(1)     anything to the contrary contained in the Security Documents;

(2)     the time of incurrence of any Series of Senior Lien Debt;

(3)     the order or method of attachment or perfection of any Liens securing any Series of Senior Lien Debt;

(4)     the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral;

(5)     the time of taking possession or control over any Collateral;

(6)     that any Senior Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7)     the rules for determining priority under any law governing relative priorities of Liens,

all Junior Liens at any time granted by EFIH (including the Junior Liens securing the Notes) shall be subject and subordinate to all Senior Liens securing Senior Lien Obligations.

(b)     The provisions described in Section 10.02(a) hereof are intended for the benefit of, and shall be enforceable as a third party beneficiary by, each present and future holder of Senior Lien Obligations, each present and future Senior Lien Representative and the Collateral Trustee as holder of Senior Liens.

Section 10.03    Relative Rights.

(a)     Nothing herein or in any other Junior Lien Documents shall:

(1)     impair, as between EFIH and the Holders of the Notes, the obligation of EFIH to pay principal of and premium, if any, and interest (including Additional Interest, if any) on the Notes in accordance with their terms or any other obligation of EFIH under this Indenture;

(2)     affect the relative rights of Holders of Notes as against any other creditors of EFIH (other than holders of Senior Liens or other Junior Liens);

(3)     restrict the right of any Holder of Notes to sue for payments that are then due and owing (but not enforce any judgment in respect thereof against any Collateral to the extent specifically prohibited by the provisions of the Collateral Trust Agreement);

123

(4)    restrict or prevent any Holder of Notes or holder of other Junior Lien Obligations, the Collateral Trustee or any other Person from exercising any of its rights or remedies upon a Default or Event of Default not specifically restricted or prohibited by the provisions of the Collateral Trust Agreement; or

(5)    restrict or prevent any Holder of Notes or holder of other Junior Lien Obligations, the Trustee, the Collateral Trustee or any other Person from taking any lawful action in an insolvency or liquidation proceeding not specifically restricted or prohibited by the provisions of the Collateral Trust Agreement.

Section 10.04    Security Documents.

The due and punctual payment of the principal of and premium, if any, and interest (including Additional Interest, if any) on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of and premium, if any, and interest (including Additional Interest, if any) (to the extent permitted by law), on the Notes and performance of all other Obligations of EFIH to the Holders of Notes or the Trustee under this Indenture and the Notes, according to the terms hereunder or thereunder, are secured as provided in the Pledge Agreement and the Collateral Trust Agreement. Each Holder of Notes, by its acceptance thereof, consents and agrees to the terms of the Pledge Agreement and Collateral Trust Agreement (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms and authorizes and directs the Collateral Trustee and/or the Trustee (as the case may be) to enter into the Pledge Agreement, the Collateral Trust Agreement and any other Security Document and to perform its obligations and exercise its rights thereunder in accordance therewith.

EFIH, at its own expense, shall deliver to the Trustee copies of all documents delivered to the Collateral Trustee pursuant to the Pledge Agreement and Collateral Trust Agreement, and shall do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Pledge Agreement or the Collateral Trust Agreement, to assure and confirm to the Trustee and the Collateral Trustee the security interest in the Collateral contemplated hereby, by the Pledge Agreement or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed. Subject to the terms of the Pledge Agreement, EFIH, at its own expense, shall take, upon request of the Trustee, any and all actions reasonably required to cause the Pledge Agreement to create and maintain, as security for the Obligations of EFIH hereunder, a valid and enforceable perfected Lien in and on all the Collateral, in favor of the Collateral Trustee for the benefit of the Holders of Notes and future permitted Junior Lien Obligations, superior to and prior to the rights of all third Persons and subject to no other Liens other than Permitted Liens and other Liens pursuant to Section 4.12 hereof.

Section 10.05    Recording and Opinions.

The Issuer shall comply with the provisions of TIA §314(b) (including, without limitation, the provision of an initial and annual Opinion of Counsel under TIA §314(b)). To the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA §314(b)(2), the Issuer shall furnish such opinion not more than 60 but not less than 30 days prior to each December 31.

027141-0016-11400-Active.12335081

Section 10.06   Release of Collateral.

(a)     The Collateral Trustee's Liens upon the Collateral shall no longer secure the Notes and Guarantees outstanding under this Indenture or any other Obligations under this Indenture, and the right of the Holders of the Notes and such Obligations to the benefits and proceeds of the Collateral Trustee's Liens on the Collateral shall terminate and be discharged:

(1)     upon satisfaction and discharge of this Indenture in accordance with Article 12 hereof;

(2)     upon a Legal Defeasance or Covenant Defeasance of the Notes in accordance with Article 8 hereof;

(3)     upon payment in full of the Notes and all other Note Obligations that are outstanding, due and payable at the time the Notes are paid in full;

(4)     in whole or in part, with the consent of the holders of the requisite percentage of Secured Lien Debt and/or Junior Lien Debt in accordance with the provisions set forth in the Security Documents, and upon delivery of instructions and any other documentation, in each case as required by this Indenture and the Security Documents, in a form satisfactory to the Collateral Trustee; or

(5)     in whole or in part as the result of a sale, transfer or other disposition in any transaction or other circumstance that is not prohibited by this Indenture or any applicable Secured Debt Document, at the time of, or immediately prior to, such sale, transfer or other disposition; provided that EFIH shall have delivered an Officer's Certificate to the Collateral Trustee certifying that such sale, transfer or other disposition does not violate the terms of this Indenture or any applicable Secured Debt Document.

(b)     To the extent applicable, the Issuer shall cause TIA §313(b), relating to reports, and TIA §314(d), relating to the release of property or securities or relating to the substitution therefore of any property or securities to be subjected to the Lien created by the Security Documents, to be complied with. Any certificate or opinion required by TIA §314(d) may be made by an Officer of the Issuer except in cases where TIA §314(d) requires that such certificate or opinion be made by an independent Person, which Person shall be an independent engineer, appraiser or other expert reasonably satisfactory to the Trustee.   Notwithstanding anything to the contrary in this Section 10.06(b), the Issuer shall not be required to comply with all or any portion of TIA §314(d) if it determines, in good faith based on advice of counsel, that under the terms of TIA §314(d) and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of TIA §314(d) is inapplicable to released Collateral.

(c)     To the extent applicable, the Issuer shall furnish to the Trustee and the Collateral Trustee, prior to each proposed release of Collateral pursuant to the Security Documents:

(1)     all documents required by TIA §314(d); and

(2)     an Opinion of Counsel to the effect that such accompanying documents constitute all documents required by TIA §314(d).

Section 10.07    Authorization of Actions to Be Taken by the Trustee Under the Security Documents.

(a)    Subject to the provisions of the Security Documents, the Trustee may (but shall have no obligation to), in its sole discretion and without the consent of the Holders of Notes, direct, on behalf of the Holders of Notes, the Collateral Trustee to, take all actions it deems necessary or appropriate in order to:

(1)    enforce any of the terms of the Pledge Agreement; and

(2)    collect and receive any and all amounts payable in respect of the Obligations of the Issuer hereunder.

(b)    The Trustee shall have power (but shall have no obligation) to direct, on behalf of the Holders of the Notes, the Collateral Trustee to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Pledge Agreement or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders of Notes or of the Trustee).

Section 10.08    Authorization of Receipt of Funds by the Trustee under the Pledge Agreement.

The Trustee is authorized to receive any funds for the benefit of the Holders of Notes distributed under the Pledge Agreement and/or the Collateral Trust Agreement, and to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture.

Section 10.09    Lien Sharing and Priority Confirmation.

The Trustee agrees for itself and on behalf of the Holders of the Notes, and by holding Notes each such Holder shall be deemed to agree:

(a)    for the enforceable benefit of all holders of each existing and future Series of Senior Lien Debt and Series of Junior Lien Debt, and each existing and future Senior Lien Representative and Junior Lien Representative, that all Junior Lien Obligations shall be and are secured equally and ratably by all Junior Liens at any time granted by the Issuer or any Guarantor to secure any Obligations in respect of this Indenture, the Notes and any Guarantees, and that all such Junior Liens shall be enforceable by the Collateral Trustee for the benefit of all holders of Junior Lien Obligations equally and ratably;

(b)    for the enforceable benefit of all holders of each existing and future Series of Senior Lien Debt and Series of Junior Lien Debt, and each existing and future Senior Lien Representative and Junior Lien Representative, that the holders of Obligations in respect of this Indenture, the Notes and the Guarantees are bound by the provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Junior Liens and the order of application of proceeds from enforcement of Junior Liens; and

126

(c)      to consent to and direct the Collateral Trustee to perform its obligations under the Collateral Trust Agreement and the other Security Documents in respect of this Indenture, the Notes and the Guarantees.

Section 10.10    Voting.

In connection with any matter under the Collateral Trust Agreement requiring a vote of holders of Secured Lien Debt, the Holders shall cast their votes in accordance with this Indenture. The amount of the Notes to be voted by the Holders shall equal the aggregate outstanding principal amount of the Notes outstanding at the time of such vote. Following and in accordance with the outcome of the applicable vote under this Indenture, the Trustee shall vote the total amount of the Notes as a block in respect of any vote under the Collateral Trust Agreement.

Section 10.11    Limitation on Duty of Trustee in Respect of Collateral; Indemnification.

(a)      Beyond the exercise of reasonable care in the custody thereof, the Trustee shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Trustee shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Trustee in good faith.

(b)      The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture, the Collateral Trust Agreement or the Security Documents by the Issuer, any Guarantors, the Secured Debt Representatives or the Collateral Trustee.

Section 10.12    Asset Sale Cash Collateral Account.

EFIH shall establish an Asset Sale Cash Collateral Account with the Collateral Trustee prior to any Asset Sale of Collateral or other Oncor-related Assets. The Collateral Trustee shall have sole dominion and control over any Asset Sale Cash Collateral Account and EFIH shall not have any right to withdraw funds from such Asset Sale Cash Collateral Account, except in accordance with the provisions of this Section 10.12 and Section 4.10 hereof. Any Asset Sale Cash Collateral Account shall be a securities account, as defined in the Uniform Commercial Code. The Collateral Trustee shall have no duty to inquire as to whether any funds deposited into an Asset Sale Cash Collateral Account are entitled to be so deposited and may conclusively assume that any such deposit by or on behalf of EFIH is proper. Prior to the occurrence of an Event of Default, EFIH shall have the right to direct investment of the funds held in an Asset Sale Cash Collateral Account or the liquidation of any such investments; provided, however, that any such investment shall only be permitted to the extent it is in the form of Cash

127

Equivalents. Any investment direction or direction as to the liquidation of investments shall be in writing and signed by an Officer of EFIH, shall specify the particular investment to be made or liquidated and shall state that any investment or liquidation to be made in accordance with such direction is permitted hereby. The Collateral Trustee shall have no liability for any losses incurred in connection with the making or liquidation of any investment in accordance with this Section 10.12. Any investment in a fund referred to in clause (8) of the definition of "Cash Equivalents" may include money market funds with respect to which the Collateral Trustee or an Affiliate of the Collateral Trustee acts as an investment manager or advisor and with respect to which it may receive fees for the administration. The funds held in an Asset Sale Cash Collateral Account shall be released in accordance with Section 4.10(f) hereof. Such funds shall also be released to repurchase Notes and other Secured Lien Debt and to make related payments in connection with a Collateral Asset Sale Offer pursuant to Sections 4.10(g) and 4.10(h) hereof and/or upon consummation of any Collateral Asset Sale Offer, whether or not any Collateral Excess Proceeds remain. The Issuer shall deliver to the Trustee and the Collateral Trustee an Officer's Certificate stating that such release was permitted by Section 4.10 hereof, except in the case of the payment of scheduled interest payments on the Notes, other Junior Lien Obligations and/or Senior Lien Obligations in accordance with Section 4.10(f).

Section 10.13    Collateral Trustee a Third Party Beneficiary.

This Article 10 is intended for the benefit of, and shall be enforceable as a third party beneficiary by, the Collateral Trustee as holder of Senior Liens.

ARTICLE 11

GUARANTEES

Section 11.01    Guarantee.

Subject to this Article 11, each of the Guarantors hereby, jointly and severally, fully and unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that: (a) the principal of and premium, if any, and interest (including Additional Interest, if any) on the Notes shall be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal and interest on the Notes, if any, if lawful, and all other obligations of the Issuer to the Holders or the Trustee hereunder or thereunder shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

The Guarantors hereby agree that their obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the

128

Issuer, protest, notice and all demands whatsoever and covenants that this Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees) incurred by the Trustee or any Holder in enforcing any rights under this Section 11.01.

If any Holder or the Trustee is required by any court or otherwise to return to the Issuer, any of the Guarantors, or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or any of the Guarantors, any amount paid either to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantees.

Each Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation, reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made. In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

In case any provision of any Guarantee shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

The Guarantees shall rank equally in right of payment with all existing and future Senior Indebtedness of the Guarantor. The Guarantees shall be senior in right of payment to all existing and future Subordinated Indebtedness of each Guarantor.

Each payment to be made by a Guarantor in respect of its Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

Section 11.02    Limitation on Guarantor Liability.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform

129

Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as shall, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 11, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent conveyance or fraudulent transfer under applicable law. Each Guarantor that makes a payment under its Guarantee shall be entitled upon payment in full of all guaranteed obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

Section 11.03    Execution and Delivery.

To evidence its Guarantee set forth in Section 11.01 hereof, each Guarantor hereby agrees that this Indenture shall be executed on behalf of such Guarantor by an Officer or person holding an equivalent title.

Each Guarantor hereby agrees that its Guarantee set forth in Section 11.01 hereof shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

If an Officer whose signature is on this Indenture no longer holds that office at the time the Trustee authenticates the Note, the Guarantee shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantors.

If required by Section 4.15 hereof, the Issuer shall cause any newly created or acquired Restricted Subsidiary to comply with the provisions of Section 4.15 hereof and this Article 11, to the extent applicable.

Section 11.04    Subrogation.

Each Guarantor shall be subrogated to all rights of Holders of Notes against the Issuer in respect of any amounts paid by any Guarantor pursuant to the provisions of Section 11.01 hereof; provided that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture or the Notes shall have been paid in full.

Section 11.05    Benefits Acknowledged.

Each Guarantor acknowledges that it shall receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Guarantee are knowingly made in contemplation of such benefits.

027141-0016-11400-Active.12335081

Section 11.06    Release of Guarantees

(a)    A Guarantee by a Guarantor shall be automatically and unconditionally released and discharged, and no further action by such Guarantor, the Issuer or the Trustee is required for the release of such Guarantor's Guarantee, upon:

(1)    any sale, exchange or transfer (by merger, wind-up, consolidation or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or sale of all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with the applicable provisions of this Indenture;

(2)    the release or discharge of the guarantee by such Guarantor that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(3)    the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with Section 4.07 hereof and the definition of "Unrestricted Subsidiary" hereunder; or

(4)    the exercise by the Issuer of its Legal Defeasance option or Covenant Defeasance option in accordance with Article 8 hereof or the Issuer's obligations under this Indenture being discharged in accordance with the terms of this Indenture;

provided that such Guarantor shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in this Indenture relating to such transaction have been complied with.

ARTICLE 12

SATISFACTION AND DISCHARGE

Section 12.01    Satisfaction and Discharge.

This Indenture shall be discharged and shall cease to be of further effect as to all Notes, when either:

(1)    all Notes theretofore authenticated and delivered, except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust, have been delivered to the Trustee for cancellation; or

(2)    (A)    all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, shall become due and payable within one year or may be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for

131

principal, premium, if any, and accrued and unpaid interest to the date of maturity or redemption;

      (B)    no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) with respect to this Indenture or the Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit, and such deposit shall not result in a breach or violation of, or constitute a default, under any material agreement or instrument (other than this Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and in each case, the granting of Liens in connection therewith);

      (C)    the Issuer has paid or caused to be paid all sums payable by it under this Indenture; and

      (D)    the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the Redemption Date, as the case may be.

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (A) of clause (2) of this Section 12.01, the provisions of Section 12.02 and Section 8.06 hereof shall survive.

Section 12.02    <u>Application of Trust Money</u>.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 12.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal and premium, if any, and interest (including Additional Interest, if any) for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01 hereof; <u>provided</u> that if the Issuer has made any payment of principal, premium, if any, and interest on any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

027141-0016-11400-Active.12335081

ARTICLE 13

MISCELLANEOUS

Section 13.01    <u>Trust Indenture Act Controls</u>.

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by Trust Indenture Act § 318(c), the imposed duties shall control.

Section 13.02    <u>Notices</u>.

Any notice or communication by the Issuer, any Guarantor or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Issuer and/or any Guarantor:

Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
Attention: General Counsel
and
Facsimile No.:  (214) 812-4097
Attention:  Treasurer
and
EFIH Finance Inc.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
Attention: General Counsel
or
Facsimile No.:  (214) 812-4097
Attention:  Treasurer

With a copy to:
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Facsimile No.:  (212) 455-2502
Attention:  Edward P. Tolley III

If to the Trustee:
The Bank of New York Mellon Trust Company, N.A.
Corporate Trust Division
601 Travis Street - 16th Floor
Houston, TX 77002
Facsimile No.:  (713) 483-6954

133

Attention:  EFIH Senior Secured Second Lien Notes Trustee

To surrender Definitive Notes:
The Bank of New York Mellon Trust Company, N.A.
c/o The Bank of New York Mellon
101 Barclay Street -- 7 East
New York, NY 10286
Facsimile no.: (212) 298-1915
Attention: EFIH Senior Secured Second Lien Notes Trustee

The Issuer, any Guarantor, or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five calendar days after being deposited in the mail postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery; provided that any notice or communication delivered to the Trustee shall be deemed effective upon actual receipt thereof.

Any notice or communication to a Holder shall be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar.  Any notice or communication shall also be so mailed to any Person described in Trust Indenture Act § 313(c), to the extent required by the Trust Indenture Act. Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Issuer mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Section 13.03    Communication by Holders of Notes with Other Holders of Notes.

Holders may communicate pursuant to Trust Indenture Act § 312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Trustee, the Registrar and anyone else shall have the protection of Trust Indenture Act § 312(c).

Section 13.04    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer or any of the Guarantors to the Trustee to take any action under this Indenture, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee:

(a)    an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b)      an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 13.05    Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to Section 4.04 hereof or Trust Indenture Act § 314(a)(4)) shall comply with the provisions of Trust Indenture Act § 314(e) and shall include:

(a)      a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)      a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an Opinion of Counsel, may be limited to reliance on an Officer's Certificate as to matters of fact); and

(d)      a statement as to whether or not, in the opinion of such Person, such condition has been satisfied or such covenant has been complied with.

Section 13.06    Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.07    No Personal Liability of Directors, Officers, Employees and Stockholders.

No past, present or future director, officer, employee, incorporator or stockholder of the Issuer or any Guarantor, as such, shall have any liability for any obligations of the Issuer or the Guarantors under the Notes, this Indenture, the Guarantees, the Registration Rights Agreement or any Security Document or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

Section 13.08    Governing Law.

THIS INDENTURE, THE NOTES AND THE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 13.09    Waiver of Jury Trial.

EACH OF THE ISSUER, THE GUARANTORS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

135

Section 13.10    Force Majeure.

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

Section 13.11    No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer or its Restricted Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.12    Successors.

All agreements of the Issuer in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors. All agreements of any Guarantor in this Indenture shall bind its successors, except as otherwise provided in Section 11.06 hereof.

Section 13.13    Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.14    Counterpart Originals.

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.15    Table of Contents, Headings, etc.

The Table of Contents, Cross-Reference Table and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.16    Qualification of Indenture

The Issuer shall qualify this Indenture under the Trust Indenture Act in accordance with the terms and conditions of the Registration Rights Agreement and shall pay all reasonable costs and expenses (including attorneys' fees and expenses for the Issuer and the Trustee) incurred in connection therewith, including, but not limited to, costs and expenses of qualification of this Indenture and the Notes and printing this Indenture and the Notes. The Trustee shall be entitled to receive from the Issuer any such Officer's Certificates, Opinions of Counsel or other documentation as it may reasonably request in connection with any such qualification of this Indenture under the Trust Indenture Act.

Section 13.17    Ring-Fencing of Oncor.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Issuer and any Guarantor from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric

136

Delivery Facility and the holders of Oncor Electric Delivery Company LLC's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer and any Guarantor, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and EFIH's Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer and any Guarantor only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the Notes shall look solely to the Issuer and any Guarantor and their assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under this Indenture, the Registration Rights Agreement and any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under this Indenture, the Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, shall acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any Oncor Subsidiary, or against any of the Oncor Subsidiaries' assets. The Holders further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the foregoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

027141-0016-11400-Active.12335081

Dated as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC

By: _____
    Name: Anthony R. Horton
    Title: Senior Vice President and Treasurer

EFIH FINANCE INC.

By: _____
    Name: Anthony R. Horton
    Title: Senior Vice President and Treasurer

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee

By: _____
    Name:
    Title:

Dated as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC


By: _____
　　Name:
　　Title:


EFIH FINANCE INC.


By: _____
　　Name:
　　Title:


THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustee


By: _____
　　Name:　 Julie Hoffman-Ramos
　　Title:　　Vice President

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

**AND**

**EFIH FINANCE INC.**

**FIRST SUPPLEMENTAL INDENTURE**

**Dated as of February 6, 2012**

**To the Indenture dated as of April 25, 2011**

**THE BANK OF NEW YORK
MELLON TRUST COMPANY, N.A.**

**TRUSTEE**

027141-0016-02676-Active.12840521.7

First Supplemental Indenture (this "First Supplemental Indenture"), dated as of February 6, 2012, among Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with EFIH, the "Issuer"), and The Bank of New York Mellon Trust Company, N.A., as Trustee.

W I T N E S S E T H

WHEREAS, the Issuer and the Trustee have entered into an Indenture, dated as of April 25, 2011 (the "Existing Indenture"), providing for the issuance of $406,392,000 aggregate principal amount of 11% Senior Secured Second Lien Notes due 2021 (the "Initial 2021 Second Lien Notes");

WHEREAS, Section 9.01 of the Existing Indenture provides, among other things, that the Issuer and the Trustee may amend and supplement the Existing Indenture to provide for the issuance of additional series of debt securities of the Issuer constituting Required Debt in accordance with the Existing Indenture;

WHEREAS, the Issuer has duly authorized the creation of an issue of $800,000,000 aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 (the "Initial 2022 Second Lien Notes");

WHEREAS, the Issuer desires to amend the Existing Indenture to provide for the issuance of the Initial 2022 Second Lien Notes and to make certain other changes that provide additional rights or benefits to the holders of the Initial 2021 Second Lien Notes in accordance with Section 9.01(5) and 9.01(6) of the Existing Indenture; and

WHEREAS, the Issuer has duly authorized the execution and delivery of this First Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of all Persons who are now or hereafter become Holders of 2021 Second Lien Notes and 2022 Second Lien Notes, hereby enter into this First Supplemental Indenture and agree as follows:

Section 1.    DEFINITIONS.

1.1.1    Capitalized Terms. Capitalized terms used herein without definition shall have the meanings assigned to them in the Existing Indenture.

1.1.2    Rules of Construction. For all purposes of this First Supplemental Indenture, except as otherwise herein expressly provided or unless the context otherwise requires: (i) the words "herein," "hereof" and "hereby" and other words of similar import used in this First Supplemental Indenture refer to this First Supplemental Indenture as a whole and not to any particular section hereof and (ii) the terms and expressions used herein shall have the same meanings as corresponding terms and expressions used in the Existing Indenture.

Section 2.    CHANGES TO CERTAIN PROVISIONS.

2.1    Amendments to Article 1.

(a)    The following definitions shall be added to Section 1.01 and replace any existing definitions of the same terms in the Existing Indenture prior to the date hereof:

027141-0016-02676-Active.12840521.7

"144A Global Note" means a Global Note substantially in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto, as the case may be, bearing the Global Note Legend, the Private Placement Legend and the Tax Legend (if applicable) and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes of the applicable series sold in reliance on Rule 144A.

"2021 Second Lien Notes" means the Initial 2021 Second Lien Notes and any Additional 2021 Second Lien Notes.

"2022 Second Lien Notes Issue Date" means the first date on which any 2022 Second Lien Notes were issued pursuant to the First Supplemental Indenture.

"2022 Second Lien Notes" means the Initial 2022 Second Lien Notes and any Additional 2022 Second Lien Notes.

"Additional Interest" means all additional interest then owing pursuant to the applicable Registration Rights Agreement.

"Additional Notes" means Additional 2021 Second Lien Notes and Additional 2022 Second Lien Notes.

"Additional 2021 Second Lien Notes" means additional 2021 Second Lien Notes (other than the Initial 2021 Second Lien Notes and Exchange Notes, if any, issued in exchange for such Initial 2021 Second Lien Notes) issued from time to time under this Indenture in accordance with Sections 2.01(d), 2.02, 4.09 and 4.12 hereof, as part of the same series as the Initial 2021 Second Lien Notes.

"Additional 2022 Second Lien Notes" means additional 2022 Second Lien Notes (other than the Initial 2022 Second Lien Notes and Exchange Notes, if any, issued in exchange for such Initial 2022 Second Lien Notes) issued from time to time under this Indenture in accordance with Sections 2.01(d), 2.02, 4.09 and 4.12 hereof, as part of the same series as the Initial 2022 Second Lien Notes.

"Applicable Premium" means, with respect to any Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such Note; and

(2)    (A) with respect to the 2021 Second Lien Notes, the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such 2021 Second Lien Note at May 15, 2016 (such redemption price as set forth in the applicable table appearing under Section 3.07(d) hereof), plus (ii) all required interest payments due on such 2021 Second Lien Note through May 15, 2016 (excluding accrued and unpaid interest, if any, to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such 2021 Second Lien Note; or

(B) with respect to the 2022 Second Lien Notes, the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such 2022 Second Lien Note at March 1, 2017 (such redemption price as set forth in the applicable table appearing under Section 3.07(d) hereof), plus (ii) all required interest payments due on such 2022 Second Lien Note through March 1, 2017 (excluding accrued and unpaid interest, if any, to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such 2022 Second Lien Note.

"Definitive Note" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A-1 or Exhibit A-2, as applicable, hereto, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Exchange Notes" means any notes issued in exchange for the Notes pursuant to the applicable Registration Rights Agreement or similar agreement.

"First Supplemental Indenture" means the First Supplemental Indenture, dated as of February 6, 2012, between the Issuer and the Trustee.

"Global Notes" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto, as the case may be, and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.06(a), 2.06(b)(iii), 2.06(b)(iv), 2.06(d)(ii), 2.06(d)(iii) or 2.06(f) hereof.

"Initial Notes" means the Initial 2021 Second Lien Notes and the Initial 2022 Second Lien Notes.

"Initial 2021 Second Lien Notes" has the meaning set forth in the recitals hereto.

"Initial 2022 Second Lien Notes" has the meaning set forth in the recitals hereto.

"Interest Payment Date" means, with respect to the 2021 Second Lien Notes, May 15 and November 15 of each year to the Stated Maturity thereof and, with respect to the 2022 Second Lien Notes, March 1 and September 1 of each year to the Stated Maturity thereof.

"Investors" means Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., J.P. Morgan Ventures Corporation, Citigroup Global Markets Inc., Morgan Stanley & Co. LLC, Goldman, Sachs & Co. and LB I Group, Inc. and each of their respective Affiliates but not including, however, any portfolio companies of any of the foregoing.

"Issue Date" means the first date on which any Notes are issued under this Indenture, which was April 25, 2011.

"Junior Lien Consolidated Leverage Ratio" as of any date of determination, means the ratio of (x) an amount equal to (i) the aggregate amount of Oncor Subsidiaries' Consolidated Total Indebtedness as of the end of the most recent fiscal quarter for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, plus (ii) $4.0 billion (provided that such amount shall be reduced by an amount equal to the amount of Senior Lien Debt repaid using the Net Proceeds from Asset Sales of Oncor-related Assets (other than Equity Interests of any Oncor Subsidiary or any Successor Oncor Business) in accordance Section 4.10 hereof), less (iii) the aggregate amount of Unrestricted Cash (treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation) to (y) the aggregate amount of EBITDA of Oncor Holdings (treating all Subsidiaries of Oncor Holdings as Restricted Subsidiaries for purposes of such calculation) for the most recently ended four full consecutive fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such pro forma adjustments to such items as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

3

"Notes" means the Initial 2021 Second Lien Notes and the Initial 2022 Second Lien Notes (including, in each case, Exchange Notes, if any, issued in exchange therefor), and more particularly means any Note authenticated and delivered under this Indenture. For all purposes of this Indenture, the term "Notes" shall also include any Additional 2021 Second Lien Notes and Additional 2022 Second Lien Notes that may be issued under this Indenture. The 2021 Second Lien Notes and the 2022 Second Lien Notes (including, in each case, Exchange Notes, if any, issued in exchange therefor) are separate series of Notes, but shall be treated as a single class for all purposes under this Indenture, except as set forth herein. For purposes of this Indenture, all references to Notes to be issued or authenticated upon transfer, replacement or exchange shall be deemed to refer to Notes of the applicable series.

"Offering Memorandum" means the offering memorandum, dated February 1, 2012, relating to the sale of the Initial 2022 Second Lien Notes.

"Oncor Electric Delivery Facility" means the revolving credit agreement entered into as of the Closing Date, as amended and restated on October 11, 2011, by and among Oncor Electric Delivery Company LLC, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

"Oncor Subsidiaries' Consolidated Total Indebtedness" means, as at any date of determination, an amount equal to (1) the aggregate amount of all outstanding Indebtedness of the Oncor Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, debt obligations evidenced by promissory notes and similar instruments, letters of credit (only to the extent of any unreimbursed drawings thereunder) and Obligations in respect of Capitalized Lease Obligations, plus (2) the aggregate amount of all outstanding Disqualified Stock and Preferred Stock of the Oncor Subsidiaries on a consolidated basis, with the amount of such Disqualified Stock and Preferred Stock equal to the greater of their respective voluntary or involuntary liquidation preferences and maximum fixed repurchase prices, in each case determined on a consolidated basis in accordance with GAAP, and less (3) all deposit L/C loans and incremental deposit L/C loans of the Oncor Subsidiaries outstanding on such date of determination. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Stock or Preferred Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Stock or Preferred Stock as if such Disqualified Stock or Preferred Stock were purchased on any date on which Oncor Subsidiaries' Consolidated Total Indebtedness shall be required to be determined, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock or Preferred Stock, such fair market value shall be determined reasonably and in good faith by EFIH.

"Record Date" for the interest (including Additional Interest, if any) payable on any applicable Interest Payment Date means, with respect to the 2021 Second Lien Notes, May 1 or November 1 and, with respect to the 2022 Second Lien Notes, February 15 or August 15, in each case whether or not a Business Day, next preceding such Interest Payment Date.

"Registration Rights Agreement" means, as applicable, (1) the Registration Rights Agreement relating to the Initial 2021 Second Lien Notes, dated as of the Issue Date among the Issuer and the initial purchasers of the Initial 2021 Second Lien Notes, (2) the Registration Rights Agreement relating to the Initial 2022 Second Lien Notes, dated as of the date of the First Supplemental Indenture, among the Issuer and the initial purchasers of the Initial 2022 Second Lien Notes and (3) with respect to any Additional

4

Notes, any registration rights agreement among the Issuer and the other parties thereto relating to the registration by the Issuer of such Additional Notes under the Securities Act.

"Regulation S Global Note" means a Global Note in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto, bearing the Global Note Legend, the Private Placement Legend and the Tax Legend (if applicable) and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes of the applicable series sold in reliance on Regulation S.

"Required Debt" means, with respect to any action, on any date, the outstanding principal amount of:

(1)       the Notes (including any Additional Notes); and

(2)       securities that constitute Junior Lien Debt and are designated as Required Debt in an Officer's Certificate delivered to the Trustee

at such date, other than, in each case, any such debt beneficially owned by the Issuer or its Affiliates, voting as a single class, except to the extent prohibited by law; provided that (a) Required Debt shall only include debt described in clause (2) of this definition to the extent such debt would require the consent of the holders of the debt described in this definition voting as a single class to take such action, except to the extent described below in clauses (b) and (c); (b) if any amendment, waiver or other action would disproportionately affect the holders of the 2021 Second Lien Notes, the 2022 Second Lien Notes or any other series of securities that constitute Junior Lien Debt, Required Debt shall mean the 2021 Second Lien Notes, the 2022 Second Lien Notes or such other series of securities that constitute Junior Lien Debt, as the case may be, voting as a single class and the other series of debt described in clauses (1) and (2) voting as a single class, and (c) if any amendment, waiver or other action would affect (i) only the 2021 Second Lien Notes, (ii) only the 2022 Second Lien Notes or (iii) only any other series of securities that constitute Junior Lien Debt, Required Debt shall mean the 2021 Second Lien Notes, the 2022 Second Lien Notes or such other series of securities that constitute Junior Lien Debt, as the case may be, voting as a single class without any other series of debt.

Notwithstanding the foregoing, with respect to the taking of any action with respect to a Default or an Event of Default or the exercise of any rights or remedies with respect to an Event of Default, Required Debt shall mean the 2021 Second Lien Notes, the 2022 Second Lien Notes and any other series of securities that constitute Junior Lien Debt described in clause (2) of this definition voting together, only to the extent such Default or Event of Default applies to each such series of debt in the same manner and only to the extent the holders of each such series of debt have the right to take such action or exercise such rights or remedies.

"Treasury Rate" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to (x) May 15, 2016, in the case of the 2021 Second Lien Notes, and (y) March 1, 2012, in the case of the 2022 Second Lien Notes; provided, however, that if the period from the Redemption Date to May 15, 2016 or March 1, 2017, as applicable, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

"Unrestricted Global Note" means a permanent Global Note, substantially in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto, that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing Global Notes that do not bear and are not required to bear the Private Placement Legend.

(b)     The following amendment shall be made to the definition of "Change of Control" where it appears in Section 1.01:

2.1.2    the word "applicable" shall be inserted immediately before the words "Registration Rights Agreement" where they appear in clause (b) of the proviso thereof.

(c)     The following amendment shall be made to clause (1)(d)(i) of the definition of "EBITDA":

2.1.3    the words "2021 Second Lien" shall be inserted immediately before the word "Notes" the first time it appears.

(d)     The following amendment shall be made to the definition of "TCEH Senior Secured Facilities":

2.1.4    the words "and April 7, 2011" shall be inserted immediately after the words "August 7, 2009".

2.2     Amendments to Article 2.

2.2.1    Clause (a) of Section 2.01 shall be deleted and replaced with the following:

(a)     General. The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rules or usage. Each Note shall be dated the date of its authentication. The Notes shall be in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

2.2.2    Clause (b) of Section 2.01 shall be deleted and replaced with the following:

(b)     Global Notes. Notes issued in global form shall be substantially in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto (including, in each case, the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes issued in definitive form shall be substantially in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto (but without, in each case, the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note" attached thereto and each shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

6

2.2.3    The fourth paragraph of Clause (d) of Section 2.01 shall be deleted and replaced with the following:

Additional Notes of any series ranking *pari passu* with the Initial Notes of such series may be created and issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Initial Notes of such series and shall have the same terms as to status, redemption or otherwise as the Initial Notes of such series; provided that the Issuer's ability to issue Additional Notes shall be subject, among other things, to the Issuer's compliance with Sections 4.09 and 4.12 hereof.  The 2021 Second Lien Notes and the 2022 Second Lien Notes are each a separate series of Notes but shall be treated as a single class of securities under this Indenture, except as otherwise stated herein.  As a result, except as otherwise provided for in this Indenture, Holders of each series of Notes will not have separate rights to, among other things, give notice of Defaults or to direct the Trustee to exercise remedies during an Event of Default or otherwise.   Except as otherwise stated herein, the Notes offered by the Issuer and any Additional Notes subsequently issued under this Indenture shall be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase.  Unless the context requires otherwise, references to "Notes" for all purposes under this Indenture include any Additional Notes that are actually issued.  Any Additional Notes shall be issued with the benefit of an indenture supplemental to this Indenture.  Each series of Notes is a separate series of debt, but will be treated as a single class with other series of Required Debt for certain actions and voting as set forth in this Indenture.

2.2.4    Section 2.02 shall be deleted and replaced with the following:

At least one Officer shall execute the Notes on behalf of the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A-1 (in the case of the 2021 Second Lien Notes) or Exhibit A-2 (in the case of the 2022 Second Lien Notes) hereto, as applicable, by the manual signature of the Trustee.  The signature shall be conclusive evidence that the Note has been duly authenticated and delivered under this Indenture.

On the Issue Date, the Trustee shall, upon receipt of a written order of the Issuer signed by an Officer (an "Issuer Authentication Order") authenticate and deliver the Initial 2021 Second Lien Notes specified in such Issuer Authentication Order.  On the date of the First Supplemental Indenture, the Trustee shall, upon receipt of an Issuer Authentication Order, authenticate and deliver the Initial 2022 Second Lien Notes.  In addition, at any time, and from time to time, the Trustee shall, upon receipt of an Issuer Authentication Order, authenticate and deliver any Additional Notes or Exchange Notes, for an aggregate principal amount specified in such Issuer Authentication Order for such Additional Notes or Exchange Notes.   Such Issuer Authentication Order shall specify the amount of the Notes to be authenticated and, in the case of any issuance of Additional Notes, shall certify that such issuance is in compliance with Sections 4.09 and 4.12 hereof.

The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes.  An authenticating agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

2.3    Amendments to Article 3.

7

2.3.1    Section 3.01 shall be deleted and replaced with the following:

If the Issuer elects to redeem the 2021 Second Lien Notes or the 2022 Second Lien Notes pursuant to Section 3.07 hereof, it shall furnish to the Trustee, at least five Business Days (or such lesser number of days as shall be acceptable to the Trustee) before notice of redemption is required to be mailed or caused to be mailed to Holders pursuant to Section 3.03 hereof but not more than 60 days before a Redemption Date, an Officer's Certificate setting forth (i) the paragraph or subparagraph of such Notes and/or Section of this Indenture pursuant to which the redemption shall occur, (ii) the Redemption Date, (iii) the principal amount of such series of Notes to be redeemed and (iv) the redemption price.

2.3.2    Clause (a) of Section 3.02 shall be deleted and replaced with the following:

If less than all of the 2021 Second Lien Notes or the 2022 Second Lien Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee shall select the Notes of such series to be redeemed or purchased (a) if the series of Notes to be redeemed is listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which such series of Notes is listed, (b) on a pro rata basis to the extent practicable or (c) by lot or such similar method in accordance with the procedures of DTC.

2.3.3    Section 3.07 shall be deleted and replaced with the following:

(b)    Notes Make Whole Redemption.  At any time prior to May 15, 2016 (in the case of the 2021 Second Lien Notes) or March 1, 2017 (in the case of the 2022 Second Lien Notes), the Issuer may redeem each series of Notes, in whole or in part, at a redemption price equal to 100% of the principal amount of the series of Notes to be redeemed plus the Applicable Premium as of, and accrued and unpaid interest (including Additional Interest, if any) to, the applicable date of redemption (the "Redemption Date"), subject to the right of Holders of such series of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(c)    Notes Equity Redemption.  Prior to May 15, 2014 (in the case of the 2021 Second Lien Notes) or March 1, 2015 (in the case of the 2022 Second Lien Notes), the Issuer may, at its option, on one or more occasions, redeem up to 35% of the aggregate principal amount of each series of Notes at a redemption price equal to 111.00% (in the case of the 2021 Second Lien Notes) or 111.750% (in the case of the 2022 Second Lien Notes) of the aggregate principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the Redemption Date, subject to the right of Holders of record of the series of Notes to be redeemed on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings; provided that at least 50% of the sum of the original aggregate principal amount of such series of Notes issued under this Indenture and any Additional Notes of such series of Notes issued under this Indenture remains outstanding immediately after the occurrence of each such redemption; and provided further that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.  Notice of any redemption upon any Equity Offerings may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's option and discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

(d)    Except pursuant to clause (a) and (b) of this Section 3.07, the 2021 Second Lien Notes will not be redeemable at the Issuer's option prior to May 15, 2016, and the 2022 Second Lien Notes will not be redeemable at the Issuer's option prior to March 1, 2017.

8

(e)  Notes Optional Redemption.  From and after May 15, 2016 (in the case of the 2021 Second Lien Notes) or March 1, 2017 (in the case of the 2022 Second Lien Notes), the Issuer may redeem each series of Notes, in whole or in part, at the redemption prices (expressed as percentages of principal amount of the series of Notes to be redeemed) set forth below, plus accrued and unpaid interest (including Additional Interest, if any) to the applicable Redemption Date, subject to the right of Holders of record of such series of Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date if redeemed during the twelve-month period beginning on May 15 (in the case of the 2021 Second Lien Notes) or March 1 (in the case of the 2022 Second Lien Notes) of each of the years indicated below:

*2021 Second Lien Notes:*

| Year | Percentage |
|---|---|
| 2015 | 105.500% |
| 2016 | 103.667% |
| 2017 | 101.833% |
| 2018 and thereafter | 100.000% |

*2022 Second Lien Notes:*

| Year | Percentage |
|---|---|
| 2017 | 105.875% |
| 2018 | 103.917% |
| 2019 | 101.958% |
| 2020 and thereafter | 100.000% |

(f)  Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

2.3.4    Section 3.08 shall be deleted and replaced with the following:

Except as set forth in this Section 3.08, the Issuer shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.

If the Initial 2021 Second Lien Notes would otherwise constitute "applicable high yield discount obligations" within the meaning of Section 163(i)(1) of the Code, at the end of each "accrual period" (as defined in Section 1272(a)(5) of the Code) ending after the fifth anniversary of the Issue Date (each, an "AHYDO Redemption Date"), the Issuer will be required to redeem for cash a portion of the then outstanding Initial 2021 Second Lien Notes equal to the "Mandatory Principal Redemption Amount" (each such redemption, a "Mandatory Principal Redemption").  The redemption price for the portion of the Initial 2021 Second Lien Notes redeemed pursuant to any Mandatory Principal Redemption will be 100% of the aggregate principal amount of such portion of the Initial 2021 Second Lien Notes to be redeemed plus any accrued interest thereon (including Additional Interest, if any) on the date of the redemption.  "Mandatory Principal Redemption Amount" means, as of each AHYDO Redemption Date, the portion of the Initial 2021 Second Lien Notes required to be redeemed at such date to prevent the Initial 2021 Second Lien Notes from being treated as "applicable high yield discount obligations" within the meaning of Section 163(i)(1) of the Code.  No partial redemption or repurchase of the Initial 2021 Second Lien Notes prior to any AHYDO Redemption Date pursuant to any other provision of this Indenture will alter the Issuer's obligation to make any Mandatory Principal Redemption with respect to the Initial 2021 Second Lien Notes that remain outstanding on such AHYDO Redemption Date.

027141-0016-02676-Active.12840521.7

2.4     Amendments to Article 4.

2.4.1     Clause (b)(9)(B)(i) of Section 4.08 shall be deleted and replaced with the following:

(i) the provisions relating to such encumbrance or restriction contained in such Indebtedness are no less favorable to EFIH, taken as a whole, as determined by EFIH in good faith, than the provisions contained in this Indenture on the Issue Date or, in the case of the 2021 Second Lien Notes, in the provisions described in the "Description of the Notes" attached to the Exchange Agreements as Appendix B or

2.4.2     Clause (b)(2)(w) of Section 4.09 shall be deleted and replaced with the following:

(w)  by the Issuer or any Guarantor of Indebtedness represented by the 2021 Second Lien Notes issued on the Issue Date, the 2022 Second Lien Notes issued on the date of the First Supplemental Indenture and, without duplication, any Exchange Notes (including any guarantees thereof),

2.4.3     Clause (b)(2) of Section 4.12 shall be deleted and replaced with the following:

Junior Liens on the Collateral securing Junior Lien Debt (including, without duplication, the 2021 Second Lien Notes, the 2022 Second Lien Notes and any Additional Notes and any Exchange Notes of either series) permitted to be incurred pursuant to Section 4.09; provided that either (x) the aggregate principal amount of Junior Lien Debt does not exceed $2.85 billion, or (y) at the time of such incurrence and after giving pro forma effect thereto, the Junior Lien Consolidated Leverage Ratio for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur would be equal to or less than 7.5 to 1.0.

2.5     Amendments to Article 5.

The words "Registration Rights Agreement" contained in clauses (a)(2) and (a)(6) of Section 5.01 and shall be deleted and replaced with "applicable Registration Rights Agreement".

2.6     Amendments to Article 6.

2.6.1     The introductory clause of clause (a) of Section 6.01 shall be amended by inserting the words "with respect to any series of Notes" immediately after the words "wherever used herein".

2.6.2     Clauses (a)(1), (a)(2) and (a)(3) of Section 6.01 shall be amended by inserting the words "of such series" immediately after each reference to "the Notes".

2.6.3     The first sentence of the first paragraph of Section 6.02 shall be amended by inserting the words "of the affected series" immediately after each reference to "Notes".

2.6.4     Section 6.08 shall be amended by inserting the words "of the applicable series" immediately after the words "the Notes".

2.7     Amendments to Article 9.

2.7.1     Clause (12) of Section 9.01 shall be deleted and replaced with the following:

10

(12)    to conform the text of this Indenture, the Guarantees, the Notes or any Security Document to any provision of (a) in the case of the 2021 Second Lien Notes, the "Description of the Notes" attached to the Exchange Agreements as Appendix B, or (b) in the case of the 2022 Second Lien Notes, the "Description of the Notes" section of the Offering Memorandum, in either case, to the extent that such provision in the applicable "Description of the Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Guarantees, the Notes or any Security Document;

    2.8        Amendments to Exhibits.

        2.8.1    Exhibit A-2 to this First Supplemental Indenture shall be added to the Existing Indenture.

        2.8.2    Exhibits B, C and D to the Existing Indenture shall be deleted and replaced by Exhibits B, C and D to this First Supplemental Indenture.

    2.9        Other Amendments.

        2.9.1    Reference to "Exhibit A FORM OF NOTE" in the Table of Contents shall be replaced with "Exhibit A-1 FORM OF 2021 SECOND LIEN NOTE and Exhibit A-2 FORM OF 2022 SECOND LIEN NOTE".

Section 3.      RATIFICATION OF EXISTING INDENTURE; FIRST SUPPLEMENTAL INDENTURE PART OF EXISTING INDENTURE.

Except as expressly amended hereby, the Existing Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. Upon the execution and delivery of this First Supplemental Indenture by the Issuer and the Trustee, this First Supplemental Indenture shall form a part of the Existing Indenture for all purposes, and the Issuer, the Trustee and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. Any and all references to the Existing Indenture, whether within the Existing Indenture or in any notice, certificate or other instrument or document, shall be deemed to include a reference to this First Supplemental Indenture (whether or not made), unless the context shall otherwise require.

Section 4.      NO EXCHANGE OF EXISTING NOTES REQUIRED.

The execution of this First Supplemental Indenture shall not require the exchange of or modification to the certificates representing Notes existing prior to the date hereof.

Section 5.      GOVERNING LAW.

THIS FIRST SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 6.      COUNTERPARTS.

The parties may sign any number of copies of this First Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

Section 7.      EFFECT OF HEADINGS.

The Section headings herein are for convenience only and shall not affect the construction hereof.

027141-0016-02676-Active.12840521.7

Section 8.        THE TRUSTEE.

The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this First Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Issuer.

Section 9.        BENEFITS OF FIRST SUPPLEMENTAL INDENTURE.

Nothing in this First Supplemental Indenture, the Existing Indenture or the Notes express or implied, shall give to any Person, other than the parties hereto and thereto and their successors hereunder and thereunder, any Paying Agent, any Registrar and the Holders any benefit of any legal or equitable right, remedy or claim under the Existing Indenture, this First Supplemental Indenture or the Notes.

Section 10.        SUCCESSORS.

All agreements of the Issuer in this First Supplemental Indenture shall bind its successors.  All agreements of the Trustee in this First Supplemental Indenture shall bind its successors.

*[Signature Page Follows]*

12

IN WITNESS WHEREOF, the parties hereto have caused this First Supplemental Indenture to be duly executed, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

By: _____
    Name:   Anthony R. Horton
    Title:    Senior Vice President and Treasurer

EFIH FINANCE INC.

By: _____
    Name:   Anthony R. Horton
    Title:    Senior Vice President and Treasurer

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee

By: _____
    Name:
    Title:

SIGNATURE PAGE TO FIRST SUPPLEMENTAL INDENTURE

IN WITNESS WHEREOF, the parties hereto have caused this First Supplemental Indenture to be duly executed, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC


By: _____
    Name:   Anthony R. Horton
    Title:    Senior Vice President and Treasurer


EFIH FINANCE INC.


By: _____
    Name:   Anthony R. Horton
    Title:    Senior Vice President and Treasurer


THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee


By: _____
    Name:  Julie Hoffman-Ramos
    Title: Vice President


SIGNATURE PAGE TO FIRST SUPPLEMENTAL INDENTURE

EXHIBIT A-2

[Face of 2022 Second Lien Note]

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Tax Legend, if applicable pursuant to the provisions of the Indenture]*

CUSIP: [          ] [1]
ISIN: [          ]

[RULE 144A] [REGULATION S]  GLOBAL NOTE

11.750% Senior Secured Second Lien Notes due 2022

No.[R-1][S-1]                                                      [$_____]

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**

promise to pay to CEDE & CO. or registered assigns, the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto] [of [_____] United States Dollars ($[____])] on March 1, 2022.

Interest Payment Dates:  March 1 and September 1, commencing September 1, 2012

Record Dates:  February 15 and August 15

**[SIGNATURE PAGE FOLLOWS]**

---

[1]      Rule 144A Note CUSIP:   29269Q AD9
         Rule 144A Note ISIN:      US29269QAD97
         Regulation S Note CUSIP:U29197 AB3
         Regulation S Note ISIN:   USU29197AB36

A-2-1

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

Dated: _____, 20__

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC

By: _____
Name:
Title:

EFIH FINANCE INC.

By: _____
Name:
Title:

This is one of the 2022 Second Lien Notes referred to in the within-mentioned Indenture:

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., as Trustee

By: _____
Authorized Signatory

Dated: _____, 20__

[Back of 2022 Second Lien Note]

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)    *INTEREST.*    Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuer"), promise to pay interest on the principal amount of this 2022 Second Lien Note at 11.750% per annum from February 6, 2012 until maturity and shall pay Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below.  The Issuer will pay interest (including Additional Interest, if any) semi-annually in arrears on March 1 and September 1 of each year, commencing on September 1, 2012, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date") without interest accruing on the amount then so payable from such day that is not a Business Day until such Business Day.  Interest on the 2022 Second Lien Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the date of issuance.  The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the 2022 Second Lien Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (including Additional Interest, if any) (without regard to any applicable grace periods) from time to time on demand at the interest rate on the 2022 Second Lien Notes.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

(2)    *METHOD OF PAYMENT.*    The Issuer will pay interest on the 2022 Second Lien Notes (including Additional Interest, if any) to the Persons who are registered Holders of 2022 Second Lien Notes at the close of business on the February 15 and August 15 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such 2022 Second Lien Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  Payment of interest (including Additional Interest, if any) may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds will be required with respect to principal of, premium, if any, and interest (including Additional Interest, if any) on, all Global Notes and all other 2022 Second Lien Notes the Holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent.  Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3)    *PAYING AGENT AND REGISTRAR.*    Initially, The Bank of New York Mellon Trust Company, N.A., the Trustee under the Indenture, will act as Paying Agent and Registrar.  The Issuer may change any Paying Agent or Registrar without notice to the Holders.  The Issuer or any of its Subsidiaries may act in any such capacity.

(4)    *INDENTURE.*    The Issuer issued the 2022 Second Lien Notes under an Indenture, dated as of April 25, 2011 (the "Existing Indenture"), between the Issuer and the Trustee, as supplemented by the First Supplemental Indenture, dated as of February 6, 2012, between the Issuer and the Trustee (the Existing Indenture as supplemented, the "Indenture").  This 2022 Second Lien Note is one of a duly authorized issue of notes of the Issuer designated as its 11.750% Senior Secured Second Lien Notes due 2022.  The Issuer shall be entitled to issue Additional 2022 Second Lien Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture.  The 2021 Second Lien Notes (including any Exchange Notes issued in exchange therefor) and the 2022 Second Lien Notes (including any Exchange Notes issued in exchange therefor) (collectively referred to herein as the "Notes") are separate series of Notes, but shall be treated

A-2-3

as a single class of securities under the Indenture, unless otherwise specified in the Indenture. In addition, the Notes will be treated along with certain other securities designated as Junior Lien Debt of the Issuer as a single class for amendments and waivers and for taking certain other actions. The terms of the 2022 Second Lien Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"). The 2022 Second Lien Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of such terms. To the extent any provision of this 2022 Second Lien Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

(5)    *OPTIONAL REDEMPTION.*

(a)    Except as set forth below, the Issuer will not be entitled to redeem 2022 Second Lien Notes at its option prior to March 1, 2017.

(b)    At any time prior to March 1, 2017, the Issuer may redeem the 2022 Second Lien Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of 2022 Secured Lien Notes or otherwise delivered in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the 2022 Second Lien Notes redeemed, plus the Applicable Premium, plus accrued and unpaid interest (including Additional Interest, if any) to, the applicable date of redemption (the "Redemption Date"), subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(c)    From and after March 1, 2017, the Issuer may redeem the 2022 Second Lien Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of 2022 Second Lien Notes or otherwise delivered in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of the principal amount of the 2022 Second Lien Notes to be redeemed) set forth below, plus accrued and unpaid interest (including Additional Interest, if any) to the applicable Redemption Date, subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on March 1 of each of the years indicated below:

| Year | Percentage |
|---|---|
| 2017 | 105.875% |
| 2018 | 103.917% |
| 2019 | 101.958% |
| 2020 and thereafter | 100.000% |

(d)    Prior to March 1, 2015, the Issuer may, at its option, on one or more occasions, redeem up to 35% of the aggregate principal amount of all 2022 Second Lien Notes at a redemption price equal to 111.750% of the aggregate principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the Redemption Date, subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings; provided that at least 50% of the sum of the original aggregate principal amount of Initial 2022 Second Lien Notes and any Additional 2022 Second Lien Notes issued under the Indenture remains outstanding immediately after the occurrence of each such redemption; provided further that each such redemption occurs within 90 days of the date of closing of each such Equity Offering. Notice of any redemption upon any Equity Offerings may be given prior to

027141-0016-02676-Active.12840521.7

the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

(e)     If the Issuer redeems less than all of the outstanding 2022 Second Lien Notes, the Trustee shall select the 2022 Second Lien Notes to be redeemed in the manner described under Section 3.02 of the Indenture.

(f)     Any redemption pursuant to this paragraph 5 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of the Indenture.

(6)     *MANDATORY REDEMPTION.*  The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the 2022 Second Lien Notes.

(7)     *NOTICE OF REDEMPTION.*  Subject to Section 3.03 of the Indenture, notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date (except that redemption notices may be mailed or delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 12 of the Indenture) to each Holder whose 2022 Second Lien Notes are to be redeemed at its registered address or otherwise delivered in accordance with the procedures of DTC.  2022 Second Lien Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000 in excess thereof, unless all of the 2022 Second Lien Notes held by a Holder are to be redeemed.  On and after the Redemption Date interest ceases to accrue on 2022 Second Lien Notes or portions thereof called for redemption.

(8)     *OFFERS TO REPURCHASE.*

(a)     If a Change of Control occurs, the Issuer shall make an offer (a "Change of Control Offer") to each Holder to purchase all or any part (equal to $2,000 or an integral multiple of $1,000 in excess thereof) of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date of purchase (the "Change of Control Payment"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date. The Change of Control Offer shall be made in accordance with Section 4.14 of the Indenture.

(b)     If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets), within 10 Business Days of each date that the aggregate amount of Excess Proceeds exceeds $200.0 million, EFIH shall make an offer to all Holders of the Notes, and if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "Asset Sale Offer"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, EFIH may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or such Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes and such Senior Indebtedness shall be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered.

A-2-5

(c)    EFIH may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets); provided that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

(d)    If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale of Collateral or other Oncor-related Assets, within 10 Business Days of each date that the aggregate amount of Collateral Excess Proceeds exceeds $200.0 million, EFIH and/or any of its Restricted Subsidiaries shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any other Secured Lien Debt, to the holders of such other Secured Lien Debt (and if required or permitted by the terms of any Indebtedness of EFH Corp. that is guaranteed by EFIH and constitutes Secured Lien Debt, EFH Corp. may make an offer to all holders of such Indebtedness) (a "Collateral Asset Sale Offer"), to purchase the maximum aggregate principal amount of such Secured Lien Debt that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the terms and procedures set forth in the Indenture and the other applicable Secured Debt Documents; provided that in any such Collateral Asset Sale Offer, all Senior Lien Debt properly tendered will be purchased before any Junior Lien Debt is purchased; provided that in the event EFIH or such Restricted Subsidiary cannot make an offer to the holders of Senior Lien Debt and holders of Junior Lien Debt at the same time, EFIH or such Restricted Subsidiary may make a Collateral Asset Sale Offer to the holders of Senior Lien Debt first and make a Collateral Asset Sale Offer to the holders of Junior Lien Debt thereafter with any Collateral Excess Proceeds not used to purchase Senior Lien Debt as soon as practicable upon consummation of the Collateral Asset Sale Offer for the Senior Lien Debt. To the extent that the aggregate amount of Notes and such Secured Lien Debt tendered pursuant to a Collateral Asset Sale Offer, or sequential Collateral Asset Sale Offers to holders of Senior Lien Debt and Junior Lien Debt as provided for in the immediately preceding sentence, is less than the Collateral Excess Proceeds, EFIH and/or any of its Restricted Subsidiaries may use any remaining Collateral Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes and other Secured Lien Debt surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, all Senior Lien Debt properly tendered will be purchased before any Junior Lien Debt is purchased and thereafter the Notes and any other Junior Lien Debt will be purchased on a pro rata basis based upon the accreted value or principal amount of the Notes or such other Junior Lien Debt tendered.

(e)    The Issuer (and, if applicable, EFH Corp.) may, at its option, make a Collateral Asset Sale Offer using proceeds from any Asset Sale of Collateral or any other Oncor-related Assets at any time after consummation of such Asset Sale; provided that such Collateral Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Collateral Asset Sale Offer, or sequential Collateral Asset Sale Offers to holders of Senior Lien Debt and Junior Lien Debt, any Net Proceeds not required to be used to purchase Secured Lien Debt shall not be deemed Collateral Excess Proceeds and the Issuer and EFIH's Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in the Indenture.

(9)    DENOMINATIONS, TRANSFER, EXCHANGE.  The 2022 Second Lien Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. The transfer of 2022 Second Lien Notes may be registered and 2022 Second Lien Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the

A-2-6

transfer of any 2022 Second Lien Notes or portion of 2022 Second Lien Notes selected for redemption, except for the unredeemed portion of any 2022 Second Lien Notes being redeemed in part. Also, the Issuer need not exchange or register the transfer of any 2022 Second Lien Notes for a period of 15 days before a selection of 2022 Second Lien Notes to be redeemed.

(10) *PERSONS DEEMED OWNERS.* The registered Holder of a 2022 Second Lien Note may be treated as its owner for all purposes.

(11) *AMENDMENT, SUPPLEMENT AND WAIVER.* The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

(12) *DEFAULTS AND REMEDIES.* The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. If any Event of Default occurs and is continuing, the Trustee or the Required Holders of at least 30% in aggregate principal amount of the then outstanding Required Debt may declare the principal of and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on all the then outstanding Notes of the affected series to be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all principal of, and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on, all the then outstanding Notes will become due and payable immediately without further action or notice. Holders may not enforce the Indenture, the Notes or the Guarantees except as provided in the Indenture. Subject to certain limitations, Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default (except a Default relating to the payment of principal, premium, if any, or interest (including Additional Interest, if any)) if it determines that withholding notice is in their interest. The Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt by notice to the Trustee may on behalf of the Required Holders of all of the Required Debt waive any existing Default or and its consequences under the Indenture except a continuing Default in the payment of the principal of, or premium, if any, or interest (including Additional Interest, if any) on, any of the Notes held by a non-consenting Holder. EFIH is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and EFIH is required within five Business Days after becoming aware of any Default, to deliver to the Trustee a statement specifying such Default and what action EFIH proposes to take with respect thereto.

(13) *AUTHENTICATION.* This 2022 Second Lien Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

(14) *ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.* In addition to the rights provided to Holders of 2022 Second Lien Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, dated as of February 6, 2012, among the Issuer and the other parties named on the signature pages thereof (the "Registration Rights Agreement"), relating to such 2022 Second Lien Notes, including the right to receive Additional Interest, if any (as defined in the Registration Rights Agreement).

(15) *GOVERNING LAW.* THE INDENTURE, THE 2022 SECOND LIEN NOTES AND THE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

027141-0016-02676-Active.12840521.7

(16)   *CUSIP/ISIN NUMBERS.* Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP/ISIN numbers to be printed on the 2022 Second Lien Notes and the Trustee may use CUSIP/ISIN numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the 2022 Second Lien Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture, the Registration Rights Agreement relating to the 2022 Second Lien Notes and/or the Security Documents. Requests may be made to the Issuer at the following address:

Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
Attention: General Counsel
And
Facsimile No.:  (214) 812-4097
Attention: Treasurer

And

EFIH Finance Inc.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
Attention: General Counsel
And
Facsimile No.: (214) 812-4097
Attention: Treasurer

### ASSIGNMENT FORM

To assign this 2022 Second Lien Note, fill in the form below:

(I) or (we) assign and transfer this 2022 Second Lien Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's Soc. Sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this 2022 Second Lien Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____

Your Signature _____

(Sign exactly as your name appears on the
face of this 2022 Second Lien Note)

Signature Guarantee*:_____

\* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-2-9

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this 2022 Second Lien Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(g) or 4.14 of the Indenture, check the appropriate box below:

☐ Section 4.10(d)        ☐ Section 4.10(g)        ☐ Section 4.14

If you want to elect to have only part of this 2022 Second Lien Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(g) or 4.14 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this 2022 Second Lien Note)

Tax Identification No.: _____

Signature Guarantee*: _____

*        Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

027141-0016-02676-Active.12840521.7

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE[1]

The initial outstanding principal amount of this Global Note is $ _____. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following each decrease or increase | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|

---

[1]    This schedule should be included only if the 2022 Second Lien Note is issued in global form.

A-2-11

EXHIBIT B

## FORM OF CERTIFICATE OF TRANSFER

Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
          (214) 812-4097

EFIH Finance Inc.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
          (214) 812-4097

The Bank of New York Mellon Trust Company, N.A.
Corporate Trust Division
601 Travis Street – 16th Floor
Houston, TX 77002
Facsimile No.:  (713) 483-6954
Attention:  EFIH Senior Secured Second Lien Notes Trustee

Re:                    [11% Senior Secured Second Lien Notes due 2021]
                    [11.750% Senior Secured Second Lien Notes due 2022]

        Reference is hereby made to the Indenture, dated as of April 25, 2011, among Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (collectively, the "Issuer") and the Trustee, as supplemented by the First Supplemental Indenture dated as of February 6, 2012, between the Issuer and the Trustee (collectively, the "Indenture").  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

        _____ (the "Transferor") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "Transfer"), to _____ (the "Transferee"), as further specified in Annex A hereto.  In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

        1.        ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Definitive Note pursuant to Rule 144A.**  The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Securities Act of 1933, as amended (the "Securities Act"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.

B-1

2.      ☐   **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Definitive Note pursuant to Regulation S.**   The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser).  Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Indenture and the Securities Act.

3.      ☐   **Check and complete if Transferee will take delivery of a beneficial interest in the Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S.**   The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

    (a)   [ ] such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

**OR**

    (b)   [ ] such Transfer is being effected to the Issuer or a subsidiary thereof;

**OR**

    (c)   [ ] such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

4.      ☐   **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note.**

    (a)   ☐   **Check if Transfer is Pursuant to Rule 144.**  (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

027141-0016-02676-Active.12840521.7

(b)      ☐ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)      ☐ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

[Insert Name of Transferor]

By: _____
       Name:
       Title:

Dated: _____

**ANNEX A TO CERTIFICATE OF TRANSFER**

1.      The Transferor owns and proposes to transfer the following:

**[CHECK ONE OF (a) OR (b)]**

(a)     ☐  a beneficial interest in the:

    (i)      ☐  144A Global Note (CUSIP [            ] [              ]), or

    (ii)     ☐  Regulation S Global Note (CUSIP [          ] [            ]), or

(b)     ☐  a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

**[CHECK ONE]**

(a)     ☐  a beneficial interest in the:

    (i)      ☐  144A Global Note (CUSIP [            ] [              ]), or

    (ii)     ☐  Regulation S Global Note (CUSIP [              ] [            ]), or

    (iii)    ☐  Unrestricted Global Note (CUSIP [            ] [            ]);

or

(b)     ☐  a Restricted Definitive Note; or

(c)     ☐  an Unrestricted Definitive Note, in accordance with the terms of the Indenture.

B-4

EXHIBIT C

## FORM OF CERTIFICATE OF EXCHANGE

Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
                (214) 812-4097

EFIH Finance Inc.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201-3411
Facsimile No.:  (214) 812-6032
                (214) 812-4097

The Bank of New York Mellon Trust Company, N.A.
Corporate Trust Division
601 Travis Street – 16th Floor
Houston, TX 77002
Facsimile No.:  (713) 483-6954
Attention:  EFIH Senior Secured Second Lien Notes Trustee

Re:               [11% Senior Secured Second Lien Notes due 2021]
                  [11.750% Senior Secured Second Lien Notes due 2022]

        Reference is hereby made to the Indenture, dated as of April 25, 2011, among Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (collectively, the "Issuer") and the Trustee, as supplemented by the First Supplemental Indenture dated as of February 6, 2012, between the Issuer and the Trustee (collectively, the "Indenture").  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

        _____ (the "Owner") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "Exchange").  In connection with the Exchange, the Owner hereby certifies that:

        1.      **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

        (a)      ☐  **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the United States Securities Act of 1933, as amended (the "Securities Act"), (iii) the restrictions on transfer

C-1

contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b)    ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note.** In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)    ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note.** In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)    ☐ **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note.** In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2.    **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)    ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note.** In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b)    ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note.** In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐ 144A Global Note ☐ Regulation S Global Note, with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in

C-2

compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer and are dated _____.

[Insert Name of Transferor]


By: _____
    Name:
    Title:


Dated: _____

EXHIBIT D

## [FORM OF SUPPLEMENTAL INDENTURE

## TO BE DELIVERED BY SUBSEQUENT GUARANTORS]

Supplemental Indenture (this "Supplemental Indenture"), dated as of _____, among _____ (the "Guaranteeing Subsidiary"), a subsidiary of Energy Future Intermediate Holding LLC, a Delaware limited liability company ("EFIH"), EFIH Finance Inc., a Delaware corporation (together with EFIH, the "Issuer"), and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee").

WITNESSETH

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an Indenture (the "Existing Indenture"), dated as of April 25, 2011, as supplemented by the First Supplemental Indenture (the Existing Indenture as so supplemented, the "Indenture"), dated as of February 6, 2012, providing for the initial issuance of $406,392,000 aggregate principal amount of 11% Senior Secured Second Lien Notes due 2021, the initial issuance of $800,000,000 aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 and the issuance of Additional Notes (as defined therein) and Exchange Notes (as defined therein) from time to time thereafter (collectively, the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture (the "Guarantee"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1.    CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.    AGREEMENT TO GUARANTEE.  The Guaranteeing Subsidiary hereby agrees as follows:

(a)    Along with any Guarantors named in the Indenture, to jointly and severally, fully and unconditionally guarantee to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of the Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that:

(i)    the principal of and premium, if any, and interest (including Additional Interest, if any) on the Notes shall be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Issuer to the

D-1

Holders or the Trustee hereunder or thereunder shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(ii)    in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors and the Guaranteeing Subsidiary shall be jointly and severally obligated to pay the same immediately. Each Guarantor (including the Guaranteeing Subsidiary) agrees that this is a guarantee of payment and not a guarantee of collection.

(b)    The obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or the Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

(c)    The following is hereby waived:  diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever.

(d)    Except as set forth in Section 5 hereof, this Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes, the Indenture and this Supplemental Indenture, and the Guaranteeing Subsidiary accepts all obligations of a Guarantor under the Indenture.

(e)    If any Holder or the Trustee is required by any court or otherwise to return to the Issuer, any of the Guarantors (including the Guaranteeing Subsidiary), or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or any of the Guarantors, any amount paid either to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

(f)    The Guaranteeing Subsidiary shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.

(g)    As between the Guaranteeing Subsidiary, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 of the Indenture for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article 6 of the Indenture, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Guarantee.

(h)    The Guaranteeing Subsidiary shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under this Guarantee.

D-2

(i)         Pursuant to Section 11.02 of the Indenture, after giving effect to all other contingent and fixed liabilities that are relevant under any applicable Bankruptcy or fraudulent conveyance laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under Article 11 of the Indenture, this new Guarantee shall be limited to the maximum amount permissible such that the obligations of such Guaranteeing Subsidiary under this Guarantee will not constitute a fraudulent transfer or conveyance.

(j)         This Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation, reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be rescinded or returned by any obligee on the Notes or Guarantees, whether as a "voidable preference", "fraudulent transfer" or otherwise, all as though such payment or performance had not been made.  In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Note shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(k)         In case any provision of this Guarantee shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(l)         This Guarantee shall be a general senior [unsecured][secured] obligation of such Guaranteeing Subsidiary, ranking equally in right of payment with all existing and future Senior Indebtedness of the Guaranteeing Subsidiary, [and will be effectively subordinated to all Secured Indebtedness of such Guaranteeing Subsidiary to the extent of the value of the assets securing such Indebtedness]. The Guarantees will be senior in right of payment to all existing and future Subordinated Indebtedness of each Guarantor. The Notes will be structurally subordinated to all Indebtedness and other liabilities of Subsidiaries of the Issuer that do not Guarantee the Notes, if any.

(m)         Each payment to be made by the Guaranteeing Subsidiary in respect of this Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

3.         EXECUTION AND DELIVERY.    The Guaranteeing Subsidiary agrees that the Guarantee shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

4.         MERGER, CONSOLIDATION OR SALE OF ALL OR SUBSTANTIALLY ALL ASSETS.

(a)         The Guaranteeing Subsidiary may not consolidate or merge with or into or wind up into (whether or not the Issuer or Guaranteeing Subsidiary is the surviving corporation), or sell, assign, transfer except in compliance with Section 5.01(c) of the Indenture.

(b)         Subject to certain limitations described in the Indenture, the Successor Person will succeed to, and be substituted for, the Guaranteeing Subsidiary under the Indenture and the Guaranteeing Subsidiary's Guarantee.    Notwithstanding the foregoing, the Guaranteeing

D-3

Subsidiary may (i) merge into or transfer all or part of its properties and assets to another Guarantor or the Issuer, (ii) merge with an Affiliate of the Issuer solely for the purpose of reincorporating the Guaranteeing Subsidiary in the United States, any state thereof, the District of Columbia or any territory thereof or (iii) convert into a corporation, partnership, limited partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor.

5.    RELEASES. The Guarantee of the Guaranteeing Subsidiary shall be automatically and unconditionally released and discharged, and no further action by the Guaranteeing Subsidiary, the Issuer or the Trustee is required for the release of the Guaranteeing Subsidiary's Guarantee, upon:

(1)(A)    any sale, exchange or transfer (by merger, wind-up, consolidation or otherwise) of the Capital Stock of the Guaranteeing Subsidiary (including any sale, exchange or transfer), after which the Guaranteeing Subsidiary is no longer a Restricted Subsidiary or sale of all or substantially all the assets of the Guaranteeing Subsidiary which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture;

(B)    the release or discharge of the guarantee by the Guaranteeing Subsidiary of the guarantee which resulted in the creation of the Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(C)    the designation of the Guaranteeing Subsidiary as an Unrestricted Subsidiary in compliance with Section 4.07 of the Indenture and the definition of "Unrestricted Subsidiary" in the Indenture; or

(D)    the exercise by the Issuer of its Legal Defeasance option or Covenant Defeasance option in accordance with Article 8 of the Indenture or the Issuer's obligations under the Indenture being discharged in accordance with the terms of the Indenture; and

(2)    the delivery by Guaranteeing Subsidiary to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in the Indenture relating to such transaction have been complied with.

6.    NO RECOURSE AGAINST OTHERS. No past, present or future director, officer, employee, incorporator or stockholder of the Guaranteeing Subsidiary shall have any liability for any obligations of the Issuer or the Guarantors (including the Guaranteeing Subsidiary) under the Notes, any Guarantees, this Supplemental Indenture, the Indenture or any Security Document or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

7.    GOVERNING LAW.    THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.    COUNTERPARTS.    The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

027141-0016-02676-Active.12840521.7

9.    EFFECT OF HEADINGS.  The Section headings herein are for convenience only and shall not affect the construction hereof.

10.    THE TRUSTEE.  The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary.

11.    SUBROGATION.  The Guaranteeing Subsidiary shall be subrogated to all rights of Holders of Notes against the Issuer in respect of any amounts paid by the Guaranteeing Subsidiary pursuant to the provisions of Section 2 hereof and Section 11.01 of the Indenture; provided that if an Event of Default has occurred and is continuing, the Guaranteeing Subsidiary shall not be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under the Indenture or the Notes shall have been paid in full.

12.    BENEFITS ACKNOWLEDGED.    The Guaranteeing Subsidiary's Guarantee is subject to the terms and conditions set forth in the Indenture.  The Guaranteeing Subsidiary acknowledges that it shall receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and this Supplemental Indenture and that the guarantee and waivers made by it pursuant to this Guarantee are knowingly made in contemplation of such benefits.

13.    SUCCESSORS.    All agreements of the Guaranteeing Subsidiary in this Supplemental Indenture shall bind its Successors, except as otherwise provided in Section 2(k) hereof or elsewhere in this Supplemental Indenture.  All agreements of the Trustee in this Supplemental Indenture shall bind its successors.

D-5

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

By: _____
     Name:
     Title:

EFIH FINANCE INC.

By: _____
     Name:
     Title:

[NAMES OF GUARANTORS]

By: _____
     Name:
     Title:

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee

By: _____
     Name:
     Title:

[GUARANTEEING SUBSIDIARY]

By: _____
     Name:
     Title:

027141-0016-02676-Active.12840521.7

EXECUTION COPY

## SECOND SUPPLEMENTAL INDENTURE

Second Supplemental Indenture (this "Second Supplemental Indenture"), dated as of February 28, 2012, among Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with EFIH, the "Issuer"), and The Bank of New York Mellon Trust Company, N.A., as Trustee.

## W I T N E S S E T H

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an Indenture, dated as of April 25, 2011 (the "Existing Indenture"), providing for the issuance of $406,392,000 in aggregate principal amount of 11% Senior Secured Second Lien Notes due 2021 (the "Initial 2021 Second Lien Notes") and a First Supplemental Indenture, dated as of February 6, 2012 (the "First Supplemental Indenture" and, together with the Existing Indenture, the "Indenture"), providing for the issuance of $800,000,000 in aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 (the "Initial 2022 Second Lien Notes");

WHEREAS, on February 6, 2012, the Issuer issued and sold the Initial 2022 Second Lien Notes;

WHEREAS, Section 2.01(d) of the Indenture provides for the issuance from time to time of Additional 2022 Second Lien Notes by the Issuer;

WHEREAS, the Issuer desires to issue $350,000,000 aggregate principal amount of Additional 2022 Second Lien Notes on the date hereof (the "New Additional Notes");

WHEREAS, the New Additional Notes shall be consolidated with, and form a single series and be fully fungible with, the Initial 2022 Second Lien Notes and, along with the Initial 2022 Second Lien Notes, will form a separate series of Notes but be treated as a single class with the Initial 2021 Second Lien Notes;

WHEREAS, Section 9.01(9) of the Indenture provides that the Issuer and the Trustee may amend or supplement the Indenture without the consent of any Holder to provide for the issuance of Additional 2022 Second Lien Notes that constitute Required Debt in accordance with the Indenture so long as such Additional 2022 Second Lien Notes are issued in compliance with the provisions of the Indenture;

WHEREAS, the New Additional Notes shall be issued in compliance with the Indenture;

WHEREAS, all conditions necessary to authorize the execution and delivery of this Second Supplemental Indenture and to make this Second Supplemental Indenture valid and binding have been complied with or have been done or performed; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Second Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of all Persons who are now or hereafter become Holders of the New Additional Notes as follows:

1. CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. ADDITIONAL NOTES.   Pursuant to this Second Supplemental Indenture, the New Additional Notes are hereby designated as "Additional 2022 Second Lien Notes" under the Indenture, and are being originally issued by the Issuer on the date hereof in an aggregate principal amount of $350,000,000, which shall increase the aggregate principal amount of, and shall be consolidated and form a single series with, the Initial 2022 Second Lien Notes. The New Additional Notes issued hereunder shall be treated as a single class with the Initial 2022 Second Lien Notes for all purposes under the Indenture, including, without limitation, for purposes of waivers, amendments, redemptions and offers to purchase.   Unless the context requires otherwise, references to "2022 Second Lien Notes" or "Notes" for all purposes under the Indenture, as supplemented by this Second Supplemental Indenture, shall include the New Additional Notes.   The New Additional Notes shall be issued in global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof in substantially the form of Exhibit A hereto.   The terms and provisions of the New Additional Notes set forth in Exhibit A hereto shall constitute and are expressly made a part of this Second Supplemental Indenture.

3. NO EXCHANGE OF EXISTING NOTES REQUIRED. The execution of this Second Supplemental Indenture shall not require the exchange of or modification to the certificates representing Notes existing prior to the date hereof.

4. GOVERNING LAW. THIS SECOND SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

5. RATIFICATION, CONFIRMATION AND PRESERVATION OF INDENTURE.   Except as expressly supplemented hereby, the Indenture continues in full force and effect and is in all respects confirmed, ratified and preserved and the provisions thereof shall be applicable to the New Additional Notes and this Second Supplemental Indenture.   Upon the execution and delivery of this Second Supplemental Indenture by the Issuer and the Trustee, this Second Supplemental Indenture shall form a part of the Indenture for all purposes, and the Issuer, the Trustee and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby. Any and all references to the "Indenture," whether within the Indenture or in any notice, certificate or other instrument or document, shall be deemed to include a reference to this Second Supplemental Indenture (whether or not made), unless the context shall otherwise require.

6. INDENTURE AND SECOND SUPPLEMENTAL INDENTURE CONSTRUED TOGETHER.   This Second Supplemental Indenture is an indenture supplemental to the Indenture, and the Indenture

and this Second Supplemental Indenture shall henceforth be read and construed together for all purposes.

7. BENEFITS OF SECOND SUPPLEMENTAL INDENTURE.    Nothing in this Second Supplemental Indenture, the Indenture or the Notes, express or implied, shall give to any Person other than the parties hereto and thereto and their successors hereunder and thereunder, any Paying Agent, any Registrar and the Holders, any benefit of any legal or equitable right, remedy or claim under the Indenture, this Second Supplemental Indenture or the Notes.

8. SUCCESSORS.    All agreements of the Issuer in this Second Supplemental Indenture shall bind its successors.    All agreements of the Trustee in this Second Supplemental Indenture shall bind its successors.

9. THE TRUSTEE.    The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Second Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Issuer.

10. COUNTERPARTS.    The parties may sign any number of copies of this Second Supplemental Indenture.    Each signed copy shall be an original, but all of them together represent the same agreement.

11. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

*[Remainder of Page Left Intentionally Blank]*

-3-

IN WITNESS WHEREOF, the parties hereto have caused this Second Supplemental Indenture to be duly executed, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC

By: _____
     Name:  Anthony R. Horton
     Title:    Senior Vice President and Treasurer

EFIH FINANCE INC.

By: _____
     Name:  Anthony R. Horton
     Title:    Senior Vice President and Treasurer

THE BANK OF NEW YORK MELLON TRUST COMPANY,
    N.A., as Trustee

By: _____
     Name:
     Title:

SIGNATURE PAGE TO SECOND SUPPLEMENTAL INDENTURE

IN WITNESS WHEREOF, the parties hereto have caused this Second Supplemental Indenture to be duly executed, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

By: _____
      Name:  Anthony R. Horton
      Title:   Senior Vice President and Treasurer

EFIH FINANCE INC.

By: _____
      Name:  Anthony R. Horton
      Title:   Senior Vice President and Treasurer

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee

By: _Julie H Ramos_____
      Name: Julie Hoffman-Ramos
      Title: Vice President

SIGNATURE PAGE TO SECOND SUPPLEMENTAL INDENTURE

EXHIBIT A

[Face of 2022 Second Lien Note]

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Tax Legend, if applicable pursuant to the provisions of the Indenture]*

CUSIP: [        ][1]
ISIN: [        ]

[RULE 144A] [REGULATION S]  GLOBAL NOTE

11.750% Senior Secured Second Lien Notes due 2022

No.[R-[  ][S-[  ]]                                        [$_____]

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**

promise to pay to CEDE & CO. or registered assigns, the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto] [of [_____] United States Dollars ($[____])] on March 1, 2022.

Interest Payment Dates:  March 1 and September 1, commencing September 1, 2012

Record Dates:  February 15 and August 15

**[SIGNATURE PAGE FOLLOWS]**

---

[1]
| Rule 144A Note CUSIP: | 29269Q AD9 |
| Rule 144A Note ISIN: | US29269QAD97 |
| Regulation S Note CUSIP: | U29197 AB3 |
| Regulation S Note ISIN: | USU29197AB36 |

A-1

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

Dated: _____, 20__

ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC


By: _____
    Name:
    Title:



EFIH FINANCE INC.


By: _____
    Name:
    Title:

This is one of the 2022 Second Lien Notes referred to in the within-mentioned Indenture:

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., as Trustee


By:_____
    Authorized Signatory


Dated: _____, 20__

[Back of 2022 Second Lien Note]

This 2022 Second Lien Note is one of a duly authorized series of notes of the Issuer designated as the "11.750% Senior Secured Second Lien Notes due 2022" (the "2022 Second Lien Notes"), originally issued in an aggregate principal amount of $800,000,000 on February 6, 2012, and, as a result of a further issuance of $350,000,000 aggregate principal amount of 2022 Second Lien Notes on February 28, 2012, now issued in an aggregate principal amount of $1,150,000,000, under the Indenture referred to below.

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)    *INTEREST.*    Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuer"), promise to pay interest on the principal amount of this 2022 Second Lien Note at 11.750% per annum from February 6, 2012 until maturity and shall pay Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below. The Issuer will pay interest (including Additional Interest, if any) semi-annually in arrears on March 1 and September 1 of each year, commencing on September 1, 2012, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date") without interest accruing on the amount then so payable from such day that is not a Business Day until such Business Day. Interest on the 2022 Second Lien Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including February 6, 2012. The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the 2022 Second Lien Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (including Additional Interest, if any) (without regard to any applicable grace periods) from time to time on demand at the interest rate on the 2022 Second Lien Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

(2)    *METHOD OF PAYMENT.*    The Issuer will pay interest on the 2022 Second Lien Notes (including Additional Interest, if any) to the Persons who are registered Holders of 2022 Second Lien Notes at the close of business on the February 15 and August 15 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such 2022 Second Lien Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of interest (including Additional Interest, if any) may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds will be required with respect to principal of, premium, if any, and interest (including Additional Interest, if any) on, all Global Notes and all other 2022 Second Lien Notes the Holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3)    *PAYING AGENT AND REGISTRAR.*    Initially, The Bank of New York Mellon Trust Company, N.A., the Trustee under the Indenture, will act as Paying Agent and Registrar. The

A-3

Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer or any of its Subsidiaries may act in any such capacity.

(4)    *INDENTURE.* The Issuer issued the 2022 Second Lien Notes under an Indenture, dated as of April 25, 2011 (the "Existing Indenture"), between the Issuer and the Trustee, as supplemented by the First Supplemental Indenture, dated as of February 6, 2012, between the Issuer and the Trustee, and the Second Supplemental Indenture, dated as of February 28, 2012 (the Existing Indenture as so supplemented, the "Indenture"), between the Issuer and the Trustee. This 2022 Second Lien Note is one of a duly authorized issue of notes of the Issuer designated as its 11.750% Senior Secured Second Lien Notes due 2022. The Issuer shall be entitled to issue Additional 2022 Second Lien Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture. The 2021 Second Lien Notes (including any Exchange Notes issued in exchange therefor) and the 2022 Second Lien Notes (including any Exchange Notes issued in exchange therefor) (collectively referred to herein as the "Notes") are separate series of Notes, but shall be treated as a single class of securities under the Indenture, unless otherwise specified in the Indenture. In addition, the Notes will be treated along with certain other securities designated as Junior Lien Debt of the Issuer as a single class for amendments and waivers and for taking certain other actions. The terms of the 2022 Second Lien Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"). The 2022 Second Lien Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of such terms. To the extent any provision of this 2022 Second Lien Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

(5)    *OPTIONAL REDEMPTION.*

(a)    Except as set forth below, the Issuer will not be entitled to redeem 2022 Second Lien Notes at its option prior to March 1, 2017.

(b)    At any time prior to March 1, 2017, the Issuer may redeem the 2022 Second Lien Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of 2022 Secured Lien Notes or otherwise delivered in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the 2022 Second Lien Notes redeemed, plus the Applicable Premium, plus accrued and unpaid interest (including Additional Interest, if any) to, the applicable date of redemption (the "Redemption Date"), subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(c)    From and after March 1, 2017, the Issuer may redeem the 2022 Second Lien Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of 2022 Second Lien Notes or otherwise delivered in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of the principal amount of the 2022 Second Lien Notes to be redeemed) set forth below, plus accrued and unpaid interest (including Additional Interest, if any) to the applicable Redemption Date, subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest

A-4

Payment Date, if redeemed during the twelve-month period beginning on March 1 of each of the years indicated below:

| Year | Percentage |
|---|---|
| 2017 | 105.875% |
| 2018 | 103.917% |
| 2019 | 101.958% |
| 2020 and thereafter | 100.000% |

(d)     Prior to March 1, 2015, the Issuer may, at its option, on one or more occasions, redeem up to 35% of the aggregate principal amount of all 2022 Second Lien Notes at a redemption price equal to 111.750% of the aggregate principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the Redemption Date, subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings; provided that at least 50% of the sum of the original aggregate principal amount of Initial 2022 Second Lien Notes and any Additional 2022 Second Lien Notes issued under the Indenture remains outstanding immediately after the occurrence of each such redemption; provided further that each such redemption occurs within 90 days of the date of closing of each such Equity Offering. Notice of any redemption upon any Equity Offerings may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

(e)     If the Issuer redeems less than all of the outstanding 2022 Second Lien Notes, the Trustee shall select the 2022 Second Lien Notes to be redeemed in the manner described under Section 3.02 of the Indenture.

(f)     Any redemption pursuant to this paragraph 5 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of the Indenture.

(6)     *MANDATORY REDEMPTION*.  The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the 2022 Second Lien Notes.

(7)     *NOTICE OF REDEMPTION*.  Subject to Section 3.03 of the Indenture, notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date (except that redemption notices may be mailed or delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 12 of the Indenture) to each Holder whose 2022 Second Lien Notes are to be redeemed at its registered address or otherwise delivered in accordance with the procedures of DTC. 2022 Second Lien Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000 in excess thereof, unless all of the 2022 Second Lien Notes held by a Holder are to be redeemed. On and after the Redemption Date interest ceases to accrue on 2022 Second Lien Notes or portions thereof called for redemption.

A-5

(8)    *OFFERS TO REPURCHASE.*

(a)    If a Change of Control occurs, the Issuer shall make an offer (a "<u>Change of Control Offer</u>") to each Holder to purchase all or any part (equal to $2,000 or an integral multiple of $1,000 in excess thereof) of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof, <u>plus</u> accrued and unpaid interest (including Additional Interest, if any) to the date of purchase (the "<u>Change of Control Payment</u>"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date. The Change of Control Offer shall be made in accordance with Section 4.14 of the Indenture.

(b)    If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets), within 10 Business Days of each date that the aggregate amount of Excess Proceeds exceeds $200.0 million, EFIH shall make an offer to all Holders of the Notes, and if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "<u>Asset Sale Offer</u>"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, <u>plus</u> accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, EFIH may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or such Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes and such Senior Indebtedness shall be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered.

(c)    EFIH may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets); <u>provided</u> that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

(d)    If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale of Collateral or other Oncor-related Assets, within 10 Business Days of each date that the aggregate amount of Collateral Excess Proceeds exceeds $200.0 million, EFIH and/or any of its Restricted Subsidiaries shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any other Secured Lien Debt, to the holders of such other Secured Lien Debt (and if required or permitted by the terms of any Indebtedness of EFH Corp. that is guaranteed by EFIH and constitutes Secured Lien Debt, EFH Corp. may make an offer to all holders of such Indebtedness) (a "<u>Collateral Asset Sale Offer</u>"), to purchase the maximum aggregate principal amount of such Secured Lien Debt that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof,

A-6

plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the terms and procedures set forth in the Indenture and the other applicable Secured Debt Documents; provided that in any such Collateral Asset Sale Offer, all Senior Lien Debt properly tendered will be purchased before any Junior Lien Debt is purchased; provided that in the event EFIH or such Restricted Subsidiary cannot make an offer to the holders of Senior Lien Debt and holders of Junior Lien Debt at the same time, EFIH or such Restricted Subsidiary may make a Collateral Asset Sale Offer to the holders of Senior Lien Debt first and make a Collateral Asset Sale Offer to the holders of Junior Lien Debt thereafter with any Collateral Excess Proceeds not used to purchase Senior Lien Debt as soon as practicable upon consummation of the Collateral Asset Sale Offer for the Senior Lien Debt. To the extent that the aggregate amount of Notes and such Secured Lien Debt tendered pursuant to a Collateral Asset Sale Offer, or sequential Collateral Asset Sale Offers to holders of Senior Lien Debt and Junior Lien Debt as provided for in the immediately preceding sentence, is less than the Collateral Excess Proceeds, EFIH and/or any of its Restricted Subsidiaries may use any remaining Collateral Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes and other Secured Lien Debt surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, all Senior Lien Debt properly tendered will be purchased before any Junior Lien Debt is purchased and thereafter the Notes and any other Junior Lien Debt will be purchased on a pro rata basis based upon the accreted value or principal amount of the Notes or such other Junior Lien Debt tendered.

(e)     The Issuer (and, if applicable, EFH Corp.) may, at its option, make a Collateral Asset Sale Offer using proceeds from any Asset Sale of Collateral or any other Oncorrelated Assets at any time after consummation of such Asset Sale; provided that such Collateral Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Collateral Asset Sale Offer, or sequential Collateral Asset Sale Offers to holders of Senior Lien Debt and Junior Lien Debt, any Net Proceeds not required to be used to purchase Secured Lien Debt shall not be deemed Collateral Excess Proceeds and the Issuer and EFIH's Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in the Indenture.

(9)     *DENOMINATIONS, TRANSFER, EXCHANGE.*  The 2022 Second Lien Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. The transfer of 2022 Second Lien Notes may be registered and 2022 Second Lien Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any 2022 Second Lien Notes or portion of 2022 Second Lien Notes selected for redemption, except for the unredeemed portion of any 2022 Second Lien Notes being redeemed in part. Also, the Issuer need not exchange or register the transfer of any 2022 Second Lien Notes for a period of 15 days before a selection of 2022 Second Lien Notes to be redeemed.

(10)    *PERSONS DEEMED OWNERS.*  The registered Holder of a 2022 Second Lien Note may be treated as its owner for all purposes.

(11)   *AMENDMENT, SUPPLEMENT AND WAIVER.* The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

(12)   *DEFAULTS AND REMEDIES.* The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. If any Event of Default occurs and is continuing, the Trustee or the Required Holders of at least 30% in aggregate principal amount of the then outstanding Required Debt may declare the principal of and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on all the then outstanding Notes of the affected series to be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all principal of, and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on, all the then outstanding Notes will become due and payable immediately without further action or notice. Holders may not enforce the Indenture, the Notes or the Guarantees except as provided in the Indenture. Subject to certain limitations, Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default (except a Default relating to the payment of principal, premium, if any, or interest (including Additional Interest, if any)) if it determines that withholding notice is in their interest. The Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt by notice to the Trustee may on behalf of the Required Holders of all of the Required Debt waive any existing Default or and its consequences under the Indenture except a continuing Default in the payment of the principal of, or premium, if any, or interest (including Additional Interest, if any) on, any of the Notes held by a non-consenting Holder. EFIH is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and EFIH is required within five Business Days after becoming aware of any Default, to deliver to the Trustee a statement specifying such Default and what action EFIH proposes to take with respect thereto.

(13)   *AUTHENTICATION.* This 2022 Second Lien Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

(14)   *ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.* In addition to the rights provided to Holders of 2022 Second Lien Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, dated as of February 6, 2012, and the Registration Rights Agreement, dated as of February 28, 2012, each among the Issuer and the other parties named on the signature pages thereof (together, the "Registration Rights Agreement"), relating to such 2022 Second Lien Notes, including the right to receive Additional Interest, if any (as defined in the Registration Rights Agreement).

(15)   *GOVERNING LAW.* THE INDENTURE, THE 2022 SECOND LIEN NOTES AND THE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(16)   *CUSIP/ISIN NUMBERS.* Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP/ISIN

A-8

numbers to be printed on the 2022 Second Lien Notes and the Trustee may use CUSIP/ISIN numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the 2022 Second Lien Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture, the Registration Rights Agreement relating to the 2022 Second Lien Notes and/or the Security Documents. Requests may be made to the Issuer at the following address:

> Energy Future Intermediate Holding Company LLC
> Energy Plaza
> 1601 Bryan Street
> Dallas, Texas 75201-3411
> Facsimile No.: (214) 812-6032
> Attention: General Counsel
> And
> Facsimile No.: (214) 812-4097
> Attention: Treasurer
>
> And
>
> EFIH Finance Inc.
> Energy Plaza
> 1601 Bryan Street
> Dallas, Texas 75201-3411
> Facsimile No.: (214) 812-6032
> Attention: General Counsel
> And
> Facsimile No.: (214) 812-4097
> Attention: Treasurer

027141-0016-11400-Active.12888346

## ASSIGNMENT FORM

To assign this 2022 Second Lien Note, fill in the form below:

(I) or (we) assign and transfer this 2022 Second Lien Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's Soc. Sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____ to transfer this
2022 Second Lien Note on the books of the Issuer.  The agent may substitute another to act for
him.

Date: _____

Your Signature _____

(Sign exactly as your name appears on the
face of this 2022 Second Lien Note)

Signature Guarantee*:_____

*    Participant in a recognized Signature Guarantee Medallion Program (or other signature
     guarantor acceptable to the Trustee).

A-10

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this 2022 Second Lien Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(g) or 4.14 of the Indenture, check the appropriate box below:

☐ Section 4.10(d)          ☐ Section 4.10(g)          ☐ Section 4.14

If you want to elect to have only part of this 2022 Second Lien Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(g) or 4.14 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of

this 2022 Second Lien Note)

Tax Identification No.: _____

Signature Guarantee*: _____

\*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-11

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE[2]

The initial outstanding principal amount of this Global Note is $ _____. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following each decrease or increase | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|

---

[2]     This schedule should be included only if the 2022 Second Lien Note is issued in global form.

A-12

**EXECUTION VERSION**

## FOURTH SUPPLEMENTAL INDENTURE

Fourth Supplemental Indenture (this "Fourth Supplemental Indenture"), dated as of August 14, 2012, among Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation ("EFIH Finance" and, together with EFIH, the "Issuer"), and The Bank of New York Mellon Trust Company, N.A., as Trustee.

## W I T N E S S E T H

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an Indenture, dated as of April 25, 2011 (the "Base Indenture"), providing for the issuance of $406,392,000 in aggregate principal amount of 11% Senior Secured Second Lien Notes due 2021 (the "2021 Notes"), a First Supplemental Indenture, dated as of February 6, 2012, providing for the issuance of $800,000,000 in aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 (the "Initial 2022 Notes"), a Second Supplemental Indenture, dated as of February 28, 2012, providing for the issuance of $350,000,000 in aggregate principal amount of 11.750% Senior Secured Second Lien Notes due 2022 (the "First Additional 2022 Notes," and together with the Initial 2022 Notes, the "Existing 2022 Notes"), and a Third Supplemental Indenture, dated as of May 31, 2012 (the Base Indenture as so supplemented, the "Indenture").

WHEREAS, on February 6, 2012, the Issuer issued and sold the Initial 2022 Notes;

WHEREAS, on February 28, 2012, the Issuer issued and sold the First Additional 2022 Notes;

WHEREAS, Section 2.01(d) of the Indenture provides for the issuance from time to time of Additional 2022 Second Lien Notes by the Issuer;

WHEREAS, the Issuer desires to issue $600,000,000 aggregate principal amount of Additional 2022 Second Lien Notes on the date hereof (the "New Additional 2022 Notes");

WHEREAS, the New Additional 2022 Notes shall be consolidated with, and form a single series and be fully fungible with, the Existing 2022 Notes and, along with the Existing 2022 Notes, will form a separate series of Notes but be treated as a single class with the 2021 Notes;

WHEREAS, Section 9.01(9) of the Indenture provides that the Issuer and the Trustee may amend or supplement the Indenture without the consent of any Holder to provide for the issuance of Additional 2022 Second Lien Notes that constitute Required Debt in accordance with the Indenture so long as such Additional 2022 Second Lien Notes are issued in compliance with the provisions of the Indenture;

WHEREAS, the New Additional 2022 Notes shall be issued in compliance with the Indenture;

WHEREAS, all conditions necessary to authorize the execution and delivery of this Fourth Supplemental Indenture and to make this Fourth Supplemental Indenture valid and binding have been complied with or have been done or performed; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Fourth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of all Persons who are now or hereafter become Holders of the New Additional 2022 Notes as follows:

1.  CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.  ADDITIONAL NOTES.  Pursuant to this Fourth Supplemental Indenture, the New Additional 2022 Notes are hereby designated as "Additional 2022 Second Lien Notes" under the Indenture, and are being originally issued by the Issuer on the date hereof in an aggregate principal amount of $600,000,000, which shall increase the aggregate principal amount of, and shall be consolidated and form a single series with, the Existing 2022 Notes.  The New Additional 2022 Notes issued hereunder shall be treated as a single class with the Existing 2022 Notes for all purposes under the Indenture, including, without limitation, for purposes of waivers, amendments, redemptions and offers to purchase.  Unless the context requires otherwise, references to "2022 Second Lien Notes" or "Notes" for all purposes under the Indenture, as supplemented by this Fourth Supplemental Indenture, shall include the New Additional 2022 Notes.  The New Additional 2022 Notes shall be issued in global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof in substantially the form of Exhibit A hereto.  The terms and provisions of the New Additional 2022 Notes set forth in Exhibit A hereto shall constitute and are expressly made a part of this Fourth Supplemental Indenture.

3.  MANDATORY EXCHANGE OF REGULATION S GLOBAL NOTES.  New Additional 2022 Notes issued in the form of Regulation S Global Notes (collectively, the "Initial Regulation S Global Note") shall bear the Temporary Regulation S Note CUSIP set forth on Exhibit A hereto until the 40th day after the date hereof. Notwithstanding the provisions of Section 2.6 of the Base Indenture, on or after such 40th day, at the option of the Issuer, upon instruction of the Issuer to the Trustee, beneficial interests in the Initial Regulation S Global Note shall automatically be exchanged for beneficial interests in one or more Regulation S Global Notes bearing the Permanent Regulation S Note CUSIP set forth on Exhibit A hereto in accordance with such procedures as the Depositary shall require. Upon such exchange of beneficial interests pursuant to this Section 3, the Registrar shall reflect on its books and records the date of such exchange and a decrease and increase in the principal amount of the applicable Regulation S Global Notes, equal to the principal amount of beneficial interests exchanged. Following any such exchange pursuant to this Section 3, the Initial Regulation S Global Note shall be cancelled.

4. NO EXCHANGE OF EXISTING NOTES REQUIRED. The execution of this Fourth Supplemental Indenture shall not require the exchange of or modification to the certificates representing Notes existing prior to the date hereof.

5. GOVERNING LAW. THIS FOURTH SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6. RATIFICATION, CONFIRMATION AND PRESERVATION OF INDENTURE.  Except as expressly supplemented hereby, the Indenture continues in full force and effect and is in all respects confirmed, ratified and preserved and the provisions thereof shall be applicable to the New Additional 2022 Notes and this Fourth Supplemental Indenture.  Upon the execution and delivery of this Fourth Supplemental Indenture by the Issuer and the Trustee, this Fourth Supplemental Indenture shall form a part of the Indenture for all purposes, and the Issuer, the Trustee and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.  Any and all references to the "Indenture," whether within the Indenture or in any notice, certificate or other instrument or document, shall be deemed to include a reference to this Fourth Supplemental Indenture (whether or not made), unless the context shall otherwise require.

7. INDENTURE AND FOURTH SUPPLEMENTAL INDENTURE CONSTRUED TOGETHER.  This Fourth Supplemental Indenture is an indenture supplemental to the Indenture, and the Indenture and this Fourth Supplemental Indenture shall henceforth be read and construed together for all purposes.

8. BENEFITS OF FOURTH SUPPLEMENTAL INDENTURE.  Nothing in this Fourth Supplemental Indenture, the Indenture or the Notes, express or implied, shall give to any Person other than the parties hereto and thereto and their successors hereunder and thereunder, any Paying Agent, any Registrar and the Holders, any benefit of any legal or equitable right, remedy or claim under the Indenture, this Fourth Supplemental Indenture or the Notes.

9. SUCCESSORS.  All agreements of the Issuer in this Fourth Supplemental Indenture shall bind its successors.  All agreements of the Trustee in this Fourth Supplemental Indenture shall bind its successors.

10. THE TRUSTEE.  The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Fourth Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Issuer.

11. COUNTERPARTS.  The parties may sign any number of copies of this Fourth Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

12. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

*[Remainder of Page Left Intentionally Blank]*

NYDOCS01/1304244.4

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

By: _____
     Name:  Anthony R. Horton
     Title:  Senior Vice President and Treasurer

EFIH FINANCE INC.

By: _____
     Name:  Anthony R. Horton
     Title:  Senior Vice President and Treasurer

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee

By: _____
     Name:
     Title:

*[Signature Page to Fourth Supplemental Indenture]*

IN WITNESS WHEREOF, the parties hereto have caused this Fourth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC


By: _____
     Name:  Anthony R. Horton
     Title:  Senior Vice President and Treasurer


EFIH FINANCE INC.


By: _____
     Name:  Anthony R. Horton
     Title:  Senior Vice President and Treasurer


THE BANK OF NEW YORK MELLON TRUST
    COMPANY, N.A., as Trustee


By: _____
    Name:    Julie Hoffman-Ramos
    Title:     Vice President


*[Signature Page to Fourth Supplemental Indenture]*

EXHIBIT A

[Face of 2022 Second Lien Note]

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Tax Legend, if applicable pursuant to the provisions of the Indenture]*

CUSIP: [          ][1]
ISIN: [          ]

[RULE 144A] [REGULATION S]  GLOBAL NOTE

11.750% Senior Secured Second Lien Notes due 2022

No.[R-[   ][S-[   ]]                                                    [$_____]

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**EFIH FINANCE INC.**

promise to pay to CEDE & CO. or registered assigns, the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto] [of [_____] United States Dollars ($[____])] on March 1, 2022.

Interest Payment Dates:  March 1 and September 1, commencing September 1, 2012

Record Dates:  February 15 and August 15

**[SIGNATURE PAGE FOLLOWS]**

---

[1]
| Rule 144A Note CUSIP: | 29269Q AD9 |
| Rule 144A Note ISIN: | US29269QAD97 |
| Temporary Regulation S Note CUSIP: | U29197 AD9 |
| Temporary Regulation S Note ISIN: | USU29197AD91 |
| Permanent Regulation S Note CUSIP: | U29197 AB3 |
| Permanent Regulation S Note ISIN: | USU29197AB36 |

A-1

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

Dated: _____, 20__

ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC


By: _____
     Name:
     Title:




EFIH FINANCE INC.


By: _____
     Name:
     Title:

This is one of the 2022 Second Lien Notes referred to in the within-mentioned Indenture:

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A., as Trustee


By:_____
    Authorized Signatory


Dated: _____, 20__

[Back of 2022 Second Lien Note]

This 2022 Second Lien Note is one of a duly authorized series of notes of the Issuer designated as the "11.750% Senior Secured Second Lien Notes due 2022" (the "2022 Second Lien Notes"), originally issued in an aggregate principal amount of $800,000,000 on February 6, 2012, then, as a result of a further issuance of $350,000,000 aggregate principal amount of 2022 Second Lien Notes on February 28, 2012, issued in an aggregate principal amount of $1,150,000,000, and, as a result of a further issuance of $600,000,000 aggregate principal amount of 2022 Second Lien Notes on August 14, 2012, now issued in an aggregate principal amount of $1,750,000,000, under the Indenture referred to below.

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)     *INTEREST.*   Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuer"), promise to pay interest on the principal amount of this 2022 Second Lien Note at 11.750% per annum from February 6, 2012 until maturity and shall pay Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below. The Issuer will pay interest (including Additional Interest, if any) semi-annually in arrears on March 1 and September 1 of each year, commencing on September 1, 2012, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date") without interest accruing on the amount then so payable from such day that is not a Business Day until such Business Day. Interest on the 2022 Second Lien Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including February 6, 2012. The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the 2022 Second Lien Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (including Additional Interest, if any) (without regard to any applicable grace periods) from time to time on demand at the interest rate on the 2022 Second Lien Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

(2)     *METHOD OF PAYMENT.*   The Issuer will pay interest on the 2022 Second Lien Notes (including Additional Interest, if any) to the Persons who are registered Holders of 2022 Second Lien Notes at the close of business on the February 15 and August 15 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such 2022 Second Lien Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of interest (including Additional Interest, if any) may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds will be required with respect to principal of, premium, if any, and interest (including Additional Interest, if any) on, all Global Notes and all other 2022 Second Lien Notes the Holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

A-3

(3)    *PAYING AGENT AND REGISTRAR.*  Initially, The Bank of New York Mellon Trust Company, N.A., the Trustee under the Indenture, will act as Paying Agent and Registrar.  The Issuer may change any Paying Agent or Registrar without notice to the Holders.  The Issuer or any of its Subsidiaries may act in any such capacity.

(4)    *INDENTURE.*  The Issuer issued the 2022 Second Lien Notes under an Indenture, dated as of April 25, 2011 (the "Base Indenture"), between the Issuer and the Trustee, as supplemented by the First Supplemental Indenture, dated as of February 6, 2012, between the Issuer and the Trustee, the Second Supplemental Indenture, dated as of February 28, 2012, between the Issuer and the Trustee, the Third Supplemental Indenture, dated as of May 31, 2012, between the Issuer and the Trustee, and the Fourth Supplemental Indenture, dated as of August 14, 2012 (the Base Indenture as so supplemented, the "Indenture"), between the Issuer and the Trustee.  This 2022 Second Lien Note is one of a duly authorized issue of notes of the Issuer designated as its 11.750% Senior Secured Second Lien Notes due 2022.  The Issuer shall be entitled to issue Additional 2022 Second Lien Notes pursuant to Sections 2.01, 4.09 and 4.12 of the Indenture.  The 2021 Second Lien Notes (including any Exchange Notes issued in exchange therefor) and the 2022 Second Lien Notes (including any Exchange Notes issued in exchange therefor) (collectively referred to herein as the "Notes") are separate series of Notes, but shall be treated as a single class of securities under the Indenture, unless otherwise specified in the Indenture.  In addition, the Notes will be treated along with certain other securities designated as Junior Lien Debt of the Issuer as a single class for amendments and waivers and for taking certain other actions.  The terms of the 2022 Second Lien Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act").  The 2022 Second Lien Notes are subject to all such terms, and Holders are referred to the Indenture and the Trust Indenture Act for a statement of such terms.  To the extent any provision of this 2022 Second Lien Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

(5)    *OPTIONAL REDEMPTION.*

(a)    Except as set forth below, the Issuer will not be entitled to redeem 2022 Second Lien Notes at its option prior to March 1, 2017.

(b)    At any time prior to March 1, 2017, the Issuer may redeem the 2022 Second Lien Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of 2022 Secured Lien Notes or otherwise delivered in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the 2022 Second Lien Notes redeemed, plus the Applicable Premium, plus accrued and unpaid interest (including Additional Interest, if any) to, the applicable date of redemption (the "Redemption Date"), subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(c)    From and after March 1, 2017, the Issuer may redeem the 2022 Second Lien Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first class mail to the registered address of each Holder of 2022 Second Lien Notes or otherwise delivered in accordance with the procedures of DTC, at the redemption prices

A-4

(expressed as percentages of the principal amount of the 2022 Second Lien Notes to be redeemed) set forth below, <u>plus</u> accrued and unpaid interest (including Additional Interest, if any) to the applicable Redemption Date, subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on March 1 of each of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2017 | 105.875% |
| 2018 | 103.917% |
| 2019 | 101.958% |
| 2020 and thereafter | 100.000% |

(d)     Prior to March 1, 2015, the Issuer may, at its option, on one or more occasions, redeem up to 35% of the aggregate principal amount of all 2022 Second Lien Notes at a redemption price equal to 111.750% of the aggregate principal amount thereof, <u>plus</u> accrued and unpaid interest (including Additional Interest, if any) to the Redemption Date, subject to the right of Holders of 2022 Second Lien Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, with the net cash proceeds of one or more Equity Offerings; <u>provided</u> that at least 50% of the sum of the original aggregate principal amount of Initial 2022 Second Lien Notes and any Additional 2022 Second Lien Notes issued under the Indenture remains outstanding immediately after the occurrence of each such redemption; <u>provided further</u> that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.  Notice of any redemption upon any Equity Offerings may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering.

(e)     If the Issuer redeems less than all of the outstanding 2022 Second Lien Notes, the Trustee shall select the 2022 Second Lien Notes to be redeemed in the manner described under Section 3.02 of the Indenture.

(f)     Any redemption pursuant to this paragraph 5 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of the Indenture.

(6)     *MANDATORY REDEMPTION.*  The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the 2022 Second Lien Notes.

(7)     *NOTICE OF REDEMPTION.*  Subject to Section 3.03 of the Indenture, notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date (except that redemption notices may be mailed or delivered more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 12 of the Indenture) to each Holder whose 2022 Second Lien Notes are to be redeemed at its registered address or otherwise delivered in accordance with the procedures of DTC.  2022 Second Lien Notes in denominations larger than $2,000 may be redeemed in part but only in whole multiples of $1,000 in excess thereof, unless all of the 2022 Second Lien Notes held by a

Holder are to be redeemed. On and after the Redemption Date interest ceases to accrue on 2022 Second Lien Notes or portions thereof called for redemption.

(8)    *OFFERS TO REPURCHASE.*

(a)    If a Change of Control occurs, the Issuer shall make an offer (a "<u>Change of Control Offer</u>") to each Holder to purchase all or any part (equal to $2,000 or an integral multiple of $1,000 in excess thereof) of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof, <u>plus</u> accrued and unpaid interest (including Additional Interest, if any) to the date of purchase (the "<u>Change of Control Payment</u>"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date. The Change of Control Offer shall be made in accordance with Section 4.14 of the Indenture.

(b)    If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets), within 10 Business Days of each date that the aggregate amount of Excess Proceeds exceeds $200.0 million, EFIH shall make an offer to all Holders of the Notes, and if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "<u>Asset Sale Offer</u>"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, <u>plus</u> accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, EFIH may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or such Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes and such Senior Indebtedness shall be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered.

(c)    EFIH may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale (other than an Asset Sale of Collateral or other Oncor-related Assets); <u>provided</u> that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

(d)    If EFIH or any of its Restricted Subsidiaries consummates an Asset Sale of Collateral or other Oncor-related Assets, within 10 Business Days of each date that the aggregate amount of Collateral Excess Proceeds exceeds $200.0 million, EFIH and/or any of its Restricted Subsidiaries shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any other Secured Lien Debt, to the holders of such other Secured Lien Debt (and if required or permitted by the terms of any Indebtedness of EFH Corp. that is guaranteed by EFIH and constitutes Secured Lien Debt, EFH Corp. may make an offer to all holders of such Indebtedness) (a "<u>Collateral Asset Sale Offer</u>"), to purchase the maximum

A-6

aggregate principal amount of such Secured Lien Debt that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest (including Additional Interest, if any) to the date fixed for the closing of such offer, in accordance with the terms and procedures set forth in the Indenture and the other applicable Secured Debt Documents; provided that in any such Collateral Asset Sale Offer, all Senior Lien Debt properly tendered will be purchased before any Junior Lien Debt is purchased; provided that in the event EFIH or such Restricted Subsidiary cannot make an offer to the holders of Senior Lien Debt and holders of Junior Lien Debt at the same time, EFIH or such Restricted Subsidiary may make a Collateral Asset Sale Offer to the holders of Senior Lien Debt first and make a Collateral Asset Sale Offer to the holders of Junior Lien Debt thereafter with any Collateral Excess Proceeds not used to purchase Senior Lien Debt as soon as practicable upon consummation of the Collateral Asset Sale Offer for the Senior Lien Debt. To the extent that the aggregate amount of Notes and such Secured Lien Debt tendered pursuant to a Collateral Asset Sale Offer, or sequential Collateral Asset Sale Offers to holders of Senior Lien Debt and Junior Lien Debt as provided for in the immediately preceding sentence, is less than the Collateral Excess Proceeds, EFIH and/or any of its Restricted Subsidiaries may use any remaining Collateral Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes and other Secured Lien Debt surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, all Senior Lien Debt properly tendered will be purchased before any Junior Lien Debt is purchased and thereafter the Notes and any other Junior Lien Debt will be purchased on a pro rata basis based upon the accreted value or principal amount of the Notes or such other Junior Lien Debt tendered.

(e)     The Issuer (and, if applicable, EFH Corp.) may, at its option, make a Collateral Asset Sale Offer using proceeds from any Asset Sale of Collateral or any other Oncor-related Assets at any time after consummation of such Asset Sale; provided that such Collateral Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Collateral Asset Sale Offer, or sequential Collateral Asset Sale Offers to holders of Senior Lien Debt and Junior Lien Debt, any Net Proceeds not required to be used to purchase Secured Lien Debt shall not be deemed Collateral Excess Proceeds and the Issuer and EFIH's Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in the Indenture.

(9)     *DENOMINATIONS, TRANSFER, EXCHANGE.* The 2022 Second Lien Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1,000 in excess thereof. The transfer of 2022 Second Lien Notes may be registered and 2022 Second Lien Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any 2022 Second Lien Notes or portion of 2022 Second Lien Notes selected for redemption, except for the unredeemed portion of any 2022 Second Lien Notes being redeemed in part. Also, the Issuer need not exchange or register the transfer of any 2022 Second Lien Notes for a period of 15 days before a selection of 2022 Second Lien Notes to be redeemed.

(10)  *PERSONS DEEMED OWNERS.*  The registered Holder of a 2022 Second Lien Note may be treated as its owner for all purposes.

(11)  *AMENDMENT, SUPPLEMENT AND WAIVER.*  The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

(12)  *DEFAULTS AND REMEDIES.*  The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture.  If any Event of Default occurs and is continuing, the Trustee or the Required Holders of at least 30% in aggregate principal amount of the then outstanding Required Debt may declare the principal of and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on all the then outstanding Notes of the affected series to be due and payable immediately.  Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all principal of, and premium, if any, interest (including Additional Interest, if any) and any other monetary obligations on, all the then outstanding Notes will become due and payable immediately without further action or notice.  Holders may not enforce the Indenture, the Notes or the Guarantees except as provided in the Indenture.  Subject to certain limitations, Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of the Notes notice of any continuing Default (except a Default relating to the payment of principal, premium, if any, or interest (including Additional Interest, if any)) if it determines that withholding notice is in their interest.  The Required Holders of a majority in aggregate principal amount of the then outstanding Required Debt by notice to the Trustee may on behalf of the Required Holders of all of the Required Debt waive any existing Default and/or its consequences under the Indenture except a continuing Default in the payment of the principal of, or premium, if any, or interest (including Additional Interest, if any) on, any of the Notes held by a non-consenting Holder.  EFIH is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and EFIH is required within five Business Days after becoming aware of any Default, to deliver to the Trustee a statement specifying such Default and what action EFIH proposes to take with respect thereto.

(13)  *AUTHENTICATION.*  This 2022 Second Lien Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

(14)  *ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.*  In addition to the rights provided to Holders of 2022 Second Lien Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, dated as of February 6, 2012, the Registration Rights Agreement, dated as of February 28, 2012, and the Registration Rights Agreement, dated as of August 14, 2012, each among the Issuer and the other parties named on the signature pages thereof (together, the "Registration Rights Agreement"), relating to such 2022 Second Lien Notes, including the right to receive Additional Interest, if any (as defined in the Registration Rights Agreement).

A-8

(15)    *GOVERNING LAW*.  THE INDENTURE, THE 2022 SECOND LIEN NOTES AND THE GUARANTEES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(16)    *CUSIP/ISIN NUMBERS*.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP/ISIN numbers to be printed on the 2022 Second Lien Notes and the Trustee may use CUSIP/ISIN numbers in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the 2022 Second Lien Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any Holder upon written request and without charge a copy of the Indenture, the Registration Rights Agreement relating to the 2022 Second Lien Notes and/or the Security Documents.  Requests may be made to the Issuer at the following address:

> Energy Future Intermediate Holding Company LLC
> Energy Plaza
> 1601 Bryan Street
> Dallas, Texas 75201-3411
> Facsimile No.:  (214) 812-6032
> Attention: General Counsel
> And
> Facsimile No.:  (214) 812-4097
> Attention: Treasurer
>
> And
>
> EFIH Finance Inc.
> Energy Plaza
> 1601 Bryan Street
> Dallas, Texas 75201-3411
> Facsimile No.:  (214) 812-6032
> Attention: General Counsel
> And
> Facsimile No.: (214) 812-4097
> Attention: Treasurer

A-9

## ASSIGNMENT FORM

To assign this 2022 Second Lien Note, fill in the form below:

(I) or (we) assign and transfer this 2022 Second Lien Note to: _____
(Insert assignee's legal name)

_____
(Insert assignee's Soc. Sec. or tax I.D. no.)

_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint

_____ to transfer this
2022 Second Lien Note on the books of the Issuer.  The agent may substitute another to act for
him.

Date: _____

Your Signature _____
(Sign exactly as your name appears on the
face of this 2022 Second Lien Note)

Signature Guarantee[*]:_____

[*]    Participant in a recognized Signature Guarantee Medallion Program (or other signature
guarantor acceptable to the Trustee).

NYDOCS01/1304244.4

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this 2022 Second Lien Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(g) or 4.14 of the Indenture, check the appropriate box below:

☐ Section 4.10(d)     ☐ Section 4.10(g)     ☐ Section 4.14

If you want to elect to have only part of this 2022 Second Lien Note purchased by the Issuer pursuant to Section 4.10(d), 4.10(g) or 4.14 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of
this 2022 Second Lien Note)

Tax Identification No.: _____

Signature Guarantee[*]: _____

*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

NYDOCS01/1304244.4

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE[2]

The initial outstanding principal amount of this Global Note is $ _____. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following each decrease or increase | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|
| | | | | |

---

[2] This schedule should be included only if the 2022 Second Lien Note is issued in global form.

NYDOCS01/1304244.4