**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
In re:                                              :    Chapter 11
                                                    :
Energy Future Holdings, Inc., et al.,               :    Case No. 14-10978 (CSS)
                                                    :
                            Debtors.                :    (Jointly Administered)
                                                    :
------------------------------------------------------------ x
```

**OBJECTION OF EFIH SECOND LIEN NOTES**
**INDENTURE TRUSTEE AND EFIH SECOND LIEN GROUP**
**TO DEBTORS' MOTION TO APPROVE SECOND LIEN DIP**

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................................ 4

I.    The PIK DIP ............................................................................................................ 4

II.   The Negotiations With Respect to a Second Lien DIP .................................... 6

   A.    The Debtors' Flawed Prepetition Process ........................................................ 6

   B.    The Debtors' Flawed Postpetition Process ...................................................... 8

ARGUMENT ................................................................................................................... 14

I.    The Court Should Not Approve the PIK DIP .................................................. 14

   A.    The Strategic DIP is Less Expensive and Otherwise Superior to the PIK DIP .......... 15

   B.    The Debtors Have Failed to Exercise Sound and Reasonable Business Judgment in Selecting the PIK DIP ........................................................................................... 17

II.   The PIK DIP Has Other Flaws ......................................................................... 19

   A.    Payments to Non-Settling Holders  Should be Made through the Indenture Trustee 20

   B.    Clarifications to the Proposed DIP Order .................................................... 21

   C.    The Proposed DIP Order Should be Subject to the 14-day Stay ................ 22

Computershare Trust Company, N.A. and Computershare Trust Company of Canada, as indenture trustee (the "**Indenture Trustee**") for $2,156,392,000 aggregate principal amount of second lien notes (the "**Second Lien Notes**" and the holders thereof the "**Second Lien Noteholders**") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (collectively, "**EFIH**"), and certain Second Lien Noteholders (the "**EFIH Second Lien Group**"), by and through their undersigned counsel, hereby file this objection (the "**Objection**") to the motion (the "**Second Lien DIP Motion**" or the "**Motion**") [Dkt. No. 477][1] of the above-captioned debtors (the "**Debtors**" or the "**Company**") to approve, among other things, second lien debtor-in-possession financing (as amended, the "**PIK DIP**").[2] This objection supplements the Preliminary Objection filed yesterday (Dkt.1060).

## PRELIMINARY STATEMENT

1.     The PIK DIP is not merely a loan. It is the PIK RSA Parties' commitment to purchase the equity of reorganized EFIH through the conversion of the PIK DIP at consummation.

2.     The PIK DIP is demonstrably more expensive financing than the alternative Strategic DIP (as defined below) jointly submitted by NextEra Energy, Inc., which owns one of the largest regulated electric utilities in the United States, and the EFIH Second Lien Group.[3]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[2] Depositions and discovery relating to the Motion are ongoing, and the Indenture Trustee and EFIH Second Lien Group thus reserve the right to supplement and amend this pleading with any additional information which may come to light.

[3] All holders of EFIH Second Lien Notes are eligible to participate in the Strategic DIP.

3

3.    Additionally, the PIK DIP provides for sale of EFIH at a price which is demonstrably lower than the price NextEra and the EFIH Second Lien Group have committed to pay.

4.    Finally, the PIK DIP is a product of a deeply flawed process. The Debtors never sought alternative DIP financing, never even negotiated the material terms of the PIK DIP until confronted with a cheaper alternative (by which time that the Debtors were already locked into the PIK DIP) and finally settled on the inferior PIK DIP without even briefing their board adequately on the most recent, timely submitted and superior Strategic DIP. Because the Debtors never adequately explored alternative DIP financing and never gave the board the information it needed to exercise its business judgment, the Debtors' selection of the PIK DIP is not entitled to deference under the business judgment rule.

## BACKGROUND

I.    **The PIK DIP**

5.    The Debtors commenced these chapter 11 cases with the stated goal of consummating a global restructuring pursuant to which, among other things, they propose to refinance the Second Lien Notes using the proceeds of the PIK DIP.[4] Relatedly, the Debtors have proposed a settlement of all outstanding obligations under the Second Lien Notes (the "**Second Lien Settlement**"), which settlement is to be accomplished through a tender offer (the "**Second Lien Tender Offer**"). The restructuring is reflected in a restructuring support

---

[4] The Debtors' choice to refinance the Second Lien Notes is an optional redemption that triggered the makewhole premium under the Indenture governing the Second Lien Notes. On June 16, 2014, the Indenture Trustee commenced an adversary proceeding regarding the makewhole and related issues.

agreement (the "**RSA**") and related term sheet (the "**RSA Term Sheet**") between the Debtors and various parties in their capital structure.[5]

      6.     The PIK DIP will provide the Debtors with $1.9 billion of "new money." *See* Second Lien DIP Motion at ¶¶ 7, 13. The Debtors will use these proceeds, together with proceeds from the first lien financing the Court has previously approved, to pay principal and interest on the Second Lien Notes as well as the settlement consideration to the Second Lien Noteholders who have opted into the Second Lien Settlement. The non-settling Second Lien Noteholders' rights for any remaining claims under the indenture governing the Second Lien Notes (the "**Second Lien Indenture**"), including claims for payment on account of, among other things, the makewhole premium, Additional Interest (as defined in the Second Lien Indenture), interest on interest and fees and expenses of the Indenture Trustee under the Second Lien Indenture (collectively, the "**Remaining Claims**"), are expressly preserved.[6]

      7.     As part of the Debtors' proposed restructuring, certain holders (the "**PIK RSA Parties**") of EFIH's unsecured senior toggle notes (the "**PIK Notes**") are funding at least 91% of the PIK DIP. Fidelity, one of the largest holders of the Second Lien Notes, has the right to participate in up to 9% of the PIK DIP. Under the RSA, the Debtors are required to share any competing second lien financing proposals with the PIK RSA Parties, *see* RSA § 4.03(b), such that the PIK RSA Parties effectively have the opportunity to review and attempt to best any such competing proposals. As discussed further below, the terms of the PIK DIP have recently been amended.

---

[5] The RSA and RSA Term Sheet are attached to the First Day Declaration of Paul Keglevic, the Debtors' executive vice president, chief financial officer, and co-chief restructuring officer. [Dkt. No. 98].

[6] The PIK DIP is being incurred under section 364(c) of the Bankruptcy Code, such that it does not prime the Second Lien Notes or any claims under the Second Lien Indenture, including any makewhole claims. *See* Second Lien DIP Motion at ¶ 12.

II.    **Negotiations With Respect to a Second Lien DIP**

8.    Beginning prior to the Petition Date, the EFIH Second Lien Group, represented by Kramer Levin Naftalis & Frankel, L.L.P. and Rothschild Inc., has attempted to engage the Debtors on multiple occasions regarding the provision of debtor-in-possession financing and settlement of their makewhole claims. Prepetition, the EFIH Second Lien Group's efforts to engage with the Debtors regarding postpetition financing were completely rebuffed; postpetition, the Debtors grudgingly employed only a flawed and limited process to receive and evaluate competing financing proposals.

A.    **The Debtors' Flawed Prepetition Process**

9.    ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████

10.    Having decided to pursue second lien financing, the Debtors never solicited competing bids or exposed the PIK RSA Parties' prepetition proposal to any form of a marketing process. *See, e.g.,* Declaration of David Ying [Dkt. No. 478] (the "**Ying Declaration**") at ¶ 20 (acknowledging "Debtors did not engage in a traditional marketing process"). ████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

11.     More specifically, as set forth in the Declaration of Todd R. Snyder (the "**Snyder Declaration**"), filed contemporaneously herewith, in March 2014, the EFIH Second Lien Group attempted to engage with the Company by sending an unsolicited DIP financing proposal to the Debtors.  Thereafter, the Company never entered into negotiations with the EFIH Second Lien Group regarding its proposal, asked no substantive questions regarding the proposal, and – even though the EFIH Second Lien Group had unilaterally submitted a proposal – never asked the EFIH Second Lien Group to bid against the postpetition financing that the Debtors ultimately chose.  *See* Snyder Declaration ¶ 11.

12.     In fact, when the EFIH Second Lien Group proposed financing at a March meeting between the parties, the Debtors responded that they had DIP financing agreed and were not interested in other proposals and were not even willing to share the terms of the PIK RSA Parties' proposed financing.  As a result, the EFIH Second Lien Group did not see the terms of the PIK DIP until they were revealed in the Debtors' motion to approve post-petition financing. *See* Snyder Declaration ¶ 11.

13.     The Debtors' principal justification for the PIK DIP has always been that it provides for conversion into the equity of reorganized EFIH – it is an agreement for the sale of the company through the "equitization" of the DIP.  However, the Debtors' pre-petition process relating to sale of the company through "equitization" was equally flawed and further illustrative of the Debtors' determination to negotiate only with the PIK Holders.  In early March, the EFIH Second Lien Group met with the Debtors and presented them with an equitization proposal. Much like the Debtors' non-response to the EFIH Second Lien Group's DIP proposal, the Company provided no response regarding the equitization proposal.  Subsequently, the EFIH

Second Lien Group determined to submit a makewhole settlement (and equitization) proposal by partnering with Fidelity, a significant holder of Second Lien Notes. *See* Snyder Declaration ¶ 12.

14.     The EFIH Second Lien Group engaged in a series of discussions with Fidelity that quickly led to agreement on a proposal (the "**EFIH Second Lien Group/Fidelity Proposal**") to be submitted to the Debtors by Fidelity that had the support of more than two-thirds of the Second Lien Notes. The terms of the EFIH Second Lien Group/Fidelity Proposal demonstrated a willingness to make significant compromises on the makewhole. *See* Snyder Declaration ¶ 12.

15.     Fidelity presented the EFIH Second Lien Group/Fidelity Proposal to EFIH's advisors in March. However, the EFIH Second Lien Group received no response from the Company directly regarding the EFIH Second Lien Group/Fidelity Proposal.

16.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

17.     ████████████████████████████████████████

██████████████████████████████████████████

**B.     The Debtors' Flawed Postpetition Process**

18.     Post-petition, the EFIH Second Lien Group continued its efforts to engage the Debtors. On May 12, the EFIH Second Lien Group presented the Debtors with a proposal for competing second lien postpetition financing (the "**Initial Competing DIP**") on substantially better terms (including with respect to the interest rate and commitment fees) than the PIK DIP (as originally proposed). At the May 22 hearing, in exchange for the EFIH Second Lien Group withdrawing its emergency motion to compel the Debtors to obtain prior approval of procedures governing their proposed tender offer, the Debtors committed on the record to engage in good

faith negotiations with the EFIH Second Lien Group with respect to its proposal of a competing DIP and other related issues. On May 26, the EFIH Second Lien Group submitted to the Debtors commitment letters indicating that the Initial Competing DIP was fully funded. *See* Snyder Declaration ¶ 15.

19.     Thereafter, the EFIH Second Lien Group and its advisors had discussions with the Debtors and their advisors regarding the Initial Competing DIP, including an in-person meeting at Kirkland & Ellis on May 30 during which the EFIH Second Lien Group's advisors again presented the terms of the Initial Competing DIP and addressed various questions raised by the Debtors and again offered to negotiate a settlement of the makewhole premium. Following the May 30 meeting, the EFIH Second Lien Group received no substantive feedback from the Debtors. The Debtors never provided a formal response to the proposal nor provided any feedback as to how the EFIH Second Lien Group could satisfy any concerns of the Debtors. *See* Snyder Declaration ¶ 16.

20.     Instead, on Sunday, June 8, the Debtors informed the EFIH Second Lien Group's advisors that it should submit its "best and final" offer by Wednesday, June 11 (three days later). The Debtors indicated that they would then evaluate the EFIH Second Lien Group's offer and any competing offer from the PIK RSA Parties. Under the terms of the "process" the Debtors said they were implementing, the EFIH Second Lien Group would be given no opportunity to respond to any new proposal from the PIKs. The PIK RSA Parties, for their part, would have a "last look," under which they would not be required to submit their best and final offer until after they had seen the offer submitted by the EFIH Second Lien Group. *See* Snyder Declaration ¶ 17.

21.    The June 11 deadline was subsequently extended through Wednesday, June 18, in part so that the EFIH Second Lien Group could attempt to negotiate directly with the PIK RSA Parties regarding a potential global resolution. During the intervening days, the EFIH Second Lien Group negotiated the terms of an alternative (and superior) second lien DIP financing proposal (the "**Strategic DIP**") and an accompanying new restructuring plan (the "**Alternative Restructuring Plan**") with a strategic investor, NextEra Energy, Inc. ("NextEra"). As noted above, NextEra owns one of the largest rate-regulated electric utilities in the United States and, through its subsidiaries, is the largest generator of renewable energy from the wind and sun in North America. NextEra subsidiaries generate the most wind energy in Texas and have significant operations and facilities within the Electric Reliability Council of Texas, including electric transmission facilities that are regulated by the Public Utility Commission of Texas. The market capitalization of NextEra is approximately $43.5 billion as of June 23, 2014.

22.    The EFIH Second Lien Group and NextEra submitted their Strategic DIP and Alternative Restructuring Plan to the Debtors by the June 18 deadline. *See* Snyder Declaration ¶ 18.[7]

23.    On Thursday, June 19, representatives and advisors to the Debtors met telephonically for approximately 45 minutes with advisors to the EFIH Second Lien Group and NextEra to discuss the Strategic DIP and Alternative Restructuring Plan. The Debtors focused primarily, indeed exclusively, on two issues: An alleged shortfall in the amount of cash needed to consummate the Alternative Restructuring Plan and the non-callable nature of the Strategic DIP, which the Debtors complained failed to provide them with a "fiduciary out" to pursue other deals. *See* Snyder Declaration ¶ 21.

---

[7] Although it is clear that the Strategic DIP provides superior value to the Debtors' estates, to the extent the Debtors reject and/or refuse to move forward on the Strategic DIP, the EFIH Second Lien Group is also prepared to stand behind, and remains committed to fund, the Initial Competing DIP.

24.     On Friday, June 20, the EFIH Second Lien Group and NextEra responded by providing that the Strategic DIP would be callable at a fee far less than the pre-payment fee demanded in the proposed PIK DIP. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████ the cash shortfall could, in any event, be solved through a relatively insignificant (and easily achievable) increase in exit financing. *See* Snyder Declaration ¶ 22.

25.     On the weekend of June 21-22, the Debtors informed the EFIH Second Lien Group and NextEra that the RSA PIK Parties had amended their proposed DIP to reduce the fees payable thereunder. The Debtors said the EFIH boards would meet at 6:00 p.m. Sunday, June 22, to consider which EFIH Second Lien DIP to pursue. *See* Snyder Declaration ¶ 23.

26.     At 4:47 p.m. Sunday, June 22, the EFIH Second Lien Group and NextEra transmitted four pages (including a term sheet) containing improvements in their Strategic DIP and Alternative Restructuring Plan to the Debtors' advisors. *See* Snyder Declaration ¶ 24. These documents are attached as Exhibit 4 to the Snyder Declaration. In summary form, the key terms of the Strategic DIP and Alternative Restructuring Plan are as follows:[8]

| Term | Summary |
|---|---|
| Size and Structure | • $2.3 billion second lien convertible DIP facility comprised of one or more tranches<br>  • $1.6 billion to be provided by NextEra |
| Interest Rate | • 6.0% |
| Equity Conversion | • Pre-conversion splits remain consistent with existing RSA (98.0% to EFIH Unsecured PIK/Toggle, 1.0% EFH Unsecured, 1.0% to existing equity)<br>• DIP facility, together with $100 million of retain Second Lien Notes, shall convert into 68.0% of the fully diluted reorganized EFH equity (implied equity value of $3.6 billion) |
| Use of Funds | • Partial refinancing of Second Lien Noteholders, including payment of applicable |

---

[8] To the extent that this summary conflict with the terms reflected in the proposal submitted to the Debtors, the latter shall control.

| Term | Summary |
|---|---|
| | makewhole claim<br>• General corporate purposes/pre-funding of plan of reorganization |
| Improved Creditor Treatment | • Payment in full to EFIH PIK/Toggle Noteholders (combination of cash and equity)<br>• Payment in full to Second Lien Notes (combination of cash and equity)<br>• $20 million or greater incremental cash payment (over current expected RSA payment) to EFH Unsecured Noteholders |
| Fees and Expenses | • No Alternative Transaction Fee<br>• PIK Fee of $50 million to new money lenders<br>• Payment of reasonable professional fees and expenses of the Second Lien Noteholders and NextEra<br>• Payment of reasonable fees and expenses of J.P. Morgan and Credit Suisse |
| Maturity | • 24 months |
| Optional Prepayment Premium | • $160 million prepayment fee to NextEra, with a 5 business day right for NextEra to negotiate and match or top any alternative proposal. |
| Exit Facility | • First lien exit facility to be appropriately sized in order to provide for desired minimum cash balance upon emergence |
| Collateral | • All liens securing EFIH first lien DIP facility on a second-priority basis |
| Covenants | • Usual and customary affirmative and negative covenants<br>• Financial covenants consistent with EFIH first lien DIP facility subject to a 15% cushion |
| Potential Merger | • Within 30 days of the issuance of the DIP Facility, NextEra will seek board approval for potential tax free merger of EFH and NextEra post-EFH exit from bankruptcy in an all-stock transaction bringing NextEra ownership to 100%.<br>• The Strategic DIP is not contingent on this potential merger occurring, and all other restructuring transactions would occur irrespective of whether the potential merger occurs. |

27.    The Alternative Restructuring Plan would provide enhanced recoveries to key EFH and EFIH creditor constituencies, would provide holders of the PIK Notes with a full recovery, and would eliminate the need for further litigation regarding the EFIH Second Lien Group's makewhole claims. The EFH unsecured noteholders would receive a $20 million or greater increase in cash distribution over their contemplated recovery under the current RSA.

12

*See* Snyder Declaration ¶ 19. The Strategic DIP, which is fully committed, contains materially better terms than the Debtors' current Second Lien DIP, including a lower interest rate and $104 million less in non-contingent fees. *See* Snyder Declaration ¶ 26.

28.     The board determined to select the PIK DIP rather than the Strategic DIP at its Sunday June 22 meeting. *See* Snyder Declaration ¶ 25. 

29.     Finally, the PIK DIP is worse than other potential DIPs because it may force the Debtors to pay interest *twice* on a sizeable a portion of their debt. On Friday, June 20, CSC Trust Company of Delaware, the indenture trustee for the EFIH First Lien Notes (the "**EFIH First Lien Trustee**") filed a complaint (the "**First Lien Complaint**") against The Depository Trust Company ("**DTC**"), Cede & Co. Epiq Systems, Inc. ("**Epiq**") and the Indenture Trustee. The EFIH First Lien Trustee is asserting a claim for approximately $432.4 million in makewhole premium under the EFIH First Lien Indenture. The First Lien Complaint alleges that the intercreditor agreement relating to the EFIH First Lien Notes and EFIH Second Lien Notes precludes EFIH from consummating its tender offer for EFIH Second Lien Notes or from consummating the forced prepayment of non-tendered EFIH Second Lien Notes, so long as the EFIH First Lien Notes' $432.4 million makewhole claim remains unresolved.

30.     The Indenture Trustee and the EFIH Second Lien Group believe the First Lien Trustee's complaint is without merit and will respond to it in due course. However, that complaint freezes the payment of at least $432.4 million to the EFIH Second Lien Noteholders. The Indenture Trustee anticipates that none of the intermediaries –Cede & Co, DTC, Epiq, ,and

certainly not the Indenture Trustee – will incur damages (or the risk of damages) by disbursing

moneys to repay the EFIH Second Lien Notes until that First Lien Complaint (or the underlying

claim for an EFIH First Lien makewhole) is resolved.

31.    The PIK DIP must, under the terms of the RSA, be drawn within five days

of its approval. Thus, if the PIK DIP is approved on June 30, it must be drawn by July 3 --

whereupon at least $432.4 million of the money borrowed will sit at the various intermediaries

for a time. During that time EFIH will pay interest on $432.4 million of PIK DIP *and* interest on

the $432.4 million of EFIH Second Lien Notes.[9]

## ARGUMENT

### I.    The Court Should Not Approve the PIK DIP

32.    A debtor seeking court approval of debtor-in-possession financing has the

burden of proving, among other things, that the "terms of the transaction are fair, reasonable, and

adequate, given the circumstances of the debtor-borrower and the proposed lender." *In re Los

Angeles Dodgers*, 457 B.R. 308, 312 (Bankr. D. Del. 2011). In addition, courts will inquire

whether any superior financing alternatives are available. *See, e.g., In re Phase-I Molecular

Toxicology*, 285 B.R. 494, 495 (Bankr. D. N.M. 2002) (debtor must prove "that no better offers,

bids, or timely proposals are before the Court").

33.    Requests to obtain financing are typically scrutinized using the business

judgment standard. *See Los Angeles Dodgers*, 457 B.R. at 313. Where, however, the debtor's

decision-making process is compromised – *e.g.*, directors were uninformed, grossly negligent or

not disinterested – a debtor's decision is not entitled to deference. *See id.; see also, e.g., In re

Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (courts should not approve financing

---

[9] In contrast to the PIK DIP, the EFIH Second Lien Group is prepared to defer funding of the relevant portion of the Strategic DIP pending resolution of the issues raised in the First Lien Complaint.

"when it is sought for the primary benefit of a party other than the debtor."); *cf. In re Bidermann Indus. U.S.A., Inc.,* 203 B.R. 547 (Bankr. S.D.N.Y. 1997) (denying approval of letter agreement regarding leveraged buyout of debtors on grounds that transaction had been inadequately marketed).

34.    Here, as set forth below, the PIK DIP should not be approved because it is demonstrably inferior to the Strategic DIP.  Moreover, the Debtors' decision to select the PIK DIP is not entitled to any deference in light of the flawed process the Debtors have employed.

**A.    The Strategic DIP is Less Expensive and Otherwise Superior to the PIK DIP**

35.    The Strategic DIP is a superior financing option for the Debtors.  Below is a comparison of the key terms of the Strategic DIP and the PIK DIP:[10]

| Term | PIK DIP | Strategic DIP |
|---|---|---|
| **Size of Facility** | $1,900 | $2,300 |
| **Interest Rate** | 6.25% | 6.00% |
| **Implied Equity Valuation** | $3,325 | $3,603 |
| **Fees** | | |
| Upfront PIK Fee | $95 | $50 |
| Alternative Transaction Fee | — | — |
| Additional Fees | $69 | $10 |
| Optional Prepayment Premium | $95 | $160 |
| **Total Fees** | $259 | $220 |
| **Treatment** | | |
| **Payment in full to EFIH PIK Toggle** | NO | YES |
| **Incremental recovery to** | — | $20 |

---

[10] All $ in millions.

| Term | PIK DIP | Strategic DIP |
|------|---------|---------------|
| EFH Unsecured vs. RSA | | |

36.     As the foregoing makes clear, the Strategic DIP is less expensive and otherwise superior to the PIK DIP in that, among other things, the interest rate and total fees are lower.  Over the course of 365 days, the Debtors would save $78.4 million in non-contingent interest and fees by selecting the Strategic DIP over the PIK DIP.

37.     Further, the Alternative Restructuring Plan associated with the Strategic DIP is also superior to the RSA associated with the PIK DIP in that (a) NextEra (and the EFIH Second Lien Group) are, through the Strategic DIP, committing to purchase 68% of reorganized EFIH's equity at a price $278 million higher than the price payable under the PIK DIP, (b) the unsecured PIK Notes will receive cash and stock (valued at the price NextEra is paying) sufficient to pay in full all of the PIK Notes' principal, pre-petition interest (at the contract rate) and post-petition interest (at the federal judgment rate, *cf.* 11 U.S.C. § 726(a)(5)), and (c) EFIH's parent EFH will receive $20 million more cash for distributions to its own unsecured noteholders than is contemplated under the RSA.[11]

38.     Notably, the Strategic DIP and Alternative Restructuring Plan demonstrate that EFIH is a solvent estate.

39.     In addition, the Alternative Restructuring Plan, like the Debtors' RSA, facilitates the Debtors' tax strategy by accommodating the continuity of interest requirements for facilitating the TCEH tax-free spin.  The EFIH Second Lien Group and NextEra on June 19 asked the Debtors to identify any tax issues in the Alternative Restructuring Plan; as of this date, the Debtors have identified none.

---

[11] In light of these benefits, the PIK RSA Parties' opposition to the Strategic DIP can only be attributable to the fact that they had been hoping to acquire the Company at a discount.

40.     Finally, the Alternative Restructuring Plan has improved executability, as the significant investment from NextEra enhances the likelihood of obtaining required regulatory approvals.

**B.     The Debtors Have Failed to Exercise Sound and Reasonable Business Judgment in Selecting the PIK DIP**

41.     The Debtors' decision to choose an inferior financing proposal is not entitled to any deference under the business judgment standard because, discovery shows, the board did not explore alternative financing, received inadequate information about available alternatives and thus did not exercise (and indeed was prevented from exercising) its business judgment.

42.     In particular, as discussed in detail above and in the Snyder Declaration, the evidence will show the following:

- Prepetition:

    - The Debtors did not affirmatively seek out any second lien financing alternatives other than the proposal from the PIK RSA Parties;

    - The Debtors rebuffed the EFIH Second Lien Group's efforts to engage in negotiations regarding proposed second lien financing;

    

- Postpetition:

    - The EFIH Second Lien Group submitted an unsolicited proposal for second lien postpetition financing that the Debtors have acknowledged was superior to the PIK RSA Parties' initial prepetition proposal;

    - The Debtors initially refused to negotiate with the EFIH Second Lien Group regarding this superior postpetition proposal;

17

- The Debtors grudgingly agreed to negotiate with the EFIH Second Lien Group only after it had filed an emergency motion to compel additional disclosures regarding the Second Lien Tender Offer;

- The Debtors' "process" amounted to little more than a request for final offers; and

- 

43.     The Debtors' flawed process is further evidenced by their decision to proceed with the hearing on the PIK DIP on June 30. The RSA does not require that the PIK DIP be approved until July 13. *See* RSA § 8.02(b). More importantly, the First Lien Indenture Trustee has commenced an adversary proceeding to prevent the payment of the Second Lien Notes unless and until the First Lien Notes have received payment in full of their own makewhole claim for $432.4 million. Until resolution of this adversary proceeding, it makes no sense to consummate the PIK DIP. Doing so will ensure that the Debtors "double pay" for at least some period of time, paying interest on the new second lien financing as well as interest on the Second Lien Notes that have not been paid as a result of the pending adversary proceeding (an amount estimated at over $400 million)

44.     The Debtors acknowledge that they did not conduct an affirmative prepetition marketing process and that they did not pursue negotiations with the only party that made an unsolicited alternative financing proposal: the EFIH Second Lien Group. *See* Ying Declaration ¶¶ 20-22. They offer several reasons for this decision, but none are defensible. *See id.* at ¶ 22.[12] First, because the Debtors failed to engage with the EFIH Second Lien Group, they

---

[12] Mr. Ying states:

had no basis for believing that the obstacles identified in paragraph 22 of the Ying Declaration were truly problematic. Because they never responded to the EFIH Second Lien Group's proposal, they could not have reasonably concluded, for instance, that the EFIH Second Lien Group would not "be willing to offer a valuation . . . that maximized recoveries for unsecured creditors." *Id.*[13]

45.    In addition,   Moreover, the EFIH Second Lien Group's prepetition proposal to provide postpetition financing was not contingent on settlement of their makewhole claims, in any event. Finally, to the extent Mr. Ying relies on tax concerns, *see id.*, the Strategic DIP provides an alternative that preserves the Debtors' tax strategies for their restructuring.

46.    The Debtors' position, in the end, is based on the Debtors' belief that only the PIK Holders can make a DIP Loan because only the PIK Holders can buy the reorganized EFIH. It is the Debtors' burden to prove that only the PIK Holders can buy the Debtors; given the Strategic DIP and Alternate Restructuring Proposal, the Debtors cannot meet that burden.

## II.    The PIK DIP Has Other Flaws

47.    To the extent the Court approves the PIK DIP, the Indenture Trustee and

---

The EFIH Debtors chose not to pursue the March 2014 proposal because they did not believe it was reasonably likely that (a) the proponents would be willing to offer a valuation of EFH Corp. or EFIH that maximized recoveries for unsecured creditors of those respective Debtors; (b) the proponents would agree to a less expensive settlement of their alleged makewhole claims; or (c) such negotiations would lead to a consensual global restructuring that preserved the tax advantages in the restructuring contemplated by the RSA.

Ying Declaration ¶ 22.

[13] The EFIH Second Lien Group's postpetition proposal in the form of the Strategic DIP and Alternative Restructuring Proposal proves this assumption was not only unfounded, but misguided.

the EFIH Second Lien Group have objections to the form of the proposed order approving the

PIK DIP (the "**Proposed DIP Order**").

**A.      Payments to Non-Settling Holders**
**Should be Made through the Indenture Trustee**

48.      The mechanics of the proposed repayment of the Second Lien Notes under

the Second Lien Settlement and Tender Offer are improper.  Section 2.04 of the Second Lien

Indenture specifically provides that upon an event of default, the Indenture Trustee becomes the

paying agent and can assert its charging lien (*see* Indenture at §§ 6.12 and 6.13) against

recoveries.  In contravention of the Indenture, the Proposed DIP Order provides that payments to

non-settling Second Lien Noteholders will be made through DTC rather than the Indenture

Trustee.  By directing payment away from the Indenture Trustee to DTC, the Debtors are, in

effect, stripping the Indenture Trustee of its charging lien.

49.      In order to avoid this issue, the Proposed DIP Order should be modified to

comply with the Indenture and the Objectors previously submitted the following proposed

language to this effect:

> The Borrowers shall pay the proceeds payable to the non-settling Prepetition
> EFIH Second Lien Creditors under the EFIH Second Lien Repayment, in
> immediately available funds, to Computershare Trust Company, N.A. and
> Computershare Trust Company of Canada ("EFIH Second Lien Notes Paying
> Agent"), in its capacities as paying agent and EFIH second Lien Note Trustee
> under the EFIH Second  Lien Notes Indenture, and, as soon as practicable
> thereafter, the Second Lien Notes Paying Agent shall, subject to the terms of the
> EFIH Second Lien Notes Indenture, distribute such proceeds to the non-settling
> Prepetition EFIH Second Lien Creditors in accordance with the EFIH Second
> Lien Notes Indenture.  The EFIH Debtors' payment of these amounts[14] to the
> EFIH Second Lien Notes Paying Agent shall constitute full satisfaction of all
> principal and accrued but unpaid interest (but excluding Additional Interest and
> interest on interest and interest on any other disputed claims) under the EFIH
> Second Lien Notes held by non-settling  Prepetition EFIH Second Lien Creditors,
> and all obligations of the EFIH Debtors shall cease with respect thereto, and for
> the avoidance of doubt, no interest shall accrue on the EFIH Second Lien Notes

---

[14] [AMOUNT OF PRINCIPAL AND ACCRUED INTEREST TO BE AGREED ON]

held by non-settling Prepetition EFIH Second Lien Creditors with respect to amounts so paid.

**B.    Clarifications to the Proposed DIP Order.**

50.    The Second Lien DIP Motion states that that no adequate protection is necessary because the PIK DIP is junior to the Second Lien Notes' makewhole claims. Motion at ¶ 47.  While at least one provision of the Proposed DIP Order is more inclusive in providing that the PIK DIP is not priming the "liens purportedly securing the Prepetition Second Lien Obligations" *see* Proposed DIP Order at ¶ L [Dkt. No. 994], other provisions in the Proposed DIP Order do not accurately reflect all the issues that have been reserved and therefore should not be primed or impacted by the PIK DIP. [15]  Specifically:

- Both Paragraph E (vii) ("Rights Reserved with Respect to Prepetition Secured Obligations") and Paragraph 12 ("The EFIH Second Lien Repayment and EFIH Second Lien Settlement") should be amended to state that, in addition to reserving rights on the makewhole claim, interest on interest and Additional Interest, all parties are reserving rights to interest on the makewhole claims and claims for compensation and indemnity, including payment of any professional fees and expenses of the Indenture Trustee and its agents and counsel (including interest thereon).  In addition, the reserved issues with regard to interest on interest and Additional Interest should not be characterized as default or penalty interest.

- The Proposed DIP Order should include an affirmative provision that the "the EFIH Debtors shall not take any actions to release the liens securing the Prepetition Second Lien Obligations."

- Paragraph L ("Adequate Protection") needs to clarify that the Second Lien Notes are being repaid "other than the disputed amounts."

- Paragraph 15 ("Use of Cash Collateral") should be amended such that the DIP Lender's right to credit bit is "subject to the Prepetition Second Priority Liens."

- Section 12(a) and (b) of the Note Purchase Agreement ("Security: (a) Collateral: Grant of Lien and Security Interest and (b); Administrative Priority") do not clearly indicate that that the Second Lien DIP security interests and liens and superpriority

---

[15] On June 19, counsel to the Indenture Trustee and the EFIH Second Lien Group proposed language to counsel to the Debtors to resolve these issues but, as of the filing of this Objection, has not received any response from the Debtors.

administrative claim are subject to the Prepetition Second Priority Liens.[16] While the Second Lien DIP Order contains a provision that the order controls in the event of an inconsistency between the provisions of the Second Lien DIP Order and the Note Purchase Agreement, prior to approval of the Second Lien DIP, the Debtors should be required to amend these documents to ensure maximum consistency and avoid any ambiguity. Furthermore, the specific language of Section 12(a)(ii) provides that the security interests and liens are only subject to the Carve-Out, the terms and conditions set forth in the Final Order, the Senior DIP Obligations and the Subordination Agreement "during the continuance of an event of default." The Second Lien DIP should be junior to all obligations, regardless of whether an event of default has occurred.

C.     **The Proposed DIP Order Should be Subject to the 14-day Stay**

51.     The Debtors' request for a waiver of the fourteen-day stay of Bankruptcy Rule 6004(h) should be denied. Bankruptcy Rule 6004(h) requires, that absent a court ruling otherwise, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen days after entry of the order." FED. R. BANKR. P. 6004(H). This rule is designed to provide an objecting party sufficient time to request a stay pending appeal before an order is implemented.

52.     To satisfy the standard for a waiver of the fourteen-day stay, the party requesting the stay must show a sufficient business need requiring closing within the fourteen-day period. *See In re Filene's Basement, LLC*, 2014 WL 1713416, at *13 - *14 (Bankr. D. Del, Apr. 29, 2014). In connection with the First Lien Settlement, the Debtors argued that the RSA required that the First Lien DIP be consummated five business days after the date the order approving the financing was entered. *See RSA § 8.02(c)*. While true, this deadline is illusory.

53.     First, elsewhere in the RSA, it was contemplated that the Proposed DIP Order be entered within seventy-five days of the Petition Date – i.e., by July 13th. *See RSA §* 8.02(b). There is no reason why the entry of the order approving the PIK DIP should accelerate

---

[16] There is a passing reference in Section 12(e)(ii) ("Security: (e) Survival") that the liens are subject to the "Permitted Liens" (which is defined in the Note Purchase Agreement to include the Prepetition Second Priority Liens). The language, however ,should be made clear.

this outside deadline, as the lenders have already indicated their willingness to remain committed until July 13th. Second, the Debtors have repeatedly extended the original hearing dates proposed for various relief sought in their Second Lien DIP Motion and Settlement Motion, indicating that precise adherence to the originally-contemplated timelines is not essential to the parties to the RSA. Holding the funding of the PIK DIP in abeyance until July 13 – the outside date through which the lenders have previously indicated they were willing to remain committed – will dash no legitimate expectations of the RSA parties or DIP lenders. Any additional costs of delay are minimal and pale in comparison to the significance of not providing the Indenture Trustee and the EFIH Second Lien Group sufficient time to appeal a decision of this importance. Finally, as noted above, the PIK DIP should not be consummated prior to resolution of the First Lien Indenture Trustee's adversary proceeding, because to do so would result in the Debtors paying interest on the PIK DIP *and* the Second Lien Notes pending resolution of that dispute.[17]

WHEREFORE, the Indenture Trustee and the EFIH Second Lien Group request that the Motion be denied and the Court grant such other relief as is just and proper.

Dated: June 24, 2014                     PACHULSKI STANG ZIEHL & JONES LLP


/s/ *Laura Davis Jones* _____
Laura Davis Jones
(Bar No. 2436)
Robert J. Feinstein
(NY Bar No. RF-2836)
919 N. Market Street, 17th Floor
P.O. Box 8705

---

[17] At the very least, the Court should grant the three-day stay that it provided when entering the First Lien DIP Order. *See* June 6, 2014 Hr. Tr. at 264:11.

Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@ pszjlaw.com
        rfeinstein@ pszjlaw.com

*- and -*

KRAMER  LEVIN  NAFTALIS  &  FRANKEL  LLP
Thomas Moers Mayer
Philip Bentley
Joshua K. Brody
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000
Email: tmayer@kramerlevin.com
        pbentley@kramerlevin.com
        jbrody@kramerlevin.com

*Counsel to the EFIH Second Lien Group and the Indenture Trustee*

*- and -*

BRYAN CAVE LLP

Stephanie Wickouski
1290 Avenue of the Americas
New York, New York 10104-3300
Tel: 212-541-1114
Fax: 212-904-0514
Email: stephanie.wickouski@bryancave.com

*Counsel to the Indenture Trustee*