IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

------------------------------------------------------------ x
In re:                                                    :     Chapter 11
                                                          :
Energy Future Holdings, Inc., *et al.*,                   :     Case No. 14-10978 (CSS)
                                                          :
                                    Debtors.              :     (Jointly Administered)
                                                          :
------------------------------------------------------------ x     **Related to Docket No. 472**

### OBJECTION OF THE EFIH SECOND LIEN NOTES INDENTURE TRUSTEE AND EFIH SECOND LIEN GROUP TO DEBTORS' MOTION TO APPROVE SECOND LIEN SETTLEMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .................................................................................................................... 3

    A.    The Debtors' Proposed Restructuring.................................................................. 3

    B.    The Second Lien Tender Offer ............................................................................ 4

    C.    The Special Benefits Conferred on the Second Lien RSA Parties ......................... 5

Argument THE SECOND LIEN SETTLEMENT IS CONTRARY TO APPLICABLE LAW .... 8

    A.    The Bankruptcy Code Requires Equal Treatment, Including Equal
          Settlement Offers, For Similarly-Situated Creditors ............................................. 9

    B.    The Second Lien Settlement Violates the Bankruptcy Code's Equal
          Treatment Principles by Offering More Favorable Settlements to RSA
          Signatories Than to Other Second Lien Noteholders .......................................... 15

    C.    The Debtors Are Not Entitled to a Waiver of the Rule 6004(h) Stay .................. 19

Computershare Trust Company, N.A. and Computershare Trust Company of Canada, as indenture trustee (the "**Indenture Trustee**") for $2,156,392,000 aggregate principal amount of second lien notes (the "**Second Lien Notes**" and the holders thereof, the "**Second Lien Noteholders**") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (collectively, "**EFIH**"), and certain Second Lien Noteholders (the "**EFIH Second Lien Group**"), by and through their undersigned counsel, hereby file this objection (the "**Objection**") to the motion of EFIH and its affiliated debtors (the "**Debtors**") to approve certain EFIH settlements (the "**Settlement Motion**") [Dkt. No. 472]. Specifically, the Indenture Trustee and the EFIH Second Lien Group object to the proposed settlement of certain issues related to the Second Lien Notes (the "**Second Lien Settlement**").[1]

## PRELIMINARY STATEMENT

The Second Lien Settlement unlawfully discriminates against Second Lien Noteholders that are not parties to the Debtors' restructuring support agreement (the "**RSA**"). Pre-petition, the few Second Lien Noteholders that are parties to the RSA – principally Fidelity, an acknowledged "anchor" of the Debtors' restructuring – negotiated a settlement of their Second Lien makewhole claims that pays them well in excess of 50% of the asserted amount of those claims. Post-petition, the remaining Second Lien Noteholders, with whom the Debtors had refused to negotiate, were offered a "take-it-or-leave-it" settlement that would pay them only a purported 50% of their Second Lien makewhole claims. This disparate treatment – offering substantially more favorable settlement terms to a few preferred parties than to all other Second

---

[1] Depositions and discovery relating to the Settlement Motion are ongoing, and the Indenture Trustee and EFIH Second Lien Group thus reserve the right to supplement and amend this pleading with any additional information which may come to light.

Lien Noteholders – violates the Bankruptcy Code's prohibition of discrimination among similarly-situated creditors.

In prior briefing, the Debtors conceded that, had the Second Lien Settlement been proposed as part of a chapter 11 plan, they would have been required to provide the same settlement terms to all Second Lien Noteholders, so as not to violate Bankruptcy Code section 1123(a)(4). The premium treatment they have given to their RSA negotiating partners is permissible, the Debtors contend, because the Code's requirement of equal treatment within a class supposedly applies *only* at the plan confirmation stage, and not at earlier stages of a bankruptcy case. But such a constricted application of the Code's non-discrimination principles makes no sense and has been squarely rejected by the Third Circuit and other courts of appeal. As the Third Circuit explained in *Combustion Engineering*, "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code," which applies throughout the course of a bankruptcy case. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 239 (3d Cir. 2005).

With the case law against them, the Debtors have fallen back on the contention that the premium consideration being given to the preferred Second Lien Noteholders is not on account of their Second Lien Notes, but rather on account of their other holdings or commitments. *See* Debtors' Reply in Support of First Lien Settlement ¶ 25. But this is not true. The Debtors have already expressly acknowledged, in both the RSA term sheet and the Settlement Motion, that several of the premium items given to Fidelity and the other preferred parties are part of the Second Lien Settlement. And discovery has revealed that the remaining premium items, too, were given for the specific purpose of bringing Fidelity's aggregate recovery *on its Second Lien Notes* up to a specific amount that it had demanded.

2

In short, the premium treatment that the Debtors are giving to Fidelity and the other RSA parties on account of their Second Lien Notes contravenes non-discrimination principles fundamental to the Bankruptcy Code. Having extended an offer to Fidelity designed to provide it with a specific recovery on its Second Lien Notes, the Debtors were required to make that same offer, or an economically equivalent one, available to all Second Lien Noteholders. Consequently, unless the Debtors modify the Second Lien Settlement to provide the same consideration to *all* holders, their motion to approve that settlement must be denied.

## BACKGROUND

### A. The Debtors' Proposed Restructuring

1.    The Debtors commenced these chapter 11 cases on April 29, 2014, with the stated goal of consummating a global restructuring under which they will refinance the First and Second Lien Notes, spin off TCEH from EFH, and provide specified treatment to holders of claims and equity interests against each Debtor. *See* Declaration of Paul Keglevic (the "**Keglevic First Day Declaration**") [Dkt. No. 98]. The proposed restructuring is reflected in a restructuring support agreement and related term sheet (the "**RSA Term Sheet**") between the Debtors and various parties in their capital structure, including Fidelity and certain other holders of the Second Lien Notes (together with Fidelity, the "**Second Lien RSA Parties**").[2]

2.    In furtherance of their proposed restructuring, the Debtors have filed a series of motions, including the Settlement Motion, a motion to assume the RSA, and motions to approve debtor-in-possession financing to facilitate the First Lien Settlement (the "**First Lien DIP**") and the Second Lien Settlement (the "**Second Lien DIP**"). The Settlement Motion seeks three main forms of relief:  approval of the First Lien Settlement, approval of the Second Lien

---

[2] The RSA and RSA Term Sheet are attached to the Keglevic First Day Declaration.

Settlement, and approval of an amendment to a tax sharing agreement among EFH, Oncor Electric Delivery Holdings Company LLC, and other parties (the "**Oncor TSA Amendment**"). The First Lien DIP and First Lien Settlement were approved on June 6. The Debtors have since adjourned consideration of the Oncor TSA Amendment to July 18.

### B. The Second Lien Tender Offer

3.    Pursuant to the Second Lien Settlement, the Debtors have proposed to settle all outstanding obligations under the Second Lien Notes by entering into the Second Lien DIP and using the proceeds thereof to refinance the Second Lien Notes through a tender offer (the "**Second Lien Tender Offer**").

4.    Under the terms of the Second Lien Tender Offer, which commenced on May 9, 2014, holders of Second Lien Notes were given until June 11 (the "**Early Tender Deadline**") to opt into the tender in order to receive principal, interest and a fixed amount with respect to their makewhole claim that the Debtors assert is equal to 50% thereof.[3] Holders of Second Lien Notes who did not opt into the tender by the Early Tender Deadline may still tender up until July 3 (the "**Final Tender Deadline**"), at a step-down in consideration – namely, principal, interest and, depending on the composition of their holdings, an amount equal to what the Debtors assert is between 29.7% and 35.0% of the value of their makewhole claim.[4]

5.    Second Lien Noteholders who do not opt into the tender offer (the "**Non-Participants**") will be forced to accept payment of their notes from the proceeds of the Second Lien DIP at par plus accrued interest at a lower rate than is being paid to holders that opt into the settlement. *See* Settlement Motion at ¶¶ 25-26. The Debtors will then litigate with the Non-

---

[3] The Indenture Trustee and EFIH Second Lien Group believe that, when the amount of Second Lien Noteholders' makewhole claims is properly computed, the amount proposed to be paid for such claims in the tender offer amounts to only 48%, not 50%, of such claims.

[4] The Early Tender Deadline and Final Tender Deadline were originally scheduled for May 23 and June 6, respectively. At the May 22 hearing, the Debtors agreed to extend these deadlines to the dates set forth herein.

4

Participants over their entitlement to a makewhole premium or any other amounts due under the Indenture, such as Additional Interest. Residual claims held by Non-Participants, including, among other things, makewhole claims and claims for Additional Interest and interest-on-interest allowed with respect to their Second Lien Notes, will be impaired; they will receive either payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. RSA Term Sheet at 13-14.

6.     On June 13, the Debtors announced that holders of 43% of the Second Lien Notes – only 8% more than the 35% held by Second Lien RSA Parties – had opted into the Second Lien Settlement by the Early Tender Deadline. *See* Form 8-K dated June 13, 2014.

### C. The Special Benefits Conferred on the Second Lien RSA Parties

7.     As part of the Second Lien Settlement, and on account of their holdings of Second Lien Notes, the Second Lien RSA Parties have been promised substantial additional consideration in excess of that being offered to other Second Lien Noteholders:

- A First Lien DIP "Commitment Fee" for Fidelity. The Second Lien Settlement gives Fidelity the option to convert up to $500 million of its recovery on the Second Lien Settlement into the $5.4 billion First Lien DIP and to receive a purported "commitment fee" equal to 1.75% of the amount so converted – i.e., a fee of up to $8.75 million. *See* RSA Term Sheet at 7; Settlement Motion at ¶ 26. This fee is payable to Fidelity even though it had not committed to fund any portion of the First Lien DIP.[5]

- The Right to Participate in the Second Lien DIP for Fidelity. Fidelity is given the option to participate in up to 9% of the Second Lien DIP. *See* RSA Term Sheet at 8; Second Lien DIP Motion at 14. As explained in the Declaration of Todd Snyder filed contemporaneously with this Objection ("**Snyder**

---

[5] Subsequently, after the Indenture Trustee objected repeatedly that Fidelity should not receive a "commitment fee" without undertaking a commitment to fund, Fidelity gave a belated funding commitment by letter dated June 3, 2014 – just two days before the hearing to approve the First Lien DIP, and a total of seven business days before the First Lien DIP obligations would expire. *See* EFIH Debtors' Omnibus Reply to Objections to the EFIH Debtors' Motion for Approval of the EFIH First Lien DIP Financing, the EFIH First Lien Repayment, and the Fidelity Funding Fee ¶ 18 [Dkt. No. 735]. A commitment of capital for such a short period scarcely warrants any commitment fee at all – and certainly not a fee of the size (1.75%) that the Debtors gave to the other First Lien DIP commitment parties, who committed their capital in late April rather than early June.

**Declaration**"), this option is worth approximately $23 million, and perhaps substantially more. *See* Snyder Decl. ¶ 30.

- A Second Lien DIP "Participation Fee" for Fidelity. If Fidelity chooses to participate in the Second Lien DIP, it will receive a fixed payment of $11.25 million. This payment is due no matter how much of the Second Lien DIP Fidelity actually funds – i.e., even if it funds only a single dollar of that DIP. *See* RSA Term Sheet at 8 ("Fidelity shall receive an $11.25 million payment from EFIH in connection with the exercise of *any* of its Participation Rights") (emphasis added); Second Lien DIP Motion at 14.

- A "Most Favored Nation" Clause for Fidelity. The Second Lien Settlement gives Fidelity a "most favored nation" clause (the "**Fidelity MFN**"), pursuant to which it will receive the benefit of any more favorable settlements that the Debtors may ultimately reach with other Second Lien Noteholders. *See* RSA Term Sheet at 7-8.[6]

- "Settlement Consideration" of $1.57 Million for GSO, York, and Avenue. As part of the Second Lien Settlement, GSO Capital Partners ("**GSO**"), York Capital Management LLC ("**York**"), and Avenue Capital Group ("**Avenue**") will receive additional "settlement consideration" totaling $1.57 million. *See* RSA Term Sheet at 7; Settlement Motion ¶ 26.

8.       The Debtors have acknowledged that three of these five premium items –

the First Lien DIP commitment fee, the Fidelity MFN, and the $1.57 million payment to GSO,

York and Avenue – are part of the Second Lien Settlement. *See* RSA term sheet at 7-8

(describing all three items as elements of that settlement); Settlement Motion ¶ 26 (Fidelity's

First Lien DIP commitment fee is "part of the Second Lien Settlement," as is the other parties'

$1.57 million payment).

9.       ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[6] The Fidelity MFN terminates upon the occurrence of certain specified events, including most notably the exercise by the Commitment Parties (as defined in the RSA Term Sheet) of their "call right" with respect to Fidelity's EFH Legacy Notes. That call right can only be exercised by purchasing those notes at 37.15% of par plus accrued interest, *see* RSA Term Sheet at 8, which would give Fidelity a total distribution of at least $240 million on account of its EFH Legacy Notes, a much larger sum than it might otherwise receive. That Fidelity conditioned the termination of its MFN on the occurrence of such a valuable event is indicative of the substantial (though unquantifiable) value that the parties attribute to the MFN.



████████████ attached as **Exhibit** A hereto) (emphasis added).

10.    The ██████ recovery promised to Fidelity on account of its second lien position significantly exceeds the recovery available to all holders through the Second Lien Tender Offer. *See* Snyder Declaration ¶ 30. Moreover, the *actual* value of what Fidelity is getting is substantially greater than the ██████ recovery referenced in the███████████. That supposed ██████ recovery was calculated based on ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ As noted above, the financial advisor to the Indenture Trustee and EFIH Second Lien Group has calculated that the opportunity to participate in the Second Lien DIP is worth approximately $23 million, and perhaps substantially more. *Id.* Adding this $23 million of value to the $20 million in purported DIP fees, as well as accrued interest, gives Fidelity a total recovery of ██████ per dollar of its Second Lien Notes, without attributing any value to its MFN. *Id.*[7]

---

[7] While Mr. MacDougal's calculation of Fidelity's recovery was thus inaccurate, his email makes clear that the parties' focus in negotiations was on providing Fidelity with a settlement package designed to provide it with a target recovery on its second lien position.

11.    Other holders of the Second Lien Notes were never given the opportunity to obtain any of the benefits provided to Fidelity. As set forth in the Snyder Declaration, both before and after the Petition Date, the EFIH Second Lien Group actively sought to engage the Debtors in settlement negotiations regarding their makewhole claims, and also pursued the opportunity to participate in the Second Lien DIP. *Id.* ¶ 9 - 18. The Debtors rebuffed these efforts, choosing to engage in settlement discussions only with Fidelity. *Id.* ¶ 14. Even when the EFIH Second Lien Group and Fidelity submitted a joint prepetition settlement proposal to the Debtors, the Debtors engaged only with Fidelity. *Id.* ¶¶ 12-14. The Debtors never made available to the EFIH Second Lien Group the Second Lien settlement offer that they presented to Fidelity and the other Second Lien RSA Parties and that those parties accepted. *Id.* ¶ 14.[8]

### Argument

### THE SECOND LIEN SETTLEMENT IS CONTRARY TO APPLICABLE LAW

12.    The Debtors ask the Court to approve the Second Lien Settlement on the ground that it resolves the Second Lien makewhole claims on terms favorable to the Debtors and, consequently, satisfies the requirements of Rule 9019. But this focus on Rule 9019's requirements side-steps the much more problematic issue raised by the Second Lien Settlement: However good a deal this settlement may be for the estate, it may not be approved if it does not comply with the Bankruptcy Code. As this Court has recognized, a "Court may not approve a settlement that would violate applicable law, regardless of whether it is a 'good deal' for a debtor." *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 476 (Bankr. D. Del. 2010) (Sontchi, J.).

---

[8] In addition to the five premium items listed above, the Second Lien Settlement favors the Second Lien RSA Parties in another respect as well. Once non-RSA parties tender their Second Lien Notes, those notes are locked up *indefinitely*. They cannot be withdrawn prior to closing, and there is no required closing date, and, accordingly, the settlement freezes trading by non-RSA parties. By contrast, the Second Lien RSA Parties *can* trade their Second Lien Notes (subject to the RSA), and they have milestones which allow them to terminate the RSA or renegotiate its terms, while non-RSA parties are stuck in limbo.

A. **The Bankruptcy Code Requires Equal Treatment, Including Equal Settlement Offers, For Similarly-Situated Creditors**

13.     As the Third Circuit has counseled, "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *In re Combustion Engineering, Inc.*, 391 F.3d 190, 239 (3d Cir. 2005) (quoting *Begier v. IRS*, 496 U.S. 53, 58 (1990)). This Court, too, has observed that "equality of distribution" to similarly-situated creditors is "[o]ne of the primary goals – if not the primary goal – of the Code." *Sass v. Barclays Bank PLC (In re American Home Mortgage Holdings, Inc.)*, 501 B.R. 44, 59 (Bankr. D. Del. 2013) (Sontchi, J.) (quoting *In re Semcrude, L.P.*, 399 B.R. 388, 399 (Bankr. D. Del. 2009)); *see also, e.g., Howard Delivery Service Inc. v. Zurich American Ins. Co.*, 547 U.S. 651, 655 (2006) (noting "Bankruptcy Code aims, in the main, to secure equal distribution among creditors," and "preferential treatment of a class of creditors is in order only when clearly authorized by Congress"); *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 304 (Bankr. D. Del. 2012) (Sontchi, J.) (referencing "bankruptcy policy of equal treatment for similarly situated creditors").

14.     This principle is set forth expressly in section 1123(a)(4) of the Bankruptcy Code, which provides that a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). But this equal treatment principle is not limited to the plan confirmation context: "Several sections of the Code are designed to ensure equality of distribution *from the time the bankruptcy petition is filed*." *Combustion Eng'g*, 391 F.3d at 239 (emphasis added). Just as a chapter 11 plan cannot discriminate unfairly, actions taken outside

9

of a plan – including settlements – must also comply with basic standards of equality of distribution among similarly situated creditors.[9]

15.     The Debtors have conceded that a discriminatory settlement offer could not be approved in a chapter 11 plan of reorganization.  In connection with the First Lien Settlement, the Debtors wrote:  "Even if the Debtors were required to provide the same settlement terms to all similarly situated parties, *as section 1123(a)(4) would require under a plan*, the First Lien Settlement could still be approved."  Debtors' Reply to Objections of CSC Trust Company of Delaware, as Indenture Trustee, to the EFIH Debtors' Motion to Approve Proposed First Lien Settlement ("**Debtors' Reply in Support of First Lien Settlement**") [Dkt. No. 737], at ¶ 24 (emphasis added).

16.     The case law bears out the Debtors' concession.  For instance, in a case closely on point, *In re AOV Industries Inc.*, 792 F.2d 1140 (D.C. Cir. 1986), the D.C. Circuit condemned the practice of offering a more favorable settlement to certain creditors than to others.  In *AOV*, the debtor had proposed a plan under which an unsecured creditor could receive a distribution only if it agreed to release its claims against two third parties who were funding the plan.  *Id.* at 1150.  A creditor objected on the ground that its claims against these third parties were much stronger than the claims of other creditors, yet it was being offered the exact same recovery, namely, its pro rata share of the settlement fund.  *Id.* at 1151.  The D.C. Circuit held

---

[9] The central requirement of equal treatment is reflected in multiple provisions throughout the Bankruptcy Code, including sections 502(b), 547, and 726.  *See Combustion Eng'g*, 391 F.3d at 239 ("Several sections of the Code are designed to ensure equality of distribution . . ."); *see also, e.g., Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 797-98 (4th Cir. 1991) (section 547 "promotes the 'prime bankruptcy policy of equality of distribution among creditors'") (quoting legislative history); *Dorroh v. Wurst (In re Warren)*, 2011 WL 3299819, *5 (9th Cir. B.A.P. Mar. 15, 2011) (section 726 "provides the textual basis for the fundamental principle that creditors of equal priority should receive pro rata shares of the debtor's property"); *Ames Merchandising Corp. v. Cellmark Paper, Inc. (In re Ames Department Stores, Inc.)*, 450 B.R. 24, 30 (Bankr. S.D.N.Y. 2011) (preferences "run contrary to the goal of equality of treatment amongst creditors – one of the longest standing, and fundamental, principles of American bankruptcy law"); *Leslie Fay Cos., Inc. v. Corporate Prop. Assocs. 3 (In re Leslie Fay Cos., Inc.)*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) (section 502(b)(6) "grounded in principles of ratable distribution").

that, if one creditor in fact was being asked to release stronger claims in exchange for the same consideration, this would render the proposed settlement discriminatory and therefore unlawful. *Id.* at 1151-52.

17.    In so holding, the D.C. Circuit noted that "the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members." *Id.* at 1152. The court expressly rejected the argument that there was an "equality in the option" accorded to each settling claimant. Although the lower courts had found that each creditor had the option "either to tender a release in exchange for a 13% distribution, or to retain its claims and seek more substantial recovery," *id.* at 1151, the D.C. Circuit recognized that the litigate-or-settle option provided each claimant was not, in fact, the same if certain creditors held stronger claims than others, *id.* Thus, even though in *AOV* – as here – parties that rejected the settlement retained the right to litigate, the court held that the settlement violated section 1123(a)(4) because the settlement offers made to different parties were unequal.

18.    The Debtors having conceded, as they must, that they could not offer a discriminatory settlement in a chapter 11 plan, they are left to argue that they can achieve in a *pre-plan* settlement that which they could not achieve in a plan. But there is ample authority to the contrary, including decisions addressing pre-plan settlements from the Third, Eighth, Second, and Fifth Circuits, as well as numerous lower court decisions.

19.    The Third Circuit's decision in *Combustion Engineering* is instructive. There, the debtor had entered into a prepetition "Master Settlement Agreement" and pre-packaged plan with the vast majority of its current asbestos claimants, under which it contributed half of its assets to a prepetition settlement trust. *See Combustion Eng'g*, 391 F.3d at 204-06. Settling claimants were to receive various percentages of their recoveries from the prepetition

11

trust (ranging up to 95%), with their remaining "stub claims" giving them the right to vote on the prepackaged plan and to participate in a postpetition trust. *Id.* The postpetition trust was to be funded with the debtor's remaining assets and would pay the stub claims and the claims of non-settling current claimants and future claimants. *Id.* After the lower courts confirmed the plan, a group of current claimants appealed, and the Third Circuit reversed confirmation.

20.     The Third Circuit found numerous problems with the plan that required further examination, including whether the prepetition payments were voidable preferences and whether the claims of the settling parties had been artificially impaired. *See id.* at 240, 243. But its core holding regarding unequal treatment was much broader and relied on no particular provision of the Bankruptcy Code. Rather, the court "consider[ed] the bankruptcy scheme as an integrated whole," and in so doing determined that "the pre-pack bankruptcy . . . may lack the requisite equality of distribution among creditors." *Id.* at 241-42. Although the prepetition transfer was outside of the context of a plan – indeed, prior to the debtor's bankruptcy filing – the Third Circuit determined that "[t]he pre-petition transfer . . . implicate[d] the fundamental bankruptcy policy of 'equality of distribution among creditors.'" *Id.* In language applicable here, the court held that the debtor's "pre-petition side arrangement with a privileged group of . . . claimants," *id.* at 244, appeared to give those claimants "a demonstrably unequal share" of the debtor's assets. *Id.* at 242.

21.     Similarly, in *In re Flight Transportation Corp. Securities Litigation*, 730 F.2d 1128 (8th Cir. 1984), the Eighth Circuit rejected a pre-plan settlement that would have resulted in certain creditors being excluded from participation in a settlement fund. In *Flight Transportation*, the chapter 11 trustee sought approval of a settlement – called the "Sharing Agreement" – under which the debtor's "business creditors" and certain securities claimants

(who claims arose out of the debtor's alleged fraud) resolved their competing claims to various assets. Under the terms of the agreement, recoveries allocated to general unsecured creditors (i.e., to non-securities claimants) were further allocated into two sub-funds, one of which would *not* be available to satisfy the claims of co-defendants who asserted contingent indemnity claims against the debtor. *Id.* at 1132-33. The co-defendants objected on the grounds that the Sharing Agreement was a de facto plan and, separately, that it discriminated unfairly. *See id.* at 1134.

22.    The Eighth Circuit overruled the first objection, finding that the pre-plan settlement did not constitute a de facto plan of reorganization. *Id.* at 1134-35. Turning to the second objection, however, the court held that the settlement discriminated unfairly by excluding certain creditors from participation in one of the settlement sub-funds. Notwithstanding that approval of the Settlement Agreement was sought outside the context of a plan – and, indeed, was not even a de facto plan in the court's judgment – the Eighth Circuit saw "no reason" why a co-defendant's claim for indemnity "should be a priori treated different from, and less advantageously than, the claims of other creditors of FTC." *Id.* at 1138-39.

23.    The Third and Eighth Circuits are not alone in applying core bankruptcy principles, such as equality of distribution, to pre-plan settlements. The Second Circuit and the Fifth Circuit have likewise held that pre-plan settlements may not be used as an end-run around confirmation requirements. *See Motorola, Inc. v. Off. Comm. of Uns. Creds. (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (reversing bankruptcy court's approval of pre-plan settlement for failure to consider whether it complied with absolute priority rule: "[W]hether a pre-plan settlement's distribution plan complies with the Bankruptcy Code's priority scheme will be the most important factor for a bankruptcy court to consider in approving a settlement under Bankruptcy Rule 9019."); *U.S. v. AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir.

1984) (bankruptcy court abused its discretion by approving pre-plan settlement that violated absolute priority rule); *see also Costa v. Robotic Vision Systems, Inc. (In re Robotic Vision Systems, Inc.)*, 2006 WL 929322, *3 (1st Cir. B.A.P. Apr. 11, 2006) (bankruptcy court should have determined whether pre-plan settlement "violated the bankruptcy priority scheme for distribution of estate property, by allowing the general, unsecured creditors to receive money while bypassing Costa's alleged secured claim").[10]

    24.    Many other courts have similarly held that pre-plan settlements, as well as other actions taken outside the context of a plan, must comport with the fundamental standard of equality of distribution among similarly situated creditors. *See, e.g., In re Allegheny Int'l, Inc.*, 118 B.R. 282, 295-96 (Bankr. W.D. Pa. 1990) (holding plan proponent's pre-plan tender offer to purchase claims "caused discriminatory treatment among members of the same class, in violation of 11 U.S.C. § 1123(a)(4)," because creditors who accepted tender offer received immediate cash while others would receive distributions at a later undetermined date); *In re AppliedTheory Corp.*, 2008 WL 1869770, *2 (Bankr. S.D.N.Y. Apr. 24, 2008) (denying approval of settlement provision on grounds of "discriminatory treatment" of certain professionals); *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004) (denying critical vendors motion for non-compliance with

---

[10] While the Third Circuit has not directly addressed the issue, its discussion of related issues strongly suggests that it would agree with *Iridium* and *AWECO* that the priority scheme of the Bankruptcy Code must be enforced even outside the context of a chapter 11 plan. In *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003), the Third Circuit held that it was permissible for assets to be sold free and clear of successor liability pursuant to section 363(f) of the Code. In so holding, the Third Circuit relied, in part, on the priority scheme of the Bankruptcy Code, holding that "[t]o allow the claimants to assert [general unsecured] successor liability claims against [the purchaser] while limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme." *Id.* at 292. The Third Circuit's decision in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), is another instance of the court casting doubt on attempts to circumvent the creditor protections of chapter 11. There, the court held that, when a bankruptcy court authorizes a sale of assets pursuant to section 363 – a section of the Code relied upon by the Debtors in seeking approval of the Second Lien Settlement – it is required to make a finding with respect to the "good faith" of the purchaser. *Id.* at 149-50. The court reasoned that "such a procedure ensures that section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and, as such, it mirrors the requirement of section [1129(a)(3)]." *Id.* at 150. This reasoning, like that of *Trans World Airlines*, indicates that the Third Circuit in all likelihood would follow *Iridium* and *AWECO*, and would reject the holding of *Jevic Holding Corp.*, 2014 WL 268613 (D. Del. Jan. 24, 2014), upon which the Debtors rely, *see* Debtors' Reply in Support of First Lien Settlement ¶ 23.

equal-treatment and priority standards broadly applicable in bankruptcy; noting that "[m]any sections [of the Bankruptcy Code] require equal treatment"); *In re Warren*, 2011 WL 3299819 at *5 (reversing approval of settlement that "unequally distribut[ed] proceeds from the liquidation of an estate asset" in contravention of "fundamental concept of ratable distribution"); *In re CGE Shattuck, LLC*, 254 B.R. 5 (Bankr. D. N.H. 2000) (disapproving secured creditor's proposal to share its collateral with select unsecured creditors if debtor's plan was voted down because it would "sanction a distribution scheme that discriminates between creditors in the same class").

25.     These cases make clear that, from the inception of bankruptcy, a debtor that offers to settle with a class of its creditors must do so in a non-discriminatory manner; it may not offer preferential treatment to favored creditors.   Application of these principles to the Second Lien Settlement is particularly appropriate, since that settlement – like the pre-petition settlement reviewed by the Third Circuit in *Combustion Engineering* – is part of a comprehensive restructuring that is to be implemented through a pre-negotiated plan.

**B.  The Second Lien Settlement Violates the Bankruptcy Code's Equal Treatment Principles by Offering More Favorable Settlements to RSA Signatories Than to Other Second Lien Noteholders**

26.     The Second Lien Settlement provides substantially greater consideration to RSA signatories than to other holders of Second Lien Notes that elect to accept the Second Lien Settlement. As described above, Fidelity is to receive 50% of its makewhole claim *plus a* number of side payments worth at least $44 million in the aggregate, and GSO, Avenue and York are to receive 50% of their makewhole claims *plus* a "settlement premium" of $1.57 million. The other holders of the Second Lien Notes, in contrast, should they choose to settle, will receive what the Debtors assert is 50% of their makewhole claims – *and nothing else*.

27.     In light of the disparate settlement opportunities offered to holders, the Settlement cannot be defended on the ground that any holder, if dissatisfied with the proposed

Settlement, can simply choose not to settle. As *AOV* makes clear, the very act of providing

Fidelity and the other Second Lien RSA Parties with one choice (litigate or take 50%-*plus*) and

the other holders of the Second Lien Notes with another (litigate or take 50% – *and nothing

more*) is itself discriminatory and violative of the Bankruptcy Code's policy of equality of

treatment.[11]

28.    Importantly, the Second Lien RSA Parties are receiving their premium

recoveries as part of the Second Lien Settlement and on account of their holdings of the Second

Lien Notes. As noted above, the Debtors have explicitly acknowledged this with respect to the

First Lien DIP commitment fee and MFN given to Fidelity (as well as the $1.57 million payment

given to GSO, York and Avenue), ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████     *See*

Exhibit A.[12]

---

[11] The Debtors have previously cited to cases holding that a plan may properly provide a claimant with the opportunity of valuing its claim either through settlement or through litigation. *See* Debtors' Obj. to Mot. to Compel ¶ 23 (citing *In re Wash. Mutual, Inc.*, 442 B.R. 314 (Bankr D. Del. 2011) and *In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000)). Such cases are inapposite, as the claimants in those cases were all provided with the identical choice – i.e., the "same opportunity to receive equal treatment." *See Wash. Mutual*, 442 B.R. at 355-56 (plan provision giving different distribution to creditors that gave releases did not violate section 1123(a)(4) because all creditors within class were offered same settlement opportunity). Here, Fidelity and the holders of the PIK Notes were provided one choice, and the other holders were provided another. The choice itself is the relevant treatment, and it is discriminatory.

[12] ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

29.     The discriminatory nature of the Second Lien Settlement – in particular, the substantially more favorable treatment given to Fidelity than to other Second Lien Noteholders – makes this settlement distinctly different from the First Lien Settlement that the Court recently approved. As the Court explained in its June 6, 2014 bench ruling, that settlement discriminated among First Lien Noteholders in only minor and justifiable ways.

30.     *First*, the principal "discrimination" of the First Lien Settlement was in the different treatment it gave to the two tranches of First Lien Notes, which as the Court observed had "slightly different" rights. *See* June 6 Hr. Tr. at 256:13-257:3.[13] The court concluded that this discrimination between different classes of bonds – as distinct from discrimination among holders of a single class of bonds – was justified. *Id.* Having resolved that issue, the Court concluded that "a lot of the objection just falls away." *Id.* In connection with the Second Lien Settlement, by contrast, the allegation is not that two classes of bonds are getting different treatment, but that holders of the *same* bonds are receiving different treatment.

31.     *Second*, the Court concluded in connection with the First Lien Settlement that the additional benefits given to the RSA parties were justified by the "additional consideration" they gave, in the form of a backstop commitment. *See* June 6 Hr. Tr. 257:6-8. Again, the same is not true of the Second Lien Settlement. As noted above, the First Lien DIP "commitment fee" promised to Fidelity as part of the Second Lien Settlement was unearned because Fidelity had made no actual commitment to fund – and its subsequent June 3 commitment, made just two days before the First Lien DIP hearing, was too late to justify a substantial commitment fee. The Second Lien DIP "participation fee" promised to Fidelity was

---

[13] The objectors to the First Lien Settlement had argued, primarily, that the 10% First Lien Notes were treated less favorably than the 6-7/8% First Lien Notes, despite having identical redemption premium language. *See generally* Objection of CSC Trust Company of Delaware, as Indenture Trustee, to the EFIH Debtors' Motion to Approve the First Lien Settlement ¶¶ 3, 25 [Dkt. No. 694]; June 6 Hr. Tr. 223:13-23.

similarly a windfall, in that Fidelity will receive the entire $11.25 million payment even if funds only a single dollar of the Second Lien DIP.

32.    *Third*, the Court found that all First Lien Noteholders were given the same chance to obtain the favorable terms offered to the RSA parties in connection with the First Lien Settlement. *See* June 6 Hr. Tr. at 257:24-258:12 (observing that "it may be that one party snapped at a settlement a little soon – a little earlier than the other party, and maybe the party that didn't snap is a little annoyed because they wish they had"). This is not true of the Second Lien Settlement. As noted above, Second Lien Noteholders other than the RSA parties were never given the opportunity to receive the favorable treatment offered to Fidelity. Instead, the Debtors rebuffed the efforts of other holders to negotiate a resolution of their makewhole claims, giving Fidelity – and no one else – the chance to obtain a similar settlement. Indeed, when the EFIH Second Lien Group and Fidelity submitted a joint prepetition settlement proposal to the Debtors, the Debtors responded by negotiating only with Fidelity.

33.    *Finally*, while the Court was not troubled by the most favored nation provision included in the First Lien Settlement, the Court noted that it intended to give further consideration to the propriety of an MFN clause in the context of the Second Lien Settlement. *See* June 6 Hr. Tr. at 259:7-10. This is particularly appropriate, considering that the Fidelity MFN in the Second Lien Settlement is of much longer duration. The First Lien Settlement's MFN terminates upon the funding of the First Lien DIP, effectively protecting the settling parties only up until the moment that they know their settlement is locked in. *See* RSA Term Sheet at 5-6. In connection with the Second Lien Settlement, by contrast, the Fidelity MFN extends (as relevant here) through the earlier of (i) seven days after commencement of a trial on the merits of the Second Lien makewhole, or (ii) the date upon which the "call right" on Fidelity's EFH

Legacy Notes is exercised. *See* RSA Term Sheet at 7-8. This protection is much more extensive, and therefore much more unfair to non-settling holders.

### C. The Debtors Are Not Entitled to a Waiver of the Rule 6004(h) Stay

34. The proposed order regarding the Settlement Motion requests a waiver of the 14-day stay of Bankruptcy Rule 6004(h). *See* Settlement Motion Exhibit A ¶ 9. In the event the Court otherwise grants the Settlement Motion, it should deny the request for a waiver of this stay, because the Debtors have not shown a sufficient business need for such a waiver.

35. Bankruptcy Rule 6004(h) requires that, absent a court ruling to the contrary, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen days after entry of the order." FED. R. BANKR. P. 6004(H). This rule is designed to provide an objecting party sufficient time to request a stay pending appeal before an order is implemented. To obtain a waiver of the 14-day stay, a party must show a sufficient business need to close within the 14-day period. *See In re Filene's Basement, LLC*, 2014 WL 1713416, at *13 - *14 (Bankr. D. Del, Apr. 29, 2014).

36. In connection with the First Lien Settlement, the Debtors argued that the RSA required that the First Lien DIP be consummated five business days after the date the order approving the financing was entered. *See* RSA § 8.02(c). While the RSA does contain a similar five-day consummation deadline for the Second Lien DIP, this deadline is illusory. Elsewhere in the RSA, it was contemplated that the Second Lien DIP Order be entered within 75 days of the Petition Date – i.e., by July 13. *See* RSA § 8.02(b). There is no reason why the entry of the order approving the Second Lien DIP should accelerate this outside deadline, as the lenders have already indicated their willingness to remain committed until July 13. Moreover, the Debtors have repeatedly extended the original hearing dates proposed for the various relief sought in their Second Lien DIP Motion and Settlement Motion. Holding the funding of the Second Lien DIP

19

in abeyance until July 13 – the outside date through which the lenders have previously indicated they were willing to remain committed – will dash no legitimate expectations of the RSA parties or DIP lenders.  Any additional costs of delay pale in comparison to the cost of not providing the Indenture Trustee and the EFIH Second Lien Group sufficient time to appeal a decision of this importance.[14]

WHEREFORE, the Indenture Trustee and the EFIH Second Lien Group request that approval of the Second Lien Settlement be denied and the Court grant such other relief as is just and proper.

Dated: June 24, 2014               PACHULSKI STANG ZIEHL & JONES LLP

                                   /s/ Laura Davis Jones
                                   Laura Davis Jones
                                   (Bar No. 2436)
                                   Robert J. Feinstein
                                   (NY Bar No. RF-2836)
                                   919 N. Market Street, 17th Floor
                                   P.O. Box 8705
                                   Wilmington, DE  19899-8705 (Courier 19801)
                                   Telephone:  (302) 652-4100
                                   Facsimile:  (302) 652-4400
                                   Email: ljones@ pszjlaw.com
                                          rfeinstein@ pszjlaw.com

                                           - and -

---

[14] At the very least, the Court should grant the three-day stay that it provided when entering the First Lien DIP Order.  *See* June 6, 2014 Hr. Tr. at 264:11.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Thomas Moers Mayer
Gregory Horowitz
Philip Bentley
Joshua K. Brody
David E. Blabey, Jr.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000
Email: tmayer@kramerlevin.com
        ghorowitz@kramerlevin.com
        pbentley@kramerlevin.com
        jbrody@kramerlevin.com
        dblabey@kramerlevin.com

*Counsel to the EFIH Second Lien Group and the Indenture Trustee*

        *- and -*

BRYAN CAVE LLP

Stephanie Wickouski
1290 Avenue of the Americas
New York, New York 10104-3300
Tel: 212-541-1114
Fax: 212-904-0514
Email: stephanie.wickouski@bryancave.com

*Counsel to the Indenture Trustee*

# Exhibit A

**Redacted**