IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| | Case No. 14-10979 (CSS) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | (Jointly Administered) |
| *Debtors.* | Related Docs. 472, 477, 478, 994 |
| | Objection Deadline: June 24, 2014 at 12:00 p.m. |
| | Hearing Date: June 30, 2014 at 9:30 a.m. |

**OBJECTION OF CSC TRUST COMPANY OF DELAWARE,
AS INDENTURE TRUSTEE AND COLLATERAL TRUSTEE,
TO DEBTORS' (A) MOTION TO APPROVE SECOND LIEN
POST-PETITION FINANCING, REDEEM SECOND LIEN
NOTES, AND DETERMINE SECURED CLAIM AND
(B) MOTION TO APPROVE CERTAIN EFIH SETTLEMENTS**

CSC Trust Company of Delaware ("CSC Trust"), as (i) Indenture Trustee (the

"10% Indenture Trustee") for the 10% Senior Secured Notes Due 2020 (the "10% Notes"

and the holders of such notes, the "10% Noteholders") issued by the EFIH Debtors (as

defined below) under that certain Indenture dated as of August 17, 2010 (together with all

supplements, amendments, and exhibits, the "10% Indenture") between Energy Future

Intermediate Holdings LLC ("EFIH"), EFIH Finance Inc. ("EFIH Finance," and together

with EFIH, the "EFIH Debtors") and CSC Trust (as successor to The Bank of New York

Mellon Trust Company, N.A.), and (ii) as Collateral Trustee (the "Collateral Trustee")

under that certain Collateral Trust Agreement dated as of November 16, 2009 among

EFIH, CSC Trust, as successor first lien trustee (the "First Lien Trustee"), the other

Secured Debt Representatives from time to time party thereto, and CSC Trust, as

successor Collateral Trustee (the "Collateral Trust Agreement"), hereby objects to (1) the

1

EFIH Debtors' Motion for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees under the Commitment Letter, and (F) Determining the Value of Secured Claims [D.I. 477] (the "EFIH Second Lien DIP Motion"), and (2) the Debtors' Motion for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment (the "Second Lien Settlement") insofar as relief is sought at the hearing set for June 30-July 1, 2014 [D.I. 472] (the "Second Lien Settlement Motion").[1]

## SUMMARY OF OBJECTION

1.      CSC Trust objects to the proposed EFIH Second Lien DIP Financing (as defined below) and Second Lien Settlement for two reasons.  First, the relief sought in the Proposed Order[2] is designed to eliminate CSC Trust's rights under the Collateral Trust Agreement in respect of the EFIH first lien notes (the "First Lien Notes, and the holders of such notes, the "First Lien Noteholders") including CSC Trust's priority over the EFIH second lien notes (the "Second Lien Notes, and the holders of such notes, the Second Lien Noteholders").  The EFIH Debtors are trying to evade the priority scheme set forth in the Collateral Trust Agreement by paying Second Lien Noteholders, including

---

[1] The 10% Indenture Trustee makes this objection (the "Objection") at the written direction of holders with a majority in original principal amount of the $3.5 billion of 10% Notes.  The percentage of directing holders has now increased as a result of additional holders joining the direction and the redemption and tender accomplished under the so-called First Lien Settlement and First Lien Refinancing.

[2] The "Proposed Order" is the EFIH Debtors' Proposed Form of Final Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay [D.I. 994-1].

both settling holders (primarily, parties to their Restructuring Support Agreement (the "RSA")) and non-settling holders (whom the RSA parties are trying to replace in the capital structure), before paying First Lien Noteholders.  However, the First Lien Noteholders must be paid in full in cash before Second Lien Noteholders can recover funds from these proposed transactions.  The EFIH Debtors seek this relief as it is another step in their "global deal" (which is being implemented piecemeal to gain further advantage, as discussed below).  But a deal among some parties cannot eviscerate third party intercreditor rights.  Put simply, the Collateral Trust Agreement prohibits such payments.

      2.    Second, the $1.9 billion DIP financing of which the EFIH Debtors seek approval (the "EFIH Second Lien DIP Financing," and the DIP facility, the "EFIH Second Lien DIP Facility") and the Second Lien Settlement are an unprecedented attempt by the EFIH Debtors' management and certain holders of the EFIH Debtors' unsecured PIK notes (the "PIK Notes, and such holders, the "PIK Noteholders") to effectively lock in a restructuring of the EFIH Debtors just two months into these chapter 11 cases.  The EFIH Second Lien DIP Facility (as defined below) does not actually save the EFIH Debtors any money.  It merely effects a preordained division of the reorganized EFIH Debtors' equity for the benefit of one particular group of unsecured creditors to the direct detriment of others, namely holders of redemption premium claims and inter-debtor claims, long before such a division is even necessary.[3]  The EFIH Debtors themselves

_____

[3]

acknowledge that at least nine months must elapse to obtain regulatory and other approvals, and it is clear it may take far longer, since the EFIH Debtors arranged DIP financing for a 24-30 month period to accommodate delays in such approvals.

3.      The EFIH Debtors will no doubt respond that CSC Trust and the First Lien Noteholders have no stake in this issue, and that "a trial on the redemption premium is set for September" – which is their new mantra.  The reality of the case is that there are a number of potential outcomes of major litigation (whether of the redemption premium or other inter-debtor issues) that could result in CSC Trust and others having very large unsecured claims, and/or the PIK Noteholders having no claim at all against the EFIH Debtors.  CSC Trust is not required, and is not willing, to damage its position in the event it ends up with an unsecured claim, merely because these Debtors (or the competing PIK Noteholders) want to avoid or ignore  the key elements of  the chapter 11 process (which protect CSC Trust's actual economic standing as a potential unsecured creditor).

4.      CSC Trust is not trying to slow this case down: it has agreed to a four-month litigation and trial of the remaining $431 million first lien redemption premium.  Simply put, multi-billion dollar cases take time and cannot be effectively crammed into six weeks as the EFIH Debtors and PIK Noteholders intend.

5.      Rather, the Debtors have brought this issue and objection upon themselves.  These cases are not a "melting ice cube."  While this is a pure balance sheet restructuring with no operational need for such breakneck speed, the EFIH Debtors have insisted on stacking every major issue in the EFIH cases into a few hearings held at the outset of these cases.  And the sole beneficiary of these actions at EFIH are the allegedly

impaired PIK Noteholders whose bonds currently trade at 125% of par.  The Debtors

have neither asked, nor answered, why the PIK Noteholders' claims, which may also be

subject to dispute from the Debtors or holders of non-RSA claims, should be treated in a

such a preferred manner.

6.     Lastly, CSC Trust objects to the untimely filing of the form of order

approving the Second Lien Settlement, which the EFIH Debtors have not yet filed.  CSC

Trust expressly reserves its right to file additional papers as may be necessary after the

EFIH Debtors file such form of order.

## BACKGROUND [4]

7.     The EFIH Debtors have filed motions seeking approval of the EFIH

Second Lien DIP Financing and EFIH Second Lien DIP Facility that, under the guise of

post-petition financing, establish the terms of a plan of reorganization and a post-

confirmation equity infusion from existing junior creditors.  At the first day hearing, the

EFIH Debtors touted the savings that would be achieved with the EFIH Second Lien DIP

Financing.  Now, the EFIH Debtors have admitted (in the supporting affidavit) that the

savings will occur only <u>after</u> confirmation; they claim cash interest savings during the

---

[4] The background set forth in (i) the 10% Indenture Trustee's Preliminary Objection to the EFIH First Lien
DIP Financing Motion [D.I. 421] (the "<u>Preliminary EFIH First Lien DIP Financing Objection</u>"), (ii) the
10% Indenture Trustee's Limited Objection to the EFIH First Lien Postpetition Financing [D.I. 691] (the
"<u>EFIH First Lien DIP Financing Objection</u>"), (iii) the 10% Indenture Trustee's Objection to the First Lien
Settlement [D.I. 694] (the "<u>EFIH First Lien Settlement Objection</u>"), (iv) the allegations of the Redemption
Premium Complaint [Adv. No. 14-50363; D.I. 1], and (v) CSC Trust's intercreditor complaint [Adv. No.
14-50410; D.I. 1] filed on June 20, 2014 (the "<u>Intercreditor Complaint</u>") are incorporated herein by
reference.  For convenience a copy of the Intercreditor Complaint (without exhibits) is attached hereto as
<u>Exhibit A</u>.  Capitalized terms defined in the EFIH First Lien Settlement Objection and the Intercreditor
Complaint, and not otherwise defined herein are used herein with the meanings so defined.

case, but acknowledge that fees paid in kind raise the cost of the refinancing above the cost of the prepetition second lien notes.  Ying Declaration [D.I. 478] ¶ 27-28.[5]

8.     This Second Lien DIP Financing has many unprecedented features.  It is mandatorily convertible into 64% of the equity of the reorganized EFIH Debtors.  The EFIH Second Lien DIP Financing permits the proposed lenders (the "Second Lien DIP Lenders") to reallocate $900 million of the loan to unnamed and undisclosed third parties – a transparent attempt to allocate equity of the reorganized entities without disclosure and supervision of this Court.  *See* EFIH Second Lien DIP Motion ¶ 8 n.10.

9.     Another unusual feature of the EFIH Second Lien DIP Financing is that collateral for the financing includes proceeds of avoidance actions, and a superpriority claim that is entitled to payment from any avoidance recoveries.  [D.I. 994-1 ¶ 8(a)].  A significant potential avoidance action of the EFIH estate is in fact against the PIK Noteholders who would take a security interest in such actions under the EFIH Second Lien DIP Financing.  Specifically, the EFIH Debtors may have causes of action to avoid the obligations of the PIK Noteholders, at least to the extent necessary to render EFIH

---

[5] The EFIH Second Lien DIP Financing also bears a significant interest rate (8%) and very large fees that aggregate $146.25 million, or fully 7.697% of the principal amount of this loan.  Based on the EFIH Debtors' assertion that plan confirmation will occur in less than 12 months, the EFIH Second Lien DIP Financing carries an effective interest of 15.64%.  That is higher than the highest interest rate on the existing 11.25% EFIH Second Lien Notes.  Even if the EFIH Debtors instead chose not to make current base interest and interest-on-interest payments on the Second Lien Notes during the chapter 11 cases, the effective interest rate on the Second Lien Notes would be only 11.57%.  The motion to approve the EFIH Second Lien DIP Financing obscures the cost to the EFIH Debtors' estates by stating that the "cash interest cost" of the EFIH Second Lien DIP Financing is less.  But "cash interest cost" fails to take into account massive additional secured claims for fees.  The EFIH Debtors defend the extraordinarily high costs of the EFIH Second Lien DIP Financing on the basis that the financing is mandatorily convertible to equity.  But that is no answer; delivery of 64% of the equity value of the reorganized EFIH Debtors is still the delivery of value.  As a result, the cost of the financing is far higher for unsecured creditors of the EFIH Debtors' estates than the cost of no additional DIP financing at all.

solvent if it is not currently solvent[6].  However, the EFIH Debtors' financial advisor

testified that ███████████████████████████████████████████████

███████████████████████████████████████

     10.    The 10% Indenture Trustee has fully secured claims for the redemption

premium.  The EFIH Debtors agree that such claims are oversecured and rank ahead of

the proposed EFIH Second Lien DIP Financing.  Nevertheless, CSC Trust has concerns

about these substantive terms of the EFIH Second Lien DIP Financing because of the

possibility that its claim is unsecured.  A CSC Trust unsecured claim could arise in

several ways if for some reason the fully secured claim is not allowed, including: (i) if

EFIH is solvent (and its unsecured bonds, the PIK Notes, currently trade at 125% of par),

CSC Trust is entitled to an unsecured claim for the redemption premium regardless of

bankruptcy-specific arguments; (ii) if the status of the redemption premium as a secured

claim is determined to be unreasonable under Section 506(b), the law is clear that the

10% Indenture Trustee would still have an allowed unsecured claim under Section 502;

(iii) if the EFIH Debtors successfully contend that the redemption premium is not entitled

to status as a secured claim under applicable non-bankruptcy law, there would be an

unsecured claim under Section 502; (iv) a claim arising from the rescission rights, or the

no-call provision of section 2.04(c) of the 10% Indenture, could conceivably (although

the 10% Indenture Trustee disagrees) be said to be only an unsecured claim; or (v)

damages for breach of the Collateral Trust Agreement, whether because the EFIH

---

[6] If EFIH is solvent, the EFIH Debtors have even less basis for trying to deny the redemption premium owed on the 10% Notes. Courts have held that redemption premiums are payable where a debtor is solvent notwithstanding arguments based on the borrower's bankruptcy filing. *See, e.g.*, *UPS Capital Bus. Credit v. Gencarelli* (*In re Gencarelli*), 501 F.3d 1 (1st Cir. 2007).

Debtors successfully argue that such claims are not secured obligations or otherwise. Thus, CSC Trust has an undeniable interest in preserving the integrity of the EFIH Debtors' reorganization process. The proposed EFIH Second Lien DIP Financing subverts that process and should not be approved.

## ARGUMENT

**I.**     **The Second Lien Settlement and the EFIH Second Lien DIP Financing Are Structured to Eliminate the Intercreditor Rights of the First Lien Trustee and the Collateral Trustee as Against the Second Lien Trustee and Holders**

11.     Intercreditor agreements such as the Collateral Trust Agreement provide, *inter alia*, that in various circumstances senior creditors will be paid in full (and usually, as here, paid in full in cash) before junior creditors are entitled to be paid. Bankruptcy Code Section 510(a) ensures that such agreements are enforceable in bankruptcy. The Court may not approve an agreement or enter an order that eliminates such rights that exist between non-debtor parties. The Collateral Trust Agreement here both effectuates lien subordination, and specifically provides for several situations in which no payments can be made on account of the Second Lien Notes until the First Lien Noteholders are paid in full in cash all amounts claimed to be due.

12.     On June 20, 2014, CSC Trust, as 10% Indenture Trustee and Collateral Trustee, commenced an adversary proceeding in this Court (*CSC Trust Co. v. Computershare Trust Co.*, Adv. No. 14-50410 (RSS)), asserting its intercreditor rights under the Collateral Trust Agreement as against the Second Lien Trustee (as defined below) and two intermediaries (Epiq and The Depository Trust Company ("DTC"), and its nominee, Cede & Co.) through which the EFIH Debtors are attempting to evade the

restrictions of the Collateral Trust Agreement.[7] As discussed more fully in the

Intercreditor Complaint, the Collateral Trust Agreement requires that until first lien

obligations are paid in full in cash, any Second Lien Note representative such as their

indenture trustee (the "Second Lien Trustee"), or any holder of Second Lien Notes (such

representatives or holders, the "Second Lien Parties"), holds such proceeds in trust and

must remit them to CSC Trust. The Collateral Trust Agreement also provides that after a

chapter 11 filing the Second Lien Parties hold in trust and must remit all "proceeds of

Collateral" (not just proceeds of "Sales" of Collateral). Collateral Trust Agreement

§§ 2.4(c), (d), 3.4(a). The EFIH Debtors propose to violate these requirements by paying

proceeds consisting of (i) proceeds of loans advanced under the First Lien Priming DIP

Facility, (ii) proceeds of loans advanced under the EFIH Second Lien DIP Facility, and

(iii) cash collateral commingled with such loan proceeds, all in order to (a) refinance

certain of the Second Lien Notes, and (b) make payments to the rest of the Second Lien

Noteholders by way of a tender offer. These payments all violate the Collateral Trust

Agreement.[8]

13.    The EFIH Debtors' proposed transactions and relief essentially divide the

Second Lien Parties into two categories: non-settling parties ("Non-Settling Second Lien

Parties"), who are to have principal and interest paid, and settling parties ("Settling

---

[7] CSC Trust reserves all rights against all beneficial holders of the Second Lien Notes, including under the Collateral Trust Agreement and all other applicable documents.

[8] If this Court allows the Second Lien Settlement Motion and approves the EFIH Second Lien DIP Financing notwithstanding these violations of the Collateral Trust Agreement, the 10% Indenture Trustee will pursue its claims against the EFIH Debtors, including under Sections 2.4(c) and 7.14 of the Collateral Trust Agreement, in the adversary proceeding commenced by the Intercreditor Complaint or such other court of competent jurisdiction as is appropriate.

Second Lien Parties") who have accepted the tender offer, including the RSA parties who hold Second Lien Notes.

14.    The Intercreditor Complaint provides the appropriate vehicle to litigate these intercreditor issues.  However, in the Proposed Order for the EFIH Second Lien DIP Financing and approval of the use of proceeds, the EFIH Debtors seek to cut off the intercreditor rights of the First Lien Noteholders.  Most notably, the EFIH Debtors ask this Court to make two interrelated findings and orders: (i) ordering that, completely outside their usual practice and customary market practice, the EFIH Debtors would send funds for the second lien refinancing to DTC, bypassing the Second Lien Trustee who is the actual paying agent under the indenture governing the Second Lien Notes (the "Second Lien Indenture") [D.I. 994, ¶ 13] and (ii) finding that such amounts transferred to DTC are deemed, as to all parties to the case, a payment of principal and interest on the second lien notes [D.I. 994, ¶ 14].  On information and belief the EFIH Debtors will attempt the same in the form of order approving the Second Lien Settlement (no proposed order has been filed) that would effectuate the same as to Settling Second Lien Parties. The specific concern of CSC Trust in this regard is that the Second Lien Parties cannot be allowed to later assert that these findings and orders regarding payment and cancellation of the notes preclude, or have any effect on, the rights of CSC Trust against third parties under the provisions of the Collateral Trust Agreement.

15.    With respect to the Non-Settling Second Lien Parties, the EFIH Debtors could have obtained the result they seek without having this adverse affect on disputes that exist solely *inter se* between the First Lien Notes and the Second Lien Notes.

Sections 2.03 and 2.04 of the Second Lien Indentures establish a clear mechanism for payment of the notes, with all amounts routed through a "Paying Agent." Indeed, Section 2.04 of the Second Lien Indentures provides that upon a bankruptcy the Second Lien Trustee <u>must</u> take on the additional role of Paying Agent. Section 4.01 of the Second Lien Indentures then provides that the EFIH Debtors are deemed to have paid the Second Lien Notes when they transfer funds to the Paying Agent. Together, these contractual provisions provide a clear safe harbor for the EFIH Debtors to obtain their desired ruling that payment for the non-settling Second Lien Parties has occurred.

16. Instead the EFIH Debtors choose in their Proposed Order to try to eliminate CSC Trust's intercreditor rights by routing payment differently and seeking a finding regarding efficacy of payment. The Bankruptcy Code cannot be used to cut off third party intercreditor rights in this manner.

17. The EFIH Debtors and others are likely to argue that because CSC Trust is oversecured and has a scheduled trial of its asserted redemption premium claim, there is no harm to CSC Trust and the First Lien Noteholders from the Proposed Order. Quite to the contrary, when CSC Trust has its redemption premium claim allowed, the fact that it is oversecured does not necessarily mean that CSC Trust will be paid <u>in full in cash</u>. The EFIH Debtors have specifically stated in the RSA that they have the option to "cram-up" any such allowed claim. RSA [D.I. 98] at 275.

18. To be clear, and as set forth in detail in the Intercreditor Complaint, the Collateral Trust Agreement provides that CSC Trust can recover the amount of the redemption premium (and all other amounts currently and in the future due under the

10% Indenture) from the Second Lien Trustee and the Second Lien Noteholders, regardless of the allowance of those claims in this chapter 11 case.  Funds must be held to protect CSC Trust in that circumstance.  But funds must also be held for the circumstance in which CSC Trust obtains an allowed redemption premium claim (and other claims) because at that point CSC Trust does not have to wait for resolution of the chapter 11 case.  The right to full and immediate payment in full in cash, protecting against both cram-up after allowance, and disallowance, is precisely the right that CSC Trust has under the Collateral Trust Agreement.

19.     This Court must either deny the relief requested in the Proposed Order or require that it be modified to provide that nothing in the order shall have any effect or evidentiary weigh in any intercreditor dispute, and that all second lien parties, including the Second Lien Trustee, Epiq, DTC (and Cede & Co.) and all beneficial holders of Second Lien Notes remain fully subject to the Collateral Trust Agreement.

## II.     The Proposed Second Lien DIP Order Contains Many Inappropriate and Objectionable Provisions

20.     In addition to the intercreditor issues raised by the Second Lien Settlement, the Proposed Order contains numerous deficiencies and objectionable provisions.  For efficiency, these are detailed in Appendix A attached hereto and incorporated herein by reference.

III.   **The Second Lien Settlement, as a Piece of the "Global" Settlement Under the RSA, Is A *Sub Rosa* Plan, and Even if It Can Proceed Prior to a Plan Process, Cannot Meet Plan Scrutiny or Modified Iridium Plan Scrutiny**

A.    ***Sub Rosa* Plan**

21.     The EFIH Debtors' repeated invocation of the elements of their "global plan" leads, once again, to the conclusion that the EFIH Second Lien DIP Financing and the Second Lien Settlement are an impermissible *sub rosa* plan of reorganization.  CSC Trust hereby incorporates the arguments made in connection with the objections previously made [D.I. 421; 690; 691; 694].  The EFIH Second Lien DIP Financing and Second Lien Settlement, by themselves and in conjunction with the First Lien DIP Financing and First Lien Settlement, as well as the planned but yet to be approved Oncor TSA Amendment,  resolve substantially all claims against the EFIH Debtors, make a conclusive division of the reorganized equity of the EFIH Debtors, and convert prepetition claims of the Second Lien Notes to a Second Lien DIP financing that can only be paid out in a plan with cash (and not otherwise restructured under the Bankruptcy Code), thus locking in restructuring terms absent the procedural safeguards of the plan confirmation process. *See In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010); *see also PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Belk Props., LLC*, 421 B.R. 221 (Bank N.D. Miss. 2009); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452,

13

463-64 (2d Cir. 2007).  Courts do not permit one class of creditors to "strong-arm the
debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at
the expense of other stakeholders, in a proceeding that amounts to a reorganization in all
but name, achieved by stealth and momentum."  *In re Chrysler LLC*, 576 F.3d 108, 116
(2d Cir. 2010).  That is what is occurring here.

22.    The EFIH Second Lien DIP Financing presents at least one additional
specific *sub rosa* plan problem beyond those discussed elsewhere.  First, in a cloaked
way the EFIH Second Lien DIP Financing tries to resolve a major potential dispute in
these cases: the EFIH Debtors' potential avoidance of the claims of the PIK Noteholders
and the indenture trustee for the PIK Notes.  The PIK Notes came into existence in a
series of exchange offers in the very recent timeframe of December 2012 – January 2013;
this is a mere 15-18 months prepetition.  The prior notes exchanged were solely payable
at the parent company EFH level; the PIK Notes are new and recent debt at EFIH.  The
RSA is premised on the notion that EFIH is not solvent; that unsecured creditors will not
be paid in full.  This raises the significant possibility that it is the incurrence of the PIK
Notes that rendered EFIH insolvent.

23.    All three tranches of debt of the EFIH Debtors are the product of exchange
offers: the First Lien Notes, the Second Lien Notes, and the PIK Notes.  However, there
is a critical distinction among them.  The First Lien and Second Lien Notes were issued
in exchange for (or to repay) EFH-issued debt <u>that already was guaranteed by EFIH</u>.  In
direct contrast, the PIK Notes were issued, just over a year ago, for EFH (parent-level)
debt that was not guaranteed by EFIH.  That is, if EFIH is insolvent, it is as a result of

14

incurring the PIK Notes obligations.[9]  If the PIK Noteholders are able to take *de facto*

control over these avoidance actions, by having proceeds of these actions collateralize

EFIH Second Lien DIP Financing obligations that cannot effectively be repaid or

financed, they have cut off any potential challenge.  None of this is disclosed in the EFIH

Second Lien DIP Motion or any of the supporting papers.[10]

      24.      This Court should require at a minimum, that avoidance actions against

the PIK Notes and PIK indenture trustee (and the proceeds of such actions) be excluded

from the collateral package and not be subject to the superpriority claim.

      25.      This is relevant in considering approval of the EFIH Second Lien DIP

Financing because (i) that financing is being funded by the current holders of the PIK

Notes, whose claims are at risk of disallowance, and (ii) the proceeds of all avoidance

claims are pledged as collateral for the EFIH Second Lien DIP Facility.  Proposed Order

at ¶ 8(a).  In short, the EFIH Second Lien DIP Facility effects a *de facto* release of

avoidance claims against the PIK Noteholders.  Alternative resolutions of these litigation

claims could have dramatic effects on the possible restructurings in this case (including

potential benefits for the TCEH restructuring, because of the asserted intercompany

claims).

---

[9] In addition to solvency, no investigation has been made into the other financial tests for avoidance of constructive fraudulent transfers under section 548(a)(1)(B) or applicable state law, such as adequate capitalization or incurrence of debts beyond the ability to pay as such debts matured.

[10] The EFIH Debtors may contend that this avoidance action is not to recover a transfer, but rather to avoid an obligation.  However, that action could be settled for a cash payment from defendants, and a party benefitting from it could easily arrange a settlement transaction to take advantage of the collateral position.

**B.**   **The Second Lien Settlement and EFIH Second Lien DIP Financing, Even if Permitted Outside a Plan, Cannot Satisfy Plan Requirements**

26.    Even if a pre-plan transaction is not barred as a *sub rosa* plan, courts still require that certain comprehensive pre-plan settlements comply with plan confirmation requirements.  Although the Third Circuit has not confronted this question, the Fifth Circuit has concluded that strict compliance with plan requirements is necessary.  *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984). The Second Circuit has a slightly more flexible standard, but only permitting "slight" deviations that are well justified.  *See Iridium*, 478 F.3d at 463-64.  Neither standard is met here.

**1.**   ***The Second Lien DIP Financing Violates the Absolute Priority Rule***

27.    There can be no question that the Second Lien DIP Facility violates the absolute priority rule under binding Supreme Court precedent.  A debtor-proposed plan during the exclusivity period (and therefor an *AWECO/Iridium* governed transaction) may not provide a distribution to equity holders unless there is a true auction opportunity to ensure that the distribution is only for "new value."  *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).  The Second Lien DIP Facility fails because of the participation of Fidelity, the cancellation of the intercompany notes, and the small participation of the sponsors, no matter how well intentioned.

28.    Fidelity has a controlling stake in the debt at the parent company level. The EFIH Debtors' CFO has testified that ████████████████████████████ ██████████████████  The negotiating history makes clear that this was part of a

broader *quid pro quo* for Fidelity's control of the parent company.[11]  In addition, with the PIK Notes (who receive the bulk of the EFIH Second Lien DIP Financing opportunity and which are trading at 125% of par), there is no question that the Second Lien DIP Facility represents a valuable distribution on claims against EFIH.  However, while Fidelity has only a small amount of PIK Notes, it is receiving the ability to fund over 9% of the EFIH Second Lien DIP Financing due to its ability to deliver consent from EFH noteholders.  Thus it is receiving a disproportionate opportunity solely in respect of its interests through the EFH parent.

29.    The EFIH Debtors will assert that this is all part of a settlement of intercompany disputes, including the Oncor TSA Amendment, consideration of which was to occur simultaneously with the EFIH Second Lien DIP Financing, but which has now been adjourned.  This is precisely the circumstance in which a true market test is required to prevent violation of the absolute priority rule.  Even more directly, by the Oncor TSA Amendment, the parent EFH is receiving a distribution with the cancellation of billions of dollars in face amount of EFH notes that are held by EFIH.  This is also unquestionably a distribution that must be tested under *203 North LaSalle.*

---

[11]

17

### 2. *Disclosures Under Sections 1129(a)(4) and 1129(a)(5)*

30.      Bankruptcy Code Section 1129(a)(4) requires that any payment made by the debtor for services or costs and expenses in connection with the case or the plan be approved by, or be subject to approval of, the court as reasonable. 11 U.S.C. § 1129(a)(4).  The EFIH Second Lien DIP Financing specifically provides, however, that portions of the DIP loan (and thus the reorganized EFIH Debtors' equity) may be parceled out to "consultants" in unspecified amounts and for undescribed services.  This is precisely what Section 1129(a)(4) requires to be court-approved, not outsourced to a set of existing creditors.

31.      Similarly, Section 1129(a)(5) provides, in relevant part, that the plan proponent disclose the identity and affiliation of any individual proposed to serve as a director, officer, or voting trustee of the debtor after confirmation of the plan, as well as the identity of any insider who will be employed or retained by the debtor, and the nature of such insider's compensation.  11 U.S.C. § 1129(a)(5).  The EFIH Debtors seek to allocate the equity, as by a plan, without disclosing who the officers and directors of the reorganized company will be, in contravention of Section 1129(a)(5)(A).  Just like the DIP loan amounts (and reorganized EFIH Debtors' equity) that can go to consultants, other substantial amounts can go to yet-to-be-named investment partners.  It seems likely that future partners investing hundreds of millions of dollars would likely want board representation, at the very least.  It may be that the EFIH Debtors cannot currently make the requisite disclosures; if so, that is another clear reason the Court cannot approve these transactions.

**IV.    The Proposed Financing Has Above-Market Terms, as a Result of a Truncated Process and Preordained Outcome, and the Court Has No Way to Determine if Better Terms Are Available**

32.    There is no evidence to support the requested finding in the Proposed Order regarding the lack of availability of alternative and better financing terms. *See* Proposed Order at ¶ G(iii). To the contrary, the EFIH Debtors have sought from the outset to steer this EFIH Second Lien DIP Financing to the PIK Noteholder group and Fidelity. In the EFIH Second Lien DIP Motion and the supporting Affidavit of David Ying, the EFIH Debtors stated that due to tax considerations only the PIK Noteholders could provide the EFIH Second Lien DIP Financing in order to justify the admitted absence of any competitive process. It has now been shown that the tax allegation justifying the no-bid DIP is false.

33.    A post-petition competition has now developed for the terms of the EFIH Second Lien DIP Loan. There are three current bidders: the original PIK Noteholders, the non-Fidelity Second Lien Noteholders, and the First Lien Noteholders. Each have now submitted more than one bid.[12] And many of the terms have already become more favorable for the EFIH Debtors.

34.    However, the process has been anything but fair. The EFIH Debtors have set more than one "final bid deadline." At the first such deadline of June 11, only the First Lien Noteholders timely submitted a proposal. And so the EFIH Debtors then solicited more proposals. When the PIK Noteholders were finally ready to submit, the EFIH Debtors gave the First Lien Noteholders 18 hours' notice of a new deadline of June

---

[12] The last bid submitted by certain holders of the 10% Notes is attached hereto as <u>Exhibit D</u>.

18. Then when the Second Lien Noteholders submitted a revised proposal after that "second final deadline," the EFIH Debtors cancelled a board meeting and set yet another deadline of June 20, more than a week before the hearing, and this time on less than two days' notice.

35.     As discussed above, there actually is no time urgency other than the EFIH Debtors' attempt to lock in a deal for the PIK Noteholders. That is now unquestionably clear based on a June 21, 2014 letter from the EFIH Debtors. *See* Exhibit E, Letter from Stephen Hessler to counsel for CSC Trust, June 21, 2014 ("From the outset of these chapter 11 cases, the Debtors have transparently reiterated their intent to seek Bankruptcy Court approval of the Second Lien DIP Financing *that was fully negotiated and committed as of the petition date*.") (emphasis in original). The original proposed EFIH Second Lien DIP Facility does not save the EFIH Debtors money, and even the bidding so far has been so unstructured that it is clear that parties are not only unprepared, but unable, to put their best bids on the table. The real bidding to be done (if this structure of a mandatorily-convertible DIP financing is to be permitted) is over the proposed equity share for the DIP financing.

36.     The EFIH Debtors are emphasizing certain alleged "tax issues" to justify a deal with a favored party. In the first place, the Court must discount this position of the Debtors, because there is no question that the "tax reasons" given in the original affidavit of Mr. Ying are incorrect. Furthermore, he is not competent to testify on these matters: the EFIH Debtors have done nothing more for this Court than invoke the word "tax" in the hopes that the Court will not inquire further. At deposition, Mr. Ying testified that

20



37.     Beyond this, the alleged "tax issue" is that some bidders may make it more difficult at the margin to get the tax ruling the EFIH Debtors seek as a critical condition precedent to their currently desired plan of reorganization.  But the EFIH Debtors cannot confirm their plan <u>before they actually get the tax ruling</u>.  They say this will take at least nine months, and maybe more.  At that point they will know who can be in the competition for the new equity financing.  Instead, the EFIH Debtors want to have their "auction" for this equity right now, at a time when the uncertainty means they exclude and disfavor some bidders.  This process is entirely backwards because the process preordains the results.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 311 (Bankr. D. Del. 2011) (noting that DIP financing exists to preserve estate value, but that a particular DIP facility may be approved only when negotiating avenues have been pursued and where no other, better unsecured financing option exists).

## V.     A Finding Under Section 364(e) Is Inappropriate

38.     The typical purpose and effect of debtor-in-possession financing is to provide funds needed for maintaining and stabilizing the debtor's operations.  The

Bankruptcy Code facilitates DIP financing by providing special protection under Section 364(e). If the lenders are found to be "in good faith," the validity of the obligations owed and priority of any liens cannot be overturned on appeal. This is because companies are often in chapter 11 because they cannot borrow additional funds outside of bankruptcy (where they are constrained by state law loan priorities), and therefore DIP loans have various kinds of special priority. The special priority is necessary to (i) obtain the funds, which are needed during the case; (ii) protect against a challenge by junior creditors who may be rendered worse off; and (iii) strike a balance between appropriate consideration of the legal disputes regarding approval and giving the lenders certainty once a decision is made. Congress solved this problem by providing that under certain circumstances the validity and priority of DIP loans cannot be overturned on appeal. This results in many appeals of DIP financing orders being dismissed as moot; that is, approvals of DIP financing are in many situations simply immune from appellate review. Thus there is always a secondary question a court must answer when it approves financing: should the validity and priority of the loans and the equity allocation be immune from appeal?

39.    It is true that courts regularly approve DIP loans with good faith findings to protect the lenders. Although the Bankruptcy Code does not define "good faith," courts in this Circuit have provided guidance on its meaning in the equivalent provision of Section 363(m), which protects buyers in bankruptcy sales. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986). The good faith requirements of 363(m) and 364(e) are equivalent for purposes of analysis and interpretation. *See Krebs*

*Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998); *In re*

*Joshua Slocum Ltd.*, 922 F.2d 1081 (3d Cir. 1990).

40.     Courts have "borrowed from traditional equitable principles, holding that

the concept of 'good faith' speaks to the integrity of a party's conduct in the course of the

. . . proceedings." *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996)

(citing *Abbotts Dairies*, 788 F.2d at 147).  An attempt to show good faith is countered by

showings of fraud, collusion, or an attempt to take "grossly unfair advantage of other[s]."

*Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see*

*also In re DESA Holdings Corp.*, 353 B.R. 419, 421 (Bankr. D. Del. 2001) (transaction

"undertaken . . . at arm's length, without collusion"); *In re Foreside Mgmt. Co.*, 402 B.R.

446, 452-53 (1st Cir. 2009).  There must be an affirmative showing in the record to

justify a party's entitlement to the good faith finding that will immediately eliminate

much of the appellate review of the transaction, locking it in for the duration of the

bankruptcy case.  *See, e.g., In re CB Holding Corp.*, 447 B.R. 222, 227 (Bankr. D. Del.

2010).

41.     The EFIH Second Lien DIP Loan and the surrounding conduct matches

exactly with the facts of the two cases where Courts of Appeals have reversed a good

faith finding.  The conduct of the lenders also runs afoul of the one Bankruptcy Court

reported decision in this Circuit in which the Court denied a good faith finding.

42.     First, a lender is not entitled to a good faith finding if it is (i) an existing

creditor, (ii) using the Section 364 process with ulterior purpose as part of a larger

settlement in a case, and (iii) trying to obtain payment for something that is not actually a

23

claim against the estate. *In re EDC Holding Co.*, 676 F.2d 945, 948 (7th Cir. 1982). Just like the *EDC Holding* case, here the EFIH Debtors are obtaining a DIP loan from the PIK Noteholders (existing creditors) with an "intended effect that is improper under the Bankruptcy Code." *Id.* As the *EDC Holdings* court stated, it is permitted to have a DIP financing loan for purposes of effectuating a settlement, but not for purposes of giving a claim where no claim would otherwise exist. The EFIH Second Lien DIP Financing is exactly the opposite of the usual debtor-in-possession loan. It is designed solely to establish a distribution of the reorganized equity of the debtor. It is fundamentally an equity investment, not a loan; it is <u>mandatorily convertible</u> into reorganization equity. That equity infusion, properly made at consummation of a plan of reorganization, would never be a claim against the estate (and indeed will not be a claim against the reorganized debtor). Yet the PIK Noteholders seek priority, protection against cramdown in a reorganization plan (because DIP loans cannot be restructured, and must be paid in cash), a specific division of the reorganized equity that is protected against dilution, and insulation from appellate review <u>now</u>.

43.    DIP lenders are also not entitled to good faith findings when those lenders are unidentified. *Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*, 211 F.3d 475 (9th Cir. 2000). In that case a "purchaser" obtained a good faith finding under Section 363(m). The Ninth Circuit reversed the good faith finding because there actually were several purchasers and the record did not have evidence as to which were actually buying various assets. This EFIH Second Lien DIP Loan has exactly the same issue. Nearly $900 million of the proposed $1.9 billion loan can be allocated at the discretion of the PIK

Noteholders to "consultants" and "partners" who are totally unidentified.  In fact, the

chief financial officer has testified that ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ [13]  There is no possible way for this court to enter a

good faith finding as to unidentified lenders or even to the PIK Noteholders who are to be

given a right to "allocate" loans in return for future services and investments.  The good

faith test requires disclosure to this Court and parties in interest of the arrangements and

circumstances surrounding the making of the loan.  A bankruptcy court cannot give a

blank check for a finding that precludes appellate review.

      44.    A good faith finding is inappropriate when the transactions include

preferential treatment for insiders and a lack of disclosure to the Court.  *In re Indus.*

*Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15 (Bankr. E.D. Pa.

1987); *In re White Crane Trading Co.*, 170 B.R. 694 (Bankr. E.D. Cal. 1994).  Both exist

here, in the form of a truly disturbing fact.  The Ad Hoc Group of PIK Noteholders

offering the financing has specifically and in writing discussed ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████  *See* Exhibit H.  These discussions have not been disclosed to the Court.

      45.    Moreover, a lender is not entitled to a good faith finding where it fails to

reveal material facts to the court.  *See White Crane Trading*, 170 B.R. at 705 ("Parties

lack the requisite good faith when they fail to reveal ulterior motives that may affect the

---

[13] ████████████████████████████████████████████████

25

court's reasoning. Parties similarly lack good faith when they fail to reveal material facts."). Here, the ad hoc committee of PIK Noteholders has steadfastly refused—on no legal basis whatsoever—to produce either (a) any documents from within the companies that hold the PIK Notes, or (b) any documents preceding an arbitrarily chosen date of January 28, 2014, notwithstanding the fact that the EFIH Debtors' own SEC filings show that the EFIH Debtors were negotiating with the PIK Noteholders as early as April of 2013 and that the PIK Noteholders provided a restructuring proposal to the EFIH Debtors in October of 2013. These issues are addressed in greater detail in a letter submitted to this Court by counsel for the 10% Indenture Trustee on June 23, 2014 [D.I. 1058]. This Court cannot make the good faith finding under section 364(e) with regard to the EFIH Second Lien DIP Financing while the PIK Noteholders—the lenders under the EFIH Second Lien DIP Financing—are actively engaged in concealing documents that may reveal material facts affecting that finding.

46.    Fidelity is also being given a piece of the EFIH Second Lien DIP Facility, and is not entitled to a good faith finding. Fidelity is economically in the position of being the direct equity holder of EFIH; the company's CFO has testified that ███████ ████████████████████████████████ [14] It is getting a global deal for all its positions, especially including its position at the parent company (EFH) level. That deal is dependent on the so-called Oncor TSA Settlement, which was originally part of the "Global Settlement Motion," but has now been adjourned by the Debtors. There is no possible way to determine whether Fidelity is entitled to a good faith finding until the

---

[14] ███████████████████████████████████████████

Oncor TSA is scrutinized. It was the EFIH Debtors' choice to adjourn that relief. For this independent reason, Fidelity cannot receive the benefit a good faith finding under Section 364(e) for its share of the EFIH Second Lien DIP Financing.

47.     The terms and purposes of the EFIH Second Lien DIP Financing are also collusive. This is an "insider deal" not only because of the Fidelity component, but also because the proposed lenders are making themselves the future owners of the EFIH Debtors, by taking 64% of the equity just for their DIP loan, with much more in respect of their existing claims. Those lenders will be the future employers of management of the EFIH Debtors. Under these circumstances, the PIK Noteholders should not be permitted to step up in the capital structure and lock into a DIP loan that has to be paid in cash with punitive fees at confirmation if they do not get their own deal.

48.     In short, what the PIK Noteholders are trying to do is lock in an equity investment in reorganized EFIH by styling it as a "debtor-in-possession loan." They want to make the equity investment before parties can raise challenges and alternatives can be seriously considered, not make disclosures even as to who the lenders will be and eliminate any appellate review. All this in the first 60 days of a chapter 11 case that the EFIH Debtors themselves say will take at least nine months, and where they have made plans for a case that could last as long as 30 months. This abuses the form and protections of a DIP financing to defeat competing creditors' substantive rights, procedural rights in the bankruptcy case, and even their appellate rights. The Third Circuit has expressly warned of the dangers of abuse of bankruptcy mootness protections.

*See Samson Energy Res. Co. v. Semcrude, L.P. (In re Semcrude, L.P.)*, 728 F.3d 314, 326 (3d Cir. 2013).

**VI.    Tender Offer Issues**

49.    The "tender offer" for Second Lien Notes that the EFIH Debtors announced at the first-day hearings was launched on Friday, May 9, 2014, shortly after launch of the "tender offer" for First Lien Notes on May 7, 2014.  These tenders have numerous substantive flaws, as well as serious omissions and misstatements in the solicitation materials.  Tender offers are not permitted in chapter 11 cases and upset the congressionally established scheme of substantive rights and class bargaining.  The basis for this objection is detailed in the 10% Indenture Trustee's EFIH First Lien Settlement Objection, which is incorporated herein by reference.  *See* D.I. 694.

**VII.    The Court Should Not Waive the Stay Required by Bankruptcy Rule 6004**

50.    The 14-day stay of Rule 6004 should not be waived.  The EFIH Debtors have not shown any ground to justify a waiver or shortening of the stay.   In the first instance, the financing commitment from the PIK Noteholder Group lasts until 335 days from the Petition Date.  *See* RSA ¶ 8.09.

51.    CSC Trust expects the EFIH Debtors to once again make the argument they made at the June 6 hearing on the First Lien DIP Financing: that the documents provide that the commitment expires five business days after entry of the approval order. This Court has no choice but to reject any such explanation <u>for the simple reason that</u> <u>after the EFIH Debtors and their allies told this Court and the District Court that there</u> <u>was a rush to close the First Lien DIP Financing in a 5-day window, **it actually took**</u>

**them 13 days to close.**  The EFIH Debtors position on need to close quickly is even less credible here, since the potential lenders are not going anywhere, and in fact have sought fiercely to protect the chance to make this DIP loan, and thereby avoid the chapter 11 plan and claims allowance process.  Furthermore, unlike the First Lien DIP Financing, the EFIH Second Lien DIP Facility is not saving the EFIH Debtors any money.  No grounds for a waiver of the stay exists.

### SUMMARY

52.     This case presents an attempt to achieve unprecedented relief very early in these cases.  Certainly there are prepackaged bankruptcy cases that can proceed this quickly in accordance with the Bankruptcy Code and Bankruptcy Rules when all major creditor constituencies are agreed.  That is not the case here.  Four or five competing sets of creditors on the EFIH side of this case alone are engaged in litigation of what is purely an intercreditor dispute.  Some bankruptcies proceed this quickly with a transaction for the sale of the entire business as a going concern when a debtor is hemorrhaging cash or there is otherwise a "melting ice cube."  Neither of those is the case here – the EFIH Debtors expressly disclaim any intention to sell the business and this is a pure holding company case.  Because the EFIH Debtors themselves propose a minimum nine-month path to confirmation, there is no need for approval now of the relief requested.

WHEREFORE, this Court should deny the Motion, and grant such other relief as is appropriate under the circumstances.

Dated:  June 24, 2014

COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, P.A.


/s/ Norman L. Pernick
Norman L. Pernick (DE No. 2290)        Warren A. Usatine
J. Kate Stickles (DE No. 2917)         25 Main Street,
Nicholas J. Brannick (DE No. 5721)     P.O. Box 800
500 Delaware Avenue, Suite 1410        Hackensack, NJ 07602
Wilmington, DE  19801                  Telephone: 201-489-3000
Telephone: 302-652-3131                Facsimile:  201-489-1536
Facsimile:  302-652-3117               wusatine@coleschotz.com
npernick@coleschotz.com
kstickles@coleschotz.com
nbrannick@coleschotz.com

    --and--

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

*Counsel for CSC Trust Company of Delaware,
as successor indenture trustee*