IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
In re:                                                     :    Chapter 11
                                                           :
Energy Future Holdings, Inc., *et al.*,                    :    Case No. 14-10978 (CSS)
                                                           :
                    Debtors.                               :    (Jointly Administered)
                                                           :
---------------------------------------------------------- x

## DECLARATION OF TODD R. SNYDER

Pursuant to 28 U.S.C. § 1746, I, Todd R. Snyder, hereby declare as follows under penalty of perjury:

1. I am Executive Vice Chairman of North American Global Financial Advisory and Co-Chair of the North American Debt Advisory and Restructuring Group at the financial advisory and investment banking firm of Rothschild Inc. ("**Rothschild**"), which has its principal office at 1251 Avenue of the Americas, 51st Floor, New York, New York 10020. I respectfully submit this Declaration in support of (1) the EFIH Second Lien Notes Indenture Trustee's Objection to Debtors Settlement Motion (the "**Settlement Objection**") and (2) the Objection of EFIH 2nd Lien Notes Indenture Trustee to Second Lien DIP Motion (the "**DIP Objection**)", and together with the Settlement Objection, (the "**Objections**").

2. Rothschild is one of the world's leading investment banks with expertise in mergers and acquisitions, restructurings and other financial advisory services. Rothschild has extensive experience representing the interests of debtors, creditors and institutional investors in business and sovereign restructurings and workouts both in and out of chapter 11, and in representing clients in a wide range of industries.

KL2 2851956.20

3.  I have advised companies regarding restructurings and reorganizations for approximately 26 years. I have worked with companies in a wide range of industries providing advice regarding restructurings, reorganizations, workouts, and a variety of other transactions, including exchange offers, financing transactions, mergers, divestitures and management-led buyouts.

4.  Among my positions prior to joining Rothschild, I was a Managing Director at the investment banking firm of Peter J. Solomon Company and a Managing Director at KPMG in the Corporate Recovery Group. I also previously practiced law in the Business Reorganization department of Weil, Gotshal & Manges LLP. I received a J.D. from the University of Pennsylvania Law School and an undergraduate degree from Wesleyan University. A copy of my professional biography is attached hereto as **Exhibit 1**.

5.  I have testified at trial, by deposition, declaration or by proffer in at least the following chapter 11 cases: (a) UAL Corporation; (b) Dow Corning Corporation; (c) Adelphia Communications Corporation; (d) Federal Mogul Corporation; (e) Emerald Casino; (f) Comdisco, Inc.; (g) Globe Manufacturing; (h) Finova Group Inc.; (i) Recycling Industries, Inc.; (j) Renaissance Cosmetics, Inc.; (k) Qualitech Steel Corporation; (l) Zenith Electronics Corporation; (m) Solutia Inc.; (n) Visteon Corporation; (o) Tronox Incorporated; (p) Nebraska Book Company; (q) Global Aviation Holdings Inc., and (r) these chapter 11 cases. In many of these matters I have been accepted as an expert, typically in finance in general and business restructuring and reorganization in particular. I have offered opinions on postpetition financing and valuation related to adversary proceedings and the proposed confirmation of a number of chapter 11 plans.

6. Within the preceding ten years, I have authored or co-authored the following articles: *Why All the Noise about Muni Bankruptcies?* N.Y. TIMES (Feb. 7, 2011); *The Busted Spinoff: Lessons for Directors*, Navigating IN TODAY'S ENVIRONMENT: THE DIRECTORS' AND OFFICERS' GUIDE TO RESTRUCTURING (2010); *Asbestos Pre-Packaged Bankruptcies: Apply the Brakes Carefully and Retain Flexibility for Debtors*, AM. BANKR. INST. L. REV. 801 (2005); and *The Patronus Technique: A Practical Proposal for Asbestos-Driven Bankruptcies*, 11 J. OF BANKR. L. & PRACTICE 357 (2002).

7. On September 4, 2013, a group of holders (the "**EFIH Second Lien Group**") of second lien notes (the "**Second Lien Notes**" and the holders thereof, the "**Second Lien Noteholders**") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (jointly, the "**Company**") retained Rothschild as its financial advisor and investment banker and Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**") as its counsel in connection with the potential financial restructuring of the Company.

8. On April 25, 2014, at the request of holders of a majority of the Second Lien Notes, including members of the EFIH Second Lien Group, Computershare Trust Company, N.A. and Computershare Trust Company of Canada as successor trustee for the Second Lien Notes (the "**Indenture Trustee**"), retained Kramer Levin as its special counsel and Rothschild as its financial advisor and investment banker in connection with this case, effective April 18, 2014.

I. **NEGOTIATIONS WITH THE COMPANY**

9. The EFIH Second Lien Group was formed in September 2013. Since its formation, through the prepetition period, and to this date, the EFIH Second Lien Group has consistently tried to engage in good faith negotiations with the Company on a reasonable settlement of the makewhole premium due upon a prepayment of the Second Lien Notes. The

EFIH Second Lien Group would like to be a constructive participant in a consensual restructuring of the Company's debt and was and remains fully prepared to become an "anchor tenant" in a proposed restructuring.

10. The EFIH Second Lien Group was initially hopeful that it would be able to seriously engage with the Debtors prior to their filing for bankruptcy; indeed this was a primary impetus for the formation of the EFIH Second Lien Group. However, from shortly after the EFIH Second Lien Group's formation through the Petition Date, the Debtors consistently locked the EFIH Second Lien Group out of negotiations. For example, in October 2013, members of the EFIH Second Lien Group were willing to get restricted but the Debtors then terminated any negotiations. Nonetheless, the EFIH Second Lien Group made multiple efforts to submit unsolicited proposals to the Debtors to consensually resolve disputes regarding the treatment of the makewhole premium provided for in the Second Lien Notes indenture and to provide postpetition financing for the Company.

11. In March 2014, the EFIH Second Lien Group attempted to engage with the Company by sending a proposal to the Company to provide post-petition financing. Thereafter, the Company never entered into negotiations with the EFIH Second Lien Group regarding its proposal, asked no substantive questions regarding the proposal, and – even though the EFIH Second Lien Group had unilaterally submitted a proposal – never asked the EFIH Second Lien Group to bid against the postpetition financing that the Debtors ultimately chose. In fact, when the EFIH Second Lien Group proposed financing at a March meeting between the parties, the Debtors responded that they had DIP financing agreed and were not interested in other proposals and were not even willing to share the terms of the PIK RSA Parties' proposed financing. The EFIH Second Lien Group did not see the terms of the Debtors' proposed DIP

until they were revealed in the Debtors' motion to approve post-petition financing sponsored by certain holders of the EFIH Senior Unsecured Toggle Noteholders (the "**PIKs**").

12. In early March, the EFIH Second Lien Group met with the Debtors and presented them with an equitization proposal. Other than a few perfunctory questions, we received no response from the Company regarding this proposal. Following this unproductive meeting, the EFIH Second Lien Group determined to submit a makewhole settlement (and equitization) proposal by partnering with Fidelity, a significant holder of Second Lien Notes. The EFIH Second Lien Group engaged in a series of discussions with Fidelity that quickly led to agreement on a proposal (the "**EFIH Second Lien Group/Fidelity Proposal**") to be submitted to the Debtors by Fidelity that had the support of more than two-thirds of the Second Lien Notes. Without commenting specifically on the terms of that proposal, the EFIH Second Lien Group/Fidelity Proposal demonstrated the EFIH Second Lien Group's willingness to make significant compromises on their right to receive a premium in the event that the Debtors choose to repay the Second Lien Notes before their stated Maturity Date.

13. We understand from communications from principals and advisors of Fidelity that Fidelity presented the EFIH Second Lien Group/Fidelity Proposal to the Company in March (although we were not copied on any communications). We received no response from the Company directly regarding the EFIH Second Lien Group/Fidelity Proposal. Rather, the only "communication" we had with the Company about the EFIH Second Lien Group/Fidelity Proposal involved questions relayed to us by advisors to Fidelity regarding Rothschild's arithmetical calculation of the makewhole premium payment due under the Second Lien Indenture. With the exception of this limited follow-up, we heard nothing further from Fidelity or the Debtors regarding our proposal.

14. Subsequently, on or around the Petition Date, the EFIH Second Lien Group learned that the Debtors had reached an agreement with Fidelity resolving Fidelity's makewhole claims. But while the earlier proposal had, as noted, been submitted on behalf of both the EFIH Second Lien Group and Fidelity, the Debtors did not offer the EFIH Second Lien Group the same treatment that it offered to Fidelity. Indeed, prior to the Petition Date, the Debtors made no offer at all to the EFIH Second Lien Group.

15. Post-petition, the EFIH Second Lien Group continued its efforts to engage the Debtors. On May 12, the EFIH Second Lien Group presented the Debtors with a proposal for competing second lien postpetition financing (the "**Initial Competing DIP**") on substantially better terms than the Debtors' proposed Second Lien DIP, including with respect to the interest rate and upfront fees. A copy of the term sheet relating to that proposal was attached as Exhibit 2 to my May 14 declaration in support of the Second Lien Trustee's Motion to Compel [Dkt. No. 477]. At the May 22 hearing, in exchange for the EFIH Second Lien Group's withdrawal of its emergency motion to compel the Debtors to obtain prior approval of procedures governing their proposed tender offer, the Debtors committed on the record in Court to engage in good faith negotiations with the EFIH Second Lien Group with respect to its proposal of a competing DIP and other case issues. On May 26, the EFIH Second Lien Group submitted to the Debtors commitment letters indicating that the Initial Competing DIP was fully funded. The terms of the EFIH Second Lien Group's Initial Competing DIP are attached hereto as **Exhibit 2**.

16. Thereafter, the EFIH Second Lien Group and its advisors had discussions with the Debtors and their advisors regarding the Initial Competing DIP, including an in-person meeting at Kirkland & Ellis on May 30 during which the EFIH Second Lien Group's advisors again presented the terms of the Initial Competing DIP and addressed various questions raised by

KL2 2851956.20

the Debtors and again offered to negotiate a settlement of the makewhole premium. Following the May 30 meeting, however, we received no substantive feedback from the Debtors. The Debtors never gave us a formal response to our proposals nor provided us feedback as to how we could satisfy any of the Debtors' concerns.

17. Instead, on Sunday, June 8, before we could establish a true dialogue with the Debtors regarding our Initial Competing DIP, the Debtors informed the EFIH Second Lien Group's advisors that we should submit our "best and final" offer by Wednesday, June 11 (three days later). The Debtors informed us that they would then evaluate our offer and any competing offer from the PIKs. Under the terms of the "process" that the Debtors told us they were implementing, we would be given no opportunity to respond to any new proposal from the PIKs. The PIKs, for their part, because of the Debtors' obligations under the RSA to share any competing proposals, would have a "last look," under which they would not be required to submit their best and final offer until after they had seen ours.

18. The June 11 deadline was subsequently extended through Wednesday, June 18, in part so that the EFIH Second Lien Group could attempt to negotiate directly with the PIK holders regarding a potential global resolution. As discussed below, during the intervening days we negotiated the terms of an alternative (and superior) second lien DIP financing proposal (the "**Strategic DIP**") and an accompanying new restructuring plan (the "**Alternative Restructuring Plan**") with a strategic investor, NextEra Energy, Inc. ("**NextEra**"). The EFIH Second Lien Group and NextEra submitted a superior proposal for a Strategic DIP and Alternative Restructuring Plan to the Debtors by the June 18 deadline. In our June 18 letter to the Debtors regarding this new proposal, we indicated that we were also prepared to stand behind, and remained committed to fund, the Initial Competing DIP.

KL2 2851956.20

## II. THE ALTERNATIVE SECOND LIEN RSA AND DIP PROPOSAL

19. For the past week, I have been working with members of the EFIH Second Lien Group and NextEra Energy, Inc. ("**NextEra**") to negotiate and propose an alternative second lien DIP financing option – i.e., the Strategic DIP – and the Alternative Restructuring Plan that is superior in numerous important respects to the Debtors' current Restructuring Support Agreement. The Alternative Restructuring Plan would provide enhanced recoveries to key EFH and EFIH creditor constituencies, would provide holders of the PIKs with a full recovery, and would eliminate the need for further litigation regarding the EFIH Second Lien Group's makewhole claims by providing the Second Lien Noteholders with payment in full. The EFH Unsecured Noteholders would receive a $20 million or greater increase in cash distribution over their contemplated recovery under the current RSA.

20. We transmitted the terms of our Strategic DIP and Alternative Restructuring Plan, as originally proposed, to the Debtors by letter dated June 18, 2014. The letter, with attached term sheet, is attached as **Exhibit 3** to this declaration.

21. On Thursday, June 19, representatives and advisors to the Debtors met telephonically for approximately 45 minutes with advisors to the EFIH Second Lien Group and NextEra to discuss the Strategic DIP and Alternative Restructuring Plan. The Debtors focused primarily, indeed exclusively, on two issues: An alleged shortfall in the amount of cash needed to consummate the Alternative Restructuring Plan and the non-callable nature of the Strategic DIP, which the Debtors complained failed to provide them with a "fiduciary out" to pursue other deals. During this meeting, we asked the Debtors to identify any tax issues in the Alternative Restructuring Plan. As of today, the Debtors have not identified any tax issues in the Alternative Restructuring Plan.

22. On Friday, June 20, the EFIH Second Lien Group and NextEra responded by providing that the Strategic DIP would be callable at a fee far less than the pre-payment fee demanded in the proposed PIK DIP. The alleged cash shortfall resulted from failures in the Debtors' public projections, which were incomplete (in that they failed to include certain expense items) or outdated; the cash shortfall could, in any event, be solved through a relatively insignificant (and easily achievable) increase in exit financing

23. On Saturday, June 21, the Debtors informed the EFIH Second Lien Group and NextEra that the RSA PIK Parties had amended their proposed DIP to reduce the fees payable thereunder. The Debtors said their board of managers would meet at 6 p.m. Sunday, June 22, to consider which EFIH Second Lien DIP to pursue.

24. At 4:47 p.m. Sunday, June 22, the EFIH Second Lien Group and NextEra transmitted four pages (including a term sheet) containing improvements in their Strategic DIP and Alternative Restructuring Plan to the Debtors' advisors. The email transmitting our updated proposal for the Strategic DIP and Alternative Restructuring Plan, together with the term sheet reflecting the updated proposal, is attached as **Exhibit 4** to this declaration. The Strategic DIP reflected in our June 22 proposal is fully committed.

25. We understand that, in advance of the Company's June 22 board meeting, the PIK RSA Parties likewise submitted a revised second lien DIP proposal to the Debtors. Late in the evening of June 22, we were informed by counsel to the Debtors that the Company's board had met on June 22 and had decided to select the PIK RSA Parties' proposed DIP instead of the EFIH Second Lien Group's Strategic DIP and Alternative Restructuring Plan.

26. Notwithstanding the Debtors' decision to proceed with the PIK RSA Parties' proposed DIP, the Strategic DIP proposed by the EFIH Second Lien Group on June 22

contains materially better terms than the PIK RSA Parties' proposed DIP, including a lower interest rate and $104 million less in upfront fees. A comparison of the terms of the two competing DIPs is attached as **Exhibit 5** to this declaration.

27.  The EFIH Second Lien Group and NextEra remain committed to negotiating with the Debtors regarding the Alternative RSA and the Alternative RSA Second Lien DIP. As such, the final terms remain fluid. I reserve my right to present an analysis to the Court at trial setting forth how the Alternative RSA and related financing maximize value to the estates.

### III. ADDITIONAL ANALYSIS

28.  I have been asked by counsel to perform an additional analysis.

29.  I have been asked by counsel to perform an analysis and provide my opinions and conclusions on the value of Fidelity's recovery on account of the Second Lien Settlement proposed by the Debtors in the Settlement Motion. I have been asked by counsel to assume that the following elements of value being provided to Fidelity are attributable to the claim it holds on its sizeable Second Lien Notes position: (1) the Fidelity Commitment Fee (later, the Funding Fee) on the First Lien DIP; (2) the Fidelity Participation Fee on the Second Lien DIP; and (3) Fidelity's right to participate in the Second Lien DIP. I have not attempted to quantify the exact value of the Most Favored Nation clause but note that, in my opinion, it provides Fidelity with additional value.

30.  Under the RSA, Fidelity would receive up to $8.75 million in the First Lien DIP Funding Fee and a fixed $11.25 million in the Second Lien DIP Participation Fee. Based on my analysis, Fidelity is also receiving $23 million, and perhaps substantially more,

through its right to participate in the Second Lien DIP.[1] Together, these premiums provide Fidelity a total additional consideration of approximately $43 million, and potentially substantially more, in excess of the value offered by the Debtors under the Second Lien Settlement to other Second Lien Noteholders who tendered before the Early Tender Deadline, exclusive of the value of the Most Favored Nation provision. This gives Fidelity a total recovery of ▓▓▓▓ per dollar on its Second Lien Notes. According to the Debtors, other Second Lien Noteholders will be entitled to receive 121 cents on the dollar (for the 11.75% Notes) and 119 cents on the dollar (for the 11% Notes) if they elect to participate in the Second Lien Settlement before the Early Tender Deadline.[2]

*Remainder of Page Intentionally Left Blank*

---

[1] In the absence of a true marketing process, I based the value of Fidelity's right to participate in the Second Lien DIP on the difference in implied equity value between the Debtors' proposed Second Lien DIP and the Strategic DIP. A true marketing process may yield an even further increase in value and may accordingly increase the value to Fidelity.

[2] Amounts in this paragraph are shown including accrued interest as of an illustrative settlement date of July 9, 2014.

KL2 28519956.20

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Executed on June ___, 2014

By: _____
Todd R. Snyder
Executive Vice Chairman
Rothschild Inc.