REDACTED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: June 30, 2014 at 9:30 a.m.** |
| | **Objection Deadline: June 24, 2014 at 12:00 p.m. (Extended By Consent)** |
| | **Related Docket No. 472, 477** |

## AD HOC GROUP OF EFH LEGACY NOTEHOLDERS' OBJECTION TO APPROVAL OF PROPOSED SECOND LIEN FINANCING AND MAKEWHOLE SETTLEMENT

**REDACTED**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 6

    A.    The Bankruptcy Cases ....................................................................... 6

    B.    The Restructuring Support Agreement ............................................. 8

    C.    The Second Lien DIP Facilityp................................................................ 8

    D.    The Second Lien Settlement ............................................................ 10

ARGUMENT ................................................................................................................... 11

I.    THE SECOND LIEN DIP FACILITY (A) IMMEDIATELY AND
PERMANENTLY LOCKS THE DEBTORS INTO AN UNREASONABLY
LOW VALUATION, AND (B) ALONG WITH THE SECOND LIEN
SETTLEMENT, IS A *SUB ROSA* PLAN ............................................................ 11

    A.    Artificially Low And Untested Valuation ...................................... 11

    B.    Illegal *Sub Rosa* Plan .................................................................... 16

II.    IMPERMISSIBLE DISCRIMINATION ............................................................. 18

III.    THE SECOND LIEN DIP FACILITY IS UNNECESSARY ............................. 20

IV.    THE SECOND LIEN DIP FACILITY  FAILS THE THIRD CIRCUIT'S
*O'BRIEN* TEST ................................................................................................ 22

V.    THE SETTLEMENTS ARE UNREASONABLE AND NOT IN THE BEST
INTEREST OF THE DEBTORS AND THEIR ESTATES ............................... 26

VI.    STANDARDS OF REVIEW ............................................................................... 29

    A.    Heightened Standard Of Entire Fairness Applies ......................... 29

    B.    Business Judgment Is Not Enough ................................................. 31

    C.    The Business Judgment Test............................................................ 32

    D.    Settlements And Compromises........................................................ 33

**REDACTED**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allegheny Int'l, Inc.,*
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ...................................................................19

*In re Am. Home Mortg. Holdings, Inc.,*
    501 B.R. 44 (Bankr. D. Del. 2013) .......................................................................18

*In re AMR Corp.,*
    730 F.3d 88 (2d Cir. 2013)....................................................................................26

*In re Barbara K. Enters.,*
    2008 Bankr. LEXIS 1917 (Bankr. S.D.N.Y. June 16, 2008)..................................30

*In re Bidermann Indus. U.S.A., Inc.,*
    203 B.R. 547 (Bankr. S.D.N.Y. 1997)..................................................................29

*In re Braniff Airways, Inc.,*
    700 F.2d 935 (5th Cir. 1983) ...............................................................................16

*In re Bridgeport Holdings, Inc.,*
    388 B.R. 548 (Bankr. D. Del. 2008) .....................................................................13

*In re Broadstripe, LLC,*
    444 B.R. 51 (Bankr. D. Del. 2010) .......................................................................29

*In re Calpine Corp.,*
    365 B.R. 392 (Bankr. S.D.N.Y. 2007)..................................................................18

*In re Calpine Corp.,*
    356 B.R. 585 (S.D.N.Y. 2007)..............................................................................18

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),*
    181 F.3d 527 (3d Cir. 1999)...................................................................4, 22, 25

*In re Capmark Fin. Grp. Inc.,*
    438 B.R. 471 (Bankr. D. Del. 2010) ..............................................................16, 32

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re*
    *Papercraft Corp.),* 211 B.R. 813 (W.D. Pa. 1997)...............................................29

*In re Crowthers McCall Pattern, Inc.,*
    114 B.R. 877 (Bankr. S.D.N.Y. 1990)..................................................................17

*In re Defender Drug Stores, Inc.,*
    145 B.R. 312 (9th Cir. B.A.P. 1992) ................................................................17

*Emerald Partners v. Berlin,*
    787 A.2d 85 (Del. 2001) ................................................................................32

*In re Flight Transp. Corp. Secs. Litig.,*
    730 F.2d 1128 (8th Cir. 1984) .......................................................................19

*In re Fruehauf Trailer Corp.,*
    250 B.R. 168 (D. Del. 2000) ..........................................................................31

*In re Gen. Motors Corp.,*
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) ..........................................................30

*In re Grayhall Res.,*
    63 B.R. 382 (Bankr. D. Colo. 1986) ..............................................................31

*In re Integrated Res., Inc.,*
    147 B.R. 650 (S.D.N.Y. 1992) ......................................................................31

*In re Iridium Operating LLC,*
    478 F.3d 452 (2d Cir. 2007) ..........................................................................16

*In re Kmart Corp.,*
    359 F.3d 866 (7th Cir. 2004) .........................................................................19

*In re L.A. Dodgers LLC,*
    457 B.R. 308 (Bankr. D. Del. 2011) ..............................................................30

*Mangano v. Warriner (In re ID Liquidation One, LLC),*
    2014 U.S. App. LEXIS 2971 (3d Cir. Del. Feb. 19, 2014) ..........................32

*In re Martin,*
    91 F.3d 389 (3d Cir. 1996) .........................................................................6, 32

*In re Mid-State Raceway, Inc.,*
    323 B.R. 40 (Bankr. N.D.N.Y. 2005) ......................................................17, 30

*Mission Iowa Wind Co. v. Enron Corp.,*
    291 B.R. 39 (S.D.N.Y. 2003) ........................................................................31

*Pepper v. Litton,*
    308 U.S. 295 (1939) ......................................................................................28

*In re Pub. Serv. Co. of N.H.,*
    90 B.R. 575 (Bankr. D.N.H. 1988) ................................................................17

*In re RathGibson, Inc.*,
    Case No. 09-12452 (CSS) (Bankr. D. Del. Mar. 23, 2010) ....................................................23

*In re Reliant Energy Channelview LP*,
    594 F.3d 200 (3d Cir. 2010)...........................................................................................22, 24

*Roselink Invs., L.L.C. v. Shenkman*,
    386 F. Supp. 2d 209 (S.D.N.Y. 2004)..................................................................................32

*In re Semcrude, L.P.*,
    399 B.R. 388 (Bankr. D. Del. 2009) ....................................................................................18

*In re Sentry Operating Co. of Tex.*,
    264 B.R. 850 (Bankr. S.D. Tex. 2001) ................................................................................18

*In re Shubh Hotels Pittsburgh, LLC*,
    439 B.R. 637 (Bankr. W.D. Pa. 2010) ................................................................................16

*In re Tenney Vill. Co.*,
    104 B.R. 562 (Bankr. D.N.H. 1989) ...................................................................................30

*In re Tower Auto. Inc.*,
    241 F.R.D. 162 (S.D.N.Y. 2006) ........................................................................................17

*Trak Auto Corp. v. Ramco-Gershenson (In re Trak Auto Corp.)*,
    2002 Bankr. LEXIS 938 (Bankr. E.D. Va. Jan. 9, 2002)......................................................31

*In re Troll Commc'ns, LLC*,
    385 B.R. 110 (Bankr. D. Del. 2008) ...................................................................................32

*United States Bank Nat'l Ass'n v. S. Side House, LLC*,
    2012 U.S. Dist. LEXIS 10824 (E.D.N.Y. Jan. 24, 2012) .....................................................26

*In re US Digital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) .....................................................................................13

*In re White*,
    2008 Bankr. LEXIS 4388 (Bankr. D. Idaho Aug. 19, 2008) .................................................28

*Will v. Northwestern Univ. (In re Nutraquest, Inc.)*,
    434 F.3d 639 (3d Cir. 2006)...............................................................................................32

**Statutes**

11 U.S.C. § 503(b) ..................................................................................................22, 23

11 U.S.C. § 1129 ..........................................................................................................16

**REDACTED**

The Ad Hoc Group of EFH Legacy Noteholders (the "Objectors"), by its undersigned counsel, objects to the above-captioned debtors and debtors in possession's (collectively, the "Debtors") (i) motion to approve postpetition second lien financing [Docket No. 477] (the "Second Lien DIP Motion") and (ii) motion to approve the second lien note settlement [Docket No. 472] (the "Settlement Motion") (together, the "Motions") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

If the Court approves the proposed Second Lien DIP Facility, it will be determining the valuation of Oncor now, without a supporting record, and providing the interested parties with control of Oncor on an artificially low plan valuation that has never been, and may never be, tested. The $1.9 billion Second Lien DIP Facility mandatorily converts into ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ The Debtors are asking the Court to lock in that valuation now. Of course, setting a low valuation (or any valuation) on no record harms the EFH Legacy Noteholders, who effectively are EFIH's equity.

To protect this negotiated but not actual valuation, if the Debtors do not deliver ▉▉▉▉ ▉▉▉▉▉▉ to the Second Lien DIP Lenders in a plan, then the Debtors would have to pay the loan in cash. The cost of doing that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ which as the Debtors' financial advisor, David Ying, rightly declares, is meant to "protect [the] 2nd Lien DIP purchasers from the loss of ownership in reorganized EFH". The Second Lien DIP Facility dictates today what the Debtors can or cannot do at confirmation. If the Court approves the Second Lien DIP Facility, the damage to EFH from undervaluing the Debtors via the mandatory conversion will be immediate and permanent. At absolute bare minimum, should the Court entertain approving the proposed Second Lien DIP

---

[1] Any capitalized terms used in the Preliminary Statement but not otherwise defined herein have the meanings ascribed to them in the body of this Objection or in the Motions.

Facility, it should provide for a valuation hearing at or near confirmation with a full reservation to reduce the conversion ratio upon a demonstration that ███████ overpays the constituents.

This is necessary because even a preliminary cursory analysis shows that the mandatory conversion *undervalues* the Debtors by *billions of dollars*. While the Objectors have not yet performed a valuation and have not formed a view as to the best method to do so, an initial analysis, using readily available public data, illustrates the basis for the Objectors' concerns.



An analysis of trading comparables ███████████████, [2] implies a median multiple of 9.7x 2014 EBITDA. [3] 9.7x 2014 Oncor EBITDA, ██████████████████████████████████████████. This Court cannot approve this outcome at this stage of the case. [4]

Correspondingly, as one would expect, the EFIH PIK Notes trade at prices in the range of 118-125 based on the cheap equity the Second Lien DIP Facility offers them. These trading

---

[2] ███████████████████████████████████████

[3]     The valuation information presented herein – the trading prices on EFIH PIK bonds, TEV/EBITDA multiples and the implied valuations generated from these numbers -- is for illustrative purposes only. This data is based on the trading activities and multiples generated by third parties that have no stake in valuation litigation involving these estates. While illustrative, this information raises troubling questions over whether the EFIH unsecured creditors are receiving more than the allowed amounts of their claims under the guise of the rights offering in violation of Section 1129 of the Bankruptcy Code. The Ad Hoc Group of EFH Legacy Noteholders has not performed complete due diligence nor has it had the opportunity to perform an appropriate valuation and reserves all rights with respect thereto.

[4]     It is, of course, no answer to say that the plan still must be confirmable and thus the EFIH PIK Noteholders at confirmation cannot be paid more than in full. If Fidelity controls the vote of the EFH equity at EFIH and the EFH notes at EFH, the Court may never get to a valuation other than the one locked in on the current motion.

prices imply an expected return 18-25 points higher than par or $282-$392 million in total.  For EFH PIK Notes to achieve this return under the RSA, the implied valuation of Oncor would be $17.427 billion - $17.583 billion or approximately 9.48x-9.57x 2014 Oncor EBITDA.[5]

EFIH appears to be decidedly solvent.  Plainly, every dollar lost through a giveaway of cheap equity is a dollar lost by the EFH estate and directly by the EFH Legacy Noteholders. Holders of EFIH PIK Notes – which until a recent exchange were EFH notes – have ensured that value is trapped at EFIH and will not flow to EFH Legacy Noteholders.

Fidelity is the exception (here and throughout the cases).  The Second Lien DIP Facility allows Fidelity – and only Fidelity – to participate in the facility and in the equity conversion on account of its unsecured EFH notes.[6]  The proposed Second Lien DIP Facility entitles Fidelity – and no other EFH unsecured creditor – to an $11.25 million participation fee, a *pro rata* ████████ ████████████████████████████████████, and extensive consent rights and protections.  All this constitutes impermissible discrimination against holders other than Fidelity in violation of the Bankruptcy Code and its underlying principles.[7]

The Second Lien DIP Facility imposes massive prejudice with no offsetting benefit. There is no dispute that the proposed financing provides the Debtors with *no* working capital, *no* borrowing capacity and *no* debt relief.  Rather, in the RSA, the Debtors simply agreed to enable a pre-plan rights offering – at a defined plan value – to guarantee certain recoveries to Fidelity and

---

[5]       The implied multiple determined by adding the market value of the Oncor Net Debt, EFIH First Lien Notes, EFIH Second Lien Notes, EFIH PIK Notes and EFH debt implies a multiple of 10.8x 2014 EBITDA (assuming $190 million pof distributable cash at EFH as of 3/31/15 per EFH Budget). Thus, while not determinative, it is clear that the market believes that the RSA and the Rights Offering undervalue the Debtors by billions of dollars.

[6]       Fidelity is allowed to participate in 9% of the Second Lien DIP Facility, which mandatorily converts into 9% of the equity issued to satisfy the DIP. While all EFH unsecured creditors (including Fidelity) would be allowed to acquire that equity from Fidelity on a *pro rata* basis, such rights are only able to be purchased after the fact at confirmation.

[7]       Fidelity is also receiving substantial value on account of its Second Lien Notes, which, unlike other Second Lien Notes, are permitted to participate in the First Lien DIP Facility and are entitled to related fees.

the holders of EFIH PIK Notes.  The Second Lien DIP Facility is simply unnecessary.  And it appears that the relevant boards did no analysis if EFIH and EFH are better off with no Second Lien DIP Facility.

The Debtors do not, because they cannot, justify the Second Lien DIP Facility on any traditional operational need bases as they did with the "T" side DIP.  Here, they weakly assert that the Second Lien DIP Facility will provide them with a monthly interest rate arbitrage of ███ ██████████████████████████████  However, the actual monthly savings from the Second Lien DIP Facility is no more than $7.7 million and decreases as the Debtors borrow more under the First Lien DIP Facility to pay settling makewhole claims.  That is $92.4 million over a year, which is eclipsed by the commitment fees on the DIP of $51.25 million, ███████ ████████████████████████████████, each of which utterly fails the Third Circuit's *O'Brien* test anyhow.  The latter two are arguably not even necessary; there already are competing DIP proposals so there is no benefit from the break-up fees at this point.

Repaying the Second Lien Notes also strips the estate of powerful rights.  Once converted to Second Lien DIP Facility debt, the Debtors can no longer reinstate, treat or cram down the Second Lien Notes under a plan.  The Second Lien DIP debt must be paid (here with ████ ████████████████████████████.  If the Second Lien DIP Facility is approved, the Debtors forfeit their contractual right to reinstate 65% of the Second Lien Notes through an "equity claw" in the EFIH Second Lien Notes Indentures that would allow them to repurchase 35% of the Second Lien Notes with proceeds of an equity issuance at a premium to par of approximately $88 million – rather than the approximately $330

million offered to settle makewhole claims.[8] But if the Second Lien DIP Facility is approved, the Debtors no longer may use this powerful right to reinstate or treat or cram down that remaining 65% under a plan.

The standard for approval here is high. Where, as here, DIP financing involves insiders or implicates conflicts of interest among affiliated debtors, the entire fairness standard governs. Among other things, the DIP represents a negotiated plan split of equity between EFIH and EFH done largely at combined board meetings on a *negotiated* rather than actual valuation, with the negotiation done by nondebtor parties (Fidelity and the holders of EFIH PIK Notes). The Debtors cannot show fair dealing and fair pricing. They can only show a PIK/Fidelity dictated plan valuation and the pre-plan poison pill protected sale of cheap equity. And even if the Court applies the business judgment standard, the DIP fails. The Court cannot defer to a board on an inside transaction when the board accepts a financing that provides no financing. The Court simply cannot approve the DIP transaction on these facts.

The makewhole settlement fares no better. The Debtors propose to pay 50% to settle litigation that they do not settle. They provide no evidence on the likelihood of success or loss. Tellingly, there is no evidence that 50% is reasonable or in the estates' best interests. The settlement eliminates no litigation. For sure, the parties are not going to litigate 43% less strenuously and at 43% less cost because 43% of the holders settled. The litigation is not complex and is largely, if not completely, contractual. The Debtors save no costs, suffer the same delay, and have the same inconvenience. Through plan treatment, the Debtors have the ability to pay, and they certainly have the ability to pay less, should they win. And they will win.

---

[8]     If the Debtors were to utilize an equity clawback for 35% of their Second Lien Notes, their total monthly interest expense on the remaining notes would be only $███████ higher per month than the contemplated interest on the Second Lien DIP Facility. Given the immense makewhole savings, the incremental additional interest payments are negligible.

On the merits, neither the act of acceleration nor a repayment after acceleration trigger a prepayment "makewhole" penalty under the EFIH Second Lien Notes Indentures and applicable law. Of paramount importance, most creditors oppose the settlement. And the parties that support it, like Fidelity, stand to benefit greatly from the Debtors' overpayment on makewhole claims. The proposed makewhole settlement fails the Third Circuit's *Martin* test. It also fails the higher best interests test that the Court adopted with the first lien makewhole settlement.

* * * *

In the rush to set a valuation under arbitrary RSA "milestones" and to appease Fidelity and the EFIH PIK Noteholders, who have leveraged the bankruptcy process, the Court unfortunately faces DIP financing that provides no financing and a litigation settlement that settles no litigation. The Ad Hoc Group of EFH Legacy Noteholders respectfully requests that the Court deny both motions.

## BACKGROUND

### A.   The Bankruptcy Cases

1.       On April 29, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

2.       As of the Petition Date, the Debtors' total funded indebtedness was almost $42 billion, of which Energy Future Holdings Corp. ("EFH") had approximately $1.929 billion of funded debt outstanding, consisting primarily of: (i) EFH Legacy Notes; (ii) EFH LBO Notes; and (iii) EFH Unexchanged Notes.[9]

---

[9]       *See Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* ("First Day Decl."), at 38 [Docket No. 98].

1.    **The EFH Legacy Notes**

3.      Pursuant to three separate indentures, each dated as of November 1, 2004 (as amended, modified, or supplemented), and three associated officer's certificates, each dated as of November 26, 2004, for three series of unsecured notes (the "EFH Legacy Notes"),[10] by and among EFH, as issuer, and American Stock Transfer & Trust Company, LLC ("AST"), as successor indenture trustee to the Bank of New York Mellon Trust Company, N.A. ("BNY"), the predecessor to EFH issued the EFH Legacy Notes.[11]

4.      The aggregate principal amount of EFH Legacy Notes outstanding as of April 29, 2014 is approximately $1.864 billion.  This includes approximately $1.282 billion held by EFIH and at least $406 million[12] held by Fidelity Investments and its affiliates (collectively, "Fidelity").[13]  As of June 24, 2014, members of the Ad Hoc Group of EFH Legacy Noteholders or their affiliates are the holders, advisors, or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of or with respect to more than $49 million[14] of the aggregate principal amount of EFH Legacy Notes and are supported in this Objection by Caxton Associates LP, as trading advisor for a client that holds $40 million of certain EFH Legacy Notes, raising the total to $89 million.[15]

---

[10]      The three series of EFH Legacy Notes are as follows:  (i) the 5.55% notes originally due November 15, 2014; (ii) the 6.50% notes originally due November 15, 2024; and (iii) the 6.55% notes originally due November 15, 2034.

[11]      First Day Decl. ¶ 84.

[12]      Fidelity has not disclosed the makeup of its $471 million of EFH notes.  At a minimum, if one assumes that Fidelity holds all LBO Notes ($60 million) and all "unexchanged notes" ($5 million), Fidelity holds at least $406 million of EFH Legacy Notes.

[13]      *Id.*

[14]      Caxton Associates LP, as trading advisor for a client that holds certain EFH Legacy Notes, while not a member of the Ad Hoc Group of EFH Legacy Noteholder supports this objection.

[15]      The identity of the members of the Ad Hoc Group of EFH Legacy Noteholders and their respective EFH holdings are set forth in the Rule 2019 statement filed shortly.

**B.    The Restructuring Support Agreement**

5.       The Debtors and certain of their stakeholders, including Fidelity, entered into a

Restructuring Support and Lock-Up Agreement, dated April 29, 2014 (the "RSA").[16]  As

modified, the RSA governs several inter-Debtor and third-party transactions that in essence

govern (a) a purported tax-free "spin-off" and concurrent deleveraging of TCEH and (b) a

recapitalization of EFIH and EFH.[17]  As contemplated in the RSA, the Debtors have filed several

related motions, including the Second Lien DIP Motion and the Settlement Motion.

6.       In addition, under the RSA, the Debtors have agreed to certain milestones,

including that by July 13, 2014, the Court must have approved the Second Lien Settlement.

**C.    The Second Lien DIP Facility**

7.       Under the Second Lien DIP Motion, the EFIH Debtors seek authority to borrow

$1.9 billion under a debtor in possession note-purchase facility (the "Second Lien DIP Facility").

The following are the salient provisions of the Second Lien DIP Facility:

- **Use of Proceeds.**  The Debtors would use **all proceeds** of the Second Lien DIP Facility, along with proceeds of the First Lien DIP Facility, to repay approximately $2.156 billion of EFIH Second Lien Notes.[18]

- **Lenders.**  The opportunity to fund the Second Lien DIP Facility is open to substantially all of the EFIH Debtors' unsecured creditors including holders of the EFIH senior unsecured notes ("EFIH PIK Notes"), EFH LBO Notes, and Fidelity, as an EFH unsecured creditor.  *But not holders of EFH Legacy Notes,* although they are similarly situated with Fidelity at EFH.  Fidelity, *but not other EFH Legacy Noteholders,* would have the right to fund up to 9% of the Second Lien DIP Facility.[19]  Certain holders of EFIH unsecured notes (the "Initial Commitment Parties")[20] and certain

---

[16]      *Id.* ¶ 17.

[17]      *Id.* ¶¶ 168, 171.

[18]      Second Lien DIP Motion ¶ 5; Ying DIP Decl. ¶ 7.

[19]      Second Lien DIP Motion ¶ 7.

[20]      The Initial Parties include: Avenue Capital Management II, LP; York Capital Management Global Advisors, LLC; GSO Capital Partners LP; Third Avenue Management LLC; and P. Schoenfeld Asset Management LP.

other preferred parties (the "Preferred Parties" and, together with the Initial Commitment Parties, the "Commitment Parties") have agreed to backstop the entire $1.9 billion. *Again, the Debtors did not provide that opportunity to other EFH Legacy Noteholders, though similarly situated with Fidelity.*[21]

- **Mandatory Conversion.** The Second Lien DIP Facility incorporates a pre-plan negotiated valuation and will mandatorily convert (the "Equity Conversion") into ███████████ of the equity of reorganized EFH (the "Equity Conversion Shares"). Holders of the EFIH PIK Notes and the EFH LBO Notes (including the Commitment Parties) that fund the Second Lien DIP Facility will share 91% of the Equity Conversion Shares. Fidelity, *not other similarly situated EFH Legacy Noteholders*, will receive the remaining 9% of the Equity Conversion Shares. All EFH unsecured creditors (including Fidelity) will be allotted pro-rata rights to acquire these 9% Equity Conversion Shares from Fidelity at confirmation, after Fidelity has been paid from the outset on "agreeing" to participate, *with no other similarly situated holders given that opportunity.*

- **Fees.** The Second Lien DIP Facility provides extensive fees and forms of compensation to the Commitment Parties.

8.     The facility provides for an "unprecedented" ████████ prepayment fee due if the Debtors repay the Second Lien DIP Facility in cash without consent or upon acceleration (the "Prepayment Fee").[22] As disclosed on the term sheet, the Prepayment Fee provides:

> If the Second Lien DIP Facility is repaid in cash without the consent of the Required Note Purchasers and other than upon acceleration, the Issuers shall pay an optional prepayment fee of $380 million . . . .[23]

9.     As discussed further below, ███████████████████ ███████████████████████████████ for a competing transaction and serve as a poison pill that effectively locks the Debtors into the Equity Conversion feature of the RSA and Second Lien DIP Facility before a plan tests the underlying valuation, if a valuation is to occur at all. As the Debtors' financial advisor put it, the

---

[21]     Second Lien DIP Motion ¶ 8.

[22]     Second Lien DIP Motion at 13; Note Purchase Agreement § 4.1.

[23]     *See* Second Lien DIP Notes Term Sheet, Second Lien DIP Motion, Ex. A to Ex. E, at 7.

prepayment penalty fee is meant to "protect [the] 2nd Lien DIP purchasers from the loss of ownership in reorganized EFH". In fact, mandatory conversion appears intended to forestall any valuation of EFIH.

10.    The Second Lien DIP Facility also contains the following other fees:

- $95 million closing fee in the form of notes to be issued to certain backstopping parties (the "Closing Fee"). The Closing Fee gives the Commitment Parties additional equity through the Equity Conversion.

- $11.25 million participation fee payable to Fidelity, if Fidelity exercises any of its participation rights (the "Participation Fee"), but not to the other EFH Legacy Noteholders.

- $40 million in assorted other fees, including execution, approval, arranger, and funding cash fees.[24]

### D.    The Second Lien Settlement

11.    On May 15, 2014, the Debtors filed the Settlement Motion, which seeks, among other things, approval of the following settlements (the "Second Lien Settlement," and, together with the Second Lien DIP Facility, the "Transactions"):

- **Repayment of Second Lien Notes.** The Debtors propose to repay the entire principal outstanding under the EFIH Second Lien Notes,[25] together with all accrued but unpaid interest, by using the proceeds of the Second Lien DIP Facility as well as proceeds of the EFIH First Lien DIP Facility and EFIH cash.[26]

- **Settlement of Makewhole Claims.** The Debtors seek authority to settle makewhole claims asserted by holders of the EFIH Second Lien Notes. The Debtors estimate that the total claims asserted equal $682 million.[27] In the Settlement Motion, the Debtors propose to pay settling holders 50% of their asserted claims in cash.[28] The Debtors are engaged in a tender offer seeking holder sign on to this proposed settlement. As of June 13,

---

24        Second Lien DIP Motion at 13-14.

25        The "Second Lien Notes" are comprised of: (i) $406 million principal amount of 11.00% EFIH Second Lien Notes and (ii) approximately $1.75 billion principal amount of 11.75% EFIH Second Lien Notes.

26        Settlement Motion ¶ 25.

27        Ying Settlement Decl. ¶ 10.

28        Settlement Motion ¶ 26.

2014, holders of 43% of the Second Lien Notes had agreed to accept this settlement amount.[29]

## ARGUMENT

I. **THE SECOND LIEN DIP FACILITY (A) IMMEDIATELY AND PERMANENTLY LOCKS THE DEBTORS INTO AN UNREASONABLY LOW VALUATION, AND (B) ALONG WITH THE SECOND LIEN SETTLEMENT, IS A *SUB ROSA* PLAN**

### A.   Artificially Low And Untested Valuation

12.      The Transactions dictate ultimate plan valuation. The Debtors have, pre-plan, agreed to convert the Second Lien DIP Facility ▮▮▮▮▮ reorganized equity of EFH. The Debtors readily acknowledge this. *See* Ying DIP Decl. ¶ 16 ("Neither constituent [Fidelity or the ad hoc group of EFIH second lien notes] offered a committed financing proposal that both met the EFIH Debtors' criteria and *offered a valuation of the EFIH Debtors' enterprise that was superior to that implied by the EFIH Second Lien DIP Facility*") (emphasis added). The mandatory conversion, combined with the threat of the Prepayment Fee, locks in plan valuation. And the documentary evidence demonstrates that the "valuation" was the result of negotiations between Fidelity and the EFIH PIK Notes holders, not a market-tested valuation.

13.      In fact, the Debtors did not perform a formal valuation. At the May 22 hearing, Mr. Paul Keglevic, the Debtors' CFO, was questioned about a valuation being performed on the Debtors:

> Q: David Ying and his team and Evercore act as the debtors' financial advisors, correct?
>
> A: Correct.
>
> Q: Has Evercore undertaken a valuation of the debtors' business?
>
> A: You'd have to ask Mr. Ying, but I've not seen any valuation report from Mr. Ying or his firm.

---

[29]      8-K filed June 13, 2014.

Q:  Do you know whether Evercore has done a valuation?

A:  I don't believe they have.[30]



15.    Mr. Ying, the Debtors' investment banker, confirmed further at his June 23, 2014

deposition that



[32]

\*        \*        \*

---
[30]    May 22, 2014 Hr'g Tr., 129:10-18.

[31]

[32]



16.    Charles Cremens, EFIH's independent director, ███████████:

17.    The Debtors' abandonment of their responsibilities and simple agreement to

Fidelity's and the EFIH PIK Noteholders' negotiated valuation warrants denial of the Motions

because the Debtors and their decision-makers were uninformed and failed to exercise requisite

due care. *In re US Digital, Inc.*, 443 B.R. 22, 41 (Bankr. D. Del. 2011) (Sontchi, J.) ("[t]he duty

of care has been described as the duty to act on an informed basis" and is breached when "the

directors individually and the board collectively have failed to inform themselves fully and in a

---

33 ███████████

34 ███████████████

deliberate manner"); *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) (if directors "fail to inform themselves fully and in a deliberate manner, then they lose the protection of the business judgment rule and the court is required to scrutinize the challenged transaction under an entire fairness standard of review") (internal citations and quotations omitted).

18.     Importantly, the values implied by the Transactions are artificially low and, had the Debtors performed a valuation, they should have concluded that the Transactions over-compensate the EFIH noteholders.

19.     While the Objectors have not yet performed a valuation and have not formed a view as to the best method to do so, an initial analysis, using readily available public data, illustrates the importance of a proper valuation in this context:[35]



20.     As shown above, merely adjusting the implied multiple from ▮▮▮▮▮▮▮ to 9.7x EBITDA based on a current comparable company analysis results in an additional ▮▮▮▮ ▮▮▮ of incremental EFH equity value.  Thus, there is a near certainty that the EFIH

---

[35]     *See* note 3 *supra.*

[36]     *See* note 2 *supra.*

[37]     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[38]     Implied value of 80.3% of Oncor less 80.3% of Oncor net debt.

[39]     Implied Oncor equity value to EFH less *pro forma* EFIH cash plus *pro forma* EFIH debt.

noteholders will be paid more than the allowed amount of their claims under the proposed RSA.
The Court should not mandate that result, not tested by valuation, the "best interests" test, the
good faith test, and the "fair and equitable" test, through an unnecessary DIP facility.

21.    As the following chart shows, the Fidelity/PIK negotiated ██████/EBITDA

valuation is too low given market comparables:[40,41,42]

| Company | EV / EBITDA 2014E |
|---|---|
| **Transmission & Distribution:** | |
| CenterPoint Energy, Inc. | 8.4x |
| Consolidated Edison, Inc. | 8.6x |
| ITC Holdings Corp. | 11.7x |
| Northeast Utilities | 9.9x |
| UIL Holdings Corporation | 8.0x |
| **Regulated Electric:** | |
| Duke Energy Corporation | 9.8x |
| Southern Company | 9.5x |
| Wisconsin Energy Corp. | 10.4x |
| **Mean** | **9.6x** |
| **Median** | **9.7x** |

22.    As shown above, the implied plan valuation in the mandatory conversion is
unreasonably low, untested by the Debtors and transfers substantial value to the EFIH PIK Notes
and to Fidelity that is owed to the EFH unsecured creditors.  And, as discussed next, approval of
the Second Lien DIP Facility locks valuation in place today and sets these cases down an
irreversible course.

---

[40]    

[41]    *See note 3 supra.*

[42]    While this is only a preliminary analysis and the Ad Hoc Group of EFH Legacy Noteholders has not
performed a full valuation, Oncor may warrant a premium valuation in excess of the comparable range illustrated for
various reasons and under other appropriate methodologies.

**B.**    **Illegal *Sub Rosa* Plan**

23.    A transaction is an impermissible *sub rosa* plan if it effectively disposes of all or substantially all of a debtor's assets (*i.e.*, EFIH's Oncor interest) without following the Bankruptcy Code's procedural protections in connection with the process for disclosure and approval of a plan of reorganization.  The procedural protections provided in the Bankruptcy Code include, among other things, the right to receive a detailed disclosure statement from a debtor, and the right to vote on the proposed plan.  Here, these rights must include a proper valuation and, critically, the reservation by the Court of the right to reduce the conversion amount should valuation prove that the holders of the EFIH PIK Notes are being overpaid.  Indeed, a plan of reorganization may only be confirmed if it satisfies the extensive list of requirements in Section 1129.  *See* 11 U.S.C. § 1129.  Where, as here, a debtor seeks to employ an alternative transaction designed to circumvent section 1129's requirements, courts will strike down the transaction as a *sub rosa* plan of reorganization.  *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").  "The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan." *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (internal citations and quotations omitted).

24.    This Court has held that transactions embody a *sub rosa* plan when they "[have] the effect of dictating the terms of a prospective chapter 11 plan." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (Sontchi, J.) (citations omitted); *see also In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 644 (Bankr. W.D. Pa. 2010) ("Where a transaction has

the effect of dictating the terms of a prospective chapter 11 plan, it will constitute a prohibited *sub rosa* plan.").

25.     By entering into or agreeing to the Transactions, the Debtors will commit to pursuing a specific plan at a specific valuation. Mandatory conversion of the Second Lien DIP Facility, the Closing Fee, the Prepayment Fee and the Second Lien Settlement severely limit the Debtors' potential options and tie their hands. The mandatory conversion of the Second Lien DIP Facility imposes a pre-plan valuation that is too low and untested.[43]

26.     The ███████████████████████████████████ both become due to the Second Lien DIP Facility lenders if the Debtors *repay in full in cash* the Second Lien DIP Facility through any alternative transaction. In other words, if the Second Lien DIP Facility lenders are completely repaid, but do not receive equity pursuant to the Equity Conversion, the Debtors must ██████████████.

27.     The Second Lien Settlement limits potential plan options. By repaying the Second Lien Notes, the Debtors would foreclose the possibility of reinstating their Second Lien Notes. Unlike the Second Lien Notes, the Second Lien DIP Facility must be repaid at emergence. This materially constrains the universe of viable plan alternatives.

28.     Thus, here, the Debtors are using the Transactions to evade confirmation requirements – creating a textbook *sub rosa* plan. This applies with equal force to the Second Lien DIP Facility and the Second Lien Settlement. *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.") (citing *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. B.A.P.

---

[43]     *See* discussion at I.A, *supra*.

1992)); *In re Tower Auto. Inc.*, 241 F.R.D. 162, 168 (S.D.N.Y. 2006) ("[a] settlement which has

the effect of dictating the terms of the debtor's plan of reorganization prior to the confirmation

process cannot be approved"); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr.

S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be

permitted."); *In re Pub. Serv. Co. of N.H.*, 90 B.R. 575, 581-82 (Bankr. D.N.H. 1988) (finding

that when a proposed transaction outside the ordinary course "might improperly and indirectly

lock the estate into any particular plan mode prematurely, and without the protection afforded by

the procedures surrounding a disclosure statement and confirmation hearing," it should not be

approved).[44]

## II.    IMPERMISSIBLE DISCRIMINATION

29.    The Court should not approve the Transactions because they unfairly discriminate

against the non-Fidelity holders of the EFH Legacy Notes, like the Objectors.  Indeed, Fidelity

appears to have tied its negotiation of the EFH Legacy Notes to getting satisfaction elsewhere on

the capital structure such as through the makewhole settlement benefitting its Second Lien Notes

and its ability to participate in the First Lien DIP Facility on account of its Second Lien Notes.

30.    "In general, the Bankruptcy Code is premised on the rule of equality of treatment.

Creditors with claims of equal rank are entitled to equal distribution."[45]  This Court has held that

"[o]ne of the primary goals – if not the primary goal – of the Code is to ensure that similarly-

---

[44]    The cases the Debtors cite in support of using the Second Lien DIP Facility to pay pre-petition
indebtedness are inapposite as none involved disagreements concerning the debtor's exercise of business judgment.
*See In re Calpine Corp.*, 365 B.R. 392, 392 (Bankr. S.D.N.Y. 2007) ("[n]o party seriously disputes that the proposed
multi-billion refinancing will provide massive benefits and advantages to the Debtors' chapter 11 estates and the
majority of their creditors"); *In re Calpine Corp.*, 356 B.R. 585, 597 (S.D.N.Y. 2007) ("the Trustee does not argue
that the bankruptcy court erred in finding a good business reason existed for granting Debtors' Repayment Motion").
In addition, in *In re School Specialty, Inc.*, the court found that the debtors required the refinancing DIP "to permit,
among other things, the orderly continuation of the operation of their businesses." *In re School Specialty, Inc.*, 13-
10125 (KJC) ¶ 5 (Bankr. D. Del. Mar. 14, 2013).  Here, no DIP proceeds will fund operations.

[45]    *See In re Sentry Operating Co. of Tex.*, 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001).

situated creditors are treated fairly and enjoy an equality of distribution." *In re Am. Home Mortg. Holdings, Inc.*, 501 B.R. 44, 59 (Bankr. D. Del. 2013) (quoting *In re Semcrude, L.P.*, 399 B.R. 388, 399 (Bankr. D. Del. 2009)).  Section 1123(a)(4) of the Bankruptcy Code requires that claims in the same class receive equal treatment.[46]  Courts have applied the principle of equality of distribution to similarly situated creditors in numerous other non-plan contexts, including pre-plan settlements.  *See, e.g., In re Allegheny Int'l, Inc.*, 118 B.R. 282, 295-96 (Bankr. W.D. Pa. 1990) (holding plan proponent's pre-plan tender offer to purchase claims "caused discriminatory treatment among members of the same class, in violation of 11 U.S.C. § 1123(a)(4)," because creditors who accepted tender offer received immediate cash while others would receive distributions at a later undetermined date); *In re Flight Transp. Corp. Secs. Litig.*, 730 F.2d 1128, 1138-39 (8th Cir. 1984) (denying in part settlement of estate's claims to disputed escrow funds because funds allocated to debtor's estate would not be made available to certain creditors); *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004) (denying critical vendors motion for non-compliance with equal-treatment and priority standards broadly applicable in bankruptcy; noting that "[m]any sections [of the Bankruptcy Code] require equal treatment").

31.    Under the Second Lien DIP Facility, the Debtors and their respective estates are effectively locked into a plan of reorganization that unfairly discriminates against the non-Fidelity holders of the EFH Legacy Bonds.  Fidelity receives a suite of benefits unavailable to similarly situated creditors at EFH, including:

- 9% participation rights in the Second Lien DIP Facility; *other EFH unsecured creditors get none.*

- $11.25 million Commitment Fee in connection with the exercise of participation rights; *other EFH unsecured creditors get none.*

---

[46]    *See* 11 U.S.C. § 1123(a)(4).

- Reimbursement of advisor and other fees; *other EFH unsecured creditors get none.*

32.     Contrary to the Bankruptcy Code's mandate, similarly situated EFH creditors are only receiving a contingent right to buy out a piece of Fidelity's recovery.

33.     The Debtors' apparent primary, if not sole, justification for the improved treatment to Fidelity to the exclusion of other EFH creditors is that Fidelity is an "anchor tenant" given its interest throughout the debt structure and that its participation is essential to the RSA.[47] What the Debtors are essentially arguing is that they can transfer value from the EFH creditors to Fidelity in order to co-opt Fidelity to support a framework that enriches Fidelity but hurts EFH creditors. This view is severely flawed and cannot justify the Debtors' decision to prefer Fidelity over similarly situated creditors.

## III.    THE SECOND LIEN DIP FACILITY IS UNNECESSARY

34.     The Second Lien DIP Facility has a single interrelated purpose: to repay the Second Lien Notes and to set the valuation for the plan. The Debtors will not use any of the Second Lien DIP Facility to fund operations, case administration, or ordinary course liabilities. Thus, the sole beneficiaries of the Second Lien DIP Facility would be the repaid Second Lien Notes and the new lenders who will end up owning the Debtors after emergence. The Debtors' other stakeholders and their estates, however, will receive no benefit from the Second Lien DIP Facility and, in fact, would be saddled with immense fees and limited emergence possibilities. The Debtors offer three, equally flawed, justifications for the Second Lien DIP Financing.

35.     First, the Debtors contend that the Court should approve the Second Lien DIP Facility because it "is critical to recapitalizing the EFH Debtors *at emergence*" and because through the "*mandatory conversion feature*, the EFIH Second Lien DIP Facility provides a

---

[47]     *See* June 6 Hr. Tr. 182:13-17; 191:7-21.

mechanism, *at an early date in these chapter 11 cases*, for EFIH to ensure that it can deleverage its capital structure."[48]  In other words, the Debtors aver that the Second Lien DIP Facility is proper now because of the plan treatment it dictates in the future.  As discussed *supra*, these are the hallmarks of an impermissible *sub rosa* plan and cannot justify the Debtors' incurrence of massive fees and undue burdens to the estate.

36.    *Second*, the Debtors contend that the lower interest payable on the Second Lien DIP Facility compared with the interest due on the Second Lien Notes will "sav[e] the EFIH Debtors approximately $8 million in monthly cash interest expense (approximately $96 million per year) during the EFIH Debtors' Chapter 11 cases . . . ."[49]  ████████████████████ ████████████████████████████████████████████████████████

████████████████████ The Objectors seriously doubt this calculation.  ████████████████ ████████████████████ is inflated because it ignores that certain Second Lien Notes will be repaid with proceeds outside the Second Lien DIP Facility.  Based on 43% of the Second Lien Notes opting into the Second Lien Settlement (as of the early tender deadline), the Debtors would pay $139.6 million in makewhole claims to settling holders.  That amount, combined with the contemplated payment of all outstanding principal, totals $2.296 billion in payments, which means the Debtors must fund a deficiency of $395.6 million from cash on hand and First Lien DIP Facility proceeds.  The interest expense saved by paying that deficiency is not attributable to the Second Lien DIP Facility and should not be included in the purported interest savings relied upon by the Debtors.

37.    Moreover, the extensive fees the Debtors are incurring in connection with the Second Lien DIP Facility fees eclipse the purported interest savings – ████████████████████

---

[48]    Ying DIP Decl. ¶ 13 (emphases added).

[49]    Ying DIP Decl. ¶ 7.

███████████████████████  As discussed *supra*, those fees include (a) the $95 million

Closing Fee, (b) the $11.25 million Participation Fee and (c) $40 million in assorted other fees,

including execution, approval, arranger, and funding cash fees.  Thus, any minimal interest saved

by the Second Lien DIP Facility is quickly lost to the extensive fees pledged to the Commitment

Parties.  Interest savings do not provide sound justification for the Second Lien DIP Facility.

38.    Third, the Debtors claim that the Second Lien DIP Facility "facilitates a tax-

efficient restructuring of each of EFH and EFIH" because "[i]f third parties who are not existing

creditors of EFIH or EFH obtain a majority interest as a group in EFIH or EFH Corp. in

connection with a restructuring of the Debtors, the tax free nature of the restructuring

contemplated in the RSA would no longer be achievable."[50]  This point, however, does not

justify the Debtors' entry into the Second Lien DIP Facility and asks the Court to make

unsubstantiated assumptions.  This assumes that the Debtors must borrow additional funds

(which they have not established), that they must provide equity to lenders (which is not the

case), and that there are not other existing creditors willing to fund. ███████████████

███████████████████████████████████.  Thus, it appears

that there are many ways that the purported deconsolidation tax can be avoided.  In other words,

this concern may determine who should be a lender and the terms of repayment, but does not

answer this more fundamental question:  why do the Debtors need the Second Lien DIP Facility?

The answer is they do not.

## IV.    THE SECOND LIEN DIP FACILITY
## FAILS THE THIRD CIRCUIT'S *O'BRIEN* TEST

39.    Section 503(b) of the Bankruptcy Court permits the allowance of administrative

claims for "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. §

---

[50]    Ying DIP Decl. ¶¶ 9, 11.

503(b). "[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). "[A] break-up fee is not necessary to preserve the value of the estate when the bidder would have bid even without the break-up fee." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (internal citations and quotations omitted). Moreover, this Court has denied approval of a break-up fee when the recipients of the break-up fee were parties already in the capital structure. *See In re RathGibson, Inc.*, Case No. 09-12452 (CSS) (Bankr. D. Del. Mar. 23, 2010) Hr'g Tr. 31:10-14 ("The problem with the fee – the breakup fee and the expense reimbursement isn't the amount. It is the parties to whom it benefits. It is the bidders. These are DIP bidders. These are pre-petition lenders. They have been involved in the case.").

40.    The Second Lien DIP Motion proposes granting the Second Lien DIP Lenders the following fees:  (a) the $95 million Closing Fee, (b) the $11.25 million Participation Fee, (c) $40 million in assorted other fees, including execution, approval, arranger, and funding cash fees and (d) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

41.    The Debtors cannot establish that the foregoing fees constitute "actual, necessary costs and expenses of preserving the estate." *See* 11 U.S.C. § 503(b).

42.    The Debtors' decision to pay these fees is unsupportable. The Debtors readily acknowledge that no precedent exists for the Second Lien DIP Facility or for the extensive fees sought. Ying DIP Decl. ¶ 25 ("Although I am not aware of any historical DIP financing agreement against which to compare the EFIH Second Lien DIP Facility's terms and conditions, I believe that the EFIH Second Lien DIP Facility was the only *viable* proposal to emerge from

pre-filing negotiations."); ¶ 30 ("I believe that, given the unique nature of the EFIH Second Lien DIP, this Alternative Transaction Fee is reasonable under the circumstances and a critical element of the Investment Commitment."). The Debtors do not explain, however, why this particular instance, of a DIP that is entirely unnecessary and highly coveted by its lenders, justifies creating new precedent.

43.    The Debtors' attempt to justify the $95 million Closing Fee fails. The Debtors contend that this "fee is reasonable and comparable to a commitment fee paid in connection with an equity rights offering because it compensates the Commitment Parties for backstopping the Equity Conversion."[51] The Debtors do not and cannot explain why a backstop is necessary. The Equity Conversion is struck at a low valuation that makes it attractive to all constituents. There is every reason to believe that a rights offering would be fully subscribed such that a backstop is unnecessary.

44.    The Debtors defend the █████████ Prepayment Fee by contending that "[t]he Second Lien DIP Facility's conversion structure is closely analogous to a rights offering, and the Alternative Transaction Fees are well within the range of fees payable in connection with rights offerings in chapter 11 cases."[52] This misses the point. "[A] break-up fee is not 'necessary to preserve the value of the estate' when the bidder would have bid even without the break-up fee." *Reliant Energy*, 594 F.3d at 206 (internal citations and quotations omitted). As discussed above, the Debtors have not shown that the Commitment Parties would not have agreed to backstop the rights offering without this fee.

45.    The Debtors half-hearted attempt to justify the █████████ Prepayment Fee is meritless. Ying DIP Decl. ¶ 31 ("The Termination Fee was bargained for to protect the EFIH

---

[51]    Ying DIP Decl. ¶ 28.

[52]    *Id.* ¶ 30.

Second Lien DIP Purchasers from the loss of ownership in reorganized EFH, which was a

significant driver of their willingness to fund the EFIH Second Lien DIP Facility."). In essence,

the Debtors' sole defense of this fee is that the EFIH Second Lien DIP Purchasers really wanted

it. Indeed, the moment competitive bidders emerged with lower fees, the EFIH Second Lien DIP

Purchasers immediately reduced theirs. This shows that the fee was never necessary and plainly

fails to meet the requirements of an administrative expense claim. This fee is highly prejudicial

in that it locks the Debtors into an equity conversion at a predetermined (yet untested) plan

valuation.[53] Nonetheless, the Debtors approved this fee without giving it sufficient consideration

and exercising the requisite level of due care.

46.    Accordingly, the fees fail any applicable level of scrutiny.[54] First, the "entire

fairness" standard should apply to the extent of any insider dealings. The Debtors have not

demonstrated, and cannot demonstrate, that the fees reflect a fair price derived from fair

dealings. Second, the Debtors' approval of the fees cannot meet the heightened standard

applicable to these types of transactions. See O'Brien, 181 at 535 ("In other words, the

allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees

were actually necessary to preserve the value of the estate. Therefore, we conclude that the

business judgment rule should not be applied as such in the bankruptcy context."). The Debtors'

decisions disregarded that no precedent exists for such transactions and such fees. Third, the

Debtors' decisions were uninformed and reached without due care and the business judgment

test provides them no relief.

---

[53]    See Discussion at I.A., supra.

[54]    See Discussion of Standards of Review at VI., infra.

## V.    THE SETTLEMENTS ARE UNREASONABLE AND NOT IN THE BEST INTEREST OF THE DEBTORS AND THEIR ESTATES

47.    In the Settlement Motion, the Debtors ask the Court to approve the Second Lien Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy procedure. The Court should deny the Settlement Motion because the Debtors cannot satisfy the Third Circuit's requirements for approval.[55]

48.    First, the Debtors have not demonstrated that there is any validity to the Second Lien Noteholders' arguments for a makewhole payment. Indeed, Mr. Cremens testified ████ ████████████████████:



49.    In fact, there are several obstacles to the Second Lien Noteholders making their case. Section 6.01(a)(6) of the Second Lien Notes Indenture provides that the commencement of a bankruptcy proceeding constitutes an "Event of Default" and Section 6.02 provides that in such a case "all principal of and **premium, if any**, interest (including Additional Interest, if any) and any other monetary obligations on the outstanding Notes shall be due and payable immediately without further action or notice" (emphasis added).

---

[55]    *See* Section VI.D., *infra.*

[56]    Cremens Dep. Tr. June 23, 2014, 60:15-61:11.

50.     Under New York law, which governs, "[g]enerally, a lender forfeits the right to a prepayment consideration by accelerating the balance of the loan.  The rationale commonly cited for this rule is that acceleration of the debt advances the maturity date of the loan, and any subsequent payment by definition cannot be a prepayment." *United States Bank Nat'l Ass'n v. S. Side House, LLC*, 2012 U.S. Dist. LEXIS 10824, at *13-14 (E.D.N.Y. Jan. 24, 2012) (citations omitted).  An exception exists when a "clear and unambiguous clause . . . calls for payment of the prepayment premium." *Id.* at *14.  That does not exist here.

51.     The acceleration provision does not impose a prepayment premium.  It merely provides that a "premium, if any" must be paid upon acceleration.  This does not create an obligation that does not otherwise exist elsewhere in the indenture.  The Second Lien Note Indenture does not say, as it could say and other others do say, that a premium *becomes due* upon acceleration.

52.     In addition, repayment *after* acceleration is not "an optional repayment" and cannot trigger a prepayment premium. *See In re AMR Corp.*, 730 F.3d 88, 103 (2d Cir. 2013) ("When the event of default occurred and the debt accelerated, the new maturity date for the debt was November 29, 2011.  Consequently, American's attempt to repay the debt in October 2012 was not a voluntary prepayment because prepayment can only occur *prior* to the maturity date.") (internal citations and quotations omitted).  Inasmuch as the Second Lien Notes will be repaid *after* acceleration, an "optional repayment" will not occur and, therefore, no prepayment premium would be due.

53.     Finally, the acceleration provision is not "clear and unambiguous" because the amount of the premium cannot be calculated at the time of the acceleration because the calculation requires knowledge of the redemption date.

54.    <u>Second</u>, the Debtors justify the settlements as "a necessary first step to a successful restructuring" because they are "supported by the most junior economic stakeholders of EFIH and EFH, those that bear the economic risk, and provides a means by which all senior EFIH stakeholders may receive payment in full on account of their allowed claims."[57]  However, by "most junior economic stakeholders" the Debtors mean only Fidelity.  Fidelity's support must be discounted given its roles all over the capital structure coupled with the benefits that it is receiving signing the RSA.[58]  The real parties in interest here – the Ad Hoc Group of EFH Legacy Noteholders – do not support the RSA.

55.    <u>Third</u>, the Debtors argue that unless the Court approves the Settlement "the Debtors' chapter 11 cases would be subject to a complex web of litigation that could threaten confirmation of chapter 11 plans of reorganization by the Debtors."[59]  However, litigation over the makewhole already has begun and will proceed regardless of the Settlements.  *See* Case No. 14-10979 (CSS), Adv. Proc. No. 14-50363, filed May 15, 2014; Case No. 14-10979 (CSS), Adv. Proc. No. 14-50405, filed June 16, 2014.  Because the makewhole premium affects all of the EFIH Second Lien Noteholders equally, litigating the makewhole premium as to one creditor is essentially the same as litigating to all of the creditors. The Debtors' position can only be true if all parties accept the Second Lien Settlement, whereas, to date, only 43% have accepted it.

56.    The makewhole litigation is not complex and is largely, if not completely contractual.  Moreover, given that certain of the Debtors' creditors have already commenced litigation regarding the makewhole – to which – the Debtors must defend, the Debtors save no

---

[57]    Settlement Motion ¶ 43.

[58]    *See* Section II, *supra.*

[59]    Settlement Motion ¶ 44.

costs, suffer the same delay, and have the same inconvenience, even if the Second Lien

Settlement is approved.[60]

57.    Accordingly, the Second Lien Settlement fails the requisite standards for

approving settlements and compromises.

## VI.    STANDARDS OF REVIEW

58.    In a typical – rather than unprecedented – case, courts evaluate transactions by

reviewing a debtor's business judgment.  Here, however, because insider dealings drove and

tainted the Transactions, they are subject to heightened scrutiny.

### A.    Heightened Standard Of Entire Fairness Applies

59.    It is well settled law that insider transactions are:

> subject[] to rigorous scrutiny and where any of their contracts or
> engagements with the corporation is challenged the burden is on
> the director or stockholder not only to prove the good faith of the
> transaction but also to show its inherent fairness from the
> viewpoint of the corporation and those interested therein.

*Pepper v. Litton*, 308 U.S. 295, 306-07 (1939).  This Court has likewise held that:

> [t]he requirement of fairness is unflinching in its demand that
> where one stands on both sides of a transaction, he has the burden
> of establishing its entire fairness, sufficient to pass the test of
> careful scrutiny by the courts. This 'fairness' requirement contains
> both (i) fair dealing and (ii) fair price, examined together as a
> whole. 'Fair dealing' involves elements such as (i) when the
> transaction was timed, (ii) how it was initiated, (iii) how it was
> structured, (iv) how it was negotiated, (v) how it was disclosed to
> the directors, and (vi) how the approvals of the directors and the
> stockholders were obtained. 'Fair price' includes such
> considerations as 'economic and financial considerations of the
> proposed merger, including all relevant factors: assets, market

---

[60]    *See In re White*, No. 07-41080-JDP, 2008 Bankr. LEXIS 4388, at *16 (Bankr. D. Idaho Aug. 19, 2008) ("As to the third factor, this is not a particularly complex case . . . the Court is not persuaded that any factual deviations add in any significant fashion to the complexity of the litigation. Indeed, most, if not all, of the material facts are undisputed, as is apparent from the transaction documentation and public records already submitted to the Court.").

> value, earnings, future prospects, and any other elements that affect
> the intrinsic or inherent value of a company's stock.

*In re Broadstripe, LLC*, 444 B.R. 51, 106 (Bankr. D. Del. 2010) (internal citations and quotations

omitted). *See also In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y.

1997) (transactions between a debtor and insiders "are necessarily subjected to heightened

scrutiny because they are rife with the possibility of abuse.") (internal citations and quotations

omitted); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re

Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("insider transactions are subjected to

rigorous scrutiny and, when challenged, the burden is on the insider not only to prove the good

faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation

and those with interests therein").

60.    The Second Lien DIP Facility and the Second Lien Settlement dictate allocation

of value between EFH and EFIH stakeholders through mandatory conversion at a pre-plan

valuation and through use of potential EFH recoveries to fund the makewhole settlements.

Negotiations or other dealings between the boards and principals of EFH and those of EFIH

constitute insider dealings subject to the "entire fairness" standard. *Bidermann*, 203 B.R. at 551

(transactions between a debtor and insiders "are necessarily subjected to heightened scrutiny

because they are rife with the possibility of abuse").

61.    As shown above, the Court cannot approve the Transactions at question because

the Debtors have not and cannot satisfy this rigorous standard.

**B.    Business Judgment Is Not Enough**

62.    Even if this Court were to conclude that the entire fairness standard[61] should not apply to the Transactions, the stakes here are too high and the impact on the Debtors' cases too permanent and prejudicial to simply defer to the Debtors.

63.    Although the Court, in reviewing requests for post-petition financing, would normally "defer to a debtor's own business judgment," that deference only applies "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede[s] control of the reorganization to one party in interest." *In re Barbara K. Enters.*, 2008 Bankr. LEXIS 1917, at *39-40 (Bankr. S.D.N.Y. June 16, 2008) (quoting *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)).  Courts do not allow financing arrangements when they "convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender." *Mid-State Raceway*, 323 B.R. at 59.  *See also In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (denying approval of DIP financing, in part, because the "directors were not disinterested or independent"); *In re Tenney Vill. Co.*, 104 B.R. 562, 569 (Bankr. D.N.H. 1989) (rejecting DIP because "the execution of the Financing Agreement violates the Debtors' fiduciary obligations to the estate").

64.    Courts considering pre-plan sale transactions, particularly in early stages of the case, apply a heightened standard.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 492 n.54 (Bankr. S.D.N.Y. 2009) (applying "close factual scrutiny" to a pre-plan sale where the "the proportionate value of the assets being sold is high"); *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43

---

[61]    *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) ("The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.").

(S.D.N.Y. 2003) ("[w]here a debtor attempts to sell substantially all of its assets pursuant to 11 U.S.C. § 363(b), instead of waiting for confirmation of a reorganization plan and the safeguards that that process provides, *more than cursory scrutiny* is required by the Bankruptcy Court . . . *meaningful* scrutiny of the allocation here in issue is needed, among other reasons, to address the possibility that the allocation may have been infected by self-dealing . . . ") (emphasis added).

65.    The Equity Conversion constitutes a sale of the Debtors' reorganized equity and cannot withstand meaningful scrutiny because, as discussed *supra*, it so dramatically undervalues the Debtors and requires the Debtors to pay enormous and unnecessary fees.

### C.    The Business Judgment Test

66.    At the very minimum, the Debtors must demonstrate that the Transactions pass the business judgment test. This means that the Debtors must exercise their judgment fairly for the benefit of all creditors. *See In re Grayhall Res.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986) (debtor may assume contracts under section 365 where "assumption represents a sound business judgment on the part of the Debtor and will not be prejudicial to the interest of the creditors"); *Trak Auto Corp. v. Ramco-Gershenson (In re Trak Auto Corp.)*, 2002 Bankr. LEXIS 938, at *6 (Bankr. E.D. Va. Jan. 9, 2002) (court must "evaluate debtor's business judgment by considering the impact of the debtor's decision on a variety of parties as well as the impact on the debtor's estate").

67.    "The business judgment rule shields corporate decision-makers and their decisions from judicial second-guessing where the five elements of the rule—a business decision, disinterestedness, due care, good faith, and no abuse of discretion—are present." *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 196 (D. Del. 2000) (internal citations and quotations omitted). *See also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (same). "The presumption of the business judgment rule is rebutted . . . where a plaintiff establishes facts to show that any of the four elements was not present." *Roselink Invs., L.L.C. v. Shenkman*, 386 F.

Supp. 2d 209, 216-17 (S.D.N.Y. 2004).  "A plaintiff can rebut the presumption of the business

judgment rule by showing that the board of directors, in reaching its challenged decision,

violated any one of its triad of fiduciary duties:  due care, loyalty, or good faith."  *In re Troll*

*Commc'ns, LLC*, 385 B.R. 110, 118 (Bankr. D. Del. 2008) (internal quotations omitted) (citing

*Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001)).

> **D.** **Settlements And Compromises**

68.      Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, the court

may approve a compromise or settlement.  *See* Fed. R. Bankr. P. 9019.  Prior to approving a

settlement, the court must "assess and balance the value of the claim that is being compromised

against the value to the estate of the acceptance of the compromise proposal."  *In re Martin*, 91

F.3d 389, 393 (3d Cir. 1996).  This Court examines the four factors set forth by the Third Circuit

in determining whether to approve a settlement:

> (1) the probability of success in ligation; (2) the likely difficulties
> in collection; (3) the complexity of the litigation involved, and the
> expense, inconvenience and delay necessarily attending it; and (4)
> the paramount interest of the creditors.

*Id.*; *see also Capmark*, 438 B.R. at 476; *Mangano v. Warriner (In re ID Liquidation One, LLC)*,

2014 U.S. App. LEXIS 2971, at *8-9 (3d Cir. Del. Feb. 19, 2014) (same); *Will v. Northwestern*

*Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (same).

69.      The Court has indicated that the standard of review for a settlement is higher than

business judgment, where as here, it is discriminatory and prejudicial.  (June 6, 2014 Hr'g Tr.

259:17-23) ("And I haven't heard anything about discrimination or about any kind of

unsupported activity that would make me look at this settlement as anything other than under the

normal reasonable exercise of business judgment, lowest range of reasonableness which I think

is – personally I think is too low. I think about it in the concept of exercise of business

judgment.") But even if the Court were to use the lowest reasonable business judgment standard, the Second Lien Settlement fails because (1) the Debtors have a high probability of success in litigation, (2) there are no relevant collection difficulties, (3) the issues are not particularly complex and litigation expenses are unavoidable and (4) the paramount interest of the creditors is to avoid paying claims that not legitimately owed. *See In re Martin*, 91 F.3d at 393.

WHEREFORE, the Objectors respectfully request that the Court deny the Motions and grant the Objectors such other and further relief deemed just and proper.

Dated: June 24, 2014
      Wilmington, Delaware

      THE HOGAN FIRM

      By: *Garvan F. McDaniel*
      Garvan F. McDaniel, Esq. (DE #4167)
      1311 Delaware Avenue
      Wilmington, Delaware 19806
      Telephone:  (302) 656-7540
      Facsimile:  (302) 656-7599
      Email: gfmcdaniel@dkhogan.com

        – and –

      KASOWITZ, BENSON, TORRES
        & FRIEDMAN LLP
      David S. Rosner, Esq.
      Andrew K. Glenn, Esq.
      Daniel A. Fliman, Esq.
      1633 Broadway
      New York, New York 10019
      Telephone:  (212) 506-1700
      Facsimile:  (212) 506-1800
      Email: drosner@kasowitz.com
          aglenn@kasowitz.com
          dfliman@kasowitz.com

      *Counsel to the Ad Hoc Group of EFH Legacy*
      *Noteholders*