## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. 477**<br>**Objection Deadline: June 24, 2014 at 12:00 p.m.**<br>**Hearing Date and Time: June 30, 2014 at 9:30 a.m.** |

### OBJECTION OF THE AD HOC GROUP OF TCEH UNSECURED NOTEHOLDERS TO THE MOTION OF ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE INC. FOR ENTRY OF AN ORDER (A) APPROVING POSTPETITION SECOND LIEN FINANCING, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) AUTHORIZING THE EFIH SECOND LIEN REPAYMENT, (E) AUTHORIZING ENTRY INTO AND PAYMENT OF FEES UNDER THE COMMITMENT LETTER, AND (F) MODIFYING THE AUTOMATIC STAY AND LIMITED OBJECTION TO THE RELATED MOTION <u>TO APPROVE THE EFIH SECOND LIEN SETTLEMENT</u>

The ad hoc group of certain holders (the "Ad Hoc Group of TCEH Unsecured Noteholders") of approximately $2.8 billion of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued by Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc., by and through its undersigned counsel, hereby files its (1) objection to the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition

---

[1]     The last four digits of Energy Future Holdings Corp.'s federal tax identification number are 8810. The location of the Debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.efhcaseinfo.com.

Second Lien Financing, (B) Granting Liens and Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay [Docket No. 477] (the "Motion")[2] and (2) limited objection to the Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment [Docket No. 505] (together, the "Objection").[3] In support of the Objection, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      By the Motion, the EFIH Debtors (with the support of the other Debtors) is unabashedly seeking to lock in a plan structure that allocates its post-reorganization equity to its debtor-in-possession lenders and prepetition creditors outside of a plan of reorganization.  It is, however, premature for the Debtors to undertake a transaction that will define, and at the same time limit, how any of them are to reorganize.  Among other things, approval of the transaction at EFIH is being sought before and without the benefit of:

- an enterprise valuation of the EFIH Debtors, other than the value implied by the competing bids themselves, from which the Court can value the equity being allocated;

- any diligence into the validity, extent and priority of the security interests and liens securing the EFIH Second Lien Notes, which are to be repaid in full and without question with the proceeds of the EFIH Second Lien DIP Facility;

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3]      By the Objection, and for the reasons discussed below, the Ad Hoc Group of TCEH Unsecured Noteholders objects to approval of the EFIH Second Lien Settlement at this time.

- Court approval of the Debtors' assumption of the Restructuring Support Agreement on which the EFIH Second Lien DIP Facility and the Equity Conversion are premised; and

- consideration by the fiduciaries for the TCEH Debtors[4] of how the EFIH Second Lien DIP Facility and the Equity Conversion will affect the "T-side" Debtors' prepetition claims and causes of action against the EFIH Debtors.

2.      Despite the lack of any closure on these key issues, the Debtors have elected to move forward with the Motion, citing to a need to save the EFIH estate approximately $11 million in interest per month by replacing the existing EFIH Second Lien Notes with lower interest debt under the EFIH Second Lien DIP Facility.  Those savings are illusory, and in any event immaterial in the context of these chapter 11 cases.  In addition to the millions that the EFIH Debtors are spending in legal fees pursuing the EFIH Second Lien DIP Facility over the objection of a material percentage of EFIH's secured lenders, the fees associated with entering and exiting the contemplated facility swamp the savings in the near term, and ultimately may cost EFIH substantially more than any "saving."  There is simply no rational reason why the Motion must proceed now, before the chapter 11 process has been given any opportunity to work.

3.      Leaving aside the purported exigency of interest savings, the fight here is not about the EFIH Second Lien DIP Facility, but rather, a plan of reorganization.  The EFIH Second Lien DIP Facility is admittedly a critical component of a global restructuring that seeks to lock in now, outside of a plan process and without the benefit of a valuation, plan recoveries to

---

[4]      The "TCEH Debtors" include TCEH, Energy Future Competitive Holdings Company LLC ("EFCH"), and their direct and indirect subsidiaries.

existing EFIH unsecured funded debt claimants and Fidelity and set a timeline for resolution of "T-side" disputes.

4.    Fundamentally, the EFIH Debtors have taken a "so what" approach to any criticism that the Motion encroaches too far on the plan process, repeatedly touting the supermajority support from the EFIH unsecured creditors and the existence of a "fiduciary out." But not all unsecured creditors were canvassed for support, and the fiduciary out is too restrictive.  The relief requested in the Motion, if granted, would severely and irreparably prejudice the ability of the TCEH Debtors to recover on their potentially substantial prepetition claims against the EFIH Debtors, which could conceivably rank senior in right to claims of the Prepetition EFIH Second Lien Creditors that are being paid pursuant to the Motion, and it would further the process of binding the TCEH Debtors to the pursuit of a plan process that would release the TCEH Debtors' claims for no consideration.  Likewise, exercising the fiduciary out here will cost EFIH $190 million—a year and a half of "interest savings"—that otherwise could have been distributed to unsecured creditors.  That "break-up" fee, one of the largest ever sought in a chapter 11 case, is particularly inappropriate in that the Debtors have not completed their own work as to the value of the equity they are committing to distribute.

5.    In the end, the Motion represents the latest example of management's misguided decision to barrel forward, without proper diligence, process or forethought in the face of uniform opposition from substantially all TCEH general unsecured creditors, on an expedited timetable with a proposed plan that would benefit the parties to the Restructuring Support Agreement at the expense of all other stakeholders.  The Motion should be denied.[5]

---

[5]    Despite repeated requests from the Ad Hoc Group of TCEH Unsecured Noteholders, the Debtors would not agree to make Mr. Hugh Sawyer, the independent member of TCEH's board of managers, available for deposition in

## OBJECTION

6.    To obtain postpetition secured financing under section 364(c) of the

Bankruptcy Code, the EFIH Debtors must sustain the burden of establishing each of the

following three requirements:

> (1) They are unable to obtain unsecured credit per 11 U.S.C.
> § 364(b), i.e., by allowing a lender only an administrative claim
> per 11 U.S.C. § 503(b)(1)(A);
>
> (2) The credit transaction is necessary to preserve the assets of the
> estate; and
>
> (3) The terms of the transaction are fair, reasonable, and adequate,
> given the circumstances of the debtor-borrower and the proposed
> lender.

In re St. Mary Hosp., 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988) (citing In re Crouse Grp., Inc., 71

B.R. 544, 549 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 553 (E.D. Pa. 1987)).  As discussed below,

the EFIH Debtors cannot satisfy their burden because the proposed EFIH Second Lien DIP

Facility is (1) unnecessary and (2) the terms thereof are not fair, reasonable or adequate under the

circumstances.

### A.    The EFIH Second Lien DIP Facility Is Not
### In The Best Interests Of The EFIH Debtors

7.    If the Motion is approved, it is unclear at this early stage of these chapter

11 cases what the financing will actually cost or what the benefit, if any, will be to the EFIH

Debtors' estates.  The EFIH Debtors repeatedly state that the EFIH Second Lien DIP Facility

should be approved now to replace the existing EFIH Second Lien Notes and thereby "save" the

---

advance of the deadline for filing the Objection.  That deposition is currently scheduled for Thursday, June 26, 2014.
The Ad Hoc Group of TCEH Unsecured Noteholders reserves the right to file a supplemental objection following
such deposition.

EFIH Debtors' estates approximately $11 million per month in interest.[6] Those "savings," however, may never be realized. Although the EFIH Debtors can forestall the incurrence of approximately $11 million per month in interest accruals, the minimum fees being paid to the Commitment Parties total $146.25 million (see Motion ¶¶ 44-45 (describing the Total Second Lien DIP Commitment Fees of approximately $51.25 million and the Closing Fee of $95 million)). As such, even in the best case scenario, with the incurrence of the minimum costs, there would be no net savings realized until the fourteenth month following the closing of the EFIH Second Lien DIP Facility and the EFIH Second Lien Repayment. Notably, based on the restructuring timeline agreed to by the parties to the Restructuring Support Agreement, including the EFIH Debtors and the EFIH Second Lien DIP Note Purchasers, the purported savings from the EFIH Second Lien DIP Facility would not be realized until several months after the Debtors' proposed exit from bankruptcy, which means they would not be realized at all.[7]

8.      The passage of additional time, however, would not ensure that the EFIH Debtors realize any of their purported "savings" through the EFIH Second Lien DIP Facility. In the event the EFIH Debtors consummate a restructuring that does not provide 60% of the equity of reorganized EFH Corp. to the EFIH Second Lien DIP Note Purchasers, then, at a minimum, the EFIH Debtors will incur an additional "Prepayment Fee" in the amount of $95 million,

---

[6]      Subsequent to the filing of the Motion, the base interest rate that would be charged with respect to the EFIH Second Lien DIP Facility was reduced from 8.0% per annum to 6.25% per annum. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

[7]      The Restructuring Support Agreement contemplates that the plan of reorganization described therein will be confirmed and become effective within approximately eleven months following the Petition Date. See Restructuring Support Agreement § 8.01(f); (i).

wiping out any purported savings for another eight months.[8]  Furthermore, having conducted no

valuation of EFIH's assets, the EFIH Debtors cannot know how much they are really paying for

the EFIH Second Lien DIP Facility.  That is, if the EFIH Debtors do consummate a restructuring

that provides the EFIH Second Lien DIP Note Purchasers with 60% of the equity of reorganized

EFH Corp., but the value of reorganized EFH Corp. is higher than the assumed value, then each

additional dollar of value going to the EFIH Second Lien DIP Note Purchasers and not junior

stakeholders would be a cost of the EFIH Debtors' estates of entering into the EFIH Second Lien

DIP Facility.

9.     Perhaps more important, the concept of "savings" is a misnomer, here.  As

a result of the commencement of these chapter 11 cases, the EFIH Debtors are not obligated to

pay on a current basis any interest with respect to the existing EFIH Second Lien Notes.[9]  Thus,

the EFIH Debtors could simply hold the status quo, leave the EFIH Second Lien Notes in place

and conserve all cash and accrue interest on the EFIH Second Lien Notes, to be paid at exit from

chapter 11 in an amount determined by the Court under section 506 of the Bankruptcy Code.

10.     ███████████████████████████████████

████████████████████████████████

---

[8]     The percentage of the equity of reorganized EFH Corp. into which the EFIH Second Lien DIP Facility
would convert has been reduced from 64% to 60%, and the amount of the Prepayment Fee has been reduced from
$380 million to $95 million. ███████████████████████████████

[9]



███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ These claims and liens, in fact, may

have substantial defects relating to, among other things, the Debtors' leveraged buyout and the

creation of the Oncor ring-fence. Nonetheless, the Motion seeks to defease these claims as fully

secured and have them replaced with Court-sanctioned postpetition claims and liens arising

under the EFIH Second Lien DIP Facility, thereby curing any existing defects.[10]

      11.     Given that no net savings is likely to be realized from the EFIH Second

Lien DIP Facility, and there is no justification for rushing to approve this de facto rights offering

outside of a plan confirmation process, and the Debtors have failed to complete certain critical

work, the Motion should be denied. At a minimum, consideration of the Motion should be

deferred until such time as it can be considered alongside the Debtors' motion to assume the

Restructuring Support Agreement.[11]

---

[10]     No record has been made regarding the Debtors' investigation of the validity extent, priority or allowability of the EFIH Second Lien Notes claims and Prepetition EFIH Second Priority Liens. The Ad Hoc Group of Unsecured Noteholders objects to the EFIH Second Lien Settlement to the extent it would result in payment of the EFIH Second Lien Notes before the validity, extent, priority and allowability of the EFIH Second Lien Notes claims and Prepetition EFIH Second Priority Liens have been property and fully examined and determined. Proposed counsel to the Debtors has suggested including a reservation of rights as to potential claims and causes of action against only non-settling holders of the EFIH Second Lien Notes in the order approving the EFIH Second Lien Settlement. The Ad Hoc Group of TCEH Unsecured Noteholders sees no principled reason for this distinction.

[11]     The Ad Hoc Group of TCEH Unsecured Noteholders further understands that the Official Committee of Unsecured Creditors appointed in these chapter 11 cases, among others, will be objecting to the economics of the

B.    <u>The EFIH Second Lien DIP Facility Is Prejudicial To The TCEH Debtors</u>

12.    From the outset of these chapter 11 cases, the Ad Hoc Group of TCEH

Unsecured Noteholders has been concerned with the investigation, preservation and eventual

prosecution of prepetition claims and causes of action that one or more of the TCEH Debtors

may have against their affiliates, including EFIH and EFH Corp., relating to billions of dollars of

prepetition transactions and transfers of value from the TCEH Debtors to other Debtors and their

stakeholders (collectively, the "TCEH Claims"), all of which the TCEH Debtors are committing

to release pursuant to the Restructuring Support Agreement.  The Ad Hoc Group of TCEH

Unsecured Noteholders' concerns and resolve have only grown with the recent admissions by the

Debtors that the TCEH Debtors have been insolvent for years and that, in the sixteen months

preceding the filing of these chapter 11 cases, the TCEH Debtors transferred more than $2 billion

to EFH Corporate Services Company ("Corporate Services") for the benefit of, among others,

EFIH, EFH Corp., its equity sponsors and advisors to other creditors and stakeholders of the

Debtors, many of which transfers occurred during the preference period.  To that end, the Ad

Hoc Group of TCEH Noteholders has repeatedly sought to preserve and protect all TCEH

Claims for the benefit of all creditors of the TCEH Debtors and have insistently sought

discovery, pursuant to Federal Rule of Bankruptcy Procedure 2004 and otherwise, to diligence

the TCEH Claims so that the Ad Hoc Group of TCEH Unsecured Noteholders would be in a

position to understand how those TCEH Claims relate to the releases being offered and the

recoveries to claimants against the TCEH Debtors.  The TCEH Debtors' disclosures in response

thereto have been insufficient to put the Ad Hoc Group of TCEH Unsecured Noteholders in a

---

EFIH Second Lien DIP Facility.  The Ad Hoc Group of TCEH Unsecured Noteholders may join in those objections, as appropriate.

position to speak with authority about the TCEH Claims, other than to affirm its belief that those TCEH Claims may represent the most significant source of recovery for unsecured creditors of the TCEH Debtors.

13.     Consistent with such concerns and efforts, the Ad Hoc Group of TCEH Unsecured Noteholders objects to the EFIH Second Lien DIP Facility because, among other things, it threatens to prejudice the TCEH Debtors and the TCEH Claims in at least two ways. As an initial matter, as discussed in the statement of the Ad Hoc Group of TCEH Unsecured Noteholders with respect to the Alternative Transaction Fee [Docket No. 643], the imprecision that results from overlapping management, counsel and advisors taking action on behalf of "the Debtors" has resulted in the Commitment Letter which purports to obligate the TCEH Debtors to pay some or all of the $57 million "break-up" fee for a transaction "involving EFIH" and "on equal or better terms and conditions for EFIH . . . ." See Motion, Ex. E (the "Commitment Letter"), at 5 ("the Debtors shall pay . . . an amount in cash equal to 3.00% of $1.9 billion . . . to the Initial Commitment Parties (the 'Alternative Transaction Fee') . . . ."). None of the TCEH Debtors, however, executed the Commitment Letter (see id.), nor is there any evidence that any TCEH Debtors are benefitting in any way by the proposed EFIH Second Lien DIP Facility. ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■[12] Thus, any order approving any EFIH debtor-in-

---

[12] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

possession financing should clarify that no TCEH Debtor is incurring any obligation with respect to that financing.

### 1. The TCEH Debtors Are Prepetition Creditors Of The EFIH Debtors

14. More importantly, even with that clarification, approval of the EFIH Second Lien DIP Facility will compromise the value of the TCEH Claims against the EFIH Debtors stemming from questionable prepetition intercompany transactions. Such TCEH Claims would be irreparably impaired if (i) the EFIH Second Lien Notes are defeased with the proceeds of the proposed EFIH Second Lien DIP Facility; and (ii) the allocation of value for distribution to creditors of the EFIH Debtors, including the TCEH Debtors, is determined now rather than as part of the plan confirmation process.

15. As noted, since the outset of these chapter 11 cases, the Ad Hoc Group of TCEH Unsecured Noteholders has sought discovery from the Debtors regarding questionable prepetition intercompany transactions made in the period during which the TCEH Debtors were admittedly insolvent. To date, the Ad Hoc Group of TCEH Unsecured Noteholders' discovery and diligence with respect to those TCEH Claims has been largely held in abeyance by the Debtors. The need for discovery and diligence has, however, been made even more acute by the evidence obtained through discovery with respect to the Motion suggesting that ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████—they have not been produced to or otherwise

shared with the advisors to the Ad Hoc Group of TCEH Unsecured Noteholders, despite such

claims being placed in issue as early as the "first-day" hearing in these chapter 11 cases and

pending discovery requests.

        16.    Based on the public record and the little diligence that has been provided

to date, the TCEH Claims include, but are not limited to, causes of action with respect to the

transfer of Oncor (defined below), transfers made under the TAA (defined below) and transfers made pursuant to "shared services."

       17.    <u>Oncor-Related Claims</u>:  Oncor Electric Delivery Company LLC ("Oncor") has not always been owned by the "E-side" Debtors subject to a purported "ring fence."  In fact, 100% of the equity interests in Oncor once constituted an asset of the TCEH Debtors.  EFCH, TCEH's immediate parent, however, transferred its equity interests in Oncor to EFH Corp. by way of dividend in exchange for what appears to have been zero consideration.  <u>See</u> Form 8-K of EFH Corp. and TCEH filed October 17, 2007, Ex. 99.2 at F-51 (indicating transfer was structured as an intercompany dividend to parent).  EFH Corp., in turn, transferred the equity interests in Oncor to EFIH as part of the 2007 leveraged buyout.  <u>See</u> Form 10-K of EFH Corp. for the fiscal year ended December 31, 2007, Ex. 10(eee).  These transfers will be the subject of significant diligence in these chapter 11 cases.  The initial dividend by EFCH to EFH Corp. of its equity interests in Oncor may ultimately be avoidable as a fraudulent conveyance.  To the extent that initial transfer is ultimately unwound, EFCH would be entitled to recover the equity interests of Oncor from EFIH pursuant to section 550(a) of the Bankruptcy Code.  Such relief would entitle the TCEH Debtors—not the EFIH Debtors—to the value deriving from the equity interests in Oncor.  In so doing, it would effectively subordinate any recovery by the holders of EFIH Second Lien Notes on their secured claims against EFIH to the prior recovery in full by general unsecured creditors of the TCEH Debtors.  If the Motion is granted, however, this Claim will be subordinated to the EFIH Second Lien DIP Liens without any consideration.

       18.    <u>TAA-Related Claims</u>:  The TCEH Debtors may also possess claims to recover hundreds of millions of dollars from the EFIH Debtors as a result of a series of intercompany transfers purportedly made pursuant to an intercompany tax allocation agreement

(the "TAA"). That agreement was entered into by EFH Corp., TCEH, and EFIH on May 15, 2012, but purports to retroactively govern intercompany tax payments from January 1, 2010.[13] The TAA obligated EFH Corp. to file a single consolidated U.S. federal income tax return on behalf of its subsidiaries but entitled it to payments from those subsidiaries in an amount equal to the hypothetical tax liability that each such subsidiary would have owed as a separate stand-alone taxpayer. In the years prior to the Petition Date, TCEH incurred significant annual net operating losses (the "TCEH NOLs"). See Texas Competitive Electric Holdings Company LLC Statements of Consolidated Income (Loss), available at http://www.energyfutureholdings.com/pdf/2013_Unaudited_Financial_Statements_-_Texas_Competitive_Electric_Holdings_Company.pdf. EFH Corp. appears to have utilized these TCEH NOLs to shelter income earned by its other subsidiaries—including Oncor and the EFIH Debtors—from federal and state taxes. See Form 10-K of EFH Corp. for the fiscal year ended December 31, 2013, at 127. Section 3 of the TAA, however, required EFH Corp. to compensate TCEH for the use of the TCEH NOLs—compensation which does not appear to have been made. As the Debtors have admitted in their public filings, the TCEH Debtors were likely insolvent during the period. See Form 10-K of EFH Corp. for the fiscal year ended December 31, 2010, at 23; Form 10-K of EFH Corp. for the fiscal year ended December 31, 2011, at 30 ("Third party analyses of TCEH's business . . . have indicated that the principal amount of TCEH's outstanding debt exceeds its enterprise value."). The transfers of the TCEH NOLs and TCEH Tax Payments to EFH Corp. may therefore be avoidable as fraudulent transfers. Moreover the TAA itself may be avoidable as a fraudulent transfer. As a result, any

---

[13]    The TAA appears as Exhibit 10(b) to the Form 10-Q of EFH Corp. for the quarterly period ended September 30, 2012.

transfers of TCEH NOLs made to EFH Corp. pursuant to that agreement—which ultimately

benefitted the EFIH Debtors—would be unwound. Under such circumstances, the TCEH

Debtors could possess claims for recovery against the EFIH Debtors.

19.    Shared Services-Related Claims:  Perhaps the largest instance of "T-side"

and "E-side" dispute is with respect to the series of intercompany transfers made pursuant to a

prepetition shared services agreement. Less than one year before the Petition Date, in October

2013, the TCEH Debtors entered into an intercompany shared services agreement (the "Shared

Services Agreement") with Corporate Services. See Declaration of Paul Keglevic, Executive

Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future

Holdings Corp., et al., in Support of First Day Motions [Docket No. 98] (the "First Day

Declaration"), Ex. A at 23. That agreement was subsequently amended in the month prior to the

commencement of these chapter 11 cases. Id. Pursuant to that agreement, Corporate Services

reportedly provided a range of services to the TCEH Debtors, including back-office services,

employment of corporate-level employees, and payments directly to vendors on account of

expenses incurred by the TCEH Debtors. Id. In exchange, the TCEH Debtors reportedly made

cash payments to the EFH Corp. "Money Pool Main Account" that is managed by Corporate

Services. Id. at 24. The payments totaled approximately $2.235 billion in 2013 alone. Id. The

services provided by Corporate Services are also provided to EFIH under a separate services

agreement, and to EFH Corp. and Oncor based on a series of operational agreements and

historical practices, respectively. Id. at 23. The expenses relating to such services are allocated

by Corporate Services between the TCEH Debtors and the EFIH Debtors, pursuant to a

predetermined formula. Id. In 2014, the Debtors expect to allocate the cost for the shared

services provided by Corporate Services as between the TCEH Debtor and the EFIH Debtors

(and EFIH's subsidiaries) 84% and 16%, respectively. Id.  Subject to ongoing diligence, the

TCEH Debtors possess a number of significant claims against the EFIH Debtors on account of

these prepetition arrangements.  Given that the agreements were entered into between affiliates

within the preference period, the agreements themselves may be avoidable.  █████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████  Any excess payments made to Corporate Services pursuant to an intercompany

expense allocation that are ultimately determined to have been unreasonable from the perspective

of the TCEH Debtors may be avoidable as fraudulent transfers.  To the extent avoided, the

TCEH Debtors may be entitled to recover the amount of such excess from the EFIH Debtors, to

whose benefit any such excess redounded, pursuant to section 550 of the Bankruptcy Code.

> **2.  The Relief Sought In The Motion Will Impair The
> TCEH Debtors' Claims Against The EFIH Debtors**

20.    These unliquidated TCEH Claims against the other Debtors, including the

three categories described above, "are what they are" Right now, and no party is requesting that

the Court adjudicate them.  Indeed, the validity and amount of those TCEH Claims will have to

be determined at a later time following substantial diligence by unconflicted advocates for both

sides of the disputes.  In the meantime, however, the TCEH Debtors' fiduciaries have an

obligation to protect those TCEH Claims, whatever their value may be, for the benefit of the

creditors of the TCEH Debtors.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d

325, 339 (3d Cir. 2004) (finding that the debtor-in-possession, i.e., the debtor's management, has

a fiduciary duty to maximize the estate's assets, which includes the duty to protect and conserve

property in its possession for the benefit of creditors); In re Marvel Entm't Grp., Inc., 140 F.3d

463, 474 (3d Cir. 1998) ("[A]mong the fiduciary obligations of a debtor-in-possession is the 'duty to protect and conserve property in its possession for the benefit of creditors.'") (quoting In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990); United States v. State St. Bank & Trust Co. (In re Scott Cable Commc'ns, Inc.), Adv. A-01-04605, 2002 WL 417013, at *3 (Bankr. D. Del. Mar. 4, 2002) (noting the debtor's fiduciary duty to preserve the estate for the benefit of its creditors); In re Campbell-Erskine Apothecary, Inc., 302 B.R. 169, 174 (Bankr. W.D. Pa. 2003) ("Included among the fiduciary duties of a debtor-in-possession is protecting and conserving estate assets for the benefit of creditors . . . . This is a paramount duty . . . of a debtor-in-possession.") (citing In re Cybergenics Corp., 226 F.3d 237, 243 (3d Cir. 2000)).



21.

On its face, however, the proposed EFIH financing will prejudice the TCEH Claims in two ways (i) a reduction in the amount of assets that the EFIH Debtors will have available to satisfy the TCEH Claims once resolved, and (ii) an

allocation of value away from general unsecured creditors of the EFIH Debtors such as the

TCEH Debtors for the benefit of a select subset of creditors of EFIH and EFH Corp.

> **a.  The Relief Sought Assumes There Are No Infirmities In The Claims And Liens Of The Holders Of The EFIH Second Lien Notes**

22.    As a key component of the EFIH Second Lien DIP Facility, the EFIH

Debtors propose (i) to indefeasibly repay in full the EFIH Second Lien Notes (other than any

EFIH Second Lien Makewhole Claims compromised as part of the EFIH Second Lien

Settlement), and (ii) to grant "continuing, valid, binding, enforceable, non-avoidable, and

automatically and properly perfected postpetition security interests and liens . . . ." on "all

prepetition and postpetition property of the EFIH Debtors . . . ."  See Motion, Ex. A (the

"Proposed Order") at ¶¶ 1, 8(a)-(b).

23.    

24.    In proposing the EFIH Second Lien DIP Facility, the EFIH Debtors have apparently simply assumed the claims of the holders of the EFIH Second Lien Notes and the liens securing those notes are free of infirmities or relied on non-estate fiduciaries—the Ad Hoc Committee of EFIH Unsecured Noteholders—to tell them otherwise.  That lack of concern and rigor is particularly unjustified in that, if the amount of Prepetition EFIH Second Lien Creditors' "secured" claims or the Prepetition EFIH Second Priority Liens were successfully challenged (pursuant to section 506 of the Bankruptcy Code or otherwise), the resulting reduction in the amount of the EFIH Second Lien Creditors' "secured" claims would redound directly to the benefit of unsecured creditors of the EFIH Debtors, including the TCEH Debtors.

**b.    The Equity Conversion Prematurely Allocates The Equity Of Reorganized EFH Corp. To The Detriment Of <u>EFIH Unsecured Creditors, Including The TCEH Debtors</u>**

25.    Even assuming the EFIH Second Lien Notes are fully secured, approval of the EFIH Second Lien DIP Facility would prejudice the claims of the TCEH Debtors by fixing the recovery by holders of general unsecured claims against the EFIH Debtors based on (i) the negotiated plan value used to calculate the percentage of the reorganized equity of EFH Corp. into which the EFIH Second Lien DIP Facility will convert (Motion, Ex. B to Ex. E (the "Equity Conversion Term Sheet"), at 1); and (ii) the "split" of that reorganized equity between the EFIH Second Lien DIP Note Purchasers, on the one hand, and holders of general unsecured claims against EFIH, on the other.  Under the Equity Conversion, 60% of the reorganized equity of EFH Corp. is allocated to the EFIH Second Lien DIP Note Purchasers, and approximately 40% is allocated to the holders of general unsecured claims against EFIH.

26.    █████████████████████████████████

███████████████████████████████████████████████



MIAMI 1017946

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████

27.     The EFIH Debtors' misplaced decision to pursue approval of the Equity

Conversion now, in advance of any plan process and to the detriment of certain unsecured

creditors of the EFIH Debtors, can only be explained by the limited valuation work performed to

date by "the Debtors."  Typically, approval of the conversion of debt to equity in a reorganized

company would occur through confirmation of a plan, in reliance on valuation findings made by

the Court in accordance with section 1129 of the Bankruptcy Code.  The Equity Conversion

embedded in the requested relief, however, remains subject only to a "reasonable business

judgment" standard of review.  See Motion at ¶¶ 49-53.  In attempting to substitute a

"reasonableness" standard of review for the rigorous valuation analysis conducted in connection

with the plan confirmation process, the EFIH Debtors seek to enshrine a recovery for a select

group of favored general unsecured creditors without having to present the requisite supporting

valuation evidence.

28.    In addition, the de facto rights offering is being pursued without first

defining the universe of unsecured creditors that should, in order to avoid otherwise unfair

discrimination, be allowed to participate.[14]    As discussed above, "the Debtors" may well have

made no effort to determine the validity or amount of the TCEH Claims against the EFIH

Debtors, which claims may rank pari passu with those of the holders of EFIH funded debt that

are being offered the right to participate in the EFIH Second Lien DIP Facility and the Equity

Conversion.  Even if they have, there is simply no valid justification to rush approval of the

Equity Conversion outside of a plan confirmation process through which "the Debtors'"

conclusions may be tested.

29.    The fact that the EFIH Debtors could decide to repay the EFIH Second

Lien DIP Facility in cash if the negotiated plan value turns out to be an underestimate of the

value of the EFIH Debtors, and thus, the Equity Conversion yields an outsized return to the EFIH

Second Lien DIP Note Purchasers at the expense of unsecured creditors of the EFIH Debtors,

provides little comfort given the aggregate amount of the Prepayment Fee, even as revised, and

the Closing Fee.  At $190 million combined, the Prepayment Fee and Closing Fee will chill any

such decision, if not render the EFIH Debtors' "out" illusory.  Only when it becomes clear that

postpetition lenders will receive a recovery greater than par-plus-ten-percent (i.e., $1.9 billion of

---

[14]    Notably, even if the claims of the TCEH Debtors against the EFIH Debtors were recognized by "the
Debtors'" management, the restrictions on who can participate in the EFIH Second Lien DIP Offering agreed to by
"the Debtors'" conflicted fiduciaries would prevent the TCEH Debtors from participating therein.  As a result, the
TCEH Debtors are left with no means to protect themselves against the possibility that the existing allocation of the
equity of reorganized EFH Corp. underestimates the value of EFIH.  See Motion, Ex. A to Ex. E (the "Second Lien
DIP Notes Term Sheet"), at 1 (defining "Second Lien DIP Facility Rights Holder").

principal, plus the $95 million Closing Fee, plus the $95 million Prepayment Fee) because the "equity" in EFIH's assets (post-EFIH First Lien DIP Financing) exceeds the negotiated plan value will the EFIH Debtors consider exercising their "out" with respect to the Equity Conversion.

### 3. The Court Must Fashion Some Relief To Prevent The TCEH Debtors From Being Prejudiced By The Relief Sought By The Motion

30.     Given all the foregoing, the Motion should not be granted either (1) prior to determination of the TCEH Claims, or (2) with a full reservation of rights with respect to the Claims of the TCEH Debtors against the EFIH Debtors.

31.     ███████████████████████████████████

███████████████████████████████████ Even if they have

done that analysis, it has yet to be disclosed to, and subjected to the scrutiny of, parties in interest other than the parties to the Restructuring Support Agreement.  Until all parties in interest have had a chance to diligence those claims, and in order to protect them for the benefit of their stakeholders, the Court should protect those stakeholders' interests by requiring that any order granting the Motion include a reservation of rights that (i) preserves all prepetition claims and causes of action that one or more of the TCEH Debtors has against the EFIH Debtors; (ii) renders the EFIH Second Lien DIP Obligations and the EFIH Second Lien DIP Liens subject to the same claims and infirmities, if any, as the Prepetition EFIH Second Lien Obligations and the Prepetition EFIH Second Priority Liens; and (iii) reserves the allocation of the equity of reorganized EFH Corp. as between the EFIH Second Lien DIP Note Purchasers and the holders of general unsecured claims against the EFIH Debtors and EFH Corp. for the Court to determine

in connection with confirmation of a plan of reorganization for the EFIH Debtors (and based

upon the enterprise value of the EFIH Debtors at that time).

### C.    The Ad Hoc Group of TCEH Unsecured Noteholders Has Standing To Bring The Objection

32.    As a final matter, while the Debtors have conceded that the Ad Hoc Group

of TCEH Unsecured Noteholders may submit the Objection as a party in interest in these jointly

administered chapter 11 cases, certain other parties have suggested that TCEH creditors lack

standing to object to the Motion.  Those suggestions are contrary to law for two reasons.

33.    The Ad Hoc Group of TCEH Unsecured Noteholders—the members of

which hold substantial claims against the TCEH Debtors that will be directly impacted by any

impairment of the TCEH Debtors' rights to pursue their claims against the EFIH Debtors—is a

party in interest in these jointly administered chapter 11 cases within the meaning of section

1109(b) of the Bankruptcy Code and therefore entitled to be heard on the matters raised in the

Objection.  See In re Global Indus. Techs., Inc., 645 F.3d 210, 211 (3d Cir. 2011) (recognizing

that "section 1109(b) must be construed broadly to permit parties affected by a chapter 11

proceeding to appear and be heard" and that standing should be granted to "anyone who has a

legally protected interest that could be affected by a bankruptcy proceeding") (internal citation

omitted).  It would be ironic to say the least if the only creditor constituency that objected to joint

administration of these chapter 11 cases—the Ad Hoc Group of TCEH Unsecured Noteholders—

was now barred from appearing with respect to a motion brought by the EFIH Debtors,

particularly where the relief sought by that motion will have a material impact on the TCEH

Debtors' estates.

## RESERVATION OF RIGHTS

34.     The Ad Hoc Group of TCEH Unsecured Noteholders expressly reserves the right to supplement and amend this Objection.  Further, the Ad Hoc Group of TCEH Unsecured Noteholders reserves the right to seek discovery with respect to the Motion and introduce evidence at any hearing relating to the Motion.  Further, the Ad Hoc Group of TCEH Unsecured Noteholders reserves the right to respond, join in, or amend this Objection with respect to any argument or objection made by any person relating to the Motion.

## CONCLUSION

Based on the foregoing, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully requests that the Court (i) deny the Motion; and (ii) grant such other and further relief as the Court deems just.

*[Remainder of page intentionally left blank]*

Dated: June 24, 2014
       Wilmington, Delaware

FOX ROTHSCHILD LLP

By:   */s/ Jeffrey M. Schlerf*
       Jeffrey M. Schlerf (No. 3047)
       John H. Strock (No. 4965)
       L. John Bird (No. 5310)
       919 North Market St., Suite 300
       Wilmington, DE 19801
       Telephone: (302) 654-7444
       Facsimile: (302) 463-4971
       jschlerf@foxrothschild.com
       jstrock@foxrothschild.com
       lbird@foxrothschild.com

       and

       WHITE & CASE LLP
       Thomas E Lauria (admitted *pro hac vice*)
       Matthew C. Brown (admitted *pro hac vice*)
       Southeast Financial Center, Suite 4900
       200 South Biscayne Blvd.
       Miami, FL 33131
       Telephone: (305) 371-2700
       Facsimile: (305) 358-5744
       tlauria@whitecase.com
       mbrown@whitecase.com

       J. Christopher Shore (admitted *pro hac vice*)
       Gregory M. Starner (admitted *pro hac vice*)
       1155 Avenue of the Americas
       New York, NY 10036
       Telephone: (212) 819-8200
       Facsimile: (212) 354-8113
       cshore@whitecase.com
       gstarner@whitecase.com

       *Counsel to the Ad Hoc Group of*
       *TCEH Unsecured Noteholders*