# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Energy Future Holdings Corp., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 472, 477** |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) THE MOTION OF ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC AND EFIH FINANCE INC. FOR ENTRY OF AN ORDER (A) APPROVING POSTPETITION SECOND LIEN FINANCING, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) AUTHORIZING THE USE OF CASH COLLATERAL, (D) AUTHORIZING THE EFIH SECOND LIEN REPAYMENT, (E) AUTHORIZING ENTRY INTO AND PAYMENT OF FEES UNDER THE COMMITMENT LETTER, AND (F) MODIFYING THE AUTOMATIC STAY AND (II) THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF ORDERS APPROVING CERTAIN EFIH SETTLEMENTS AND THE ONCOR TSA AMENDMENT**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

I.      Preliminary Statement ........................................................................................... 1

II.     Background ........................................................................................................... 7

        A.      The Debtors' Corporate Enterprise and Operations ................................. 7

        B.      The RSA ..................................................................................................... 8

        C.      EFIH First Lien DIP Financing ................................................................. 8

        D.      EFIH Second Lien DIP Financing ........................................................... 10

                1.      The Debtors' Proposed EFIH Second Lien DIP Financing ........... 10

                2.      Alternative Financing Proposals .................................................... 12

        E.      The Second Lien Settlement ..................................................................... 14

        F.      The Oncor TSA Amendment .................................................................... 16

III.    Argument ............................................................................................................. 17

        A.      The Pre-RSA Transactions Impermissibly Seek to Tilt the Conduct of
                These Proceedings Toward the RSA Plan ................................................ 17

        B.      The EFIH Second Lien DIP Serves No Legitimate Business Purpose ................ 21

                1.      The EFIH Second Lien DIP Is Not Necessary to Continue
                        the Debtors' Operations ................................................................. 21

                2.      The EFIH Second Lien DIP Is Not Fair or Reasonable ................... 22

                        a)      The EFIH Second Lien DIP Will Not Result in Cost
                                Savings ............................................................................... 23

                        b)      The Refinancing of the EFIH Second Lien Notes Will
                                Reduce the Debtors' Liquidity ........................................... 26

                        c)      Multiple Better Financing Offers Leave No Doubt That the
                                Terms of the Proposed EFIH Second Lien DIP Are Unfair
                                and Unreasonable ............................................................... 29

                3.      The EFIH Second Lien DIP Is Not Really a DIP ............................ 29

                4.      Certain of the Fees Associated With the EFIH Second Lien
                        DIP Are Unreasonable .................................................................... 31

        C.      The Oncor TSA Amendment Is Unnecessary and Inappropriate Prior to
                Confirmation of the RSA Plan ................................................................. 33

        D.      Approval of the Pre-RSA Transactions Is Premature and Prejudicial While
                Intercompany Claims and Causes of Action Are Being Investigated and in
                the Absence of a Formal Valuation .......................................................... 35

IV.     RESERVATION OF RIGHTS .............................................................................. 37

V.      CONCLUSION ..................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aurelius Capital Master, Ltd. v. Acosta*,
No. 3:13-cv-1173 (N.D. Tex.) ...................................................................................37

*Bland v. Farmworker Creditors*,
308 B.R. 109 (S.D. Ga. 2003)..................................................................................18

*In re America West Airlines, Inc.*,
166 B.R. 908 (Bankr. D. Ariz. 1994).......................................................................33

*In re Ames Department Stores, Inc.*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990)..................................................................18, 19

*In re Angelika Films 57th, Inc.*,
227 B.R. 29 (Bankr. S.D.N.Y. 1998) *aff'd*, 246 B.R. 176 (S.D.N.Y. 2000) ............33

*In re Aqua Associates*,
123 B.R. 192 (Bankr. E.D. Pa. 1991) .......................................................................18

*In re Barbara K. Enterprises*,
No. 08-11474 (MG), 2008 WL 2439649 (Bankr. S.D.N.Y. Jun. 16, 2008) ............22

*In re Berry Good, LLC*,
400 B.R. 741 (Bankr. D. Ariz. 2008)........................................................................19

*In re Chevy Devco*,
78 B.R. 585 (Bankr. C.D. Cal. 1987)........................................................................19

*In re Defender Drug Stores, Inc.*,
145 B.R. 312 (B.A.P. 9th Cir. 1992)...................................................................18, 19

*In re Farmland Industries, Inc.*,
294 B.R. 855 (Bankr. W.D. Mo. 2003)......................................................................18

*In re Hupp Industries, Inc.*,
140 B.R. 191 (Bankr. N.D. Ohio 1992) ....................................................................33

*In re Innkeepers USA Trust*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010) ......................................................................19

*In re L.A. Dodgers, LLC*,
457 B.R. 308 (Bankr. D. Del. 2011) ...................................................................19, 30

*In re Mid-State Raceway, Inc.*,
323 B.R. 40 (Bankr. N.D.N.Y. 2005) ........................................................................18

*In re O'Brien Environmental Energy, Inc.*,
  181 F.3d 527 (3d. Cir. 1999)................................................................34

*In re Phase-I Molecular Toxicology Inc.*,
  285 B.R. 494 (Bankr. D.N.M. 2002) .........................................18, 22

*In re Reliant Energy Channelview LP*,
  594 F.3d 200 (3d Cir. 2010)................................................................34

*In re Western Pacific Airlines, Inc.*,
  223 B.R. 567 (Bankr. D. Colo. 1997) ...............................................18

*Samjens Partners I v. Burlington Industries, Inc.*,
  663 F. Supp. 614 (S.D.N.Y. 1987) .....................................................33

**STATUTES**

11 U.S.C. 363(b) ....................................................................................9

11 U.S.C. 363(c) ....................................................................................9

11 U.S.C. 364(c) .................................................................17, 19, 22

11. U.S.C. 503(b) .................................................................................34

ny-1146543

The Official Committee of Unsecured Creditors (the "Committee") of Energy Future Holdings Corp., *et al.* (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this omnibus objection (the "Objection") to (i) the motion [Docket No. 477] (the "Financing Motion") of Energy Future Immediate Holding Company LLC and EFIH Finance Inc. (together, the "EFIH Borrowers") for entry of an order authorizing the EFIH Second Lien DIP (defined below) and (ii) the motion [Docket No. 472] (the "Settlement/TSA Motion" and together with the Financing Motion, the "Motions") of Energy Future Holdings Corp. ("EFH Corp."), *et al.*, for entry of orders approving the Second Lien Settlement and the Oncor TSA Amendment (each defined below).[2] In support of the Objection, the Committee submits the declaration of Timothy R. Pohl (the "Pohl Declaration") and the declaration of Todd M. Goren (the "Goren Declaration"), and respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.    Through these chapter 11 proceedings, the Debtors intend to seek approval of a plan (the "RSA Plan") effectuating a restructuring support agreement (the "RSA") that turns over their valuable businesses to certain chosen creditors, releases potentially valuable estate and intercompany claims for no consideration, and leaves almost nothing for the TCEH Debtors' unsecured creditors.

2.    Although the RSA is not before the Court today, and the contemplated plan has not yet been filed, the relief requested in the Motions would immediately and irrevocably implement certain elements of the RSA Plan to the detriment of TCEH and its creditors. Specifically, this Objection concerns the proposed EFIH second lien debtor-in-possession financing (the "EFIH Second Lien DIP"), the proposed settlement of claims (including

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Financing Motion or Settlement/TSA Motion, as applicable.

"makewhole claims") of certain holders of EFIH Second Lien Notes (the "Second Lien Settlement"), and the proposed amendment of the Oncor TSA[3] (the "Oncor TSA Amendment" and, collectively with the EFIH Second Lien DIP and the Second Lien Settlement, the "Pre-RSA Transactions").[4] Taken together, these transactions would (a) result in the satisfaction of the EFIH Second Lien Notes (defined below), (b) allow *certain* of EFH and EFIH's unsecured creditors to make an equity investment in reorganized EFH through their participation in the EFIH Second Lien DIP, and (c) protect such creditors from potential downside in the event that the transactions proposed under the RSA are not consummated.  The Committee has a clear interest in preventing hasty, unnecessary changes in the Debtors' capital structure, which could prove to be detrimental to the Committee's constituents and difficult or impossible to unwind once consummated.  As demonstrated below, these transactions are premature, unfairly prejudice the interests of TCEH and its creditors, and are not in the best interests of any of the Debtors' estates.  While the DIP financing proposals received by the Debtors have improved over the course of the past few weeks, those improvements (which have been taken into account in the analysis performed by the Committee's professionals described herein) do not remedy the underlying problems with the Pre-RSA Transactions.  If anything, the fact that the proposals (and the implied valuations underlying the proposals) have improved so greatly over such a limited period of time is yet a further indication that the haste with which the Debtors are seeking to enter into the Pre-RSA Transactions is completely unwarranted and ill-advised.  Accordingly, the Committee opposes approval of the Pre-RSA Transactions.

---

[3] The "Oncor TSA" is a tax sharing agreement dated as of November 5, 2008 by and among EFH, Oncor Holdings, Oncor, Texas Transmission Investment LLC, and Oncor Management Investment LLC.

[4] The Debtors have adjourned the hearing solely with respect to the Oncor TSA Amendment [Docket No. 1026], despite the fact that the Pre-RSA Transactions are all interrelated.  The Committee reserves its right to further supplement this Objection with respect to the Oncor TSA Amendment.

ny-1146543

3.      As an initial matter, the Pre-RSA Transactions serve no legitimate business purpose. The EFIH Second Lien DIP does not serve any of the functions for which a DIP loan is typically sought by a debtor. It does not provide the Debtors with any necessary additional liquidity (to the contrary, it is a significant liquidity drain), nor does it save the EFIH Debtors any meaningful amount of money when compared to doing nothing at all. While the Debtors have asserted that the EFIH Second Lien DIP will result in savings of approximately $8 million per month (which, using the Debtors' methodology, would increase to approximately $11 million per month under the revised proposal, due to the decrease in interest rate from 8% to 6.25%), that "analysis" is woefully incomplete. Once the full costs of the Pre-RSA Transactions are fully analyzed, including the transaction fees, the risks of litigating the Alleged Makewhole Claims, the costs of making payments under the Second Lien Settlement, and the differences in cash balances are factored in, it becomes clear that the proposed transactions do not make economic sense.

4.      Once these factors are taken into account, it becomes apparent that the EFIH Second Lien DIP is, in reality, not a DIP at all. Rather, the EFIH Second Lien DIP is really a mechanism to secure an equity investment at the conclusion of the case *without* the protections of a plan process and *without* any formal sale process or other valuation work done to determine if the proposed equity investment is on reasonable terms. In fact, as described in further detail below, based on the market's reaction to the transaction and the revised alternative financing proposals received by the Debtors, it appears that the Debtors have significantly undervalued the equity in reorganized EFH, as well as the total enterprise value of Oncor, and are thus providing valuable participation rights in the EFIH Second Lien DIP (and, as a result, reorganized EFH

equity) to only a select group of creditors[5] to the detriment of TCEH (and TCEH's creditors), as well as other contingent creditors of EFH and EFIH that are not entitled to participate. Furthermore, EFH general unsecured creditors (including, potentially, TCEH), are particularly disadvantaged as their recoveries are effectively capped pursuant to the equity splits; if Oncor's valuation were to increase, it would be principally for the benefit of EFIH Second Lien DIP Lenders and, to a lesser extent, the benefit of EFIH's general unsecured creditors.

5.    Moreover, the EFIH Second Lien DIP effectively locks in the plan treatment of the Participating Unsecured Notes through the proposed $95 million Prepayment Fee and $95 million PIK Funding Fee, which are both payable in cash in the event the EFIH Second Lien DIP is repaid in anything other than reorganized EFH equity and, taken together, amount to a staggering 10% break-up fee.  A $190 million break-up fee is particularly exorbitant in light of the complete lack of any marketing process undertaken or fundamental valuation analysis performed by the Debtors.   Given the magnitude of the costs to enter into the Pre-RSA Transactions, the Debtors' much-hyped "fiduciary out" rings hollow.[6]

6.    To effectuate the EFIH Second Lien DIP, EFIH Second Lien Notes refinancing, and Second Lien Settlement, the Debtors intend to immediately use approximately $560 million of the EFIH Borrowers' liquidity and subsequently pay ongoing interest on the EFIH Second Lien DIP.[7]   Under certain circumstances, including one in which a substantial number of the

---

[5] The RSA contemplates that the EFIH Second Lien DIP Lenders (consisting of select holders of EFIH Unsecured Notes and EFH Unsecured Notes, collectively the "Participating Unsecured Notes"), will convert their DIP claims into 60% of the equity in EFH Corp.

[6] In the event the Court approves the EFIH Second Lien DIP, the Committee believes that the order granting the Financing Motion must be revised to preserve the rights of TCEH (to the extent TCEH is an unsecured creditor of EFH or EFIH) to participate, for itself and for the benefit of TCEH creditors, in reorganized EFH equity on the same terms as the proposed EFIH Second Lien DIP Lenders. This is particularly important where, as here, the EFIH Second Lien DIP Lenders will receive certain absolute benefits in the form of either $190 million in topping fees or 60% of the equity in EFH Corp.

[7] Notably, as discussed below, under the EFIH First Lien DIP Order (as defined below), the Debtors are not required to make current interest payments (or any adequate protection payments) on the existing EFIH Second Lien Notes

4

EFIH Second Lien noteholders elect to participate in the Second Lien Settlement (over and above the 43% already committed to participate), EFIH's liquidity could become strained and potentially result in a default under the minimum liquidity covenant in the EFIH First Lien DIP Financing.[8] The Debtors assert that this self-inflicted wound warrants entering into yet another unnecessary transaction: the Oncor TSA Amendment. In contrast, if the Debtors did not enter into the EFIH Second Lien DIP to begin with, EFIH would have at least $1 billion in liquidity at all times during these chapter 11 cases, and the Debtors' purported need to enter into the Oncor TSA Amendment prior to confirmation of a plan would be eliminated.

7.      Finally, the transfer of assets that would be accomplished via the Oncor TSA Amendment, pursuant to which payments that Oncor currently makes directly to EFH to cover tax obligations contractually attributable to Oncor but payable by EFH would be diverted to EFIH (a non-tax-paying entity), is merely another attempt to lock in the RSA Plan. The only consideration to be provided to EFH for giving up these cash flows would be provided under the proposed RSA Plan. The Debtors should not be allowed to alter the status quo by irrevocably transferring value among the Debtors prior to a plan while the Committee is still in the early stages of investigating intercompany claims and causes of action. Moreover, the diversion of cash flows from EFH to EFIH that would be effected by the Oncor TSA Amendment and concurrent entry into the EFIH Second Lien DIP would insulate EFIH creditors from any negative repercussions that may arise should the transactions contemplated under the RSA not be

---

during these chapter 11 cases.

[8] The "EFIH First Lien DIP Financing" means the financing authorized by the *Final Order (A) Approving Postpetition Financing For Energy Future Intermediate Holding Company LLC And EFIH Finance Inc., (B) Granting Liens And Providing Superpriority Administrative Expense Claims, (C) Approving The Use Of Cash Collateral By Energy Future Intermediate Holding Company LLC And EFIH Finance Inc., (D) Authorizing The EFIH First Lien Repayment, (E) Authorizing Issuance Of Roll-Up Debt To The Extent Authorized By The Settlement Orders, And (F) Modifying The Automatic Stay* [Docket No. 859] (the "EFIH First Lien DIP Order") and governed by that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as may be amended from time to time, the "EFIH First Lien Credit Agreement"), a substantially final copy of which is annexed as Exhibit 1 to Docket No. 600.

consummated. This all but eliminates any incentive for those parties to participate in further plan negotiations with other creditor constituencies. In sum, it is far too early to determine how creditors with claims (of any nature) against EFH and EFIH (such as the TCEH Debtors' estates) will be impacted by the Oncor TSA Amendment. Its approval should be taken up only as part of a plan of reorganization.

8.     In the end, the Pre-RSA Transactions must stand on their own without reference to the RSA or RSA Plan as the justification for entry into the transactions. For the reasons set forth herein, they cannot. The Pre-RSA Transactions are unabashed attempts to tilt the conduct of these cases toward the inevitable conclusion of consummation of the RSA Plan. As the inherent unreasonableness of the Pre-RSA Transactions makes abundantly clear, they were approved by boards of directors suffering from deal fatigue and irreconcilable conflicts of interest. In their eagerness to strike a deal, each of the Debtors' boards failed to act with the requisite care in approving the RSA, and the Pre-RSA Transactions in particular. The TCEH board consented to the Pre-RSA Transactions by signing onto the RSA even though the Pre-RSA Transactions provide absolutely no benefit to the TCEH Debtors, and, in fact, are demonstrably harmful to TCEH and its creditors for the reasons set forth herein. Amazingly, none of the boards ever even considered the possibility of not engaging in the Pre-RSA Transactions, and what impact that might have on their respective estates. Moreover, in agreeing to the Prepayment Fee, PIK Funding Fee, mandatory conversion, and equity splits under the EFIH Second Lien DIP, the EFH and EFIH boards also agreed to sell equity in reorganized EFH without having conducted any market process and in the absence of any formal valuation. This flawed process represents an abdication of the fiduciary duties owed by each of the Debtors to their respective constituents, and does not constitute an exercise of reasonable business judgment. Notably, the Debtors actually entered into these proposed transactions and agreed to

support them with break-up fees being an even more staggering 25%. This speaks volumes about the Debtors' flawed process, the need to stop it, and the need to allow a full and fair process to occur before the Debtors are locked in to unnecessary transactions that forever alter the economics and dynamics of these chapter 11 cases.

9.    Although denial of the Motions may mean that the RSA is terminated (or that certain parties withdraw from the RSA), that termination does not in and of itself preclude a different tax-friendly restructuring. Avoiding the creation of massive tax liabilities is presumably in the best interests of all creditor constituencies. This is true whether the plan that accomplishes those goals is the one contemplated under the RSA or some other plan.

## II.    BACKGROUND

### A.    The Debtors' Corporate Enterprise and Operations

10.    The Debtors are an integrated corporate enterprise. They are linked through, among other things, shared corporate services, shared management, and a shared cash management system. In addition, only EFH Corp. and EFH Corporate Services (together, the "Consolidated Group Members") are recognized by the IRS as tax-paying entities. Each of the other Debtors is a disregarded entity for tax purposes, and any income (or loss) they generate is imputed to the Consolidated Group Members, which are jointly and severally liable for the tax liabilities of the entire group.

11.    Although the Debtors' operations are strong and the Debtors anticipate that they will continue to be cash flow positive before debt service during these chapter 11 cases, the Debtors maintain that it is impossible for them to support their current debt load. (First Day Decl. ¶ 11.) Accordingly, the Debtors commenced these chapter 11 cases to begin the process of implementing the global restructuring memorialized in the RSA. (*Id.* ¶ 179.) The Debtors ambitiously maintain that they are poised to exit chapter 11 within a year. (*Id.* ¶ 178.)

7

**B.**     **The RSA**

12.     According to the Debtors' first day pleadings, the RSA signatories were unable to agree on an enterprise valuation and an allocation of that value during prepetition negotiations, rendering impossible a consensual global reorganization that would keep the Debtors' corporate enterprise in one piece.   (First Day Decl. ¶¶ 159-61.)   Accordingly, the RSA contemplates separating the Debtors' corporate enterprise by spinning off the TCEH Debtors.   However, the Debtors contend that separating the corporate structure under a typical asset sale or plan scenario risks triggering massive tax liabilities.   (*Id.* ¶ 158.)   The structure that would be implemented under the RSA Plan is (we are told) intended to minimize the tax consequences of a break-up, while building in protections through the Pre-RSA Transactions for certain of EFIH's creditors in the event the transactions contemplated under the RSA are not consummated.   That structure benefits (a) select current unsecured creditors of EFIH and EFH, who will wind up holding the equity in reorganized EFH Corp. and, indirectly, Oncor, and (b) the TCEH first lien debtholders, who will take ownership of TCEH with a partial step-up in tax basis.   However, the RSA Plan leaves TCEH unsecured creditors with virtually nothing to satisfy billions of dollars in claims.

13.     The Debtors filed a motion to assume the RSA [Docket No. 505], which is currently scheduled to be heard on July 18, 2014.

**C.**     **EFIH First Lien DIP Financing**

14.     On June 6, 2014, the Court entered the EFIH First Lien DIP Order, which, among other things, authorized the EFIH Debtors to use the cash collateral of the Prepetition EFIH Second Lien Creditors (as defined therein), and found that the Prepetition EFIH Second Lien Creditors are adequately protected.[9]   (*See* EFIH First Lien DIP Order, ¶¶ K, 15.)   The EFIH First

---

[9]  The Prepetition EFIH Second Lien Creditors did not oppose this finding, as they had already waived their right to seek adequate protection pursuant to sections 6.02 and 6.04 of the Collateral Trust Agreement, dated as of November 16, 2009, by and among EFIH, The Bank of New York Mellon Trust Company, N.A., as first lien trustee,

ny-1146543

Lien DIP Order provides, in relevant part:  "The EFIH First Lien DIP Financing and the EFIH

Debtors' use of cash collateral satisfy sections 363(c)(2) and 364(d)(4) of the Bankruptcy Code

because . . . the Prepetition EFIH Second Lien Creditors are adequately protected."  (*Id.* at ¶ K.)

The order further provides that "[t]he EFIH Debtors are hereby authorized to use the cash and

cash equivalent proceeds of the collateral securing the EFIH Prepetition Secured Obligations that

constitute "cash collateral" within the meaning of section 363 of the Bankruptcy Code and other

property in which the EFIH Prepetition Collateral Trustee and Prepetition Secured Notes

Trustees have an interest pursuant to sections 363(b) and 363(c) of the Bankruptcy Code in

accordance with the terms and conditions of the EFIH First Lien DIP Credit Agreement and as

set forth in this Final Order. . . ."  (*Id.* at ¶ 15.)

15.    The Committee was generally supportive of the EFIH First Lien DIP Financing,

which provided the Debtors with necessary liquidity and resulted in immediate considerable

interest expense savings.  Accordingly, the Committee filed a limited objection to the EFIH First

Lien DIP [Docket No. 687], which sought only to implement certain discrete changes to the

order to protect the interests of TCEH unsecured creditors.  The parties agreed to incorporate

those protections into the final order.

---

The Bank of New York Mellon Trust Company, N.A., as collateral trustee, and other Secured Debt Representatives, (as amended from time to time, the "Collateral Trust Agreement").  Notwithstanding the repayment of the EFIH First Lien Notes, the Collateral Trust Agreement remains in effect as the first lien lenders assert that they have not been paid in full due to outstanding makewhole amounts.  In fact, on June 20, 2014, CSC Trust Company of Delaware ("CSC Trust"), in its capacity as successor indenture trustee and successor collateral agent for EFIH First Lien Notes, filed an adversary complaint (the "Complaint") seeking to enforce the Collateral Trust Agreement to prevent the Debtors from making any payments to the holders of EFIH Second Lien Notes (including consummating the Second Lien Settlement) prior to making payment in full (including any makewhole premiums) to the holders of EFIH First Lien Notes.  Thus, if the proposed EFIH Second Lien DIP and Second Lien Settlement are approved, there will be lengthy and costly litigation to address their respective entitlements to the payments made under the Second Lien Settlement.  If, however, the EFIH Second Lien DIP and Second Lien Settlement are not approved, it appears that the relief sought in the Complaint will be moot.

ny-1146543

16.     The EFIH First Lien DIP Financing contains a minimum liquidity covenant, pursuant to which the EFIH Borrowers cannot permit Unrestricted Cash (as defined therein) to be less than $150 million at any time. (*See* EFIH First Lien Credit Agreement at § 8.9.)

### D.     EFIH Second Lien DIP Financing

17.     The $1.9 billion EFIH Second Lien DIP will be used (together with contributions from the EFIH First Lien DIP Financing and cash on hand) to repay $2.16 billion in outstanding EFIH Second Lien Notes plus accrued and unpaid interest thereon.[10] (Financing Mot. ¶ 27; Ying Financing Decl. ¶ 12;[11] Settlement/TSA Mot. ¶ 25.)

18.     The Debtors assert that the EFIH Second Lien DIP is necessary because it is "a key component of" and will "set the stage for" the RSA and the RSA Plan. (Financing Mot. ¶¶ 4, 8; *see also* First Day Decl. ¶ 171 (referring to the EFIH Second Lien DIP as the "lynchpin of the recapitalization of EFIH and EFH Corp.")). The Debtors also assert that the refinancing of the EFIH Second Lien Notes will save interest expense and deleverage EFH Corp. and EFIH. (First Day Decl. ¶ 172.)

### 1.     The Debtors' Proposed EFIH Second Lien DIP Financing

19.     Under the most recent EFIH Second Lien DIP proposal accepted by the Debtors, the EFIH Borrowers would receive $1.9 billion in cash in exchange for issuing $1.9 billion of "Tranche A Notes" to the EFIH Second Lien DIP Lenders bearing a 6.25% interest rate, and $95 million in "Tranche B Notes" to the Commitment Parties[12] in satisfaction of a $95 million

---

[10]  The "<u>EFIH Second Lien Notes</u>" consist of (a) approximately $406 million principal amount of 11.00% EFIH Second Lien Notes due October 1, 2021; and (b) approximately $1.750 billion principal amount of 11.75% EFIH Second Lien Notes due March 1, 2022.

[11]  "<u>Ying Financing Declaration</u>" means the declaration of David Ying dated May 15, 2015 [Docket No. 478].

[12]  The "<u>Commitment Parties</u>" include the Initial Commitment Parties, the Selected Partners, and the Transferee Commitment Parties (each as defined in the Financing Motion).

ny-1146543

closing fee. (Financing Mot. at 14; Goren Decl., Ex. 1 at 10.)[13] If approved, the EFIH Second

Lien DIP will require quarterly debt service payments of approximately $30 million in cash

(approximately $9.9 million monthly). (*See* Pohl Decl. at ¶ 7.) At maturity, the holders of the

Tranche A Notes and Tranche B Notes (collectively, the "DIP Notes") would receive

approximately 60% of the equity of EFH Corp. (Financing Mot. at 17.)

20.    In addition to the $95 million closing fee (payable in the form of Tranche B

Notes) (the "PIK Funding Fee"), the EFIH Second Lien DIP also provides for up-front cash fees

of approximately $35 million in various execution, approval, arranger, and funding cash fees, as

well a potential $11.25 million participation fee. (Financing Mot. at 14; Commitment Letter

at 3.) If the EFIH Borrowers enter into an alternative transaction such that the holders of DIP

Notes are repaid in cash rather than equity, the EFIH Borrowers will further be liable for a

Prepayment Fee of $95 million, which equals another 5% of the total proposed financing

amount. (*Id.*) The Prepayment Fee as well as the PIK Funding Fee would be due in cash if the

EFIH Borrowers repay the EFIH Second Lien DIP in anything other than reorganized EFH

equity as contemplated under the RSA (except if the EFIH Second Lien DIP is accelerated as the

result of a default).

21.    The parties providing the funding for the EFIH Second Lien DIP are a select

group of holders of EFIH Unsecured Notes and EFH Unsecured Notes that have been given

participation rights in the Investment Commitment (91% and 9%, respectively). (First Day Decl.

¶ 171.)[14]

---

[13] As originally proposed, the EFIH Second Lien DIP provided that interest on Tranche A Notes would increase by 4% to 12.0% if the Oncor TSA Amendment (which provides that Oncor will shift its payments to EFIH rather than to EFH) is not approved by July 27, 2014. In addition, a 10% "PIK fee" would be assessed on all outstanding DIP Notes (nearly $200 million) if the Oncor TSA Amendment is not approved by April 29, 2015. The Committee understands that this provision has been removed from the revised proposal.

[14] These participation rights are subject, in the case of the participation rights held by holders of EFIH Unsecured Notes, to pro rata reduction by certain investing partners selected by the Initial Commitment Parties. (First Day

### 2.    Alternative Financing Proposals

22.    The EFIH Borrowers received an alternative financing proposal from the Ad Hoc Committee of EFIH Second Lien Creditors in March 2014 that they admittedly chose not to pursue. (Ying Financing Decl. ¶¶ 20-22.) The EFIH Borrowers then received a revised offer for alternative financing from the same parties on May 12, 2014 (as amended, the "Second Lien Creditor DIP"). The Second Lien Creditor DIP provides substantially similar terms to the EFIH Second Lien DIP, except with lower interest rates and fees. (*See Emergency Motion of EFIH 2d Lien Notes Indenture Trustee To Compel Debtors To Obtain Prior Approval Of Procedures Governing Their EFIH 2d Lien Tender Offer*, Ex. 2 [Docket No. 441-2]; Goren Decl., Ex. 1 at 10.)

23.    The EFIH Borrowers acknowledge that "the nominal terms of the Competing Second Lien DIP Summary appear, in some ways, economically favorable compared to the EFIH Second Lien DIP . . . ." ( Financing Mot. ¶ 38; *see also* Ying Financing Decl. ¶ 23.) The EFIH Borrowers note, however, that "most importantly," the proposal did not address how it would "retain the support of current signatories to the RSA." (Ying Financing Decl. ¶ 23.) In other words, while the economic terms of the deal on a standalone basis are more favorable to the EFIH Borrowers, the downside—if it can be called that—is that the Second Lien Creditor DIP apparently provides less of a financial benefit to the specific group of creditors that signed on to the RSA.

24.    Subsequently, on May 30, 2014, the Debtors received another offer or alternative financing proposal from the Ad Hoc Group of Holders of EFIH First Lien Notes (as amended, the "First Lien Creditor DIP"). Compared to the initial EFIH Second Lien DIP, the terms of First Lien Creditor DIP were better still. (*See* Goren Decl., Ex. 1 at 10.)

---

Decl. ¶ 171.)

ny-1146543

25.    Each of the financing proposals has improved since the Financing Motion was filed. In particular, the Second Lien Creditor DIP has been modified to include a financing commitment from a NextEra, a strategic partner that operates in the ERCOT region, and reflects an implied valuation of EFIH that would potentially render it solvent, paying Alleged Makewhole Claims (defined below) on the EFIH Second Lien Notes in full and providing additional cash consideration to EFH creditors. (*See* Goren Decl. at Ex. 1 at 4, 10, 14.)

26.    The following chart compares just a few of the key terms upon which the proposals differ as they existed at the time this Objection was filed (with additional terms either the same or slightly more advantageous to the Debtors in the alternative proposals as compared to the proposal offered in the Financing Motion):

| | Initial EFIH Second Lien DIP | Revised EFIH Second Lien DIP | Second Lien Creditor DIP | First Lien Creditor DIP |
|---|---|---|---|---|
| Principal Amount | $1.9 billion | $1.9 billion | $2.4 billion | $1.9 billion |
| Interest Rate | Tranche A: 8.0% Tranche B: 0.0% | Tranche A: 6.25% Tranche B: 0.0% | Tranche A: 6.0% Tranche B: 0.0% | Tranche A: 6.5% Tranche B: 0.0% |
| Equity Conversion | 64% | 60% | 68% | 63% |
| Prepayment Fee | $380 million | $95 million | $160 million | $75 million |
| PIK Funding Fee | $95 million | $95 million | $50 million | $95 million |
| Cash Financing Fees | $46 million | $46 million | arranger fees TBD | arranger fees TBD |
| Oncor TSA Amendment-Related Terms | Yes[15] | None | None | None |

---

[15] Under the initial Financing Motion proposal, interest on Tranche A Notes would increase by 4% to 12.0% if the Oncor TSA Amendment is not approved by July 27, 2014. In addition, a 10% PIK fee would be assessed on the Tranche A Notes and Tranche B Notes if the Oncor TSA Amendment is not approved by April 29, 2015.

ny-1146543

### E.    The Second Lien Settlement

27.    Certain holders of the EFIH Second Lien Notes ("EFIH Second Lien Noteholders") contend that refinancing those notes as contemplated under the EFIH Second Lien DIP will entitle them to makewhole premiums (the "Alleged Makewhole Claims"). (Settlement/TSA Mot. ¶ 25.)  While they dispute that the refinancing of the EFIH Second Lien Notes contemplated under the Financing Motion would trigger makewhole obligations under the EFIH Second Lien Notes (Settlement/TSA Mot. ¶ 13), the Debtors propose to settle the claims of four entities holding approximately 35% of the outstanding principal amount of the EFIH Second Lien Notes (the "Settling Noteholders") relating to those notes, including those entities' Alleged Makewhole Claims.    Among other consideration to be provided under the Second Lien Settlement, Settling Noteholders would receive cash equal to 50% of the aggregate amount of the Alleged Makewhole Claims, calculated as of the date of consummation of the Second Lien Settlement.  (Settlement/TSA Mot. ¶ 26; Ying Settlement Decl. [16] ¶ 11.)    The payments to Settling Noteholders would be due within five days of approval of the Second Lien Settlement, in accordance with the RSA.  (Settlement/TSA Mot. ¶ 4.)

28.    The Debtors are proposing to allow all other holders of EFIH Second Lien Notes to opt into the Second Lien Settlement.[17]  (Settlement/TSA Mot. ¶ 3.)  To the extent noteholders do not opt in, the Debtors intend to seek a determination that the Alleged Makewhole Claims of those noteholders are invalid.  (Plan Term Sheet at 2.)  As of June 11, 2014, 43% (in principal) of EFIH Second Lien Noteholders (including the Settling Noteholders) have committed to participate in the Second Lien Settlement.  (*See* Form 8-K, dated June 13, 2014.)  Given that the

---

[16] "Ying Settlement Declaration" means the declaration of David Ying dated May 15, 2015 [Docket No. 474].

[17] *See Notice of Initiation of Opt-In Period for Proposed EFIH Second Lien Settlement* [Docket No. 400].

early opt-in date has passed, it is unlikely that additional noteholders will opt in to the Second Lien Settlement at this point.

29.    Using prevailing rates and time remaining to maturity as of July 9, 2014 (the "Assumed Settlement Date"), [18] the Alleged Makewhole Claims are estimated to total approximately $664 million. (*See* Pohl Decl. at ¶ 17.) Thus, as of the Assumed Settlement Date, the anticipated cash payment due under the Second Lien Settlement on account of the Alleged Makewhole Claims, assuming the current participation rate of 43%, would be approximately $140 million, with the potential to increase up to approximately $333 million if all holders were to opt in to the settlement. (*See* Pohl Decl. at ¶ 21.)

30.    Critically, the Settlement/TSA Motion fails to explain that the amount of any makewhole premiums due under the EFIH Second Lien Notes decreases over time.  The calculation of the makewhole premium is dependent on the remaining time until maturity (the more premature the payment, the greater the amount of the alleged premium due), and upon prevailing interest rates at the time of prepayment (the lower the prevailing U.S. Treasury rate, the greater the premium due). (*See* Pohl Decl. at ¶ 16.) As a result, the amount of the Alleged Makewhole Claims decreases with each passing month.  (*Id.*)  The amount of the Alleged Makewhole Claims will also decrease if interest rates (which remain at historic lows) rise, thereby increasing the rate used to discount each future interest payment.  (*Id.*)[19]

31.    On average, the Alleged Makewhole Claims decrease (non-linearly) by approximately $17 million per month, depending on prevailing interest rates. (*See* Pohl Decl. at ¶ 17.)  Assuming these chapter 11 cases last eighteen months, the total Alleged Makewhole Claims would be reduced from the claimed amount as of the Assumed Settlement Date by

---

[18] July 9, 2014 is the assumed settlement date contained in the Form 8-K filed by the Debtors on June 9, 2014.

[19] While it is true that fluctuations in prevailing interest rates could increase the makewhole calculation, only a downward movement in rates would work against the Debtors. (*See* Pohl Decl. at ¶ 16, n. 9.)

ny-1146543

approximately 40% to $397 million (representing the full amount of all such claims) by the end of these proceedings. (*Id.*)

### F.    The Oncor TSA Amendment

32.    In connection with the EFIH Second Lien DIP, the Debtors are also seeking approval of the Oncor TSA Amendment.  The Oncor TSA allocates liability for taxes with respect to the operations of Oncor and Oncor Holdings among the Oncor TSA Parties. (Settlement/TSA Mot. ¶ 32.)  This is currently accomplished by requiring Oncor and Oncor Holdings to make payments to EFH and Oncor's minority equity holders, as they are the entities that are liable for the tax burden associated with Oncor's earnings, in amounts sufficient for those entities to pay the taxes on the income generated by Oncor.  (*Id.*)  Pursuant to the Oncor TSA Amendment, the payments that are currently made by Oncor directly to EFH—the tax payer—under the Oncor TSA would be diverted to EFIH (a disregarded entity for income tax purposes). (*Id.* at ¶ 33.)  As a result, the collateral under the EFIH First Lien DIP Facility and the EFIH Second Lien DIP Facility would include proceeds of the Oncor TSA Amendment payments. (*Id.*)  Those payments are estimated to total approximately $320 million in net cash flows during the period between the Assumed Settlement Date and twelve months following the Petition Date, and approximately $575 million in the first twenty-four months following the Petition Date. (*See* Pohl Decl. at ¶ 26.)

33.    In exchange for relinquishing the payments it currently receives under the Oncor TSA, EFH is to receive the following consideration under the RSA Plan: a cash payment from EFIH of $55 million (subject to adjustment), and forgiveness by EFIH of $1.3 billion in debt claims it holds against EFH. (Ying Settlement Decl. ¶ 21.)  There is no provision regarding what consideration EFH will receive in connection with entering into the Oncor TSA Amendment in the event that the RSA Plan is not confirmed.

ny-1146543

## III.   ARGUMENT

34.   The Court should deny the Debtors' Motions to approve the Pre-RSA Transactions because those transactions have no independent business purpose. Rather, those transactions collectively operate to transfer assets among certain Debtors and lock in the plan structure contemplated under the RSA prior to approval of the RSA Plan, to the detriment of the TCEH Debtors' estates and their creditors.

### A.   The Pre-RSA Transactions Impermissibly Seek to Tilt the Conduct of These Proceedings Toward the RSA Plan

35.   The Court may not approve secured DIP financing under Bankruptcy Code section 364(c) if the terms of the proposed financing would "tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits." *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (requiring onerous provisions to be modified before approving postpetition financing and noting that the court's discretion in determining whether to approve debtor-in-possession financing "is not unbridled").[20] That is exactly what the Debtors seek to do here.

---

[20] The business judgment rule does not shield the Debtors' financing decisions from review. *See Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised *so long as the financing agreement does not contain terms that leverage the bankruptcy process* and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.")(emphasis added) (collecting cases); *see also In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (explaining that the court must "make a qualitative assessment of the credit transaction in light of readily-available alternatives before granting *any* § 364 motion."). Whether a debtor's financing decisions meet the business judgment rule is just one of several factors that a court reviews. *See, e.g., In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (whether "the proposed financing is an exercise of sound and reasonable business judgment" is just one of four factors a court should consider); *In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494, 495 (Bankr. D.N.M. 2002) (same); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (one of five factors); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (one of five factors); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (one of seven factors).

ny-1146543

36.     The Court should not approve the EFIH Second Lien DIP because it would prematurely tilt these proceedings towards consummation of the RSA Plan by eliminating the practical ability of the Debtors to pursue other potential plan structures. Indeed, the Pre-RSA Transactions, more than the RSA itself, would lock in various aspects of the RSA Plan well before a plan has even been filed with the Court, much less confirmed. The Court should not—and cannot—prejudge the necessity and fairness of the RSA Plan under the pretense of the Financing Motion. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements."); *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) (same); *In re Chevy Devco*, 78 B.R. 585, 589 (Bankr. C.D. Cal. 1987) (rejecting debtor-in-possession financing where the proposal was "equivalent to its plan of reorganization."). *See also In re Innkeepers USA Trust*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) (rejecting plan support agreement where it "tie[d] the Debtors to the proposed plan").

37.     The Debtors' primary argument in favor of the EFIH Second Lien DIP—that it will "set the stage" for the RSA (*see, e.g.*, Financing Mot. ¶ 32)—all but concedes that its purpose is to tilt the course of these proceedings towards a particular outcome. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (focusing on whether the DIP would improperly "tilt the conduct of the bankruptcy case"). In fact, the EFIH Second Lien DIP, as proposed, would do far more than "set the stage": it would effectively lock in the restructuring contemplated by the RSA and nullify the Debtors' "fiduciary out" to consider more beneficial alternatives. A "proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *Id.* at 39. That is exactly what the proposed EFIH Second Lien DIP is designed to do, and it should therefore be rejected.

18

38.     As set forth below, the Debtors cannot demonstrate that the EFIH Second Lien DIP is "necessary to preserve the assets of the estate" and "fair, reasonable, and adequate" (*In re L.A. Dodgers, LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011)).  As a result, the Debtors have failed to carry their burden under section 364(c) unless and until the RSA Plan is determined to be confirmable.  It would defy logic to determine that the EFIH Second Lien DIP is necessary and fair solely based on the financing's role in a broader plan if that plan might later be determined to be unfair and improper.  However, the Debtors have not analyzed the propriety of the EFIH Second Lien DIP separate and apart from the RSA. ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

39.     Taken together, the Pre-RSA Transactions inappropriately limit the Debtors' optionality to consider alternative plan structures going forward.  By borrowing under the EFIH Second Lien DIP in order to refinance the EFIH Second Lien Notes, the EFIH Borrowers are replacing prepetition debt obligations with postpetition debt obligations, placing liens on assets that do not secure EFIH's existing second lien obligations, and eliminating the ability to cram down the EFIH second lien debt under a plan of reorganization.  As a result, the Debtors will have deprived themselves—and their creditors—of negotiating leverage, and of the ability to explore other potentially value-maximizing options.  The Debtors maintain that the bulk of the financing to be provided under the EFIH Second Lien DIP must come from existing creditors so that consummation of a restructuring does not trigger tax liabilities.  (Financing Mot. ¶ 36 ("If

19

any person or persons other than current creditors of the EFIH Borrowers were to obtain, as a group, a majority interest in EFIH or EFH Corp. in connection with a debt-restructuring deal, the tax-free nature of the restructuring contemplated by the restructuring support agreement would no longer be achievable.").) But it is not true as a matter of tax law that the opportunity must be made available exclusively to creditors of the EFIH Borrowers, nor is it a foregone conclusion that a spin-off of TCEH is the only feasible plan structure that would avoid adverse tax consequences.

40.    Furthermore, in the form currently proposed, the EFIH Second Lien DIP undermines the "fiduciary out" provision of the RSA upon which the Debtors heavily rely to establish that the RSA itself is fair and reasonable. Before this Court, the Debtors have repeatedly asserted that the RSA does not predetermine the outcome of these chapter 11 proceedings because it contains a fiduciary out for the Debtors to consider alternative restructuring proposals:

> [T]he debtors want to be clear that they are not locked into the RSA. The RSA contains an unqualified fiduciary duty out, and if another party proposes a better alternative or if the facts or circumstances change, then the debtors have the right to opt out of the RSA. (6/5/14 Hearing Transcript at 17:14-19.)
>
> [W]e do have the fiduciary out that we highlight so much because we are not (indiscernible) on a path one way towards confirmation…. (6/6/14 Hearing Transcript at 36:4-7.)
>
> InnKeepers was radically different than it was here, and there was a question as to whether there was a valid and usable fiduciary out and whether there was a deal with insiders. That is not what we have here. [¶] We have an undeniably, unqualified fiduciary out as you've recognized. (6/6/14 Hearing Transcript at 64:11-16.)

41.    The EFIH Second Lien DIP risks nullifying that fiduciary out and locking in the RSA Plan because it guarantees that the EFIH Second Lien DIP Lenders will receive either 60% of the equity of EFH Corp. or, in the event the EFIH Second Lien DIP Financing is repaid in

cash other than as a result of acceleration under an event of default (without the consent of certain noteholders), a Prepayment Fee of $95 million on top of the PIK Funding Fee of $95 million. (Financing Mot. ¶ 43.)  In other words, if the Debtors do not follow through with the restructuring contemplated by the RSA, they will be forced to pay what is effectively a break-up fee of a staggering $190 million, or 10% of the proposed financing amount.  (*See supra* III.B.2.a.).

42.    As set forth below, the Committee believes that no break-up fee is appropriate under the circumstances.[21]  Even if the Prepayment Fee and PIK Financing Fees are eliminated, however, approval of the Motions still puts in motion transactions contemplated under the RSA that, once started, may not be able to be unwound.  The Pre-RSA Transactions should not be approved unless (a) they provide an independent benefit to the Debtors' estates, whether or not the RSA is approved *and* (b) they do not unfairly prejudice creditor constituencies that are not a party to those transactions.  As set forth below, the Pre-RSA Transactions do not meet either of these criteria and must be rejected.

### B.    The EFIH Second Lien DIP Serves No Legitimate Business Purpose

43.    The EFIH Second Lien DIP is wholly unnecessary and demonstrably harmful to each of the Debtors' estates.  If it is approved, EFIH will be left with reduced liquidity on an immediate basis and will be unlikely to achieve any savings over the course of these chapter 11 cases, while claims that EFH and TCEH hold against EFIH will potentially be prejudiced.

### 1.    The EFIH Second Lien DIP Is Not Necessary to Continue the Debtors' Operations

44.    As a threshold inquiry, the Court should consider whether "the credit is necessary for continued operation" of the estate.  *In re Barbara K. Enters.*, No. 08-11474 (MG), 2008 WL

---

[21] *See* Section II.D *supra*.

2439649, at *8 (Bankr. S.D.N.Y. Jun. 16, 2008). *See also In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. at 496 (denying application for Section 364(c) financing where, among other factors, the short term of the financing "rais[ed] concerns that the proposed lending [would] do little towards preserving assets of the estate"). The Debtors never assert that the EFIH Second Lien DIP is necessary from an operational or debt-service perspective. Indeed, the record clearly reflects the Debtors' intent to use all of the EFIH Second Lien DIP proceeds (together with proceeds of the EFIH First Lien DIP Financing and cash on hand) to refinance the EFIH Second Lien Notes and pay the Alleged Makewhole Claims, which they assert will save interest expense and deleverage EFH Corp. and EFIH. (First Day Decl. ¶ 172.)

45.    A debtor-in-possession should *not* incur secured debt that it does not need. Based on the Debtors' projections, the EFIH Borrowers will be modestly cash flow negative during the chapter 11 cases if they do not enter into the EFIH Second Lien DIP. However, as a result of the liquidity provided under the EFIH First Lien DIP, the EFIH Borrowers currently have approximately $1.1 billion in cash. (*See* Pohl Decl. at ¶ 21.) Even if these chapter 11 cases run for two years, the EFIH Borrowers' liquidity will never fall below $1 billion, absent any additional financing. (*See* Pohl Decl. at ¶ 22.) Thus, the EFIH Second Lien DIP is not necessary to continue operations or otherwise to preserve the estates' assets.

### 2.    The EFIH Second Lien DIP Is Not Fair or Reasonable

46.    As set forth above, the EFIH Second Lien DIP is not necessary to the Debtors' continued operations, or to the preservation of the assets of the estates; instead, the proceeds of the financing will be used to refinance the EFIH Second Lien Notes. Arguably, if the Debtors would clearly save money by refinancing prepetition debt and had the liquidity available to do so, then such a refinancing would make business sense. However, as demonstrated below, the proposed refinancing of the EFIH Second Lien Notes will have an immediate and dramatic

*negative* impact on available cash, and, even in the Debtors' framework, will provide little to no benefit on a net cost basis.

          **a)**      **The EFIH Second Lien DIP Will Not Result in Cost Savings**

      47.    The Debtors assert that the EFIH Second Lien Notes refinancing will save interest expense and deleverage EFH Corp. and EFIH, based on the anticipated one-year duration of these proceedings. (First Day Decl. ¶¶ 172, 178.) Under the original proposal, the Debtors estimated that the potential interest savings under the EFIH Second Lien DIP would be "up to" $8 million per month. (Financing Mot. ¶ 32.) Those interest rate savings increase to approximately $11 million per month under the revised EFIH Second Lien DIP proposal. (*See* Pohl Decl. ¶ 9.) The Debtors' analysis seems to start and end with this alone. As set forth below, however, a full analysis, taking into account all relevant factors, demonstrates that any such interest expense savings are illusory.

      48.    *First*, cash fees need to be considered. Here, there are approximately $46 million in aggregate cash transaction fees due under the EFIH Second Lien DIP (excluding the proposed PIK Funding Fee, Prepayment Fee and fees already paid prepetition). (Financing Mot. at 14; Pohl Decl. at ¶ 12.)[22]

      49.    *Second*, the opportunity cost of utilizing excess balance sheet cash to facilitate the Pre-RSA Transactions must be considered. Since a portion of the funds under the EFIH First Lien DIP were borrowed with the express purpose of using such proceeds to fund the refinancing of the EFIH Second Lien Notes and Second Lien Settlement, the cost of such funds must be

---

[22] In addition, there is a $95 million PIK fee that is being satisfied in Tranche B Notes and ultimately will be converted to equity under the RSA Plan. While the Debtors *are* paying the $95 million PIK Funding Fee, albeit in equity, that fee is, as the Debtors recognize, another form of break-up fee because it will need to be paid in cash if an alternative transaction goes forward. Depending on whether the PIK Funding Fee is viewed as an upfront cost or a break-up fee, the EFIH Borrowers are either seeking approval of one of the most expensive DIP financings ever proposed (and one that is unlikely to ever result in savings), or a DIP that provides for break-up fees of 10% ($190 million) to lock in an artificially low equity valuation when multiple competing offers already exist. Either option is untenable.

23

incorporated into the EFIH Second Lien DIP savings analysis. Specifically, if the Pre-RSA Transactions are not effectuated, the EFIH Borrowers could use excess balance sheet cash to repay a portion of the EFIH First Lien DIP Financing without a prepayment penalty to avoid interest expense at 4.25% per annum. (*See* Pohl Decl. at ¶ 13.) EFIH could conservatively use at least $600 million of excess cash to pay down the EFIH First Lien DIP and therefore reduce its interest expense by at least approximately $26 million per year, or approximately $2 million per month. (*Id.*)

50. *Third*, the cost of the Second Lien Settlement and EFIH's potential liability on the Alleged Makewhole Claims that are not settled must be considered. The principal purpose of the makewhole premium provision in the EFIH Second Lien Notes Indenture is to ensure that the EFIH Borrowers cannot simply refinance the debt when interest rates fall, thereby depriving debtholders of their contracted stream of interest payments over a specific period of time. (*See* Pohl Decl. at ¶ 14.) Thus, upon a refinancing or repayment, the EFIH Borrowers' obligation to accrue above-market interest on the EFIH Second Lien Notes could be replaced by Alleged Makewhole Claims that offset any potential interest savings. (*Id.*) Moreover, once triggered, EFIH would be obligated to accrue interest on the Alleged Makewhole Claims until they are paid unless the Court determines that no makewhole premiums are due. (*Id.*)

51. As previously noted, the amount of the Alleged Makewhole Claims will only decrease over time. The refinancing of the EFIH Second Lien Notes now will cause those claims to crystalize at their peak, substantially increasing the amount of the Alleged Makewhole Claims to be settled and increasing the Debtors' risk with respect to the non-settling noteholders. Specifically, the full amount of the Alleged Makewhole Claims will decrease from approximately $664 million as of the Assumed Settlement Date to approximately $511 million at twelve months from the Petition Date, to approximately $397 million at eighteen months from

24

the Petition Date, and to approximately $289 million at twenty-four months from the Petition Date (assuming interest rates remain constant). (*See* Pohl Decl. at ¶ 17.) Once the full amount of the Alleged Makewhole Claims that will be triggered is factored in, regardless of whether EFIH is ultimately successful in the makewhole litigation, refinancing the EFIH Second Lien Notes and entering into the Second Lien Settlement are not justifiable.

52.    So, if the Debtors refinance the EFIH Second Lien Notes, settle the Alleged Makewhole Claims of 43% of noteholders for 50% of those claims (calculated as of the Assumed Settlement Date), and it is assumed that the Debtors lose their makewhole litigation against the remaining 57% of non-settling noteholders, the Pre-RSA Transactions will save the Debtors a negligible $4-41 million assuming a twelve to eighteen-month long bankruptcy case. (*See* Pohl Decl. at ¶ 18.)

53.    On the other hand, if the Debtors are successful in the makewhole litigation, the combined cost of the EFIH Second Lien DIP transaction fees and Second Lien Settlement with 43% of noteholders will still result in a net cost to the estates compared to doing nothing at all unless the Debtors remain in bankruptcy for fourteen months or more, assuming that default interest is payable on the EFIH Second Lien Notes. (*See* First Day Decl. ¶ 178; Pohl Decl. at ¶ 19.) If the EFIH Second Lien Notes are only entitled to interest at the contract rate, the chapter 11 cases will need to last more than nineteen months in order for the refinancing to result in any cost savings. (*Id.*)

54.    It appears that the Debtors' board never considered the total cost of the EFIH Second Lien DIP against the cost of leaving the EFIH Second Lien Notes in place. ███

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

ny-1146543

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ Whether the Debtors' boards simply failed to perform this type of analysis when evaluating whether to enter into the Pre-RSA Transactions, or decided to enter into the transactions in spite of the clear lack of justification for doing so, the sheer unreasonableness of refinancing the EFIH Second Lien Notes at this time places the judgment of the Debtors' boards into question. Of course, the decision regarding the best use of EFIH's current $1 billion in liquidity is not strictly binary. There may well be uses for that cash (including repaying the First Lien DIP Financing, as noted above) that would generate alternative savings for the Debtors' estates. The fact that those options have not been explored further highlights the lack of justification for the proposed refinancing and underscores the questionable decision-making by the Debtors' boards.

**b)  The Refinancing of the EFIH Second Lien Notes Will Reduce the Debtors' Liquidity**

55.    The proposed refinancing of the EFIH Second Lien Notes will substantially reduce the EFIH Borrowers' liquidity because they will be required to (i) make payments of up to approximately $420 million out of cash on hand to refinance the EFIH Second Lien Notes, including financing fees related thereto, (ii) make the payments under Second Lien Settlement of approximately $140 million (assuming the current 43% participation rate), and (iii) pay interest on a current basis on the EFIH Second Lien DIP—all costs that the EFIH Borrowers would not otherwise be required to bear during these chapter 11 cases.

56.    *First*, the EFIH Second Lien DIP will provide only $1.9 billion towards the proposed refinancing of $2.156 billion (plus accrued interest) of the EFIH Second Lien Notes.

ny-1146543

When accrued interest and fees are taken into account, the EFIH Borrowers must contribute an additional $420 million in cash, which amounts will be taken from a combination of cash on hand and/or proceeds of the EFIH First Lien DIP Financing. (*See* Settlement/TSA Mot. ¶ 25; Ying Settlement Decl. ¶ 7.) Thus, the refinancing of the EFIH Second Lien Notes would substantially reduce the cash available to the EFIH Borrowers.

57.    *Second*, the proposed refinancing of the EFIH Second Lien Notes is itself the event that would potentially trigger the noteholders' Alleged Makewhole Claims. (Settlement/TSA Mot. ¶ 25.) Absent the refinancing, there is no arguable claim for makewhole premiums because such claims are only due upon the prepayment of the debt. Thus, while the Debtors propose to settle at least 35% of those claims immediately upon approval of the Second Lien Settlement, which would result in a cash payment of between $140 million (43% participation in the settlement) and $333 million (100% participation in the settlement) as of the Assumed Settlement Date (*see supra* at ¶ II.E; Settlement/TSA Mot. ¶ 26; Ying Settlement Decl. ¶ 11), there would be nothing to settle absent the proposed refinancing, and no settlement payment would be necessary other than potentially a much small makewhole amount at the end of the chapter 11 cases.

58.    *Third*, the refinancing of the EFIH Second Lien Notes with proceeds of the EFIH Second Lien DIP will require the EFIH Borrowers to make monthly interest payments of approximately $9.9 million in cash under the EFIH Second Lien DIP, excluding the additional $900,000 per month in cash required to make monthly interest payments on the portion of the EFIH First Lien DIP Financing that would be used to pay off the EFIH Second Lien Notes. (*See* Pohl Decl. ¶ 7.) However, the Debtors are not obligated to make payments on the EFIH Second Lien Notes on a current basis during these chapter 11 cases, because the Court has already determined that the holders of EFIH Second Lien Notes are adequately protected and authorized

27

the Debtors' continued use of their cash collateral. (*See* EFIH First Lien DIP Final Order ¶¶ K, 15.) As a result, interest under the EFIH Second Lien Notes may continue to accrue during the chapter 11 cases but will not need to be paid in cash currently—unlike the interest under the EFIH Second Lien DIP.

59.     Remarkably, the Debtors have admitted that, prior to filing the Financing Motion, they never performed any analysis that considered whether additional DIP financing at EFIH would be appropriate if there is no ongoing obligation to make monthly cash payments under the EFIH Second Lien Notes, and did not revisit the issue following entry of the EFIH First Lien DIP Order. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Thus, in evaluating the reasonableness of the EFIH Second Lien DIP, the Debtors failed to take into account the fact that EFIH is not required to make adequate protection payments to the EFIH Second Lien Noteholders pursuant to the EFIH First Lien DIP Order. (*See* EFIH First Lien DIP Order, ¶¶ K, 15.)

60.     Altogether, the refinancing of the EFIH Second Lien Notes will immediately drain EFIH of approximately $560 million in cash to fund up-front payments to certain of the RSA signatories and result in the further diminishment of liquidity through payment of ongoing interest on the EFIH Second Lien DIP. (*See* Pohl Decl. at ¶ 21.)

28

c)    **Multiple Better Financing Offers Leave No Doubt That the Terms of the Proposed EFIH Second Lien DIP Are Unfair and Unreasonable**

61.    Finally, even if the refinancing of the EFIH Second Lien Notes and corresponding need for DIP financing were appropriate or beneficial to the Debtors' estates, the Debtors cannot meet their burden to establish that the terms of their proposed EFIH Second Lien DIP are "fair, reasonable, and adequate" (*In re L.A. Dodgers, LLC*, 457 B.R. at 312), because the Debtors have already received multiple competing proposals offering significantly better terms. (*See supra* at II.D.2; Financing Mot. ¶ 38; Ying Financing Decl. ¶ 23 (acknowledging an alternative proposal with terms that are more "economically favorable").)

3.    **The EFIH Second Lien DIP Is Not Really a DIP**

62.    As set forth above, the EFIH Second Lien DIP does not make financial sense from the Debtors' perspective. That is so because the EFIH Second Lien DIP is, in reality, not a DIP at all. █████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ Rather, the EFIH Second Lien DIP is a clear attempt to secure an equity investment in reorganized EFH at the conclusion of the case without the protections of a plan process. Viewed in this context, the relief sought by the Debtors is unprecedented. The Debtors are selling their equity without having conducted any formal sale process or performed any formal valuation to determine if the proposed equity investment is on reasonable terms. ████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████

29

63.     By providing for a mandatory equity split, the EFIH Second Lien DIP implies an equity value for EFH of approximately $3.3 billion and a total enterprise value ("TEV") for Oncor of approximately $16.7 billion. (*See* Pohl Decl. at ¶ 23.) Importantly, the only parties who had input in determining the equity splits for the conversion (other than the Debtors and Mr. Ying, who agreed that the proposed numbers were reasonable despite having performed no formal valuation) were the DIP participants who stand to benefit if the Debtors' enterprise value is underestimated. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████

64.     There is ample evidence that the DIP participants may have indeed undervalued EFH's equity. The initial EFIH Second Lien DIP proposal accepted by the Debtors implied an equity value of $3.1 billion and Oncor TEV of $16.5 billion. (*See* Pohl Decl. at ¶ 24.) Under the revised EFIH Second Lien DIP proposal, the implied equity value and Oncor TEV increase to $3.3 billion and $16.7 billion, respectively, and the revised Second Lien Creditor DIP implies an equity value of $3.6 billion and Oncor TEV of $17.6 billion. (*See* Pohl Decl. at ¶ 23.) This increase of approximately one billion dollars in the implied TEV of Oncor in the span of just a few weeks is a strong signal that entering into a "DIP loan" that predetermines equity splits for EFH/EFIH cannot be countenanced at this time. In fact, the revised Second Lien Creditor DIP appears to leave EFIH solvent by paying EFIH general unsecured creditors in full while providing some additional value to EFH noteholders. (*See* Goren Decl. at Ex. 1 at 14.)

30

65.    In addition, the securities that would be entitled to participate in the EFIH Second

Lien DIP are currently trading at 124% of par and, more relevantly, 118% of the accrued

prepetition claims under those securities—a substantial premium, and one far in excess of the

recovery implied by the proposed equity splits in the EFIH Second Lien DIP.  (*See* Pohl Decl. at

¶ 25.) ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  These substantial premiums

are indicators that the market believes the participation rights attributable to the EFIH Unsecured

Notes have significant independent value.  That opportunity to share in that value is not being

offered to TCEH (and by extension, its creditors) to the extent it has claims against EFH and/or

EFIH.  If the rights offering proposed to be made through the EFIH Second Lien DIP was being

made in a plan (as it should be), the Committee (and other creditors of TCEH) would be raising

an unfair discrimination objection.  The Debtors should not be permitted to avoid such an

objection by locking in this preferential treatment in advance of a plan.

### 4.    Certain of the Fees Associated With the EFIH Second Lien DIP Are Unreasonable

66.    Because the EFIH Second Lien DIP is appropriately viewed as nothing more than

an equity investment in EFH, the Prepayment Fee and the PIK Fee are properly viewed as a

collective break-up fee with respect to that proposed purchase.  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  The Prepayment Fee, which has been reduced to a

still-excessive 5% of the proposed $1.9 billion EFIH Second Lien DIP, is roughly double the 1-

3% break-up fees typically deemed acceptable by courts.  Moreover, if the $95 million PIK

Funding Fee is included, consistent with the Debtors' analysis, then the Debtors will be required to pay break-up fees totaling $190 million, or 10%, in the event they elect to pursue an alternative restructuring transaction. A 10% break-up fee is more than three times the *high* end of the range that is typically approved by courts. *Cf. In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions, break-up fees ranging from one to two percent of the purchase price have been authorized by some courts.") *See also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 625 (S.D.N.Y. 1987) (approving break-up fee of 2%); *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 41 (Bankr. S.D.N.Y. 1998) *aff'd,* 246 B.R. 176 (S.D.N.Y. 2000) (finding a break-up fee of 10% "entirely unwarranted."); *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 913 (Bankr. D. Ariz. 1994) (finding break-up fees "not economically reasonable in this mega type bankruptcy case . . .[where] a very large number of creditors, bondholders and shareholders" exists). Topping fees of this size could make alternative restructuring proposals cost-prohibitive (assuming the RSA does not drastically undervalue the Debtors and Oncor, which is an issue for another day). ███████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ While the Debtors would retain the theoretical ability to consider alternative restructuring proposals under the RSA's fiduciary out, that right becomes meaningless upon the approval of the EFIH Second Lien DIP.[23]

67.    Moreover, in light of the multiple competing offers to provide additional DIP financing to EFIH, the Committee believes that a break-up fee of any amount is inappropriate. Payment of a break-up fee is governed by section 503(b) of the Bankruptcy Code, which, in

---

[23] As discussed below, the proposed Oncor TSA Amendment seeks to further tilt these proceedings by shifting assets from EFH to EFIH, with the only consideration to EFH to be separately provided under the RSA Plan.

ny-1146543

relevant part, permits payment of post-petition administrative expenses for the "'actual, necessary costs and expenses of preserving the estate.'" *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citation omitted); 11 U.S.C. § 503(b). Therefore, to award a break-up fee, the court must determine that the break-up fee was an actual and necessary cost and expense of preserving the estate. The burden is on the EFIH Borrowers to prove the necessity of, and benefit to the estates from, the proposed break-up fee. In cases where, for example, "a potential purchaser will bid whether or not break-up fees are offered . . . . the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate." *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d. Cir. 1999). Here, the EFIH Borrowers have several competing offers on substantially similar terms to the EFIH Second Lien DIP, except with lower interest rates and fees. (*Supra* II.D.2) The Debtors have not satisfied their burden to show that a break-up fee is a necessary and accordingly, any DIP proposal that provides for one, including the Prepayment Fee under the Financing Motion, should be rejected.

### C.    The Oncor TSA Amendment Is Unnecessary and Inappropriate Prior to Confirmation of the RSA Plan

68.    The Debtors assert that "[t]he Oncor TSA Amendment is intended to ensure that the cash flow support for the various consensual transactions contemplated by the [RSA] will remain in place for the duration of the chapter 11 cases." (Settlement/TSA Mot. at ¶¶ 3, 34.) Putting this "cash flow support" into place prior to the approval or consummation of any of those transactions and while EFH remains liable for the income taxes generated as a result of its subsidiaries' operations is unnecessary and serves no legitimate business purpose. Rather, the Oncor TSA Amendment is intended to inappropriately shield assets that would otherwise be available to satisfy claims against EFH, including any intercompany claims or causes of action that could potentially be asserted by or on behalf of TCEH.

69.     The Debtors contend that, "[w]ithout the incremental cash flow provided by the Oncor TSA Amendment, EFIH may not have sufficient cash to meet its minimum cash covenant requirement under the EFIH First and Second Lien DIP Facilities if the bankruptcy process runs longer than anticipated by the RSA." (Ying Settlement Decl. at ¶ 20.) As set forth above, however, the liquidity shortage the Debtors are seeking to remedy with the Oncor TSA Amendment is a self-created problem caused by entering into the EFIH Second Lien DIP and refinancing the EFIH Second Lien Notes. (*See supra* at III.B.) Approval of the EFIH Second Lien DIP and Second Lien Settlement will significantly deplete the EFIH Borrowers' liquidity, and place them at risk of violating the minimum liquidity covenant under the EFIH First Lien DIP Financing at some point in the future. As a result, approval of those transactions could necessitate that the EFIH Borrowers obtain additional liquidity at some point in the future (which could well be after the conclusion of these chapter 11 cases). Nonetheless, the Debtors have argued that this potential liquidity shortage makes entry into the Oncor TSA Amendment imperative. (Settlement/TSA Motion at ¶ 35.) In contrast, if the Debtors did not enter into the EFIH Second Lien DIP at all, the EFIH Borrowers should have at least $1 billion in liquidity at all times during these chapter 11 cases, and the Debtors' purported need to enter into the Oncor TSA Amendment would be eliminated.

70.     While these possible liquidity issues are certainly not a problem that needs to be solved today (and may not ever arise), if there is no EFIH Second Lien DIP, then it is certain that there will be no problem to be solved at all. Furthermore, there are a variety of other potential ways to solve any liquidity problems triggered by entry into the EFIH Second Lien DIP, including through an intercompany loan from EFH to EFIH.

71.     The Oncor TSA Amendment is not necessary to fund the EFIH Debtors' operations during these chapter 11 cases. Rather, it is intended to ensure that, in the event the

34

restructuring transactions contemplated under the RSA are not consummated, the cash that is ordinarily remitted by Oncor to EFH will be beyond the reach of EFH creditors and instead safely in the hands of EFIH creditors. As a result, EFIH creditors would have little or no incentive to participate in plan negotiations with other creditor constituencies, further reducing the likelihood that an alternative restructuring proposal will be considered or pursued by the Debtors.

72.     Moreover, the only consideration EFH will receive in exchange for relinquishing the payments it currently receives under the Oncor TSA—a cash payment from EFIH of $55 million (subject to adjustment), and forgiveness by EFIH of $1.3 billion in unsecured notes it holds against EFH—will be pursuant to, and contingent on confirmation of, the RSA Plan. (Ying Settlement Decl. ¶ 21.) In other words, EFIH creditors are receiving a benefit now, at the potential expense of TCEH creditors, and EFH will be compensated for providing that benefit only if the RSA Plan is confirmed. Thus, the Oncor TSA Amendment is yet another example of how the Debtors are seeking to lock in aspects of the RSA Plan prior to confirmation.

73.     As set forth above, the Oncor TSA Amendment is a one-sided transaction intended to benefit EFIH creditors at the potential expense of other creditor constituencies, and improperly shifts assets among creditors outside of a plan. Accordingly, to the extent the Court is asked to evaluate this request, it should not be approved by the Court.

**D.      Approval of the Pre-RSA Transactions Is Premature and Prejudicial While Intercompany Claims and Causes of Action Are Being Investigated and in the Absence of a Formal Valuation**

74.     Although the Debtors have not yet filed their schedules and statements of financial affairs, the Committee's professionals have already begun investigating potential intercompany claims and causes of action that might be asserted amongst the Debtors. That investigation, which involves a detailed analysis and review of numerous complex intercompany

transactions reaching back years, is still in its initial stages.[24]  If approved, the Pre-RSA

Transactions would permanently alter the status quo among the Debtors' estates as of the Petition

Date by (a) satisfying prepetition secured claims without an investigation of the validity of liens

and claims; (b) shifting assets among Debtor entities; and (c) providing holders of Participating

Unsecured Notes with a secured, superpriority position that will shield them from the potential

downside of these cases that all other unsecured creditors will face.  Pursuant to the Oncor TSA

Amendment, projected payments totaling approximately $320 million during the first year

following the Petition Date would be diverted from EFH to EFIH and be included in the

collateral package of the EFIH First Lien DIP Lenders and Second Lien DIP Lenders.  Thus, if

the Committee determines as a result of its investigation that TCEH holds significant claims or

causes of action against EFH, the ability of TCEH creditors to recover on those claims will be

prejudiced.

> 75.    To the extent the Pre-RSA Transactions alter the status quo among the Debtors,

approval of those transactions is premature while intercompany claims and causes of action are

still being investigated by the Committee.  The Debtors offer no rational justification for

prejudicing the rights of EFH and/or EFIH creditors (including, potentially, TCEH) with respect

to such claims before the claims can be reasonably assessed.

> 76.    Furthermore, there has been no analysis of the impact of the RSA Plan on claims

between EFH and EFIH, of whether the various Debtor entities are solvent, or of the overall

value of those entities.  (*See supra* III.B.3.)  In the absence of such data, the proposed entry into

the Pre-RSA Transactions, which involve the waiver of certain of those claims and an allocation

---

[24] The claims and causes of action being investigated by the Committee include, *inter alia*, a potential claim that could be asserted on behalf of TCEH against EFH in connection with TCEH's charging below-market interest rates to EFH on an intercompany note, as initially alleged in *Aurelius Capital Master, Ltd. v. Acosta*, No. 3:13-cv-1173 (N.D. Tex.), and potential claims TCEH may hold against EFIH arising from the improper allocation of liability for sponsor fees and/or other shared services obligations, which appear to have been borne exclusively by TCEH although both TCEH and EFIH received the benefit of such shared services.

of equity that is based on an implied but completely untested valuation, is also premature and does not constitute an exercise of reasonable business judgment by the Debtors. The fact that the Debtors' boards of directors approved the Pre-RSA Transactions without a full understanding of these issues is yet another indication that they failed to exercise due care in carrying out the fiduciary duties owed by the Debtors to their creditors.

## IV.    RESERVATION OF RIGHTS

77.    In the event the Court approves the EFIH Second Lien DIP (or any alternative financing proposal), the Committee believes that the order granting such relief must preserve the rights of TCEH (to the extent TCEH is an unsecured creditor of EFH or EFIH) to participate, for itself and for the benefit of TCEH creditors, in reorganized EFH equity on the same terms as the proposed EFIH Second Lien DIP Lenders.[25] This is particularly important where, as here, the EFIH Second Lien DIP Lenders will receive certain absolute benefits in the form of either the $95 million Prepayment Fee or 60% of the equity in EFH Corp.

## V.    CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Financing Motion, (ii) deny the Settlement/TSA Motion to the extent it seeks approval of the Second Lien Settlement and Oncor TSA Amendment, and (iii) grant such other and further relief as the Court may deem just and proper.

---

[25] In the event the Court determines that additional DIP financing is appropriate, the Committee believes that the proposed order granting the Financing Motion (a draft copy of which was annexed to Docket No. 994, the "Proposed Order") should be modified. First, for the first time in the Proposed Order, the EFIH Borrowers propose to include stipulations in paragraph F of the Proposed Order regarding the validity of the Prepetition Toggle Notes Obligation. The proposed stipulations, which contain no challenge period for parties in interest to conduct an investigation, were never mentioned in the Motion, nor were they highlighted as required by Local Rule 4001-2(a)(1)(B). Second, paragraph 12 of the Proposed Order should be modified to clarify that the EFIH Second Lien Repayment has no impact on, and is without prejudice to, the rights of any party to seek to recharacterize or equitably subordinate the claims held by holders of EFIH Second Lien Notes as if the EFIH Second Lien Repayment had not been consummated. Third, paragraph 46 of the Proposed Order should be modified to require the EFIH Debtors to file a notice with the Court within five (5) business days of the filing of a petition for relief for any subsidiary guarantor indicating that the subsidiary is a guarantor under the EFIH Second Lien DIP NPA (as defined in the Proposed Order).

ny-1146543

Dated: Wilmington, Delaware
June 24, 2014

**MORRISON & FOERSTER LLP**
James M. Peck
Todd M. Goren
Erica J. Richards
Samantha Martin
250 West 55th Street
New York, New York 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:  jpeck@mofo.com
         tgoren@mofo.com
         erichards@mofo.com
         smartin@mofo.com

        -and-

*/s/ Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del. Bar No. 5352)
**POLSINELLI PC**
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile:  (302) 252-0921
E-mail:  cward@polsinelli.com
         jedelson@polsinelli.com
         skatona@polsinelli.com


*Proposed Counsel for The Official*
*Committee of Unsecured Creditors of*
*Energy Future Holdings Corp., et al.*