# EXHIBIT A

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

JOSHUA BRODY
PARTNER
PHONE 212-715-9314
FAX 212-715-8444
JBRODY@KRAMERLEVIN.COM

June 26, 2014

VIA E-MAIL
Stephen E. Hessler
Kirkland & Ellis
601 Lexington Avenue
New York, New York 10022

> Re:    Second Lien Debtor-in-Possession Financing
>         Proposal for Energy Future Intermediate Holding
>         Company LLC

Dear Steve:

On June 22, 2014, the EFIH Second Lien Group and NextEra Energy, Inc. ("NextEra") submitted a revised joint proposal for an alternative second lien debtor-in-possession financing (the "Strategic DIP"). Attached are the commitment letter, DIP term sheet, and equity conversion term sheet reflecting the Strategic DIP that the Commitment Letter Parties (as defined in the Commitment Letter) are prepared to execute.

We remain committed to proceeding with the Strategic DIP and believe it represents the best available option for the Debtors' estates.

Sincerely,

Joshua K. Brody

1177 AVENUE OF THE AMERICAS  NEW YORK NY 10036-2714  PHONE 212.715.9100  FAX 212.715.8000

990 MARSH ROAD  MENLO PARK CA 94025-1949  PHONE 650.752.1700  FAX 650.752.1800

47 AVENUE HOCHE  75008 PARIS FRANCE  PHONE (33-1) 44 09 46 00  FAX (33-1) 44 09 46 01

WWW.KRAMERLEVIN.COM

KRAMER LEVIN NAFTALIS & FRANKEL LLP

June 26, 2014
Page 2


Encl.


Cc: Mark E. Hickson, Vice President, Strategy and Corporate Development, NextEra Energy,
Inc.
Charles E. Sieving, Executive Vice President & General Counsel, NextEra Energy, Inc.
Thomas Moers Mayer, Kramer Levin Naftalis & Frankel
David Ying, Evercore Partners
Howard Seife, Chadbourne & Parke
David LeMay, Chadbourne & Parke

June 26, 2014

Energy Future Holdings Corp.
Energy Future Intermediate Holdings Company LLC
Energy Plaza
1601 Bryan Street
Dallas, TX 75201

<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised NextEra Energy, Inc. ("<u>NEE</u>"), JPMorgan Chase Bank, N.A. ("<u>JPMorgan Chase Bank</u>"), J.P. Morgan Securities LLC ("<u>JPMorgan</u>") and Credit Suisse Securities (USA) LLC ("<u>Credit Suisse</u>"), and the undersigned holders (the "<u>SC Holders</u>," and together with NEE, JPMorgan Chase Bank, JPMorgan, Credit Suisse, the "<u>Commitment Letter Parties</u>," "<u>us</u>" or "<u>we</u>")) of Second Lien Notes of Energy Future Intermediate Holdings Company LLC ("<u>EFIH</u>"), a Delaware limited liability company and a debtor and debtor-in-possession in a case (together with the related cases of Energy Future Holdings Corp. ("<u>EFH</u>", together with EFIH ("<u>you</u>")) and of certain affiliates of EFIH, the "<u>Chapter 11 Cases</u>") under title 11 of the United States Code (the "<u>Bankruptcy Code</u>") pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") that EFIH and EFIH Finance, Inc. desire to a obtain a second lien subordinated secured debtor-in-possession facility (the "<u>Second Lien DIP Facility</u>") which shall consist of (a) non-amortizing notes in an amount up to $2,300,000,000 (the "<u>Tranche A DIP Notes</u>") and (b) non-amortizing, non-interest-bearing notes issued in full satisfaction of the Funding PIK Fee (as defined in the DIP Term Sheet) (the "<u>Tranche B DIP Notes</u>" and, together with the Tranche A DIP Notes, the "<u>Second Lien DIP Facility</u>"), in accordance with and subject to the terms and conditions set forth herein, in the term sheet attached hereto as <u>*Exhibit A*</u> (the "<u>DIP Term Sheet</u>") and in the term sheet attached hereto as <u>*Exhibit B*</u> (the "<u>Equity Conversion Term Sheet</u>" and, together with this letter and the DIP Term Sheet, this "<u>Commitment Letter</u>").  Capitalized terms used in this Commitment Letter without definition have the meanings assigned to them in the DIP Term Sheet (including by reference to other documents).

The cash proceeds of the Second Lien DIP Facility, together with other funds available to EFIH, shall be used to pay the outstanding principal of and accrued interest on certain of (x) EFIH's 11.00% Second Lien Notes due October 1, 2021 and (y) EFIH's 11.75% Second Lien

Notes due March 1, 2022 (collectively, the "EFIH Second Lien Notes") (as more particularly described in the DIP Facility Term Sheet, the "Second Lien Refinancing"), as described in the DIP Term Sheet.  Upon the effectiveness of a plan of reorganization in the Chapter 11 Cases, the Second Lien DIP Facility shall be subject to conversion to common stock in reorganized EFH ("Reorganized EFH") on the terms and subject to the conditions set forth in the Equity Conversion Term Sheet and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

As used herein, the term "Transactions" means, collectively, the entering into and funding of the Second Lien DIP Facility, the Second Lien Refinancing and all other related transactions as provided for in the Commitment Letter (including the DIP Term Sheet and Equity Conversion Term Sheet), including the payment of fees and expenses in connection therewith. The date on which the Second Lien DIP Facility becomes effective is referred to as the "Closing Date."  The provisions of this Commitment Letter (other than Sections 7, 8, 9 and 10) shall be subject to entry of the DIP Order (as defined below).

1.  Commitments

In connection with the Transactions, the Commitment Letter Parties are pleased to advise you of the following commitments, each of which is made on a several and not joint basis:

- NEE commits to provide $1.6 billion of the aggregate amount of the Second Lien DIP Facility, in the form of cash (the "NEE Commitment"); and

- The SC Holders commit, on a several and not joint basis, to exercise their Participation Rights with respect to all of the EFIH Second Lien Notes owned by each of them, including the rollover of $700 million in principal amount of EFIH Second Lien Notes into Tranche A DIP Notes subject to a pro rata cutback to the extent other holders of EFIH Second Lien Notes exercise their Participation Rights.

Each of the foregoing commitments is subject to the terms and conditions set forth in this Commitment Letter and the exhibits attached hereto.

2.  Titles and Roles

It is agreed that JPMorgan and Credit Suisse will act as joint placement agents and bookrunners for the NEE Commitment (acting in such capacities, each a "Placement Agent", and together, the "Placement Agents").  You agree that JPMorgan will have "left" placement in any and all materials or documentation used in connection with the Second Lien DIP Facility.

You agree that other than the appointment of an Administrative Agent and Collateral Agent as contemplated by the DIP Term Sheet, no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by this Commitment Letter, including the exhibits attached hereto, and the Fee Letter referred to below) will be paid in connection with the Second Lien DIP Facility.  You further agree that none of

JPMorgan or any of its affiliates is underwriting or purchasing securities or providing any financing in connection with the Second Lien DIP Facility.

3.    <u>Information</u>

You hereby represent and warrant that (a) all information (the "<u>Information</u>"), other than the Projections (as defined below) and information of a general economic or industry specific nature, that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the financial projections and other forward-looking information (the "<u>Projections</u>") that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Letter Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence is incorrect, in any material respect, then you will promptly supplement the Information and the Projections so that such representations are correct, in all material respects, under those circumstances.

4.    <u>Fees</u>

As consideration for the commitments and agreements of the Commitment Letter Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees described in the DIP Term Sheet and in the Placement Agent Fee Letter dated the date hereof and delivered herewith (the "<u>Fee Letter</u>") on the terms and subject to the conditions set forth therein.

You agree that, once paid, the fees or any part thereof payable pursuant to this Commitment Letter shall not be refundable under any circumstances, except as otherwise agreed in writing. All fees payable pursuant to this Commitment Letter shall be paid in immediately available funds, except as expressly provided in the DIP Term Sheet with respect to the Funding PIK Fee.  All fees payable hereunder shall be in addition to reimbursement of our out-of-pocket expenses as provided for herein. You agree that we may, in our sole discretion, share all or a portion of any of the fees payable pursuant to this Commitment Letter with such parties as we determine.

5.    <u>Conditions Precedent</u>

Each Commitment Letter Party's commitments and agreements hereunder are subject only to (x) the execution and delivery by the parties thereto of mutually agreeable definitive financing documentation for the Second Lien DIP Facility (as more particularly described in the DIP Facility Term Sheet (including the Conversion Agreement (as defined in the Equity

Conversion Term Sheet)), (the "DIP Documents"), and (y) the satisfaction of the conditions set forth in the DIP Term Sheet under the heading "Conditions Precedent to the Closing".

6.    Indemnification and Expenses

Whether or not the transactions contemplated hereby are consummated, EFH and EFIH agree, on a joint and several basis, (a) to indemnify and hold harmless the Commitment Letter Parties, their respective affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all losses, claims, damages, liabilities and expenses to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letter, the Second Lien DIP Facility, the use of the proceeds thereof, otherwise relating to the Chapter 11 Cases or the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, including without limitation any Proceeding based upon any untrue statement or any alleged untrue statement of any material fact contained in any information or other communication provided by or on behalf of you, in each case regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable legal or other expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final nonappealable judgment of a court of competent jurisdiction to arise from the bad faith or willful misconduct of such indemnified person or its affiliates, directors, officers, employees, advisors, agents or other representatives (collectively, the "Related Parties") and (b) regardless of whether the Closing Date occurs, to reimburse each Commitment Letter Party, and the indenture trustee for the EFIH Second Lien Notes (the "EFIH Second Lien Indenture Trustee") and their respective affiliates for all reasonable and documented out-of-pocket expenses (including due diligence expenses, syndication expenses, travel expenses and the reasonable fees, charges and disbursements of counsel, financial advisors and other advisors) incurred in connection with the Second Lien DIP Facility and any related documentation (including this Commitment Letter and the DIP Documents (as defined below)) or the administration, amendment, modification or waiver thereof or otherwise relating to the Chapter 11 Cases or the Restructuring, including the fees and expenses of (i) Davis Polk & Wardwell LLP, (ii) Kramer Levin Naftalis & Frankel LLP (iii) Rothschild Inc., (iv) Pachulski Stang Ziehl & Jones LLP, (v) Bryan Cave LLP, (vi) Latham & Watkins LLP, (vii) Chadbourne & Parke LLP, (viii) Credit Suisse (ix) JP Morgan (in its capacities other than Placement Agent). It is further agreed that each Commitment Letter Party shall only have liability to you (as opposed to any other person). No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith or willful misconduct of such indemnified person (or any of its Related Parties). None of the indemnified persons or any of their Related Parties shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letter, the Second Lien DIP Facility or the transactions contemplated hereby.  Any provisions in this Commitment Letter relating to payment of the fees and expenses of the EFIH Second Lien Indenture Trustee and/or its advisors shall be in addition

to, and shall not limit, any rights the EFIH Second Lien Indenture Trustee may have under the indenture governing the EFIH Second Lien Notes.

7.  Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that JPMorgan, Credit Suisse and certain of the SC Holders (or their respective affiliates) are full service securities firms and such persons may from time to time effect transactions, for their own or affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates. Each such Commitment Letter Party will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Letter Party and its affiliates of services for other companies or persons and the Commitment Letter Party and its affiliates will not furnish any such information to any of their other customers. You also acknowledge that the Commitment Letter Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Letter Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Letter Parties have advised or are advising you on other matters, (b) the Commitment Letter Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Letter Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Letter Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Letter Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Letter Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Letter Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Letter Party and you or any such affiliate.

8.  Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person without our prior written consent except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which

case you agree, to the extent permitted by law, to inform us promptly in advance thereof and it being understood and agreed that you shall take such reasonable actions as shall be necessary to prevent the Fee Letter from becoming publicly available) and (c) upon notice to the Commitment Letter Parties, this Commitment Letter and the existence and contents hereof (but not the Fee Letter or the contents thereof) may be disclosed in connection with any public filing requirement, including in connection with any filing seeking the DIP Order (as defined below), in connection with other filings in the Chapter 11 Cases, or as otherwise required by the Bankruptcy Court. Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file the Fee Letter with the Bankruptcy Court under seal and provide an unredacted copy of the Fee Letter to (x) the Bankruptcy Court and the Office of the United States Trustee and (y) (i) the advisors to the official committee of unsecured creditors in the Chapter 11 Cases, (ii) Kramer Levin Naftalis & Frankel LLP and Rothschild Inc., in their respective capacities as advisors to certain potential Lenders and (iii) Chadbourne & Parke LLP and Credit Suisse, in their capacities as advisors to NEE, so long as, in the case of this clause (y), the disclosure to such advisors is on a confidential "professionals only" basis.

The Commitment Letter Parties shall use all nonpublic information received by them in connection with the Transactions and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such nonpublic information; provided, however, that nothing herein shall prevent any Commitment Letter Party from disclosing any such information (a) to rating agencies, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Letter Party shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Letter Party or its affiliates, (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Letter Party (collectively, "Representatives") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its respective affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Letter Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Letter Party's affiliates or Representatives in breach of this Commitment Letter, (g) for purposes of establishing a "due diligence" defense and (h) to the extent that such information is received by the Commitment Letter Parties from a third party that is not to the Commitment Letter Parties' knowledge subject to confidentiality obligations to you.  The obligations of the Commitment Letter Parties under this paragraph shall remain in effect until the earlier of (i) one year from the date hereof and (ii) the date the DIP Documents are entered into, at which point any confidentiality undertaking in the DIP Documents shall supersede the provisions of this paragraph.

You agree not to provide any nonpublic information directly to any SC Holder unless written request for the information is made by such SC Holder, but nothing shall preclude you from providing such nonpublic information to the legal and financial advisors of any SC Holder on a "professional eyes only" basis.

9.  <u>Assignment</u>

Except as otherwise provided in this Section 9, this Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Letter Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein.  Any Commitment Letter Party may assign its commitment hereunder to one or more of its affiliates, <u>provided</u> any such assignment shall not relieve a Commitment Letter Party of its obligations hereunder without your prior written consent.

A SC Holder may sell, assign, transfer or otherwise dispose any or all of its EFIH Second Lien Notes to a transferee that executes and delivers to you in advance a joinder agreement in the form attached hereto agreeing to be bound by the terms of this Commitment Letter applicable to SC Holders with respect to all the EIFH Second Lien Notes owned by such transferee, in which case such transferee shall be deemed to be an SC Holder for all purposes of this Commitment Letter.  Notwithstanding the foregoing, a Qualified Marketmaker that acquires any EFIH Second Lien Notes from an SC Holder with the purpose and intent of acting as a Qualified Marketmaker therefor shall not be required to execute and deliver a joinder agreement if such Qualified Marketmaker transfers such EFIH Second Lien Notes to a transferee that executes a joinder agreement no later than the earlier of (x) three (3) business days of its date of acquisition and (y) two (2) business days prior to the expiration of the Participation Rights.  "<u>Qualified Marketmaker</u>" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers EFIH Second Lien Notes (or enter with customers into long and short positions in EFIH Second Lien Notes), in its capacity as a dealer or market maker in EFIH Second Lien Notes and (b) is, in fact, regularly in the business of making a market in debt securities.

10. <u>Miscellaneous</u>

JPMorgan, JPMorgan Chase Bank and Credit Suisse reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Commitment Letter Parties in such manner as the Commitment Letter Parties and their affiliates may agree in their sole discretion.  This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Letter Party.  Any notes issued to NEE under the EFIH Second Lien DIP Facility will be offered and sold pursuant to exemptions from the registration requirements under Section 4(a)(2) of the Securities Act of 1933, as amended (the "<u>Act</u>"), and otherwise in accordance with the Act and JPMorgan's customary procedures for such transactions, including delivery by NEE (or its successors or assignees) of a customary representation letter.  Upon JPMorgan's request, you will enter into a customary placement agency agreement with JPMorgan.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "<u>pdf</u>" or "<u>tif</u>") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Fee Letter are the only agreements that have

been entered into among us and you with respect to the Second Lien DIP Facility and set forth the entire understanding of the parties with respect thereto. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or, if such court does not have (or abstains from) jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder.

Each of the Commitment Letter Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Issuer and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Issuer and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Letter Parties and each Lender.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether the DIP Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality of the Fee Letter and the contents thereof) shall automatically terminate and be superseded by the provisions of the DIP Documents upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time, in each case to the extent the DIP Documents have comparable provisions with comparable coverage.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter not later than 5:00 p.m., New York City time, on July 3, 2014. This offer and the commitments of the Commitment Letter Parties hereunder will automatically terminate at such time if we have not received such executed counterparts in accordance with the preceding sentence.  This offer and the commitments of the Commitment Letter Parties hereunder shall also automatically terminate at 12:00 noon, New York City time, on July 21, 2014 (unless we shall, in our discretion, agree to an extension) ("Commitment Letter

Termination Date") if the Bankruptcy Court shall not have entered an order prior to that time, in form and substance satisfactory to the Commitment Letter Parties, authorizing your entry into and performance under this Commitment Letter, the Fee Letter and all of the transactions contemplated hereby and thereby (the "DIP Order").  In the event the Closing Date has not occurred by August 31, 2014, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our discretion, agree to an extension.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

NEXTERA ENERGY, INC.

By: _____
     Name:
     Title:

JPMORGAN CHASE BANK, N.A.

By: _____
     Name:
     Title:

J.P. MORGAN SECURITIES LLC

By: _____
     Name:
     Title:

CREDIT SUISSE SECURITIES (USA) LLC

By: _____
     Name:
     Title:

*[SC Holder signatures follow]*

NAME OF SC HOLDER


By: _____
      Name:
      Title:

Accepted and agreed to as of the date first written
above:

ENERGY FUTURE HOLDINGS CORP.

By: _____
     Name:
     Title:


ENERGY FUTURE INTERMEDIATE HOLDINGS
    COMPANY LLC

By: _____
     Name:
     Title:

[Signature Page to Commitment Letter]

**Annex**

**SC HOLDER**
**JOINDER AGREEMENT**

      This is a Joinder Agreement ("<u>Joinder</u>") to that certain Commitment Letter (the "<u>Commitment Letter</u>"), dated June 26, 2014 among Energy Future Holdings Corp. ("<u>EFH</u>"), Energy Future Intermediate Holdings Company LLC ("<u>EFIH</u>") and the Commitment Letter Parties, party thereto.  Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Commitment Letter.

      1.      The undersigned hereby acknowledges (i) receipt of a copy of the Commitment Letter, (ii) having had an opportunity to review and consider the Commitment Letter and (iii) having had an opportunity to consult with counsel selected by the undersigned regarding the Commitment Letter and this Joinder.  Upon execution of this Joinder, the undersigned shall become a party to the Commitment Letter as an SC Holder, and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Commitment Letter as though an original party thereto and as an SC Holder thereunder.

      2.      This Joinder shall inure to the benefit of and be enforceable by EFH and EFIH and their respective successors and assigns.

      3.      This Joinder may be executed in separate counterparts (by facsimile, photo or other electronic means), each of which shall be an original and all of which taken together shall constitute one and the same agreement.

      4.      This Joinder shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any rules, principles or provisions of choice of law or conflicts of laws.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned has executed this Joinder as of this ___ day of ____, 2014.

_____

By: _____
    Name:
    Title:

Acknowledged and Agreed:

ENERGY FUTURE HOLDINGS CORP.
ENERGY FUTURE INTERMEDIATE HOLDINGS COMPANY LLC

By: _____
    Name:
    Title:

## **Exhibit A to the Commitment Letter**

**ENERGY FUTURE HOLDINGS CORP.**
**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

SECOND LIEN SUBORDINATED
SECURED DEBTOR IN POSSESSION NOTES FACILITY TERM SHEET

*Capitalized terms used but not defined in this term sheet (this "DIP Term Sheet")
shall have the meanings set forth in the letter agreement, dated as of June 26, 2014
(including the exhibits, annexes and schedules thereto, the "Commitment Letter"), to
which this DIP Term Sheet is attached. Terms not defined herein or in the Commitment
Letter shall have the meanings set forth in the Restructuring Support Agreement.[1]*

| | |
|---|---|
| Issuers | Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuers"). |
| Guarantors | All of the Issuers' direct and indirect domestic restricted subsidiaries that guarantee the EFIH First Lien DIP Financing (collectively, the "Guarantors") in the Chapter 11 Cases. The Issuers and the Guarantors are referred to herein as "Note Parties" and each, a "Note Party." All obligations of the Issuers under the Second Lien DIP Facility will be unconditionally guaranteed by the Guarantors. |
| Commitment Parties | The "Commitment Parties" consist of:<br><br>(i) NextEra Energy, Inc. or one of its wholly-owned subsidiaries ("NEE") which has committed, pursuant to the Commitment Letter, to purchase $1.6 billion in Tranche A DIP Notes; and<br><br>(ii) a group of financial parties (such parties or any of their respective successors and assigns, the "Participating Commitment Parties") that hold at least $800 million in principal amount of EFIH Second Lien Notes in the aggregate which have committed pursuant to the Commitment Letter to exercise their Participation Rights (as defined below). |
| Participation Rights | The Issuers shall provide all Holders of EFIH Second Lien |

---

[1] The "Restructuring Support Agreement" refers to the Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, as amended by the amendments thereto dated May 7, 2014 and May 16, 2014, among EFH, EFIH and certain of their affiliates, and the other parties thereto, as in effect as of the date hereof.

Note Claims the right (such rights, the "<u>Participation Rights</u>") to commit to participate in the Second Lien DIP Facility as described below.  The right to exercise the Participation Rights shall be provided through an amendment of the terms of the EFIH Second Lien Tender Offer[2], which amendment shall, in lieu of the consideration previously offered in the EFIH Second Lien Tender Offer, allow all Holders of EFIH Second Lien Note Claims to exercise Participation Rights (irrespective of whether such noteholder previously tendered its EFIH Second Lien Notes into the EFIH Second Lien Tender Offer) in accordance with the terms of the Commitment Letter (including the Equity Conversion Term Sheet and this DIP Term Sheet) and the amended EFIH Second Lien Tender Offer and the procedures specified herein and therein which procedures shall be otherwise satisfactory to the Required Commitment Parties (the "<u>Second Lien DIP Procedures</u>").

A Holder of EFIH Second Lien Note Claims which exercises its Participation Rights (a "<u>Participating Holder</u>") shall receive the consideration, and shall be bound by the terms and conditions of this DIP Term Sheet and Equity Conversion Term Sheet, including, as follows:

(i) A portion of each Participating Holder's EFIH Second Lien Notes (the "<u>Rolled Notes</u>") shall be fully and completely extinguished and converted into Tranche A DIP Notes of an equivalent principal amount and the right to receive the Rolled Notes Consideration described below and be subject to the Equity Conversion as described below (the "<u>Rollover</u>").  The aggregate principal amount of Rolled Notes shall be $700 million in the aggregate and the Rollover shall be allocated pro rata among Participating Holders based on the principal amount of EFIH Second Lien Notes held by each Participating Holder.  If a Participating Holder holds both EFIH Second Lien 2021 Notes and EFIH Second Lien 2022 Notes, its portion of the Rollover shall be allocated pro rata among those two series of EFIH Second Lien Notes based on respective principal amount of each held by such Participating Holder.

<u>Rolled Notes Treatment</u>. Each Participating Holder shall

---

[2] "<u>EFIH Second Lien Tender Offer</u>" means the offer for EFIH Second Lien Notes as described in the Offer Memorandum (as amended) filed with the Bankruptcy Court on May 9, 2014 and subsequently amended on June 9, 2014.

2

receive a payment (the "Rolled Notes Consideration") in cash on the Issue Date (as defined below) in respect of its Rolled Notes in an amount equal to the sum of (a) the amount of accrued and unpaid interest as of the Issue Date (including Additional Interest, and interest on overdue interest)[3] thereon and (b) the full amount of the EFIH Second Lien Makewhole Claim in respect thereof, calculated as of the Issue Date.  As used herein, "Issue Date" means the date of the issuance of the Second Lien DIP Notes (as defined below) upon Closing.

(ii) A portion of each Participating Holder's EFIH Second Lien Notes (the "Retained Notes") shall remain outstanding. The aggregate principal amount of Retained Notes shall be $100 million in the aggregate and shall be allocated pro rata among Participating Holders based on the principal amount of EFIH Second Lien Notes held by each Participating Holder.  If a Participating Holder holds both EFIH Second Lien 2021 Notes and EFIH Second Lien 2022 Notes, its Retained Notes shall be allocated pro rata among those two series of EFIH Second Lien Notes based on respective principal amount of each held by such Participating Holder.  Each Participating Holder shall agree to vote its Retained Notes in favor of a plan of reorganization consistent with the Commitment Letter (including this DIP Term Sheet and Equity Conversion Term Sheet) and the Restructuring (as defined below), which agreement shall be binding upon each transferee of Retained Notes, as evidenced by documentation satisfactory to the Issuers.

Retained Notes Treatment. The holders of Retained Notes shall receive payment of interest (including Additional Interest and interest on overdue interest) on a current basis. Additionally, to the extent there is any interest (including Additional Interest and interest on overdue interest) on the Retained Notes which is due and payable as of the Issue Date, such interest shall be paid to the Participating Holders on the Issue Date.

---

[3] The amount of accrued and unpaid interest (including Additional Interest and interest on overdue interest) in respect of the EFIH Second Lien Notes as of an assumed Issue Date of July 21, 2014 is set forth on Annex I hereto.  For the avoidance of doubt, the assumed Issue Date of July 21, 2014 is chosen for illustrative purposes only and the actual amount of accrued and unpaid interest (including Additional Interest and interest on overdue interest) in respect of the EFIH Second Lien Notes on the Issue Date will vary depending on the Issue Date.

Upon the Effective Date (as defined below) of the Plan (as defined below), the principal amount of the Retained Notes shall convert into equity as described herein and in the Equity Conversion Term Sheet and, additionally, each Participating Holder shall receive a payment in cash in respect of its Retained Notes in an amount equal to the sum of (a) the amount of accrued and unpaid interest as of Effective Date (including Additional Interest, and interest on overdue interest) thereon and (b) the full amount of the EFIH Second Lien Makewhole Claim in respect thereof, calculated as of the Effective Date.

(iii) Each Participating Holder shall receive a payment in cash on the Issue Date in respect of all EFIH Second Lien Notes held by it (other than the Rolled Notes and the Retained Notes) (the "Redeemed Notes") in an amount equal to the sum of (a) the principal amount thereof, (b) the amount of accrued and unpaid interest as of the Issue Date (including Additional Interest, and interest on overdue interest) thereon and  (c) the full amount of the EFIH Second Lien Makewhole Claim in respect thereof, calculated as of the Issue Date, and all such Redeemed Notes shall be cancelled and retired.

A Holder of EFIH Second Lien Notes must exercise its Participation Rights in respect of either all or none of the EFIH Second Lien Notes held by it.

Any Holder of EFIH Second Lien Notes that does not exercise its Participation Rights (a "Non-Participating Holder") shall be repaid all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing as of the Issue Date under the EFIH Second Lien Notes (other than Retained Claims (as defined below).  Provision shall be made so that any Non-Participating Holder retains all rights to the EFIH Second Lien Makewhole Claim, Additional Interest, interest on overdue interest and any other residual rights in respect of its EFIH Second Lien Notes other than the amounts which are repaid (the "Retained Claims").

The Issuers agree to enter into any definitive documentation reasonably satisfactory to the Commitment Parties necessary to effectuate the exercise of the Participation Rights.

For the avoidance of doubt, to the extent that the cash

4

proceeds of the Second Lien DIP Facility are insufficient to repay in full all amounts required to be paid hereunder on the Issue Date, such deficiency shall be funded by the Issuers concurrently with the Closing so as to ensure repayment in full of all amounts required to be paid on the Issue Date.

For the avoidance of doubt, nothing herein shall limit the obligations of the Issuers in respect of the Retained Claims of the Non-Participating Holders to the extent otherwise due and owing, as determined in the Chapter 11 Cases.

| | |
|---|---|
| Joint Placement Agents for Tranche A-1 DIP Notes | J.P. Morgan Securities LLC and Credit Suisse Securities (USA) LLC |
| Administrative Agent | TBD |
| Collateral Agent | TBD |
| Second Lien DIP Facility | A second lien subordinated secured debtor-in-possession note facility consisting of (a) non-amortizing notes, which will be issuable in a single transaction on the Closing in an amount up to $2,300,000,000 for the purposes described herein under "Use of Proceeds" (the "Tranche A DIP Notes") and (b) $50,000,000 in principal amount of non-amortizing, non-interest-bearing notes issued in full satisfaction of the Funding PIK Fee (the "Tranche B DIP Notes", and, together with the Tranche A DIP Notes, the "Second Lien DIP Notes", and the holders thereof, the "Second Lien DIP Noteholders"). The Tranche A DIP Notes shall consist of (i) $1.6 billion of Tranche A DIP Notes to be purchased by NEE for cash and (ii) $700 million of Tranche A DIP Notes to be issued to Participating Holders pursuant to the Rollover.  The Tranche A DIP Notes issued pursuant to clause (i) of the preceding sentence shall be denominated "Tranche A-1 DIP Notes", and the Tranche A DIP Notes issued pursuant to clause (ii) shall be denominated "Tranche A-2 DIP Notes."  Tranche A-2 DIP Notes, and at the election of NEE, Tranche A-1 DIP Notes shall be eligible to be held through the Depository Trust Company.  The Tranche A-1 DIP Notes shall be offered and sold pursuant to exemptions from the registration requirements under Section 4(a)(2) of the Securities Act of 1933, as amended (the "Act").  The Tranche A-2 DIP Notes shall be offered and sold pursuant to exemptions from the registration requirements under |

5

Sections 3(a)(9) or 4(a)(2) of the Act.

The Tranche B DIP Notes shall be issued to NEE as provided under "Funding PIK Fee" below.

| | |
|---|---|
| Second Lien DIP Procedures | The Issuers shall cause the EFIH Second Lien Tender Offer to be extended to a date that is no earlier than (x) if the Commitment Letter shall be terminated, 10 business days after the Commitment Letter Termination Date (as defined in the Commitment Letter) and (y) such date as shall be required under applicable securities laws in order to effect the amendment to the EFIH Second Lien Tender Offer as provided in the following sentence.  As soon as practicable following approval by the Bankruptcy Court of the Second Lien DIP Facility consistent with the Commitment Letter (including this DIP Term Sheet and the Equity Conversion Term Sheet), the Issuers shall cause to be amended the EFIH Second Lien Tender Offer in a manner consistent with the Commitment Letter (including this DIP Term Sheet and the Equity Conversion Term Sheet). |
| Second Lien DIP Facility Termination Date | All Second Lien DIP Notes shall become due and payable on the DIP Facility Termination Date (as defined below), subject to the Equity Conversion. |
| | The "DIP Facility Termination Date" shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) the consummation of any Section 363 sale, (c) the effective date of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court or (d) the acceleration of the notes and the termination of the commitment with respect to the Second Lien DIP Facility in accordance with the DIP Documents (as defined below). |
| | "Scheduled Termination Date" means the date that is 24 months from the Issue Date. |
| Equity Conversion | Upon the Effective Date,[4] the Second Lien DIP Notes and the principal amount of the Retained Notes shall be subject |

---

[4] "Effective Date" refers to the effective date of the plan of reorganization (the "Plan") of EFIH and EFH under Chapter 11 of the United States Bankruptcy Code, providing for the Restructuring.  "Restructuring" means the restructuring of the existing liabilities of EFH and EFIH in accordance with the Chapter 11 of the United States Bankruptcy Code as contemplated by the Amended RSA.   "Amended RSA" means  the

6

to conversion to Reorganized EFH Common Stock (as defined in the Equity Conversion Term Sheet), on the terms set forth in the Equity Conversion Term Sheet, and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

Within 30 days of the issuance of the Second Lien DIP Facility, NEE will seek board approval for a potential tax free merger of EFH and NEE post EFH exit from bankruptcy in an all-stock transaction bringing NEE ownership to 100% (the "Merger"); provided however, that Merger shall be structured in a manner that will not adversely affect the Private Letter Ruling. The consummation of the Second Lien DIP Facility is not contingent on the occurrence of the Merger, and the Restructuring shall occur irrespective of whether the Merger occurs.

If the Equity Conversion (as defined in the Equity Conversion Term Sheet) does not occur, the Tranche B DIP Notes shall convert to Tranche A DIP Notes and the Retained Notes and Second Lien DIP Notes shall be repaid in accordance with their terms and the terms of the Plan.

Use of Proceeds

Proceeds of the Second Lien DIP Facility will be used (together with cash on hand and proceeds of the EFIH First Lien DIP Financing) to (i) fund payments to holders of EFIH Second Lien Notes provided for hereunder and (ii) general corporate purposes, including the pre-funding of the Plan.

---

(continued….)

Restructuring Support Agreement amended as follows: (i) the term sheet attached as Exhibit H to the Restructuring Support Agreement (Second Lien DIP Notes Term Sheet) shall be replaced with this DIP Term Sheet; (ii) the term sheet attached as Exhibit J to the Restructuring Support Agreement (Equity Conversion Term Sheet) shall be replaced with Exhibit B to the Commitment Letter; (iii) such other changes and modifications as shall be necessary or appropriate to conform to or in light of the Commitment Letter, including this DIP Term Sheet and the Equity Conversion Term Sheet, (iv) amendments to provide the Commitment Parties with similar rights to those provided to the Consenting Creditors under the Restructuring Support Agreement, (v) payment in full (through a combination of cash payments and equity distributions) of EFIH Unsecured Note Claims, (vi) an additional recovery of $20 million in aggregate incremental cash payment over cash recovery guaranteed to holders of EFH Non-Guaranteed Note Claims under the Restructuring Support Agreement, (vii) the addition of the Commitment Parties as parties to the Amended RSA (solely in respect of their EFIH Second Lien Note Claims) and (viii) NEE shall coordinate with Oncor Electric Delivery to obtain any necessary regulatory approvals from the PUC relating to changes in equity ownership at EFH (the "PUC Regulatory Approval"). EFH and EFIH shall cooperate as reasonably necessary to obtain the PUC Regulatory Approval

7

| | |
|---|---|
| DIP Documents | The Second Lien DIP Facility will be documented by a note purchase agreement (the "Note Purchase Agreement") and other guarantee, security, intercreditor, and other relevant documentation (together with the Note Purchase Agreement, collectively, the "DIP Documents") reflecting the terms and provisions set forth in this DIP Term Sheet and otherwise in form and substance reasonably satisfactory to the Placement Agents (to the extent affecting the rights or obligations of the Placement Agents), the Required Commitment Parties and the Issuers; *provided, however*, that such DIP Documents will be drafted in form and substance consistent with the documents governing the EFIH First Lien DIP Financing in the form in which such documents are publicly available as of the date of the Commitment Letter (the "First Lien DIP Documents"), with adjustments made to reflect the Commitment Letter, including this DIP Term Sheet; *provided further* that the DIP Documents shall  be consistent with the Commitment Letter, and in the event of any inconsistency between the Commitment Letter and the First Lien DIP Documents, the Commitment Letter (including this DIP Term Sheet) shall govern.  It is agreed that each "basket" or "cushion" set forth in the covenants and events of default contained in the DIP Documents shall be at least 15% more than the corresponding provision in the First Lien DIP Documents. |
| Transferability of Participation Rights | Subject to compliance with all applicable securities laws, unless otherwise agreed by the Issuers, the Participation Rights will only be transferable to transferees of the associated EFIH Second Lien Notes; *provided, however*, the Participation Rights may not be transferred, and any such transfer shall be null and void *ab initio* if, assuming the Restructuring were to be consummated immediately upon such Transfer, the transferee and/or its affiliates of such transfer were to obtain or have beneficial ownership of, in the aggregate, fifty percent (50%) or more of the Reorganized EFH Common Stock. |
| Transferability of Second Lien DIP Notes | For the avoidance of doubt, the Second Lien DIP Notes shall be transferable to the extent permitted by applicable law, *provided, however*, that transfers of Second Lien DIP Notes shall not be permitted, and any such transfers shall be null and void  *ab initio* if, in the reasonable business judgment of the Issuers and their legal and tax advisors, in consultation with the Required Second Lien DIP |

Noteholders, such transfers would adversely (a) affect or delay the Debtors' ability to obtain the Private Letter Ruling or violate the terms and conditions of the Private Letter Ruling or (b) affect or delay the Debtors' ability to obtain the regulatory consents or approvals necessary to effectuate the Restructuring, *provided, further,* that, any transfer described above shall be null and void *ab initio*, if, assuming the Restructuring were to be consummated immediately upon such Transfer, the transferee of such transfer (other than affiliates transfers) was to obtain beneficial ownership of, in the aggregate, more than fifty percent (50%) or more of the Reorganized EFH Common Stock.

Interest Rates

The Tranche A DIP Notes will bear interest at a fixed rate of 6% per annum, payable in cash on the final business day of each quarter beginning on the first such day after the Issue Date.

Default Interest

During the continuance of an Event of Default (as defined in the DIP Documents), overdue amounts on the Second Lien DIP Notes will bear interest at an additional 2% per annum.

Funding PIK Fee

The Issuers shall pay to NEE a funding PIK fee (the "Funding PIK Fee") in an amount equal to $50 million, paid in the form of Tranche B DIP Notes on the Issue Date having an aggregate principal amount equal to the amount of the Funding PIK Fee. The Funding PIK Fee will be compensation to NEE for committing to provide the $1.6 billion of Second Lien DIP Notes and shall be earned and due and payable on the Issue Date simultaneously with the funding of the Second Lien DIP Facility.

Prepayment Fee

If the Second Lien DIP Facility is repaid other than by the Equity Conversion, the Issuers shall pay a prepayment fee of $160 million (the "Prepayment Fee") to the holder or holders of the Tranche A-1 DIP Notes.

Optional Prepayment

The Issuers may prepay the Second Lien DIP Notes (in whole and not in part) subject to customary notice periods and payment of breakage costs and the Prepayment Fee (which payment may be waived upon the written consent of the holders of the majority in aggregate principal amount of the Tranche A-1 DIP Notes in their sole discretion), subject to the Last Look provisions described below.

9

| | |
|---|---|
| <u>Mandatory Prepayments</u> | Subject to waiver in the sole discretion of the Required Second Lien DIP Noteholders, the DIP Documents will contain mandatory prepayment provisions found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above); provided that, (a) notwithstanding anything to the contrary herein, the Second Lien DIP Notes shall not be mandatorily prepaid unless the EFIH First Lien DIP Financing is mandatorily prepaid first and in full and (b) application of mandatory prepayment amounts shall be subject to the provisions of the Intercreditor Agreement (as defined below). |
| <u>Last Look</u> | Notwithstanding anything to the contrary set forth herein, in the event that amounts outstanding under the Second Lien DIP Facility become due and payable (or are reasonably expected to become due and payable for any reason (any such event a "<u>Termination Event</u>"), and as a result of such Termination Event the Equity Conversion would not occur, the Issuers shall give NEE prior written notice of such Termination Event and inform NEE of the reasons for the Termination Event and the anticipated source of repayment of the Second Lien DIP Facility, including the terms of any related transaction and the identities of the parties thereto, and if requested by NEE, enter into good faith exclusive negotiations with NEE with respect to a potential revised transaction with NEE. Neither the Issuers nor their affiliates shall enter into any related transaction not involving NEE (or engage in any related payment of the Second Lien DIP Facility), if, within five (5) business days after such notice, NEE has made a bona fide proposal for a transaction which provides the Issuers with equivalent or superior economic benefits, in which case the Issuers shall enter into such equivalent or superior transaction with NEE.  If the Issuers do not enter into an alternative transaction with NEE because NEE's proposed transaction does not provide equivalent or superior economic benefits and the Equity Conversion does not occur, the Issuers shall pay the Prepayment Fee to the holder or holders of the Tranche A-1 DIP Notes.  Nothing in the foregoing shall adversely affect the right of any Second Lien DIP Noteholders or Holders of Retained Notes, without their consent, to receive cash or equity, as applicable, in the amount and at the time they would otherwise been entitled to in accordance with the terms of the DIP Documents (including the Conversion Agreement) |

10

or the Amended RSA as then in effect.

| | |
|---|---|
| <u>Security and Priority</u> | All amounts owing by the Issuers under the Second Lien DIP Facility and the obligations of the Guarantors in respect thereof will be secured, subject to (i) the Carve-Out (as defined in the First Lien DIP Documents), (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents, (iii) liens securing the Retained Claims of the Non-Participating Holders and claims for fees and expenses of the indenture trustee for the EFIH Second Lien Notes (the "<u>EFIH Second Lien Note Related Claims</u>") and (iv) all other valid, perfected, enforceable and unavoidable liens as of the Closing (the "<u>Permitted Liens</u>"), by a second priority perfected security interest (on a *pari passu* basis with the liens securing the Retained Notes) in all assets owned by the Note Parties that secure the EFIH First Lien DIP Financing, including, without limitation, distributions pursuant to the Oncor TSA so long as the Oncor TSA Amendment is in effect (the "<u>Collateral</u>"). |

The liens granted under the Second Lien DIP Facility will be junior only to the (i) the Carve-Out, (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents, (iii) liens securing the EFIH Second Lien Note Related Claims, and (iv) the Permitted Liens.

In the Chapter 11 Cases, the Second Lien DIP Noteholders will be granted in the DIP Order (as defined below) a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the Second Lien DIP Facility with priority above all other administrative claims, subject to (i) the Carve-Out, (ii) the liens granted under the EFIH First Lien DIP Financing, (iii) liens securing the EFIH Second Lien Note Related Claims, and (iv) Permitted Liens; provided that, for the avoidance of doubt, the Second Lien DIP Facility shall be secured on a *pari passu* basis with the Retained Notes.

The Second Lien DIP Facility will be subject to an intercreditor agreement, which includes, among other things, customary payment block and standstill provisions (the "<u>Intercreditor Agreement</u>"), in form and substance reasonably acceptable to the requisite

11

lenders under the EFIH First Lien DIP Financing, the Issuers, the Required Commitment Parties and the Administrative Agent.

Conditions Precedent to the Closing

The closing date (the "Closing") under the Second Lien DIP Facility shall be subject to satisfaction (or waiver by the Administrative Agent, the Placement Agents (to the extent failure to satisfy such condition is materially adverse to the Placement Agents) and the Required Commitment Parties) of the following conditions:

1.  The DIP Documents (including the Conversion Agreement) shall be in form and substance consistent with the Commitment Letter and this DIP Term Sheet and otherwise satisfactory to the Administrative Agent, the Placement Agents (to the extent relating to the rights or obligations of the Placement Agents), the Required Commitment Parties, the Issuers and each of their counsel.

2.  The Issuers and the Guarantors shall each be a debtor and a debtor in possession in the Chapter 11 Cases.

3.  The Amended RSA shall be in full force and effect and the Issuers shall be in compliance with the Amended RSA in all material respects as of the Closing.

4.  Substantially concurrently with the Closing, the DIP Documents shall have been delivered, all applicable fees and expenses shall have been paid, and all applicable liens shall have been perfected.

5.  Substantially concurrently with the Closing, the payments provided for hereunder to be made to holders of EFIH Second Lien Notes on the Issue Date shall have been made.

6.  The Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Administrative Agent, the Placement Agents (to the extent relating to the rights or obligations of the Placement Agents), the Required Commitment Parties and the Issuers (the "DIP Order"), *inter alia*, authorizing and approving the issuance of the Second Lien DIP Notes, the granting of the superpriority claims and liens and other liens referred to above under the heading "Security and

12

Priority" and the payment of all fees and expenses of the Commitment Parties, the Placement Agents and the indenture trustee for the EFIH Second Lien Notes under the DIP Documents and under the Commitment Letter (including this DIP Term Sheet) and the Fee Letter, which DIP Order shall have been entered by the Bankruptcy Court, not have been vacated, reversed, modified, amended or stayed, in a manner adverse to the Second Lien DIP Noteholders, without the consent of the Required Commitment Parties.

7. The Issuers shall have complied in all material respects with the terms and conditions of the Second Lien DIP Procedures, and the Participation Rights shall have been allocated in accordance with the Second Lien DIP Procedures.

8. No default (or any event which with the giving of notice or lapse of time or both would be a default) under the EFIH First Lien DIP Financing shall be then existing, after giving effect to applicable grace periods or waivers, which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis.

9. The Administrative Agent shall have received a customary opinion of counsel to the Issuers, along with customary officer's certificates and evidence of corporate or limited liability company authority.

10. There shall not have occurred any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Issuers and their subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Issuers and their subsidiaries (taken as a whole) to perform their payment obligations under the DIP Documents to which they are a party, or the rights and remedies of the Administrative Agent, the Collateral Agent and the Second Lien DIP Noteholders under the DIP Documents (other than, in each case, as a result of the events following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement,

13

continuation and prosecution, which shall not individually or in the aggregate constitute a Material Adverse Event (as defined below)), and *provided* that nothing disclosed in any of the following filings by EFIH and/or EFH (1) the Annual Report on Form 10-K for the year ended December 31, 2013, as filed on April 30, 2014, (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of the Issuers provided to the Commitment Parties on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) be a Material Adverse Event (any of the foregoing being a "Material Adverse Event").

11. Any and all governmental consents and approvals necessary in connection with the Second Lien DIP Facility shall have been obtained and shall remain in effect.

12. To the extent requested at least five (5) business days prior to Closing, each Commitment Party who has requested the same shall have received "know your customer" and similar information.

13. The Second Lien DIP Noteholders shall have a valid and perfected second priority lien on and security interest in the Collateral pursuant to the DIP Order.

14. (i) There shall exist no default under the DIP Documents, (ii) the representations and warranties of the Issuers and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding and (iii) the borrowing of the Second Lien DIP Notes shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

15. The Debtors shall have complied in all material respects with each of the covenants and agreements in

14

the Amended RSA.

16. None of the conditions, circumstances or events shall have occurred and be continuing, which with notice and passage of time, would allow the Commitment Parties to terminate the Amended RSA.

<u>Representations and Warranties</u>

The DIP Documents will contain representations and warranties consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) and shall include representations and warranties with respect to: valid existence, compliance with law, requisite power, due authorization, approvals, no conflict with material post-petition agreements (to the extent enforceable post-petition) or applicable law, enforceability of the DIP Documents, ownership of subsidiaries and property, material accuracy of financial statements and certain other written information provided, litigation, absence of Material Adverse Event, taxes, cash on hand, absence of undisclosed liabilities, margin regulations, no default under the DIP Documents, inapplicability of Investment Company Act, use of proceeds, insurance, labor matters, ERISA, environmental matters, security interests, necessary rights to intellectual property and ownership of properties, DIP Order, sanctioned persons, anti-corruption laws and Patriot Act.

<u>Affirmative Covenants</u>

The DIP Documents will contain affirmative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) and shall include affirmative covenants with respect to:

A.   Preservation of corporate existence.

B.   Compliance with applicable laws (including ERISA and environmental laws).

C.   Conduct of business.

D.   Payment of taxes.

E.   Maintenance of insurance.

F.   Access to books and records and visitation rights.

15

G.  Maintenance of books and records.

H.   Maintenance of properties.

I.   Use of proceeds.

J.   Provision of additional collateral and mortgages.

K.   Delivery of certain reports and information.

L.   Transactions with affiliates.

M.   Certain bankruptcy matters.

N.   Limitations on changes to fiscal year.

O.   Further assurances.

Negative Covenants    The DIP Documents will contain negative
covenants consistent with those found in the EFIH First
Lien DIP Financing (subject to the principles set forth
in "DIP Documents" above), which include
negative covenants with respect to:

A.   Limitations on debt and guarantees.

B.   Limitations on liens.

C.   Limitations on loans and investments.

D.   Limitations on asset dispositions, including,
without limitation, the issuance and sale of capital
stock of subsidiaries; *provided that*, no sales,
dispositions, or other transfers of equity interests in
Oncor Electric Delivery Holdings Company LLC
shall be permitted.

E.   Limitations on dividends, redemptions
and repurchases with respect to capital stock.

F.   Limitations on cancellation of debt and
on prepayments, redemptions and repurchases of pre-
petition debt, except as expressly provided for in the
DIP Documents or pursuant to "first day" or other
orders entered by the Bankruptcy Court.

G.   Limitations on fundamental changes.

16

H.    Limitations on material changes in business.

I.    Limitation on certain affiliate value transfers.

J.    Limitations on sale/leasebacks.

K.    Limitations on amendment of constituent documents except for modifications that could not reasonably be expected to materially and adversely affect the interests of the Second Lien DIP Noteholders.

L.    Limitation on amending, modifying, or terminating the Oncor TSA Amendment, to the extent such agreement is effective without consent of the Required Second Lien DIP Noteholders.

M.    Certain other bankruptcy matters.

| | |
|---|---|
| <u>Financial Covenants</u> | The DIP Documents will contain financial covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above), subject to at least a 15% cushion. |
| <u>Reporting Requirements</u> | The DIP Documents will contain reporting requirements consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above). |
| <u>Events of Default</u> | The DIP Documents will contain events of default consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) (which will be applicable to the Issuers, the Guarantors, and their respective restricted subsidiaries), which (subject, where appropriate, to grace periods and exceptions consistent with those in the EFIH First Lien DIP Financing and to the principles set forth in "DIP Documents" above) shall include events of default with respect to: |

A.    Failure to pay principal, interest or any other amount when due.

B.    Representations and warranties incorrect in any material respect when given.

C.    Failure to comply with covenants (with grace period

17

as appropriate).

D.   Cross-acceleration against post-petition indebtedness in excess of an amount to be mutually agreed upon.

E.   Failure to satisfy or stay execution of final postpetition judgments in excess of an amount to be mutually agreed upon.

F.   The occurrence of certain ERISA events that result in a Material Adverse Event.

G.   Actual or asserted (by any Note Party or any affiliate thereof) invalidity or impairment of any DIP Document (including the failure of any lien to remain perfected).

H.   Change of ownership or control.

I.   (a) The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code,

(b)   the entry of an order appointing a chapter 11 trustee in any of the Chapter 11 Cases;

(c)   the entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner materially adverse to the Administrative Agent, the Placement Agents (to the extent materially adverse to the Placement Agents) or the Second Lien DIP Noteholders, without the prior consent of the Administrative Agent, the Placement Agents (to the extent materially adverse to the Placement Agents) and the Required Second Lien DIP Noteholders, the Second Lien DIP Facility or the DIP Order;

(d)   the entry of an order in any of the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code);

(e)   the entry of an order in any of the Chapter 11 Cases denying or terminating use of cash collateral by the Issuers and such order has not be stayed or superseded by an order granting use of cash collateral;

(f)    the filing of any pleading by any Debtor seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (e) above;

(g)    the entry of a final non-appealable order in the Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Second Lien DIP Noteholders or the commencement of other actions that is materially adverse to the Administrative Agent, the Second Lien DIP Noteholders or their respective rights and remedies under the Second Lien DIP Facility in any of the Chapter 11 Cases or inconsistent with the DIP Documents;

(h)    the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Note Parties in excess of an amount to be mutually agreed upon in the aggregate;

(i)    existence of any claims or charges, other than in respect of the Carve-Out, the EFIH First Lien DIP Financing, the EFIH Second Lien Note Related Claims, the Retained Notes, the Second Lien DIP Facility, the Permitted Liens or as otherwise permitted under the DIP Documents, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the Second Lien DIP Facility;

(j)    the Debtors or any of their subsidiaries, or any person claiming by or through the Debtors any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Second Lien DIP Noteholders relating to the Second Lien DIP Facility; and

(k)    a plan shall be filed or confirmed in any of the Chapter 11 Cases that does not provide for either (i) the indefeasible payment in full in cash of the obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan, as provided in this DIP Term Sheet, (ii) conversion of the Second Lien

19

DIP Facility and the Retained Notes to Conversion Shares on terms pursuant to the Equity Conversion or (iii) is otherwise inconsistent with the Amended RSA.

<table>
<tr>
<td>

Expenses and Indemnification
</td>
<td>

The Issuers will indemnify the Administrative Agent, the Placement Agents, the Second Lien DIP Noteholders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold them harmless from and against all costs, expenses (in the case of legal counsel, limited to reasonable and documented fees, disbursements and other charges) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Issuers or any of its affiliates) that relates to the Second Lien DIP Facility or the transactions contemplated thereby; *provided* that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from its or its related parties' gross negligence, willful misconduct or bad-faith.

The Issuers shall reimburse the Placement Agents and the Administrative Agent for their reasonable and documented fees and out-of-pocket expenses (including the legal expenses of Davis Polk & Wardwell LLP) incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Administrative Agent incurred in connection with the Agent's participation in the Chapter 11 Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant
</td>
</tr>
</table>

20

jurisdiction to the affected indemnified persons similarly situated).

The Issuers shall also reimburse the reasonable and documented out-of-pocket expenses of NEE and the reasonable and documented fees and out-of-pocket expenses of (i) Kramer Levin Naftalis & Frankel LLP, (ii) Latham & Watkins, (iii) Pachulski Stang Ziehl & Jones LLP, (iv) Bryan Cave LLP, (v) Rothschild Inc., (vi) JPMorgan (other than in its capacity as Placement Agent) and (vii) such other advisors retained by the indenture trustee for the EFIH Second Lien Notes, including any regulatory counsel, during these cases (collectively, the "Second Lien Notes Professionals") incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof or otherwise in connection with the Chapter 11 Cases or the Restructuring (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of Second Lien Notes Professionals incurred in connection with their participation in the Chapter 11 Cases).

The Issuers shall also reimburse the reasonable and documented fees and out-of-pocket expenses of (i) Chadbourne & Parke LLP, (ii) Credit Suisse Securities (USA) LLC, and (iii) such other advisors retained by NEE, including any regulatory counsel, during these cases (collectively, the "NEE Professionals") incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof or otherwise in connection with the Chapter 11 Cases or the Restructuring (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of NEE Professionals incurred in connection with their participation in the Chapter 11 Cases).

The foregoing shall be in addition to, and shall not limit, any obligation of the Note Parties under the indenture governing the EFIH Second Lien Notes to reimburse the fees and expenses and/or indemnify the indenture trustee

21

for the EFIH Second Lien Notes or its advisors.

Required Parties

"Required Second Lien DIP Noteholders" means Second Lien DIP Noteholders holding at least 50.1% of the Second Lien DIP Notes; *provided* that

(a) any actions, votes consents or waivers having a disproportionate material adverse effect on a Second Lien DIP Noteholder (either as compared to NEE or as compared to the majority of other holders other than NEE) shall not be binding on such Second Lien DIP Noteholder without such Second Lien DIP Noteholder's consent;

(b) any actions, votes consents or waivers in respect of (i) reduction of interest rate or a change in the time of payment of interest, (ii) reduction of principal amount, (iii) extension of the DIP Facility Termination Date, (iv) the security for and priority of the Second Lien DIP Facility (v) the transferability of the Tranche A-2 DIP Notes, (vi) modification of the guarantees of any significant subsidiary, (vii) payment of the Second Lien DIP Facility in currency other than that of the United States, or (viii) any change in the amendment or waiver provisions, shall only be binding on those Second Lien DIP Noteholders who consent thereto;

(c) with respect to (i) any vote to amend the DIP Documents (including the Conversion Agreement), or the exercise of any right of waiver or consent under the DIP Documents (including the Conversion Agreement), if the approval of such amendment, waiver or consent would result in NEE having an economic, financial or structural interest or advantage that is not shared by other Second Lien DIP Noteholders, other than (x) by reason of and to the extent of NEE's proportionate ownership of the Second Lien DIP Notes or (y) by reason of the nature of NEE's business (provided that in the case of clause (y) that such, amendment, waiver or consent would not have an adverse effect on other Second Lien DIP Noteholders), and (ii) waivers of a mandatory repayment obligation, Required Second Lien DIP Noteholders shall mean NEE and Second Lien DIP Noteholders holding 50.1% of the Second Lien DIP Notes not held by NEE and its affiliates; and

(d) any changes to the terms of the Equity Conversion (including the circumstances and timing thereof) shall only be made in accordance with the provisions of the Equity

22

Conversion Term Sheet.

"Required Commitment Parties" means (i) NEE and (ii) holders holding 50.1% of the principal amount of EFIH Second Lien Notes held by the Participating Commitment Parties.

Amendments

All amendments to the Second Lien DIP Facility shall require the consent of the Administrative Agent (if such amendment adversely affects the rights or obligations of the Administrative Agent) and the Required Second Lien DIP Noteholders.

Miscellaneous

The DIP Documents will include (i) standard yield protection provisions (including, without limitation, provisions related to compliance with risk-based capital guidelines, increased costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary agency, set-off and sharing language and (iv) customary replacement of lender provisions.

Governing Law and Submission to Non-Exclusive Jurisdiction

State of New York.

Counsel to JPMorgan

Davis Polk & Wardwell LLP.

Oncor TSA Amendment

Subject to reasonable consultation with NEE, consistent with the Amended RSA, the Debtors shall have the flexibility, based on their exercise of their business judgment and fiduciary duties, to seek approval of the Oncor TSA Amendment or maintain the Oncor TSA as currently in place. If requested by NEE, the Debtors shall in good faith consider seeking approval of the Oncor TSA Amendment.

Reservation of Rights

Except as expressly provided in this DIP Term Sheet, unless and until the Closing occurs, the Participating Commitment Parties reserve all rights and challenges with respect to the Restructuring Support Agreement, including without limitation, with respect to the EFIH Second Lien Settlement, the EFIH Second Lien Note Claims (including in respect of the Retained Notes), the EFIH Second Lien Note Related Claims and the Second Lien Refinancing and any other rights in respect of the EFIH Second Lien Notes. Without limiting the foregoing, nothing in this DIP

23

Term Sheet or in the Commitment Letter is intended to limit the rights of the indenture trustee for the EFIH Second Lien Notes.

KL2 2852147.12

# Annex I

## ($ in millions)

| Accrued and unpaid Second Lien interest as of the assumed Issue Date (July 21, 2014) | | | |
|---|---|---|---|
| | **11.00% Notes due 2021** | **11.75% Notes due 2022** | **Total** |
| Principal | $406.4 | $1,750.0 | $2,156.4 |
| Accrued interest [1] | 30.5 | 80.0 | 110.5 |
| Additional Interest (50bps) | – | 3.4 | 3.4 |
| Interest on overdue interest [2] | 0.5 | – | 0.5 |
| **Total accrued and unpaid interest at July 21, 2014** | **$31.0** | **$83.4** | **$114.4** |

**Notes**
1    Accrued Interest on 11.00% Notes includes $22.4 million of interest due on May 15, 2014
2    Reflects interest on $22.4 million coupon payment due May 15, 2014 on 11.00% Notes



## **Exhibit B to the Commitment Letter**

# ENERGY FUTURE HOLDINGS CORP.

## EQUITY CONVERSION TERM SHEET

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of June 26, 2014 (including the annexes, exhibits and schedules thereto, the "Commitment Letter"), to which this Equity Conversion Term Sheet is attached, including by reference to the DIP Term Sheet.*

| | |
|---|---|
| Issuer | Reorganized Energy Future Holdings Corp. ("Reorganized EFH"). |
| Summary of Equity Conversion | The newly issued common stock of Reorganized EFH shall consist of 100 million shares that are to be issued prior to the Equity Conversion in accordance with the Plan and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any). In the Equity Conversion, the principal amount outstanding of the Second Lien DIP Notes and Retained Notes shall be mandatorily converted to 212,500,000 Conversion Shares outstanding on the Effective Date, on the terms set forth herein (the "Equity Conversion"), provided, further, that the stated plan value of the Conversion Shares shall be at least equal to the adjusted issue price of the EFIH Second Lien DIP Financing; provided, however, that, for the avoidance of doubt, this is a negotiated plan value solely for purposes of the deal embodied in this Equity Conversion Term Sheet and the Amended RSA and shall not be binding upon any party to the extent the Plan is not confirmed and consummated. |
| Parties | The parties entitled to participate in the Equity Conversion shall be limited to the Second Lien DIP Noteholders under the Second Lien DIP Facility and the Holders of the Retained Notes (the "Conversion Parties"). |
| Conversion Agreement | The parties acknowledge and agree that this Equity Conversion Term Sheet does not include all of the conditions, covenants, closing conditions, representations, warranties and other terms that would be contained in definitive documents for transactions of this type. As such, NEE, holders of 50.1% of the principal amount of EFIH Second Lien Notes held by the Participating Commitment Parties and EFH shall, prior to Closing, enter into a conversion agreement (the "Conversion Agreement") containing the terms and conditions set forth in this Equity Conversion Term Sheet, the Commitment Letter (including the DIP Term Sheet) and other customary terms and conditions for transactions of this type, and which must be consistent with the Restructuring and reasonably satisfactory to the such parties, which Conversion Agreement shall be incorporated by reference into the Note Purchase Agreement or shall be attached as an exhibit thereto. Each person exercising Participation Rights shall be deemed |

to have agreed to be bound by the terms of the Conversion Agreement, effective as of the Closing, including their successors and assigns.

Organizational
Documents

In the event the Merger is not consummated promptly following the Equity Conversion, corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "Organizational Documents"), shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, shall be determined by the Required Conversion Parties in consultation with (i) EFH, (ii) EFIH, and, (iii) a representative of the holders of a majority in principal amount of EFIH Second Lien DIP Notes and Retained Notes that are not owned by NEE. In the event the Merger is consummated as aforesaid, such matters shall be determined by NEE only.

Such Organizational Documents shall, among other things, contain the following provisions if the Merger is not consummated promptly following the Equity Conversion:

- NEE shall have the right to appoint board members proportionate to its level of ownership.

- The holders of the shares of Reorganized EFH other than NEE shall have the right, voting as a separate class, to elect two board members (the "Non-NEE Directors"). At least one of the Non-NEE Directors shall have the right to be appointed to all committees of the board of Reorganized EFH.

- Any transaction between NEE or its affiliates and Reorganized EFH shall require the separate approval of the Non-NEE directors, independently advised, subject to enumerated customary ordinary course exceptions including exceptions for transactions below specified dollar amounts.

- If an affiliate of NEE is effectuating a transaction as a result of which the drag-along right with respect to the interest in Oncor not owned indirectly by Reorganized EFH can be exercised, the shareholders of EFH shall not oppose exercise of such drag-along right.

Notwithstanding the foregoing, the board of Reorganized EFH shall be structured and the Organizational Documents shall be prepared in form and substance so as to not adversely affect the Private Letter Ruling.

ROFO

If any shareholder of Reorganized EFH Common Stock, other than NEE (a "Seller'),  intends to sell any portion of its shares, the following process will govern:

(i) Such Seller must promptly inform NEE of such intent, by written or electronic notice (a "Sale Notice"), specifying the amount of such shares it intends to sell.

(ii) Upon receipt of such notice, NEE will have twenty-four (24) hours or until 1:00 p.m. Eastern time on the next business day (whichever is later) to provide such Seller with its offer, by written or electronic notice, to purchase all or any portion of such shares for cash, setting forth the price at which NEE is willing to buy such shares (the "ROFO Offer").

(iii) Following receipt of the ROFO Offer, such Seller will have twenty-four (24) hours or until 9:00 a.m. Eastern time on the next business day (whichever is later) to either accept or reject the ROFO Offer, by written or electronic notice to NEE.

(iv) If such Seller accepts the ROFO Offer, such Seller and NEE will use their commercially reasonable efforts to close the sale no later than three (3) trading days following the date of such Seller's acceptance of the ROFO Offer.

(v) If such Seller rejects the ROFO Offer (or if NEE does not make a ROFO Offer with respect to any portion of such shares within the applicable period), such Seller may market and sell such shares for cash for a period not to exceed 30 days, provided that (x) in the event NEE has made a ROFO Offer, the sale price in any such sale shall be no less than the price offered in the ROFO Offer, and (y) if such Seller conducts a sale process (as opposed to an ordinary course trading transaction), NEE is given the right to participate in such Seller's sale process along with and on equal terms as other prospective buyers; provided further, for the avoidance of doubt, that Seller shall always have the option during such 30-day period to deliver an additional Sale Notice to NEE pursuant to clause (i) above.

(vi) If such Seller fails to sell such shares within such 30-day period, then any proposed sale will again be subject to this provision.

Registration Rights

In the event the Merger is not consummated promptly following the Equity Conversion, Reorganized EFH and any Conversion Parties that will constitute affiliates of Reorganized EFH under the Securities Act of 1933 after the Effective Date will enter into a registration rights agreement (the "Registration Rights Agreement"), which shall contain such terms and conditions reasonably satisfactory

3

to such parties and as necessary to comply with the terms of the Private Letter Ruling and provide for registration rights, including demand, piggyback and shelf registration rights, with the number of long form demand registration rights to be determined by such parties.

| | |
|---|---|
| <u>Transferability of Converted Shares</u> | Subject to compliance with the provisions under "ROFO," the Conversion Shares will be transferable, subject to compliance with applicable securities laws (including the Securities Act of 1933, as amended) and the terms of the Private Letter Ruling. |
| <u>Representations and Warranties:</u> | The Conversion Agreement shall contain customary representations and warranties of EFH and the Commitment Parties for transactions of this type, consistent with the Second Lien DIP Facility. |
| <u>Covenants</u> | The Conversion Agreement will contain covenants and agreements of EFH and EFIH, consistent with, and subject to, the Amended RSA. |
| <u>Conditions Precedent to Equity Conversion</u> | The Equity Conversion will be conditioned upon satisfaction of terms and conditions in the Conversion Agreement, as provided by, consistent with, the Restructuring, including, without limitation, the following: |

- The Amended RSA as of the closing of the Equity Conversion shall not have been amended or modified without the prior consent of the Required Conversion Parties;

- The Bankruptcy Court shall have entered an order approving the Disclosure Statement and the other solicitation materials in respect of the Plan, and such order shall be in full force and effect and not subject to a stay;

- The Bankruptcy Court shall have entered an order confirming the Plan, and such order shall be in full force and effect and not subject to a stay;

- The Registration Rights Agreement shall be in form and substance reasonably satisfactory to the parties thereto;

- Any and all governmental and third party consents and approvals necessary in connection with the Equity Conversion and the Restructuring shall have been obtained and shall remain in effect;

- The Private Letter Ruling shall have been obtained from the IRS;

- The Plan shall have become, or simultaneously with the issuance

of the new stock in Reorganized EFH, will become, effective;

- The covenants and agreements to be performed by EFH and EFIH in the Conversion Agreement shall have been performed and complied with in all material respects on the closing date of the Equity Conversion; and

- There shall not have been a continuing default (or any event which with the giving of notice or lapse of time or both would be a default) under the Second Lien DIP Facility.

| | |
|---|---|
| <u>Termination of Equity Conversion</u> | All of the obligations of the Commitment Parties, Conversion Parties, EFH, and EFIH shall be of no further force or effect, upon the giving of written notice of termination by the Required Conversion Parties, in the event of: |

- a termination of the Amended RSA by any party thereto, or the Commitment Letter;

- an event of default, cancellation and/or acceleration of the Second Lien DIP Facility;

- EFH and EFIH shall fail to perform or comply with in all material respects any covenant or agreement under the Conversion Agreement, and such failure shall continue for a period of ten (10) business days after notice by the Required Conversion Parties; or

- any of the conditions, circumstances or events shall have occurred and be continuing, which with notice and passage of time, would allow the Commitment Parties to terminate the Amended RSA.

| | |
|---|---|
| <u>Indemnification</u> | EFH and EFIH shall, jointly and severally, indemnify and hold harmless each Conversion Party not indemnified under the Commitment Letter, and their respective affiliates, shareholders, members, partners, and other equity holders, general partners, managers and its and their respective Representatives, agents and controlling persons (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities, and costs and expenses that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the Plan, the Restructuring, the Equity Conversion, or any matter relating to the foregoing. |
| <u>Amendments</u> | Amendments to the Conversion Agreement will require the consent |

of the Required Conversion Parties.

| Required Conversion Parties | "Required Conversion Parties" means the Conversion Parties entitled to receive a 50.1% of the Conversion Shares; provided that (a) actions, votes, consents or waivers having a disproportionate material adverse effect on a Conversion Party (either as compared to NEE or as compared to the Conversion Parties entitled to receive a majority of the Conversion Shares not entitled to be received by NEE and its affiliates) shall not be binding on such Conversion Party without such Conversion Party's consent, and (b) (i) on any vote to amend the DIP Documents (including the Conversion Agreement), or the exercise of any right of waiver or consent under the DIP Documents (including the Conversion Agreement), if the approval of such amendment, waiver or consent would result in NEE having an economic, financial or structural interest or advantage that is not shared by other Conversion Parties, other than (x) by reason of and to the extent of NEE's proportionate ownership of the Second Lien DIP Notes and Retained Notes or (y) by reason of the nature of NEE's business (provided that in the case of clause (y) such, amendment, waiver or consent would not have an adverse effect on other Conversion Parties), Required Conversion Parties shall also include Conversion Parties entitled to receive 50.1% of the Conversion Shares not entitled to be received by NEE and its affiliates and (ii) any actions, votes, consents or waivers affecting the percentage of the outstanding equity of Reorganized EFH to be owned by the Conversion Parties following the Equity Conversion or affecting the timing of the Equity Conversion (other than changes to timing that are immaterial or pursuant to a permitted termination right) or the conditions to the Equity Conversion (other than such changes to conditions that are immaterial or that do not adversely affect the other Conversion Parties), Required Conversion Parties shall also include Conversion Parties entitled to receive 50.1% of the Conversion Shares not entitled to be received by NEE and its affiliates; provided further that prior to the Closing, "Required Conversion Parties" shall mean NEE and holders of 50.1% of the principal amount of EFIH Second Lien Notes held by the Participating Commitment Parties. |
|---|---|