**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 477, 1068, 1066, 1071, 1078, 1090** |

**DEBTORS' OMNIBUS REPLY TO**
**OBJECTIONS TO SECOND LIEN DIP MOTION**

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## Table of Contents

Preliminary Statement................................................................................................2

Background ...............................................................................................................5

Argument ................................................................................................................13

I.     Entry Into the Second Lien DIP Facility, Including the Equity Conversion, Is a Reasonable Exercise of the Debtors' Business Judgment and Should Be Approved Under Section 364 of the Bankruptcy Code. ....................................................13

II.    The Second Lien DIP Facility Is Not A *Sub Rosa* Plan....................................18

     A.     The Second Lien DIP Facility Does Not Satisfy Either of the *Capmark* Elements for a Sub Rosa Plan..............................................................18

     B.     The Equity Conversion Is Essentially a Plan Support Agreement That Is Subject to a Full Fiduciary Out............................................................20

III.   The Fees Under the Second Lien DIP Facility Are Reasonable and Necessary................22

IV.   The TCEH Unsecured Group and the Creditors' Committee's Remaining Objections Are Meritless. ....................................................................24

V.    The Debtors' Payment of Principal and Accrued Interest to the Second Lien Trustee Will Cut Off Interest on the EFIH Second Lien Notes.........................................25

VI.   The Second Lien Note Purchasers Are Entitled to a Finding of Good Faith Under Section 364(e) of the Bankruptcy Code.............................................................27

VII.  Waiver of the Stay Under Bankruptcy Rule 6004(h) is Warranted. ...................................29

VIII.  The Remaining Issues Raised with Respect to the DIP Order Are Either Unfounded or Addressed in the Revised Order. .............................................................30

## Table of Authorities

**Statutes**

11 U.S.C. § 363(c) ........................................................................................................... 13

11 U.S.C. § 503(b)(1)(A) ................................................................................................ 22

**Cases**

*Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 354-55 (5th Cir. 1997) ...................................... 19

*Evergreen Int'l Airlines Inc. v. Pan Am Corp. (In re Pan Am Corp.)*, 1992 WL 154200, *2-5 (S.D.N.Y. June 18, 1992) ....................................................................................... 27

*Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*, 211 F.3d 475 (9th Cir. 2000) .......................... 28

*In re Adams Apple, Inc.*, 829 F.2d 1484, 1488-89 (9th Cir. 1987) ............................................... 27

*In re Belk Properties, LLC*. 421 B.R. 221 (Bankr. N.D. Miss. 2009) ........................................... 21

*In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) ................................. 17

*In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) .............................. 18, 19

*In re CB Holding Corp.*, 447 B.R. 222, 227 (Bankr. D. Del. 2010) ............................................. 13

*In re Delphi Corp.*, No. 05-44481 (RDD), *111 (Bankr. S.D.N.Y. Jan. 12, 2007) ..................... 20

*In re EDC Holdings Co*, 676 F.2d 945, 948 (7th Cir. 1982) ......................................................... 27

*In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 605 (6th Cir. 1987) ................................ 27

*In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr D. Del. June 6, 2014) .......... 19

*In re Fleetwood Enterprises, Inc.*, 427 B.R. 852, 859 (Bankr. S.D. Cal. 2010) .......................... 27

*In re Gen. Motors Corp.*, 407 B.R. 463, 492 n.54 ....................................................................... 18

*In re Genco Shipping & Trading Limited*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 24, 2014) ..................................................................................................... 20

*In re Indus. Valley Refrigeration & Air Condition Supplies, Inc.*, 77 B.R. 15 (Bankr. E.D. Pa. 1987) ...................................................................................................... 28

*In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) ................................... 20

*In re Integrated Resources, Inc.*, 147 B.R. 650, 658 (S.D.N.Y. 1992) ......................................... 17

*In re ION Media Networks, Inc.*, 2009 WL 2902568 (Bankr. S.D.N.Y. July 6, 2009) ............... 13

*In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2008) ............................... 13

*In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 251 (D. Del. 1998) ............................................. 19

*In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).......................................... 22

*In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ............................ 22, 23

*In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 644-45 (Bankr. W.D. Pa. 2010)................. 19

*In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010)......................................... 22

*In re White Crane Trading Co.*, 170 B.R. 694 (Bankr. E.D. Cal. 1994) ..................................... 28

*Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 597 (S.D.N.Y. 2007) ...................................................................................................................................... 19

*Rake v. Wade*, 508 U.S. 464, 468 (1993)................................................................................... 25

*United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994) ............................................... 19

**Rules**

Bankruptcy Rule 6004(h).............................................................................................................. 29

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply")[1] to the objections (collectively, the "Objections") filed by:  (a) the indenture trustee under the 10.00% EFIH First Lien Notes (the "First Lien Trustee");[2] (b) the indenture trustee under the EFIH Second Lien Notes (the "Second Lien Trustee") and the ad hoc group of EFIH Second Lien Noteholders (the "Second Lien Group");[3] (c) the ad hoc group of EFH Legacy Noteholders (the "EFH Unsecured Group");[4] (d) the Official Committee of Unsecured Creditors (the "Creditors Committee");[5] (e) the ad hoc group of holders of TCEH Unsecured Notes (the "TCEH Unsecured Group");[6] and (f) certain joining parties[7] (together with

---

[1]  Capitalized terms used but not defined in this Reply shall have the meanings set forth in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [D.I. 98] (the "First Day Declaration").

[2]  *Objection of CSC Trust Company of Delaware, as Indenture Trustee and Collateral Trustee, to Debtors' (A) Motion to Approve Second Lien Post-Petition Financing, Redeem Second Lien Notes, and Determine Secured Claim and (B) Motion to Approve Certain EFIH Settlements* [D.I. 1068].

[3]  *Objection of the EFIH Second Lien Notes Indenture Trustee and EFIH Second Lien Group to Debtors' Motion to Approve Second Lien DIP* [D.I. 1066].

[4]  *Ad Hoc Group of EFH Legacy Noteholders' Objection to Approval of Proposed Second Lien Financing and Makewhole Settlement* [D.I. 1071].

[5]  *Omnibus Objection of the Official Committee of Unsecured Creditors to (I) Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and (II) Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [D.I. 1090].

[6]  *Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and Limited Objection to the Related Motion to Approve the EFIH Second Lien Settlement* [D.I. 1078].

[7]  *Joinder of Caxton Associates LP to the Objection of the Ad Hoc Group of EFH Legacy Noteholders to the Approval of Proposed Second Lien Financing and Makewhole Settlement* [D.I. 1079]; *Joinder of Wilmington Savings Fund Society, FSB to Certain Objections to (I) the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens And Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and (II) the Motion Of*
(Continued…)

the forgoing objecting parties, the "Objectors").    In support of this Reply, the Debtors respectfully state as follows.

## Preliminary Statement

1.    Two of the primary reasons EFIH filed for protection under chapter 11 of the Bankruptcy Code are its high interest expense on secured debt and significantly overleveraged capital structure.    EFIH consequently focused the early stages of this restructuring on reducing interest expense and developing a strategy to deleverage its balance sheet.    The First Lien DIP Financing, which this Court has already approved, was an important first step.    But the aggregate amount outstanding on that facility—based on analyses conducted by the Debtors and their financial advisors and multiple discussions with financial institutions and other potential lenders—represents the maximum desirable long-term debt that EFIH can carry.    Therefore, exercising their business judgment, the Debtors have determined that the most effective option to further reduce interest expense at EFIH during these chapter 11 cases is through a mandatorily convertible secured "take-out" facility.    The Second Lien DIP Facility is the best available facility of this kind—and is critical to maximizing the value of the Debtors' estates.

2.    In addition, the Second Lien DIP Facility is an integral initial step toward consummating the transactions embodied in the Debtors' Restructuring Support Agreement.    The value of this agreement to the estate is immense, in part because it helps to avoid a potential

---

*Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [D.I. 1083]; *Joinder of Law Debenture Trust Company of New York, as Indenture Trustee to (1) Omnibus Objection of the Official Committee of Unsecured Creditors to (I) Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and (II) Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [D.I. 1098].

double deconsolidation that would impose billions of dollars in tax liability.  The Second Lien

DIP Facility is a necessary condition to the participation of the Unsecured Group and Fidelity—

holders of a supermajority in amount of EFIH and EFH Corp. general unsecured claims,

respectively—in the transactions embodied in the Restructuring Support Agreement.  It plays a

vital role in mitigating any capital markets risk, including interest rate risk, that would result

from delaying either the repayment of the EFIH Second Lien Notes or a commitment for the

Equity Conversion.  And it is the only financing available to the Debtors that has the support of

each of the other parties to the Restructuring Support Agreement.

       3.      In light of its importance to the estate, the Debtors have evaluated a series of

alternative proposals for the Second Lien DIP Facility.  Since filing the Second Lien DIP Motion

on May 15, as a beneficial result of competing proposals from other potential lenders, the

Debtors have run a process to improve the terms of the Second Lien DIP Facility.  That process

has been transparent, designed to maximize value for the Debtors, and successful.  Under the

terms of the Restructuring Support Agreement, the Debtors must share competing restructuring

proposals with the parties to the agreement.  The Debtors thus opted to make the process

completely open, and provided all proposals to all competing lenders (and all other parties in

interest).

       4.      As a result of the full and transparent process run by the Debtors, the Debtors

received a series of increasingly favorable offers from each of the First Lien Group, the Second

Lien Group, and the Unsecured Group.  Further, the Second Lien Group submitted several

proposals with a bidding partner, NextEra Energy, which is a transmission and distribution

service provider in Texas.  The parties repeatedly improved their bids in response to one

another.  Ultimately, upon the analysis and advice of the Debtors' management and advisers, the

EFIH Debtors' Boards reaffirmed its support for the proposal put forward by the Unsecured Group (as significantly—and beneficially—modified).  In short, this process was a monumental success in terms of maximizing value for the estates.

5.    The proponents of the alternative proposals, certain of whom are also pursuing their alleged makewhole claims against the Debtors, now oppose the Debtors' decision to select a DIP proposal other than their own.  This is unsurprising.  But the appropriate standard for approval of DIP financing focuses on the interests of the *estate*, not the proposed lenders.  And because of the competitive terms of the modified Second Lien DIP Facility, its support from significant creditor constituents, and most importantly, its integral role within the Restructuring Support Agreement, the EFIH Debtors' Boards have, in the reasonable exercise of their business judgment, elected to pursue to the Second Lien DIP Facility on its revised terms.

6.    In an effort to derail this financing, the Objectors now argue that the Second Lien DIP Facility is a *sub rosa* plan.  It is not.  The facility does not satisfy all the claims against EFIH, nor does it abridge any creditors' plan voting rights.  The Equity Conversion sets a floor and a path to confirmation, a path that the Debtors have full fiduciary flexibility to take or not.  In return for the billions of dollars of up-front cash investment and willingness to accept equity rather than cash on account of their DIP claims, moreover, the Commitment Parties are entitled to receive commensurate fees.

7.    Many of the remaining Objections focus on ancillary issues that are not relevant to the matter before the Court.  For example, certain Objectors argue that the Debtors should not be allowed to enter into the Second Lien DIP Facility because a late-filed intercreditor adversary proceeding will cause the Debtors to "double-pay" interest.  But the Debtors will not double-pay interest and the intercreditor adversary proceeding provides no other basis to delay the Second

Lien DIP Facility or Second Lien Repayment. Nor are the Debtors seeking to prejudice the rights of TCEH under the *EFIH* Second Lien DIP Facility. Indeed, the claims to the contrary—that somehow TCEH unsecured creditors are entitled to participation rights in an EFIH DIP financing today on account of hypothetical intercompany causes of action that have not been asserted—are misplaced. In addition, neither the Commitment Parties nor the Second Lien Note Purchasers have done anything untoward in this process that would jeopardize their statutory finding of "good faith." Finally, the Debtors are optimistic that they will resolve the majority of remaining language issues with the Order in advance of the hearing.

8.    At bottom, the relief the Debtors are seeking is subject to a permissive business judgment standard and finds ample support in the record. For these reasons, the Debtors respectfully request that the Court approve the modified Second Lien DIP Facility.

**Background**

9.    The Debtors filed their petitions for relief under chapter 11 of title 11 of the United States Code on April 29, 2014 (the "Petition Date"), in the United States Bankruptcy Court for the District of Delaware. On the Petition Date, the Debtors filed the Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, as Exhibit D to the First Day Declaration (as amended from time to time, including the Restructuring Term Sheet and all other schedules and exhibits thereto, collectively, the "Restructuring Support Agreement"). In connection with the Restructuring Support Agreement, the Debtors obtained a commitment from an ad hoc group of holders of EFIH Unsecured Notes (the "Commitment Parties") to backstop a $1.9 billion second lien debtor-in-possession note purchase facility (as modified, the "Second Lien DIP Facility"). On May 15, 2014, the Debtors filed a motion requesting the Court's

approval of the Second Lien DIP Facility (the "Second Lien DIP Motion").[8]  In support of the motion, the Debtors submitted: (a) the First Day Declaration; and (b) a declaration of David Ying of Evercore Group L.L.C., proposed financial advisor to the Debtors.[9]

10.    The Second Lien DIP Facility is designed both to repay the EFIH Second Lien Notes, which currently accruing above-market interest, and ultimately to deleverage the EFIH balance sheet by nearly $2 billion dollars.  And, as discussed further below, the terms of the financing have improved substantially since the Debtors' filed the Second Lien DIP Motion. The improved terms of the proposed facility would provide the Debtors the option to repay the facility's entire outstanding principal balance with 60% of the reorganized EFH Corp. equity to be issued under the Debtors' currently contemplated plan of reorganization (the "Equity Conversion").  The facility will be composed of a $1.9 billion tranche to be issued to the lenders in cash, plus a $95 million tranche to be issued as a payment-in-kind funding fee (the "PIK Funding Fee").  This PIK Funding Fee is designed to compensate the Commitment Parties for what is essentially an equity rights offering inherent in the Equity Conversion.  Until the plan is confirmed and the Equity Conversion is consummated, however, the rights of all parties in interest to contest confirmation, including with respect to the valuation of equity or extent of regulatory approvals, are fully reserved, and parties can assert their objections at the appropriate

---

[8]    *See Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* [D.I. 477].

[9]    *See Declaration of David Ying, Senior Managing Director of Evercore Group L.L.C., in Support of the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* [D.I. 478].

time.[10]  Likewise, if the Debtors are presented with a higher and better restructuring proposal before confirmation, they can accept that offer and repay the $1.995 billion outstanding on the facility in cash, including under a plan.  The original Second Lien DIP Facility proposal included an optional redemption fee would become due to the Commitment Parties at such time (the "Optional Redemption Fee"), but this fee has since been waived.

11.    Participation in the Second Lien DIP Facility, the Equity Conversion, or both will be open to all qualified holders of EFIH and EFH Unsecured Notes.  If and when the Court approves the Second Lien DIP Facility, the Debtors plan to offer the right to purchase 91% of the DIP notes issued under the facility to qualified holders of EFIH Unsecured Notes and the remaining 9% to Fidelity (the "Second Lien DIP Offering").  Although Fidelity will be the only holder of EFH Unsecured Notes that will have the right to participate in the Second Lien DIP Facility, immediately before the Equity Conversion, all qualified holders of EFH Unsecured Notes will have the right to purchase their *pro rata* share of Fidelity's 9% tranche of the DIP notes and, in so doing, participate in the Equity Conversion.

12.    Since the Petition Date, the Debtors have received multiple iterations of alternative proposals for the Second Lien DIP Facility from both the Second Lien Group and an ad hoc group of holders of EFIH First Lien Notes (the "First Lien Group").  A timeline illustrating this process is attached to this Reply as **Appendix A**.  These competing proposals prompted the Commitment Parties to submit two revised proposals, each of which included substantially improved terms.  During this period, the Debtors engaged in good-faith negotiations with the First Lien Group, the Second Lien Group, and the Unsecured Group around the terms of

---

[10]    The EFIH Debtors will only implement the Equity Conversion—or any other change in control transaction—following receipt of any required regulatory approvals.

their respective proposals, including by providing feedback on the proposals and ultimately by submitting all of the proposals to the boards of managers and directors of EFIH and EFIH Finance for consideration. The evidence will show that the Debtors carefully considered each of the proposals and engaged in negotiations where appropriate.

13.     The Debtors received the first alternative proposal on May 12, 2014, when the Second Lien Group submitted a short-form term sheet that proposed a facility similar to the Second Lien DIP Facility with incrementally improved terms. Soon thereafter, counsel and financial advisors for the Debtors and the Second Lien Group met to discuss the Second Lien Group's proposal. At the meeting, the Debtors explained to the Second Lien Group their high-level issues with the proposal, placing particular emphasis on the most significant issue: whether the transactions contemplated by the Restructuring Support Agreement, including the tax-free spin, could still be executed if the Debtors elected to pursue the alternative proposal. In particular, the Debtors requested assurance from the Second Lien Group that either or both of Fidelity and the Commitment Parties would continue to support the transactions contemplated by the Restructuring Support Agreement or that such transactions could be executed without their support. During the following weeks, the Second Lien Group submitted a number of revised proposals that focused primarily on providing more substantial documentation for the proposed facility. On May 30, 2014, the Second Lien Group submitted additional documentation of their proposal, including a draft commitment letter from JPMorgan Chase Bank for the full $1.9 billion facility. Notably, the Second Lien Group did not garner the support of Fidelity or the Commitment Parties or demonstrate how the transactions contemplated by the Restructuring Support Agreement could be executed without their support.

14.     Also on May 30, 2014, the First Lien Group submitted to the Debtors the first of its alternative proposals for the Second Lien DIP Facility.  Like the Second Lien Group's original proposals, the First Lien Group's proposal was largely identical in structure to the existing proposed Second Lien DIP Facility but presented improved terms.  The First Lien Group submitted a revised proposal on June 11, 2014, and their final proposal on June 21, 2014.  Unlike the Second Lien Group's proposal, the First Lien Group's proposal has never been fully committed:  the June 22 proposal was backed by commitments for no more than $1.6 billion.  Nevertheless, the Debtors engaged with counsel and financial advisors to the First Lien Group around the terms of the proposal on a number of occasions.  Like the Second Lien Group, the First Lien Group did not obtain the support of Fidelity or the Commitment Parties or demonstrate how the transactions contemplated by the Restructuring Support Agreement could be executed without their support.

15.     On June 18, 2014, the Second Lien Group and a large utility company that operates in the ERCOT region, NextEra Energy, Inc., submitted a proposal for a Second Lien DIP Facility with a revised structure and further reduced pricing.  Among other things, the proposal increased the size of the facility to $2.4 billion, with the excess proceeds primarily being utilized to fund payment in full of all of the disputed makewhole claims under the EFIH Second Lien Notes.  After several discussions with the Debtors and their advisors, during which the Debtors reiterated their concern as to the integration of the proposal with the Restructuring Support Agreement, the Second Lien Group submitted revised proposals with improved terms on June 20, 2014, and June 22, 2014.  On June 27, 2014, the Second Lien Group submitted a draft commitment letter and term sheets memorializing the economic terms of their most recent proposal.  Again, the Second Lien Group failed to obtain the support of Fidelity or the

Commitment Parties or demonstrate how the transactions contemplated by the Restructuring Support Agreement could be executed without their support.

16.    The Debtors provided transparency throughout this process, sharing the competing bids with the other bidders in order to ensure equal footing among the participants and to drive a competitive process.  This resulted in a "race to the bottom."  The competing proposals submitted by the First Lien Group, the Second Lien Group, and NextEra prompted the Unsecured Group to substantially improve the terms of the Second Lien DIP Facility as originally proposed.  To that end, on June 17, 2014, the Unsecured Group submitted a proposal to the Debtors that, among other things, deleted the payment-in-kind penalties associated with the Oncor TSA Amendment, reduced the Optional Redemption Fee to $190 million, and reduced the alternative transaction fee to $28.5 million.  Finally, on June 21, 2014, the Unsecured Group submitted a proposal reducing the interest rate to 6.25%, reducing the Equity Conversion ratio to 60%, reducing the Optional Redemption Fee to $95 million, and deleting the alternative transaction fee entirely.  Since this time, the Unsecured Group has agreed to eliminate the Optional Redemption Fee to further support the Debtors' ability to exercise their fiduciary out, if appropriate.  Thus, as a result of this competitive process, the Debtors were presented with a proposal that greatly improved pricing and, most importantly, has the support of all of the parties to the Restructuring Support Agreement.

17.    During this period, the EFIH Debtors' Boards met twice to consider the bidding process and proposals.  On June 16, 2014, the EFIH Debtors' Boards convened to give preliminary consideration to the competing proposals and, on June 22, 2014, met again to evaluate and make a formal decision between the proposals.  In conjunction with these meetings, directors were presented with the competing proposals to date, the accompanying

documentation, and materials summarizing and analyzing the financial terms and legal implications of the proposals. (*See* Ex. A, EFH2D10073242 (June 16, 2014 Board deck); Ex. B, EFH2D10073528 (June 22, 2014 Board deck).) Those materials included detailed, side-by-side financial analyses of the competing proposals across all material economic terms. Further, counsel advised the boards as to their fiduciary duties, the legal standard for approval of DIP financing under the Bankruptcy Code, and the various factors to consider in deciding between the alternative proposals. After careful deliberation, the boards approved the Second Lien DIP Facility embodied in the Unsecured Group's proposal, as modified.

18.     The following table summarizes the key terms of the proposals that the Debtors have received at present:

| (*$ millions*) | Unsecured Group | Second Lien Group/ NextEra[11] | Second Lien Group | First Lien Group |
|---|---|---|---|---|
| 12 Month Interest Expense | $119 | $150 | $133 | $124 |
| Financing Fees | 43 | 10 | 29 | 10 |
| **Total Cash Costs** | **$161** | **$160** | **$162** | **$133** |
| | | | | |
| Funding PIK Fee | $95 | $50 | $76 | $95 |
| Optional Redemption Fee | N/A | 160 | 190 | 95 |
| **Total Break-up Fees** | **$95** | **$210** | **$266** | **$190** |

19.     The pricing of the various proposals, however, was not the only differentiating factor. Of the proposals, only the Unsecured Group proposal had the support of all of the parties to the Restructuring Support Agreement, including the Unsecured Group itself (a holder of more

---

[11]     Under the Second Lien Group/NextEra proposal, the 12 month interest expense is based on borrowings of $2,300 million at the proposed cash interest rate of 6% plus $100 million at the current 12% blended average interest rate. The financing fees placeholder is based on a figure supplied by the financial advisor to the Second Lien Group. Detail has not yet been received with respect to $10 million arranger fee.

than 70% of the EFIH Unsecured Notes), Fidelity (a major holder of EFIH First Lien Notes before their repayment and EFIH Second Lien Notes and the holder of a supermajority in amount of EFH Unsecured Notes that are not held by EFIH), and the ad hoc group of holders of TCEH First Lien Debt.  The support of these parties is critical to effectuating the tax-free spinoff of TCEH from EFH Corp., which avoids an approximately $6 billion deconsolidation tax at EFH Corp. and the potential for multibillion tax litigation against EFIH.

20.    In contrast, not only are the alternative proposals not supported by the parties to the Restructuring Support Agreement, but the lenders under all three of these proposals would be oversecured creditors that are currently prosecuting lawsuits against EFIH alleging hundreds of millions of dollars in contract claims.  Other non-pricing issues also differentiated the proposals, including, by way of example, implementation issues, tax issues, and confirmation issues.

21.    In advance of the June 30, 2014 hearing to consider approval of the Second Lien DIP Facility, the First Lien Group, the Second Lien Group, the EFH Unsecured Group, the Creditors Committee, and the TCEH Unsecured Group each filed objections to the Second Lien DIP Motion.  In support of their Objections, the Second Lien Group filed a declaration of their financial advisor, Todd Snyder (the "Snyder Declaration"), and the Creditors Committee filed a declaration of their financial advisor, Timothy Pohl (the "Pohl Declaration").  Various parties have also filed objections to the approval of the Second Lien Settlement, which the Debtors address in a separate reply.[12]  The Debtors now reply to the Objections and respectfully request that the Court approve the Second Lien DIP Facility and Second Lien Repayment.

---

[12]    *Debtors' Omnibus Reply to Objections to the EFIH Second Lien Settlement*, filed contemporaneously herewith (the "Settlement Reply").

**Argument**

I.    **Entry Into the Second Lien DIP Facility, Including the Equity Conversion, Is a Reasonable Exercise of the Debtors' Business Judgment and Should Be Approved Under Section 364 of the Bankruptcy Code.**

22.    For the Court to approve the Second Lien DIP Facility under section 364(c), the Debtors must establish that (a) they were unable to obtain unsecured credit under section 364(b); (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *See* 11 U.S.C. § 363(c); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2008).  In considering these elements, "[r]elevant features of the financing must be evaluated, including non-economic elements, such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization."  *See In re ION Media Networks, Inc.*, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

23.    In making this determination, however, the Debtors are entitled to significant deference.  The court should evaluate the Debtors' decision to obtain financing, and its choice between competing proposals, under the business judgment standard.  *Dodgers*, 457 B.R. at 312; *see also In re CB Holding Corp.*, 447 B.R. 222, 227 (Bankr. D. Del. 2010).  In particular, "courts will almost always defer to the business judgment of a debtor in the *selection of the lender.*"  *Dodgers*, 457 B.R. at 313 (emphasis added).  "Under the [business judgment] rule, courts will not second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision."  *Id.*  The rule is "designed to protect the wide latitude conferred on a board of directors in handling the affairs of the corporate enterprise."  *Id.*

24.    Here, the Second Lien DIP Facility meets the basic requirements for approval under Section 364(c) of the Bankruptcy Code.  ***First***, no Objector suggests that the Debtors would be able to obtain $2 billion of unsecured credit to repay their second lien debt.  ***Second***,

although various Objectors have argued to the contrary, the Second Lien DIP Facility plainly preserves the value of the estate: it yields 12 month cash savings of $87 million, net of fees. (Ying Dep. Tr. 352:8-25.) Likewise, the Equity Conversion places a floor on the value of the equity in reorganized EFH Corp., a very literal preservation of value.

25.    Certain Objectors dispute the cash savings associated with the Second Lien DIP Facility. For example, the Creditors Committee, through the Pohl Declaration, asserts that there are no cash savings associated with the Second Lien DIP Facility. On its face, the argument that the Debtors do not save money by repaying debt bearing interest at a rate of approximately 12% with debt bearing interest at 6.25% and cash raised under the First Lien DIP Financing at an even lower rate is incorrect. Pohl himself concedes that this yields cash savings of between $130 million and $195 million over a 12 month period, depending whether default interest is accruing. (Pohl Decl. ¶¶ 9-10.) From there, Pohl makes the following logical leaps:

- **Opportunity Costs.** Pohl suggests that the Debtors need to factor in the interest they could save by repaying $600 million of the $5.4 billion they just borrowed under the First Lien DIP Financing, saving $26 million per year. (*Id.* ¶ 13.) But it is unclear why the Debtors' would repay debt bearing a 4.25% interest rate when they can instead repay debt bearing interest at 11% or more.

- **Makewhole Offsets.** Pohl suggests that this calculation should factor in the reduction over time in the amount of the alleged makewhole premium. (*Id.* ¶¶ 14-20.) Hindsight analysis of the makewhole premium is not appropriate in evaluating the Second Lien DIP Facility--those risks and costs are appropriately weighed under the Second Lien Settlement. Rather, the point the Debtors make is simple: the reductions in the makewhole premium over time are less than the continuing interest on the EFIH Second Lien Notes. Stopping that accrual of above-market interest is precisely the point of the Second Lien Repayment.

- **Fees.** Pohl argues that cash fees should be backed out of benefits of the Second Lien DIP Financing. (Pohl Decl. ¶ 12.) In doing so, Pohl is essentially assuming that the source of plan funding would come free. This assumption does not sync with the reality that any plan that satisfies the EFIH Second Lien Note claims with either more favorable exit financing or a rights offering will also require similar fees.

- **Capital Markets Risk.** Pohl's analysis also ignores the significant capital markets risks inherent in delaying the repayment of the EFIH Second Lien Notes and obtaining the benefit of the Equity Conversion until later in the chapter 11 cases or in connection with confirmation. The Second Lien DIP Facility is on highly favorable terms and in a highly favorable interest rate environment. Any delay causes significant risk with respect to these rates that could both significantly increase the cost of capital for the repayment of the EFIH Second Lien Notes (which cannot be forced to take equity because of their secured status) and negatively affect the valuation of Oncor. Entry into the Second Lien DIP Facility mitigates this risk.

These unsubstantiated arguments are not valid bases to disturb the Debtors' business judgment in seeking DIP financing to preserve the value of the estate through interest savings.

26.     ***Third***, the terms of the Second Lien DIP Facility are fair and within the Debtors' sound business judgment. Given the numerous factors other than nominal pricing at issue and the minimal extent of any economic disparity, selection of the Unsecured Group proposal was well within the Debtors' sound business judgment.

27.     In an effort to refute this proposition, certain of the Objectors argue that the Second Lien DIP Facility is not the best available financing to the Debtors. Setting aside the overriding consideration of the Restructuring Support Agreement, the Second Lien Group, through the Snyder Declaration, makes the following incorrect economic observations about the Second Lien DIP Facility:

- **Interest Rate.** Although the Second Lien Group/NextEra proposal has a 6.00% interest rate compared to the Unsecured Group's 6.25% rate, the Second Lien Group/NextEra proposal would involve borrowing an additional $400 million (primarily to pay their own disputed makewhole claims in full) and leave $100 million of EFIH Second Lien Notes outstanding. (Snyder Decl., ex. 5). Their proposal would accordingly cost the Debtors an additional $31 million a year in interest expense compared to the Unsecured Group's proposal.

- **Fees.** The cash financing fees under the Unsecured Group's proposal are $43 million, not including a $5 million arranger fee payable to the group's financial advisor that is properly understood as a professional fee. The Second Lien Group, however, improperly places the fees under the Unsecured Group's proposal at $69 million. (Snyder Decl., ex. 5.) This is

15

based on the incorrect inclusion of (a) an $8.75 million fee paid to Fidelity and approved by the Court under the EFIH First Lien DIP Financing, (b) $9 million of professional fees, and (c) an $8.75 million signing fee that was paid prepetition and is economically a "sunk cost" that should not be taken into account in deciding between proposals going forward.  On the other hand, the Second Lien Group has been able to rest on the assertion that their facility would have lower fees by using a $10 million placeholder without providing a breakout or a definitive figure.

- **Cost of Cash Repayment.**  The cost of repaying the Second Lien DIP Facility, under any of the proposals, includes the PIK Funding Fee plus the Optional Redemption Fee.  Despite assertions that the Second Lien Group/NextEra proposal is clearly the less expensive proposal, these combined fees are $210 million under that proposal compared to $95 million under the Unsecured Group proposal (after accounting for the removal of the Prepayment Fee).  No proposal was less expensive on this metric.

- **Implied Equity Value.**  The Second Lien Group stresses the difference in the implied equity value of the proposals.  A higher implied valuation in itself is not beneficial to the estate.  Here, the supposedly greater consideration is being used by the Second Lien Group in large part to pay its own makewhole claims in full—paying one's self for unallowed claims does not benefit the estate.  The remaining value is equity (and some cash) being forced on holders of EFIH and EFH unsecured claims.  The simple fact, however, is that the holders of a supermajority in principal amount of the EFIH and EFH unsecured claims, support the Unsecured Group's proposal.

In sum, the notion that the Unsecured Group proposal is plainly the more expensive proposal or that it fails to maximize the value of the estates is not correct.

28.    Most importantly, the Unsecured Group proposal has the support of key creditors across the EFIH and EFH Corp. capital structure, including Fidelity, the ad hoc group of holders of TCEH First Lien Debt, and the Unsecured Group itself.  The support of these parties is critical to effectuate a tax-free deconsolidation, which avoids an approximately $6 billion deconsolidation tax at EFH Corp. and the ensuing claims against EFIH and TCEH.  (Ying Dep. Tr. 64:12-19 ("If EFH were to check the box at EFIH, EFIH would now become . . . jointly and severally liable with EFH for the EFIH deconsolidation tax . . . .").)  By contrast, the Debtors

were presented with the prospect of borrowing from the First or Second Lien Groups, each of which lacks the support of any parties to the Restructuring Support Agreement. With these multibillion dollar issues at stake, it is well within the Debtors' sound business judgment to choose a proposal with marginally higher pricing but with other more attractive features.

29.     Further, all three of the competing proposals have a fundamental flaw: they would provide the benefit of any upside in the value of Oncor's equity to EFIH's oversecured first or second lien creditors. This is because participation rights in each of these facilities and the ensuing equity conversions would be limited to EFIH secured creditors. The Unsecured Group's proposal, on the other hand, would provide the participation rights in the Second Lien DIP Facility and Equity Conversion to EFIH and EFH unsecured creditors—the rightful beneficiaries of the upside value of these estates.

30.     To avoid this conclusion, the EFH Unsecured Group argues in favor of higher standards than business judgment. It argues for the "entire fairness" standard because of an alleged "insider" transaction between EFH Corp. and EFIH. The entire fairness standard, however, is only appropriate in one of two circumstances. The first is where "directors individually and the board collectively fail to inform themselves fully and in a deliberate manner." *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) (internal quotations omitted). The second is "in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries." *In re Integrated Resources, Inc.*, 147 B.R. 650, 658 (S.D.N.Y. 1992) (internal quotations omitted). Neither of those circumstances is present here. As the evidence will show, the EFIH board was thoroughly advised by EFIH's management, counsel, and financial advisors. This DIP facility, moreover, does not involve a transaction between EFH Corp. and EFIH at all. At most, the EFH Unsecured Group might be

able to point to the Restructuring Support Agreement, but that heavily-negotiated document is supported by the holders of a supermajority in principal amount of the unsecured claims at both EFH Corp. and EFIH.

31.    The EFH Unsecured Group goes on to argue that the Second Lien DIP Facility should be held to the heightened standard involving a section 363 sale of substantially all of the Debtors' assets.  *See, e.g.*, *In re Gen. Motors Corp.*, 407 B.R. 463, 492 n.54.  But this is neither an asset sale nor an equity sale.  The Equity Conversion instead reflects an agreement to backstop a *future* plan transaction—which is commonplace in restructurings—that will be held to all applicable confirmation standards.  To the extent any party believes that the plan should not be confirmed, they can object at that time.  As a result, the business judgment standard applies to the approval of the Second Lien DIP Facility.  In choosing a competitive proposal that provides the foundation for a confirmable plan of reorganization, the Debtors have met that standard.

## II.    The Second Lien DIP Facility Is Not A *Sub Rosa* Plan.

32.    The Second Lien DIP Facility essentially serves two functions.  First, like typical "take-out" DIP facilities, it allows the Debtors to repay the high interest rate EFIH Second Lien Notes with lower interest rate debt (similar to the EFIH First Lien DIP Financing).  Second, the Equity Conversion, which is coupled with the Restructuring Support Agreement, is essentially an agreement to support (and backstop) the Debtors' plan of reorganization.  These functions, taken either collectively or in isolation, do not constitute a *sub rosa* plan.

### A.    The Second Lien DIP Facility Does Not Satisfy Either of the *Capmark* Elements for a Sub Rosa Plan.

33.    As this Court has held, a settlement is a *sub rosa* plan only if it "either (i) dispose[s] of all claims against the estate or (ii) restrict[s] creditors' rights to vote."  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (Sontchi, J.) (denying an

objection to a settlement involving the preplan payment of secured claims); *see also Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997) (stating that a settlement was not a *sub rosa* plan because, among other things, it did not "dispose of all claims against" the debtors); *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 251 (D. Del. 1998) (stating that a settlement is not a *sub rosa* plan so long as it does not "bypass the confirmation process"); *In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 644 (Bankr. W.D. Pa. 2010) (citing *Capmark* favorably for the same proposition).

34.     Here, the Second Lien DIP Facility does not dispose of all claims against the EFIH estates—only the EFIH Second Lien Notes are to be repaid.  As this Court has found, payments of secured claims outside of a plan are "routinely made," and "post-petition refinancing of uneconomical secured debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business." *Capmark*, 438 B.R. at 510-11; *see also In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr D. Del. June 6, 2014); *Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 597 (S.D.N.Y. 2007) (affirming order of bankruptcy court allowing use of DIP facility to repay prepetition secured debt under section 363(b)); *United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994) (affirming order of bankruptcy court granting debtor permission to repay prepetition secured debt).

35.     Nor does the Second Lien DIP Facility improperly preclude any party's right to vote—in fact, the opposite is true, parties are able to vote or assert any objection at confirmation. As such, the Debtors are not seeking to "bypass the confirmation process."   *In re Marvel Entm't Grp., Inc.*, 222 B.R. at 251.  Instead, the Debtors are seeking approval of the Second Lien DIP

19

Facility because it provides favorable financing. The interest rates, fees, covenants, and events of default, taken as a whole, are below-market and therefore reasonable, especially given the unprecedented nature of this debtor in possession financing, which includes the Equity Conversion as part of the Restructuring Support Agreement.

**B.    The Equity Conversion Is Essentially a Plan Support Agreement That Is Subject to a Full Fiduciary Out.**

36.    The Equity Conversion is a component to the Debtors' Restructuring Support Agreement—as with any typical plan support agreement, it is an agreement by certain creditors to accept a plan containing certain agreed upon terms. Entry into a plan support agreement is not tantamount to confirmation of a plan. *See, e.g.*, *In re Delphi Corp.*, No. 05-44481 (RDD), *111 (Bankr. S.D.N.Y. Jan. 12, 2007), Hr'g. Tr. 109: 18-19 (in deciding to approve the assumption of the plan support agreement, the court caveated that it was "not ruling today on the underlying plan or any elements of it"); *In re Genco Shipping & Trading Limited*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 24, 2014), Hr'g. Tr. 16: 3-7 ("[O]bjection[s] to the RSA and to that plan resulting from the RSA can be appropriately raised in an objection to plan confirmation. At this point, the Court is only being asked to approve assumption of the RSA; that is, the agreement among most of the parties in this bankruptcy."). Instead, the Equity Conversion should be analyzed under the standard applicable to the approval of non-insider plan support agreements: the business judgment standard. *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

37.    There are ample business reasons to support the Equity Conversion, any of which would be sufficient under the business judgment standard. As the Debtors' financial advisor, Mr. Ying, explained in his declaration, "[t]he conversion of debt-to-equity provides EFH Corp. and the EFIH Debtors with a more feasible and sustainable capital structure at emergence."

20

(Ying Decl. at ¶8.)  Moreover, the Equity Conversion places a *floor* on the value of the Debtors' equity.  This is because it provides the Debtors the right, but not the obligation, to convert nearly $2 billion of DIP claims to equity at a fixed ratio.  If the value of EFIH decreases between now and confirmation, EFIH and its creditors will enjoy the benefit of having locked in an equity conversion at a high valuation.  If the value of EFIH increases during that time, on the other hand, EFIH has a full fiduciary out that it may exercise to pursue an alternative transaction.  This fiduciary out is inherent in EFIH's ability to repay the EFIH Second Lien DIP Facility in cash.  The only thing the Equity Conversion "locks in," therefore, is a potential emergence alternative.

38.    The cases that the Objectors cite do not support their position that the Second Lien DIP Facility is a *sub rosa* plan.[13]  The case arguably most analogous to the Second Lien DIP Facility is *In re Belk Properties, LLC*. 421 B.R. 221 (Bankr. N.D. Miss. 2009), but even this is distinguishable.  The key distinction is that, in *Belk*, the debtors were seeking court approval of an equity issuance to a DIP lender *before* confirmation including the installation of the lender as the Debtors' manager.  *Id.* at 225.  The Equity Conversion feature here, if exercised, will be part of a plan that will be subject to all applicable confirmation requirements and to which all parties will have a right to object or otherwise contest valuation.  For these reasons, the Second Lien DIP Facility is not a *sub rosa* plan.[14]

---

[13]    To that end, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986), and *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983), are cases about section 363 asset sales outside of a plan, and *In re Iridium Operating LLC*, 478 F.3d 452, 463-64 (2d Cir. 2007), is about a distribution to an unsecured creditor that would have resulted in an absolute priority violation if it were done within a plan.

[14]    The First Lien Trustee makes the argument that because proceeds of avoidance actions are subject to the liens securing the Second Lien DIP Facility, the Debtors have somehow effectuated a "de facto" release of claims against holders of EFIH Unsecured Notes.  But it is routine and typical for a DIP lender to receive a lien on proceeds of avoidance actions, and it is unclear how this standard protection makes the Second Lien DIP Facility a *sub rosa* plan.

**III.    The Fees Under the Second Lien DIP Facility Are Reasonable and Necessary.**

39.    Given that the Second Lien DIP Facility presents a relatively novel structure, there are few comparable transactions.  Each of its two components, however, are comparable to more common transactions and the Second Lien DIP Facility reflects fees consistent with market precedent for these types of transactions.

40.    To that end, the PIK Funding Fee is a reasonable fee for a rights offering.  Courts recognize that backstopping an equity rights offering is a valuable contribution to the estate.  *See, e.g.*, *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010).  Courts therefore commonly approve equity rights offering commitment fees of around 5%.[15]

41.    Moreover, it is common for backstop fees to be payable regardless of whether the transaction is ultimately consummated.  *See, e.g.*, *Visteon*, No. 09-1178.  But even if the PIK Funding Fee were to be held to the standard reserved for break-up fees, it is a reasonable and necessary expense of the estate.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).  As a general matter administrative expense claims are allowable if they are "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  To that end, it is permissible to

---

[15]    *See, e.g.*, *In re K-V Discovery Solutions Inc.*, No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013) (approving a 5% equity rights offering fee); *In Vertis Holdings, Inc.*, No. 10-16170 (Bankr. S.D.N.Y. Dec. 1, 2010) (approving a 10% equity rights offering fee); *In re Tronox, Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Sept. 17, 2010) (approving a 6% equity rights offering fee); *In re AbitibiBowater Inc.*, No. 09-11296 (Bankr. D. Del. June 25, 2010) (approving a 6% commitment fee for a rights offering of convertible unsecured notes); *In re Visteon Corp.*, No. 09-11786 (Bankr. D. Del. June 17, 2010) (approving a 4.8% equity rights offering fee); *In re Spansion Inc.*, No. 09-10690 (Bankr. D. Del. Jan. 7, 2010) (approving a 4.1% equity rights offering fee); *In re RathGibson, Inc.*, No. 09-12452 (Bankr. D. Del. Sept. 2, 2009) (approving a 5% to 7.5% equity rights offering fee); *In re Magnachip Semiconductor Fin. Co.*, No. 09-12008 (Bankr. D. Del. Aug. 31, 2009) (approving a 10% equity rights offering fee); *In re Landsource Cmtys. Dev. LLC*, No. 08-11111 (Bankr. D. Del. June 2, 2009) (approving a 5% equity rights offering fee); *In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136 (Bankr. D. Del. Oct. 29, 2008) (approving a 5% commitment fee for a rights offering of preferred stock); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Aug. 17, 2007) (approving a 4% equity rights offering fee); *In re Bally Total Fitness of Greater NY Inc.*, No. 07-12395 (Bankr. S.D.N.Y. Aug. 1, 2007) (approving a 4% equity rights offering fee).

allow a breakup fee as an administrative expense if it is necessary to induce an initial bid and will not chill further bidding.  *See Reliant*, 594 F.3d at 206; *O'Brien*, 181 F.3d at 537.  As set forth in the Second Lien DIP Motion, courts in this district and others routinely grant breakup fees in the 3-6% range in the context of equity rights offerings.[16]

42.    Here, the Second Lien DIP Facility and Equity Conversion contain an agreement to fund a deleveraging transaction subject to a plan that will create tremendous value for the estates and serve as a floor for a higher value transaction.  The Commitment Parties indicated to the Debtors that they would not agree to the Second Lien DIP Facility and Equity Conversion without the PIK Funding Fee—this is not a case in which "a potential purchaser will bid whether or not break-up fees are offered."  The PIK Funding Fee will not chill further bidding—it represents a reasonably small percentage when compared to the enterprise value of Oncor.  In fact, the PIK Funding Fee represents just 0.6% of the total enterprise value of Oncor implied by the Equity Conversion.  And, unlike the typical 30 to 90 days that a rights offering commitment might remain open, the Commitment Parties have agreed to hold open the rights offering inherent in the Equity Conversion for at least the 11-month duration of the Restructuring Support Agreement.  Last, the PIK Funding Fee has been market tested:  all of the proposals EFIH received included PIK Funding Fee and, in fact, a pure break-up fee in addition (i.e., Optional

---

[16]    *See, e.g.*, *In re K-V Discovery Solutions Inc.*, No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013) (approving a 3% alternative transaction fee for an equity rights offering); *In re Tronox, Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Sept. 17, 2010) (approving a 6% breakup fee for an equity rights offering); *In re AbitibiBowater Inc.*, No. 09-11296 (Bankr. D. Del. June 25, 2010) (approving a 3% termination fee for a rights offering of convertible unsecured notes); *In re Visteon Corp.*, No. 09-11786 (Bankr. D. Del. June 17, 2010) (approving a 4.8% termination fee, including the nonrefundable portion of the commitment fee); *In re Accuride Corp.*, No. 09-13449 (Bankr. D. Del. Nov. 2, 2009) (approving a 7.1% breakup fee for a convertible notes rights offering); *see also In re Sea Launch Co., L.L.C.*, No. 09-12153 (Bankr. D. Del. May 12, 2010) (approving 3.75% DIP breakup fee).

Redemption Fees) well in excess of the fee associated with the proposed Second Lien DIP Facility.

## IV.    The TCEH Unsecured Group and the Creditors' Committee's Remaining Objections Are Meritless.

43.    Certain of the Objectors—most notably, the TCEH Unsecured Group—describe or allude to various causes of action the TCEH Debtors may have against EFIH and EFH Corp. As the Debtors will demonstrate in the future, the disinterested directors of the TCEH Debtors considered the purported intercompany claims raised by the TCEH Debtors in considering the Restructuring Support Agreement and the releases contemplated thereunder.  But, more importantly, these issues are not relevant to the Second Lien DIP Facility.  Such causes of action are not the subject of any proof of claim, adversary proceeding, or lawsuit, nor have they otherwise been allowed.  There is therefore no basis to argue that any such claims should receive participation rights in the Second Lien DIP Financing.  Moreover, the Second Lien DIP Financing is without prejudice to the TCEH Debtors' ability to allege such claims in the future or, if allowed, dispute the treatment of any such claims at confirmation (including with respect to the Equity Conversion)—for the avoidance of doubt, no creditors' ability to contest the equity conversion at confirmation is prejudiced by the terms of the Order.  And the ability of the Debtors or any other party's rights to pursue claims against non-settling holders of EFIH Second Lien Notes are preserved under the terms of the Order.[17]  The Objections of the TCEH Unsecured Group and the Creditors' Committee should be overruled in their entirety.

---

[17]    The assertion that there is no principled distinction between settling and non-settling creditors is without merit. As discussed in more detail in the Settlement Reply, the releases provided to settling creditors are reciprocal and entirely justified.

24

**V.    The Debtors' Payment of Principal and Accrued Interest to the Second Lien Trustee Will Cut Off Interest on the EFIH Second Lien Notes.**

44.    Certain Objectors assert that the Debtors should not consummate the Second Lien DIP Facility and Second Lien Repayment today because the First Lien Trustee's late-filed intercreditor adversary proceeding will require the Debtors to "double pay" interest.    Such concerns are unfounded.

45.    Payment of a claim by a debtor cuts off any entitlement to interest under section 506(a) of the Bankruptcy Code.    *See Rake v. Wade*, 508 U.S. 464, 468 (1993) ("It is generally recognized that the interest allowed by [section] 506(b) will accrue until payment of the secured claim or until the effective date of the plan.").    Here, the Debtors propose to pay the claims of holders of the Second Lien Notes (through the Second Lien Trustee) on the closing date of the Second Lien Settlement.

46.    Moreover, under the express terms of the Second Lien Indenture, the Debtors' payment of principal and interest to the Paying Agent pursuant to the Order cuts off any ongoing interest expense.    The EFIH Second Lien Notes have been automatically accelerated by virtue of the Debtors' chapter 11 filing.    Indenture § 6.02 (providing for automatic acceleration upon bankruptcy filing).    Several provisions of the Indenture provide that payments to the Paying Agent of principal amounts that are due and owing cuts off interest expense.    *See, e.g.*, Indenture § 2.08 ("If the Paying Agent . . . holds, on a . . . maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest."); 4.01 (providing that principal and interest "shall be considered paid on the date due if the *Paying Agent* . . . holds as of noon Eastern Time on the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay all principal . . . and interest . . . then due."); *see also* Indenture § 3.05

(providing that where notes are redeemed or repurchased—which is not occurring here, because the notes have been accelerated—payment to the Paying Agent cuts off interest).  The revised form of Order provides that the Second Lien Trustee shall act as Paying Agent for these purposes.[18]  Therefore, the Debtors are entitled to a finding that they are not required to pay future interest on account of the principal and interest paid under Second Lien Repayment.  No provision of the Second Lien Indenture makes an exception to these provisions on the basis of pending turnover proceedings.[19]

47.    Therefore, the provision in the Order that provides for the termination of interest expense on the EFIH Second Lien Notes on the date the Second Lien Repayment and Second Lien Settlement are consummated, notwithstanding the pendency of the First Lien Trustee's adversary proceeding, is appropriate.

---

[18]   The Debtors believe this change resolves the objections of the First Lien Trustee and Second Lien Trustee with respect to the identity of the paying agent.

[19]   Any assertion that the EFIH Collateral Trust Agreement prevents the Debtors from using the proceeds of the First Lien DIP Financing and Second Lien DIP Facility to consummate the Second Lien Repayment and Second Lien Settlement is without merit.  As an initial matter, the First Lien DIP Order, which the First Lien Trustee vigorously negotiated and consented to, was clear that the proceeds of the EFIH Debtors' DIP financings would be used to consummate the Second Lien Repayment and Second Lien Settlement.  Indeed, the First Lien Trustee vigorously negotiated a reservation of rights, and nowhere did that reservation of rights assert any intercreditor arguments.  More importantly, the turnover provisions relied upon by the First Lien Trustee are inapplicable because the Second Lien DIP Facility and First Lien DIP Facility are neither proceeds of collateral nor "Asset Sales."  The Debtors are using the proceeds of the Second Lien DIP Facility and the First Lien DIP Facility to consummate the Second Lien Repayment.  These amounts are neither proceeds of the First Lien Trustee's collateral nor are the DIP facilities "Asset Sales," as the First Lien Trustee has asserted in its adversary proceeding.  *See* 9.75% Indenture § 1.01.  This scenario cannot be likened to a sale-leaseback financing which is characterized in both law and finance as a sale.  Similarly, the carveout for "financing transactions" refers to "Sale and Lease-Back Transactions and asset securitizations permitted by this Indenture"--this clarifies that the only relevant financings under the indenture are disguised sales that are performed as financings.  The definition of "Asset Sales" was not intended to capture straightforward financings such as the instant case.

**VI.    The Second Lien Note Purchasers Are Entitled to a Finding of Good Faith Under Section 364(e) of the Bankruptcy Code.**

48.     The Second Lien Note Purchasers are entitled to the protections for good faith lender set forth in section 364(e) of the Bankruptcy Code.  In general, the Bankruptcy Code does not define "good faith," but courts generally hold that "[g]ood faith means honesty in fact in the conduct or transaction concerned."  *See, e.g.*, *In re Ellingsen MacLean Oil Co., Inc.*, 834 F.2d 599, 605 (6th Cir. 1987).  One of the purposes of section 364(e) is to protect a "lenders' reliance on the possibility of profit."  *In re Adams Apple, Inc.*, 829 F.2d 1484, 1488 (9th Cir. 1987) (holding that section 364(e) protected a cross-collateralization clause and that lenders stripped of the "possibility of profit" "may choose to invest in other enterprises" and, as a result, "[c]ongressional intent of fostering private investment in failing companies by promoting reliance on a bankruptcy court's authorization would be defeated"); *see also In re Fleetwood Enterps., Inc.*, 427 B.R. 852, 859 (Bankr. S.D. Cal. 2010) ("It is well-settled that the overall policy behind [section] 364 is to encourage lenders to provide financing to debtors by offering them incentives for their risk taking.").  Lending funds to a debtor to facilitate the eventual acquisition of assets is not bad faith.  *Evergreen Int'l Airlines Inc. v. Pan Am Corp. (In re Pan Am Corp.)*, 1992 WL 154200, *2-5 (S.D.N.Y. June 18, 1992) (holding that DIP lender who lent funds to protect a debtor's value and facilitate the DIP lender's acquisition of the debtor's assets did not act with an improper motive and was entitled to the protection of section 364(e)).  As the record shows, the Second Lien DIP Facility was heavily negotiated at arm's length between the Debtors and the Commitment Parties.  Each party worked in good faith, resulting in the highly favorable terms of the Second Lien DIP Facility.  The First Lien Trustee's attempt to translate its disappointment at the result of this process to bad faith on the part of the Second Lien Note Purchasers is unwarranted.

49.     Indeed, the First Lien Trustee is simply incorrect that (1) a DIP lender that provides a Debtor an equity conversion option or (2) a DIP lender that is not "identified" as of the time of entry of the Order is by default acting in bad faith.  Each of the cases relied on by the First Lien Trustee are inapposite.  The First Lien Trustee relies on *In re EDC Holdings Co*, 676 F.2d 945, 948 (7th Cir. 1982) for the proposition that a good faith finding is inappropriate here because the DIP has an "intended effect that is improper under the Bankruptcy Code."  Here, the Debtors are seeking approval of the repayment in connection with the DIP, so there is no "improper" motive.  Nor is the Second Lien DIP Facility somehow collusive because the lenders could become the new majority owners of EFH Corp. (unless an alternative transaction is entered into).  Similarly, *Ferrari North America, Inc. v. Sims (In re R.B.B., Inc.)*, 211 F.3d 475 (9th Cir. 2000) involved a unique set of facts that arose from ambiguous sale documents that among other things failed to identify the purchaser.  The First Lien Trustee's broad application of this case to the lending context would effectively prohibit trading or syndication of DIP loans because such lenders are not "identified" as of the time of funding—which of course would be an absurd result.

50.     Last, the First Lien Trustee's argument that a good-faith finding is inappropriate because of a discovery dispute related to a key employee incentive plan issue is frivolous.  As an initial matter, the First Lien Trustee has actually withdrawn its letter brief on this exact issue. [D.I. 1161.]  And the cases the First Lien Trustee cites reflect egregious facts that find no analogy here.  *In re Industrial Valley Refrigeration & Air Condition Supplies, Inc.*, 77 B.R. 15 (Bankr. E.D. Pa. 1987) involved an inflated sale price motivated by a "sweetheart" insider compensation deal.  Worse yet, *In re White Crane Trading Co.*, 170 B.R. 694 (Bankr. E.D. Cal. 1994), involved bad faith concealment of violations of state consumer protection and deceptive

trade practices from the court.  The First Lien Trustee's attempt to analogize those cases to these facts is completely misplaced.

51.     Finally, the First Lien Trustee appears to argue that Fidelity's good faith as a Second Lien DIP Purchaser cannot be determined until the Oncor TSA Amendment is before the Court.  As discussed above, and as the First Lien Trustee is aware, the Second Lien DIP Facility no longer turns in any way on approval of the Oncor TSA Amendment.  The Oncor TSA Amendment is therefore not relevant to Fidelity's decision to exercise its participation rights in the Second Lien DIP Facility.

## VII.    Waiver of the Stay Under Bankruptcy Rule 6004(h) is Warranted.

52.     The record clearly supports a waiver of the stay period of Bankruptcy Rule 6004(h).  Under Bankruptcy Rule 6004(h):

> if an objection has been filed and is being overruled, the court should eliminate or reduce the 14–day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14–day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected.  If the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests.

53.     Waiver of the stay here is appropriate.  It may be very difficult for the Debtors to take certain steps necessary to closing—including the launch and completion of the offering for participation in the Second Lien DIP, which the Debtors intend to do as soon as practicable after entry of the Order—while the Order is subject to a stay.  As a result, any stay of the Order will likely result in commensurate delay in closing.  This is important for two reasons.  *First*, the Restructuring Support Agreement requires that the Second Lien DIP Facility and Second Lien Settlement each be consummated within five business days of entry of the orders approving

those transactions.[20]   A stay would effectively make meeting this requirement impossible and give rise to termination rights under the Restructuring Support Agreement and therefore the Second Lien DIP Facility.   The Debtors cannot afford to take the capital markets exposure of losing the Second Lien DIP Facility.   ***Second***, each day of delay in consummation of the Second Lien DIP Facility and Settlement cause the Debtors $350,000 per day in added interest expense. Therefore, the effect of a delay on the Debtors would be acute and significant.

## VIII.   The Remaining Issues Raised with Respect to the DIP Order Are Either Unfounded or Addressed in the Revised Order.

54.   The First Lien Trustee and Second Lien Trustee have each raised certain additional technical objections to the language in the Order.   The Order could be entered as initially filed and the Debtors reserve the right to argue at the hearing that any provision that is not settled is appropriate, but the Debtors will work to resolve as many points as possible in advance of the hearing.   The main outstanding points are as follows:

- Paragraph E(ii) (First Lien Trustee):   Interest on interest, Additional Interest, and professional fees and costs are all subject to dispute.   The EFIH Debtors have no obligation to reveal their substantive arguments on these points in advance of the scheduled litigation on unresolved issues.

- 8(a) (First Lien Trustee):   This language is substantively identical to the language in the First Lien DIP Order that the First Lien Trustee consented to, is standard language for a DIP order, and does not prejudice the First Lien Trustee in any way.

- Proposed addition to paragraph 8 (First Lien Trustee):   The proposed language is incorrect with respect to EFIH DIP Collateral that is not prepetition collateral or proceeds thereof and unnecessary with respect to prepetition collateral and proceeds thereof given other provisions in the Order.

---

[20]   The Debtors are in the process of seeking an amendment to the Restructuring Support Agreement to provide for ten business days for closing, but that extended period of time does not mean that closing can occur within ten business days if a stay extends to that period.

- 16 (First Lien Trustee):  The First Lien Trustee asks for both notice of material amendments and the affirmative need for court approval.  The First Lien Trustee is not entitled to notice of amendments for this subordinated facility, and provisions that provide for material amendments without court approval in the absence of an objection are commonplace in this jurisdiction.

- 17 (First Lien Trustee):  The First Lien Trustee has failed to articulate any reason why the Debtors should be forced to provide budget information to an adverse party in connection with a subordinated facility.

- (Second Lien Trustee) It is not necessary for the Order to include specific language prohibiting the Debtors from releasing the liens securing the Prepetition Second Lien Obligations.

   [*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court (a) overrule the Objections, (b) approve the Second Lien DIP Facility, and (c) grant such other relief as it deems necessary and proper under the circumstances.

Dated:  June 27, 2014
        Wilmington, Delaware

/s/ Jason M. Madron
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    defranceschi@rlf.com
    madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    richard.cieri@kirkland.com
    edward.sassower@kirkland.com
    stephen.hessler@kirkland.com
    brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    chad.husnick@kirkland.com
    steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession