**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 14-10979 (CSS) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re: D.I. 472, 477, 1060, 1066, 1067, 1068, 1071,** |
| | ) | **1078, 1079, 1090, 1098, 1106, 1191,  1192** |

**OMNIBUS REPLY OF THE AD HOC COMMITTEE OF EFIH UNSECURED
NOTEHOLDERS AND THE EFIH SECOND LIEN DIP COMMITMENT
PARTIES TO OBJECTIONS TO (I) MOTION APPROVING POSTPETITION
SECOND LIEN FINANCING AND (II) MOTION APPROVING
CERTAIN EFIH SETTLEMENTS AND THE ONCOR TSA AMENDMENT
<u>AND JOINDER TO DEBTORS' REPLY TO OBJECTIONS</u>**

The Ad Hoc Committee of EFIH Unsecured Noteholders[2] and the EFIH Second Lien DIP

Commitment Parties[3] respectively submit this (i) omnibus reply (the "<u>Reply</u>") to certain

objections (collectively, the "<u>Objections</u>")[4] filed in opposition to the (I) *Motion of Energy Future*

*Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order*

*(A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing*

*Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral,*

*(D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] The "<u>Ad Hoc Committee of EFIH Unsecured Noteholders</u>" means the ad hoc committee of holders of 11.25%/12.25% unsecured senior toggle notes due December 1, 2018 issued pursuant to that certain Indenture, dated December 5, 2012, by and among Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>") and EFIH Finance Inc., as issuers, and UMB Bank, N.A., as successor trustee.

[3] The "<u>EFIH Second Lien DIP Commitment Parties</u>" means the parties to that certain second lien Commitment Letter, dated April 28, 2014, with Energy Future Holdings Corp. and Energy Future Intermediate Holdings Company, LLC.

[4] The Objections are listed on **Schedule 1** hereto.

*Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* [D.I. 477] (the "Second Lien DIP Motion") and (II) *Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [D.I. 472] (the "Settlement Motion" and, together with the Second Lien DIP Motion, the "Motions") and (ii) joinder to the Debtors' Reply (as defined below). In support of this Reply, the Ad Hoc Committee of EFIH Unsecured Noteholders and the EFIH Second Lien DIP Commitment Parties respectfully submit as follows:

## PRELIMINARY STATEMENT[5]

1.      The Ad Hoc Committee of EFIH Unsecured Noteholders and the EFIH Second Lien Commitment DIP Parties file this Reply for the limited purpose of responding to two objections raised by CSC Trust (as defined in the First Lien Objection) and the Second Lien Group, respectively:  (i) whether the EFIH Second Lien DIP Commitment Parties are entitled to a good faith finding under Bankruptcy Code section 364(e) in connection with the funding of a $1.9 billion second lien, non-priming debtor-in-possession facility (the "EFIH Second Lien DIP") and (ii) whether the terms of the Second Lien Settlement contravene Bankruptcy Code section 1123(a)(4), which requires equality of treatment *under a plan*.

2.      *First*, the EFIH Second Lien DIP Commitment Parties are entitled to a good faith finding under section 364(e) of the Bankruptcy Code because the record is clear that the EFIH Second Lien DIP is the product of extensive, arm's length negotiations.  CSC Trust cannot establish that the EFIH Second Lien DIP Commitment Parties have engaged in the sort of fraudulent, collusive or improper conduct that would prohibit this Court from entering a good

---

[5] Capitalized terms used but not defined in this Reply shall have the meanings set forth in the Second Lien DIP Motion or the Settlement Motion, as applicable.  Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed below or in the Motions, as applicable.

faith finding under Bankruptcy Code section 364(e) in connection with its approval of the EFIH Second Lien DIP. To the contrary, the record is clear that the EFIH Second Lien DIP Commitment Parties have provided substantial value to these estates for the benefit of all creditors through, among other things, funding a debtor in possession facility that mandatorily converts to equity and facilitates a tax free spin of the TCEH Debtors, thus avoiding the triggering of more than $6 billion in tax liabilities that threaten non-priority unsecured recoveries on both the "T-Side and "E-Side" of the estates. Moreover, the cases relied upon by the Indenture Trustee and the EFIH Second Lien Group (each as defined in the Second Lien Group Settlement Objection and, together, the "Second Lien Group") in support of their contention that the EFIH Second Lien DIP Commitment Parties are not entitled to a good faith finding are inapposite and—as addressed in detail below—easily distinguishable on the facts. Accordingly, the EFIH Second Lien DIP Commitment Parties have demonstrated that they are entitled to a good faith finding under section 364(e).

3. *Second*, approval of the Second Lien Settlement is appropriate under Bankruptcy Rule 9019 and does not result in the inequitable treatment of holders of EFIH Second Lien Notes under Bankruptcy Code section 1123(a)(4) or otherwise. By the Second Lien Settlement, the Debtors seek authority to offer to each holder of EFIH Second Lien Notes—at each such holder's election—the *identical settlement* offered to the Second Lien RSA Parties on account of such holder's Alleged Second Lien Makewhole Claims. This wholly voluntary proposed settlement has been criticized by the Second Lien Group as "inequitable" and "discriminatory" by those who have already determined not to opt into the settlement and have thus preserved all rights to litigate a contractual entitlement to the makewhole premium. Second Lien Group Settlement Objection ¶ 27. In so doing, the Second Lien Group cites *not* to the standards applicable to the

3

approval of a settlement in this and every other jurisdiction (*i.e.,* Bankruptcy Rule 9019) but instead to cases construing Bankruptcy Code section 1123(a)(4), a provision of the code made expressly applicable to the contents of a plan. Nevertheless, for the reasons set forth below, these objections are without merit and should be overruled.

## BACKGROUND

4.       On May 15, 2014, the Debtors filed the Second Lien DIP Motion [D.I. 477] and the Settlement Motion [D.I. 472].

5.       On June 23, 2014, the Second Lien Group filed the *Preliminary Objection Of Second Lien Notes Indenture Trustee and EFIH Second Lien Group of Second Lien Noteholders to Debtors Motion to Approve Second Lien DIP* [D.I. 477].

6.       On June 24, 2014, various parties in interest filed the Objections listed on **Schedule 1** hereto.

7.       On June 27, 2014 the Debtors filed their omnibus replies to the Objections (collectively, the "Debtors' Reply").

## ARGUMENT

**A.      The EFIH Second Lien DIP Commitment Parties are Entitled to a Good Faith Finding Under Bankruptcy Code Section 364(e)**

8.       CSC Trust argues that the conduct of the EFIH Second Lien DIP Commitment Parties in these cases—conduct which in their words "*matches exactly* with the facts of the two cases where Courts of Appeals have reversed a good faith finding" and "*runs afoul* of the one Bankruptcy Court reported decision in this Circuit in which the Court denied a good faith finding"—precludes a good faith finding in favor of the EFIH Second Lien DIP Commitment Parties under Bankruptcy Code section 364(e). First Lien Obj. ¶ 41 (emphasis added). For the

reasons that follow, these allegedly analogous cases are wholly inapposite to the facts of this case, and CSC Trust's unsubstantiated accusations of wrongdoing are simply inaccurate.[6]

9.     CSC Trust concedes that "courts regularly approve DIP loans with good faith findings to protect the lenders." First Lien Obj. ¶ 39. A good faith finding normally is granted by a court in circumstances where the evidence demonstrates that a financing was negotiated at arm's-length between the debtor and its lenders. *See, e.g., In re CB Holding Corp.*, 447 B.R. 222, 227 (Bankr. D. Del. 2010) (making a good faith finding because the financing was "negotiated in good faith at arm's length"); *In re WorldSpace, Inc.*, 08-12412, 2008 WL 8153639, at *7 (Bankr. D. Del. Oct. 20, 2008) (making a good faith finding, explaining "[t]he DIP Facility, Term Sheet and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Lenders, and the Noteholders"). A good faith finding will only be denied in circumstances where an objecting party produces evidence of "fraud, collusion, or an attempt to take grossly unfair advantage of others," or if it is established that the proposed financing is in furtherance of an "improper purpose." *See In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996); *In re Foreside Mgmt. Co., LLC*, 402 B.R. 446, 452 (B.A.P. 1st Cir. 2009) (*quoting In re Adams Apple, Inc.*, 829 F.2d 1484, 1489 (9th Cir. 1987)).

10.     Here, the evidence overwhelmingly demonstrates that the EFIH Second Lien DIP was negotiated extensively and at arm's-length with the EFIH Debtors over a period of several months, and the evidence further demonstrates that such negotiations have continued since the commencement of these cases as the EFIH Second Lien DIP Commitment Parties have agreed to a series of modifications to the EFIH Second Lien DIP in response to the competitive financing

---

[6] In the First Lien Objection, CSC Trust raises certain discovery disputes set forth in full in a letter to the Court dated June 23, 2014 [D.I. 1058] (the "Discovery Letter"). In light of CSC Trust's withdrawal of the Discovery Letter on June 26, 2014 [D.I. 1161], such issues are not addressed in this Reply.

process.[7]  The evidence also establishes that there are no undisclosed deals, agreements or other arrangements between, on the one hand, members the Ad Hoc Committee of EFIH Unsecured Noteholders or the EFIH Second Lien DIP Commitment Parties and, on the other, any of the Debtors, their respective directors, officers and managers, or other creditor constituencies in these cases.

11.    Indeed, CSC Trust has not presented any facts (even if taken as true) that rise to the level of "fraud, collusion, or an attempt to take grossly unfair advantage of others."  Instead, CSC Trust attempts to raise the specter of bad faith and collusion by drawing conclusory analogies to three cases that share few, if any, factual similarities with this case:  (i) *In re EDC Holding Co.*,[8] (ii) *Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*[9], and (iii) *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*[10]  Each case is addressed in turn below.

**(i)    *In re EDC Holding Co.***

12.    The first case cited by CSC Trust as "exactly" on point is *In the Matter of EDC Holding Co.*, in which the Court of Appeals for the Seventh Circuit (the "Seventh Circuit") reversed a good faith finding granted to a postpetition lender.  The facts of *EDC Holding*, which bear no similarity to those at issue here, are as follows.  Prior to filing for bankruptcy, debtor Wisconsin Steel obtained a loan from Chase Manhattan Bank ("Chase").  *Id.* at 946.  The loan was secured by a lien on inventory and a bank account maintained with Chase.  *Id.*  Wisconsin Steel defaulted on the loan, causing Chase to set off against funds held in the bank account.  *Id.*  As a result, Wisconsin Steel bounced its payroll checks and sought relief under chapter 11.

---

[7]  Indeed, on the date hereof, the EFIH Second Lien DIP Commitment Parties agreed to remove the Prepayment Fee, further modifying the terms of the EFIH Second Lien DIP for the benefit of the Debtors' estates.

[8]  *In the Matter of EDC Holding Co.*, 676 F.2d 945 (7th Cir. 1982).

[9]  *Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*, 211 F.3d 475 (9th Cir. 2000).

[10]  *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15 (Bankr. E.D. Pa. 1987).

*Id.* The debtor's employees were unionized, and the union filed a complaint in the bankruptcy proceedings seeking payment of wages. *Id.* Chase simultaneously attempted to exercise its rights against the inventory but was prevented from doing so by picketing union employees. *Id.*

13.     In settlement of the disputes between Chase and the union employees, Chase agreed to extend the debtor a $1.7 million loan, the majority of which was to be used to pay back wages. *Id.* $77,000 of the loan was earmarked for the union's attorneys' fees and other legal expenses, which fees and expenses were to be given priority treatment under the terms of the loan agreement notwithstanding Chase's express knowledge that such fees and expenses were not entitled to priority status under the Bankruptcy Code. *Id.* The creditors' committee objected to approval of the loan and specifically to the grant of priority treatment for the legal fees and expenses. *Id.* at 946-47. The Seventh Circuit was troubled by the fact that proceeds of the Chase loan would be used to pay the legal fees of a third party whose claims were *not assertable as a claim of any kind against the debtor's estate*. Hence, the court only denied a good faith finding with respect to the portion of the loan proceeds earmarked for the union's attorneys, not the entire loan amount. *Id.* at 948 (emphasis added).

14.     Contrary to CSC Trust's assertions, the conversion of the EFIH Second Lien DIP into equity (a feature described as "vital" by the Debtors[11]) does not result in the creation of a

---

[11] *See e.g. Declaration of David Ying, Senior Managing Director of Evercore Group L.L.C., in Support of Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay* [D.I. 478] ("Upon emergence, the EFIH Second Lien DIP Facility, which is expected to include the $1.9 billion of new money (the "Tranche A Notes") and a payment-in-kind closing fee of $95 million (the "Tranche B Notes"), will convert into approximately 64% of equity in reorganized EFH Corp. Because of this mandatory conversion feature, the EFIH Second Lien DIP Facility provides a mechanism, at an early date in these chapter 11 cases, for EFIH to ensure that it can deleverage its capital structure. This is vital to ensuring that the EFIH Debtors have a sustainable capital structure post-emergence, particularly given that current EFIH leverage is likely too great to be repaid entirely with debt.").

claim where no claim would otherwise exist. Here, unlike *EDC Holding*, the proceeds of the EFIH Second Lien DIP are not being used to elevate existing claims to a higher priority in the chapter 11 cases vis-à-vis other creditors, nor are proceeds being used to pay claims which are not otherwise assertable against the estates. Rather, the Debtors have the right to require the proposed EFIH Second Lien DIP lenders (the "Second Lien DIP Lenders") to convert their DIP claims into equity of Reorganized EFH subject to satisfaction of certain conditions in lieu of paying off the obligations in cash. The circumstances here thus bear no resemblance to the concerns that prompted the Seventh Circuit to limit the good faith finding in *EDC*.

(ii)    *Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*

15.    CSC Trust also asserts that a good faith finding should be denied because the EFIH Second Lien DIP Commitment Parties have failed to disclose their "selected partners" under the EFIH Second Lien DIP Facility. In support of this position, CSC Trust cites *Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*, a section 363 sale case where the Ninth Circuit reversed a section 363(m) good faith finding in connection with a proposed trustee's sale of several Ferrari dealerships to unidentified purchasers, certain of whom it was later disclosed had criminal records. 211 F.3d at 476. Ferrari objected in the bankruptcy court to the proposed sale on the basis that, among other things, the true identity of the purchaser was unknown. *Id.* The bankruptcy court overruled Ferrari's objection, holding that Ferrari had unreasonably withheld its consent to the transfer. *Id.* at 478. The Court of Appeals for the Ninth Circuit reversed the lower court's order, holding that the purchaser was not entitled to the protections afforded to a good faith purchaser under section 363(m) of the Bankruptcy Code because (i) the purchaser had not in fact been identified and (ii) no showing had been made that the potential purchaser satisfied the legal test applicable to the transfer of an automobile dealership. *Id.* at 480.

16.      While the EFIH Second Lien DIP Commitment Parties are not obligated to disclose every lender under the EFIH Second Lien DIP in order to obtain a good faith finding, to assuage any concern in this regard, the EFIH Second Lien DIP Commitment Parties have designated (i) Hunt Consolidated, Inc. ("Hunt") and (ii) Teacher Retirement System of Texas ("TRS") as the sole Selected Partners entitled to participate in the EFIH Second Lien DIP. Hunt has been designated a Selected Partner because they are a strategic Texas participant with the relevant regulatory and stakeholder relationships and expertise necessary to assist in a successful transition of ownership of Oncor's assets. Hunt is a global group of privately held companies owned and managed by the Ray L. Hunt family of Dallas, Texas, engaged in activities related to oil and gas exploration, refining, real estate, ranching, private equity investments, and electric power. Hunt has been involved in the Texas energy business for 80 years. Sharyland Utilities, a Hunt affiliate, was approved in 1999 as a regulated utility in Texas, the first regulated electric utility created in Texas since the Public Utility Commission of Texas (the "PUCT") was formed in the 1970s. Since inception, Sharyland's operated assets have grown to over $1 billion and it operates in one of the fastest growing service territories in the United States. Sharyland has strong, long-standing relationships with both the PUCT and policymakers in Texas.

17.      TRS has been designated a Selected Partner because it is the largest public retirement system in the state of Texas in both membership and assets. The agency serves 1,369,640 participants – 1,012,412 are public and higher education members, and 348,228 are retirement recipients. As of December 31, 2013, system net assets totaled $124 billion. Including public service employees of Texas signifies the sensitivity of the EFIH Second Lien DIP Commitment Parties for a Texas-based resolution. With the involvement of local teachers,

the EFIH Second Lien DIP Commitment Parties hope to align the incentives of future equity owners with the stakeholders served by the system.

18.    The EFIH Second Lien DIP Commitment Parties believe both of these highly regarded Texas organizations will provide the Debtors with the highest level of certainty in obtaining all required upcoming approvals from the PUCT.

**(iii)    *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.***

19.    Finally, CSC Trust relies on *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.* for the proposition that the Second Lien DIP Lenders' preliminary discussions regarding a key employee incentive plan constitute improper dealing with insiders and preclude a good faith finding. First Lien Obj. ¶ 44. In *In re Indus. Valley Refrigeration*, an involuntary chapter 7 petition was filed against the debtor in an attempt by certain creditors to block a scheduled sale of the debtor's business.   77 B.R. at 17.   A month after the commencement of the involuntary petition, the debtor converted the case to chapter 11.   *Id.* Shortly thereafter, the debtor sought approval pursuant to Bankruptcy Code section 363 for the sale of its business.   *Id.*   At the sale hearing, it was revealed that the proposed purchaser was simply a successor to the entity that sought to purchase the debtor's assets prepetition.   *Id.* at 17-18. Additional disclosures were made during the sale hearing reflecting, among other things, that (i) the proposed purchaser offered a lucrative employment agreement to the father of the debtor's vice president and (ii) the purchaser agreed to lease a warehouse from the vice president's mother for substantially more than she was receiving at the time.   *Id.* at 22.   There was no evidence in the record before the court justifying either the employment agreement or the rent increase (which together amounted to approximately $400,000 in value, as compared to the proposed purchase price of approximately $480,000), and theorized that these offers were

10

designed to subsidize the insiders personally while reducing the purchase price of the underlying sale to the detriment of creditors. *Id.*

20.    CSC Trust seeks to draw an analogy between the improper conduct in *In re Indus. Valley Refrigeration* and the fact that the EFIH Second Lien DIP Commitment Parties engaged in preliminary discussions regarding an estate-funded key employee incentive plan. First Lien Obj. ¶ 44. As with the other cases cited in the First Lien Objection, however, the situations are not comparable. Contrary to the facts in *In re Indus. Valley Refrigeration*, the EFIH Second Lien DIP Commitment Parties, the EFH and EFIH Debtors and the applicable management teams have not reached any agreement on a key employee incentive plan, post-reorganization employment or any other arrangements with the Debtors' senior management team. Moreover, implementation of any incentive plan would require this Court's approval—a key safeguard against the "sweetheart" deals offered in *In re Indus. Valley Refrigeration*.

21.    For the reasons stated above and in the Debtors' Reply, CSC Trust's objection to approval of the EFIH Second Lien DIP should be overruled, and a finding of good faith entered in favor of the EFIH Second Lien DIP Commitment Parties.

**B.    The Second Lien Settlement Does Not Unfairly Discriminate Among Similarly Situated Creditors**

22.    By its objection, the Second Lien Group challenges the propriety of the Second Lien Settlement by invoking a provision applicable by its express terms to the contents of a plan—Bankruptcy Code section 1123(a)(4). Bankruptcy Code section 1123(a)(4) states that "a plan shall provide the same treatment for each claim or interest of a particular class. . . ." Based on its plain language, Bankruptcy Code section 1123(a)(4) is not relevant to the issue of whether a proposed settlement satisfies the standard indisputably applicable to the evaluation of settlements under Bankruptcy Rule 9019: whether the settlement is above the lowest rung of

reasonableness. Nevertheless, the Second Lien Group argues that the case law construing section 1123(a)(4) *is* relevant insofar as it demonstrates that the Second Lien Settlement would, if implemented, effectuate the unequal distribution of assets in violation of a "central policy of the Bankruptcy Code." Second Lien Group Settlement Objection ¶ 13.[12] The Second Lien Group is wrong on the facts and misapplies the law.

23. First and foremost, the evidence in the record irrefutably demonstrates that each holder of an asserted second lien makewhole claim is receiving the same offer on account of such claim as each other holder, including the Second Lien RSA Parties. *See* Deposition of Michael G. MacDougall, Feb. 24, 2014 (the "MacDougal Depo") at 299:21-300:7. Although the Second Lien RSA Parties are receiving consideration that is not being offered to other constituents in these cases, such additional consideration is wholly separate from the consideration offered to the Second Lien RSA Parties on account of their asserted makewhole claims. *See generally* MacDougal Depo at 300:8-306:4. Specifically, the Restructuring Support Agreement contemplates the following additional forms of consideration (collectively, the "Other Consideration"):

- First Lien Commitment Fee. A 1.75% commitment fee paid to Fidelity in respect of the EFIH First Lien DIP Facility (the "First Lien Commitment Fee"). *See* MacDougal Depo at 303:22-306:15

---

[12] As authority for this "central policy of the Bankruptcy Code," the Second Lien Group quotes an excerpt from this Court's decision in *Sass v. Barclays Bank PLC (In re Am. Home Mort., Holdings, Inc.)*, 501 B.R. 44, 59 (Bankr. D. Del. 2013)) ("'equality of distribution' to similarly-situated [sic] creditors is '[o]ne of the primary goals—if not the primary goal—of the Code.'") (internal citations omitted). The Second Lien Group omits, however, the final clause from the quote (which contains a significant and highly relevant caveat); in context, the full quote is as follows: "One of the primary goals—if not the primary goal—of the Code is to ensure that similarly-situated creditors are treated fairly and enjoy an equality of distribution from a debtor *absent a compelling reason to depart from this principle*." *See Am. Home Mortg.*, 501 B.R. at 59 (emphasis added and internal citations omitted).

- <u>Second Lien Participation Right</u>.  Fidelity's option to participate in up to 9% of the EFIH Second Lien DIP, subject to sharing the ability to convert the DIP into equity in the reorganized Debtors pro rata with other holders of EFH Corp. unsecured claims (the "9% Participation Right").  *See* MacDougal Depo at 300:13-301:21

- <u>Second Lien Participation Fee</u>.  A fixed payment of $11.25 million to Fidelity for participating in the EFIH Second Lien DIP (the "Second Lien DIP Participation Fee").  *See* MacDougal Depo at 301:22-303:21

- <u>Additional Settlement Consideration</u>:  A $1.57 million "synthetic premium" payable to certain non-Fidelity RSA Parties (the "Additional Fee").  *See* MacDougal Depo at 243:3-244:17

24.    In addition, the cases relied upon by the Second Lien Group are clearly distinguishable from the facts that underlie the Second Lien Settlement and do not bear upon the reasonableness of a fully negotiated, fully voluntary settlement open to all holders.  Below is a brief discussion of *In re AOV Indus., Inc.*,[13] *In re Combustion Eng'g, Inc.*,[14] and *In re Flight Transp. Corp.*,[15] as well as a summary analysis as to how each case differs from the case at bar.

     (i)    ***In re AOV Industries, Inc.***

25.    In *In re AOV Indus., Inc.*, the debtor proposed a plan that classified all holders of general unsecured claims in a single class and conditioned the recoveries afforded to such creditors on the grant of two third-party releases.  792 F.2d at 1150.  One of the debtor's unsecured creditors objected to confirmation of the plan on the grounds that it was being asked to

---

[13]    *In re AOV Indus., Inc.*, 792 F.2d 1140, 1142 (D.C. Cir. 1986).

[14]    *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2005).

[15]    *In re Flight Transportation Corp. Securities Litigation*, 730 F.2d 1128, 1139 (8th Cir. 1984).

abandon claims more valuable than those held by similarly situated creditors in exchange for the same consideration. *Id.* at 1151. More specifically, the debtor's disclosure statement detailed certain derivative claims held by all unsecured creditors against both third parties, which claims would be released upon confirmation of the plan. *Id.* at 1152. The objecting creditor, however, asserted that it had the right to sue one of the two third parties for the full amount of its claim because of an alleged guarantee issued by the third party in favor of the objecting creditor. *Id.* at 1142. Because the plan did not account for the fact that the objecting creditor had an independent right as against the third party, the objecting creditor argued that it was being forced to exchange a meaningfully higher amount of consideration for the same distribution afforded other unsecured creditors who did not benefit from the guarantee. *Id.* at 1151. The potential disparity arising from the existence of the guarantee claim was significant; as proposed, the plan contemplated a recovery for unsecured creditors of ***approximately 17% as compared to what may have been a full recovery*** had the objecting creditor successfully pursued its guarantee claim against the non-bankrupt third party. *Id.* at 1150. The Court of Appeals for the District of Columbia (the "D.C. Circuit") ultimately held that the plan unfairly discriminated between the unsecured creditors as it would require the holder of the direct guarantee claim to forego substantially *greater* consideration than the other class members holding derivative claims, in exchange for the *same* distribution. *Id.* at 1154. The D.C. Circuit "simply [found] that . . . it is unfair to require a creditor to pay a higher price for the same benefit" and that unfair discrimination lies where "equal levels of distribution [are] exchange[d] for different levels of consideration." *Id.* at 1154. In addition, the D.C. Circuit expressly limited its decision in *AOV* to the facts of the case. Id. at 1154 ("We simply find that on these facts, it is unfair to require a creditor to pay a higher price for the same benefit.").

14

26.     While the Second Lien Group alleges that *AOV* is "closely on point," the facts of the case are demonstrably distinguishable.  First, the D.C. Circuit conducted an analysis of class recovery under Bankruptcy Code section 1123(a)(4) at the appropriate juncture—plan confirmation—and never opined that section 1123(a)(4) was appropriately applied in any other context (such as to the determination of whether a pre-plan voluntary settlement should be approved).  Second, all prepetition creditors of EFIH who agree to be bound by the Second Lien Settlement are exchanging *exactly* the same consideration and receiving *exactly* the same distribution:  the right to litigate entitlement to the full asserted amount of the Second Lien Makewhole Claim in exchange for 50% of the asserted amount.  As set forth above, any additional value to be distributed to the Second Lien RSA Parties is on account of additional consideration given—***not*** on account of such parties' Second Lien Makewhole Claims.  As no Prepetition EFIH Second Lien Creditor is giving *greater* consideration for the *same* recovery, *AOV* is not instructive and should be disregarded.

**(ii)     *In re Combustion Engineering, Inc.***

27.     In *In re Combustion Eng'g, Inc.*, the debtors entered into a prepetition settlement with certain asbestos litigation claimants pursuant to which the debtors agreed to transfer nearly half of their assets to a trust from which participating asbestos claimants would receive between 37.5% and 95% of the value of their claims.  391 F.3d at 205.  The transfer occurred 87 days before the debtors filed for bankruptcy with a prepackaged plan that addressed the entire universe of potential asbestos claims (including those claims held by litigants who declined to participate in the prepetition settlement).  The plan also provided that the residual (or "stub") claims held by settling claimants would be entitled to an additional recovery from a newly created postpetition trust, which would also fund recoveries to non-settling claimants.  Non-

settling claimants, whose recovery would have been limited to the postpetition trust, objected to confirmation, arguing that the two-trust structure constituted unequal treatment. *Id.* at 239.

28.     After concluding that the transfer to the prepetition trust could be an avoidable preference if the lower court could were to make the requisite factual findings, the Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>") acknowledged that "viewing the . . . bankruptcy as a whole, the record reveals that it *may* lack the requisite equality of distribution among creditors." *Id.* at 241-42 (emphasis added). The evidence before the court indicated that, while certain settling claimants would receive ***in excess of <u>95%</u>*** of their asserted claims (and settling claimants would receive about 59% on average), non-settling claimants would recover only about *<u>18%</u>* of their claim under the plan. *Id.* at 242. Confronted with the fact that the disparity between the settling and non-settling creditors could be as much as 77 cents on the dollar (though without the benefit of a lower court finding on the disparity), the court held only that such treatment *might* run afoul of the concept of equality of distribution among creditors, and remanded to the lower court for further factual findings.

29.     Again, *In re Combustion Eng'g* addressed egregious discrepancies in the plan treatment afforded similarly situation creditors.  Moreover, the Third Circuit's decision was clearly informed by the debtor's determination to preferentially transfer nearly half of its assets for the benefit of a subset of creditors at the expense of other similarly situation creditors. Those facts simply do not exist here.  The Second Lien Settlement before the Court is a pre-plan voluntary settlement made equally available to all similarly situation creditors (i.e., all holders of EFIH Second Lien Notes) that does not in any way implicate an avoidable transfer.  Indeed, if the message to be gleaned from *In re Combustion Eng'g* is simply that all similarly-situated creditors must be treated equally at every stage of a debtor's bankruptcy case (a reading that

would extend the case far beyond its holding), the Second Lien Settlement should be approved as proposed.

        **(iii)**    ***In re Flight Transportation Corp. Securities Litigation***

    30.      Finally, in *In re Flight Transp. Corp. Sec. Litig.*, the Court of Appeals for the Eighth Circuit (the "Eighth Circuit") considered whether a debtor's directors and officers who were defendants in various pending actions involving the debtor could be foreclosed from sharing in a pool of assets (some of which constituted assets of the debtor's estate) reserved for non-defendant creditors. 730 F.2d 1128, 1139 (8th Cir. 1984). Prior to the commencement of the debtor's bankruptcy case, the Securities Exchange Commission and multiple class action plaintiffs commenced securities fraud litigation against the debtor, its directors and officers and other related third parties with respect to two prepetition securities offerings. *Id.* at 1130-31. Certain defendants in these suits cross-claimed for indemnity. *Id.* at 1131. Following the bankruptcy filing, certain of the debtors' securities holders and creditors entered into a "sharing agreement" with respect to allocating proceeds of the securities litigations. *Id.* The sharing agreement established two funds to disburse pooled recoveries to creditors, denying recovery from one of the funds (which contained, in part, proceeds from the debtor's securities fraud claims) to defendants or potential defendants in the various securities-related litigations. *Id.* at 1132-35. Certain of the debtor's directors and officers, who were also defendants in the various securities-related litigations and had asserted unsecured claims for indemnification against the debtor, argued that the sharing agreement discriminated unfairly among unsecured creditors by excluding the directors and officers from participation in the second fund. *Id.* at 1138. The excluded unsecured creditors were not signatories to the sharing agreement and thus had no way of "opting out" to retain their right to pursue claims against the carved-out assets.

31.     In reviewing the propriety of the sharing agreement, the Eighth Circuit held that while a bankruptcy court has "the right to approve settlements, and may do so, in a proper case, over the objection of some parties, so long as a settlement is found to be in the best interests of the estate as a whole," it lacked the requisite facts to determine whether it was appropriate to exclude the directors and officers from participation in the second fund.  *Id.* at 1138-39. Specifically, the court noted that it knew "nothing of the merits of any of the claims" made against the defendant directors and officers which might warrant their exclusion from the second fund.  *Id.* at 1138.

32.     As with *In re AOV Indus., Inc.* and *In re Combustion Eng'g* the Second Lien Group once again attempts to ground its meritless argument in a wholly inapposite case.  As set forth above, the *Flight Transp.* Court was primarily concerned with whether individual unsecured claimants charged with fraud could be prohibited from participating in a trust to which other unsecured claimants had access.  This fact pattern is simply not analogous to the proposed settlement at issue here, in which parties are given the voluntary option to either accept the settlement or litigate for the full allowance of their claim.  Moreover, and contrary to the Second Lien Group's assertions, there is no "pool of assets" that holders of EFIH Second Lien Notes are precluded from accessing in connection with the proposed Second Lien Settlement.  Indeed, far from foreclosing access to assets, the Second Lien Settlement instead *facilitates* access to an immediate distribution if and only if the applicable holder of EFIH Second Lien Notes so elects.

33.     Even if the Court were to apply section 1123(a)(4) when considering approval the of the Other Consideration, such consideration would not run afoul of the Bankruptcy Code because it was earned on account of participation in the EFIH First and Second Lien DIPs.  Third Circuit case law clearly provides that section 1123(a)(4) is not violated where a class member

receives additional consideration on account of having made a contribution not made by other class members. *See In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.C. 1992) (approving plan releases that were provided only to those class members that made additional capital contributions as on account of such additional contributions and not on account of claims).[16] Like the class members in *Heron* (and the DIP lenders in *Aleris* and *Harry & David*), the Second Lien RSA Parties are receiving fees on account of additional contributions made to the estate—their share of a $1.9 billion debtor-in-possession financing and a value-preserving and tax-minimizing path toward emergence from chapter 11.[17]

34.     For the reasons stated above and in the Debtors' Reply, the Second Lien Group's objection to approval of the Second Lien Settlement should be overruled.

## C.     Joinder to the Debtors' Reply

35.     The Ad Hoc Committee of EFIH Unsecured Noteholders and the EFIH Second Lien DIP Commitment Parties agree with the factual and legal arguments set forth in the Debtors' Reply and, accordingly, join the arguments set forth therein.

---

[16]    *See also In re Aleris Int'l Inc.*, 2010 WL 3492664, at *14 (Bankr. D. Del. May 13, 2010) (finding that Bankruptcy Code section 1123(a)(4) was not violated where a class member that was a backstop party received additional consideration on account of financing commitment); *In re Harry & David Holdings, Inc.*, No. 11-10884 (MFW) (Bankr. D. Del. Aug. 29, 2011) [ECF No. 767] (confirming plan providing for distribution of new common stock to backstop parties in consideration for commitment under backstop agreement).

[17]    In any event, the Debtors would have had to pay the amount of the Other Consideration to another financial institution to fund the EFIH First Lien DIP and the EFIH Second Lien DIP had the Debtors not agreed to pay the Other Consideration to the Second Lien RSA Parties to fund such portion of the EFIH First and Second Lien DIPs.

## CONCLUSION

For the reasons stated in the Reply and the Debtors' Reply, the Ad Hoc Committee of EFIH Unsecured Noteholders and the EFIH Second Lien DIP Commitment Parties respectfully request that the Court overrule the Objections, approve the Motions, and grant such other relief as it deems necessary and proper under the circumstances.

Dated: June 27, 2014
Wilmington, Delaware

**COUSINS CHIPMAN & BROWN, LLP**

_____/s/ Scott D. Cousins_____
Scott D. Cousins (No. 3079)
Mark Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:      (302) 295-0191
Facsimile:      (302) 295-0199
Email:          cousins@ccbllp.com
                olivere@ccbllp.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Ira S. Dizengoff (admitted _pro hac vice_)
Meredith A. Lahaie (admitted _pro hac vice_)
Lindsay Zahradka
One Bryant Park
New York, New York 10036
Telephone:      (212) 872-1000
Facsimile:      (212) 872-1002
Email:          idizengoff@akingump.com
                mlahaie@akingump.com
                lzahradka@akingump.com

Scott L. Alberino (admitted _pro hac vice_)
1333 New Hampshire Avenue
Washington, DC 20036-1564
Telephone:      (202) 887-4000
Facsimile:      (202) 887-4288
Email:          salberino@akingump.com

_Co-Counsel for the Ad Hoc Committee of EFIH
Unsecured Noteholders and the EFIH Second Lien
DIP Commitment Parties_

20

## SCHEDULE 1

## <u>OBJECTIONS</u>

1. Preliminary Objection of Second Lien Notes Indenture Trustee and EFIH Second Lien Group of Second Lien Noteholders to Debtors' Motion to Approve Second Lien DIP [D.I. 1060]

2. Objection of EFIH Second Lien Notes Indenture Trustee and EFIH Second Lien Group to Debtors' Motion to Approve Second Lien DIP [D.I. 1066]

3. Objection of the EFIH Second Lien Notes Indenture Trustee and EFIH Second Lien Group to Debtors' Motion to Approve Second Lien Settlement [D.I. 1067] (the "<u>Second Lien Group Settlement Objection</u>")

4. Objection of CSC Trust Company of Delaware, as Indenture Trustee and Collateral Trustee, to Debtors' (A) Motion to Approve Second Lien Post-Petition Financing, Redeem Second Lien Notes, and Determine Secured Claim and (B) Motion to Approve Certain EFIH Settlements [D.I. 1068] (the "<u>First Lien Objection</u>").

5. Ad Hoc Group of EFH Legacy Noteholders' Objection to Approval of Proposed Second Lien Financing and Makewhole Settlement [D.I. 1071]

6. Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and Limited Objection to the Related Motion to Approve the EFIH Second Lien Settlement [D.I. 1078]

7. Joinder of Caxton Associates LP to the Objection of the Ad Hoc Group of EFH Legacy Noteholders to the Approval of Proposed Second Lien Financing and Makewhole Settlement [D.I. 1079]

8. Omnibus Objection of the Official Committee of Unsecured Creditors to (I) the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and (II) the Motion of Energy Future Holdings Corp., et al, for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment [D.I. No. 1090]

9. Joinder of Law Debenture Trust Company of New York, as Indenture Trustee, to (1) Omnibus Objection of the Official Committee of Unsecured Creditors to (I) the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry

of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and (II) the Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment and (2) Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and Limited Objection to the Related Motion to Approve the EFIH Second Lien Settlement [D.I. 1098]

10. Statement of Support and Limited Reservation of Rights of UMB Bank, N.A., as Indenture Trustee, With Respect to: (1) EFIH Debtors' Motion for Entry of an Order Approving Second Lien DIP Financing, and (2) Debtors' Motion for Entry of Orders Approving Certain EFIH Settlement Agreements [D.I. 1104]

11. Joinder of Wilmington Savings Fund Society, FSB to Omnibus Objection of the Official Committee of Unsecured Creditors to (I) the Motion of Energy Future Intermediate Holding Company LLC And EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and (II) the Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment [D.I. 1106]

2