**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No. 14-10979 (CSS) |
| Debtors. | ) ) ) | (Jointly Administered)<br>**Re: Docket No. 1222** |

**DECLARATION OF CARRIE KIRBY,
THE EXECUTIVE VICE PRESIDENT OF
HUMAN RESOURCES IN SUPPORT OF THE MOTION
OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY
OF AN ORDER AUTHORIZING CERTAIN OF THE DEBTORS TO
CONTINUE HONORING OBLIGATIONS TO RETIREES AND NON-INSIDER
EMPLOYEES ON ACCOUNT OF NON-QUALIFIED BENEFIT PROGRAMS**

Pursuant to 28 U.S.C. § 1746, I, Carrie Kirby, declare as follows:

1. I am the Executive Vice President of Human Resources for Energy Future Holdings Corp. ("EFH Corp."). I have been with EFH Corp. since 2006, and have served as Vice President of Human Resources for TXU Energy Retail Company, LLC, and before that as Human Resources Director. I am generally familiar with EFH Corp.'s day-to-day operations, staffing, organizational development, employee activities, employee-related policies and standards, and related information from my review of records, relevant documents, and information supplied to me by EFH Corp.'s human resources and legal team. I am over the age of 18 and duly authorized to execute this declaration (the "Declaration") on behalf of the Debtors in support of, the *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

*Authorizing Certain of the Debtors to Continue Honoring Obligations to Retirees and Non-Insider Employees on Account of Non-Qualified Benefit Programs* (the "Motion"),[2] filed contemporaneously herewith.

2. The facts in this Declaration are based on my personal knowledge and review of information and my experience with the Debtors' operations and transactions relating to human resources. If called to testify, I would testify to the facts set forth herein.

### I. Overview of the Non-Qualified Benefit Programs.

3. The Debtors have, through the Participating Debtors, historically offered two Non-Qualified Benefit Programs to certain eligible employees: (a) the Second Supplemental Retirement Plan[3] and (b) the Salary Deferral Program.

4. Obligations under the Non-Qualified Benefit Programs are, in part, funded by rabbi trusts that EFH Corp owns. The assets in the trusts consist of cash, fixed income securities, and variable life insurance contracts. As of the Petition Date, the Salary Deferral Program rabbi trust has approximately $9.9 million in assets and the Second Supplemental Retirement Plan rabbi trusts have approximately $13.8 million in assets. The assets in the rabbi trusts are available to satisfy creditor claims against the Participating Debtors.

5. The Participating Debtors froze the Non-Qualified Benefit Programs in December 2012 such that no current employee can join the Non-Qualified Benefit Programs and previously participating current employees can no longer contribute to the Non-Qualified Benefit

---

[2] All capitalized terms used herein have the meaning given to them in the Motion.

[3] The Participating Debtors historically maintained a First Supplemental Retirement Plan. All amounts under the First Supplemental Retirement Plan were paid through a secular trust in 2013 and neither the trust nor the First Supplemental Retirement Plan is in existence as of the Petition Date. All plan documentation related to the Second Supplemental Retirement Plan refers to such plan as the "Second" Supplemental Retirement Plan and for the sake of consistency, the same nomenclature is used herein.

Programs. That said, the Participating Debtors have continued to honor their obligations under the Non-Qualified Benefit Programs and, by the Motion, seek to continue honoring certain of these obligations, specifically to retirees and current, non-insider employees, during these chapter 11 cases.

6. The Participating Debtors' obligations under the Non-Qualified Benefit Programs represent compensation that participating current, non-insider and former employees earned in the ordinary course of business, but opted to receive at a later date. These current and former employees are leaders within the Debtors' businesses as well as leaders within the Debtors' industry and communities. As such, I believe they are in a position to contribute to stabilization of the Debtors' workforce and communities at a time when attrition may be high. I also believe they can help preserve the Debtors' long-standing and crucial relationships with key players in the Texas energy market, including ERCOT, various regulators, political leaders, community leaders, and vendors that are necessary for the Debtors' business operations.

7. Importantly, many of the retirees receiving payments under the Non-Qualified Benefit Programs have been receiving such payments for over twenty years and rely on such payments to meet basic living costs. These retirees are by and large in the 70-90 year age range and, in many instances, do not have access to other funds. I believe the inability to access payments under the Non-Qualified Benefit Programs will have an immediate and substantially harmful effect on their day-to-day lives and, ultimately, their health and welfare.

### A.    Second Supplemental Retirement Plan.

8. As of the Petition Date, the Participating Debtors are obligated to provide benefits to a total of 274 current and former employees (with a total obligation of approximately $21.2 million) under the Second Supplemental Retirement Plan. Importantly, however, the Participating Debtors do not seek to make payments to any insider (as I understand the term is

defined in the Bankruptcy Code).

9. As described below, these current, non-insider and former employees are eligible to receive either a cash benefit or a traditional defined benefit.[4] The SERP Beneficiaries who are either currently receiving benefits under the Second Supplemental Retirement Plan or who are entitled to receive such benefits in the future upon achieving certain eligibility metrics are described as follows:

- *SERP Retirees*. There are 162 SERP Retirees who currently receive traditional benefits under the Second Supplement Retirement Plan. The Participating Debtors' total outstanding obligation on account of the SERP Retirees is approximately $15.3 million.

- *SERP Term Vested Retirees*. There are 85 SERP Term Vested Retirees and 52 SERP Term Vested Retirees will receive a cash benefit that EFH Corp. will pay as a lump sum. The remaining SERP Term Vested Retirees will receive a traditional benefit which EFH Corp. will pay on a monthly basis. The Participating Debtors' total outstanding obligation on account of the SERP Term Vested Employees is approximately $4.1 million.

- *SERP Active Employees*. There are 15 SERP Active Employees. Approximately 7 of these employees may be considered insiders under the Bankruptcy Code. The Participating Debtors do not seek any relief with respect to these employees. The remaining eligible employees are entitled to receive either a cash balance benefit (that EFH Corp. will pay as a lump sum) or a traditional defined benefit. The Participating Debtors' total outstanding obligation on account of the SERP Active Employees is approximately $207,000.[5]

---

[4] A cash benefit is a defined aggregate amount that is paid out either as a lump sum or in the form of monthly payments, at the participant's election at the time of deferral. A traditional benefit does not have a defined aggregate amount but, rather, has a defined monthly payment that is paid until the participant's death.

[5] There are approximately 12 currently employees of Oncor Electric Delivery Holding Company LLC (a non-Debtor affiliate of the Debtors, "Oncor") who spent a portion of their career working for the Debtors before moving to Oncor. These employees accrue benefits under the Second Supplemental Retirement Plan in connection with their service to the Debtors. Six of these employees will be entitled to a cash benefit and six will be entitled to a traditional defined benefit. EFH Corp.'s total payment obligations on account of these 12 Oncor employees, determined based on how many years each such employee spent at the Debtors as opposed to at Oncor, cannot be determined with certainty while such employees are still working at Oncor. For illustrative purposes, assuming all such employees retired on December 31, 2013, EFH Corp.'s total outstanding obligation on account of these 12 Oncor employees would be approximately $25,000.

10. EFH Corp. uses the services of Fidelity to pay those participants who are entitled to payments under the Second Supplemental Retirement Plan. Each month, EFH Corp. funds its obligations under the Second Supplemental Retirement Plan to Fidelity and Fidelity, in turn, pays each participant. On average, EFH Corp. pays Fidelity approximately $5,600 on a monthly basis for its services. EFH Corp. also pays The Bank of New York Mellon approximately $1,750 on a quarterly basis for its services as trustee of the Second Supplemental Retirement Plan rabbi trusts. As of the Petition Date, approximately $32,000 is due and payable on account of these administration costs.

11. Importantly, the SERP Retirees include approximately 20 EBASCO SERP Retirees retirees affiliated with an entity the Debtors acquired in 1997. As part of the acquisition, the Participating Debtors absorbed the retirement obligations owed to the EBASCO Retirees. The Participating Debtors' total outstanding obligation on account of SERP Retirees, approximately $17 million, includes approximately $1 million attributable to the EBASCO SERP Retirees. Each EBASCO SERP Retiree is entitled to receive, on average, approximately $570 per month through the SERP.

**B.   The Salary Deferral Program.**

12. The Salary Deferral Program historically permitted participating employees to contribute up to 50% of their base salary and up to 85% of their annual incentive plan bonus. As of the Petition Date, the Participating Debtors are obligated to provide benefits to a total of 72 current and former employees (with a total obligation of approximately $6 million) under the Salary Deferral Program.

13. Benefits under the Salary Deferral Program vest over various periods of time for each participant and, once vested, the trustee for the Salary Deferral Program (The Bank of New York Mellon) distributes the benefits as either a lump sum or as annual installments, depending

on the participant's election at the date of deferral. There are 53 SDP Retirees that participate in the Salary Deferral Program. EFH Corp. pays all of the benefits owed to the SDP Retirees either as a lump sum or in monthly installments, depending on the participant's election at the date of deferral. The Participating Debtors' total outstanding obligation on account of the SDP Retirees is approximately $5.6 million.[6] On average, EFH Corp. pays The Bank of New York Mellon approximately $4,500 each quarter to administer the Salary Deferral Program, of which approximately $9,000 is due and payable as of the Petition Date.

**II.  Honoring Obligations Under the Non-Qualified Benefit Programs is Critical to the Health and Welfare of the Debtors' Retirees and the Stability of the Debtors' Operations.**

14.  Payments under the Second Supplemental Retirement Plan are absolutely critical to the EBASCO SERP Retirees, who, like others across the SERP Retiree population, have been receiving payments for over 20 years and rely on these payments for basic needs. Relatedly, a number of the SERP Retirees receive more from the Second Supplemental Retirement Plan than they do from a traditional retirement plan because they either opted for early retirement or participated in a buyback of their benefits in the 1980s. In both cases, these SERP Retirees received a lump sum amount which was placed in the Second Supplemental Retirement Plan and with respect to which they are now entitled to payments.

15.  In addition, the SERP Retirees and SDP Retirees continue to be influential within

---

[6] There are 19 active employee participants in the Salary Deferral Program, approximately 4 of whom may be considered insiders under the Bankruptcy Code. The Participating Debtors do not seek any relief with respect to these employees. The remaining 15 employees who participate in the Salary Deferral Program are entitled to receive EFH Corp. stock. Under the terms of the relevant plan documents, this stock must remain in a restricted account until the occurrence of an "event" as defined in such plan documents. Upon the occurrence of an "event," the participating SDP active employees are eligible to receive the cash value of the EFH Corp. stock to which they are entitled, valued as of the date of the "event." The filing of these chapter 11 cases constituted an "event" and, consequently, the eligible SDP active employees are entitled to the cash value of their EFH Corp. stock as of the Petition Date, which is zero.

the Debtors' communities and within the Debtors' industry. I believe the SERP Retirees' continued (and vocal) support of the Debtors' operations and business planning efforts plays an important role in the Debtors' outreach efforts and helps keep the Debtors competitive. Similarly, the SDP Retirees support the Debtors' businesses by using their influence within the Debtors' communities to garner support for the Debtors' operations and, critically, by using their industry experience to continue advising the Debtors' leadership team. Importantly, the majority of compensation deferred in the Salary Deferral Plan was deferred when the Participating Debtors operated as a regulated entity. Under these circumstances, the SDP Retirees reasonably believed their deferred compensation would be protected and available to them upon their retirement.

16. Finally, I believe the SERP Active Employees consist of vital business leaders, whose direction and ongoing commitment to the Debtors is indispensable during these chapter 11 cases. This is a balance sheet restructuring, not an operational restructuring and operationally, the Debtors have historically been, and continue to be, leaders in their various hyper-competitive industries and this accomplishment is in no small part due to their exceptional leadership team.

### III. Sufficient Cause Exists to Authorize the Debtors to Honor Non-Qualified Benefit Programs

17. I believe the relief requested in the Motion will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption and I believe the employees and former employees that are eligible to participate in the Non-Qualified Benefit Programs are critical to the Debtors' rehabilitation efforts in two distinct ways. First, these current and former employees are, and continue to be, leaders within the Debtors' *internal* businesses, and therefore, are crucial to the Debtors' efforts to maintain the continued stability of

the workforce at a time when employee morale is low and attrition is potentially high. Second, these employees are leaders within the Debtors' *external* businesses, and therefore are key to the Debtors preserving their role in the Texas energy market. Together, both current and former employees in these plans are active participants in the extended family of the Debtors created over decades of multiple generations of people across the state working for and doing business with the Debtor organizations. I believe the influence of this extended family on the stability of current and future operations of the company and the Texas energy market is significant.

18. From both these perspectives, I believe the employees eligible to participate in the Non-Qualified Benefit Programs possess indispensable institutional knowledge and experience, as well as critical relationships with key players in the Debtors' industry. Following the Petition Date, employee retention may become an immediate and significant issue for the Debtors. Payment of obligations arising in connection with the Non-Qualified Benefit Programs, and the continuation of these Non-Qualified Benefit Programs on a postpetition basis, will provide critical Employees with a greater sense of financial security. I believe a greater sense of financial security may benefit the Debtors in two ways. First, these employees may be deterred from gifting their irreplaceable institutional knowledge and experience to other companies in the Debtors' industry. Second, these employees are in a position to continue to promote stability in the business.

19. Importantly, the amounts payable under the Non-Qualified Benefit Programs reflect compensation earned by eligible employees. These amounts are *not* performance or incentive bonuses tied to targets that were not, but are rather amounts that employees earned in the ordinary course of business. Accordingly, failure to make payments under the Non-Qualified Benefit Programs would result in a significant and unwarranted salary reduction and retirement

funding for the impacted employees.

20. This point is especially worth emphasizing with respect to the EBASCO SERP Retirees. The EBASCO SERP Retirees earned their retirement funding in the ordinary course of business. At this point, the EBASCO SERP Retirees are well beyond any applicable working-age limits. On average, they receive less than $600 a month from the SERP and for some, the SERP payments serve as their primary, **if not sole**, source of funds. Inability to access SERP payments they have earned and are otherwise entitled to will significantly endanger the lives of the EBASCO SERP Retirees.

21. In consideration of all these factors, I believe that the Court should approve certain of the Debtors to continue to honor obligations on account of Non-Qualified Benefit Programs.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Wilmington, Delaware
Dated: June 27, 2014

/s/ Carrie Kirby
Carrie Kirby
Executive Vice President, Human Resources
Energy Future Holdings Corp.