## EXHIBIT B

**Frenzel Declaration**

KE 31772781

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | )    Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | )    (Jointly Administered) |
| | ) |

**DECLARATION OF ROBERT FRENZEL, SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF LUMINANT GENERATION COMPANY LLC IN SUPPORT OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, AUTHORIZING CERTAIN DEBTORS TO ENTER INTO AMENDMENTS TO THE COMANCHE PEAK JOINT VENTURE AGREEMENTS**

Pursuant to 28 U.S.C. § 1746, I, Robert Frenzel, declare as follows:

       1.      I am Senior Vice President and Chief Financial Officer of Luminant Generation Company LLC, a limited liability company organized under the laws of the state of Texas ("Luminant Generation"). Luminant Generation is an indirect subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Luminant Generation, EFH Corp., and various other direct and indirect subsidiaries of EFH Corp. are collectively referred to as the "Debtors" in this declaration.

       2.      I have worked for EFH Corp. since 2009 and Luminant Generation since 2012. I am generally familiar with Luminant Generation's day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records. All facts set forth in this declaration are based upon my personal knowledge of Luminant Generation's business,

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by members of the Luminant Generation's management team and advisors. I am over the age of 18 and duly authorized to execute this declaration on behalf of the Debtors in support of the *Motion of Energy Future Holdings Corp.,* et al., *for Entry of an Order Authorizing Certain Debtors to Assume and Modify the Comanche Peak Joint Venture Agreement* (the "Motion"),[2] filed contemporaneously herewith.

3.      This declaration addresses the facts surrounding entry into the Amendments modifying the Joint Venture Agreements.

4.      Luminant Generation owns and operates the Comanche Peak nuclear power facility ("Comanche Peak"), located in Somervell County, Texas. Currently, Comanche Peak has two licensed, operating nuclear generation units. Unit 1 was completed in 1990 and received its operating license from the Nuclear Regulatory Commission (the "NRC") in the same year. Unit 2 was completed in 1993 and received its operating license in the same year.

5.      In July 2007, Luminant Generation and Mitsubishi Nuclear Energy Systems, Inc. ("MNES") entered into a services agreement, whereby MNES would provide services to Luminant Generation in the preparation of a combined operating license application (the "License Application") to be filed with the NRC for the construction and operation of two new nuclear generation units (the "New Units"). In the License Application, Luminant Generation indicated that, based on the pressurized water reactor platform used at Comanche Peak Units 1 and 2, Luminant Generation wanted to generate power at the New Units using an advanced type of nuclear reactor, called the US-Advanced Pressurized Water Reactor (the "US-APWR"),

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

developed by MNES's affiliate, Mitsubishi Heavy Industries Ltd. (together with MNES and certain other affiliates, "MHI").[3]  As a result, Luminant Generation entered into negotiations with MHI to develop and use the US-APWR at the New Units.

6.      In September 2008, Luminant Generation formed a number of wholly-owned Delaware limited liability companies, including the non-Debtor entity Nuclear Energy Future Holdings II LLC ("NEFH II").  Together with Luminant Generation and Luminant Generation's parent entity, EFH Corp., these entities formed a joint venture for the purposes of holding the assets of, and conducting the development, construction, and operating activities of the New Units.  These terms were memorialized in a limited liability company agreement.

7.      In January 2009, the limited liability company agreement was amended and restated to admit MHI for purposes of further developing the New Units using the US-APWR. With the addition of MHI, the joint venture was renamed Comanche Peak Nuclear Power Company LLC (the "Comanche Peak Joint Venture").

8.      Contemporaneous with MHI's induction into the Comanche Peak Joint Venture, the Comanche Peak Joint Venture executed other documents relating to the development and construction of the New Units (collectively the "Joint Venture Agreements").

9.      The parties to the Joint Venture Agreements collectively consist of Comanche Peak Nuclear Power Company LLC, EFH Corp., TCEH LLC, Luminant Generation, NEFH II and its immediate, non-Debtor parent, Nuclear Energy Future Holdings LLC ("NEFH I"), and

---

[3]     The US-APWR is not yet licensed or available for use in the United States.

3

MHI (collectively, the "Joint Venture Parties"). The following are the key terms of the Joint

Venture Agreements:[4]

- ***Creation and Purpose of Comanche Peak Joint Venture.*** As described above, the Comanche Peak Joint Venture would be created for the purpose of developing, constructing, owning, and operating the New Units on land adjacent to the Comanche Peak site;[5]

- ***MHI's Obligations.*** MHI would (a) develop and implement the US-APWR and (b) file the design certification document application with the NRC to gain approval for the use of the US-APWR (the "Design Application");

- ***TCEH LLC's Obligations.*** TCEH LLC, Luminant Generation's indirect Debtor-parent company, would guarantee NEFH II's obligations to make capital contributions under the Comanche Peak Nuclear Power Company LLC amended and restated limited liability company agreement;

- ***Comanche Peak Joint Venture Ownership Interests.*** Ownership of the Comanche Peak Joint Venture and certain related intellectual property developed in conjunction with the Design Application and the License Application, as determined in the Joint Venture Agreements, would be shared between Luminant Generation and EFH Corp, through NEFH II, on the one hand, and MHI on the other hand;

- ***Contribution of "CWIP" Rights.*** Luminant Generation would contribute existing construction work in progress ("CWIP") to the Comanche Peak Joint Venture for use in the development of the New Units;

- ***Assignment of Rights to Comanche Peak Joint Venture.*** Luminant Generation would use commercially reasonable efforts to assign and/or lease its water rights to the Comanche Peak Joint Venture for use in the development of the New Units.

10.    It is my understanding that at the time the Joint Venture Parties entered into the

Joint Venture Agreements, they expected to obtain NRC approval of the the License Application

and the Design Application in time for the New Units to be operational by 2016.

---

[4]    This summary of key terms of the Joint Venture Agreements is for illustrative purposes only. To the extent there are inconsistencies between the summary of key terms provided herein and the provisions in the Joint Venture Agreements, the provisions in the Joint Venture Agreements control.

[5]    The Comanche Peak Joint Venture is under the direct control of NEFH II and is not a Debtor in these chapter 11 cases.

11.     Unfortunately, developments outside the Joint Venture Parties' control have delayed licensing and development of the New Units.  These developments primarily include: (a) the regulatory and political response to nuclear power following the Fukushima nuclear plant incident in March 2011; and (b) the substantial reduction in the forecast of Texas electricity prices attributable to technological advances in economical extraction of natural gas.

12.     Specifically, MHI determined that supporting Japanese utilities in restarting MHI-affiliated pressurized water reactors should be its highest priority after the Japanese regulatory agencies offered a path toward restoration of Japan's nuclear generating assets.[6] Consequently, Luminant Generation, NEFH II, and MHI put all development activities related to the New Units on indefinite hold as of the fourth quarter of 2013, and at MHI's request, the NRC reduced its Design Application review activities.

13.     Contemporaneously with MHI's request to the NRC, Luminant Generation and NEFH II also requested that the NRC suspend all reviews of the License Application.  Neither the License Application nor the Design Application has been withdrawn from NRC review, and, if conditions change in the future, Luminant Generation, NEFH II, and MHI will revisit application modification requests with the NRC.  Based on the current circumstances, however, the Joint Venture Parties believe that continued development of the New Units is not economically feasible at this time and have decided to revise the Joint Venture Agreements to reflect the suspension of development activities related to the New Units.

---

[6]     Following the Fukushima nuclear plant incident, all of Japan's nuclear generating facilities were shut down, including 24 nuclear power plants designed and built by MHI.

14.      In light of the developments described above, the Joint Venture Parties have decided to enter into the Amendments to modify the Joint Venture Agreements. The Amendments consist of the following key terms:[7]

- suspension or termination of certain obligations that the Joint Venture Parties owe to each other under various portions of the Joint Venture Agreements;

- termination of Luminant Generation's obligation under the Joint Venture Agreements to assign water rights to the Comanche Peak Joint Venture and the reversion of any assignment of such rights from the Comanche Peak Joint Venture to NEFH II;

- conveyance from the Comanche Peak Joint Venture to NEFH II of certain easements and fee tracts acquired by the Comanche Peak Joint Venture during the US-APWR development period;

- assignment of Comanche Peak Nuclear Power Company LLC's rights as the tenant under the ground lease where the New Units were to be developed to NEFH II;

- transfer and/or license of certain site-specific intellectual property rights as determined in the Amendments, to NEFH II and the assignment of intellectual property rights related to the US-APWR technology to MHI;

- termination of TCEH LLC's guaranty of certain of NEFH II's rights and obligations under the Joint Venture Agreements; and

- the independent right of each of Luminant Generation and MHI to dissolve the Comanche Peak Joint Venture, at its option, after a specified period of time has passed following execution of the Amendments.

15.      Importantly, I understand that the Amendments also provide for material releases of any and all claims by and between the Joint Venture Parties under certain of the Joint Venture Agreements. Currently, I understand that Luminant Generation and NEFH II do not believe that it holds any potential claims against MHI.

---

[7]    This summary of key terms of the Amendments is for illustrative purposes only. To the extent there are inconsistencies between the summary of key terms provided herein and the provisions in the Amendments attached hereto as **Exhibit 1** to **Exhibit B**, the provisions in the Amendments control.

KE 31793292

16.    Because the Amendments are described in various documents, the Joint Venture Parties seek to execute an integration letter that confirms the Joint Venture Parties' intentions to treat the Amendments, collectively, as a single, unified, non-severable document (the "Integration Letter"). The Integration Letter memorializes the Joint Venture Parties' intent to treat the effectiveness of each individual Amendment as being dependent on the execution of the other Amendments.

17.    Luminant Generation, TCEH LLC, and EFH Corp. now seek authority to enter into the Amendments to modify the Joint Venture Agreements. I understand that these Debtors' entry into the Amendments will provide a host of benefits to the Debtors. Importantly, the Amendments transfer the rights to certain land, water, and intellectual property previously held by the Comanche Peak Joint Venture to the control of Luminant Generation and/or its subsidiary NEFH II. I believe that these rights are more valuable than any claims released upon execution of the Amendments against MHI (which claims I understand Luminant Generation values at zero). In addition, TCEH LLC will no longer be required to guaranty the obligations owed by NEFH II under the Joint Venture Agreements. Further, Luminant Generation may, after a specified period of time has passed following execution of the Amendments, decide to fully dissolve the Comanche Peak Joint Venture, giving Luminant Generation the right to reevaluate whether such an arrangement is in its best interests.[8] Finally, execution of the Integration Letter preserves the Joint Venture Parties' intent to treat the Amendments as collectively amending the Joint Venture Agreements as opposed to individually amending the Joint Venture Agreements.

---

[8]    Dissolution of the Comanche Peak Joint Venture before such period of time has passed requires mutual agreement with MHI.

Accordingly, I believe that the Court should authorize Luminant Generation, TCEH LLC, and EFH Corp. to enter into the Amendments modifying the Joint Venture Agreements.

KE 31793292

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 27, 2014                              Respectfully submitted,

                                                   /s/ Robert Frenzel
                                                   _____
                                                   Robert Frenzel
                                                   Senior Vice President and Chief Financial
                                                   Officer
                                                   Luminant Generation Company LLC

**<u>EXHIBIT 1</u> to <u>EXHIBIT B</u>**

**Amendments**

EXECUTION VERSION

## SECOND AMENDMENT TO
## DEVELOPMENT SERVICES AGREEMENT

This Second Amendment to Development Services Agreement (this "*Amendment*") dated as of April 28, 2014 (the "*Effective Date*") is entered into by and among Luminant Generation Company LLC, a Texas limited liability company ("*Luminant*"), MHI Nuclear North America, Inc., a Delaware corporation (the "*MHI Member*") and Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company (the "*Company*" and, together with Luminant and the MHI Member, the "*Parties*" and each a "*Party*").

### RECITALS

WHEREAS, the Parties entered into that certain Development Services Agreement dated as of January 30, 2009, as amended by that certain First Amendment thereto dated as of April 27, 2012, and as further amended from time to time (as amended, the "*DSA*"), pursuant to which Luminant has agreed to provide the Company with certain development services relating to the Project;

WHEREAS, the Parties desire to effect the suspension of certain rights, duties, obligations and liabilities under the Development Services Agreement to be effective as of March 31, 2014; and

WHEREAS, the Parties desire to further amend the DSA as set forth below.

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### AMENDMENTS

Section 1.1    *Definitions*.  Capitalized terms used in this Amendment but not defined herein shall have the meanings given to such terms in the DSA.  References to the LLC Agreement in the DSA and in this Amendment shall refer to the LLC Agreement as amended as of the Effective Date.

Section 1.2    *Development Services*.  Section 2.1(b) is hereby amended and restated in its entirety to read as follows:

> (b)    "Development Services" means all services and activities that Luminant and its Affiliates perform on behalf of the Company in connection with the administration of the Company and the development of the Project, including the services and activities set forth in Exhibit B, but excluding in all cases any services or activities not provided for in the applicable Annual Budget and funded by the Mitsubishi Member.  The Development Services shall not include any services and activities that Luminant and its

Affiliates or subcontractors perform in connection with Luminant's Affiliate's ownership interest in the Company.

Section 1.3    *Exhibit B.*    Exhibit B is hereby amended and restated as set forth on Schedule 1 to reflect the reduced level of Development Services to be provided by Luminant to the Company under the DSA from and after the Effective Date.

Section 1.4    *Meetings.*    Sections 2.2(d) of the DSA is hereby deleted.

Section 1.5    *Certain Reports.*    Section 2.2(k)(ii) is hereby amended and restated in its entirety to read as follows:

> (ii)    *Quarterly Financial Reports.*    As soon as available, but in any event within 60 Days after the end of each of the first three fiscal quarters of each fiscal year of the Company, beginning with the fiscal year ended December 31, 2009, the Development Manager shall deliver a quarterly report (a "Quarterly Report") containing a balance sheet of the Company as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year and the related statements of operations, members' equity and cash flows for such fiscal quarter, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by the Development Manager as fairly presenting the financial condition and results of operations of the Company and as having been prepared in accordance with GAAP applied on a consistent basis.

Section 1.6    *Term.*    Section 4.1 is hereby amended and restated in its entirety to read as follows:

> 4.1    *Term.*    Unless earlier terminated in accordance with the terms of this Agreement, the term of this Agreement shall begin on and as of the Effective Date and shall remain in full force and effect until the occurrence of a Dissolution Event as set forth in Section 11.1 of the LLC Agreement or the termination of this Agreement in accordance with Section 4.2. From the Effective Date, and continuing indefinitely until the Parties mutually agree otherwise in writing, all rights, duties, obligations and liabilities under this Agreement except those rights, duties, obligations and liabilities related to the Development Services set forth in Exhibit B shall be suspended in all respects and be of no force or effect, with the result that no Party shall have any rights, duties, obligations or liabilities of any nature whatsoever with respect to, in connection with or otherwise arising under this Agreement from and after the Effective Date, except with respect to the Development Services set forth in Exhibit B.

2

Section 1.7    ***Limitations on Liability***.    The last sentence of Section 6.3 is hereby amended and restated in its entirety to read as follows:

> NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL LUMINANT'S AGGREGATE LIABILITY HEREUNDER EXCEED THE AGGREGATE AMOUNT OF PAYMENTS PROPERLY PAID OR DUE AND PAYABLE TO LUMINANT HEREUNDER FROM AND AFTER MARCH 31, 2014.

Section 1.8    ***Notices***.    Section 8.5 is hereby amended and restated in its entirety to read as follows:

> 8.5    ***Notices***.    Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder shall be in writing and shall be deemed given upon (i) confirmed delivery by a standard overnight carrier or when delivered by hand, (ii) actual receipt, addressed to the respective Parties at the following addresses (or such other address for a Party as shall be specified by like notice), or (iii) electronic transmission (if followed by delivery by standard overnight carrier or delivery by hand) to the email addresses set forth below:

> If to Luminant or the Company, to:

>> Luminant Generation Company LLC
>> 500 N. Akard Street
>> Dallas, Texas 75201
>> Attention: Bob Frenzel, Chief Financial Officer
>> Email: bob.frenzel@luminant.com

> with a copy to:

>> Luminant Generation Company LLC
>> 500 N. Akard Street
>> Dallas, Texas 75201
>> Attention: Stephanie Zapata Moore, General Counsel
>> Email: stephanie.moore@luminant.com

> If to MHI or the Company, to:

3

MHI Nuclear North America, Inc.
c/o Mitsubishi Heavy Industries, Ltd.
Global Nuclear Business Operations
16-5, Konan 2-Chome, Minato-ku
Tokyo 108-8215 Japan
Attention: Hiroshi Matsuda, Deputy Senior Vice President
Email: hiroshi_matsuda@mhi.co.jp

with a copy to:

Mitsubishi Heavy Industries, Ltd.
Legal & General Affairs Department
16-5, Konan 2-Chome, Minato-ku
Tokyo 108-8215 Japan
Attention: Hisashi Kato
Email: hisasi_kato@mhi.co.jp

A Party may change its notice address by giving written notice in the manner specified above.

Section 1.9    **Payments.**    The Parties hereby acknowledge no payments are due by Luminant, the MHI Member or the Company to any other party under the DSA as of the Effective Date, nor will any payment be due or payable after the Effective Date except with respect to the Development Services set forth in Exhibit B.

## ARTICLE II
## MISCELLANEOUS

Section 2.1    **Governing Law; Disputes.**    This Amendment and the rights and obligations of the Parties under this Amendment (including all matters of construction, validity and performance) shall be governed by, and construed and interpreted in accordance with, the law of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding, to the maximum extent permitted by applicable law, all other choice of law rules). This Amendment shall be subject to the same dispute resolution provisions set forth in Article VII of the DSA.

Section 2.2    **Entire Amendment.**    This Amendment, together with the DSA and the First Amendment, sets forth the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior inquiries, proposals, negotiations, commitments and any other agreements, whether written or oral. The provisions of this Amendment may be changed only by a writing executed by the Parties to this Amendment. Except as modified and amended by this Amendment and the First Amendment, all of the terms, covenants and conditions of the DSA are hereby ratified and confirmed and shall continue to be and remain in full force and effect.

4

Section 2.3    ***Counterparts.***  This Amendment may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one agreement.

*[Signature Page Follows]*

5

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment as of the day and year first set forth above.

**LUMINANT GENERATION COMPANY LLC**

By: _____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief
          Financial Officer

**MHI NUCLEAR NORTH AMERICA, INC.**

By: _____
Name: Hiroshi Matsuda
Title:   President

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**

By: _____
Name: Robert C. Frenzel
Title:   Senior Vice President, Chief Financial
          Officer and Development Manager

Schedule 1

## **EXHIBIT B**

## DEVELOPMENT SERVICES

- Annual reports pursuant to Section 2.2(k)(i) of the DSA.

- Quarterly financial reports pursuant to Section 2.2(k)(ii) of the DSA and preparation of the books of account of the Company in connection with the annual financial audit of the Company pursuant to Section 9.1 of the LLC Agreement.

- Periodic reports promptly following any status change or other update regarding the DOE Loan Guarantee, the COL application (including the status of the COL application and any required responses or communications to the NRC), or any other material development in respect of the ongoing business and operations of the Company occurring in such immediately preceding calendar month.

- Maintenance of the DOE Loan Guarantee and any necessary correspondence related thereto.

- Any necessary correspondence to the NRC with respect to the COL application (including any responses required in the event of a contention hearing) unless and until a COLA Amendment pursuant to Section 2(b) of Exhibit E of the LLC Agreement.

- Coordination and planning of annual meetings of the Board of Managers in accordance with Section 5.1(e)(iii) of the LLC Agreement.

- MHI US-APWR design certification support upon request by the Mitsubishi Member and subject to Section 1 of Exhibit E of the LLC Agreement.

- Project management activities relating to the Project, including back office administrative activities (accounts payable, treasury, budget actualization) and budget coordination.

EXECUTION VERSION

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "*Agreement*") dated as of April 28, 2014 (the "*Effective Date*"), is entered into by and among Nuclear Energy Future Holdings II LLC, a Delaware limited liability company ("*NEFH*"), Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company (the "*Company*"), and MHI Nuclear North America, Inc., a Delaware corporation ("*MNNA*" and, collectively with NEFH and the Company, the "*Parties*" and each a "*Party*"). The assignment of the Luminant Assets and Mitsubishi Assets (as each term is hereinafter defined) shall be deemed effective immediately prior to the execution of the Intellectual Property and Delivery Agreement. Unless otherwise specified, each capitalized term used herein but not otherwise defined herein shall have the meaning ascribed to such term in that certain Second Amended and Restated Limited Liability Company Agreement of the Company dated as of the Effective Date, by and between Nuclear Energy Future Holdings II LLC and MHI Nuclear North America, Inc., as amended from time to time (as amended, the "*LLC Agreement*").

WHEREAS, effective as of the Effective Date, the members of the Company (the "*Members*"), desire to cause the Company to make an in-kind capital distribution to NEFH (the "*Luminant Capital Distribution*"), consisting of all of the Company's right, title and interest in, to and under all of the assets of the Company, including without limitation those certain assets set forth on Schedule 1 hereto, but expressly excluding the Excluded Liabilities (as defined below) and the excluded contracts and other assets set forth on Schedule 2 hereto (the "*Excluded Assets*") and the Mitsubishi Assets to be assigned to MNNA pursuant to the Mitsubishi Capital Distribution (as each term is hereinafter defined) (collectively, the included assets being distributed to NEFH, the "*Luminant Assets*"), and NEFH hereby desires to acquire the Luminant Assets from the Company and to assume the liabilities and obligations related thereto as set forth herein;

WHEREAS, effective as of the Effective Date, Members desire to cause the Company to make an in-kind capital distribution to MNNA (the "*Mitsubishi Capital Distribution*"), consisting of all of the Company's right, title and interest in, to and under those certain assets set forth on Schedule 3 hereto, but expressly excluding the Excluded Liabilities (collectively, the included assets being the "*Mitsubishi Assets*"), and MNNA hereby desires to acquire the Mitsubishi Assets from the Company and to assume the liabilities and obligations related thereto as set forth herein; and

WHEREAS, in order to effect the Luminant Capital Distribution and the Mitsubishi Capital Distribution, the Company is executing this Agreement.

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  <u>Assignment.</u>

(a)    The Company hereby irrevocably transfers, assigns, conveys, delivers and sets over unto NEFH, and NEFH hereby accepts from the Company, all of the

Company's right, title and interest in, to and under the Luminant Assets as of the Effective Date.

(b)    The Parties acknowledge that no monetary consideration is due from NEFH to the Company, MNNA or any of MNNA's affiliates in connection with the assignment of the Luminant Assets, as such assignment is being undertaken in order to effect the Luminant Capital Distribution as of the Effective Date.

(c)    The Company hereby irrevocably transfers, assigns, conveys, delivers and sets over unto MNNA, and MNNA hereby accepts from the Company, all of the Company's right, title and interest in, to and under the Mitsubishi Assets as of the Effective Date.

(d)    The Parties acknowledge that no monetary consideration is due from MNNA to the Company, NEFH or any of NEFH's affiliates in connection with the assignment of the Mitsubishi Assets, as such assignment is being undertaken in order to effect the Mitsubishi Capital Distribution as of the Effective Date.

(e)    The Luminant Assets and Mitsubishi Assets are being assigned on an "as is" / "with all faults" basis without any representation, warranty or guarantee of any nature whatsoever, whether express or implied, and whether arising out of contract, at law, or otherwise.

(f)    To the best of NEFH and MNNA's knowledge, the Luminant Assets, the Mitsubishi Assets and the Excluded Assets collectively represent all of the assets of the Company as of the Effective Date.

2.    <u>Assumption.</u>

(a)    NEFH hereby acquires and accepts all of the Company's right, title and interest in, to and under the Luminant Assets as of the Effective Date, and hereby assumes and agrees to pay for, observe, perform and discharge, when due, all liabilities, obligations, duties, claims, damages and responsibilities relating to the Luminant Assets other than the Excluded Liabilities.

(b)    MNNA hereby acquires and accepts all of the Company's right, title and interest in, to and under the Mitsubishi Assets as of the Effective Date, and hereby assumes and agrees to pay for, observe, perform and discharge, when due, all liabilities, obligations, duties, claims, damages and responsibilities relating to the Mitsubishi Assets other than the Excluded Liabilities.

3.    <u>Excluded Liabilities</u>.  The Parties expressly acknowledge and agree that NEFH and MNNA shall not be liable for and is not assuming or agreeing to pay for, observe, perform or discharge, when due, any liabilities, obligations, duties, claims, damages or responsibilities of any kind or nature whatsoever relating to the Luminant Assets or the Mitsubishi Assets, respectively, that occurred or accrued prior to the Effective Date, whether known or unknown, contingent or absolute, direct or indirect or otherwise, and the Company shall remain responsible

for, and shall pay for, observe, perform and discharge, when due, any and all of such liabilities, obligations, duties, claims, damages and responsibilities which are not assumed by NEFH or MNNA, respectively, hereunder (collectively, the "***Excluded Liabilities***").

4.    <u>Governing Law</u>.  This Agreement and the rights and obligations of the Parties under this Agreement (including all matters of construction, validity and performance) shall be governed by, and construed and interpreted in accordance with, the law of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding, to the maximum extent permitted by applicable law, all other choice of law rules).

5.    <u>Dispute Resolution</u>.

(a)    <u>Negotiation to Resolve Disputes</u>.  If any claim, counterclaim, demand, cause of action, dispute, controversy or other matter (including as to whether any particular asset constitutes an "Asset" or "Excluded Asset") in question arising out of or relating to this Agreement, or to the alleged breach hereof, or in any way relating to the subject matter of this Agreement or the relationship among the Parties created by this Agreement (whether extra-contractual in nature, sounding in contract, tort or otherwise, or provided for by federal or state statute, common law or otherwise) (hereafter a "***Dispute***") arises, a Party desiring to initiate dispute resolution shall give notice to all other Parties to initiate the dispute resolution procedures set forth herein.  Promptly upon receipt of such notice, each Party that is a party to the Dispute (each, a "***Disputing Party***") shall refer such Dispute to a senior executive officer ("***SEO***") of such Disputing Party.  The SEOs will meet in person or by teleconference as soon as mutually practicable (but in any event within 10 Business Days after such notice) in order to try and resolve the Dispute.  If the SEOs are unable to resolve the Dispute on or before the 30th Day after such notice, any Disputing Party may notify each other Disputing Party that it desires to commence an arbitration under this Section 5 (an "***Arbitration Notice***").

(b)    <u>Arbitration</u>.    All Disputes shall be finally settled under the Commercial Arbitration Rules (the "***Rules***") of the American Arbitration Association ("***AAA***").  The Parties agree that any such arbitration shall be confidential and no Party shall publicly disclose the fact of such Dispute, the pleadings and positions taken in the arbitration, or the decision of the Tribunal.

(c)    <u>Selection of Arbitrators</u>.  Any arbitration conducted under this Section 5 shall be heard by three arbitrators (each an "***Arbitrator***" and collectively the "***Tribunal***") selected in accordance with this Section 5 and the Rules.  When a Dispute involves only two Disputing Parties, each Disputing Party shall appoint one Arbitrator within 10 Days after the sending of the Arbitration Notice.  The two party-appointed Arbitrators will thereafter appoint a third Arbitrator within 15 Days after the appointment of the second Arbitrator, which third Arbitrator shall not be a citizen of the United States of America or Japan.  Where a Dispute involves more than two Disputing Parties, all three Arbitrators shall be selected in accordance with the Rules, with the exception that the AAA shall not directly appoint the Tribunal without first attempting to make the appointments through

3

the National Roster list system.  Each Disputing Party and any proposed Arbitrator shall, as soon as practicable, disclose to the other Disputing Parties any business, personal or other relationship or affiliation that may exist between any Party and the proposed Arbitrators. The Disputing Parties may then object to any of the proposed Arbitrators on the basis of such relationship or affiliation.  The validity of any such objection shall be determined according to the Rules.

(d)     Conduct of Arbitration.  The Tribunal shall expeditiously hear and decide all matters concerning the Dispute.  Any arbitration hearing shall be held in New York, New York.  Arbitration proceedings shall be conducted in English.  The decision of the Tribunal (which shall be rendered in English in the form of a written award) shall be final, nonappealable and binding upon the Parties and may be confirmed in, and judgment upon the award entered by, any court having jurisdiction over the Parties.  It is acknowledged and agreed that, consistent with the Rules, the Disputing Parties shall be permitted to request interim or injunctive relief from a court at any time.

(e)     Arbitration Costs and Expenses.  The responsibility for paying the costs of the Tribunal and any experts retained by the Tribunal shall be borne equally by the Disputing Parties, and costs incurred by any Disputing Party for its attorneys, advisors, consultants and experts shall be borne by the Disputing Party incurring such costs.

(f)     Jurisdiction and Venue.  Each Party hereby consents to the non-exclusive personal jurisdiction and venue of the Federal District Court for the Southern District of New York and the Federal District Court for the Northern District of Texas for any proceedings in aid of arbitration under this Section 5, including any request for interim or injunctive relief.

6.     Limitations on Liability.  **NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY EVER BE LIABLE TO ANY OTHER PARTY OR THIRD PARTY (EXCEPT FOR, IN EACH CASE, ANY DAMAGES ACTUALLY PAID TO A THIRD PARTY THAT IS NOT AN INDEMNIFIED PARTY PURSUANT TO A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION IS REQUIRED HEREUNDER) WITH RESPECT TO ANY CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT FOR ANY LOST OR PROSPECTIVE PROFITS OR FOR SPECIAL, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, INCIDENTAL OR INDIRECT LOSSES OR DAMAGES FROM ITS PERFORMANCE UNDER THIS AGREEMENT OR FOR ANY FAILURE OF PERFORMANCE HEREUNDER OR RELATED HERETO, WHETHER ARISING OUT OF BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR OTHERWISE AND WHETHER OR NOT ARISING FROM ANY OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT.**

7.     Severability.  If any provision of this Agreement or the application thereof to any Party or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to the other Parties or circumstances is not

4

affected thereby and the Parties shall, to the extent practicable and permitted by applicable law, negotiate in good faith to replace that provision with a new provision that is valid and enforceable and that puts the Parties in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable.

8.    Amendments. This Agreement may be amended, modified or superseded, and any of the terms or provisions herein may be waived, only by a written instrument executed by each of the Parties. No waiver by any Party of any breach of any term or provision contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or a waiver of any other breach of any other term or provision.

9.    Headings. Titles or captions of sections, paragraphs or subparagraphs contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof.

10.    Notices.    Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder shall be in writing and shall be deemed given upon (i) confirmed delivery by a standard overnight carrier or when delivered by hand, (ii) actual receipt, addressed to the respective Parties at the following addresses (or such other address for a Party as shall be specified by like notice), or (iii) electronic transmission (if followed by delivery by standard overnight carrier or delivery by hand) to the email addresses set forth below:

If to NEFH, to:

> Nuclear Energy Future Holdings LLC
> c/o Luminant Generation Company LLC
> 500 N. Akard Street
> Dallas, Texas 75201
> Attention: Bob Frenzel, Chief Financial Officer
> Email: bob.frenzel@luminant.com

> with a copy to:

> Luminant Generation Company LLC
> 500 N. Akard Street
> Dallas, Texas 75201
> Attention: Stephanie Zapata Moore, General Counsel
> Email: stephanie.moore@luminant.com

If to MNNA or the Company, to:

> Mitsubishi Heavy Industries, Ltd.
> Global Nuclear Business Operations
> 16-5, Konan 2-Chome, Minato-ku

5

Tokyo 108-8215 Japan
Attention: Hiroshi Matsuda, Vice President
Email: hiroshi_matsuda@mhi.co.jp

with a copy to:

Mitsubishi Heavy Industries, Ltd.
Legal and General Affairs Department
16-5, Konan 2-Chome, Minato-ku
Tokyo 108-8215 Japan
Attention: Hisashi Kato, Manager
Email: hisasi_kato@mhi.co.jp

A Party may change its notice address by giving written notice in the manner specified above.

11.    Counterparts.  This Agreement may be signed in counterparts, each of which when taken together shall constitute one and the same instrument.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

12.    Entire Agreement.  This Agreement contains the entire agreement of the Parties hereto with respect to its subject matter.

13.    Waivers.  Any waiver shall be only effective for the particular instance for which it is granted and shall not constitute a waiver of a subsequent occurrence of the waived event nor constitute a waiver of any other provision hereof, at the same time or subsequently.

14.    Successors and Assigns.  All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assigned by any Party without the prior written consent of the other Parties.

15.    Further Assurances.  Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

ASSIGNOR:

**Comanche Peak Nuclear Power Company LLC**

By:_____
Name:  Robert C. Frenzel
Title:   Senior Vice President, Chief Financial
          Officer and Development Manager

ASSIGNEES:

**Nuclear Energy Future Holdings II LLC**

By:_____
Name:  Robert C. Frenzel
Title:   Senior Vice President and Chief Financial
          Officer

**MHI Nuclear North America, Inc.**

By:_____
Name:  Hiroshi Matsuda
Title:   President

**Schedule 1**

**LUMINANT ASSETS**

1.    Contracts:

- The following contracts, which were assigned by Luminant Generation Company LLC ("***Luminant***") to the Company pursuant to that certain Luminant Contribution Agreement dated as of January 30, 2009 by and between Luminant and the Company:

  o Agreement to Perform a Facilities Study (RE: ERCOT Generation Interconnection Request No. GIR 151NR0002), dated January 25, 2008, between Oncor Electric Delivery Company LLC ("***Oncor***") and Luminant

  o Agreement to Perform a Stability Study (RE: ERCOT Generation Interconnection Request No. GRI 151NR0002), dated January 2, 2008, between Oncor and Luminant

  o Agreement to Perform a Steady-State Study, a Short-Circuit Study, and an Off Site Power Delivery Study (RE: ERCOT Generation Interconnection Request No. GIR 151NR0002), dated August 9, 2007, between Oncor and Luminant (f/k/a TXU Generation Company LP)

  o Professional Services Agreement, dated October 6, 2008, between R. W. Beck, Inc. and Luminant

  o Letter Agreement, dated October 3, 2008, among Fitch Inc., Fitch Ratings Ltd and Energy Future Holdings ("***EFH***") , as assigned to Luminant

  o Letter Agreement, dated October 10, 2008, between Standard & Poor's Rating Services and EFH, as assigned to Luminant

2.    All studies, surveys, plans, drawings, applications and other works-in-progress conducted by or on behalf of Luminant to the extent they relate to the design, planning, licensing, construction, installation, financing and development of nuclear power generation units at the Site and were contributed to the Company by Luminant, including without limitation the following:

- Survey, prepared for Luminant by RJ Daum, RPLS No. 4826, of Geophysical Data Management, Inc.

- The Impact of Luminant's Proposed Investment in Nuclear Power Facilities in Somervell County on Business Activity in Somervell County, Water Planning Region G, and Texas, dated June 2008, prepared by The Perryman Group

- Nuclear Power Plant Siting Report, dated August 28, 2007, prepared by Luminant Power

- Lake Granbury Dissolved Minerals Study, dated October 10, 2008, prepared by Freese and Nichols, Inc.

- Memorandum Regarding Scenario 3c of Joint BRA-TXU Modeling, dated September 28, 2008, from Jon S. Albright of Freese and Nichols, Inc. to Bruce Turner

- The following diagrams prepared by Freese and Nichols, Inc. in connection with the Project:

  o Lake Granbury Mass Balance Looking at Annualized Water Flow During Drought (2020 Conditions)
  o Lake Granbury Mass Balance Looking at Annualized Water Flow During Drought (2060 Conditions)
  o Lake Granbury Storage (2020 and 2060 Simulation with Treatment)
  o Lake Granbury Elevation (2020 and 2060 Simulation with Treatment)
  o Lake Granbury Storage vs Elevation (Estimated 2020 and 2060 Conditions)
  o Squaw Creek Reservoir Contract Water Spill Calculation

- Facilities Study Report for the Addition of Luminant 3280 MW Generation Facility at Oncor Comanche Peak 3&4 Switching Station in Somervell County, Texas (GIR 15INR0002), dated August 25, 2008, prepared by Oncor

- Steady-State Analysis Report (GIR 15INR0002), dated January 14, 2008, prepared by Oncor

- Draft Transient Stability Study (GIR 15INR0002), dated May 16, 2008, prepared by Oncor

- Supporting Workpapers for the NRC Decommissioning Funding Requirement Report for Financial Assurance of New Plants, dated April 20, 2007, from John E. Thompson, Jr. to Donald R. Woodlan

- Independent Engineer's Report, Comanche Peak Units 3&4, dated December 5, 2008, prepared by R. W. Beck, Inc.

- Potential Effects of Comanche Peak Cooling Tower Operation on Total Dissolved Solids in Lake Granbury, dated January 31, 2008, prepared by George H. Ward, Consultant in Water Resources.

3.   All rights (including, without limitation, rights to "goods", "instruments" and "chattel paper"), actions, claims, "general intangibles", "accounts", and "supporting obligations" under or with respect to the foregoing, and all "proceeds" of items described in this Schedule 1.  Terms in quotation marks in the preceding sentence shall have the meanings ascribed to such terms in the Uniform Commercial Code as in effect in any relevant jurisdiction.

4. Applications:

- All water applications of the Company submitted to the Brazos River Authority.

5. The core boring land sample from the Site obtained as work product from subcontract with Enercon Services, Inc.

Schedule 2

**EXCLUDED ASSETS**

- The Company shall remain party to the following contracts following the date of this Agreement (collectively, the "*Excluded Contracts*"):

  - Contract for Services (Contract No. C-0540212-6C1) dated July 31, 2007, by and between Mitsubishi Nuclear Energy Systems, Inc. and the Company (as successor-in-interest to Luminant), as amended from time to time.

  - Engineering Services Agreement dated as of January 30, 2009, by and between Mitsubishi Nuclear Energy Systems and the Company, as amended from time to time.

  - Mitsubishi Engineering Services Agreement Guaranty dated as of January 30, 2009, by and between Mitsubishi Heavy Industries, Ltd. and the Company, as amended from time to time.

  - Development Services Agreement dated as of January 30, 2009, as amended from time to time, by and between Luminant, MHI Nuclear North America, Inc. and the Company.

  - Amended and Restated Confidentiality Agreement dated as of January 30, 2009, by and among Mitsubishi Nuclear Energy Systems, Mitsubishi Heavy Industries, Ltd., Luminant and the Company, as amended from time to time.

  - DOE Loan Guarantee Application (subject to provisions of paragraph 5 of Exhibit E to the LLC Agreement).

- The intellectual property rights of the Company for which the Company is granting Luminant Generation Company LLC, Mitsubishi Heavy Industries Ltd., and their respective affiliates a right of use pursuant to the Intellectual Property and Delivery Agreement dated as of the Effective Date (including any intellectual property rights obtained by the Company pursuant to the agreements set forth above in this Schedule 2, including any COLA basis documents, but excepting in all cases, any Mitsubishi Assets).

- Subject to Paragraph 2 of Exhibit E of the LLC Agreement, the COLA.

- Cash and cash equivalents of the Company.

## Schedule 3

### MITSUBISHI ASSETS

- All studies, surveys, plans, drawings, applications and other works-in-progress of the Company to the extent that they are specific to the MHI US-APWR Technology, including all such work product and information prepared or obtained in connection with the Design Center Working Group.

- All of the intellectual property and other assets obtained by the Company pursuant to the Excluded Contracts to the extent that they are related to the MHI US-APWR Technology.

EXECUTION VERSION

## UNANIMOUS WRITTEN CONSENT OF
## THE MEMBERS OF
## COMANCHE PEAK NUCLEAR POWER COMPANY LLC

April 28, 2014

The undersigned, being all of the members (the "*Members*") of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company (the "*Company*"), acting pursuant to the provisions of Section 18-302(d) of the Delaware Limited Liability Company Act and Section 3.1 of the Amended and Restated Limited Liability Company Agreement of the Company dated as of January 30, 2009 (the "*LLC Agreement*"), as the same may be amended and/or amended and restated from time to time, hereby adopt, by written consent, the following resolutions.

**Transaction Agreements**

**WHEREAS**, it is proposed that the Company enter into a termination agreement with Energy Future Holdings Corp., a Texas corporation, Luminant Generation Company LLC, a Texas limited liability company ("*Luminant*"), Nuclear Energy Future Holdings II LLC, a Delaware limited liability company (the "*Luminant Member*"), Mitsubishi Heavy Industries, Ltd., a Japanese corporation ("*MHI*"), Mitsubishi Nuclear Energy Systems, Inc., a Delaware corporation ("*MNES*"), MHI Nuclear North America, Inc., a Delaware corporation (the "*MHI Member*") and Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company, in substantially the form attached hereto as Exhibit A (the "*Termination Agreement*") for the purpose of terminating certain previous agreements among the parties to the Termination Agreement;

**WHEREAS**, it is proposed that the Company enter into a suspension agreement with Luminant, MHI, the MHI Member and MNES in substantially the form attached hereto as Exhibit B (the "*Suspension Agreement*") for the purpose of suspending certain agreements among the parties to the Suspension Agreement;

**WHEREAS**, it is proposed that the Company enter into an assignment and assumption agreement with the Luminant Member and the MHI Member in substantially the form attached hereto as Exhibit C (the "*Assignment and Assumption Agreement*") for the purpose of assigning certain assets to the Luminant Member or its affiliates and to the MHI Member, as applicable, as set forth in the Assignment and Assumption Agreement;

**WHEREAS**, the Company, the MHI Member and Luminant entered into that certain Development Services Agreement dated as of January 30, 2009, as amended by that certain First Amendment thereto dated as of April 27, 2012 (as amended, the "*Development Services Agreement*"), and whereas, it is proposed that the parties to the Development Services Agreement enter into a Second Amendment to the Development Services Agreement in substantially the form attached hereto as Exhibit D (the "*Second Amendment to Development Services Agreement*");

**WHEREAS**, it is proposed that the Company enter into an Intellectual Property and Delivery Agreement with Luminant, MHI and MNES in substantially the form attached hereto as Exhibit E (the "*Intellectual Property and Delivery Agreement*"); and

**WHEREAS**, it is proposed that the Company, Luminant, Nuclear Energy Future Holdings LLC, a Delaware limited liability company, MHI, MNES, the Mitsubishi Member and certain other parties enter into certain real estate agreements in substantially the forms set forth on Exhibit F (the "*Real Estate Agreements*" and, together with the Termination Agreement, the Suspension Agreement, the Assignment and Assumption Agreement, the Second Amendment to Development Services Agreement and the Intellectual Property and Delivery Agreement, the "*Transaction Agreements*").

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms and provisions of each of the Transaction Agreements, and the performance by the Company of its respective obligations thereunder, be, and hereby are, authorized, adopted and approved in all respects; and

**FURTHER RESOLVED**, that the officers of the Company (the "*Authorized Officers*") be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Company, to execute and deliver each of the Transaction Agreements, with such changes and revisions thereto as any such Authorized Officer may deem necessary, advisable or appropriate, and to take any and all actions which any such Authorized Officer may deem necessary, advisable or appropriate in order to effect the transactions contemplated by the Transaction Agreements; and

## General Authorization and Ratification

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Company, to take or cause to be taken any and all such actions, including but not limited to any actions or performances with respect to the Combined License Application pending with the Nuclear Regulatory Commission (the "*NRC*") and with respect to the matters set forth in Exhibit E of the LLC Agreement (in accordance with the terms and conditions set forth therein), or any other actions and performances in connection with any of the transactions contemplated by any Transaction Agreement or the LLC Agreement, and to enter into, execute and deliver, or to cause to be entered into, executed and delivered, any and all such agreements, acknowledgments, instruments, statements, certificates, notices, filings (including but not limited to filings with the NRC and other regulatory filings), memoranda, reports, applications and other documents (collectively, "*Documents*") as any such Authorized Officer may deem necessary, advisable or appropriate to effectuate and carry out the purposes and intent of the foregoing resolutions; all such actions to be performed in such manner and all such Documents to be executed and delivered in such form as the Authorized Officer performing or executing or causing the execution of the same shall approve, such Authorized Officer's performance or execution and delivery thereof to be conclusive evidence of such approval and the approval of the Company; and

**FURTHER RESOLVED**, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Company, to prepare, with the

2

assistance of counsel, execute and file, or cause to be prepared, executed and filed, all Documents and information as may be required or advisable to be filed or submitted, or to pay or remit any taxes, fees, costs or expenses, including any state franchise taxes, required to be paid or remitted, to any applicable regulatory authority or agency, under any federal, state, local or foreign statute, ordinance, rule, regulation, permit, consent, approval, license, judgment, order, decree, injunction or other authorization in connection with the foregoing resolutions; and

**FURTHER RESOLVED**, that all acts and deeds previously performed by any Authorized Officers prior to the date hereof that are within the authority conferred by the foregoing resolutions be, and they hereby are, approved, authorized, adopted, ratified and confirmed in all respects as the authorized acts and deeds of the Company.

*[Remainder of Page Intentionally Left Blank]*

3

**IN WITNESS WHEREOF,** the undersigned, being all of the members of the Company, have executed this written consent as of the date first written above.

MEMBERS:

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**

By: _____
Name: Robert C. Frenzel
Title:  Senior Vice President and Chief Financial Officer

**MHI NUCLEAR NORTH AMERICA, INC.**

By: _____
Name: Hiroshi Matsuda
Title:  President

**Exhibit A**

<u>**Form of Termination Agreement**</u>

A-1

US 2170467v.8

**Exhibit B**

<u>**Form of Suspension Agreement**</u>

US 2170467v.8

**Exhibit C**

**Form of Assignment and Assumption Agreement**

US 2170467v.8

**Exhibit D**

**Form of Second Amendment to Development Services Agreement**

D-1

US 2170467v.8

Exhibit E

**Form of Intellectual Property and Delivery Agreement**

US 2170467v.8

**Exhibit F**

**<u>Real Estate Agreements</u>**

1.    Real Estate Assignment and Assumption Agreement

2.    Memorandum of Assignment of Lease

3.    Memorandum of Assignment of Easements and Easement Rights

4.    Special Warranty Deed

5.    Industrial Solid Waste Disposal Site Deed Recordation Amendment – Landfill #6

6.    Industrial Solid Waste Disposal Site Deed Recordation Amendment – Landfill #8

7.    Industrial Solid Waste Disposal Site Deed Recordation Amendment – Landfill #9

8.    Industrial Solid Waste Disposal Site Deed Recordation Amendment – Landfill #10E

9.    Industrial Solid Waste Disposal Site Deed Recordation Amendment – Landfill #10W

US 2170467v.8

EXECUTION VERSION

## INTELLECTUAL PROPERTY AND DELIVERY AGREEMENT

This Intellectual Property and Delivery Agreement (this "*Agreement*") dated as of April 28, 2014 (the "*Effective Date*"), is entered into by and among Luminant Generation Company LLC, a Texas limited liability company ("*Luminant*"), Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company ("*Company*"), Mitsubishi Heavy Industries, Ltd., a Japanese corporation ("*MHI*") and Mitsubishi Nuclear Energy Systems, Inc., a Delaware corporation ("*MNES*", and collectively with MHI, Luminant and Company, the "*Parties*" and each a "*Party*"). Unless otherwise specified, each capitalized term used herein but not otherwise defined herein shall have the meaning ascribed to such term in that certain Second Amended and Restated Limited Liability Company Agreement of the Company dated as of the Effective Date, by and between Nuclear Energy Future Holdings II LLC and MHI Nuclear North America, Inc., as amended from time to time (as amended, the "*LLC Agreement*").

WHEREAS, effective as of the Effective Date, Luminant and MHI, in their capacity as the parent entities of the respective members of the Company (such Parties, in such capacity, the "*Members*"), desire to cause Company to license certain rights to use the Company Intellectual Property (as defined herein) to Luminant and its Affiliates and to deliver copies of the Basis Documents (as defined herein) to Luminant, and Luminant hereby desires to acquire such license and Basis Documents from the Company;

WHEREAS, effective as of the Effective Date, the Members, desire to cause Company to license certain rights to use the Company Intellectual Property to MHI and its Affiliates, and MHI hereby desires to acquire such license from the Company;

WHEREAS, effective as of the Effective Date, MHI and MNES desire to license certain rights to use the Licensed MHI Intellectual Property (as defined herein) to Luminant and its Affiliates, and Luminant hereby desires to acquire such license from MHI and MNES;

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) payable by each of the Members to the Company and of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Definitions.

      (a)    "*Amended and Restated Confidentiality Agreement*" means the Amended and Restated Confidentiality Agreement dated as of January 30, 2009, by and between the Company, MNES, MHI, and Luminant, as amended.

      (b)    "*Availability*" or "*Available*" shall mean whether or not the particular Basis Document is in MHI's or MNES's possession, custody or control and can be located by MHI or MNES exercising commercial reasonable efforts to locate such particular Basis Document in their possession, custody or control, and is available to be provided to Luminant pursuant to this Agreement such that it can be uploaded to the Basis Document Data Room.

(c)  *"**Basis Document**"* means any document, book or record, digital or tangible, that provides or supports the basis for or substantiation of a Statement of Fact set forth in the COLA, which may be in the form of drawings, engineering calculations, technical analysis and reports, computer studies or codes and standards.

(d)  *"**Basis Document Categories**"* shall mean (1) Site Specific Basis Documents; (2) MHI US-APWR Technology Basis Documents; and (3) Disputed Basis Documents.

(e)  *"**Basis Document Data Room**"* means the virtual data room to be maintained by MHI and MNES (which shall allow Luminant full access to the Available, Site Specific Basis Documents and Available, Disputed Basis Documents (if any), including the ability for Luminant to review, print and download such documents in PDF format and to the extent that the native file format was listed as Available in the Native File Index, in their native file format), or if mutually agreed by the Parties in writing, then by other means of delivery that provide a satisfactory provision of the Available, Site Specific Basis Documents. In the event that such other means of delivery is mutually agreed upon, the applicable data room-related provisions of this Agreement shall be deemed amended *mutatis mutandis.*

(f)  *"**Basis Document Index**"* means the document in the form attached as Exhibit 1, as supplemented pursuant to Section 3 of this Agreement, which shall be deemed to include the Native File Index for all purposes under this Agreement. The Basis Document Index shall include with respect to each Statement of Fact in the Required Index Parts the following categories of information: document name, number, Basis Document Category, owner of the Intellectual Property in the document (to the best of MHI's and MNES's knowledge and belief), and Availability.

(g)  *"**CA Site Information**"* means all information that is Confidential Information (as defined in the Amended and Restated Confidentiality Agreement) or MHI Restricted Information (as defined in the Amended and Restated Confidentiality Agreement) that is Site Specific.

(h)  *"**Certain Contracts**"* shall mean that certain ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(i)  *"**COL**"* means a combined construction and operating license.

(j)  *"**COLA**"* means a combined construction and operating license application in connection with the construction and operation of nuclear power generation units at the Site prepared by or on behalf of the Company.

(k)  *"**COLA Services Contract**"* means that certain Contract for Services (Contract No. C-0540212-6C1) dated July 31, 2007, by and between MNES and Luminant (formerly known as TXU Generation Company LP), as amended.

2

(l)     "*Comanche Peak Units 1&2*" means Luminant's two existing nuclear plant units that are located in Somervell and Hood Counties, Texas.

(m)    "*Comanche Peak Units 3&4*" means two nuclear plant units that are the subject matter of the COLA with respect to the Site, which, subject to Paragraph 4 of Exhibit E of the LLC Agreement, may be developed by Luminant and its Affiliates with or without the use of the MHI US-APWR Technology.

(n)     "*Company Intellectual Property*" means all Intellectual Property (other than the Marks) owned by or licensed to the Company relating or connected to, or arising out of the Project, but not including any MHI US-APWR Intellectual Property.

(o)     "*Desired Basis Document*" shall have the meaning ascribed to it in Section 3(b).

(p)     "*Disputed Basis Document*" means any document that (i) substantiates information referenced in the COLA that the Parties cannot agree under Section 3 is either a Site Specific Basis Document or an MHI US-APWR Technology Basis Document or (ii) MHI or MNES determines is not Available, but which Luminant believes is Available to MHI or MNES if they were to use commercially reasonable efforts to locate such particular Basis Document in accordance with Section 3(c)(iii). With respect to subsection (ii), Luminant shall provide MHI and MNES with a reasonable basis supporting its belief (e.g., a prior email indicating that such Basis Document was Available to MHI or MNES).

(q)     "*Encumbrance*" means any condemnation proceeding, restriction on transfer, preferential right, option, defect in title, condemnation award, expropriation award, operating lease, sublease, conditional sales contract or other title encumbrance of any nature whatsoever.

(r)     "*Future Comanche Peak Site Units*" means any nuclear plant unit located or to be located at the Comanche Peak site in Somervell and Hood County, Texas.

(s)     "*Intellectual Property*" means all intellectual property rights arising from or in respect of the following, whether protected, filed, created or arising under the laws of the United States or any other jurisdiction: (i) all patents, utility models, and statutory invention registrations, and any patents issuing in the future from patent applications, continuations, divisionals, supplementary protection certificates, extensions, reexaminations, continuations-in-part, or reissues of patent applications (collectively, "*Patents*"), (ii) all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (collectively, "*Marks*"), (iii) copyrights and registrations and applications therefor, works of authorship and mask work rights (collectively, "*Copyrights*"), and (iv) trade secret or confidential information, including trade secret and confidential

3

information regarding ideas, invention disclosures, research and development, confidential patent applications, know-how, formulae, inventions, compositions, manufacturing and production processes and techniques, technical data, procedures, designs, drawings, specifications, databases, customer lists, supplier lists, pricing and cost information, and business and marketing plans and proposals (collectively, "*Trade Secrets*").

(t)   "*Licensed MHI Intellectual Property*" means the Intellectual Property (other than Marks or the MHI-US APWR Intellectual Property) owned or controlled by MHI, MNES or their respective Affiliates (other than Company) and set forth in the COLA or the Site Specific Basis Documents.

(u)   "*Luminant Intellectual Property*" means the Intellectual Property (other than Marks) owned or controlled by Luminant or its Affiliates (other than Company) and set forth in the Basis Documents.

(v)   "*MHI US-APWR Design Certification Application*" means MHI's MHI US-APWR Design Certification Application before the Nuclear Regulatory Commission of the United States.

(w)   "*MHI US-APWR Intellectual Property*" means except to the extent necessary to support or substantiate a Site Specific Statement of Fact described in the Basis Document Index, the (i) Intellectual Property to the extent related to the MHI US-APWR Technology or (ii) other MHI Confidential Information of a technical or financial nature, including with respect to clauses (i) and (ii), any such Intellectual Property that is included in the information disclosed in the MHI US-APWR Design Certification Application that is incorporated by reference into the COLA or the Basis Documents and any specific design information, except to the extent the double bracketed ("[[   ]]") or conceptual design information therein contains Site Specific information and to the extent that Appendix A of the HAE Report contains Site Specific information.

(x)   "*MHI US-APWR Specific*" means except to the extent necessary to support or substantiate a Site Specific Statement of Fact described in the Basis Document Index, the extent to which any information, material, data or documents contain, comprise or reveal information that is related to the MHI US-APWR Technology or other MHI Confidential Information of a technical nature, including to the extent such matters exclusively relate to the MHI US-APWR Design Certification Application.

(y)   "*MHI US-APWR Technology*" means the MHI US-APWR technology.

(z)   "*MHI US-APWR Technology Basis Document*" means a Basis Document that comprises or reveals MHI US-APWR Specific information or if a Basis Document is not solely a MHI US-APWR Technology Basis Document, then the extent to which such document comprises or reveals MHI US-APWR Specific information. For avoidance of doubt, a Basis Document that comprises or reveals information that is incorporated by reference into the COLA from the MHI US-APWR Design Certification Application shall be a MHI US-APWR Technology Basis Document, except to the extent the double bracketed ("[[   ]]") or conceptual design information therein contains Site

4

Specific information and to the extent that Appendix A of the HAE Report contains Site Specific information.

(aa) *"Native File Index"* means the portion of the Basis Document Index containing a list of the native files for the COLA and COLA figures as well as the calculation input/output data files that are Available. For the purpose of the Native File Index and native files, the term "Available" or "Availability" means that the native file is Available (as defined in <u>Section 1(b)</u>). For the native files of COLA figures, the Native File Index shall list the COLA figure number and the Availability of the corresponding native file (which will be titled by the COLA figure number). For the calculation input/output data files, the Native File Index will list the Basis Document title, document number with revision (as listed in the Basis Document Index), and the Availability of the calculation input/output data files.

(bb) *"Project"* means the development of two nuclear generating units on a site contiguous to Comanche Peak Units 1&2 located in Somervell and Hood Counties, Texas.

(cc) *"Required Index Parts"* shall mean all of the COLA (Parts 1 – 11), except for COLA Part 1 "Administrative and Financial Information.

(dd) *"Site"* means a site contiguous to Comanche Peak Units 1 & 2 located in Somervell and Hood Counties, Texas.

(ee) *"Site Specific"* means the extent to which any information, material, data or documents contain, comprise or reveal information related to the Site, including to the extent such matters exclusively relate to seismic, geophysical, hydrological, environmental analysis of the Site or an emergency plan for the Site.

(ff) *"Site Specific Basis Document"* means any Basis Document that comprises or reveals Site Specific information or if a Basis Document is not solely a Site Specific Basis Document, then the extent to which such document comprises or reveals Site Specific information.

(gg) *"Statement of Fact"* means a statement of fact in the COLA which is based upon engineering work, standards, codes or other products which substantiate or establish the validity of the statement of fact. Statements to comply with a standard (or code, etc.) or to use such a product in the future are a commitment and not a statement of fact. Statements of Fact are listed as an "SOF" in Exhibit 1.

2. Licenses.

(a) Company hereby irrevocably grants a ████████████████████████████ ████████████████████████████████ license and right (and sublicense in the case of licenses or sublicenses granted by MHI or MNES) to use the Basis Documents and the Company Intellectual Property (except the MHI US-APWR Intellectual Property) to Luminant and its Affiliates, to the best of Company's knowledge and belief, free and clear of Encumbrances, and Luminant and its Affiliates hereby accepts such

5

license and right (and sublicense in the case of licenses or sublicenses granted by MHI and MNES) to use the Basis Documents and the Company Intellectual Property from Company, to license, engineer, procure, design, construct, install, operate, use, repair, finance, estimate the price for, and maintain nuclear plant units solely at Comanche Peak Units 3&4, Comanche Peak Units 1&2, and the Future Comanche Peak Site Units, and to make, use, offer for sale, and sell power produced in the nuclear plant units at Comanche Peak Units 3&4, Comanche Peak Units 1&2, and the Future Comanche Peak Site Units. Luminant and its Affiliates shall not have the right to sublicense the Company Intellectual Property for use by a third party at a nuclear plant unit other than Comanche Peak Units 3&4, Comanche Peak Units 1&2, and the Future Comanche Peak Site Units.

(b)    Company hereby irrevocably grants a ███████ ██████████ ███ █████████████████████████ license and right to use the Basis Documents and the Company Intellectual Property to MHI and its Affiliates, to the best of Company's knowledge and belief, free and clear of Encumbrances, and MHI hereby accepts such license and right to use the Basis Documents and the Company Intellectual Property from Company, to engineer, procure, design, construct, install, operate, use, repair, finance, estimate the price for, and maintain nuclear plant units and to make, use, offer for sale, and sell power produced in nuclear plant units.

(c)    Each of MHI and MNES, on their own behalf and on behalf of their Affiliates (other than the Company), hereby irrevocably grants a ██████████████████████ ████████████████████████████████████████████████████████ license and right (i) to use the Basis Documents (except with respect to the MHI US-APWR Technology Basis Documents and the Disputed Basis Documents (until the resolution of such Disputed Basis Documents in accordance with this Agreement)) and the Licensed MHI Intellectual Property to Luminant and its Affiliates, to the best of MHI's and MNES's knowledge and belief, free and clear of Encumbrances, and Luminant and its Affiliates hereby accepts such license and right from MHI and MNES, to use the Basis Documents (except with respect to the MHI US-APWR Technology Basis Documents) and the Licensed MHI Intellectual Property to license, engineer, procure, design, construct, install, operate, use, repair, finance, estimate the price for, and maintain nuclear plant units solely at Comanche Peak Units 3&4, Comanche Peak Units 1&2 and the Future Comanche Peak Site Units, and to make, use, offer for sale, and sell power produced in the nuclear plant units at Comanche Peak Units 3&4, Comanche Peak Units 1&2 and the Future Comanche Peak Site Units, and (ii) if required by the NRC or delivered to Luminant by MHI or MNES, to disclose the Basis Documents set forth in Exhibit 2, Exhibit 3 or Exhibit 4 to the NRC to support or substantiate a Site Specific Statement of Fact set forth in the Basis Document Index. Luminant and its Affiliates shall not have the right to sublicense the license rights set forth in subsection (ii) in any event (except to the extent covered by other Basis Documents pursuant to the license in subsection (i) above) or to sublicense the Licensed MHI Intellectual Property for use by a third party at a nuclear plant unit other than Comanche Peak Units 3&4, Comanche Peak Units 1&2 and the Future Comanche Peak Site Units.

(d)    Luminant hereby irrevocably grants a ███████ ██████████ ███ █████████████████████████ license and right to use the Basis Documents and the Luminant Intellectual Property to MHI and its Affiliates, to the best of Luminant's knowledge and belief, free and clear of Encumbrances, and MHI hereby accepts such license and right to use the Basis Documents and the Luminant Intellectual Property from Luminant, to engineer, procure, design, construct, install, operate, use, repair, finance, estimate the price for, and

6

maintain nuclear plant units and to make, use, offer for sale, and sell power produced in nuclear plant units.

(e)    With respect to Intellectual Property contained in any Basis Documents provided under the Certain Contracts, MHI and MNES hereby confirm that they will not contest the right of Luminant, its Affiliates, or any of their sublicensees to use such Intellectual Property within the scope of the licenses granted herein. Luminant hereby agrees that any sublicense from MHI and MNES with respect to such Intellectual Property is on an as-is basis, and Luminant further agrees to assume the full risk without any recourse from MHI or MNES for any claim made by ▮▮▮▮▮▮▮▮ against Luminant or its Affiliates arising out of Luminant's use or sublicensing of such Basis Documents within the scope of the grant of the sublicense granted under this Agreement.

(f)    MHI and MNES shall be responsible for, and shall indemnify, defend and hold harmless Luminant and its Affiliates from, any damage, loss, cost or liability (including but not limited to reasonable attorney's fees and costs of enforcing such obligations under this defense and indemnity) for a claim by a third party against Luminant or one of its Affiliates based on an allegation that MHI or MNES used Intellectual Property owned or controlled by Luminant and licensed hereunder to MHI or MNES pursuant to Section 2(d) of this Agreement outside of the scope of the grant of the license granted pursuant to Section 2(d) of this Agreement. Luminant shall be responsible for, and shall indemnify, defend and hold harmless MHI, MNES and their Affiliates from, any damage, loss, cost or liability (including but not limited to reasonable attorney's fees and costs of enforcing such obligations under this defense and indemnity) for a claim made by ▮▮▮▮▮▮▮▮ against MHI, MNES or one of their Affiliates based on an allegation that Luminant used Intellectual Property owned or controlled by ▮▮▮▮▮▮▮▮ and sublicensed hereunder to Luminant by MHI or MNES pursuant to Section 2(a) of this Agreement outside of the scope of the grant of the license granted pursuant to Section 2(a) of this Agreement.

3.    Delivery of Basis Documents and Preparation of the Basis Document Index.

(a)    The version of the Basis Document Index attached in Exhibit 1 includes the latest version of the Basis Document Index prepared by Luminant. After the Effective Date, the Basis Document Index shall be amended in a manner consistent with the terms of this Agreement, provided that the Parties agree that all Statements of Fact for the Basis Document Index have been agreed upon and are set forth in the Basis Document Index attached in Exhibit 1. Accordingly, except for the COLA Figure Index, no other new Statements of Fact will be added to the Basis Document Index. MHI and MNES shall provide pinpoint citation references in the Basis Document Index to the particular place in each Site Specific Basis Document that substantiates or supports the relevant Statement of Fact to the extent such pinpoint citations are known to MHI and MNES as of the Effective Date. After the Effective Date, the COLA figures portion of the Basis Document Index shall be amended in a manner consistent with the terms of this Agreement and otherwise mutually agreed upon by the Parties, subject to the following conditions:

(i)    MHI shall create a new "*COLA Figure Index*" listing all Site Specific COLA figures, which will be a part of the Basis Document Index, and shall add references to the applicable Basis Documents supporting or substantiating each Site Specific COLA figure described in the COLA Figure Index by July 15, 2014 (the "*Site Specific COLA Figure Basis Documents*"), in substantially the same format as provided in the other parts of the Basis

7

Document Index with respect to the Basis Documents that support or substantiate Statements of Fact. Luminant shall review the draft COLA Figure Index and provide its comments to MHI by July 31, 2014 so that the Parties can reach agreement on the COLA Figure Index by August 11, 2014. All Site Specific COLA figures shall be deemed Statements of Fact, unless otherwise mutually agreed. The Site Specific COLA Figure Basis Documents shall not be considered part of the Native File Index; and

(ii)    MHI shall provide all Site Specific COLA Figure Basis Documents that are Available to MNES, MHI, ███████████ to Luminant on or before August 31, 2014, subject to the other terms of this Agreement governing the delivery of Site Specific Basis Documents, including the potential redaction of such Site Specific COLA Figure Basis Documents or designation of such Site Specific COLA Figure Basis Documents as Specified Redaction Basis Documents, Limited License Basis Documents, or MHI Retained Basis Documents. Any dispute regarding the foregoing designations shall be resolved in accordance with the terms of <u>Section 3(h)</u>. Subject to the following sentence, for the purpose of this subsection (ii) only, the term "Availability" shall have the meaning ascribed in Section I(b), but shall apply also to ███████████ *mutatis mutandis*. If any Site Specific COLA Figure Basis Documents are held by Enercon or ███████████ shall obtain such documents from such party ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, and MHI will respond to such comments in accordance with the terms of this Agreement by October 31, 2014 in order to resolve all issues regarding the Site Specific COLA Figure Basis Documents. The dates set forth in this <u>Section 3(a)</u> shall supersede all of the corresponding dates set forth in <u>Section 3(c)</u> with respect to the Site Specific COLA Figure Basis Documents.

(b)    After the Effective Date, subject to <u>Section 3(a)</u>, Luminant may review the version of the Basis Document Index attached in Exhibit 1 and notify MNES and MHI of (i) any documents for which Luminant disputes the designations by MNES and MHI in the Basis Document Index regarding Availability, (ii) any documents for which Luminant disputes the Basis Document Category designation, or (iii) any other corrections that Luminant reasonably believes are needed to be made to the Basis Document Index. To the extent that MNES and MHI agree with Luminant's assertions, MNES and MHI shall promptly rectify the Basis Document Index by preparing entries correcting the Availability designations, correcting the Basis Document Category designation or otherwise correcting the Basis Document Index in accordance with Luminant's notice, and shall send such rectified Basis Document Index to Luminant for Luminant's review and approval as promptly as practicable. The Parties agree Luminant hereby designates all of the Site Specific Basis Documents and Disputed Basis Documents on the Basis Document Index that are designated as Available as documents that Luminant desires to be delivered to the Basis Document Data Room by MHI and MNES (the "*Desired Basis Documents*"), except as described in <u>Section 3(c)(vi)</u>.

8

(c)     On or before June 30, 2014 (which date may be extended by the agreement of the Parties), subject to Sections 3(c)(ii) and 3(c)(vi) below, MNES and MHI shall upload in the Basis Document Data Room all Site Specific Basis Documents plus Disputed Basis Documents identified in the Basis Document Index which have been designated as Available to Luminant and which Luminant has designated as Desired Basis Documents. Luminant shall own all right, title and interest in and to the physical and electronic copies (but expressly excluding any MHI US-APWR Intellectual Property and third party Intellectual Property in the information contained therein) of the Basis Documents downloaded to and from the Basis Document Data Room and shall have the right to make copies of such Basis Documents within the scope of the license granted herein. MNES and MHI agree that the following shall apply with respect to the Site Specific Basis Documents and Disputed Basis Documents to be uploaded to the Basis Document Data Room:

(i)     MNES and MHI shall use commercially reasonable efforts to upload such Basis Documents as such Basis Documents are gathered and made Available for uploading to the Basis Document Data Room. In the event that MHI and MNES substantially complete the gathering of the Basis Documents required to be provided to Luminant for a particular Required Index Part or chapter before June 30, 2014 (which date may be extended by the agreement of the Parties), then MHI and MNES shall notify Luminant in writing and promptly upload such Basis Documents into the Basis Document Data Room for downloading by Luminant so that Luminant can commence the review of the Basis Documents uploaded into the Basis Document Data Room to determine whether or not the Basis Documents match the documents identified in the Basis Document Index and whether or not such Basis Documents provide or support the basis for or substantiation of a Statement of Fact set forth in the COLA for the Project.

(ii)     MNES and MHI shall deliver to the Basis Document Data Room all Site Specific Basis Documents that are in their possession and have been located by MHI or MNES exercising commercial reasonable efforts to locate such particular Basis Document in their possession, custody or control, including, to the extent that they are designated as "Available" in the Native File Index, documents in native file format to the extent related to the Site Specific Basis Documents supporting or substantiating a Statement of Fact, COLA figure files, or calculation input/output data files; provided that notwithstanding anything to the contrary in this Agreement, (i) MNES and MHI shall not have the obligation to create new or revise existing Basis Documents after the Effective Date, (ii) the COLA revision 4 will be provided in FrameMaker file format for COLA Parts 2, 3, 4, 5 and 10 and Microsoft Word file format for Parts 1, 6, 7, 8, 9 and 11, and in addition the figures in the COLA and other files imported into the COLA will be provided in native file format to the extent designated as Available in the Native File Index, (iii) all files designated as Available in the Native File Index will be uploaded to the Basis Document Data Room in native file format, (iv) Basis Documents may be uploaded to the Basis Document Data Room as PDF files except as set forth in subclauses (ii) and (iii) above, and (v) all Available, Site Specific Basis Documents for Appendix A of the HAE Report shall be provided to Luminant in the Basis Document Data Room or another mutually agreed upon manner so that, in accordance with all applicable laws and regulations, only

9

authorized employees of Luminant will have access to such Basis Documents and Appendix A.

(iii)    MNES and MHI agree to use commercially reasonable efforts to locate all Site Specific Basis Documents in their possession, custody or control to upload into the Basis Document Data Room; provided except as set forth in Section 3(a)(ii), but notwithstanding anything else to the contrary in this Agreement, "commercially reasonable efforts" shall not require MNES and MHI to make any payments to a non-Affiliate to obtain any Site Specific Basis Document unless such amount was due by MNES or MHI prior to the Effective Date in connection with the preparation of Basis Documents by such non-Affiliate.  For the avoidance of doubt, the terms "MNES" and "MHI" as used in this Agreement do not include third party subcontractors of MNES and MHI.

(iv)    With respect to any Basis Document that includes both Site Specific information and MHI US-APWR Specific information, MHI and MNES shall have the right to redact the MHI US-APWR Specific information, or other Confidential Information under the Amended and Restated Confidentiality Agreement that is not Site Specific information, from the Basis Document and provide the Basis Document with the Site Specific information and other non-redacted information only.  The following shall apply with respect to redacted Basis Documents:

(A)  In the event that there is a dispute regarding the redaction of information in the Basis Document because the redaction also includes the redaction of Site Specific information, Luminant shall have the right to challenge such redaction and any dispute regarding such redaction that cannot be resolved by agreement shall be subject to the expedited dispute resolution process of Section 3(h).

(B)  For Basis Documents with respect to which a pinpoint citation reference has been included in the Basis Document Index and such citation reference supports or substantiates the relevant Statement of Fact, MHI and MNES shall have the right to redact the portions of such Basis Document that do not support or substantiate the relevant Statement of Fact, or alternatively, if there is a substantial portion of such Basis Document that needs to be redacted, indicate that all other portions of the such Basis Document are deemed to be redacted.  In the case of the foregoing alternative approach, Luminant shall have the right to redact the Basis Document in accordance with this Agreement as Luminant reasonably believes it should be and send such redacted Basis Document to MHI and MNES and, if MHI and MNES do not contest the redaction within thirty (30) days of receipt of such redacted document from Luminant, such redaction shall be deemed to reflect the redaction.  If MHI or MNES contest the redaction, MHI and MNES shall indicate any additional redaction that MHI or MNES reasonably believes should be completed and send such Basis Document to Luminant with such additional redaction within thirty (30) days of receipt of such redacted document from Luminant.  Any dispute regarding such redaction shall be subject to the Section 3 Dispute procedures.

10

(C)   For Site Specific Basis Documents with respect to which a pinpoint citation reference has not been included in the Basis Document Index, MHI and MNES shall not redact any portion of such Basis Document that supports or substantiates the relevant Statement of Fact and the Parties shall cooperate in good faith to the extent desired by Luminant to locate the portion of such document that supports or substantiates the relevant Statement of Fact.

(D)   For Disputed Basis Documents with respect to which a pinpoint citation reference has not been included in the Basis Document Index, Luminant may, at its sole option, locate the portion of such Basis Document that supports or substantiates the relevant Site Specific Statement of Fact. Upon agreement by MHI and Luminant on the portion of such document that supports or substantiates the relevant Site Specific Statement of Fact, such portion only shall be deemed to be a Site Specific Basis Document and all other portions of such Disputed Basis Document shall be deemed to be a MHI US-APWR Technology Basis Document for the purpose of the license granted in Section 2(c) above.

(E)  Special Provisions for Certain Basis Documents.  Notwithstanding anything to the contrary in this Agreement:

(1)   The Basis Documents set forth in Exhibit 2 shall be the "*Specified Redaction Basis Documents*".  The Parties acknowledge MHI and MNES intend to redact the MHI US-APWR Specific information included in the Specified Redaction Basis Documents and provide the Specified Redaction Basis Documents to Luminant with Site Specific information only.  The redacted portion of the Specified Redaction Basis Documents shall be deemed to be MHI US-APWR Technology Basis Documents subject to the provisions set forth in Sections 2(c). If there is a dispute regarding the redaction of information in the Specified Redaction Basis Documents because Luminant believes redacted portions of such documents may be needed to support or substantiate a Site Specific Statement of Fact, then Luminant may inform MHI and MNES thereof.  Within thirty (30) days of receipt of such notice, MHI and MNES shall provide Luminant a written summary of the information included in the redacted portions of such Specified Redaction Basis Documents.  In addition, MHI and MNES agree to maintain in its possession for as long as the COLA docket remains active (including periods during which the COLA is in suspension) at the NRC, ▇▇▇▇▇▇▇▇▇▇▇, a copy of all redacted portions of the Specified Redaction Basis Documents; provided MHI and MNES shall be relieved of such obligation if the redacted portions of the Specified Redaction Basis Documents are delivered to Luminant, if the COLA is terminated or if the COLA remains in suspension for a period of ten (10) years following the effective date of this Agreement. If delivered to Luminant, the Specified Redaction Basis Documents shall be governed under the license granted in Section 2(c)(ii).  If not previously delivered to Luminant and if required by the NRC to support or substantiate a Site Specific Statement of Fact set forth in the Basis Document Index with the NRC, MHI and MNES agree to deliver

11

to the NRC within ten (10) Business Days of written request any Specified Redaction Basis Document.

(2)    The Basis Documents and calculation input/output data files set forth in Exhibit 3 shall be the "***Limited License Basis Documents***". MHI and MNES will upload to the Basis Document Data Room the entirety of such Limited License Basis Documents without any redaction, but such Limited License Basis Documents shall be deemed to be MHI US-APWR Technology Basis Documents subject to the provisions set forth in Sections 2(c) and this Section 3(c)(iv)(E)(2). On or before August 31, 2014, Luminant may, at its sole option, locate any portion of the Basis Documents set forth on Exhibit 3 that it wishes to receive a license in excess of the license rights granted in Section 2(c)(ii) and provide a pinpoint citation for such portion to MHI. Upon receipt of the pinpoint citations provided by Luminant, the Parties shall agree on a procedure and timeline to determine whether such pinpoint citation portions contain, comprise or reveal any MHI US-APWR Technology information, and to the extent that it is determined that they do not, such agreed-upon portions shall be deemed to be a Site Specific Basis Document.

(3)    The Basis Documents set forth in Exhibit 4 shall be the "***MHI Retained Basis Documents***". The Parties acknowledge MHI and MNES will not provide the MHI Retained Basis Documents to Lumiuant, but will provide a written summary of the MHI Retained Basis Documents. The MHI Retained Basis Documents shall be deemed to be MHI US-APWR Technology Basis Documents subject to the provisions set forth in Sections 2(c). In addition, MHI and MNES agree to maintain in its possession for as long as the COLA docket remains active (including periods during which the COLA is in suspension) at the NRC, ███████████████, a copy of all MHI Retained Basis Documents; provided MHI and MNES shall be relieved of such obligation if the MHI Retained Basis Documents are delivered to Luminant, if the COLA is terminated or if the COLA remains in suspension for a period of ten (10) years following the effective date of this Agreement. If delivered to Luminant, the MHI Retaiued Basis Documents shall be governed under the license granted in Section 2(c)(ii). If not previously delivered to Luminant and if required by the NRC to support or substantiate a Site Specific Statement of Fact set forth in the Basis Document Index with the NRC, MHI and MNES agree to deliver to the NRC within ten (10) Business Days of written request any MHI Retained Basis Documents.

(F)    Unless and until an agreement by MHI and Luminant (or other resolution) is reached on the portion of such document that supports or substantiates the relevant Statement of Fact or unless and until such dispute is decided through the expedited dispute resolution process of Section 3(h), such entire Disputed Basis Document shall be deemed to be a MHI US-APWR Technology Basis Document for the purpose of the license granted in Section 2(c) above.

12

(v)     Luminant shall use commercially reasonable efforts to promptly review the documents uploaded in the Basis Document Data Room to determine if the documents substantiate or support the relevant Statements of Fact.

(vi)    MHI and MNES shall not be obligated to upload to the Basis Document Data Room Site Specific Basis Documents that are publicly available, provided that in the event that Luminant cannot locate such Basis Documents after exercising reasonable efforts, MHI and MNES will use reasonable efforts to assist Luminant in locating such Site Specific Basis Documents.

(vii)   For each Site Specific Basis Document that is uploaded in the Basis Document Data Room by MHI and MNES, the Basis Document Index will be revised to include a notation indicating that such Basis Document has been uploaded in the Basis Document Data Room.

(viii)  MHI and MNES shall have no obligation to translate into the English language a limited number of Available Basis Documents (or portions thereof) that were originally created in the Japanese language and that are designated as only being available in the Japanese language in the Basis Document Index.

(d)     On or before August 31, 2014, Luminant shall notify MNES and MHI regarding documents in the Basis Document Data Room that Luminant believes do not substantiate or support the relevant Statement of Fact and those Basis Documents that Luminant believes should be made available to Luminant.  The procedures of Section 3(e) shall apply to such notification.  In addition, Luminant shall have the right to inform MNES and MHI that Luminant does not believe that it has enough information to evaluate the designation of a Basis Document Category or a Basis Document that has been uploaded to the Basis Document Data Room and request additional information reasonably necessary to perform such evaluation, and MNES and MHI shall provide any additional information reasonably necessary to the extent that using commercially reasonable efforts, MNES or MHI can locate such information.

(e)     On or before September 30, 2014, MNES and MHI shall respond to all notifications from Luminant pursuant to Section 3(d) and provide Luminant at least one of the following responses to such notification:

(i)     an explanation as to why MNES and MHI believe the document does in fact substantiate or support the relevant Statement of Fact;

(ii)    an additional document or documents will be added to the Basis Document Data Room;

(iii)   acknowledge that the citation in the Basis Document Index was incorrect and provide the correct citation;

(iv)    acknowledge that the wrong document was uploaded into the Basis Document Data Room and upload the correct document; or

(v)    agree with Luminant's point but confirm, after reasonable efforts to locate any additional documents that substantiate or support such Statement of Fact, that no further documents are Available to be provided at such time.

(f)    Until the earlier of the delivery of the notice by Luminant described in the last sentence of this clause (f) or October 31, 2014, MNES and MHI shall maintain the Basis Document Data Room and allow Luminant full access to the Site Specific Basis Documents loaded into the Basis Document Data Room, including providing to Luminant the ability for Luminant to review, print and download such documents in their uploaded file format (including native file format to the extent the native file is required to be uploaded under Section 3(c)(ii)), provided that the ability for Luminant to download such documents in their native file format shall be subject to Luminant having the software and necessary licenses to review, print and download such documents based on the native file format.    Once (i) Luminant has finally downloaded or received the last of the Site Specific Basis Documents from the Basis Document Data Room (or ten Business Days after the last Site Specific Basis Document has been added to the Basis Document Data Room or otherwise provided to Luminant), (ii) Luminant has received a response from MNES and MHI pursuant to <u>Section 3(e)</u> for every notice provided pursuant to <u>Section 3(d)</u> and (iii) any Section 3 Disputes have been resolved, Luminant shall notify MHI and MNES that it has downloaded or received such Site Specific Basis Documents.    After receipt by MHI and MNES of the notification from Luminant in the preceding sentence, MHI and MNES shall transmit a certification that MHI and MNES have exercised commercially reasonable efforts to locate all Site Specific Basis Documents in their possession, custody or control and delivered all such Basis Documents to the Basis Document Data Room, and upon receipt of such certification, Luminant shall deliver notification to MHI and MNES that all issues under this <u>Section 3</u> and the obligations of MHI and MNES regarding the Site Specific Basis Documents have been fully satisfied.

(g)    Upon receipt of a designation by MHI and MNES of the Basis Document Categories or Availability of the respective Basis Documents, Luminant shall notify MHI and MNES if Luminant disputes MHI and MNES's designations of the Basis Document Category or Availability for a Basis Document in accordance with the timeline set forth above in this <u>Section 3</u>, and the Parties shall discuss such matter in good faith.    If Luminant notifies MHI and MNES that Luminant agrees with MHI and MNES's designation of the Basis Document Category or Availability for a particular Basis Document, then the designation shall be agreed as final.    If Luminant disputes MHI's and MNES's designation of a Basis Document Category or Availability for a Basis Document, then the Basis Document shall be then designated as a Disputed Basis Document.

(h)    If the Parties are unable to resolve a dispute with respect to any matter under this <u>Section 3</u> (“***Section 3 Dispute***”), either of (i) MHI and MNES, on the one hand, or (ii) Luminant, on the other hand, may elect to proceed with the expedited dispute resolution process of this <u>Section 3(h)</u> in lieu of the dispute resolution process in <u>Section 7</u>.    Any Party can send a dispute notice to the other Parties for a matter covered by this <u>Section 3</u>.    Within ten (10) days after the delivery of such dispute notice, the receiving Party shall summarize its position with regard to such dispute in a written document and submit such summaries to a mutually agreed expert as the Parties may mutually select (the “***Expert***”).    If the parties are unable to mutually agree on the identity of such Expert within ten (10) days of such dispute notice, either Party shall be entitled to seek resolution of such dispute pursuant to <u>Section 7</u> hereof.    Within fourteen (14) Business Days of the latter of receipt of the Parties' respective

14

submissions, and the Parties' confirmation of the Expert's appointment, the Expert shall render a decision with respect to each matter addressed in any dispute notice. The Expert shall have complete discretion in all matters of procedure, and all Parties agree that such Section 3 Dispute proceeding can be on a "documents only" basis. Any decision rendered by the Expert pursuant hereto shall be final, conclusive and binding on the Parties as an arbitration award and will be enforceable against any of the Parties to such Section 3 Dispute proceeding, provided that the Expert shall only have the authority to make determinations with respect to disputes regarding Basis Documents (including, but not limited to, redactions), the Basis Document Index, and as necessary, require specific performance by MHI and MNES with respect to a Basis Document or the Basis Document Index or to determine the extent of redaction. In no event may the Expert award damages of any kind to either Party. The determination shall state reasons. Judgment on the decision of the Expert may be entered in any court having jurisdiction thereof. The costs of such Expert shall be borne one-half by (i) MHI and MNES, on the one hand, and (ii) Luminant, on the other hand.

(i)       In the event that MHI and MNES fail to deliver the Basis Documents as required by this Agreement to the Basis Document Data Room, except as set forth in the LLC Agreement, Luminant shall only have the right to seek specific performance of such obligation. Luminant shall have the right to seek such remedy in district court or, at Luminant's election, by way of arbitration as set forth in Section 7.

(j)       This Section 3 and Section 2(f) sets forth MHI's and MNES's sole and exclusive obligations with respect to the Statement of Facts and any Basis Document pertaining thereto. Except as set forth in the LLC Agreement, this Section 3 and Section 2(f) sets forth Luminant's sole and exclusive remedies for MHI or MNES with respect to the Statement of Facts and any Basis Document pertaining thereto.

4.       Excluded Liabilities. The Parties expressly acknowledge and agree that Luminant, MNES and MHI shall not be liable for and each is not assuming or agreeing to pay for, observe, perform or discharge, when due, any liabilities, obligations, duties, claims, damages or responsibilities of any kind or nature whatsoever relating to the Company Intellectual Property or the Licensed MHI Intellectual Property, that occurred or accrued prior to the Effective Date, whether known or unknown, contingent or absolute, direct or indirect or otherwise, and the Company shall remain responsible for, and shall pay for, observe, perform and discharge, when due, any and all of such liabilities, obligations, duties, claims, damages and responsibilities which are not assumed by the Parties hereunder (collectively, the "*Excluded Liabilities*").

5.       Representations and Warranties. The Company, Luminant, MNES and MHI each represents that, to the best of its respective knowledge, it owns (or has the right to license the use of) the Company Intellectual Property, the Luminant Intellectual Property and the Licensed MHI Intellectual Property, respectively. Except for the representation and warranty in the preceding sentence, the Company Intellectual Property, the Luminant Intellectual Property and the Licensed MHI Intellectual Property are being provided on an "as is" / "with all faults" basis, and this Agreement is made without representation or warranty or guarantee of any nature, whether express or implied (including any implied warranty of non-infringement), and whether arising out of contract, at law, or otherwise.

6.       Governing Law. This Agreement and the rights and obligations of the Parties under this Agreement (including all matters of construction, validity and performance) shall be governed by, and construed and interpreted in accordance with, the law of the State of New

15

York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding, to the maximum extent permitted by applicable law, all other choice of law rules).

7.    Dispute Resolution.

(a)    Negotiation to Resolve Disputes.  Except for the procedures set forth in Section 3(h), any claim, counterclaim, demand, cause of action, dispute, controversy or other matter in question arising out of or relating to this Agreement, or to the alleged breach hereof, or in any way relating to the subject matter of this Agreement or the relationship among the Parties created by this Agreement (whether extra-contractual in nature, sounding in contract, tort or otherwise, or provided for by federal or state statute, common law or otherwise) (hereafter a "*Dispute*") shall be settled by the procedures set forth in this Section 7. A Party desiring to initiate dispute resolution shall give notice to all other Parties to initiate the dispute resolution procedures set forth herein.  Promptly upon receipt of such notice, each Party that is a party to the Dispute (each, a "*Disputing Party*") shall refer such Dispute to a senior executive officer ("*SEO*") of such Disputing Party.  The SEOs will meet in person or by teleconference as soon as mutually practicable (but in any event within 10 Business Days after such notice) in order to try to resolve the Dispute.  If the SEOs are unable to resolve the Dispute on or before the 30th Day after such notice, any Disputing Party may notify each other Disputing Party that it desires to commence an arbitration under this Section 7 (an "*Arbitration Notice*").

(b)    Arbitration.  All Disputes shall be finally settled under the Commercial Arbitration Rules (the "*Rules*") of the American Arbitration Association ("*AAA*").  The Parties agree that any such arbitration shall be confidential and no Party shall publicly disclose the fact of such Dispute, the pleadings and positions taken in the arbitration, or the decision of the Tribunal, except insofar as such disclosure shall be required by law.  The seat of arbitration shall be New York, New York.

(c)    Selection of Arbitrators.  Any arbitration conducted under this Section 7 shall be heard by three arbitrators (each an "*Arbitrator*" and collectively the "*Tribunal*") selected in accordance with this Section 7 and the Rules.

(d)    Conduct of Arbitration.  Any arbitration hearing shall be held in New York, New York.  Arbitration proceedings shall be conducted in English.  The decision of the Tribunal (which shall be rendered in English in the form of a written award) shall be final, nonappealable and binding upon the Parties and may be confirmed in, and judgment upon the award entered by, any court having jurisdiction over the Parties.  It is acknowledged and agreed that, consistent with the Rules, the Disputing Parties shall be permitted to request interim or injunctive relief from a court at any time.

(e)    Arbitration Costs and Expenses.  The responsibility for paying the costs of the Tribunal and any experts retained by the Tribunal shall be borne equally by the Disputing Parties, and costs incurred by any Disputing Party for its attorneys, advisors, consultants and experts shall be borne by the Disputing Party incurring such costs.

US 2196140v.22

(f)    Jurisdiction and Venue.   Each Party hereby consents to the non-exclusive personal jurisdiction and venue of the Federal District Court for the Southern District of New York and the Federal District Court for the Northern District of Texas for any proceedings in aid of arbitration, or to enforce an award rendered pursuant to this Section 7 or pursuant to Section 3(h), including any request for interim or injunctive relief.

8.    Limitations on Liability.   **NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY EVER BE LIABLE TO ANY OTHER PARTY OR THIRD PARTY WITH RESPECT TO ANY CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT FOR ANY LOST OR PROSPECTIVE PROFITS OR FOR SPECIAL, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, INCIDENTAL OR INDIRECT LOSSES OR DAMAGES FROM ITS PERFORMANCE UNDER THIS AGREEMENT OR FOR ANY FAILURE OF PERFORMANCE HEREUNDER OR RELATED HERETO, WHETHER ARISING OUT OF BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR OTHERWISE AND WHETHER OR NOT ARISING FROM ANY OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT.**

9.    Term.

(a)    With respect to the Intellectual Property licensed hereunder, the licenses granted hereunder shall remain in effect for the life of such Intellectual Property.

(b)    In the event of a breach of this Agreement, neither Party shall have the right to terminate this Agreement or any license granted herein, and with respect to any cause of action arising out of a breach of this Agreement, whether in contract or tort, no licensor shall have the right to terminate this Agreement or the license granted hereunder because of such breach.

(c)    A licensor shall have the right to sue for patent infringement, misappropriation of trade secrets, or breach of contract if a licensee uses the Intellectual Property licensed hereunder other than as licensed hereunder, and to obtain damages, injunctive relief and/or specific performance, as may be available at law or in equity, for such use other than as licensed hereunder.

(d)    It is the express intent of the parties that the licenses granted under this Agreement are, and will otherwise be deemed to be, licenses of rights to intellectual property as set forth in section 365(n) of the Bankruptcy Code (11 U.S.C. §§101-1330), and that all of the Licensed IP constitutes "intellectual property" under section 365(n) of the Bankruptcy Code or any successor to such section.

10.    Confidentiality.

(a)    This Agreement supersedes and replaces the Amended and Restated Confidentiality Agreement solely with respect to the Trade Secrets set forth in the Intellectual Property licensed hereunder and the CA Site Information (collectively, the "*Covered Information*"). With respect to any other Trade Secrets or Confidential Information (as defined in the Amended and Restated Confidentiality Agreement) that is not Covered

17

Information, the Amended and Restated Confidentiality Agreement shall continue to control with respect to confidentiality obligations.

(b)    "Covered Information" shall not include, and all obligations regarding Covered Information shall not apply to, an item of information that is within any of the four following exceptions:

(i)    Information that was known to a Party licensed hereunder (the "***Receiving Party***") prior to disclosure under the Amended and Restated Confidentiality Agreement;

(ii)    Information that hereafter becomes known to a Receiving Party on a non-confidential basis from a source other than the Company or the licensing Party; provided that such Information is not, to the knowledge of the Receiving Party, subject to any confidentiality agreement with or other contractual, legal or fiduciary obligations of confidentiality to the Company;

(iii)    Publicly Available Information (as that term is defined in the Amended and Restated Confidentiality Agreement); and

(iv)    Information that was developed by or for the Receiving Party independently of any delivery of the Information hereunder as evidenced by the records of the Receiving Party.

(c)    Each Party agrees to use at least the same level of care in safeguarding the confidentiality of the Covered Information licensed hereunder that it uses with its own confidential, proprietary or non-public information, but in no event less than reasonable care.

(d)    In the event a Receiving Party or anyone to whom the Receiving Party Discloses Covered Information is required pursuant to Applicable Law, or receives a request, order or similar direction under the terms of a subpoena, court order, civil investigative demand or similar judicial process or other oral or written request issued by a court of competent jurisdiction or by an international, national, state or local governmental or regulatory body, to Disclose all or any part of such Covered Information the Receiving Party shall if disclosure of the Covered Information is required, furnish only that portion of the Covered Information as the Receiving Party reasonably believes, and is advised by its counsel, is legally required to be disclosed (or is effectively compelled to be disclosed as a result of actions taken or threatened to be taken by any Governmental Authority against the Receiving Party for the failure to disclose such Covered Information that would reasonably be expected to have a material adverse effect on the Receiving Party).

(e)    Notwithstanding anything herein to the contrary, each of the Parties agrees that it (and its Representatives) may Disclose to any and all Persons, without limitation of any kind from the commencement of discussions, the U.S. federal and state income tax treatment and tax structure of any transaction related hereto and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure (where, for this purpose, "tax structure" is limited to facts relevant to the U.S. federal and state income tax treatment

18

of such transaction and does not include information relating to the identity of the Parties or their Representatives (as that term is defined in the Second ).

(f)     Notwithstanding anything herein or in the Amended and Restated Confidentiality Agreement to the contrary, a Receiving Party to which Covered Information is provided shall have the right to disclose any such Covered Information to any Person for which such disclosure is reasonably necessary for the Receiving Party to pursue the Project or any other activities or undertakings relating to or similar in nature to the Project, whether at the Site or otherwise, with or without the use of the MHI US-APWR Technology, and whether with the assistance, consent, knowledge and/or cooperation of the other parties to this Agreement or otherwise, provided that any such Persons to whom the Receiving Party discloses any Covered Information pursuant to this provision shall agree to confidentiality restrictions at least as restrictive as those set forth herein.

(g)     The Parties agree the Disclosure Exceptions (as defined in the LLC Agreement) shall apply as exclusions to permit any press releases that would otherwise be restricted pursuant to the terms of Section 9 of the Confidentiality Agreement.

11.     Severability.  If any provision of this Agreement or the application thereof to any Party or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to the other Parties or circumstances is not affected thereby and the Parties shall, to the extent practicable and permitted by applicable law, negotiate in good faith to replace that provision with a new provision that is valid and enforceable and that puts the Parties in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable.

12.     Amendments. This Agreement may be amended, modified or superseded, and any of the terms or provisions herein may be waived, only by a written instrument executed by each of the Parties. No waiver by any Party of any breach of any term or provision contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or a waiver of any other breach of any other term or provision.

13.     Headings.  Titles or captions of sections, paragraphs or subparagraphs contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof.

14.     Notices.  Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder shall be in writing and shall be deemed given upon (i) confirmed delivery by a standard overnight carrier or when delivered by hand, (ii) actual receipt, addressed to the respective Parties at the following addresses (or such other address for a Party as shall be specified by like notice), or (iii) electronic transmission (if followed by delivery by standard overnight carrier or delivery by hand) to the email addresses set forth below:

If to Luminant or the Company, to:

Luminant Generation Company LLC

19

500 N. Akard Street
Dallas, Texas 75201
Attention: Bob Frenzel, Chief Financial Officer
Email: bob.frenzel@luminant.com

with a copy to:

Luminant Generation Company LLC
500 N. Akard Street
Dallas, Texas 75201
Attention: Stephanie Zapata Moore, General Counsel
Email: stephanie.moore@luminant.com

If to MHI, MNES or the Company, to:

MHI Nuclear North America, Inc.
c/o Mitsubishi Heavy Industries, Ltd.
Global Nuclear Business Operations
16-5, Konan 2-Chome, Minato-ku
Tokyo 108-8215 Japan
Attention: Hiroshi Matsuda, Deputy Senior Vice President
Email: hiroshi_matsuda@mhi.co.jp

with a copy to:

Mitsubishi Heavy Industries, Ltd.
Legal & General Affairs Department
16-5, Konan 2-Chome, Minato-ku
Tokyo 108-8215 Japan
Attention: Hisashi Kato, Manager
Email: hisasi_kato@mhi.co.jp

A Party may change its notice address by giving written notice in the manner specified above.

15.    Counterparts.  This Agreement may be signed in counterparts, each of which when taken together shall constitute one and the same instrument.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

16.    Entire Agreement.  This Agreement contains the entire agreement of the Parties hereto with respect to its subject matter.

17.    Waivers.  Any waiver shall be only effective for the particular instance for which it is granted and shall not constitute a waiver of a subsequent occurrence of the waived event nor constitute a waiver of any other provision hereof, at the same time or subsequently.

18.    Successors and Assigns.  All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assigned by any Party without the prior written consent of the other

20

Parties; provided, however, Luminant shall have the right to assign this Agreement to an Affiliate.

19.    <u>Construction</u>.  Unless the context requires otherwise: the gender of all words used in this Agreement includes the masculine, feminine, and neuter; each reference to an Article or Section refers to such Article or Section of this Agreement; each reference to an Exhibit refers to such Exhibit attached to this Agreement, which is made a part hereof for all purposes; each reference to a Law refers to such Law as it may be amended from time to time, and each reference to a particular provision of a Law includes any corresponding provision of any succeeding Law; the word "including" means "including, but not limited to"; each reference to money refers to the legal currency of the United States of America; and each reference to a certain agreement or contract refers to such agreement or contract as it may be amended, waived or supplemented from time to time.  For all obligations under this Agreement undertaken by MHI and MNES, such obligations shall be deemed to be satisfied if satisfied by either MHI or MNES (i.e., both companies do not need to fulfill the same obligation).

20.    <u>Further Assurances</u>.  Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

21.    <u>Joint and Several Liability</u>.  MHI and MNES shall be jointly and severally liable for each of their obligations under this Agreement.

<div align="center">[<em>Signature Page Follows</em>]</div>

US 2196140v.22

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**Comanche Peak Nuclear Power Company LLC**

By: _____
Name: Robert C. Frenzel
Title:   Senior Vice President, Chief Financial
          Officer and Development Manager

**Luminant Generation Company LLC**

By: _____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief
          Financial Officer

**Mitsubishi Nuclear Energy Systems, Inc.**

By: _____
Name: Makoto Toyama
Title:   President and Chief Executive Officer

**Mitsubishi Heavy Industries, Ltd.**

By: _____
Name: Hiroshi Matsuda
Title:   Deputy Senior Vice President
          Global Nuclear Business Operations
          Plant Business Department

**Exhibit 1**

[REDACTED]

## Exhibit 2

[REDACTED]

**Exhibit 3**

[REDACTED]

**Exhibit 4**

[REDACTED]

EXECUTION VERSION

After recording, return to:
Vinson & Elkins LLP
Attention: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

STATE OF TEXAS                    §
                                  §
COUNTY OF SOMERVELL               §

### INDUSTRIAL SOLID WASTE
### DISPOSAL SITE DEED RECORDATION
### AMENDMENT

KNOW ALL MEN THAT BY THESE PRESENTS THAT:

This document amends that certain Industrial Solid Waste Disposal Site Deed Recordation dated July 2, 1985, and recorded in Volume 88, Page 215 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated August 30, 1991, and recorded in Volume 17, Page 313 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Certificate of Remediation dated July 20, 2005, and recorded in Volume 145, Page 501 of the real property records of Somervell County, Texas; and that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated January 30, 2009, and recorded as Instrument No. 20090227 in the real property records of Somervell County, Texas (collectively, the "**Prior Recording**").

### I.

The Prior Recording evidenced the deposit of Class II industrial solid waste in the landfill on the land as more particularly described in Section II herein (the "**Landfill Site**").

### II.

Being a tract of land, 2.008 acres in area, all this certain tract, lots, or parcels of land, part of the W.B. Smith Survey, Abstract No. 90, Somervell County, Texas, and being completely described in that instrument recorded in Volume 145, Page 501 of the real property records of Somervell County, Texas, and as follows, to-wit:

BEING 2.008 acres of land located in the WILLIAM B. SMITH SURVEY, Abstract No. 90, Somervell County, Texas, and being a portion of the Tract of land outlined in Exhibit A-1(b) in a deed from Texas Municipal Power Agency to Texas Utilities Electric Company, recorded in Volume 1, Page 780 of the Deed Records of Somervell County, Texas. Said Tract of land described in Exhibit A-1(b) being the overall consolidation into a single parcel of the combined Texas Municipal Power Agency Tracts as grantor to Texas Utilities Electric Company, as grantee. Said 2.008 acres, lying Northwest of the Comanche Peak Power Generator, and said

2.008 acres being more particularly described by metes and bounds, as follows:

BEGINNING at a point located N 25° 33' 14" W 10,208.86 feet, from the most Southerly corner of Jose Antonio Hernandez Survey, Abstract No. 42.  Said Point of Beginning also having Texas Plane Coordinate Values of North of N = 6794830.15853, and E = 2187101.46486, based on the Lambert Grid for the North Central Texas Zone modified to surface coordinates.

THENCE the following courses and distances based upon the Texas Plane Coordinates System, North Central Texas Zone Grid Bearings:

1.    S 05° 29' 30" W 60.00 feet, to a point;

2.    SOUTHWESTERLY 369.29 feet, along a curve to the left having a radius of 700.00 feet, a central angle of 30° 13' 38", and a chord bearing S 80° 22' 41" W 365.03 feet, to a point;

3.    S 05° 29' 30" W 133.43 feet, to a point;

4.    S 62° 06' 50" W 91.61 feet, to a point;

5.    S 12° 19' 06" E 66.70 feet, to a point;

6.    S 59° 26' 42" W 65.43 feet, to a point;

7.    S 66° 38' 34" W 59.48 feet, to a point;

8.    S 88° 01' 35" W 58.50 feet, to a point;

9.    N 70° 06' 56" W 62.36 feet, to a point;

10.   N 01° 36' 55" E 112.69 feet, to a point;

11.   NORTHEASTERLY 760.00 feet, along a curve to the right having a radius of 760.00 feet, a central angle of 57° 17' 45", and a chord bearing N 66° 50' 37" E 728.73 feet, to THE POINT OF BEGINNING, containing 2.008 acres (87,460 square feet) of land.

### III.

This amendment serves to provide notice of a change of the operator of the Landfill Site. Effective as of April 28, 2014 (the "**Effective Date**") (a) the owner of the Landfill Site is Nuclear Energy Future Holdings LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201, (b) the operator of the landfill is Luminant Generation

Company, LLC, a Texas limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201 and (c) the ground lessee of the Landfill Site is Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201.

Executed as of the Effective Date.

**LUMINANT GENERATION COMPANY LLC**, a Texas
limited liability company

By:_____
Name:  Robert C. Frenzel
Title:    Senior Vice President and Chief Financial Officer

STATE OF TEXAS              §
                                           §
COUNTY OF DALLAS        §


This instrument was acknowledged before me on this the ____ day of _____, 20__,
by Robert C. Frenzel, Chief Financial Officer of Luminant Generation Company LLC, a Texas
limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a
Delaware limited liability company

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer

STATE OF TEXAS           §
                         §
COUNTY OF DALLAS         §

This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

**COMANCHE PEAK NUCLEAR POWER COMPANY**
**LLC**, a Delaware limited liability company

By:_____

Name: Robert C. Frenzel

Title:   Senior Vice President, Chief Financial Officer and
         Development Manager

STATE OF TEXAS           §
                         §
COUNTY OF DALLAS         §

    This instrument was acknowledged before me on this the ____ day of _____, 20__, by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager, of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____

Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a
Delaware limited liability company

By:_____

Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

    This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

After recording, return to:
Vinson & Elkins LLP
Attention: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF SOMERVELL | § |

## INDUSTRIAL SOLID WASTE
## DISPOSAL SITE DEED RECORDATION
## AMENDMENT

KNOW ALL MEN THAT BY THESE PRESENTS THAT:

This document amends that certain Industrial Solid Waste Disposal Site Deed Recordation dated February 14, 1986, and recorded in Volume 90, Page 246 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated March 17, 1986, and recorded in Volume 90, Page 500 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated July 14, 1986, and recorded in Volume 91, Page 772 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Disposal Site Deed Recordation dated November 9, 1987, and recorded in Volume 96, Page 155 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Disposal Site Deed Recordation dated November 16, 1987, and recorded in Volume 96, Page 392 of the real property records of Somervell County, Texas; and that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated January 30, 2009, and recorded as Instrument No. 20090228 in the real property records of Somervell County, Texas (collectively, the "**Prior Recording**").

### I.

The Prior Recording evidenced the deposit of Class II and Class III industrial solid waste in the landfill on the land as more particularly described in Section II herein (the "**Landfill Site**").

### II.

Being a tract of land, 0.72 acres in area, all this certain tract, lots, or parcels of land, part of the W.B. Smith Survey, Abstract No. 90, Somervell County, Texas, and being completely described in that instrument recorded in Volume 90, Page 246 of the real property records of Somervell County, Texas, and as follows, to-wit:

BEGINNING at coordinates 10487.40N – 5152.70E (Texas Plane
Coordinates, North Central Texas Zone) located on plant property,

being 778.90 feet North and 2658.27 feet West of a permanent Aluminum Monument set in concrete (9708.50N − 7810.97E);

THENCE East for a distance of 150 feet;

THENCE South for a distance of 208 feet;

THENCE West for a distance of 150 feet;

THENCE North for a distance of 208 feet to the point of beginning and containing 0.72 acres of land, more or less.

### III.

This amendment serves to provide notice of a change of the operator of the Landfill Site. Effective as of April 28, 2014 (the "**Effective Date**") (a) the owner of the Landfill Site is Nuclear Energy Future Holdings LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201, (b) the operator of the landfill is Luminant Generation Company, LLC, a Texas limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201 and (c) the ground lessee of the Landfill Site is Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201.

[Remainder of page intentionally left blank.]

Executed as of the Effective Date.

**LUMINANT GENERATION COMPANY LLC**, a Texas
limited liability company

By:_____

Name:  Robert C. Frenzel

Title:    Senior Vice President and Chief Financial Officer

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §


This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Luminant Generation Company LLC, a Texas limited liability company, on behalf of said limited liability company.


_____

Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a
Delaware limited liability company


By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer


STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §


    This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

**COMANCHE PEAK NUCLEAR POWER COMPANY**
**LLC**, a Delaware limited liability company

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President, Chief Financial Officer and
         Development Manager

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §


This instrument was acknowledged before me on this the ____ day of _____, 20__, by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager, of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a
Delaware limited liability company

By:_____
Name:  Robert C. Frenzel
Title:    Senior Vice President and Chief Financial Officer

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §


    This instrument was acknowledged before me on this the _____ day of _____, 20__,
by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings II LLC, a
Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

EXECUTION VERSION

After recording, return to:
Vinson & Elkins LLP
Attention: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

STATE OF TEXAS              §
                           §
COUNTY OF SOMERVELL        §

## INDUSTRIAL SOLID WASTE
## DISPOSAL SITE DEED RECORDATION
## AMENDMENT

KNOW ALL MEN THAT BY THESE PRESENTS THAT:

This document amends that certain Industrial Solid Waste Disposal Site Deed Recordation dated November 15, 1988, and recorded in Volume 99, Page 418 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Disposal Site Deed Recordation dated November 9, 1987, and recorded in Volume 96, Page 155 of the real property records of Somervell County, Texas; that certain Industrial Solid Waste Disposal Site Deed Recordation dated November 16, 1987, and recorded in Volume 96, Page 392 of the real property records of Somervell County, Texas; and that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated January 30, 2009, and recorded as Instrument No. 20090229 in the real property records of Somervell County, Texas (collectively, the "**Prior Recording**").

**I.**

The Prior Recording evidenced the deposit of Class II industrial solid waste in the landfill on the land as more particularly described in Section II herein (the "**Landfill Site**").

**II.**

Being a tract of land, 1.22 acres in area, all this certain tract, lots, or parcels of land, part of the W.B. Smith Survey, Abstract No. 90, Somervell County, Texas, and being completely described in that instrument recorded in Volume 99, Page 418 of the real property records of Somervell County, Texas, as follows, to-wit:

> Beginning at plant coordinates N 10275.0, E 5309.20, located on plant property, being 566.50 feet North and 2501.77 feet West of permanent Aluminum Monument set in concrete having plant coordinate N 9708.50, E 7810.97;

THENCE North for a distance of 259.0 feet and East for a distance of 18.63 feet to a fence corner having plant coordinate N 10534.00, E 5327.83;

THENCE East for a distance of 221.60 feet and South for a distance of 38.79 feet to a fence post having plant coordinate N 10495.21, E 5549.43;

THENCE South for a distance of 223.95 feet and West for a distance of 25.62 feet to a fence post having plant coordinate N 10271.26, E 5523.81;

THENCE West for a distance of 214.61 feet and North for a distance of 3.74 feet to the point of beginning and containing 1.22 acres of land.

### III.

This amendment serves to provide notice of a change of the operator of the Landfill Site. Effective as of April 28, 2014 (the "**Effective Date**") (a) the owner of the Landfill Site is Nuclear Energy Future Holdings LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201, (b) the operator of the landfill is Luminant Generation Company, LLC, a Texas limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201 and (c) the ground lessee of the Landfill Site is Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201.

[Remainder of page intentionally left blank.]

Executed as of the Effective Date.

**LUMINANT GENERATION COMPANY LLC**, a Texas
limited liability company

By:_____

Name:  Robert C. Frenzel
Title:    Senior Vice President and Chief Financial Officer

STATE OF TEXAS            §
                                        §
COUNTY OF DALLAS       §


This instrument was acknowledged before me on this the ____ day of _____, 20__,
by Robert C. Frenzel, Chief Financial Officer of Luminant Generation Company LLC, a Texas
limited liability company, on behalf of said limited liability company.


_____

Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a
Delaware limited liability company

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

**COMANCHE PEAK NUCLEAR POWER COMPANY**
**LLC**, a Delaware limited liability company

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President, Chief Financial Officer and
         Development Manager

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §


    This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager, of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a
Delaware limited liability company


By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §


    This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

EXECUTION VERSION

<u>After recording, return to:</u>
Vinson & Elkins LLP
Attention: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

STATE OF TEXAS           §
                         §
COUNTY OF SOMERVELL      §

## INDUSTRIAL SOLID WASTE
## DISPOSAL SITE DEED RECORDATION
## AMENDMENT

KNOW ALL MEN THAT BY THESE PRESENTS THAT:

This document amends that certain Industrial Solid Waste Disposal Site Deed Recordation dated July 24, 1990, and recorded in Volume 11, Page 442 of the real property records of Somervell County, Texas and that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated January 30, 2009, and recorded as Instrument No. 20090230 in the real property records of Somervell County, Texas (the "**Prior Recording**").

### I.

The Prior Recording evidenced the deposit of Class II industrial solid waste in the landfill on the land as more particularly described in Section II herein (the "**Landfill Site**").

### II.

Being a tract of land, 1.09 acres in area, all this certain tract, lots, or parcels of land, part of the W.B. Smith Survey, Abstract No. 90, Somervell County, Texas, and being completely described as follows, to-wit:

> Beginning at plant coordinates N 10272.085, E 5754.145, located in plant property, being 563.585 feet North and 2056.825 feet West of permanent Aluminum Monument set in concrete having plant coordinate N 9708.50, E 7810.97;

> THENCE North for a distance of 186.735 feet and East for a distance of 23.135 feet to a fence corner having plant coordinate N 10458.82, E 5777.28;

> THENCE East for a distance of 294.7651 feet and South for a distance of 58.1438 feet to a fence post having plant coordinate N 10400.6762, E 6072.0451;

THENCE South for a distance of 127.4488 feet and West for a distance of 15.7911 feet to a fence post having plant coordinate N 10273.2274, E 6056.254;

THENCE West for a distance of 302.109 feet and North for a distance of 1.1424 feet to the point of beginning and containing 1.09 acres of land.

### III.

This amendment serves to provide notice of a change of the operator of the Landfill Site. Effective as of April 28, 2014 (the "**Effective Date**") (a) the owner of the Landfill Site is Nuclear Energy Future Holdings LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201, (b) the operator of the landfill is Luminant Generation Company, LLC, a Texas limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201 and (c) the ground lessee of the Landfill Site is Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201.

[Remainder of page intentionally left blank.]

Executed as of the Effective Date.

**LUMINANT GENERATION COMPANY LLC**, a Texas
limited liability company

By:_____
Name:  Robert C. Frenzel
Title:    Senior Vice President and Chief Financial Officer

STATE OF TEXAS          §
                                        §
COUNTY OF DALLAS   §

    This instrument was acknowledged before me on this the _____ day of _____, 20__,
by Robert C. Frenzel, Chief Financial Officer of Luminant Generation Company LLC, a Texas
limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a
Delaware limited liability company

By:_____

Name: Robert C. Frenzel

Title:   Senior Vice President and Chief Financial Officer

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §


    This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____

Notary Public, State of Texas

**COMANCHE PEAK NUCLEAR POWER COMPANY**
**LLC**, a Delaware limited liability company

By:_____

Name: Robert C. Frenzel

Title:   Senior Vice President, Chief Financial Officer and
         Development Manager

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §


    This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager, of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____

Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a
Delaware limited liability company


By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer


STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §


        This instrument was acknowledged before me on this the ____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, on behalf of said limited liability company.


                        _____
                        Notary Public, State of Texas

EXECUTION VERSION

After recording, return to:
Vinson & Elkins LLP
Attention: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

STATE OF TEXAS                §
                              §
COUNTY OF SOMERVELL           §

## INDUSTRIAL SOLID WASTE
## DISPOSAL SITE DEED RECORDATION
## AMENDMENT

KNOW ALL MEN THAT BY THESE PRESENTS THAT:

This document amends that certain Industrial Solid Waste Disposal Site Deed Recordation dated November 15, 1988, and recorded in Volume 99, Page 421 of the real property records of Somervell County, Texas and that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment dated January 30, 2009, and recorded as Instrument No. 20090231 in the real property records of Somervell County, Texas (collectively, the "**Prior Recording**").

### I.

The Prior Recording evidenced the deposit of Class II industrial solid waste in the landfill on the land as more particularly described in Section II herein (the "**Landfill Site**").

### II.

Being a tract of land, 1.08 acres in area, all this certain tract, lots, or parcels of land, part of the W.B. Smith Survey, Abstract No. 90, Somervell County, Texas, and being completely described as follows, to-wit:

> Beginning at plant coordinates N 10271.26, E 5523.81, located on plant property, being 562.76 feet North and 2287.16 feet West of permanent Aluminum Monument set in concrete having plant coordinate N 9708.50, E 7810.97;
>
> THENCE North for a distance of 223.95 feet and east for a distance of 25.62 feet to a fence corner having plant coordinate N 10495.21, E 5549.43;
>
> THENCE East for a distance of 226.95 feet and South for a distance of 40.25 feet to a fence post having plant coordinate N 10454.96, E 5776.38;

THENCE South for a distance of 187.22 feet and West for a distance of 21.82 feet to a fence post having plant coordinate N 10267.74, E 5754.56;

THENCE West for a distance of 230.75 feet and North for a distance of 3.52 feet to the point of beginning and containing 1.08 acres of land.

### III.

This amendment serves to provide notice of a change of the operator of the Landfill Site. Effective as of April 28, 2014 (the "**Effective Date**") (a) the owner of the Landfill Site is Nuclear Energy Future Holdings LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201, (b) the operator of the landfill is Luminant Generation Company, LLC, a Texas limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201 and (c) the ground lessee of the Landfill Site is Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, and its address is 500 N. Akard Street, Dallas, Texas 75201.

[Remainder of page intentionally left blank.]

Executed as of the Effective Date.

**LUMINANT GENERATION COMPANY LLC**, a Texas limited liability company

By:_____
Name:   Robert C. Frenzel
Title:    Senior Vice President and Chief Financial Officer

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §


This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Luminant Generation Company LLC, a Texas limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a Delaware limited liability company

By:_____

Name: Robert C. Frenzel

Title:   Senior Vice President and Chief Financial Officer

STATE OF TEXAS              §
                           §
COUNTY OF DALLAS           §


This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____

Notary Public, State of Texas

**COMANCHE PEAK NUCLEAR POWER COMPANY
LLC,** a Delaware limited liability company

By:_____

Name: Robert C. Frenzel

Title:   Senior Vice President, Chief Financial Officer and
         Development Manager

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §


This instrument was acknowledged before me on this the ____ day of _____, 20__, by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager, of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____

Notary Public, State of Texas

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a
Delaware limited liability company

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §


    This instrument was acknowledged before me on this the _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, on behalf of said limited liability company.


                               _____
                               Notary Public, State of Texas

After recording, return to:
Vinson & Elkins LLP
Attention: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

## MEMORANDUM OF ASSIGNMENT OF EASEMENTS AND EASEMENT RIGHTS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

THIS MEMORANDUM OF ASSIGNMENT OF EASEMENTS AND EASEMENT RIGHTS (this "**Memorandum**") is made and entered into on this 28th day of April 2014 (the "**Effective Date**"), by and between **NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a Delaware limited liability company (together with its successors and assigns, "**Assignee**") and **COMANCHE PEAK NUCLEAR POWER COMPANY LLC**, a Delaware limited liability company ("**Assignor**").

RECITALS

A.      Assignor and Assignee are parties to that certain Real Estate Assignment and Assumption Agreement dated of even date herewith (the "**Assignment and Assumption**") pursuant to which, among other things, Assignor conveyed, assigned and transferred to Assignee the Easement Agreements and Reserved Easements (each defined below).  All capitalized terms used in this Memorandum and not defined herein shall have the meanings set forth in the Assignment and Assumption.

B.      Assignor and Assignee desire to execute this Memorandum for the purposes of recording and giving notice of the existence of the assignment of the Easement Agreements and Reserved Easements.

NOW, THEREFORE, by executing and recording this Memorandum, Assignor and Assignee give notice of the matters set forth herein:

I.      Pursuant to the Assignment and Assumption, Assignor did GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER to Assignee all of the right, title and interest of the Assignor in and to the following:

   a.   the Easement Agreements described on Exhibit A hereto, including all rights and interests granted to Assignor therein, including the permanent easements and, if any, temporary work space easements in the areas in Hood County, Texas described on the attachments to Exhibit A hereto (the "**Easement Agreements**"); and

   b.   The Reserved Easements described on Exhibit B hereto, including all rights and interests reserved by Assignor therein, including the permanent easements and temporary work space easements in the areas in Hood County, Texas described on the attachments to Exhibit B hereto (the "**Reserved Easements**").

II.    This Memorandum is made in accordance with and is subject to the terms, covenants and conditions contained in the Assignment and Assumption, and is made solely to give record notice of the conveyance, assignment and transfer of the Easement Agreements and Reserved Easements and is not intended to amend or supersede the Assignment and Assumption.

This Memorandum may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

2

**IN WITNESS WHEREOF**, Assignor and Assignee have caused this Memorandum to be duly executed by their respective authorized representatives as of the Effective Date.

**ASSIGNOR:**

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**

By:_____
Name: Robert C. Frenzel
Title:　Senior Vice President, Chief Financial
　　　　Officer and Development Manager

STATE OF TEXAS　　　　　　§
　　　　　　　　　　　　　　§
COUNTY OF DALLAS　　　　　§


　　　　This instrument was acknowledged before me on this _____ day of _____, 20__, by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public

Printed Name: _____
My Commission Expires: _____

*Signature Page to Memorandum of Easements and Easement Rights*

**ASSIGNEE:**

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a Delaware limited liability company

By:_____
Name:  Robert C. Frenzel
Title:  Senior Vice President and Chief Financial
   Officer

STATE OF TEXAS       §
            §
COUNTY OF DALLAS     §

   This instrument was acknowledged before me on this _____ day of _____, 20__, by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, on behalf of said limited liability company.

        _____
        Notary Public

        Printed Name: _____
        My Commission Expires: _____

*Signature Page to Memorandum of Easements and Easement Rights*

# EXHIBIT A

## EASEMENT AGREEMENTS

| Legal Description | Grantor | Recording Information |
|---|---|---|
| See Attachment A-1 | Berney Beckworth, Independent Administrator of the Estate of Rosemary Beckworth, Deceased | Volume 2548 Page 606 |
| See Attachment A-2 | Ted L. Hayes and Linda I. Hayes, husband and wife | Volume 2507 Page 917  Correction: Volume 2514 Page 780 |
| See Attachment A-3 | Rickey Wheeler, Individually and as Independent Executor of the estate of David Wheeler and as the administrator of the estate of Zelma Fay Wheeler, and Marla Wheeler, Individually, and Gary Price, Trustee | Volume 2540 Page 157 |
| See Attachment A-4 | Wolf Hollow I, L.P., a Delaware limited partnership | Volume 2544 Page 4 |
| See Attachment A-5 | Michael Eugene Fraley and wife, Tracey Ruth Fraley | Volume 2507 Page 930 |
| See Attachment A-6 | Charles Martin and wife, Selina Martin | Volume 2535 Page 760 |

A-1

| Legal Description | Grantor | Recording Information |
|---|---|---|
| See Attachment A-7 | Thomas F. Heppler, Independent Executor of the Estate of Joseph Thomas Heppler, Deceased and Joseph T. Heppler, Jr. and Thomas F. Heppler both Independent Executor of the Estate of Helen M. Heppler, Deceased | Volume 2510 Page 940 |
| See Attachment A-8 | Roy Stacy and wife, Amanda Stacy | Volume 2533 Page 714 |
| See Attachment A-9 | Raymond W. Wiley and wife, Linda Lee Wiley | Volume 2528 Page 835 |
| See Attachment A-10 | Michael Fraley and Tracey Fraley | Volume 2528 Page 824 |
| See Attachment A-11 | William H. Vogler and Laurie A. Vogler, husband and wife | Volume 2507 Page 671 |
| See Attachment A-12 | Michael Eugene Fraley and wife, Tracey Ruth Fraley | Volume 2507 Page 947 |
| See Attachment A-13 | Robert Smith and Betty Smith | Volume 2533 Page 53 |

A-2

| Legal Description | Grantor | Recording Information |
|---|---|---|
| See Attachment A-14 | B. M. Manning, Jr. and Linda R. Manning, husband and wife | Volume 2510 Page 926 |
| See Attachment A-15 | Larry Wayne Mitschke and wife, Mary JoAnn Mitschke | Volume 2515 Page 247 |
| See Attachment A-16 | Kenneth Leroy Seaman and wife, Nancy Lou Seaman | Volume 2510 Page 955 |
| See Attachment A-17 | Stephen W. Williams and Arlene F. Williams | Volume 2510 Page 913 |
| See Attachment A-18 | Gerald L. Finn and wife, Janice Finn | Volume 2514 Page 794 |
| See Attachment A-19 | Leslie L. Mabery and wife, Patsy C. Mabery | V2543 Page 542 |
| See Attachment A-20 | Tom W. Crum and wife, Mary Crum | Volume 2518 Page 285 |
| See Attachment A-21 | Lake Granbury Builders, LP, a Texas limited partnership | 2011-0007253 |

A-3

| Legal Description | Grantor | Recording Information |
|---|---|---|
| See Attachment A-22 | Donald Dirks and Sherra Dirks | Volume 2515 Page 259 |
| See Attachment A-23 | Boyce Cates and wife, Darlene Cates | Volume 2516 Page 530 |
| See Attachment A-24 | Brazos River Authority | 2011-0008326 |

A-4

## EXHIBIT B

## RESERVED EASEMENTS

| Legal Description | Owner of Fee Estate | Recording Information |
|---|---|---|
| See Attachment B-1 | 2504 Oakland Properties, LLC | 2011-0004650 |
| See Attachment B-2 | Chris T. Bryan and Abette Bryan | 2011-0007249 |

B-1

After recording, return to:
Vinson & Elkins LLP
Attention: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

## MEMORANDUM OF ASSIGNMENT OF LEASE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

This Memorandum Assignment of Lease (this "**Memorandum**") is made and entered into as of the 28th day of April 2014 by and between Nuclear Energy Future Holdings LLC, a Delaware limited liability company (the "**Laudlord**"), Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company ("**Tenant**") and Nuclear Energy Future Holdings II LLC, a Delaware limited liability company ("**Assignee**").

## RECITALS

A.      Landlord and Tenant are parties to the Memorandum of Lease dated as of January 30, 2009 and recorded in the Real Property Records of Somervell County as Instrument No. 20090235 and the Real Property Records of Hood County in Volume 2455, Page 0283 (the "**Memorandum**") executed and recorded for the purposes of recording and giving notice of the existence of the Ground Lease dated as of January 30, 2009 of the tracts of land described in Exhibit 1 (the "**Lease**") and related assignment by Landlord and assumption by Tenant of Landlord's rights and obligations under the Reciprocal Easements and Covenants Agreement dated as of January 30, 2009 between Luminant Generation Company LLC, a Texas limited liability company ("**Luminant**"), and Landlord (the "**Easement Agreement**"), as amended by Partial Release of Reciprocal Easements and Covenants Agreement dated June 23, 2011 and First Amendment to Reciprocal Easements and Covenants Agreement dated April 27, 2012, including certain easements over and across portions of the property described in Exhibit 2 hereto (the "**Remainder Complex**").  A memorandum of the Easement Agreement was recorded in the Real Property Records of Somervell County as Instrument No. 20090234 and in the Real Property Records of Hood County, Texas in Volume 2455, Page 0251, the Partial Release of Reciprocal Easements and Covenants Agreement was recorded in the Real Property Records of Hood County, Texas as Instrument No. 2011-0007265.

B.      All capitalized terms used in this Memorandum and not defined shall have the meanings set forth in the Lease.

C.      Pursuant to the terms of a Real Estate Assignment and Assumption Agreement dated of even date herewith (the "**Assignment and Assumption**"), Tenant has assigned its interest in the Lease and the Easement Agreement to Assignee, and Landlord, Tenant and

1

Assignee desire to execute this Memorandum for the purposes of recording and giving notice of the assignment of the Lease and the Easement Agreement.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants contained in the Lease, Landlord, Tenant and Assignee hereby agree as follows:

1.    <u>Assignment of Lease and Easement Agreement</u>. Pursuant to the Assignment and Assumption, and subject to the terms and conditions of the Assignment and Assumption, Tenant assigned to Assignee all of Tenant's right, title and interest in and to, and liabilities and obligations under, the Lease and the Easement Agreement.

2.    <u>Counterparts</u>.   This Memorandum may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts so executed shall together constitute but one and the same instrument.

[Remainder of page intentionally left blank.]

2

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum as of the day and year first above written.

LANDLORD:                          **NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a Delaware limited liability company


By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial
         Officer


STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §

This instrument was acknowledged before me on this the _____ day of _____, 20__ by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

TENANT:

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**, a Delaware limited liability company

By:_____

Name: Robert C. Frenzel

Title:  Senior Vice President, Chief Financial
       Officer and Development Manager

STATE OF TEXAS      §
                          §
COUNTY OF DALLAS    §

    This instrument was acknowledged before me on this the _____ day of _____, 20__ by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

**ASSIGNEE:**

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a Delaware limited liability company

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief Financial
         Officer

STATE OF TEXAS       §
                                    §
COUNTY OF DALLAS   §

This instrument was acknowledged before me on this the _____ day of _____, 20__ by Robert C. Frenzel, Chief Financial Officer of Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of Texas

## EXHIBIT 1

## DESCRIPTION OF LEASED PREMISES

The following described real property in Hood and Somervell Counties, Texas, SAVE AND EXCEPT, with respect to each of the following parcels, any coal, lignite, oil, gas and other minerals in, under and that may be produced from the land, together with all rights, privileges and immunities relating thereto.

### Section A

**PARCEL 1:   POWER PLANT PARCEL**

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 485.45 ACRES, SITUATED IN THE JAMES D. ELLIOT SURVEY, ABSTRACT NO. 170, WILLIAM B. SMITH SURVEY, ABSTRACT NO. 90, AND GALVESTON COUNTY SCHOOL LAND SURVEY, ABSTRACT NO. 852 IN HOOD AND SOMERVELL COUNTY, TEXAS AND BEING PART OF THE LAND DESCRIBED IN A DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING FROM LUMINANT GENERATION COMPANY LLC AS RECORDED (1) IN VOLUME 2343, PAGE 0734 OF THE REAL PROPERTY RECORDS OF HOOD COUNTY, TEXAS AND (2) AS INSTRUMENT NUMBER 20072921 IN THE REAL PROPERTY RECORDS OF SOMERVELL COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING, at an iron rod found at the southwest corner of said Luminant tract whose coordinates are Northing: 6792287.89, Easting: 2179084.52, from which a concrete monument found bears S 29°12'54' E, a distance of 127.54 feet whose coordinates are Northing: 6792176.49, Easting: 2179146.87;

THENCE, North 59 degrees, 29 minutes, 18 seconds East, a distance of 2858.02 feet to an iron rod found for corner;

THENCE, North 31 degrees, 14 minutes, 42 seconds West, a distance of 17.00 feet to an iron rod found for corner;

THENCE, North 21 degrees, 11 minutes, 31 seconds East, a distance of 2801.00 feet to an iron rod found for corner;

THENCE, North 59 degrees, 34 minutes, 31 seconds East, a distance of 2313.76 feet to a point for corner;

THENCE, South 30 degrees, 47 minutes, 52 seconds East, a distance of 28.18 feet to a point for corner; said point being the beginning of a non-tangent curve to the right;

EXHIBIT 1-1

THENCE, along a non-tangent curve to the right having a radius of 1185.58 feet, a central angle of 61 degrees, 10 minutes, 53 seconds, a tangent length of 700.89 feet, the long chord of which bears South 26 degrees, 13 minutes, 42 seconds West for a distance of 1206.69 feet with a radial line in of South 85 degrees, 38 minutes, 16 seconds West and a radial line out of South 33 degrees, 10 minutes, 51 seconds East for an arc length of 1265.98 feet to a point;

THENCE, South 56 degrees, 49 minutes, 09 seconds West, a distance of 290.66 feet to a point for corner;

THENCE, South 44 degrees, 18 minutes, 47 seconds West, a distance of 256.85 feet to a point for corner;

THENCE, South 25 degrees, 28 minutes, 27 seconds West, a distance of 311.19 feet to a point for corner;

THENCE, South 32 degrees, 40 minutes, 03 seconds West, a distance of 167.80 feet to a point for corner;

THENCE, South 02 degrees, 00 minutes, 06 seconds East, a distance of 142.13 feet to a point for corner;

THENCE, South 20 degrees, 24 minutes, 37 seconds West, a distance of 101.48 feet to a point for corner;

THENCE, South 46 degrees, 52 minutes, 05 seconds East, a distance of 20.59 feet to a point for corner;

THENCE, North 63 degrees, 22 minutes, 59 seconds East, a distance of 73.08 feet to a point for corner;

THENCE, North 22 degrees, 50 minutes, 14 seconds East, a distance of 117.45 feet to a point for corner;

THENCE, North 64 degrees, 20 minutes, 45 seconds East, a distance of 128.69 feet to a point for corner;

THENCE, North 39 degrees, 17 minutes, 47 seconds East, a distance of 111.82 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 142.21 feet, a central angle of 131 degrees, 38 minutes, 31 seconds, a tangent length of 316.75 feet, the long chord of which bears North 79 degrees, 42 minutes, 21 seconds East for a distance of 259.47 feet with a radial line in of South 76 degrees, 06 minutes, 54 seconds East and a radial line out of North 55 degrees, 31 minutes, 37 seconds East for an arc length of 326.75 feet to a point;

THENCE, South 34 degrees, 28 minutes, 23 seconds East, a distance of 57.79 feet to a point for corner;

EXHIBIT 1-2

THENCE, North 84 degrees, 41 minutes, 53 seconds East, a distance of 30.76 feet to a point for corner;

THENCE, North 03 degrees, 56 minutes, 41 seconds East, a distance of 36.09 feet to a point for corner;

THENCE, North 31 degrees, 11 minutes, 59 seconds East, a distance of 84.83 feet to a point for corner;

THENCE, North 65 degrees, 37 minutes, 43 seconds East, a distance of 481.38 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 248.43 feet, a central angle of 69 degrees, 12 minutes, 53 seconds, a tangent length of 171.43 feet, the long chord of which bears North 87 degrees, 06 minutes, 01 seconds East for a distance of 282.19 feet with a radial line in of South 37 degrees, 30 minutes, 26 seconds East and a radial line out of North 31 degrees, 42 minutes, 27 seconds East for an arc length of 300.11 feet to a point;

THENCE, South 58 degrees, 17 minutes, 33 seconds East, a distance of 208.16 feet to a point for corner;

THENCE, North 03 degrees, 35 minutes, 24 seconds West, a distance of 185.37 feet to a point for corner;

THENCE, North 33 degrees, 50 minutes, 46 seconds East, a distance of 455.86 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 256.77 feet, a central angle of 110 degrees, 08 minutes, 18 seconds, a tangent length of 367.65 feet, the long chord of which bears South 89 degrees, 01 minutes, 49 seconds East for a distance of 421.03 feet with a radial line in of South 54 degrees, 05 minutes, 58 seconds East and a radial line out of North 56 degrees, 02 minutes, 20 seconds East for an arc length of 493.59 feet to a point;

THENCE, South 26 degrees, 15 minutes, 07 seconds East, a distance of 97.75 feet to a point for corner;

THENCE, South 89 degrees, 32 minutes, 07 seconds East, a distance of 208.78 feet to a point for corner;

THENCE, South 39 degrees, 41 minutes, 36 seconds East, a distance of 167.67 feet to a point for corner;

THENCE, South 39 degrees, 41 minutes, 36 seconds East, a distance of 39.34 feet to a point for corner;

THENCE, South 20 degrees, 30 minutes, 51 seconds East, a distance of 178.37 feet to a point for corner;

EXHIBIT 1-3

THENCE, along a non-tangent curve to the left having a radius of 23.01 feet, a central angle of 125 degrees, 23 minutes, 53 seconds, a tangent length of 44.58 feet, the long chord of which bears South 74 degrees, 28 minutes, 37 seconds East for a distance of 40.89 feet with a radial line in of North 78 degrees, 13 minutes, 20 seconds East and a radial line out of South 47 degrees, 10 minutes, 33 seconds East for an arc length of 50.36 feet to a point;

THENCE, North 42 degrees, 49 minutes, 27 seconds East, a distance of 190.26 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 194.49 feet, a central angle of 36 degrees, 46 minutes, 38 seconds, a tangent length of 64.65 feet, the long chord of which bears North 32 degrees, 42 minutes, 16 seconds East for a distance of 122.70 feet with a radial line in of North 38 degrees, 54 minutes, 25 seconds West and a radial line out of South 75 degrees, 41 minutes, 03 seconds East for an arc length of 124.84 feet to a point;

THENCE, along a reverse curve to the right with a radius of 245.37 feet, a tangent length of 94.24 feet, a central angle of 42 degrees, 01 minutes, 23 seconds, the radius of which bears South 75 degrees, 41 minutes, 03 seconds East, the chord of which bears North 35 degrees, 19 minutes, 39 seconds East for a distance of 175.95 feet; Thence along the arc of said curve for a distance of 179.96 feet to a point;

THENCE, North 56 degrees, 20 minutes, 21 seconds East, a distance of 326.15 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 370.51 feet, a central angle of 51 degrees, 17 minutes, 31 seconds, a tangent length of 177.88 feet, the long chord of which bears South 79 degrees, 37 minutes, 03 seconds East for a distance of 320.72 feet with a radial line in of South 15 degrees, 15 minutes, 48 seconds East and a radial line out of North 36 degrees, 01 minutes, 43 seconds East for an arc length of 331.68 feet to a point;

THENCE, South 23 degrees, 00 minutes, 52 seconds East, a distance of 377.46 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 159.75 feet, a central angle of 68 degrees, 16 minutes, 28 seconds, a tangent length of 108.31 feet, the long chord of which bears South 15 degrees, 25 minutes, 37 seconds West for a distance of 179.30 feet with a radial line in of South 71 degrees, 17 minutes, 23 seconds West and a radial line out of South 40 degrees, 26 minutes, 09 seconds East for an arc length of 190.36 feet to a point;

THENCE, South 49 degrees, 33 minutes, 51 seconds West, a distance of 34.35 feet to a point for corner;

Thence, along a non-tangent curve to the left having a radius of 88.02 feet, a central angle of 64 degrees, 51 minutes, 11 seconds, a tangent length of 55.92 feet, the long chord of which bears South 28 degrees, 56 minutes, 25 seconds West for a distance of 94.40 feet with a radial line in of South 28 degrees, 38 minutes, 00 seconds East and a radial line out of South 86 degrees, 30 minutes, 49 seconds West for an arc length of 99.63 feet to a point;

EXHIBIT 1-4

THENCE, South 03 degrees, 29 minutes, 11 seconds East, a distance of 137.99 feet to a point for corner;

THENCE, South 11 degrees, 28 minutes, 18 seconds East, a distance of 126.81 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 111.22 feet, a central angle of 68 degrees, 10 minutes, 36 seconds, a tangent length of 75.27 feet, the long chord of which bears South 02 degrees, 04 minutes, 17 seconds West for a distance of 124.67 feet with a radial line in of South 57 degrees, 58 minutes, 59 seconds West and a radial line out of South 53 degrees, 50 minutes, 25 seconds East for an arc length of 132.34 feet to a point;

THENCE, South 36 degrees, 09 minutes, 35 seconds West, a distance of 200.07 feet to a point for corner;

THENCE, South 59 degrees, 08 minutes, 11 seconds West, a distance of 154.05 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 65.21 feet, a central angle of 82 degrees, 24 minutes, 52 seconds, a tangent length of 57.10 feet, the long chord of which bears South 46 degrees, 18 minutes, 14 seconds West for a distance of 85.92 feet with a radial line in of South 02 degrees, 29 minutes, 20 seconds East and a radial line out of North 84 degrees, 54 minutes, 12 seconds West for an arc length of 93.80 feet to a point;

THENCE, along a reverse curve to the right with a radius of 220.66 feet, a tangent length of 61.45 feet, a central angle of 31 degrees, 07 minutes, 20 seconds, the radius of which bears North 84 degrees, 54 minutes, 12 seconds West, the chord of which bears South 20 degrees, 39 minutes, 28 seconds West for a distance of 118.39 feet; Thence along the arc of said curve for a distance of 119.86 feet to a point;

THENCE, South 36 degrees, 13 minutes, 08 seconds West, a distance of 191.02 feet to a point for corner;

THENCE, South 41 degrees, 34 minutes, 06 seconds West, a distance of 79.40 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 358.01 feet, a central angle of 50 degrees, 36 minutes, 39 seconds, a tangent length of 169.27 feet, the long chord of which bears South 72 degrees, 10 minutes, 25 seconds West for a distance of 306.06 feet with a radial line in of North 43 degrees, 07 minutes, 55 seconds West and a radial line out of South 07 degrees, 28 minutes, 44 seconds West for an arc length of 316.24 feet to a point;

THENCE, along a reverse curve to the left with a radius of 115.74 feet, a tangent length of 78.82 feet, a central angle of 68 degrees, 30 minutes, 38 seconds, the radius of which bears South 07 degrees, 28 minutes, 44 seconds West, the chord of which bears South 63 degrees, 13 minutes, 25 seconds West for a distance of 130.30 feet; Thence along the arc of said curve for a distance of 138.40 feet to a point;

EXHIBIT 1-5

THENCE, along a non-tangent curve to the right having a radius of 435.25 feet, a central angle of 84 degrees, 33 minutes, 21 seconds, a tangent length of 395.75 feet, the long chord of which bears South 25 degrees, 40 minutes, 59 seconds West for a distance of 585.62 feet with a radial line in of South 73 degrees, 24 minutes, 18 seconds West and a radial line out of South 22 degrees, 02 minutes, 21 seconds East for an arc length of 642.34 feet to a point;

THENCE, along a non-tangent curve to the left having a radius of 110.31 feet, a central angle of 171 degrees, 45 minutes, 12 seconds, a tangent length of 1530.16 feet, the long chord of which bears South 65 degrees, 24 minutes, 22 seconds East for a distance of 220.04 feet with a radial line in of South 69 degrees, 31 minutes, 46 seconds East and a radial line out of South 61 degrees, 16 minutes, 58 seconds East for an arc length of 330.67 feet to a point;

THENCE, North 63 degrees, 40 minutes, 46 seconds East, a distance of 1118.42 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 233.80 feet, a central angle of 45 degrees, 06 minutes, 26 seconds, a tangent length of 97.10 feet, the long chord of which bears North 72 degrees, 15 minutes, 09 seconds East for a distance of 179.35 feet with a radial line in of North 04 degrees, 48 minutes, 22 seconds East and a radial line out of South 40 degrees, 18 minutes, 04 seconds East for an arc length of 184.06 feet to a point;

THENCE, along a reverse curve to the right with a radius of 128.13 feet, a tangent length of 236.15 feet, a central angle of 123 degrees, 01 minutes, 57 seconds, the radius of which bears South 40 degrees, 18 minutes, 04 seconds East, the chord of which bears South 68 degrees, 47 minutes, 05 seconds East for a distance of 225.24 feet; Thence along the arc of said curve for a distance of 275.14 feet to a point;

THENCE, South 07 degrees, 16 minutes, 07 seconds East, a distance of 98.88 feet to a point for corner;

THENCE, South 15 degrees, 31 minutes, 36 seconds East, a distance of 28.08 feet to a point for corner;

THENCE, South 01 degrees, 17 minutes, 54 seconds East, a distance of 56.71 feet to a point for corner;

THENCE, South 05 degrees, 18 minutes, 00 seconds East, a distance of 30.79 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 16.55 feet, a central angle of 101 degrees, 16 minutes, 58 seconds, a tangent length of 20.18 feet, the long chord of which bears South 37 degrees, 07 minutes, 32 seconds East for a distance of 25.60 feet with a radial line in of South 02 degrees, 13 minutes, 59 seconds West and a radial line out of South 76 degrees, 29 minutes, 03 seconds East for an arc length of 29.26 feet to a point;

Thence, along a reverse curve to the left with a radius of 63.94 feet, a tangent length of 59.03 feet, a central angle of 85 degrees, 26 minutes, 01 seconds, the radius of which bears South 76 degrees, 29 minutes, 03 seconds East, the chord of which bears South 29 degrees, 12 minutes, 03

EXHIBIT 1-6

seconds East for a distance of 86.74 feet; Thence along the arc of said curve for a distance of 95.33 feet to a point;

THENCE, South 71 degrees, 55 minutes, 04 seconds East, a distance of 149.36 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 71.08 feet, a central angle of 59 degrees, 36 minutes, 35 seconds, a tangent length of 40.71 feet, the long chord of which bears North 86 degrees, 16 minutes, 25 seconds East for a distance of 70.66 feet with a radial line in of North 26 degrees, 04 minutes, 43 seconds East and a radial line out of South 33 degrees, 31 minutes, 53 seconds East for an arc length of 73.95 feet to a point;

THENCE, North 56 degrees, 28 minutes, 07 seconds East, a distance of 176.90 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 58.09 feet, a central angle of 71 degrees, 46 minutes, 36 seconds, a tangent length of 42.03 feet, the long chord of which bears North 85 degrees, 06 minutes, 25 seconds East for a distance of 68.10 feet with a radial line in of South 40 degrees, 46 minutes, 53 seconds East and a radial line out of North 30 degrees, 59 minutes, 43 seconds East for an arc length of 72.77 feet to a point;

THENCE, South 59 degrees, 00 minutes, 17 seconds East, a distance of 202.10 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 92.39 feet, a central angle of 91 degrees, 20 minutes, 48 seconds, a tangent length of 94.59 feet, the long chord of which bears South 12 degrees, 10 minutes, 01 seconds East for a distance of 132.19 feet with a radial line in of South 32 degrees, 09 minutes, 35 seconds West and a radial line out of South 56 degrees, 29 minutes, 36 seconds East for an arc length of 147.30 feet to a point;

THENCE, along a reverse curve to the left with a radius of 139.01 feet, a tangent length of 55.29 feet, a central angle of 43 degrees, 22 minutes, 42 seconds, the radius of which bears South 56 degrees, 29 minutes, 36 seconds East, the chord of which bears South 11 degrees, 49 minutes, 03 seconds West for a distance of 102.75 feet; Thence along the arc of said curve for a distance of 105.24 feet to a point;

THENCE, along a compound curve to the left with a radius of 244.38 feet, a tangent length of 53.49 feet, a central angle of 24 degrees, 41 minutes, 26 seconds, the radius of which bears North 80 degrees, 07 minutes, 41 seconds East, the chord of which bears South 22 degrees, 13 minutes, 02 seconds East for a distance of 104.50 feet; Thence along the arc of said curve for a distance of 105.31 feet to a point;

THENCE, South 34 degrees, 33 minutes, 45 seconds East, a distance of 319.27 feet to a point for corner;

THENCE, over and across said Luminant tract, the following courses;

EXHIBIT 1-7

THENCE, South 05 degrees, 57 minutes, 21 seconds West, a distance of 825.91 feet to a point for corner;

THENCE, North 88 degrees, 52 minutes, 16 seconds West, a distance of 1515.95 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 594.60 feet, a central angle of 09 degrees, 38 minutes, 10 seconds, a tangent length of 230.25 feet, the long chord of which bears South 69 degrees, 57 minutes, 38 seconds West for a distance of 429.43 feet, for an arc length of 439.36 feet to a point;

THENCE, South 39 degrees, 21 minutes, 15 seconds West, a distance of 144.39 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 399.31 feet, a central angle of 53 degrees, 03 minutes, 25 seconds, a tangent length of 199.33 feet, the long chord of which bears South 64 degrees, 34 minutes, 19 seconds West for a distance of out of South 01 degrees, 06 minutes, 02 seconds West for an arc length of 369.76 feet to a point;

THENCE, North 83 degrees, 36 minutes, 27 seconds West, a distance of 1468.13 feet to a point for corner;

THENCE, North 60 degrees, 41 minutes, 20 seconds West, a distance of 23.99 feet to a point for corner;

THENCE, North 83 degrees, 37 minutes, 41 seconds West, a distance of 903.70 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 1530.45 feet, a central angle of 39 degrees, 57 minutes, 10 seconds, a tangent length of 556.33 feet, the long chord of which bears South 80 degrees, 36 minutes, 35 seconds West for a distance of 1045.71 feet with a radial line in of South 10 degrees, 35 minutes, 10 seconds West and a radial line out of North 29 degrees, 22 minutes, 00 seconds West for an arc length of 1067.20 feet to a point;

THENCE, South 57 degrees, 57 minutes, 56 seconds West, a distance of 832.39 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 1289.69 feet, a central angle of 26 degrees, 52 minutes, 29 seconds, a tangent length of 308.14 feet, the long chord of which bears South 46 degrees, 15 minutes, 12 seconds West for a distance of 599.40 feet with a radial line in of South 30 degrees, 18 minutes, 33 seconds East and a radial line out of North 57 degrees, 11 minutes, 02 seconds West for an arc length of 604.93 feet to a point;

THENCE, South 32 degrees, 48 minutes, 58 seconds West, a distance of 261.56 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 1358.41 feet, a central angle of 13 degrees, 31 minutes, 28 seconds, a tangent length of 161.07 feet, the long chord of which

EXHIBIT 1-8

bears South 40 degrees, 54 minutes, 03 seconds West for a distance of 319.91 feet with a radial line in of North 55 degrees, 51 minutes, 41 seconds West and a radial line out of South 42 degrees, 20 minutes, 13 seconds East for an arc length of 320.65 feet to a point;

THENCE, South 58 degrees, 17 minutes, 13 seconds West, a distance of 568.59 feet to a point for corner;

THENCE, North 30 degrees, 05 minutes, 31 seconds West, a distance of 48.95 feet to a point for corner said point being the beginning of a curve to the left;

THENCE, along said curve, having a central angle of 12 degrees, 20 minutes, 05 seconds, a radius of 1492.39 feet, a chord bearing and distance of North 36 degrees, 15 minutes, 33 seconds West, 320.66 feet, an arc distance of 321.28 feet to an iron rod found at the end of said curve;

THENCE, North 30 degrees, 10 minutes, 42 seconds West, a distance of 669.61 feet to the POINT OF BEGINNING and CONTAINING 21146354 Square Feet or 485.45 acres of land.

In Hood County:  126.18 acres

In Somervell County:  359.27 acres

EXHIBIT 1-9



EXHIBIT 1-10

## Section B

### PARCEL 2:    BLOWDOWN TREATMENT PARCEL

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 399.96 ACRES, SITUATED IN THE SUSANNAH MCKELEVY SURVEY, ABSTRACT NO. 68 AND IN J.A. HERNANDEZ SURVEY, ABSTRACT NO. 42, IN SOMERVELL , TEXAS AND BEING PART OF THE LAND DESCRIBED IN A DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING FROM LUMINANT GENERATION COMPANY LLC AS RECORDED (1) IN VOLUME 2343, PAGE 0734 OF THE REAL PROPERTY RECORDS OF HOOD COUNTY, TEXAS AND (2) AS INSTRUMENT NUMBER 20072921 IN THE REAL PROPERTY RECORDS OF SOMERVELL COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**BEGINNING,** at an iron rod found at the most southeast corner of said Luminant tract whose coordinates are Northing: 6783384.12 Easting: 2193865.38 NAD 83 Texas North Central State Plane Coordinates;

**THENCE,** with the southeasterly line of Luminant tract N 31°51'31" W, passing an iron rod found for an interior ell corner of said Luminant tract at a distance of 2695.51 feet, in all a distance of 2837.27 feet to a point;

**THENCE,** over and across said Luminant tract N 58°06'14" E, a distance of 6144.00 feet to a point;

**THENCE,** S 31°51'31" E, a distance of 2838.06 feet to a point in the southeasterly line of Luminant tract;

**THENCE,** with the southeasterly line of Luminant tract, the following three (3) courses;

1.    S 58°34'59" W, a distance of 1316.02 feet to an iron rod found;

2.    S 57°15'54" W, a distance of 697.70 feet to an iron rod found

3.    S 58°06'14" W, a distance of 4130.40 feet to the **POINT OF BEGINNING** and containing 399.96 acres more or less.

EXHIBIT 1-11



R. J. Daum
Registered Professional Land Surveyor
State of Texas No. 4826
Date: October 8, 2008

SKETCH to ACCOMPANY DESCRIPTION No. PD08-014

G.D.M., Inc.
11676 Jollyville Road
Suite 111
Austin, Texas 75759
Phone: (512) 918-8111
Fax: (512) 918-8192
www.gdmint.com
© Copyright 2004 G.D.M., Inc.

Page 2 of 2

EXHIBIT 1-12

**Section C**

**PARCEL 3: SUPPORT FACILITIES PARCEL — PARKING LOT & DEMINERALIZED WATER PRODUCTION FACILITY**

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 17.74 ACRES, SITUATED IN THE WILLIAM B. SMITH SURVEY, ABSTRACT NO. 90, AND GALVESTON COUNTY SCHOOL LAND SURVEY, ABSTRACT NO. 852 IN SOMERVELL COUNTY, TEXAS AND BEING PART OF THE LAND DESCRIBED IN A DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING FROM LUMINANT GENERATION COMPANY LLC AS RECORDED (1) IN VOLUME 2343, PAGE 0734 OF THE REAL PROPERTY RECORDS OF HOOD COUNTY, TEXAS AND (2) AS INSTRUMENT NUMBER 20072921 IN THE REAL PROPERTY RECORDS OF SOMERVELL COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING, at an iron rod found at the southwest corner of said Luminant tract whose coordinates are Northing: 6792287.89, Easting: 2179084.52, from which a concrete monument found bears S 29°12'54" E, a distance of 127.54 feet whose coordinates are Northing: 6792176.49, Easting: 2179146.87;

THENCE, over and across said Luminant tract, S 86°59'25" E, a distance of 7326.65 feet to the POINT OF BEGINNING;

THENCE, over and across said Luminant tract, the following eight (8) courses;

1.    N 13°38'20" E, a distance of 115.08 feet to a point;

2.    S 84°14'25" E, a distance of 731.38 feet to a point;

3.    N 05°25'52" E, a distance of 54.29 feet to a point;

4.    N 06°00'04" E, a distance of 731.65 feet to a point;

5.    S 84°14'09" E, a distance of 384.62 feet to a point;

6.    S 06°45'54" W, a distance of 734.20 feet to a point;

7.    S 10°22'14" W, a distance of 662.16 feet to a point;

8.    Along a curve to the right, having a central angle of 36°39'10", a radius of 1871.95 feet, an arc length of 1197.51, a tangent of 620.05 feet, and a chord which bears N 59°25'04" W, a distance of 1177.20 feet to the POINT OF BEGINNING and containing 17.74 acres more or less.

EXHIBIT 1-13



EXHIBIT 1-14

**PARCEL 4: SUPPORT FACILITIES PARCEL — ONSITE SWITCHING STATION, LIQUID RADWASTE EFFLUENT EVAPORATION POND, AND SIMULATOR**

DESCRIPTION of a 15.63 acre tract of land situated in the William B. Smith Survey, Abstract No. 91, Somervell County, Texas; said tract being all of a Simulator, Unit 3 and Unit 4 Onsite Switching Station, a Liquid Radwaste Effluent Evaporation Pond and part of that land described in Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Luminant Generation Company LLC as recorded in (1) Volume 2343, Page 0734, of the Deed Records of Hood County, Texas, and (2) Instrument Number 20072921 in the Real Property Records of Somervell County, Texas; said 15.63 acre tract being more particularly described as follows:

COMMENCING, at an iron rod found at the southwest corner of said Luminant tract with coordinates of Northing: 6792287.89, Easting: 2179084.52, from which a concrete monument found bears South 29 degrees, 12 minutes, 54 seconds East, a distance of 127.54 feet whose coordinates are Northing: 6792176.49, Easting: 2179146.87;

THENCE, over and across said Luminant tract, North 83 degrees, 18 minutes, 35 seconds East, a distance of 3,554.67 feet to the POINT OF BEGINNING; said point being the southwest corner of said Simulator;

THENCE, North 07 degrees, 22 minutes, 21 seconds East, along the west line of said Simulator tract, a distance of 200.00 feet to a point for corner; said point being the northwest corner of said Simulator;

THENCE, South 82 degrees, 37 minutes, 39 seconds East, along the north line of said Simulator, a distance of 190.00 feet to a point for corner;

THENCE, North 07 degrees, 22 minutes, 21 seconds East, departing the north line of said Simulator, a distance of 169.39 feet to a point for corner;

THENCE, South 84 degrees, 25 minutes, 58 seconds East, a distance of 2,256.42 feet to a point for corner; said point being the northeast corner of said Switching Station;

THENCE, South 05 degrees, 34 minutes, 02 seconds West, along the east line of said Switching Station, a distance of 900.00 feet to a point for corner;

THENCE, South 84 degrees, 25 minutes, 58 seconds East, departing the east line of said Switching Station, a distance of 500.00 feet to a point for corner; said point being the northeast corner of said Evaporation Pond;

THENCE, South 05 degrees, 34 minutes, 02 seconds West, along the east line of said Evaporation Pond, a distance of 200.00 feet to a point for corner; said point being the southeast corner of said Evaporation Pond;

EXHIBIT 1-15

THENCE, North 84 degrees, 25 minutes, 58 seconds West, along the south line of said Evaporation Pond, a distance of 400.00 feet to a point for corner; said point being the southwest corner of said Evaporation Pond;

THENCE, North 05 degrees, 34 minutes, 02 seconds East, along the west line of said Evaporation Pond, a distance of 190.00 feet to a point for corner;

THENCE, North 84 degrees, 25 minutes, 58 seconds West, departing the west line of said Evaporation Pond, a distance of 281.00 feet to a point for corner;

THENCE, North 05 degrees, 34 minutes, 02 seconds East, a distance of 10.00 feet to a point for corner; said point being in the south line of said Switching Station;

THENCE, North 84 degrees, 25 minutes, 58 seconds West, along the south line of said Switching Station, a distance of 419.00 feet to a point for corner; said point being the southwest corner of said Switching Station;

THENCE, North 05 degrees, 34 minutes, 02 seconds East, along the west line of said Switching Station, a distance of 890.00 feet to a point for corner;

THENCE, North 84 degrees, 25 minutes, 58 seconds West, a distance of 1,646.73 feet to a point for corner;

THENCE, South 07 degrees, 22 minutes, 21 seconds West, a distance of 359.70 feet to a point for corner; said point being the southeast corner of said Simulator;

THENCE, North 82 degrees, 37 minutes, 39 seconds West, along the south line of said Simulator, a distance of 200.00 feet to the POINT OF BEGINNING.

CONTAINING, 680,971 square feet or 15.63 acres of land, more or less.

EXHIBIT 1-16



EXHIBIT 1-17

## EXHIBIT 2

## DESCRIPTION OF THE REMAINDER COMPLEX

The following described real property in Hood and Somervell Counties, Texas:

The real property described in that certain Deed of Trust, Security Agreement and Fixture Filing dated October 10, 2007, executed by Luminant and recorded (a) in Volume 2343, Page 0734 of the real property records of Hood County, Texas and (b) as Instrument Number 20072921 in the real property records of Somervell County, Texas,

TOGETHER WITH the following:

1. 0.226-acre easement area situated in the A. O'Brien Survey, Abstract No. 433, Hood County, Texas, further being a portion of Lot 8, The Village At Lake Granbury recorded in Slide C-131, Plat Records, Hood County, Texas, said easement area being more particularly described in that certain Easement Agreement between Lake Granbury Builders LLC and Luminant, and recorded in the real property records of Hood County, Texas in Volume 2454, Page 686 (Easement estate only).

2. Easements retained under that certain Special Warranty Deed from Luminant to Lake Granbury Builders LLC, and recorded in the real property records of Hood County, Texas in Volume 2454, Page 675.

SAVE AND EXCEPT the following:

1. Lot 2, Block 1 of the Re-Plat of Tract "A" of the Bluffs of Granbury, Slide A-232-B, P.R.H.C.T.

2. Coal, lignite, oil, gas and other minerals in, under and that may be produced from the land, together with all rights, privileges and immunities relating thereto.

3. The Leased Premises, as conveyed from Luminant to Landlord in a Special Warranty Deed dated as of even date herewith, and described in Exhibit 1 to this Memorandum.

4. A 0.351-acre tract of land situated in the A. O'Brien Survey, Abstract No. 433, Hood County, Texas, said tract of land being more particularly described in that certain Special Warranty Deed from Luminant to Lake Granbury Builders LLC, and recorded in the real property records of Hood County, Texas in Volume 2454, Page 675.

EXHIBIT 2-1

EXECUTION VERSION

## REAL ESTATE ASSIGNMENT AND ASSUMPTION AGREEMENT

This Real Estate Assignment and Assumption Agreement (this "**Agreement**") entered into as of April 28, 2014 (the "**Effective Date**"), by and between **COMANCHE PEAK NUCLEAR POWER COMPANY LLC**, a Delaware limited liability company (together with its successors and assigns, "**Assignor**"); **NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a Delaware limited liability company (together with its successors and assigns, "**Assignee**"); **NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a Delaware limited liability company (together with its successors and assigns, "**Landlord**"); **MITSUBISHI HEAVY INDUSTRIES, LTD.**, a Japanese corporation (together with its successors and assigns, "**Mitsubishi**"); **MITSUBISHI NUCLEAR ENERGY SYSTEMS, INC.**, a Delaware corporation (together with its successors and assigns, "**MNES**"), **MHI NUCLEAR NORTH AMERICA, INC.**, a Delaware corporation (together with its successors and assigns, "**Mitsubishi Member**" and, together with Mitsubishi and MNES, the "**MHI Parties**") and **LUMINANT GENERATION COMPANY LLC**, a Texas limited liability company (together with its successors and assigns, "**Luminant**"). Assignor, Assignee, Landlord, the MHI Parties and Luminant are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

A.    Landlord and Assignor are parties to the Ground Lease dated as of January 30, 2009 (the "**Ground Lease**") pursuant to which Landlord leased to Assignor the property described on Exhibit A hereto.

B.    In connection with the Ground Lease, Landlord assigned to Assignor Landlord's right, title and interest in, and liabilities and obligations under, the Reciprocal Easements and Covenants Agreement entered into as of January 30, 2009 (as amended by Partial Release of Reciprocal Easements and Covenants Agreement dated June 23, 2011 and First Amendment to Reciprocal Easements and Covenants Agreement dated April 27, 2012, the "**Easement Agreement**") by and between Luminant and Landlord and Assignor assumed such right, title, interest, liabilities, and obligations pursuant to the Easement Agreement.

C.    Assignor acquired certain fee properties (the "**Fee Properties**") and acquired or reserved upon sale of certain of the Fee Properties pipeline easements and rights-of-way, including those easements and easement rights (collectively, the "**Pipeline Easements and Rights of Way**") identified in that certain Memorandum of Assignment of Easements and Easement Rights of even date herewith (the "**Memorandum of Assignment**"). The geographic areas to which the Pipeline Easements and Rights of Way pertain are referred to herein as the "**Pipeline Easements Area**" and are described in more detail in the attachments to Exhibit A and Exhibit B of the Memorandum of Assignment.

D.    Simultaneous with the execution of this Agreement, Assignor is conveying to Assignee certain properties located in Hood County, Texas ("**Assignor's Fee Property**") by Special Warranty Deed of even date herewith (the "**Special Warranty Deed**").

1

E.    Assignor desires to assign the Ground Lease and its interest in the Easement Agreement to Assignee, Assignee desires to assume all of Assignor's obligations under the Ground Lease and the Easement Agreement, Landlord desires to consent to the assignment of Ground Lease, and Luminant desires to consent to the assignment of the interest in the Easement Agreement, each subject to the terms and conditions contained herein.

F.    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Ground Lease.

1.    **Assignment of Ground Lease and Interest in Easement Agreement**.  Subject to Section 3 of this Agreement, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to and liabilities and obligations under:

(a)    the Ground Lease; and

(b)    Assignor's interest in the Easement Agreement (including, without limitation, Assignor's obligations under Section 2.B of the Ground Lease with respect to the Easement Agreement).

2.    **Assignment of Pipeline Easements and Rights of Way**.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby forever GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER to Assignee all of the right, title and interest of the Assignor in and the Pipeline Easements and Rights of Way, TO HAVE AND TO HOLD the Pipeline Easements and Rights of Way unto Assignee, its successors and assigns, forever, subject, however, to the covenants, terms and conditions set forth herein.

3.    **Acceptance; Assumption of Liabilities and Obligations**.  Assignee accepts the Leased Premises subject to the terms of the Ground Lease, the Easement Areas subject to the terms of the Easement Agreement and the Pipeline Easements Areas subject to the terms of the Pipeline Easements and Rights of Way, in their "**AS-IS**" condition as of the Effective Date **WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED**.  From and after the Effective Date, Assignee hereby assumes and agrees to perform all of the obligations of Assignor under the Ground Lease, the Easement Agreement and the Pipeline Easements and Rights of Way; provided, however, Assignee shall not be liable for and is not assuming or agreeing to pay for, observe, perform or discharge, when due, any liabilities, obligations, duties, claims, damages or responsibilities of any kind or nature whatsoever relating to the Ground Lease, the Easement Agreement or the Pipeline Easements and Rights of Way that occurred or accrued prior to the Effective Date, whether known or unknown, contingent or absolute, direct or indirect or otherwise, and subject to the provisions of this Agreement, Assignor shall remain responsible for, and shall pay for, observe, perform and discharge, when due, any and all of such liabilities, obligations, duties, claims, damages and responsibilities occurring or accruing prior to the Effective Date, which are not assumed by Assignee.

2

4.     **Consent and Agreement of Landlord**.  Subject to the terms and conditions of this Agreement, Landlord hereby consents to the assignment of the Ground Lease and Assignor's interest in the Easement Agreement by Assignor to Assignee.  Landlord's consent contained herein shall not waive its rights as to any subsequent assignment, sublease or other transfer and shall not be construed as a consent to any modifications of the terms of the Ground Lease or the Easement Agreement except for those modifications that are expressly set forth in this Agreement, it being expressly agreed and acknowledged that Landlord shall have no liability for (and shall not be bound by) any modifications, deletions or waivers of any provision of the Ground Lease or the Easement Agreement which are not specifically set forth herein.  Landlord makes no representations or warranties, express or implied, concerning the condition of the Leased Premises or the Easement Areas (as defined in the Easement Agreement).  From and after the Effective Date, Landlord agrees and acknowledges as follows:

(a)     All references in the Ground Lease and the Easement Agreement to "Tenant" shall mean Assignee; and

(b)     Any notice to Tenant under Section 19 of the Ground Lease shall be delivered only to the address for Assignee set forth in Section 18 below.

5.     **Consent and Agreement of Luminant**.  Subject to the terms and conditions of this Agreement, Luminant hereby consents to the assignment of Assignor's interest in the Easement Agreement to Assignee.  Luminant's consent contained herein shall not waive its rights as to any subsequent assignment, sublease or other transfer and shall not be construed as a consent to any modifications of the terms of the Easement Agreement except for those modifications that are expressly set forth in this Agreement, it being expressly agreed and acknowledged that Luminant shall have no liability for (and shall not be bound by) any modifications, deletions or waivers of any provision of the Easement Agreement which are not specifically set forth herein.  From and after the Effective Date, Luminant agrees and acknowledges that all references in the Easement Agreement to "Tenant" shall mean Assignee.

6.     **Conveyed Property**.  On or before the Effective Date, Assignor shall vacate and surrender the Leased Premises, the Easement Areas, the Pipeline Easements Area, and the Lay Down Areas (collectively, the "**Conveyed Property**") in its current condition, free and clear of all Liens, claims and other Encumbrances created by, through or under Assignor.  References in this Agreement to the Easement Areas shall include the Pump Station, as contemplated by the Easement Agreement.  The terms and conditions of this Section 6 shall not merge with the Special Warranty Deed and shall survive closing.

7.     **Termination of Rights**.  From and after the Effective Date, the Parties hereby expressly agree that the MHI Parties and their respective Affiliates shall not have any express or implied rights arising under the Easement Agreement or the Ground Lease and all references to any of the MHI Parties and their respective Affiliates are hereby deleted.  Accordingly, from and after the Effective Date:

(a)     Luminant and Landlord shall have no obligation to provide notice to any of the MHI Parties under or otherwise pursuant to the Easement Agreement or the Ground Lease.

3

Accordingly, the last sentence of Section 5(a) of the Easement Agreement and the provisions for notice to any of the Mitsubishi Parties under Section 19 of the Ground Lease are hereby deleted;

(b)    The references to Mitsubishi in Section 1 and Section 5(b) of the Easement Agreement and to the Mitsubishi Member in Section 1 of the Ground Lease are hereby deleted;

(c)    Mitsubishi shall have no right to have a Representative on the Liaison Committee (as defined in the Easement Agreement) or to designate or select a Representative to the Liaison Committee on behalf of Tenant pursuant to Section 12 of the Easement Agreement;

(d)    Mitsubishi and its Affiliates shall have no right to enforce any right, demand, claim, action or cause of action against Luminant pursuant to the last sentence of Section 20.11(e) of the Easement Agreement and the last sentence of Section 35.E of the Ground Lease, and each of such sentences are hereby deleted.

(e)    The "Mitsubishi Member" shall have no right to prevent Landlord from declaring a Tenant Event of Default under the Ground Lease pursuant to the last sentence Section 11.D of the Ground Lease, and such sentence is hereby deleted.

8.    **No Representations or Warranties**.    Notwithstanding anything contained herein to the contrary, it is understood and agreed that Assignor and Assignor's agents or employees have never made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, oral or written, with respect to the Conveyed Property, the Ground Lease or the Easement Agreement to Assignee, Luminant or Landlord.  ASSIGNOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND TO ASSIGNEE, LUMINANT OR LANDLORD, INCLUDING, WITHOUT LIMITATION, THE PHYSICAL CONDITION OF THE CONVEYED PROPERTY, OR ITS SUITABILITY FOR ANY PARTICULAR PURPOSE OR OF MERCHANTABILITY. ASSIGNEE IS RELYING ON ITS INVESTIGATIONS OF THE CONVEYED PROPERTY IN DETERMINING WHETHER TO ACQUIRE IT.  THE PROVISIONS OF THIS PARAGRAPH ARE A MATERIAL PART OF THE CONSIDERATION FOR ASSIGNOR EXECUTING THIS AGREEMENT AND SHALL SURVIVE CLOSING.

9.    **Resignations from the Liaison Committee.**    Mitsubishi hereby agrees that it shall have no Representative on the Liaison Committee and that any person appointed by Mitsubishi to the Liaison Committee created under Section 12 of the Easement Agreement is hereby removed therefrom.

10.    **Prorations**.    All unpaid real and personal property ad valorem taxes and assessments payable by Assignor with respect to the Pipeline Easements and Rights of Way and the Assignor's Fee Property and payable by Assignor pursuant to the Ground Lease and the Easement Agreement for the then-current calendar year, if any ("**Prorated Taxes**") shall be prorated as of the Effective Date for the period for which such taxes and assessments are assessed, regardless of when payable. If Prorated Taxes for the year in which the Effective Date occurs (the "**Effective Year**") are not known or cannot be reasonably estimated, Prorated Taxes shall be prorated based on real and personal property ad valorem taxes and assessments for the

4

year prior to the Effective Year and such proration shall be adjusted in cash between Assignee and Assignor upon presentation of written evidence that the actual Prorated Taxes paid for the Effective Year differ from the amounts used to make to make the prorations on the Effective Date. If any assessments are payable in installments, then the installment allocable to the current period shall be prorated (with Assignee being allocated the obligation to pay any installments due after the Effective Date).

11.    **Releases**: As of the Effective Date:

(a)    Luminant, on behalf of itself and its Affiliates (including, without limitation, Nuclear Energy Future Holdings LLC) (the "**Lumiuant Parties**") hereby releases the MHI Parties and each of their respective Related Parties (the "**Mitsubishi Released Parties**") from any and all actions, arbitrations, audits, hearings, investigations, litigations, orders, suits (whether civil, criminal, administrative, investigative or informal), debts, sums of money, interest owed, accounts, contribution obligations, reckonings, bonds, bills, covenants, controversies, agreements, guaranties, promises, undertakings, variances, trespasses, credit memoranda, charges, damages, judgments, executions, obligations, costs, expenses, fees (including attorneys' and accountants' fees, expenses and court costs), counterclaims, claims, demands, causes of action and liabilities (including, without limitation, any "Claims" as such term is defined in the Ground Lease and the Easement Agreement), and hereby finally, unconditionally, irrevocably and absolutely forever waives any and all offsets and defenses, in each case to the extent arising out of any action, inaction, event, circumstance, agreement, misrepresentation, omission, transaction, fact or occurrence occurring or alleged to have occurred on or prior to the Effective Date hereof, whether known or unknown, absolute or contingent, matured or unmatured, foreseeable or unforeseeable, suspected or unsuspected, accrued or not accrued, previously or presently existing or hereafter discovered, at law, in equity or otherwise, whether arising by statute, common law, in contract, in tort or otherwise, of any kind, character or nature whatsoever (collectively, the "**Claims**"), which the Luminant Parties ever had, now have or hereafter can, shall or may have against the Mitsubishi Released Parties relating to or connected to, or arising out of, the Ground Lease, the Easement Agreement or any of the transactions contemplated by this Agreement. The Luminant Parties understand and agree that they are expressly waiving all Claims against the Mitsubishi Released Parties concerning the Ground Lease, the Easement Agreement and any of the transactions contemplated by this Agreement, including, without limitation, those Claims that it may not know or suspect to exist, which if known may have adversely affected the decision to provide this release, and the Luminant Parties expressly waive any rights under applicable law that provide to the contrary. This subparagraph (a) does not apply to any Excluded Claims.

(b)    The MHI Parties, each on behalf of itself and its Affiliates (the "**Mitsubishi Parties**") hereby releases Luminant and each of its Related Parties (the "**Luminant Released Parties**"), from any and all Claims which the Mitsubishi Parties ever had, now have or hereafter can, shall or may have against the Luminant Released Parties relating to or connected to, or arising out of, the Ground Lease, the Easement Agreement or any of the transactions contemplated by this Agreement (including, without limitation, any third party beneficiary rights). The Mitsubishi Parties understand and agree that they are expressly waiving all Claims against the Luminant Released Parties concerning the Ground Lease, the Easement Agreement and any of the transactions contemplated by this Agreement, including, without limitation, those

5

Claims that it may not know or suspect to exist, which if known may have adversely affected the decision to provide this release, and the Mitsubishi Parties expressly waive any rights under applicable law that provide to the contrary. This subparagraph (b) does not apply to any Excluded Claims.

       (c)    As used in this Section 11,

          (i)    "**Related Parties**" means a Party's Affiliates, such Party's and such Party's Affiliates' respective individual, joint or mutual, past, present and future parents, affiliates, predecessors, successors, assigns, heirs, executors, administrators, stockholders, partners, members, managers, employees, agents, representatives, assignees, insurers and attorneys; and

          (ii)    "**Excluded Claims**" means (A) any obligation under this Agreement or breach thereof or (B) any Claim arising from an inaccurate representation or warranty or breach of any representation or warranty in this Agreement.

       12.    **Governing Law**. This Agreement and the rights and obligations of the Parties under this Agreement (including all matters of construction, validity and performance) shall be governed by, and construed and interpreted in accordance with, the law of the State of Texas.

       13.    **Dispute Resolution**.

       (a)    If any claim, counterclaim, demand, cause of action, dispute, controversy or other matter in question arising out of or relating to this Agreement, or to the alleged breach hereof, or in any way relating to the subject matter of this Agreement or the relationship among the Parties created by this Agreement (whether extra-contractual in nature, sounding in contract, tort or otherwise, or provided for by federal or state statute, common law or otherwise) (hereafter a "**Dispute**") arises, a Party desiring to initiate dispute resolution shall give notice to all other Parties to initiate the dispute resolution procedures set forth herein. Promptly upon receipt of such notice, each Party that is a party to the Dispute (each, a "**Disputing Party**") shall refer such Dispute to a senior executive officer ("**SEO**") of such Disputing Party. The SEOs will meet in person or by teleconference as soon as mutually practicable (but in any event within 10 Business Days after such notice) in order to try and resolve the Dispute. If the SEOs are unable to resolve the Dispute on or before the 30th Day after such notice, any Disputing Party may notify each other Disputing Party that it desires to commence an arbitration under this Section 13 (an "**Arbitration Notice**").

       (b)    All Disputes shall be finally settled under the Commercial Arbitration Rules (the "**Rules**") of the American Arbitration Association ("**AAA**"). The Parties agree that any such arbitration shall be confidential and no Party shall publicly disclose the fact of such Dispute, the pleadings and positions taken in the arbitration, or the decision of the Tribunal.

       (c)    Any arbitration conducted under this Section 13 shall be heard by three arbitrators (each an "**Arbitrator**" and collectively the "**Tribunal**") selected in accordance with this Section 13 and the Rules. When a Dispute involves only two Disputing Parties, each Disputing Party shall appoint one Arbitrator within 10 Days after the sending of the Arbitration

Notice. The two party-appointed Arbitrators will thereafter appoint a third Arbitrator within 15 Days after the appointment of the second Arbitrator, which third Arbitrator shall not be a citizen of the United States of America or Japan. Where a Dispute involves more than two Disputing Parties, all three Arbitrators shall be selected in accordance with the Rules, with the exception that the AAA shall not directly appoint the Tribunal without first attempting to make the appointments through the National Roster list system. Each Disputing Party and any proposed Arbitrator shall, as soon as practicable, disclose to the other Disputing Parties any business, personal or other relationship or affiliation that may exist between any Party and the proposed Arbitrators. The Disputing Parties may then object to any of the proposed Arbitrators on the basis of such relationship or affiliation. The validity of any such objection shall be determined according to the Rules.

(d)     The Tribunal shall expeditiously hear and decide all matters concerning the Dispute. Any arbitration hearing shall be held in New York, New York. Arbitration proceedings shall be conducted in English. The decision of the Tribunal (which shall be rendered in English in the form of a written award) shall be final, nonappealable and binding upon the Parties and may be confirmed in, and judgment upon the award entered by, any court having jurisdiction over the Parties. It is acknowledged and agreed that, consistent with the Rules, the Disputing Parties shall be permitted to request interim or injunctive relief from a court at any time.

(e)     The responsibility for paying the costs of the Tribunal and any experts retained by the Tribunal shall be borne equally by the Disputing Parties, and costs incurred by any Disputing Party for its attorneys, advisors, consultants and experts shall be borne by the Disputing Party incurring such costs.

(f)     Each Party hereby consents to the non-exclusive personal jurisdiction and venue of the Federal District Court for the Southern District of New York and the Federal District Court for the Northern District of Texas for any proceedings in aid of arbitration under this Section 13, including any request for interim or injunctive relief.

14.     **Limitations on Liability**. Notwithstanding any provision of this Agreement, in no event shall any Party ever be liable to any other Party or third party (except for, in each case, any damages actually paid to a third party that is not an indemnified party pursuant to a third party claim for which indemnification is required hereunder) with respect to any claim arising out of or relating to this Agreement for any lost or prospective profits or for special, punitive, exemplary, consequential, incidental or indirect losses or damages from its performance under this agreement or for any failure of performance hereunder or related hereto, whether arising out of breach of contract, negligence, tort, strict liability or otherwise and whether or not arising from any other Party's sole, joint or concurrent negligence, strict liability or other fault.

15.     **Severability**. If any provision of this Agreement or the application thereof to any Party or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to the other Parties or circumstances is not affected thereby and the Parties shall, to the extent practicable and permitted by applicable law, negotiate in good faith to replace that provision with a new provision that is valid and

7

enforceable and that puts the Parties in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable.

16.    **Amendments**. This Agreement may be amended, modified or superseded, and any of the terms or provisions herein may be waived, only by a written instrument executed by each of the Parties. No waiver by any Party of any breach of any term or provision contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or a waiver of any other breach of any other term or provision.

17.    **Headings**. Titles or captions of sections, paragraphs or subparagraphs contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof.

18.    **Notices**.    Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder shall be in writing and shall be deemed given upon (a) confirmed delivery by a standard overnight carrier or when delivered by hand, (b) actual receipt, addressed to the respective Parties at the following addresses (or such other address for a Party as shall be specified by like notice), or (c) electronic transmission (if followed by delivery by standard overnight carrier or delivery by hand) to the email addresses set forth below:

If to Luminant, Landlord, Assignor, or Assignee, to:

> Nuclear Energy Future Holdings LLC
> c/o Luminant Generation Company LLC
> 500 N. Akard Street
> Dallas, Texas 75201
> Attention: Bob Frenzel, Chief Financial Officer
> Email: bob.frenzel@luminant.com

with a copy to:

> Luminant Generation Company LLC
> 500 N. Akard Street
> Dallas, Texas 75201
> Attention: Stephanie Zapata Moore, General Counsel
> Email: stephanie.moore@luminant.com

If to Mitsubishi or Assignor, to:

> Mitsubishi Heavy Industries, Ltd.
> Global Nuclear Business Operations
> 16-5, Konan 2-Chome, Minato-ku
> Tokyo 108-8215 Japan
> Attention: Hiroshi Matsuda, Deputy Senior Vice President
> Email: hiroshi_matsuda@mhi.co.jp

with a copy to:

> Mitsubishi Heavy Industries, Ltd.
> Legal Department
> 16-5, Konan 2-Chome, Minato-ku
> Tokyo 108-8215 Japan
> Attention: Hisashi Kato, Manager
> Email: hisasi_kato@mhi.co.jp

A Party may change its notice address by giving written notice in the manner specified above.

19. **Counterparts**. This Agreement may be signed in counterparts, each of which when taken together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

20. **Entire Agreement**. This Agreement, along with the other Transaction Agreements, contains the entire agreement of the Parties hereto with respect to its subject matter. Nothing in this Agreement amends, modifies or supersedes in any respect any term or provision contained in any other Transaction Agreement, and any breach by any Party of any other Transaction Agreement shall be governed by the terms and conditions of such other Transaction Agreement.

21. **Successors and Assigns**. All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assigned by any Party without the prior written consent of the other Parties.

22. **Further Assurances**. Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

23. **Authority**. Each Party represents and warrants to the other as follows: it is a duly organized and existing limited liability company or corporation under the laws of the jurisdiction of its organization, it has the full right and authority to enter into, execute and deliver this Agreement (and with respect to Assignor, the Special Warranty Deed), its execution of this

9

Agreement (and with respect to the Assignor, the Special Warranty Deed) do not result in the violation of any law or the breach of any agreement to which Assignor may be bound; each person signing this Agreement (and with respect to the Assignor, the Special Warranty Deed) on its behalf was and continues to be authorized to do so; upon execution by Assignor and Assignee, this Agreement shall be an enforceable agreement binding upon it in accordance with the terms hereof; each has not heretofore assigned or transferred, or purported to assign or transfer, to any person, firm or corporation whatsoever, any claim, debt, liability, demand, obligation, cost, attorneys' fees, expense, action or cause of action herein released.

<div align="center">[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]</div>

2141911v.6 EFH100/45001

Executed as of the date first written above.

LANDLORD:                           **NUCLEAR ENERGY FUTURE HOLDINGS LLC**, a Delaware limited liability company


                                    By: _____
                                    Name: Robert C. Frenzel
                                    Title:   Senior Vice President and Chief Financial
                                             Officer


ASSIGNOR:                           **COMANCHE PEAK NUCLEAR POWER COMPANY LLC**, a Delaware limited liability company


                                    By: _____
                                    Name: Robert C. Frenzel
                                    Title:   Senior Vice President, Chief Financial
                                             Officer and Development Manager


ASSIGNEE:                           **NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a Delaware limited liability company


                                    By: _____
                                    Name: Robert C. Frenzel
                                    Title:   Senior Vice President and Chief Financial
                                             Officer


LUMINANT:                           **LUMINANT GENERATION COMPANY LLC**, a Texas limited liability company


                                    By: _____
                                    Name: Robert C. Frenzel
                                    Title:   Senior Vice President and Chief Financial
                                             Officer

**MITSUBISHI:**

**MITSUBISHI HEAVY INDUSTRIES, LTD.,** a Japanese corporation

By: _____
Name:  Hiroshi Matsuda
Title:   Deputy Senior Vice President
            Global Nuclear Business Operations
            Plant Business Department

**MNES:**

**MITSUBISHI NUCLEAR ENERGY SYSTEMS, INC.,** a Delaware corporation

By: _____
Name:  Makoto Toyama
Title:   President and Chief Executive Officer

**MITSUBISHI MEMBER:**

**MHI NUCLEAR NORTH AMERICA, INC.,** a Delaware corporation

By: _____
Name:  Hiroshi Matsuda
Title:   President

**EXHIBIT A**

**LEASED PREMISES**

The following described real property in Hood and Somervell Counties, Texas, SAVE AND EXCEPT, with respect to each of the following parcels, any coal, lignite, oil, gas and other minerals in, under and that may be produced from the land, together with all rights, privileges and immunities relating thereto.

**Section A**

**PARCEL 1:   POWER PLANT PARCEL**

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 485.45 ACRES, SITUATED IN THE JAMES D. ELLIOT SURVEY, ABSTRACT NO. 170, WILLIAM B. SMITH SURVEY, ABSTRACT NO. 90, AND GALVESTON COUNTY SCHOOL LAND SURVEY, ABSTRACT NO. 852 IN HOOD AND SOMERVELL COUNTY, TEXAS AND BEING PART OF THE LAND DESCRIBED IN A DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING FROM LUMINANT GENERATION COMPANY LLC AS RECORDED (1) IN VOLUME 2343, PAGE 0734 OF THE REAL PROPERTY RECORDS OF HOOD COUNTY, TEXAS AND (2) AS INSTRUMENT NUMBER 20072921 IN THE REAL PROPERTY RECORDS OF SOMERVELL COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING, at an iron rod found at the southwest corner of said Luminant tract whose coordinates are Northing: 6792287.89, Easting: 2179084.52, from which a concrete monument found bears S 29°12'54' E, a distance of 127.54 feet whose coordinates are Northing: 6792176.49, Easting: 2179146.87;

THENCE, North 59 degrees, 29 minutes, 18 seconds East, a distance of 2858.02 feet to an iron rod found for corner;

THENCE, North 31 degrees, 14 minutes, 42 seconds West, a distance of 17.00 feet to an iron rod found for corner;

THENCE, North 21 degrees, 11 minutes, 31 seconds East, a distance of 2801.00 feet to an iron rod found for corner;

THENCE, North 59 degrees, 34 minutes, 31 seconds East, a distance of 2313.76 feet to a point for corner;

THENCE, South 30 degrees, 47 minutes, 52 seconds East, a distance of 28.18 feet to a point for corner; said point being the beginning of a non-tangent curve to the right;

THENCE, along a non-tangent curve to the right having a radius of 1185.58 feet, a central angle of 61 degrees, 10 minutes, 53 seconds, a tangent length of 700.89 feet, the long chord of which bears South 26 degrees, 13 minutes, 42 seconds West for a distance of 1206.69 feet with a radial line in of South 85 degrees, 38 minutes, 16 seconds West and a radial line out of South 33 degrees, 10 minutes, 51 seconds East for an arc length of 1265.98 feet to a point;

A-1

THENCE, South 56 degrees, 49 minutes, 09 seconds West, a distance of 290.66 feet to a point for corner;

THENCE, South 44 degrees, 18 minutes, 47 seconds West, a distance of 256.85 feet to a point for corner;

THENCE, South 25 degrees, 28 minutes, 27 seconds West, a distance of 311.19 feet to a point for corner;

THENCE, South 32 degrees, 40 minutes, 03 seconds West, a distance of 167.80 feet to a point for corner;

THENCE, South 02 degrees, 00 minutes, 06 seconds East, a distance of 142.13 feet to a point for corner;

THENCE, South 20 degrees, 24 minutes, 37 seconds West, a distance of 101.48 feet to a point for corner;

THENCE, South 46 degrees, 52 minutes, 05 seconds East, a distance of 20.59 feet to a point for corner;

THENCE, North 63 degrees, 22 minutes, 59 seconds East, a distance of 73.08 feet to a point for corner;

THENCE, North 22 degrees, 50 minutes, 14 seconds East, a distance of 117.45 feet to a point for corner;

THENCE, North 64 degrees, 20 minutes, 45 seconds East, a distance of 128.69 feet to a point for corner;

THENCE, North 39 degrees, 17 minutes, 47 seconds East, a distance of 111.82 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 142.21 feet, a central angle of 131 degrees, 38 minutes, 31 seconds, a tangent length of 316.75 feet, the long chord of which bears North 79 degrees, 42 minutes, 21 seconds East for a distance of 259.47 feet with a radial line in of South 76 degrees, 06 minutes, 54 seconds East and a radial line out of North 55 degrees, 31 minutes, 37 seconds East for an arc length of 326.75 feet to a point;

THENCE, South 34 degrees, 28 minutes, 23 seconds East, a distance of 57.79 feet to a point for corner;

THENCE, North 84 degrees, 41 minutes, 53 seconds East, a distance of 30.76 feet to a point for corner;

THENCE, North 03 degrees, 56 minutes, 41 seconds East, a distance of 36.09 feet to a point for corner;

THENCE, North 31 degrees, 11 minutes, 59 seconds East, a distance of 84.83 feet to a point for corner;

THENCE, North 65 degrees, 37 minutes, 43 seconds East, a distance of 481.38 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 248.43 feet, a central angle of 69 degrees, 12 minutes, 53 seconds, a tangent length of 171.43 feet, the long chord of which

A-2

bears North 87 degrees, 06 minutes, 01 seconds East for a distance of 282.19 feet with a radial line in of South 37 degrees, 30 minutes, 26 seconds East and a radial line out of North 31 degrees, 42 minutes, 27 seconds East for an arc length of 300.11 feet to a point;

THENCE, South 58 degrees, 17 minutes, 33 seconds East, a distance of 208.16 feet to a point for corner;

THENCE, North 03 degrees, 35 minutes, 24 seconds West, a distance of 185.37 feet to a point for corner;

THENCE, North 33 degrees, 50 minutes, 46 seconds East, a distance of 455.86 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 256.77 feet, a central angle of 110 degrees, 08 minutes, 18 seconds, a tangent length of 367.65 feet, the long chord of which bears South 89 degrees, 01 minutes, 49 seconds East for a distance of 421.03 feet with a radial line in of South 54 degrees, 05 minutes, 58 seconds East and a radial line out of North 56 degrees, 02 minutes, 20 seconds East for an arc length of 493.59 feet to a point;

THENCE, South 26 degrees, 15 minutes, 07 seconds East, a distance of 97.75 feet to a point for corner;

THENCE, South 89 degrees, 32 minutes, 07 seconds East, a distance of 208.78 feet to a point for corner;

THENCE, South 39 degrees, 41 minutes, 36 seconds East, a distance of 167.67 feet to a point for corner;

THENCE, South 39 degrees, 41 minutes, 36 seconds East, a distance of 39.34 feet to a point for corner;

THENCE, South 20 degrees, 30 minutes, 51 seconds East, a distance of 178.37 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 23.01 feet, a central angle of 125 degrees, 23 minutes, 53 seconds, a tangent length of 44.58 feet, the long chord of which bears South 74 degrees, 28 minutes, 37 seconds East for a distance of 40.89 feet with a radial line in of North 78 degrees, 13 minutes, 20 seconds East and a radial line out of South 47 degrees, 10 minutes, 33 seconds East for an arc length of 50.36 feet to a point;

THENCE, North 42 degrees, 49 minutes, 27 seconds East, a distance of 190.26 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 194.49 feet, a central angle of 36 degrees, 46 minutes, 38 seconds, a tangent length of 64.65 feet, the long chord of which bears North 32 degrees, 42 minutes, 16 seconds East for a distance of 122.70 feet with a radial line in of North 38 degrees, 54 minutes, 25 seconds West and a radial line out of South 75 degrees, 41 minutes, 03 seconds East for an arc length of 124.84 feet to a point;

THENCE, along a reverse curve to the right with a radius of 245.37 feet, a tangent length of 94.24 feet, a central angle of 42 degrees, 01 minutes, 23 seconds, the radius of which bears South 75 degrees, 41 minutes, 03 seconds East, the chord of which bears North 35 degrees, 19 minutes, 39 seconds East for a distance of 175.95 feet; Thence along the arc of said curve for a distance of 179.96 feet to a point;

A-3

THENCE, North 56 degrees, 20 minutes, 21 seconds East, a distance of 326.15 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 370.51 feet, a central angle of 51 degrees, 17 minutes, 31 seconds, a tangent length of 177.88 feet, the long chord of which bears South 79 degrees, 37 minutes, 03 seconds East for a distance of 320.72 feet with a radial line in of South 15 degrees, 15 minutes, 48 seconds East and a radial line out of North 36 degrees, 01 minutes, 43 seconds East for an arc length of 331.68 feet to a point;

THENCE, South 23 degrees, 00 minutes, 52 seconds East, a distance of 377.46 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 159.75 feet, a central angle of 68 degrees, 16 minutes, 28 seconds, a tangent length of 108.31 feet, the long chord of which bears South 15 degrees, 25 minutes, 37 seconds West for a distance of 179.30 feet with a radial line in of South 71 degrees, 17 minutes, 23 seconds West and a radial line out of South 40 degrees, 26 minutes, 09 seconds East for an arc length of 190.36 feet to a point;

THENCE, South 49 degrees, 33 minutes, 51 seconds West, a distance of 34.35 feet to a point for corner;

Thence, along a non-tangent curve to the left having a radius of 88.02 feet, a central angle of 64 degrees, 51 minutes, 11 seconds, a tangent length of 55.92 feet, the long chord of which bears South 28 degrees, 56 minutes, 25 seconds West for a distance of 94.40 feet with a radial line in of South 28 degrees, 38 minutes, 00 seconds East and a radial line out of South 86 degrees, 30 minutes, 49 seconds West for an arc length of 99.63 feet to a point;

THENCE, South 03 degrees, 29 minutes, 11 seconds East, a distance of 137.99 feet to a point for corner;

THENCE, South 11 degrees, 28 minutes, 18 seconds East, a distance of 126.81 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 111.22 feet, a central angle of 68 degrees, 10 minutes, 36 seconds, a tangent length of 75.27 feet, the long chord of which bears South 02 degrees, 04 minutes, 17 seconds West for a distance of 124.67 feet with a radial line in of South 57 degrees, 58 minutes, 59 seconds West and a radial line out of South 53 degrees, 50 minutes, 25 seconds East for an arc length of 132.34 feet to a point;

THENCE, South 36 degrees, 09 minutes, 35 seconds West, a distance of 200.07 feet to a point for corner;

THENCE, South 59 degrees, 08 minutes, 11 seconds West, a distance of 154.05 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 65.21 feet, a central angle of 82 degrees, 24 minutes, 52 seconds, a tangent length of 57.10 feet, the long chord of which bears South 46 degrees, 18 minutes, 14 seconds West for a distance of 85.92 feet with a radial line in of South 02 degrees, 29 minutes, 20 seconds East and a radial line out of North 84 degrees, 54 minutes, 12 seconds West for an arc length of 93.80 feet to a point;

THENCE, along a reverse curve to the right with a radius of 220.66 feet, a tangent length of 61.45 feet, a central angle of 31 degrees, 07 minutes, 20 seconds, the radius of which bears North

A-4

84 degrees, 54 minutes, 12 seconds West, the chord of which bears South 20 degrees, 39 minutes, 28 seconds West for a distance of 118.39 feet; Thence along the arc of said curve for a distance of 119.86 feet to a point;

THENCE, South 36 degrees, 13 minutes, 08 seconds West, a distance of 191.02 feet to a point for corner;

THENCE, South 41 degrees, 34 minutes, 06 seconds West, a distance of 79.40 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 358.01 feet, a central angle of 50 degrees, 36 minutes, 39 seconds, a tangent length of 169.27 feet, the long chord of which bears South 72 degrees, 10 minutes, 25 seconds West for a distance of 306.06 feet with a radial line in of North 43 degrees, 07 minutes, 55 seconds West and a radial line out of South 07 degrees, 28 minutes, 44 seconds West for an arc length of 316.24 feet to a point;

THENCE, along a reverse curve to the left with a radius of 115.74 feet, a tangent length of 78.82 feet, a central angle of 68 degrees, 30 minutes, 38 seconds, the radius of which bears South 07 degrees, 28 minutes, 44 seconds West, the chord of which bears South 63 degrees, 13 minutes, 25 seconds West for a distance of 130.30 feet; Thence along the arc of said curve for a distance of 138.40 feet to a point;

THENCE, along a non-tangent curve to the right having a radius of 435.25 feet, a central angle of 84 degrees, 33 minutes, 21 seconds, a tangent length of 395.75 feet, the long chord of which bears South 25 degrees, 40 minutes, 59 seconds West for a distance of 585.62 feet with a radial line in of South 73 degrees, 24 minutes, 18 seconds West and a radial line out of South 22 degrees, 02 minutes, 21 seconds East for an arc length of 642.34 feet to a point;

THENCE, along a non-tangent curve to the left having a radius of 110.31 feet, a central angle of 171 degrees, 45 minutes, 12 seconds, a tangent length of 1530.16 feet, the long chord of which bears South 65 degrees, 24 minutes, 22 seconds East for a distance of 220.04 feet with a radial line in of South 69 degrees, 31 minutes, 46 seconds East and a radial line out of South 61 degrees, 16 minutes, 58 seconds East for an arc length of 330.67 feet to a point;

THENCE, North 63 degrees, 40 minutes, 46 seconds East, a distance of 1118.42 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 233.80 feet, a central angle of 45 degrees, 06 minutes, 26 seconds, a tangent length of 97.10 feet, the long chord of which bears North 72 degrees, 15 minutes, 09 seconds East for a distance of 179.35 feet with a radial line in of North 04 degrees, 48 minutes, 22 seconds East and a radial line out of South 40 degrees, 18 minutes, 04 seconds East for an arc length of 184.06 feet to a point;

THENCE, along a reverse curve to the right with a radius of 128.13 feet, a tangent length of 236.15 feet, a central angle of 123 degrees, 01 minutes, 57 seconds, the radius of which bears South 40 degrees, 18 minutes, 04 seconds East, the chord of which bears South 68 degrees, 47 minutes, 05 seconds East for a distance of 225.24 feet; Thence along the arc of said curve for a distance of 275.14 feet to a point;

THENCE, South 07 degrees, 16 minutes, 07 seconds East, a distance of 98.88 feet to a point for corner;

A-5

THENCE, South 15 degrees, 31 minutes, 36 seconds East, a distance of 28.08 feet to a point for corner;

THENCE, South 01 degrees, 17 minutes, 54 seconds East, a distance of 56.71 feet to a point for corner;

THENCE, South 05 degrees, 18 minutes, 00 seconds East, a distance of 30.79 feet to a point for corner;

Thence, along a non-tangent curve to the right having a radius of 16.55 feet, a central angle of 101 degrees, 16 minutes, 58 seconds, a tangent length of 20.18 feet, the long chord of which bears South 37 degrees, 07 minutes, 32 seconds East for a distance of 25.60 feet with a radial line in of South 02 degrees, 13 minutes, 59 seconds West and a radial line out of South 76 degrees, 29 minutes, 03 seconds East for an arc length of 29.26 feet to a point;

Thence, along a reverse curve to the left with a radius of 63.94 feet, a tangent length of 59.03 feet, a central angle of 85 degrees, 26 minutes, 01 seconds, the radius of which bears South 76 degrees, 29 minutes, 03 seconds East, the chord of which bears South 29 degrees, 12 minutes, 03 seconds East for a distance of 86.74 feet; Thence along the arc of said curve for a distance of 95.33 feet to a point;

THENCE, South 71 degrees, 55 minutes, 04 seconds East, a distance of 149.36 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 71.08 feet, a central angle of 59 degrees, 36 minutes, 35 seconds, a tangent length of 40.71 feet, the long chord of which bears North 86 degrees, 16 minutes, 25 seconds East for a distance of 70.66 feet with a radial line in of North 26 degrees, 04 minutes, 43 seconds East and a radial line out of South 33 degrees, 31 minutes, 53 seconds East for an arc length of 73.95 feet to a point;

THENCE, North 56 degrees, 28 minutes, 07 seconds East, a distance of 176.90 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 58.09 feet, a central angle of 71 degrees, 46 minutes, 36 seconds, a tangent length of 42.03 feet, the long chord of which bears North 85 degrees, 06 minutes, 25 seconds East for a distance of 68.10 feet with a radial line in of South 40 degrees, 46 minutes, 53 seconds East and a radial line out of North 30 degrees, 59 minutes, 43 seconds East for an arc length of 72.77 feet to a point;

THENCE, South 59 degrees, 00 minutes, 17 seconds East, a distance of 202.10 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 92.39 feet, a central angle of 91 degrees, 20 minutes, 48 seconds, a tangent length of 94.59 feet, the long chord of which bears South 12 degrees, 10 minutes, 01 seconds East for a distance of 132.19 feet with a radial line in of South 32 degrees, 09 minutes, 35 seconds West and a radial line out of South 56 degrees, 29 minutes, 36 seconds East for an arc length of 147.30 feet to a point;

THENCE, along a reverse curve to the left with a radius of 139.01 feet, a tangent length of 55.29 feet, a central angle of 43 degrees, 22 minutes, 42 seconds, the radius of which bears South 56 degrees, 29 minutes, 36 seconds East, the chord of which bears South 11 degrees, 49 minutes, 03 seconds West for a distance of 102.75 feet; Thence along the arc of said curve for a distance of 105.24 feet to a point;

A-6

THENCE, along a compound curve to the left with a radius of 244.38 feet, a tangent length of 53.49 feet, a central angle of 24 degrees, 41 minutes, 26 seconds, the radius of which bears North 80 degrees, 07 minutes, 41 seconds East, the chord of which bears South 22 degrees, 13 minutes, 02 seconds East for a distance of 104.50 feet; Thence along the arc of said curve for a distance of 105.31 feet to a point;

THENCE, South 34 degrees, 33 minutes, 45 seconds East, a distance of 319.27 feet to a point for corner;

THENCE, over and across said Luminant tract, the following courses;

THENCE, South 05 degrees, 57 minutes, 21 seconds West, a distance of 825.91 feet to a point for corner;

THENCE, North 88 degrees, 52 minutes, 16 seconds West, a distance of 1515.95 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 594.60 feet, a central angle of 09 degrees, 38 minutes, 10 seconds, a tangent length of 230.25 feet, the long chord of which bears South 69 degrees, 57 minutes, 38 seconds West for a distance of 429.43 feet, for an arc length of 439.36 feet to a point;

THENCE, South 39 degrees, 21 minutes, 15 seconds West, a distance of 144.39 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 399.31 feet, a central angle of 53 degrees, 03 minutes, 25 seconds, a tangent length of 199.33 feet, the long chord of which bears South 64 degrees, 34 minutes, 19 seconds West for a distance of out of South 01 degrees, 06 minutes, 02 seconds West for an arc length of 369.76 feet to a point;

THENCE, North 83 degrees, 36 minutes, 27 seconds West, a distance of 1468.13 feet to a point for corner;

THENCE, North 60 degrees, 41 minutes, 20 seconds West, a distance of 23.99 feet to a point for corner;

THENCE, North 83 degrees, 37 minutes, 41 seconds West, a distance of 903.70 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 1530.45 feet, a central angle of 39 degrees, 57 minutes, 10 seconds, a tangent length of 556.33 feet, the long chord of which bears South 80 degrees, 36 minutes, 35 seconds West for a distance of 1045.71 feet with a radial line in of South 10 degrees, 35 minutes, 10 seconds West and a radial line out of North 29 degrees, 22 minutes, 00 seconds West for an arc length of 1067.20 feet to a point;

THENCE, South 57 degrees, 57 minutes, 56 seconds West, a distance of 832.39 feet to a point for corner;

THENCE, along a non-tangent curve to the left having a radius of 1289.69 feet, a central angle of 26 degrees, 52 minutes, 29 seconds, a tangent length of 308.14 feet, the long chord of which bears South 46 degrees, 15 minutes, 12 seconds West for a distance of 599.40 feet with a radial line in of South 30 degrees, 18 minutes, 33 seconds East and a radial line out of North 57 degrees, 11 minutes, 02 seconds West for an arc length of 604.93 feet to a point;

A-7

THENCE, South 32 degrees, 48 minutes, 58 seconds West, a distance of 261.56 feet to a point for corner;

THENCE, along a non-tangent curve to the right having a radius of 1358.41 feet, a central angle of 13 degrees, 31 minutes, 28 seconds, a tangent length of 161.07 feet, the long chord of which bears South 40 degrees, 54 minutes, 03 seconds West for a distance of 319.91 feet with a radial line in of North 55 degrees, 51 minutes, 41 seconds West and a radial line out of South 42 degrees, 20 minutes, 13 seconds East for an arc length of 320.65 feet to a point;

THENCE, South 58 degrees, 17 minutes, 13 seconds West, a distance of 568.59 feet to a point for corner;

THENCE, North 30 degrees, 05 minutes, 31 seconds West, a distance of 48.95 feet to a point for corner said point being the beginning of a curve to the left;

THENCE, along said curve, having a central angle of 12 degrees, 20 minutes, 05 seconds, a radius of 1492.39 feet, a chord bearing and distance of North 36 degrees, 15 minutes, 33 seconds West, 320.66 feet, an arc distance of 321.28 feet to an iron rod found at the end of said curve;

THENCE, North 30 degrees, 10 minutes, 42 seconds West, a distance of 669.61 feet to the POINT OF BEGINNING and CONTAINING 21146354 Square Feet or 485.45 acres of land.

In Hood County:  126.18 acres

In Somervell County:  359.27 acres

A-8



A-9

Section B

## PARCEL 2:   BLOWDOWN TREATMENT PARCEL

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 399.96 ACRES, SITUATED IN THE SUSANNAH MCKELEVY SURVEY, ABSTRACT NO. 68 AND IN J.A. HERNANDEZ SURVEY, ABSTRACT NO. 42, IN SOMERVELL , TEXAS AND BEING PART OF THE LAND DESCRIBED IN A DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING FROM LUMINANT GENERATION COMPANY LLC AS RECORDED (1) IN VOLUME 2343, PAGE 0734 OF THE REAL PROPERTY RECORDS OF HOOD COUNTY, TEXAS AND (2) AS INSTRUMENT NUMBER 20072921 IN THE REAL PROPERTY RECORDS OF SOMERVELL COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING, at an iron rod found at the most southeast corner of said Luminant tract whose coordinates are Northing: 6783384.12 Easting: 2193865.38 NAD 83 Texas North Central State Plane Coordinates;

THENCE, with the southeasterly line of Luminant tract N 31°51'31" W, passing an iron rod found for an interior ell corner of said Luminant tract at a distance of 2695.51 feet, in all a distance of 2837.27 feet to a point;

THENCE, over and across said Luminant tract N 58°06'14" E, a distance of 6144.00 feet to a point;

THENCE, S 31°51'31" E, a distance of 2838.06 feet to a point in the southeasterly line of Luminant tract;

THENCE, with the southeasterly line of Luminant tract, the following three (3) courses;

1.       S 58°34'59" W, a distance of 1316.02 feet to an iron rod found;

2.       S 57°15'54" W, a distance of 697.70 feet to an iron rod found

3.       S 58°06'14" W, a distance of 4130.40 feet to the **POINT OF BEGINNING** and containing 399.96 acres more or less.

A-10



A-11

**PARCEL 3: SUPPORT FACILITIES PARCEL — PARKING LOT & DEMINERALIZED WATER PRODUCTION FACILITY**

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 17.74 ACRES, SITUATED IN THE WILLIAM B. SMITH SURVEY, ABSTRACT NO. 90, AND GALVESTON COUNTY SCHOOL LAND SURVEY, ABSTRACT NO. 852 IN SOMERVELL COUNTY, TEXAS AND BEING PART OF THE LAND DESCRIBED IN A DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING FROM LUMINANT GENERATION COMPANY LLC AS RECORDED (1) IN VOLUME 2343, PAGE 0734 OF THE REAL PROPERTY RECORDS OF HOOD COUNTY, TEXAS AND (2) AS INSTRUMENT NUMBER 20072921 IN THE REAL PROPERTY RECORDS OF SOMERVELL COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**COMMENCING**, at an iron rod found at the southwest corner of said Luminant tract whose coordinates are Northing: 6792287.89, Easting: 2179084.52, from which a concrete monument found bears S 29°12'54" E, a distance of 127.54 feet whose coordinates are Northing: 6792176.49, Easting: 2179146.87;

**THENCE**, over and across said Luminant tract, S 86°59'25" E, a distance of 7326.65 feet to the **POINT OF BEGINNING**;

**THENCE**, over and across said Luminant tract, the following eight (8) courses;

1.     N 13°38'20" E, a distance of 115.08 feet to a point;

2.     S 84°14'25" E, a distance of 731.38 feet to a point;

3.     N 05°25'52" E, a distance of 54.29 feet to a point;

4.     N 06°00'04" E, a distance of 731.65 feet to a point;

5.     S 84°14'09" E, a distance of 384.62 feet to a point;

6.     S 06°45'54" W, a distance of 734.20 feet to a point;

7.     S 10°22'14" W, a distance of 662.16 feet to a point;

8.     Along a curve to the right, having a central angle of 36°39'10", a radius of 1871.95 feet, an arc length of 1197.51, a tangent of 620.05 feet, and a chord which bears N 59°25'04" W, a distance of 1177.20 feet to the **POINT OF BEGINNING** and containing 17.74 acres more or less.

A-12



GRAPHIC SCALE

LEGEND
• IRON ROD FOUND
○ CONCRETE MONUMENT FOUND
P.O.C. POINT OF COMMENCEMENT
P.O.B. POINT OF BEGINNING

LUMINANT GENERATION COMPANY LLC
VOL. 2343, PG. 0734
D.R.H.C.TX

LINE TABLE
| LINE | BEARING | DISTANCE |
|------|---------|----------|
| L1 | N13°38'20"E | 115.08' |
| L2 | N00°23'02"E | 84.29' |

NORTHING: 6792297.90
EASTING: 2179084.52
P.O.C.

NORTHING: 6792176.39
EASTING: 2179144.82

PARKING LOT & DEMINERALIZED WATER
PRODUCTION FACILITY
17.74 ACRES

R=1871.95
L=1187.61
Tan=620.05
Δ=36°39'10"
C=1177.20
CB=S59°25'04"E

R.J. Daum
Registered Professional Land Surveyor
State of Texas No. 4826
Date: October 7, 2008

SKETCH to ACCOMPANY DESCRIPTION No. PD08-011
G.D.M. Inc.
11075 Jollyville Road
Suite 111
Austin, Texas 78759
Phone: (512) 918-8111
Fax: (512) 918-0122
www.gdminc.com
© Copyright 2004 G.D.M. Inc.

Page 2 of 2

A-13

**PARCEL 4: SUPPORT FACILITIES PARCEL — ONSITE SWITCHING STATION, LIQUID RADWASTE EFFLUENT EVAPORATION POND, AND SIMULATOR**

DESCRIPTION of a 15.63 acre tract of land situated in the William B. Smith Survey, Abstract No. 91, Somervell County, Texas; said tract being all of a Simulator, Unit 3 and Unit 4 Onsite Switching Station, a Liquid Radwaste Effluent Evaporation Pond and part of that land described in Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Luminant Generation Company LLC as recorded in (1) Volume 2343, Page 0734, of the Deed Records of Hood County, Texas, and (2) Instrument Number 20072921 in the Real Property Records of Somervell County, Texas; said 15.63 acre tract being more particularly described as follows:

COMMENCING, at an iron rod found at the southwest corner of said Luminant tract with coordinates of Northing: 6792287.89, Easting: 2179084.52, from which a concrete monument found bears South 29 degrees, 12 minutes, 54 seconds East, a distance of 127.54 feet whose coordinates are Northing: 6792176.49, Easting: 2179146.87;

THENCE, over and across said Luminant tract, North 83 degrees, 18 minutes, 35 seconds East, a distance of 3,554.67 feet to the POINT OF BEGINNING; said point being the southwest corner of said Simulator;

THENCE, North 07 degrees, 22 minutes, 21 seconds East, along the west line of said Simulator tract, a distance of 200.00 feet to a point for corner; said point being the northwest corner of said Simulator;

THENCE, South 82 degrees, 37 minutes, 39 seconds East, along the north line of said Simulator, a distance of 190.00 feet to a point for corner;

THENCE, North 07 degrees, 22 minutes, 21 seconds East, departing the north line of said Simulator, a distance of 169.39 feet to a point for corner;

THENCE, South 84 degrees, 25 minutes, 58 seconds East, a distance of 2,256.42 feet to a point for corner; said point being the northeast corner of said Switching Station;

THENCE, South 05 degrees, 34 minutes, 02 seconds West, along the east line of said Switching Station, a distance of 900.00 feet to a point for corner;

THENCE, South 84 degrees, 25 minutes, 58 seconds East, departing the east line of said Switching Station, a distance of 500.00 feet to a point for corner; said point being the northeast corner of said Evaporation Pond;

THENCE, South 05 degrees, 34 minutes, 02 seconds West, along the east line of said Evaporation Pond, a distance of 200.00 feet to a point for corner; said point being the southeast corner of said Evaporation Pond;

THENCE, North 84 degrees, 25 minutes, 58 seconds West, along the south line of said Evaporation Pond, a distance of 400.00 feet to a point for corner; said point being the southwest corner of said Evaporation Pond;

THENCE, North 05 degrees, 34 minutes, 02 seconds East, along the west line of said Evaporation Pond, a distance of 190.00 feet to a point for corner;

A-14

THENCE, North 84 degrees, 25 minutes, 58 seconds West, departing the west line of said Evaporation Pond, a distance of 281.00 feet to a point for corner;

THENCE, North 05 degrees, 34 minutes, 02 seconds East, a distance of 10.00 feet to a point for corner; said point being in the south line of said Switching Station;

THENCE, North 84 degrees, 25 minutes, 58 seconds West, along the south line of said Switching Station, a distance of 419.00 feet to a point for corner; said point being the southwest corner of said Switching Station;

THENCE, North 05 degrees, 34 minutes, 02 seconds East, along the west line of said Switching Station, a distance of 890.00 feet to a point for corner;

THENCE, North 84 degrees, 25 minutes, 58 seconds West, a distance of 1,646.73 feet to a point for corner;

THENCE, South 07 degrees, 22 minutes, 21 seconds West, a distance of 359.70 feet to a point for corner; said point being the southeast corner of said Simulator;

THENCE, North 82 degrees, 37 minutes, 39 seconds West, along the south line of said Simulator, a distance of 200.00 feet to the POINT OF BEGINNING.

CONTAINING, 680,971 square feet or 15.63 acres of land, more or less.



2141911v.6 EFH100/45001

EXECUTION VERSION

SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT

OF

COMANCHE PEAK NUCLEAR POWER COMPANY LLC

*a Delaware Limited Liability Company*

DATED AS OF

APRIL 28, 2014

## TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS AND CONSTRUCTION

1.1    Definitions ........................................................................................................ 2
1.2    Construction ..................................................................................................... 2

ARTICLE II
ORGANIZATION

2.1    Formation ......................................................................................................... 2
2.2    Name ................................................................................................................ 2
2.3    Registered Office and Agent; Offices ............................................................. 2
2.4    Purposes ........................................................................................................... 3
2.5    Foreign Qualification ....................................................................................... 3
2.6    Term ................................................................................................................. 3
2.7    No State-Law Partnership ................................................................................ 3
2.8    Certain Agreements ......................................................................................... 3

ARTICLE III
MEMBERSHIP UNITS; MEMBERS

3.1    Membership Units ............................................................................................ 4
3.2    Members as of the Effective Date ................................................................... 4
3.3    Ceasing to Be a Member .................................................................................. 4
3.4    Representations, Warranties and Covenants .................................................... 4
3.5    Additional Terms Relating to Members ........................................................... 5
3.6    Waiver of Fiduciary Duties; Members Have No Exclusive Duty to Company;
        Member Competition ....................................................................................... 5
3.7    Creation of Additional Membership Units ...................................................... 6
3.8    Control of Members ......................................................................................... 7

ARTICLE IV
DISPOSITIONS OF MEMBERSHIP UNITS

4.1    Requirements for Dispositions ........................................................................ 7
4.2    Certain Restrictions on Disposition and Encumbrances .................................. 8
4.3    Transfers of the Mitsubishi Member's Membership Units During the Development
        Period ............................................................................................................... 8
4.4    Transfers of the Luminant Member's Membership Units During the Development
        Period ............................................................................................................... 9
4.5    [Reserved ......................................................................................................... 9
4.6    Right of First Offer .......................................................................................... 9
4.7    Drag Along Rights After the Development Period .......................................... 10

i

4.8    Tag Along Rights After the Development Period ........................................................... 12
4.9    IPO ........................................................................................................................................ 14
4.10  Remedies ............................................................................................................................. 15

## ARTICLE V
## MANAGEMENT

5.1    Managers ............................................................................................................................. 15
5.2    Development Manager and Officers ............................................................................... 19
5.3    Authority ............................................................................................................................. 19
5.4    Discretion of Managers .................................................................................................... 20
5.5    Limitation of Liability of Managers and Officers; Indemnity ................................... 20
5.6    Budget .................................................................................................................................. 20
5.7    Indemnification for Breach of Agreement .................................................................... 21
5.8    Separateness Provisions ................................................................................................... 23

## ARTICLE VI
## CAPITAL CONTRIBUTIONS; DEFAULTS; COVENANTS

6.1    Prior Capital Contributions ............................................................................................ 25
6.2    Subsequent Capital Contributions ................................................................................ 25
6.3    Failure to Contribute ....................................................................................................... 28
6.4    Return of Contributions .................................................................................................. 29
6.5    Capital Accounts ............................................................................................................... 29
6.6    [Reserved ............................................................................................................................ 29
6.7    [Reserved ............................................................................................................................ 29

## ARTICLE VII
## DISTRIBUTIONS AND ALLOCATIONS

7.1    Distributions ...................................................................................................................... 29
7.2    Member Withdrawals ....................................................................................................... 30
7.3    Allocations of Profits and Losses ................................................................................... 30
7.4    Income Tax Allocations .................................................................................................... 32
7.5    Varying Interests ............................................................................................................... 33

## ARTICLE VIII
## TAXES

8.1    Tax Returns Generally ...................................................................................................... 33
8.2    2013-2015 Tax Returns .................................................................................................... 34
8.3    Tax Partnership ................................................................................................................. 34
8.4    Tax Elections ...................................................................................................................... 35
8.5    Tax Matters Member ........................................................................................................ 35

## ARTICLE IX
## BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS

ii

9.1     Maintenance of Books ........................................................................ 36
9.2     Reports ................................................................................................ 36
9.3     Bank Accounts .................................................................................... 37
9.4     Inspection Rights ................................................................................ 37

ARTICLE X
DISPUTE RESOLUTION

10.1    Negotiation to Resolve Disputes ........................................................ 37
10.2    Arbitration .......................................................................................... 37
10.3    Selection of Arbitrators ...................................................................... 37
10.4    Conduct of Arbitration ....................................................................... 38
10.5    Arbitration Costs and Expenses ......................................................... 38
10.6    Proper Parties to Arbitration .............................................................. 38
10.7    Exception to Mandatory Arbitration ................................................... 38
10.8    Jurisdiction and Venue ....................................................................... 38

ARTICLE XI
DISSOLUTION, WINDING-UP AND TERMINATION

11.1    Dissolution ......................................................................................... 39
11.2    Winding-Up and Termination ............................................................. 39
11.3    Deficit Capital Accounts .................................................................... 41
11.4    Certificate of Cancellation ................................................................. 41

ARTICLE XII
GENERAL PROVISIONS

12.1    Confidential Information .................................................................... 41
12.2    Notices ................................................................................................ 41
12.3    Entire Agreement; Superseding Effect ............................................... 41
12.4    Effect of Waiver or Consent ............................................................... 41
12.5    Amendment or Restatement ............................................................... 42
12.6    Binding Effect ..................................................................................... 42
12.7    Governing Law; Severability .............................................................. 42
12.8    Waiver of Certain Damages ............................................................... 42
12.9    Further Assurances ............................................................................. 43
12.10   Counterparts ....................................................................................... 43
12.11   Press Releases .................................................................................... 43
12.12   Specific Performance; Other Remedies .............................................. 43

**EXHIBITS:**

Exhibit A     —     Initial Members
Exhibit B     —     Definitions
Exhibit C     —     Prohibited Competitors

████████     ██     ███████████████████████████████
Exhibit E       —      Certain Agreements
Exhibit F       —      Luminant Actions and Proceedings
Exhibit G       —      Mitsubishi Actions and Proceedings
Exhibit H       —      Form of Membership Units Assignment Agreement
Exhibit I        —      Managers and Officers as of Effective Date
Exhibit J       —      Delegation of Authority

SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
COMANCHE PEAK NUCLEAR POWER COMPANY LLC
*a Delaware Limited Liability Company*

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of Comanche Peak Nuclear Power Company LLC (the "*Company*"), dated as of April 28, 2014 (the "*Effective Date*"), is entered into by and between the Members.

## RECITALS

WHEREAS, the Company was organized with the name "Nuclear Project Company LLC" as a Delaware limited liability company by the filing of a Certificate of Formation (the "*Certificate*") on September 8, 2008 (the "*Formation Date*"), with the Secretary of State of Delaware pursuant to the Act, with the name of the Company subsequently being changed to "Comanche Peak Nuclear Power Company LLC";

WHEREAS, the Members entered into that certain Amended and Restated Limited Liability Company Agreement of the Company, dated January 30, 2009, as amended by the First Amendment thereto dated April 27, 2012 (the "*Original LLC Agreement*");

WHEREAS, the original purpose of the Company pursuant to the Original LLC Agreement was to develop up to two nuclear power generation units ("*Units*") using MHI US-APWR Technology on a site (the "*Site*") contiguous to Comanche Peak units 1 and 2 located in Somervell and Hood Counties, Texas (the pursuit of such original purpose, the "*Project*");

WHEREAS, ██████████████████████████████████████ MHI is minimizing its MHI US-APWR Technology design certification review activities with the NRC to a level that will satisfy the minimal certification process requirements short of a suspension;

WHEREAS, as a result of such minimization of the MHI US-APWR Technology design certification review, the Members desire to amend and restate the Original LLC Agreement in its entirety, to change the purpose of the Company as set forth in Section 2.4 hereof and to change certain rights, duties and obligation of the Members hereunder relating to such change of purpose;

WHEREAS, in connection with the change of purpose of the Company, the Members and/or certain of their respective Affiliates are concurrently entering into certain Transaction Documents as of the Effective Date for the purpose of revising, amending, amending and restating, suspending and/or terminating certain agreements among the Members and their respective Affiliates previously entered into and/or memorializing the current understandings and agreements among the parties thereto; and

1

WHEREAS, each Member executing this Agreement as of the Effective Date shall own the number of Membership Units and shall have the Membership Percentage as of the Effective Date set forth opposite its name in Exhibit A.

NOW, THEREFORE, the Members hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND CONSTRUCTION

1.1    *Definitions*.  Capitalized terms used in this Agreement (including in the recitals and the preamble) shall have the meanings given to them in Exhibit B.  Other terms defined herein have the meanings so given them.

1.2    *Construction*.  Unless the context requires otherwise: the gender of all words used in this Agreement includes the masculine, feminine, and neuter; each reference to an Article or Section refers to such Article or Section of this Agreement; each reference to an Exhibit refers to such Exhibit attached to this Agreement, which is made a part hereof for all purposes; each reference to a Law refers to such Law as it may be amended from time to time, and each reference to a particular provision of a Law includes any corresponding provision of any succeeding Law; the word "including" means "including, but not limited to"; each reference to money refers to the legal currency of the United States of America; and each reference to a certain agreement or contract refers to such agreement or contract as it may be amended, waived or supplemented from time to time.

## ARTICLE II
## ORGANIZATION

2.1    *Formation*.  The Company was organized as a Delaware limited liability company by the filing of the Certificate with the Delaware Secretary of State as of the Formation Date.  The Members hereby continue the Company pursuant to the terms and conditions of this Agreement.

2.2    *Name*.  The name of the Company is "Comanche Peak Nuclear Power Company LLC", and all Company business must be conducted in that name or such other names that comply with Law as the Board may select.

2.3    *Registered Office and Agent; Offices*.  The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law.  The principal office of the Company in the United States shall be at such place as the Board may designate, which need not be in the State of Delaware, and the Company shall maintain records there or at such other place as the Board shall designate.  The Company may have such other offices as the Board may designate.

2

2.4    **Purposes.** The purposes of the Company are, directly or indirectly through one or more Subsidiaries, to (a) be used as the entity or entities to pursue the development of up to two nuclear power generating units on the Site that use MHI's U.S. Advanced Pressurized Water Reactor technology ("**MHI US-APWR Technology**") if, and only if, the Members mutually agree after the Effective Date in writing to pursue such development; (b) support the efforts of (i) the Members and their respective Affiliates to obtain a COL from the NRC with respect to the Site and (ii) MHI to obtain a design certification for the MHI US-APWR Technology from the NRC, in each case to the extent set forth in the Long-Term Budget; (c) allow for status updates among the Members regarding the COLA, the design certification for the MHI US-APWR Technology, and the Project; and (d) to engage in any other business or activity during the remainder of the Term that may be necessary, incidental, proper, advisable, or convenient to accomplish the foregoing purposes and that is not prohibited by applicable Law. The Members intend for this Agreement to be amended and restated in its entirety if the Luminant Member and its Affiliates make the reassignment, reconveyance or retransfer election as provided in Section 6.2(e); provided, however, the terms of this Agreement shall continue to govern after any election to make such reassignment, reconveyance or retransfer is made until such time that the Members agree to amend and restate this Agreement. Subject to the terms of Section 4 of Exhibit E, the Members agree and acknowledge the Luminant Member and its Affiliates may elect to pursue any development or other project at the Site with or without the participation of the Company or the Mitsubishi Member or its Affiliates, as determined in the sole discretion of the Luminant Member and its Affiliates.

2.5    **Foreign Qualification.** The Board shall cause the Company to comply with all requirements of Law of the State of Texas to permit the Company to conduct business in the State of Texas as a foreign limited liability company. At the request of the Board, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments not inconsistent with this Agreement that are necessary or appropriate to permit the Company to conduct business in the State of Texas as a foreign limited liability company or to qualify the Company as a foreign limited liability company in the State of Texas and to continue and, when appropriate, terminate such qualification.

2.6    **Term.** The period of existence of the Company (the "**Term**") commenced on the Formation Date and shall continue perpetually, unless and until its business and affairs are wound up and a certificate of cancellation is filed with the Secretary of State of Delaware in accordance with Section 11.4.

2.7    **No State-Law Partnership.** The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member, for any purposes other than federal and applicable state income tax purposes. This Agreement may not be construed in a manner contrary to the intent set forth in the preceding sentence.

2.8    **Certain Agreements.** The Members hereby make the agreements, covenants, promises, representations and warranties listed on Exhibit E, which such Exhibit E and the agreements, covenants, promises, representations and warranties listed thereon are incorporated into this Agreement.

3

## ARTICLE III
## MEMBERSHIP UNITS; MEMBERS

3.1    ***Membership Units***.  The "***Membership Units***" represent the ownership interests of a Member in the Company, including a Member's right to share in the Company's items of income, gain, loss, deduction, credits and similar items, and the right to receive distributions from the Company, as well as a Member's rights to authorize and otherwise participate in the operation or affairs of the Company as provided for in this Agreement and under the Act.

3.2    ***Members as of the Effective Date***.  Each Member executing this Agreement as of the Effective Date has been or is hereby admitted as a Member of the Company on or prior to the Effective Date, each having been issued the number of Membership Units and having the Membership Percentage as of the Effective Date as set forth opposite its name in Exhibit A.

3.3    ***Ceasing to Be a Member***.  Any Person admitted as a Member pursuant to this Agreement shall cease to be a Member, and shall cease to have the rights of a Member, under this Agreement at such time such Person no longer owns, beneficially and of record, any Membership Units, but such Person shall remain bound by the terms of Article X and Article XII.

3.4    ***Representations, Warranties and Covenants***.  Each Member hereby represents and warrants to the Company and the other Member that the following statements are true and correct as of the Effective Date:

(a)    *Organization; Power and Authority*.  Such Member is duly formed, incorporated or organized (as applicable), validly existing, and in good standing under the Law of the jurisdiction of its formation, incorporation or organization (if a good standing assessment or similar qualification is generally available for business organizations of that type in the relevant jurisdiction).  If required by applicable Law, such Member is duly qualified and in good standing in the jurisdiction of its principal place of business, if different from its jurisdiction of formation, incorporation or organization, and such Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other applicable Persons owning or managing such Member necessary for the due authorization, execution, delivery, and performance of this Agreement by such Member have been duly taken.  Such Member is under the Control of its Parent as set forth opposite its name on Exhibit A.

(b)    *Execution and Delivery; Enforceability*.  Such Member has duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligation of such Member enforceable against such Member in accordance with its terms (except as may be limited by bankruptcy, insolvency or similar Laws of general application and by the effect of general principles of equity, regardless of whether considered at law or in equity).

(c)    *Non-Contravention*.  Such Member's authorization, execution, delivery, and performance of this Agreement does not and will not (i) conflict with, or result in a breach,

4

default or violation of, (A) the organizational documents of such Member, (B) any contract or agreement to which such Member is a party or is otherwise subject or (C) any Law, order, judgment, decree, writ, injunction or arbitral award to which such Member is subject or (ii) require any consent, approval or authorization from, filing or registration with, or notice to, any Governmental Authority or other Person, unless such requirement has already been satisfied.

(d)     *No Actions or Proceedings.*  There is no Action or Proceeding pending against or, to the knowledge of such Member, threatened against or affecting such Member (i) that draws into question the validity of this Agreement or (ii) except, with respect to the Luminant Member, as set forth on Exhibit F, and with respect to the Mitsubishi Member as set forth on Exhibit G, that would reasonably be expected to have a material adverse effect on such Member's ability to perform its obligations under this Agreement.

(e)     *Investment.*  Such Member is acquiring its Membership Units for its own account, for investment purposes only and with no current intention or plan to distribute, sell or otherwise Dispose of the Membership Units and does not have any contract, undertaking, agreement or arrangement with any person to distribute, sell or otherwise Dispose of the Membership Units.  Such Member acknowledges that its Membership Units have not been registered pursuant to the Securities Act.  Such Member has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the risks of its investment in the Company and is capable of bearing the economic risks of the transactions contemplated by this Agreement.  Such Member is an informed and sophisticated participant in the transactions contemplated by this Agreement and has undertaken such investigation, and has been provided with and has evaluated such documents and information, as it has deemed necessary in connection with the execution, delivery and performance of this Agreement and its investment in the Company; such Member acknowledges that it is relying on its own investigation and analysis in entering into the transactions contemplated by this Agreement, including making its Capital Contributions, and has consulted its own legal, tax, financial and accounting advisors to determine the merits and risks thereof; and such Member has not relied on any due diligence investigation of any other Member or its advisors and their respective Affiliates, or on any oral or written materials prepared or presented by any other Member or its advisors, including any projections, forecasts, return on investment or other future cash flow illustrations prepared by any such Member or its advisors or their respective Affiliates.

3.5     ***Additional Terms Relating to Members.***  (a) No Member has the right or power to withdraw or resign as a Member from the Company without the prior consent of each other Member, (b) no Member shall be liable for the debts, obligations or liabilities of the Company or any other Member and (c) no Member may be expelled from the Company.

3.6     ***Waiver of Fiduciary Duties; Members Have No Exclusive Duty to Company; Member Competition.***

(a)     Except for the implied covenant of good faith and fair dealing and except for such other duties as may be expressly set forth in this Agreement, no Member shall owe any fiduciary or other duties (including any duty of loyalty or duty of care) to the Company or any other Member.  The Members acknowledge and agree that the foregoing is intended to comply

5

with the provisions of the Act (including Section 18-1101 of the Act) permitting members of a limited liability company to eliminate fiduciary duties.

(b)     Without limiting the generality of Section 3.6(a), except as expressly provided in Section 4 of Exhibit E, (i) the Members and their Affiliates shall have no exclusive duty to act on behalf of the Company, (ii) each Member and its Affiliates may have other business interests and may engage in other activities in addition to those relating to the Company or the Project, (iii) nothing in this Agreement shall be deemed to restrict in any way the rights of any Member or any of its Affiliates from engaging in, possessing, expanding or divesting itself of, any interests in any other business activity whatsoever, (iv) the Luminant Member and its Affiliates shall have the rights described in the last sentence of Section 2.4, (v) the Mitsubishi Member and its Affiliates shall be permitted to determine in their sole discretion the manner in which to pursue the design certification with the NRC with respect to the MHI US-APWR Technology, and (vi) no Member shall be liable to the Company or any other Member for any such business or activity even if such business or activity competes directly or indirectly with the business or purposes of the Company or the Project. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in any other investments or activities of the other Members or any of their Affiliates, and the formation and purposes of the Company shall be without prejudice to the Members' or their Affiliates' respective rights to maintain, expand, or diversify such other investments and activities and to receive and enjoy the compensation or revenue therefrom. No Member or any of its Affiliates shall incur any liability to the Company or any other Member as a result of engaging in any other business or venture.

(c)     Without limiting the generality of Section 3.6(a), to the fullest extent permitted by Law (including Section 18-1101(c) of the Act), the doctrine of corporate opportunity or any other analogous doctrine shall not apply to the business of the Company, and except as expressly provided in Section 4 of Exhibit E, no Member (or Affiliate of a Member) shall have any obligation to refrain from, among other things, (i) engaging in the same or similar activities or lines of business as the Company or developing, acquiring, owning or operating any facilities or assets that compete, directly or indirectly, with those of the Company or the Project, (ii) doing business with a customer of or service provider to the Company or the Project, or (iii) developing a business relationship with anyone having a current or previous business relationship with the Company or the Project.

3.7     ***Creation of Additional Membership Units.***  Subject to approval by the Board as provided in Section 5.1(e)(i)(J), additional Membership Units may be created and issued to Persons other than Members, and such other Persons may be admitted to the Company as Members, on terms and conditions approved by the Board. Any admission of a new Member is effective only after the new Member has executed and delivered to the Members an agreement in form and substance satisfactory to the Board containing the notice address of the new Member and, if the new Member has a Parent, the name of the Parent, the new Member's ratification of this Agreement and the Confidentiality Agreement and agreement to be bound by this Agreement and the Confidentiality Agreement, and its confirmation that the representations and warranties in Section 3.4 are true and correct with respect to it as of the date it is admitted as a Member. The provisions of this Section 3.7 shall not apply to Dispositions of Membership Units or admissions of Assignees in connection therewith, such matters being governed by Article IV.

3.8    *Control of Members*.  During the Development Period, (a) MHI shall Control the Mitsubishi Member, and (b) Luminant shall Control the Luminant Member.

## ARTICLE IV
## DISPOSITIONS OF MEMBERSHIP UNITS

4.1    *Requirements for Dispositions*.

(a)    *Compliance with Article IV*.  A Member may not Dispose of all or any portion of its Membership Units, except in accordance with this Article IV.  Any attempted Disposition of any Membership Units, other than in accordance with this Article IV, shall be null and void *ab initio*.

(b)    *General Requirements for Dispositions*.  Any Member Disposing of all or any portion of its Membership Units (a "*Disposing Member*") and its Assignee shall cause the requirements in this Section 4.1(b) to be met in connection with such Disposition and, if applicable, the admission of such Assignee as a Member, and such Disposition (and admission, if applicable) shall not be effective unless such requirements are complied with:

(i)    The following documents must be delivered to the Company and each Member other than the Disposing Member (each, a "*Nondisposing Member*"): (A) an instrument, executed by the Disposing Member and its Assignee, substantially in the form of Exhibit H attached hereto (unless otherwise agreed by the Managers appointed by the Nondisposing Members (each, a "*Nondisposing Manager*") holding a majority of the total Membership Units held by all Nondisposing Members that have appointed Nondisposing Managers to the Board (the "*Nondisposing Manager Voting Percentage*")) (which instrument shall disclose the material terms and consideration with respect to such transaction); and (B) unless the Membership Units subject to the Disposition are registered under the Securities Act and any applicable state securities Law, a favorable opinion of legal counsel reasonably acceptable to Nondisposing Managers holding the Nondisposing Manager Voting Percentage, to the effect that the Disposition and admission, if applicable, is being made pursuant to a valid exemption from registration under those Laws and in accordance with those Laws (the "*Legal Opinion*"); provided, however, that Nondisposing Managers holding the Nondisposing Manager Voting Percentage, in their sole and absolute discretion, may waive the foregoing subsection (B).

(ii)    The Disposing Member and its Assignee shall (A) pay, or reimburse the Company for, all reasonable third party costs and expenses incurred by the Company in connection with the Disposition and admission, if applicable, and (B) pay, or reimburse the Nondisposing Managers for, the legal fees incurred in connection with the review of the Legal Opinion, in each case on or before the tenth Day after the receipt by that Person of the Company's or the Nondisposing Managers', as applicable, invoice for the amount due.  If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Rate (as determined on the date such amount became due and payable).

(c)    *Release of Disposing Member*.  Except as otherwise provided in Section 3.3 or Section 4.2(a), from and after the Disposition of any Membership Units in

accordance with this Article IV, the Disposing Member shall be released from all obligations and liabilities arising hereunder on or after the date of the Disposition to the extent of the Membership Units Disposed of.

(d)     *Admission of Assignee as a Member.*  An Assignee has the right to be admitted to the Company as a Member, with the Membership Units so transferred to such Assignee, only if the Disposition complies with this Article IV and either the Disposing Member making the Disposition has expressly granted such right to the Assignee or Nondisposing Managers holding the Nondisposing Manager Voting Percentage otherwise approve.

4.2     *Certain Restrictions on Disposition and Encumbrances.*

(a)     *Assignments to Affiliates.*  Subject to compliance with the terms set forth in Section 4.1(b) and Section 4.2(c), a Member may Dispose of all or any portion of its Membership Units to an Affiliate of such Member; provided, however, that the Disposing Member shall not be released from its obligations under this Agreement.

(b)     *Encumbrances of Membership Units.*  No Member may, at any time, Encumber any of its Membership Units without the approval of the Board.

(c)     *Regulatory Requirements.*  Any Assignee must meet all applicable regulatory requirements before being admitted as a Member, including all requirements, including any requirements relating to creditworthiness, of the NRC relating to a COLA applicant's or COL licensee's owner and financial obligor.

(d)     *Prohibited Competitors.*  A Member may not Dispose of any of its Membership Units to a Mitsubishi Prohibited Competitor without the prior written consent of the Mitsubishi Member.  A Member may not Dispose of any of its Membership Units to a Luminant Prohibited Competitor without the prior written consent of the Luminant Member.

(e)     *Minimum Membership Interest.*  Except as otherwise provided in Section 4.2(a) and Section 4.3 or as a result of dilution of Membership Percentages pursuant to this Agreement, no Member as a result of, and immediately following, any Disposition shall hold a Membership Percentage of less than 10%; provided, however, that after the expiration of the Development Period, any Member and its Affiliates that collectively hold a Membership Percentage of less than 10% may Dispose of all of their Membership Units to a single Person in a single transaction, subject to compliance with the terms set forth in Section 4.1, Section 4.2(c) and Section 4.2(d).

4.3     *Transfers of the Mitsubishi Member's Membership Units During the Development Period.*  The Mitsubishi Member and its Affiliates may not Dispose of their Membership Units during the Development Period, except as follows: (a) in accordance with Section 4.2(a), and (b) subject to compliance with the terms set forth in Section 4.1, Section 4.2(c) and Section 4.2(d), in a single transaction or a series of related transactions to a single Person  (or Affiliates of such Person) upon receipt of the prior written consent of the Luminant Member; provided, however, with respect to any Disposition pursuant to this clause (b), (i) the Luminant Member will not unreasonably withhold, condition or delay such consent to such Disposition, (ii) if such Disposition is made to a Person that will be providing

8

engineering, procurement or construction services jointly with MHI or its Affiliates for the Units, such consent of the Luminant Member will not be required and (iii) such Disposition does not result in the Mitsubishi Member and its Affiliates collectively holding a Membership Percentage of less than 6% during the Development Period. For the avoidance of doubt, any Disposition of Membership Units by the Mitsubishi Member or its Affiliates pursuant to this Section 4.3 shall not require compliance with the terms of Section 4.2(e).

4.4    ***Transfers of the Luminant Member's Membership Units During the Development Period.***    Subject to compliance with the terms set forth in Section 4.1, Section 4.2(c), Section 4.2(d), Section 4.2(e) and Section 5.1(b), during the Development Period, the Luminant Member may Dispose of its Membership Units to any Person; provided that any Disposition does not result in the Luminant Member and its Affiliates collectively holding a Membership Percentage of less than 44% during the Development Period. Except as specified in the preceding sentence, there shall not be any consent or approval rights, rights of first offer or any other restrictions on behalf of any other Member or the Company in connection with such Disposition. Except as set forth in Section 4.2(a) and this Section 4.4, the Luminant Member and its Affiliates shall not Dispose of any of its Membership Units during the Development Period.

4.5    **[Reserved.]**

4.6    ***Right of First Offer.***

(a)    ***Right of First Offer.***    Except for Dispositions permitted in accordance with Section 4.2(a), and subject to compliance with the terms set forth in Section 4.1, Section 4.2(c), Section 4.2(d) and Section 4.2(e), if after the Development Period, a Member proposes to Dispose of all or any portion of its Membership Units or will become subject to a Deemed Disposition, then such Member shall promptly give notice of such proposed Disposition or Deemed Disposition (the "***Disposition Notice***") to the Company and each other Member. The Disposition Notice shall set forth all material terms of the proposed Disposition or Deemed Disposition, including the price to be sought for such Membership Units (or, in the event of a Deemed Disposition, the price to be sought in such Deemed Disposition). The Mitsubishi Member (if it is not the Disposing Member) and the Luminant Member (if it is not the Disposing Member) and each other Nondisposing Member holding a Membership Percentage of 10% or greater (each, a "***ROFO Eligible Member***") shall have the right of first offer (the "***ROFO***"), exercisable by notice (the "***Exercise Notice***" and each exercising Member a "***Purchasing Member***") given to each other Member and the Company on or before the 30th Day after the Disposition Notice is given, to acquire, for the same purchase price and on the same terms and conditions as are set forth in the Disposition Notice, all of the Membership Units described in the Disposition Notice or, if any other ROFO Eligible Member delivers an Exercise Notice, such Purchasing Member's pro rata portion of the Membership Units described in the Disposition Notice (for purposes of determining such pro rata portion, including only the Membership Units of the Purchasing Members), in accordance with this Section 4.6. Any Purchasing Member's Exercise Notice must specify that the Purchasing Member will purchase all of the Membership Units described in the Disposition Notice if no other ROFO Eligible Member delivers an Exercise Notice or in the event any other ROFO Eligible Member that delivers an Exercise Notice fails to complete the purchase of its pro rata portion of the Membership Units. If any

9

ROFO Eligible Member fails to exercise its ROFO by delivering an Exercise Notice during the applicable period set forth in this Section 4.6(a), such Member shall be deemed to have waived such ROFO with respect to the Disposition or Deemed Disposition described in such Disposition Notice, but not any future ROFO with respect to any Disposition or Deemed Disposition described in any other Disposition Notice with respect to which such Member is a ROFO Eligible Member.

(b)    *Closing Following Exercise Notice.* If one or more Purchasing Members delivers an Exercise Notice, the closing of the purchase of the Membership Units of the Disposing Member specified in such Disposition Notice shall occur at the principal place of business of the Company on the 90th Day after the date on which the Disposition Notice is given, unless the Disposing Member and the Purchasing Members agree upon a different place or date. At the closing, the Disposing Member and each Purchasing Member shall execute and deliver an assignment of the Membership Units being transferred to such Purchasing Member substantially in the form of Exhibit H attached hereto (unless otherwise agreed by Nondisposing Managers holding the Nondisposing Manager Voting Percentage) and any other instruments reasonably requested by such Purchasing Member to give effect to the purchase; and such Purchasing Member shall deliver to the Disposing Member in immediately available funds the purchase price for the Membership Units included in such proposed Disposition or Deemed Disposition as set forth in the Disposition Notice (or, in the event there are multiple Purchasing Members, its pro rata portion, based on the Membership Units being purchased by such Purchasing Member, of such purchase price).

(c)    *Failure to Exercise.* If none of the ROFO Eligible Members timely delivers an Exercise Notice (or if one or more Purchasing Members delivers an Exercise Notice but the closing of the purchase of the Membership Units of the Disposing Member specified in the Disposition Notice does not occur on the 90th Day after the Disposition Notice is given or on any other agreed-upon date as a result of the failure by such Purchasing Member or Purchasing Members to complete such purchase due to such Purchasing Member's or Purchasing Members' breach of the obligation to purchase the Membership Units pursuant to the applicable Exercise Notice or Exercise Notices), then the Disposing Member shall have the right, subject to compliance with the provisions of this Article IV (other than Section 4.6), to Dispose of its Membership Units or the portion thereof specified in the Disposition Notice (or consummate the Deemed Disposition, if applicable) on or before the 270th Day after the date the Disposition Notice was given on terms no less favorable to the Disposing Member than the terms set forth in the Disposition Notice (provided that, if the only reason for the failure to Dispose of the Membership Units or consummate the Deemed Disposition within such 270-Day period is the failure to obtain requisite governmental or regulatory approval for the Disposition or Deemed Disposition during such period, such period shall be extended for such period (not to exceed 360 Days after the date the Disposition Notice was given) that the Disposing Member and an Assignee are diligently pursuing the requisite governmental or regulatory approval for the Disposition or Deemed Disposition) (such period, the "***Disposition Period***"). If, however, the Disposing Member fails to so Dispose of the Membership Units or consummate the Deemed Disposition during the Disposition Period, the proposed Disposition or Deemed Disposition shall again become subject to the ROFO.

4.7    ***Drag Along Rights After the Development Period.***

10

(a)     *Applicability.* If, after the Development Period, (i) the Luminant Member delivers a Disposition Notice with respect to a Disposition of all of its and its Affiliates' Membership Units or a Deemed Disposition and (ii) either no ROFO Eligible Member elects to exercise its ROFO in respect of such Disposition or Deemed Disposition in accordance with Section 4.6(a) or, if one or more Purchasing Members delivers an Exercise Notice, the closing of the purchase of the Membership Units of the Disposing Member specified in the Disposition Notice does not occur on the 90th Day after the Disposition Notice is given or on any other agreed-upon date as a result of the failure of the Purchasing Member or Purchasing Members to complete such purchase due to such Purchasing Member's or Purchasing Members' breach of the obligation to purchase the Membership Units pursuant to the applicable Exercise Notice or Exercise Notices, then the Luminant Member and its Affiliates shall have the right, exercisable by at least 30 days' prior written notice (the "*Drag Along Notice*") to each Nondisposing Member, to require each Nondisposing Member to include all of the Membership Units of such Nondisposing Member (or to require each Nondisposing Member to agree as Members of the Company to the sale of all or substantially all of the assets of the Company) in such Disposition or Deemed Disposition (such Disposition or Deemed Disposition, a "*Drag Along Sale*"), which Drag Along Sale must occur during the Disposition Period in accordance with the provisions of this Section 4.7. The Luminant Member shall attach to the Drag Along Notice a copy of the purchase and sale documentation for the Drag Along Sale and the name of the proposed Assignee.

(b)     *Terms of Disposition.* In connection with a Drag Along Sale, each Member shall enter into the same documentation relating to the Drag Along Sale as shall be entered into by the Luminant Member in the case of a Disposition or, in the case of a Deemed Disposition, documentation substantially similar to the documentation entered into by the Luminant Member, and shall be liable, only on a several and pro-rata basis based on the proportion of the total cash consideration for the Drag Along Sale that shall be payable to it, for all liabilities of the sellers thereunder (but not to exceed an amount equal to the consideration received by such Member in such Drag Along Sale). Each Member shall use all reasonable commercial efforts to cause the satisfaction of all conditions to the closing of the Drag Along Sale to the extent such conditions are within such Member's control or subject to such Member's influence and shall otherwise cooperate in good faith with the Luminant Member and the Company in connection with consummating the Drag Along Sale. No Member shall be required to amend, extend or terminate any contractual or other relationship with the Company, the acquiring party or their respective Affiliates nor agree to any covenant not to compete or covenant not to solicit customers, employees or suppliers of the Company, the acquiring party or their respective Affiliates.

(c)     *Payment of Consideration.* All of the consideration payable to the Members in connection with a Drag Along Sale shall be paid to the Members pro-rata based on their respective Membership Percentages.

(d)     *Power of Attorney.* Each Member hereby makes, constitutes and appoints the secretary of the Company as its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit to sign, execute, certify, acknowledge, swear to, file and record any instrument that is now or may hereafter be deemed necessary by the Company in its reasonable discretion to carry out fully the obligations of such Member set forth in this

11

Section 4.7. Each Member hereby gives such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in connection with such Member's obligations and agreements pursuant to this Section 4.7 as fully as such Member might or could do personally, and hereby ratifies and confirms all that any such attorney-in-fact shall lawfully do or cause to be done by virtue of the power of attorney granted hereby. The power of attorney granted pursuant to the foregoing is a special power of attorney, coupled with an interest, and is irrevocable, and shall survive the bankruptcy, insolvency, dissolution or cessation of existence of such Member.

### 4.8    *Tag Along Rights After the Development Period.*

(a)    *Applicability.* If, after the Development Period, (i) the Luminant Member delivers a Disposition Notice with respect to (A) a Disposition of all of its Membership Units or a part of its Membership Units representing greater than 50% of its Membership Units or (B) a Deemed Disposition, (ii) either no ROFO Eligible Member elects to exercise its ROFO in respect of such Disposition or Deemed Disposition in accordance with Section 4.6(a), or, if one or more Purchasing Members (but less than all of the ROFO Eligible Members) delivers an Exercise Notice, the closing of the purchase of the Membership Units of the Disposing Member specified in the Disposition Notice does not occur on the 90th Day after the Disposition Notice is given or on any other agreed-upon date as a result of the failure of the Purchasing Member or Purchasing Members to complete such purchase due to such Purchasing Member's or Purchasing Members' breach of the obligation to purchase the Membership Units pursuant to the applicable Exercise Notice or Exercise Notices (any such Purchasing Member, a "***Defaulting Purchasing Member***"), and (iii) in the case of a Disposition of all of the Membership Units of the Luminant Member or a Deemed Disposition, the Luminant Member does not deliver a Drag Along Notice in accordance with Section 4.7(a), the Luminant Member shall not, during the Disposition Period, Dispose of its Membership Units proposed to be Disposed of in such Disposition Notice or consummate the Deemed Disposition proposed to be consummated in such Disposition Notice (such Disposition or Deemed Disposition, the "***Tag Along Disposition***") unless the terms and conditions of such Tag Along Disposition include a binding offer, on the same terms and subject to the same conditions and with the same economic terms, as the offer by the proposed Assignee to the Luminant Member, to each of the Nondisposing Members (other than any Defaulting Purchasing Member) (the "***Tag Offerees***") to include at the option of each Tag Offeree, in the Tag Along Disposition, the Tag Along Units and, if applicable, Carry Over Tag Along Units of such Tag Offeree.

(b)    *Tag Along Notice.* The Luminant Member shall cause such third party transferee offer to be reduced to writing (which writing shall include a binding offer, on the same terms and subject to the same conditions and with the same economic terms as the offer by the proposed Assignee to the Luminant Member, to purchase or otherwise acquire the Tag Along Units and, if applicable, Carry Over Tag Along Units from each Tag Offeree as required by this Section 4.8 and a time and place designated for the closing of such purchase, which time shall not be less than 30 Days after delivery of such notice) and shall send written notice of such third party offer (the "***Tag Along Notice***") to each Tag Offeree in the manner specified herein, which Tag Along Notice shall include a copy of the written offer and a summary of the material terms and conditions of the proposed Tag Along Disposition, including (i) the name of the proposed

Assignee, (ii) the proposed amount and form of consideration, (iii) the proposed Disposition date, and (iv) the number of Tag Along Units with respect to such Tag Along Offeree.

(c)     *Tag Right*.  Each Tag Offeree shall have the right (the "***Tag Right***"), exercisable by delivery of a notice (the "***Tag Along Acceptance Notice***") to the Luminant Member at any time within 10 Days after receipt of the Tag Along Notice, to Dispose pursuant to such third party offer, and upon the terms and conditions set forth in the Tag Along Notice, a number of such Tag Offeree's Membership Units equal to the product of (i) such Tag Offeree's total number of Membership Units multiplied by (ii) the percentage of the Luminant Member's Membership Units that the Luminant Member is proposing to sell relative to the total number of Membership Units held by the Luminant Member (the "***Tag Along Units***") (it being understood that the failure to exercise such right within such time period shall be deemed to constitute a waiver of all of such Tag Offeree's rights with respect to such proposed Tag Along Disposition (but not with respect to any subsequent Tag Along Disposition).  Each Tag Offeree delivering a Tag Along Acceptance Notice (an "***Accepting Tag Offeree***") shall also specify in its Tag Along Acceptance Notice the number of Membership Units, in addition to such Accepting Tag Offeree's Tag Along Units, that such Accepting Tag Offeree desires to Dispose in the Tag Along Disposition (the "***Additional Tag Along Units***"), and, in the event that one or more Tag Offerees does not deliver a Tag Along Acceptance Notice (each, a "***Declining Tag Offeree***"), then (A) the aggregate Tag Along Units that could have been Disposed by the Declining Tag Offerees had they delivered Tag Along Acceptance Notices (the "***Declined Tag Along Units***") shall be allocated to the Accepting Tag Offerees to the extent of their Additional Tag Along Units; provided that, if the aggregate number of Additional Tag Along Units exceeds the aggregate number of Declined Tag Along Units, then the Declined Tag Along Units shall be allocated to the Accepting Tag Offerees pro rata based on the number of Additional Tag Along Units specified in the Accepting Tag Offerees' Tag Along Acceptance Notices (such allocated Membership Units, which shall not exceed the Additional Tag Along Units for any Accepting Tag Offeree, the "***Carry Over Tag Along Units***"), (B) the Luminant Member shall cause the Tag Along Disposition to include the purchase from each Accepting Tag Offeree of such Accepting Tag Offeree's Carry Over Tag Along Units, and (C) the Luminant Member shall cause a revised Tag Along Notice to be sent promptly to each Accepting Tag Offeree that is allocated Carry Over Tag Along Units that specifies the total number of Tag Along Units and Carry Over Tag Along Units to be purchased in the Tag Along Disposition from such Accepting Tag Offeree.  The Tag Offerees and the Luminant Member shall consummate the Tag Along Disposition at the time and place provided for the closing in the Tag Along Notice, or at such other time and place as the parties (including the Tag Offeree) may agree.  Notwithstanding anything herein to the contrary, no Tag Offeree shall be entitled to Dispose of Membership Units pursuant to a Tag Right in the event that, notwithstanding delivery of a Tag Along Notice, the Luminant Member fails to consummate the Disposition or Deemed Disposition that gave rise to such Tag Right.

(d)     *No Tag Right*.  Notwithstanding anything herein to the contrary, no Tag Offeree shall have a Tag Right in connection with any Tag Along Disposition, if and to the extent making available or exercising such Tag Right, if applicable to such Tag Along Disposition, would require the relevant Assignee to (i) register under applicable securities Laws securities to be issued to the Luminant Member and the Tag Offerees or the securities of such Assignee (unless the proposed Tag Along Disposition involved the registration of such securities notwithstanding the Tag Offeree's participation, in which case the Tag Offeree shall pay the

registration fees related to any securities required to be registered due to the Tag Offeree's participation), or (ii) effect a private placement that does not satisfy the requirements of Regulation D under the Securities Act.

(e)    *Terms of Disposition.*  In connection with any Tag Along Disposition, each Tag Offeree exercising the Tag Right shall enter into the same documentation relating to the Disposition as shall be entered into by the Luminant Member in the case of a Disposition or, in the case of a Deemed Disposition, documentation substantially similar to the documentation entered into by the Luminant Member, and shall be liable, only on a several and pro-rata basis based on the proportion of the total cash consideration for the Tag Along Disposition that shall be payable to it, for all liabilities of the sellers thereunder. Each Tag Offeree exercising the Tag Right shall use all reasonable commercial efforts to cause the satisfaction of all conditions to the closing of the Tag Along Disposition to the extent such conditions are within the Tag Offeree's control or subject to the Tag Offeree's influence and shall otherwise cooperate in good faith with the Luminant Member and the Company in connection with consummating the Tag Along Disposition. No Member shall be required to amend, extend or terminate any contractual or other relationship with the Company, the Assignee or their respective Affiliates nor agree to any covenant not to compete or covenant not to solicit customers, employees or suppliers of the Company, the Assignee or their respective Affiliates.

(f)    *Payment of Consideration.*  All of the consideration payable to the Members in a Tag Along Disposition shall be paid to the Tag Offerees exercising the Tag Right and the Luminant Member based on their respective number of Membership Units sold in the Tag Along Disposition.

4.9    ***IPO.***  If at any time after the Development Period one or more Units achieves commercial operation, without the need for any action or consent of any Member, the Board may develop and implement an IPO Conversion (as defined below). In connection therewith, the Board may take any and all actions to create and implement an initial public offering ("***IPO***"), including (a) amendment of this Agreement, including amendments that alter the capital structure of the Company, whether through the issuance, conversion or exchange of equity securities or otherwise, (b) the merger, conversion or consolidation of the Company, (c) the formation of subsidiaries and the distribution to Members of equity or other interests in such subsidiaries, (d) transferring, domesticating or otherwise moving the Company to another jurisdiction, and (e) taking such other steps as it deems necessary, advisable or convenient to create a suitable vehicle for an offering (the resulting entity, the "***IPO Corporation***"), in each case conditioned upon and for the express purpose of an initial offering of the securities of such IPO Corporation for sale to the public in an IPO (any such action, an "***IPO Conversion***"). In connection therewith, the Members agree to cooperate in good faith in order to effectuate the IPO Conversion and ensure that each Member receives shares (or other equity securities) and other rights in connection with such IPO Conversion substantially equivalent to its economic interest, governance, priority and other rights and privileges as such Member had with respect to its Membership Units prior to such IPO Conversion and are consistent with the rights and preferences attendant to such Membership Units as set forth in this Agreement as in effect immediately prior to such IPO Conversion and to ensure that such rights and privileges are reflected in the organizational and other documents of the IPO Corporation, including entering into a stockholders or similar agreement containing restrictions on transfer of such shares and

14

such other rights and obligations as are provided for herein with respect to the Membership Units. In the event the Board determines that the Company should engage in an IPO Conversion, the Board and the Members will use commercially reasonable efforts to cooperate with each other so the IPO Conversion is undertaken in a tax-efficient manner for all Members, and no Member shall be treated in a disproportionately adverse manner relative to the other Members in connection with the IPO.

4.10    **Remedies.**  The Members agree that a breach of the provisions of this Article IV may cause irreparable injury to the Company and to the other Members for which monetary damages (or other remedy at law) are inadequate in view of (a) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (b) the uniqueness of the Company business and the relationship between the Members.  Accordingly, the Members agree that the provisions of this Article IV may be enforced by specific performance.

### ARTICLE V
### MANAGEMENT

5.1    **Managers.**

(a)    *Delegation of Authority.*  The management of the Company is fully vested in and is hereby delegated to a board (the "**Board**") of managers appointed by the Members in accordance with this Section 5.1 (each, a "**Manager**").  The names of the Managers as of the Effective Date are set forth on Exhibit 1 hereto.  Decisions or actions taken by the Board in accordance with the provisions of this Agreement shall constitute decisions or actions by the Company and shall be binding on each Member and the Company.  In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, subject to Section 5.1(e) and the other terms of this Agreement, the Board shall have, and each Member hereby delegates to the Board, full power and authority to do all things on such terms as it may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company and to operate, or cause to be operated, the properties and assets of the Company.

(b)    *Issuances of Membership Units and Sales of Undivided Interests in Assets.*  Subject to Section 5.1(e)(i)(J), the Board shall have the authority to cause the Company to issue new Membership Units and admit new Members in connection therewith and to sell undivided interests in the assets of the Project; provided, however, that during the Development Period, unless all Managers appointed by the Mitsubishi Member and the Luminant Member agree otherwise, (i) any issuance of Membership Units by the Company or sale of Membership Units by Luminant shall not result in the Luminant Member and its Affiliates collectively holding a Membership Percentage of less than 44% on a fully-diluted basis (i.e., assuming conversion, exercise or exchange of all securities convertible, exercisable or exchangeable for Membership Units), (ii) any sale of undivided interests in the assets of the Project shall not result in the Luminant Member and its Affiliates indirectly holding less than a 44% undivided interest in the assets of the Project, (iii) except as set forth in Section 4.3, no purchaser of Membership Interests will hold a Membership Percentage of less than 10%, (iv) no purchaser of undivided interests in the assets of the Project will hold less than a 10% undivided interest in such assets, (v) any

15

purchaser of Membership Units must meet all applicable regulatory requirements before being admitted as a Member, (vi) any purchaser of undivided interests in the assets of the Project must meet all applicable regulatory requirements to be an owner of an undivided interest in the assets of the Project, (vii) no purchaser of Membership Units or undivided interests in the assets of the Project shall be a Mitsubishi Prohibited Competitor (without the prior written consent of the Mitsubishi Member) or a Luminant Prohibited Competitor (without the prior written consent of the Luminant Member), and (viii) any issuance of Membership Units or sale of undivided interests in the assets of the Project shall be structured in a manner that does not treat the Mitsubishi Member in any disproportionate manner relative to the Luminant Member and will provide, unless otherwise determined by the Board with respect to any such issuance of Membership Units or sale of undivided interests in the assets of the Project (a "*Proceeds Determination*"), for the prompt distribution of the net cash proceeds and other consideration received in connection with such sale of undivided interests or issuance of new Membership Units by the Company to the Members on the basis of their Membership Percentages at the time of the sale or issuance, as applicable. In connection with any sale of undivided interests in the assets of the Project, the Company shall enter into any assignment agreements or other amendments with respect to any of the agreements to which the Company is a party that are reasonably requested by a purchaser of undivided interests in the assets of the Project in order to reflect such purchaser's interest in such agreements. Any issuance of new Membership Units by the Company during the Development Period shall be issued for consideration at least equal to the fair market value of such Membership Units, which shall be deemed to be the price that would be demanded and obtained in an arms-length transaction between a willing and able buyer with respect to the portion of the enterprise value represented by such Membership Units and the Company, under no compulsion, respectively, to buy or to issue Membership Units, each with reasonable knowledge of the relevant facts regarding the Company and neither of which is an Affiliate of or otherwise related to the other, determined by the Board in good faith, including by evaluating the present value of all the future benefits of owning the Membership Units, including the expected cash flow from the enterprise allocable to such Membership Units, expected expenses and capital expenditures associated therewith (and any provision therefor), the eventual value of the enterprise allocable to such Membership Units and non-cash benefits of ownership, and by taking into account goodwill, development rights and other intangible assets to the extent associated with the Company. Any sale of undivided interests in the assets of the Project by the Company during the Development Period shall be made for consideration at least equal to the fair market value of such undivided interests in the assets of the Project, which shall be deemed to be the price that would be demanded and obtained in an arms-length transaction between a willing and able buyer with respect to the portion of the total assets of the Project represented by such undivided interests in the assets of the Project and the Company, under no compulsion, respectively, to buy or to sell such undivided interests in the assets of the Project, each with reasonable knowledge of the relevant facts regarding the Company and neither of which is an Affiliate of or otherwise related to the other, determined by the Board in good faith, including by evaluating the present value of all the future benefits of owning the undivided interests in the assets of the Project, including the expected cash flow from the enterprise allocable to such undivided interests in the assets of the Project, expected expenses and capital expenditures associated therewith (and any provision therefor), the eventual value of the enterprise allocable to such undivided interests in the assets of the Project and non-cash benefits of ownership, and

16

by taking into account goodwill, development rights and other intangible assets to the extent associated with the Company.

(c)    *Appointment.* Each Member that holds a Membership Percentage of 10% or greater (and, during the Development Period if the Mitsubishi Member does not hold a Membership Percentage of 10% or greater, the Mitsubishi Member) shall have the right to appoint two Managers (and two alternates to serve in such Managers' absence) and shall have the right to remove, replace, and/or reappoint such Managers (or such alternates) at any time and from time to time by notice to the other Members, which appointment, removal, replacement, or reappointment may be effective simultaneously with the giving of such notice or prospectively (but not retroactively).

(d)    *Voting Percentage.* The Managers appointed by a Member shall have the right to collectively vote an amount equal to the percentage determined by dividing such Member's Membership Units by the total number of Membership Units held by all Members that have appointed Managers to the Board pursuant to Section 5.1(b) (in each case, such Managers' "***Voting Percentage***"). Except as specified in Section 5.1(e), all decisions of the Board shall require the affirmative vote or written consent of Managers having a majority of the total Voting Percentage.

(e)    *Required Manager Approval.*

(i)    Notwithstanding anything in this Agreement to the contrary, the Company shall not take any of the following actions unless approved by the affirmative vote or written consent of all the Managers appointed by the Mitsubishi Member and the Luminant Member (the "***Required Manager Approval***"):

(A)    engaging in any activity that is not consistent with the purposes of the Company set forth in Section 2.4 or taking any act in contravention of this Agreement;

(B)    engaging in any fundamental business transactions, including mergers, consolidations, reorganizations, liquidations and asset divestitures;

(C)    entering into or changing the terms of any transaction (other than those contemplated by this Agreement and/or entered into on or before the Effective Date) between the Company, on one hand, and any Manager or any Member or any of its Affiliates, on the other hand, including the Transaction Documents;

(D)    entering into any agreement between the Company and the Mitsubishi Member or its Affiliates regarding promotion services in respect of the MHI US-APWR Technology;

(E)    commencing a voluntary case in bankruptcy or taking any action that would result in termination, liquidation, dissolution or winding up of the Company, or omitting to take any actions to avoid such a result;

17

(F)    subject to Section 4.9, changing the legal form of the Company;

(G)    redeeming any Membership Units;

(H)    subject to Section 4.9, electing to treat the Company other than as a partnership for tax purposes;

(I)    approving the Annual Budget, and subject to Section 5.6, amending the Annual Budget or the Long-Term Budget, or incurring any cost or expense in excess of the Annual Budget;

(J)    creating or issuing any new Membership Units or creating a new class of equity interests in the Company;

(K)    subject to Section 5.6, spending Company funds or making any commitment to spend Company funds other than in accordance with the applicable Annual Budget and the Long-Term Budget;

(L)    selling any assets of the Company;

(M)    making a Proceeds Determination; or

(N)    authorizing, committing or agreeing to take any of the foregoing actions or amending this Agreement to effect any of the foregoing actions.

The foregoing list of approval items is in addition to, and not in limitation of, any other actions described herein that expressly require the consent of all Managers or a particular subset of Managers.

(ii)    If any matter that requires a Required Manager Approval is approved by Managers having a majority of the Voting Percentage but fails to receive Required Manager Approval, such matter shall be referred to the chief executive officers or the equivalent of the Members for consideration in good faith.

(iii)    The Board shall have one meeting per calendar year to be held on a date designated by the Development Manager; provided such Board meeting may be held on any other date proposed by the Development Manager that is approved by the Board.  Special meetings of the Board may be called by any Manager on five Business Days' notice to each Member.  In the event that any Member's Managers do not attend a duly called meeting of the Board such that a vote cannot be taken on a matter requiring Required Manager Approval, then the next special meeting of the Board shall be a telephonic meeting held during regular business hours of the Managers that failed to attend the initial meeting unless otherwise agreed to by all of the Managers.  If such Member's Managers do not participate in such duly called telephonic meeting of the Board, and at such meeting the same matter requiring Required Manager Approval is considered, such Member's absent Managers shall be deemed to have approved such matter and for purposes of such approval shall be deemed to have granted a proxy to the other Managers to approve such matter.  Such proxy shall be deemed to be coupled with an interest

18

sufficient in law to support an irrevocable proxy. Meetings of the Board may be held telephonically or using any other medium in which each meeting participant can hear the other meeting participants. The Board may adopt such other procedural rules as it may determine.

(iv)    Any action required or permitted to be taken by the Board may be taken without a meeting if all the Managers shall collectively consent in writing (which consent in writing may be evidenced by a fax or electronic mail) to such action. Such written consent or consents shall be filed with the minutes of the proceedings of the Board. Such action by written consent shall have the same force and effect as a unanimous vote of the Board.

5.2    *Development Manager and Officers.*

(a)    The Person who manages the Company on a day-to-day basis (the "*Development Manager*") shall be determined by the Board and shall remain an employee of Luminant and its Affiliates. The Development Manager as of the Effective Date shall be Robert C. Frenzel. The Board shall have the authority to remove the Development Manager and may designate another Person to serve as Development Manager with at least ten (10) Days' prior written notice to the Luminant Member and the Mitsubishi Member, and subject to the Luminant Member's and the Mitsubishi Member's prior consent, which shall not be unreasonably withheld, conditioned or delayed. The Development Manager shall follow the directives of the Board. Unless approved by the unanimous consent of the Managers in accordance with Section 5.1(e)(i)(I), the Development Manager shall not approve or pay any Development Costs that are not Approved Costs or otherwise included in an Annual Budget or the Long-Term Budget.

(b)    For the avoidance of doubt, any failure by the Development Manager to comply with the terms of this Agreement shall be deemed a breach or default under the Development Services Agreement and not a breach or default by any Member under this Agreement.

(c)    The Board may designate one or more other natural persons to be Officers of the Company, and any such Officers so designated shall have such titles and, subject to the other provisions of this Agreement, have such authority and perform such duties as the Board may delegate to them and shall serve at the pleasure of the Board. The names of the Officers as of the Effective Date are set forth on Exhibit I hereto. In addition to or in lieu of Officers, the Board may authorize any person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such person may be referred to as an "authorized person." An employee or other agent of the Company shall not be an authorized person unless specifically appointed as such by the Board.

5.3    *Authority*. Except to the extent authority is expressly granted in the Development Services Agreement, no Member or Manager in its capacity as such shall have the authority to bind the Company or to take any action on behalf of the Company. No Officer shall have the authority to bind the Company or to take any action on behalf of the Company except pursuant to authorization granted by the Board. Notwithstanding the foregoing, the Development Manager shall have the authority to take any action and bind the Company in any respect, in each case to the extent not expressly prohibited by this Agreement, subject, with respect to expenditures, to Section 5.2(a), Section 5.6 and the Company's Delegation of Authority applicable at the time (as

19

such Delegation of Authority may be amended from time to time). The Company's Delegation of Authority as of the Effective Date is set forth in Exhibit J.

5.4 ***Discretion of Managers***. Each Manager shall be entitled to exercise his or her voting and other rights as a Manager in his or her sole discretion and shall be free to consider solely the interests of the Member appointing such Manager in exercising such rights.

5.5 ***Limitation of Liability of Managers and Officers; Indemnity***. To the fullest extent permitted under the Act and applicable Law, the Managers, the Development Manager and the Officers shall not be liable to the Company or any Member for any act or omission unless such act or omission resulted from such Person's fraud, intentional misconduct, bad faith or gross negligence, and the Company shall indemnify the Managers, the Development Manager and the Officers against and save each Manager, the Development Manager and Officer harmless from any liability incurred by such Manager, Development Manager or Officer, in connection with (a) the performance by such Person of his or her duties as a Manager, Development Manager or Officer of the Company or (b) any action based on any act performed or omitted to be performed by any such Person in connection with the business of the Company, including attorneys' fees incurred by such Person in connection with the defense of any action based on any such act or omission, which attorneys' fees shall be paid as incurred, including all such liabilities under federal and state securities laws; provided, however, no Manager, Development Manager or Officer shall be indemnified from any liability for fraud, intentional misconduct, bad faith or gross negligence. The Company's payment of such attorney's fees as incurred shall be subject to the Manager's, Development Manager's or Officer's obligation to repay all such amounts if such Manager, Development Manager or Officer is ultimately determined not to be entitled thereto pursuant to this Section 5.5.

5.6 ***Budget***.

(a) The long-term budget of the Company shall be the Long-Term Budget attached hereto as Exhibit D. The annual budget of the Company for fiscal year 2014 shall be the Annual Budget attached hereto in Exhibit D, which shall include, among other expenses, an allowance for all costs and expenses expected to be incurred by the Company that are associated with or relate to the COLA for the Project, including any costs and expenses that result from a regulatory action by or before a Governmental Authority related to the COLA for the Project, as well as a mutually agreed-upon contingency allowance for all unexepected costs and expenses that may be incurred by the Company related to the COLA, in each case prior to the first date on which the Luminant Member has the right to cause the COLA Amendment pursuant to Exhibit E. Within 60 Days prior to the end of each fiscal year of the Company, the Development Manager shall prepare and submit to the Board for approval a proposed annual budget for the next succeeding fiscal year (each, a "***Proposed Annual Budget***"). The Proposed Annual Budgets shall adhere to substantially the same presentation format as the Annual Budget for fiscal year 2014 attached hereto in Exhibit D (provided that, for the avoidance of doubt, the line items other than the Major Line Items may be changed). If the Board approves a Proposed Annual Budget in accordance with the terms of this Agreement, including the terms of Section 5.1(e)(i)(1), the Proposed Annual Budget shall be the annual budget for such fiscal year (each, as may be amended from time to time in accordance with the terms of this Agreement, an "***Annual Budget***"). If the Board fails to approve a Proposed Annual Budget for any fiscal year, then the

applicable portion of the Long-Term Budget corresponding to such fiscal year shall apply to expenditures during such fiscal year. The Development Manager may re-allocate spending among Major Line Items in the applicable Annual Budgets or, in the event that the Board fails to approve a Proposed Annual Budget for any fiscal year, the portion of the Long-Term Budget corresponding to such fiscal year (with any increase in a Major Line Item not exceeding 10% of the budgeted amount for such Major Line Item for such fiscal year and any increase in a Major Line Item being completely offset dollar for dollar by actual or identifiable anticipated decreased spending during such fiscal year in other Major Line Items); provided that overall spending during the period covered by the Long-Term Budget does not exceed the maximum amount set forth in the Long-Term Budget without the consent of the Mitsubishi Member and the Luminant Member; and provided, further, that such re-allocation is reported to the Board promptly in writing, and in any event no later than the date that the annual report is required to be delivered pursuant to Section 9.2. During the Development Period, no costs other than Approved Costs will be payable by the Company.

(b)    As set forth on the Long-Term Budget, after the later of March 31, 2014, or such time that the COLA is suspended with the NRC as contemplated by the agreements set forth in Exhibit E hereto,



5.7    *Indemnification for Breach of Agreement.*    Each Member (a "***Breaching Member***") shall indemnify, protect, defend, release and hold harmless, each other Member and its Affiliates and each of their respective officers, directors, employees, representatives, attorneys and agents (collectively, the "***Indemnified Parties***") to the full extent permitted by Law from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, reasonable expenses of any nature (including, without limitation, attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative (each of the foregoing, a "***Claim***"), asserted by or on behalf of a Person (including another Member) that arise out of, relate to or are otherwise attributable to, directly or indirectly, a breach by such Breaching Member of this Agreement; provided however that such

indemnification does not extend to a Member's failure to make a Capital Contribution, and provided further that no Member shall be liable under this Section 5.7 for any exemplary, punitive, special, consequential, incidental or indirect damages or damages for any lost or prospective profits or revenues, loss of use or losses by reason of cost of capital, whether arising out of breach of contract, negligence, tort, strict liability or any other legal or equitable principle, and whether or not arising from any other party's sole, joint or concurrent negligence, strict liability or other fault, except for, in each case, any such damages actually paid to a third party that is not an Indemnified Party pursuant to a third party claim for which indemnification is required hereunder. A Breaching Member shall not be required to indemnify under this Section 5.7 as to any Indemnified Party for any Claim to the extent resulting from, attributable to or arising out of, directly or indirectly, any acts or omissions that constitute fraud, gross negligence, intentional misconduct, bad faith or breach of this Agreement by such Indemnified Party.

(a)     Whenever any Claim shall arise for indemnification under this Section 5.7, the Indemnified Party shall promptly notify the Breaching Member of the Claim and, when known, the facts constituting the basis for such Claim; provided, however, that no delay on the part of the Indemnified Party in notifying the Breaching Member shall relieve the Breaching Member from any obligation hereunder unless (and then solely to the extent) the Breaching Member is materially prejudiced thereby. In the event of any such Claim for indemnification hereunder resulting from or in connection with any Claim by a third party, the notice shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

(b)     In connection with any Claim that may give rise to indemnity hereunder resulting from or arising out of any Claim by a third party, the Breaching Member may, upon written notice to the Indemnified Party, assume the control of the defense, at the Breaching Member's sole cost and expense, of any such third party Claim, with counsel reasonably acceptable to the Indemnified Party; provided that, the Breaching Member shall not be entitled to assume the control of the defense of any such Claim if (i) in the Indemnified Party's good faith judgment, it is advisable, based on the advice of counsel, for the Indemnified Party to be represented by separate counsel because a conflict or potential conflict exists between the Breaching Member and the Indemnified Party, (ii) the Indemnified Party determines, based on the advice of counsel, that there are separate defenses that are available to it that are unavailable to the Breaching Member, (iii) in the reasonable opinion of such Indemnified Party, such Claim involves any risk of the imposition of criminal or quasi criminal liability or the remedy sought in such Claim is an injunction, restraining order, declaratory relief, or other non-monetary relief against the Indemnified Party, or (iv) such Claim involves material Claims not fully indemnified by the Breaching Member that the Breaching Member and the Indemnified Party have been unable to sever from the indemnified Claims.

(c)     If the Breaching Member shall assume the control of the defense of any Claim in accordance with the provisions of Section 5.7(b), (i) the Indemnified Party shall be entitled to participate, at its own cost and expense, in the defense of such Claim and to employ, at its own cost and expense, separate counsel of its choice for such purpose, and (ii) the Breaching Member shall not consent to any settlement, compromise, admission or acknowledgement of the validity of such Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed) if

such settlement, admission or acknowledgement (A) does not unconditionally release the Indemnified Party from all liabilities and obligations with respect to such Claim, (B) imposes injunctive or other equitable relief against the Indemnified Party, (C) includes any statement or undertaking as to fault or culpability of the Indemnified Party, or (D) involves a finding or admission of any violation of applicable Laws.

(d)     In the event that any of clauses (i), (ii), (iii) or (iv) of the proviso in Section 5.7(b) applies, if the Breaching Member does not assume the control of the defense of any Claim within 30 Days after the date the Breaching Member is notified of such Claim by the Indemnified Party, or if the Breaching Member assumes the control of the defense of any Claim in accordance with this Section 5.7 but fails to conduct such defense actively and diligently: (i) the Indemnified Party may defend against such Claim, at the sole cost and expense (which cost and expense shall be reasonable) of the Breaching Member, in such manner as it may deem reasonably appropriate, including consenting to any settlement, compromise, admission or acknowledgment of the validity of such Claim, subject to the prior written consent of the Breaching Member (which consent shall not be unreasonably withheld, conditioned or delayed) and (ii) the Breaching Member shall be entitled to participate in (but not control) the defense of such Claim, with its counsel and at its sole cost and expense; provided that the Breaching Member's participation does not interfere with the Indemnified Party's control of the defense of such Claim.

(e)     Expenses incurred by an Indemnified Party in defending any Claim in accordance with this Section 5.7 that are the responsibility of the Breaching Member shall be advanced by the Breaching Member prior to the final disposition of such Claim upon receipt by the Breaching Member of a written commitment by or on behalf of the Indemnified Party to repay such amount if it shall be determined that the Indemnified Party is not entitled to be indemnified as authorized in this Section 5.7.

(f)     Each of the Breaching Member and the Indemnified Party shall cooperate, and shall cause their respective Affiliates to cooperate, in the defense of any third party Claim and shall furnish or cause to be furnished such records, information and testimony (subject to any applicable confidentiality agreement), and attend such conferences, discovery proceedings, hearings, trials or appeals as may be reasonably requested in connection therewith, in each case at the expense of the Breaching Member.

(g)     The provisions of this Section 5.7 are for the benefit of the Indemnified Parties and shall not be deemed to create any rights for the benefit of any other Person.

5.8     *Separateness Provisions*.    To ensure separateness of the Company from the Members and their Affiliates, the Board and the Members shall, except as expressly contemplated hereby, use their best efforts to cause the Company to take or refrain from taking, as the case may be, the following actions, provided that if the Company takes or refrains from taking action in violation of this Section 5.8, the Members agree to cooperate in good faith to cure such violation, and no Member shall be deemed to be in default under this Section 5.8 so long as it is diligently attempting to cure such violation:

23

(a)    at all times hold itself out to the public and all other Persons as a legal entity separate from the Members and any other Person;

(b)    use stationery, invoices, checks, logos and other business forms separate from the Members or any other Person;

(c)    not enter into any pledge, encumbrance or guaranty, or otherwise become intentionally liable for, or pledge or encumber its assets to secure the liability, debts or obligations of, any Member or any Affiliate of any Member;

(d)    not hold out its credit as being available to satisfy the debts or obligations of any Member or any Affiliate of any Member, other than as contemplated by the Transaction Documents;

(e)    maintain accurate books, financial records and accounts, including checking and other bank accounts and custodian and other securities safekeeping accounts, that are separate and distinct from those of any other Person;

(f)    maintain its books, financial records and accounts in a manner so that it will not be difficult or costly to segregate, ascertain or otherwise identify its assets and liabilities from the assets and liabilities of the Members and Affiliates of the Members;

(g)    not commingle any of its assets, funds or liabilities with the assets, funds or liabilities of any Member or any Affiliate of any Member;

(h)    observe appropriate organizational procedures and formalities;

(i)    cause all material transactions and agreements between the Company and any Member or any Affiliate of a Member to be entered into in the names of the Persons that are parties to the transaction or agreement and to be formally documented in writing;

(j)    to the extent that the Company and any Member or any Affiliate of any Member jointly contract or do business with vendors or service providers or share overhead expenses, allocate fairly, appropriately and reasonably the costs and expenses incurred in so doing between or among such Persons, with the result being that each such Person bears its fair share of all such costs and expenses;

(k)    to the extent that the Company contracts or does business with vendors or service providers where the goods or services are wholly or partially for the benefit of any Member or any Affiliate of any Member, allocate fairly, appropriately and reasonably the costs incurred in so doing to the Person for whose benefit the goods and services are provided, with the result being that each such Person bears its fair share of all such costs;

(l)    to the extent that the Company occupies any premises in the same location or shares the use of equipment with any Member or any Affiliate of any Member, allocate fairly, appropriately and reasonably any rent or overhead expenses among and between such Persons with the result being that each such Person bears its fair share of all such rent and expenses;

(m)    except with respect to shared expenses and corporate functions covered by clauses (j) through (l) above, conduct transactions with Members and their Affiliates and third parties in the Company's name and as an entity that is separate and distinct from the Members and their Affiliates;

(n)    except with respect to shared expenses and corporate functions covered by clauses (j) through (l) above, pay its own liabilities, expenses and losses only from its own assets;

(o)    except with respect to shared expenses and corporate functions covered by clauses (j) through (l) above, compensate all consultants, independent contractors and agents from its own funds for services provided to it by such consultants, independent contractors and agents;

(p)    maintain separate financial statements from the Members and Affiliates of the Members prepared in accordance with GAAP showing the Company's assets and liabilities separate and distinct from those of any other Persons;

(q)    correct any known material misunderstanding regarding the Company's identity as an entity separate from any Member or any Affiliate of any Member; and

(r)    not make any loans to any Member or any Affiliate of any Member or buy or hold any indebtedness or other securities or other obligations issued by any Member or any Affiliate of any Member.

## ARTICLE VI
## CAPITAL CONTRIBUTIONS; DEFAULTS; COVENANTS

6.1    ***Prior Capital Contributions***. As of the Effective Date, the Luminant Member has made Capital Contributions in an amount equal to ███████████ to the Company and has, after giving effect to the distributions pursuant to the Assignment and Assumption Agreement, Unreturned Capital Contributions in the amount equal to ███████████, and the Mitsubishi Member has made Capital Contributions in an amount equal to ███████████ to the Company and has, after giving effect to the distributions pursuant to the Assignment and Assumption Agreement, Unreturned Capital Contributions in the amount equal to ███████████.

6.2    ***Subsequent Capital Contributions***.

(a)    *Capital Contributions*. The Members agree to make the following Capital Contributions in cash to fund future Development Costs in the following order of priority:



25



   (iv) with respect to any additional Capital Contributions, subject to approval by the Board, the Company will have the right from time to time and at any time to call for the Members to make a voluntary contribution or contributions to the capital of the Company in a stated amount (each such call a "*Capital Call*") to fund costs and expenses of the Company that are in excess of the Approved Costs. The Development Manager shall, at the direction of the Board and by written notice to each Member, request that the Members pay to the Company the amount specified in such notice. Each Member may (but shall not be obligated to), on or

26

before the 45th Day after such Capital Call, pay to the Company in cash or in immediately available funds such Member's Membership Percentage of the amount for which the Capital Call is made. The written notice of Capital Call shall set forth in reasonable detail how the proceeds of the Capital Call will be applied, the timing of such expenditures and whether the proceeds will be used for their intended purpose if the Company fails to raise the amount requested in the notice of such Capital Call. If any Member elects not to make a contribution in response to a Capital Call, the other contributing Members shall have the right, pro-rata in accordance with their Membership Percentages, to make such contributions to the capital of the Company, and additional Membership Units shall be issued to each such contributing Member based on the fair market value of such Membership Units at such time, which fair market value shall be deemed to be the price in cash that would be demanded and obtained in an arms-length cash transaction between a willing and able buyer with respect to the portion of the enterprise value represented by such Membership Units and an informed, willing and able seller, under no compulsion, respectively, to buy or to sell, each with reasonable knowledge of the relevant facts regarding the Company and neither of which is an Affiliate of or otherwise related to the other, determined by the Board in good faith, including by evaluating the present value of all the future benefits of owning the Membership Units, including the expected cash flows from the enterprise allocable to such Membership Units, expected expenses and capital expenditures associated therewith (and any provision therefor), the eventual value of the enterprise allocable to such Membership Units and non-cash benefits of ownership, and by taking into account goodwill, development rights and other intangible assets to the extent associated with the Company.

(b)    In the event that this Agreement is amended and restated as contemplated in Section 2.4, then such amended and restated Agreement shall set forth each Member's respective responsibility for any cost overruns for the annual budget during the Development Period.

(c)    *Additional Membership Units.* The Members acknowledge and agree that, in the event that the Company proposes to issue new Membership Units and admit a new Member or Members in connection therewith, the Members (including the proposed new Member or Members) shall cooperate in good faith to amend the provisions of this Section 6.2 to reflect such new Member's or Members' obligations with respect to Capital Contributions. Such new Member or Members shall not be admitted as a Member or Members until the existing Members and the proposed new Member or Members agree on amendments to this Section 6.2 or such parties agree that no such amendments should be made.

(d)    *No Additional Membership Units.* Except as set forth in Section 6.2(a)(iv), no additional Membership Units shall be issued to the Luminant Member or the Mitsubishi Member as a result of any subsequent Capital Contributions because the Membership Units in respect of such subsequent Capital Contributions have been issued to the Luminant Member and the Mitsubishi Member as of the Effective Date.





(f)      *Termination of Obligations.*  In the event that the Development Services Agreement or the Engineering Services Agreement (as defined in the Original LLC Agreement) is terminated prior to the funding of all amounts allocated in the Long-Term Budget or any Annual Budget with respect to such agreement, then the Capital Contribution obligations pursuant to Section 6.2(a) with respect to the remaining funds allocated to such agreement in the Long-Term Budget or any Annual Budget shall be terminated, subject to any Capital Contributions required to pay any accrued but unpaid amounts owed by the Company pursuant to such agreements.

(g)      *No Further Obligation.*  Notwithstanding any other provision of this Agreement, after the expiration of the Development Period, the Capital Contribution obligations pursuant to Section 6.2(a) shall be terminated, subject to any Capital Contributions required to pay any accrued but unpaid amounts owed by the Company as of the expiration of the Development Period.

(h)      *Termination of Contribution Obligations.*  No Member shall have any further obligations to make any Capital Contribution after such Person ceases to be a Member.

6.3      ***Failure to Contribute.***  If a Member does not contribute a Capital Contribution required under Section 6.2 in accordance with the terms of Section 6.2 (including making such Capital Contribution by the date due), and either (a) the Company or (b) in the case of a Capital Contribution required under Section 6.2, another Member, (provided that, in the event such other Member was required to make a Capital Contribution under Section 6.2, such other Member has made such required Capital Contribution) (the "***Nondefaulting Member***"), has given such Member (the "***Noncontributing Member***") written notice of such default and the Noncontributing Member has failed to cure within 15 Days after such notice, any Nondefaulting Member may cause the Company to, or the Company (at the direction of the Nondefaulting Member) may, exercise one or more of the following remedies (with each failure to make a required Capital Contribution entitling the Nondefaulting Members to make a separate determination as to the remedy or remedies for such failure):

(a)      take such action (including court proceedings) as the Nondefaulting Members (with the power to act on behalf of the Company and in the Company's name, including bringing court proceedings) may deem appropriate to obtain payment by the Noncontributing Member of the Noncontributing Member's Capital Contribution (or portion thereof) that is in default, together with interest thereon at the Default Rate, from the date that the

28

Capital Contribution was due until the date that it is made by the Noncontributing Member, all at the cost and expense of the Noncontributing Member; or

(b)    exercise any other rights and remedies available at Law or in equity.

6.4    ***Return of Contributions.***  Except as expressly provided herein, a Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unrepaid Capital Contribution is not a liability of the Company or of any Member.  Except as expressly provided herein, a Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

6.5    ***Capital Accounts.***  A Capital Account shall be established and maintained for each Member in accordance with the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv).  Each Member's Capital Account (a) shall be increased by (i) the amount of money contributed by such Member to the Company pursuant to Section 6.1 or Section 6.2, (ii) the initial Book Value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Code Section 752), and (iii) allocations to such Member of Profits and any other items of income or gain allocated to such Member pursuant to Section 7.3, and (b) shall be decreased by (i) the amount of money distributed to such Member by the Company (including pursuant to Section 7.1 or Section 11.2(a)), (ii) the Book Value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that such Member is considered to assume or take subject to under Code Section 752) and (iii) allocations to such Member of Losses and any other items of loss or deduction allocated to such Member pursuant to Section 7.3.  On the transfer of all or part of a Member's Membership Units, the Capital Account of the transferor that is attributable to the transferred Membership Units shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).  A Member shall have a single Capital Account that reflects all Membership Units held by the Member.  No Member will at any time have any liability to the Company for any negative balance in its Capital Account except to the extent that such negative balance arose as the result of distributions in violation of this Agreement or applicable Law.

6.6    **[Reserved.]**

6.7    **[Reserved.]**

## ARTICLE VII
## DISTRIBUTIONS AND ALLOCATIONS

7.1    ***Distributions.***  The Board may from time to time distribute to the Members such amounts as the Board may determine from the funds on hand of the Company, after the payment of all then-due obligations of the Company and the establishment of reasonable reserves for the Company's liabilities, obligations, working capital and other anticipated needs, to the extent (a) the Board determines that the Company is not restricted by contract or Law from making a distribution to the Members from such funds and (b) such funds have not been allocated to fund costs and expenses of the Company set forth in the Annual Budget.  Any

29

distributions payable to the Members pursuant to this Section 7.1 shall be made in the priorities set forth in Section 11.2(a)(iii)(C)(1)(I) – (IV).

7.2    ***Member Withdrawals.***    Notwithstanding anything in this Article VII to the contrary, if a Member withdraws or resigns from the Company pursuant to Section 3.5, such Member shall not have any right to any distributions or allocations upon the dissolution and winding up of the Company.

7.3    ***Allocations of Profits and Losses.***

(a)    *General Profit and Loss Allocations.*    For each Allocation Period of the Company (including the Allocation Period in which the dissolution of or liquidation of the Company occurs), Profits and Losses for such Allocation Period shall be allocated, after giving effect to the allocations provided in Section 7.3(b) for such Allocation Period, among the Persons who were Members during such Allocation Period as follows:

(i)    *Profits.*    Profits (or, in the sole discretion of the Board, items of income or gain) shall be allocated as follows:

(A)    First, to the Members with deficit Capital Account balances, pro rata in proportion to such deficit balances, until the Capital Account balance of each such Member has been increased to zero (0).

(B)    Second, but only prior to the Commencement Date, to each Member whose Capital Account balance is less than its Unreturned Capital Contribution to the minimum extent necessary to cause each such Member's Capital Account balance to equal such Member's Unreturned Capital Contribution; provided, however, if there are insufficient Profits to cause the Capital Account balances of all such Members to equal their respective Unreturned Capital Contributions, then Profits shall be allocated among such Members in a manner so as to cause, to the maximum extent possible, the Capital Account balances of such Members to be in the same proportion to one another as are such Members' respective Unreturned Capital Contributions.

(C)    Third, to the Members in a manner so as to cause, to the maximum extent possible, the Members' Capital Account balances to be in the same proportion to one another as are the Members' respective Membership Percentages.

(D)    Thereafter, to the Members pro rata in proportion to their respective Membership Percentages.

(ii)    *Losses.*    Losses (or in the sole discretion of the Board, items of loss or expense) shall be allocated as follows:

(A)    First, but only prior to the Commencement Date, to each Member whose Capital Account balance exceeds its Unreturned Capital Contribution to the minimum extent necessary to cause each such Member's Capital Account balance to equal such Member's Unreturned Capital Contribution; provided, however, that if there are insufficient Losses to cause the Capital Account balances of all such Members to equal their respective

Unreturned Capital Contributions, then Losses shall be allocated among such Members in a manner so as to cause, to the maximum extent possible, the Capital Account balances of such Members to be in the same proportion to one another as are such Members' respective Membership Percentages.

(B)     Second, but only prior to the Commencement Date, to the Members in a manner so as to cause, to the maximum extent possible, the Members' Capital Account balances to be in the same proportion to one another as are the Members' respective Unreturned Capital Contributions.

(C)     Third, but only prior to the Commencement Date, to the Members pro rata in proportion to their Unreturned Capital Contributions until the Capital Account balance of each Member is equal to zero (0).

(D)     Thereafter, to the Members pro rata in proportion to their respective Membership Percentages.

(b)     *Special Allocations*.    Notwithstanding any other provision of this Section 7.3, the following special allocations shall be made for each Allocation Period:

(i)     Items of expense in respect of taxes for which a Member is responsible pursuant to Section 8.5(e) shall be allocated to that Member.

(ii)     Nonrecourse Deductions for any Company taxable period shall be allocated to the Members in accordance with their Membership Percentages.

(iii)     Member Nonrecourse Deductions for any Allocation Period shall be allocated 100% to the Member that bears the Economic Risk of Loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i). If more than one Member bears the Economic Risk of Loss with respect to a Member Nonrecourse Debt, Member Nonrecourse Deductions attributable thereto shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss. This Section 7.3(b)(iii) is intended to comply with the provisions of Treasury Regulation Section 1.704-2(i) and shall be interpreted consistently therewith.

(iv)     Notwithstanding any other provision of this Section 7.3, if there is a net decrease in Minimum Gain during any Allocation Period, each Member shall be allocated items of Company income and gain for such period (and, if necessary, subsequent taxable periods) in the manner and amounts provided in Treasury Regulation Section 1.704-2(f)(6), (g)(2), and (j)(2)(i). For purposes of this Section 7.3(b)(iv), the Capital Account of each Member shall be determined, and the allocation of income or gain required hereunder shall be effected, prior to the application of any other allocations pursuant to this Section 7.3 with respect to such Allocation Period. This Section 7.3(b)(iv) is intended to comply with the partner minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(v)      Notwithstanding the other provisions of this Section 7.3 (other than Section 7.3(b)(iv) above), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Company Allocation Period, any Member with a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Allocation Period shall be allocated items of Company income and gain for such period (and, if necessary, subsequent Allocation Periods) in the manner and amounts provided in Treasury Regulation Section 1.704-2(i)(4) and (j)(2)(ii).  For purposes of this Section 7.3(b)(v), the balance of each Member's Adjusted Capital Account shall be determined, and the allocation of income and gain required hereunder shall be effected, prior to the application of any other allocations pursuant to this Section 7.3, other than Section 7.3(b)(iv) with respect to such Allocation Period.  This Section 7.3(b)(v) is intended to comply with the member nonrecourse debt minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(vi)      Except as provided in Section 7.3(b)(iv) and Section 7.3(b)(v), in the event that any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by such Treasury Regulation, the deficit balance, if any, in its Adjusted Capital Account created by such adjustments, allocations or distributions as quickly as possible unless such deficit balance is otherwise eliminated pursuant to Sections 7.3(b)(iv), 7.3(b)(v) or 7.3(b)(vii).

(vii)      In the event any Member has a deficit balance in its Adjusted Capital Account at the end of any Allocation Period, such Member shall be allocated items of gross income and gain in the amount of such excess as quickly as possible; provided, however, that an allocation pursuant to this Section 7.3(b)(vii) shall be made only if and to the extent that such Member would have a deficit balance in its Adjusted Capital Account after all other allocations provided in this Section 7.3(b)(vii) have been tentatively made as if Section 7.3(b)(vi) and this Section 7.3(b)(vii) were not in this Agreement.

(viii)      To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Sections 734(b) or 743(b) of the Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts as a result of a distribution in liquidation of a Members' interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such item of gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such provisions.

7.4      *Income Tax Allocations.*

(a)      Except as provided in this Section 7.4, each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under Section 7.3.

32

(b)     In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value. In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Treasury Regulations thereunder.

(c)     All items of income, gain, loss, deduction and credit allocated to the Members in accordance with the provisions hereof and basis allocations recognized by the Company for federal income tax purposes shall be determined without regard to any election under Code Section 754 which may be made by the Company.

(d)     If any deductions for depreciation or cost recovery are recaptured as ordinary income upon the sale or other disposition of Company properties, the ordinary income character of the gain from such sale or disposition shall be allocated among the Members in the same ratio as the deductions giving rise to such ordinary income character were allocated.

7.5     *Varying Interests*.  All items of income, gain, loss, deduction or credit allocable to any Membership Units that may have been transferred shall be allocated between the transferor and the transferee as determined by the Board in accordance with a method permissible under Code Section 706 and the Treasury Regulations thereunder.   If any Membership Units are disposed of or redeemed in compliance with the provisions of this Agreement, all distributions with respect to which the record date is before the date of such Disposition or redemption shall be made to the disposing Member, and all distributions with respect to which the record date is after the date of such Disposition, in the case of a Disposition other than a redemption, shall be made to the transferee.

### ARTICLE VIII
### TAXES

8.1     *Tax Returns Generally*.  The Company shall prepare and timely file all U.S. federal, state, local and any foreign tax returns required to be filed by the Company.  Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed.  The Company shall deliver to each Member by July 1 following the end of the applicable fiscal year, a Schedule K-1 together with such additional information as may be required by the Members in order to file their individual returns reflecting the Company's operations.   Additionally, the Company shall deliver to each Member (a) within 60 days following the end of each fiscal quarter, such estimated financial information as may be required by such Member in order to make estimated quarterly income tax payments with respect to such fiscal quarter and (b) within 60 days following the end of each fiscal year, such estimated financial information as may be required by such Member in order to file an

application for extension of time to file the income tax returns for such fiscal year. The Company shall bear the costs of the preparation and filing of its returns.

8.2    *2013-2015 Tax Returns.*

(a)    The Members intend for the Company to report on its federal and applicable state income tax returns for the taxable years beginning January 1, 2013, 2014 and 2015 consistent with the following, unless contrary to then applicable law or a change in anticipated facts or circumstances makes such reporting inapplicable or inappropriate:

(i)    The Company will not file a final federal or applicable state income tax return or treat the Company as having liquidated or dissolved in a taxable year prior to the taxable year beginning January 1, 2015;

(ii)    The Company will treat the transfer, pursuant to the Assignment and Assumption Agreement, of the Mitsubishi Assets to the Mitsubishi Member or its Affiliate and the Luminant Assets to the Luminant Member or its Affiliate as non-liquidating distributions to such Members under Code Section 731. The Book Value of any such property (after giving effect to clause (c) of the definition of Book Value) distributed will reduce the Capital Account balances and the Unreturned Capital Contributions of the Members receiving such property. It is anticipated that neither the Company nor either Member would recognize gain or loss on such distributions;

(iii)    To the extent that assets of the Company (other than the COLA) have been disposed of, abandoned or become worthless, such that the Company is entitled to recognize a loss with respect to such assets, the Company will recognize such loss and allocate such loss to the Members in accordance with Article VII;

(iv)    Upon the effectiveness of the COLA Amendment, the Company will treat the COLA as having been distributed in kind to the Luminant Member pursuant to Section 7.1 or Section 11.2(a)(iii)(C)(1), as applicable. The Book Value of the COLA (after giving effect to clause (c) of the definition of Book Value) distributed will reduce the Capital Account balance and Unreturned Capital Contribution of the Luminant Member. It is anticipated that neither the Company nor either Member would recognize gain or loss on such distribution.

(b)    Each Member hereby acknowledges and agrees that such Member is relying on its own investigation and analysis with respect to tax matters and has consulted its own tax advisors to determine the merits and risks of all tax matters relating to the Company and such Member's participation therein, including the intended tax positions described above; and that there is no assurance that such tax positions can or will be taken in any particular tax return or, if such tax positions are taken in a tax return, that such positions or such tax return will not be successfully challenged by the applicable taxing authority. Neither Member provides any guarantee or assurance of any particular tax treatment to any other Member.

8.3    *Tax Partnership*.    It is the intention of the Members that the Company be classified as a partnership for U.S. federal income tax purposes. Unless otherwise approved in accordance with this Agreement, neither the Company nor any Member shall make an election for the Company to be excluded from the application of the provisions of subchapter K of

34

chapter 1 of subtitle A of the Code or any similar provisions of applicable state law or to be classified as other than a partnership pursuant to Treasury Regulation Section 301.7701-3.

8.4     *Tax Elections.*    The Company shall make the following elections on the appropriate forms or tax returns: to adopt the calendar year as the Company's fiscal year; if permitted under the Code, to adopt the accrual method of accounting and to keep the Company's books and records on the U.S. federal income tax method; if a distribution of the Company's property as described in Code Section 734 occurs or upon a transfer of Membership Units as described in Code Section 743 occurs, on request by notice from any Member, to elect, pursuant to Code Section 754, to adjust the basis of the Company's properties; to elect to amortize the organizational expenses of the Company as permitted by Code Section 709(b); to elect to capitalize, to the maximum extent permitted under Code Sections 266, 179 or otherwise, items of expense incurred prior to the commercial operation date of the Project; and any other election the Board may deem necessary or appropriate that is otherwise consistent with the provisions of this Agreement.

8.5     *Tax Matters Member.*

(a)     *Appointment; Duties.*    The tax matters partner of the Company pursuant to Code Section 6231(a)(7) shall be a Member designated from time to time by the Board subject to replacement by the Board. (Any Member who is designated as the tax matters partner is referred to herein as the "*Tax Matters Member*"). The initial Tax Matters Member will be the Luminant Member. The Tax Matters Member shall take such action as may be necessary to cause, to the extent possible, each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code. The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each Member copies of all significant written communications it may receive in that capacity. Subject to Section 8.4(e), any cost or expense incurred by the Tax Matters Member in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

(b)     *Settlements.*    The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Board. The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the consent of such Member. Any Member that enters into a settlement agreement with respect to any Company item (as described in Code Section 6231(a)(3)) shall notify the other Member of such settlement agreement and its terms within 90 Days from the date of the settlement.

(c)     *Administrative Adjustments.*    No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Member. If the Board consents to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members. If such consent is not obtained within 30 Days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own

35

behalf. Any Member intending to file a petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Member of such intention and the nature of the contemplated proceeding. In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Member to participate in the choosing of the forum in which such petition will be filed.

(d)     *Notice of Inconsistent Treatment.* If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

(e)     *Expenses of Certain Tax Proceedings.* Any cost or expense incurred by the Tax Matters Member or the Company in connection with the defense of any audit or other administrative or judicial proceeding relating to tax items that are unique to one or more, but not all, of the Members shall be borne by such affected Member(s) and such Member(s) shall promptly reimburse the Tax Matters Member or the Company for such cost or expense. Notwithstanding anything to the contrary in this Agreement, (i) the Luminant Member shall be responsible for any transfer or similar tax incurred by the Company as a consequence of the distribution of the Luminant Assets as set forth in the Assignment and Assumption Agreement, and (ii) the Mitsubishi Member shall be responsible for any transfer or similar tax incurred by Company as a consequence of the distribution of the Mitsubishi Assets as set forth in the Assignment and Assumption Agreement.

## ARTICLE IX
## BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS

9.1     ***Maintenance of Books.*** The Company shall keep or cause to be kept at the principal office of the Company, or at such other location approved by the Board, complete and accurate books and records of the Company, supporting documentation of the transactions with respect to the conduct of the Company's business and minutes of the proceedings of its Members and Board, and any other books and records that are required to be maintained by applicable Law. The books of account of the Company shall be maintained on the basis of a fiscal year that is the calendar year, maintained on an accrual basis in accordance with GAAP, consistently applied and audited by certified public accountants chosen by the Board at the end of each calendar year.

9.2     ***Reports.*** The Company shall distribute to the Members all annual reports and quarterly financial reports that the Company receives from the Development Manager pursuant to the Development Services Agreement promptly after receipt from the Development Manager. At any time when the Development Services Agreement is no longer in effect or otherwise no longer requires the Development Manager to deliver such reports to the Company, the Board shall in good faith determine the reports to be delivered to the Members and shall cause the Company to deliver such reports to the Members.

9.3    *Bank Accounts*. Funds of the Company shall be deposited in such banks or other depositories as shall be designated from time to time by the Board. All withdrawals from any such depository shall be made only as authorized by the Board and shall be made only by check, wire transfer, debit memorandum or other written instruction.

9.4    *Inspection Rights*. Each Member shall have the right to examine and audit the books and records of the Company (including supporting documentation, minutes and any other documentation kept or maintained by the Company) at the Company's principal place of business or another location agreed upon by such Member and the Company, at any reasonable time and without causing unreasonable disruption to the business and operation of the Company and the discharge of the Development Manager's duties, for any purpose reasonably related to such Member's interest as a Member (including the preparation, at the sole cost and expense of such Member, of a separate audit report for the Company). Such Member shall bear all costs incurred by such Member and the Company in connection with such examination and audit.

## ARTICLE X
## DISPUTE RESOLUTION

10.1    *Negotiation to Resolve Disputes*. If any claim, counterclaim, demand, cause of action, dispute, controversy, or other matter in question arising out of or relating to this Agreement, or to the alleged breach hereof, or in any way relating to the subject matter of this Agreement or the relationship between the Members created by this Agreement (whether extra-contractual in nature, sounding in contract, tort or otherwise, or provided for by federal or state statute, common law or otherwise) (hereafter a *"Dispute"*) arises, a Member desiring to initiate dispute resolution shall give notice to all other Members to initiate the dispute resolution procedures set forth herein. Promptly upon receipt of such notice, each Member that is a party to the Dispute (each, a *"Disputing Member"*) shall refer such Dispute to a senior executive officer (*"SEO"*) of each Disputing Member. The SEOs will meet in person or by teleconference as soon as mutually practicable (but in any event within 10 Business Days after such notice) in order to try and resolve the Dispute. If the SEOs are unable to resolve the Dispute on or before the 30th Day after such notice, any Disputing Member may notify each other Disputing Member that it desires to commence an arbitration under this Article X (an *"Arbitration Notice"*).

10.2    *Arbitration*.    All Disputes shall be finally settled under the Commercial Arbitration Rules (the *"Rules"*) of the American Arbitration Association (*"AAA"*). The parties agree that any such arbitration shall be confidential and neither party shall publicly disclose the fact of such Dispute, the pleadings and positions taken in the arbitration, or the decision of the Tribunal.

10.3    *Selection of Arbitrators*. Any arbitration conducted under this Article X shall be heard by three arbitrators (each an *"Arbitrator"* and collectively the *"Tribunal"*) selected in accordance with this Article X and the Rules. When a Dispute involves only two Disputing Members, each Disputing Member shall appoint one Arbitrator within 10 Days after the sending of the Arbitration Notice. The two party-appointed Arbitrators will thereafter appoint a third Arbitrator within 15 Days after the appointment of the second Arbitrator, which third Arbitrator shall not be a citizen of the United States of America or Japan. Where a Dispute involves more

37

than two Disputing Members, all three Arbitrators shall be selected in accordance with the Rules, with the exception that the AAA shall not directly appoint the Tribunal without first attempting to make the appointments through the National Roster list system. Each Disputing Member and any proposed Arbitrator shall, as soon as practicable, disclose to the other Disputing Members any business, personal or other relationship or affiliation that may exist among any Member, the Company and the proposed Arbitrators. The Disputing Members may then object to any of the proposed Arbitrators on the basis of such relationship or affiliation. The validity of any such objection shall be determined according to the Rules.

10.4  *Conduct of Arbitration.*  The Tribunal shall expeditiously hear and decide all matters concerning the Dispute. Any arbitration hearing shall be held in New York, New York. Arbitration proceedings shall be conducted in English. The decision of the Tribunal (which shall be rendered in English in the form of a written award) shall be final, nonappealable and binding upon the parties and may be confirmed in, and judgment upon the award entered by, any court having jurisdiction over the parties. It is acknowledged and agreed that, consistent with the Rules, the Disputing Members shall be permitted to request interim or injunctive relief from a court at any time.

10.5  *Arbitration Costs and Expenses.*  The responsibility for paying the costs of the Tribunal and any experts retained by the Tribunal shall be borne equally by the Disputing Members, and costs incurred by any Disputing Member for its attorneys, advisors, consultants and experts shall be borne by the Disputing Member incurring such costs.

10.6  *Proper Parties to Arbitration.*  The Members acknowledge and agree that any right, demand, claim, action or cause of action against any Member hereunder shall reside with the other Members and not with the Company, such that the proper parties to any arbitration hereunder shall be Members and not the Company.

10.7  *Exception to Mandatory Arbitration.*  Notwithstanding anything else in this Article X to the contrary, (a) any Nondefaulting Member may cause the Company to, or the Company (at the direction of the Nondefaulting Member) may, exercise the applicable remedies specified in Section 6.3, and the other provisions of this Article X (except for Section 10.8) shall not apply with respect to (i) the exercise of any such remedy, (ii) any compulsory or voluntary counterclaims brought in connection with the exercise of any such remedy, (iii) any claims brought by the Noncontributing Member against any Nondefaulting Member, or (iv) any claims brought by any Nondefaulting Member against the Noncontributing Member, and (b) any Member shall be entitled to seek a decree of judicial dissolution of the Company under Section 18-802 of the Act.

10.8  *Jurisdiction and Venue.*  Each Member hereby consents to the non-exclusive personal jurisdiction and venue of the Federal District Court for the Southern District of New York and the Federal District Court for the Northern District of Texas for any proceedings in aid of arbitration under this Article X, any request for interim or injunctive relief, and any proceedings permitted under Section 10.7(a); provided that any application by a Member for a decree of judicial dissolution of the Company shall be brought in the Delaware Court of Chancery pursuant to Section 18-802 of the Act.

## ARTICLE XI
## DISSOLUTION, WINDING-UP AND TERMINATION

11.1 ***Dissolution***. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "***Dissolution Event***"): (i) the unanimous consent of the Members, (ii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act, (iii) in the event of a Change of Control with respect to any Member, upon 30-days written notice of the Member for which the Change of Control did not occur (the "***Terminating Member***") to the Member for which the Change of Control did occur (to be delivered at the Terminating Member's discretion), (iv) upon 30-days written notice by any Member to the other Member at any time after the ▮▮▮▮▮ anniversary of the Effective Date, provided that the Members shall cause the Board to have a meeting to discuss dissolution in such event prior to the expiration of such 30-day notice period and (v) upon written notice by the Luminant Member to the Mitsubishi Member if applicable pursuant to the terms of <u>Section 2(d)(ii)</u> of <u>Exhibit E</u>. No other event shall cause a dissolution of the Company.

11.2 ***Winding-Up and Termination***.

(a) *Actions of Liquidator*. On the occurrence of a Dissolution Event, the Board shall act as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of winding up shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Members. The steps to be accomplished by the liquidator are as follows:

(i) as promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last Day of the calendar month in which the dissolution occurs or the final winding up is completed, as applicable;

(ii) the liquidator shall discharge from Company funds all of the indebtedness and other debts, liabilities and obligations of the Company (including all expenses incurred in winding up) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(iii) all remaining assets of the Company shall be distributed to the Members as follows:

(A) the liquidator may sell any or all property of the Company, including to Members, for consideration at least equal to fair market value as determined by the Board in good faith, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members in accordance with <u>Section 7.3</u>;

(B) with respect to all property of the Company that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss,

39

and deduction inherent in property that has not been reflected in such Capital Accounts previously would be allocated between the Members pursuant to <u>Section 7.3</u> if there were a taxable disposition of that property for the fair market value of that property on the date of distribution in the manner described in <u>Section 11.2(a)(iii)(A)</u>; and

(C)    property (including cash) of the Company shall be distributed to the Members by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 Days after the date of the liquidation) as follows:

(1)    If the Dissolution Event shall have occurred prior to the Commencement Date then distributions made pursuant to this <u>Section 11.2(a)(iii)</u> shall be made in the following order of priority:

(I)    First, to the extent the Company has cash on hand and such cash is not needed for anticipated expenses, such cash shall be distributed as follows: (a) first, to those Members who made cash Capital Contributions to the Company on or after the date that is thirty days prior to the date of the Dissolution Event in proportion to, and to the extent of, such cash Capital Contributions made during such period, (b) second, to those Members who made cash Capital Contributions to the Company during the period commencing on the date that is sixty days prior to the date of the Dissolution Event and ending on the date that is thirty-one days prior to the date of the Dissolution Event, pro rata in proportion to, and to the extent of, such cash Capital Contributions made during such period and (c) third, to those Members who made cash Capital Contributions to the Company during the period commencing on January 30, 2009 and ending on the date that is sixty-one days prior to the date of the Dissolution Event, pro rata in proportion to, and to the extent of, such cash Capital Contributions made during such period;

(II)    Second, to the Members pro rata in proportion to the relative Unreturned Capital Contributions of the Members until the Unreturned Capital Contributions of each Member have been reduced to zero (0);



(IV)    Thereafter, to the Members pro rata in proportion to their relative Membership Percentages.

(2)    If the Dissolution Event shall have occurred on or subsequent to the Commencement Date then distributions made pursuant to this <u>Section 11.2(a)(iii)</u> shall be made to the Members pro rata in proportion to their relative Membership Percentages.

(b)    *Return on Capital Contributions.* The distribution of cash or property to a Member in accordance with the provisions of this <u>Section 11.2</u> constitutes a complete return to

40

the Member of its Capital Contributions and a complete distribution to the Member of its Membership Units and all the Company's property and constitutes a compromise to which all Members have consented pursuant to Section 18-502(b) of the Act. To the extent that a Member returns funds to the Company, it has no claim against the other Member for those funds.

11.3  **Deficit Capital Accounts.**  No Member will be required to pay to the Company, to the other Member or to any third party any deficit balance that may exist from time to time in any Capital Account of a Member.

11.4  **Certificate of Cancellation.**  On completion of the distribution of Company assets as provided herein, the Board (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the existence of the Company. Upon the filing of such certificate of cancellation, the existence of the Company shall terminate (and the Term shall end), except as may be otherwise provided by the Act or other applicable Law.

## ARTICLE XII
## GENERAL PROVISIONS

12.1  **Confidential Information.**  Each Member acknowledges that it is subject to the Confidentiality Agreement. Any breach of the Confidentiality Agreement shall be governed by the terms and conditions of the Confidentiality Agreement.

12.2  **Notices.**  Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder shall be in writing and shall be deemed given upon (a) confirmed delivery by a standard overnight carrier or when delivered by hand, (b) actual receipt, addressed to the respective parties, in each case described in clauses (a) and (b) at the addresses set forth on Exhibit A hereto or in the instrument described in Section 3.7 or Section 4.1(b)(i) (or such other address for a party as shall be specified by like notice), or (c) electronic transmission (if followed by delivery by standard overnight carrier or delivery by hand) to the e-mail address set forth on Exhibit A hereto or in the instrument described in Section 3.7 or Section 4.1(b)(i). Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, shall be deemed equivalent to the giving of such notice.

12.3  **Entire Agreement; Superseding Effect.**  This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and supersedes all provisions and concepts contained in all prior contracts or agreements between the Members or any of their Affiliates with respect to the Company and the subject matter hereof.

12.4  **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any Member in the performance by that Member of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Member of the same or any other obligations of that Member with respect to the Company. Failure on the part of a Member to complain of any act of any other Member or to declare any other Member in default with respect to the Company, irrespective of how

long that failure continues, does not constitute a waiver by that Member of its rights with respect to that default until the applicable statute-of-limitations period has run.

12.5 *Amendment or Restatement.* Subject to Section 5.1(e), this Agreement or the Certificate may be amended or restated only by a written instrument executed (or, in the case of the Certificate, approved) by Members holding a majority of the then outstanding Membership Units; provided, however, that (a) any such amendment or restatement that disproportionately affects the rights or obligations of any Member in its capacity as a Member shall require the prior written consent of such Member and (b) any such amendment or restatement that modifies, supplements, terminates or waives any of the Specified Sections shall require the prior written consent of each Member.

12.6 *Binding Effect.* Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective successors and permitted assigns.

12.7 *Governing Law; Severability.* This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. If there is a direct conflict between the provisions of this Agreement and any mandatory, non-waivable provision of the Act, such provision of the Act shall control. If any provision of the Act provides that it may be varied or superseded in a limited liability company agreement (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived to the extent that this Agreement contains a provision addressing the same issue or subject matter. If any provision of this Agreement or the application thereof to any Member or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to the other Member or circumstances is not affected thereby and the Members shall negotiate in good faith to replace that provision with a new provision that is valid and enforceable and that puts the Members in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable. If the Act is amended or interpreted in a manner that renders valid any provision of this Agreement that formerly was invalid, such provision shall be considered to be valid from and after the effective date of such amendment or interpretation.

12.8 *Waiver of Certain Damages.* TO THE FULLEST EXTENT PERMITTED BY LAW, AND NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT (BUT SUBJECT TO SECTION 5.7), NONE OF THE MEMBERS, THE COMPANY, THE MANAGERS, THE DEVELOPMENT MANAGER OR THE OFFICERS SHALL BE LIABLE TO EACH OTHER OR ANY THIRD PARTY FOR ANY EXEMPLARY, PUNITIVE, SPECIAL, CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES OR DAMAGES FOR ANY LOST OR PROSPECTIVE PROFITS OR REVENUES, LOSS OF USE OR LOSSES BY REASON OF COST OF CAPITAL, WHETHER ARISING OUT OF BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE, AND WHETHER OR NOT ARISING FROM ANY OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR

OTHER FAULT, AND EACH SUCH PERSON RELEASES EACH OF THE OTHER SUCH PERSONS FROM LIABILITY FOR ANY SUCH DAMAGES.

12.9 *Further Assurances.* In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

12.10 *Counterparts.* This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

12.11 *Press Releases.* Without limiting the Members' rights and obligations under the Confidentiality Agreement, each Member shall promptly advise and consult with, and obtain the consent (which consent will not be unreasonably withheld, conditioned or delayed) of, the other Members before issuing, or permitting any of its directors, officers, employees, agents or its Affiliates to issue, any press release with respect to this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, unless subject to a Disclosure Exception or otherwise required by Law or rules of the appropriate stock exchanges, in which case, and to the extent permitted by Law and to the extent practicable, the issuing Member shall (a) notify the other Members of any request for disclosure, (b) consult with the nonissuing Members on the advisability of taking steps to resist or narrow such request and (c) if disclosure is required or deemed advisable, use commercially reasonable efforts to cooperate with the nonissuing Members in any attempt it may make to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed information. If any press release to be issued by a Member with respect to this Agreement or the transactions contemplated hereby is in a language other than English, then a complete and accurate translation of such press release into English shall be provided to the other Members. In the event of any conflict between this Section 12.11 and the Confidentiality Agreement, the Confidentiality Agreement shall prevail.

12.12 *Specific Performance; Other Remedies.* The Members agree that a breach of any of the provisions of this Agreement may cause irreparable injury to the Company and to the other Members for which monetary damages (or other remedy at law) are inadequate in view of (a) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (b) the uniqueness of the Company business and the relationship between the Members. Accordingly, the Members agree that the provisions of this Agreement may be enforced by specific performance.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Members have executed this Agreement effective as of the Effective Date.

MEMBERS:

NUCLEAR ENERGY FUTURE HOLDINGS II LLC

By: _____
Name:     Robert C. Frenzel
Title:     Senior Vice President and Chief
          Financial Officer

MHI NUCLEAR NORTH AMERICA, INC.

By: _____
Name:     Hiroshi Matsuda
Title:     President

**EXHIBIT A**
**MEMBERS**

| Name/Address of Members | Membership Percentage | Membership Units | Name of Parent |
|---|---|---|---|
| Nuclear Energy Future Holdings II LLC<br>c/o Luminant Generation Company LLC<br>500 N. Akard Street<br>Dallas, TX 75201<br>Attention: Bob Frenzel, Chief Financial Officer<br>Email: bob.frenzel@luminant.com<br><br>with a copy to:<br>Luminant Generation Company LLC<br>500 N. Akard Street<br>Dallas, TX 75201<br>Attention: Stephanie Zapata Moore, General Counsel<br>Email: stephanie.moore@luminant.com | ▉ | ▉ | Energy Future Holdings Corp. |
| MHI Nuclear North America, Inc.<br>c/o Mitsubishi Heavy Industries, Ltd.<br>Global Nuclear Business Operations<br>16-5, Konan 2-Chome, Minato-ku<br>Tokyo 108-8215 Japan<br>Attention: Hiroshi Matsuda, Deputy Senior Vice President<br>Email: hiroshi_matsuda@mhi.co.jp<br><br>with a copy to:<br><br>Mitsubishi Heavy Industries, Ltd.<br>Legal & General Affairs Department<br>16-5, Konan 2-Chome, Minato-ku<br>Tokyo 108-8215 Japan<br>Attention: Hisashi Kato, Manager<br>Email: hisasi_kato@mhi.co.jp | ▉ | ▉ | Mitsubishi Heavy Industries, Ltd. |
| **TOTALS** | 100% | ▉ | N/A |

## EXHIBIT B
## DEFINITIONS

"*AAA*" has the meaning assigned to such term in <u>Section 10.2</u>.

"*Accepting Tag Offeree*" has the meaning assigned to such term in <u>Section 4.8(c)</u>.

"*Act*" means the Delaware Limited Liability Company Act.

"*Actions or Proceedings*" means any action, suit, proceeding, arbitration or investigation by or before any Governmental Authority.

"*Additional Tag Along Units*" has the meaning assigned to such term in <u>Section 4.8(c)</u>.

"*Adjusted Capital Account*" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore or is treated as obligated to restore under Treasury Regulation Section 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5)) and (b) decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) with respect to such Member.

"*Affiliate*" means with respect to any Person, (a) each entity that such Person Controls; (b) each Person that Controls such Person, including, in the case of a Member, such Member's Parent; and (c) each entity that is under common Control with such Person, including, in the case of a Member, each entity that is Controlled by such Member's Parent.

"*Agreement*" means this Second Amended and Restated Limited Liability Company Agreement of the Company, as amended, modified, supplemented or restated from time to time.

"*Allocation Period*" means a period commencing on the first day of each fiscal year, on any day in which an adjustment to the Book Value of the Company's assets pursuant to clause (b) of the definition of Book Value occurs and on the Commencement Date, and the prior Allocation Period shall terminate on the day immediately preceding the day of commencement of a new Allocation Period.

"*Annual Budget*" has the meaning assigned to such term in <u>Section 5.6(a)</u>.

"*Approved Costs*" has the meaning assigned to such term in <u>Section 5.6(c)</u>.

"*Arbitration Notice*" has the meaning assigned to such term in <u>Section 10.1</u>.

"*Arbitrator*" has the meaning assigned to such term in <u>Section 10.3</u>.

"*Assignee*" means any Person that acquires any Membership Units through a Disposition; provided, however, that, an Assignee shall have no right to be admitted to the Company as a Member except in accordance with <u>Article IV</u> and until such admission, shall not be deemed to be a Member.

"*Assignment and Assumption Agreement*" means that certain Assignment and Assumption Agreement dated as of the Effective Date by and among the Company, the Luminant Member, and the Mitsubishi Member.

"*Board*" has the meaning assigned to such term in Section 5.1(a).

"*Book Value*" means, with respect to any property, such property's adjusted basis for federal income tax purposes, except as follows:

        (a)    The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as reasonably determined by the Board;

        (b)    The Book Values of all properties shall be adjusted to equal their respective fair market values as determined by the Managers in connection with (i) the acquisition of an interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution to the Company, (ii) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company, (iii) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member, (iv) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(1) (other than pursuant to Section 708(b)(1)(B) of the Code), or (v) any other event to the extent determined by the Board to be necessary to properly reflect Book Values in accordance with the standards set forth in Treasury Regulation Section 1.704-1(b)(2)(iv)(q); provided, however, that adjustments pursuant to clauses (i), (ii) or (iii) above shall be made only if the Board determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members of the Company;

        (c)    The Book Value of any property distributed to a Member shall be the fair market value of such property as reasonably determined by the Board; and

        (d)    The Book Values of all properties shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704 1(b)(2)(iv)(m) and clause (h) of the definition of Profits and Losses or Section 7.3(b)(viii); provided, however, Book Value shall not be adjusted pursuant to this clause (d) to the extent the Board reasonably determines that an adjustment pursuant to clause (b) hereof is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (d).

If the Book Value of property has been determined or adjusted pursuant to clauses (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into

account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Article VII.

"*Breaching Member*" has the meaning assigned to such term in Section 5.7.

"*Business Day*" means any Day other than a Saturday, a Sunday, or a holiday on which commercial banks in New York, New York, Dallas, Texas or Tokyo, Japan are closed.

"*Capital Account*" means the capital account to be maintained for each Member in accordance with Section 6.5.

"*Capital Call*" has the meaning assigned to such term in Section 6.2(a)(iv).

"*Capital Contribution*" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member. Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors-in-interest.

"*Carry Over Tag Along Units*" has the meaning assigned to such term in Section 4.8(c).

"*Certificate*" has the meaning assigned to such term in the Recitals to this Agreement.

"*Change of Control*" means (a) with respect to the Luminant Member, an event or series of events by which Luminant, its successors or assigns ceases to Control the Luminant Member, and (b) with respect to the Mitsubishi Member, an event or series of events by which MHI, its successors or assigns ceases to Control the Mitsubishi Member.

"*Claim*" has the meaning assigned to such term in Section 5.7.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*COL*" means a Combined License from the NRC.

"*COLA*" means the application for a COL in connection with the construction and operation of the Units.

"*COLA Amendment*" has the meaning assigned to such term in Exhibit E.

"*COLA Amendment Documents*" has the meaning assigned to such term in Exhibit E.

"*COLA Suspension*" has the meaning assigned to such term in Exhibit E.

"*Commencement Date*" means the date on which the Financial Closing occurs.

"*Company*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"*Confidentiality Agreement*" means the Amended and Restated Confidentiality Agreement dated as of January 30, 2009, among MNES, MHI, Luminant and the Company, as amended, revised or supplemented by the parties thereto from time to time.

"*Control*" means the possession, directly or indirectly through one or more intermediaries, of any of the following with respect to another Person: (a) the right to more than 50% of the distributions from such Person (including liquidating distributions) or more than 50% of the economic or beneficial interest in such Person, (b) the power to elect more than 50% of the directors, managers or other voting members of the governing body of such person, or (c) more than 50% of the voting securities (or equivalent voting interests) in such Person, and "*Controls*" and "*Controlled*" have the correlative meanings.

"*Day*" means a calendar day; provided, however, that, if any period of Days referred to in this Agreement shall end on a Day that is not a Business Day, then the expiration of such period shall be automatically extended until the end of the first succeeding Business Day.

"*Declined Tag Along Units*" has the meaning assigned to such term in Section 4.8(c).

"*Declining Tag Offeree*" has the meaning assigned to such term in Section 4.8(c).

"*Deemed Disposition*" means, with respect to a Member, a Change of Control with respect to such Member.

"*Default Rate*" means a rate of interest equal to the lesser of (a) the highest non-usurious contract rate permitted by applicable Law or (b) 450 basis points in excess of the rate published by Citibank, N.A. from time to time, as its "prime rate."

"*Defaulting Purchasing Member*" has the meaning assigned to such term in Section 4.8(a).

"*Depreciation*" means, for each taxable year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to property for such taxable year, except that (a) with respect to any property the Book Value of which differs from its adjusted tax basis for federal income tax purposes and which difference is being eliminated by use of the remedial allocation method pursuant to Treasury Regulation Section 1.704-3(d), Depreciation for such taxable year shall be the amount of book basis recovered for such taxable year under the rules prescribed by Treasury Regulation Section 1.704-3(d)(2), and (b) with respect to any other property the Book Value of which differs from its adjusted tax basis at the beginning of such taxable year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis; provided, that if the adjusted tax basis of any property at the beginning of such taxable year is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board.

"*Development Costs*" means all costs and expenses of the Company, including the costs and reimbursement items described in the Long-Term Budget and any Annual Budget.

Exhibit B – Page 4

"*Development Manager*" has the meaning assigned to such term in Section 5.2(a).

"*Development Period*" means the period of time from the Effective Date until the earlier to occur of (a) if the Parties have mutually agreed to resume activities related to the Project or the COLA, the issuance of the COL or (b) a Dissolution Event pursuant to Section 11.1.

"*Development Services Agreement*" means the Development Services Agreement dated as of January 30, 2009, as amended by that certain First Amendment thereto dated as of April 27, 2012, as further amended by that certain Second Amendment thereto dated as of Effective Date, and as further amended from time to time, by and between Luminant, the Mitsubishi Member and the Company.

"*Disclosure Exception*" has the meaning assigned to such term in Exhibit E.

"*Disposing Member*" has the meaning assigned to such term in Section 4.1(b).

"*Disposition*" means with respect to any asset (including any Membership Units), a sale, assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by operation of Law, including a disposition in connection with, or in lieu of, a foreclosure of an Encumbrance (but such terms shall not include the creation of an Encumbrance), and "Dispose", "Disposes", "Disposed" and "Disposing" have the correlative meanings.

"*Disposition Notice*" has the meaning assigned to such term in Section 4.6(a).

"*Disposition Period*" has the meaning assigned to such term in Section 4.6(c).

"*Dispute*" has the meaning assigned to such term in Section 10.1.

"*Disputing Member*" has the meaning assigned to such term in Section 10.1.

"*Dissolution Event*" has the meaning assigned to such term in Section 11.1.

"*DOE*" means the United States Department of Energy.

"*Drag Along Notice*" has the meaning assigned to such term in Section 4.7(a).

"*Drag Along Sale*" has the meaning assigned such term in Section 4.7(a).

"*Economic Risk of Loss*" has the meaning set forth in Treasury Regulation Section 1.752-2(a).

"*Effective Date*" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"*EFH*" means Energy Future Holdings Corp.

"*Encumbrance*" means the creation of a security interest, lien, pledge, mortgage or other encumbrance, whether such encumbrance be voluntary, involuntary or by operation of Law, and "Encumber" and "Encumbered" have the correlative meanings.

"*Exercise Option Date*" has the meaning assigned to such term in Exhibit E.

"*Exercise Notice*" has the meaning assigned to such term in Section 4.6(a).

"*Expansion Project*" has the meaning assigned to such term in Exhibit E.

"*Financial Closing*" means a project financing has closed between the Company and the applicable lenders providing the necessary debt funds for the construction of a Unit.

"*Formation Date*" has the meaning assigned to such term in the Recitals to this Agreement.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time, consistently applied.

"*Governmental Authority*" means any federal, state or local or foreign governmental entity, authority or agency, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof).

"*Indemnified Party*" has the meaning assigned to such term in Section 5.7.

"*Intellectual Property and Delivery Agreement*" means that certain Intellectual Property and Delivery Agreement dated as of the Effective Date by and among Luminant, the Company, MHI and MNES.

"*IPO*" has the meaning assigned to such term in Section 4.9.

"*IPO Conversion*" has the meaning assigned to such term in Section 4.9.

"*IPO Corporation*" has the meaning assigned to such term in Section 4.9.

"*Law*" means any statute, law, treaty, rule, code, ordinance, regulation, permit, guidelines, directive or certificate of any Governmental Authority, any interpretation of any of the foregoing by any Governmental Authority (including, but not limited to, formal orders, administrative decisions, directives and staff guidance issued by the NRC in interpreting its regulations), or any binding judgment, decision, decree, injunction, writ, order or like action of any court, arbitrator or other Governmental Authority.

"*Legal Opinion*" has the meaning assigned to such term in Section 4.1(b)(i).

"*Long-Term Budget*" means the budget attached in Exhibit D, as it may be amended from time to time in accordance with the terms of this Agreement.

"*Luminant*" means Luminant Generation Company LLC, a Texas limited liability company.

"*Luminant Assets*" means the assets of the Company set forth on <u>Schedule 1</u> of the Assignment and Assumption Agreement that have been distributed to the Luminant Member as a capital distribution.

"*Luminant Disclosure Exception*" has the meaning assigned to such term in <u>Exhibit E</u>.

"*Luminant Member*" means Nuclear Energy Future Holdings II LLC.

"*Luminant Prohibited Competitor*" means a Person described on <u>Exhibit C</u> attached hereto under the heading "Luminant Prohibited Competitor."

"*Major Line Item*" means the line items in the Long-Term Budget and Annual Budget.

"*Manager*" has the meaning assigned to such term in <u>Section 5.1(a)</u>.

"*Member*" means each Person executing this Agreement as of the Effective Date as a member or hereafter admitted to the Company as a member in accordance with this Agreement, but such term does not include any Person who does not own, beneficially or of record, any Membership Units.

"*Member Nonrecourse Debt*" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(4).

"*Member Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulation Section 1.704-2(i)(2).

"*Member Nonrecourse Deductions*" has the meaning assigned to the term "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i)(1).

"*Membership Percentage*" means with respect to each Member at each time of determination, a fraction, expressed as a percentage, the numerator of which is the number of Membership Units of such Member and the denominator is the total number of Membership Units of all Members.

"*Membership Units*" has the meaning assigned to such term in <u>Section 3.1</u>.

"*MHI*" means Mitsubishi Heavy Industries, Ltd., a Japanese corporation.

"*MHI US-APWR Technology*" has the meaning assigned to such term in <u>Section 2.4</u>.

"*Minimum Gain*" has the meaning assigned to that term in Treasury Regulation Section 1.704 2(d).

"*Mitsubishi Assets*" means the assets of the Company set forth on <u>Schedule 3</u> of the Assignment and Assumption Agreement that have been distributed to the Mitsubishi Member as a capital distribution.

"*Mitsubishi Disclosure Exception*" has the meaning assigned to such term in <u>Exhibit E</u>.

"*Mitsubishi Member*" means MHI Nuclear North America, Inc.

"*Mitsubishi Prohibited Competitor*" means a Person described on Exhibit C attached hereto under the heading "Mitsubishi Prohibited Competitor."

"*MNES*" means Mitsubishi Nuclear Energy Systems, Inc.

"*Noncontributing Member*" has the meaning assigned to such term in Section 6.3.

"*Nondefaulting Member*" has the meaning assigned to such term in Section 6.3.

"*Nondisposing Manager*" has the meaning assigned to such term in Section 4.1(b)(i).

"*Nondisposing Manager Voting Percentage*" has the meaning assigned to such term in Section 4.1(b)(i).

"*Nondisposing Member*" has the meaning assigned to such term in Section 4.1(b)(i).

"*Nonrecourse Deductions*" means any and all items of loss, deduction or expenditures (described in Section 705(a)(2)(B) of the Code) that, in accordance with the principles of Treasury Regulation Section 1.704-2(b), are attributable to a Nonrecourse Liability.

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulation Section 1.752-1(a)(2).

"*NRC*" means the Nuclear Regulatory Commission of the United States or any successor thereto.

"*Officer*" means any Person (that is a natural person) designated as an officer of the Company as provided in Section 5.2(c), but such term does not include any Person who has ceased to be an officer of the Company.

"*Original LLC Agreement*" has the meaning ascribed to such term in the Recitals of this Agreement.

"*Parent*" means the Person that Controls a Member and that is not itself Controlled by any other Person. The Parents of all of the Members as of the Effective Date are set forth on Exhibit A.

"*Person*" has the meaning assigned to such term in Section 18-101(12) of the Act.

"*Proceeds Determination*" has the meaning assigned to such term in Section 5.1(b).

"*Profits*" or "*Losses*" means, for each Allocation Period, an amount equal to the Company's taxable income or loss for such Allocation Period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

(c)    In the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(d)    In the event the Book Liability Value of any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) is adjusted as required by this Agreement, the amount of such adjustment shall be treated as an item of loss (if the adjustment increases the Book Liability Value of such liability of the Company) or an item of gain (if the adjustment decreases the Book Liability Value of such liability of the Company) and shall be taken into account for purposes of computing Profits or Losses;

(e)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(f)    In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation;

(g)    To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(h)    Any items that are allocated pursuant to Section 7.3(b) shall be determined by applying rules analogous to those set forth in clauses (a) through (f) hereof but shall not be taken into account in computing Profits and Losses.

"*Project*" has the meaning assigned to such term in the Recitals to this Agreement.

"*Proposed Annual Budget*" has the meaning assigned to such term in Section 5.6(a).

Exhibit B – Page 9

"*Purchasing Member*" has the meaning assigned to such term in <u>Section 4.6(a)</u>.

"*Real Property Agreements*" means (a) that certain Real Estate Assignment and Assumption Agreement dated as of the Effective Date, (b) that certain Memorandum of Assignment of Lease dated as of the Effective Date, (c) that certain Memorandum of Assignment of Easements and Easement Rights dated as of the Effective Date, (d) that certain Special Warranty Deed dated as of the Effective Date, (e) that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment for Landfill #6 dated as of the Effective Date, (f) that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment for Landfill #8 dated as of the Effective Date, (g) that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment for Landfill #9 dated as of the Effective Date, (h) that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment for Landfill #10E dated as of the Effective Date, and (i) that certain Industrial Solid Waste Disposal Site Deed Recordation Amendment for Landfill #10W dated as of the Effective Date.

"*Required Manager Approval*" has the meaning assigned to such term in <u>Section 5.1(e)(i)</u>.

"*ROFO*" has the meaning assigned to such term in <u>Section 4.6(a)</u>.

"*ROFO Eligible Member*" has the meaning assigned to such term in <u>Section 4.6(a)</u>.

"*Rules*" has the meaning assigned to such term in <u>Section 10.2</u>.

"*Securities Act*" means the Securities Act of 1933, as amended, of the United States.

"*SEO*" has the meaning assigned to such term in <u>Section 10.1</u>.

"*Site*" has the meaning assigned to such term in the Recitals to this Agreement.

"*Specified Sections*" means <u>Article IV</u>, <u>Section 5.1(d)</u>, <u>Section 6.2</u>, <u>Article VII</u>, <u>Article X</u>, <u>Article XI</u>, and <u>Sections 12.1</u>, <u>12.5</u>, <u>12.7</u>, and <u>12.8</u> and all of the definitions used therein.

"*Suspension Agreement*" means that certain Suspension Agreement dated as of the Effective Date by and among the Company, Luminant, MHI, the Mitsubishi Member, and MNES.

"*Subsidiaries*" means any Persons Controlled by another Person or Persons.

"*Tag Along Acceptance Notice*" has the meaning assigned to such term in <u>Section 4.8(c)</u>.

"*Tag Along Disposition*" has the meaning assigned to such term in <u>Section 4.8(a)</u>.

"*Tag Along Notice*" has the meaning assigned to such term in <u>Section 4.8(b)</u>.

"*Tag Along Units*" has the meaning assigned to such term in <u>Section 4.8(c)</u>.

"*Tag Offerees*" has the meaning assigned to such term in <u>Section 4.8(a)</u>.

"*Tag Right*" has the meaning assigned to such term in <u>Section 4.8(c)</u>.

"*Tax Matters Member*" has the meaning assigned to such term in <u>Section 8.5(a)</u>.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*Term*" has the meaning assigned to such term in <u>Section 2.6</u>.

"*Terminating Member*" has the meaning assigned to such term in <u>Section 11.1</u>.

"*Termination Agreement*" means that certain Termination Agreement dated as of the Effective Date by and among the Company, EFH, Luminant, the Luminant Member, TCEH, MHI, MNES, and the Mitsubishi Member.

"*Transaction Documents*" means, collectively, the Transaction Documents (as defined in the Original LLC Agreement), as revised, amended, restated, supplemented, suspended and/or terminated, as applicable, by the following documents as of the Effective Date: (a) this Agreement, (b) the Termination Agreement, (c) the Suspension Agreement, (d) the Assignment and Assumption Agreement, (e) the Second Amendment to Development Services Agreement, (f) the Intellectual Property and Delivery Agreement, and (g) the Real Property Agreements.

"*Treasury Regulations*" means the regulations (including temporary regulations) promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar or substitute, temporary or final Treasury Regulations.

"*Tribunal*" has the meaning assigned to such term in <u>Section 10.3</u>.

"*Units*" has the meaning assigned to such term in the Recitals to this Agreement.

"*Unreturned Capital Contributions*" of a Member as of any date means the excess of (a) the sum of the aggregate Capital Contributions theretofore made by such Member to the Company over (b) the cumulative distributions theretofore made by the Company to such Member pursuant to <u>Sections 7.1</u> (including pursuant to the Assignment and Assumption Agreement) and <u>11.2(a)(iii)(C)(1)(I)</u> and <u>11.2(a)(iii)(C)(1)(II)</u>; <u>provided</u> that in no event shall the Unreturned Capital Contributions of any Member be less than zero (0).

"*Voting Percentage*" has the meaning assigned to such term in <u>Section 5.1(d)</u>.

# EXHIBIT C
# PROHIBITED COMPETITORS

<u>Mitsubishi Prohibited Competitors</u>

Any of the following Persons (including such Person's successor by merger, consolidation, amalgamation or acquisition of all or substantially all of such Person's nuclear energy business) and its Affiliates (to the extent provided in the paragraph following the list):



<u>Luminant Prohibited Competitors</u>



Exhibit C – Page 1

## EXHIBIT D
## LONG-TERM AND ANNUAL BUDGET

[REDACTED]



Exhibit D – Page 2

EXHIBIT E
CERTAIN AGREEMENTS

The Members of the Company, as of the Effective Date, hereby agree as follows:

1.    Design Certification Support. The Company shall participate together with MHI in meetings with the NRC to further the Mitsubishi Member's and its Affiliates' pursuit of a design certification of the MHI US-APWR Technology (i) to the extent reasonably requested by the Mitsubishi Member from time to time, (ii) to the extent the Company's or the Luminant Member's or its Affiliate's personnel is available to participate in such meetings and (iii) to the extent all costs of the Company, the Luminant Member and its Affiliates to participate in such meetings are included as Approved Costs.

2.    Agreements and Actions Related to the COLA.

    (a)    Prior to the Effective Date, the Members have caused the Company to suspend NRC review of, but not withdraw, the COLA (the "*COLA Suspension*") in accordance with the structured work plan for the COLA Suspension included in ████████████████████. The Members agree the Luminant Member or its Affiliates may send, file or otherwise provide any documents and correspondence to any applicable Governmental Authority that the Luminant Member determines to be necessary at any time to effect the COLA Suspension; provided (i) the Mitsubishi Member's approval will be required to the extent such documentation discusses future activities relating to the MHI US-APWR Technology or the status of the MHI US-APWR Technology design certification review with the NRC, and (ii) for all other documentation, the Luminant Member shall provide the Mitsubishi Member the opportunity to review (but not approve) such documentation, and shall consult with the Mitsubishi Member regarding such documentation prior to submission with the applicable Governmental Authority.



Exhibit E – Page 1

(c)    The Mitsubishi Member shall provide the Luminant Member the opportunity to review (but not approve) any documents and correspondence that MHI and its Affiliates submit to any applicable Governmental Authority relating to the COLA and shall consult with the Luminant Member regarding such documentation prior to submission with the applicable Governmental Authority. The Luminant Member's approval will be required to the extent such documentation discusses future activities relating to the status of the COLA review with the NRC.

(d)

(i)    The Members agree to use commercially reasonable efforts to cause compliance by their respective Affiliates with the terms of the Intellectual Property and Delivery Agreement.

(ii)    If MHI and/or MNES are not in compliance with the obligations set forth in Section 3 of the Intellectual Property and Delivery Agreement on or after September 30, 2014, in addition to all rights and remedies set forth in the Intellectual Property and Delivery Agreement, then after such date (1) the Luminant Member or its Affiliate may provide notice thereof to the Mitsubishi Member, and (2) thereafter MHI and/or MNES shall have 60 days to cure such non-compliance and (3) if such non-compliance has not been cured within 60 days after delivery of written notice by the Luminant Member or its Affiliate to the Mitsubishi Member and MHI and/or MNES is not diligently pursuing a cure to such breach, the Luminant Member shall have the right to cause a dissolution of the Company at any time from and after such date unless and until such non-compliance is cured. Notwithstanding the foregoing, in the event that such non-compliance has not been cured by date of the COLA Amendment, the Luminant Member shall have the right to cause a dissolution of the Company at any time from and after such date unless and until such non-compliance is cured. Any dissolution of the Company arising out of this <u>Section 2(d)(ii)</u> of <u>Exhibit E</u> shall be conducted in accordance with the provisions set forth in <u>Article XI</u> of the Agreement.

(iii)    The Mitsubishi Member agrees to, and to cause MHI and MNES to, cooperate with the Luminant Member and its Affiliates, in order for the Luminant Member or its Affiliate to obtain from ████████████████████ an assignment of, or direct rights to access the information to be provided by ███████████████████████████████████ under, the Certain Contracts (as defined in the Intellectual Property and Delivery Agreement).

3.    No Termination of Certain Rights. The Members acknowledge and agree that, notwithstanding the termination of certain agreements pursuant to the Termination Agreement and the suspension of certain agreements under the Suspension Agreement, from and after the Effective Date:

(a)    the Mitsubishi Member (or its Affiliates if such right and power is delegated thereto) shall have the sole right and power to make any decisions with respect to how to pursue a design certification with the NRC with respect to the MHI US-APWR Technology without any duty, obligation or liability to, and without requiring any consent of or notice to, the Company, the Luminant Member or any of its Affiliates; and



4.



5.    <u>DOE Loan Guarantee Modifications</u>.  The Company shall take the minimum steps necessary to maintain the DOE loan guarantee application in effect.  In the event a permitted COLA Amendment has occurred, the Members agree to take commercially reasonable efforts to cause the Company to make any necessary modifications to the DOE loan guarantee documents to allow Affiliates of the Luminant Member to pursue a DOE loan guarantee as the Luminant Member or such Affiliates determine is appropriate, provided that in no event shall the Company

Exhibit E – Page 4

or the Mitsubishi Member be required to incur any costs in such activities unless otherwise unanimously approved by the Members (in the case of the Company) or by the Mitsubishi Member, respectively.    Without limiting the foregoing, following a permitted COLA Amendment, the Members agree the Luminant Member or its Affiliates may send, file or otherwise provide any documents and correspondence to any applicable Governmental Authority that the Luminant Member determines to be necessary in connection with the DOE loan guarantee for the Project; provided (i) the Mitsubishi Member's approval will be required to the extent such documentation discusses future activities relating to the MHI US-APWR Technology or the status of the MHI US-APWR Technology design certification review with the NRC, and (ii) for all other documentation, the Luminant Member shall provide the Mitsubishi Member the opportunity to review (but not approve) such documentation, and shall consult with the Mitsubishi Member regarding such documentation prior to submission with the applicable Governmental Authority.

6.





Exhibit E – Page 6



**Schedule 1**

[REDACTED]

**EXHIBIT F**
**LUMINANT ACTIONS AND PROCEEDINGS**

None.

**EXHIBIT G**
**MITSUBISHI ACTIONS AND PROCEEDINGS**

None.

## EXHIBIT H
## FORM OF MEMBERSHIP UNITS ASSIGNMENT AGREEMENT

This MEMBERSHIP UNITS ASSIGNMENT AGREEMENT (this *"Assignment Agreement"*), dated as of _____, is by and between _____, a _____ (*"Disposing Member"*), and _____, a _____ (*"Transferee"*).

WHEREAS, Disposing Member is a member of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company (the *"Company"*);

WHEREAS, as a member of the Company, Disposing Member is subject to the Amended and Restated Limited Liability Company Agreement of the Company, as it may be amended from time to time in accordance with its terms (the *"LLC Agreement"*);

WHEREAS, Disposing Member desires to Dispose of [_____] of its Membership Units to Transferee (the *"Subject Units"*), and Transferee desires to acquire the Subject Units, in each case subject to the terms and conditions of the LLC Agreement and this Assignment Agreement; and

WHEREAS, capitalized terms used herein that are not defined herein shall have the meanings assigned to such terms in the LLC Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, the parties hereto agree as follows:

1.    Transfer of Subject Units.  Subject to the terms and conditions of the LLC Agreement and this Assignment Agreement, Disposing Member hereby transfers and conveys to Transferee, and Transferee hereby acquires from Disposing Member, the Subject Units.

2.    Terms of Transfer.  The terms of the transfer of the Subject Units (including the consideration for the Disposition of the Subject Units) are set forth on Schedule 1 hereto.

3.    Representations and Warranties of Disposing Member.  Disposing Member hereby represents and warrants as follows:

(a)    *Organization; Power and Authority.*  Disposing Member is duly formed, incorporated or organized (as applicable), validly existing, and in good standing under the Law of the jurisdiction of its formation, incorporation or organization (if a good standing assessment or similar qualification is generally available for business organizations of that type in the relevant jurisdiction).  If required by applicable Law, Disposing Member is duly qualified and in good standing in the jurisdiction of its principal place of business, if different from its jurisdiction of formation, incorporation or organization, and Disposing Member has full power and authority to execute and deliver this Assignment Agreement and to perform its obligations hereunder, and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other applicable Persons owning or managing Disposing Member necessary for the due

authorization, execution, delivery, and performance of this Assignment Agreement by Disposing Member have been duly taken.

(b) *Execution and Delivery; Enforceability.* Disposing Member has duly executed and delivered this Assignment Agreement, and this Assignment Agreement constitutes the legal, valid and binding obligation of Disposing Member enforceable against Disposing Member in accordance with its terms (except as may be limited by bankruptcy, insolvency or similar Laws of general application and by the effect of general principles of equity, regardless of whether considered at law or in equity).

(c) *Non-Contravention.* Disposing Member's authorization, execution, delivery, and performance of this Assignment Agreement does not and will not (i) conflict with, or result in a breach, default or violation of, (A) the organizational documents of Disposing Member, (B) any contract or agreement to which Disposing Member is a party or is otherwise subject or (C) any Law, order, judgment, decree, writ, injunction or arbitral award to which Disposing Member is subject or (ii) require any consent, approval or authorization from, filing or registration with, or notice to, any Governmental Authority or other Person, unless such requirement has already been satisfied at Disposing Member's or Transferee's sole cost and expense without imposing any material burden or adverse regulatory consequences on the Company or the Nondisposing Members.

(d) *No Actions or Proceedings.* There is no Action or Proceeding pending against or, to the knowledge of Disposing Member, threatened against or affecting Disposing Member (i) that draws into question the validity of this Assignment Agreement or the LLC Agreement or (ii) that would reasonably be expected to have a material adverse effect on Disposing Member's ability to perform its obligations under this Assignment Agreement.

(e) *Legal Opinion.* The matters covered in the Legal Opinion regarding the transfer of the Subject Units are true and correct.

(f) *Ownership and Capital Contributions.* Disposing Member is the owner of and has good and valid title to the Subject Units, free and clear of all Encumbrances, except for Encumbrances arising under applicable securities laws and under the LLC Agreement. All Capital Contributions required to have been made by Disposing Member prior to the date hereof pursuant to the LLC Agreement have been made or are being made concurrently herewith, and Disposing Member has delivered to Transferee a certificate executed by the Development Manager to such effect.

4. <u>Representations and Warranties of Transferee.</u>   Transferee hereby represents and warrants as follows:

(a) *Organization; Power and Authority.* Transferee is duly formed, incorporated or organized (as applicable), validly existing, and in good standing under the Law of

the jurisdiction of its formation, incorporation or organization (if a good standing assessment or similar qualification is generally available for business organizations of that type in the relevant jurisdiction). If required by applicable Law, Transferee is duly qualified and in good standing in the jurisdiction of its principal place of business, if different from its jurisdiction of formation, incorporation or organization, and Transferee has full power and authority to execute and deliver this Assignment Agreement and to perform its obligations hereunder, and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other applicable Persons owning or managing Transferee necessary for the due authorization, execution, delivery, and performance of this Assignment Agreement by Transferee have been duly taken. Transferee is under the Control of its Parent as set forth below its name on the signature page hereto.

(b)     *Execution and Delivery; Enforceability.*   Transferee has duly executed and delivered this Assignment Agreement, and this Assignment Agreement constitutes the legal, valid and binding obligation of Transferee enforceable against Transferee in accordance with its terms (except as may be limited by bankruptcy, insolvency or similar Laws of general application and by the effect of general principles of equity, regardless of whether considered at law or in equity).

(c)     *Non-Contravention.*   Transferee's authorization, execution, delivery, and performance of this Assignment Agreement does not and will not (i) conflict with, or result in a breach, default or violation of, (A) the organizational documents of Transferee, (B) any contract or agreement to which Transferee is a party or is otherwise subject or (C) any Law, order, judgment, decree, writ, injunction or arbitral award to which Transferee is subject or (ii) require any consent, approval or authorization from, filing or registration with, or notice to, any Governmental Authority or other Person, unless such requirement has already been satisfied at Disposing Member's or Transferee's sole cost and expense without imposing any material burden or adverse regulatory consequences on the Company or the Nondisposing Members.

(d)     *No Actions or Proceedings.*   There is no Action or Proceeding pending against or, to the knowledge of Transferee, threatened against or affecting Transferee (i) that draws into question the validity of this Assignment Agreement or the LLC Agreement or (ii) that would reasonably be expected to have a material adverse effect on Transferee's ability to perform its obligations under this Assignment Agreement or the LLC Agreement.

(e)     *Legal Opinion.*   The matters covered in the Legal Opinion regarding the transfer of the Subject Units are true and correct.

(f)     *Investment.*   Transferee is acquiring the Subject Units for its own account, for investment purposes only and with no current intention or plan to distribute, sell or otherwise dispose of the Subject Units and does not have any contract, undertaking, agreement or arrangement with any person to distribute, sell or

otherwise dispose of the Subject Units. Transferee acknowledges that the Subject Units have not been registered pursuant to the Securities Act. Transferee has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the risks of its investment in the Company and is capable of bearing the economic risks of the transactions contemplated by the LLC Agreement. Transferee is an informed and sophisticated participant in the transactions contemplated by the LLC Agreement and has undertaken such investigation, and has been provided with and has evaluated such documents and information, as it has deemed necessary in connection with the execution, delivery and performance of this Assignment Agreement and the LLC Agreement and its investment in the Company; Transferee acknowledges that it is relying on its own investigation and analysis in entering into the transactions contemplated by this Assignment Agreement and the LLC Agreement, including making its Capital Contributions, and has consulted its own legal, tax, financial and accounting advisors to determine the merits and risks thereof; and Transferee has not relied on any due diligence investigation of any Member or its advisors and their respective Affiliates, or on any oral or written materials prepared or presented by any Member or its advisors, including any projections, forecasts, return on investment or other future cash flow illustrations prepared by any Member or its advisors or their respective Affiliates.

(g)    The correct notice address of Transferee is set forth below Transferee's name on the signature page hereto.

5.    LLC Agreement.  Transferee hereby ratifies the LLC Agreement and agrees **[to be bound by the LLC Agreement as a Member] [NOTE: if Transferee is being admitted as a Member]/[to assume the obligations and liabilities of Disposing Member under the LLC Agreement with respect to the Subject Units] [NOTE: if Transferee is not being admitted as a Member]**.

6.    Confidentiality Agreement.  Transferee hereby ratifies the Confidentiality Agreement and agrees to be bound by the Confidentiality Agreement as if a signatory thereto.

7.    Assumption of Obligations.  Transferee hereby assumes all obligations of Disposing Member pursuant to the LLC Agreement to the extent of the Subject Units and to the extent arising from and after the date of this Assignment Agreement, or as otherwise set forth on Schedule I hereto.

8.    Modification and Waiver.  No supplement, modification, waiver or termination of this Assignment Agreement or any provisions hereof shall be binding unless executed in writing by the parties to be bound thereby. No waiver of any of the provisions of this Assignment Agreement shall constitute a waiver of any other provision (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

9.    Governing Law.  This Assignment Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, excluding any conflict-of-laws rule or

principle that might refer the governance or the construction of this Assignment Agreement to the law of another jurisdiction.

10.    Execution in Counterparts.  This Assignment Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.    All counterparts shall be construed together and constitute the same instrument.

[Remainder of page is intentionally blank.]

IN WITNESS WHEREOF, this Assignment Agreement is executed as of the date first written above.

<div align="right">

DISPOSING MEMBER:

_____

By:_____
Name:_____
Title:_____


TRANSFEREE:

_____

By:_____
Name:_____
Title:_____

Notice Address:

_____
_____
_____

Parent:  _____

</div>

## SCHEDULE I

## TERMS OF THE TRANSFER

## EXHIBIT I
## MANAGERS AND OFFICERS AS OF EFFECTIVE DATE

**Managers Appointed by the Mitsubishi Member**

Yoshinobu Shibata
Masato Iida

**Managers Appointed by the Luminant Member**

Rafael Flores
M. A. McFarland

**Officers**

| Name | Title |
| --- | --- |
| M. A. McFarland | Chairman of the Board of Managers, President and Chief Executive |
| Yoshinobu Shibata | Executive Vice President for Japanese Finance |
| Masato Iida | Executive Vice President for US-APWR Engineering |
| Robert C. Frenzel | Senior Vice President, Chief Financial Officer and Development Manager |
| Rafael Flores | Senior Vice President, Chief Nuclear Officer |
| Hiroshi Matsuda | Executive Officer for Japanese Finance |
| Frank P. Gillespie | Senior Vice President for US-APWR Engineering |
| Stanley J. Szlauderbach | Senior Vice President |
| Norm Spence | Vice President |
| Anthony R. Horton | Treasurer |
| Stephanie Zapata Moore | Secretary |
| Betty R. Fleshman | Assistant Secretary |
| Robert Baker | Assistant Treasurer |
| Carla A. Howard* | Tax Signing Officer |

* Authority limited to signing tax returns and other documents

Exhibit I – Page 1

# EXHIBIT J

## DELEGATION OF AUTHORITY

| Manager/Officer/Designee | Area of Competency | Maximum Monetary Amount (per annum) |
|---|---|---|
| Robert C. Frenzel | All company activities |  |
| Norm Spence | All company activities |  |
| Robert Baker | Treasury and accounting operations, financial planning |  |
| Hiroshi Matsuda | All company activities |  |

\*      In exigent circumstances, successive delegations of authority may be made solely by the Development Manager. Such delegations of authority shall only be made by the Development Manager to a member of the Managing Board. Any member of the Managing Board that is so authorized pursuant to such successive delegation cannot abdicate responsibility by further delegating such authority to a subordinate. In any event, responsibility and accountability for the underlying approval decision remains with the Development Manager.

EXECUTION VERSION

After Recording, Return To:
Vinson & Elkins L.L.P.
Attn: Lila C. Marsh
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201

## SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DALLAS | § | |

      **COMANCHE PEAK NUCLEAR POWER COMPANY LLC**, a Delaware limited liability company ("**Grantor**"), for and in consideration of the sum of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, BARGAINED, SOLD, and CONVEYED and by these presents does GRANT, BARGAIN, SELL, and CONVEY unto **NUCLEAR ENERGY FUTURE HOLDINGS II LLC**, a Delaware limited liability company ("**Grantee**") the tracts or parcels of land in Hood County, Texas, described in <u>Exhibit A</u>, together with (1) all improvements located thereon, but expressly excluding improvements and structures owned by any third party, (2) all right, title, and interest of Grantor, if any, in and to the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in any way appertaining thereto, and (3) all right, title, and interest of Grantor, if any, in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such tract or parcel of land (such land and interests are hereinafter collectively referred to as the "**Property**").

      1.    This Special Warranty Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject to all easements, restrictions, reservations and covenants now of record and further subject to all matters that a current, accurate survey of the Property would show (hereinafter referred to collectively as the "**Permitted Exceptions**").

      2.    Grantee acknowledges that Grantee has independently and personally inspected the Property. The Property is hereby conveyed to and accepted by Grantee in its present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**" Notwithstanding anything contained herein to the contrary, it is understood and agreed that Grantor and Grantor's agents or employees have never made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, oral or written, with respect to the Property, including, but not limited to, warranties, representations or guaranties as to (a) matters of title (other than Grantor's warranty of title set forth herein), (b) environmental matters relating to the Property or any portion thereof, including, without limitation, the presence of Hazardous Materials (as defined below) in, on, under or in the vicinity of the Property, (c) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water, and geologic faults and the resulting damage of past and/or future faulting, (d) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground), body of water, wetlands, flood prone area, flood plain, floodway or special flood hazard, (e) drainage, (f) soil conditions, including the existence of instability, past soil repairs, soil additions

1

or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any undershoring, (g) the presence of endangered species or any environmentally sensitive or protected areas, (h) zoning or building entitlements to which the Property or any portion thereof may be subject, (i) the availability of any utilities to the Property or any portion thereof including, without limitation, water, sewage, gas and electric, (j) usages of adjoining property, (k) access to the Property or any portion thereof, (l) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, suitability, structural integrity, operation, title to, or physical or financial condition of the Property or any portion thereof, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Property or any part thereof, (m) the condition or use of the Property or compliance of the Property with any or all federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, (n) the existence or non-existence of underground storage tanks, surface impoundments, or landfills, (o) any other matter affecting the stability and integrity of the Property, (p) the potential for further development of the Property, (q) the merchantability of the Property or fitness of the Property for any particular purpose, (r) the truth, accuracy or completeness of the Property Documents, (s) tax consequences, or (t) any other matter or thing with respect to the Property.  **EXCEPT AS EXPRESSLY SET FORTH HEREIN GRANTOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND TO GRANTEE, INCLUDING, WITHOUT LIMITATION, THE PHYSICAL CONDITION OF THE PROPERTY, OR ITS SUITABILITY FOR ANY PARTICULAR PURPOSE OR OF MERCHANTABILITY.  GRANTEE IS RELYING ON ITS INVESTIGATIONS OF THE PROPERTY IN DETERMINING WHETHER TO ACQUIRE IT. THE PROVISIONS OF THIS PARAGRAPH ARE A MATERIAL PART OF THE CONSIDERATION FOR GRANTOR EXECUTING THIS SPECIAL WARRANTY DEED, AND SHALL SURVIVE CLOSING.**

3.      Grantee hereby **FOREVER RELEASES AND DISCHARGES** Grantor, its partners, shareholders, members, managers, owners, officers, directors, agents, employees, controlling persons and affiliates and all of their respective predecessors-in-interest from all responsibility and liability relating to the physical, environmental or legal compliance status of the Property, whether arising before or after the date hereof, and liabilities under the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 *et seq.*), as amended ("**CERCLA**"), regarding the condition, valuation, salability or utility of the Property, or its suitability for any purpose whatsoever (including, but not limited to, with respect to the presence in the soil, air, structures and surface and subsurface waters, of Hazardous Materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines, and any structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous Materials on, under, adjacent to or otherwise affecting the Property).  Grantee further hereby WAIVES any and all objections and complaints (including, but not limited to, federal, state and local statutory and common law based actions, and any private right of action under any federal, state or local laws, regulations or guidelines to which the Property is or may be subject, including, but not limited to, CERCLA concerning the physical characteristics and any existing conditions of the Property, whether arising before or after the date hereof.  Grantee further hereby assumes the risk of

2

changes in applicable laws and regulations relating to past, present and future environmental conditions on the Property and the risk that adverse physical characteristics and conditions, including, without limitation, the presence of Hazardous Materials or other contaminants, may not have been revealed by its investigation. For purposes hereof, "**Hazardous Materials**" means "Hazardous Material," "Hazardous Substance," "Pollutant or Contaminant," and "Petroleum" and "Natural Gas Liquids," as those terms are defined or used in Section 101 of CERCLA, and any other substances regulated because of their effect or potential effect on public health and the environment, including, without limitation, PCBs, lead paint, asbestos, mold, urea formaldehyde, radioactive materials, putrescible materials, and infectious materials.

4.     TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the title to the Property unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor but not otherwise, subject to the Permitted Exceptions.

Grantee's address is:               Nuclear Energy Future Holdings LLC
                                    c/o Luminant Generation Company LLC
                                    500 N. Akard Street
                                    Dallas, Texas 75201
                                    Attention: Bob Frenzel, Chief Financial Officer
                                    Email: bob.frenzel@luminant.com

with a copy to:                     Luminant Generation Company LLC
                                    500 N. Akard Street
                                    Dallas, Texas 75201
                                    Attention: Stephanie Zapata Moore, General Counsel
                                    Email: stephanie.moore@luminant.com


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

EXECUTED as of April 28, 2014.

<div style="margin-left:40%;">

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**, a Delaware limited liability company

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President, Chief Financial
        Officer and Development Manager

</div>

STATE OF TEXAS         §
                          §
COUNTY OF DALLAS    §

This instrument was acknowledged before me on _____, 20___, by Robert C. Frenzel, Senior Vice President, Chief Financial Officer and Development Manager of Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public, State of Texas

<div style="text-align:center;">

Signature Page to
Special Warranty Deed

</div>

## EXHIBIT A

## DESCRIPTION OF THE PROPERTY

**Lake Granbury Builders**

DESCRIPTION of a 1.161 acre (50,560 square feet) tract of land, situated in the Alexander O'Brien Survey, Abstract No. 433, Hood County, Texas, and being a portion of Lot 3, Block 1 as shown on the Re-Plat of Tract "A" of The Bluffs on Lake Granbury, Slide A-232-B, P.R.H.C.T. and Lots 7R and 8R, Block 1 of the Amending Plat of Lots 1R Through 8R, Block 1, The Village of Lake Granbury, Slide C-309, Recorded in Cabinet C, Page 345 the Plat Records of Hood County, Texas (P.R.H.C.T.), and being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod with an aluminum cap stamped "Frontier Surveying RPLS 5991" found at the southeast corner of Lot 3 of said Re-Plat, same point also being in the north Right-of-Way (R.O.W.) line of F.M. 3210 (Mambrino Highway);

THENCE: North 60 Degrees 56 Minutes 46 Seconds West, along the south line of said Lot 3 and the common north R.O.W. line of said F.M. 3210 (Mambrino Highway), a distance of 110.27 feet to a 1/2 inch iron rod found for corner, being at the intersecting point of the north R.O.W. line of said F.M. 3210 (Mambrino Highway) and the northeast R.O.W. line of Lake Village Court, a Private 40' Ingress and Egress and Utility Easement, recorded in Slide C-309, P.R.H.C.T.;

THENCE: North 29 Degrees 03 Minutes 14 Seconds East along the common line of said Lot 3 and Lake Village Court, a distance of 30.00 feet, to a 1/2 inch iron rod found (disturbed), being the beginning of a curve to the left with a radius of 70.95 feet;

THENCE: Along said curve to the left with a chord bearing of North 16 Degrees 55 Minutes 01 Seconds East, 29.83 feet, and an Arc Length of 30.05 feet to a 1/2 inch iron rod found with a yellow cap stamped "ISS" being a point in the beginning of a curve to the left with a radius of 70.99 feet;

THENCE: Along said curve to the left with a chord bearing of North 15 Degrees 55 Minutes 49 Seconds West, 50.19 feet, and an Arc Length of 51.30 feet to a 1/2 inch iron rod found with a yellow cap stamped "ISS" for a corner, and being the southeast corner of Lot 6R of Lots 7R and 8R, Block 1 of the Amending Plat of Lots 1R Through 8R, Block 1, The Village of Lake Granbury, Slide C-309;

THENCE: North 41 Degrees 35 Minutes 57 Seconds East along the common line of said Lot 6R and Lot 3 a distance of 232.41 feet to a 5/8 inch iron rod with an aluminum cap stamped "Frontier Surveying RPLS 5991" for corner, being the northeast corner of said Lot 6R;

THENCE: Over and across said Lot 3 the following courses and distances;

South 65 Degrees 00 Minutes 22 Seconds East, a distance of 84.59 feet, to a point being the beginning of a curve to the right with a radius of 200.00 feet;

Along said curve to the right with a chord bearing of South 58 Degrees 26 Minutes 00 Seconds East, 45.79 feet, and an Arc Length of 45.89 feet;

South 51 Degrees 50 Minutes 22 Seconds East, a distance of 30.06 feet to a 5/8 inch iron rod with an aluminum cap stamped "Frontier Surveying RPLS 5991" found for corner;

THENCE: South 38 Degrees 16 Minutes 44 Seconds West, a distance of 211.43 feet to a 1/2 inch iron rod found with a yellow cap stamped "ISS" for corner;

THENCE:  South 41 Degrees 19 Minutes 26 Seconds West, a distance of 114.67 feet to the **POINT OF BEGINNING** and containing 1.161 acres (50,560 Square feet) of land more or less.


**Gerald Finn and Janice Finn**

All that certain tract or parcel of land, a part of the Alexander O'Brien Survey, Abstract No. 433 in Hood County, Texas, and being a portion of the called 123.436 acre tract deeded to Gerald L. Finn, recorded in Volume 1990, Page 813 of the Official Public Records of Hood County, Texas, and part of the remaining portion of a called 27.697 acres tract deeded to said Finn, recorded in Volume 1990, Page 817 of said records, and all being more particularly described as follows:

BEGINNING at a 1/2 inch capped iron rod found in place in the easterly line of a called 77.950 acre tract deeded to David H. Whitson, recorded in Volume 1938, Page 304 of said records, same being in the westerly line of said called 123.436 acre tract, and being the Southwest corner of a called 30.000 acre tract deeded out of said called 123.436 acre tract, to Don L. Rubenkoenig and wife, Patsy J. Rubenkoenig, recorded in Volume 2254, Page 530 of said records, and being the Northwest corner of this tract, from which a 1/2 inch iron rod found in place at the Northwest corner of said called 30.000 acre tract bears North 30 degrees 06 minutes 49 seconds West, a distance of 1054.20 feet;

THENCE North 45 degrees 23 minutes 32 seconds East, across said called 123.436 acres and along the southerly line of said called 30.000 acre tract, a distance of 1637.66 feet to a 1/2 inch capped iron rod found in place in the westerly right of way line of F.M. Highway No. 2425, same an easterly line of said called 123.436 acre tract, the Southeast corner of said called 30.000 acre tract, and the Northeast corner of this tract, from which a 1/2 inch iron rod found in place at the Northeast corner of said called 30.000 acres bears North 49 degrees 45 minutes 33 seconds West, a distance of 738.92 feet;

THENCE South 49 degrees 43 minutes 49 seconds East, along the easterly line of said called 123.436 acre tract and the easterly line of said part remainder tract of said called 27.697 acre tract to said Finn, and the westerly right of way line of said highway, a distance of 741.67 feet to a 1/2 inch capped iron rod found in place at the Northeast corner of Lot 1, Block 1 of FINN ESTATES, a subdivision in Hood County, Texas, according to the plat thereof recorded in Slide B-399 of the Plat Records of said county, and being a northerly Southeast corner of this tract;

THENCE South 40 degrees 16 minutes 11 seconds West, along a southerly portion of said remainder tract to said Finn and the North line of said Lot 1, a distance of 700.00 feet to a 1/2 inch capped iron rod found in place in an easterly line of said called 123.436 acre tract and being the Northwest corner of said Lot 1, for an inner el corner of this tract;

THENCE South 49 degrees 43 minutes 49 seconds East, along an easterly line of said called 123.436 acre tract and the west lines of said Lot 1 and Lot 2 of said subdivision, a distance of 374.88 feet to a 1/2 inch capped iron rod found in place for the Southwest corner of said Lot 2, the Northwest corner of Lot 3 of said subdivision, and the most southerly Southeast corner of this tract;

THENCE South 57 degrees 16 minutes 19 second West, across said called 123.436 acre tract, a distance of 1136.19 feet to a 1/2 inch iron rod found in place for an inner el corner of said called 123.436 acre tract, same being the Northeast corner of Tract 12 of HIDDEN CREEK ESTATES, a subdivision in Hood County, according to the plat thereof recorded in Slide A-229 of said Plat Records, for an angle corner in the southerly line of this tract;

THENCE South 57 degrees 38 minutes 22 seconds West, along a southerly line of said called 123.436 acre tract and the northerly line of said Tract 12, a distance of 166.22 feet to a 1/2 inch iron rod found in place at the Southeast corner of said called 77.95 acre tract to said Whitson, and being a Southwest corner of said called 123.436 acre tract and the Southwest corner of this tract;

THENCE North 30 degrees 06 minutes 49 seconds West, along the West line of said called 123.436 acre tract and the East line of said called 77.950 acre tract, a distance of 934.65 feet to the POINT OF BEGINNING containing 1,699,145 Square Feet or 39.007 Acres of Land.


### John B. Schoolfield, James Robert Schoolfield, and Ernest Lynn Schoolfield

Being a 26.080 acre tract of land situated in the Galveston School Land Survey, Abstract No. 852, Hood County, Texas, and being a portion of a called "40 acres of land", described in deed to John B. Schoolfield Jr., James Robert Schoolfield, and Ernest Lynn Schoolfield (herein after referred to as the Schoolfield Tract), recorded in Volume 1659, Page 748 Deed Records of Hood County, Texas (D.R.H.C.T.). Said 26.080 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a Concrete Right of Way (R.O.W.) Monument found in the north line of said Schoolfield Tract, same point being in the common south line of a tract of land described in deed to Paul E. Beckworth, recorded in Volume 1067, Page 51 D.R.H.C.T., said point also being in the east R.O.W. line of State Highway No. 144 (Glen Rose Highway-a variable width R.O.W.) as shown on sheet 12 of the Texas Department of Transportation R.O.W. Map from Granbury to Somervell County Line;

THENCE: North 59 Degrees 41 Minutes 08 Seconds East, with said common line, a distance of 1,091.23 feet to a 5/8" iron rod found with yellow plastic cap stamped "R.P.S. 314" found for the northeast corner of said Schoolfield Tract and the common northwest corner of a tract of land

described in deed to Ted L. Hayes and Linda I. Hayes, recorded in Volume 1580, Page 718 D.R.H.C.T.;

THENCE: South 16 Degrees 12 Minutes 12 Seconds East, with the west line of said Ted L. Hayes and Linda I. Hayes Tract, a distance of 1,081.97 feet to a 5/8" iron rod with aluminum cap stamped "FRONTIER SURVEYING COMPANY RPLS 5991" set for corner from which a 5/8" iron rod found for the southwest corner of said Ted L. Hayes and Linda I. Hayes Tract bears South 16 Degrees 12 Minutes 12 Seconds East, a distance of 364.16 feet;

THENCE South 40 Degrees 47 Minutes 47 Seconds West, over and across said Schoolfield Tract, a distance of 896.88 feet to a 5/8" iron rod with aluminum cap stamped "FRONTIER SURVEYING COMPANY RPLS 5991" set for corner in the east R.O.W. line of said State Highway No. 144 from which a 5/8" iron rod with yellow cap stamped "CLEARFORK" bears South 31 Degrees 34 Minutes 15 Seconds East, a distance of 220.05 feet;

THENCE: With the east R.O.W. line of said State Highway No. 144 the following courses and distances;

> North 31 Degrees 34 Minutes 15 Seconds West, a distance of 629.04 feet to a point for corner at a Concrete R.O.W. Monument found (disturbed);

> North 57 Degrees 43 Minutes 47 Seconds East a distance of 50.01 feet to a point for corner at a Concrete R.O.W. Monument found (broken);

> North 31 Degrees 31 Minutes 48 Seconds West, a distance of 709.24 feet to the **POINT OF BEGINNING** and containing 26.080 acres (1,136,026 square feet) of land more or less.

EXECUTION VERSION

## SUSPENSION AGREEMENT

This Suspension Agreement (this "*Agreement*") dated as of April 28, 2014 (the "*Effective Date*"), is entered into by and among Mitsubishi Heavy Industries, Ltd., a Japanese corporation ("*MHI*"), Mitsubishi Nuclear Energy Systems, Inc., a Delaware corporation ("*MNES*"), MHI Nuclear North America, Inc., a Delaware corporation (the "*MHI Member*" and, together with MHI and MNES, the "*MHI Parties*"), Luminant Generation Company LLC, a Texas limited liability company ("*Luminant*") and Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company (the "*Company*" and, collectively with Luminant and the MHI Parties, the "*Parties*" and each a "*Party*"). Unless otherwise specified, each capitalized term used herein but not otherwise defined herein shall have the meaning ascribed to such term in that certain Second Amended and Restated Limited Liability Company Agreement of the Company dated as of the Effective Date, as amended from time to time (as amended, the "*LLC Agreement*").

WHEREAS, MNES and the Company entered into that certain Engineering Services Agreement dated as of January 30, 2009, as amended by that certain First Amendment thereto dates as of February 1, 2011, as further amended by that certain Second Amendment thereto dated as of April 27, 2012, and as further amended from time to time (as amended, the "*Engineering Services Agreement*"), pursuant to which MNES has agreed to provide the Company with site-specific engineering services necessary for the development of the Project (as defined in the Engineering Services Agreement) and to provide pricing and schedules required to achieve Project financing and to obtain engineering, equipment supply and construction contracts in support of the Project, subject to the terms and conditions set forth in the Engineering Services Agreement;

WHEREAS, MNES and the Company desire to effect the suspension of all rights, duties, obligations and liabilities under the Engineering Services Agreement as of the Effective Date;

WHEREAS, MHI and the Company entered into that certain Mitsubishi Engineering Services Agreement Guaranty dated as of January 30, 2009, as amended from time to time (as amended, the "*Mitsubishi Engineering Services Agreement Guaranty*"), pursuant to which MHI has agreed to provide security for certain obligations of MNES for the benefit of the Company, subject to the terms and conditions set forth in the Mitsubishi Engineering Services Agreement Guaranty;

WHEREAS, MHI and the Company desire to effect the suspension of all rights, duties, obligations and liabilities under the Mitsubishi Engineering Services Agreement Guaranty as of the Effective Date;

WHEREAS, MNES and the Company (as successor-in-interest by novation to Luminant Generation Company LLC) are parties to that certain Contract for Services dated as of July 31, 2007, as such contract has been amended from time to time (as amended, the "*COLA Services Contract*" and, collectively with the Engineering Services Agreement and the Mitsubishi Engineering Services Agreement Guaranty, the "*Suspended Agreements*"), pursuant to which MNES has agreed to provide engineering, licensing, environmental and other technical support as necessary to develop a Combined Operating License Application;

WHEREAS, MNES and the Company desire to effect the suspension of all rights, duties, obligations and liabilities under the COLA Services Contract as of the date the COLA Suspension takes effect pursuant to Section 2(a) of Exhibit E of the LLC Agreement;

WHEREAS, in connection herewith, certain of the Parties and/or their affiliates are contemporaneously entering into the agreements set forth in Exhibit B hereto (collectively, the "*Transaction Agreements*").

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Suspension of the Engineering Services Agreement.

(a)    Subject to Section 4 hereof, effective as of the Effective Date and continuing indefinitely until MNES and the Company mutually agree otherwise in writing, the Engineering Services Agreement, and all rights, duties, obligations and liabilities thereunder, shall be suspended in all respects and be of no force or effect, with the result that no Party shall have any rights, duties, obligations or liabilities of any nature whatsoever with respect to, in connection with or otherwise arising under the Engineering Services Agreement during the Term. The Parties hereby acknowledge that no payments are due by the Company to MNES under the Engineering Services Agreement and MNES is not entitled to further payment of any amounts under the Engineering Services Agreement.

(b)    Notwithstanding anything in this Agreement to the contrary, the Parties agree and acknowledge that no provision of this Agreement, nor the termination of this Agreement on the Termination Date, shall cause to become due and payable, and each of MHI and MNES hereby waives in all respects its right to receive, the payment contemplated by Section 8.2(c) of the Engineering Services Agreement unless and until MNES and the Company mutually agree in writing to terminate the suspension and resume activities under the Engineering Services Agreement.

2.    Suspension of the Mitsubishi Engineering Services Agreement Guaranty. Subject to Section 4 hereof, effective as of the Effective Date and continuing indefinitely until MHI and the Company mutually agree otherwise in writing, the Mitsubishi Engineering Services Agreement Guaranty, and all rights, duties, obligations and liabilities thereunder, shall be suspended in all respects and be of no force or effect, with the result that no Party shall have any rights, duties, obligations or liabilities of any nature whatsoever with respect to, in connection with or otherwise arising under the Mitsubishi Engineering Services Agreement Guaranty during the Term.

3.    Suspension of the COLA Services Contract. Subject to Section 4 hereof, effective as of the date the COLA Suspension takes effect pursuant to Section 2(a) of Exhibit E of the LLC Agreement and continuing indefinitely thereafter until MNES and the Company mutually agree otherwise in writing, the COLA Services Contract, and all rights, duties, obligations and liabilities thereunder, shall be suspended in all respects and be of no force or effect, with the result that no Party shall have any rights, duties, obligations or liabilities of any nature

2

whatsoever with respect to, in connection with or otherwise arising under the COLA Services Contract from and after the date the COLA Suspension takes effect pursuant to Section 2(a) of Exhibit E of the LLC Agreement during the Term. The Parties hereby acknowledge that no payments are due by the Company to MNES under the COLA Services Contract, and MNES is not entitled to further payment of any amounts under the COLA Services Contract unless and until MNES and the Company mutually agree in writing to terminate the suspension and resume activities under the COLA Services Contract. Notwithstanding the suspension of the COLA Services Contract or the releases contemplated by paragraph 6 and Exhibit A to this Agreement, MNES agrees to continue to maintain quality assurance programs required by the NRC in connection with the COLA Services Contract until the time of the COLA Amendment (as defined in the LLC Agreement). Notwithstanding anything to contrary in this Agreement, the releases contemplated by paragraph 6 and Exhibit A of this Agreement shall apply to the obligation set forth in the immediately preceding sentence after the COLA Amendment.

    4.    <u>Term and Termination</u>. This Agreement shall commence on the Effective Date and shall terminate upon the termination of the LLC Agreement or such other date as is mutually agreed in writing by the Parties. The date of such termination of this Agreement shall be referred to herein as the "***Termination Date***" and the period between the Effective Date and the Termination Date shall be referred to herein as the "***Term***".

    5.    <u>Effect of Termination</u>. Upon the occurrence of the Termination Date, without any further action on the part of any Party:

        (a)    all rights, duties, obligations and liabilities under this Agreement shall terminate and be of no further force or effect, with the result that no Party shall have any further rights, duties, obligations or liabilities of any nature whatsoever with respect to, in connection with or otherwise arising under this Agreement; *provided, however*, that Section 4, this Section 5, Sections 6 – 16 and Exhibit A hereof shall survive any termination of this Agreement; and

        (b)    unless the Parties shall otherwise agree in writing, each Suspended Agreement and all rights, duties, obligations and liabilities thereunder, shall terminate and be of no further force or effect, with the result that no party to any such Suspended Agreement shall have any further rights, duties, obligations or liabilities of any nature whatsoever under such Suspended Agreement.

Termination of this Agreement shall not relieve any Party from any liability or obligation arising under this Agreement prior to such termination or for any breach of this Agreement occurring prior to such termination.

    6.    <u>Releases</u>. The releases attached hereto as <u>Exhibit A</u> shall immediately become effective in all respects as to each of the Parties as of the COLA Suspension with respect to Claims in respect of the COLA Services Contract and as of the Effective Date with respect to Claims in respect of the other Suspended Agreements, and such releases shall remain in full force and effect unless otherwise agreed by the Parties in writing.

<div align="center">3</div>

7.    <u>Governing Law</u>.  This Agreement and the rights and obligations of the Parties under this Agreement (including all matters of construction, validity and performance) shall be governed by, and construed and interpreted in accordance with, the law of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding, to the maximum extent permitted by applicable law, all other choice of law rules).

8.    <u>Dispute Resolution</u>.

(a)    <u>Negotiation to Resolve Disputes</u>.  If any claim, counterclaim, demand, cause of action, dispute, controversy or other matter in question arising out of or relating to this Agreement, or to the alleged breach hereof, or in any way relating to the subject matter of this Agreement or the relationship among the Parties created by this Agreement (whether extra-contractual in nature, sounding in contract, tort or otherwise, or provided for by federal or state statute, common law or otherwise) (hereafter a "***Dispute***") arises, a Party desiring to initiate dispute resolution shall give notice to all other Parties to initiate the dispute resolution procedures set forth herein.  Promptly upon receipt of such notice, each Party that is a party to the Dispute (each, a "***Disputing Party***") shall refer such Dispute to a senior executive officer ("***SEO***") of such Disputing Party.  The SEOs will meet in person or by teleconference as soon as mutually practicable (but in any event within 10 Business Days after such notice) in order to try and resolve the Dispute.  If the SEOs are unable to resolve the Dispute on or before the 30th Day after such notice, any Disputing Party may notify each other Disputing Party that it desires to commence an arbitration under this Section 7 (an "***Arbitration Notice***").

(b)    <u>Arbitration</u>.  All Disputes shall be finally settled under the Commercial Arbitration Rules (the "***Rules***") of the American Arbitration Association ("***AAA***").  The Parties agree that any such arbitration shall be confidential and no Party shall publicly disclose the fact of such Dispute, the pleadings and positions taken in the arbitration, or the decision of the Tribunal.

(c)    <u>Selection of Arbitrators</u>.  Any arbitration conducted under this Section 7 shall be heard by three arbitrators (each an "***Arbitrator***" and collectively the "***Tribunal***") selected in accordance with this Section 7 and the Rules.  When a Dispute involves only two Disputing Parties, each Disputing Party shall appoint one Arbitrator within 10 Days after the sending of the Arbitration Notice.  The two party-appointed Arbitrators will thereafter appoint a third Arbitrator within 15 Days after the appointment of the second Arbitrator, which third Arbitrator shall not be a citizen of the United States of America or Japan.  Where a Dispute involves more than two Disputing Parties, all three Arbitrators shall be selected in accordance with the Rules, with the exception that the AAA shall not directly appoint the Tribunal without first attempting to make the appointments through the National Roster list system.  Each Disputing Party and any proposed Arbitrator shall, as soon as practicable, disclose to the other Disputing Parties any business, personal or other relationship or affiliation that may exist between any Party and the proposed Arbitrators.  The Disputing Parties may then object to any of the proposed Arbitrators on the basis of such relationship or affiliation.  The validity of any such objection shall be determined according to the Rules.

(d)    <u>Conduct of Arbitration</u>.  The Tribunal shall expeditiously hear and decide all matters concerning the Dispute.  Any arbitration hearing shall be held in New York, New

4

York. Arbitration proceedings shall be conducted in English. The decision of the Tribunal (which shall be rendered in English in the form of a written award) shall be final, nonappealable and binding upon the Parties and may be confirmed in, and judgment upon the award entered by, any court having jurisdiction over the Parties. It is acknowledged and agreed that, consistent with the Rules, the Disputing Parties shall be permitted to request interim or injunctive relief from a court at any time.

(e)     Arbitration Costs and Expenses. The responsibility for paying the costs of the Tribunal and any experts retained by the Tribunal shall be borne equally by the Disputing Parties, and costs incurred by any Disputing Party for its attorneys, advisors, consultants and experts shall be borne by the Disputing Party incurring such costs.

(f)     Jurisdiction and Venue. Each Party hereby consents to the non-exclusive personal jurisdiction and venue of the Federal District Court for the Southern District of New York and the Federal District Court for the Northern District of Texas for any proceedings in aid of arbitration under this Section 7, including any request for interim or injunctive relief.

9.     Limitations on Liability. **NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY EVER BE LIABLE TO ANY OTHER PARTY OR THIRD PARTY (EXCEPT FOR, IN EACH CASE, ANY DAMAGES ACTUALLY PAID TO A THIRD PARTY THAT IS NOT AN INDEMNIFIED PARTY PURSUANT TO A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION IS REQUIRED HEREUNDER) WITH RESPECT TO ANY CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT FOR ANY LOST OR PROSPECTIVE PROFITS OR FOR SPECIAL, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, INCIDENTAL OR INDIRECT LOSSES OR DAMAGES FROM ITS PERFORMANCE UNDER THIS AGREEMENT OR FOR ANY FAILURE OF PERFORMANCE HEREUNDER OR RELATED HERETO, WHETHER ARISING OUT OF BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR OTHERWISE AND WHETHER OR NOT ARISING FROM ANY OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT.**

10.     Severability. If any provision of this Agreement or the application thereof to any Party or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to the other Parties or circumstances is not affected thereby and the Parties shall, to the extent practicable and permitted by applicable law, negotiate in good faith to replace that provision with a new provision that is valid and enforceable and that puts the Parties in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable.

11.     Amendments. This Agreement may be amended, modified or superseded, and any of the terms or provisions herein may be waived, only by a written instrument executed by each of the Parties. No waiver by any Party of any breach of any term or provision contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or a waiver of any other breach of any other term or provision.

5

12.    <u>Headings</u>.  Titles or captions of sections, paragraphs or subparagraphs contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof.

13.    <u>Notices</u>.  Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder shall be in writing and shall be deemed given upon (i) confirmed delivery by a standard overnight carrier or when delivered by hand, (ii) actual receipt, addressed to the respective Parties at the following addresses (or such other address for a Party as shall be specified by like notice), or (iii) electronic transmission (if followed by delivery by standard overnight carrier or delivery by hand) to the email addresses set forth below:

If to Luminant or the Company, to:

> Luminant Generation Company LLC
> 500 N. Akard Street
> Dallas, Texas 75201
> Attention:  Bob Frenzel, Chief Financial Officer
> Email:  bob.frenzel@luminant.com

> with a copy to:

> Luminant Generation Company LLC
> 500 N. Akard Street
> Dallas, Texas 75201
> Attention:  Stephanie Zapata Moore, General Counsel
> Email: stephanie.moore@luminant.com

If to MHI, MNES, the MHI Member or the Company, to:

> Mitsubishi Heavy Industries, Ltd.
> Global Nuclear Business Operations
> 16-5, Konan 2-Chome, Minato-ku
> Tokyo 108-8215 Japan
> Attention:  Hiroshi Matsuda, Deputy Senior Vice President
> Email:  hiroshi_matsuda@mhi.co.jp

> with a copy to:

> Mitsubishi Heavy Industries, Ltd.
> Legal & General Affairs Department
> 16-5, Konan 2-Chome, Minato-ku
> Tokyo 108-8215 Japan
> Attention: Hisashi Kato, Manager
> Email: hisasi_kato@mhi.co.jp

<div align="center">6</div>

A Party may change its notice address by giving written notice in the manner specified above.

14.    <u>Counterparts</u>.  This Agreement may be signed in counterparts, each of which when taken together shall constitute one and the same instrument.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

15.    <u>Entire Agreement</u>.   This Agreement, along with the other Transaction Agreements, contains the entire agreement of the Parties hereto with respect to its subject matter. Nothing in this Agreement amends, modifies or supersedes in any respect any term or provision contained in any other Transaction Agreement, and any breach by any Party of any other Transaction Agreement shall be governed by the terms and conditions of such other Transaction Agreement.

16.    <u>Successors and Assigns; Assignment</u>.  All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assigned by any Party without the prior written consent of the other Parties.

17.    <u>Further Assurances</u>.  Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**MITSUBISHI HEAVY INDUSTRIES, LTD.**

By:_____

Name:  Hiroshi Matsuda

Title:  Deputy      Senior      Vice      President
Global    Nuclear    Business    Operations
Plant Business Department

**MITSUBISHI NUCLEAR ENERGY SYSTEMS, INC.**

By:_____

Name:  Makoto Toyama

Title:  President and Chief Executive Officer

**MHI NUCLEAR NORTH AMERICA, INC.**

By:_____

Name:  Hiroshi Matsuda

Title:  President

**LUMINANT GENERATION COMPANY LLC**

By:_____

Name:  Robert C. Frenzel

Title:  Senior Vice President and Chief Financial
Officer

**COMANCHE   PEAK   NUCLEAR   POWER COMPANY LLC**

By:_____

Name:  Robert C. Frenzel

Title:  Senior Vice President, Chief Financial
Officer and Development Manager

# EXHIBIT A

## Releases

1.    Release of Claims by the Mitsubishi Parties. As of the date set forth in paragraph 6 of the Agreement, and subject to the second to last sentence of paragraph 3 of the Agreement, MHI, MNES, the MHI Member and the Company, on behalf of themselves and each of their respective individual, joint or mutual, past, present and future parents, affiliates, predecessors, successors, assigns, heirs, executors, administrators, stockholders, partners, members, managers, employees, agents, representatives, assignees, insurers and attorneys (collectively, the "*Mitsubishi Parties*"), hereby release Luminant and the Company and each of their respective individual, joint or mutual, past, present and future parents, affiliates, predecessors, successors, assigns, heirs, executors, administrators, stockholders, partners, members, managers, employees, agents, representatives, assignees, insurers and attorneys (collectively, the "*Company Parties*"), from any and all actions, arbitrations, audits, hearings, investigations, litigations, orders, suits (whether civil, criminal, administrative, investigative or informal), debts, sums of money, interest owed, accounts, contribution obligations, reckonings, bonds, bills, covenants, controversies, agreements, guaranties, promises, undertakings, variances, trespasses, credit memoranda, charges, damages, judgments, executions, obligations, costs, expenses, fees (including attorneys' and accountants' fees, expenses and court costs), counterclaims, claims, demands, causes of action and liabilities, and hereby finally, unconditionally, irrevocably and absolutely forever waives any and all offsets and defenses, in each case to the extent arising out of any action, inaction, event, circumstance, agreement, misrepresentation, omission, transaction, fact or occurrence occurring or alleged to have occurred on or prior to the Termination Date, whether known or unknown, absolute or contingent, matured or unmatured, foreseeable or unforeseeable, suspected or unsuspected, accrued or not accrued, previously or presently existing or hereafter discovered, at law, in equity or otherwise, whether arising by statute, common law, in contract, in tort or otherwise, of any kind, character or nature whatsoever (collectively, the "*Claims*"), which the Mitsubishi Parties ever had, now have or hereafter can, shall or may have against the Company Parties relating to or connected to, or arising out of, the Suspended Agreements. The Mitsubishi Parties understand and agree that they are expressly waiving all Claims against the Company Parties concerning the Suspended Agreements, including, without limitation, those Claims that it may not know or suspect to exist, which if known may have adversely affected the decision to provide this release, and the Mitsubishi Parties expressly waive any rights under applicable law that provide to the contrary.

2.    Release of Claims by the Company. As of the date set forth in paragraph 6 of the Agreement, and subject to the second to last sentence of paragraph 3 of the Agreement, the Company Parties, hereby release the Mitsubishi Parties from any and all Claims which the Company Parties ever had, now have or hereafter can, shall or may have against the Mitsubishi Parties relating to or connected to, or arising out of, the Suspended Agreements. The Company Parties understand and agree that they are expressly waiving all Claims against the Mitsubishi Parties concerning the Suspended Agreements, including, without limitation, those Claims that it may not know or suspect to exist, which if known may have adversely affected the decision to provide this release, and the Company Parties expressly waive any rights under applicable law that provide to the contrary.

A-1

## EXHIBIT B

### Transaction Agreements

1. Second Amended and Restated LLC Agreement
2. Suspension Agreement
3. Termination Agreement
4. Assignment and Assumption Agreement
5. Second Amendment to the Development Services Agreement
6. Real Estate Assignment and Assumption Agreement
7. Memorandum of Assignment of Easements and Easement Rights
8. Memorandum of Assignment of Lease
9. Special Warranty Deed
10. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #6
11. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #8
12. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #9
13. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #10E
14. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #10W
15. Intellectual Property and Delivery Agreement

US 2195837v.6

EXECUTION VERSION

## TERMINATION AGREEMENT

This Termination Agreement (this *"Agreement"*) dated as of April 28, 2014 (the *"Effective Date"*), is entered into by and among Energy Future Holdings Corp., a Texas corporation (*"EFH"*), Luminant Generation Company LLC, a Texas limited liability company (*"Luminant"*), Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, (the *"Luminant Member"*), Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company (*"TCEH"*), Mitsubishi Heavy Industries, Ltd., a Japanese corporation (*"MHI"*), Mitsubishi Nuclear Energy Systems, Inc., a Delaware corporation (*"MNES"*), MHI Nuclear North America, Inc., a Delaware corporation (the *"MHI Member"*), and Comanche Peak Nuclear Power Company LLC, a Delaware limited liability company (the *"Company"* and, together with EFH, Luminant, the Luminant Member, TCEH, MHI, MNES and the MHI Member, the *"Parties"* and each a *"Party"*). Unless otherwise specified, each capitalized term used herein but not otherwise defined herein shall have the meaning ascribed to such term in that certain Second Amended and Restated Limited Liability Company Agreement of the Company dated as of the Effective Date, as amended from time to time (as amended, the *"LLC Agreement"*).

WHEREAS, EFH, Luminant, the Luminant Member, MHI, MNES, the MHI Member and the Company (the *"Omnibus Parties"*) entered into that certain Omnibus Agreement dated as of January 30, 2009 (the *"Omnibus Agreement"*), pursuant to which the Omnibus Parties set forth certain rights and obligations of the Omnibus Parties with respect to certain terms relating to the Project (as defined in the Omnibus Agreement);

WHEREAS, pursuant to Section 3.1(a) of the Omnibus Agreement, the Omnibus Parties desire for the Omnibus Agreement to be terminated in full and to be of no further force or effect as of the Effective Date;

WHEREAS, TCEH and the Company entered into that certain Luminant Guaranty Agreement dated as of January 30, 2009 (the *"Luminant Guaranty Agreement"*), pursuant to which TCEH agreed to provide security for certain obligations of the Luminant Member for the benefit of the Company, subject to the terms and conditions set forth in the Luminant Guaranty Agreement;

WHEREAS, pursuant to Section 9 of the Luminant Guaranty Agreement, TCEH, the MHI Member and the Company desire for the Luminant Guaranty Agreement to be terminated in full and to be of no further force or effect as of the Effective Date;

WHEREAS, MHI and the Company entered into that certain Mitsubishi Guaranty Agreement dated as of January 30, 2009 (the *"Mitsubishi Guaranty Agreement"*), pursuant to which MHI agreed to provide security for certain obligations of the MHI Member for the benefit of the Company, subject to the terms and conditions set forth in the Mitsubishi Guaranty Agreement;

WHEREAS, pursuant to Section 9 of the Mitsubishi Guaranty Agreement, MHI, the Luminant Member, and the Company desire for the Mitsubishi Guaranty Agreement to be terminated in full and to be of no further force or effect as of the Effective Date;

WHEREAS, Luminant and the Company entered into that certain Luminant Contribution Agreement dated effective as of January 30, 2009 (the "*Luminant Contribution Agreement*" and, together with the Omnibus Agreement, the Luminant Guaranty Agreement and the Mitsubishi Guaranty Agreement, the "*Terminated Agreements*"), pursuant to which Luminant transferred, assigned and conveyed to the Company certain development rights and assets related to the Project;

WHEREAS, Luminant and the Company desire for the Luminant Contribution Agreement to be terminated in full and to be of no further force or effect as of the Effective Date; and

WHEREAS, in connection herewith, certain of the Parties and/or their affiliates are contemporaneously entering into the agreements set forth in Attachment A hereto (collectively, the "*Transaction Agreements*").

NOW, THEREFORE, in consideration of the premises, the agreements and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Termination of the Omnibus Agreement. Effective as of the Effective Date, the Omnibus Agreement, and all rights, duties, obligations and liabilities thereunder, shall terminate and be of no further force or effect, with the result that no Party shall have any further rights, duties, obligations or liabilities of any nature whatsoever under the Omnibus Agreement.

2.    Termination of the Luminant Guaranty Agreement. Effective as of the Effective Date, and notwithstanding anything to the contrary in Section 13 of the Luminant Guaranty Agreement, the Luminant Guaranty Agreement, and all rights, duties, obligations and liabilities thereunder, shall terminate and be of no further force or effect, with the result that no Party shall have any further rights, duties, obligations or liabilities of any nature whatsoever under the Luminant Guaranty Agreement.

3.    Termination of the Mitsubishi Guaranty Agreement. Effective as of the Effective Date, and notwithstanding anything to the contrary in Section 13 of the Mitsubishi Guaranty Agreement, the Mitsubishi Guaranty Agreement and all rights, duties, obligations and liabilities thereunder, shall terminate and be of no further force or effect, with the result that no Party shall have any further rights, duties, obligations or liabilities of any nature whatsoever under the Mitsubishi Guaranty Agreement.

4.    Termination of the Luminant Contribution Agreement. Effective as of the Effective Date, with the exception of the Amendments and Agreements related to the COLA Services Contract set forth in Exhibit C of the Luminant Contribution Agreement, the Luminant Contribution Agreement, and all rights, duties, obligations and liabilities thereunder, shall terminate and be of no further force or effect, with the result that no Party shall have any further rights, duties, obligations or liabilities of any nature whatsoever under the Luminant Contribution Agreement.

5.    Licensing and Project Development. The Parties acknowledge and agree that, notwithstanding anything herein or in the Transaction Agreements to the contrary, from and after

2

the Effective Date, (a) MHI and its Affiliates shall have the sole right and power to make any decisions with respect to how to pursue a design certification with the NRC with respect to the MHI US-APWR Technology without any duty, obligation or liability to, and without requiring any consent of or notice to, the Company, EFH, Luminant or the Luminant Member, subject to the notice and approval (when applicable) requirements set forth in Section 2(c) of Exhibit E of the LLC Agreement; and (b) Luminant and its Affiliates shall have the sole right and power to make any decisions and take any actions with respect to (i) after the permitted COLA Amendment pursuant to Section 2(b) of Exhibit E of the LLC Agreement, filings with the NRC and all other decisions with respect to how to pursue the COLA, subject to the notice and approval (when applicable) requirements set forth in Section 2(b) of Exhibit E of the LLC Agreement and (ii) the development of a nuclear power generation project (or any other project at the Site), without any duty, obligation or liability to, and without requiring any consent of or notice to, the Company, MHI, MNES or the MHI Member, except as set forth in Section 4 of Exhibit E of the LLC Agreement.   This Section 5 shall survive any termination of this Agreement and the Parties expressly agree and acknowledge that no Claims in respect of this Section 5 shall be released by the releases set forth in Section 6 and Section 7, respectively.

6.    Release of Claims by the Mitsubishi Parties.  As of the Effective Date, MHI, MNES, the MHI Member and the Company, on behalf of themselves and each of their respective individual, joint or mutual, past, present and future parents, affiliates, predecessors, successors, assigns, heirs, executors, administrators, stockholders, partners, members, managers, employees, agents, representatives, assignees, insurers and attorneys (collectively, the "*Mitsubishi Parties*"), hereby release EFH, Luminant, the Luminant Member, TCEH and the Company, and each of their respective individual, joint or mutual, past, present and future parents, affiliates, predecessors, successors, assigns, heirs, executors, administrators, stockholders, partners, members, managers, employees, agents, representatives, assignees, insurers and attorneys (collectively, the "*EFH Parties*"), from any and all actions, arbitrations, audits, hearings, investigations, litigations, orders, suits (whether civil, criminal, administrative, investigative or informal), debts, sums of money, interest owed, accounts, contribution obligations, reckonings, bonds, bills, covenants, controversies, agreements, guaranties, promises, undertakings, variances, trespasses, credit memoranda, charges, damages, judgments, executions, obligations, costs, expenses, fees (including attorneys' and accountants' fees, expenses and court costs), counterclaims, claims, demands, causes of action and liabilities, and hereby finally, unconditionally, irrevocably and absolutely forever waives any and all offsets and defenses, in each case to the extent arising out of any action, inaction, event, circumstance, agreement, misrepresentation, omission, transaction, fact or occurrence occurring or alleged to have occurred on or prior to the Effective Date hereof, whether known or unknown, absolute or contingent, matured or unmatured, foreseeable or unforeseeable, suspected or unsuspected, accrued or not accrued, previously or presently existing or hereafter discovered, at law, in equity or otherwise, whether arising by statute, common law, in contract, in tort or otherwise, of any kind, character or nature whatsoever (collectively, the "*Claims*"), which the Mitsubishi Parties ever had, now have or hereafter can, shall or may have against the EFH Parties relating to or connected to, or arising out of, the Terminated Agreements.  The Mitsubishi Parties understand and agree that they are expressly waiving all Claims against the EFH Parties concerning the Terminated Agreements, including, without limitation, those Claims that it may not know or suspect to exist, which if known may have adversely affected the decision to provide this release,

3

and the Mitsubishi Parties expressly waive any rights under applicable law that provide to the contrary.

7.    Release of Claims by the EFH Parties.  As of the Effective Date, the EFH Parties hereby release the Mitsubishi Parties from any and all Claims which the EFH Parties ever had, now have or hereafter can, shall or may have against the Mitsubishi Parties relating to or connected to, or arising out of, the Terminated Agreements and the Transaction Agreements listed in #6 through #14 on Attachment A.  The EFH Parties understand and agree that they are expressly waiving all Claims against the Mitsubishi Parties concerning the Terminated Agreements, including, without limitation, those Claims that it may not know or suspect to exist, which if known may have adversely affected the decision to provide this release, and the EFH Parties expressly waive any rights under applicable law that provide to the contrary.

8.    Governing Law.  This Agreement and the rights and obligations of the Parties under this Agreement (including all matters of construction, validity and performance) shall be governed by, and construed and interpreted in accordance with, the law of the State of New York (including Sections 5-1401 and 5-1402 of the New York General Obligations Law, but excluding, to the maximum extent permitted by applicable law, all other choice of law rules).

9.    Dispute Resolution.

(a)    Negotiation to Resolve Disputes.  If any claim, counterclaim, demand, cause of action, dispute, controversy or other matter in question arising out of or relating to this Agreement, or to the alleged breach hereof, or in any way relating to the subject matter of this Agreement or the relationship among the Parties created by this Agreement (whether extra-contractual in nature, sounding in contract, tort or otherwise, or provided for by federal or state statute, common law or otherwise) (hereafter a "*Dispute*") arises, a Party desiring to initiate dispute resolution shall give notice to all other Parties to initiate the dispute resolution procedures set forth herein.  Promptly upon receipt of such notice, each Party that is a party to the Dispute (each, a "*Disputing Party*") shall refer such Dispute to a senior executive officer ("*SEO*") of such Disputing Party.  The SEOs will meet in person or by teleconference as soon as mutually practicable (but in any event within 10 Business Days after such notice) in order to try and resolve the Dispute.  If the SEOs are unable to resolve the Dispute on or before the 30th Day after such notice, any Disputing Party may notify each other Disputing Party that it desires to commence an arbitration under this Section 9 (an "*Arbitration Notice*").

(b)    Arbitration.  All Disputes shall be finally settled under the Commercial Arbitration Rules (the "*Rules*") of the American Arbitration Association ("*AAA*").  The Parties agree that any such arbitration shall be confidential and no Party shall publicly disclose the fact of such Dispute, the pleadings and positions taken in the arbitration, or the decision of the Tribunal.

(c)    Selection of Arbitrators.  Any arbitration conducted under this Section 9 shall be heard by three arbitrators (each an "*Arbitrator*" and collectively the "*Tribunal*") selected in accordance with this Section 9 and the Rules.  When a Dispute involves only two Disputing Parties, each Disputing Party shall appoint one Arbitrator within 10 Days after the sending of the Arbitration Notice.  The two party-appointed Arbitrators will thereafter appoint a

4

third Arbitrator within 15 Days after the appointment of the second Arbitrator, which third Arbitrator shall not be a citizen of the United States of America or Japan. Where a Dispute involves more than two Disputing Parties, all three Arbitrators shall be selected in accordance with the Rules, with the exception that the AAA shall not directly appoint the Tribunal without first attempting to make the appointments through the National Roster list system. Each Disputing Party and any proposed Arbitrator shall, as soon as practicable, disclose to the other Disputing Parties any business, personal or other relationship or affiliation that may exist between any Party and the proposed Arbitrators. The Disputing Parties may then object to any of the proposed Arbitrators on the basis of such relationship or affiliation. The validity of any such objection shall be determined according to the Rules.

(d)    <u>Conduct of Arbitration</u>. The Tribunal shall expeditiously hear and decide all matters concerning the Dispute. Any arbitration hearing shall be held in New York, New York. Arbitration proceedings shall be conducted in English. The decision of the Tribunal (which shall be rendered in English in the form of a written award) shall be final, nonappealable and binding upon the Parties and may be confirmed in, and judgment upon the award entered by, any court having jurisdiction over the Parties. It is acknowledged and agreed that, consistent with the Rules, the Disputing Parties shall be permitted to request interim or injunctive relief from a court at any time.

(e)    <u>Arbitration Costs and Expenses</u>. The responsibility for paying the costs of the Tribunal and any experts retained by the Tribunal shall be borne equally by the Disputing Parties, and costs incurred by any Disputing Party for its attorneys, advisors, consultants and experts shall be borne by the Disputing Party incurring such costs.

(f)    <u>Jurisdiction and Venue</u>. Each Party hereby consents to the non-exclusive personal jurisdiction and venue of the Federal District Court for the Southern District of New York and the Federal District Court for the Northern District of Texas for any proceedings in aid of arbitration under this Section 9, including any request for interim or injunctive relief.

10.    <u>Limitations on Liability</u>. **NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY EVER BE LIABLE TO ANY OTHER PARTY OR THIRD PARTY (EXCEPT FOR, IN EACH CASE, ANY DAMAGES ACTUALLY PAID TO A THIRD PARTY THAT IS NOT AN INDEMNIFIED PARTY PURSUANT TO A THIRD PARTY CLAIM FOR WHICH INDEMNIFICATION IS REQUIRED HEREUNDER) WITH RESPECT TO ANY CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT FOR ANY LOST OR PROSPECTIVE PROFITS OR FOR SPECIAL, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, INCIDENTAL OR INDIRECT LOSSES OR DAMAGES FROM ITS PERFORMANCE UNDER THIS AGREEMENT OR FOR ANY FAILURE OF PERFORMANCE HEREUNDER OR RELATED HERETO, WHETHER ARISING OUT OF BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR OTHERWISE AND WHETHER OR NOT ARISING FROM ANY OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT.**

11.    <u>Severability</u>. If any provision of this Agreement or the application thereof to any Party or circumstance is held invalid or unenforceable to any extent, the remainder of this

5

Agreement and the application of that provision to the other Parties or circumstances is not affected thereby and the Parties shall, to the extent practicable and permitted by applicable law, negotiate in good faith to replace that provision with a new provision that is valid and enforceable and that puts the Parties in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable.

12.    Amendments. This Agreement may be amended, modified or superseded, and any of the terms or provisions herein may be waived, only by a written instrument executed by each of the Parties. No waiver by any Party of any breach of any term or provision contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such breach or a waiver of any other breach of any other term or provision.

13.    Headings. Titles or captions of sections, paragraphs or subparagraphs contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof.

14.    Notices. Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder shall be in writing and shall be deemed given upon (i) confirmed delivery by a standard overnight carrier or when delivered by hand, (ii) actual receipt, addressed to the respective Parties at the following addresses (or such other address for a Party as shall be specified by like notice), or (iii) electronic transmission (if followed by delivery by standard overnight carrier or delivery by hand) to the email addresses set forth below:

If to any EFH Party, to:

      Energy Future Holdings Corp.
      c/o Luminant Generation Company LLC
      500 N. Akard Street
      Dallas, Texas 75201
      Attention:  Bob Frenzel, Chief Financial Officer
      Email: bob.frenzel@luminant.com

with a copy to:

      Energy Future Holdings Corp.
      c/o Luminant Generation Company LLC
      500 N. Akard Street
      Dallas, Texas 75201
      Attention:  Stephanie Zapata Moore, General Counsel
      Email: stephanie.moore@luminant.com

If to Luminant, the Luminant Member, TCEH or the Company, to:

      Luminant Generation Company LLC

500 N. Akard Street
Dallas, Texas 75201
Attention: Bob Frenzel, Chief Financial Officer
Email: bob.frenzel@luminant.com

with a copy to:

Luminant Generation Company LLC
500 N. Akard Street
Dallas, Texas 75201
Attention: Stephanie Zapata Moore, General Counsel
Email: stephanie.moore@luminant.com

If to MHI, MNES, the MHI Member or the Company, to:

Mitsubishi Heavy Industries, Ltd.
Global Nuclear Business Operations
16-5, Konan 2-Chome, Minato-ku
Tokyo 108-8215 Japan
Attention: Hiroshi Matsuda, Deputy Senior Vice President
Email: hiroshi_matsuda@mhi.co.jp

with a copy to:

Mitsubishi Heavy Industries, Ltd.
Legal & General Affairs Department
16-5, Konan 2-Chome, Minato-ku
Tokyo 108-8215 Japan
Attention: Hisashi Kato, Manager
Email: hisasi_kato@mhi.co.jp

A Party may change its notice address by giving written notice in the manner specified above.

15.    Counterparts. This Agreement may be signed in counterparts, each of which when taken together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

16.    Entire Agreement.    This Agreement, along with the other Transaction Agreements, contains the entire agreement of the Parties hereto with respect to its subject matter. Nothing in this Agreement amends, modifies or supersedes in any respect any term or provision contained in any other Transaction Agreement, and any breach by any Party of any other Transaction Agreement shall be governed by the terms and conditions of such other Transaction Agreement.

17.    Successors and Assigns. All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by, the Parties and their

7

respective successors and permitted assigns. This Agreement and the rights and obligations hereunder shall not be assigned by any Party without the prior written consent of the other Parties.

18.    <u>Further Assurances</u>.  Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

*[Signature Pages Follow]*

US 2195831v.7

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

**ENERGY FUTURE HOLDINGS CORP.**

By:_____
Name:  M. A. McFarland
Title:   Executive Vice President

**LUMINANT GENERATION COMPANY LLC**

By:_____
Name:  Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer

**NUCLEAR ENERGY FUTURE HOLDINGS II LLC**

By:_____
Name:  Robert C. Frenzel
Title:   Senior Vice President and Chief Financial Officer

**TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC**

By:_____
Name:  M. A. McFarland
Title:   Executive Vice President

**MITSUBISHI HEAVY INDUSTRIES, LTD.**

By:_____
Name:  Hiroshi Matsuda
Title:   Deputy  Senior  Vice  President Global Nuclear Business Operations Plant Business Department

**MITSUBISHI NUCLEAR ENERGY SYSTEMS, INC.**

By:_____
Name:  Makoto Toyama
Title:     President and Chief Executive Officer


**MHI NUCLEAR NORTH AMERICA, INC.**

By:_____
Name:  Hiroshi Matsuda
Title:     President


**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**

By:_____
Name:  Robert C. Frenzel
Title:     Senior    Vice    President,    Chief
              Financial Officer and Development
              Manager

## Attachment A

### Transaction Agreements

1. Second Amended and Restated LLC Agreement
2. Suspension Agreement
3. Termination Agreement
4. Assignment and Assumption Agreement
5. Second Amendment to the Development Services Agreement
6. Real Estate Assignment and Assumption Agreement
7. Memorandum of Assignment of Easements and Easement Rights
8. Memorandum of Assignment of Lease
9. Special Warranty Deed
10. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #6
11. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #8
12. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #9
13. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #10E
14. Industrial Solid Waste Disposal Site Deed Recordation Amendment: Landfill #10W
15. Intellectual Property and Delivery Agreement

**EXHIBIT 2 to EXHIBIT B**

**Integration Letter**

EXECUTION VERSION



**MITSUBISHI HEAVY INDUSTRIES, LTD.**
16-5, KONAN 2-CHOME, MINATO-KU
TOKYO, JAPAN

<u>**Confirmation Letter**</u>

Date:    April 28, 2014
To:      Luminant Generation Company LLC

Mitsubishi Heavy Industries, Ltd., a Japanese corporation, Mitsubishi Nuclear Energy Systems, Inc., a Delaware corporation, and MHI Nuclear North America, Inc., a Delaware corporation (collectively, the "**MHI Parties**"), on the one hand, and Energy Future Holdings Corp., a Texas corporation, Luminant Generation Company LLC, a Texas limited liability company, Nuclear Energy Future Holdings LLC, a Delaware limited liability company, Nuclear Energy Future Holdings II LLC, a Delaware limited liability company, and Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company (collectively, the "**Luminant Parties**"), on the other hand, hereby confirm the purposes of and the parties' intentions and understandings with respect to the agreements set forth in <u>Attachment A</u> hereto (collectively, the "**Integrated Agreements**") between and among the applicable MHI Parties and Luminant Parties (collectively, the "**Parties**").

1.  This Confirmation Letter serves to confirm the Parties' intentions and understandings regarding the Integrated Agreements, and notwithstanding anything to the contrary contained in any of them, supplements the provisions, terms and conditions thereof as set forth herein.

2.  The Parties hereby confirm that taken together, the Integrated Agreements comprise one integrated agreement between and among the Parties in furtherance of modifying the original purpose of Comanche Peak Nuclear Power Company LLC and the rights, duties and obligations of the members thereof and their respective affiliates, such that the Integrated Agreements are not to be construed as a bundle of separate, independent or severable agreements of the Parties.

3.  The Parties hereby confirm that each of the Integrated Agreements is given by the parties thereto in consideration for each other Integrated Agreement, none of which the Parties would enter into without entry into each other Integrated Agreement by the parties thereto and the expectation of the continued effectiveness of each such Integrated Agreement.

4.  Except to the extent otherwise agreed by the Parties, in the event that any Integrated Agreement is rescinded, invalidated, voided, avoided, rejected under section 365 of the United States Bankruptcy Code (or any analogous statute), or otherwise deemed or rendered ineffective for any reason (including without limitation by operation of law or court order), the Parties shall promptly take all steps necessary to reinstate and

restore all agreements and assets affected by the Integrated Agreements, as applicable, to the *status quo* existing on the date hereof.

5.  If any provision of this Confirmation Letter or the application thereof to any Party or circumstance is held to be invalid or unenforceable to any extent, the remainder of this Confirmation Letter and the application of that provision to the other Parties or circumstances shall not be affected thereby and the Parties shall, to the extent practicable and permitted by applicable law, replace that provision with a new provision that is valid and enforceable and that puts the Parties in substantially the same economic, business and legal position as they would have been in if the original provision had been valid and enforceable.

**[Intentionally left blank.  Signature pages to follow.]**

2

By executing below, each of the Parties agrees to and acknowledges the terms of this Confirmation Letter as of the date first written above.

Yours truly,

**MITSUBISHI HEAVY INDUSTRIES, LTD.**

By:_____
Name:  Hiroshi Matsuda
Title:   Deputy   Senior   Vice   President
          Global Nuclear Business Operations
          Plant Business Department


**MITSUBISHI NUCLEAR ENERGY SYSTEMS, INC.**

By:_____
Name:  Makoto Toyama
Title:   President and Chief Executive Officer


**MHI NUCLEAR NORTH AMERICA, INC.**

By:_____
Name:  Hiroshi Matsuda
Title:   President


**Acknowledged and Agreed:**

**ENERGY FUTURE HOLDINGS CORP.**

By:_____
Name:  M. A. McFarland
Title:   Executive Vice President

**LUMINANT GENERATION COMPANY LLC**

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief
           Financial Officer

**NUCLEAR ENERGY FUTURE HOLDINGS
LLC**

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief
           Financial Officer

**NUCLEAR ENERGY FUTURE HOLDINGS
II LLC**

By:_____
Name: Robert C. Frenzel
Title:   Senior Vice President and Chief
           Financial Officer

**TEXAS COMPETITIVE ELECTRIC
HOLDINGS COMPANY LLC**

By:_____
Name: M. A. McFarland
Title:   Executive Vice President

Attachment A
Integrated Agreements

1.    Second Amended and Restated LLC Agreement
2.    Termination Agreement
3.    Suspension Agreement
4.    Assignment and Assumption Agreement
5.    Second Amendment to the Development Services Agreement
6.    Intellectual Property and Delivery Agreement
7.    Real Property Agreements (as defined in the Second Amended and Restated LLC
      Agreement)