# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF CARRIE KIRBY, EXECUTIVE VICE PRESIDENT OF HUMAN RESOURCES AND ADMINISTRATION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, IN SUPPORT OF THE NON-INSIDER COMPENSATION PROGRAMS MOTION AND THE SEVERANCE RELIEF REQUESTED IN THE WAGES MOTION

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been provided on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

i

Pursuant to 28 U.S.C. § 1746, I, Carrie Kirby, hereby declare as follows under penalty of perjury:

1. I am the Executive Vice President of Human Resources for Energy Future Holdings Corp. ("EFH Corp."). I have been with EFH Corp. since 2006, and have served as Vice President of Human Resources for TXU Energy Retail Company, LLC, and before that as Human Resources Director. I am familiar with EFH Corp.'s day-to-day operations, staffing, organizational development, employee activities, employee-related policies and standards, and related information from my review of records, relevant documents, and information supplied to me by EFH Corp.'s human resources and legal team. I am over the age of 18 and duly authorized to execute this declaration (the "Declaration") on behalf of the Debtors in support of the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts On Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis* (the "Non-Insider Compensation Motion") and the *Motion of Energy Future Holdings Corp., et al., for for Entry of Interim and Final Orders Authorizing (A) the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* (the "Wages Motion")[2]

2. The facts in this Declaration are based on my personal knowledge and review of information and my experience with the Debtors' operations and transactions relating to human resources. If called to testify, I would testify to the facts set forth herein.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Non-Insider Compensation Motion.

KE 32126234.19

## **Introduction**

3.  The Non-Insider Compensation Programs are a continuation of the Debtors' historical compensation practices.  Among other things:

- They were developed and implemented to encourage and reward exceptional performance and to help ensure that the Debtors motivate and keep key employees, and the Non-Insider Compensation Programs have historically succeeded in achieving these goals and I believe they will continue to achieve these goals going forward.

- The costs of the Non-Insider Compensation Programs are reasonable and well justified given the size of the Debtors' business, assets, liabilities, and earning potential and the value of the benefits generated by the Non-Insider Compensation Programs, including the increased employee motivation and the value that would be generated to the extent the applicable incentive thresholds are reached.  Towers Watson's benchmarking analyses, as described by Douglas Friske in his declarations, also supports the reasonableness of the costs.

- The scope of the Non-Insider Compensation Programs is fair and reasonable given that all of the Debtors' non-insider employees participate in at least one of the Non-Insider Compensation Programs and that the selection of participants for individual programs was based on appropriate criteria, including role, importance to the Debtors' businesses, and market pressures.

- The Non-Insider Compensation Programs are consistent with industry standards based on my experience and based on a review by Towers Watson as detailed in the supplemental declaration of Douglas Friske.

- The Debtors carefully developed the Non-Insider Compensation Programs and they were ultimately reviewed and approved by the Debtors' Organization and Compensation Committee (the "O&C Committee"), which is a committee of the board of directors of EFH Corp. focused on evaluating the Debtors' employee compensation practices.  The Debtors' development and review process is iterative.  As it does each year, the SPC's and the O&C Committee's review of the programs resulted in multiple changes and multiple iterations of the Non-Insider Compensation Programs were reviewed.  After this process, the O&C Committee ultimately determined that the programs as described in the Non-Insider Compensation Motion are appropriate, reasonable in scope, consistent with the Debtors' historical practice, and properly calculated to achieve the Debtors' objectives.

- Further, in developing the Non-Insider Compensation Programs, the Debtors' management team received independent advice from Kirkland & Ellis, Towers Watson and Filsinger Energy Partners to ensure that the Debtors' compensation

2

structure comported with industry and restructuring-scenario norms and historical practices, and was properly calibrated to achieve the Debtors' goals.[3]

### Roles of the Debtors' Personnel

4. As is typical for an organization of the size, scope, and complexity of the Debtors, the Debtors have developed an organizational structure to ensure the efficient development and execution of corporate strategy across their companies. I have attached an organizational chart with a portion of that structure as **Exhibit A** (the "Organization Chart"). The Debtors' seven-member Strategy and Policy Committee (the "SPC") manages the businesses, including the companies' competitive electricity generation, mining, wholesale electricity sales, and commodity risk management and trading activities at Luminant and the competitive retail electricity sales operations and related operations at TXU Energy. The SPC includes the Chief Executive Officer of EFH Corp. and the Debtors' six Executive Vice Presidents. All six of these individuals report to EFH's CEO and are officers and/or directors at the Debtors' operating companies (*e.g.*, TXU Energy Retail Company, Luminant Generation Company) or their parents. These seven individuals manage the Debtors' businesses and employees and develop strategy for all of the Debtors' operations (excluding Oncor). The members of the SPC are not participants in the company's Non-Insider Compensation Programs.

5. Beyond the SPC members, the Debtors have 16 Senior Vice Presidents, all of whom are excluded from the Non-Insider Compensation Programs. Although the Debtors do not believe that all of these 16 individuals are insiders, we have opted not to include them at this

---

[3] *See Declaration in Support Declaration of Douglas Friske in Support of Debtors Motion for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis (related document(s)[468]) Filed by Energy Future Holdings Corp..* (May 15, 2014) [D.I. 469]; *Supplemental Declaration of Douglas Friske in Support of Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis.*

time. This group includes the SVP-Corporate Controller, SVP-CFO TXU Energy, SVP-CFO Luminant, SVP-Treasurer, SVP-General Tax Counsel, SVP-Planning and Assistant Treasurer, SVP-Chief Nuclear Officer, SVP-Chief Commercial Officer, SVP-Chief Fossil Officer, SVP-Mining, SVP-Power Services, SVP-Fossil Generation, SVP-Chief Operating Officer, SVP-State and Local Public Affairs, SVP-Chief Information Officer, and SVP-Development and Corporate Strategy. These SVPs help oversee components of or functional groups within the Debtors' business—for example, the Debtors' Chief Fossil Officer manages the company's various energy plants and mines, and the Debtors' Chief Nuclear Officer is in charge of the Debtors' nuclear facilities. But they all report to and take direction from the Debtors' senior leadership team: the members of SPC.

6.  The Debtors' 51 Vice Presidents sit a layer below the Debtors' Senior Vice Presidents. Three are in the human resources group, six in the public policy and external affairs group, six in the legal services group, 12 in the finance/treasury group, eight in the TXU Energy group, and 16 in the Luminant group.[4] Two Vice Presidents are excluded from the Non-Insider Compensation Programs—one will become the Debtors' controller later this year and the other is a member of the board of directors of a Debtor entity.

---

[4] Of the 49 Vice Presidents who are recipients under the non-insider plans, 34 report directly to Senior Vice Presidents (who report to SPC Members) and the other 17 report to SPC Members (who are for the most part in smaller departments that do not have an additional layer of employees or report to two different SPC Members). The Vice Presidents who report directly to SPC members do not control the Debtors' operations—they provide support to the Debtors' operations in functional areas (e.g., legal, human resources, public policy and external affairs, audit, and risk). The Vice Presidents who directly report to the SPC members do not have greater authority or control than Vice Presidents that report to Senior Vice Presidents. The SPC members to whom the 17 Vice Presidents directly report control the budgets for the functional groups in which these Vice Presidents reside. None report to the EFH CEO. Within the group of 49 Vice Presidents, there are four individuals that report to two SPC members: (a) one individual reports to both the Luminant CEO and the EVP-Human Resources, (b) one individual reports to both the Luminant CEO and EVP-General Counsel, (c) one individual reports to both the TXU Energy CEO and the EVP-Human Resources, (d) one individual reports to both the TXU Energy CEO and EVP-General Counsel; and (e) one individual reports to both the EVP-General Counsel and the EVP-Public Policy and External Affairs.

7. All of the participants in the Non-Insider Compensation Programs are current employees of the Debtors. None of the participants in the Non-Insider Compensation Programs is an officer of a Debtor, a director of a Debtor, a person in control of a Debtor, a partnership in which a Debtor is a general partner, a general partner of a Debtor; or a relative of a general partner, director, officer, or person in control of a Debtor (as I understand how courts have interpreted those terms as they are found in section 101(31) of the Bankruptcy Code).

8. Subsequent to the filing of the Non-Insider Compensation Motion, the Debtors removed four additional employees (the SVP-State and Local Public Affairs, SVP-Chief Information Officer, SVP-Development and Corporate Strategy, and VP-Assistant Treasurer) from the relief requested in the Non-Insider Compensation Motion. Although the Debtors do not believe that the four are insiders for purposes of the relief requested in the Non-Insider Compensation Motion, the Debtors have removed them from the relief requested in the Non-Insider Compensation Motion.

## I. Delegation of Authority to Participants In Non-Insider Compensation Programs

9. Like any job where some delegation of responsibility is necessary, the Vice Presidents typically have employees that report to them, have specific topics on which their daily work is focused, and have a level of autonomy necessary to carry out their daily work efficiently. Ultimately, though, the Debtors' SPC Members and 13 Senior Vice Presidents oversee and manage the functional groups that are critical to the operation of the Debtors' businesses (e.g., treasury and financial management, energy retail operations, nuclear generating, power services, fossil generation, mining, risk management and trading, legal services, public policy and external relations, and human resources and administration.). The Vice Presidents are approved by the boards of directors for the respective Debtor that employs the Vice Presidents (approved as a group on an annual basis by such boards). That said, the Vice Presidents are not appointed to

5

manage the daily operations of a corporation, do not sit on the board of directors, and do not regularly participate in board meetings, although they may attend certain board meetings at the direction of a Senior Vice President or Executive Vice President to whom they report. None of these Vice Presidents dictates company policy or strategy on an overall or debtor-by-debtor basis, has enterprise-wide decision-making authority (or on a Debtor-by-Debtor basis), or manages the Debtors' businesses and/or functional groups. (These are the responsibilities of employees who have been excluded from the Non-Insider Compensation Programs).

10. Each of the non-insider Vice Presidents operate within a department-level budget that is approved and supervised by employees (e.g., SPC members and SVPs) that have been excluded from the relief requested in the Non-Insider Compensation Motion. All disbursements by the Debtors are subject to the budgets, and the budgets are established pursuant to a planning process that is approved by the SPC and EFH Corp. board of directors. Moreover, after budgets are established, actual expenditures during the relevant budget period are subject to the review and oversight of SPC members and other employees excluded from the relief requested in the Non-Insider Motion. The non-insider Vice Presidents have the discretion to expend estate assets only on items included in the approved budget—expending estate assets outside of the approved budget requires the additional approval of an employee (or multiple employees) that are excluded from the relief requested in the Non-Insider Compensation Motion.

11. The employees included in the Non-Insider Compensation Programs do not have any specific budgets assigned to them. The overall budget is reviewed and approved by successive levels within the Debtors, and ultimately approved by each Business Unit CEO, the SPC, CEO, as well as the Board of Directors. The employees included in the Non-Insider

Compensation Programs operate within the parameters of that budget. Any decision-making authority that they have is subject to review of certain SVPs and EVPs at the company.

12. Employees included in the Non-Insider Compensation Programs, in some instances, are delegated authority to engage in transactions within the bounds of that pre-approved budget through a Transaction Decision Paper ("TDP") process. The Transaction Decision Paper Process requires these VPs to also get the approval of supervisors in their functional area before moving forward with those transactions. The amount of the delegation of authority for VPs ranges from $0 to $10 million. A majority (34 of the Debtors' 49 VPs who are in the Non-Insider Compensation Programs) are only delegated authority to approve invoices of $1 million or less. Four VPs have authority to spend between $1 and $5 million on invoices under the budget.[5]

13. The TDP Process is an enterprise-wide transaction approval process that is required for any transaction or contract that exceeds more than $5 million in aggregate expenditures. The TDP process requires multiple reviews and approvals by different organizations within the business—including legal, accounting, financial planning, treasury and others—to ensure that oversight and communication of significant transactions across the enterprise. Additionally, the TDP process, depending on the type of transaction/contract being approved, requires various levels of approvals of the VP's supervisors. Given the size of certain contracts related to the power generation operations or mining operations, many of those TDPs require Senior Vice President, Executive Vice President, EFH CEO or board of director approval.

---

[5] Those individuals include VP IT Infrastructure, VP, IT Applications, VP Chief Information Security Officer, and VP IT Governance & Strategy.

14.     Eleven VPs have authority to spend $5-10 million on specific, pre-approved transactions through the Transaction Decision Paper Process.[6] All eleven of those individuals work at the company's plants or are involved in fuel or commodity procurement. They work within the parameters of the Debtors' operations and maintenance, capital expenditure, and trading budgets (as applicable)—which are significantly larger than their invoice spending authority. In other words, these individuals have authority to make limited purchases of expensive products and other services. For example, the VP of Nuclear Engineering has authority to invoice up to $10 million to procure nuclear fuel and disburse monies for operations and maintenance within the parameters of the Debtors' budget at the two nuclear facilities at Comanche Peak. This $10 million authority represents less than 2% of the company's nuclear facilities' gross annual expenditures of approximately $550 million. Excluding the payment of interest, taxes, and professional fees, in 2013 and year-to-date 2014, none of the 11 VPs disbursed assets of the Debtors of more than $5 million without pre-approval. All $5+ million transactions were specifically pre-approved by the EFH CEO or the Debtors' board on a one-off basis or through the Transaction Decision Paper Process.

15.     Ultimately, these delegations of authority are only for pre-approved transactions within the context of the broader annual budget. Moreover, a VP's decision to exercise that authority is subject to oversight from his or her supervisor even within the context of that budget. Supervisors often review decisions before they are made even within the context of the annual budget, and senior management reviews VP decisions after they are made in the context of the monthly budget review. Thus, none of the employees included in the Non-Insider Compensation

---

[6]   Those individuals include the VP Nuclear Engineering & Support, VP Financial Trading, VP Commercial Pricing, VP Site (Comanche Peak), VP Mining Operations, VP Environmental, VP Southern Region - Generation, VP Northern Region - Generation, VP Northern Region - Mining, VP Fossil Engineering & Support, VP Construction Management.

8

Programs have the authority to directly disburse substantial Debtor assets without substantial oversight from supervisors.

## II. The Debtors' Non-Insider Compensation Programs Carry Over Pre-Petition Practices.

16. The Debtors have historically compensated non-insider employees with a combination of salary, discretionary incentive compensation programs (to encourage and reward exceptional performance), and retention bonus programs (to help ensure that the Debtors motivate and keep key employees). The support of these senior, mid-level, and rank-and-file employees[7] is essential to stabilizing the Debtors' business and implementing a successful reorganization that maximizes value for all stakeholders. Decisions regarding which employees participate in which programs are based on the employee's role, how critical the employee is to the Debtors' businesses, and the type of performance that the Debtors want to incentivize (*e.g.*, with respect to the Luminant Commercial Incentive Plan and the Luminant Developer Incentive Plan), and market data analysis.

17. Prior to the Petition Date, the Debtors' management, boards of EFH Corp. and certain subsidiaries of EFH Corp. that have employees (*e.g.*, TCEH, EFH Corporate Services, certain Luminant entities, and TXU Energy), and the O&C Committee determined that achieving business goals and financial objectives would be substantially facilitated if the Debtors continued during the chapter 11 cases the overall structure of their historical compensation programs on a go-forward basis—with certain adjustments that are discussed in paragraph 22 to the Owner/Operator Plan (as implemented in the Key Leader Program) to account for the Debtors' financial circumstances, the fierce competition for top-tier employees within the energy industry,

---

[7] Participants in the Non-Insider Compensation Programs include approximately 2,000 unionized employees that are paid on an hourly basis and which unionized employees are eligible for a target payment under the AIP of 5% or 7% of their annual hourly base salary (or approximately $1,500 to $5,100 each) but do not otherwise participate in any of the other Non-Insider Compensation Programs.

9

and an anticipated financial restructuring. All of the Non-Insider Compensation Programs are consistent with the Debtors' historical practices, including with respect to amounts paid, participants, and overall purpose. The Debtors do not believe that current circumstances warrant any other changes to their non-insider compensation approach.

18. The Non-Insider Compensation Programs were developed by members of the Debtors' SPC—the Debtors' executive management team, all of whom have been omitted from the programs currently under consideration—and were ultimately reviewed and approved by the O&C Committee, which is a committee of the board of directors of EFH Corp. focused on evaluating the Debtors' employee compensation practices. In doing so, the Debtors' management team engaged the services of Towers Watson and Filsinger Energy Partners to ensure that the Debtors' compensation structure comported with industry norms and historical practices, and was properly calibrated to achieve the Debtors' goals.

19. Specifically, the Debtors consulted Towers Watson to ensure that the Debtors' programs were consistent with market, industry, and restructuring practice as well as justified given the size of the Debtors' businesses. Towers Watson and the Debtors conducted benchmarking analyses regarding the Debtors' prepetition and potential postpetition compensation levels (which included a sampling of pay levels for approximately 70 of the Debtors' 5,700 employees as discussed in the declarations of Douglas Friske). That analysis confirmed that, even if all of the bonuses under the Non-Insider Compensation Plan were earned and awarded, the Debtors' total compensation amounts would remain consistent with market practices.

20. **Annual Incentive Plan and Executive Annual Incentive Plans.** For at least the last decade, the Debtors have maintained an Annual Incentive Plan for employees below the

level of Vice President and Executive Annual Incentive Plan for approximately 74 employees at or above the Vice President level.  The AIP and the EAIP are identical programs (except for the identities of the participants) and utilize the same incentive metrics.  Those programs have been in place for over ten years, and, each year, bonuses have been paid out only when the company or certain business groups achieve incentive goals that are focused on the financial and operational performance of the company.  This year is no different.  Like previous years, the incentive metrics for the 2014 AIP and the 2014 EAIP were developed as part of a comprehensive, bottoms-up, budgeting process that incorporates multiple rounds of input from the senior leadership team at each business unit, the SPC, and the O&C Committee.  None of the participants that would receive payments pursuant to the relief requested in the Non-Insider Compensation Motion are insiders.  For 2014, Filsinger Energy Partners, an independent energy advisory firm that provides high-level strategy, economic and market evaluation, and corporate budget development services to energy, industrial, and manufacturing companies, provided input concerning and evaluated the annual incentive metrics

21. **Owner/Operator Plan and Key Leader Program.**  The Debtors historically have offered an incentive plan to approximately 128 employees that required the achievement of certain targets in the years 2010-2011 and 2012-2013 under the Owner/Operator Plan, which has existed since 2010.  50% of the potential payments (which included equity and cash components) under the Owner/Operator Plan have required the Debtors to hit certain EBITDA targets (which targets were in fact met), and 50% of the potential payments have required the individuals to remain employed with the Debtors through a certain date.

22. As part of their ordinary course review of their existing compensation practices, at the beginning of 2014, the Debtors, after review and based on input from Towers Watson, opted

11

to modify the Owner/Operator Program on a go-forward basis, though the historical Owner/Operator Program remains in place, with final payments due this September. The modified program, called the Key Leader Program, was implemented at the beginning of 2014 for various reasons, including that a shorter program with quarterly payments that was focused more on retention was more appropriate than a multiple-year program given the uncertainty of the Debtors' restructuring process. The Key Leader Program, thus, maintains the retention-based compensation structure provided by the Owner/Operator Plan (implemented in 2010)—as well as similar payment ranges—though it eliminates the incentive piece of that bonus structure (as non-insiders already have an incentive-based bonus structure in the AIP and EAIP). The Debtors added approximately 30 individuals to the Key Leader Program to ensure that they do not lose key employees who would be particularly difficult to replace during this critical period, but otherwise the Key Leader Program is much the same as the Owner/Operator Program. The Key Leader Program will be in place through the earlier of 2016 or the implementation of a post-restructuring equity incentive plan (although the Non-Insider Compensation Motion only seeks relief with respect to the 2014 Key Leader Program payments). Potential annual payments under the Key Leader Program range from $12,500 to $150,000. Potential payment amounts were decided based on various factors, including title, role, criticality, and market pressures. In addition to historical payments under the Owner/Operator Plan that might be owed to some individuals, participants in the Key Leader Program also are eligible for payments under either the AIP or the EAIP (with 65 Luminant or Business Services employees also able to earn a payment under either the Luminant Commercial Incentive Plan or Luminant Developer Incentive Plan).[8]

---

[8] The Luminant Developer Incentive Plan has been in place since at least approximately 2006-2007. An incentive plan has been in place for the wholesale and trading operations at Luminant for at least the last ten

23. The only go-forward Non-Insider Compensation Programs that are retention-based are the Key Leader Program and the Individual Bonus Awards. The Key Leader Program bonuses are paid on a quarterly basis to employees who are employed at the end of the quarter; there is no requirement that the employee stay past the end of the quarter to receive or keep the bonus for that quarter under the plan. The Debtors decided to award these retention bonuses on a quarterly, as opposed to annual, basis in light of management analysis, surveys of comparable programs, and advice from the Debtors' compensation expert and counsel. The Debtors believe that such quarterly payments would improve employee morale and create stronger retention incentives.

24. 50% of the amount potentially awarded under the Owner/Operator Program was retention-based; that program, however, has been replaced by the Key Leader Program,

### III. Potential Amounts to Be Paid Pursuant to Non-Insider Compensation Motion.

25. Below is a table that sets forth potential payments under the Non-Insider Compensation Programs and annual salaries for the approximately 34 employees (out of the approximately 5,675 employees that could potentially receive a payment under the Non-Insider Compensation Programs) with potential payments under the Non-Insider Compensation Programs that exceed $200,000 in the aggregate. 56 employees—or approximately 1% of the Debtors' employees—have potential target payments under the Non-Insider Compensation Programs that may exceed $100,000 in the aggregate. This table assumes that the various incentive thresholds under the Non-Insider Compensation Programs are met and that the target payments are paid.[9]

---

years, with the Luminant Commercial Incentive Plan coming into existence in 2009.

9   Based on target amounts for 2014 or actual payments in 2013 for the two programs without target amounts (the Luminant Commercial Incentive Plan and the Luminant Developer Plan do not have target amounts).

13

26. Of the Debtors' 5,700 employees, the relief sought in the Non-Insider Compensation Motion includes 56 employees with a base salary of $200,000 or higher. However, none of these employees manages the daily operations of the Debtors' businesses, dictates company policy or strategy, has company-wide decision-making authority (or decision-making authority on a Debtor-wide basis), or has the ability to expend significant corporate assets without the approval of individuals that are excluded from the relief sought in the Non-Insider Compensation Motion. These employees generally have substantial tenures with the Debtors (in some cases decades of experience), significant institutional knowledge, and highly specialized skills (e.g., securities law, nuclear engineering) that could not be obtained without paying market-rate compensation. These 56 employees' potential compensation is a result of this experience, institutional knowledge, technical experience, and the highly competitive market for such employees in Texas and in the energy industry.

27. For the employees in the table listed in the Luminant Energy Services Unit only, a significant portion of the relief requested in the Non-Insider Compensation motion for these employees (approximately 25-50% depending on the employees) relates to the Luminant Commercial Incentive Plan ("CIP"). The CIP pool is calculated based on incremental value created by the trading and hedging operations. In 2013, the pool created was $5.4 million. Of this pool, $3.3 million was used for CIP payments. Payments to this group of employees are intended to provide for market-based performance incentives commensurate with other commodity hedging and trading organizations. Payments will be made to these employees pursuant to the Luminant Commercial Incentive Plan only if incremental value is generated by the Debtors commercial trading transactions in 2014.

28.     Approximately 40-50% of the potential payments for each employee listed in the below chart (depending on the employee) are for the Owner/Operator Plan.[10] These payments are owed for a two-year performance period and one half of the Owner/Operator Plan payments only became payable as a result of the Debtors' achievement of incentive metrics that generated substantial value for the Debtors' business (the other half of the Owner/Operator Plan payments will only be paid if the employee is employed by the Debtors in September 2014). The prospect of these payments (due in September 2014) was key to motivating performance over two full years (January 2012-December 2013) and has been important to promote retention of employees from January 2012 through September 2014. Approximately 30-50% of the potential payments for each employee listed in the below chart (depending on the employee) are for the AIP or EAIP. These payments only will be made to the extent the Debtors achieve the incentive metrics of the annual incentive plans, the achievement of which will result in substantial value for the Debtors' business. The remainder of the potential payments to employees in the above chart (approximately 10-15% depending on the employee) would be for the Key Leader Program, which program will promote the retention of key employees during the remainder of 2014.

---

[10]  Payments under the Luminant Commercial Incentive Plan make up a significant portion of the payments owed to the employees in the Luminant Energy Services Unit. For these employees, the Owner/Operator Plan payments constitute approximately 10-40% of total payments (in comparison to 40-50% for the other employees listed in the chart); annual incentive plan payments constitute approximately 20-40% of total payments (in comparison to 30-50% for the other employees listed in the chart); and Key Leader Program payments are approximately 5-15% of total payments made to certain Luminant Energy Services employees (in comparison to 10-15% for the other employees listed in the chart).

Moreover, a few employees listed in the chart are excluded entirely from either the Owner/Operator Plan or the Key Leader Program, in which case the percentages of payments to these employees coming from the other Non-Insider Compensation Programs (i.e., the annual incentive plan) generally are higher in comparison to the other employees that participate in a greater number of the Non-Insider Compensation Programs.

15


| Function/Role | Total Potential Payments Under Non-Insider Compensation Order | Annual Base Salary | Total Potential Payments Under Non-Insider Compensation Order Plus Annual Base Salary | Total Potential Payments Under Non-Insider Compensation Order as Percentage of Total Potential Payments Under Non-Insider Compensation Order Plus Annual Base Salary |
|---|---|---|---|---|
| **Key Employees in the Luminant Energy Services Unit** This group of 14 includes employees that are key to Luminant Energy Services, which is the Debtors' commodity trading and hedging unit. These employees are eligible for the Luminant Commercial Incentive Plan, which provides for payments only when substantial incremental value is generated by this unit. | $590,059 | $215,514 | $805,573 | 73.2% |
| | $486,981 | $185,349 | $672,330 | 72.4% |
| | $473,169 | $238,000 | $711,169 | 66.5% |
| | $474,943 | $210,000 | $684,943 | 69.3% |
| | $375,366 | $209,992 | $585,358 | 64.1% |
| | $381,475 | $155,727 | $537,202 | 71.0% |
| | $300,978 | $178,249 | $479,227 | 62.8% |
| | $275,909 | $206,999 | $482,908 | 57.1% |
| | $277,627 | $159,009 | $436,637 | 63.6% |
| | $236,783 | $200,004 | $436,787 | 54.2% |
| | $213,832 | $180,405 | $394,237 | 54.2% |
| | $208,476 | $180,723 | $389,199 | 53.6% |
| | $207,356 | $161,508 | $368,864 | 56.2% |
| | $200,622 | $172,483 | $373,105 | 53.8% |
| **Key Employees in the Business Services Unit** This group of nine includes employees with important responsibilities for the day-to-day activities of the Debtors' business services unit, including audit, communications, regulatory policy, and legal functions. These shared services are provided to the Debtors' business units and the contributions of these employees provide functional support to business operations and senior management and generate significant cost savings. | $545,723 | $341,445 | $887,168 | 61.5% |
| | $416,625 | $308,250 | $724,875 | 57.5% |
| | $350,032 | $250,080 | $600,112 | 58.3% |
| | $312,500 | $300,000 | $612,500 | 51.0% |
| | $301,946 | $286,114 | $588,060 | 51.3% |
| | $288,578 | $239,655 | $528,233 | 54.6% |
| | $235,563 | $245,157 | $480,720 | 49.0% |
| | $231,250 | $250,000 | $481,250 | 48.1% |
| | $218,712 | $249,904 | $468,616 | 46.7% |
| **Key Employees in the Luminant Unit** This group of nine includes employees with important responsibilities for the day-to-day activities of the Debtors' nuclear | $476,250 | $340,000 | $816,250 | 58.3% |
| | $462,500 | $300,000 | $762,500 | 60.7% |
| | $400,000 | $275,000 | $675,000 | 59.3% |
| | $238,202 | $219,007 | $457,209 | 52.1% |

16

| Function/Role | Total Potential Payments Under Non-Insider Compensation Order | Annual Base Salary | Total Potential Payments Under Non-Insider Compensation Order Plus Annual Base Salary | Total Potential Payments Under Non-Insider Compensation Order as Percentage of Total Potential Payments Under Non-Insider Compensation Order Plus Annual Base Salary |
|---|---|---|---|---|
| and fossil fuel generation business, including operations, legal, human resources, planning, mining, and construction functions. They provide critical support to senior management at Luminant. | $208,751 | $275,004 | $483,755 | 43.2% |
| | $207,446 | $199,820 | $407,266 | 50.9% |
| | $200,621 | $223,204 | $423,825 | 47.3% |
| | $266,240 | $271,849 | $538,089 | 49.5% |
| | $214,954 | $269,868 | $484,822 | 44.3% |
| **Key Employees in the TXU Unit** These two employees have important responsibilities for the day-to-day activities of the Debtors' retail energy unit, including certain marketing and sales functions. | $227,585 | $287,712 | $515,297 | 44.2% |
| | $205,916 | $231,188 | $437,103 | 47.1% |

**IV.    The Debtors Seek Limited Relief With Respect to Their Severance Program.**

29.    As described in the Wages Motion, the Debtors historically have maintained a severance program on behalf of (a) non-Executive, non-Union employees and (b) union employees (as defined in the Wages Motion, the "Severance Program"). Payments under the Severance Program are not due and payable until termination. Thus, the Debtors do not owe any prepetition amounts in connection with the Severance Program. The Debtors seek authority to continue honoring obligations under the Severance Program on a postpetition basis, subject to two limitations. *First*, the Debtors will not honor obligations under the Severance Program to any "insider," which will exclude any person who is an "insider" for purposes of the Non-Insider Compensation Motion. *Second*, following discussions with the official committee of unsecured creditors appointed in these chapter 11 cases, the Debtors have agreed that they will not honor postpetition obligations under the Severance Program in excess of $15 million in the aggregate

17

(without prejudice to the Debtors' rights to seek additional relief with respect to the Severance Program pursuant to separate Court order).

## Conclusion

17. The Debtors operate in a highly competitive industry. Without the Non-Insider Compensation Plans, the Debtors fear that many mission-critical, senior and mid-level employees may seek alternative career opportunities, which would impede the Debtors' ability to execute on critical business and restructuring initiatives. The Debtors cannot afford to lose these talented and valuable employees, each of whom possesses unique and vital institutional knowledge that is key to business operations at this crucial time. These employees are intimately familiar with the Debtors' businesses and have the experience, skills, and knowledge necessary to ensure the Debtors' continued operations through the completion of the chapter 11 cases. The Debtors cannot easily replace these employees without significantly reducing operating efficiency and distracting management from the Debtors' restructuring efforts. With respect to the Severance Program, the Debtors' requested relief is limited in three ways: (a) the Debtors are not seeking to honor any prepetition obligations; (b) the Debtors only seek to honor postpetition obligations to those employees who are eligible to receive relief in connection with the Non-Insider Compensation Motion, and (c) the Debtors are prevented from honoring such postpetition obligations in excess of $15 million.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Wilmington, Delaware
Dated: June 29, 2014

_____
Carrie Kirby
Executive Vice President, Human Resources
Energy Future Holdings Corp.