B26 (Official Form 26)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**PERIODIC REPORT OF DEBTORS PURSUANT TO**

**BANKRUPTCY RULE 2015.3**

This is the Bankruptcy Rule 2015.3 report as of May 31, 2014 (the "Periodic Report") on the value, operations and profitability of certain non-debtor entities in which one or more Debtors hold a substantial or controlling interest, as required by Bankruptcy Rule 2015.3. Energy Future Holdings Corp. ("EFH Corp.") either directly or indirectly holds a substantial or controlling interest of the equity interest in the following entities:

| Name of entity | Interest of the Estate | Valuation, Income Statement, Balance Sheets, Statements of Cash Flows and Shareholders' Equity are attached |
|---|---|---|
| Basic Resources Inc. | 100% | Yes |
| Collin G/G&B, LLC | 74% | Yes |
| Comanche Peak Nuclear Power Company LLC | 88% | Yes |
| EFH Properties Company | 100% | Yes |
| EFH Vermont Insurance Company | 100% | Yes |
| Greenway Development Holding Company LLC | 100% | Yes |
| Humphreys & Glasgow Limited | 100% | Yes |
| Nuclear Energy Future Holdings II LLC | 100% | Yes |
| Nuclear Energy Future Holdings LLC | 100% | Yes |
| Oncor Electric Delivery Company LLC | 80% | See Note 1 |
| Oncor Electric Delivery Holdings Company LLC | 100% | See Note 1 |

---

[1]     The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

B26 (Official Form 26) – Cont.

| Name of entity | Interest of the Estate | Valuation, Income Statement, Balance Sheets, Statements of Cash Flows and Shareholders' Equity are attached |
|---|---|---|
| Oncor Electric Delivery Transition Bond Company LLC | 80% | See Note 1 |
| Oncor Communications Holdings Company LLC | 100% | See Note 1 |
| Oncor Electric Delivery Administration Corp. | 80% | See Note 1 |
| Oncor License Holdings Company LLC | 100% | See Note 1 |
| Oncor Management Investment LLC | 80% | See Note 1 |
| STARS Alliance LLC | 20% | Yes |

Note 1:   Pursuant to the *Order Pursuant to Bankruptcy Rule 2015.3 (A) Modifying Bankruptcy Rule 2015.3 Reporting Requirements for Cause With Respect to Certain Entities and (B) Finding that the Debtors Do Not Have a Substantial or Controlling Interest With Respect to Certain Entities* (the "Modification Order") the Debtors are not completing Form 26 with respect to the Oncor ring-fenced entities.  The Debtors have attached applicable filing made with the Securities and Exchange Commission to satisfy their Rule 2015.3 reporting requirements for those entities.

Note 2:  EFH Corp. also indirectly owns 100% of the equity interests in the International Entities (as defined in the Modification Order).  Pursuant to the Modification Order, the Bankruptcy Court determined that EFH Corp. does not have a substantial or controlling interest in such entities.  As a result, such entities are not included in this Periodic Report.

This Periodic Report contains separate reports ("Entity Reports") on the operations, and profitability of each entity listed above. This report does not include entities in which the Debtors directly hold less than a 20% interest (the "Non Controlling Interest Entities").[2]

---

[2]    The Debtors do not believe that they have a "substantial or controlling" interest in the Non Controlling Interest Entities within the meaning of Rule 2015.3 and further believe that cause exists to excuse compliance if such entities are deemed to be within the requirements of Rule 2015.3.

B26 (Official Form 26) – Cont.

The undersigned, having reviewed the above listing of entities in which the estate of Energy Future Holdings Corp. holds a substantial or controlling interest, and being familiar with the Debtor's financial affairs, verifies under the penalty of perjury that the listing is complete, accurate and truthful to the best of his/her knowledge.

Date: June 30, 2014

Michael Carter

Authorized Signatory

B26 (Official Form 26) – Cont.

# General Notes

***Condensed Statements*** – The condensed financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects. Information is presented on the same basis as it is aggregated into the consolidated results of Energy Future Holdings Corp.; however, such presentation may not be appropriate for each entity on a stand-alone basis.

The Debtors are providing balance sheets, income and cash flow statements, and statements of shareholders equity for each of the Non-Debtors that are "controlled", as that term is defined in Rule 2015.3, by the Debtors. The reporting, pursuant to the [Rule 2015.3 Order citation], excludes the Oncor entities and the International entities.  The unaudited condensed financial statements presented in this report have been derived from the books and records of the Non-Debtors. This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures, the Debtors and the Non-Debtors believe that the financial information could be subject to changes, and these changes could be material. The information furnished in this report includes primarily normal recurring adjustments, but does not include all of the adjustments that would typically be made in accordance with U.S. GAAP. Certain account balances have been reclassified for presentation purposes.

The results of operations contained herein are not necessarily indicative of results which may be expected  from any other period or for the full year and may not necessarily reflect the results of operations, financial position, and cash flows of the Non-Debtors in the future.

***Intercompany Transactions*** – Receivables and payables between the Non-Debtors and Debtors and/or among the Non-Debtors have not been eliminated. No conclusion as to the legal obligation related to these intercompany transactions is made by the presentation herein.

***Valuation*** – The valuation information provided herein is based on the book value of the Non-Debtors (book value of assets less book value of liabilities). The Debtors do not maintain fair market value or other basis of valuation for these entities.

B26 (Official Form 26) – Cont.

## Exhibit A

## Valuation Estimate for Non-Debtor Entities

March 31, 2014
(USD in thousands)

| Legal Entity | Interest of Estate | Net Book Value |
|---|---|---|
| Basic Resources Inc. | 100.0% | $  (28,667) |
| EFH Properties Company | 100.0% | (28,197) |
| EFH Vermont Insurance Company | 100.0% | 357 |
| Greenway Development Holding Company LLC | 100.0% | 11,067 |
| Humphreys & Glasgow Limited | 100.0% | (3,017) |
| Nuclear Energy Future Holdings II LLC | 100.0% | 211 |
| Nuclear Energy Future Holdings LLC | 100.0% | 13,025 |
| **Joint Ventures** | | |
| Comanche Peak Nuclear Power Company LLC | 88.0% | 2,828 |
| STARS Alliance LLC | 20.0% | 86 |
| Collin G/G&B, LLC | 74.0% | 4,622 |
| Oncor Electric Delivery Holdings Company LLC | 100.0% | 7,753 |
| Oncor Electric Delivery Company LLC | 80.0% | 5,970 |
| Oncor Electric Delivery Transition Bond Company LLC | 80.0% | 13,144 |

Note:  The basis for the valuation of each non-debtor entity is the net book value, calculated as total assets less total liabilities, as of the date of the latest balance sheet presented.

B26 (Official Form 26)

## Exhibit B-1

## Balance Sheets for Non-Debtor Entities

Exhibit B-1
**Balance Sheets for Non-Debtor Entities**
As of December 31, 2013 and March 31, 2014
Unaudited
(US dollars in thousands)

| | Basic Resources Inc. | | EFH Properties Company | | EFH Vermont Insurance Company | | Greenway Development Holding Company LLC | | Humphreys & Glasgow Limited | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 |
| **ASSETS** | | | | | | | | | | |
| Current assets: | | | | | | | | | | |
| Cash and cash equivalents | - | - | - | - | 185 | 171 | 1,336 | 1,336 | - | - |
| Restricted cash | - | - | - | - | - | - | - | - | - | - |
| Trade accounts receivable - net | - | - | 189 | 63 | - | - | - | - | - | - |
| Income taxes receivable - net | - | - | - | - | - | - | - | - | - | - |
| Accounts receivable - affiliates | - | - | 2,093 | 2,135 | - | - | - | - | - | - |
| Advances to affiliates | - | - | - | - | - | - | - | - | - | - |
| Inventories | - | - | - | - | - | - | - | - | - | - |
| Commodity and other derivative contractual assets | - | - | - | - | - | - | - | - | - | - |
| Accumulated deferred income taxes | - | - | (27) | (27) | - | - | - | - | - | - |
| Margin deposits related to commodity positions | - | - | - | - | - | - | - | - | - | - |
| Other current assets | - | - | 66,407 | 61,111 | - | - | - | - | - | - |
| Total current assets | - | - | 68,662 | 63,282 | 185 | 171 | 1,336 | 1,336 | - | - |
| | | | | | | | | | | |
| Restricted cash | - | - | - | - | - | - | - | - | - | - |
| Advances to affiliates | - | - | - | - | - | - | - | - | - | - |
| Receivable from unconsolidated subsidiary | - | - | (28,067) | (28,667) | - | - | - | - | - | - |
| Investment in unconsolidated subsidiary | - | - | - | - | - | - | 8,532 | 8,511 | - | - |
| Other investments | - | - | 13 | 13 | - | - | - | - | - | - |
| Property, plant and equipment - net | - | - | 71,852 | 69,897 | - | - | - | - | - | - |
| Goodwill | - | - | - | - | - | - | - | - | - | - |
| Identifiable intangible assets - net | - | - | - | - | - | - | - | - | - | - |
| Commodity and other derivative contractual assets | - | - | - | - | - | - | - | - | - | - |
| Accumulated deferred income taxes | 5,919 | 5,919 | 130,323 | 130,323 | 252 | 252 | 1,210 | 1,210 | - | - |
| Other noncurrent assets | - | - | 3,726 | 3,450 | 287 | 287 | - | - | - | - |
| Total assets | 5,919 | 5,919 | 246,509 | 238,298 | 724 | 710 | 11,078 | 11,057 | - | - |
| | | | | | | | | | | |
| **LIABILITIES AND MEMBERSHIP INTERESTS / EQUITY** | | | | | | | | | | |
| Current liabilities: | | | | | | | | | | |
| Borrowings under credit facilities | - | - | - | - | - | - | - | - | - | - |
| Notes, loans and other debt | - | - | 54,783 | 50,595 | - | - | - | - | - | - |
| Trade accounts payable | - | - | 909 | 652 | 33 | 28 | - | - | - | - |
| Accounts payable - affiliates | - | - | 106 | 73 | 14 | - | - | - | - | - |
| Advances from affiliates | 33,990 | 34,922 | 69,571 | 72,334 | - | 8 | - | - | - | - |
| Notes payable to parent | - | - | 140,261 | 142,035 | - | - | - | - | - | - |
| Commodity and other derivative contractual liabilities | - | - | - | - | - | - | - | - | - | - |
| Margin deposits related to commodity positions | - | - | - | - | - | - | - | - | - | - |
| Accrued income taxes | (4) | (336) | 122 | (1,630) | (1) | (2) | (3) | (10) | - | - |
| Accrued taxes other than income | - | - | 2,032 | 509 | - | - | - | - | - | - |
| Accumulated deferred income taxes | - | - | (128) | (128) | - | - | - | - | - | - |
| Accrued interest | - | - | 1,158 | 355 | - | - | - | - | - | - |
| Other current liabilities | - | - | 433 | 93 | - | - | - | - | - | - |
| Total current liabilities | 33,986 | 34,586 | 269,247 | 264,888 | 46 | 34 | (3) | (10) | - | - |
| | | | | | | | | | | |
| Accumulated deferred income taxes | - | - | - | - | - | - | - | - | - | - |
| Commodity and other derivative contractual liabilities | - | - | - | - | - | - | - | - | - | - |
| Notes or other liabilities due to affiliates | - | - | - | - | - | - | - | - | 3,017 | 3,017 |
| Debtor-in-possession financing | - | - | - | - | - | - | - | - | - | - |
| Notes, loans and other debt | - | - | - | - | - | - | - | - | - | - |
| Liabilities subject to compromise | - | - | - | - | - | - | - | - | - | - |
| Other noncurrent liabilities and deferred credits | - | - | 1,696 | 1,608 | 319 | 319 | - | - | - | - |
| Total liabilities | 33,986 | 34,586 | 270,942 | 266,496 | 365 | 353 | (3) | (10) | 3,017 | 3,017 |
| | | | | | | | | | | |
| Membership interests / equity: | | | | | | | | | | |
| Membership interests / shareholders' equity | (28,067) | (28,667) | (24,433) | (28,198) | 359 | 357 | 11,081 | 11,067 | (3,017) | (3,017) |
| Noncontrolling interests in subsidiaries | - | - | - | - | - | - | - | - | - | - |
| Total membership interests / equity | (28,067) | (28,667) | (24,433) | (28,198) | 359 | 357 | 11,081 | 11,067 | (3,017) | (3,017) |
| Total liabilities and membership interests / equity | 5,919 | 5,919 | 246,509 | 238,298 | 724 | 710 | 11,078 | 11,057 | - | - |

**Exhibit B-1**
**Balance Sheets for Non-Debtor Entities**
As of December 31, 2013 and March 31, 2014
Unaudited
(US dollars in thousands)

| | Nuclear Energy Future Holdings II LLC | | Nuclear Energy Future Holdings LLC | | STARS Alliance LLC | | Collin G/G&B, LLC | | Comanche Peak Nuclear Power Company LLC | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2013 | Mar. 31, 2014 | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2012 | Dec. 31, 2013 | Dec. 31, 2011 | Dec. 31, 2012 |
| **ASSETS** | | | | | | | | | | |
| Current assets: | | | | | | | | | | |
| Cash and cash equivalents | - | - | - | - | Please see Tab A | Please see Tab B | Please see Tab C | | Please see Tab D | |
| Restricted cash | - | - | - | - | | | | | | |
| Trade accounts receivable - net | - | - | - | - | | | | | | |
| Income taxes receivable - net | - | - | - | - | | | | | | |
| Accounts receivable - affiliates | - | - | - | - | | | | | | |
| Advances to affiliates | - | - | - | - | | | | | | |
| Inventories | - | - | - | - | | | | | | |
| Commodity and other derivative contractual assets | - | - | - | - | | | | | | |
| Accumulated deferred income taxes | - | - | - | - | | | | | | |
| Margin deposits related to commodity positions | - | - | - | - | | | | | | |
| Other current assets | - | - | - | - | | | | | | |
| Total current assets | - | - | - | - | | | | | | |
| | | | | | | | | | | |
| Restricted cash | - | - | - | - | | | | | | |
| Advances to affiliates | - | - | - | - | | | | | | |
| Receivable from unconsolidated subsidiary | | | | | | | | | | |
| Investment in unconsolidated subsidiary | 2,315 | 2,441 | (1,757) | (1,631) | | | | | | |
| Other investments | - | - | - | - | | | | | | |
| Property, plant and equipment - net | - | - | 1,843 | 1,843 | | | | | | |
| Goodwill | - | - | - | - | | | | | | |
| Identifiable intangible assets - net | - | - | - | - | | | | | | |
| Commodity and other derivative contractual assets | - | - | - | - | | | | | | |
| Accumulated deferred income taxes | - | - | 12,871 | 12,871 | | | | | | |
| Other noncurrent assets | - | - | - | - | | | | | | |
| Total assets | 2,315 | 2,441 | 12,957 | 13,083 | | | | | | |
| | | | | | | | | | | |
| **LIABILITIES AND MEMBERSHIP INTERESTS / EQUITY** | | | | | | | | | | |
| Current liabilities: | | | | | | | | | | |
| Borrowings under credit facilities | - | - | - | - | | | | | | |
| Notes, loans and other debt | - | - | - | - | | | | | | |
| Trade accounts payable | | | | | | | | | | |
| Accounts payable - affiliates | 2,230 | 2,230 | 10 | 10 | | | | | | |
| Advances from affiliates | - | - | - | - | | | | | | |
| Notes payable to parent | - | - | - | - | | | | | | |
| Commodity and other derivative contractual liabilities | - | - | - | - | | | | | | |
| Margin deposits related to commodity positions | - | - | - | - | | | | | | |
| Accrued income taxes | - | - | 2 | 47 | | | | | | |
| Accrued taxes other than income | - | - | - | - | | | | | | |
| Accumulated deferred income taxes | - | - | - | - | | | | | | |
| Accrued interest | - | - | - | - | | | | | | |
| Other current liabilities | - | - | - | - | | | | | | |
| Total current liabilities | 2,230 | 2,230 | 12 | 57 | | | | | | |
| | | | | | | | | | | |
| Accumulated deferred income taxes | - | - | - | - | | | | | | |
| Commodity and other derivative contractual liabilities | - | - | - | - | | | | | | |
| Notes or other liabilities due to affiliates | - | - | - | - | | | | | | |
| Debtor-in-possession financing | - | - | - | - | | | | | | |
| Notes, loans and other debt | - | - | - | - | | | | | | |
| Liabilities subject to compromise | - | - | - | - | | | | | | |
| Other noncurrent liabilities and deferred credits | - | - | - | - | | | | | | |
| Total liabilities | 2,230 | 2,230 | 12 | 57 | | | | | | |
| | | | | | | | | | | |
| Membership interests / equity: | | | | | | | | | | |
| Membership interests / shareholders' equity | 85 | 211 | 12,945 | 13,026 | | | | | | |
| Noncontrolling interests in subsidiaries | - | - | - | - | | | | | | |
| Total membership interests / equity | 85 | 211 | 12,945 | 13,026 | | | | | | |
| Total liabilities and membership interests / equity | 2,315 | 2,441 | 12,957 | 13,083 | | | | | | |

B26 (Official Form 26) – Cont.

**Exhibit B-2**

**Statements of Operations for Non-Debtor Entities**

**Exhibit B-2**
**Statements of Operations for Non-Debtor Entities**
**Twelve months ended December 31, 2013 and Three months ended March 31, 2014**
Unaudited
(US dollars in thousands)

| | Basic Resources Inc. | | EFH Properties Company | | EFH Vermont Insurance Company | | Greenway Development Holding Company LLC | | Humphrey & Glasgow Limited | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Twelve Months Ended Dec. 31, 2013 | Three Months Ended Mar. 31, 2014 | Twelve Months Ended Dec. 31, 2013 | Three Months Ended Mar. 31, 2014 | Twelve Months Ended Dec. 31, 2013 | Three Months Ended Mar. 31, 2014 | Twelve Months Ended Dec. 31, 2013 | Three Months Ended Mar. 31, 2014 | Twelve Months Ended Dec. 31, 2013 | Three Months Ended Mar. 31, 2014 |
| Operating revenues | - | - | - | - | - | - | - | - | - | - |
| Fuel, purchased power costs and delivery fees | - | - | - | - | - | - | - | - | - | - |
| Net gain (loss) from commodity hedging and trading activities | - | - | - | - | - | - | - | - | - | - |
| Operating costs | - | - | - | - | - | - | - | - | - | - |
| Depreciation and amortization | - | - | (10,468) | (2,274) | - | - | - | - | - | - |
| Selling, general and administrative expenses | (4) | - | (17,759) | (4,478) | (43) | (3) | (1) | - | - | - |
| Franchise and revenue-based taxes | - | - | - | - | - | - | - | - | - | - |
| Goodwill impairment | - | - | - | - | - | - | - | - | - | - |
| Other income | - | - | 23,134 | 5,806 | - | - | - | - | - | - |
| Other deductions | - | - | (5) | - | - | - | (96) | (22) | - | - |
| Interest income | - | - | - | - | - | - | - | - | - | - |
| Interest expense and related charges | (3,534) | (932) | (17,664) | (3,971) | - | - | - | - | - | - |
| Reorganization items, net | - | - | - | - | - | - | - | - | - | - |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiaries | (3,538) | (932) | (22,762) | (4,917) | (43) | (3) | (97) | (22) | - | - |
| Income tax (expense) benefit | (434) | 332 | 3,622 | 1,752 | 15 | 1 | - | 8 | - | - |
| Equity in earnings of unconsolidated subsidiaries, net of tax | - | - | (3,972) | (600) | - | - | - | - | - | - |
| Net income (loss) | (3,972) | (600) | (23,112) | (3,765) | (28) | (2) | (97) | (14) | - | - |

**Exhibit B-2**
**Statements of Operations for Non-Debtor Entities**
**Twelve months ended December 31, 2013 and Three months ended March 31, 2014**
Unaudited
(US dollars in thousands)

| | Nuclear Energy Future Holdings II LLC | | Nuclear Energy Future Holdings LLC | | STARS Alliance LLC | | Collin G/G&B, LLC | | Comanche Peak Nuclear Power Company LLC | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Twelve Months Ended Dec. 31, 2013 | Three Months Ended Mar. 31, 2014 | Twelve Months Ended Dec. 31, 2013 | Three Months Ended Mar. 31, 2014 | Twelve Months Ended Dec. 31, 2012 | Twelve Months Ended Dec. 31, 2013 | Twelve Months Ended Dec. 31, 2012 | Twelve Months Ended Dec. 31, 2013 | Twelve Months Ended Dec. 31, 2012 | Twelve Months Ended Dec. 31, 2013 |
| Operating revenues | - | - | - | - | Please see Tab A | Please see Tab B | Please see Tab C | | Please see Tab D | |
| Fuel, purchased power costs and delivery fees | - | - | - | - | | | | | | |
| Net gain (loss) from commodity hedging and trading activities | - | - | - | - | | | | | | |
| Operating costs | - | - | - | - | | | | | | |
| Depreciation and amortization | - | - | - | - | | | | | | |
| Selling, general and administrative expenses | - | - | - | - | | | | | | |
| Franchise and revenue-based taxes | - | - | - | - | | | | | | |
| Goodwill impairment | - | - | - | - | | | | | | |
| Other income | - | - | - | - | | | | | | |
| Other deductions | - | - | - | - | | | | | | |
| Interest income | - | - | - | - | | | | | | |
| Interest expense and related charges | - | - | - | - | | | | | | |
| Reorganization items, net | - | - | - | - | | | | | | |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiaries | - | - | - | - | | | | | | |
| Income tax (expense) benefit | - | - | 11,468 | (45) | | | | | | |
| Equity in earnings of unconsolidated subsidiaries, net of tax | (33,864) | 126 | (33,864) | 126 | | | | | | |
| Net income (loss) | (33,864) | 126 | (22,396) | 81 | | | | | | |

B26 (Official Form 26) – Cont.

**Exhibit B-3**

**Statements of Cash Flows for Non-Debtor Entities**

Exhibit B-3

**Statements of Cash Flows for Non-Debtor Entities**
**Three Months Ended March 31, 2014**
Unaudited
(US dollars in thousands)

| | Basic Resources Inc. | EFH Properties Company | EFH Vermont Insurance Company | Greenway Development Holding Company LLC | Humphreys & Glasgow Limited |
|---|---|---|---|---|---|
| Cash flows - operating activities: | | | | | |
| Net income (loss) | (600) | (3,765) | (2) | (14) | - |
| | | | | | |
| Adjustments to reconcile net income (loss) to cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | - | 2,274 | - | - | - |
| Deferred income tax expense (benefit), net | - | - | - | - | - |
| Equity (earnings) losses of unconsolidated subsidiaries | - | 600 | - | 21 | - |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable - affiliates and other | - | 84 | - | - | - |
| Accounts payable - affiliates and other | - | (290) | (19) | - | - |
| Other assets, net | - | 163 | - | - | - |
| Other liabilities, net | (332) | (3,438) | (1) | (7) | - |
| Cash provided by (used in) operating activities | (932) | (4,372) | (22) | - | - |
| | | | | | |
| Cash flows - financing activities: | | | | | |
| Contributions from noncontrolling interests | | | | | |
| Notes/advances due to affiliates | 932 | 4,537 | 8 | - | - |
| Other, net | | | | | |
| Cash provided by (used in) financing activities | 932 | 4,537 | 8 | - | - |
| | | | | | |
| Cash flows - investing activities: | | | | | |
| Capital expenditures | - | (186) | - | - | - |
| Other, net | - | 21 | - | - | - |
| Cash provided by (used in) investing activities | - | (165) | - | - | - |
| | | | | | |
| Net change in cash and cash equivalents | - | - | (14) | - | - |
| Cash and cash equivalents - beginning balance | - | - | 185 | 1,336 | - |
| Cash and cash equivalents - ending balance | - | - | 171 | 1,336 | - |

Exhibit B-3

**Statements of Cash Flows for Non-Debtor Entities**
**Three Months Ended March 31, 2014**
Unaudited
(US dollars in thousands)

| | Nuclear Energy Future Holdings II | Nuclear Energy Future Holdings | STARS Alliance LLC | Collin G/G&B, LLC | Comanche Peak Nuclear Power Company LLC |
|---|---|---|---|---|---|
| Cash flows - operating activities: | | | **Please see Tab B** | **Please see Tab C** | **Please see Tab D** |
| Net income (loss) | 126 | 81 | | | |
| | | | | | |
| Adjustments to reconcile net income (loss) to cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | - | - | | | |
| Deferred income tax expense (benefit), net | - | - | | | |
| Equity (earnings) losses of unconsolidated subsidiaries | (126) | (126) | | | |
| Changes in operating assets and liabilities: | | | | | |
| Accounts receivable - affiliates and other | - | - | | | |
| Accounts payable - affiliates and other | - | - | | | |
| Other assets, net | - | - | | | |
| Other liabilities, net | - | 45 | | | |
| Cash provided by (used in) operating activities | - | - | | | |
| | | | | | |
| Cash flows - financing activities: | | | | | |
| Contributions from noncontrolling interests | | | | | |
| Notes/advances due to affiliates | - | - | | | |
| Other, net | | | | | |
| Cash provided by (used in) financing activities | - | - | | | |
| | | | | | |
| Cash flows - investing activities: | | | | | |
| Capital expenditures | - | - | | | |
| Other, net | - | - | | | |
| Cash provided by (used in) investing activities | - | - | | | |
| | | | | | |
| Net change in cash and cash equivalents | - | - | | | |
| Cash and cash equivalents - beginning balance | - | - | | | |
| Cash and cash equivalents - ending balance | - | - | | | |

B26 (Official Form 26) – Cont.

**Exhibit B-4**

**Statements of Changes In Shareholders' Equity (Deficit) For Non-Debtor Entities**

Exhibit E-4

**Statements of Changes in Shareholders' Equity (Deficit) for Non-Debtor Entities**
**Three Months Ended March 31, 2014**
Unaudited
(US dollars in thousands)

| | Basic Resources Inc. | EFH Properties Company | EFH Vermont Insurance Company | Greenway Development Holding Company LLC | Humphreys & Glasgow Limited |
|---|---|---|---|---|---|
| Shareholders' equity (deficit) at December 31, 2013 | (28,067) | (24,432) | 359 | 11,081 | (3,017) |
| Net income (loss) | (600) | (3,765) | (2) | (14) | - |
| Other | | | | | |
| Shareholders' equity (deficit) at March 31, 2014 | (28,667) | (28,197) | 357 | 11,067 | (3,017) |
| | | | | | |
| Noncontrolling interests in subsidiaries at December 31, 2013 | | | | | |
| Investment by noncontrolling interests | | | | | |
| Other | | | | | |
| Noncontrolling interests in subsidiaries at March 31, 2014 | - | - | - | - | - |
| | | | | | |
| Total equity (deficit) | (28,667) | (28,197) | 357 | 11,067 | (3,017) |

Exhibit E-4

**Statements of Changes in Shareholders' Equity (Deficit) for Non-Debtor Entities**
**Three Months Ended March 31, 2014**
Unaudited
(US dollars in thousands)

| | Nuclear Energy Future Holdings II LLC | Nuclear Energy Future Holdings LLC | STARS Alliance LLC | Collin G/G&B, LLC | Comanche Peak Nuclear Power Company LLC |
|---|---|---|---|---|---|
| | | | Please see Tab B | Please see Tab C | Please see Tab D |
| Shareholders' equity (deficit) at December 31, 2013 | 85 | 12,944 | | | |
| Net income (loss) | 126 | 81 | | | |
| Other | | | | | |
| Shareholders' equity (deficit) at March 31, 2014 | 211 | 13,025 | | | |
| | | | | | |
| Noncontrolling interests in subsidiaries at December 31, 2013 | | | | | |
| Investment by noncontrolling interests | | | | | |
| Other | | | | | |
| Noncontrolling interests in subsidiaries at March 31, 2014 | - | - | | | |
| | | | | | |
| Total equity (deficit) | 211 | 13,025 | | | |

B26 (Official Form 26)

## Exhibit C

## Description of Operations for Non-Debtor Entities Other Than Oncor and the International Entities

| Name of Entity | Descriptions of Operations |
|---|---|
| Basic Resources Inc. | Entity originally established to hold/manage the Company's intellectual property. |
| Collin G/G&B LLC | Entity established to develop and sell land for the purpose of residential lots and retail development in Frisco, Texas. |
| Comanche Peak Nuclear Power Company LLC | Entity established to ultimately hold the assets and conduct the development, construction and operating activities of two nuclear generation units. |
| EFH Properties Company | Entity originally established to hold/manage the Company's office buildings. |
| EFH Vermont Insurance Company | Entity originally established as a captive insurance company to adminster certain insurance programs. |
| Greenway Development Holding Company LLC | Entity established to hold an interest in the Collin G/G&B, LLC company. |
| Humphreys & Glasgow Limited | Entity originally established for European operations that was discontinued. |
| Nuclear Energy Future Holdings II LLC | Entity is a direct wholly-owned subsidiary of Nuclear Energy Future Holdings LLC, and holds direct ownership interest in the Comanche Peak Nuclear Power Company. |
| Nuclear Energy Future Holdings LLC | Entity holds the ground lease for the nuclear units to be developed by Comanche Peak Nuclear Power Company. |
| STARS Alliance LLC | Entity established to coordinate various activities on behalf of its nuclear industry group members. |

B26 (Official Form 26) – Cont.

**Tab A**

**2012 STARS**

**STARS Alliance LLC**

**Report**

**December 31, 2012**

**STARS Alliance LLC**

**Independent Auditor's Report and Financial Statements**

**December 31, 2012**

**STARS Alliance LLC**

**Table of Contents**

|  | Page |
|---|---|
| Independent Auditor's Report | 1 |
| Balance Sheet as of December 31, 2012 | 2 |
| Statement of Income from Inception July 12, 2012 through December 31, 2012 | 3 |
| Statement of Changes in Members' Equity from Inception July 12, 2012 through December 31, 2012 | 4 |
| Statement of Cash Flows from Inception July 12, 2012 through December 31, 2012 | 5 |
| Notes to Financial Statements | 6 - 10 |

# KLECKA, WILKINS & KLECKA

• CERTIFIED PUBLIC ACCOUNTANTS •

Daniel E. Klecka, CPA

Harry F. Wilkins III, CPA

Michael J. Klecka, CPA

635 East Maryland Avenue

Phoenix, Arizona 85012

## INDEPENDENT AUDITOR'S REPORT

To the Members and Series A Board of Directors
STARS Alliance LLC

We have audited the accompanying financial statements of STARS Alliance LLC (a Delaware limited liability company), which comprise the balance sheet as of December 31, 2012 and the related statements of income, changes in members' equity, and cash flows from inception July 12, 2012 through December 31, 2012, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**
Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**
Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**
In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of STARS Alliance LLC as of December 31, 2012, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Klecka, Wilkins & Klecka*

Phoenix, Arizona
February 21, 2013

**STARS Alliance LLC**
Balance Sheet
As of December 31, 2012

### ASSETS

| | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash and Cash Equivalents | $ | 1,639,065 |
| Prepaid Expenses | | 28,968 |
| **Total Current Assets** | | 1,668,033 |
| | | |
| **Property and Equipment, Net** | | 44,319 |
| | | |
| **TOTAL ASSETS** | $ | 1,712,352 |

### LIABILITIES AND MEMBERS' EQUITY

| | | |
|---|---:|---:|
| **Current Liabilities** | | |
| Accrued Expenses | $ | 274,108 |
| Accrued Expenses – Members | | 867,916 |
| Due to Members | | 143,846 |
| **Current/Total Liabilities** | | 1,285,870 |
| | | |
| Members' Equity | | 426,482 |
| | | |
| **TOTAL LIABILITIES AND MEMBERS' EQUITY** | $ | 1,712,352 |

**STARS Alliance LLC**
Statement of Income
From July 12, 2012 (Date of Inception) through December 31, 2012

| | | |
|---|---|---:|
| **Revenue** | | |
| Gross Services Fee | $ | 4,777,753 |
| Less: Budgeted Funds Not Expended | | (28,875) |
| **Net Services Fee** | | 4,748,878 |
| | | |
| **Operating Expenses** | | |
| Loaned Employees | | 2,146,317 |
| Utilities | | 23,449 |
| Travel | | 446,349 |
| Transition Costs | | 23,670 |
| Telephone | | 13,220 |
| Depreciation | | 52 |
| Subscription and Membership Dues | | 17,265 |
| Rent | | 239,023 |
| Relocation Costs | | 68,703 |
| Professional Fees | | 176,651 |
| Professional Labor | | 560,359 |
| Office Supplies and Expense | | 174,236 |
| Meals and Entertainment | | 27,295 |
| Legal and Professional Fees | | 429,178 |
| Contractor Support | | 70,101 |
| Consulting | | 167,367 |
| Computer Support | | 21,477 |
| Computer and Internet Expense | | 68,514 |
| **Total Operating Expenses** | | 4,673,226 |
| | | |
| **Income from Operations** | | 75,652 |
| | | |
| **Other Income (Expense)** | | |
| Interest Income | | 830 |
| | | |
| **Net Income** | $ | 76,482 |

See Accompanying Notes and Auditor's Report

3

**STARS Alliance LLC**
Statement of Changes in Members' Equity
From July 12, 2012 (Date of Inception) through December 31, 2012

| Members | Equity % | Series | Class | Members' Contribution | Allocation of Net Income (Loss) | Balance December 31, 2012 |
|---|---|---|---|---|---|---|
| Arizona Public Service Company | 14.29% | A | E | $ 50,000 | $ 10,929 | $ 60,929 |
| Luminant Generation Company LLC | 14.29% | A | E | 50,000 | 10,929 | 60,929 |
| Pacific Gas and Electric Company | 14.29% | A | E | 50,000 | 10,929 | 60,929 |
| Southern California Edison Company | 14.29% | A | E | 50,000 | 10,929 | 60,929 |
| STP Nuclear Operating Company | 14.28% | A | NE | 50,000 | 10,922 | 60,922 |
| Union Electric Company dba Ameren Missouri | 14.28% | A | E | 50,000 | 10,922 | 60,922 |
| Wolf Creek Nuclear Operating Corporation | 14.28% | A | NE | 50,000 | 10,922 | 60,922 |
| | 100% | | | $ 350,000 | $ 76,482 | $ 426,482 |

See Accompanying Notes and Auditor's Report

4

**STARS Alliance LLC**

Statement of Cash Flows

From July 12, 2012 (Date of Inception) through December 31, 2012

**Cash Flows Provided by (Used for) Operating Activities:**

| | | |
|---|---:|---:|
| Net Income | $ | 76,482 |
| Adjustment to Reconcile Net Income (Loss) to Net Cash Provided by Operating Activities: | | |
| Depreciation | | 52 |
| Changes in Assets and Liabilities: | | |
| Due from (to) Members | | 143,846 |
| Prepaid Expenses | | (28,968) |
| Accrued Expenses | | 274,108 |
| Accrued Expenses - Members | | 867,916 |
| | | |
| **Net Cash Provided by Operating Activities** | | 1,333,436 |
| | | |
| **Cash Used for Investing Activities:** | | |
| Purchase of Property and Equipment | | (44,371) |
| | | |
| **Cash Provided by Financing Activities:** | | |
| Contributions from Members | | 350,000 |
| | | |
| **Increase in Cash and Cash Equivalents** | | 1,639,065 |
| | | |
| **Cash and Cash Equivalents at Inception** | | - |
| | | |
| **Cash and Cash Equivalents at December 31, 2012** | $ | 1,639,065 |

**STARS Alliance LLC**
Notes to Financial Statements
Year Ended December 31, 2012

## NOTE 1 - NATURE OF OPERATIONS:

### History
The Company received approval from the U.S. Department of Justice on July 3, 2012 to establish STARS Alliance as an LLC. STARS Alliance LLC (the Company) was organized as a Delaware limited liability company on July 12, 2012. Prior to LLC formation (since 2000), STARS Alliance was part of Utilities Service Alliance, Inc. (USA) Strategic Teaming And Resource Sharing (STARS) Alliance Steering Committee. The Company's headquarters are located in Goodyear, Arizona.

### Company Mission and Structure
To support its participant/member stations' efforts to achieve excellence in nuclear power plant operations. The Company's affairs will be divided in a multiple series structure. On July 30, 2012, the initial series (Series A) was established.

### Company Purposes
The general purposes and business objectives of the Company are to: Procure or arrange for procurement of goods and/or services with vendors/suppliers on behalf of the Company, Series, or participant(s); facilitate the sharing of information, personnel, services, equipment, tools, and materials between and among the Company, a Series, or participant(s); collaborate on the best practices of the participants so as to achieve operational excellence for the Company, Series, or participant(s); coordinate participation of nuclear industry groups; coordinate joint or shared operational activities of the participants or provide services related to such operational activities; any other activity approved by unanimous approval of the Series A Board and relating to the operation of nuclear power reactors.

### Members and Operating Stations
Member participants and stations consist of the following: Arizona Public Service Company (Palo Verde Nuclear Generating Station in Arizona), Luminant Generation Company LLC (Comanche Peak Nuclear Power Plant in Texas), Pacific Gas and Electric Company (Diablo Canyon Power Plant in California), Southern California Edison Company (San Onofre Nuclear Generating Station in California), Union Electric Company, dba Ameren Missouri (Callaway Energy Center in Missouri), STP Nuclear Operating Company (South Texas Project Electric Generating Station in Texas) and Wolf Creek Nuclear Operating Corporation (Wolf Creek Generating Station in Kansas).

## NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

### Basis of Financial Statement Presentation
The accompanying financial statements have been prepared on the accrual basis of accounting. The accrual basis recognizes revenues in the accounting period in which revenues are earned regardless of when cash is received, and recognizes expenses in the accounting period in which expenses are incurred.

### Date of Management's Review
Management has evaluated subsequent events through February 21, 2013, which is prior to the date the financial statements were available to be issued.

### Cash Equivalents
For purposes of the statement of cash flows, the Company considers all short-term debt securities purchased with a maturity of three months or less to be cash equivalents.

### Property and Equipment
Property and equipment are recorded at cost and depreciated over their estimated useful lives using the straight-line method. Property and equipment with a cost of $1,500 or more are capitalized. Depreciation of property and equipment is provided on a straight-line basis over the estimated useful lives of the respective assets, ranging from 3 to 5 years.

Maintenance and repairs are charged to expense as incurred. The costs of additions and improvements are capitalized and depreciated over the remaining useful lives of the assets. The costs and accumulated depreciation of assets sold or retired are removed from the accounts and any gain or loss is recognized in the year of disposal.

### Services Fees Revenue Recognition
The Company's services fee charged to each member is determined annually as a result of the budgeting process. The annual services fee is billed and revenue is recognized at the beginning of the year and are due from members preferably within thirty days of billing. At the end of the calendar year, the member is entitled to a refund if the services fees collected by the Company exceed the cash value of the aggregate operating expenses. A member may withdraw voluntarily in accordance with the specifications outlined in the limited liability company agreement. A withdrawing member is required to pay the services fee for the calendar year of withdrawal.

**STARS Alliance LLC**
Notes to Financial Statements
Year Ended December 31, 2012

## NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued):

### Services Fee Receivable
As of December 31, 2012 there were no services fee receivables. There are no late charges assessed on late payments of services fees.

Services fee receivables are net of any allowance for doubtful accounts. As of December 31, 2012 there was no allowance for doubtful accounts.

### Use of Estimates
Management uses estimates and assumptions in preparing these financial statements in accordance with generally accepted accounting principles. Those estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities, and the reported revenues and expenses. Actual results could vary from the estimates that were used.

### Income Taxes
The Company files its income tax returns as a partnership for federal and state income tax purposes. As such, the Company does not pay income taxes, as any income or loss is included in the income tax returns of the members. Accordingly, no income tax provision has been made in the financial statements. Net income for financial statement purposes may differ significantly from taxable income reportable to members as a result of differences between the tax bases and financial reporting bases of assets and liabilities.

The Company has adopted ASC Topic 740, *Accounting for Uncertainty in Income Taxes*, which prescribes a recognition threshold and measurement attribute for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. For the year ended December 31, 2012, the Company had no material uncertain tax positions to be accounted for in the financial statements under the new rules, and had no interest or penalties assessed by income taxing authorities. The Company's income tax returns will be subject to possible federal and state examination, generally for three years after they are filed.

## NOTE 3 - PROPERTY AND EQUIPMENT:

Property and equipment consist of the following:

| | | |
|---|---:|---:|
| Computer Equipment | $ | 35,680 |
| Computer Software | | 8,691 |
| Total Assets | | 44,371 |
| (Less) Accumulated Depreciation | | (52) |
| Property and Equipment, Net | $ | 44,319 |

Depreciation expense for the year ended December 31, 2012 totaled $52.

## NOTE 4 - CONCENTRATIONS OF CREDIT RISK:

### Revenue
100% of the Company's revenue is from its seven members.

### Cash
The Company has concentrated its credit risk for cash by maintaining deposits in one financial institution, which at times exceed amounts covered by insurance provided by the U.S. Federal Deposit Insurance Company. The Company has not experienced any losses in such accounts and believes that it is not exposed to significant credit risk to cash.

## NOTE 5 - CREDIT CARD PAYABLE:

The Company has a credit card with a maximum available line of $200,000. At December 31, 2012, the amount owed on the credit card totaled $32,070 and is reported in accrued expenses.

**STARS Alliance LLC**
Notes to Financial Statements
Year Ended December 31, 2012

## NOTE 6 - RELATED PARTY TRANSACTIONS - DUE FROM (TO) MEMBERS:

Amount due to related parties consisted of the following at December 31, 2012:

| Member | Total | Services Fee Refund | Pass-Thru Cash Collected by Company |
|---|---|---|---|
| Arizona Public Service | $ 119,096 | $ 4,125 | $ 114,971 |
| Luminant Generation Co. | 4,125 | 4,125 | - |
| Pacific Gas and Electric Co. | 4,125 | 4,125 | - |
| Southern California Edison Co. | 4,125 | 4,125 | - |
| STP Nuclear Operating Co. | 4,125 | 4,125 | - |
| Union Electric Co. | 4,125 | 4,125 | - |
| Wolf Creek Nuclear Operating | 4,125 | 4,125 | - |
| Due to Members | $ 143,846 | $ 28,875 | $ 114,971 |

Amounts due from (to) members are classified as current when collectible or (payable) within one year. Amounts owed to members for loaned employee expense and reimbursed operating expenses are recorded in accrued expenses-members.

### ARIZONA PUBLIC SERVICE COMPANY
Arizona Public Service is a corporation owning 14.29% of the Company and operates the Palo Verde Nuclear Generating Station in Arizona.

### Services Fee
For the year ended December 31, 2012, the Company billed Arizona Public Service $682,536 for services fee and collected $682,536. At December 31, 2012 the Company owed $4,125 to Arizona Public Service Company for unused services fee.

### Pass-Through Funds
As a convenience for its members, the Company collects funds from members and makes payments to members for certain member-to-member activities. During the year ended December 31, 2012 the Company collected cash of $114,971 from three members for cyber security charges that was due to Arizona Public Service Company at December 31, 2012.

### Loaned Employee Expense and Reimbursed Operating Expenses
The Company entered into a verbal agreement with Arizona Public Service for loaned employees (salary and related expenses, travel and transition costs), and reimbursed operating expenses of: legal and professional services, office expenses and supplies, and business travel totaling $1,382,207 for the year ended December 31, 2012. The Company was billed $1,382,207 for expenses and made payments of $1,019,700. Payments are made when funds are available. At December 31, 2012, amounts owed to Arizona Public Service for loaned employees and reimbursed operating expenses was $362,507 and is included in accrued expenses - members.

### Office Rent
The Company entered into a verbal sub-lease agreement with APS for office rent in Goodyear, Arizona on a month-to-month basis. During the year ended December 31, 2012, monthly rent was approximately $19,000. Rent expense for the year ended December 31, 2012 was $228,363. The Company was billed $228,363 and made payments of $195,153. At December 31, 2012 amounts owed to Arizona Public Service for rent was $33,210 and is included in accrued expenses - members.

### LUMINANT GENERATION COMPANY LLC
Luminant Generation Company is a limited liability company owning 14.29% of the Company and operates the Comanche Peak Power Plant in Texas.

### Services Fee
For the year ended December 31, 2012, the Company billed Luminant Generation Company $682,536 for services fee and collected $682,536. At December 31, 2012 the Company owed $4,125 to Luminant Generation Company for unused services fee.

### Loaned Employee Expense and Reimbursed Operating Expenses
The Company entered into a verbal agreement with Luminant Generation Company for a loaned employee (salary and related expenses), and business travel reimbursements, totaling $154,310 for the year ended December 31, 2012. The Company was billed $154,310 for expenses and made payments of $152,249. Payments are made when funds are available. At December 31, 2012, amounts owed to Luminant Generation Company for loaned employee expense and reimbursed operating expenses was $2,061 and is included in accrued expenses - members.

**STARS Alliance LLC**
Notes to Financial Statements
Year Ended December 31, 2012

*NOTE 6 - RELATED PARTY TRANSACTIONS – DUE FROM (TO) MEMBERS (Continued):*

**PACIFIC GAS AND ELECTRIC COMPANY**
Pacific Gas and Electric Company is a corporation owning 14.29% of the Company and operates the Diablo Canyon Power Plant in California.

**Services Fee**
For the year ended December 31, 2012, the Company billed Pacific Gas and Electric Company $682,536 for services fee and collected $682,536. At December 31, 2012 the Company owed $4,125 to Pacific Gas and Electric Company for unused services fee.

**Loaned Employee Expense and Reimbursed Operating Expenses**
The Company entered into a verbal agreement with Pacific Gas and Electric Company for a loaned employee (salary and related expenses), and business travel reimbursements totaling $311,319 for the year ended December 31, 2012. The Company was billed $311,319 for expenses and made payments of $188,030. Payments are made when funds are available. At December 31, 2012, amounts owed to Pacific Gas and Electric Company for loaned employee and reimbursed operating expenses was $123,289 and is included in accrued expenses - members.

**SOUTHERN CALIFORNIA EDISON COMPANY**
Southern California Edison Company is a corporation owning 14.29% of the Company and operates the San Onofre Nuclear Generating Station in California.

**Services Fee**
For the year ended December 31, 2012, the Company billed Southern California Edison Company $682,536 for services fee and collected $682,536. At December 31, 2012 the Company owed $4,125 to Southern California Edison Company for unused services fee.

**Reimbursed Operating Expenses**
The Company entered into a verbal agreement with Southern California Edison Company for business travel reimbursements totaling $13,672 for the year ended December 31, 2012. The Company was billed $13,672 for expenses and made payments of $13,672. Payments are made when funds are available. At December 31, 2012, no amounts were owed to or from Southern California Edison Company.

**STP NUCLEAR OPERATING COMPANY**
STP Nuclear Operating Company is owned by (Austin Energy, 16%; CPS Energy, 40%; NRG Energy, Inc. 44%) participating in 14.28% of the Company profits and losses that is passed to its 3 owners. STP Nuclear Operating Company operates the South Texas Project Electric Generating Station in Texas.

**Services Fee**
For the year ended December 31, 2012, the Company billed STP Nuclear Operating Company $682,536 for services fee and collected $682,536. At December 31, 2012 the Company owed $4,125 to STP Nuclear Operating Company for unused services fee.

**Loaned Employees and Reimbursed Operating Expenses**
The Company entered into one written and one verbal agreement with STP Nuclear Operating Company for loaned employees (salary and related expenses). The written loan employee agreement is for the position of the business operations manager, dated July 30, 2012 and expires May 1, 2015; other verbal agreements for reimbursement of operating expenses for: business travel, consulting (risk informed), accounting and computer consulting, scholarship, totaling $1,386,830 for the year ended December 31, 2012. The Company was billed $1,386,830 for operating and reimbursed expenses and made payments of $1,162,454. Payments are made when funds are available. At December 31, 2012, amounts owed to STP Nuclear Operating Company for loaned employees and reimbursed operating expenses was $224,378 and is included in accrued expenses - members.

**UNION ELECTRIC COMPANY PACIFIC GAS AND ELECTRIC COMPANY**
Union Electric Company, dba Ameren Missouri is a corporation owning 14.28% of the Company and operates the Callaway Energy Center in Missouri.

**Services Fee**
For the year ended December 31, 2012, the Company billed Union Electric Company $682,536 for services fee and collected $682,536. At December 31, 2012 the Company owed $4,125 to Union Electric Company for unused services fee.

**STARS Alliance LLC**
Notes to Financial Statements
Year Ended December 31, 2012

### NOTE 6 - RELATED PARTY TRANSACTIONS - DUE FROM (TO) MEMBERS (Continued):

#### Loaned Employee Expenses and Reimbursed Operating Expenses

The Company entered into a written agreement on July 30, 2012 with Pacific Gas and Electric Company for a loaned employee (salary and related expenses) for the position of Acting President (through August 1, 2012) and then Executive Director and Secretary (August 2, 2012 and expiring December 31, 2012); and a verbal agreement for business travel reimbursements, totaling $369,747 for the year ended December 31, 2012.  The Company was billed $369,747 for expenses and made payments of $306,487.  Payments are made when funds are available.  At December 31, 2012, amounts owed to Union Electric Company for loaned employee and reimbursed operating expenses was $63,260 and is included in accrued expenses - members.

#### WOLF CREEK NUCLEAR OPERATING CORPORATION

Wolf Creek Nuclear Operating Corporation is a subsidiary of three owners (Kansas City Power & Light, 47%; Kansas Gas and Electric, 47%; Kansas Electric Power Cooperative, 6%) participating in 14.28% of the Company profits and losses that is passed to its owners.  Wolf Creek Nuclear Operating Corporation operates the Wolf Creek Generating Station in Kansas for its owners.

#### Services Fee

For the year ended December 31, 2012, the Company billed Wolf Creek Nuclear Operating Corporation $682,536 for services fee and collected $682,536.  At December 31, 2012 the Company owed $4,125 to Wolf Creek Nuclear Operating Corporation for unused services fee.

#### Loaned Employee Expenses and Reimbursed Operating Expenses

The Company entered into a verbal agreement with Wolf Creek Nuclear Operating Corporation for a loaned employee (salary and related expenses), and reimbursed operating expenses for computer services and business travel totaling $396,650 for the year ended December 31, 2012.   The Company was billed $396,650 for expenses and made payments of $337,439. Payments are made when funds are available.  At December 31, 2012, amounts owed to Wolf Creek Nuclear Operating Corporation for loaned employee and reimbursed operating expenses was $59,211 and is included in accrued expenses - members.

### NOTE 7 - OPERATING LEASE:

In November 2012, the Company entered into an office equipment lease with an unrelated party.  The monthly lease payment is $392 and the lease expires in October 2015.  Future minimum lease payments are as follows:

| Year Ending December 31: | | |
|---|---|---:|
| 2013 | $ | 4,680 |
| 2014 | | 4,680 |
| 2015 | | 3,916 |
| Total Minimum Payments Required | $ | 13,276 |

B26 (Official Form 26) – Cont.

**Tab B**

**2013 STARS**

**STARS Alliance LLC**

**Report**

**December 31, 2013**

**STARS Alliance LLC**

**Independent Accountant's Review Report and Financial Statements**

**December 31, 2013**

**STARS Alliance LLC**

Table of Contents

|  | Page |
|---|---|
| Independent Accountant's Review Report | 1 |
| Balance Sheet as of December 31, 2013 | 2 |
| Statement of Income for the Year Ended December 31, 2013 | 3 |
| Statement of Changes in Members' Equity for the Year Ended December 31, 2013 | 4 |
| Statement of Cash Flows for the Year Ended December 31, 2013 | 5 |
| Notes to Financial Statements | 6 - 11 |

# KLECKA, WILKINS & KLECKA

• CERTIFIED PUBLIC ACCOUNTANTS •

Daniel E. Klecka, CPA

Harry F. Wilkins III, CPA

Michael J. Klecka, CPA

.

635 East Maryland Avenue

Phoenix, Arizona 85012

## INDEPENDENT ACCOUNTANT'S REVIEW REPORT

To the Members and Series A Board of Directors
STARS Alliance LLC

We have reviewed the accompanying balance sheet of STARS Alliance LLC (a Delaware limited liability company) as of December 31, 2013, and the related statements of income, changes in members' equity, and cash flows for the year then ended. A review includes primarily applying analytical procedures to management's financial data and making inquiries of Company management. A review is substantially less in scope than an audit, the objective of which is the expression of an opinion regarding the financial statements as a whole. Accordingly, we do not express such an opinion.

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statements.

Our responsibility is to conduct the review in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. Those standards require us to perform procedures to obtain limited assurance that there are no material modifications that should be made to the financial statements. We believe that the results of our procedures provide a reasonable basis for our report.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

Klecka, Wilkins & Klecka

Phoenix, Arizona
May 22, 2014

**STARS Alliance LLC**
Balance Sheet
December 31, 2013

### ASSETS

| | | |
|---|---|---:|
| **Current Assets** | | |
| Cash and Cash Equivalents | $ | 1,530,755 |
| **Total Current Assets** | | 1,530,755 |
| | | |
| **Property and Equipment, Net** | | 41,037 |
| | | |
| **TOTAL ASSETS** | $ | 1,571,792 |

### LIABILITIES AND MEMBERS' EQUITY

| | | |
|---|---|---:|
| **Current Liabilities** | | |
| Accrued Expenses | $ | 78,855 |
| Accrued Expenses – Members | | 786,695 |
| Credit Card Payable | | 17,677 |
| Due to Members | | 256,323 |
| **Current/Total Liabilities** | | 1,139,550 |
| | | |
| Members' Equity | | 432,242 |
| | | |
| **TOTAL LIABILITIES AND MEMBERS' EQUITY** | $ | 1,571,792 |

See Accompanying Notes and Accountant's Review Report

2

**STARS Alliance LLC**

Statement of Income

Year Ended December 31, 2013

**Revenue**

| | |
|---|---:|
| Gross Services Fee | $ 5,622,496 |
| Less: Budgeted Funds Not Expended (Net of Strategic Sourcing Costs $190,567) | (303,714) |
| **Net Services Fee** | 5,318,782 |

**Operating Expenses**

| | |
|---|---:|
| Loaned Employees | 2,646,673 |
| Utilities | 42,815 |
| Travel | 309,743 |
| Transition Costs | 262,676 |
| Telephone | 10,400 |
| Depreciation | 13,573 |
| Subscription and Membership Dues | 2,963 |
| Rent | 248,588 |
| Relocation Costs | 89,569 |
| Professional Fees | 536,300 |
| Professional Labor | 203,322 |
| Office Supplies and Expense | 168,569 |
| Insurance | 20,232 |
| Meals and Entertainment | 60,390 |
| Legal and Professional Fees | 30,431 |
| Contractor Support | 64,276 |
| Miscellaneous | 1,221 |
| Consulting | 423,060 |
| Computer Support | 58,097 |
| Computer and Internet Expense | 126,168 |
| **Total Operating Expenses** | 5,319,066 |
| **Loss from Operations** | (284) |

**Other Income (Expense)**

| | |
|---|---:|
| Interest Income | 6,044 |
| **Net Income** | $ 5,760 |

See Accompanying Notes and Accountant's Review Report

3

**STARS Alliance LLC**
Statement of Changes in Members' Equity
Year Ended December 31, 2013

| Members | Equity % | Series | Class | Balance December 31, 2012 | Members' Contribution | Allocation of Net Income (Loss) | Balance December 31, 2013 |
|---|---|---|---|---|---|---|---|
| Arizona Public Service Company | 14.29% | A | E | $ 60,929 | $ - | $ 823 | $ 61,752 |
| Luminant Generation Company LLC | 14.29% | A | E | 60,929 | - | 823 | 61,752 |
| Pacific Gas and Electric Company | 14.29% | A | E | 60,929 | - | 823 | 61,752 |
| Southern California Edison Company | 14.29% | A | E | 60,929 | - | 823 | 61,752 |
| STP Nuclear Operating Company | 14.28% | A | NE | 60,922 | - | 823 | 61,745 |
| Union Electric Company dba Ameren Missouri | 14.28% | A | E | 60,922 | - | 823 | 61,745 |
| Wolf Creek Nuclear Operating Corporation | 14.28% | A | NE | 60,922 | - | 823 | 61,745 |
| | 100% | | | $ 426,482 | $ - | $ 5,760 | $ 432,242 |

See Accompanying Notes and Accountant's Review Report
4

**STARS Alliance LLC**

Statement of Cash Flows

Year Ended December 31, 2013

**Cash Flows Provided (Used) by Operating Activities:**

| | | |
|---|---|---:|
| Net Income | $ | 5,760 |
| Adjustment to Reconcile Net Income (Loss) to Net Cash Provided by Operating Activities: | | |
| Depreciation | | 13,573 |
| Changes in Assets and Liabilities: | | |
| Due from (to) Members | | 91,359 |
| Prepaid Expenses | | 28,968 |
| Credit Card Payable | | 17,677 |
| Accrued Expenses | | (195,252) |
| Accrued Expenses – Members | | (60,104) |
| **Net Cash Used by Operating Activities** | | (98,019) |
| **Cash Used for Investing Activities:** | | |
| Purchase of Property and Equipment | | (10,291) |
| **Decrease in Cash and Cash Equivalents** | | (108,310) |
| **Cash and Cash Equivalents at December 31, 2012** | | 1,639,065 |
| **Cash and Cash Equivalents at December 31, 2013** | $ | 1,530,755 |

See Accompanying Notes and Accountant's Review Report

5

STARS Alliance LLC
Notes to Financial Statements
Year Ended December 31, 2013

## NOTE 1 - NATURE OF OPERATIONS:

### History
The Company received approval from the U.S. Department of Justice on July 3, 2012 to establish STARS Alliance as an LLC. STARS Alliance LLC (the Company) was organized as a Delaware limited liability company on July 12, 2012. Prior to LLC formation (since 2000), STARS Alliance was part of Utilities Service Alliance, Inc. (USA) Strategic Teaming And Resource Sharing (STARS) Alliance Steering Committee. The Company's headquarters are located in Goodyear, Arizona.

### Company Mission and Structure
The Company's mission is to support its participant/member stations' efforts to achieve excellence in nuclear power plant operations. The Company's affairs will be divided in a multiple series structure. On July 30, 2012, the initial series (Series A) was established.

### Company Purposes
The general purposes and business objectives of the Company are to:  Procure or arrange for procurement of goods and/or services with vendors/suppliers on behalf of the Company, Series, or participant(s); facilitate the sharing of information, personnel, services, equipment, tools, and materials between and among the Company, a Series, or participant(s); collaborate on the best practices of the participants so as to achieve operational excellence for the Company, Series, or participant(s); coordinate participation of nuclear industry groups; coordinate joint or shared operational activities of the participants or provide services related to such operational activities; any other activity approved by unanimous approval of the Series A Board and relating to the operation of nuclear power reactors.

### Members and Operating Stations
Member participants and stations consist of the following: Arizona Public Service Company (Palo Verde Nuclear Generating Station in Arizona), Luminant Generation Company LLC (Comanche Peak Nuclear Power Plant in Texas), Pacific Gas and Electric Company (Diablo Canyon Power Plant in California), Southern California Edison Company (San Onofre Nuclear Generating Station in California), Union Electric Company, dba Ameren Missouri (Callaway Energy Center in Missouri), STP Nuclear Operating Company (South Texas Project Electric Generating Station in Texas) and Wolf Creek Nuclear Operating Corporation (Wolf Creek Generating Station in Kansas).

## NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

### Basis of Financial Statement Presentation
The accompanying financial statements have been prepared on the accrual basis of accounting.  The accrual basis recognizes revenues in the accounting period in which revenues are earned regardless of when cash is received, and recognizes expenses in the accounting period in which expenses are incurred.

### Date of Management's Review
Management has evaluated subsequent events through May 22, 2014, which is prior to the date the financial statements were available to be issued.

### Cash Equivalents
For purposes of the statement of cash flows, the Company considers all short-term debt securities purchased with a maturity of three months or less to be cash equivalents.

### Property and Equipment
Property and equipment are recorded at cost and depreciated over their estimated useful lives using the straight-line method. Property and equipment with a cost of $1,500 or more are capitalized. Depreciation of property and equipment is provided on a straight-line basis over the estimated useful lives of the respective assets, ranging from 3 to 5 years.

Maintenance and repairs are charged to expense as incurred. The costs of additions and improvements are capitalized and depreciated over the remaining useful lives of the assets. The costs and accumulated depreciation of assets sold or retired are removed from the accounts and any gain or loss is recognized in the year of disposal.

### Services Fees Revenue Recognition
The Company's services fee charged to each member is determined annually as a result of the budgeting process. The annual services fee is billed and revenue is recognized at the beginning of the year and is due from members preferably within thirty days of billing. At the end of the calendar year, the member is entitled to a refund if the services fees collected by the Company exceed the cash value of the aggregate operating expenses. A member may withdraw voluntarily in accordance with the specifications outlined in the limited liability company agreement. A withdrawing member is required to pay the services fee for the calendar year of withdrawal.

STARS Alliance LLC
Notes to Financial Statements
Year Ended December 31, 2013

## NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued):

### Services Fees Receivable

As of December 31, 2013 there were no services fees receivables. There are no late charges assessed on late payments of services fees.

Services fee receivables are net of any allowance for doubtful accounts. An allowance for doubtful accounts is recorded based write-off history and aging analysis. As of December 31, 2013 there was no allowance for doubtful accounts.

### Use of Estimates

Management uses estimates and assumptions in preparing these financial statements in accordance with generally accepted accounting principles. Those estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities, and the reported revenues and expenses. Actual results could vary from the estimates that were used.

### Income Taxes

The Company files its income tax returns as a partnership for federal and state income tax purposes. As such, the Company does not pay income taxes, as any income or loss is included in the income tax returns of the members. Accordingly, no income tax provision has been made in the financial statements. Net income for financial statement purposes may differ significantly from taxable income reportable to members as a result of differences between the tax bases and financial reporting bases of assets and liabilities.

The Company has adopted ASC Topic 740, *Accounting for Uncertainty in Income Taxes*, which prescribes a recognition threshold and measurement attribute for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. For the year ended December 31, 2013, the Company had no material uncertain tax positions to be accounted for in the financial statements under the new rules, and had no interest or penalties assessed by income taxing authorities. The Company's income tax returns will be subject to possible federal and state examination, generally for three years after they are filed.

## NOTE 3 - PROPERTY AND EQUIPMENT:

Property and equipment consisted of the following at December 31, 2013:

| | | |
|---|---|---|
| Computer Equipment | $ | 39,108 |
| Furniture and Fixtures | | 6,863 |
| Computer Software | | 8,691 |
| Total Assets | | 54,662 |
| (Less) Accumulated Depreciation | | (13,625) |
| Property and Equipment, Net | $ | 41,037 |

Depreciation expense for the year ended December 31, 2013 totaled $13,573.

## NOTE 4 - CONCENTRATIONS OF CREDIT RISK:

### Revenue

100% of the Company's revenue is from its seven members.

### Cash

The Company has concentrated its credit risk for cash by maintaining deposits in one financial institution, which at times exceed amounts covered by insurance provided by the U.S. Federal Deposit Insurance Company. The Company has not experienced any losses in such accounts and believes that it is not exposed to significant credit risk to cash.

## NOTE 5 - CREDIT CARD PAYABLE:

The Company has a credit card with a maximum available line of $200,000. At December 31, 2013, the amount owed on the credit card totaled $17,677.

STARS Alliance LLC
Notes to Financial Statements
Year Ended December 31, 2013

## NOTE 6 - RELATED PARTY TRANSACTIONS - DUE FROM (TO) MEMBERS:

Amount due to related parties consisted of the following at December 31, 2013:

| Member | Total | Services Fee Refund (Net of Strategic Costs) | RAPID Renewal Reimbursement | Pass-Through Cash Collected by Company | Overpaid Pass Through |
|---|---|---|---|---|---|
| Arizona Public Service | $ 24,161 | $ 42,408 | $ (27,330) | $ 9,083 | $ - |
| Luminant Generation Co. | 22,124 | 42,408 | (22,665) | - | 2,381 |
| Pacific Gas and Electric Co. | 23,705 | 42,408 | (20,050) | - | 1,347 |
| Southern California Edison Co. | 72,763 | 49,266 | - | 21,116 | 2,381 |
| STP Nuclear Operating Co. | 44,789 | 42,408 | - | - | 2,381 |
| Union Electric Co. | 26,373 | 42,408 | (16,035) | - | - |
| Wolf Creek Nuclear Operating Corp. | 42,408 | 42,408 | - | - | - |
| Due to Members | $ 256,323 | $ 303,714 | $ (86,080) | $ 30,199 | $ 8,490 |

Amounts due from (to) members are classified as current when collectible or (payable) within one year. Amounts owed to members for loaned employee expense and reimbursed operating expenses are recorded in accrued expenses-members.

### ARIZONA PUBLIC SERVICE COMPANY

Arizona Public Service is a corporation owning 14.29% of the Company and operates the Palo Verde Nuclear Generating Station in Arizona.

#### Services Fee

For the year ended December 31, 2013, the Company billed Arizona Public Service $803,214 for services fee and collected $803,214. At December 31, 2013 the Company owed $42,408 to Arizona Public Service Company for unused services fee, which is net of strategic sourcing costs of $27,714.

#### Pass-Through Funds

As a convenience for its members, the Company collects funds from members and makes payments to members for certain member-to-member activities. During the year ended December 31, 2013 the Company collected cash from members of $308,771 for cyber security charges and $2,320 for PAM COB (Plant Aging Management Center of Business) charges and made payments of $299,688 to Arizona Public Service Company. At December 31, 2013 the Company owed cash of $9,083 to Arizona Public Service Company for pass-through cash collected by the Company.

#### Loaned Employee Expense

The Company entered into a verbal agreement with Arizona Public Service for loaned employees (salary and related expenses, travel and transition costs) totaling $977,041 for the year ended December 31, 2013. The Company was billed $977,041 for expenses and made payments of $759,377. Payments are made when funds are available. At December 31, 2013, amounts owed to Arizona Public Service for loaned employee expenses was $217,664 and is included in accrued expenses - members.

#### RAPID Renewal Reimbursement

For the year ended December 31, 2013, the Company billed Arizona Public Service $53,358 for a membership renewal and collected $26,028. At December 31, 2013, Arizona Public Service owed the Company $27,330 for rapid renewal reimbursement.

STARS Alliance LLC
Notes to Financial Statements
Year Ended December 31, 2013

## NOTE 6 - RELATED PARTY TRANSACTIONS – DUE FROM (TO) MEMBERS (Continued):

### Office Rent
The Company entered into a verbal sub-lease agreement with APS for office rent in Goodyear, Arizona on a month-to-month basis. During the year ended December 31, 2013, monthly rent was approximately $20,000. Rent expense for the year ended December 31, 2013 was $242,983. The Company was billed $242,983 and made payments of $183,661. Payments are made when funds are available. At December 31, 2013 amounts owed to Arizona Public Service for rent was $59,322 and is included in accrued expenses - members.

### LUMINANT GENERATION COMPANY LLC
Luminant Generation Company is a limited liability company owning 14.29% of the Company and operates the Comanche Peak Power Plant in Texas.

### Services Fee
For the year ended December 31, 2013, the Company billed Luminant Generation Company $803,214 for services fee and collected $803,214. At December 31, 2013 the Company owed $42,408 to Luminant Generation Company for unused services fee, which is net of strategic sourcing costs of $27,714.

### RAPID Renewal Reimbursement
For the year ended December 31, 2013, the Company billed Luminant Generation Company, $44,252 for a membership renewal and collected $21,587. At December 31, 2013, Luminant Generation Company owed the Company $22,665 for rapid renewal reimbursement.

### Pass-Through Funds
As a convenience for its members, the Company collects funds from members and makes payments to members for certain member-to-member activities. At December 31, 2013, Luminant Generation Company had an overpayment of $2,381 that is owed by the Company for a license renewal transaction.

### PACIFIC GAS AND ELECTRIC COMPANY
Pacific Gas and Electric Company is a corporation owning 14.29% of the Company and operates the Diablo Canyon Power Plant in California.

### Services Fee
For the year ended December 31, 2013, the Company billed Pacific Gas and Electric Company $803,214 for services fee and collected $803,214. At December 31, 2013 the Company owed $42,408 to Pacific Gas and Electric Company for unused services fee, which is net of strategic sourcing costs of $27,714.

### Pass-Through Funds
As a convenience for its members, the Company collects funds from members and makes payments to members for certain member-to-member activities. During the year ended December 31, 2013 the Company collected cash from members of $1,502 for PAM COB (Plant Aging Management Center of Business) charges and made payments of $1,502 to Pacific Gas and Electric Company.

In addition, at December 31, 2013, Pacific Gas and Electric Company had an overpayment of $1,347 that is owed by the Company for a license renewal transaction.

### Loaned Employee Expense
The Company entered into a verbal agreement with Pacific Gas and Electric Company for a loaned employee (salary and related expenses), totaling $586,028 for the year ended December 31, 2013. The Company was billed $586,028 for expenses and made payments of $460,271. Payments are made when funds are available. At December 31, 2013, amounts owed to Pacific Gas and Electric Company for loaned employee expenses was $125,757 and is included in accrued expenses - members.

### RAPID Renewal Reimbursement
For the year ended December 31, 2013, the Company billed Pacific Gas and Electric Company, $39,137 for a membership renewal and collected $19,087. At December 31, 2013, Pacific Gas and Electric Company owed the Company $20,050 for rapid renewal reimbursement.

### SOUTHERN CALIFORNIA EDISON COMPANY
Southern California Edison Company is a corporation owning 14.29% of the Company and operates the San Onofre Nuclear Generating Station in California.

### Services Fee
For the year ended December 31, 2013, the Company billed Southern California Edison Company $803,214 for services fee and collected $803,214. At December 31, 2013 the Company owed $49,266 to Southern California Edison Company for unused services fee, which is net of strategic sourcing costs of $24,286.

**STARS Alliance LLC**
Notes to Financial Statements
Year Ended December 31, 2013

*NOTE 6 - RELATED PARTY TRANSACTIONS – DUE FROM (TO) MEMBERS (Continued):*

**Incentive Reimbursements**
For the year ended December 31, 2013, the Company billed Southern California Edison Company $61,569 for incentive charges and considered the amount collected by an offset of $82,685 owed to Southern California Edison Company.

**RAPID Renewal Reimbursement**
For the year ended December 31, 2013, the Company billed Southern California Edison Company $19,087 for a membership renewal and collected $19,087.

**Pass-Through Funds**
As a convenience for its members, the Company collects funds from members and makes payments to members for certain member-to-member activities.    During the year ended December 31, 2013 the Company collected cash from members of $82,685 for license renewal charges and $125,496 for PAM COB (Plant Aging Management Center of Business) charges and made payments and credits of $187,065 to Southern California Edison Company.    At December 31, 2013 the Company owed cash of $21,116 to Southern California Edison Company for pass-through cash collected by the Company.

In addition, at December 31, 2013, Southern California Edison Company had an overpayment of $2,381 that is owed by the Company for a license renewal transaction.

**STP NUCLEAR OPERATING COMPANY**
STP Nuclear Operating Company is owned by (Austin Energy, 16%; CPS Energy, 40%; NRG Energy, Inc. 44%) participating in 14.28% of the Company profits and losses that is passed to its 3 owners. STP Nuclear Operating Company operates the South Texas Project Electric Generating Station in Texas.

**Services Fee**
For the year ended December 31, 2013, the Company billed STP Nuclear Operating Company $803,214 for services fee and collected $803,214. At December 31, 2013 the Company owed $42,408 to STP Nuclear Operating Company for unused services fee, which is net of strategic sourcing costs of $27,714.

**Loaned Employees**
The Company entered into a written agreement with STP Nuclear Operating Company for a loaned employee (salary and related expenses). The written loan employee agreement is for the position of the business operations manager, dated July 30, 2012 and expires May 1, 2015; totaling $642,037 for the year ended December 31, 2013.   The Company was billed $642,037 and made payments of $434,658.  Payments are made when funds are available.  At December 31, 2013, amounts owed to STP Nuclear Operating Company for loaned employee expenses was $207,379 and is included in accrued expenses – members.

**RAPID Renewal Reimbursement**
For the year ended December 31, 2013, the Company billed STP Nuclear Operating Company $21,587 for a membership renewal and collected $21,587.

**Pass-Through Funds**
As a convenience for its members, the Company collects funds from members and makes payments to members for certain member-to-member activities.    During the year ended December 31, 2013 the Company collected cash from members of $33,759 for PAM COB (Plant Aging Management Center of Business) charges and made payments of $33,759 to STP Nuclear Operating Company.

In addition, at December 31, 2013, STP Nuclear Operating Company had an overpayment of $2,381 that is owed by the Company for a license renewal transaction.

**UNION ELECTRIC COMPANY**
Union Electric Company, dba Ameren Missouri is a corporation owning 14.28% of the Company and operates the Callaway Energy Center in Missouri.

**Services Fee**
For the year ended December 31, 2013, the Company billed Union Electric Company $803,214 for services fee and collected $803,214. At December 31, 2013 the Company owed $42,408 to Union Electric Company for unused services fee, which is net of strategic sourcing costs of $27,714.

**Pass-Through Funds**
As a convenience for its members, the Company collects funds from members and makes payments to members for certain member-to-member activities. During the year ended December 31, 2013 the Company collected cash from members of $99,423 for PAM COB (Plant Aging Management Center of Business) charges and made payments of $99,423 to Union Electric Company.

**STARS Alliance LLC**
Notes to Financial Statements
Year Ended December 31, 2013

### NOTE 6 - RELATED PARTY TRANSACTIONS – DUE FROM (TO) MEMBERS (Continued):

**Loaned Employee Expenses**
The Company entered into a verbal agreement with Union Electric Company for two loaned employees (salary and related expenses) totaling $517,387 for the year ended December 31, 2013. The Company was billed $517,387 for expenses and made payments of $400,761. Payments are made when funds are available. At December 31, 2013, amounts owed to Union Electric Company for loaned employee expenses was $116,624 and is included in accrued expenses - members.

**RAPID Renewal Reimbursement**
For the year ended December 31, 2013, the Company billed Union Electric Company $31,304 for a membership renewal and collected $15,269. At December 31, 2013, Union Electric Company owed the Company $16,035 for rapid renewal reimbursement.

### WOLF CREEK NUCLEAR OPERATING CORPORATION

Wolf Creek Nuclear Operating Corporation is a subsidiary of three owners (Kansas City Power & Light, 47%; Kansas Gas and Electric, 47%; Kansas Electric Power Cooperative, 6%) participating in 14.28% of the Company profits and losses that is passed to its owners. Wolf Creek Nuclear Operating Corporation operates the Wolf Creek Generating Station in Kansas for its owners.

**Services Fee**
For the year ended December 31, 2013, the Company billed Wolf Creek Nuclear Operating Corporation $803,214 for services fee and collected $803,214. At December 31, 2013 the Company owed $42,408 to Wolf Creek Nuclear Operating Corporation for unused services fee, which is net of strategic sourcing costs of $27,714.

**Loaned Employee Expenses**
The Company entered into a verbal agreement with Wolf Creek Nuclear Operating Corporation for a loaned employee (salary and related expenses), totaling $284,113 for the year ended December 31, 2013. The Company was billed $284,113 for expenses and made payments of $224,164. Payments are made when funds are available. At December 31, 2013, amounts owed to Wolf Creek Nuclear Operating Corporation for loaned employee expenses was $59,949 and is included in accrued expenses - members.

### NOTE 7 - OPERATING LEASE:

In November 2012, the Company entered into an office equipment lease with an unrelated party. The monthly lease payment is $392 and the lease expires in October 2015. Future minimum lease payments are as follows:

**Year Ending December 31:**

| | |
|---|---|
| 2014 | 4,680 |
| 2015 | 3,916 |
| Total Minimum Payments Required | $ 8,596 |

### NOTE 8 – SUBSEQUENT EVENTS:

Effective January 1, 2014, Southern California Edison Company and STP Nuclear Operating Company were no longer members of the Company.

B26 (Official Form 26) – Cont.

**Tab C**

**2013 Collin G / G&B**

COLLIN G/G&B, LLC
(A DELAWARE LIMITED LIABILITY COMPANY)

CONSOLIDATED FINANCIAL STATEMENTS
AND REPORT OF INDEPENDENT
CERTIFIED PUBLIC ACCOUNTANTS

DECEMBER 31, 2013

LANE GORMAN TRUBITT PLLC
*Accountants & Advisors*

COLLIN G/G&B, LLC
(A DELAWARE LIMITED LIABILITY COMPANY)

CONSOLIDATED FINANCIAL STATEMENTS
AND REPORT OF INDEPENDENT
CERTIFIED PUBLIC ACCOUNTANTS

DECEMBER 31, 2013

COLLIN G/G&B, LLC
(A DELAWARE LIMITED LIABILITY COMPANY)

CONTENTS

|  | Page |
|---|---|
| REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS | 1 |
| CONSOLIDATED FINANCIAL STATEMENTS | |
| CONSOLIDATED BALANCE SHEETS | 2 |
| CONSOLIDATED STATEMENTS OF OPERATIONS | 3 |
| CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' CAPITAL | 4 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS | 5 |
| NOTES TO CONSOLIDATED FINANCIAL STATEMENTS | 6 – 11 |



LANE GORMAN TRUBITT PLLC
*Accountants & Advisors*

Report of Independent Certified Public Accountants

The Members
Collin G/G&B, LLC

Report on the Financial Statements

We have audited the accompanying consolidated financial statements of Collin G/G&B LLC and Subsidiary, which comprise the consolidated balance sheet as of December 31, 2013, and related consolidated statements of operations, changes in members' capital and cash flows for the year then ended, and the related notes to the consolidated financial statements.

Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America. This includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

Opinion

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Collin G/G&B LLC and Subsidiary as of December 31, 2013, and the results of their operations and their cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

Other Matter

The 2012 financial statements were compiled by us and our report thereon dated May 9, 2013, stated we did not audit or review those financial statements and, accordingly, express no opinion or any other form of assurance on them.

LANE GORMAN TRUBITT, PLLC

Dallas, Texas
April 2, 2014

Members of AICPA & The Leading Edge Alliance

2626 Howell Street  |  Suite 700  |  Dallas, TX 75204-4064  |  214.871.7500  |  Fax 214.871.0011  |  Toll Free 877.231.7500  |  www.lgt-cpa.com

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
CONSOLIDATED BALANCE SHEETS
December 31,

|  | 2013 | (Unaudited) 2012 |
|---|---|---|
| **ASSETS** | | |
| PROPERTY HELD FOR INVESTMENT - at cost | | |
| Land and improvements | $ 6,204,401 | $ 5,899,376 |
| Construction in progress | - | - |
| Total property held for investment | 6,204,401 | 5,899,376 |
| OTHER ASSETS | | |
| Cash and cash equivalents | 40,429 | 451,748 |
| Escrow funds | 24,423 | 25,000 |
| Total other assets | 64,852 | 476,748 |
| | $ 6,269,253 | $ 6,376,124 |
| **LIABILITIES AND MEMBERS' CAPITAL** | | |
| LIABILITIES | | |
| Accounts payable and other liabilities | $ 23,068 | $ - |
| Total liabilities | 23,068 | - |
| Commitments and contingencies | - | - |
| MEMBERS' CAPITAL | | |
| Capital member | 4,881,718 | 4,977,873 |
| Operating member | 1,364,467 | 1,398,251 |
| Total members' capital | 6,246,185 | 6,376,124 |
| | $ 6,269,253 | $ 6,376,124 |

The accompanying notes are an integral part of these financial statements.

2

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
CONSOLIDATED STATEMENTS OF OPERATIONS
Year ended December 31, 2013 and period ended December 31, 2012

|  | Year ended December 31, 2013 | (Unaudited) Period ended December 31, 2012 |
|---|---|---|
| REVENUE |  |  |
| Rental income | $ - | $ - |
| Total revenues | - | - |
|  |  |  |
| COSTS AND EXPENSES |  |  |
| Property operating expenses |  |  |
| Property taxes and insurance | 26,509 | 1,861 |
| General and administrative | 103,430 | 25,000 |
| Total costs and expenses | 129,939 | 26,861 |
|  |  |  |
| NET LOSS | $ (129,939) | $ (26,861) |

The accompanying notes are an integral part of these financial statements.

3

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
CONSOLIDATED STATEMENT OF CHANGES IN MEMBERS' CAPITAL
Year ended December 31, 2013 and period ended December 31, 2012

| | Initial Capital Contribution Accounts | | |
| | Capital Member | Operating Member | Total |
| --- | --- | --- | --- |
| Balance at November 16, 2012 (Inception) | $ - | $ - | $ - |
| Capital contributions | 6,222,750 | 1,405,235 | 7,627,985 |
| Distributions | (1,225,000) | - | (1,225,000) |
| Net loss | (19,877) | (6,984) | (26,861) |
| Balance at December 31, 2012 | 4,977,873 | 1,398,251 | 6,376,124 |
| Net loss | (96,155) | (33,784) | (129,939) |
| Balance at December 31, 2013 | $ 4,881,718 | $ 1,364,467 | $ 6,246,185 |

The accompanying notes are an integral part of these financial statements.

4

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
CONSOLIDATED STATEMENTS OF CASH FLOWS
Year ended December 31, 2013 and period ended December 31, 2012

|  | 2013 | (Unaudited) 2012 |
|---|---|---|
| Cash flows from operating activities: |  |  |
| Net loss | $ (129,939) | $ (26,861) |
| Adjustments to reconcile net loss to net cash used in operating activities |  |  |
| Change in operating assets and liabilities: |  |  |
| Escrow funds | 577 | (25,000) |
| Accounts payable and other liabilities | 23,068 | - |
| Net cash used in operating activities | (106,294) | (51,861) |
|  |  |  |
| Cash flows from investing activities: |  |  |
| Additions to property held for investment | (305,025) | (194,626) |
| Net cash used in investing activities | (305,025) | (194,626) |
|  |  |  |
| Cash flows from financing activities: |  |  |
| Capital contributions | - | 1,923,235 |
| Distributions | - | (1,225,000) |
| Net cash provided by financing activities | - | 698,235 |
|  |  |  |
| Net increase (decrease) in cash and cash equivalents | (411,319) | 451,748 |
|  |  |  |
| Cash and cash equivalents at beginning of period | 451,748 | - |
|  |  |  |
| Cash and cash equivalents at end of period | $ 40,429 | $ 451,748 |
|  |  |  |
| Supplemental disclosures of cash flow information: |  |  |
| Interest paid | $ - | $ - |
| Income taxes paid | $ - | $ - |
|  |  |  |
| Noncash investing and financing activities: |  |  |
| Contributed property held for investment | $ - | $ 5,704,750 |

The accompanying notes are an integral part of these financial statements.

5

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NATURE OF BUSINESS

Collin G/G&B, LLC (the "Company"), is a Delaware limited liability company. The Company was established to purchase, develop, market and sell property for the purpose of residential lots and retail development in Frisco, Texas. The total development will consist of roughly 400 to 450 residential lots (depending on lot size allocations) with associated green space covering approximately 165 acres, retail and pad sites covering roughly 19 acres. In addition, there will be an amenity center for the residential project, a possible school site and several other market-determined features.

Members in the Company include Greenway/G&B Frisco L.P. (the "Operating Member" or "Manager") and Greenway Development Holding Company, LLC (the "Capital Member"). The Company's operations are governed by the Limited Liability Company Agreement (the "Agreement"). Members should refer to the Agreement for a detailed description of its terms and provisions.

The Company will have perpetual existence, unless sooner dissolved upon the occurrence of certain events specified in the Agreement. Upon dissolution of the Company, the Operating Member will promptly wind up the affairs of the Company and make final distributions as provided by the Agreement.

1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

A summary of significant accounting policies applied in the preparation of the accompanying financial statements follows.

Principles of Consolidation

The consolidated financial statements include the accounts of the Company and its subsidiary, Rock Hill & Preston Retail, LLC. Significant intercompany accounts and transactions have been eliminated upon consolidation.

Cash and Cash Equivalents

Cash and cash equivalents consist of short-term, highly-liquid instruments with an original maturity when purchased of three month or less. The Company maintains its cash balances in financial institutions located in Texas, which at times may exceed insured limits. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash and cash equivalents.

Property Held for Investment

*Construction in Progress*

Costs associated with development and construction are capitalized into construction in progress at cost. Depreciation on property held for investment, excluding land and improvements, will commence when the constructed asset is completed and placed into service. General and administrative costs are charged to expense as incurred. Development and construction activities have not yet commenced as of December 31, 2013.

*Property and Equipment*

Property and equipment acquisitions are recorded at cost. Expenditures for maintenance and repairs are charged to expense as incurred. Depreciation and amortization is provided using straight-line methods over their estimated useful lives. Upon the sale or disposition of property and equipment, its cost and the related accumulated depreciation are eliminated from the respective accounts, and gains or losses arising from the disposition are recognized in operations.

Members' Capital

*Initial Capital Contribution*

The initial Capital Member made a capital contribution of $6,222,750 consisting of land and improvements of $5,704,750 and cash of $518,000. The initial Operating Member made a capital contribution of $1,405,235, consisting of cash.

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

   Members' Capital (continued)

   *Additional Capital Contributions*

   After the initial capital contributions have been made, Members shall only be obligated to make additional capital contributions ("Project Capital Contributions") to the extent such contributions are expressly provided for in the business plan or in a budget (it being agreed and acknowledged that Capital Member shall not have any obligation to make any Project Capital Contributions unless such Project Capital Contribution is expressly approved by the Capital Member in its sole and absolute discretion and that the Operating Member is responsible for the payment of all cost overruns as provided in the Agreement. Project Capital Contributions, if any, shall be made by the Members in proportion to their respective Capital Sharing ratios (26% from the Operating Member and 74% from the Capital Member). Members are entitled to receive a preferred return on any such capital contributions.

   If a Member defaults in making additional capital contributions, the non-delinquent Member may elect (a) to not make its share of the requested capital contribution, or (b) to contribute its share of the requested capital contribution and none or any portion of the delinquent Member's capital contribution, in which case, all capital contributions made by the non-delinquent Member in respect of the requested capital contribution (including the non-delinquent Member's capital contribution in respect thereof) shall constitute a "Default Capital Contribution" by the non-delinquent Member. Members are entitled to receive a preferred return on any such capital contributions.

   *Return of Capital Contributions*

   Except as otherwise specifically provided in the Agreement, no Member shall be entitled to (a) the return of any part of its capital contributions, (b) any interest in respect of any capital contribution, or (c) the fair market value of its membership interest in connection with a withdrawal from the Company or otherwise. Unpaid capital contributions are not liabilities of the Company or of any Member. No Member is required to contribute or lend any cash or property to the Company to enable the Company to return any Member's capital contributions.

   *Distributions*

   From time to time, but not less often than quarterly, the Manager and the Capital Member shall determine the amount, if any, by which the Company's available cash then on hand exceeds the reasonable working capital needs of the Company, including reasonable reserves for future Company obligations. Any excess funds shall be distributed to the Members as provided in the Agreement.

   *Additions and Dispositions of Membership Interests*

   Additional membership interests (or new classes or groups of Members) may be created and issued to existing Members or to other persons, and such other persons may be admitted to the Company as Members, with the written approval of the Manager and the Capital Member, on such terms and conditions as the Manager and the Capital Member may determine at the time of admission.

   A Member may not assign, transfer, or dispose (voluntarily, involuntarily or by operation of law) of all or any portion of its membership interest, nor pledge, mortgage, hypothecate, grant a security interest in, or otherwise encumber all or any portion of its membership interest, except with the consent of the other member or as permitted in the Agreement. No Member has the right or power to withdraw or resign as a Member of the Company without the prior consent of each other Member, except as permitted in the Agreement. No Member may be expelled from the Company. If the Capital Member removes the Operating Member as Manager, then at any time thereafter the Capital Member may elect to exercise the purchase right or the buy-sell option as provided in the Agreement.

   *Member Liability*

   Except as otherwise required by applicable law, a Member is not liable for the debts, obligations or liabilities of the Company or any other Member.

7

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Members' Capital (continued)

*Allocations of Earnings and Losses*

Earnings and losses are allocated to the Members in accordance with the Agreement.

Income Taxes

For Federal income tax purposes the Company is taxed as a partnership and the members are taxed on their proportionate share of the Company's taxable income.  Therefore, no provision or liability for Federal income tax has been included in these financial statements.  The Company is subject to franchise tax in the State of Texas.

The Company's Federal income tax returns are subject to examination by the Internal Revenue Service ("IRS").  Since many types of transactions are susceptible to varying interpretations under Federal income tax laws and regulations, amounts reported in the accompanying financial statements may be subject to change if successfully challenged by the IRS.

The Financial Accounting Standards Board issued guidance on accounting for uncertainty in income taxes. Management evaluated the Company's tax positions and concluded that the Company had taken no uncertain tax positions that require adjustment to the financial statements to comply with the provisions of this guidance.  However, the conclusions regarding accounting for uncertainty in income taxes are subject to review and may be adjusted at a later date based on factors including, but not limited to, ongoing analysis of tax laws, regulations, and interpretations thereof. With few exceptions, the Company is no longer subject to income tax examinations for years before 2010.

Advertising Costs

The Company's policy is to expense all advertising costs in the year in which the advertising first takes place.  Advertising expenses were approximately $162 for the year ended December 31, 2013.

Use of Estimates

In preparing the Company's financial statements, management is required to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.  Actual results could differ from those estimates.

2.  RELATED PARTY TRANSACTIONS

The Company incurred legal fees of $62,089 from a related party during 2013.  The Company also incurred accounting fees of $2,400 from a related party during 2013. Included in accounts payable at December 31, 2013 are related party accounts payable of $8,357.

3.  COMMITMENTS AND CONTINGENCIES

Environment Regulations

The Company is subject to environmental regulations related to the ownership, management, development and acquisition of real estate.  The cost of complying with the environmental regulations was not material to the Company's financial statements for the year ended December 31, 2013. Management is not aware of any environmental condition on its property which is likely to have a materially adverse effect on the Company's financial statements.

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

3.   COMMITMENTS AND CONTINGENCIES (Continued)

Property Acquisitions

The Company entered into a commercial contract of sale to purchase a 1.11 acre tract of land in Frisco, Texas. The original purchase price of the property was $350,000 payable in cash at closing.  The initial closing date of December 6, 2012, has been extended to February 28, 2014.  In the event the Company elects to extend the closing date, the purchase price increases by 4% per annum to the actual date of closing.  The accrued difference between the original purchase price and the increased purchase price is non-refundable.

The Company entered into a commercial contract of sale to purchase a 5.11 acre tract of land in Frisco, Texas. The original purchase price of the property was $2,669,008 payable in cash at closing.  The initial closing date of December 15, 2012, was extended to December 16, 2013. In the event the Company elects to extend the closing date, the purchase price increases by 4% per annum to the actual date of closing.  The accrued difference between the original purchase price and the increased purchase price is generally non-refundable.  On December 16, 2013, the purchase price was increased to $2,695,658 and the contract of sale was assigned from the Company to a related limited liability company.  The closing took place on December 16, 2013.

Buy-Sell Option

The Members have agreed to a procedure under which one Member may purchase the other Member'' membership interest in the Company or obligate the other Member to purchase its membership interest in the Company on the following terms and conditions:

The Member initiating the Buy-Sell Option (the "Offeror") shall first deliver a notice (the "Offer Notice") to the other Member (the "Offeree"): (a) stating that Offeror is initiating the Buy-Sell Option; (b) stating the amount which Offeror would be willing to pay for the assets of the Company as of the buy-sell closing date, free and clear of all liabilities (the "Buy-Sell Valuation Amount"); arid (c) describing all written offers or inquiries received by Offeror during the previous twelve months relating to the financing, disposition, sale or lease of any Company property (including proposals for the formation of any new entity for the ownership and operation of the project) (other than lot sales contracts).

Within 30 days following its receipt of an Offer Notice (the "Election Period"), Offeree must elect either: (a) to sell its entire membership interest to Offeror for an amount equal to the amount Offeree would have been entitled to receive if the Company had sold its assets for the Buy-Sell Valuation Amount on the buy-sell closing date and the Company had immediately paid all Company liabilities and distributed the net proceeds of sale to the Members, or (b) purchase the entire membership interest of Offeror for an amount equal to the amount Offeror would have been entitled to receive if the Company had sold all of its assets for the Buy-Sell Valuation Amount on the buy-sell closing date and the Company had immediately paid all Company liabilities and distributed the net proceeds of the sale to the Members.

If Offeree does not elect to acquire Offeror's membership interest within the Election Period, Offeree shall be deemed to have elected to sell its interest to Offeror. Within seven business days after an election has been made (whether deemed or otherwise), the acquiring Member shall deposit with the selling Member a non-refundable earnest money deposit in the amount of five percent of the amount the selling Member is entitled to receive for its membership interest, which amount shall he applied to the purchase price at closing; however, if the acquiring Member should thereafter fail to consummate the transaction other than as a result of a breach by the non-acquiring member, such amount shall be retained as liquidated damages by the selling Member, free of all claims of the acquiring Member. The defaulting acquiring Member shall have no further right to initiate the provisions of this article as Offeror for a period of twelve months after the latest date provided for the buy-sell closing date, and the amount of non-refundable earnest money to be paid by such defaulting member if it ever invokes its right to purchase the entire membership interest of Offeror shall be increased to twenty percent of the amount the selling Member is entitled to receive for its membership interest.

Put Option

The Operating Member agrees, on notice from the Capital Member as provided in the Agreement, to purchase the Capital Member's membership interest, in consideration of the payment of an amount equal to $33,750 per acre of the land owned by the Company (the "Put Option Valuation").

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

3.   COMMITMENTS AND CONTINGENCIES (Continued)

Put Option (continued)

In addition to any other remedy available to the Capital Member, if, after a put notice, the Operating Member fails to timely deposit with the Capital Member the put option earnest money, or if, after having deposited the put option earnest money, the Operating Member fails to timely pay the Put Option Valuation to the Capital Member, then, in the case of the Operating Member's failure to pay the Put Option Valuation, the Capital Member may retain the put option earnest money, and, in either case, upon notice to the Operating Member and payment of $1,000 by the Capital Member to the Operating Member, the Capital Member may be and become the sole Member of the Company and the Operating Member automatically shall be deemed to have assigned and transferred to the Capital Member, the Operating Member's membership interest and to have withdrawn from the Company, and the Capital Member, or a person designated by the Capital Member shall be deemed to have become the Manager.

Right of First Offer

If either Member desires to offer the entire project or all of the membership interests for sale on specified terms or receives from an unaffiliated purchaser a bona fide written cash offer (i.e., not seller financed) for the purchase of the project or all of the membership interests on terms which such Member desires for the Company or the Members to accept (such specified terms or bona fide offer being herein called the "Offer"), the Member desiring to make or accept the Offer ("Initiating Member") may exercise its right to sell the project or all of the membership interests by providing notice of the terms of such Offer (the "Sale Notice"") to the other Member ("Non--initiating Member"), Any offer must equal or exceed the greater of (a) the Put Option Valuation and (b) the amount of any indebtedness secured by the project, including all payoff fees, yield maintenance and penalty amounts, together with all unreturned capital contributions. Additionally, the Operating Member may not deliver an Offer as the Initiating Member if a removal event has occurred with respect to the Operating Member.

The Non-Initiating Member shall have 15 days from the date of the Sale Notice (the "Response Period") to provide notice to the Initiating Member of its willingness or unwillingness to make or accept the Offer; failure to deliver such notice shall constitute an election to sell the project on the terms of the Offer.

If the Non-Initiating Member does not desire for the Company to make or accept the Offer, the Initiating Member may elect to sell to the Non-Initiating Member, in which case Non-Initiating Member must purchase Initiating Member's membership interest for an amount equal to ninety percent of the amount that would be distributable to the Initiating Member if the Company had accepted the Offer, closed the sale pursuant to the Offer and, if applicable, wound up its affairs. Initiating Member must exercise this option, if at all, by delivering written notice thereof to Non-Initiating Member within 20 days after the end of the Response Period. The Non-Initiating Member shall pay Initiating Member cash for its membership interest. Closing shall take place on or before the date specified in the Sale Notice, but if the Non-Initiating Member is purchasing Initiating Members" membership interest, the Non-Initiating Member shall have until 120 days after the Sale Notice in which to close. If the Initiating Member or the Non-Initiating Member defaults at closing, the non-defaulting party shall have the right to bring suit for damages, for specific performance, or exercise any other remedy available and the defaulting Member shall have no further right to invoke the provisions of this article as the Initiating Member or to reject an Offer during the existence of the Company.

If the Non-Initiating Member consents to the Company selling the project or all the membership interests on the terms of the Offer, then the Initiating Member shall be allowed to consummate such sale for cash on the terms of the Offer for a period of up to 60 days following the expiration of the Response Period. If the Initiating Member obtains a bona fide third party contract to sell the project or all membership interests on the terms of the Offer within such 60-day period, Initiating Member shall have an additional period of 60 days after the date of such contract (that is, within 120 days after the expiration of the Response Period) in which to consummate the sale. If after having received the consent of the Non-Initiating Member to the sale of the project or all membership interests on the terms of the Offer, Initiating Member is unable to obtain a bona fide contract within such 60-day period, or if after having obtained such bona fide contract, the Initiating Member is unable to consummate such sale within 120 days after the expiration of the Response Period, then the Initiating Member must again submit an Offer to the Non-Initiating Member under the terms of this article before it may sell the project or all of the membership interests.

Collin G/G&B, LLC
(A Delaware Limited Liability Company)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

4.   SUBSEQUENT EVENTS

Management has evaluated subsequent events through April 2, 2014, which is the date the financial statements were available to be issued.

B26 (Official Form 26) – Cont.

## Tab D

### 2013 Comanche Peak

**Comanche Peak Nuclear Power Company LLC**
**A Development Stage Enterprise**

**FINANCIAL STATEMENTS**

**AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2013 AND**
**DECEMBER 31, 2012 AND FOR THE CUMULATIVE PERIOD FROM**
**SEPTEMBER 8, 2008 (DATE OF INCORPORATION)**
**TO DECEMBER 31, 2013**

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **A&R LLC Agreement** | CPNPC Amended and Restated Limited Liability Agreement, dated January 30, 2009, entered into by NEFH II and MHI Nuclear for the purpose of developing two new nuclear generation units. The development period commenced on September 1, 2008 and will continue until the earlier of (a) the issuance of the combined operating license or; (b) termination by NEFH II.  See Note 1 to Financial Statements for discussion of the proposed April 2014 amendment to this agreement. |
| **COLA** | Combined Operating License Application filed with the NRC on September 19, 2008 that if granted would provide CPNPC a permit to construct and operate the two new nuclear generation units with MHI's US-APWR reactor technology. |
| **Committed Capital Contribution** | Cash capital that NEFH II and MHI Nuclear are committed to fund during the development stage of the Company subject to the terms of A&R LLC Agreement.  See Note 1 to Financial Statements for discussion of amendments in April 2014. |
| **CPNPC** | Refers to Comanche Peak Nuclear Power Company LLC (formerly NEPCO), a joint venture formed in January 2009 by NEFH II and MHI Nuclear to further the development of two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. Under the terms of the joint venture, NEFH II holds an 88% membership interest in the company, and MHI Nuclear has a 12% membership interest. |
| **DSA** | Development Services Agreement entered into in January 2009 by CPNPC and Luminant Generation under which Luminant Generation is to provide certain development services to CPNPC as discussed in Note 2 to Financial Statements. |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries.  Luminant Generation is an indirect wholly-owned subsidiary of EFH Corp. |
| **EPC** | Engineering, Procurement and Construction |
| **ESA** | Engineering Services Agreement entered into in January 2009 by CPNPC and MNES under which MNES is to provide site-specific engineering services necessary to achieve project financing and EPC contracts in support of the project, which includes design criteria and design basis, total project scope, EPC cost estimate, and project schedule. See Note 2 to Financial Statements for discussion of the suspension of this agreement in April 2014. |

| | |
|---|---|
| **Financial Closing** | The anticipated project financing that will close between CPNPC and the applicable lenders providing the necessary debt funds for the construction of a unit. |
| **Ground Lease** | Ground Lease and Reciprocal Easements and Covenants Agreement entered into by NEFH I and CPNPC in January 2009 for approximately 920 acres representing the site on which the new nuclear generation units would be located. See Note 1 to Financial Statements. |
| **Luminant Generation** | Luminant Generation Company LLC, a Texas limited liability company, and/or its subsidiaries as determined in context, is an indirect wholly-owned subsidiary of EFH Corp. engaged in the generation of electricity in Texas utilizing nuclear, lignite/coal and gas/oil-fueled generation units. |
| **MHI** | Mitsubishi Heavy Industries, Ltd., and/or its subsidiaries as determined in context, is a global heavy machinery manufacturer providing industrial products and services to various industries including shipbuilding, power plants, chemical plants, environmental equipment, steel structures, aircraft, space rocketry and air-conditioning systems. |
| **MHI Nuclear** | MHI Nuclear North America, Inc., a direct wholly-owned subsidiary of MHI that holds a direct ownership interest in CPNPC. |
| **MNES** | Mitsubishi Nuclear Energy Systems, Inc., a direct wholly-owned subsidiary of MHI. |
| **MW** | Megawatts |
| **NEFH I** | Nuclear Energy Future Holdings I LLC, a direct wholly-owned subsidiary of Luminant Generation that holds the Ground Lease with CPNPC |
| **NEFH II** | Nuclear Energy Future Holdings II LLC, a direct wholly-owned subsidiary of NEFH I, that holds the direct ownership interest in CPNPC |
| **NRC** | US Nuclear Regulatory Commission |
| **NEPCO** | Nuclear Energy Project Company LLC was the original Delaware entity formed in September 2008. In January 2009, the name was changed to CPNPC as a part of the A&R LLC Agreement. |
| **SG&A** | Selling, general and administrative expenses |
| **US** | United States of America |
| **US-APWR** | Advance Pressurized Water Reactor technology for use in the US that is designed, developed and held by MHI. . |
| **US GAAP** | Generally accepted accounting principles or accounting rules used to prepare, present, and report financial statements in the United States, as established by the Financial Accounting Standards Board. |

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**
**A Development Stage Enterprise**
**STATEMENTS OF OPERATIONS**
**(Thousands of US dollars)**

| | Year Ended December 31, 2013 | Year Ended December 31, 2012 | Cumulative period from September 8, 2008 (date of incorporation) to December 31, 2013 |
|---|---|---|---|
| Operating revenues ................................. | $          - | $          - | $          - |
| Selling, general and administrative expenses ……………………………... | (133) | (266) | (1,889) |
| Asset impairment expense (Note 5) ........ | (140,284) | - | (140,284) |
| Loss on property sale ............................. | - | - | (15) |
| Interest income........................................ | - | - | 30 |
| Net loss  ................................................ | $   (140,417) | $      (266) | $   (142,158) |

See Notes to Financial Statements.

1

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**
**A Development Stage Enterprise**
**STATEMENTS OF CASH FLOWS**
**(Thousands of US dollars)**

| | Year Ended December 31, 2013 | Year Ended December 31, 2012 | Cumulative period from September 8, 2008 (date of incorporation) to December 31, 2013 |
|---|---|---|---|
| **Cash flows — operating activities:** | | | |
| Net loss ............................................. | $    (140,417) | $      (266) | $    (142,158) |
| Adjustments to reconcile net loss to cash used in operating activities: | | | |
| Net loss on property sale | - | - | 15 |
| Impairment of assets | 140,284 | - | 140,284 |
| Changes in operating assets and liabilities: | | | |
| Accounts payable to affiliates.................. | (4) | (14) | 7 |
| Other liabilities ....................................... | (10) | (40) | - |
| Cash used in operating activities.............. | (147) | (320) | (1,852) |
| **Cash flows — financing activities:** | | | |
| Capital contributions from members ............... | 5,659 | 7,319 | 108,730 |
| Deferred financing costs (Note 1) .................... | (30) | (33) | (3,728) |
| Cash provided by financing activities...... | 5,629 | 7,286 | 105,002 |
| **Cash flows — investing activities:** | | | |
| Capital expenditures ......................................... | (5,535) | (7,878) | (101,937) |
| Proceeds from property sale -net | - | - | 73 |
| Cash used in investing activities.............. | (5,535) | (7,878) | (101,864) |
| Net change in cash and cash equivalents ............ | (53) | (912) | 1,285 |
| Cash and cash equivalents — beginning balance.. | 1,338 | 2,250 | 0 |
| Cash and cash equivalents — ending balance....... | $     1,285 | $     1,338 | $     1,285 |
| **Supplemental Noncash Investing and Financing Activities:** | | | |
| Noncash contribution of assets by Luminant Generation  …………………………….......... | $        - | $        - | $36,641 |
| Noncash construction expenditures end-of-period accruals  …………………………….. | $626 | $1,119 | $626 |

See Notes to Financial Statements

2

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**
**A Development Stage Enterprise**
**BALANCE SHEET**
**(Thousands of US dollars)**

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $    1,285 | $    1,338 |
| Total current assets | 1,285 | 1,338 |
| Property, plant and equipment (Note 1) | 2,562 | 134,075 |
| Deferred financing costs (Note 1) | - | 3,704 |
| Total assets | $    3,847 | $    139,117 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Trade accounts payable – nonaffiliates | $    397 | $    814 |
| Accounts payable to affiliates (Note 1) | 222 | 332 |
| Accrued taxes other than income | 14 | 0 |
| Total current liabilities | 633 | 1,146 |
| Total liabilities | 633 | 1,146 |
| Commitments and Contingencies (Note 2) | | |
| Membership interests | 145,371 | 139,712 |
| Deficit accumulated during the development stage | (142,157) | (1,741) |
| Total membership interests (Note 3) | 3,214 | 137,971 |
| Total liabilities and membership interests | $    3,847 | $    139,117 |

See Notes to Financial Statements.

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**
**A Development Stage Enterprise**
**STATEMENTS OF MEMBERSHIP INTERESTS**
**(Thousands of US Dollars)**

|  | Period from September 8, 2008 (date of incorporation) to December 31, 2013 |
|---|---|
| Membership interests: | |
| Balance at Date of Incorporation (September 8, 2008) | $            - |
| Balance at December 31, 2008 | - |
| | |
| Balance at beginning of period (January 1, 2009) | - |
| Net loss | (447) |
| Capital contributions from members | 84,448 |
| Balance at  December 31, 2009 | $     84,001 |
| | |
| Balance at January 1, 2010 | 84,001 |
| Net loss | (589) |
| Capital contributions from members | 32,177 |
| Balance at December 31, 2010 | $   115,589 |
| | |
| Balance at January 1, 2011 | 115,589 |
| Net loss | (439) |
| Capital contributions from members | 15,768 |
| Balance at December 31, 2011 | $   130,918 |
| | |
| Balance at January 1, 2012 | 130,918 |
| Net loss | (266) |
| Capital contributions from members | 7,319 |
| Balance at December 31, 2012 | $   137,971 |
| | |
| Balance at January 1, 2013 | 137,971 |
| Net loss | (140,417) |
| Capital contributions from members | 5,659 |
| Balance at December 31, 2013 | $     3,214 |

See Notes to Financial Statements.

**COMANCHE PEAK NUCLEAR POWER COMPANY LLC**
**A Development Stage Enterprise**
**NOTES TO FINANCIAL STATEMENTS**

1.    **BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

*Description of Business*

See "Glossary" for definition of terms and abbreviations.

In July 2007, Luminant Generation and MNES entered into a services agreement, whereby MNES would provide services to Luminant Generation in the preparation of a COLA to be filed with the NRC for the construction and operation of two new nuclear generation units.   On September 8, 2008, Luminant Generation formed three new Delaware limited liability companies, CPNPC (formerly NEPCO), Nuclear Energy Future Holdings I LLC (NEFH I), and Nuclear Energy Future Holdings II LLC (NEFH II), all wholly-owned subsidiaries of Luminant Generation which would ultimately hold the assets and conduct the development, construction, and operating activities of the two new nuclear generation units.   NEFH II is a direct wholly-owned subsidiary of NEFH I and NEFH I is a direct wholly-owned subsidiary of Luminant Generation, which is an indirect, wholly owned subsidiary of EFH Corp.   NEFH II holds Luminant Generation's ownership interest in CPNPC.   See Note 6 for discussion of EFH Corp.'s and the substantial majority of its direct and indirect subsidiaries, including Luminant Generation, but not including NEFH I, NEFH II or CPNPC, filing on April 29, 2014, of voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the Bankruptcy Court).

In January 2009, the limited liability agreement of CPNPC was amended and restated to admit as a member, MHI Nuclear, to further develop the two new nuclear generation units using MHI's US-Advanced Pressurized Water Reactor technology.   Under the terms of the amended and restated limited liability agreement, NEFH II would own an 88% membership interest in the joint venture and MHI Nuclear would own a 12% membership interest in the joint venture.   In exchange for the initial contribution of the members in January 2009, CPNPC issued 35.2 million membership units to NEFH II and 4.8 million units to MHI Nuclear totaling 40.0 million membership units.   Also, in January 2009, (a) Luminant Generation entered into a Development Services Agreement (DSA) with CPNPC to provide development services for the COLA; (b) MNES entered into an Engineering Services Agreement (ESA) with CPNPC to provide engineering services to the joint venture and; (c) NEFH I entered into a ground lease with CPNPC to lease approximately 920 acres of land, adjacent to Luminant Generation's existing nuclear generation facilities in Texas, to be used for the construction and operation of two new nuclear generation units.

CPNPC is a development stage enterprise since it is devoting substantially all of its efforts to establish a new business and planned principal operations have not commenced.   CPNPC is funded by capital contributions by its two members.   CPNPC is reliant upon such capital contributions, together with proceeds from anticipated financing arrangements to obtain a license, construct and operate the two nuclear generation units.

In the fourth quarter 2013, MHI notified CPNPC, Luminant Generation and the NRC of its plans to refocus MHI's US resources on the restart of nuclear reactors in Japan and thus reduce its support of review activities related to the NRC's Design Certification of MHI 's US-APWR technology for an indeterminate period of time.   As a result, Luminant Generation has notified the NRC on behalf of CPNPC of its intent to suspend all reviews associated with the COLA by March 31, 2014 for an indeterminate period of time.   CPNPC does not intend to withdraw the license application at this time.    While in suspension, any requests for additional information from the NRC are expected to be answered timely.   MHI expressed to the NRC its continuing commitment to obtaining an NRC design certification for its technology.   CPNPC filed a loan guarantee application with the DOE for financing the proposed units prior to commencement of construction, and expects to continue to update the application in accordance with the loan solicitation guidelines.

In April 2014, MHI Nuclear and NEFH II amended the A&R Agreement (Second A&R LLC Agreement), several other agreements and entered into other agreements describing the suspension and detailing current activities (the Suspension Amendments), all subject to approval for Luminant Generation by the Bankruptcy Court discussed above and in Note 6.  The terms of these amendments and agreements include:

- minimizing CPNPC's activities in support of the NRC's Design Certification (DC) of MNES's US-APWR technology;
- suspending activities on the COLA in accordance with a structured work suspension plan for an indefinite period of time;
- suspending but, but not withdrawing, the DOE loan guarantee application, if possible, during the suspension period with Luminant Generation providing required DOE activities and updates;
- modifying CPNPC's Long-Term Budget to minimize expenses after March 31, 2014 with MHI Nuclear funding all amounts;
- Eliminating NEFH II's Committed Capital Contribution and MHI's guarantee of MHI Nuclear's funding commitments;
- reflecting the right of either owner to terminate CPNPC in 5 years without penalty or liability to the other owner;
- reflecting the right of MHI Nuclear to make any further decisions with respect to the DC without obligation or liability to CPNPC or Luminant Generation and after assignment of the COLA to Luminant Generation, the right of Luminant Generation to make any further decisions and take any further actions with respect to activities related to the COLA and the development of the project without the consent or any obligation or liability to the CPNPC or MHI;
- entering into an assignment agreement assigning CPNPC's assets to MHI Nuclear if related to MHI's US-APWR technology or to NEFH II for other assets, for no monetary consideration with an agreement that if and when the parties mutually agree to resume activities related to the COLA, the parties would agree on which assets will be returned to the CPNPC, generally at the same basis originally transferred to plus any applicable expenses incurred by NEFH II in connection with the assets; and
- terminating Luminant Generation's commitment to supply water rights to CPNPC and transferring the Ground Lease and CPNPC's land and easement rights to a Luminant Generation subsidiary.

The development of the amendments and new agreements triggered an analysis of the recoverability of the joint venture's assets that resulted in the impairment discussed in Note 5.

Due to the suspension of the licensing activities for an indefinite period of time, and the development of the amendments to the A&R LLC Agreement and several other agreements and entry into other agreements, subject to approval as discussed above (including the provisions that allow the parties to unilaterally take certain actions with respect to future development activities, including cessation of such activities), it is uncertain whether CPNPC would be able to obtain the funding from its owners and/or anticipated financing arrangements to obtain a license, construct and operate the two new nuclear generation units, or when such license would be obtained.

In addition to the suspension, CPNPC is subject to certain risks and uncertainties, including but not limited to, obtaining a combined operating license and approved design certificate from the NRC based on the MHI US-APWR technology, environmental and neighboring community opposition, uncertain energy prices, change to regulatory structure in Texas, supplier and manufacturing dependence, competition in capital markets, and other risks related to governmental regulations and approvals.  There is no assurance CPNPC will be able to obtain a combined operating license to construct and operate the new nuclear generation units, the US-APWR technology will be accepted by the NRC.  Additionally, there is no assurance that CPNPC will operate profitably.  As a result, substantial doubt exists regarding whether CPNPC will continue as a going concern and would be able to continue its primary purpose of obtaining a COLA and further developing the two new nuclear units utilizing the MHI US-APWR technology.

6

*Significant Accounting Policies*

**Basis of Presentation** — The financial statements of CPNPC have been prepared in accordance with US GAAP. CPNPC is a development stage enterprise. The financial statements have been prepared assuming CPNPC will continue as a going concern but do not reflect the liquidation basis of accounting. All dollar amounts in the financial statements and tables in the notes are stated in thousands of US dollars unless otherwise indicated. Subsequent events have been evaluated through June 5, 2014 the date these financial statements were issued.

**Use of Estimates** — Preparation of the financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet date. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

**Impairment of Long-Lived Assets** — CPNPC evaluates long-lived assets for impairment whenever indications of impairment exist. The carrying value of such assets are deemed to be impaired if the projected undiscounted cash flows are less than the carrying value. If there is such an impairment, a loss would be recognized based on the amount by which the carrying value exceeds the fair value. Fair value is determined primarily by available market valuations, if applicable. See "Description of Business." See Note 5 for discussion of an impairment of assets recorded during the year ended December 31, 2013.

**Accounting for Contingencies** — The financial results of CPNPC may be affected by judgments and estimates related to loss contingencies. Accruals for loss contingencies are recorded when management determines it is probable an asset has been impaired or a liability has been incurred and that such economic loss can be reasonably estimated. Such determinations are subject to interpretations of current facts and circumstances, forecasts of future events and estimates of the financial impacts of such events. See Note 2.

**Cash and Cash Equivalents** — For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents. Cash is concentrated at a major financial institution.

**Property, Plant and Equipment** — Properties are stated at historical cost. The cost of property additions includes materials and both direct and indirect labor and applicable overhead, including payroll related costs. As of December 31, 2013, property, plant and equipment consisted of $1.8 million reported as land (pursuant to the Ground Lease) and $0.7 million reported as construction work in process (which consists of three properties owned as part of the pipeline easement process). All of these assets are expected to be transferred to a subsidiary of Luminant Generation as a result of the April 2014 amendments and new agreements discussed above. As of December 31, 2012, property, plant and equipment consisted of $1.8 million reported as land (pursuant to the Ground Lease) and $132.2 million reported as construction work in process (which primarily related to costs incurred related to obtaining the COLA).

**Deferred Financing Costs** — Deferred financing costs include expenditures directly related to CPNPC's efforts to obtain debt financing for CPNPC including obtaining a loan guarantee from the United States Department of Energy. All accumulated cost was impaired in December 2013. See Note 5.

**Accounts Payable to Affiliates** — As of December 31, 2013, CPNPC had accounts payable to affiliates of $0.2 million related to affiliated billings from Luminant Generation under the DSA. As of December 31, 2012, CPNPC had accounts payable to affiliates of $0.3 million related to affiliated billings from Luminant Generation under the DSA.

**Income Taxes** — CPNPC is generally not subject to income taxes, except as discussed below, because its income is taxed directly to its members. CPNPC is subject to the gross margin tax enacted by the State of Texas; however, such effects are not material.

**Comprehensive Income (Loss)** — Comprehensive income (loss) is the same as net loss for all periods presented.

*Fair Value of Financial Instruments* — The carrying amount of cash and cash equivalents and accounts payable approximates fair value due to their short-term maturities.

## 2.    COMMITMENTS AND CONTINGENCIES

### Contractual Commitments

**Capital Contributions** — The initial Capital Contributions to CPNPC in January 2009 include (a) NEFH II's contributed assets at historical cost (inclusive of capitalized interest), which include site drawings, plans, surveys, studies, reports, contractual rights, permit applications, other intangible rights and works-in-progress related to the design, planning, licensing, construction, installation, financing and development of the two new nuclear generation units,   NEFH I's Ground Lease with CPNPC and; (b) MHI Nuclear's cash contribution.  The Suspension Amendments document the members' agreement for funding expenses during the suspension period.

**Development Services Agreement** – In January 2009, the DSA was entered into between and among Luminant Generation, MHI Nuclear, and CPNPC, and provides that Luminant Generation will be responsible for providing certain development services in connection with the administration and operations of CPNPC.  These services originally included, but were not limited to, the following:

a)    On-site Development Services, including, water, transmission, permits, easements, property tax;
b)    Off-site Development Services, including, accounting, legal, financial modeling, budget coordination;
c)    Other Off-site Development Services such as fuel sourcing, insurance and contract administration;
d)    Financing Activities, including, structure planning and implementation, loan guarantees, debt financing sources, third party reports, Nuclear Energy Institute (NEI) financing functions;
e)    Licensing Activities, including, NRC interface, Institute of Nuclear Power Operations (INPO) interface, and NEI regulatory interface;
f)    Project Execution Activities and Services, including, division of responsibilities, workforce availability, scheduling and cost control, engineering, procurement, construction;
g)    Operation Activities and Services, including, operational readiness, long-term service agreement, spent fuel plan, decommissioning, performance management;
h)    Project Management Activities, including, back office functions, budget coordination; and
i)    Services of the Development Manager relating to the project.

In return, Luminant Generation will be compensated in an amount equal to Luminant Generation's actual time and materials plus actual out-of-pocket third party expenses incurred.

The amendments and new agreements discussed in Note 1 eliminate a), c), f), g) and h) from the services performed and limits the other activities to those included in CPNPC's Long Range Budget.

**Engineering Services Agreement** - MNES entered into the ESA with CPNPC, which provides that MNES will be responsible for site-specific engineering services necessary to achieve project financing and to obtain engineering, equipment supply and construction contracts in support of the project.  The April 2014 amendments and new agreements discussed in Note 1 will suspend the ESA.  Responsibilities previously included the following:

- sufficient design, engineering, equipment and material bidding/budgeting, estimating, and scheduling, as set forth in the ESA to improve the accuracy and confidence in the total project cost estimates;
- establish an acceptable design criteria and design basis for detailed design to proceed for the period following the ESA;
- establish a total project scope of work and schedule for estimating the EPC scopes;
- preparation of an EPC capital cost estimate;
- development of a Level 2 EPC project schedule for engineering, procurement, construction and startup of the project;
- provide optimum use of equipment modularization to increase the economic viability of the project;
- readiness to place equipment and material orders for all items noted in the ESA portion of the A&R LLC Agreement related to MNES exclusive equipment and BOP equipment (Balance of Plan or other equipment that does not constitute MNES Exclusive Equipment); and
- preparation of preliminary technical specifications for the construction contractor bid package.

The objective of the ESA was to deliver a conceptual layout or design such that the construction requirements could be established for the site under the Ground Lease.  The ESA did not expressly provide for the construction or use of the MHI technology for the project.

MNES is compensated at a price equal to the actual cost and rates specified in the Second A&R LLC Agreement plus other reimbursable items, as defined by the ESA.

**Litigation** – CPNPC is not involved in any lawsuits.

## 3.    MEMBERSHIP INTERESTS

*Member Contributions* — For the cumulative period from the date of incorporation through December 31, 2013, the members have made capital contributions in cash and noncash capital.  Noncash contributions consist of assets at historical cost of $36.6 million.  In addition, the members have made cash contributions of $5.7 million for the year ended December 31, 2013, $7.3 million for the year ended December 31, 2012, and $108.7 million in cash for the cumulative period from the date of incorporation through December 31, 2013.

*Deficit accumulated during the development stage* – CPNPC reported a net loss of $140.4 million for the year ended December 31, 2013, $0.3 million for the year ended December 31, 2012, and $142.2 million for the cumulative period from the date of incorporation through December 31, 2013.  The 2013 net loss reflected an asset impairment expense of $140.3 million (see Note 5).  Prior, to 2013, the net losses primarily related to period costs such as general & administrative expenses that did not meet the requirements for capitalization.

## 4.    RELATED-PARTY TRANSACTIONS

The following represent the significant related-party transactions of CPNPC:

In connection with the DSA, Luminant Generation provided $5.5 million of development services to CPNPC for the year ended December 31, 2013 and $7.6 million of development services to CPNPC for the year ended December 31, 2012.  DSA services totaled $53.3 million during the cumulative period from September 8, 2008 (date of incorporation) to December 31, 2013.  These services will be limited to minimal activities while the project is under suspension (see Note 2).

MNES provided engineering services to CPNPC substantially related to the ESA totaling $1.2 million for the year ended December 31, 2012. $51.1 million of ESA services have been received during the cumulative period from September 8, 2008 (date of incorporation) to December 31, 2012. No ESA services were provided in 2013. These activities have been suspended under the terms of the Suspension Amendments (see Note 2).

Certain of Luminant Generation's affiliates have existing contracts with the Brazos River Authority which provide them rights to purchase and use water in its generation plants. Luminant Generation billed CPNPC for water rights relating to water reserved for the two new nuclear generation units. Luminant Generation billed $0.7 million, $0.7 million, and $3.5 million to CPNPC for these reserved water rights for the years ended December 31, 2013 and December 31, 2012 and the cumulative period from September 8, 2008 (date of incorporation) to December 31, 2013, respectively. CPNPC recorded these amounts to property, plant and equipment and subsequently impaired them during the year ended December 31, 2013 (see Note 5). As a result of the April 2014 amendments and new agreements discussed in Note 1, these water rights will no longer be reserved for use by CPNPC.

## 5.  IMPAIRMENT OF ASSETS

In the fourth quarter 2013, MHI notified CPNPC, Luminant Generation and the NRC of its plans to refocus MHI's US resources on the restart of nuclear reactors in Japan and thus reduce its support of review activities related to the NRC's Design Certification of MHI's US-APWR technology for an indefinite period of time. As a result, Luminant Generation has notified the NRC on behalf of CPNPC of its intent to suspend all reviews associated with the COLA by March 31, 2014 for an indefinite period of time. CPNPC and does not intend to withdraw the license application at this time. MHI expressed to the NRC its continuing commitment to obtaining an NRC design certification for its technology. CPNPC filed a loan guarantee application with the DOE for financing the proposed units prior to commencement of construction and expects to continue to update the application in accordance with the loan solicitation guidelines.

As discussed in Note 1, in the second quarter 2014, MHI Nuclear and NEFH II amended their A&R agreement and certain other agreements and entered into certain new agreements, subject to approval for Luminant Generation by the Bankruptcy Court (see Note 6). The amendments and new agreements include provisions that allow the parties to unilaterally take certain actions with respect to future development activities, including cessation of such activities. The amendments and new agreements triggered an analysis of the recoverability of the CPNPC's assets.

Because of the significant uncertainty regarding the development of the nuclear generation units, considering the wholesale electricity price environment in Texas and risks related to financing and cost escalation, in the fourth quarter 2013 essentially all of CPNPC's assets were impaired resulting in a charge of $140.3 million. The assets largely represented costs incurred related to the filing with the NRC of a COLA, the filing with the DOE of a loan guarantee application and initial operational readiness activities for the two units. See Note 1 for discussion of remaining property, plant and equipment as of December 31, 2013.

## 6.  FILING UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE BY LUMINANT GENERATION

On April 29, 2014, EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including Luminant Generation, but excluding NEFH I, NEFH II, CPNPC and Oncor Electric Delivery Holdings Company LLC and its subsidiaries, filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court for the District of Delaware (Bankruptcy Court). Certain CPNPC actions that would have previously required approval by Luminant Generation, such as approval of the April 2014 amendments to the existing CPNPC agreements and the entry into new agreements discussed in Note 1, will require approval by the Bankruptcy Court.

B26 (Official Form 26) – Cont.

**Tab E**

**Energy Future Intermediate Holding Company LLC 1st Quarter Form 10-Q**

(includes the financial results of Oncor Electric Delivery Holdings Company LLC)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-Q

☒  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

## FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2014

— OR —

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

---

Commission File Number 1-34544

# Energy Future Intermediate Holding Company LLC
### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Delaware | 26-1191638 |
| (State of Organization) | (I.R.S. Employer Identification No.) |
| 1601 Bryan Street, Dallas, TX 75201 | (214) 812-4600 |
| (Address of Principal Executive Offices) (Zip Code) | (Registrant's Telephone Number) |

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.
Large accelerated filer ☐  Accelerated filer ☐   Non-Accelerated filer ☒ (Do not check if a smaller reporting company)
Smaller reporting company ☐

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐ No ☒

At May 7, 2014, the outstanding membership interest in Energy Future Intermediate Holding Company LLC was directly held by Energy Future Holdings Corp.

**TABLE OF CONTENTS**

|  |  | PAGE |
|---|---|---|
| **GLOSSARY** |  | ii |
| **PART I.** | **FINANCIAL INFORMATION** |  |
| **Item 1.** | **Financial Statements (Unaudited)** |  |
|  | Condensed Statements of Consolidated Income (Loss) — Three Months Ended March 31, 2014 and 2013 | 1 |
|  | Condensed Statements of Consolidated Comprehensive Income (Loss) — Three Months Ended March 31, 2014 and 2013 | 1 |
|  | Condensed Statements of Consolidated Cash Flows — Three Months Ended March 31, 2014 and 2013 | 2 |
|  | Condensed Consolidated Balance Sheets — March 31, 2014 and December 31, 2013 | 3 |
|  | Notes to Condensed Consolidated Financial Statements | 4 |
| **Item 2.** | **Management's Discussion and Analysis of Financial Condition and Results of Operations** | 26 |
| **Item 3.** | **Quantitative and Qualitative Disclosures About Market Risk** | 35 |
| **Item 4.** | **Controls and Procedures** | 38 |
| **PART II.** | **OTHER INFORMATION** |  |
| **Item 1.** | **Legal Proceedings** | 39 |
| **Item 1A.** | **Risk Factors** | 39 |
| **Item 4.** | **Mine Safety Disclosures** | 39 |
| **Item 5.** | **Other Information** | 39 |
| **Item 6.** | **Exhibits** | 40 |
| **SIGNATURE** |  | 41 |

Energy Future Intermediate Holding Company LLC's (EFIH) annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports are made available to the public, free of charge, on the Energy Future Holdings Corp. (EFH Corp.) website at *http://www.energyfutureholdings.com* as soon as reasonably practicable after they have been filed with or furnished to the Securities and Exchange Commission. The information on EFH Corp.'s website shall not be deemed a part of, or incorporated by reference into, this quarterly report on Form 10-Q. The representations and warranties contained in any agreement that EFIH has filed as an exhibit to this quarterly report on Form 10-Q or that EFIH has or may publicly file in the future may contain representations and warranties made by and to the parties thereto at specific dates. Such representations and warranties may be subject to exceptions and qualifications contained in separate disclosure schedules, may represent the parties' risk allocation in the particular transaction, or may be qualified by materiality standards that differ from what may be viewed as material for securities law purposes.

This quarterly report on Form 10-Q and other Securities and Exchange Commission filings of EFIH and its subsidiaries occasionally make references to EFIH (or "the company"), EFH Corp., Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with, or otherwise reflected in, their respective parent company's financial statements for financial reporting purposes. However, these references should not be interpreted to imply that the relevant parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or vice versa.

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **2013 Form 10-K** | EFIH's Annual Report on Form 10-K for the year ended December 31, 2013 |
| **Bankruptcy Filing** | Voluntary petitions for relief under Chapter 11 of the US Bankruptcy Code (Bankruptcy Code) in the US Bankruptcy Court for the District of Delaware (Bankruptcy Court) filed on April 29, 2014 by the Debtors. |
| **Consenting Creditors** | Means collectively, (i) certain lenders or investment advisors or managers of discretionary accounts (Consenting TCEH First Lien Lenders) that hold claims under the TCEH Senior Secured Facilities; (ii) certain holders (Consenting TCEH First Lien Noteholders and together with the Consenting TCEH First Lien Lenders, the Consenting TCEH First Lien Creditors) of TCEH Senior Secured Notes; (iii) certain holders (Consenting EFIH First Lien Noteholders) of the EFIH 6.875% Notes and the EFIH 10% Notes (EFIH First Lien Notes); (iv) certain holders (Consenting EFIH Second Lien Noteholders) of the EFIH 11% Notes and the EFIH 11.75% Notes (EFIH Second Lien Notes); (v) certain holders (Consenting EFIH Unsecured Noteholders) of the EFIH Toggle Notes; and certain holders (the Consenting EFH Corp. Unsecured Noteholders) of the EFH Corp. 5.55% Series P Senior Notes due 2014, the EFH Corp. 6.50% Series Q Senior Notes due 2024, the EFH Corp. 6.55% Series R Senior Notes due 2034, the EFH Corp. 11.250%/12.00% Senior Toggle Notes due 2017, the EFH Corp. 10.875% Senior Notes due 2017, the EFH Corp. 9.75% Fixed Senior Notes due 2019, and the EFH Corp. 10% Fixed Senior Notes due 2020 (EFH Corp. Unsecured Notes). |
| **CREZ** | Competitive Renewable Energy Zone |
| **DIP Facilities** | Refers to EFIH's proposed debtor-in-possession financing. See Note 5 to Financial Statements. |
| **Debtors** | EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities |
| **EFCH** | Energy Future Competitive Holdings Company LLC, a direct, wholly owned subsidiary of EFH Corp. and the direct parent of TCEH, and/or its subsidiaries, depending on context |
| **EFH Corp.** | Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context, whose major subsidiaries include TCEH and Oncor |
| **EFH Corp. 10.875% Notes** | EFH Corp.'s 10.875% Senior Notes with a maturity date of November 1, 2017, which are guaranteed on a senior unsecured basis by EFIH and EFCH as discussed in Note 5 to Financial Statements |
| **EFH Corp. Toggle Notes** | EFH Corp.'s 11.25%/12.00% Senior Toggle Notes with a maturity date of November 1, 2017, which are guaranteed on a senior unsecured basis by EFIH and EFCH as discussed in Note 5 to Financial Statements |
| **EFIH** | Energy Future Intermediate Holding Company LLC, a direct, wholly owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings, and/or its subsidiaries depending on context. |
| **EFIH Debtors** | EFIH and EFIH Finance |
| **EFIH Finance** | EFIH Finance Inc., a direct, wholly owned subsidiary of EFIH, formed for the sole purpose of serving as co-issuer with EFIH of certain debt securities |
| **EFIH Notes** | Refers, collectively, to EFIH's and EFIH Finance's 6.875% Senior Secured Notes with a maturity date of August 15, 2017 (EFIH 6.875% Notes), 10.000% Senior Secured Notes with a maturity date of December 1, 2020 (EFIH 10% Notes), 11% Senior Secured Second Lien Notes with a maturity date of October 1, 2021 (EFIH 11% Notes), 11.75% Senior Secured Second Lien Notes with a maturity date of March 1, 2022 (EFIH 11.75% Notes), 11.25%/12.25% Senior Toggle Notes with a maturity date of December 1, 2018 (EFIH Toggle Notes) and 9.75% Senior Notes with a maturity date of October 15, 2019 (EFIH 9.75% Notes). |
| **EFIH Second Lien DIP Facility** | Refers, collectively, to the facility that includes the EFIH Second Lien DIP Notes. |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **GAAP** | generally accepted accounting principles |

| | |
|---|---|
| **LIBOR** | London Interbank Offered Rate, an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market |
| **Luminant** | subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas |
| **Merger** | The transaction referred to in the Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp., which was completed on October 10, 2007. |
| **Oncor** | Oncor Electric Delivery Company LLC, a direct, majority owned subsidiary of Oncor Holdings, and/or its wholly owned consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context, that is engaged in regulated electricity transmission and distribution activities |
| **Oncor Holdings** | Oncor Electric Delivery Holdings Company LLC, a direct, wholly owned subsidiary of EFIH and the direct majority owner of Oncor, and/or its subsidiaries, depending on context |
| **Oncor Ring-Fenced Entities** | Oncor Holdings and its direct and indirect subsidiaries, including Oncor |
| **Oncor Tax Sharing Agreement** | Federal and State Income Tax Allocation Agreement among EFH Corp., Oncor Holdings, Oncor and Texas Transmission |
| **PUCT** | Public Utility Commission of Texas |
| **REP** | retail electric provider |
| **SEC** | US Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933, as amended |
| **SG&A** | selling, general and administrative |
| **Sponsor Group** | Refers, collectively, to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Global, LLC (together with its affiliates, TPG) and GS Capital Partners, an affiliate of Goldman, Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Texas Competitive Electric Holdings Company LLC, a direct, wholly owned subsidiary of EFCH and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context, that are engaged in electricity generation and wholesale and retail energy markets activities, and whose major subsidiaries include Luminant and TXU Energy |
| **TCEH Demand Notes** | Refers to certain loans from TCEH to EFH Corp. in the form of demand notes to finance EFH Corp. debt principal and interest payments and, until April 2011, other general corporate purposes of EFH Corp., that were guaranteed on a senior unsecured basis by EFCH and EFIH and were settled by EFH Corp. in January 2013. |
| **Texas Holdings** | Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group, that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities |
| **TXU Energy** | TXU Energy Retail Company LLC, a direct, wholly owned subsidiary of TCEH that is a REP in competitive areas of ERCOT and is engaged in the retail sale of electricity to residential and business customers |
| **US** | United States of America |
| **VIE** | variable interest entity |

## PART I.  FINANCIAL INFORMATION

### Item 1.    FINANCIAL STATEMENTS

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**CONDENSED STATEMENTS OF CONSOLIDATED INCOME (LOSS)**
**(Unaudited)**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2014** | **2013** |
|  | **(millions of dollars)** | |
| Selling, general and administrative expenses | $ (11) | $ — |
| Other deductions (Note 4) | (77) | — |
| Interest income — affiliates (Note 7) | — | 284 |
| Interest expense and related charges (Note 9) | (198) | (184) |
| Income (loss) before income taxes and equity in earnings of unconsolidated subsidiary | (286) | 100 |
| Income tax benefit (expense) | 72 | (36) |
| Equity in earnings of unconsolidated subsidiary (net of tax) (Note 3) | 80 | 67 |
| Net income (loss) | $ (134) | $ 131 |

See Notes to Financial Statements.

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**(Unaudited)**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2014** | **2013** |
|  | **(millions of dollars)** | |
| Net income (loss) | $ (134) | $ 131 |
| Other comprehensive loss — net of tax effects: |  |  |
| Reclassification to interest income of mark-to-market valuations of holdings of affiliate debt (net of tax expense of $— and $99) (Note 7) | — | (185) |
| Comprehensive loss | $ (134) | $ (54) |

See Notes to Financial Statements.

## ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
## CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS
### (Unaudited)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| | (millions of dollars) | |
| Cash flows — operating activities: | | |
| Net income (loss) | $ (134) | $ 131 |
| Adjustments to reconcile net income to cash used in operating activities: | | |
| Equity in earnings of unconsolidated subsidiary | (80) | (67) |
| Distributions of earnings from unconsolidated subsidiary | 37 | 31 |
| Deferred income taxes, net | (1) | — |
| Interest expense related to pushed-down debt of parent (Notes 5 and 9) | 1 | 3 |
| Interest expense on toggle notes payable in additional principal (Notes 5 and 9) | 49 | 41 |
| Reserve recorded for income tax receivable from EFH Corp. (Note 4) | 77 | — |
| Amortization of debt exchange and issuance costs | (13) | (10) |
| Mark-to-market gain reclassified from accumulated other comprehensive income (Note 7) | — | (284) |
| Changes in operating assets and liabilities: | | |
| Income taxes receivable from/payable to EFH Corp. (Note 8) | — | 34 |
| Other changes in operating assets and liabilities | (42) | 15 |
| Cash used in operating activities | (106) | (106) |
| Cash flows — financing activities: | | |
| Interest received on holdings of affiliate debt (Note 7) | — | 163 |
| Distributions to EFH Corp. (Note 7) | — | (680) |
| Debt exchange and issuance costs, premiums and discounts | — | (6) |
| Cash used in financing activities | — | (523) |
| Cash flows — investing activities: | | |
| Restricted cash related to debt issuance | — | 680 |
| Cash provided by investing activities | — | 680 |
| Net change in cash and cash equivalents | (106) | 51 |
| Cash and cash equivalents — beginning balance | 242 | 424 |
| Cash and cash equivalents — ending balance | $ 136 | $ 475 |

See Notes to Financial Statements.

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| ASSETS | | March 31, 2014 | | December 31, 2013 |
|---|---|---|---|---|
| | | **(millions of dollars)** | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 136 | $ | 242 |
| Other current assets | | 2 | | 2 |
| Total current assets | | 138 | | 244 |
| Investment in Oncor Holdings (Note 3) | | 5,993 | | 5,950 |
| Other noncurrent assets, principally unamortized debt premium/discount | | 56 | | 58 |
| Total assets | $ | 6,187 | $ | 6,252 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | | | |
| Current liabilities: | | | | |
| Trade accounts and other payables to affiliates | $ | 3 | $ | 10 |
| Debt (Note 5) | | 7,862 | | 7,877 |
| Accumulated deferred income taxes | | 26 | | 26 |
| Accrued interest | | 223 | | 137 |
| Total current liabilities | | 8,114 | | 8,050 |
| Accumulated deferred income taxes | | 24 | | 24 |
| Total liabilities | | 8,138 | | 8,074 |
| Commitments and Contingencies (Note 6) | | | | |
| Membership interests (Note 7): | | | | |
| Capital account | | (1,277) | | (1,148) |
| Affiliate debt held by EFIH (Note 7) | | (635) | | (635) |
| Accumulated other comprehensive income (loss) | | (39) | | (39) |
| Total membership interests | | (1,951) | | (1,822) |
| Total liabilities and membership interests | $ | 6,187 | $ | 6,252 |

See Notes to Financial Statements.

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1.    BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### *Description of Business*

References in this report to "the company" are to EFIH and/or its direct and indirect subsidiaries as apparent in the context. See "Glossary" for defined terms.

EFIH, a direct, wholly owned subsidiary of EFH Corp., is a Dallas, Texas-based holding company with no operations or operating assets whose wholly owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell electricity to residential, business and other consumers in the north-central, eastern and western parts of Texas. EFIH has no reportable business segments. Oncor Holdings and its subsidiaries (the Oncor Ring-Fenced Entities) are not consolidated in EFIH's financial statements in accordance with consolidation accounting standards related to variable interest entities (VIEs) (see Note 3).

Various "ring-fencing" measures have been taken to enhance the credit quality of Oncor Holdings and Oncor. These measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to the Texas Holdings Group, which includes EFIH, and to reduce the risk that the assets and liabilities of the Oncor Ring-Fenced Entities would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of Texas Holding Group's subsidiaries. Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission Investment LLC (a limited liability company that owns a 19.75% equity interest in Oncor and is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group) in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; the board of directors of Oncor Holdings and Oncor being comprised of a majority of independent directors, and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group. Oncor and Oncor Holdings do not bear any liability for debt or contractual obligations of the Texas Holdings Group (including, but not limited to, EFIH's debt obligations), and vice versa. Accordingly, Oncor Holdings' operations are conducted, and its cash flows managed, independently from the Texas Holdings Group.

### *Bankruptcy Filing*

As discussed further in Note 2, on April 29, 2014 (the Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, (the Debtors) filed voluntary petitions for relief (the Bankruptcy Filing) under Chapter 11 of the United States Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (the Bankruptcy Court). See Note 5 for discussion of debtor-in-possession financing and classification of debt as current liabilities.

### *Basis of Presentation*

The condensed consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as the audited financial statements included in EFIH's 2013 Form 10-K. The condensed consolidated financial statements have been prepared as if EFIH is a going concern but do not reflect the application of ASC 852, *Reorganizations*. EFIH's investment in Oncor Holdings does not meet accounting standards criteria for consolidation and is accounted for under the equity method (see Note 3). Adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein. All intercompany items and transactions have been eliminated in consolidation. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC. Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in EFIH's 2013 Form 10-K. The results of operations for an interim period may not give a true indication of results for a full year. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

*Use of Estimates*

Preparation of financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of income and expense, including fair value measurements.  In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

**2.    SUBSEQUENT EVENT - BANKRUPTCY FILING**

On April 29, 2014, EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  During the pendency of the Bankruptcy Filing, the Debtors will operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code.

In 2013, EFH Corp. began to engage in discussions with certain creditors, including EFIH creditors, with respect to proposed changes to its capital structure.  In anticipation of the Bankruptcy Filing, on April 29, 2014, the Debtors entered into a Restructuring Support and Lock-Up Agreement (the Restructuring Support and Lock-Up Agreement) with various stakeholders in order to effect an agreed upon restructuring of the Debtors through a pre-arranged Chapter 11 plan of reorganization (the Restructuring Plan).

***Restructuring Support and Lock-Up Agreement***

*General*

In anticipation of the Bankruptcy Filing, on April 29, 2014, the Debtors, Texas Holdings and its general partner Texas Energy Future Capital Holdings LLC (TEF and, together with Texas Holdings, the Consenting Interest Holders) and the Consenting Creditors entered into the Restructuring Support and Lock-Up Agreement in order to effect an agreed upon restructuring of the Debtors through the Restructuring Plan.

Pursuant to the Restructuring Support and Lock-Up Agreement, the Consenting Interest Holders and Consenting Creditors agreed, subject to the terms and conditions contained in the Restructuring Support and Lock-Up Agreement, to support the Debtors' proposed financial restructuring (the Restructuring Transactions), and further agreed to limit certain transfers of any ownership (including any beneficial ownership) in the equity interests of or claims held against the Debtors, including any such interests or claims acquired after executing the Restructuring Support and Lock-Up Agreement.

*Material Restructuring Terms*

The Restructuring Support and Lock-Up Agreement along with the accompanying term sheet sets forth the material terms of the Restructuring Transactions pursuant to which, in general:

*TCEH First Lien Secured Claims*

As a result of the Restructuring Transactions, holders of TCEH first lien secured claims will receive, among other things, their pro rata share of (i) 100% of  the equity of newly reorganized TCEH (Reorganized TCEH) consummated through a tax-free spin (in accordance with the Private Letter Ruling described below) in connection with TCEH's emergence from bankruptcy and (ii) all of the net cash from the proceeds of the issuance of new long-term secured debt of Reorganized TCEH.

*TCEH Unsecured Claims*

As a result of the Restructuring Transactions, holders of general unsecured claims against EFCH, TCEH and its subsidiaries (including TCEH first lien deficiency claims, TCEH second lien claims and TCEH unsecured note claims) will receive their pro rata share of the unencumbered assets of TCEH.

*EFIH First Lien and EFIH Second Lien Settlements*

Pursuant to the Restructuring Support Agreement, certain holders of each of the EFIH 6.875% Notes and EFIH 10% Notes (such holders, the RSA EFIH First Lien Note Parties) have agreed to voluntary settlements with respect to EFIH's and EFIH Finance's obligations under the EFIH First Lien Notes held by such RSA EFIH First Lien Note Parties. Under the terms of the settlement, each such RSA EFIH First Lien Note Party has agreed to accept as payment in full of any claims arising out of its EFIH First Lien Notes an amount of loans under the EFIH First Lien DIP Facility (as discussed in Note 5) equal to the greater of (a) 105% of the principal amount on the EFIH First Lien Notes plus 101% of the accrued and unpaid interest at the non-default rate on such principal (which amount will be deemed to include the original issue discount on the loans under the EFIH First Lien DIP Facility) or (b) 104% of the principal amount of, plus accrued and unpaid interest at the non-default rate on, the EFIH First Lien Notes, as adjusted by the original issue price discount paid on the loans under the EFIH First Lien DIP Facility in connection with the initial lender syndication of the EFIH First Lien DIP Facility (such settlement, the EFIH First Lien Settlement). The Debtors plan to file a motion seeking the Bankruptcy Court's approval of the EFIH First Lien Settlement.

Pursuant to the Restructuring Support Agreement, certain holders of each of the EFIH 11% Notes and EFIH 11.75% Notes (such holders, the EFIH Second Lien Note Parties) have agreed to voluntary settlements with respect to EFIH's and EFIH Finance's obligations under the EFIH Second Lien Notes held by the EFIH Second Lien Note Parties. Under the terms of the settlement, each EFIH Second Lien Note Party has agreed to accept as payment in full of any claims arising out of its EFIH Second Lien Notes, its pro rata share of an amount in cash equal to (i) 100% of the principal, plus accrued and unpaid interest at the non-default rate on such principal, of EFIH Second Lien Notes held by such EFIH Second Lien Party plus (ii) 50% of the aggregate amount of any claim derived from or based upon make-whole or other similar provisions under the EFIH 11% Notes or EFIH 11.75% Notes (such settlement, the EFIH Second Lien Settlement). The Debtors plan to file a motion seeking the Bankruptcy Court's approval of the EFIH Second Lien Settlement.

On May 6, 2014, EFIH commenced an offer to certain remaining holders of the EFIH First Lien Notes to participate in the EFIH First Lien Settlement; provided however, such EFIH First Lien Note holders agree to accept as payment in full of any claims arising out of such holders' EFIH First Lien Notes an amount of loans under the EFIH First Lien DIP Facility (as discussed in Note 5) equal to 105% of the principal amount of the EFIH First Lien Notes held by such holders plus 101% of the accrued and unpaid interest at the non-default rate on such principal (which amount will be deemed to include original issue discount on the loans under the EFIH First Lien DIP Facility). During the early portion of the Chapter 11 Cases, EFIH expects to (i) commence an offer to the remaining holders of EFIH Second Lien Notes to participate in the EFIH Second Lien Settlement, and (ii) initiate litigation to obtain entry of an order from the Bankruptcy Court disallowing the claims of any non-settling holders of the EFIH First Lien Notes and EFIH Second Lien Notes from or based on make-whole or other similar provisions under the respective notes. Following the completion of these offers, and pending Bankruptcy Court approval, non-settling EFIH First Lien Holders and non-settling EFIH Second Lien Note Holders will receive their respective pro rata shares of cash equal to 100% of the principal of applicable notes plus accrued and unpaid interest at the non-default rate of the notes held by such holder (not taking into account alleged premiums, settlements, fees or claims relating to the repayment of such claims) from the proceeds of the EFIH First Lien DIP Facility and EFIH Second Lien DIP Facility (as described in Note 5).

The EFIH First Lien Settlement and the EFIH Second Lien Settlement will not be consummated unless, among other things, the Bankruptcy Court approves the EFIH First Lien DIP Facility, the EFIH First Lien Settlement, the EFIH Second Lien DIP Facility and the EFIH Second Lien Settlement.

*EFIH Second Lien DIP Notes Offering*

During the early portion of the Chapter 11 Cases, EFIH and EFIH Finance expect to offer (the EFIH Second Lien DIP Notes Offering) to certain holders of EFIH unsecured claims and a significant EFIH Second Lien Note Party the right to purchase $1.9 billion aggregate principal amount of 8% Mandatorily Convertible Second Lien Subordinated Secured DIP Financing Notes due 2016 (EFIH Second Lien DIP Facility or EFIH Second Lien DIP Notes).

*Backstop Commitment*

In connection with the execution of the Restructuring Support and Lock-Up Agreement, certain holders of the EFIH Unsecured Notes (the Backstop Parties) entered into a commitment letter with EFH Corp. and EFIH, dated April 29, 2014 (the Commitment Letter), pursuant to which such holders committed, severally and not jointly, up to $1.9 billion in available funds (the Backstop Commitment) to purchase EFIH Second Lien DIP Notes not sold in the EFIH Second Lien DIP Notes offering. Any EFIH Second Lien DIP Notes not sold in the EFIH Second Lien DIP Notes Offering will be purchased by the Backstop Parties, pro rata in proportion to their respective share of the Backstop Commitment. If any Backstop Party fails to satisfy its obligation to purchase its pro rata share of the unpurchased notes, the other Backstop Parties would have the right, but not the obligation, to purchase such unpurchased notes. The obligations under the Commitment Letter are not subject to the approval of the Oncor TSA Amendment (as described below) by the Bankruptcy Court.

Under the Commitment Letter and in consideration of the Backstop Commitment, EFIH agreed to pay the Backstop Parties fees consisting of approximately (i) $40 million in execution and approval fees payable at various milestones within the bankruptcy process and (ii) a fee equal to $95 million payable in the form of Non-Interest Bearing Mandatorily Convertible Second Lien Subordinated Secured DIP Financing Tranche B Notes due 2016 (EFIH Second Lien DIP Tranche B Notes) to be paid concurrently with the consummation of the EFIH Second Lien DIP Notes Offering.

In the event the EFIH Second Lien DIP Notes are repaid in cash prior to the effective date of the plan of reorganization (Effective Date) without the consent of certain creditors, EFIH agreed to pay the Backstop Parties a termination fee of $380 million. In addition, if EFIH seeks to consummate an alternative transaction that delivers equal or greater value to EFIH than the transactions contemplated by the Restructuring Support and Lock-Up Agreement, EFIH agreed to pay the holders of EFIH Second Lien DIP Notes a break-up fee of approximately $57 million.

*EFIH Unsecured Claims and EFH Corp. Unsecured Claims*

On the Effective Date, all of the EFIH Unsecured Notes and EFH Corp. Unsecured Notes will be canceled. In full satisfaction of all general unsecured claims against EFIH and all general unsecured claims against EFH Corp., (i) each holder of a general unsecured claim against EFIH will receive its pro rata share of 98.0% of the equity interests of newly reorganized EFH Corp. (Reorganized EFH Corp.) (subject to dilution by the Equity Conversion as described below) and (ii) each holder of a general unsecured claim against EFH Corp. will receive its pro rata share of 1.0% of the equity interests of Reorganized EFH Corp. (subject to dilution by the Equity Conversion) and the right to purchase up to 9% of the equity interests in Reorganized EFH Corp. from certain holders of EFIH Second Lien DIP Notes.

Holders of general unsecured claims against EFH Corp. will also receive on the Effective Date their pro rata share of either (A) if the Oncor TSA Amendment (described below) has then been approved, (1) $55 million in cash from EFIH, *provided, however*, that if the Oncor tax payments received by EFIH under the Oncor TSA Amendment through the Effective Date are less than 80% of projected amounts, the $55 million payment will be reduced on a dollar for dollar basis by the amount of such shortfall, and (2) cash on hand at EFH Corp. (not including the settlement payment in clause (1) hereof); or (B) if the Oncor TSA Amendment has not then been approved, all assets of EFH Corp., including cash on hand but excluding the equity interests in EFIH.

*EFH Corp. Equity Interests*

On the Effective Date, all of the equity interests in EFH Corp. (EFH Corp. Interests) will be canceled. In full satisfaction of the claims under the EFH Corp. Interests, each holder of EFH Corp. Interests will receive its pro rata share of 1.0% of the equity interests of Reorganized EFH Corp. (subject to dilution by the Equity Conversion).

*Equity Conversion*

On the Effective Date, the EFIH Second Lien DIP Notes will, subject to certain conditions, automatically convert (Equity Conversion) on a pro rata basis into approximately 64% of the equity interests of Reorganized EFH Corp., subject to adjustment based on the principal amount of the EFIH Second Lien DIP Notes.

*Oncor TSA Amendment*

The Restructuring Support and Lock-Up Agreement provides that the Debtors will request authority from the Bankruptcy Court to amend, or otherwise assign the right to payments under, the Oncor Tax Sharing Agreement (the Oncor TSA Amendment) to provide that any payment required to be made to EFH Corp. under the Oncor Tax Sharing Agreement after March 31, 2014, will instead be made to EFIH.  Any tax payments received by EFH Corp. before the Bankruptcy Court enters or denies an order authorizing the Oncor TSA Amendment will be deposited by EFH Corp. into a segregated account until the earlier of (i) the date the Bankruptcy Court enters the order authorizing the Oncor TSA Amendment, in which case such amounts will be remitted to EFIH, or (ii) the date the Bankruptcy Court denies authorization of the Oncor TSA Amendment, in which case such amounts will be remitted to EFH Corp.

The Oncor TSA Amendment will automatically terminate and be of no further force and effect in the event that the Commitment Letter is terminated by the Backstop Parties; provided, however, that any amounts that were paid to EFIH in accordance with the Oncor TSA Amendment before its termination will be retained by EFIH if the Commitment Letter terminates or the EFIH Second Lien DIP Facility is not fully funded in accordance with its terms (i.e., except as a result of a breach by the Backstop Parties). Neither EFH Corp. nor EFIH will have the right to terminate or modify the Oncor TSA Amendment during the Chapter 11 Cases if the EFIH Second Lien DIP Facility is consummated.

If the Bankruptcy Court has not approved the Oncor TSA Amendment within 90 days after the Petition Date, the interest rate on the interest bearing EFIH Second Lien DIP Tranche A Notes (but not the EFIH Second Lien DIP Tranche B Notes) will increase by 4.0% with such additional interest to be paid-in-kind (compounded quarterly) until such approval is received from the Bankruptcy Court.  If the Bankruptcy Court has not approved the Oncor TSA Amendment by April 29, 2015, each holder of EFIH Second Lien DIP Notes (including the non-interest bearing EFIH Second Lien DIP Tranche B Notes) will receive additional EFIH Second Lien DIP Notes equal to 10.0% of the amount of EFIH Second Lien DIP Notes held by such holder.

*Private Letter Ruling*

The Restructuring Support and Lock-Up Agreement provides that EFH Corp. will file a request with the IRS for a private letter ruling (Private Letter Ruling) that, among other things, will provide (a) that (i) the transfer by TCEH of all of its assets and its ordinary course operating liabilities to Reorganized TCEH, (ii) the transfer by the Debtors to Reorganized TCEH of certain operating assets and liabilities that are reasonably necessary to the operation of Reorganized TCEH and (iii) the distribution by TCEH of (A) the equity it holds in Reorganized TCEH and (B) the cash proceeds TCEH receives from Reorganized TCEH to the holders of TCEH First Lien Claims, will qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G) , 355 and 356 of the Code and (b) for certain other rulings under Sections 368(a)(1)(G) and 355 of the Code.

There are various conditions precedent to the restructuring transactions under the Restructuring Support and Lock-Up Agreement including, but not limited to, the receipt of the Private Letter Ruling, requisite regulatory approvals and approvals by the Bankruptcy Court.

### Operation and Implications of the Chapter 11 Cases

The accompanying consolidated financial statements contemplate the realization of assets and the satisfaction of liabilities in the normal course of business.  Our ability to continue as a going concern is contingent upon our ability to comply with the financial and other covenants contained in the debtor-in-possession financing (DIP Facilities, described below), the Bankruptcy Court's approval of the Restructuring Plan or another Chapter 11 plan and our ability to successfully implement the Restructuring Plan or another Chapter 11 plan and obtain new financing, among other factors.  As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty.  While operating as debtors-in-possession under Chapter 11, the Debtors may sell or otherwise dispose of or liquidate assets or settle liabilities, subject to the approval of the Bankruptcy Court or as otherwise permitted in the ordinary course of business (and subject to restrictions contained in the DIP Facilities), for amounts other than those reflected in the accompanying consolidated financial statements.  Further, the Restructuring Plan or another Chapter 11 plan could materially change and may impact the amounts and classifications of assets and liabilities reported in our consolidated financial statements.

### Financing During the Chapter 11 Cases

See Note 5 for discussion of the EFIH First Lien DIP Facility, which is expected to provide $5.4 billion in senior secured, super-priority financing and the EFIH Second Lien DIP Facility, which is expected to provide $1.9 billion in secured, super-priority financing.

***Significant Bankruptcy Court Actions***

On May 1 and 2, 2014 at the first-day hearings of the Chapter 11 Cases, the Bankruptcy Court issued certain interim orders relating to the Debtors' businesses. These orders authorized the Debtors to, among other things, enter into the TCEH DIP Facilities (described in Note 5), pay certain prepetition employee and retiree expenses and benefits, use their existing cash management system, maintain and administer customer programs primarily at TXU Energy, pay certain critical vendors, perform under certain prepetition hedging and trading arrangements and pay certain prepetition taxes and related fees. In addition, during the first-day hearings, the Bankruptcy Court set June 5 and 6, 2014 as the date for the second-day hearings in the Chapter 11 Cases. We expect that at the second-day hearings the Bankruptcy Court will consider issuing final orders related to the matters approved in the interim orders as well as certain other related matters.

These orders are significant because they allow us to operate our businesses in the normal course.

**3.    INVESTMENT IN ONCOR HOLDINGS**

EFIH has an equity investment in Oncor Holdings, which holds an approximate 80% interest in Oncor.  Oncor Holdings is considered a variable interest entity (VIE).  A VIE is an entity with which EFIH has a relationship or arrangement that indicates some level of control over the entity or results in economic risks to it.  Accounting standards require consolidation of a VIE if EFIH has (a) the power to direct the significant activities of the VIE and (b) the right or obligation to absorb profit and loss from the VIE (primary beneficiary).  In determining the appropriateness of consolidation of a VIE, EFIH evaluates its purpose, governance structure, decision making processes and risks that are passed on to its interest holders.  EFIH also examines the nature of any related party relationships among the interest holders of the VIE and the nature of any special rights granted to the interest holders of the VIE.

EFIH does not consolidate Oncor Holdings and instead accounts for it as an equity method investment because              the structural and operational "ring-fencing" measures discussed in Note 1 prevent it from having power to direct the significant activities of Oncor Holdings or Oncor.  In accordance with accounting standards, EFIH accounts for its investment in Oncor Holdings under the equity method, as opposed to the cost method, based on its level of influence over its activities.

The carrying value of EFIH's variable interest in Oncor Holdings totaled $5.993 billion and $5.950 billion at March 31, 2014 and December 31, 2013, respectively, and is reported as investment in Oncor Holdings in EFIH's balance sheet.  EFIH's maximum exposure to loss from this investment does not exceed its carrying value.

See Note 8 for discussion of Oncor Holdings' and Oncor's transactions with EFH Corp. and its other subsidiaries.

***Distributions from Oncor Holdings and Related Risks*** — Oncor Holdings' distributions of earnings to EFIH totaled $37 million and $31 million for the three months ended March 31, 2014 and  2013, respectively.  Distributions may not be paid except to the extent Oncor maintains a required regulatory capital structure as discussed below.  At March 31, 2014, $239 million was eligible to be distributed to Oncor's members after taking into account the regulatory capital structure limit, of which approximately 80% relates to EFIH's ownership interest in Oncor.  The boards of directors of each of Oncor and Oncor Holdings can withhold distributions to the extent the applicable board determines in good faith that it is necessary to retain such amounts to meet expected future requirements of Oncor and/or Oncor Holdings.

Oncor's distributions are limited by its regulatory capital structure, which is required to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.  At March 31, 2014, Oncor's regulatory capitalization ratio was 58.4% debt and 41.6% equity.  The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio.  For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt.  The debt calculation excludes bonds issued by Oncor Electric Delivery Transition Bond Company LLC, which were issued in 2003 and 2004 to recover specific generation-related regulatory assets and other qualified costs.  Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of accounting for the Merger (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization).

As a result of the Bankruptcy Filing, Oncor has credit risk exposure to trade accounts receivable from TCEH, which relate to delivery services provided by Oncor to TCEH's retail operations.  At the Petition Date, these accounts receivable totaled $109 million, including $37 million in unbilled amounts.  The accounts receivable are secured by $5 million in letters of credit posted by TCEH.  Oncor has additional credit risk exposure to EFH Corp. and certain of its subsidiaries totaling approximately $20 million at the Petition Date, including an $18 million federal income tax receivable from EFH Corp. under the Federal and State Income Tax Allocation Agreement.  Additional income tax receivable amounts may arise in the normal course under that agreement.

Because Oncor would not seek regulatory rate recovery for such credit losses, Oncor's earnings could be reduced by the amount (after-tax) of any nonpayment by EFH Corp. and its subsidiaries of amounts owed to Oncor.

Oncor has not established any reserves related to these exposures.

***Oncor Holdings Financial Statements*** — Condensed statements of consolidated income of Oncor Holdings and its subsidiaries for the three months ended March 31, 2014 and 2013 are presented below:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Operating revenues | $ 917 | $ 817 |
| Operation and maintenance expenses | (345) | (298) |
| Depreciation and amortization | (210) | (199) |
| Taxes other than income taxes | (108) | (102) |
| Other income | 4 | 5 |
| Other deductions | (3) | (4) |
| Interest income | 1 | 1 |
| Interest expense and related charges | (88) | (94) |
| Income before income taxes | 168 | 126 |
| Income tax expense | (67) | (41) |
| Net income | 101 | 85 |
| Net income attributable to noncontrolling interests | (21) | (18) |
| Net income attributable to Oncor Holdings | $ 80 | $ 67 |

Assets and liabilities of Oncor Holdings at March 31, 2014 and December 31, 2013 are presented below:

| | March 31, 2014 | December 31, 2013 |
| --- | --- | --- |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 32 | $ 28 |
| Restricted cash | 58 | 52 |
| Trade accounts receivable — net | 390 | 385 |
| Trade accounts and other receivables from affiliates | 120 | 135 |
| Income taxes receivable from EFH Corp. | 22 | 16 |
| Inventories | 69 | 65 |
| Accumulated deferred income taxes | 27 | 32 |
| Prepayments and other current assets | 86 | 82 |
| Total current assets | 804 | 795 |
| Restricted cash | 16 | 16 |
| Other investments | 91 | 91 |
| Property, plant and equipment — net | 12,068 | 11,902 |
| Goodwill | 4,064 | 4,064 |
| Regulatory assets — net | 1,222 | 1,324 |
| Other noncurrent assets | 79 | 71 |
| Total assets | $ 18,344 | $ 18,263 |
| **LIABILITIES** | | |
| Current liabilities: | | |
| Short-term borrowings | $ 979 | $ 745 |
| Long-term debt due currently | 633 | 131 |
| Trade accounts payable — nonaffiliates | 147 | 178 |
| Income taxes payable to EFH Corp. | 85 | 23 |
| Accrued taxes other than income | 65 | 169 |
| Accrued interest | 64 | 95 |
| Other current liabilities | 118 | 135 |
| Total current liabilities | 2,091 | 1,476 |
| Accumulated deferred income taxes | 1,901 | 1,905 |
| Long-term debt, less amounts due currently | 4,852 | 5,381 |
| Other noncurrent liabilities and deferred credits | 1,747 | 1,822 |
| Total liabilities | $ 10,591 | $ 10,584 |

**4.    RESERVE FOR INCOME TAX RECEIVABLE**

At March 31, 2014, EFIH had an income tax receivable from EFH Corp. totaling $77 million that arose in the three months ended March 31, 2014 under the Federal and State Income Tax Allocation Agreement.  In consideration of the Bankruptcy Filing, EFIH fully reserved the income tax receivable because of the significant uncertainty regarding its ultimate settlement.  The charge was reported in other deductions.

At December 31, 2013, EFIH had an income tax receivable from EFH Corp. totaling $110 million that arose under the Federal and State Income Tax Allocation Agreement.  In the fourth quarter 2013, EFIH fully reserved the income tax receivable because of the significant uncertainty regarding its ultimate settlement.

5. **DEBT**

**Debtor-In-Possession (DIP) Facilities**

*EFIH First Lien DIP Facility* — EFIH has received a binding commitment and agreements to participate, subject to certain customary conditions, for a $5.4 billion first-lien DIP facility described below (the EFIH First Lien DIP Facility). EFIH filed a motion with the Bankruptcy Court for approval of certain fees related to the EFIH First Lien DIP Facility.

The proposed EFIH First Lien DIP Facility is a Senior Secured, Super-Priority Credit Agreement by and among the EFIH Debtors, the lenders that are party thereto from time to time and an administrative and collateral agent.

On May 1, 2014, the Bankruptcy Court approved an interim order authorizing the EFIH Debtors to pay certain fees related to the EFIH Debtors' proposed EFIH First Lien DIP Facility in accordance with the EFIH First Lien DIP commitment letter and the EFIH First Lien DIP fee letter.

See Note 2 for further discussion regarding the Restructuring Support and Lock-Up Agreement, the EFIH First Lien Settlement and the EFIH First Lien DIP Facility.

The principal amounts outstanding under the EFIH First Lien DIP Facility will bear interest based on applicable LIBOR or base rates plus applicable margins as set forth in the EFIH First Lien DIP Facility. The EFIH First Lien DIP Facility also will provide for certain additional fees payable to the agents and lenders, as well as availability fees payable with respect to any unused portions of the available EFIH First Lien DIP Facility.

The EFIH First Lien DIP Facility will mature on the twenty-fourth month after the closing date of the EFIH First Lien DIP Facility. The maturity date may be extended to the thirtieth month after the closing date of the EFIH First Lien DIP Facility subject to the satisfaction of certain conditions, including the payment of a 25 basis points extension fee, a requirement that an acceptable plan of reorganization has been filed on or prior to such extension and the availability of certain metrics of liquidity applicable to the EFIH Debtors.

EFIH's obligations under the EFIH First Lien DIP Facility will be secured by a first lien covering substantially all of EFIH's assets, rights and properties, subject to certain exceptions set forth in the EFIH First Lien DIP Facility. The EFIH First Lien DIP Facility provides that all obligations thereunder will constitute administrative expenses in the Chapter 11 Cases, with administrative priority and senior secured state under Section 364(c) and 364(d) of the Bankruptcy Code and, subject to certain exceptions set forth in the EFIH First Lien DIP Facility, will have priority over any and all administrative expense claims, unsecured claims and costs and expenses in the Chapter 11 Cases.

The EFIH First Lien DIP Facility will provide for affirmative and negative covenants applicable to the EFIH Debtors, including affirmative covenants requiring the EFIH Debtors to provide financial information, budgets and other information to the agents under the EFIH First Lien DIP Facility, and negative covenants restricting the EFIH Debtors' ability to incur additional indebtedness, grant liens, dispose of assets, pay dividends or take certain other actions, in each case except as permitted in the EFIH First Lien DIP Facility. EFIH's ability to borrow under the EFIH First Lien DIP Facility will be subject to the satisfaction of certain customary conditions precedent set forth therein. The Oncor Ring-Fenced Entities will not be restricted subsidiaries for purposes of the EFIH First Lien DIP Facility.

The EFIH First Lien DIP Facility will provide for certain customary events of default, including events of default resulting from non-payment of principal, interest or other amounts when due, material breaches of representations and warranties, material breaches of covenants in the EFIH First Lien DIP Facility or ancillary loan documents, cross-defaults under other agreements or instruments and the entry of material judgments against EFIH. The EFIH First Lien DIP Facility will also include an event of default that may arise from its failure to meet a minimum liquidity test. Upon the existence of an event of default, the EFIH First Lien DIP Facility will provide that all principal, interest and other amounts due thereunder will become immediately due and payable, either automatically or at the election of specified lenders.

*EFIH Second Lien DIP Facility* — The EFIH Second Lien DIP Facility will provide for a secured, super-priority term loan in the amount of $1.9 billion (with (a) an additional $95 million issued as a payment-in-kind closing fee and (b) additional amounts issued as payment-in-kind interest or a one-time fee if the Oncor TSA Amendment is not approved). The proposed EFIH Second Lien DIP Facility will be a Secured, Subordinated Super-Priority Note Purchase Agreement by and among the EFIH Debtors, the lenders that are party thereto from time to time and an administrative and collateral agent. On the Effective Date, the EFIH Second Lien DIP Notes will automatically convert (Equity Conversion) on a pro rata basis into approximately 64% of the equity interests of newly reorganized EFH Corp. (Reorganized EFH Corp.), subject to adjustment based on the principal amount of the EFIH Second Lien Notes.

See Note 2 for further discussion of the Restructuring Support and Lock-Up Agreement, the EFIH Second Lien DIP Notes Offering and the Backstop Commitment received from certain holders of the EFIH Unsecured Notes.

The principal amounts outstanding under the EFIH Second Lien DIP Facility will bear interest at a fixed rate of 8% per annum, subject to certain adjustments if the Bankruptcy Court has not approved the Oncor TSA Amendment within 90 days after the Petition Date.

The EFIH Second Lien DIP Facility will mature on the twenty-fourth month after the closing date of the EFIH Second Lien DIP Facility.

EFIH's obligations under the EFIH Second Lien DIP Facility will be secured by a second lien covering substantially all of EFIH's assets, rights and properties, subject to certain exceptions set forth in the EFIH Second Lien DIP Facility. The EFIH Second Lien DIP Facility will provide that all obligations thereunder will constitute administrative expenses in the Chapter 11 Cases, with administrative priority and senior secured state under Section 364(c) and 364(d) of the Bankruptcy Code and, subject to certain exceptions set forth in the EFIH Second Lien DIP Facility (including with respect to the EFIH First Lien DIP Facility), will have priority over any and all administrative expense claims, unsecured claims and costs and expenses in the Chapter 11 Cases.

The EFIH Second Lien DIP Facility will provide for affirmative and negative covenants applicable to the EFIH Debtors, including affirmative covenants requiring the EFIH Debtors to provide financial information, budgets and other information to the agents under the EFIH Second Lien DIP Facility, and negative covenants restricting the EFIH Debtors' ability to incur additional indebtedness, grant liens, dispose of assets, pay dividends or take certain other actions, in each case except as permitted in the EFIH Second Lien DIP Facility. EFIH's ability to borrow under the EFIH Second Lien DIP Facility will be subject to the satisfaction of certain customary conditions precedent set forth therein. The Oncor Ring-Fenced Entities will not be restricted subsidiaries for purposes of the EFIH Second Lien DIP Facility.

The EFIH Second Lien DIP Facility will provide for certain customary events of default, including events of default resulting from non-payment of principal, interest or other amounts when due, material breaches of representations and warranties, material breaches of covenants in the EFIH Second Lien DIP Facility or ancillary loan documents, cross-defaults under other agreements or instruments and the entry of material judgments against EFIH. Upon the existence of an event of default, the EFIH Second Lien DIP Facility will provide that all principal, interest and other amounts due thereunder will become immediately due and payable, either automatically or at the election of specified lenders.

**Debt**

The Bankruptcy Filing constituted an event of default under the indentures governing the debt instruments listed below and those debt obligations became immediately due and payable.  As a result, the accompanying consolidated balance sheets as of March 31, 2014 and December 31, 2013 present all debt classified as current.  Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Debtors as a result of the default.

At March 31, 2014 and December 31, 2013, debt consisted of the following:

| | March 31, 2014 | December 31, 2013 |
|---|---:|---:|
| Debt issued by EFIH: | | |
| 6.875% Fixed Senior Secured First Lien Notes due August 15, 2017 | $      503 | $      503 |
| 10% Fixed Senior Secured First Lien Notes due December 1, 2020 | 3,482 | 3,482 |
| 11% Fixed Senior Secured Second Lien Notes due October 1, 2021 | 406 | 406 |
| 11.75% Fixed Senior Secured Second Lien Notes due March 1, 2022 | 1,750 | 1,750 |
| 11.25%/12.25% Senior Toggle Notes due December 1, 2018 | 1,566 | 1,566 |
| 9.75% Fixed Senior Notes due October 15, 2019 | 2 | 2 |
| Unamortized premium | 265 | 284 |
| Unamortized discount | (142) | (146) |
| Total debt issued by EFIH | 7,832 | 7,847 |
| Pushed down debt (a): | | |
| 10.875% EFH Corp. Fixed Senior Notes due November 1, 2017 | 17 | 17 |
| 11.25%/12.00% EFH Corp. Senior Toggle Notes due November 1, 2017 | 13 | 13 |
| Total pushed down debt | 30 | 30 |
| Total debt | $      7,862 | $      7,877 |

_____

(a)  Represents 50% of the amount of these EFH Corp. securities guaranteed by EFIH and pushed down per the discussion below under "Guarantees and Push Down of EFH Corp. Debt."

***Guarantees and Push Down of EFH Corp. Debt***

Merger-related debt of EFH Corp. and its subsidiaries consists of debt issued or existing at the time of the Merger.  Debt issued in exchange for Merger-related debt is considered Merger-related.  Debt issuances for cash are considered Merger-related debt to the extent the proceeds are used to repurchase Merger-related debt.  EFCH and EFIH (excluding their subsidiaries) fully and unconditionally guarantee on a joint and several basis the Merger-related debt of EFH Corp. (parent).  Such debt is subject to push down in accordance with SEC Staff Accounting Bulletin Topic 5-J, and as a result, a portion of such debt and related interest expense is reflected in EFIH's financial statements.  Merger-related debt of EFH Corp. held by its subsidiaries is not subject to push down.

Debt guaranteed and subject to push down at March 31, 2014 totals $60 million and consists of $33 million principal amount of EFH Corp. 10.875% Senior Notes and $27 million principal amount of EFH Corp. 11.25%/12.00% Senior Toggle Notes.  The amount reflected in EFIH's balance sheet as pushed down debt ($30 million at both March 31, 2014 and December 31, 2013, as shown in the debt table above) represents 50% of the principal amount of the EFH Corp. Merger-related debt guaranteed.  This percentage reflects the fact that at the time of the Merger, the equity investments of EFCH and EFIH in their respective operating subsidiaries were essentially equal amounts.  Because payment of principal and interest on the debt is the responsibility of EFH Corp., EFIH records the settlement of such amounts as noncash capital contributions from EFH Corp.

There were no payments of interest by EFH Corp. on debt pushed down for the three months ended March 31, 2014.  EFH Corp. payments of interest on debt pushed down totaled $20 million for the three months ended March 31, 2013.

*Information Regarding Other Significant Pre-Petition Debt*

**EFIH 6.875% Senior Secured Notes** — At March 31, 2014, the principal amount of the EFIH 6.875% Notes totaled $503 million. These notes have a maturity date in August 2017, with interest payable in cash semiannually in arrears on February 15 and August 15 at a fixed rate of 6.875% per annum. The EFIH 6.875% Notes are secured on a first-priority basis by EFIH's pledge of its 100% ownership of the membership interests in Oncor Holdings (the EFIH Collateral) on an equal and ratable basis with the EFIH 10% Notes.

The EFIH 6.875% Notes are senior obligations of EFIH and rank equally in right of payment with all senior indebtedness of EFIH and are senior in right of payment to any future subordinated indebtedness of EFIH. The EFIH 6.875% Notes are effectively senior to all second lien and unsecured indebtedness of EFIH, to the extent of the value of the EFIH Collateral, and are effectively subordinated to any indebtedness of EFIH secured by assets of EFIH other than the EFIH Collateral, to the extent of the value of such assets. Furthermore, the EFIH 6.875% Notes are structurally subordinated to all indebtedness and other liabilities of EFIH's subsidiaries (other than EFIH Finance), including Oncor Holdings and its subsidiaries. The holders of the EFIH 6.875% Notes vote as a separate class from the holders of the EFIH 10% Notes.

There currently are no restricted subsidiaries under the indenture related to the EFIH 6.875% Notes (other than EFIH Finance, which has no assets). Oncor Holdings, the immediate parent of Oncor, and its subsidiaries are unrestricted subsidiaries under the indenture and, accordingly, are not subject to any of the restrictive covenants in the indenture.

The EFIH 6.875% Notes were issued in private placements and are not registered under the Securities Act. EFIH had agreed to use its commercially reasonable efforts to register with the SEC notes having substantially identical terms as the EFIH 6.875% Notes (except for provisions relating to transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable notes for the EFIH 6.875% Notes. Because the exchange offer was not completed, the annual interest rate on the EFIH 6.875% Notes increased by 25 basis points (to 7.125%) on August 15, 2013 and by an additional 25 basis points (to 7.375%) on November 15, 2013.

**EFIH 10% Senior Secured Notes** — At March 31, 2014, the principal amount of the EFIH 10% Notes totaled $3.482 billion. The notes have a maturity date in December 2020, with interest payable in cash semiannually in arrears on June 1 and December 1 at a fixed rate of 10% per annum. The notes are secured by the EFIH Collateral on an equal and ratable basis with the EFIH 6.875% Notes.

The EFIH 10% Notes are senior obligations of EFIH and rank equally in right of payment with all existing and future senior indebtedness of EFIH, including the EFIH 6.875% Notes. The EFIH 10% Notes have substantially the same terms as the EFIH 6.875% Notes. The holders of the EFIH 10% Notes vote as a separate class from the holders of the EFIH 6.875% Notes.

The $1.302 billion of EFIH 10% Notes issued in January 2013 were issued in private placements and are not registered under the Securities Act. EFIH had agreed to use its commercially reasonable efforts to register with the SEC notes having substantially identical terms as the EFIH 10% Notes (except for provisions relating to transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable notes for the EFIH 10% Notes. Because the exchange offer was not completed, the annual interest rate on the EFIH 10% Notes increased by 25 basis points (to 10.25%) on January 30, 2014 and by an additional 25 basis points (to 10.50%) on April 30, 2014.

**EFIH 11% Senior Secured Second Lien Notes** — At March 31, 2014, the principal amount of the EFIH 11% Notes totaled $406 million. The notes have a maturity date in October 2021, with interest payable in cash semiannually in arrears on May 15 and November 15 at a fixed rate of 11% per annum. The EFIH 11% Notes are secured on a second-priority basis by the EFIH Collateral on an equal and ratable basis with the EFIH 11.75% Notes.

The EFIH 11% Notes are senior obligations of EFIH and EFIH Finance and rank equally in right of payment with all senior indebtedness of EFIH and are effectively senior in right of payment to all existing or future unsecured debt of EFIH to the extent of the value of the EFIH Collateral. The notes have substantially the same terms as the EFIH 11.75% Notes discussed below, and the holders of the EFIH 11% Notes will generally vote as a single class with the holders of the EFIH 11.75% Notes.

***EFIH 11.75% Senior Secured Second Lien Notes*** — At March 31, 2014, the principal amount of the EFIH 11.75% Notes totaled $1.750 billion. These notes have a maturity date in March 2022, with interest payable in cash semiannually in arrears on March 1 and September 1 at a fixed rate of 11.75% per annum. The EFIH 11.75% Notes are secured on a second-priority basis by the EFIH Collateral on an equal and ratable basis with the EFIH 11% Notes. The EFIH 11.75% Notes have substantially the same covenants as the EFIH 11% Notes, and the holders of the EFIH 11.75% Notes will generally vote as a single class with the holders of the EFIH 11% Notes.

The EFIH 11.75% Notes were issued in private placements and are not registered under the Securities Act. EFIH had agreed to use its commercially reasonable efforts to register with the SEC notes having substantially identical terms as the EFIH 11.75% Notes (except for provisions relating to transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable notes for the EFIH 11.75% Notes. Because the exchange offer was not completed, the annual interest rate on the EFIH 11.75% Notes increased by 25 basis points (to 12.00%) on February 6, 2013 and by an additional 25 basis points (to 12.25%) on May 6, 2013.

***EFIH 11.25%/12.25% Senior Toggle Notes*** — At March 31, 2014, the principal amount of the EFIH Toggle Notes totaled $1.566 billion. These notes have a maturity date in December 2018, with interest payable semiannually in arrears on June 1 and December 1 at a fixed rate of 11.25% per annum for cash interest and 12.25% per annum for PIK Interest. The terms of the Toggle Notes include an election by EFIH, for any interest period until June 1, 2016, to pay interest on the Toggle Notes (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new EFIH Toggle Notes (PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. EFIH made its 2013 interest payments on the EFIH Toggle Notes by using the PIK feature of those notes.

The EFIH Toggle Notes were issued in private placements and are not registered under the Securities Act. EFIH had agreed to use its commercially reasonable efforts to register with the SEC notes having substantially identical terms as the EFIH Toggle Notes (except for provisions relating to transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable notes for the EFIH Toggle Notes. Because the exchange offer was not completed, the annual interest rate on the EFIH Toggle Notes increased by 25 basis points (to 11.50%) on December 6, 2013 and by an additional 25 basis points (to 11.75%) on March 6, 2014.

***Material Cross Default/Acceleration Provisions*** — Certain of EFIH's financing arrangements contain provisions that result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" or "cross acceleration" provisions. The Bankruptcy Filing triggered defaults on EFIH's debt obligations, but pursuant to the Bankruptcy Code, the creditors are stayed from taking any actions against the Debtors as a result of such defaults.

**Fair Value of Debt**

At March 31, 2014 and December 31, 2013, the estimated fair value of EFIH's debt (including pushed down debt) totaled $7.812 billion and $7.489 billion, respectively, and the carrying amount totaled $7.862 billion and $7.877 billion, respectively. EFIH determines fair value in accordance with accounting standards and at March 31, 2014 its debt fair value represents Level 2 valuations. EFIH obtains security pricing from a vendor who uses broker quotes and third-party pricing services to determine fair values. Where relevant, these prices are validated through subscription services such as Bloomberg.

**6.    COMMITMENTS AND CONTINGENCIES**

***Guarantees***

See Note 5 for discussion of EFIH's guarantees of certain EFH Corp. debt.

***Legal Proceedings***

From time to time, EFIH may be involved in various legal and administrative proceedings in the normal course of business the ultimate resolutions of which, in the opinion of management, should not have a material effect upon its financial condition, results of operations or liquidity.

## 7.    MEMBERSHIP INTERESTS

### Cash Distributions

No cash distributions were made in the three months ended March 31, 2014.  In January 2013, EFIH's board of directors declared, and EFIH paid, a cash distribution to EFH Corp. of $680 million, which was used by EFH Corp. to settle the TCEH Demand Notes (see Note 8).

### Distribution Restrictions

Under applicable law, EFIH is prohibited from paying any distribution to the extent that immediately following payment of such distribution, it would be insolvent.  In addition, due to the Bankruptcy Filing, no dividends are eligible to be paid without the approval of the Bankruptcy Court.

### Affiliate Debt Held by EFIH

As a result of debt exchanges in 2009 through 2013, EFIH held debt securities of EFH Corp. and TCEH.  In December 2012, management determined that some or all of these securities may be returned as dividends to EFH Corp.; accordingly, the balances were reclassified at that time from investment in debt of affiliates and reported as a reduction of membership interests. Interest received reduces the carrying value of the securities and thus increases membership interests.  There was no interest received in the three months ended March 31, 2014.  Interest received for the three months ended March 31, 2013 totaled $163 million after-tax and represented accrued interest on notes distributed to EFH Corp. in first quarter 2013.  As a result of the Bankruptcy Filing, EFIH does not expect to receive further interest payments on affiliate debt securities it holds.

In the first quarter 2013, EFIH distributed to EFH Corp. $6.360 billion principal amount of EFH Corp. debt held.  As a result of this distribution, EFIH reclassified to interest income $284 million (pretax) of mark-to-market gains previously reported in accumulated other comprehensive income.

The principal amounts, coupon rates, maturities and carrying value of holdings of debt of affiliates at both March 31, 2014 and December 31, 2013 are as follows:

|  | Principal Amount (a) | Carrying Value |
|---|---|---|
| EFH Corp. 5.55% Fixed Senior Notes Series P due November 15, 2014 | $    281 | $    185 |
| EFH Corp. 6.50% Fixed Senior Notes Series Q due November 15, 2024 | 545 | 249 |
| EFH Corp. 6.55% Fixed Senior Notes Series R due November 15, 2034 | 456 | 194 |
| TCEH 10.25% Fixed Senior Notes due November 1, 2015 (both periods include $48 million principal amount of Series B Notes) | 79 | 7 |
| Balance reported as reduction in membership interests | $    1,361 | $    635 |

_____

(a)  Pursuant to the terms of the Restructuring Support and Lock-Up Agreement, the debt is expected to be cancelled in connection with the Restructuring Plan.

The indentures governing the EFIH Notes do not limit EFIH's ability to distribute the EFH Corp. debt securities that it holds to EFH Corp. so long as it received such securities in exchange for the issuance of EFIH debt, which applies to all the EFH Corp. debt EFIH currently holds.

*Membership Interests*

The following table presents the changes (all after tax) to membership interests for the three months ended March 31, 2014:

| | Capital Accounts | Affiliate Debt Held by EFIH | Accumulated Other Comprehensive Income (Loss) | Total Membership Interests |
|---|---|---|---|---|
| Balance at December 31, 2013 | $ (1,148) | $ (635) | $ (39) | $ (1,822) |
| Net income | (134) | — | — | (134) |
| Effect of debt push-down from EFH Corp. | 5 | — | — | 5 |
| Balance at March 31, 2014 | $ (1,277) | $ (635) | $ (39) | $ (1,951) |

The following table presents the changes to membership interests for the three months ended March 31, 2013:

| | Capital Accounts | Affiliate Debt Held by EFIH | Accumulated Other Comprehensive Income (Loss) | Total Membership Interests |
|---|---|---|---|---|
| Balance at December 31, 2012 | $ 5,049 | $ (5,388) | $ 160 | $ (179) |
| Net income | 131 | — | — | 131 |
| Cash distributions to EFH Corp. | (680) | — | — | (680) |
| Push-down of deferred net loss on debt exchanges, net of tax | 12 | — | — | 12 |
| Effect of debt push-down from EFH Corp. (a) | 434 | — | — | 434 |
| Distribution to EFH Corp. of debt held as investment | (5,776) | — | — | (5,776) |
| EFH Corp. debt distributed to EFH Corp. ($5.125 billion principal amount) | — | 4,524 | — | 4,524 |
| Net affiliate debt received in debt exchanges ($31 million principal amount) | — | (23) | — | (23) |
| Interest received on holdings of affiliate debt | — | 163 | — | 163 |
| Recognition in interest income of mark-to-market valuations of investments in affiliate debt upon distribution to EFH Corp. | — | — | (185) | (185) |
| Balance at March 31, 2013 | $ (830) | $ (724) | $ (25) | $ (1,579) |

(a) Represents the effect of a reduction of $420 million of debt pushed down from EFH Corp and related interest and income tax effects.

*Accumulated Other Comprehensive Income (Loss)*

There were no material changes to accumulated other comprehensive income (loss) in the three months ended March 31, 2014.

The following table presents the changes to accumulated other comprehensive income (loss) for the three months ended March 31, 2013.  There was no other comprehensive income (loss) before reclassification for the period.

| | Dedesignated Cash Flow Hedges - Oncor | Changes in Fair Values of Investment in Debt Securities of Affiliates | Pension and Other Postretirement Employee Benefit Liabilities Adjustments - Oncor | Total Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|---|
| Balance at December 31, 2012 | $      (23) | $      185 | $      (2) | $      160 |
| Amounts reclassified from accumulated other comprehensive income (loss) and reported in: | | | | |
|    Interest income | — | (284) | — | (284) |
|    Equity in earnings (losses) of unconsolidated subsidiaries | 1 | — | (1) | — |
|    Income tax benefit | — | 99 | — | 99 |
|    Total amount reclassified from accumulated other comprehensive income (loss) during the period | 1 | (185) | (1) | (185) |
| Balance at March 31, 2013 | $      (22) | $      — | $      (3) | $      (25) |

## 8.    RELATED–PARTY TRANSACTIONS

The following represent EFIH's significant related-party transactions.  Also see Note 7 for a discussion of EFH Corp. and TCEH debt securities held by EFIH.

- EFH Corp. allocates expense to EFIH for management fees owed by EFH Corp. to the Sponsor Group.  This expense, which is reported in SG&A expenses, totaled $2 million for the three months ended March 31, 2014.  Beginning with the quarterly management fee due December 31, 2013, the Sponsor Group, while reserving the right to receive the fees, directed EFH Corp. to suspend payments of the management fees for an indefinite period.  Accordingly, EFIH did not reimburse EFH Corp. for the allocated management fees.  There was no allocation of fees to EFIH for the three months ended March 31, 2013.

  In addition to amounts paid directly by EFIH, a subsidiary of EFH Corp. allocates costs to EFIH for legal and other consulting services associated with EFIH's debt restructuring activities, and EFIH reimburses the subsidiary for the allocated costs on a monthly basis.  The allocated expense, which is reported in SG&A expenses, totaled $3 million for the three months ended March 31, 2014.  There was no allocation of legal and other consulting services costs to EFIH for the three months ended March 31, 2013.

  A subsidiary of EFH Corp. bills EFIH for administrative services at cost, and EFIH reimburses the subsidiary for the allocated costs on a monthly basis.  This expense, which is reported in SG&A expenses, totaled $1 million for the three months ended March 31, 2014.  There was no allocation of administrative service costs to EFIH for the three months ended March 31, 2013.

- EFH Corp. files consolidated federal income tax and Texas state margin tax returns, and under a Federal and State Income Tax Allocation Agreement, allocates income taxes to EFIH substantially as if it were filing its own corporate income tax returns.  At March 31, 2014 and December 31, 2013, EFIH had current income tax receivables from EFH Corp. totaling $77 million and $110 million, respectively, both of which were fully reserved (see Note 5).  EFIH made no income tax payments to EFH Corp. for the three months ended March 31, 2014.  EFIH's income tax payments to EFH Corp. totaled $3 million for the three months ended March 31, 2013.  See discussion below in this note regarding allocation of income tax liabilities to Oncor Holdings and Oncor.

- At December 31, 2012, EFH Corp. had demand notes payable (TCEH Demand Notes) to TCEH totaling $698 million arising from borrowings used to fund EFH Corp. debt principal and interest payments (P&I Note) and net borrowings for general corporate purposes (SG&A Note).  EFIH was a guarantor of these demand notes.  EFH Corp. settled the balance of the TCEH Demand Notes in January 2013 using the cash distribution from EFIH discussed in Note 7.

- Affiliates of the Sponsor Group have sold or acquired, and in the future may sell or acquire, debt or debt securities issued by EFIH in open market transactions or through loan syndications.

See Note 5 regarding guarantees and push-down of certain EFH Corp. debt and Note 7 regarding distributions to, and contributions from, EFH Corp.

Significant related-party transactions between Oncor Holdings (including its consolidated subsidiary Oncor) and EFH Corp., other affiliates of EFH Corp. and the Sponsor Group are as follows:

- Oncor receives payments from TCEH for services it provides, principally the delivery of electricity.  Revenues recorded by Oncor for these services totaled $241 million and $225 million for the three months ended March 31, 2014 and 2013, respectively.  The fees are based on rates regulated by the PUCT that apply to all REPs.  These revenues from TCEH represented 26% and 28% of Oncor Holdings' operating revenues for the three months ended March 31, 2014 and 2013, respectively.  Oncor Holdings' balance sheets at March 31, 2014 and December 31, 2013 reflect receivables from affiliates totaling $120 million and $135 million, respectively, consisting almost entirely of trade receivables from TCEH related to these electricity delivery fees.

- Oncor pays EFH Corp. subsidiaries for financial and other administrative services and shared facilities at cost.  Such amounts increased reported operation and maintenance expense by $9 million and $8 million for the three months ended March 31, 2014 and 2013, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility (reported on TCEH's balance sheet) is funded by a delivery fee surcharge collected from REPs by Oncor, as collection agent, and remitted monthly to TCEH.  The delivery fee surcharges remitted to TCEH totaled $4 million for both the three months ended March 31, 2014 and 2013.

- EFH Corp. files a consolidated federal income tax return that includes Oncor Holdings' results.  Oncor is not a member of EFH Corp.'s consolidated tax group, but EFH Corp.'s consolidated federal income tax return includes EFH Corp.'s portion of Oncor's results as a result of EFH Corp.'s equity ownership in Oncor.  EFH Corp. also files a consolidated Texas state margin tax return that includes all of Oncor Holdings' and Oncor's results.  However, under a Federal and State Income Tax Allocation Agreement, Oncor Holdings and Oncor record their federal income and Texas state margin taxes substantially as if Oncor Holdings and Oncor were filing their own corporate income tax returns.

  At March 31, 2014, Oncor Holdings had a current payable to EFH Corp. related to federal and state income taxes totaling $63 million, which includes $61 million payable by Oncor.  The Oncor payable to EFH Corp. consists of a $51 million federal income tax payable and $28 million state margin tax payable net of an $18 million federal income tax receivable.  At December 31, 2013, Oncor Holdings had a current payable totaling $7 million, which included $5 million payable by Oncor.  Oncor's liability at December 31, 2013 consists of a $23 million state margin tax payable net of an $18 million federal income tax receivable.

  For the three months ended March 31, 2014 and 2013, Oncor Holdings made income tax payments to EFH Corp totaling $5 million and $9 million, respectively.  Oncor made no income tax payments to EFH Corp. for the three months ended March 31, 2014 and 2013.

- Oncor has requirements in place to assure adequate creditworthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of Oncor Electric Delivery Transition Bond Company LLC.  Under these requirements, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods.  Accordingly, at both March 31, 2014 and December 31, 2013, TCEH had posted letters of credit in the amount of $9 million for Oncor's benefit.

- Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger.  As part of this stipulation, TCEH would be required to post a letter of credit in an amount equal to $170 million to secure its payment obligations to Oncor in the event, which has not occurred, two or more rating agencies downgrade Oncor's credit rating below investment grade.

- Affiliates of the Sponsor Group have (1) sold or acquired Oncor's debt or debt securities in open market transactions or through loan syndications, and (2) performed various financial advisory, dealer, commercial banking and investment banking services for Oncor and certain of its affiliates for which they have received customary fees and expenses.

- Oncor has participated in plans sponsored by EFH Corp. that provide pension, health care and other retiree benefits.  Accordingly, Oncor Holdings' consolidated financial statements have reflected allocations to Oncor of amounts related to these retiree benefit plans.  Certain regulatory provisions allow for the recovery by Oncor of retiree benefit costs for all applicable former employees of EFH Corp.'s regulated predecessor integrated electric utility, which in addition to Oncor's active and retired employees consists largely of active and retired personnel engaged in TCEH's activities, related to service of those additional personnel prior to the deregulation and disaggregation of EFH Corp.'s businesses effective January 1, 2002.  Accordingly, Oncor and TCEH entered into an agreement whereby Oncor assumed responsibility for applicable retiree benefit costs related to those personnel.

  Oncor's retained liability under the Employee Retirement Income Security Act of 1974 (ERISA) relates to the nonrecoverable portion of the unfunded obligation of EFH Corp.'s pension plan.  In the first quarter 2014, TCEH contributed $20 million to the EFH Corp. pension plan assets, resulting in the plan being fully funded as calculated under the provisions of ERISA.

  In the second quarter 2014, Oncor and EFH Corp. entered into an agreement whereby Oncor will cease participation in EFH Corp.'s OPEB Plan and establish its own OPEB plan for Oncor's eligible retirees and their dependents effective July 1, 2014.  Participants in the EFH Corp. OPEB plan with split service will become participants in the Oncor plan.  The methodology for OPEB cost allocations between EFH Corp. and Oncor is not expected to change, and the agreement is not expected to have a material effect on the net assets or cash flows of EFH Corp.

**9.    SUPPLEMENTARY FINANCIAL INFORMATION**

*Interest Expense and Related Charges*

| | Three Months Ended March 31, | |
| | 2014 | 2013 |
|---|---|---|
| Interest paid/accrued | $ 161 | $ 150 |
| Interest expense related to pushed down debt | 1 | 3 |
| Interest expense on toggle notes payable with additional principal (Note 5) | 49 | 41 |
| Amortization of debt exchange premiums | (18) | (22) |
| Amortization of debt exchange discounts and issuance costs | 5 | 12 |
| Total interest expense and related charges | $ 198 | $ 184 |

*Supplemental Cash Flow Information*

| | Three Months Ended March 31, | |
| | 2014 | 2013 |
|---|---|---|
| Cash payments related to: | | |
| Interest on EFIH debt | $ 125 | $ 125 |
| Income taxes | — | 3 |
| Noncash investing and financing activities: | | |
| Parent's payment of interest on pushed-down debt accounted for as a contribution of capital (net of tax) (Note 5) | — | 18 |
| Reduction of debt pushed down from EFH Corp. (a) | — | (420) |
| Debt exchange transactions (b) | — | 14 |
| Distribution to EFH Corp. of debt held as an investment (Note 7) | — | (5,776) |

_____

(a)  For the three months ended March 31, 2013, represents $838 million principal amount of EFH Corp. debt exchanged (at 50%).

(b)  For the three months ended March 31, 2013 reflects: $1.302 billion of EFIH debt issued in exchange for $1.310 billion of EFH Corp. and EFIH debt and $89 million of EFIH debt issued in exchange for $95 million of EFH Corp. debt.

**Item 2.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of EFIH's financial condition and results of operations for the three months ended March 31, 2014 and 2013 should be read in conjunction with its condensed consolidated financial statements and the notes to those statements.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

*Business*

EFIH, a direct, wholly owned subsidiary of EFH Corp., is a Dallas, Texas-based holding company whose wholly owned subsidiary, Oncor Holdings, holds a majority interest (approximately 80%) in Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell electricity to residential, business and other consumers in the north-central, eastern and western parts of Texas. Revenues from services provided to TCEH represented 26% and 28% of Oncor's total reported consolidated revenues for the three months ended March 31, 2014 and 2013, respectively. EFIH has no reportable business segments. See Notes 1 and 3 to Financial Statements for a discussion of the reporting of EFIH's investment in Oncor Holdings as an equity method investment and a description of the "ring-fencing" measures implemented with respect to Oncor Holdings and Oncor. These measures were put in place to further enhance Oncor's credit quality and mitigate Oncor's and Oncor Holdings' exposure to the Texas Holdings Group with the intent to minimize the risk that a court would order any of the assets and liabilities of the Oncor Ring-Fenced Entities to be substantively consolidated with those of any member of the Texas Holdings Group in the event any such member were to become a debtor in a bankruptcy case. EFIH believes, as several major credit rating agencies have acknowledged, that the likelihood of such substantive consolidation of the Oncor Ring-Fenced Entities' assets and liabilities is remote in consideration of the ring-fencing measures and applicable law.

*Significant Activities and Events and Items Influencing Future Performance*

***Filing under Chapter 11 of the United States Bankruptcy Code*** — On April 29, 2014 (the Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, (the Debtors) filed voluntary petitions for relief (the Bankruptcy Filing) under Chapter 11 of the United States Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (the Bankruptcy Court). During the pendency of the Bankruptcy Filing (the Chapter 11 Cases), the Debtors will operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code. EFH Corp. intends to conduct its business operations in the normal course and maintain its focus on achieving excellence in customer service and meeting the needs of electricity consumers in Texas.

In 2013, EFH Corp. began to engage in discussions with certain creditors, including EFIH creditors, with respect to proposed changes to its capital structure. In anticipation of the Bankruptcy Filing, on April 29, 2014, the Debtors entered into a Restructuring Support and Lock-Up Agreement (the Restructuring Support and Lock-Up Agreement) with various stakeholders in order to effect an agreed upon restructuring of the Debtors through a pre-arranged Chapter 11 plan of reorganization (the Restructuring Plan).

***Restructuring Support and Lock-Up Agreement*** — *General* — In anticipation of the Bankruptcy Filing, on April 29, 2014, the Debtors, Texas Holdings and its general partner Texas Energy Future Capital Holdings LLC (TEF and, together with Texas Holdings, the Consenting Interest Holders) and the Consenting Creditors entered into the Restructuring Support and Lock-Up Agreement in order to effect an agreed upon restructuring of the Debtors through the Restructuring Plan.

Pursuant to the Restructuring Support and Lock-Up Agreement, the Consenting Interest Holders and Consenting Creditors agreed, subject to the terms and conditions contained in the Restructuring Support and Lock-Up Agreement, to support the Debtors' proposed financial restructuring (the Restructuring Transactions), and further agreed to limit certain transfers of any ownership (including any beneficial ownership) in the equity interests of or claims held against the Debtors, including any such interests or claims acquired after executing the Restructuring Support and Lock-Up Agreement.

*Material Restructuring Terms*

The Restructuring Support and Lock-Up Agreement along with the accompanying term sheet sets forth the material terms of the Restructuring Transactions pursuant to which, in general:

*TCEH First Lien Secured Claims*

As a result of the Restructuring Transactions, holders of TCEH first lien secured claims will receive, among other things, their pro rata share of (i) 100% of the equity of newly reorganized TCEH (Reorganized TCEH) consummated through a tax-free spin (in accordance with the Private Letter Ruling described below) in connection with TCEH's emergence from bankruptcy and (ii) all of the net cash from the proceeds of the issuance of new long-term secured debt of Reorganized TCEH.

*TCEH Unsecured Claims*

As a result of the Restructuring Transactions, holders of general unsecured claims against EFCH, TCEH and its subsidiaries (including TCEH first lien deficiency claims, TCEH second lien claims and TCEH unsecured note claims) will receive their pro rata share of the unencumbered assets of TCEH.

*EFIH First Lien Settlement*

Pursuant to the Restructuring Support Agreement, certain holders of EFIH 6.875% Notes and EFIH 10% Notes (such holders, the RSA EFIH First Lien Note Parties) have agreed to voluntary settlements with respect to EFIH's and EFIH Finance's obligations under the EFIH First Lien Notes held by such RSA EFIH First Lien Note Parties.  Under the terms of the settlement, each such RSA EFIH First Lien Note Party has agreed to accept as payment in full of any claims arising out of its EFIH First Lien Notes an amount of loans under the EFIH First Lien DIP Facility (as discussed in Note 5 to Financial Statements) equal to the greater of (a) 105% of the principal amount on the EFIH First Lien Notes plus 101% of the accrued and unpaid interest at the non-default rate on such principal (which amount will be deemed to include the original issue discount on the loans under the EFIH First Lien DIP Facility) or (b) 104% of the principal amount of, plus accrued and unpaid interest at the non-default rate on, the EFIH First Lien Notes, as adjusted by the original issue price discount paid on the loans under the EFIH First Lien DIP Facility in connection with the initial lender syndication of the EFIH First Lien DIP Facility (such settlement, the EFIH First Lien Settlement).  The Debtors plan to file a motion seeking the Bankruptcy Court's approval of the EFIH First Lien Settlement.

On May 6, 2014, EFIH commenced an offer to the remaining holders of the EFIH First Lien Notes to participate in the EFIH First Lien Settlement; provided however, such EFIH First Lien Note holders agree to accept as payment in full of any claims arising out of such holders' EFIH First Lien Notes an amount of loans under the EFIH First Lien DIP Facility (as discussed in Note 5 to Financial Statements) equal to 105% of the principal amount on the EFIH First Lien Notes plus 101% of the accrued and unpaid interest at the non-default rate on such principal (which amount will be deemed to include original issue discount on the loans under the EFIH First Lien DIP Facility).  During the early portion of the Chapter 11 Cases, EFIH expects to initiate litigation to obtain entry of an order from the Bankruptcy Court disallowing the claims of holders of EFIH First Lien Notes not a party to the EFIH First Lien Settlement (non-settling EFIH First Lien Note Holders) derived from or based upon make-whole or other similar payment provisions under the EFIH First Lien Notes.

Following the completion of the EFIH First Lien Settlement offer, Non-Settling EFIH First Lien Note Holders will receive their pro rata share of cash from the proceeds of the EFIH First Lien DIP Facility in an amount equal to the principal plus accrued and unpaid interest through the closing of the EFIH First Lien DIP Facility, at the non-default rate of such holder's claim (not including any premiums, fees, or claims relating to the repayment of the EFIH First Lien Notes).

The EFIH First Lien Settlement and the EFIH Second Lien Settlement will not be consummated unless, among other things, the Bankruptcy Court approves the EFIH First Lien DIP Facility, the EFIH First Lien Settlement, the EFIH Second DIP Facility and the EFIH Second Lien Settlement.

*EFIH First Lien DIP Facility*

On April 28, 2014, EFIH and certain proposed lenders entered into a commitment letter to provide a $5.4 billion first-lien DIP facility as described in Note 5 to Financial Statements (the EFIH First Lien DIP Facility).  As a result of certain parties agreeing to exchange their EFIH First Lien Notes and/or EFIH Second Lien Notes, as applicable, and to provide certain back stop commitments (as described immediately below) under and pursuant to the terms of the Restructuring and Lock-Up Support Agreement, that commitment amount has been significantly reduced.  As of May 6, 2014, the initial lenders' commitment amount under the EFIH First Lien DIP Facility has been reduced from $5.4 billion to $1.85 billion.  In addition, the commitment would be further reduced by an amount of loans under the EFIH First Lien DIP Facility required to consummate the transactions contemplated by the EFIH First Lien Settlement. Any such reduction in commitments that occurs on or before the early participation date in the offer to participate in the EFIH First Lien Settlement will reduce the fees earned by the commitment parties under the commitment letter.  In no event will the aggregate amount of the loans EFIH First Lien DIP Facility exceed $5.4 billion.

Certain holders of EFIH First Lien Notes that signed the Restructuring Support and Lock-Up Agreement have provided backstop commitments to the EFIH First Lien DIP Facility in the amount of $1.7 billion. Receipt of proceeds of such commitments is subject to the satisfaction or waiver of the conditions precedent of the EFIH First Lien DIP Facility, including the rights of a backstop commitment party to approve certain matters and the payment of backstop commitment fees to such significant holders in a range of 1.00% to 1.75% of their respective backstop commitment. A certain backstop party will provide a $50 million commitment on the terms set forth in the EFIH First Lien DIP Facility, including original issue discount, but not including commitment fees.

The initial lenders intend that the EFIH First Lien DIP Facility will be fully syndicated. Syndication may result in certain limited changes to the terms of the EFIH First Lien DIP Facility that make it more favorable to the lenders.

*EFIH Second Lien Settlement*

Pursuant to the Restructuring Support Agreement, certain holders of each of the EFIH 11% Notes and EFIH 11.75% Notes (such holders, the EFIH Second Lien Note Parties) have agreed to voluntary settlements with respect to EFIH's and EFIH Finance's obligations under the EFIH Second Lien Notes held by the EFIH Second Lien Note Parties. Under the terms of the settlement, each EFIH Second Lien Note Party has agreed to accept as payment in full of any claims arising out of its EFIH Second Lien Notes, its pro rata share of an amount in cash equal to (i) 100% of the principal, plus accrued and unpaid interest at the non-default rate on such principal, of EFIH Second Lien Notes held by such EFIH Second Lien Party plus (ii) 50% of the aggregate amount of any claim derived from or based upon make-whole or other similar provisions under the EFIH 11% Notes or EFIH 11.75% Notes (such settlement, the EFIH Second Lien Settlement). The Debtors plan to file a motion seeking the Bankruptcy Court's approval of the EFIH Second Lien Settlement.

EFIH expects to commence an offer to the remaining holders of the EFIH Second Lien Notes to participate in the EFIH Second Lien Settlement. During the early portion of the Chapter 11 Cases, EFIH expects to initiate litigation to obtain entry of an order from the Bankruptcy Court disallowing the claims of holders of EFIH Second Lien Notes not a party to the EFIH Second Lien Settlement (non-settling EFIH Second Lien Note Holders) derived from or based upon make-whole or other similar payment provisions under the EFIH Second Lien Notes.

Following the completion of the EFIH Second Lien Settlement offer, Non-Settling EFIH Second Lien Note Holders will receive their pro rata share of cash from the proceeds of the EFIH Second Lien DIP Facility (as described below) in an amount equal to the principal plus accrued and unpaid interest through the closing of the EFIH Second Lien DIP Facility, at the non-default rate of such holder's claim (not including any premiums, fees, or claims relating to the repayment of the EFIH Second Lien Notes).

*EFIH Second Lien DIP Notes Offering*

During the early portion of the Chapter 11 Cases, EFIH and EFIH Finance expect to offer (the EFIH Second Lien DIP Notes Offering) to all holders as of a specified record date of EFIH Unsecured Notes the right to purchase up to its pro rata share of $1.73 billion aggregate principal amount of 8% Mandatorily Convertible Second Lien Subordinated Secured DIP Financing Tranche A-1 Notes due 2016 (EFIH Second Lien DIP Tranche A-1 Notes). Concurrently with the EFIH Second Lien DIP Notes Offering, EFIH and EFIH Finance will also offer (the concurrent offering) to a significant EFIH Second Lien Note Party the right to purchase up to $170 million aggregate principal amount of 8% Mandatorily Convertible Second Lien Subordinated Secured DIP Financing Tranche A-3 Notes due 2016 (EFIH Second Lien DIP Tranche A-3 Notes). If such significant EFIH Second Lien Note Party elects to participate in the offering, EFIH will pay such party $11.3 million. To the extent the Backstop Parties are required to purchase any notes in the offering pursuant to the terms of the Commitment Letter (as described below), such notes will be 8% Mandatorily Convertible Second Lien Subordinated Secured DIP Financing Tranche A-2 Notes due 2016 (EFIH Second Lien DIP Tranche A-2 Notes). The EFIH Second Lien DIP Tranche A-1 Notes, the EFIH Second Lien DIP Tranche A-2 Notes and the EFIH Second Lien DIP Tranche A-3 Notes are expected to have the same terms and conditions (other than (i) the ability to trade as a single tranche, (ii) the EFIH Second Lien Tranche A-1 Notes will trade together with the corresponding EFIH Unsecured Notes and (iii) the EFIH Second Lien Tranche A-2 Notes and EFIH Second Lien Tranche A-3 Notes will not trade together with any other notes).

*Backstop Commitment*

In connection with the execution of the Restructuring Support and Lock-Up Agreement, certain holders of the EFIH Unsecured Notes (the Backstop Parties) entered into a commitment letter with EFH Corp. and EFIH, dated April 29, 2014 (the Commitment Letter), pursuant to which such holders committed, severally and not jointly, up to $1.9 billion in available funds (the Backstop Commitment) to purchase EFIH Second Lien DIP Notes not sold in the EFIH Second Lien DIP Notes offering. Any EFIH Second Lien DIP Notes not sold in the EFIH Second Lien DIP Notes offering will be purchased by the Backstop Parties, pro rata in proportion to their respective share of the Backstop Commitment. If any Backstop Party fails to satisfy its obligation to purchase its pro rata share of the unpurchased notes, the other Backstop Parties would have the right, but not the obligation, to purchase such unpurchased notes. The obligations under the Commitment Letter are not subject to the approval of the Oncor TSA Amendment (as described below) by the Bankruptcy Court.

Under the Commitment Letter and in consideration of the Backstop Commitment, EFIH agreed to pay the Backstop Parties a commitment fee consisting of approximately (i) a $10 million execution fee that was paid to the Backstop Parties concurrently with the execution of the Commitment Letter, (ii) a $10 million approval fee to be paid within five days of the issuance of an order by the Bankruptcy Court authorizing the EFIH First Lien Settlement, the EFIH Second Lien Settlement, and the performance by EFH Corp. and EFIH under the Commitment Letter, (iii) a $20 million funding fee to be paid concurrently with the consummation of the EFIH Second Lien DIP Notes Offering to holders of EFIH Unsecured Notes and the concurrent offering and (iv) a fee equal to $95 million payable in the form of Non-Interest Bearing Mandatorily Convertible Second Lien Subordinated Secured DIP Financing Tranche B Notes due 2016 (EFIH Second Lien DIP Tranche B Notes and, together with the EFIH Second Lien DIP Tranche A-1 Notes, the EFIH Second Lien DIP Tranche A-2 Notes and the EFIH Second Lien DIP Tranche A-3 Notes, the EFIH Second Lien DIP Notes) to be paid concurrently with the consummation of the EFIH Second Lien DIP Notes Offering to holders of EFIH Unsecured Notes and the concurrent offering.

In the event the EFIH Second Lien DIP Notes are repaid in cash prior to the effective date of the plan of reorganization (Effective Date) without the consent of certain creditors, EFIH agreed to pay the Backstop Parties a termination fee of $380 million. In addition, if EFIH seeks to consummate an alternative transaction that delivers equal or greater value to EFIH than the transactions contemplated by the Restructuring Support and Lock-Up Agreement, EFIH agreed to pay the holders of the EFIH Second Lien DIP Notes a break-up fee of approximately $57 million.

*EFIH Unsecured Claims and EFH Corp. Unsecured Claims*

On the Effective Date, all of the EFIH Unsecured Notes and EFH Corp. Unsecured Notes will be canceled. In full satisfaction of all general unsecured claims against EFIH and all general unsecured claims against EFH Corp., (i) each holder of a general unsecured claim against EFIH will receive its pro rata share of 98.0% of the equity interests of newly reorganized EFH Corp. (Reorganized EFH Corp.) (subject to dilution by the Equity Conversion as described below) and (ii) each holder of a general unsecured claim against EFH Corp. will receive its pro rata share of 1.0% of the equity interests of Reorganized EFH Corp. (subject to dilution by the Equity Conversion) and the right to purchase up to 9% of the equity interests in Reorganized EFH Corp. from certain holders of EFIH Second Lien DIP Notes.

Holders of general unsecured claims against EFH Corp. will also receive on the Effective Date their pro rata share of either (A) if the Oncor TSA Amendment (described below) has then been approved, (1) $55 million in cash from EFIH, *provided, however*, that if the Oncor tax payments received by EFIH under the Oncor TSA Amendment through the Effective Date are less than 80% of projected amounts, the $55 million payment will be reduced on a dollar for dollar basis by the amount of such shortfall, and (2) cash on hand at EFH Corp. (not including the settlement payment in clause (1) hereof); or (B) if the Oncor TSA Amendment has not then been approved, all assets of EFH Corp., including cash on hand but excluding the equity interests in EFIH.

*EFH Corp. Equity Interests*

On the Effective Date, all of the equity interests in EFH Corp. (EFH Corp. Interests) will be canceled. In full satisfaction of the claims under the EFH Corp. Interests, each holder of EFH Corp. Interests will receive its pro rata share of 1.0% of the equity interests of Reorganized EFH Corp. (subject to dilution by the Equity Conversion).

*Equity Conversion*

On the Effective Date, the EFIH Second Lien DIP Notes will, subject to certain conditions, automatically convert (Equity Conversion) on a pro rata basis into approximately 64% of the equity interests of Reorganized EFH Corp., subject to adjustment based on the principal amount of the EFIH Second Lien DIP Notes.

*Oncor TSA Amendment*

The Restructuring Support and Lock-Up Agreement provides that the Debtors will request authority from the Bankruptcy Court to amend, or otherwise assign the right to payments under, the Oncor Tax Sharing Agreement (the Oncor TSA Amendment) to provide that any payment required to be made to EFH Corp. under the Oncor Tax Sharing Agreement after March 31, 2014, will instead be made to EFIH. Any tax payments received by EFH Corp. before the Bankruptcy Court enters or denies an order authorizing the Oncor TSA Amendment will be deposited by EFH Corp. into a segregated account until the earlier of (i) the date the Bankruptcy Court enters the order authorizing the Oncor TSA Amendment, in which case such amounts will be remitted to EFIH, or (ii) the date the Bankruptcy Court denies authorization of the Oncor TSA Amendment, in which case such amounts will be remitted to EFH Corp.

The Oncor TSA Amendment will automatically terminate and be of no further force and effect in the event that the Commitment Letter is terminated by the Backstop Parties; provided, however, that any amounts that were paid to EFIH in accordance with the Oncor TSA Amendment before its termination will be retained by EFIH if the Commitment Letter terminates or the EFIH Second Lien DIP Facility is not fully funded in accordance with its terms (i.e., except as a result of a breach by the Backstop Parties). Neither EFH Corp. nor EFIH will have the right to terminate or modify the Oncor TSA Amendment during the Chapter 11 Cases if the EFIH Second Lien DIP Facility is consummated.

If the Bankruptcy Court has not approved the Oncor TSA Amendment within 90 days after the Petition Date, the interest rate on the interest bearing EFIH Second Lien DIP Tranche A Notes (but not the EFIH Second Lien DIP Tranche B Notes) will increase by 4.0% with such additional interest to be paid-in-kind (compounded quarterly) until such approval is received from the Bankruptcy Court. If the Bankruptcy Court has not approved the Oncor TSA Amendment by April 29, 2015, each holder of EFIH Second Lien DIP Notes (including the non-interest bearing EFIH Second Lien DIP Tranche B Notes) will receive additional EFIH Second Lien DIP Notes equal to 10.0% of the amount of EFIH Second Lien DIP Notes held by such holder.

*Private Letter Ruling*

The Restructuring Support and Lock-Up Agreement provides that EFH Corp. will file a request with the IRS for a private letter ruling (Private Letter Ruling) that, among other things, will provide (a) that (i) the transfer by TCEH of all of its assets and its ordinary course operating liabilities to Reorganized TCEH, (ii) the transfer by the Debtors to Reorganized TCEH of certain operating assets and liabilities that are reasonably necessary to the operation of Reorganized TCEH and (iii) the distribution by TCEH of (A) the equity it holds in Reorganized TCEH and (B) the cash proceeds TCEH receives from Reorganized TCEH to the holders of TCEH First Lien Claims will qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G) , 355 and 356 of the Code and (b) for certain other rulings under Sections 368(a)(1)(G) and 355 of the Code.

*Conditions Precedent to Restructuring Transactions*

The Restructuring Support and Lock-Up Agreement provides that the consummation of the Restructuring Transactions is subject to the satisfaction or waiver (if applicable) of various conditions, including, among other things:

- the consummation of the debtor-in-possession financing transactions and settlements described above;

- holders of certain EFH Corp. Nonguaranteed Notes (EFH Corp. 5.55% Series P Senior Notes due 2014, the EFH Corp. 6.50% Series Q Senior Notes due 2024, the EFH Corp. 6.55% Series R Senior Notes due 2034, the EFH Corp. 9.75% Fixed Senior Notes due 2019, and the EFH Corp. 10% Fixed Senior Notes due 2020) will have received not less than 37.15% in value for their respective claims under the plan of reorganization;

- immediately following the distribution by TCEH described above under the heading "Private Letter Ruling", the aggregate tax basis, for federal income tax purposes, of the assets held by Reorganized TCEH will be equal to a specified minimum amount of aggregate tax basis, and the step-up in aggregate tax basis will be no less than $2.1 billion;

- the receipt of requisite regulatory approvals;

- the receipt of the Private Letter Ruling, and

- the receipt of requisite approvals by the Bankruptcy Court.

*Termination*

The Restructuring Support and Lock-Up Agreement may be terminated upon the occurrence and continuation of certain events described in the Restructuring Support and Lock-Up Agreement.

***Operation and Implications of the Chapter 11 Cases*** — The accompanying consolidated financial statements contemplate the realization of assets and the satisfaction of liabilities in the normal course of business.  Our ability to continue as a going concern is contingent upon our ability to comply with the financial and other covenants contained in the debtor-in-possession financing (DIP Facilities, described below), the Bankruptcy Court's approval of the Restructuring Plan or another Chapter 11 plan and our ability to successfully implement the Restructuring Plan or another Chapter 11 plan and obtain new financing, among other factors.  As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors-in-possession under Chapter 11, the Debtors may sell or otherwise dispose of or liquidate assets or settle liabilities, subject to the approval of the Bankruptcy Court or as otherwise permitted in the ordinary course of business (and subject to restrictions contained in the DIP Facilities), for amounts other than those reflected in the accompanying consolidated financial statements.  Further, the Restructuring Plan or another Chapter 11 plan could materially change and may impact the amounts and classifications of assets and liabilities reported in our consolidated financial statements.

***Financing During the Chapter 11 Cases*** — See Note 5 to Financial Statements for discussion of the TCEH DIP Facility, which provides up to $4.5 billion in senior secured, super-priority financing, the EFIH First Lien DIP Facility, which is expected to provide $5.4 billion in senior secured, super-priority financing and the EFIH Second Lien DIP Facility, which is expected to provide $1.9 billion in secured, super-priority financing.

***Chapter 11 Plan*** — A Chapter 11 plan (including the Restructuring Plan) determines the rights and satisfaction of claims of various creditors and security holders and is subject to the ultimate outcome of negotiations and Bankruptcy Court decisions ongoing through the date on which the Chapter 11 plan is confirmed.  The Debtors currently expect that any proposed Chapter 11 plan (including the Restructuring Plan) will provide, among other things, mechanisms for settlement of claims against the Debtors' estates, treatment of EFH Corp.'s existing equity holders and the Debtors' respective existing debt holders, potential income tax liabilities and certain corporate governance and administrative matters pertaining to a reorganized EFH Corp.  Any proposed Chapter 11 plan will (and the Restructuring Plan may) be subject to revision prior to submission to the Bankruptcy Court based upon discussions with the Debtors' creditors and other interested parties, and thereafter in response to creditor claims and objections and the requirements of the Bankruptcy Code or the Bankruptcy Court.  There can be no assurance that the Debtors will be able to secure approval for the Restructuring Plan or any other Chapter 11 plan from the Bankruptcy Court or that any Chapter 11 plan will be accepted by the Debtors' creditors.

In order for the Debtors to emerge successfully from the Chapter 11 Cases as reorganized companies, they must obtain approval from the Bankruptcy Court and certain of their respective creditors for a Chapter 11 plan, which will enable each of the Debtors to transition from the Chapter 11 Cases into reorganized companies conducting ordinary course operations outside of bankruptcy.  In connection with an exit from bankruptcy, TCEH and EFIH will require a new credit facility, or "exit financing." TCEH's and EFIH's ability to obtain such approval, and TCEH's and EFIH's ability to obtain such financing will depend on, among other things, the timing and outcome of various ongoing matters in the Chapter 11 Cases.

***Regulatory Requirements Related to the Bankruptcy Filing*** — Pursuant to the Bankruptcy Code, the Debtors intend to comply with all applicable regulatory requirements, including all requirements related to environmental and safety law compliance, during the pendency of the Chapter 11 Cases.  In addition, the Debtors will seek all necessary and appropriate regulatory approvals necessary to consummate any transactions proposed in the Chapter 11 plan.  Moreover, to the extent the Debtors either maintain insurance policies or self-insure their regulatory compliance obligations, the Debtors intend to continue such insurance policies or self-insurance in the ordinary course of business.

*Significant Bankruptcy Court Actions* — On May 1 and 2, 2014 at the first-day hearings of the Chapter 11 Cases, the Bankruptcy Court issued certain interim orders relating to the Debtors' businesses. These orders authorized the Debtors to, among other things, enter into the TCEH DIP Facilities (described in Note 5), pay certain prepetition employee and retiree expenses and benefits, use their existing cash management system, maintain and administer customer programs primarily at TXU Energy, pay certain critical vendors, perform under certain prepetition hedging and trading arrangements and pay certain prepetition taxes and related fees. In addition, during the first-day hearings, the Bankruptcy Court set June 5 and 6, 2014 as the date for the second-day hearings in the Chapter 11 Cases. We expect that at the second-day hearings the Bankruptcy Court will consider issuing final orders related to the matters approved in the interim orders as well as certain other related matters. These orders are significant because they allow us to operate our businesses in the normal course.

*Credit Risk Exposure to EFH Corp. and its Subsidiaries* — As a result of the Bankruptcy Filing, Oncor has credit risk exposure to trade accounts receivable from TCEH, which relate to delivery services provided by Oncor to TCEH's retail operations. At the Petition Date, these accounts receivable totaled $109 million, including $37 million in unbilled amounts. The accounts receivable are secured by $5 million in letters of credit posted by TCEH. Oncor has additional credit risk exposure to EFH Corp. and certain of its subsidiaries totaling approximately $20 million at the Petition Date, including an $18 million federal income tax receivable from EFH Corp. under the Federal and State Income Tax Allocation Agreement. Additional income tax receivable amounts may arise in the normal course under that agreement.

Because Oncor would not seek regulatory rate recovery for such credit losses, Oncor's earnings could be reduced by the amount (after-tax) of any nonpayment by EFH Corp. and its subsidiaries of amounts owed to Oncor.

Oncor has not established any reserves related to these exposures.

Further, EFIH had an income tax receivable from EFH Corp. totaling $77 million that arose in the three months ended March 31, 2014 under the Federal and State Income Tax Allocation Agreement. In consideration of the Bankruptcy Filing, EFIH fully reserved the income tax receivable because of the significant uncertainty regarding its ultimate settlement. The charge was reported in other deductions.

Table of Contents

## RESULTS OF OPERATIONS

### *Financial Results — Three Months Ended March 31, 2014 Compared to Three Months Ended March 31, 2013*

Selling, general, and administrative expenses totaled $11 million in 2014, and no amounts were recorded in 2013. The 2014 amount includes $8 million for legal and other consulting services associated with EFIH's debt restructuring activities, of which $3 million was allocated by EFH Corp. The 2014 amount also includes $2 million in allocated management fees owed to the Sponsor Group by EFH Corp. See Note 8 to Financial Statements for discussion of allocations from EFH Corp.

Other deductions totaled $77 million in 2014, reflecting the recording of a reserve against EFIH's income tax receivable from EFH Corp. (see Note 4 to Financial Statements).

Interest income – affiliates decreased $284 million to none in 2014. The decline reflects reclassification in 2013 of mark-to-market gains on certain holdings of affiliate debt from accumulated other comprehensive income to interest income. See Note 7 to Financial Statements.

Interest expense and related charges increased $14 million to $198 million in 2014. The increase was driven by the issuance of EFIH Notes in 2013.

Income tax benefit totaled $72 million in 2014 on a pretax loss compared to income tax expense of $36 million on pretax income 2013. Excluding the effect of the reserve against the income tax receivable that was recorded without income tax benefit, the effective tax rate on pretax loss was 34.4% in 2014 compared to 36.0% on pretax income in 2013. The change in the effective income tax rate was driven by higher nondeductible expense related to EFIH's debt restructuring activities.

Equity in earnings of EFIH's Oncor Holdings unconsolidated subsidiary (net of tax) increased $13 million to $80 million in 2014. The increase in equity earnings of Oncor reflected higher revenues driven by the effects of colder winter weather, partially offset by an $8 million favorable tax effect in 2013 due to resolution of certain income tax positions as well as higher depreciation expense. See Note 3 to Financial Statements.

Net loss totaled $134 million in 2014 compared to net income of $131 million in 2013. The $265 million change was driven by a decrease in interest income, an increase in interest expense and the reserve against the income tax receivable from EFH Corp., partially offset by higher equity in earnings of Oncor Holdings.

## FINANCIAL CONDITION

*Cash Flows* — *Three Months Ended March 31, 2014 Compared to Three Months Ended March 31, 2013* — Cash used in operating activities totaled $106 million for both 2014 and 2013.

Amortization of debt issuance costs reported in the statement of consolidated cash flows relates to both the debt pushed down from EFH Corp. and the debt EFIH has issued (see Note 5 to Financial Statements) and is reported in interest expense and related charges in the statement of consolidated income.

There was no cash used in or provided by financing activities in 2014. Cash used in financing activities in 2013 totaled $523 million and reflected a cash distribution to EFH Corp. of $680 million for the purpose of EFH Corp. repaying the balance of the TCEH Demand Notes (see discussion below of investing cash flows), partially offset by $163 million of interest received on holdings of affiliate debt.

There was no cash used in or provided by investing activities in 2014. Cash provided by investing activities in 2013 totaled $680 million and represented a release of funds from escrow to pay a distribution to EFH Corp. in January 2013. The funds represented a portion of the net proceeds from the issuance of EFIH Notes in 2012 that were placed in escrow at that time.

*Liquidity After the Bankruptcy Filing* — Subject to certain exceptions under the Bankruptcy Code, the Bankruptcy Filing automatically enjoined, or stayed, the continuation of most pending judicial or administrative proceedings and the filing of other actions against the Debtors or their property to recover on, collect or secure a claim arising prior to the date of the Bankruptcy Filing (including with respect to EFIH's debt instruments).

EFIH has received binding commitments, subject to certain customary conditions, from certain institutions for DIP Facilities as discussed in Note 5 to Financial Statements. The EFIH First Lien DIP Facility is expected to provide for $5.4 billion in senior secured, super-priority financing. The EFIH Second Lien DIP Facility is expected to provide for $1.9 billion in secured, super-priority financing. The Bankruptcy Court approved interim orders in May 2014 authorizing EFIH to pay certain fees in connection with the EFIH DIP Facility, as described in more detail in Note 5 to Financial Statements. EFIH cannot be certain that the Bankruptcy Court will approve final orders authorizing entry into the EFIH DIP Facilities.

EFIH believes that the DIP Facilities, plus cash distributions received from Oncor Holdings, will be sufficient to fund its anticipated cash requirements through at least the end of 2014. As a result of the Bankruptcy Filing, EFIH does not expect to receive further interest payments on affiliate debt securities it holds.

***Distributions of Earnings from Oncor Holdings*** — Oncor Holdings' distributions of earnings to EFIH totaled $37 million and $31 million for the three months ended March 31, 2014 and 2013, respectively. On May 1, 2014 EFIH received a distribution of $40 million from Oncor Holdings. See Note 3 to Financial Statements for discussion of limitations on amounts Oncor can distribute to its members.

***Income Tax Matters*** — EFH Corp. and its subsidiaries (including EFCH, EFIH, and TCEH, but not including Oncor Holdings and Oncor) are parties to a Federal and State Income Tax Allocation Agreement, which provides, among other things, that any corporate member or disregarded entity in the group is required to make payments to EFH Corp. in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return. EFH Corp., Oncor Holdings, Oncor and Oncor's third-party minority investor are parties to a separate Federal and State Income Tax Allocation Agreement, which governs the computation of federal income tax liability among such parties, and similarly provides, among other things, that each of Oncor Holdings and Oncor will pay EFH Corp. its share of an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return. Pursuant to the proposed Oncor TSA Amendment, any payment required to be made to EFH Corp. under the agreement after March 31, 2014, will instead be made to EFIH.

***Financial Covenants, Credit Rating Provisions and Cross Default Provisions*** — The Bankruptcy Filing constituted an event of default under the agreements governing the debt of EFH Corp. and its subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities. The creditors are, however, stayed from taking any action against the Debtors as a result of such defaults under the Bankruptcy Code. See Note 5 to Financial Statements for discussion of covenants related to the DIP Facilities.

*Material Cross Default/Acceleration Provisions* — Certain of EFIH's financing arrangements contain provisions that result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" or "cross acceleration" provisions. The Bankruptcy Filing triggered defaults on EFIH's debt obligations, but pursuant to the Bankruptcy Code, the creditors are stayed from taking any actions against the Debtors as a result of such defaults.

***Guarantees*** — See Note 6 to Financial Statements for discussion of guarantees.


## OFF-BALANCE SHEET ARRANGEMENTS

See Notes 3 and 6 to Financial Statements regarding VIEs and guarantees, respectively.


## COMMITMENTS AND CONTINGENCIES

See Note 6 to Financial Statements for discussion of commitments and contingencies.


## CHANGES IN ACCOUNTING STANDARDS

There have been no recently issued accounting standards effective after March 31, 2014 that are expected to materially impact EFIH's financial statements.

**Item 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the risk that in the ordinary course of business EFIH may experience a loss in value as a result of changes in market conditions that affect economic factors such as interest rates.  All of EFIH's debt at March 31, 2014 and December 31, 2013 carried fixed interest rates.

Except as discussed below, the information required hereunder is not significantly different from the information set forth in Item 7A, "Quantitative and Qualitative Disclosures About Market Risk" included in EFIH's 2013 Form 10-K and is therefore not presented herein.

*Credit Risk*

***Oncor's Credit Risk*** — Credit risk relates to the risk of loss associated with nonperformance by counterparties.  Oncor's customers consist primarily of REPs.  As a prerequisite for obtaining and maintaining certification, a REP must meet the financial resource standards established by the PUCT.  Meeting these standards does not guarantee that a REP will be able to perform its obligations.  REP certificates granted by the PUCT are subject to suspension and revocation for significant violation of Texas Public Utility Regulatory Act and PUCT rules.  Significant violations include failure to timely remit payments for invoiced charges to a transmission and distribution utility pursuant to the terms of tariffs approved by the PUCT.  PUCT rules allow for the recovery of uncollectible amounts from nonaffiliated REPs, reducing the credit risk of such receivables.

At March 31, 2014, Oncor's exposure to credit risk associated with accounts receivable from nonaffiliate customers totaled $393 million.  The nonaffiliated customer receivable amount is before the allowance for uncollectible accounts, which totaled $3 million, and includes trade accounts receivable from REPs totaling $278 million, which are almost entirely noninvestment grade.  At March 31, 2014, REP subsidiaries of one nonaffiliated entity collectively represented approximately 14% of the nonaffiliated trade receivable amount.  No other nonaffiliated parties represented 10% or more of the total exposure.  Oncor views its exposure to this customer to be within an acceptable level of risk tolerance considering PUCT rules and regulations; however, this concentration increases the risk that a default would have a material effect on cash flows.

See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Significant Activities and Events and Items Influencing Future Performance – Credit Risk Exposure to EFH Corp. and its Subsidiaries" above for discussion of Oncor's credit risk to accounts receivable from affiliates.

See Note 8 to Financial Statements for discussion of transactions between Oncor and TCEH and EFH Corp.

## FORWARD-LOOKING STATEMENTS

This report and other presentations made by EFIH contain "forward-looking statements." All statements, other than statements of historical facts, that are included in this report, or made in presentations, in response to questions or otherwise, that address activities, events or developments that may occur in the future, including such matters as activities related to EFIH's bankruptcy, financial or operational projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of facilities, market and industry developments and the growth of EFIH's business and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely," "unlikely," "expected," "anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements.  Although EFIH believes that in making any such forward-looking statement its expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under Item 1A, "Risk Factors" in EFIH's 2013 Form 10-K and the discussion under Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report and the following important factors, among others, that could cause EFIH's actual results to differ materially from those projected in such forward-looking statements:

- EFIH's ability to obtain the approval of the Bankruptcy Court with respect to the Debtors' motions in the bankruptcy proceedings, including with respect to the DIP Facilities;
- the effectiveness of the overall restructuring activities pursuant to the Bankruptcy Filing and any additional strategies EFIH employs to address its liquidity and capital resources;
- the terms and conditions of any bankruptcy plan that is ultimately approved by the Bankruptcy Court;
- the significant time and effort required to be spent by EFIH's senior management in dealing with the bankruptcy and restructuring activities rather than focusing exclusively on the business;
- EFIH's ability to remain in compliance with the requirements of the DIP Facilities;
- EFIH's ability to maintain or obtain sufficient financing sources or to fund any bankruptcy plan and meet future obligations;
- the actions and decisions of creditors, regulators and other third parties that have an interest in the bankruptcy proceedings that may be inconsistent with EFIH's plans;
- the length of time that the Debtors will be debtors-in-possession under the Bankruptcy Code;
- the actions and decisions of regulatory authorities relative to EFIH's bankruptcy plan;
- restrictions on EFIH's activities due to the terms of its debt agreements, including the DIP Facilities, and restrictions imposed by the Bankruptcy Court;
- EFIH's ability to obtain any required regulatory consent necessary to implement a bankruptcy plan;
- the outcome of potential litigation regarding whether note holders are entitled to make-whole premiums in connection with the treatment of their claims in bankruptcy;
- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the US Congress, the US Federal Energy Regulatory Commission, the North American Electric Reliability Corporation, the Texas Reliability Entity, Inc., the PUCT, the Environmental Protection Agency, and the Texas Commission on Environmental Quality, with respect to, among other things:
  ◦ allowed rate of return;
  ◦ permitted capital structure;
  ◦ industry, market and rate structure;
  ◦ recovery of investments;
  ◦ acquisition and disposal of assets and facilities;
  ◦ operation and construction of facilities;
  ◦ changes in tax laws and policies, and
  ◦ changes in and compliance with environmental and safety laws and policies;
- legal and administrative proceedings and settlements, including the legal proceedings arising out of the bankruptcy;
- general industry trends;
- economic conditions, including the impact of an economic downturn;
- weather conditions, including drought and limitations on access to water, and other natural phenomena, and acts of sabotage, wars or terrorist or cyber security threats or activities;
- population growth or decline, or changes in market supply or demand and demographic patterns, particularly in ERCOT;
- changes in business strategy, development plans or vendor relationships;
- changes in interest rates or rates of inflation;
- changes in operating expenses, liquidity needs and capital expenditures;
- commercial bank and financial market conditions, access to capital, the cost of such capital, and the results of financing and refinancing efforts by EFIH and/or its subsidiaries and affiliates, including availability of funds in the capital markets and the potential impact of disruptions in US credit markets;

- activity in the credit default swap market related to EFIH's debt securities or debt securities of EFH Corp. that EFIH guarantees;
- restrictions placed on EFIH by the agreements governing its debt instruments;
- EFIH's ability to generate sufficient cash flow to make interest payments on, or refinance, its debt instruments;
- changes in technology used by and services offered by EFIH and/or its subsidiaries;
- significant changes in the relationship of EFIH and/or its subsidiaries with their employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;
- changes in assumptions used to estimate costs of providing employee benefits, including medical and dental benefits, pension and other postretirement employee benefits, and future funding requirements related thereto;
- significant changes in critical accounting policies material to EFIH and/or its subsidiaries;
- circumstances that may contribute to impairment of goodwill, intangible or other long-lived assets of EFIH and/or its subsidiaries;
- restrictions imposed by the agreements governing EFIH's, Oncor's and certain of EFH Corp.'s debt instruments;
- defaults under EFIH's debt agreements that could trigger cross default or cross acceleration provisions under other debt agreements;
- EFH Corp.'s or its subsidiaries', including, in particular, TCEH's, ability to make principal and interest payments on their debt EFIH holds as an investment or to provide sufficient capital contributions or loans to EFIH to make interest payments on its debt instruments;
- hazards customary to the industry and the possibility that EFIH and/or its subsidiaries may not have adequate insurance to cover losses resulting from such hazards;
- actions by credit rating agencies, and
- the ability of EFIH and/or its subsidiaries to effectively execute their operational strategy.

Any forward-looking statement speaks only at the date on which it is made, and except as may be required by law, EFIH undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events.  New factors emerge from time to time, and it is not possible for EFIH to predict all of them; nor can EFIH assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement.  As such, you should not unduly rely on such forward-looking statements.

**Item 4.    CONTROLS AND PROCEDURES**

An evaluation was performed under the supervision and with the participation of EFIH's management, including the principal executive officer and principal financial officer, of the effectiveness of the design and operation of the disclosure controls and procedures in effect at the end of the current period included in this quarterly report.  Based on the evaluation performed, EFIH's management, including the principal executive officer and principal financial officer, concluded that the disclosure controls and procedures were effective.  During the most recent fiscal quarter covered by this quarterly report, there has been no change in EFIH's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, EFIH's internal control over financial reporting.

## PART II.  OTHER INFORMATION

### Item 1.    LEGAL PROCEEDINGS

Reference is made to the discussion in Note 6 to Financial Statements regarding legal proceedings.

### Item 1A.   RISK FACTORS

There have been no material changes from the risk factors discussed in Part I, "Item 1A. Risk Factors" in EFIH's 2013 Form 10-K, as amended, except for the risk factors discussed more fully below and the information disclosed elsewhere in this Form 10-Q that provides factual updates to risk factors contained in EFIH's 2013 Form 10-K, as amended.  The risks described in such reports are not the only risks facing the company.

***The structure of the reorganized company could differ in material respects from the structure contemplated by the Restructuring Support and Lock-Up Agreement.***

The description of the various parts of the Restructuring Plan, including the transactions contemplated by the Restructuring Support and Lock-Up Agreement, assumes that all parts of the Restructuring Plan are approved and implemented as currently proposed.  However, there can be no assurance that all or any part of the Restructuring Plan will in fact be approved in the form currently proposed, in the timeframe currently expected, or at all.  The bankruptcy process is inherently uncertain, and subject to the actions and decisions of creditors and other third parties who have interests in the Chapter 11 Cases, including the risk of objections to the proposed Restructuring Plan and the risk of litigation.  In addition, the Bankruptcy Court has broad discretion in its review and approval of all and any parts of the Restructuring Plan.  As a result of these uncertainties, the capital and other structure of the reorganized company, if a Chapter 11 reorganization is implemented at all, could differ in very material respects from the transactions contemplated by the Restructuring Support and Lock-Up Agreement.

***EFIH may not be able to obtain exit financing to repay the DIP Facilities or, if it is able to obtain such exit financing, the credit agreement governing such exit financing may significantly restrict its financing and operations flexibility after emerging from bankruptcy.***

It is expected that the EFIH First Lien DIP Facility will be repaid using the proceeds from borrowings under exit financing that will be put in place at EFIH in connection with its emergence from bankruptcy.  EFIH's ability to obtain such exit financing will depend on, among other things, the timing and outcome of various ongoing matters in the Chapter 11 Cases, EFIH's business, operations and financial condition, and market conditions.  EFIH has not yet received any commitment with respect to any exit facilities, and there can be no assurance that it will be able to obtain such exit facilities on reasonable economic terms, or at all.  If EFIH cannot secure exit financing, it may not be able to emerge from bankruptcy and may not be able to repay the EFIH First Lien DIP Facility at its maturity.  Any exit financing that EFIH is able to secure may include a number of significant restrictive covenants which could impair its financing and operational flexibility and make it difficult for EFIH to react to market conditions and satisfy its ongoing capital needs and unanticipated cash requirements.  In addition, such exit facilities may require EFIH to periodically meet various financial ratios and tests such as maximum capital expenditure, maximum leverage, minimum excess availability and minimum interest coverage levels. These financial covenants and tests could limit EFIH's ability to react to market conditions or satisfy extraordinary capital needs and could otherwise restrict its financing and operations.

### Item 4.    MINE SAFETY DISCLOSURES

Not applicable.

### Item 5.    OTHER INFORMATION

None.

**Item 6.    EXHIBITS**

(a)    Exhibits filed or furnished as part of Part II are:

| Exhibits | Previously Filed With File Number* | As Exhibit | | |
|---|---|---|---|---|
| **(3(i))** | **Articles of Incorporation** | | | |
| 3(a) | 333-153529<br>Form S-4<br>(filed September 17, 2008) | 3(c) | — | Certificate of Formation of Energy Future Intermediate Holding Company LLC, as amended |
| **(3(ii))** | **By-laws** | | | |
| 3(b) | 1-34544<br>Form 10-K<br>(filed February 21, 2012) | 3(b) | — | Second Amended and Restated Limited Liability Company Agreement of Energy Future Intermediate Holding Company LLC |
| **(10)** | **Material Contracts** | | | |
| | **Credit Agreements and Related Agreements** | | | |
| 10(a) | 1-12833<br>Form 8-K<br>(filed May 7, 2014) | 10.1 | — | Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of May 5, 2014 among EFCH, as Parent Guarantor, TCEH, as Borrower, the Several Lenders from Time to Time Parties Thereto, Citibank, N.A., as Administrative Agent and Collateral Agent, the Co-Syndication Agents Parties Thereto, the Co-Documentation Agents Parties thereto and the Joint Lead Arrangers and Joint Bookrunners Parties thereto |
| **(31)** | **Rule 13a - 14(a)/15d - 14(a) Certifications.** | | | |
| 31(a) | | | — | Certification of John F. Young, chair, president and chief executive of Energy Future Intermediate Holding Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31(b) | | | — | Certification of Paul M. Keglevic, executive vice president and chief financial officer of Energy Future Intermediate Holding Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| **(32)** | **Section 1350 Certifications.** | | | |
| 32(a) | | | — | Certification of John F. Young, chair, president and chief executive of Energy Future Intermediate Holding Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32(b) | | | — | Certification of Paul M. Keglevic, executive vice president and chief financial officer of Energy Future Intermediate Holding Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| **(99)** | **Additional Exhibits** | | | |
| 99(a) | | | — | Condensed Statement of Consolidated Income - Twelve Months Ended March 31, 2014. |
| | **XBRL Data Files** | | | |
| 101.INS | | | — | XBRL Instance Document |
| 101.SCH | | | — | XBRL Taxonomy Extension Schema Document |
| 101.CAL | | | — | XBRL Taxonomy Extension Calculation Document |
| 101.DEF | | | — | XBRL Taxonomy Extension Definition Document |
| 101.LAB | | | — | XBRL Taxonomy Extension Labels Document |
| 101.PRE | | | — | XBRL Taxonomy Extension Presentation Document |

_____

\*    Incorporated herein by reference

Table of Contents

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

| | |
|---|---|
| By: | /s/ STANLEY J. SZLAUDERBACH |
| Name: | Stanley J. Szlauderbach |
| Title: | Senior Vice President and Controller (Principal Accounting Officer) |

Date:  May 7, 2014

Exhibit 31(a)

## ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
### Certificate Pursuant to Section 302
### of Sarbanes - Oxley Act of 2002

I, John F. Young, certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Energy Future Intermediate Holding Company LLC;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  May 7, 2014                                                    /s/ JOHN F. YOUNG

                                          Name:    John F. Young
                                          Title:    Chair, President and Chief Executive

Exhibit 31(b)

# ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
## Certificate Pursuant to Section 302
## of Sarbanes - Oxley Act of 2002

I, Paul M. Keglevic, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Energy Future Intermediate Holding Company LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  May 7, 2014

/s/ PAUL M. KEGLEVIC

Name:  Paul M. Keglevic

Title:  Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer

**Exhibit 32 (a)**

## ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
### Certificate Pursuant to Section 906
### of Sarbanes - Oxley Act of 2002
### CERTIFICATION OF CEO

The undersigned, John F. Young, Chair, President and Chief Executive of Energy Future Intermediate Holding Company LLC (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1. The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2014 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 7th day of May, 2014.

/s/ JOHN F. YOUNG

Name:    John F. Young
Title:    Chair, President and Chief Executive

A signed original of this written statement required by Section 906 has been provided to Energy Future Intermediate Holding Company LLC and will be retained by Energy Future Intermediate Holding Company LLC and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 32(b)

## ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
### Certificate Pursuant to Section 906
### of Sarbanes - Oxley Act of 2002
### CERTIFICATION OF CFO

The undersigned, Paul M. Keglevic, Executive Vice President and Chief Financial Officer of Energy Future Intermediate Holding Company LLC (the "Company"), DOES HEREBY CERTIFY that, to his knowledge:

1. The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2014 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 7th day of May, 2014.

|  |  |
|---|---|
|  | /s/ PAUL M. KEGLEVIC |
| Name: | Paul M. Keglevic |
| Title: | Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer |

A signed original of this written statement required by Section 906 has been provided to Energy Future Intermediate Holding Company LLC and will be retained by Energy Future Intermediate Holding Company LLC and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 99(a)

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**
**CONDENSED STATEMENT OF CONSOLIDATED INCOME (LOSS)**
**(Unaudited)**

|  | Twelve Months Ended March 31, 2014 |
|---|---|
|  | (millions of dollars) |
| Selling, general and administrative expenses | $ (31) |
| Restructuring and other (a) | (187) |
| Interest expense and related charges | (774) |
| Loss before income taxes and equity in earnings of unconsolidated subsidiary | (992) |
| Income tax benefit | 277 |
| Equity in earnings of unconsolidated subsidiaries (net of tax) | 348 |
| Net loss | $ (367) |

_____

(a)   Restructuring and other represents reserve for income taxes receivable from EFH Corp.

B26 (Official Form 26) – Cont.

**Tab F**

**Oncor Electric 10Q**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

---

# FORM 10-Q

[√] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2014

— OR —

[  ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

---

Commission File Number 333-100240

# Oncor Electric Delivery Company LLC

(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Delaware | 75-2967830 |
| (State of Organization) | (I.R.S. Employer Identification No.) |
| 1616 Woodall Rodgers Fwy., Dallas, TX  75202 | (214) 486-2000 |
| (Address of Principal Executive Offices) | (Registrant's Telephone Number) |

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes_____  No _√_

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes  _√_  No _____

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer _____     Accelerated filer _____     Non-Accelerated filer _√_   (Do not check if a smaller reporting company)
Smaller reporting company ___

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes___  No _√_

As of May 1, 2014,  80.03% of the outstanding membership interests in Oncor Electric Delivery Company LLC (Oncor) were directly held by Oncor Electric Delivery Holdings Company LLC and indirectly by Energy Future Holdings Corp.,  19.75% of the outstanding membership interests were held by Texas Transmission Investment LLC and 0.22% of the outstanding membership interests  were indirectly held by certain members of Oncor's management and board of directors.  None of the membership interests are publicly traded.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **GLOSSARY** | 2 |
| **PART I   FINANCIAL INFORMATION** | 5 |
| **ITEM 1.   FINANCIAL STATEMENTS (UNAUDITED)** | 5 |
| Condensed Statements of Consolidated Income — Three Months Ended March 31, 2014 and 2013 | 5 |
| Condensed Statements of Consolidated Comprehensive Income — Three Months Ended March 31, 2014 and 2013 | 5 |
| Condensed Statements of Consolidated Cash Flows — Three Months Ended March 31, 2014 and 2013 | 6 |
| Condensed Consolidated Balance Sheets — March 31, 2014 and December 31, 2013 | 7 |
| Notes to Condensed Consolidated Financial Statements | 8 |
| Item 2.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION  AND RESULTS OF OPERATIONS | 22 |
| Item 3.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 32 |
| Item 4.   CONTROLS AND PROCEDURES | 34 |
| **PART II.   OTHER INFORMATION** | 35 |
| Item 1.   LEGAL PROCEEDINGS | 35 |
| Item 1A  RISK FACTORS | 35 |
| Item 2.   UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS | 35 |
| Item 3.   DEFAULTS UPON SENIOR SECURITIES | 35 |
| Item 4.   MINE SAFETY DISCLOSURES | 35 |
| Item 5.   OTHER INFORMATION | 35 |
| Item 6.   EXHIBITS | 36 |
| **SIGNATURE** | 37 |

Oncor Electric Delivery Company LLC's (Oncor) annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports are made available to the public, free of charge, on the  Oncor website at http://www.oncor.com as soon as reasonably practicable after they have been filed with or furnished to the Securities and Exchange Commission.  The information on Oncor's website  or available by hyperlink from the website  shall not be deemed a part of, or incorporated by reference into, this quarterly report on Form 10-Q.  The representations and warranties contained in any agreement that we have filed as an exhibit to this quarterly report on Form 10-Q or that we have or may publicly file in the future may contain representations and warranties made by and to the parties thereto as of specific dates.   Such representations and warranties may be subject to exceptions and qualifications contained in separate disclosure schedules, may represent the parties' risk allocation in the particular transaction, or may be qualified by materiality standards that differ from what may be viewed as material for securities law purposes.

This Form 10-Q and other Securities and Exchange Commission filings of Oncor and its subsidiary occasionally make references to Oncor (or "we," "our," "us" or "the company") when describing actions, rights or obligations of its subsidiary.  These references reflect the fact that the subsidiary is consolidated with Oncor for financial reporting purposes.  However, these references should not be interpreted to imply that Oncor is actually undertaking the action or has the rights or obligations of its subsidiary or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or of any other affiliate.

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **2013 Form 10-K** | Oncor's Annual Report on Form 10-K for the year ended December 31, 20 13 |
| **AMS** | advanced metering system |
| **Bondco** | Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs. |
| **CREZ** | Competitive Renewable Energy Zone |
| **Deed of Trust** | Deed of Trust, Security Agreement and Fixture Filing, dated as of May 15, 2008, made by Oncor to and for the benefit of The Bank of New York Mellon Trust Company, N.A. (as successor to The Bank of New York Mellon, formerly The Bank of New York), as collateral agent, as amended |
| **EECRF** | energy efficiency cost recovery factor |
| **EFCH** | Refers to Energy Future Competitive Holdings Company LLC, a direct, wholly -owned subsidiary of EFH Corp. and the direct parent of TCEH, and/or its subsidiaries, depending on context. |
| **EFH Bankruptcy Proceedings** | Refers to voluntary petitions for relief under Chapter 11 of the US Bankruptcy Code filed in US Bankruptcy Court for the District of Delaware on April 29, 2014 (EFH Petition Date) by EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH. The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings. |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH. |
| **EFH Petition Date** | April 29, 2014. See EFH Bankruptcy Proceedings above. |
| **EFH Retirement Plan** | Refers to a defined benefit pension plan sponsored by EFH Corp., in which Oncor participat es. In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) into a new plan. See Oncor Retirement Plan below. |
| **EFIH** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** | generally accepted accounting principles |
| **Investment LLC** | Refers to Oncor Management Investment LLC, a limited liability company and minority membership interest owner (approximately 0.22%) of Oncor, whose managing member is Oncor and whose Class B Interests are owned by certain members of the management team and independent directors of Oncor. |
| **IRS** | US Internal Revenue Service |
| **LIBOR** | London Interbank Offered Rate, an interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |

| | |
|---|---|
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct , majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context. |
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner (approximately 80.03%) of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor Retirement Plan** | Refers to the defined benefit pension plan sponsored by Oncor.  In 2012, EFH Corp. made various changes to the EFH Retirement Plan, including splitting off all of the assets and liabilities associated with Oncor employees and all retirees and terminated vested participants of EFH Corp. and its subsidiaries (including discontinued businesses) into a new plan.  Effective January 1, 2013, Oncor assumed sponsorship of this new plan. |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries , including Oncor. |
| **OPEB** | other postretirement employee benefits |
| **OPEB Plan** | Refers to an EFH Corp. sponsored plan (in which Oncor participates) that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from the company. |
| **PUCT** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **purchase accounting** | The purchase method of accounting for a business combination as prescribed by US GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values.  The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **REP** | retail electric provider |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. (a credit rating agency) |
| **SEC** | US Securities and Exchange Commission |
| **Sponsor Group** | Refers collectively to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Global, LLC (together with its affiliates, TPG) and GS Capital Partners, an affiliate of Goldman, Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFCH and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context.  Its major subsidiaries include Luminant and TXU Energy. |
| **TCOS** | transmission cost of service |
| **TCRF** | transmission cost recovery factor |
| **Texas Holdings** | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |

| | |
|---|---|
| **Texas Holdings Group** | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas margin tax** | A privilege tax imposed on taxable entities chartered/organized or doing business in the State of Texas that, for accounting purposes, is reported as an income tax.  Also referred to as "Texas franchise tax" and/or "Texas gross margin tax." |
| **Texas Transmission** | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor.  Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd.  Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers.  TXU Energy is a REP in competitive areas of ERCOT. |
| **US** | United States of America |

4

PART I. FINANCIAL INFORMATION

ITEM 1.          FINANCIAL STATEMENTS

**ONCOR ELECTRIC DELIVERY COMPANY LLC**
**CONDENSED STATEMENTS OF CONSOLIDATED INCOME**
**(Unaudited)**

| | Three Months Ended March 31, | |
| | 2014 | 2013 |
| --- | ---: | ---: |
| | (millions of dollars) | |
| Operating revenues: | | |
| Nonaffiliates | $ 676 | $ 592 |
| Affiliates | 241 | 225 |
| Total operating revenues | 917 | 817 |
| Operating expenses: | | |
| Wholesale transmission service | 179 | 131 |
| Operation and maintenance | 166 | 167 |
| Depreciation and amortization | 210 | 199 |
| Provision in lieu of income taxes (Note 10) | 63 | 38 |
| Taxes other than amounts related to income taxes | 108 | 102 |
| Total operating expenses | 726 | 637 |
| Operating income | 191 | 180 |
| Other income and deductions: | | |
| Other income (Note 11) | 4 | 5 |
| Other deductions (Note 11) | 3 | 4 |
| Nonoperating provision in lieu of income taxes | 1 | 1 |
| Interest income | 1 | 1 |
| Interest expense and related charges (Note 11) | 88 | 94 |
| Net income | $ 104 | $ 87 |

See Notes to Financial Statements.

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended March 31, | |
| | 2014 | 2013 |
| --- | ---: | ---: |
| | (millions of dollars) | |
| Net income | $ 104 | $ 87 |
| Other comprehensive income (loss): | | |
| Cash flow hedges – derivative value net loss recognized in net income (net of tax benefit of $– and $–) (Note 1) | - | 1 |
| Defined benefit pension plans (net of tax benefit of $– and $–) (Note 9) | - | (1) |
| Total other comprehensive income (loss) | - | - |
| Comprehensive income | $ 104 | $ 87 |

See Notes to Financial Statements.

5

**ONCOR ELECTRIC DELIVERY COMPANY LLC**
**CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| | (millions of dollars) | |
| Cash flows — operating activities: | | |
| Net income | $ 104 | $ 87 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 220 | 207 |
| Provision in lieu of deferred income taxes – net | (2) | 39 |
| Other – net | (1) | (1) |
| Changes in operating assets and liabilities: | | |
| Deferred revenues (Note 4) | 1 | (12) |
| Changes in other operating assets and liabilities | (124) | (162) |
| Cash provided by operating activities | 198 | 158 |
| Cash flows — financing activities: | | |
| Repayments of long-term debt (Note 6) | (28) | (27) |
| Net increase in short-term borrowings (Note 5) | 234 | 242 |
| Distributions to members (Note 8) | (53) | (50) |
| Debt discount, premium, financing and reacquisition expenses – net | (1) | (1) |
| Cash provided by financing activities | 152 | 164 |
| Cash flows — investing activities: | | |
| Capital expenditures | (347) | (349) |
| Other – net | 1 | 3 |
| Cash used in investing activities | (346) | (346) |
| Net change in cash and cash equivalents | 4 | (24) |
| Cash and cash equivalents — beginning balance | 27 | 45 |
| Cash and cash equivalents — ending balance | $ 31 | $ 21 |

See Notes to Financial Statements.

6

**ONCOR ELECTRIC DELIVERY COMPANY LLC**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

|  | At March 31, 2014 | At December 31, 2013 |
|---|---|---|
|  | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 31 | $ 27 |
| Restricted cash — Bondco (Note 11) | 58 | 52 |
| Trade accounts receivable from nonaffiliates – net (Note 11) | 390 | 385 |
| Trade accounts and other receivables from affiliates – net (Note 10) | 120 | 135 |
| Amounts receivable from members related to income taxes (Note 10) | 23 | 23 |
| Materials and supplies inventories — at average cost | 69 | 65 |
| Prepayments and other current assets | 84 | 79 |
| Total current assets | 775 | 766 |
| Restricted cash — Bondco (Note 11) | 16 | 16 |
| Investments and other property (Note 11) | 91 | 91 |
| Property, plant and equipment – net (Note 11) | 12,068 | 11,902 |
| Goodwill (Note 11) | 4,064 | 4,064 |
| Regulatory assets – net — Oncor (Note 4) | 1,025 | 1,098 |
| Regulatory assets – net — Bondco (Note 4) | 197 | 226 |
| Other noncurrent assets | 79 | 71 |
| Total assets | $ 18,315 | $ 18,234 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 5) | $ 979 | $ 745 |
| Long-term debt due currently — Oncor (Note 6) | 500 | - |
| Long-term debt due currently — Bondco (Note 6) | 133 | 131 |
| Trade accounts payable to nonaffiliates | 147 | 178 |
| Amounts payable to members related to income taxes (Note 10) | 92 | 23 |
| Accrued taxes other than amounts related to income | 65 | 169 |
| Accrued interest | 64 | 95 |
| Other current liabilities | 118 | 135 |
| Total current liabilities | 2,098 | 1,476 |
| Long-term debt, less amounts due currently — Oncor (Note 6) | 4,703 | 5,202 |
| Long-term debt, less amounts due currently — Bondco (Note 6) | 149 | 179 |
| Liability in lieu of deferred income taxes (Note 10) | 2,422 | 2,414 |
| Other noncurrent liabilities and deferred credits (Note 11) | 1,483 | 1,554 |
| Total liabilities | 10,855 | 10,825 |
| Commitments and contingencies (Note 7) | | |
| Membership interests (Note 8): | | |
| Capital account — number of interests outstanding 2014 and 2013 – 635,000,000 | 7,508 | 7,457 |
| Accumulated other comprehensive loss | (48) | (48) |
| Total membership interests | 7,460 | 7,409 |
| Total liabilities and membership interests | $ 18,315 | $ 18,234 |

See Notes to Financial Statements.

7

**ONCOR ELECTRIC DELIVERY COMPANY LLC**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1.  BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

References in this report to "we," "our," "us" and "the company" are to Oncor and/or its subsidiary as apparent in the context.  See "Glossary" for definition of terms and abbreviations.

We are a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.  Revenues from TCEH represented 26% and 28% of our total operating revenues for the three months ended March 31, 2014 and 2013, respectively.  We are a direct, majority-owned subsidiary of Oncor Holdings, which is a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp.  EFH Corp. is a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.  Oncor Holdings owns  80.03% of our membership interests, Texas Transmission owns 19.75% of our membership interests and certain members of our management team and board of directors indirectly own the remaining membership interests through Investment LLC.  We are managed as an integrated business; consequently, there are no separate reportable business segments.

Our consolidated financial statements include our wholly-owned, bankruptcy-remote financing subsidiary, Bondco, a variable interest entity.  This financing subsidiary was organized for the limited purpose of issuing certain transition bonds in 2003 and 2004.  Bondco issued $ 1.3 billion principal amount of transition bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and our credit quality.  These measures serve to mitigate our and Oncor Holdings' credit exposure to the Texas Holdings Group and to reduce the risk that our assets and liabilities or those of Oncor Holdings would be substantially consolidated with the assets and liabilities of the Texas Holdings Group in connection with a bankruptcy of one or more of those entities.  Such measures include, among other things: our sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; our board of directors being comprised of a majority of independent directors; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group.  The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any  member of the Texas Holdings Group.  We do not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa.  Accordingly, our operations are conducted, and our cash flows are managed, independently from the Texas Holdings Group.

### EFH Corp. Bankruptcy Proceedings

On April 29, 2014 (EFH Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH, commenced proceedings under Chapter 11 of the US Bankruptcy Code.  The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings.  We believe the "ring-fencing" measures discussed above mitigate our  potential exposure to the EFH Bankruptcy Proceedings.  See Note  2 for a discussion of the potential impacts of the EFH Bankruptcy Proceedings on our financial statements.

### Basis of Presentation

Our condensed consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as the audited financial statements in our 2013 Form 10-K.  Adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included

8

therein.  All intercompany items and transactions have been eliminated in consolidation.  Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the  SEC.  Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes in our 2013 Form 10-K.  The results of operations for an interim period may not give a true indication of results for a full year due to seasonality.  All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

### Use of Estimates

Preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements.  In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information.

### Derivative Instruments and Mark-to-Market Accounting

We have from time-to-time entered into derivative instruments to hedge interest rate risk.  If the instrument meets the definition of a derivative under accounting standards related to derivative instruments and hedging activities, the fair value of each derivative is recognized on the balance sheet as a derivative asset or liability and changes in the fair value are recognized in net income, unless criteria for certain exceptions are met.  This recognition is referred to as "mark-to-market" accounting.

### Reconcilable Tariffs

The PUCT has designated certain tariffs (TCRF, EECRF surcharges, AMS surcharges and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred costs are deferred as either regulatory assets or regulatory liabilities.  Accordingly, at prescribed intervals, future tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.

### Contingencies

We evaluate and account for contingencies using the best information available.  A loss contingency is accrued and disclosed when it is probable that an asset has been impaired or a liability incurred and the amount of the loss can be reasonably estimated.  If a range of probable loss is established, the minimum amount in the range is accrued, unless some other amount within the range appears to be a better estimate.  If the probable loss cannot be reasonably estimated, no accrual is recorded, but the loss contingency is disclosed to the effect that the probable loss cannot be reasonably estimated.  A loss contingency will be disclosed when it is reasonably possible that an asset has been impaired or a liability incurred.  If the likelihood that an impairment or incurrence is remote, the contingency is neither accrued nor disclosed.  Gain contingencies are recognized upon realization.

## 2.   SUBSEQUENT EVENT

On the EFH Petition Date, EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH,  commenced proceedings under Chapter 11 of the US Bankruptcy Code.  The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings.  We believe the "ring-fencing" measures discussed above mitigate our potential exposure to the EFH Bankruptcy Proceedings.

At March 31, 2014, our receivables from the Texas Holdings Group totaled  $138 million.  As of the EFH Petition Date, we estimate that our receivables  from the Texas Holdings Group totaled approximately $124 million as indicated below.  The US Bankruptcy Code automatically enjoined, or stayed, us from judicial or administrative proceedings or filing of other actions against our affiliates or their property to recover, collect or secure our claims arising prior to the EFH Petition Date.  Following the EFH Petition Date, EFH Corp. has sought approval from the

9

bankruptcy court to pay or otherwise honor certain prepetition obligations generally designed to stabilize its operations.  Included in the EFH Corp. requests are the obligations owed to us representing our receivables.  If the bankruptcy court determines that EFH Corp. cannot pay any of these obligations, we would incur a loss in the amount of the related receivable.  Therefore, we estimate the potential pre-tax loss to be in the range of zero to $124 million depending on the outcome of various aspects of the EFH Bankruptcy Proceedings.  We are unable to predict the outcome of the requests at this time.  As such, at March 31, 2014, a provision for uncollectible accounts from affiliates had not been established.  We expect to collect for services rendered to the Texas Holdings Group after the EFH Petition Date.

Our estimate of receivables from EFH Corp. affiliates as of the EFH Petition Date consisted of the following:

| | | |
|---|---|---:|
| Electricity delivery fees (including transition bond charges) | $ | 109 |
| Transition bond charges secured by letters of credit | | (5) |
| Federal income taxes under the tax sharing agreement | | 18 |
| Administrative services, shared facilities and miscellaneous | | 2 |
| Receivables from affiliates | $ | 124 |

The EFH Bankruptcy Proceedings are a complex litigation matter and the full extent of potential liability at this time is unknown.  Bankruptcy courts have broad equitable powers, and as a result, outcomes in bankruptcy proceedings are inherently difficult to predict.  We will continue to evaluate our affiliate transactions and contingencies throughout the EFH Bankruptcy Proceedings to determine any risks and resulting impacts on our financial statements.

See Note 10 for details of our related-party transactions with members of the Texas Holdings Group.

## 3. REGULATORY MATTERS

### 2008 Rate Review

In August 2009, the PUCT issued a final order with respect to our June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (PUCT Docket No. 35717), and new rates were implemented in September 2009.  In November 2009, the PUCT issued an order on rehearing that established a new rate class but did not change the revenue requirements.  We and four other parties appealed various portions of the rate review final order to a state district court.   In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities.  We filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues we appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities.  Oral argument before the Austin Court of Appeals was completed in April 2012.  There is no deadline for the court to act.  We are unable to predict the outcome of the appeal.

See Note 2 to Financial Statements in our 2013 Form 10-K for additional information regarding regulatory matters.

**4.    REGULATORY ASSETS AND LIABILITIES**

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT.  Components of the regulatory assets and liabilities are provided in the table below.  Amounts not earning a return through rate regulation are noted.

| | Remaining Rate Recovery/Amortization Period at | Carrying Amount At | |
| --- | --- | --- | --- |
| | March 31, 2014 | March 31, 2014 | December 31, 2013 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a)(e) | 2 years | $            250 | $            281 |
| Employee retirement costs | 6 years | 67 | 71 |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 229 | 224 |
| Employee retirement liability (a)(c)(d) | To be determined | 480 | 491 |
| Self-insurance reserve (primarily storm recovery costs) — net | 6 years | 150 | 158 |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 194 | 196 |
| Securities reacquisition costs (pre-industry restructure) | 3 years | 30 | 32 |
| Securities reacquisition costs (post-industry restructure) — net | Terms of related debt | 5 | 5 |
| Recoverable amounts in lieu of deferred income taxes — net | Life of related asset or liability | 35 | 42 |
| Rate review expenses (a) | Largely 2 years | 7 | 4 |
| Advanced meter customer education costs | 6 years | 8 | 8 |
| Deferred conventional meter and metering facilities depreciation | Largely 7 years | 140 | 146 |
| Deferred AMS costs | 6 years | 76 | 62 |
| Energy efficiency performance bonus (a) | 1 year | 9 | 12 |
| Under-recovered wholesale transmission service expense — net (a) | 1 year | 38 | 37 |
| Other regulatory assets | Various | 2 | 2 |
| Total regulatory assets | | 1,720 | 1,771 |
| Regulatory liabilities: | | | |
| Estimated net removal costs | Life of utility plant | 423 | 385 |
| Investment tax credit and protected excess deferred taxes | Various | 21 | 23 |
| Over-collection of transition bond revenues (a)(e) | 2 years | 36 | 35 |
| Energy efficiency programs (a) | Not applicable | 18 | 4 |
| Total regulatory liabilities | | 498 | 447 |
| Net regulatory asset | | $          1,222 | $          1,324 |

_____

(a)    Not earning a return in the regulatory rate-setting process.

(b)    Costs incurred since the period covered under the last rate review.

(c)    Recovery is specifically authorized by statute or by the PUCT, subject to reasonableness review.

(d)    Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.

(e)    Bondco net regulatory assets of $197 million at March 31, 2014 consisted of $233 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $36 million.  Bondco net regulatory assets of $226 million at December 31, 2013 consisted of $261 million included in generation-related regulatory assets net of the regulatory liability for over-collection of transition bond revenues of $35 million.

**5.   BORROWINGS UNDER CREDIT FACILITIES**

At March 31, 2014, we had a $2.4 billion secured revolving credit facility to be used for working capital  and general corporate purposes, issuances of letters of credit and support for any commercial paper issuances.  The revolving credit facility expires in October 2016, and we have the option of requesting up to  two one-year extensions, with such extensions subject to certain conditions and lender approval.   The terms of the revolving credit facility allow us to request an additional increase in our borrowing capacity of $ 100 million, provided certain conditions are met, including lender approval.

Borrowings under the revolving credit facility are classified as short-term on the balance sheet and are secured equally and ratably with all of our other secured indebtedness by a first priority lien on property we acquired or constructed for the transmission and distribution of electricity.  The property is mortgaged under the Deed of Trust.

At March 31, 2014, we had outstanding borrowings under the revolving credit facility totaling $ 979 million with an interest rate of 1.65% and outstanding letters of credit totaling $ 7 million.  At December 31, 2013, we had outstanding borrowings under the revolving credit facility totaling $ 745 million with an interest rate of 1.67% and outstanding letters of credit totaling $ 6 million.

Borrowings under the revolving credit facility bear interest at per annum rates equal to, at our option, (i)  LIBOR plus a spread ranging from 1.00% to 1.75% depending on credit ratings assigned to our senior secured non-credit enhanced long-term debt or (ii) an alternate base rate (the highest of (1) the prime rate of JPMorgan Chase, (2) the federal funds effective rate plus 0.50%, and (3) daily one-month LIBOR plus 1.00%) plus a spread ranging from 0.00% to 0.75% depending on credit ratings assigned to our senior secured non-credit enhanced long-term debt.   At March 31, 2014, all outstanding borrowings bore interest at LIBOR plus 1.50%.  Amounts borrowed under the revolving credit facility, once repaid, can be borrowed again from time to time.

An unused commitment fee is payable quarterly in arrears and upon termination or commitment reduction at a rate equal to 0.100% to 0.275% (such spread depending on certain credit ratings assigned to our senior secured debt) of the daily unused commitments under the revolving credit facility.  Letter of credit fees on the stated amount of letters of credit issued under the revolving credit facility are payable to the lenders quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR.  Customary fronting and administrative fees are also payable to letter of credit fronting banks.  At March 31, 2014, letters of credit bore interest at 1.70%, and a commitment fee (at a rate of 0.225% per annum) was payable on the unfunded commitments under the  revolving credit facility, each based on our current credit ratings.

Subject to the limitations described below, borrowing capacity available under the  revolving credit facility at March 31, 2014 and December 31, 2013 was $1.414 billion and $1.649 billion, respectively.  Generally, our indentures and revolving credit facility limit the incurrence of other secured indebtedness except for indebtedness secured equally and ratably with the indentures and revolving credit facility and certain permitted exceptions.  As described further in Note 6 to Financial Statements in our 2013 Form 10-K, the Deed of Trust permits us to secure indebtedness (including borrowings under our revolving credit facility) with the lien of the Deed of Trust up to the aggregate of (i) the  amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that have been certified to the Deed of Trust collateral agent.  At March 31, 2014, the available bond credits were approximately $ 1.940 billion and the amount of additional potential indebtedness that could be secured by property additions, subject to a certification process, was $1.527 billion.  At March 31, 2014, the available borrowing capacity of the revolving credit facility could be fully drawn.

The revolving credit facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, us and our subsidiaries from, among other things: incurring additional liens; entering into mergers and consolidations; and sales of substantial assets.  In addition, the  revolving credit facility requires that we maintain a consolidated senior debt-to-capitalization ratio of no greater than  0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.  For purposes of the ratio, debt is calculated as indebtedness defined in the revolving credit facility (principally, the sum of long-term debt, any capital leases, short-term debt and debt due currently in accordance with US GAAP).  The debt calculation excludes transition bonds issued by Bondco, but includes the unamortized fair value discount related to Bondco.  Capitalization is calculated as membership interests determined in accordance with US GAAP plus indebtedness described above.  At March

31, 2014, we were in compliance with this covenant with a debt-to-capitalization ratio of 0.45 to 1.00 and with all other covenants.

6.  **LONG-TERM DEBT**

At March 31, 2014 and December 31, 2013, our long-term debt consisted of the following:

| | March 31, 2014 | December 31, 2013 |
|---|---|---|
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due January 15, 2015 | $ 500 | $ 500 |
| 5.000% Fixed Senior Notes due September 30, 2017 | 324 | 324 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | 550 |
| 5.750% Fixed Senior Notes due September 30, 2020 | 126 | 126 |
| 4.100% Fixed Senior Notes due June 1, 2022 | 400 | 400 |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | 300 |
| 5.250% Fixed Senior Notes due September 30, 2040 | 475 | 475 |
| 4.550% Fixed Senior Notes due December 1, 2041 | 400 | 400 |
| 5.300% Fixed Senior Notes due June 1, 2042 | 500 | 500 |
| Unamortized discount | (22) | (23) |
| Less amount due currently | (500) | - |
| Long-term debt, less amounts due currently — Oncor | 4,703 | 5,202 |
| Bondco (b): | | |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 | 78 | 106 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 205 | 205 |
| Unamortized fair value discount related to transition bonds | (1) | (1) |
| Less amount due currently | (133) | (131) |
| Long-term debt, less amounts due currently — Bondco | 149 | 179 |
| Total long-term debt, less amounts due currently | $ 4,852 | $ 5,381 |

_____

(a)  Secured by first priority lien on certain transmission and distribution assets equally and ratably with all of Oncor's other secured indebtedness.  See "Deed of Trust" in Note 6 to Financial Statements in our 2013 Form 10-K for additional information.

(b)  The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

### *Debt-Related Activity in 2014*

*Debt Repayments*

Repayments of long-term debt in the three months ended March 31, 2014 totaled $28 million and represent transition bond principal payments at scheduled maturity dates.

### *Fair Value of Long-Term Debt*

At March 31, 2014 and December 31, 2013, the estimated fair value of our long-term debt (including current maturities) totaled $6.382 billion and $6.188 billion, respectively, and the carrying amount totaled $5.485 billion and $5.512 billion, respectively.  The fair value is estimated based upon the market value as determined by quoted market prices, representing Level 1 valuations under accounting standards related to the determination of fair value.

**7.    COMMITMENTS AND CONTINGENCIES**

*EFH Bankruptcy Proceedings*

On the EFH Petition Date,  EFH Corp. and the substantial majority of its direct and indirect subsidiaries  that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH,  commenced proceedings under Chapter 11 of the US Bankruptcy Code.    The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings.  See Notes  2 and 10 for  a  discussion of the potential impacts on us as a result of the EFH Bankruptcy Proceedings and our related-party transactions involving members of the Texas Holdings Group .

*Guarantees*

We are the lessee under various operating leases that obligate  us to guarantee the residual values of the leased assets.  At March 31, 2014, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled $ 7 million.  These leased assets consist primarily of vehicles used in distribution activities.  The average life of the residual value guarantees under the lease portfolio is approximately  2.2 years.

*Legal/Regulatory Proceedings*

We are involved in various legal and administrative proceedings in the normal course of business , the ultimate resolution of which, in the opinion of management, should not have a material effect upon  our financial position, results of operations or cash flows.  See Note 7 to Financial Statements in our 2013 Form 10-K for additional information regarding our legal and regulatory proceedings .

**8.    MEMBERSHIP INTERESTS**

*Cash Distributions*

On April 30, 2014, our board of directors declared a  cash distribution of $ 57 million, which was paid to our members on May 1, 2014.  In February 2014, our board of directors declared, and we paid a cash distribution of $53 million to our members.

Distributions are limited by our required regulatory capital structure to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at  60% debt to 40% equity.  At March 31, 2014, our regulatory capitalization ratio was 58.4% debt and 41.6% equity.  The PUCT has the authority to determine what types of debt and equity are included in a utility's debt-to-equity ratio.  For purposes of this ratio, debt is calculated as long-term debt plus unamortized gains on reacquired debt less unamortized issuance expenses, premiums and losses on reacquired debt.  The debt calculation excludes transition bonds issued by Bondco.  Equity is calculated as membership interests determined in accordance with US GAAP, excluding the effects of purchase accounting (which included recording the initial goodwill and fair value adjustments and the subsequent related impairments and amortization).  At March 31, 2014, $ 239 million was available for distribution to our members under the capital structure restriction.

14

*Membership Interests*

The following tables present the changes to membership interests during the three months ended March 31, 2014 and 2013:

| | Capital Accounts | Accumulated Other Comprehensive Income (Loss) | Total Membership Interests |
|---|---|---|---|
| Balance at December 31, 2013 | $ 7,457 | $ (48) | $ 7,409 |
| Net income | 104 | - | 104 |
| Distributions | (53) | - | (53) |
| Balance at March 31, 2014 | $ 7,508 | $ (48) | $ 7,460 |

| | Capital Accounts | Accumulated Other Comprehensive Income (Loss) | Total Membership Interests |
|---|---|---|---|
| Balance at December 31, 2012 | $ 7,335 | $ (31) | $ 7,304 |
| Net income | 87 | - | 87 |
| Distributions | (50) | - | (50) |
| Net effects of cash flow hedges (net of tax) | - | 1 | 1 |
| Defined benefit pension plans (net of tax) | - | (1) | (1) |
| Balance at March 31, 2013 | $ 7,372 | $ (31) | $ 7,341 |

*Accumulated Other Comprehensive Income (Loss)*

The following tables present the changes to accumulated other comprehensive income (loss) for the three months ended March 31, 2014 and 2013:

| | Cash Flow Hedges – Interest Rate Swap | Defined Benefit Pension and OPEB Plans | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|
| Balance at December 31, 2013 | $ (26) | $ (22) | $ (48) |
| Defined benefit pension plans (net of tax) | - | - | - |
| Amounts reclassified from accumulated other comprehensive income (loss) and reported in interest expense and related charges | - | - | - |
| Balance at March 31, 2014 | $ (26) | $ (22) | $ (48) |

| | Cash Flow Hedges – Interest Rate Swap | Defined Benefit Pension and OPEB Plans | Accumulated Other Comprehensive Income (Loss) |
|---|---|---|---|
| Balance at December 31, 2012 | $ (28) | $ (3) | $ (31) |
| Defined benefit pension plans (net of tax) | - | (1) | (1) |
| Amounts reclassified from accumulated other comprehensive income (loss) and reported in interest expense and related charges | 1 | - | 1 |
| Balance at March 31, 2013 | $ (27) | $ (4) | $ (31) |

**9.    PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS PLANS**

We participate in two defined pension plans, the Oncor Retirement Plan and the EFH Retirement Plan, and also participate with EFH Corp. and other subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. We also have supplemental pension plans for certain employees whose retirement benefits cannot be fully earned under the qualified retirement plans. See Note 9 to Financial Statements in our 2013 Form 10-K for additional information regarding our pension plans and the OPEB Plan.

Our net costs related to pension plans and the OPEB Plan for the three months ended March 31, 2014 and 2013 were comprised of the following:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | **2014** | **2013** |
| Components of net allocated pension costs: | | |
| Service cost | $        6 | $        6 |
| Interest cost | 33 | 31 |
| Expected return on assets | (34) | (30) |
| Amortization of net loss | 10 | 17 |
| Net pension costs | 15 | 24 |
| Components of net OPEB costs: | | |
| Service cost | 2 | 1 |
| Interest cost | 11 | 10 |
| Expected return on assets | (3) | (3) |
| Amortization of prior service cost | (5) | (5) |
| Amortization of net loss | 6 | 6 |
| Net OPEB costs | 11 | 9 |
| Total net pension and OPEB costs | 26 | 33 |
| Less amounts deferred principally as property or a regulatory asset | (17) | (24) |
| Net amounts recognized as expense | $        9 | $        9 |

The discount rates reflected in net pension and OPEB costs in 2014 are 4.72%, 5.07% and 4.98% for the Oncor Retirement Plan, the EFH Retirement Plan and the OPEB Plan, respectively. The expected return on pension and OPEB plan assets reflected in the 2014 cost amounts are 6.48%, 6.17% and 7.05% for the Oncor Retirement Plan, the EFH Retirement Plan and the OPEB Plan, respectively.

We made cash contributions to the pension plans and OPEB Plan of $65 million and $4 million, respectively, during the three months ended March 31, 2014, and we expect to make additional cash contributions of $22 million and $11 million, respectively, during the remainder of 2014.

16

**10.  RELATED-PARTY TRANSACTIONS**

The following represent our significant related-party transactions . See Note 2 for additional information regarding related-party contingencies resulting from the EFH Bankruptcy Proceedings.

- We record revenue from TCEH, principally for electricity delivery fees, which totaled $ 241 million and $225 million for the three months ended March 31, 2014 and 2013, respectively. The fees are based on rates regulated by the PUCT that apply to all REPs. These revenues included less than $ 1 million for each of the three-month periods ended March 31, 2014 and 2013 pursuant to a transformer maintenance agreement with TCEH. The balance sheets at March 31, 2014 and December 31, 2013 reflect trade accounts and other receivables from affiliates – net totaling $120 million ($42 million of which was unbilled) and $ 135 million ($5 6 million of which was unbilled), respectively, primarily consisting of trade receivables from TCEH related to these electricity delivery fees. As of the EFH Petition Date, we had collected approximately $ 73 million of the accounts receivable from affiliates outstanding at March 31, 2014.

  Trade accounts and other receivables from EFH Corp. affiliates – net reported on our balance sheet consisted of the following:

| | At March 31, 2014 | | At December 31, 2013 | |
|---|---|---|---|---|
| Trade accounts and other receivables from affiliates | $ | 126 | $ | 141 |
| Trade accounts and other payables to affiliates | | (6) | | (6) |
| Trade accounts and other receivables from affiliates – net | $ | 120 | $ | 135 |

- EFH Corp. subsidiaries charge us for certain administrative services at cost. Our payments to EFH Corp. subsidiaries for administrative services, which are primarily reported in operation and maintenance expenses, totaled $8 million for each of the three-month periods ended March 31, 2014 and 2013. We also charge each other for shared facilities at cost . Our payments to EFH Corp. for shared facilities totaled $1 million for the each of the three-month periods ended March 31, 2014 and 2013. Payments we received from EFH Corp. subsidiaries related to shared facilities totaled less than $ 1 million for each of the three-month periods ended March 31, 2014 and 2013.

- We are not a member of EFH Corp.'s consolidated tax group, but EFH Corp.'s consolidated federal income tax return includes EFH Corp.'s portion of our results due to EFH Corp.'s equity ownership in us. Under the terms of a tax sharing agreement among us, Oncor Holdings, Texas Transmission, Investment LLC and EFH Corp., we are generally obligated to make payments to Texas Transmission, Investment LLC and EFH Corp., pro rata in accordance with their respective membership interests, in an aggregate amount that is substantially equal to the amount of federal income taxes that we would have been required to pay if we were filing our own corporate income tax return. For periods prior to the tax sharing agreement (entered into in October 2007 and amended and restated in November 2008), we are responsible for our share , if any, of redetermined tax liability for the EFH Corp. consolidated tax group. EFH Corp. also includes our results in its consolidated Texas margin tax payments, which are accounted for as income taxes and calculated as if we were filing our own return. See discussion in Note 1 to Financial Statements in our 201 3 Form 10-K under "Income Taxes." Under the "in lieu of" tax concept, all in lieu of tax assets and tax liabilities represent amounts that will eventually be settled with our members. No income tax payments were made to or received from members in the three months ended March 31, 2014 and 2013.

Amounts payable to (receivable from) members related to income taxes under the agreement and reported on our balance sheet consisted of the following:

| | At March 31, 2014 | | | At December 31, 2013 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | EFH Corp. | Texas Transmission | Total | EFH Corp. | Texas Transmission | Total |
| Federal income taxes receivable | $ (18) | $ (5) | $ (23) | $ (18) | $ (5) | $ (23) |
| Federal income taxes payable | 51 | 13 | 64 | - | - | - |
| Texas margin taxes payable | 28 | - | 28 | 23 | - | 23 |
| Net payable (receivable) | $ 61 | $ 8 | $ 69 | $ 5 | $ (5) | $ - |

- Our PUCT-approved tariffs include requirements to assure adequate credit worthiness of any REP to support the REP's obligation to collect transition bond-related charges on behalf of Bondco. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, at March 31, 2014 and December 31, 2013, TCEH had posted letters of credit in the amount of $9 million for our benefit.

- Under Texas regulatory provisions, the trust fund for decommissioning TCEH's Comanche Peak nuclear generation facility is funded by a delivery fee surcharge we collect from REPs and remit monthly to TCEH. Delivery fee surcharges totaled $4 million for each of the three-month periods ended March 31, 2014 and 2013. Our sole obligation with regard to nuclear decommissioning is as the collection agent of funds charged to ratepayers for nuclear decommissioning activities. If, at the time of decommissioning, actual decommissioning costs exceed available trust funds, we would not be obligated to pay any shortfalls but would be required to collect any rates approved by the PUCT to recover any additional decommissioning costs. Further, if there were to be a surplus when decommissioning is complete, such surplus would be returned to ratepayers under terms prescribed by the PUCT.

- Affiliates of the Sponsor Group have (1) sold, acquired or participated in the offerings of our debt or debt securities in open market transactions or through loan syndications, and (2) performed various financial advisory, dealer, commercial banking and investment banking services for us and certain of our affiliates for which they have received or will receive customary fees and expenses , and may from time to time in the future participate in any of the items in (1) and (2) above .

See Notes 8 and 9 for information regarding distributions to members and our participation in EFH Corp. pension and OPEB plans, respectively.

18

**11.   SUPPLEMENTARY FINANCIAL INFORMATION**

*Major Customers*

Revenues from TCEH represented 26% and 28% of our total operating revenues for the three months ended March 31, 2014 and 2013, respectively. Revenues from REP subsidiaries of NRG Energy, Inc., a nonaffiliated entity, collectively represented 15% and 16% of our total operating revenues for the three months ended March 31, 2014 and 2013, respectively. No other customer represented 10% or more of our total operating revenues.

### Other Income and Deductions

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | | 2013 | |
| Other income: | | | | |
| Accretion of fair value adjustment (discount) to regulatory assets due to purchase accounting | $ | 3 | $ | 5 |
| Other | | 1 | | - |
| Total other income | $ | 4 | $ | 5 |
| Other deductions: | | | | |
| Professional fees | $ | 1 | $ | 2 |
| Other | | 2 | | 2 |
| Total other deductions | $ | 3 | $ | 4 |

*Interest Expense and Related Charges*

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | | 2013 | |
| Interest expense | $ | 89 | $ | 89 |
| Amortization of debt issuance costs and discounts | | 1 | | 7 |
| Allowance for funds used during construction – capitalized interest portion | | (2) | | (2) |
| Total interest expense and related charges | $ | 88 | $ | 94 |

*Restricted Cash*

All restricted cash amounts reported on our balance sheet at March 31, 2014 and December 31, 2013 relate to the transition bonds.

*Trade Accounts Receivable*

Trade accounts receivable reported on our balance sheet consisted of the following:

| | At March 31, 2014 | | At December 31, 2013 | |
| --- | --- | --- | --- | --- |
| Gross trade accounts receivable | $ | 517 | $ | 527 |
| Trade accounts receivable from TCEH | | (124) | | (139) |
| Allowance for uncollectible accounts | | (3) | | (3) |
| Trade accounts receivable from nonaffiliates – net | $ | 390 | $ | 385 |

Gross trade accounts receivable at March 31, 2014 and December 31, 2013 included unbilled revenues of $150 million and $180 million, respectively. At both March 31, 2014 and December 31, 2013, REP subsidiaries of NRG Energy, Inc., a nonaffiliated entity, collectively represented approximately 14% and 12% of the nonaffiliated trade accounts receivable amount, respectively.

19

Under a PUCT rule relating to the Certification of Retail Electric Providers, write-offs of uncollectible amounts owed by REPs are deferred as a regulatory asset.  Due to commitments made to the PUCT in 2007, we are not allowed to recover bad debt expense, or certain other costs and expenses, from ratepayers in the event of a default or bankruptcy by an affiliate REP.

### *Investments and Other Property*

Investments and other property reported on our balance sheet consisted of the following:

| | At March 31, 2014 | | At December 31, 2013 | |
|---|---|---|---|---|
| Assets related to employee benefit plans, including employee savings programs | $ | 88 | $ | 88 |
| Land | | 3 | | 3 |
| Total investments and other property | $ | 91 | $ | 91 |

### *Property, Plant and Equipment*

Property, plant and equipment reported on our balance sheet consisted of the following:

| | At March 31, 2014 | | At December 31, 2013 | |
|---|---|---|---|---|
| Total assets in service | $ | 17,571 | $ | 17,056 |
| Less accumulated depreciation | | 5,828 | | 5,725 |
| Net of accumulated depreciation | | 11,743 | | 11,331 |
| Construction work in progress | | 310 | | 556 |
| Held for future use | | 15 | | 15 |
| Property, plant and equipment – net | $ | 12,068 | $ | 11,902 |

### *Intangible Assets*

Intangible assets (other than goodwill) reported on our balance sheet consisted of the following:

| | At March 31, 2014 | | | At December 31, 2013 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Identifiable intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Land easements | $ 443 | $ 83 | $ 360 | $ 440 | $ 82 | $ 358 |
| Capitalized software | 394 | 202 | 192 | 385 | 189 | 196 |
| Total | $ 837 | $ 285 | $ 552 | $ 825 | $ 271 | $ 554 |

Aggregate amortization expense for intangible assets totaled $14 million and $15 million for the three months ended March 31, 2014 and 2013, respectively. The estimated aggregate amortization expense for each of the next five fiscal years from December 31, 2013 is as follows:

| Year | Amortization Expense |
|------|------|
| 2014 | $      56 |
| 2015 | 56 |
| 2016 | 53 |
| 2017 | 45 |
| 2018 | 41 |

At both March 31, 2014 and December 31, 2013, goodwill totaling $4.1 billion was reported on our balance sheet. None of this goodwill is being deducted for tax purposes.

### *Other Noncurrent Liabilities and Deferred Credits*

Other noncurrent liabilities and deferred credits reported on our balance sheet consisted of the following:

| | At March 31, 2014 | At December 31, 2013 |
|---|---|---|
| Retirement plans and other employee benefits | $      1,342 | $      1,399 |
| Uncertain tax positions (including accrued interest) | 38 | 56 |
| Amount payable related to income taxes | 17 | 17 |
| Investment tax credits | 20 | 20 |
| Other | 66 | 62 |
| Total other noncurrent liabilities and deferred credits | $      1,483 | $      1,554 |

In the first quarter of 2014, several uncertain tax positions were remeasured under US GAAP guidance as a result of new information received from the IRS with respect to the audit of tax years 2007 through 2009. As a result, we reduced the liability for uncertain tax positions by $18 million. This reduction consisted of a $16 million increase to liability in lieu of deferred income taxes and a $2 million ($1 million after tax) reversal of accrued interest, which is reported as a decrease in provision in lieu of income taxes.

The IRS audit for the years 2003 through 2006 was concluded in June 2011. A significant number of adjustments to the originally filed returns for such years were proposed. In March 2013, EFH Corp. and the IRS agreed on terms to resolve the disputed adjustments. In the first quarter of 2013, we reduced the liability for uncertain tax positions by $76 million to reflect the terms of the agreement. This reduction consisted of a $58 million increase to liability in lieu of deferred income taxes and a reversal of accrued interest and tax totaling $18 million ($12 million after tax), which is reported as a decrease in provision in lieu of income taxes. Any cash income tax impact related to the conclusion of the 2003 through 2006 audit is expected to be immaterial.

### *Supplemental Cash Flow Information*

| | Three Months Ended March 31, | |
|---|---|---|
| | 2014 | 2013 |
| Cash payments (receipts) related to: | | |
| Interest | $      119 | $      96 |
| Capitalized interest | (2) | (2) |
| Interest (net of amounts capitalized) | $      117 | $      94 |
| | | |
| Noncash construction expenditures (a) | $      35 | $      69 |

————————

(a)    Represents end-of-period accruals.

21

**ITEM 2.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of our financial condition and results of operations for the three months ended March 31, 2014 and 2013 should be read in conjunction with the condensed consolidated financial statements and the notes to those statements as well as the Risk Factors contained in our 2013 Form 10-K .

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

**BUSINESS**

We are a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.  Revenues from TCEH represented 26% and 28% of our reported total operating revenues for the three months ended March 31, 2014 and 2013, respectively.   We are a majority-owned subsidiary of Oncor Holdings, which is a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp.  Oncor Holdings owns 80.03% of our outstanding membership interests, Texas Transmission owns 19.75% of our outstanding membership interests and certain members of our management team and board of directors indirectly own the remaining 0.22% of the outstanding membership interests through Investment LLC.   We are managed as an integrated business; consequently, there are no separate reportable business segments.

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and our credit quality.  These measures serve to mitigate our and Oncor Holdings' credit exposure to the Texas Holdings Group and to reduce the risk that our assets and liabilities or those of Oncor Holdings would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in connection with a bankruptcy of one or more of those entities.  Such measures include, among other things:  our sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; our board of directors being comprised of a majority of independent directors ; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group.  The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group.  We do not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa.  Accordingly, our operations are conducted, and our cash flows are managed, independently from the Texas Holdings Group.

*Significant Activities and Events*

*EFH Corp. Bankruptcy Proceedings* — On April 29, 2014 (EFH Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH, commenced proceedings under Chapter 11 of the US Bankruptcy Code.  The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings.  EFH Corp. and EFIH are our direct 80.03% equity holders.  We believe the "ring-fencing" measures discussed above mitigate our potential exposure to the EFH Bankruptcy Proceedings and associated transactions.

At March 31, 2014, our receivables from the Texas Holdings Group totaled $138 million.  As of the EFH Petition Date, we estimate that our receivables from the Texas Holdings Group totaled approximately  $124 million (see Note 2 to Financial Statements).  The US Bankruptcy Code automatically enjoined, or stayed, us from judicial or administrative proceedings or filing of other actions against our affiliates or their property to recover, collect or secure our claims arising prior to the EFH Petition Date.  Following the EFH Petition Date, EFH Corp. has sought approval from the bankruptcy court to pay or otherwise honor certain prepetition obligations generally designed to stabilize its operations.  Included in the EFH Corp. requests are the obligations owed to us representing our receivables.  If the bankruptcy court determines that EFH Corp. cannot pay these obligations, we would incur a loss in the amount of the related receivable.  Therefore, we estimate the potential pre-tax loss to be in the range of zero to $124 million depending on the outcome of the various aspects of the EFH Bankruptcy Proceedings .  We are unable

to predict the outcome of these requests at this time.  We expect to collect for services rendered  to the Texas Holdings Group after the EFH Petition Date.

The EFH Bankruptcy Proceedings are a complex litigation matter and the full extent of potential liability at this time is unknown.  Bankruptcy courts have broad equitable powers, and as a result, outcomes in bankruptcy proceedings are inherently difficult to predict.   We will continue to evaluate our affiliate transactions and contingencies throughout the EFH Bankruptcy Proceedings to determine any risks and resulting impacts on our financial statements in accordance with our accounting policies.  See Notes, 2, 7 and 10 to Financial Statements  and "Item 3. Quantitative and Qualitative Disclosures About Market Risk" for additional information.

For information regarding matters with the PUCT, see discussion below under "Regulation and Rates."

23

**RESULTS OF OPERATIONS**

*Operating Data*

|  | Three Months Ended March 31, | | % |
|---|---|---|---|
|  | 2014 | 2013 | Change |
| **Operating statistics:** | | | |
| Electric energy billed volumes (gigawatt-hours): | | | |
| Residential | 11,343 | 9,455 | 20.0 |
| Other (a) | 16,752 | 16,041 | 4.4 |
| Total electric energy billed volumes | 28,095 | 25,496 | 10.2 |
|  | | | |
| **Reliability statistics (b):** | | | |
| System Average Interruption Duration Index (SAIDI) (nonstorm) | 104.8 | 101.7 | 3.0 |
| System Average Interruption Frequency Index (SAIFI) (nonstorm) | 1.4 | 1.3 | 7.7 |
| Customer Average Interruption Duration Index (CAIDI) (nonstorm) | 75.8 | 78.8 | (3.8) |
|  | | | |
| **Electricity points of delivery (end of period and in thousands):** | | | |
| Electricity distribution points of delivery (based on number of active meters) | 3,296 | 3,253 | 1.3 |

|  | Three Months Ended March 31, | | $ |
|---|---|---|---|
|  | 2014 | 2013 | Change |
| **Operating revenues:** | | | |
| Distribution base revenues | $        448 | $        414 | $      34 |
| Transmission base revenues (TCOS) (c) | 187 | 165 | 22 |
| Reconcilable rates: | | | |
| TCRF (c) | 246 | 192 | 54 |
| Transition charges | 36 | 34 | 2 |
| AMS surcharges | 36 | 40 | (4) |
| EECRF and rate case expense surcharges | 15 | 16 | (1) |
| Other miscellaneous revenues | 15 | 16 | (1) |
| Intercompany eliminations (c) | (66) | (60) | (6) |
| Total operating revenues | $        917 | $        817 | $    100 |

_____

(a)    Includes small business, large commercial and industrial and all other non-residential distribution points of delivery.

(b)    SAIDI is the average number of minutes electric service is interrupted per consumer in a year.  SAIFI is the average number of electric service interruptions per consumer in a year.  CAIDI is the average duration in minutes per electric service interruption in a year.  The statistics presented are based on twelve months ended March 31, 2014 and 2013 data.

(c)    A portion of transmission base revenues (TCOS) is recovered from Oncor's distribution customers through the TCRF rate.

24

*Financial Results — Three Months Ended March 31, 2014 Compared to Three Months Ended March 31, 2013*

Total operating revenues increased $100 million, or 12%, to $917 million in 2014.  All revenue is billed under tariffs approved by the PUCT.  The change reflected:

- *An Increase in Distribution Base Revenues* — Base rates are set periodically in a rate review docket initiated by either us or the PUCT.  The present distribution base rates became effective on January 1, 2012.  The $ 34 million increase in distribution base rate revenues consisted of a $ 32 million impact of higher average consumption, largely driven by the effects of colder weather in 2014 as compared to 2013 and an estimated $ 2 million effect of growth in points of delivery.

- *An Increase in Transmission Base Revenues* — TCOS revenues are collected from load serving entities benefitting from our transmission system.  REPs serving customers in our service territory are billed though the TCRF mechanism discussed below while other load serving entities are billed directly.  In order to reflect changes in our invested transmission capital, PUCT rules allow us to update our TCOS rates by filing up to two interim TCOS rate adjustments in a calendar year.  The $22 million increase in transmission base revenues primarily reflects interim rate increases to recover ongoing investment, including a return component, in the transmission system.  See TCOS Filings Table below for a listing of Transmission Interim Rate Update Applications impacting revenues for the three months ended March 31, 2014 and 2013 as well as filings that will impact revenues for the year ended December 31, 2014.

### TCOS Filings Table

| Docket No. | Filed | Effective | Annual Revenue Impact | Third-Party Wholesale Transmission | Included in TCRF |
|---|---|---|---|---|---|
| 42267 | February 2014 | April 2014 | $    74 | $    47 | $    27 |
| 41706 | July 2013 | September 2013 | $    71 | $    45 | $    26 |
| 41166 | January 2013 | March 2013 | $    27 | $    17 | $    10 |
| 40603 | July 2012 | August 2012 | $    30 | $    19 | $    11 |

- *An Increase in Reconcilable Rates* — The PUCT has designated certain tariffs (TCRF, EECRF surcharge, AMS surcharge and charges related to transition bonds) as reconcilable, which means the differences between amounts billed under these tariffs and the related incurred costs, including a return component where allowed, are deferred as either regulatory assets or regulatory liabilities.  Accordingly, at prescribed intervals, future applicable tariffs are adjusted to either repay regulatory liabilities or collect regulatory assets.  Changes in these tariffs do not impact operating income, except for the AMS return component, but do impact the timing of cash flows.  See Note 1 to Financial Statements for accounting treatment of reconcilable tariffs.

  - *An Increase in TCRF* — TCRF  is a distribution rate charged to REPs to recover fees we pay to other transmission service providers under their TCOS rates and the retail portion of our own TCOS rate.  PUCT rules allow us to update the TCRF component of our retail delivery rates on March 1 and September 1 each year.  The $54 million increase in TCRF revenue reflects the pass through of a $ 48 million increase in third-party wholesale transmission expense described below and a  $6 million increase in our own TCOS rate to recover ongoing investment in our transmission system including a return component.  At March 31, 2014, $38 million was deferred as under-recovered wholesale transmission service expense (see Note 4 to Financial Statements).  See TCRF Filings Table below for a listing of TCRF filings impacting cash flow for the three months ended March 31, 2014 and 2013 as well as filings that will impact cash flow for the year ended December 31, 2014.

25

### TCRF Filings Table

| Docket No. | Filed | Effective | Semi-Annual Billing Impact Increase (Decrease) | |
|---|---|---|---|---|
| 42059 | December 2013 | March 2014 – August 2014 | $ | 44 |
| 41543 | June 2013 | September 2013 – February 2014 | $ | 88 |
| 41002 | November 2012 | March 2013 – August 2013 | $ | (47) |
| 40451 | June 2012 | September 2012 – February 2013 | $ | 129 |

–  *An Increase in Transition Charges* — Transition charge revenue is dedicated to paying the principal and interest of transition bonds.  We account for the difference between transition charge revenue recognized and cost related to the transition bonds as a regulatory liability.  Annual true-up adjustments are filed to increase or decrease the transition charges such that sufficient funds will be collected during the following period to meet scheduled debt service payments.  The final transition bonds mature in 2016.  The $ 2 million increase in charges related to transition bonds corresponds with an offsetting increase in amortization expense and primarily reflects higher electricity volumes delivered by us due to the effects of colder weather in 2014 as compared to 2013.

–  *A Decrease in AMS Surcharges* — The PUCT has authorized monthly per customer advanced meter cost recovery factors designed to recover the cost of our initial AMS deployment over an eleven-year period ending in 2019.  We recognize revenues equal to reconcilable expenses incurred including depreciation net of calculated savings plus a return component on our investment.  The $ 4 million decrease in recognized AMS revenues is due to lower costs associated with meter installation and systems development.

–  *A Decrease in EECRF Surcharges* — The EECRF is a reconcilable rate designed to recover current energy efficiency program costs and performance bonuses earned by exceeding PUCT targets in prior years and recover or refund any over/under recovery of our costs in prior years.  We recognize the performance bonuses in other miscellaneous revenues upon approval by the PUCT.  PUCT rules require us to file an annual EECRF tariff update by the first business day in June of each year for implementation on March 1 of the next calendar year.  For the three months ended March 31, 2014, we recognized a $1 million decrease in EECRF surcharges, which is offset in operation and maintenance expense.  See EECRF Filings Table below for a listing of EECRF filings impacting revenues for the three months ended March 31, 2014 and 2013 as well as filings that will impact revenues for the year ended 2014.

### EECRF Filings Table

| Docket No. | Filed | Effective | Monthly Charge per Residential Customer | | Program Costs | | Performance Bonus | | Under-/ (Over)- Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|
| 41544 | May 2013 | March 2014 | $ | 1.01 * | $ | 62 | $ | 12 | $ | (1) |
| 40361 | May 2012 | January 2013 | $ | 1.23 | $ | 62 | $ | 9 | $ | 2 |

_____

\*  Monthly charge of $1.01 is for a residential customer using 1,000 kWh, as the energy efficiency substantive rules require rates to be on a volumetric basis as of March 2014 rather than a fixed monthly charge.

●  *A Decrease in Other  Miscellaneous Revenues* — Miscellaneous revenues includes disconnect/reconnect fees and other discretionary revenues for services requested by REPs, services provided on a time and materials basis, rents, energy efficiency performance bonuses approved by the PUCT and other miscellaneous revenues .

26

Wholesale transmission service expense increased  $48 million, or 37%, to $179 million in 2014 due to higher fees paid to other transmission entities.

Operation and maintenance expense decreased $1 million, or 1%, to $166 million in 2014.  The change included recognition of a PUCT order allowing recovery of $3 million of rate case expense previously written off,  offset by $3 million in higher vegetation management expenses and other costs.  Operation and maintenance expense also reflects fluctuations in expenses that are offset by corresponding  reconcilable rate revenues, including a $2 million decrease related to advanced meters and a $1 million decrease in costs related to programs designed to improve customer electricity efficiency.  Amortization of regulatory assets reported in operation and maintenance expense totaled $13 million for each of the three-month periods ended March 31,  2014 and 2013.

Depreciation and amortization increased $11 million, or 6%, to $210 million in 2014.  The increase reflected $9 million attributed to ongoing investments in property, plant and equipment  and $2 million in higher amortization of regulatory assets associated with transition bonds (with an offsetting increase in revenues).

Taxes other than amounts related to income taxes increased $6 million, or 6%, to $108 million in 2014.  The change reflected a $4 million increase in property taxes and a $2 million increase in local franchise fees.

Other income totaled $4 million in 2014 and $5 million in 2013, and for both periods, consisted  primarily of the accretion of an adjustment (discount) to regulatory assets resulting from purchase accounting.  See Note 11 to Financial Statements.

Other deductions totaled $3 million in 2014 and $4 million in 2013.  See Note 11 to Financial Statements.

Provision in lieu of income taxes totaled $64 million in 2014 (including $63 million related to operating income and $1 million related to nonoperating income) compared to $39 million (including $38 million related to operating income and $1 million related to nonoperating income) in 2013.  The effective income tax rate on pretax  income was 38.1% in 2014 and 31.0% in 2013.  The increase was primarily due to favorable resolution of uncertain tax positions totaling $12 million in 2013.  The 2014 effective income tax rate on pretax income differs from the US federal statutory rate of 35% primarily due to  $4 million of non-deductible amortization of the regulatory asset attributed to a change in deductibility of the Medicare Part D subsidy as a result of the Patient Protection and Affordable Care Act of 2010 and the effect of the 2014 Texas margin tax,  partially offset by the reversal of $1 million of interest related to favorable resolution of uncertain  tax positions.

Interest expense and related charges decreased $6 million, or 6%, to $88 million in 2014.  The change was driven by a $7 million decrease in amortization of net debt-related costs , partially offset by a $1 million increase attributable to higher average borrowings reflecting ongoing capital investments.

Net income increased $17 million, or 20%, to $104 million in 2014.  The change reflected increased revenue from higher average consumption, largely driven by the effects of colder weather in 2014,  higher transmission rates, growth in points of delivery and lower interest expense,  partially offset by higher income taxes,  higher depreciation and higher ad valorem taxes.

27

FINANCIAL CONDITION

### *LIQUIDITY AND CAPITAL RESOURCES*

#### *Cash Flows — Three Months Ended March 31, 2014 Compared to Three Months Ended March 31, 2013*

Cash provided by operating activities totaled $ 198 million and $158 mllion in 2014 and 2013, respectively.  The $40 million change was driven by a $105 million increase in transmission and distribution receipts due to higher rates and increased consumption attributed to the effects of colder weather in 2014 compared to 2013 , a $74 million increase due to timing of payments in 2013 and a $14 million increase in accounts payable levels.  These increases in cash were partially offset by a  $60 million increase in pension contributions, a $33 million increase in cash payments to third-party transmission providers, a $23 million increase in cash interest payments due to the timing of interest payments on long-term debt made in 2013, a $21 million increase in  storm and liability losses and a $14 million increase in ad valorem tax payments.

Cash provided by financing activities totaled $152 million in 2014 and $164 million in 2013.  The 2014 activity reflected a $234 million increase in short-term borrowings, partially offset by $53  million of cash used in distributions to our members (a $3 million increase compared to 2013 (see Note 8 to Financial Statements)) and $28 million in cash principal payments on transition bonds (a $ 1 million increase compared to 2013 (see Note  6 to Financial Statements)).

Cash used in investing activities, which consists primarily of capital expenditures, totaled $ 346 million in each of the three-month periods ended March 31, 2 014 and 2013.  The 2014 activity reflected  increases in capital expenditures for transmission and distribution facilities to serve new customers and information technology initiatives, offset by decreases in capital expenditures for CREZ.

Depreciation and amortization expense reported in the statements of consolidated cash flows was $ 10 million and $8 million more than the amounts reported in the statements of consolidated income for the three-month periods ended March 31, 2014 and 2013, respectively.  The differences result from amortization reported in the following different lines items in the statements of consolidated income: regulatory  asset amortization (reported in operation and maintenance expense), the accretion of the adjustment (discount) to regulatory assets (reported in other income) and the amortization of debt fair value discount (reported in interest expense and related charges) .

***Long-Term Debt Activity*** — Repayments of long-term debt in the three months ended March 31, 2014 totaled $28 million and represent transition bond principal payments at scheduled maturity dates (see Note  6 to Financial Statements).

***Available Liquidity/Credit Facility*** — Our primary source of liquidity, aside from operating cash flows, is our ability to borrow under our revolving credit facility.  At March 31, 2014, we had a $2.4 billion secured revolving credit facility.  The revolving credit facility expires in October 2016.   Subject to the limitations described below, available borrowing capacity under our revolving credit facility totaled $ 1.414 billion and $1.649 billion at March 31, 2014 and December 31, 2013, respectively.  We may request an increase in our borrowing capacity of $100 million in the aggregate and up to two one-year extensions, provided certain conditions are met, including lender approval.

The revolving credit facility contains a senior debt-to-capitalization ratio covenant that effectively limits our ability to incur indebtedness in the future.  At March 31, 2014, we were in compliance with the covenant.  See " *Financial Covenants, Credit Rating Provisions and Cross Default Provisions*" below for additional information on this covenant and the calculation of this ratio.   The revolving credit facility and the senior notes and debentures issued by us are secured by the Deed of Trust, which permits us to secure other indebtedness with the lien of the Deed of Trust up to the aggregate of (i) the amount of available bond credits, and (ii) 85% of the lower of the fair value or cost of certain property additions that have been certified to the Deed of Trust collateral agent.  Accordingly, the availability under our revolving credit facility is limited by the amount of available bond credits and any property additions certified to the Deed of Trust collateral agent in connection with the revolving credit facility borrowings.  In addition, our outstanding senior notes and debentures are secured by the Deed of Trust.  To the extent we continue to issue debt securities secured by the Deed of Trust, those debt securities would also be

28

limited by the amount of available bond credits and any property additions that have been certified to the Deed of Trust collateral agent.  At March 31, 2014, the available bond credits totaled $1.940 billion, and the amount of additional potential indebtedness that could be secured by property additions, subject to the completion of a certification process, totaled $1.527 billion.  At March 31, 2014, the available borrowing capacity of the revolving credit facility could be fully drawn.

Under the terms of our revolving credit facility, the commitments of the lenders to make loans to us are several and not joint.  Accordingly, if any lender fails to make loans to us, our available liquidity could be reduced by an amount up to the aggregate amount of such lender's commitments under the facility.  See Note 5 to Financial Statements for additional information regarding the revolving credit facility.

Cash and cash equivalents totaled $31 million and $27 million at March 31, 2014 and December 31, 2013, respectively.  Available liquidity (cash and available revolving credit facility capacity) at March 31, 2014 totaled $1.445 billion reflecting a decrease of $231 million from December 31, 2013.  The change reflects our ongoing capital investment in transmission and distribution infrastructure.

We also committed to the PUCT that we would maintain a regulatory capital structure at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.  At March 31, 2014 and December 31, 2013, our regulatory capitalization ratios were 58.4% debt and 41.6% equity and 58.7% debt and 41.3% equity, respectively.  See Note 8 to Financial Statements for discussion of the regulatory capitalization ratio.

***Liquidity Needs, Including Capital Expenditures —*** We expect our capital expenditures to total approximately $1.1 billion in 2014, approximately $1.0 billion in 2015 and approximately $1.1 billion in each of the years 2016 through 2018.  These capital expenditures are expected to be used for investment in transmission and distribution infrastructure.

We expect cash flows from operations, combined with availability under the revolving credit facility, to provide sufficient liquidity to fund current obligations, projected working capital requirements, maturities of long-term debt and capital spending for at least the next twelve months.  We do not anticipate the EFH Bankruptcy Proceedings to have a material impact on our liquidity.  Should additional liquidity or capital requirements arise, we may need to access capital markets, generate equity capital or preserve equity through reductions or suspension of distributions to members.  In addition, we may also consider new debt issuances, repurchases, exchange offers and other transactions in order to refinance or manage our long-term debt.  The inability to raise capital on favorable terms or failure of counterparties to perform under credit or other financial agreements, particularly during any uncertainty in the financial markets, could impact our ability to sustain and grow the business and would likely increase capital costs that may not be recoverable through rates.

***Distributions —*** On April 30, 2014, our board of directors declared a cash distribution of $57 million, which was paid to our members on May 1, 2014.  In February 2014, our board of directors declared, and we paid a cash distribution of $53 million to our members.

See Note 8 to Financial Statements for discussion of the distribution restriction.

***Pension and OPEB Plan Funding —*** Our funding for the pension plans and the OPEB Plan for the calendar year 2014 is expected to total $87 million and $15 million, respectively.  In the three months ended March 31, 2014, we made cash contributions to the pension plans and the OPEB Plan of $65 million and $4 million, respectively.

***Financial Covenants, Credit Rating Provisions and Cross Default Provisions —*** Our revolving credit facility contains a financial covenant that requires maintenance of a consolidated senior debt-to-capitalization ratio of no greater than 0.65 to 1.00.  For purposes of this ratio, debt is calculated as indebtedness defined in the revolving credit facility (principally, the sum of long-term debt, any capital leases, short-term debt and debt due currently in accordance with US GAAP).  The debt calculation excludes transition bonds issued by Bondco, but includes the unamortized fair value discount related to Bondco.  Capitalization is calculated as membership interests determined in accordance with US GAAP plus indebtedness described above.  At March 31, 2014, we were in compliance with this covenant with a debt-to-capitalization ratio of 0.45 to 1.00.

29

*Impact on Liquidity of Credit Ratings* — The rating agencies assign credit ratings to certain of our debt securities.  Our access to capital markets and cost of debt could be directly affected by our credit ratings.  Any adverse action with respect to our credit ratings could generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease.  In particular, a decline in credit ratings would increase the cost of our revolving credit facility (as discussed below).  In the event any adverse action with respect to our credit ratings takes place and causes borrowing costs to increase, we may not be able to recover such increased costs if they exceed our PUCT-approved cost of debt determined in our most recent rate review or subsequent rate reviews.

Most of our large suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions with us.  If our credit ratings decline, the costs to operate our business could increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with us.

On April 29, 2014, S&P changed our rating outlook to "developing" from "stable" and affirmed our senior secured rating.  The change in outlook by S&P reflects the developments related to the EFH Bankruptcy Proceedings.  Oncor remains on "stable" outlook with Fitch and Moody's .  Presented below are the credit ratings assigned for our debt securities at May 1, 2014.

|  | Senior Secured |
|---|---|
| S&P | A |
| Fitch | BBB+ |
| Moody's | Baa3 |

As described in Note 6 to Financial Statements, our long-term debt, excluding Bondco's non-recourse debt, is currently secured pursuant to the Deed of Trust by a first priority lien on certain of our transmission and distribution assets and is considered senior secured debt.

A rating reflects only the view of a rating agency, and is not a recommendation to buy, sell or hold securities.  Ratings can be revised upward or downward at any time by a rating agency if such rating agency decides that circumstances warrant such a change.

*Material Credit Rating Covenants* — Our revolving credit facility contains terms pursuant to which the interest rates charged under the agreement may be adjusted depending on credit ratings.  Borrowings under the revolving credit facility bear interest at per annum rates equal to, at our option, (i)  LIBOR plus a spread ranging from 1.00% to 1.75% depending on credit ratings assigned to our senior secured non-credit enhanced long-term debt or (ii) an alternate base rate (the highest of (1) the prime rate of JPMorgan Chase, (2) the federal funds effective rate plus 0.50%, and (3) daily one-month LIBOR plus 1.00%) plus a spread ranging from 0.00% to 0.75% depending on credit ratings assigned to our senior secured non-credit enhanced long-term debt.  Based on our current ratings, our borrowings are generally LIBOR-based and will bear interest at LIBOR plus 1.50%.  A decline in credit ratings would increase the cost of our revolving credit facility and likely increase the cost of any debt issuances and additional credit facilities.

*Material Cross Default Provisions* — Certain financing arrangements contain provisions that may result in an event of default if there was a failure under other financing arrangements to meet payment terms or to observe other covenants that could result in an acceleration of payments due.  Such provisions are referred to as "cross default" provisions.

Under our revolving credit facility, a default by us or our subsidiary in respect of indebtedness in a principal amount in excess of $100 million or any judgments for the payment of money in excess of $50 million that are not discharged within 60 days may cause the maturity of outstanding balances ($ 9 79 million in short-term borrowings and $7 million in letters of credit at March 31, 2014) under that facility to be accelerated.  Additionally, under the Deed of Trust, an event of default under either our revolving credit facility or our indentures would permit our lenders and the holders of our senior secured notes to exercise their remedies under the Deed of Trust.

*Guarantees* — At March 31, 2014, we did not have any material guarantees.

## OFF-BALANCE SHEET ARRANGEMENTS

At March 31, 2014, we did not have any material off-balance sheet arrangements with special purpose entities or variable interest entities.

## COMMITMENTS AND CONTINGENCIES

See Note 7 to Financial Statements for details of commitments and contingencies.

## CHANGES IN ACCOUNTING STANDARDS

There have been no recently issued accounting standards effective after  March 31, 2014 that are expected to materially impact us.

## REGULATION AND RATES

### *Matters with the PUCT*

*2008 Rate Review (PUCT Docket No. 35717)*  — In August 2009, the PUCT issued a final order with respect to our June 2008 rate review filing with the PUCT and 204 cities based on a test year ended December 31, 2007 (PUCT Docket No. 35717), and new rates were implemented in September 2009.  In November 2009, the PUCT issued an order on rehearing that established a new rate class but did not change the revenue requirements.  We and four other parties appealed various portions of the rate review final order to a state district court.  In January 2011, the district court signed its judgment reversing the PUCT with respect to two issues: the PUCT's disallowance of certain franchise fees and the PUCT's decision that PURA no longer requires imposition of a rate discount for state colleges and universities.  We filed an appeal with the Texas Third Court of Appeals (Austin Court of Appeals) in February 2011 with respect to the issues we appealed to the district court and did not prevail upon, as well as the district court's decision to reverse the PUCT with respect to discounts for state colleges and universities.  Oral argument before the Austin Court of Appeals was completed in April 2012.  There is no deadline for the court to act.  We are unable to predict the outcome of the appeal.

### *Summary*

We cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions.  Such actions or changes could significantly alter our basic financial position, results of operations or cash flows.

**ITEM 3.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the risk that we may experience a loss in value as a result of changes in market conditions such as interest rates that may be experienced in the ordinary course of business.  We may transact in financial instruments to hedge interest rate risk related to our debt, but there are currently no such hedges in place.  All of our long-term debt at March 31, 2014 and December 31, 2013 carried fixed interest rates.

Except as discussed below, the information required hereunder is not significantly different from the information set forth in "Item 7A. Quantitative and Qualitative Disclosures About Market Risk" in our 2013 Form 10-K and is therefore not presented herein.

### *Credit Risk*

Credit risk relates to the risk of loss associated with nonperformance by counterparties.  Our customers consist primarily of REPs.  As a prerequisite for obtaining and maintaining certification, a REP must meet the financial resource standards established by the PUCT.  Meeting these standards does not guarantee that a REP will be able to perform its obligations.  REP certificates granted by the PUCT are subject to suspension and revocation for significant violation of PURA and PUCT rules.  Significant violations include failure to timely remit payments for invoiced charges to a transmission and distribution utility pursuant to the terms of tariffs approved by the PUCT.  We believe PUCT rules that allow for the recovery of uncollectible amounts due from nonaffiliated REPs significantly reduce our credit risk.

Our exposure to credit risk associated with trade accounts receivable from affiliates totaled $1 18 million at March 31, 2014, consisting of $82 million of billed receivables and $42 million of unbilled receivables, of which $6 million is secured by letters of credit posted by TCEH for our benefit.  Under PUCT rules, unbilled amounts are billed within the following month and amounts are due in 35 days of billing.   Due to commitments made to the PUCT, this concentration of accounts receivable from affiliates increases the risk that a default could have a material effect on earnings and cash flows.  Unlike a nonaffiliated REP default, we are not able to recover in rates the amount of an affiliated REP default. As of the EFH Petition Date, we estimate that our exposure to credit risk associated with trade accounts receivable from affiliates was approximately $104 million, consisting of $72 million of billed receivables and $37 million of unbilled receivables, of which $5 million is secured by letters of credit posted by TCEH for our benefit.   See Notes 2, 7 and 10 to Financial Statements for additional information regarding the potential impacts of the EFH Bankruptcy Proceedings on our transactions with affiliates and related-party transactions involving members of the Texas Holdings Group.

Our exposure to credit risk associated with accounts receivable fr om nonaffiliates totaled $393 million at March 31, 2014.  The nonaffiliated receivable amount is before the allowance for uncollec tible accounts, which totaled $3 million at March 31, 2014.  The nonaffiliated exposure includes trade accounts receivable  from REPs totaling $278 million, which are almost entirely noninvestment grade.  At March 31, 2014, REP subsidiaries of a nonaffiliated entity collectively represented approximately 14% of the nonaffiliated trade receivable amount.  No other nonaffiliated parties represented 10% or more of the total trade accounts receivable amount.  We view our exposure to this customer to be within an acceptable level of risk tolerance considering PUCT rules and regulations; however, this concentration increases the risk that a default could have a material effect on cash flows.

**FORWARD-LOOKING STATEMENTS**

This report and other presentations made by us contain "forward-looking statements." All statements, other than statements of historical facts, that are included in this report, or made in presentations, in response to questions or otherwise, that address activities, events or developments that we expect or anticipate to occur in the future, including such matters as projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of facilities, market and industry developments and the growth of our business and operations (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Item 1A. Risk Factors" and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2013 Form 10-K, "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report and the following important factors, among others, that could cause actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the US Congress, the Texas Legislature, the Governor of Texas, the US Federal Energy Regulatory Commission, the PUCT, the North American Electric Reliability Corporation, the Texas Reliability Entity, Inc., the Environmental Protection Agency, and the Texas Commission on Environmental Quality, with respect to:
    - allowed rate of return;
    - permitted capital structure;
    - industry, market and rate structure;
    - recovery of investments;
    - acquisition and disposal of assets and facilities;
    - operation and construction of facilities;
    - changes in tax laws and policies, and
    - changes in and compliance with environmental, reliability and safety laws and policies;
- legal and administrative proceedings and settlements, including the exercise of equitable powers by courts and any adverse impacts on us as a result of the EFH Bankruptcy Proceedings ;
- weather conditions and other natural phenomena;
- acts of sabotage, wars or terrorist or cyber security threats or activities;
- economic conditions, including the impact of a recessionary environment;
- unanticipated population growth or decline, or changes in market demand and demographic patterns, particularly in ERCOT;
- changes in business strategy, development plans or vendor relationships;
- unanticipated changes in interest rates or rates of inflation;
- unanticipated changes in operating expenses, liquidity needs and capital expenditures;
- inability of various counterparties to meet their financial obligations to us, including failure of counterparties to perform under agreements;
- general industry trends;
- hazards customary to the industry and the possibility that we may not have adequate insurance to cover losses resulting from such hazards;
- changes in technology used by and services offered by us;
- significant changes in our relationship with our employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;
- changes in assumptions used to estimate costs of providing employee benefits, including pension and OPEB, and future funding requirements related thereto;
- significant changes in critical accounting policies material to us;
- commercial bank and financial market conditions, access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in the capital markets and the potential impact of disruptions in US credit markets;

- circumstances which may contribute to future impairment of goodwill, intangible or other long-lived assets;
- financial restrictions under our revolving credit facility and indentures governing our debt instruments;
- our ability to generate sufficient cash flow to make interest payments on our debt instruments;
- actions by credit rating agencies, and
- our ability to effectively execute our operational strategy.

Any forward-looking statement speaks only at the date on which it is made, and, except as may be required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events.  New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement.  As such, you should not unduly rely on such forward-looking statements.

## ITEM 4.   CONTROLS AND PROCEDURES

An evaluation was performed under the supervision and with the participation of  our management, including the principal executive officer and principal financial officer, of the effectiveness of the design and operation of the disclosure controls and procedures in effect at the end of the current period included in this quarterly report .  Based on the evaluation performed, our management, including the principal executive officer and principal financial officer, concluded that the disclosure controls and procedures were effective.   During the most recent fiscal quarter covered by this report, no changes in internal controls over financial reporting have occurred that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II.  OTHER INFORMATION**

**ITEM 1.   LEGAL PROCEEDINGS**

Reference is made to the discussion in Note s  3 and 7 to Financial Statements regarding legal  and regulatory proceedings.

**ITEM 1A.   RISK FACTORS**

There are numerous factors that affect our business and results of operations, many of which are beyond our control.  In addition to the other information set forth in this report, including  "Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations, " you should carefully consider the factors discussed in "Part I, Item 1A.  Risk Factors" in our 2013 Form 10-K, which could materially affect our business, financial condition or future results.  The risks described in such reports  are not the only risks we face.

**ITEM 2.   UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

None.

**ITEM 3.   DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4.   MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5.   OTHER INFORMATION**

None.

**ITEM 6.  EXHIBITS**

**(a)  Exhibits provided as part of Part II are:**

| Exhibits | Previously Filed*<br>With File Number | As<br>Exhibit | |
|---|---|---|---|
| **(31)** | **Rule 13a – 14(a)/15d – 14(a)  Certifications.** | | |
| 31(a) | | — | Certification of Robert S. Shapard, chairman of the board and chief executive of Oncor Electric Delivery Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31(b) | | — | Certification of David M. Davis, senior vice president and chief financial officer of Oncor Electric Delivery Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| **(32)** | **Section 1350 Certifications.** | | |
| 32(a) | | — | Certification of Robert S. Shapard, chairman of the board and chief executive of Oncor Electric Delivery Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32(b) | | — | Certification of David M. Davis, senior vice president and chief financial officer of Oncor Electric Delivery Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| **(99)** | **Additional Exhibits.** | | |
| 9 9 | | — | Condensed Statement of Consolidated Income  – Twelve Months Ended March  31, 2014. |
| | **XBRL Data Files.** | | |
| 101.INS | | — | XBRL Instance Document |
| 101.SCH | | — | XBRL Taxonomy Extension Schema Document |
| 101.CAL | | — | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | | — | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | | — | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | | — | XBRL Taxonomy Extension Presentation Linkbase Document |

\*  Incorporated herein by reference.

36

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ONCOR ELECTRIC DELIVERY COMPANY LLC**

By: _____/s/ David M. Davis_____

Date:  May 1, 2014

David M. Davis
Senior Vice President and
Chief Financial Officer

37

(Principal Financial Officer and
Duly Authorized Officer)

**EXHIBIT INDEX**

| Exhibits | Previously Filed* With File Number | As Exhibit | |
|---|---|---|---|
| **(31)** | **Rule 13a – 14(a)/15d – 14(a) Certifications.** | | |
| 31(a) | | — | Certification of Robert S. Shapard, chairman of the board and chief executive of Oncor Electric Delivery Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31(b) | | — | Certification of David M. Davis, senior vice president and chief financial officer of Oncor Electric Delivery Company LLC, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| **(32)** | **Section 1350 Certifications.** | | |
| 32(a) | | — | Certification of Robert S. Shapard, chairman of the board and chief executive of Oncor Electric Delivery Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32(b) | | — | Certification of David M. Davis, senior vice president and chief financial officer of Oncor Electric Delivery Company LLC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| **(99)** | **Additional Exhibits.** | | |
| 9 9 | | — | Condensed Statement of Consolidated Income  – Twelve Months Ended March  31, 2014. |
| | **XBRL Data Files.** | | |
| 101.INS | | — | XBRL Instance Document |
| 101.SCH | | — | XBRL Taxonomy Extension Schema Document |
| 101.CAL | | — | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | | — | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | | — | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | | — | XBRL Taxonomy Extension Presentation Linkbase Document |

_____

\*   Incorporated herein by reference.

Exhibit 31(a)

# ONCOR ELECTRIC DELIVERY COMPANY LLC
## Certificate of Chief Executive Officer
### Pursuant to Section 302 of Sarbanes – Oxley Act of 2002

I, Robert S. Shapard, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Oncor Electric Delivery Company LLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))  for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiary, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2014

|  |  |
|---|---|
|  | /s/ Robert S. Shapard |
| Name: | Robert S. Shapard |
| Title: | Chairman of the Board and Chief Executive |

**Exhibit 31(b)**

**ONCOR ELECTRIC DELIVERY COMPANY LLC**
**Certificate of Chief Financial Officer**
**Pursuant to Section 302 of Sarbanes – Oxley Act of 2002**

I, David M. Davis, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Oncor Electric Delivery Company LLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))  for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiary, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2014

|  |  |
|---|---|
|  | /s/ David M. Davis |
| Name: | David M. Davis |
| Title: | Senior Vice President and Chief Financial Officer |

Exhibit 32(a)

### ONCOR ELECTRIC DELIVERY COMPANY LLC
### Certificate of Chief Executive Officer
### Pursuant to Section 906 of Sarbanes – Oxley Act of 2002

The undersigned, Robert S. Shapard, Chairman of the Board and Chief Executive of Oncor Electric Delivery Company LLC (the "Company"), DOES HEREBY CERTIFY that:

1.  The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2014 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 1st day of May, 2014.

_____/s/ Robert S. Shapard_____

Name:        Robert S. Shapard
Title:         Chairman of the Board and Chief Executive

A signed original of this written statement required by Section 906 has been provided to Oncor Electric Delivery Company LLC and will be retained by Oncor Electric Delivery Company LLC and furnished to the Securities and Exchange Commission or its staff upon request.

**Exhibit 32(b)**

## ONCOR ELECTRIC DELIVERY COMPANY LLC
### Certificate of Chief Financial Officer
### Pursuant to Section 906 of Sarbanes – Oxley Act of 2002

The undersigned, David M. Davis, Senior Vice President and Chief Financial Officer of Oncor Electric Delivery Company LLC (the "Company"), DOES HEREBY CERTIFY that:

1. The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2014 (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. Information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be executed this 1st day of May, 2014.

|  |  |
|---|---|
|  | /s/ David M. Davis |
| Name: | David M. Davis |
| Title: | Senior Vice President and Chief Financial Officer |

A signed original of this written statement required by Section 906 has been provided to Oncor Electric Delivery Company LLC and will be retained by Oncor Electric Delivery Company LLC and furnished to the Securities and Exchange Commission or its staff upon request.

**Exhibit 99**

**ONCOR ELECTRIC DELIVERY COMPANY LLC**
**CONDENSED STATEMENT OF CONSOLIDATED INCOME**
**(Unaudited)**

| | Twelve Months Ended March 31, 2014 |
|---|---|
| | **(millions of dollars)** |
| Operating revenues: | |
| Nonaffiliates | $ 2,669 |
| Affiliates | 983 |
| Total operating revenues | 3,652 |
| Operating expenses: | |
| Wholesale transmission service | 636 |
| Operation and maintenance | 680 |
| Depreciation and amortization | 825 |
| Provision in lieu of income taxes | 272 |
| Taxes other than amounts related to income taxes | 430 |
| Total operating expenses | 2,843 |
| Operating income | 809 |
| Other income and deductions: | |
| Other income | 17 |
| Other deductions | 14 |
| Nonoperating provision in lieu of income taxes | 2 |
| Interest income | 4 |
| Interest expense and related charges | 365 |
| Net income | $ 449 |

B26 (Official Form 26) – Cont.

**Tab G**

**Oncor Bond Co. 10Q**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C.  20549

───────────────

# FORM 10-Q

[√] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

## FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2014

— OR —

[  ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

───────────────

Commission File Number 333-91935

# Oncor Electric Delivery Transition Bond Company LLC

### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| Delaware | 75-2851358 |
| (State of Organization) | (I.R.S. Employer Identification No.) |
| 1616 Woodall Rodgers Fwy., Dallas, TX  75202 | (214) 486-2000 |
| (Address of Principal Executive Offices) | (Registrant's Telephone Number) |

───────────────

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 9 0 days.    Yes ___ No __√__

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes __√__ No ___

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ___ Accelerated filer ___ Non-Accelerated filer __√__ (Do not check if a smaller reporting company)
Smaller reporting company ___

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ___ No __√__

As of May 1, 2014, all outstanding membership interests in Oncor Electric Delivery Transition Bond Company LLC were held by Oncor Electric Delivery Company LLC.

**Oncor Electric Delivery Transition Bond Company LLC meets the conditions set forth in General Instructions (H) (1) (a) and (b) of Form 10-Q and is therefore filing this report with the reduced disclosure format.**

# TABLE OF CONTENTS

| | | **Page** |
|---|---|---|
| **GLOSSARY** | | 2 |
| **PART I.** | **FINANCIAL INFORMATION** | |
| **Item 1.** | **Financial Statements** | 4 |
| | Condensed Statements of Income — Three Months Ended March  31, 2014 and 2013 | 4 |
| | Condensed Statements of Cash Flows — Three Months Ended March  31, 2014 and 2013 | 4 |
| | Condensed Balance Sheets — March  31, 2014 and December 31, 2013 | 5 |
| | Notes to Condensed Financial Statements | 6 |
| **Item 2.** | **Management's Discussion and Analysis of Financial Condition and Results of Operations** | 10 |
| **Item 4.** | **Controls and Procedures** | 13 |
| **PART II.** | **OTHER INFORMATION** | 14 |
| | **Required Reports** | 14 |
| **Item 1A.** | **Risk Factors** | 15 |
| **Item 6.** | **Exhibits** | 15 |
| **SIGNATURE** | | 16 |

Oncor Electric Delivery Transition Bond Company LLC's annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports are made available to the public, free of charge, on the Oncor Electric Delivery Company LLC website at http://www.oncor.com as soon as reasonably practicable after they have been filed with or furnished to the Securities and Exchange Commission.  The information on Oncor Electric Delivery Company LLC's website  or available by hyperlink from the website shall not be deemed a part of, or incorporated by reference into, this  quarterly report on Form 10-Q.

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **2003 Bonds** | Refers collectively to the four series of securitization bonds issued in August 2003. Three of these series were retired at maturity in 2007, 2010 and 2013. |
| **2004 Bonds** | Refers collectively to the three series of securitization bonds issued in June 2004. Two of these series were retired at maturity in 2009 and 2012. |
| **2013 Form 10-K** | Oncor Electric Delivery Transition Bond Company LLC's Annual Report on Form 10-K for the year ended December 31, 2013 |
| **Bondco** | Refers to Oncor Electric Delivery Transition Bond Company LLC, a wholly-owned consolidated bankruptcy-remote financing subsidiary of Oncor that has issued securitization (transition) bonds to recover certain regulatory assets and other costs. |
| **EFCH** | Refers to Energy Future Competitive Holdings Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of TCEH, and/or its subsidiaries, depending on context. |
| **EFH Bankruptcy Proceedings** | Refers to voluntary petitions for relief under Chapter 11 of the US Bankruptcy Code filed in US Bankruptcy Court for the District of Delaware on April 29, 2014 by Energy Future Holdings Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH. The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings. |
| **EFH Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH. |
| **EFIH** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **ERCOT** | Electric Reliability Council of Texas, Inc., the independent system operator and the regional coordinator of various electricity systems within Texas |
| **Financing Order** | The financing order issued by the PUCT on August 5, 2002 to Oncor, its successors and assignees that provide electricity transmission and distribution service |
| **GAAP** | generally accepted accounting principles |
| **Indenture** | The agreement (dated as of August 21, 2003 as appended) between Bondco, as issuer, and the Indenture Trustee, which describes the governing terms of, and secures payment of, the Transition Bonds |
| **Indenture Trustee** | The Bank of New York Mellon, a New York banking corporation |
| **Luminant** | Refers to subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation and wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Oncor** | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Bondco, depending on context, that is engaged in regulated electricity transmission and distribution activities. |

2

| | |
|---|---|
| **Oncor Holdings** | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of EFIH and the direct majority owner (approximately 80%) of Oncor, and/or its subsidiaries, depending on context. |
| **Oncor Ring-Fenced Entities** | Refers to Oncor Holdings and its direct and indirect subsidiaries. |
| **PUCT** | Public Utility Commission of Texas |
| **REP** | retail electric provider |
| **SEC** | US Securities and Exchange Commission |
| **Sponsor Group** | Refers collectively to certain investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Global LLC and GS Capital Partners, an affiliate of Goldman Sachs & Co., that have an ownership interest in Texas Holdings. |
| **TCEH** | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFCH and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. |
| **Texas Holdings** | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor.  Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **Transition Bonds** | Refers collectively to the 2003 Bonds and the 2004 Bonds. |
| **TXU Energy** | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers.  TXU Energy is a REP in competitive areas of ERCOT. |
| **US** | United States of America |

**PART I. FINANCIAL INFORMATION**

### Item 1. FINANCIAL STATEMENTS

**ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC**
**CONDENSED STATEMENTS OF INCOME**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| | (thousands of dollars) | |
| Operating revenues: | | |
| Transition charge revenue: | | |
| Nonaffiliates | $ 26,571 | $ 24,081 |
| Affiliates | 9,918 | 9,724 |
| Investment income | - | - |
| Total operating revenues | 36,489 | 33,805 |
| Operating expenses: | | |
| Interest expense | 3,955 | 5,623 |
| Amortization of transition property | 31,342 | 29,675 |
| Over/(under) recovery of transition charges | 985 | (1,700) |
| Servicing fees, administrative and general expenses | 207 | 207 |
| Total operating expenses | 36,489 | 33,805 |
| Net income | $ - | $ - |

See Notes to Financial Statements.

**CONDENSED STATEMENTS OF CASH FLOWS**
**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| | (thousands of dollars) | |
| Cash flows – operating activities: | | |
| Net income | $ - | $ - |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Amortization of transition property | 31,342 | 29,675 |
| Over/(under) recovery of transition charges | 985 | (1,700) |
| Changes in operating assets | 802 | (2,589) |
| Changes in operating liabilities | 770 | 1,311 |
| Cash provided by operating activities | 33,899 | 26,697 |
| Cash flows – financing activities: | | |
| Repayment of debt | (28,222) | (26,919) |
| Cash used in financing activities | (28,222) | (26,919) |
| Cash flows – investing activities: | | |
| Change in restricted funds | (5,677) | 222 |
| Cash provided by (used in) investing activities | (5,677) | 222 |
| Net change in cash and cash equivalents | - | - |
| Cash and cash equivalents – beginning balance | 3 | 2 |
| Cash and cash equivalents – ending balance | $ 3 | $ 2 |
| Supplemental cash flow disclosures: | | |
| Cash interest payments | $ 2,872 | $ 4,175 |

See Notes to Financial Statements.

4

**ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC**
**CONDENSED BALANCE SHEETS**
**(Unaudited)**

| | At March 31, 2014 | | At December 31, 2013 | |
|---|---|---|---|---|
| | (thousands of dollars) | | | |
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 3 | $ | 3 |
| Restricted cash (Note 5) | | 57,623 | | 51,946 |
| Transition charge receivable: | | | | |
|   Nonaffiliates | | 15,393 | | 15,660 |
|   Affiliates | | 6,286 | | 6,821 |
|     Total current assets | | 79,305 | | 74,430 |
| Investments: | | | | |
| Restricted funds held in trust (Note 5) | | 16,449 | | 16,449 |
| Transition property, net of accumulated amortization of $1,040,567 and $1,009,225 | | 249,210 | | 280,552 |
| Total assets | $ | 344,964 | $ | 371,431 |
| | | | | |
| **LIABILITIES AND MEMBER'S INTEREST** | | | | |
| Current liabilities: | | | | |
| Long-term debt due currently (Note 3) | $ | 132,778 | $ | 131,387 |
| Accounts payable – affiliate | | 217 | | 265 |
| Accrued interest | | 4,592 | | 3,509 |
| Other current liabilities | | 5,052 | | 5,317 |
|     Total current liabilities | | 142,639 | | 140,478 |
| Transition bonds (Note 3) | | 149,942 | | 179,555 |
| Regulatory liability (Note 1) | | 35,960 | | 34,975 |
|     Total liabilities | | 328,541 | | 355,008 |
| Member's interest (Note 4) | | 16,423 | | 16,423 |
| Total liabilities and member's interest | $ | 344,964 | $ | 371,431 |

See Notes to Financial Statements.

5

## ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC
### NOTES TO CONDENSED FINANCIAL STATEMENTS
#### (Unaudited)

**1.    DESCRIPTION OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

*Description of Business*

References in this report to "we," "our," "us" and "the company" are to Bondco as apparent in the context.  See "Glossary" for definition of terms and abbreviations.

We are a bankruptcy-remote, special-purpose Delaware limited liability company, wholly-owned by Oncor.  Oncor is a regulated electricity transmission and distribution company principally engaged in delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.  Oncor is a majority-owned (approximately 80%) subsidiary of Oncor Holdings, which is a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp.

We were organized for the limited purposes of purchasing and owning transition property and issuing Transition Bonds to recover generation-related regulatory assets and other qualified costs.   We are structured and operated in a manner such that in the event of bankruptcy proceedings involving Oncor, our assets would not be consolidated into the bankruptcy estate of Oncor.  Oncor is not the owner of the transition property described herein, and our assets are not available to pay creditors of Oncor or any of its affiliates.

Various "ring-fencing" measures have been taken to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and Oncor's credit quality.  These measures serve to mitigate Oncor's and Oncor Holdings' credit exposure to the Texas Holdings Group and to reduce the risk that the assets and liabilities of Oncor or Oncor Holdings would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in connection with a bankruptcy of one or more of those entities.  Such measures include, among other things: Oncor's sale of a 19.75% equity interest to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; Oncor's board of directors being comprised of a majority of independent directors; and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group.  The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or contractual obligations of any member of the Texas Holdings Group.  Oncor does not bear any liability for debt or contractual obligations of the Texas Holdings Group, and vice versa.  Accordingly, Oncor's operations are conducted, and its cash flows are managed, independently from the Texas Holdings Group.

On April 29, 2014, EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH, commenced proceedings under Chapter 11 of the US Bankruptcy Code.  The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings.  We believe the "ring-fencing" measures discussed above mitigate Oncor's exposure to the EFH Bankruptcy Proceedings .   In addition, we do not expect the EFH Bankruptcy Proceedings to have a material impact on our reported results of operations, financial condition or liquidity because we do not believe those proceedings will adversely impact our ability to recover transition charges from the affected REPs as a result of security previously posted for our benefit.  In this regard, the bankruptcy court in the EFH Bankruptcy Proceedings also entered an order on May 1, 2014 authorizing payment of the transition charges by Oncor's affiliated REPs.

*Basis of Presentation*

Our condensed financial statements have been prepared in accordance with US GAAP and on the same basis as the audited financial statements included in the 2013 Form 10-K.  All adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein.  Certain information and footnote disclosures normally included in our annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC.  Because the condensed interim financial statements do not include all of the information and footnotes

required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in the 2013 Form 10-K. The results of operations for an interim period may not give a true indication of results for a full year due to seasonality. All dollar amounts in the financial statements and tables in the notes are stated in US dollars unless otherwise indicated.

### Use of Estimates

The preparation of our financial statements requires management to make estimates and assumptions about future events that affect the reporting and disclosure of assets and liabilities at the balance sheet dates and the reported amounts of revenues and expenses, including fair value measurements of debt at the period end and unbilled revenue estimates. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments were made to previous estimates or assumptions during the current year.

### Over/(Under) Recovery of Transition Charges

We account for the difference between transition charge revenues and the total of interest expense, amortization of the transition property and other fees and expenses as an over- or under-recovery of transition charges. To the extent revenues exceed expenses, we record an increase to expense with a corresponding increase to a regulatory liability. To the extent revenues are less than expenses, we record a decrease to expense with a corresponding decrease to the regulatory liability.

### Annual and Interim True-Up Adjustments

Variations in customer usage impact transition charge revenues resulting in temporary over/(under) recovery of transition charges. In such instances where sufficient funds are not collected through transition charges, the over-collateralization and the capital subaccounts are drawn down on the payment date to make scheduled payments on the Transition Bonds. Oncor files, on behalf of the company, an annual true-up adjustment with the PUCT with respect to each series of Transition Bonds. The annual true-up adjustments for the 2003 Bonds and the 2004 Bonds are filed in August and May, respectively. In any true-up filing, Oncor requests the PUCT to increase or decrease the authorized transition charges such that, based on the then current forecast of customer usage, sufficient funds will be collected during the following period to meet the scheduled debt service payments and replenish the over-collateralization and capital subaccounts to their required levels. We also have the right, under certain circumstances, to file interim true-up adjustment requests semi-annually, if needed, to make scheduled payments.

## 2.    RELATED–PARTY TRANSACTIONS

Pursuant to administration and servicing agreements between us and Oncor, Oncor furnishes to us, at a fixed fee per year, billing, payment processing, collection, accounting and other administrative services, which are reflected as administrative and general expenses in our income statement. Our expenses for servicing and administration activities performed by Oncor totaled approximately $206,000 for each of the three-month periods ended March 31, 2014 and 2013.

Transition charges billed to the REP subsidiaries of TCEH, which are included in operating revenues, totaled $9,918,000 and $9,724,000 for the three months ended March 31, 2014 and 2013, respectively. The balance of the transition charge receivable due from the REP subsidiaries of TCEH totaled $6,286,000 and $6,821,000 at March 31, 2014 and December 31, 2013, respectively.

Oncor, as servicer of the Transition Bonds, collects security deposits from REPs for payment of the REPs' transition charges and remits these amounts to the Indenture Trustee as they are collected. No amounts were outstanding from Oncor at March 31, 2014 and December 31, 2013. Oncor reviews the security amount for the REPs quarterly and requests increases when required. At March 31, 2014 and December 31, 2013, the Indenture Trustee held security in the amount of $8,770,000 and $9,395,000, respectively, for the REP subsidiaries of TCEH.

Also see discussion in Note 4 regarding cash distributions.

**3.    FINANCING ARRANGEMENTS**

*Long-Term Debt*

At March 31, 2014 and December 31, 2013, our long-term debt (Transition Bonds) consisted of the following:

|  | At March 31, 2014 | | At December 31, 2013 | |
|---|---|---|---|---|
|  | (thousands of dollars) | | | |
| 5.420% Fixed Series 2003 Bonds due in semi-annual installments through August 15, 2015 | $ | 77,762 | $ | 105,984 |
| 5.290% Fixed Series 2004 Bonds due in semi-annual installments through May 15, 2016 | | 204,958 | | 204,958 |
| Total | | 282,720 | | 310,942 |
| Less amount due currently | | (132,778) | | (131,387) |
| Total long-term debt | $ | 149,942 | $ | 179,555 |

The transition property sold to us, as well as restricted cash of $ 6,449,000 in the capital subaccount at March 31, 2014 and December 31, 2013,  is pledged as collateral for the Transition Bonds.  Collections of transition charges will be used to pay the principal, interest and associated costs of the Transition Bonds.  We are required to maintain restricted cash pledged as collateral for the Transition Bonds in an amount equal to  0.50% of the initial aggregate principal amount of Transition Bonds outstanding.  Should the transition charges collected through the specified payment dates listed above not provide adequate funds to make the scheduled payments of principal, the transition charges can continue to be collected for approximately  two years before the Transition Bonds go into default for nonpayment of principal.

The fair value of the outstanding Transition Bonds was approximately $ 296,809,000 and $328,074,000 at March 31, 2014 and December 31, 2013, respectively.  The fair values are estimated based upon market value s as determined by quoted market prices, representing Level 1 valuations under accounting standards related to the determination of fair value.

*Covenants*

The terms of the Indenture contain various covenants, including payment covenants, covenants to file certain information with the SEC and covenants to deliver certain information to the Indenture Trustee.  At March 31, 2014 and December 31, 2013, we were in compliance with these covenants.

**4.    MEMBER'S INTEREST**

Subject to certain provisions of the Indenture and favorable interest rates, we receive interest income with respect to the Indenture Trustee reserve account and capital subaccounts.  Cash distributions to Oncor, which typically represent interest income released by the Indenture Trustee, totaled  zero in each of the three-month periods ended March 31, 2014 and 2013.  Distributions, if any, are recorded as a reduction in member's interest.

**5.    RESTRICTED CASH**

| | Balance Sheet Classification | | | |
| | At March 31, 2014 | | At December 31, 2013 | |
| | Current Assets | Investment | Current Assets | Investment |
| | (thousands of dollars) | | | |
| Collections related to Transition Bonds used only to service debt and pay expenses (includes over-collateralization subaccount of $4,814, $—, $5,209 and $—) | $    57,623 | $              - | $    51,946 | $              - |
| Funds for payment of fees associated with Transition Bonds (Indenture Trustee reserve account) | - | 10,000 | - | 10,000 |
| Reserve for shortfalls of Transition Bond charges (capital subaccount) | - | 6,449 | - | 6,449 |
| Total | $    57,623 | $    16,449 | $    51,946 | $    16,449 |

9

**Item 2.      MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of our financial condition and results of operations for the three months ended March 31, 2014 and 2013 should be read in conjunction with our condensed financial statements and the notes to those statements.

The information required hereunder is in its reduced format as allowed for under General Instruction (H) (1) of Form 10-Q.  All dollar amounts in the in the following tables and discussion and analysis are stated in US dollars unless otherwise indicated.

## BUSINESS

We are a bankruptcy-remote, special-purpose Delaware limited liability company, wholly-owned by Oncor.  Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.  Oncor is a direct, majority-owned (approximately 80%) subsidiary of Oncor Holdings, which is a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp.  See Note 1 to Financial Statements for discussion of certain "ring-fencing" measures taken by EFH Corp. and Oncor to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group and Oncor's credit quality.

We were organized for the limited purpose of purchasing and owning transition property and issuing Transition Bonds to recover generation-related regulatory assets and other qualified costs.  We are structured and operated in a manner such that in the event of bankruptcy proceedings against Oncor, our assets would not be consolidated into the bankruptcy estate of Oncor.  Oncor is not the owner of the transition property described herein, and our assets are not available to pay creditors of Oncor or any of its affiliates.

On April 29, 2014, EFH Corp. and the substantial majority of its direct and indirect subsidiaries that are members of the Texas Holdings Group, including EFIH, EFCH and TCEH,  commenced proceedings under Chapter 11 of the US Bankruptcy Code.  The Oncor Ring-Fenced Entities are not parties to the EFH Bankruptcy Proceedings.  We believe the "ring-fencing" measures discussed above mitigate Oncor's exposure to the EFH Bankruptcy Proceedings.  In addition, we do not expect the EFH Bankruptcy Proceedings to have a material impact on our reported results of operations, financial condition or liquidity because we do not believe those proceedings will adversely impact our ability to recover transition charges from the affected REPs as a result of security previously posted for our benefit.  In this regard, the bankruptcy court in the EFH Bankruptcy Proceedings also entered an order on May 1, 2014 authorizing payment of the transition charges by Oncor's affiliated REPs.

## RESULTS OF OPERATIONS— *Three Months Ended March 31, 2014 Compared to Three Months Ended March 31, 2013*

Our operations are restricted by our organizational documents to billing and collecting transition charges and using those funds to service the Transition Bonds.  Other than investment income on funds held by the Indenture Trustee, all revenues are restricted for servicing the Transition Bonds.  Therefore, the difference between transition charge revenue and the total of interest expense, amortization of the transition property (which is equal to the Transition Bonds' scheduled principal payments) and other fees and expenses is accounted for as an over- or under-recovery of transition charges resulting in minimal net income.

Transition charge revenue necessary to service the Transition Bonds can be impacted by variations in electricity volumes delivered by Oncor resulting in temporary over- or under-recovery of transition charges.  In such instances where sufficient funds are not collected through transition charges, the over-collateralization and the capital subaccounts are drawn down on the payment date to make scheduled payments on the Transition Bonds.  Oncor files, on our behalf, an annual true-up adjustment with the PUCT with respect to each series of Transition Bonds.  The annual true-up adjustments for the 2003 Bonds and the 2004 Bonds are filed in August and May, respectively.  In any true-up filing, Oncor requests the PUCT to increase or decrease the authorized transition charges such that, based on the then current forecast of customer usage, sufficient funds will be collected during the

following period to meet the scheduled debt service payments and replenish the over-collateralization and capital subaccounts to their required levels.  See Note 1 to Financial Statements.

Transition charge revenue increased 8% for the three months ended March 31, 2014 reflecting higher electricity volumes delivered by Oncor due to the effects of colder weather in 2014 as compared to 2013, partially offset by lower transition charge tariff rates reflecting annual true-ups.

Interest expense decreased 30% for the three months ended March 31, 2014, and will continue to decrease each period, reflecting lower average debt balances due to scheduled principal payments on the Transition Bonds.

Amortization of transition property increased 6% for the three months ended March 31, 2014, and will continue to increase each period, reflecting increased principal payments on the Transition Bonds.

Fluctuations in the over/(under) recovery of transition charges primarily result from variances in revenues from the revenue forecast used to set the transition charges.  See discussion under "Over/(Under) Recovery of Transition Charges" in Note 1 to Financial Statements.

Net income was zero for each of the three-month periods ended March 31, 2014 and 2013.  Net income includes interest earned on the Indenture Trustee reserve account and capital subaccounts, which we expect to periodically distribute to Oncor as released by the Indenture Trustee.  See Note 4 to Financial Statements.

**FINANCIAL CONDITION** — *Three Months Ended March 31, 2014 Compared to Three Months Ended March 31, 2013*

*Cash Flows* — Cash provided by operating activities increased $7,202,000, or 27%, for the three months ended March 31, 2014.  The change was driven by a $3,391,000 decrease in accounts receivables, a $2,684,000 increase in transition charge revenues reflecting changes in certain transition charge tariffs and higher volumes delivered due to colder weather in 2014 compared to 2013 and a $1,303,000 decrease in cash interest payments as a result of principal payments that have been made on the Transition Bonds.  These increases were partially offset by a $176,000 decrease in customer deposits received (reported in other current liabilities on the balance sheet).

Cash used in financing activities increased 5% for the three months ended March 31, 2014 and was driven by scheduled principal payments on the Transition Bonds.

Cash used in investing activities totaled $5,677,000 and cash provided by investing activities totaled $222,000 for the three months ended March 31, 2014 and 2013, respectively.  These amounts represent changes in the balances of restricted cash accounts. See Note 5 to Financial Statements for information regarding restricted cash.

As discussed in Note 1 to Financial Statements, Oncor, as servicer, files for increases or decreases (true-ups) in transition charges with the PUCT to ensure sufficient funds will be collected during the following period to meet scheduled payments on the Transition Bonds and to maintain the capital and over-collateralization subaccounts at the required levels.  The latest filings of the annual true-ups for the Transition Bonds were in August 2013 and May 2013 for the 2003 Bonds and the 2004 Bonds, respectively.  Based on the approved transition charges and current forecast of customer usage, we expect that revenues collected will be sufficient to make the scheduled payments.

At March 31, 2014, restricted cash included the balances in the capital subaccount totaling $2,500,000 and $3,949,000 for the 2003 Bonds and the 2004 Bonds, respectively, which are equal to the required levels under the Indenture.  Additionally, at March 31, 2014, the balance in the over-collateralization subaccount for the 2003 Bonds totaled $1,688,000 compared to the required level of $2,188,000 and for the 2004 Bonds totaled $3,126,000, which is equal to the required level.  Required levels are determined at the respective scheduled payment dates.  Required level amounts reported above are as of the most recent payment dates.  There are no penalties as a result of being above or below the required levels in the capital and over-collateralization subaccounts.  Any future shortfalls in the subaccounts for either series of Transition Bonds would be addressed in future true-up filings with the PUCT.

11

## FINANCING ACTIVITIES

Our financing activities are limited to issuance of the Transition Bonds.  There is no provision to allow for any other borrowings.

***Covenants and Cross Default Provisions*** — The terms of the Indenture contain various covenants, including payment covenants, covenants to file certain information with the SEC and covenants to deliver certain information to the Indenture Trustee.  At March 31, 2014, we were in compliance with these covenants.

Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could do result in an acceleration of payments due.  Such provisions are referred to as "cross default" provisions.  Under the Indenture, each of the 2003 Bonds and 2004 Bonds are cross-defaulted to each other.  The Indenture does not contain any cross default provisions in respect of any indebtedness of Oncor.

## CHANGES IN ACCOUNTING STANDARDS

There have been no recently issued accounting standards effective after March 31, 2014 that are expected to materially impact us.

## FORWARD-LOOKING STATEMENTS

This report and other presentations made by us contain "forward-looking statements."  All statements, other than statements of historical facts, that are included in this report, or made in presentations, in response to questions or otherwise, that address activities, events or developments that we expect or anticipate to occur in the future (often, but not always, through the use of words or phrases such as "intends," "plans," "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "should," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements.  Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Item 1A. Risk Factors" and the discussion under "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" in our 2013 Form 10-K and "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations" in this report and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- state or federal legislative or regulatory developments or judicial actions;
- economic conditions, including the impact of a recessionary environment;
- the accuracy of the servicer's estimates of market demand and prices for electricity;
- the accuracy of the servicer's estimates of industrial, commercial and residential growth in Oncor's service territory, including related estimates of conservation and electricity usage efficiency;
- weather conditions and other natural phenomena affecting retail customer electricity usage;
- acts of sabotage, wars, terrorist or cyber security threats or activities or other catastrophic events;
- the operating performance of Oncor's facilities and third-party suppliers of electricity in Oncor's service territory;
- the accuracy of the servicer's estimates of the payment patterns of retail electricity customers, including the rate of delinquencies and any collections curves ;
- the operational and financial ability of REPs to bill and collect transition charges and make timely payments of amounts billed by the servicer to the REPs for transition charges , including as a result of a bankruptcy involving a REP, and
- a material reduction in the number of retail customers who pay transition charges .

Any forward-looking statement speaks only at the date on which it is made, and, except as may be required by law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events.  New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to

12

which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statement.

**Item 4.  CONTROLS AND PROCEDURES**

An evaluation was performed under the supervision and with the participation of management, including the principal executive officer and principal financial officer, of the effectiveness of the design and operation of the disclosure controls and procedures in effect at the end of the current period included in this report.  Based on the evaluation performed, management, including the principal executive officer and principal financial officer, concluded that the disclosure controls and procedures were effective.  During the most recent fiscal quarter covered by this report, no changes in internal controls over financial reporting have occurred that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

13

## PART II.  OTHER INFORMATION

### REQUIRED REPORTS

We have included in this quarterly report on Form 10-Q or furnished on Oncor's website at  **www.oncor.com**, as indicated, the following information in respect of each series of outstanding Transition Bonds, as required by the terms of the Indenture relating to the Transition Bonds.  Exhibits that are filed as a part of this Form 10-Q are listed in Item 6.

| Required Item | Filed as Exhibit or Furnished on Website |
|---|---|
| Monthly Servicer Report (Series 2004-1 for January 2014) | Exhibit 99(a)(1) |
| Monthly Servicer Report (Series 2004-1 for February 2014) | Exhibit 99(a)(2) |
| Monthly Servicer Report (Series 2004-1 for March 2014) | Exhibit 99(a)(3) |
| Monthly Servicer Report (Series 2003-1 for January 2014) | Exhibit 99(a)(4) |
| Monthly Servicer Report (Series 2003-1 for February 2014) | Exhibit 99(a)(5) |
| Monthly Servicer Report (Series 2003-1 for March 2014) | Exhibit 99(a)(6) |
| Statement of Collection Account Balances as of  March  31, 2014 | Exhibit 99(b) |
| A quarterly statement affirming that, in all material respects, for each materially significant REP, (a) each REP has been billed in compliance with the requirements outlined in the Financing Order, (b) each REP has made payments in compliance with the requirements outlined in the Financing Order, and (c) each REP satisfies the creditworthiness requirements of the Financing Order | Exhibit 99(c) |
| Statement of Outstanding Bond Balances Series 2003-1 | Exhibit 99(d)(1) |
| Statement of Outstanding Bond Balances Series 2004-1 | Exhibit 99(d)(2) |
| Semi-Annual Servicer's Certificate (Series 2003-1 for February 2014) | Exhibit 99(e) |

14

**Item 1A.**          **RISK FACTORS**

We believe that there have been no material changes to the risks disclosed in the 2013 Form 10-K, including under the heading "Risk Factors" in "Item 1A" of our 2013 Form 10-K, except for information disclosed elsewhere in this Form 10-Q that provides factual updates to risks contained in our 2013 Form 10-K.  The risks disclosed in our 2013 Form 10-K are not the only risks we face.

**Item 6.**    **EXHIBITS**

(a)Exhibits:

**Exhibits**

(99)          **Additional Exhibits.**

| | | |
|---|---|---|
| 99(a)(1) | — | Monthly Servicer Report (Series 2004-1 for January 2014) |
| 99(a)(2) | — | Monthly Servicer Report (Series 2004-1 for February 2014) |
| 99(a)(3) | — | Monthly Servicer Report (Series 2004-1 for March 2014) |
| 99(a)(4) | — | Monthly Servicer Report (Series 2003-1 for January 2014) |
| 99(a)(5) | — | Monthly Servicer Report (Series 2003-1 for February 2014) |
| 99(a)(6) | — | Monthly Servicer Report (Series 2003-1 for March 2014) |
| 99(b) | — | Statement of Collection Account Balances as of March 31, 2014 |
| 99(c) | — | A quarterly statement affirming that, in all material respects, for each materially significant REP, (a) each REP has been billed in compliance with the requirements outlined in the Financing Order , (b) each REP has made payments in compliance with the requirements outlined in the Financing Order, and (c) each REP satisfies the creditworthiness requirements of the Financing Order |
| 99(d)(1) | — | Statement of Outstanding Bond Balances Series 2003-1 |
| 99(d)(2) | — | Statement of Outstanding Bond Balances Series 2004-1 |
| 99(e) | — | Semi-Annual Servicer's Certificate (Series 2003-1 for February 2014) |

**XBRL Data Files.**

| | | |
|---|---|---|
| 101.INS | — | XBRL Instance Document |
| 101.SCH | — | XBRL Taxonomy Extension Schema Document |
| 101.CAL | — | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | — | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | — | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | — | XBRL Taxonomy Extension Presentation Linkbase Document |

15

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC**

By _____/s/ David M. Davis_____

David M. Davis

Senior Vice President and Chief Financial Officer

(Principal Financial Officer and  Duly Authorized Officer)

Date:  May 1, 2014

16

**EXHIBIT INDEX**

<u>Exhibits</u>

| | | |
|---|---|---|
| **(99)** | **Additional Exhibits.** | |
| 99(a)(1) | — | Monthly Servicer Report (Series 2004-1 for January 2014) |
| 99(a)(2) | — | Monthly Servicer Report (Series 2004-1 for February 2014) |
| 99(a)(3) | — | Monthly Servicer Report (Series 2004-1 for March 2014) |
| 99(a)(4) | — | Monthly Servicer Report (Series 2003-1 for January 2014) |
| 99(a)(5) | — | Monthly Servicer Report (Series 2003-1 for February 2014) |
| 99(a)(6) | — | Monthly Servicer Report (Series 2003-1 for March 2014) |
| 99(b) | — | Statement of Collection Account Balances as of March 31, 2014 |
| 99(c) | — | A quarterly statement affirming that, in all material respects, for each materially significant REP, (a) each REP has been billed in compliance with the requirements outlined in the Financing Order, (b) each REP has made payments in compliance with the requirements outlined in the Financing Order, and (c) each REP satisfies the creditworthiness requirements of the Financing Order |
| 99(d)(1) | — | Statement of Outstanding Bond Balances Series 2003-1 |
| 99(d)(2) | — | Statement of Outstanding Bond Balances Series 2004-1 |
| 99(e) | — | Semi-Annual Servicer's Certificate (Series 2003-1 for February 2014) |
| | **XBRL Data Files.** | |
| 101.INS | — | XBRL Instance Document |
| 101.SCH | — | XBRL Taxonomy Extension Schema Document |
| 101.CAL | — | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | — | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | — | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | — | XBRL Taxonomy Extension Presentation Linkbase Document |

17

**Exhibit 99(b)**

**Oncor Electric Delivery Transition Bond Company LLC**
**Statement of Collection Account Balances as of**
**March 31, 2014**

The balances in the sub-accounts on deposit with the trustee as of the above date were:

|                                   | Series 2003-1 |     | Series 2004-1 |
|-----------------------------------|--------------:|-----|--------------:|
| General Sub-Account               | $ 9,998,031.19 | $ | 37,749,022.97 |
| Capital Sub-Account               | $ 2,500,019.27 | $ | 3,949,200.67 |
| Overcollateralization Sub-Account | $ 1,687,959.55 | $ | 3,126,389.45 |
| Reserve Sub-Account               | $ 0.00 | $ | 9,474.31 |
|                                   |               |     |               |
| REP Deposit Account*              | $ 5,051,657.38 |     |               |

---

\* REP deposits are held in one account with a sub-ledger outlining the respective amount of
   each REP's deposit attributable to each series of bonds.

Exhibit 99(a)(1)

# MONTHLY SERVICER'S CERTIFICATE
### (TO BE DELIVERED EACH MONTH PURSUANT TO SECTION 3.01(b)(i)
### OF THE SERIES 2004-1 TRANSITION PROPERTY SERVICING AGREEMENT)

### ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC,
Series 2004-1 Bonds

Oncor Electric Delivery Company LLC, as Servicer

Pursuant to the Series 2004-1 Transition Property Servicing Agreement dated as of June 7, 2004 (the "Series 2004-1 Transition Property Servicing Agreement") between Oncor Electric Delivery Company LLC, as Servicer, and Oncor Electric Delivery Transition Bond Company LLC, as Issuer, the Servicer does hereby certify as follows:

### SERIES 2004-1 COLLECTION PERIOD: January 2014

| Customer Class | a. Series 2004-1 Transition Charges in Effect May 31, 2013 | b. Series 2004-1 Transition Charges Billed | c. Actual Series 2004-1 Transition Charge Payments Received | d. Series 2004-1 Transition Charge Remittances Made to Trustee |
|---|---|---|---|---|
| Residential Service | $0.000902 / kWh | $ 3,783,375.40 | $ 3,013,232.78 | $ 3,013,232.78 |
| General Service Secondary | | $ 3,445,097.14 | $ 3,169,279.68 | $ 3,169,279.68 |
|   Non-demand | $0.000899 / kWh | | | |
|   Demand | $0.276 / kW | | | |
| General Service Primary | | $ 440,435.46 | $ 397,585.46 | $ 397,585.46 |
|   Non-demand | $0.000464 / kWh | | | |
|   Demand | $0.248 / kW | | | |
| High Voltage Service | $0.135 / kW | $ 163,702.30 | $ 132,808.98 | $ 132,808.98 |
| Lighting Service | $0.001383 / kWh | $ 52,569.13 | $ 49,544.98 | $ 49,544.98 |
| Instantaneous Interruptible | $0.127 / kW | $ 122,443.03 | $ 92,587.76 | $ 92,587.76 |
| Noticed Interruptible | $0.285 / kW | $ 206,901.34 | $ 139,322.05 | $ 139,322.05 |
| Total | | $ 8,214,523.80 | $ 6,994,361.69 | $ 6,994,361.69 |

Capitalized terms used herein have their respective meanings set forth in the Series 2004-1 Transition Property Servicing Agreement.

In WITNESS HEREOF, the undersigned has duly executed and delivered this Monthly Servicer's Certificate this 5th day of February 2014.

ONCOR ELECTRIC DELIVERY COMPANY LLC,
as Servicer

By:      /s/ John M. Casey
Name:    John M. Casey
Title:   Vice President - Treasurer

Exhibit 99(a)(2)

# MONTHLY SERVICER'S CERTIFICATE

(TO BE DELIVERED EACH MONTH PURSUANT TO SECTION 3.01(b)(i)
OF THE SERIES 2004-1 TRANSITION PROPERTY SERVICING AGREEMENT)

ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC,
Series 2004-1 Bonds

Oncor Electric Delivery Company LLC, as Servicer

Pursuant to the Series 2004-1 Transition Property Servicing Agreement dated as of June 7, 2004 (the "Series 2004-1 Transition Property Servicing Agreement") between Oncor Electric Delivery Company LLC, as Servicer, and Oncor Electric Delivery Transition Bond Company LLC, as Issuer, the Servicer does hereby certify as follows:

**SERIES 2004-1 COLLECTION PERIOD: February 2014**

| Customer Class | a. Series 2004-1 Transition Charges in Effect May 31, 2013 | b. Series 2004-1 Transition Charges Billed | c. Actual Series 2004-1 Transition Charge Payments Received | d. Series 2004-1 Transition Charge Remittances Made to Trustee |
|---|---|---|---|---|
| Residential Service | $0.000902 / kWh | $ 3,358,896.41 | $3,399,965.07 | $ 3,399,965.07 |
| General Service Secondary | | $ 3,398,364.54 | $3,151,325.91 | $ 3,151,325.91 |
| Non-demand | $0.000899 / kWh | | | |
| Demand | $0.276 / kW | | | |
| General Service Primary | | $ 447,610.53 | $ 447,790.00 | $ 447,790.00 |
| Non-demand | $0.000464 / kWh | | | |
| Demand | $0.248 / kW | | | |
| High Voltage Service | $0.135 / kW | $ 177,440.32 | $ 177,530.22 | $ 177,530.22 |
| Lighting Service | $0.001383 / kWh | $ 51,288.75 | $ 35,242.07 | $ 35,242.07 |
| Instantaneous Interruptible | $0.127 / kW | $ 123,293.55 | $ 129,907.20 | $ 129,907.20 |
| Noticed Interruptible | $0.285 / kW | $ 207,626.95 | $ 246,538.99 | $ 246,538.99 |
| Total | | $ 7,764,521.05 | $7,588,299.46 | $ 7,588,299.46 |

Capitalized terms used herein have their respective meanings set forth in the Series 2004-1  Transition Property Servicing Agreement.

In WITNESS HEREOF, the undersigned has duly executed and delivered this Monthly Servicer's Certificate this 4th day of March 2014.

ONCOR ELECTRIC DELIVERY COMPANY LLC,
as Servicer

By:      /s/ John M. Casey
Name:    John M. Casey
Title:     Vice President - Treasurer

Exhibit 99(a)(3)

# MONTHLY SERVICER'S CERTIFICATE
(TO BE DELIVERED EACH MONTH PURSUANT TO SECTION 3.01(b)(i)
OF THE SERIES 2004-1 TRANSITION PROPERTY SERVICING AGREEMENT)

ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC,
Series 2004-1 Bonds

Oncor Electric Delivery Company LLC, as Servicer

Pursuant to the Series 2004-1 Transition Property Servicing Agreement dated as of June 7, 2004 (the "Series 2004-1 Transition Property Servicing Agreement") between Oncor Electric Delivery Company LLC, as Servicer, and Oncor Electric Delivery Transition Bond Company LLC, as Issuer, the Servicer does hereby certify as follows:

### SERIES 2004-1 COLLECTION PERIOD: March 2014

| Customer Class | a. Series 2004-1 Transition Charges in Effect May 31, 2013 | b. Series 2004-1 Transition Charges Billed | c. Actual Series 2004-1 Transition Charge Payments Received | d. Series 2004-1 Transition Charge Remittances Made to Trustee |
|---|---|---|---|---|
| Residential Service | $0.000902 / kWh | $ 2,836,904.04 | $ 3,500,015.36 | $ 3,500,015.36 |
| General Service Secondary | | $ 3,411,275.42 | $3,483,356.81 | $ 3,483,356.81 |
| Non-demand | $0.000899 / kWh | | | |
| Demand | $0.276 / kW | | | |
| General Service Primary | | $ 434,649.37 | $ 456,672.41 | $ 456,672.41 |
| Non-demand | $0.000464 / kWh | | | |
| Demand | $0.248 / kW | | | |
| High Voltage Service | $0.135 / kW | $ 162,698.28 | $ 179,653.99 | $ 179,653.99 |
| Lighting Service | $0.001383 / kWh | $ 51,250.58 | $ 45,377.10 | $ 45,377.10 |
| Instantaneous Interruptible | $0.127 / kW | $ 124,617.85 | $ 125,158.40 | $ 125,158.40 |
| Noticed Interruptible | $0.285 / kW | $ 211,452.85 | $ 210,611.26 | $ 210,611.26 |
| Total | | $ 7,232,848.39 | $ 8,000,845.33 | $ 8,000,845.33 |

Capitalized terms used herein have their respective meanings set forth in the Series 2004-1 Transition Property Servicing Agreement.

In WITNESS HEREOF, the undersigned has duly executed and delivered this Monthly Servicer's Certificate this 2nd day of April 2014.

ONCOR ELECTRIC DELIVERY COMPANY LLC,
as Servicer

By:        /s/ John M. Casey
Name:      John M. Casey
Title:     Vice President - Treasurer

Exhibit 99(a)(4)

# MONTHLY SERVICER'S CERTIFICATE
### (TO BE DELIVERED EACH MONTH PURSUANT TO SECTION 3.01(b)(i)
### OF THE SERIES 2003-1 TRANSITION PROPERTY SERVICING AGREEMENT)

### ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC,
Series 2003-1 Bonds

Oncor Electric Delivery Company LLC, as Servicer

Pursuant to the Series 2003-1 Transition Property Servicing Agreement dated as of August 21, 2003 (the "Series 2003-1 Transition Property Servicing Agreement") between Oncor Electric Delivery Company LLC, as Servicer, and Oncor Electric Delivery Transition Bond Company LLC, as Issuer, the Servicer does hereby certify as follows:

### SERIES 2003-1 COLLECTION PERIOD: January 2014

| Customer Class | a. Series 2003-1 Transition Charges in Effect August 28, 2013 | b. Series 2003-1 Transition Charges Billed | c. Actual Series 2003-1 Transition Charge Payments Received | d. Series 2003-1 Transition Charge Remittances Made to Trustee |
|---|---|---|---|---|
| Residential Service | $0.000576 / kWh | $ 2,416,584.19 | $ 1,924,972.25 | $ 1,924,972.25 |
| General Service Secondary | | $ 2,199,723.17 | $ 2,023,479.04 | $ 2,023,479.04 |
| Non-demand | $0.000580 / kWh | | | |
| Demand | $0.176 / kW | | | |
| General Service Primary | | $ 275,253.33 | $ 248,887.95 | $ 248,887.95 |
| Non-demand | $0.000378 / kWh | | | |
| Demand | $0.154 / kW | | | |
| High Voltage Service | $0.079 / kW | $ 95,796.08 | $ 77,324.05 | $ 77,324.05 |
| Lighting Service | $0.000886 / kWh | $ 33,606.32 | $ 31,671.85 | $ 31,671.85 |
| Instantaneous Interruptible | $0.085 / kW | $ 81,950.25 | $ 62,367.48 | $ 62,367.48 |
| Noticed Interruptible | $0.147 / kW | $ 106,717.45 | $ 71,854.62 | $ 71,854.62 |
| Total | | $ 5,209,630.79 | $ 4,440,557.24 | $ 4,440,557.24 |

Capitalized terms used herein have their respective meanings set forth in the Series 200 3-1 Transition Property Servicing Agreement.

In WITNESS HEREOF, the undersigned has duly executed and delivered this Monthly Servicer's Certificate this 5th day of February, 2014.

ONCOR ELECTRIC DELIVERY COMPANY LLC,
as Servicer


By:       /s/ John M. Casey
Name:     John M. Casey
Title:    Vice President - Treasurer

Exhibit 99(a)(5)

# MONTHLY SERVICER'S CERTIFICATE

(TO BE DELIVERED EACH MONTH PURSUANT TO SECTION 3.01(b)(i)
OF THE SERIES 2003-1 TRANSITION PROPERTY SERVICING AGREEMENT)

ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC,
Series 2003-1 Bonds

Oncor Electric Delivery Company LLC, as Servicer

Pursuant to the Series 2003-1 Transition Property Servicing Agreement dated as of August 21, 2003 (the "Series 2003-1 Transition Property Servicing Agreement") between Oncor Electric Delivery Company LLC, as Servicer, and Oncor Electric Delivery Transition Bond Company LLC, as Issuer, the Servicer does hereby certify as follows:

**SERIES 2003-1 COLLECTION PERIOD:  February 2014**

| Customer Class | a. Series 2003-1 Transition Charges in Effect August 28, 2013 | b. Series 2003-1 Transition Charges Billed | c. Actual Series 2003-1 Transition Charge Payments Received | d. Series 2003-1 Transition Charge Remittances Made to Trustee |
|---|---|---|---|---|
| Residential Service | $0.000576 / kWh | $  2,145,492.67 | $2,171,656.34 | $  2,171,656.34 |
| General Service Secondary | | $  2,169,778.05 | $  2,012,244.97 | $  2,012,244.97 |
|   Non-demand | $0.000580 / kWh | | | |
|   Demand | $0.176 / kW | | | |
| General Service Primary | | $     279,751.61 | $     280,008.46 | $     280,008.46 |
|   Non-demand | $0.000378 / kWh | | | |
|   Demand | $0.154 / kW | | | |
| High Voltage Service | $0.079 / kW | $     104,089.45 | $     103,887.98 | $     103,887.98 |
| Lighting Service | $0.000886 / kWh | $       32,786.35 | $       22,515.92 | $       22,515.92 |
| Instantaneous Interruptible | $0.085 / kW | $       82,519.52 | $       86,714.87 | $       86,714.87 |
| Noticed Interruptible | $0.147 / kW | $     107,091.71 | $     126,904.38 | $     126,904.38 |
| Total | | $  4,921,509.36 | $  4,803,932.92 | $  4,803,932.92 |

Capitalized terms used herein have their respective meanings set forth in the Series 200 3-1 Transition Property Servicing Agreement.

In WITNESS HEREOF, the undersigned has duly executed and delivered this Monthly Servicer's Certificate this 4th day of March, 2014.

ONCOR ELECTRIC DELIVERY COMPANY LLC,
as Servicer


By:       /s/ John M. Casey
Name:     John M. Casey
Title:    Vice President - Treasurer

Exhibit 99(a)(6)

# MONTHLY SERVICER'S CERTIFICATE
(TO BE DELIVERED EACH MONTH PURSUANT TO SECTION 3.01(b)(i)
OF THE SERIES 2003-1 TRANSITION PROPERTY SERVICING AGREEMENT)

ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC,
Series 2003-1 Bonds

Oncor Electric Delivery Company LLC, as Servicer

Pursuant to the Series 2003-1 Transition Property Servicing Agreement dated as of August 21, 2003 (the "Series 2003-1 Transition Property Servicing Agreement") between Oncor Electric Delivery Company LLC, as Servicer, and Oncor Electric Delivery Transition Bond Company LLC, as Issuer, the Servicer does hereby certify as follows:

**SERIES 2003-1 COLLECTION PERIOD: March 2014**

| Customer Class | a. Series 2003-1 Transition Charges in Effect August 28, 2013 | b. Series 2003-1 Transition Charges Billed | c. Actual Series 2003-1 Transition Charge Payments Received | d. Series 2003-1 Transition Charge Remittances Made to Trustee |
|---|---|---|---|---|
| Residential Service | $0.000576 / kWh | $ 1,812,349.87 | $2,235,638.16 | $ 2,235,638.16 |
| General Service Secondary | | $ 2,177,834.27 | $ 2,223,672.18 | $ 2,223,672.18 |
| Non-demand | $0.000580 / kWh | | | |
| Demand | $0.176 / kW | | | |
| General Service Primary | | $ 271,280.72 | $ 285,449.80 | $ 285,449.80 |
| Non-demand | $0.000378 / kWh | | | |
| Demand | $0.154 / kW | | | |
| High Voltage Service | $0.079 / kW | $ 95,115.38 | $ 104,360.68 | $ 104,360.68 |
| Lighting Service | $0.000886 / kWh | $ 32,761.50 | $ 29,010.94 | $ 29,010.94 |
| Instantaneous Interruptible | $0.085 / kW | $ 83,406.18 | $ 84,364.42 | $ 84,364.42 |
| Noticed Interruptible | $0.147 / kW | $ 109,065.05 | $ 108,630.98 | $ 108,630.98 |
| Total | | $ 4,581,812.97 | $ 5,071,127.16 | $ 5,071,127.16 |

Capitalized terms used herein have their respective meanings set forth in the Series 200 3-1 Transition Property Servicing Agreement.

In WITNESS HEREOF, the undersigned has duly executed and delivered this Monthly Servicer's Certificate this 2nd day of April, 2014.

ONCOR ELECTRIC DELIVERY COMPANY LLC,
as Servicer

By:  /s/ John M. Casey
Name: John M. Casey
Title:  Vice President - Treasurer

Exhibit 99(c)

## QUARTERLY AFFIRMATION STATEMENT

This Quarterly Statement is being provided pursuant to the requirement of Section 3.07(h)VIII of that certain Indenture dated as of August 21, 2003 between Oncor Electric Delivery Transition Bond Company LLC (the "Transition Bond Company"), as Issuer, and The Bank of New York, as Indenture Trustee, (as originally executed and, as from time to time supplemented or amended by one or more Series Supplements or indentures supplemental thereto entered into pursuant to the applicable provisions of the Indenture, as so supplemented or amended, or both, the "Indenture").  Capitalized terms used herein and not otherwise defined herein, shall have the meaning ascribed to such term in Appendix A of the Indenture.

I, John M. Casey, hereby certify that I am the Vice President - Treasurer of Oncor Electric Delivery Company LLC ("Oncor"), the parent company of the Transition Bond Company, and the servicer of the transition bonds under that certain Series 2003-1 Transition Property Servicing Agreement, dated as of August 21, 2003 and that certain Series 2004-1 Transition Property Servicing Agreement dated as of June 7, 2004 between the Transition Bond Company and Oncor.

I hereby affirm that, in all material respects, for each materially significant REP for which Oncor provided electric delivery transmission and distribution services for  the quarterly period ending March  31, 2014, (a) each REP has been billed in compliance with the requirements outlined in the Financing Order; (b) each REP has made payments in compliance with the requirements outlined in the Financing Order; and (c) each REP satisfies the creditworthiness requirements of the Financing Order.

DATED as of March  31, 2014

/s/ John M. Casey
John M. Casey

**Exhibit 99(d)(1)**

**Oncor Electric Delivery Transition Bond Company LLC**
**Series 2003-1 Transition Bonds**
**Statement of Outstanding Balances**
**as of March  31, 2014**
**(reflects actual payments made)**

| Payment Date | Scheduled Principal Payment | Actual Principal Payment | Outstanding Balance |
|---|---|---|---|
| 08/21/03 | $ | $ | 500,000,000 |
| 02/15/04 | $ 7,693,695 | $ 7,693,695 | $ 492,306,305 |
| 08/15/04 | $ 14,849,544 | $ 14,849,544 | $ 477,456,761 |
| 02/15/05 | $ 20,514,532 | $ 20,514,532 | $ 456,942,229 |
| 08/15/05 | $ 15,245,936 | $ 15,245,936 | $ 441,696,293 |
| 02/15/06 | $ 20,936,802 | $ 20,936,802 | $ 420,759,491 |
| 08/15/06 | $ 15,639,784 | $ 15,639,784 | $ 405,119,707 |
| 02/15/07 | $ 21,333,128 | $ 21,333,128 | $ 383,786,579 |
| 08/15/07 | $ 16,180,886 | $ 16,180,886 | $ 367,605,693 |
| 02/15/08 | $ 22,152,926 | $ 22,152,926 | $ 345,452,767 |
| 08/15/08 | $ 16,870,815 | $ 16,870,815 | $ 328,581,951 |
| 02/15/09 | $ 22,887,407 | $ 22,887,407 | $ 305,694,545 |
| 08/15/09 | $ 17,675,575 | $ 17,675,575 | $ 288,018,970 |
| 02/15/10 | $ 23,697,230 | $ 23,697,230 | $ 264,321,740 |
| 08/15/10 | $ 18,564,598 | $ 18,564,598 | $ 245,757,143 |
| 02/15/11 | $ 24,689,884 | $ 24,689,884 | $ 221,067,258 |
| 08/15/11 | $ 19,632,748 | $ 19,632,748 | $ 201,434,510 |
| 02/15/12 | $ 25,779,810 | $ 25,779,810 | $ 175,654,700 |
| 08/15/12 | $ 20,760,586 | $ 20,760,586 | $ 154,894,114 |
| 02/15/13 | $ 26,919,355 | $ 26,919,355 | $ 127,974,759 |
| 08/15/13 | $ 21,990,463 | $ 21,990,463 | $ 105,984,296 |
| 02/15/14 | $ 28,222,131 | $ 28,222,131 | $ 77,762,165 |
| 08/15/14 | $ 23,354,481 | | |
| 02/15/15 | $ 29,612,944 | | |
| 08/15/15 | $ 24,794,740 | | |

**Exhibit 99(d)(2)**

**Oncor Electric Delivery Transition Bond Company LLC**
**Series 2004-1 Transition Bonds**
**Statement of Outstanding Balances**
**as of March  31, 2014**
**(reflects actual payments made)**

| Payment Date | Scheduled Principal Payment | Actual Principal Payment | Outstanding Balance |
|---|---|---|---|
| 06/07/04 | | $ | 789,777,000 |
| 11/15/04 | $  9,497,122 | $  9,497,122 | $  780,279,878 |
| 05/15/05 | $  24,931,710 | $  24,931,710 | $  755,348,168 |
| 11/15/05 | $  29,612,875 | $  29,612,875 | $  725,735,293 |
| 05/15/06 | $  26,001,686 | $  26,001,686 | $  699,733,607 |
| 11/15/06 | $  30,518,702 | $  30,518,702 | $  669,214,905 |
| 05/15/07 | $  27,068,916 | $  27,068,916 | $  642,145,989 |
| 11/15/07 | $  31,965,647 | $  31,965,647 | $  610,180,342 |
| 05/15/08 | $  28,029,697 | $  28,029,697 | $  582,150,645 |
| 11/15/08 | $  32,379,952 | $  32,379,952 | $  549,770,693 |
| 05/15/09 | $  28,670,797 | $  28,670,797 | $  521,099,896 |
| 11/15/09 | $  34,010,045 | $  34,010,045 | $  487,089,851 |
| 05/15/10 | $  29,909,541 | $  29,909,541 | $  457,180,310 |
| 11/15/10 | $  35,653,605 | $  35,653,605 | $  421,526,704 |
| 05/15/11 | $  31,484,179 | $  31,484,178 | $  390,042,526 |
| 11/15/11 | $  37,278,430 | $  37,278,431 | $  352,764,095 |
| 05/15/12 | $  33,135,283 | $  33,135,283 | $  319,628,812 |
| 11/15/12 | $  38,933,171 | $  38,933,171 | $  280,695,641 |
| 05/15/13 | $  34,894,486 | $  34,894,486 | $  245,801,155 |
| 11/15/13 | $  40,843,190 | $  40,843,190 | $  204,957,965 |
| 05/15/14 | $  36,895,349 | | |
| 11/15/14 | $  42,915,221 | | |
| 05/15/15 | $  39,006,143 | | |
| 11/15/15 | $  45,007,615 | | |
| 05/15/16 | $  41,133,638 | | |

**Exhibit 99(e)**

# SEMI-ANNUAL SERVICER'S CERTIFICATE

ONCOR ELECTRIC DELIVERY TRANSITION BOND COMPANY LLC,

$500,000,000 Transition Bonds, Series 2003-1

Oncor Electric Delivery Company, as Servicer

   Pursuant to Section 4.01(c)(ii) of the Series 2003-1 Transition Property Servicing Agreement dated as of August 21, 2003 (the "Agreement") between Oncor Electric Delivery Company, as Servicer and Oncor Electric Delivery Transition Bond Company LLC, as Issuer, the Servicer does hereby certify as follows:

   Capitalized terms used herein have the respective meanings as set forth in the Agreement.  References herein to certain sections and subsections are references to the respective sections of the Agreement.

| | |
|---|---|
| Collection Periods: | August 2013 to January 2014 |
| **Payment Date:** | **February 18, 2014** |
| Today's Date: | February 6, 2014 |

1.

COLLECTIONS ALLOCABLE AND AGGREGATE AMOUNTS AVAILABLE FOR THE CURRENT PAYMENT DATE:

| | | | |
|---|---|---|---:|
| i. | Remittances for the August 2013 Series 2003-1 Collection Period | $ | 5,248,285.37 |
| ii. | Remittances for the September 2013 Series 2003-1 Collection Period | $ | 5,843,088.32 |
| iii. | Remittances for the October 2013 Series 2003-1 Collection Period | $ | 5,511,938.64 |
| iv. | Remittances for the November 2013 Series 2003-1 Collection Period | $ | 4,988,741.81 |
| v. | Remittances for the December 2013 Series 2003-1 Collection Period | $ | 4,464,280.02 |
| vi. | Remittances for the January 2014 Series 2003-1 Collection Period | $ | 4,440,557.24 |
| vii. | Remittances for the _____ Series 2003-1 Collection Period after_____ (use 6 prior periods only) | $ | |
| viii. | Remittances for the _____ Series 2003-1 Collection Period after_____ (use 6 prior periods only) | $ | |
| ix. | Remittances for the _____ Series 2003-1 Collection Period after_____ (use 6 prior periods only) | $ | |
| x. | Remittances for the _____ Series 2003-1 Collection Period | $ | |
| xi. | Remittances for the _____ Series 2003-1 Collection Period | $ | |
| xii. | Investment Earnings on Series 2003-1 Collection Account: | $ | 0.00 |
| xiii. | Investment Earnings on Series 2003-1 Capital Subaccount | $ | 244.17 |
| xiv. | Investment Earnings on Series 2003-1 Overcollateralization Subaccount | $ | 202.82 |
| xv. | Investment Earnings on Series 2003-1 Reserve Subaccount: | $ | 0.00 |
| xvi. | Investment Earnings on Series 2003-1 General Subaccount | $ | 3.35 |

| | | | |
|---|---|---|---:|
| xvii. | Series 2003-1 General Subaccount Balance (sum of i through xvi above): | $ | **30,497,341.74** |
| xviii. | Series 2003-1 Reserve Subaccount Balance as of Prior Series 2003-1 Payment Date | $ | 458,493.36 |
| xix. | Series 2003-1 Overcollateralization Subaccount Balance as of Prior Series 2003-1 Payment Date | $ | 2,083,333.00 |
| xx. | Series 2003-1 Capital Subaccount Balance as of Prior Series 2003-1 Payment Date | $ | 2,500,000.00 |
| xxi. | Series 2003-1 Collection Account Balance (sum of xvii. through xx above) | $ | **35,539,168.10** |

2.    OUTSTANDING AMOUNTS AS OF PRIOR SERIES 2003-1 PAYMENT DATE:

| | | | |
|---|---|---|---:|
| i. | Class A-1 Outstanding Amount | $ | 0.00 |
| ii. | Class A-2 Outstanding Amount | $ | 0.00 |
| iii. | Class A-3 Outstanding Amount | $ | 0.00 |
| iv. | Class A-4 Outstanding Amount | $ | 105,984,296.00 |
| v. | Aggregate Outstanding Amount of All Series 2003-1 Bonds | $ | 105,984,296.00 |

3.    REQUIRED FUNDING/PAYMENTS AS OF CURRENT PAYMENT DATE:

| | SERIES 2003-1 PRINCIPAL | | PRINCIPAL DUE |
|---|---|---|---:|
| i. | Class A-1 | $ | 0.00 |
| ii. | Class A-2 | $ | 0.00 |
| iii. | Class A-3 | $ | 0.00 |
| iv. | Class A-4 | $ | 28,222,131.00 |
| v. | For all Series 2003-1 Bonds | $ | 28,222,131.00 |

| | SERIES 2003-1 | BOND INTEREST RATE | DAYS IN INTEREST PERIOD (1) | PRINCIPAL BALANCE | | INTEREST DUE |
|---|---|---|---|---:|---|---:|
| vi. | Class A-1 | 2.26% | 180/360 | $ 0.00 | $ | 0.00 |
| vii. | Class A-2 | 4.03% | 180/360 | $ 0.00 | $ | 0.00 |
| viii. | Class A-3 | 4.95% | 180/360 | $ 0.00 | $ | 0.00 |
| ix. | Class A-4 | 5.42% | 180/360 | $ 105,984,296.00 | $ | 2,872,174.42 |
| x. | For All Series 2003-1 Bonds | | | $ 105,984,296.00 | $ | 2,872,174.42 |

| | | REQUIRED LEVEL | | FUNDING REQUIRED |
|---|---|---:|---|---:|
| xi. | Series 2003-1 Overcollateralization Subaccount | $ 2,187,500.00 | $ | 0.00 |
| xii. | Series 2003-1 Capital Subaccount | $ 2,500,000.00 | $ | 0.00 |

(1) On 30/360 day basis for initial payment date; otherwise use one-half of annual rate.

4.      ALLOCATION OF REMITTANCES AS OF CURRENT PAYMENT DATE PURSUANT TO §8.02(d) OF INDENTURE

| | | | |
|---|---|---|---:|
| i. | Trustee Fees and Expenses (subject to cap-see 8.02(e)(i) of the Indenture): | $ | 0.00 |
| ii. | Indenture Manager Fees (subject to cap-see 8.02(e)(i) of the Indenture): | $ | 2,000.00 |
| iii. | Series 2003-1 Servicing Fee: | $ | 200,000.00 |
| iv. | Operating Expenses (subject to cap-see 8.02(e)(iii) of the Indenture): | | |
| | Trust Operating Expense: | $ | 0.00 |
| | Trust Accounting Expense: | $ | 0.00 |
| | Rating Agency Fees (already paid by Servicer): | $ | 12,500.00 |
| | Administration Fee: | $ | 25,000.00 |
| | Audit Fee (already paid by Administrator) | $ | 17,423.00 |
| | Total Fees and Expenses (i. through iv.) | $ | 256,923.00 |

v.   Semi-Annual Interest -including any past-due for prior period(s)

| | | Per $1,000 of Original | |
|---|---|---|---:|
| SERIES 2003-1 | | AGGREGATE | PRINCIPAL |
| 1. | Class A-1 Interest Payment | $ | 0.00 |
| 2. | Class A-2 Interest Payment | $ | 0.00 |
| 3. | Class A-3 Interest Payment | $ | 0.00 |
| 4 | Class A-4 Interest Payment | $ | 2,872,174.42 |

vi.   Principal Due and Payable as a Result of Event of Default or on Final Maturity Date

| | | Per $1,000 of Original | |
|---|---|---|---:|
| SERIES 2003-1 | | AGGREGATE | PRINCIPAL |
| 1. | Class A-1 Principal Payment | $ | 0.00 |
| 2. | Class A-2 Principal Payment | $ | 0.00 |
| 3. | Class A-3 Principal Payment | $ | 0.00 |
| 4. | Class A-4 Principal Payment | $ | 0.00 |

vii.   Semi-Annual Principal

| | | Per $1,000 of Original | |
|---|---|---|---:|
| SERIES 2003-1 | | AGGREGATE | PRINCIPAL |
| 1. | Class A-1 Principal Payment | $ | 0.00 |
| 2. | Class A-2 Principal Payment | $ | 0.00 |
| 3. | Class A-3 Principal Payment | $ | 0.00 |
| 4. | Class A-4 Principal Payment | $ | 28,222,131.00 |

4.    ALLOCATION OF REMITTANCES AS OF CURRENT PAYMENT DATE PURSUANT TO §8.02(d) OF INDENTURE (CONTINUED)

| | | | |
|---|---|---|---|
| viii. | Funding of Series 2003-1 Capital Subaccount (to required level) | $ | 0.00 |
| ix. | Funding of Series 2003-1 Overcollateralization Subaccount (to required level) | $ | 0.00 |
| x. | Investment Earnings on Series 2003-1 Capital Subaccount Released to Issuer | $ | 0.00 |
| xi. | Deposit to Series 2003-1 Reserve Subaccount | $ | 0.00 |
| xii. | Released to Issuer upon Retirement of all Bonds | $ | 0.00 |
| xiii. | AGGREGATE REMITTANCES AS OF CURRENT PAYMENT DATE | $ | **31,351,228.42** |

5.    OUTSTANDING AMOUNT AND SERIES 2003-1 COLLECTION ACCOUNT BALANCE AS OF CURRENT PAYMENT DATE (AFTER GIVING EFFECT TO PAYMENTS TO BE MADE ON SUCH PAYMENT DATE):

SERIES 2003-1

| | | | |
|---|---|---|---|
| i. | Class A-1 Outstanding Amount | $ | 0.00 |
| ii. | Class A-2 Outstanding Amount | $ | 0.00 |
| iii. | Class A-3 Outstanding Amount | $ | 0.00 |
| iv. | Class A-4 Outstanding Amount | $ | 77,762,165.00 |
| v. | AGGREGATE OUTSTANDING AMOUNT OF ALL SERIES 2003-1 BONDS | $ | 77,762,165.00 |
| vi. | Series 2003-1 Reserve Subaccount Balance | $ | 0.00 |
| vii. | Series 2003-1 Overcollateralization Subaccount Balance | $ | 1,687,939.68 |
| viii. | Series 2003-1 Capital Subaccount Balance | $ | 2,500,000.00 |
| ix. | AGGREGATE SERIES 2003-1 COLLECTION ACCOUNT BALANCE | $ | 4,187,939.68 |

6.    SUBACCOUNT WITHDRAWALS AS OF CURRENT PAYMENT DATE (IFAPPLICABLE, PURSUANT TO SECTION 8.02(e) OF INDENTURE):

| | | | |
|---|---|---|---|
| i. | Series 2003-1 Reserve Subaccount | $ | 458,493.36 |
| ii. | Series 2003-1 Overcollateralization Subaccount | $ | 395,393.32 |
| iii. | Series 2003-1 Capital Subaccount | $ | 0.00 |
| iv. | TOTAL WITHDRAWALS | $ | 853,886.68 |

7.     SHORTFALLS IN INTEREST AND PRINCIPAL PAYMENTS AS OF CURRENT PAYMENT DATE;

    i.          Semi-annual Interest

    SERIES 2003-1

| | | | |
|---|---|---|---|
| 1. | Class A-1 Interest Payment | $ | 0.00 |
| 2. | Class A-2 Interest Payment | $ | 0.00 |
| 3. | Class A-3 Interest Payment | $ | 0.00 |
| 4. | Class A-4 Interest Payment | $ | 0.00 |

    ii.          Semi-annual Principal

    SERIES 2003-1

| | | | |
|---|---|---|---|
| 1. | Class A-1 Principal Payment | $ | 0.00 |
| 2. | Class A-2 Principal Payment | $ | 0.00 |
| 3. | Class A-3 Principal Payment | $ | 0.00 |
| 4. | Class A-4 Principal Payment | $ | 0.00 |

8.     SHORTFALLS IN REQUIRED SERIES 2003-1 SUBACCOUNT LEVELS AS OF CURRENT PAYMENT DATE:

| | | | |
|---|---|---|---|
| i. | Series 2003-1 Overcollateralization Subaccount | $ | 499,560.32 |
| ii. | Series 2003-1 Capital Subaccount | $ | 0.00 |

    IN WITNESS HEREOF, the undersigned has duly executed and delivered this Semi-Annu al Servicer's Certificate this 6th day of February, 2014.

ONCOR ELECTRIC DELIVERY COMPANY,
as Servicer,

By:      /s/ John M. Casey
Name:    John M. Casey
Title:   Vice President -Treasurer