```
1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS        :

     CORP.,  et al.,               :    Case No. 14-10979(CSS)

7                                  :

             Debtors.             :    (Jointly Administration

8    _____     :    Requested)

     CSC TRUST COMPANY OF DELAWARE,:

9    as INDENTURE TRUSTEE,         :

                                   :

10           Plaintiff,            :

                                   :

11      v.                         :    Adv. Proc. No. 14-50363

                                   :    (CSS)

12   ENERGY FUTURE INTERMEDIATE    :

     HOLDING COMPANY LLC and EFIH  :

13   FINANCE INC.,                 :

                                   :

14           Defendants.           :

     _____:

15

16

17

18                           United States Bankruptcy Court

19                           824 North Market Street

20                           Wilmington, Delaware

21                           June 30, 2014

22                           9:44 AM - 5:43 PM

23

24

25
```

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8    ECR OPERATOR:   AL LUGANO

9

10

11

12   HEARING re Motion of Energy Future Holdings Corp., et al.,

13   for Entry of Interim and Final Orders (A) Authorizing the

14   Debtors to (I) Pay Certain prepetition Compensation and

15   Reimbursable Employee Expenses, (II) Pay and Honor Employee

16   and Retiree Medical and Similar Benefits, and (III) Continue

17   Employee and Retiree Benefit Programs, and (B) Modifying the

18   Automatic Stay [D.I. 25; filed April 29, 2014]

19

20   HEARING re Motion of Energy Future Holdings Corp., et al.,

21   for Entry of Interim and Final Orders Authorizing the

22   Debtors to (A) Continue Performing Under Prepetition Hedging

23   and Trading Arrangements, (B) Pledge Collateral and Honor

24   Obligations Thereunder, and (C) Enter into and Perform Under

25   Trading Continuation Agreements and Postpetition Hedging and

1   Trading Arrangements [D.I. 41; filed April 29, 2014]

2

3   HEARING re Motion of Energy Future Holdings Corp., et al.,

4   for Entry of an Order Authorizing the Debtors to (A) Pay

5   Certain Prepetition Amounts on Account of Non-Insider

6   Compensation Programs and (B) Continue the Non-Insider

7   Compensation Programs in the Ordinary Course of Business on

8   a Postpetition Basis [D.I. 468; filed May 15, 2014]

9

10  HEARING re Motion of Energy Future Holdings Corp., et al.,

11  for Entry of Orders Approving Certain EFIH Settlements and

12  the Oncor TSA Amendment [D.I. 472; filed May 15, 2014]

13

14  HEARING re Motion of Energy Future Intermediate Holding

15  Company LLC and EFIH Finance Inc. for Entry of an Order (A)

16  Approving Postpetition Second Lien Financing, (B) Granting

17  Liens and Providing Superpriority Administrative Expense

18  Claims; (C) Authorizing the Use of Cash Collateral, (D)

19  Authorizing the EFIH Second Lien Repayment, (E) Authorizing

20  Entry into and Payment of Fees Under the Commitment Letter;

21  and (F) Modifying the Automatic Stay [D.I. 477; filed May

22  15, 2014]

23

24  HEARING re Complaint for Declaratory Relief [D.I. 470/Adv.

25  D.I. 1; filed May 15, 2014]

1    HEARING re Motion of Wilmington Savings Fund Society, FSB

2    for Leave to Conduct Discovery Pursuant to Rule 2004 of the

3    Federal Rules of Bankruptcy Procedure of Energy Future

4    Holdings Corporation, its Affiliates, and Certain Third

5    Parties (the "2004 Motion") [D.I. 6; filed April 29, 2014]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dawn South, Lisa Beck, and Sheila Orms

25

```
1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorneys for the Debtors

4

5    BY:  BRIAN SCHARTZ, ESQ.

6         MARK MCKANE, ESQ.

7         ANDY MCGAAN, ESQ.

8         DAVID DEMPSEY, ESQ.

9         EDWARD SASSOWER, ESQ.

10        STEVE HESSLER, ESQ.

11        CHAD HUSNICK, ESQ.

12        JONATHAN F. GANTER, ESQ.

13

14   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

15        Attorneys for Ad Hoc Committee of TCEH First Lien

16        Creditors

17

18   BY:  JACOB ADLESTEIN, ESQ.

19        BRIAN HERMANN, ESQ.

20

21   YOUNG CONAWAY STARGATT & TAYLOR, LLP

22        Attorney for Ad Hoc Committee of TCEH First Lien

23        Creditors

24

25   BY:  RYAN M. BARTLEY, ESQ.
```

1    BROWN RUDNICK

2         Attorney for TCEH, Second Lien Trustee

3

4    BY:   JEFFREY L. JONAS, ESQ.

5

6    UNITED STATES DEPARTMENT OF JUSTICE

7         Attorneys for the U.S. Trustee

8

9    BY:   ANDREA B. SCHWARTZ, ESQ

10        RICHARD L. SCHEPACARTER, ESQ.

11

12   AKIN GUMP STRAUSS HAUER & FELT LLP

13        Attorneys for Ad Hoc Committee of EFIH Unsecured

14        Noteholders

15

16   BY:   SCOTT ALBERINO, ESQ.

17        IRA DIZENGOFF, ESQ.

18

19   SHEARMAN & STERLING

20        Attorneys for Duetsche Bank AG New York Branch

21

22   BY:   FREDRIC SOSNICK, ESQ.

23        NED S. SCHODEK, ESQ.

24

25

1   POTTER ANDERSON & CORROON LLP

2        Attorneys for Deutsche Bank AG New York Branch

3

4   BY:  LAURIE SELBER SILVERSTEIN, ESQ.

5        R. STEPHEN MCNEILL, ESQ.

6

7   COUSINS CHIPMAN & BROWN, LLP

8        Attorney for Ad Hoc Committee of EFIH Unsecured

9        Noteholders

10

11  BY:  SCOTT D. COUSINS, ESQ.

12

13  ROPES & GRAY LLP

14        Attorneys for CSC Trust Company of Delaware

15

16  BY:  D. ROSS MARTIN, ESQ.

17        KEITH HOWARD WOFFORD, ESQ.

18

19  COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

20        Attorney for CSC Trust Company of Delaware

21

22  BY:  NORMAN L. PERNICK, ESQ.

23

24

25

1    MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

2         Attorney for Sponsors

3

4    BY:  CURTIS MILLER, ESQ.

5

6    WACHTELL LIPTON ROSEN & KATZ

7         Attorneys for EFH Equity Owners

8

9    BY:  RICKY MASON, ESQ.

10        AUSTIN WITT, ESQ.

11        EMIL A. KLEINHAUS, ESQ.

12

13   DRINKER BIDDLE & REATH LLP

14        Attorneys for Citibank, N.A.

15

16   BY:  HOWARD A. COHEN, ESQ.

17        ROBERT K. MALONE, ESQ.

18

19   BINGHAM MCCUTCHEN LLP

20        Attorneys for Pacific Investment Management Co. LLC

21

22   BY:  JEFFREY SABIN, ESQ.

23        JULIA FROST-DAVIES, ESQ.

24

25

1   WHITE & CASE LLP

2        Attorneys for Ad Hoc Group of TCEH Unsecured

3        Noteholders

4

5   BY:  J. CHRISTOPHER SHORE, ESQ.

6        THOMAS LAURIA, ESQ.

7

8   FRIED FRANK HARRIS SHRIVER & JACOBSON

9        Attorneys for Fidelity Management & Research Company

10

11  BY:  MATTHEW M. ROSSE, ESQ.

12       GARY KAPLAN, ESQ.

13

14  CROSS & SIMON, LLC

15       Attorneys for Fidelity Management & Research Company

16

17  BY:  DAVID HOLMES, ESQ.

18       MICHAEL JOSEPH JOYCE, ESQ.

19

20

21

22

23

24

25

1   POLSINELLI

2       Attorneys for the Committee

3

4   BY:   CHRIS WARD, ESQ.

5         JUSTIN K. EDELSON, ESQ.

6         JARRETT VINE, ESQ.

7

8   MORRISON & FOERSTER

9       Attorneys for the Committee

10

11  BY:   TODD M. GOREN, ESQ.

12        SAMANTHA MARTIN, SQ.

13        KAYVAN SADEGHI, ESQ.

14        JIM PECK, ESQ.

15        ANDREW MCGAAN, ESQ.

16        WILLIAM HILDBOLD, ESQ.

17

18  LANDIS RATH & COBB

19      Attorneys for Next Era Energy

20

21  BY:   MATTHEW B. MCGUIRE, ESQ.

22        KERRI MUNNFORD, ESQ.

23

24

25

1   KLEHR HARRISON HARVY BRANZBURG LLP

2        Attorney for UMB Bank, Indenture Trust

3

4   BY:  RAYMOND H. LEMISCH, ESQ.

5

6   THE HOGAN FIRM

7        Attorney for the Ad Hoc Committee EFH Legacy

8

9   BY:  GARVAN MCDANIEL, ESQ.

10

11  KASOWITZ BENSON

12       Attorneys for the Ad Hoc Committee EFH Legacy

13

14  BY:  DAVID ROSNER, ESQ.

15       ANDREW GLENN, ESQ.

16

17  CHADBOURNE & PARKE

18       Attorneys for Next Era Energy

19

20  BY:  HOWARD SEIFE, ESQ.

21       DAVI LEMAY, ESQ.

22       MARC ROITMAN, ESQ.

23

24

25

1  BRYAN CAVE

2       Attorney for Computershare Trust Co.

3

4  BY:  STEPHANIE WICKOUSKE, ESQ.

5

6  NIXON PEADOBY

7

8  BY:  RICHARD PEDONE, ESQ.

9

10  FOX ROTHSCHILD

11       Attorney for TECH Unsecured Ad Hoc Group

12

13  BY:  JOHN STROCK, ESQ.

14

15  REED SMITH LLP

16       Attorney for Bank of new York Mellon

17

18  BY:  JOSEPH GRIECO, ESQ.

19

20  ASHBY & GEDDES

21       Attorney for WSFS, Trustee

22

23  BY:  GREG TAYLOR, ESQ.

24

25

```
 1   PACHULSKI STANG ZIEHL & JONES

 2   Attorneys for Computershare

 3

 4   BY:  LAURA DAVIS JONES, ESQ.

 5        JOHN MORRIS, ESQ.

 6

 7   ZIETH & JONES LLP

 8        Attorney for Indenture Trustee

 9

10   BY:  TIMOTNY CAIRNS, ESQ.

11

12   KRAMER LEVIN

13        Attorneys for Computershare

14

15   BY:  GREGORY HORWITZ, ESQ.

16        THOMAS MOERS MAYERS, ESQ.

17        ALICE J. BYOWITZ, ESQ.

18        JOSHUA BRODY, ESQ.

19

20   MORRIS JAMES LLP

21        Attorney for Law Debenture

22

23   BY:  STEPHEN M. MILLER, ESQ.

24

25
```

1   PATTERSON BELKNAP WEBB & TYLER

2        Attorney for Law Debenture

3

4   BY:  DAN LOWENTHAL, ESQ.

5

6   FOLEY & LARDNER

7        Attorney for UMB Indenture Trustee

8

9   BY:  HAROLD KAPLAN, ESA.

10       MARK HEBBELN, ESQ.

11

12  DRINKER

13       Attorney for EFIH/CSC

14

15  BY:  JIM MILLAR, SQ.

16

17  COLE SCHOTZ

18       Attorney for EFIH/CSC

19

20  BY:  WARREN USATINE, ESQ.

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.

4              Good morning.

5              MR. SASSOWER:  Good morning, Your Honor.

6              THE COURT:  And proceed.

7              MR. SASSOWER:  For the record, Edward Sassower of

8    Kirkland & Ellis LLP, proposed counsel to the debtors.

9              Your Honor, there are five motions on today's

10   agenda.  The EFIH second lien DIP, which should consume most

11   of today and tomorrow, and four first or second day motions,

12   which are wages, proprietary trading, non-inside -- non-

13   insider incentive compensation, and critical vendors.

14             We believe we have resolved wages, proprietary

15   trading, and non-insider incentive compensation, but the

16   parties did not want to supply all certificates of counsel,

17   because they wanted to make statements on the record in

18   connection with the entry of the orders.

19             With respect to critical vendors we believe we've

20   resolved everyone's issues other than maybe those of the ad

21   hoc TCH committee.  We'll find out exactly where they stand

22   shortly.

23             But before we turn to those motions, Your Honor,

24   I'd like to quickly update the Court on events that have

25   transpired between the last hearing and today.

1          First, the debtor is in the process of filing

2     their SOFAs, schedules, and their first monthly report as we

3     speak.  All of these documents will have been filed by the

4     conclusion of today's hearing.

5          Second, on June 17th the Railroad Commission of

6     Texas approved the superpriority carve out that as included

7     in the TCH DIP as a replacement bond.

8          Third, on June 12th the District Court entered an

9     order denying the EFIH first lien trustees motion to stay

10    Your Honor's ruling approving the EFIH first lien

11    settlement, and the debtors have since closed on the EFIH

12    first lien DIP and the settlement.

13         In addition the debtors have spent a significant

14    amount of time continuing the get the official committee up

15    to speed, including countless phone conversations, two

16    meetings with the committees' advisors in Dallas, and a

17    meeting with the committee members and their advisors in New

18    York.

19         The debtors have also spent a significant amount

20    of time with the Office of the Unites States Trustee

21    regarding the first and second lien motions, including

22    numerous phone conversations and two in-person meetings.

23         The debtors, the official committee, and the

24    Office of the United States Trustee have also agreed upon a

25    construct for a fee review committee and plan to file papers

1    shortly, although we'll likely require a short extension of

2    the 70-day deadline that's included in your standing order.

3             The last 30 days were also busy with depositions

4    mostly in connection with the EFIH second lien DIP, but also

5    in connection with the RSA assumption motion, which is

6    scheduled for July 18th.

7             Since the last hearing there have been 12

8    depositions bringing the total in this case to date to 17.

9             In addition since the last hearing the debtors

10   have produced another 90,000 pages of documents through

11   discovery bringing the total in this case to date to 250,000

12   pages.

13            The debtors were also busy over the past month

14   negotiating the EFIH second lien DIP, we've received many

15   proposals and counter-proposals since the last hearing,

16   including one late last night.  My partner, Mr. Hessler,

17   will take the Court through all of this shortly.

18            Lastly, the debtors are continuing to negotiate an

19   amendment to the RSA.

20            Regarding the milestones the parties have agreed

21   in principal to the following:

22            The date by which the debtors would need to obtain

23   an order approving the RSA assumption motion will be moved

24   from June 13th to July 21st to reflect the fact that the

25   hearing on the RSA assumption motion is schedule for

1    July 18th.

2              The date by which the debtors would need to file

3    their plan and disclosure statement will be moved from

4    June 13th to July 2nd, and the date by which the debtors

5    would need to obtain an order approving the disclosure

6    statement will be moved from August 12th to September 18th.

7              Your Honor has given us hearing dates on

8    September 16th and 17th.  We have not yet asked Your Honor

9    to allow us to conduct the disclosure statement hearing on

10   those dates, but we're hopeful that Your Honor will request

11   when we make it in order to allow us to comply with the

12   hopefully soon to be revised milestones.

13             Just a few more words, Your Honor, on the

14   disclosure statement.

15             Every fall the company updates its five-year

16   business plan.  We didn't see the point in filing the

17   disclosure statement with the current numbers only to update

18   those numbers shortly before or after the disclosure

19   statement hearing date.  Thus what we determined to do is

20   file the disclosure statement on or around July 2nd without

21   numbers so that the parties can start to digest the non-

22   numerical portions of the disclosure statement.

23             In addition the company has accelerated its

24   traditional business planning process to produce new numbers

25   by late July.  Evercore will then take several weeks to

1    finalize its formal valuation, and then the debtors will

2    file a revised disclosure statement that has been populated

3    with numbers by mid-August.

4            This could all change, but that's the current

5    framework that the debtors are operating under, and the

6    debtors hope to finalize an RSA amendment reflecting all of

7    that in short order.

8            With that, unless Your Honor has comments to

9    anything I said, particularly with respect to the disclosure

10   statement, I will yield the podium to my partner, Brian

11   Schartz, who will present the remaining relief on the wages

12   motion.

13           THE COURT:  What's the order of battle for the

14   day?

15           MR. SASSOWER:  We're going to start with the

16   wages, then we're going to move to non-insider incentive

17   compensation, then proprietary trading.  Again, those first

18   three we believe are consensual, albeit people want to make

19   statements on the record, and then we're going to move to

20   critical vendor, which may be contested, and then the

21   remaining portion of today and all of tomorrow will be about

22   the EFIH second lien DIP.

23           THE COURT:  Wait just a minute.

24       (Pause)

25           THE COURT:  Well what's going on with the second

1    lien settlement?

2              MR. HESSLER:  Your Honor, Steve Hessler of

3    Kirkland on behalf of the debtors.

4              It's going to be presented in conjunction with the

5    second lien DIP, so it's --

6              THE COURT:  Oh, okay.

7              You may proceed.

8              MR. SSASSOWER:  Thank you, Your Honor.

9              MR. SCHARTZ:  Good morning, Your Honor, Brian

10   Schartz from Kirkland & Ellis, proposed counsel for the

11   debtors.

12             The next two items on the agenda relate to wages

13   motion, which has two items of relief that have yet to be

14   closed out.  The first relates to severance for non-insider

15   employees, and the second relates to certain fees that are

16   due on a post-petition basis to independent directors, one

17   at EFIH and one at TCH, and then the second motion relates

18   to non-insider compensation programs.  So there's two

19   separate motions.

20             As Mr. Sassower noted we have agreement on the

21   relief specified in these motions, but we did not do them on

22   certificate of counsel because that resolution really is the

23   result of significant conversations with Morrison &

24   Foerster, counsel to the official committee, White & Case,

25   counsel to the ad hoc unsecured committee at TCH, and most

1    importantly the Office of the United States Trustee, which

2    has been working very closely with us on both motions,

3    including and most importantly the relief that we're seeking

4    in the non-insider compensation programs.

5            Those discussions not only resulted in changes to

6    the orders but they also resulted in the filing of two

7    declarations that are supplemental to the relief that we're

8    seeking today.  The first is from Doug Friske from Towers

9    Watson, who is in the courtroom today I believe, and also

10   Carrie Kirby who is the debtors executive vice president for

11   human resources and administration.  She's -- her first time

12   -- it's the first time she's been here and she's here today

13   as well.  I believe that declaration was delivered to

14   chambers this morning, we filed it very late last night.  If

15   it hasn't I have a hard copy that I can pass up to you.

16           That declaration covers both motions, and so what

17   I'm going to do is I'm going to cover just the relief that

18   we're seeking in wages with respect to severance and the

19   directors' fees -- independent director fees, and then

20   rather than present the order for that what I'd like to do

21   is move to the non-insider comp, like one of my colleagues,

22   Mr. Guerrieri, is going to talk about the relief that we're

23   seeking there and how it's changed a little bit, and then

24   Mr. Dempsey is actually going to present as a proffer into

25   evidence Ms. Kirby's declaration and walk through that.  And

1    once we're finished with the presentation on both motions I

2    believe Ms. Schwartz and perhaps some others would like to

3    stand up and make a few comments on the record.

4              So with that said let's move through wages.

5              Just so we're very clear this is -- deal with

6    relief that the debtors sought in a first day motion that

7    they filed at the beginning of the case, it's located at

8    document number 25.  There is a supplement that we filed to

9    the motion which covers directors' fees and a few other

10   things for which relief has already been granted.  We filed

11   that on May 29th, and that's located at docket number 629,

12   and then of course there's a supplement declaration that we

13   filed last night for Ms. Kirby, which is at docket number

14   1231.

15             Very quickly with respect to severance the debtors

16   initially sought authority to continue their severance

17   programs in ordinary course, and there are three severance

18   programs.  One is for rank and file employees, the second is

19   for union employees, and the second -- and the third is for

20   -- it's called the executive severance plan.  But the

21   debtors only sought relief at the outside with respect to

22   non-insiders, but they did seek relief with respect to

23   insiders.

24             Following a number of discussions with Morrison &

25   Foerster, counsel for the committee, we agreed that as to

1    non-insiders the debtors would have authority to continue to

2    sever (indiscernible - 9:59:00) in the ordinary course up to

3    aggregate cap of $15 million, with the understanding that

4    the debtors could always come back to the Court for

5    additional relief if they still needed it, and this is

6    something that we've also reflected in Ms. Kirby's

7    declaration.  We've made clear that the debtors will take

8    basically the same approach as to insiders for the purposes

9    of severance that they're taking with respect to non-insider

10   compensations.  The two are linked together with respect to

11   that one concept.

12              As to independent director fees, the second bucket

13   of relief that we're seeking in the wages motion today,

14   is --

15              THE COURT:  I'm going to interrupt you for a

16   minute.

17              MR. SCHARTZ:  Sure.

18              THE COURT:  You said 15 million on the severance

19   program?

20              MR. SCHARTZ:  Yeah, as an aggregate cap

21   (indiscernible - 9:59:43) programs.

22              THE COURT:  Look, the document I have says that

23   between 2010 and 2013 debtors paid an average of four

24   million a year.

25              MR. SCHARTZ:  Yes, that's right.  You know --

1                THE COURT:  Why the triple --

2                MR. SCHARTZ:  That's a good question.

3                THE COURT:  Thank you.

4                MR. SCHARTZ:  There's a couple reasons.

5           The first is the debtors were always very nervous

6      -- well all debtors are very nervous not to put in a

7      projected number for severance in a wages motion because it

8      obviously can create some (indiscernible - 10:00:12) among

9      the employees when you're trying to go through a

10     restructuring and tell everyone that this is on a balance

11     sheet restructuring not an operational restructuring.  So

12     there is admittedly some cushion in there.

13          The second point is, you know, the debtors are

14     looking at doing a number of things that may or may not

15     affect decisions in the future, and so we choose a number

16     that has enough cushion that we don't have to come back to

17     the Court.  I can't tell you today whether or not the

18     debtors would use the bucket within the course of the case,

19     but they wanted to have relief on a final basis with respect

20     to severance so they wouldn't have to come back and have a

21     discussion with the Court again.

22                THE COURT:  And it's not limited to 15 million a

23     year or whatnot, it's an aggregate amount for overall.

24                MR. SCHARTZ:  It's an aggregate amount for the

25     course of the case, and if we feel like we need to go over

1    or, you know, something happens that would require a motion

2    we have the flexibility to do that at a later date.

3              THE COURT:  All right.  And I understood from the

4    documents too that there's actually nothing due as we sit

5    here today.

6              MR. SCHARTZ:  That's correct.

7              THE COURT:  All right.  Go ahead.

8              MR. SCHARTZ:  Although these are prepetition

9    programs, but yes, there's nothing due today.

10             So as to independent director fees.  The

11   supplement that we filed on May 29th asked for authority to

12   pay about I think it's $70,000 in prepetition fees to two

13   independent directors, Mr. Chuck Cremmons (ph) is an

14   independent director of EFIH, and Hughes Sawyer who is the

15   independent director at TCH, and following discussions with

16   a number of the constituencies we have dropped the request

17   to pay prepetition fees, although we would like the order to

18   state very clearly that we can continue to pay post-petition

19   fees as they are earned during the course of the Chapter 11

20   cases, and I believe that relief is agreed to.

21             That is it for the relief that we're seeking in

22   the wages motion today, unless you have further question.

23             THE COURT:  And just so I'm -- just to make sure

24   -- close the loop on this, the pinnacle staff provider issue

25   was mooted by the draw down on the letter of credit; is that

1   right?

2           MR. SCHARTZ:  Correct, and the final -- the first

3   final order on wages I guess is what we should refer to that

4   as, and I don't remember exactly when it was ordered.

5           THE COURT:  All right.  I just want to -- all

6   right.

7           MR. SCHARTZ:  All right, I'm going to cede the

8   podium to my colleague, Mr. Guerrieri, who will walk through

9   the relief on non-insider comp.

10          THE COURT:  Okay.

11          MR. GUERRIERI:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. GUERRIERI:  William Guerrieri from Kirkland &

14   Ellis on behalf of the debtors.

15          Next item on the agenda is the motion to approve

16   the debtors' non-insider compensation programs, which motion

17   was filed on May 15th at docket number 468.

18          As some background in the six weeks since the

19   filing of the motion the debtors have had many productive

20   discussions with the United States Trustee, counsel to the

21   committee, and counsel to the ad hoc committee of TCEH

22   unsecured noteholders, which was the only party that filed a

23   formal objection.

24          Over the six weeks there's been numerous

25   conferences, including in-person meetings with these various

1    parties, the debtors shared a great deal of information on

2    the programs, and the participants in the programs spending

3    a lot of time on whether any of the proposed participants

4    were insiders, and in particular we spent a lot of time with

5    the United States Trustee's Office on this motion and are

6    thankful for all of their input and cooperation on the

7    process.

8              Your Honor, we've made certain changes to the

9    requested relief following these discussions, including

10   removing four participants from the programs and making

11   certain modifications to the proposed order.

12             You know, further to these discussions and in

13   particular the discussions with the United States Trustee as

14   my colleague, Mr. Schartz, mentioned, the debtors filed two

15   additional declaration that provide additional evidentiary

16   support for the motion.  The Kirby declaration and the

17   Douglas Friske supplemental declaration.  Both are in the

18   courtroom today.

19             In a minute my colleague, Mr. David Dempsey, will

20   provide an overview of the substance of these declarations.

21             The debtors have also revised the proposed order,

22   which we'll save till the end, to reflect certain

23   discussions with the United States Trustee and the

24   creditors' committee.  The draft form of the order has been

25   circulated to the U.S. Trustee, the committee, and the ad

1    hoc committee of TCH unsecured noteholders.

2           The key change is essentially a reservation of

3    rights with respect to insider or non-insider status for

4    issues other than with respect to this motion.

5           Overall, you know, we believe taken together the

6    motions and all of the declarations satisfy the debtors'

7    burden with respect to the programs.  I believe we have a

8    resolution that's satisfactory to all parties; however, I do

9    understand that Mrs. Schwartz -- Ms. Schwartz for the United

10   States Trustee's Office would like to make a statement with

11   respect to the motion, and other people may have comments

12   with respect to the motion as well, but before I turn the

13   podium over to Mrs. Schwartz we did want to provide Your

14   Honor with some additional context regarding the motion, and

15   happy to answer any questions you may have along the way.

16          My colleague, David Dempsey, will now provide an

17   overview of the two declarations that were filed last night

18   by way of proffer.

19          THE COURT:  Well which -- so there -- I hade five

20   buckets that were left.  So you're going to go through which

21   of those are -- you're going to deal with in the context of

22   the proffer?

23          MR. DEMPSEY:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. DEMPSEY:  And good morning.  For the purpose

1   of the record David Dempsey from Kirkland & Ellis.

2           With regard to the proffers, Your Honor,

3   Mrs. Kirby and Mr. Friske, both of whom are here to testify,

4   have submitted declarations.

5           With regard to Mr. Friske he submitted

6   declarations at 469/1232.  With regard to Mrs. Kirby it's

7   1231 and then an attachment at 1233.  And those

8   declarations, Your Honor, cover the annual incentive plan,

9   the non-insider portions of the executive annual incentive

10  plan, the owner/operator plan, the key leader program, the

11  Luminant developer incentive program, the Luminant

12  commercial incentive program, as well as finally some

13  individual bonus plans.  These are basically contracts for

14  specific employees.

15          THE COURT:  What was -- I'm sorry -- what was the

16  one after the owner/operator?

17          MR. DEMPSEY:  That is the key leader program.

18          THE COURT:  Oh, I thought we'd already dealt with

19  that.

20          MR. DEMPSEY:  I think we dealt with some of these

21  programs, Your Honor, on an interim basis at the last

22  hearing with regard to payments between that hearing and

23  this one, and this is --

24          MR. SCHARTZ:  Your Honor, there was a -- there was

25  essentially a bridge order on non-insider comp that was

1    entered at the last hearing to basically handle a couple of

2    payments that came due between then and now, and the

3    agreement that we had with the U.S. Trustee's Office and the

4    creditor constituents was to use the time between then and

5    now to sort out the rest on the remaining portion of the

6    payments.  So yes, you are remember correctly there was a

7    surge order.  Unfortunately I don't have a copy with me, but

8    I can get it.

9              THE COURT:  All right.  Well to a certain extent

10   I'm relying on your agenda which says that I've already

11   entered an order granting the relief in connection with the

12   key leader program, so I'm not focusing on it because the

13   agenda says it's already been done.

14             MR. SCHARTZ:  Yeah, I apologize for that.

15             THE COURT:  It's all right.

16             MR. DEMPSEY:  Your Honor, with regard to

17   Mrs. Kirby, who's in the courtroom, she's the executive vice

18   president of human resources of EFH for the debtors.

19             THE COURT:  Is there any objection to the use of a

20   proffer?

21             All right, you may proceed.

22             MR. DEMPSEY:  She's a member, Your Honor, of the

23   debtors' seven member strategy and policy committee and has

24   been at EFH since 2006 and has served since then in various

25   HR roles at the company.

1          After receiving her BA and MBA at TCU she entered

2     into the HR field, she has 20 plus years of experience in

3     that field.  And with regard to EFH in particular she has

4     substantial familiarity with the day-to-day operations of

5     the company's organizational structure, and she was heavily

6     involved and is heavily involved in the review annually and

7     sometimes more frequently in administration of all the

8     programs before the Court as well as putting together

9     several of the programs.

10          If Mrs. Kirby were to testify she'd give some

11     background on these programs, which is important for Your

12     Honor to note, exclude actually 26 individuals from the

13     number, and we'll get back to that in a second.

14          The first bucket of programs, Your Honor, are the

15     annual incentive programs, and in this regard there's two.

16     The annual incentive program and the executive annual

17     incentive program.  The latter only with regard to this

18     motion covers the vice presidents.

19          This motion basically seeks to roll over

20     prepetition practices with regard to those particular

21     programs, and between the two covers approximately 5,500

22     employees.

23          The programs establish a target payment as a

24     percentage of base salary that only gets paid -- only gets

25     paid if the debtors achieve financial and operational

1    metrics that are based on the debtors' annual budget review

2    process.

3           In addition here, Your Honor, the debtors

4    benchmarked these analyses based on input from their

5    independent energy expert, Todd Filsinger from Filsinger

6    Energy Partners.

7           These programs which are incentivizing were

8    developed and implemented to encourage and reward

9    exceptional performance to drive value for the debtors.

10          The second bucket of programs, Your Honor, are the

11   owner/operator plan and a key leader, and I'll treat those

12   together for a reason that will become obvious in a second.

13          The owner/operator program, Your Honor,

14   historically has been offered to 128 employees.  It's not --

15   we're not seeking approval on a go forward basis.  And

16   basically it's a four-year program that was divided into two

17   buckets.  Performance in 2010 and 2011 paid out in 2012 and

18   performance in 2012 and 2013 paid out in September of this

19   year.

20          Fifty percent of the payments, Your Honor, are

21   tied to EBITDA targets, 50 percent are retentive, but the

22   monies would be paid out in that third year.

23          The owner/operator program, Your Honor, was

24   modified at the beginning of this year based on a review of

25   compensation programs with input from Towers Watson, and

1    that new program is now called the key leader program.

2            There are some differences between the two.  The

3    key leader program is a shorter program with quarterly

4    payments, and they choose this quarterly payment system in

5    order to increase employee morale in this difficult time so

6    they'd have something to look forward to every quarter.  It

7    also creates, Your Honor, stability for employees, and it

8    insures retention for folks.

9            An additional change, Your Honor, from the

10   owner/operator is that it eliminates the incentive piece of

11   that bonus structure, so this instead of being 50 percent,

12   50 percent it's 100 percent (indiscernible - 10:11:31).

13           The program will be in place, Your Honor, through

14   2016 for implementation of a post-restructuring plan.

15           The next bucket of programs, Your Honor, are

16   Luminant specific programs, and there's two here.

17           The first is the Luminant commercial incentive

18   plan which applies to about 55 trading and hedge employees

19   on the commodity hedging and trading desk.  Last year

20   approximately $3.3 million was paid out based on the

21   incremental value that these traders and hedges -- hedgers

22   had to the commercial operations portfolio.  It's purely

23   incentivizing.

24           The second program under this bucket, Your Honor,

25   is the Luminant developer incentive plan which again is

1    incentivizing based on development projects.  So, for

2    example, folks who are involved in helping to identify sites

3    to build new plants, to increase mines.  For Your Honor I

4    think there was a motion earlier this week about a bidding

5    process with regard to some particular assets.  The folks

6    who are involved in this program, Your Honor, would be

7    involved in those processes, and to the extent that the

8    debtors end up getting approval to bid in that auction and

9    win that auction it may trigger some bonuses.  Last year

10   about $17,000 was paid out, so not very much.

11          The last bucket, Your Honor, are individual bonus

12   awards.  These are a small number of individual retention

13   agreements with lump sum retention bonuses as well as small

14   bonuses for certifications and licenses.  So the average

15   retention bonus is about $16,000 in these licensing, and

16   certification bonuses are between 3- and $6,000.

17          Taking a step back, Your Honor, a couple of

18   highlights and key takeaways that Mrs. Kirby would testify

19   to.

20          First, the debtors have historically compensated

21   non-insiders with a combination of salary, discretion

22   incentive programs, and retention programs.  And these

23   programs, Your Honor, are a continuation of that historical

24   practice.

25          First both of the annual incentive programs have

1    been in place for over ten years, no material differences

2    between prepetition and post-petition practices.

3            Second the owner/operator program, which has been

4    replaced by the key leader and it is in some ways different,

5    has many of the same features.  Similar size, scope, total

6    cost, retention, focus.

7            Third the Luminant developer program, which has

8    been in place since 2006/2007 materially the same

9    prepetition and post-petition.

10           Fourth the incentive program for traders has been

11   in existence in some form or fashion by different games, but

12   substantively the same for at least the last ten years, Your

13   Honor.

14           Last the individual retention awards are just

15   being rolled over, so literally it's the same exact

16   contracts.

17           The second highlight, Your Honor, the programs

18   have been carefully developed through an iterative process

19   by senior most levels of the company and reviewed each year

20   by the operations and compensation committee of the board.

21           These programs in particular that are before the

22   Court today were developed with the independent advice of

23   Kirkland & Ellis with regard to the structure, Towers Watson

24   with regard to both the structure and the compensation

25   levels, and Filsinger Energy Partners with regard to the

1    incentivizing metrics.  This advice, Your Honor, helps

2    assure the structure comports with industry and

3    restructuring scenario in historical norms.

4         The third point, Your Honor, and perhaps this

5    should have been the first one, is that the debtors operate

6    in a highly competitive business for top talent, and debtors

7    to this end have historically undertaken a lot of

8    benchmarking efforts to insure that compensation is

9    competitive with market.  This goes on on an annual basis.

10   A year and a half ago, two years ago, Your Honor, the

11   company undertook a benchmarking analysis with regard to all

12   of its employees, and then with regard to one off promotions

13   and the like the company also engages in benchmarking

14   analysis to insure that compensation is consistent with

15   market practices.

16        The reason for this, Your Honor, as you might

17   imagine, is that the energy industry has a very, very

18   polluted workforce and there's a lot of compensation for

19   these highly skilled and long tenured employees at the

20   debtors.

21        The last point, Your honor, highlight at least,

22   the programs are reasonable in their structure.  The other

23   -- the programs include incentive bonuses that trigger

24   compensation that's tied to the annual budget process to

25   drive value for the debtors, and then the retention

1   programs, Your Honor, are very consistent with other sorts

2   of retention programs that Your Honor has seen in other

3   cases.

4           I mentioned earlier that we would talk a little

5   bit about the programs' participants and I want to return to

6   that briefly.  These employees include 5,500 folks across

7   the debtors from line level employees at the plants and the

8   mines up to vice presidents who at the end of the day are

9   really mid-level managers at EFH corporate services and

10  similar entities.

11          There are 26 individuals who are excluded from the

12  program, 4 of whom were removed after significant

13  conversations with the United States Trustee's Office.

14          Who are these folks?  First the seven member

15  strategy and policy committee, those are the folks who sit

16  at the top of the company, Your Honor, it includes the CEO

17  and executive vice presidents.  Below that level, Your

18  Honor, are 16 senior vice presidents who report directly to

19  the executive vice presidents and the CEO.  Below those 16

20  senior vice presidents, Your Honor -- so three levels down,

21  depending on how your counting the particular individual --

22  are 51 total vice presidents.  Of that number we're asking

23  for approval for 49.  These vice presidents, Your Honor,

24  report variously either to senior vice presidents who

25  frequently will report themselves to another layer of senior

1    vice presidents who will report themselves to another layer

2    of executive vice presidents or in some circumstances

3    they'll report more narrowly to an EVP if they're in a

4    smaller group like Mrs. Kirby's HR function.

5            These employees -- these vice presidents in

6    particular none of them are directors, none are related to

7    insiders, none have decision making authority with regard to

8    corporate policy whether of the debtors as a whole, the

9    business units, so Luminant, TXU Energy, or EFIH, or of

10   individual subsidiaries of the debtors, the mines, the

11   plants.  None oversee debtors' businesses.  None report

12   directly to the debtors' boards.  None report directly to

13   the debtors' CEO.  Many, if not most of these employees, are

14   three tiers down in an organizational structure and they

15   don't have, Your Honor, any specific budgets assigned to

16   them, and this is a significant point that we talked through

17   with the U.S. Trustee, so I think it's worth talking through

18   in some detail as we did file that declaration late last

19   night.

20           The overall budget, Your Honor, is reviewed and

21   approved by successive levels of the company.  Ultimately

22   approved by each business unit CEO, so Luminant's CEO, TXU

23   Energy's CEO, above that the SPC, and then above that the

24   board of directors.

25           The employees included in this program, Your

1    Honor, operate within the contours of that budget, and any

2    decision making authority that they have is subject to

3    review by senior members and must be preapproved within the

4    context of that budget.

5            The budget itself is reviewed on a monthly basis,

6    Your Honor, by members of senior management can be changed

7    -- if there's a change and those vice presidents and junior

8    member employees can't -- are not authorized to act.  Like

9    any job though, Your Honor, where there's some delegation of

10   responsibility that's necessary the vice presidents in some

11   instances are delegated authority to engage in transactions

12   within specific bounds.  And there's two (indiscernible -

13   10:19:29) on this.

14           One is the preapproved budget process, and then

15   two is a process called the transaction decision making

16   paper.  It even has an acronym called the TDP.  And

17   basically what that requires is for VPs to get approval --

18   prior approval from their supervisors as well as other

19   members of functional areas as applicable tax, legal,

20   finance, treasurer before moving forward with certain

21   transactions.

22           The amount of delegation of authority, Your Honor,

23   within that framework varies from 0 to $10 million.  A large

24   majority of the 49 VPs before the Court in these motions, 34

25   only have authority to sign invoices of 0 to $1 million.

1    Eleven have authority to spend 5- to $10 million on specific

2    preapproved transactions in the budget through the

3    transaction decision paper process.  All 11 of these, Your

4    Honor, are involved in fuel or commodity procurement which

5    is really expensive either on a trading desk or at the

6    plants or on capital expenditures and O&M work.  You can

7    imagine with a nuclear facility if something breaks --

8              THE COURT:  What's O&M?

9              MR. DEMPSEY:  Operations and maintenance.

10             With regard to $5 million transactions or more all

11   of them -- all of them have to be preapproved by the EFH CEO

12   or the debtors' board on a one off basis or through the

13   budget and transaction decision paper process.  So there's

14   multiple layers of relieve here, Your Honor.

15             As for transactions that are less than $5 million,

16   Your Honor, they're only authorized within the context of

17   the debtors' preapproved budget, and they're subject --

18   those decisions too are subject to review of supervisors.

19             One key point too, Your Honor, is that with regard

20   to these 5- to $10 million transactions they don't happen

21   very frequently, so over the last 18 months, Your Honor,

22   Mrs. Kirby looked at the invoices for the folks -- the 11

23   VPs who have authority to act within 5- and $10 million,

24   there wasn't a single transaction, Your Honor, that was

25   authorized by one of those vice presidents that didn't

1    either go through the budget process along with the TDP

2    process or that was not on a one off basis approved by the

3    CEO or board.

4              In short, Your Honor, Mrs. Kirby would testify

5    that the debtors fear that without these programs being

6    approved they may lose many of their mission critical

7    employees who are the heart of the company, not easily

8    replaceable, and possess vital institutional skills and

9    knowledge that are essential to insuring that the debtors

10   continue to create value for creditors and other

11   constituents.  They can't afford to lose these folks in this

12   competitive industry at this difficult time.

13             With that, Your Honor, I'd move on to Mr. Friske's

14   proffer.

15             Your Honor, Mr. Friske's proffer in his

16   declarations are at 469 and 1232, focuses on his experience

17   not only in the executive compensation field but also with

18   regards to these particular programs.

19             Mr. Friske who I believe has testified before you

20   before, he's the managing director of executive compensation

21   at Towers Watson with more than 20 years of experience of

22   this particular field, the compensation field.

23             He has a bachelors from the University of

24   Illinois, an MBA from Northwest Kellogg, and he's

25   participated in the development and design of hundreds if

1    not thousands of management employee incentive programs for

2    Fortune 1000 companies both within and without the

3    bankruptcy context.  And in particular he's been retained in

4    at least 30 restructurings in which he provided compensation

5    strategy and program advice.

6            Here, Your Honor, Towers was engaged prepetition

7    in October 2012, so about 20 months ago, to access and

8    provide advice concerning the debtors' compensation

9    programs.  In that capacity being around for 20 months he's

10   very familiar with the debtors' prepetition practices and

11   the motions -- or the programs covered by this motion.

12           He has four opinions, Your Honor, and I'll walk

13   through them one at a time, quickly.

14           Number one, the overall design and structure of

15   the non-insider compensation programs before the Court are

16   consistent with those in place prior to filing.  The annual

17   incentive program, the EAIP, the Luminant programs, and the

18   individual bonus programs materially the same prepetition

19   and post-petition.  They had the same structure, size,

20   population, participants, total comp.

21           The debtors have replaced the owner/operator

22   program with the key leader program, Your Honor.  Very, very

23   similar programs at the end of the day.  The general size of

24   the program is similar and its objective are very similar

25   insofar as they're focusing on retention.

1            Opinion two, the overall design and structure of

2      the non-insider compensation programs are consistent with

3      others in the energy industry specifically and then with

4      restructurings more broadly.  This is the case both with

5      regard to payment features, retention incentive, the number

6      of programs, Your Honor, the types of programs, the general

7      size of the programs in terms of total compensation, the

8      types of participants.  All of this is typical of

9      compensation programs for energy companies and companies in

10     restructuring.  And the incentive metrics in particular,

11     Your Honor, are similar to the incentive metrics that you'd

12     see in many other energy industry companies incentive bonus

13     programs based on Mr. Friske's analysis proprietary data

14     that Towers Watson has access to.

15            Opinion number three, total compensation under

16     these programs is consistent with programs of other

17     companies in the energy industry.

18            What Mr. Friske did in this regard, Your Honor, is

19     he too a sampling of 70 employees at the VP and above level

20     and benchmarked them to competitor energy companies working

21     through each of the employees, working for matches across

22     the energy industry and utility industry to determine where

23     compensation fell within that competitive landscaping.

24            Overall levels were well within competitive norms.

25     So on average the compensation of a debtors' employees is 21

1    percent below the 75th percentile.  So what that meant is

2    that if at the 75th percentile somebody makes $100,000 that

3    the debtors did make $79,000.

4              With regard to the market median the debtors are

5    nine percent below that.  So again, if the market median is

6    50,000 they're going to be making what, 46.5 or something

7    like that -- 45.5.

8              These benchmarking analyses, Your Honor, in

9    Mr. Friske's opinion have revealed that the programs are

10   within the reasonable range competitive practices, and

11   without the programs, Your Honor, Mr. Friske would testify

12   that total compensation for these employees would be well

13   below industry readings.

14             Opinion four, Your Honor, and the last opinion, is

15   that the total cost of the key leader and the retention

16   award programs are consistent with retention award programs

17   in other restructurings.

18             In order to normalize for the fact that companies

19   that go into restructuring are different sizes, different

20   industries, different types of programs Towers Watson

21   compared the total cost of these programs to data for 20

22   companies who have filed for Chapter 11 protection since

23   2008, and he assessed the total cost of the debtors' program

24   as a percentage of total revenue to the total cost of these

25   other companies' programs as a percentage of revenue.  This

1    is an analysis, Your Honor, that Mr. Friske has conducted

2    both inside and outside of restructuring.

3              And what he found, Your Honor, is that the total

4    cost of these programs is slightly -- slightly above the

5    median and below the 75th percentile as a percent of total

6    revenue of the debtors.  It's well within the range of

7    reasonableness.

8              If Mr. Friske were to testify he would say that

9    the debtors' programs are appropriately designed, consistent

10   with market practice, and reasonable, Your Honor, in light

11   of competitive market practice.

12             Glad to answer any questions.  Mrs. Kirby or

13   Mr. Friske are here as well if Your Honor has questions for

14   them.

15             THE COURT:  I don't have any -- does anyone wish

16   to cross-examine the witnesses?

17             All right, I have no questions.

18             MR. DEMPSEY:  Just to save time, Your Honor, I

19   think -- Mrs. Schwartz, do you want to --

20             MS. SCHWARTZ:  Good morning, Your Honor, Andrea

21   Schwartz for the United States Trustee, and with me, Your

22   Honor, today is Rich Schepacarter, and we're pleased to be

23   here before you.

24             I think Mr. -- each of Misters Schartz, Dempsey,

25   Guerrieri provided Your Honor with the results of many, many

1   discussions that we've had with the debtors with respect to

2   these plans.

3            When we saw the actual initial motion it gave us

4   some concern with respect to the aggregate dollars that were

5   being proposed to be spent, and also the rigorous

6   requirements under the case law with respect to

7   determinations as to whether any potential recipients are in

8   fact insiders under 10131, Your Honor's decision in

9   Foothills, the Rescap decision with respect to the

10  heightened standard under 501(c)(3).

11           I am pleased to say, Your Honor, that I think that

12  the Kirby declaration, which is 18 pages in length,

13  sufficiently addresses those standards.  I do not take

14  objection to the debtors having met their burden to show

15  that the persons that are subject to this order are not

16  insiders under 10131.

17           I will say, Your Honor, that with the -- in the

18  supplemental declaration, which I understand you may not

19  even have seen, but was filed late last night, we're very

20  gratified by the disclosures that the debtors have made,

21  including of the dollar amounts that are going to some of

22  these very high level vice presidents.

23           I think what the debtors accomplished here however

24  was to show that although they do have the vice president

25  title they do not as far as the information has been

1    presented thus far carry with them the indicia of insider

2    status with respect to control and disposition of assets and

3    decision making authority, and the debtors have included in

4    great detail the structure of decision making authority up

5    to including what Mr. Dempsey was including about the TDP.

6    Because when we learned that the director of nuclear

7    operations could invoice purchases of up to ten million we

8    wanted additional information on how that could in fact take

9    place, and it could in fact take place in the same year

10   multiple times.

11        The only thing I'd mention, Your Honor, with

12   respect to our decision to not object to the program, and

13   also, Your Honor, we didn't file an objection because we

14   took the approach that we wanted to see if we could on a

15   non-adversarial basis obtain the information from the

16   debtors and have them put in the evidence to meet their

17   burden of proof with respect to non-insider status and

18   reasonableness of the program, non-discrimination, and so

19   forth, which in fact they did.

20        The only thing I'll note for the Court is that

21   there is not a Filsinger declaration that was submitted in

22   connection with this motion.  We relied on the two

23   declarations of Mr. Friske and also the statements of

24   Ms. Kirby with respect to the metrics for the compensation

25   programs.  Although there was reference to Mr. Filsinger we

1    didn't have any information to review.

2            But based on those statements and the supplemental

3    declarations we have no objection to the motion.

4            THE COURT:  Okay.  Thank you.

5            Any other statements?

6            MR. HILDBOLD:  Good morning, Your Honor.  Billy

7    Hildbold, Morrison & Foerster, proposed counsel for the

8    official committee.

9            As to the non-insider compensation motion we spent

10   countless hours going over the different programs, and

11   ultimately with the help of the debtors and the U.S. Trustee

12   we're comfortable with the economics.

13           We look to insure that this decision would not --

14   would not hurt us later on as to the insider status of some

15   of these employees, and agreed with the debtors and the U.S.

16   Trustee as to a reservation of rights in the order, but

17   outside of that we are comfortable with the order.

18           THE COURT:  Okay, thank you.  All right.

19           MR. SCHARTZ:  For the record Brian Schartz on

20   behalf of the debtors.

21           While we do have agreement on the relief requested

22   we're hashing out one last point on the proposed order as it

23   relates to the non-insider compensation.  So what I would

24   propose to do is hold that one, we'll finish that up, and

25   maybe at some point today we can come back in and get that

1    signed.

2           I do have a proposed order on the wages relief

3    that if Your Honor doesn't mind my approaching I can pass

4    that up and walk you through it.

5           THE COURT:  Yes, please.  While you're doing that,

6    based on the evidence supplementing the record, especially

7    in consideration of the compensation issues, both the filed

8    declarations as well as the proffered testimony and relying

9    in particular in connection with the insider or non-insider

10   status as those covered under the executive AIP the Court

11   finds that the -- at least for its purposes I'll reserve my

12   rights as well -- for purposes of this motion those persons

13   are not insiders and I will approve the incentive plan in

14   connection with all of those covered, but specifically with

15   the executive AIP and a finding based on a fulsome record

16   that they're not insiders for that reason.

17          And what am I looking at here?  Second final

18   order.

19          MR. SCHARTZ:  That is, Your Honor, the order that

20   relates to the wages relief.

21          THE COURT:  Right.

22       (Pause)

23          THE COURT:  All right, I've signed the wage order

24   and as discussed on the record I'll await submission of the

25   compensation order.

1          MR. SCHARTZ:  Thank you, Your Honor.  Thank you

2     very much.

3          Your Honor, I'm going to pass the podium to

4     Mr. Husnick who'll choreograph the critical vendors -- or

5     I'm sorry -- proprietary trading.

6          MR. HUSNICK:  Good morning, Your Honor.  Chad

7     Husnick, Kirkland & Ellis, proposed counsel to the debtors.

8          Your Honor, the first motion that I'll take up

9     today is the motion that began on the first day hearing in

10    connection with the debtors' hedging and trading business

11    filed at docket number 41.

12         As Your Honor may remember the motion sought

13    relief with respect to really two aspects of the debtors'

14    hedging and trading business.  That is hedging and trading

15    transactions in general that are related to the debtors'

16    generation and wholesale power operations as well as

17    proprietary trading transactions, that is transactions where

18    the debtors engage in trading for a profit and to supplement

19    their hedging transactions.

20         Your Honor, with respect to the hedging and

21    trading obligations, that is the stuff related directly the

22    generation of wholesale marketing, Your Honor entered a

23    final order at the second day hearing granting that relief

24    and allowing the debtors to continue.

25         At the second day hearing Your Honor also entered

1    a second interim order allowing the debtors to continue

2    proprietary trading on a limited basis, and that is to

3    maintain existing proprietary trades and enter into new

4    proprietary trades solely for the purposes of mitigating

5    loss on existing trades.

6            Your Honor, since that time we've spent a

7    considerable amount of time with the Office of the United

8    States Trustee explaining and understanding ourselves in

9    further detail exactly how the proprietary trading serves

10   the business and how the company has in place significant

11   controls to manage and mitigate risk as to the company.  And

12   in particular we spent a considerable amount of time talking

13   about how the proprietary trading activities feed into the

14   overall value of the debtors' business.

15           To that end, Your Honor, we worked closely with

16   Ms. Schwartz of the Office of the United States Trustee to

17   develop a supplemental declaration of Terry Nutt, who's the

18   vice president of risk for Energy Future Holdings.  Mr. Nutt

19   submitted his declaration and we filed it on Friday at

20   docket number 1197.

21           Your Honor, unless you have any objection we'd

22   proceed by offering that declaration into evidence.

23   Mr. Nutt is available here in the courtroom for cross, to

24   the extent any parties wish to cross Mr. Nutt.

25           THE COURT:  Any objection?  Okay.

1        (Debtors' Exhibit was admitted)

2            MR. HUSNICK:  Thank you, Your Honor.

3            The declaration of Mr. Nutt speaks in a great

4    level of detail about the controls that the debtors have

5    over the proprietary trading, and I'd just like to summarize

6    just a couple of them for the record to give the Court

7    comfort as to the parameters around trading -- or

8    proprietary trading.

9            Your Honor, the first and probably most important

10   limitation is the markets in which the debtors participate

11   in proprietary trading.  The debtors only conduct

12   proprietary trading -- and this is all in the declaration of

13   Mr. Nutt -- in commodities and regions where the TCH debtors

14   have preexisting operations and quality market information,

15   that is ERCOT, wholesale power energy, natural gas, and

16   solid fuels.

17           Importantly the debtors do not participate in

18   proprietary trading transactions in other markets around the

19   country in which they do not have significant operations.

20           Second, Your Honor, the debtors use a well-known

21   industry standard called VAR, or value at risk is the longer

22   term.  Value at risk was developed by a large bank as a

23   metric for measuring risk.  It calculates approximately

24   1,000 potential price movements around a particular trade

25   and produces a loss scenario that would only have a five

1    percent chance of occurring.  This allows the TCH debtors to

2    keep a conservative limit on proprietary trading activities

3    and to monitor it on a day-to-day basis, and we discussed

4    with the United States Trustee as well as with the

5    creditors' committee and their advisors the specific VAR or

6    value at risk limit that the debtors use on a day-to-day

7    basis.  While I won't disclose that on the record, Your

8    Honor, given it's sensitivity, you know, we did talk them

9    through how we arrived at the number and where that comes

10   from.

11            Your Honor, the debtors also have in place

12   individual trade limits and delegations of authority.  While

13   VAR is measured on an aggregate basis across all proprietary

14   trading transactions the company tracks and monitors

15   individual contributions to the overall VAR and imposes

16   limitations on the types of transactions that a particular

17   trader can do depending upon that trader's experience and

18   tenor with the company.

19            As a result it allows the company to continue to

20   monitor trading activity and at any given time alter the

21   limits of an individual trader in order to insure that the

22   company continues to stay within its VAR limitation.

23            Your Honor, another category of protections that

24   the debtors have in place here is an internal sanctions

25   protocol to insure compliance with the debtors' risk

1    management guidelines.  The debtors have a very detailed and

2    robust set of risk management guidelines, again that we

3    shared with both the Office of the United States Trustee and

4    the counsel to the creditors' committee and their advisors.

5              Your Honor, these risk management guidelines set

6    forth rigorous requirements and checks and balances.

7    Importantly one aspect of the debtors' risk management

8    structure is to have an independent risk management team

9    that reports directly to the CFO separate from the trading

10   organization that reports up through the CEO of Luminant.

11   that's important because it does provide an independent

12   check within the company on the trading activities, and it's

13   actually the risk management team under the guidance of

14   Mr. Keglevic and Mr. Nutt that monitor the VAR compliance on

15   a day-to-day basis.

16             Your Honor, there are additional limitations on

17   the types of transactions that traders can do, this is all

18   embodied in the risk management guidelines, including limits

19   on the short-term electricity trades that can be done, which

20   is a slightly more volatile market in a market in which the

21   debtors would not have an opportunity to get out of if there

22   was an issue.  So there's significant limitations there.

23             There's also limitations on the types of

24   contractual transactions that can be done.  And again, those

25   are all monitored by the risk management team.

1                In sum, Your Honor, the company has imposed

2     rigorous set of internal controls that mitigates the risk

3     associated with this, but at the same time recognizes the

4     value that proprietary trading offers to the company.

5                In particular, Your Honor, proprietary trading --

6     and this is discussed in the Nutt declaration -- provides on

7     average 50- to $60 million of incremental EBIDTA each year.

8     The proprietary trading also feeds into the value generation

9     aspects of the business on the hedging side and increases

10    EBIDTA associated with those hedging activities.

11               Without proprietary trading, Your Honor, the

12    debtors would lose access to valuable market information,

13    including critically the pricing information and activities

14    of other market participants.

15               Perhaps the best example here, Your Honor, is a

16    situation where the debtor brings to market approximately 70

17    terawatts of energy each year to sell into the wholesale

18    power market.  Without the ability to come in on a

19    proprietary trade and price discover, i.e. try and buy into

20    the market to see what people are willing to pay for the

21    power, the market would lose integrity because they see just

22    a seller coming to the market that has no interest in

23    selling and they will slowly walk the price down.

24               What the proprietary trading allows the debtors to

25    do, Your Honor, is go into the market, if the counterparties

1    that are buying the debtors' power are walking the price

2    down the debtor will eventually say well we'll buy at that

3    price and it'll stop that decline in price and therefore

4    that proprietary trade is an important aspect of maintaining

5    the integrity of the overall trading market and allowing the

6    debtors to maximize the value associated with the hedging

7    and trading activities on their generation business.

8              Your Honor, I won't add too much more other than

9    to say that the debtors are thankful for the time that the

10   Office of the United States Trustee and Ms. Schwartz and

11   Mr. Schepacater in particular spent with the debtors and

12   their management in speaking on these very difficult issues

13   related to this important aspect of the overall business.

14             Your Honor, the U.S. Trustee did play a very

15   significant role in the drafting of and detail contained in

16   the Nutt declaration, and I believe as a result of the --

17   not declaration -- I can represent that the United States

18   Trustee does not object to the relief that the debtors are

19   seeking here today, which is final relief on proprietary

20   trading.

21             THE COURT:  Thank you.

22             Does anyone else wish to be heard?  Yes,

23   Ms. Schwartz.

24             MS. SCHWARTZ:  Just very briefly, Your Honor.

25             One thing I just wanted to note for the Court, and

1    it actually relates back to the comp motion as well as this

2    one, is that one of the things that we suggested to the

3    debtors was that the declarations be of people that actually

4    are the people with the personal knowledge of the

5    information, and I'm gratified that, for example, the

6    declaration submitted in support of the non-insider comp

7    program was Ms. Kirby because she's really the person that

8    knows the ins and outs of all those comp programs similarly,

9    and I've had many discussions with her as well as with

10   Mr. Nutt, who has an enormous base of information on the

11   hedging and trading activities.

12           In addition the debtors and I met with

13   Mr. McFarland, who's the CEO of the Luminant corporation,

14   who had formally worked on the desk, ran the desk, went up

15   the desk, this is the highest person that has level and

16   decision making there too with respect to the hedging and

17   trading.

18           So we're gratified by that.

19           Your Honor, there is a -- we do not object to the

20   motion, we're also not taking a position on the motion.  And

21   the reason is, Your Honor, that as Your Honor knows the

22   company uses this term proprietary trading for this portion

23   of their trading activities.  We have been in communication

24   with the CFTC and under the CTFC's vision there's only

25   hedging and speculative trading.  So there's a footnote in

1    the order that says there's no determination on the

2    characterization of the trading.  We understand from the

3    debtors why they use that term, because they're in the

4    market and they have knowledge of that market, and that's

5    all right, they can use it.  We're not signing on to that

6    one way or the other.

7              And the other thing I wanted to let Your Honor

8    know that we learned through the process was that the

9    debtors have explained to us, and I think it's also

10   contained in the declaration, that their ability to engage

11   in what they call the prop trading enables them to protect

12   the value of all their other assets on the hedging side and

13   also to prevent it from diminution of value, which we

14   thought was an important point.

15             But again, Your Honor, we're not experts

16   unfortunately in this area and we don't have our own

17   financial advisors to advise us.  Although, Your Honor, I

18   will let you know that I did speak with the committee made

19   representatives of Lazard and FTI available to us as did the

20   first lien lenders, we spoke to an investment banker from

21   Milstein about how the bar was set, who picked the bar, why

22   they're all comfortable with the bar, et cetera.  So if that

23   provides the Court with an additional information it does,

24   but for this point we're not objecting, we're not support.

25             THE COURT:  Understood.  Thank you.

1             Anyone else?

2             Okay, do you have an order?

3             MR. HUSNICK:  I do, Your Honor.  May I approach?

4             THE COURT:  Yes.

5         (Pause)

6             MR. HUSNICK:  Your Honor, for your benefit the

7     redline is a redline against the second interim proprietary

8     order and we felt that would be the most straightforward to

9     show you the changes made here.

10            THE COURT:  Okay.

11        (Pause)

12            THE COURT:  I've signed the order.

13            MR. HUSNICK:  Thank you, Your Honor.

14            The next item on the agenda, Your Honor, is the

15    debtors' critical vendor motion.

16            Your Honor may remember that at the second day

17    hearing the debtors were prepared to proceed with their

18    request for relief, but in advance of the hearing the

19    debtors had engaged the TCH ad hoc group in discussions

20    relating to a potential settlement of their objection to the

21    final relief.  In particular the TCH ad hoc group had asked

22    that particular sunset provisions be include in the order.

23            As part of those discussions, Your Honor, we'd

24    agreed on a piece of language that required the debtor to

25    provide notice of any request from a member of the

1   creditors' committee for a critical vendor payment to the

2   TCH ad hoc group.  And as Your Honor may remember when the

3   creditors' committee and the Office of the United States

4   Trustee had an opportunity to review that language that

5   language drew fire from those two groups.

6            Following the hearing, Your Honor, which we agreed

7   and Your Honor so ordered the debtors to continue operating

8   under the interim relief the debtors continued to engage the

9   parties in negotiations in an effort to resolve the open

10  issues.

11           Your Honor, the debtors informed the White & Case

12  group, that is the TCH ad hoc group represented by White &

13  Case that the debtors were not prepared to proceed against

14   -- with the language that they had discussed with them in

15  advance of the second day hearing in the fact of objection

16  from the creditors' committee and the U.S. Trustee.  And,

17  Your Honor, we've provided a revised form of order that

18  removed the language that had been objectionable to White &

19  Case I believe early last week.

20           Since that time we've continued to have

21  discussions with the parties in an effort to try and bridge

22  the gap.

23           Unfortunately, Your Honor, as I stand here today I

24  don't believe we have resolution.  The debtors are prepared

25  to proceed on the relief as we originally proposed it in the

1    motion and as we've agreed to with the Office of the United

2    States Trustee and with the creditors' committee.  I am not

3    certain exactly where the TCH ad hoc group sit.

4            So unless Your Honor has any objection what I

5    would propose at this point is that I allow Mr. Shore or

6    Mr. Lauria to address the Court on what the remaining

7    objections are, and I would reserve an opportunity to

8    respond, including with evidence to the extent necessary.

9            THE COURT:  Okay.

10           MR. HUSNICK:  Thank you.

11           MR. SHORE:  Good morning, Your Honor.  Chris Shore

12   from White & Case on behalf of the ad hoc group, the TCH

13   unsecured notes.

14           Let's provide a little more background that what

15   Mr. Husnick just gave you.

16           On the critical vendor motion we were the only

17   objecting party.  There was no objection from either the

18   United States Trustee's Office or the officially committee

19   by the time we got to the second day hearings.

20           The deal that was reached -- actually the

21   negotiations occurred not with respect to the creditors'

22   committee or anything else, the discussions were we just

23   want notice if any creditor over a certain threshold makes a

24   demand for the repayment of a prepetition claim before

25   providing post-petition goods or services.  That was

1    unacceptable to the debtors and it got narrowed down to

2    committee members.

3            But there was a deal reached and there was a deal

4    that was read into the record, it was not contingent on

5    anything -- any approval by anybody else, just approval by

6    the Court.

7            There were oral objections made, we still have not

8    seen any filed objections to that deal which was read into

9    the record.  We've implored the debtors not to walk away

10   from their deal, we think it's bad form, we think it's bad

11   precedent in a case of this size.  Obviously now they are

12   going to walk away from that deal.

13           We really want one of two remedies at this point

14   for what they've decided to do.  One is to calendar the

15   motion for a contested hearing, not to handle it today with

16   everybody here, but it will give us an opportunity now to

17   seek discovery, we need to open discovery since the

18   objection deadline has passed and the hearing has already

19   occurred, which has been resolved with the settlement, and

20   we can send some discovery which I'll discuss in a bit.

21           The other is to grant the motion as is and

22   authorize a 2004.  We'd send one interrogatory to the

23   debtors saying who has made a demand and when did they make

24   a demand for payment of prepetition claims before providing

25   essential post-petition goods and services?

1          Either way I think where we -- where this has

2     proceeded is there needs to be a little more sunshine.  I

3     think from our perspective obviously people have been

4     threatening, we'd like to know that, we'd like to know who

5     was involved in that.  The issue of prepetition vendors

6     getting paid in this case is problematic for us for reasons

7     I've addressed before.

8          Either solution seems to be without any real harm.

9     First if people want to move to quash on the basis that such

10    discovery impinges upon some right they have to have the

11    debtors not explain conversations they've had with people

12    they'll be free to do so, and equally as important as I

13    understand it, and maybe we can get a representation on the

14    record from the debtors, they are substantially under their

15    interim cap by a very large multiple and thus have no

16    pressing need at this moment to get final relief.  I think

17    they can operate under the interim cap while this runs out.

18          Thank you, Your Honor.

19          THE COURT:  You're welcome.

20          Let me hear from the committee, and who is the

21    other objector?  I apologize.  I think it was just the

22    committee.

23          UNIDENTIFIED SPEAKER:  (Indiscernible - 10:57:05).

24          THE COURT:  Oh, the Office of the U.S. Trustee,

25    thank you.

1          MR. HILDBOLD:  Good morning again, Your Honor.

2    Billy Hilbold, Morrison & Foerster, proposed counsel to the

3    official committee.

4          Given Mr. Shore's representation that he would be

5    satisfied with entering the order as is and serving 2004

6    discovery --

7          THE COURT:  Why don't you tell me why it's a

8    problem to make the debtor and make you live with the deal

9    that was cut last time?

10          DILBOLD:  Well first it was a deal that affected

11    us which we weren't a part of.

12          THE COURT:  I understand.

13          MR. HILDBOLD:  So --

14          THE COURT:  (Indiscernible - 10:57:39) substance.

15          MR. HILDBOLD:  Sure.  The implication of the

16    language is that a vendor who serves on a committee cannot

17    maintain an ordinary business relationship with the debtors,

18    and ultimately it goes beyond just this case but for a

19    policy reason it will have a chilling effect on --

20          THE COURT:  But if that's your -- if policy and

21    chilling effect is your first argument you've got a problem.

22    Talk to me about this case and why it's a problem for the

23    members of your committee to provide notice to the ad hoc

24    committee if they're demanding payment of critical trade

25    vendor amounts.

```
 1              MR. HILDBOLD:  It isn't the appropriate vehicle to

 2    obtain that information.  The Bankruptcy Code and the

 3    bankruptcy rules have set up a mechanism, a Rule 2004

 4    mechanism to obtain that information.

 5              THE COURT:  Well they've also set up a process

 6    whereby unsecured claims get paid pursuant to plans that are

 7    confirmed by the court.  The whole point of the critical

 8    trade vendor motion is that that's not operations, it

 9    doesn't work in the context of the demand or the doctrine of

10    necessity as it would apply to this case.

11              So we've got a system just like the 2004 system

12    that's the baseline that doesn't work.  So if the baseline

13    doesn't work on the critical trade vendor motion why should

14    I stick with the baseline of the 2004 procedure when it's

15    directly related to something why I'm already departing from

16    the baseline?

17              MR. HILDBOLD:  It serves in this capacity to put a

18    burden on the members of the committee who are vendors to --

19    to monitor in some cases every employee to understand their

20    potential negotiations with the debtors, and there's

21    contractual rights that they have agreed to which -- which

22    in this case would -- would serve to hurt them.  The ad hoc

23    committee is requesting information that is just I'll use

24    the word unusual.  We just believe that it is an

25    inappropriate burden on our vendor committee members to put
```

1    them in a situation where their normal negotiating behavior

2    with the debtors in their ordinary business relationship is

3    going to subject them to scrutiny from a third party group.

4              THE COURT:  Okay.  All right.

5              Mr. Schepacarter?

6              MR. SCHEPACARTER:  Good morning, Your Honor.

7    Richard Schepacarter for the United States Trustee.

8              A couple concerns, one of which is our office when

9    they appoint persons to official committees also has a

10   certification process that deals with their claims.

11   Basically they report back to us on a quarterly basis as to

12   whether their claims have changed in any way, shape, or

13   form, and they need to certify that us to us so that

14   information is available.

15             Also it seems to me that with respect to an ad hoc

16   committee asking for this information from vendor because

17   the way the structure of the committee was it was basically

18   three vendors, three indenture trustees, and then I think it

19   was the PBGC I think we put on the committee.

20             In this situation we have the vendor participants

21   on the committee.  To me it seems that to a certain extent

22   the ad hoc committee is asking for information and putting

23   not so much a chilling effect -- I'm not going to use the

24   same words that counsel used -- but putting almost like I

25   want to say a veto effect or an ability to somehow interfere

1   with the vendors on the committee to do their normal

2   business and to somehow change the way vendors may want to

3   either participate on the committee or be members of a

4   committee, because at that point they may decide that it's

5   not worth it to be committee members at any point in time.

6           I think there's other ways to get the information

7   rather than to stick that language into a critical trade

8   order.  I've never seen it in a critical trade order before

9   and I've probably seen -- I've been here in Delaware since

10  1999 so I've probably seen a bunch of these critical trade

11  vendor orders and I don't remember or recall seeing that in

12  any of the cases that I've dealt with.

13          So as to the deal aspect of it I was unaware, we

14  were unaware of the language that went in first.  I heard it

15  in court, I didn't real understand it when I saw it in

16  writing, and then I had a --

17          THE COURT:  Yeah.  No, I remember that.  It's

18  certainly to say that you and the committee were not party

19  to the deal --

20          MR. SCHEPACARTER:  Right.

21          THE COURT:  -- that was read into the record that

22  the debtor and the ad hoc committee had agreed to.  So I

23  certainly appreciate that.

24          MR. SCHEPACARTER:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1              Let me hear from the debtor and then I'll hear

2     from Mr. Shore again.

3              MR. HUSNICK:  Can I make just a quick statement,

4     Your Honor --

5              THE COURT:  Yeah.

6              MR. HUSNICK:  -- on a couple of the points?

7              Your Honor, a couple things that Mr. Shore said.

8     One is that the request from the ad hoc committee was to

9     provide prior notice of payments.  There actually is in

10    paragraph 5 of the order an obligation to provide prior

11    notice of payments in excess of $2 million.  That was

12    something we negotiated with the creditors' committee and

13    the other creditors, and the TCH ad hoc group is included in

14    that notice provision.

15             Your Honor, as far as I've seen in the papers and

16    the only objection I've heard from Mr. Shore in writing was

17    a request for sunset provisions.  And, Your Honor, why I

18    think it's important is because now that objection has

19    started to creep into the size of the bucket, and I think

20    it's important to point to paragraph 1 of their limited

21    objection stating:

22             "The ad hoc group of TCH unsecured noteholders

23    likewise consents to the remaining request of the debtors

24    for final authority to pay an additional 10 million of

25    critical vendor claims."

1          They then say, "But only subject to the four

2     conditions set forth below."

3          Those conditions, Your Honor, are the sunset

4     provisions, not these -- the notice requirement for members

5     of the committee.  And while I know Mr. Marinuzzi is not

6     here my understanding of that is that the committee is

7     concerned that they're being effectively accused of not

8     being able to police themselves.  And quite frankly the

9     function of a member of the committee and their negotiations

10    with the debtor in the ordinary course of business is I

11    don't think something, and I think this is the committees'

12    position, the debtor here is kind of stuck between a rock

13    and hard place.

14          We're willing to live with what we gave the

15    committee, but we don't want to pick an extra set of fights.

16    But this type of obligation to give notice of anytime

17    somebody requests for the payment as a member of the

18    committee we do think is quite unorthodox.

19          MR. SHORE:  Chris Shore for the ad hoc TCH group.

20          I guess I heard three objections there.  One --

21    and none of them have to do with why the debtor should live

22    up to their deal -- but one of them is that people are

23    getting singled out.  As I said, if the people want to make

24    creditor wide, that it's not limited to committee members

25    but limited to any trade creditor over a certain threshold

1   who makes a demand to be paid that they provide us notice of

2   that.  That's fine and they can provide notice of that to

3   everybody.  I don't have any burning desire to be the sole

4   controlling party of that information.

5          Second there was a burden objection that was

6   raised that it singles out people to have to do something.

7   Again, the deal that was cut was that nobody has to do

8   anything except for the debtors.  Individual trade creditors

9   who do business with the debtors do so subject to sunshine

10  and discovery potentially and the debtor saying anything

11  about what was told to them, and the debtors have disclosure

12  obligations with respect to that.

13         So there's no burden on anybody other than the

14  debtors, and the debtors agreed to accept that burden as --

15  as a means of settling the objection.

16         And third this notion of creep.  We raised the

17  sunset for one reason.  If they are truly critical vendors

18  they will be paid early in the case.  And we've seen,

19  because we've been getting reports, that the debtors have

20  been making payments -- limited payments going forward.

21         But what we didn't want to do is people using the

22  critical vendor status during a key time in this case,

23  particularly around the RSA so we wanted it sunsetted.  The

24  remedy that was agreed to, because the debtors wouldn't

25  agree to sunsetting, was just disclosure.  That's the same

1    -- it's a different way of dealing with the same problem,

2    which is what communications are being had at this period of

3    time in the case?

4            So it's in the limited objection, we just agreed

5    on a different mechanism and we think the debtors should

6    live up to it.  If they're not going to live up to it then I

7    think at this point we really do need some sunshine on it.

8            THE COURT:  All right.

9            MR. HUSNICK:  One last thing to add, Your Honor,

10   that this notion of sunshine.  And, Your Honor, they've had

11   60 days -- the TCH group has had 60 days to review and

12   conduct discovery.  They did so in fact in response to the

13   debtors' motion and in connection with the sunset provisions

14   that they proposed.  We produced John Stewart from Alavarez

15   & Marsal as a witness and the TCH ad hoc group took

16   Mr. Stewart's deposition in connection with the sunset

17   provisions, and we're happy to put him on today as to the

18   merits of the sunset provisions, which we believe are

19   inappropriate in this context.

20           Your Honor, the debtors -- as far as the usage of

21   the buckets, the debtors have been extraordinarily rigorous

22   in their process of making payments to the critical vendors

23   and as a result they've been successful in keeping the

24   amount of the payments as low as possible, but to say that

25   the relief somehow sunsets 30 to 45 days outside of the

1   petition date is just completely unsupported in the evidence

2   and we'd be happy to put a witness on to that effect.

3            Instead, Your Honor, the health and safety

4   concerns that we articulated on the very first day of this

5   case and that Your Honor recognized when you said people can

6   die, those don't go away in 30 days, 45 days, or even a

7   year.

8            Your Honor, this relief is critical and necessary

9   for the debtors to continue to function on the ordinary

10  course of business.

11           Importantly, Your Honor, the debtors are entering

12  into a stage of their cycle where additional vendors will be

13  coming forward for outages.

14           Thank you.

15           THE COURT:  All right.  You're welcome.

16           All right, here's where I am.  Mr. Schepacarter

17  quickly?

18           MR. SCHEPACARTER:  Just one (indiscernible --

19  11:09:48).  Something that Mr. Shore brought up and I wanted

20  to sort address it now and maybe you can dip it in the

21  bundle of it.

22           With respect to the creep issue.  There is one

23  official committee in this case.  There are a number of ad

24  hoc committees in this case, probably too many that I can

25  even remember the names of, but with respect to the official

1    committee, the official committee has certain rights,

2    duties, and standing in this case.  With respect to the ad

3    hoc committees, to the extent that they want to infuse

4    themselves into the process in certain areas they don't have

5    standing and they don't have the ability to sort of veto

6    different aspects of the relief that's sought in this case.

7              You'll probably see -- you may see it in other

8    issues that may come before the Court in July and August of

9    this year, but this I think is one of those instances where

10   I think the committee -- the ad hoc committee in this case

11   has tried to infuse itself into a process where I don't

12   believe it belongs.

13             THE COURT:  Well their position is going to be

14   that they represent a large portion of general unsecured

15   creditors in an estate that by debtors own RSA is under

16   water and that every unsecured claim that turns into an

17   admin claim is albeit hundredths of a penny perhaps on a

18   global basis but affects the return of general unsecured

19   creditors so they have standing to be heard on whether or

20   not and under what circumstances unsecured claims can be

21   turned into admin claims.

22             MR. SCHEPACARTER:  Understood, but as I said

23   before there is an official committee that represents those

24   interests as well, so.

25             THE COURT:  Yeah, but the whole fight here is

1   whether or not the official committee should be able to be

2   the sole monitor of its own house perhaps.  I'm not saying

3   that's necessarily quite accurate, but I think that's the --

4          MR. SCHEPACARTER:  Right.  And I don't think

5   there's any evidence that it hasn't, so.

6          THE COURT:  Well we don't know.  We don't have any

7   evidence at all.

8          All right, here's where I am on this.

9          MR. SCHEPACARTER:  Thank you, Your Honor.

10          THE COURT:  You're welcome.

11          I will sign an order today that includes the

12   resolution that was agreed to between the debtor and the ad

13   hoc committee with regard to the disclosure, otherwise we'll

14   have an evidentiary hearing from ground one on July 11th at

15   9:30, so you can think about that when we take a recess and

16   figure out how -- if that's how you want to proceed.

17          That would turn us to the next matter which would

18   be the EFIH second lien settlement, et cetera.

19          So before we turn to that let's take a recess, say

20   ten minutes or so.

21      (A chorus of thank you)

22      (Recess at 11:12 a.m.)

23          THE CLERK:  All rise.

24          THE COURT:  Please be seated.  Please be seated.

25   Thank you.

1            MR. HUSNICK:  Your Honor, Chad Husnick from

2     Kirkland & Ellis, proposed counsel for the debtors.

3            If I may quickly before we jump in to the EFIH

4     report on discussions from the break on Your Honor's last

5     ruling on critical vendors.

6            Your Honor, in light of your ruling we discussed

7     with both the ad hoc group as well as the official committee

8     of unsecured creditors effectively bifurcating the orders.

9     We'll do a limited order that grants the 2004 request that

10    will include the deal that we negotiated with the ad hoc

11    committee and the debtors' agreement to provide notice

12    related to requests from the creditors -- or from members of

13    the creditors' committee.  And in the critical vendor order

14    we'll just cross-reference that 2004 order so that the

15    actual relief on that point is not in the critical vendor

16    order.

17            I believe that's acceptable to both the TCH group

18    and the committee, subject to seeing the draft orders, which

19    we're working on.  And the U.S. Trustee, sorry.

20            Thank you.

21            THE COURT:  Any contravention of what was just

22    said?

23            MR. SHORE:  Yeah, that's fine.  We'll just say

24    subject to everyone's review of the 2004 order to see where

25    it goes.

1          THE COURT:  All right.  Excellent.  Thank you.

2          MR. HUSNICK:  Thank you, Your Honor.

3          With that I'll turn the podium over to

4     Mr. Hessler.

5          THE COURT:  All right.

6          MR. HESSLER:  Good morning, Your Honor.  For the

7     record Steve Hessler of Kirkland & Ellis, proposed counsel

8     to the debtors.

9          Your Honor, the next items on the docket, it's

10    numbers 31 and 32 on the filed agenda, and these are the

11    EFIH debtors' motion for authority to enter into a second

12    lien DIP facility and the EFIH debtors' motion for approval

13    of a settlement of the alleged make-whole claims of certain

14    EFIH certainly noteholders.

15          Suffice to say, Your Honor, a number of joinders

16    and pleadings in support of both motions have been filed as

17    have a number of objections, and many of those objections

18    remain unresolved.

19          Your Honor, the debtors have caucused with various

20    of the parties in support and oppose opposition and are

21    proposing to proceed with consolidated presentations on both

22    motions.  Meaning opening statements on both, presentation

23    of evidence and witness on both, and closing statements on

24    both.  And to my knowledge, Your Honor, the parties have an

25    agreement that the opening remarks of the debtors will be 30

1    minutes or less and 15 minutes or less as to each objector.

2              Your Honor, if there are no questions at the

3    outset on process I'm prepared to turn to the debtors'

4    presentation.

5              THE COURT:  No questions.  Do I need see this?

6              MR. HESSLER:  Yes, Your Honor, and what's up on

7    the screen what we're going to do -- as I did at the last

8    hearing on the EFIH first lien DIP and EFIH first lien make-

9    whole settlement before actually arguing the motions I

10   thought it may be helpful to spend a few minutes to provide

11   an update on the most recent modifications to the proposed

12   second and DIP facility, including quite notably a

13   modification that came in very late last night, and then we

14   also wanted to take a few minutes, Your Honor, to just

15   level, set, and clarify both the composition and structure

16   of the second lien DIP facility, the mechanics of the

17   proposed equity conversation, explain the interrelationship

18   of these features with that proposed second lien make-whole

19   settlement.

20             What's up on the screen, Your Honor, we do have

21   copies, it a four-page doc.  We do have copies for folks in

22   the courtroom and I have a copy for Your Honor if you'd like

23   me to hand it up.

24             THE COURT:  I'm fine here.

25        (Pause)

1              MR. HESSLER:  Turning to the first slide.  What

2    this is, Your Honor, is just a high level comparison of the

3    proposed facility.  You're going to hear a lot of testimony

4    over the course of today of competing proposals that we did

5    receive, but what this is and what this brief presentation

6    in particular focuses on is the facility that we are

7    proposing to enter into.  So this is the facility that's

8    being sponsored by the EFIH unsecured group.  And what we

9    have here are some of the key terms and showing how these

10   key terms modified from the facility as proposed on the

11   petition date and what we are proposing to enter into as of

12   today's hearing date.

13              So, Your Honor, the commitment parties are the

14   EFIH unsecured group, the principal amount of the DIP is

15   $1.9 billion.

16              Starting on the third line with regard to the

17   interest rate there was very significant movement to the

18   benefit of the estates on the interest rate, which has been

19   reduced from 8 percent to 6.25 percent, and this is a

20   payable in cash facility, Your Honor, but there has been a

21   reduction 1.75 percent since the petition date.

22              Similarly with regard to the EFH equity conversion

23   ratio in the event, Your Honor, that the equity conversion

24   does occur pursuant to a confirmed plan, the amount of -- or

25   the percentage of EFH equity that the second lien DIP would

1    convert into has been reduced from 64 percent to 60 percent.

2           The upfront cash fees remain the same, Your Honor,

3    $42.5 million.  This is approximately, you know, 2.24

4    percent of the overall facility.

5           Your Honor, the PIK funding fee next, this is a

6    change that occurred over negotiations right up through late

7    last night and there was very significant movement on this

8    and it's very much to the benefit of the estate so I'll take

9    a moment to walk through it.

10          What the (indiscernible - 11:34:00) has proposed

11   on the petition date it had a 95 million PIK funding fee.

12   This was going to be paid in DIP notes at the time of

13   funding and then there were a couple different things that

14   could occur at confirmation.  In the event that the equity

15   conversion were to occur those DIP notes would convert to

16   $95 million of equity along with the $1.9 billion of DIP

17   funding that would also convert to equity.

18          However, in the event that an alternative

19   transaction were consummated and the DIP was to be repaid in

20   cash these $95 million of PIK funding fee notes would have

21   been repaid in cash.  So either way the notes would have

22   been paid at the outset or up front upon the funding of the

23   DIP either to convert into $95 million -- or to convert into

24   the amount of $95 million in equity or be repaid in cash.

25          Here's where things stand as of today, and this

1    was the modification that we received last night from the

2    unsecured group.  The $95 million fee still exists; however,

3    it will be paid at confirmation -- so it would not be paid

4    up front -- only at confirmation and only upon the exercise

5    of the equity conversion.  So it moves from an up front fee

6    to a back end fee payable only upon the exercise of the

7    equity conversion, and this is what's most significant, it's

8    not payable in either equity or cash upon consummation of an

9    alternative restructuring transaction.

10             The effect of this, Your Honor, when conjoined

11   with the optional redemption fee elimination, which I'll

12   talk about in a moment, is we believe the debtors at this

13   point have a completely unfettered fiduciary out to either

14   refinance this second lien DIP or pursue a different

15   transaction at exit.  We're going to spend a lot of time on

16   that this morning, but I want to highlight that is what we

17   believe the effect of this change is that we received late

18   last night.

19             Finishing up this slide though, Your Honor, the

20   alternative transaction fee.  This was to compensate the

21   lenders if a different transaction were consummated between

22   approval of the DIP and the funding of the DIP this was a

23   proposed $57 million fee.  This has been eliminated

24   entirely.  There is no alternative transaction fee now.

25             Your Honor, there was an optional redemption fee

1    at the outset, this was to compensate the lenders if a

2    different transaction were consummated between the funding

3    of the DIP and exit.  That was originally proposed to be

4    $380 million.  That fee, Your Honor, has been eliminated

5    entirely, and it's the elimination of the actual redemption

6    fee as well as the modification of the PIK funding fee that

7    gives the debtors the unfettered fiduciary out to refinance

8    the DIP or pursue a different transaction at exit if those

9    circumstances warrant at that time.

10           Lastly, Your Honor, there were Oncor TSA amendment

11   fees, these are fees that would be due if the amendment of

12   the Oncor tax sharing agreement did not occur within certain

13   defined benchmark time period.  Those have been eliminated

14   entirely also, Your Honor.  There are no fees related to the

15   timing with regard to the Oncor tax sharing agreement

16   amendment, which has not yet come before Court in any event,

17   Your Honor.  But those fees have also been eliminated

18   entirely.

19           So we believe these specific modifications,

20   they'll get a lot of attention today, you'll hear a lot of

21   testimony about it, but we believe all of these are to a

22   significant benefit of the debtors, Your Honor.

23           Next slide, please.

24           Your Honor, the facility itself.  These are the

25   petition patient rights and we aggregated amongst the four

1    principal constituencies.  So the EFIH unsecured commitment

2    parties, these are effectively the primary lenders under the

3    DIP facility, moving from left to right.  The contribution

4    to the EFH -- EFH EFI's restructuring here's what they are

5    contributing.  They have fully backstopped a $1.9 billion

6    DIP facility and equity conversion.  Pursuant to that they

7    also have negotiated, and this is on the restructuring

8    support agreement, their participation in a DIP, Your Honor,

9    they have committed to purchase up to 100 percent of the DIP

10   notes, so they're fully backstopping this DIP.

11            Their equity participation, Your Honor, is at the

12   debtors' election which we intend to elect, we will

13   introduce the plan, subject to confirmation that provides to

14   convert those DIP notes to equity under the plan.  So that's

15   the equity conversion option under this DIP.

16            The consideration that they will be receiving is

17   to this specific group $31.25 million in cash financing

18   fees, those are just the up front financing fees associated

19   with the DIP, Your Honor.  There's the 95 million

20   potentially to be paid in equity upon the exercise of the

21   equity conversion.  Again, we believe that we will exercise

22   the equity conversion and we intend to introduce a plan to

23   that effect, but we do want to -- we do need to highlight

24   that this is a potentially contingent fee in the event an

25   alternative transaction does come to life.  And of course

1    they'll be getting like all lenders will be getting the 6.25

2    percent cash pay interest.

3              Your Honor, as to all EFIH unsecured note claims,

4    so this is the entire class, not just PIK amendment parties,

5    the entire class, they're obviously not parties to the

6    restructuring support agreement, most of the members of that

7    class are because they're members of the commitment party

8    group, but looking at the class as a whole not members of

9    the restructuring support agreement.  The (indiscernible -

10   11:39:03) is 91 percent of the DIP is open to all EFIH

11   unsecured noteholders, and upon approval of the DIP, which

12   we hope will be today or tomorrow, Your Honor, there will be

13   a solicitation process conducted to determine, you know, who

14   opts to participate in the DIP, but again, it is fully

15   backstopped by the EFIH unsecured commitment parties.

16             The equity participation is the same.  Upon the

17   exercise of the equity conversion, subject to plan

18   confirmation these DIP notes all convert to equity under the

19   plan.

20             And then as a class, to the extent that they are

21   participating in the DIP, what they would be receiving also

22   is the 6.25 percent cash pay interest.

23             We're halfway down the chart, Your Honor,

24   Fidelity.  Fidelity in the capacity as a holder of 73

25   percent of the EFH unsecured notes, Fidelity's participation

1    is as follows.  Fidelity is a DIP lender, and Fidelity of

2    course is a critical member -- or a critical counterpart of

3    the restructuring support agreement.  So there's benefits --

4    tangible benefits that are being provided to the estates.

5              Within the DIP, Your Honor, Fidelity has the right

6    to purchase up to nine percent of the DIP notes.  So that's

7    Fidelity's potential participation under the DIP.

8              With the equity participation what Fidelity is

9    actually doing is making its nine percent conversion rights,

10   it's going to offer those on a pro rata basis to all EFH

11   general unsecured creditors, so there's a mini rights

12   offering.  At exit, Your Honor, or at confirmation I would

13   say, Your Honor, where Fidelity's nine percent of DIP notes

14   which are effectively nine percent equity conversion rights,

15   those are going to be offered on a pro rata basis to all EFH

16   general unsecured creditors, and in exchange for this, Your

17   Honor, Fidelity is getting an $11.25 million participation

18   fee for its participation as a DIP lender, and that fee is

19   payable ratably to the extent of their participation, and

20   then Fidelity as the DIP lender of course also would receive

21   the 6.25 percent cash pay interest.

22             Your Honor, at the bottom of the page the -- all

23   EFH general unsecured creditors of the class, this just

24   repeats what we said in the context of Fidelity, but just to

25   highlight it their participation in this process is they

1    have the opportunity to purchase on a pro rata basis

2    Fidelity's nine percent conversion rights that Fidelity

3    would have received under the DIP with the right to convert

4    into equity at exit, Your Honor.

5              Next slide, please.

6              Your Honor, more on the equity conversion right.

7    So as I prefaced at the first line, this equity conversion

8    right is an option of the debtors -- and again to be clear,

9    the debtors intend to exercise that option -- but it is an

10   option of the debtors to propose a plan that would repay the

11   $1.9 billion second lien DIP with 60 percent of reorganized

12   EFH's equity.  I don't want to be a broken record on this,

13   but it's subject to confirmation of a plan.  Some of the

14   objections focused upon locking in today what necessarily

15   has to happen, we have an equity conversion right, they're

16   bound to convert their DIP holdings into 60 percent of EFH

17   equity if the debtors propose a plan, as we will, that

18   purports to do so, but what is going to be approved in the

19   DIP order that we're requesting, Your Honor, is not the

20   conversion itself, it's our right to exercise the conversion

21   through a plan which is of course still subject to

22   confirmation and objection.

23             If we were to go a different direction, Your

24   Honor, and decide that a better transaction were apparent,

25   something that would otherwise maximize the value of the

1   estates at exit we would repay the DIP -- or the DIP would

2   be repayable with $1.9 billion in cash.  So that's the

3   equity conversion right.  You have two different options

4   there.

5           What this means, Your Honor, with regard to as I

6   mentioned at the outset, the elimination of the optional

7   redemption fee as well as the modification of the PIK

8   funding fee, is the debtors we believe, as we said a

9   completely unfettered fiduciary out to either refinance the

10  DIP if circumstances warrant, or pursue a different form of

11  (indiscernible - 11:42:56) offering if circumstances

12  warrant.  You will hear testimony that we do not believe

13  circumstances will warrant, but the critical point is we

14  have the fiduciary out to be able to do so if an alternative

15  path forward were to materialize to maximize transaction.

16  So there is that downside protection with all of the upside

17  benefit that we otherwise receive that we're going to talk

18  about at great length today through entering into this DIP

19  and equity conversion.

20          Next slide, please.

21          Your Honor, this is the interplay that's in the

22  DIP and the proposed second lien make-whole settlement.  The

23  consideration proposed to be provided to settling second

24  lien noteholders is 50 percent of their alleged make-whole

25  claims plus of course, you know, the principal accrued

1    interest on their debt.  The timeline at the bottom shows

2    where we started and where we are today.

3              As of the petition date 761 million of the 2.156

4    billion outstanding second lien debt to 35 percent of the

5    second lien debt holders opted to participate in the

6    settlement by being RSA parties.  So we started the case

7    with 35 percent support for the DIP and the second lien

8    make-whole settlement.  And, Your Honor, that was when we

9    initiated an opt-in period, a tender process for all second

10   lien holders to elect to participate in the second lien

11   settlement.  The consequence of holding that process is an

12   incremental 162 million of the 2.156 billion of second lien

13   debt, so this is another 8 percent of institutional holders

14   opted to participate in the settlement.

15             So just a level set where we find ourselves today

16   is 923 million of the outstanding second lien debt, which is

17   43 percent, that's the total participation, 43 percent of

18   second lien debt holders want to avail themselves of the

19   second lien settlement, Your Honor.

20             Your Honor, if there are questions on the slide --

21   I'm going to talk about all of this a little bit more, but I

22   would propose at this point to go ahead and turn to our

23   argument on the DIP itself.

24             THE COURT:  Okay.

25             MR. HESSLER:  Your Honor, the debtors announced on

1    the petition date that we and certain constituencies had

2    negotiated a transaction that provided the following

3    extraordinary benefits to the estate, and I'll highlight the

4    most prominent four.

5              First, Your Honor, we wanted to replace high

6    interest rate second lien debt with low interest rate second

7    lien debt, and in doing so we wanted to obtain over -- well

8    over $100 million of interest savings to the estates.

9              Second, Your Honor, we wanted to provide for the

10   repayment of the principal and interest of the second lien

11   noteholders, in doing so settle the alleged make-whole

12   claims of a very significant number of that class, thus

13   decreasing litigation risk on a key contested issue in these

14   cases.

15             Third, Your Honor, we want to deleverage EFIH

16   through a fully backstopped equity investment, and in doing

17   do establish a floor on EFIH's valuation and mitigate the

18   material capital market risk that would be involved in

19   having to wait until confirmation to secure the solution

20   that we otherwise have available at the outset of the case.

21             And fourth, Your Honor, by entering into the DIP

22   and executing a settlement we want to protect and facilitate

23   the global restructuring of all of the debtors' estates and

24   avoid a staggering deconsolidation tax, this can be

25   effectuated through the restructuring support agreement, and

1    we're going to explain why entry into this DIP and approval

2    of this settlement facilitates the restructuring support

3    agreement and protects the restructuring support agreement.

4              So, Your Honor, that's what we announced on the

5    petition date.  In the two months since all of these

6    benefits have remained an option, they're all still very

7    salient, they're very powerful, and they're available to the

8    estates.  What is not however, the (indiscernible -

9    11:46:43) of the second lien DIP facility have only gotten

10   better.  They have been materially modified in the debtors'

11   favor.  So the scenario as we stand here today is actually

12   better than it was at the petition date.

13             So, Your Honor, the debtors are going to offer the

14   testimony of two witnesses, David Young of Evercore, the

15   proposed financial officer -- proposed financial advisor to

16   the debtors, and Paul Keglevic, the chief financial officer

17   and co-chief restructuring officer of the debtors, both have

18   testified before.

19             Your Honor, they will testify in detail about the

20   following.  The benefits to EFIH and its stakeholders by

21   approving the DIP, the harms to EFIH and its stakeholders by

22   denying or delaying the debtors' entry into the transaction,

23   as well as the process by which the debtors and their

24   creditor constituencies negotiated and repeatedly improved

25   the proposed DIP, and here's what their testimony will

1    establish.

2         First as to the benefits.  The economic

3    justifications for this DIP are very straightforward and

4    very compelling.  The second lien DIP replaces higher

5    interest rate debt with a coupon of approximately 12 percent

6    with lower interest rate debt with a coupon of 6.25 percent.

7    Your Honor, this saves the estates $132 million a year,

8    $11 a month, or approximately $360,000 per day.

9         The equity conversion feature as described places

10   a floor on the value of the equity in reorganized EFH and it

11   locks in this commitment protection at an early stage of

12   this case, which again, avoids the inherent risk that the

13   capital markets could turn against the debtors and their

14   creditor constituencies between now and confirmation and

15   exit.  Because the DIP no longer has the optional redemption

16   payment or the up front PIK funding fee, stated different,

17   because the PIK funding fee is only paid upon exercise of

18   the equity conversion the debtors have a completely

19   unfettered fiduciary out to consummate an alternative

20   transaction before or at confirmation if doing so would

21   further maximize value of the EFI's estates.

22         Your Honor, this point cannot be over emphasized.

23   The debtors believe, and you will hear testimony on this,

24   that we have negotiated the best possible second lien DIP

25   facility and equity investment, and again, we intend to file

1     a plan that facilities the equity conversion.

2             But if it turns out that we were wrong, if it

3     turns out other lenders are willing to refinance this DIP or

4     lower rates or sponsor a rights offering on more attractive

5     terms we have maximum optionality to do those deals.

6             Your Honor, this one-way option we believe is a

7     staggering benefit to the estates and it rebuts directly

8     many of the objections that argue this DIP prematurely or

9     unwisely commits the debtors to a sub optimal transaction.

10            Next, Your Honor, I'd like to touch on the

11    restructuring support agreement.  As we stated at length in

12    our papers and as our witnesses today will testify, the

13    beneficial economical impact of a second lien DIP extends

14    far beyond just the favorable terms of the facility, and

15    those terms cannot be considered in the abstract.  In the

16    abstract we think they've evidently justifiable, but what is

17    more they need to be understood in the context of the

18    overall restructuring.

19            Entry into the second lien DIP is a valid exercise

20    of the debtors' business judgment also because the DIP

21    proposal has the support of the RSA counterparties, and thus

22    it is the only DIP proposal at present that furthers the

23    ball of consummating the tax-free spin that avoids a multi-

24    billion dollar deconsolidation tax that could be disastrous

25    to the value of EFIH creditors' claims.  This point also

1    cannot be over emphasized.

2            Approving of the second lien DIP is a necessary

3    condition to the participation in the RSA of the EFIH

4    unsecured group, and that group holds a super majority in

5    amount of EFIH general unsecured claims, as well as of

6    Fidelity, and Fidelity holds a super majority in amount of

7    the EFH general unsecured claims.

8            Without these parties continued support for the

9    RSA, Your Honor, the debtors may need to reopen and restart

10   negotiations on their entire prearranged plan, which could

11   result in immense delay and expense to these Chapter 11

12   cases.  (Indiscernible - 11:50:58) that outcome, Your Honor,

13   would be a gigantic setback for these Chapter 11 cases.

14           Though we'd acknowledge certain oversecured and

15   out of the money creditors approve the RSA and the

16   transaction comprise it, but here as well if these parties

17   somehow establish that a different restructuring outside of

18   the second lien DIP or the equity conversion, but a

19   different overall restructuring is in the best interest of

20   the debtors' estate.  The EFIH second lien DIP does not

21   preclude the debtors from pursuing that alternative path

22   given the fiduciary out to do so.

23           My last point on the second lien DIP, Your Honor,

24   before turning to the make-whole settlement, involves the

25   process by which we negotiated this facility.

1          Your Honor, many, many pages of objections were

2     filed, and with respect there will be a lot of allegations

3     made today and tomorrow, much of it from parties that are

4     already litigating with the debtors over their demands to be

5     paid 100 cents on their alleged make-whole claims.  No new

6     allegations arguing the debtors' (indiscernible - 11:52:02)

7     negotiation.

8          Your Honor, we could not agree -- disagree more

9     strongly.  There will be testimony to the following.  The

10    facts speak for themselves as do the results here, Your

11    Honor.  Both pre and post-petition the debtors solicited,

12    received, and negotiated at least 17 proposals, and modified

13    proposals for second lien DIP financing.  The debtors

14    management and advisors had multiple meetings and calls with

15    competing lenders' principals and professionals to

16    (indiscernible - 11:52:32) for bids and to provide specific

17    feedback on how those proposals could be improved.

18          The EFIH board had at least four meetings

19    dedicated personally to the consideration and approval of

20    the prevailing and competing second lien DIP proposals.

21          Your Honor, the Court will hear testimony that we

22    believe the proposal that the EFIH board selected is the

23    best available financing option.

24          Your Honor, we also do not believe that any

25    competing proposer can credibly testify that they did not

1    have sufficient notice, time, or access to put forth their

2    best and final competing offer.

3            The debtors, Your Honor, are at a highly

4    transparent and highly competitive process, remember there

5    was a major success as demonstrated by the very material and

6    very beneficial modifications that the potential lenders

7    kept making to the proposals, literally into the eve of

8    today's hearing.  We received no less than two or three

9    proposals over the course of the last 72 hours.

10           To that end, Your Honor, the debtors sincerely

11   appreciate the many competing proposals that were submitted

12   and the very important impact that those proposals had on

13   improving each others terms.  We were grateful for

14   everybody's participation in that process.

15           But to state the obvious, Your Honor, the very

16   unsurprising fact that losing bidders are disappointed does

17   not mean that a process is deficient, and it certainly does

18   not provide a legal basis for denying a debtors' request to

19   enter into their proposed DIP.

20           Very long time, Your Honor, but turning to the

21   proposed make-whole settlement.  My comments here will be

22   relatively brief.

23           As with the first lien settlement, Your Honor,

24   nearly all of the objectors took a pass on arguing the

25   relevant legal standard to approval of the second lien

1    settlement, and that's Bankruptcy Rule 9019.

2            The declarations that we filed, the testimony

3    that's forthcoming today these will amply establish that the

4    second lien settlement is supported by a legitimate business

5    justification and is a solid exercise of the debtors'

6    business judgment.

7            Your Honor, almost identically to the first lien

8    settlement, which had the support of 42 percent of the first

9    lien lenders, the second lien settlement is supported by 43

10   percent of the second lien lenders.  Here as well we think

11   this almost definitionally establishes the settlements

12   reasonableness.  A bit less than of the second lien holders

13   think it's a good enough deal, a little bit more than half

14   want to hold out for more.  The creditors that want to hold

15   out for more are not prejudiced by this settlement.  They

16   retain every right to litigate their claims for a full

17   payment of their alleged make whole, and that litigation is

18   already underway.

19           Here as well, Your Honor, we think there's a

20   disconnect to the second lien's trustees objection to the

21   settlement.  Their clients oppose the settlement, we

22   understand, but their clients don't have to participate in

23   the settlement, and they're not participate in the

24   settlement, and there is no prejudice to them if the

25   settlement is approved.  But there are 43 percent of second

1     lien holders that are not their clients that do support the

2     settlement.  They want to be cashed out on their make-whole

3     claims at the price we had offered and they are the losers

4     here if the proposed settlement is denied.

5              So, Your Honor, like the first lien trustee the

6     second lien trustee is trying to defeat a settlement between

7     the debtors and parties that are not their clients to the

8     detriment of parties that are not their clients with no

9     discernable detriment to the parties that are their clients.

10             Your Honor, our evidence will demonstrate the

11    following.  The proposed settlement reduced a material

12    litigation risk facing the debtors.  The proposed settlement

13    was critical to obtaining certain counterparties' support

14    for the RSA.  And, Your Honor, the proposed settlement has

15    the support of a vast majority of the parties that are

16    effectively paying for the settlement, and that is the EFIH

17    unsecureds, Your Honor.

18             Your Honor, unless the Court has any questions I

19    will cede the podium.

20             THE COURT:  I'm good.  Thank you.

21             MR. HESSLER:  Thank you, Your Honor.

22             MR. PECK:  Good morning.

23             THE COURT:  Good morning.

24             MR. PECK:  I'm James Peck from Morrison & Foerster,

25    proposed counsel for the creditors' committee and I have

1    some comments about the proposed EFIH second lien DIP

2    facility and settlement.

3         The committee filed objections to this transaction

4    maybe ten days ago and as demonstrated by the slideshow that

5    was just presented, the transaction has changed and it has

6    gotten better.  But we're not here to challenge the process

7    by which this financing improved as much as we are here to

8    challenge the need for that financing at all.

9         Section 364 of the Bankruptcy Code is entitled

10   "Obtaining Credit".  And in the typical Chapter 11 case,

11   parties come into court with liquidity constraints.  Here,

12   this debtor has come in with option value.  They don't

13   really need the financing.  The financing is, for all

14   practical purposes, a means to a different end which is the

15   equity conversion feature.

16        Now why does that matter?  For one thing, let's

17   look at the courtroom.  We are here at a very early stage of

18   this bankruptcy case talking about contested terms of a

19   financing.  Now everyone who is contesting the financing is

20   self-interested.  Some think they can get the equity for

21   themselves with a different deal.  Some are partnering with

22   strategic acquirers.  Some are concerned about what this

23   means for them as noteholders elsewhere in the capital

24   structure.

25        As was noted earlier in the hearing, the committee

1    has fiduciary duties to all parties-in-interest.  But notice

2    of notably creditors on the TCEH side, we have just begun an

3    investigation on their behalf.  And as the objections note,

4    there is reason to believe that there are substantial

5    potential claims on behalf of TCEH creditors as against the

6    E side entities.  The much touted fiduciary out doesn't

7    really address the needs of this group.  One of the things

8    that our evidence through Lazard will show is that the

9    market has already spoken.  Sixty percent of the equity, on

10   a hypothetical basis, of this reorganized enterprise is

11   already trading on an as-issued basis substantially above

12   par.  In effect, we already know based upon at least how the

13   market is moving that sixty percent of the equity is

14   undervalued.  And it represents an extraordinary investment

15   opportunity for those who are opting in to this facility.

16           We, at the moment, have no such opt-in rights.  And

17   one of the unanswered questions is what happens under the

18   fiduciary out to the sixty percent equity conversion

19   assuming we get to confirmation, assuming the tax-free spin

20   actually is feasible, assuming there is reason to believe

21   that the requested rulings can be obtained.  Assuming all

22   those things are true, what gives anyone on the TCEH side

23   any comfort to believe that the sixty percent is going to be

24   sufficient to compensate claims that we have as against that

25   enterprise?  Now those claims at the moment are entirely

1    hypothetical and contingent although we believe that there

2    is support for such claims.  But I don't understand, and I

3    think our advisors don't understand either, how, at the end

4    of the day, when there is a fiduciary out to refinance the

5    DIP that there is any ability to reset the equity splits to

6    compensate our class to the extent our class has claims.

7    That's a problem that I do not believe the fiduciary out

8    fixes.

9           Now having sat through Mr. Hessler's presentation,

10   and I think it's a very effective one, it appears that

11   between the petition date and the hearing date, many of the

12   economic problems with the proposal have gone away.  In that

13   sense, the objections have already been useful.  And in that

14   sense, an informal process has already produced benefits.

15   But those benefits have been obtained in a context of a DIP

16   facility that isn't, in fact, needed.  We are talking about

17   a monthly saving of interest.  But we're also talking about

18   a settlement of make-whole claims.  That settlement does not

19   need to be achieved now.  This financing does not need to be

20   obtained now.  This case is moving forward at breakneck

21   speed.  And frankly, one of the things that I believe the

22   Court should consider is whether there is value to the

23   overall process in developing a consensual reorganization in

24   slowing down the evident deal momentum that the debtors are

25   insisting upon.

1         We are talking today at a DIP hearing about an

2    equity raise at the end of the case that is entirely

3    hypothetical.  Why are we doing that?  I believe we are

4    doing that because we are trying to frontload into the case

5    issues that are directly tied to the RSA to be heard in

6    several weeks.  An RSA that is not necessarily the only

7    means to the end of an effective reorganization of these

8    debtors.  An RSA that was put together, as we understand it,

9    in the months immediately before the bankruptcy filing as,

10   in effect, plan B because of the failure of an earlier

11   attempt to develop a comprehensive restructuring.

12        I complement the professionals whose ingenuity and

13   work have put together what is a very creative transaction.

14   But it is not necessarily the only means to the end of an

15   effective reorganization of these businesses.  But there is

16   an impact in nailing down these pieces early.  It creates an

17   atmosphere, an atmosphere of undo speed, undo haste and,

18   frankly, inevitability that may or may not exist.  And that

19   inevitability is something that our committee greatly

20   dislikes.  Stop the music, please.

21        What we are looking for is an opportunity for full,

22   fair interaction with all parties-in-interest.  What we are

23   looking for is an opportunity to complete our work, to test

24   valuation, a valuation which seems to be missing completely

25   given from the opening remarks of Mr. Sassower.  It's clear

1    that valuation isn't happening until sometime between now

2    and the disclosure statement.  It's clear that the company

3    is going through a process in August to update its numbers.

4    It's equally clear that Lazard needs time to complete its

5    work on our behalf.  Yet, despite the fact that all that

6    work is to be done in the future, we are dealing today with

7    equity splits.  We're dealing with equity splits that the

8    market has already valued as inappropriate.  Even if there

9    is an ability under the universal antidote of the fiduciary

10   out to redo this deal later with another financing, how

11   likely is that?  How likely is that in an environment of

12   constant moving forward?  Of not moving hearings despite the

13   fact that multiple parties objected?

14          We are proceeding today with a contested hearing

15   today and tomorrow for strategic reasons.  Think about who

16   has benefited it here.  Certainly not the unsecured

17   creditors.  Certainly not any of the objectors.  But I

18   suspect those who are most benefited are the lenders.  Those

19   who have the opportunity to participate in what is

20   unquestionably a sweetheart deal even as it has been

21   improved.

22          Your Honor, this is a highly unusual "financing".

23   We are obtaining credit for purposes of exiting a bankruptcy

24   with equity splits already determined.  Please slow down the

25   process.  Thank you very much.

1           THE COURT:  Thank you, Mr. Peck.

2           MR. ROSNER:  Good morning, Your Honor.  David

3    Rosner of Kasowitz Benson Torres & Friedman for the ad hoc

4    group of EFH Legacy noteholders and Caxton Associates.

5    We're the non-Fidelity EFH Legacy noteholders.  Thank you.

6           The question to the Court today is whether you

7    should lock in a rights offering to one defiant class that

8    is not the fulcrum security.  That class bonds are trading

9    today at 124 to 125 cents on the dollar as Judge Peck made

10   mention to the Court.

11          THE COURT:  I'm just going to stop you right there.

12   It's Mr. Peck.  And it's not disrespect; it's judicial

13   ethics.  It's Mr. Peck.

14          MR. ROSNER:  I apologize.  It's my custom, Your

15   Honor, having been -- Mr. Peck.

16          The debtor essentially says yes, we should lock in

17   that rights offering today.  One, we save some interest;

18   two, we lock in the RSA.  That's really what they're saying

19   is it's circular; it's backwards.  We're locking in the RSA

20   and that's what we're really here about and that's what se

21   should be doing is locking in the RSA.  The way we've got a

22   fiduciary out but we should be locking in the RSA.

23          The fiduciary out is not something that anybody,

24   particularly the fulcrum security, the EFH holders, the

25   creditors of the equity, can actually rely upon because,

1    first of all, let's just see how it's operated to date.  The

2    debtors ran no process here.  They had absolutely no process

3    to get to the second lien DIP.  What they had was a bunch of

4    people trying to stop them from the DIP that they were

5    pushing forward which was outrageous on the terms that it

6    was including things like a 380 million dollar termination

7    fee that you saw disappeared in an instant once somebody

8    came to the table that had fees of, like, 57 million that

9    also disappeared in an instant when somebody came to the

10   table.

11        The debtors, although they say they're looking for

12   alternatives, what Mr. Hessler said and what I heard him say

13   was, well, if something comes to light, well, then things

14   may change.  Well, that's not the debtor -- that's not what

15   the debtor's role is.  The debtor's role is to make those

16   things come to light, is to look for those transactions that

17   are going to maximize the value to the estate not to sell

18   undervalued equity at the outset of a case pursuant to a

19   DIP.  And let's talk about what this fiduciary out doesn't

20   do, what it can't do.

21        What the debtors have done right now is they're

22   incrementalizing a balance sheet restructuring.  That's

23   unheard of to incrementalize a balance sheet restructuring.

24   The Bankruptcy Code gives people many, many rights --

25   gives -- I'm sorry -- debtors many, many rights to

1   incrementalize a reorganization in an operational context.

2   People normally -- debtors normally borrow money to properly

3   make incremental changes in their operations to assume or

4   reject leases, to sell or abandon certain assets, to address

5   employee issues.  That's the reason that debtors obtain

6   financing.  It's for those operational reasons where they

7   need money.

8            But that's not what the debtors here are doing.

9   Not a single employee or person outside of the capital

10  structure is affected by the scheme that's before Your Honor

11  today.  What they're doing is, they're eliminating an entire

12  possibility of reorganization by converting pre-petition

13  debt that no one's even looked at -- no one's looked at

14  whether this is second lien debt, but they're converting

15  that second lien debt into DIP debt.  So there's no

16  possibility of dealing with that debt anymore.  You can't

17  treat that debt.  You can't reinstate that debt.  You can't

18  cram that debt up.  You can't cram that debt down.  All of

19  those reorganizational possibilities are off the table.

20  And, by the way, the second lien debt contains in its own

21  documents what's called an equity claw where contractually,

22  the debtors have the opportunity, through a rights offering,

23  to equitize thirty-five percent of the second lien debt at a

24  price way, way lower than the make-whole settlement at a

25  price of 111.  And they can do that under the contracts

1    themselves.  It's like a drop-down DIP that we heard about

2    earlier in the case except that they didn't do that and

3    there was no chance to do that.  There's still a chance to

4    do the equity claw.  In fact, they negotiated over the

5    equity claw for several months up until the last month when

6    finally the PIKs made the ultimate grab for sixty percent of

7    the equity through their rights offering done in the last

8    month of the negotiations or the so-called negotiations.

9    And the reason that I say so-called negotiations is it's not

10   to be pejorative at all.  The fact is that there were no

11   negotiations relating to this DIP proposal whatsoever.

12   There was a dictated number by the PIK creditors of sixty-

13   four percent equals 1.9 billion dollars.  And the debtors

14   never said, well, that's a little bit to low, maybe we're

15   undervaluing the debtors, maybe we should look at it like

16   this.  Why didn't the debtors do that?  Number one, because

17   they've already sold this company to the PIKs.  They've

18   already made that decision and they're pushing forward with

19   that regardless.  Number two, because they didn't bother to

20   do a valuation of the company, the one thing that you would

21   do to determine what is the appropriateness of the valuation

22   of a rights offering.  In fact, Evercore, who's charged with

23   this responsibility and we hear today that at some point

24   they're going to be doing a valuation in their work stream,

25   talking about how they were going to try to move to a

1    consensual deal.  There is a section -- and you'll see this

2    in the documents during the course of the trial.  It says

3    under the work stream, rights offering, size and valuation.

4    And then they decided intentionally not to do a valuation.

5    Why?  Because nobody wanted a valuation done.  Certainly,

6    the PIKs didn't want a valuation done.  They determined

7    there's sixty-four percent of what was then the trading

8    prices.  We need to look at what the trading prices are now.

9    It's all way, way, way above par.  And that above par value

10   is value that belongs to the EFH noteholders and that vale

11   is being stripped of the EFH noteholders through the rights

12   offering that's being done through the conversion that will

13   occur under this plan should the Court actually approve the

14   DIP today that provides no financing on an operational

15   basis, is not needed by this debtor and eliminates

16   reorganizational possibilities.

17         I can't stress enough -- Mr. Hessler had a point to

18   stress.  I can't stress enough the undervaluation that's

19   occurring before Your Honor today.  If you just take a look

20   at the 124 to 125 cent trading price that the PIKs are

21   trading at today, you can see that the absence of a

22   valuation caused a complete undervaluation of what the

23   rights offering was offering.  The evidence that Your Honor

24   will see is that it's premature, that it's below market and

25   that for that reason, the market value, the entire capital

1    structure, the entire Oncor capital structure, at a much

2    higher value than that which is offered under the rights

3    offering.

4           You know what, Your Honor?  It's actually

5    unprecedented and I believe Mr. Peck made this point or at

6    least alluded to the point.  It's actually unprecedented for

7    collective boards simply to hand over to the beneficiary of

8    a rights offering a blank check to say how much they get for

9    how much they put in.  The PIKs set this price; it was never

10   negotiated.  The documents -- the documentary evidence that

11   you will see and the testimony that you will hear will --

12   you'll see documents where they actually use the phrase to

13   the PIKs:  name your price.  They're not doing a valuation.

14   You name your price and that's what we're going to stick in

15   for the rights offering and that's what you're going to get.

16   And does it lock in any floor for the debtors?  It doesn't

17   lock in any floor for the debtors.  If it was a third party,

18   perhaps it would be locking in a floor.  Here, they're

19   getting the equity no matter what.  Value goes up, they get

20   it through -- under the plan through the equity split.

21   Value goes down, they get -- they pick up the difference in

22   the equity split under the plan.  All that's being decided

23   today by Your Honor.  You're being asked to take a DIP that

24   provides no financing to the company and make those

25   decisions today.

1            There were actually two people who negotiated this

2    DIP.  The debtor wasn't one of those.  It was Fidelity and

3    it was York Capital.  And actually I should say the PIKs

4    because I think --

5            THE COURT:  I'm sorry, who?  Say those two parties

6    again.

7            MR. ROSNER:  It's Fidelity.

8            THE COURT:  Right.

9            MR. ROSNER:  And York Capital.  But I should say in

10   terms of -- I should really say the PIKs because towards the

11   end of the process -- and this process lasted a very short

12   period of time when they finally made the move to take the

13   entire rights offering at this value.  A few other of the

14   PIK holders entered into the picture.  And so, at the very

15   end, there were a few others.  But the debtor acted, by its

16   own admission, solely as an intermediary.  And for these

17   reasons, Your Honor, we make the point in our papers -- I

18   believe the committee made the point in its papers that it's

19   imperative that the Court not simply say this is a business

20   judgment analysis and I can -- because, first of all, the

21   business judgment was an exercise, I would tell you.  So

22   even by that analysis, I don't think it would pass muster.

23   But because the debtor solely took the role as an

24   intermediary and delegated and abdicated its

25   responsibilities and gave it to third parties to negotiate

1    what this DIP would actually look like or what this rights

2    offering would actually look like, we think that Your Honor

3    needs to carefully scrutinize whether it's going to put into

4    place today the actual RSA-led plan that's dictated by the

5    parties that are outside of the board of directors.

6            I have no doubt that if Your Honor approves the DIP

7    today that the bonds will trade even higher.

8            The nineteen to twenty points above par that Your

9    Honor will see and will hear through the testimony is

10   sufficient to pay the EFH Legacy noteholders in full.  You

11   will see evidence during the course of the trial that

12   demonstrates that the rights offering is a severe

13   undervaluation.  And we're talking billions of dollars on

14   valuation.  This is a big company.  We're not talking about

15   -- you know, around the corners there's a few hundred

16   thousand dollars lost.  You'll see evidence that shows that

17   the capital structure trades and the comps with which Oncor

18   trades trade at a multiple much higher than that implied by

19   the rights offering.

20           Look at what the PIKs did in terms of just the

21   renegotiation of their deal.  They got from sixty-four

22   percent to sixty percent in a day just to keep a lock on

23   this deal.  They know it doesn't matter because they pick it

24   up through the equity splits anyway.  But they show that

25   it's not done on the basis of what's an actual valuation

1    that's beneficial to the company.  But what it's done is on

2    a dictated number that indicates that they're going to get

3    an undervalued chunk of the equity to the exclusion of all

4    other parties.

5            By the way, the EFH Legacy noteholders, the non-

6    Fidelity Legacy noteholders, we were not invited to the

7    process whatsoever.  Nobody, even the documentary evidence

8    that we will see that shows that specifically they were

9    excluded from the process, and Fidelity, just because it was

10   the largest holder was the only one who was invited to

11   negotiate.  And what Fidelity did was Fidelity negotiated

12   for Fidelity.  And Fidelity takes nine percent down off of

13   this rights offering for itself.  At the end, it then allows

14   other EFH holders to come and participate in this nine

15   percent.  But that's after it itself has been paid for the

16   privilege of having invested the nine percent over the

17   course of the case.  So they're the ones that are being paid

18   the interest on the nine percent at the very outset.

19           And in addition to that, Your Honor, they're

20   getting an eleven and a half percent fee.  And the -- I'm

21   sorry -- an 11.25 million dollar fee.  And the 11.25 million

22   dollar fee is not one that is shared with any of the other

23   EFH Legacy Noteholders.  It's another benefit that Fidelity

24   gets that discriminates against the EFH Legacy noteholders.

25   And why did they get fee?  They get that fee solely because

1    the PIK parties did not allow them to backstop the rights

2    offering.  The PIK parties view the backstop as being so

3    valuable that they actually excluded Fidelity from doing it

4    but then they paid Fidelity as if it had participated in the

5    backstop.  So Fidelity, to the exclusion of all other EFH

6    Legacy noteholders, gets interest during the course of the

7    case and also gets an 11.25 million dollar fee that is

8    shared with no other Legacy noteholder.  That, Your Honor,

9    is unfair discrimination that's imposed by its DIP.  Not

10   even a plan.  We're not even at confirmation where we can

11   contest unfair discrimination.  This is a DIP that is

12   imposing unfair discrimination and setting forth the rights

13   offering.

14           I'll turn for a second to the settlement motion.

15   As I was trying to explain to the Court, what the settlement

16   motion does is by incrementalizing a balance sheet

17   restructuring, it eliminates the reorganization

18   possibilities for the settling class.  They disappear on the

19   date that this Court allows them to be paid.  There are

20   factors that actually this Court has adopted and has used

21   and that are found in the Third Circuit's Martin decision

22   that dictate when this Court is actually permitted even if

23   it looks at the settlement under a business judgment and

24   saying when is the Court actually allowed to approve a

25   settlement or when should the Court approve a settlement.

1          The evidence shows -- will show absolutely no

2     evidence of likelihood of success on the merits.  That's the

3     first thing that they need to show.  In fact, the company

4     says that there's absolutely no merit to the make-whole

5     settlement -- there's absolutely no merit to the make-whole

6     argument whatsoever.  They even have documents that say

7     there's a lowest chance -- or the percentage is very low

8     that there would be any success on the merits but yet they

9     introduce no evidence on that point but go ahead with the

10    fifty cent settlement.

11          There's no collection issues here.  There's no

12    funding issues here.  This is not complex litigation.  It's

13    largely contractual.  They've only settled with forty-three

14    percent of the class.  That means fifty-seven percent of the

15    class are going to litigate with them.  There's absolutely

16    no litigation that's being avoided by the settlement.  The

17    settlement -- I mean, the make-whole litigation will go

18    forward but it will go forward at the expense of the estate

19    because the estate will have already paid off the second

20    lien debt through the rights offering which, as I said,

21    eliminates reorganizational possibilities.

22          Your Honor, we submit that the pre-RSA transactions

23    must be viewed under heightened scrutiny.  The

24    undervaluation and the trading prices are the best indicator

25    of why this Court should be looking at it through heightened

1    scrutiny because it shows, by virtue of the fact that the

2    debtors never did a valuation and the market is implying a

3    gross undervaluation that this Court needs to look at this

4    transaction strictly and not simply say, well, the debtors,

5    even though they kept themselves uninformed on the most

6    critical aspect and the market is indicating that it's

7    different, I'm still going to just say it's okay because the

8    debtors had four board meetings.

9            It's also essentially a sale of all of the debtors'

10   assets before a plan.  Sixty percent of Oncor is -- and

11   Oncor is the only asset.  And so, when you think about a

12   sale of all the assets, you think about the standards where

13   Courts say, well, let's slow down.  In the context of a sale

14   of all of the assets, I'm not just going to look at the

15   business judgment.  This isn't, you know, a sale of one plan

16   or this isn't a sale of a very minor asset.  What this is,

17   is a sale of substantially all of the assets.

18           Similarly, the board here ran no process.  No

19   process whatsoever until one was forced upon it.  Its equity

20   was selectively given to members of its existing capital

21   structure.  It didn't go outside of the capital structure in

22   a no-bid auction.  I think all the points that Mr. Hessler

23   makes about improvements to the deal are also points that

24   the Court should understand in terms of what the process

25   actually was because each one of those things could have

1   been eliminated in a competitive auction process if the

2   debtor had chosen to have one.  Instead, the board blindly

3   accepted the dictated equity conversion without negotiation

4   and without informing themselves of a valuation.  Under

5   those circumstances, the debtors simply may not rely on

6   business judgment.  If it's not entire fairness, Your Honor,

7   then it must be viewed as heightened as a sale of

8   substantially all the equity to a chosen party not subject

9   to the process.

10          With that, Your Honor, we respectfully request that

11  both motions be denied today and we proceed on a normal path

12  towards a confirmation of a plan in which a rights offering

13  or the value of Oncor can be tested on a normal basis

14  through its disclosure statement.  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          MR. MARTIN:  Good afternoon, Your Honor.  Ross

17  Martin, Ropes & Gray, for CSC Trust Company of Delaware

18  which is the indenture trustee for the first lien notes and

19  the collateral trustee.

20          Your Honor, CSC has a number of issues and those

21  include echoing many of the arguments you've already heard,

22  a few I think you're going to hear in a moment from the

23  second liens and we have some variance on those arguments of

24  our own.

25          Where I saw the number of issues that the Court

1    will have to decide even if the DIP and settlement are

2    approved to the affected status on appeal such as a 364(e)

3    finding and the requested waiver of the stay.  But we'll set

4    those aside for closing.

5         What I specifically want to take just a few minutes

6    to talk about now are the issues raised with respect to the

7    intercreditor agreement among the debtor, the first liens

8    and the second liens.  Now I'm not proposing to walk through

9    the merits of those intercreditor arguments here.  We filed

10   an adversary proceeding just four days after the debtors

11   unveiled their scheme to use these motions on the settlement

12   and the second lien DIP to affect intercreditor rights.  But

13   those matters will now be litigated in due course in the

14   separate adversary.

15        What is worth talking about now is how the debtors

16   are proposing to use these motions to preclude litigation

17   over the intercreditor issues and why the proposed relief

18   does not provide appropriate protections.  Again, we'll get

19   into the details of that in closing but just at a high level

20   and to set up some of the evidence.  To be clear, what the

21   debtors are now proposing is the structure of the

22   transactions in order to benefit the RSA parties and

23   specifically the settling second lien noteholders, in

24   particular.  And they propose to do that in ways that will

25   prejudice our intercreditor rights.

1           We simply are focused on the intercreditor issues

2      on three things that we want.  One, we want the money, both

3      for settling and non-settling folks, to go with the

4      documents the debtors' own documents say it's supposed to

5      go.  It's supposed to go to certain intermediaries which are

6      the subject of our intercreditor adversary.  Two, we don't

7      want this litigation to substantively or preclusively affect

8      the merits of that litigation.  And three, once the money

9      lands in the hands where it's supposed to go, in those

10     intermediary hands, we  don't want these orders to be

11     directing those intermediaries to take some other step.  And

12     all three of those things have been put in play in what the

13     debtors are asking for.

14          Now you're going to hear some testimony about this.

15     It's not going to be the bulk of the testimony you'll hear

16     but we wanted to just focus the Court on this as we prepare

17     to go to the witnesses.  Testimony about what the debtors

18     have done historically with respect to their payment

19     practices; his testimony about the fact that the debtors

20     have tried to use this process that's been going on along

21     with the other processes you've been hearing about to try to

22     structure these transactions around that in order to

23     improperly affect our rights.

24          You're going to hear testimony about how the

25     debtors actually didn't even move for this relief initially.

1    And that the debtors themselves are trying to take actions

2    and contravention of the collateral trust agreement and

3    other documents.  So those are the principle things I wanted

4    to focus on very briefly.  We also will, just to give the

5    Court a little bit of a roadmap, we'll have testimony also

6    with respect to the appellate (indiscernible 12:29:07)

7    issues and some of the need or, as we would put it, lack

8    thereof, lack of need of a quick closing.  But we wanted to

9    just outline those issues this morning.

10             THE COURT:  Thank you.

11             MR. MARTIN:  Thank you.

12             MR. MAYER:  Good afternoon, Your Honor.  For the

13   record, Thomas Moers Mayer of Kramer Levin Naftalis &

14   Frankel LLP, counsel to both Computershare as EFIH second

15   lien trustee and to institutions holding approximately

16   fifty-three percent of all EFIH second lien notes.  We filed

17   objections to both the settlement and the DIP and I'm going

18   to talk about the settlement 'cause you've heard a lot about

19   the DIP so I'll come back to the DIP.

20             We're not challenging the settlement under Rule

21   9019.  It's not that it's unreasonable, it's that it's

22   unlawful.  We challenge under 1123(f)(4).  We believe now

23   and always believed that it discriminates, it pays the RSA

24   supporters more than it offered to pay anyone else.  We

25   think that's discriminatory and I note in this connection

1    that this is different from a first lien settlement that you

2    approved.  At the time you approved the first lien

3    settlement, you specifically found that the first lien

4    settlement did not, as a matter of fact, discriminate.

5    Therefore, there was no lien to reach the issue of whether

6    or not, as a legal matter, the debtors could discriminate.

7            The evidence that you will hear today, Your Honor,

8    will show that the debtors did discriminate.  They set out

9    to discriminate; they succeeded.  The evidence will show,

10   the documents are clear on their face, that the debtors

11   offered Fidelity at least sixty-three cents, probably more.

12   There are e-mails saying we'll give you 1.22.  There are

13   term sheets.  There are provisions in the RSA.  And one of

14   the unedifying spectacles of the depositions was watching

15   individuals try to explain why the documents that they sent

16   and approved don't mean what they say they mean.  Mr.

17   MacDougall, EFH director, says his e-mail offering 1.22 to

18   Fidelity for its second lien notes doesn't really mean he's

19   offering 1.22 for its second lien notes.

20           The debtors' term sheets offering 1.22 for Fidelity

21   seconds, well, Mr. MacDougall says those are wrong and it's

22   not his job to correct them.  The RSA provisions explicitly

23   offering Fidelity a premium.  Mr. Rosenbaum says those are

24   irrelevant.  The documents don't lie, as Mr. Vangouser (ph)

25   for Fidelity himself said.  The RSA says what it says.

1          The legal arguments, Your Honor, in our papers --

2     and I won't spend a lot of time on them.  I summarize them

3     very briefly as follows:  equal claims must precede equal

4     treatment unless a creditor agrees to take less.  And

5     that's -- as I understand it, that's the law.  The debtors

6     argue that equal claims precede equal treatment unless the

7     debtors decide to pay them more.  And I think that's wrong.

8     The debtors' answer to everything has been, well, what the

9     seconds (indiscernible 12:32:39) for a hundred percent of

10    their make whole and if they would now get paid in cash,

11    everything (indiscernible 12:32:45) all cram down paper.

12    And as we show in our papers, this has never been a

13    sufficient answer.  Paying Fidelity a lot more without a

14    litigation is not equal to the choice between fifty percent

15    and litigation.

16          But in the last three days, the debtors have made

17    this a lot worse.  Mr. Martin referred to this.  As you

18    know, and as Mr. Martin referred to being first liens -- and

19    I am always in the EFIH category, Your Honor, when I say EFI

20    firsts and seconds, I mean EFIH firsts and EFIH seconds.

21          The first liens have sued my client, Computershare,

22    indenture trustee and paying agent to prevent it from

23    disbursing about 432 million dollars to pay second lien

24    noteholders under the second lien settlement.  We made the

25    point in our objection that this was going to cause the

1   debtors to pay interest twice because the 432 was going to

2   hang up and they'd have to pay interest on the notes and

3   then have to pay interest on the DIP.

4           The debtors responded on Friday with the argument

5   that payment to the paying agent that couldn't be used to

6   pay the notes was payment of the notes going to stop payment

7   of the interest under Section 208 of the indenture.  We

8   think this is clearly wrong.  It's in violation of Sections

9   401, 807 and 1202 of the indenture.  It's in violation of

10  collateral trust Section 2.4(d).  It is not -- this is not

11  the time and the place for me to take the Court through a

12  detailed documentary submission.  We'd be happy to brief

13  this and we think it needs to be briefed because in a

14  desperate effort to avoid, this results.  And to stop the

15  accrual of interest in the last two days, the debtors have

16  snuck into their second lien DIP order relief that they have

17  never asked for.  I have a copy of that order and I can hand

18  it up.  It may just be useful to the Court to have it in

19  front.  Would it be possible?

20          THE COURT:  Yeah.  That's fine.  We're talking

21  about the same paragraph.  I think I already know but go

22  ahead.

23          MR. MAYER:  Now this is paragraph 13.  It appears

24  on pages --

25          THE COURT:  Right.

1          MR. MAYER:  -- 26 and 27 of the redline.  And

2     basically, paragraph 13 asks for a finding and it asks for

3     an order.  As for a finding, the payments to the paying

4     agent, even if it can't be used to pay the notes,

5     constitutes payment.  Which, by the way, the necessary

6     corollary of this is that after telling the Court and

7     telling the public securities markets that you can only

8     stick around and litigate the full payment, the debtors are

9     now taking the position that we might end up 432 million

10    dollars short permanently which I don't think will happen.

11    I think the -- on the merits, we disagree with the first

12    liens.  We don't think they're going to win.  But there's no

13    way this money is going to move until that issue is decided.

14          Now they say that money that can't be used to pay

15    the notes constitutes payment.  Well we should have a little

16    briefing on that.  To ask this Court to make that finding

17    today on no briefing, on no request is, I submit, just

18    improper.  It's not due process.  By the same token and even

19    worse, they then ask for an order compelling Computershare

20    to disburse money to the noteholders even if that creates

21    liability on behalf of the paying agent and trustee.  And

22    again, they never asked for this.  There's no pleading.  No

23    authority is given on how they can force an intermediary to

24    pay money at the risk of its own financial status is beyond

25    me but they ask for it.  And they've done it on no notice

1    and without any requests.

2           Finally, and this is really sort of icing on the

3    cake, buried in an order on the settlement agreement -- and

4    I don't have an extra copy of this.  And this was a brand

5    new order.  I believe it was also filed on June 26th.

6    Again, Your Honor, may I approach?  I only have the one

7    copy.

8           THE COURT:  Yes.  Oh yeah.  No, this is the

9    language I had seen.  Okay.

10          MR. MAYER:  Paragraph 7 asks this Court to enter an

11   order, provides this Court to enter an order prohibiting any

12   intermediary from consulting counsel on the validity of the

13   transaction.  I've never seen this in my life.  That's how

14   the desperate the debtors are to get this done.

15          Now I understand that these are all issues that can

16   be litigated and we're prepared to brief them expeditiously.

17   But the notion that you would force a paying agent and an

18   indenture trustee to make a payment at the risk of its own

19   financial standing without a formal request, without

20   briefing and without any real notice -- well, I don't think

21   it's proper.  I think the orders that have been submitted

22   are defective on their face.

23          Okay.  I think that's enough on the settlement

24   agreement.  As I said, you will hear testimony to the effect

25   that it is discriminatory.  I want to turn to the proposed

1    DIP.  And you hear a lot about why the proposed DIP

2    shouldn't be approving -- endorsing necessarily all of the

3    arguments.  I'm going to refer to it as the PIK DIP because

4    it is a DIP funded by the PIK notes.  And it's going to be

5    useful for me to refer in shorthand to the PIK notes.

6            We believe the evidence will show that this

7    marketing process was in effect and completely drama like.

8    It was done for show.  The evidence will show the debtors

9    never marketed the PIK DIP before bankruptcy.  The debtors

10   talked to us only when they absolutely had to.  They never

11   make anything that might be called a counteroffer.  Yes,

12   they told us what they didn't like about our DIP but they

13   never told us what it would take to win a round.  And we

14   understood there'd be many rounds.  We're always betting

15   blind.  And that's because the debtors' management has

16   always viewed itself as working for the PIKs.  You can see

17   that in today's orders which had a decretal paragraph

18   allowing the PIK's claims in full and providing for payment

19   of the PIK indenture trustee's fees.  Now don't get me

20   wrong, Your Honor.  I represent an indenture trustee and I

21   think indenture trustee's fees should be paid.  But this one

22   is sort of a new one on me because that's also, I think, a

23   new provision in the order.  Again, no notice, no pleadings,

24   no nothing.  It just says the PIK's indenture trustee's fees

25   will be paid.  Okay.  I don't have a substance objection;

1    it's not really my mind but we think it's indicative of the

2    rest of the process.

3           Okay.  You've heard reference to an auction and Mr.

4    Hessler spent a lot of time talking about how this is the

5    greatest DIP in the history of the world because there's a

6    completely unfettered fiduciary out there.  No fees.  Anyone

7    can come by and take us out whenever they want.  Your Honor,

8    that's a fake.  No stip has approved this auction will end

9    and I can show in an argument and we will prove it in

10   testimony.  Four steps to lock up.  One, it is not contested

11   that a competing bidder can compete only in conjunction with

12   creditors of EFH and EFIH.  The tax laws require that.  So

13   it's not like there's this open avenue where anyone can come

14   in and bid.  It doesn't work that way.  You can only do it

15   if you're doing it in conjunction with EFI's creditors or

16   the EFI creditors.  Point one.

17          Point two.  The debtors have already paid off the

18   EFIH first.  They're trying to pay off the EFIH seconds.

19   That leaves the PIKs and the EFH Legacy notes.  The notes

20   are the only two constituents left through whom a competing

21   bidder can compete.  And the PIKs have an option to buy

22   about seventy percent of the EFH Legacy notes on five days'

23   notice.

24          So if you approve this DIP, the PIKs (indiscernible

25   12:41:26), no one will be able to compete without the PIKs'

1    consent.  That's been the drumbeat through all of these

2    negotiations.  Do you have the PIKs' consent?  Do you have

3    the PIKs' consent?  Do you have the PIKs' consent?  Of

4    course we don't have the PIKs' consent.  The PIKs are

5    trading at over 120.  The bids that you've seen show that

6    the PIKs are obtaining well more than they'll allow them out

7    of their claims.  So no, they are never going to consent.

8    And all of this bit about all of the fees have come down and

9    we have the unfettered right to go to a competing bidder --

10   it's a fake.  The evidence will show that the only way for

11   competition for these assets to proceed is if there are EFIH

12   and EFH claims were (indiscernible 12:42:12) on as an avenue

13   for a competing bid.  And once this settlement and this DIP

14   is approved it's game over.

15            Now I return, in closing, to the question of why we

16   care because I know Mr. Hessler likes to go there.  I don't

17   think they're going to get paid 100 cents if they win.  Why

18   do they care?  Well, I want to sort of put a reservation on

19   the record which is we do think we are going to win even if

20   this estate is insolvent.  We think it's pretty clearly

21   solvent.  But we do believe we're going to win if this

22   estate is insolvent.  We're being redeemed before our set

23   maturity or call dates.  That's the only way to describe a

24   proposed settlement which forces us to take cash on a date

25   we don't want.  Our indenture provides for the premium -- a

1  make-whole premium upon redemption and provides upon

2  acceleration for payment of principal, interest, premium, if

3  any, and other amounts.  We think our documents are good

4  enough for us to win even if we're just fighting the battle

5  on (indiscernible 12:43:16) we're an oversecured creditor

6  and our documents give us our make whole.  But being

7  realists, and I think the evidence will show, that we have

8  not, as has previously been said, been unwilling to

9  negotiate our make whole.  We have put offers on the table.

10  We have tried to have discussions that were all in the

11  nature of sort of one-way, we say things and nothing comes

12  back.

13          We recognize this is a litigable issue.  And in our

14  judgment, which I think is a reasonable judgment, if

15  everybody is getting paid in full, our odds of getting our

16  make whole in full go up.  And that's why we care.  That's

17  why we care that debtors come in to pay everything in full.

18  Because if, in fact, all the EFIH claims are paid in full,

19  we can't believe a make-whole claim will be denied if the

20  beneficiary of that denial is either junior equity or PIK

21  notes who are already getting more than a hundred cents on

22  the dollar.  So that's why we care.  That's why we brought

23  NextEra to the party.

24          Your Honor, this is not a fragile case, not

25  anymore.  Usually, a debtor comes into court with a

1    restructuring agreement that says you got to get this done

2    because it's going to blow up and there's going to be

3    catastrophe.  There will be riots in the streets.  The

4    estate will dissolve in a public of ash.  Your Honor, in the

5    last two weeks, we have NextEra who is in this courtroom and

6    is a strategic buyer with a (indiscernible 12:44:48)

7    checkbook.  But it's an enormous checkbook.  We have the

8    Hunt family.  They showed up two days ago.  They want to bid

9    for this company.  This is a hot auction unless you approve

10   the DIP and the settlement offer because then it's game

11   over.

12            One last thing.  I'd just like a status on the RSA.

13   I heard that there are all of these amendments pushing the

14   dates.  I'm just curious.  Has that actually been signed off

15   by everybody?

16            THE COURT:  I don't think you could ask questions.

17            MR. MAYER:  All right.  You know, I think we should

18   because our understanding is that it hasn't, by the way.

19   But for whatever that's worth, we understand that that

20   amendment has been out for signature and it actually hasn't

21   been signed.  And that's because people are looking to see

22   if there's more value coming in.  I think there is more

23   value coming in.  I think a good chance that it's going to

24   end up at a EFH after our make wholes have been paid in

25   full.  And what happens to it then?  It's not ours to say.

1    There are people who say that the only reason there is value

2    here is that the TCEH firsts are playing the -- have agreed

3    to play along on a step-up basis and they did so because

4    they thought the value at EFH was limited.  And, guess what?

5    If it turns out that there's a ton of value coming in to EFH

6    then I think they should be compensated for it which is a

7    reasonable position.

8              But in any event, don't call the game over, Your

9    Honor, because there's a lot of innings left to play if

10   you'll only let the players play.

11             I have nothing further unless the Court has

12   questions.

13             THE COURT:  No.  Thank you.  How many more parties?

14   Mr. Shore, you, and who else wants to be heard?

15             MR. SHORE:  I'll be brief, Your Honor.

16             THE COURT:  Okay.  Anyone -- all right.  Good.

17             MR. SHORE:  Thank you, Your Honor.  Chris Shore

18   from White & Case on behalf of the ad hoc group of TCH

19   noteholders.  Maybe a little levity before lunch would be

20   helpful.  My dad loves to tell a great shaggy dog story of

21   the time he took my grandmother to buy her first car about a

22   year after my grandfather died.  And they go and she

23   expresses reticence at buying a car and the dealer has

24   really got his hooks into her and he starts selling.  He's

25   got her a new floor mat.  He's got her an AM/FM radio.  He

1    can do a warranty package.  My dad sits down at the desk --

2    the metal desk to negotiate the price, what they're really

3    there to do.  And to his horror, my grandmother opens up her

4    purse, takes out the checkbook, takes out a pen and says how

5    much do I owe.

6         This deal is too early in this case to be cutting

7    it.  First -- I guess five reasons.  First, if they've got

8    material terms being negotiated the day before the hearing,

9    that tells you that we're not there yet.  If they've reached

10   the best in final deal on the day of this hearing, it's

11   purely a coincidence that they've reached equilibrium today.

12        Two, as everyone said, there's been no market test

13   for the Oncor asset.  That's the asset being sold.  The fees

14   is great.  They're getting rid of all these other fees.  But

15   we're here to talk about the price of the equity.  No one's

16   here for the fee opportunity.  People are here for the

17   equity.  The fiduciary out, as Mr. Rosner pointed out, is an

18   insufficient substitute for debtor actually going out and

19   knocking on doors and trying to market this.  Their saying

20   we will accept incoming calls is not the same as having

21   their talented FAs going out and beating down the bushes to

22   try to raise the best price for the equity.

23        Three, an attempt to justify why they want to have

24   the pen out right now and sign right now.  We've now got an

25   argument that appears in the papers and I doubt will come

1    through in any evidence that this is a wasting asset, that

2    the equity is subject to market concerns and the debtors

3    want to lock in now for the downside.  As I said, I don't

4    think you're going to get any evidence on that.  In fact, it

5    runs completely contrary to their thesis of why they were

6    doing this deal in the first place, that EFIH was solvent --

7    balance sheet solvent but they had cash flow problems they

8    needed to fix.  And now what they're doing is moving from an

9    accrual of interest to voluntarily making themselves pay

10   interest to a DIP lender on a current basis.  Again, as Mr.

11   Rosner pointed out, they can't be restructured.

12            Three -- I'm sorry -- four -- no.  We're on three.

13   The problem -- the problem with this notion that what

14   they're doing is they're locking in is they're really not

15   locking in anything right now.  Section 4.7(e) of the notes

16   purchase agreement, which is the outs on the equity

17   conversion, makes the equity conversion, their right

18   essentially to put the equity subject to the RSA remaining

19   in effect.  So we could go through this whole hearing.  We

20   could have the approval of this.  And if you don't approve

21   the RSA on July 18th -- and I'm sure all these other people

22   are going to be here arguing it then -- they don't have an

23   equity commitment at that point.  Or, if any time after

24   that, there is a basis for terminating the RSA or they don't

25   get an approval from the IRS, that equity commitment that

1    they're trying to lock in right now vaporizes.

2           Point four.  Even with the fiduciary out, under

3    this field that they've put in, we can't get back to the

4    status quo ante.  The premise of this is that they're going

5    to defease the existing second lien notes.  They're going to

6    pay their pre-petition claims in full.  There is nothing in

7    the record, either on the settlement or on the DIP, that

8    there has been any analysis by an estate fiduciary of the

9    collateral package or of any claims against the second lien

10   lenders.  The debtors essentially admit as much by saying in

11   their reply papers, you can have a reservation of rights

12   with respect to the non-settling seconds.  Feel free to

13   attach their liens and claims.  But you can't attack the

14   liens and claims of the settling second lien lender.  Why?

15   If the debtors haven't done the analysis to determine

16   whether or not the UCC was filed in the right place or

17   whether they have an equity claw right or whether the second

18   lien liens are infected by the LBO, how can they settle with

19   the settling second lien lenders at this point?  There's got

20   to be a process run by an estate fiduciary not by the EFIH

21   PIKs who hold claims everywhere whereby Fidelity, which

22   holds claims everywhere, there needs to be a process by

23   which we're determined that people who are being paid their

24   pre-petition claims are actually owed those pre-petition

25   claims.

1         Five and finally, all of this is being done without

2     any analysis of what Mr. Peck referred to as the TCH claims.

3     It's been our thesis from the beginning of the case that the

4     TCH is a material creditor of both EFH and EFIH starting

5     with the premise that while the TCEH debtors were insolvent,

6     according to Mr. Keglevic -- in 2013, they paid 2.2 billion

7     dollars to affiliates.  We have to look at those claims.  We

8     filed our 2004, as you'll hear at the end of this hearing.

9     We're still not even there on the 2004.  And, you know, the

10    amount of documentation that has been produced to date is

11    woefully inadequate.  There needs to be a sequence here.

12    The debtors just filed their schedules.  On those

13    schedules -- I haven't reviewed them but I'm told TCEH is

14    scheduling a 773 million dollar claim against EFH.  TCEH may

15    be the largest creditor of EFH.  The TCEH board has not met

16    on an EFIH DIP.  They haven't met on the equity splits.  How

17    can the TCEH board as the largest creditor of EFH be

18    standing back and watching the equity splits occur or

19    allowing Fidelity, which is a smaller creditor, to take the

20    fees?  There's a reason for process.  There's a reason for

21    sequencing.  And when they try to jump ahead of this, that's

22    where we all get into problems.

23         So what we're saying is, the debtors should put the

24    pen back.  And if they insist on taking the pen out at this

25    point, Your Honor should tell them no.  If they can arrange

1    a DIP that takes out the second liens in a manner that

2    allows some kind of clawback and without any kind of equity

3    conversion or anything like that, the bells and whistles of

4    a plan, we can address that.  But that's not what's on the

5    table.  They're trying to go too fast here with what all the

6    creditors you're hearing from who aren't getting the deal

7    right now believe is a bad decision on their part.

8              THE COURT:  Thank you, Mr. Shore.

9              MR. JONAS:  Good afternoon, Your Honor.  Jeff Jonas

10   from Brown Rudnick on behalf of WSFS, trustee for the second

11   liens.

12             Your Honor, we filed a joinder to the objections of

13   the committee and the TCEH unsecured noteholders.  And

14   including for the sake of efficiency, we intend to permit

15   the primary objectors to handle today's proceedings, but I

16   wanted to rise to make sure the Court was aware that we

17   fully support those objections to the debtors' proposed EFIH

18   second lien DIP and settlement.

19             Also, Your Honor, to that end, I wanted to ask

20   that, as this hearing unfolds, the Court ask itself one

21   question.  Where is the fiduciary looking out for the

22   interest of TCEH's second liens and unsecured creditors?

23   These proposed E side transactions, Your Honor, provide no

24   benefit and, in fact, only detriment to TCEH's second liens

25   and unsecured creditors.

1           Mr. Keglevic has admitted that as of today, there

2    is no quantifiable benefit to the T side debtors.  In fact,

3    the T side debtors are giving up potentially valuable

4    intercompany and other claims for little or no

5    consideration.  Yet, Mr. Keglevic admitted that the T side

6    debtors' boards have not met to consider the transactions

7    now at hand and Mr. Keglevic, who as you know from previous

8    testimony, sits on both E side and T side boards, is

9    hopelessly conflicted.  In the past, when faced with this

10   exact problem, Your Honor, the conflict at the board level,

11   the debtors have tried it out.  The T side -- four T side

12   creditors, the allegedly independent T side director, Hugh

13   Sawyer.  Yet, Your Honor, Mr. Sawyer has admitted that he

14   doesn't recall reviewing the EFIH second lien DIP motion.

15   He doesn't recall whether the TCEH board considered the EFIH

16   first or second lien DIPs.  He's aware that objections had

17   been filed but he hadn't reviewed them.  So, Your Honor, the

18   debtors come before the Court with the proposed EFIH second

19   lien DIP and settlement initially on very bad economic terms

20   which included a 380 million dollar optional redemption fee

21   which would be due and payable if the debtors ever exercised

22   their alleged fiduciary out to do any other plan or deal.

23           Under those terms, Your Honor, the alleged

24   fiduciary out was no out at all.  The economics of ever

25   exercising that out was so detrimental as to make that out

1    nothing more than window dressing.  Of course, over the past

2    few days after being faced with numerous objections and

3    competing DIPs, the debtors have slowly improved their

4    economic terms.  And that's included reducing the prepayment

5    fee ultimately to today and that fee being zero.

6           The question is, Your Honor, why is it that it's

7    taken this process to get to where we are today.  Why is it

8    that it's taken objection and competing DIPs in order to get

9    these debtors to act responsibly.  At present, Your Honor,

10   the TCEH second lien and unsecured creditors have no

11   fiduciary.  For that reason, as we've raised at prior

12   hearings, the Court, as it hears the testimony today, should

13   consider reviewing the transactions proposed today and in

14   the future including in connection with the RSA on a higher

15   level of scrutiny and should not defer to the debtors'

16   business judgment.  It is also why, Your Honor, in this

17   case, in which valuation of the T side debtors is so

18   critical that such valuation take place sooner rather than

19   later.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22          MR. KAPLAN:  Good morning -- I'm going to step

23   here.  I guess afternoon, Your Honor.  Gary Kaplan from

24   Fried Frank on behalf of Fidelity.

25          Your Honor, I rise just to reserve for closing any

1    possible statements or arguments that don't -- and I presume

2    other parties will as well but I don't want to just belabor

3    this and so, I guess, to be able to get on to the evidence.

4            THE COURT:  All right.  Thank you, Mr. Kaplan.

5    Anyone else?  All right.  The next proposal would be to turn

6    to the debtor providing evidence.  Okay.  Well, we're going

7    to take lunch.  We'll reconvene promptly at 2:15 and we'll

8    get right into the evidence.  Thank you.

9        (Whereupon, Court recessed from 12:59 until 2:18 p.m.)

10           THE CLERK:  All rise.

11           THE COURT:  Please be seated.  Excuse me.

12   Goodness.  Any time.

13           MR. MCGAAN:  Thank you, Your Honor.  Andrew McGaan

14   for the debtors.  Before we call our first witness, Your

15   Honor, I just wanted to share with the Court I think some

16   understandings we've reached with the objectors on how to

17   handle evidence to see if it's acceptable to Your Honor.

18           We have a series of, well, four transcripts of

19   depositions that were taken.  And there's been a sharing of

20   designations from those transcripts.  And the plan is that

21   at the end of the day today, we'll supply Your Honor jointly

22   with a set color-coded of the four transcripts so you'll be

23   able to see who designated what.  And the four witnesses are

24   Chuck Cremmons, independent board member -- the four

25   witnesses -- Chuck Cremmons, EFIH independent board member;

1    Michael McDougal (ph), an EFH director and a managing

2    director of TPG, one of the equity sponsors; Jeff Rosenbaum

3    from York Capital; and Nate Vangouser from Fidelity.  So

4    those are the four witnesses from whom you'll have marked up

5    transcripts.  And we'll give you a set at the end of the

6    day.

7              THE COURT:  Okay.

8              MR. MCGAAN:  With respect to exhibits, my intention

9    is, at least for this afternoon, I've got a very small

10   number of exhibits I intend to offer.  I doubt they'll be

11   controversial.  And I hope to be able to put them in

12   evidence today.  But we are most certainly going to go into

13   tomorrow.  And we have from the objectors a large set -- you

14   might have a set up there, a green binder --

15             THE COURT:  I do.

16             MR. MCGAAN:  -- with over 100 exhibits.  There's a

17   chunk of those that are exhibits that were used in

18   depositions, the portions of which were designated.  Parties

19   are going to work out tonight whether we really have any

20   issues over the admissibility of some or all of those.  And

21   hopefully tomorrow then, or at the conclusion of the

22   evidentiary portion, be able to submit to Your Honor maybe

23   what's agreed as admissible.  And if there is one, two,

24   three documents, something -- I don't want to make any

25   promises but if there is some small number, we can take it

1    up with you either today, if it arises, or tomorrow, if we

2    can't reach complete agreement, if that's all right.

3            THE COURT:  Okay.

4            MR. MCGAAN:  As Mr. Hessler said, the debtors

5    intend to call in this order, David Ying and then Paul

6    Keglevic.  So if we could proceed?

7            THE COURT:  Yes.

8            MR. MCGAAN:  All right.  The debtors call Mr. David

9    Ying.

10        (Witness sworn)

11           THE CLERK:  Please state your full name for the

12   record and spell it.

13           THE WITNESS:  My name is David Ying, Y-I-N-G.

14           THE CLERK:  Thank you, sir.

15   DIRECT EXAMINATION

16   BY MR. MCGAAN:

17   Q    Good afternoon, Mr. Ying.

18   A    Good afternoon.

19   Q    You've got some binders up there.  I don't think I'm

20   going to direct your attention to any of them but if you

21   need to turn to them, someone will point to the right one.

22   So don't worry about that.

23   A    Thank you.

24   Q    Would you remind the Court again where you work?

25   A    I work at Evercore.

1    Q    And it's the case that you last testified in this court

2    regarding the first lien DIP and make-whole settlement

3    motions on June 6th, correct?

4    A    Yes.

5    Q    And when was Evercore retained in this case?

6    A    In July of 2012.

7    Q    For what purpose?

8    A    To be the company's financial advisor.

9    Q    All right.  You understand that today you've been asked

10   to testify in support of two motions that are in front of

11   the Court for approval, firstly, a motion to approve the

12   EFIH second lien's DIP financing, correct?

13   A    That's correct.

14   Q    And a motion to approve a proposed settlement of make-

15   whole claims by second lien noteholders, correct?

16   A    Yes.

17   Q    Have you, in your capacity as a financial advisor to

18   the debtor, provided advice and assistance to the company

19   with respect to its efforts to obtain second lien DIP

20   financing?

21   A    Yes, I have.

22   Q    What has your role specifically been in that regard?

23   A    Well, as the leader of about a dozen people at

24   Evercore, we work very closely with the management team, led

25   by Paul Keglevic and Stacey Dore as co-chief restructuring

1    officers as well as counsel Kirkland & Ellis in trying to

2    find second lien DIP financing for EFIH.

3    Q    Okay.  And what has your role been specifically with

4    respect to negotiation of the DIP financing?

5    A    We have been involved in some direct discussions with

6    various providers of the second lien DIP.  We've evaluated

7    carefully every proposal.  And every time we see a new

8    proposal, we review it and give the company our advice with

9    respect to its appropriateness and its relative

10   attractiveness to other proposals.

11   Q    With respect to the proposed settlement of make-whole

12   claims, here, what's your role been in advising the debtor

13   on that?

14   A    Well, we've been party to the various negotiations that

15   went on between the interested parties, namely, the EFIH

16   unsecureds and the EFH and Fidelity and a major hold, the

17   second liens that led to the agreement on the settlement for

18   the second lien notes at EFIH.

19   Q    And has your advice around the proposed make-whole

20   settlement gone specifically to the impact on the debtors'

21   estates both financially and in terms of its restructuring

22   efforts?

23   A    Yes, it has.

24   Q    All right.  So let's talk first about the proposed DIP

25   financing, okay?

1    A    Sure.

2    Q    I'd like to begin by having you tell the Court what the

3    debtors are seeking to accomplish by this DIP financing.

4    A    Well, EFIH, as an entity, has two problems.  One, it

5    has way more debt than it can support; and secondly, the

6    interest rate on the debt that it has is much higher than it

7    can support.  So it has those dual problems.  And that is a

8    problem that the company has been trying to address for a

9    very long time.

10   Q    How does the proposed DIP facility address the problem

11   of interest cost and de-leveraging that you just referred

12   to?

13   A    Well, the proposed DIP facility of a billion nine will

14   help enable EFIH to repay the sole -- 2.51 billion of second

15   lien notes outstanding.  The interest rate on the DIP is six

16   and one quarter percent.  The average interest rate on the

17   existing second lien notes is approximately twelve percent

18   today including additional interest.  And so there's a

19   significant interest savings with the repayment.

20   Q    You were here in the courtroom when there was some

21   argument from the objectors regarding these proposed

22   motions, is that right?

23   A    Yes, I was.

24   Q    And did you hear one of the objectors inform the Court

25   that there really is no debate about the tax consequences of

1    a deconsolidation here if not done in a particular fashion?

2    Did you hear comments to that effect?

3    A    I did.

4    Q    Does the proposed DIP and make-whole settlement here

5    play any role in the debtors' efforts to avoid a

6    deconsolidation tax?

7    A    Very much so.  The deconsolidation tax refers primarily

8    to either TCEH or EFIH de-consolidating from the parent,

9    EFH, in a typical bankruptcy restructuring where debt gets

10   converted into equity.  In the case of TCH, debt converting

11   into equity of TCH.  That generates a tax at EFH.  EFIH

12   converting debt into equity because it has too much debt

13   triggers again a potential deconsolidation tax at EFH of its

14   own.  So in -- so those two taxes are put in paramount in

15   the company's mind in terms of trying to avoid triggering

16   those taxes.  And obviously, a provision of the second lien

17   DIP is that it mandatorily converts not into EFIH stock but

18   into EFH stock.  And that thereby helps avoid the

19   deconsolidation tax that'd be triggered if EFIH were to

20   deconsolidate.

21   Q    Well, I'm going to ask you a little bit about this

22   shortly, but has the avoidance of the deconsolidation tax

23   that you're referring to been something that's been

24   discussed in the negotiations with the different creditor

25   constituencies bidding on the second lien DIP?

1   A    Yes.  The fact that there's a deconsolidation tax at

2   either entity has been discussed at great length with each

3   of the various constituencies.  It's been unlike any other

4   restructuring I've been involved with where, aside from the

5   typical challenges or restructuring presents, the tax

6   considerations have overlaid all of the restructuring

7   discussions to a very material extent.

8   Q    Have any of the proposed DIP lenders who have, again,

9   been bidding on the DIP facility suggested to you that they

10  didn't understand or were incapable of addressing those

11  issues in their proposals?

12  A    In the case of each of the constituencies who has made

13  a proposal to do a second lien DIP at EFIH, we have had

14  specific meetings or conference calls where professionals,

15  both financial, restructuring, tax have all been present and

16  the tax aspects of the proposal and whether that fits the

17  requirements to accomplish the tax free spin of TCH has been

18  a central issue which has been discussed back and forth

19  between each of the parties.

20  Q    Okay.  I'd like to turn to the key terms, the high

21  level, the proposed DIP facility.  Let's begin with the size

22  of the facility.  What is it and what does it consist of?

23  A    The second lien DIP facility being proposed by the

24  unsecured notes at EFIH is a 1.9 billion DIP facility.

25  Q    New money?

1    A     It's all new money.

2    Q     All right.  There's been some -- there was some

3    discussion from Mr. Hessler today about a change and was

4    referred to as the PIK funding fee.  Do you recall that?

5    A     Yes.

6    Q     Can you explain to the Court what that is and what the

7    current state of that proposed term is with regard to the

8    DIP facility?

9    A     The original incarnation of the DIP funding fee in the

10   amount of five percent of a billion nine of 95 million was

11   that it would be issued in the form of non-interest paying

12   what they call Tranche B notes.  The Tranche B notes rank

13   pari passu to the Tranche A notes which would be represented

14   by the billion nine of cash investment.  Both the billion

15   nine and the 95 million would all collectively convert into

16   now it's sixty percent of the equity of a restructured EFH.

17   And the question at hand had been if before conversion the

18   debtor decided to instead of allowing conversion of the

19   second lien DIP into sixty percent of equity, if the debtor

20   chose to refinance the DIP facility by paying it off, how

21   much would be owed to the second lien DIP providers.  Until

22   last night, the debtor would have had to pay a billion 995

23   after the change that the second -- the unsecured committee

24   has made to pay off the second lien DIP.  We do not have to

25   pay a billion 995 back.  We only have to pay the money they

1    invested, a billion nine.  So the net effect of the 95

2    million, PIK funding fee, which is what it's called, is

3    essentially to just reallocate who owns the sixty percent

4    equity when the DIP converts amongst the various

5    participants in the DIP.

6    Q    Does it cost the debtors anything at this point?

7    A    It costs us nothing.

8    Q    All right.  Would you tell the Court what the debtor

9    plans to do with the proceeds of the DIP facility?

10   A    The proceeds of a billion nine plus 250 million of

11   cash, which is now on the balance sheet because the Court

12   approved and refunded the first lien DIP facility, that

13   billion nine plus 250 will be in the aggregate used to pay

14   off the 2.15 billion face amount of second lien notes.

15   Q    Okay.  What is the proposed interest rate on the DIP?

16   A    Six and a quarter percent.

17   Q    How does that rate compare to the rate on the notes

18   that will be refinanced by the DIP if it's approved?

19   A    The weighted average rate on the two existing second

20   lien note issues plus additional interest is twelve percent.

21   Q    By retiring the combined twelve percent debt with six

22   and a quarter percent debt, is the debtor saving money?

23   A    Yes.

24   Q    How much?

25   A    The debtor will save 11 million dollars a month or

1    across twelve months, 130 million dollars.

2    Q    In some of the objections, one or more of the

3    objections that were filed, an argument's been made that the

4    proposed DIP does not save the debtor money because of fees.

5    Are you familiar with that argument?

6    A    I've heard that argument.

7    Q    Is it accurate?

8    A    I don't agree with it.

9    Q    Why not?

10   A    Well, the upfront fees required to put these unsecured

11   proposed second lien DIP in place are 43 million of cash.

12   So if you have to pay 43 million of cash upfront, you'll

13   save 130 million dollars of fees over the course of a year.

14   And I know that some people have argued that the fees are

15   higher.  I don't agree.  But I think 43 is the right number.

16   And secondly, others have said, well, if you didn't

17   refinance the debt and they have argued that these fees are

18   getting in the way, we said, well, in any event, somehow

19   you're going to have to repay that second lien debt at some

20   point.  And that refinancing will cost money.  And

21   therefore, whether we pay them upfront or at the back end of

22   confirmation, we're going to have to pay them no matter

23   what.

24   Q    Well, that, I guess, leads to my next question which is

25   an argument has also been made that the debtors shouldn't do

1    this financing now but should do something later or at the

2    end of the case.  Is that what you're referring to?

3    A    Yes, I was.

4    Q    And are you, in some respect, indifferent as an

5    economic to whether it's done now or later?

6    A    I don't think we're indifferent because --

7    Q    Why?

8    A    -- if we pay off the twelve percent debt now and we

9    only pay six and a quarter percent for the new incremental

10   financing, we're going to save, as I said, 130 million over

11   twelve months irrespective fees of when we pay the financing

12   fees, upfront or at the back end.

13   Q    And if the debtor were to leave the second lien notes

14   in place, as you just described, to the end of the case, how

15   would it have to deal with them then and would it cost the

16   debtor anything?

17   A    Well, the debtor and the estate would be at risk for

18   how do I refinance them, on what terms, at what price, we

19   just don't know.  We'll have to wait and see what the

20   capital markets look like twelve months forward.

21   Q    In your judgment, Mr. Ying, does the proposed DIP

22   facility help preserve assets of the estate?

23   A    Yes, very much so.

24   Q    Could -- in your judgment, based in your involvement in

25   negotiating, seeking out and negotiating this DIP, could the

1    debtor have received this financing on an unsecured basis?

2    A    No.  We approached a lot of banks just to arrange the

3    first lien facility and we certainly asked them could they

4    provide additional financing beyond the first lien debt and

5    the answer was absolutely not.

6    Q    This DIP comes with an equity conversion feature,

7    correct?

8    A    Yes it does.

9    Q    Would you describe its key elements to the Court?

10   A    Well, as I said earlier, when the company gets to

11   emergence and we've talked to the first lien bank universe

12   about refinancing EFIH once it does come to time for the

13   company to emerge, we determined in talking to them that we

14   think the maximum amount of debt that could be issued at

15   emergence and have that debt be marketable, the interest

16   would be covered by the cash flows inherent at EFIH, that

17   the maximum amount of debt we could possibly incur is about

18   5.3, 5.4 billion.  And therefore, to the extent that we

19   wanted to save the estate by taking advantage of this second

20   lien DIP facility and reduce the interest cost to again

21   create more value in the estate, create more value for

22   junior creditors, the only way it would be safe and prudent

23   to allow a second lien to sit at the capital structure is to

24   incorporate some sort of mandatory conversion feature

25   because if we let that second lien DIP in place, I wouldn't

1    think it would conscionable to leave that there and not know

2    for certain that we could certain that we could convert to

3    equity and emerge safely.

4    Q    This analysis you described looking at the maximum debt

5    EFIH could carry -- correct?

6    A    That's correct

7    Q    When did you do that?

8    A    Oh, we did that back in -- I think we were looking at

9    debt capacity at EFIH probably since mid-2013.

10   Q    Okay.  So you've been looking at it for some time.

11   A    In fact, I take it back.  I think we've been looking at

12   debt capacity at EFIH ever since we got retained in July of

13   2012.

14   Q    Was analysis of the debt capacity at EFIH important to

15   your advice to the company about the manner in which to

16   handle the second lien DIP financing?

17   A    Yes, it was.

18   Q    Okay.  In the way you just described?

19   A    Yes, that's correct.

20   Q    Did the debtors look at other alternatives to paying

21   off the second lien notes with the DIP facility that's on

22   the table now?

23   A    We did look at one other alternative which was to

24   potentially leave the second lien notes outstanding or to

25   leave them outstanding and reinstate them and exercise

1    what's called an equity claw that's in one of the

2    instruments.

3    Q    Were you in the courtroom?  There was some argument

4    about the equity claw at mid-day.  Do you remember hearing

5    that?

6    A    I do recall that, yes.

7    Q    Let's start -- let's just take a moment then and, if

8    you would, describe what the equity claw feature is and how

9    you understood that it worked at the time you were

10   considering it as an alternative to the DIP.

11   A    Sure.  A typical provision in a high yield bond

12   indenture is that, first of all, it's non-callable for a

13   certain period and then it's opt or redeemable several years

14   out, four or five years out, typically.  In additional to

15   that optional redemption provision, there is another

16   optional redemption provision called the equity claw.  The

17   triggering event for that equity claw redemption provision

18   is that new equity must be come into the issuer either

19   through an IPO or an equity investment by the parent.  If

20   that money comes in, the issuer has the option to buy back

21   or claw back -- typically, it's thirty-five percent of the

22   outstanding issue.  Typically, the price of the clawback is

23   at par plus the coupon.  And typically, a clawback provision

24   has a limited time period.  Usually it's two or three years

25   from the date of issuance.  So that when you look at the two

1    second lien instruments that are outstanding, there's an --

2    Q    I'm sorry to interrupt you, Mr. Ying.  Are you talking

3    about equity claw provisions generally or are you describing

4    the equity claw provisions that were in the indentures here

5    specifically?

6    A    Well, I was general and I was going to go to the

7    specific.

8    Q    Okay.  Go ahead.  Sure.

9    A    So specifically, there's a 400 million dollar debt

10   issue with an eleven percent coupon.  And I believe the

11   equity claw provision expired in March of this year.

12   There's a billion 750 principal amount issue of eleven and a

13   quarter percent second lien notes.  That claw provision

14   expires in March of 2015.

15   Q    All right.  And if you would now, describe for the

16   Court why it is the debtors didn't pursue that as an option

17   in lieu of the proposed second lien financing.

18   A    Well, the only way the debtor could exercise an

19   operative indenture -- or provision in an indenture is to

20   emerge from bankruptcy, reinstate the debt and, post-

21   emergence, optionally exercise the claw provision.  So a big

22   risk in trying to exercise the equity claw would be could

23   you emerge before the claw in the 750 -- a billion 750 issue

24   of eleven and three quarter percent second lien notes, could

25   you do it before that claw expires in March of 2015.

1    Q    Did you arrive at the conclusion at the time you were

2    looking at the equity claw option whether it would be more

3    or less costly or more or less risky to the debtor than the

4    proposal that's now before the Court?

5    A    Yes.

6    Q    And what conclusions did you reach?

7    A    Well, I'll try to state it in a simplistic way.  Let's

8    assume there's two billion of second lien notes outstanding

9    and let's assume that the average rate is twelve percent.

10   When we had looked at refinancing EFIH and we've told you

11   that we think the company could incur 5.4 billion of debt,

12   for argument's sake, when it emerges, let's assume that the

13   average interest rate on that new debt is six percent or

14   half of the interest rate on the second lien notes.  The

15   problem is that the

16   reason -- one of the reasons why the amount of debt that can

17   be issued at EFIH post-emergence is limited to 5.4 billion

18   is that when I take 5.4 billion and multiply it by six

19   percent, it just covers the cash flows at EFIH.  In fact, in

20   that example, we think EFIH would probably have

21   approximately 30 million of free cash flow after all of its

22   interest expense.  If I left debt -- two billion of debt on

23   EFIH with twice the interest costs as our proposed new exit

24   financing, it would -- that two billion of twelve percent

25   that would effectively take up interest expense that I can

1   afford equal to four billion of debt times six percent.  And

2   if I can only incur 5.4 billion, that would mean that I

3   could only raise another billion 4 of six percent debt on

4   top of the two billion I left outstanding.  And that, to me,

5   says that I would have a hole of three billion dollars.  And

6   right now, you know that we're trying to raise a DIP of 1.9

7   billion or in the NextEra proposal, they're providing a

8   billion six of fresh cash.  So trying to raise more equity,

9   three billion or almost a fifty percent increase would mean

10  that we'd be more diluted to the existing shareholders, it

11  would be more expensive and it would not optimally leverage

12  EFIH at emergence.

13  Q    Is that why you recommended against it ultimately?

14  A    Yes.

15  Q    Okay.  In your judgment, does the mandatory equity

16  conversion feature in this DIP that you just described

17  provide benefits to the debtors' estates?

18  A    Yes, it does.

19  Q    And how so?

20  A    Well, the reason we're here is that, as I said, we do

21  not want to trigger a deconsolidation tax at either TCH or

22  EFIH.  For the longest time, the TCH first lien lenders have

23  said we don't really care about your tax problem.  We're

24  first lien lenders.  We're fully secured.  We want our

25  assets.  We want to go home.  And if we do so, we might

1    actually be able to step up the basis of our assets, take

2    extra value from a step up in basis, extra compensation, and

3    the taxes are a problem.  And it took us the longest time to

4    get the TCH first liens to agree not to do that, to not

5    trigger a deconsolidation tax, and to agree to the tax-free

6    spin.  The only reason the TCH first liens agreed to not

7    take incremental economic compensation and deconsolidate in

8    a taxable fashion is that we were able to reassure them that

9    we had a completely negotiated consensual deal between EFIH

10   and EFH because a consensual deal between those two entities

11   is a necessary condition for a tax free spin with TCH.  And

12   it was only when we delivered a consensual deal that the TCH

13   lenders say, okay, we'll go with the tax free spin.  Now to

14   do what I said, we must de-leverage EFIH.  It must de-

15   leverage into EFH stock.  The second lien mandatory

16   convertible DIP does that.  And the terms of that conversion

17   were acceptable to the super majority holder of EFH

18   unsecured debt, namely Fidelity.  So we had that consensual

19   deal and we felt that that was the best way to preserve

20   value for all the entities that make up EFH.

21   Q    So that brings me, I think, to a question that -- a

22   response to some of the criticism we heard earlier today as

23   well.  That is the marketing process.  Pre-petition, did the

24   debtors conduct a marketing process for the second lien DIP?

25   A    No, we did not.

1    Q     And why is that?

2    A     Well, first of all, we talked to all the relevant

3    creditors at EFIH and EFH to determine what they were

4    willing to do that would be in alignment with the

5    restructuring that we knew needed to happen at EFIH and EFH.

6    And in particular, there was an issue which was who's the

7    fulcrum security holder.  Now the second lien noteholders

8    said we'd love to be the fulcrum security.  We'd love to own

9    the company.  And the EFIH unsecureds said no, we don't want

10   them to own the company.  We would like to.  And we said to

11   them, well, therefore, for you to be able to do that, we

12   need to de-leverage EFH -- EFIH -- excuse me.  How are we

13   going to do that?  And they said, fine, we'll write a big

14   equity check to pay off the more senior secured creditor in

15   full and we want to own the equity of the company.  And

16   Fidelity, as EFH, said, okay, we'll go along with that.  And

17   as you can see from the terms of the restructuring

18   agreement, Fidelity and -- on behalf of the other EFH

19   noteholders, gets to participate in nine percent of the DIP.

20          Now I have worked on a lot of restructurings over

21   the last twenty-nine years.  And it was very clear to me

22   that, in talking to the EFIH unsecured creditors, they were

23   not interested in selling the company to a third party.

24   They wanted to own the company because they think once

25   they're the owner, they will have the right to try to create

1    more value for themselves and the other shareholders of EFH.

2    I have represented lots of strategic buyers who wanted to

3    buy companies out of bankruptcy.  They are regularly

4    rebuffed by creditors who want to keep ownership of the

5    company.  So I never felt I was obligated or would advise my

6    clients that they are obligated to shop the company.  That's

7    just the reason from a pure restructuring perspective.  But

8    we did not pursue a marketing process.

9    Q    Did the company's board and management instruct you

10   also to pursue a restructuring solution that would preserve

11   the tax strategy that you testified about?

12   A    They most certainly did.

13   Q    And does that have an impact on the way in which the

14   company sought second lien DIP financing here and with whom?

15   A    Yes, it absolutely did.

16   Q    And can you describe how so?

17   A    Well, I told you why we wanted to avoid a

18   deconsolidation tax.

19   Q    Right.

20   A    And I've referred to the fact that we would like to do

21   a tax free spin of TCH out from EFH.  One of the

22   requirements of that tax free spin is that we do not have a

23   party, either a person or a group -- or persons acting as a

24   group ending up owning a majority of the stock of either the

25   spun off TCEH or EFH.  Now that rule is called the

1    continuity of interest rule.  The one exception to that

2    continuity of interest rule definition of what constitutes a

3    group is that there's a special bankruptcy exception.  And

4    what I believe the bankruptcy exception says is that even

5    though creditors may be acting as a group because they're in

6    a committee, because they're compromising their debt claims

7    into equity of the reorganized company, those people acting

8    as a group may end up owning the majority of interest in the

9    company.  And that's the constraint that each of the DIP

10   providers who are convertible into majority of EFH have to

11   live within so that we don't endanger the tax free spin.

12   Q    And earlier you talked about negotiations with

13   different entities or groups bidding on the DIP financing.

14   These features of the proposed tax strategy were discussed

15   back and forth with these other creditor constituencies, is

16   that right?

17   A    Yes, at great length.

18   Q    So tell the Court then why it is the debtors went and

19   negotiated with the EFIH unsecured creditors with respect to

20   this DIP and also with respect to Fidelity.

21   A    Well, we felt that the EFIH unsecured creditors

22   represented the fulcrum security.  All the other proposals

23   that we saw from other constituencies couldn't solve the

24   problem of how do I restructure EFIH if I can't get the EFIH

25   unsecureds to agree to a plan.  None of them could tell us

1    how to cram them down or force them with -- beyond their

2    will.  And obviously, we had to restructure EFIH by having

3    the unsecured EFIH creditors convert into equity of EFH.  To

4    do that, therefore, we had to restructure the EFH notes

5    which were controlled by Fidelity.  And hence, that was the

6    crux of the very lengthy hard-fought negotiation that ensued

7    earlier this year.

8    Q    How long of a process -- or over how long of a period

9    of time did those negotiations take place?

10   A    My recollection that the discussions between the

11   company, the EFIH unsecureds, Fidelity and the shareholders

12   of EFH started in late January, early February, and they

13   remained extremely active up until the eve of the filing

14   date which was April 20th.

15   Q    What was the nature or tenor of those negotiations, do

16   you know?

17   A    Extensive back and forth, hard-fought, arms length and

18   ultimately, thankfully, consensual.

19   Q    Did you have -- from your participation in these

20   negotiations and advising the debtor, do you have any reason

21   to question the good faith of either the EFIH unsecured

22   lenders or Fidelity in their negotiation of the DIP?

23   A    No.  I have no reason to question the good faith

24   efforts.

25   Q    Prior to filing the petition, did the debtors receive a

1    proposal for DIP financing from anyone else?

2    A    I recall in early March that representatives or

3    advisors to the second lien ad hoc group, Kramer Levin and

4    Rothschild, made a proposal on a restructuring that had the

5    form of a second lien DIP in it.

6    Q    And what was the debtors' response to that?

7    A    Well, the proposal was actually written.  It was very

8    helpful.  It was several pages.  And what was evident in the

9    proposal was that the implied valuation that the second lien

10   noteholders were willing to convert their claims into equity

11   at was substantially lower than what the unsecured creditors

12   were actively engaged in talking to the company about.

13   There was very little being said in their proposal about

14   what would they do to get this consent of the EFH

15   noteholders to allowing the EFIH creditors to convert into

16   EFH equity.  And when we asked the advisors to the second

17   lien noteholders what's your intent with respect to your

18   make-whole claim, embedded in their proposal was a proposal

19   whereby the second lien notes would remain outstanding till

20   the end of the eighteen month bankruptcy case.  And at the

21   end of the eighteen month bankruptcy case, my recollection

22   is that those -- that make-whole claim would be paid out in

23   its full amount.  And obviously, since one can dispute

24   whether that make-whole claim is a valid claim, that was

25   another issue we thought was problematic.

1    Q    All right.  And was it on the basis of those

2    observations that the debtor chose not to pursue the second

3    lien noteholders' proposal at that time?

4    A    Yes.

5    Q    Did the second lien noteholder group ever get

6    restricted?

7    A    You know, that wasn't my primary area of involvement

8    negotiating NDNAs.  But my recollection is that both the

9    EFIH unsecured group and Fidelity were restricted for long

10   periods of time.  For example, we knew that prior to April

11   1st when there was a major interest payment that we knew we

12   could not make payment on, everybody was restricted up

13   through April 1st so that the company wouldn't have

14   premature disclosure of big massive proposals.  And I know

15   that after we passed April 1st, all of the restricted

16   parties agreed to extend their non-disclosure agreements I

17   believe up until the end of the interest payment grace

18   period which was the end of April which was when we did

19   file.

20            My recollection with respect to the second lien ad

21   hoc group was that they were not willing to get restricted

22   on that basis.  They may have offered to get restricted for

23   a couple of days but we viewed that given the complexity of

24   what we were trying to negotiate, a couple of days just

25   wouldn't cut it.  And if we had to make disclosure of all

1   that had been as between the parties that were negotiating,

2   we thought that would be very damaging to the ongoing

3   negotiations.

4   Q    After the petition was filed, were there then changes

5   in various proposals for competing DIPs to the company?

6   A    Yes.

7   Q    And were there changes to the EFIH unsecureds' proposed

8   DIP itself?

9   A    Well, yes.  We obviously announced that a unsecured

10  second lien DIP, as of the signing of the RSA, after the

11  bankruptcy filing and the dissemination of all that

12  information publicly, we started to draw multiple competing

13  proposals to make the second lien DIP.

14  Q    All right.  Mr. Ying, you have a demonstrative that

15  summarizes the changes over time and the various DIP

16  proposals?

17  A    Yes, I do.

18  Q    Would it help illustrate your testimony here?

19  A    It would.

20          MR. MCGAAN:  Your Honor, I'd like to mark as

21  Debtors' demonstrative number 1 a timeline and display it.

22          THE COURT:  Okay.

23      (Debtors' Demonstrative 1 was marked)

24          MR. MCGAAN:  Can I approach and give you a copy?

25          THE COURT:  Yes.  A copy for Ms. Bello, too,

1    please.  Thank you.  Do you have a hard copy of the

2    demonstrative during your opening?  I know I said no, but

3    may I have a hard copy?  It helps a little with the alphabet

4    soup.  Thank you.

5    BY MR. MCGAAN:

6    Q    Okay.  In general, Mr. Ying, what does this

7    demonstrative timeline show just at a high level?

8    A    Sure.  It shows both pre-filing and post-filing all the

9    various proposals that the debtor received.  The light blue

10   shows proposals from the second lien group.  The green shows

11   the RSA agreement that was signed by the respective parties

12   and was provided by the EFIH unsecureds.  The redder pink

13   shows proposals that were made by the first lien note group.

14   And the purple shows the proposals made by the NextEra

15   second lien note group.

16   Q    Okay.  Then does this timeline pick up each instance

17   where there might have been a -- where there was a

18   modification to an existing proposal or a new proposal

19   altogether or are they both in here?

20   A    Yes, it does.  In fact, it even includes changes that

21   were made in the last two days.

22   Q    Okay.  It shows also a series of board meetings, does

23   it not?

24   A    Yes, it does.

25   Q    And when those occurred, right?

1    A    Yes.

2    Q    Those are EFIH board meetings?

3    A    Yes, they are.

4    Q    The first one -- other than the board meeting that took

5    place at or around the petition date on April 29th, the

6    first one here is June 11th, correct?

7    A    That's correct.

8    Q    And you were present at that meeting?

9    A    Yes, I was, by phone.

10   Q    And you addressed the board at that meeting?

11   A    Yes, I did.

12   Q    What was -- in this chronology, what's significant

13   about June 11th?  What had happened leading up to that?

14   A    Well, by June 11th, we had actually received different

15   proposals from both the second lien note group and the first

16   lien note group.

17   Q    Okay.  So if you look at the chart then, as of June

18   11th, it showed that, either new proposals or revised

19   proposals, there were six from the second lien group, right?

20   A    That's correct.

21   Q    And there's the PIK/Fidelity box that shows the one

22   that was announced in conjunction with the RSA?

23   A    That's correct.

24   Q    And then there was a proposal -- two proposals or one

25   plus a revision from the first lien noteholders, right?

1    A     That's correct.

2    Q     What did the board to with respect to the DIP financing

3    proposals at the June 6th meeting?

4    A     At the June --

5    Q     11th.  I apologize.

6    A     Yes.  Well, at the June 11th meeting, we informed the

7    board of all the various iterations of a second lien DIP

8    proposal from the second lien group and the first lien

9    group.  And aside from counsel advising the board on

10   procedures, we described to the board the terms of the

11   various proposals.  And we described to the board the fact

12   that since we had received so many proposals, it was

13   incumbent upon us to try to elicit from them the best

14   proposal possible.  And my recollection is that we told the

15   board that we would proceed subsequent to that board meeting

16   to at least ask all the various interested parties to submit

17   a "best and final offer" so that the board could make a calm

18   and reasoned determination of the best and final offers from

19   all these competing groups.

20   Q     Okay.  So the company, as this demonstrative reflects,

21   announced that it wanted best and final offers by June 11th,

22   is that right?

23   A     No.  Actually, by June 11th, we were just receiving

24   proposals and absorbing all the different terms and pricing.

25   And we obviously apprised the board of what we thought of

1    the various proposals, their strengths and weaknesses.  We

2    also knew that this was not the end of the process since our

3    hearing date wasn't going to be until June 30.  And we also

4    knew that even the interested bidders knew that all

5    proposals that were submitted to us had to be shared with

6    the RSA parties.  But it obviously creates another issue

7    when you try to have an auction process because everybody

8    knows that the guy you're competing against has to see your

9    best shot.

10   Q    So did the company make a decision about sharing the

11   proposals as they came in more broadly than just with the

12   RSA parties?

13   A    Well, what happened was that after June 11th, we said

14   to the parties give us your best and final.  Because they

15   knew that if they put in another proposal or just repeated

16   their proposal, the unsecured group would get to see it,

17   guess what, no one respected our line in the sand of the

18   best and final.  So we actually drew it twice.  And then I

19   think by the time we drew it the second time, we did

20   establish a protocol that if we get new proposals that we

21   would also share them with all of the interested parties.  I

22   believe once we did that then there was a period where new

23   proposals came in fast and furious just before our second

24   board meeting on the 22nd.

25   Q    Okay.  So you received -- did you receive further

1    changes by the time of the board meeting on June 16th?

2    A    Excuse me.  There was another board meeting on June

3    16th.  Yes.  I misspoke.  Yes.  By June 16th, that's the

4    second board meeting and we had said -- there was a protocol

5    for sharing and there was a flurry of activity and proposals

6    that we received by June 16th.

7    Q    Okay.  And did you attend the June 16th board meeting?

8    A    Yes, I did, by phone.

9    Q    And did you address the board with respect to the

10   competing DIP proposals as they stood at that time?

11   A    Yes, I did.

12   Q    Did you help put together a presentation to the board

13   that shared your analysis and provided the board with a

14   comparison of key terms?

15   A    I certainly did.

16   Q    All right.

17           MR. MCGAAN:  I'd like to mark as Debtors' number 1,

18   Your Honor, a presentation from a June 16th, 2014 EFIH and

19   EFIH finance board meeting.

20           Can I approach, Your Honor?

21           THE COURT:  Yes.  Thank you.  What are we marking

22   this?

23           MR. MCGAAN:  Debtors' number 1.

24        (Debtors' Exhibit No. 1 was marked)

25   Q    Okay.  What is Debtors' Exhibit No. 1, Mr. Ying?

1    A    It's a board presentation as of June 16th.

2    Q    All right.  Let's look -- let me turn your attention to

3    what is page 2 of the deck here in the lower right-hand

4    corner.

5         MR. MCGAAN:  We're not displaying it, Your Honor.  Just

6    handing it out.

7    BY MR. MCGAAN:

8    Q    And this is a page entitled "Comparison of Key Terms

9    and Proposals", correct?

10   A    Correct.

11   Q    All right.  Would you, at a high level, just share with

12   the Court the key points you made in your presentation to

13   the board at that time?

14   A    Sure.  Well, we described who was funding each of the

15   DIPs and to the extent that funding was fully committed or

16   not.  We obviously described that they are all basically the

17   same size, a billion nine of fresh capital.  We described

18   the equity ownership associated with each of the DIPs in

19   terms of what would happen -- how much stock they would get

20   if they converted.  And then we highlighted for the board

21   all the cash terms of each instrument from cash interest

22   rate to financing fees to what we call topping fees which

23   would be the fees that would be payable if even we put the

24   DIP in place if we chose to go to another direction, what

25   costs would be incurred if we changed direction.

1    Q    All right.  And this reflects the status of DIP

2    proposals from which groups at that time?

3    A    This was -- these were proposals from the second lien

4    group and the first lien noteholders.  And I misspoke

5    earlier.  I apologize.  There have been so many board

6    meetings and they've all run together.  As of June 16th,

7    these are the only two proposals out there.  And this -- my

8    comment about last and final really happened after June 16th

9    but before the June 22nd board meeting.  So my apologies.

10   Q    The first column here is "Unsecured Group Proposal".

11   That's the third one in the comparison here, right?

12   A    That's correct.

13   Q    All right.  And that is the then current status of the

14   proposal from the EFIH unsecured noteholders, right?

15   A    The first column is the unsecureds, yes.

16   Q    Right.  How long was the meeting?  And describe for the

17   Court the board's deliberations regarding the terms of the

18   various proposals as they stood at that time.

19   A    I believe the meeting was approximately an hour.  I

20   believe that we talked about both the financial terms and

21   the implications for how all the constituencies would be

22   treated.  And there was an extensive discussion about if we

23   were to change and adopt one of these other proposals, how

24   would that impact the restructuring and the RSA.

25   Q    All right.  Did the board, to your recollection, make a

1    decision at this meeting?

2    A    I don't think they made a decision affirmatively or

3    negatively.  I believe our advice was that, at this point in

4    time, we felt that there were potentially more offers coming

5    and that we would try to embark on a process to try to

6    elicit best and final offers.  And we advised the board

7    let's see how things go.  It's several weeks until the

8    hearing on June 30.

9    Q    Okay.  As of that time, had any of the participants in

10   the bidding, if we can call it that, on the second lien DIP

11   complain to the debtors that they didn't have enough time to

12   make a proposal and have the board consider it in the manner

13   in which this deck in your description did?

14   A    No.  I never heard that complaint.

15   Q    Did you hear it any time later?

16   A    No, I never heard that.

17   Q    Okay.  So turning back to the timeline, it shows that

18   there were more changes in yet another board meeting which

19   was on the evening of Sunday, June 22nd, is that right?

20   A    Yes, that's correct.

21        MR. MCGAAN:  I'd like to mark, Your Honor, as

22   Debtors' Exhibit No. 2 presentation from that board meeting.

23        (Debtors' Exhibit No. 2 was marked)

24        MR. MCGAAN:  If I could approach, Your Honor?

25        THE COURT:  Thank you.

1    BY MR. MCGAAN:

2    Q    All right.  Are you familiar with Debtors' Exhibit No.

3    2?

4    A    Yes, I am.

5    Q    What is it?

6    A    It's a deck that was presented to the board on the

7    Sunday, 6 p.m., June 22nd.

8    Q    And did you attend this meeting?

9    A    Yes, I attended it by phone.

10   Q    Did you help create this presentation entitled "Second

11   Lien DIP Facility"?

12   A    My colleagues and I prepared some of the financial

13   pages that are incorporated in this deck.

14   Q    And when you refer to your colleagues, you're talking

15   about the team that you directed at Evercore that's

16   representing the debtors here?

17   A    Yes, I am.

18   Q    Okay.  Let me draw your attention then to page number

19   10 in the deck, lower right-hand corner, which is a table

20   entitled "Comparison of Key Terms and Proposals", correct?

21   A    Yes.

22   Q    Okay.  At this point, June 22nd, which proposals was

23   the board considering and were you commenting on?

24   A    Well, we commented on all of them.

25   Q    And describe to the Court who had made proposals by

1    this point in time.  Which groups?

2    A     Right.  Well, in addition to proposals by the

3    unsecureds and the -- which had changed between the last --

4    between June 22nd and June 16th, the old second lien note

5    proposal which had not changed from June 16th and the first

6    lien note proposal which had changed on the previous

7    evening, Saturday the 21st, we now had a brand new proposal

8    from what we call the NextEra second lien note group.

9    Q     Okay.  And I notice on this exhibit, page 10, there's

10   red boxes.  Is that intended to show where -- to direct the

11   board to where changes have been made?

12   A     Yes.

13   Q     What was new?

14   A     Yes.

15   Q     All right.  At a high level, if you would, describe for

16   the Court the principle differences that you brought to the

17   board's attention as a result of the analysis you and your

18   team did.

19   A     Well, what I did for the board was I first tried to

20   compare and contrast the unsecured note proposal to the

21   original second lien note proposal and the first lien note

22   proposal.  The reason I did that is because they're

23   relatively similar in structure.  They all have a billion

24   nine of new DIP in cash.  The use of proceeds of that cash

25   are all the same.  Take out the second lien notes with some

1    additional cash on the balance sheet.  And therefore, the

2    comparability of those three proposals is fairly easy to lay

3    out in terms of cash costs, interest rate savings and what

4    happens to valuation and recoveries to the various

5    constituencies.

6            After walking them through those comparisons, we

7    then spent a lot of time explaining to the directors the

8    terms of the NextEra second lien note proposal.  And then we

9    proceeded to evaluate what are the criteria to use to

10   evaluate that proposal versus the others.

11   Q    The second column here in your comparison were first

12   and second lien NextEra proposal, correct?

13   A    Yes, it does.

14   Q    And that was a new kind of proposal in this back and

15   forth, correct?

16   A    Yes.  It was new and significantly different in

17   structure.

18   Q    And it appears in the demonstrative for the first time,

19   in the purple box, on June 18th.  Is that when it first --

20   the so-called second lien NextEra proposal?

21   A    Yes, that's correct.

22   Q    What is NextEra?

23   A    NextEra is a public company.  It's a holding company

24   that owns one of the biggest regulated utilities in the

25   country, Florida Power and Light.  And the last I looked,

1    they have about a 72 billion dollar total enterprise value,

2    a 40 billion dollar market capitalization of equity.  And,

3    you know, they're a BBB-rated company.  Very well -- very

4    well financed.

5    Q    And what, in general, is different about that proposal

6    than the nature of the proposals that had come up earlier?

7    A    Well, there's a whole clutch of differences.

8    Q    What are the most important ones?

9    A    Well, the size of the facility appears to be much

10   bigger.  It's -- in this incarnation, it was 2.4 billion.

11   In this incarnation -- and, by the way, this deck reflects

12   what we put together in the morning of Sunday.  We received

13   some modifications from the NextEra group at 4 p.m. on

14   Sunday.  Our board meeting was two hours later so we

15   couldn't change this deck.

16   Q    Well, let me stop you there.  So this was a meeting in

17   the evening of the 22nd, right?

18   A    That's correct.

19   Q    And is it your testimony that just shortly before the

20   meeting there was a further revision to the second lien

21   NextEra proposal?

22   A    Yes, there was.

23   Q    Were you able to inform the board fully of those

24   changes even though they had come in after you prepared the

25   deck?

1    A    I did my very best to voice over the words in the deck

2    to inform the board of the changes that were contained in

3    that modification that had come in two hours earlier.

4    Q    Okay.  Based on your participation in the meeting with

5    the board, were they able to fully, at that time, consider

6    not only the changes updating the preexisting offers but

7    also the new second lien NextEra offer?

8    A    I believe we spent an hour and a half talking about the

9    proposals.  And a vast majority of that time was spent

10   discussing the NextEra proposal since the other two really

11   hadn't changed all that much.

12   Q    Okay.  And I want to draw your attention quickly now to

13   pages 14 and 15 of this deck which is entitled -- continues

14   on -- it starts on 14 and continues to 15, "Illustrative

15   Recoveries Under a Plan", correct?

16   A    That's correct.

17   Q    And you and your group prepared these pages?

18   A    Yes, we did.

19   Q    What is it that you're communicating to the board here?

20   What's the analysis you're doing and why?

21   A    Well, the top half of both 14 and 15 focus on

22   statistics like what is the implied equity value of the

23   restructured company once the DIP converts as a way to

24   compare proposals.  We felt that was a fine way to compare

25   the unsecured proposal to the original second lien note

1    proposal and the first lien note proposal because those

2    proposals are all, as I said earlier, largely identical in

3    terms of structure.  Same size DIP, same use of proceeds.

4    It's merely a function of what are the terms of the DIP, who

5    has the highest conversion price or the lowest conversion

6    percentage, who has the lowest fees, who has the lowest

7    interest rate.  So it's easy to compare on those basic

8    statistics.

9             The NextEra proposal is significantly different

10   because not only are they providing a DIP, like all the

11   others are, but the allocation of the proceeds in the

12   NextEra proposal is completely different from the other

13   three.  What the NextEra proposal does is that the second

14   lien notes are getting a combination of cash and equity, not

15   just cash.  And the unsecured creditors at EFIH are getting

16   now not just equity but, again, a combination of cash and

17   equity.  So we laid out these statistics to highlight that

18   you can't just look at those statistics to understand the

19   differences between the NextEra proposal and the others.  As

20   in our original presentation, we also highlighted who's

21   getting what at various enterprise values which is the

22   bottom half of the pages.  And we focused heavily on that

23   area because it's important to look at each of the proposals

24   at the same valuation because you have to make apples to

25   apples comparisons to understand who's doing better and

1    who's doing worse and will they accept the restructuring or

2    will they not based on relative recoveries at -- by

3    comparing the same enterprise value under different

4    proposals.

5    Q    On page 15, you -- with respect to the comparative

6    analysis you just described, page 15 discusses the -- I'll

7    call the old second lien group proposal and then the first

8    lien proposal, right?

9    A    Yes.

10   Q    And as of the time of this meeting, were those still in

11   the running in terms of economics and structure as compared

12   to the EFIH unsecured DIP facility?

13   A    As of that meeting, we felt that, no, neither of those

14   proposals were "in the running".

15   Q    On page 14, you're setting the second lien NextEra

16   proposal side by side to the EFIH unsecured proposal, right?

17   A    That's correct.

18   Q    And at the bottom of that page, you called out, among

19   other things, comparative recoveries of the EFIH unsecureds

20   and the EFH unsecureds, right?

21   A    That's correct.

22   Q    And are those groups that you referred -- you referred

23   to them earlier as fulcrum securities?

24   A    Well, we certainly think the EFIH unsecureds are the

25   fulcrum security.

1    Q    Right.

2    A    And the EFH creditors -- well, we need their consent.

3    They may or may not be in the money.  And in the unsecured

4    proposal, they're being paid extra, forms of consideration

5    by allowing them to participate in the DIP and also the

6    Oncor TSA amendment.

7    Q    What happens to their pro forma recoveries here under

8    the second lien NextEra proposal as compared to the EFIH

9    unsecured proposal?

10   A    Sure.  As you can read off the chart on the bottom of

11   page 14, what you see at -- you know, pick your enterprise

12   value, at seventeen and a half billion, the second lien

13   notes are getting a significant increase in recovery to 131

14   percent of their principle amount versus 115 percent under

15   the unsecured proposal.  And correspondingly, the recoveries

16   for the EFIH unsecureds and the EFH unsecureds drops.  And

17   obviously, NextEra gets their recovery because they're also

18   investing.

19   Q    As of this time -- so let me ask you this.  The second

20   lien NextEra proposal went through some additional changes

21   after this board meeting, correct?

22   A    Yes, it did.

23   Q    All right.  We'll turn to those in just a moment.  But

24   at any time, as of this time, June 22nd, or any time after

25   that, have representatives of either the EFIH unsecureds or

1    the EFH unsecureds expressed support for the competing

2    second lien NextEra proposal?

3    A    I've spoken directly to the financial advisor to the

4    EFIH unsecureds and he has told me that they do not support

5    the NextEra proposal and that they have spoken to NextEra

6    directly and have refused to work with them on modifying

7    their proposal.

8    Q    Okay.  And what issues does this -- did this present

9    for the debtor in considering these competing proposals?

10   A    Well unfortunately the next -- or second lien note

11   proposal makes choices in terms of who's getting what, and

12   obviously for NextEra to play as a participant in this

13   restructuring they had to team up with someone, the EFI

14   unsecured did not want to team up with NextEra, because as I

15   said earlier they do not want to sell their equity interest

16   which they think they are entitled to as the fulcrum

17   security holder to a third party, and so NextEra has teamed

18   up with the second lien noteholders and the price of their

19   teaming up is that they are paying the full make whole in

20   this presentation.

21   Q    What effect does that aspect of their proposal have on

22   the size of the DIP facility they're proposing?

23   A    Well actually the size the DIP facility as of this

24   iteration was 2.4 billion, but the composition of the

25   2.4 billion is that NextEra would be investing a billion six

1    of fresh capital, and the remaining 800 in this proposal was

2    constituted by the second lien holders taking 800 of their

3    claim and rolling it into the DIP so that the remaining

4    amount of their claim of a billion three fifty would be paid

5    off in cash.

6    Q    Did you make a recommendation to the board at this

7    meeting, June 22nd?

8    A    Yes, we did.

9    Q    What was the recommendation?

10   A    Our recommendation was for board to reaffirm its

11   commitment to go forward with the second lien DIP proposal

12   by the EFIH unsecureds.

13   Q    What recommendation did management make?

14   A    I believe they made the same recommendation.

15   Q    And what decision did the board make at that time?

16   A    I believe the board adopted the recommendation that I

17   described.

18   Q    Did negotiations continue after this meeting/

19   A    Yes, they did.

20   Q    All right.  And there was yet another board meeting

21   just last night, correct?

22   A    That's correct.

23   Q    And did you participate in that meeting

24   A    Yes, by phone.

25   Q    Did you address the board with respect to the current

1    state of play as of last night with respect to the competing

2    DIP proposals?

3    A    Yes, I did.

4    Q    All right.  Let me --

5              MR. MCGAAN:  If I may approach, Your Honor, we'll

6    mark as Debtors' Exhibit No. 3 the presentation from last

7    nights board meeting.

8         (Debtors' Exhibit No. 3 was marked)

9              THE COURT:  Thank you.

10   BY MR. MCGAAN:

11   Q    What is Debtors' Exhibit No. 3?

12   A    It's the board dec that we shared during our board call

13   last night on June 29th.

14   Q    Prior to the meeting on last night June 29th were there

15   additional changes to the proposed DIP facilities?

16   A    Yes, there were.

17   Q    All right.  If we turn to page 4 of Exhibit 3 you'll

18   see the same timeline that we marked earlier as the

19   demonstrative, correct?

20   A    Yes, that's correct.

21   Q    And what was the point of sharing this chronology with

22   the board?

23   A    The point of the chronology was to share with the board

24   that there had been an active dialogue with multiple parties

25   and multiple changes and improvements to everyone's proposal

1    except for the first liens.

2    Q    Let's turn to -- where shall we start -- with page 5 of

3    the dec?

4    A    I have it.

5    Q    All right.  So as of this time there had been further

6    changes to both the -- what's called the unsecured group,

7    the EFIH unsecured group that the board was in favor of at

8    this point, correct?

9    A    There were further changes to the unsecured proposal,

10   yes.

11   Q    And further changes to what's called the second lien

12   NextEra proposal?

13   A    Yes.

14   Q    All right.  And did you just talk through what the

15   changes to the second lien NextEra proposal were as of this

16   time?

17   A    Sure.  From the prior board meeting the NextEra second

18   lien proposal had changed in a number of ways.  First of all

19   you can see the DIP is now sized at 2.325 billion, it was

20   reduced from 400- because they wanted to keep 100 million of

21   their second lien notes outstanding and not roll them into

22   the DIP, I believe they wanted to keep their claim

23   outstanding so that they could claim they're an impaired

24   class and any fight with the unsecureds.  They also

25   increased the size of NextEra's funding commitment from a

1    billion six to a billion six two five.  I believe they also

2    made the provision at the bottom of the page that they would

3    provide $150 million second lien loan facility to exit

4    because we had raised some concerns with them about how much

5    cash was in the company given they were paying out a lot

6    more cash than the other proposals and they were trying to

7    be helpful and provide some additional liquidities so that

8    their deal would be deemed to be feasible at exit.

9    Q    Prior to this meeting and prior to those changes in the

10   NextEra -- what I'll the NextEra proposal had the debtors'

11   representatives engaged in conversation with the

12   representatives of the NextEra proposal?

13   A    Yes, we did.

14   Q    And what in general was communicated to them between

15   these two board meetings?

16   A    Well, I remember we got on a call with all of the

17   various legal and financial advisors to NextEra and between

18   counsel at Kirkland and myself we enumerated a series of

19   points, I think there might have been six or seven, saying

20   here are a number of dimensions where if you could improve

21   your proposal that would be viewed as being constructive in

22   our being able to view your proposal as something that we

23   could consider supporting.

24   Q    Did they in their revised proposals meet all of the

25   needs or desires expressed by the debtors in those

1    conversations?

2    A    Well one thing they did do which we did request was to

3    eliminate the optional redemption payment, they reduced it

4    from I think it was $160 million at the time to zero.  We

5    asked them to do some other things which they did not do

6    however.

7    Q    Such as?

8    A    One thing we asked them was to try to come up with a

9    mechanism so that we could be assured that their assertion

10   that the recovery that they're offering the EFIH unsecureds

11   represents full payment of their claims so that we could

12   therefore have some comfort that we wouldn't end up in a

13   valuation fight with the EFIH unsecureds at confirmation

14   over whether conversion of this DIP into equity would ever

15   happen.

16   Q    And did you get that comfort?

17   A    No, we did not.

18   Q    In the filed objections one of the things the second

19   lien group has argued is that their proposal is better for

20   the debtor because the interest rate of six percent is lower

21   than the interest of six and a quarter percent, correct?

22   A    That's correct.

23   Q    Do you view that as beneficial to the debtor under the

24   terms of the proposed DIPs?

25   A    Well since their DIP is bigger than the DIP that's

1    proposed by the EFIH unsecureds the actual interest expense

2    that the estate would incur if we went through with their

3    proposal is actually much higher.

4    Q    So the cost is higher despite having a lower rate?

5    A    Yes, that's correct.

6    Q    Another argument that's been made by the second liens

7    in their objections is that the facility is higher and

8    therefore implies a higher equity value at EFH.  Are you

9    familiar with that argument?

10   A    I am.

11   Q    And does that in your judgment make their proposal, the

12   NextEra proposal more attractive to the debtors?

13   A    No.  As I said earlier, I think that because the

14   structure of their deal is completely different, because as

15   I said earlier they're now paying both cash and equity to

16   the second lien noteholders and they're paying cash and

17   equity to the EFIH unsecureds.  Just focusing on equity

18   value doesn't really tell the whole picture, in fact it

19   clouds the picture.

20   Q    Okay.  And we're going to turn to I think where you

21   would turn in this analysis to who gets what.  If you just

22   turn first though to page 6 there's a high level of

23   comparison of costs among the fees and costs among the DIPs,

24   correct?

25   A    That's correct.

1    Q    And we see under the unsecured group the 95 million

2    funding PIK fee, correct?

3    A    That's correct.

4    Q    Would you in light of the modification to that -- that

5    occurred after this dec was prepared?

6    A    Yes, it occurred after this dec was prepared.

7    Q    And would you then make any changes to this as a

8    consequence to that modification?

9    A    Yes, now I would make a change and basically strike the

10   95 million funding PIK fee under the unsecured group because

11   it is not payable in cash under any circumstances.

12   Q    Okay.  So what would total break-up fees under the

13   unsecured group be in this analysis after making the change

14   you described?

15   A    Total break-up fees would be zero.

16   Q    All right.  Now you've got a -- on pages, and I want to

17   turn to this quickly.  At pages 7 and 8 -- or should we turn

18   to page 8 I guess, recovery table?

19   A    Happy to do either.

20   Q    All right.  What is it -- let's look at page 8, the

21   recovery table.  What is it you're intending to show the

22   board here?

23   A    Well in -- obviously there are a lot of numbers so

24   unfortunately I could talk for hours about all the numbers

25   because that's my job, but the --

1    Q    We don't want to do that.

2    A    -- but the -- I know don't, no one wants to.  But the

3    overall reason for this page is that under each of the

4    constituencies again we put their total recovery as a

5    percentage of either their claim amount in the case of those

6    who are not putting up money but just have a claim and you

7    can -- or those who are making an investment like NextEra,

8    or in the case of those who both have a claim and are

9    offering to make an investment we showed their recovery as a

10   percentage of the combination of their existing claim and

11   their new money investment as a DIP investor.  And again the

12   purpose of this slide is very similar to the purpose of the

13   slides we talked about in the June 22nd dec, it shows across

14   a range of values who's getting what, and again what it

15   shows is that obviously the second lien noteholders are

16   doing better than we have proposed they should do because

17   they're fully secured and their make whole may or may not be

18   a claim, and as a result of that choice by NextEra the EFIH

19   unsecured creditors and the EFH unsecured creditors are both

20   doing worse.

21   Q    There was some discussion again during the opening

22   arguments about the trading prices of EFIH securities.  Do

23   you recall that?

24   A    I do.

25   Q    Does this bear on the degree to which you look at and

1    rely upon those trading prices in making your

2    recommendations to the board?

3    A    Well certainly we observe, we're not ignorant of them.

4    I would caution that in the case of the EFIH unsecured class

5    that there's roughly a billion five sixty of debt claim out

6    there, the unsecured committee there owns 80 percent of that

7    instrument, so there's roughly 300 million of these bonds

8    trading on the market, and I would hardly say that a market

9    with 300 million of bonds out there was very liquid.  To the

10   extent there are quotes they're probably -- maybe represent

11   trades of a couple of bonds, maybe at most a million bonds,

12   but it's not a broad liquid market and one trade on a buyer

13   still can push the market up and down dramatically.

14        And that goes even more importantly to the EFH

15   unsecured, it's an under $600 million class between Fidelity

16   which owns 73 percent of that class, and I understand from

17   the 2019 filing that Pacton (ph) owns about 80 million of

18   that class or another 12 percent.  So there's maybe 15

19   percent of, you know, 600 million trading, quote/unquote.

20        So yes, there are quotes and maybe a bond or two

21   is trading, but it's not the most determinative, it's

22   certainly not a liquid market.

23        Notwithstanding all that I would also caution

24   people in terms of those prices to recognize that between

25   now and the time the DIP would be funded that represents

1    both the trading -- or the economic value that one is going

2    to realize on your existing claim, plus it represents the

3    right to invest in the DIP.  Obviously the right to invest

4    in the DIP will mature when the DIP gets funded and you

5    obviously have to write a new check to be entitled to

6    participate in the value in the DIP.

7           So what this chart shows as differentiated from

8    the other is that here's what you're getting both for your

9    old claim plus your right to invest in the DIP.

10          THE COURT:  I'm sorry, I have a question.

11          THE WITNESS:  I'm sorry.

12          THE COURT:  That's all right.

13          I'm looking at EFIH second lien's make-whole cash

14   which you say constitutes a big change because of a choice

15   by NextEra and the second liens to pay 100 percent on the

16   make whole, and I'm looking at your footnote and that 142

17   number assumes zero to non-settled parties on 60 -- 57

18   percent of the make wholes.  If you actually to assume 100

19   percent payment on those make wholes you --

20          THE WITNESS:  One forty two would become 330.

21          THE COURT:  And that actually would tip things to

22   the --

23          THE WITNESS:  Well again, the --

24          THE COURT:  -- the second is doing better under

25   the current unsecured DIP.

1                THE WITNESS:  No, because the 115 percent --

2                THE COURT:  Uh-huh.

3                THE WITNESS:  -- is the recovery to the settling

4     second lien noteholders.  The full amount of the make-whole

5     accounts for --

6                THE COURT:  Right.

7                THE WITNESS:  -- 29 -- or actually 30 cents, so

8     our settlement offer offers settling holders have to make

9     whole are 115 on face.

10               THE COURT:  Right.

11               THE WITNESS:  A full make-whole payment would get

12    them to 130.  And I forgot to mention because there's so

13    many details here that a couple days ago the NextEra

14    proposal was modified so that the recovery in the NextEra

15    proposal on the make whole was reduced by 25 million, which

16    is roughly 4 cents of make-whole claim or something like

17    that.

18               THE COURT:  All right, well I'm confused.

19               THE WITNESS:  Yeah, I'm sure I confused everybody.

20               THE COURT:  When I'm looking -- what I've got in

21    front of me, page 8, EFIH second lien treatment, okay,

22    unsecured versus second lien/NextEra, and I'm trying to

23    understand how changing the assumption that the debtor will

24    be 100 percent successful in its litigation to being 100

25    unsuccessful in it litigation will change if it at all the

1    totals, totals percentage of principal, and the rest of the

2    waterfall so that it could have perhaps a more sort of

3    apples to apples comparison of the two proposals.

4              THE WITNESS:  Well this waterfall shows that we're

5    only able to settle with the 43 percent that have agreed.

6              THE COURT:  Right.

7              THE WITNESS:  And it assumes that the other 57

8    percent we're going to have to litigate with them.

9              THE COURT:  Right, and get zero.

10             THE WITNESS:  And if they get zero then these

11   waterfall amounts are exactly as stated.

12             THE COURT:  Right.

13             THE WITNESS:  We could run this table and say that

14   if we only settle for 43 percent and we litigated and lost

15   with the 57 percent --

16             THE COURT:  Right.

17             THE WITNESS:  -- we would actually have to incur

18   another $380 million of payments, and that 380 million of

19   value would come straight out of the equity accounts of all

20   the to be equity holders, the EFIH unsecureds and the EFH

21   unsecureds.  But we could run that math for you if you wish.

22             THE COURT:  Well it would -- it would reduce --

23   for example, (indiscernible - 3:35:46) we look at EFH

24   unsecureds where we're looking at recoveries of 52/58

25   percent, somewhere in that range, those numbers would go

1    down because -- those percentage recoveries would go down by

2    some metric because the numbers at the top would go up.

3              THE WITNESS:  Correct.

4              THE COURT:  All right.  So have you run them to --

5    if I -- if you were to run the numbers with the assumption

6    that the debtor pays 100 percent of the litigation claims

7    that 52/58 compared to the 43/44 that would -- there would

8    be shrinkage there but we don't know what the quantum would

9    be without actually doing the math.

10             THE WITNESS:  Yeah, we don't, but -- and I

11   shouldn't speak, but my sense is it wouldn't be so great

12   because half of their recovery or more than half their

13   recover is coming from cash in the cash of the EFH

14   unsecureds.

15             THE COURT:  Right.

16             THE WITNESS:  In fact exact -- not quite half.

17   Obviously since the EFIH unsecureds are going to end up

18   owning a vast majority of the percentage of the EFH --

19             THE COURT:  Uh-huh.

20             THE WITNESS:  -- they're the ones who have the

21   most to lose if we lose the make whole.

22             THE COURT:  Okay.  So I'm looking at the wrong --

23   I should be looking at the EFIH unsecureds?

24             THE WITNESS:  Yes, that's probably the most

25   important.  Obviously (indiscernible - 3:37:06) things that

```
 1    are important, but the --

 2            THE COURT:  Well --

 3            THE WITNESS:  -- the burden of losing the make

 4    whole will fall primarily on the EFIH unsecureds.

 5            THE COURT:  Okay.  So that 89,114 might drop.

 6            THE WITNESS:  Yes, by a meaningful amount.  In

 7    fact --

 8            THE COURT:  The --

 9            THE WITNESS:  In fact between the two of them they

10    own 90 percent of the equity --

11            THE COURT:  Uh-huh.

12            THE WITNESS:  -- and so 90 percent of the

13    380 million or say 350 million would be deducted from these

14    totals --

15            THE COURT:  Uh-huh.

16            THE WITNESS:  -- and say, for example, on the left

17    column 350- you've lost versus the 287- of total recovery --

18            THE COURT:  Uh-huh.

19            THE WITNESS:  -- so that's like a 15 cent drop

20    from probably 89 to 74.

21            THE COURT:  Okay.

22            THE WITNESS:  And then on the right column 360-

23    reduced by, you know, 350, it's like a 10 cent drop.

24            THE COURT:  Okay.

25            THE WITNESS:  But we'd be happy to run the numbers
```

1    for you to be precise.

2              THE COURT:  I'm just trying to understand the

3    chart.

4              Okay, thank you.

5    BY MR. MCGAAN:

6    Q    Did you make a recommendation to the board based on the

7    analysis reflected in this chart from last night?

8    A    Yes, we did.

9    Q    What was your recommendation?

10   A    Our recommendation was to reaffirm staying with the

11   existing EFIH unsecured second lien DIP proposal.

12   Q    And what in -- what were the principals reasons for

13   that recommendation, Mr. Ying?

14   A    Well from an economic standpoint there -- it apportions

15   the upside of the company where it should be with the junior

16   most creditors.  It provides a plan that is we believe

17   confirmable if the second lien DIP is confirmable because it

18   has the support of the EFIH unsecureds and the EFH

19   unsecureds as represented by Fidelity under the RSA.  And

20   because all of the so-called topping fees have been

21   eliminated from the instrument if when we get to

22   confirmation there are better deals out there for repaying

23   the DIP we can do so with no material -- with no incremental

24   costs to the estate.

25   Q    At the outset of my questioning I asked you what the

1    debtors' goals were in seeking the DIP financing.  Do you

2    recall that?

3    A    I do.

4    Q    And does the proposal that you recommended last night

5    satisfy each of those goals?

6    A    Yes, it does.

7    Q    What decision did the board make last night?

8    A    Again they decided to reaffirm supporting the second

9    lien DIP proposal made by the EFIH unsecured group.

10   Q    In your opinion is entry into the second lien DIP

11   proposal as currently constituted a reasonable exercise of

12   the debtors' business judgment?

13   A    Yes.

14   Q    One criticism that we've heard is that the mandatory

15   equity conversion feature locks in value here in advance of

16   a confirmation hearing.  You recall generally hearing that

17   criticism?

18   A    I do.

19   Q    Do you agree that the proposed second lien DIP with the

20   equity conversion feature does that?

21   A    No, I think it's the one-way option in the debtors'

22   favor.

23   Q    How so?

24   A    It locks in a conversion price, but if someone can

25   offer a better financing at a higher price we can take it at

1    the end without an incremental costs.

2              THE COURT:  What about this argument Mr. Rosner

3    was making about the fact that it is locked in because you

4    have to have an existing creditor as part of the transaction

5    in order to truly be competitive?

6              THE WITNESS:  I heard that argument and I believe

7    that since you can replace this DIP with something better,

8    if Mr. Rosner and his colleagues want to replace it with

9    something better and reallocate the value they can do so.  I

10   mean this really because there's no cost to refinance it you

11   can effective undo the DIP, and the estate's perspective

12   we've accomplished what we wanted to accomplish which is to

13   reduce the cash interest burden on the company.

14   BY MR. MCGAAN:

15   Q    Did you -- when analyzing the proposed equity split

16   built into this equity conversion feature, you took a look

17   at that, correct?

18   A    Yes, I did.

19   Q    And what is the current proposed equity split?

20   A    Well the DIP converts into 60 percent of EFH and the

21   remaining 40 percent of EFH is being apportioned between the

22   old EF -- or between the claims of the EFH unsecured

23   creditors, the EFH creditors, and the EFH shareholders.

24   Q    And given the size of the proposed DIP facility, the

25   proposed equity split implies a value for the company,

1    correct?

2    A    Yes, it does.

3    Q    Did you make a judgment about whether that was a

4    reasonable value?

5    A    Yes, I did.

6    Q    And I -- well tell me, what was your judgment in that

7    regard.

8    A    Well, I thought the valuation that's embedded in the

9    proposal by the EFIH unsecureds reflects the fact that they

10   are the fulcrum security holder.  It reflects the behavior

11   of the second lien notes who have said we're fully

12   adequately secured and we're entitled to our make whole.  I

13   think it reflects the behavior of Fidelity of the super

14   majority holder of the EFH notes.  We said, gee, I guess

15   they could have provided a DIP too, but they choose not to

16   even though they have trillions of dollars under management.

17   And obviously as the companies' banker we have continually

18   been monitoring valuation based on all the public comparable

19   metrics that go into a valuation and we constantly try to

20   update them, and the business assessment that the EFIH

21   unsecureds are the fulcrum security certainly fits well with

22   all the valuation metrics that we see and monitor closely.

23   So we felt that the form of the transaction not only met how

24   the creditors are actually behaving and agreeing to do a

25   deal, but they also met our criteria of if I had to produce

1    a valuation report, which everybody wants me to do at some

2    point, that at the time we signed the RSA it seemed to fit

3    closely with the valuation of metrics we were closely

4    monitoring.

5              THE COURT:  Mr. Shore?

6              MR. SHORE:  Objection and motion to strike to the

7    extent that the witness is providing any expert testimony.

8    There has been obviously no closure and no valuation

9    provided to anybody (indiscernible - 3:44:53).

10             MR. MCGAAN:  I'm not offering an opinion -- I

11   haven't asked a question about his opinion on value here, I

12   simply asked him what he did at the time to assure himself

13   about the reasonableness of the equity split and the implied

14   value, and now I'm going to ask him some questions about the

15   work he did to inform himself so he could provide that

16   advice to the board.  But we're not -- we're not asking the

17   Court to make a finding about value today, which is why I'm

18   not asking him to offer an opinion on value.

19             So with respect to the objection there hasn't been

20   a question that is seeking his expert opinion on value.

21             THE COURT:  Well then I'm confused what you're

22   asking him, because you're asking him, you know, whether his

23   advise -- whether he's comfortable with the implied

24   valuation of his advise and you're saying, well, I'm not

25   actually asking him what he thinks the value is, but you

1    can't ask him whether he's comfortable with the value of his

2    advice without asking him whether he's comfortable with what

3    the value is.  He has to have an opinion as to value in

4    order to say he's comfortable with it.

5              MR. MCGAAN:  The questions I'm -- the testimony

6    rather that I'm intending the elicit, Your Honor, and I hope

7    to do it right now, is to ask him because it's been raised

8    as an objection that he hasn't provided a full and formal

9    valuation opinion to the board or to this Court at this

10   time, and that's the case, and I'm going to have him explain

11   that.  But I want to ask him as a historic and factual

12   matter what work has he done to look at this issue and what

13   was it he told the board and why.

14             THE COURT:  All right.  Well, I'll see how it

15   plays out.

16             MR. MCGAAN:  Because that is --

17             THE COURT:  Mr. Shore?

18             MR. SHORE:  The issue is not whether Mr. Ying has

19   done a valuation or not, it's immaterial.  The question is

20   whether the debtors are operating with a valuation and

21   whether the debtors in the exercise of their business

22   judgment are doing the right thing here.  I think that's

23   even the standard to be applied, not what Mr. Ying did.

24             To the extent that the questions are seeking to

25   elicit from the witness here that he provided some sort of

1    value or he has an opinion with respect to value that needs

2    to meet the admissibility requirements of the Federal Rules

3    of Evidence.  He can't just stand up and say that he has a

4    view of value other than anybody else on the street saying

5    they have a view of value and polling the people in the

6    board room as to whether they have a view on value.

7              He's here as a financial expert, he was in the

8    board meeting as a financial expert, and to the extent he

9    was providing something if he wants to -- if they want to

10   elicit that testimony in court it needs to be admissible.

11             MR. MCGAAN:  Your Honor, it's admissible as a

12   historic fact about the work he did and the things he told

13   the board and why he said the things to the board.  It's not

14   even a question at all, it's a fact question.

15             THE COURT:  All right.  Let's see how it plays

16   out, but I have some concerns.  So ask your next question.

17             MR. MCGAAN:  Thank you.

18   BY MR. MCGAAN:

19   Q    All right.  Let's turn to this because there's been

20   some debate about the work you did.

21             What steps have you and your team at Evercore

22   taken since your retention to look at the question of value

23   to aid you in providing advice to the boards?  What are the

24   things that you've done since been retained in that regard?

25   A    Well, I think everybody in this courtroom is familiar

1    with the three basic procedures that an investment bank

2    would follow to try to come up with a valuation for a

3    subject company, comparable company analysis, discounted

4    cash flow, and precedent transactions.  We have obviously

5    attempted to construct value -- all the data and do all the

6    calculations in connection with each of those three prongs

7    of a valuation opinion.  Over time we have continually

8    monitored and updated that analysis.  Obviously as time goes

9    on the prices of companies change every day, companies may

10   come in or go out of what is a comparable company universe,

11   precedent transactions may happen that may add to the body

12   of evidence of what precedent transactions would be

13   comparable here, and even the discounted cash flow analysis

14   might change because of updated financials, new market data

15   that would help determine the weighted average cost to

16   capital and determine -- and the determination of a terminal

17   value in the discounted cash flow.

18           So we have continually tried to update those to

19   inform us as to what's a reasonable valuation.

20   Q    Okay.  And you mentioned earlier that -- that the

21   company to the belief that the EFIH unsecureds are the

22   fulcrum security, correct?

23   A    That's correct.

24   Q    Did the -- did the management and the board ask you for

25   your view on whether you thought that was the case?

```
 1    A    Yes, we --

 2            MR. SHORE:  Objection.  Now given the answer with

 3    respect to the works he's been doing with the three

 4    valuation methods and all the work he's done the question is

 5    clearly seeking the elicit expert testimony to

 6    (indiscernible - 3:50:17).

 7            THE COURT:  No, let's -- no, I don't so, not yet

 8    at least.  He's asking whether -- whether the board asked

 9    that question, right?

10            MR. MCGAAN:  Correct.  Correct.

11    BY MR. MCGAAN:

12    Q    With respect to the view taken by the company that the

13    EFIH secured -- unsecured creditors are the fulcrum security

14    did they ask your view on that?

15    A    Yes, they did.

16    Q    And what did you tell them?

17            THE COURT:  Now here we go.

18        (Laughter)

19            THE COURT:  Well who cares.  If he's not an expert

20    the dog could have told him what it's worth, but if he's an

21    expert you can only get that -- that's only testimony if

22    you're able to prove that it's valid expert testimony.

23            MR. MCGAAN:  The only -- the distinction I'm

24    attempting to draw, Your Honor, and I understand your point,

25    but the distinction I'm drawing very carefully and
```

1    intentionally is that there is no rule of admissibility of

2    expert testimony that governs a financial advisor's

3    recommendations to a board of directors.

4            If the criticism is that whatever he said to the

5    board about why he's comfortable that once one set of

6    creditors are the fulcrum security or why an equity split

7    was not unreasonable, the criticism is that what he said to

8    the board didn't meet the Federal Rules of Evidence for

9    expert opinion testimony.  They can certainly make that

10   argument, they can ask him the foundation questions I

11   suppose to test whether when he sat down with the board at

12   different times in the past and said, hey, here's my view

13   about whether I'm comfortable on this decision or that

14   decision meets those standards, but those standards don't

15   govern the things he said to the board.

16           So the criticism is that he should have done more

17   work or said something to meet evidentiary standards when he

18   spoke to the board last night, a week ago, a month ago.  I'm

19   not sure where that objection really gets other than to the

20   decision the Court needs to make about whether the board

21   should have been listening to Mr. Ying, and that's a fair

22   debate to have, but to elicit for this record what did you

23   tell the board, it doesn't have to meet the evidentiary

24   standards of expert testimony.  He in fact said something to

25   the board about it.  I don't know what that's inadmissible,

1    it's a historic fact.

2              MR. SHORE:  You've got a dual -- I'm going t have

3    a dual objection, Your Honor.

4              We don't have a board member in the seat.  If the

5    question was being asked of a board member what was told to

6    them about valuation then I can cross-examine that person on

7    whether or not there was a dog barking out the valuation to

8    them or they believed that it was an expert providing it.

9    That's one thing, and that's what Mr. McGaan is seeking to

10   elicit through this witness.  That's all hearsay.  The board

11   member can come in and say this is what I heard and relied

12   upon in making my determination.

13             Putting this witness in the stand to say what he

14   told becomes expert testimony with respect to what's going

15   on.  There is no way to cross-examine this expert witness on

16   what his conclusions are without having all of the material

17   on which he expressed that opinion.  So this is the wrong

18   witness to provide the testimony that Mr. McGaan is seeking

19   elicit.

20             THE COURT:  Okay.  I'll agree with Mr. Shore.

21   Objection sustained.

22        (Pause)

23   BY MR. MCGAAN:

24   Q    Okay.  Let me go back to your testimony that the

25   mandatory equity conversion feature in the proposed DIP

1    along with the size of the facility implies an equity value

2    for the company.  Do you recall that?

3    A    I do.

4    Q    And it does, right?

5    A    Yes, it does.

6    Q    All right.  And there's been some argument today, and

7    I'd like you to address it, that somehow locks in value

8    at confirmation in this case.  Do you recall that?

9    A    I do.

10   Q    All right.  Now given the way in which you understand

11   the proposed mandatory equity conversion feature to work,

12   what happens if the value of Oncor goes up substantially by

13   the time of confirmation?  What plays out?

14   A    Well instead of allowing the DIP to convert to equity

15   the debtor could, with the benefit of someone else's offer

16   that implies a much higher valuation, could refinance out

17   the billion nine DIP loan and thereby replace that

18   conversion with some other conversion at a higher price.

19   Q    And what happens if it goes down, what plays out?

20   A    Well, I think the debtor would avail itself of the best

21   offer, which would be this offer and not seek any third

22   parties at any lower offer.  But we've, as I said, set a

23   one-way option or a floor on the value at which the DIP will

24   convert into equity of EFH.

25   Q    And is that the one-way option you referred to earlier

1    in your testimony?

2    A    Yes, it is.

3    Q    All right.  Now, I want to ask you about the turn now

4    to talk about the economics of the proposed make-whole

5    settlement.

6              First, describe the terms of the make-whole

7    settlement offer that the debtors are seeking approval of

8    here.

9    A    Well there's an offer to purchase outstanding that

10   describes specific prices for each of the two outstanding

11   debt securities, the 11 percent note, and the 11 three

12   quarter percent note.  There are specific calculations that

13   went into deciding on what those amounts are.  There's a

14   settlement date involved.  There are treasury interest rates

15   involved in the calculation of why those numbers are the way

16   they are.  But the represent approximately a 15 -- 50

17   percent of the make-whole calculation for each of those two

18   debt instruments as of an assumed closing date, which I

19   believe was July 9th.

20   Q    Okay.  And how is the settlement being funded?

21   A    The settlement is being funded by the excess cash that

22   currently sits on EFIH's balance sheet by virtue of raising

23   a $5.4 billion DIP where only 4.4 billion of that DIP was

24   used to retire the existing first lien notes.

25   Q    When did negotiations over the proposed settlement

1    begin?

2    A    I believe they began in earnest in late January, early

3    February when active discussions started between Fidelity as

4    a large holder of the EFIH second lien notes and the EFIH

5    unsecureds and the equity of EFH and the company.

6    Q    What were the companies' goals in seeking to come to

7    agreement on a make-whole settlement?

8    A    Well obviously the company would like to have certainty

9    in terms of what will the make whole be.  It certainly helps

10   induce an equity investor to commit to a valuation.

11   Obviously we only have 43 percent of the second liens

12   agreeing to the settlement, so there is uncertainly, and

13   that obviously weighs on the valuation that any equity

14   investor would put on the company.  And obviously Fidelity

15   was a large holder across the capital structure, and I don't

16   think there's any denying the fact that we needed Fidelity

17   to reach a consensual for EFH and EFIH.

18   Q    Is the -- are the terms of the offer that you've

19   described being made to all second lien noteholders equally?

20   A    Yes.

21   Q    Why did the company open up the settlement offer to all

22   second lien noteholders?

23   A    Well, I think we just felt it was the right thing to

24   do.  We certainly didn't have to.

25   Q    What percentage of the second lien noteholders have

1    indicated acceptance of the proposed settlement terms?

2    A    Originally when we signed the RSA 35 percent of the

3    outstanding second liens had signed on, and since -- since

4    that time I believe we've picked up another 8 percent,

5    162 million facing out of second liens have tendered into

6    the tender offer, so we're up to 43 percent of the

7    outstanding.

8    Q    Some of the objections being made to the proposed make-

9    whole settlement are along the lines of Fidelity as the

10   second lien noteholders being paid more than the terms of

11   the settlement you just described, correct?

12   A    Indeed I've heard that.

13   Q    Okay.  Do you agree with that criticism?

14   A    No.

15   Q    Why not?

16   A    Well, I can't recount all the allegations or

17   assertions, but one of them I know is that they've asserted

18   that Fidelity is getting paid a fee for providing

19   500 million of first lien financing as part of the first

20   lien DIP.  We discussed that the last time I was in this

21   courtroom.  Fidelity was lending the company $500 million in

22   terms of the loan were the same terms that anyone else would

23   have charged us had we gone to someone else, and obviously

24   that financing was approved.

25             I believe people have also said that why is

1    Fidelity getting 11.25 million in connection with their

2    participation as a 9 percent participant in the $1.9 billion

3    DIP --

4              THE COURT:  Hang on.

5              MR. HOROWITZ:  Your Honor, Greg Horowitz on behalf

6    of the second lien trustee and ad hoc group.

7              I've been waiting, but I have an objection to this

8    whole line.  I think there's lack of foundation that the

9    witness has any knowledge of the nature of the discussions,

10   and it's unclear to me whether opinion testimony is being

11   offered, but if there is them I'm sure you have the witness

12   who's qualified to offer an opinion on the subject.

13             THE COURT:  I don't think it's opinion testimony.

14   Well let me hear the response.  Mr. McGaan?

15             MR. HOROWITZ:  (Indiscernible - 4:00:34) had

16   anything to do with the negotiations of the make-whole

17   settlement, now he's offering either fact testimony, in

18   which case he has no competence to do so, or opinion

19   testimony, and I'm not clear of why.

20             MR. MCGAAN:  The foundation for the questions,

21   Your Honor, are number one, his role in advising the company

22   with respect to the make-whole settlement.

23             THE COURT:  Uh-huh.

24             MR. MCGAAN:  Both its economic benefits and

25   detriments, and the questions go to why is it that certain

1    payments are being made to Fidelity.  He's been testifying

2    all afternoon about why the company is and why he advised,

3    number one, and secondly, why the company is in fact making

4    certain payments, entering into certain transactions

5    proposing to pay certain fees and not others.

6           These are simply fact questions about why is it,

7    and I can ask it that way, why is Fidelity being paid X and

8    why is it -- the argument is they were paid that for a

9    different reason, the debtor has a different perspective and

10   I think he's entitled to testify to it.

11          MR. HOROWITZ:  But, Your Honor, I think it's a

12   factual issue on what basis Fidelity is getting these extra

13   elements of value, and the witness has nothing to do with

14   it, he hasn't been asked whether he had anything to do with

15   it.  I think it's different than what's been -- he's been

16   testifying to all afternoon, because it is clear that he's

17   been testifying about the advice he's given to the board

18   about competing DIP proposals.  There hasn't been any

19   discussion about who approved the make-whole settlement --

20          THE COURT:  All right.

21          MR. HOROWITZ:  -- how the make-whole settlement

22   has evolved.

23          THE COURT:  Why don't you lay a foundation if you

24   can.

25          MR. MCGAAN:  Sure.

1    BY MR. MCGANN:

2    Q    You're -- you testified in this courtroom in support of

3    the first lien DIP facility, correct?

4    A    Yes.

5    Q    Did Fidelity, as proposed and approved by the Court,

6    participate in that DIP facility?

7    A    Yes, it did.

8    Q    By what amount?

9    A    Well they had existing bonds which they rolled into the

10   DIP facility, and they invested a fresh 500 million of cash

11   into the DIP facility.

12   Q    All right.  And was Fidelity paid a fee in connection

13   with its participation in that DIP facility?

14   A    Yes.

15   Q    How much was the fee both percentage wise and then

16   dollar amount?

17   A    For the $500 million of fresh capital investment in the

18   first lien DIP they were paid a 1.75 percent fee, which is

19   $8.75 million.

20   Q    Did you recommend that the board approve Fidelity's

21   $500 million participation in that DIP facility along with

22   the fee that you just described?

23   A    Yes.

24   Q    Did you make that recommendation -- tell me why you

25   made that recommendation?

1   A     Well from the debtors' perspective it didn't matter who

2   they raised the money from, whether it was Fidelity or

3   someone else that would have come on the same terms, and if

4   that was inducement to Fidelity to agree to their signing

5   the RSA we thought that was clearly in the best interest of

6   all constituencies in the debtors' estates.

7   Q     All right.  In your view it was your recommendation

8   that the debtors should make that payment to induce Fidelity

9   to settle its make-whole claim on second lien notes that I

10  base this information?

11  A     You know, I can't go to what Fidelity's motivation is,

12  all I know is if they're willing to sign the RSA and this is

13  a term of the transaction it's -- I think it stands on its

14  own as good business judgment, but the debtor is no worse

15  off by letting Fidelity invest versus letting someone else

16  invest.

17  Q     And why are they no worse off?

18  A     Because if we has to raise the 500 million from

19  Deutsche Bank or someone else they would have charged us the

20  exact same amount.

21  Q     Okay.  You're familiar with the fact that under the RSA

22  Fidelity is to be paid an $11,250,000 fee, correct?

23  A     I am.

24  Q     And what does the RSA say that the purpose of that fee

25  is?

1    A    The fee is in connection with Fidelity's participation

2    in funding 9 percent of the 1.9 billion second lien DIP.

3    Q    And is -- does the RSA describe that fee in connection

4    with Fidelity's position in the capital structure?

5    A    It says that the participation in nine percent of the

6    second lien DIP is by virtue of Fidelity's ownership

7    position in the EFH unsecured notes.

8    Q    Did you recommend in favor of approving the payment of

9    that fee on the terms and for the purposes you just

10   described?

11   A    Yes, I did.

12   Q    Okay.  Based on your involvement in negotiating and

13   making recommendations to the company with regard to the

14   proposed second lien make-whole settlement do you believe

15   it's a reasonable settlement?

16   A    Yes.

17   Q    Why?

18   A    Well it settles -- actually would you please ask the

19   question again?

20   Q    Yes.

21   A    The whole question?

22   Q    Yes.  Do you believe that the proposed make-whole

23   settlement is reasonable?

24   A    Yes, I do, because it --

25   Q    Why?

1    A      -- settles the make-whole claim and a substantial

2    discount to face amount and I think it adds more certainty

3    from an equity investor's perspective as to exactly what are

4    they buying when they're committing to invest a billion

5    nine.

6    Q     Earlier in response to a question Judge Sontchi asked

7    you said that the EFIH unsecured creditors have the most to

8    lose of the make-whole litigation is lost.  Do you remember

9    saying that?

10   A      I sure do.

11   Q     What do you mean by that?

12   A      Well under the proposed deal if the make-whole

13   litigation on the remaining outstanding make-whole claim,

14   which I believe is $380 million, if the second lien notes

15   are fortunate to win that litigation the full cost of that

16   incremental claim will be added to the net debt of the

17   company and that'll basically be either -- it implies

18   therefore that the price that the unsecured noteholders are

19   paying by virtue of being a large shareholder fully falls on

20   their economics.

21   Q     What position do the EFIH unsecured noteholders take

22   with respect to the proposed settlement, do you know?

23   A      Well they're in support of the settlement, they

24   approved it, and they are also in support that if we can't

25   settle the entire second lien make-whole claim they're still

1    willing to make the economic commitment they made without

2    varying the price of their investment.

3    Q    Does that contribute in any way to your view on whether

4    the proposed terms of the settlement are reasonable for the

5    debtor?

6    A    Yes, because the junior most constituency who bears the

7    cost has approved the settlement.

8              MR. MCGAAN:  Thank you, that's all I have for now,

9    Your Honor.

10             THE COURT:  All right.  We're going to take a

11   recess and then we'll turn to cross.  Who's going to want to

12   cross this witness?  Mr. Horowitz?

13             MR. HOROWITZ:  Yes, Your Honor, I'm going to be

14   the first cross, and I don't know how long we plan to go

15   today.

16             THE COURT:  Well, I don't, we'll figure that out

17   later, I'm just trying to figure out the parade of who's

18   going to --

19             MR. HOROWITZ:  I expect that --

20             THE COURT:  You'll be going first?  All right.

21             UNIDENTIFIED SPEAKER:  I'll be going second, Your

22   Honor, (indiscernible - 4:07:45).

23             THE COURT:  Okay.

24             UNIDENTIFIED SPEAKER:  (Indiscernible - 4:07:47)

25   from Morrison & Foerster.

1          THE COURT:  You'll go third, all right.

2     Mr. Jonas?

3          MR. JONAS:  (Indiscernible - 4:07:52).

4          THE COURT:  All right.  Mr. Martin?

5          MR. MARTIN:  (Indiscernible - 4:07:54) Your Honor.

6          THE COURT:  All right, so five of you.  All right.

7     Oh, Mr. Shore.  All right.  Well we're going to take -- I

8     need 10 or 15 minutes to get reset here.

9          So we'll take a recess.  During the interim, sir,

10    you may not discuss your testimony with any person, and

11    we'll reconvene in about 15 minutes.

12        (Recess at 4:08 p.m.)

13          THE CLERK:  All rise.

14          THE COURT:  Please be seated.  Thank you.  Sorry

15    about that.

16          MR. HOROWITZ:  Thank you, Your Honor.  For the

17    record, Greg Horowitz from Kramer Levin Naftalis and Frankel

18    on behalf of the EFIH second lien notes trustee and the EFIH

19    second lien notes ad hoc group.

20          Your Honor, just for a little further orientation

21    and also for the witness, as Mr. McGaan said, there are

22    three binders of exhibits that were premarked as objector's

23    exhibits.  Those consist of all of the exhibits to the

24    depositions.  It may be over inclusive, but as we hopefully

25    are going to get Your Honor the highlighted deposition

1    transcripts, everything that's referred to in there should

2    be in those binders.

3         It also includes exhibits that were submitted in

4    connection with the objections and other pleadings that were

5    pulled out.  You will also have, both of you, a separate

6    binder of all of the declarations that have been submitted

7    in connection with these two motions, and another binder

8    representing the pleadings.  And I may make reference to any

9    one of those and we'll help you try and find those, Mr.

10   Ying.

11        THE COURT:  Well, I have three binders of

12   exhibits, that's all I have.

13        MR. HOROWITZ:  You better get a binder of the

14   pleadings and a binder of the declaration.  That was the

15   debtors' job.

16        THE COURT:  Thank you.

17        MR. HOROWITZ:  Thank you, Your Honor.

18        THE COURT:  Melissa, do you need a set?  Make sure

19   Melissa has a set.  Go ahead.

20        MR. HOROWITZ:  Thank you.

21   CROSS-EXAMINATION

22   BY MR. HOROWITZ:

23   Q    Good afternoon, Mr. Ying.

24   A    Good afternoon.

25   Q    Mr. Ying, you've testified both in your declarations

1    and I think on direct today, that in your opinion, the EFIH

2    second lien DIP facility that the debtors are seeking to

3    have approved today is an integral component of a consensual

4    restructuring; is that correct?

5    A    Yes.

6    Q    And when you say it's an integral component, you mean

7    to suggest that in your view there is no other way that the

8    debtors can accomplish the essential goals of their

9    restructuring, correct?

10   A    That's true.

11   Q    Okay.  And one of those essential goals, one of the

12   foremost of those essential goals is to accomplish a tax

13   free spin of EFH.

14   A    Yes.

15   Q    I should've said a tax -- TCEH.

16   A    TCEH.

17   Q    I never get that right.  EFIH is what remains, TCEH is

18   what gets spun, right?

19   A    That's correct.

20   Q    And the tax free spin is essential to avoid very large

21   tax liabilities in the range of $6 billion; is that right?

22   A    That's correct.

23   Q    Okay.  And as you -- I think you explained it pretty

24   well this afternoon, to accomplish a tax free spin, the

25   debtors need to assure that there is continuity of interest

1    with regard to the -- with EFH ownership.

2    A    That's correct.

3    Q    And continuity of interest, I think this is, you know,

4    maybe the blindfolding of a blind -- I'm as ignorant on tax

5    issues as you are, but I think we both understand that

6    generally it requires that a majority of the equity in the

7    reorganized company has to remain in the hands of present

8    creditors, correct?

9    A    I think it's actually expressed in the reverse, but I

10   think it's the same effect.  I don't think any person can

11   own a majority, and to the extent creditors do, there's an

12   exemption for them.

13   Q    Okay.  Now, this second lien DIP facility that's being

14   presented to the Court is actually a hybrid of two different

15   types of transactions.  You'd agree with that, wouldn't you?

16   A    I believe if you -- if it's -- yes, it's a DIP, and

17   yes, it converts into equity, so it's two different

18   instruments, yes.

19   Q    Okay, exactly.  So one of the elements of it is the

20   extension of credit to the debtor in possession during the

21   course of the bankruptcy case, right?

22   A    That's correct.

23   Q    And the other part of it is something akin to a back

24   stopped rights offering upon emergence from bankruptcy.

25   A    That's correct.

1    Q    And that rights offering part of this hybrid

2    transaction is the part that's necessary to assure -- to

3    accomplish -- assure continuity of interest, and thereby

4    accomplish a tax free spin.

5    A    Well, I think they're inextricably linked.  You can't

6    ignore the fact that we have to refinance the existing

7    second lien debt at a lower interest rate.

8    Q    Okay.  But I'm simply asking about the tax free spin

9    part.  And in order to accomplish the tax free spin, you

10   need the back end, back stop rights offering, correct?

11   A    That's correct.

12   Q    And, in fact, there was a time, a period of time --

13   well, withdrawn.

14        First of all, you testified this afternoon that the

15   company began to explore tax free spin structures in January

16   -- late January or early February of this year, right?

17   A    Well, the company went back to the laboratory post-

18   November 1st, to look at a wide range of alternatives.  We

19   came up with a tax free spin idea, or the company and its

20   tax advisors did in late November, early December.  But in

21   negotiations between the relevant parties at EFH and EFIH

22   only began in earnest in late January/early February of

23   2014.

24   Q    Thank you.  Take the correction.

25        And at that time, and for a period of time thereafter,

1    there was a time -- first of all, I'm going to refer to what

2    I think you and Mr. McGaan were referring to as the EFIH

3    unsecureds as the PIKs, you'll understand what I mean when I

4    say that?

5    A    Yes.

6    Q    Because I'll always get it wrong, if I try EFIH

7    unsecureds.

8         So there was a period of time when the PIKs and the

9    debtors were negotiating over a potential restructuring

10   support agreement, RSI.  It did not contemplate a DIP, but

11   did contemplate a rights offering, right?

12   A    That's correct.

13   Q    Now, if you look at your first exhibit binder, if I ask

14   you to turn Exhibit 8.

15   A    Yes, I have it.

16   Q    And this is an exhibit we've looked at it and discussed

17   at your deposition, right?

18   A    Actually that feels like so long ago, I don't remember.

19   Q    That was six days ago.  Okay.  In any event, Exhibit 8

20   is a string of e-mails and attachment, and the first one, or

21   the last one actually, but the one up at the top is from

22   yourself to Samuel Green.  And who's Mr. Green?

23   A    He's the senior banker at Centerview who advises the

24   techs.

25   Q    Okay.  And attached to this string of e-mails is a term

1  sheet that Mr. Green had sent on behalf -- a proposed --

2  well, it's referred to at the end.  I'm looking at the very

3  last page, as an illustrative restructuring term sheet, and

4  this came from the PIKs, right?

5  A    I believe so, yes.

6  Q    And this term sheet, as it says in the very first

7  bullet point, it contemplates a restructuring of EFH and

8  EFIH, right?

9  A    Actually I don't have the term sheet, so I'm little bit

10  at a loss.

11  Q    Oh, I'm sorry, you don't have a two-sided copy?  Ellis,

12  can you make sure he has the right -- is it a two-sided

13  copy?

14  A    It's a two-sided copy, but all I have is an e-mail

15  from --

16        MR. HOROWITZ:  Your Honor, is your copy -- I'm

17  assuming, the term sheet at the end?  I apologize.

18        THE COURT:  Yeah.

19     (Pause)

20        MR. HOROWITZ:  It's in my copy of the binder.

21        THE COURT:  I can't help you there.

22        MR. HOROWITZ:  Your Honor, I'll move to the next

23  document then, while we're looking into this.

24  BY MR. HOROWITZ:

25  Q    Let me ask you to turn to -- I apologize that this is

1    so far away, but tab 68, Exhibit 68 in your binders, and

2    hopefully that one will also have --

3    A    Which binder is that in?

4    Q    That should be in the third binder.  It's the last

5    exhibit in the second binder, Objector's Exhibit No. 68.

6    A    I have it.

7    Q    And this is another set of e-mails with a term sheet,

8    this one does have a term sheet in it, doesn't it?

9    A    Yes, it does.

10   Q    And this is from March 15th, 2014, correct?

11   A    Yes.

12   Q    So if you look at the term sheet, and that's the

13   document that's Bates ending 1211, the first page, do you

14   see that?

15   A    Yes.

16   Q    Under framework, this is a term sheet that was proposed

17   by the PIKs for a restructuring of EFH and EFIH by a pre-

18   arranged Chapter 11 plan with a tax free spin of TCEH.  Do

19   you see that?

20   A    Yes.

21   Q    Okay.  And if you look at the second page, or the next

22   page, the page that's Bates ending 12, do you see on the

23   second box, this is under -- I know it's hard to read

24   because Xeroxing isn't great, but "treatment of key

25   constituents EFIH second lien notes."  Do you see that box?

1    A    Yes, I do.

2    Q    Okay.  And do you see that at this time, what the PIKs

3    were proposing was a reservation of rights on the make-

4    whole, if no settlement is reached to make-whole to be

5    litigated, and based on outcome of litigation; next bullet

6    point is, we finance that par from proceeds of a second lien

7    DIP or alternatively, reinstated and paid down pursuant to

8    equity claw at effective date of Chapter 11 plan, right?

9    A    Yes.

10   Q    And you described -- on questioning by Mr. McGaan, you

11   described what that equity clause, right?

12   A    Yes, I did.

13   Q    And it is accurate that for a period of time, the PIKs

14   and the debtors were contemplating an RSA that would've left

15   the second lien notes in place while the make whole was

16   litigated, correct?

17   A    Correct.

18   Q    And if the debtors prevailed on the make whole, then

19   there would be a second lien DIP to take out the existing

20   second lien notes, right?

21   A    Correct.

22   Q    And if the second lien noteholders prevailed on the

23   make-whole litigation, then they would be reinstated and

24   whatever portion was available for equity claw would be

25   clawed back, right?

1    A    Correct.

2    Q    Okay.  And as far as -- oh, strike -- in connection

3    with that term sheet, the PIKs were prepared to enter into a

4    back stop rights offering in order to purchase equity on

5    emergence, right?

6    A    I believe so, yes.

7    Q    And that back stop rights offering was without a DIP,

8    would've been satisfactory to meet the debtors tax

9    objectives, right?

10   A    I believe so, yes.

11   Q    So if I understand correctly, it was only in late March

12   that the debtors and the PIKs determined to go ahead with

13   the current structure of a DIP that would be funded before

14   resolution of the make-whole litigation, right?

15   A    That's correct.

16   Q    The DIP with the mandatory conversion feature as you've

17   referred to it, right?

18   A    Yes.

19   Q    Okay.  Now, prior to the petition date, the debtors did

20   not run a traditional marketing process for this DIP,

21   correct?

22   A    Correct.

23   Q    And the reason or one of the reasons at least I guess,

24   the reason you offered in your declaration why the debtors

25   did not do so was because of tax considerations, right?

```
 1    A    That's correct.

 2    Q    Because in light of tax considerations, the debtors had

 3    concluded that there was only a very limited number of

 4    creditor constituencies who could deliver the required tax

 5    treatment.

 6    A    That's correct.

 7    Q    And those -- that limited universe group included the

 8    existing creditor groups at EFIH and EFH, right?

 9    A    That's correct.

10    Q    Okay.  That'd be the first lien noteholders at EFIH,

11    right?

12    A    I'm sorry, I --

13    Q    I'm just -- I want to list all of them.

14         The first lien note -- the EFIH first lien noteholders

15    were one of those potential constituencies.  Would you like

16    me to rephrase?

17    A    I think at the time we didn't know if the first lien

18    noteholders could actually provide the DIP and still meet

19    the continuity of interest test.

20    Q    Okay.  Well, the second lien noteholders were one

21    potential constituency, right?

22    A    Actually, at the time we weren't sure that they could

23    do it either.

24    Q    Okay.  And the PIKs were one potential constituency,

25    right?
```

1    A     There it was clear that because they were naturally

2    compromising their claims, that was the obvious of party

3    that could meet the continuity of interest test.

4    Q    And by the way, the debtors never told the EFIH second

5    lien noteholders that they had any question about their

6    ability to provide the tax treatment, correct?

7    A     I believe that when the first second lien DIP proposal

8    was made by the second lien note group after we filed for

9    bankruptcy, we raised serious concerns about whether a cash

10   DIP to take out the second liens met the continuity of

11   interest test.  And it was only after a -- I forget if it

12   was a face-to-face meeting or a conference call between

13   professionals and tax professionals, that the idea emanate

14   that you would roll your second lien notes into the DIP, and

15   the DIP would then convert into equity.  And that roll-up --

16            THE COURT:  Can you keep your voice up, please?

17            THE WITNESS:  I'm sorry.  And that roll-up would

18   therefore meet the continuity of interest test.

19   Q    Okay.  I'm sorry, sir, I didn't understand that.

20        So your -- so we're in agreement then, we've got an

21   understanding that when it was understood that the

22   contemplation was a DIP that would roll up existing claims

23   into equity, the debtors were satisfied that that could also

24   provide the required continuity of interest?

25   A     And to be clear, I believe that the consensus of the

1    tax lawyers was, that's a little removed from the intent of

2    the Code and continuity of interest because these are fully

3    secured creditors getting paid at par, but given the roll-up

4    feature of existing second lien notes into the DIP, the DIP

5    then converts into equity.  The feeling from the tax lawyers

6    it was that if we go to the IRS and explain this to them,

7    they ought to agree, but it will take more effort than the

8    proposal from the PIKs.

9              MR. SHORE:  Objection, motion to strike with

10   respect to what the tax (indiscernible) are saying, it's all

11   hearsay, Your Honor.

12             THE COURT:  Agreed, stricken.

13             MR. HOROWITZ:  Thank you, Your Honor.

14   BY MR. HOROWITZ:

15   Q    Okay.  And I was just going through the list of

16   potential constituencies.  So the final potential -- another

17   potential constituency would've been EFH unsecured

18   noteholders, they could've provided the required tax

19   (indiscernible), correct?

20   A    That's correct.

21   Q    Now, even as to that limited group of potential credit

22   constituencies, the debtor never engaged in a marketing

23   process for a potential DIP prior to the petition date,

24   right?

25   A    That's correct.

1   Q    In your -- well, let me ask you to turn to the thin

2   binder which is your declaration binder.  It's underneath

3   the -- to your right, it's the one that's underneath the

4   bigger binder.

5        And if I ask you to turn to tab 2, I don't want to read

6   out this whole thing, but this is the declaration -- the

7   initial declaration that you submitted in support of the

8   second lien DIP motion, right?

9   A    Yes.

10  Q    And I'll ask you to turn to page 10, and paragraph 22,

11  but hold on for a second.  First of all, there did come a

12  time in early March, actually March 3rd, and I think it's on

13  the timeline, when without being solicited, the ad hoc group

14  of second lien noteholders had a meeting with the debtors to

15  provide a proposal for a DIP and equitization transaction,

16  right?

17  A    Yes.

18  Q    And in paragraph 22, you refer to that March 2014

19  proposal, right?

20  A    Yes.

21  Q    And you say that the debtors did not choose to pursue

22  -- that the debtors chose not to pursue that proposal

23  because, among other things, I'm looking at sub D, which is

24  the fourth line down, sir, the debtors believed that it was

25  -- it did not believe it was reasonably likely that the

1    proponents would agree to a less expensive settlement of

2    their alleged make-whole claims.  Do you see that?

3    A    Yes.

4    Q    And I think you gave some testimony along these lines

5    on direct with Mr. McGaan, I think you testified that it was

6    your understanding when the ad hoc group, the second lien ad

7    hoc group made that proposal that they -- one requirement to

8    that proposal was a 100 percent payment of the make-whole

9    claim?

10   A    That's correct.

11   Q    Okay.  Can you get Exhibit 29 in the binder, the second

12   binder?  It's exhibit -- did I say 29?

13   A    I have it.

14   Q    Now, Exhibit 29 is a slide deck from Rothschild.

15   Rothschild is financial advisor to the second lien

16   noteholders, right?

17   A    Yes.

18   Q    And this is a dec that was presented at a face-to-face

19   meeting on March 3rd, right?

20   A    Yes.

21   Q    And you attended that meeting?

22   A    I did.

23   Q    Okay.  And if you look at the -- at page 4 of the dec,

24   it's Bates ending 54, the DIP facility proposal.  Do you see

25   that?

1    A    Just flipping pages, getting to it.

2    Q    Sure.

3    A    Page 4, got it.

4    Q    On this page, the second lienholders expressed a

5    willingness to provide DIP financing on a second lien basis,

6    right?

7    A    That's correct.

8    Q    But they don't spell out terms such as interest, that's

9    to be negotiated later, right?

10   A    That's correct.

11   Q    Okay.  Now, if I ask you to turn to the next page,

12   second lien plan proposal, this is a schematic showing that

13   the second lienholders are also proposing to convert their

14   claims into equity of a reorganized company, right?

15   A    Yes.

16   Q    And I actually -- when I showed you your declaration, I

17   skipped past point A, but one of the points, and I think you

18   said this on direct as well, one of the problems the debtors

19   had with the proposal was that you thought it was -- it

20   represented too low a valuation based on the amount of

21   equity that it would convert into.

22   A    That's correct.

23   Q    Right.  And you were referring to the -- in the

24   schematic in the middle, the 88.6 percent ownership in EFIH;

25   is that right?

```
 1    A     I was thinking of a different page, but it's the same

 2    number.

 3    Q     Okay.  And that's in brackets, right?

 4    A     It is.

 5    Q     And there's a coil out box to the left of it, right?

 6    A     Yes, there is.

 7    Q     And the coil out box says, "illustrative analysis at

 8    full make whole as in 341-16," right?

 9    A     Yes, it does.

10    Q     And then the next sentence says, "consensual plan may

11    involve a discount," right?

12    A     Yes, it does.

13    Q     Okay.  So in this presentation, you understood the

14    second lienholders to be saying that they're prepared to

15    discuss a discount on their make-whole claim and consensual

16    plan, didn't you?

17    A     I did remember that, and I asked how big a discount and

18    they wouldn't tell me.

19    Q     Okay.  Well, two weeks later you received a proposed --

20    a joint proposal on behalf of Fidelity and the ad hoc group

21    for a settlement of make-whole claims, right?

22    A     Yes.

23    Q     And if I can ask you to turn to Exhibit 2, the second

24    tab in the first binder, chronological order would've made

25    sense, but we didn't have time.
```

```
 1              THE COURT:  That's okay.

 2    Q    Okay.  Thank you.  Now, Exhibit 2 is an e-mail saying

 3    that I think -- you looked at this deposition, do you

 4    remember that?

 5    A    Yes, I do.

 6    Q    And it would be established, I told you, and you can

 7    confirm, you're not on the e-mail string, right?

 8    A    That's correct.

 9    Q    Have you subsequently learned that, in fact, you did

10    see this e-mail and the attachment?

11    A    Yes, after my deposition I went and looked and refound

12    this in our files.

13    Q    And you found that somebody had forwarded it to you,

14    right?

15    A    I never looked for the cover and the e-mail, but we did

16    have it.

17    Q    Okay.  And this is an e-mail from Nate Vangouser he was

18    -- he's been the negotiating representative at Fidelity in

19    this case, right?

20    A    Yes.

21    Q    Okay.  To a variety of people, but the first one is

22    Michael McDougal, whose deposition is in evidence in this

23    case or will be tonight.  And Mr. McDougal is an EFH board

24    member, right?

25    A    Yes.
```

1   Q    And I think you testified that Mr. McDougal played a

2   role in the negotiations of the RSA, right?

3   A    Yes.

4   Q    And the first sentence after "Hi, Michael," Mr.

5   Vangouser writes, "please attach -- find attached this

6   proposal which is supported by funds holding in excess of

7   two-thirds of the EFIH second lien notes, including

8   Fidelity," right?

9   A    Yes.

10  Q    And you had an understanding at the time as to

11  approximately what Fidelity's holdings in the second lien

12  notes were, right?

13  A    Yes.

14  Q    And approximately what holdings were represented by --

15  I'm going to stop saying ad hoc now, and say by the Kramer

16  Levin Rothschild group?

17  A    Yes.

18  Q    Okay.  And you understood that any proposal supported

19  by funds holding in excess of two-thirds of the EFIH second

20  lien notes necessarily included both Fidelity and the ad hoc

21  group, right?

22  A    Yes.

23  Q    Okay.  And turning your attention to the -- well, you

24  understand that the proposal that Mr. Vangouser was

25  transmitting had two alternative proposals for settling the

1   make-whole claim, right?

2   A    Yes.

3   Q    One would've been through cash, been cash raised

4   through a rights offering, right?

5   A    Funded by the unsecureds, yes.

6   Q    Right.  Well, at the time of this proposal the

7   contemplation was that the unsecureds would be backstopping

8   a rights offering, right?

9   A    Correct.

10  Q    And part of this proposal, which you'll see at page 3,

11  it's Bates ending 102 under rights offering treatment.

12  A    103?

13  Q    102.

14  A    102, pardon me.  All right.

15  Q    That under the second box in that category of treatment

16  of key constituents, EFIH second lien notes, do you see the

17  second bullet point is under rights offering treatment make-

18  whole settlement in an amount equal to bracketed 68 percent

19  of the full make-whole claim?

20  A    Yes.

21  Q    Okay.  And the proposal also included an alternative

22  settlement proposal in the event that the make whole would

23  be paid in equity, right?

24  A    That's correct.

25  Q    And that's on page 5, which is Bates ending 104.

1    A    I have it.

2    Q    And that that would be a proposal to settle the make

3    whole at 75 percent if paid in equity, right?

4    A    That's correct.

5    Q    Okay.  So when you wrote in your declaration that the

6    debtors did not believe that the proponents would agree to a

7    less extensive settlement to their alleged make-whole claim,

8    at that point you were aware that shortly prior to the

9    petition date the second lien ad hoc group had proposed a

10   make-whole settlement at a material discount?

11   A    Well, as I testified in my deposition, I had no

12   recollection of this particular proposal.

13   Q    Okay.  You know it now though, right?

14   A    I do know it now.

15   Q    Now after receiving the ad hoc group's DIP proposal the

16   debtors did not make any counteroffer, right?

17   A    Which proposal are you referring to?

18   Q    FairPoint (ph).  We've seen that on March 3rd the ad

19   hoc group expressed an interest in providing DIP financing,

20   right?

21   A    That's correct.

22   Q    And the debtors did not make any counterproposal after

23   hearing the expression of interest did they?

24   A    That's correct.

25   Q    And have you read Mr. Snyder -- we'll be hearing from

1    Mr. Snyder hopefully tomorrow, but who is Todd Snyder?

2    A    Oh, he's the senior banker at Rothschild who's advising

3    the second lien group.

4    Q    Okay.  And have you read Mr. Snyder's declaration in

5    this -- on these motions?

6    A    Yes.

7    Q    Okay.  Mr. Snyder testifies that at that meeting the

8    debtors indicated that they had financing agreed to and were

9    not interested in other proposals, did you read that?

10   A    Yes.

11   Q    And you have no basis for disagreeing with that, right?

12   A    No, I have no basis for disagreeing.

13   Q    Okay.  And Mr. Snyder also testified that the debtors

14   were not willing to share the terms of the PIK RSA parties'

15   proposed financing.  You saw that, right?

16   A    Yes, I did.

17   Q    And you have no basis for disagreeing with that, right?

18   A    No.

19   Q    Now the terms of the -- I'll call it the original PIK

20   DIP that the debtors were seeking approval of on this

21   motion, the terms of that original PIK DIP were made public

22   on the first day of the bankruptcy, right?

23   A    That's correct.

24   Q    Among other things in Mr. Keglevic's first day

25   declaration, right?

1    A    Correct.

2    Q    Okay.  And less than two weeks after that -- I'm going

3    to the timeline, but it's on there -- the second lien ad hoc

4    group made a concrete competing DIP proposal, correct?

5    A    That's correct.

6    Q    Okay.  And -- let's see.  If we can take a look at what

7    was marked among the loose exhibits that are hopefully still

8    on your desk by Mr. McGaan as Debtor's Exhibit 1, it's also

9    -- but it doesn't matter.

10   A    I have it.

11   Q    Do you have Debtors' Exhibit 1, the June -- sorry, the

12   June 16th board book?

13   A    Yes.

14   Q    Okay.  So I'll just ask you to turn to page 2 of that

15   book, the comparison of key terms of proposals.  Do you see

16   that?

17   A    I have it.

18   Q    Okay.  The second lien group proposal that's listed on

19   this page, it's the one I just referred to that was

20   submitted less than two weeks after the bankruptcy, right?

21   A    That's correct.

22   Q    And as of June 16th the PIKs had not made any changes

23   to their PIK DIP proposal, right?  The proposal that's

24   described on this page is the one that existed on the

25   petition date?

1    A    I believe so, yes.

2    Q    Okay.  And just looking down this list I will ask you

3    to confirm that there isn't a single key term identified

4    here where the second lien group proposal is not equal or

5    superior.

6    A    Well if you're referring to interest rate and cash fees

7    I think that's correct.

8    Q    Okay.  And you have a -- you have a category on this

9    list called topping fees, right?

10   A    That's correct.

11   Q    And if I understand the logic behind that you include

12   in topping fees any fee that a competing provider would have

13   to pay in order to be superior to the existing proposal.

14   A    That's correct, we are evaluating each of the DIPs

15   based on their cash impact to the debtor.

16   Q    And based on how much more value a competing provider

17   would have to offer in order to be superior to that

18   proposal, right?

19   A    That's correct.

20   Q    So, for example, under the PIK proposal in that box you

21   have alternative transaction fee of 57 million, and I gather

22   that if somebody else came in with another proposal and the

23   debtors took it after signing up the PIK DIP they would have

24   to pay a $57 million fee to the PIKs; is that right?

25   A    That fee was operative only between the time of

1    approval and funding.

2    Q    Okay.  Exactly.  So if the DIP were approved and then

3    somebody came in with a better offer --

4    A    Before funding, yes.

5    Q    Right.  And the second item, the funding PIK fee,

6    that's not a cash item, right?

7    A    Not on the initial grant date, no.

8    Q    Okay.  But is it part -- it becomes part of the DIP

9    lenders claim that would have to be satisfied after funding

10   if -- in order to take out the DIP loan, right?

11   A    Correct.

12   Q    Okay.  And the optional fee payment fee of 380 million

13   is also an amount that would have to be paid after funding

14   if someone came to took out -- to take out that DIP, right?

15   A    That's correct.

16   Q    Okay.  So the topping fees for the PIK DIP would be --

17   well what's five percent of the -- I understand that you're

18   much better with numbers than I am.

19   A    Five percent is 95 million.

20   Q    Okay.  So the total topping cost after funding, since

21   you told me the alternative transaction fee drops out, are

22   380 million plus 95 million, right?

23   A    That's correct.

24   Q    Okay.  And on that score the topping -- what you've

25   categorized as topping fees for the second lien group

1    proposal are significantly smaller than the then current PIK

2    DIP, right?  You want me to try that again?

3    A    Oh, yes, please.

4    Q    Sure.  Under the second lien group proposal after

5    funding to take out that proposed DIP they'd have to --

6    someone would have to pay 190 million optional fee payment

7    fee, right?

8    A    Yes.

9    Q    And a four percent funding fee, right?

10   A    Yes.

11   Q    And I'm assuming 4 percent of 1.9 billion is less than

12   5 percent, but I didn't do the arithmetic.

13   A    Right.

14   Q    Okay.  So it's a smaller topping fee by a considerable

15   margin.

16   A    I agree.

17   Q    Okay.  Now, I'm not going to -- I was going to but

18   Mr. McGaan did it, so I'll be more (indiscernible - 5:07:24)

19   take you through the (indiscernible - 5:07:27) of subsequent

20   proposals up to June 26th, that's the Sunday night board

21   meeting, you remember that Sunday night 6 p.m. board

22   meeting?

23   A    Yes.  I'm sorry, June 22nd?

24   Q    June 22nd.  I apologize, I misspoke.

25         But it's fair to say, and I'm looking at the

1    timeline that Mr. McGaan marked as debtors' demonstrative 1,

2    which is also part of Debtors' Exhibit 3.  It's fair to say

3    that in the period after the second lien group came in with

4    their competing DIP proposal less than two weeks after the

5    bankruptcy that there was a robust exchange of competing

6    proposals?

7    A    That's correct.

8    Q    And that in each of these robust -- at each point of

9    the robust exchange there was improvement in terms?

10   A    That's correct.

11        (Pause)

12   Q    Okay.  Now you gave some testimony about the board

13   meeting on Sunday night -- on Sunday, June 22nd and there

14   actually was an improvement in terms on behalf of the second

15   liens of NextEra a couple of hours before the board meeting,

16   right?

17   A    That's right.

18   Q    And then that night the debtors disclosed to the

19   competing parties that the board had nonetheless chosen to

20   stay with the then improved PIK DIP, right?

21   A    That's correct.

22   Q    Okay.  But that wasn't the end, right?

23   A    No, it was not.

24   Q    So, for example, on Friday, last Friday, June 27th the

25   debtors announced -- disclosed that the PIK had further

1    improved their proposal by removing one of the topping fees,

2    right?

3    A    That was one of the changes, yes.

4    Q    Okay.  And late -- a couple of hours later the debtors

5    learned that the ad hoc, the NextEra group, had also made a

6    change to their topping fees, right?

7    A    I believe so, yes.

8    Q    Okay.  So that is the state of play.  If you look at

9    Debtors' Exhibit 3 (indiscernible - 5:20:23) of 2014 or dec.

10   A    I have it.

11   Q    Okay.  If you look at page 6, this is --

12   A    (Indiscernible - 5:10:46) the second lien DIP?

13   Q    Yeah.  It's not actually a key term summary but it'll

14   do because it shows that the -- by this point both the PIKs

15   and the second lien NextEra group had removed the optional

16   redemption fee altogether, right?

17   A    That's correct.

18   Q    But as of this point the PIK proposal still had the

19   funding PIK fee --

20   A    That's correct.

21   Q    -- and the NextEra -- the second lien NextEra proposal

22   had a funding PIK fee but it was smaller, right?

23   A    That's correct.

24   Q    So that the net was that at this point in terms of

25   topping costs the second lien NextEra proposal was superior,

1    right?

2    A    That's correct.

3    Q    Okay.  And then we learned this morning that last night

4    the PIKs had responded by removing -- not removing the

5    funding PIK fee, but providing that it would not be paid --

6    that it would only be relevant in the event of an equity

7    conversion; is that right?

8    A    Well effectively the representation in this chart,

9    which is topping fee or cash cost to the debtor, would have

10   been to remove the 95 million from that column.

11   Q    Exactly.  So again, there had been an exchange of -- an

12   exchange of proposals that have led to further improvement,

13   right?

14   A    That's correct.

15   Q    Okay. And it's fair to conclude that all of this

16   improvement has been as a result of competition, right?

17   A    Yes.

18   Q    Okay.  And you have no reason to believe that this

19   exchange of competing proposals is at an end do you?

20   A    Ask the question again?

21   Q    Sure.  As far as you know the competitors are going to

22   continue to exchange -- to provide new proposals, right?

23   A    I have no idea what the competitors will do.

24   Q    At least when I took your deposition you believed that

25   there was still room for improvement in the DIP, right?

1    A    As of the date of my deposition, yes.  As of this point

2    I have idea what people will do.

3    Q    Okay.  You don't know.  Okay.

4              And I think when we were talking then we were

5    specifically referring to the implied values.  Have the

6    implied -- have the values implied by the DIPs changed

7    significantly since -- well withdrawn.

8              Most of the changes we've talked about just now

9    have had to do with elimination of topping fees, right?

10   A    Yes.

11   Q    Okay.  There was a change on behalf of the second lien

12   NextEra group that involved putting in more consideration,

13   right?

14   A    They modified the terms of the DIP to increase it by

15   25 million, and they've reduced payment on the second lien

16   make whole by 25 million, which puts another 50 million of

17   cash into the EFIH entity.

18   Q    Okay.  And I want to be clear on this because I

19   understand when you say they increase, so the DIP, that does

20   have the immediate effect of it being a $25 million larger

21   borrowing, right?

22   A    That's correct.

23   Q    Which I think we'll get to in a little bit shows up in

24   a very slight increase in the cash interest expense during

25   the bankruptcy, right?

1    A    Very slight, yes.

2    Q    Yes.  But it also amounts to an increase in the

3    consideration paid on conversion into the same amount of

4    equity, right?

5    A    Well because the size of the DIP went up by 25 million

6    but the percentage of equity that the DIP converts into

7    stayed the same it's a very small, but it is an increase in

8    the implied equity value if that's the only measure you're

9    looking at.

10   Q    Yes, that's what I was asking about.  Okay.  I do want

11   to talk about that implied equity value, because we've

12   looked at a number of exhibits that derive implied equity

13   values from DIP proposals.

14           First of all just to set the stage.  The primary

15   asset on the E side directly or directly is the -- is EFIH's

16   80 percent stockholding in Oncor, right?

17   A    That's correct.

18   Q    Under each of these competing DIP and conversion

19   proposals you can project a restructured company that has a

20   certain amount of debt, right?

21   A    Yes.

22   Q    Okay.  And a DIP -- well withdrawn.

23           The backstop rights offering portion of this

24   hybrid -- these hybrid transactions represents an offer to

25   purchase a percentage of the equity in the restructured

1    company at a given price, right?

2    A    That's correct.

3    Q    The original DIP had a conversion feature that

4    represented an offer to purchase 64 percent of the equity in

5    the reorganized company at 1.9 billion, right?

6    A    That's correct.

7    Q    And you can derive from that, just to grossing up that

8    1.9 billion to 100 percent you can derive the total --

9    implied total equity value of the reorganized company,

10   right?

11   A    Yes, you can.

12   Q    And then by grossing up the 80 percent holdings in

13   Oncor and taking the -- there's debt at Oncor, right?

14   A    Yes, there is.

15   Q    Okay.  So by -- but you know the debt at Oncor, right?

16   A    Yes, I do.

17   Q    Okay.  So by taking the implied total equity value of

18   the restructured company, which owns 80 percent of Oncor and

19   factoring in the Oncor date, you can also derive an implied

20   TED for Oncor from a -- from a backstop (indiscernible -

21   5:16:36) offering proposal, right?

22   A    It's a little more complicated than that.  You'd have

23   to have (indiscernible - 5:16:40) EFIH to get to an

24   enterprise value of EFIH first.

25   Q    You're right I missed a step.  I'm sorry.  Okay.

1            And you used this TEV calculation approach that

2     you'd used -- withdrawn.

3            You used the fact that the PIKs -- the original

4     PIK DIP and backstop rights offering represented an offer to

5     purchase equity as a basis for determining -- or forming an

6     opinion that there was an equity cushion on the -- for the

7     existing first liens on the DIP motion, right?

8     A    That's correct.

9                 THE COURT:  Mr. Shore?

10                MR. SHORE:  Objection.  Now we're back to

11    soliciting opinions from this witness as to value.  I don't

12    know why we're doing that in light of Your Honor's ruling on

13    this.

14                MR. HOROWITZ:  Your Honor, it's key to -- key to

15    our objection is to this DIP motion is that it's locking in

16    an over distribution of value to the PIKs.  Mr. Ying has

17    accepted -- has testified in a number of ways, and I'll get

18    into it, that an actual offered purchase is current market

19    evidence of value.  I'm not asking for his opinion, I'm

20    asking him to confirm that a current offer to purchase is

21    market evidence, at least market evidence of a floor on

22    value.

23                THE COURT:  All right.

24                MR. HOROWITZ:  Okay.

25    BY MR. HOROWITZ:

1    Q    You heard me just say that.  Do you accept that

2    proposition that current offer to purchase is market -- that

3    a bona fide offer to purchase is market evidence of a

4    minimum of floor on what the value is?

5    A    Well it's akin to the aphorism that, you know, it's

6    worth what someone will pay for it.

7    Q    Yes.

8    A    So it's a measure of -- one measure of value, but

9    obviously it's different from how investment bankers

10   ultimate value companies.

11   Q    Okay.  The EFIH -- the PIK DIP -- well all of these

12   DIPs, but let's -- let's start with the original PIK DIP as

13   of the petition date, that represented an investment -- a

14   commitment to a substantial capital infusion by

15   sophisticated financial investors, right?

16   A    Yes.

17   Q    And the valuation and pride by that commitment in your

18   view represents an objective third-party indication of

19   EFIH's value, right?

20   A    that's correct.

21   Q    Now the competing DIP proposals have led to higher

22   indications of a higher (indiscernible - 5:10:04) for

23   reorganized EFIH, right?

24   A    That's correct.

25   Q    And also higher TEDs for Oncor, right?

1    A    That's correct.

2    Q    Okay.  And each of these bids is a floor on value since

3    it's not a consummated transaction there still could be room

4    to go up, right?

5    A    Or down.

6    Q    Well if somebody makes a --

7    A    I was referring to what the market value is of the

8    remaining stock, but yes, if you have a series of bids, I

9    apologize, that improved it would be at a higher value.

10   Q    Okay.  Now let me ask you to look at the June 22nd,

11   Sunday night board book, Debtors' Exhibit 2.

12   A    I have it.

13   Q    And let me ask you to turn to page 15.  I'm sorry, 14.

14   A    I have it.

15   Q    You testified about this earlier, but on this page --

16   this page was prepared by Evercore?

17   A    Yes.

18   Q    By people working at your direction?

19   A    Yes.

20   Q    And you've reviewed the methodology they used, right?

21   A    Yes.

22   Q    And you believe it's appropriate?

23   A    Yes.

24   Q    Okay.  Using the -- well the first line says, "Implied

25   total EFH equity value," right?

1   A    Yes.

2   Q    And you say it in footnote 2, but it's what we just

3   talked about, it's whatever the proposed -- whatever the

4   proposed DIP funder proposes to pay in exchange for a given

5   percentage of equity, right?

6   A    Yes.

7   Q    Okay.  So just to put some teeth on it.  At this point

8   in time NextEra is a participant in the second lien NextEra

9   proposal was going to be funding $1.6 billion in cash; is

10  that right?

11  A    That's correct.

12  Q    For a given percentage of equity?

13  A    That's correct.

14  Q    And as shown on the -- well down at the bottom you've

15  got what I would call sensitivity charts, right?

16  A    That's correct.

17  Q    Showing what the recoveries to various constituencies

18  would be at different Oncor TEBs, right?

19  A    That's correct.

20  Q    And you put NextEra down not because they're an

21  existing creditor, but just to see what it would take for

22  them to get the right return on their investment, right?

23  A    Well they're an important part of the allocation of the

24  value so you have to include them.

25  Q    Okay.  And what you show is that in order for NextEra

1    to receive equity that's actually worth the full

2    $1.6 billion that it's offering to pay for it the Oncor TEB

3    would have to be seventeen and a half billion dollars,

4    right?

5    A     That's correct.

6    Q     Okay.  By the way, to your knowledge does NextEra have

7    -- is NextEra a prepetition creditor of the estate?

8    A     Not to my knowledge.

9    Q     Okay.  So you have no reason to believe that NextEra is

10   bidding for any reason other than to get a good deal on the

11   equity that it's looking to apply, right?

12   A     Well, actually, it's beyond the equity they're

13   acquiring to the DIP.  They've also said that they want to

14   buy the rest of the company post-emergence with stock.

15   Q     Right, okay.  So they want to acquire even more?

16   A     Okay, they want to acquire the whole company, yes.

17   Q     But you have no reason to believe that they're bidding

18   for any reason to -- you have no reason to believe that they

19   want to enhance their recovery as a prepetition creditor

20   because you're not even aware of them being one, right?

21   Withdraw the question.  Never mind.  You'll agree with me

22   that NextEra is a sophisticated party, right?

23   A     Yes.

24   Q     And highly knowledgeable in this industry?

25   A     Oh, yes.

1  Q    Okay.  So you would agree with me then that the NextEra

2  proposal represents objective market evidence that the value

3  of Encore is $17.5 billion?

4  A    Well, I can't deny that they are willing to pay 1.6

5  billion for their pro rata share of a 2.4 billion DIP, which

6  implies a 17.5 billion TEV, but clearly, they want to buy

7  the rest of the company for stock, and, once they have a 45

8  percent share ownership, they should have a big lever on the

9  company in terms of how they're going to acquire the rest.

10 Q    Uh-huh.  And you have no reason to believe that they

11 expect to be able to acquire the stock on the remainder for

12 anything less than they're paying for this slug, do you?

13 A    Well, given the shareholder rights that they want to

14 impose on the 55 percent of shares that --

15          THE COURT:  We need to stop and back up the truck

16 here a little bit.

17          MR. HOROWITZ:  Okay.

18          THE COURT:  I don't read the same newspaper

19 articles you do.  This is for NextEra.  NextEra wants to buy

20 what for what?

21          MR. HOROWITZ:  Well, in one of the written

22 proposals that NextEra sent to us, it says in addition to

23 the terms of the DIP that they are participating, it says

24 that they would like to, upon emergence of EFIH from

25 bankruptcy, acquire the remaining shares of the FH in a

1    stock-for-stock exchange.

2              THE COURT:  Okay.  Is that part of the actual last

3    extant bid that's in front of the Court?

4              MR. HOROWITZ:  Yeah, it's a fair question enough.

5    I guess you should ask the witness, but I can offer it

6    after, too.

7              THE COURT:  Okay.  Well, --

8              THE WITNESS:  My understanding is that it's an

9    intention but there's no specific offer.

10             THE COURT:  Okay.  So what's your point then --

11   all right.  So let's assume that it's not part of their

12   specific offer, but it's a stated intention.  What's your

13   point on how that impacts value or implied value?

14             THE WITNESS:  Well, in a subsequent transmittal, I

15   believe it must have been Thursday, counsel sent us a full

16   set of -- or expanded term sheets of the NextEra offer, and,

17   in those term sheets, there is a provision about NextEra

18   having a -- I believe it's called a right of first offer on

19   the sale of any shares of EFIH post-restructuring not held

20   by NextEra that would be potentially sold to a third party.

21   NextEra merely wants to control any trades in the stock

22   post-emergence.

23             THE COURT:  Okay.

24             MR. HOROWITZ:  I'm going to circle up on that one,

25   Your Honor.

```
 1            THE COURT:  So --
 2            MR. SHORE:  Objection, and move to strike on the
 3   basis of speculation.  He doesn't know what NextEra
 4   (indiscernible - 5:25:40).
 5            MR. YING:  I'm sure of that.
 6            THE COURT:  Well, wait a minute.
 7            MR. SHORE:  Your Honor?
 8            THE COURT:  No, it's overruled.  He's responding
 9   to, a, questions I have, but I think they're valid, and b,
10   he's responding to -- well, no, I ask stuff all the time
11   that's objectionable.
12        (Laughter)
13            THE COURT:  That's what the circuit court's for,
14   but no, I think it's important because it's in the context
15   of the cross that's going on in connection with what the
16   second liens are willing to do and what --
17            MR. HOROWITZ:  I'm going to go back to what
18   Your Honor --
19            THE COURT:  I think they're called NextEra.
20            UNIDENTIFIED SPEAKER:  Yeah.
21            THE COURT:  Different people pronounce it
22   different ways, but technically, I think it's NextEra.
23   People -- like I do, they roll it together, I think.
24            So anyway, objection's overruled.
25            You can go ahead.
```

1         (Laughter)

2               MR. HOROWITZ:   Gotcha.   I'll circle back on that.

3    BY MR. HOROWITZ:

4    Q    You're still on page 14, right?

5    A    Yes, I am.

6    Q    And you testified, by the way, that one of -- you

7    understood one of the aspects of the second lien NextEra

8    proposal was that the second lien holders were insisting on

9    full recovery on their make whole (ph), right?

10   A    That is correct.

11   Q    And full recovery on their make whole is, I think,

12   shown on this chart on the fifth line from the bottom would

13   be -- as of this time, would have been 31 cents on the

14   dollar, 31 percent?

15   A    Yes, 31 percent of their principal amount.

16   Q    Okay.   And I think you actually said that you found

17   that one of the problematic aspects of this offering, in

18   your view, was that the second lien holders were seeking to

19   recover 100 percent of the make whole, right?

20   A    That's correct.

21   Q    And one of the things that this chart shows is that the

22   only way that the second lien holders would actually recover

23   100 percent of their make whole, given that a part of -- a

24   significant portion of their recovery would be in equity, is

25   if, indeed, the Encore TEV is 17.5 billion, right?

1    A    That is true.

2    Q    Okay.

3    A    It also shows that, at lower valuations, they're still

4    getting a better deal than the settlement offer of 115.

5    Q    Yeah, well, that's a settlement offer they rejected,

6    isn't it?

7    A    Of course.

8    Q    Okay.  So you also understand that one of the aspects

9    of the NextEra offer was -- and I know what you're going to

10   say.  So we'll get into it, but one aspect of the NextEra

11   proposal was that the PIKs' claim would be paid in full, in

12   a combination of equity and cash, but in full, right?

13   A    That is correct.

14   Q    Okay.  And I think you told Mr. McGaan that one of the

15   debtors' concerns was over the possibility of a battle over

16   the value of the equity used to satisfy PIK claims, right?

17   A    That is correct.

18   Q    Okay.  But you also understand that -- well, withdrawn.

19   No, I'll stick with it.  You also understand that the intent

20   of the proposal was that, to the extent that the PIKs assert

21   and establish an entitlement to, for example, post-petition

22   interests, it's the intent to pay those claims in full?

23   A    I gather that there's an issue as to what the post-

24   petition interests might be.

25   Q    Right.

1    A    And the belief of your client is that post-petition

2    interests should be something called the applicable federal

3    rate, which is a very modest amount these days because of

4    the Federal Reserve.

5    Q    And you understood in discussions that there was an

6    acknowledgement that there could be a dispute about that,

7    right?

8    A    Yes.

9    Q    And you understood that the intent was that, if that

10   dispute were litigated and the PIKs were found to be

11   entitled to some higher rate, that the plan would provide

12   that they get paid it?

13   A    Actually, I had not heard that.

14   Q    Okay.

15   A    Or it certainly had not crossed my consciousness.

16   Q    Okay.  By the way, you used these sensitivities in

17   order to illustrate -- in order to show to the board what

18   each constitutiencies' potential recoveries were at

19   different potential TEVs for Encore, right?

20   A    It's for that and to try to put the two proposals on

21   the same footing.

22   Q    Okay.  But you stopped your sensitivity at 17.5

23   billion, right?

24   A    I just didn't want to put more numbers on the page.  It

25   would be too crowded.

1    Q    Okay.  Although you acknowledge that, given the bidding

2    process, it's entirely possible that some party, maybe even

3    some party that's not yet in this process, ascribes a higher

4    TEV to Encore than what is implied by the current NextEra

5    bid, right?

6    A    Well, certainly someone may think the company's worth

7    more, but unless they team up with one of the creditor

8    groups, it'll be a problem from the tax standpoint.

9    Q    Okay.  But there may be an obstacle to them actually

10   coming in, but it's possible that, in a full and fair

11   process, somebody would be willing to pay more?

12   A    Well, if you could have an auction for the company,

13   obviously, I have no idea what the outcome might be.

14   Q    All right.  Okay.  So looking on the left-hand side of

15   this chart where you show the recoveries under the PIK

16   proposal, I'm reading this correctly, aren't I, that at the

17   $17.5 billion value implied by the NextEra bid, you

18   calculate a recovery for the PIKs, the EFIH unsecureds, of

19   121 percent?

20   A    That's correct, but it's a representation of the right

21   to the PIKs for the time period from when their deal was

22   approved and the time they have to fund.  That represents a

23   combined recovery, assuming the enterprise value is 17.5

24   billion.  In fact, to be entitled to that return, the PIKs

25   actually have to write a large equity check to earn that

1    return.

2    Q    Okay.  You've said that before.  So you're saying that

3    there's value attributable to the right to participate in

4    the PIK, in the DIP, right?

5    A    I think you have to look at their returns in the

6    context of how much money they have to invest.

7    Q    Okay.  You understand that, under this RSA and under

8    the plan that the debtors were going to propose, the right

9    to participate -- well, withdrawn.  I'm sorry.  You

10   understand that, under the RSA, the right to participate in

11   the DIP is being offered to the PIKs?  Did I say PIK?  I'm

12   sorry.  The right to participate in the DIP is being offered

13   to the PIKs on account of their status as creditors, right?

14   A    True, yes.

15   Q    Okay.  And, by the way, that 121 -- I know we've had

16   some discussion about the DIP and a significant amount of

17   discussion about trading prices, but that 121 percent

18   recovery, which is derived from market evidence from the

19   NextEra bid, that's slightly less than what you've observed

20   to be the current trading price of the PIKs, right?

21   A    Well, the trading price keeps moving around.  So I

22   actually don't know exactly where it was, you know,

23   yesterday.  Actually, yesterday was Sunday, but where it was

24   late last week.

25   Q    Okay.  Well, you've referred to a 124 to 125 range,

1    haven't you?

2    A    Right.  Actually, I think it's moved down in the last

3    few days.

4    Q    Okay.  Do you know what it is currently?

5    A    The last report I saw had them under 120.

6    Q    Okay.  Was that after Mr. Mayer's opening?

7    A    It must be.

8         (Laughter)

9    Q    Okay.  So let's just talk about a 121 recovery.  Sir,

10   are you aware of any legal basis for the PIKs to have a

11   claim in this bankruptcy of 121 percent or more?

12   A    Well, I'm no lawyer, so I can't respond to that.

13   Q    All right.  Well, let's parse it out.  There was

14   accrued interest as of the petition date on the PIKs, right?

15   A    Oh, that's true.

16   Q    And I believe, if my memory serves, that the PIKs par

17   plus accrued claim as of the petition date was somewhere

18   between 105 and 106, right?

19   A    That's correct.

20   Q    Okay.  And you've talked about there being -- we've

21   already discussed the fact that there could be a dispute as

22   to whether an unsecured creditor is entitled to post-

23   petition interest, right?

24   A    That's true.

25   Q    But, as a restructuring professional, you understand

1    that an unsecured creditor can only be entitled to post-

2    petition interest if it's a solvent debtor, right?

3    A    That's correct.

4    Q    Okay.  And, while there may be a dispute between the

5    federal judgment rate and the contract rate -- what's the

6    contract rate on the PIKs?

7    A    I believe it's 11.75.

8    Q    Okay.  And you were projecting an emergence from

9    bankruptcy -- you're projection, on this page at least, a

10   12-month bankruptcy, right?

11   A    That's correct.

12   Q    Okay.  And, while the PIKs indenture has virtually the

13   same make whole language as the second lien indenture.

14   You're aware of that, right?

15   A    Yes, I am.

16   Q    Okay.  But the PIKs make whole expires in December of

17   this year.  You're aware of that as well, right?

18   A    Oh, yes.

19   Q    Okay.  So the PIKs would be in the (indiscernible -

20   5:35:14) redemption period on emergence, right?

21   A    If you reinstated them, yes.

22   Q    Okay.  So, sir, have you done any calculation to

23   determine whether the PIKs could have any conceivable

24   ability to recover 121 cents or more as a result of their

25   bankruptcy claim?

```
 1    A    I have done that calculation.  I think the number of
 2    1.9 billion comes to mind in terms of if you gave them their
 3    full contract rate, you paid them their make whole after
 4    emergence, which means you'd have to pay their 105 call
 5    price plus interest from the bankruptcy dates of the call
 6    price MPV'd (sic), their accrued interest as of the filing
 7    date.  The number of 1.9 billion comes to mind on 1.560
 8    billion a claim.  So actually, that's a pretty big number.
 9    Q    About 120.
10    A    It's about 120.
11    Q    Yeah, it's about 120.  Okay.
12    A    Yeah.
13    Q    So, under this proposal, based on the current market
14    evidence, it looks like the PIKs will be getting their full
15    par plus accrued plus post-petition interest at a disputed
16    contract rate plus a make whole without having to litigate,
17    right?
18    A    Well, again, I think the 121 mischaracterizes the fact
19    that to earn it, they have to write a very large check.
20    Q    By the way, setting aside how common the trades are,
21    you agree with me, don't you, that people who trade in these
22    kinds of securities in bankruptcy are highly sophisticated
23    parties, right?
24    A    Well, if trading in, you know, a bond here, a bond
25    there -- I don't think those are being traded by mega-hedge
```

1    funds.  It's not enough money to make it worth their while.

2    Q    Well, but the commitment parties, the three commitment

3    parties, they increased the size of their holdings during

4    this case by something North of $50 million, right?

5    A    Yes.  The trading in $50 million pieces -- that's

6    sophisticated money.  That's more than us mortals can

7    afford.

8    Q    More than me.  So, if there's a trade at 125 or 124,

9    then presumably, somebody believes that the expected

10   potential recovery associated with that instrument can be

11   greater than that amount, right?

12   A    Well, again, as I said before, I think the trading is

13   very thin.  So obviously, I observe it, but I don't hang my

14   hat on it.

15   Q    But you do know that actual trades have been occurring,

16   right?

17   A    I believe, yes, that some trades have been happening,

18   but I think they're of a very modest size.

19   Q    You testified somewhat sporadically about your opinion

20   that the PIKs are the fulcrum security, right?

21   A    Yes, I have.

22   Q    And I don't know that we got an exact timeframe, but

23   certainly, during the prepetition period when the RSA was

24   being negotiated, had you concluded that the PIKs were the

25   fulcrum security?

1    A    I think we determined that back in June of 2013.

2    Q    Okay.  And you never talked about -- you never defined

3    it, but fulcrum security is the party that's getting some

4    recovery when the waterfall runs out; is that one way of

5    putting it?

6    A    Yes, that's correct.

7    Q    Okay.  And, if an entity is solvent, then the fulcrum

8    security is equity, actually, right?

9    A    I'm sorry.  Please say that again.

10   Q    Well, if there's enough value to pay off all creditors

11   in full, then the fulcrum security becomes the equity,

12   right?

13   A    Well, if there's enough value to pay off a fulcrum

14   security, I assume you're saying that they're solvent, but

15   the problem is what are you paying them with.  I think if

16   you're paying them with equity, then I think they are the

17   fulcrum.  If you're paying them off in cash and the guy who

18   ranks below the guy who's being paid off, I guess, becomes

19   the fulcrum.

20   Q    Well, EFIH -- if there's enough value, be it from cash

21   or equity, to pay off all creditors, including the PIKs at

22   EFIH, then any additional value would flow up to EFIH,

23   right?

24   A    Assuming that you can prove that the equity you're

25   giving them is, in fact, worth what they're entitled to

1    receive from the claim imbedded in their contract.

2    Q    Okay.

3    A    Otherwise, as I said earlier, I think you end up in a

4    valuation fight.

5    Q    And you've been in cases where there have been --

6    withdrawn.  Have you been in cases where there's been a

7    valuation fight because equity contends that the creditors

8    are being overpaid and there should be more value flowing to

9    equity?

10   A    Yes, I have.

11   Q    Okay.  And do you agree with me that, on the basis of

12   this page 14 in your board debt, potentially the EFH

13   creditors who are the beneficiaries of the EFIH equity might

14   wage such a valuation battle?

15   A    I'm sorry.  The EFH creditors, did you say?

16   Q    Yes.

17   A    It's possible they might try to come in and say we want

18   a valuation fight, yes.

19   Q    Okay.

20           THE COURT:  Would this be a natural stopping

21   point?

22           MR. HOROWITZ:  It would be, Your Honor.

23           THE COURT:  All right.

24           MR. HOROWITZ:  I think that --

25           THE COURT:  We're going to adjourn until tomorrow.

1          We're going to meet tomorrow at 9:30.  You can

2     leave all your materials here.

3          Sir, during the evening, you may not discuss your

4     testimony with any persons.  So you get the night off.

5          MR. HOROWITZ:  Your Honor, we undertook -- or a

6     promise was made to you to give you -- I don't know if you

7     want reading tonight.

8          THE COURT:  Well, if you have the depositions,

9     I'll take them.

10          MR. HOROWITZ:  Okay.  We've parceled them out

11     among four law firms.  So I know we have ours.  I hope

12     somebody isn't going to kill me by saying that, and I think

13     the debtors have the one they're responsible for.

14          THE COURT:  Okay.  So -- we're still on the

15     record.  If people don't mind, we're still on the record.

16     I'm trying to get these -- you're fine, but I'm trying to

17     get the depositions before we go off the record.  So I have

18     Mr. Cremmons', and I'm told that yellow is the debtor, blue

19     is the other side?

20          UNIDENTIFIED SPEAKER:  Yes, sir.

21          THE COURT:  Yes?

22          UNIDENTIFIED SPEAKER:  I think everyone was on the

23     same page, Your Honor.  Okay.  So we just write it down on

24     the list for you?

25          THE COURT:  That's okay.  As long as it -- yeah

1    you better write it down.

2            Let's do this.  It looks like there needs to be

3    some work done on that.  So I'm going to leave the bench.

4    We'll go off the record.  You can get the stack together and

5    give them to my assistants, and they'll bring them in the

6    back.  That would be very helpful.  Thank you.

7            And you can leave everything else here until

8    tomorrow.  Please take all of your water bottles, used water

9    bottles, trash, et cetera so my staff doesn't have to do it

10   for you, and we'll see you tomorrow at 9:30.

11       (Whereupon these proceedings were concluded at 5:43 PM)

12

13

14

15

16

17

18

19

20

21                        * * * * *

22

23

24

25

```
1                    I N D E X

2                 W I T N E S S E S

3   WITNESS              BY                    PAGE

4   David Ying        Mr. McGaan               138

5                     Mr. Horowitz            216

6


7                    I N D E X

8                 E X H I B I T S

9   PARTY    NO   DESCRIPTION      ID.      EVID.

10  Debtors       Declaration of

11              Mr. Nutt          52         --

12  Demons.  1   Timeline         161        --

13           1   June 16 Board Books  166    --

14           2   June 22 Board Books  169    --

15           3   Board Dec

16              Presentation      180        --

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2                  R U L I N G S

3     DESCRIPTION                                      PAGE

4     Motion of Energy Future Holdings Corp., et al.,

5     for Entry of an Order Authorizing the Debtors to

6     (A) Pay Certain Prepetition Amounts on Account of

7     Non-Insider Compensation Programs and (B) Continue

8     the Non-Insider Compensation Programs in the Ordinary

9     Course of Business on a Postpetition Basis [D.I. 468;

10    filed May 15, 2014]                               49

11

12    Motion of Energy Future Holdings Corp., et al., for

13    Entry of Interim and Final Orders (A) Authorizing the

14    Debtors to (I) Pay Certain prepetition Compensation

15    and Reimbursable Employee Expenses, (II) Pay and

16    Honor Employee and Retiree Medical and Similar

17    Benefits, and (III) Continue Employee and Retiree

18    Benefit Programs, and (B) Modifying the Automatic

19    Stay [D.I. 25; filed April 29, 2014]              49

20

21    Motion of Energy Future Holdings Corp., et al.,

22    for Entry of Interim and Final Orders Authorizing

23    the Debtors to (A) Continue Performing Under

24    Prepetition Hedging and Trading Arrangements, (B)

25    Pledge Collateral and Honor Obligations Thereunder,

1    and (C) Enter into and Perform Under Trading

2    Continuation Agreements and Postpetition Hedging

3    and Trading Arrangements [D.I. 41; filed

4    April 29, 2014]                                    59

5

6    Critical Vendors                                   74

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 271

C E R T I F I C A T I O N

We, Dawn South, Lisa Beck, and Sheila Orms certify that the foregoing transcript is a true and accurate record of the proceedings.

# Dawn South

Digitally signed by Dawn South
DN: cn=Dawn South, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2014.07.01 13:41:16 -04'00'

AAERT Certified Electronic Transcriber CET**D-408

# Lisa Beck

Digitally signed by Lisa Beck
DN: cn=Lisa Beck, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2014.07.01 13:41:57 -04'00'

Lisa Beck

AAERT Certified Electronic Transcriber CET**D-486

# Shelia G. Orms

Digitally signed by Shelia G. Orms
DN: cn=Shelia G. Orms, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2014.07.01 13:42:33 -04'00'

Signature of Approved Transcriber

Veritext

330 Old Country Road
Suite 300

Mineola, NY 11501

Date:  July 1, 2014