Page 1

1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3

4

5  In re:                        :
                                 :  Chapter 11
6  ENERGY FUTURE HOLDINGS        :
   CORP.,  et al.,               :  Case No. 14-10979(CSS)
7                                :
            Debtors.             :  (Jointly Administration
8  _____     :  Requested)
   CSC TRUST COMPANY OF DELAWARE,:
9  as INDENTURE TRUSTEE,         :
                                 :
10          Plaintiff,           :
                                 :
11     v.                        :  Adv. Proc. No. 14-50363
                                 :  (CSS)
12  ENERGY FUTURE INTERMEDIATE   :
   HOLDING COMPANY LLC and EFIH  :
13  FINANCE INC.,                :
                                 :
14          Defendants.          :
   _____:

15

16

17

18                         United States Bankruptcy Court

19                         824 North Market Street

20                         Wilmington, Delaware

21                         July 1, 2014

22                         9:35 AM - 5:18 PM

23

24

25

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    ECR OPERATOR:   AL LUGANO

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of Interim and Final Orders (A) Authorizing the

3    Debtors to (I) Pay Certain prepetition Compensation and

4    Reimbursable Employee Expenses, (II) Pay and Honor Employee

5    and Retiree Medical and Similar Benefits, and (III) Continue

6    Employee and Retiree Benefit Programs, and (B) Modifying the

7    Automatic Stay [D.I. 25; filed April 29, 2014]

8

9    HEARING re Motion of Energy Future Holdings Corp., et al.,

10   for Entry of Interim and Final Orders Authorizing the

11   Debtors to (A) Continue Performing Under Prepetition Hedging

12   and Trading Arrangements, (B) Pledge Collateral and Honor

13   Obligations Thereunder, and (C) Enter into and Perform Under

14   Trading Continuation Agreements and Postpetition Hedging and

15   Trading Arrangements [D.I. 41; filed April 29, 2014]

16

17   HEARING re Motion of Energy Future Holdings Corp., et al.,

18   for Entry of an Order Authorizing the Debtors to (A) Pay

19   Certain Prepetition Amounts on Account of Non-Insider

20   Compensation Programs and (B) Continue the Non-Insider

21   Compensation Programs in the Ordinary Course of Business on

22   a Postpetition Basis [D.I. 468; filed May 15, 2014]

23   HEARING re Motion of Energy Future Holdings Corp., et al.,

24   for Entry of Orders Approving Certain EFIH Settlements and

25   the Oncor TSA Amendment [D.I. 472; filed May 15, 2014]

1    HEARING re Motion of Energy Future Intermediate Holding

2    Company LLC and EFIH Finance Inc. for Entry of an Order (A)

3    Approving Postpetition Second Lien Financing, (B) Granting

4    Liens and Providing Superpriority Administrative Expense

5    Claims; (C) Authorizing the Use of Cash Collateral, (D)

6    Authorizing the EFIH Second Lien Repayment, (E) Authorizing

7    Entry into and Payment of Fees Under the Commitment Letter;

8    and (F) Modifying the Automatic Stay [D.I. 477; filed May

9    15, 2014]

10

11   HEARING re Complaint for Declaratory Relief [D.I. 470/Adv.

12   D.I. 1; filed May 15, 2014]

13   HEARING re Motion of Wilmington Savings Fund Society, FSB

14   for Leave to Conduct Discovery Pursuant to Rule 2004 of the

15   Federal Rules of Bankruptcy Procedure of Energy Future

16   Holdings Corporation, its Affiliates, and Certain Third

17   Parties (the "2004 Motion") [D.I. 6; filed April 29, 2014]

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Nicole Yawn, Lisa Beck, Linda

25   Foley, Sherri Breach and Sheila Orms

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3        Attorneys for the Debtors

4

5    BY:  BRIAN SCHARTZ, ESQ.

6        MARK MCKANE, ESQ.

7        ANDY MCGAAN, ESQ.

8        DAVID DEMPSEY, ESQ.

9        EDWARD SASSOWER, ESQ.

10        STEVE HESSLER, ESQ.

11        CHAD HUSNICK, ESQ.

12        JONATHAN F. GANTER, ESQ.

13

14    PAUL, WEISS, RIFKIND, WHARTON & GARRISON

15        Attorneys for Ad Hoc Committee of TCEH First Lien

16        Creditors

17

18    BY:  JACOB ADLESTEIN, ESQ.

19        BRIAN HERMANN, ESQ.

20

21    YOUNG CONAWAY STARGATT & TAYLOR, LLP

22        Attorney for Ad Hoc Committee of TCEH First Lien

23        Creditors

24

25    BY:  RYAN M. BARTLEY, ESQ.

1  BROWN RUDNICK

2       Attorney for TCEH, Second Lien Trustee

3

4  BY:  JEFFREY L. JONAS, ESQ.

5

6  UNITED STATES DEPARTMENT OF JUSTICE

7       Attorney for the U.S. Trustee

8

9  BY:  RICHARD L. SCHEPACARTER, ESQ.

10

11  AKIN GUMP STRAUSS HAUER & FELT LLP

12       Attorneys for Ad Hoc Committee of EFIH Unsecured

13       Noteholders

14

15  BY:  SCOTT ALBERINO, ESQ.

16       IRA DIZENGOFF, ESQ.

17

18  SHEARMAN & STERLING

19       Attorneys for Duetsche Bank AG New York Branch

20

21  BY:  FREDRIC SOSNICK, ESQ.

22       NED S. SCHODEK, ESQ.

23

24

25

1   POTTER ANDERSON & CORROON LLP

2        Attorneys for Deutsche Bank AG New York Branch

3

4   BY:  LAURIE SELBER SILVERSTEIN, ESQ.

5        R. STEPHEN MCNEILL, ESQ.

6

7   COUSINS CHIPMAN & BROWN, LLP

8        Attorney for Ad Hoc Committee of EFIH Unsecured

9        Noteholders

10

11  BY:  SCOTT D. COUSINS, ESQ.

12

13  ROPES & GRAY LLP

14       Attorneys for CSC Trust Company of Delaware

15

16  BY:  D. ROSS MARTIN, ESQ.

17       KEITH HOWARD WOFFORD, ESQ.

18

19  COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

20       Attorney for CSC Trust Company of Delaware

21

22  BY:  NORMAN L. PERNICK, ESQ.

23

24

25

1    MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

2         Attorney for Sponsors

3

4    BY:  CURTIS MILLER, ESQ.

5

6    WACHTELL LIPTON ROSEN & KATZ

7         Attorneys for EFH Equity Owners

8

9    BY:  RICKY MASON, ESQ.

10        AUSTIN WITT, ESQ.

11        EMIL A. KLEINHAUS, ESQ.

12

13   DRINKER BIDDLE & REATH LLP

14        Attorneys for Citibank, N.A.

15

16   BY:  HOWARD A. COHEN, ESQ.

17        ROBERT K. MALONE, ESQ.

18

19   BINGHAM MCCUTCHEN LLP

20        Attorneys for Pacific Investment Management Co. LLC

21

22   BY:  JEFFREY SABIN, ESQ.

23        JULIA FROST-DAVIES, ESQ.

24

25

1    WHITE & CASE LLP

2         Attorneys for Ad Hoc Group of TCEH Unsecured

3         Noteholders

4

5    BY:  J. CHRISTOPHER SHORE, ESQ.

6         THOMAS LAURIA, ESQ.

7

8    FRIED FRANK HARRIS SHRIVER & JACOBSON

9         Attorneys for Fidelity Management & Research Company

10

11   BY:  MATTHEW M. ROSSE, ESQ.

12        GARY KAPLAN, ESQ.

13

14   CROSS & SIMON, LLC

15        Attorneys for Fidelity Management & Research Company

16

17   BY:  DAVID HOLMES, ESQ.

18        MICHAEL JOSEPH JOYCE, ESQ.

19

20   POLSINELLI

21        Attorneys for the Committee

22

23   BY:  CHRIS WARD, ESQ.

24        JUSTIN K. EDELSON, ESQ.

25        JARRETT VINE, ESQ.

```
1   MORRISON & FOERSTER

2        Attorneys for the Committee

3

4   BY:   TODD M. GOREN, ESQ.

5         SAMANTHA MARTIN, SQ.

6         KAYVAN SADEGHI, ESQ.

7         JAMES PECK, ESQ.

8         ANDREW MCGAAN, ESQ.

9         WILLIAM HILDBOLD, ESQ.

10        ERICA RICHARDS, ESQ.

11        CHARLES KERR, ESQ.

12

13  LANDIS RATH & COBB

14        Attorneys for Next Era Energy

15

16  BY:   MATTHEW B. MCGUIRE, ESQ.

17        KERRI MUNNFORD, ESQ.

18

19  KLEHR HARRISON HARVY BRANZBURG LLP

20        Attorney for UMB Bank, Indenture Trust

21

22  BY:   RAYMOND H. LEMISCH, ESQ.

23

24

25
```

1   THE HOGAN FIRM

2        Attorney for the Ad Hoc Committee EFH Legacy

3

4   BY:  GARVAN MCDANIEL, ESQ.

5

6   KASOWITZ BENSON

7        Attorneys for the Ad Hoc Committee EFH Legacy

8

9   BY:  DAVID ROSNER, ESQ.

10       ANDREW GLENN, ESQ.

11

12  CHADBOURNE & PARKE

13       Attorneys for Next Era Energy

14

15  BY:  HOWARD SEIFE, ESQ.

16       DAVI LEMAY, ESQ.

17       MARC ROITMAN, ESQ.

18

19  BRYAN CAVE

20       Attorney for Computershare Trust Co.

21

22  BY:  STEPHANIE WICKOUSKE, ESQ.

23

24

25

1   NIXON PEADOBY

2

3   BY:  RICHARD PEDONE, ESQ.

4

5   FOX ROTHSCHILD

6        Attorney for TECH Unsecured Ad Hoc Group

7

8   BY:  JOHN STROCK, ESQ.

9

10  REED SMITH LLP

11       Attorney for Bank of new York Mellon

12

13  BY:  JOSEPH GRIECO, ESQ.

14

15  ASHBY & GEDDES

16       Attorney for WSFS, Trustee

17

18  BY:  GREG TAYLOR, ESQ.

19

20

21  PACHULSKI STANG ZIEHL & JONES

22  Attorneys for Computershare

23

24  BY:  LAURA DAVIS JONES, ESQ.

25       JOHN MORRIS, ESQ.

```
 1   ZIETH & JONES LLP
 2        Attorney for Indenture Trustee
 3
 4   BY:  TIMOTNY CAIRNS, ESQ.
 5
 6   KRAMER LEVIN
 7        Attorneys for Computershare
 8
 9   BY:  GREGORY HOROWITZ, ESQ.
10        THOMAS MOERS MAYERS, ESQ.
11        ALICE J. BYOWITZ, ESQ.
12        JOSHUA BRODY, ESQ.
13
14   MORRIS JAMES LLP
15        Attorney for Law Debenture
16
17   BY:  STEPHEN M. MILLER, ESQ.
18
19   PATTERSON BELKNAP WEBB & TYLER
20        Attorney for Law Debenture
21
22   BY:  DAN LOWENTHAL, ESQ.
23
24
25
```

```
 1  FOLEY & LARDNER
 2       Attorney for UMB Indenture Trustee
 3
 4  BY:  HAROLD KAPLAN, ESA.
 5       MARK HEBBELN, ESQ.
 6
 7  DRINKER
 8       Attorney for EFIH/CSC
 9
10  BY:  JIM MILLAR, ESQ.
11
12  COLE SCHOTZ
13       Attorneys for EFIH/CSC
14
15  BY:  NORMAN PERNICK, ESQ.
16  WARREN USATINE, ESQ.
17
18  BINGHAM
19       Attorneys for PIMCO
20
21  JEFF SABIN, ESQ.
22  JULIS FROST-DAVIS
23  CHRIS CARTER
24
25
```

Page 15

1   CONNOLLY GALLAGHER

2        Attorney for PIMCO

3

4   BY:  KAREN C. BIFFERATO, ESQ.

5

6   QUINN EMANUEL URQUHART & SULLIVAN, LP

7        Attorney for Centerbridge

8

9   BY:  KATE SCHERLING, ESQ.

10

11  LORD ABBETT

12        Attorney for Bank of New York Mellon

13

14  BY:  MITCHELL MOSS, ESQ.

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  Good morning.

4      (A chorus of good morning)

5          THE COURT:  Quickly before we start I understand

6   that there was decent amount of trash left behind in the

7   overflow room, which is Judge Carey's courtroom which I'm

8   using based on his good offices, so I would just ask people

9   to really to be stewards of my colleague's courtrooms with

10  Judge Walrath today.  If we can't do that the overflow room

11  will move down to the multipurpose room on the third floor,

12  and that's no good for anybody.  So please be responsible.

13  Thank you.

14          MR. DEFRANCESCHI:  Thank you, Your Honor.

15          THE COURT:  Mr. DeFranceschi.

16          MR. DEFRANCESCHI:  Dan DeFranceschi, Richards,

17  Layton & Fingers on behalf of the debtors.

18          Before we start today, Your Honor, the debtors and

19  I'm sure many other parties are all thinking about timing

20  and what's on the agenda for the rest of the day.

21          As you know we have to finish the cross-examination

22  of the current witness, there are four additional witnesses,

23  and of course there's closing, there are many parties

24  involved.

25          So, Your Honor, we are working under the assumption

1    that Your Honor will go until 5:00 or 6:00 today, somewhere

2    in that time frame.  I know at least from the debtors'

3    standpoint we are concerned that we won't be able to finish

4    in that allotted time, so Your Honor had mentioned

5    potentially having time on July 11th for another motion, I

6    don't know if that was just a limited period of time.  We

7    are looking for as much as Your Honor may have, perhaps a

8    day, but I would think at a minimum an additional five hours

9    or a good solid half a day.

10          THE COURT:  Well, I can tell you that I'm trying

11   clear tomorrow morning.  I thought if we went over today we

12   could at least use tomorrow morning, moving a few things

13   around.  We have the balance of the day today, I moved -- I

14   had a contested hearing that I moved to Thursday, so we'll

15   have all of today.  Obviously Friday is out.  If necessary I

16   do have time at the end of next week.  If we have to

17   continue into the 10th or the 11th we'll be able to do that.

18          Is continuing tomorrow morning a problem?  I know

19   people have sort of planned to leave.  Maybe you can chew on

20   that as the hearing goes forward and we can figure out --

21          MR. DEFRANCESCHI:  Yeah.  Your Honor --

22          THE COURT:  -- we'll have a better idea as the day

23   goes as to actually how much extra time we'll need.

24          MR. DEFRANCESCHI:  I think that makes sense, Your

25   Honor.  Perhaps before the break at lunch or after lunch if

1    we can revisit the issue after everyone has had a time to

2    digest that.

3              THE COURT:  All right.

4              MR. DEFRANCESCHI:  Thank you, Your Honor.

5              THE COURT:  Mr. Ying.

6              MR. HOROWITZ:  Your Honor, while Mr. Ying is

7    getting up, Greg Horowitz on behalf of the second lien --

8    EFIH second lien notes trustee and ad hoc group.

9              Further on the scheduling issue our witness,

10   Mr. Snyder, unfortunately has to leave today at 2 o'clock

11   for oral surgery and won't be available again until later.

12   I think, you know, we had hoped Your Honor would have some

13   time tomorrow, but I think even with tomorrow morning it's

14   fair to assume we're not going to conclude all of the

15   witnesses until -- until the next free date, and in which

16   case we can put Mr. Snyder on then, otherwise we had offered

17   and we would have to put on Mr. Snyder out of order now,

18   which I don't think is ideal.  And we hadn't talked about

19   the possibility of having tomorrow morning, but do you agree

20   that we should assume that we're not going to finish --

21             MR. MCGAAN:  Yeah, as Mr. DeFranceschi said, we're

22   not -- I think the parties are in agreement we're not going

23   to finish -- Andrew McGaan, Kirkland & Ellis for the debtors

24   -- that we're not going to finish today so I don't think we

25   need to get into taking witnesses out of order at this

 1    point.

 2            THE COURT:  Okay.

 3            MR. MCGAAN:  We'd normally work with counsel on

 4    that if there was a hope of finishing it, but I think we

 5    understand that we can't, so I'm not sure that's going to be

 6    a problem for Mr. Snyder.

 7            THE COURT:  All right.  Well let's -- let's do this

 8    right now then.  I will -- we'll forget about tomorrow

 9    morning and we'll schedule continuations all day on the 10th

10    and 11th commencing at 9:30 to 5:30.  Now having just said

11    that I have to check two places to make sure that works.

12    That's a Thursday and a Friday, is that going to be okay?

13            MR. HOROWITZ:  That's good for the second lien

14    folks.

15            THE COURT:  All right.  Let me --

16            MR. MCGAAN:  I'm sorry, I just didn't hear Your

17    Honor, what was the time on those days?

18            THE COURT:  All day, 9:30 to 5:30.  I may have to

19    take a break at one point to handle something, but I'm going

20    to try to schedule around that.  Let's see.  Actually does

21    July 9th work for people?

22            MR. HOROWITZ:  I hope I'm not violating anyone.

23            THE COURT:  No, you're fine.  Thank you.

24            UNIDENTIFIED SPEAKER:  (Indiscernible - 9:41:38).

25            THE COURT:  All right.  Okay.  All right, we'll

1    just stay with the 10th and the 11th then.

2         MR. HOROWITZ:  Thank you, Your Honor.

3         THE COURT:  All right.  So let me just double check

4    the two places I have to look.

5         (Pause)

6         THE COURT:  Okay.  This is what happens when I

7    think aloud while we're sitting here, so I apologize,

8    because I'm about to -- all right.  I'm worried about even

9    that amount of time being sufficient, so here's what we'll

10   do.  We will go from 9:30 to 12:00 tomorrow morning, all

11   right?  Everybody is smiling which is --

12        MR. HOROWITZ:  I'm looking at peoples' faces as

13   well, yes.

14        THE COURT:  And then all day on the 10th and 11th

15   from 9:30 to 5:30.  There are a lot of witnesses.

16        MR. HOROWITZ:  That seems safest.

17        THE COURT:  Okay.  Let me double -- yeah, we'll

18   move that back.

19        (Pause)

20        THE COURT:  If anyone in court is present in

21   connection with the Optum (ph) case that'll be moved back to

22   3 p.m. tomorrow from its current position.

23        Just give me a minute.

24        (Pause)

25        THE COURT:  My hemming and hawing up here is

1    costing the estate thousands of dollars, so I'm trying to go

2    as fast as I can.

3         (Laughter)

4              MR. HOROWITZ:  (Indiscernible - 9:44:3) goes down

5    over time, Your Honor.

6              THE COURT:  All right.  Yeah.  All right, July 2nd,

7    9:30 to 12:00 and the 10th and the 11th all day 9:30 to 5:30

8    and that'll do it.

9              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10             THE COURT:  You're welcome.  And we'll go with Mr.

11   -- all right, let's get started then.

12             MR. HOROWITZ:  Okay.  One more small housekeeping

13   item, Your Honor.  As you may recall on my very first

14   exhibit we had a document problem.  Overnight we reviewed

15   the binders and there were some problems only in the first

16   binder.  I'd like to hand up to the Court and clerk

17   corrected version of binder number 1 of the objectors'

18   exhibits.

19             THE COURT:  Okay.  And the witness as well?

20             MR. HOROWITZ:  Yeah.

21             THE COURT:  Or was his okay?

22             MR. HOROWITZ:  No, we didn't ask for permission to

23   change that.

24             THE COURT:  Oh, okay, you already fixed it.  Very

25   good.  You can take that one with you, please.

1            MR. HOROWITZ:  And I believe we made the corrected

2     copies available to other folks, but if not I'll hand them

3     out.

4            THE COURT:  And, Mr. Ying, your affirmation from

5     yesterday is still in place.

6            THE WITNESS:  Yes.

7            THE COURT:  Very good.  Let's begin.

8            MR. HOROWITZ:  Thank you.

9     CROSS-EXAMINATION (Continued)

10    BY MR. HOROWITZ:

11    Q    Good morning, Mr. Ying.

12    A    Good morning.

13    Q    Yesterday during direct testimony by Mr. McGaan you

14    were asked some questions about the Fidelity funding fee for

15    the first lien DIP.  Do you recall that?

16    A    Yes.

17    Q    And for the fee that Fidelity will be receiving on

18    account of the second lien DIP.  Do you recall that?

19    A    Yes.

20    Q    And you were asked questions about whether in your view

21    those fees were attributable to Fidelity's second lien

22    notes.  Do you recall?

23    A    Yes.

24    Q    Okay.  In fact, sir, you were not responsible for

25    negotiating the settlement of Fidelity's second lien note

1    claims were you?

2    A    I was not.

3    Q    That was -- in that regard Mr. McDougal served as the

4    lead negotiator on behalf of the debtors, correct?

5    A    I believe he and his financial legal advisors were

6    involved with that.

7    Q    And he lead the charge on that?

8    A    I believe so, yes.

9    Q    And it was primarily a negotiation brokered by

10   Mr. McDougal between the PIKs and Fidelity, correct?

11   A    I think it was not just Mr. McDougal, but it was, yeah,

12   the PIKs and the -- and Fidelity.

13   Q    Okay.  In forming your view as to whether the second

14   lien -- I'm sorry -- whether these two fees, the first lien

15   DIP fee and the second lien DIP fee to Fidelity were on

16   account of Fidelity's second lien notes claims, the make-

17   whole claim, did you review all of the documents relating to

18   those negotiations?

19   A    I certainly reviewed what I was given, but I don't know

20   if I saw every single document.

21   Q    Okay.  So would you do me a favor and turn to

22   Objectors' Exhibit 39, which is in I believe the second

23   volume of your exhibits?

24       (Pause)

25           THE COURT:  If you're on the telephone please mute

1    your phone, I can hear you typing.  Go ahead.

2    BY MR. HOROWITZ:

3    Q    Tell me when you're there, sir.

4    A    I have it.

5    Q    Okay.  So Objectors' Exhibit 39 is an exhibit -- sorry

6    -- is an email from Mr. Rosenbalm (ph), he was -- he's at

7    York, right?

8    A    Yes, he is.

9    Q    And he was negotiating on behalf of the PIKs, right?

10   A    Yes.

11   Q    And Mr. McDougal, among others, who we've just

12   discussed, right?

13   A    Yes.

14   Q    And you're not on this email are you, sir?

15   A    No, I am not.

16   Q    And you have never seen this email before have you?

17   A    No, I have not.

18   Q    Okay.  And do you see in this email that Mr. Rosenbalm

19   says:

20            "Was going some thinking and a colleague of mine

21   raised a very, very good point.  This would be timely.  See

22   below and let me know."

23            And in the second bullet he says:

24            "In EFIH first lien DIP we still one and a half to

25   two points of commitment fee as currency until the DIP goes

1      out the door."

2              In the next bullet point he says:

3              "Accordingly, if we can get a deal done soon on the

4      EFIH second lien settlement we could potentially use part of

5      the EFIH first lien DIP as 'currency' to bridge the gap on a

6      settlement with the EFIH second liens."

7              Do you see that?

8      A    I do.

9      Q    Okay.  And until you read this email you were not aware

10     that Mr. Rosenbalm had proposed using the fee on the first

11     lien DIP as current to bridge the gap on the second lien

12     settlement negotiations were you?

13     A    No.

14     Q    Let me ask you to turn to Objectors' Exhibit 49, which

15     I believe is in the same volume.  And tell me when you're

16     there.

17     A    I'm there.

18     Q    Okay.  So Objectors' Exhibit 48 is an email from

19     Mr. McDougal to Nate Van Duzer (ph) who was negotiating on

20     behalf of Fidelity, correct?

21     A    Yes.

22     Q    Dated March 31st, 2014, right?

23     A    Yes.

24     Q    And you're not on this email are you?

25     A    No, I'm not.

1    Q    And you've never seen this email before have you?

2    A    No.

3    Q    Okay.  In this email Mr. McDougal says, I'm going to

4    skip down to the first paragraph:

5         "For its EFIH second lien piece Fidelity gets a wire

6    from York/Avenue, et al. over" -- oh, withdrawn.  I'm sorry,

7    let me go back.  Let me go back to the first paragraph after

8    Nate.

9         Do you see four lines down and the sentence that

10   starts, "By my math ..."?

11   A    This is the second part of the email?

12   Q    I'm sorry, I'm in the first -- I confused you and I

13   apologize for that, but I'm in the first paragraph of the

14   email after he says, "Nate."

15   A    I'm in number --

16   Q    And I'm on the fourth line down.

17   A    You're in Exhibit 47?

18   Q    No, I'm in Exhibit 48.  Are you in the wrong --

19   A    I'm sorry.  I apologize.  My mistake.  I'm sorry.

20   Okay, it says, "Nate."  Sure.

21   Q    So know we're in the first paragraph four lines down

22   Mr. McDougal writes, "By my math this gets to somewhere very

23   close to 122 on your second lien position."

24         Do you have a recollection as to what 50 percent of

25   the make whole would have -- would have represented around

1    this time on the second lien notes?

2    A    I don't.  I don't know what the 50 percent would have

3    been.  I know what it is now, but I don't know what it would

4    have been back in March.

5    Q    Okay.  Let me ask you to skip down to paragraph, see

6    where Mr. Rosen -- sorry -- Mr. McDougal writes, "For EFIH

7    second lien piece Fidelity gets a wire from York Avenue, et

8    al. over the next several days when the trade can settle,"

9    and we see who has principal accrued and unpaid interest and

10   a month of additional interest.  Do you see that?

11   A    Yes.

12   Q    And then he goes on to list:

13            "Fidelity's pro rata share (based on Fidelity's

14   holdings of both tranches of EFIH second lien paper) of the

15   settled amount of 380 million for the second lien make

16   whole.  Fidelity can roll this part into EFIH first lien

17   DIP, together with an amount of principal we paid so it can

18   take up the full 380 million; if it elects to roll Fidelity

19   earns 1.75 percent DIP fees on this 380 million."

20            Do you see that?

21   A    I do.

22   Q    Okay.  And do you see in the next paragraph he also

23   says:

24            "Fidelity gets to participate in EFIH second lien

25   DIP for the full nine percent available for EFIH creditors,

1    plus its pro rata piece as an existing EFIH second line --

2    sorry -- as an EFIH unsecured creditor.  Fidelity gets a

3    $12 million fee on this participation that will be paid in

4    cash as part of it -- as part of and incremental to its

5    second lien buyout terms in lieu of backstop fees."

6         You see that?

7    A    I do.

8    Q    Okay.  And before I pointed this email out to you you

9    were not aware that Mr. McDougal had told Mr. Van Duzer that

10   these were elements that Fidelity was getting on account of

11   a its second lien piece?

12        MR. MCGAAN:  Objection, Your Honor.  No foundation

13   for this witness to know what Mr. McDougal meant.

14        Secondly, this mischaracterizes what the author of

15   this email said in response to questions from Mr. Horowitz

16   in testimony that's already been submitted to Your Honor.

17        I other words Your Honor has the authors testimony

18   about what this means and he actually said it doesn't mean

19   what Mr. Horowitz just suggested it means.

20        So I object to the questions to this witness who's

21   never seen this email and just add that Your Honor has

22   testimony from the author.

23        MR. HOROWITZ:  I agree, Your Honor, that's the

24   testimony.  I disagree with Mr. McGaan's characterization of

25   it.  Mr. McDougal, Your Honor, testified that he gets to the

1    very close to 122 by adding up each of these elements.

2           That said I'll move past that and I'll just ask

3    another question.

4    BY MR. HOROWITZ:

5    Q    You never saw this email before you offered your

6    opinion as to what elements were attributable to Fidelity's

7    second lien claim did you?

8    A    No, I haven't.

9    Q    Thank you.

10          Now --

11        (Pause)

12   Q    Can I ask you to pull out your declaration binder,

13   which is on your left, which I just asked Alice for when it

14   was sitting in front of me.

15   A    I have it.

16   Q    If you look at the first tab this is a declaration that

17   you submitted, sir, in connection with a motion to approve

18   certain EFIH settlements and the Oncor TSA amendment.  Do

19   you recall writing this declaration?

20   A    Yes, I do.

21   Q    And, sir, in this declaration, if I ask you to turn to

22   page 7 -- well go back to page 6, you see there's a heading

23   entitled, "The backstop fees were negotiated at arms length

24   and are reasonable under the circumstances"?

25   A    Page 6 anywhere in particular?

1    Q     I'm looking at the heading.

2    A     Oh, I'm sorry.  Yes, I do see that.

3    Q     Okay.  So this is a section of your declaration where

4    you were addressing backstop fees that were to be paid to

5    PIMCO and WAMCO in connection with the first lien DIP,

6    right?

7    A     Yes.

8    Q     Okay.  And as you described on page 7 at the time, this

9    is a paragraph 16, the debtor was proposing and the Court

10   ultimately approved a commitment fee of 1.75 percent for

11   PIMCO, right?

12   A     Yes.

13   Q     And of one percent for WAMCO, right?

14   A     That's correct.

15   Q     Now in this declaration you explain why in your view

16   such a commitment fee is reasonable and necessary, right?

17   A     Yes, I do.

18   Q     And in paragraph 17 what you explain is that PIMCO and

19   WAMCO were required to commit the funds a significant period

20   of time before the actual funding, right?

21   A     That's correct.

22   Q     And in three lines down in the second sentence you

23   write, "Essentially, PIMCO and WAMCO are permitting the EFIH

24   debtors to use their balance sheets without a fee."  And

25   that's -- that's the explanation for why a commitment fee is

1    appropriate, right?

2    A    That's correct.

3    Q    Okay.  You do not mention the Fidelity fee in this

4    declaration, right?

5    A    I haven't read it all the way through in a long time,

6    but if you say I didn't I didn't.

7    Q    Okay.  You -- do we have the supplemental declaration?

8         MR. HOROWITZ:  Your Honor, may I approach?

9         THE COURT:  Yeah.

10        MR. HOROWITZ:  I don't intend to mark this because

11   it's a declaration and it's got a docket number, but we

12   actually had three-hole punch versions yesterday that were

13   lost (indiscernible - 9:57:38) to the declaration binder

14   we'll get you one.

15        THE COURT:  All right.

16   (Pause)

17   BY MR. HOROWITZ:

18   Q    So, sir, I have just handed you docket number 610 in

19   this case, which is debtors' notice of filing of a

20   supplemental declaration of yourself in connection with the

21   first lien DIP motion and the EFIH settlement motion, and

22   attached as Exhibit A is your declaration.  Do you see that?

23   A    Yes.

24   Q    And this is a supplemental declaration that you

25   submitted in connection with the first lien DIP motion,

1    among other things, right?

2    A    Yes.

3    Q    Okay.  If I ask you to turn to the supplemental

4    declaration at page 10, do you see the heading paren 3 on

5    page 10?

6    A    Yes.

7    Q    Which reads:

8         "The issuance of the EFIH first lien DIP roll up

9    claims and Fidelity's option to fund $500 million of the

10   EFIH first lien DIP facility are both appropriate under the

11   circumstances."

12        Do you see that?

13   A    Yes.

14        THE COURT:  I don't, I'm sorry.

15        MR. HOROWITZ:  Oh, I'm sorry, Your Honor.  I'm on

16   -- it's page 11 of 17 of the document.

17        THE COURT:  Yeah.

18        MR. HOROWITZ:  And just above paragraph 27 is the

19   heading 3.

20        THE COURT:  Oh, I'm sorry, I was looking -- okay.

21   I was looking at Romanette III at the top.  I apologize.  Go

22   ahead.

23        MR. HOROWITZ:  Oh, okay.

24   BY MR. HOROWITZ:

25   Q    And in this section of your declaration you explain why

1    you believe it's appropriate for the debtors to give

2    Fidelity an option to fund 500 million of the EFIH first

3    lien DIP facility, right?

4    A    Yes, I do.

5    Q    You do not characterize it as a commitment fee do you?

6    A    No, I don't.

7    Q    And you explain in paragraph -- excuse me a second --

8    29 that:

9         "Furthermore the potential $500 million first lien

10   DIP facility contribution and the EFIH first lien DIP roll

11   up claims help the EFIH debtors and EFH Corp. secure

12   Fidelity's support for the restructuring support agreement."

13        That was your explanation for why it was

14   appropriate to allow Fidelity the option to participate in

15   the first lien DIP, correct?

16   A    Yes.

17   Q    Okay.  In fact you're aware that Fidelity did not

18   actually commit to fund $500 million in the first lien DIP

19   until very shortly before the DIP hearing or are you aware

20   of that?

21   A    I don't know the exact date, but I know that Fidelity

22   wanted very much to make the investment, and as you know and

23   as I've testified, the whole negotiation between Fidelity

24   and the company and the unsecureds and the shareholders was

25   very difficult, and I have to tip my hat to Fidelity, they

1    were very good at saying whatever they wanted to say to

2    extract as much value for themselves as possible.  All I can

3    do is tell you that it evaluated the merits of these

4    investments and fees in the perspective of the debtor.

5    Q    Okay.  And you did not in this declaration undertake to

6    try to identify any specific Fidelity claim on account of

7    which this opportunity was being afford to Fidelity did you?

8    A    Based on where we saw the fees being paid relative to

9    value the company was receiving we thought that each

10   component of what was happening seemed reasonable to us in

11   the context of the overall negotiation and support for the

12   RSA.

13   Q    Sir, in your declaration you said that the fee was

14   appropriate in order to secure Fidelity's support for the

15   restructuring support agreement, correct?

16   A    Yes, I did.

17   Q    Okay.  And you did not seek in your declaration to

18   identify which aspect of Fidelity's claim it was being

19   compensated on account of, correct?  You did not in your

20   declaration do that.

21   A    I did not.

22   Q    Thank you.

23        And by the way, let me ask you to turn to

24   Objectors' Exhibit 6 in the first binder.

25        (Pause)

1   Q    Objectors' Exhibit 6 is a copy of the signed commitment

2   letter where Fidelity committed to fund $500 million of the

3   first lien DIP, correct?

4   A    Yes, it is.

5   Q    And it's dated June 3rd, 2014, right?

6   A    Yes.

7   Q    And you recall being in court on June 5th for the first

8   lien DIP motion, right?

9   A    I believe that's right.

10  Q    Okay.  And by the way, attached as a schedule to this

11  commitment letter is a schedule of Fidelity entities and

12  their commitment amounts.  Do you see that?

13  A    I see that.

14  Q    And do you have an understanding as to how Fidelity

15  allocated those commitment amounts among its various funds?

16  A    I do not.

17  Q    Have you read Mr. Van Duzer's testimony in this case?

18  A    I have not.

19  Q    Okay.  So when you offered your opinion that the

20  opportunity -- that Fidelity's opportunity to participate in

21  the $500 million bid -- to participate in the first lien DIP

22  up to $500 million and earn a fee was not attributable to

23  its second lien notes, you were not aware that Mr. Van Duzer

24  had testified that the allocation -- that the commitment

25  amounts were allocated pro rata in accordance to each fund

1    -- in accordance with each funds' second lien note holdings

2    were you?

3    A    I was not aware of that.

4         MR. MCGAAN:  I'm sorry, I have an objection.

5    Again, it characterizes testimony that has been submitted as

6    part of the -- in transcript form to Your Honor.  It's

7    unfair to us and I also think it's unfair to the witness to

8    characterize the deposition he hasn't read and ask him

9    whether he aware of it, implying it has in fact

10   (indiscernible - 10:04:30).

11        MR. HOROWITZ:  I think it was verbatim, Your Honor,

12   but the purpose of the testimony was to establish as I said

13   yesterday that the witness had no foundation for offering an

14   opinion as to on what account that fee was being offered to

15   Fidelity.

16        THE COURT:  I think it's fair grounds for cross.

17   BY MR. HOROWITZ:

18   Q    Now you also offered testimony on direct about the

19   eleven and a quarter million dollar fee Fidelity looks to

20   get upon funding any portion of the second lien DIP.  Do you

21   recall that?

22   A    I do.

23   Q    Have you read the debtors' briefs in this case in

24   connection with this motion?

25   A    I believe I have, yes.

```
 1   Q    Okay.  Are you aware that the debtors have asserted

 2   that Fidelity's -- that Fidelity will only earn this fee pro

 3   rata in accordance with how much of the nine percent it

 4   actually funds?

 5   A    I just don't recall exactly whether it was pro rata or

 6   they earn the entire fee no matter what.

 7   Q    Okay.  Well let me ask you to turn to your pleading

 8   binder, tab 4 in your pleading binder.

 9        (Pause)

10   A    I have it.

11   Q    It's just the original second lien DIP motion.  Do you

12   see it?

13   A    I have it.

14   Q    Okay.  And can you turn to page 14.

15   A    Okay.

16   Q    This is in the box, you can turn back to page 13 if you

17   want to see the heading, it's in -- it's in the box of the

18   summary payable on fees.  Do you see that?

19   A    Yes.

20   Q    So this is describing fees relating to the second lien

21   DIP, and I want to direct your attention to the very last

22   fee in that box on page 14, participation fee.  Do you see

23   that?

24   A    Yes.

25   Q    And do you see that it reads, "A one-time participation
```

1    fee of eleven and a quarter million payable to Fidelity on

2    the exercise of any of its participation rights."  Do you

3    see that?

4    A    Yes, I do see that.

5    Q    So does that refresh your recollection that Fidelity

6    gets the full eleven and a quarter million dollar fee if it

7    exercises any of it's participation rights?

8    A    That refreshes my memory, yes.

9    Q    Thank you.

10        Mr. McGaan also asked you a question about why the

11   debtors decided to extend the 50 percent make-whole

12   settlement to all holders of second lien notes.  Do you

13   recall that?

14   A    Yes.

15   Q    And I don't have the transcript yet, but I wrote it

16   down and I think I got it right, you answered, "I guess

17   because it was the right thing to do."  Do you recall that?

18   A    I do.

19   Q    Yes.  Let me ask you to turn to Objectors' Exhibit 49.

20   Let me know when you're there.

21        (Pause)

22   A    I think I'm there.

23   Q    Okay.  Folks from Kirkland are going to let me know if

24   I get this right.

25        Objectors' Exhibit 49 is an email from Steven

1    Seragenni (ph) to Ira Dizengoff, Akin Gump, among others,

2    and dated April 9th, 2014.  It's going to take you a while

3    so I'll point you somewhere in the middle of this cc block,

4    almost exactly in the middle is your name.

5    A    I see it.

6    Q    Okay.  And this email is translating a list of RSA

7    issues that begins on the page Bates ending 1487, do you see

8    that?

9    A    I do.

10   Q    In the fourth box down under term sheet issues do you

11   see EFIH second lien settlement participation?

12   A    I do.

13   Q    And do you see that the companies' ask had "limited to

14   second liens that's signed before the petition date"?

15   A    Yes.

16   Q    And the Akin, Akin represents the PIKs, right?

17   A    That's correct.

18   Q    The Akin ask was open to all second liens anytime

19   before funding of second lien DIP.  Do you see that?

20   A    I do.

21   Q    So does that refresh your recollection that in fact it

22   was the PIKs who insisted that the 50 percent make-whole

23   settlement be offered to all second lien holders after the

24   petition date?

25   A    That seems to be what this says, I just don't have a

1    recollection.

2    Q    Okay.  And you testified yesterday that under the PIK

3    DIP the large majority of risk associated with the make-

4    whole litigation is going -- would be borne by the PIKs.

5    Did I get that right?

6    A    Yes.

7    Q    Okay.  So it's fair to conclude is it not that the PIKs

8    had decided that they would be happy trading a 50 percent

9    make-whole settlement to eliminate the exposure of a 100

10   percent make whole?

11   A    I think that's very fair.

12   Q    Okay.  I want to turn to asking you some questions

13   about the competing DIPs again.  And let -- you should I

14   hope still have the -- it's probably loose -- the three

15   exhibits that Mr. McGaan marked with your Debtors' Exhibits

16   1 through 3?

17   A    I do.

18   Q    Let's turn to the last one, Debtors' Exhibit 3, the

19   board dec from the night before last, June 29th.

20   A    I have it.

21   Q    Okay.  One of the comparison -- well let me turn -- ask

22   you to turn to page 6 of the board dec.

23   A    All right.

24   Q    Well let's start on page 5.  Page 5 has the comparison

25   -- has the side by side comparison of the competing second

1    lien DIP proposals, right?

2    A    Yes.

3    Q    With the second lien NextEra DIP proposal having a six

4    percent interest rate as opposed to a six and a quarter

5    percent interest rate, right?

6    A    Yes.

7    Q    Now on questioning from Mr. McGaan yesterday you said

8    that even though the six percent is a lower interest rate,

9    the total interest expenses under the second -- under the --

10   I'll call it the NextEra proposal -- under the NextEra

11   proposal would be greater because the amount borrowed would

12   be greater, right?

13   A    That's correct.

14   Q    And on page 6 you show that, right?  On -- under

15   interest expense, the first box on cash cost -

16   A    That's correct.

17   Q    -- second lien DIP?

18   A    Yes.

19   Q    Okay.  And you explained that the reason that the

20   amount borrowed under the NextEra proposal was larger, at

21   least much of the reason for the dealt and amount borrowed,

22   is that under the NextEra proposal there would be an

23   immediate cash settlement of the make-whole claim -- oh, I'm

24   sorry -- yeah, so it would be a needed cash settlement of

25   the second lien make-whole claims, right?

1    A    That's correct.

2    Q    Which would need to be funded through borrowing.

3    A    Yes.

4    Q    Okay.

5    A    And company cash.

6    Q    Okay.  That's a fair point, the total amount of

7    settling the make-whole claim would be greater than the

8    dealt and the two borrowings, right?

9    A    That's correct.  There's a billion six of the NextEra

10   cash, there's a billion three twenty-five going to the

11   second liens, and there's another 640 million I think going

12   to the make whole.

13   Q    Okay.  But under the --

14   A    Almost identical to the billion nine going out to pay

15   off the second liens under the unsecured proposal.

16   Q    Okay.  And the PIK DIP proposal does contemplate some

17   immediate cash settlement for the settling -- for the second

18   lien holders who have tendered or otherwise -- or previously

19   in the RSA accepted a settlement, right?

20   A    Yes, 140 million.

21   Q    Okay.  So the different in the amounts borrowed under

22   the two proposals is roughly equal to the difference in the

23   cash amount that would be necessary to settle make-whole

24   claims under the two proposals?

25   A    I'm not sure that's right, but I'd have to figure that

1    one out.

2    Q    Okay.  Now, I think it was pointed out yesterday that

3    there's a possibility that the debtors will lose some make-

4    whole litigation.  You'll accept that, right?

5    A    Oh, yes, there's a possibility.

6    Q    And your understanding is that the make-whole

7    litigation would be resolved not before September, right?

8    A    So I understand now, yes.

9    Q    Okay.  And if the debtors do lose the make-whole

10   litigation you understand that the second lien holders, the

11   non-settling second lien holders will assert a claim for

12   interest on the interest, right?

13   A    Yes.

14   Q    Including interest on the make whole from the date it

15   became payable, right?

16   A    Yes.

17   Q    Okay.  And that interest on interest you understand

18   they will assert that claim at the contract rate, right?

19   A    I understand that, yes.

20   Q    So if the debtors litigate and lose the make-whole

21   claim then in effect they will have been borrowing the

22   amount of that make whole from the second lien holders at

23   the contract rate on the second lien notes, right?

24   A    That's true.

25   Q    Okay.  Which is you said blended rate of 12 percent

1    yesterday, right?

2    A    I did.

3    Q    Okay.  So if that happens then in fact there will have

4    been a negative carry between the 6 percent that the NextEra

5    proposal offers to fund for the make-whole settlement and

6    the 12 percent that the debtors will have ended up accruing

7    on that amount.

8    A    The analysis is true only if you assume we're going to

9    lose the make whole.

10   Q    And in doing your analyses I assume that you have

11   accepted that as a possibility, yes?

12   A    Well it's a possibility, but all of our analyses are

13   based on assuming we win the make whole.

14   Q    All right.  Ours are premised on the other assumption.

15          THE COURT:  I'm sorry, what was the last comment?

16          MR. HOROWITZ:  I said ours are premised on the

17   other assumption.  It was not a question.  I apologize, Your

18   Honor.

19   BY MR. HOROWITZ:

20   Q    Okay.  Now on direct one of the -- we just talked about

21   one of the financial elements of the proposal and you said

22   that the lower interest in your opinion on the NextEra

23   proposal is not necessarily better because of the higher

24   amount borrowed, right?

25   A    That's correct.

1    Q    You also on direct said that another problem you have

2    with the NextEra proposal is that it seeks to dictate --

3            THE COURT:  What's the contingency plan under the

4    debtors' analyses if you lose the make-whole settlement or

5    the make-whole litigation?

6            THE WITNESS:  Sure.  Well in our plan, and actually

7    if you look at the same exhibit that the counselor was

8    questioning me on, if you just turn to the next page, page 7

9    you'll see in the first column under win the make whole

10   there's 488 million of cash at exit.

11   BY MR. HOROWITZ:

12   Q    I'm sorry, I know it's a good question, but I want to

13   be oriented.  Which page are you on?

14   A    Of course.  I'm on the next page you were at

15   questioning me on page 7 of the board dec.

16   Q    That one.

17   A    And on the first column on the left we calculate

18   implied enterprise values and equity values and net debt at

19   the -- assuming the remaining 57 percent of the second liens

20   we win the make whole.  If they're litigating it shows that

21   we'll have 488 million of cash at the exit date.

22            So we have a fair amount of cash to make a make-

23   whole payment, plus I believe in the RSA there's a provision

24   amongst the parties that says that if we need more cash they

25   agree to -- that they agree to an issuance of additional

1    indebtedness at EFIH to support the additional cash payment.

2    It doesn't specify the terms of that indebtedness, but it

3    says if people agree if we have to pay it we certainly have

4    to figure out a way to pay it.  We can borrow or use our

5    excess cash.

6         And I believe the -- I haven't calculated the

7    interest on interest or the interest on the make whole,

8    pardon me, but I do believe the full amount of the unsettled

9    settling second line noteholders make-whole claim is

10   $380 million.

11        THE COURT:  Actually your contingency is available

12   cash, which is identified as 488 million under the win make-

13   whole scenario plus additional borrowings if necessary,

14   which there's a commitment under the RSA for certain parties

15   to provide?

16        THE WITNESS:  It's not a commitment, but there's an

17   agreement that they will figure out a way to raise it.  Or

18   an issue notes to the -- to the parties who are demanding

19   payment.

20        THE COURT:  Okay.  Sorry, counsel.

21   BY MR. HOROWITZ:

22   Q    So there is a contemplation of a possible attempt to

23   cram down the secured lenders' claims with new paper?

24   A    It's one of the many alternatives, obviously we could

25   try to raise some new financing as well.

1    Q     Okay.

2    A     It doesn't specify.

3    Q     Okay.  Okay.  Now another problem that you -- another

4    complaint you had about the NextEra proposal that you

5    discussed during your direct testimony was that it proposed

6    to dictate how the second liens -- what the second lien

7    noteholders would recover on their make-whole claims, right?

8    A     It's just an observation, I wouldn't characterize it as

9    a complaint.

10   Q     Okay.  But you understand that that NextEra proposal

11   also seeks to pay all EFIH unsecured creditors in full,

12   right?

13   A     That's the assertion, yes.

14   Q     Okay.  And you -- but you don't hold yourself out as an

15   expert on the merits of the make-whole claim, right?

16   A     No.

17   Q     You do understand that outside of bankruptcy EFIH could

18   not have prepaid the second lien notes without a make whole,

19   you do understand that, right?

20   A     Yes, I do.

21   Q     Okay.  And you don't have any basis for criticizing the

22   second lien noteholders' position that if they bring enough

23   value to pay creditors in full they should also get their

24   make-whole claim do you?

25   A     If they truly are paying creditors in full that would

1    be terrific.

2    Q    Okay.  And you also recognize that the debtors'

3    decision to go with the PIK DIP has an effect on dictating

4    on what different creditor constituencies recover, right?

5    A    Yes, but they're the junior creditors so they get the

6    risk and return of being the junior creditors.

7    Q    Okay.  So your notion that it's more appropriate to

8    give the PIKs the potential equity upside is based on your

9    view that junior creditors should also get that right; is

10   that true?

11   A    Well, I looked at dozens and dozens of rights offerings

12   in our restructuring world and I only know of rights

13   offerings where the fulcrum securities providing the

14   capital, the use of proceeds to pay off more senior

15   creditors in full, and if they're junior creditors below the

16   fulcrum who want more there's also concession.  Here we have

17   a concession the junior creditors, the EFH bonds are getting

18   a portion of the rights offering.  And I haven't seen a

19   rights offering where the senior secured creditors providing

20   the equity funding, particularly in objection by the more

21   junior saying I'll pay you off and let you litigate the full

22   extent of your make whole.

23   Q    Okay.  But you have seen in this case that secured

24   creditors have offered to propose rights offering financing,

25   right?

1    A    Yes.  Just to be clear what's happening here to me

2    looks highly unusual.

3    Q    Okay.

4    A    I can't think of another example like it.

5    Q    Now let me turn finally to the issue of what would

6    happen if this PIK DIP were approved.

7            Your heard Mr. Hessler yesterday during his opening

8    say that if the -- that under the PIK DIP the debtors have

9    an unfettered fiduciary out.  He said that on a number of

10   occasions, right?

11   A    Yes, he did.

12   Q    Okay.  And do you agree with that?

13   A    I do.

14   Q    Okay.  You also heard him characterize the fiduciary

15   out as a one-way option, I think you even characterized it

16   as a one-way option yesterday too.

17   A    Yeah, I did.

18   Q    Okay.  So you believe that it is a one-way -- that this

19   PIK DIP amounts to a one-way option in the debtors' favor?

20   A    That's correct.

21   Q    Okay.  A one-way option is something that only has

22   value to the party holding the option, right?

23   A    Yeah, I haven't really thought about the precise

24   definition of a one-way option.  I actually thought the term

25   one-way option was redundant.  (Indiscernible - 10:22:59)

1    option.

2    Q    And an option adds value to the party that's holding

3    the option?

4    A    Yes, the option ascribes the option holder a contract

5    right.

6    Q    Okay.  And under your analysis in the final proposal

7    the only thing that the PIKs get in exchange for writing

8    this one-way option is 42 million in cash fees; is that

9    right?

10   A    And they get to earn six and a quarter percent interest

11   on their billion nine investment.

12   Q    Okay.  And that -- you said at deposition that you

13   thought that was probably below market interest rate.

14   A    I do, yeah, I do think so given that they're right on

15   the 5.4 billion of first lien as four and a quarter percent.

16   Q    So you don't really think that the PIKs are writing

17   this one-way option in exchange for the opportunity to loan

18   money to the company at six and a quarter percent do you?

19   A    I'm quite confident that six and a quarter percent is

20   well below their opportunity cost of capital.

21   Q    Okay.  Is it possible, sir, that the PIKs have

22   concluded that the debtors will as a practical matter never

23   be able to exercise their fiduciary out?

24        MR. BALDINI:  Objection, Your Honor.

25   (Indiscernible - 10:24:00).  Steven Baldini, Akin Gump.  It

1    calls for speculation.

2         THE COURT:  Yeah, you've got to come all the way to

3    the microphone or I'm not going to --

4         MR. BALDINI:  Steve Baldini, Akin Gump, counsel for

5    the PIK group.  Calls for speculation.

6         THE COURT:  Counsel for who, I'm sorry?

7         MR. BALDINI:  Calls for speculation.  Sorry.

8         THE COURT:  I'm sorry, who do you represent?  I

9    can't --

10        MR. BALDINI:  Steve Baldini, Akin Gump, counsel for

11   the PIK group.

12        THE COURT:  Okay.  And the objection is?

13        MR. BALDINI:  Calls for speculation.

14        THE COURT:  Overruled.  If you're going to

15   participate why don't you grab a seat.

16        MR. BALDINI:  Certainly.

17        THE WITNESS:  I'm sorry, would you ask the question

18   again?

19   BY MR. HOROWITZ:

20    Q   Sure.  I'm asking in your view is it possible that the

21   PIKs have concluded that the debtors will never as a

22   practical matter be able to exercise their fiduciary out?

23    A   I think the PIKs are very nervous that they may not be

24   the ultimate owners of the substantial amount of equity of

25   this company, and I think they're going to compete hard to

1    try to earn that right.

2    Q    Okay.  You've testified that one of the items of

3    paramount importance in this case is the debtors preserving

4    their ability to affect a tax-free spin transaction, right?

5    A    Yes.

6    Q    So the debtors will only exercise their fiduciary out

7    in circumstances where they'll be assured that they can

8    retain that ability to do a tax-free spin, right?

9    A    As long as we see a deal that has EFIH feasible and

10   healthy from a debt perspective and the equity conversion of

11   the debt of EFIH goes into EFH if it's at a higher valuation

12   and ascribes more value to the constituencies as they

13   deserve based on their claims, as the debtor the higher the

14   value the better for us.

15   Q    As long as it preserve the tax-free spin, right?

16   A    Yes.

17   Q    Okay.

18   A    Which is a detriment to all the creditors in the case.

19   Q    Understood.

20         And we've talked about it and don't mean to repeat,

21   but let's just remind ourselves.  For a tax-free spin you

22   need to insure that the equity upon the effective date, a

23   majority of the equity remains in the hands of existing

24   creditors, right?

25   A    I believe so, yes.

1    Q    And because we're talking here about a convertible DIP

2    the DIP can only come from existing creditors, right?  Well

3    it can only come with the -- in partnership with existing

4    creditors, that's with the NextEra bid.

5    A    Well again, I'm confused about what I can say from a

6    tax perspective.  I won't profess to be a tax expert.

7    Q    Okay.  Well let me just ask you to reconfirm what I

8    believe you said on direct, which is this.

9    A    Of course.

10   Q    In order for any strategic to come in with a proposal

11   they would need a creditor partner, you did say that, right?

12   A    I did say that.

13   Q    Okay.  And the strategic partner can't take more than

14   the 49 percent of the equity of the reorganized debtor,

15   right?

16   A    That's correct.

17   Q    So the creditors must have sufficient claims to convert

18   into a meaningful portion of the equity, right?

19   A    Or they could do a DIP convertible into less than 50

20   percent of the equity, that would be a higher valuation, it

21   could certainly work.

22   Q    Well and providing that the remaining equity is

23   distributed to existing creditors?

24   A    Absolutely.

25   Q    Okay, gotcha.

1    A    Or the EFH unsecureds who are not Fidelity could also

2    propose them.

3    Q    Okay.  But you would agree with me that the strategic

4    -- a strategic would need a credit -- an existing creditor

5    partner, right?

6    A    Unless they were willing to own less than half I think

7    it's --

8    Q    Okay.

9    A    -- I think -- I think a strategic could come in.

10   Q    And I think Mr. Sassower announced in court at the

11   beginning of the hearing yesterday the first lien DIP is

12   closed, right?

13   A    Yes, it is.

14   Q    Okay.  And have principal and interest on the first

15   lien notes now been repaid?

16   A    Yes, they have.

17   Q    Okay.  So that -- the first lien noteholders' remaining

18   claim in this case is a -- is a contingent claim for the

19   disputed make whole, right?

20   A    That is correct.

21   Q    Okay.  And if approved the debtors propose to use the

22   second lien to pay off the principal and interest on the

23   second lien notes, right?

24   A    That is correct.

25   Q    Which would leave the second lien noteholders with only

1    a claim for -- a contingent claim for a disputed make whole,

2    right?

3    A    That is correct.

4    Q    And interest on interest and so forth.

5         So if this DIP is approved the debtors will have

6    largely removed the two main other creditor bodies who would

7    be able to propose an alternative transaction?

8    A    That's true.

9    Q    Now one other thing that you say --

10        THE COURT:  Based on your I understand limited

11   ability to opine on tax matters is the -- is a DIP lender a

12   creditor partner for purposes of the tax respin?

13        THE WITNESS:  That's a very good question, that's

14   why I tried to defer a little bit because I don't have a 100

15   percent clear understanding.

16        I think the problem with a DIP lender is what kind

17   of debt are they retiring?  If they're retiring secured debt

18   in full and then converting to equity I'm not sure that

19   necessarily qualifies for the bankruptcy exception in the

20   tax code.  That's why I said that if a DIP lender came in

21   and only converted into 49 percent of the company and the

22   remaining 51 percent were owned by the existing creditor

23   constituencies I think that would work.

24        And I realize that, you know, we're creating a

25   hurdle here of raising enough to take out the DIP, but if

1    someone said, well, I'll put in a billion nine and convert

2    into 49 percent but the balance of value that I want, you

3    know, I'll take back some preferred stock or debt or some

4    other junior instrument, again, I think, you know, with a

5    will there's a way from a financial engineering perspective

6    for someone else to potentially come in.  You could -- I

7    don't want to speculate as to whether they would or not, but

8    I do think you can engineer your way around it.

9              MR. HOROWITZ:  Your Honor, I may have understood a

10   little bit differently.  Was you question if a wholly-third

11   party came in and provided new money on a DIP would they

12   then be creditors --

13             THE COURT:  Yeah, I'm spinning the idea that --

14   which is a follow up on your question -- of course the

15   existing first lien EFIH debt has been paid off, the

16   existing second line EFIH debt is paid off under the

17   debtors' transaction, correct?

18             MR. HOROWITZ:  Correct.

19             THE COURT:  Which leaves -- so if one were to

20   exercise the fiduciary out that the debtor has characterized

21   as an option that would in effect require a payout of the

22   new DIP -- a pay down of -- a take out of the new DIP.

23             MR. HOROWITZ:  Yes.

24             THE COURT:  Okay.  So what I'm trying to figure out

25   in my own head is whether that in and of itself without

1    another quote/unquote creditor partner would nonetheless

2    reserve the tax-free spin, and that's a legal argument it

3    sounds like.

4            MR. HOROWITZ:  I --privy to conversations I think

5    it's a complex question without a clear answer, but it is

6    one that's probably not for this witness.

7            THE COURT:  All right.

8            THE WITNESS:  And again, just to be clear what I

9    was trying to say, is I think a fresh third party who wanted

10   to convert into a majority of the stock to take out the DIP

11   I think would be problematic, and I'm saying but there's a

12   way to do it and not violate the 51 percent.

13           THE COURT:  All right.  Thank you.

14           THE WITNESS:  Sorry if I wasn't clear.

15   BY MR. HOROWITZ:

16   Q    No, actually let me ask one follow-up question because

17   that might clarify.

18           So is it your understand just based on what you've

19   heard that the tax analysis would be different if the money

20   that comes in to take out the existing DIP comes from

21   existing creditors as opposed to a third party?

22           UNIDENTIFIED SPEAKER:  Objection to the form, Your

23   Honor.

24           THE COURT:  No, that's okay.  Go ahead.

25           THE WITNESS:  Yeah.  No, I think it's different if

1   it's an existing creditor somehow converting it's debt

2   claims into equity.

3   BY MR. HOROWITZ:

4   Q    That's the most light I can shed on that actually.

5          THE COURT:   Thank you.

6   BY MR. HOROWITZ:

7   Q    I want to turn to a slightly different topic, which is

8   that one of the other issues that you raised and the debtors

9   have raised with the NextEra proposal is that the second

10  lien holders and NextEra have failed to garner the support

11  of Fidelity or the commitment parties to their alternative

12  transaction; is that correct?

13  A    As far as I know that's correct, yes.

14  Q    Okay.  You did testify yesterday that the PIKs had told

15  -- I don't know, I can't recall if it was directly or

16  indirectly that you had heard that the PIKs had indicated

17  they would not support the NextEra proposal, right?

18  A    That's correct.

19  Q    And I think you said yesterday that that's not

20  surprising because you have observed that the PIKs want to

21  own this company very badly, right?

22  A    Yes, I have.

23  Q    Okay.  And under the NextEra proposal they would have a

24  significantly lower equity stake than under -- in the

25  reorganized company than under their proposal, right?

1    A    I'm sorry, ask the question again.

2    Q    Under the NextEra proposal the PIKs would stand to

3    receive a lower equity stake in the reorganized company than

4    in their own proposal.

5    A    That's true, but under NextEra PIKs also get cash.

6    Q    Right.  I'm just saying they would have less of an

7    equity stake in the new company, right?

8    A    I agree.

9    Q    And the equity they receive would be distributed at a

10   higher value than under their proposal, right?

11   A    Yes.

12   Q    Okay.  So the NextEra proposal gives the PIKs less of a

13   potential upside, right?

14   A    Yes.

15   Q    Okay.  And if the NextEra proposal is successful in

16   what it seeks to do in paying the PIKs in full it also

17   limits the PIKs downside, right?

18   A    Yes, it gives them cash.

19   Q    Okay.  And cash has a limited downside?

20   A    Indeed, but also I think there's issues with the

21   shareholder agreement that NextEra wants with the rest of

22   the 55 percent it doesn't own.

23   Q    Okay.  Now you didn't testify as to whether the other

24   RSA parties besides the PIKs have indicated whether they

25   would be supportive of the NextEra proposal, and they

1    haven't have they?

2    A    They haven't said yes or no.

3    Q    Right.  In fact the debtors haven't asked either of the

4    other RSA parties whether they would support the NextEra

5    proposal have they?

6    A    That's not true.

7    Q    Well did the debtors ask Mr. Van Duzer if Fidelity

8    would support the NextEra proposal?

9    A    Well, I did speak to Mr. Van Duzer.  I think it was

10   Wednesday night.  That was the night before, I think, he was

11   having his deposition, and I just asked him, "I know you've

12   seen all the proposals.  You know, we'd love to know what

13   you're thinking," and at least at that moment, he says,

14   "Look, we're evaluating them.  You know, we'd like to honor

15   our commitments under the RSA, but we're evaluating all the

16   proposals, and obviously, things are continuing to change."

17   Q    Did you read Mr. Van Duzer's testimony?

18   A    I have not.

19   Q    I think I asked you that before.  Okay.

20            MR. HOROWITZ:  Your Honor, can I hand the witness

21   a transcript of Mr. Van Duzer's testimony?

22            THE COURT:  Yes.

23            But my copy is on my -- that's okay.  Can you give

24   me the depositions?  They're right on the blotter.  Oh, no,

25   you can give me my -- yeah.

```
 1            No, that's all right.  She's getting them.

 2       (Pause)

 3    BY MR. HOROWITZ:

 4    Q   If I can ask you to turn to page 93 of Mr. Van Duzer's

 5    --

 6            THE COURT:  Could you hang on 'til I get it?

 7            MR. HOROWITZ:  Oh, I'm sorry, Your Honor.

 8            THE COURT:  That's okay.  Okay, I have it.  What

 9    page?

10            MR. HOROWITZ:  Page 93, line 17 to 21.

11    BY MR. HOROWITZ:

12    Q   Sir, at the deposition, which is now in evidence,

13    Mr. Van Duzer was asked the following question and gave the

14    following answer.  "Question, Did the debtors ever ask

15    Fidelity whether or not they would support the other

16    proposed second lien DIP financings?"  Answer, "No."  Do you

17    have any reason to question the accuracy of that statement?

18    A   No, but I'm not the debtor.  I'm just their financial

19    advisor.

20    Q   Oh, never mind.  You also told me that, when you talked

21    to Mr. Van Duzer, he said that Fidelity was going to honor

22    its obligations under the RSA; is that right?

23    A   Oh, but he qualified it by saying that he's obviously

24    monitoring the situation and things are very fluid, and I

25    thought that was a very natural response by him.
```

1    Q    And you understand that Fidelity considers itself

2    obligated to support only the PIK proposal pursuant to the

3    RSA?

4    A    I read the transcript.  I guess that's what it says.

5    Q    Okay.  And you understand that Fidelity does not have a

6    fiduciary out under the RSA, right?

7    A    Actually, I'm just not aware of what the terms of their

8    agreement under the RSA are.

9    Q    Okay.  By the way, are you familiar with the rights of

10   the debtor to terminate under the RSA?

11   A    No, I don't consider myself at all an expert in the

12   terms of that RSA, from a legal standpoint.

13   Q    Okay.  But you do know that the debtors have a

14   fiduciary out that allows them to terminate the RSA, right?

15   A    Indeed, yes, I do.

16   Q    It allows them to terminate the RSA if they've

17   concluded that an economically superior proposal has been

18   brought to them?

19   A    Yes.

20   Q    Okay.  Are you aware that the debtors have to provide

21   five days business notice before exercising that fiduciary

22   out?

23   A    I was not aware of the notice period.

24   Q    Okay.  In the interest of time, I'm not going to show

25   it to you.  We can point Your Honor to it.  It's in the

1   record.  You are also aware that, under the RSA, the PIKs

2   have the right to call Fidelity's EFH notes at any time for

3   a price of 37.15 cents on the dollar?

4   A    Yes, I do.

5   Q    Okay.  By the way, I should have gone back and asked

6   you this, but, in your view -- I think you testified during

7   direct on this a lot -- Fidelity's support is essential to

8   any RSA that would provide assurance of the tax-free spin,

9   right?

10  A    Yes.

11  Q    And that's because Fidelity holds a super-majority

12  position in the unsecured claims at EFH, right?

13  A    That's correct.

14  Q    And any tax-free spin would have to distribute EFH

15  stock to EFIH creditors, right?

16  A    That's correct.

17  Q    And, in order to do so, you would need an accepting

18  impaired class at EFH, right?

19  A    That's correct.

20  Q    And, as long as Fidelity holds the super-majority

21  position in the EFH unsecured claims, only Fidelity can

22  deliver an accepting impaired class at EFH, correct?

23  A    That's correct.

24  Q    Okay.  But, as I was just saying, the PIKs have a right

25  to call Fidelity's position, EFH position, at any time,

1   right?

2   A    I do believe that that's the case, but I think it was

3   in response to the fact that Fidelity also has the right, I

4   believe, to withdraw from the RSA if they're given notice

5   that they're not going to receive 37.15 cents by virtue of

6   the cash at EFH exposing with all the RSA -- excuse me --

7   with the benefit of the Encore TSA amendment.

8   Q    Fair enough.  That's the genesis of -- well, withdrawn.

9   If Fidelity issues notice that it believes it's not going to

10  recover 37.15 cents, then it can terminate the RSA, unless,

11  within a period of time, the PIKs exercise their call

12  option, right?

13  A    Correct.  I think that these two provisions were checks

14  and balances, if you will, against one another.

15  Q    Okay.  But, as it happens, that PIK call right is in

16  effect at any time, regardless of whether Fidelity issues a

17  notice, correct?

18  A    I believe that is correct, yes.

19  Q    Okay.  So, if the debtors issued notice pursuant to the

20  RSA that they have received an economically superior

21  proposal and intend to exercise their fiduciary out, the

22  PIKs could, the next day, exercise their call right on

23  Fidelity's EFH notes, couldn't they?

24  A    I believe they could, yes.

25  Q    Yes.  And, if they did, the debtors would then be in a

1    position where they could not accept any other proposal

2    without the PIKs -- would deliver a tax-free spin without

3    the PIKs' consent, true?

4    A    I haven't thought about that.  I'd have to think long

5    and hard about it to give you a good answer.

6    Q    Okay.

7         MR. HOROWITZ:  May I have one moment, Your Honor?

8    I think I'm done.

9        (Pause)

10        MR. HOROWITZ:  I pass the witness, Your Honor.

11        THE COURT:  Okay.  (Indiscernible - 10:42:33.)

12        MR. GLENN:  For the record, Andrew Glenn,

13   Kasowitz, Benson, Torres & Friedman, on behalf of the Ad Hoc

14   Group of EFH noteholders and Kaxton (ph) Associates.

15   CROSS-EXAMINATION

16   BY MR. GLENN:

17   Q    Good morning, Mr. Ying.

18   A    Good morning.

19   Q    You testified on your direct examination yesterday

20   about your role in the negotiations of this restructuring,

21   correct?

22   A    Yes, I did.

23   Q    And I believe there was testimony about your role in

24   negotiating at least part of the make-whole statement,

25   correct?

1    A    Yes.

2    Q    Now, Michael McDougal is a director at EFH, correct?

3    A    Yes.

4    Q    And he's affiliated with TPG, one of the equity

5    sponsors of the company, right?

6    A    Yes.

7    Q    Okay.  And the Wachtell Lipton firm acted as counsel to

8    the board of directors and Mr. McDougal in this case,

9    correct?

10   A    I believe they acted as counsel to the three primary

11   owners of the FH, not to the board of directors.

12   Q    Okay.  And Blackstone served as the financial advisor

13   to that group, right?

14   A    To the group of sponsors, yes.

15   Q    Okay.  And isn't it the case that Mr. McDougal,

16   Wachtell, and Blackstone were the ones that acted primarily

17   as the intermediaries between the PIK group on the one hand

18   and Fidelity on the other hand?

19   A    Yes, they acted as intermediary, but they reported

20   faithfully to Paul Keglevic in particular at the company, as

21   to all of their deliberations and discussions.

22   Q    Okay.  I'd like to focus on your role, if we could,

23   please.  Your role in this restructuring, sir, has been

24   primarily to support Mr. McDougal, Wachtell, and Blackstone,

25   correct?

1  A    No, my role has been to help the company look at this

2  intercreditor discussion that was raging back and forth for

3  several months and to make sure that the ultimate outcome

4  met the company's criteria for the restructuring that it had

5  set forth.

6  Q    Okay.  I'd like to focus, though, on your role in the

7  negotiations themselves.  Isn't it the case that your role

8  was to support the efforts of Mr. McDougal, Blackstone, and

9  Wachtell, who were conducting the direct negotiations in

10  this case, correct?

11  A    No, that's not correct.

12  Q    Okay.  I'd like to go to your deposition, please.

13  A    Okay.

14  Q    If you could turn to page 135.

15          MR. GLENN:  Is that up there?

16          THE COURT:  Do we have it?

17          MR. GLENN:  Is it up there?  Okay.

18          May we approach, please, Your Honor?

19          THE COURT:  Yeah.

20          MR. GLENN:  Okay.  Thank you.

21          UNIDENTIFIED SPEAKER:  What page, Counsel?

22          MR. GLENN:  135.

23          UNIDENTIFIED SPEAKER:  Thank you.

24          THE COURT:  Okay.  Do you have a copy, please, for

25  my assistant?

1          MR. GLENN:  Okay.

2     BY MR. GLENN:

3     Q    Are you with me, sir, on page 135, line 11?  I'll wait

4     for --

5          THE COURT:  Hang on for a minute.  I'm not.

6          MR. GLENN:  Okay.

7          THE WITNESS:  It starts with a question, sir.

8          THE COURT:  Okay, just wait a minute, please.

9          Go ahead.

10         MR. GLENN:  Okay.

11    BY MR. GLENN:

12    Q    When you were asked these questions and did you give

13    these answers, "Sir, what did you and others at Evercore

14    negotiate in terms of this restructuring, just general

15    subjects, general issues."  And then, there's an objection,

16    and I said, "As opposed to performing a supporting role."

17         And you answered, "Well, we would review all the

18    proposals being made by the various sides.  We would assess

19    whether they were reasonable from the debtors' perspective.

20    We would assess them in terms of whether they were feasible

21    from a capital structure perspective, and we would advise

22    the company and other people who were involved in direct

23    conversations, including McDougal, Blackstone, and Wachtell

24    as to what we thought in terms of various provisions of the

25    deal, and we would have a healthy dialogue with them, and

1    they would handle most of the direct conversation."  You

2    testified truthfully as to that, Mr. Ying, didn't you?

3    A    Absolutely, yes.

4            MR. MCGAAN:  I object, Your Honor.  The

5    implication is --

6            THE COURT:  That's what redirect is for.

7            MR. GLENN:  Okay.

8            MR. MCGAAN:  It's not proper impeachment.

9    BY MR. GLENN:

10   Q    And, in fact, last week, when you were deposed, you

11   couldn't recall what your involvement was in the

12   negotiations, sir; isn't that correct?

13   A    I don't recall that statement.

14   Q    Okay.  Turn to page 136, please.  Were you asked these

15   questions, and did you give these answers?  Line --

16   A    Page 136?

17   Q    136.

18   A    I'm sorry.  I'm trying to get there.  It's just below,

19   right?

20           UNIDENTIFIED SPEAKER:  Yes.

21           THE COURT:  Okay.  Go ahead.

22           MR. GLENN:  Okay.

23   BY MR. GLENN:

24   A    What line?

25   Q    I believe it's line 9.

1   A      Thank you.

2   Q      "I think I asked you a slightly different question.  I

3   want to know what you personally negotiated in interacting

4   with the creditor constituencies as opposed to advising your

5   client and its representatives.  What did you personally

6   negotiate?  Answer, "I don't recall specifically what we

7   negotiated.  There were some things that we would talk to

8   one of the creditor groups about directly, but I don't

9   recall specifically what it was."  Were you asked that

10  question, and did you give that answer?

11  A      I certainly did.

12  Q      Thank you.

13          THE COURT:  Now, just so that this record is

14  clear, the first sentence of the answer was, "I don't recall

15  specifically what we personally negotiated."  You excluded

16  personally, just for the record.

17          MR. GLENN:  Excuse me.  Thank you.  Thank you.

18  BY MR. GLENN:

19  Q      Okay.  Let's turn now to the topic of valuation

20  briefly.  When the discussion of the rights offering

21  started, one of the key considerations that the company and

22  Evercore identified was the size and the valuation of the

23  rights offering, correct?

24  A      That is correct.

25  Q      Okay.  If you could turn, please, in the objectors'

1    witness binder.  I believe it's Exhibit 1.

2              MR. GLENN:  What?  Okay.

3    Q    And it's also in the supplemental binder I gave you.

4    A    Is it in the witness binder?

5    Q    Yes.

6    A    I'm sorry.  I'm a little lost here.

7    Q    Yes, please.

8    A    Okay.  Which tab?

9    Q    One.

10             UNIDENTIFIED SPEAKER:  Which one?

11             MR. GLENN:  One.

12             UNIDENTIFIED SPEAKER:  All right.  I'm sorry.

13   Which binder are we in?

14             MR. GLENN:  Okay.

15             UNIDENTIFIED SPEAKER:  I'm sorry, Counsel.  Which

16   binder are we in?

17             MR. GLENN:  Binder 1 of 3.

18             UNIDENTIFIED SPEAKER:  The other set up here

19   (sic)?

20             MR. GLENN:  Yes, it's in both.

21             THE COURT:  Well, which one do you want us to use?

22             MR. GLENN:  Let's use the Objector's Exhibit

23   Binder, Number 1.

24             UNIDENTIFIED SPEAKER:  Okay.  All right.

25        (Pause)

1           THE COURT:  Okay.

2    BY MR. GLENN:

3    Q    Now, I believe you were asked a question or two about

4    this yesterday.  This is an e-mail with a presentation

5    prepared by Evercore on the second page.  The legend is EFH

6    projected cash balance and recoveries.  Do you see that?

7    A    Yes, I do.

8    Q    Okay.  I'd like you, please, to go to the page with the

9    bates number 5 at the end where it says work (sic) streams.

10   Do you see that?

11        (Pause)

12           THE COURT:  I'm sorry.  Page number?

13           MR. GLENN:  A lot of zeroes and then five on the

14   lower right-hand corner.

15           THE COURT:  I found nine.

16   BY MR. GLENN:

17   A    I'm sorry.  I found it now.  Yes.

18   Q    Thank you.  Okay.  So am I correct that, as of

19   February 5th, 2014, what Evercore is trying to do with its

20   documents outline the process of how the restructuring

21   negotiations would unfold from then going forward, correct?

22   A    That's correct.

23   Q    Okay.  Now, the next part of this is in the

24   illustrative EFIH terms sheet transaction also of the same

25   date starting on the bates page 8.  Okay.  Do you see that?

1   A    Yes.

2   Q    Okay.  So let's turn to page 9, and I'll get to the

3   point here.  The last bullet point for your illustrative

4   EFIH terms sheet transaction was considerations for the

5   equity rights offering include, number one, size and

6   valuation and, number two, other commitment terms.  Do you

7   see that?

8   A    Yes, I do.

9   Q    Okay.  So, from the outset of the discussions on the

10  rights offering, Evercore identified valuation as one of the

11  key considerations for how the rights offering would be

12  evaluated, correct?

13  A    Yes.

14  Q    Okay.  Now, I'd like you to turn to the next page.

15  I'll ask some foundation questions.

16          THE COURT:  You're getting an echo.

17          MR. GLENN:  Yeah.

18          THE COURT:  I think from the telephone.

19          Can you speak into the microphone, if you don't

20  mind?  Just --

21          MR. GLENN:  Testing.

22          THE COURT:  All right.  We're good.  Thank you.

23  BY MR. GLENN:

24  Q    So excuse me for one moment.

25          UNIDENTIFIED SPEAKER:  Check, check.

```
 1                THE COURT:  And could you repeat the question?  I

 2       apologize.  I got distracted.

 3                MR. GLENN:  Sure.

 4       BY MR. GLENN:

 5       Q    Okay.  So I think we left off I asked you whether

 6       Evercore identified valuation as one of the key

 7       considerations for the rights offering, and your answer was

 8       yes, correct?

 9       A    Yes, it's one of the 20 things enumerated in this

10       little deck, yes.

11       Q    Thank you.  And, in this document as well, if you go

12       back to the work streams page, bates page 7,

13       A    All right.  I have it.

14       Q    Great.  And the legend of this is pre-filing

15       restructuring negotiations.  Do you see that?

16       A    Yes.

17       Q    Now, the first thing you say on this bullet point is

18       that the company and EFIH creditors to further develop

19       EFIH/EFH restructuring framework, strategy, and timeline,

20       including commitment to rights offering sufficient to

21       provide a sustainable EFIH/EFH capital structure.  Do you

22       see that?

23       A    It sounds like motherhood, yes.

24       Q    Okay.  And then, the next thing you say here is after

25       that, "Engage with Fidelity and its advisors regarding a
```

1   consensual EFIH/EFH restructuring mid-February."  Do you see

2   that?

3   A    I do.

4   Q    Okay.  So, from the outset in February, the company is

5   identifying or indicating that it's going to work with the

6   PIKs to develop the strategy for this restructuring along

7   with the timeline and these other things discussed here,

8   correct?

9   A    I thought it said Fidelity.

10   Q    In the first bullet point.

11   A    Oh, it says we're going to work with everybody, but

12   sure.

13   Q    Okay, but the first bullet point is the EFIH unsecured

14   creditors, which are the PIKs, right?

15   A    Fine, yes, it does say that.

16   Q    Okay.  And it doesn't say develop the strategy in

17   coordination with Fidelity, does it?  It says engage with

18   Fidelity, right?

19   A    Well, we knew the PIKs were going to provide the

20   capital, so that usually dictates the terms, but obviously,

21   in any consensual restructuring, everybody's got to agree,

22   no matter where you start.

23   Q    You knew that the PIKs were going to provide the

24   capital before you started the negotiations?

25   A    The PIKs had said that they were going to provide the

1    capital before the date of this presentation.

2    Q    But, if you had asked other creditors, they might have

3    been willing to provide the capital, correct?

4    A    Well, the PIKs were restricted, and they said they

5    would do it, and obviously, at the time, we didn't think any

6    other creditors could or would do it.

7    Q    Okay.  So I'd like you to pull out Exhibit 62, please,

8    from the objectors' binder.

9    A    I have it.

10   Q    Right.  Now, this is an e-mail exchange between you and

11   a Jeremy Maddoxson (ph) at Evercore, at the top, correct?

12   A    Yes, it is.

13   Q    And this is dated October 9th of 2013, correct?

14   A    It sure is.

15   Q    Okay.  If you turn to the second page of this e-mail

16   string, going down to the one October 9th, 1:19 p.m.  Do you

17   see that?

18   A    Yes, I do.

19   Q    Okay.  And, in that, Mr. Green is the financial advisor

20   to the PIKs from the Centerview firm, right?

21   A    Yes, he is.

22   Q    And he's the lead person on behalf of Centerview,

23   right?

24   A    Yes, he is.

25   Q    Okay.  And, in this e-mail, he asked you, "Can we

1   reschedule our valuation meeting for tomorrow or Friday."

2   Do you see that?

3   A    Yes, I do.

4   Q    Okay.  And then, you respond right above, quote, "To

5   talk about IPP multiples?  Isn't this a moot point, given

6   the last proposal by TCEH?  I would rather talk to your

7   committee about a deal along the general likes of the latest

8   TCEH proposal.  Here's a feasible structure.  You get to

9   name your price."  Were those your words, Mr. Ying?

10  A    Yes, they are.

11  Q    Okay.  You're telling the financial advisor to the PIKs

12  that they get to name their price, correct?

13  A    Well, you can take it out of context, but I can explain

14  what it means.

15  Q    Okay.  Well, let's go up for a moment to the e-mail

16  above that.  Mr. Green says, "Value of Encore is key to

17  naming price.  If you want to keep our guys engaged in this,

18  we need to have this meeting."  Do you see that?

19  A    Yes, I do.

20  Q    Okay.  Now, part of what we're talking about today is

21  the equity split for this rights offering, correct?

22  A    That is true.

23  Q    Okay.  And I believe it's your view that the amount

24  invested in the rights offering and the equity split, in

25  some sense, sets the valuation for the transaction.  Is that

1    a fair summary of your view?

2    A    It apportions who gets the upside and the downside in

3    the restructuring.

4    Q    Okay.  And you've used in various presentations the

5    implied equity value of these transactions, right?

6    A    Across a range of values, yes, I have.

7    Q    Okay.  And, when we talk about the price of the rights

8    offering, that's set by the amount the investor is going to

9    put into the company and the amount of equity obtained in

10   return for that, correct?

11   A    It certainly determines the price they're paying for

12   their shares.

13   Q    Okay.  And isn't it the case in this transaction, for

14   this rights offering sponsored by the PIKs that they named

15   their price from day one?

16   A    You'll have to ask them.  I wasn't intimate in terms of

17   the negotiation or the conversion price.

18   Q    Okay.  Well, were you aware that the opening price for

19   the equity split was 64/36?

20   A    I don't recall.

21   Q    Okay.  Were you --

22   A    Actually -- pardon.  I do know about 64/36 because,

23   clearly, that's in the RSA.

24   Q    That's where the equity split ended up, right?

25   A    That's where the RSA was.  I've been so distracted by

1    all the subsequent offers.  I'm sorry.

2    Q    Okay.  And isn't that the case that that's where it

3    started?

4    A    That's where the RSA price is set, yes.

5    Q    Okay.  I'm asking you at the beginning of the

6    negotiations that led to the RSA.  Isn't it correct that the

7    starting point was 64/36?

8    A    I don't remember, but, if you say it is, I'll take your

9    word for it.

10   Q    Okay.  Well, let's go to the record, please.

11   Objector's Exhibit 18 -- if you could pull that up.

12   A    Okay.  Which number?  18?

13   Q    18, please.

14   A    Thank you.  I see it.

15   Q    Okay.  Bo Yee (ph) is one of your colleagues at

16   Evercore, correct?

17   A    Yes, he is.

18   Q    Okay.  And he's had a significant role in this

19   engagement on behalf of Evercore, correct?

20   A    He's done a terrific job.

21   Q    Okay.  It says here -- well, let me ask a foundation

22   question.  Mark Davis, Jeremy Maddoxson, and Brian Smith --

23   what entities or institutions are they with?

24   A    Well, Jeremy and Brian work for us.  I must say I don't

25   even remember the name Mark Davis.

1    Q    Well, actually below, it indicates he's from Perella.

2    That's the financial adviser to Fidelity, correct?

3    A    Oh, that's why I didn't remember him.

4    Q    Okay.

5    A    Yes, thank you.

6    Q    And this is dated March 30th of 2014, correct?

7    A    Yes, it is.

8    Q    Okay.  It says here, "Mark, we are discussing the SNU

9    (sic) with the company.  We will get back to you soon on

10   that request.  We don't have any supporting analysis on the

11   64.3 percent.  That was a number we heard from Akin last

12   night.  We will be reaching out to Centerview on how they

13   got to that ownership.  I suggest you separately reach out

14   to them as well."  Do you see that?

15   A    I sure do.

16   Q    Okay.  So 64 percent is where the RSA split ended up,

17   correct?

18   A    That's correct.

19   Q    Okay.  and you would agree with me that at least as of

20   March 30th that the split was 64.3 percent and 36.7 percent,

21   as indicated by this document, correct?

22   A    Seems that way, yes.

23   Q    Okay.  And you have no basis to know whether there was

24   ever any other split discussed among the parties, correct?

25   A    No, I assumed if Fidelity felt differently, they could

1    have spoken up and said something.

2    Q    That's your assumption?

3    A    That's my presumption.  They're smart guys.

4    Q    Because you weren't involved in that negotiation?

5    A    I was not involved with that negotiation.

6    Q    Okay.  So I'd like you, please, to go to Objector's

7    Exhibit 8.

8    A    I have it.

9    Q    Okay.  This goes back in time a little bit, and we'll

10   go through this very quickly.  This is an e-mail, again,

11   between you, Mr. Ying, and Mr. Green of Centerview.  Do you

12   see that?

13   A    Yes, I do.

14   Q    Okay.  And, in this, you are reacting to an

15   illustrative restructuring terms sheet provided by the PIKs,

16   correct?

17   A    Yes, I am.

18   Q    Okay.  And I believe you were asked questions about

19   this yesterday.  If you go to page 734, in this proposal on

20   the EFIH LL notes, it says, "Partial paydown via favorable

21   resolution of make whole or, two, equity claw at emergence."

22   Do you see that?

23   A    I do.

24   Q    Okay.  Now, going down to the EFH estate, this proposal

25   reflects, does it not, that the EFH estate would receive

1    $150 million cash payment?

2    A    It says that, yes.

3    Q    And the legacy bonds would receive 120 million of that?

4    A    It does say that.

5    Q    Okay.  And, below that, it says something.  "Sponsors

6    receive three percent of pre-rights offering equity plus

7    ability to co-invest in any rights offering in an amount up

8    to ten percent of total proceeds laised (ph)."  Do you see

9    that?

10   A    I sure do.

11   Q    Now, going back to the first page, this is --

12            THE COURT:  I'm sorry.  I don't.  Where?

13            MR. GLENN:  I'm sorry.

14            THE COURT:  What exhibit are we on, 8?

15            MR. GLENN:  8.

16            THE COURT:  It says EFH shareholders receive three

17   percent of pre-rights offering in a stock post-conversion

18   (sic) of EFIH debt?  That's what I'm looking at.

19            MR. GLENN:  Okay.

20            THE COURT:  I have the wrong document?

21            MR. GLENN:  May I approach, Your Honor?

22            THE COURT:  Yes.  I'm in the wrong place.  Yes.

23   I'm totally lost.  You better back up then.

24            MR. GLENN:  Okay.

25   BY MR. GLENN:

1   Q    So the Court was behind us in terms of the terms sheet.

2   So starting again.  We talked just a moment ago about the

3   EFIH second lien notes having a favorable resolution in the

4   make whole or equity claw at emergence, and then, we were

5   going down to the EFH estate.  And so, just very quickly so

6   we can catch the Court up, am I correct that the proposal at

7   this point was EFH would get $150 million.  A hundred and

8   twenty million of that would go to the EFH legacy

9   bondholders, correct?

10  A    That's what the terms sheet says, yes.

11  Q    Okay.  Now, I want to focus next on the next bullet

12  point here.  It says, "Sponsors receive three percent of

13  pre-rights offering equity plus ability to co-invest in any

14  rights offering in an amount up to ten percent of the total

15  proceeds laised.  Co-investment amount currently

16  contemplated to be $200 million."  Do you see that?

17  A    I do.

18  Q    Okay.  Now, going back to the first page, your e-mail

19  response to this proposal.  You articulate three questions.

20  First one is about where the cash is going.  Do you see

21  that?

22  A    Yes.

23  Q    Now, then you go on to say, "EFH shareholders get three

24  percent of rights offering, EFH stock, post-conversion of

25  EFIH debt, 97 percent held by EFIH noteholders.  What

1    valuation have you set for" -- I believe you mean this three

2    percent, correct?

3    A    Yes.

4    Q    Okay.  And then, you say, "EFH shareholders step up for

5    ten percent, 200 million of a 2 billion rights offering and

6    specific valuation for the rights offer."  Do you see that?

7    A    I do.

8    Q    Okay.  So you're asking the PIKs how they're valuing

9    their own proposal, correct?

10   A    I'm asking them for the terms of their proposal.  I

11   thought they were deficient by not laying them out.

12   Q    Okay.  Now, at this point in time, you had concluded

13   that the fulcrum security was the EFIH bondholders, correct?

14   A    That's correct.

15   Q    Okay.  And, in that scenario, the shareholders of EFH

16   are deeply out of the money, correct?

17   A    Indeed.

18   Q    Okay.  But notwithstanding that, what the PIKs are

19   trying to do here is offer the EFH shareholders a

20   participation in their transaction, correct?

21   A    They did, but obviously, we all knew they couldn't keep

22   it, and obviously, they didn't.

23   Q    Okay.  But they tried?

24   A    They made an offer.

25   Q    Okay.  Well, --

```
1    A    I think we're sophisticated people.  We know when

2    people make offers that it has to be negotiated to a

3    consensual resolution.  We all knew that EFH would never

4    stand for that, and obviously, if you follow the train of

5    the negotiations along back and forth, the sponsors knew

6    they were going to give that money away to appease Fidelity.

7    Q    Okay.  But, in fact, the sponsors are participating in

8    this recovery, to some -- this restructuring, to some

9    extent, correct?

10   A    They get one percent of EFH before the dilution of the

11   rights offering, which, at this point, is, you know, .4

12   percent of the company.  And, not to get in trouble, but

13   there's tax reasons for that, too.

14   Q    Okay.  So, sir, we searched the documents for any

15   evidence, any documentary evidence where you or anyone else

16   on behalf of the company tried to argue for a higher

17   valuation for this company, and we can't find any.  Are you

18   aware, as you sit here today, of any document that suggests

19   that the company or its representatives were arguing for a

20   higher valuation than what the PIKs had proposed?

21   A    I'm sorry.  Would you ask the question again, the

22   punchline here?

23   Q    Are you aware of any document that suggests that the

24   company tried to argue for a higher valuation for this

25   rights offering?
```

1    A    I don't know of any documents.

2    Q    I'd like you to turn, please, to Exhibit -- well,

3    actually, let me back up.  Now, you have not completed a

4    valuation, sir, just very briefly, for a foundation that was

5    discussed yesterday?  You haven't completed that, right?

6    A    That is correct.

7    Q    Okay.  Are you aware of circumstances in this

8    restructuring where representatives of the debtors have

9    asked the parties to set the plan value in this case?

10   A    I don't have any recollection of that commentary.

11   Q    Okay.  I'd like you to turn to Exhibit 20 in the

12   objectors' binder, please.

13   A    My binder goes from 18 to 23.

14   Q    The one that says objectors' trial exhibits.

15   A    Sorry.  Sorry.

16        (Pause)

17   A    Ah.  It's the June 22nd forward deck, Exhibit 23?

18   Q    No, 20.

19   A    I'm sorry.  Exhibit 20.  Pardon me.  Okay.  I think I

20   have it.

21   Q    Okay.  So, just for background, we talked about

22   Wachtell.  Richard Mason is one of the lawyers from Wachtell

23   who negotiated aspects of this transaction, correct?

24   A    I believe he did.

25   Q    And Brad Scheler is a lawyer from Fried Frank, correct,

1    representing Fidelity?

2    A    Yes.

3    Q    Okay.  Does this refresh your recollection about

4    discussions where the representatives of the company asked

5    the parties to set the plan value where it says in bullet

6    point number two here, Nate says that the deal -- I'm sorry.

7    Bullet point three.  "You or Nate come back with plan value.

8    It will be a somewhat complicated discussion if we have to

9    have it, I suspect, because the future is hard to predict."

10   Does that refresh your recollection about any discussions

11   where representatives of the company asked the parties to

12   set the plan valuation in this case?

13   A    I've never seen this e-mail.  Mr. Ricky Mason works for

14   Wachtell.  They're the financial adviser to the sponsors.

15   They are not advisers to the debtor.

16   Q    Okay.  Thank you.  You can put that away.  Now, you

17   testified earlier that there was no marketing process for

18   the equity raised that's in the second lien DIP prepetition,

19   correct?

20   A    That is correct.

21   Q    Now, and when the company filed, it was subject to the

22   RSA almost immediately, right?  The company filed, like, in

23   conjunction with the (indiscernible - 11:12:40)?

24   A    We signed the RSA, and then we filed.

25   Q    Correct.

1    A    So --

2    Q    Now, the RSA includes a no-shop provision, correct?

3    A    Actually, you'll have to refresh my memory.  I'm not

4    that up to speed on all the legal terms around the RSA.

5    Q    Well, it says what it says.

6    A    Okay.

7    Q    The company has not engaged in a marketing process

8    post-petition, correct?

9    A    That's correct.

10   Q    Okay.  Now, just so we're clear, you have not engaged

11   in any negotiations with any of the post-petition bidders

12   about how they may increase their offers to a point that

13   would be acceptable to the company, correct?

14   A    Well, every time a bidder presents a proposal, we ask

15   them a lot of questions in terms of clarifications.  If we

16   don't think they've calculated the sources and uses of funds

17   correctly, we attempt to guide them in terms of how they

18   might attempt to do so so their plan might work.  We get on

19   a phone with bankers and company personnel, and we talk

20   about the tax issues to make sure it doesn't violate all the

21   various constraints that taxes provide.  On occasion, we've

22   actually gone back and said would you improve your proposal

23   by eliminating some of the fiduciary out provisions -- I

24   think is the term of art that we've used.  Other than that,

25   we've never negotiated.

1    Q    Okay.  So you haven't asked people to pay more money

2    for the company, have you?

3    A    Well, you know, this is a very funny process where

4    everybody else gets to see everybody else's proposals.  So

5    my negotiating with anybody is pretty useless, because

6    they're not going to give me anything until they see what

7    everybody else did, and then, they'll say well, what do I

8    have to do to top it.  And the other problem is that, as a

9    company, we're relatively powerless in offering more value,

10   because the value comes out of the pockets of the junior-

11   most creditors, and, as we've said, until someone gives us

12   the plan where we don't need the consent of the junior

13   creditors to agree to a deal, we're powerless to say oh, if

14   you just put a little more, we'll pick you.  This is not a

15   normal, you know, M&A auction.  This is a restructuring.

16   Q    Okay.  So we'll explore the powerless issue

17   momentarily.  I just want to make sure the record is clear.

18   You have not told any of the competitive bidders what they

19   need to do so that the offer would be a topping bid in the

20   viewpoint of the company, its advisers, and the board of

21   directors, correct?

22   A    I couldn't possibly do that, because someone else could

23   top them.  And, if I did, they wouldn't believe me.

24   Q    Okay.  I'm asking you a very specific question, and I'd

25   like your answer to that, sir.

1    A     Of course (indiscernible - 11:15:19).

2    Q     Have you or have you not told any of the competitive

3    bidders, "If you raise the price to a certain threshold, you

4    will be the topping bidder"?

5    A     Oh, I most certainly have never said that.

6    Q     Okay.  Now, let's talk about the powerless point that

7    you just raised.  Why is the company powerless in this

8    circumstance?  Please explain that.

9    A     Because we need consensus.  This is a restructuring.

10   Q     Okay.  Well, you're not trying to get the consent of

11   the first liens and the second liens in this deal, are you?

12   A     No.

13   Q     Okay.

14   A     Because they're fully secured.

15   Q     Okay.

16   A     And the plans call for them being paid in full, with

17   the exception of the alleged make-whole claims.

18   Q     Thank you.  Okay.  So, with respect to the EFIH

19   bondholders, if you paid them off in cash, you don't need

20   their consent, correct?

21   A     Yes.

22   Q     So am I correct that the company is powerless, in your

23   words, sir, to agree to any other restructuring that offers

24   the EFIH noteholders equity?

25   A     Unless someone can show us that the equity has enough

1    value that the EFIH unsecureds can be, in fact, paid off in

2    full, whatever that means.

3    Q    Okay.  But you're aware that a creditor has the right

4    to vote on a plan, correct?

5    A    Yes, I do.

6    Q    And that happens when the creditor is impaired.  And

7    I'm not asking for your legal opinion, but you've heard that

8    term in our business.  If the creditor is impaired, the

9    general rule is they get to vote.

10   A    That's correct.

11   Q    Okay.  And, if the EFIH creditors are offered equity in

12   exchange for their debts, they get the right to vote,

13   correct?

14   A    That's correct.

15   Q    Okay.  And so, isn't it the case that the company is

16   powerless to agree to any other proposal in a scenario where

17   the EFIH creditors get to vote?

18   A    I guess if I asked the EFIH creditors what they prefer

19   and they said yes, we'll vote in favor, that would make a

20   big difference.

21   Q    Okay.  Well, if they --

22   A    Or --

23   Q    -- vote yes, you don't have a problem.  Okay.  But

24   (indiscernible - 11:18:36).

25   A    Or if the composition of the proposal was so

1    unambiguously in equity worth more than they were owed, I

2    think the debtor would be delighted to support such a plan.

3    Q    But, if the EFIH --

4    A    But these are all hypotheticals.  I mean, we can talk

5    about those all day.

6    Q    Well, we're trying to understand what's going to happen

7    in this process going forward, and I believe you testified

8    yesterday that one of the concerns about the NextEra

9    proposal that the company evaluated was the possibility of a

10   valuation fight with the PIKs.  Do you recall that?

11   A    I do.

12   Q    What did you mean by that?

13   A    Well, the NextEra proposal contemplates -- I think it's

14   30 percent of the pro forma company goes to the PIKs, and

15   they get -- I forget the exact amount of cash.  I think it's

16   580 million, some of which is accrued interest.  The

17   balance, you know, is to their principal amount.  So

18   therefore, the 30 percent has to be equal to the unsatisfied

19   portion of their claim, assuming it's just principal amount

20   and accrued interest as of the date of the filing date and a

21   smidgeon for post-petition interest at the applicable

22   federal rate.  And it's unclear as to if investment bankers

23   were asked, "How do you value the remaining 55 percent of

24   the NextEra proposal" what the answer might be.

25   Q    Okay.  So, in that context, the EFIH noteholders would

1   be given equity, and the company decided, in the exercise of

2   its fiduciary duties, not to proceed with that proposal

3   because of the possibility of a valuation fight, at least in

4   part, correct?

5   A    That was one of the considerations.

6   Q    Okay.  And, if any other party makes a similar

7   proposal, that issue isn't going away, is it?

8   A    I'm sorry.  When you say any other party, I'm confused.

9   Q    If another party comes forward and offers a mix of cash

10  and equity, we're still going to be facing the scenario, at

11  least possibly, of a valuation fight with the EFIH PIK

12  bondholders, correct?

13  A    You're asking a hypothetical.  I have no idea.  NextEra

14  could just say, look, I have a publicly traded New York

15  Stock Exchange listed stock.  Here's my exchange ratio.

16  Q    Okay.  Sir, there's a feature of the lien DIP, is there

17  not, where the PIK bondholders have offered the right to

18  participate in the DIP to what they call, quote, "selected

19  partners".  Do you recall that?

20  A    I do.

21  Q    Okay.  And is it fair to say that what is going on with

22  that is that the PIK bondholders get to slice off $400

23  million of the PIK and offer it as parties to pay HAN PIK

24  (ph), correct?

25  A    I believe the intention of that provision is that --

1    and you've read this in the newspapers -- obviously, EFH

2    owns 80 percent or the majority interest of a very important

3    regulating utility in Texas which is regulated by the Public

4    Utility Commission of Texas which, in turn, gets lots of

5    flack from the Texas state legislature and I think that even

6    though we on Wall Street think we're very powerful, I think

7    the people down in Texas are very concerned about the

8    ownership, stewardship and long-term future of their very

9    important regulated utility and I think what the PIK's are

10   concerned about and conscious about and trying to address is

11   to bring in a partner who has a track record, is known to

12   the Texas legislature and the PUCT so that their group won't

13   be deemed to be just a bunch of Wall Street guys who are in

14   for a quick flip.  I believe that is the purpose of the

15   selected partners provision in their agreement.

16   Q    Okay.  So what you're testifying to is that in exchange

17   for offering these people $400 million participation in the

18   DIP, that that will somehow obtain them influence or the

19   gratitude of the Public Utilities Commission?

20   A    I think they want to prove to the Public Utilities

21   Commission that their interests are aligned with those of

22   the utility commission which is to insure that the

23   operations of Encore continue to serve the state because it

24   is a regulated entity.

25   Q    Okay.  Now, one of the things that's being offered to

1    the EFH note holders is the right to participate in nine

2    percent of the rights that Fidelity is obtaining pursuant to

3    the second lien DEP, correct?

4    A    Yes, that was the original 10 percent offer to sponsors

5    which, over time, was hotly fought over and Fidelity was

6    able to negotiate that nine percent participation for itself

7    and the EFH -- all the EFH note holders.

8    Q    Okay.  So nine percent is being taken out of the DEP

9    for rights offering purposes and provided to the EFH

10   bondholders and 21 percent of the bonds -- strike that, 21

11   percent of the rights offering is being offered to the

12   selected partners, correct?

13   A    I guess -- is it 400 million out of --

14   Q    It is.

15   A    I'm sorry, nine and you did the math.  Thank you.

16   Q    Okay.  So outsiders to this bankruptcy are being

17   offered more participation in the second lien DEP than the

18   creditors at EFH, correct?

19   A    That may be true but if the PUCT doesn't like the

20   ownership profile, they can come and say we don't like it.

21   They can lock your -- the entire restructuring transaction.

22   You know, I learned a long time ago don't mess with the

23   government.  You may not like the consequences.

24   Q    Well, one way to solve that problem would have been to

25   offer an option to all these people who have this alleged

1    influence with the Public Utilities Commission, correct?

2    A    I don't know whether an auction's a right forum for

3    what you're talking about.  I think that if the PIK-holders

4    have the right to invest in 91 percent and the EFH

5    bondholders have a right to invest in nine, I think the PIK

6    should have the right to choose their partner and I think

7    there you have a very valid, important, good business reason

8    to do what they're doing.  I'm sure the PIK's would love to

9    keep the economics of the investment for themselves.

10   Q    Now, notwithstanding the partaking 21 percent of the

11   rights offering that would have been, potentially, allocated

12   to the PIK's, the PIK's were trading in the range of 120

13   points, correct?

14   A    That's correct.

15   Q    Okay.  Now, has it been disclosed to the company who

16   these, quote, "selected partners" are?

17   A    I don't know the exact provisions in the agreement but

18   my recollection is that this was hotly fought over between

19   the company and the PIK's in terms of the company's ability

20   to know who they are -- who the PIK's are talking to as --

21   in terms of who the selected party might be and I don't

22   recall for sure but I think there's a right of a -- right of

23   approvals at -- reasonable approval of who they're talking

24   to.

25   Q    Okay.  My question is this, has the -- have the PIK's

1   identified to the company who these selected partners are?

2   A    Well, I know there's been newspaper articles about the

3   Hunt family but I do recall -- and I -- again, I don't know

4   if this is confidential or not but at the time of the

5   negotiation of this provision, one of the other entities

6   that I think signed an NDNA to look at -- the restructuring

7   plan was Texas Teachers, I think, Pension Fund.

8   Q    Okay.  So we have a pension fund and the Hunt family.

9   Those are the two that you believe are participating,

10  correct?

11  A    Those are the only names that I've heard and I

12  explained the reasons why.  I don't know if there are or are

13  not any others.

14  Q    Okay.  Isn't it the case, sir, that the Hunt family was

15  a competitive bidder for these assets, the Encore assets,

16  when the 2007 OBO was consummated?

17  A    I'm not aware of that but I'll take your word for it.

18  Q    Okay.  And, as you're sitting here today, you're not

19  aware of any auction process for that $400 million

20  participation in the DEP, are you?

21  A    No, I'm not.

22  Q    Let's talk very briefly about trading prices, sir.

23  A    Sure.

24  Q    Now, if the transactions that are contemplated by this

25  restructuring occur, then the PIK note holder groups will

1    receive the largest amount of the reorganized equity,

2    correct?

3    A    That is correct.

4    Q    And I believe you testified yesterday that during the

5    negotiations, you believe the PIK note holders were the

6    fulcrum security, correct?

7    A    That is correct.

8    Q    And I believe you also testified that the conclusion

9    that they were the fulcrum was how -- was based, in part, on

10   how the parties worked behaving in the negotiations, right?

11   A    That's correct.

12   Q    Okay.  And I believe it's your understanding, sir, that

13   in the last year, the PIK's have traded before the

14   announcement of the RSA between 50 and 80, correct?

15   A    If that's what I said in my deposition, I believe

16   that's correct.

17   Q    Well, just apart from that, that's --

18   A    I think that's roughly correct, yes.

19   Q    That's right.  Okay.  Now, you testified yesterday that

20   the fulcrum is the last party in the capital structure to

21   receive recovery in the waterfall; is that correct?

22   A    That's correct.

23   Q    Now, is it correct that bond trading values between 50

24   and 80 is generally consistent with that bond being the

25   fulcrum security, correct?

1    A    Well, certainly, trading of 50 to 80 percent of their

2    principal amount, yes.

3    Q    Yeah, that's consistent with it being the fulcrum,

4    correct?

5    A    Unless they don't write a check so that they can really

6    own most of the equity.  If they just sat there by

7    themselves, they'd end up owning a tiny piece of the equity

8    and the second liens would be the fulcrum but yes.

9    Q    Thank you.  Now, I'd like you, please, to turn to the

10   June 22nd, 2013 board presentation.

11   A    I have it.

12   Q    If you could turn to page 4, the last three Bates

13   numbers are 532, please.

14   A    I have it.

15   Q    Okay.  Now, on this page, you present the TEV's of each

16   of the four presentations outlined here, correct?

17   A    I do.

18   Q    Okay.  And the implied TEV of the PIK proposal is

19   approximately $16.5 billion, correct?

20   A    That's correct.

21   Q    Okay.  And if you go down to the lower left-hand corner

22   of this page, please, at a TEV of $16.5 billion, the

23   projected recovery is 75 cents on the dollar for the PIK's,

24   correct?

25   A    That's correct.

1    Q    Okay.  And you've testified that the trading value of

2    the PIK bonds post RSA has reached as high as 125, correct?

3    A    Yes, I did.

4    Q    Okay.  It would really be an irrational economic

5    decision, would it not, to pay 125 for something that's

6    fairly valued at 75?  That wouldn't be a ration economic

7    decision, would it?

8    A    I think if you want to pose that question in the

9    complete abstract, I would have to agree with you.

10   Q    Thank you.  Now, I believe that you testified yesterday

11   that you didn't include an $18 billion TEV because the page

12   would be, quote, "too cramped", right?

13   A    That's correct.

14   Q    Okay.  Now, at an $18 billion valuation, each of these

15   numbers for the EFH PIK recovery would go up by

16   approximately 50, 55 percent, correct?

17   A    I don't -- I can't do that math in my head but I'll

18   give you the benefit of the doubt.

19   Q    Thank you.

20   A    Except that I would say that what these numbers don't

21   show is that to earn that amount, you have to invest their

22   -- the PIK's per rata share of the billion-nine DIP.

23   Q    That's correct and let's talk about that for a moment.

24   A    Okay.

25   Q    Now, it's your view that because you have to invest

1    money in the deal, that that should not be counted as

2    additional value on your recovery in this case.  Is that a

3    fair summary of your testimony?

4    A    Well, you have to take into account -- I mean, money

5    doesn't grow on trees.  It doesn't come for free.

6    Q    Okay.

7    A    There's an opportunity cost, as someone has said, for

8    new money.

9    Q    And there could be a value to that opportunity cost,

10   correct?

11   A    Yes, there could be.

12   Q    Okay.  And this deal could have been structured so that

13   all of those additional rights to participate in this DIP

14   were allocated solely to people in the capital structure

15   rather than outsiders be selected partners, correct?

16   A    As I said earlier, I'm sure the PIK's would like not to

17   bring in a selected partner but I think if anybody wants to

18   derive value with all this back leverage that EFH -- or,

19   excuse me, EFIH, you better be darned sure the regulatory

20   buys in Texas are happy with you or they can make your life

21   miserable and I must say that the chronology that this LBO

22   went through when it went private back in 2007 and the

23   things that the Texas legislature threatened and actually

24   did were very damaging to the business.  So I think that

25   it's fine for you to complain about it but I think it's --

1    you're missing something that's very important here.

2    Q    Well, we could have offered those people $50 million of

3    the DEP, right, if it wasn't -- in order to bring them in,

4    right?

5    A    I'm sure that the Texas legislatures can see the

6    difference between a big investment and a small one, a

7    meaningful partner who they know and trust versus a bunch of

8    fast money Wall Street guys who who knows if they'll be

9    around next week.

10   Q    Okay.  And I believe your testimony is --

11   A    I don't mean to be pejorative but that's the way they

12   talk down in Texas about us.

13   Q    I believe your testimony is, sir, that we could offer

14   up to 49.9 percent of the post-reorganization equity to

15   third parties without triggering the tax concern, correct?

16   A    Again, I'm -- if I have to act as tax expert which I am

17   not, I think that would be correct.  If there's a continuity

18   of interest where 51 percent of the restructured EFH is

19   attributable, I believe, to constituencies in the debt

20   capital structure who have gotten their stock by

21   compromising their claims, I think that would probably meet

22   the continuity of interest test.

23   Q    Okay.  Now, we --

24   A    The guy next door can own 45 percent.  I'm sure they

25   picked 45 because they don't want to get close to that line.

1   Q    So we could have offered these important select

2   partners up to 49.9 percent of this rights offering without

3   triggering the tax issue, right?

4   A    You know, as a total hypothetical, sure, but I don't

5   think the EFI to unsecureds is going to issue any more to

6   them than they have to.

7   Q    Okay.  Has the Texas Public Utility Commission dictated

8   to the PIK's what the precise investment of the selected

9   partners is supposed to be?

10   A    I have no idea about that but I believe that there has

11   been lots of dialog that the PIK's and their representatives

12   have had with the various state legislators and

13   administration officials and regulators -- and possibly

14   regulators.  I don't know about the regulators.

15   Q    Excuse me for a moment.

16         MR. GLENN:  Your Honor, would it be possible to

17   have a five-minute break now?

18         THE COURT:  Yeah, that'd be fine.  Actually, let's

19   make it ten minutes.  We'll reconvene at quarter till.

20         MR. GLENN:  Thank you.

21      (Recess at 11:35 a.m.)

22         THE CLERK:  All rise.

23         THE COURT:  Please be seated.  We'll plan to break

24   for lunch about 1 o'clock.

25         MR. GLENN:  Thank you.

1    CROSS-EXAMINATION (Continued)

2    BY MR. GLENN:

3    Q    Mr. Ying, I believe you testified earlier that the PIKs

4    were trading in the 50 to 80's range before the RSA was

5    executed.  Do you recall that?

6    A    Yes.

7    Q    Okay.  And that was at a time that the company

8    considered the PIKs as the fulcrum, correct?

9    A    Yes.

10   Q    Okay.  So are you aware of the EFH bond trading values

11   post-petition?

12   A    Yes, I am.

13   Q    Okay.  And isn't it fair to say that they're now

14   trading in the range of 70?

15   A    Yes, I think that's right.

16   Q    Okay.  So the EFH bonds are now trading in the range

17   where you consider the PIKs to be the fulcrum prepetition,

18   correct?

19   A    Yes.  Well, I told you I thought that the market for

20   the PIKs is very thin and I thought about what that means in

21   terms of if I were to take that as an indicator of value,

22   and I just did some mental math that at 70 cents under the

23   PIKs' proposal I think the total enterprise value of the

24   company would have to be close to 21 billion.  And, you

25   know, I don't know what people are thinking about when

1    they're trading those securities at those prices, but

2    certainly 21 billion is no where near anything that's been

3    talked about.  So you can hang your hat on a very illiquid

4    set of securities where a little bit of speculative excess

5    can drive it to the moon for all I care, but at some point

6    I'm not sure how relevant that is.

7    Q    Sir, you have no idea what the trading volumes of any

8    of the bonds have been over the last year do you?

9    A    Well, I can look and trace and see, you know, what the

10   trades are for those instruments because they are on trace I

11   believe.

12   Q    Okay.  Please go to your deposition at page 108.

13        (Pause)

14   Q    Okay.  If you could go to page 108 at line 9, please.

15   So after starting at page 107 I asked you -- were you asked

16   these questions and did you give these answers?

17             "So approximately at a low watermark do you recall

18   on the PIK trading value is approximately 50 and the high

19   watermark that you can recall is about 25 during the last

20   year, correct?"

21             Answer, "Only after the RSA was signed.  Prior to

22   the RSA I think the high watermark might have been, you

23   know, 75."

24             "Have you noticed in the last year the volumes of

25   trading?"

1          Answer, "I have no idea as to the volumes."

2          Were you asked those questions and did you give

3    those answers?

4    A    I did.

5    Q    Now your declaration in support of the second lien DIP

6    was partially to defend the fees that the PIKs, the second

7    lien DIP lenders were going to charge in this case, correct?

8    A    That's correct.

9    Q    Okay.  And most of those fees are now gone, correct?

10   A    Certainly all the contingent fees if the DIP was

11   refinanced and not converted, yes.  Certainly all the

12   contingent fees if the DIP was refinanced and not converted,

13   yes.

14   Q    Okay.  So let's -- let's stick with that one for the

15   moment.

16          There was a termination fee of $380 million for a

17   topping bid for the rights offering in effect, correct?

18   A    Yes, there was.

19   Q    Okay.  And your declaration indicated that that level

20   of fee was reasonable, correct?

21          THE COURT:  That's not our problem, right,

22   that's --

23          UNIDENTIFIED SPEAKER:  I don't know, Your Honor.

24          THE COURT:  Okay.  It seems to have gone.  Did

25   you --

1                UNIDENTIFIED SPEAKER:  I turned the volume down.

2                THE COURT:  Oh, I don't want to mess with the

3       volume too much.  The volume on the phone you mean?  Oh,

4       okay.

5                Go ahead.

6                MR. GLENN:  Thank you.

7       BY MR. GLENN:

8       Q    Now, I'm not sure where I ended so I'll back up.

9                So you testified in your declaration that the

10      $380 million fee was reasonable, correct?

11      A    I did in the context of achieving the RSA.

12      Q    Okay.  And that fee is now zero dollars, correct?

13      A    That is correct.

14      Q    Okay.  And that fee was reduced only after competitive

15      bids emerged, correct?

16      A    That's correct.

17      Q    Okay.  And one of the things that informed your view as

18      to the reasonableness of that fee was the fact that it was

19      negotiated between the PIKs and Fidelity, correct?

20      A    That's correct.

21      Q    Okay.  But in fact there was no active dialogue between

22      Fidelity and the PIKs about that fee was there?

23      A    I have no idea since I wasn't there.

24      Q    Okay.  So you testified that you thought it was

25      reasonable because people negotiated it, but you didn't know

1    whether they negotiated it, correct, because you weren't

2    there?

3    A    Well, I knew they were aware of it therefore whether

4    they argued over it or said I concede it I don't know, but

5    obviously Fidelity is a very smart institution, they've got

6    a big law firm and a big financial advisor, they're smart

7    guys, I have to defer to their judgment in terms of what

8    they considered reasonable as a EFH holder.

9    Q    Okay.  But in fact you know whether that fee was

10   negotiated at all do you?

11   A    I wasn't there, I've told you that, so I don't know

12   exactly the byplay that reached that number.

13   Q    Okay.  If you could turn, please, to Exhibit 85 in your

14   binder.  This is the objectors' exhibits.

15        THE COURT:  85?

16        MR. GLENN:  85, please.

17        (Pause)

18   BY MR. GLENN:

19   Q    So for the record this is an email exchange at the top

20   with Mike McDougal, Jason New, and Nate Van Duzer of

21   Fidelity.  Do you see that?

22   A    I do.

23   Q    And this email exchange was on April 25th of 2014.  Do

24   you see that?

25   A    I do.

1    Q    Okay.  The company filed Chapter 11 on April 29th,

2    correct?

3    A    That's correct.

4    Q    Okay.  I'd like you to turn to the page with the Bate

5    stamp 694, this is the second page of the document.

6         Starting with the second sentence this says:

7         "I didn't have the benefit of knowing all the terms

8    of the DIP when we spoke.  Turns out Jason's group has in

9    the DIP term sheet a 400 million payment for DIP lenders if

10   taken out without consent, plus the 10 percent PIK payment

11   after 12 months, thus us accepting 10 percent is much too

12   low.  We're speaking this morning, but clearly Jason's group

13   is trying to force us into taking a worse deal at the

14   deadline."

15        Do you see that?

16   A    I do.

17   Q    So does this not indicate that Fidelity did not know

18   about this termination fee until four days before the

19   Chapter 11?

20        MR. MCGAAN:  Object, calls for speculation.

21        THE WITNESS:  I can only --

22        THE COURT:  Sustained.

23   BY MR. GLENN:

24   Q    Now, sir, you testified earlier about the Public

25   Utilities Commission did you not?

1    A    I did.

2    Q    You have not negotiated with the Public Utilities

3    Commission have you?

4    A    I have not.

5    Q    And you have not communicated with the Public Utilities

6    Commission have you?

7    A    I have not.

8    Q    All of your understandings about the Public Utilities

9    Commission are entirely informed by third parties disclosing

10   that information to you, correct?

11   A    Primarily in reliance on Ms. Dore of the company, yes.

12   Q    Okay.

13           MR. GLENN:  So I would move to strike all of his

14   testimony about what the Public Utilities Commission has

15   said or were due on the grounds of hearsay.

16           MR. MCGANN:  Your Honor, those were responses to

17   questions asked by counsel for his views about the

18   $400 million participation, so he's stuck with the answer he

19   got.  The witness gave him the basis for his view.  So he

20   answered his questions, you can't strike them.

21           THE COURT:  I agree.

22           MR. GLENN:  Nothing further.

23       (Pause)

24           MR. SADEGHI:  Yes, good afternoon, Your Honor.  For

25   the record Kayvan Sadeghi from Morrison & Foerster, proposed

1    counsel to the official committee.

2    CROSS-EXAMINATION

3    BY MR. SADEGHI:

4    Q    Good afternoon, Mr. Ying.

5    A    Good afternoon.

6    Q    I believe you testified this morning just a little

7    while ago, we were talking about the June 29th board dec,

8    which I believe you have in front of you as Debtors'

9    Exhibit 3.  Do you have that handy?

10   A    Yes.

11   Q    If you could turn to page 7 I think we were discussing

12   this chart on page 7 concerning the make whole, and your

13   testimony was something to the effect that all of your

14   analyses have been based assuming that the debtors win the

15   make-whole litigation; is that right?

16   A    Which page are you referring to specifically?

17   Q    It's page -- I'm sorry, that was page 8.

18   A    Thank you.

19        With the exception of the settlement by at least

20   the 43 percent of the seconds that have accepted the

21   settlement, yes.

22   Q    And you offered I believe in response to a question

23   from the Court that you could do the analysis if the debtors

24   lost the make whole but you had not done that analysis as of

25   today?

1   A    Well, I just didn't have it at present.  I'm sure the

2   team of people who work for me have it.

3   Q    All right.  Well let's walk through a little bit of

4   what that might look like.

5        If you turn back to page 7 I believe this shows

6   EFIH cash at exit at 488 million; is that correct?

7   A    That's correct.

8   Q    And that assumes a 12-month case?

9   A    Yes, it does.

10  Q    And if the transactions -- the DIP is approved EFIH

11  will be losing cash on a monthly basis, correct, they will

12  have a negative cash flow; is that right?

13  A    I think it depends on whether the Oncor TSA amendment

14  gets approved or not.  This analysis and all the analyses

15  for all the alternatives assumes the Oncor TSA is approved.

16  Q    But that's not up for consideration today?

17  A    No, it's not.

18  Q    So based on the motions that are up for consideration

19  today if they're approved Oncor will be cash flow negative;

20  is that correct?  I'm sorry, EFIH would be cash flow

21  negative.

22  A    I believe without the Oncor TSA amendment EFIH will

23  have more out flows than in flows, but that's also based on

24  estimates of the legal pros at EFIH, which I have no idea

25  how they're going to turn out relative to the budget

1    embedded in these numbers.

2    Q    All right.  I believe you've also already testified to

3    this to some degree, but the remaining contingent make-whole

4    claim on the second liens is approximately $358 --

5    358 million; is that right?

6    A    I said 380-, I may be off by a couple million, I just

7    don't remember the exact number.

8    Q    All right.  And you understand their claim to include

9    interest on that amount going forward as well, correct?

10   A    The number I quoted does not include interest on that

11   amount.

12   Q    But you understand their claim would include that?

13   A    I understand that, yes.

14   Q    And at the contract rate that would be approximately

15   45 million a year?

16   A    Sorry, I'm slow.  Actually if it were 380- times 12

17   that would be 42-, 42-.

18   Q    Sure.  The math is the math, somewhere in that

19   neighborhood.

20   A    Yeah, somewhere in that neighborhood.  I'm sorry.

21   Q    So the total obligation or the total claim would be

22   somewhere in the neighborhood of 425-, 430 million?

23   A    Okay.

24   Q    And in addition there's a --

25   A    I'm sorry, that's over one year, correct?

1    Q     Over one year, correct.

2    A     And -- but I thought the -- I don't know when the date

3    that there would be a trial for the second lien make whole,

4    in fact I'm not even aware of when that might be.

5    Q     Understood.  And the -- there's also a contingent make-

6    whole claim on the first liens, correct?

7    A     That is true.

8    Q     In the amount of approximately 430 million?

9    A     That number sounds familiar.

10   Q     And their claim would include interest as well?

11   A     Yes, and I think there's a trial set in September.

12   Q     So taking these two contingent make-whole claims

13   together if the debtors lose the make whole over the course

14   of the year you'd be looking at over $800 million in make-

15   whole claims; is that correct?

16   A     In the worse case scenario, yes.

17   Q     And the debtors would have 488 million in available

18   cash at the end of the year?

19   A     Yes, but we'd have a DIP that's mandatorily convertible

20   and I would think that would put the owners of the DIP in a

21   tough spot because they'd have to come up with the cash

22   because they have to mandatorily convert.  So they know that

23   they're taking the risk of the make wholes totally on their

24   economic backs.

25

1

2   Q    You testified, I think, the contingency plan is that

3   the debtors will raise more debt to pay for any shortfall,

4   correct?

5   A    I think at the time we'll have to negotiate with them

6   as to how to deal with the shortfall if they lose the full

7   amounts.

8   Q    But I believe you testified yesterday that the -- your

9   projection of the maximum debt capacity at EFIH is

10  approximately 5.3 to 5.4 billion, is that correct?

11  A    That's correct.  That's been our feedback we've gotten

12  from various underwriters as we have talked to them about

13  prospectively what would the company look like at emergence.

14  Obviously, as we all know, market conditions can change for

15  the good or for bad here.

16  Q    And just so we're clear, the size of the first lien DIP

17  is approximately 5.4 billion, correct?

18  A    That's correct.

19  Q    And the debtors plan to roll that into new debt at

20  emergence, right?

21  A    That is correct.

22  Q    All right.  And as of today, you understand the first

23  lien DIP has closed, correct?

24  A    Yes.

25  Q    And so, EFIH has approximately, give or take, a billion

1    dollars on its balance sheet?

2    A    I think a little over a billion, yes.

3    Q    A little over a billion.  Now this proposed second lien

4    DIP does not increase cash liquidity for EFIH during these

5    proceedings, does it?

6    A    No.  The second lien DIP -- well, the size of the first

7    lien DIP was designed to help fund the second lien DIP and

8    still leave adequate liquidity for the estate.

9    Q    So, in fact, the second lien DIP would substantially

10   reduce liquidity at EFIH, correct?

11   A    Well, it would be reduced but it was increased by the

12   first lien DIP, yes, beyond what it needs.

13   Q    As compared to today, the second lien DIP would

14   substantially reduce liquidity at EFIH, correct?

15   A    I agree.  On the incremental margin, the use of

16   proceeds of the repayment of the second lien notes will

17   require that we use some excess cash that's sitting at the

18   company today.

19   Q    And I believe you testified in connection with the

20   first lien DIP that there was approximately 650 million

21   dollars from the proceeds of that first lien DIP allocated

22   towards the second lien transactions, both the second lien

23   DIP and the second lien make-whole settlement, is that

24   correct?

25   A    That was assuming 100 percent of the second liens

1    except for fifty cent on the dollar settlement.  At current,

2    I believe that with the raising of a billion nine DIP, you

3    would pay off -- use 250 of cash to pay off the remaining

4    balance of the second lien notes and the current dollar

5    amount of the settlements by the 43 percent of accepting

6    second liens is about 140 million.  So the net cash that

7    would be used from the balance sheet is about 400.

8    Q    There are also cash transaction fees, though, correct?

9    A    There are cash transaction fees and there are some

10   accrued interest on the second lien notes.

11   Q    Cash transaction fees are at least 43 million?

12   A    I think the number is 43.

13   Q    And what was the accrued interest that you just

14   mentioned?

15   A    That's a stumper.  I -- I think it's -- is it as much

16   as 100?  I just don't have -- I think it might be as much as

17   100 of accrued.

18   Q    All right.  You assert that the benefit or a benefit of

19   this DIP is interest savings during the course of this case,

20   correct?

21   A    That's correct.

22   Q    And you had presented that interest savings as a cash

23   savings over the course of this case, haven't you?

24   A    That's correct.

25   Q    But, in fact, the proposed DIP will result in the

1   debtors having higher cash expense for interest during these

2   proceedings as compared to the status quo, isn't that right?

3   A   Well, if we don't have to pay cash interest in the

4   seconds, that's correct.

5   Q   And in your declaration, you stated that the interest

6   savings was approximately eight million dollars a month.

7   But I believe you testified that under the current proposal,

8   that would be approximately eleven million dollars per

9   month, is that right?

10  A   That's correct because the interest rate on the

11  unsecured DIP dropped from eight percent to six and one-

12  quarter percent.

13  Q   And over twelve months, that would add up to 130

14  million in savings?

15  A   That's correct.

16  Q   And you calculate that savings from the DIP without

17  netting it against the transaction fees, isn't that right?

18  A   That's correct.  That's strictly just the interest

19  savings.

20  Q   Let's turn your attention to -- if you have a loose

21  copy at Debtors' Exhibit 2.  This is the June 22nd board

22  dec.  I believe it's also Objectors' Exhibit 23.

23  A   I have it.

24  Q   If you could turn to page 11.  All right.  Starting at

25  the top left of the chart, this reflects the calculation

1    that gets you to 130 million dollars in interest savings

2    over the course of the year, correct?

3    A    That's correct.

4    Q    And that's because under the existing second lien

5    notes, the current interest expense is 259 million dollars

6    over the course of the year?

7    A    I think that's correct, yes.

8    Q    And the interest under the DIP would be 130 million

9    dollars over the course of the year?

10   A    I think we also added in the fact that we have to use

11   250 million of first lien proceeds to fund out the balance

12   of the principal amount of the second lien notes.  So it's

13   six and a quarter percent times a billion nine plus four and

14   a quarter percent times 250 million dollars.

15   Q    That's fine.  And here, when presented to the board,

16   you do net the interest savings against the cash fees in

17   order to present a net cash savings, isn't that right?

18   A    We tried to do this analysis just to compare and

19   contrast all the various proposals against one another, yes.

20   Q    Again, you present this as -- when presenting it to the

21   board, as a cash savings over the next twelve months.

22   A    That's correct.  On the margin less the cash savings to

23   the company.

24   Q    You never present the scenario looking at the

25   possibility that current interest would not be paid in cash

```
1    on a going forward basis but would instead be accrued, do

2    you?

3    A    That's right.  We were just looking at what would be

4    the cash impact assuming we had to pay cash interest on the

5    second liens.  I mean, we do owe it to them.  I would

6    question if you want to leave them out, why would you want

7    to incur interest on interest if you didn't pay them in

8    cash.

9    Q    The status quo, as you understand it, is that the

10   debtors are, in fact, accruing current interest expense and

11   not making payments in cash, right?

12   A    I understand that's correct, yes.

13   Q    But your understanding is if the second lien DIP is

14   approved, the debtors will have to pay the 130 million in

15   DIP interest in cash on a going forward basis, right?

16   A    Yes.

17   Q    So on a cash basis, as compared to the status quo, the

18   DIP would result in an increased interest expense on a going

19   forward basis, right?

20   A    Well, if we assume that you would in the status quo

21   case and leave it outstanding as a status quo case, I'm not

22   sure if it would be wise to not pay the interest currently.

23   Q    That is your understanding of the status quo, though.

24   A    I believe it's the status quo because it's pending the

25   outcome of this hearing.
```

1    Q    In connection with your testimony in May in connection

2    with the first lien DIP, you testified that 340 million

3    dollars had been set aside towards the make-whole on the

4    second lien DIP but when we spoke at your deposition in

5    connection with the second lien DIP, you testified that that

6    amount had dropped to 330 million.  Do you recall that?

7    A    Yes.

8    Q    And the reason that it dropped by ten million dollars

9    was because the time had passed essentially, because one

10   month had passed?

11   A    No.  We paid full interest out and so therefore, the

12   discounted value of the future payments had dropped because

13   we paid out one month's worth of current interest.

14   Q    So as an alternative, either you pay the interest or

15   the make-whole -- and the make-whole premium goes down or

16   you don't pay the interest and the make whole stays the

17   same?

18   A    I'm sorry.  Say that again.

19   Q    The reason the make-whole amount went down from 340 to

20   330 is because you paid or accrued current interest.

21   A    Well, we're accruing interest.  You're absolutely

22   right.  But as time moves forward, the net present value of

23   the make whole does go down by some amount that's not quite

24   equal to the interest that is otherwise due for the passage

25   of that month.

1    Q    Just to make sure I understand your testimony, your

2    testimony is that the make whole goes down by some amount

3    but that is not quite equal to the amount of the accrued

4    interest.

5    A    That is correct.

6    Q    But you've never actually performed calculation of the

7    interest savings net of that decline in make-whole

8    obligation, have you?

9    A    I haven't because all of our analysis is based on -- in

10   these documents, is based off of assuming that we win the

11   make whole.

12   Q    And also assuming that you settle a portion of it

13   especially at this time.

14   A    And obviously, if people wish to settle with us, we're

15   happy to settle with these terms.  But otherwise, we had

16   assumed that we will win the make whole type.

17   Q    I still have a few more questions, Mr. Ying.  The

18   debtors walk you through three decs presented to the board

19   at different times.  They were marked as Debtors' Exhibits

20   1, 2 and 3.  Do you remember that?

21   A    Yes.

22   Q    And each of those decs considered competing DIP

23   proposals, is that fair?

24   A    Yes.

25   Q    But since signing onto the RSA, the debtors have never

1    reconsidered whether it is necessary to take on a second

2    lien DIP at all as opposed to simply leaving the second lien

3    notes in place, correct?

4    A    That's correct because I don't see why the reason

5    they're competing offers has changed the fundamental reasons

6    for us to want to do a second lien mandatorily convertible

7    DIP.

8    Q    And similarly, the debtors have never reconsidered

9    whether it's appropriate, putting aside whether it's

10   necessary, whether it's appropriate to take on a second lien

11   DIP as opposed to simply leaving the second lien notes in

12   place, is that right?

13   A    If I got your question right, I don't think we've

14   reevaluated our support of the terms of our restructuring

15   plan because I don't think the circumstances have changed

16   sufficiently to change our fundamental business judgment

17   that we made as of the filing date.

18   Q    And you've not done any analysis of the possibility

19   that the debtors' motion to approve the second lien DIP

20   would not be approved, isn't that correct?

21   A    I've done it in my head but I don't -- I don't remember

22   any analysis that shows specifically what happens --

23   Q    And you've --

24   A    We did tons of analysis before we even got to the

25   second lien DIP that didn't have it.  So there are versions

1    of numbers flying around the company's and our, you know,

2    computers with, you know, hundreds of scenarios.

3    Q    All right.  You were never asked to conduct an analysis

4    of that possibility by the debtors, is that correct?

5    A    Not in recent memory, no.

6    Q    Another benefit that you assert here with respect to

7    the DIP is that it locks in the equity conversion at sixty

8    percent, is that right?

9    A    That is correct.

10   Q    And the primary concern here is that over time, an

11   increase in interest rate could reduce the value of Oncor,

12   is that fair?

13   A    Well, the primary motivation is to assure all the

14   constituencies at all levels of the capital structure that

15   if -- that we have at least a confirmable plan.  Obviously,

16   if values are superior and there's a superior way to finance

17   out the DIP as proposed, we still have the freedom to do it.

18   But it assures people that there is a path to a consensual

19   bankruptcy plan of reorganization.  And that's been seminal

20   in driving our thinking, you know, for months and months.

21   Q    You've read the debtors' reply to the objections to the

22   DIP motion, correct?

23   A    I have, yes.

24   Q    And that's at docket 1192.  I think for efficiency,

25   I'll not put it in front of you.  I'm happy to, if you'd

1    like, but I believe it's in your pleadings binder there at

2    tab 31, if you want to take a look.

3        The debtor refers to the capital markets risk and says

4    that any delay causes significant risk with respect to these

5    rates, referring to the interest rates, that could both

6    significantly increase the cost of capital for the repayment

7    of the EFIH second lien notes and negatively affect the

8    valuation of Oncor.

9    A    Yes.  I remember it says that.

10   Q    And that's at page 15.

11   A    Yes.  I remember it says that.

12   Q    You're not aware of any subsequent plan if this DIP is

13   not approved to refinance the second lien notes as debt upon

14   emergence, correct?

15   A    Definitely not.  I think I've testified a couple of

16   times as to the lack of feasibility of that and --

17   Q    So the question is whether the interest rates will

18   affect the valuation of Oncor, is that the primary concern?

19   A    Well, obviously, interest rates could adversely affect

20   the value of Oncor.  We experienced in the period from -- I

21   think it was almost a full year ago, probably May of 2013

22   through August where the Federal Reserve started talking

23   about stopping quantitative easing.

24   Q    And you've not done any formal analysis of interest

25   rate movements over the next twelve to twenty-four months,

1    have you?

2    A    I'm not here to predict interest rates.  All I'm

3    speaking to is recent -- past that we experienced where the

4    interest rate and environment changed radically.  The ten-

5    year bond went from 1.7 percent to 3 percent.

6    Q    Just --

7    A    And values of utilities did drop precipitously in

8    connection with that event.

9    Q    But you've not done any analysis of this valuation over

10   time.

11   A    I've not tried to predict what would happen to the

12   value of Oncor if interest rates move by a certain

13   percentage.

14   Q    And the company -- the debtors have not asked you to do

15   any analysis of that sort, have they?

16   A    They have not asked me to do it but we recently

17   experienced it.

18            MR. SADEGHI:  I have no further questions, Your

19   Honor.

20            MR. JONAS:  For the record, Jeff Jonas from Brown

21   Rudnick.

22   CROSS-EXAMINATION

23   BY MR. JONAS:

24   Q    Good afternoon, Mr. Ying.

25   A    Good afternoon.

```
 1   Q    Mr. Ying, this second lien DIP facility is important to

 2   get done in order to facilitate a tax efficient

 3   restructuring of each of EFH and EFIH which is a necessary

 4   condition to the tax free spinoff of TCEH, correct?

 5   A    Yes.

 6   Q    And the tax free spinoff of TCEH is a critical part of

 7   the debtors' overall strategy in this case, correct?

 8   A    Yes.

 9   Q    Who initially developed that strategy?

10   A    I recall that in the month of November, the company

11   with help from our firm and from K&E did a very in-depth

12   analysis of what were alternative restructuring plans to the

13   previous restructuring plan which had failed by November 1st

14   which was to keep the two companies together and have

15   creditors of both TCH and EFIH convert into stock of EFH.

16   And we could not get the two constituencies to agree on

17   relative valuations and therefore an equity split between

18   the two.  So it looked at six or seven different

19   alternatives and this was the one that came out as the most

20   feasible.

21   Q    Well, this strategy, if you will, the tax free spinoff

22   of TCEH, that's -- it's beneficial to the sponsors, that is

23   the owners of EFH, isn't that correct?

24   A    Well, I think it's beneficial to all three estates.

25   Q    Well, let's talk about that.  Let's talk for a minute
```

1      about the first lien creditors at TCH.  It's not beneficial

2      to them that TCEH be spun off in a tax free basis, is it?

3      A    Well, they would assert that if they could accomplish

4      that if they were to seize their assets by virtue of their

5      liens, there's another tax impact which is that they get to

6      step up the cost basis in their assets in an amount equal to

7      the fair market value of their assets at the time that they,

8      I guess, exchange their lien to -- their debt with liens for

9      the assets.  That asset step-up could be, you know, ten

10     billion or more.  That's ten billion of more tax basis over

11     a long period of time of depreciation has a lot of net

12     present value, but very controversial in terms of whether

13     the IRS would allow them ultimately to do it.  Certainly,

14     people have speculated that the government might look at

15     that and say why should the U.S. government subsidize a

16     bunch of hedge funds, restructuring a company and paying

17     them a free tax -- give them a huge tax benefit and leave

18     what we call the stranded tax at EFH and TCH to the

19     detriment of all the unsecured creditors of those entities.

20     Q    Mr. Ying, I don't want you to speculate about what the

21     U.S. government might or might not do, but the fact of the

22     matter is that if a tax free spinoff of TCH was not and the

23     assets were otherwise ultimately given to or provided to the

24     first lien creditors, they would get, on its face, the

25     benefit of a step up in basis that could be worth billions

1    of dollars, correct?

2    A    I believe that's correct.  But I think that it's not a

3    clear to -- shall we call it victory in their regard?

4    Q    Okay.  Well, what benefits -- or just talk about

5    benefits.  What benefits do those first lien creditors who

6    are giving up billions of dollars of step-up in basis, what

7    benefits are they getting from the tax free spinoff?

8    A    I think they would like to complete the bankruptcy and

9    get on to the business of running the company.  And I know

10   the company is doing a great job of running itself.  But I

11   think as new owners, they would like to get control of the

12   company they think they have -- are entitled to control.

13   Q    So your understanding is that the first lien creditors

14   give up billions of dollars of tax benefit in order to

15   ultimately get control of the company?

16   A    I believe that's correct but you'd probably have to ask

17   them.  That's just my impression.

18   Q    Did you think it was strange that when you presented a

19   tax free spinoff strategy to the first liens that would cost

20   them billions of dollars that they just said okay?

21   A    Well, they didn't just say okay.

22            MR. MCGAAN:  Object just to the relevance of this

23   particular line of questioning to the motion we're going to

24   call.

25            MR. JONAS:  Oh, I'll move on on this question, Your

1    Honor.  The relevance -- he's testified that the tax free

2    spinoff of TCEH completely undermines all of the strategy in

3    this case.  He's also testified that in part, at least, if

4    not entirely, the reason for doing --

5         THE COURT:  I'm not sure I just -- I'm not sure I

6    followed your first point.  Did the TCEH tax free spinoff

7    undermine --

8         MR. JONAS:  I'm going to get to --

9         THE COURT:  -- the strategy?

10        MR. JONAS:  Yes, Your Honor.  He said that one of

11   the reasons, the primary reason, not the primary reason, for

12   doing the second lien transaction -- that is, the DIP and

13   the settlement is to ultimately get to the TCH tax-free

14   spinoff.  That was his testimony yesterday.

15        THE COURT:  Who was that?

16        MR. MCGAAN:  It's not, Your Honor.  The debtors'

17   position has been that the restructuring strategy is to

18   avoid the incurrence of a deconsolidation tax and that

19   whatever structure that might happen will avoid that because

20   of the crushing effect it'll have on creditors throughout --

21        MR. JONAS:  And then the testimony was, Your Honor,

22   that in doing these transactions, the ones that are before

23   the Court, the second lien transactions, that's part of the

24   consolidated strategy that will ultimately get them to the

25   TCH tax free spinoff.

1          Also, Your Honor, related to that, I think we're

2    entitled, on the T side of the house, who you haven't heard

3    much from in these proceedings, as to the impact and the

4    effect, both cost and benefit of the second lien

5    transactions.  And that's where I'm going, Your Honor.

6          MR. MCGAAN:  Yeah.  My objection was the line of

7    questioning about the motives of the first lien creditors of

8    TCEH and entering into a transaction.  That's -- if this

9    witness has a foundation to speak to it or not is one thing,

10   but it's not relevant to the motion before the Court.

11         MR. JONAS:  And I'm happy to move on on that --

12         THE COURT:  Do that.

13         MR. JONAS:  -- that point, Your Honor.

14   BY MR. JONAS:

15   Q    Mr. Ying, the tax free spinoff of TCH doesn't benefit

16   the TCH second liens or unsecureds, does it?

17   A    Well, I think it's a question of whether it would

18   benefit the second liens or not.  But I think it definitely

19   would not benefit the unsecureds.

20   Q    Are you worried that the debtors' position in these

21   cases is or has been to date that the second liens are

22   completely under water and are effectively unsecured

23   creditors?

24   A    Yes, I am.

25   Q    Okay.  So the tax free spinoff of TCEH doesn't benefit

1     the second liens or un -- so-called second liens or

2     unsecureds, does it?

3     A     That's correct.

4     Q     And if the tax free spinoff wasn't done, the

5     deconsolidation tax that you've made reference to and are

6     concerned about, that would fall on EFH not TCEH, correct?

7     A     I don't think that's correct.

8     Q     Why do you think that's not correct?

9     A     Well, TCH and EFH have a tax sharing agreement.  And I

10    believe EFH and the IRS would assert tax claims against TCEH

11    which is why I said it wouldn't be at all a creative to the

12    unsecured creditors of TCEH.

13    Q     Sir, have you -- strike that.

14              Mr. Ying, it is the case, though, that TCEH could

15    -- could conceivably reject the tax sharing agreement in

16    which case any obligations arising thereunder would be

17    unsecured claims, correct?

18    A     Well, I think that would be cause for another great

19    litigation and trial.

20    Q     And why do you say that?

21    A     I don't think it's so easy for them to reject it but,

22    again, I'm not either tax counsel or the lawyer involved

23    here.

24    Q     Okay.  But if it could reject it, that would -- what

25    that would mean is those obligations would fall to general

1    unsecured claims at TCH, correct?

2    A    If I take your supposition that TCH, as an entity, has

3    absolutely no tax liability for deconsolidating from TCH, I

4    would agree with you.  I certainly never heard anyone talk

5    about that before.

6    Q    And would you disagree with that as a proposition?

7    A    Again, I haven't heard anyone talk about that theory

8    before.

9    Q    Okay.  And have you heard the concern, if you will, the

10   debtors allege that there would also be a possibility for a

11   check the box election that could have a negative taxing

12   consequence on TCEH?

13   A    Yes, I have.

14   Q    And what's your understanding of that?

15   A    Well, if there were a -- a person or possibly a Chapter

16   7 trustee at EFH that had only its own interests in mind,

17   they conceptually could -- and this is, again, a tax term,

18   "Check the Box" which means basically to take the tax status

19   of TCH and transition it from a nontax paying entity -- I

20   think the term is disregarded entity -- and make it a

21   corporation.  And by making it a corporation, it, through

22   the tax code becomes joint and several with EFH for all tax

23   liabilities of the consolidated group.

24   Q    But you're not suggesting that the EFCH board, assuming

25   there was no Chapter 7 trustee or any trustee, but the EFCH

1    board itself, you're not suggesting that they would check

2    the box, would you?

3    A    I qualified my comments by saying you'd have to have --

4              THE COURT:  TSCH not EFCH.

5              MR. JONAS:  I'm sorry, Your Honor.  EFH.

6              MR. MCGAAN:  Again, object to the relevance.  And

7    this is beyond the scope of witness' knowledge of what the

8    tax strategy of the EFH board would be.  I think he's

9    already said that he doesn't know.  So I think he's being

10   asked to speculate that's beyond his category.

11             MR. JONAS:  Well, I'll move on, Your Honor.

12   BY MR. JONAS:

13   Q    Mr. Ying, I want to try and wrap up.  The TCH tax free

14   spinoff is being done to benefit, for the most part, E side

15   creditors and sponsors, correct?

16   A    Well, the tax claim that would be triggered in a TCH

17   deconsolidation really would be at issue for EFH and TCEH.

18   Q    Why do you think --

19   A    I actually don't think it at all adversely affects EFIH

20   because TCH is the triggering entity.

21   Q    Well, again, I just will repeat my question which was

22   the TCEH tax-free spinoff is being done for the most part to

23   benefit E side creditors and sponsors, correct?

24   A    Well, I think it does benefit T side unsecured

25   creditors because I do think they would find themselves pari

1    passu with significant tax claims by virtue of the tax

2    sharing agreement.

3    Q    And they'd have to share the 150 million dollars of

4    unencumbered assets which are being offered to them, right?

5    A    Whatever the number is, they would be -- now have at

6    least the three billion dollar pari passu claim.

7    Q    You know what the total unsecured claims are estimated

8    to be on the T side?

9    A    Only the bond obligations.

10   Q    And what does that mean?

11   A    Well, you've got, what, five and a half billion of

12   unsecured bonds, a billion 7 of second lien which may not

13   have any collateral value, and then you have the unsatisfied

14   or the deficiency claim in the first lien of some unknown

15   number.

16   Q    Here, your testimony is that the benefit of avoiding

17   the deconsolidation tax to the TCEH unsecured creditors that

18   instead of sharing 150 million over approximately 8 billion

19   dollars, they'd have to share it over 11 billion dollars.

20   A    That's correct.

21   Q    And have you provided any advice to TCEH on what

22   position it should take on these second lien transactions?

23   A    I've provided to the company and to EFIH with regard to

24   the company as a whole and to -- because that's part of the

25   RSA  And with respect to deliberations, most recently I've

1    been meeting with the EFIH board.

2    Q    Well, I'm sorry.  I'm a little confused.  I just want

3    to talk about TCEH.  Have you provided any advice to TCEH on

4    what position it should take on these second lien

5    transactions?

6    A    I don't recall being asked specifically by TCEH to

7    provide them advice on the second lien.

8    Q    Okay.  Do you know if anyone has provided any advice,

9    professional advice, to TCEH on what position it should take

10   in connection with the second lien transaction?

11   A    Beyond the approval of the RSA, no.

12   Q    Okay.  So let me confirm.  As far as you know, no

13   professional has given any advice to TCEH in connection with

14   what position it should take on the second lien

15   transactions.

16            MR. MCGAAN:  Object that (indiscernible 12:40:54)

17   is his testimony.

18            THE WITNESS:  I said that as of the signing of the

19   RSA, we provided advice to all the boards about the RSA

20   transactions.

21   BY MR. JONAS:

22   Q    I want to focus --

23   A    And -- but I thought I said post-filing.  I have not

24   been asked to address the TCH board specifically on the

25   EF -- or on the EFIH second lien transactions.

1    Q    Okay.  I appreciate that.  Now my question is do you

2    know if any professional postpetition has provided any

3    advice to TCEH on what position it should take in connection

4    with the second lien transaction.

5    A    I do not know.

6         MR. JONAS:  Thank you, Mr. Ying.  I'm done, Your

7    Honor.

8         THE COURT:  Mr. Martin.

9         MR. MARTIN:  Your Honor, I probably got -- just in

10   the interest of scheduling time, I've probably twenty-five

11   or thirty minutes and I think Mr. Shore has a little bit,

12   too.  And so, I just wanted to give the Court the option of

13   whether it wants me to start and break or break now or --

14        THE COURT:  We'll break now then.  We'll reconvene

15   as close to 2 p.m. as possible.  I think that gives -- is

16   that right?

17        MR. MARTIN:  That would be --

18        THE COURT:  An hour and fifteen minutes.

19        MR. MARTIN:  Yes, Your Honor.

20        THE COURT:  Get people in and out.  Okay.  We'll

21   recess till 2 o'clock.  And, Mr. Ying, again you cannot

22   discuss your testimony.

23        (Whereupon the Court recessed at 12:42 p.m.)

24        (DISCLAIMER: Notes for the afternoon session were not

25   received with audio; therefore, all speakers excluding the

1     Judge who did not identify themselves are noted as

2     "UNIDENTIFIED")

3          (Proceedings resumed at 2:05 p.m.)

4               THE CLERK:  All rise.

5               THE COURT:  Please be seated.

6               Before we start I understand there's some issues

7     with continuing tomorrow.

8               MR. DEFRANCESCHI:  Yes, Your Honor.  The parties

9     were of the view, I believe, that in light of the two days

10    you had later in July that we would certainly be able to

11    finish then.  And it might be more efficient rather than

12    spending two-and-a-half hours tomorrow and then breaking to

13    just pick it up again on the -- I think it was the 10th and

14    the 11th Your Honor had.

15              THE COURT:  Well, I don't know if I share your

16    optimism.

17         (Laughter)

18              THE COURT:  All right.  I'll noodle that over as

19    we proceed.

20              Go ahead, Mr. Martin.

21              MR. MARTIN:  Thank you, Your Honor.

22              For the record, Ross Martin, Ropes & Gray, for CSC

23    Trust Company of Delaware as indenture trustee and

24    collateral trustee.

25    CROSS-EXAMINATION

1    BY MR. MARTIN:

2    Q    Good afternoon, Mr. Ying.

3    A    Good afternoon.

4    Q    Mr. Ying, you testified earlier -- I don't recall

5    actually whether it was yesterday or today, but you

6    testified earlier that the company did not do any marketing

7    for the DIP, the second lien DIP, prior to the petition date

8    because tax considerations listed the universal potential

9    investors, isn't that right?

10   A    That was one of the reasons.

11   Q    Okay.  And the other reason was consent; is that

12   correct?

13   A    It's a restructuring.  We need support from all the

14   various constituencies, and a marketing process seemed a

15   secondary issue to getting the key constituencies to agree

16   to a form of restructuring.

17   Q    Okay.  In that limited universe for tax reasons, was

18   the limited use of -- excuse me -- the limited universe of

19   potential investors limited to the PIKs, the EFIH seconds

20   and the EFH unsecureds; is that correct?

21   A    I think that's correct.

22   Q    Now, Mr. Ying, you never contacted the EFIH first lien

23   group prepetition to ask if they had any interest in funding

24   a potential second lien DIP; is that correct?

25   A    We had enough trouble getting the first lien group to

1    talk to us about doing a first lien DIP.

2    Q    But you never contacted them about the second lien DIP,

3    did you?

4    A    Given our discussions about the first lien DIP as

5    providing a second lien DIP never crossed our minds.

6    Q    So you didn't contact them, that's correct?

7    A    We had enough trouble getting the first lien --

8              THE COURT:  Yeah.  Okay.

9              THE WITNESS:  -- DIP to even do a first lien.

10             THE COURT:  That's the third time.  Answer the

11   question or we'll be here forever.

12             THE WITNESS:  I'm sorry.  No.  We did not.

13   BY MR. MARTIN

14   Q    And you didn't do that whether it was the original

15   group which was larger institutional holders or later when

16   that group had more, shall we say, hedge fund investors in

17   it; is that correct?

18   A    Well, we were always in contact with the advisors, but

19   -- and the composition of your group changed.  But, no, we

20   never contacted you --

21   Q    Okay.

22   A    -- for a second lien financing.

23   Q    Now, Mr. Ying, are you aware that the company has asked

24   the IRS for a ruling with respect to whether the tax re-spin

25   (sic) works as a matter of tax law?

1    A    Yes, I am.

2    Q    Okay.  And are you aware that in connection with that

3    the company has submitted what's call a pre-submission

4    memorandum to the IRS explaining the company's position?

5    A    I'm aware that there's such a document.  Yes.

6    Q    Okay.  And, Mr. Ying, if you could turn to the exhibit

7    binders to Tab 16, please.

8         (Pause)

9         Now if you would take a look at that.  Mr. Ying, do you

10   recognize that as the restructuring support agreement?

11   A    Yes.

12            MR. MARTIN:  Your Honor, just for completeness, I

13   would like to move the admission of that document if the --

14            THE COURT:  Any objection?

15            MR. MCGAAN:  Your Honor, the -- I do not, but the

16   parties have talked about doing this in a more -- I don't

17   have an objection to that, but I wanted to let the Court

18   know there's a series of documents that have already been

19   used and we've been in discussions about offering them

20   likely without much in the way of any objections at the end

21   of the evidence.

22            MR. MARTIN:  And that's fine with us, Your Honor.

23   I think I only have a few so I thought I would just clear

24   that out of the way.

25            THE COURT:  I will admit that for now, but let's

1    hold off the rest to -- till perhaps more (indiscernible) --

2            MR. MARTIN:  Okay.  Thank you, Your Honor.

3            THE COURT:  -- process

4        (Unidentified exhibit admitted into evidence)

5    BY MR. MARTIN

6    Q    Now, Mr. Ying, if you would turn to what I believe is

7    page 333 of that document --

8            THE COURT:  I take it you're referencing the

9    legend at the top?

10           MR. MARTIN:  Yes.

11       (Pause)

12           THE WITNESS:  I think I have it.

13   BY MR. MARTIN:

14   Q    Okay.  So -- and you'll see that's Exhibit E, the pre-

15   submission memo?

16   A    I have page 303 of Exhibit 16.

17   Q    Oh, I think it's 333.

18   A    I'm sorry.  333.

19   Q    Okay.  I'm -- I just want to make sure we're synced up.

20   A    It says, Roman Number IV, the COI.

21   Q    Okay.  Go back to the beginning of that document. I see

22   what the difference is.  It should be on page 324.  That's

23   the beginning of that document.

24   A    Page 324.

25   Q    It should be Exhibit E, pre-submission memo.

1    A    I have it.  Yes.

2    Q    Okay.  Now is this an exhibit to the restricting

3    support agreement?

4    A    I believe it is.  Yes.

5    Q    Okay.  And the parties under the restructure -- excuse

6    me -- the debtor is required to submit this specific pre-

7    submission memo to the IRS as part of the restructuring

8    support agreement, isn't that correct?

9    A    Yes.

10   Q    Okay.  And so have you reviewed this document before?

11   A    Not for over a month, but I do recall reading it.

12   Q    Okay.  Do you recall reading it pre-petition?

13   A    I may have seen a draft or two pre -- pre-filing.

14   Q    Okay.  Now, Mr. Ying, are you aware that in the pre-

15   submission memo the debtors take the position with the IRS

16   that it does not matter who the second lien DIP investor is

17   for purposes of the continuity of interest test?

18   A    I'm not aware of that.

19   Q    Okay.  Let's turn to page 333, please.  This is where I

20   was pointing before, little Roman IV.  And you see that

21   section, little Roman IV, the continuity -- the COI

22   requirement?

23   A    Yes.

24   Q    Okay.  And you see the first sentence there that says,

25   "After the distribution the SpinCo stock will be owned 100

1   percent by TCEH creditors.  The EFH stock will be owned 100

2   percent by the sponsors, unsecured EFH creditors and the

3   unsecured EFIH creditors."  Do you see that?

4   A    I do.

5   Q    Okay.  So that all the stock, as you said, would

6   actually be owned by the existing creditors.  Do you see

7   that?

8   A    Where are you pointing?

9   Q    That first sentence.  That first sentence says that

10  it's the debtors' position that the existing creditors at

11  the time of the spin will own all of the relevant stock for

12  purposes of the spin.

13  A    Yes.

14  Q    Okay.  Now if you go down to the bottom of that page,

15  the regular text on that page, you see that carry-over

16  paragraph that --

17  A    Yes.

18  Q    -- starts, "After the distribution" -- that is, after

19  the spin -- "EFH expects to issue approximately 65 percent

20  of its stock for $2.1 billion."  Do you see that?

21  A    Yes.

22  Q    And that's a reference essentially to the second lien

23  DIP loan; is that correct?

24  A    I think there was a time when it was larger than it is

25  today.  Yes.

1    Q    Okay.  And then this says, "However, such stock

2    offering does not decrease the value of the interest in EFH

3    held by the unsecured EFIH creditors to sponsors and the

4    unsecured EFH creditors and, therefore, should not impact

5    the continuity of interest."  Do you see that?

6    A    I do.

7    Q    And this is the position the company is taking with the

8    IRS; is that correct?

9    A    Yes.

10   Q    Okay.  Therefore, sir, isn't the company taking a

11   position that it doesn't matter for purposes of continuity

12   of interest who is getting the 65 percent of the equity by

13   virtue of the second lien DIP?

14   A    It's certainly what it says, but it's beyond my

15   knowledge from a tax standpoint.

16   Q    And you, sir, as the lead financial advisor for the

17   company were running this process for the second lien DIP

18   loan?

19   A    I was the advisor to the company, yes.

20   Q    With respect to this process; is that correct?

21   A    That is correct.

22   Q    And you advised the company what bidders could be in or

23   out based on tax considerations, isn't that correct?

24           MR. MCGAAN:  Objection, Your Honor.  There's been

25   no testimony that he provided the tax advice to the company.

1    He's already said that -- I mean, his (indiscernible) IRS is

2    beyond his expertise.  So I think it lacks foundation and

3    it's not relevant, his view is not relevant on that.

4              THE COURT:  No.  I think it's -- it -- I think

5    based on previous testimony and certainly subject to caveats

6    that the witness has made numerous times about his tax

7    expertise he's nonetheless been advising the EFIH in

8    connection with a transaction with an integral piece of

9    which is the tax spinoff.

10             So, no.  I think it's relevant and I think there's

11   sufficient foundation.  Objection's overruled.

12             Mr. Martin, do you want to restate the question?

13             MR. MARTIN:  Certainly, Your Honor.

14   BY MR. MARTIN:

15   Q    Mr. Ying, you advised the company which potential

16   bidders could -- should be allowed into the process for the

17   second lien DIP based on your understanding of the tax

18   considerations, isn't that correct?

19   A    Yes, but at every step of the way we do ask tax counsel

20   what works, what doesn't, and I realize it says what it says

21   on its face.  I have to admit I haven't read it for so long

22   and I don't even remember reading that particular phrase.

23   It's clear what it says on its face, but every time we get a

24   new proposal we bring tax counsel in -- into our

25   deliberations and ask them, well, does this work.

1    Q    Mr. Ying, if you could pick up what I think what you

2    have up there, which is Debtors' Exhibit 3, which is the

3    board package from the June 29th board meeting just prior to

4    this, and so the date prior to the commencement of this

5    hearing.

6         (Pause)

7    A    I have it.

8    Q    Okay.  And if you would go to page 4 there's this time

9    line which shows when the various bids came in.  Do you see

10   that?

11   A    I do.

12   Q    Mr. Ying, did the first lien group make an unsolicited

13   proposal to the company to provide a second lien DIP on May

14   30th of this year?

15   A    Yes, they did.

16   Q    Okay.  And at that point, or maybe as of that same day,

17   you had received four other proposals all from the second

18   lien group; is that correct?

19   A    Prior to and through May 30th and after the filing

20   date, yes, we had received four different proposals.

21   Q    Okay.  At any point from the petition date to now has

22   the company announced that it's conducting a process to get

23   competing bids for the second lien DIP?

24   A    I don't know if we've announced we're doing a process.

25   No.

1    Q    Okay.  And at any time from the petition date to now

2    has the company ever set forth rules, ground rules for the

3    process for competitors for the second DIP?

4    A    Well, I believe at various points in time counsel has

5    communicated to all the parties who have submitted proposals

6    to send us best and finals.  I think at another point in

7    time there was a protocol established so that when offers

8    were received everyone who was an interested party would get

9    to see everybody else's proposals.

10   Q    Okay.

11   A    Beyond those ground rules I don't know of any others.

12   Q    Okay.  Let's take those one at a time.

13            Did the company request best and final bids to be

14   submitted on June 11th?

15   A    I don't recall a specific date.

16   Q    If you would take a look at the chart, Mr. Ying, at the

17   top, sort of right below the words, post-petition bids, you

18   see the entry for June 11th?

19   A    I do see that.  Yes.

20   Q    Does that refresh your recollection as to whether the

21   company called for best and final bids for June 11th?

22   A    It does, but I believe we drew other lines that people

23   disregarded, at least that's my recollection.

24   Q    Did you draw any lines before that date for best and

25   final bids?

```
 1    A    I don't know.  But I think there was at least one other

 2    that's not on the chart.

 3    Q    Do you recall whether it was before that date?

 4    A    I just don't remember.

 5    Q    Okay.  How many bidders submitted bids in response to

 6    that call for best and final on June 11th?

 7    A    Are you referring to -- oh, June 11th?

 8    Q    Yes.

 9    A    Well, obviously, we only got a proposal from the first

10    lien group.

11    Q    Okay.  Now if you would turn to Tab 71.  I think it's

12    in Binder 3.

13    A    What was the tab number again?

14    Q    71.

15    A    Thank you.

16    Q    You see this is a letter from my firm from one of my --

17    my firm and Capstone, excuse me, who is the financial

18    advisor to the first lien group.  And you see that letter is

19    addressed to Mr. Hessler, Mr. Sieri (ph) and yourself?

20    A    Yes.

21    Q    Okay.

22         MR. MARTIN:  I'm sorry, Your Honor.

23    Q    And is this the proposal that the first lien group put

24    in in response to that call for best and final?

25    A    Yes, it is.
```

1    Q    Okay.  And you'll see at the bottom of that first page

2    the first sentence says, "We're writing in response to your

3    communication with Ropes & Gray on Monday the 9th stating

4    that EFIH was requesting definitive proposals by today,

5    Wednesday, the 11th."  Do you see that?

6    A    I do see that.

7    Q    Is that your recollection of the process; that the

8    first lien group was informed just two days before the best

9    and final deadline?

10   A    Yes.

11   Q    Okay.  And I would then like to turn to -- well, let me

12   ask this question.  The board met regarding this best and

13   final deadline on June 16th; is that correct?

14   A    Yes.

15   Q    Okay.  So I would now like to turn to the board package

16   for that.

17            MR. MARTIN:  Is that marked as a debtors' exhibit?

18            UNIDENTIFIED:  Yeah.

19            MR. MARTIN:  16?

20            UNIDENTIFIED:  Debtors' 1.

21            MR. MARTIN:  Debtors' 1.

22        (Pause)

23   BY MR. MARTIN:

24   Q    And I would like to go to page 2, if we could, Mr.

25   Ying.

1    A    I have it.

2    Q    Okay.  Now this compared the proposals you had as of

3    that point; is that correct?

4    A    That's correct.

5    Q    Now the unsecured group proposal was the original

6    proposal filed at the outset of the case; is that correct?

7    A    Yes, that is.

8    Q    Okay.  So they had never updated it in response to the

9    company's call for best and final?

10   A    That's correct.

11   Q    Okay.  And the second lien group proposal, I gather,

12   was their latest proposal which was of May 30th, so 11 days

13   prior to this; is that correct?

14   A    Yes.

15   Q    Okay.  And they didn't update either in response to the

16   company's call for best and final?

17   A    That's correct.

18   Q    Okay.  Now -- but you compared the terms of those three

19   side by side for the board; is that right?

20   A    Yes, we did.

21   Q    Okay.  And if you take a look at the equity ownership

22   percentage, the first lien group's proposal is lower than

23   the PIKs and the same as the second liens; is that correct?

24   A    Yes, it is.

25   Q    Okay.  And the cash interest proposal is lower than the

1    other two; is that correct?

2    A    Yes, but the number was in brackets.

3    Q    All right.  Did you call to ask anything about that to

4    the first lien group?

5    A    I believe we did.  Yes.

6    Q    Okay.  And did people say they had any reason to think

7    it would be something different than that?

8    A    Well, at the time I recall being told that the first

9    lien group did not have the full 1.9 billion committed to;

10   that they were still searching for other parties to help

11   fill out the commitment, including a potential backstop

12   underwriter who would play the same role that JPMorgan was

13   playing for the second lien group at that time, and they

14   said that we -- they had left the terms in brackets because

15   until they brought tin more investors they were unsure that

16   they could maintain those numbers.

17   Q    Okay.  The optional pre-payment fee, which is the last

18   term listed under the first lien group proposal, that's the

19   comparable number to the $380 million fee we've heard so

20   much talk about.  That was 95 million; is that correct?

21   A    Yes.

22   Q    And that was also at that point lower, substantially

23   lower than either the PIKs proposal or the second lien

24   proposal; is that correct?

25   A    Yes.

1    Q    Okay.  And you point out that the first lien group had

2    said they were committed for, at that point, only 1.3

3    billion of the 1.9; is that right?

4    A    That's correct.

5    Q    Okay.  So -- but the terms, at least the terms offered

6    by those -- that first 1.3 were better than the other terms

7    on those -- on those numbers that we have here?

8    A    That's correct.

9    Q    Okay.  Now can we go back to the time line in Debtors'

10   3.

11   A    I have it.

12   Q    Okay.  The very next day after that board meeting and

13   after the board was forced to face the comparison of those

14   three proposals, did the PIKs for the first time post-

15   petition submit a new bid?

16   A    Yes, they did on June 17th.

17   Q    And the day after that the second liens were forced to

18   submit a new, better proposal for the DIP, isn't that

19   correct?

20   A    Well, I'm not sure I would use the word forced.  What

21   they told me was that they had been approached by Nextera

22   (ph) and had been working furiously on coming up with an

23   innovative plan and that's the day they presented it to us.

24   Q    Okay.  How many best and final deadlines were given to

25   the various parties?

```
 1    A     I don't recall.

 2    Q     More than five?

 3    A     I don't recall.

 4    Q     More than one, though?

 5    A     Yes.

 6    Q     Okay.  But those all would have been from June 11 to

 7    June 30?

 8    A     That probably is the case.

 9    Q     Okay.

10    A     I just don't recall.

11    Q     Now is it fair to say that when the debtor said best

12    and final, it wasn't actually best and final, right?

13    A     Well, the debtor can say a lot of things, but people

14    don't seem to listen, so.

15    Q     And that's what you were referring to early -- in your

16    earlier testimony when you said it felt like the debtor was

17    powerless; is that correct?

18    A     One of the reasons, yes.

19    Q     Okay.  Did you ever consider setting a set of

20    guidelines and asking the Court to impose them?

21    A     No.  I remember discussing what we should do with

22    counsel and this is the process that we agreed to conduct,

23    if you can -- that's the process that we did conduct.

24    Q     Okay.  I would like you to turn to Tab 72, please.

25          (Pause)
```

```
 1   Q    You'll see that --
 2            MR. MARTIN:  Your Honor, you'll see that this is a
 3   letter again from Ropes & Gray and Capstone on June 21st,
 4   BY MR. MARTIN:
 5   Q    And I would ask if you recall if this reflects the bid
 6   that's in your chart in Debtors' 3 of the bid from the first
 7   liens on June 21st?
 8   A    Yes.  I think it does.
 9   Q    Okay.  And the first lien group updated its terms here
10   and also included some additional mechanics to deal with the
11   unique situation that it's in with its claim for the first
12   liens and how its DIP would adjust, isn't that correct?
13   A    Yes.  I recall that we received this on a Saturday
14   night and I recall that one of my colleagues actually had to
15   send an email to Capstone to clarify exactly what your
16   conversion mechanics were --
17   Q    Okay.
18   A    -- suggesting.
19   Q    And the reason it came on Saturday is because there was
20   a Sunday board meeting; is that correct?
21   A    Yes.  There was a Sunday, the 22nd 6 p.m. board
22   meeting.
23   Q    Okay.  And if you go to page 2 of that letter, you see
24   the last paragraph on page 2?
25   A    I see it.
```

1    Q    Okay.  And do you recall reading that at the time you

2    received this letter?

3    A    I actually don't recall the paragraph, but I know that

4    this was submitted to K&E and it was their responsibility to

5    review this from a tax perspective.

6    Q    Can you go back to the first page?  Was it also

7    submitted to you, sir?

8    A    Oh, yes.  It absolutely was.

9    Q    Okay.  And so you took no responsibility for anything

10   in this letter that had anything to do with the tax

11   qualifications of the potential bidders?

12   A    I rely on the other advisors to speak because they're

13   the experts in various aspects.  I can't speak -- I can't

14   speak as a tax or securities lawyers, restruct -- or a

15   bankruptcy law expert.

16   Q    Do you recall asking Kirkland & Ellis to check their

17   analysis, without reviewing what it was or what they said

18   back, did you ask them?

19   A    I don't recall if I did, but I believe K&E tax experts

20   were on the board call when we discussed these various

21   proposals and they spoke to the tax issues with the other --

22   with respect to each.

23   Q    Okay.  What did they say on the board all?

24              MR. MCGAAN:  Objection, Your Honor.  Privilege.

25   The advice from the EFIH board of directors regarding tax

1    consequences is (indiscernible).

2         THE COURT:  Well, the reason I'm not saying

3    anything is I'm struggling, you know, with the 800 pound

4    gorilla in the entire operation, which is the tax impact,

5    and one of the themes the debtors approach is that the tax

6    treatment is obviously an indispensable part of its

7    strategy, its restructuring strategy, and impacts what DIP

8    loan the debtor thinks should or shouldn't be approved by

9    the Court.  So you really put the question at issue.  And we

10   haven't had to address it directly.  We've sort of danced

11   around it.  But now we have this question, as Mr. Martin has

12   raised, that really puts the -- it really puts the issue or

13   the question at least at issue.

14        MR. MCGAAN:  Yeah.  I've got a two-fold response,

15   Your Honor.

16        Firstly, when I was examining Mr. Ying about his

17   conduct in participating in the negotiations with respect to

18   the tax consequences, I was very careful to ask him on a

19   number of occasions about the discussions between him and

20   company representatives and other creditors in non-

21   privileged settings and he testified that the potential tax

22   consequences in these non-privileged communications were

23   discussed openly among counsel and principals and advisors

24   of the individuals or the groups bidding on the second lien

25   DIP financing and the company, and direction he received

1    from management with respect to his financial advice.

2           So in that respect we haven't opened the door to

3    it.

4           Secondly, as to the 800 pound gorilla you're

5    referring to, the significance of this issue, we don't

6    disagree, but this is a matter that Counsel should address

7    to the Court in terms of legal argument.  And we have done

8    that already and we will, in light of the development of the

9    evidence in this hearing, do that further to address the

10   Court directly about the tax consequences inasmuch as the

11   exhibit -- Objector's Exhibit 16, which is a RSA term sheet

12   contains a pre-submission memorandum prepared by counsel to

13   preview arguments to be made to the IRS in seeking a private

14   letter ruling regarding the tax consequences.

15          So there is a public non-privileged way in which

16   the debtors can address the Court, as they've already done

17   in addressing the other constituents in these cases about

18   tax issues without breaching the privilege of the

19   confidential advice tax lawyers gave to the board when they

20   were deliberating.

21          So I think it fully gets laid out in the table in

22   the way it has been and will be through arguments of counsel

23   when it comes to legal effects.

24          As a result there has been no waiver because none

25   of the testimony, for example, from Mr. Ying so far has

1    indicated that it was the correctness or lack of correctness

2    of confidential tax advice Kirkland lawyers gave to the

3    board that affected anything he did.  So we have not put it

4    in issue for that reason.

5            MR. SHORE:  May I make a suggestion, Your Honor,

6    because this is an issue that affects all of us here and it

7    will -- we were kind of building to a brewing dispute when

8    the debtors sought to move in Exhibits 1, 2 and 3, which are

9    heavily redacted board presentations.

10           This witness, as an FA, doesn't really have the

11   authority to waive the privilege on behalf of the company

12   and, more importantly, he can't answer the question as to

13   what the board did in reliance on any of that advice, which

14   would be putting it at issue.

15           We are going to have Mr. Keglevic on -- my sense

16   is he probably won't be finished today -- so that if we

17   could defer the issue until the 10th or 11th until he's

18   there and he, as a board member, can answer those questions

19   if Your Honor so rules and the parties submit on the 8th or

20   so, you know, short letter briefs on the issue of whether or

21   not, given the testimony that's occurred, about how this

22   whole thing was structured around avoiding a deconsolidation

23   facts or maintaining continuity of interest that we could --

24   Your Honor will have a better record on which to rule on

25   that issue because it is, from our perspective, the critical

1    issue for all the people on this side of the table.

2           MR. MGAAN:  The -- what -- I don't have a problem

3    if Your Honor wants to have us address you on that

4    particular issue.  That's absolutely fine with us.  We're

5    happy to do it to work our way through this.

6           But I want to reiterate that simply talking about

7    the conduct of financial advisors and negotiators and even

8    the company in structuring a deal that may implicate

9    confidential advice received from counsel does not waive the

10   privilege or put it in issue.

11          Inasmuch as the witnesses in this case have

12   already testified in depositions and will continue to

13   testify in hearings in this hearing and more about

14   structuring -- set aside tax for a moment, but as Your Honor

15   sees all the time there are debates about structure --

16   restructuring companies that involve discussions of the

17   absolute priority rule and objecting classes.  All of that

18   is the subject of confidential advice bankruptcy lawyers

19   sitting at these tables give to their clients all the time,

20   and yet they come in and their financial advisors say, well,

21   we spoke to this group because we believe they were the

22   (indiscernible) security.  Why does that matter?  Well, it

23   matters because of the way people interpret the bankruptcy

24   rules.

25          The tax issue here isn't any different.  Counsel,

1    like they do on the Bankruptcy Code, address the Court from

2    the podium in argument and in writing about the legal

3    effects of the Bankruptcy Code as to the facts and we intend

4    to do the same with regard to the tax issues.

5            THE COURT:  Well, that -- and that may be Mr. --

6    really playing to Mr. Shore's point because I know what the

7    absolute priority rule means and I don't know tax law, never

8    wanted to know tax law.

9        (Laughter)

10           MR. MCGAAN:  And that -- and I take your point,

11   and that makes it --

12           THE COURT:  So I don't -- so as I sit here today,

13   if you had a tax judge who could hear what he or she would

14   have heard over the last -- this -- the last two days, I

15   think you would have a judge who had a very good feeling as

16   to whether the debtors' position is -- I don't want to use

17   the word legitimate because that's -- I don't want to be

18   pejorative.  But, you know --

19           MR. MCGAAN:  I understand.

20           THE COURT:  -- has some legs under it or whether,

21   you know, it doesn't.  And I had -- as I sit here I have no

22   way of knowing what the -- how the continuity of interest

23   works enough to know how it will affect the transaction.

24           MR. MMCGAAN:  And that's why I suggest I think

25   counsel should address you directly on that and they should

1    do it in writing and go right to the issue that you're

2    saying is murky or confusing or beyond the issues that you

3    typically deal with as to legal issues.

4            But, you know, with respect, I -- we all

5    understand how well you understand the absolute priority

6    rule, but I read the objections filed here, as I know you

7    did, and there's lawyers addressing you on how the absolute

8    priority rule applies here.  So we're having, in parallel

9    fashion, an open legal debate addressing ourselves to the

10   Court and no one is taking the position that Mr. Shore has

11   to give us the memorandums or the confidential conversations

12   that he had with his clients about whether those objections

13   are valid or not.

14           THE COURT:  All right.

15           MR. MCGAAN:  We can separate those two things as

16   we do all the time.

17           MR. GLENN:  May I be heard, Your Honor?

18           THE COURT:  Sure.

19           MR. GLENN:  Thank you.  For the record, Andrew

20   Glenn.

21           If Your Honor looks at paragraph 11 of Mr. Ying's

22   affidavit, I'll just read it into the record very briefly.

23   He says, "A consensual restructuring among the EFH and EFIH

24   debtors and respective unsecured creditors in which all

25   unsecured creditors become shareholders in a reorganized EFH

1      is a critical part of avoiding this deconsolidation tax."

2              So I think the questions that were posed were to

3      challenge that issue on which he has already put this at

4      issue as Your Honor surmised.

5              We're troubled by this because at Mr. Ying's

6      deposition there were questions asked of him -- and for the

7      record starting at page 37 -- where he was asked about the

8      statements in his declaration and Kirkland & Ellis cut us

9      off from answering or asking those questions and getting

10     answers.

11             So I said very clearly that you can't have him

12     testify or put in the declaration on tax issues and then

13     hide behind the basis of those statements as privilege

14     because, as Your Honor just said, they're putting it in

15     issue.

16             Now to the extent that there are concerns about

17     privilege, somehow waiving privilege and getting us this

18     information, somehow jeopardizing value to the estate, we

19     get that.  We get that and maybe there's some way off the

20     record we can get around that issue.  But if statements like

21     this are coming in where the witness is taking a position,

22     trying to sell this restructuring to the Court as being

23     either critical or the only alternative, I think we're

24     entitled to either examine that or those statements have to

25     be stricken from the record.

1           So that's our position on this.

2           Thank you.

3           THE COURT:  Mr. Horowitz.

4           MR. HOROWITZ:  Thank you, Your Honor.  And I'm

5    sorry that the -- there are five parties in the room.

6    You're going to get ten points of view on this.

7           But I think it's important that we have some

8    clarity about what we're joining issue on and what the

9    relevance of the tax issues are to the motions here.  And I

10   want to make it clear what our position was.

11          At Mr. Ying's deposition I pointed out that his

12   original declaration said, based on economic and tax

13   considerations I believe the PIK DIP -- I'm paraphrasing --

14   is in the best interest of the estate.  I made it clear on

15   the record that if the debtors here invoke tax

16   considerations as one of the bases for saying that the PIK

17   DIP is preferable to the alternative competing proposals,

18   including the Nextera transaction, we would seek to preclude

19   because that information (a) is part of Mr. Ying's opinion

20   and (b) effectively the debtors would be relying on advice

21   of counsel as a basis in putting it in issue.

22          My understanding to date is that the debtors have

23   not invoked preferability of one of those proposals over

24   another for tax purposes as a basis for their decision.  So

25   on that basis I do not at this point believe they've put it

1    in issue in that respect.

2            The tax issue comes up in another respect because

3    we have pointed out that the debtors' view about who might

4    or might not be an acceptable party, what might or might not

5    make an acceptable proposal, goes to the realistic chances

6    that there could be any competition going into the future.

7    That's a different issue and that's not an issue where I

8    believe the debtors have put it at issue.

9            So at this point, at least for the EFIH second

10   lien holders, as long as the debtors are not invoking tax

11   considerations as a basis for preferring one proposal over

12   another, I don't believe they've put it at issue.

13           MR. SHORE:  Well, let me -- let me just make our

14   position clear then, Your Honor.  This is Mr. Shore for the

15   record for the TCH unsecured noteholders.

16           This witness on the stand said he didn't accept

17   other bidders, didn't go out to other bidders, didn't accept

18   bids here based upon the tax lawyers being on the phone and

19   saying something.  If the board ultimately took an action to

20   select one bidder or not select another bidder or not go out

21   to the market to find more bidders based upon the advice of

22   the tax counsel, they can't then not give the advice of

23   counsel.  They just can't proceed that way.

24           MR. MCGAAN:  I don't think that was the testimony.

25   I think we've been extraordinarily careful and I certainly

1    was in my examination of Mr. Ying regarding where he talked

2    about this as the basis for his testimony in this courtroom

3    and, again, it was discussions with creditor constituencies.

4    We've got written proposals from creditors that are in this

5    record where they -- they, themselves, address to the

6    company the continuity of interest rule and how their

7    proposal facilitates the avoiding incurring the

8    deconsolidation tax that we've been talking about.

9              They talk about it.  They're able to do it.  We're

10   not taking the position that we now get their lawyers'

11   files.  This is an open discussion informed in the

12   background certainly by advice, but Mr. Ying has not

13   testified that he conducted himself because of advice that

14   Kirkland lawyers gave to him or to the board.  That is not

15   -- that has not been the testimony.

16             But to cut through it, Your Honor, I think the way

17   to get to the question you have raised, as you sit and

18   patiently listen to this, we ought to submit, and we're

19   prepared to do it, a memorandum that addresses directly how

20   the tax rules -- how we believe the tax rules work here, how

21   they apply or don't apply, so that the legal issue is

22   clarified, I would hope, for the Court and that would give

23   an opportunity for the objectors then to say if, in fact,

24   they are saying it -- because I don't believe anybody said

25   it in their written objections and they've all spent

1    countless hours debating this with the debtor outside of the

2    courtroom -- I don't think any of them said they view it

3    differently.  But we might learn otherwise.

4              The outcome of that is Your Honor would be

5    informed about the legal rules and how I think the parties

6    see them applying here.  And that might get to the Court's

7    issue.

8              MR. SHORE:  May I be heard on that concept, on

9    another memorandum?  The debtors filed this motion.  The

10   debtors filed their supporting papers.  They filed reply

11   papers.  They never -- they chose not to file anything.

12   You'll not see an IRS code section cited to you or any tax

13   law cited to you or anything else.  They decided to proceed

14   on this motion without giving you a record either from the

15   board or from the lawyers with respect to -- that would join

16   the links of the testimony you've heard about why they've

17   been acting in the way they are.

18             To say that the debtors should now be given an

19   opportunity to reset their whole motion practice, file a

20   brief which sets forth points and authorities with respect

21   to tax law, and then have us respond on some kind of

22   abbreviated schedule isn't fair.

23             There is an issue that is at bar right now which

24   is the question that is pending, which is should this

25   witness be asked or be required to testify with respect to

1    what the tax lawyer said.  That is an issue that Your Honor

2    can rule on now or if you want briefing from the parties

3    with some cases cited on shield and sword and putting, you

4    know, advice at issue in the case you can have that or not

5    and rule.  But we don't consent to opening up the briefing

6    on a motion that's been pending for months now so that the

7    debtors can fill in a hole and force all of the tax lawyers

8    who aren't in this room to start writing brief.

9             MR. MCGAAN:  Well, Mr. Shore raises -- puts his

10   finger on a point that two legal issues have come up that

11   we're debating here today.  Evidently, he takes the position

12   there was a waiver.  We disagree.  And the Court has said,

13   look, I'm not an expert in tax law.  Understood.  And we

14   say, we should address that as well.

15            So my response to that is, let's address both of

16   them rather than pick and choose strategically the legal

17   issue to address to the Court that favors our client's

18   position.  I'm prepared to address the waiver one in writing

19   if he cares to put forth what his theory is and what the

20   support is for a waiver.  We don't believe we've waived the

21   privilege here.  We're confident of that.  We ought to speak

22   to it.  We ought to speak to it in a more deliberative way

23   than what's happening on the fly.

24            But we think we ought to be able to speak to Your

25   Honor also about the way the tax laws effect these

1    transactions in light of how the hearing has developed.

2              THE COURT:  Let's deal with the immediate issue

3    which is the pending question, and I will sustain the

4    objection for present purposes.  I'm not prepared to make

5    what might be a significant -- well, which would be a

6    significant ruling as to whether there's been a waiver of

7    privilege sort of on the fly as you -- if you will.

8              So if we're talking about what the tax lawyers

9    told the board of directors with Mr. Ying present I suppose

10   as a -- which is claimed to be privileged, I'm not going to

11   at this time allow inquiry into that.

12             It may be that, as Mr. Shore indicated, Mr.

13   Keglevic might be a better witness on this issue.  I do

14   think that Mr. Ying's testimony has been fairly consistent,

15   or not -- has been consistent as to the way he has operated

16   in connection with his understanding of the tax

17   implications.  And they have been to basically rely on

18   instructions given by the board to assume certain things are

19   an appropriate way to proceed.

20             So I'm not going to allow inquiry into the

21   privileged communications at this time.

22             As to briefing on that specific issue about waiver

23   and sword versus shield as Mr. Shore put it, that is

24   something that I think we'll need to talk about later today

25   or tomorrow morning because I see it arising again and I

1    think it's an important issue that I need to make a careful

2    decision on as opposed to an -- on the fly and I think some

3    assistance from the lawyers to orient the question and to

4    provide law would be helpful, although I don't want 25 page

5    briefs on such a discreet issue.

6            The further implications of the tax, I'm not

7    really sure how that's going to play out with the hearing

8    record.  It may be, as Mr. Shore says, that there's a giant

9    whole in the debtors' case as to the ability to prove up

10   whether or not their approach to the tax issue is correct or

11   not or whether we're going to want more briefing on that.

12   That one I'm going to noodle on and try to think about an

13   appropriate way forward.

14           So for present purposes the objection is sustained

15   and we're going to have to revisit either at the end of the

16   day today or tomorrow morning -- I really want to go forward

17   tomorrow morning.  I have zero confidence as to whether two

18   full days would be sufficient.  I don't want to waste time

19   that's been made available, and it may be for no other

20   purpose than orienting ourselves on the path forward that

21   sometime tomorrow would be appropriate.  Although I

22   understand it's very inconvenient and I apologize, but I

23   think it's appropriate to go forward tomorrow as well.

24           So objection sustained.

25           MR. MARTIN:  Could I -- thank you, Your Honor.

1          Could I add -- at the risk of adding one more just

2     variant of that on the pile, Mr. -- I've heard the

3     suggestion that Mr. Keglevic may be a better witness.  Mr.

4     Keglevic sits on multiple boards and, therefore, each -- as

5     I understand it each side has an independent director, in

6     this case Mr. Kremmens (ph) on the EFIH side.  And there's,

7     I believe, designated testimony -- I'm sure someone will

8     correct me if I'm wrong -- that there were, you know,

9     separate meetings in conjunction with the board meetings at

10    which the independent director met with the various

11    advisors.

12          So it may very well be, we may find, that some of

13    the relevant information has -- or relevant discussion of

14    these issues has -- at the very least may have happened

15    without Mr. Keglevic there.  So I have a very practical

16    suggestion as to all this.

17          That the parties simply be allowed to argue, based

18    on the sword versus shield briefing and how the evidence

19    developments, that they can recall Mr. Ying at the later

20    hearings we're going to have next week.

21          THE COURT:  I think Mr. Ying will remain available

22    throughout the hearings.

23          MR. MARTIN:  Okay.  Thank you, Your Honor.

24          THE COURT:  If appropriate.

25          MR. MARTIN:  That's all I was asking, Your Honor.

1    I didn't want that to be waived when we shift to --

2              THE COURT:  No.

3              MR. MARTIN:  -- who's on.

4              THE COURT:  However, once he's done -- I mean,

5    once redirect is over, he will at least at that point be

6    freed of the prohibition from discussing his testimony with

7    the legal advisors.

8              MR. MARTIN:  I think that's okay, Your Honor.  I

9    mean, I --

10             THE COURT:  Well, I'm glad you agree.

11        (Laughter)

12             MR. MARTIN:  Sorry, Your Honor.  I was listening

13   to --

14             THE COURT:  I know.  We're all thinking on our

15   feet, which is difficult.

16   BY MR. MARTIN:

17   Q    Let me shift topics, then, with all of that, Mr. Ying.

18        When you received the bids from the first liens on May

19   30th and June 11th, did you share those with the PIK lend --

20   the PIK holders?

21   A    I did not, but I understand that counsel did because

22   that's a requirement under the RSA.

23   Q    Did you share them with the second lien holders?

24   A    I don't know what the right -- what the answer to that

25   is because I allowed counsel to deal with that issue.

1    Q    But the PIK holders as RSA parties had the right to

2    immediately see all the other bids?

3    A    That's my understanding, yes.

4    Q    Okay.  And you do understand that part of the RSA

5    apparently?

6    A    Yes, I do.

7    Q    Okay.  Now did you share the PIK bids when they bid

8    again on June 17th with the first liens or the second liens,

9    the day after that board meeting?

10   A    My general recollection is that there was a protocol

11   agreed to amongst counsels for the various competing DIP

12   providers that all bids would be shared.  I don't recall the

13   exact date. It might have been just before the June 22nd

14   Sunday board meeting that that protocol was agreed to.

15   Q    I'm sorry.  Before the June 22nd board meeting?

16   A    Yes.

17   Q    Okay.  So that would not have been in effect on the

18   June 17th and 18th in any event?

19   A    I think that's correct.

20   Q    Okay.  So to the -- you don't have any recollection

21   that those bids that came in right after the first -- the

22   first best and final were shared back; that is, the PIK bid

23   was not shared -- that first PIK bid was not shared back?

24   A    Shared back to --

25   Q    The first liens and the second liens.

1    A    I don't believe so.  No.

2    Q    Is there any documentary record that you're aware of of

3    this arrangement among the counsel and when it was to share

4    -- to clarify the rules about when the bids were going to be

5    shared?

6    A    I don't know of any.  No.

7    Q    Did the debtors set any best and final deadline in

8    advance of the June 29th board meeting?

9    A    I don't recall if we did or didn't.

10   Q    Mr. Ying, as you sit here today, you can't say whether

11   the debtors have received best and final bids from any of

12   these bidders, can you?

13   A    I have no idea what they have in mind.

14        (Pause)

15   Q    Changing topics just a little bit, Mr. Ying, is -- am I

16   correct that there are basically two reasons why this

17   transaction is structured as a DIP loan instead of an equity

18   infusion; that is, one, it's being done now to diminish the

19   cash burn on the estate and, two, you can't do an equity

20   infusion in the middle of a Chapter 11 case?

21   A    It would be improvident to do that.  That's correct.

22   Q    Okay.  It would be improvident or you can't do it under

23   the code?

24   A    I'm not bankruptcy expert.  I presume you can't do it

25   under the code, but it wouldn't make economic sense either.

1    Q    Okay.  You aware of any case where a DIP facility was

2    done right at the outset of a case with mandatorily

3    convertible provisions into equity?

4    A    I'm not aware of any.

5    Q    With respect to the settlement component of the release

6    being sought today, Mr. Ying, it's your view that the 50

7    percent second lien settlement is reasonable; is that

8    correct?

9    A    Yes.

10   Q    Okay.  And that's based on your understanding as an

11   experienced restructuring professional about what would be

12   an appropriate settlement of those contractual claims?

13   A    Well, it's really based on a good healthy give and take

14   between various constituencies and, in particular, the PIKs

15   as you refer to them as where they're paying the economic

16   price of offering that settlement and they approve the

17   settlement.

18   Q    And you're saying that as --

19   A    And --

20   Q    -- as -- strike that.  You're saying that the 50

21   percent in -- reflects a fair settlement because it reflects

22   a negotiation between two parties who take the opposite

23   legal views:  One, Fidelity holding second lien notes and,

24   two, the PIKs who bear the brunt if the make-hole is

25   allowed?

1    A     That's correct.

2    Q     So -- and that you -- you contend that that was an

3    arm's length negotiation, right?

4    A     As far as I can tell, yes, it was.

5    Q     Okay.  So that that, in your view as an experienced

6    restructuring professional, should at least approximate at

7    least something like the legal merits of the outcome of that

8    dispute; is that correct?

9    A     I'm not here to assess the legal merits of the

10   disputes.  It's not my --

11   Q     But you're saying they're --

12   A     It's not my area of expertise.

13   Q     But that's not the question that I'm asking.  I'm

14   asking --

15   A     Sorry.

16   Q     -- if two parties advised by sophisticated counsel are

17   negotiating a settlement over legal claims back and forth,

18   you said it's your view that where they tend to come out at

19   least approximates the chances of success on that dispute,

20   isn't that correct?

21   A     Well, I certainly think where they came out is fair.

22   I'm not sure if that necessarily translates to chances of

23   success or not.

24   Q     Okay.  You're aware that the chances of success are one

25   of the key factors in justifying a settlement in bankruptcy,

1   isn't that correct?

2   A    I think that's a fair comment.  Yes.

3   Q    Sir, are you aware that the restructuring support

4   agreement requires the second lien DIP to close within five

5   days after the Court approves the second lien DIP, if the

6   Court does?

7   A    I don't recall the exact provision, but that sounds

8   familiar.  Yes.

9   Q    Okay.  Has any party suggested that they would back out

10  of their commitment to make the second lien DIP if it

11  doesn't close within a mere five days, five business days?

12  A    I have never heard the question asked so I don't know

13  if anyone has ever expressed that interest -- that intent.

14  Q    And have you ever heard any of the RSA parties express

15  that they might terminate the RSA if the second lien DIP is

16  not closed within five business days of approval?

17  A    I'm not aware.  I've not been very close to any

18  discussions about the RSA of recent -- you know, recent

19  vintage.

20  Q    You've not been involved in the discussions, for

21  example, that are referenced in the debtors' reply about

22  extending that five-business-day period to ten business

23  days?

24  A    I've not been involved in those discussions.

25         MR. MARTIN:  I have nothing further, Your Honor.

1                THE COURT:  Okay.  Thank you.

2         (Pause)

3    CROSS-EXAMINATION

4    BY MR. SHORE:

5    Q    Good afternoon, Mr. Ying.  I'm Chris Shore from White &

6    Case on behalf of the TCH unsecured ad hoc committee.  I'm

7    going to -- I've got a lot of notes here and I'm going to

8    try to make this as easy as possible.  I may jump around, so

9    I apologize.

10               Let me clean up a few things in the record, first

11   with respect to the trading prices on the EFIH PIK notes.

12               So if I understand your testimony on the EFIH PIK

13   notes, the value of their claims that is being traded is a

14   component of different factors that go into the trading

15   price, right?

16   A    Yes.

17   Q    One is -- one thing that's affecting the trading price

18   is the recovery on the unsecured claim, right?

19   A    On their prepetition claim, yes.

20   Q    And another is value that's attributable potentially to

21   the right to participate in the DIP, right?

22   A    Which only accrues if they exercise that right and

23   write a check.

24   Q    Right.  And that would be -- also, there's a percentage

25   likelihood that the Court will either approve this process

1    or that the debtors won't exercise a fiduciary out at some

2    point, right?

3    A    Correct.

4    Q    Right.  So there could be valuable -- value

5    attributable to the rights offering, but if the perception

6    in the market is that the Court would not grant this motion,

7    that would mean that the bonds might trade lower than they

8    would if everyone believed that the Court would grant the

9    motion?

10   A    That's possible.  It also may be related just to the

11   perception of value inherent in these securities.

12   Q    Right.  And it could be the perception as to whether

13   the debtors will or will not exercise their fiduciary out at

14   some point?

15   A    That's a possibility, too.

16   Q    Okay.  But to be clear, you're not offering any

17   testimony to the Court about whether the rights offering is

18   or is not providing value to the second lien lenders -- or,

19   sorry -- to the PIK -- the PIK notes that will participate

20   in the DIP?

21   A    That's correct.

22   Q    And you provided the Court with no valuation as to what

23   that value might be?

24   A    That's correct.

25   Q    Right.  But I want to understand one thing importantly,

1    which is if you get the confirmation it's your intent to do

2    a valuation on the EFH equity, right?

3    A    Yes.

4    Q    Okay.  And just so I understand it, if it turns out

5    that if you -- when you value the EFH equity and it turns

6    out that the value has gone up and the DIP notes, if they

7    get 60 percent of the equity, get paid more than the face

8    value of their notes, plus accrued interest -- do you

9    understand that scenario?

10   A    I understand the question.  Yes.

11   Q    Is it going to be your recommendation to the board that

12   if the PIK -- sorry -- if the DIP notes are getting more

13   than the value of the face amount of their claims and

14   everything they're owed under those notes, that the debtors

15   should exercise the fiduciary out?

16   A    I think I'll have to face that question at the time.  I

17   don't know what the answer is at this point in time.

18   Q    You can't tell me whether you would recommend to the

19   board of EFIH that if the DIP lenders are receiving more

20   than their claim in satisfaction of confirmation you would

21   advise the board to exercise a fiduciary out?

22           MR. MCGAAN:  Objection.  (Indiscernible).

23           THE COURT:  Overruled.

24           THE WITNESS:  I think the question would be, could

25   you replace that DIP or that capital at that implied higher

 1    price.

 2              MR. SHORE:  Right.

 3    BY MR. SHORE:

 4    Q    So we're going to come back to that.  So the exercise

 5    of the fiduciary out is going to be what are your

 6    restructuring options at that point, right?

 7    A    Or capital raising options.

 8    Q    Right.  So if you couldn't raise capital or you

 9    couldn't restructure it otherwise, you -- you're saying you

10    would advise the board to pay the DIP lenders more than

11    they're owed under their notes?

12    A    I can only address the economic issues.

13    Q    Uh-huh.

14    A    And so for me the economic issues are could you replace

15    the DIP with something else that wasn't as expensive and,

16    therefore, didn't imply that there was more value to the DIP

17    notes than what they're entitled to under the face amount of

18    those notes.

19    Q    Right.  So if you couldn't raise $1.9 billion at the

20    time of confirmation when you finish your valuation -- if I

21    look back up, when in relation to valuation do you think

22    you're going to have your EFIH valuation done?   Sorry, when

23    in relation to confirmation?

24    A    I don't even know what the confirmation date is.  So --

25    Q    Okay.

1    A    -- I'm a little confused by the question.

2    Q    All right.  So you don't know when you're going to come

3    to the view as to whether or not the DIP lenders are

4    receiving more than the face value of their notes?

5    A    I haven't thought about it.  No.

6    Q    Okay.  And so the consequence -- if you think about it

7    now, the consequence of exercising the fiduciary out when

8    you finish your valuation is going to be having to redo an

9    entire restructuring of the companies?

10   A    I'm not sure it would be an entire redo of the

11   restructuring of the companies.  The issue will be can you

12   raise a billion-nine of equity at a better price than is

13   implied in the conversion price of the DIP notes.

14   Q    And if you can't do that and you -- you have to raise

15   that money and you have to confirm a plan which contains

16   that, right?

17   A    That's correct.

18   Q    Right.  So there are going to be some circumstances in

19   your view in which you would not be advising the board that

20   they should exercise a fiduciary out even though the DIP

21   lenders are getting paid more than they're owed?

22   A    As I said, I think the question is can you raise that

23   kind of capital at a better valuation.

24   Q    Can you raise it and get it confirmed in a plan,

25   because I want to come back to that later, right?  You're

1    going to have to confirm that in a plan.

2    A    Well, presumably, if we can get a commitment to raise

3    the funds, you can then incorporate that into the plan.

4    Q    All right.  Well, let me pre-stage this a bit.  If you

5    pay off the second lien notes who are your creditors who

6    you're soliciting for that plan that you're going to redo at

7    that point at EFIH?

8    A    It would be the EFH -- EFIH unsecureds.

9    Q    Right.  And those are the -- and then that class is --

10   I think you said about 100 times in the paper there's a

11   super majority of that class which is controlled by the ad

12   hoc EFIH group?

13   A    That's correct.

14   Q    Okay.  So you're going to have to get the consent of

15   the ad hoc EFIH group to approve a plan in which you take

16   out the DIP that pays the DIP lenders more than in full?

17   A    That's correct.

18   Q    Okay.  Let me -- let me focus on the marketing process

19   and clear up some of those questions.

20            The rights offering here is for EFH post-re-org

21   equity, right?

22   A    That's correct.

23   Q    And you never marketed post-re-org equity to anybody

24   who wasn't a current creditor of either EFH or EFIH, right?

25   A    That's correct.

1    Q    And the primary asset of EFIH is its stake, 80 percent

2    stake in Encore, right?

3    A    That's correct.

4    Q    And you never marketed that asset, the E -- EFIH Encore

5    equity stake to any party other than creditors within the

6    structure?

7    A    That's correct.

8    Q    All right.  Let's just get over your qualifications

9    here.  Now when I wrote this down -- and, again, I

10   apologize.  I keep interlineating notes.  With respect to

11   consent, it's not your testimony, is it, that you needed the

12   consent of EFIH creditors to market the Encore stock?

13   A    Well, I think what I said was certainly I could market

14   various stock of various entities in the Encore, Encore

15   Holdings, EFIH, EFH chain.  But if I were to market

16   something and creditors don't want it to happen, I'm not

17   sure how fruitful that is because without their consent,

18   unless I can pay them off, I can't get a consensual

19   restructuring done.

20   Q    All right.  I'm going to come back to that consent

21   point again when we get to the plan mechanics and dynamics

22   you're setting up.  But just to be clear on this, your

23   testimony, you were not operating under the impression that

24   you needed the consent of any creditors, either pre-petition

25   or post-petition to go out and market either the Encore

1    equity or EFIH post-re-org equity, are you?

2    A    I'm sorry.  I didn't follow your question.

3    Q    While you were doing all of this, were you under the

4    impression that you needed the consent of EFIH creditors to

5    market either the Encore equity or the EFH post-re-org

6    equity?

7    A    No.

8    Q    All right.  And I'm not asking you for your legal

9    analysis, but I do want you to -- to ask you a few questions

10   about your role as the financial advisor.  You know how to

11   run a marketing process for assets like Encore equity or EFH

12   post-re-org equity, right?

13   A    Yes.

14   Q    You know how to go out to the market and solicit

15   interest?

16   A    Yes, I do.

17   Q    And you know how to come to court to set bid

18   procedures?

19   A    Yes.

20   Q    And you know how to operate under bid procedures?

21   A    Yes.

22   Q    And you know how, for example, you can go then to

23   potential buyers and tell them the Court has ordered bids by

24   certain dates?

25   A    Yes.

1    Q     And then you don't have the problem of bidders not

2    listening to you?

3    A     Yes.

4    Q     And that in the sense establishing bidding procedures

5    gives the debtors more power than you thought you had in

6    this process?

7    A     Yes.

8    Q     And you know that when you get to a auction and when

9    you get to a final bid you know how to set a stalking horse

10   bid?

11   A     Yes.

12   Q     And you know how to remarket the asset and allow higher

13   and better offers even up to the time of the approval of a

14   sale?

15   A     Yes.

16   Q     And you know that once you establish the auction price,

17   that gives you a market value for the asset, right?

18   A     Yes, it does.

19   Q     And that gives the debtors knowledge with respect to

20   what the value is of the assets, right?

21   A     Yes.

22   Q     And that knowledge is what provides you power over your

23   creditor body to tell them you're the fulcrum security or

24   you're the fulcrum security, right?

25   A     Yes.

1    Q    Okay.  And leaving aside any tax advice which isn't in

2    the record, you had then the expertise to go out and do a

3    market test for the value of Encore equity?

4    A    I certainly know -- would know how to do it if I

5    thought that was a practical route to take.

6    Q    Okay.  And you know how to go about marketing the EFH

7    post-re-organization equity?

8    A    If I could tell anybody what the restructuring was,

9    sure, I could market that equity.  Sure.

10   Q    And you could have done it whether just to creditors

11   within EFIH and EFH or you could have gone out to the third

12   party market, right?

13   A    Without regard to tax considerations I believe that's

14   correct.

15   Q    Right.  And my questions are all premised on -- I don't

16   want you to --

17   A    Okay.

18   Q    -- (indiscernible) because we're going to come to this.

19   A    Okay.

20   Q    Because then you went out and you got bids from the

21   market for Encore equity, right, and they were from third

22   parties.  We could have all come into the court and argued

23   in front of the Court whether or not a third party bid for

24   the equity triggered an adverse tax consequence, right?

25   A    Well, I must say if you really wanted to run a

1    hypothetical auction without knowing the tax consequences, I

2    don't think you actually would run a full auction because

3    buyers are very smart.  They ask a lot of good questions.

4    They don't want to waste their time either, and if they

5    thought that it was a fake auction they really wouldn't

6    participate and I would have a hard time doing all the steps

7    that you described to get the best and highest price.

8    Q    Okay.  So we could have come into the court and

9    resolved the issue as to what represents a qualified bidder

10   when we set the bid procedures, right?

11   A    Well, I think our decision was to try to get the TCH

12   guys to cooperate as opposed to just coming into court and

13   saying, let's start from scratch.

14   Q    Can you answer my question?  And you --

15   A    I'm sorry.

16   Q    -- could have established as part of the bidding

17   procedures what constitutes a qualified bid, right?

18   A    Yes, you could.

19   Q    And part of that would have been, you know, what --

20   whether or not they are paired with existing creditors,

21   right?

22   A    Yes.  That could be.

23   Q    Okay.  And so we could have had an opportunity to

24   address before you went out and marketed this -- these

25   assets in the manner you did the salient issue as to what

1    bid really is superior from a tax perspective?

2    A    Given your hypothetical, yes.

3    Q    Okay.  And that -- and just to be clear, when we set up

4    the procedures for a qualified bidder, I think you gave the

5    testimony that where sophisticated parties are involved,

6    where there's a will there's a way.  You testified to that,

7    right?

8    A    I did.

9    Q    And if we set up bidding procedures and let people know

10   what the salient tax characteristics have to be for a

11   qualifying bid, is it also fair to say that where a bidder

12   would want those assets they would find a way to become a

13   qualifying bid?

14   A    I think that's fair.

15   Q    But you just assumed there was no way that anybody

16   could come in with a qualifying bid if they were outside the

17   capital structure, and that's why you proceeded just with

18   the creditors within the structure?

19   A    That's correct.

20   Q    And just to be clear on the issue you said -- and I

21   think you said it before, that when you want to take out the

22   DIP you might be able to get a proposal with 49 percent of

23   the equity.  That might not trigger, in your understanding

24   of the tax law, whatever it is, that it wouldn't trigger the

25   continuity in interest problem, right?

1    A    That's what I said.

2    Q    All right.  I want you to look at Exhibit 2 just as a

3    demonstrative here.  And I'm going to ask you to refresh

4    your recollection if you need to.  It's page 14, Exhibit --

5    Debtors' Exhibit 2.

6         (Pause)

7         Now on page 14 or at least -- you did an analysis which

8    based upon the bids informed you -- have you got it?

9    A    Yeah.  I have it.  Thank you.

10   Q    Okay.  It informed you as to what the implied TED was

11   of Encore equity, Encore equity based upon the bid; that is,

12   60 percent of the debt applied to the amount of money they

13   were giving you, or 60 percent of the equity applied to the

14   money that they were giving you gave you a sense of what the

15   implied Encore TEB was, right?

16   A    Well, it's a straight calculation in our defense.

17   Q    All right.  So the unsecured group's proposal had an

18   implied Encore equity of 16.5 billion, approximately.  Do

19   you recall that?

20   A    Actually, it's on total enterprise value, not equity.

21   Q    Did I say -- oh, sorry.  Encore TED.

22   A    Okay.

23   Q    All right.  So just so I understand the math, as Encore

24   TED goes up, right, that means that the amount of equity

25   that's needed to satisfy the DIP claims goes down?

1    A    That's correct.

2    Q    All right.  So can you calculate as you sit here today

3    what the implied TED of Encore would have to be for 49

4    percent of the EFH equity to equal $1.9 billion?

5    A    A rough guess is probably about a billion because if a

6    billion-nine converted into 49 percent, it would be actually

7    3.8 billion of equity.

8    Q    Uh-huh.

9    A    That would be 50/50.  So 3.8 is 600 more than 3.1.

10   Q    Uh-huh.

11   A    Six, seven and since we own 80 percent of it it's

12   probably 800 million higher than the 16.5.

13   Q    Okay.  So that would bring it within this -- so if

14   Encore equity was 17. -- the implied Encore equity was $17.5

15   billion --

16   A    You mean TED?

17   Q    That's -- sorry.  Let me go back.  If the Encore

18   implied TED was $17.5 billion, you could, you could, if you

19   got a proposal, sell 49 percent of the equity for $1.9

20   billion?

21   A    Yeah, if an investor wanted to do that.  Yes.

22   Q    Okay.  And so -- so -- but there's been no market test

23   of the Encore equity, right?

24   A    No, there has not.

25   Q    Right.  So if you went out and you did a market test

1    and the market told you that there was a value of Encore of

2    $17.5 billion implied TED of Encore that was $17.5 billion,

3    you could have just sold the Encore equity, raised the $1.9

4    billion and not triggered any of those tax considerations

5    with respect to COI?

6    A    Well, I think under your hypothesis, yes, but at the

7    same time you're selling all this equity we have to have a

8    TCH tax re-spin.  We have to have EFH holders converting

9    their existing debt claims to equity.  It's much more than

10   just a simple auction, isn't it?

11   Q    Well, I'm just saying you didn't go out -- you said you

12   didn't go out and market these assets because you needed to

13   have -- to third parties because you couldn't see a way to

14   do it without triggering the COI issue.

15   A    Actually, I'm just saying that in a case where I could

16   avoid the COI, I would have had to tell a buyer in a full-

17   blown auction, (a) I've got to get the equity to -- the EFIH

18   debt to convert.  I have to have the EFH debt to convert,

19   and I have to get the TCH guys to tax re-spin for you to be

20   able to invest in this auction opportunity.  That's a very

21   complicated auction to run in any context.  I'm just trying

22   to work with your hypothetical.

23   Q    Right.  And the reason it's a hypothetical is because

24   you never thought about that before you embarked on this

25   process of just giving the DIP convert to equity proposal or

1   accepting the DIP to equity proposal from the EFIH PIKs?

2   A    Well, I would openly admit that I never thought of this

3   hypothetical, but on the other hand I'm listening to the

4   hypothetical and trying to say politely that I don't think

5   it's a very easy auction to run.  In fact, it's so heavily

6   contingent on other parties' consenting to a transaction.  I

7   don't think it would be a very good auction unless all the

8   other parties were signed up and committed to do their part

9   to make a auction of a 49 percent of EFH an actionable

10  event.

11  Q    And isn't one of the ways you do that, you get all the

12  parties' consent and then you go about and then you do this

13  auction.  You do it in a plan process and you let people

14  vote and give you their consents pursuant to a plan?

15  A    Well, I know a lot of plans that don't have auctions,

16  but if people felt that was the best way to create value,

17  sure.

18  Q    Right.  So then you could go out and market the Encore

19  equity if you hadn't committed it to the DIP lenders here

20  under the terms of the second lien DIP?

21  A    I think that's right, although I would just ask that,

22  you know, is selling 49 percent of Encore to a party the

23  best way to maximize its value for everybody.

24  Q    I'm just saying there are ways -- I'm just responding.

25  Didn't you testify on direct that there weren't ways to do

1    this without triggering COI?

2    A    I certainly testified that at the time we were putting

3    together the RSA we hadn't -- I had no idea of other ways to

4    accomplish the event without avoiding all the various myriad

5    of tax obstacles that we -- that I -- I understood at the

6    time.

7    Q    Okay.  And one of the other consequences of running an

8    auction like that which told you what the stake of Encore

9    was worth is it would give you a better view as to who was

10   actually the fulcrum security at EFIH, whether it's the PIKs

11   or whether it's the equity of the EFIH which is EFH, right?

12   A    It would.  Yes.

13   Q    And for the record, because I think there's been some

14   questions about valuation, you have not provided any written

15   valuation to EF -- of EFIH's assets to the EFIH board, have

16   you?

17   A    That's correct.

18   Q    All right.  Let me give you one more series of

19   questions on this concept of powerlessness.

20          You testified on direct that one reason to pursue

21   the equity check process was to address concerns raised by

22   the TCH firsts, right?

23   A    Yes, I did.

24   Q    And the TCH firsts ad hoc committee was insisting on

25   velocity to plan confirmation in exchange for giving up a

1    stepped up basis in their collateral?

2    A    That's correct.

3    Q    In short, they wanted a sale or a quick possession of

4    the assets?

5    A    Yes.  They would love to see an auction of the assets

6    of TCH.

7    Q    And if the TCH firsts succeeded in getting a sale, that

8    would potentially have triggered the deconsolidation tax at

9    TCH?

10   A    I believe that the sale would happen in the form of a

11   Section 363, yes.

12   Q    Well, and that would then trigger --

13   A    Yes.

14   Q    -- a deconsolidation tax?

15   A    Yes.

16   Q    And management of the debtors wanted to avoid that?

17   A    Yes.

18   Q    And accepting the equity check now, is it your

19   testimony that it gives the TCH firsts some of the velocity

20   they demanded?

21   A    Yes.

22   Q    And it keeps them essentially in a box?

23   A    I'm not sure what you mean by "in a box".

24         MR. SHORE:  Withdraw the question.

25   Q    If we focused on the status quo now, the RSA is not

1    approved, right?

2    A    That's correct.

3    Q    So the TCH firsts had no right to demand that the

4    debtors comply with the RSA until the Court approves it,

5    right?

6    A    That's correct.

7    Q    So in your view, given the status quo now, can you

8    think of any circumstances under which the TCH firsts could

9    force the sale of their collateral?

10   A    I hadn't contemplated that so I don't have a good

11   answer for you.

12   Q    Well, let me ask you.  Would one way be to seek to

13   terminate exclusivity and propose their own plan which has a

14   363 sale?

15   A    That would be one way to do it.

16   Q    Okay.  But you understand that would require Court

17   approval?

18   A    Yes, I do.

19   Q    And they could seek to lift the automatic stay.

20   A    I guess that's another way they could try to do it.

21   Q    Right.  But that would require Court approval.

22   A    I would think any action to try to sell the assets

23   would require Court approval.

24   Q    And you understand that they consented to eighteen

25   months of cash collateral in exchange for 100 plus million

1    dollars a month in adequate protection payments?

2    A    Yes.

3    Q    And that they consented already to the priming of their

4    liens by the TCH DIP lender?

5    A    Yes.

6    Q    And do you understand that they are, in fact, getting

7    100 million dollars a month approximately in adequate

8    protection payments?

9    A    Yes.

10   Q    So even with me telling you that, can you think of any

11   way without coming to court first that they can trigger a

12   tax?

13   A    I think any action that they want to take to try to get

14   their assets requires Court approval.

15   Q    Okay.  So you don't have any concern as you sit here

16   today that the TCH firsts can cause a sale to occur and

17   trigger the tax if this DIP is not approved.

18   A    I think that's correct.

19   Q    Okay.  So let me -- let me kind of maybe distill some

20   of your testimony.  As I first had heard --

21   A    May I respond just to your last question for a

22   second --

23   Q    Yeah.

24   A    -- if I could?

25   Q    Um-hmm.

1    A    I think that's correct but I think if we do that, they

2    conversely don't have to approve and vote for a tax free

3    spin either.

4    Q    No, but right now you only have 40 percent of -- or 43

5    percent of the EFIH firsts, right?

6    A    I thought I heard that they had more than that but I

7    think that's all that they say they have.  I'll agree with

8    whatever you say.  I haven't paid much attention to how much

9    they own.

10   Q    Do you know whether or not they have an accepting class

11   there?

12   A    I don't think they have an accepting class.

13   Q    Okay.  So as I understand it, there are three steps to

14   the process here.  And to do what you testified you wanted

15   to do which is manage the interest burn and get a path

16   towards the plan.  The first step is to settle with the

17   seconds who want to settle, right?

18   A    Yes.

19   Q    And then the second step is to lower the interest rate

20   on -- the interest rate accrual for the seconds who don't

21   want to settle by taking them out with new money.

22   A    It's taking both out but yes.  Both classes, settling

23   and non-settling.

24   Q    No.  But the saving of the interest has to do with the

25   creating or managing that interest arbitrage between the

1   existing second lien notes that aren't settling and the

2   proposed DIP.

3   A    I'm thinking of small issues but the interest arbitrage

4   relates to retiring the entire class of second lien

5   noteholders and settling with the 43 percent that agreed to

6   settle.

7   Q    All right.  And then the third step is to get this

8   equity option, the one way option so that you have a path

9   out of EFIH, right?

10  A    Correct.  Otherwise, it's more debt than we could

11  refinance as debt.

12  Q    All right.  So let me start with the first step which

13  is getting a settlement and your testimony that you believe

14  that the settlement is reasonable.  You understand that the

15  dispute is a legal one, right?

16  A    Oh yes.

17  Q    There's no dispute -- is there any dispute over the

18  math right now as to how to calculate the makewhole for the

19  second liens?

20  A    Actually, I think there is.

21  Q    And how material is that in the context of the overall

22  claim?

23  A    Well, some people think it's everything.  But it's a

24  small number.

25  Q    Okay.  So when you said that 50 percent is reasonable,

1     that was between no makewhole being paid and the full

2     makewhole being paid subject to whatever -- how ever that

3     little discrepancy gets resolved on the other side.

4     A     Yes.

5     Q     All right.  Now is there some -- have you received any

6     specialized training in evaluating settlements?

7     A     No.

8     Q     Okay.  And is there any kind of literature in the

9     investment banker world that allows you to opine on the

10    reasonableness of settlements?

11    A     Not that I know of.

12    Q     And if I understand the testimony that you just gave,

13    the reason you said it was reasonable -- well, I take it one

14    of the reasons it's reasonable is because it's not

15    everything, right?

16    A     I think the reason it's reasonable is because parties-

17    in-interest had agreed to it.

18    Q     Okay.  The parties-in-interest that agreed to it,

19    they're not estate fiduciaries, are they?

20    A     All I know is they're just interested parties in the

21    debtor.

22    Q     Okay.  Well, did you make any inquiry as to what their

23    economic interests were in any settlement?

24    A     I don't follow the question.

25    Q     Okay.  So you understand Fidelity has got pieces of

1   debt throughout the capital structure, right?

2   A    Oh, yes, I do.

3   Q    And so it has its own agenda with respect to what

4   settlement is going to be beneficial for Fidelity that may

5   not be the same as what settlement is beneficial for someone

6   who only owns EFIH claims.

7   A    Agreed.

8   Q    All right.  And you didn't make any inquiry into how

9   Fidelity's position on the makewhole might affect their

10  other economics in the case?

11  A    All I know is that we needed Fidelity's vote across the

12  capital structure and they made it a condition of their

13  vote.

14  Q    Okay.  And so what I'm saying -- you're relying on

15  Fidelity's settlement, right, recommendation of settlement

16  without doing any inquiry into what its economics were

17  looking at all of its positions in the capital structure?

18  A    The only check and balance against what Fidelity

19  demanded was what the EFIH unsecureds who were part of that

20  negotiation would agree to pay to them.

21  Q    Okay.  You understand that the obligation to pay the

22  makewhole is an obligation that EFIH may owe to the EFIH

23  second lien noteholders, right?

24  A    Yes.

25  Q    And you, in your mind, are testifying that the

1    settlement is reasonable because a non-estate fiduciary said

2    that it was reasonable?

3    A    Well, I believe the EFIH unsecureds are definitely at

4    risk in terms of their recovery based on whether there is or

5    isn't a settlement or what's the ultimate resolution of the

6    makewhole litigation.

7    Q    But they may have their own economic interest which

8    would lead them to want to do a settlement that wasn't

9    necessarily in the best interest of EFIH but rather was in

10   the best interest of what Texas perceives as fast money Wall

11   Street guys?

12   A    I'm not sure about that particular reference.

13   Q    Okay.  But, I mean, you do understand --

14   A    I'm not sure what your question --

15   Q    Well, you do understand that the ad hoc EFIH PIK group

16   has its own motivations with respect to why it wants to

17   settle and how it wants to settle that aren't necessarily

18   aligned directly with EFIH the estate, right?

19   A    Please illuminate.  I'm --

20   Q    Well --

21   A    I'm listening to you.

22   Q    For example, you don't know as to whether or not

23   there's a side deal between one of the ad hoc group members

24   at EFIH and Fidelity in which they just rotate money back

25   and forth based upon how the plan comes out.

1           MR. MCGAAN:  Calls for speculation.  There's just

2     no fact in evidence that would suggest anything was done.

3           THE COURT:  Overruled.

4     A    I have no idea.

5     Q    Right.  In other words, you're just assuming that the

6     hedge funds on one side were completely pure of heart with

7     the interest of EFIH when they said the settlement is

8     reasonable.

9           MR. MCGAAN:  Object to the (indiscernible 3:30:16)

10    testimony.

11          THE COURT:  Overruled.

12    A    I'm not sure about whether people are completely pure

13    of heart.  I certainly observed various parties negotiating

14    extraordinarily hard against one another to maximize their

15    own respective economic recoveries that I was aware that

16    they held.

17    Q    Other than observing that, observing that process, did

18    you play any role in driving the settlement to a particular

19    number?

20    A    No.

21    Q    Okay.  Now you understand that as part of this process,

22    all the money that's raised under the DIP is going to be

23    used to pay principal and accrued interest other than

24    makewhole interest to all of the EFIH second lien notes,

25    right?

1    A    All the money raised under the DIP is going to pay a

2    portion of the principal amount of the EFIH second lien

3    notes.  The remaining repayment of the principal, accrued

4    interest, makewhole settlement comes from cash at EFIH which

5    was raised through the EFIH first lien DIP.

6    Q    Right.  Let me clarify my question.  All the money

7    raised under the DIP is going to be used to pay principal

8    and accrued interest to all the second lien notes.

9    A    Since money is fungible, sure.

10   Q    Yes.  And part of it is going to be used to pay half

11   the makewhole amount to the second lien noteholders who

12   settle.

13   A    Since money's fungible between what's on the balance

14   sheet and what's raised, absolutely, yes.

15   Q    And do you understand that one of the terms of the

16   settlement is that the EFIH second lien noteholders who

17   settle are going to have releases from the estate?

18   A    I hadn't paid attention to that, no.

19   Q    Okay.  So in forming your opinion that you expressed to

20   the Court that the settlement is reasonable, did you not

21   know that there is a release of the second lien noteholders

22   who settle?

23   A    I was not aware of that.

24   Q    Okay.  So when you said -- well, you testified that its

25   size -- I wrote this down at some point.  EFIH is going to

1     have to pay the second liens at some point.  You testified

2     to that, right?

3     A     I did.

4     Q     And part of your assumption in making that testimony is

5     that the second lien noteholders are actually due principal,

6     interest and post-petition interest on their claims.

7     A     I have no reason to believe they don't have their

8     claims.

9     Q     And they're fully secured.

10    A     I have no reason to believe that they're not fully

11    secured.

12    Q     Right.  But you don't know of any analysis -- first of

13    all, they're going to be paid outside a plan, right?

14    A     Yes.

15    Q     Okay.  And you don't know of any analysis that the

16    debtors have done into the validity extent of priority of

17    the liens of the second lien notes, do you?

18    A     Well, I think during -- pardon me.  During my

19    deposition, I believe you asked me a similar or related

20    question and I said that Kirkland & Ellis has done a very

21    extensive study and they shared it with various

22    constituencies about all the intercompany transfers.  And as

23    a result of that, I certainly am not aware of any reason why

24    second lien notes don't have their claim and their security.

25    Q     No.  I didn't ask about intercompany claims.

1          MR. SHORE:  And I ask that answer be stricken, Your

2     Honor.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  Stricken.

5          THE WITNESS:  Okay.  I misinterpreted what you were

6     asking.

7     BY MR. SHORE:

8     Q    Are you aware of any analysis that any of the debtors

9     have done into the validity, extent or priority of the liens

10    and claims of the second lien noteholders?

11    A    Pardon me.  I misunderstood.  No, I'm not.

12    Q    Okay.  And you haven't heard any discussion at any

13    board meeting as to the -- any analysis of the validity,

14    extent and priority of the second lien notes' claims and

15    liens.

16    A    I am not aware of any.

17    Q    And are you aware of whether any estate fiduciary has

18    been given an opportunity to determine whether, in fact, the

19    liens of the second lien noteholders are valid?

20    A    I'm not aware.

21    Q    Or whether or not there's any defect in the claim

22    amount.

23    A    Yeah.  I'm not aware of that.

24    Q    Or whether or not any of the debtors holds a claim

25    against the second lien noteholders.

```
 1    A     I'm not aware of that.

 2    Q     For example, you're not aware of whether or not

 3    anybody's done an analysis as to whether there's any defect

 4    in the second lien notes that are going to get paid in full

 5    if this settlement is approved as to whether or not the

 6    liens are defective as a result of the LBO.

 7    A     I'm not aware of that.

 8    Q     You're just assuming when you answered the question

 9    that the settlement is reasonable that the claims are fully

10    secured, right?

11    A     That's correct.

12    Q     And that the -- that EFIH has no counterclaims against

13    any of the second lien noteholders.

14    A     That's correct.

15    Q     And would you agree with me, for example, the second

16    liens notes' trustee had not filed a UCC and had never

17    perfected its lien on the collateral, that the settlement

18    which pays the settling second lien noteholders their full

19    par plus accrued plus post-petition interest plus half the

20    makewhole as a secured creditor outside of a plan is not a

21    reasonable settlement.

22    A     Well, first, to say a visible defect, that would not be

23    fair.

24    Q     Right.  But you don't even know whether anybody looked

25    to find a visible defect.
```

1   A    I'm not aware.

2   Q    Let me focus on the consequences of the DIP then and

3   where you're putting yourself if what you do is you pay the

4   second lien noteholders in full except for their makewhole.

5   Okay?

6   A    Okay.

7   Q    Do you have an understanding of the concept of

8   cramdown?

9   A    Some, yes.

10  Q    And what is your understanding?

11  A    Well, cramdown is that there's an impaired consenting

12  class that is voting in favor of a plan and there are more

13  junior creditors who are therefore denied any recovery.  And

14  that is the cramdown term.

15  Q    Okay.  And one way to cram down an unsecured creditor

16  is to -- is under the absolute priority rule which is to

17  give nobody -- no creditor -- junior creditor anything until

18  the cramdown class is paid in full, right?

19  A    Correct.

20  Q    Okay.  And another way of doing it is giving them

21  property equal to the value of their claims.

22  A    Yes.

23  Q    And if you're right about the unsecureds being -- the

24  PIKs being the fulcrum here, you can cram -- under the

25  current status quo, you can cram the unsecureds down by

1    filing an EFIH plan where no one junior got anything, right?

2    A    Well, if no one junior got anything then the question

3    would be would EFH stay consolidated with EFIH.

4    Q    Okay.  But you could file that plan.

5    A    We could file anything.

6    Q    Right.  And you could file a plan in which you gave

7    EFIH PIKs equity and if the value of the equity exceeded the

8    value of the PIK claims as determined by the Court, you

9    could keep it consolidated because you've been distributing

10   equity up to EFIH -- EFH, right?

11   A    You'd have to make sure there's enough value beyond

12   what you're giving to the PIKs to give them their full

13   claim.

14   Q    And as I understood your testimony before, the -- in

15   that scenario, you'd have a valuation fight with the PIKs,

16   right?

17   A    That's correct.

18   Q    Do you have any reason to believe that a valuation

19   fight with the PIK -- well, you're going to be doing a

20   valuation, right?  And do you have any reason to believe

21   that the valuation fight on the EFIH side is going to be any

22   less than tense or harder to do or have any material

23   distinction between the valuation fight that you're

24   expecting on the TCH side?

25   A    Should be a little easier because Oncor is a lot easier

1    to value.

2    Q    Okay.  So you picked a valuation fight on the TCH side

3    and that hasn't stopped you from constructing a plan

4    structure which has that valuation fight, right?

5    A    That's true.

6    Q    And it would be easier than that to have a valuation

7    fight on the EFIH side.  Is that your testimony?

8    A    If we thought the valuations were sufficient to be able

9    to cram down the PIKs, yes.

10   Q    Right.  But I think the concept of cramdown that you

11   raised at the beginning has to have an impaired accepting

12   class, right?

13   A    That's correct.

14   Q    All right.  And if you pay off the existing -- you paid

15   off the first lien DIP, right?

16   A    We did.

17   Q    So you've only got post-petition DIP lenders existing

18   where the pre-petition first liens existed, right?

19   A    Correct.

20   Q    And your intent is to pay off the second lien lenders

21   such that the only party that will be there are post-

22   petition DIP lenders where pre-petition creditors existed.

23   A    That's correct.

24   Q    So your only impaired -- can you think of any impaired

25   accepting class which you can have at EFIH other than the

1    existing EFIH PIK notes?

2    A    No.

3    Q    So let's get to the scenario I gave you before where

4    the value's up of Oncor equity and you are faced with a

5    valuation that shows your DIP lender is getting paid in full

6    plus is getting a distribution above the rights that they

7    have under the notes.  Okay?

8    A    I'm following.

9    Q    All right.  And you're faced with the fiduciary out.

10   And the fiduciary out you want to exercise is to take out

11   the DIP lender and bring in a new structure --

12   A    Right.

13   Q    --  that's going to have to go in a plan, right?

14   A    Correct.

15   Q    And the one who controls that plan because they are the

16   impaired accepting class is going to be the EFIH PIK notes,

17   right?

18   A    That's correct.

19   Q    Simple majority of which are held by the ad hoc group.

20   A    Correct.

21   Q    So the situation you find yourself in is even if you're

22   paying a creditor more than they're entitled to, you can

23   only stop that if the EFIH ad hoc group holders consent.

24   A    Unless, in your scenario, you can argue that the value

25   of the equity that's being allocated to the EFIH unsecureds

1   exceeds their claims and they don't get to vote either.  And

2   then the EFH creditors are the --

3   Q     Right.

4   A     -- impaired consenting class.

5   Q     And I think Mr. Horowitz took you through that.  And

6   then the EFIH PIK notes can stop that if they exercise their

7   option on the claims of Fidelity, right, because they will

8   then control the accepting class at EFH.

9   A     They might try that, yes.

10  Q     All right.  So we could have a scenario in which the

11  DIP lenders are radically overpaid and you really can't

12  exercise a fiduciary out, right?

13  A     But they will have bought out all the other classes of

14  debt.

15  Q     Right, except who are the people who are left out of

16  the ability to participate in the EFIH DIP?

17  A     Well, I think it's being offered to all the EFIH

18  unsecured creditors.

19  Q     Um-hmm.  Are you aware that the debtors filed a

20  schedule which lists TCH as having a undisputed unliquidated

21  -- or, sorry -- undisputed liquidated noncontingent claim

22  against EFIH?

23  A     I'm not aware of that.

24  Q     And are you aware that the debtors' counsel filed

25  papers that said that TCEH is not permitted to participate

1   in the DIP?

2   A    I'm not aware of that.

3   Q    All right.  And contingent creditors aren't permitted

4   to participate in the DIP, are they?

5   A    That's correct.

6   Q    So if TCH holds material claims against EFIH and it's

7   determined by the Court, there's an adversary proceeding,

8   everybody comes in, we fight about it, TCH gets a judgment

9   in the favor -- in the amount of 1.2 billion dollars and

10  it's determined that they have 1.2 billion dollars of

11  claims, they aren't -- those claims never participated in

12  the DIP, right?

13  A    That's correct.

14  Q    And we're going to have a situation in which the

15  debtors can't exercise a fiduciary out because of the

16  consequences of having these -- having gotten rid of any

17  creditors who could be the impaired accepting class.

18  A    I -- you -- it sounds correct.

19            MR. SHORE:  Stick with me.

20            MR. MCGAAN:  Mr. Shore, could we take a short

21  recess?

22            MR. SHORE:  Sure.  I think it's good because I'm

23  missing a page here.

24            THE COURT:  All right.  Five or ten minutes.

25        (Recess from 3:43 p.m. until 4:00 p.m.)

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Please be seated.

3     Sorry.

4     RESUME CROSS-EXAMINATION

5     BY MR. SHORE:

6     Q    Okay.  Good afternoon, Mr. Ying.  I noticed you were

7     just on your BlackBerry.  Were you e-mail -- reviewing

8     e-mails relating to this case?

9     A    No.

10    Q    Okay.  Go back to some testimony you gave before about

11    this cramdown scenario.  In the event that you want to pay

12    the EFIH PIKs in full and you want to use -- so you use the

13    equity as the impaired accepting class?

14    A    I believe so, yes.

15    Q    Right.  But in that scenario, aren't you getting equity

16    what it has which is the equity?

17    A    Yes.

18    Q    So it's not impaired, is it?  It's getting exactly what

19    it had which is the equity in EFIH.

20    A    Sure.  I'm not expert in how a plan would unfold where

21    you were reinstating or able to pay off the junior creditors

22    of EFIH in full.

23    Q    Okay.  So just -- you do have expertise in what

24    restructuring options are if you can't get a plan done,

25    right?

1    A    I'm an expert in the economics not in the legal but go

2    ahead.

3    Q    Right.  So one of the economic things you can do is you

4    can just abandon the assets to the secured lenders.  You

5    can't get a plan done.

6    A    So hopefully the assets are worth more than the secured

7    lenders.

8    Q    Right.  But if you can't get a plan done, your options

9    are to abandon to the secured lenders or convert the case to

10   a 7, right?

11   A    I'll agree with you because that's -- I've never worked

12   on one of those before.

13   Q    Okay.  So in the event that a 7 occurs, do you

14   understand that there aren't going to be any releases that

15   are -- plan releases that are granted?

16   A    I believe if there were a 7 at EFH, yeah, there would

17   not be any releases granted.

18   Q    Right.  So the consequence -- one of the consequences

19   of exercising the fiduciary -- oh, by the way, if you have a

20   7 and the assets are then sold to the secured lenders in the

21   7, you've triggered the tax liability, right?

22   A    I think that's right, yes.

23   Q    Right.  So the consequence of exercising a fiduciary

24   out, to wrap this all up, is either you need the consent of

25   the PIK notes or you have to go through a 7 in which you

1    trigger the tax and that don't get any releases for any of

2    the parties involving any of these transactions either pre

3    or post-petition or getting releases under the proposed plan

4    in the RSA.

5    A    I don't feel expert to answer what you just said.

6    Q    Okay.  And now that's the value rising scenario, right,

7    that we've gone through, that a situation has occurred where

8    the value of the EFIH assets has risen such that the DIP's

9    getting overpaid and the debtors want to do something to

10   protect the actual pre-petition unsecured creditors who are

11   in the case, right.

12   A    I'm not following what you're saying.

13   Q    The scenario I just went through, all of these things

14   that occur with exercising the fiduciary out, that was all

15   to tell you -- that was all in relation to my questions

16   about value going up.  I want to focus on what happens if

17   value goes down, okay?

18   A    Okay.

19   Q    The value of the EFIH assets goes down.  And one of the

20   concerns you expressed to the Court is that if you don't

21   accept the equity check now, you're going to have to go out

22   to the capital markets at confirmation and see if you can do

23   a debt and equity raise that could get rid of the secured

24   claims, right?

25   A    Are you presuming that there's no second lien DIP or

1    are you presuming this is after a second lien DIP?

2    Q    One of the reasons you're seeking to do this DIP is so

3    that you don't have to go out to the equity -- or the

4    capital markets later to do a debt and equity raise, right?

5    A    Either a debt and equity raise or a consensual deal

6    with the second liens t covert their debt to equity.

7    Q    Okay.  And this is getting -- taking the equity check

8    now reduces the risk that you won't be able to get either of

9    those things done.

10   A    Well, taking the equity check now sets a floor for the

11   valuation at which the debt is being converted to equity.

12   So if value goes down, we've preserved value for the estate.

13   Q    Right.  So the concern is -- well, first of all, you

14   know that you can go out and raise money now, right?  You've

15   got competing bids.

16   A    Although we're not at the confirmation date.  So --

17   Q    Right.  So -- no.  But right now, the capital markets

18   are telling you that you can raise enough money to take out

19   the secured debt.

20   A    Yes, they are.

21   Q    Okay.  So the concern you're expressing to the Court is

22   that there's some volatility in the assets of EFIH which is

23   going to be a change of the status quo now, that you are

24   able to raise money to take them out but you might not be

25   able to do that at confirmation.

1   A    That is a possibility.

2   Q    And just to clarify an earlier question, you presented

3   the Court with no analysis of the volatility of EFIH assets,

4   have you?

5   A    No, I have not.

6   Q    Nor have you provided the Court any written analysis of

7   factors that could influence the volatility of the EFIH

8   assets.

9   A    I have provided nothing in writing, no.

10  Q    But I take it that the -- you get some comfort because

11  you got a bird in the hand.  You've got this equity check

12  now, right?

13  A    Well, I've observed the value of Oncor go up and down

14  with interest rates.

15  Q    Right.  And I think your testimony was you thought it

16  was safe and prudent to accept the -- accept the check now

17  along with all the consequences of that, all this fight, all

18  the fees that have to be paid, the risks that I just -- that

19  we just went through with you because you've got this bird

20  in the hand, right?

21  A    That's one of the reasons, yep.

22  Q    All right.  Have you reviewed the notes purchase

23  agreement, the actual document by which the debtors are

24  controlling this one-way option?

25  A    No, I have not.

1    Q    All right.

2          MR. SHORE:  Hand it up, Your Honor?

3          THE COURT:  Yes.  Thank you.

4    BY MR. SHORE:

5    Q    All right.  If you turn to Exhibit A --

6    A    All right.

7    Q    -- in the binder -- I'm not going to --

8          MR. SHORE:  We're not going to even put it in

9    evidence so you -- we just ask the Court to take notice of

10   the docket entry.  This is the attachment to the notice of

11   filing of the proposed form of order.

12   Q    Turn to the document here -- this is the draft of the

13   notes purchase agreement which has been filed with the

14   Court.  Okay?

15   A    Yes.

16   Q    And though you haven't read it, I'm going to ask you to

17   tell me whether you understand the deal as it is set forth

18   here.  Can you turn to Section 4.7(e)?

19          THE COURT:  Do you have a page reference?

20          MR. SHORE:  And it's the equity conversion.  It

21   starts on page 55.  Okay.  And (e) starts on page 57.

22          THE COURT:  Okay.

23   BY MR. SHORE:

24   Q    All right.  Now, Mr. Ying, you do understand that in

25   order to put the equity, 60 percent of the equity on the DIP

1    lenders in defeasance of their claims, you have conditions

2    you have to meet, right?

3    A    I'm aware of that, yes.

4    Q    Okay.  Are you aware that one of the conditions as set

5    forth in Section (e)(5) is that the restructuring support

6    agreement shall be in full force and effect?

7    A    Yes.

8    Q    And you're aware that the Court must have entered the

9    disclosure statement order?

10   A    Yes.

11   Q    And the confirmation order?

12   A    I believe that's right, yes.

13   Q    And you need the consent -- or you need to resolve the

14   tax issue with the IRS?

15   A    Yes.

16   Q    And there needs to be, obviously, no default under the

17   DIP?

18   A    Yes.

19   Q    Okay.  So when you talk about a one-way option, right,

20   do you know whether the restructuring support agreement has

21   even been amended?

22   A    I don't.

23   Q    All right.  So if the restructuring support agreement

24   isn't even amended -- you're (indiscernible 4:09:37) that

25   the DIP today that the judge allows it or whenever we get to

1    it and you fund the DIP and you pay the second lien notes

2    and you've got in hand your one-way equity option, right?

3    A    That's correct.

4    Q    If the restructur -- if the parties don't amend the

5    restructuring support agreement, they have an immediate out.

6    Is that your understanding?  The EFIH DIP lenders can't be

7    put any of the equity unless the restructuring agreement is

8    in full force and effect, right?

9    A    That's correct.

10   Q    Okay.  And if we get to July 18th or whenever the RSA

11   is up for approval and the Court doesn't approve the RSA,

12   your one-way equity option doesn't exist, does it?

13   A    That's true.

14   Q    And if the debtors miss in -- if the Court approves the

15   RSA and the debtors miss one milestone and it gives the EFIH

16   lenders the right -- sorry -- the EFIH ad hoc group the

17   right to terminate the RSA, your one-way option goes away,

18   doesn't it?

19   A    Well, they've showed a willingness to amend so far.

20   Q    Right.  But in the down scenario, do you believe that

21   they're going to want to be paid -- so let's talk about it.

22   Oncor equity has now fallen by 20 percent.  I take it that

23   you can understand that the DIP lenders will not want to be

24   paid their 1.9 billion dollars back in 60 percent of the EFH

25   equity.

1   A     That's a good point.

2   Q     Yeah.  And they'll be looking for any way to get out of

3   that option, right?

4   A     Well, I assume people will argue and litigate that they

5   can't pull out.

6   Q     Right.  But if you miss a milestone under the RSA and

7   the RSA is validly terminated, then you don't have them, do

8   you?

9   A     That sounds correct.

10  Q     Right.  And if there's a change to the deal, something

11  happens, something happens that the EFIH ad hoc group

12  doesn't consent to, one of the terms of the RSA needs to be

13  changed by -- because something's happening on the TCEH

14  side.  If the equity has fallen 20 percent, it's going to be

15  in their economic interest to not show the same willingness

16  to amend, right?

17  A     Obviously, the RSA has to be in effect.

18  Q     Right.  And do you know that one of the outs is that

19  for the EFIH lenders under the RSA -- sorry -- the EFIH ad

20  hoc committee under the RSA is that an examiner is then

21  appointed with expanded powers in any one of the seventy-one

22  cases?

23  A     Yes.  I understand that.

24  Q     Right.  So if Judge Sontchi determines that we need an

25  examiner down at Big Brown Mining Company at some point

1   during this case, that would give the EFIH ad hoc committee

2   the ability to terminate the RSA, right, as you understand

3   it?

4   A    I'm sure if Judge Sontchi wanted something, they would

5   amend it.

6   Q    No, no.  If Judge Sontchi -- no.  I'm saying Judge

7   Sontchi has appointed an examiner.  It's your understanding

8   that even though it's way off down on the other side of the

9   giant organizational chart that sits on my wall in my

10  office, that it gives the EFIH ad hoc group the right to

11  terminate the RSA.

12  A    I don't feel I am an expert in this but it sounds like

13  you're right.

14  Q    Right.  And so in that circumstance, the value is

15  falling 20 percent on the Oncor -- on the EFIH Oncor equity.

16  And just because there is a determination there needs to be

17  an examiner with expanded powers all the way across the

18  capital structure, your one-way option goes away, doesn't

19  it?

20  A    Sounds correct.

21  Q    And another out is that there's a trustee appointed at

22  any of the debtors, right?

23  A    I didn't realize that, no.

24  Q    Okay.  So then I won't ask you questions about the

25  trustee.

1    A    No.

2    Q    Another out would be if the IRS doesn't approve the

3    spin.

4    A    That's correct.

5    Q    If the IRS doesn't approve the spin, you've done this

6    whole DIP structure in order to -- the whole rights offering

7    and taken the equity check and paid the fees and done

8    everything else and at the end of the day, you can't put

9    that equity to the DIP lenders.

10   A    That's correct.

11   Q    So we did the downside to the upside.  Now I'm going to

12   do the downside to the downside.  We're in a scenario now

13   where you've got a 1.9 billion dollars of DIP out to the DIP

14   lenders and you can't force equity on them.

15   A    That's correct.

16   Q    And the only way you can restructure then is to take

17   them out with a new DIP, right?

18   A    Correct.

19   Q    But if the Oncor equity is down 20 percent, do you have

20   any belief you're going to be able to raise a 1.9 billion

21   dollar DIP?

22   A    It may be challenging.

23   Q    Second lien DIP -- right.  So your only option in the

24   downside where the asset value has fallen is going to be to

25   have a conversion or get the consent of the class, the EFIH

1   PIK class, which is dominated by the DIP lenders who want to

2   be repaid, right?

3   A    That's true but I think they would want to protect

4   their investment in their unsecured claim.

5   Q    If they recover through the DIP, right, they don't have

6   to share that recovery with anybody who didn't participate

7   in the DIP, do they?

8   A    Obviously not, but I think there's not 100 percent

9   commonality of ownership between the unsecured claim and the

10  DIP.

11  Q    Right.  We went through that.  Their claims, for

12  example, the TCH scheduled claim is going to be sitting in

13  the EFIH unsecured pool but isn't going to be in the DIP,

14  right?

15  A    I just meant that even aside from whether there is or

16  isn't any TCH claims at EFIH, an institution that may own

17  ten percent of the unsecured claim may not own the same

18  percentage of the DIP.

19  Q    Right.  So you can't tell me one way or the other as to

20  how that mess is going to work itself out if the Oncor has

21  fallen 20 percent.

22  A    Right.  I just think that they would want to protect

23  the value of their existing investment as well.

24  Q    Now let's turn to the status quo.  We're in the status

25  quo in the Oncor equity has fallen 20 percent, right?

1    A    I'm listening.

2    Q    You got that?  The -- you have at that point all of the

3    cash that committee counsel told you or walked through with

4    you that you are otherwise going to be spending on paying

5    interest on the DIP.

6    A    That's correct.

7    Q    And paying the accrued interest on the pre-petition

8    notes.

9    A    That's correct.

10   Q    Right?  And paying the principal on the pre-petition

11   notes that you're giving --

12   A    I'm sorry.  Which pre-petition notes?

13   Q    You've got cash on hand at EFIH right now, right?

14   A    As you're speaking today, yes.

15   Q    And no operational expenses, right?

16   A    That's corr -- well, other than restructuring expenses,

17   yes.

18   Q    Right.  You have no offsets but you do have

19   restructuring expense.

20   A    That's correct.

21   Q    And the restructuring expenses are burning right now,

22   right?

23   A    Yes.

24   Q    Not mine but everyone else's.  But when you get to the

25   scenario in which the value of Oncor has fallen, at least

1    you have a cash reserve at that point for which you can buy

2    time to address the issue you have with the second lien

3    notes.

4    A    I think there will still be a cash reserve even after

5    the second lien DIP.

6    Q    Okay.  And let me ask you this question.  If we're in

7    the scenario in which the second lien notes, the downside

8    scenario, Oncor has fallen and you can't raise enough debt

9    to take them out, they're undersecured.  Are they entitled

10   to any of this makewhole or post-petition interest or

11   anything else, as you know?  I'm not asking for your legal

12   opinion but as a restructuring professional, do you know

13   whether they're even entitled to that?

14   A    A makewhole on their claim?

15   Q    On the existing EFIH seconds.

16   A    Are they entitled to a makewhole -- I'm sorry.  Are the

17   EFI seconds still entitled to a makewhole claim?  I'm

18   confused.

19   Q    On post-petition interest.

20   A    Again, the question is with respect to the EFIH second

21   lien notes?

22   Q    You've gone -- under this DIP, you're paying the second

23   lien notes.  The debtor is settling in cash for all of their

24   principal plus post-petition interest and half the

25   makewhole, right?

1   A    That's correct.

2   Q    And the assumption is that they are secured.

3   A    That's correct.

4   Q    And full secured.

5   A    That's correct.

6   Q    And oversecured.

7   A    Yes.

8   Q    And in the scenario, when we get to confirmation, if it

9   turns out that they are, in fact, undersecured, the Oncor

10  equity has fallen, the thing you're trying to fix by

11  getting -- locking in the equity now, that event has

12  occurred and maybe can undersecure.  Is it your

13  understanding whether they are entitled -- the existing

14  second lien notes are entitled to post-petition interest?

15         MR. MCGAAN:  Objection.  Calls for a legal

16  conclusion.

17  A    Yeah.  I don't have any conclusion to that.

18  Q    Now as you understand it, is there any right of

19  clawback against the second lien notes who get paid now?

20  A    Not that I know of.

21  Q    Did you try to negotiate for one?

22  A    I did not.

23  Q    Now let's talk about what happens to the PIKs in the

24  instance in which they get the DIP.  One of the consequences

25  to being a DIP lender -- do you understand that they're

1   going to get superpriority claims?

2   A    Yes.

3   Q    And they're going to get liens on all of the assets of

4   EFIH?

5   A    Yes.

6   Q    And that the consequence of that will be they will be

7   senior to any administrative expense of the EFIH estates?

8   A    Yes.

9   Q    And is there any carve-out in that DIP as you know for

10  post-petition tax claims?

11  A    I don't know about a carve-out for post-petition tax

12  claims.

13  Q    So as you sit here today, can you tell the Court

14  whether or not you believe that if the deconsolidation

15  occurred post-petition -- we get into the meltdown

16  scenario -- the deconsolidation occurs and the tax is

17  triggered, whether or not the EFIH DIP lenders will now have

18  claims senior to the IRS?

19  A    I'm not aware of the carve-out, no.

20  Q    Okay.  So one of the advantages to the DIP lenders here

21  is that if they're allowed to invest now to take out the

22  second lien DIP, they will become senior to any

23  deconsolidation tax.

24  A    That's correct.

25  Q    And in that instance, the DIP lenders do not

1    necessarily have the same interests as EFIH PIK holders in

2    avoiding a deconsolidation event.

3    A     That's true.  But I do believe they would want to

4    protect the value of their unsecured claims as well.

5    Q     Right.  But from the perspective of the DIP, they get a

6    look at 60 percent of the -- I'm sorry.  They get a look at

7    100 -- let's clarify this.  As part of their DIP liens,

8    they're getting a lien on the entire Oncor equity estate,

9    right?

10   A     If they're our only DIP lenders, obviously, they would

11   only look out for their DIP claim.

12   Q     So if people are out, really, what the interest here is

13   people bidding on the Oncor equity.  Okay.  And you do

14   understand -- I think you testified before NextEra is here

15   because they want to look at the Oncor equity, right?

16   A     That's correct.

17   Q     They're not here because they want TSH equity, right?

18   A     Well, they certainly told us they're not a DIP lender

19   either.

20   Q     Okay.  So if what people are here for is the Oncor

21   equity, if the DIP goes into default, it's your

22   understanding that the EFIH DIP lenders get to take the

23   Oncor equity, right, if you haven't otherwise been able to

24   refinance them out?

25   A     I believe that's correct, yes.

1    Q    And again, if you try to refinance them out, you've got

2    the cram problems that we went through, right?

3    A    Yes, you do.

4    Q    And if -- even if they are in compliance in the DIP,

5    right, they can -- you can -- sorry -- you can't ever give

6    them the Oncor equity -- if you gave them -- sorry.  If you

7    gave them EFH equity to defease their claim, then they would

8    care about whether there's a deconsolidation tax, right?

9    A    Well, they wouldn't take it unless there was no

10   deconsolidation tax.

11   Q    Right.  Exactly.  So there's not going to be a

12   situation in which the EFIH new DIP lenders, second lien DIP

13   lenders, will have to concern themselves as to whether or

14   not a deconsolidation event occurs, except to the extent

15   that they are concerned about their EFIH unsecured claims.

16   A    That's correct.

17   Q    So if they get sufficient value out of taking the Oncor

18   equity through their DIP claims, do they really care whether

19   they get paid on their pre-petition claims, as a matter of

20   economic substance?

21   A    I think they would because they really paid real money

22   for those unsecured claims.

23   Q    Well, what's your basis for saying they paid real money

24   for those claims?

25   A    I know they bought claims recently.

```
 1   Q    Okay.  And what percentage of the -- on a weighted

 2   average, do you know what the weighted average basis is of

 3   the EFIH ad hoc group in their notes?

 4   A    I know only that -- I saw a report that shows they had

 5   acquired about 45 million principal amount of EFIH unsecured

 6   claims between the filing date and probably a month after.

 7   Q    Right.  And how big is the size of the aggregate claims

 8   of the ad hoc group?

 9   A    About a billion 560.

10   Q    Right.  So about a billion 520.  So you know what their

11   basis is in that?

12   A    No, I don't.

13   Q    So just coming to safe and prudent, if the prudent

14   thing here to do is to lock in an equity commitment, a one-

15   sided option, isn't the prudent and safe thing to do to find

16   out whether or not the RSA has even been amended before you

17   draw down the DIP?

18   A    Well, the timing of the second lien DIP -- or the RSA

19   requires that we get the second lien DIP approved before the

20   actual approval of the RSA.

21   Q    I just -- we went through this before.  You don't know

22   whether the RSA -- you know that you've already missed

23   milestones under the RSA which has been filed with the

24   Court, right?

25   A    Yes, I do.
```

1   Q    And that you need to amend that document before it

2   becomes operative again.

3   A    That's correct.

4   Q    Right.  So wouldn't the safe and prudent thing to be

5   doing to find out whether or not the RSA has even been

6   amended before you get Court approval for a DIP?

7   A    I'd want to think about that, but it sounds like a

8   prudent step.

9   Q    Right?  And what about just getting the RSA approved?

10  Wouldn't you want to get the RSA approved because otherwise

11  you've got a DIP that you've done, this whole structure that

12  you've done, and if the Court doesn't approve it on July

13  18th, you're going to not even have the option, right?  So

14  isn't the safe and prudent thing to do to wait until after

15  the RSA is approved?

16  A    Well, I think there's been talk about not even -- well,

17  I want to think about that but I think it's a good point.

18  Q    Yeah.  And wouldn't you want to know whether or not the

19  debtors could actually live up to their commitments under

20  the RSA and meet those milestones before you did this whole

21  DIP structure which is premised on getting a one-way option

22  that goes away if they miss those milestones?

23  A    I think you raise a good point.

24  Q    While we're addressing sequencing, do you know --

25  what's your understanding of the business deal, because I'm

1    not sure it's clear in the RSA, as to whether or not the

2    EFIH ad hoc group can terminate the RSA if the Court orders

3    the makewhole of the estate?

4    A    I don't know the answer to that.

5    Q    Okay.  So wouldn't it also be prudent then to find out

6    whether or not if the EFIH ad hoc group gets an out for

7    allowance of the makewhole?  You'd want to know that before

8    you did this whole DIP structure to get your one-way option?

9    A    Well, I want to qualify all my answers by the fact that

10   I wasn't the drafter of the RSA and so I'm not a real expert

11   in how it works.

12   Q    Okay.  I get that.  But I'm just asking -- you were the

13   one who testified to the Court that it would be safe and

14   prudent to lock in this one-way option now.  So I'm just

15   exploring what safe and prudent means.  If the option goes

16   away if the makewhole is awarded, wouldn't it be safe and

17   prudent to find out whether or not the makewhole is going to

18   be awarded before you buy the option?

19   A    I think it's a reasonable point.

20         MR. SHORE:  I think I have nothing further.

21   Q    Oh, just one last thing.  On the cash and talking about

22   whether you want to change the status quo, is it fair to say

23   that under all circumstances, the EFIH lenders will be in a

24   worse cash position up until confirmation if they do the

25   second lien DIP?

```
 1    A    There will be less cash, yes.

 2            MR. SHORE:  I have nothing further.

 3            THE COURT:  Thank you.  Redirect.

 4            MR. MCGAAN:  (Indiscernible 4:28:37) loose paper

 5    around there?

 6            THE COURT:  Yes, of course.

 7        (Pause)

 8            THE COURT:  Take your time.

 9        (Pause)

10            MR. MCGAAN:  Thank you, Your Honor.  Andrew McGaan

11    for the debtors.

12    REDIRECT EXAMINATION

13    BY MR. MCGAAN:

14    Q    Mr. Ying, I'm going to jump around, go back to what may

15    end up being a small number of items but a number of items

16    that have been touched on by the various cross-examiners,

17    okay?

18    A    That's fine.

19    Q    All right.  During Mr. Horowitz' examination, he -- or

20    I believe you mentioned that in connection with what we've

21    been referring to as the NextEra proposal, you observed that

22    NextEra had announced or stated that it was planning to

23    acquire all of EFIH, is that right?

24    A    Yes, I did.

25    Q    All right.  Let me --
```

 1          MR. MCGAAN:  May I approach, Your Honor.  I've got

 2    an exhibit here.  We'll mark it as Debtors' Exhibit 5.

 3          THE COURT:  Okay.

 4          Thank you.

 5    BY MR. MCGAAN:

 6    Q    Okay.  Debtors' Exhibit 5, Mr. Ying, is a June 26, 2014

 7    letter from Joshua Brody at Kramer Levin to Steve Hessler at

 8    Kirkland & Ellis with -- commitment letter and some related

 9    documents attached, correct?

10    A    Yes.

11    Q    Do you recognize this?

12    A    Yes.

13    Q    This came in to the debtors' counsel last Thursday?

14    A    I believe that's correct.

15    Q    And you had a chance at that time or shortly thereafter

16    to review it and the attached documents, did you not?

17    A    Yes, I have.

18    Q    What is it in general?  And then I'm going to draw your

19    attention to a particular part of it.

20    A    In general, it's a markup of a DIP term sheet for the

21    second lien DIP along the lines of the term sheet proposals

22    that we have received from the NextEra second lien note

23    group prior to the transmittal of this term sheet.

24    Q    Okay.  So some documents formalizing a proposal made a

25    number of days earlier from the second lien noteholder

1    NextEra group, correct?

2    A    That's correct.

3    Q    All right.  And the cover letter says it attaches a

4    commitment letter, a DIP term sheet and an equity conversion

5    term sheet, right?

6    A    Yes, it does.

7    Q    And the equity conversion term sheet is -- your

8    understanding sets out the terms under which the equity

9    conversion would work in the NextEra proposal?

10   A    Yes, it does.

11   Q    All right.  Now let me turn your attention in the

12   equity conversion term sheet to page 3.  And there's a

13   section entitled "ROFO".  Do you see that?

14   A    Yes.

15   Q    And you've read this before?

16   A    Yes, I have.

17   Q    What do you understand ROFO, R-O-F-O, to refer to here?

18   A    It's to refer as a right of first offer.

19   Q    And is this what during your examination earlier you

20   were beginning to make reference to when you were talking

21   about NextEra's plans to acquire all of EFIH beyond the

22   equity they convert into?

23   A    Yes.

24   Q    In general, what do you understand the ROFO to do here?

25   A    Well, essentially, any shareholder of EFH post-

1    restructuring must, if they wish to sell their shares, they

2    must first offer to sell their shares to NextEra.  And once

3    NextEra makes them an offer, or if they do, that shareholder

4    may then accept NextEra's offer or they can go to the

5    marketplace and try to get a better offer.

6    Q    Okay.  And across the various presentations that were

7    made to the board over the last two weeks or so regarding

8    the competing second lien DIP proposals, and we talked about

9    them during your direct examination, you had set forth

10   implied equity values reflected in the different bids,

11   correct?

12   A    That's correct.

13   Q    And including the NextEra bid, correct?

14   A    That's correct.

15   Q    And I think you had observed that we can take a look --

16   in fact, why don't you pull out Debtors' Exhibit -- we'll

17   take out one example -- Debtors' Exhibit 3 which is the most

18   recent presentation to the board, June 29th.  Do you have

19   that in front of you?

20   A    Yes, I have it.

21   Q    All right.  And then where -- would you just draw our

22   attention to where you're showing for comparative purposes

23   the implied value arising from the NextEra proposal?

24   A    Well, it's primarily on page 8, the last page of the

25   board dec.

```
 1   Q    Okay.  And just tell us where it is you show the higher
 2   implied --
 3              MR. MCGAAN:  I'm sorry, Your Honor.  Are you there
 4   or are we -- am I getting --
 5              THE COURT:  I'm not there yet.
 6              MR. MCGAAN:  Okay.
 7              THE COURT:  Do we have a page number?
 8              MR. MCGAAN:  It's Debtors' Exhibit 3 and it would
 9   be page 8 which is the last page --
10              THE COURT:  Okay.
11              MR. MCGAAN:  -- of the -- should be the last page
12   of the dec.
13              THE COURT:  I'm there.  Thank you.  Sorry.
14              MR. MCGAAN:  Okay.
15   BY MR. MCGAAN:
16   Q    And would you just draw the Court's attention to where
17   you're showing the higher implied value and what it means?
18   A    Well, it's actually -- the higher implied value is
19   easier to say -- I apologize -- on page 7.
20   Q    Okay.
21   A    In the right-hand column, we describe the second lien
22   NextEra group proposal.  And we start the numbers with the
23   line item "Implied Oncor TEV at Conversion".  And that
24   number is derived by taking the 2.425 billion DIP, dividing
25   it by the 68 percent that it converts into, deriving the
```

1    implied EFIH equity value and then building up to Oncor TEV

2    by adding the debt on the capital structures.

3    Q    Okay.  Now I'm where I wanted to be.  Does the

4    existence of the ROFO in Debtors' Exhibit 5, the equity

5    conversion feature, did it have any impact on your

6    assessment of the implied value in your presentation?

7    A    Well, it creates a lot of questions in my mind that

8    this is not a typical stock of a publicly traded company.

9    This provision is highly unusual.  And the other corporate

10   governance features that were brand new when we received

11   this raised issues in my mind in terms of how NextEra can

12   potentially influence the future course of events at this

13   company and how the 55 percent of the stock of EFH might

14   trade in the future.

15   Q    Does the existence of a ROFO have value to NextEra in

16   the context of this proposal?

17   A    I believe it does, yes.

18   Q    And did it have an effect on the price that NextEra is

19   willing to bid on the DIP financing and the equity

20   conversion feature to the debtors?

21   A    Yes, it does.

22   Q    What kind of effect could it have?

23   A    Well, it limits the marketability of the remaining

24   stock.

25   Q    And what does that tell you, if anything, about the

1    implied equity value arising from the NextEra bid?

2    A    Well, it puts a question mark in terms of how it would

3    be valued.

4    Q    Mr. Horowitz also showed you some DIP proposals from

5    the second lien noteholders that had been made in March

6    prior to the filing of the petition in this case and drew

7    your attention to different proposed percentage makewhole

8    settlements, correct?

9    A    Yes, he did.

10   Q    And do you remember -- and we can pull them out if you

11   need to, but my notes show that in Exhibit 29, he showed you

12   a proposal -- this is Objectors' Exhibit 29 -- offering an

13   88.6 makewhole settlement or suggesting that, do you recall

14   that?

15   A    Was it a 68 percent makewhole settlement or 88?

16   Q    Did I misspeak?

17            MR. HOROWITZ:  I think you better get it in front

18   of you because you're mischaracterizing evidence.

19   BY MR. MCGAAN:

20   Q    Would you turn to -- let's just take a quick look --

21   Exhibit 29 in the -- it's in binder 2.

22   A    I think I have Exhibit 29.

23   Q    Right.  Are you there?  And this contains -- Mr.

24   Horowitz had drawn your attention to this -- a second lien

25   DIP proposal.

```
 1   A     From Rothschild?

 2   Q     Yes.

 3   A     Yes.

 4   Q     All right.  And on page 5, there's a reference to a

 5   88.6 percent.  Do you see that?

 6   A     Oh, yes.  I do.

 7   Q     And what does that refer to?

 8   A     It represents the equity that the -- this particular

 9   financing would convert into.

10   Q     Okay.  Not a makewhole percentage.

11   A     Not a makewhole percentage.

12   Q     My mistake.  Thank you.  Now let's look at Exhibit 2

13   which is in binder number 1.  And if you turn -- this is

14   another proposal.  This one's dated March 18, 2014 from the

15   second lien noteholders, correct?

16   A     Yes.

17   Q     Or in participation with Fidelity as I think it was

18   described when you were examined earlier, right?

19   A     That's right.  It was a Fidelity proposal but it

20   included the second lien group.

21   Q     And if you turn to page 3 of this dec, you can go to a

22   reference in the center there of the proposed rights

23   offering treatment.  And there's a makewhole settlement,

24   right?

25   A     Yes, there is.
```

1    Q    Okay.  And what's the percentage makewhole settlement

2    offered according to these terms at that time?

3    A    I think it's two numbers.  It's 68 percent and --

4    Q    Right.  And the 68 -- the 68 percent is what --

5    proposed makewhole settlement is what Mr. Horowitz drew your

6    attention to during his examination, right?

7    A    That's correct.

8    Q    All right.  Now you noted that in assessing the NextEra

9    proposals in the last week or two, one of the observations

10   that you made about one of the criticisms was that the

11   proposed makewhole settlement in those proposals was too

12   high, correct?

13   A    That's correct.

14   Q    And what was the proposed percentage?

15   A    Well, the original proposal was 100 percent.  The

16   current proposal is 100 percent minus 25 million.

17   Q    And do you know even roughly what happens to 100

18   percent if you adjust the proposed makewhole settlement in

19   their most recent proposal downward by 25 million?

20   A    I believe it's now 96 percent.

21   Q    Okay.  Did you get an explanation why NextEra wants to

22   pay second lien noteholders 96 percent, give or take, now

23   when they were willing to pay 68 percent earlier?

24   A    No.

25   Q    You were asked some questions about some fees paid to

1    Fidelity.  Do you recall that?

2    A    Yes.

3    Q    And specifically, it was a fee in connection with

4    Fidelity's participation in the first lien DIP.  That was

5    one of them, right?

6    A    Yes.

7    Q    And a fee, 11,250,000 dollar fee proposed to be paid to

8    Fidelity I think, as you said, in connection with its

9    position as an EFH unsecured creditor, right?

10   A    Actually, I think it was the eleven and a quarter.  It

11   was in reference -- or in connection with their

12   participation in the DIP.

13   Q    Right, which the RSA describes as a participation given

14   to them as a consequence of their position as an EFH

15   unsecured creditor, right?

16   A    Well, actually, I think it was really -- as their

17   participation as an EFH creditor, they're allowed to

18   participate in the second lien DIP.  Oh, and they have to

19   share a part of that with the other EFH creditors upon

20   conversion.

21   Q    And you were showed a couple of documents and asked

22   questions about whether those fees were being paid to

23   Fidelity for participating in the second lien makewhole

24   settlement, right?

25   A    That's correct.

1    Q    All right.  And at the time, you testified that you

2    didn't agree with that, that you looked at it from the

3    debtors' perspective at the time.  Do you recall that

4    testimony?

5    A    Yes, I do.

6    Q    And what do you mean when you say that at the time you

7    looked at it from the debtors' perspective and how did that

8    influence your view about why Fidelity had been paid the one

9    fee and was being proposed to pay the other?

10   A    Well, I was looking at strictly not how the negotiation

11   ran but strictly given what I was told that where the fees

12   were being paid that, to the extent fees were being paid to

13   Fidelity, the debtor was getting good value for the actions

14   associated because -- that result from the payment of those

15   fees.

16   Q    And was that your role -- did you view that as part of

17   your role as a financial advisor to take the debtors'

18   perspective on the gives and the gets and whether they made

19   economic sense?

20   A    Absolutely.  I represent the debtor.

21   Q    And what -- so quite apart from what the creditors said

22   to one another during the negotiations, what conclusion did

23   you reach about the economics of the proposed fees?

24   A    I thought the economics of the proposed fees were

25   reasonable given commitment fees and financing fees

1   associated with raising that kind of capital.

2   Q    And what, there's been references to the fact that

3   Fidelity owns positions throughout the capital structure,

4   correct?

5   A    Yes.

6   Q    And can you -- I don't know if it's come out all that

7   clearly, but where and to the extent you know just sitting

8   here the degree to which Fidelity holds positions in the

9   capital structure, can you describe that?

10  A    Sure.  Well, I think they own about 500 million of the

11  4 billion of first lien debt when that debt was outstanding

12  at the signing of the RSA.  I believe they own 650 million

13  of the 2.15 billion of second lien debt.  I believe they

14  also own about 73 percent of the not quite 600 million of

15  the EFH unsecured debt.

16  Q    Okay.  And would -- under the transactions envisioned

17  by the RSA, is Fidelity settling all or part of its

18  positions that you just described?

19  A    It's settling all of its positions.

20  Q    Okay.  And when you were advising the debtor about the

21  advisability to the economics of the proposed fees including

22  the ones that have been disputed in this hearing, were you

23  aware at that time that Fidelity was -- negotiated to settle

24  all of its positions in the capital structure, and not just

25  its second lien make whole settlement?

1    A    I was aware that they were settling all their

2    positions.

3    Q    All right.  Did that have any bearing on the advice

4    that you gave to the debtor with respect to the

5    reasonableness of the fees?

6    A    I tried to look at each of the fees in the context of

7    what they were associated with, and I thought each of those

8    fees were reasonable in the context of what the company was

9    getting for paying those fees.

10   Q    Okay.  Now, I want to turn your attention in exhibit

11   binder number 2 to Exhibit No. 62, which you were asked

12   about before, and we're going to come back to that.

13   A    I have it.

14   Q    Okay.  This is the -- this is a few e-mails strung

15   together that one at the top of the exhibit is an e-mail

16   from Jeremy Madiken (ph) to you October 9th, 2013.

17   A    Yes.

18   Q    Excuse me.  Now, we turn to the second page of the

19   exhibit, and I want to go I think to the part of this that

20   you were asked about earlier.  This is an October 9, 2013 e-

21   mail from you to Sam Green, correct?

22   A    That's correct.

23   Q    And your attention was drawn to the last line in your

24   note to Mr. Green.  Mr. Green is who again?

25   A    He's the senior banker at Centerview who advises the

1    EFIH unsecureds.

2    Q    Okay.  And it says here, quote, you get to name your

3    price, close quote.  Do you remember shown that on cross-

4    examination?

5    A    Yes, I do.

6    Q    What -- before you get to that language, this e-mail

7    October 9, 2013, what in general was the proposed structure

8    being discussed, proposed restructuring structure was being

9    discussed among the creditors at that time?

10   A    Well, up -- around that time we had been talking about

11   a deleveraging of both TCEH and EFIH where both creditors

12   would take stock of EFH and we were negotiating relative

13   equity splits, which required that we talk about the

14   valuation of both TCH and EFIH and hence Encore.  Those

15   discussions were not going well, and to try to facilitate --

16   Q    Let me -- I'm sorry to interrupt you, just -- I want to

17   go to that, but in terms of the structure that was on the

18   table at the time, does -- was it the same or different than

19   the one that is proposed in the RSA and is parts of which

20   have been before the Court in this bankruptcy?

21   A    It's completely different.  We were keeping the

22   companies together under the common parent EFH.

23   Q    All right.  And did there come a time -- and that's

24   been referred to as Project Olympus?

25   A    Yes, that's correct.

1    Q    Did there come a time when that was abandoned?

2    A    Well, it was completely abandoned once we made the

3    November 1st interest payment in November 2013.

4    Q    Okay.  So we're about a month before that.

5    A    That's correct.

6    Q    All right.  So then I interrupted you.  Would you then

7    give the context now for this e-mail where you say to Mr.

8    Green on October 9, 2013, quote, you get to name your price,

9    close quote?

10   A    Yes.

11   Q    What were you talking about?

12   A    Well, the negotiation between the TCH and EFIH

13   unsecured creditors about relative valuations and how they

14   would merge if the parent were not going well, so to try to

15   break the inability to get both sides to agree on their

16   relative valuations, TCEH said that they would be willing to

17   make an offer to, in effect, buy out the EFIH unsecureds.

18   So that TCH would then become the owner of EFIH, and that

19   would resolve the dispute.  And then the TCH creditors could

20   convert their claims into EFH parent company equity and that

21   would keep the two companies together, avoid the

22   deconsolidation tax, and lead to a successful restructuring

23   of both companies.

24   Q    Okay.  And then to be clear, why were you saying to Mr.

25   Green at that time, you get to name your price?

1    A    Because I said TCH was willing to negotiate with you

2    about buying out your constituency, so you get a chance to

3    name a price that is acceptable to your group.

4    Q    Okay.  And were you telling him, you name your price

5    we'll pay it?

6    A    I was trying to encourage him to come to the table to

7    put an offer on the table, or an ask on the table, so that I

8    could develop a bid ask between his group and the TCH group.

9    Q    Okay.  Does this bear any relationship to the way in

10   which pricing or value was debated, discussed or conclusions

11   were arrived at with respect to the second lien DIP motions

12   before the Court today?

13   A    No.  This was a completely different situation,

14   context.

15   Q    In the context then of the second lien DIP -- the

16   proposed second lien DIP and make whole settlement, had you

17   ever communicated to creditor groups that they can simply --

18   any creditor group they can simply name their price?

19   A    Absolutely not.

20        (Pause)

21   Q    You had -- during one of the cross-examinations, you

22   had referred to the -- well, let me turn your attention to

23   the pleadings binder.  And if you would go back to tab 31.

24   You were shown during one of the cross-examinations, I

25   apologize I don't recall which one, this is debtor's omnibus

```
1    reply to objections to the second lien DIP motion, right?
2    A    Yes.
3    Q    Turn to page 15, I want to go back to the part of
4    this --
5              THE COURT:  What (indiscernible)?
6              UNIDENTIFIED:  I'm sorry, Your Honor, it's tab 31
7    in the pleadings binder.
8              THE COURT:  All right.
9              UNIDENTIFIED:  And specifically page 15.
10   BY MR. UNIDENTIFIED:
11   Q    And there -- I'll wait for you.
12        There at the top is a bullet point called capital
13   market risks, and that's the specific part of this filing
14   that you were asked about, right?
15   A    Yes, that's correct.
16   Q    All right.  One of the things you say in that -- one of
17   the things rather that this filing says, is that -- let me
18   -- right in the center there, this is with respect to the
19   second lien DIP, this leading says, any delay causes
20   significant risk with respect to these rates.  What rates
21   are being referred to there?
22   A    I believe it's the general level of interest rates.
23   Q    Okay.  So these interest rates that could both
24   significantly increase the cost of capital for the repayment
25   of the EFIH second lien notes.  Let me stop there, do you
```

1    agree with that?

2              UNIDENTIFIED:  Your Honor, I think reading from

3    the debtors' brief and asking the debtor if he agrees with

4    it constitutes leading questioning on redirect examination.

5              THE COURT:  Agreed.

6    BY MR. UNIDENTIFIED:

7    Q    What is the point that's being made here, this -- what

8    is the point that is being made here?

9    A    Sure.  Well, the point is that obviously we're talking

10   about the enterprise value of Encore, there's a lot of

11   leverage.  There is variability in the value that's

12   available to the EFIH unsecureds, and therefore, changes in

13   market conditions, changes in interest rate, and

14   particularly since this is a regulated utility, there is

15   volatility and variability in the valuation.

16   Q    Okay.  And that is --

17             UNIDENTIFIED:  Go ahead.

18             UNIDENTIFIED:  Motion to strike to the extent

19   you're now offering expert testimony in the things that I

20   went through on cross.  He hasn't provided any written

21   analysis on to anybody with respect to volatility in the

22   Encore equity, which I think is exactly the question that

23   was asked.

24             UNIDENTIFIED:  Your Honor, I am coming back to

25   questions he was asked on cross and giving him an

1    opportunity to explain more fully his answer.

2              THE COURT:  Yeah, I'll allow it.

3              UNIDENTIFIED:  That's all I'm doing, Your Honor.

4              THE COURT:  Overruled.

5    BY MR. UNIDENTIFIED:

6    Q    You had started to say when you were asked about this

7    provision on cross-examination, you had started to refer to

8    a relationship between interest rates and the value of

9    Encore.  Do you recall that?

10   A    Yes, I do.

11   Q    And what is it you were attempting to say then, can you

12   tell the Court now?

13   A    Sure.  I was attempting to say that in particular

14   during the summer of last year when we were negotiating with

15   the TCH lenders and the EFIH lenders about the relative

16   values of their respective companies, we experienced a

17   period of rising interest rates, and that led to a decline

18   in the valuation metrics that one would use to value Encore.

19   And that was causing a lot of angst on the part of the EFIH

20   unsecureds, and the TCEH constituency who we are asking to

21   merge with the EFIH unsecured creditors expressed a lack of

22   desire in making an offer to merge or establishing an

23   exchange ratio because they felt that the value of Encore

24   and EFIH was declining.

25   Q    All right.  And you observed a relationship between

1    interest rates and Encore's value?

2    A    Yes, we did.  As interest rates rose, Encore's value

3    did decline.  And the valuation metrics we looked at like

4    multiples of earnings did go down during that period.

5    Q    Okay.  And what time period had you been observing

6    those kind of data with respect to interest rates on

7    Encore's value?

8    A    Well, I was referring particularly to the time period

9    from I believe was May of 2013, so August of 2013 when there

10   was -- when the markets experienced a significant increase

11   in the rate of interest.

12   Q    Okay.  And does that observation have any bearing, and

13   if so, what is it on your recommendation in favor of the

14   debtors adoption of the proposed second lien DIP and make

15   whole settlement?

16   A    Well, obviously we don't want to experience another

17   period where rates are rising and the value of Encore

18   declines because it would then mean that the economic terms

19   of the DIP facility that are currently are on offer would

20   potentially no longer be available to the debtor.

21   Q    All right.  Now, I want to turn to -- back to I think

22   Debtor's Exhibit 2, which is the June 22nd, 2014 board

23   presentation.

24   A    I have it.

25   Q    Okay.  And if you could turn to page 4.  I think you

1    were asked some questions about this page by Mr. Glenn, yes,

2    during his examination.  Do you recall that?

3    A    Yes.

4    Q    And he drew your attention to the Encore TEV referenced

5    in the lower left-hand corner, correct?

6    A    He did.

7    Q    And specifically to the calculated percentage

8    recoveries of the EFIH unsecured noteholders here.

9    A    Yes, he did.

10   Q    All right.  And in that connection, he asked you to

11   compare those observed recoveries with observations today

12   about trading values of the EFIH unsecured notes.  Do you

13   recall that?

14   A    Yes, he did.

15   Q    All right.  The -- your observation, and you were aware

16   at various times of the trading quotes for the EFIH

17   unsecured notes during the bidding process and the second

18   lien DIP, correct?

19   A    Yes, I am.

20   Q    Did those prices, whatever they were at the particular

21   time you were looking at them, cause you to doubt the

22   reasonableness of the implied Encore TEV that arises from

23   the unsecured group proposal, or the EFIH unsecured proposal

24   for DIP financing here?

25   A    Could you ask the question again?

1    Q    Yeah.  Did your observation of the EFIH unsecured note

2    trades that you were asked about on cross, did they cause

3    you to doubt or question the reasonableness of the Encore

4    TEV implied by the EFIH second lien note DIP proposal?

5    A    No, it didn't.

6    Q    Okay.  Why not?

7    A    Well, we tried to decompose why this price is

8    observable, and obviously it's a composition of accrued

9    interest to be paid.  The recovery of the existing unsecured

10   claim and it's a function of the economics of the DIP

11   agreement, whereby somebody has to write a check to own

12   equity at conversion date.

13        And when you put all those pieces together, and as

14   we've shown in other demonstratives, you can show where that

15   value tracks to.  And I would say that since we have drawn

16   the analogy that the conversion of that to equity in the DIP

17   at the confirmation of the case is akin to a rights

18   offering, it's not unusual that when you raise equity equal

19   to 60 percent of the outstanding of a company, that that

20   kind of equity raise would come at a discount to market.

21        Even if you went to an underwriter and asked them to

22   raise me 60 percent of the company in an IPO, they will tell

23   you, well, it has to come at a discount to market, plus

24   there are underwriting fees on top of that.

25   Q    Okay.  And I don't want to -- I'm not asking you what

1   you told the board regarding value, but I simply want to

2   know what kind of work you and your team had done regarding

3   valuation.  Not what you told the board, but the kind of

4   work that you did.

5   A     In connection with --

6   Q     Your --

7   A     -- the RSA or just during the course of our engagement?

8   Q     During the course of your engagement to prepare

9   yourself to advise the board regarding the different DIP

10  proposals that are -- that were before the board throughout

11  this process.

12  A     Well, we've been looking at the question of valuation

13  since we were hired almost two years ago.  We look at both

14  obviously TCH and Encore.  We have tried -- we have done

15  much of the rudimentary work, whether it's looking at

16  identifying comparable companies, measuring the various

17  valuation metrics of those, calculating means and medians,

18  continuing to refine whether that's the right comparable

19  company set.

20        With respect to precedent transactions, we've obviously

21  looked at what those are, looked at their valuation metrics

22  and looked at how that influences our sense of valuation.

23  And obviously on occasion, there's a new deal that we have

24  to add to the comparable universe.

25        And lastly, there's the DCF calculation.  We have

1    Encore projections.  Every year they update them, and

2    obviously we apply all the various calculations to those

3    discounted cash flows, including calculating betas, weighted

4    average cost of capitals, terminal values.

5    Q    And over what time period have you been engaged in that

6    kind of work?

7    A    Well, we've been doing that since the beginning of our

8    engagement, and we do our best to update all the metrics

9    that feed into all these calculations on a periodic basis,

10   whether there's a new comp or one of the comp leaves the

11   universe because it's being bought, whether there's another

12   precedent transaction to add, whether we just update stock

13   prices and therefore calculate valuation multiples.

14   Q    All right.  Okay.  I want to go something else you were

15   asked about, and I think this is a question from the Court.

16   Do you recall being asked whether the debtors had a back-up

17   plan if they lost the make whole litigation?  Do you recall

18   that generally?

19   A    Yes, I do.

20   Q    And can you go through, just give them a couple of

21   different times, so I want to put in one place, can you go

22   through the variety of options that you believe are

23   available to the debtor with respect to that?

24   A    Well, obviously the capitalization of the company as

25   we've presented has a fair amount of excess cash, so we do

1    have the capacity to pay a make whole settlement of some

2    meaningful size.

3         In addition to that, there is a provision in the RSA

4    that the parties would agree that additional debt could be

5    issued to meet additional demands to make larger

6    settlements.  As I said earlier, the terms of the data, as I

7    understand are not set in stone, and the parties would have

8    to negotiate on what structure would be used.  And either

9    that could be raised in the third party marketplace, or we

10   could offer it to the second lienholders who need to receive

11   some debt obligation, we'd have to negotiate the terms with

12   them, as in satisfaction to their claims.

13   Q    The RSA envisions that the EFIH unsecureds will obtain

14   60 percent of the equity of EFIH, right, if the transactions

15   before the Court are approved, and a plan is confirmed, and

16   the equity conversion takes place.

17   A    That's correct.

18   Q    What impact, if any, does the proposed make whole

19   settlement have on their economics, if they go forward and

20   convert into the equity?

21   A    Well, between the 60 percent, they would own through

22   the DIP and the 38 percent that they would own through their

23   existing claims, they bear them -- the vast majority of the

24   burden if the make whole claims are crystallized and this

25   Court decides that their -- that the second lien noteholders

1    are owed their make whole claims.

2    Q    And you -- and did -- with respect specifically to the

3    settlement terms that are being offered, does that fact have

4    any bearing on your conclusions regarding the reasonableness

5    of the proposed settlement?

6    A    Well, yes, because the settlement was approved by the

7    EFIH unsecureds.  They're the ones that bear the full cost

8    of it, and that weighs very heavily in terms of the

9    reasonableness of the settlement.

10   Q    All right.  You agreed with Mr. Shore that if the TCEH

11   first lien creditors wanted to pursue the assets of TCEH, it

12   would require a -- it would require some form of Court

13   approval.  Do you recall those questions?

14   A    Yes.

15   Q    Is there any concern, do the debtors have any concern,

16   Mr. Ying, if the TCEH first lien creditors abandon the RSA,

17   that they might immediately do just that, that is seek Court

18   approval to obtain those assets?

19   A    They've certainly threatened that in the past.

20   Q    All right.  And is that a concern for the debtors?

21   A    Very much so.

22   Q    Why?

23   A    Well, certainly it would be disruptive to the operating

24   business which is TCH.  They have retail customers.  The

25   rest of the business even though it's unregulated operates

1   in a regulated marketplace, I think just bad news onto

2   itself would send lots of negative publicity with respect to

3   the business.

4   Q    And what effect would it have on the debtors' proposed

5   restructuring plan and the benefits they're trying to

6   achieve?

7   A    Well, if they were to persevere, I think it would cause

8   massive litigation over the size and the ranking and the

9   recovery of tax claims at all the major entities of the

10  company.

11  Q    All right.  You'd mentioned earlier in testimony that

12  the company needed, with respect to the RSAs, still talking

13  about that, you mentioned the company needed to achieve

14  resolution regarding the EFIH side claims before it could

15  reach an agreement with the TCEH first lien creditors.  Do

16  you recall that testimony?

17  A    I do.

18  Q    And why was that the case in your view?

19  A    Because the TCH creditors were, until we reached an

20  agreement, restructured EFIH and EFH consensually were

21  threatening to deconsolidate in a taxable fashion.  They

22  wanted nothing to do with an ongoing war amongst the

23  creditors at EFIH and EFH.

24  Q    To do just what you were describing.

25  A    Yes, to do what -- just what I was describing, take

1    their assets, get their assets, step up and go home.

2    Q    And in your judgment, could the company have staged

3    prepetition an Encore auction?

4    A    As I tried to say earlier, I think that would've been a

5    failed effort, because I can't imagine a strategic buyer

6    would want to get in the middle of such a confrontational,

7    confusing, multi-layered, highly conditional transaction.

8    Q    If the second lien DIP that's proposed today, if it's

9    approved by the Court, with its fiduciary out, can the

10   debtors run an auction for the Encore assets if they want?

11   A    Well, I think selling the Encore assets again, I have

12   concerns about potential tax consequences.

13   Q    Could they seek the highest and best bid for the assets

14   of EFIH?

15   A    Well, if you're selling stock of EFIH again subject to

16   tax constraints, I believe you could.

17   Q    You were asked some questions about the -- a series of

18   questions about the fiduciary out, and I think Mr. Shore was

19   asking you a series of hypotheticals of what might happen if

20   value changed in the future, what would you recommend, what

21   would the company do.  Do you remember that generally?

22   A    Yes, I do.

23   Q    And if circumstances change, if the DIP motion were

24   approved, and we move forward in time, we followed Mr.

25   Shore's logic there, and circumstances changed in one

1    fashion or another, would you be able to tell the Court what

2    your recommendation would be to the company about the

3    fiduciary out without having full information about

4    alternative proposals?

5    A    You'd have to rephrase the question, I'm not following.

6    Q    Sure.  Mr. Shore had put to you a series of questions

7    about what recommendation you would or would not make to the

8    company with regard to the exercise of the fiduciary out in

9    the future.  Do you remember that?

10   A    Yes.

11   Q    All right.  And in order to answer that fully and

12   completely, would you need to know the full details

13   regarding whatever alternate transactions were available for

14   the company to pursue?

15   A    Well, to exercise a fiduciary out obviously it raises

16   the question of is there a better deal.

17   Q    And before you could tell the Court what advice you

18   would give the debtors in future days, would you want to

19   know the details of the alleged better deal?

20   A    I think answering these kind of hypotheticals is

21   impossible without the facts.

22   Q    And would you expect then the debtor would want to be

23   fully informed about an alleged better deal before it could

24   determine whether it made sense or not to exercise the

25   fiduciary out?

1   A    Unquestionably, yes, exercising the fiduciary out is an

2   important step, and you'd want to analyze the specific

3   circumstances of the potential event.

4           UNIDENTIFIED:  Thank you, Mr. Ying, that's all I

5   have for now.

6           THE COURT:  All right.  Thank you.

7           You may step --

8           UNIDENTIFIED:  (indiscernible) oh, I

9   (indiscernible) saying I can't do recross.

10          THE COURT:  I was, yeah.

11          UNIDENTIFIED:  Yeah.  If he can, I can.

12          THE COURT:  No, I don't -- no, we don't need

13  recross.  You can step down, Mr. Ying.

14          UNIDENTIFIED:  Thank you.

15          THE COURT:  You're excused.

16          THE WITNESS:  Thank you, sir.

17          THE COURT:  Let's -- your next witness will be Mr.

18  Keglevic?

19          UNIDENTIFIED:  Yes.

20          THE COURT:  Okay.  We're obviously not going to do

21  that now.  I'm not sure how we'll actually proceed tomorrow.

22  I have to sort of -- you know, there's no way we'll start

23  and finish Mr. Keglevic in two and a half hours.

24          UNIDENTIFIED:  I agree, Your Honor.  I can tell

25  the Court his direct examination will be shorter than Mr.

1   Ying's.  But I don't -- I doubt with the -- I'm not casting

2   aspersions, but with the cross to come, I don't think we

3   would finish it.

4           THE COURT:  No.  And maybe it doesn't make sense

5   to start.

6           UNIDENTIFIED:  Your Honor, I was just suggesting

7   Mr. Horton as a witness who I think is likely to be short,

8   and we might be able to do him in the entirety.

9           THE COURT:  Okay.

10          UNIDENTIFIED:  I don't know what other people feel

11  about that.

12          THE COURT:  Who's Mr. Horton's witness?

13          UNIDENTIFIED:  Mr. Horton is the treasurer of the

14  company but we're not offering his testimony.  They've asked

15  to have him here to cross him is my understanding.

16          THE COURT:  All right.  So we'll do cross of Mr.

17  Horton tomorrow morning?

18          UNIDENTIFIED:  He's all witness, Your Honor, so

19  that would be taking it out of order, but that's --

20          THE COURT:  Well --

21          UNIDENTIFIED:  If debtors want to do that or not.

22          UNIDENTIFIED:  Your Honor, I mean --

23          THE COURT:  Should we -- well, I apologize for

24  sort of going back and forth on this, it's obviously a fluid

25  situation, but it doesn't sound -- I guess -- I have two

1    observations I want to make, which may have an impact on how

2    we proceed going forward.

3           So I don't think it makes sense to proceed

4    tomorrow, so we'll continue the hearing to July 10th, and

5    that way we won't be interrupting somebody in the middle of

6    cross or direct and having this eight day window where we

7    have to worry about the niceties of whether that person can

8    discuss testimony, et cetera.

9           And I'll let my staff work with you to figure out

10   how to get all these documents out.  They don't have to come

11   out today.  They can come out tomorrow morning, you don't

12   need to kill yourself on that, although we need to be good

13   stewards of Judge Walrath's courtroom if you don't mind.

14          And let me make my observations and then we'll

15   close until the 10th.  I have two.  At this stage, while

16   noting the record remains open, and I'm looking forward to

17   hearing the presentations of the debtor and the objectors

18   alike, and there are a myriad of issues before the Court.

19          I would observe as a threshold matter I believe

20   there are two particular issues in which the debtor needs to

21   present further evidence.  First, I'm referencing the market

22   effort relating to the DIP, and more particularly the equity

23   conversion feature, because that is obviously one of the

24   statutory criteria the debtors need to establish.

25          I understand that this prong is not in dispute in

1    many cases where the lender and the terms are obvious to

2    everyone from the get go.  This is a central feature of the

3    objections.  This is clearly not your run of the mill DIP

4    and there's evidence there are serious competing proposals.

5             Second, I'm concerned with the debtors' effort to

6    enter into the second lien EFIH DIP prior to approval of the

7    assumption of the RSA, and while that would be a prudent

8    exercise of the debtors' business judgment.  So I think

9    candor requires that I convey that the debtors' record on

10   these particular issues is fairly thin and is going to need

11   more evidence to satisfy the Court that this is the

12   appropriate path to continue to go down.

13            So offering those observations, we'll continue the

14   hearing to July 10th, and the Court is available at the

15   parties' convenience if there are any developments between

16   now and then.  All right.  Thank you.

17        (Whereupon, the proceedings were concluded at 5:18 PM)

18                          * * * * *

19

20

21

22

23

24

25

Page 268

                              I N D E X

                          W I T N E S S E S

   WITNESS                     BY                          PAGE

David Ying              Mr. Horowitz                        22

                        Mr. Glenn                           65

                        Mr. Sadeghi                        111

                        Mr. Jonas                          126

                        Mr. Martin                         138

                        Mr. Shore                          178

                        Mr. McGaan                         235




                              I N D E X

                          E X H I B I T S

   PARTY      NO    DESCRIPTION              ID.       EVID.

Page 269

1                    C E R T I F I C A T I O N

2    We, Dawn South, Nicole Yawn, Lisa Beck, Sherri Breach,

3    Sheila Orms, and Linda Foley certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

                    *Dawn South*
6    Dawn South                      Digitally signed by Dawn South
                                     DN: cn=Dawn South, o=Veritext, ou,
                                     email=digital@veritext.com, c=US
                                     Date: 2014.07.02 12:21:10 -04'00'

7     AAERT Certified Transcriber CET**D-408

8
                    *Nicole Yawn*    Digitally signed by Nicole Yawn
                                     DN: cn=Nicole Yawn, o=Veritext, ou,
                                     email=digital@veritext.com, c=US
9     Nicole Yawn                    Date: 2014.07.02 12:22:29 -04'00'

10
                    *Linda S. Foley*  Digitally signed by Linda S. Foley
                                      DN: cn=Linda S. Foley, o=Veritext, ou,
                                      email=digital@veritext.com, c=US
11    Linda S. Foley                  Date: 2014.07.02 12:23:21 -04'00'

12
                    *Lisa Beck*      Digitally signed by Lisa Beck
                                     DN: cn=Lisa Beck, o=Veritext, ou,
                                     email=digital@veritext.com, c=US
13    Lisa Beck                      Date: 2014.07.02 12:24:28 -04'00'

14    AAERT Certified Electronic Transcriber CET**D-486

15
                    *Lisa Beck*      Digitally signed by Lisa Beck
                                     DN: cn=Lisa Beck, o=Veritext, ou,
                                     email=digital@veritext.com, c=US
16    Sherri L. Breach               Date: 2014.07.02 12:25:22 -04'00'

17    AAERT Certified Transcriber CERT*D-397

18
                    *Shelia G. Orms*  Digitally signed by Shelia G. Orms
                                      DN: cn=Shelia G. Orms, o=Veritext, ou,
                                      email=digital@veritext.com, c=US
19    Sheila Orms                     Date: 2014.07.02 12:28:13 -04'00'

20    Veritext 330 Old Country Road St. 300 Mineola, NY 11501

21     July 2, 2014

22

23

24

25