```
1   UNITED STATES BANKRUPTCY COURT
2   DISTRICT OF DELAWARE
3
4   In re:                        :
                                  :   Chapter 11
5   ENERGY FUTURE HOLDINGS        :
    CORP.,  et al.,               :   Case No. 14-10979(CSS)
6                                 :
            Debtors.              :   (Jointly Administration
7   _____     :   Requested)
    CSC TRUST COMPANY OF DELAWARE,:
8   as INDENTURE TRUSTEE,         :
                                  :
9           Plaintiff,            :
                                  :
10     v.                         :   Adv. Proc. No. 14-50363
                                  :   (CSS)
11  ENERGY FUTURE INTERMEDIATE    :
    HOLDING COMPANY LLC and EFIH  :
12  FINANCE INC.,                 :
                                  :
13          Defendants.           :
    _____:
14
15                          United States Bankruptcy Court
16                          824 North Market Street
17                          Wilmington, Delaware
18                          July 11, 2014
19                          9:41 AM - 10:27 AM
20
21  B E F O R E :
22  HON. CHRISTOPHER S. SONTCHI
23  U.S. BANKRUPTCY JUDGE
24
25  ECRO - AL LUGANO
```

1    HEARING Re Motion for entry of an order authorizing

2    Wilmington Savings Fund society, FSB to file (I) Redacted

3    versions of its July 8, 2014 letter and (II) Certain

4    exhibits to the letter under seal (D.I. 1501; filed July 8,

5    2014) (the "Motion to Seal")

6

7    HEARING Re Pre-Trial Conference in Adversary 14-50363;

8    Complaint for Declaratory Relief (D.I. 470/Adv. D.I. 1;

9    filed May 15, 2014)

10

11   HEARING Re Status Conference Matter; Motion of Wilmington

12   Savings Fund Society, FSB for Leave to Conduct Discovery

13   Pursuant to Rule 2004 of the Federal Rules of Bankruptcy

14   Procedure of Energy Future Holdings Corporation, its

15   Affiliates, and Certain Third Parties (D.I. 6; filed April

16   29, 2014)

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms and Nicole Yawn

1   A P P E A R A N C E S :

2

3   POTTER ANDERSON & CORROON LLP

4       Attorneys for Deutsche Bank AG New York Branch

5

6   BY:  LAURIE SELBER SILVERSTEIN, ESQ.

7       R. STEPHEN MCNEILL, ESQ.

8

9   BINGHAM MCCUTCHEN LLP

10      Attorneys for Pacific Investment Management Co. LLC

11

12  BY:  JEFFREY SABIN, ESQ.

13

14  LANDIS RATH & COBB

15      Attorneys for Next Era Energy

16

17  BY:  JOSEPH WRIGHT, ESQ.

18

19  FOX ROTHSCHILD

20      Attorney for Ad Hoc Unsecured Noteholders

21

22  BY:  L. JOHN BIRD, ESQ.

23

24

25

1   QUINN EMANUEL URQUHART & SULLIVAN, LP

2        Attorney for Centerbridge

3

4   BY:  KATE SCHERLING, ESQ.

5

6   TELEPHONIC APPEARANCES:

7

8   ENRIQUE A. VICIANA, THE BLACKSTONE GROUP

9   JACOB A. ADLERSTEIN, PAUL WEISS

10  SCOTT L. ALBERINO, AKIN GUMP

11  ARLENE R. ALVES, SEWARD & KISSEL LLP

12  NII-AMAR AMAMOO, KASOWITZ & BENSON

13  JENNIFER H. ANDERSON, FARALLON CAPITAL MANAGEMENT

14  PHIL ANKER, WILMER CUTLER

15  STEPHEN M. BALDINI, AKIN GUMP

16  CORINNE BALL, JONES DAY

17  DANIEL M. BARDES, SILVER POINT CAPITAL

18  RYAN BARTLEY, YOUNG CONAWAY

19  PHILLIP BENTLEY, KRAMER LEVIN

20  JON R. BERKE, DEBTWIRE

21  DAVID BERSH, APPALOOSA MANAGEMENT

22  ROBERT J. BOLLER, AKIN GUMP

23  CASEY BOYLE, KELLEY DRYE

24  PEG A. BRICKLEY, DOW JONES & CO.

25  MATTHEW BROD, MILBANK TWEED

1   MATTHEW C. BROWN, WHITE & CASE LLP

2   PHILIP E. BROWN, PSAM, LP

3   STEPHEN BURNAZIAN, AVENUE CAPITAL GROUP

4   JUSTIN CARROLL, JONES DAY

5   CHRIS CARTY, AKIN GUMP

6   RICHARD M. CIERI, KIRKLAND & ELLIS

7   MARK A. CODY, JONES DAY

8   JEREMEY COFFEY, BROWN RUDNICK

9   HOWARD COHEN, DRINKER BIDDLE

10   KENT COLLIER, REORG RESEARCH, INC.

11   JIM COOPER, CENTERVIEW PARTNERS

12   SCOTT D. COUSINS, COUSINS CHIPMAN

13   LOUIS A. CURCIO, DENTONS US LLP

14   AMANDA D. DARWIN, NIXON PEABODY

15   MICHAEL L. DAVITT, JONES DAY

16   DANIEL DEFRANCESCHI, RICHARDS LAYTON

17   DAVID DEMPSEY, KRIKLAND & ELLIS

18   ADAM M. DENHOFF, PAUL WEISS

19   HARRISON DENMAN, WHITE & CASE LLP

20   ANDREW DEVOTRE, ROPES & GRAY LLP

21   IRA DIZENGOFF, AKIN GUMP

22   CHRISTOPHER DRESSEL, SKADDEN ARPS

23   DAVID DUBACK, MERCED CAPITAL, LP

24   DAVID M. DUNN, ARROWGRASS CAPITAL PARTNERS U.S., LP

25   JUSTIN EDELSON, POLSINELLI PC

1   PHILIP EISENBERG, LOCKE LORD LLP

2   MARITA ERBECK, DRINKER BIDDLE

3   BRADLEY FEINGERTS, GSO CAPITAL PARTNERS

4   JEFFREY R. FINE, DYKEMA GOSSETT PLLC

5   JEFF FINGER, CENTERVIEW PARTNERS

6   MARK FLANNAGAN, UMB BANK CORPORATE TRUST

7   MARK FLANNAGAN, CLIENT, FOLEY & LARDNER

8   PATRICK FLEURY, CLIENT, GSO CAPITAL PARTNERS

9   RICHARD GADHIA, AKIN GUMP

10  CHARLES GARRISON, AKIN GUMP

11  MEGGIE GILSTRAP, BAKER BOTTS

12  SAMUEL GREENE, CLIENT, AKIN GUMP

13  PETER T. GRUSZKA, CHICAGO FUNDAMENTAL INVESTMENT

14  DANIEL J. HARRIS, MORRISON & FOERSTER

15  CRAIG HART, AVENUE CAPITAL GROUP

16  MARK F. HEBBELN, FOLEY & LARDNER

17  BRIAN HERMANN, PAUL WEISS

18  ROBERT S. HERTZBERG, PEPPER HAMILTON

19  IAN HOLMES, AKIN GUMP

20  SANDRA HORWITZ, CLIENT, ROPES & GRAY

21  MARSHALL HUEBNER, DAVID POLK

22  TODD JELEN, VARDE PARTNERS, INC.

23  DENNIS L. JENKINS, WILMER CUTLER

24  JEFFREY L. JONAS, BROWN RUDNICK

25  LAURA D. JONES, PACULSKI STANG

1  MICHAEL J. JOYCE, CROSS & SIMON

2  HAROLD KAPLAN, FOLEY & LARDNER

3  JAMES KATCHADURIAN, EPIQ BANKRUPTCY SOLUTIONS

4  CHRISTOPHER KEARNES, CAPSTONE ADVISORY GROUP

5  CHRIS D. KENNY, AURELIUS CAPITAL MANAGEMENT

6  MATTHEW KIMBLE, AVENUE CAPITAL GROUP

7  GEOFFREY KING, SIDLEY AUSTIN

8  CHARLES KOSTER, WHITE & CASE

9  STUART KOVENSKY, ONEX CREDIT PARTNERS

10  STEVEN KRAUSE, CLIENT, ROPES & GRAY

11  AARON KRIEGER, ROPES & GRAY

12  AVI KRIPALANI, CLIENT, ROPES & GRAY

13  MICHELE F. KYROUZ, WATERSHED ASSET MANAGEMENT

14  MEREDITH A. LAHAIE, AKIN GUMP

15  FREDRICK LEE, AKIN GUMP

16  MICHAEL LEE, CARL MARKS STRATEGIC

17  DANIEL A. LOWENTHAL, PATTERSON BELKNAP

18  JASON M. MADRON, RICHARDS LAYTON

19  LORENZO MARINUZZI, MORRISON & FOERSTER

20  D. ROSS MARTIN, ROPES & GRAY

21  RICHARD G. MASON, WACHTELL LIPTON

22  SCOTT T. MCCABE, LATIGO PARTNERS

23  GARVAN MCDANIEL, THE HOGAN FIRM

24  ANDY MCGAAN, KIRKLAND & ELLIS

25  MATTHEW B. MCGUIRE, LANDIS RATH & COBB

1   HAL F. MORRIS, ATTORNEY GENERAL OF TEXAS

2   NAOMI MOSS, AKIN GUMP

3   JASON NEW, CLIENT, GSO CAPITAL PARTNERS

4   JOANNA S. NEWDECK, AKIN GUMP

5   MICHAEL O'NEILL, MOUNT KELLETT CAPITAL MANAGEMENT

6   SAMUEL S. ORY, FREDERICK DOWART

7   MAURA O'SULLIVAN, SHEARMAN & STERLING

8   RUSSELL W. PARKS, AKIN GUMP

9   RICHARD PEDONE, NIXON PEABODY

10  TUVIA PERETZ, KRAMER LEVIN

11  NORMAN L. PERNICK, COLE SCHOTZ

12  CHARLES PERSONS, WEIL GOTSHAL

13  JESSICA S. PEVZNER, FRIED FRANK

14  MEREDITH PFISTER, BARCLAYS BANK

15  KIRAN RAMINENI, AVENUE CAPITAL GROUP

16  ELIZABETH RASSKAZOVA, PLYGON GLOBAL PARTNERS

17  MARC B. ROITMAN, CHADBOURNE & PARKE

18  JEFF ROSENBAUM, YORK CAPITAL MANAGEMENT

19  RAVI SARAWGI, JPMORGAN CHASE & CO.

20  DAMIAN S. SCHAIBLE, DAVIS POLK

21  ERIC SCHNEIDER, NIXON PEABODY LLP

22  NED S. SCHODEK, SHEARMAN & STERLING LLP

23  ANDREW B. SCHWARTZ, OFFICE OF THE U.S. TRUSTEE

24  JOHN N. SCHWARTZ, FULBRIGHT & JAWORSKI

25  HOWARD SEIFE, CHADBOURNE & PARKE

1    GEORGE W. SHUSTER, JR., WILMER CUTLER

2    CHARLES SIEVING, NEXTERA ENERGY RESOURCES

3    MATTHEW SMITH, CLEARY GOTTLIEB

4    MARK SOMERSTEIN, ROPES & GRAY

5    ANDREW SORKIN, THE CAPITAL FORUM

6    J. KATE STICKLES, COLE SHOTZ

7    PATRICK STRAWBRIDGE, BINGHAM MCCUTCHEN

8    JOSHUA STURM, ROPES & GRAY

9    GREGORY TAYLOR, ASHBY & GEDDES

10   ANDREW M. THAU, SOUTHPAW ASSET MANAGEMENT

11   MEREDITH S. TINKHAM, ROPES & GRAY

12   CARL TULLSON, SKADDEN ARPS

13   WARREN USATINE, COLE SCHOTZ

14   FRANK F. VELOCCI, DRINKER BIDDLE

15   PATRICIA J. VILLAREAL, JONES DAY

16   MICHAEL J. WALSH, BANK OF AMERICA

17   CHRISTOPHER A. WARD, POLSINELLI P.C.

18   EDWARD WEISFELNER, BROWN RUDNICK

19   GREG WILKES, FULBRIGHT & JAWORSKI

20   KEITH WOFFORD, ROPES & GRAY

21   APARNA YENAMANDRA, KIRKLAND & ELLIS

22   LINDSAY ZAHRADKA, AKIN GUMP

23   JOSEPH ZELWSKI, THIRD AVENUE MANAGEMENT

24   SEAN M. BRENNECKE, KLEHR HARRISON

25

1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.  Good morning, this

4    is Judge Sontchi and this is the hearing in Energy Future

5    Holdings Corp, I'm not asking for notices of appearance,

6    everyone signed in, either in court or on the court call

7    sheet.  And I'll turn it over to debtors' counsel to run

8    through the agenda.

9            MR. MCGAAN:  Andrew McGaan, Kirkland & Ellis on

10   behalf of the debtors.  And as I understand it, the sole

11   item up for today is a status conference on what we refer to

12   as the first lien noteholder make whole litigation.

13           THE COURT:  Yes.

14           MR. MCGAAN:  Do you want me to proceed?

15           THE COURT:  Yeah, status away.

16           MR. MCGAAN:  Okay.  The -- just a brief update on

17   where we are in terms of scheduling.  I think it's pretty

18   straight forward.  The make whole dispute began with the

19   filing of the contested matter by the debtors on April 29th,

20   challenging the first lien noteholders claim to make whole

21   premium.

22           The CST trust company, indenture trustee for the

23   first lien note filed that adversary proceeding raising the

24   same issue, May 15th parties negotiated and agreed upon a

25   scheduling order which we submitted to Your Honor, on June

1    4th, and subject to that scheduling order, we've been

2    engaged in document discovery, the adversary has been

3    answered.  The parties exchanged initial disclosures on or

4    about June 13th.

5              And as of today, what remains to be done is

6    completion of document discovery, substantial amount of

7    document production has been completed.  And on behalf of

8    the debtors, there's a little bit more to go, and that's

9    forthcoming very soon.

10             Simultaneous summary judgment motions are to be

11   filed on July 30th, and simultaneous oppositions to summary

12   judgment on August 15.  And then finally, Your Honor has

13   scheduled trial for three days September 10, 11 and 12th.

14             Depositions have not yet occurred, but they're

15   going to this month and the parties, at least between the

16   debtors and the first lien trustee are just n discussions

17   about scope and witnesses and the like, and nothing to

18   report in more detail on that, unless we need to come back

19   and seek your guidance.  We're in the process of discussing

20   that now.

21             So that's the status and the map and that we're on

22   track for trial in September.

23             THE COURT:  All right.  Does anyone have anything

24   else to say?

25             MR. PERNICK:  Your Honor, it's Norm Pernick from

1    Cole Schotz on behalf of CSC.  I just wanted to introduce to

2    the Court Phil Anchor from Wilmer Hale.  He's going to speak

3    to this, but you've already signed his pro hac vitae motion.

4              THE COURT:  All right.  Thank you, Mr. Pernick.

5              MR. ANKER:  Good morning, Your Honor.  I'm -- this

6    is Phillip Anker from Wilmer Cutler Pickering Hale & Dorr

7    for CSC.  I'm on a speakerphone in my office, and I

8    appreciate the Court allowing this hearing to proceed

9    telephonically.  I am audible --

10             THE COURT:  Yes.

11             MR. ANKER:  -- Your Honor?

12             THE COURT:  Yes, you are.

13             MR. ANKER:  Thank you, Your Honor.

14             Good morning, Your Honor.  Let me provide a sense

15   of a status from our perspective which I think somewhat

16   differs from Mr. McGaan's perspective.  Although I think

17   basic facts as he set them forth are essentially right.

18             As Mr. McGaan noted, document discovery is ongoing,

19   and because document discovery is ongoing, deposition

20   discovery has not begun.  The debtors have taken the

21   position, and I don't think in principle it's an

22   unreasonable position, that they want each of their

23   witnesses deposed once and only once with respect to this

24   adversary.

25             Now, there may be issues if they put in affidavits

1    after a witness is deposed about whether we get a second

2    deposition about the affidavit, but the basic proposition

3    that you have document discovery first and then take

4    depositions is a sensible one.

5            Having said that, the debtors have not completed

6    their document discovery, and I don't mean in any way, shape

7    or form to insinuate that they have acted in bad faith.

8    I've been in many conversations with Mr. McGaan's partner,

9    David Dempsey.  They have been extremely professional, and I

10   think productive conversations.

11           But significant groups of documents have not been

12   produced.  By way of example, only underlying counsel

13   drafting and negotiating, really drafting for the debtor the

14   relevant indenture here and the debtor and the indenture for

15   the predecessor notes that were then exchanged for these

16   notes with Simpson Thacher, we have not received a single

17   document to my knowledge, and I'm happy to stand corrected

18   by Simpson -- from Simpson Thacher from its files and those

19   documents are highly pertinent to this dispute.

20           I've been told by counsel for the debtors, Mr.

21   Dempsey, that he is hopeful but cannot assure us that those

22   documents will be produced by next week.  We may have other

23   issues, including gaps in production.  I think Mr. McGaan is

24   accurate in saying we're in meaningful discussions about

25   them.

1        There is significant, in addition, third party, or

2   I shouldn't say third party -- party discovery here,

3   involving in particular the EFIH ad hoc committee, the so-

4   called PICs.  I say party, because they have intervened in

5   this action as a party defendant.

6        We have sought from them and have been in ongoing

7   discussions with them documents regarding a variety of

8   subjects.  They include but are not limited to the

9   negotiations and discussions before the petition date that

10  led to the first day filing of a motion to refinance our

11  debt, in an effort to deny us the make whole.  There's no

12  question that the PICs were intimately involved in those

13  discussions.

14       The PICs take the position that many if not all of

15  those materials are either irrelevant or subject to a common

16  interest privilege.  Similarly, we believe and this is not a

17  fishing expedition, there have been conversations that make

18  it abundantly clear that this right, that the PICs have

19  substantial documents including models, we believe, on the

20  recoveries that they anticipate receiving here.

21       That they have discussions about transactions once

22  they become the owners of Encore of selling it and that

23  those models show recoveries that are well in advance of

24  even 125 cents on the dollar or more that their notes are

25  trading at.

1          And that is relevant because while we believe that

2    we are entitled to our make whole purely as a matter of

3    contract, some courts have said, look there are bankruptcy

4    rules that may limit state law contract rights, but those

5    limitations don't apply at all if the debtor is solvent.

6    And obviously, the views of sophisticated financial

7    institutions and major constituents in this matter like the

8    PICs about their value in light of the Campbell Soup and

9    remaining precedent in this circuit, are plainly relevant

10   and could lead to the discovery of admissible evidence on

11   solvency, on questions of whether there's been deliberate

12   strategy here to seek to avoid paying the make whole, and to

13   refinance these notes.

14          But we have tried at considerable time to resolve

15   those disputes with the PICs.  We had initially sought the

16   discovery a while ago.  We decided to take it off calendar

17   in connection with the -- you may have seen letter briefs in

18   connection with the second lien DIP, because we thought that

19   frankly Your Honor could decide the issues on the second

20   lien DIP and second lien settlement without this issue being

21   front and center, and we took it off without prejudice.

22          I have been in contact with counsel for the PICs,

23   Mr. Boller from Akin Gump and last night received an e-mail,

24   I guess this morning at about 12 -- about midnight from him,

25   indicating that they were unprepared to turn over any of

1    these documents or make any of the witnesses on their end

2    who we have noticed for deposition available.

3           Today is not the occasion.  You don't have letter

4    briefs to argue, for Your Honor to decide that issue I

5    think.  But what I would propose is that we will submit a

6    letter brief by Tuesday of next week if it's agreeable to

7    Your Honor.  The PICs can respond by Thursday.  I gather

8    that has been the normal course in this action -- I'm sorry,

9    in this bankruptcy case.  And we could hopefully have the

10   matter resolved next Friday.  And I would suggest that this

11   status conference be continued until next Friday.  We're

12   also trying to work out a discovery protocol.  And while we

13   are close, we are not quite there.

14          In terms of overall scheduling, I think what all of

15   this means is the following.  I'm sorry, did someone speak

16   up?

17          MR. BOLLER:  Yeah, Your Honor, good morning.  This

18   is Robert Boller from Akin Gump on behalf of the unsecured

19   noteholders of EFIH.

20          I don't know how you'd like to proceed here, Your

21   Honor.  I can respond to Mr. Anker's points now, or I can

22   wait until we get his views on scheduling, I'll leave that

23   up to you.

24          THE COURT:  Why don't we wait until he's finished

25   speaking.

1            MR. BOLLER:  Yeah, I thought that.

2            MR. ANKER:  Thank you.  Thank you, Your Honor.

3            Your Honor, on scheduling, I guess I think this

4     means the following.  I think Mr. McGaan when he said

5     depositions will occur this month, that's not going to

6     realistically happen or put differently, they're not going

7     to be completed this month.

8            I've already had discussions with his partner, Mr.

9     Dempsey, and there's no question that under any schedule

10    depositions will have to continue into next month.  If Your

11    Honor were to agree with us on the discovery we're entitled

12    of the PICs, I'm confident that Mr. Boller would say it will

13    take him a while to gather the documents up.

14            I'm sure we'll have hopefully that we can resolve,

15    but nevertheless, just agreements on search terms and the

16    like.  I wouldn't be surprised if we don't get the

17    production before next month commences.

18            And so we've already had discussions with the

19    debtors about having deposition discovery and experts

20    continue past July 30.  Does that mean it will be impossible

21    for us to file a brief on July 30?  I'm not going to say

22    that to Your Honor.  We could and we are working on it.

23            But it does mean, Your Honor, that the brief will

24    not be, as is typical with a summary judgment brief, cover

25    the whole record.  There will be substantial discovery that

1    will have not yet occurred.

2           I leave it to Your Honor whether you want to stick

3    with that schedule at this point, or whether we should

4    revisit the question next week and that may make more sense

5    once Your Honor has ruled on the discovery issue.

6           I am hopeful that we can get the discovery done in

7    August, but that is also not certain and I wanted to alert

8    the Court.  As I said, I have no question the debtor is

9    acting in good faith, but as the debtors' own response to

10   the second lien -- I'm sorry, to the creditor's committee

11   status report indicates the debtors are obviously under the

12   gun with lots of discovery requests.

13          And I would suggest that we take up further

14   scheduling next week as this matter develops.  But I do want

15   to alert the Court that I think there is no realistic

16   possibility that discovery will be completed and therefore

17   that by July 30, or even by August 15, and that therefore,

18   of the briefing will cover the discovery.

19          One last thing as a scheduling matter that I sort

20   of feel obligated to mention to the Court.  I am scheduled

21   personally to argue an appeal in the Second Circuit, this is

22   arising out of another case coming out of this district, the

23   Tribune bankruptcy.  As Your Honor may know, following the

24   confirmation of that plan, creditors filed their own state

25   law fraudulent transfer claims.  That became a part of an

1    MDL, a multi-district litigation.

2         We representing defendants and other counsel moved

3    to dismiss.  That motion was granted by the district court

4    Judge Sullivan, and it is now up on appeal in the Second

5    Circuit to be heard consolidated with an appeal of a case

6    that raises related issues about the application of the safe

7    harbor under Section 546(e) of the Bankruptcy Code, the SIM

8    Group case (ph).

9         I got a call on Tuesday of this week from Katherine

10   Wolf in the Clerk's office from the Second Circuit saying

11   that the Court was hoping to schedule argument, and it has

12   been very hard for the Court to find the time to schedule

13   argument, and frankly to find a panel that didn't have

14   potential conflicts, given the breadth of the defendants in

15   this case for September 11.

16        But the moment we got involved in the present

17   matter, the EFIH matter, I sent a letter to the Second

18   Circuit saying I was unavailable the week that included

19   September 10, 11 and 12, when this case is scheduled to be

20   tried.

21        Ms. Wolf asked me a number of questions about what

22   my trial was, I don't know whether Your Honor's chambers

23   have been contacted, but she left it simply that we would

24   hear back from -- she would report what I had reported, that

25   I was on trial to her -- to others, and she would get back

1    to me.

2            But there was clearly -- I think it's fair to say a

3    fair amount of frustration on her part that after trying to

4    schedule this matter for argument for about the last three

5    months, that date did not, at least that I have a conflict,

6    and so does our co-counsel at Ropes & Gray.  The Akin Gump

7    firm is involved as well, Your Honor.

8            I don't know whether we're going to get a call back

9    from the Second Circuit saying, I'm sorry, but September 11

10   is it, but I felt it incumbent on me to at least notify the

11   Court of that possibility.

12           That's what I have on my end, Your Honor.  Thank

13   you.

14           MR. BOLLER:  Good morning, Your Honor, this is

15   Robert Boller from Akin Gump again on behalf of the ad hoc

16   committee of EFIH unsecured noteholders.

17           Can I respond to Mr. Anker briefly?

18           THE COURT:  Yes.

19           MR. BOLLER:  Sure.  I just wanted to give the Court

20   an understanding, and some of these issues were actually

21   briefed and put before Your Honor, but I wanted to disabuse

22   the Court of any notion that we have thus far refused to

23   produce documents or communications related to the

24   negotiation of, you know, the RSA, the first lien make whole

25   settlement, or the first lien DIP financing.

1          As we've told counsel to the first lien trustee

2     several times, both on the phone and in letters, we have

3     produced all the negotiations with all of the parties

4     related to the first lien DIP, the first lien make whole

5     settlement.

6          We've produced 20,000 pages of documents from our

7     clients related to these negotiations.  So it's simply not

8     true to say that we're withholding that information from the

9     plaintiffs here, from the first lien trustee.

10          The second point I wanted to make with respect to

11    these solvency issues, and really kind of the broader

12    categories of additional documents, that the first lien

13    trustee is seeking here, is that the make whole adversary

14    proceeding at its core is a contract case.

15          There's an indenture.  Our clients were not parties

16    to the indenture when it was signed.  They weren't involved

17    in the negotiations.  So this is a document that can be

18    interpreted on its four corners.

19          Even if, assuming for argument sake, you were to

20    admit parole evidence on this, and find the parole evidence

21    is relevant, our clients were not involved in negotiating

22    these documents.

23          And so we don't have relevant evidence that the

24    Court would consider in trying to figure out what did the

25    parties mean in 2010 when they entered into this indenture.

1          With respect to the specific issue that Mr. Anker

2    raised on solvency, the first lien trustee still has not

3    articulated to us the relevance at all of EFIH's solvency at

4    the time of the filing.  So taking a step back.  We got an

5    indenture.  There is no provision in the indenture

6    whatsoever that says that the make-whole payment is not

7    provided for or is provided for in the event that the

8    company is solvent at the time of the bankruptcy filing.

9    It's not relevant at all to the contract.

10          Mr. Anker has intimated to the Court and he's

11   intimated to us that he believes there is some authority for

12   the proposition that they can ignore the plain terms of the

13   agreement if the debtor is solvent when it entered into

14   bankruptcy, but I haven't seen any such authority.  I'm not

15   aware of any, and they haven't pointed us to any.

16          And then, third, even if you assumed that you can

17   ignore the plain provisions of this agreement and then

18   assumed that solvency was in some way relevant to how the

19   Court should interpret the parties' respective obligations

20   under the indenture, there's still no explanation of how our

21   clients, the individual members of our committee who are not

22   parties to this litigation, would have relevant documents

23   that the Court should consider in making a solvency

24   valuation.  This is similar to an issue that was raised in

25   connection with discovery on the TCEH side a couple of weeks

1    ago.  This is similar to an issue, I believe, that came

2    before the Court when Mr. Ying was testifying in connection

3    with the second lien DIP.

4           Our clients, to the extent that they have models

5    and those models discuss valuations, that's not relevant

6    evidence for the Court to consider in trying to make a

7    solvency determination, and I still don't -- and Mr. Anker

8    has not articulated to us how that is the case.  So I don't

9    want to get too far afield and discuss the rested (sic)

10   positions (sic), because, as Mr. Anker indicated, you know,

11   there's nothing before the Court right now, but I felt like

12   those issues needed to be addressed.

13          And on scheduling, you know, the point that I'd

14   like to make is that I understand Mr. Anker has some

15   complications with some other cases, and we can appreciate

16   that, but the schedule that we have is the schedule that was

17   agreed to by the parties.  Mr. Anker is new to the case, but

18   his client filed this complaint two months ago, and the

19   issues that Mr. Anker is raising on this call and that he

20   proposes to raise again with the Court next week are issues

21   that were fully briefed and ready to be argued weeks ago,

22   and the requests have not changed.  The scope of the

23   documents that they're looking for have not changed.

24          And so, this is a second bite at the apple a

25   couple of weeks later, and I apologize, because I did have

1    one more point, Your Honor, which is, in connection with all

2    of this discovery, the first lien trustee served upon us 13

3    separate depositions subpoenas for each and every individual

4    member of the committee and for a variety of specific

5    employees at each member institution.  For all of the

6    reasons that we believe that these discovery requests, these

7    additional document requests above and beyond what we've

8    already produced are irrelevant, we think that 13 deposition

9    subpoenas of the members of our committee are not just

10   irrelevant, but they're burdensome, and they're harassing.

11          And so, I assume we're going to have letter briefs

12   in front of Your Honor shortly.  I don't have a problem with

13   the schedule that Mr. Anker articulated shortly ago.  So

14   Tuesday, Thursday is okay with us, but one of the issues

15   that we are going to want the Court's guidance on is whether

16   it is justifiable or rather oppressively burdensome to

17   require this committee to make 13 separate witnesses

18   available in connection with an adversary proceeding

19   intended to interpret the provisions of an agreement to

20   which we are not a part.  So --

21          MR. ANKER:  Your Honor, this is Mr. Anker.  May I

22   respond very briefly?

23          THE COURT:  Oh, I'm not sure he's finished,

24   Mr. Anker.

25          MR. ANKER:  I'm sorry, Your Honor?

1          THE COURT:  I said I'm not sure your opponent is

2     finished, if you don't mind.

3          MR. ANKER:  Oh, I apologize, Your Honor.  I

4     thought he was.  I apologize, Your Honor.

5          MR. BOLLER:  Yeah, I just want to take a look at

6     the notes that I wrote down while Mr. Anker was speaking and

7     then -- thank you, Your Honor, for your patience.  I think

8     that's all that I have at this point.

9          THE COURT:  Very good.  Thank you.

10         Mr. McGaan, do you wish to be heard?

11         MR. MCGAAN:  Yes, Your Honor, briefly.  With

12    regard to scheduling and depositions, as Mr. Anker noted,

13    there have been ongoing discussions in trying to fit this in

14    under the schedule that was set a month ago, and there's

15    only -- the first lien trustee has noticed only six

16    depositions of debtor employees, one of which is a 30(b)(6).

17    So we may be talking about five depositions, and we won't

18    get into this now, because it's not in front of you, but

19    some of those involve witnesses who don't know anything

20    about this dispute, but that's the subject of ongoing

21    discussions.

22         So there's no issue at all in getting fact

23    discovery done in advance of the summary judgment deadline,

24    as everybody anticipated when the schedule was set.  There

25    have been discussions about the question of expert witnesses

1    and how they layer into the summary judgment schedule and

2    whether there'd be a need to conduct discovery of experts in

3    August pre-trial, but, in all things, we're going to

4    continue to be reasonable on scheduling, but, at the moment,

5    we don't see any issue that would preclude us from moving

6    forward to the summary judgment briefing on July 30th.

7             And we're in, no surprise, the same position as

8    the EFIH unsecureds, Mr. Boller's clients, with respect to

9    the solvency issue.  This adversary puts in front of Your

10   Honor a pretty straightforward question.  Does the language

11   of the contract, the indenture, entitle these parties to a

12   make-whole premium, yes or no?  Our position is and it's

13   going to be that you can interpret that on the face of the

14   document.

15            We've not withheld production on that position.

16   Rather than initiate discovery disputes, we've turned over,

17   as of a month ago, nearly 50,000 pages of documents that

18   includes everything we have or just about everything we

19   have.  I don't want to be absolute on that, but that was the

20   intent regarding the negotiation of the indentures and the

21   background to that.

22            So we don't agree that all these extraneous issues

23   on people's motives and intents filing for bankruptcy,

24   negotiations with other creditor constituencies, the

25   solvency of EFIH -- that any of that is going to be relevant

1    to the question in dispute in this case, which is the

2    interpretation of the indenture.  And so, to the extent that

3    it advances the ball to have letter briefing, we certainly

4    are in favor of that.

5              It certainly sounds, in listening to Mr. Anker,

6    who is, of course, new to the case, describe his theory of

7    how this ought to go forward that that's a gating issue here

8    of some significance.  Because, if he has his way, we're

9    talking about a much vaster dispute if we're going to be

10   litigating the solvency of EFIH, which we believe the case

11   law does not make relevant to this kind of dispute.

12             That's all I have, Your Honor.

13             THE COURT:  Thank you.

14             Mr. Anker?

15             Oh, I'm sorry.  Hang on.  Hang on.

16             MR. ANKER:  Thank you, Your Honor, and I do

17   apologize.

18             THE COURT:  Hang on.  I'm sorry.

19             I want to hear from the people in court first.

20   Thank you.

21             MR. SABIN:  Good morning, Your Honor.  Jeffrey

22   Sabin, from Bingham, McCutchen, on behalf of PIMCO, who has

23   now intervened in this make-whole litigation and, as you may

24   recall, as of the petition date, was one of the largest

25   single holders of EFIH first lien debt, and, as a result of

1    your orders entered approving the settlement and approving

2    the first lien DIP, they now hold in excess of $2.3 billion

3    of that $5.4 billion DIP.

4         Also relevant, Your Honor, for dates and for

5    timing is, of course, the appeal that is now pending that

6    was taken of the settlement, which, in part, seeks to

7    potentially undo a piece of the DIP itself.  So I understand

8    the background of which I'm here, but mostly important, our

9    position is similar to the debtors' and to that of the Akin

10   Gump firm, and that is a schedule was negotiated, and the

11   holders of the notes that did not settle and the trustee, in

12   essence, cannot have their way when they want to as to

13   timing and when they don't want to as to timing.

14         They're the ones who wanted expedition of the

15   timeframe.  They filed their adversary very early in this

16   case.  They negotiated the scheduling order very early in

17   this case.  They even sought and obtained informal discovery

18   very early in this case.

19         They then slowed this down, and this is

20   independent, of course, of Mr. Anker, who is new to the

21   litigation team.  They slowed this down for their own

22   purposes of fighting a second lien settlement and the second

23   lien DIP.  That was their choice.

24         But, in any event, I think the most important

25   thing is that the scheduling order was fully negotiated with

1    everybody's intentions, whatever they may have been, and

2    should go forward, and whatever we can do to resolve the

3    discovery disputes and set a schedule that still makes sense

4    and still keeps our September 10th through September 12th

5    schedule that is what we are otherwise asking this Court to

6    preserve.  Thank you, Your Honor.

7              THE COURT:  Thank you, Mr. Sabin.

8              All right, Mr. Anker.

9              MR. ANKER:  Thank you, Your Honor, and I do

10   apologize earlier.  I did not realize Mr. Boller had not

11   finished.

12             And my apologies to you, Mr. Boller.

13             Your Honor, I'll try to be brief.  I think that

14   the question of what discovery we're entitled to of the EFIH

15   Ad Hoc Committee, the so-called PIC, I think the Court will

16   be helped by briefing.  There are cases -- Cantura (ph) is a

17   classic example, Premier Entertainment Biloxi is a second

18   case dealing with entitlement to a make whole that

19   specifically looked to the debtors' solvency.

20             I don't disagree with Mr. McGaan that I think

21   we're -- well, he wouldn't put it this way, but I'll put it

22   this way.  I think we're entitled to the make whole and my

23   clients are, whether or not these debtors are solvent, but,

24   to say that there is not case law, there aren't that many

25   cases out there -- there are a number of them that

1    specifically look to the debtors' solvency as a relevant

2    factor, including in consideration, Your Honor, of whether

3    there are bankruptcy reasons, reasons under Section 502 or

4    otherwise of the code, to otherwise alter the state law

5    entitlement of a holder to a make whole, and we'll be happy

6    to cite those cases to Your Honor.

7              Again, I don't want to preview or have today,

8    unless Your Honor wants it to be, the argument on the

9    merits.  I think Your Honor will be helped by briefing, but,

10   on the proposition that what the PIC's own view of their

11   recoveries are going to be, which are much higher than even

12   the 125 cents on the dollar the notes are trading at, we're

13   in the Third Circuit, and the Third Circuit in the Campbell

14   Soup case certainly held that evidence of sophisticated

15   market participants' views of valuation was relevant, in

16   that case, dispositive of ultimate valuation.

17             Now, could other people have different arguments

18   that, on the merits, that evidence is not dispositive?  Of

19   course.  But the standard is lead to the discovery of

20   admissible evidence.

21             There also are lots of cases -- and we will cite

22   them to the Court -- saying that it is relevant whether the

23   debtor, in connection with junior creditors and others, has

24   taken deliberate action to seek to avoid paying a make

25   whole.  We will cite those cases, but, I mean, I'm confident

1    that my adversaries are aware of that precedent.

2            On the number of depositions, I think the way to

3    handle that, if Your Honor ultimately says we're entitled to

4    this discovery, is we go forward with some number of a

5    deposition.  It may be that after taking 3, 4, we find that

6    we have discovered what we need and we don't need all 13.

7            I'm not asking and wouldn't ask next Friday -- I

8    don't think the issue is ripe -- that the Court order that

9    we are entitled to take 13 or 10 or 7 or 5.  I simply would

10   ask that the Court hold next Friday that we are entitled to

11   take discovery and Mr. Boller and his clients and the debtor

12   as well will reserve all rights to argue at a later date

13   that we're seeking too many, and we would reserve all

14   rights, and we would then have that issue come up on a

15   concrete record where people could talk about the number of

16   depositions that have occurred and what has come out of

17   them.

18           Finally, on scheduling, I'm not asking for relief

19   today, and so, I understand Mr. Sabin's comments.  I simply

20   was trying to be helpful to the Court by providing a status

21   report informing the Court that I don't think discovery will

22   be completed, and I hear the debtor agreeing with this, by

23   July 30 and that, therefore, the briefing that will be

24   submitted that day, if Your Honor continues to want

25   briefings submitted that day, will not be on a full and

1   complete record.  And I simply felt it incumbent sort of as

2   an officer of the court to report on the conversation that

3   -- the call I received from the Second Circuit's clerk's

4   office.

5           Finally, on document discovery, there's no

6   question, there's no question that the PICs have produced

7   some documents.  There is no question that the debtors have

8   produced some documents.  I didn't say they haven't.

9           There is also no question that we've not received

10  any documents from the files of Simpson Thacher, at least

11  the debtors' counsel so confirmed to me two days ago, and

12  there's also no question that I received an e-mail

13  yesterday, and it was at midnight, Your Honor, from

14  Mr. Boller saying that, with respect to all of the remaining

15  discovery we seek, their position is we are entitled to none

16  of it, not one piece of it.

17          So has some discovery been provided?  Absolutely.

18  Has it been completely provided by either party?  No.  And

19  do we have a concrete, ripe-for-decision dispute with the

20  PICs?  I think Mr. Boller would acknowledge -- and indeed

21  his e-mail to me acknowledges -- that that is now ripe for

22  briefing and decision.

23          One last point.  Sometimes no good deed goes

24  unpunished.  It is right, as Mr. Boller said, that this

25  issue was going to be teed up a couple -- that is the

1    further discovery of the PICs was going to be teed up two

2    weeks ago in connection with the second lien motion and

3    settlement.  Frankly, we didn't think we needed the

4    discovery for those purposes.  And so, we thought that the

5    right thing to do for all parties involved and for the Court

6    was not to tee up an issue that was not incumbent to be

7    resolved in connection with the contested matter that was

8    then before the Court.

9             It is, in our view -- and explicitly -- I'm happy

10   to provide the Court with the letters and e-mail

11   communications.  It was expressly withdrawn by my client

12   with full reservation of rights and with the expectation

13   that, if we couldn't resolve the issue consensually, we

14   would bring it back to the Court.

15            There's a record on that.  I apologize if we

16   should have pressed when the matter was not, in fact,

17   timely, but I don't think that's the right conduct of any

18   litigant.

19            THE COURT:  Right, right.

20            MR. ANKER:  It is timely now.

21            THE COURT:  Right.

22            MR. ANKER:  So I would simply ask that we submit

23   the order briefs, we come back next Friday.  We can report

24   on what further progress has been made on discovery, and we

25   can have argument on the discovery we are seeking from the

1    PICs, and Your Honor will decide, and we'll then go from

2    there.

3                 THE COURT:  All right.

4                 MR. ANKER:  Thank you, Your Honor.  Again, my

5    apologies for interrupting earlier.

6                 THE COURT:  That's fine.  Okay.

7                 I've heard way more than I anticipated hearing in

8    a status conference where those issues weren't identified

9    ahead of time as being relevant or subject to discussion.

10                 You're certainly free to brief what sounds like an

11   ongoing discovery dispute on the terms as indicated and

12   schedule it up for Friday.  I will tell you it goes at the

13   bottom of the list.  I have many other matters already

14   scheduled for Friday.

15                 So just because it's on the agenda for Friday

16   doesn't mean it'll actually get heard on Friday, but you can

17   certainly schedule it for that time, and we'll see how that

18   day and how the matters that are on for that day clear out.

19   But, if you want to brief up a discovery dispute, that makes

20   a lot of sense, and certainly, it would give more context to

21   any kind of discussion if I have something in writing on it

22   in order to form the issues to be properly prepared.

23                 As to the completion of discovery, when that

24   occurs and how that might affect the agreed briefings

25   schedule for summary judgment, I'm certainly not going to

1    make any kind of decision and make an observation, which is

2    I don't, as I sit here today, understand how you can have a

3    summary judgment issue put in front of the Court which, by

4    its very nature, requires there not being any general

5    dispute as to (indiscernible) of fact without having

6    completed discovery as to what the facts are.

7         It may be that open facts are relevant, et cetera,

8    but it is certainly preferable that the discovery record be

9    completed before you move for summary judgment.  Now, having

10   said that, moving back summary judgment briefing deadlines

11   'til the days or, you know, weeks, one, two weeks, one or

12   two days prior to trial is a waste of effort and resources,

13   because the Court is not going to be able to turn around and

14   make a summary judgment ruling on 24 hours' notice or 48

15   hours' notice.

16        And I was always uncomfortable, frankly, with the

17   compression of the time between the summary judgment

18   briefing and the scheduled hearing on the merits.

19   Ultimately, that may simply be something that gets decided

20   at the same time, which really would not make sense,

21   especially if we're talking about, you know, is this a

22   contract interpretation issue that can be narrowly decided

23   on the four corners of the document.  It'd be nice to be

24   able to make that decision before having to hear oral

25   evidence for three days as to what it may or may not mean

1    and then ultimately decide, hey, we really needed to hear

2    that in the first place.

3              So a summary judgment definitely really makes

4    sense in this case.  The only thing that I'm trying to say

5    is that they'd have to give the Court the time to adjust it

6    and decide it prior to having a hearing (indiscernible) I'll

7    just wait and hear post-trial hearing.

8              I'm okay with the schedule as it's been presented

9    with me.  I'm comfortable with the timeframes, but, if

10   there's going to be slippage, it may result in problems.

11             Obviously, it was a heavily negotiated scheduling

12   order.  It's been in place.  We certainly expect the

13   parties, including the plaintiff who brought the action and

14   has sought to have a trial in short order to make every

15   effort to comply with the scheduling order that's already

16   negotiated.  If there's slippage, there's slippage, but I

17   think we should try very hard to stay on to the scheduling

18   everybody's already agreed to.

19             As to any potential conflicts with the Second

20   Circuit, certainly, I am as accommodating as possible to my

21   sister courts, but the debtors will realize that are in

22   front of the Court and the importance in this issue and the

23   importance of timing and the importance of the amount of

24   money at stake, making it indispensable to this operation,

25   and if there's a conflict, somebody's going to have to find

1    someone else to represent them at each of the conflicting

2    court hearings.  I certainly don't expect to get a call from

3    the Second Circuit.  I've never gotten a call in my eight

4    years on the bench from another Court in connection with

5    scheduling.

6            Like I said, I'd be accommodating if I could, but

7    I don't see waiving the next hearing based on the fact that

8    counsel might have a conflict with a different Court.  So

9    that's all I'll say about that, and I'll look forward to the

10   briefing, and I look forward to having the argument some

11   time on Friday or whatever date thereafter is available.

12           Is there anything else in connection with this

13   status conference?

14           MR. MARTIN:  Your Honor, it's Ross Martin, for CSC

15   on a separate matter that we and the debtors are in

16   agreement on, but we needed to report to the Court very

17   briefly.

18           THE COURT:  All right.  As long as no one else has

19   anything --

20           MR. ANKER:  Mr. Martin?  Mr. Martin, this is

21   Phillip Anker.  May I just ask the Court one question, if I

22   might, on the other matter?

23           MR. MARTIN:  Yes, sir.

24           MR. ANKER:  I apologize, Your Honor.  Is it

25   Your Honor's -- one thing that is not provided for in the

1    scheduling order, Your Honor, is a date for -- and I don't

2    know whether Your Honor contemplated that there would be --

3    oral argument on summary judgment.

4              THE COURT:  Right.

5              MR. ANKER:  And I wanted to flag that.  I

6    certainly think, from my perspective -- and Your Honor may

7    just want to look at the briefs and, you know, decide then

8    whether argument would be helpful.  My own perspective is

9    that it would be, and I just wanted to flag for the Court

10   that the schedule does not speak to the question one way or

11   the other.

12             THE COURT:  My general rule is that I look at the

13   briefing and then decide whether oral argument's appropriate

14   or necessary.

15             MR. ANKER:  Okay.  Thank you, Your Honor.

16             THE COURT:  You're welcome.

17             Mr. Martin?

18             MR. MARTIN:  Your Honor, for the record, Ross

19   Martin, Ropes & Gray, for CSC Trust Company as indentured

20   trustee, and we've spoken over the last 24 hours with the

21   debtors.  We received an inquiry -- our colleagues at Cole

22   Schotz received an inquiry yesterday afternoon from the

23   district court regarding the appeal of the first lien

24   settlement motion, and, just for the record, I'm going to

25   specifically speak to the motion that is pending in this

1   court as docket number 1123.  That's the motion for

2   certification of direct appeal.

3              I'm not going to be speaking to the merits of the

4   appeal, though, or any of that.  This is literally a matter

5   as to jurisdiction.

6              But this Court, the bankruptcy court, had

7   transmitted the record yesterday to the district court.  We

8   received a call from the district court in the afternoon

9   asking us to ask Your Honor if it had -- if the bankruptcy

10  court had intended to still decide the motion for

11  certification of a direct appeal.  So we had been preparing

12  to come before Your Honor this morning to relay that

13  question.

14             This morning, we checked the district court

15  docket, and, for whatever reason, which is beyond our

16  control and beyond Your Honor's control, they have since

17  docketed the appeal, which was not the case yesterday when

18  they asked the question.  We have conferred with the debtor,

19  and it is our view that the matter is now divested of

20  jurisdiction before Your Honor and in the district court,

21  including on the motion, but, since the district court had

22  told us to ask Your Honor, we had to relay it to you.

23             I'm not asking for any specific commentary or

24  anything, but we did need to raise it, and we'll return back

25  to the district court with anything Your Honor wants us to

1    relay or not, given the status of the matter, but we did

2    need to report that.

3              THE COURT:  All right.  Okay.  Who asked?

4              MR. MARTIN:  Chambers of Judge Andrews, who has

5    the matter -- who had the matter on the stay pending appeal,

6    Your Honor, and it may have been that the clerk's office

7    subsequently docketed the appeal, but our view and believe

8    along with the debtors is that, once it's docketed, it's

9    there, and it may have been in a different posture while the

10   record was transmitted, but it had not been formally

11   docketed yet, but I think, as of this morning, that's a moot

12   point.  So I'm not trying to put Your Honor on the spot, but

13   we did feel we had to report it, given that chambers had

14   reached out to us.

15             THE COURT:  But I think the procedures that are in

16   place as well as the well-settled law is that, once that

17   appeal is docketed, your business is with the district court

18   and not with me, and I think that's the way both the statute

19   and the rules read, but I'll have my staff contact

20   Judge Andrews' staff and relay to Judge Andrews that my

21   opinion is that it's his opinion that matters at this point

22   and that he should -- he's the one that's going to have to

23   make that decision.

24             MR. MARTIN:  Thank you, Your Honor.  Again, we

25   just needed to report that, and that's all I had.

1              THE COURT:  Okay.

2              Lots of stuff going on.  Anything else?

3              UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

4              THE COURT:  Okay.  Very good.

5              We're adjourned, and I will see some or all of you

6    next Friday.

7              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8              THE COURT:  You're welcome.

9              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10   (Proceedings concluded at 10:27 AM)

11                         * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

1                    C E R T I F I C A T I O N S

2

3    We, Sheila Orms and Nicole Yawn certify that the foregoing

     transcript is a true and accurate record of the proceedings.

4

5

6

     Dated:  July 11, 2014

7

8    Sheila          Digitally signed by Sheila Orms
                     DN: cn=Sheila Orms, o, ou,
9    Orms            email=digital1@veritext.com,
                     c=US
10                   Date: 2014.07.11 17:21:33
                     -04'00'

     Signature of Approved Transcriber

11

12   Nicole          Digitally signed by Nicole
                     Yawn
13   Yawn            DN: cn=Nicole Yawn, o, ou,
                     email=digital1@veritext.com,
14                   c=US
                     Date: 2014.07.11 17:22:21
15                   -04'00'

     Nicole Yawn

16

17

     Veritext

18

     330 Old Country Road

19

     Suite 300

20

     Mineola, NY 11501

21

22

23

24

25