WILMERHALE

July 15, 2014

**VIA HAND DELIVERY AND ECF**

Philip D. Anker

+1 212 230 8890 (t)
+1 212 230 8888 (f)
philip.anker@wilmerhale.com

Hon. Christopher S. Sontchi
United States Bankruptcy Court
 for the District of Delaware
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

    Re:   *In re Energy Future Holdings Corp. et al.*, Case No. 14-10979 (CSS), and *CSC Trust Co. of Delaware v. Energy Future Intermediate Holding Co. LLC et al.*, Adv. Proc. No. 14-50363 (CSS)

Dear Judge Sontchi:

    We submit this letter on behalf of CSC Trust Company of Delaware, as successor indenture trustee (the "10% Trustee") for the holders of the 10% Senior Secured Notes Due 2020 (the "10% Noteholders" and the "10% Notes," respectively) issued by Energy Future Intermediate Holding LLC and EFIH Finance Inc. (together, the "EFIH Debtors") in connection with the so-called Makewhole Litigation.[1] In accordance with the colloquy that we and other counsel had with the Court at the status conference held on July 11, 2014 regarding the Makewhole Litigation, we write to address substantive disputes regarding the responses of the Ad Hoc Committee (the "Ad Hoc Committee") of EFIH Unsecured Noteholders (the "PIK Noteholders") to the 10% Trustee's requests for the production of documents (the "Document Requests") and deposition subpoenas relating to the Makewhole Litigation.

---

[1] The "Makewhole Litigation" refers to the matters subject to the Scheduling Order with Respect to (A) Contested Matter Motion, (B) Adversary Proceeding, and (C) Stay-Applicability Motion [D.I. 803] (the "Scheduling Order"). Those matters are: (1) the contested matter seeking a determination concerning the EFIH First Lien Noteholders' entitlement to a makewhole premium (the "Contested Matter Motion"), which is a portion of the relief sought in the Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of (I) an Interim Order (A) Approving Certain Fees Related to Postpetition Financing and Granting Such Fees Administrative Expense Priority and (B) Scheduling a Final Hearing; and (II) a Final Order (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH First Lien Refinancing, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Motion, (F) Determining the Value of Secured Claims, and (G) Modifying the Automatic Stay [D.I. 74] (the "EFIH First Lien DIP Financing Motion"); (2) the adversary proceeding filed by the 10% Trustee for declaratory relief on entitlement to a make-whole premium, Adversary Proceeding No. 14-50363 (the "Adversary Proceeding"); and (3) the Joint Motion of CSC Trust Company of Delaware, as Indenture Trustee, and Certain EFIH 10% First Lien Noteholders, for Confirmation that the Automatic Stay Does Not Apply or, Alternatively, for Limited Relief from the Automatic Stay, Solely Regarding Rescission of Acceleration (D.I. 473) (the "Stay Applicability Motion").

WILMERHALE

July 15, 2014
Page 2

**Background**

As the Court is aware, immediately upon filing their Chapter 11 cases, the EFIH Debtors sought and obtained permission to refinance the 10% Notes, by using lower-cost financing provided under the EFIH first lien DIP facility to repay principal and accrued interest on the 10% Notes. The EFIH Debtors did not, however, pay the "Applicable Premium" prescribed in the indenture for the 10% Notes (the "Indenture"), notwithstanding that the Indenture requires the EFIH Debtors to pay such a premium (as well as all principal, accrued interest, and other amounts due) if it redeems the 10% Notes prior to December 1, 2015, and otherwise bars any such redemption of the 10% Notes, again at any time before December 1, 2015. Instead, the EFIH Debtors, with the active support of the Ad Hoc Committee, took the position that they are not required to pay the Applicable Premium or any other makewhole amount. The Makewhole Litigation ensued. By its own actions, the Ad Hoc Committee became a party to that litigation; it voluntarily intervened as a defendant in the Adversary Proceeding.[2]

On June 4, 2014, the Court entered the Scheduling Order, joining all of the issues relating to the 10% Noteholders' entitlement to the Applicable Premium (or other premium designed to make the 10% Noteholders whole) together in the Makewhole Litigation. Pursuant to the Scheduling Order, summary judgment briefs in the Makewhole Litigation are due on July 30, 2014 (with reply briefs due on August 15, 2014), and a trial is scheduled to begin on September 10, 2014. Yet, the EFIH Debtors have still not completed their production of documents in response to initial document requests served by the 10% Trustee on May 21, 2014. For purposes of this letter, however, it is the position of the Ad Hoc Committee that is critical. While the Ad Hoc Committee has produced some documents, it has categorically refused to produce any documents responsive to several of the Document Requests, and it refuses to make a single witness available for deposition.

The 10% Trustee has sought to resolve these discovery disputes with the Ad Hoc Committee, but it has been unable to do so. The parties have exchanged numerous emails and letters and participated in multiple meet-and-confers in connection with these discovery disputes. Rather than burden the Court with a lengthy recitation of this history, the 10% Trustee respectfully refers the Court to the June 23, 2014 letter from counsel to the 10% Trustee to the Court [D.I. 1058] (the "June 23 Letter"), a copy of which is attached as Exhibit A, and to the June 25, 2014 letter from counsel to the Ad Hoc Committee to the Court [D.I. 1111] (the "June 25 Letter"), a copy of which is attached as Exhibit B. While the June 23 Letter and June 25 Letter (and the exhibits thereto) address many of the current disputes in the context of the Second Lien DIP Financing, Second Lien Settlement, and the RSA Assumption Motion (each as defined below) rather than in the context of the Makewhole Litigation, they provide relevant background.

---

[2] *See* Notice of Intervention of the Ad Hoc Committee of EFIH Unsecured Noteholders [Adv. Proc. D.I. 15].

WILMERHALE

July 15, 2014
Page 3

In this letter, we outline only those additional facts relevant to the current disputes that are not already set forth in June 23 Letter and June 25 Letter.

After several requests to the Ad Hoc Committee that it comply with the Document Requests, counsel for the 10% Trustee participated in another meet-and-confer with counsel to the Ad Hoc Committee on Tuesday, July 8, 2014, in advance of the pretrial conference scheduled for July 11, 2014. During that meet-and-confer, counsel to the 10% Trustee explained why each category of requested documents is relevant to the Makewhole Litigation. On July 9, 2014, at the request of counsel for the Ad Hoc Committee, counsel to the 10% Trustee sent a confirming email to counsel to the Ad Hoc Committee reiterating the 10% Trustee's requests and responding to the arguments raised by the Ad Hoc Committee. Counsel to the Ad Hoc Committee responded by email on July 11, 2014, indicating that the Ad Hoc Committee and its members would provide "none of the additional categories of documents that your client has once again requested." In addition, for the first time, counsel to the Ad Hoc Committee indicated that his clients would make none of its 13 witnesses whom the 10% Trustee had noticed, weeks ago, for deposition "available voluntarily." A copy of that email exchange is attached as Exhibit C.

In light of this impasse and the impending deadlines under the Scheduling Order, the parties' dispute is ripe for resolution by the Court.

I. **The Discovery Sought By The 10% Trustee Is Relevant To The Makewhole Litigation**

As this Court observed at the July 11 status conference, the stakes for the 10% Noteholders in this Makewhole Litigation are substantial. While a handful of 10% Noteholders that hold positions elsewhere in the EFIH Debtors' capital structure (and that would obtain substantial recoveries on those other positions under the EFIH Debtors' proposed restructuring) have agreed to settle their claims with respect to the Applicable Premium, a majority of the 10% Noteholders have not. The Court will hear evidence on the dollar amount that remains at issue, but it is in excess of $430 million.

Without a doubt, the 10% Trustee believes that the 10% Noteholders are entitled to payment of the Applicable Premium under the plain language of the Indenture (and related documents). Nevertheless, in light of the substantial sums at issue, the 10% Trustee has sought documents and deposition testimony relating to (among other matters): (1) the valuation and solvency of the EFIH Debtors, including the PIK Noteholders' own valuations of the EFIH Debtors, of Oncor, and of the consideration the PIK Noteholders expect to receive under the restructuring contemplated under the Restructuring Support Agreement (the "RSA"), and (2) the PIK Noteholders' efforts in collaboration with the EFIH Debtors to avoid paying the 10% Noteholders the Applicable Premium or any other makewhole amount and to circumvent the provisions of the Indenture. The 10% Trustee is entitled to this discovery.

WILMERHALE

July 15, 2014
Page 4

      As numerous other cases involving disputes over makewhole premiums show, the discovery sought from the Ad Hoc Committee is relevant to one or more "claim[s] or defense[s]" that are likely to arise in the Makewhole Litigation. *See* Fed. R. Civ. P. 26(b)(1) (providing that a party may obtain discovery regarding any matter "relevant to any party's claim or defense" and that "relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence"); Fed. R. Bankr. P. 7026.[3]

      *First*, the 10% Trustee is entitled to discovery from the PIK Noteholders on issues of valuation and solvency, including the PIK Noteholders' expected recoveries under the restructuring as contemplated by the RSA. It is well-established that the solvency of the debtor can be relevant in makewhole disputes. For example, when a debtor is solvent, it may not rely on the Bankruptcy Code to deny payment of a redemption premium otherwise required under state law. "With a solvent debtor, ... the allowance of claims under a make-whole provision" "'should be an issue of state law alone.'" *In re Chemtura Corp.*, 439 B.R. 561, 605 (Bankr. S.D.N.Y. 2010); *accord Gencarelli v. UPS Capital Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 636 (Bankr. S.D. Miss. 2010) (explaining that "when a debtor is solvent, bankruptcy courts generally will enforce the debtor's contractual obligations to the extent they are valid under applicable state law" and considering the debtor's solvency an important factor in determining to allow damages for breach of a no-call provision); Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 ABI L. Rev. 537, 584 (2007). And the EFIH Debtors' solvency and financial condition may bear on an assessment of whether the EFIH Debtors have taken voluntary actions, that they were not otherwise required to take, to evade payment of the Applicable Premium or other makewhole amount, an additional factor courts have considered in makewhole disputes, as described below.

      The PIK Noteholders cannot deny that they have documents about the valuation of the EFIH Debtors and the PIK Noteholders' expected recoveries in these cases or that they have witnesses that could be deposed on those topics. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

---

[3] The documents being sought by the 10% Trustee in the current discovery disputes also bear on other motions before the Court in which the 10% Trustee has an interest, including without limitation: (1) Motion of Energy Future Holdings Corp., et al., for Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment [D.I. 472] (the "Second Lien Settlement"); (2) Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay [D.I. 477] (the "Second Lien DIP Financing"); and (3) Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay [D.I. 505] (the "RSA Assumption Motion").

WILMERHALE

July 15, 2014
Page 5

███████████████████████████████████████████████████████████[4]
███████████████████████████████████████████████████████████
And, while the 10% Trustee has not yet been able to obtain discovery to confirm the facts, certain 10% Noteholders have been told by members of the Ad Hoc Committee that they project that their recoveries in this case—principally from the stock they will receive in reorganized EFH—could approach 150% or more of the full face amount of the PIK Notes.

Instead, the Ad Hoc Committee of PIK Noteholders seem to suggest that because they are not the EFIH Debtors, their views of those debtors' value and solvency are irrelevant. The law, including that of the Third Circuit, is to the contrary. Courts routinely admit evidence of how lenders and other sophisticated market participants value debtors as highly probative, if not dispositive, on issues of valuation and solvency. *See VFB LLC v. Campbell Soup Co.*, No. 02-137, 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007); *In re Plassein Int'l Corp.*, Bankr. No. 03-11489, 2008 WL 1990315, at *8 (Bankr. D. Del. May 5, 2008) ("'A powerful indication of contemporary, informed opinion as to value' comes from private investors who '[w]ith their finances and time at stake, and with access to substantial professional expertise, [] concluded at the time [] that the business was indeed one that could be profitably pursued.'") (quoting *In re Longview Aluminum, L.L.C.*, No. 04-00279, 2005 WL 3021173, at *7 (N.D. Ill. July 14, 2005), *aff'd sub nom. In re McCook Metals, L.L.C.*, No. 05 C 2990, 2007 WL 4287507 (N.D. Ill. Dec. 4, 2007)) (alternations in original); *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 10-1842, 2013 WL 230329, at *9, 14 (N.D. Tex. Jan. 22, 2013) (considering the internal views of lenders and market participants as "credible evidence" of debtor's value); *In re Iridium Operating LLC*, 373 B.R. 283, 332 (Bankr. S.D.N.Y. 2007) (finding that investment banker valuations' "very existence is a factor that tends to rebut the Committee's assertions regarding insolvency"). Here, evidence from the Ad Hoc Committee is especially relevant since its members played such a central role in negotiating the RSA, which (at the Ad Hoc Committee's insistence) would give the PIK Noteholders most of the equity in a reorganized EFH.

*Second*, it appears that one of the EFIH Debtors' principal arguments for avoiding payment of the Applicable Premium is that their bankruptcy filings resulted in the automatic acceleration of the 10% Notes, and as a result, that the EFIH Debtors were no longer obligated to pay any makewhole amount under the terms of the Indenture. But, just as the EFIH Debtors were under no legal compulsion to file for bankruptcy, they were also under no legal compulsion to seek authority to refinance the 10% Notes at the very outset of their bankruptcy cases. *See, e.g., Imperial Coronado Partners, Ltd. v. Home Fed. Sav & Loan Ass'n (In re Imperial Coronado Partners, Ltd.)*, 96 B.R. 997, 1000 (B.A.P. 9th Cir. 1989) (enforcing prepayment

---

[4] This deposition occurred in connection with the contested matters relating to the Second Lien Settlement and Second Lien DIP Financing. No deposition of any member of the Ad Hoc Committee (or of any other witness) has yet occurred in connection with the Makewhole Litigation.

WILMERHALE

July 15, 2014
Page 6

penalty where debtor could have reinstated or deaccelerated the debt in bankruptcy). The law is clear that where a debtor precipitated a default under an indenture, or otherwise took voluntary actions, in an effort to avoid paying a redemption premium, that premium is payable regardless of any technical arguments that the debtor may raise regarding acceleration. *See, e.g., Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982) (bondholders entitled to prepayment fee despite debtor's argument that its payment default entitled the bondholders to accelerate the debt; "[t]his is not a case in which a debtor finds itself unable to make required payments," and thus there was "no bar ... to the Indenture Trustees seeking specific performance of the redemption provisions where the debtor causes the debentures to become due and payable by its voluntary actions"); *Chemtura*, 439 B.R. at 603, n.186 ("If a bankruptcy case were filed with the *purpose* (or, arguably, a material purpose) of sidestepping a no-call provision, or to avoid liability for a make-whole, such a circumstance would trouble me, and I think that arguments to disallow claims based on either would be much weaker.") (emphasis in original).

Accordingly, the 10% Trustee is entitled to discovery concerning the reasons for the EFIH Debtors' bankruptcy filings, the negotiation of the RSA including the provisions therein that expressly required the EFIH Debtors to commence (and limited their ability to settle) litigation to avoid payment of any makewhole premium to the 10% Notes, and the decision immediately upon the EFIH Debtors' entry into bankruptcy to refinance the 10% Notes. In this regard, the EFIH Debtors have admitted that "when EFIH filed its chapter 11 petitions, EFIH intended to seek to repay the 10% Notes ... without the payment of a so-called redemption premium." *See* Energy Futures Intermediate Holding Company, LLC's and EFIH Finance Inc.'s Answer [Adv. Pro. D.I. 27] ¶ 43. The 10% Trustee is entitled to discovery regarding the efforts to avoid payment of any makewhole premium and the role of the Ad Hoc Committee of PIK Noteholders in those efforts.

The Ad Hoc Committee was anything but a stranger to these matters. To the contrary, it and its members (perhaps even more than the EFIH Debtors) appear to have been the driving force behind the strategy for denying payment of any premium to the 10% Noteholders and to propose to give the bulk of the equity in a reorganized EFH to the PIK Noteholders. As this Court is aware, the members of the Ad Hoc Committee were (and are) signatories to the RSA. During the 12 months before the bankruptcy filing, they were critical parties to the negotiations concerning the EFIH Debtors' restructuring. Indeed, their professionals incurred approximately $10 million in pre-petition fees that, immediately upon the filing of these bankruptcy cases, the EFIH Debtors sought (and obtained) authority to pay. *See* RSA Assumption Motion, Ex. A, Ex. 1, Sched. 1; ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

WILMERHALE

July 15, 2014
Page 7

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████ Given these facts, obtained without the benefit of discovery relating to the Makewhole Litigation, it is inconceivable that the Ad Hoc Committee and its members were not intimately involved in the overall strategy for refinancing the 10% Notes at the outset of these Chapter 11 cases and seeking to deny the 10% Noteholders any makewhole amount.

While the Ad Hoc Committee may dispute the 10% Noteholders' entitlement to the Applicable Premium, they cannot credibly dispute that they possess relevant documents and can provide relevant testimony. The only issue now before the Court is whether the documents and depositions sought by the 10% Trustee are reasonably calculated to lead to the discovery of admissible evidence. For the reasons described above, they are.

### A. Documents

The 10% Trustee has requested documents from the Ad Hoc Committee related to the above subject matters. The Ad Committee has refused to produce: (a) any documents relating to seven specific topics; and (b) three types of documents—(i) internal communications and documents, (ii) instant messages, and (iii) documents created prior to January 28, 2014—in response to all of the 10% Trustee's Document Requests.

*First*, the Ad Hoc Committee has refused—on the basis of relevancy—to produce documents on the following seven topics:

(a) Matters relating to the valuation of the EFIH Debtors and Oncor, and the projected value of the distributions members of the Ad Hoc Committee will receive under the proposed restructuring of the EFIH Debtors (Document Request Nos. 11, 12, 14, 24, 25);

(b) Any potential or actual post-confirmation employment of any present or former directors, officers or management of the EFIH Debtors (Document Request No. 31);

(c) Oncor strategic business plans, financial projections, and other documents and communications concerning any possible transaction involving Oncor, including without limitation any possible sale of Oncor (or any interest therein including any equity interest therein) following confirmation of a Chapter 11 plan for the EFIH Debtors (Document Request No. 9);

(d) References to a "fulcrum" security in the EFIH Debtors' capital structure (Document Request No. 23);

WILMERHALE

July 15, 2014
Page 8

> (e) Underwriting or investment memoranda for the investments made by the members of the Ad Hoc Committee (Document Request No. 6);
>
> (f) Matters relating to tax allocation agreements (Document Request No. 8); and
>
> (g) Matters relating to the RSA (numerous Document Requests).

*See* Ex. C. However, each of these topics is directly relevant to the Makewhole Litigation. Topics (a), (c), (d), (e), and (f) relate to the EFIH Debtors' value and solvency. And topics (b), (d), (f), and (g) relate to the Ad Hoc Committee's efforts to curry favor with the EFIH Debtors and their management and to work with them to refinance the 10% Notes and avoid paying any makewhole premium to the 10% Noteholders. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉ For the reasons explained above, documents relating to these subject matters are relevant.

*Second*, in response to all of the 10% Trustee's Document Requests, the Ad Hoc Committee has refused to produce any documents in the following three categories: (i) internal communications and documents from within the specific firms that are members of the Ad Hoc Committee; (ii) Bloomberg instant messages or other similar electronic modes of communication widely used in the hedge-fund industry (the members of the Ad Hoc Committee are all hedge funds); and (iii) documents of any kind created prior to January 28, 2014. The Ad Hoc Committee's blanket refusal to produce any documents in these categories is unwarranted.

    1.    **<u>Internal Communications and Documents From Ad Hoc Committee Members</u>**

The Ad Hoc Committee contends that its members' internal communications and documents are not discoverable. *See* June 25 Letter at 7; Ex. C. The Ad Hoc Committee originally withheld these documents based on a claim that such communications and documents were not relevant to the parties' dispute concerning the Second Lien DIP Financing and the Second Lien Settlement. *See* June 25 Letter at 7. In its most recent correspondence on July 11, the Ad Hoc Committee asserts that the requested documents are also not relevant to the Makewhole Litigation because the Makewhole Litigation "involves a fairly straight-forward contract dispute." *See* Ex. C. The Ad Hoc Committee also claims that the documents are not discoverable because the "[t]he individual members of our Ad Hoc Committee—who are not parties to the litigation—were not involved in negotiating the terms of the First Lien indenture that is at the center of the dispute." *See id.*

For the reasons discussed above, these arguments are fallacious. While the terms of the Indenture are no doubt relevant, so too potentially are many other documents. As described above, internal communications about the EFIH Debtors' valuation and solvency, as well as pre-

WILMERHALE

July 15, 2014
Page 9

and post-bankruptcy documents and communications regarding the 10% Noteholders' claim for a makewhole and any purported strategy for denying its payment, are relevant and discoverable. This includes not only documents and communications between and among various PIK Noteholders (or between the members of the Ad Hoc Committee and the EFIH Debtors), but also documents and communications internal to each of the hedge funds that make up the Ad Hoc Committee of PIK Noteholders. ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████

As for the assertion that the members of the Ad Hoc Committee are not parties to the Makewhole Litigation, the short answer is that the Ad Hoc Committee is. Acting on its own volition, it intervened as a defendant in the Adversary Proceeding. And, as the Ad Hoc Committee has made clear in filings with the Court, there is no legal distinction between the Ad Hoc Committee and the individual members that comprise the Ad Hoc Committee. *See* Verified Statement of the Ad Hoc Committee of EFIH Unsecured Noteholders Pursuant to Bankruptcy Rule 2019 [D.I. 1193] ¶ 2 ("[T]he Ad Hoc Committee of EFIH Unsecured Noteholders does not represent or purport to represent any other entities in connection with the Debtors' chapter 11 cases."). The Ad Hoc Committee should be required to produce the internal communications and documents requested by the 10% Trustee.

### 2. Bloomberg and Other Electronic Messaging

The Ad Hoc Committee has also refused to produce any Bloomberg instant messages or other similar electronic modes of communication, again with respect to the same subject matters. In connection with the dispute concerning the Second Lien DIP Financing and the Second Lien Settlement, the Ad Hoc Committee took the position that "only documents relating to the negotiation of the transactions at issue are even *arguably* relevant" and that "as evidenced by the Ad Hoc Committee of EFIH Unsecured Noteholders' extensive email production, those negotiations took place via email." *See* June 25 Letter at 8. It now contends that any Bloomberg instant messages or other similar electronic modes of communication are also irrelevant to the Makewhole Litigation. But, for the reasons described above, communications internal to and among members of the Ad Hoc Committee (and among the members of the Ad Hoc Committee and the EFIH Debtors or other parties) regarding the value of the EFIH Debtors and payment (or non-payment) of the makewhole are relevant. And portfolio managers, traders and other professionals employed by hedge funds routinely communicate by Bloomberg instant message and other electronic messaging systems other than email. ████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████

Case 14-10979-CSS    Doc 1572    Filed 07/15/14    Page 10 of 13

### 3. Pre-2014 Documents

The 10% Trustee's Document Requests seek documents from January 1, 2013 forward, again relating to the same subject matters. The Ad Hoc Committee, however, has refused to produce documents created prior to January 28, 2014. *See* June 25 Letter at 8-9. That position is unreasonable. According to the EFIH Debtors' SEC filings, the EFIH Debtors (or their affiliates or equity sponsors) were engaged in negotiations with their creditor constituencies as early as April 2013 regarding the restructuring of the EFIH Debtors' debt. *See* June 23 Letter at 4; 8-K (Oct. 15, 2013), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=102498&p=irol-sec. Moreover, the RSA to which the members of the Ad Hoc Committee are parties indicates that the Ad Hoc Committee had retained a litany of professionals—primary counsel (Akin Gump), Delaware counsel, technical and market advisor, tax advisor, regulatory counsel, and financial advisor (Centerview)—as early as between May and June 2013. *See* RSA Assumption Motion, Ex. A, Ex. 1, Sched. 1.



Accordingly, the Ad Hoc Committee should be required to produce documents from January 1, 2013 forward that are responsive to the 10% Trustee's Document Requests, or, in the alternative, to produce all documents beginning with the earliest date such documents exist and certify to the 10% Trustee that, after a reasonable search, the Ad Hoc Committee discovered no responsive documents before that date.

### B. Depositions

In its July 11, 2014 email responding to the 10% Trustee's request that the Ad Hoc Committee produce the non-privileged categories of documents described above, the Ad Hoc Committee for the first time indicated that it will not voluntarily produce *any* of its members for deposition. *See* Ex. C. The Ad Hoc Committee takes the position that its members "have no relevant testimony to provide in connection with the [Makewhole Litigation]." *See id.* For the reasons discussed, that is simply wrong.

WILMERHALE

July 15, 2014
Page 11

While the Ad Hoc Committee had previously expressed concern about the *number* of depositions noticed by the 10% Trustee, *see* June 25 Letter at 11, it had not sought to bar testimony by the Ad Hoc Committee members entirely in connection with the Makewhole Litigation. Indeed, the Ad Hoc Committee had agreed to make certain members' witnesses available for depositions, including depositions that were scheduled for last week. By agreement between counsel to the 10% Trustee and counsel to the Ad Hoc Committee, those depositions were postponed in light of the EFIH Debtors' continuation of the hearing on the Second Lien DIP Financing and the Second Lien Settlement, the EFIH Debtors' decision to postpone the scheduled depositions of three of the EFIH Debtors' representatives, and the Ad Hoc Committee's refusal to produce the documents identified in this letter. A copy of the parties' email exchange regarding the scheduling and postponement of the depositions is attached as Exhibit J. Counsel to the Ad Hoc Committee did not indicate at that time that it intended to change course and seek to deprive the 10% Trustee of access to all relevant witnesses. The Ad Hoc Committee cannot change course at this late date, given the tight time frame for the Makewhole Litigation and the relevance of the testimony sought.

With respect to the actual number of depositions, the 10% Trustee believes that the most sensible way to proceed is to defer the issue and see if the parties can resolve it without having to trouble the Court. In this regard, I informed counsel for the Ad Hoc Committee during the telephonic meet and confer on July 8, that, while the 10% Trustee could not commit to taking less than the full number of noticed depositions, it would be willing to explore a deposition schedule that would permit certain depositions to take place in the short run, with the possibility that the 10% Trustee would determine after those depositions that it did not need to conduct all, or at least some, of the remaining noticed depositions. If the 10% Trustee determined that it needed more depositions, and the Ad Hoc Committee disagreed, the parties would meet and confer and either party could seek relief from the Court, which could then assess the matter against a concrete record that included the depositions that would have by then occurred. The 10% Trustee submits that this would be a reasonable and efficient way to proceed.

**II.    The Ad Hoc Committee Cannot Withhold Documents On The Basis Of Common Interest Privilege, and It Cannot Refuse to Provide a Privilege Log**

The Ad Hoc Committee has also refused to produce communications that its members and its advisors have had with the EFIH Debtors and their advisors concerning the 10% Noteholders' (and the EFIH second lien noteholders') claims for payment of a makewhole premium, and on strategies for evading payment of any such makewhole premium, on the basis that such communications are subject to a common interest privilege between the Ad Hoc Committee and the EFIH Debtors. *See* June 25 Letter at 9-10; Exhibit F to June 23 Letter at 6; Ex. C.

WILMERHALE

July 15, 2014
Page 12

   Three initial points warrant mention: *First*, the Ad Hoc Committee's blanket objection to the production of any such documents on grounds of privilege is telling. In particular, the Ad Hoc Committee's categorical refusal to produce documents in this category strongly suggests that such documents exist and that, in fact, the Ad Hoc Committee was heavily involved in the overall effort to deny payment of any makewhole premium to the 10% Noteholders. *Second*, like its intervention in the Makewhole Litigation, the Ad Hoc Committee's assertion of a common interest with the EFIH Debtors is necessarily at odds with its position that, because its members are not the EFIH Debtors, their documents and deposition testimony regarding the EFIH Debtors are not relevant to issues of valuation, solvency, and the EFIH Debtors' intent in pursuing the restructuring as currently contemplated under the RSA. *Third*, the 10% Trustee is not seeking the production of communications directly between counsel to the Ad Hoc Committee and counsel to the EFIH Debtors since the filing of the EFIH Debtors' Chapter 11 cases regarding their litigation strategy in the Makewhole Litigation. Instead, the 10% Trustee is requesting only (1) communications that occurred pre-bankruptcy—before the EFIH Debtors and the Ad Hoc Committee reached agreement and signed the RSA—involving counsel or other professionals representing the Ad Hoc Committee and the EFIH Debtors, and (2) communications, whether they occurred pre- or post-bankruptcy, involving non-lawyers (documents falling within (1) or (2) and withheld on grounds of common interest, "Withheld Documents"). No common interest privilege protects either category of documents.

   The law is clear that the common interest doctrine is an extension of the attorney-client privilege; "thus, the doctrine is only applicable if an underlying privilege has been established." *In re Leslie Controls, Inc.*, 437 B.R. 493, 496 (Bankr. D. Del. 2010). Communications among businesspersons, and even communications between business persons and attorneys that do not involve requests for or the provision of legal advice, are not protected by the attorney-client privilege or the common interest doctrine. Accordingly, even if the Ad Hoc Committee were entitled to rely on the common interest doctrine with respect to certain specific documents, it must provide a privilege log so that the 10% Trustee and, if necessary, the Court can assess the claim of privilege. The Federal Rules require that a party declining to produce documents on the basis of a claim of privilege provide such a log. Fed. R. Civ. P. 26(b)(5). Yet, the Ad Hoc Committee has flatly refused to produce a privilege log. It should be required to do so for any Withheld Documents.

   Even once a privilege log is produced, the Ad Hoc Committee bears the burden of establishing that particular communications between it and the EFIH Debtors are entitled to protection under the common interest doctrine. *See Leslie Controls*, 437 B.R. at 496. To warrant protection under the common interest doctrine, parties must share a common *legal* interest, not solely a commercial interest. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007); *Leslie Controls*, 437 B.R. at 497. There are substantial reasons to think that the Ad Hoc Committee, whose members will not be liable for any makewhole amount owed to

# WILMERHALE

July 15, 2014
Page 13

the 10% Noteholders, will be unable to establish that it shares a *legal* interest with the EFIH Debtors regarding the 10% Noteholders' entitlement to the makewhole.[5] Rather than seek a determination at this time without the benefit of a more concrete record, the 10% Trustee simply asks for now that the Ad Hoc Committee be required, promptly, to produce a privilege log in accordance with the Federal Rules. Counsel for the 10% Trustee will review that log and confer with counsel for the Ad Hoc Committee to the extent that there are questions about the claims of privilege. Hopefully, those issues can be resolved consensually. If not, the 10% Trustee reserves all rights in respect of the Ad Hoc Committee's and/or the EFIH Debtors' assertion of a common interest privilege, including without limitation the right to seek relief from the Court with respect to such assertion after reviewing the Ad Hoc Committee's privilege log.

\* \* \* \* \*

We hope that this letter has been helpful to the Court in framing the discovery dispute. Counsel for the 10% Trustee will be available to address any questions the Court may have at the hearing scheduled for July 18, 2014.

The 10% Trustee also respectfully requests that the Court hold available some time on its July 25 calendar, and/or entertain requests for telephonic conferences, should the 10% Trustee need to bring any additional discovery-related or other issues before the Court before the July 30 deadline for the submission of opening briefs in the Makewhole Litigation.

Respectfully submitted,

/s/ Philip D. Anker

Philip D. Anker (admitted *pro hac vice*)

---

[5] The Ad Hoc Committee has no legal interest in the outcome of the Makewhole Litigation. While the EFIH Debtors' interest is a legal one—whether they are contractually or otherwise legally bound to pay the Applicable Premium or some other premium to the 10% Noteholders—the Ad Hoc Committee's interest is purely economic. The Ad Hoc Committee has no risk of liability for any makewhole. It may recover more or less from the EFIH Debtors depending on whether the EFIH Debtors are required to pay a makewhole, but its interest is, at most, that of a third-party beneficiary, not a legal interest. *See Schaeffler v. U.S.*, No. 13 CIV. 4864 GWG, 2014 WL 2208057, at \*10 (S.D.N.Y. May 28, 2014) (holding that a debtor and one of its creditors did not share a common legal interest where the debtor had a legal obligation to the United States in respect of tax liabilities arising out of the debtor's restructuring transactions, and the creditor, despite its desire to minimize the debtor's tax liabilities and to see him prevail in any dispute with the IRS, had no such legal obligation); *Leslie Controls*, 437 B.R. at 500 ("The intervenors' status as third party beneficiaries to litigation did not, in and of itself, give rise to a legal interest.").