# **<u>EXHIBIT 2</u>**

# In Re:

*GENCO SHIPPING & TRADING LIMITED, et al.*
*Case No. 14-11108-shl*

*June 3, 2014*

*eScribers, LLC*
*(973) 406-2250*
*operations@escribers.net*
*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*



**Min-U-Script® with Word Index**

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 14-11108-shl

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  GENCO SHIPPING & TRADING LIMITED, et al.,

9

10           Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14           United States Bankruptcy Court

15           One Bowling Green

16           New York, New York

17

18           June 3, 2014

19           2:45 PM

20

21  B E F O R E:

22  HON. SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25

1

2  Status Conference re: Discovery

3

4  Hearing re: Rothschild Retention

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Dena Page

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2  A P P E A R A N C E S :

3  KRAMER LEVIN NAFTALIS & FRANKEL LLP

4        Attorneys for Debtors

5        1177 Avenue of the Americas

6        New York, NY 10036

7

8  BY:   ADAM C. ROGOFF, ESQ.

9        P. BRADLEY O'NEILL, ESQ.

10

11

12  SIDLEY AUSTIN LLP

13        Attorneys for Official Committee of Equity Holders

14        787 7th Avenue

15        New York, NY 10019

16

17  BY:   MICHAEL G. BURKE, ESQ.

18        STEVEN M. BIERMAN, ESQ.

19        LARRY J. NYHAN, ESQ.

20        BENJAMIN NAGIN, ESQ.

21

22

23

24

25

4

1

2  MILBANK, TWEED, HADLEY & MCCLOY LLP

3      Attorneys for Wilmington Trust, N.A. as

4        agent for the 2007 secured loan facility

5      One Chase Manhattan Plaza

6      New York, NY 10005

7

8  BY:   DENNIS F. DUNNE, ESQ.

9        SAMUEL A. KHALIL, ESQ.

10

11

12  MILBANK, TWEED, HADLEY & MCCLOY LLP

13      Attorneys for Wilmington Trust, N.A. as

14        agent for the 2007 secured loan facility

15      1850 K Street, NW

16      Washington, DC 20006

17

18  BY:   AARON RENENGER, ESQ.

19

20

21

22

23

24

25

```
 1
 2   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 3          Attorneys for Credit Agricole Corporate and Investment
 4            Bank and Deutsche Bank AG, Agents under 2010
 5            Pre-Petition Secured Credit Facilities
 6          1285 Avenue of the Americas
 7          New York, NY 10019
 8
 9   BY:   ELIZABETH R. MCCOLM, ESQ. (TELEPHONICALLY)
10
11
12   DEBEVOISE & PLIMPTON LLP
13          Attorneys for Rothschild Inc.
14          919 Third Avenue
15          New York, NY 10022
16
17   BY:   RICHARD F. HAHN, ESQ.
18          DEREK P. ALEXANDER, ESQ.
19
20
21
22
23
24
25
```

1

2  ORRICK, HERRINGTON & SUTCLIFFE LLP

3         Attorneys for Credit Agricole Corporate and

4         Investment Bank

5         Columbia Center

6         1152 15th Street, N.W.

7         Washington, DC 20005

8

9  BY:   DOUGLAS S. MINTZ, ESQ.

10

11

12  ORRICK, HERRINGTON & SUTCLIFFE LLP

13         Attorneys for Credit Agricole Corporate and

14         Investment Bank

15         51 West 52nd Street

16         New York, NY 10019

17

18  BY:   PETER J. AMEND, ESQ.

19

20

21

22

23

24

25

1

2  AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for Informal Noteholder Group

4         One Bryant Park

5         New York, NY 10036

6

7  BY:   SEAN E. O'DONNELL, ESQ.

8         MICHAEL S. STAMER, ESQ.

9

10

11  AKIN GUMP STRAUSS HAUER & FELD LLP

12         Attorneys for Informal Noteholder Group

13         1700 Pacific Avenue

14         Suite 400

15         Dallas, TX 75201

16

17  BY:   SARAH LINK SCHULTZ, ESQ.

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  -- a continued hearing on a renewed

3     application as to the Rothschild retention.  We're also here

4     for discovery, continued discussions.  I confess, I can't

5     decide which is more exciting, but I think, given the timing

6     concerns, I think it probably makes to start with the

7     Rothschild retention.

8              MR. O'NEILL:  I'd like to give you a brief report on

9     Rothschild, Your Honor.

10             THE COURT:  Sure.

11             MR. O'NEILL:  And then we may -- and the parties may

12    suggest that we reverse the order of your consideration of

13    those two issues.

14             THE COURT:  That's fine.

15             MR. O'NEILL:  After the oral motion yesterday, the RSA

16    parties got together and made a collective proposal to the

17    equity committee to amicably resolve their objections to the

18    Rothschild retention.  The equity committee is considering that

19    proposal.  We have not yet received a counter or a response,

20    but our understanding is the matter is percolating and likely

21    will percolate during the course of this hearing, and it may be

22    profitable, therefore, to take up discovery matters and let

23    that --

24             THE COURT:  That's fine.

25

1          MR. O'NEILL:  -- proceed in the hope that maybe we

2     have a resolution by the end.

3          THE COURT:  Let's do that.  And I will tell you that I

4     am not anxious to issue a ruling on the issue.  I understand

5     what happened and the order that was entered in the case in

6     Delaware.  That's where all parties agreed.  But it's another

7     thing for a court to start issuing a ruling about what one side

8     characterizes as a fee paid for just showing up while the other

9     side characterized it as something where it needs to be paid or

10    they're not going to get a financial advisor.  As reading the

11    transcript that was provided to me in the discovery context

12    from another Delaware case, it's pretty clear everything is

13    precedential, and there's some potentially thorny aspects of

14    ruling on that, per se.  So I appreciate the parties' continued

15    discussions.

16          And so I'm happy to segue to the discovery issue where

17    I understand, based on the letters, that there has been some

18    progress on a number of fronts, so if you want to start with

19    that.

20          MR. O'NEILL:  I think my function, here, is

21    introductory.  I think there's principally one issue to be

22    addressed to you today, and that's the issue that's outlined in

23    the letters.  But maybe to begin, I'll give you a little

24    consensus on a couple of items.

25          First, after yesterday's hearing, the debtor took

1   stock of what had occurred and we withdrew our objections to

2   the two depositions that Your Honor considered yesterday, and

3   so those depositions are now in the schedule, and from our --

4   there may still be some dickering about dates; I certainly hope

5   not, but from the debtors' perspective, we have eight

6   depositions on the schedule of debtor or debtors' expert --

7             THE COURT:  Right.

8             MR. O'NEILL:  -- or professional witness.

9             And then the second item is, at the request of the

10  equity committee, the debtors have consented to the equity

11  committee exceeding the page limits in Your Honor's case

12  management order on its objection to confirmation, and the

13  agreed length would be fifty pages.

14            THE COURT:  All right, and I assume that you've worked

15  out whatever your reply is, in terms of the same level of

16  collegiality.

17            MR. O'NEILL:  We did, and there's one other issue

18  which we may present to you, which is after the schedule

19  adjustments yesterday, we actually ended up losing half a day

20  on our response period.  In other words, they got an additional

21  day and we got only an additional half day.  But I'll consult

22  with them and --

23            THE COURT:  Am I right?  I thought I was giving half a

24  day.  I thought the due date for the objection was Thursday,

25  and I thought I moved it to Friday at noon.

1       MR. O'NEILL:  I think they moved from Thursday noon to
2   Friday noon, and we went from --
3       THE COURT:  Oh, I see.  All right, all right.
4       MR. O'NEILL:  That's how it worked.  Now, we can --
5   we'll attempt to work it out and come up with something.
6       THE COURT:  Yeah, I mean, I'm trying to be evenhanded,
7   so I think --
8       MR. O'NEILL:  I know it was unintentional.
9       THE COURT:  -- I thought I was moving --
10      MR. O'NEILL:  Yeah.
11      THE COURT:  -- although I was incorrect about it,
12  everything a half a day.  But if I moved theirs a day, I'll
13  move yours a day.
14      MR. O'NEILL:  Okay.
15      THE COURT:  It should be fair to everybody.
16      MR. O'NEILL:  Thank you.  And now I'll turn it over to
17  Mr. O'Donnell.
18      THE COURT:  All right, well, let me hear from the -- I
19  see the committee counsel rising.  So anything briefly before
20  we get to discovery?
21      MR. BIERMAN:  On the discovery issue -- may the
22  committee proceed first, Your Honor?
23      THE COURT:  Yeah, I've read everything.  Maybe I'll do
24  the recap, and then nobody has to fight for the podium.
25      I understand that basically, as to the debtor, things

1  are resolved and you've reached an agreement about the

2  depositions.

3          As to what I'll say is everybody else, I understand

4  your letter to be saying that you'll limit yourself to six

5  depositions, and that's the context in which this discussion is

6  happening about the scope of those depositions, in terms of the

7  evidence to be adduced.  Am I right on that?

8          MR. BIERMAN:  That's right, Your Honor.

9          THE COURT:  Okay.

10          MR. BIERMAN:  Might I briefly supplement that?

11          THE COURT:  Sure.

12          MR. BIERMAN:  May I do it from here?  Would you like

13  me to --

14          THE COURT:  Anywhere, as long as you're on a

15  microphone so you're heard --

16          MR. BIERMAN:  Okay.

17          THE COURT:  -- and you can be counted in the

18  transcript, that's the most important thing.

19          MR. BIERMAN:  Thank you, Your Honor.  Steven Bierman

20  from Sidley Austin, proposed counsel for the official equity

21  committee.

22          Your Honor's exactly right.  We have made progress,

23  and we have limited the requests that we were discussing with

24  the Court yesterday.  I think the propositions we want to leave

25  Your Honor with this afternoon are very simple and only a few.

1  One is that we are not looking to adduce opinion testimony;

2  we're not looking to sneak in, somehow, opinion testimony

3  through lay witnesses.  What we seek is factual evidence of

4  who, what, when, where at the time in making decisions and in

5  interacting with the debtors.  That's one proposition.

6          The second is that we believe we've made a showing in

7  the letter that we submitted to Your Honor a number of ways, by

8  example at least, in which the evidence that we seek to adduce,

9  which is narrowcast in its focus, is directly relevant and

10  probative of ultimate issues in the case.  And we've laid those

11  out, and Your Honor's read the letter, so I won't presume to

12  repeat them.

13          I will say this, though, Your Honor, and that is that

14  as much as we are telescoping down to the smallest scope

15  possible discovery, in terms of number of depositions, length

16  of depositions, scope of inquiry, it is still discovery in aid

17  of ultimate fact-finding and ultimate decision-making.  And we

18  believe that apart from the relevance that we've set forth in

19  the half dozen or so bullets in our letter that this is

20  discovery calculated to lead to the discovery of admissible

21  evidence.  There are any number of scenarios in which we

22  believe Your Honor will want to hear and see the evidence that

23  we will adduce at the confirmation hearing.

24          And the last thing I'd leave Your Honor with is in

25  connection with Mr. O'Donnell's submission from Akin Gump, it

1   referred to the Dolan case before Judge Shannon in Delaware.

2   And I've appeared before Judge Shannon; I know that Judge

3   Shannon, as well as judges, generally, takes cases as he finds

4   them, and the circumstances of each case, of course, matter.

5          It's interesting, when one looks at the transcript of

6   the hearing before Judge Shannon, which Mr. O'Donnell helpfully

7   attached, that the issue that he was raising at the time before

8   the court was not one of the relevance of this information, but

9   rather one of burden, and the weighing of relevance versus

10  burden.  And notably, the discovery requests that Mr. O'Donnell

11  was complaining about -- and he may have been appropriately

12  complaining about, for all I know, because I know what I read

13  on the subway on the way down to court, Your Honor -- requests

14  all documents -- the request in that case was "all documents

15  concerning the plan".  That's not what we're doing.

16         THE COURT:  No, I'm aware.  I read it, and each case

17  that everybody cites has to be understood in the context of its

18  facts.  So I'm mindful of the factual --

19         MR. BIERMAN:  Thank you.

20         THE COURT:  -- distinctions between all of the cases

21  cited.

22         MR. BIERMAN:  Thank you, and so the bottom line for us

23  is that we have really tried hard, I think as you heard from

24  everybody, everyone's trying hard in trying circumstances.

25  We've tried hard to be narrow and to be limited.  We think the

1  discovery we've outlined is probative and, in any event,

2  calculated to lead to discovery of admissible evidence.  And I

3  will note that at least one of the depositions, the Kayne

4  Anderson deposition, is already scheduled and so Your Honor,

5  we're already on our way to accomplishing this very limited

6  goal.

7            THE COURT:  All right.

8            MR. BIERMAN:  Thank you.

9            THE COURT:  Thank you.

10            MR. O'DONNELL:  Good afternoon, Your Honor.

11            THE COURT:  Good afternoon.

12            MR. O'DONNELL:  May it please the Court, Sean

13  O'Donnell of Akin Gump on behalf of the noteholders.

14            Your Honor, first of all, we took to heart the request

15  by the Court yesterday -- seems so long ago -- when you asked

16  for three cases that related to the relevancy of an internal

17  analysis by creditors or lenders as it relates to a debtor's

18  valuation in the context of a confirmation hearing.

19            We did not understand the Court's request that you

20  were looking for arguments on the merit, nor did we think you

21  were interested in more e-mails that were sent over to the

22  equity committee.

23            THE COURT:  No, I mean, I got it.  I have what I have,

24  and I asked for what I asked for.  And again, this is why I

25  should've made myself more clear that when I say I want three

1  cases, I actually didn't want a letter; I just wanted three

2  cases, cites, and if you're so inclined, a PDF of the cases.

3  But I'll be more clear next time.  But that's fine; it is what

4  it is.  I've read everything that -- I mean, I selectively read

5  some of the longer opinions, but I think I read the relevant

6  parts.

7          MR. O'DONNELL:  Thank you, Your Honor.  And just

8  because of how we understood the Court's instruction from

9  yesterday, obviously, we didn't respond to the letter from

10 Friday which also attached e-mails and made arguments on the

11 merits.  I shared the same library as Mr. Bierman; I had the

12 pleasure of reading on the subway down here, just now, and got

13 to take a look at the exhibits that were annexed -- Exhibit A,

14 I believe it was -- that were annexed to their letter.

15         And at this point, I do just very briefly -- all of

16 thirty seconds -- feel compelled to respond, at least in part,

17 to the e-mails that they keep pointing to.  So the e-mails are

18 from Kayne Anderson who are no longer members of the noteholder

19 group, and the e-mails of late, they're dated -- if I have it

20 written down correctly -- December 16th and December 17th,

21 2013.  And just to put it in context, Your Honor, it was

22 approximately two weeks later, December 31st, 2013 that the RSA

23 was signed.

24         The reason why those dates are relevant -- pardon me.

25         UNIDENTIFIED SPEAKER:  Sean, March 31st.  Three

1  months; three and a half months.

2           THE COURT:  I was going to ask you, but I saw people

3  popping up to see December.  This case may have felt like it's

4  taken that long, but it actually has been fairly brief.  So --

5           MR. O'DONNELL:  Yeah, I apologize.  I get by with a

6  little help from my friends.

7           THE COURT:  Yeah, start from the top of the date so I

8  can understand your point.

9           MR. O'DONNELL:  Thank you.  And there is a reason I'm

10 mentioning the date.

11          THE COURT:  Yes, no.

12          MR. O'DONNELL:  So the e-mails themselves were

13 December 16th and 17th, 2013.  The RSA was signed on March

14 31st, 2013 and --

15          UNIDENTIFIED SPEAKER:  2014.

16          MR. O'DONNELL:  -- when we -- 2014, excuse me.  Thank

17 you.

18          UNIDENTIFIED SPEAKER:  Not December; March.

19          MR. O'DONNELL:  I'm going to do this one more time.  I

20 think I said it right this time but if not, I'm going to sit

21 down and let somebody else come up and argue.

22          THE COURT:  That's all right.

23          MR. O'DONNELL:  So --

24          THE COURT:  When things are done at a very -- I

25 appreciate how quickly everybody got me what they got.

1          MR. O'DONNELL:  Okay.

2          THE COURT:  And so I understand that there's a lot of

3     doing things on the fly, so that's fine.  And also, I can try

4     to be of some help by actually just opening to the e-mails

5     myself.

6          MR. O'DONNELL:  Yeah.

7          THE COURT:  So when you talk, I will do that.

8          MR. O'DONNELL:  And I apologize, Your Honor, because

9     I've already taken longer than I anticipated taking on this

10    point.

11         THE COURT:  That's all right.

12         MR. O'DONNELL:  But again, the point is that the

13    e-mails were December 16th and 17th of 2013 -- let me get this

14    right -- and the RSA was signed March 31st, 2014.

15         THE COURT:  '14.

16         MR. O'DONNELL:  Okay.  So those dates are relevant

17    because you're going to hear when we get to the confirmation

18    trial and when you actually have an opportunity to listen to

19    experts opine as to the value of the debtors as opposed to

20    musings in the shower or otherwise, the Baltic Dry Index, the

21    BDI, is something that is a humongous driver of the debtors'

22    value and of other shipping companies in this market.  And the

23    Baltic Dry Index for those respective dates since December 16,

24    2013 and the date of the e-mails, Your Honor, it's dropped

25    fifty-eight percent.  As of the date of the RSA -- since the

1  date of the RSA, it's dropped a respective thirty-nine percent.

2         THE COURT:  Okay.

3         MR. O'DONNELL:  So I really go back to a comment you

4  made yesterday which is we could poll people in this room and

5  it would be more efficient as to what they think the value is

6  of the company but it probably wouldn't be any more or less

7  probative than we asked what somebody says on their own.

8         And that goes to a point where maybe again we're

9  talking past each other and there isn't in fact a disagreement,

10 because what I heard Mr. Bierman say a moment ago is we're not

11 asking for internal opinions as to value.  Well, if that's the

12 case, then we've got nothing to fight about because --

13        THE COURT:  Well, let me just see if I can respond to

14 one or two things you just said in the aid of efficiency:  one

15 is, I heard Mr. Bierman say he's talking about interaction with

16 the debtors, and I think I've already ruled if there's

17 interaction about value, that's relevant.

18        MR. O'DONNELL:  We volunteered that, too.

19        THE COURT:  Yes, so I think the only thing we're

20 talking about is internal evaluations that are not shared with

21 anyone else, and in reading the transcript in front of Judge

22 Shannon, I was struck by a couple of things but relevant here

23 was that he asked if the -- he noted that it was the debtors'

24 burden and then he said is this party going to offer evidence

25 of value.

1          So I know that there's a rebuttal report that's been

2    much discussed but I don't think the time has yet come for that

3    to spring into being.  But that may be very relevant.

4          So he said if you're not going to be a proponent of

5    value and you're not going to say here's what the value is and

6    here's why, then I'll keep it out, but if you are, then we'll

7    revisit it and then it would seem to be an appropriate subject

8    for discovery.

9          So I realize the deadline for that has not yet come

10   but certainly, it's something that Judge Shannon identified and

11   I thought it probably makes sense to put that on the table now.

12         MR. O'DONNELL:  Yes, Your Honor and I hope also you

13   recognize that we made it a point to highlight that both in the

14   quote from the transcript in our letter --

15         THE COURT:  Yes.  No, you gave --

16         MR. O'DONNELL:  -- as well in the footnote.

17         THE COURT:  I think it was very helpful; you gave the

18   whole transcript to everybody so people could mine it for -- it

19   wasn't selective.  So no, that's fine and it's helpful to do

20   that, so I can sort of see even some things that -- on an

21   anecdotal note, he makes some comment about sitting through his

22   last valuation trial promising he'd never do this again; why

23   can't we just have an auction?  Which I thought was very

24   interesting and rather amusing.  So, I totally agree.

25         But, yes -- no, the question is if we hue to that line

1    from your point of view that if you were going to offer

2    evidence of valuation, that is in some sort of report with an

3    expert, then that would seem to use the sort of trial lawyer

4    view, you open the door to evidence of valuation.  So I don't

5    know if you have any thinking on that subject.

6           MR. O'DONNELL:  We do and I anticipated questions

7    along those lines which is precisely why we set forth in a

8    letter and why we quoted the transcript to that point.  I

9    haven't had the privilege of trying a case before you yet, Your

10   Honor, but you may find me bad with dates but you will find me

11   forthcoming and I am not going to try and hide any of this from

12   you.

13          THE COURT:  Right.

14          MR. O'DONNELL:  I do think as it relates to the

15   reports, there are two points really:  one is, as in Dolan,

16   we're hopeful that we never have to put on valuation evidence

17   and that the debtors' experts and we have a lot of faith in

18   Blackstone, will carry the burden, et cetera.  I have no idea

19   yet what Rothschild's going to say.  I'm not looking to

20   besmirch them at all.  They're a reputable firm.  But we're

21   reserving our rights as lawyers, too, particularly in these

22   instances to have the right to look at it, not to introduce new

23   valuation evidence but to critique to the extent we feel

24   necessary, the report.

25          Those rebuttal reports, the equity report is not due

1   until -- is due on June 11th.  The valuation trial itself

2   doesn't start until the 23rd.  I have to confirm with my

3   colleagues, but on the 12th, we could tell you whether or not

4   we anticipate putting in rebuttal reports and that's almost two

5   weeks before the valuation trial begins.

6           THE COURT:  Right.

7           MR. O'DONNELL:  That's a lifetime in the bankruptcy

8   world.  So I'm very comfortable with us revisiting the issue.

9           THE COURT:  All right.  But it's your position that if

10  you do have a rebuttal report that talks about valuation, that

11  then following that logic, you would open the door to a

12  discussion of your clients' understandings of value.

13          MR. O'DONNELL:  We also point out in our letter that

14  we don't believe Judge Shannon viewed his ruling as

15  precedential and --

16          THE COURT:  Yeah, well --

17          MR. O'DONNELL:  -- you take things on a case-by-case

18  basis.

19          THE COURT:  -- but you take the good with the bad.

20          MR. O'DONNELL:  No, I'm kidding.  I'm kidding.

21          THE COURT:  But --

22          MR. O'DONNELL:  So --

23          THE COURT:  Yeah.

24          MR. O'DONNELL:  -- But in all honesty --

25          THE COURT:  Again, I think he's trying to -- and I was

1   thinking about it to myself, relevance is -- there are

2   obviously some black and white situations.  You're not going to

3   ask the cab driver outside about the evidence of value of Genco

4   unless he happens to have an interesting past.  But most other

5   things are shades of gray.  And what I am trying to do is given

6   the amount of time we have to not punt everything to the trial,

7   because I don't think that benefits anybody, and I think we're

8   trying to do this here and in a sensible way.

9          So I will say that I think if there is evidence of

10  value and there's a rebuttal report by the RSA parties, that I

11  do think then it does make sense to open the door to what

12  historically speaking people said about value prior to the RSA

13  because I don't -- then you're really in the shoes of the

14  debtor that way and being a proponent of a valuation.

15         But I don't think we need to get there now but that

16  would be my leanings.  Let me hear everything from him and then

17  I'll move back to you.

18         UNIDENTIFIED SPEAKER:  Okay.  Thank you, Your Honor.

19         MR. BIERMAN:  I would like to be heard in between.

20         THE COURT:  Yes, well fair enough.

21         MR. O'DONNELL:  So that's our take, as well, Your

22  Honor.  We're perfectly fine with if we decide that we're going

23  to put in a rebuttal report, we can come back here on the 12th

24  and we can revisit what, if any, additional discovery is

25  required by virtue of the rebuttal report that we intend to

1  submit.  But again, we remain hopeful that may or may not be

2  necessary.

3          THE COURT:  All right.  That's fine.

4          MR. O'DONNELL:  Just -- I want to also just be very

5  clear on what it was we volunteered yesterday and what we

6  understood the Court to rule, order or agree with.  So what

7  we -- we really have kind of, as it relates to the RSA itself,

8  you have three camps:  you have the debtors, you have the

9  secureds and you have the noteholders.  And what we've said is

10 anything -- any communications as to value pre-RSA or I guess

11 it's the term sheet for the RSA is what we had in mind, but

12 again we'll take guidance from the Court, but the

13 communications from the noteholders to any of the lenders or to

14 any of the debtors, any communications among those three

15 groups, they can have it.

16         THE COURT:  Right.

17         MR. O'DONNELL:  I don't know that there's any there

18 but, you know, even though I think we could argue the value of

19 that evidence, we're not looking to draw the line in the sand

20 there.

21         If I can have just one more minute to talk to the

22 cases that are cited in the equity committee's letter.  So,

23 there are really two sets of cases that are relied upon there.

24 The first is Chemtura, which you heard about a lot yesterday

25 during argument, and my read of the Chemtura decision that

1  relates to evidence, other than the expert opinion, is that the

2  Court understandably looked to comparable transactions as part

3  of the valuation analysis.  And of course we're not saying that

4  a comparable transaction shouldn't be something parties at

5  least consider and determine or whether or not there are

6  relevant transactions that weigh in towards value.  That's

7  something to be decided later on.  If they want to take

8  discovery on that, they should have at it.

9          The other two cases that they talk about, Iridium and

10 I believe it's Peltz -- yes, Peltz, and again, I apologize, I

11 did have the pleasure of reading these on the subway on the way

12 down, but these are fraudulent conveyance cases and they are

13 dealing with a very, very different issue than what's going to

14 be presented to this Court at the confirmation hearing.  What

15 they deal with is looking back in time as to the solvency of

16 the debtor and determining whether or not a fraudulent

17 conveyance claim could stand.

18         And Judge Peck, in the Iridium decision, did a very

19 nice job, Your Honor, of illustrating for us all, the

20 difference of the type of evidence that the Court was

21 considering in that case.  And what the Court did there was,

22 you know, you have a defendant, Motorola, and then you had the

23 unsecured creditors' committee as the plaintiff.  And I'm at

24 page 5 of my printout of the decision.

25         THE COURT:  All right.

1        MR. O'DONNELL:  But Judge Peck refers to how "Motorola

2   refers the Court to Iridium's success in the capital markets

3   and raising impressive amounts of debt and equity into an

4   efficient public trading market in which Iridium securities

5   traded within ranges indicative of substantial enterprise

6   value.  Motorola's solvency defense is grounded in this

7   empirical data."

8        Similar -- and whereas in contrast, "The committee

9   asked this Court to disregard historical market data as

10  manifestly unreliable and accept the conclusions of expert

11  witnesses who performed a discounted cash flow analysis using

12  adjusted cash flow projections prepared in contemplation of

13  litigation."

14        That doesn't have anything to do with this.  What

15  we're arguing about is whether or not musing in private as to

16  the value, an opinion, a layperson opinion or somebody who is

17  some sophisticated market participant but what they internally

18  view as to value.  If we were to try and offer up their

19  testimony as to value, then they would get to depose them.

20  They would have to be required by Rule 26 to put up a report

21  and they get all the documents that go along with it.  That's

22  not what's happening here.

23        What they're saying is we have former noteholders who

24  are opining at a particular point in time that's no longer

25  relevant to the TEV of the debtors and we should have at that

1   discovery and be able to put as much of that evidence as we

2   want in front of the Court because it may show bad faith or it

3   may undermine the valuation of the debtors.

4           Your Honor, yesterday you had mentioned, when you were

5   listening to the discovery that the equity committee was

6   talking about, that it started to sound like a thirty-day

7   trial.  Well, if Iridium is any example, that was a fifty-day

8   trial, Your Honor, and it followed years of discovery and I

9   don't think that's anything -- I don't think that's what we're

10  looking for here.

11          THE COURT:  All right.  Thank you.

12          MR. BIERMAN:  Your Honor, before Mr. Dunne, I would

13  just briefly respond while the points are fresh?

14          THE COURT:  Well, I usually like to hear everybody on

15  one side and then everybody on the other side.

16          MR. BIERMAN:  That's fine, Your Honor.

17          THE COURT:  So --

18          MR. BIERMAN:  Thank you.

19          THE COURT:  -- we'll get to everybody and you'll have

20  as much time as you need.

21          MR. BIERMAN:  Thank you.

22          THE COURT:  Certainly.

23          MR. DUNNE:  Good afternoon, Your Honor.

24          THE COURT:  Good afternoon.

25          MR. DUNNE:  Dennis Dunne from Milbank Tweed Hadley &

1  McCloy on behalf of Wilmington Trust Co. as agent for the 2007

2  secured loan facility.

3          I just want to drill down on a couple of points.  I

4  guess I'll start off by saying we did not cite the Dolan

5  transcript, so I feel less bound by the good and the bad in

6  that transcript.  But I do think our fact pattern here shows

7  one of the difficulties with the conclusion, that if you file

8  an expert report as rebuttal evidence, that you open the door

9  potentially to the internal lender's valuation.

10          Why?  Our client is Wilmington Trust Company.  We're

11  the agent's counsel for a syndicate that includes, you know,

12  numerous lenders that change over time and I'm going to make a

13  couple of points on that.  As a result, we're not representing

14  Apollo, Centerbridge, Davidson Kempner, for all confirmation

15  purposes in this case.  It's Wilmington Trust.

16          And more importantly, I think that looking at lender's

17  internal valuation opinions and models and beliefs is flawed

18  and unrepresentative by definition because you're only looking

19  at those institutions who are currently in my syndicate, who

20  are currently -- made a business decision to buy recently or to

21  remain in the credit.  And so it wouldn't be surprising that

22  their internal views is or that they expect to make a profit

23  and they're kind of bullish on shipping generally and bullish

24  potentially on Genco specifically.

25          What's missing and why we believe it's

1   unrepresentative, and this would lead to chaos if I actually

2   explored all this, is what's the other side of those

3   transactions?  The syndicate turned over greatly, you know, in

4   the past weeks and months and year or so prior to the RSA; what

5   if I looked at those lender's models and views of values who

6   exited the credit?  Those that sold their debt, some of whom to

7   the parties that are standing here.

8          I can guarantee you that they're going to have a very

9   different view of value and why is that not probative to this

10  issue if you open the door?  But as I said before, that would

11  be chaotic to bring that in and to look at people who shorted

12  the Genco securities or looked at the bank debt and didn't take

13  a position because they didn't think that they could make some

14  money.

15         So we view it as not only irrelevant at trial but not

16  a proper inquiry within a deposition because it's not likely to

17  lead to admissible evidence.  Now that being said, I agree when

18  they talk about these e-mails about what some investor, lender

19  or bondholder said to the company or mused to a third party,

20  oh, that's a fact, right?  That's a fact that's going to come

21  out.  But their internal views on value is exactly that; it's

22  in the nature of a lay opinion.  I think we have agreement on

23  that, that doesn't come in and that we'd be limited to these

24  facts.

25         I raised my issue about representing Wilmington Trust

1  because I don't think that Judge Shannon's solution works for

2  us because I would feel compelled then to look at the syndicate

3  broadly and see what all their views were, both in terms of

4  incoming and exiting lenders and we'd have offsetting views of

5  value and we'd waste a lot of time and we would have an

6  interminable trial.

7          And I also don't know at the end of the day what it

8  adds, right, because what you would find, no doubt, is that a

9  lot of these market participants are using very different

10  assumptions, very different methodologies, and at the end of

11  the day, what matters to the Court presumably by confirmation

12  is or kind of two things:  one is, did an alternative proposal

13  materialize in the two-and-a-half months between the public

14  announcement and the date of confirmation?  If not, okay.

15  What's the expert opinion and what were the actual

16  methodologies used by the experts and were they reasonable or

17  persuasive to Your Honor?

18          To overlay a number of individual lenders' views on

19  methodologies and assumptions can only serve to be confusing

20  and beside the point, particularly when we don't represent them

21  individually for purposes of valuation, and to the extent we

22  submit an expert report, Houlihan Lokey, that would be on

23  behalf of Wilmington Trust, and they would not have seen or

24  relied on the internal valuation models or musings of the

25  lenders in the syndicate.

1       So it's not something that they put into the mix when
2   they were doing their report.  I think it would be appropriate
3   if they had to look at it but that will not be the case and
4   they can certainly Houlihan that under oath when they -- if we
5   actually get to the position where we put in a rebuttal expert
6   report.
7           THE COURT:  All right.
8           MR. DUNNE:  And unless Your Honor has any questions,
9   that --
10          THE COURT:  I don't.
11          MR. DUNNE:  -- concludes my remarks.  Thank you.
12          MR. O'NEILL:  Your Honor, just briefly.  I'm not going
13  to recapitulate what other people said.  I'll only make the
14  point that although we agree with what the lenders and the
15  bonds are saying about lay opinions and the propriety of taking
16  what's effectively expert testimony from unqualified third
17  parties, I just make the point that we are the plan proponents.
18  No one else is the plan proponent.  The issue of good faith
19  applies to the debtor and not to others and third parties'
20  views of value don't impact on the debtors' good faith.
21          We're putting up five company witnesses, three
22  experts.  They have more than an ample opportunity to
23  investigate the debtors' good faith.  Talking to bondholders,
24  talking to banks is not relevant to that.
25          And then a couple of little tweaks:  the BDI is not an

1    index of value.  The BDI is an index of rates.  Mr. O'Donnell

2    is right that rates dropped by fifty-five percent according to

3    the BDI from the end of last year to today.  That obviously has

4    an impact on value but it is not itself value.

5              THE COURT:  It's not value.  It's a proxy for saying

6    something about value.

7              MR. O'NEILL:  Yes, thank you, Your Honor.

8              THE COURT:  All right.  You're up.

9              MR. BIERMAN:  Thank you, Your Honor.  I think I will

10   come to the podium.

11             Steven Bierman again for the official equity

12   committee.  Just a couple of quick points, Your Honor.

13             First, to be clear, again, we are looking for evidence

14   concerning valuation and assessments and analysis as to what

15   happened at the time, what people said and thought and believed

16   at the time.  We're not looking to qualify those persons or

17   those entities as experts.  It's factual evidence.

18             Now let me point out, Your Honor, that we've heard

19   from everyone that stood up, interestingly, all on the same

20   side of the issue.  All of them represent clients that support

21   this plan.  They've come before you.  They came before you on

22   the first day hearing, Your Honor, and said -- counsel for the

23   noteholders came before you and said, this is a plan that's

24   fair, it's reasonable and it's in the parties' interest.

25             Are they not supporting the plan?  They are

1    contractually obligated to support the plan.  Are they not

2    conveying to Your Honor the clear notion that they believe that

3    this plan is made in good faith after negotiation and

4    deliberation together with the debtors?  Are they not putting

5    that forward?  Indeed, Your Honor.

6          We're not looking to take depositions of, as Your

7    Honor put it, the cab driver outside or as Mr. Dunne put it,

8    people who have come in and out of the equity.  We're looking

9    to take a handful of focused, short depositions of people who

10   negotiated with the plan proponent, the debtors, who had

11   conversations about it, and that's already the subject of

12   testimony that Your Honor's allowed, and who brought to that

13   table what they understood about the fundamental issues of

14   value and fairness.

15         THE COURT:  But when you say "brought to the table"

16   that implies conversation and decision making among this group

17   of debtors, noteholders and lenders, and I agree with you on

18   that.  So, but I just -- I mention it now because you keep

19   talking in that language but that language, I think deals with

20   something that I've already said is permissible.

21         MR. BIERMAN:  Right.

22         THE COURT:  So what I think we're focused on here is

23   just the opinion in isolation.  And so it came up in front of

24   Judge Shannon where people were talking about the proprietary

25   analysis that somebody would use to come up with their own in-

1  house opinion of value, whether that's a back of an envelope or

2  something much more extensive, whatever it is, but not share

3  with anybody outside of that shop.

4          And so the question is, if it's not shared with

5  anybody outside of that shop before this case, and it's not

6  going to be offered by anybody in this case, what's the

7  relevance of it?  And that's -- because you can understand how

8  you can end up having mini-trials about all these different

9  views on valuation because once they're introduced, you say

10  well, we're introducing it for a limited purpose but, in fact,

11  other people then say well, you're introducing this part but I

12  want to introduce that part.  So instead of having however many

13  experts we now have which is, I don't know, six, eight -- I've

14  lost track -- we're going to end up making witnesses of -- on

15  valuation, albeit with certain caveats -- of other folks who

16  are not in the lawsuit now.

17          MR. BIERMAN:  I think not, Your Honor.  We're not

18  looking to do that and I don't believe that will happen.

19          THE COURT:  Then what's the --

20          MR. BIERMAN:  The point is several, Your Honor.  In-

21  house valuations informed the decision making by the parties

22  that negotiated the plan and that in-house valuation, indeed,

23  must have been informed by communications with the debtor.  I

24  think --

25          THE COURT:  Yeah, but you're getting those.  We keep

1    going back to that.

2              MR. BIERMAN:  But the in-house valuations, whether or

3    not shared, informed the decision making.  It cannot be that

4    these parties come before the Court and say that under the

5    Bankruptcy Code, this plan is confirmable with the equity out

6    of the money, with the valuation that underlies the debtors'

7    plan.  If it is the case, Your Honor, that they all or some of

8    them knew at the time that there was good reason to believe

9    that the valuation that the debtor would rely upon was low, I

10   would think Your Honor would reserve, until the time of hearing

11   that evidence, its admissibility and relevance because I would

12   suggest that today is not the day to make that determination.

13             THE COURT:  But I --

14             MR. BIERMAN:  It can't be.

15             THE COURT:  Well, let me just -- there's a couple of

16   things.  I got into relevance, and you're right, and you're

17   right, relevance is often -- and in fact, that's one of Judge

18   Shannon's first comments is can't we decide this later?  And

19   that's, I think, a default setting for all judges.  But at the

20   same time, we also run into the issue of managing both trial

21   and pre-trial and some judges are more active in doing that,

22   leading up to a trial and some are less.  Some circumstances

23   call for a more active hand than others.

24             And since we don't have much time under the schedule

25   to get this all together, I am thinking seriously about where

1    this all fits.  And so, in the discussion about the other issue

2    that you've resolved which is the number of depositions, at a

3    certain point -- I don't need to get into it because you have

4    an agreement, I was just simply going to set a number and say

5    take whoever you want.  Here's your number.

6           And is that tied to relevance?  No, but it's a time-

7    honored and rule-recognized way of saying this is what's going

8    to happen.  And people do that with time limits, as well, both

9    in depositions and at trial to say you decide what you think is

10   the most important thing to do and if you decide that this is

11   more important than say taking -- spending that time on an

12   expert's deposition, then it's your time, do what you want with

13   it.

14          MR. BIERMAN:  Okay.

15          THE COURT:  So I am concerned that your view is to

16   view this only from your perspective which is to say well,

17   here's what you're trying to do or not do, but I think once

18   you're in for a penny, you're in for a pound.  If we open up

19   valuation evidence by folks that's not shared with anybody

20   else, you're going to have mini-valuation trials.

21          MR. BIERMAN:  Well, Your Honor --

22          THE COURT:  I don't see any other way around that and

23   I'm trying to figure out as Judge Shannon did, if the debtor is

24   the proponent and there's not an intent -- putting Mr. Dunne's

25   point aside for a second, if -- and the RSA parties are not a

1    proponent, meaning they're not putting on evidence of value,

2    you could always have this happen.  You could have somebody

3    who's a buyer in a 363 sale saying well, what is it that you

4    think and is this all collusion.

5            I've certainly had a case in the not too distant past

6    where there was only -- there was a lot of complaints by the

7    folks out of the money saying this can't be right, it can't be

8    right.  We waited eight months to a year.  No one else showed

9    up.  And I think in that case, if that door was opened, I'm

10   sure the party in question would have walked through it and

11   said I want to hear what they have, what they think about

12   value.

13           MR. BIERMAN:  I understand, Your Honor.  We're

14   certainly not looking to create collateral trials or mini-

15   trials.  We put before Your Honor in the correspondence over

16   the last couple days, a couple of examples that suggest to us a

17   serious concern about what --

18           THE COURT:  But that's a perfect example.  So let's

19   take your serious concern.

20           MR. BIERMAN:  Yeah.

21           THE COURT:  So then we should have a trial -- you

22   introduce that as evidence and say it was just one party's

23   internal evaluation in December.  So we'll tweak the facts a

24   little bit, an internal evaluation in December.  So then

25   we're -- in addition to the trial on the actual valuation right

1    now as to whether the RSA and the related plan complies with

2    the Bankruptcy Code, we're going to have a trial about the

3    valuation in December and then hear evidence about what, if

4    anything, we should take as a probative matter about that

5    valuation in December.

6          Now, the normal way to do this is to funnel all the

7    facts through the experts.  So that's why I would think

8    anything that you think is good that you learn in discovery,

9    you'll immediately send your expert and the other side will do

10   the same.  And that's how it will magically appear, and it will

11   appear in the context of an opinion that is recognizable under

12   the rules.

13         So if we all put aside our bankruptcy hats for a

14   second and think like the district court and the Court of

15   Appeals do, they're going to say well, is it expert opinion?

16   No, it's not.  So it's lay opinion.  All right.  So it's either

17   lay opinion that -- you have to walk a very tight line because

18   lay opinion has two potential problems on either end.  On the

19   one end, it can be excluded because it's become an expert.

20   It's somebody has said well, I'm taking my experience and now

21   I'm doing some predictive stuff.  Okay, you're out because

22   you're really an expert.

23         On the other hand, it can be times that it's out

24   because it's not based on anything.  It's a back of an envelope

25   sort of calculation.  And multiple evidences of value here, I

1  just -- I'm having a real gatekeeping problem thinking about
2  where this is not just a multiple trials on evidence.  I know
3  you're saying you want to just use it for what's good for you
4  but everybody's going to want to do the same thing.

5         MR. BIERMAN:  Well, Your Honor, I think on the
6  particular e-mail that we both may be thinking of, I think the
7  point of that was actually not what Mr. O'Donnell was pointing
8  you to about the timing of that party's evaluation but rather
9  that there had been a conversation with Mr. Wobensmith about it
10 and, of course, as Your Honor's already ruled, we're entitled
11 to get that --

12         THE COURT:  Yeah.

13         MR. BIERMAN:  -- and take that where we can take it.
14 So I think we're conflating a couple of things there.

15         In terms of the --

16         THE COURT:  No, I changed your hypothetical.  If you
17 were listening, I changed your hypothetical --

18         MR. BIERMAN:  No, I did.  I did, Your Honor.

19         THE COURT:  -- to say let's take such an evaluation by
20 an RSA party done in December of 2013, which is not a far-flung
21 hypothetical.  So that was my hypothetical, to illustrate the
22 concerns that I have.

23         MR. BIERMAN:  I think it's a fair question, Your
24 Honor, that if an RSA party that has come before you from the
25 first day hearing onward, and presumably will always say or

1    imply that they support the plan, that the plan is fair, that

2    the plan was arrived at in good faith and that the valuation

3    underlies it, does not violate the absolute priority rule under

4    Section 1129.  That's the implication.

5              THE COURT:  But that's the debtors' burden.

6              MR. BIERMAN:  I understand that.

7              THE COURT:  And that's what Judge Shannon pointed out

8    and I -- I mean, that was discussed way before I ever got that

9    transcript; who's trying the case?  And I have said -- again,

10   Mr. Dunne has put a sort of pin in that issue for the moment,

11   but I've said if there is no evidence of value that's being

12   advocated by the RSA parties where they come in and say we have

13   now put our valuation, we've put up the flag and we have a

14   standard bearer and we're walking into the Court with that,

15   well then, people are going to take shots at you and that seems

16   to me subject to talking about it further.  If you don't do

17   that, the question is what are we doing?

18             MR. BIERMAN:  I understand that and I understand Your

19   Honor's attempt to strike a fair balance on this issue.  I will

20   say though that in --

21             THE COURT:  Because to be honest, I don't think Mr.

22   Dunne thinks that's such a good idea at all.  I haven't gotten

23   there, but it's certainly -- again, in this case I'm deciding

24   what I have to decide at the time; right now the record in

25   front of me is that nobody of the RSA parties have advocated a

1  value.

2          MR. BIERMAN:  Well, Your Honor, the other related

3  issue -- the other shoe dropping, in effect, is about good

4  faith.  And I understand who has the burden on these issues,

5  but nonetheless, it matters to everyone, all the lawyers here,

6  the parties and the Court.

7          THE COURT:  How could it matter if it's not shared

8  with anybody?  If the debtor has to have good faith in

9  proposing a plan and we're talking about -- these hypothetical

10  valuations we're talking about are not shared with the debtor.

11  They're not shared outside of these groups -- the noteholders,

12  the 2007 lenders, the debtors -- there's no crossing of that

13  barrier.  How is it relevant to the debtors' good faith in

14  proposing a plan?

15          MR. BIERMAN:  The noteholders and the other creditors

16  have been made contractually obligated by the debtors to

17  support the plan.  They are made contractually obligated to

18  take steps necessary to support it.

19          Their experts -- their professionals are being

20  compensated by the debtor.  It seems to me that --

21          THE COURT:  Well, I don't understand your point.

22  That's the true for RSAs, PSAs, prepacks.  I mean, what does

23  that have to do with valuation and good faith?

24          The debtors have to come in.  I agree with you -- and

25  again, we're going -- I want to make it very clear for purposes

1   of the record and this transcript so if any lucky judge has to

2   revisit this issue -- that good faith in bankruptcy is about

3   whether the debtor has good faith to satisfy that relevant Code

4   provision in proposing a plan and asking that that plan be

5   confirmed.

6          My understanding is that your concern about valuation

7   is that, one, you're not getting the recovery as equity holders

8   that you should get and, two, that the plan is not in good

9   faith because everybody knows that this valuation is not

10  accurate.  It's a low ball.

11         All right.  It's a not uncommon problem in bankruptcy

12  court.

13         MR. BIERMAN:  Understood.

14         THE COURT:  Probably much to the dismay of various

15  judges who have had to have extensive valuation trials.  But it

16  relies on a party and looks at what they know and what they

17  made their decision on.

18         If it was never an input and it was done by a monk

19  sitting in a cave somewhere and buried only to be unearthed

20  thousands of years from now, but nobody knows it exists, how

21  could it be relevant to the inputs and what the debtors were

22  thinking in proposing a plan?

23         MR. BIERMAN:  I'm caught in an awkward spot between

24  two concepts here, Your Honor.

25         One is the burden that Your Honor has identified

1   regarding that the debtors bear and the fact in the procedure

2   that, from the first day hearing onward through to

3   confirmation, that other parties have stood up before Your

4   Honor, and I assume may stand up again, and say that, as was

5   said before by the ad hoc committee of noteholders on opening

6   day, the informal convertible noteholders groups supports the

7   assumption of the RSA.  We think it's a reasonable exercise of

8   debtors' business judgment.

9          What it does is provides a meaningful distribution to

10  what we believe is an out-of-the-money equity class.  If people

11  are going to get up before you and undertake a burden that they

12  don't have, is Your Honor going to discount that?

13         THE COURT:  So what would you

14         MR. BIERMAN:  Because if you're going to consider

15  it --

16         THE COURT:  -- I mean, aren't we elevating form over

17  substance?

18         MR. BIERMAN:  I hope not.

19         THE COURT:  I mean, would you have them say we're part

20  of the RSA so you know where I stand, and certainly that was

21  the case in the case before Judge Shannon, right?  There's a

22  party to an RSA.  It's the exact same factual circumstances as

23  here.  And would you have them get up and say but because I'm

24  concerned is somehow being construed as being adopted a burden

25  of proof that I am not going to say anything?

1        I mean, what I was concerned about and I think is

2   echoed in Judge Shannon's discussion is who is providing

3   evidence?  Who is standing up to meet the burden?  It's the

4   debtors' burden.

5        Again, I think that the RSA parties if they start

6   providing evidence of value, then I think they open themselves

7   up.  And that's a very common concede in evidence in criminal

8   cases, other civil cases.  You just say well, it's off limits,

9   but if you open the door, you open the door.

10        And so I think from a point of view of an evaluation

11   of the debtors here, the debtors' value by a party done, not

12   shared.  I also think that -- we haven't gotten into it -- but

13   there are other concerns identified by Judge Shannon in the

14   transcript, which is what is it based on.  Is it a proprietary

15   model?  What's the time frame for it?

16        And once you introduce those, there will need to be a

17   response to those.  And I will tell you that sitting here right

18   now, I'm trying to do the parties a favor and not have us spend

19   time at the trial that I don't think is going to be productive.

20        And I think rather than hear days of that testimony --

21   and I can't see as how it's not going to take over the trial,

22   because I think once we go there it's like nuclear weapons.

23   You're going to get some.  They're going to get some.  And I

24   think it's going to escalate.

25        I don't see any way it's going to deescalate.  And I

1    think people will be back here asking for a modified discovery

2    order given the circumstances if we open that door.  And I can

3    understand why they would because I think once you're in,

4    you're in.

5         If we're asking for people who are parties to the RSA

6    for their value, even if we're just asking those folks, you're

7    going to say, well, we just want these folks, but then they

8    could say, well, there are other parties to the RSA who we had

9    to drag to the RSA kicking and screaming because their views of

10   value weren't as bullish as these other folks.

11        And then what about the person who jumped out of this

12   group just before the RSA?  I mean, again, the debtors have the

13   burden.  If some other party is going to pick up that standard

14   and raise it, then they're going to get shot at.  And that

15   seems fair.  But if they don't, then I really don't know --

16   putting aside the whole lay just classic federal case law on

17   lay opinion, I have real problems with it as lay opinion.

18        It reminds me of a discussion I had in a Chapter 13

19   panel of all things.  Who's entitled to give the evidence about

20   the view of a house?  Okay.  An expert?  Okay.  A debtor can do

21   it because the debtor is an owner, much like an owner of a

22   business, however big, however small.

23        And if it's somebody other than those two parties,

24   they're lay opinion witnesses or they're experts.  And why

25   should they be in as lay opinion witnesses?  And for the most

1  part, they're not allowed.  So it's, in a way, it falls

2  straight into the standard evidentiary lines that are drawn in

3  all cases, not just bankruptcy cases.

4          MR. BIERMAN:  I appreciate that, Your Honor.  I

5  suppose the issue I'm trying to posit boils down to this, and

6  then I'll be done.  To the extent that anyone other than the

7  debtors is getting up and making argument to you, submitting

8  briefs in support of confirmation, submitting other support,

9  whether or not it is "evidence" as such, unless Your Honor is

10 going to somehow discount or ignore that, respectfully, I would

11 encourage that the record be made open and be able to be

12 created so that Your Honor can test whether they know better

13 than what they're saying.

14         So I think to the extent --

15         THE COURT:  I don't know what that means.  What does

16 that mean?

17         MR. BIERMAN:  Well, I don't know whether -- I didn't

18 hear, for example, Mr. O'Donnell or Mr. Dunne say that they're

19 not going to put in briefs in support or other documentation in

20 support.

21         THE COURT:  People are parties to the case; they can

22 do what they're going to do.  If they touch the issue of

23 valuation and say we are advocating a valuation, then they've

24 crossed the line.  And we'll discuss exactly what the

25 appropriate way to handle that is, but I have strongly

1  suggested that I think Judge Shannon has made a very wise

2  decision in saying it's relevant for discovery and that we can

3  fight about it for trial, but I would think at that point if

4  somebody's going to put their nose in and talk valuation,

5  they've opened themselves up to at least discovery.

6          And then we'll -- I'm trying to make a cut through

7  this now in discovery and then we'll get to trial, but I

8  just -- I'm having a real problem not making this into eight

9  million mini-trials as to other people's evidence of valuation.

10  And again, I think anything that was shared with anybody about

11  valuation is fair game and it should be.

12          MR. BIERMAN:  I will certainly take the depositions on

13  the subjects Your Honor has approved.  And as to these presumed

14  briefs or other submissions I posited to Your Honor, I think

15  we'll have to take a look at them at the time -- we'll ask the

16  Court to take a look at them at the time --

17          THE COURT:  Well --

18          MR. BIERMAN:  -- for this reason, Your Honor, then I'm

19  truly done.  If someone is supporting approval of the plan,

20  they are necessarily supporting the assumption underlying --

21          THE COURT:  I reject that line, so if you're going to

22  trot that out now, you can consider me have rejecting it now,

23  because then what you're saying is by being in the case and

24  being an RSA party they have advocated a valuation actively and

25  have assumed a burden of proof.  And that goes another step

1  then to saying that these individuals -- which I would submit

2  is a leap that I can't make -- that these individual's evidence

3  of valuation in a vacuum is relevant here.

4          I mean, what did you -- I don't know what else to say.

5          MR. BIERMAN:  I understand, Your Honor.

6          THE COURT:  I don't know what else to say.

7          MR. BIERMAN:  I understand, Your Honor, and I thank

8  you for your time on this.

9          THE COURT:  Because I thought that the general rule

10  was for people who were -- you can make whatever objections you

11  want.  I understand that.  Make your record.  But please let's

12  not waste time on posturing.  It's a bench trial.

13          So if you start getting into, well, I want to object

14  paragraph 54, argue that I shouldn't listen to it in your

15  argument, but what do you really get by making that kind of

16  statement?  I just don't understand it.  And if we're going

17  to -- again, that's why I said I'm going to make all my rulings

18  assuming it's a hotly contested environment, because all I've

19  seen is everybody wants to fight about everything.

20          So I just ask you to use some common sense.  You can

21  argue in your opening, in your closing, through your questions

22  of witnesses and advocate for your case.  You have every right

23  to do that and you should do that.  I have no problem with

24  that.  So all your arguments about valuation and how it should

25  be construed, I fully expect you to say, well, the RSA parties

1    have said this, that and the other thing.  Here's what the
2    debtors have and they notably haven't provided any valuation
3    testimony because maybe they don't want to expose themselves.

4           I mean, you could make whatever arguments you want to
5    make.  That's fine.  That's all part of what's presented in
6    front of me.  And what is not presented in front of me is in
7    evidence, but certainly I can note the fact that it's not
8    there, which courts do all the time in all sorts of other
9    context.

10          MR. BIERMAN:  Again, thank you, Your Honor.

11          THE COURT:  All right.

12          MR. DUNNE:  All right.  And just clarifications,
13   Judge, I think I understand it which is, on my issue -- the
14   Wilmington Trust issue, we put a pin in that.  It may or may
15   not be relevant.  We may not need to get there if, for
16   instance, we don't put in rebuttal expert opinions, we're never
17   there.  And the internal, you know, valuation data doesn't come
18   out.  The third party to third party what people say to
19   somebody else about values certainly is fair game.

20          And also, I thought I heard the Court reject the
21   notion that if we do not put in a rebuttal expert opinion, but
22   the record is whatever the record will be created by the
23   debtors and the equity committee, we can make legal argument
24   off of that --

25          THE COURT:  Yeah.  I think that's fine.  I think

1  that's fine.  The record is what it is.  Again, I think if

2  you're advocating, meaning you're putting in a witness that

3  changes things in my mind.

4         MR. DUNNE:  Right.  And if that happens, we'll come

5  back and talk about my issue about the -- I want to be clear

6  Mr. Khalil reminded me that we recently agreed to represent the

7  steering committee defensively solely with respect to their

8  document production requests and depositions to facilitate that

9  so that they didn't have to hire, you know, five, six different

10 law firms so that we could keep --

11        THE COURT:  Right.

12        MR. DUNNE:  -- to the schedule.

13        THE COURT:  All right.

14        MR. O'DONNELL:  So this goes against the fundamental

15 rule of advocacy which is when the judge rules in favor of you

16 run for the door.

17        THE COURT:  I was going to say, but it run through my

18 head, but

19        MR. O'DONNELL:  So I just --

20        THE COURT:  -- there are more things in heaven and

21 earth as the Bard says.

22        MR. O'DONNELL:  Yeah, and I'm not asking for my cake

23 and eating it also.  I just want to -- there were a couple of

24 times when we were talking about the impact of this Court's

25 ruling where I wanted to make sure we were clear so we're not

1  in front of you again in terms of what it means.

2          So absolutely to the extent that somebody in the

3  noteholder group made communications to the debtors, or to

4  Wilmington Trust, the secured lenders, as relates to value

5  prior to the RSA, they can have it.

6          There was a little bit of a colloquy about if anybody

7  says anything to anybody about value, of course you can have at

8  it.  I don't interpret that -- or I didn't interpret it, unless

9  you tell me otherwise, to mean if members of the noteholder

10  group express a value among themselves, but they don't express

11  it with the debtors, they don't express it with the lenders,

12  that to me would still remain proprietary information based on

13  your ruling, but I --

14          THE COURT:  Well, then you get into the common

15  interest privilege.  Am I sort of getting a sense of what tree

16  you're barking up?

17          MR. O'DONNELL:  Yeah.  Actually, and it's not -- so

18  the common interest privilege, as you know, is an extension of

19  the attorney-client privilege.  And this would also be work

20  product as well presumably because its valuation, maybe or

21  maybe not done in anticipation of litigation, only is waived if

22  it's shared with an adversary.

23          The probative value if it's said among the lenders as

24  it relates to the good faith of the plan, and it's never said

25  to the debtors, I think remains the same.

1          THE COURT:  Well, I suspect -- I'm not saying this

2     isn't important, but at the same time I would expect that what

3     we're really talking about is the internal valuations that they

4     put together by themselves then sharing them among their

5     constituency.

6          MR. O'DONNELL:  Right.  That's what I'm referring to.

7     And if it's within -- again, you've got your three camps:

8     you've got the notes, you've got the lenders and you've got the

9     debtor.  And if it's shared among one of those camps, but it's

10    not shared with the lenders, it's not shared with the debtors.

11    I don't understand how that would go to the good faith and I

12    didn't understand your ruling otherwise.

13         THE COURT:  Let me ask Mr. Bierman's view on that.

14         MR. BIERMAN:  And, Your Honor, I hope we don't have to

15    quibble about who won what.  We've all listened to Your Honor

16    and your well expressed and clear views on the subject.  And I

17    think we go forward from this hearing understanding how to

18    proceed.

19         THE COURT:  Well, is there a dispute about this issue

20    because it'll just rebound back at me in about an hour?  So I

21    really don't --

22         MR. BIERMAN:  I don't --

23         MR. O'DONNELL:  I'm now glad I stood up.

24         THE COURT:  -- I understand that parties sometimes

25    really say I don't want to have to get into this, but I expect

1  we're going to walk out of the courtroom and have this problem.

2  So I don't know if it's an issue or not.

3          MR. BIERMAN:  No.

4          MR. O'DONNELL:  I don't think so, Your Honor.

5          THE COURT:  All right.

6          MR. O'DONNELL:  Okay.  Thank you, Your Honor.

7          MR. BIERMAN:  Thank you.

8          THE COURT:  All right.  Thank you.

9          MR. O'DONNELL:  Thank you for your time.  I'm sorry

10  for two days of discovery.

11          THE COURT:  No, that's fine.  And again, there were

12  other limitations I thought I might have to impose in discovery

13  and I'm not because I think parties worked the other issues

14  out.  I appreciate that.

15          Again, I think my concern is about the scope of the

16  trial.  I don't think it does anybody a service by allowing

17  people to get into sort of these independent or these separate

18  not shared views of valuation and then spend all this time

19  working that up and then show up at trial and say I don't want

20  to hear that.  I think that's unfair to everybody.

21          You have enough stuff to do otherwise, and if there

22  are rebuttal reports, I expect we'll have a discussion and

23  we'll need to have a discussion about what's open season,

24  although, I certainly have given you my inclinations as to how

25  that would work.

1          So, but let me just -- unless anybody has anything

2     else, I'm just going to  make a few comments on the record as

3     to why I ended up where I ended up so any reviewing court has

4     an idea.

5          MR. RENENGER:  Thanks, Your Honor.  Aaron Renenger

6     from Milbank on behalf of Wilmington Trust.

7          Just briefly there may still be a ripe issue with

8     respect to the number of depositions of lenders.  I heard the

9     number six stated earlier today.  That was in the letter that

10    was sent this morning, Your Honor.

11          I don't know whether that's still the equity

12    committee's position, they need six lender depositions.  It

13    would be our position that that is cumulative, duplicative and

14    unduly burdensome.

15          THE COURT:  Well, that's the number that was

16    identified for me before at the last conference.  And I will

17    say this, that I think it's got to be -- the numbers that we're

18    talking about and the depositions that have been discussed

19    today and yesterday are the universe without it being subject

20    to expanding based on additional documents or other concerns.

21    So you make your choices.

22          It is subject to be expanding only in the event of

23    rebuttal experts.  And that seems to be fair.  You can't depose

24    with somebody on something you don't know they're going to talk

25    about.

1          So at this point, I think there's a lot of RSA

2    parties.  I am not well versed enough to know exactly what's

3    out there in terms of the documents.  I would submit to you

4    that any prolonged discussion of that, in terms of cumulative

5    and the number of these six depositions is ultimately probably

6    going to be unproductive for all of you to sit through and

7    educate me on and it will probably take more time and expense

8    going that way.

9          So at this point I'm just inclined to let the six stay

10    and again, I was going to come up with a cap, which I'm not

11    going to do, but I understand essentially cap has been self-

12    imposed.  We're talking about eight for the debtors.  We're

13    talking about six for the lenders.  And that's discovery

14    subject to any rebuttal expert reports.

15          So again, I think for me to reach any intelligent

16    conclusion and preclude any of those six, I really will need a

17    significant education.  And I've got to say it's probably not

18    worth your time to do that.  It's probably faster to take these

19    depositions for a couple of hours.  It's probably faster to

20    just take the deposition and be done with it.  And it probably

21    makes more sense for the purposes of having a robust record in

22    which to try the case.

23          MR. RENENGER:  Your Honor, I guess -- thank you for

24    that.  And I would just -- the point I would make is that we

25    would just want to reserve the right, Your Honor, to the extent

1  that meet-and-confer discussions on the number of depositions

2  aren't productive, to come back.

3          The position that we'll take --

4          THE COURT:  Well, what discussions are there?  I think

5  the six were identified for me yesterday and so I think they

6  are what they are.  And that's what I presume the number is

7  based on for today was the six of yesterday; is that right?

8          MR. NAGIN:  Yes, Your Honor, Benjamin Nagin from

9  Sidley Austin also for the official committee --

10          THE COURT:  You want to slide that.  Thank you.

11          MR. NAGIN:  Sure.  And we're talking about, just to be

12  clear, we're talking about six lenders and noteholders

13  together.  And maybe we can do less than that.

14          MR. RENENGER:  A total of six?

15          MR. NAGIN:  Correct.

16          MR. RENENGER:  A total of six.

17          MR. NAGIN:  Yeah, right.

18          THE COURT:  And that's the same number as yesterday?

19          MR. NAGIN:  Yes.

20          THE COURT:  That includes their advisors and things of

21  that sort or is it --

22          MR. NAGIN:  It does not Houlihan or Jeffries, no.

23          THE COURT:  All right.  Well, yesterday I heard, I

24  thought, three folks:  Apollo, two others and then the two

25  financial advisors for those folks.  So I think that's how I

1    ended up with five and I forget the sixth is a bit fuzzy in my

2    memory.

3            MR. NAGIN:  Well, we'll --

4            THE COURT:  So this would be an expansion of that if

5    you're talking about the six just of the noteholders and

6    bondholders.

7            MR. NAGIN:  Then we'll make it six with -- I don't

8    remember exactly how yesterday's conference went, but we will

9    make it six, inclusive of Houlihan and Jeffries.

10           THE COURT:  Right.

11           MR. NAGIN:  And then the remaining four will be some

12   combination of noteholders and lenders.

13           THE COURT:  All right.  That work for you?

14           MR. RENENGER:  Thank you, Your Honor.

15           THE COURT:  All right.  Thank you, I appreciate your

16   accommodation that way.

17           MR. NAGIN:  Thank you, Judge.

18           THE COURT:  And in fact you've ended up exactly where

19   I was going to be if I had imposed a cap, which is to say the

20   experts, the three, and one more just to see however else

21   things work out in the discovery that you're getting.  So as my

22   grandmother used to say, reasonable minds agree or fools seldom

23   differ.  We can, you know, figure out where this fits in.

24           So in light of all that, is there anything else we

25   need to discuss here this afternoon?

1          MR. ROGOFF:  Yes, Your Honor, for the record Adam

2     Rogoff on behalf of the debtors.  With permission I

3          THE COURT:  Are we seguing over to the --

4          MR. ROGOFF:  Well, I'm going to segue to just tell you

5     where we are.

6          THE COURT:  Right.

7          MR. ROGOFF:  And then I'm going to ask with Your

8     Honor's permission if we can just take a break.  We've been

9     having discussions with counsel to the equity committee as well

10    as counsel to Rothschild in an effort to amicably resolve the

11    oral application.

12          As Mr. O'Neill indicated earlier, there are proposals

13    that have been made to Rothschild and the equity committee on

14    behalf of the company, working in coordination with the

15    supporting creditors that objected to the written application.

16    Our offer is currently being considered and reviewed by the

17    equity committee counsel as well as Rothschild's counsel.

18          We are waiting for them to come back.  I'm hopeful

19    that we will be able to present something which is consensual

20    to Your Honor.

21          THE COURT:  How long do you think you need to finish

22    those up?

23          MR. ROGOFF:  I would imagine that if we take another

24    fifteen minutes.

25          THE COURT:  All right.

1          MR. ROGOFF:  I mean, during this entire hearing I've

2     been sort of moving in and out of the courtroom to try to close

3     the gap on the open points.

4          THE COURT:  And are the people here the same people

5     you need to chat with?

6          MR. ROGOFF:  The people that I'm working with are

7     actually in a conference room down the hall

8          THE COURT:  All right.

9          MR. ROGOFF:  -- but they are present.

10          THE COURT:  All right.  Then what I'm going to do is I

11     just want to put a couple of observations on.  I think when I

12     said anything else I meant discovery.  I didn't say it out

13     loud.  But why don't you continue to have those discussions.

14     I'm just going to make a few points for purposes of the record

15     as to why I came out where I came out in discovery.  And then

16     that will eat into the fifteen minutes, then we'll take a

17     break.

18          First of all, I just want to confirm and I think it's

19     the case that all the submissions on this discovery issue on

20     valuation were put on the docket, so they're on the record.  I

21     think that that's right.

22          MR. O'DONNELL:  It is for the noteholders, Your Honor.

23          THE COURT:  All right.  Uh, and I think that's true

24     for the committee, as well and --

25          MR. O'DONNELL:  And the lenders as well.

1          THE COURT:  -- and the lenders.  All right.

2          MR. BIERMAN:  It is for the equity committee.  Thank

3     you, Your Honor.

4          THE COURT:  All right.  Thank you.

5          So I'm just going to comment in no particular order,

6     actually just based on what I have in front of me in my various

7     notes.  So just to make a few observations.

8          And the first of which is, I did read Judge Shannon's

9     comments in the In re: Dolan Company transcript that was

10    provided.  I understand it is not precedential.  I think it is

11    helpful in that it is his thoughts thinking out loud through

12    the issues.  And I would agree with the equity committee that

13    he is taking the case as it is and just as I'm trying to do in

14    this case.

15          And I think that in thinking both about case

16    management, trial management, cost, expense, all the things

17    that are in Federal Rule 1 and 16 of the Federal Rules of Civil

18    Procedure, as well as just the facts of this case, I think his

19    comments and musings are instructive in this case because it is

20    factually very similar where you have an RSA party who is not

21    going to be presenting evidence on valuation at the trial.

22          The question is whether their internal communications

23    and views on values shared with nobody outside their group

24    would be relevant.  And I think that in that case, the court

25    made a number of comments, is that he viewed it as generally

1  not an appropriate area of inquiry, drew an analogy to a 363

2  sale in a buyer's view.  I think he is very concerned, as am I,

3  about opening the floodgates to having many, many trials --

4  individual, separate trials about valuation where everybody's

5  individual views are expressed.  And while I know that the

6  committee here has only asked for a few witnesses, I think the

7  principles are the same.

8        Once we open up the door to that, I would fully expect

9  that the other side would say, well, we have other -- people

10  have other views.  And then we'll have to think about how to

11  cabin those folks off in terms of the level of their

12  consideration, the timing of their consideration, any biases

13  they might have, and there are thirty RSA parties.

14        I made the comment earlier, and I think it's true,

15  that most courts expect that something like valuation in this

16  context will be addressed by experts in the context of

17  different valuation methodologies, considering all the things

18  that they have in the record.  And I think here, given the

19  production of documents, it's been much discussed, but I think

20  has now been concluded or is in the process of being concluded

21  to everyone's satisfaction.

22        That is all grist for the mill, for any expert to say,

23  well, I considered this and I considered that.  And as part of

24  that, here, you will have any communications between the

25  noteholder group on the one hand, the lenders on the other

1  hand, and the debtors on the other hand in terms of expressions

2  about valuation, which I think is completely appropriate.

3       But in terms of having mini-trials, I agree with Judge

4  Shannon that I don't believe it's a discrete or narrowly

5  focused inquiry.  It may start out as one, but I don't think it

6  would end up there.

7       I also think if we went down that road, we would end

8  up having arguments about confidentiality and sensitive

9  business information, because as anybody who has sat on this

10  bench for any length of time knows that how people value things

11  often is a proprietary consideration.  And I think there's no

12  way we wouldn't end up there, or certainly is a very good

13  chance that we would.

14       I do think it all would be of limited relevance to the

15  inquiry.  Again, I think Judge Shannon talks about the burden

16  resting with the debtor on the value of the company.  I would

17  agree with that.  And I think there's been a robust discovery

18  process that's ongoing as to the debtors and their views about

19  value.

20       Finally, I would echo Judge Shannon's views, at least

21  preliminarily, without ruling at this point, but he does make a

22  comment that this type of inquiry is not appropriate unless a

23  party becomes an active participant in presenting evidence and

24  testimony to the court regarding the value of the company.  And

25  that's on page 21 and 22 of the transcript.

1        And he uses the term "vigorously participate", but I

2   think he cabins that off by saying, "To seek to demonstrate

3   with its own evidence that in fact the value of the business is

4   X and here's why."  So I think that that is the appropriate

5   line.

6        That's why I think participation in the form of

7   briefing and legal argument is permissible by the RSA parties,

8   but I do think that if somebody's coming in with its own

9   evidence, and I think that's the touchstone for Judge Shannon,

10  and I think it's the touchstone for me as well.

11       Turning to a few other cases that cited by the

12  parties.  I will mention first the discussion in the Iridium

13  case.  It's an extensive opinion that reflects an extensive

14  trial.  It was cited for the proposition that essentially

15  analysts' views about -- and the market's views about the value

16  can be of some use, but I think it has to be understood in the

17  context of the dispute in that case.

18       In fact the opinion is littered with caveats.  So for

19  example, in footnote 2, it talks about business judgment and

20  whether it was prudent to invest in or extend credit to the

21  company.  It says, "These business judgments, while anecdotal,

22  imply that it was insolvent."

23       So it's a much broader inquiry and this is made clear

24  in subsequent discussions.  So on page, I think it's roughly

25  334 of the opinion under the subheading B, "Analysts", it talks

1    about analysts and their view about the equity value.  But goes

2    on to cabin it off by saying, "Those assessments do not

3    establish that the value of the company was within that range.

4    It essentially provides insight into what the contemporaneous

5    thinking was."

6           And while that is related, it's not the same.  This is

7    again, this distinction is revisited on pages 347 and 348 that

8    talks about confirming the validity of management's projections

9    as an indication of reasonableness, but it goes on to cabin

10   that off by saying that, "In fact, although these analyst

11   reports were not admitted into evidence for the truth of their

12   conclusions reached regarding Iridium's enterprise value," and

13   further by saying, "These assessments of value by analysts do

14   not establish the value of Iridium."

15          The context of that case needs to be understood as to

16   why that evidence was mentioned at all.  It's not as to a

17   specific value.  And here that's exactly what we're talking

18   about, the specific value of the company.

19           I think the other cases cited are a discussion about

20   similar things.  I think that it also is important that the

21   discussion, Iridium uses its touchstone as the stock price more

22   than it does the independent evaluations.  There's not a whole

23   lot more in the other cases that I haven't covered in

24   discussing Iridium.

25          But moving on to a few other cases that are

1   identified, one is CopeLink & Sons (ph.), and in that case, it

2   talks about the Second Circuit, Bank of China case and the

3   distinction between expert opinion and lay opinion.  I think

4   this is sort of an independent way of looking at this as well

5   under Rule 701.  And it talks about the value of a business,

6   that an outsider's personal perception would be modest at best,

7   and really that that evidence, the value of a business,

8   traditionally involves the testimony of bona fide experts

9   except in cases where the actual owner of the business might

10  have the requisite personal perception.  And I think that

11  that's a very important line, and that's the line not only for

12  evaluation but for all testimony -- opinion testimony.  So I

13  think it has here marginal relevance.  It's not shared with

14  anyone else and certainly will balloon this trial beyond

15  anything recognizable in its current form.

16         I also note that in I believe it's Judge Gropper's

17  decision, in MarketXT Holdings Corporation, he echoes the same

18  idea that you don't want to have a lay opinion, turns out to be

19  an expert in lay opinion clothing, but at the same time you

20  also have the converse concern about someone's evidence of

21  value being too speculative to be helpful to a clear

22  understanding of the fact at issue as required by Rule 701.

23         And I think the capper for all this probably, and a

24  fitting place to stop, is his reference to Charter

25  Communications where he quotes the case as saying the art of

1    valuing a business requires the exercise of well-informed

2    judgment and experts, that it's a terribly subjective and fact-

3    intensive nature of valuation, projection of profits; the

4    testimony from nonexperts regarding profit can be excluded as

5    improper lay opinion.

6          And again, this view and the distinction between

7    expert opinion and lay opinion, what's permissible lay opinion

8    is also revisited in the Fifth Circuit's decision in Dojo, Inc.

9    (ph.) which is cited by the parties and the distinctions

10   between Rule 701 and 702.  And it notes that a lay witness who

11   was never employed by or directly involved in a business is

12   unlikely to have the type of firsthand knowledge necessary to

13   provide a reliable forecast of future lost profits.  And it

14   goes on to talk about only two cases where an individual

15   provided information about lost profits where the individual is

16   not a current or former employee, officer or director of the

17   business.  Again, it's a different context, but again, I think

18   it exposes the concerns out having a lay opinion on valuation

19   that's not from an expert or the owner of the business.

20         So those are a few observations, just an understanding

21   why I came out where I came out.  And again, this is all

22   subject to revisiting if, in fact, there is a rebuttal expert

23   report provided on valuation at which point a RSA party

24   potentially becomes the standard bearer in terms of burden, in

25   terms of valuation.

1          So in light of that, I think we are waiting for

2    further discussions, so I will recess for fifteen minutes, but

3    I assume probably folks will just knock on the door when you're

4    ready.  But I'll plan to come out no later than 4:30 just so we

5    can find out where things are.

6          IN UNISON:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. O'DONNELL:  Your Honor, my partners, Mike Stamer

9    and Sarah Schultz, are going to stay here, but with the Court's

10   permission may I be excused now that this part is over?

11         THE COURT:  By all means.

12         MR. O'DONNELL:  Thank you.

13         THE COURT:  Thank you.  And that's true for anybody

14   else who finds that they have some other things to do in life

15   which is probably all of you.

16         IN UNISON:  Thank you.

17      (Recess from 4:02 p.m. until 5:12 p.m.)

18         THE CLERK:  All rise.

19         THE COURT:  Good afternoon once again.  Please be

20   seated.

21         So what news?

22         MR. BURKE:  Good afternoon, Your Honor.  Michael

23   Burke, Sidley Austin, for the equity committee.  Thank you

24   again for permitting us to make an oral application yesterday.

25         And we spent a good portion of the day with the

1    supporting creditors and the debtor.  And subject to what Mr.

2    Rogoff has to say, we would like to propose the following, Your

3    Honor.  We believe that we have a deal on the economics of the

4    transaction.  There are still open issues related to, among

5    other things, the engagement letter.  We just ran a bit short

6    of time, so what we would propose, with Your Honor's

7    indulgence, is either tomorrow we enter a consensual form of

8    order, file it under certificate -- certification of counsel or

9    I believe Your Honor has reserved time on Friday.  We don't

10   want to impose another hearing date on you, but if there is no

11   form of -- agreed form of order tomorrow, we would come back to

12   you Friday.  We will use the next twenty-four --

13           THE COURT:  All right.  But you've worked out the

14   economics.  Does it make sense to put that on the record now or

15   do you want to wait or what do you want to do?

16           MR. ROGOFF:  Your Honor, for the record, Adam Rogoff.

17   I'd prefer that we not.  There have been proposals that have

18   been made.  They're a package of proposals; they're not just

19   the economics but also going to the terms and the conditions

20   upon which a fee would or wouldn't be earned.  I'm not going to

21   get the specifics, but there's been some back and forth, I

22   think productive back and forth during the course of the day

23   between the company Rothschild with the support of the

24   supporting creditors that had objected to the written

25   application.  We've made a lot of progress, but we're not there

1  yet.  We are all hopeful that we will be able to come up with a

2  consensual form of order and then would propose to simply

3  submit that to Your Honor, of course subject to Your Honor's

4  rights to want to ask questions or have a hearing on it.

5          But since it's still evolving back and forth, I'd

6  rather not start identifying individual --

7          THE COURT:  No, no, that's fine.

8          MR. ROGOFF:  -- components that could shift.

9          THE COURT:  That's fine.  Let me ask whether -- and

10 I -- it's my role to sort of be an official nudge in these

11 situations and -- but that said, is it helpful to just keep

12 everybody here not courthouse to finish this?  Is there some

13 benefit to, while everybody's here, put in the final nails in

14 the coffin, or does it make more sense to go -- well, I don't

15 mean such a good metaphor -- to get this done, or does it make

16 sense to say, well, we need to talk to various constituencies

17 and so it makes sense for us to take a break?

18         MR. BURKE:  Your Honor, we -- I believe I can speak

19 for counsel for Rothschild's as well.  We'll stay as late as it

20 takes to try to hammer this out, pardon the expression,

21 tonight.

22         THE COURT:  All right.

23         MR. ROGOFF:  Your Honor, I have no objection to

24 remaining the try to get this resolved.  We'd like to get it

25 resolved.  It's just a function of how quickly Rothschild can

1 respond on the open points.

2          THE COURT:  All right.  Let me ask Mr. Hahn -- not to

3 put you on the spot, but from your point of view, given the

4 conversations you're having with your client, do you think it

5 would be helpful just to be here in the interest of making the

6 push to get it done -- there's a happier metaphor for you -- or

7 does it really not make a whole lot of sense and we're just

8 depriving people of the comforts of their office and everyone

9 has e-mail and phones and what difference does it make?

10          MR. HAHN:  Well, I hesitate to make predictions, Your

11 Honor, or I would have.

12          THE COURT:  Yes.

13          MR. HAHN:  I, in fact, have predicted this was going

14 to be done long before it is.  But Rothschild, I think, would

15 like to try to close this off as soon as possible and certainly

16 tonight if we can do that.

17          THE COURT:  All right.  Well, unless there's some

18 objection as to this not being helpful, why don't we try to get

19 it done here just in the interest of striking while the iron is

20 hot.  The reason why I say that is I'm sort of getting the vibe

21 that you're close, and I don't think it serves the benefit for

22 anybody to drag this out.  So again, if it's going be

23 counterproductive, tell me that.  I don't know.  I'm just doing

24 the best I can to sort of make these calls from what I see.

25 But if it's going to be counterproductive, tell me that.  But

1   if not, I would just say let's get it done here because it adds
2   a little bit of urgency even if it's a bit artificial.
3          MR. HAHN:  Your Honor, I think that's fine from the
4   company's perspective.  The only thing I would just note is we
5   are waiting to get this resolved with the business party who's
6   not here.  And so it's just a function of how quickly
7   Rothschild can respond to the open issues.  If they can move
8   with the same diligence as if they were in the courtroom and
9   desire to get home as the rest of us, that's fine.  But we are
10  coordinating with a party that's not present.
11         THE COURT:  Mr. Hahn, maybe you can -- I mean, they're
12  in town, right, so maybe you can tell if it doesn't get done
13  soon that we'll just ask them to come down and join us.  That
14  probably will have some beneficial --
15         MR. HAHN:  I can't speak for where my client will be
16  tonight.  I think he has been responding timely.  I would point
17  out the proposal we've been debating, we got out an hour before
18  the Court today.  So it's not as if sitting on it for a long
19  time.
20         THE COURT:  No.  Again, I'm not casting any
21  aspersions.  I'm just --
22         MR. BURKE:  He is available by phone though, Your
23  Honor.
24         THE COURT:  I'm just trying to get this done.  So what
25  I'd ask is that you reach out to your client and say, the judge

1    is sticking around, everybody's sticking around with the
2    expectation this is getting done soon, and by "soon" meaning
3    real soon.

4           MR. BURKE:  Soon, right.

5           THE COURT:  And I would trust that Mr. Hahn's desire
6    to move on with the rest of his life will also add to the
7    urgency since, while his client is not here, he is.  So let's
8    do that.  And what I will say is that it's a quarter after 5.
9    We've taken forty-five minutes really I think -- I'm beginning
10   to lose track as to the time.  Why don't we reconvene in half
11   an hour with the thought that there will be an answer on these
12   points because at a certain point -- this is not a fine wine;
13   it doesn't get better with age, so we might as well see what we
14   can do with it, all right?

15          MR. BURKE:  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you very much for all
17   your efforts.

18          IN UNISON:  Thank you, Your Honor.

19      (Recess from 5:18 p.m. to 5:50 p.m.)

20          THE COURT:  Good evening.

21          MR. ROGOFF:  Good evening, Your Honor.

22          THE COURT:  Please be seated.  So what news?

23          MR. ROGOFF:  So without getting into the specifics of
24   the motion or the specifics of the status of the discussions,
25   there is one issue which I think it would be useful just to

1  apprise Your Honor of which I think gives some direction to how

2  readily or quickly this can get resolved.  And that concerns

3  the fact that the committee is appointed as the official equity

4  committee with respect to Genco Shipping & Trading Limited,

5  which is the parent company, although it does have some

6  operations and some specific assets.  The majority of the

7  assets, as I think Your Honor knows, are with the various other

8  entity debtors that are the vessel-owning entities.  And if

9  Your Honor recalls the capital structure, Genco Shipping &

10  Trading is the only public company.  It's the company on whose

11  behalf the equity committee was appointed.  It also happens to

12  be the entity that issued the bonds which are not guaranteed by

13  any of the other SPEs.

14          The sticking point -- or at least one of the key

15  sticking points that we have is the request that a transaction

16  that would trigger a payment to Rothschild be a transaction

17  other than solely with respect to Genco Shipping & Trading.

18  And so, for example, if there were to be a sale of vessel

19  assets by the other entities, whether or not that should be a

20  transaction with respect to Genco Shipping & Trading that earns

21  Rothschild a fee.

22          THE COURT:  All right.

23          MR. ROGOFF:  We have indicated that we would be

24  prepared to consent to a fee, assuming the economics of a deal

25  and the rest of the terms are acceptable to us, so long as

1  there is a Chapter 11 plan that is confirmed for Genco Shipping

2  & Trading, but that a transaction would not be triggered solely

3  off of a transaction for any of the other asset-owning

4  entities, the subsidiaries, the other debtors, and as Your

5  Honor knows, these are not substantively consolidated estates.

6  And I think that is where we seem to be hitting a hurdle that

7  needs to be addressed which is, under what circumstances, as to

8  which entity, the committee would be entitled to have its

9  financial advisor fees paid from insofar as a transaction.

10        THE COURT:  All right.  Mr. Burke.

11        MR. BURKE:  Thank you, Your Honor.  Again, Michael

12  Burke, proposed counsel for the equity committee, Your Honor,

13  and thank you.

14        We took heed of what you said yesterday, and I will

15  just repeat very briefly what the terms of our oral motion are.

16        THE COURT:  No, I got it.  I just want to hear

17  what's --

18        MR. BURKE:  Certainly.

19        THE COURT:  -- given the hour.

20        MR. BURKE:  The way that we have viewed this

21  restructuring fee is, if there is a 2.2 million dollar

22  restructuring fee, if there is a plan of reorganization that

23  improves recovery to holders of equity, that would be the best-

24  case scenario, 2.25.  Now, mind you, we understand that we are

25  an equity committee of Genco and we're seeking recovery from

1  the Genco estate.  The lower tier, if you will, Your Honor, is

2  1.35.  Now --

3          THE COURT:  I understand, but what -- why is tie --

4  not tying to Genco, from your point of view, and Genco only

5  problematic, if you're the equity committee of the parent?

6          MR. BURKE:  Well, I think we are tying it in the sense

7  that we know we can only seek recovery from Genco.  We are just

8  seeking on the 1.35.  Is that your question, Your Honor, on the

9  1.35?

10         THE COURT:  Well, let me understand that the -- I

11 thought the comment was about the higher fee, was about the

12 transaction fee and when that would be triggered and what this

13 transaction would be in terms of an improvement.

14         MR. ROGOFF:  I think to gel the issue, Your Honor, the

15 argument or the approach that they're taking is that the fee of

16 1.35, that completion fee, which is not triggered to an

17 enhanced recovery for equity.

18         THE COURT:  Right.

19         MR. ROGOFF:  That's a separate concept --

20         THE COURT:  Yes.

21         MR. ROGOFF:  -- but that the 1.35 million dollar fee

22 would be payable by Genco, I'm not sure from what resources, if

23 there's only a transaction, however, with respect to the

24 subsidiary.  So, for example, if the prepack plan were not to

25 be confirmed and as a result the various vessel-owning entities

1  were to start selling off their assets either in a single

2  transaction or in multiple transactions, Rothschild would take

3  the view, under their proposed engagement letter, that that is

4  a transaction that then triggers a right to payment from Genco

5  and whatever other assets Genco may have in its own right.  And

6  our position --

7            THE COURT:  When you say a payment, you mean the

8  1.3 --

9            MR. ROGOFF:  The 1.35.  Basically, they're viewing it

10 as a guaranteed fee to them together with the monthly fee

11 irrespective of not only a Chapter 11 plan not being confirmed

12 for Genco but irrespective of the fact that a transaction is

13 one only for the vessel-owning entities or the other subsidiary

14 entities.

15           THE COURT:  Well, before we get any further into this,

16 this is the subject of negotiation.  I mean, we're starting to

17 get into what people are willing to do and not willing to do.

18 And you either work it out or I'm just going to take the

19 parties' last positions for purposes of the motion, and I'm

20 just going to tell you what the result is, whatever that is,

21 and everybody caveat emptor.  So -- because what I understand

22 you're talking about is the circumstances under which the 1.35

23 is going to be paid or not paid and the certainty under which

24 that happens or doesn't happen, which is really part of the

25 negotiation.

1        So if I weigh in, essentially I'm giving you a ruling,

2   and my thought is that you either are going to reach an

3   agreement or I'm going to rule.  So as much as I'd like to help

4   you, I think I can't give you sort of a half a loaf on it,

5   meaning that if you reach an agreement, which I strongly urge

6   you to do, that you reach an agreement.  But if you don't, then

7   you don't, because this is a substantive point, and I know I'm

8   trying to make a comment to ram that agreement down somebody's

9   throat or not.

10       All I can say, as an objection, I think what I hear

11  Mr. Rogoff saying is that they're looking for some triggering

12  event for the 1.35 other than just simply providing a report.

13  And again, if you work this out consensually, I don't really

14  have to, in my view -- if it's outrageous, I won't approve it,

15  but subject to being in generally reasonable light, I will.

16       I don't know what the halfway -- he is essential I

17  saying, I think, that the 1.35's got to be essentially

18  guaranteed because otherwise they're working for not enough.

19  Again, the halfway point or whatever it is or what's

20  appropriate for that is really is subject of negotiation,

21  because I can't -- at that point I'm making a ruling about what

22  the renewed motion is, as to whether it's permissible under the

23  code or not, consistent with my prior ruling.

24       So, I mean, I'm happy to hear -- if you think there's

25  some discrete thing that I can address --

1          MR. BURKE:  No.

2          THE COURT:  -- but I'm just afraid I can't really,

3    without short of ruling --

4          MR. BURKE:  Your Honor, perhaps maybe the easiest way

5    to handle it at this point, since we're probably reaching --

6    I'm not saying we're there yet, but I think we're soon reaching

7    the end of the utility of saying here is I think we can come

8    back, we'll take a break, we'll see if we can resolve it, and

9    if not, I think the estate would be happy to put on the record

10   its response and what it would be prepared to agree with or not

11   object to in terms of the oral application.  And as Your Honor

12   said, you can hear what Rothschild has asked for, you can hear

13   what the estate's position is, and ultimately Your Honor can

14   make a ruling.  I mean, we'd like to avoid that, we'd like to

15   have a consensus, but at some point in time, we need to have

16   some parameters.

17          THE COURT:  Right.

18          MR. KHALIL:  Your Honor, may I please?

19          THE COURT:  Yes.

20          MR. KHALIL:  Your Honor, based upon, I think, your

21   guidance, I'm not going to respond to the various points of Mr.

22   Rogoff.  Needless to say, I think he's incorrect.  And I take a

23   little umbrage in --

24          THE COURT:  Well, it's 6 o'clock --

25          MR. KHALIL:  Understood, but based upon your --

1          THE COURT:  -- so we've plenty of time to spend

2     together where we all can take umbrage any time.

3          MR. KHALIL:  Okay.

4          THE COURT: So --

5          MR. KHALIL:  What do you suggest, Your Honor?

6          THE COURT:  My suggestion is you -- either you bang

7     heads one last time, you either reach an agreement or you come

8     back, say whatever it is you want to say for purposes of the

9     motion, and I'll make a ruling tomorrow.  It's, I submit,

10    ridiculous, but that's what I'll do.  And everybody has to take

11    the risks of whatever I'm going to rule as what they are.  So

12    it's really the only thing I can probably offer at this point.

13    But I want to get it done quickly.  We've spent enough time on

14    this that I think that's probably the only thing that

15    everybody's in agreement upon, that it's just not going to --

16    if it's not going to get my better, I'll just rule.

17          So is there anything, before you go back and bang

18    heads one last time, that anybody wants to discuss?

19          MR. KHALIL:  I'd like to just -- I think that we have

20    a very discrete issue, and the issue is really -- they actually

21    have something much broader on the 1.35 than an expert report.

22    It's confirmation of a plan of their entity, Genco Shipping &

23    Trading.  So if there's a plan confirmed at that entity, any

24    plan is confirmed, they get 1.35.  If a plan is confirmed at

25    that entity with a material improvement to -- recoveries to

1    equity holders, they get the 2.25.  The question -- the

2    discrete question is whether they get a 1.35 if there isn't a

3    plan confirmed at the entity but there are some vessel that is

4    are being sold at some of the subsidiaries where they don't

5    have claims.  They stand behind the secured lenders and the

6    bondholders in that circumstance.  That universe only comes up

7    in a situation with this RSA fails, no plan is confirmed at

8    their entity, and we're now selling off vessels because we've

9    delayed.

10          THE COURT:  No, I understand.

11          MR. KHALIL:  I just wanted to make sure that that's --

12          THE COURT:  I understand.  Again, I think they're

13   trying to search for a way to get a guaranteed payment of 1.35

14   as part of, essentially, the compensation for doing work in the

15   case, and folks are -- the other side are looking for some sort

16   of trigger that's more than simply providing an expert report

17   and it has something else to it.

18          And again, you can either negotiate that or I'll just

19   make a ruling, because again, if I rule on that point, then I

20   think that's sort of the crux of what the parties' legal

21   differences are.  So if I do that, I'm just ruling.  So at a

22   certain point very, very soon, that's going to be the only

23   appropriate thing to do, for better or for worse.

24          So in light of that, how much time is appropriate?  I

25   don't know how sick of each other you all are and whether it

 1  makes sense to say twenty minutes.

 2          MR. KHALIL:  Thirty minutes, Your Honor.

 3          THE COURT:  All right, thirty minutes.  And what I'm

 4  going to do is I'm going to let this very nice lady go home,

 5  figuring that if you actually do reach an agreement today, it

 6  would be sufficient for purposes of everyone's -- you come in,

 7  you tell me, it will be on the record but not recorded.  So I

 8  just made up a category; I don't know if it's accurate or not.

 9  But we've just made one.  So she can go about her life.  Well,

10  she's been very gracious in agreeing to stay, but I'm giving

11  her an out in case she actually has to go.

12          So anyhow, I will see you all back here at 6:30, and

13  if you don't reach an agreement, I'll ask anybody to make any

14  other statements in terms of what you're prepared to do so that

15  I can have the narrowest dispute in front of me.  And then what

16  we'll do is adjourn at that point, and I will tell you a time

17  when I'm going to make a ruling.  All right.

18          IN UNISON:  Thank you, Your Honor.

19          THE COURT:  Thank you very much.

20      (Recess from 6:03 p.m. until 6:33 p.m.)

21          THE COURT:  On the record.  All right.  So I was

22  provided with a copy, a markup of what -- well, there will be

23  no agreement.  I was given a markup of a one-page thing as to

24  what the committee proposed -- amended, it would be what the

25  debtors -- presumably the RSA parties are willing to do.  And

1  so it narrows the scope of the dispute from previously to what
2  I have in front of me.  So I assume you're well aware of what
3  they want to do.
4          MR. BURKE:  I'm not exactly sure, Your Honor, actually
5  what they --
6          MR. ROGOFF:  Let me just -- if I may, Your Honor --
7          THE COURT:  Sure.
8          MR. ROGOFF:  -- for the record and for the benefit of
9  Mr. Burke, what we took was the document that we sent to you
10  earlier today in terms of our proposal.  There's only one copy.
11  But we also added in -- and again, we'll get to this on the
12  record.  We added in the fact that an additional trigger for
13  the 1.3 million dollar fee would be in the absence of a prepack
14  plan transaction would be any Chapter 11 plan that is confirmed
15  for Genco would also trigger a right to payment of the 1.3
16  million dollar fee.  We made the clarification with respect to
17  August 1st as when the crediting starts.  In all other
18  respects, the document is the same as what we e-mailed to you.
19          And then we provided the Court with our markup of the
20  engagement letter which is consistent with the markup that we
21  had previously shared with you, the only change being that we
22  removed the reference to the 75,000 dollars in expenses.  And
23  I'll address before Your Honor later that the expenses are
24  always subject to court review.  And we clarified one of the
25  requests on the scope of the indemnity that you had requested

1  in terms of stetting the language that we deleted but just

2  changing it from a substantial right to a material right.  In

3  all other respects, the document is consistent with what we

4  sent you.

5          THE COURT:  So a couple things.  One is, after you

6  leave here, I'd ask that you make a copy of this and send it to

7  the equity committee and anybody else who wants to see it so it

8  conditions the 1.35 million dollar deal on the payment on a

9  consummation of a plan.

10          MR. ROGOFF:  That is correct, Your Honor.

11          THE COURT:  All right.

12          MR. BURKE:  Your Honor, if I may?

13          THE COURT:  Yes.

14          MR. BURKE:  Thank you.  Quite literally, I think what

15  he -- Mr. Rogoff has shown you has obviously reflected all of

16  the efforts that the parties have undertaken over the course of

17  the past two days.

18          With that point, I think is issue is very narrow.  You

19  can see that all -- the equity committee as well as Rothschild,

20  the debtors and the supports creditors have moved a

21  considerable amount, and there is essentially one issue

22  outstanding.  It is the 1.35.  And I just want to talk briefly

23  about that 1.35, and I think what Mr. Rogoff has provided you

24  with is that Rothschild delivers an expert report to the

25  committee -- I'm sorry -- delivers the expert report and that

1  there is a plan or a transaction.

2          Now, it is true that if there is a plan, whether it's

3  the prepack plan or another plan, Rothschild would be entitled

4  to the 1.35 as a guaranteed amount.  I think the issue

5  specifically that we'd like to present, Your Honor, is the

6  debtor does have control over certain elements of the plan.  We

7  know that there's a restructuring support agreement, but, for

8  example, it would be a very perverse incentive that if the

9  equity committee were to prevail and, Your Honor, I would

10 submit, needs to see an expert valuation report in order to vet

11 the plan, in order to test if valuation is correct, but it

12 could present a scenario, if it's contingent on a plan of only

13 Genco, that another plan of reorganization could be developed

14 where Genco is not involved, where it's just the subsidiaries

15 of Genco or --

16         THE COURT:  I see where you're going with that, but

17 maybe one way to do this is something that's implicit but to

18 make it explicit, some language about good faith in arriving at

19 such a plan, which basically, I think, memorializes, for

20 purposes of the agreement, that no one's being clever in

21 crafting a plan that, for all practical purposes, resolves

22 everything but somehow magically doesn't have Genco involved in

23 it, and maybe that gives you -- because one thing I notice

24 that's not in here is any sort of timing requirement; it's

25 really for the case.  So I think that that solves some concerns

1    that way, but maybe if you draft some good faith language, that

2    might -- you might be able to give your client some comfort

3    that no one's going to try to out-clever you so as to make this

4    fee go away.  And certainly, you could also say, to the extent

5    that that good faith backs a question, that it ends up in front

6    of me, and I'll be more than familiar with what's gone on in

7    the cases.  And if it looks odd, we'll apply the walks like a

8    duck, talks like a duck test to see whether there's something

9    that is -- seems to be improper about it.

10          I mean, now I'm doing what I thought I couldn't do

11   before, but that occurs to me as a possible way to bridge some

12   of the gap, if that's what you're concerns about.

13          MR. BURKE:  Your Honor, that is partially what we're

14   concerned about.  Another point I'd like to address is, similar

15   to -- in addition to providing the expert report, there would

16   be a plan or a transaction, that necessarily doesn't include

17   that they have to artificially cut us out of a Chapter 11 plan;

18   however, there would also be a situation where there could be

19   assets sold, and I take a little bit of comment when you look

20   at the definition of "transaction" just talking about selling

21   off a ship could trigger a transaction fee for Rothschild.

22   That's not what they're looking for.  Obviously, transaction,

23   there's got to be some materiality to it.  Also --

24          THE COURT:  Yeah, but that too, I think, might be a

25   language fix.  All or substantially all of the assets -- I

1  mean, there's a way to address that if you -- again, I'm not

2  sure what the arguments are in the conference rooms, but that

3  would seem to be a drafting problem.  Again, I --

4          MR. BURKE:  No, these are excellent suggestions, Your

5  Honor.

6          THE COURT:  I'm just throwing these things out to the

7  extent that I'm here and you're here, and hopefully, we get

8  somewhere, but if we don't, we certainly will tomorrow.

9          All right.  Anything else that you can think of that's

10 a concern that we might potentially address?

11         MR. BURKE:  Well, actually, at this point, Your Honor,

12 we believe that the transaction fee that -- again, the

13 structure that it is, the expert report, the -- whether a plan

14 is confirmed, or there is a transaction that involves

15 substantially all the assets or substantially all of the debt

16 restructured, which could happen about Genco being involved,

17 and we appreciate Your Honor's good faith drafting issues.  I

18 mean, there will always have to be an objective standard to

19 take a look at this, but perhaps, thinking off the cuff, and

20 obviously I'd need to confer with Mr. Hahn, but it certainly

21 seems that we wouldn't need to get into the issue of and bring

22 in front of Your Honor if the equity committee is successful in

23 proving that value is more than what the debtor says and not

24 tee up for another day the issue of are they acting in good

25 faith with a subsequent plan or subsequent transaction.  This

1   is not meant to simply just earn a fee because there is not a

2   material transaction.  It's really, if there's a material

3   transaction as a result of Rothschild's efforts in proving that

4   value is higher, so they shouldn't be penalized for that.

5           THE COURT:  No, understand that.  I understand that,

6   and I suppose that's another way that you could look at

7   drafting which is to say if it's determined that value is --

8   essentially that you prevail on your confirmation objection.

9   But again, me getting involved in spit-balling ideas is a

10  slippery slope, and I also think it's an only limited utility.

11  There are a lot of really smart people in this room who've

12  probably thought and rethought of issues and ways around this,

13  and so I'm throwing things out.  I may hit the mark.  I may be

14  wildly off the mark.  So I don't hold any illusions that way.

15          So I think you have what you have, and what I will do

16  is schedule something tomorrow to issue a ruling on this if you

17  don't find some other way to resolve it between now and then.

18          MR. ROGOFF:  All right.  If I may, Your Honor, before

19  we conclude, I would like to, at least for purposes of the

20  record, respond to some of the comments that were made and

21  elaborate upon what the debtors' position would be upon which

22  they wouldn't object.

23          THE COURT:  All right.  Let me -- in the interest of

24  hearing from everybody on one side, which I've been trying to

25  do, let me hear from Mr. Hahn who's on the same side of the

1  issue.

2          MR. HAHN:  Thank you, Your Honor.  I think

3  realistically, further efforts of crafting language are not

4  going to succeed, and we've spent the better part of two days

5  at that, and everyone, I'm sure, has their own and different

6  views on who's at fault on that, but we are where we are.

7          I just want to make a couple of things hopefully clear

8  about where Rothschild is on this.  One, this is not about who

9  pays for the fees.  The debtors have asked and Rothschild has

10  agreed that the counterparty to the letter will just be Genco,

11  is purely about what triggers the fee.  And particularly in the

12  event where Rothschild has done -- provided the services that

13  it was contracted to provide in order -- in connection with the

14  contested hearing, it's delivered it expert report, which we

15  thought perhaps -- and you don't view it as sufficient -- as a

16  response to your view that the Rothschild people shouldn't get

17  a fee for just showing up, but they had to contribute to the

18  process.

19          For better or worse, delivery of that report really is

20  a necessary step towards the confirmation hearing, which the

21  debtor wants to have happen.  So it is actually a material

22  contribution of the process, not different in many ways from

23  the fairness opinion is that investment bankers deliver an M&A

24  transaction to allow the approval and consummation of those

25  transactions.

1     Rothschild is loath to narrow the triggering event,

2  which the second element of the triggering event because they

3  have to deliver the report, namely the transaction, in ways

4  that it has no control over.  And it's not because we have any

5  concerns about the bad faith of Mr. Rogoff or the other

6  purchase incidents were quite sure that they would not be

7  proposing plans that they didn't think complied with the

8  requirements of the code.

9     But the case can take a course where they conclude

10 that those transactions quite -- those requirements can or

11 should be met by a transaction that doesn't involve Genco,

12 notwithstanding the fact that Rothschild has provided all the

13 services it's contracted to provide, it has delivered it

14 report, and perhaps its report has persuaded Your Honor that

15 there -- that the plan should not be confirmed.  That might

16 actually be what triggers the alternative transaction.

17     They don't want to be in a position, since they don't

18 control the course of these cases, where the result -- and I

19 was saying they're doing everything that they were contracted

20 to do, is that the -- because of a structural quirk, frankly,

21 in the transaction, they don't get paid.

22     THE COURT:  All right.

23     MR. HAHN:  Thank you, Your Honor.

24     MR. ROGOFF:  So to sort of focus on the narrow part of

25 the issue, first of all, just to remind the Court, Genco -- and

1  by Genco, Genco Shipping & Trading, the parent company, is also

2  where the bonds lie.  It's also where, for example, Jefferies'

3  fee would be paid.  It's where the other fees to which Genco

4  has contractually obligated itself to be paid lie.  And it's

5  important because it's where the equity committee exists at the

6  parent level.

7          It's not simply a function of what triggers the

8  payment -- and let me back up a second.  Your Honor will note

9  from the hand markup that I provided to the Court is that the

10 company with the consent of the RSA parties that objected

11 yesterday actually moved quite materially from what the

12 original proposal that we gave was.  The original proposal,

13 taking into account yesterday's discussion, is that there had

14 to be some additional value created for Rothschild to receive a

15 fee was we had bifurcated the fee into two tiers.  One was

16 assume no new value was created but the plan is confirmed, and

17 that would be what we agreed to as a part of a resolution would

18 be the 1.35 million dollar completion fee, and the second would

19 be the higher fee, the 2.25 million dollar in the event that

20 the improvement -- for equity, there's a material improvement.

21         And then during the course of today, the request was

22 made which the creditors agreed to and the companies agreed to,

23 that so long as any Chapter 11 plan for Genco is confirmed --

24 and it's not just a payment issue; it's also a trigger issue.

25 As long as any Chapter 11 plan for Genco is confirmed,

1   including a plan of liquidation for Genco Shipping & Trading,

2   that we would agree that that would be also earn the sort of

3   minimum fee, the 1.3 million dollar fee.  I know there's been a

4   reference to guarantee.  It's not that it's guaranteed because

5   it's not backstopped by any of the other entities, but it would

6   be -- the trigger would be satisfied.

7          So what we're talking about as a result, Your Honor,

8   is a scenario not in which is transaction is structured in an

9   effort not to confirm a plan for Genco because we have other

10  creditors that we would like to be able to confirm a plan for

11  Genco, even if it's only a plan of liquidation, but that the

12  estate is unable to confirm a plan and ultimately would go into

13  a Chapter 7 proceeding or the case were to be dismissed.

14         And it is in that narrow context that where we have

15  said is all right, Rothschild, we'll agree to the 1.3 million

16  dollar fee that would be triggered and payable even if you are

17  successful in prosecuting the confirmation objection, as a

18  result we can confirm the plan, as a result the RSA is

19  terminated, we need to then pursue other, since we still have

20  other estates and creditors, another transaction which could

21  include the sale of assets.  And at the end of the day, the

22  assets left in the Genco Shipping & Trading estate itself, and

23  it does have some of its own assets in addition to the equity

24  of its subsidiaries, but in the event that those assets that

25  are left are not sufficient for us to confirm even a

1 | liquidating Chapter 11 plan.

2 | So what we've moved away from, what the estate has

3 | moved towards, Rothschild, in trying to allow the committee to

4 | retain its professional, is we've moved away from value

5 | creation to actually a value-destructive proposition --

6 | THE COURT:  All right.

7 | MR. ROGOFF:  -- because we're left with the inability

8 | to confirm a plan.

9 | THE COURT:  All right, well, let me make one last shot

10 | here to add any value myself, which is, I see your point that

11 | you're trying to set what you think is a low hurdle for getting

12 | this fee, that is, any plan, including a plan of liquidation by

13 | Genco.  What I hear on the other side saying is that, well,

14 | that wouldn't be fair if, in fact, we prevailed in our

15 | confirmation objection about value.  So isn't there a way that

16 | this can be an either/or, that it's your condition, or if the

17 | committee has prevailed in its objection to confirmation about

18 | the value --

19 | MR. ROGOFF:  The problem, I think, with that, Your

20 | Honor -- I appreciate the suggestion -- the problem, I think,

21 | is simply determining that the debtors' plan is not

22 | confirmable, unless we're ultimately able --

23 | THE COURT:  No, it would be more narrow than that; it

24 | would have to be tied to value because if they're providing

25 | evidence of value, then they will have shown, for purposes of

1  the estate, that there's a problem with value, and so you

2  wouldn't -- the idea would be let's not penalize them for

3  having been successful.

4          MR. ROGOFF:  But the problem is, we've been penalized

5  because they've been successful unless value -- unless that

6  determination actually results in something occurring that

7  allows the plan to be confirmed.  So for example --

8          THE COURT:  Well, no, I understand you, but at that

9  point, if they're right, then people try to put Humpty Dumpty

10  back together again whatever way is appropriate under the Code

11  and considering everybody's interests.  But you could -- it

12  would be hard to blame somebody for, at that point, prosecuting

13  an objection and having been successful.

14          MR. ROGOFF:  Except, Your Honor, in that instance,

15  however, and it really goes -- I think, Your Honor pointed out,

16  we set a very, very low threshold here, which is just a plan is

17  confirmed.

18          THE COURT:  No, I understand that.

19          MR. ROGOFF:  And we haven't set a time deadline.  And

20  so I think what we're struggling with is, so if Your Honor were

21  to determine not to confirm the plan, and it's not confirmed,

22  we have to do something.  We either have to do a sale

23  transaction, we have to go back to the drawing board and

24  confirm a plan, and ultimately, even a sale transaction has to

25  result in a liquidating plan.  And if we can't at least get

1    that basic level of a trigger, which is a Chapter 11 plan is

2    confirmed for Genco, they may have succeeded by putting in

3    their expert report, but the estate has not been befitted

4    because we're talking about a scenario in which we can't even

5    confirm a plan.  And I think at the end of the day, certainly

6    from our perspective at the 1.35 million dollar fee that we

7    have agreed, under this context, phrasing it a different way

8    is, is at that level fee, there needs to be a plan that's

9    confirmed.  We didn't stage this to say you get X dollars just

10   for submitting your report, even if you blow up the case and we

11   can't confirm a case for Genco.

12              THE COURT:  No, I understand you're trying to -- some

13   of the subtext here is to set up something where no one's

14   incentivized to act in a way that's unreasonable.  I get it.  I

15   don't know if that means that there are three tiers and one is

16   one way and another has to do with the confirmation objection.

17   I don't know the answer.  Again, I'm throwing out ideas; they

18   may be of some utility, they may be of none.  But --

19              MR. ROGOFF:  We certainly didn't, Your Honor, discuss

20   a lower tier simply for putting in the expert report and

21   prevailing on valuation.

22              THE COURT:  All right.

23              MR. ROGOFF:  We tried to work with their request --

24              THE COURT:  Right.

25              MR. ROGOFF:  -- at the 1.35 million dollar fee, and

1  that, we felt, a baseline has to be that we can confirm a plan.

2  Not even just the pre-pack plan, but a plan.  But Your Honor,

3  fair point that we did not go back and say, for a much lower

4  threshold, is there some amount.

5          THE COURT:  No, I'm not suggesting that would fly,

6  anyway.  But -- and again, at a certain point, I think we're

7  talking in circles.  So when we're done here, we're done here,

8  and I'll just rule.

9          So anything else anybody else wants to say?

10          MR. KHALIL:  Your Honor, very briefly; I don't have

11  much to add to Mr. Rogoff's comments, but -- forgive me if I'm

12  redundant in any way -- there are really three options for

13  Genco Shipping & Trading:  it's either confirmed plan,

14  dismissed, or liquidated.  So if we're in dismissed or

15  liquidated zone, that's what we're worried about.  We're trying

16  to do exactly what Your Honor said.  We're trying to avoid an

17  incentive to destroy value.

18          The other issue we're concerned with is a defined

19  concept like "substantially all".  What does that exactly mean

20  if we sell a dozen ships and they get their 1.3.  So that's

21  what we're trying to avoid.  So what we did try to do was

22  create a construct that protects them in all circumstances that

23  are reasonable and not value destructive or would result in a

24  windfall or gamesmanship.  If any plan gets confirmed, they get

25  paid.  I'm sure if they win on valuation, there's going to be

1   another plan that provides an enhanced recovery.  It's hard to

2   imagine that they win on valuation and we end up with that

3   debtor being dismissed or that debtor liquidating in a Chapter

4   7.

5          So I'm not sure what the ghost is that they're solving

6   for.  It's hard to see.  And I think all of the suggestions

7   that Your Honor is making and why they aren't solving the

8   problem is because it's hard to see exactly what the problem is

9   because if they win on confirmation -- there's going to be a

10  confirmed plan that provides them with --

11         THE COURT:  Well, didn't OSG, when there was an

12  argument about valuation, and I know equity was involved in

13  transaction, but wasn't there a rights offering when people

14  thought there was more value?  I mean, that rights offering, I

15  assume, is pursuant to a plan.

16         MR. KHALIL:  It was pursuant to a plan, Your Honor.

17  So it always ends up -- again, the --

18         THE COURT:  I will say, I do have trouble imagining

19  that if there is a -- if the committee prevails in its

20  objection about valuation that the case is going to be

21  dismissed or go to Chapter 7 --

22         MR. KHALIL:  It's almost impossible to --

23         THE COURT:  -- because that would -- I mean, I don't

24  know what that would look like.

25         MR. KHALIL:  The only scenario where that would be

1    possible is, and I think it's already solved by the Code, is a

2    situation where the debtors have decided to sell off all of the

3    assets of the subsidiaries pursuant to a plan, and then

4    affirmatively dismiss the cases at Genco Shipping & Trading; it

5    would be war with the bondholders if they did that.  What would

6    they do with all of the assets?  They wouldn't get their

7    releases for their board members.  It's just not going to

8    happen.  And I'm sure, Your Honor, the equity committee would

9    come march in to court and say none of the subsidiaries' plans

10   are proposed in good faith because they're specifically

11   designed to deprive me of my one-million-dollar fee.

12          THE COURT:  Yeah, in a case that's worth over a

13   billion dollars, I can't imagine that there would be such

14   pretzel-like machinations to avoid the payment of a one-

15   million-dollar fee.

16          MR. KHALIL:  Exactly.  And that's why our -- just our

17   very limited -- we think that the construct works as is; it

18   avoids that incentive to be value destructive, and --

19          THE COURT:  Do you have any objection -- and

20   theoretically, I do -- to language about good faith?

21          MR. KHALIL:  Not at all, Your Honor, because again, I

22   believe that already exists in 1129(a).

23          THE COURT:  Well, I think it does.

24          MR. KHALIL:  Yeah.

25          THE COURT:  All right.  Well, yeah, 1129, a plan has

1  to be in good faith, but the idea is the absence of a plan, to

2  make it explicit that it can't be done for purposes of avoiding

3  a million-dollar fee.  But again, if the values are either what

4  the estate says or a higher value, then I would say a million

5  dollars is a drop in the bucket.  But it's certainly not going

6  to be the driver for everything else that goes on.

7          MR. KHALIL:  I couldn't agree more.

8          THE COURT:  All right.

9          MR. KHALIL:  Thank you, Your Honor.

10          THE COURT:  All right, last shot.

11          MR. BURKE:  Very briefly; last comment.

12          THE COURT:  And then we're going to mercifully pull

13  the plug on this for all concerned.

14          MR. BURKE:  Your Honor has quite clearly identified

15  the issue and there's been a lot of talk about value

16  destruction and what have you, and Your Honor's also talked

17  about tied to results.  I just submit that it would, again, be

18  a perverse result that if the equity committee, with

19  Rothschild's assistance with the valuation report, were to

20  determine that the plan -- the valuation was higher and the

21  plan could not be confirmed, that another plan could be

22  constructed.  And very importantly, you talk about good faith

23  under 1129, well, if they don't include, notwithstanding all of

24  these assurances that have been discussed of how that

25  practically can't work, it could happen.

1           THE COURT:  But do you really think that a one-million

2    dollar fee is going to be the driver if the valuation's found

3    to be north of what's in this RSA?

4           MR. BURKE:  It's not --

5           THE COURT:  I mean, that somebody would say I've got a

6    lot of fish to fry, irons in the fire, whatever metaphor you

7    want, but I'm going to let this one-million-dollar fee drive

8    the case after the trial and the finding that there's been a

9    valuation of the RSA plus, I just -- and again, that's why I

10   say, if you add some sort of good-faith component, that you

11   can't essentially decide to go down a path that doesn't involve

12   a Genco plan and that you look at that for a good-faith

13   inquiry.  But I just -- I mean, it's a bit of belt and

14   suspenders in the sense that why would someone, for a million

15   dollars, jump through all these hoops.

16          So if I was -- when I mentioned the idea of you

17   prevailing at the hearing on valuation, I was thinking, well,

18   you want to make sure that if you do win, you don't end up

19   holding a bag of rocks, to make the Charlie Brown analogy.  But

20   thinking about the economics of the case, I have trouble

21   imagining how that would happen.  So, I mean, that's --

22          MR. BURKE:  I understand, Your Honor.  There's two

23   questions there:  how could it really happen, and then the more

24   important one is why should Rothschild be subject to that risk.

25   Well, we can all talk about situations, but why should the

1    party that is helpful in providing that there's more value be

2    taking the risk that they may not receive their transaction

3    fee.  So it's really an economic question, but Rothschild

4    shouldn't have to take that risk.

5          THE COURT:  Well, I've got to say, I'm frustrated

6    we're here.  One of the reasons I do think we're here is

7    because the original ask in the motion was really

8    inappropriate.  And I've got to say, I went back to double-

9    check; there's not any discussion in the motion to justify the

10   transaction fee.  Zero.  And you've got to have known that it

11   was going to get heavy fire.  So I just submit it was a really

12   bad way to start the conversation, and if we had maybe started

13   at a closer point, we'd be closing the deal now, rather than

14   still fighting over where we are.

15          So be that as it may, I understand, I hear you.

16   There's no agreement, and if parties find religion between now

17   and tomorrow morning, they can let me know.  If not, I will

18   call -- chambers will call folks to just schedule a time to

19   tell you what my decision is.

20          MR. BURKE:  Thank you.

21          THE COURT:  Which is probably a result nobody will

22   want, but -- because I can tell you right now, sitting here I

23   don't know what it is.  So that's not a good situation for

24   anybody because it's uncertainty, and uncertainty is really not

25   helpful, I think, for any of the parties.

1          MS. SCHULTZ:  Your Honor, I'm sorry.  Just for

2     clarity.  Do you want to do a telephonic decision tomorrow, or

3     do you want us to come on down?

4          THE COURT:  No, telephonic is fine because at that

5     point, I don't think anybody wants to talk about these issues

6     any further, and so we'll just do it on the phone and save

7     everybody a trip on the subway and I'll just tell you what my

8     ruling is.

9          MS. SCHULTZ:  Thank you, Your Honor.

10         THE COURT:  I'd like to give you a time now, but I

11    confess, I'm not sure.  If anybody has an irreconcilable

12    conflict tomorrow, let me know.  Otherwise, it'll probably be

13    some time in the early afternoon, say 2 or 3 o'clock because I

14    know this really -- this has to get done.  So if I can do it

15    sooner than that, I may call you and tell you I'll do it sooner

16    than that.

17         So thank you very much for your slog this evening.  I

18    appreciate your efforts to try to resolve this.

19         Oh, while we're here, on a completely different

20    subject, happily, there was another request, and I think my law

21    clerk mentioned it in the hallway, a retention for CMJ, which I

22    think originally was going to be done on super-super short

23    notice.  I think it was filed Friday; it was going to be on for

24    Monday and I said we can't get it on for Monday, which was

25    probably, under all circumstances, a good thing.  We need to

1  get that on for a hearing, and so I think there was a

2  suggestion of Friday for that.  Is that -- that was --

3           MR. BIERMAN:  That's our second expert.  Is that fine?

4           THE COURT:  Right.

5           MR. BURKE:  We didn't file it on shortened notice,

6  obviously --

7           THE COURT:  Right.

8           MR. BURKE:  -- so we just filed it.  Friday would be

9  fine with the committee.

10          THE COURT:  Any --

11          MR. ROGOFF:  Your Honor, this is the professional that

12 we noted yesterday there was a disclosure, for the first time,

13 in the retention application that a principal of that entity,

14 and in fact, the individual who is working as their expert or

15 providing them with guidance, has been asked to serve on a

16 board of a competitor, Dry Bulk Shipper.  The company is

17 currently evaluating whether or not this rises to the level of

18 a conflict such that we may need to respond in a way other than

19 saying we have no objection.  And so I would request that we be

20 given more time since we need to diligence this information.

21 Otherwise, we could go forward on Friday, but we're probably

22 going to need to object to the engagement, which we're not

23 looking to do.

24          THE COURT:  How much time do you need to do your

25 diligence?

1          MR. ROGOFF:  I would need to speak with the client

2     about it, Your Honor.

3          THE COURT:  So this was filed I think Friday, right?

4          MR. BURKE:  Correct, Your Honor.

5          THE COURT:  So let's do this.  Why don't you talk

6     about an appropriate schedule in light of diligence.  You

7     obviously would prefer not to have an objection.  It sounds

8     like that's the issue, right?  There's no other issue, such as

9     this about compensation or --

10         MR. ROGOFF:  No, Your Honor, we had had discussions

11    with the equity committee about Mr. Arden's (ph.) involvement

12    and about the retention.  These issues had been brought up.  We

13    weren't planning on objecting, and then, as I said, it wasn't

14    until we saw the application, we saw the disclosure of his

15    involvement with a competitor that this gave rise to concern

16    about his involvement.

17         MR. BURKE:  Your Honor, I think this is scheduling.

18    We can reserve argument until later.

19         THE COURT:  All right, so let's do this.  Try to work

20    out an appropriate schedule for this so we get it done, I would

21    imagine it would be early next week if it's not Friday.  If you

22    work it out, I don't see any reason that will be a problem.

23    But we will need to address it so that it's done in time for

24    everybody to do what they have to do.

25         MR. BIERMAN:  Well, Your Honor, I'll just remind the

1   Court that the expert reports are due next Wednesday.  The

2   notion of resolving the issue sometime --

3            THE COURT:  I didn't make the application on Friday.

4            MR. BIERMAN:  I understand, Your Honor.  I understand,

5   Your Honor.

6            THE COURT:  So it's a good thing I didn't put it on

7   for Monday; it would've been just another in a series of

8   exciting, difficult, and ultimately problematic things that we

9   dealt with.  So that's a discrete issue; that's a factual

10  issue.  Either it's a problem that can be -- it's a problem; if

11  it's a problem, it may be able to be worked around, maybe not.

12  So what I'd ask is that folks exchange information and work the

13  problem as quickly as possible.  I'd like to talk about it on

14  Friday to see if we have anything illuminating to discuss so if

15  we can put it to bed faster than Monday, that's fine.

16           So why don't we do this in the hope springs eternal

17  mode.  I'd like to put it on for Friday.  I'm going to allow

18  you to make any oral statements you want to make.  I'm also

19  going to say that if you ask for more time at that point, I

20  will adjourn it to some other time that we work out.  But this

21  way, if there is no objection, we can get it resolved on

22  Friday.  If you're still working on it, you're working on it,

23  and that's fine.

24           MR. ROGOFF:  That's fine.  And just for clarity, I

25  believe this is what Your Honor was getting towards.  We would

1  like to avoid having to file an objection --

2            THE COURT:  Yeah.

3            MR. ROGOFF:  -- if we can resolve the issues, so to

4  the extent that we can resolve it consensually for Friday, it

5  could be presented without objection.

6            THE COURT:  Right.

7            MR. ROGOFF:  If there is an objection, we can

8  certainly share concerns with Your Honor at Friday's hearing,

9  but we don't want to be constrained to have to file a written

10  objection between now and Friday.

11            THE COURT:  No, I don't want a written objection by

12  Friday.

13            MR. ROGOFF:  Thank you.

14            THE COURT:  So I may need one Monday or Tuesday, but

15  I -- it just -- I don't want to force anybody's hand to fight

16  about something else.

17            MR. ROGOFF:  Agreed.

18            THE COURT:  We have enough things to fight about.  All

19  right.

20            MR. BURKE:  We'll try to work it out with Mr. Rogoff.

21            THE COURT:  If for some reason, religion finds anybody

22  or everybody this evening, please shoot us an e-mail on the

23  chamber's e-mail.  I give you permission to do that just so I

24  can stop thinking about it.  But if not, we'll be in touch

25  tomorrow.

1          MR. BURKE:  But I presume no letter briefs.

2          THE COURT:  No letter briefs.  No.  Thank you very

3   much for that reminder.  Appreciate it.

4          IN UNISON:  Thank you, Your Honor.

5          THE COURT:  Thank you.  Have a good evening.

6       (Whereupon these proceedings were concluded at 7:06 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8                    

9    _____

10   DENA PAGE

11   AAERT Certified Electronic Transcriber CET**D 629

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  June 4, 2014

18

19

20                                    Digitally signed by eScribers, LLC
                                      DN: cn=eScribers, LLC gn=eScribers, LLC
21                                    c=United States l=US o=eScribers ou=eScribers
                                      e=operations@escribers.net
22                                    Reason: I attest to the accuracy and integrity of
                                      this document
23                                    Location:
                                      Date: 2014-06-04 16:57-04:00
24

25

# A

**AARON (2)**
4:18;54:5

**able (8)**
27:1;46:11;58:19;
69:1;85:2;91:10;
92:22;104:11

**absence (2)**
82:13;98:1

**absolute (1)**
40:3

**absolutely (1)**
51:2

**accept (1)**
26:10

**acceptable (1)**
73:25

**accommodation (1)**
57:16

**accomplishing (1)**
15:5

**according (1)**
32:2

**account (1)**
90:13

**accurate (2)**
42:10;81:8

**act (1)**
94:14

**acting (1)**
86:24

**active (1)**
35:21,23;62:23

**actively (1)**
47:24

**actual (3)**
30:15;37:25;65:9

**actually (21)**
10:19;16:1;17:4;
18:4,18;29:1;31:5;
39:7;51:17;59:7;
60:6;79:20;81:5,11;
82:4;86:11;88:21;
89:16;90:11;92:5;
93:6

**ad (1)**
43:5

**Adam (2)**
58:1;68:16

**add (4)**
72:6;92:10;95:11;
99:10

**added (2)**
82:11,12

**addition (3)**
37:25;85:15;91:23

**additional (6)**
10:20,21;23:24;
54:20;82:12;90:14

**address (2)**
77:25;82:23;

**85:14;86:1,10;**
**103:23**

**addressed (3)**
9:22;61:16;74:7

**adds (2)**
30:8;71:1

**adduce (3)**
13:1,8,23

**adduced (1)**
12:7

**adjourn (1)**
81:16;104:20

**adjusted (1)**
26:12

**adjustments (1)**
10:19

**admissibility (1)**
35:11

**admissible (3)**
13:20;15:2;29:17

**admitted (1)**
64:11

**adopted (1)**
43:24

**adversary (1)**
51:22

**advisor (2)**
9:10;74:9

**advisors (2)**
56:20,25

**advocacy (1)**
50:15

**advocate (1)**
48:22

**advocated (3)**
40:12,25;47:24

**advocating (1)**
46:23;50:2

**affirmatively (1)**
97:4

**afraid (1)**
78:2

**afternoon (9)**
12:25;15:10,11;
27:23,24;57:25;
67:19,22;101:13

**AG (1)**
5:4

**again (55)**
15:24;18:12;19:8;
20:22;22:25;24:1,
12;25:10;32:11,13;
40:9,23;41:25;43:4;
44:5;45:12;47:10;
48:17;49:10;50:1;
51:1;52:7;53:11,15;
55:10,15;62:15;
64:7;66:6,17,17,21;
67:19,24;70:22;
71:20;74:11;77:13,
19;80:12,18,19;
82:11;86:1,3,12;
87:9;93:10;94:17;

**95:6;96:17;97:21;**
**98:3,17;99:9**

**against (1)**
50:14

**age (1)**
72:13

**agent (3)**
4:4,14;28:1

**Agents (1)**
5:4

**agent's (1)**
28:11

**ago (2)**
15:15;19:10

**agree (14)**
20:24;24:6;29:17;
31:14;33:17;41:24;
57:22;60:12;62:3,
17;78:10;91:2,15;
98:7

**agreed (10)**
9:6;10:13;50:6;
68:11;88:10;90:17,
22,22;94:7;105:17

**agreeing (1)**
81:10

**agreement (15)**
12:1;29:22;36:4;
77:3,5,6,8;79:7,15;
81:5,13,23;84:7,20;
100:16

**Agricole (1)**
5:3;6:3,13

**aid (2)**
13:16;19:14

**AKIN (4)**
7:2,11;13:25;
15:13

**albeit (1)**
34:15

**ALEXANDER (1)**
5:18

**allow (3)**
88:24;92:3;104:17

**allowed (2)**
33:12;46:1

**allowing (1)**
53:16

**allows (1)**
93:7

**almost (2)**
22:4;96:22

**along (2)**
21:7;26:21

**alternative (2)**
30:12;89:16

**although (5)**
11:11;31:14;
53:24;64:10;73:5

**always (5)**
37:2;39:25;82:24;
86:18;96:17

**AMEND (1)**

**6:18**

**amended (1)**
81:24

**Americas (1)**
5:6

**amicably (2)**
8:17;58:10

**among (7)**
24:14;33:16;
51:10,23;52:4,9;68:4

**amount (4)**
23:6;83:21;84:4;
95:4

**amounts (1)**
26:3

**ample (1)**
31:22

**amusing (1)**
20:24

**analogy (2)**
61:1;99:19

**analysis (5)**
15:17;25:3;26:11;
32:14;33:25

**analyst (1)**
64:10

**Analysts (3)**
63:25;64:1,13

**analysts' (1)**
63:15

**Anderson (2)**
15:4;16:18

**anecdotal (2)**
20:21;63:21

**annexed (2)**
16:13,14

**announcement (1)**
30:14

**anticipate (1)**
22:4

**anticipated (2)**
18:9;21:6

**anticipation (1)**
51:21

**anxious (1)**
9:4

**apart (1)**
13:18

**Apollo (2)**
28:14;56:24

**apologize (3)**
17:5;18:8;25:10

**Appeals (1)**
38:15

**appear (2)**
38:10,11

**appeared (1)**
14:2

**application (9)**
8:3;58:11,15;
67:24;68:25;78:11;
102:13;103:14;
104:3

**applies (1)**
31:19

**apply (1)**
85:7

**appointed (2)**
73:3,11

**appreciate (9)**
9:14;17:25;46:4;
53:14;57:15;86:17;
92:20;101:18;106:3

**apprise (1)**
73:1

**approach (1)**
75:15

**appropriate (13)**
20:7;31:2;46:25;
61:1;62:2,22;63:4;
77:20;80:23,24;
93:10;103:6,20

**appropriately (1)**
14:11

**approval (2)**
47:19;88:24

**approve (1)**
77:14

**approved (1)**
47:13

**approximately (1)**
16:22

**Arden's (1)**
103:11

**area (1)**
61:1

**argue (4)**
17:21;24:18;
48:14,21

**arguing (1)**
26:15

**argument (8)**
24:25;46:7;48:15;
49:23;63:7;75:15;
96:12;103:18

**arguments (6)**
15:20;16:10;
48:24;49:4;62:8;
86:2

**around (5)**
36:22;72:1,1;
87:12;104:11

**arrived (1)**
40:2

**arriving (1)**
84:18

**art (1)**
65:25

**artificial (1)**
71:2

**artificially (1)**
85:17

**aside (3)**
36:25;38:13;45:16

**aspects (1)**
9:13

**aspersions (1)**
71:21
**assessments (3)**
32:14;64:2,13
**asset-owning (1)**
74:3
**assets (14)**
73:6,7,19;76:1,5;
85:19,25;86:15;
91:21,22,23,24;97:3,
6
**assistance (1)**
98:19
**assume (6)**
10:14;43:4;67:3;
82:2;90:16;96:15
**assumed (1)**
47:25
**assuming (2)**
48:18;73:24
**assumption (2)**
43:7;47:20
**assumptions (2)**
30:10,19
**assurances (1)**
98:24
**attached (2)**
14:7;16:10
**attempt (2)**
11:5;40:19
**attorney-client (1)**
51:19
**Attorneys (8)**
4:3,13;5:3,13;6:3,
13;7:3,12
**auction (1)**
20:23
**August (1)**
82:17
**Austin (3)**
12:20;56:9;67:23
**available (1)**
71:22
**Avenue (3)**
5:6,14;7:13
**avoid (5)**
78:14;95:16,21;
97:14;105:1
**avoiding (1)**
98:2
**avoids (1)**
97:18
**aware (2)**
14:16;82:2
**away (3)**
85:4;92:2,4
**awkward (1)**
42:23

**B**

**back (25)**
19:3;23:17,23;

25:15;34:1;35:1;
38:24;45:1;50:5;
52:20;56:2;58:18;
68:11,21,22;69:5;
78:8;79:8,17;81:12;
90:8;93:10,23;95:3;
100:8
**backs (1)**
85:5
**backstopped (1)**
91:5
**bad (6)**
21:10;22:19;27:2;
28:5;89:5;100:12
**bag (1)**
99:19
**balance (1)**
40:19
**ball (1)**
42:10
**balloon (1)**
65:14
**Baltic (2)**
18:20,23
**bang (2)**
79:6,17
**Bank (6)**
5:4,4;6:4,14;
29:12;65:2
**bankers (1)**
88:23
**bankruptcy (7)**
22:7;35:5;38:2,13;
42:2,11;46:3
**banks (1)**
31:24
**Bard (1)**
50:21
**barking (1)**
51:16
**barrier (1)**
41:13
**based (9)**
9:17;38:24;44:14;
51:12;54:20;56:7;
60:6;78:20,25
**baseline (1)**
95:1
**basic (1)**
94:1
**basically (3)**
11:25;76:9;84:19
**basis (1)**
22:18
**BDI (4)**
18:21;31:25;32:1,
3
**bear (1)**
43:1
**bearer (2)**
40:14;66:24
**become (1)**
38:19

**becomes (2)**
62:23;66:24
**bed (1)**
104:15
**befitted (1)**
94:3
**begin (1)**
9:23
**beginning (1)**
72:9
**begins (1)**
22:5
**behalf (7)**
15:13;28:1;30:23;
54:6;58:2,14;73:11
**behind (1)**
80:5
**beliefs (1)**
28:17
**belt (1)**
99:13
**bench (2)**
48:12;62:10
**beneficial (1)**
71:14
**benefit (3)**
69:13;70:21;82:8
**benefits (1)**
23:7
**Benjamin (1)**
56:8
**beside (1)**
30:20
**besmirch (1)**
21:20
**best (2)**
65:6;70:24
**best- (1)**
74:23
**better (6)**
46:12;72:13;
79:16;80:23;88:4,19
**beyond (1)**
65:14
**biases (1)**
61:12
**BIERMAN (56)**
11:21;12:8,10,12,
16,19,19;14:19,22;
15:8;16:11;19:10,
15;23:19;27:12,16,
18,21;32:9,11;33:21;
34:17,20;35:2,14;
36:14,21;37:13,20;
39:5,13,18,23;40:6,
18;41:2,15,22;53:3,
7;60:2;102:3;
103:25;104:4
**Bierman's (1)**
52:13

**bifurcated (1)**
90:15
**big (1)**
45:22
**billion (1)**
97:13
**bit (8)**
37:24;51:6;57:1;
68:5;71:2,2;85:19;
99:13
**black (1)**
23:2
**Blackstone (1)**
21:18
**blame (1)**
93:12
**blow (1)**
94:10
**board (3)**
93:23;97:7;102:16
**boils (1)**
46:5
**bona (1)**
65:8
**bondholder (1)**
29:19
**bondholders (4)**
31:23;57:6;80:6;
97:5
**bonds (3)**
31:15;73:12;90:2
**both (6)**
20:13;30:3;35:20;
36:8;39:6;60:15
**bottom (1)**
14:22
**bound (1)**
28:5
**break (4)**
58:8;59:17;69:17;
78:8
**bridge (1)**
85:11
**brief (2)**
8:8;17:4
**briefing (1)**
63:7
**briefly (10)**
11:19;12:10;
16:15;27:13;31:12;
54:7;74:15;83:22;
95:10;98:11
**briefs (5)**
46:8,19;47:14;
106:1,2
**bring (2)**
29:11;86:21
**broader (2)**
63:23;79:21
**broadly (1)**
30:3
**brought (3)**
33:12,15;103:12

**Brown (1)**
99:19
**Bryant (1)**
7:4
**bucket (1)**
98:5
**Bulk (1)**
102:16
**bullets (1)**
13:19
**bullish (3)**
28:23,23;45:10
**burden (15)**
14:9,10;19:24;
21:18;40:5;41:4;
42:25;43:11,24;44:3,
4;45:13;47:25;
62:15;66:24
**burdensome (1)**
54:14
**buried (1)**
42:19
**BURKE (32)**
67:22,23;69:18;
71:22;72:4,15;74:10,
11,12,18,20;75:6;
78:1,4;82:4,9;83:12,
14;85:13;86:4,11;
98:11,14;99:4,22;
100:20;102:5,8;
103:4,17;105:20;
106:1
**business (15)**
23:20;43:8;45:22;
62:9;63:3,19,21;
65:5,7,9;66:1,11,17,
19;71:5
**buy (1)**
28:20
**buyer (1)**
37:3
**buyer's (1)**
61:2

**C**

**cab (2)**
23:3;33:7
**cabin (3)**
61:11;64:2,9
**cabins (1)**
63:2
**cake (1)**
50:22
**calculated (2)**
13:20;15:2
**calculation (1)**
38:25
**call (4)**
35:23;100:18,18;
101:15
**calls (1)**
70:24

Case 14-10979-CSS    Doc 1614-2    Filed 07/17/14    Page 112 of 129
GENCO SHIPPING & TRADING LIMITED, et al.
Case No. 14-11108-shl

June 3, 2014

**came (7)**
  32:21,23;33:23;
  59:15,15;66:21,21
**camps (3)**
  24:8;52:7,9
**can (78)**
  11:4;12:17;17:8;
  18:3;19:13;20:20;
  23:23,24;24:15,21;
  29:8;30:19;31:4;
  34:7,8;38:19,23;
  39:13;45:2,20;46:12,
  21;47:2,22;48:10,20;
  49:7,23;51:5,7;
  56:13;57:23;58:8;
  63:16;66:4;67:5;
  69:18,25;70:16,24;
  71:7,7,11,12;72:14;
  73:2;75:7;77:10,25;
  78:7,8,12,12,13;
  79:2,12;80:18;81:9,
  15;83:19;86:9;89:9,
  10;91:18;92:16;
  95:1;99:25;100:17,
  22;101:14;103:18;
  104:10,15,21;105:3,
  4,7,24
**cap (3)**
  55:10,11;57:19
**capital (2)**
  26:2;73:9
**capper (1)**
  65:23
**carry (1)**
  21:18
**case (53)**
  9:5,12;10:11;
  13:10;14:1,4,14,16;
  17:3;19:12;21:9;
  25:21;28:15;31:3;
  34:5,6;35:7;37:5,9;
  40:9,23;43:21,21;
  45:16;46:21;47:23;
  48:22;55:22;59:19;
  60:13,14,15,18,19,
  24;63:13,17;64:15;
  65:1,2,25;74:24;
  80:15;81:11;84:25;
  89:9;91:13;94:10,
  11;96:20;97:12;
  99:8,20
**case-by-case (1)**
  22:17
**cases (23)**
  14:3,20;15:16;
  16:1,2,2,24;22:23;
  25:9,12;44:8,8;46:3,
  3;63:11;64:19,23,25;
  65:9;66:14;85:7;
  89:18;97:4
**cash (2)**
  26:11,12
**casting (1)**

**71:20**
**category (1)**
  81:8
**caught (1)**
  42:23
**cave (1)**
  42:19
**caveat (1)**
  76:21
**caveats (2)**
  34:15;63:18
**Center (1)**
  6:5
**Centerbridge (1)**
  28:14
**certain (6)**
  34:15;36:3;72:12;
  80:22;84:6;95:6
**certainly (23)**
  10:4;20:10;27:22;
  31:4;37:5,14;40:23;
  43:20;47:12;49:7,
  19;53:24;62:12;
  65:14;70:15;74:18;
  85:4;86:8,20;94:5,
  19;98:5;105:8
**certainty (1)**
  76:23
**certificate (1)**
  68:8
**certification (1)**
  68:8
**cetera (1)**
  21:18
**chambers (1)**
  100:18
**chamber's (1)**
  105:23
**chance (1)**
  62:13
**change (2)**
  28:12;82:21
**changed (2)**
  39:16,17
**changes (1)**
  50:3
**changing (1)**
  83:2
**chaos (1)**
  29:1
**chaotic (1)**
  29:11
**Chapter (12)**
  45:18;74:1;76:11;
  82:14;85:17;90:23,
  25;91:13;92:1;94:1;
  96:3,21
**characterized (1)**
  9:9
**characterizes (1)**
  9:8
**Charlie (1)**
  99:19

**Charter (1)**
  65:24
**Chase (1)**
  4:5
**chat (1)**
  59:5
**check (1)**
  100:9
**Chemtura (2)**
  24:24,25
**China (1)**
  65:2
**choices (1)**
  54:21
**circles (1)**
  95:7
**Circuit (1)**
  65:2
**Circuit's (1)**
  66:8
**circumstance (1)**
  80:6
**circumstances (9)**
  14:4,24;35:22;
  43:22;45:2;74:7;
  76:22;95:22;101:25
**cite (1)**
  28:4
**cited (6)**
  14:21;24:22;
  63:11,14;64:19;66:9
**cites (2)**
  14:17;16:2
**civil (2)**
  44:8;60:17
**claim (1)**
  25:17
**claims (1)**
  80:5
**clarification (1)**
  82:16
**clarifications (1)**
  49:12
**clarified (1)**
  82:24
**clarity (2)**
  101:2;104:24
**class (1)**
  43:10
**classic (1)**
  45:16
**clear (14)**
  9:12;15:25;16:3;
  24:5;32:13;33:2;
  41:25;50:5,25;
  52:16;56:12;63:23;
  65:21;88:7
**clearly (1)**
  98:14
**CLERK (2)**
  67:18;101:21
**clever (1)**
  84:20

**client (7)**
  28:10;70:4;71:15,
  25;72:7;85:2;103:1
**clients (1)**
  32:20
**clients' (1)**
  22:12
**close (3)**
  59:2;70:15,21
**closer (1)**
  100:13
**closing (2)**
  48:21;100:13
**clothing (1)**
  65:19
**CMJ (1)**
  101:21
**Co (1)**
  28:1
**Code (7)**
  35:5;38:2;42:3;
  77:23;89:8;93:10;
  97:1
**coffin (1)**
  69:14
**collateral (1)**
  37:14
**colleagues (1)**
  22:3
**collective (1)**
  8:16
**collegiality (1)**
  10:16
**colloquy (1)**
  51:6
**collusion (1)**
  37:4
**Columbia (1)**
  6:5
**combination (1)**
  57:12
**comfort (1)**
  85:2
**comfortable (1)**
  22:8
**comforts (1)**
  70:8
**coming (1)**
  63:8
**comment (9)**
  19:3;20:21;60:5;
  61:14;62:22;75:11;
  77:8;85:19;98:11
**comments (7)**
  35:18;54:2;60:9,
  19,25;87:20;95:11
**committee (45)**
  8:17,18;10:10,11;
  11:19,22;12:12,21;
  15:22;25:23;26:8;
  27:5;32:12;43:5;
  49:23;50:7;56:9;
  58:9,13,17;59:24;

**60:2,12;61:6;67:23;
  73:3,4,11;74:8,12,
  25;75:5;81:24;83:7,
  19,25;84:9;86:22;
  90:5;92:3,17;96:19;
  97:8;98:18;102:9;
  103:11
**committee's (2)**
  24:22;54:12
**common (4)**
  44:7;48:20;51:14,
  18
**communications (8)**
  24:10,13,14;
  34:23;51:3;60:22;
  61:24;65:25
**companies (2)**
  18:22;90:22
**company (18)**
  19:6;28:10;29:19;
  31:21;58:14;60:9;
  62:16,24;63:21;64:3,
  18;68:23;73:5,10,10;
  90:1,10;102:16
**company's (1)**
  71:4
**comparable (2)**
  25:2,4
**compelled (2)**
  16:16;30:2
**compensated (1)**
  41:20
**compensation (2)**
  80:14;103:9
**competitor (2)**
  102:16;103:15
**complaining (2)**
  14:11,12
**complaints (1)**
  37:6
**completely (2)**
  62:2;101:19
**completion (2)**
  75:16;90:18
**complied (1)**
  89:7
**complies (1)**
  38:1
**component (1)**
  99:10
**components (1)**
  69:8
**concede (1)**
  44:7
**concept (2)**
  75:19;95:19
**concepts (1)**
  42:24
**concern (7)**
  37:17,19;42:6;
  53:15;65:20;86:10;
  103:15
**concerned (7)**

Case 14-10979-CSS    Doc 1614-2    Filed 07/17/14    Page 113 of 129
GENCO SHIPPING & TRADING LIMITED, et al.
Case No. 14-11108-shl

June 3, 2014

36:15;43:24;44:1;
61:2;85:14;95:18;
98:13
**concerning (2)**
14:15;32:14
**concerns (10)**
8:6;39:22;44:13;
54:20;66:18;73:2;
84:25;85:12;89:5;
105:8
**conclude (2)**
87:19;89:9
**concluded (3)**
61:20,20;106:6
**concludes (1)**
31:11
**conclusion (2)**
28:7;55:16
**conclusions (2)**
26:10;64:12
**condition (1)**
92:16
**conditions (2)**
68:19;83:8
**confer (1)**
86:20
**conference (4)**
54:16;57:8;59:7;
86:2
**confess (2)**
8:4;101:11
**confidentiality (1)**
62:8
**confirm (13)**
22:2;59:18;91:9,
10,12,18,25;92:8;
93:21,24;94:5,11;
95:1
**confirmable (2)**
35:5;92:22
**confirmation (18)**
10:12;13:23;
15:18;18:17;25:14;
28:14;30:11,14;
43:3;46:8;79:22;
87:8;88:20;91:17;
92:15,17;94:16;96:9
**confirmed (24)**
42:5;74:1;75:25;
76:11;79:23,24,24;
80:3,7;82:14;86:14;
89:15;90:16,23,25;
93:7,17,21;94:2,9;
95:13,24;96:10;
98:21
**confirming (1)**
64:8
**conflating (1)**
39:14
**conflict (2)**
101:12;102:18
**confusing (1)**
30:19

**connection (2)**
13:25;88:13
**consensual (3)**
58:19;68:7;69:2
**consensually (2)**
77:13;105:4
**consensus (2)**
9:24;78:15
**consent (2)**
73:24;90:10
**consented (1)**
10:10
**consider (3)**
25:5;43:14;47:22
**considerable (1)**
83:21
**consideration (4)**
8:12;61:12,12;
62:11
**considered (4)**
10:2;58:16;61:23,
23
**considering (4)**
8:18;25:21;61:17;
93:11
**consistent (3)**
77:23;82:20;83:3
**consolidated (1)**
74:5
**constituencies (1)**
69:16
**constituency (1)**
52:5
**constrained (1)**
105:9
**construct (2)**
95:22;97:17
**constructed (1)**
98:22
**construed (2)**
43:24;48:25
**consult (1)**
10:21
**consummation (2)**
83:9;88:24
**contemplation (1)**
26:12
**contemporaneous (1)**
64:4
**contested (2)**
48:18;88:14
**context (14)**
9:11;12:5;14:17;
15:18;16:21;38:11;
49:9;61:16,16;
63:17;64:15;66:17;
91:14;94:7
**contingent (1)**
84:12
**continue (1)**
59:13
**continued (3)**
8:2,4;9:14

**contracted (3)**
88:13;89:13,19
**contractually (4)**
33:1;41:16,17;
90:4
**contrast (1)**
26:8
**contribute (1)**
88:17
**contribution (1)**
88:22
**control (3)**
84:6;89:4,18
**conversation (3)**
33:16;39:9;100:12
**conversations (2)**
33:11;70:4
**converse (1)**
65:20
**convertible (1)**
43:6
**conveyance (2)**
25:12,17
**conveying (1)**
33:2
**coordinating (1)**
71:10
**coordination (1)**
58:14
**CopeLink (1)**
65:1
**copy (3)**
81:22;82:10;83:6
**Corporate (3)**
5:3;6:3,13
**Corporation (1)**
65:17
**correctly (1)**
16:20
**correspondence (1)**
37:15
**cost (1)**
60:16
**counsel (11)**
11:19;12:20;
28:11;32:22;58:9,10,
17,17;68:8;69:19;
74:12
**counted (1)**
12:17
**counter (1)**
8:19
**counterparty (1)**
88:10
**counterproductive (2)**
70:23,25
**couple (15)**
9:24;19:22;28:3,
13;31:25;32:12;
35:15;37:16,16;
39:14;50:23;55:19;
59:11;83:5;88:7
**course (11)**

8:21;14:4;25:3;
39:10;51:7;68:22;
69:3;83:16;89:9,18;
90:21
**COURT (250)**
8:2,10,14,24;9:3,7;
10:7,14,23;11:3,6,9,
11,15,18,23;12:9,11,
14,17,24;14:8,13,16,
20;15:7,9,11,12,15,
23;17:2,7,11,22,24;
18:2,7,11,15;19:2,
13,19;20:15,17;
21:13;22:6,9,16,19,
21,23,25;23:20;24:3,
6,12,16;25:2,14,20,
21,25;26:2,9;27:2,
11,14,17,19,22,24;
30:11;31:7,10;32:5,
8;33:15,22;34:19,25;
35:4,13,15;36:15,22;
37:18,21;38:14,14;
39:12,16,19;40:5,7,
14,21;41:6,7,21;
42:12,14;43:13,16,
19;46:15,21;47:16,
17,21;48:6,9;49:11,
20,25;50:11,13,17,
20;51:14;52:1,13,19,
24;53:5,8,11;54:3,
15;56:4,10,18,20,23;
57:4,10,13,15,18;
58:3,6,21,25;59:4,8,
10,23;60:1,4,24;
62:24;67:7,11,13,19;
68:13;69:7,9,22;
70:2,12,17;71:11,18,
20,24;72:5,16,20,22;
73:22;74:10,16,19;
75:3,10,18,20;76:7,
15;78:2,17,19,24;
79:1,4,6;80:10,12;
81:3,19,21;82:7,19,
24;83:5,11,13;84:16;
85:24;86:6;87:5,23;
89:22,25;90:9;92:6,
9,23;93:8,18;94:12,
22,24;95:5;96:11,18,
23;97:9,12,19,23,25;
98:8,10,12;99:1,5;
100:5,21;101:4,10;
102:4,7,10,24;103:3,
5,19;104:1,3,6;
105:2,6,11,14,18,21;
106:2,5
**courthouse (1)**
69:12
**courtroom (3)**
53:1;59:2;71:8
**courts (2)**
49:8;61:15
**Court's (4)**
15:19;16:8;50:24;

67:9
**covered (1)**
64:23
**crafting (2)**
84:21;88:3
**create (2)**
37:14;95:22
**created (4)**
46:12;49:22;
90:14,16
**creation (1)**
92:5
**Credit (7)**
5:3,5;6:3,13;
28:21;29:6;63:20
**crediting (1)**
82:17
**creditors (9)**
15:17;41:15;
58:15;68:1,24;
83:20;90:22;91:10,
20
**creditors' (1)**
25:23
**criminal (1)**
44:7
**critique (1)**
21:23
**crossed (1)**
46:24
**crossing (1)**
41:12
**crux (1)**
80:20
**cuff (1)**
86:19
**cumulative (2)**
54:13;55:4
**current (2)**
65:15;66:16
**currently (4)**
28:19,20;58:16;
102:17
**cut (2)**
47:6;85:17

**D**

**Dallas (1)**
7:15
**data (3)**
26:7,9;49:17
**date (8)**
10:24;17:7,10;
18:24,25;19:1;
30:14;68:10
**dated (1)**
16:19
**dates (5)**
10:4;16:24;18:16,
23;21:10
**Davidson (1)**
28:14

**day (19)**
10:19,21,21,24;
11:12,12,13;30:7,11;
32:22;35:12;39:25;
43:2,6;67:25;68:22;
86:24;91:21;94:5
**days (5)**
37:16;44:20;
53:10;83:17;88:4
**DC (2)**
4:16;6:7
**deadline (2)**
20:9;93:19
**deal (5)**
25:15;68:3;73:24;
83:8;100:13
**dealing (1)**
25:13
**deals (1)**
33:19
**dealt (1)**
104:9
**debating (1)**
71:17
**DEBEVOISE (1)**
5:12
**debt (4)**
26:3;29:6,12;
86:15
**debtor (23)**
9:25;10:6;11:25;
23:14;25:16;31:19;
34:23;35:9;36:23;
41:8,10,20;42:3;
45:20,21;52:9;
62:16;68:1;84:6;
86:23;88:21;96:3,3
**debtors (35)**
10:10;13:5;18:19;
19:16;24:8,14;
26:25;27:3;33:4,10,
17;41:12,16,24;
42:21;43:1;44:11;
45:12;46:7;49:2,23;
51:3,11,25;52:10;
55:12;58:2;62:1,18;
73:8;74:4;81:25;
83:20;88:9;97:2
**debtors' (15)**
10:5,6;18:21;
19:23;21:17;31:20,
23;35:6;40:5;41:13;
43:8;44:4,11;87:21;
92:21
**debtor's (1)**
15:17
**December (13)**
16:20,20,22;17:3,
13,18;18:13,23;
37:23,24;38:3,5;
39:20
**decide (7)**
8:5;23:22;35:18;

36:9,10;40:24;99:11
**decided (2)**
25:7;97:2
**deciding (1)**
40:23
**decision (13)**
24:25;25:18,24;
28:20;33:16;34:21;
35:3;42:17;47:2;
65:17;66:8;100:19;
101:2
**decision-making (1)**
13:17
**decisions (1)**
13:4
**deescalate (1)**
44:25
**default (1)**
35:19
**defendant (1)**
25:22
**defense (1)**
26:6
**defensively (1)**
50:7
**defined (1)**
95:18
**definition (2)**
28:18;85:20
**Delaware (3)**
9:6,12;14:1
**delayed (1)**
80:9
**deleted (1)**
83:1
**deliberation (1)**
33:4
**deliver (2)**
88:23;89:3
**delivered (2)**
88:14;89:13
**delivers (2)**
83:24,25
**delivery (1)**
88:19
**demonstrate (1)**
63:2
**DENNIS (2)**
4:8;27:25
**depose (2)**
26:19;54:23
**deposition (4)**
15:4;29:16;36:12;
55:20
**depositions (21)**
10:2,3,6;12:2,5,6;
13:15,16;15:3;33:6,
9;36:2,9;47:12;50:8;
54:8,12,18;55:5,19;
56:1
**deprive (1)**
97:11
**depriving (1)**

70:8
**DEREK (1)**
5:18
**designed (1)**
97:11
**desire (2)**
71:9;72:5
**destroy (1)**
95:17
**destruction (1)**
98:16
**destructive (2)**
95:23;97:18
**determination (2)**
35:12;93:6
**determine (3)**
25:5;93:21;98:20
**determined (1)**
87:7
**determining (2)**
25:16;92:21
**Deutsche (1)**
5:4
**developed (1)**
84:13
**dickering (1)**
10:4
**differ (1)**
57:23
**difference (2)**
25:20;70:9
**differences (1)**
80:21
**different (12)**
25:13;29:9;30:9,
10;34:8;50:9;61:17;
66:17;88:5,22;94:7;
101:19
**difficult (1)**
104:8
**difficulties (1)**
28:7
**diligence (4)**
71:8;102:20,25;
103:6
**direction (1)**
73:1
**directly (2)**
13:9;66:11
**director (1)**
66:16
**disagreement (1)**
19:9
**disclosure (2)**
102:12;103:14
**discount (2)**
43:12;46:10
**discounted (1)**
26:11
**discovery (32)**
8:4,22;9:11,16;
11:20,21;13:15,16,
20,20;14:10;15:1,2;

20:8;23:24;25:8;
27:1,5,8;38:8;45:1;
47:2,5,7;53:10,12;
55:13;57:21;59:12,
15,19;62:17
**discrete (5)**
62:4;77:25;79:20;
80:2;104:9
**discuss (5)**
46:24;57:25;
79:18;94:19;104:14
**discussed (5)**
20:2;40:8;54:18;
61:19;98:24
**discussing (2)**
12:23;64:24
**discussion (13)**
12:5;22:12;36:1;
44:2;45:18;53:22,
23;55:4;63:12;
64:19,21;90:13;
100:9
**discussions (10)**
8:4;9:15;56:1,4;
58:9;59:13;63:24;
67:2;72:24;103:10
**dismay (1)**
42:14
**dismiss (1)**
97:4
**dismissed (5)**
91:13;95:14,14;
96:3,21
**dispute (4)**
52:19;63:17;
81:15;82:1
**disregard (1)**
26:9
**distant (1)**
37:5
**distinction (3)**
64:7;65:3;66:6
**distinctions (2)**
14:20;66:9
**distribution (1)**
43:9
**district (1)**
38:14
**docket (1)**
59:20
**document (4)**
50:8;82:9,18;83:3
**documentation (1)**
46:19
**documents (6)**
14:14,14;26:21;
54:20;55:3;61:19
**Dojo (1)**
66:8
**Dolan (4)**
14:1;21:15;28:4;
60:9
**dollar (12)**

74:21;75:21;
82:13,16;83:8;90:18,
19;91:3,16;94:6,25;
99:2
**dollars (5)**
82:22;94:9;97:13;
98:5;99:15
**done (25)**
17:24;39:20;
42:18;44:11;46:6;
47:19;51:21;55:20;
69:15;70:6,14,19;
71:1,12,24;72:2;
79:13;88:12;95:7,7;
98:2;101:14,22;
103:20,23
**door (12)**
21:4;22:11;23:11;
28:8;29:10;37:9;
44:9,9;45:2;50:16;
61:8;67:3
**double- (1)**
100:8
**doubt (1)**
30:8
**DOUGLAS (1)**
6:9
**down (14)**
13:14;14:13;
16:12,20;17:21;
25:12;28:3;46:5;
59:7;62:7;71:13;
77:8;99:11;101:3
**dozen (2)**
13:19;95:20
**draft (1)**
85:1
**drafting (3)**
86:3,17;87:7
**drag (1)**
45:9;70:22
**draw (1)**
24:19
**drawing (1)**
93:23
**drawn (1)**
46:2
**drew (1)**
61:1
**drill (1)**
28:3
**drive (1)**
99:7
**driver (5)**
18:21;23:3;33:7;
98:6;99:2
**drop (1)**
98:5
**dropped (3)**
18:24;19:1;32:2
**dropping (1)**
41:3
**Dry (3)**

18:20,23;102:16

**duck (2)**
85:8,8

**due (4)**
10:24;21:25;22:1;
104:1

**Dumpty (1)**
93:9

**DUNNE (14)**
4:8;27:12,23,25,
25;31:8,11;33:7;
40:10,22;46:18;
49:12;50:4,12

**Dunne's (1)**
36:24

**duplicative (1)**
54:13

**during (5)**
8:21;24:25;59:1;
68:22;90:21

**E**

**earlier (4)**
54:9;58:12;61:14;
82:10

**early (2)**
101:13;103:21

**earn (2)**
87:1;91:2

**earned (1)**
68:20

**earns (1)**
73:20

**earth (1)**
50:21

**easiest (1)**
78:4

**eat (1)**
59:16

**eating (1)**
50:23

**echo (1)**
62:20

**echoed (1)**
44:2

**echoes (1)**
65:17

**economic (1)**
100:3

**economics (5)**
68:3,14,19;73:24;
99:20

**educate (1)**
55:7

**education (1)**
55:17

**effect (1)**
41:3

**effectively (1)**
31:16

**efficiency (1)**
19:14

**efficient (2)**
19:5;26:4

**effort (2)**
58:10;91:9

**efforts (5)**
72:17;83:16;87:3;
88:3;101:18

**eight (5)**
10:5;34:13;37:8;
47:8;55:12

**either (13)**
38:16,18;68:7;
76:1,18;77:2;79:6,7;
80:18;93:22;95:13;
98:3;104:10

**either/or (1)**
92:16

**elaborate (1)**
87:21

**element (1)**
89:2

**elements (1)**
84:6

**elevating (1)**
43:16

**ELIZABETH (1)**
5:9

**else (22)**
12:3;17:21;19:21;
31:18;36:20;37:8;
48:4,6;49:19;54:2;
57:20,24;59:12;
65:14;67:14;80:17;
83:7;86:9;95:9,9;
98:6;105:16

**e-mail (4)**
39:6;70:9;105:22,
23

**e-mailed (1)**
82:18

**e-mails (10)**
15:21;16:10,17,17,
19;17:12;18:4,13,24;
29:18

**empirical (1)**
26:7

**employed (1)**
66:11

**employee (1)**
66:16

**emptor (1)**
76:21

**encourage (1)**
46:11

**end (16)**
9:2;30:7,10;32:3;
34:8,14;38:18,19;
62:6,7,12;78:7;
91:21;94:5;96:2;
99:18

**ended (5)**
10:19;54:3,3;57:1,
18

**ends (2)**
85:5;96:17

**engagement (4)**
68:5;76:3;82:20;
102:22

**enhanced (2)**
75:17;96:1

**enough (6)**
23:20;53:21;55:2;
77:18;79:13;105:18

**enter (1)**
68:7

**entered (1)**
9:5

**enterprise (2)**
26:5;64:12

**entire (1)**
59:1

**entities (8)**
32:17;73:8,19;
74:4;75:25;76:13,
14;91:5

**entitled (4)**
39:10;45:19;74:8;
84:3

**entity (9)**
73:8,12;74:8;
79:22,23,25;80:3,8;
102:13

**envelope (2)**
34:1;38:24

**environment (1)**
48:18

**equity (43)**
8:17,18;10:10,10;
12:20;15:22;21:25;
24:22;26:3;27:5;
32:11;33:8;35:5;
42:7;43:10;49:23;
54:11;58:9,13,17;
60:2,12;64:1;67:23;
73:3,11;74:12,23,25;
75:5,17;80:1;83:7,
19;84:9;86:22;90:5,
20;91:23;96:12;
97:8;98:18;103:11

**escalate (1)**
44:24

**ESQ (11)**
4:8,9,18;5:9,17,18;
6:9,18;7:7,8,17

**essential (1)**
77:16

**essentially (9)**
55:11;63:14;64:4;
77:1,17;80:14;
83:21;87:8;99:11

**establish (2)**
64:3,14

**estate (8)**
75:1;78:9;91:12,
22;92:2;93:1;94:3;
98:4

**estates (2)**
74:5;91:20

**estate's (1)**
78:13

**et (1)**
21:18

**eternal (1)**
104:16

**evaluating (1)**
102:17

**evaluation (6)**
37:23,24;39:8,19;
44:10;65:12

**evaluations (2)**
19:20;64:22

**even (11)**
20:20;24:18;45:6;
71:2;91:11,16,25;
93:24;94:4,10;95:2

**evenhanded (1)**
11:6

**evening (5)**
72:20,21;101:17;
105:22;106:5

**event (8)**
15:1;54:22;77:12;
88:12;89:1,2;90:19;
91:24

**everybody (19)**
11:15;12:3;14:17,
24;17:25;20:18;
27:14,15,19;42:9;
48:19;53:20;69:12;
76:21;79:10;87:24;
101:7;103:24;
105:22

**everybody's (6)**
39:4;61:4;69:13;
72:1;79:15;93:11

**everyone (4)**
32:19;41:5;70:8;
88:5

**everyone's (3)**
14:24;61:21;81:6

**evidence (45)**
12:7;13:3,8,21,22;
15:2;19:24;21:2,4,
16,23;23:3,9;24:19;
25:1,20;27:1;28:8;
29:17;32:13,17;
35:11;36:19;37:1,
22;38:3;39:2;40:11;
44:3,6,7;45:19;46:9;
47:9;48:2;49:7;
60:21;62:23;63:3,9;
64:11,16;65:7,20;
92:25

**evidences (1)**
38:25

**evidentiary (1)**
46:2

**evolving (1)**
69:5

**exact (1)**
43:22

**exactly (12)**
12:22;29:21;
46:24;55:2;57:8,18;
64:17;82:4;95:16,
19;96:8;97:16

**example (12)**
13:8;27:7;37:18;
46:18;63:19;73:18;
75:24;84:8;90:2;
93:7

**examples (1)**
37:16

**exceeding (1)**
10:11

**excellent (1)**
86:4

**except (2)**
65:9;93:14

**exchange (1)**
104:12

**exciting (2)**
8:5;104:8

**excluded (2)**
38:19;66:4

**excuse (1)**
17:16

**excused (1)**
67:10

**exercise (2)**
43:7;66:1

**Exhibit (1)**
16:13

**exhibits (1)**
16:13

**exists (3)**
42:20;90:5;97:22

**exited (1)**
29:6

**exiting (1)**
30:4

**expanding (2)**
54:20,22

**expansion (1)**
57:4

**expect (7)**
28:22;48:25;52:2,
25;53:22;61:8,15

**expectation (1)**
72:2

**expense (2)**
55:7;60:16

**expenses (2)**
82:22,23

**experience (1)**
38:20

**expert (36)**
10:6;21:3;25:1;
26:10;28:8;30:15,
22;31:5,16;38:9,15,
19,22;45:20;49:16,
21;55:14;61:22;

Case 14-10979-CSS    Doc 1614-2    Filed 07/17/14    Page 116 of 129
GENCO SHIPPING & TRADING LIMITED, et al.
Case No. 14-11108-shl

June 3, 2014

65:3,19;66:7,19,22;
79:21;80:16;83:24,
25;84:10;85:15;
86:13;88:14;94:3,
20;102:3,14;104:1
**experts (14)**
18:19;21:17;
30:16;31:22;32:17;
34:13;38:7;41:19;
45:24;54:23;57:20;
61:16;65:8;66:2
**expert's (1)**
36:12
**explicit (2)**
84:18;98:2
**explored (1)**
29:2
**expose (1)**
49:3
**exposes (1)**
66:18
**express (3)**
51:10,10,11
**expressed (2)**
52:16;61:5
**expression (1)**
69:20
**expressions (1)**
62:1
**extend (1)**
63:20
**extension (1)**
51:18
**extensive (4)**
34:2;42:15;63:13,
13
**extent (9)**
21:23;30:21;46:6,
14;51:2;55:25;85:4;
86:7;105:4

## F

**facilitate (1)**
50:8
**Facilities (1)**
5:5
**facility (3)**
4:4,14;28:2
**fact (21)**
19:9;28:6;29:20,
20;34:10;35:17;
43:1;49:7;57:18;
63:3,18;64:10;
65:22;66:22;70:13;
73:3;76:12;82:12;
89:12;92:14;102:14
**fact- (1)**
66:2
**fact-finding (1)**
13:17
**facts (5)**
14:18;29:24;

37:23;38:7;60:18
**factual (5)**
13:3;14:18;32:17;
43:22;104:9
**factually (1)**
60:20
**fails (1)**
80:7
**fair (12)**
11:15;23:20;
32:24;39:23;40:1,
19;45:15;47:11;
49:19;54:23;92:14;
95:3
**fairly (1)**
17:4
**fairness (2)**
33:14;88:23
**faith (26)**
21:17;27:2;31:18,
20,23;33:3;40:2;
41:4,8,13,23;42:2,3,
9;51:24;52:11;
84:18;85:1,5;86:17,
25;89:5;97:10,20;
98:1,22
**falls (1)**
46:1
**familiar (1)**
85:6
**far-flung (1)**
39:20
**faster (3)**
55:18,19;104:15
**fault (1)**
88:6
**favor (2)**
44:18;50:15
**federal (3)**
45:16;60:17,17
**fee (40)**
9:8;68:20;73:21,
24;74:21,22;75:11,
12,15,16,21;76:10,
10;82:13,16;85:4,21;
86:12;87:1;88:11,
17;90:3,15,15,18,19;
91:3,3,16;92:12;
94:6,8,25;97:11,15;
98:3;99:2,7;100:3,10
**feel (4)**
16:16;21:23;28:5;
30:2
**fees (3)**
74:9;88:9;90:3
**FELD (2)**
7:2,11
**felt (2)**
17:3;95:1
**few (8)**
12:25;54:2;59:14;
60:7;61:6;63:11;
64:25;66:20

**fide (1)**
65:8
**fifteen (3)**
58:24;59:16;67:2
**Fifth (1)**
66:8
**fifty (1)**
10:13
**fifty-day (1)**
27:7
**fifty-eight (1)**
18:25
**fifty-five (1)**
32:2
**fight (6)**
11:24;19:12;47:3;
48:19;105:15,18
**fighting (1)**
100:14
**figure (2)**
36:23;57:23
**figuring (1)**
81:5
**file (5)**
28:7;68:8;102:5;
105:1,9
**filed (3)**
101:23;102:8;
103:3
**final (1)**
69:13
**Finally (1)**
62:20
**financial (3)**
9:10;56:25;74:9
**find (6)**
21:10,10;30:8;
67:5;87:17;100:16
**finding (1)**
99:8
**finds (3)**
14:3;67:14;105:21
**fine (23)**
8:14,24;16:3;18:3;
20:19;23:22;24:3;
27:16;49:5,25;50:1;
53:11;69:7,9;71:3,9;
72:12;101:4;102:3,
9;104:15,23,24
**finish (2)**
58:21;69:12
**fire (2)**
99:6;100:11
**firm (1)**
21:20
**firms (1)**
50:10
**First (14)**
9:25;11:22;15:14;
24:24;32:13,22;
35:18;39:25;43:2;
59:18;60:8;63:12;
89:25;102:12

**firsthand (1)**
66:12
**fish (1)**
99:6
**fits (2)**
36:1;57:23
**fitting (1)**
65:24
**five (3)**
31:21;50:9;57:1
**fix (1)**
85:25
**flag (1)**
40:13
**flawed (1)**
28:17
**floodgates (1)**
61:3
**flow (2)**
26:11,12
**fly (2)**
18:3;95:5
**focus (2)**
13:9;89:24
**focused (3)**
33:9;22;62:5
**folks (13)**
34:15;36:19;37:7;
45:6,7,10;56:24,25;
61:11;67:3;80:15;
100:18;104:12
**followed (1)**
27:8
**following (2)**
22:11;68:2
**fools (1)**
57:22
**footnote (2)**
20:16;63:19
**force (1)**
105:15
**forecast (1)**
66:13
**forget (1)**
57:1
**forgive (1)**
95:11
**form (7)**
43:16;63:6;65:15;
68:7,11,11;69:2
**former (2)**
26:23;66:16
**forth (5)**
13:18;21:7;68:21,
22;69:5
**forthcoming (1)**
21:11
**forty-five (1)**
72:9
**forward (3)**
33:5;52:17;102:21
**found (1)**
99:2

**four (1)**
57:11
**frame (1)**
44:15
**frankly (1)**
89:20
**fraudulent (2)**
25:12,16
**fresh (1)**
27:13
**Friday (18)**
10:25;11:2;16:10;
68:9,12;101:23;
102:2,8,21;103:3,21;
104:3,14,17,22;
105:4,10,12
**Friday's (1)**
105:8
**friends (1)**
17:6
**front (12)**
19:21;27:2;33:23;
40:25;49:6,6;51:1;
60:6;81:15;82:2;
85:5;86:22
**fronts (1)**
9:18
**frustrated (1)**
100:5
**fry (1)**
99:6
**fully (2)**
48:25;61:8
**function (4)**
9:20;69:25;71:6;
90:7
**fundamental (2)**
33:13;50:14
**funnel (1)**
38:6
**further (6)**
40:16;64:13;67:2;
76:15;88:3;101:6
**future (1)**
66:13
**fuzzy (1)**
57:1

## G

**game (2)**
47:11;49:19
**gamesmanship (1)**
95:24
**gap (2)**
59:3;85:12
**GARRISON (1)**
5:2
**gatekeeping (1)**
39:1
**gave (4)**
20:15,17;90:12;
103:15

**gel (1)**
75:14
**Genco (42)**
23:3;28:24;29:12;
73:4,9,17,20;74:1,
25;75:1,4,4,7,22;
76:4,5,12;79:22;
82:15;84:13,14,15,
22;86:16;88:10;
89:11,25;90:1,1,3,
23,25;91:1,9,11,22;
92:13;94:2,11;
95:13;97:4;99:12
**general (1)**
48:9
**generally (4)**
14:3;28:23;60:25;
77:15
**gets (1)**
95:24
**ghost (1)**
96:5
**given (9)**
8:5;23:5;45:2;
53:24;61:18;70:3;
74:19;81:23;102:20
**gives (2)**
73:1;84:23
**giving (3)**
10:23;77:1;81:10
**glad (1)**
52:23
**goal (1)**
15:6
**goes (8)**
19:8;47:25;50:14;
64:1,9;66:14;93:15;
98:6
**Good (44)**
15:10,11;22:19;
27:23,24;28:5;31:18,
20,23;33:3;35:8;
38:8;39:3;40:2,22;
41:3,8,13,23;42:2,3,
8;51:24;52:11;
62:12;67:19,22,25;
69:15;72:20,21;
84:18;85:1,5;86:17,
24;97:10,20;98:1,22;
100:23;101:25;
104:6;106:5
**good-faith (2)**
99:10,12
**gracious (1)**
81:10
**grandmother (1)**
57:22
**gray (1)**
23:5
**greatly (1)**
29:3
**grist (1)**
61:22

**Gropper's (1)**
65:16
**grounded (1)**
26:6
**Group (9)**
7:3,12;16:19;
33:16;45:12;51:3,
10;60:23;61:25
**groups (3)**
24:15;41:11;43:6
**guarantee (2)**
29:8;91:4
**guaranteed (4)**
73:12;76:10;
77:18;80:13;84:4;
91:4
**guess (3)**
24:10;28:4;55:23
**guidance (3)**
24:12;78:21;
102:15
**GUMP (4)**
7:2,11;13:25;
15:13

## H

**HADLEY (3)**
4:2,12;27:25
**HAHN (11)**
5:17;70:2,10,13;
71:3,11,15;86:20;
87:25;88:2;89:23
**Hahn's (1)**
72:5
**half (8)**
10:19,21,23;
11:12;13:19;17:1;
72:10;77:4
**halfway (2)**
77:16,19
**hall (1)**
59:7
**hallway (1)**
101:21
**hammer (1)**
69:20
**hand (7)**
35:23;38:23;
61:25;62:1,1;90:9;
105:15
**handful (1)**
33:9
**handle (2)**
46:25;78:5
**happen (10)**
34:18;36:8;37:2;
76:24;86:16;88:21;
97:8;98:25;99:21,23
**happened (2)**
9:5;32:15
**happening (2)**
12:6;26:22

**happens (4)**
23:4;50:4;73:11;
76:24
**happier (1)**
70:6
**happily (1)**
101:20
**happy (3)**
9:16;77:24;78:9
**hard (7)**
14:23,24,25;
93:12;96:1,6,8
**hats (1)**
38:13
**HAUER (2)**
7:2,11
**head (1)**
50:18
**heads (2)**
79:7,18
**hear (18)**
11:18;13:22;
18:17;23:16;27:14;
37:11;38:3;44:20;
46:18;53:20;74:16;
77:10,24;78:12,12;
87:25;92:13;100:15
**heard (10)**
12:15;14:23;
19:10,15;23:19;
24:24;32:18;49:20;
54:8;56:23
**hearing (21)**
8:2,21;9:25;13:23;
14:6;15:18;25:14;
32:22;35:10;39:25;
43:2;52:17;59:1;
68:10;69:4;87:24;
88:14,20;99:17;
102:1;105:8
**heart (1)**
15:14
**heaven (1)**
50:20
**heavy (1)**
100:11
**heed (1)**
74:14
**help (3)**
17:6;18:4;77:3
**helpful (9)**
20:17,19;60:11;
65:21;69:11;70:5,
18;100:1,25
**helpfully (1)**
14:6
**here's (6)**
20:5,6;36:5,17;
49:1;63:4
**HERRINGTON (2)**
6:2,12
**hesitate (1)**
70:10

**hide (1)**
21:11
**higher (5)**
75:11;87:4;90:19;
98:4,20
**highlight (1)**
20:13
**hire (1)**
50:9
**historical (1)**
26:9
**historically (1)**
23:12
**hit (1)**
87:13
**hitting (1)**
74:6
**hoc (1)**
43:5
**hold (1)**
87:14
**holders (3)**
42:7;74:23;80:1
**holding (1)**
99:19
**Holdings (1)**
65:17
**home (2)**
71:9;81:4
**honest (1)**
40:21
**honesty (1)**
22:24
**Honor (154)**
8:9;10:2;11:22;
12:8;19,25;13:7,13,
22,24;14:13;15:4,10,
14;16:7,21;18:8,24;
20:12;21:10;23:18,
22;25:19;27:4,8,12,
16,23;30:17;31:8,12;
32:7,9,12,18,22;
33:2,5,7;34:17,20;
35:7,10;36:21;37:13,
15;39:5,18,24;41:2;
42:24,25;43:4,12;
46:4,9,12;47:13,14,
18;48:5,7;49:10;
52:14,15;53:4,6;
54:5,10;55:23,25;
56:8;57:14;58:1,20;
59:22;60:3;67:6,8,
22;68:3,9,16;69:3,
18,23;70:11;71:3,23;
72:15,18,21;73:1,7,
9;74:5,11,12;75:1,8,
14;78:4,11,13,18,20;
79:5;81:2,18;82:4,6,
23;83:10,12;84:5,9;
85:13;86:5,11,22;
87:18;88:2;89:14,
23;90:8;91:7;92:20;
93:14,15,20;94:19;

95:2,10,16;96:7,16;
97:8,21;98:9,14;
99:22;101:1,9;
102:11;103:2,4,10,
17,25;104:4,5,25;
105:8;106:4
**honored (1)**
36:7
**Honor's (11)**
10:11;12:22;
13:11;33:12;39:10;
40:19;58:8;68:6;
69:3;86:17;98:16
**hoops (1)**
99:15
**hope (6)**
9:1;10:4;20:12;
43:18;52:14;104:16
**hopeful (4)**
21:16;24:1;58:18;
69:1
**hopefully (2)**
86:7;88:7
**hot (1)**
70:20
**hotly (1)**
48:18
**Houlihan (3)**
30:22;31:4;56:22;
57:9
**hour (4)**
52:20;71:17;
72:11;74:19
**hours (1)**
55:19
**house (3)**
34:1;21;45:20
**hue (1)**
20:25
**humongous (1)**
18:21
**Humpty (1)**
93:9
**hurdle (2)**
74:6;92:11
**hypothetical (5)**
39:16,17,21,21;
41:9

## I

**idea (7)**
21:18;40:22;54:4;
65:18;93:2;98:1;
99:16
**ideas (2)**
87:9;94:17
**identified (7)**
20:10;42:25;
44:13;54:16;56:5;
65:1;98:14
**identifying (1)**
69:6

**ignore (1)**
46:10
**illuminating (1)**
104:14
**illusions (1)**
87:14
**illustrate (1)**
39:21
**illustrating (1)**
25:19
**imagine (4)**
58:23;96:2;97:13;
103:21
**imagining (2)**
96:18;99:21
**immediately (1)**
38:9
**impact (3)**
31:20;32:4;50:24
**implication (1)**
40:4
**implicit (1)**
84:17
**implies (1)**
33:16
**imply (2)**
40:1;63:22
**important (8)**
12:18;36:10,11;
52:2;64:20;65:11;
90:5;99:24
**importantly (2)**
28:16;98:22
**impose (2)**
53:12;68:10
**imposed (2)**
55:12;57:19
**impossible (1)**
96:22
**impressive (1)**
26:3
**improper (2)**
66:5;85:9
**improvement (4)**
75:13;79:25;
90:20,20
**improves (1)**
74:23
**in- (2)**
33:25;34:20
**inability (1)**
92:7
**inappropriate (1)**
100:8
**Inc (2)**
5:13;66:8
**incentive (3)**
84:8;95:17;97:18
**incentivized (1)**
94:14
**incidents (1)**
89:6
**inclinations (1)**

**53:24**
**inclined (2)**
16:2;55:9
**include (3)**
85:16;91:21;98:23
**includes (2)**
28:11;56:20
**including (2)**
91:1;92:12
**inclusive (1)**
57:9
**incoming (1)**
30:4
**incorrect (2)**
11:11;78:22
**Indeed (2)**
33:5;34:22
**indemnity (1)**
82:25
**independent (3)**
53:17;64:22;65:4
**Index (4)**
18:20,23;32:1,1
**indicated (2)**
58:12;73:23
**indication (1)**
64:9
**indicative (1)**
26:5
**individual (7)**
30:18;61:4,5;
66:14,15;69:6;
102:14
**individually (1)**
30:21
**individuals (1)**
48:1
**individual's (1)**
48:2
**indulgence (1)**
68:7
**Informal (3)**
7:3,12;43:6
**information (6)**
14:8;51:12;62:9;
66:15;102:20;
104:12
**informed (3)**
34:21,23;35:3
**in-house (2)**
34:22;35:2
**input (1)**
42:18
**inputs (1)**
42:21
**inquiry (8)**
13:16;29:16;61:1;
62:5,15,22;63:23;
99:13
**insight (1)**
64:4
**insofar (1)**
74:9

**insolvent (1)**
63:22
**instance (2)**
49:16;93:14
**instances (1)**
21:22
**instead (1)**
34:12
**institutions (1)**
28:19
**instruction (1)**
16:8
**instructive (1)**
60:19
**intelligent (1)**
55:15
**intend (1)**
23:25
**intensive (1)**
66:3
**intent (1)**
36:24
**interacting (1)**
13:5
**interaction (2)**
19:15,17
**interest (6)**
32:24;51:15,18;
70:5,19;87:23
**interested (1)**
15:21
**interesting (3)**
14:5;20:24;23:4
**interestingly (1)**
32:19
**interests (1)**
93:11
**interminable (1)**
30:6
**internal (13)**
15:16;19:11,20;
28:9,17,22;29:21;
30:24;37:23,24;
49:17;52:3;60:22
**internally (1)**
26:17
**interpret (2)**
51:8,8
**into (24)**
20:3;26:3;31:1;
35:16,20;36:3;
40:14;44:12;46:2;
47:8;48:13;51:14;
52:25;53:17;59:16;
64:4,11;72:23;76:15,
17;86:21;90:13,15;
91:12
**introduce (4)**
21:22;34:12;
37:22;44:16
**introduced (1)**
34:9
**introducing (2)**

**34:10,11**
**introductory (1)**
9:21
**invest (1)**
63:20
**investigate (1)**
31:23
**Investment (4)**
5:3;6:4,14;88:23
**investor (1)**
29:18
**involve (2)**
89:11;99:11
**involved (5)**
66:11;84:14,22;
86:16;87:9;96:12
**involvement (3)**
103:11,15,16
**involves (2)**
65:8;86:14
**Iridium (8)**
25:9,18;26:4;27:7;
63:12;64:14,21,24
**Iridium's (2)**
26:2;64:12
**iron (1)**
70:19
**irons (1)**
99:6
**irreconcilable (1)**
101:11
**irrelevant (1)**
29:15
**irrespective (2)**
76:11,12
**isolation (1)**
33:23
**issue (51)**
9:4,4,16,21,22;
10:17;11:21;14:7;
22:8;25:13;29:10,
25;31:18;32:20;
35:20;36:1;40:10,
19;41:3;42:2;46:5,
22;49:13,14;50:5;
52:19;53:2;54:7;
59:19;65:22;72:25;
75:14;79:20,20;
83:18,21;84:4;86:21,
24;87:16;88:1;
89:25;90:24,24;
95:18;98:15;103:8,
8;104:2,9,10
**issued (1)**
73:12
**issues (13)**
8:13;13:10;33:13;
41:4;53:13;60:12;
68:4;71:7;86:17;
87:12;101:5;103:12;
105:3
**issuing (1)**
9:7

**item (1)**
10:9
**items (1)**
9:24

## J

**Jefferies' (1)**
90:2
**Jeffries (2)**
56:22;57:9
**job (1)**
25:19
**join (1)**
71:13
**Judge (29)**
14:1,2,2,6;19:21;
20:10;22:14;25:18;
26:1;30:1;33:24;
35:17;36:23;40:7;
42:1;43:21;44:2,13;
47:1;49:13;50:15;
57:17;60:8;62:3,15,
20;63:9;65:16;71:25
**judges (4)**
14:3;35:19,21;
42:15
**judgment (2)**
43:8;63:19;66:2
**judgments (1)**
63:21
**jump (1)**
99:15
**jumped (1)**
45:11
**June (1)**
22:1
**justify (1)**
100:9

## K

**Kayne (2)**
15:3;16:18
**keep (6)**
16:17;20:6;33:18;
34:25;50:10;69:11
**Kempner (1)**
28:14
**key (1)**
73:14
**KHALIL (19)**
4:9;50:6;78:18,20,
25;79:3,5,19;80:11;
81:2;95:10;96:16,22,
25;97:16,21,24;98:7,
9
**kicking (1)**
45:9
**kidding (2)**
22:20,20
**kind (4)**
24:7;28:23;30:12;

Case 14-10979-CSS    Doc 1614-2    Filed 07/17/14    Page 119 of 129

GENCO SHIPPING & TRADING LIMITED, et al.
Case No. 14-11108-shl

June 3, 2014

48:15
**knew (1)**
  35:8
**knock (1)**
  67:3
**knowledge (1)**
  66:12
**known (1)**
  100:10
**knows (5)**
  42:9,20;62:10;
  73:7;74:5

## L

**lady (1)**
  81:4
**laid (1)**
  13:10
**language (8)**
  33:19,19;83:1;
  84:18;85:1,25;88:3;
  97:20
**last (11)**
  13:24;20:22;32:3;
  37:16;54:16;76:19;
  79:7,18;92:9;98:10,
  11
**late (2)**
  16:19;69:19
**later (6)**
  16:22;25:7;35:18;
  67:4;82:23;103:18
**law (3)**
  45:16;50:10;
  101:20
**lawsuit (1)**
  34:16
**lawyer (1)**
  21:3
**lawyers (2)**
  21:21;41:5
**lay (19)**
  13:3;29:22;31:15;
  38:16,17,18;45:16,
  17,17,24,25;65:3,18,
  19;66:5,7,7,10,18
**layperson (1)**
  26:16
**lead (4)**
  13:20;15:2;29:1,
  17
**leading (1)**
  35:22
**leanings (1)**
  23:16
**leap (1)**
  48:2
**learn (1)**
  38:8
**least (9)**
  13:8;15:3;16:16;
  25:5;47:5;62:20;

73:14;87:19;93:25
**leave (3)**
  12:24;13:24;83:6
**left (3)**
  91:22,25;92:7
**legal (3)**
  49:23;63:7;80:20
**lender (2)**
  29:18;54:12
**lenders (21)**
  15:17;24:13;
  28:12;30:4,25;
  31:14;33:17;41:12;
  51:4,11,23;52:8,10;
  54:8;55:13;56:12;
  57:12;59:25;60:1;
  61:25;80:5
**lenders' (1)**
  30:18
**lender's (3)**
  28:9,16;29:5
**length (3)**
  10:13;13:15;62:10
**less (4)**
  19:6;28:5;35:22;
  56:13
**letter (18)**
  12:4;13:7,11,19;
  16:1,9,14;20:14;
  21:8;22:13;24:22;
  54:9;68:5;76:3;
  82:20;88:10;106:1,2
**letters (2)**
  9:17,23
**level (6)**
  10:15;61:11;90:6;
  94:1,8;102:17
**library (1)**
  16:11
**lie (2)**
  90:2,4
**life (3)**
  67:14;72:6;81:9
**lifetime (1)**
  22:7
**light (5)**
  57:24;67:1;77:15;
  80:24;103:6
**likely (1)**
  8:20;29:16
**limit (1)**
  12:4
**limitations (1)**
  53:12
**limited (9)**
  12:23;14:25;15:5;
  29:23;34:10;62:14;
  73:4;87:10;97:17
**limits (3)**
  10:11;36:8;44:8
**line (9)**
  14:22;20:25;
  24:19;38:17;46:24;

47:21;63:5;65:11,11
**lines (2)**
  21:7;46:2
**LINK (1)**
  7:17
**liquidated (2)**
  95:14,15
**liquidating (3)**
  92:1;93:25;96:3
**liquidation (3)**
  91:1,11;92:12
**listen (2)**
  18:18;48:14
**listened (1)**
  52:15
**listening (2)**
  27:5;39:17
**literally (1)**
  83:14
**litigation (2)**
  26:13;51:21
**littered (1)**
  63:18
**little (8)**
  9:23;17:6;31:25;
  37:24;51:6;71:2;
  78:23;85:19
**LLP (8)**
  4:2,12;5:2,12;6:2,
  12;7:2,11
**loaf (1)**
  77:4
**loan (3)**
  4:4,14;28:2
**loath (1)**
  89:1
**logic (1)**
  22:11
**Lokey (1)**
  30:22
**long (9)**
  12:14;15:15;17:4;
  58:21;70:14;71:18;
  73:25;90:23,25
**longer (4)**
  16:5,18;18:9;
  26:24
**look (12)**
  16:13;21:22;
  29:11;30:2;31:3;
  47:15,16;85:19;
  86:19;87:6;96:24;
  99:12
**looked (3)**
  25:2;29:5,12
**looking (20)**
  13:1,2;15:20;
  21:19;24:19;25:15;
  27:10;28:16,18;
  32:13,16;33:6,8;
  34:18;37:14;65:4;
  77:11;80:15;85:22;
  102:23

**looks (3)**
  14:5;42:16;85:7
**lose (1)**
  72:10
**losing (1)**
  10:19
**lost (3)**
  34:14;66:13,15
**lot (13)**
  18:2;21:17;24:24;
  30:5,9;37:6;55:1;
  64:23;68:25;70:7;
  87:11;98:15;99:6
**loud (2)**
  59:13;60:11
**low (4)**
  35:9;42:10;92:11;
  93:16
**lower (3)**
  75:1;94:20;95:3
**lucky (1)**
  42:1

## M

**M&A (1)**
  88:23
**machinations (1)**
  97:14
**magically (2)**
  38:10;84:22
**majority (1)**
  73:6
**makes (6)**
  8:6;20:11,21;
  55:21;69:17;81:1
**making (11)**
  13:4;33:16;34:14,
  21;35:3;46:7;47:8;
  48:15;70:5;77:21;
  96:7
**management (3)**
  10:12;60:16,16
**management's (1)**
  64:8
**managing (1)**
  35:20
**Manhattan (1)**
  4:5
**manifestly (1)**
  26:10
**many (4)**
  34:12;61:3,3;
  88:22
**March (5)**
  16:25;17:13,18;
  18:14;97:9
**marginal (1)**
  65:13
**mark (2)**
  87:13,14
**market (5)**
  18:22;26:4,9,17;

30:9
**markets (1)**
  26:2
**market's (1)**
  63:15
**MarketXT (1)**
  65:17
**markup (5)**
  81:22,23;82:19,
  20;90:9
**material (6)**
  79:25;83:2;87:2,2;
  88:21;90:20
**materiality (1)**
  85:23
**materialize (1)**
  30:13
**materially (1)**
  90:11
**matter (4)**
  8:20;14:4;38:4;
  41:7
**matters (3)**
  8:22;30:11;41:5
**may (40)**
  8:11,11,21;10:4,
  18;11:21;12:12;
  14:11;15:12;17:3;
  20:3;21:10;24:1,1;
  27:2,3;39:6;43:4;
  49:14,14,15;54:7;
  62:5;67:10;76:5;
  78:18;82:6;83:12;
  87:13,13,18;94:2,18,
  18;100:2,15;101:15;
  102:18;104:11;
  105:14
**maybe (16)**
  9:1,23;11:23;19:8;
  49:3;51:20,21;
  56:13;71:11,12;
  78:4;84:17,23;85:1;
  100:12;104:11
**MCCLOY (3)**
  4:2,12;28:1
**MCCOLM (1)**
  5:9
**mean (29)**
  11:6;15:23;16:4;
  40:8;41:22;43:16,
  19;44:1;45:12;
  46:16;48:4;49:4;
  51:9;59:1;69:15;
  71:11;76:7,16;
  77:24;78:14;85:10;
  86:1,18;95:19;96:14,
  23;99:5,13,21
**meaning (4)**
  37:1;50:2;72:2;
  77:5
**meaningful (1)**
  43:9
**means (4)**

46:15;51:1;67:11;
94:15
**meant (2)**
59:12;87:1
**meet (1)**
44:3
**meet-and-confer (1)**
56:1
**members (3)**
16:18;51:9;97:7
**memorializes (1)**
84:19
**memory (1)**
57:2
**mention (2)**
33:18;63:12
**mentioned (4)**
27:4;64:16;99:16;
101:21
**mentioning (1)**
17:10
**mercifully (1)**
98:12
**merit (1)**
15:20
**merits (1)**
16:11
**met (1)**
89:11
**metaphor (3)**
69:15;70:6;99:6
**methodologies (4)**
30:10,16,19;61:17
**MICHAEL (3)**
7:8;67:22;74:11
**microphone (1)**
12:15
**Might (10)**
12:10;53:12;
61:13;65:9;72:13;
85:2,2,24;86:10;
89:15
**Mike (1)**
67:8
**MILBANK (4)**
4:2,12;27:25;54:6
**mill (1)**
61:22
**million (14)**
47:9;74:21;75:21;
82:13,16;83:8;90:18,
19;91:3,15;94:6,25;
98:4;99:14
**million-dollar (2)**
97:15;98:3
**mind (3)**
24:11;50:3;74:24
**mindful (1)**
14:18
**minds (1)**
57:22
**mine (1)**
20:18

**mini- (1)**
37:14
**minimum (1)**
91:3
**mini-trials (3)**
34:8;47:9;62:3
**mini-valuation (1)**
36:20
**MINTZ (1)**
6:9
**minute (1)**
24:21
**minutes (7)**
58:24;59:16;67:2;
72:9;81:1,2,3
**missing (1)**
28:25
**mix (1)**
31:1
**mode (1)**
104:17
**model (1)**
44:15
**models (3)**
28:17;29:5;30:24
**modest (1)**
65:6
**modified (1)**
45:1
**moment (2)**
19:10;40:10
**Monday (5)**
101:24,24;104:7,
15;105:14
**money (3)**
29:14;35:6;37:7
**monk (1)**
42:18
**monthly (1)**
76:10
**months (5)**
17:1,1;29:4;30:13;
37:8
**more (31)**
8:5;15:21,25;16:3;
17:19;19:5,6;24:21;
28:16;31:22;34:2;
35:21,23;36:11;
50:20;55:7,21;
57:20;64:21,23;
69:14;80:16;85:6;
86:23;92:23;96:14;
98:7;99:23;100:1;
102:20;104:19
**morning (2)**
54:10;100:17
**most (5)**
12:18;23:4;36:10;
45:25;61:15
**motion (8)**
8:15;72:24;74:15;
76:19;77:22;79:9;
100:7,9

**Motorola (2)**
25:22;26:1
**Motorola's (1)**
26:6
**move (4)**
11:13;23:17;71:7;
72:6
**moved (8)**
10:25;11:1,12;
83:20;90:11;92:2,3,4
**moving (3)**
11:9;59:2;64:25
**much (20)**
13:14;20:2;27:1,
20;34:2;35:24;
42:14;45:21;61:19;
63:23;72:16;77:3;
79:21;80:24;81:19;
95:3,11;101:17;
102:24;106:3
**multiple (3)**
38:25;39:2;76:2
**mused (1)**
29:19
**musing (1)**
26:15
**musings (3)**
18:20;30:24;60:19
**must (1)**
34:23
**myself (4)**
15:25;18:5;23:1;
92:10

## N

**NA (2)**
4:3,13
**Nagin (11)**
56:8,8,11,15,17,
19,22;57:3,7,11,17
**nails (1)**
69:13
**namely (1)**
89:3
**narrow (6)**
14:25;83:18;89:1,
24;91:14;92:23
**narrowcast (1)**
13:9
**narrowest (1)**
81:15
**narrowly (1)**
62:4
**narrows (1)**
82:1
**nature (2)**
29:22;66:3
**necessarily (2)**
47:20;85:16
**necessary (5)**
21:24;24:2;41:18;
66:12;88:20

**need (24)**
23:15;27:20;36:3;
44:16;49:15;53:23;
54:12;55:16;57:25;
58:21;59:5;69:16;
78:15;86:20,21;
91:19;101:25;
102:18,20,22,24;
103:1,23;105:14
**Needless (1)**
78:22
**needs (5)**
9:9;64:15;74:7;
84:10;94:8
**negotiate (1)**
80:18
**negotiated (2)**
33:10;34:22
**negotiation (4)**
33:3;76:16,25;
77:20
**New (7)**
4:6;5:7,15;6:16;
7:5;21:22;90:16
**news (2)**
67:21;72:22
**next (4)**
16:3;68:12;
103:21;104:1
**nice (2)**
25:19;81:4
**nobody (5)**
11:24;40:25;
42:20;60:23;100:21
**none (2)**
94:18;97:9
**nonetheless (1)**
41:5
**nonexperts (1)**
66:4
**noon (3)**
10:25;11:1,2
**nor (1)**
15:20
**normal (1)**
38:6
**north (1)**
99:3
**nose (1)**
47:4
**notably (2)**
14:10;49:2
**note (6)**
15:3;20:21;49:7;
65:16;71:4;90:8
**noted (2)**
19:23;102:12
**Noteholder (6)**
7:3,12;16:18;51:3,
9;61:25
**noteholders (14)**
15:13;24:9,13;
26:23;32:23;33:17;

41:11,15;43:5,6;
56:12;57:5,12;59:22
**notes (3)**
52:8;60:7;66:10
**notice (3)**
84:23;101:23;
102:5
**notion (3)**
33:2;49:21;104:2
**notwithstanding (2)**
89:12;98:23
**nuclear (1)**
44:22
**nudge (1)**
69:10
**number (16)**
9:18;13:7,15,21;
30:18;36:2,4,5;54:8,
9,15;55:5;56:1,6,18;
60:25
**numbers (1)**
54:17
**numerous (1)**
28:12
**NW (2)**
4:15;6:6
**NY (5)**
4:6;5:7,15;6:16;
7:5

## O

**oath (1)**
31:4
**object (4)**
48:13;78:11;
87:22;102:22
**objected (3)**
58:15;68:24;90:10
**objecting (1)**
103:13
**objection (21)**
10:12,24;69:23;
70:18;77:10;87:8;
91:17;92:15,17;
93:13;94:16;96:20;
97:19;102:19;103:7;
104:21;105:1,5,7,10,
11
**objections (3)**
8:17;10:1;48:10
**objective (1)**
86:18
**obligated (4)**
33:1;41:16,17;
90:4
**observations (3)**
59:11;60:7;66:20
**obviously (8)**
16:9;23:2;32:3;
83:15;85:22;86:20;
102:6;103:7
**occurred (1)**

10:1

**occurring (1)**
93:6

**occurs (1)**
85:11

**o'clock (2)**
78:24;101:13

**odd (1)**
85:7

**O'DONNELL (51)**
7:7;11:17;14:6,10;
15:10,12,13;16:7;
17:5,9,12,16,19,23;
18:1,6,8,12,16;19:3,
18;20:12,16;21:6,14;
22:7,13,17,20,22,24;
23:21;24:4,17;26:1;
32:1;39:7;46:18;
50:14,19,22;51:17;
52:6,23;53:4,6,9;
59:22,25;67:8,12

**O'Donnell's (1)**
13:25

**off (15)**
28:4;44:8;49:24;
61:11;63:2;64:2,10;
70:15;74:3;76:1;
80:8;85:21;86:19;
87:14;97:2

**offer (5)**
19:24;21:1;26:18;
58:16;79:12

**offered (1)**
34:6

**offering (2)**
96:13,14

**office (1)**
70:8

**officer (1)**
66:16

**official (5)**
12:20;32:11;56:9;
69:10;73:3

**offsetting (1)**
30:4

**often (2)**
35:17;62:11

**once (7)**
34:9;36:17;44:16,
22;45:3;61:8;67:19

**One (52)**
4:5;7:4;9:7,21;
10:17;13:1,5;14:5,8,
9;15:3;17:19;19:14,
14;21:15;24:21;
27:15;28:7;30:12;
31:18;35:17;37:8,
22;38:19;42:7,25;
52:9;57:20;61:25;
62:5;65:1;72:25;
73:14;76:13;79:7,
18;81:9;82:10,24;
83:5,21;84:17,23;

87:24;88:8;90:15;
92:9;94:15,16;
99:24;100:6;105:14

**one- (1)**
97:14

**O'NEILL (16)**
8:8,11,15;9:1,20;
10:8,17;11:1,4,8,10,
14,16;31:12;32:7;
58:12

**one-million (1)**
99:1

**one-million-dollar (2)**
97:11;99:7

**one-page (1)**
81:23

**one's (3)**
84:20;85:3;94:13

**ongoing (1)**
62:18

**only (32)**
10:21;12:25;
19:19;28:18;29:15;
30:19;31:13;36:16;
37:6;42:19;51:21;
54:22;61:6;65:11;
66:14;71:4;73:10;
75:4,7,23;76:11,13;
79:12,14;80:6,22;
82:10,21;84:12;
87:10;91:11;96:25

**onward (2)**
39:25;43:2

**open (17)**
21:4;22:11;23:11;
28:8;29:10;36:18;
44:6,9,9;45:2;46:11;
53:23;59:3;61:8;
68:4;70:1;71:7

**opened (2)**
37:9;47:5

**opening (4)**
18:4;43:5;48:21;
61:3

**operations (1)**
73:6

**opine (1)**
18:19

**opining (1)**
26:24

**opinion (33)**
13:1,2;25:1;26:16,
16;29:22;30:15;
33:23;34:13;38:11,15,
16,17,18;45:17,17,
24,25;49:21;63:13,
18,25;65:3,3,12,18,
19;66:5,7,7,7,18;
88:23

**opinions (5)**
16:5;19:11;28:17;
31:15;49:16

**opportunity (2)**

18:18;31:22

**opposed (1)**
18:19

**options (1)**
95:12

**oral (5)**
8:15;58:11;67:24;
74:15;78:11;104:18

**order (12)**
8:12;9:5;10:12;
24:6;45:2;60:5;68:8,
11;69:2;84:10,11;
88:13

**original (3)**
90:12,12;100:7

**originally (1)**
101:22

**ORRICK (2)**
6:2,12

**OSG (1)**
96:11

**others (3)**
31:19;35:23;56:24

**otherwise (7)**
18:20;51:9;52:12;
53:21;77:18;101:12;
102:21

**out (52)**
10:15;11:5;13:11;
20:6;22:13;29:21;
32:18;33:8;35:5;
36:23;37:7;38:21,
23;40:7;45:11;
47:22;49:18;53:1,
14;55:3;57:21,23;
59:2,12,15,15;60:11;
62:5;65:18;66:18,21,
21;67:4,5;68:13;
69:20;70:22;71:17,
17,25;76:18;77:13;
81:11;85:17;86:6;
87:13;93:15;94:17;
103:20,22;104:20;
105:20

**out-clever (1)**
85:3

**outlined (1)**
9:22;15:1

**out-of-the-money (1)**
43:10

**outrageous (1)**
77:14

**outside (6)**
23:3,3;33:7;34:3,5;
41:11;60:23

**outsider's (1)**
65:6

**outstanding (1)**
83:22

**over (14)**
11:16;15:21;
28:12;29:3;37:15;
43:16;44:21;58:3;

67:10;83:16;84:6;
89:4;97:12;100:14

**overlay (1)**
30:18

**own (7)**
19:7;33:25;63:3,8;
76:5;88:5;91:23

**owner (4)**
45:21,21;65:9;
66:19

---

# P

**Pacific (1)**
7:13

**package (1)**
68:18

**page (4)**
10:11;25:24;
62:25;63:24

**pages (2)**
10:13;64:7

**paid (9)**
9:8,9;74:9;76:23,
23;89:21;90:3,4;
95:25

**panel (1)**
45:19

**paragraph (1)**
48:14

**parameters (1)**
78:16

**pardon (2)**
16:24;69:20

**parent (4)**
73:5;75:5;90:1,6

**Park (1)**
7:4

**part (14)**
16:16;25:2;34:11,
12;43:19;46:1;49:5;
61:23;67:10;76:24;
80:14;88:4;89:24;
90:17

**partially (1)**
85:13

**participant (2)**
26:17;62:23

**participants (1)**
30:9

**participate (1)**
63:1

**participation (1)**
63:6

**particular (3)**
26:24;39:6;60:5

**particularly (3)**
21:21;30:20;88:11

**parties (33)**
8:11,16;9:6;23:10;
25:4;29:7;31:17;
34:21;35:4;36:25;
40:12,25;41:6;43:3;

44:5,18;45:5,8,23;
46:21;48:25;52:24;
53:13;55:2;61:13;
63:7,12;66:9;81:25;
83:16;90:10;100:16,
25

**parties' (5)**
9:14;31:19;32:24;
76:19;80:20

**partners (1)**
67:8

**parts (1)**
16:6

**party (18)**
19:24;29:19;
37:10;39:20,24;
42:16;43:22;44:11;
45:13;47:24;49:18,
18;60:20;62:23;
66:23;71:5,10;100:1

**party's (2)**
37:22;39:8

**past (5)**
19:9;23:4;29:4;
37:5;83:17

**path (1)**
99:11

**pattern (1)**
28:6

**PAUL (1)**
5:2

**payable (2)**
75:22;91:16

**payment (9)**
73:16;76:4,7;
80:13;82:15;83:8;
90:8,24;97:14

**pays (1)**
88:9

**PDF (1)**
16:2

**Peck (2)**
25:18;26:1

**Peltz (2)**
25:10,10

**penalize (1)**
93:2

**penalized (2)**
87:4;93:4

**penny (1)**
36:18

**people (31)**
17:2;19:4;20:18;
23:12;29:11;31:13;
32:15;33:8,9,24;
34:11;36:8;40:15;
43:10;45:1,5;46:21;
48:10;49:18;53:17;
59:4,4,6;61:9;62:10;
70:8;76:17;87:11;
88:16;93:9;96:13

**people's (1)**
47:9

per (1)
9:14
percent (3)
18:25;19:1;32:2
perception (2)
65:6,10
percolate (1)
8:21
percolating (1)
8:20
perfect (1)
37:18
perfectly (1)
23:22
performed (1)
26:11
perhaps (4)
78:4;86:19;88:15;
89:14
period (1)
10:20
permissible (4)
33:20;63:7;66:7;
77:22
permission (4)
58:2,8;67:10;
105:23
permitting (1)
67:24
person (1)
45:11
personal (2)
65:6,10
persons (1)
32:16
perspective (4)
10:5;36:16;71:4;
94:6
persuaded (1)
89:14
persuasive (1)
30:17
perverse (2)
84:8;98:18
PETER (1)
6:18
ph (3)
65:1;66:9;103:11
phone (2)
71:22;101:6
phones (1)
70:9
phrasing (1)
94:7
pick (1)
45:13
pin (2)
40:10;49:14
place (1)
65:24
plaintiff (1)
25:23
plan (92)

14:15;31:17,18;
32:21,23,25;33:1,3,
10;34:22;35:5,7;
38:1;40:1,1,2;41:9,
14,17;42:4,4,8,22;
47:19;51:24;67:4;
74:1,22;75:24;
76:11;79:22,23,24,
24;80:3,7;82:14,14;
83:9;84:1,2,3,3,6,11,
12,13,19,21;85:16,
17;86:13,25;89:15;
90:16,23,25;91:1,9,
10,11,12,18;92:1,8,
12,12,21;93:7,16,21,
24,25;94:1,5,8;95:1,
2,2,13,24;96:1,10,15,
16;97:3,25;98:1,20,
21,21;99:12
planning (1)
103:13
plans (2)
89:7;97:9
Plaza (1)
4:5
please (6)
15:12;48:11;
67:19;72:22;78:18;
105:22
pleasure (2)
16:12;25:11
plenty (1)
79:1
PLIMPTON (1)
5:12
plug (1)
98:13
plus (1)
99:9
pm (7)
67:17,17;72:19,
19;81:20,20;106:6
podium (2)
11:24;32:10
point (51)
16:15;17:8;18:10,
12;19:8;20:13;21:1,
8;22:13;26:24;
30:20;31:14,17;
32:18;34:20;36:3,
25;39:7;41:21;
44:10;47:3;55:1,9,
24;62:21;66:23;
70:3;71:16;72:12;
73:14;75:4;77:7,19,
21;78:5,15;79:12;
80:19,22;81:16;
83:18;85:14;86:11;
92:10;93:9,12;95:3,
6;100:13;101:5;
104:19
pointed (2)
40:7;93:15

pointing (2)
16:17;39:7
points (11)
21:15;27:13;28:3,
13;32:12;59:3,14;
70:1;72:12;73:15;
78:21
poll (1)
19:4
popping (1)
17:3
portion (1)
67:25
posit (1)
46:5
posited (1)
47:14
position (10)
22:9;29:13;31:5;
54:12,13;56:3;76:6;
78:13;87:21;89:17
positions (1)
76:19
possible (5)
13:15;70:15;
85:11;97:1;104:13
posturing (1)
48:12
potential (1)
38:18
potentially (5)
9:13;28:9,24;
66:24;86:10
pound (1)
36:18
practical (1)
84:21
practically (1)
98:25
precedential (3)
9:13;22:15;60:10
precisely (1)
21:7
preclude (1)
55:16
predicted (1)
70:13
predictions (1)
70:10
predictive (1)
38:21
prefer (2)
68:17;103:7
preliminarily (1)
62:21
prepack (5)
75:24;82:13;84:3
pre-pack (1)
95:2
prepacks (1)
41:22
prepared (4)
26:12;73:24;

78:10;81:14
Pre-Petition (1)
5:5
pre-RSA (1)
24:10
present (6)
10:18;58:19;59:9;
71:10;84:5,12
presented (4)
25:14;49:5,6;
105:5
presenting (2)
60:21;62:23
presumably (4)
30:11;39:25;
51:20;81:25
presume (3)
13:11;56:6;106:1
presumed (1)
47:13
pre-trial (1)
35:21
pretty (1)
9:12
pretzel-like (1)
97:14
prevail (2)
84:9;87:8
prevailed (2)
92:14,17
prevailing (2)
94:21;99:17
prevails (1)
96:19
previously (2)
82:1,21
price (1)
64:21
principal (1)
102:13
principally (1)
9:21
principles (1)
61:7
printout (1)
25:24
prior (4)
23:12;29:4;51:5;
77:23
priority (1)
40:3
private (1)
26:15
privilege (4)
21:9;51:15,18,19
probably (22)
8:6;19:6;20:11;
42:14;55:5,7,17,18,
19,20;65:23;67:3,15;
71:14;78:5;79:12,
14;87:12;100:21;
101:12,25;102:21
probative (6)

13:10;15:1;19:7;
29:9;38:4;51:23
problem (17)
39:1;42:11;47:8;
48:23;53:1;86:3;
92:19,20;93:1,4;
96:8,8;103:22;
104:10,10,11,13
problematic (2)
75:5;104:8
problems (2)
38:18;45:17
procedure (2)
43:1;60:18
proceed (3)
9:1;11:22;52:18
proceeding (1)
91:13
proceedings (1)
106:6
process (4)
61:20;62:18;
88:18,22
product (1)
51:20
production (2)
50:8;61:19
productive (3)
44:19;56:2;68:22
professional (3)
10:8;92:4;102:11
professionals (1)
41:19
profit (2)
28:22;66:4
profitable (1)
8:22
profits (3)
66:3,13,15
progress (3)
9:18;12:22;68:25
projection (1)
66:3
projections (2)
26:12;64:8
prolonged (1)
55:4
promising (1)
20:22
proof (2)
43:25;47:25
proper (1)
29:16
pronoun (6)
20:4;23:14;31:18;
33:10;36:24;37:1
proponents (1)
31:17
proposal (7)
8:16,19;30:12;
71:17;82:10;90:12,
12
proposals (3)

58:12;68:17,18

**propose (3)**
68:2,6;69:2
**proposed (5)**
12:20;74:12;76:3;
81:24;97:10
**proposing (5)**
41:9,14;42:4,22;
89:7
**proposition (3)**
13:5;63:14;92:5
**propositions (1)**
12:24
**proprietary (4)**
33:24;44:14;
51:12;62:11
**propriety (1)**
31:15
**prosecuting (2)**
91:17;93:12
**protects (1)**
95:22
**provide (3)**
66:13;88:13;89:13
**provided (11)**
9:11;49:2;60:10;
66:15,23;81:22;
82:19;83:23;88:12;
89:12;90:9
**provides (4)**
43:9;64:4;96:1,10
**providing (8)**
44:2,6;77:12;
80:16;85:15;92:24;
100:1;102:15
**proving (2)**
86:23;87:3
**provision (1)**
42:4
**proxy (1)**
32:5
**prudent (1)**
63:20
**PSAs (1)**
41:22
**public (3)**
26:4;30:13;73:10
**pull (1)**
98:12
**punt (1)**
23:6
**purchase (1)**
89:6
**purely (1)**
88:11
**purpose (1)**
34:10
**purposes (13)**
28:15;30:21;
41:25;55:21;59:14;
76:19;79:8;81:6;
84:20,21;87:19;
92:25;98:2

**pursuant (3)**
96:15,16;97:3
**pursue (1)**
91:19
**push (1)**
70:6
**put (31)**
16:21;20:11;
21:16;23:23;26:20;
27:1;31:1,5;33:7,7;
37:15;38:13;40:10,
13,13;46:19;47:4;
49:14,16,21;52:4;
59:11,20;68:14;
69:13;70:3;78:9;
93:9;104:6,15,17
**putting (9)**
22:4;31:21;33:4;
36:24;37:1;45:16;
50:2;94:2,20

---

## Q

**qualify (1)**
32:16
**quarter (1)**
72:8
**quibble (1)**
52:15
**quick (1)**
32:12
**quickly (6)**
17:25;69:25;71:6;
73:2;79:13;104:13
**quirk (1)**
89:20
**Quite (5)**
83:14;89:6,10;
90:11;98:14
**quote (1)**
20:14
**quoted (1)**
21:8
**quotes (1)**
65:25

---

## R

**raise (1)**
45:14
**raised (1)**
29:25
**raising (2)**
14:7;26:3
**ram (1)**
77:8
**ran (1)**
68:5
**range (1)**
64:3
**ranges (1)**
26:5
**rates (2)**

32:1,2
**rather (6)**
14:9;20:24;39:8;
44:20;69:6;100:13
**re (1)**
60:9
**reach (8)**
55:15;71:25;77:2,
5,6;79:7;81:5,13
**reached (2)**
12:1;64:12
**reaching (2)**
78:5,6
**read (9)**
11:23;13:11;
14:12,16;16:4,4,5;
24:25;60:8
**readily (1)**
73:2
**reading (4)**
9:10;16:12;19:21;
25:11
**ready (1)**
67:4
**real (4)**
39:1;45:17;47:8;
72:3
**realistically (1)**
88:3
**realize (1)**
20:9
**really (35)**
14:23;19:3;21:15;
23:13;24:7,23;
38:22;45:15;48:15;
52:3,21,25;55:16;
65:7;70:7;72:9;
76:24;77:13,20;
78:2;79:12,20;
84:25;87:2,11;
88:19;93:15;95:12;
99:1,23;100:3,7,11,
24;101:14
**reason (7)**
16:24;17:9;35:8;
47:18;70:20;103:22;
105:21
**reasonable (6)**
30:16;32:24;43:7;
57:22;77:15;95:23
**reasonableness (1)**
64:9
**reasons (1)**
100:6
**rebound (1)**
52:20
**rebuttal (15)**
20:1;21:25;22:4,
10;23:10,23,25;28:8;
31:5;49:16,21;
53:22;54:23;55:14;
66:22
**recalls (1)**

73:9
**recap (1)**
11:24
**recapitulate (1)**
31:13
**receive (2)**
90:14;100:2
**received (1)**
8:19
**recently (2)**
28:20;50:6
**recess (4)**
67:2,17;72:19;
81:20
**recognizable (2)**
38:11;65:15
**recognize (1)**
20:13
**reconvene (1)**
72:10
**record (21)**
40:24;42:1;46:11;
48:11;49:22,22;
50:1;54:2;55:21;
58:1;59:14,20;
61:18;68:14,16;
78:9;81:7,21;82:8,
12;87:20
**recorded (1)**
81:7
**recoveries (1)**
79:25
**recovery (6)**
42:7;74:23,25;
75:7,17;96:1
**redundant (1)**
95:12
**reference (3)**
65:24;82:22;91:4
**referred (1)**
14:1
**referring (1)**
52:6
**refers (2)**
26:1,2
**reflected (1)**
83:15
**reflects (1)**
63:13
**regarding (4)**
43:1;62:24;64:12;
66:4
**reject (2)**
47:21;49:20
**rejecting (1)**
47:22
**related (5)**
15:16;38:1;41:2;
64:6;68:4
**relates (6)**
15:17;21:14;24:7;
25:1;51:4,24
**releases (1)**

97:7
**relevance (11)**
13:18;14:8,9;23:1;
34:7;35:11,16,17;
36:6;62:14;65:13
**relevancy (1)**
15:16
**relevant (17)**
13:9;16:5,24;
18:16;19:17,22;
20:3;25:6;26:25;
31:24;41:13;42:3,
21;47:2;48:3;49:15;
60:24
**reliable (1)**
66:13
**relied (2)**
24:23;30:24
**relies (1)**
42:16
**religion (2)**
100:16;105:21
**rely (1)**
35:9
**remain (3)**
24:1;28:21;51:12
**remaining (2)**
57:11;69:24
**remains (1)**
51:25
**remarks (1)**
31:11
**remember (1)**
57:8
**remind (2)**
89:25;103:25
**reminded (1)**
50:6
**reminder (1)**
106:3
**reminds (1)**
45:18
**removed (1)**
82:22
**RENENGER (7)**
4:18;54:5,5;55:23;
56:14,16;57:14
**renewed (2)**
8:2;77:22
**reorganization (2)**
74:22;84:13
**repeat (2)**
13:12;74:15
**reply (1)**
10:15
**report (32)**
8:8;20:1;21:2,24,
25;22:10;23:10,23,
25;26:20;28:8;
30:22;31:2,6;66:23;
77:12;79:21;80:16;
83:24,25;84:10;
85:15;86:13;88:14,

19;89:3,14,14;94:3,
10,20;98:19
**reports (7)**
21:15,25;22:4;
53:22;55:14;64:11;
104:1
**represent (3)**
30:20;32:20;50:6
**representing (2)**
28:13;29:25
**reputable (1)**
21:20
**request (9)**
10:9;14:14;15:14,
19;73:15;90:21;
94:23;101:20;
102:19
**requested (1)**
82:25
**requests (5)**
12:23;14:10,13;
50:8;82:25
**required (3)**
23:25;26:20;65:22
**requirement (1)**
84:24
**requirements (2)**
89:8,10
**requires (1)**
66:1
**requisite (1)**
65:10
**reserve (3)**
35:10;55:25;
103:18
**reserved (1)**
68:9
**reserving (1)**
21:21
**resolution (2)**
9:2;90:17
**resolve (7)**
8:17;58:10;78:8;
87:17;101:18;105:3,
4
**resolved (7)**
12:1;36:2;69:24,
25;71:5;73:2;104:21
**resolves (1)**
84:21
**resolving (1)**
104:2
**resources (1)**
75:22
**respect (7)**
50:7;54:8;73:4,17,
20;75:23;82:16
**respectfully (1)**
46:10
**respective (2)**
18:23;19:1
**respects (2)**
82:18;83:3

**respond (9)**
16:9,16;19:13;
27:13;70:11;71:7;
78:21;87:20;102:18
**responding (1)**
71:16
**response (5)**
8:19;10:20;44:17;
78:10;88:16
**rest (3)**
71:9;72:6;73:25
**resting (1)**
62:16
**restructured (1)**
86:16
**restructuring (3)**
74:21,22;84:7
**result (12)**
28:13;75:25;
76:20;87:3;89:18;
91:7,18,18;93:25;
95:23;98:18;100:21
**results (2)**
93:6;98:17
**retain (1)**
92:4
**retention (6)**
8:3,7,18;101:21;
102:13;103:12
**rethought (1)**
87:12
**reverse (1)**
8:12
**review (1)**
82:24
**reviewed (1)**
58:16
**reviewing (1)**
54:3
**revisit (3)**
20:7;23:24;42:2
**revisited (2)**
64:7;66:8
**revisiting (2)**
22:8;66:22
**RICHARD (1)**
5:17
**ridiculous (1)**
79:10
**RIFKIND (1)**
5:2
**Right (104)**
10:7,14,23;11:3,3,
18;12:7,8,22;15:7;
17:20,22;18:11,14;
21:13,22;22:6,9;
24:3,16;25:25;
27:11;29:20;30:8;
31:7;32:2,8;33:21;
35:16,17;37:7,8,25;
38:16;40:24;42:11;
43:21;44:17;48:22;
49:11,12;50:4,11,13;

52:6;53:5,8;55:25;
56:7,17,23;57:10,13,
15;58:6,25;59:8,10,
21,23;60:1,4;68:13;
69:22;70:2,17;
71:12;72:4,14,16;
73:22;74:10;75:18;
76:4,5;78:17;81:3,
17,21;82:15;83:2,2,
11;86:9;87:18,23;
89:22;91:15;92:6,9;
93:9;94:22,24;
97:25;98:8,10;
100:22;102:4,7;
103:3,8,19;105:6,19
**rights (4)**
21:21;69:4;96:13,
14
**ripe (1)**
54:7
**rise (2)**
67:18;103:15
**rises (1)**
102:17
**rising (1)**
11:19
**risk (3)**
99:24;100:2,4
**risks (1)**
79:11
**road (1)**
62:7
**robust (2)**
55:21;62:17
**rocks (1)**
99:19
**ROGOFF (47)**
58:1,2,4,7,23;59:1,
6,9;68:2,16,16;69:8,
23;72:21,23;73:23;
75:14,19,21;76:9;
77:11;78:22;82:6,8;
83:10,15,23;87:18;
89:5,24;92:7,19;
93:4,14,19;94:19,23,
25;102:11;103:1,10;
104:24;105:3,7,13,
17,20
**Rogoff's (1)**
95:11
**role (1)**
69:10
**room (3)**
19:4;59:7;87:11
**rooms (1)**
86:2
**Rothschild (30)**
5:13;8:3,7,9,18;
58:10,13;68:23;
69:25;70:14;71:7;
73:16,21;76:2;
78:12;83:19,24;
84:3;85:21;88:8,9,

12,16;89:1,12;90:14;
91:15;92:3;99:24;
100:3
**Rothschild's (5)**
21:19;58:17;
69:19;87:3;98:19
**roughly (1)**
63:24
**RSA (39)**
8:15;16:22;17:13;
18:14,25;19:1;23:10,
12;24:7,11;29:4;
36:25;38:1;39:20,
24;40:12,25;43:7,20,
22;44:5;45:5,8,9,12;
47:24;48:25;51:5;
55:1;60:20;61:13;
63:7;66:23;80:7;
81:25;90:10;91:18;
99:3,9
**RSAs (1)**
41:22
**rule (14)**
24:6;26:20;40:3;
48:9;50:15;60:17;
65:5,22;66:10;77:3;
79:11,16;80:19;95:8
**ruled (2)**
19:16;39:10
**rule-recognized (1)**
36:7
**rules (3)**
38:12;50:15;60:17
**ruling (19)**
9:4,7,14;22:14;
50:25;51:13;52:12;
62:21;77:1,21,23;
78:3,14;79:9;80:19,
21;81:17;87:16;
101:8
**rulings (1)**
48:17
**run (3)**
35:20;50:16,17

## S

**sale (6)**
37:3;61:2;73:18;
91:21;93:22,24
**same (18)**
10:15;16:11;
32:19;35:20;38:10;
39:4;43:22;51:25;
52:2;56:18;59:4;
61:7;64:4;65:17,19;
71:8;82:18;87:25
**SAMUEL (1)**
4:9
**sand (1)**
24:19
**SARAH (2)**
7:17;67:9

12,16;89:1,12;90:14;
91:15;92:3;99:24;
100:3

**sat (1)**
62:9
**satisfaction (1)**
61:21
**satisfied (1)**
91:6
**satisfy (1)**
42:3
**save (1)**
101:6
**saw (3)**
17:2;103:14,14
**saying (27)**
12:4;25:3;26:23;
28:4;31:15;32:5;
36:7;37:3,7;39:3;
46:13;47:2,23;48:1;
52:1;63:2;64:2,10,
13;65:25;77:11,17;
78:6,7;89:19;92:13;
102:19
**scenario (5)**
74:24;84:12;91:8;
94:4;96:25
**scenarios (1)**
13:21
**schedule (9)**
10:3,6,18;35:24;
50:12;87:16;100:18;
103:6,20
**scheduled (1)**
15:4
**scheduling (1)**
103:17
**SCHULTZ (4)**
7:17;67:9;101:1,9
**scope (6)**
12:6;13:14,16;
53:15;82:1,25
**screaming (1)**
45:9
**se (1)**
9:14
**SEAN (3)**
7:7;15:12;16:25
**search (1)**
80:13
**season (1)**
53:23
**seated (2)**
67:20;72:22
**second (9)**
10:9;13:6;36:25;
38:14;65:2;89:2;
90:8,18;102:3
**seconds (1)**
16:16
**Section (1)**
40:4
**secured (6)**
4:4,14;5:5;28:2;
51:4;80:5
**secureds (1)**

24:9

**securities (2)**
26:4;29:12

**seek (4)**
13:3,8;63:2;75:7

**seeking (2)**
74:25;75:8

**seem (4)**
20:7;21:3;74:6;
86:3

**seems (7)**
15:15;40:15;
41:20;45:15;54:23;
85:9;86:21

**segue (2)**
9:16;58:4

**seguing (1)**
58:3

**seldom (1)**
57:22

**selective (1)**
20:19

**selectively (1)**
16:4

**self- (1)**
55:11

**sell (2)**
95:20;97:2

**selling (3)**
76:1;80:8;85:20

**send (2)**
38:9;83:6

**sense (13)**
20:11;23:11;
48:20;51:15;55:21;
68:14;69:14,16,17;
70:7;75:6;81:1;
99:14

**sensible (1)**
23:8

**sensitive (1)**
62:8

**sent (4)**
15:21;54:10;82:9;
83:4

**separate (3)**
53:17;61:4;75:19

**series (1)**
104:7

**serious (2)**
37:17,19

**seriously (1)**
35:25

**serve (2)**
30:19;102:15

**serves (1)**
70:21

**service (1)**
53:16

**services (2)**
88:12;89:13

**set (7)**
13:18;21:7;36:4;

92:11;93:16,19;
94:13

**sets (1)**
24:23

**setting (1)**
35:19

**several (1)**
34:20

**shades (1)**
23:5

**Shannon (16)**
14:1,2,3,6;19:22;
20:10;22:14;33:24;
36:23;40:7;43:21;
44:13;47:1;62:4,15;
63:9

**Shannon's (5)**
30:1;35:18;44:2;
60:8;62:20

**share (2)**
34:2;105:8

**shared (18)**
16:11;19:20;34:4;
35:3;36:19;41:7,10,
11;44:12;47:10;
51:22;52:9,10,10;
53:18;60:23;65:13;
82:21

**sharing (1)**
52:4

**sheet (1)**
24:11

**shift (1)**
69:8

**ship (1)**
85:21

**Shipper (1)**
102:16

**shipping (13)**
18:22;28:23;73:4,
9,17,20;74:1;79:22;
90:1;91:1,22;95:13;
97:4

**ships (1)**
95:20

**shoe (1)**
41:3

**shoes (1)**
23:13

**shoot (1)**
105:22

**shop (2)**
34:3,5

**short (4)**
33:9;68:5;78:3;
101:22

**shorted (1)**
29:11

**shortened (1)**
102:5

**shot (3)**
45:14;92:9;98:10

**shots (1)**

40:15

**show (2)**
27:2;53:19

**showed (1)**
37:8

**shower (1)**
18:20

**showing (3)**
9:8;13:6;88:17

**shown (2)**
83:15;92:25

**shows (1)**
28:6

**sick (1)**
80:25

**side (12)**
9:7,9;27:15,15;
29:2;32:20;38:9;
61:9;80:15;87:24,
25;92:13

**Sidley (3)**
12:20;56:9;67:23

**signed (3)**
16:23;17:13;18:14

**significant (1)**
55:17

**Similar (4)**
26:8;60:20;64:20;
85:14

**simple (1)**
12:25

**simply (8)**
36:4;69:2;77:12;
80:16;87:1;90:7;
92:21;94:20

**single (1)**
76:1

**sit (2)**
17:20;55:6

**sitting (5)**
20:21;42:19;
44:17;71:18;100:22

**situation (4)**
80:7;85:18;97:2;
100:23

**situations (3)**
23:2;69:11;99:25

**six (17)**
12:4;34:13;50:9;
54:9,12;55:5,9,13,
16;56:5,7,12,14,16;
57:5,7,9

**sixth (1)**
57:1

**slide (1)**
56:10

**slippery (1)**
87:10

**slog (1)**
101:17

**slope (1)**
87:10

**small (1)**

45:22

**smallest (1)**
13:14

**smart (1)**
87:11

**sneak (1)**
13:2

**sold (3)**
29:6;80:4;85:19

**solely (3)**
50:7;73:17;74:2

**solution (1)**
30:1

**solved (1)**
97:1

**solvency (2)**
25:15;26:6

**solves (1)**
84:25

**solving (2)**
96:5,7

**somebody (12)**
17:21;19:7;26:16;
33:25;37:2;38:20;
45:23;49:19;51:2;
54:24;93:12;99:5

**somebody's (3)**
47:4;63:8;77:8

**somehow (4)**
13:2;43:24;46:10;
84:22

**someone (2)**
47:19;99:14

**someone's (1)**
65:20

**sometime (1)**
104:2

**sometimes (1)**
52:24

**somewhere (2)**
42:19;86:8

**Sons (1)**
65:1

**soon (8)**
70:15;71:13;72:2,
2,3,4;78:6;80:22

**sooner (2)**
101:15,15

**sophisticated (1)**
26:17

**sorry (3)**
53:9;83:25;101:1

**sort (20)**
20:20;21:2,3;
38:25;40:10;51:15;
53:17;56:21;59:2;
65:4;69:10;70:20,
24;77:4;80:15,20;
84:24;89:24;91:2;
99:10

**sorts (1)**
49:8

**sound (1)**

27:6

**sounds (1)**
103:7

**speak (3)**
69:18;71:15;103:1

**SPEAKER (4)**
16:25;17:15,18;
23:18

**speaking (1)**
23:12

**specific (3)**
64:17,18;73:6

**specifically (3)**
28:24;84:5;97:10

**specifics (3)**
68:21;72:23,24

**speculative (1)**
65:21

**spend (3)**
44:18;53:18;79:1

**spending (1)**
36:11

**spent (3)**
67:25;79:13;88:4

**SPEs (1)**
73:13

**spit-balling (1)**
87:9

**spot (2)**
42:23;70:3

**spring (1)**
20:3

**springs (1)**
104:16

**stage (1)**
94:9

**STAMER (2)**
7:8;67:8

**stand (4)**
25:17;43:4,20;
80:5

**standard (5)**
40:14;45:13;46:2;
66:24;86:18

**standing (2)**
29:7;44:3

**start (12)**
8:6;9:7,18;17:7;
22:2;28:4;44:5;
48:13;62:5;69:6;
76:1;100:12

**started (2)**
27:6;100:12

**starting (1)**
76:16

**starts (1)**
82:17

**stated (1)**
54:9

**statement (1)**
48:16

**statements (2)**
81:14;104:18

**status (1)**
72:24
**stay (4)**
55:9;67:9;69:19;
81:10
**steering (1)**
50:7
**step (2)**
47:25;88:20
**steps (1)**
41:18
**stetting (1)**
83:1
**Steven (2)**
12:19;32:11
**sticking (4)**
72:1,1;73:14,15
**still (10)**
10:4;13:16;51:12;
54:7,11;68:4;69:5;
91:19;100:14;
104:22
**stock (2)**
10:1;64:21
**stood (3)**
32:19;43:3;52:23
**stop (2)**
65:24;105:24
**straight (1)**
46:2
**STRAUSS (2)**
7:2,11
**Street (3)**
4:15;6:6,15
**strike (1)**
40:19
**striking (1)**
70:19
**strongly (2)**
46:25;77:5
**struck (1)**
19:22
**structural (1)**
89:20
**structure (2)**
73:9;86:13
**structured (1)**
91:8
**struggling (1)**
93:20
**stuff (2)**
38:21;53:21
**subheading (1)**
63:25
**subject (17)**
20:7;21:5;33:11;
40:16;52:16;54:19,
22;55:14;66:22;
68:1;69:3;76:16;
77:15,20;82:24;
99:24;101:20
**subjective (1)**
66:2

**subjects (1)**
47:13
**submission (1)**
13:25
**submissions (2)**
47:14;59:19
**submit (9)**
24:1;30:22;48:1;
55:3;69:3;79:9;
84:10;98:17;100:11
**submitted (1)**
13:7
**submitting (3)**
46:7,8;94:10
**subsequent (3)**
63:24;86:25,25
**subsidiaries (5)**
74:4;80:4;84:14;
91:24;97:3
**subsidiaries' (1)**
97:9
**subsidiary (2)**
75:24;76:13
**substance (1)**
43:17
**substantial (2)**
26:5;83:2
**substantially (4)**
85:25;86:15,15;
95:19
**substantive (1)**
77:7
**substantively (1)**
74:5
**subtext (1)**
94:13
**subway (4)**
14:13;16:12;
25:11;101:7
**succeed (1)**
88:4
**succeeded (1)**
94:2
**success (1)**
26:2
**successful (5)**
86:22;91:17;93:3,
5,13
**sufficient (3)**
81:6;88:15;91:25
**suggest (4)**
8:12;35:12;37:16;
79:5
**suggested (1)**
47:1
**suggesting (1)**
95:5
**suggestion (3)**
79:6;92:20;102:2
**suggestions (2)**
86:4;96:6
**Suite (1)**
7:14

**super-super (1)**
101:22
**supplement (1)**
12:10
**support (11)**
32:20;33:1;40:1;
41:17,18;46:8,8,19,
20;68:23;84:7
**supporting (6)**
32:25;47:19,20;
58:15;68:1,24
**supports (2)**
43:6;83:20
**suppose (2)**
46:5;87:6
**Sure (17)**
8:10;12:11;37:10;
50:25;56:11;75:22;
80:11;82:4,7;86:2;
88:5;89:6;95:25;
96:5;97:8;99:18;
101:11
**surprising (1)**
28:21
**suspect (1)**
52:1
**suspenders (1)**
99:14
**SUTCLIFFE (2)**
6:2,12
**syndicate (5)**
28:11,19;29:3;
30:2,25

---

## T

**table (3)**
20:11;33:13,15
**talk (16)**
18:7;24:21;25:9;
29:18;47:4;50:5;
54:24;66:14;69:16;
83:22;98:15,22;
99:25;101:5;103:5;
104:13
**talked (1)**
98:16
**talking (25)**
19:9,15,20;27:6;
31:23,24;33:19,24;
40:16;41:9,10;
50:24;52:3;54:18;
55:12,13;56:11,12;
57:5;64:17;76:22;
85:20;91:7;94:4;
95:7
**talks (8)**
22:10;62:15;
63:19,25;64:8;65:2,
5;85:8
**tee (1)**
86:24
**telephonic (2)**

101:2,4
**TELEPHONICALLY (1)**
5:9
**telescoping (1)**
13:14
**term (2)**
24:11;63:1
**terminated (1)**
91:19
**terms (21)**
10:15;12:6;13:15;
30:3;39:15;51:1;
55:3,4;61:11;62:1,3;
66:24,25;68:19;
73:25;74:15;75:13;
78:11;81:14;82:10;
83:1
**terribly (1)**
66:2
**test (3)**
46:12;84:11;85:8
**testimony (12)**
13:1,2;26:19;
31:16;33:12;44:20;
49:3;62:24;65:8,12,
12;66:4
**TEV (1)**
26:25
**Thanks (1)**
54:5
**theirs (1)**
11:12
**theoretically (1)**
97:20
**therefore (1)**
8:22
**thinking (13)**
21:5;23:1;35:25;
39:1,6;42:22;60:11,
15;64:5;86:19;
99:17,20;105:24
**Third (6)**
5:14;29:19;31:16,
19;49:18,18
**thirty (4)**
16:16;61:13;81:2,
3
**thirty-day (1)**
27:6
**thirty-nine (1)**
19:1
**thorny (1)**
9:13
**though (4)**
13:13;24:18;
40:20;71:22
**thought (18)**
10:23,24,25;11:9;
20:11,23;32:15;
48:9;49:20;53:12;
56:24;72:11;75:11;
77:2;85:10;87:12;
88:15;96:14

**thoughts (1)**
60:11
**thousands (1)**
42:20
**three (13)**
15:16,25;16:1,25;
17:1;24:8,14;31:21;
52:7;56:24;57:20;
94:15;95:12
**threshold (2)**
93:16;95:4
**throat (1)**
77:9
**throwing (3)**
86:6;87:13;94:17
**Thursday (2)**
10:24;11:1
**tie (1)**
75:3
**tied (3)**
36:6;92:24;98:17
**tier (2)**
75:1;94:20
**tiers (2)**
90:15;94:15
**tight (1)**
38:17
**time- (1)**
36:6
**timely (1)**
71:16
**times (2)**
38:23;50:24
**timing (4)**
8:5;39:8;61:12;
84:24
**today (10)**
9:22;32:3;35:12;
54:9,19;56:7;71:18;
81:5;82:10;90:21
**together (8)**
8:16;33:4;35:25;
52:4;56:13;76:10;
79:2;93:10
**tomorrow (9)**
68:7,11;79:9;86:8;
87:16;100:17;101:2,
12;105:25
**tonight (3)**
69:21;70:16;71:16
**took (4)**
9:25;15:14;74:14;
82:9
**top (1)**
17:7
**total (2)**
56:14,16
**totally (1)**
20:24
**touch (2)**
46:22;105:24
**touchstone (3)**
63:9,10;64:21

GENCO SHIPPING & TRADING LIMITED, et al.

Case No. 14-11108-shl

June 3, 2014

**towards (4)**
25:6;88:20;92:3;
104:25
**town (1)**
71:12
**track (2)**
34:14;72:10
**traded (1)**
26:5
**trading (12)**
26:4;73:4,10,17,
20;74:2;79:23;90:1;
91:1,22;95:13;97:4
**traditionally (1)**
65:8
**transaction (37)**
25:4;68:4;73:15,
16,20;74:2,3,9;
75:12,13,23;76:2,4,
12;82:14;84:1;
85:16,20,21,22;
86:12,14,25;87:2,3;
88:24;89:3,11,16,21;
91:8,20;93:23,24;
96:13;100:2,10
**transactions (6)**
25:2,6;29:3;76:2;
88:25;89:10
**transcript (14)**
9:11;12:18;14:5;
19:21;20:14,18;
21:8;28:5,6;40:9;
42:1;44:14;60:9;
62:25
**tree (1)**
51:15
**trial (28)**
18:18;20:22;21:3;
22:1,5;23:6;27:7,8;
29:15;30:6;35:20,
22;36:9;37:21,25;
38:2;44:19,21;47:3,
7;48:12;53:16,19;
60:16,21;63:14;
65:14;99:8
**trials (7)**
36:20;37:14,15;
39:2;42:15;61:3,4
**tried (3)**
14:23,25;94:23
**trigger (8)**
73:16;80:16;
82:12,15;85:21;
90:24;91:6;94:1
**triggered (2)**
74:2;75:12,16;
91:16
**triggering (3)**
77:11;89:1,2
**triggers (4)**
76:4;88:11;89:16;
90:7
**trip (1)**

**101:7**
**trot (1)**
47:22
**trouble (2)**
96:18;99:20
**true (5)**
41:22;59:23;
61:14;67:13;84:2
**truly (1)**
47:19
**Trust (11)**
4:3,13;28:1,10,15;
29:25;30:23;49:14;
51:4;54:6;72:5
**truth (1)**
64:11
**try (15)**
18:3;21:11;26:18;
55:22;59:2;69:20,
24;70:15,18;85:3;
93:9;95:21;101:18;
103:19;105:20
**trying (24)**
11:6;14:24,24;
21:9;22:25;23:5,8;
36:17,23;40:9;
44:18;46:5;47:6;
60:13;71:24;77:8;
80:13;87:24;92:3,
11;94:12;95:15,16,
21
**Tuesday (1)**
105:14
**turn (1)**
11:16
**turned (1)**
29:3
**Turning (1)**
63:11
**turns (1)**
65:18
**tweak (1)**
37:23
**tweaks (1)**
31:25
**TWEED (3)**
4:2,12;27:25
**twenty (1)**
81:1
**twenty-four (1)**
68:12
**two (21)**
8:13;10:2;16:22;
19:14;21:15;22:4;
24:23;25:9;30:12;
38:18;42:8,24;
45:23;53:10;56:24,
24;66:14;83:17;
88:4;90:15;99:22
**two-and-a-half (1)**
30:13
**TX (1)**
7:15

**tying (2)**
75:4,6
**type (3)**
25:20;62:22;66:12

**U**

**Uh (1)**
59:23
**ultimate (3)**
13:10,17,17
**ultimately (6)**
55:5;78:13;91:12;
92:22;93:24;104:8
**umbrage (2)**
78:23;79:2
**unable (1)**
91:12
**uncertainty (2)**
100:24,24
**uncommon (1)**
42:11
**under (18)**
5:4;31:4;35:4,24;
38:11;40:3;63:25;
65:5;68:8;74:7;76:3,
22,23;77:22;93:10;
94:7;98:23;101:25
**underlies (2)**
35:6;40:3
**underlying (1)**
47:20
**undermine (1)**
27:3
**understandably (1)**
25:2
**understandings (1)**
22:12
**understood (8)**
14:17;16:8;24:6;
33:13;42:13;63:16;
64:15;78:25
**undertake (1)**
43:11
**undertaken (1)**
83:16
**unduly (1)**
54:14
**unearthed (1)**
42:19
**unfair (1)**
53:20
**UNIDENTIFIED (4)**
16:25;17:15,18;
23:18
**unintentional (1)**
11:8
**UNISON (5)**
67:6,16;72:18;
81:18;106:4
**universe (2)**
54:19;80:6
**unless (10)**

23:4;31:8;46:9;
51:8;54:1;62:22;
70:17;92:22;93:5,5
**unlikely (1)**
66:12
**unproductive (1)**
55:6
**unqualified (1)**
31:16
**unreasonable (1)**
94:14
**unreliable (1)**
26:10
**unrepresentative (2)**
28:18;29:1
**unsecured (1)**
25:23
**up (55)**
8:22;9:8;10:19;
11:5;17:3,21;26:18,
20;31:21;32:8,19;
33:23,25;34:8,14;
35:22;36:18;37:9;
40:13;43:3,4,11,23;
44:3,7;45:13;46:7;
47:5;51:16;52:23;
53:19,19;54:3,3;
55:10;57:1,18;
58:22;61:8;62:6,8,
12;69:1;80:6;81:8;
85:5;86:24;88:17;
90:8;94:10,13;96:2,
17;99:18;103:12
**upon (8)**
24:23;35:9;68:20;
78:20,25;79:15;
87:21,21
**urge (1)**
77:5
**urgency (2)**
71:2;72:7
**use (6)**
21:3;33:25;39:3;
48:20;63:16;68:12
**used (2)**
30:16;57:22
**useful (1)**
72:25
**uses (2)**
63:1;64:21
**using (2)**
26:11;30:9
**usually (1)**
27:14
**utility (3)**
78:7;87:10;94:18

**V**

**vacuum (1)**
48:3
**validity (1)**
64:8

**valuation (65)**
15:18;20:22;21:2,
4,16,23;22:1,5,10;
23:14;25:3;27:3;
28:9,17;30:21,24;
32:14;34:9,15,22;
35:6,9;36:19;37:25;
38:3,5;40:2,13;
41:23;42:6,9,15;
46:23,23;47:4,9,11,
24;48:3,24;49:2,17;
51:20;53:18;59:20;
60:21;61:4,15,17;
62:2;66:3,18,23,25;
84:10,11;94:21;
95:25;96:2,12,20;
98:19,20;99:9,17
**valuations (4)**
34:21;35:2;41:10;
52:3
**valuation's (1)**
99:2
**value (79)**
18:19,22;19:5,11,
17,25;20:5,5;22:12;
23:3,10,12;24:10,18;
25:6;26:6,16,18,19;
29:9,21;30:5;31:20;
32:1,4,4,5,6;33:14;
34:1;37:1,12;38:25;
40:11;41:1;44:6,11;
45:6,10;51:4,7,10,
23;62:10,16,19,24;
63:3,15;64:1,3,12,
13,14,17,18;65:5,7,
21;86:23;87:4,7;
90:14,16;92:4,10,15,
18,24,25;93:1,5;
95:17,23;96:14;
97:18;98:4,15;100:1
**value-destructive (1)**
92:5
**values (4)**
29:5;49:19;60:23;
98:3
**valuing (1)**
66:1
**various (6)**
42:14;60:6;69:16;
73:7;75:25;78:21
**versed (1)**
55:2
**versus (1)**
14:9
**vessel (2)**
73:18;80:3
**vessel-owning (3)**
73:8;75:25;76:13
**vessels (1)**
80:8
**vet (1)**
84:10
**vibe (1)**

70:20

**view (19)**
21:1,4;26:18;29:9,
15;36:15,16;44:10;
45:20;52:13;61:2;
64:1;66:6;70:3;75:4;
76:3;77:14;88:15,16

**viewed (3)**
22:14;60:25;74:20

**viewing (1)**
76:9

**views (19)**
28:22;29:5,21;
30:3,4,18;31:20;
34:9;45:9;52:16;
53:18;60:23;61:5,
10;62:18,20;63:15,
15;88:6

**vigorously (1)**
63:1

**violate (1)**
40:3

**virtue (1)**
23:25

**volunteered (2)**
19:18;24:5

**W**

**wait (1)**
68:15

**waited (1)**
37:8

**waiting (3)**
58:18;67:1;71:5

**waived (1)**
51:21

**walk (2)**
38:17;53:1

**walked (1)**
37:10

**walking (1)**
40:14

**walks (1)**
85:7

**wants (6)**
48:19;79:18;83:7;
88:21;95:9;101:5

**war (1)**
97:5

**Washington (2)**
4:16;6:7

**waste (2)**
30:5;48:12

**way (35)**
14:13;15:5;23:8,
14;25:11;36:7,22;
38:6;40:8;44:25;
46:1,25;55:8;57:16;
62:12;65:4;74:20;
78:4;80:13;84:17;
85:1,11;86:1;87:6,
14,17;92:15;93:10;

94:7,14,16;95:12;
100:12;102:18;
104:21

**ways (4)**
13:7;87:12;88:22;
89:3

**weapons (1)**
44:22

**Wednesday (1)**
104:1

**week (1)**
103:21

**weeks (3)**
16:22;22:5;29:4

**weigh (2)**
25:6;77:1

**weighing (1)**
14:9

**WEISS (1)**
5:2

**well-informed (1)**
66:1

**weren't (2)**
45:10;103:13

**West (1)**
6:15

**WHARTON (1)**
5:2

**what's (19)**
25:13;26:22;
28:25;29:2;30:15;
31:16;34:6,19;36:7;
39:3;44:15;49:5;
53:23;55:2;66:7;
74:17;77:19;85:6;
99:3

**whereas (1)**
26:8

**Whereupon (1)**
106:6

**white (1)**
23:2

**whole (4)**
20:18;45:16;
64:22;70:7

**who's (6)**
37:3;40:9;45:19;
71:5;87:25;88:6

**whose (1)**
73:10

**who've (1)**
87:11

**wildly (1)**
87:14

**willing (3)**
76:17,17;81:25

**Wilmington (10)**
4:3,13;28:1,10,15;
29:25;30:23;49:14;
51:4;54:6

**win (4)**
95:25;96:2,9;
99:18

**windfall (1)**
95:24

**wine (1)**
72:12

**wise (1)**
47:1

**withdrew (1)**
10:1

**within (4)**
26:5;29:16;52:7;
64:3

**without (5)**
54:19;62:21;
72:23;78:3;105:5

**witness (3)**
10:8;50:2;66:10

**witnesses (8)**
13:3;26:11;31:21;
34:14;45:24,25;
48:22;61:6

**Wobensmith (1)**
39:9

**won (1)**
52:15

**words (1)**
10:20

**work (15)**
11:5;51:19;53:25;
57:13,21;76:18;
77:13;80:14;94:23;
98:25;103:19,22;
104:12,20;105:20

**worked (5)**
10:14;11:4;53:13;
68:13;104:11

**working (7)**
53:19;58:14;59:6;
77:18;102:14;
104:22,22

**works (2)**
30:1;97:17

**world (1)**
22:8

**worried (1)**
95:15

**worse (2)**
80:23;88:19

**worth (2)**
55:18;97:12

**written (5)**
16:20;58:15;
68:24;105:9,11

**Y**

**year (3)**
29:4;32:3;37:8

**years (2)**
27:8;42:20

**yesterday (19)**
8:15;10:2,19;
12:24;15:15;16:9;
19:4;24:5,24;27:4;

54:19;56:5,7,18,23;
67:24;74:14;90:11;
102:12

**yesterday's (3)**
9:25;57:8;90:13

**York (5)**
4:6;5:7,15;6:16;
7:5

**Z**

**Zero (1)**
100:10

**zone (1)**
95:15

**1**

**1 (1)**
60:17

**1.3 (6)**
76:8;82:13,15;
91:3,15;95:20

**1.35 (19)**
75:2,8,9,16,21;
76:9,22;77:12;79:21,
24;80:2,13;83:8,22,
23;84:4;90:18;94:6,
25

**1.35's (1)**
77:17

**10005 (1)**
4:6

**10019 (2)**
5:7;6:16

**10022 (1)**
5:15

**10036 (1)**
7:5

**11 (8)**
74:1;76:11;82:14;
85:17;90:23,25;
92:1;94:1

**1129 (3)**
40:4;97:25;98:23

**1129a (1)**
97:22

**1152 (1)**
6:6

**11th (1)**
22:1

**1285 (1)**
5:6

**12th (2)**
22:3;23:23

**13 (1)**
45:18

**14 (1)**
18:15

**15th (1)**
6:6

**16 (2)**
18:23;60:17

**16th (3)**
16:20;17:13;18:13

**1700 (1)**
7:13

**17th (3)**
16:20;17:13;18:13

**1850 (1)**
4:15

**1st (1)**
82:17

**2**

**2 (2)**
63:19;101:13

**2.2 (1)**
74:21

**2.25 (3)**
74:24;80:1;90:19

**20005 (1)**
6:7

**20006 (1)**
4:16

**2007 (4)**
4:4,14;28:1;41:12

**2010 (1)**
5:4

**2013 (7)**
16:21,22;17:13,
14;18:13,24;39:20

**2014 (3)**
17:15,16;18:14

**21 (1)**
62:25

**22 (1)**
62:25

**23rd (1)**
22:2

**26 (1)**
26:20

**3**

**3 (1)**
101:13

**31st (4)**
16:22,25;17:14;
18:14

**334 (1)**
63:25

**347 (1)**
64:7

**348 (1)**
64:7

**363 (2)**
37:3;61:1

**4**

**4:02 (1)**
67:17

**4:30 (1)**
67:4

**GENCO SHIPPING & TRADING LIMITED, et al.**
**Case No. 14-11108-shl**                                      **June 3, 2014**

**400 (1)**
    7:14

## 5

**5 (2)**
    25:24;72:8
**5:12 (1)**
    67:17
**5:18 (1)**
    72:19
**5:50 (1)**
    72:19
**51 (1)**
    6:15
**52nd (1)**
    6:15
**54 (1)**
    48:14

## 6

**6 (1)**
    78:24
**6:03 (1)**
    81:20
**6:30 (1)**
    81:12
**6:33 (1)**
    81:20

## 7

**7 (3)**
    91:13;96:4,21
**7:06 (1)**
    106:6
**701 (3)**
    65:5,22;66:10
**702 (1)**
    66:10
**75,000 (1)**
    82:22
**75201 (1)**
    7:15

## 9

**919 (1)**
    5:14