# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

|  |  |  |
|---|---|---|
| Andrew R. McGaan, P.C.<br>To Call Writer Directly:<br>(312) 862-2183<br>andrew.mcgaan@kirkland.com | 300 North LaSalle<br>Chicago, Illinois 60654<br><br>(312) 862-2000<br><br>www.kirkland.com | Facsimile:<br>(312) 862-2200 |

July 17, 2014

**VIA ECF**

Hon. Christopher S. Sontchi
United States Bankruptcy Court
  for the District of Delaware
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

        Re:    July 15, 2014 Letter Submitted by the Indenture Trustee for the 10% First Lien Noteholders in *In re Energy Future Holdings Corp. et al.*, No. 14-10979, and *CSC Trust Co. of Delaware v. Energy Future Intermediate Holding Co. LLC et al.*, A.P. No. 14-50363.

Dear Judge Sontchi:

        Energy Future Intermediate Holding LLC and EFIH Finance Inc. ("Debtors") respectfully submit this letter in response to two arguments CSC Trust Company, the indenture trustee for the 10% First Lien Noteholders, ("Trustee") advances in its Tuesday letter brief, [D.I. 1572] ("Ltr.").

        *First*, the Trustee claims that it is entitled to discovery on the Debtors' solvency. But solvency is irrelevant to the controlling issue in this case: the interpretation of the plain language of the indentures. As other courts have held in similar circumstances, this Court should deny the Trustee's request for an inquiry into this irrelevant—and burdensome—issue.

        *Second*, the Trustee incorrectly asserts that the common interest privilege does not shield communications between the Debtors and the Ad Hoc Committee of EFIH Unsecured Noteholders. To the contrary, this Court has held that the common interest privilege applies in precisely these circumstances.

**I.**    **The Court Should Deny The Trustee's Request For Additional Discovery Regarding The Debtors' Solvency.**

        As an initial matter, the Trustee asserts that "solvency of the debtor *can be* relevant in makewhole disputes." (Ltr. at 4 (emphasis added).) The Trustee fails to explain, however, how

## KIRKLAND & ELLIS LLP

Hon. Christopher S. Sontchi
July 17, 2014
Page 2

solvency of the Debtors is relevant to *this* makewhole dispute. It is not, and the burdensome discovery requested to address this irrelevant question should be denied.

A.  **Background**

The heart of the makewhole premium dispute is whether the First Lien indentures provide for the payment of a so-called makewhole premium where EFIH's bankruptcy filing automatically accelerated that debt. The First Lien indentures plainly do not allow for such damages. EFIH and its lenders agreed in the two series of First Lien notes that EFIH's bankruptcy filing would be an event of default automatically accelerating the First Lien debt. That acceleration provision, Section 6.02 of the Indentures, provides only that EFIH's "outstanding Notes shall be due and payable immediately." It says nothing about the payment of a makewhole premium. Had the parties intended EFIH to pay a makewhole premium upon a bankruptcy-induced event of default, the drafters would have included such a provision. They did not, and the Court should not read a term into these contracts—negotiated at arm's length between sophisticated parties—that is not found anywhere in the indentures. That simple fact should be the beginning and end of this matter.

The Trustee responds that the repayment of the First Lien debt with proceeds of the First Lien DIP Financing constitutes an Optional Redemption (§ 3.07), thus requiring the payment of the Applicable Premium (§ 1.01) in addition to principle and accrued interest. But the First Lien Notes were "due and payable immediately without further action or notice," and, as courts across the country have held, a repayment in these circumstances is not an optional redemption. *See*, *e.g.*, *In re AMR Corp.*, 730 F.3d 88, 104 (2d Cir. 2013), *cert. denied*, 2014 WL 583570 (U.S. Apr. 21, 2014) (No. 13-971).

The First Lien Trustee and the Debtors disagree whether a makewhole premium is owed, and that contract-interpretation question is to be addressed on summary judgment and, as necessary, at trial. The Trustee and the Debtors *do* agree, however, that the terms of the indentures control this question. The Trustee's Tuesday letter makes clear that the First Liens assert a right to a makewhole premium "under the plain language of the Indenture," (Ltr. 3), and the Debtors similarly believe that the plain language of the indentures should settle this issue. Accordingly, to resolve this dispute, the Court will be asked to do nothing more than interpret the relevant indentures to determine whether their plain language "provide[s] for" a makewhole premium in these circumstances. *See* 11 U.S.C. § 506(b).

# KIRKLAND & ELLIS LLP

Hon. Christopher S. Sontchi
July 17, 2014
Page 3

      **B.**    **The Indentures Confirm That Solvency Is Irrelevant To Whether The Noteholders Are Owed A Makewhole Premium.**

      The Trustee has not explained, however, how discovery into the Debtors' solvency (or insolvency) might be reasonably calculated to lead to evidence relevant to the Court's interpretation of the indentures. *See* Fed. R. Civ. P. 26(b)(1). The plain terms of the indentures confirm that whether the Debtor is solvent has no bearing on whether the Noteholders are owed a makewhole premium. As a general matter—and without commenting on EFIH's solvency at all—a debtor does not have to be insolvent to file bankruptcy. *In re General Growth Properties, Inc.*, 409 B.R. 43, 60 (Bankr. S.D.N.Y. 2009) (citing cases). It is also a fundamental tenet of bankruptcy law that a debtor's solvency—without more—is not grounds for allowing claims against it. *See Bank of Montreal v. Am. Homepatient, Inc.*, 309 B.R. 738, 742 (M.D. Tenn. 2004) (rejecting "the proposition that a debtor's ability to pay the entire amount of damages a creditor seeks entitles a creditor to such payment"). And courts have rejected arguments to inject solvency issues into simple makewhole fights in other similar circumstances. *See, e.g.*, *HSBC Bank USA, National Ass'n v. Calpine Corp.*, No. 07 Civ 3088 (GBD), 2010 WL 3835200, at *4 (S.D.N.Y. Sept. 15, 2010) (holding the indenture did not provide for a prepayment premium and declining to award one even though the debtor was solvent); *see also* Br. for Appellees, at 32, *In re AMR Corp.*, No. 13-1204 (2d Cir. April 23, 2013) (Dkt. No. 61) (explaining that the bankruptcy court refused to allow discovery concerning the American Airlines Debtors' "intentions at the time it made [certain bankruptcy-related] Elections and … the Debtors' marketing efforts regarding the proposed new financing" because neither were relevant to the contract dispute concerning the availability of a makewhole premium).

      There is no reason to depart from that precedent here. Whether the First Liens are owed a makewhole premium turns on the terms of the indentures, and those agreements do not in any way suggest that EFIH's solvency as of the petition date might be relevant here. In fact, the words "solvent" or "solvency" do not appear in the agreements at all.

      More importantly, the indentures expressly confirm that solvency is irrelevant to whether a makewhole premium is owed. An Event of Default is defined as "any one of the following events"—including commencing a bankruptcy proceeding—"***whatever the reason*** for such Event of Default and whether it shall be voluntary or involuntary …." (§ 6.01(a) (emphasis added).) The plain terms of the indentures therefore establish that the reason for an Event of Default is irrelevant; rather, an Event of Default occurred the moment the Debtors filed their bankruptcy petition, irrespective of whether the Debtors were solvent. Moreover, even if the Debtors were solvent on the petition date, the indentures establish that merely "***commenc[ing] proceedings*** to be adjudicated bankrupt" (§ 6.01(a)(6)(i) (emphasis added)) causes the Notes to become "due and payable immediately" (§ 6.02); the contract contains no language providing that the Debtors must actually be found insolvent to trigger the Event of Default and resulting

## KIRKLAND & ELLIS LLP

Hon. Christopher S. Sontchi
July 17, 2014
Page 4

acceleration. The Court should apply the plain terms of the indentures, and should decline to read into the agreement a "solvent debtor" exception to the indentures' automatic acceleration provision. "The time and place" for the Trustee to have sought such an exception "was at the bargaining table." *In re Solutia Inc.*, 379 B.R. 473, 489 (Bankr. S.D.N.Y. 2007).

None of the authorities the Trustee cites even suggest that a debtor's solvency affects whether the indentures provide for a makewhole premium. (Ltr. 4.) Both *Chemtura* and *Premier Entertainment* addressed *no call* provisions—not makewhole premiums. *In re Chemtura Corp.*, 439 B.R. 561, 603-05 (Bankr. S.D.N.Y. 2010); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 636 (Bankr. S.D. Miss. 2010). In both of those cases, the courts held that the no call provisions at issue could not be specifically enforced to prevent the repayment of the notes because of the debtors' bankruptcy filings. *Chemtura*, 439 B.R. at 603; *Premier Entertainment*, 445 B.R. at 634. The courts concluded, however, that, where the debtor is solvent, the noteholders would have an allowed unsecured claim for breach of contract damages resulting from repaying the notes contravention of a no call provision. *Chemtura*, 439 B.R. at 604-05; *Premier Entertainment*, 445 B.R. at 636-37. Other courts have come to contrary conclusions, and the Debtors do not believe such a claim would be owed even if they are solvent. Regardless of the resolution of that issue, however, neither *Chemtura* nor *Premier Entertainment* holds that a solvent debtor will owe a makewhole premium where the indenture does not otherwise provide for one. In fact both cases as the first step in their analyses look to the indenture to determine whether a prepayment premium is owed.[1] *Chemtura*, 439 B.R. at 600-01; *Premier Entertainment*, 445 B.R. at 634.

Importantly, both *Chemtura* and *Premier Entertainment* focus on whether the claims for damages arising from repayment should be disallowed as unmatured interest under 11 U.S.C. § 502(b)(2). *Chemtura* suggests (in dicta) and *Premier Entertainment* holds that solvent debtors should not be able to avoid contract damages claims for breach of a no call provision using this Code provision. *Chemtura*, 439 B.R. at 604-05; *Premier Entertainment*, 445 B.R. at 637. The Trustee suggests that these holdings are somehow relevant by pointing out that solvent debtors "may not rely on the Bankruptcy Code to deny payment of a redemption premium otherwise required under state law." (Ltr. 4.)

---

[1] The Trustee also cites *UPS Capital Business Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1 (1st Cir. 2007), which is inapplicable here. There, the First Circuit ruled that the bankruptcy court erred by disallowing a makewhole premium as an unreasonable fee under 11 U.S.C. § 506(b), especially because the debtor there was solvent. *Id.* at 5. The article the Trustee cites is similarly inapt. *See* Scott K Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 ABI L. Rev. 537, 584 (2007). That article, discussing *Gencarelli*, contends that where debtors are solvent prepayment fees should not be disallowed as unreasonable under section 506(b). *Id.* Regardless of whether the Debtors are solvent, the Debtors have not argued that a makewhole premium on the 10% First Lien Notes should be disallowed as unreasonable under section 506(b).

## KIRKLAND & ELLIS LLP

Hon. Christopher S. Sontchi
July 17, 2014
Page 5

The Trustee misses the mark. Setting aside that these contracts do not "require" the payment of a redemption premium, as the Trustee suggests, the Debtors do not argue that makewhole premiums that the Trustee claims to be owed should be disallowed as unmatured interest under section 502(b)(2). Cases holding that solvent debtors may not make use of this provision to avoid makewhole premiums (or no call damages) are therefore beside the point.

In sum, the question before the Court instead is whether these indentures provide the Trustee with a makewhole premium in these circumstances. The Debtors' solvency or insolvency has nothing whatever to do with this straightforward question of contract interpretation. Discovery into this irrelevant question therefore cannot be reasonably calculated to lead to the discovery of admissible evidence. *See* Fed. R. Civ. P. 26(b)(1). Accordingly, the Trustee's request for extensive discovery on the irrelevant issue of the Debtors' solvency should be denied.

Finally, the Debtors wish to make absolutely clear, contrary to the Trustee's assertions, that they did not file bankruptcy to avoid paying any makewhole premiums. The Debtors instead sought bankruptcy protection for the completely proper purpose that EFIH was running out of cash. In fact, the Debtors are providing discovery that addresses this very point.

## II. The Common Interest Privilege Protects Communications Between The Debtors And The Ad Hoc Committee.

Although the Trustee states it does not "seek a determination" on the privileged status of certain documents, it also claims that the "Ad Hoc Committee cannot withhold documents on the basis of common interest privilege." (Ltr. 13, 11.) The Trustee then speculates that the Ad Hoc Committee "will be unable to establish that it shares a legal interest with the EFIH debtors" because, the Trustee argues, the Ad Hoc Committee's interest in the makewhole litigation is merely economic, not legal. (Ltr. 13 & n.5.) The Trustee is mistaken.

As a general matter, the common interest privilege applies in litigation where two or more parties face a common opponent, and counsel for those parties work together to prepare a defense as part of an on-going common defense strategy. *In re Cherokee Simeon Venture I, LLC*, Case No. 12-12913, (Bankr. D. Del. May 31, 2012) (citing *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362-66 (3d Cir. 2007); *Haines v. Liggett Grp.*, 975 F.2d 81, 94 (3d Cir. 1992)). The privilege can also extend to pre-petition discussions between parties with a common interest. *In re Leslie Controls*, 437 B.R. 493, 502 (Bankr. D. Del. 2010).

This Court explained in *Leslie Controls* the relevant question is whether the "Debtor shared information … that was related to the parties common legal interest against their 'common enemy.'" *Id.* There, this Court held that the common interest privilege protected pre-

## KIRKLAND & ELLIS LLP

Hon. Christopher S. Sontchi
July 17, 2014
Page 6

petition communications between the debtor and an ad hoc committee of unsecured creditors (specifically, asbestos plaintiffs). *Id.* As this Court explained, the ad hoc committee there "shared a common interest in maximizing the asset pool" and therefore questions that "go[] to the size of the asset pool" are "a matter of common interest." *Id.*

The reasoning in *Leslie Controls* applies with equal force here. The result of the makewhole litigation in this case clearly affects "the size of the asset pool." *See In re Leslie Controls*, 437 B.R. at 502. The Debtors and Ad Hoc Committee here—like the debtor and ad hoc committee in *Leslie Controls*—therefore share a common legal interest in the resolution of the makewhole litigation that protects communications under the common interest privilege. Accordingly, contrary to the Trustee's assertions, this Court's holding in *Leslie Controls* clearly establishes that the Debtor and the Ad Hoc Committee have a sufficient common legal interest to protect communications under the common interest privilege.

Even if the common interest privilege can be invoked as a general matter, the Trustee contends that two specific categories of documents should fall outside that privilege. (Ltr. 12.) *First*, the Trustee argues that the common interest privilege cannot apply to pre-bankruptcy communications between the Ad Hoc Committee and the Debtors. Not so. *Leslie Controls* held that the common interest privilege applied to pre-petition discussions. *See In re Leslie Controls*, 437 B.R. at 495, 502. The Debtors' legal interests with regard to the availability of the First Lien makewhole were no less common pre-petition than they are now.

*Second*, the Trustee argues that communications involving non-lawyers cannot be protected by the common interest privilege. (Ltr. 12.) The Trustee correctly alludes to the unarguable principle that a communication must first be protected by the attorney-client privilege or work product doctrine before it can be protected by the common interest privilege. *See In re Leslie Controls*, 437 B.R. at 497. The Trustee is mistaken, however, that communications between non-attorneys cannot be withheld as privileged. To the contrary, "a document does not even need to be addressed to or from an attorney to be privileged—privileged communications may be shared by non-attorney employees 'in order to relay information requested by attorneys,' and so that the corporation is 'properly informed of legal advice and [may] act appropriately.'" *Shire Dev. Inc. v. Cadila Healthcare Ltd.*, CA 10-581-KAJ, 2012 WL 5247315, at *3 (D. Del. June 15, 2012) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D. Pa. 2005)). Therefore, the common interest privilege *can* apply to communications between non-attorneys. Whether the privilege applies to particular documents will be determined on a document by document basis.[2]

---

[2] Moreover, even if the common interest privilege does not apply, many of these communications may be protected by the work product doctrine, and their disclosure does not constitute a waiver. The law is clear that "a disclosure to

# KIRKLAND & ELLIS LLP

Hon. Christopher S. Sontchi
July 17, 2014
Page 7

      Accordingly, this Court should reject the Trustee's argument that the common interest privilege cannot protect communications between the Debtors and the Ad Hoc Committee.

                                       Respectfully submitted,

                                       */s/ Andrew R. McGaan*

                                       Andrew R. McGaan, P.C.

---

a third party does not necessarily waive the protection of the work-product doctrine." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991). "Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information." *Id.*; *see also Magnetar Technologies Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 478 (D. Del. 2012) *aff'd sub nom. Magnetar Technologies Corp. v. Six Flags Theme Parks Inc*., CV 07-127-LPS-MPT, 2014 WL 545440 (D. Del. Feb. 7, 2014). Here, the Trustee has made no claim that the Debtors or the Ad Hoc Group have disclosed work product to parties with whom their interests are not aligned.