```
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4
 5   In re:                         :
                                    :   Chapter 11
 6   ENERGY FUTURE HOLDINGS         :
     CORP.,  et al.,                :   Case No. 14-10979(CSS)
 7                                  :
             Debtors.              :   (Jointly Administration
 8   _____       :   Requested)
     CSC TRUST COMPANY OF DELAWARE,:
 9   as INDENTURE TRUSTEE,          :
                                    :
10            Plaintiff,            :
                                    :
11      v.                          :   Adv. Proc. No. 14-50363
                                    :   (CSS)
12   ENERGY FUTURE INTERMEDIATE     :
     HOLDING COMPANY LLC and EFIH   :
13   FINANCE INC.,                  :
                                    :
14            Defendants.           :
     _____:
15                                  :
     COMPUTERSHARE TRUST COMPANY,   :
16   N.A. and COMPUTERSHARE TRUST   :
     COMPANY OF CANADA, as          :
17   INDENTURE TRUSTEE,             :
                                    :   Adv. Proc. No. 14-50405
18            Plaintiffs,           :   (CSS)
                                    :
19      v.                          :
                                    :
20   ENERGY FUTURE INTERMEDIATE     :
     HOLDINGS COMPANY LLC and EFIH  :
21   FINANCE INC.,                  :
                                    :
22            Defendants.           :
     _____:
23
24
25
```

1                    United States Bankruptcy Court

2                    824 North Market Street

3                    Wilmington, Delaware

4                    July 18, 2014

5                    9:35 AM - 12:11 PM

6

7

8

9    B E F O R E :

10   HON CHRISTOPHER S. SONTCHI

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25   ECR OPERATOR:  AL LUGANO

1    HEARING re Motion for Entry of an Order Authorizing

2    Wilmington Savings Fund Society, FSB to File (I) Redacted

3    Version of its July 8, 2014 Letter and (II) Certain Exhibits

4    to the Letter Under Seal [D.I. 1501; filed July 8, 2014]

5    (the "Motion to Seal")

6

7    HEARING re Emergency Motion for Entry of an Order

8    Determining Applicability of the Automatic Stay to Non-

9    Bankruptcy Litigation Involving Certain of the Debtors [D.I.

10   1506; filed July 8, 2014]

11

12   HEARING re Motion of Wilmington Savings Fund Society, FSB

13   for Leave to Conduct Discovery Pursuant to Rule 2004 of the

14   Federal Rules of Bankruptcy Procedure of Energy Future

15   Holdings Corporation, its Affiliates, and Certain Third

16   Parties [D.I. 6; filed April 29, 2014]

17

18   HEARING re Complaint for Declaratory Relief [D.I. 995/Adv.

19   D.I. 1; filed June 16, 2014]

20

21   HEARING re Complaint for Declaratory Relief [D.I. 470/Adv.

22   D.I. 1; filed May 15, 2014]

23

24   Transcribed by:  Nicole Yawn, Dawn South, Sheila Orms, Jamie

25   Gallagher

```
 1   A P P E A R A N C E S :
 2   KIRKLAND & ELLIS
 3        Attorneys for the Debtors
 4
 5   BY:  BRIAN SCHARTZ, ESQ.
 6        MARK MCKANE, ESQ.
 7        ANDY MCGAAN, ESQ.
 8        DAVID DEMPSEY, ESQ.
 9        EDWARD SASSOWER, ESQ.
10        STEVE HESSLER, ESQ.
11        CHAD HUSNICK, ESQ.
12        JONATHAN F. GANTER, ESQ.
13
14   GOLDSTEIN & MCCLINTOCK, LLP
15        Attorney for Sierra Club
16        208 South LaSalle Street
17        Chicago, IL 60604
18
19   BY:  MARIA APRILE SAWCZUK, ESQ.
20
21
22
23
24
25
```

1   GIBSON DUNN

2        Attorney for Debtors in Sierra Club litigation

3        2100 McKinney Avenue

4        Suite 1100

5        Dallas, TX  75201-6912

6

7   BY:  MICHAEL L. RAIFF, ESQ.

8

9   WILMER CUTLER PICKERING HALE AND DOOR, LLP

10       Attorney for CSC Trust of Delaware

11       7 World Trade Center

12       250 Greenwich Street

13       New York, NY 10007

14

15  BY:  PHILIP D. ANKER, ESQ.

16

17  PAUL, WEISS, RIFKIND, WHARTON & GARRISON

18       Attorneys for Ad Hoc Committee of TCEH First Lien

19       Creditors

20

21  BY:  JAKE ADLERSTEIN, ESQ.

22       BRIAN HERMANN, ESQ.

23

24

25

1   YOUNG CONAWAY STARGATT & TAYLOR, LLP

2        Attorney for Ad Hoc Committee of TCEH First Lien

3        Creditors

4

5   BY:  RYAN M. BARTLEY, ESQ.

6

7   BROWN RUDNICK

8        Attorney for TCEH, Second Lien Trustee

9

10  BY:  JEFFREY L. JONAS, ESQ.

11

12  UNITED STATES DEPARTMENT OF JUSTICE

13        Attorney for the U.S. Trustee

14

15  BY:  RICHARD L. SCHEPACARTER, ESQ.

16

17  AKIN GUMP STRAUSS HAUER & FELT LLP

18        Attorneys for Ad Hoc Committee of EFIH Unsecured

19        Noteholders

20

21  BY:  SCOTT ALBERINO, ESQ.

22        IRA DIZENGOFF, ESQ.

23        ABID QURESHI, ESQ.

24

25

```
 1   SHEARMAN & STERLING
 2        Attorneys for Deutsche Bank AG New York Branch
 3
 4   BY:  FREDRIC SOSNICK, ESQ.
 5        NED S. SCHODEK, ESQ.
 6
 7   POTTER ANDERSON & CORROON LLP
 8        Attorneys for Deutsche Bank AG New York Branch
 9
10   BY:  LAURIE SELBER SILVERSTEIN, ESQ.
11        R. STEPHEN MCNEILL, ESQ.
12
13   COUSINS CHIPMAN & BROWN, LLP
14        Attorney for Ad Hoc Committee of EFIH Unsecured
15        Noteholders
16
17   BY:  SCOTT D. COUSINS, ESQ.
18
19   ROPES & GRAY LLP
20        Attorneys for CSC Trust Company of Delaware
21
22   BY:  D. ROSS MARTIN, ESQ.
23        KEITH HOWARD WOFFORD, ESQ.
24
25
```

1  COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

2       Attorney for CSC Trust Company of Delaware

3

4  BY:  NORMAN L. PERNICK, ESQ.

5

6  MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

7       Attorney for Sponsors

8

9  BY:  CURTIS MILLER, ESQ.

10

11  WACHTELL LIPTON ROSEN & KATZ

12       Attorneys for EFH Equity Owners

13

14  BY:  RICKY MASON, ESQ.

15       AUSTIN WITT, ESQ.

16       EMIL A. KLEINHAUS, ESQ.

17

18  DRINKER BIDDLE & REATH LLP

19       Attorneys for Citibank, N.A.

20

21  BY:  HOWARD A. COHEN, ESQ.

22       ROBERT K. MALONE, ESQ.

23

24

25

1    BINGHAM MCCUTCHEN LLP

2         Attorneys for Pacific Investment Management Co. LLC

3

4    BY:  JEFFREY SABIN, ESQ.

5         JULIA FROST-DAVIES, ESQ.

6

7    WHITE & CASE LLP

8         Attorneys for Ad Hoc Group of TCEH Unsecured

9         Noteholders

10

11   BY:  J. CHRISTOPHER SHORE, ESQ.

12        THOMAS LAURIA, ESQ.

13

14   FRIED FRANK HARRIS SHRIVER & JACOBSON

15        Attorneys for Fidelity Management & Research Company

16

17   BY:  MATTHEW M. ROSSE, ESQ.

18        GARY KAPLAN, ESQ.

19

20   CROSS & SIMON, LLC

21        Attorneys for Fidelity Management & Research Company

22

23   BY:  DAVID HOLMES, ESQ.

24        MICHAEL JOSEPH JOYCE, ESQ.

25

```
 1   POLSINELLI

 2         Attorneys for the Committee

 3

 4   BY:  CHRIS WARD, ESQ.

 5         JUSTIN K. EDELSON, ESQ.

 6         JARRETT VINE, ESQ.

 7

 8   MORRISON & FOERSTER

 9         Attorneys for the Committee

10

11   BY:  TODD M. GOREN, ESQ.

12         SAMANTHA MARTIN, SQ.

13         KAYVAN SADEGHI, ESQ.

14         JAMES PECK, ESQ.

15         ANDREW MCGAAN, ESQ.

16         WILLIAM HILDBOLD, ESQ.

17         ERICA RICHARDS, ESQ.

18         CHARLES KERR, ESQ.

19

20   LANDIS RATH & COBB

21         Attorneys for Next Era Energy

22

23   BY:  MATTHEW B. MCGUIRE, ESQ.

24         KERRI MUNNFORD, ESQ.

25
```

1   KLEHR HARRISON HARVY BRANZBURG LLP

2        Attorney for UMB Bank, Indenture Trust

3

4   BY:  RAYMOND H. LEMISCH, ESQ.

5

6   THE HOGAN FIRM

7        Attorney for the Ad Hoc Committee EFH Legacy

8

9   BY:  GARVAN MCDANIEL, ESQ.

10

11  KASOWITZ BENSON

12       Attorneys for the Ad Hoc Committee EFH Legacy

13

14  BY:  DAVID ROSNER, ESQ.

15       ANDREW GLENN, ESQ.

16

17  CHADBOURNE & PARKE

18       Attorneys for Next Era Energy

19

20  BY:  HOWARD SEIFE, ESQ.

21       DAVI LEMAY, ESQ.

22       MARC ROITMAN, ESQ.

23

24

25

1   BRYAN CAVE

2        Attorney for Computershare Trust Co.

3

4   BY:  STEPHANIE WICKOUSKE, ESQ.

5

6   NIXON PEABODY

7

8   BY:  RICHARD PEDONE, ESQ.

9

10  FOX ROTHSCHILD

11       Attorney for TECH Unsecured Ad Hoc Group

12

13  BY:  JOHN STROCK, ESQ.

14

15  REED SMITH LLP

16       Attorney for Bank of new York Mellon

17

18  BY:  JOSEPH GRIECO, ESQ.

19

20  ASHBY & GEDDES

21       Attorney for WSFS, Trustee

22

23  BY:  GREG TAYLOR, ESQ.

24

25

```
 1   PACHULSKI STANG ZIEHL & JONES
 2         Attorneys for Computershare
 3
 4   BY:  LAURA DAVIS JONES, ESQ.
 5         JOHN MORRIS, ESQ.
 6
 7   ZIETH & JONES LLP
 8         Attorney for Indenture Trustee
 9
10   BY:  TIMOTNY CAIRNS, ESQ.
11
12   KRAMER LEVIN
13         Attorneys for Computershare
14
15   BY:  GREGORY HOROWITZ, ESQ.
16         THOMAS MOERS MAYERS, ESQ.
17         ALICE J. BYOWITZ, ESQ.
18         JOSHUA BRODY, ESQ.
19
20   MORRIS JAMES LLP
21         Attorney for Law Debenture
22
23   BY:  STEPHEN M. MILLER, ESQ.
24
25
```

1  PATTERSON BELKNAP WEBB & TYLER

2       Attorney for Law Debenture

3

4  BY:  DAN LOWENTHAL, ESQ.

5

6  FOLEY & LARDNER

7       Attorneys for UMB Indenture Trustee

8

9  BY:  HAROLD KAPLAN, ESA.

10      MARK HEBBELN, ESQ.

11

12 DRINKER

13      Attorney for EFIH/CSC

14

15 BY:  JIM MILLAR, ESQ.

16

17 COLE SCHOTZ

18      Attorneys for EFIH/CSC

19

20 BY:  NORMAN PERNICK, ESQ.

21      WARREN USATINE, ESQ.

22

23

24

25

1   BINGHAM
2         Attorneys for PIMCO
3
4   BY:  JEFF SABIN, ESQ.
5         JULIS FROST-DAVIS
6         CHRIS CARTER
7
8   CONNOLLY GALLAGHER
9         Attorney for PIMCO
10
11  BY:  KAREN C. BIFFERATO, ESQ.
12
13  QUINN EMANUEL URQUHART & SULLIVAN, LP
14        Attorney for Centerbridge
15
16  BY:  KATE SCHERLING, ESQ.
17
18  LORD ABBETT
19        Attorney for Bank of New York Mellon
20
21  BY:  MITCHELL MOSS, ESQ.
22
23  SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
24
25  BY:  ELENA SAXONHOUSE, ESQ. (TELEPHONIC)

```
1                    P R O C E E D I N G S
2              THE CLERK:  All rise.
3              THE COURT:  Please be seated.  Excuse me.  Good
4       morning.
5              MR. SASSOWER:  Good morning, Your Honor.  For the
6       record, Edward Sassower, of Kirkland & Ellis, LLP, proposed
7       counsel to the debtors.
8              THE COURT:  Yes, sir.  Go ahead.
9              MR. SASSOWER:  Thank you.
10             Your Honor, before we turn to today's agenda, I
11      wanted to give you a status report.  First, regarding the
12      EFIH second lien DIP, the debtors are not planning to resume
13      the contested hearing on the proposed EFIH second lien DIP,
14      and, if the debtors would decide to do so, the debtors would
15      want additional process, make appropriate modifications to
16      the facility, and provide appropriate notice to the Court
17      and all parties and interests.
18             Second, the RSA remains terminable, but has not yet
19      been terminated.  The debtors expect that in the coming days
20      that either the parties will move to terminate the RSA or
21      that the parties will amend the RSA to provide that the RSA
22      will self-terminate on August 8th, absent an additional,
23      more comprehensive amendment.  In other words, the amendment
24      would merely provide a short-term extension while the
25      debtors continue to determine the best path forward.
```

1          THE COURT:  You said August 8th?

2          MR. SASSOWER:  August 8th, 8/8.

3          THE COURT:  Got it.

4          MR. SASSOWER:  Your Honor, the RSA reflected the

5     best deal that was available to the debtors at the time that

6     the RSA was entered into.  The same can be said for the EFIH

7     second lien DIP.  However, since we filed, the trading

8     prices of debt across the capital structure has risen.  We

9     don't know whether this shift is temporary or permanent, and

10    we don't know all the reasons for the rising prices.

11          Some of the debt tranches have so little float that

12    it's hard to read too much into trading prices.  And, in any

13    event, as Your Honor knows well, trading prices are not

14    dispositive of value.

15          Trading prices, however, do influence behavior.

16    They impact what people are willing to offer, and they

17    impact what people are willing to accept.  As a result,

18    parties have been reaching out to the debtors suggesting

19    that they might be willing to sponsor transactions in

20    amounts that were not available to the debtors' prepetition.

21    The revised offer that NextEra and the Ad Hoc Group of EFIH

22    Second Lien Noteholders filed with the Court yesterday is

23    indicative of this fact.

24          To that end, the revised NextEra proposal is very

25    promising.  The debtors appreciate the proposal and are

1   heartened by its terms and look forward to continuing their

2   ongoing discussions with NextEra about those terms.  Howard

3   Seife, of Chadbourne & Parke, who represents NextEra, is in

4   the court today, if Your Honor has any questions about that

5   proposal.

6          As a result, the debtors, as responsible

7   fiduciaries, owe it to their constituents to take stock of

8   the situation and recalibrate their path towards

9   confirmation, if appropriate.  The debtors intend to conduct

10  a process to vigorously pursue any and all of these

11  conversations and potential transactions and have already

12  had productive negotiations with many parties since the last

13  hearing.

14         Your Honor, this was the primary reason why the RSA

15  included an unqualified fiduciary duty out.  The primary

16  reason for the fiduciary out was not because the debtors

17  thought that someone might develop a better structure.  We

18  spent two years stress testing various structures and

19  studying the tax consequences of each.  As a result, we feel

20  that we've explored the universe of potential structures.

21         Now, the primary reason for the fiduciary duty out

22  was because we didn't know how the energy markets and the

23  capital markets would respond over the course of these

24  Chapter 11 cases, and we didn't know whether strategic

25  buyers like NextEra would be interested in bidding for the

1    company while it was still in Chapter 11.

2         Regarding the limited universe of possible

3    structures, I had a section on this in my draft first-day

4    presentation, but I removed it in the days leading up to the

5    first-day hearing, because I felt that the presentation was

6    running long and because I thought it was too in the weeds

7    for the first day.  But listening to Your Honor's tax

8    questions at the last hearing made me realize that we've

9    probably reached the point in these Chapter 11 cases where

10   that missing section would be helpful.  I think it would

11   provide the Court with added context on which to evaluate

12   potential future transactions, and, as a result, I will plan

13   to present it at one of the upcoming hearings, and we may

14   supplement that presentation by filing an explanatory tax

15   memorandum on the docket.

16        Turning back to the RSA, I'd like to make two more

17   points.  First, with or without the RSA, at this stage in

18   the Chapter 11 cases, the debtors have always intended to

19   turn their focus to the plan, and that has not changed.

20        Second, even if the parties determine that the RSA

21   has outlived its usefulness, the RSA provided a tremendous

22   value to the debtors.  First, it enabled the debtors to

23   obtain the support of the TCH first lien holders for a $4.4

24   billion priming DIP facility and the use of cash collateral

25   for 18 months without any milestones.

1          Second, it also effectively served as a stalking

2     horse, which brought NextEra and other potential bidders to

3     the table sooner than might have been otherwise possible in

4     these Chapter 11 cases, and third, it also enabled the

5     debtors to initiate a productive dialogue with the IRS

6     regarding the tax-free stuff (sic).

7          Your Honor, unless you have any questions at this

8     time, I think that some of the other parties may have wanted

9     to make a few opening remarks before we turn to today's

10    agenda, which is basically the Sierra Club automatic stay

11    matter and then a handful of discovery and status conference

12    related issues.

13          THE COURT:  Thank you.

14          MR. SASSOWER:  Thank you, Your Honor.

15          THE COURT:  I would just note that just for the

16    record that I don't follow the docket every item-by-item.

17    So I was not aware that a new proposal had been filed, which

18    is fine, but, just so everyone knows, I haven't read it.  So

19    I'm not saying I have to, but I just want that to be clear

20    for the record.

21          MR. SASSOWER:  That's helpful.

22          THE COURT:  Okay.

23          MR. SASSOWER:  For future reference.  Thank you,

24    Your Honor.

25          THE COURT:  Right.  I'm sure it was in the press,

1    but I don't read the press, either.

2          Does anyone else wish to make any statement?

3          MR. SASSOWER:  That's especially helpful to know.

4          THE COURT:  Yeah.

5          MR. SASSOWER:  Thank you.

6          THE COURT:  Mr. Lauria, good morning.

7          MR. LAURIA:  Good morning, Your Honor.  Tom Lauria,

8    with White & Case, for the Ad Hoc Group of TCEH Unsecured

9    Noteholders.

10          Your Honor, we're pleased with the direction that

11    things appear to be headed, which is a big change from where

12    we were the last time we were in this courtroom.  Since

13    then, we've had significant discussions with the debtors and

14    their advisors regarding alternative paths forward and

15    potential transactions that could result in a value-

16    maximizing outcome here, which I think is our -- has always

17    been our objective.

18          We are engaged in discussions about how we have

19    these conversations and how we convert ideas into reality,

20    and I think that one of the things that has been made clear

21    and the parties agree on is that it's dependent on

22    significant legal and financial diligence being conducted,

23    and the debtors have indicated their intention to facilitate

24    our going forward with that diligence, and indeed, we have

25    plans to kick off diligence next week, and we're hopeful

1    that this process moves forward at pace, but it's clear that

2    what we're going to need is time.

3              There are a lot of complex issues here.  Counsel

4    alluded to the tax issues.  There are numerous issues of

5    great complexity when you have to have this enterprise with

6    the complex inter-company relationships that are present

7    here to sort through to determine, not only what the value

8    is, but where the value is.

9              As far as the RSA is concerned, we clearly would

10   prefer to see the RSA terminated.  We agree with counsel's

11   comment that it outlived its usefulness, if it ever had any,

12   and we agree that it was premised on economic assumptions

13   that no longer appear to apply in these cases.  It simply

14   doesn't work, and I think the best evidence of the fact that

15   the RSA doesn't work is the unsolicited third party offer

16   that counsel referred to that was received from NextEra,

17   which suggests a significantly higher price for the debtors'

18   equity interest in Encore.

19             It seems clear that, if you can get that kind of

20   movement in pricing without soliciting competing offers,

21   that it's incumbent on the debtor to engage in a process, as

22   counsel was referring to, and to go out and to solicit the

23   market and find out who else is out there.  Create some

24   competition and see where we can get the value of that

25   equity interest.

1        The RSA, as it currently exists, precludes the

2   debtor from conducting an auction.  They can consider

3   proposals that are inbound, but they can't go out and seek

4   them.  So, to me, it seems like that's just the best

5   indicator, or one of the best indicators, that the RSA

6   really is a thing of the past in these cases.

7        Interestingly, the RSA also contemplates a plan

8   that settles the claims of TCEH against the affiliated

9   debtors for zero, and yet, since the RSA was entered into,

10  the debtors have filed their schedules, and it turns out

11  that EFH has scheduled a $700 million plus undisputed claim

12  by TCH against it.  We can't understand how such a claim

13  should be settled for zero.

14        So the plan envisioned by the RSA just doesn't

15  work, and we ought to get this thing out of the way.  It

16  sounds like, from counsel's comments, that it's going to die

17  a natural death, and we certainly hope that it does, because

18  its continued presence in the case is nothing more than a

19  distraction at this point and really gets in the way of the

20  parties engaging in what we all think we need to do in this

21  case, which is solve the problems and find a path to exit

22  that maximizes value.  So, whether we get there the hard way

23  or the easy way, it feels like the case is going to get

24  where it's supposed to get hopefully in the near future.

25        THE COURT:  Thank you.

1          MR. JONAS:  Good morning, Your Honor.  Jeff Jonas,

2     from Brown Rudnick, on behalf of the Wilmington Savings Fund

3     Society, trustee for the TCH Second Liens.

4          Your Honor, I want to very briefly advise the Court

5     of our view of the world, because I think it informs

6     positions we've taken and will take in the weeks to come,

7     including both on substantive matters and perhaps some of

8     the procedural and discovery issues that we'll face, if not

9     today, probably on August 11th.

10          Your Honor, first of all, I just want to point out

11     -- and we don't need to discuss it substantively.  One of

12     the motions that was taken off calendar that the debtors

13     aren't proceeding with is the Optim Motion, which was the

14     debtors' effort to bid on certain coal assets.  That bid, or

15     their effort to bid, has now been withdrawn, and the point

16     of my comments today, Your Honor, is there are things that

17     are happening that we think are relevant to us that may be

18     beyond the direct purview of the Court but ultimately will

19     be important.  And again, they're not to be dealt with

20     today, but I didn't want to let the opportunity pass to at

21     least advise the Court.

22          For example, Your Honor, on the Optim motion, our

23     view was that that could have been a value additive

24     transaction for the debtors.  We think it was ultimately

25     pulled when there was a realization that proceeding with

1    that bid might have ultimately supported a better -- when I

2    say better, I mean higher -- valuation of the debtors' own

3    coal assets, and that, of course, would have ultimately

4    supported our view on the T side of value, and our view is

5    that's why that bid was pulled.  Ultimately, we will get

6    discovery on that, Your Honor, and hopefully get to the

7    bottom of it.

8            THE COURT:  Do you have anything remotely to back

9    up such a serious comment?

10           MR. LAURIA:  Your Honor, we're in the middle of

11   pursuing discovery.  We have disputes on discovery, and

12   we'll get to the bottom of it.

13           THE COURT:  You're speculating?

14           MR. LAURIA:  I am speculating, yes.  Your Honor,

15   the other thing that I think is constant, from at least our

16   view of the case, is the debtors' position that, despite the

17   fact that there is no value for -- or relatively no value

18   for -- T side creditors beyond the first liens, which I

19   think the debtors' position permits them, as long as they

20   have a core group of TCEH first liens onboard, to proceed as

21   they see fit, including with a tax-free spin-off.

22           You know, Your Honor, that again, continues to come

23   up.  It will continue to come up, and it presents a serious

24   problem for us, and the reason is, as I've expressed before

25   and you'll hear us express again -- our view is that a tax-

1    free spin of the T side assets, if it is not done, could be

2    accretive (sic) in terms of value to the second lies in the

3    magnitude of 2 to $3 billion.  Again, that ultimately will

4    need to be proven and demonstrated in the future, but it is

5    driving things that are happening in the case today.  That

6    is the debtors' continued effort to go forward with a tax-

7    free spin transaction, which obviously was encompassed

8    within the RSA.

9            Again, Your Honor, our view of this highlights what

10   we see as inherent conflicts with effectively the same

11   boards that are both on the E side and the T side.  We'll

12   deal with the counsel issue -- that is the same counsel

13   representing both the E side and the T side -- at a future

14   hearing, but, Your Honor, I wanted to address the Court,

15   because these issues will continue to come up.  I think

16   they're relevant today, and they'll continue to be relevant

17   in the weeks to come.  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           Anyone else?

20           Okay.

21           MR. MCKANE:  Your Honor, Mark McKane, of Kirkland &

22   Ellis, proposed counsel for the debtors.  Because of two

23   statements that were just made by counsel, both Mr. Jonas

24   and Mr. Lauria, we just need to respond.

25           As it relates to this Optim bid, you are right to

1    seize on it as absolute rank speculation, and we were not --

2    there is no basis for this statement.  It is pure

3    speculation, and, more importantly, as it relates to

4    Mr. Lauria, he made a comment regarding some of the SOFAs

5    and schedules, and this is not the first inquiry we've

6    received on this, and we wanted to make a statement to alert

7    the Court and all parties and interests.

8            As the Court is aware, we did file our SOFAs, the

9    statements of assets and liabilities and the statements of

10   financial affairs on June 30th, and, since then, the debtors

11   have received multiple inquiries -- excuse me, Your Honor --

12   regarding scheduled inter-company claims, two ones in

13   particular.  One, an inter-company claim of approximately

14   $774 million by TCEH against EFH, and then second, an inter-

15   company claim of approximately $1.29 billion by EFH against

16   Luminant Generation Company, LLC.

17           Substantially, all of these amounts are

18   attributable to obligations under the competitive tax

19   allocation agreement dated May 15th, 2012 for tax years 2003

20   through 2013.  The debtors are evaluating a potential

21   amendment or clarification to the duals (sic) to evaluate

22   the inquiries we've received to date, and we will update the

23   Court and all parties once that determination has been

24   reached.

25           THE COURT:  Okay.

1          Shall we turn to the, I take it, the Sierra Club

2    matter first?

3          Ms. Sawczuk's somewhere.  There she is.

4          Good morning.

5          MS. SAWCZUK:  Good morning, Your Honor.  How are

6    you?  It's a long walk from the back.

7          THE COURT:  Okay.

8          MS. SAWCZUK:  Your Honor, as I'm you've read the

9    papers -- Maria Sawczuk, on behalf of the Sierra Club, and I

10   have on the phone with me Elena Saxonhouse, who is a staff

11   attorney for the Sierra Club.  Ms. Saxonhouse is basically

12   on the phone in case there's an issue of the underlying

13   matter that you need to know that I don't already know.  So

14   --

15         THE COURT:  Very good.

16         MS. SAWCZUK:  Your Honor, this is really a pretty

17   straight vanilla claim here.  As you read in the papers,

18   there is a district court matter that's pending in the -- I

19   believe it's the Western District of Texas.  A judgment was

20   entered against Sierra Club, which has been appealed to the

21   Fifth Circuit.

22         At that time, also a motion was filed -- or a

23   motion was filed by -- a post-judgment motion was filed by

24   the debtors to request attorneys' fees in the matter.  Now

25   we have a -- we're in a position where there the fee motion,

1    what I've called the fee motion.  There's a motion to amend

2    that is related to the fee motion and as well as a -- and I

3    apologize.  I'm trying to remember what I called it.

4              What did I call it?

5              UNIDENTIFIED SPEAKER:  Postpone.

6              MS. SAWCZUK:  Thank you.

7              As well as the motion to postpone.  And then, there

8    is the appeal that's in the Fifth Circuit.

9              All of these matters are related to the same facts

10   and tied together, and they really are the same case, even

11   though they're pending in two different courts, and they

12   relate under -- in underlying, relate to the same set of

13   facts.

14             What we're concerned about is that, if the --

15   frankly, we don't really care if all of these matters are

16   stayed or all of these matters are not stayed.  The problem

17   that we're finding is that, if the appeal is stayed but the

18   underlying fee motion is not stayed, there's going to be an

19   issue, because whether or not the appeal is successful will

20   weigh heavily on whether or not the fee motion is

21   successful, and we see them as so intricately entwined that

22   you can't have one go forward and have the other be stayed.

23             So what we're basically asking for, Your Honor, is

24   that the matters either all move forward or all be stayed,

25   and the substantive matter is -- or substantively, the

1    standard to collect the attorneys' fees, under the Clean Air

2    Act, is that the Sierra Club brought a frivolous,

3    unreasonable, or groundless claim, under the Clean Air Act.

4    That's the standard for the debtors to recover their fees.

5    That's, of course, tied with the merits of the case and with

6    the appeal, and, if the appeal is successful, there is not

7    going to be an attorneys' fee awarded, because that means --

8    if the appeal is successful, that means it was not

9    frivolous, unreasonable, or groundless.

10           Additionally, if that motion goes forward and the

11   debtors are successful and in obtaining fees from Sierra

12   Club, Sierra Club is going to want to appeal that, and the

13   appeal, at the Fifth Circuit, is going to need to be

14   amended.  The notice of appeal is going to need to be

15   amended to add the appeal of this post-judgment motion.  So

16   it's just that they're just so intertwined that I feel that

17   they need to move forward at the same pace.

18           I guess the problem I'm having is that I'm unclear

19   how it would work otherwise.  What would happen if one of

20   them is stayed?  And I don't want either Sierra Club or --

21   frankly, the debtors, if the debtors are unsuccessful in

22   their fee motion and want to appeal it, the same thing

23   happens.  If the appeal is stayed, then there's an issue

24   with how that mechanically is going to work.  So, I mean,

25   it's really just trying to protect the status quo and moving

1    forward in these litigations.

2             And, Your Honor, that's really the issue that --

3    you know, as I said, I think it's very simple.  It's

4    important to note this attorneys' fee issue is not a claim

5    or a counterclaim.  It's a post-judgment motion.

6             So it's part and parcel of the underlying matter,

7    which was brought against the debtors and which, under the

8    code, I believe, should be stayed, but, as I said, as a

9    practical matter, the Sierra doesn't -- they're ready to go

10   forward.  They don't care if it's stayed or not.  It's just

11   that one half of it can't be stayed while the other half

12   moves forward, and that's really the issue.  So either the

13   whole kit and caboodle has to be stayed, or it all has to

14   move forward.

15            THE COURT:  All right.

16            MS. SAWCZUK:  And that's basically the argument.

17            THE COURT:  Thank you.

18            MS. SAWCZUK:  Thank you.

19            MR. RAIFF:  Your Honor, Mike Raiff, from Gibson

20   Dunn.  I was one of the attorneys involved in the underlying

21   litigation against Sierra Club representing the debtors.

22            Sierra Club's motion that's here today really

23   involves one narrow issue for the Court.  Is the debtors'

24   affirmative claim for attorneys' fees subject to the

25   automatic stay?  The answer to that question is no.  The

1   automatic stay does not apply to claims asserted by the

2   debtor.

3           The Third Circuit has explained to us that we apply

4   the automatic stay based on a claim-by-claim analysis.  So,

5   within a single lawsuit, we can have claims against the

6   debtor that are subject to the automatic stay, and we can

7   have claims by the debtor that are not subject to the

8   automatic stay, and, Your Honor, that's what we have here

9   today, except our case is even easier, because we have a

10  very clean division of claims.

11          All of Sierra Club's claims against the debtor, all

12  of them -- they're all pending up here at the Fifth Circuit

13  Court of Appeals.  Meanwhile, our claim, the claim by the

14  debtors, is still sitting here at the trial court level.

15          Everyone, Your Honor, agreed --

16          THE COURT:  Just one minute.

17          MR. RAIFF:  Yes, Your Honor?

18          THE COURT:  Let me ask you what happens in a couple

19  scenarios.

20          MR. RAIFF:  Yes, Your Honor.

21          THE COURT:  Assume that you are unsuccessful in the

22  district court in getting your fees paid.

23          MR. RAIFF:  Yes, Your Honor.

24          THE COURT:  And you then appeal that matter.

25          MR. RAIFF:  Yes, Your Honor.

1           THE COURT:  Okay.  Does that appeal go forward?

2           MR. RAIFF:  That appeal would then start --

3           THE COURT:  Right.  Would this --

4           MR. RAIFF:  It would come up in the Fifth Circuit.

5     As a technical matter, it could if you're just looking at

6     whether or not the automatic stay applies.  As a practical

7     matter, we know the Fifth Circuit would never do that.  The

8     Fifth Circuit is never going to allow one of those to

9     proceed without the other.  They're going to consolidate the

10    two.

11          THE COURT:  Uh-huh.

12          MR. RAIFF:  And they're both going to move

13    together.

14          THE COURT:  Uh-huh.

15          MR. RAIFF:  So, as a practical matter, they're

16    going to be together, once again, at the Fifth Circuit, and

17    they're going to move together.

18          THE COURT:  Okay.  So, if you're successful or you

19    are unsuccessful, somebody's going to appeal?

20          MR. RAIFF:  That's exactly right, Your Honor.

21          THE COURT:  I don't think there's any question

22    there.  So, once that appeal happens, you would agree with

23    me that, as if not a technical matter, as a practical

24    matter, you won't be going forward with further appeal in

25    the Fifth Circuit absent stay relief?

 1            MR. RAIFF:  The Fifth Circuit's not going to allow

 2    us, as a practical matter.

 3            THE COURT:  All right.

 4            MR. RAIFF:  And what we're trying to do,

 5    Your Honor, is just try to catch this up with this part,

 6    because, after the district court ruled in our favor on the

 7    merits of Sierra Club's claims, the Court determined we are

 8    entitled to our fees under the fee-shifting provision of the

 9    Clean Air Act.

10            THE COURT:  Right.

11            MR. RAIFF:  The judge then ordered us, within 14

12    days, to provide our motion and all our evidence supporting

13    our fees.  We did that prepetition.  We filed our lengthy

14    brief.  We filed all our evidence supporting our fees.  Now

15    we're just waiting for Sierra Club to provide their

16    responses.

17            THE COURT:  I'm trying to figure out when the sort

18    of -- and I understand that.

19            MR. RAIFF:  Sure.

20            THE COURT:  And I'm trying to think down the road.

21    So let's assume you're successful at the district court

22    level, which wouldn't be surprising, given what's happened

23    so far.  Can the Sierra Club appeal?  Can they file their

24    notice of appeal, or would that be a stay violation?

25            MR. RAIFF:  No, they can file their appeal.

```
 1            THE COURT:  And that's it's --

 2            MR. RAIFF:  Because if --

 3            THE COURT:  -- wrapped up in your claim?

 4            MR. RAIFF:  Exactly, exactly.  You look at a claim-

 5   by-claim analysis.  Our claim won't --

 6            THE COURT:  Then you could make the argument that

 7   then that appeal could proceed.

 8            MR. RAIFF:  It could, as a technical matter, if all

 9   we're doing is thinking about the automatic stay.

10            THE COURT:  Uh-huh.

11            MR. RAIFF:  If that's our only analysis, yes,

12   technically, it could.  Practically, never's going to

13   happen.

14            THE COURT:  All right.  So, even --

15            MR. RAIFF:  The Fifth Circuit's not going to allow

16   it.

17            THE COURT:  Even an appeal by a non-debtor of a

18   successful debtor claim is not subject to the automatic

19   stay?

20            MR. RAIFF:  That's right.  Claim-by-claim, claim-

21   by-claim.

22            THE COURT:  Uh-huh.

23            MR. RAIFF:  If I'm allowed to pursue my claim, they

24   obviously are allowed --

25            THE COURT:  They get the --
```

1          MR. RAIFF:  -- to defend (sic) themselves.

2          THE COURT:  I think that's a pretty novel position.

3    I've certainly heard debtors say that nothing adverse to

4    them can go forward, even an appeal by a losing party of a

5    claim that the debtor brought.

6          MR. RAIFF:  Not under Third Circuit law, which is

7    very clearly you just look at the claim.

8          THE COURT:  Uh-huh.

9          MR. RAIFF:  And we're not going to tie the hands of

10   Sierra Club.  They can defend themself.  For example, they

11   can file motions attacking my claim.

12         THE COURT:  Uh-huh.

13         MR. RAIFF:  And they have.  Those are not stayed.

14         THE COURT:  Uh-huh.

15         MR. RAIFF:  If it relates to my claim, they can

16   defend themself, including filing an appeal of that.

17         THE COURT:  Okay.

18         MR. RAIFF:  Again, it's a claim-by-claim analysis,

19   and I think the Court in Maritime Electric had it exactly

20   right and actually kind of lays out this type of scenario.

21         THE COURT:  Uh-huh.

22         MR. RAIFF:  And it doesn't matter if the claims are

23   intertwined as well.  You can still separate the two, and

24   here, our case is real easy, real easy to separate.  You've

25   got them all sitting up there, the claims against the

1    debtor.  We're still sitting here with our claim.  We're

2    just trying to get -- we're trying to catch up.  We're

3    trying to get this part resolved.  We're waiting for their

4    response.  I think the district court's ready to finish his

5    work.

6            This is the only piece left.  Once he finishes our

7    claim for fees, he's done.  Then the whole thing goes up to

8    the Fifth Circuit.

9            THE COURT:  Okay.

10           MR. RAIFF:  So, Your Honor, we respectfully request

11   that we allow the Texas District Court to complete his job

12   to rule on the final piece that's still pending here at the

13   trial court and that you deny the motion that's pending by

14   Sierra Club.  Thank you, Your Honor.

15           THE COURT:  Very good.

16           MS. SAWCZUK:  Your Honor, I just want to clarify

17   for the record that we haven't filed anything postpetition.

18   I know there was some -- just wanted to make it clear that,

19   after the petition date, nothing has really been filed in

20   any of these cases, other than the stay.

21           Your Honor, I think you hit the nail on the head.

22   You know, the problem here is that this -- the Third Circuit

23   has also, in the cases we cited and specifically, the St.

24   Croix (sic) case, said that Section 362 has to be read to

25   stay all appeals even in proceedings that have been brought

1    against the debtor.  This originally was brought against the

2    debtor.  There's no question about that.  Sierra Club

3    brought the action against the debtor.

4          Sierra Club lost at the district court level, and

5    it has been appealed.  Under St. Croix, that appeal should

6    just -- should be stayed, and, while we have the right to

7    ask for that to be lifted, we haven't done that yet, but I

8    think St. Croix is pretty clear that that matter is stayed,

9    and I'm not going to argue that here.

10          The problem is that the underlying case has not

11    been stayed as of yet, or at least the debtors are trying to

12    argue that it shouldn't be stayed, but the underlying case,

13    where the fee motion is now pending, was something brought

14    by the Sierra Club against the debtors.  This is just a

15    post-judgment motion in a case brought against the debtors,

16    which very clearly, under the bankruptcy code, needs to be

17    stayed.

18          Again, we don't care which way this goes.  If

19    Your Honor wants to lift the stay on everything, that's

20    fine, too.  It's just that it makes no sense for both pieces

21    to go forward, and Your Honor hit the nail right on the

22    head.

23          If either party loses, this is going to be

24    appealed.  Sierra Club does not want a $7 million judgment

25    sitting out there against it and rightfully can't lose

1    because of the Bankruptcy Court or because of the bankruptcy

2    being filed -- can't lose its right to appeal that.  So it

3    has to be able to be appealed.

4         The fact that the Fifth Circuit may not let it go

5    forward -- I'm not quite sure how that's going to work.  I

6    think, frankly, procedurally, it's going to be one in the

7    same appeal.  It's going to have to be an amendment to the

8    notice of appeal to wrap in this judgment.

9         This is not going to be a separate case and a

10   separate notice.  As a practical matter, it's going to be

11   part and parcel of this appeal.

12        So, you know, it just doesn't make sense.  It just

13   doesn't make sense that one half of this matter can go

14   forward while the other half has to sit there -- and, when

15   they are, honestly, substantively, you know, coagulated.

16   They're meshed together.  It just doesn't make sense, and I

17   think that it either all has to be stayed, or it all has to

18   move forward.  That's the issue.

19            THE COURT:  Okay.  Thank you.

20            MS. SAWCZUK:  Thank you.

21            MR. RAIFF:  May I make one request (sic)?

22            THE COURT:  Yes.

23            MR. RAIFF:  Your Honor, I think the Third Circuit

24   decision in that Maritime Electric case really says it all.

25   If I could just read from one paragraph, I think it

1    addresses this precise issue.

2          At the bottom of page 1204 of this opinion, 959

3    Fed. 2d, 1194, the Third Circuit explains -- and I'm

4    quoting.  "All proceedings in a single case are not lumped

5    together for purposes of the automatic stay analysis.  Even

6    if the first claim filed in a case was originally brought

7    against the debtor, Section 362 does not necessarily stay

8    all other claims in the case.  Within a single case, some

9    actions may be stayed.  Others not."

10         "Multiple-claim and multiple-party litigation must

11   be disaggregated so that particular claims, counterclaims,

12   cross-claims, and third-party claims are treated

13   independently when determining which of their respective

14   proceedings are subject to a bankruptcy stay.  Thus, within

15   one case, actions against a debtor will be suspended, even

16   though closely-related claims asserted by the debtor may

17   continue."

18         And that, Your Honor, is exactly what we have here,

19   and there is multiple cases that also explain that a claim

20   for fees is, in fact, a claim of the debtor, and there's

21   cases that we have cited in our briefing that explain that

22   this is a fee claim that is not subject to the automatic

23   stay.  Thank you, Your Honor.

24         THE COURT:  You're welcome.

25         MS. SAWCZUK:  And I apologize, Your Honor, but one

1    last word on that.  This is not a claim.  The Third Circuit

2    case that he cites, that Mr. Raiff cites, is claim,

3    counterclaim, cross-claim, third-party claim.  This is a

4    post-judgment motion.

5         The debtor tried originally to bring attorneys'

6    fees as a separate claim in the underlying bankruptcy, and I

7    have an order here from the Western District of Texas that,

8    if Your Honor wants to see it -- the plaintiff, Sierra Club,

9    moved to dismiss the defendant's counterclaim on attorneys'

10   fees, and that counterclaim was dismissed.  So it's not a

11   claim.

12        It's a motion brought on by the Court's mention in

13   its order that attorneys' fees would be invited, but it's

14   not a claim, counterclaim, cross-claim, or third-party claim

15   as the Third Circuit identified it in the case that was

16   cited by counsel.  This is not that.

17        This is something different.  So I just wanted to

18   clear that up, and, if Your Honor wants to see the order

19   from the Western District of Texas, I do have copies of that

20   I can make available to both Your Honor and to counsel.

21        THE COURT:  Okay.  Thank you.  I don't need the --

22   I'd like you to address that, though, that this is not a

23   claim.  It is a post-judgment motion related to a claim

24   brought by the Sierra Club.

25        MR. RAIFF:  It is 100 percent a claim.  Absolutely,

1    it's a claim.  In fact, let me read from our rule.  Rule

2    54(d)(2), attorneys' fee, a, uses the word claim.  Claim to

3    be by motion, a claim for attorneys' fees, and it goes on.

4    Claim is used throughout.

5         In fact, there's examples of cases, Your Honor,

6    where the reverse is happening, where someone is trying to

7    seek attorneys' fees against the debtor, and the Courts

8    obviously say that's a claim against the debtor, and it's

9    stayed.  It's treated as claim all the time.  In fact, the

10   rules itself say it's a claim multiple times, Your Honor.

11        THE COURT:  Okay.  Thank you.

12        All right.  I'm going to -- based on the arguments

13   and positions taken of the parties, under the facts and

14   circumstances of this case, I'm going to find and I do find

15   that the post-judgment request or claim for attorneys' fees

16   as set up by the district court is not subject to the

17   automatic stay and may go forward.  That includes any appeal

18   filed in connection with that claim, even if that appeal is

19   filed by the Sierra Club.

20        So, just to be clear, of course, it's up to the

21   Fifth Circuit to decide whether to hear these two appeals

22   together, whether to stay them, as a practical matter, but,

23   from an automatic stay matter, based on the arguments and

24   petitions of the debtor in this case, subject to whatever

25   the Fifth Circuit might do, but in connection with the

1    automatic stay, the request for attorneys' fees is not

2    subject to the automatic stay.

3           Any appeal, since it's a claim of the debtor,

4    including an appeal filed by the Sierra Club and the ability

5    to proceed with that appeal is not covered by the automatic

6    stay and may proceed.  Of course, the Fifth Circuit is more

7    than capable of managing its own docket, and I wouldn't even

8    presume to try to advise or force the Fifth Circuit to do

9    one thing or the other.

10          And so, I'd like counsel to consult on an order and

11   submit it under certification of counsel.

12          Ms. Sawczuk, you --

13          MS. SAWCZUK:  We shall, Your Honor.  Just for

14   clarification, but the appeal itself, as defined in the

15   motion, is still stayed, correct?

16          THE COURT:  Yes.

17          MS. SAWCZUK:  Okay.  Thank you, Your Honor.

18          THE COURT:  You're welcome.

19          All right.  Thank you.  I'll look forward for an

20   order.

21          Do you have an extra copy of the agenda?  I've lost

22   my copy.  Thank you.  Sorry.

23          Very good.

24           MR. KERR:  Good morning, Your Honor.  Charles

25   Kerr, of Morrison & Foerster, on behalf of the official

1    committee.

2            On the agenda, at item 31 is a status conference

3    on the motion of Wilmington Savings Fund Society for leave

4    to conduct discovery pursuant to Rules 2004 of the Federal

5    Rules, and, if Your Honor remembers, this had originally

6    been on last week for a status conference, and then, that

7    hearing didn't go forward.  So we put it on today.

8            In anticipation of that conference we were going

9    to have last week, the official committee had submitted a

10   status report of discovery on July 8th.  That was docket

11   number 1496, and, in that report, we provided an update to

12   the Court about the Rule 2004 motion and our efforts with

13   the debtor and with the U.S. Trustee and some of the other

14   creditors to come up with a discovery protocol, the status

15   of the committee's first lien investigation of the cash

16   collateral order, an overview of the debtors' document

17   production to date, and the status of discovery with respect

18   to the RSA assumption motion.

19           And, Your Honor, I just wanted to -- the debtors

20   filed a response to that on July 10th, which was docket

21   1538.  Your Honor, really I just want to briefly update the

22   Court to what's happened since we filed that status report

23   and to bring you up to speed in terms of what's going on

24   with the 2004 motion.

25           First with respect to that, Your Honor, the

1    committee, the debtors, the U.S. Trustee, Wilmington, and

2    the Ad Hoc Committee of Unsecured Creditors of the T Side

3    have continued to work on trying to come up with an

4    agreeable discovery protocol to deal with the discovery

5    requested under the Rule 2004 motion, and, on July 15th, we

6    submitted another draft to the debtors, and they have

7    distributed that this morning to all the creditors out there

8    to show them what is going on on that front.

9           And, to move that process along, though, because

10   it's taken longer than perhaps we all anticipated, the Rule

11   2004 motion has been set on to be heard on August 11, and

12   the notice of hearing is docket number 1571, Your Honor, and

13   that was done to make sure that we're all keeping our feet

14   to the fire and working to try to get this protocol in

15   place.

16          Our hope is that, in the next week, we will be

17   able to reach an agreement with the debtors, with the U.S.

18   Trustee, and with the ad hoc committee, and Wilmington on

19   the form of the protocol, and, if we do, we'll file it, and

20   I think that will hopefully resolve the motion.  If those

21   efforts are not successful, the motion will go on to be

22   heard on the 11th.  Any objection will have to be filed by

23   the 4th, and then, we'll respond at that point.

24          So, if Your Honor has any questions about that, I

25   can answer it, but I just wanted to give you an update about

1    that.

2              THE COURT:  If you filed -- are you anticipating

3    the protocol being subject to Court approval or simply --

4              MR. KERR:  We are, Your Honor.  Yeah, we are --

5              THE COURT:  All right.  We are going to need an

6    order.

7              MR. KERR:  Yes, we will submit it with an order

8    for Court for approval.

9              THE COURT:  Under certification I assume.

10             MR. KERR:  Yes, that's correct.

11             THE COURT:  All right.

12             Yes, counsel?

13             MR. MCKANE:  Your Honor, Mark McKane, Kirkland &

14    Ellis, proposed counsel for the debtors.

15             Everything that Mr. Kerr has said is true, and I

16    would just supplement that with a couple points.

17             One, we have been continuing with our document

18    production efforts, including as relates to the first lien

19    investigation of the committee and have made substantial

20    productions between even our report and today.  I think

21    we've had meet and confer sessions either with the

22    committee, the T side or the E side every day on a discovery

23    issue every working day between that day and today, and so

24    we're moving forward on all these fronts.

25             As it relates to the protocol it would be in the

1    form of an order, we believe that if it is agreeable to at

2    least the T side and we resubmit it in that regard it would

3    moot out the 2004 motion because it would be subsumed within

4    that order.

5         We put it out to all counsel because it would

6    apply -- this discovery protocol -- if we are able to reach

7    resolution on it, and we've made substantial progress, and

8    we think we'll make additional substantial progress -- it

9    would apply to all creditors who would like to take

10   discovery on Legacy issues, meaning prepetition transactions

11   or prepetition conduct of the debtors, and that was one of

12   the reasons why we wanted to make certain that all creditors

13   had an opportunity to see this latest draft, while not

14   final, and there are those areas that we're working on, we

15   believe that the direction that this is heading is very

16   positive and hope to have it in such that while there may be

17   other objections we'd like to get it all done and resolved

18   by the 11th.

19        THE COURT:  Okay.

20        MR. KERR:  And, Your Honor, I -- again, I agree

21   with what Mr. McKane said.  We're continuing to work hard to

22   try to bring us to closure.  We'll do that, Your Honor.

23        THE COURT:  Okay.  Just give me a second, please.

24        MR. KERR:  Sure.

25        (Pause)

1          THE COURT:  So shall we then continue this for a

2     further status conference?  Can we avoid that?

3          MR. MCKANE:  I think what will happen is either

4     there will be a hearing on the 2004 motion on the 11th or

5     they'll be a hearing for entry of the discovery protocol --

6          THE COURT:  Right.

7          MR. MCKANE:  -- on the 11th or they'll be

8     certifications of counsel asking for the Court to enter the

9     discovery protocol before the 11th and then I believe the

10    2004 motion will be rendered moot and would be withdrawn.

11         THE COURT:  All right.

12         MR. KERR:  That's correct, Your Honor.

13         THE COURT:  That's fine.  Okay.

14         MR. MCGAAN:  Your Honor, one update we'd like

15    provided on discovery because it does tie to all this, we

16    have been working with the committee and other creditors to

17    reach the form of a stipulated protective order and

18    confidentiality agreement that would govern the entire

19    cases.

20         We have reached consensus on it in terms of

21    acceptable language with the committee and the United States

22    Trustee, we also put that out to all creditors this morning

23    as we've been doing drafts along the way, and we have every

24    reason to believe that we'll hopefully reach consensus with

25    more creditors, and we'll be filing a motion early next week

1    for entry of that stipulated protective order for hearing on

2    the 11th, and to the extent that if we're able to --

3    hopefully that -- we'll be able file certification of

4    counsel as well on that, but if we're not we'll have that

5    for hearing on the 11th.

6              THE COURT:  Okay.

7              MR. MCGAAN:  Thank you.

8              MR. KERR:  Your Honor, a couple more just things I

9    want to update to from our status report.

10             The second item is the first lien discovery we're

11   undertaking in connection with the first lien investigation

12   that the committee is doing under the cash collateral order,

13   which was docket number 855.  In the report we talk about

14   the fact that we had been working with the debtors to both

15   identify both a set of priority documents and then follow

16   that up with additional requests.  That effort is ongoing.

17             The debtor has informed us that after having seen

18   our status report they have reached out to the T side first

19   lien creditors and that group had agreed to extend the date

20   by which we needed to complete this investigation by 30

21   days.  I have not yet seen that.  I don't know if that's

22   going to come in the form of an order or a stipulation, but

23   that is I understand the current status.

24             So we would update which was September 14th will

25   be moved out to October 14th, 2014 for the committee to have

1    both filed an action if based on its investigation it

2    determines that it wants to proceed.

3                    MR. MCKANE:  Your Honor, Mark McKane.  For the

4    record Mark McKane, Kirkland & Ellis, proposed counsel to

5    the debtors.

6                    The latest and greatest information that I have,

7    and I've learned this even since Mr. Kerr and I spoke 30

8    minutes before the hearing today, is that we did receive a

9    draft revision from the TCH first lien group late last night

10   and we're working to get that revised and we'll send that

11   over to the committee today or tomorrow depending on when we

12   can work out the exact language, but the term extending it

13   out 30 days is exactly as we discussed last week.

14                   THE COURT:  So we can cancel the trial?

15                   MR. MCKANE:  Oh, yes, the date that you held I

16   believe is September 4th?

17                   MR. KERR:  Yes.

18                   MR. MCKANE:  Yes, we can release that date.

19                   THE COURT:  I think I held more than the 4th, I

20   think I gave you three days.  Didn't I?

21                   MR. MCKANE:  Well there are three days held in the

22   second week of September for the first lien EFIH make-whole

23   trial, but I believe you only set aside one day for the --

24                   THE COURT:  Yes, you're right.  Thank you.  All

25   right.

1           So I'm going to cancel the hearing on the 4th of

2    September or do you want to hold it as an omnibus?

3           MR. KERR:  Can you just give us a moment, Your

4    Honor?

5           THE COURT:  Yeah.

6        (Pause)

7           MR. MCKANE:  Your Honor, the debtors request that

8    you keep that date.

9           THE COURT:  Okay.

10          MR. MCKANE:  As a potential omnibus.

11          THE COURT:  Okay, we'll keep it as an omnibus

12   hearing.

13          MR. MCKANE:  Thank you.

14          MR. SASSOWER:  Your Honor --

15          THE COURT:  It's currently -- it's currently

16   delineated as only being for the -- only being for the

17   challenge, so it'll -- it doesn't matter, but it'll be a

18   change in status so it can be treated as an omnibus hearing.

19   But now I'm hearing that that's not okay, so is that all

20   right with everyone?

21          MR. SASSOWER:  Yeah, Your Honor, we -- you may

22   have also held the 16th and 17th as -- or the 17th and 18th

23   as an omnibus date, and so our rationale was if we don't

24   finish up the business on the 11th on whatever is on the

25   11th we may need a -- a holdover date.

```
1              THE COURT:  Well, we --

2              MR. SASSOWER:  I don't know we'll need two

3    omnibuses within --

4              THE COURT:  -- we have -- we have the 4th, we have

5    the 11th -- excuse me -- we have the 4th, the 10th, 11th,

6    12th are the trial dates, so those are three days, and then

7    we have the 16th, and then we have the 17th as disclosure

8    statement.

9              MR. SASSOWER:  Right.  Now in --

10             THE COURT:  You know, I've blocked off the time --

11             MR. SASSOWER:  Right.

12             THE COURT:  -- so -- and given I'm not really very

13   available in August at all.  So why don't we keep the 4th as

14   an omnibus day.

15             MR. SASSOWER:  Very good.

16             THE COURT:  Just so you have it.  I mean there are

17   other -- there are other matters such as the Sierra Club

18   matter, there are -- you know, there might be retention

19   applications, they're, you know, sort of important but not

20   central issues that might be able to be taken care of in

21   that kind of --

22             MR. SASSOWER:  We appreciate that, Your Honor.

23             THE COURT:  -- hearing.

24             MR. SASSOWER:  Thank you.

25             THE COURT:  So I will change the 4th to an omnibus
```

1    date, which somebody has already done.

2         (Laughter)

3              UNIDENTIFIED SPEAKER:  Very efficient, Your Honor.

4              THE COURT:  Okay.

5              MR. SASSOWER:  Thank you again.

6              THE COURT:  You're welcome.

7              MR. ADLESTEIN:  Your Honor, just briefly.  Jacob

8    Adlestein, Paul, Weiss, Rifkind, Wharton & Garrison on

9    behalf of the ad hoc committee --

10             THE COURT:  Yes.

11             MR. ADLESTEIN:  -- the (indiscernible - 10:25:45)

12   first lien creditors.

13             I can confirm as counsel represented that our

14   clients have agreed to a 30-day extension of the challenge

15   period.  Just to clarify it would be for all parties in

16   interest, including the committee, and we're working on a

17   stipulation to that effect.

18             THE COURT:  Okay.

19             MR. KERR:  And, Your Honor, Charles Kerr.  One

20   final thing.

21             We are continuing to press forward to -- with our

22   investigation.  We've been working well with the debtors,

23   but we have a lot more work to do.  Even with that extension

24   we've got a lot of work to do before then.  We will work

25   very hard to meet it.  If we -- our completion of our

1    investigation however is dependent upon getting the

2    necessary documents, and if we have any problems we'll bring

3    that back to the --

4              THE COURT:  Sure.

5              MR. KERR:  -- Your Honor's attention.

6              THE COURT:  Of course.

7              MR. KERR:  Your Honor, just one final thing.

8              In our status report we had noted that, you know,

9    discovery was ongoing, we -- that there had been about I

10   think 13 -- a little over 14,000 documents served as of that

11   date, there's about a little bit more, there's about 14,312

12   documents served as of today stating all these various

13   matters -- excuse me.  You know, with the uncertainty of the

14   RSA motion that may adjust different schedules.  We'll

15   continue to work with the debtors on -- on these issues, but

16   needless to say a case of this size and complexity the scope

17   of discovery is going to expand and that is going to require

18   all the parties to work together and to work diligently, and

19   we'll continue to press everyone and work with the debtors

20   in a cooperative way, which I think we've done, to get all

21   that stuff on the table.

22             So with that, Your Honor, if you have any

23   questions I can answer that, if not I'll just sit down.

24             THE COURT:  I don't.

25             MR. KERR:  Thank you, Your Honor.

1          THE COURT:  I don't, except I do have a -- all

2    right, well, let's make sure.  Is that it for the WSFS

3    motion?

4          Yes, sir.

5          MR. STRANER:  Your Honor, Greg Straner of White &

6    Case on behalf of the TCH ad hoc committee -- or ad hoc

7    group.  If I may just briefly address the Rule 2004 motion.

8          I just wanted to highlight the fact it has been

9    pending since day one of this case effectively, and the fact

10   that we just wanted to stress the fact that the

11   investigation that that kind of contemplates is in a

12   diligence that effectively it's seeking is essential for

13   moving forward in this case.  I mean it deals with claims of

14   causes of action that would effectively be critical for any

15   discussion about how this case moves forward, and so I just

16   wanted to highlight that fact.

17         And I think also I wanted to highlight I think the

18   debtors' description of the discovery to date has been a

19   little bit generous.

20         With respect to the Rule 2004 issues and as far as

21   we are aware -- I mean effectively you're talking about,

22   about 40,000 pages of documents they initially produced, and

23   then they've also I think may be taking credit for certain

24   documents they've produced in connection with the first lien

25   investigation, but even there you're talking about less than

1    1,000 documents.  So I just want to highlight the fact is we

2    have put that -- the Rule 2004 on the calendar for

3    August 11th to try to push this forward and just highlight

4    and stress the need to move discovery forward on Rule 2004

5    issues.

6             THE COURT:  All right.

7             MR. STARNER:  Thank you, Your Honor.

8             THE COURT:  Before we turn to the next matter it's

9    -- I understand there was a scheduling request in connection

10   with the August 11 hearing to seek an additional day.  Is

11   that news to somebody?  Yeah?

12            MR. SASSOWER:  Yeah.  Yes, Your Honor.  We thought

13   we were inquiring in case -- we're still figuring out how

14   much that's on for that day to be going forward, but in the

15   event that we needed a second day we wanted to know if that

16   was possible.

17            THE COURT:  It's -- I can give you a second day or

18   even a third day that week, but I can't give you the next

19   day.

20            MR. SASSOWER:  Sure.

21            THE COURT:  Which I know is expensive and

22   troubling -- well not troubling, but annoying for counsel.

23   But I can give you 13th, 14th, or 15th.  Actually preferably

24   the 14th.  Can we -- well, I can do the 13th.  Do you want

25   to chew on that and get back to -- get back to my staff?

1           MR. SASSOWER:  Yes, Your Honor.  Just one -- just

2     one question while we -- while we chew on that is would it

3     make sense to move the 11th to the 13th so you'll have the

4     13th and 14th?

5           THE COURT:  We can do that if you wish.

6           MR. SASSOWER:  Okay.  So --

7           THE COURT:  I'll just -- I've booked three

8     hearings already for the 12th and I've moved a lot of things

9     around to make room for you guys, and --

10          MR. SASSOWER:  We appreciate it.

11          THE COURT:  -- these are all hearings that

12    probably have to go forward, at least two of them.  So --

13          MR. SASSOWER:  We appreciate your --

14          THE COURT:  -- be in contact with chambers.  We

15    can move the 11th to, you know, the 13th, I'll give you the

16    13th and the 14th or the 14th and the 15th, however you want

17    to proceed.

18          MR. SASSOWER:  Thank you again.

19          THE COURT:  Okay.  Is that going to cause trouble

20    with anybody who's now set something up for the 11th is

21    going to be upset with a two- to three-day delay?  No.

22    Good.  Excellent.

23          All right.  The next item up for bid is the

24    pretrial in adversary 14-50405.

25          Mr. McGaan.

1            MR. MCGAAN:  Good morning, Your Honor.  Andrew

2    McGaan, Kirkland & Ellis for the debtors.

3            You're on item 32 on the agenda?

4            THE COURT:  I think that's next, yeah.

5            MR. MCGAAN:  Yeah.  This is a status on the

6    adversary filed by the EFIH second lien noteholders with

7    respect to the make-whole claim, and the -- Mr. Horowitz is

8    here, but from our perspective it's a short report, we filed

9    our answer in a timely fashion on Wednesday, July 16, no

10   discovery has been served in connection with this, we're in

11   scheduling discussions with counsel for the noteholders and

12   have not yet proposed the trial schedule.

13           So I have nothing to add really at this point.

14           THE COURT:  All right.

15           MR. HOROWITZ:  Good morning, Your Honor.  Gregory

16   Horowitz from Kramer Levin.

17           THE COURT:  Good morning.

18           MR. HOROWITZ:  Good morning.  On behalf of the

19   EFIH second lien notes trustee and the EFIH second lien note

20   ad hoc group.

21           Your Honor, I think it may make sense for me to

22   withhold most of my comments until after the discovery and

23   the scheduling issues on the first liens have taken place,

24   but just to preview Your Honor we have -- I have tried on a

25   number of occasions to discuss scheduling with counsel for

1    the debtors, it's been our position that as a matter of

2    efficiency, and I think I'm going to get into this more in a

3    little bit, Your Honor, it really makes sense to have the

4    second lien make-whole litigation and the first lien make-

5    whole litigation take place on the same schedule and to be

6    briefed simultaneously, because there's substantial overlap,

7    and I'd just like to reserve comment on that until after

8    you've heard the discussion --

9            THE COURT:  Okay.

10           MR. HOROWITZ:  -- of what the scheduling is on the

11   first lien issues.

12           THE COURT:  Okay.  All right, before we jump to

13   the second lien I need to take care of something that's

14   arisen, so -- it won't be very long -- so a five- or ten-

15   minute recess, and then we'll come back and we'll talk about

16   the second lien.

17       (A chorus of thank you)

18       (Recess at 10:32 a.m.)

19           THE CLERK:  All rise.

20           THE COURT:  Please be seated.  Thank you for your

21   patience.

22           Okay, so that leaves us with the status conference

23   on the adversary proceeding.

24           MR. MCGAAN:  Right.  Andrew McGaan, Kirkland &

25   Ellis for the debtors, Your Honor.

1          The -- what Your Honor has received this week as

2     you know are -- well is a letter from -- it's a first lien

3     trustee is taking on a position on the scope of discovery

4     and then taking issue with the EFIH unsecured lenders and

5     their position on discovery.  And I might suggest that

6     because the request is coming from the first lien trustee

7     that they go ahead and address the Court on that.  We differ

8     with their position as our letter reflects and I know that

9     the folks from Akin are here to speak as well, but I'll

10    suggest maybe that Mr. Anker proceed with the basis for his

11    request to expand the discovery beyond what we think is

12    appropriate for the make-whole dispute.

13          THE COURT:  Yeah.

14          MR. MCGAAN:  And then we can respond.

15          THE COURT:  Very good.

16          Mr. Anker?

17          MR. ANKER:  Good morning, Your Honor.  Phillip

18    Anker, Wilmer Cutler Pickering Hale and Dore for CSC Trust

19    of Delaware as trustee for the first lien notes on the EFIH

20    side.

21          Your Honor, before getting to the specific

22    discovery dispute I thought it might be helpful to provide a

23    brief status report, and I am and I know counsel for all

24    parties are sensitive to your docket, and I think this will

25    affect your docket, and so I think we owe it to you to call

1    your attention to it sooner rather than later.

2             THE COURT:  Okay.

3             MR. ANKER:  We have been, and I think counsel for

4    the debtors can attest to this, working around the clock on

5    this matter.  And I want to say I think the debtors have

6    been.  I have no -- I'm not standing up here and suggesting

7    in any way, shape, or form that they have been anything but

8    diligent, but they have certainly been inundated.  As a

9    result inundated with discovery from many sources.

10            We do not have as of today many critical documents

11   with respect to this matter, matters -- documents that the

12   debtors acknowledge we are entitled to.  It's not a

13   discovery dispute and that's why I haven't teed it up that

14   way to Your Honor.  For example, the indentures that govern

15   the notes that are outstanding were in part exchanged

16   offers, and that means they were predecessor offering and

17   notes as well.  Our understanding is that the principal

18   counsel with respect to the preparation of those documents

19   representing the debtors with Simpson Thacher.  Our clients

20   asked back in May for Simpson Thacher's documents, the

21   debtor is gathering them.  Again, I don't suggest they

22   haven't acted fully diligently, but we don't have that

23   production yet.  I've been told by counsel for the debtor

24   they are hopeful we will have it this weekend, though that

25   is not certain, and we obviously don't know the volume.

1           We got -- we got outstanding requests for board

2    minutes, we did get a production last night at 10:07 p.m.

3    I'm told that they include some board minutes.  Whether

4    they're all or not I don't know.  We've had ongoing

5    discussions about search terms.  The quantity of documents

6    frankly that have been produced to date relating to the

7    make-whole has been rather startlingly small, and the result

8    of all of that is without complete document production,

9    indeed critical document production by the debtors and with

10   the outstanding discovery requests with respect to the ad

11   hoc committee -- Your Honor may call them the PICs at time

12   and I apologize if they're not all the PICs, they're only 80

13   percent of the PICs or more -- and with respect to

14   outstanding third party I think there is a realization by

15   all parties that the current schedule which calls for

16   summary judgment briefs to be filed July 30, 12 days from

17   now if I just did the math right, with reply briefs

18   August 15 and a trial September, and you did set aside three

19   days, September 10, 11, 12 I believe are the three days,

20   simply isn't going to be doable.

21           We have not taken a deposition to date in this

22   matter, and the reason we haven't is not because we're not

23   diligent, it's because we're not going to take depositions

24   before we have the documents.  The debtors have taken the

25   position that they're producing their witnesses once and

1   only once, and subject to possible reasons why one might

2   adjust that that doesn't strike me as an unprincipled or

3   unreasonable position.

4        As a result I had discussions as recently as

5   yesterday afternoon with Mr. Dempsey of the Kirkland & Ellis

6   firm for the debtors and I think there is an agreement --

7   and I'd ask for a confirmation on the record -- that the

8   schedule needs to be adjusted both with respect -- obviously

9   subject to Your Honor's approval -- both with respect to

10  summary judgment briefing and with respect to trial.

11       I think that we don't have yet, and again, it's

12  not because parties aren't trying, an agreement on what that

13  schedule should look like, in part that will turn Your Honor

14  on the discovery when we get it, what discovery Your Honor

15  permits, but I think the thought is that we and counsel for

16  the debtor and counsel for the intervenors can meet and

17  confer over the next week as we see hopefully productions

18  come in, look at peoples' schedules, including vacation

19  schedules for witnesses on deposition, and come back to Your

20  Honor with a proposal.

21       My client has no interest in having this issue

22  linger.  We think we're entitled to this money or the

23  holders are, but -- so we don't want to push this off

24  indefinitely, but I do think minimally an extension of 30 to

25  60 days is going to be required, and depending on the timing

1    of discovery everything may -- there may also be other

2    adjustments, Your Honor, that we propose.  For example, the

3    current schedule calls for a two-week period between opening

4    briefs and reply briefs for summary judgment.  We totally

5    appreciate that if summary judgment briefing is going to be

6    helpful to the Court it needs to be completed in advance of

7    trial so Your Honor has the time to read them and digest

8    them and look at them.  At the same time I think two weeks

9    is pretty tight, and frankly I think again on this issue we

10   and the debtors agree that it may make sense to have a

11   slightly longer period.

12           I wanted to just alert Your Honor to all of this.

13   I'm hopeful that by next week, knock on wood, we will be in

14   a position on certification to propose to Your Honor a

15   schedule.

16           I will also say that the current scheduling order

17   contemplated a discovery protocol specific to this

18   adversary, not the general discovery protocol that -- I

19   don't recall if it was Mr. Sassower or other counsel for the

20   debtors referred to earlier -- we are busy at work on that

21   and I think -- I'm happy to report to the Court that subject

22   to working out these dates I think we are in agreement on

23   that discovery protocol with the debtors, with the ad hoc

24   committee, and with the other intervenors.

25           So I'm hopeful that if we work out the dates we

1    will again be able to submit that to Your Honor next week on

2    certification, and obviously Your Honor will have to look at

3    it and make sure it is agreeable to you.

4            But I wanted to give you that report so you could

5    look at your schedule.

6            I -- that's what I have on status.  I do -- happy

7    to get confirmation, would like confirmation from the

8    debtors that what I've said is accurate.

9            MR. MCGAAN:  Andrew McGaan again for the debtors,

10   Your Honor.

11           Mr. Anker is correct that we're in discussions

12   about the scheduling following the conference with Your

13   Honor a week ago in thinking about how the summary judgment

14   schedule fits in and feathers in with the trial date and

15   then some overhanging discovery issues.  We're not there

16   yet, but we're in active discussion about the issues he just

17   raised.

18           And with respect to the status of discovery I'm

19   just going to ask my partner, David Dempsey, to address

20   that, he's been handling that and give you just a very brief

21   report of where we are there.

22           THE COURT:  Okay.

23           MR. DEMPSEY:  Good morning, Your Honor.  David

24   Dempsey, Kirkland & Ellis, proposed counsel for the debtors.

25           Just to provide a brief update.

1          The debtors did produce a substantial amount of

2    material, Your Honor, in June concerning the negotiations of

3    a number of the relevant indentures, both to the first lien

4    indentures, Your Honor, a predicate indenture on which that

5    one was based, the second lien indenture, which is the

6    subject of a separate dispute but about which the first

7    liens also sought discovery, and the predicate indenture

8    concerning actually that second lien indenture as well.  So

9    five indentures in total, negotiation (indiscernible -

10   10:50:09).

11         Since then we've been reviewing a slew of

12   materials running up to the petition date concerning a

13   number of requests that the first lien trustee has asked

14   about the reasons for EFIH's bankruptcy filing, specifically

15   they have a theory that we intentionally defaulted in order

16   to avoid that make-whole.  We don't believe that's the case,

17   we're providing discovery to make that clear.  EFIH filed

18   for the oldest reason in the book, it was running out of

19   case.

20         Since then, Your Honor, we've been meeting and

21   conferring I'd say extensively with counsel for the first

22   lien trustee about a number of additional search terms and

23   custodians that would stretch that discovery back to the

24   original buyouts of EFH and EFIH in 2007.  In that context,

25   Your Honor, there were a number of indentures that were

1    negotiated that were in some ways similar to those at issue

2    here.  And we've agreed, Your Honor, to provide that

3    discovery, and that additional discovery is right now under

4    review and will be produced we hope very soon.

5            But we have no quarrel, Your Honor, with the first

6    lien trustee's comment that in fact there are materials that

7    are outstanding, that is indeed true, Your Honor, but we

8    have made substantial productions and we're working

9    extraordinarily hard to insure that the first lien trustee

10   gets these materials as timely as possible given the

11   schedule that we're under operating.

12           Thank you.

13           THE COURT:  Let me -- yes, Mr. Anker.

14           MR. ANKER:  Just a couple of remarks.

15           Mr. McGaan is certainly accurate when he says we

16   have not reached agreement on a new schedule to propose to

17   the Court, but since otherwise I would be having people

18   working around the clock to take depositions, if not ten

19   next week, and to prepare summary judgment briefs, I do

20   understand that we have reached an agreement that subject to

21   the agreement of Your Honor on new dates the existing dates

22   both for opening summary judgment briefs, replies, and trial

23   we have agreed need to be adjourned, and I would ask for

24   confirmation of that.

25           MR. MCGAAN:  Yeah, I'm not sure what the problem

1    -- I don't want to negotiate at the podium here.

2           THE COURT:  Yeah, I'd rather not.

3           MR. MCGAAN:  Okay.

4           THE COURT:  And you know, I --

5           MR. MCGAAN:  I don't think we're --

6           THE COURT:  -- I'm not -- I'm not a big fan of

7    counsel asking other counsel to confirm things at the

8    podium.  You guys are professionals and can work it out.

9           MR. ANKER:  We will, Your Honor.

10          THE COURT:  Let me -- yes, Mr. Horowitz.

11          MR. HOROWITZ:  Thank you, Your Honor.  Again, Greg

12   Horowitz from Kramer Levin.

13          This is the point that I wanted to reserve.  Now

14   that Your Honor has heard about the current status of the

15   first lien make-whole litigation I think my remarks will

16   have more context.

17          Your Honor, I think as Your Honor knows our

18   indentures are -- have make-whole language that's somewhat

19   different from the first lien indentures, because I think

20   the debtors have acknowledged our make-whole case without

21   commenting at all on the strength of the firsts make-whole

22   case, is stronger, our language is more explicit.  Even if

23   the Court found that the firsts were for whatever reason not

24   entitled to a make-whole it's very possible the Court would

25   reach the opposite view with regard to the seconds, but I

1    think it is clear that conversely if the firsts prevail on

2    their make-whole claims the seconds necessarily will as

3    well.

4            There is a substantial overlap in legal issues

5    particularly with regard to these make-whole claims, and

6    therefore the second lien holders and trustee have a strong

7    interest in the first lien make-whole proceeding.

8            Recognizing that the debtors and the first lien

9    holders negotiated a schedule order that provided the second

10   lien holders who are a party that could intervene simply by

11   notice, which we did, but we weren't consulted on that

12   scheduling order and we didn't learn about it until it was

13   entered.

14           We had very promptly filed our own declaratory

15   judgment complaint in a separate adversary proceeding that

16   is -- largely tracks the firsts with reference to the

17   differences in our indentures, and then we've repeatedly

18   sought to engage with the debtors on discussions about

19   scheduling.

20           And more specifically we've expressed our view

21   that because of the substantial overlap and issues it made

22   sense for these two adversary proceedings to be briefed, if

23   not tried.  That's not necessary.  But briefed and discovery

24   to occur on the same schedule.  Doing so we think would be

25   efficient for all concerned and particularly for the Court.

1    It would eliminate the need for duplicate briefing on the

2    same issues and duplicate argument on overlapping issues.

3              With regard to discovery, Your Honor, the

4    discovery sought is really entirely co-extensive.  We've

5    reviewed the first lien holders' discovery document requests

6    and they cover everything that we would seek.  We haven't

7    been involved in meet and confer discussions over what steps

8    are being taken to locate responsive documents, we suspect

9    -- I have no basis for knowing -- that the firsts quite

10   naturally have focused more on insuring that documents

11   relating to the first lien claims, documents relating to

12   negotiation of the first lien indentures have had more --

13   have been given more priority, but we don't know that, we

14   would -- we need an opportunity to engage in meet and confer

15   discussions.

16             But in our view the sensible thing to do would be

17   to come up with a schedule that has summary judgment motions

18   on both of the adversary proceedings briefed and heard

19   simultaneously, possibly a trial occurring at the same time.

20   I don't know if that's necessary.  And again, we have no

21   interest in delay, we think that consistent with the 30 to

22   60 days of additional time in the schedule that Mr. Anker

23   had suggested we could easily have all of this done

24   simultaneously.

25             THE COURT:  Is that a controversial position?

1            MR. HOROWITZ:  I -- I wouldn't have thought so,

2    but the debtors have taken the position that they think that

3    briefing -- they're not -- they're not willing to engage in

4    discussions at this point on a consolidated schedule, Your

5    Honor, is my understanding, and we believe that it makes

6    sense to do so.

7            THE COURT:  Okay.

8            MR. HOROWITZ:  Thank you.

9            THE COURT:  Before you respond I actually want to

10   jump back to the comment about the summary judgment

11   briefing, that sort of cut short.  I think I made it -- I

12   think I made this comment last week, which is it doesn't --

13   in my mind it doesn't make sense to do summary judgment

14   briefing until the factual record is fully developed.  So

15   without pinning you down on a date or a continuance or

16   whatnot I would just comment I don't see the utility of

17   starting summary judgment briefing before the factual record

18   has been complete, which won't happen by July 30th.

19           So I'm not trying to pin you down on when the

20   briefing should or shouldn't be due, but I kind cut that

21   issue a little shorter than maybe I should have so I just

22   wanted to make that comment.

23           MR. MCGAAN:  Understood and we agree.  We -- and

24   that's what I was referring to when I said we listened

25   closely to your comments last week and in principal are in

1    agreement that it makes no sense to put forward on a summary

2    judgment schedule where there's going to be ancillary

3    disputes about whether the discovery is done entirely, and

4    that's in fact what's animating these discussions about

5    whether we need a new date.

6            So we heard you loud and clear --

7            THE COURT:  All right.

8            MR. MCGAAN:  -- and I think we agree in principal

9    that that creates problems we don't have to have here.

10           THE COURT:  Right.  And the other comment I would

11   make which I also made last week, which I'm sure everybody

12   heard but just to say it again, without blowing the schedule

13   up in its entirety some stretch between completion of

14   summary judgment briefing and trial beyond two weeks would

15   be helpful to the Court, I'm not asking for three months,

16   and I'm not even asking for, you know, four weeks, but if

17   you can build in a stretch of that you're much more likely

18   to be able to get or answer on summary judgment prior to

19   trial starting as opposed to me having to have trial while

20   summary judgments are still pending and who knows what's

21   going to -- and maybe we're wasting a lot of effort and

22   time, and who knows, you know, I'll have to decide the

23   merits of the trial and summary judgment at the same time,

24   which I can do under the rules, but maybe not be the most

25   efficient way to proceed.

1           MR. MCGAAN:  Our preference is very much -- is to

2   honor that and give you the chance to thoroughly consider

3   the matter on summary judgment, because as both parties have

4   now said in the letter they filed this week, the entitlement

5   or lack of entitlement to a make-whole here can be

6   determined from the language of the indenture.  So we don't

7   want to put pressure on that schedule for the reasons --

8           THE COURT:  Okay.  Then the final thing on

9   whatever your new date would be my only comment is please

10  just don't file something with dates you've pulled out of

11  the air, please work with my staff and we will get you the

12  time you need whether it be in the October or the November

13  timeframe, but if you can work with us on that that would be

14  preferable.  And I assume three days is still acceptable to

15  the parties?

16          MR. MCGAAN:  Right.  We --

17          THE COURT:  I'll let you talk to my staff about

18  that.

19          MR. MCGAAN:  Okay.  We'll -- we'll certainly do

20  that.

21          And if I could then respond to Mr. Horowitz's

22  comments.

23          THE COURT:  Yes.

24          MR. MCGAAN:  He's right, we haven't agreed to

25  merge these two.  There's been no discovery, none, served in

1    the second lien make-whole dispute.  And another -- there

2    are a couple of other important difference.

3           The first lien notes as Your Honor knows have been

4    paid.  The second lien notes haven't been paid.  Unclear

5    when and if a make-whole claim is going to arise there

6    depending on where this case goes.  The indentures, as

7    Mr. Horowitz said, contain different language, and if

8    there's anything -- anything the parties can agree on here

9    the law governing make-whole claims focuses extensively on

10   the precise language of the indentures.  We have two

11   different indentures here.

12          We've conducted no discovery, we're on the verge

13   of beginning depositions and completing document production

14   on the first lien make-whole claim, which is clearly ripe

15   because the notes have been paid, that we're concerned about

16   now putting the brakes on this and spending a lot of time

17   and energy with -- there may be some overlap, I'm sure

18   there's some overlap in the discovery, but it's not the

19   same, and we're not going to get and I wouldn't ask

20   Mr. Horowitz for a commitment that he doesn't need to do any

21   discovery because he can just pick up what we've served on

22   the first lien trustee, that won't be his position.

23          So it's a practical concern of some significance

24   to simply stop this and go start now doing discovery on the

25   second liens simply for what he argues is the convenience of

1    a combined trial where you're really doing two trials at

2    once involving two separate indentures.

3              So that's -- you know, we're going to continue to

4    have this discussion with him and we're all about finding

5    the reasonable more efficient way to do it.  Right now we

6    don't see that as the reasonable --

7              THE COURT:  Yeah.

8              MR. MCGAAN:  -- and efficient way to proceed.

9              THE COURT:  I offer no comment on that whether

10   that's appropriate or not appropriate.  I don't have nearly

11   enough information as I sit here today to make a decision

12   one way or the other on whether they should be combined or

13   coordinated or held at the same time --

14             MR. MCGAAN:  Yeah.

15             THE COURT:  -- and I don't think -- I don't think

16   anyone is asking me to make a decision, but even if they are

17   I'm not going to.

18             MR. MCGAAN:  I thought -- I didn't hear

19   Mr. Horowitz asking for it and we didn't come here pressing

20   Your Honor to weight in on that yet.  That's why I said

21   we'll continue to talk to Mr. Horowitz, and if that becomes

22   an issue we'll have to address Your Honor more precisely on

23   it and ask for a ruling at the right time.

24             THE COURT:  Okay.  Thank you.

25             Mr. Anker, back in your --

1           MR. ANKER:  Thank you, Your Honor.

2           THE COURT:  -- corner.

3           MR. ANKER:  I would just state on the other point

4    for the record we would not have an objection to having

5    discovery proceed in a coordinated consolidated way, and

6    frankly don't think the issues are nearly as different as

7    the debtors would portray with respect to the indentures.

8    But that I understand Your Honor is not an issue for today.

9           THE COURT:  Correct.

10          MR. ANKER:  Let me turn to the discovery and

11   dispute that is before the Court today, and I'm going to try

12   to be mindful of the fact that we wrote a long letter to

13   Your Honor and the debtors responded and the ad hoc

14   committee responded, and I will do my best not to repeat

15   what we've already said.  I will do my best to focus on

16   responding to what the ad hoc committee said in its letter

17   and the debtors said in its letter.

18          I will also try to be mindful that what is at

19   issue today is discovery, not the merits.  The debtors brief

20   was -- at least read to me -- largely as an opening

21   preliminary statement, if you will, on a summary judgment

22   brief on the merits.  Suffice it to say we think they're

23   wrong on the facts, including the language of the indenture,

24   and we think they're wrong on the law.

25          I'm happy to address that if the Court wants, on

1    the other hand today's not the day for a summary judgment or

2    trial it's the day for discovery, so unless Your Honor

3    prefers I'm going to try to focus on discovery rather than

4    responding on the merits.

5            The issue here is whether we get to take

6    meaningful discovery of a party to this litigation.  The ad

7    hoc committee has intervened in this litigation as a

8    defendant in a dispute that as Your Honor noted last time

9    has an enormous amount of money at issue.  I don't know the

10   exact amount, Your Honor, but it's north of $430 million, so

11   it's meaningful on all sides.

12           And where -- and I will come back to this in my

13   remarks today -- the ad hoc committee is not merely a party,

14   it is frankly in our view on many of the issues of discovery

15   the central party more than the debtor.  It is we believe,

16   and we think the evidence from the second lien DIP and

17   settlement hearing where Your Honor heard two days of

18   testimony, including Mr. Ying's testimony, it was not merely

19   a party to the RSA and is not merely a party to the RSA, but

20   it drove the economics deal, including the deal for the

21   debtors to file this case, and immediately on day one seek

22   to refinance and redeem our notes without paying a make-

23   whole.

24           Let me address some preliminary points, and I

25   address them because I think they're the easy issues, but I

1      think they're also important issues as I read what the ad

2      hoc committee is saying.

3              First, the ad hoc committee says it shouldn't have

4      to produce documents and presumably should not have to

5      provide testimony from witnesses with respect to the matters

6      that occurred prior to January 28th of this year, 2014, the

7      day that it says negotiations began on the RSA.

8              If this were an adversary proceeding -- or I guess

9      it wouldn't be an adversary proceeding, Your Honor -- a

10     contested matter over whether the debtors can assume the RSA

11     that might be a reasonable position to take, but this is an

12     adversary proceeding regarding entitlement to a make-whole,

13     not about an RSA, and what is in disputably clear, this is

14     not speculation, is that negotiations and discussions over

15     whether to structure a refinancing that paid my client is

16     make-whole or not occurred long, long before January 28th,

17     2014.

18             We have noted in our letter that by the debtors

19     own acknowledgment the debtors asked professionals for the

20     ad hoc -- I'm sorry -- asked the ad hoc committee to retain

21     and the ad hoc committee did retain a bevy of professionals,

22     including financial advisors and the Akin Gump firm back in

23     April -- starting in April 2013.

24             We have already a document from June 2013 for a

25     meeting between the ad hoc committee on the one hand and the

1    debtors on the other hand where the ray line as to what the

2    agenda is is make-whole.

3            We have testimony in the record that one of the

4    principal members of this ad hoc committee, York Capital,

5    became restricted as early as I believe it's August 2013.

6            Now were those discussions in connection with

7    Project Olympus and a potential different restructuring?

8    Yes.  But were those discussions that included the make-

9    whole front and center?  Absolutely.  The evidence we have

10   to date so suggests and we haven't obviously been able to

11   take full discovery.

12           In any event if the answer is I'm wrong, if the

13   answer is there were no discussion about solvency, there

14   were no discussions about the make-whole, there were no

15   discussions about anything that we're seeking that is

16   relevant to this adversary proceeding the right process is

17   not for Your Honor to quash the discovery, but for the Akin

18   Gump firm as counsel for the ad hoc committee to put in a

19   discovery response that says we have no responsive

20   documents.  The fact that they are not saying that, the fact

21   that they are not willing to proceed that way I think speaks

22   volumes that there are responsive documents.

23           And I said at the beginning I think that while

24   this is an easy issue it matters, because one of the things

25   I did last night is go back and read their discovery

1    responses, and on any of the subjects -- Your Honor, this is

2    Exhibit D to my letter -- but if you look at many of their

3    discovery responses they don't way we object to the entirety

4    of the subject matter, they say we have already produced to

5    you all responsive documents that (a) are from January 28,

6    2014 on, and (b) are not internal communications, they

7    reflect communications between the ad hoc committee on the

8    one hand and either the debtors or Fidelity or others on the

9    other hand.

10           I take it therefore, although I must say I read

11   the letter yesterday -- Your Honor, if you want I'm happy to

12   get you there, I saw you moving --

13           THE COURT:  No, I was looking for another pad of

14   paper actually.

15           MR. ANKER:  My apologies.  If Your Honor wants I'm

16   happy to hand up a pad if that would be of use to the Court.

17           THE COURT:  No, no, that's all right.

18           MR. ANKER:  I take it therefore that the ad hoc

19   committee acknowledging that the subject matter is

20   appropriate for discovery and what we really have is a time

21   period in an internal versus external communication issue.

22           Let me turn to the internal communication issue.

23   I will confess that I've never faced this issue before

24   today.  I've never in my years practicing had an adversary

25   say the subject matter about which you seek discovery

1    relevant, but would only be relevant is if it's a letter

2    from me or an email from me to a third party.  I take their

3    position to be the following.  If there were a phone call

4    between Mr. Rosenbaum of York Capital and Mr. Keglevic of

5    the debtors -- and, Your Honor, again, I'm not engaging in

6    idle speculation, the discovery to date suggests there were

7    numerous such phone calls -- and at the end of the phone

8    call Mr. Rosenbaum did what we all do, I do multiple times

9    every day, I get off the phone call with a third party and I

10   say, I just spoke to Mr. Keglevic, we discussed the

11   following, and he's typing this email out to one of his --

12   one of his colleagues at York.  That is not producible in

13   their view, even though it's about a communication with a

14   third party.

15            Indeed as I read their position, if Mr. Rosenbaum

16   sent that email not to a colleague at York but to a

17   colleague at one of the other four members of the ad hoc

18   committee, Third Avenue, Avenue Capital, P. Schoenfeld, or

19   GSO, it would not be discoverable.  And if they were just

20   having internal communication between themselves, how should

21   be address the make-whole, let's deal with the make-whole.

22   We think that these debtors are solvent, we think we're

23   going to get returns way, way in excess of par.  All of that

24   according to their position is not discoverable because it

25   was not shared with a third party.

1          The test is whether the subject matter is relevant

2    and likely to lead to the discovery of admissible evidence,

3    not whether the communication is internal or external.

4          And indeed, Your Honor, let's -- let's not --

5    let's not shuck our -- I don't want to put it that way --

6    common sense tells me the most relevant documents are

7    internal.  When I communicate with adversaries I'm guarded,

8    I posture at times, I think they do the same.  When I talk

9    with my internally I'm candid.  When I talk with my

10   colleagues I'm candid, now all of that because I'm attorney

11   and maybe privileged.  But the most significant most

12   important comments are internal documents and they are

13   emails.

14          The second sort of preliminary comment I will make

15   is -- or maybe it's the third -- is there is this notion

16   that there are types of documents, instant Bloomberg

17   messages that should be simply off -- off line.  This is

18   oral argument I don't have a witness up there.  I wish I did

19   because I am technologically in the stone age.  So I hope

20   you're not going to ask me a lot of detail about what

21   Bloomberg instant messages are.  But in the world I know

22   this much of hedge funds and the five members of the ad hoc

23   committee of PIC holders are all hedge funds, they

24   communicate by Bloomberg instant messaging all the time.

25   All the time.  It's the way my clients, which are all -- I

1    mean if you -- my -- I'm sorry, my client is CSC, but if you

2    look at the funds that own the first lien debt they are also

3    themselves principally -- I apologize, Your Honor, I

4    shouldn't have that happen.  I apologize, Your Honor.  They

5    are also principally hedge funds, they communicate and they

6    have received instant Bloomberg messages from members of the

7    PIC.

8              This is the world we live in, and what the federal

9    rules provide is for discovery of documents, and the term

10   documents is absolutely defined broad enough to pick up

11   electronic communications.  It obviously picks up emails.

12   If it didn't we wouldn't have half the productions we have.

13             The response that I hear is, well we didn't

14   negotiate the deal with the debtors by Bloomberg.  I'm going

15   to take that as true.  Let's assume that's true.  It brings

16   you back to the same issue, is the only discovery that's

17   permitted a memorialization of a communication between York

18   on the one hand of GSO on the one hand and the debtors as

19   opposed to an internal to York or York to GSO communication?

20   If you agree with me that the answer is the latter, that we

21   don't have a rule that says internal communications are

22   somehow off limits, those communications are almost surely

23   largely by Bloomberg instant messaging, and if that weren't

24   true then the response we would have gotten is not we

25   shouldn't have to produce any of this, it would be there are

1    no responsive documents.

2             Let me go to the third what I would call

3    preliminary issue that I don't think is terribly

4    substantial.  And that is that you really should access this

5    not under the standards of proper discovery aimed at a

6    party, but proper -- but rather the standards under Rule 45

7    of the federal rules for discovery of a third party.

8             And the argument, as I understand it, is that the

9    discovery is aimed at the committee members not the ad hoc

10   committee.

11            Your Honor, that argument elevates form over

12   substance.  This is not an official committee.  An official

13   committee like Mr. Kerr's committee has fiduciary duties to

14   all unsecured creditors of the debtors.  This is an ad hoc

15   committee consisting of five funds, and if Your Honor looks

16   at the 2019 statement that it filed it contains language

17   like every other 2010 statement I've ever seen filed by an

18   ad hoc committee, saying we disclaim fiduciary duties for

19   anyone else, and indeed each fund is operating itself.

20   Mr. Rosenbaum in the only deposition of any member of this

21   committee that has occurred and which occurred in connection

22   with the second lien DIP and second lien settlement, not in

23   relation to this matter, testified repeatedly -- and I will

24   represent this to the Court -- he was asked questions about,

25   well what did Avenue think?  What did Third Avenue think?

1    What did GSO think?  What did P. Schoenfeld think?  What did

2    they do?  The answer was almost invariably I don't know.

3    And frankly I don't find that answer terribly startling, and

4    I suspect it's absolutely truthful.

5             The ad hoc committee could change its name to York

6    Capital P. Schoenfeld GSO Avenue Capital Third Avenue, there

7    is no practical difference between the committee and its

8    individual members.

9             So now let me turn to what I think are the key

10   substantive issues.  And I think that's only two buckets.

11            First much of the discovery we seek goes to issues

12   of valuation, whether it's the value of Oncor, whether it's

13   the value of EFIH, whether it's the value that the PIC

14   holders expect to receive.  The debtors -- and this is

15   telling -- the responses are quite different.  The debtors

16   say, as I read their response, valuation is just a non-

17   issue, solvency is a non-issue.  The PICs say it may be an

18   issue, we're not going to take a position, but if it's an

19   issue seek the discovery of the debtors, not of us.

20            Let me take the debtors' position first.  We've

21   cited cases, I'm not going to read to the cases, I'm sure

22   Your Honor -- Your Honor can as capably as me, more capably

23   than me, read them, but case after case, Cantura, Premier

24   Biloxi, Calpine I, Judge Lifland's decision hold that

25   solvency is relevant in make-whole or no-call disputes for a

1    plethora of reasons.  It's relevant because if the debtor is

2    solvent there's absolutely no reason under federal or

3    bankruptcy to deny a claim that would be valid under state

4    law.  It's relevant because it goes to the voluntariness --

5    and I would take a little bit of issue with Mr. Dempsey's

6    framing of sort of the quote/unquote intentional default

7    issue -- there is a question of why these debtors filed --

8    EFIH debtors filed for bankruptcy when it's pretty clear

9    today that there is ample money to go around.  I know Your

10   Honor hasn't read the Nextera proposal, but it would provide

11   for payment in full of the PICs, including potentially their

12   make-whole, but not ours.  But it goes to the voluntariness,

13   it goes to the question of whether the decision to not pay

14   the make-whole was a strategy to get out of a refinancing,

15   and that goes to whether it is a redemption, which is what

16   the terms of the make-whole and the terms of the no-call

17   provision in our indenture refer to.

18           Moreover there are state law cases, and I read

19   last week with interest a brief filed by counsel for the

20   PICs here in a different case, (indiscernible - 11:19:28)

21   where they're also arguing against the make-whole clan of a

22   first liens and second liens in which they say that our

23   reading of state law is the indenture has to be absolutely

24   crystal clear, the language must be explicit before you get

25   a make-whole after acceleration.  Well, I think they've

1   misread those cases, but even the cases they read say, but

2   if what -- you could have paid the make-whole and you

3   voluntarily tried to refinance and lower debt when you could

4   have afforded the make-whole then absolutely you get the

5   make-whole and it doesn't matter how explicit or now the

6   language is.  So solvency matters for lots of reasons.

7           One more comment on the debtors.  The debtors

8   say, and I heard Mr. McGaan say it, there are other issues

9   in this make-whole dispute as to which solvency is not

10  relevant, and I acknowledge he's right.  There are certainly

11  going to be issues about the way you read a particular

12  provision of the indenture, but Your Honor, the standard

13  under the federal rules, it's right in Rule 26, is that a

14  party is entitled to discovery on an issue that is relevant

15  to a claim or a defense of that party.  It is not the

16  standard that if you plead 45 affirmative defenses, and

17  thankfully the debtor hasn't done that here, that the

18  discovery has to go to all 45 defenses.  The standard isn't

19  that if a cause of action has five elements the discovery is

20  only relevant if it goes to everyone of the five causes of

21  action.  If that were the rule I suspect there'd be next to

22  no discovery because I've never -- I don't want to go that

23  far.  I don't know that I've ever -- I'll put it that way --

24  run into an issue that was a subject matter of discovery

25  that went to every single issue in the case.

```
 1              One final comment on this position and then I'll
 2     move on.  The debtor says about the cases I mentioned
 3     earlier, Premier Biloxi, Calpine, and Cantura, those are no-
 4     call cases, not make-whole cases.  And the debtor is partly
 5     right about that.  And let me just quickly set the stage,
 6     and Your Honor, if you know all this please interrupt me, I
 7     don't want to waste the Court's time, but by a make-whole
 8     provision what I mean is a provision that says you the
 9     debtor may redeem the notes by paying a premium, an amount
10     more than just accrued interest and principal.  And what I
11     mean by a no-call provision is a provision that says you the
12     debtor may not redeem the notes, you may not call them prior
13     to their stated, as distinguished from accelerated,
14     maturity.
15              Those cases did involve no-calls and no-calls
16     only.  There were make-whole provisions but the -- the
17     payment by the debtors occurred during a no-call period, not
18     a make-whole period.
19              Our indenture has both is the short answer to
20     Mr. McGaan.  Our indenture says in Section 3.07(a) that the
21     debtor may redeem the notes at any time, not prior to
22     maturity, but prior to December 1, 2015, and I don't think
23     we're going to have to have discovery that today is before
24     December 1, 2015, by paying the applicable premium, that's
25     Section 3.07(a), along with all principal and interest.  And
```

1    then in a separate Section 3.07(c) it says except if you go

2    under 3.07(a) and pay the make-whole you may not redeem

3    these notes, you the debtor.

4            So ours has both a make-whole and a no-call and we

5    have plead a count for violation of the no-call.  So to the

6    extent those are cases about whether solvency is relevant

7    with respect to no-call provisions we have brought a claim

8    specifically for the no-call.

9            And I'll just spend one more second on the merits.

10   There is an acceleration provision, and the acceleration

11   provision says that upon acceleration the debtors have to

12   pay the notes, capital and notes.  It doesn't say principal

13   on the notes, it doesn't interest on the notes, it says the

14   notes, and when you look at the notes the notes have in them

15   on their face a provision for payment of principal,

16   interest, and a make-whole if it's a redemption that's

17   occurring before December 31, 2015.

18           So the notion that because those were no-call

19   cases they're irrelevant here that's wrong.

20           Let me turn then to the PIC's position.  The PIC's

21   position as I understand it -- I just call it the PIC's, the

22   ad hoc committee -- is that well, discovery on solvency and

23   valuation issues may be relevant, but not of us, we're not

24   the debtors.

25           Let's try to put in context who they are.  The ad

1    hoc committee by the testimony of Mr. Ying owns 80 percent

2    of the entire 1.6 I believe billion dollar issue of the PIC

3    notes.  The ad hoc committee is a party to the RSA.  There

4    is testimony from a prior hearing, Mr. Ying's testimony, how

5    is the 64/35 spilt, the split between what percentage of the

6    equity would go to those who participated in the DIP and

7    those who were just holders of the ad hoc committee?  How

8    was that determined?  Mr. Ying, we didn't determine it, the

9    debtors didn't determine it, the ad hoc committee in

10   negotiations with Fidelity determined it.  Mr. Ying

11   testified, we have not done a valuation of the debtors -- of

12   EFIH debtors.  He said that I think to Your Honor multiple

13   times.  Who did do a valuation, who set the value here?  The

14   EFIH PICs, the ad hoc committee in negotiations perhaps with

15   Fidelity and/or others.

16          So they cite cases, cases not dealing with a make-

17   whole, unpublished transcripts in which Judge Shannon in

18   this court, Judge Lane in the Southern District say in

19   connection with plan confirmation I'm not going to allow

20   discovery of what some particular creditor's valuation might

21   be, because -- but I'm not saying valuation is irrelevant,

22   because this is an issue of cram down, equity is going to

23   get nothing under the debtors' plan.

24          And what matters is the debtors' valuation that

25   debtors will have the burden of proof, and the debtors are

1    going to have to put on evidence of valuation.

2            Well, here, the debtors have disclaimed that

3    they've done any valuation.  The negotiation and I can't put

4    this, Your Honor, in terms that I think are strong enough.

5    I don't believe the debtor to be the key person in the

6    denial of this make whole.  I think the debtors if the PICs

7    would agree to it, would agree to it, and we'd have a

8    consensual deal at least as to us in an instant.

9            I think the driving party, and I think the

10   discovery to date on questions of valuation and payment of a

11   make whole are the PICs.  And, of course, Mr. Ying testified

12   that if we win our make whole, it will reduce, if not dollar

13   per dollar principally the recovery of the PICs.

14           In any event, Your Honor, the question under the

15   federal rules is do these parties have relevant evidence.

16   If valuation and solvency are relevant, then they're

17   relevant, and it doesn't matter who has the information, the

18   debtors or a third party.

19           Let me move to the other basic subject matter, and

20   I will really try to be brief here, and that's discovery of

21   discussions involving the PICs and the debtors on the make

22   whole and the strategy for immediately refinancing the 10

23   percent notes without paying them.

24           The debtors' response is to again differ from the

25   PICs.  It is to make the bold statement, and I quote from

1    their letter, quote, the debtors, quote, did not file

2    bankruptcy to avoid paying the make whole premiums.

3          For the reasons I described earlier, I think

4    that's a caricature of our position but let's assume that

5    were really the test, and that were really the issue.  The

6    debtors say so precludes us from taking discovery?  The way

7    litigation occurs is a plaintiff files a complaint and has

8    an allegation.  And then the defendant responds with an

9    answer, and he says admitted or he says denied.  Can say

10   other things, but those are the two.

11         When he says admitted, that's when the plaintiff

12   doesn't get discovery on the subject matter.  When he says

13   denied, that's when the plaintiff does get subject -- get

14   discovery on the subject matter.

15         The -- again, the ad hoc committee takes a

16   different tack.  It says, okay, maybe issues about why the

17   debtors filed for bankruptcy, whether they had enough money

18   and were solvent, whether -- that is the EFIH debtors,

19   whether -- why they filed on the first day of motion to

20   refinance our debt, maybe all of that is relevant, but we're

21   not the debtors, we didn't file for bankruptcy.  And it

22   wasn't our motion.

23         I don't know how to put the answer other than to

24   say, come on.  The ad hoc committee didn't discover that the

25   EFIH debtors had filed for bankruptcy by picking up the Wall

1   Street Journal on the day of the filing.  This was a pre --

2   not a pre-pack in the sense of a fully negotiated, but there

3   was an RSA, they were a party to it.  And that RSA

4   obligated, required, mandated that the debtors file a motion

5   on the very first day to refinance the first lien debt and

6   avoid paying the make whole.

7           The ad hoc committee was a party to that.  And

8   indeed, if you look at the RSA, it goes further than that.

9   I'm told by the ad hoc committee look, we don't -- we're not

10  going to put on evidence on some things, the debtors are

11  going to put on evidence.

12          The RSA says that the debtors may not file a

13  pleading in the make whole without first preclearing it with

14  the ad hoc committee, it has to reasonably be subject to its

15  approval.  It's not subject to its sole approval in its

16  absolute discretion but reasonably.

17          But the notion that this ad hoc committee are

18  strangers to this dispute and have no knowledge of why the

19  debtors decided to do a refinancing without paying the make

20  whole is not plausible, let me put it that way.

21          Let me just then say two other things, and I will

22  cede the podium.  Let me -- the first I hope will please the

23  Court because I think what I'm going to say is there's a

24  non-issue that Your Honor doesn't have to decide, and that's

25  this common interest question.

1            I think the right way, Your Honor, to handle a

2      question like common interest is to have a concrete dispute,

3      and therefore, our letter basically said we don't think

4      there's a common interest, but give us a privilege log.

5            In footnote 6 of the Akin Gump letter, Your Honor,

6      they indicate they will give us a privileged log.  I reserve

7      all of our rights to argue that -- and come back to Your

8      Honor that documents -- that the log is inadequate, the

9      documents that are logged shouldn't be privileged, but I'm

10     not going to take that position today because I don't know

11     what the log says, and I don't know how they're going to

12     describe any documents.  I just think on that issue, we do

13     not have a right -- a dispute.

14            And I will say, counsel for the ad hoc committee

15     called me yesterday and gave me a preview shortly before

16     they filed their letter on that issue and said I don't think

17     we have a right to dispute on this point, and I agree.

18            Finally, number of depositions.  I also think this

19     is not a ripe issue.  I understand when Akin Gump says 13

20     depositions, why do you need all 13.  The way to handle that

21     issue is we take a few depositions, we see what we learn,

22     you know, it's one thing if the first witness says, I wasn't

23     really involved, it was all this other guy who you haven't

24     deposed yet.  Or if the first guy says, that other guy had

25     nothing to do with it, it's all me, let me tell you what

1  happened.

2           They have proposed a single 30(b)(6) witness that

3  a committee -- I don't think that works.  As I say, the

4  committee is a fiction, it's five different hedge funds and

5  Mr. Rosenbaum testified he has no idea what the other four

6  were doing in numerous circumstances.

7           Would it be plausible to start this by saying, how

8  about a single 30(b)(6) deposition of each of the five

9  members, so one of York, one of Avenue, one of Third Avenue,

10  one of GSO, one of P. Seanfeld (ph) and then we reserve the

11  right to come back and seek more, they reserve the right to

12  say no more, that's not an unreasonable way to proceed.

13           I flag that as a possibility to my adversaries

14  yesterday and haven't received the response yet.  But we're

15  willing to proceed in terms of number of depositions, any

16  reasonable fashion in which everyone's rights to argue the

17  point and oppose further discovery based on a concrete

18  record are preserved and our rights are preserved as well.

19           That too, I would submit to Your Honor, is not a

20  ripe issue.  What is ripe is whether we get to take any

21  depositions at all.  And for all the reasons I've said I

22  think the answer should be yes.

23           Your Honor, I've violated my promise at the

24  beginning that I'd be brief, I apologize, but these are

25  really important issues to our client, where there's a lot

1    of money at stake.  And this is critical, critical

2    discovery.  Thank you, Your Honor.

3              THE COURT:  You're welcome.  Mr. McGaan.

4              MR. MCGAAN:  Thank you, Your Honor, Andrew McGaan,

5    Kirkland and Ellis for the debtors.

6              The issue in dispute is whether the first lien,

7    indenture and the notes provides for payment of a make whole

8    premium under these circumstances, when the notes are paid

9    off through DIP financing in a Chapter 11 proceeding.

10             We disagree.  We say the indenture clearly shows

11   that it is not triggered.  They take a position the

12   indenture clearly shows that it is.

13             We oppose the discovery into this question of

14   solvency, and I'm going to turn to that briefly in a moment,

15   but I want to just talk about this intent question.

16             We cite to Your Honor the AMR case, which the

17   Court held that the intent filing bankruptcy was not

18   relevant to the question whether the indenture provided for

19   a make whole premium, and it shouldn't be relevant here.

20             Nonetheless, the debtors are providing discovery,

21   we think it's a -- and have agreed to provide discovery, in

22   fact, have already provided discovery to the trustee here

23   that shows really without any reasonable quibble that the

24   debtors had faced a threat of a going concern opinion at

25   TCEH, which would have triggered a cascade of defaults over

1    to the E side, and driven EFIH out of cash as early as the

2    second quarter of this year.

3           So we think there's going to be no issue here, but

4    we've provided discovery.  But no issue as to whether it

5    matters whatsoever as a legal matter and as a factual matter

6    to the make whole question that Your Honor is going to have

7    to decide.

8           The more troubling request here and one we oppose

9    strongly is this inquiry into solvency of EFIH at this

10   point.  Again, there is no case that's been cited to Your

11   Honor that we could find, where a Court has held that the

12   entitlement to a make whole under the indentures turns at

13   all on whether the debtor is or was solvent.

14          They -- the trustee cited a series of cases to you

15   in which questions of no call provisions, and in some of the

16   cases even make whole provisions are discussed alongside or

17   before the Court turns to the question of solvency.

18          And what's interesting about those cases, in each

19   of them, Chemtura, Premier Entertainment, and the Gencarli

20   (ph) case in the First Circuit, each of them were in a

21   vastly different posture than this case.

22          Number one, none of them said the determination of

23   solvency drove at all the question whether a make whole was

24   due.  It had to do with the treatment of the claim at the

25   end of the case.  And, in fact, each of those opinions

```
1    reflected a make whole dispute or a no call dispute at the

2    end of the case.

3          Chemtura, as Your Honor may recall, was a 9019

4    settlement motion, at least with respect to this issue at

5    the confirmation hearing.  In Gencarli, it was a 363 sale of

6    all the debtor's assets which provided enough cash to pay

7    off all the creditors and it was in that context, the

8    decision needed to be made as to whether -- number one,

9    whether there was a make whole entitlement.

10          And secondly, and wholly apart for that, how it

11   should be treated in distribution to creditors.  We're not

12   there yet.

13          Mr. Anker raised Judge Lifland's opinion in

14   Calpine, and I think he misspoke about what happened there.

15   In the Calpine decision, we've cited in our letter, the

16   Southern District's opinion affirming and reversing in part,

17   but as to the make whole determination in Calpine, Judge

18   Lifland squarely held, now this was not at the end of the

19   case, this was in the middle of the case, there was a DIP

20   financing that took out three tranches of notes, and at the

21   hearing seeking a finding that there was a make whole

22   triggered by the refinancing.  Judge Lifland held number

23   one, there was no make whole due on language strikingly

24   similar to the language you're going to see here in the

25   indentures.  And explicitly ruled that solvency was
```

1     irrelevant, which is our position here.

2           And that finding was that make whole finding was

3     affirmed in the Southern District's opinion.  I have it, and

4     if I could hand it up, Your Honor, because we didn't attach

5     it to our letter.

6           But now that Mr. Anker has sort of put it out

7     there, I'd like to give Your Honor the transcript from --

8     that shows Judge Lifland's ruling on this question of

9     whether solvency was relevant to the make whole

10    determination in this case.  Can I hand that up?

11          THE COURT:  Yes.

12          MR. MCGAAN:  And I'll say we just flagged and

13    highlighted the relevant language.

14          THE COURT:  All right.  Thank you.  Thank you.

15          MR. MCGAAN:  So it really -- I'm not going to

16    address the common interest privilege question in light of

17    the way Mr. Anker framed it.  We've staked our position, I

18    think they've overstated the circumstances under which that

19    privilege can and cannot arise.  But it sounds like we're

20    going to have that debate, if at all, at another time.

21          And so we oppose the discovery insolvency, I think

22    it creates a sideshow at this point in the case, it's a

23    large sideshow to be debating solvency and valuation in the

24    context of whether these indentures are -- whether there is

25    a make whole provision in these indentures that's triggered

1    by the repayment of the notes under the DIP financing.

2           We disagree on whether there's a no call provision

3    here.  That's an issue for another day, and I don't think

4    whether there is or there is one here, any of these cases

5    say you need to determine solvency of the debtor to figure

6    out whether the no call is either there or was breached.

7           Mr. Anker said if these issues are relevant,

8    they're relevant.  And the case that's almost directly on

9    point here is Judge Lifland's decision where he said

10   solvency is absolutely not relevant.  Thank you.

11          THE COURT:  Thank you.  Mr. Qureshi.

12          MR. QURESHI:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. QURESHI:  Adid Qureshi, Akin & Gump on behalf

15   of the EFIH unsecured noteholder committee.

16          Your Honor, if I could start with just ensuring

17   that the Court understands exactly what it is that we have

18   produced, because it certainly would appear from Mr. Anker's

19   letter that we've done nothing at all, and that's certainly

20   not the case.

21          We have produced from a selection of agreed upon

22   custodians at the five members of our group all

23   communications between our committee and the debtors,

24   between our committee and all of the other RSA participants,

25   and, Your Honor, between the members of our committee on

1    essentially all topics related to EFH from January through

2    to the petition date.

3            And that is thousands of documents, I think at

4    numbers around 20,000 pages.  There were two categories for

5    that period of time of communication that we did not

6    produce, and that we continue to think, Your Honor, that we

7    should not be required to produce.

8            One is communications that stayed entirely

9    internal within one fund.  And the second is the internal

10   valuation materials.

11           Now, again, to the extent there was any external

12   communication between our group members and any of the RSA

13   participants, that got picked up.  So really I think what

14   we're talking about here is a dispute with respect to two

15   categories, valuation related and solvency related

16   discovery, and the internal communications, and I will

17   address each in turn.

18           So what the trustee wants, Your Honor, is the

19   valuation models, the internal proprietary valuation models

20   from each of our five committee members.  And all of the

21   communications that our funds internally may have had about

22   their own internal models.

23           As we made clear in our letter, the ad hoc

24   committee does not intend in connection with the make whole

25   dispute to offer any evidence on solvency, to offer any

1    evidence on valuation.  Neither the committee through an

2    expert, nor through any other evidence that the members

3    might offer.  That's just not something we're doing.

4            And so we didn't think that in that context, what

5    Judge Shannon in Genco (ph) and what Judge Lane in Doland

6    (ph) recently addressed is very relevant here.

7            In both of those cases, discovery was being sought

8    from a secured creditor and from an RSA party.  And in both

9    of those cases, the creditor at issue was not taking a

10   position on solvency.  And both judges reached the same

11   conclusion, which is, well, if they're not taking a position

12   in the litigation, whether through an expert or on their

13   own, of what relevance is it what a particular fund might

14   think, and of course, I'm skipping entirely the issue of

15   whether solvency is relevant at all, which I don't need to

16   address.

17           But even if Your Honor found that it was, what any

18   of our individual funds might think about solvency or about

19   value, and what their internal models generated for their

20   own internal proprietary purposes for modeling their own

21   investment for considering and modeling possible outcomes of

22   the case, what benefit that would have to help Your Honor,

23   in determining if the determination is required, whether EFH

24   was solvent as of a particular point in time.

25           Those two courts concluded and we think it's the

1    right outcome, that it wouldn't help Your Honor out at all.

2    It would also open a real Pandora's box, because if the

3    views of our clients internally on valuation and on solvency

4    are somehow relevant to the litigation, then so too would

5    the views of the first lien hedge funds.

6            And again, in the context where if people in the

7    litigation are going to take a position, presumably, they

8    will offer up an expert and Your Honor will be able to

9    determine through expert testimony the issue of solvency or

10   valuation.  But the individual members of the group I think

11   just don't have anything to contribute to that discussion

12   and it's just not relevant.

13           In addition, as Judge Lane noted in his decision,

14   Your Honor, the internal valuation models, they are

15   proprietary.  They are very sensitive.  It is not the kind

16   of stuff that usually becomes the center of a valuation

17   fight in bankruptcy, and certainly not where those funds are

18   not taking a position on valuation.

19           So with that, Your Honor, I will turn to the

20   internal communications.  And I think again it's important

21   to look at why it is, as we understand it that the first

22   lien trustee wants these internal communications.

23           And in a letter addressed to Your Honor, and it's

24   attached to Mr. Anker's letter at Exhibit A, this was the

25   last time this discovery dispute got teed up, and they sent

1    the letter and we sent the letter, and then ultimately they

2    withdrew or their prior counsel withdrew the letter and Your

3    Honor did not hear the issue.

4              But in that letter where we addressed the same

5    issue, they say it is possible that the e-mails that we have

6    produced, the external communications were all carefully

7    choreographed, their words, to avoid containing certain

8    information that might be discoverable, and you heard that

9    again from Mr. Anker in argument.  That somehow for a four

10   month period of time over the course of thousands of e-

11   mails, the wording in those e-mails were all carefully

12   choreographed and that somehow in the internal

13   communications, there's a smoking gun.

14             A smoking gun that says something to the effect

15   of, yes, the entire reason for a Chapter 11 filing is to

16   avoid their make whole, so, debtor, please file for that

17   reason.

18             And that is, I think, Your Honor, a classic

19   fishing expedition.  We are here on what should be and what

20   we think is a straight forward contract interpretation

21   issue.  There is a very real benefit and burden discussion

22   to be had with producing internal e-mails.

23             These funds have been following EFH for a long

24   time as Your Honor heard.  We were first retained in April

25   of 2013.  And so to go to each of the members of our group

1    and to pull internal e-mails from that period of time

2    through to the petition date would be many hundreds of

3    thousands of e-mails.  And the time involved in doing that,

4    I think, would be extended because it would be extremely

5    burdensome on an issue that really is a fishing expedition

6    and that we just don't understand even the relevance of it

7    in the context of a straight forward contract interpretation

8    issue.

9         Now, with respect to depositions.  Your Honor, we

10   recognize we're obviously party to the litigation, we

11   intervened.  We're not saying we should be a party, we

12   should somehow be immune from discovery.  And what we have

13   offered is a 30(b)(6).  Your Honor, the ad hoc committee

14   since the time we were retained in April of 2013 has already

15   -- has also had a financial advisor.

16        And the financial advisor represented the

17   committee through the course of all the negotiations that we

18   had, all the way up until the petition date with the debtor.

19        We're prepared to make available a 30(b)(6)

20   witness, to make available our financial advisor in response

21   to 30(b)(6) topics, so that the first lien trustee can

22   explore what it is that they want to explore about the

23   course of those negotiations.  That, we think, is very

24   reasonable in the context of this dispute.  However, asking

25   for a 30(b)(6) of each of the individual funds, we just

1     don't think it's proportionate, and we don't think it's

2     necessary.  I think a 30(b)(6), in all probability I think

3     will be sufficient entirely, but certainly is a sufficient

4     starting point.  So we don't think it's appropriate to go

5     beyond a committee representative at this point.

6              So in summary, Your Honor, it was hard to keep in

7     mind when listening to Mr. Anker that this was a contract

8     dispute.  It sounded as though he was talking about plan

9     confirmation, given the scope of everything that he's

10    seeking.  But this is a straight forward contract

11    interpretation issue, and the scope and the burden

12    associated with what he is seeking we think is just not

13    necessary to provide the discovery that they need to

14    litigate this issue.

15             So unless Your Honor has any questions.

16             THE COURT:  No.

17             MR. QURESHI:  Thank you.

18             MR. ANKER:  May I respond briefly, Your Honor?

19             THE COURT:  Yes.

20             MR. ANKER:  Thank you, Your Honor.  Mr. McGaan, I

21    hope I'm pronouncing your name correctly, I normally butcher

22    it, so I'm really lucky today, began by saying that the

23    question before the Court ultimately in the make whole

24    litigation is whether a make whole or damages for violation

25    of a no call, he didn't say the latter, I'm adding

1    (indiscernible), is allowed or is provided for under these

2    circumstances.

3              I agree, but the key three words are under these

4    circumstances.  And the circumstances include the history of

5    the negotiations that got us here.  That's what all the

6    cases say, including Premier, including Calpine or CalGen,

7    including Chemtura.

8              I'll just note parenthetically the AMR case he

9    cites is a case in which the provision on acceleration said

10   upon a bankruptcy the debt shall be accelerated and the

11   holders of the notes shall be due, principal and interest,

12   but for the avoidance of doubt, no make whole premium.  And

13   it was those words, but for the avoidance of doubt, no make

14   whole premium that the Second Circuit turned its decision

15   on.  Those words are not in ours.

16             In Calpine, what Mr. McGaan failed to note is that

17   there was no make whole provision at issue in the right

18   period.  Make whole provisions, Your Honor, typically in

19   indentures, don't begin from day one, and run to the day

20   before stated maturity.  They often typically have from day

21   one, a no call period and then when you get out -- I don't

22   actually know what's typical, but let's call it two years,

23   from two years to year 15, if maturity -- if the state of

24   maturity is thereafter a make whole, the dispute in Calpine

25   occurred during a no call period, and that was if you read a

1    published decision by Judge Lifland key, but what he went on

2    to say, yes, but the refinancing occurred during a no call,

3    and that violate -- and that refinancing violated the rights

4    of the holders to have no call during that period and that

5    gives rise to a claim.

6              And what many cases hold, including explicitly

7    both Premier Biloxi and Chemtura, Judge Gerber's decision,

8    is that solvency is absolutely relevant to that analysis.

9    I'm not going to read you from the cases.  We've cited the

10   pages, we've quoted the language, both of those courts

11   explicitly say so and they're both no call cases, I agree,

12   we have pled a claim for violation of a no call.

13             It's also relevant here on voluntariness.  I keep

14   hearing this caricature, if I will of the argument.  You

15   know, it's a fishing expedition for the PICs -- for the

16   first liens to think that they're going to get discovery

17   that shows the sole reason for the whole bankruptcy filing

18   was to provide a make whole, that's not the question.

19             The question is whether we're going to get

20   discovery that shows there were discussions about the make

21   whole, discussions about the debtor's ability to maintain

22   the first lien debt in place, and not avoid paying the make

23   whole.

24             And there, when you have a first day motion, an

25   extraordinarily unusual thing and document after document

1    referring the make wholes, there's -- it's not a fishing

2    expedition, it's clear there is -- there was discussion and

3    documents about it.

4            Just a couple of other things.  The counsel for

5    the ad hoc committee says these materials are proprietary.

6    That may be right.  But there are ways to handle that.  We

7    all deal with protective orders, we know how to negotiate in

8    good faith as professionals, protective orders that are very

9    iron clad and tight, that have provisions about who can see

10   things and who can't.  And we are certainly willing to work

11   in good faith to resolve that issue.

12           I heard about the withdrawal of the prior

13   discovery dispute.  Your Honor, I'll only spend a minute on

14   this.  I think I said at the last hearing no good deed goes

15   unpunished, and I really -- I think it's the right

16   expression.

17           There was discovery sought in connection with the

18   second lien DIP motion on these subjects.  We reached an

19   impasse with the PICs.  We reached the conclusion after

20   taking the deposition of Mr. Rosenbaum we had enough for

21   purposes of that hearing and there was an explicit e-mail

22   exchange, and I'm happy, Your Honor, to hand it up if you

23   really need to see it, but I would hope that my

24   representation would be adequate, in which -- my apologies,

25   Your Honor -- in which my co-counsel said "we're agreeing to

Case 14-10979-CSS   Doc 1645   Filed 07/21/14   Page 110 of 122

1    withdraw this for purposes of this hearing only and with

2    full reservation of rights."  And we got a response from the

3    Akin Gump firm, "that's fine."  Yes, we withdrew it in that

4    context.  We did it to make life simpler and act the way

5    professionals and lawyers should when the matter isn't

6    critical, but it is here.

7                 Finally, I heard about how the PIC's have produced

8    lots and lots and lots of documents, and they have produced

9    lots of documents.  But one of the things I asked our people

10   to do was to go back yesterday and simply search and answer

11   the -- get the answer for me, how many documents have been

12   produced to date that mention the word make-whole, or MW, or

13   implacable premium.  And the answer I got back was 152

14   documents.  In two years of negotiations, we got 152

15   documents.

16                 They're not standing up here and fighting this

17   because they know there's no other relevant documents.

18   They're standing up here and fighting this because they know

19   there's a plethora of more relevant documents and they don't

20   want to turn them over because they don't want to have the

21   strategy for denying the make-whole and the recognition long

22   ago that these debtors were insolvent and that they were

23   hoping to get recoveries way, way in excess of par by being

24   the so-called fulcrum security.  They don't want that to

25   come to light.  It bears on relevance here for all the

1    issues we said.

2            We ask that the Court grant or deny their motion

3    to quash.  I think it's really their motion, and that we

4    proceed.  And we will proceed on number of depositions, and

5    on protective orders, and on other matters in good faith,

6    quickly and to get to a reasonable resolution.

7            Unless Your Honor has questions, that's my

8    presentation.

9            THE COURT:  I don't.  Is there any final words,

10   Mr. McGaan?

11           MR. MCGAAN:  Thank you.  Briefly, Your Honor,

12   Andrew McGaan for the -- again for the debtors.

13           Mr. Anker argues that the history of -- I'm just

14   looking at my notes here and his words -- the history of

15   negotiations that got us here determines whether the make-

16   wholes do or is relevant to determining that.  And I'm not

17   clear which negotiations he's referring to.  We don't

18   dispute that the negotiation of the indenture may or may not

19   be relevant depending on whether parol evidence is admitted

20   here.  But I think he's referring to something else.  He's

21   referring to the discovery dispute with the ad hoc

22   committee, and talking about plan negotiations.  And again,

23   no case says that the history of those negotiations have

24   anything to do or are relevant in the slightest to whether

25   an indenture provides for a make-whole.

1            When I used the phrase "under the circumstances,"

2    I was, of course, referring to the automatic acceleration

3    that occurs by the filing of the bankruptcy and the language

4    in the indenture that makes it clear, in our view, that no

5    make-whole is due here.  And again, it's an argument we'll

6    have at another date.  Those are the circumstances I was

7    referring to.

8            And lastly, we'd litigated the make-whole issue in

9    front of Judge Lifland.  We, Kirkland & Ellis, along with

10   other parties, including Ropes & Gray, actually, who's here

11   on behalf -- or has been in this case on behalf of the

12   trustee, and Mr. Anker's just mistaken.  There were no call

13   provisions on some of the notes, there were make-whole

14   provisions in other notes.  In the transcript I handed up,

15   if you turn to pages -- you don't need to do it now, but for

16   the record, pages -- at the bottom of the copy, in the

17   center of the page is 193 over to 194, you'll see the

18   argument, I believe it's Ropes & Gray, but I could be

19   mistaken, but it's clearly there from an argument of

20   counsel, and it appears elsewhere throughout the transcript

21   that make-whole issues were very much in dispute.

22           The Southern District's published opinion, which

23   we cite, focuses almost entirely on the no-call issue simply

24   because it is on that issue whether damages should have been

25   awarded for an unenforceable no-call provision under the

1    Code.  That's the part of Judge Lifland's ruling that was

2    reversed by the Southern District.  His finding that no

3    make-whole was triggered and implicit in that, his

4    evidentiary ruling that solvency was irrelevant to that

5    question, was not addressed, was affirmed by the Southern

6    District, and not disturbed.  Thank you.

7              THE COURT:  Okay.  Mr. Qureshi?

8              MR. QURESHI:  Thank you, Your Honor.

9              Very briefly, I just want to ensure the record is

10   clear.  There were not two years of negotiations, okay?  But

11   on this theory that there are a plethora of documents out

12   there, where we are telling the debtors what to do, and we

13   are supposedly driving the strategy, I want to be clear.

14   The communications between our group and the debtors for a

15   four month period of time, they have.  Those have been

16   produced.  So again, that's a discussion about we're saying

17   one thing externally in our communication with the debtors,

18   and even between the members of the group, but something

19   entirely different internally between -- within each

20   institution separately and that's just not plausible and not

21   meritorious of the burden that would be associated with it.

22   Thank you.

23             THE COURT:  Okay, thank you.  Mr. Anker, last

24   words?

25             MR. ANKER:  Literally, last words.  I hate to say

1    now good afternoon.

2              I was just going to say to Your Honor,

3    (indiscernible - 12:01:04) and Mr. McGaan, if Your Honor

4    looks at the published decision in Calpine, which is

5    reported at 365 BR 392, and if one flips to the discussion

6    Judge Lifland began on page 398, he says, and I will quote,

7    "with respect to the purported prepayment premiums, none of

8    the agreements governing the CalGen secured debt require a

9    prepayment premium" -- that's a make-whole -- "for repayment

10   prior to April 1, 2007.  Thus, pursuant to the terms of the

11   agreement, so long as the refinancing is completed prior to

12   April 1, 2007, no prepayment is due."  He goes on to say,

13   however -- then when he gets to the violation, the no-call,

14   "the CalGen secured lender's expectation of an uninterrupted

15   payment stream has been dashed giving rise to damages,

16   albeit not measureable as the lenders would wish"  -- that

17   is the prepayment.  And he goes on to say, "accordingly,

18   while the agreements do not provide a premium or liquidate

19   damages for payment during the period the debtors propose,

20   the CalGen secured lenders shall have an unsecured plan."

21             And then on the solvency issue, I would just refer

22   Your Honor to the discussion in Chemtura and Premier Biloxi

23   at the specific pages, as well as the Scott Charles' article

24   in the other cases we cited.  Thank you, Your Honor.

25             THE COURT:  You're welcome.  Okay, there are a

1    number of issues I've noted here, some of which have been

2    addressed simply by Mr. Anker, some of which have been

3    addressed by Mr. McGaan and Mr. Qureshi, a little bit a

4    morphed, but I'm just going to go through them to the extent

5    some of these are not really a dispute, I'm just following

6    up and trying to address everything that we talked about.

7            As a preliminary matter, I'm going to deal with

8    the solvency issue first and at this time I'm going to take

9    this issue under advisement, probably just enter an order.

10   I'm not going to enter a formal opinion or anything, but I

11   need to take the time to read the cases and go through the

12   documents more carefully than I've had an opportunity to do

13   so.  And I think the argument in front of the Court has been

14   excellent, but expansive, and I want to make sure I get this

15   one right because there's no question I'll be opening a door

16   to a lot of discovery if I allow solvency to be a

17   discoverable issue, so I want to make sure I'm making the

18   right decision.  So everything I say here going forward at

19   this time does not allow discovery into the question of

20   solvency and valuation that we've been chatting about.

21           With regard to timing, I agree with Mr. Anker that

22   the January 2014 forward is too tight.  It's clear to me

23   there were negotiations about the make-whole premium well

24   before that.  They weren't in the context of this RSA, but I

25   don't think that's the limitation.  I wasn't given a

1    specific -- and I don't remember being asked for a specific

2    time to start.  I'm assuming 2013 forward would be

3    acceptable, Mr. Anker?

4              MR. ANKER:  I think so, Your Honor, but while you

5    are speaking, may I just -- I'll take the time, or someone

6    on my team will go look back at our discovery request.  I

7    think that's the period we may have actually had in our

8    request, but I candidly don't remember.

9              THE COURT:  Okay.  Well, I think an appropriate

10   period, not back to 2007, obviously negotiations over what

11   we're talking about today occurred some time starting in, I

12   believe, 2013, at least that's the evidence of which -- or I

13   would say evidence isn't necessarily the right word, but the

14   discussion we've been having.  So why don't you have a look

15   at that --

16             MR. ANKER:  Will do, Your Honor.

17             THE COURT:  -- and we'll get that time period as

18   long as it's -- well, maybe we have an answer.

19             UNIDENTIFIED SPEAKER:  We believe January 1, 2013

20   would be acceptable, Your Honor.

21             THE COURT:  Okay.  Mr. Qureshi, do you want to

22   respond to that?

23             MR. QURESHI:  Your Honor, the ad hoc committee was

24   formed in April of 2013, so obviously --

25             THE COURT:  Well, I'm not limiting it to the ad

1    hoc committee.  I'll get to that in a minute.

2            MR. QURESHI:  Okay.

3            THE COURT:  So, January 1, 2013, forward.

4            That leads me to sort of a mush, but let's take it

5    up at -- where we are.  Ad hoc committee of anything is not

6    a legal entity.  It is a shorthand for basically an

7    unincorporated association of people or entities, and it has

8    -- there are a lot of advantages to it, including the

9    advantage of being able to use a common interest privilege,

10   perhaps, and there are a lot of other cost sharing -- you

11   know, there are a million reasons to have ad hoc committees,

12   which is why we have them.  But I think it's important from

13   a legal standpoint that we remember what we're dealing with

14   here.

15           And to me, it's not -- discovery should not be

16   limited to the ad hoc committee.  The members of the ad hoc

17   committee are subject to the discovery rules and I think

18   should be treated as parties for purposes of the discovery

19   rules.  And that plays in in a couple of places.  One of

20   them is on the internal communications.  I believe and find

21   that the internal communications of the members of the ad

22   hoc committee are discoverable, subject to the other

23   limitations.  I also find that the Bloomberg instant

24   messages are discoverable.  I also find that -- and here I

25   don't want to be giving an advisory opinion, but I think

1    that it's pretty clear to me one deposition for the entire

2    ad hoc committee is probably almost certainly insufficient.

3    I'm not making a ruling on an offer about a 30(b)(6) for

4    each committee member, but it has some attraction.  It

5    limits it from 11 to 5 and it holds the members of the

6    committee responsible for their participation.

7              So, I'm not ruling that way one way or the other.

8    I think the way to handle it is, in fact, to go forward with

9    discovery and depositions and see how it progresses.  I'm

10   certainly not going to limit it to 1, 11 seems extreme.

11   There's always in life a happy medium and I think the

12   parties should (indiscernible - 12:08:09) so hopefully they

13   can find it.

14             Timing, terms -- with regard to the common

15   interest privilege, what I heard today is it's not ripe.  I

16   hope my opinion in Leslie can -- is it Controls?  Leslie

17   Controls?

18             UNIDENTIFIED SPEAKER:  Yes.

19             THE COURT:  Is helpful.  Both parties cited it, so

20   it probably isn't.  I do the best I can.  And let's -- I

21   think it does make some sense.  Let's see what we actually

22   have.  Let's see what the privilege log looks like, and then

23   hopefully have a more focused question, if at all, for the

24   Court.  But I hope that would provide some guidance.

25             So I'm not ruling on solvency yet.  I'm going to

1    consider that and give you a ruling.  The timing,

2    January 1, 2013, going forward.  The internal communications

3    of the member of the ad hoc committee are discoverable.  The

4    Bloomberg instant messages are discoverable.  The

5    depositions will be what they will, somewhere between 1 and

6    11, but making a point that the members of the ad hoc

7    committee are, in effect, parties, if not specifically

8    parties to the litigation in which they intervened.  So,

9    they're subject to discovery.

10              I think that's everything that was in front of me.

11   Do you have any open issues?  Would the parties like an

12   order, that might help, I don't know.  You can confer.

13              MR. ANKER:  We can confer, Your Honor.  Given the

14   tightness of time, and I think everyone can get the

15   transcript if needed.  I'm not sure an order is needed and

16   we'd rather get the substance than focus on negotiating

17   specifics on an order.

18              THE COURT:  All right, I'm not going to issue one

19   then at this time.  If you want to have one, I'd ask you to

20   communicate and submit it under COC.  If you have any issues

21   with the order, which I hope not, but sometimes that

22   happens, call and we'll have a conference call.  We'll

23   figure it out.

24              MR. ANKER:  Thank you.

25              THE COURT:  Okay.  Now, I understand -- that takes

Page 120

1    care of that issue, correct?  Okay.

2             I understand there's been a decision -- I'm not

3    getting Twitter up here, but I get some really great instant

4    messages from my staff and I understand there's been a

5    decision made on the August 11th date?

6             MR. SASSOWER:  Yes, Your Honor.  We would like to

7    move the August 11th date to August 13th and 14th, if that's

8    okay with Your Honor.

9             THE COURT:  It's fine with me.  Any objection?

10   All right, we'll do that then.

11            MR. SASSOWER:  Thank you again, Your Honor, for

12   your accommodation.

13            THE COURT:  You're welcome.  Anything left anybody

14   wants to raise?  Very good.

15            UNIDENTIFIED SPEAKER:  Nothing further from the

16   debtors.

17            THE COURT:  All right, thank you.  All right, very

18   good.  We're adjourned.  Have a pleasant weekend.

19        (Chorus of thank you)

20        (Whereupon these proceedings were concluded at 12:10

21   PM)

22

23

24

25

1                          **I N D E X**

2

3                      **D E C I S I O N S**

4

5   MOTION                                    PAGE              LINE

6   Sierra Club's Motion for Fees              42                15

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    We, Nicole Yawn, Dawn South, Sheila Orms, and Jamie

     Gallagher, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
6                  email=digital1@veritext.com, c=US
                   Date: 2014.07.18 18:05:01 -04'00'

7    AAERT Certified Electronic Transcriber CET**D-408

8

9    Nicole         Digitally signed by Nicole Yawn
                    DN: cn=Nicole Yawn, o, ou,
10   Yawn           email=digital1@veritext.com,
                    c=US
11                  Date: 2014.07.18 18:05:32
     Nicole Yawn    -04'00'

12

13

14   Sheila         Digitally signed by Sheila
                    Orms
15   Orms           DN: cn=Sheila Orms, o, ou,
                    email=digital1@veritext.co
16                  m, c=US
                    Date: 2014.07.18 18:06:08
17                  -04'00'

     Signature of Approved Transcriber

18

19   Jamie          Digitally signed by Jamie
                    Gallagher
20   Gallagher      DN: cn=Jamie Gallagher, o, ou,
                    email=digital1@veritext.com,
21                  c=US
                    Date: 2014.07.18 18:06:45
     Veritext       -04'00'

22

     330 Old Country Road

     Suite 300

23

     Mineola, NY 11501

24

     Date:  July 18, 2014

25