# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline: August 6, 2014 at 4:00 p.m. (ET)** |
| | **Hearing Date: August 13, 2014 at 9:30 a.m. (ET)** |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), extending the periods during which the Debtors have the exclusive right to (a) file a chapter 11 plan by 180 days, through and including February 23, 2015 (the "Filing Exclusivity Period"), and (b) solicit votes thereon by 180 days, through and including April 25, 2015 (the "Soliciting Exclusivity Period," and together with the Filing Exclusivity Period, the "Exclusivity Periods"), without prejudice to the Debtors' right to seek further extensions to the Exclusivity Periods.   In support of this Motion, the Debtors submit the *Declaration of Michael Carter, Senior Vice President of Corporate Planning and Assistant Treasurer of EFH Corporate Services Company in Support of the Motion of Energy Future Holdings Corp.*, et al., *for Entry of an Order Extending the Debtors' Exclusive Periods to File a*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

*Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* (the "Carter Declaration").  In further support of this Motion, the Debtors respectfully state as follows.

### Preliminary Statement

1.      The Debtors, comprising 71 separate entities, commenced these chapter 11 cases on April 29, 2014 (the "Petition Date").  With nearly $40 billion in assets and $49 billion in liabilities, the Debtors' chapter 11 cases constitute the largest operating company to file for bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Court") and the seventh largest chapter 11 case filed in history (by liabilities).  During the first 90 days of these chapter 11 cases, the Debtors have focused their efforts on:  (a) stabilizing their operations and maximizing liquidity, (b) repaying high interest rate EFIH debt with lower interest rate debtor-in-possession financing and settling certain makewhole claims of EFIH first lien creditors, and (c) discussing with stakeholders the landscape for developing a plan of reorganization and engaging in related litigation as necessary.  The Debtors have made significant progress on all fronts; however, given the size and complexity of these chapter 11 cases, significant work remains.  Accordingly, the Debtors seek a 180-day extension of the Exclusivity Periods to permit them to continue working toward their goal of confirming a consensual, value-maximizing chapter 11 plan of reorganization.

2.      ***Stabilizing Operations and Maximizing Liquidity***.  The Debtors operate in a very competitive marketplace as the largest electricity generator, coal miner, and retailer in their market.  The Debtors generate approximately 25% of the annual electricity needs for their market and service more than 1.7 million customers (nearly 30% of the Texas residential electricity market) through the efforts of more than 5,700 employees.  As such, the Debtors

2

focused significant efforts over the last 90 days on ensuring that the commencement of these chapter 11 cases did not disrupt the Debtors' competitive business operations or unnecessarily jeopardize the critical electrical infrastructure in Texas—particularly over the summer peak load season.

3.    Specifically, the Debtors obtained Court approval of nearly thirty orders designed to stabilize their business operations and make a smooth transition into chapter 11.  These orders address a wide range of issues critical to operating their businesses, including assuming and honoring all prepetition customer obligations, paying prepetition claims related to employee compensation and health and welfare benefits, to provide certainty to their 5,700 employees, ensuring continued access to the goods and services necessary to operate their businesses, ensuring continuity of their hedging and trading operations, and permitting compliance with regulatory and taxing obligations.

4.    The Debtors also obtained Court approval of a $4.475 billion DIP facility at TCEH (the "TCEH DIP Facility") and 18 months of consensual use of cash collateral at TCEH (the "TCEH Cash Collateral Order") without committing to any onerous case milestones.[2] Together the TCEH DIP Facility and TCEH Cash Collateral Order provide the Debtors with access to liquidity necessary to continue operating their businesses and satisfy restructuring costs during these chapter 11 cases.

5.    The critical relief obtained from the Court coupled with the Debtors' highly coordinated communications efforts over the last 90 days have been successful in preserving valuable customer and vendor relationships and satisfying the Debtors' regulatory obligations.

---

[2]    As used herein, "TCEH" shall refer to Debtor Texas Competitive Electric Holdings Company LLC and "TCEH Debtors" shall refer to TCEH, together with its direct and indirect Debtor subsidiaries.  "EFIH" shall refer to Energy Future Intermediate Holdings Company LLC and "EFIH Debtors" shall refer to EFIH, together with its direct Debtor subsidiary, EFIH Finance, Inc.

For example, certain of the Debtors assumed the contracts of approximately 1.7 million customers within 40 days of the Petition Date to preserve customer relationships and eliminate potential customer uncertainty during a critical time in the chapter 11 cases. As a result, the Debtors' customer turnover rate has remained relatively stable since the Petition Date in spite of the fact that their customers can change electricity providers with a mere click of a mouse. Similarly, due to the relief provided by the Court with respect to the Debtors' vendor programs, the Debtors have experienced very little disruption to their supply chain. In addition, the Debtors obtained approval from the Railroad Commission of Texas (the "RCT") for a $1.1 billion replacement collateral bond to secure the TCEH Debtors' mining reclamation obligations and permit the Debtors to continue their significant mining operations in the ordinary course.

6. ***EFIH First Lien DIP and Makewhole Settlement***. In addition to transitioning their operations into chapter 11, the Debtors successfully negotiated and obtained Court approval of a $5.4 billion first lien DIP facility at EFIH (the "EFIH First Lien DIP Facility"), the proceeds of which EFIH used to repay high interest rate debt and fund a makewhole settlement with certain holders of EFIH first lien notes (the "EFIH First Lien Makewhole Settlement"). Repaying the EFIH first lien notes early in these chapter 11 cases is saving the EFIH Debtors approximately $13 million a month in interest expense. Moreover, the EFIH First Lien DIP Facility and EFIH First Lien Makewhole Settlement represent a significant step toward deleveraging EFH and EFIH, one of the Debtors' critical restructuring goals, and, therefore, have helped clarify the landscape for further discussions regarding a plan of reorganization.

7. ***Discussions Regarding a Value-Maximizing Restructuring***. The Debtors have also continued discussions with their stakeholders regarding a consensual, value-maximizing plan of reorganization. As the Court is aware, the Debtors commenced these chapter 11 cases

4

after having signed a restructuring support agreement (the "RSA") with certain of their significant stakeholders. The RSA was the product of significant arm's-length negotiations with the Debtors' stakeholders and more than two-years of efforts to evaluate available restructuring alternatives. The restructuring transactions contemplated in the RSA represented the best available, value-maximizing restructuring alternative at the time the Debtors signed the RSA. However, since the Debtors have filed for chapter 11, certain parties have made potentially higher or better offers to the Debtors and the Debtors have decided to terminate the RSA to pursue such potential offers.

8.     Nevertheless, the Debtors, consistent with their fiduciary duties, continue to make progress on their restructuring and continue to evaluate alternative restructuring transactions that could further maximize the value of their estates for all those having an interest in them. For example, on April 30, 2014, the Debtors submitted to the Internal Revenue Service (the "IRS") a pre-filing memorandum which summarized the facts and analysis of the proposed tax-free spin of TCEH. On May 13, 2014, the Debtors met with the IRS to further discuss the proposed transaction in anticipation of the Debtors' filing of a private letter ruling request. The Debtors received preliminary feedback on the proposed transaction from the IRS, and incorporated the feedback in the Debtors' private letter ruling submitted on June 10, 2014. The Debtors are also in the process of reevaluating their proposal relating to a second-lien DIP facility at EFIH (the "EFIH Second Lien DIP Facility"). Since the current proposal was filed with the Court, trading values of EFH and EFIH debt instruments have increased and third-party strategic buyers, including NextEra Energy, Inc. ("NextEra"), have shown interest in purchasing the equity in reorganized EFH based on higher valuations of EFIH's indirect ownership interest in Oncor Electric Delivery Company LLC. As a result, the Debtors are also engaging their stakeholders in

discussions regarding the process for evaluating alternative restructuring proposals that will facilitate confirmation of a consensual, value-maximizing plan of reorganization. The Debtors would use the time provided by the extended Exclusivity Periods to ensure that all stakeholders have input into the restructuring and to develop a process that generates as much value for, and consensus with, those stakeholders as possible.

9.      As part of those efforts, the Debtors have committed substantial resources to fostering an open dialogue with each of those parties that have an interest in the Debtors' estates regarding the Debtors and their operations. During the two-year prepetition restructuring process, the Debtors executed over 70 confidentiality agreements with various professionals (and, at various times, over a dozen confidentiality agreements with the principal debt holders themselves) to allow such professionals access to confidential and proprietary business information about the Debtors to aid their evaluation of various restructuring alternatives. Since the Petition Date, the Debtors have executed another dozen confidentiality agreements to provide confidential and proprietary business information to parties who did not participate in prepetition discussions—including the official committee of unsecured creditors (the "Creditors' Committee"), the Office of the United States Trustee (the "U.S. Trustee"), and the ad hoc group of TCEH unsecured noteholders (the "Ad Hoc TCEH Unsecured Group"). To date, the Debtors' management team and advisors have had multiple meetings, whether telephonically or in-person, with these parties in interest to further their understanding of the Debtors' restructuring initiatives and operations and will have additional meetings in the coming weeks to accelerate this diligence process. The Debtors also launched a postpetition dataroom that has over 1,800 documents in it (collectively, over 80,000 pages) and have provided access to the dataroom to six separate creditor constituencies, including the Ad Hoc TCEH Unsecured Group, the Creditors'

Committee, an ad hoc group of EFH unsecured noteholders, and the indenture trustees representing the EFH and EFIH unsecured notes.

10.     While the Debtors remain focused on reaching consensus, they recognize that full consensus may not come right away or, at the end of the day, be possible given the diverse interests of their stakeholders. Thus, the Debtors and their advisors are engaged in significant discovery regarding, among other things, the 2007 buyout transaction, negotiations related to the RSA, and the Debtors' exercise of their fiduciary duties in evaluating restructuring proposals. The Debtors expect that discovery will continue during the coming months as parties work to understand more about the Debtors, their operations, and the events leading to the commencement of these chapter 11 cases.

11.     In short, the first 90 days of these chapter 11 cases have been extremely busy and productive, the culmination of nearly two years of careful planning and preparation.  However, significant work remains and the Debtors submit that cause exists for a 180-day extension of the Exclusivity Periods under the circumstances.  With the vast majority of the operational relief addressed and the Debtors' operations continuing to run in the ordinary course, the Debtors are now fully turning their focus to negotiating and implementing a plan of reorganization that maximizes the value of their estates.  The Debtors will use the additional time provided by the extended Exclusivity Periods to continue working with their stakeholders with the goal of reaching agreement on a consensual restructuring transaction that maximizes value and permits an expeditious exit from chapter 11.

## Jurisdiction and Venue

12.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the*

7

*District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.    The bases for the relief requested in this Motion are section 1121(d) of the Bankruptcy Code (the "Bankruptcy Code"), rule 9006 of the Federal Rules of Bankruptcy Rules (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9006-2.

## Relief Requested

15.    The Debtors seek entry of an order extending (a) the Filing Exclusivity Period by 180 days through and including February 23, 2015, and (b) the Debtors' Soliciting Exclusivity Period by 180 days through and including April 25, 2015, without prejudice to the Debtors' right to seek further extensions to the Exclusivity Periods.[3]

## Background

16.    The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases.  The Court has not

---

[3]    The Debtors have filed this Motion before the current deadlines for the Exclusivity Periods would otherwise expire.  Pursuant to Local Rule 9006-2, "if a motion to extend the time to take any action is filed before the expiration of the period prescribed by the [Bankruptcy] Code, the [Bankruptcy Rules], these Local Rules or Court order, the time shall automatically be extended until the Court acts on the motion, without the necessity for the entry of a bridge order."  Accordingly, Local Rule 9006-2 automatically extends the Exclusivity Periods pending the Court's hearing to consider the relief requested by this Motion.

8

appointed a trustee.  The U.S. Trustee formed the Creditors' Committee on May 13, 2014 [D.I.

420].  Further information regarding the Debtors' business operations and capital structure is set

forth in the detail in the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial*

*Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp.*, et al., *in Support*

*of First Day Motions* [D.I. 98] (the "<u>First Day Declaration</u>").

17.     As discussed above, since the Petition Date, the Debtors have been focused on

three primary goals.  First, given the extremely competitive market in which they operate, the

Debtors have worked to ensure a soft landing in chapter 11 to minimize disruption to their

business operations.  Second, the Debtors have implemented a number of restructuring initiatives

on behalf of the EFIH Debtors and in support of a global restructuring.  Third, the Debtors have

focused on maintaining a dialogue with the many parties in interest in these chapter 11 cases

(including their regulators) with the goal of obtaining consensus around a plan of reorganization.

As described below, the Debtors have made significant progress on these goals during the first

90 days of these chapter 11 cases and request an extension of the Exclusivity Periods to focus on

the next stage of these chapter 11 cases—generating support around a value-maximizing

reorganization.

> **A.     Stabilizing Operations**.

18.     ***Entry of Nearly 30 Orders Approving First and Second Day Relief***.  The Debtors

successfully obtained nearly thirty Court orders authorizing relief related to, among other things:

(a) the Debtors' customers;[4] (b) the Debtors' employees through compensation and benefit

---

[4]     *See Order Authorizing the Retail Debtors to Assume the Customer Agreements* [D.I. 785], *see also Final Order Authorizing the Debtors to Pay Prepetition Critical Vendor Claims* [D.I. 1465] (the "<u>Critical Vendor Order</u>").

programs;[5] (c) the Debtors' vendors and suppliers;[6] (d) the Debtors' taxing and regulatory fee obligations;[7] and (e) the Debtors' hedging and trading activities;[8] This relief has facilitated a soft landing in chapter 11 with minimal disruption to the Debtors' business operations.

19.    ***Customer Relations***.   The Debtors were intently focused on preserving their customer relations and took several steps to ensure stability of their customer base.   First, the Debtors thoroughly trained customer call center representatives and increased call center capacity so that customers could get their questions answered promptly.   Second, the Debtors assumed all current customer contracts (for 1.7 million customers) less than 40 days after the Petition Date.   Third, the Debtors issued a separate notice of commencement for their current and former customers within three weeks of the Petition Date, which included a special bar date for customer claims only. This bar date was set early to reduce the costs associated with noticing matters of importance to customers and the burden on such customers of receiving multiple notices relates to these chapter 11 cases.   Fourth, the Debtors are proactively reaching out to the few current customers who have filed a proof of claim to explain further the chapter 11 process

---

[5]    *See Order (Final) Authorizing the Debtors to (I) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (II) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (III) Continue Employee and Retiree Benefit Programs, and (B) Modifying the Automatic Stay* [D.I. 786], *see also First Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis* [D.I. 761]; *Second Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis* [D.I. 1420].

[6]    *See Final Order Authorizing the Debtors to Pay Prepetition Critical Vendor Claims* [D.I. 1465] (the "Critical Vendor Order").

[7]    *See Final Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees* [D.I. 799].

[8]    *See Final Order (Re: Non-Proprietary Trading and Hedging Transactions Involving the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangments* [D.I. 860]; *Final Order (Re: Proprietary Trading Transactions That Do Not Involve the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Proprietary Trading Transactions Subject to Internal Risk Management Guidelines* [D.I. 1309] (collectively, the "Hedging and Trading Orders").

RLF1 10543564v.1

and the proper use of a proof of claim form.  With these efforts, the Debtors' customer turnover rate has remained stable since the Petition Date.

20.    ***Employee and Union Relations***.    The Debtors have approximately 5,700 employees, approximately 2,100 of whom are covered by one of three collective bargaining agreements.  Since the Petition Date, the Debtors' employee base has remained stable.  This is in large part due to the relief provided by the Court regarding honoring prepetition compensation and benefit obligations.

21.    The Debtors' extensive and focused communications efforts have also been key to ensuring that employees remain focused on "Job 1."  First, leaders in each of the business units serve as "communications ambassadors" and have been formally trained to provide employees in their units with regularly scheduled updates on these chapter 11 cases.  Second, the Debtors' human resources department was specifically trained to respond to questions from potential new hires regarding the effect of the chapter 11 cases on the Debtors' employment practices.  Third, the Debtors and their advisors attach explanatory letters to any docketed items that have to be served on affected employees.  These efforts ultimately provided stability to the early days of the Debtors' chapter 11 cases.  In addition, the Debtors have maintained a positive relationship with their unions.  In fact, the Debtors' largest union, the International Brotherhood of Electrical Workers, filed a joinder in support of the Debtors' objection to the motion to transfer venue.[9]

22.    ***Vendor Relations***.  The Debtors also obtained authority from the Court to pay certain prepetition claims, subject to certain restrictions.  The relief from the Court permits the Debtors to obtain essential goods and services necessary to continue operating their businesses in

---

[9]    *Joinder of the International Brotherhood of Electrical Workers, Local 220, Local 2078 and Local 2337, to the Debtors' Objection to the Motion of Wilmington Savings Fund Society, FSB to Transfer Cases to the United States District Court for the Northern District of Texas* [D.I. 531].

RLF1 10543564v.1

the ordinary course, including critical coal, natural gas, and other commodities required to ensure reliable and safe operation of the generation fleet.[10]  Since the Petition Date, the Debtors have employed a rigorous process for reviewing requests for payment of prepetition claims to ensure that only claims of vendors that are critical are paid.  And, in spite of paying a minimal amount of prepetition critical vendor claims, the Debtors' vendor relations have remained stable, with nearly all vendors and suppliers continuing to work with the Debtors on a postpetition basis.

23.    ***Ensuring Liquidity and Compliance with Regulatory Obligations***.  The Debtors also made significant strides toward maximizing their available liquidity early in these chapter 11 cases to stabilize operations and provide the Debtors with the necessary time to execute their restructuring initiatives.  The Debtors have unfettered use of cash collateral for up to 18 months and obtained approval of the $4.475 billion TCEH DIP Facility to fund operations and provide liquidity regardless of which value-maximizing restructuring alternative the Debtors pursue.[11]  Moreover, the TCEH DIP Facility provided for a superpriority $1.1 billion carve out for the benefit of the RCT to satisfy the Debtors' mining reclamation obligations.  The RCT has since accepted this form of replacement collateral bond, thereby allowing the Debtors to continue their significant mining operations and terminating the commitment under the TCEH DIP Facility for the $1.1 billion delayed draw term loan.[12]  In addition to the RCT, the State of Texas has also vocalized its support of the Debtors' stabilization efforts on the record at various hearings and

---

[10]    *See* the Critical Vendor Order.

[11]    *See Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855]; *see also Final Order (A) Approving Postpetition Financing for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, and (C) Modifying the Automatic Stay* [D.I. 856].

[12]    *See Texas Railroad Commission's Notice of Acceptance of Debtor's Application for Substitution of Collateral* [D.I. 998].

RLF1 10543564v.1

through Court filings.[13]  In addition, members of the Debtors' management team have met or are scheduled to meet with the Nuclear Regulatory Commission and the Federal Energy Regulatory Commission to discuss various aspects of the Debtors' restructuring.  The Debtors continue to have productive discussions with all of their regulators in contemplation of a proposed tax-free spin of TCEH.

24.    ***Hedging and Trading Activities***.  To preserve the value associated with the Debtors' hedging and trading activities (ranging from $240 million to $425 million of incremental value in each of the past four years), the Debtors filed a motion to honor their hedging and trading obligations and continue their hedging and trading activities on a postpetition basis in the ordinary course of business.[14]  After extensive discussions with the U.S. Trustee and after having filed two supplemental declarations in support of the relief requested,[15] the Debtors obtained Court authority to honor such obligations.[16]  In connection with this relief, the Debtors have executed several trading continuation agreements with a number of counterparties (through which such parties agree to continue to perform under their contracts in exchange for a settlement of their prepetition claims) and continue to engage in new transactions

---

[13]    *See*, *e.g.*, *Response of the Public Utility Commission of Texas in Support of Certain First Day Pleading* [D.I. 123].

[14]    *See Motion of Energy Future Holdings Corp.*, et al. *For Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 41].

[15]    *See Declaration of Terry L. Nutt in Support of the Motion of Energy Future Holdings Corp.*, et al. *For Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 229]; *Supplemental Declaration of Terry L. Nutt in Support of the Motion of Energy Future Holdings Corp.*, et al. *For Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 1197].

[16]    *See* the *Hedging and Trading Orders*.

13

with counterparties.  Following the Petition Date, the Debtors have entered into new hedging and

trading arrangements to protect and enhance the value of the TCEH Debtors' assets.

  **B.**  **Implementation of Restructuring Initiatives in Support of a Plan of Reorganization**.

  25.  In addition to working toward a "soft landing" into chapter 11, the Debtors have

consummated a number of restructuring initiatives on behalf of the EFIH Debtors and,

ultimately, in furtherance of the Debtors' global restructuring.

  26.  ***$5.4 Billion EFIH First Lien DIP Facility***.  The Debtors negotiated, obtained

approval of, and closed the $5.4 billion EFIH First Lien DIP Facility.[17]  This financing is on

terms that are highly favorable to the Debtors, including an interest rate that is currently 4.25% a

year.  In addition to funding restructuring costs, the EFIH First Lien DIP Facility allowed the

Debtors to repay in full the EFIH first lien notes, the vast majority of which carried a 10%

interest rate.  Because of this, the Debtors are now saving $13 million a month in interest

expense.  Importantly, the Debtors were able to obtain this Court's approval of the EFIH First

Lien DIP Facility on a largely consensual basis.

  27.  ***EFIH First Lien Makewhole Settlement***.  In addition to facilitating the

repayment of all outstanding principal and accrued interest on the EFIH first lien notes, the EFIH

First Lien DIP Facility financed the EFIH First Lien Makewhole Settlement—a significant

settlement of potential litigation against EFIH.  Although the EFIH first lien notes automatically

accelerated upon the filing of these chapter 11 cases, certain holders of the notes have alleged

that the repayment of their principal and interest entitles them to "makewhole premiums" or

---

[17] *See Final Order (A) Approving Postpetition Financing for Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Approving the Use of Cash Collateral by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc., (D) Authorizing the EFIH First Lien Repayment, (E) Authorizing Issuance of Roll-Up Debt to the Extent Authorized by the Settlement Orders, and (F) Modifying the Automatic Stay* [D.I. 859] (the "EFIH First Lien DIP Final Order").*

14

prepayment penalties in excess of $650 million. To mitigate EFIH's exposure to this litigation risk, beginning prepetition, the Debtors negotiated the EFIH First Lien Makewhole Settlement. As of shortly after the Petition Date, approximately 32% of holders in principal amount had agreed to participate in the EFIH First Lien Makewhole Settlement. By opening the EFIH First Lien Makewhole Settlement to all qualified holders of EFIH first lien notes on a postpetition basis, the Debtors were able to increase the inclusiveness of the EFIH First Lien Makewhole Settlement, ultimately obtaining the participation of 42% of holders by principal amount, while also further reducing EFIH's litigation exposure. The Court approved the EFIH First Lien Makewhole Settlement on June 6, 2014, and the Debtors closed the transaction on June 19, 2014.[18]

### C.     Productive Discussions in Furtherance of a Plan of Reorganization.

28.     ***Discussions Regarding a Value-Maximizing Restructuring***.     As part of the Debtors' two-year restructuring efforts, they executed over 70 confidentiality agreements and provided significant amounts of information to advisors representing a host of creditor interests. In addition, during the prepetition period, and at two separate intervals, approximately a dozen funds agreed to temporarily refrain from trading their claims in the Debtors' securities as a condition to actively participating in restructuring discussions. These efforts culminated in the RSA. At the time it was executed, the RSA had the support of 43% of the secured first lien creditors at TCEH, 34% of the secured first lien creditors at EFIH, 70% of the unsecured creditors at EFIH, 73% of the unsecured creditors at EFH, and the equity holders at EFH.

29.     First, the RSA delivered a positive marketing message to the Debtors' various operational stakeholders, including vendors, customers, and employees, facilitating a soft landing

---

[18]     *See Order Approving EFIH First Lien Settlement* [D.I. 858].

into chapter 11.  Second, the RSA aided the Debtors in obtaining the support of secured first lien creditors at TCEH for the priming liens under the TCEH DIP Facility and 18 months of consensual use of cash collateral under the TCEH Cash Collateral Order without onerous case milestones.  Third, the Debtors also obtained the support of the EFIH and EFH unsecured creditors for the EFIH First Lien DIP Facility and the EFIH First Lien Makewhole Settlement, which represent a significant step in deleveraging EFIH and EFH.  Fourth, it was in pursuing the transactions contemplated by the RSA, including the EFIH Second Lien DIP Facility, that the Debtors attracted the attention of third-party strategic buyers, including NextEra Energy, Inc.

30.    In addition to opening a dialogue with third-party strategic buyers, the Debtors have also been engaging in productive conversations with those parties that did not participate in prepetition discussions.  To date, the Debtors have had a number of productive conversations with such parties.  Indeed, many Court orders have been entered on certification of counsel following productive negotiations with, among others, the U.S. Trustee, the Creditors' Committee, and the Ad Hoc TCEH Unsecured Group.[19]  While certain of the motions required some litigation in the first instance, the Debtors, to date, have been able to consensually resolve the vast majority of operational, non-financing issues raised by parties in interest.

31.    In addition, the Debtors have continued to have productive discussions with their regulators.  The Debtors have been communicating with the State of Texas regularly regarding these chapter 11 cases.  In addition, the Debtors have asked the IRS to advise on the tax considerations underlying the Debtors' global restructuring strategy and continue to be engaged

---

[19]    *See e.g.*, *Certification of Counsel Concerning Order Establishing Procedures to Sell, Transfer, or Abandon Certain De Minimis Assets* [D.I. 747]; *Certification of Counsel Concerning First Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of Non-Insider Compensation Programs and (B) Continue the Non-Insider Compensation Programs in the Ordinary Course of Business of a Postpetition Basis* [D.I. 753]; *Certification of Counsel Concerning Final Order Determining Adequate Assurance of Payment for Future Utility Services* [D.I. 795].

in active discussions with the IRS.  The Debtors hope to continue the productive tenor of discussions with all parties in interest as they direct their efforts toward filing a plan of reorganization and a disclosure statement.

32.    ***Discovery and Litigation***.  In the early days of these chapter 11 cases, the Debtors successfully litigated certain issues that have allowed them to preserve the efficient administration of their cases going forward.  First, with the support of joinders filed by six separate creditor constituencies, the Debtors defeated a motion to transfer venue from the District of Delaware to the Northern District of Texas.  In addition, the Court overruled the Ad Hoc TCEH Unsecured Group's objection to the Debtors' motion to jointly administer their 71 cases. In each instance, the Court cited cost savings, convenience, and/or administrative ease as bases for its ruling.[20]

33.    However, given the size and complexity of the Debtors' cases, the Debtors recognize that litigation may be inevitable.  Accordingly, the Debtors have been engaged in significant discovery and litigation preparation since the Petition Date.  The Debtors' management team and their professional advisors have participated in 17 depositions, conducted by seven different stakeholder groups, and have produced over 440,000 pages of documents through the discovery process.  The depositions and document production have related to a wide range of topics, including, among others, historical intercompany transactions, the events that led to the commencement of these chapter 11 cases, the Debtors' evaluation of their restructuring proposals, a Rule 2004 investigation into historical transactions, the liens securing the TCEH first lien debt, and makewhole fights with respect to the EFIH first and second lien notes.  The

---

[20]    *See Order Denying Motion of Wilmington Savings Fund Society, FSB to Transfer Cases to the United States District Court for the Northern District of Texas* [D.I. 596]; *see also Final Order Directing Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 849].

Debtors, their management team, and their advisors have made and will continue to make every attempt to be responsive to the deposition and discovery requests in an attempt to keep these chapter 11 cases on track and hopefully generate additional consensus.

        **D.**     **Extended Exclusivity Periods**.

34.     The Debtors' primary focus in the next phase of their chapter 11 cases is to continue fostering an open dialogue with the goal of generating consensus around a plan of reorganization that maximizes the value of the Debtors' estates for the benefit of all those parties who hold an interest in such estates. To achieve this goal, the Debtors intend to use the time provided by the Exclusivity Periods for three purposes. First, they will continue to be responsive to discovery and document production requests—recognizing that it is one available mechanism by which parties can acquire information about the Debtors' businesses and restructuring strategies—and they will continue to actively participate in diligence meetings and calls with such parties in interest. Second, they will continue to engage their stakeholders in discussions regarding other restructuring proposals and developing a process for evaluating such proposals. Third, they will continue to work toward obtaining the regulatory approvals necessary to consummate a global restructuring.

35.     Given the complexity of the Debtors' cases and the number of active creditor constituencies, the Debtors will need more time to achieve their goal of consummating a global, value-maximizing restructuring. The Debtors' initial 120-day Filing Exclusivity Period is scheduled to expire on August 27, 2014. The initial 180-day Soliciting Exclusivity Period expires on October 27, 2014. To continue the Debtors' efforts to efficiently consummate a balance sheet restructuring, the Debtors seek to extend the Filing Exclusivity Period by 180 days to February 23, 2015, and the Soliciting Exclusivity Period by 180 days to April 25, 2015.

Simply put, the facts and circumstances of these chapter 11 cases suggest that an extension of the Exclusivity Periods will allow the Debtors to continue productive discussions with their stakeholders and develop a consensual plan of reorganization.  The Debtors submit that all parties will be best served by an extension of the Exclusivity Periods, which will avoid needless distraction and provide the appropriate environment for the major stakeholders in these chapter 11 cases to work collaboratively toward a value-maximizing restructuring.

## Basis for Relief

36.    The Bankruptcy Code vests debtors with the exclusive right to propose a chapter 11 plan for the first 120 days of a chapter 11 case pursuant to section 1121(b) of the Bankruptcy Code.  Section 1121(c)(3) of the Bankruptcy Code further extends the period of exclusivity for an additional 60 days, to an initial maximum of 180 days, where the debtor has filed a chapter 11 plan and is soliciting votes on such plan.  "[T]he point of exclusivity is to promote an environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated."  *In re Burns and Roe Enters., Inc.*, 2005 WL 6289213, *4 (D.N.J. 2005).  In these chapter 11 cases, the Exclusivity Periods set forth in sections 1121(b) and 1121(c) of the Bankruptcy Code will expire on August 27, 2014 and October 27, 2014, respectively, absent further order of the Court.

37.    Section 1121(d)(1) permits a court to extend a debtor's exclusivity "for cause," subject to certain limitations not relevant here.  Specifically, section 1121(d) provides that "on request of a party in interest made within the respective periods . . . of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section."  11 U.S.C. § 1121(d).  Although the term "cause" is not defined by the Bankruptcy Code, such term should be viewed flexibly "in order to allow the

debtor to reach an agreement."  H.R. Rep. No. 95, 95th Cong., 1st Sess. 232 (1997); *see also In re Public Serv. Co. of New Hampshire*, 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("legislative intent . . . [is] to promote maximum flexibility").  At bottom, a debtor should be given a reasonable opportunity to negotiate with creditors and to prepare adequate information concerning the ramifications of any proposed plan for disclosure to creditors.  *See In re Texaco Inc.*, 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987).

38.    Courts within the Third Circuit and in other jurisdictions have held that the decision to extend a debtor's exclusivity periods is left to the sound discretion of a bankruptcy court and should be based on the totality of circumstances in each case.  *See, e.g., First Am. Bank of N.Y. v. Sw. Gloves & Safety Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986); *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).  In particular, courts examine a number of factors to determine whether a debtor has had an adequate opportunity to develop, negotiate, and propose a chapter 11 plan and thus whether there is "cause" for extension of the Exclusivity Periods.  These factors include the following:

(a)    the size and complexity of the case;

(b)    the existence of good-faith progress;

(c)    the necessity of sufficient time to negotiate and prepare adequate information;

(d)    whether creditors are prejudiced by the extension;

(e)    whether the debtor is paying its debts as they become due;

(f)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(g)    whether the debtor has made progress negotiating with creditors;

20

(h)     the length of time a case has been pending;

(i)     whether the debtor is seeking an extension to pressure creditors; and

(j)     whether or not unresolved contingencies exist.

*See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002); *McLean Indus.*, 87 B.R. at 834; *see also Dow Corning*, 208 B.R. at 664 (identifying the above factors and noting that courts generally rely on the same factors to determine whether exclusivity should be extended); *In re Friedman's Inc.*, 336 B.R. 884, 888 (Bankr. D. Ga. 2005) (same).

39.     The Debtors submit that sufficient "cause" exists pursuant to section 1121(d) to extend the Exclusivity Periods as provided herein.  As discussed below, each of the relevant factors weighs in favor of an extension of the Exclusivity Periods.

**A.     The Debtors' Chapter 11 Cases are Large and Complex**.

40.     These chapter 11 cases involve 71 Debtor entities—with approximately 5,700 employees—that engage in complex operations in a number of industries regulated by various governmental entities, and nearly $49 billion in debt.  As has been reported many times, these chapter 11 cases represent one of the the largest chapter 11 cases filed in the District of Delaware and the seventh largest case filed in history (by liabilities).

41.     In addition, one needs to look no further than the bankruptcy docket to conclude that these chapter 11 cases are complex.  In the first 90 days of these chapter 11 cases, over *1,600* items have been filed on the docket.  A number of these items reflect discovery requests from various creditor constituencies and, to be responsive to these requests, the Debtors' management team has participated in 17 depositions and produced over 440,000 pages in discovery materials. The Debtors have committed substantial time and resources to these efforts understanding that

21

such disclosures are critical to developing consensus toward a global restructuring and smooth confirmation process.

42.     That being said, given the Debtors' significant balance sheet debt, a number of parties in interest with conflicting interests have taken steadfast positions in these chapter 11 cases, resulting in significant litigation.   Thus far, the Debtors have emerged successful in several proceedings, including by, notably, obtaining approval of the TCEH DIP Facility, EFIH DIP Facility, and the EFIH First Lien Makewhole Settlement.

**B.     The Debtors Have Made Good Faith Progress Toward a Chapter 11 Plan of Reorganization**.

43.     As described earlier, the RSA provided direction in these chapter 11 cases and assisted the Debtors in transitioning into chapter 11.   To that end, the Debtors have made progress toward a consensual plan of reorganization with certain of their stakeholders and have consummated certain of the restructuring transactions necessary to execute a global restructuring. As described earlier, the Debtors closed the EFIH First Lien DIP Facility and the EFIH First Lien Makewhole Settlement, which has allowed them to immediately reap significant interest savings and avoid significant litigation exposure related to makewhole claims.   The EFIH First Lien DIP Facility and the EFIH First Lien Makewhole Settlement represent a major step toward repayment of high interest rate debt at EFIH, which is critical to the Debtors' global restructuring strategy.

44.     Since the Petition Date, the Debtors have been discussing their restructuring strategy with a number of stakeholders that did not participate in prepetition discussions.   The Debtors anticipate discussing the terms of the plan of reorganization with some of these stakeholders and hope to develop additional consensus around a value-maximizing restructuring

during the extended Exclusivity Periods.    To effectively address the conflicting interests of the various creditor constituencies, the Debtors request an extension of the Exclusivity Periods.

### C.    An Extension of the Exclusivity Periods is Necessary to Provide Sufficient Time to Negotiate and Prepare Adequate Information.

45.    Given the Debtors' ongoing productive negotiations with their creditor constituencies, the Debtors would use the time provided by an extension of the Exclusivity Periods to continue seeking such parties' support for a plan of reorganization.  Obtaining the support of as many creditor constituencies as possible is critical to ensuring an efficient, cost-effective, and value-maximizing reorganization.   Obtaining the support of the six different creditor constituencies to the RSA took many months of coordinated and focused efforts during the prepetition period, and the Debtors now require additional time to obtain additional support for a plan of reorganization.

### D.    An Extension of the Exclusivity Periods Will Not Prejudice Creditors.

46.    The Debtors are requesting an extension of the Exclusivity Periods to maintain focus on obtaining support for a consensual plan of reorganization.   This extension is not intended to pressure the Debtors' creditors.  In fact, various parties in interests have stated that the Debtors' current reorganization, as contemplated under the RSA, is rushed and a slower process is necessary to consider their respective interests.

47.    By extending the Exclusivity Periods, the Debtors are giving these parties in interest exactly what they have requested since day one—time.  The extension will allow the Debtors to work cooperatively with these parties toward a global, value-maximizing restructuring.  To the extent feasible and necessary, the Debtors will continue to hold productive discussions with parties in interests to consummate a value-maximizing plan of reorganization.

Accordingly, the relief requested in this Motion is without prejudice to the Debtors' creditors, but will instead benefit the Debtors' estates, their creditors, and all other key stakeholders.

**E.      The Debtors are Paying Their Bills as They Come Due**.

48.      Since the Petition Date, the Debtors have paid their debts in the ordinary course of business or as otherwise provided by Court order and have sufficient liquidity under the EFIH First Lien DIP Facility, the TCEH DIP Facility, and the TCEH Cash Collateral Order to continue to do so.

**F.      These Chapter 11 Cases Are in Their Infancy**.

49.      The Debtors' request for an extension of the Exclusivity Periods is the Debtors' first such request and comes less than 90 days after the Petition Date.  As discussed above, in the last 90 days, the Debtors have accomplished a great deal and continue to work diligently toward a consensual plan of reorganization.

50.      An objective analysis of the relevant factors demonstrates that the Debtors are doing everything that they should be doing as chapter 11 debtors in possession to facilitate a successful conclusion to these chapter 11 cases.  The Debtors focused their efforts in the first 90 days of these chapter 11 cases on ensuring a soft landing into chapter 11, maximizing liquidity, and consummating certain transactions at EFIH in support of a global restructuring.  These efforts required the Debtors full and undivided attention and the Debtors are now prepared to shift their focus toward generating additional support for a consensual plan of reorganization.

51.      Courts in this and other jurisdictions have often granted similar relief where, as here, the facts and circumstances justify extensions of a debtor's exclusivity.  *See, e.g.*, *In re Exide Technologies*, No. 13-11482 (KJC) (Bankr. D. Del. Oct. 15, 2013) (granting initial extension of approximately 235 days); *In re Capmark Financial Group Inc.*, No. 09-13684

(CSS) (Bankr. D. Del. Feb. 19, 2010) (granting initial extension of approximately 220 days); *In re Federal-Mogul Global Inc.*, No. 01-10578 (AMW) (Bankr. D. Del. Jan. 14, 2002) (granting initial extension of approximately 180 days); *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. May 15, 2013) (granting initial extension of approximately 205 days); *In re Gen. Growth Props., Inc.*, No. 09-11977 (ALG) (Bankr. S.D.N.Y. July 28, 2009) (granting initial extension of approximately 195 days); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Apr. 11, 2006) (granting initial extension of approximately 240 days); *see also In re Optim Energy, LLC*, No. 14-10262 (BLS) (Bankr. D. Del. June 10, 2014) (granting initial extension of approximately 120 days); *In re WP Steel Venture LLC*, No. 12-11661 (KJC) (Bankr. D. Del. Oct. 12, 2012) (granting initial extension of approximately 120 days); *In re R.H. Donnelley Corporation*, No. 09-11833 (KG) (Bankr. D. Del. Sept. 30, 2009) (granting initial extension of approximately 120 days); *In re Nortel Networks Inc.*, No. 09-10138 (KG) (Bankr. D. Del. May 20, 2009) (granting initial extension of approximately 120 days); *In re Tribune Company*, No. 08-13141 (KJC) (Bankr. D. Del. Apr. 23, 2009) (granting initial extension of approximately 120 days); *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. June 9, 2008) (granting initial extension of approximately 130 days).

**G.    The Debtors are Continuing to Address Open Contingencies.**

52.    Despite the fact that the Debtors have been doing everything they should be doing to facilitate an expeditious exit from chapter 11, there remains much work to do. There are a number of open issues the Debtors are actively addressing with their stakeholders. For example, the Debtors have discussed a potential tax-free spin of TCEH and its subsidiaries with several of their regulators, including, among others, the PUCT, the NRC, and the IRS but have not obtained any assurances regarding their assessments of such a transaction. With respect to the IRS, the

25

Debtors have asked the IRS to opine on the tax attributes of a tax-efficient restructuring and, to date, are engaged in active discussions with the IRS.  Finally, and perhaps most critically, the Debtors need to continue their diligent efforts to reevaluate the EFIH Second Lien DIP Facility (and, ultimately, the mechanisms by which to ultimately delever EFH and EFIH) and explore strategic alternatives with other interested parties.  All of these efforts are critical to achieving the Debtors' primary goals: efficiency, consensus, and value-maximization.  To address these issues and develop the broadest base of support for a plan of reorganization, the Debtors require the extension of the Exclusivity Periods.

## <u>Notice</u>

53.     The Debtors shall provide notice of this Motion on the date hereof via U.S. first class mail to:  (a) the U.S. Trustee; (b) (i) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); and (ii) proposed counsel to the Creditors' Committee; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare

Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas;

and (y) those parties who have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

54.     No prior request for the relief sought in this Motion has been made to this or any

other court.

[*Remainder of page intentionally left blank.*]

28

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated: July 23, 2014

*/s/ William A. Romanowicz*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
William A. Romanowicz (No. 5794)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                  defranceschi@rlf.com
                  madron@rlf.com
                  romanowicz@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          richard.cieri@kirkland.com
                  edward.sassower@kirkland.com
                  stephen.hessler@kirkland.com
                  brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                  chad.husnick@kirkland.com
                  steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession