## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 1683** |
| | ) | |

### DECLARATION OF MICHAEL CARTER, SENIOR VICE PRESIDENT OF CORPORATE PLANNING AND ASSISTANT TREASURER OF EFH CORPORATE SERVICES COMPANY IN SUPPORT OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE

Pursuant to 28 U.S.C. § 1746, I, Michael Carter, declare as follows:

1. I am the Senior Vice President of Corporate Planning and an Assistant Treasurer of EFH Corporate Services Company, a direct subsidiary of Energy Future Holdings Corp. ("EFH Corp."), both of which are corporations organized under the laws of the state of Texas. EFH Corp.'s direct subsidiary Energy Future Competitive Holdings Company LLC ("EFCH"), a limited liability company organized under the laws of the state of Delaware; EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH LLC" and, together with EFCH and TCEH LLC's direct and indirect subsidiaries, "TCEH," and the entities composing TCEH that are debtors in these chapter 11 cases, the "TCEH Debtors"), a limited liability company organized under the laws of the state of Delaware; EFH Corp.'s direct

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

subsidiary, Energy Future Intermediate Holding Company LLC ("EFIH"), a limited liability company organized under the laws of the state of Delaware; and various other direct and indirect subsidiaries of EFH Corp. that are debtors in these chapter 11 cases, are collectively referred to as the "Debtors" in this declaration.

1.      I have worked for the Debtors since 2005.  I am generally familiar with the Debtors' businesses, day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records.  All facts set forth in this declaration are based upon my personal knowledge of the Debtors' businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by members of the Debtors' management team and advisors.  I am over the age of 18 and duly authorized to execute this Declaration (the "Declaration") on behalf of the Debtors in support of, the *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* (the "Exclusivity Motion").[2]

2.      The facts in this Declaration are based on my personal knowledge of the Debtors' businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, information supplied to me by the members of the Debtors' management team and advisors, and my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called to testify, I would testify to the facts set forth herein.

---

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Exclusivity Motion.

I.      **Overview of the Debtors' Post-Petition Progress.**

3.      The Debtors, comprising 71 separate entities, commenced these chapter 11 cases on the Petition Date.  With nearly $40 billion in assets and $49 billion in liabilities, the Debtors' chapter 11 cases constitute the largest operating company to file for bankruptcy in the United States Bankruptcy Court for the District of Delaware and the seventh largest chapter 11 case filed in history (by liabilities).  The Debtors operate in a very competitive marketplace as the largest electricity generator, coal miner, and retailer in their market, servicing more than 1.7 million customers (nearly 30% of the Texas residential electricity market).

4.      Since the Petition Date, the Debtors have been focused on three primary goals.  First, given the extremely competitive market in which they operate, the Debtors have worked to ensure a soft landing in chapter 11 to minimize disruption to their business operations.  Second, the Debtors have implemented a number of restructuring initiatives on behalf of the EFIH Debtors and in support of a global restructuring.  Third, the Debtors have focused on maintaining a dialogue with the many stakeholders in these chapter 11 cases (including their regulators) with the goal of obtaining consensus around a plan of reorganization.  As described below, the Debtors have made significant progress on these goals during the first 90 days of these chapter 11 cases.  I believe the relief requested in the Exclusivity Motion is necessary for the Debtors to focus on the next stage of these chapter 11 cases—generating support around a value-maximizing reorganization.

A.      **Stabilizing Operations.**

5.      ***Entry of Nearly 30 Orders Approving First and Second Day Relief***. The Debtors successfully obtained nearly thirty Court orders authorizing relief related to, among other things: (a) the Debtors' customers; (b) the Debtors' employees through compensation and benefit

3

programs; (c) the Debtors' vendors and suppliers; (d) the Debtors' taxing and regulatory fee obligations; and (e) the Debtors' hedging and trading activities.  This relief has facilitated a soft landing in chapter 11 with minimal disruption to the Debtors' business operations.

6.      ***Customer Relations***.    The Debtors were intently focused on preserving their customer relations and took several steps to ensure stability of their customer base.  First, the Debtors thoroughly trained customer call center representatives and increased call center capacity so that customers could get their questions answered promptly.  Second, the Debtors assumed all current customer contracts (for 1.7 million customers) less than 40 days after the Petition Date.  Third, the Debtors issued a separate notice of commencement for their current and former customers within three weeks of the Petition Date, which included a special bar date for customer claims only. This bar date was set early to reduce the costs associated with noticing matters of importance to customers and the burden on such customers of receiving multiple notices relates to these chapter 11 cases.  Fourth, the Debtors are proactively reaching out to the few current customers who have filed a proof of claim to explain further the chapter 11 process and the proper use of a proof of claim form.  With these efforts, the Debtors' customer turnover rate has remained stable since the Petition Date.

7.      ***Employee and Union Relations***.    The Debtors have approximately 5,700 employees, approximately 2,100 of whom are covered by one of three collective bargaining agreements.  Since the Petition Date, the Debtors' employee base has remained stable.  This is in large part due to the relief provided by the Court regarding honoring prepetition compensation and benefit obligations.

8.      The Debtors' extensive and focused communications efforts have also been key to ensuring that employees remain focused on "Job 1."  First, leaders in each of the business units

4

serve as "communications ambassadors" and have been formally trained to provide employees in their units with regularly updates on these chapter 11 cases.  Second, the Debtors' human resources department was trained to respond to questions from potential new hires regarding the effect of the chapter 11 cases on the Debtors' employment practices.  Third, the Debtors and their advisors attach explanatory letters to any docketed items that have to be served on affected employees.  I believe these efforts ultimately provided stability to the early days of the Debtors' chapter 11 cases.  In addition, the Debtors have maintained a positive relationship with their unions.  In fact, the Debtors' largest union, the International Brotherhood of Electrical Workers, filed a joinder in support of the Debtors' objection to the motion to transfer venue.

9.    ***Vendor Relations***.  The Debtors also obtained authority from the Court to pay certain prepetition claims, subject to certain restrictions.  The relief from the Court permits the Debtors to obtain essential goods and services necessary to continue operating their businesses in the ordinary course, including critical coal, natural gas, and other commodities required to ensure reliable and safe operation of the generation fleet.  Since the Petition Date, the Debtors have employed a rigorous process for reviewing requests for payment of prepetition claims to ensure that only claims of vendors that are critical are paid.  And, in spite of paying a minimal amount of prepetition critical vendor claims, the Debtors' vendor relations have remained stable, with nearly all vendors and suppliers continuing to work with the Debtors on a postpetition basis.

10.    ***Ensuring Liquidity and Compliance with Regulatory Obligations***.  The Debtors also made significant strides toward maximizing their available liquidity early in these chapter 11 cases to stabilize operations and provide the Debtors with the necessary time to execute their restructuring initiatives.  The Debtors have unfettered use of cash collateral for up to 18 months (the "<u>TCEH Cash Collateral Order</u>") and obtained approval of the $4.475 billion TCEH DIP

5

facility (the "TCEH DIP Facility") to fund operations and provide liquidity regardless of which value-maximizing restructuring alternative the Debtors pursue.  Moreover, the TCEH DIP Facility provides for a superpriority $1.1 billion carve out for the benefit of the Railroad Commission of Texas (the "RCT") to satisfy the Debtors' mining reclamation obligations.  The RCT has since accepted this form of replacement collateral bond, thereby allowing the Debtors to continue their significant mining operations and terminating the commitment under the TCEH DIP Facility for the $1.1 billion delayed draw term loan.  In addition to the RCT, the State of Texas has also vocalized its support of the Debtors' stabilization efforts on the record at various hearings and through Court filings.   In addition, members of the Debtors' management team have met or are scheduled to meet with the Nuclear Regulatory Commission (the "NRC") and the Federal Energy Regulatory Commission to discuss various aspects of the Debtors' restructuring.  The Debtors continue to have productive discussions with all of their regulators in contemplation of a proposed tax-free spin of TCEH.

11.    *Hedging and Trading Activities*.   To preserve the value associated with the Debtors' hedging and trading activities (ranging from $240 million to $425 million of incremental value in each of the past four years), the Debtors filed a motion to honor their hedging and trading obligations and continue their hedging and trading activities on a postpetition basis in the ordinary course of business.  After extensive discussions with the the Office of the United States Trustee (the "U.S. Trustee") and after having filed two supplemental declarations in support of the relief requested, the Debtors obtained Court authority to honor such obligations.   In connection with this relief, the Debtors have executed several trading continuation agreements with a number of counterparties (through which such parties agree to continue to perform under their contracts in exchange for a settlement of their prepetition claims)

6

and continue to engage in new transactions with counterparties.  Following the Petition Date, the Debtors have entered into new hedging and trading arrangements to protect and enhance the value of the TCEH Debtors' assets.

> **B.    Implementation of Restructuring Initiatives in Support of a Plan of Reorganization.**

12.    In addition to working toward a "soft landing" into chapter 11, the Debtors have consummated a number of restructuring initiatives on behalf of the EFIH Debtors and, ultimately, in furtherance of the Debtors' global restructuring.

13.    ***$5.4 Billion EFIH First Lien DIP Facility***.  The Debtors negotiated, obtained approval of, and closed the $5.4 billion EFIH First Lien DIP facility (the "<u>EFIH First Lien DIP Facility</u>").  This financing is on terms that are highly favorable to the Debtors, including an interest rate that is currently 4.25% a year.  In addition to funding restructuring costs, the EFIH First Lien DIP Facility allowed the Debtors to repay in full the EFIH first lien notes, the vast majority of which carried a 10% interest rate.  Because of this, the Debtors are now saving $13 million a month in interest expense.  Importantly, the Debtors were able to obtain this Court's approval of the EFIH First Lien DIP Facility on a largely consensual basis.

14.    ***EFIH First Lien Makewhole Settlement***.  In addition to facilitating the repayment of all outstanding principal and accrued interest on the EFIH first lien notes, the EFIH First Lien DIP Facility financed a significant settlement of potential litigation against EFIH (the "<u>EFIH First Lien Makewhole Settlement</u>").  Although the EFIH first lien notes automatically accelerated upon the filing of these chapter 11 cases, certain holders of the notes have alleged that the repayment of their principal and interest entitles them to "makewhole premiums" or prepayment penalties in excess of $650 million.  To mitigate EFIH's exposure to this litigation risk, beginning prepetition, the Debtors negotiated the EFIH First Lien Makewhole Settlement.

7

As of shortly after the Petition Date, approximately 32% of holders in principal amount had agreed to participate in the EFIH First Lien Makewhole Settlement. By opening the EFIH First Lien Makewhole Settlement to all qualified holders of EFIH first lien notes on a postpetition basis, the Debtors were able to increase the inclusiveness of the EFIH First Lien Makewhole Settlement, ultimately obtaining the participation of 42% of holders by principal amount, while also further reducing EFIH's litigation exposure. The Court approved the EFIH First Lien Makewhole Settlement on June 6, 2014, and the Debtors closed the transaction on June 19, 2014.

###### C.    Productive Discussions in Furtherance of a Plan of Reorganization.

15.    ***Discussions Regarding a Value-Maximizing Restructuring***. As part of the Debtors' two-year restructuring efforts, they executed over 70 confidentiality agreements and provided significant amounts of information to advisors representing a host of creditor interests. In addition, during the prepetition period, and at two separate intervals, approximately a dozen funds agreed to temporarily refrain from trading their claims in the Debtors securities as a condition to actively participating in restructuring discussions. These efforts culminated in the restructuring support agreement (the "RSA"). At the time it was executed, the RSA had the support of 43% of the secured first lien creditors at TCEH, 34% of the secured first lien creditors at EFIH, 70% of the unsecured creditors at EFIH, 73% of the unsecured creditors at EFH, and the equity holders at EFH.

16.    At the time it was executed, the RSA reflected the best deal that was available to the Debtors. However, since the Debtors have filed for chapter 11, certain parties have made potentially higher or better offers to the Debtors and the Debtors have decided to terminate the RSA to pursue such potential offers.

17.    Nevertheless, the RSA has provided the Debtors' estates with a number of

8

benefits.   First, the RSA delivered a positive marketing message to the Debtors' various operational stakeholders, including vendors, customers, and employees, facilitating a soft landing into chapter 11.  Second, the RSA aided the Debtors in obtaining the support of secured first lien creditors at TCEH for the priming liens under the TCEH DIP Facility and 18 months of consensual use of cash collateral under the TCEH Cash Collateral Order without onerous case milestones.   Third, the Debtors also obtained the support of the EFIH and EFH unsecured creditors for the EFIH First Lien DIP Facility and the EFIH First Lien Makewhole Settlement, which represent a significant step in deleveraging EFIH and EFH.  Fourth, it was in pursuing the transactions contemplated by the RSA, including the EFIH Second Lien DIP Facility, that the Debtors attracted the attention of third-party strategic buyers, including NextEra Energy, Inc.

18.     In addition to opening a dialogue with third-party strategic buyers, the Debtors have also been engaging in productive conversations with those parties who did not participate in prepetition discussions.  To date, the Debtors have had a number of productive conversations with such parties.  Indeed, many Court orders have been entered on certification of counsel, following productive negotiations with, among others, the U.S. Trustee, the official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee"), and the ad hoc group of TCEH unsecured noteholders (the "Ad Hoc TCEH Unsecured Group").  While certain of the motions required some litigation in the first instance, the Debtors, to date, have been able to consensually resolve the vast majority of operational, non-financing issues raised by parties in interest.

19.     In addition, the Debtors have continued to have productive discussions with their regulators.  The Debtors have been communicating with the State of Texas regularly regarding these chapter 11 cases.  Moreover, the Debtors have asked the Internal Revenue Service (the

9

"IRS") to advise on the tax considerations underlying the Debtors' global restructuring strategy and continue to be engaged in active discussions with the IRS. The Debtors hope to continue the productive tenor of discussions with all parties in interest as they direct their efforts toward filing a plan of reorganization and a disclosure statement.

20.    ***Discovery and Litigation***. In the early days of these chapter 11 cases, the Debtors successfully litigated certain issues that have allowed them to preserve the efficient administration of their cases going forward. First, with the support of joinders filed by six separate creditor constituencies, the Debtors defeated a motion to transfer venue from the District of Delaware to the Northern District of Texas. In addition, the Court overruled the Ad Hoc TCEH Unsecured Group's objection to the Debtors' motion to jointly administer their 71 cases. In each instance, the Court cited cost savings, convenience and/or administrative ease as bases for its ruling.

21.    However, given the size and complexity of the Debtors' cases, I recognize that litigation may be inevitable. Accordingly, the Debtors have been engaged in significant discovery and litigation preparation since the Petition Date. The Debtors' management team and their professional advisors have participated in 17 depositions, conducted by seven different stakeholder groups, and have produced over 440,000 pages of documents through the discovery process. The depositions and document production have related to a wide range of topics including, among others, historical intercompany transactions, the events that led to the commencement of these chapter 11 cases, the Debtors' evaluation of their restructuring proposals, a Rule 2004 investigation into historical transactions, the liens securing the TCEH first lien debt, and makewhole fights with respect to the EFIH first and second lien notes. The Debtors, their management team, and their advisors have made and will continue to make every

10

attempt to be responsive to the deposition and discovery requests in an attempt to keep these chapter 11 cases on track and hopefully generate additional consensus.

### D.    Extended Exclusivity Periods.

22.    The Debtors' primary focus in the next phase of their chapter 11 cases is to continue fostering an open dialogue with the goal of generating consensus around a plan of reorganization that maximizes the value of the Debtors' estates for the benefit of all those parties who hold an interest in such estates.  To achieve this goal, the Debtors intend to use the time provided by the Exclusivity Periods for three purposes.  First, they will continue to be responsive to discovery and document production requests—recognizing that it is one available mechanism by which parties can acquire information about the Debtors' businesses and restructuring strategies—and they will continue to actively participate in diligence meetings and calls with such parties in interest.  Second, they will continue to engage their stakeholders in discussions regarding other restructuring proposals and developing a process for evaluating such proposals.  Third, they will continue to work toward obtaining the regulatory approvals necessary to consummate a global restructuring.

23.    It is my belief that given the complexity of the Debtors' cases and the number of active creditor constituencies, the Debtors will need more time to achieve their goal of consummating a global, value-maximizing restructuring.  The Debtors' initial 120-day period to file a chapter 11 plan (the "Filing Exclusivity Period") is scheduled to expire on August 27, 2014.  The initial 180-day period to solicit votes on the chapter 11 plan (the "Soliciting Exclusivity Period," and collectively with the Filing Exclusivity Period, the "Exclusivity Periods") expires on October 27, 2014.  To continue the Debtors' efforts to efficiently consummate a balance sheet restructuring, the Debtors seek to extend the Filing Exclusivity

11

Period by 180 days to February 23, 2015 and the Soliciting Exclusivity Period by 180 days to April 25, 2015.

24.    It is my understanding that the facts and circumstances of these chapter 11 cases suggest that an extension of the Exclusivity Periods will allow the Debtors to continue productive discussions with their stakeholders and develop a consensual plan of reorganization. I believe that all parties will be best served by an extension of the Exclusivity Periods, which will avoid needless distraction and provide the appropriate environment for the major stakeholders in these chapter 11 cases to work collaboratively toward a value-maximizing restructuring.

## II.    Sufficient Cause Exists to Extend the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof.

25.    I believe the relief requested in the Motion will benefit the Debtors' estates and creditors by providing the Debtors with more time to work cooperatively with parties in interests toward a global, value-maximizing plan of reorganization.   It is my understanding that all of the relevant factors that are considered by the court weigh in favor of an extension of the Exclusivity Periods:

### A.    The Debtors' Chapter 11 Cases are Large and Complex.

26.    These chapter 11 cases involve 71 Debtor entities—with approximately 5,700 employees—that engage in complex operations in a number of industries regulated by various governmental entities, and nearly $49 billion in debt.  These chapter 11 cases constitute the largest operating company to file for bankruptcy in Delaware and the seventh largest chapter 11 case filed in history (by liabilities).

27.    In addition, I believe that one needs to look no further than the bankruptcy docket to conclude that these chapter 11 cases are complex.  In the first 90 days of these chapter 11 cases, over *1,600* items have been filed on the docket.  A number of these items reflect discovery

12

requests from various creditor constituencies and, to be responsive to these requests, the Debtors' management team has participated in 17 depositions and produced over 440,000 pages in discovery materials. The Debtors have committed substantial time and resources to these efforts understanding that such disclosures are critical to developing consensus toward a global restructuring and smooth confirmation process.

28.     That being said, given the Debtors' significant balance sheet debt, a number of parties in interests with conflicting interests have taken steadfast positions in these chapter 11 cases, resulting in significant litigation. Thus far, the Debtors have emerged successful in several proceedings, including by, notably, obtaining approval of the TCEH DIP Facility, EFIH First Lien DIP Facility, and the EFIH First Lien Makewhole Settlement.

**B.      The Debtors Have Made Good Faith Progress Towards a Chapter 11 Plan of Reorganization.**

29.     I believe the RSA provided direction in these chapter 11 cases and dispelled the notion that the chapter 11 process would be never-ending. To that end, the Debtors have made progress toward a consensual plan of reorganization with certain of their stakeholders and have consummated certain of the restructuring transactions necessary to execute a global restructuring. As described earlier, the Debtors closed the EFIH First Lien DIP Facility and the EFIH First Lien Makewhole Settlement, which has allowed them to immediately reap significant interest savings and avoid significant litigation exposure related to makewhole claims. The EFIH First Lien DIP Facility and the EFIH First Lien Makewhole Settlement represent a major step toward repayment of high interest rate debt at EFIH, which I believe is critical to the Debtors' global restructuring strategy.

30.     Since the Petition Date, the Debtors have been discussing their restructuring strategy with a number of stakeholders that did not participate in prepetition discussions. The

13

Debtors anticipate discussing the terms of the plan of reorganization with some of these stakeholders and hope to develop additional consensus around a value-maximizing restructuring during the extended Exclusivity Periods.   To effectively address the conflicting interests of the various creditor constituencies, the Debtors request an extension of the Exclusivity Periods.

  **C.**  **An Extension of the Exclusivity Periods is Necessary to Provide Sufficient Time to Negotiate and Prepare Adequate Information.**

   31.  Given the Debtors ongoing productive negotiations with other creditor constituencies, the Debtors would use the time provided by an extension of the Exclusivity Periods to continue seeking such parties' support for the plan of reorganization.  Obtaining the support of as many creditor constituencies as possible is critical to ensuring an efficient, cost-effective, and value-maximizing reorganization.   Attaining the support of the six different creditor constituencies to the RSA took many months of coordinated and focused efforts during the prepetition period, and the Debtors now require additional time to obtain additional support for the plan of reorganization.

  **D.**  **An Extension of the Exclusivity Periods Will Not Prejudice Creditors.**

   32.  The Debtors are requesting an extension of the Exclusivity Periods to maintain focus on obtaining support for a consensual plan of reorganization.   This extension is not intended to pressure the Debtors' creditors.   In fact, it is my understanding that extending the Exclusivity Periods will give parties in interests exactly what they have requested—time.   The extension will allow the Debtors to work cooperatively with these parties toward a potential global, value-maximizing restructuring.   To the extent feasible and necessary, the Debtors will continue to hold productive discussions with parties in interests to consummate a value-maximizing plan of reorganization.   As such, I believe that the extending the Exclusivity Period will not prejudice the Debtors' creditors, but will instead benefit the Debtors' estates, their

14

creditors, and all other key parties in interest.

**E.      The Debtors are Paying Their Bills as They Come Due.**

33.      Since the Petition Date, the Debtors have paid their debts in the ordinary course of business or as otherwise provided by Court order and have sufficient liquidity under the EFIH First Lien DIP Facility, TCEH DIP Facility, and the TCEH Cash Collateral Order to continue to do so.

**F.      These Chapter 11 Cases Are in Their Infancy.**

34.      This Debtors' request for an extension of the Exclusivity Periods is the Debtors' first such request and comes less than 90 days after the Petition Date.  As discussed above, in the last 90 days, the Debtors have accomplished a great deal and continue to work diligently toward a consensual plan of reorganization.

35.      I believe that the Debtors are doing everything that they should be doing as chapter 11 debtors in possession to facilitate a successful conclusion to these chapter 11 cases. The Debtors focused their efforts in the first 90 days of these chapter 11 cases on ensuring a soft landing into chapter 11, maximizing liquidity, and consummating certain transactions at EFIH in support of a global restructuring.  These efforts required the Debtors full and undivided attention and the Debtors are now prepared to shift their focus toward generating additional support for a consensual plan of reorganization.

**G.      The Debtors are Continuing to Address Open Contingencies.**

36.      Despite the fact that the Debtors have been doing everything they should be doing to facilitate an expeditious exit from chapter 11, there remains much work to do.  There are a number of open issues the Debtors are actively addressing with their stakeholders.  For example, the Debtors have discussed a potential tax-free spin of TCEH and its subsidiaries with several of

15

their regulators, including, among others, the PUCT, the NRC, and the IRS but have not obtained any assurances regarding their assessments of such a transaction. With respect to the IRS, the Debtors have asked the IRS to opine on the tax attributes of a tax-efficient restructuring and, to date, are engaged in active discussions with the IRS. Finally, and perhaps most critically, the Debtors need to continue their diligent efforts to reevaluate the EFIH Second Lien DIP Facility (and, ultimately, the mechanisms by which to ultimately delever EFH and EFIH) and explore strategic alternatives with other interested parties. All of these efforts are critical to achieving the Debtors' primary goals: efficiency, consensus, and value-maximization. To address these issues and develop the broadest base of support for a plan of reorganization, I believe the Debtors require the time provided by the extension of Exclusivity Periods.

37.     In consideration of all these factors, I believe that the Court should grant the extension of the Exclusivity Periods.

*[Remainder of page intentionally left blank.]*

RLF1 10543579v.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated: July 23, 2014

Michael Carter
Senior Vice President, Corporate Planning, and Assistant Treasurer of EFH Corporate Services Company