## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS | ) | Case No. 14-10979 (CSS) |
| CORP., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| CSC TRUST COMPANY OF | ) | |
| DELAWARE, as INDENTURE | ) | |
| TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No: 14-50363 (CSS) |
| | ) | |
| ENERGY FUTURE INTERMEDIATE | ) | |
| HOLDINGS COMPANY LLC and | ) | |
| EFIH FINANCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## OPINION

Before the Court is a request for discovery, seeking information on the issue of a debtor's valuation and solvency within the context of a makewhole litigation. The defendants have objected to producing the requested financial documents on the ground that the request is irrelevant to the litigation at hand.

There are three issues:

1.     Is a discovery request for information regarding a debtor's valuation and solvency relevant within the context of adjudicating a makewhole dispute?

2.      If so, can this information be obtained from a third-party as opposed to receiving this information from the debtors?

3.      Can information be obtained from a creditor and party to a restructuring agreement regarding the intention of a debtor in filing for bankruptcy and refinancing a set of notes in order to determine whether the bankruptcy was intentionally filed in order to avoid the payment of a makewhole premium?

As set forth below, the Court reaches the following conclusions:

1.       A request for information regarding a debtor's valuation and solvency is relevant, and thus discoverable, in the context of a makewhole dispute, because if a makewhole provision is found to be applicable, the solvency of the debtor will affect how the Court determines the specific amount required to be paid.  If a debtor is solvent, the Court is able to directly enforce the terms of the contract under state law, but when it is insolvent, the Court will most likely have to make a decision based on equitable principles.

2.      While obtainable from a debtor, information regarding a debtor's valuation and solvency is not obtainable from third parties who have not taken a clear position with regard to the debtor's solvency, and who do not intend to offer expert or other evidence on the issue.

3.      Information regarding the intention of a debtor in filing for bankruptcy and refinancing a set of notes, when garnered from the point of view of a creditor and a party to a restructuring agreement (rather than the debtor itself), is not discoverable, where, as

here, the party requesting the discovery has not demonstrated the relevance of this particular information and viewpoint toward the makewhole litigation.

Notwithstanding the Court's conclusions regarding the relevance of information regarding a debtor's valuation and solvency and that discovery regarding the same is obtainable from the defendants, the Court is cognizant that such discovery would be immensely time consuming and expensive and would significantly delay resolution of the adversary proceeding.   Thus, the Court presents three alternatives to allowing discovery on valuation and solvency:

a.    The defendants may concede their insolvency solely for purposes of this makewhole litigation;

b.    The defendants may waive the right to assert any defense to payment of the makewhole premium based upon insolvency, i.e., that payment should be reduced or not paid based upon equitable principles; and/or

c.    The parties may agree to bifurcate the trial such that the issue of solvency and the related discovery will only arise if the Court finds, in the first instance, that the defendants are liable in whole or in part for a makewhole premium.

## STATEMENT OF FACTS

The debtors filed voluntary petitions under Chapter 11 of Bankruptcy Code on April 29, 2014.[1]   An adversary proceeding was filed by the CSC Trust Company, as indenture trustee ("CSC Trust" or "Trustee") for a set of 10% Senior Secured Notes Due

---

[1] Del. Bankr. 14-10979, D.I. 1.

2020 (the "10% Notes") issued by defendants Energy Future Intermediate Holding

Company LLC and EFIH Finance Inc. (together, the "EFIH Debtors"), against the EFIH

Debtors for declaratory relief. The complaint seeks a declaration from the Court that the

EFIH Debtors are obligated to pay a $665.2 million redemption premium in connection

with the proposed refinancing of the 10% Notes.[2] The Trustee argues that the refinancing

of the notes within bankruptcy constitutes an early redemption under the terms of the

indentures, which can only be completed if the applicable premium ("makewhole

premium" or "premium") is paid.[3]

 After unsuccessful attempts at negotiation, the Trustee brought a variety of

discovery disputes for resolution before the Court in a letter filed under seal on July 15,

2014.[4] One of the disputes involves the seeking of "documents and deposition testimony

relating to . . . the valuation and solvency of the EFIH Debtors, including the PIK

Noteholders' own valuations of the EFIH Debtors, of Oncor, and of the consideration the

PIK Noteholders[5] expect to receive under the contemplated Restructuring Support

Agreement."[6] The Trustee asserts that "when a debtor is solvent, it may not rely on the

Bankruptcy Code to deny payment of a redemption premium," thus leaving the

---

[2] Complaint, Adv. Pro. 14-50363, D.I. 1, ¶ 1. Unless otherwise noted, all docket references will refer to the main bankruptcy proceeding, Del. Bankr. 14-10979, rather than the adversary proceeding.

[3] *Id.* ¶¶ 19, 23.

[4] D.I. 1572 ("First Letter, written by the Trustee").

[5] The "PIK Noteholders" is a term often used within this bankruptcy case, which refers to the holders of the 11.25% / 12.25% unsecured senior toggle notes due December 1, 2018, issued pursuant to a certain indenture dated December 5, 2012, by the EFIH Debtors as issuers, and UMB Bank N.A. as successor trustee.

[6] *Id.*, p. 3.

allowance of makewhole claims to be determined solely by state law.[7]  However, if the EFIH Debtors are insolvent the Court might apply equitable principles under the Bankruptcy Code.[8]  The Trustee further argues that the EFIH Debtor's solvency and financial condition could potentially bear on an assessment of whether the EFIH Debtors have taken voluntary action to evade payment of the applicable premium or other makewhole amount.[9]  Additionally, the Trustee states that the view of the Ad Hoc Committee of PIK Noteholders ("Ad Hoc Committee," or "PIK Noteholders") as to the EFIH Debtor's value and solvency are relevant because the PIK Noteholders played a central role in the negotiation of the Restructuring Support Agreement.[10]

The EFIH Debtors filed an answering letter on July 17, 2014, arguing that discovery on solvency is irrelevant to the controlling issue in the case – namely, whether the indentures provide the Trustee with a makewhole premium under the current circumstances.[11]  The EFIH Debtors assert that the plain terms of the indentures confirm that whether they are solvent has no bearing on whether the holders of the 10% Notes (the "10% Noteholders") are owed a makewhole premium: "Whether the [10% Noteholders] are owed a makewhole premium turns on the terms on the indentures, and those agreements do not in any way suggest that EFIH's solvency as of the petition date might be relevant here. In fact, the words 'solvent' or 'solvency' do not appear in the

---

[7] *Id.*, p. 4.

[8] *Id.*

[9] *Id.*

[10] *Id,* pp. 4-7.

[11] D.I. 1615 ("Second Letter, written by the Debtor").

agreements at all."[12]  Finally, the EFIH Debtors wholly reject the notion that they filed for

bankruptcy to avoid paying makewhole premiums, but instead filed "for the completely

proper purpose that EFIH was running out of cash."[13]

The Ad Hoc Committee also filed a letter with the Court on July 17, 2014, which

discussed, *inter alia*, the issue of valuation and solvency discovery.[14] The Ad Hoc

Committee argues that its internal communications between members regarding

valuation, or their proprietary valuation models, are of no relevance in the litigation. [15]

They continue that such evidence is particularly irrelevant from the point of view of the

members, as the Ad Hoc Committee is not taking a position or offering evidence of

solvency.[16]  Additionally, with regard to the EFIH Debtors' motivations for filing

bankruptcy, the Ad Hoc Committee opines that it should remain a debtor-specific

inquiry, for the Ad Hoc Committee members cannot offer relevant testimony or evidence

as to why the EFIH Debtors made their decisions.[17]

---

[12] *Id.*, p. 3.

[13] *Id.*, p. 5.

[14] D.I. 1614 ("Third Letter, written by the Ad Hoc Committee").

[15] *Id.*, p. 4.

[16] *Id.*, pp. 4-6 ("The Ad Hoc Committee has not taken, and does not intend to take, a position on the EFIH Debtors' solvency or valuation in connection with the Makewhole Litigation, and will not offer expert or other evidence on the topic . . . Here, if the EFIH Debtor's valuation or solvency is relevant to the Makewhole Litigation, the 10% Trustee has already gotten evidence from the EFIH Debtors themselves and can offer expert testimony of its own.  The 10% Trustee does not need – and is not entitled to – discovery of the internal valuation models or analyses of the members of the Ad Hoc Committee, particularly here, where the Ad Hoc Committee is not taking a position or offering evidence on solvency.")

[17] *Id.*, pp. 6-7.

A pre-trial conference on the adversary proceeding was held on June 18, 2014, in which the parties discussed their arguments on this issue, amongst other discovery disputes.[18]  An additional letter was sent by the EFIH Debtors clarifying a possible point of confusion in a cited case, *HSBC Bank USA, Nat. Ass'n v. Calpine Corp.,*[19] which had been discussed at the pre-trial conference.[20]  The Trustee sent a final response letter, arguing that, when read correctly, *Calpine*, as well as several other cases, supported its arguments.[21]

## DISCUSSION

### 1.  Legal Standard

Discovery disputes in federal courts are governed by federal law: in particular, the Federal Rules of Civil Procedure and the Federal Rules of Evidence.[22]  Under the Federal Rule of Civil Procedure 26(b)(1),[23] parties can obtain discovery on any nonprivileged matters "relevant to any party's claim or defense . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Construed as a broad standard,[24] discovery is ordinarily allowed under the concept of relevancy "unless it is clear that the information

---

[18] *See* Hr'g Tr., Adv. Pro. 14-50363, D.I. 93.

[19] No. 07-3088, 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010).

[20] D.I. 1648 ("Fourth Letter, written by the Debtor").

[21] D.I. 1656 ("Fifth Letter, written by the Trustee").

[22] *Pearson v. Miller*, 211 F.3d 57, 61 (3d Cir. 2000).

[23] Fed. R. Civ. P. 26 is made applicable in adversarial proceedings under Fed. R. Bankr. P. 7026.

[24] *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999) ("It is well recognized that the federal rules allow broad and liberal discovery.") (citing *In re Madden*, 151 F.3d 125, 128 (3d Cir. 1998)).

sought can have no possible bearing upon the subject matter of the action."[25]  Yet while

a plaintiff can adduce evidence "in support of cognizable claims set out in [the]

complaint," a plaintiff is not entitled to discovery "for the purpose of determining

whether or not there may be a factual basis for a claim . . . not [yet] made."[26]

The primary issue for determination before the Court, then, is "whether the

documents and information sought relate to any of the legal or factual issues in

dispute."[27]  Information can be relevant even if it only leads to other relevant

information.[28]  Relevant material may subsequently be protected from discovery by

proper claims of privilege, but the initial question is relevance.[29]  If an objection has been

raised as to relevancy, the party seeking the discovery bears the burden of demonstrating

the relevance of the sought information to the claims, defenses, or the subject matter of

the litigation.[30]

---

[25] *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 39 (D. Del. 1993) (quoting *La Chemise Lacoste v. Alligator Co., Inc.*, 60 F.R.D. 164, 171 (D. Del. 1973)).

[26] *McLaughlin v. Copeland*, 455 F. Supp. 749, 753 (D. Del. 1978), *aff'd*, 595 F.2d 1213 (3d Cir. 1979).  *See also ML-Lee Acquisition*, 151 F.R.D. at 41 ("While most discovery involves some 'fishing', as with actual fishing, the hook must first be appropriately baited.").

[27] *Pierson v. United States*, 428 F. Supp. 384, 387 (D. Del. 1977); *Smith v. F. T. C.*, 403 F. Supp. 1000, 1004 (D. Del. 1975).

[28] *Scuderi v. Boston Ins. Co.*, 34 F.R.D. 463, 466 (D. Del. 1964) (citing *Vilastor Kent Theatre Corp. v. Brandt*, 18 F.R.D. 199 (S.D.N.Y. 1955); *Hickman v. Taylor*, 329 U.S. 495, 511–12 (1947)).  *See also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) ("… any matter that bears on, or that could reasonably lead to other matter that could bear on, any issue that is or may be in the case.")

[29] *Pierson*, 428 F. Supp. at 390 (citing *Smith*, 403 F. Supp. at 1004).

[30] *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009).

### 2.  Relevance of Solvency and Valuation Information

The Trustee asserts that when a debtor is solvent, the allowance of claims under a makewhole provision is an issue of "state law alone."[31]  Consequently, it can be inferred that the Trustee believes solvency information is relevant because it affects how the makewhole claim will be addressed in bankruptcy.  In contrast, the EFIH Debtors assert that the allowance of the makewhole premium will turn on the terms of the indentures, and the indentures do not "in any way suggest" that EFIH's solvency is relevant to whether a makewhole premium is owed.[32]

The standard for relevancy, however, is construed "more loosely in the discovery context than at trial."[33]  Federal Rule of Civil Procedure 26(b) clarifies that information need not be admissible in order to still be considered relevant.  While the EFIH Debtors are correct in suggesting that the terms of the indentures will need to be analyzed in order to determine how the makewhole claim will be treated, that is not a question for the Court at this stage.

The EFIH Debtors first cite to §6.01(a) of the contract, in which the term "Event of Default" is defined, and point out that the event of default occurred the moment the debtors filed for bankruptcy petition, irrespective of whether the EFIH Debtors were solvent.[34]  They then point to other sections of the indentures, arguing that the contract

---

[31] First Letter, written by the Trustee, D.I. 1572, p. 4.

[32] Second Letter, written by the Debtor, D.I. 1615, p. 3.

[33] *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257, 259 (D. Del. 1979).

[34] Second Letter, written by the Debtor, D.I. 1615, p. 3.

"contains no language providing that the [EFIH] Debtors must actually be found insolvent to trigger the Event of Default and resulting acceleration."[35]  It is apparent from these arguments that the EFIH Debtors believe the indentures can be interpreted to determine whether solvency is relevant, and whether the makewhole premium is owed.[36]

That contract interpretation, however, is one reserved for trial, and goes to the merits of the dispute; it should not be analyzed through the context of a discovery dispute between the parties.   Any pre-emptive interpretation of the terms of the indentures would subvert the interpretation of the indentures post-discovery through a proper trial. As long as the information sought has a "possible bearing upon the subject matter of the action," the broad standards of discovery permit the information to be obtained.

The Trustee argues that information regarding solvency is relevant in determining whether the Court should apply state law, or the Bankruptcy Code's equitable principles, in adjudicating possible makewhole premiums.   In other words, even in bankruptcy, a solvent debtor cannot escape its contractual obligations but an insolvent debtor may rely on equitable principles to argue the premium should be reduced or not paid.   As such, solvency is relevant, at least for discovery purposes.   An article cited by the Trustee, *Prepayment Clauses in Bankruptcy*, provides helpful context:

> In a solvent case, a "bankruptcy judge does not have free floating discretion to redistribute rights in accordance with his personal views of justice and fairness"; rather, "it is the role of the bankruptcy court to enforce the creditors' contractual rights."   The reason for this

---

[35] *Id.*, pp. 3-4.

[36] *See id.*, p. 5 ("In sum, the question before the Court instead is whether these indentures provide the Trustee with a makewhole premium in those circumstances.").

distinction between solvent and insolvent cases is that, in insolvent cases, bankruptcy courts need to facilitate the distribution of "a pie that is too small to allow each creditor to get the slice for which he originally contracted." . . . In solvent cases, on the other hand . . . [b]ecause enforcement of the parties' agreement would not harm junior creditors, the [Second Circuit has] concluded that it would be "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its [Chapter XI petition]."

                                          . . .

Finally, as noted [by the First Circuit,] there is no basis in a solvent case to limit a prepayment fee—whether it is characterized as a "charge" or as "interest"—to the lender's actual damages, unless state law does so.  In an insolvent case, there are multiple reasons to limit any prepayment fee to the lender's actual damages.  From an ex post standpoint, it is arguably unfair for a senior lender to receive more than the interest for which it bargained while a junior lender does not even receive its principal . . . In a solvent case, however, "fairness" among creditors is not an issue, and whether a borrower pursues transactions that benefit equityholders is beyond the purview of the bankruptcy court.  Because the parties' state law entitlements should be respected, section 506(b) is ultimately irrelevant: The bankruptcy estate possesses funds sufficient to pay all claims (secured and unsecured) in full, and therefore "no useful purpose would be served by inquiring into whether the prepayment penalties are reasonable (and, thus, deserving of priority) within the contemplation of section 506(b)."  The effect of prepayment clauses in solvent cases, therefore, should be an issue of state law alone.[37]

The Trustee cites to several other sources in support of the proposition that when debtors are solvent, the allowance of makewhole claims is an issue for state law alone. Within the case of *In re Chemtura Corp.*[38] the Bankruptcy Court in the Southern District of New York discussed the treatment of makewhole claims with regard to a solvent debtor whose proposed settlement plan resolved alleged breaches of the makewhole provision, and largely agreed with the principles set forth in Charles and Kleinhaus'

---

[37] Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 ABI L. REV. 537, 582-83 (2007) (quoting and citing cases from the First, Second, Sixth, and Seventh Circuits).

[38] 439 B.R. 561 (Bankr. S.D.N.Y. 2010).

article.  Within the case of *In re Premier Entm't Biloxi LLC*,[39] the Bankruptcy Court in the Southern District of Mississippi noted that because the debtors were shown to be solvent, the claimants were entitled to pursue an unsecured claim for damages for the Debtor's breach of the terms of the indenture, enforcing a valid contractual obligation.  Finally, within the case of *Gencarelli v. UPS Capital Bus. Credit*,[40] the First Circuit decided that since the debtor was solvent, the pre-bargained contractual prepayment penalty would be enforced, regardless of its reasonableness as decided under Section 506(b) of the Code.

The District of Delaware, as well as other courts, have tended to agree with the holding of *Gencarelli*.  Within *In re Los Angeles Dodgers LLC*[41], the District Court found that a contractual provision was not unenforceable merely because a debtor was in bankruptcy.  As the case involved a solvent debtor, "the equities strongly favor holding the debtor to his contractual obligations so long as those obligations are legally enforceable under applicable non-bankruptcy law."[42]  The Seventh Circuit pointed out that the nature of the equity court did not provide judges with "free-floating discretion to redistribute rights in accordance with . . . personal views of justice and fairness, however enlightened those views may be . . . If the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights," within the context of whether repayment of the

---

[39] 445 B.R. 582 (Bankr. S.D. Miss. 2010).

[40] 501 F.3d 1 (1st Cir. 2007).

[41] 465 B.R. 18 (D. Del. 2011).

[42] *Id.* at 32-33 (quoting *Gencarelli,* 501 F.3d at 7).

principal amount of an indenture had been properly accelerated according to the terms

of the contract.[43]  The Sixth Circuit agreed with this proposition within *In re Dow Corning*

*Corp.*,[44] whereby the court applied the presumption that the contracted-for default

interest rate would be paid to unsecured claim holders in a solvent debtor case.  Similarly,

the Second Circuit, within the case of *Ruskin v. Griffiths*,[45] held that the claimholder was

entitled to the benefit of the higher interest rate previously contracted for through a

variable interest rate provision.  When a debtor is solvent, "it seems . . . the opposite of

equity to allow the debtor to escape the expressly-bargained-for result of its act."[46]  The

Bankruptcy Court in the Southern District of New York also applied this rule in the case

of *In re Gen. Growth Properties, Inc.*,[47] in which the solvent debtor was required to pay the

contracted default rate of interest to effect a cure and reinstatement of debt.

　　　While solvent debtor cases are "somewhat of a rarity,"[48] the available precedent

consistently defers to previously contracted bargains and provisions when dealing with

solvent debtors in varying situations.  As a result, courts tend to look to state law in

enforcing and interpreting these provisions.  While the Debtor argues that the cases cited

---

[43] *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986).

[44] 456 F.3d 668, 679-80 (6th Cir. 2006).

[45] *Ruskin v. Griffiths*, 269 F.2d 827, 831-32 (2d Cir. 1959), *cert. denied*, 361 U.S. 947 (1960).  This case appears to remain as binding authority in the Second Circuit, even though it arose under the prior Bankruptcy Act. *See Citibank v. Nyland*, 878 F.2d 620, 625 (2d Cir. 1989) (finding that the vitality of *Ruskin* remains unimpaired); *see also Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 340 (S.D.N.Y. 2008) (collecting cases holding that *Ruskin* remains binding in the Second Circuit).

[46] *Ruskin*, 269 F.2d at 830-31.

[47] 451 B.R. 323, 328-29 (Bankr. S.D.N.Y. 2011).

[48] *Dow Corning Corp.*, 456 F.3d at 678.

by the Trustee fail to suggest that "the debtor's solvency affects whether the indentures provide for a makewhole premium," and also do not hold that "a solvent debtor will owe a makewhole premium where the indenture does not otherwise provide for one," the Trustee's argument does not follow this line of logic.[49] Instead, the cases show that when a debtor is solvent, certain contractual terms, such as the payment of a makewhole premium, can be enforced under state law, and the EFIH Debtors may not rely on the Bankruptcy Code to "deny payment of a redemption premium otherwise required" by the terms of the indenture.[50]

Notably, the EFIH Debtor's Answer to the Complaint currently does not attempt to decline payment of the makewhole premium under any sections of the Bankruptcy Code.[51]  It appears that they believe the plain language of the indentures can be read and interpreted to show that no makewhole premium will be required.[52]  This, however, is the main contractual dispute at issue in the Complaint, and cannot be decided from within the context of a discovery dispute, despite the EFIH Debtors' contention otherwise.  If the EFIH Debtors' argument is correct, it is likely that no premium will need to be paid.  If the Debtor is incorrect, however, and the terms of the indenture are found to require the payment of a makewhole premium, the solvency or insolvency of the

---

[49] Second Letter, written by the Debtor, D.I. 1615, p. 5.

[50] First Letter, written by the Trustee, D.I. 1572, p. 4.

[51] *See* Answer, Adv. Pro. 14-50363, D.I. 27.

[52] Second Letter, written by the Debtor, D.I. 1615, p. 2 ("The heart of the makewhole premium dispute is whether the First Lien indentures provide for the payment of a so-called makewhole premium where EFIH's bankruptcy filing automatically accelerated that debt.  The First Lien indentures plainly do not allow for such damages . . . [The] acceleration provision, Section 6.02 of the Indentures, provides . . . nothing about the payment of a makewhole premium.").

Debtor will come into play in determining how the Court will deal with the necessary payment. If the Debtor is solvent, the Court is able to follow the approach utilized in *Gencarelli* and similar precedent to enforce the terms of the contract under state law. If the Debtor is insolvent, however, the equities of the case may require the Court to distribute the limited pie in a different fashion.

The adversary proceeding not only asks for a determination that an applicable makewhole premium is to be paid, but also that a specific amount of the premium is warranted under the terms of the indentures. Because the standard for relevancy is construed much more loosely in the discovery context than at trial, and because information regarding the EFIH Debtors' solvency reaches the low threshold of having a possible bearing on the subject matter of the action,[53] the Trustee's request for information regarding the EFIH Debtor's solvency must be allowed.[54] It is possible that the terms of the indentures may call for the payment of a makewhole premium – at which time the solvency of the EFIH Debtors would affect the exact amount to be paid – and this possibility is enough to entitle the Trustee to discovery, because "[i]nformation can be relevant even if it only leads to other relevant information."[55] It also remains possible

---

[53] *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 39 (D. Del. 1993) (quoting *La Chemise Lacoste v. Alligator Co., Inc.*, 60 F.R.D. 164, 171 (D. Del. 1973)). *See also Scuderi v. Boston Ins. Co.*, 34 F.R.D. 463, 466 (D. Del. 1964) ("It requires only a reasonable probability of materiality and is not as strict as the standard of relevance at trial.").

[54] Any inquiry into the solvency of the EFIH Debtors must include the value of their primary asset, Oncor.

[55] *Scuderi*, 34 F.R.D. at 466 (citing *Vilastor Kent Theatre Corp. v. Brandt*, 18 F.R.D. 199 (S.D.N.Y. 1955); *Hickman v. Taylor*, 329 U.S. 495, 511–512 (1947)). *See also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) ("… any matter that bears on, or that could reasonably lead to other matter that could bear on, any issue that is or may be in the case.")

that the Court will find that the plain language of the indentures do not provide for a prepayment premium, making solvency therefore irrelevant, but, as things stand now, the Court is unable make this finding at this current stage.[56]

### 3.  Obtaining Solvency and Valuation Information from PIK Noteholders

In its discovery request, the Trustee has asked for information from the Ad Hoc Committee and the PIK Noteholders regarding the valuation and solvency of the EFIH Debtors, including the PIK Noteholders' own valuations of the EFIH Debtors.  The Trustee argues that "[c]ourts routinely admit evidence of how lenders and other sophisticated market participants value debtors as highly probative, if not dispositive, on issues of valuation and solvency."[57]  The Ad Hoc Committee and its members, however, have refused to provide such information on the grounds of a lack of relevancy, particularly because the Ad Hoc Committee "has not taken, and does not intend to take,

---

[56] The Debtor also impassionedly argues that Judge Lifland, within the case of *Calpine I,* S.D.N.Y. Bankr. 05-6022, found that solvency was irrelevant in the context of both the no-call provisions and claims for makewhole damages.  A key distinguishing fact between *Calpine I* and the present dispute, however, is that Judge Lifland was addressing the dispute not from a discovery standpoint, but from a more limited and stringent trial standpoint.  The quote cited by the Debtor – "I don't see that solvency is an issue with the respect to the matters that have been placed before me . . . The documents will control and they don't require solvency or insolvency," – was made by the Judge with regard to an objection to a line of questioning of a witness. *See* Second Letter, written by the Debtor, p. 2; *In re Calpine Corp.,* Tr. Hr'g (S.D.N.Y. Feb. 27, 2007).  It is likely that the Judge intended this statement to only be limited to the first determination the Court had to make: whether prepayment damages were available under the terms of the loan agreement.  Yet seeing as the loan agreement was not found to contain prepayment premiums, Judge Lifland never reached the second determination regarding what the proper amount of the prepayment premium was, and thus did not have to consider solvency. *See In re Calpine Corp.,* 365 B.R. 392, 398 (Bankr. S.D.N.Y. 2007) ("With respect to the purported prepayment premiums, none of the agreements governing the CalGen Secured Debt require a prepayment premium for repayment prior to April 1, 2007.  Thus, pursuant to the terms of the agreements, so long as the refinancing is completed prior to April 1, 2007, no prepayment premium is due.").

[57] First Letter, written by the Trustee, D.I. 1572, p. 5.

a position on the EFIH Debtors' solvency or valuation in connection with the Makewhole Litigation, and will not offer expert or other evidence on the topic."[58]

The Ad Hoc Committee has accurately pointed out that the cases relied on by the Trustee are inapposite or otherwise distinguishable.   The case of *VFB LLC v. Campbell Soup Co.* discusses the examination of comparable sales and assets in the market in order to determine the value of a company, rather than the examination of how other parties or creditors are valuing the debtor.[59]   The case of *In re Plassein Int'l Corp.* endorsed the use of expert analyses by investment bankers and accounting firms to confirm the validity of future projections made, to determine the reasonableness of proposed business plans, rather than expert analyses on the current valuations of the businesses.[60]  Finally, the case of *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, only examined expert evidence and market evidence to ascertain company value,[61] while the case of *In re Iridium Operating LLC* only utilized external underwriter valuations as anecdotal evidence of value.[62] Neither case dealt with a request for internal valuations from a creditor or party to a restructuring agreement.

The scope of discovery allowed by the Federal Rule of Civil Procedure is far-reaching, and is designed to cover "the identity and location of persons who know of any

---

[58] Third Letter, written by the Ad Hoc Committee, D.I. 1614, p. 4.

[59] No. 02-137, 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005), *aff'd,* 482 F.3d 624 (3d Cir. 2007).

[60] Del. Bankr. 03-11489, 2008 WL 1990315, at *8 (Bankr. D. Del. May 5, 2008).

[61] No. 10-1842, 2013 WL 230329, at *9 (N.D. Tex. Jan. 22, 2013), *aff'd,* No. 13-10752, 2014 WL 3746476 (5th Cir. July 30, 2014).

[62] 373 B.R. 283, 332 (Bankr. S.D.N.Y. 2007).

discoverable matter."[63]   There lacks precedent, however, on the applicability of the

Federal Rule of Civil Procedure 45 in adversary proceedings[64], or how one defines a

"nonparty" within an adversary proceeding of a bankruptcy. It also appears uncommon

that a creditor's valuation of a debtor is requested within a bankruptcy, except with

regard to avoidable preferences.[65]   The cases cited by the Ad Hoc Committee, however,

offer some insight.  Within the case of *In re the Dolan Co.*, Judge Shannon stated that in a

sale context, a buyer's "assessment or determination of value is [often] not an appropriate

area of inquiry, particularly given that . . . the [plan confirmation burden] . . . rests with

the Debtor," even if the buyer is not "a third-party, disconnected bidder that's simply

come to an auction table and put cash on it." [66]   This decision was motivated by the fact

that the inquiry was not discrete or narrowly focused, would likely be extensive and

expensive, and was not likely to be relevant as the debtor continued to hold the burden

of demonstrating the value of the company.[67]   Judge Shannon went on to further clarify

that he has, "in a number of instances, consistently held that this type of inquiry is not

appropriate until and unless [the buyer/party] becomes an active participant in

presenting evidence and testimony to the Court regarding the value of the company."  In

---

[63] Federal Rule of Civil Procedure 26(b)(1).

[64] The Federal Rule of Bankruptcy Procedure 9016 provides that the Federal Rule of Civil Procedure 45 applies "in cases under the Code."

[65] *See, e.g., In re Lingham Rawlings, LLC*, No. 10-32769, 2013 WL 1352320 (Bankr. E.D. Tenn. Apr. 3, 2013); *In re Tri-State Fin., LLC*, No. 08-83016, 2012 WL 1949331 (Bankr. D. Neb. May 29, 2012); *In re Luster-Coate Metallizing Corp.*, No. 01-22764, 2004 WL 432038 (Bankr. W.D.N.Y. Feb. 3, 2004); *In re Zeta Consumer Products Corp.*, 291 B.R. 336, 347 (Bankr. D.N.J. 2003).

[66] Del. Bankr. 14-10614, Tr. Hr'g (May 2, 2014), D.I. 284, pp. 10–11, 19-21, *available at* D.I. 1614, Exh. 1 within this case.

[67] *Id.*, pp. 19-21.

the case of *In re Genco Shipping & Trading,* internal valuations of the debtor's business was requested from parties to a RSA purely as factual, not expert, information, but the Bankruptcy Court in the Southern District of New York rejected the request on the grounds of irrelevance.[68]  As the internal valuations were not created to be shared, they would be classified as lay opinions, creating a risk of opening the floodgates to "mini valuation trials."[69]

The Court finds these cases persuasive when applied to the disputed issue at hand. Here, the Ad Hoc Committee does not plan to take a position or offer evidence regarding the solvency of the EFIH Debtors in connection with the makewhole litigation.  Despite that the EFIH Debtors do not, unlike in *Dolan*, hold the burden of proving solvency here, the other risks of discovery remain applicable.  More importantly, the Trustee has not sustained its own burden of demonstrating the relevance of the valuation information specifically formed by the PIK Noteholders, which is required once an objection as to relevancy has been made.  The Trustee asserts that "evidence from the Ad Hoc Committee is especially relevant since its members played such a central role in negotiating the RSA,"[70] but fail to describe how the valuation information by the Ad Hoc Committee is relevant to the current dispute regarding the allowance and enforcement of a possible makewhole claim under the terms of the indentures. While the Trustee is

---

[68] S.D.N.Y. Bankr. No. 14-11108, D.I. 336, Hr'g Tr. (June 3, 2014), pp. 19, 23, 32, *available at* D.I. 1614, Exh. 2 within this case.

[69] *Id.*, pp. 36-39, 60-63.

[70] First Letter, written by the Trustee, D.I. 1572, p. 5.

entitled to obtain information from the Debtor regarding the valuation and solvency of the EFIH Debtors, the same is not likely true of the PIK Noteholders' own valuations of the EFIH Debtors.

### 4. Other Discovery Requests

While the crux of the Trustee's discovery requests deal with valuation and solvency information, the Trustee has also requested documents and deposition testimony relating to "the consideration the PIK Noteholders expect to receive under the restructuring contemplated under the Restructuring Support Agreement," and "the PIK Noteholders' efforts in collaboration with the EFIH Debtors to avoid paying the 10% Noteholders the Applicable Premium or any other makewhole amount and to circumvent the provisions of the Indenture."[71]  In particular, the Trustee has requested for discovery, from both the Debtor and the Ad Hoc Committee, "concerning the reasons for the EFIH Debtors' bankruptcy filings, the negotiation of the RSA including the provisions therein that expressly required the EFIH Debtors to commence . . .  litigation to avoid payment of any makewhole premium to the 10% Notes, and the decision immediately upon the EFIH Debtors' entry into bankruptcy to refinance the 10% notes."[72]  It is alleged by the Trustee that if a debtor takes voluntary actions to avoid paying a redemption premium, the makewhole premium is payable regardless of any technical arguments made regarding acceleration under the terms of the indentures.

---

[71] *Id.*, p. 3.

[72] *Id.*, p. 6.

In support of this contention, Trustee cites to *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, in which the Second Circuit ordered a redemption premium to be paid because a liquidating debtor had been able to make its required payments, but had simply avoided the redemption terms of the contract by unnecessarily creating a default.[73] Additionally, the Trustee cites to a footnote in *Chemtura*, in which the Bankruptcy Court in the Southern District of New York stated, in *dicta*, that "if a bankruptcy case were filed with the *purpose* (or, arguably, a material purpose) of sidestepping a no-call provision, or to avoid liability for a make-whole, such a circumstance would [be] troubl[ing], and . . . arguments to disallow claims based on either would [likely] be much weaker."[74]  Yet there is not a large base of precedent within the Third Circuit or elsewhere for this particular argument.  The Ad Hoc Committee has objected to this request, stating that they have already produced communications with the parties to the RSA and their advisors regarding negotiations.  With respect to non-RSA parties however, the Ad Hoc Committee points out that its members "cannot offer relevant testimony or evidence about why the EFIH Debtors made their decisions," as they are neither employees nor agents of the EFIH Debtors.[75]  The EFIH Debtors, on the other hand, do not object to this topic of discovery, clarifying that they have been "providing discovery that addresses this very point."[76]

---

[73] 691 F.2d 1039, 1053 (2d Cir. 1982).

[74] 439 B.R. 561, 603 n. 186 (Bankr. S.D.N.Y. 2010) (italics in original).

[75] Third Letter, written by the Ad Hoc Committee, D.I. 1614, pp. 6-7.

[76] Second Letter, written by the Debtor, D.I. 1615, p. 5.

As the EFIH Debtors are not objecting to this area of discovery, one might conclude that the Court need not address this argument at all. The Ad Hoc Committee has set forth an objection as to relevancy, however, causing the burden to shift to the Trustee to demonstrate the relevance of the sought information to the claims, defenses, or the subject matter of the litigation. The Trustee's arguments on this matter remain brief, and the Trustee has not addressed the EFIH Debtors' arguments in its later letter to the Court. Notably, apart from conclusory allegations that "EFIH and junior creditors had substantial discussions prepetition regarding a plan to use chapter 11 to deny the redemption premium on the 10% Notes," the Complaint does not contain any factual allegations regarding the intentions and actions of the PIK Noteholders in negotiating the RSA or avoiding the makewhole premium.[77] Consequently, the Trustee has not sustained its burden of showing the relevance of obtaining information from the Ad Hoc Committee regarding the reasons for the Debtor's bankruptcy filings and refinancing of the Notes.

Separately, the Court notes that the discovery request has also asked for documents and deposition testimony regarding "the consideration the PIK Noteholders expect to receive under the . . . Restructuring Support Agreement."[78] While the Ad Hoc Committee has not clearly objected to this discovery request, the relevance of this information has not been demonstrated by the Trustee, and is not readily apparent. The

---

[77] Complaint, Adv. Pro. 14-50363, D.I. 1, ¶¶ 39-40.

[78] First Letter, written by the Trustee, D.I. 1572, p. 5.

Court will not allow discovery on this matter, as it does not currently appear to hold any relevance toward determining the existence, and possibly the amount, of a makewhole premium required to be paid.[79]

### 5. Nonetheless, Discovery As To Valuation and Solvency May Not Be Allowed

The Court has held that the Trustee is entitled to discovery from the EFIH Debtors as to their valuation and solvency. Notwithstanding that ruling, the Court is cognizant that such discovery would be immensely time consuming and expensive and would significantly delay resolution of the adversary proceeding. It is important to note that solvency is only relevant if the Court finds that the 10% Noteholders are entitled to a makewhole premium under the terms of the indentures. If the 10% Noteholders are entitled to a makewhole premium and the EFIH Debtors are solvent, the Court will apply applicable state law in awarding such premium; and if the 10% Noteholders are entitled to a makewhole premium and the EFIH Debtors are insolvent the Court may apply equitable principles under the Bankruptcy Code to limit or disallow the premium. In both instances, the threshold question is whether the indentures give rise to a makewhole premium. As such, the relevance and, thus, the discovery as to the value and the solvency of the EFIH Debtors can be eliminated or deferred.

Thus, the Court presents three alternatives to engaging in discovery on valuation and solvency:

---

[79] Any further requests for discovery by the Trustee that were subject to dispute but are not specifically enumerated herein are disallowed.

a.      The defendants may concede their insolvency solely for purposes of this makewhole litigation;

b.      The defendants may waive the right to assert any defense to payment of the makewhole premium based upon insolvency, i.e., that payment should be reduced or not paid based upon equitable principles; and/or

c.      The parties may agree to bifurcate the trial such that the issue of solvency and the related discovery will only arise if the Court finds, in the first instance, that the defendants are liable in whole or in part for a makewhole premium

In the event that any of the foregoing (or something substantially similar) occurs, the Court will not allow discovery as to the value or solvency of the EFIH Debtors at this time.

## CONCLUSION

Information regarding the EFIH Debtors' valuation and solvency is relevant and discoverable at this stage of the proceedings, as there remains a possibility that the Court will require the solvency information in the future in order to properly address the payment of makewhole premiums if the indentures are found to provide for such premiums.  While the Trustee has managed to demonstrate the relevance of obtaining this information from the EFIH Debtors, however, the Trustee has failed to do so with regard to obtaining this information from the PIK Noteholders or the Ad Hoc Committee as they have not, and do not plan to, take a position or offer evidence regarding the solvency of the EFIH Debtors in connection with the makewhole litigation.  The Trustee

has also not sustained its burden in showing the relevance of, or why it is entitled to, information relating to why the EFIH Debtors filed for bankruptcy, why the EFIH Debtors refinanced the 10% Notes, and the consideration the PIK Noteholders expected to receive through the restructuring agreement – from the PIK Noteholders.

Consequently, the Trustee is entitled to discovery from the EFIH Debtors as to their value and solvency.  Notwithstanding the foregoing, discovery as to solvency may be deferred (or possibly eliminated) if the EFIH Debtors agree to waive any claim that any allowed makewhole premium be reduced or not paid under equitable principles or the parties agree to bifurcate the trial.

The parties are directed to submit a proposed order consistent with this opinion under certification of counsel.  In the event the parties are unable to agree on a form of order the Court will conduct a status conference solely for the purpose of determining the content of an appropriate order.

BY THE COURT:

_____
Christopher S. Sontchi
United States Bankruptcy Court

Dated: August 5, 2014

25