**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: September 16, 2014 at 11 a.m.** |
| | ) | **Objection Deadline: September 5, 2014 at 4:00 p.m.** |

**MOTION OF ENERGY FUTURE HOLDINGS CORP.,
*ET AL.*, FOR ENTRY OF AN ORDER AUTHORIZING THE
DEBTORS TO (A) PAY CERTAIN PREPETITION AMOUNTS
ON ACCOUNT OF THE INSIDER COMPENSATION PROGRAMS
AND (B) CONTINUE THE INSIDER COMPENSATION PROGRAMS
IN THE ORDINARY COURSE OF BUSINESS ON A POSTPETITION BASIS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), authorizing the Debtors to:  (a) pay certain prepetition amounts owed

on account of the Debtors' Insider Compensation Programs and (b) continue the Insider

Compensation Programs in the ordinary course of business on a postpetition basis.[2]  In support of

this Motion, the Debtors respectfully submit the declarations of Todd Filsinger, Senior Managing

Director at Filsinger Energy Partners (the "Filsinger Declaration"), and Doug Friske, Global

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    The Debtors had previously submitted a motion [D.I. 468] (the "Non-Insider Compensation Motion") for the approval of their compensation programs for non-insider employees.  The Court entered a final order [D.I. 1420] (the "Non-Insider Compensation Order") on July 1, 2014 approving payments under the 2014 Non-Insider Compensation Programs.

Leader of Towers Watson's Executive Compensation Practice (the "Friske Declaration").  In further support of this Motion, the Debtors respectfully state as follows.

**Preliminary Statement**

1.      Energy Future Holdings is one of the best operated companies in the power industry—both Luminant and TXU Energy consistently lead their peers in many operational and financial metrics—and the Debtors' employees, including their senior executive team, are the backbone of this success.  This motion seeks approval of a handful of compensation programs that are a continuation of the Debtors' historical practices and are consistent with industry standards.  For years, the Debtors have offered these (or similar) incentive programs to their senior executives to provide market-based opportunities to increase compensation if the Debtors meet or exceed difficult-to-attain operational and financial metrics.  These programs have been successful in driving the Debtors' operational and financial excellence.  This Court has already approved the Annual Incentive Program (the "AIP") and Executive Annual Incentive Program (the "EAIP") for non-insider employees.  By this motion, the Debtors seek to continue those and other programs for 26 members of the Debtors' senior executive team.

2.      While the Debtors' operations remain strong, the demands placed upon the Debtors' senior executives leading up to and during these chapter 11 cases have been and will continue to be significant.  The Debtors' senior executives are, of course, responsible for leading the Debtors' approximately 5,700 employees and guiding the Debtors' overall business strategy.  But the Debtors' successful reorganization requires a management team not only with the expertise to operate the businesses efficiently and effectively on a day-to-day basis.  This is especially true given the extraordinary complexity of the Debtors' businesses, which include, among other things, electricity generation, mining operations, wholesale energy sales and

purchases, commodity risk management, retail electricity sales, and customer service. Considering the sheer magnitude of the Debtors' integrated power generation and retail energy provider operations, and the fierce competition in the power industry,[3] the stewardship of the Debtors' senior executives will be critical to driving the overall success of the Debtors' restructuring and maximizing the value of the Debtors' estates.

3.      To properly incentivize and reward the Debtors' leadership team—and thereby drive performance for the overall enterprise—the Debtors have historically offered incentive-based awards as part of their overall compensation structure.   Instead of implementing new incentive compensation programs as part of the chapter 11 cases, at this time the Debtors seek to continue four historical incentive compensation programs for the Debtors' senior executives that encourage and reward exceptional performance.[4]

4.      These incentive-based programs plainly satisfy the requirements of the Bankruptcy Code.   The Debtors worked closely with outside advisors—including their compensation experts at Towers Watson—to ensure that these programs are market-based and in line with competitive practice both for companies in the power industry *and* those in chapter 11. In collaboration with their independent power advisors at Filsinger Energy Partners, the Debtors developed performance metrics that trigger incentive awards based on stretch goals that align employees' interests with the Debtors' operational, financial, and other business objectives. Those targets are based on financial and operational metrics found in the Debtors' 2014 business plan—EBITDA, plant availability, cost management, customer retention, etc.—and were

---

[3]   *See* Tr. of Hr'g., Jun. 30, 2014, 30:22–41:12 ("Kirby Proffer"), at 36:18–20.

[4]   These programs include the 2014 Executive Annual Incentive Plan, the 2014 Key Leader Performance Program, the 2014 Luminant Commercial Incentive Plan (the "Luminant CIP," under which a single insider participates), and the SPC Long-Term Incentive Plan (collectively, the "Insider Compensation Programs").

developed over the course of several months as part of the Debtors' ground-up budgeting process, which is independent of the incentive programs. These metrics are ultimately approved by the Organization & Compensation Committee of the Board (the "O&C Committee"). The O&C Committee is made up of three highly skilled members (two of whom are unaffiliated with the Debtors' equity owners), who go through a deliberative process, hearing from the Debtors' management team as well as the advisors mentioned above, when considering the metrics presented.

5.      Importantly, while the Debtors typically use the same metrics for all of their employees, the Debtors' senior executives opted to toughen several of the targets for the insider employees this Motion covers—but not for the non-insiders whose compensation has already been approved—in light of year-to-date performance. In other words, it will be more difficult for these senior executives to earn bonuses than non-insiders under these incentive-based plans. Especially in light of these recent adjustments, there should be no doubt that these metrics are primarily incentivizing in nature.

6.      In short, the Debtors' Insider Compensation Programs are reasonable and well within their business judgment. Consistent with past practices, the Debtors focused on ensuring that market-based bonuses are awarded to the Debtors' senior executives if—and only if—the Debtors meet financial and operational targets that will generate substantial value for the Debtors' constituencies, particularly their creditors. The Debtors comprise a Fortune 500 company, in a complex business, with an industry leading management team. Without the market-based incentive programs at issue in this Motion, the Debtors face a substantial risk of losing senior executives to competitors that offer attractive incentive compensation programs. These are the executives who drive the success of the Debtors' business, and any loss

in their ranks would be detrimental to the Debtors' business before, during, and after the Chapter 11 case.  If the Debtors' Insider Compensation Programs are not approved, the target total direct compensation opportunities of the Debtors' senior-most management would lag *well below* the 25th percentile of the Debtors' peer group, on average.  (Friske Declaration at ¶ 25.)  The Debtors accordingly ask that the Court approve these programs, as they are in the best interests of the Debtors and their estates.

### Relief Requested

7.      By this Motion, the Debtors seek entry of the Order authorizing the Debtors to: (a) pay certain prepetition amounts owed on account of the Debtors' Insider Compensation Programs; and (b) continue the Insider Compensation Programs in the ordinary course of business on a postpetition basis except to the extent discussed herein.

The Debtors seek relief to pay, if earned, the potential amounts under the Insider Compensation Programs set forth in the table below:

| Program | Number of Participants | Prepetition Amounts Due | Potential Remainder of 2014 Cost | Payment Timing |
|---|---|---|---|---|
| 2014 Executive Annual Incentive Plan[5] | 26 | $0 | $7.93 million (at target)[6] | February / March 2015 |
| 2014 Key Leader Performance Program | 19 | $0 | $2.56 million (at target) | Quarterly[7] (July 31 and Oct. 31, 2014 and Jan. 31, 2015) |
| 2014 Luminant Commercial Incentive Plan | 1 | $0 | ▓▓▓▓ (2013 actual cost) | February/March 2015 |
| SPC Long-Term Incentive Plan[8] | 2[9] | ▓▓▓▓ | (inclusive of ▓▓▓ prepetition amounts) | March 2015 |
| **Total Cost:** | | | ▓▓▓▓ | |

## Jurisdiction and Venue

8.     The United States Bankruptcy Court for the District of Delaware (the "Court")
has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended
Standing Order of Reference from the United States District Court for the District of Delaware*,
dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C.
§ 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules

---

[5]   The Debtors also seek approval of the AIP for a single employee who may be an insider because the employee is married to a member of senior management.  The employee is included in the EAIP numbers, but participates only in the AIP.  Those two plans have basically identical terms, and the amounts for the EAIP set forth in this table include the employee's potential AIP award.

[6]   If the Debtors satisfy the "superior" targets under each applicable metric contained in the EAIP (*i.e.*, the highest possible targets), the maximum amount payable under the 2014 EAIP would be $15,861,322.

[7]   The Key Leader Performance Program makes payments to eligible participants approximately 30 days post-quarter close—payments that were due 30 days after the end of the second quarter will be made upon the approval of the Motion.

[8]   Amounts not funded by letters of credit.

[9]   There are two participants in the SPC LTIP with potential payments that are not funded by letters of credit. Including those two participants, there are seven total participants in the SPC LTIP.

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.    The bases for the relief requested in this Motion are sections 105(a), 363, and 503(c) of title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

11.    On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court has entered a final order for joint administration of these chapter 11 cases. The Court has not appointed a trustee. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors (the "Creditors' Committee") in these chapter 11 cases on May 13, 2014 [D.I. 420]. Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98].

### The Debtors' Insider Compensation Programs

**I.    Development of the Insider Compensation Programs.**

12.    EFH Corp.—the direct or indirect Debtor parent of each of the Debtors and their non-Debtor affiliates—and its subsidiaries collectively employ approximately 9,000 employees,

approximately 5,700 of whom are employed by the Debtors.  Historically, in addition to base salary, the Debtors have compensated their workforce, including their executive team, with a combination of incentive-based programs designed to attract and motivate talented employees in a fashion that will help the Debtors achieve superior financial and operational results.  As is typical for any organization of similar size, scope, and complexity, the Debtors maintain a set of incentive compensation programs for their leadership team—the Insider Compensation Programs—to encourage and reward exceptional employee performance.  Attached as **<u>Exhibit B</u>** is a general summary of each of the Insider Compensation Programs.  The Insider Compensation Programs have always been a critical component of the Debtors' employee compensation, providing substantial benefits and value to the Debtors by aligning employee incentives with the Debtors' business goals.  Although there are a number of Insider Compensation Programs, each is targeted at a specific goal (*e.g.*, EBITDA and cost metrics for the Key Leader Performance Program, annual EBITDA for the SPC LTIP) and targeted at specific segments of the employee population (*e.g.*, the SPC LTIP for the members of the Debtors' seven-member Strategy and Policy Committee (the "<u>SPC</u>"), the Key Leader Performance Program for certain of the Debtors' Senior Vice Presidents).

II.     **2014 Insider Compensation Programs.**

     A.     **The Executive Annual Incentive Plan.**

13.     The Debtors have maintained their Executive Annual Incentive Plan for over ten years for approximately 72 employees at or above the level of Vice President.[10]  This Motion seeks approval for the 26 EAIP participants who were not included in the Non-Insider Compensation Order.  Each employee in the program is eligible to receive a bonus equal to a

---

[10]     *See* Kirby Proffer at 34:25–35:2.

target portion of his or her base salary if—and only if—the Debtors meet difficult-to-satisfy performance incentive metrics, which vary by business unit based on the employee's role.  (*See, e.g.*, Filsinger Declaration at §§ 4.1, 4.2, 6.1, 6.4, 6.5.)  The EAIP establishes a target payment (expressed as a percentage of base salary) for eligible employees, which varies according to each participant's level of responsibility (the "EAIP Target Payment").

14.    The actual amount of the EAIP payment pool is determined by comparing the Debtors' business results against challenging financial and operational metrics, including by way of example, EBITDA, customer retention, cost management, plant and mine safety and production levels, and other similar measures.  These metrics are based on targets in the annual budget that the Debtors developed from the ground-up in 3rd Quarter of 2013, completely separate from the compensation process.  Each year, in an iterative process, the Debtors' senior executives develop a set of metrics based on the following year's budget to incentivize and reward exceptional employee performance and safe operations.[11]  For the 2013 and 2014 budget years, the Debtors augmented that process by retaining independent power industry experts from Filsinger Energy Partners, who provided advice concerning the development of the performance metrics for 2013 and 2014.  Those metrics, in the form of business unit and consolidated scorecards, are presented to and approved by the O&C Committee.  The original metrics for the 2014 EAIP were approved by the O&C Committee in October of 2013, and they represented the same targets as those in the AIP for employees covered in the Non-Insider Compensation Motion.

15.    Although the metrics represented stretch goals when developed, given that the Debtors now have over six months of performance in the books, the Debtors chose to proactively

---

[11]    *See* Kirby Proffer at 38:20–24.

review mid-year the performance metric targets that trigger bonuses under the EAIP to account for year-to-date performance, updated commodity curves (using June 30, 2014 forward pricing), known one-off circumstances, and the passage of time.  (*See, e.g.*, Filsinger Declaration at § 1.) While the Debtors are keeping the performance metric targets for non-insiders the same as before—because they were and continue to be incentivizing—the Debtors decided to toughen several targets that trigger insider bonuses in light of the items listed above, as explained more fully in Mr. Filsinger's declaration.  The updated metrics are as follows:



 "[T]here is no guarantee that the Company will meet any of the[se] metrics in this business environment."  (Filsinger Declaration at § 1.)  The metrics, instead, "constitute stretch goals that incentivize and reward exceptional employee performance."  (Filsinger Declaration at § 1.)

---

12

16.    There are, in fact, a number of risks that could cause results to differ materially from the metrics including, but not limited to, those associated with:

- Energy commodity price volatility;

- The unique structure of the ERCOT energy market;

- Operating costs of the Company's nuclear and fossil fuel generation facilities;

- Mine operating costs;

- Supply and demand forces within commodity, workforce and industrial markets;

- Existing generation assets and fuel mix;

- Fuel, emission and other variable price inputs;

- Regulatory or legislative changes that might affect the market in which the Company operates;

- Broader economic conditions;

- The Company's ability to collect trade receivables from counterparties;

- The Company's ability to attract, retain and service profitable retail customers;

- Changes in the prices of transportation of natural gas, coal and other fuel products;

- Market heat rates in ERCOT;

- The Company's ability to effectively hedge against volatile commodity prices;

- Access to adequate transmission facilities;

- The Company's ability to profitably implement cost savings without sacrificing safety or the quality of the Company's products;

- The nature and impact of current and future environmental regulations; (Filsinger Declaration at § 1.) and

- The ability to attract and retain skilled employees and leadership to keep the Company's financial and operational performance on course.  (Friske Declaration at ¶ 28.)

17.    According to Mr. Filsinger, "[t]hese risk factors affect each of the metrics in some way—especially EBITDA, the most heavily weighted metric at both Luminant (37.5%) and TXU Energy (40%)."  (Filsinger Declaration at § 1.)  Based on Mr. Filsinger's modeling efforts and analysis of Company and third party information, "the threshold EBITDA metrics that trigger a bonus require strong performance in a complex power market environment that has considerable volatility."  (Filsinger Declaration at § 1.)

18.    Ultimately, actual payments under the EAIP will be calculated at the end of 2014 by taking each employee's EAIP Target Payment and modifying it based on two factors:  (a) the Debtors' actual performance relative to the operational and financial performance criteria; and (b) an individual performance modifier for each eligible employee.  The individual performance modifier, which may range from 0% to 150%, is recommended by the applicable business unit's leaders after an extensive performance review and calibration process across the Debtors' business units and is ultimately approved by the Debtors' SPC (and by the O&C Committee for SPC members).  The Debtors also accrue approximately $3 million over the course of the year in a "presidential pool" that allows the Debtors' CEO to authorize the Debtors to make EAIP and AIP payments to employees in addition to amounts accrued based on the Debtors' performance in accordance with the final individual performance modifiers.  The individual performance modifier allows the Company to recognize exceptional performers who may receive greater than 100% of their EAIP Target Payments—in contrast, less exceptional performers may receive less than 100% of their EAIP Target Payment.  Importantly, the individual performance modifiers and EAIP Target Payments for EFH Corp.'s Chief Executive Officer and the Debtors' Executive

Vice Presidents (together constituting the SPC) are determined and approved at the sole discretion of the O&C Committee.  For the fiscal year ending December 31, 2013, the Debtors paid approximately $12.4 million under the EAIP to the 26 participants for whom the Debtors seek relief in this Motion.

19.     As of the Petition Date, no amounts are owed on account of the 2014 EAIP.  The Debtors seek authority to continue the 2014 EAIP in the ordinary course of business on a postpetition basis.

**B.     Key Leader Performance Program.**

20.     On January 1, 2014, the Debtors implemented the Key Leader Performance Program, a modified version of their previously-existing Owner/Operator Plan, which applies to 19 senior employees who historically participated in the Owner/Operator Plan.[13]  None of the participants in the Key Leader Performance Program are SPC members or Executive Vice Presidents.  Under the Key Leader Performance Program, each eligible employee's annual target award is similar to the annual target previously used in the Owner/Operator Plan (or, for the eligible employees who did not participate in the Owner/Operator Plan, the annual target is based on their peer employees and/or their role in the organization).

21.     The Debtors will make payments under the Key Leader Performance Program on a quarterly basis only if the Debtors achieve certain challenging performance goals based on EBITDA and cost metrics.  These metrics are the same as those in the EAIP program.  If the

---

[13]   *See* Kirby Proffer at 35:3–6.  The Debtors historically offered an incentive plan to approximately 128 employees that required the achievement of certain targets in the years 2010-2011 and 2012-2013 under the Owner/Operator Plan, which has existed since 2010.  50% of the potential payments (which included equity and cash components) under the Owner/Operator Plan have required the Debtors to hit certain EBITDA targets (which targets were in fact met), and 50% of the potential payments have required the individuals to remain employed with the Debtors through a certain date.  This program terminated at the end of 2013.  Further details regarding the Owner/Operator Plan are contained in the Non-Insider Compensation Motion.

incentive metrics are hit for the relevant quarter, each participant will earn 25% of the applicable annual target if s/he is employed by the Debtors on the last day of each calendar quarter ending during the term.  If the metrics are not met for a given quarter, the Key Leader Performance Plan provides that the participants may still earn the full amount of the target payments from that quarter if the cumulative year-to-date performance for subsequent quarters results in the Debtors achieving the year-to-date EBITDA and cost metrics goals.  The Debtors expect the cost of the Key Leader Performance Program for the remainder of 2014 to be up to approximately $2.56 million.

22.     As of the date hereof, approximately $880,000 is owed on account of the Key Leader Performance Program for the second quarter 2014 performance period and cumulative 2014 performance, which amount includes payments based on the achievement of second quarter 2014 performance goals and a payment of first quarter amounts that were earned based on the Debtors' achievement of the year-to-date EBITDA and cost metrics goals.  The Debtors seek authority to make payments on the approximately $880,000 that relate to payments earned at the conclusion of the second quarter 2014 performance period and continue the 2014 Key Leader Performance Program in the ordinary course of business on a postpetition basis.

### C.     Luminant Commercial Incentive Plan (Which Applies to Only One Person for Purposes of This Motion).

23.     For at least the last ten years, the Debtors have offered a commercial incentive plan—termed the Luminant CIP—to approximately 55 full-time employees at Luminant who are instrumental to the Debtors' trading activities.[14]  The Court approved the Luminant CIP for all

---

[14]   An incentive plan has been in place for Luminant's wholesale and trading operations for at least the last ten years, though those plans have gone by different names.  The Luminant CIP is the latest incarnation of those plans, and does not materially change the terms of those programs that pre-dated it.  *See* Kirby Proffer at 35:10–13.

participants—except for one employee (the Chief Commercial Officer at Luminant)—in the Non-Insider Compensation Order.  This program provides for market-based performance incentives commensurate with other commodity hedging and trading organizations.  This is necessary to remain competitive with market given that the Debtors' trading personnel are frequently recruited by competing organizations, and the industry is sensitive to market compensation changes.

24.     Each year the Debtors establish a pool of available funds based on the aggregate incremental value that Luminant achieves on all commercial trading transactions for that year.[15] An aggregate funding pool accrues based on actual incremental value, and shortly after December 31 of each year, Luminant's financial planning and analysis team determines the pool of available funds.  After the Luminant Chief Commercial Officer recommends individual payments for those eligible participants who have contributed to the creation of added value for that year under the Luminant CIP to an award committee (comprising Luminant's Chief Financial Officer, Luminant's Chief Executive Officer, and EFH's Executive Vice President of Human Resources), the Luminant Chief Executive Officer then determines if a payment to the Chief Commercial Officer is warranted based on the current year's performance and makes a recommendation to the other members of the award committee for consideration.  By rewarding participating employees if—and only if—they generate actual, additional incremental value for the Debtors, the Luminant CIP incentivizes the exact type of performance that contributes to the Debtors' bottom-line success.  Any individual payments in excess of $300,000 under the

---

[15]   The discretionary incentive pool is tied to the incremental value that Luminant provides on its trading activities, setting aside a discretionary bonus pool of:  (a) approximately 2.0% of all incremental value between $100-$250 million; (b) approximately 4.0% of all incremental value between $250-$325 million; and (c) approximately 7.0% of all incremental value higher than $325 million.

Luminant CIP must be submitted for approval to the O&C Committee. Employees receive payments under the Luminant CIP no later than March 15th of each year.

25. For the fiscal year ending December 31, 2013, the Debtors paid approximately ▬▬▬▬ under the Luminant CIP to the Chief Commercial Officer at Luminant. As of the Petition Date, no amounts are owed on account of the Luminant CIP to the Chief Commercial Officer at Luminant. The Debtors seek authority to continue the 2014 Luminant CIP with respect to the Chief Commercial Officer at Luminant in the ordinary course of business on a postpetition basis.

**D.      SPC Long-Term Incentive Plan.**

26. The Debtors historically have offered a long-term incentive award program to seven senior executive employees (the "SPC LTIP") over a six-year period. The SPC LTIP is designed to improve the Debtors' long-term stability and profitability by aligning management incentives with the Debtors' business objectives, while at the same time providing participants with competitive, market-based compensation. The SPC LTIP, adopted in 2009, provides for three installments of payments for those members of the SPC who were in their role during the performance periods for the SPC LTIP, with the final payment, for the final three years' performance, to be made in March 2015 to the extent that the Debtors achieve specified targets for 2012-2014.[16] As with the Debtors' other performance-based incentive programs, the target EBITDA metric set forth in the SPC LTIP—which track the EBITDA in the EAIP Business Services scorecard approved by the O&C Committee. The metric for the 2015 SPC LTIP

---

[16]   Four of the seven SPC members have been in SPC roles since inception of the 2009 LTIP program and therefore received the first two LTIP installments in 2012 and 2013. The other three SPC members assumed their roles after the first two performance periods and therefore did not receive the first two installments; these three SPC members are eligible only for the 2012-2014 performance period payments due in March 2015.

payment is/was the same Competitive Management EBITDA targets as those in the AIP and EAIP scorecards for 2012, 2013, and 2014.

27.    The Debtors currently estimate that up to ███████ in payments may potentially be due to employees under the SPC LTIP in March 2015 for the three-year period of 2012-2014, although final amounts will not be certified and approved until the completion of the final performance period in 2014.  All but ████████ of the Debtors' payment obligations under the SPC LTIP were fully funded through irrevocable letters of credit at Citibank in favor of each participant.  The Debtors are disclosing the terms and details of the full SPC LTIP in the interest of transparency and disclosure but are only seeking the authority to pay, if earned, up to ████████ for the 2013 and 2014 performance periods that was not fully funded by the Citibank letters of credit, if and when those payments become due in 2015.

## III.    Post-2014 Insider Compensation Programs.

28.    The Debtors have specifically limited the relief requested in this motion to amounts under the Insider Compensation Programs that relate to the 2014 performance period (and the 2013 performance period as it relates to the SPC LTIP payments that were not fully funded by letters of credit).  The Debtors intend to implement similar incentive compensation programs for 2015 and beyond, as in previous years, because aligning employee incentives with the financial and operational success of the Debtors' businesses is critical to maximizing the value of the Debtors' estates.  The Debtors will file a supplemental motion seeking approval of post-2014 variable compensation programs at some point in the future when they have developed appropriate metrics for those time periods and determined the scope of the programs in light of developments in these bankruptcy cases.

## Basis for Relief

29.    The Debtors request that the Court grant this Motion.  **First**, the Insider Compensation Programs are an ordinary-course continuation of existing programs that constitute a valid exercise of the Debtors' sound business judgment and are in the best interests of the Debtors' estates.  The payments under the Insider Compensation Programs are reasonable in light of market practice.  Without these programs, the Debtors' senior executives would earn substantially below-market level compensation—below the 25th percentile in the power industry—despite the Debtors' consistent top-tier operational performance.  There is no justification, legal or otherwise, to undermine performance goals that incentivize the Debtors' employees to achieve hard-to-meet performance targets and create value for these chapter 11 estates.  **Second**, the Insider Compensation Programs comply with the requirements of section 503(c) of the Bankruptcy Code.  The performance metrics in the programs are stretch goals that are primarily incentivizing and fully justified by the facts and circumstances of the Debtors' chapter 11 cases.

## I.    The Insider Compensation Programs Are a Continuation of the Debtors' Prepetition Practices and Thus an Ordinary Course Transaction Under Section 363(c) of the Bankruptcy Code.

30.    Section 363(c)(1) of the Bankruptcy Code allows a debtor in possession to "enter into transactions…in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  Courts in this District follow a two-part test that analyzes the transaction on horizontal and vertical bases—the horizontal inquiry focusing on whether the transaction is common to the debtor's industry, and the vertical on comparing the proposed transaction to the debtor's prepetition practices. *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del. 2007) (same).

18

31.     Here, the Insider Compensation Programs are ordinary course transactions:  the Debtors are carrying forward the same compensation structure and philosophy from their prepetition employee incentive plans.  The EAIP, Luminant CIP,[17] and SPC LTIP have each existed in substantially similar form for over six years.  Each program's hallmarks—the challenging performance metrics, the participants in the programs, and the total levels of compensation—have remained consistent on a year-to-year basis.  Moreover, the Owner/Operator Plan, which has been replaced by the Key Leader Performance Program, was put into place in 2010.  The Key Leader Performance Program is largely a continuation of the Owner/Operator Plan—it incorporates the Owner/Operator Plan's compensation targets, participation group, and utilizes very similar performance targets—and places an even greater emphasis on achieving incentive-based performance goals.  The Debtors' historical usage of performance metrics as the benchmark for awards under the Insider Compensation Motions, for "many, many, years in virtually identical form," confirms that the Insider Compensation Programs before the Court are in the ordinary court of business.  *See* Tr. of Hr'g. 230:14, *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. Feb. 18, 2010); *See Nellson*, 368 B.R. at 803 (finding that compensation plans were in the ordinary course where "[c]onsistent with the Debtors' pre-petition practices…[incentive compensation] must be viewed as a whole.  It consists of two parts: the establishment of 'aspirational goals' in the early part of the year; and a review at the end of the year to consider whether those goals have been met….").  Accordingly, the implementation of the Insider Compensation Programs reflects a continuation of prepetition practices which take into account the Debtors' operational history, financial performance, and particular business objectives.  (Friske Declaration at ¶¶ 10–12); *see also In re Dana Corp.*, 358

---

[17]     *See* Kirby Proffer at 34:25–35:2; 35:10–13.

B.R. 567, 571 (Bankr. S.D.N.Y. 2006) (finding that because a debtor's postpetition incentive program was a "refinement" of historical practices, the proposed program was within the ordinary course); *In re Global Home Prods.*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed compensation programs were "not 'new' compensation programs but, instead, [were] nearly identical to plans previously used, and approved by a compensation committee and board of directors.").

32.     The Debtors, in consultation with Towers Watson, examined the compensation practices and bonus programs of comparable companies, both in bankruptcy and in the power industry, in assessing and developing these programs.  (Friske Declaration at ¶¶ 16–19.)  These programs are similar in structure and number to those offered by peer firms, and the metrics that the Debtors have chosen are similar to those of other power companies, a majority of which use an earnings-based goal (earnings per share, EBITDA, net income, etc.) in their annual and/or long-term incentive plans.  (Friske Declaration at ¶ 17.)  Accordingly, the Debtors' Insider Compensation Programs are in line with competitive practice and the general structure of the programs is consistent with the power industry and the Debtors' peer group.  (Friske Declaration at ¶¶ 16–19.)  The Insider Compensation Programs are thus consistent with industry practice and consistent with the Debtors' prepetition practices.  *Nellson*, 369 B.R. at 797-98; *In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving the continuation of incentive bonus plans under section 363(c)(1) of the Bankruptcy Code where the debtor had maintained the plans for many years prepetition and an incentive-based bonus plan was common to the industry).

33.     These programs satisfy the "relatively light burden of establishing that [the Debtors] made a business judgment in good faith upon a reasonable basis."  *Nellson*, 369 B.R. at 800.  These programs help to ensure that the Debtors' senior executive team will continue to

strive for top-tier performance, and thus align management incentives with the company's key stakeholders' focus on achieving important financial and operational goals. The Debtors simply seek to carry forward and honor these or similar programs. Moreover, as explained in further detail below, the structure and cost of the Insider Compensation Programs are consistent with market practice—including within the Debtors' industry. (Friske Declaration at ¶ 36.) Accordingly, the Debtors request that the Court approve the continuation of the Insider Compensation Programs as an ordinary course transaction.

## II. Continuing the Insider Compensation Programs Is Also Appropriate Under Section 363(b) of the Bankruptcy Code.

34.     The Insider Compensation Programs also may be approved under the more stringent standard of section 363(b)(1) of the Bankruptcy Code, which provides that a debtor "may use, sell or lease, other than in the ordinary course of business, property of the estate" if the debtor demonstrates a "sound business purpose" for such uses. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("[U]nder normal circumstances the [bankruptcy] court would defer to the trustee's [or debtor-in-possession's] judgment so long as there is a legitimate business justification."); *Computer Sales Int'l, Inc. v. Fed. Mogul Global (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) ("[I]n the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction."). Accordingly, once a debtor articulates a valid business justification for the proposed use of estate property, the bankruptcy court shall give great weight to that judgment. *See In re Commercial Mortg. and Fin., Co.*, 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (noting that a debtor in possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the

discretionary authority to exercise business judgment given to an officer or director of a corporation").

35.     In this case, continuing the Insider Compensation Programs is a proper exercise of the Debtors' business judgment and in the best interests of the Debtors and their stakeholders. The Debtors are asking to continue existing, prepetition programs that have historically been maintained as part of their overall compensation structure.   The Debtors' senior leadership— along with their skills, knowledge, and commitment to seeing the Debtors through these chapter 11 cases—are critical to ensuring that the Debtors continue to generate value for their creditors in a difficult and complicated power market.   This is especially true where, as here, the Debtors' restructuring initiatives have placed significant additional demands on them.   It is thus imperative that the Debtors provide appropriate, market-based compensation and incentives to ensure the success of the Debtors' restructuring efforts.

36.     As Mr. Friske, the Debtors' independent compensation expert, explains in his declaration, both the incentive structure and award levels of the Debtors' Insider Compensation Programs are reasonable in light of market practice in the utilities and power industry.   The overall design and structure of the Insider Compensation Programs is consistent with market practice, including their emphasis on achieving EBITDA and cost management targets.   (Friske Declaration at ¶ 12.)   And, critically, the total compensation awarded under these programs is well within market.   First, according to Towers Watson's benchmark analysis of the total compensation of the Debtors' senior executives, the target award levels under these programs are within the reasonable range of competitive practice in the power industry and the Debtors' peer

group.[18]    (Friske Declaration at ¶ 24.)    Second, the total cost of the Debtors' Insider Compensation Programs—as a percentage of annual revenues, a common comparison point in the compensation industry—is commensurate with the median cost of similar programs in both the power industry and the broader general industry.  (Friske Declaration at ¶¶ 32–33.)  Finally, without these programs, the Debtors' senior executives would be paid well below market: assuming that these programs are not approved, the Debtors' senior leadership team's compensation would lag *well below* the 25th percentile of the Peer Group, on average, because of the absence of any incentive plans.    (Friske Declaration at ¶ 25.)  Accordingly, the Debtors submit that the costs of the Debtors' Insider Compensation Programs are well within competitive practice for large companies competing for the top talent sought by the Debtors in the power industry and are reasonable in light of all relevant circumstances.  (Friske Declaration at ¶ 36.)

37.    Moreover, and importantly, participants can earn payments if—and only if—the Debtors and their employees meet difficult-to-attain, performance-based metrics.  (*See infra* and *see, e.g.*, Filsinger Declaration at §§ 1, 4.1, 4.2, 6.1, 6.1.2, 6.2, 6.4.1, 6.4.2, 6.5.)  These programs thus assure that the Debtors' top-tier management and employees are incentivized to maximize the Debtors' financial and operational performance.  And they are consistent in this respect with insider compensation programs that courts have repeatedly approved in other cases.  *See*, *e.g.*, *Global Home Prods.*, 369 B.R. 778, 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment." (internal citation omitted)); *see also In re IPC Int'l Corp.*, No. 13-12050 (MFW) (Bankr. D. Del. Sept. 3, 2013) (approving debtors' key employee incentive plan); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (same); *In re Prommis Holdings*, No. 13-10551 (BLS)

---

[18]    *See* Kirby Proffer at 36:5–9.

(Bankr. D. Del. Apr. 16, 2013) (same); *In re DDMG Estate (f/k/a Digital Domain Media Grp., Inc.)*, No. 12-12568 (BLS) (Bankr. D. Del. Oct. 22, 2012) (same); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Mar. 29, 2011) (same).[19]  There is no good reason to depart from that precedent here, and the programs should be approved as a consequence.

### III.   The Insider Compensation Programs Are Consistent With Section 503 of the Bankruptcy Code.

38.    The Insider Compensation Programs also are permissible under section 503(c) of the Bankruptcy Code.  To be sure, section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—*i.e.*, those insider plans that are essentially "pay to stay" plans.  *In re Velo Holdings, Inc.*, No. 12-11384 (MG) slip op. at 12-13 (Bankr. S.D.N.Y. June 6, 2012) (Docket No. 227); *In re Borders Group, Inc.*, 453 B.R. 459, 471 (Bankr. S.D.N.Y. 2011) (quoting *Dana* ).  The Debtors recognize that participants in these Insider Compensation Programs include "insiders."  But none of the Insider Compensation Programs—the EAIP, the Key Leader Performance Program, the Luminant CIP, or the SPC LTIP—are retention-based.  All of the Insider Compensation Programs make awards to participating employees based upon their satisfaction of rigorous, difficult-to-attain performance targets.

### A.   The Insider Compensation Programs are Primarily Incentivizing Given the Difficult to Achieve Metrics That Trigger Payments.

39.    All of the programs at issue in this motion—the EAIP, the Key Leader Performance Program, the Luminant CIP, and the SPC LTIP—are primarily incentivizing in nature.  In this regard, the question is whether these plans are "designed to motivate insiders to

---

[19]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).    Here, the Debtors have offered market-competitive compensation if, and only if, the Debtors satisfy a series of operational and financial stretch goals.    In other words, the Insider Compensation Programs do not contain either retention-based or severance components.    Participants are not paid in the event their employment is terminated for cause, nor are they paid for merely maintaining their employment for a certain time period.    Instead, awards under the Insider Compensation Programs are paid only upon the Debtors' achievement of specific performance targets.

40.    As Mr. Filsinger, the Debtors' independent power expert, explains in detail in his declaration, the Debtors benchmarked their performance incentive metrics to targets in their annual budget, which itself was developed over the course of several months through an iterative, ground-up process involving multiple rounds of management input, review, and calibration.    From there, the Debtors refined each of their performance thresholds—tightening up the threshold metrics as compared to previous years—to ensure that each metric provided an appropriate stretch goal that was difficult to attain.    The Debtors ultimately developed scorecards for three business units—Luminant, TXU Energy, and Business Services—that focus on the key performance drivers for that particular entity.    (Filsinger Declaration at §§ 1, 4, 4.1, 4.2, 6.1, 6.4, 6.5.1, 6.5.2.1, 6.5.2.2.)    The performance metrics involve a mix of key financial and operational targets, and include a payout range based on varying levels of performance—Threshold, Baseline, and Superior.    *Id.*    These targets, which are especially difficult to attain in an industry as complicated and volatile as the power field, were then incorporated directly into the Insider Compensation Programs at the beginning of the year.

41.     While the Debtors typically use the same metrics for all of their employees, earlier this month, the Debtors' senior executives recommended to the O&C Committee that several of the targets for employees covered by this Motion be toughened—but not for the non-insiders whose compensation has already been approved—in light of year-to-date performance. The SPC thus re-calibrated several of the metrics that apply to senior management covered by these programs—in each case making them more difficult to achieve for insiders than the beginning-of-the-year metrics that apply only to non-insiders —to ensure that the metrics are and continue to be incentivizing for the full year and then recommended that the O&C Committee adopt those adjusted metrics.   The O&C Committee adopted the amended, tougher metrics. Payouts above target are paid based on a linear interpolation of the results relative to the threshold (which is typically paid at 50%), baseline (100%), and superior (200%) metrics.   The potential bonuses for those new thresholds are effectively the same as the percentage award that non-insiders would receive based on that performance, though the threshold payout for insiders for meeting the more difficult metric has a floor of 75%.   (Friske Declaration at ¶ 15.)   If the Debtors do not meet these performance targets, participants will receive no payments under these plans.   If, on the other hand, the Debtors' executives and employees do earn these incentive-based payments, it will mean that their efforts created value for the company:  a true "win-win" for both the Debtors and their creditor constituencies.

42.     The Debtors also retained an independent power expert, Todd Filsinger, and his team from Filsinger Energy Partners to assess the reasonableness of the Debtors' metrics to determine whether they are, in fact, incentivizing.   (*See, e.g.*, Filsinger Declaration at §§ 1, 2, 2.2.)   Over the last several decades, Mr. Filsinger has developed and evaluated cash flow, EBITDA, and cost projections similar to those found in the Debtors' compensation plans—

including in the bankruptcies of Calpine, NRG Energy, Mirant, Entegra Power, and National Energy Group—as well as in his roles as former Chief Commercial Operations Officer of Calpine Corporation, an independent power producer that competes with Luminant, and as CEO and CFO of Hawkeye Growth, a major ethanol producer.  *Id.* at 2-4.

43.    Mr. Filsinger concluded that the Debtors' performance incentive metrics are subject to considerable uncertainty.  The Debtors face a slew of risks that might affect the operations and profitability of Luminant and TXU Energy as well as the Debtors' enterprise as a whole—including, among other things, risks associated with ERCOT power market prices and structure; operating costs at the Debtors' nuclear, fossil-fuel, and mining facilities; supply and demand forces in the ERCOT power market; commodity price volatility; the unpredictability of the weather (which affects demand for electricity); and regulatory and emission costs and risks; and the list goes on.  (*See, e.g.*, Filsinger Declaration at §§ 1, 5, 6.1.2.1, 6.1.2.1.1, 6.1.2.2, 6.1.2.3, 6.1.2.4, 6.1.2.5, 6.4.2.1, 6.4.2.1.1, 6.4.2.1.2, 6.4.2.2, 6.4.2.3, 6.4.2.5.5, 6.5.2.)  In light of these risks, the performance metrics "constitute stretch goals that incentivize and award exceptional employee performance; there is no guarantee that the [Debtors] will meet any of the metrics." *Id.* at 1-3.

44.    In short, each of the metrics at Luminant, TXU Energy, and Business Services challenges the Debtors' key employees to perform at their highest levels.  Because participants will receive payments under the EAIP, the Key Leader Performance Program, the Luminant CIP, and the SPC LTIP <u>only</u> upon the achievement of challenging, value-maximizing performance targets, these programs are no different in kind than a host of similar incentive-based compensation programs bankruptcy courts both in this district and elsewhere have approved. *See*, *e.g.*, *Dana*, 358 B.R. at 584 (approving management incentive plan); *In re The Great Atl. &*

*Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011) (approving key employee incentive plan based on financial performance); *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving key employee incentive plan based in part on financial performance); *In re Lear Corp.*, No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 28, 2009) (same); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. July 28, 2009) (approving key employee incentive plan based in part on achievement of EBITDA targets); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. June 9, 2009); *In re WCI Cmtys., Inc.*, No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009) (approving incentive plan based in part on financial performance); *In re Riverstone Networks, Inc.*, No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006) (approving employee bonus program for successful completion of individual and company performance goals).[20]    The Debtors' programs, like those before them, should be approved by this Court.

> **B.    The Insider Compensation Programs Are Justified by the Facts and Circumstances of These Chapter 11 Cases.**

45.    The Debtors believe that the Insider Compensation Programs are ordinary course transactions and thus must merely constitute an exercise of the Debtors' business judgment. *See supra*. Even if these programs are not in the ordinary course, however, the Debtors must only demonstrate that their approval is justified by the facts and circumstances of these chapter 11 cases. This standard is essentially the same as the business judgment standard that is applied under Section 363(b) of the Bankruptcy Code. *See In re Velo Holdings, Inc.*, No. 12-11384, 2012 WL 2015870, at *9 (Bankr. S.D.N.Y. June 6, 2012) ("Courts have held that the 'facts and

---

[20]    To be clear, however, unlike some of the programs approved in these other cases, the insider programs covered in this Motion are not "KEIPs" created for the purpose of this bankruptcy. They are, rather, the Debtors' long-maintained ordinary course compensation programs. Nevertheless, they also meet the requirements of the bankruptcy code and related case law.

circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *Dana Corp.*, 358 B.R. at 576; *Global Home Prods.*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Mesa Air Grp.*, No. 10-10018, 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010); *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006).

46.    In determining whether a compensation plan satisfies the justified-by-the-facts standard under section 503(c)(3) of the Bankruptcy Code, courts consider several factors, including: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan. *See Global Home Prods.*, 369 B.R. at 786; *Dana Corp.*, 358 B.R. at 576–77. These factors are not exhaustive, but rather factors that the court may consider in evaluating the proposed plans. *See id.* at 576. In this case, the facts and circumstances fully justify these Insider Compensation Programs:

47.    ***The Insider Compensation Programs Are Calculated to Achieve the Desired Performance.*** As Mr. Filsinger explains in his declaration, payments under the Insider Compensation Programs are directly tied to financial, operational, and other business objectives, including EBITDA, cost management, customer retention, and availability of the plants. (*See, e.g.*, Filsinger Declaration at §§ 1, 4, 4.1, 4.2, 6.1, 6.2, 6.4, 6.5.) They were developed to

encourage and reward exceptional performance with compensation that is competitive with the power industry market. *Id.* §§ 1, 4.1, 4.2, 6.2, 6.5.1.

48. ***The Costs of the Insider Compensation Programs Are Reasonable in the Context of the Debtors' Assets, Liabilities, and Earning Potential.*** As Mr. Friske explains in his declaration, the costs of the Insider Compensation Programs are market-appropriate in light of the size of the Debtors' operations, the Debtors' earning potential, and the complexity of the Debtors' businesses. (Friske Declaration at ¶ 8, 31-34.) In particular, the total target cost of the Debtors' incentive programs (the AIP, EAIP, and Key Leader Performance Program) is approximately ███████████████████████████████████████████████ ███████████████████████████████████████████. *Id.* at ¶ 32. Those numbers put the Debtors' anticipated costs within the range of observed market practice: the median cost of annual incentive programs, based on general industry data, as a percentage of revenues is 0.69% and the 75th percentile is 1.15%.

49. ***The Scope of the Insider Compensation Programs is Fair and Reasonable and Does Not Discriminate Unfairly Among Employees.*** The Insider Compensation Programs are reasonable in scope: they apply to the employees who are best positioned to drive the Debtors' financial and operational performance. The Insider Compensation Programs include the entirety of the Debtors' senior executive team, which is critical to maximizing the value of the Debtors' assets during these chapter 11 cases and beyond. Furthermore, the Debtors' other approximately 5,600 employees participate in compensation programs that have already been approved by this Court—several of which (including the AIP) are similar to the programs at issue in this motion.

50. ***The Insider Compensation Programs Are Consistent with Industry Standards.*** The Debtors' compensation advisors at Towers Watson worked directly with the Debtors'

executive team to ensure that the Debtors' existing compensation programs are similar in structure, number, and scope to other companies in the power industry.  (Friske Declaration at ¶ 12, 17.)  The Insider Compensation Programs, like other programs in the industry, rely heavily on performance metrics like EBITDA and cost savings metrics—which bankruptcy courts have repeatedly approved in recent chapter 11 cases.  (Friske Declaration at ¶ 16.)  In addition, the SPC members' target total direct compensation is ███████ the 50th percentile in the aggregate.  (Friske Declaration at ¶¶ 22.)

51.     ***The Debtors Performed Due Diligence in Developing the Insider Compensation Programs.***  To ensure that the Insider Compensation Programs are competitive and market-based, the Debtors sought the advice of their advisors at Kirkland & Ellis, Towers Watson, and Filsinger Energy Partners.[21]  As a result of these efforts, the Debtors concluded that (a) it was appropriate—if not necessary—to continue their existing incentive programs (with certain modifications) to ensure the competitiveness of the Debtors' compensation; (b) the Insider Compensation Programs are reasonable and consistent with market practice and industry standards; and (c) the Insider Compensation Programs are appropriately tailored to incentivize financial and operational excellence and thus position the Debtors for long-term success.

52.     Moreover, the Debtors developed the metrics that trigger bonuses under these programs through the iterative ground-up long-range planning process.  Consistent with prior practice, these metrics and the programs more broadly were reviewed by the SPC and O&C Committee, resulting in multiple iterations of the metrics in particular.

53.     ***The Debtors Received Independent Counsel in Developing the Insider Compensation Programs.***  As set forth above, the Debtors received independent counsel from

---

[21]    *See* Kirby Proffer at 35:21–36:1.

Towers Watson, Filsinger Energy Partners, and other advisors in benchmarking and designing the Insider Compensation Programs, including their financial and operational targets, and the O&C Committee (which includes an independent director) approved the Insider Compensation Programs. (Friske Declaration at ¶¶ 10–11.)

54.    In short, these plans are necessary to encourage their participants to work toward the Debtors' ultimate goal:  maximizing value for the benefit of the Debtors' stakeholders. Accordingly, the plans are "justified by the facts and circumstances" of these chapter 11 cases and are properly approvable under section 503(c)(3).

## IV.    Authorizing the Debtors to Pay Prepetition Amounts Owed on Account of the Insider Compensation Programs is Appropriate.

55.    Courts in the Third Circuit and elsewhere generally recognize that debtors may pay prepetition amounts that are essential to the continued operation of the debtor's business. *See, e.g.*, *In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (granting the debtor the authority to pay prepetition wages); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

56.    Specifically, where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such prepetition payments under section 363(b) of the Bankruptcy Code.[22]  *See*, *e.g.*, *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *Phillips*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).

57.    The Court may approve the payment of the limited, prepetition compensation that has already accrued under the Insider Compensation Programs.  Honoring these obligations is critical to demonstrating the Debtors' ongoing commitment to the workforce in the face of challenges associated with the Debtors' restructuring.  Paying the limited, approximately ▇▇▇▇▇ in prepetition accrued obligations under the Insider Compensation Programs will help continue to motivate employees and drive value for the benefit of ***all*** parties in interest.

58.    Importantly, each of the payments that have already accrued in these programs required the Debtors to satisfy difficult-to-achieve incentive metrics to be earned.  The programs, in other words, were primarily incentivizing.  Thus, for example, the performance metrics under the SPC LTIP were no less demanding or incentivizing prior to the commencement of these chapter 11 cases than are the 2014 numbers that are based on the budget.  "[W]here, as here, the

---

[22]    Moreover, pursuant to section 105(a) of the Bankruptcy Code, courts have developed the "necessity of payment" rule that justifies payment of prepetition claims like those here.  *See, e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, No. 09-10161, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow payments [of prepetition claims] under the 'doctrine of necessity' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys. Inc.*, 171 B.R. 189, 191-92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business).

[participants] have known about the Plan [prior to the petition date], ***rewarding them for hard work already done and encouraging them to continue working hard***…does not smack of…unsound business judgment." *See Blitz*, 475 B.R. at 216.  On the other hand, not making these payments has the potential to undermine the participants' confidence in the Debtors and the incentive principles that drive performance under the Insider Compensation Programs. Accordingly, the Insider Compensation Programs are a proper exercise of the Debtors' business judgment and use of the Debtors' resources, are justified by the facts and circumstances of these chapter 11 cases and, therefore, satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

59.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

60.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Order is intended or should be construed as:  (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) to create an administrative priority claim.  If the Court grants the relief sought herein, any payment made pursuant to the

Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

61.     The Debtors shall provide notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to:  (a) the U.S. Trustee; (b) (i) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d);  and  (ii) proposed  counsel  to  the  Creditors'  Committee; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) BOKF, NA, dba Bank of Arizona, in its capacity as indenture trustee under 11.50% TCEH

senior secured notes due 2020, and counsel thereto; (i) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; and (ii) the 10.0% EFIH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (k); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties who have requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

62.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A** granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:  August 8, 2014

/s/  *William A. Romanowicz*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
William A. Romanowicz (No. 5794)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:         collins@rlf.com
                   defranceschi@rlf.com
                   madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Richard M. Cieri (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:         richard.cieri@kirkland.com
                   edward.sassower@kirkland.com
                   stephen.hessler@kirkland.com
                   brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:         james.sprayregen@kirkland.com
                   chad.husnick@kirkland.com
                   steven.serajeddini@kirkland.com

Proposed Co-Counsel to the Debtors and Debtors in Possession