Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :
                                     :   Chapter 11
6   ENERGY FUTURE HOLDINGS          :
    CORP.,  et al.,                  :   Case No. 14-10979(CSS)
7                                    :
            Debtors.                 :   (Jointly Administration
8   _____   :   Requested)
    CSC TRUST COMPANY OF DELAWARE,:
9   as INDENTURE TRUSTEE,            :
                                     :
10          Plaintiff,               :
                                     :
11      v.                           :   Adv. Proc. No. 14-50363
                                     :   (CSS)
12  ENERGY FUTURE INTERMEDIATE       :
    HOLDING COMPANY LLC and EFIH     :
13  FINANCE INC.,                    :
                                     :
14          Defendants.              :
    _____:

15

16

17

18                          United States Bankruptcy Court

19                          824 North Market Street

20                          Wilmington, Delaware

21                          August 19, 2014

22                          11:03 AM - 11:56 AM

23

24

25

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8    ECR OPERATOR:  AL LUGANO

9

10

11

12    HEARING re Status conference in Adv. 14-50363

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South and Lisa Beck

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorneys for the Debtors

4

5   BY:  ANDREW MCGAAN, ESQ. (TELEPHONIC)

6        RICHARD M. CIERI, ESQ. (TELEPHONIC)

7        DVID DEMPSEY, ESQ. (TELEPHONIC)

8        STEVE HESSLER, ESQ. (TELEPHONIC)

9        MARK MCKANE, ESQ. (TELEPHONIC)

10       APAMA YENAMANDRA, ESQ. (TELEPHONIC)

11       MICHAEL PETRINO, ESQ. (TELEPHONIC)

12

13  RICHARDS, LAYTON & FINGER, P.A.

14       Attorneys for the Debtors

15

16  BY:  DANIEL J. DEFRANCESCHI, ESQ. (TELEPHONIC)

17       JASON M. MADRON, ESQ. (TELEPHONIC)

18

19  YOUNG CONAWAY STARGATT & TAYLOR, LLP

20       Attorney for Ad Hoc Committee of TCEH First Lien

21       Creditors

22

23  BY:  RYAN M. BARTLEY, ESQ. (TELEPHONIC)

24

25

Page 4

```
 1   BROWN RUDNICK

 2        Attorney for Wilmington Saving Fund Society

 3

 4   BY:  JEREMY COFFEY, ESQ. (TELEPHONIC)

 5

 6   UNITED STATES DEPARTMENT OF JUSTICE

 7        Attorney for the U.S. Trustee

 8

 9   BY:  RICHARD L. SCHEPACARTER, ESQ. (TELEPHONIC)

10

11   AKIN GUMP STRAUSS HAUER & FELT LLP

12        Attorneys for Ad Hoc Committee of EFIH Unsecured

13        Noteholders

14

15   BY:  SCOTT ALBERINO, ESQ. (TELEPHONIC)

16        STEPHEN M. BALDINI, ESQ. (TELEPHONIC)

17        ROBERT J. BOLLER, ESQ. (TELEPHONIC)

18        CHRIS CARTY, ESQ. (TELEPHONIC)

19        IRA DIZENGOFF, ESQ. (TELEPHONIC)

20        MEREDITH A. LAHAIE, ESQ. (TELEPHONIC)

21        ABID QURESHI, ESQ. (TELEPHONIC)

22        LINDSAY ZAHRADKA, ESQ. (TELEPHONIC)

23

24

25
```

Page 5

```
 1   SHEARMAN & STERLING

 2        Attorneys for Duetsche Bank AG New York Branch

 3

 4   BY:  PAULA ANDERSON, ESQ. (TELEPHONIC)

 5        FREDRIC SOSNICK, ESQ. (TELEPHONIC)

 6

 7   POTTER ANDERSON & CORROON LLP

 8        Attorneys for Deutsche Bank AG New York Branch

 9

10   BY:  LAURIE SELBER SILVERSTEIN, ESQ. (TELEPHONIC)

11        R. STEPHEN MCNEILL, ESQ. (TELEPHONIC)

12

13   COUSINS CHIPMAN & BROWN, LLP

14        Attorneys for Ad Hoc Committee of EFIH Unsecured

15        Noteholders

16

17   BY:  SCOTT D. COUSINS, ESQ. (TELEPHONIC)

18        ANN M. KASHISHIAN, ESQ. (TELEPHONIC)

19

20   ROPES & GRAY LLP

21        Attorneys for CSC Trust Company of Delaware

22

23   BY:  ANDREW DEVORE, ESQ. (TELEPHONIC)

24        D. ROSS MARTIN, ESQ. (TELEPHONIC)

25        MEREDITH S. TINKHAM, ESQ.
```

1   COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

2        Attorneys for CSC Trust Company of Delaware

3

4   BY:  NORMAN L. PERNICK, ESQ. (TELEPHONIC)

5        J. KATE STICKLES, ESQ. (TELEPHONIC)

6

7   WACHTELL LIPTON ROSEN & KATZ

8        Attorneys for EFH Equity Owners

9

10  BY:  RICHARD G. MASON, ESQ. (TELEPHONIC)

11       AUSTIN WITT, ESQ. (TELEPHONIC)

12       EMIL KLEINHAUS, ESQ. (TELEPHONIC)

13

14  DRINKER BIDDLE & REATH LLP

15       Attorneys for CSC Trust Co. of Delaware

16

17  BY:  MARITA ERBECK, ESQ. (TELEPHONIC)

18       JAMES MILLAR, ESQ. (TELEPHONIC)

19

20  BINGHAM MCCUTCHEN LLP

21       Attorney for Pacific Investment Management Co. LLC

22

23  BY:  JEFFREY SABIN, ESQ. (TELEPHONIC)

24

25

1    WHITE & CASE LLP

2         Attorney for Ad Hoc Group of TCEH Unsecured

3         Noteholders

4

5    BY:  HARRISON DENMAN, ESQ. (TELEPHONIC)

6         MICHAEL SHEPHERD, ESQ. (TELEPHONIC)

7

8    FRIED FRANK HARRIS SHRIVER & JACOBSON

9         Attorney for Fidelity Management & Research Company

10

11   BY:  MATTHEW M. ROSSE, ESQ. (TELEPHONIC)

12

13   POLSINELLI

14        Attorney for the Committee

15

16   BY:  JUSTIN EDELSON, ESQ. (TELEPHONIC)

17        CHRISTOPHER WARD, ESQ. (TELEPHONIC)

18

19   MORRISON & FOERSTER

20        Attorney for the Committee

21

22   BY:  WILILAM HILDBOLD, ESQ. (TELEPHONIC)

23

24

25

Page 8

1   KLEHR HARRISON HARVY BRANZBURG LLP

2        Attorneys for UMB Bank, Indenture Trust

3

4   BY:  RAYMOND H. LEMISCH, ESQ. (TELEPHONIC)

5        SEAN M. BRENNECKE, ESQ. (TELEPHONIC)

6

7   THE HOGAN FIRM

8        Attorney for the Ad Hoc Committee EFH Legacy

9

10  BY:  GARVAN MCDANIEL, ESQ. (TELEPHONIC)

11

12  KASOWITZ BENSON TORRES & FRIEDMAN

13       Attorney for the Ad Hoc Committee EFH Legacy

14

15  BY:  DAVID MARK, ESQ. (TELEPHONIC)

16

17  NIXON PEADOBY

18       Attorney for AST

19

20  BY:  RICHARD PEDONE, ESQ. (TELEPHONIC)

21

22

23

24

25

1   PACHULSKI STANG ZIEHL & JONES

2   Attorneys for EFIH Second Lien Group

3

4   BY:   TIMOTHY P. CAIRNS, ESQ. (TELEPHONIC)

5        LAURA DAVIS JONES, ESQ.  (TELEPHONIC)

6

7   KRAMER LEVIN NAFTALIS & FRANKEL LLP

8        Attorneys for the Indenture Trustee

9

10  BY:   GREGORY HOROWITZ, ESQ. (TELEPHONIC)

11       TUVIA PERETZ, ESQ. (TELEPHONIC)

12

13  FOLEY & LARDNER

14       Attorneys or UMB Indenture Trustee

15

16  BY:   MARK HEBBELN, ESQ. (TELEPHONIC)

17       BARRY FELDER, ESQ. (TELEPHONIC)

18       JONATHAN FRIEDMAN, ESQ. (TELEPHONIC)

19       REBECA HAYES, ESQ. (TELEPHONIC)

20

21  MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

22       Attorney for Sponsors

23

24  BY:   DEREK ABBOTT, ESQ. (TELEPHONIC)

25       ERIN FAY, ESQ. (TELEPHONIC)

1    OWN CREEK ASSET MANAGEMENT LP

2

3    BY:  SCOTT AMEEN (TELEPHONIC)

4

5    WILMER CUTLER PICKERING HALE & DOOR, LLP

6         Attorneys for CSC Trust Company of Delaware

7

8    BY:  PHIL ANKER, ESQ. (TELEPHONIC)

9         DAVID GRINGER, ESQ. (TELEPHONIC)

10        CHARLIE PLATT, ESQ. (TELEPHONIC)

11

12   DEBTWIRE

13

14   BY:  JON R. BERKE (TELEPHONIC)

15

16   DOW JONES & CO.

17

18   BY:  PEG A. BRICKLEY (TELEPHONIC)

19

20   MILBANK, TWEED, HADLEY & MCCLOY, LLP

21        Attorney for Citi Bank

22

23   BY:  MATTHEW BROD, ESQ. (TELEPHONIC)

24

25

1    JONES DAY

2         Attorneys for Oncor Electric Delivery Holdings Company

3         LLC

4

5    BY:  MARK A. CODY, ESQ. (TELEPHONIC)

6         MICHAEL L. DAVITT, ESQ. (TELEPHONIC)

7

8    REORG RESEARCH, INC.

9

10   BY:  KENT COLLIER (TELEPHONIC)

11

12   ENERGY FUTURE HOLDINGS CORP.

13

14   BY:  STACEY DORE (TELEPHONIC)

15

16   LUXOR

17

18   BY:  MICHAEL FINKELBERG (TELEPHONIC)

19

20   WINSTON & STRAWN LLP

21         Attorney for CenterPoint Energy Resources Corp.

22

23   BY:  SARAH FOSS, ESQ. (TELEPHONIC)

24

25

```
 1   COZEN O'CONNOR

 2        Attorney for creditor - J. Aron

 3

 4   BY:  SIMON FRASER, ESQ. (TELEPHONIC)

 5

 6   BAKER BOTTS LLP

 7        Attorney for Hunt Utility Services

 8

 9   BY:  MEGGIE GILSTRAP, ESQ. (TELEPHONIC)

10

11   CARVAL INVESTORS

12

13   BY:  XIAOYU GU (TELEPHONIC)

14

15   DAVIS POLK & WARDWELL LLP

16        Attorney for Goldman Sachs

17

18   BY:  MARSHALL HUEBNER, ESQ. (TELEPHONIC)

19

20   GAVIN SOLMONESE LLC

21        Attorney for UMB Bank

22

23   BY:  ADAM L. KAPLAN, ESQ. (TELEPHONIC)

24

25
```

1   SEWARD & KISSEL LLP

2        Attorney for Wilmington Trust, N.A.

3

4   BY:  MARK K. KOTWICK, ESQ. (TELEPHONIC)

5

6   OWL CREEK ASSET MANAGEMENT LP

7

8   BY:  STEVEN C. KRAUSE (TELEPHONIC)

9

10  WATERSHED ASSET MANAGEMENT LLC

11

12  BY:  MICHELE F. KYROUZ (TELEPHONIC)

13

14  CROSS & SIMON

15       Attorney for Fidelity Management & Research Co.

16

17  BY:  KEVIN S. MANN, ESQ. (TELEPHONIC)

18

19  NORMURA SECURITIES

20

21  BY:  HANNA MORIKAMI (TELEPHONIC)

22

23

24

25

1   WHITEBOX ADVISORS LLC

2

3   BY:  AMIT P. PATEL (TELEPHONIC)

4

5   BARCLAYS BANK PLC

6

7   BY:  MEREDITH PFISTER (TELEPHONIC)

8

9   SILVER POINT CAPITAL

10

11  BY:  JASON T. PRAGER (TELEPHONIC)

12

13  JPMORGAN CHASE & CO.

14

15  BY:  RAVI SARAWGI (TELEPHONIC)

16

17  CLEARY GOTTLIEB STEEN & HAMILTON

18        Attorney for J. Aaron

19

20  BY:  MATTHEW SMITH, ESQ. (TELEPHONIC)

21

22

23  SOUTHPAW ASSET MANAGEMENT

24

25  BY:  ANDREW M. THAU (TELEPHONIC)

1

2  PAUL WEISS RIFKIND WHARTON & GARRISON

3       Attorney for Akin Gump Strauss Hauer & Feld LLP

4

5  BY:  JACOB A. ADLERSTEIN, ESQ. (TELEPHONIC)

6

7  BAYARD P.A.

8

9  BY:  NEIL GLASSMAN (TELEPHONIC)

10

11  ONEX CREDIT PARTNERS

12

13  BY:  STUART KOVENSKY (TELEPHONIC)

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Good morning, this is Judge Sontchi.

3              We're here in connection with the status

4    conference on the make-whole trial in CSC Trust Co. v. EFIH,

5    case number 14-50363.

6              We have many, many people on the telephone, I'm

7    certainly not going to take a roll call.  I just urge people

8    please, if you're not actively participating to put your

9    phone in mute so that we don't have any extraneous noise.

10             Mr. McGaan, you're the defendant, but you fired

11   off the first letter, so why don't I turn it over to you.

12             MR. MCGAAN:  Thank you, Your Honor.  Good morning,

13   Andrew McGaan for the defendants.

14             As our letter states we read your opinion closely

15   granting solvency discovery after the last argument on this

16   matter, and we've talked to the trustee and pursued the

17   third option that you had suggested, and obviously the

18   parties as we say could not agree, and the debtors very much

19   want to bifurcate in light of your order the solvency issue,

20   including the discovery that goes along with it to follow a

21   phase one at which time the Court would address what your

22   opinion calls the threshold question, whether the indenture

23   provides as a matter of contact law provides for a make-

24   whole premium here.

25             So this is not, as the trustee characterizes it, a

1    motion to reconsider anything that we believe Your Honor

2    addressed, but rather following up on the suggestions in

3    light of the -- as the way to go forward in light of the

4    fact the parties couldn't agree.

5            The -- as we set out in our letter Your Honor has

6    discretionary authority to bifurcate here, I think there's

7    no dispute that the Court has the authority to do it, and

8    the law provides we think unsurprisingly that where issues

9    present distinct issues as they do here and in fact where

10   one issue depends upon the resolution of another at least as

11   an opportune situation to bifurcate the issues for trial.

12           There also is we believe, because the trustee

13   didn't address this in their response, no prejudice from

14   bifurcation to the trustee.  It's clear that the parties

15   have to litigate phase one, the threshold issue, no matter

16   what.  The only question is whether -- as your opinion makes

17   clear -- whether solvency later is going to matter when it

18   comes to paying claims.

19           So of course if Your Honor finds that no make-

20   whole is due here under the indentures the litigation is

21   over and no one spends time and more money on discovery of

22   the solvency question, which Your Honor we think rightly

23   describes in your opinion as potentially time consuming and

24   expensive, it's different witnesses, it'll implicate the

25   development presentation of expert testimony and the like,

1    and none of that may need to happen.  Of course if Your

2    Honor rules that the make-whole is due then we're going to

3    do the solvency discovery that we would be doing now.  So no

4    one is doing any extra work and we'd create the possibility

5    of avoiding work that doesn't need to be done.

6            Also bifurcation here defers if it does become

7    necessary discovery into solvency and resolution of that

8    question for later in the case, which is closer to the time

9    after all when claims are to be paid, and that's the

10   relevant time.  If Your Honor is ever going to be asked to

11   exercise any equitable authority or authority under the code

12   with respect to a make-whole payment if you find one is due

13   it'll be at the time claims are being paid when you'll be

14   looking at whether EFIH is solvent.

15           The trustee suggests in its letter that there's

16   already solvency discovery going on and that's right in only

17   so far as it goes.  The protocol that the parties have

18   agreed to and Your Honor has separately approved on that

19   discovery relates to Legacy issues, Legacy discovery.  And

20   the solvency there is limited to the period prior to the

21   petition date.  So we're engaged in that and it is going to

22   be time consuming and it is going to be expensive and we

23   have to do it and we're doing it, but it's a different

24   solvency question that's being looked at.  So that doesn't

25   provide relief or benefit to getting this issue decided.

1          So our request is that Your Honor exercise that

2     authority and bifurcate so we can turn promptly to the

3     threshold issue.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Mr. Anker?

7          MR. ANKER:  Your Honor, this is Philip Anker for

8     the trustee.  Would you like to hear from me now?

9          THE COURT:  Yes.  Yes.

10          MR. ANKER:  Your Honor?  Sorry, I wanted to make

11     sure I could be heard.

12          Your Honor, I certainly agree with Mr. McGaan that

13     it is within the Court's discretion whether or not to

14     bifurcate.  Certainly courts have done that.  I do disagree

15     with him that however this is anything other than a motion

16     for reconsideration.

17          Your Honor's opinion quite clearly set forth the

18     third option as an option that will require the parties'

19     agreement, and as Mr. McGaan correctly says, there is no

20     such agreement.

21          Having said that Your Honor can, if it wishes

22     reconsider, and Your Honor can, and I'm not going to argue

23     you lack the power, to order bifurcation.  I think the case

24     law is quite clear however, and we cited it, that the burden

25     is on the party requesting it and courts recognize that

1    bifurcation often, including courts in this district,

2    creates delay rather than expedition.

3           We think that will be the case here and it is why

4    we have objected, and contrary to Mr. McGaan's assertion we

5    do believe there will be prejudice.

6           Anytime you have multiple trials it is by

7    definition going to be more costly, more time consuming,

8    Mr. McGaan's presentation posits that the second phase would

9    occur later in the case, and our client would like to get

10   these issues resolved sooner rather than later consistent

11   with allowing time for discovery to take place.

12          The proposition that bifurcation will be more

13   efficient assumes that the plaintiff wins on phase one and

14   one doesn't have to get to phase two.  The Court obviously

15   can't make that assumption now, and indeed for the reasons

16   we've set forth in our letter we think it's a real hard

17   stretch for the debtors here to argue when there was a clear

18   make-whole provision that even if they are solvent they

19   don't have to pay it simply because they're doing a

20   refinancing in bankruptcy rather than outside of bankruptcy.

21          Moreover the issues overlap more than Mr. McGaan I

22   think would like the Court to believe.  Courts look at the

23   question of whether something is a redemption, for example,

24   on whether -- what the debtor's options are.

25          Now, I do think as a legal matter the right answer

1    is they always have the option to reinstate debt under the

2    code, but to the extent that courts do look, and I don't

3    think it's right, at whether financially they're able to

4    that raises questions of the debtors' financial condition

5    and solvency.

6          Prejudice is a two-way street.  One of the things

7    -- and I commend Mr. McGaan for his candor with the Court --

8    he's not saying to you and he didn't say to you in his

9    letter and he didn't say to you today in his oral

10   presentation is if the Court says today that it meant what

11   it said in its order and unless the parties agree the Court

12   will not order bifurcation, he has not said to you that the

13   debtors will in fact go forward and contest solvency.

14         And as we noted in our papers and as Your Honor

15   noted in your order the debtors have not done so to date,

16   they expressly conceded in their answer to our complaint

17   that we were oversecured, they expressly conceded in their

18   answer to the second liens that they were oversecured, and

19   you now have an order -- I'm sorry -- an offer on the table

20   on the record that provides for payment in full of the

21   unsecureds at the EFIH level, which is the relevant level

22   here.

23         One way you get efficiency and one way you get

24   litigation that is fair and in which the parties litigate

25   what matters is you force parties in their complaints and in

1    their answers and in other pleadings like disclosures to set

2    forth what issues they have and then you go forward and you

3    litigate them.  And the debtor has been candid, and again, I

4    applaud this, in saying they don't -- they have not

5    contested to date and frankly I don't think they have a

6    basis to contest, that these debtors are solvent meaning

7    today they could pay all their creditors given the offer

8    that is on the table from Nextera, an offer the debtors are

9    trying to improve, obviously not lessen.

10           So we think that the way to proceed efficiently

11   here and fairly to all the parties is for the Court to stick

12   to what I read the opinion to say, that there are three

13   options, two of which are entirely within the debtors'

14   control, but the third, bifurcation, requires the agreement

15   of the parties.

16           I think and highly likely that the Court does that

17   the debtors will agree to one of the other two options, and

18   we fully understand that those options need to be written in

19   a way that are protective to the estate so that the

20   concession of solvency or the agreement not to raise any

21   solvency-based offenses is limited to this litigation and

22   doesn't have a greater or general application throughout the

23   bankruptcy case.

24           For all those reasons we would ask that the Court

25   deny the request by the debtors.

1          Thank you, Your Honor.

2          THE COURT:  Let me ask you a question if I could.

3          If the argument is that as the case has developed

4   and maybe even as it existed before it developed that there

5   is in all likelihood a very small chance that it would be

6   realistic for the debtor to contest the solvency of EFIH

7   isn't that an argument for bifurcating the case, dealing

8   with the threshold legal issue as to what the indenture

9   says, and then saving the solvency issue, if it's

10  contestable at all, for a later date, and as the case

11  develops perhaps that ability to realistically contest

12  solvency will disappear?  So isn't that an argument in favor

13  of bifurcation to say that there really is no realistic

14  argument to make, that the debtors are insolvent, by debtors

15  I mean EFIH?

16          And also isn't your position on that regard

17  inconsistent with the arguments you are making in the

18  original briefing on discovery?

19          MR. ANKER:  Let me take both of those issues on,

20  Your Honor.  Let me start with the latter if I could, just

21  because it's fresh in my mind.

22          At the time we were moving for discovery the

23  Nextera proposal to pay an amount sufficient to pay all

24  unsecured creditors in full plus and the PICs themselves

25  have a make-whole, a make-whole was not a matter of public

1    record or on the table.  And we understood the debtors'

2    position, this is how we read Mr. Ying's testimony up until

3    then, to be that while the debtors conceded that their first

4    liens and the second liens were oversecured they did not

5    concede that the PICs were fully covered.  Indeed Your Honor

6    may remember the whole premises, if you will, of the second

7    liens DIP proposal, which you know, would be -- would have

8    been convertible into equity and the RSA, was that the PICs

9    were the fulcrum security.

10          What has changed since then is that we now have

11   the proposal by Nextera, which as I say is a matter of

12   public record, that provides a -- you know, is premised on a

13   materially higher enterprise value for Oncor and for the

14   EFIH debtors' 80 percent interest in Oncor, that it's

15   sufficient to pay the unsecureds in full.

16          On your second point it seems to me what you're

17   really -- I'm sorry, your first question, Your Honor --

18   really posits that it may be that solvency is not an issue

19   at all, and if it's not an issue at all let's put it to the

20   side.

21          I don't disagree with that, but I think the way to

22   put it to the side is to say to the debtors there's a

23   pending adversary, they choose the timing here, not in terms

24   of when the adversary was filed, but they filed a motion on

25   the very first day of this bankruptcy to take out the first

1    liens without paying their make-whole and they commenced

2    their own, as part of that motion, a request for relief then

3    that we were not entitled to the make-whole.

4           So they started this out and started the timing

5    here, and it seems to me the more efficient way to put the

6    solvency issue to the side is to put the debtors to the task

7    that parties are required in answers.  You can't simply file

8    an answer and leave out affirmative defenses and then later

9    say some day I may want to assert such a defense.  You force

10   the party, and it's what the federal rules contemplate, to

11   set forth the rules and set forth -- I'm sorry -- set forth

12   their defenses so the parties can move forward.

13          I submit it will be more efficient to move forward

14   now, because one of two things will happen.  Either the

15   debtors will not contest solvency because they don't have a

16   good faith basis to do so, and I believe that will be what

17   happens, but I -- you know, I don't control them, they may

18   act in a different way than I think, or they will contest

19   solvency, I think that highly unlikely, in which case we'd

20   submit the efficient way to proceed is to move forward now

21   so we take on all the issues.

22          But in either circumstance, whether the debtors do

23   contest it or don't contest it, we submit we'll move more

24   efficiently if we get their position on the table now, no

25   if, ands, or buts, and we move forward to resolve whatever

1    issues remain.

2              I hope those answered your -- those answer --

3    those answers were responsive to your questions, Your Honor.

4              THE COURT:  They are. Thank you.

5              Mr. McGaan?  Mr. McGaan?

6              MR. SABIN:  Your Honor?

7              THE COURT:  Yes.

8              MR. SABIN:  It's Jeff Sabin representing PIMCO who

9    has intervened and is a party in this and would like to be

10   heard if now is the time.

11             THE COURT:  Of course, that's fine.

12             MR. SABIN:  Thank you very much.

13             Concisely put, Your Honor, we support fully the

14   debtors' position as purported by Mr. McGaan, but want to

15   point out in response to some of the things that you've

16   heard as alleged facts and assumptions from Mr. Anker that

17   that is not the case necessarily, and I'm going to highlight

18   three things.

19             One, when this case started, and in fact all the

20   way until July 31, there had been a restructuring support

21   agreement as we all know that has terminated.  As we all

22   know that restructuring support agreement contemplated the

23   filing of a plan.  There is no plan on file.

24             As we all know there's a continuing desire of many

25   parties in this case to understand some of the tax issues

1    that may be very relevant to valuation, and even a Nextera

2    proposal that has been referred to contemplates something

3    that is not yet on the table, i.e., the tax-free spin at the

4    T side, and a tax-free organization on the E side.

5           Secondly, there is yet no bar date.  I know you

6    have entered the order, I believe it is not until the end of

7    September that a bar date will come around so that when we

8    really get to valuation perhaps down the road it'll be a

9    little more clear if it is needed about the assumptions that

10   are going to be relevant to that valuation discovery.

11          So for all of those reasons and understanding that

12   for the longest time the trustee was the one asking to

13   expedite, and in fact let's not forget that there had been a

14   trial date set of September 10th through September 12th,

15   that we support and we advocate the bifurcation of this

16   discovery issue so we can get down to the business of

17   finalizing discovery and setting a new trial date.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Anyone else?

21          MR. ANKER:  Your Honor, this is Mr. Anker.  I'm

22   happy to respond to Mr. Sabin, although if Your Honor has

23   questions -- excuse me, Your Honor, I'm fighting a cold.

24   Based on Mr. Sabin's comments I don't feel a need

25   affirmatively to do so unless Your Honor has questions about

1    them.

2            THE COURT:  I do not.  Thank you.

3            Mr. McGaan, why don't I give you the final word?

4            MR. MCGAAN:  Thank you, Your Honor.  Andrew McGaan

5    for the debtors.

6            The -- your question to Mr. Anker touched on

7    something that we're alluding to in the -- if not raising

8    outright in the second to last paragraph of our letter to

9    the Court.  And Mr. Anker's sort of review of the chronology

10   of where we've come in the few short months since this case

11   was filed shows, if anything, how quickly things can and do

12   change and whether or not the debtors are going to identify

13   and raise solvency-based defenses to the magnitude or a

14   reasonableness of a payment, if the Court finds that a

15   makewhole is due, whatever shape that might take.  It's not

16   at all clear and nothing's been put in front of Your Honor

17   to say otherwise that those are affirmative defenses under

18   the federal rules.  I'm not sure where procedurally we're

19   required to take it unless Your Honor orders us to, of

20   course, but that's a different animal altogether.  That

21   requires us to take a full and final position on something

22   that is utterly dependent on matters that are subject to

23   great change.

24           We filed a motion at the outset of the case

25   seeking a ruling that they weren't entitled to the

1   makewhole.  But that motion addressed, again, what Your

2   Honor called the threshold question here, that the

3   indentures don't provide for one.

4         So we think despite what's been said, it still

5   makes all the sense in the world to take the largest and

6   most time-consuming part of the discovery here, that is the

7   solvency piece, and defer whether we get into it or not

8   until the threshold issue is resolved.  It seems sort of

9   like a classic situation for bifurcation.  Thank you, Your

10  Honor.

11        THE COURT:  You're welcome.  Any final comments

12  before I rule?  Okay.  I hear none.

13        I am going to bifurcate the trial and the issues

14  to save the discovery and consideration of issues related to

15  solvency until after a trial and decision on what I think

16  and identified in my opinion as the threshold issue, whether

17  the indenture itself provides for the payment of a makewhole

18  premium.

19        In (indiscernible) and in my opinion, I focused

20  on -- or I made the question if the parties would agree to a

21  makewhole premium.  And I stand by that idea that I was

22  hopeful that an agreement on bifurcation might be

23  forthcoming or the other issues with regard to the debtors

24  taking positions might be more practical.

25        One of the dangers of writing a paragraph or a

1    section of opinion like that that hasn't been discussed or

2    briefed by the parties is the Court is speculating to a

3    certain extent what might be an appropriate way to take or

4    what the pathway should be without actually getting the

5    input of the parties.  And in retrospect, it may have been

6    more appropriate to simply identify the issue that there

7    might be an ability or desire that the issue's taken

8    separately and simply ask for additional briefing or

9    something along those lines.  But I didn't do that.  And I

10   put forth those sort of three alternatives, sua sponte if

11   you will, on my own without the input of the parties.  And I

12   now have the input of the parties on whether bifurcation

13   makes sense even if the parties can't agree.  And I think it

14   does.

15          I stand by the common sense understanding that

16   discovery involving insolvency of the EFIH entities at issue

17   here will be time-consuming and expensive.  To a certain

18   extent but not fully, it will be dealt with at least and to

19   some extent in connection with the discovery protocol that

20   has been approved by the Court.  But the thrust of that

21   discovery protocol, I think, is certainly not completely in

22   line with how the issue will play out in connection with

23   this adversary proceeding.

24          Also, the -- I think it's true and I think it's

25   important to recognize that the case is dynamic, that it's

1   possible the issue will resolve itself through the ordinary

2   or extraordinary development of the case going forward and

3   seeing exactly what ultimately is put on the table.  Mr.

4   Sabin points out that that may take longer than one might

5   think.  And, to me, that's an argument that we can only wait

6   so long.  And it may be that we have to delve into these

7   issues even if the underlying plan or global issues are

8   developing but not fully developed at the time when it

9   becomes appropriate to deal with these issues.

10          By bifurcating, I am in no way putting this on the

11  back burner item (indiscernible) or without date.  It would

12  be my ruling and the procedure we would follow that if I

13  were to make a ruling that made solvency relevant or,

14  more -- I guess more appropriately an insolvency relevant,

15  we would proceed forthwith to that.  We're not going to hold

16  this off for months or even years waiting for further

17  developments.  The issue should be dealt with, has been put

18  before the Court and should be dealt with in an organized

19  and efficient and relatively quick manner.

20          Now this raises an issue that Mr. Anker

21  identified, I think, in his responsive letter.  And it goes

22  to this idea of what exactly is being put in front of the

23  Court in the first instance.  Are we assuming -- do we have

24  to be in a position where we assume insolvency and look at

25  the debtor as being a debtor that has filed bankruptcy that

1    on a global basis may be insolvent but for purposes of the

2    litigation, the EFIH entities at issue are solvent and the

3    Court will look at the documents and make its interpretation

4    based on how the documents play out in connection with a

5    solvent debtor filing bankruptcy.

6              And if there's an issue as to insolvency, it would

7    only arise if the Court were to find, yes, there is a right

8    to a makewhole premium in that instance and we would move on

9    to the question of insolvency.

10             I hope I've identified that issue correctly or

11   that sort of process correctly because I don't want to

12   get -- I don't want to go off the record here and have you

13   guys submit an order and then have to come back on this

14   nuance or what I think might be a nuance.  And having said

15   that, yes, I want to bifurcate the trial, yes, I want to

16   deal with -- and by bifurcate trial, I also mean discovery;

17   and, yes, I want to deal with what I identify as the

18   threshold question in my opinion.  But I want to make sure

19   we've got an agreement or at least an understanding of

20   exactly how that will play out in framing the legal and

21   factual issues in front of the Court in phase 1.

22             So maybe I could ask Mr. McGaan to comment on that

23   or maybe ask me what -- follow up with me and, Judge, I

24   don't understand on what exactly you're saying.  But I want

25   to make sure we hash out if we can on the record in court

1    today, okay, the judge is going to bifurcate discovery and

2    trial as requested by the debtors, focusing on this

3    threshold question.  What does that mean in how we frame the

4    issues for the Court in the first phase?  And hopefully,

5    that makes some sense.  Mr. McGaan, if you could respond.

6              MR. MCGAAN:  Yeah.  Andrew McGaan for the debtors,

7    Your Honor.  It does to an extent -- and I will confess, I'm

8    not -- I haven't wrapped my mind fully around it but I --

9    what does make sense is that we get whether it's on the

10   record fully and finally right now, which would be nice,

11   complete clarity about what phase 1 is about in light of

12   your order so that we're not just chasing our tail and back

13   to debating whether we really are doing solvency discovery

14   right now anyways.  And I don't think that's what you're

15   suggesting.

16             At the initial hearing where we debated

17   previously, and I'm sorry I don't recall the date off the

18   top of my head, scope of discovery prior to this ruling, one

19   of the things that debtors pointed out is that we've been

20   served with discovery seeking documents relating to why we

21   filed for bankruptcy.  And we take the position, we believe

22   under the law we're correct, that why we filed for

23   bankruptcy isn't relevant to whether the indentures provide

24   for a makewhole payment under these circumstances, namely,

25   we're in Chapter 11 and the Code as well as the language of

1    the contract has accelerated the payment and it's not an

2    optional redemption, all issues going to the merits, but

3    nonetheless, we're going to provide discovery on that.  And

4    if that's -- maybe I got you wrong but if that's what you're

5    driving at, we have, I believe, already provided, and maybe

6    there's more to come, documents that go to why.  And the

7    short answer is EFIH was running out of money.  And that's a

8    different question than -- I think than was EFIH a solvent

9    debtor at the time it filed.  Was it necessarily solvent at

10   that time and by what definition or standard?

11          But as I've expressed it, we're able to and are

12   providing discovery that goes to why the EFIH debtor filed

13   for Chapter 11.  And then we're going to have produced

14   documents and there'll be discovery on the meaning of the

15   indenture terms as to what accelerated the debt here and why

16   is it due.  Is it as the trustee says and they have their

17   arguments or is it as we say?

18          That's how I'm envisioning it but I'm also kind of

19   thinking out loud because I haven't thought fully through

20   your question.

21          THE COURT:  Well, that's helpful.  Mr. Anker?

22          MR. ANKER:  Your Honor, this is Philip Anker.  May

23   I respond?

24          THE COURT:  Of course.  Yes.

25          MR. ANKER:  Thank you, Your Honor.

1          Your Honor, I heard the Court's ruling earlier, as

2     in earlier being five minutes ago, loud and clearly.  And I

3     did understand that, I think, differently from what Mr.

4     McGaan just said which really does put into focus whether

5     you really can bifurcate.  And I'm not going to argue that

6     you can and I'm not going to seek to add on or to reconsider

7     the ruling you made five minutes ago.  But if we're going to

8     put solvency aside, then I think we also need to put aside

9     the question of why did the debtors file for bankruptcy and

10    could they have simply refinanced -- at least kept these

11    debtors outside of bankruptcy.  And could they, in fact,

12    financially simply today in bankruptcy reinstate this debt.

13    Obviously, they've paid it already so it's no longer a

14    practical point but could they have at the beginning of the

15    case.

16          What I would envision phase 1 would be, would be a

17    determination by the Court whether the first lienholders are

18    entitled to a makewhole assuming that the debtors have

19    enough money and the financial ability to pay all their

20    creditors -- and by the debtors, I mean the EFIH debtors --

21    in full including any makewhole or other premiums that they

22    are due.

23          Let me give concrete context to what I mean.  And

24    let me put it concretely in relation of at least two sets of

25    issues that sometimes get (indiscernible).  One of the

1    arguments that sometimes debtors make in opposition to the

2    payment of a makewhole in bankruptcy is they say that the

3    right way to read the indenture is that a redemption to

4    trigger a makewhole have to be "voluntary".  Putting aside

5    for a moment whether that's a right reading of the document,

6    the argument then is often made it isn't voluntary here.  We

7    have no financial choice but to refinance this debt and take

8    advantage of lower interest rates.  We would have no ability

9    financially to be able to simply keep the debt in place and

10   pay the -- or alternatively, refinance it but pay a

11   makewhole.

12           As I said, and I want to be candid with the Court,

13   I think even if that's true, we would be entitled to a

14   makewhole but I don't think it's the right reading of the

15   law.  But if we're going to bifurcate -- if we're going to

16   bifurcate and put solvency and valuation to the side, then

17   you have to start phase 1 with the premise that the debtors

18   made a voluntary decision to refinance this debt at the

19   outset of the case because they had the financial

20   wherewithal to pay the makewhole, pay in full the seconds,

21   pay in full the PIKs.  If Your Honor rules that we're then

22   entitled to the makewhole then the debtors can say, well,

23   hold on a second, those weren't the financial circumstances

24   we faced and they are relevant.  That's concretely example

25   1.

1          Concretely example number 2.  Some of the cases --

2     and Your Honor read some of these, I know -- in connection

3     with your discovery order, Chemtura and Premier

4     Entertainment Biloxi are the two I have in mind, I guess

5     Calpine I, as well -- were cases in which either the

6     indenture provided for no makewhole provision but simply had

7     an absolute no-call.  The debtor may not call the notes

8     provided to (indiscernible) or at least some of the

9     indentures so provided if not all of the indentures at issue

10    before the Court.  In those cases, with respect to those

11    indentures, the Court held that the claimant, the

12    noteholders, were entitled to damages for violation of a no-

13    call notwithstanding that there was no makewhole provision.

14    And in holding that the debtor was obligated to satisfy its

15    contractual obligations, the Court stressed in at least two

16    of those three -- I think it may even be all three -- that

17    the debtors were solvent.  This is something Your Honor

18    noted in your opinion.  They were able to pay all their

19    creditors in full.  Well, we, too, have both a -- we have

20    both a makewhole provision and we have a no-call provision,

21    a provision that says unless you pay the make-whole, these

22    notes may not be redeemed prior to December 1, 2015.  And we

23    have pled both counts for the makewhole premium and a cap

24    for breach of the no-call provision.  It seems to me that

25    bifurcation means that we take on the no-call issue assuming

1    that the debtors, just as in Chemtura, just as in Calpine

2    and just as in Premier Bolixi, as I recall those cases,

3    could pay all their creditors in full.  And so it

4    effectively assumes solvency and asks the question, even if

5    the debtors are insolvent, is the right way to read this

6    document, the indenture, informed by the fact discovery that

7    will occur, about the terms of the document and the

8    negotiation -- is the right way to read it that the

9    noteholders agreed they don't get any makewhole premium and

10   they don't get any damages for a no-call, effectively there

11   is no no-call, even if the debtors have the financial

12   wherewithal to pay all their creditors and simply made a

13   voluntary decision that they wanted to refinance their debt

14   and incur -- you know, have a lower cost of funding for the

15   first lien debt going forward.

16          So it seems to me if we are going to bifurcate, we

17   have to bifurcate.  It's not my preference but I understood

18   the Court's ruling.  But we either have to be fish or foul;

19   we can't be somewhere in between.  And (indiscernible) can

20   be unfair and a prescription for lots of future fights which

21   will take up the Court's time.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. MCGAAN:  Umm --

25          THE COURT:  Mr. Sabin?

1           MR. MCGAAN:  Your Honor, Andrew McGaan.  You want

2      me to respond?

3           THE COURT:  I don't know if Mr. Sabin would like

4      to comment?  Okay, I hear none.  Mr. McGaan?

5           MR. MCGAAN:  Yes, Your Honor.  Andrew McGaan for

6      the debtors.

7           Yeah.  Having listened to Mr. Anker, we do

8      disagree with that approach.  The threshold issue as Your

9      Honor identifies it in the opinion is whether the indenture

10     provides for a makewhole.  And our argument on that is

11     confined to the meaning of the contract.  And so, the

12     acceleration of the debt is a function of the contract

13     terms.  So whether or not EFIH had money in the bank and how

14     much money in the bank and whether you assume it could have,

15     as Mr. Anker is suggesting, assume for purposes of

16     interpreting the contract to determine whether a makewhole

17     provision is due, you assume it could have paid the

18     obligations, is besides the point.  We need to decide the

19     contract issue first.  And if it provides for a makewhole

20     then, as Your Honor said in your opinion, we turn to the

21     question of whether it should be paid in full depending on

22     the circumstances of the debtor.  Is it a solvent debtor?

23     Does it have enough money to pay everyone before junior

24     creditors are "cheated" out of a recovery?  Those issues

25     that you identified as some equitable and Code-based issues.

1    But whether or not the company could have paid off the notes

2    in the normal course or not doesn't go to, and the contract

3    provisions don't provide for even looking at that or asking

4    that question, in determining whether the contract provides

5    for a makewhole.

6              THE COURT:  Okay.  I have to say that my

7    understanding as I was making the decision I made was

8    focused on what Mr. McGaan just said.  And I hadn't really

9    identified the nuance of what Mr. Anker was just talking

10   about until it was identified at least by reference in his

11   letter of August 15th.  And I don't think I can -- I don't

12   think -- I'm not going to make a ruling off the cuff on

13   what's an important issue.  So I'm not going to ask parties

14   to agree on a form of order, because I know they won't

15   because there's a disagreement.  So what I'd like the

16   parties to do is to submit their own proposed order with a

17   supporting letter as to why their order is appropriate.  And

18   that should be done simultaneously.  And I will review the

19   letters and I will review the form of order.  And I -- forms

20   of order.  And I will make -- I have every intention of

21   making a decision without any further need for a further

22   teleconference or input from the parties.  But, of course, I

23   reserve the right to ask you people to appear again and give

24   me a more fulsome argument or respond to questions, whatever

25   would be appropriate at a further telephone conference.

1          And --

2          MR. ANKER:  Judge Sontchi, this is Phil Anker.  I

3     apologize.  I got disconnected.

4          THE COURT:  Okay.  Where -- well, I'll give my

5     ruling again.

6          MR. ANKER:  I truly apologize.  I hope you heard

7     what I had to say and then all of a sudden I heard nothing

8     on the line.

9          THE COURT:  All right.  I certainly did hear what

10    you had to say and I appreciate it.  And Mr. McGaan followed

11    with a -- basically, a restatement of his earlier comments.

12    And what I said is that when I was considering the issues in

13    front of me and made the decision, I was really focused and

14    my understanding was on Mr. McGaan's point which was that

15    insolvency was, in effect, different from purpose, et

16    cetera.  It was really a focus on whether they assert some

17    sort of -- in the nature of an equitable defense or

18    something even if they were otherwise required to make the

19    payment.  But I hadn't focused on the nuance that you

20    identified at least by reference in your letter of August

21    15th and certainly more fully on the record today.  And I

22    think it's an important -- possibly an important

23    distinction.  And I'm not going to make a decision on the

24    fly on that issue.  But I don't want to continue this

25    indefinitely.  And I don't think the parties will be able to

1    agree.

2          So my ruling was that I would like each party and

3    if PINCO could please work with the debtors on this to only

4    have one submission, that would be best.  But I would like

5    the parties to submit dueling forms of order with a

6    supporting letter as to why their order is appropriate.  I

7    will then review the letters and order and make a decision

8    based on the written submissions unless I decide which I

9    don't think I will but I don't know whether I decide a

10   further telephone conference is necessary.

11         And -- so that's what I had just said when you

12   rejoined the call, and I'm sorry you got cut off.  Hopefully

13   you're up to speed now.

14         On the timing of that submission, I regret to

15   inform you that I'm about to take vacation.  I don't

16   actually regret it but I'm not going to be available until

17   after Labor Day.  So a submission the week of September 2nd

18   would be fine.  And if the parties could agree on a date and

19   just let us know, that would be great.  I'd like the

20   submissions to be simultaneous or virtually simultaneous.

21   And I will turn to the matters as quickly as I can as soon

22   as I receive the submissions.  So that gives you a couple

23   weeks to possibly work it out, although I doubt it and I'm

24   not being pejorative.  If you can't, you can't.  You have

25   fundamentally different positions.  That's what litigation

1    is all about.  But if you can't then to submit dueling forms

2    of order with supporting letters the week of September 2nd

3    and I'll make a decision.  Is that all right?

4              MR. MCGAAN:  Andrew McGaan for the debtors.  Thank

5    you, Your Honor.  Understood.

6              MR. ANKER:  Philip Anker for -- sorry, Jeff.  You

7    want to go ahead?

8              MR. SABIN:  Oh, no.  That's okay.  I was just

9    going to indicate that we will work the debtors and it's

10   okay with us.

11             MR. ANKER:  Your Honor, Philip Anker for the

12   trustee.  That schedule is fine.  Let me just note - and I

13   wish you a good vacation.

14             Currently, just as a holding date, there is an

15   order in place.  I think it was actually entered by Judge

16   Shannon while you were away providing for summary judgment

17   briefs to be filed on August 29.  I think there was an

18   understanding of the parties that that wasn't going to be

19   realistic, that under any scenario, we weren't going to have

20   discovery completed by then.  And we certainly won't.  I'm

21   not confident deposition discovery will even begin by then.

22   So I would expect that the parties will be submitting some

23   form of order.  It may simply kick the date out to another

24   holding date between now and August 29.  I just wanted to

25   alert the Court to that.

1          Secondly, we have gone back in light of Your

2    Honor's written decision and the oral rulings Your Honor

3    made at the conclusion of the hearing that led to your

4    written decision to review the document request we had

5    outstanding of the PIK -- so-called PIK holders and the ad

6    hoc committee and its members.  We have gone back and

7    narrowed those in light of Your Honor's ruling about

8    solvency.  We are in ongoing discussions with the holders of

9    the PIKs.  I'm hopeful that we will reach agreement.  But if

10   not, I just wanted to alert you.  And I think we dropped a

11   footnote in the letter that we may need to come back to the

12   Court on that issue.  I'm hopeful that we will not.  But I

13   wanted to give the Court a heads up.

14          THE COURT:  All right.  I appreciate that.  Okay.

15   Any further comments, questions?

16          MR. MCGAAN:  Andrew McGaan for the debtors.  Last

17   comment, Your Honor.  With regard to scheduling issues,

18   maybe I can just throw this out as a practical solution.

19   We've got a submission to make here.  We will get a

20   further -- some further direction from Your Honor.  And I

21   would propose simply we do this with any party; we'll

22   certainly will do it with Mr. Anker's.  At that time,

23   (indiscernible) you suspend the previously set deadlines

24   regarding a makewhole litigation that was to have occurred

25   on September 10.  It's obvious that's not going to happen

1    that way.  And we simply agree and propose to Your Honor --

2    see if it's agreeable to do at that time a new schedule and

3    not have to on an interim basis keep modifying an out-of-

4    date schedule.  Does that make sense?

5              MR. ANKER:  Your Honor, Philip Anker for the

6    trustee.  The notion that we would try to reach agreement

7    and hopefully reach agreement on a new proposed schedule and

8    submit it, either competing proposals or hopefully a joint

9    proposal, the week of September 2nd makes sense.  The only

10   thing I will say is I think the trial dates of September 10,

11   11, 12 already are off calendar by Court order.  I think the

12   one thing that is currently on by Court order is summary

13   judgment briefing now due August 29, opening briefs.  And I

14   think it's that provision that needs to be changed in light

15   of where we are today.

16             THE COURT:  Well, I -- let's -- I agree with Mr.

17   McGaan.  First of all, I'll orally suspend the briefing due

18   August 29th.  And I would ask that the submission of the

19   orders the week of September 2nd basically reboot the

20   litigation.  And to the extent you can agree on all of that

21   or part of that, that'll be great.  And if you can't agree

22   on all of it and there are discreet discrepancies, you can

23   identify those in the record.  That'd be great.  And by the,

24   hopefully, as soon as possible but hopefully by the end of

25   that week, we'll have a new form of order in place that'll

1   guide going forward in the case.

2            All right?  Thank you very much.

3            MR. ANKER:  Thank you, Your Honor.

4            THE COURT:  I certainly appreciate everyone being

5   available.

6            ALL:  Thank you, Your Honor.

7            THE COURT:  And I look forward to hearing from you

8   after Labor Day.

9            MR. MCGAAN:  Thank you, Your Honor.

10   (Whereupon, the proceedings were concluded at 11:56 a.m.)

11

12

13

14

15

16                        * * * * *

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                        RULINGS

4   DESCRIPTION                          PAGE        LINE

5   Trial issues to be bifurcated        29          13

6   with solvency discovery issues to follow

7   at the end of trial

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 48

1                C E R T I F I C A T I O N

2     We certify that the foregoing transcript is a true and

3     accurate record of the proceedings.

4     Dawn South    Digitally signed by Dawn South
                    DN: cn=Dawn South, o=Veritext, ou,
                    email=digital@veritext.com, c=US
5     _____    Date: 2014.08.20 14:28:27 -04'00'

6

7     Dawn South

8     AAERT Certified Electronic Transcriber CET**D-408

9

10    Lisa Beck    Digitally signed by Lisa Beck
                   DN: cn=Lisa Beck, o=Veritext, ou,
                   email=digital@veritext.com, c=US
11    _____    Date: 2014.08.20 14:29:06 -04'00'

12    Lisa Beck

13    AAERT Certified Electronic Transcriber CET**D-486

14

15    Veritext

16    330 Old Country Road

17    Suite 300

18    Mineola, NY 11501

19

20    Date:  August 19, 2014

21

22

23

24

25