```
 1    UNITED STATES BANKRUPTCY COURT

 2    DISTRICT OF DELAWARE

 3

 4

 5    In re:                        :
                                    :    Chapter 11
 6    ENERGY FUTURE HOLDINGS         :
      CORP.,  et al.,               :    Case No. 14-10979(CSS)
 7                                   :
              Debtors.              :    (Jointly Administration
 8    _____      :    Requested)
      CSC TRUST COMPANY OF DELAWARE,:
 9    as INDENTURE TRUSTEE,         :
                                    :
10            Plaintiff,            :
                                    :
11       v.                         :    Adv. Proc. No. 14-50363
                                    :    (CSS)
12    ENERGY FUTURE INTERMEDIATE    :
      HOLDING COMPANY LLC and EFIH  :
13    FINANCE INC.,                 :
                                    :
14            Defendants.           :
      _____:
15

16

17

18                         United States Bankruptcy Court

19                         824 North Market Street

20                         Wilmington, Delaware

21                         August 13, 2014

22                         9:37 AM - 12:48 PM

23

24

25
```

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    ECR OPERATOR:   AL LUGANO

1    HEARING re Motion of Wilmington Savings fund Society, FSB

2    for Leave to Conduct Discovery Pursuant to Rule 2004 of the

3    Federal Rules of Bankruptcy Procedure of Energy Future

4    Holdings Corporation, its Affiliates, and Certain Third

5    Parties [D.I. 6; filed April 29, 2014]

6

7    HEARING re Motion of EFH Notes Indenture Trustee Pursuant to

8    11 U.C.S. §§ 1102(a)1) and 105 for Appointment of an

9    Official Committee of Unsecured Creditors for Energy Future

10   Holdings Corp. [D.I. 1676; filed July 23, 2014]

11

12   HEARING re Debtors' Motion for Entry of a Confidentiality

13   Agreement and Stipulated Protective Order [D.I. 1679; filed

14   July 23, 2014]

15   HEARING re Motion of Energy Future Holdings Corp., et al.,

16   for Entry of an order (A) Setting Bar Dates for Filing Non-

17   Customer Proofs of Claim and Requests for Payment Under

18   Section 503(b)(9) of the Bankruptcy Code, (B) Approving the

19   Form of and Manner for Filing Non-Customer Proofs of Claim

20   and Request for Payment Under Section 503(b)(9) of the

21   Bankruptcy Code, and (C) Approving Notice Thereof [D.I.

22   1682; filed July 23, 2014]

23

24   Transcribed by:  Dawn South, Lisa, Beck, Sheila Orms,  and

25   Linda Foley

```
1     A P P E A R A N C E S :

2     KIRKLAND & ELLIS

3          Attorneys for the Debtors

4

5     BY:  BRIAN SCHARTZ, ESQ.

6          MARK MCKANE, ESQ.

7          DAVID DEMPSEY, ESQ.

8          EDWARD SASSOWER, ESQ.

9          STEVE HESSLER, ESQ.

10         CHAD HUSNICK, ESQ.

11         BRIDGET O'CONNOR, ESQ.

12

13    RICHARDS, LAYTON & FINGER, P.A.

14         Attorneys for the Debtors

15

16    BY:  DANIEL J. DEFRANCESCHI, ESQ.

17         JASON M. MADRON, ESQ.

18

19    PAUL, WEISS, RIFKIND, WHARTON & GARRISON

20         Attorneys for Ad Hoc Committee of TCEH First Lien

21         Creditors

22

23    BY:  ANDREW EHRLICH, ESQ.

24         JACOB ADLESTEIN, ESQ.

25         ADAM BERNSTEIN, ESQ.
```

1    YOUNG CONAWAY STARGATT & TAYLOR, LLP

2          Attorney for Ad Hoc Committee of TCEH First Lien

3          Creditors

4

5    BY:  RYAN M. BARTLEY, ESQ.

6    BROWN RUDNICK

7          Attorneys for TCEH, Second Lien Trustee

8

9    BY:  EDWARD WEISFELNER, ESQ.

10         JEFFREY L. JONAS, ESQ.

11

12   UNITED STATES DEPARTMENT OF JUSTICE

13         Attorneys for the U.S. Trustee

14

15   BY:  ANDREA B. SCHWARTZ, ESQ.

16         RICHARD L. SCHEPACARTER, ESQ.

17

18   AKIN GUMP STRAUSS HAUER & FELT LLP

19         Attorney for Ad Hoc Committee of EFIH Unsecured

20         Noteholders

21

22   BY:  SCOTT ALBERINO, ESQ.

23

24   SHEARMAN & STERLING

25         Attorneys for Duetsche Bank AG New York Branch

1

2    BY:    FREDRIC SOSNICK, ESQ.

3           JULIE FLEISCHMAN, ESQ.

4

5    POTTER ANDERSON & CORROON LLP

6           Attorneys for Deutsche Bank AG New York Branch

7

8    BY:    LAURIE SELBER SILVERSTEIN, ESQ.

9           R. STEPHEN MCNEILL, ESQ.

10

11   COUSINS CHIPMAN & BROWN, LLP

12          Attorneys for Ad Hoc Committee of EFIH Unsecured

13          Noteholders

14

15   BY:    SCOTT D. COUSINS, ESQ.

16          ANN M. KASHISHIAN, ESQ.

17

18   ROPES & GRAY LLP

19          Attorneys for CSC Trust Company of Delaware

20

21   BY:    D. ROSS MARTIN, ESQ.

22          MEREDITH S. TINKHAM, ESQ.

23

24   COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

25          Attorneys for CSC Trust Company of Delaware

1

2    BY:  NORMAN L. PERNICK, ESQ.

3         WARREN USATINE, ESQ.

4

5    WACHTELL LIPTON ROSEN & KATZ

6         Attorneys for EFH Equity Owners

7

8    BY:  EMIL A. KLEINHAUS, ESQ.

9         JOHN LYNCH, ESQ.

10

11   DRINKER BIDDLE & REATH LLP

12        Attorney for Citibank, N.A.

13

14   BY:  HOWARD A. COHEN, ESQ.

15

16   BINGHAM MCCUTCHEN LLP

17        Attorney for Pacific Investment Management Co. LLC

18

19   BY:  JEFFREY SABIN, ESQ.

20

21   WHITE & CASE LLP

22        Attorney for Ad Hoc Group of TCEH Unsecured

23        Noteholders

24

25   BY:  J. CHRISTOPHER SHORE, ESQ.

1

2    FRIED FRANK HARRIS SHRIVER & JACOBSON

3         Attorneys for Fidelity Management & Research Company

4

5    BY:  MATTHEW M. ROSSE, ESQ.

6         GARY KAPLAN, ESQ.

7

8    CROSS & SIMON, LLC

9         Attorneys for Fidelity Management & Research Company

10

11   BY:  MICHAEL JOSEPH JOYCE, ESQ.

12        CHRISTOPHER P. SIMON, ESQ.

13

14   POLSINELLI

15        Attorneys for the Committee

16

17   BY:  CHRIS WARD, ESQ.

18        SHANTI KATONA, ESQ.

19

20

21   MORRISON & FOERSTER

22        Attorney for the Committee

23

24   BY:  CHARLES KERR, ESQ.

25

1    KLEHR HARRISON HARVY BRANZBURG LLP

2         Attorney for UMB Bank, Indenture Trust

3

4    BY:  RAYMOND H. LEMISCH, ESQ.

5

6    THE HOGAN FIRM

7         Attorney for the Ad Hoc Committee EFH Legacy

8

9    BY:  GARVAN MCDANIEL, ESQ.

10

11   KASOWITZ BENSON

12        Attorney for the Ad Hoc Committee EFH Legacy

13

14   BY:  DAVID ROSNER, ESQ.

15

16   NIXON PEADOBY

17        Attorney for AST

18

19   BY:  RICHARD PEDONE, ESQ.

20

21   FOX ROTHSCHILD

22        Attorney for TECH Unsecured Ad Hoc Group

23

24   BY:  JEFFREY SCHLERF, ESQ.

25

```
1    ASHBY & GEDDES

2         Attorney for Christiana Trust

3

4    BY:  BILL BOWD, ESQ.

5

6    PACHULSKI STANG ZIEHL & JONES

7    Attorney for Computershare

8

9    BY:  LAURA DAVIS JONES, ESQ.

10

11   KRAMER LEVIN

12        Attorney for EFIH Second Lien Group

13

14   BY:  JENNIFER SHARRET, ESQ.

15

16   MORRIS JAMES LLP

17        Attorney for Law Debenture

18

19   BY:  STEPHEN M. MILLER, ESQ.

20

21   PATTERSON BELKNAP WEBB & TYLER

22        Attorney for Law Debenture

23

24   BY:  CRAIG DENT, ESQ.

25
```

1   FOLEY & LARDNER

2        Attorney for UMB Indenture Trustee

3

4   BY:  MARK HEBBELN, ESQ.

5

6   MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

7        Attorney for Sponsors

8

9   BY:  DEREK ABBOTT, ESQ.

10

11  MORRISON & FORRESTER

12       Attorneys for the Committee

13

14  BY:  BRETT MILLER, ESQ.

15       CHET KERR, ESQ.

16

17  NIXON PEADOBY

18       Attorney for American Stock Transfer Trustee

19

20  BY:  RICHARD C. PEDONE, ESQ.

21  SEWARD KISSEL

22       Attorney for Wilmington Trust

23

24  BY:  ARLENE ALVES, ESQ.

25

1    KASOWITZ BENSON

2         Attorneys for the Ad Hoc Committee EFH Legacy

3

4    BY:  DANIEL FLIMAN, ESQ.

5

6    MONTGOMERY, MCCRACKEN, WALKER & RHOADES LLP

7         Attorneys for Asbestos PI Firms

8

9    BY:  NATALIE D RAMSEY, ESQ.

10        DAVIS LEE WRIGHT, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  Good morning.

3          MR. SASSOWER:  Good morning, Your Honor, Edward

4   Sassower of Kirkland & Ellis, LLP, proposed counsel to the

5   debtors.

6          Your Honor, there are four remaining items on the

7   agenda for today listed in the following order.  The

8   discovery protocol, the EFH indenture trustee's motion to

9   appoint an unsecured creditors' committee at EFH, the motion

10  for a stipulated protective order, and the bar date motion.

11         With Your Honor's permission the order that we

12  think makes the most sense is to start with the debtors

13  motion for the protective order, then to follow with the

14  discovery protocol, those two items go hand in hand, then to

15  go to the debtors' motion for a bar date, and then to go to

16  the EFH indenture trustee's motion.

17         THE COURT:  That's fine, I have no objection.

18         MR. SASSOWER:  Thank you, Your Honor.

19         Your Honor, before we get into that order I just

20  wanted to very quickly update you on some events that have

21  transpired since the last hearing.

22         On July 31st the debtors exercised their fiduciary

23  duty out and terminated the RSA.

24         As I stated at the last hearing the debtors have

25  reaped many benefits from the RSA, which helped insure the

1    debtors' smooth entry into Chapter 11.

2            The debtors terminated the RSA in order to take

3    advantage of a bidding competition that is broken out

4    between Nextera and the EFIH unsecured noteholders for the

5    sale of EFH's equity.

6            Since terminating the RSA the debtors have

7    continued to negotiate with Nextera and the EFIH unsecured

8    noteholders.  The debtors have also been working to enlist

9    other strategic buyers and creditors to bid.  In addition

10   the debtors have had many discussions with virtually every

11   creditor group in the capital structure about the bidding

12   process.

13           With that, unless Your Honor has any questions or

14   comments at this time, I will yield the podium to my

15   partner, Mark McKane, who will take up the protective order.

16           THE COURT:  No questions.

17           MR. SASSOWER:  Thank you, Your Honor.

18           MR. MCKANE:  Good morning, Your Honor.  For the

19   record Mark McKane, Kirkland & Ellis, proposed counsel for

20   the debtors.

21           The first motion is agenda item number 29, it's a

22   motion seeking entry of a global confidentiality agreement

23   and protective order to govern the handling of confidential

24   information in these cases.  This motion is at docket number

25   1679, and the debtors' reply at 1783.

1              Quite simply since shortly after the filing of

2      these cases the debtors have been working with all the

3      creditor constituencies and the United States Trustee to

4      develop the proposed protective order.  No one disputes that

5      a global protective order is necessary or appropriate for

6      these cases, there's no dispute there at all, and there's

7      been one limited objection with a joinder to two provisions,

8      paragraphs 16 and 17.  Those cover two issues.

9              The first is the handling of materials in open

10     court, that's at paragraph 17, and that's specifically how

11     the parties will work together to address that issue so as

12     to not have any issue with having to seal the courtroom or

13     specifically after significant negotiations with the

14     creditors and the U.S. Trustee the debtors brokered a

15     compromise, and that compromise is that to the extent that

16     someone wants to use materials that have been previously

17     designated confidential or highly confidential, they must

18     give notice at least 72 hours in advance of the hearing

19     about the potential use of those materials.

20             To the extent that the parties cannot reach some

21     compromise or work it out the party that designated the

22     materials confidential or highly confidential will -- has

23     the obligation to come forward and seek relief from the

24     Court.  That's not inconsistent in any way with Section

25     107(b) of the Bankruptcy Code.

1          The second issue is how to handle filing materials

2     that have been designated highly confidential or

3     confidential under seal, and that's in paragraph 16, Your

4     Honor.  And as the debtors in their reply, there is no

5     single universally appropriate procedure for handling this.

6     Here the United States Trustee took the position that they

7     would object to any provision that was automatic for sealing

8     materials that would have been previously designated

9     confidential under court.  And to resolve that objection,

10    again, the debtors negotiated a compromise with the United

11    States Trustee's Office and other creditors specifically to

12    provide for the temporary filing under seal of those

13    materials.  Then there'd be a meet and confer obligation,

14    and the expectation would be that the issues would be

15    resolved.

16          To the extent they're not resolved within ten

17    days, then again, the party designating the materials

18    confidential must file a motion to keep those materials

19    under seal.

20          This procedure is very similar to the approach

21    that was recently taken by the debtors in the American

22    Airlines bankruptcy and we've provided that order and cited

23    it in the reply brief.  In that case the United States

24    Trustee had an opportunity to object to any materials filed

25    under seal and the designated party to extend an objection

1    was filed had an obligation to come forward and show cause

2    why under Section 107(b) of the Code it was appropriate to

3    keep those materials under seal.  That is essentially the

4    same type of structure and approach that we've put forward

5    here.

6            There's nothing inappropriate or improper about

7    the paragraphs that we've put forward, both have been

8    heavily negotiated and discussed among the creditors'

9    groups, and the debtors would simply request that the Court

10   enter the protective order as is.

11           THE COURT:  Okay.  Thank you.

12           MR. EHRLICH:  Good morning, Your Honor, Andrew

13   Ehrlich of Paul, Weiss, Rifkind, Wharton & Garrison on

14   behalf of the ad hoc committee of TCEH first lien creditors.

15           Your Honor, the issue with respect to our limited

16   objection is really simply one of burden shifting and

17   allocation of resources.

18           We certainly don't dispute that the governing

19   legal standard is Section 107 of the Code, and I think

20   there's no dispute among the parties that that is the

21   appropriate, regardless of what provisions this Court may

22   enter in any protective order, that's the standard that all

23   parties are obligated to follow in good faith when they

24   produce documents in this case and mark them as confidential

25   or highly confidential.

1          The debtors acknowledge in their reply that the

2    proposal here is frankly a highly irregular one that is not

3    typically adopted in large cases such as this one and I

4    think that the reason for that, Your Honor, is that it will

5    lead to the unnecessary expenditure of resources by these

6    estates.

7          It's certainly not clear to us, Your Honor, what

8    -- although the debtors do say in their reply that every

9    case is different and each case should be viewed on its own

10   terms.  There's no explanation of what feature of this case

11   makes this case different, and indeed we don't think there

12   is one.

13         If one looks at the Rule 2004 motion that has been

14   filed in this case it seeks the types of information that is

15   often designated confidential -- sensitive confidential

16   information projections with respect to discovery of

17   creditor groups, although we certainly wouldn't at this

18   point concede the propriety of any of this information

19   concerning creditors, investment processes, investment BC's,

20   and the like.

21         So the question really with the two alternatives,

22   the one in the debtors' motion and the one we put forward --

23   I should say we put forward -- to be clear, Your Honor, the

24   debtors put forward the more traditional standard sealing

25   mechanism in which the assumption is that all parties act in

1    good faith to designate as confidential or highly

2    confidential, that information pursuant to Section 107 is

3    appropriate so designated and all parties were prepared to

4    sign on to that subject then to an objection from the U.S.

5    Trustee.

6           So the question is whether there should be a

7    multi-party meet and confer to reach consensus or the

8    default is then unsealing, or whether the procedure in place

9    should be that the parties exercise their reasonable

10   judgment in good faith as officers of the court to designate

11   that which is appropriately confidential, and any party that

12   has an objection should come forward and those can be

13   discussed, rather than in each instance parties being

14   required to defend those confidentiality objections and be

15   required to reach consensus with the debtors, the trustee,

16   the creditors' committee, and others.

17          So we recognize the Court has broad discretion

18   here, we think that it would be most appropriate for the

19   Court to exercise that discretion in conservation of the

20   resources of the estates in reliance on behavior of counsel

21   to act consistent with Section 107.

22          THE COURT:  Okay.  Thank you.

23          MR. EHRLICH:  Thank you.

24          MS. SCHWARTZ:  Good morning, Your Honor, Andrea

25   Schwartz for the United States Trustee.  I'm here today with

1       my colleague, Richard Schepacarter.

2               Your Honor, as debtors' counsel stated, this

3       actual provision was heavily negotiated.

4               The issue, Your Honor, as I'm sure the Court is

5       aware, is that there is a very strong presumption of the

6       public's access to documents filed with the court, and the

7       exception under 107(b) is very narrow.

8               That being said, Your Honor, when we first saw the

9       initial draft of the protective order there was a provision

10      that provided for the automatic sealing of documents that

11      had been designated during the course of discovery as

12      confidential, highly confidential, et cetera.

13              I don't think there's an attorney in the

14      courtroom, and especially any of the litigators here that

15      would not acknowledge that during the course of discovery

16      documents are over designated as confidential, highly

17      confidential, et cetera, for risk of disclosure and the

18      document review that takes place is usually taken --

19      undertaken by either contract attorneys or junior associates

20      at the firm.

21              In any event, Your Honor, the standard by which to

22      designate a document as confidential or highly confidential

23      is not the standard required by the law under 107(b) for

24      sealing with the court.

25              That said, we spent a lot of time with not only

1    the debtors but also the ad hoc committee of the second --

2    of the unsecured noteholders, the creditors' committee, all

3    of the constituencies that actually are producing documents,

4    unlike at present the objecting party, but all the parties

5    that are heavily involved in the negotiation and all the

6    document and discovery -- I meant discovery -- and we came

7    up with a compromise, and I think everybody gave a little,

8    that's what a compromise is, everybody gives a little.

9         It's the U.S. Trustee's view that in order to get

10   a document sealed with the court that the party seeking to

11   seal that document has the burden to show why that document

12   should be sealed.

13        I think counsel for the first lien is correct that

14   there was some burden shifting put into that compromise, and

15   this is what it was, Judge.  What it was was we said, okay,

16   during the course discovery people are going to designate

17   documents confidential, highly confidential, et cetera.  We

18   get to the point where either a motion is filed or there's

19   going to be a hearing and we don't want to hold up or make

20   an impediment to parties' ability with respect to timing to

21   be able to get their documents on the record.  So we said

22   let's do -- let's do this.  Let's allow a temporary seal, so

23   you go along and file your documents under the temporary

24   seal, and then there's a period of time for any party, not

25   just the U.S. Trustee, any party to say, look, that document

1    is not confidential or it doesn't meet the standard of

2    confidential trade secrets or confidential research,

3    development, or commercial information, we don't believe it

4    should be sealed.  Then if the party that filed it, the

5    quote/unquote designating party and the objecting party

6    cannot agree then the burden is on the designating party to

7    obtain an order from the Court finding that that document

8    satisfies the 107(b) standard.

9            And so that was the compromise that was reached,

10   and Your Honor, as I said, it was heavily negotiated, hours

11   and hours and hours went into that provision, and the

12   debtors have agreed and all the parties, with the exception

13   of a party that has not even been producing any documents at

14   this point is standing up.

15           Now that's not to say that at some point in time

16   there might be some document that they have to produce, but

17   we have a lot of parties here, and we have a ton of

18   information, and so to strike a balance between that very

19   strong presumption of the public's access to court documents

20   we thought this was an appropriate and reasonable provision.

21           THE COURT:  Thank you.

22           MS. SCHWARTZ:  Thank you, Your Honor.

23           THE COURT:  Anyone else?  Okay.

24           Well, I'm going to overrule the objection and

25   approve the protective order as submitted.

1            I agree with the comment that there's a high risk

2    of excessive materials being filed under seal really in any

3    case, but I think in particular in this case given if

4    nothing else the number of parties that are actively

5    participating in the case, the number of parties that are

6    going to be producing documents, we're going to have a

7    tremendous number of documents being produced, and I think

8    that in a case such as this where valuation is ultimately

9    going to be a huge issue or an issue -- take away huge --

10   although I think everything in this case is huge, so it goes

11   without saying -- but you know, valuation information and

12   communications among parties such as among parties to ad hoc

13   committees, you know, there's a lot of different things

14   people might think are confidential, and I agree that the

15   parties making the designation in discovery production are

16   going to generally be overly protective, and that's

17   appropriate.  I'm not in any way being pejorative.  But the

18   difference between what somebody puts as confidential in a

19   document production and what ultimately is going to be filed

20   under seal before the Court I agree are -- the under seal

21   before the Court is a narrower scope.

22            And so there needs to be some sort of way in order

23   to make sure that things that get filed in the court are as

24   fulsome as possible, because there is a strong public policy

25   in favor of full public access to documents and testimony

1    and hearings before the Court.

2         The sort of baseline word that we often see I

3    don't think will work well in this case given (a) the number

4    of parties involved, and (b) the number of documents being

5    produced, and (c) what I think will be overly, if you will,

6    conservative designations, in particular based on the facts

7    and circumstances of this case.

8         My problem though with using this sort of baseline

9    rule is you're really putting -- the burden is no longer on

10   the party making the designation that a document is

11   confidential, it's no longer on the party who cares whether

12   the document is confidential, you're putting the burden on

13   the United States Trustee's Office and the Court, the two

14   parties in the case with the fewest number of lawyers to

15   throw at this type of issue.  And also the parties who

16   aren't as generally informed as to the actual issues that

17   underline whether some is confidential in this case.

18        So I don't think it's at all inappropriate to in

19   effect shift the burden back to the party designating the

20   matter as confidential.

21        The other issue that often arises is that we get,

22   unless there's specific protocol or rules that really

23   require it as this does, we'll get a document that has some

24   confidential information in it and the entire document is

25   filed under seal with a redacted copy promised in the near

1    future, which is never near, and often it doesn't even ever

2    make it onto the docket.  That's very troubling here.

3             I'm not going to run this case under seal and I

4    don't think it's appropriate to run this case under seal.

5    So having a more vigorous process in place to hopefully

6    narrow the designation confidential information and filing

7    under seal to that which is truly appropriate, and there

8    will be appropriate matters to be filed under seal, I think

9    is a good idea and not a bad idea.

10            In connection with using documents in court

11   (indiscernible).  This Court is not going to seal this

12   courtroom absent highly unusual circumstances based on

13   actual evidence that's placed before the Court, and that's

14   what the Third Circuit tells me to do.  And I think it's

15   very important to have a mechanism in place to vet what's

16   going to be confidential and not confidential for purposes

17   of going into an actual hearing in front of the Court so

18   that things can either be pared down to that which is truly

19   confidential that needs to be protected and having

20   identified what that is deal with the logistics of how you

21   ask questions, how you put things on the record and then the

22   documents you're actually handing up to the Court are under

23   seal.

24            So having a mechanism in place that allows a

25   period prior to the hearing to work those things out is I

 1     think a terrific idea, it's certainly not problematic.

 2             So I have no issue with the stipulation protective

 3     order as put before the Court.  It's a stipulation ad

 4     protective order, so I don't know if I can make anyone sign

 5     it, if they sign it they sign it, if they don't they don't,

 6     but that could create a whole host of issues, and I hope

 7     that the parties will go along with what I've just ruled and

 8     sign the protective order even if they have some misgivings,

 9     but that's up to the parties.

10             I'm certainly going to approve the order as

11     presented.

12             MS. SCHWARTZ:  Thank you, Your Honor.

13             MR. SASSOWER:  Thank you, Your Honor.  May I

14     approach?

15             THE COURT:  Yes.  Is this just a duplicate?

16             MR. SASSOWER:  I believe it.  Yes, there have been

17     no changes since the filed version, Your Honor.

18         (Pause)

19             THE COURT:  I've signed that order.

20             MR. SASSOWER:  Thank you, Your Honor.

21             The next motion is the -- I believe the pending

22     Rule 2004 motion and the proposed discovery protocol, that

23     would be the order that governs the Legacy discovery.  And

24     for that I cede the podium to Mr. Weisfelner.

25             THE COURT:  All right.

```
1              MR. WEISFELNER:  Good morning, Your Honor.  Edward
2    Weisfelner, Brown Rudnick on behalf of Wilmington Savings
3    Fund Society.
4              Your Honor will recall that on the very first ay
5    of this case, April 29th, we filed our request for 2004
6    investigation.  And, Your Honor, it's been a while so I just
7    want to refresh Your Honor's recollection and for the
8    benefit of the parties as to what the basic thrust of that
9    discovery was.
10             And, Your Honor, I'm quoting from page 1 of our
11   motion, again, filed in the first day of the case, but I
12   should also emphasize that while the motion was filed on the
13   first day of the case it was the product of virtually a year
14   of work effort by the second lien group in seeking
15   unsuccessfully to engage with the debtors with regard to the
16   scope of their restructuring and an unsuccessful effort
17   during that period of time.  Notwithstanding the fact that
18   we were asked to and did sign a confidentiality agreement,
19   to get anything other than publicly available information
20   from the debtor in possession on any number of topics and in
21   particular on the subject matter that we all sort of chill
22   over, and that's taxes.  I'm going to come back to the tax
23   issue in just a minute.
24             But what we did say on page 1 of our original
25   motion was that there were three basic areas of discovery,
```

1    and among those three areas was the following.  Our concern

2    regarding -- and I'm quoting -- "disabling conflicts of

3    interest affecting management in these cases."

4           Your Honor may also recall that the very next day,

5    the 30th of April, our 2004 motion was joined by the TCEH ad

6    hoc unsecured creditors' committee -- unsecured group

7    represented by White & Case.  And on page 9 of their joinder

8    they specified among the issues critical for an appreciation

9    of where this case was heading was an appreciation and

10   understanding of tax issues.

11          So between the two of us we had raised and

12   highlighted from day one of this case concerns regarding

13   potential conflicts and concerns regarding taxes.  And I

14   want to tie those two together in connection with the

15   opening statements that Mr. Sassower made before we got into

16   the agenda, and he suggested that given the withdrawal of

17   the restructuring support agreement and the motion that the

18   debtor had filed to assume it, and given the issues that

19   arose in connection with the debtors since withdrawn motion

20   for approval of a second lien financing arrangement that

21   would have likewise involved the Oncor tax sharing

22   arrangement, the debtor is now focused on, for lack of a

23   better term, I think I heard him say an auction process with

24   regard to the debtors' interests in Oncor.

25          Now, Your Honor, we haven't seen any motion papers

1    from the debtors, and I don't want to necessarily presume

2    what you will see in the near or medium term, but I will

3    tell Your Honor that we have reason to believe that the

4    proposal that will eventually come before Your Honor will be

5    extraordinarily unique.  Unique in the following sense.

6              Most times when a debtor sells something the

7    debtor owns what it's about to sell.  That's what 363 is all

8    about.  You sell what you own subject to court approval.

9    Sometimes you sell what you own in a 363 context, sometimes

10   you sell what you own in a plan or reorganization.

11             I think what the debtor is contemplating is

12   something truly unique.  They want authority to sell

13   something that doesn't exist and that they certainly don't

14   own.

15             I think they're going to come to this Court

16   seeking authority to sell reorganized EFH stock, and I think

17   that the rationale -- or among the rationales for conducting

18   an auction and an ultimate sale of reorganized EFH stock is

19   because it needs to be done that way in order to preserve

20   the debtors' contemplated preferred tax structure.

21             But in order to conduct this auction and sell

22   reorganized EFH stock that sale is openly going to have to

23   be subject to a plan of reorganization.  The bidder that

24   emerges from this process, we believe, is invariably going

25   to have to agree once it wins the semi-auction to be the

1    stalking horse and then wins an eventual auction to be the

2    successful bidder will in effect have to run in place or

3    walk in place or stand in place until such time as there's a

4    plan of reorganization for EFH pursuant to which the EFH

5    reorganized stock comes into existence.

6           More interesting news.  Under our understanding of

7    the debtors' --

8           THE COURT:  All right.  Why are we talking about

9    all this?  Let's -- I thought we were talking about a

10   discovery protocol --

11          MR. WEISFELNER:  We are.

12          THE COURT:  -- Legacy discovery, not a preview of

13   what you want to argue three months from now about why the

14   EFH reorganized --

15          MR. WEISFELNER:  Fair question.  Let me tell you

16   where I'm going and why.

17          The objections that have been leveled against the

18   discovery protocol, in particular by the TCEH first lien

19   holders, and not surprisingly by the sponsor group, all go

20   to the extent to which the discovery protocol properly

21   prioritizes the discovery that's been agreed to, otherwise

22   commonly referred to as Legacy discovery, and what both

23   Paul, Weiss in its papers on behalf of the first liens argue

24   and what Wachtell argued in its position paper, and frankly

25   the position that the debtor has historically taken, is that

1    when one comes to prioritize discovery plan of

2    reorganization related issues ought to be prioritized

3    towards the back end.

4            They historically told you in connection with the

5    RSA motion since withdrawn.  That among the things that Your

6    Honor ought to determine are out of bounds was valuation,

7    but in addition they made pains to tell you that what was

8    out of bounds was tax-related discovery.

9            And, Your Honor, one of the concerns we have in

10   the protocol is that the debtor will continue to take the

11   position that tax-related issues are to be prioritized in

12   such a fashion as to, for lack of a better terminology,

13   we'll get there when we get there.

14           My point, Your Honor, succinctly and simply stated

15   if I can, is that taxes are driving this case.  It's driving

16   -- it drove the case with regard to the RSA, it drove the

17   case with regard to the second lien financing, it's going to

18   drive the auction process we fear that the debtor is going

19   to put forward.  And our point simply is that that same tax

20   issue also drives potential conflicts of interest.

21           We've been trying for over a year before the

22   filing to understand a series of questions with regard to

23   the tax structure the debtor has put forward.  It's never

24   been challenged, the debtor has avoided having it

25   challenged, and every single constituency on the left side

1    of the courtroom, the creditors' committee, the ad hoc

2    committee of unsecured bond holders, the second lien

3    creditors have been desperate to get the debtor, and for

4    that matter the first lien TCEH creditors, to respond to

5    inquiries regarding the propriety and appropriateness and

6    doability of what they've commonly referred to as the tax-

7    free spinoff as distinguished from what the TCEH first liens

8    had argued for during the failed Mount Olympus project and

9    that was a step up in basis with regard to their assets.

10           And the questions we posed have been fairly

11   simple.  Does the tax-free spinoff work as a matter of IRS

12   regulations?

13           Your Honor may or may not recall that there was a

14   letter heavily negotiated between the debtors and the TCEH

15   first lien creditors in connection with the RSA pursuant to

16   which a multi-faceted request for I guess a no action letter

17   was propounded to the IRS.  We don't know the status of that

18   request other than things we've heard around the proverbial

19   water cooler that they've been responses or at least partial

20   responses, but when we ask what those responses are we are

21   told that it's confidential and won't be discussed.

22           When we focus on or are told about the potential

23   bid for EFH reorganized equity we asked the question about

24   whether or not -- even assuming that the tax-free spin is

25   the way we ought to go -- does the propose by one of the

1    bidders, pursuant to which it's going to acquire EFH

2    reorganized security and in exchange is going to deliver its

3    own securities, does that satisfy the tax-free spinoff that

4    you've been referring to?  We asked the question over and

5    over again and have yet to get an answer.

6            When the first lien creditors were induced as part

7    of the RSA to give up the step up in basis that they had

8    demanded on for almost a year in favor of a tax-free spinoff

9    we understood that that was in effect achieved through a

10   compromise where the debtor was affording the first lien

11   creditors all sorts of tax attributes to attempt to make up

12   the delta between the value of a step up in basis and the

13   value of a tax-free spinoff.  And I've heard various people

14   comment on that delta as being in the billions of dollars

15   range.

16           We understand, but don't know for a fact, that

17   what the debtors offered the first liens to make up for that

18   billion dollars of delta was tax attributes that we

19   understand belong to the TCEH estate.  And the longer this

20   case goes on the more valuable those tax attributes that

21   we're funneling from TCH up to the first lien creditors for

22   their benefit.

23           Now, I will tell Your Honor that starting about a

24   week and a half ago, maybe two weeks ago, given the

25   (indiscernible) cry that they heard from their creditor

1    constituency on the T side of the equation that the debtor

2    relented and has now agreed to host on a weekly basis -- I

3    think it's every Tuesday -- we all get invited over to

4    Kirkland & Ellis for a tax seminar.  I think so far in total

5    we've had about an hour and a half of tax seminar.  I don't

6    know how much longer it's going to go on, but there are any

7    number of basic questions like access to their tax records,

8    we'd like to understand the NOLs.  It's nice when they sit

9    down and talk to us, but it's not a substitute for getting

10   the discovery that we want.

11            THE COURT:  But what does this have to do with the

12   protocol?

13            MR. WEISFELNER:  Your Honor --

14            THE COURT:  Want to talk about the protocol?

15            MR. WEISFELNER:  We can and we will, Your Honor.

16            THE COURT:  They've agreed, right?

17            MR. WEISFELNER:  They have agreed, but Your Honor,

18   I just -- I want to insure that when a protocol goes into

19   effect given the objections we've heard from the first

20   liens, given the objections we've heard from the sponsors,

21   given the debtors' historical reluctance to have tax issues

22   be anything other than plan-related issues --

23            THE COURT:  Well the entire thrust of the debtors'

24   reply to the objections is that substantive issues are

25   reserved and will be dealt with when they arise and that the

1    protocol is in effect procedural.  So I mean I guess I'm not

2    sure what we can accomplish in connection with substance.

3            MR. WEISFELNER:  Your Honor, my only point is that

4    there are so many issues that are driven by this tax,

5    including, without limitation, conflicts issues, retention

6    issues, it does not behoove any of us to bury those issues

7    or attempt to prioritize them or move them into a plan-

8    related context and thereby shield it from discovery.

9            So, Your Honor, I'm glad we've gotten to the

10   protocol, I know we were criticized for the amount of time

11   it took, the debtors and all the parties in this case were

12   busy on a bunch of things starting with venue motion that

13   someone had the misfortune to file, coupled with an RSA

14   motion that's been since withdrawn, coupled with an EFIH

15   second lien financing that --

16           THE COURT:  Well you certainly weren't criticized

17   by me, just so that's clear.

18           MR. WEISFELNER:  And I'm just responding to the

19   critique that we got in the objection.

20           The time has come I think since the rush of first

21   days, second days, and failed RSA, and failed second lien

22   motions to focus on the things that do drive this case, and

23   I think again what drives the case are taxes which give rise

24   to potential conflicts, and I'm hoping that this protocol

25   will allow the parties to focus on necessary discovery,

1       which I think in a lot of instances are precursors and

2       things that are necessary to understand so that every

3       successive motion is viewed in the appropriate context.

4              Thank you.

5              And I know that Mr. Kerr, and I'd be disappointed

6       if Mr. Shaw didn't have some comments as well.

7              THE COURT:  Okay.  Thank you.

8              MR. KERR:  Good morning, Your Honor, Charles Kerr

9       of Morrison & Forrester, we are proposed counsel for the

10      official committee of unsecured creditors of Energy Future

11      Competitive Holding Company, EFCH's direct subsidiary, Texas

12      Competitive Electric Holding Company, and their

13      direct/indirect subsidiaries in the EFH Corporate Services

14      Company.

15             Your Honor, I'm going to focus in on the protocol

16      that we have spent so much time talking about how it works

17      and why I think it's a good thing, and so let me get right

18      to that, Your Honor.

19             Just to put some fine points on this.  The motion

20      that this protocol is attempting to resolve is the Rule 2004

21      motion, it's docket number 6 originally filed by Wilmington,

22      it was joined by the ad hoc committee of TCH unsecured

23      creditors, that joinder was 226.  There was a limited

24      objection filed early on by the EFH equity holders and that

25      was docket 523.

1              On May 13th the official committee was appointed

2      and that kind of changed the ballgame here I think a little

3      bit, Your Honor.  The debtors filed a status report

4      indicating that they wanted to come up with a protocol to

5      deal with the discovery covered by the Rule 2004 motion, and

6      that's what we worked on very hard and we've been I think

7      successful in doing that.

8              And the goals in doing this is to come up with a

9      coordinated discovery process, one that flows through the

10     committee and therefore I think relieves some of the burden

11     on the debtors of getting multiplicity of document requests,

12     multiplicity of discovery requests, and we can work as a

13     funnel and effectively with all of the potential

14     participants in that process.

15             And we worked -- we staged a number of drafts over

16     the last couple of months.  We updated the Court in our

17     status reports we filed in July, that was docket 1496.  The

18     debtors filed a response to that, which is docket 1538.  And

19     we updated the Court about where we were at the July 18th

20     conference.

21             Those -- I think those efforts have been

22     successful, Your Honor, and we have now submitted -- the

23     committee has submitted a joinder to the Rule 2004 motion

24     and attached as Exhibit 1 is the discovery protocol that we

25     have agreed to, and we have agreed to it with Wilmington,

1    the original movants, the debtors, the ad hoc committee of

2    TCH unsecured creditors, the U.S. Trustee, and we've also

3    distributed that out prior to submitting it to Your Honor to

4    all the creditor constituencies and got a number of comments

5    back and tried to incorporate those comments where and if we

6    could.

7              I think the committee believes and I think the

8    parties here believe that the protocol is the most efficient

9    and effective way of getting through this discovery in a way

10   that gets the job done quickly and at least most cost

11   effectively if was can.

12             So let me just talk about the highlights of the

13   protocols.  It covers what we've been talking about as

14   Legacy discovery, and that is what's been described in the

15   original 2004 motion which Mr. Weisfelner referred to and an

16   additional and the joinder by the ad hoc committee of TCH

17   unsecured creditors.

18             And the Legacy discovery does not include -- and

19   this is important -- does not include discovery concerning

20   the current enterprise value of the debtors.  That's been

21   carved out in the protocol.  It also does not affect the

22   rights of any party as part of a contested proceeding, a

23   contested motion, or a separate adversary proceeding to seek

24   independent discovery, and that's just so that the timing of

25   that discovery is needed for particular matters, it's not

1    waylaid by this protocol.  So they can raise those issues as

2    they come up.

3            The protocol also does not apply to discovery that

4    relates to the first lien investigation being done by the

5    committee under the cash collateral order.  And it also does

6    not apply to future plan discovery.

7            We all recognize that some of this discovery

8    that's being done as part of this Legacy process will also

9    be of interest when we get to the plan confirmation process

10   will also be of interest when we get to the plan

11   confirmation process.  We had a lot of discussion about

12   whether we should just roll it all into one process at this

13   stage or not.

14           Because no plan has been filed, there's been --

15   and things have obviously been shifting around the parties

16   have agreed to proceed with this Legacy protocol -- Legacy

17   discovery protocol and use it as a model for a future plan

18   confirmation when we get there.

19           But the committee wants to make sure and respond

20   to the debtors' concerns and some of the creditors' concerns

21   that we not duplicate unnecessarily discovery, and therefore

22   if discovery has been obtained through this protocol on a

23   topic -- document discovery -- you don't get to reserve it

24   anew when you get to plan confirmation.  And as I'll

25   describe (indiscernible) procedure that the discovery is

1    being collected is going to be available to all participants

2    under this protocol and therefore it'll be available both

3    for now and for future use as well.

4           So the protocol does several important things.  It

5    creates a process by any interested party in interest to

6    participate in this by filing a notice of participation -- a

7    notice to participate within a set period of time.  The

8    debtors, the committee, and the U.S. Trustee will look at

9    that and if there's any objection to someone participating

10   because they just don't have standing or whatever we can

11   raise the objection, but I anticipate that anybody who wants

12   to participate will be able to participate.  And it will

13   then create a single service list for the service of all

14   papers to simplify that process.

15          It also requires any participant to agree to be

16   bound by the protective order that Your Honor just approved.

17   So that makes -- insures that again the discovery process

18   goes smoothly and we're all operating under the same set of

19   rules.

20          Protocol establishes a single consolidated process

21   of serving document requests, and the committee has taken on

22   the responsibility of working with all the participants and

23   collecting their views about what types of requests are

24   appropriate in light of the Legacy protocol described in the

25   motion and in the protocol itself, and consolidate them and

1    serve that on the debtors and on non-debtors.  And we've

2    taken on that role, Your Honor, recognizing that that will

3    avoid having to have multiplicity of requests and being

4    bombarded from all different angles.

5            We'll work with each of the participants to make

6    sure that we've captured their ideas and try to coordinate

7    any discovery follow up that comes with that.  We're also

8    going to work with any recipients of those on search terms

9    and identifying custodians as well.  So we've undertaken

10   that responsibility.

11           Importantly a discovery protocol establishes a

12   single document repository for all documents that are to be

13   produced by the debtors, and the debtors have agreed to also

14   populate that repository with documents produced by non-

15   debtors, and that repository will have a functionality that

16   any participant can obtain a license, go in review

17   documents, tag documents, pull documents off, use then as

18   they wish in their own private way, and that type of

19   repository from our experience have been proven very useful

20   in other large multi-party bankruptcies such as this.

21           Discovery protocol establishes a uniform process

22   for serving privilege logs, sets out timing for doing that.

23   The protocol specifically encourages the parties to come up

24   with a categorical way of dealing with privileges, and try

25   to do it by group or by category again to kind of cut

1    through some of the things that often complicate this

2    process.

3                It establishes a single process for servicing

4    notices of deposition.  Again with respect to this Legacy

5    discovery.  Again, the committee has taken on the

6    responsibility of getting from participants various topics

7    for 30(b)(6) notices, identification of witnesses, and

8    coordinating that process, serving single notices on the

9    debtors or non-debtors, coordinating the discovery -- I mean

10   the deposition taking and the like.

11               There are limits on the number of fact witnesses

12   that can be deposed under this protocol.  There are limits

13   on the time that the depositions can last.  Again, something

14   we have all agreed to.

15               It establishes a single process for service of any

16   papers associated with the Legacy discovery process.  Again,

17   it can all be done by electronic mail.

18               It establishes -- and this is in paragraph 14 of

19   the protocol, Your Honor -- a simplified process for raising

20   any disputes to the Court, if necessary, with respect to

21   this discovery.  We're very cognizant of how much -- trying

22   to make sure that these discovery issues are resolved by the

23   parties by consensus and not have it be brought to Your

24   Honor.  We don't want to burden the Court, but that may

25   happen.  So we've come up with a simplified process of a

1    letter and a responsive letter and no other pleadings, no

2    argument on it, the Court can just look at that and decide

3    the issue.

4              And there's a number of other provisions in the

5    discovery protocol which I can respond to if Your Honor has

6    any question about it.

7              There have been two limited objections that have

8    been filed, Mr. Weisfelner had mentioned them.  One is by

9    the EFH equity owners, the other one by the TCH first lien

10   creditors.

11             As I explain in a second, Your Honor, we don't

12   believe those objections are well taken, and again, we think

13   that the discovery protocol reflects instead a wide, broad

14   consensus among all the parties here that this is the way to

15   go.

16             With respect to the first lien creditors limited

17   objection.  They concede that the discovery here should

18   proceed by a protocol.  They do that on paragraph 1 of their

19   filing.  Notwithstanding this, Your Honor, they just want to

20   be carved out it.  They basically say we don't believe that

21   any discovery needs to be taken from us or it's all

22   premature and why are you doing this, leave us alone.  And

23   one, that's not a basis to challenge the protocol, the

24   protocol sets up a process by which we all work to serve

25   discovery.  Under the protocol every party reserves its

1     rights to raise objections to specific document requests or

2     discovery requests, they can raise them with us where we can

3     work them out, they can raise them with the Court.  It

4     doesn't undermine their ability to raise those at the

5     appropriate time.

6            The suggestion that the discovery against the

7     first lien creditors is either premature or there's no basis

8     for it, I think Mr. Weisfelner's comments about some of the

9     issues that were earlier on are right on point.  That's just

10    not the case.  And specifically paragraph 1-C of the

11    discovery protocol says that if one of the areas of focus

12    that we've all agreed on is any alleged prepetition efforts

13    of the debtors' senior management for the benefit of holders

14    of first lien debt, including, but not limited to debt

15    issues by TCH to affect enterprise value in advance of

16    filing these Chapter 11 cases.  And again, that's historical

17    enterprise value.  But again, that's just one example.

18           And we again as the committee, we're going to go

19    after the participants and collect their ideas, and I just

20    think it's -- people just don't get to carve themselves out

21    of this process by saying we can't do everything you ask us.

22    That's just not the way it should be.

23           Then they also make the claim that the protocol is

24    over broad because it really gives a plan confirmation

25    discovery.  And as I said before, it does not, Your Honor.

1     We focus -- we're focused on discovery of prepetition

2     conduct that's specified in Section 1 of the protocol.

3     There is no doubt -- at least I don't think there's any

4     doubt -- that things that will be collected as part of that

5     process may also be of interest when and if you get to plan

6     confirmation.  But it doesn't preclude the need to get that

7     information for purposes of the committees' investigation

8     and the creditors' investigation of these past events now in

9     here -- here and now.

10           And, Your Honor, as I said, we've provided in the

11    protocol that if you have obtained those documents as part

12    of the Legacy discovery you can't ask -- there's no need to

13    ask them again, you can't ask them again as plan

14    confirmation.  They're going to be in a repository, they'll

15    be available to everybody, you don't need to duplicate that

16    process.

17           With respect to the EFH equity owners, Your Honor,

18    they're really -- the objection they have is over the

19    timetable, which is in Section 5-H of the protocol having to

20    do with time schedule for demonstrating substantial

21    compliance with serving documents and respond to document

22    requests and then complete compliance.

23           Under the protocol we have put in there -- and

24    this is upon agreement of parties -- that parties have 60

25    days to show substantial compliance and 80 days to show

1   complete compliance.  And the reason we have dates in there,

2   Your Honor, is that for this process to work we need to make

3   sure that the parties have served requested, produced those

4   documents, and then we can begin the process of taking

5   depositions.  It makes no sense to begin the deposition

6   process where we'll have some parties on different schedules

7   producing documents at different times.

8           We think that time schedule is workable, we think

9   it's feasible, there's no doubt it's going to be a lot of

10  work on everybody, work on the committee, work on responses

11  by people who receive these requests, but the protocol has

12  been out there -- I mean not the protocol, excuse me -- the

13  motion has been out there for three months, it's not as if

14  there's going to be a lot of surprise to people about what

15  these topics are, and there therefore think that those time

16  schedules are both appropriate and should be included within

17  the protocol.

18          Absent that, Your Honor, if you have any further

19  questions about the mechanics of the protocol I'm willing to

20  answer them, but otherwise I will turn it over to Mr. Shore.

21          THE COURT:  Okay.  Thank you.

22          Mr. Shore, good morning.

23          MR. SHORE:  Good morning, Your Honor.  Chris Shore

24  from White & Case on behalf of the ad hoc group of TCH

25  noteholders.

1          Let me try to maybe tie together those two

2     presentations and address the two real objections, which is

3     tight response dates for third-party respondents to the 2004

4     requests and sequences of discovery between taking it from

5     the debtors first and then going to the respondents or going

6     to the respondents -- third-party respondents at the same

7     time.

8          In order to address that let's go back to the

9     start of this motion.  It was filed as an emergency motion

10    because there was an RSA on file which described a plan in

11    which the estates, all the debtors' estates, were going to

12    release all the other co-debtor estates, were going to

13    release management, were going to release the TCH first, the

14    EFH sponsors, Fidelity, the PICs, and everybody else for no

15    consideration.

16          We've pressed incessantly since then, both before

17    the RSA was terminated and after, to get disclosure on those

18    assets.  We've coordinated with the committee since they got

19    involved.  We participated in all the calls.  We've turned

20    the documents as quickly as we can.  We've negotiated with

21    everybody to get to the day where at least we have a

22    framework for which we can do what we wanted as we said in

23    the beginning which is to investigate the assets.

24          At the same time there has been some disclosure

25    going on both to the data room and in public filings, which

1    has disclosed that there are real assets of the TCH debtors

2    which we're going to be relieved for no consideration, and

3    most notably we have the scheduled intercompany claims which

4    have come out, all of which would have been released under

5    that plan for no consideration.

6           The objectors point to the fact that the RSA has

7    been terminated and say essentially what's the rush, why

8    can't we have more time to respond to documents?  Why can't

9    you go to the debtors first and then come to us?

10          They're correct to say the RSA has been

11   terminated, but what you heard today, and I think this

12   brings into what Mr. Weisfelner was saying, the debtors are

13   going to come back with a different metric or velocity no

14   longer do we have a plan that's fragile and needs to be put

15   together, but rather we have a wasting asset that needs to

16   be sold.  And we're going back to the point where there is

17   going to be a proposed timeline with velocity in this case.

18          I'm not going to say anything more than from the

19   first moment we heard this the notion of going out and

20   marketing the EFH post-reorganization equity, we objected to

21   it, we don't think it's right, and I'll save my reasons for

22   later.  But case velocity and disclosure slow play create

23   attention that the protocol is designed to deal with.

24          Ultimately the TCH debtors' assets are going to

25   have to be identified, whether in the schedules or through a

1    disclosure process.  The debtors have already gone on the

2    record saying we don't believe those assets exist, and so

3    it's really left to the creditors to identify them.

4         If insiders, including the co-debtors and the

5    sponsors want closure in this case they're going to need to

6    disclose the Legacy documents as defined in the protocol

7    from which third parties are going to be able to determine

8    whether or not there are any TCH assets there.

9         If we're on a rational case timeline the third

10   parties can have rational sequencing and rational timelines.

11   We are after all I think rational people.  But as the case -

12   - timelines in these cases accelerate so too must the

13   process of disclosure.

14        The protocol doesn't resolve that issue, it just

15   sets a baseline.  Obviously there is flexibility.  If the

16   case accelerates beyond anybody's expectation then we're

17   going to have to shorten some of the deadlines.  If the case

18   deadlines go out longer then either the parties will extend

19   the deadlines for responding or sequence rationally, or if

20   we don't do that the process is set for the parties to come

21   to court and object and get a protective order in the

22   context of discovery requests that are sent.

23        But there needs to be a baseline set for response

24   dates and how discovery is going to proceed.  Sixty days is

25   right for response deadlines and production, 80 days for

1    substantial completion is right.  Mr. Kerr is correct to

2    point out there's going to be no surprise about what

3    documents are being requested.  And sequencing co-production

4    from third parties makes sense at this time.

5              But our group for one will certainly be willing to

6    extend out deadlines and impress upon the creditors'

7    committee the need to slow the process down and allow

8    parties a rational time to respond if we're moving on

9    rational deadlines.

10             As it stands right now we think the baseline is

11   correct in the protocol.  It was heavily negotiated with

12   both the debtors who are committing to this and all the

13   other parties.  So if the debtors can produce documents and

14   can make clear -- there has been production to date but we

15   expect its a miniscule fraction of what will ultimately be

16   produced -- so if the debtors can commit to do it on the

17   timeline so too can the sponsors and the first liens.

18             So in short we request that Your Honor enter the

19   protocol order as submitted.

20             THE COURT:  Thank you, Mr. Shore.

21             Anyone else?

22             MR. KLEINHAUS:  Good morning, Your Honor, Emil

23   Kleinhaus from Wachtell Lipton Rosen & Katz on behalf of the

24   EFH equity owners and associated management companies and

25   individuals.

1            As a starting point I heard counsel for the second

2    lien lenders of TCEH characterize what we said in our

3    objections.  It really bears virtually no resemblance to

4    what I remember writing in the objections.  We did not

5    mention tax issues, we really covered more pedestrian

6    procedural topics, and that's really what I'm going to focus

7    on for a few minutes now.

8            With respect to the Rule 2004 motion we filed an

9    objection back in May which really made two points  One is

10   there should be a coordinated process run through the

11   creditors' committee, and number two, there needs to be a

12   process to bring objections to the Court.  There shouldn't

13   be an order compelling production of documents on some

14   immediate timetable.

15           The discovery protocol addresses both of those

16   objections.  So to the extent as I understand it the TCEH

17   creditors are seeking entry into the discovery of the

18   discovery protocol instead of the Rule 2004 order that

19   original objection to the Rule 2004 order I think is

20   resolved.  What's left is a limited objection to the

21   discovery protocol of the nature that Mr. Kerr summarized.

22           And our objection to the discovery protocol, and

23   we did get drafts of the discovery protocol and we commented

24   on it and we resolved I think all but one issue, and the one

25   issue is the issue of deadlines.

1          Paragraph 5-H of the protocol as currently

2     formulated, as Mr. Kerr noted, imposes a 60-day deadline for

3     a substantial completion of document production and the 80-

4     day deadline for complete document production.  And absent

5     an extension from the creditors' committee or the Court

6     those deadlines require certification as to both substantial

7     completion and completion.

8          We have a few problems with this.  Number one, it

9     sets a deadline for responses to document requests before

10    the requests are even served.  The document requests under

11    the protocol will not be served until 30 days after the

12    discovery protocol is entered.  Under Bankruptcy Rule 9016 a

13    subpoena directed to a third party -- and this is third-

14    party discovery -- has to be quashed if it fails to allow

15    reasonable time to comply.  It's really not possible to know

16    what a reasonable time to comply is before the requests have

17    been presented.

18         Which brings me to the second point.  Which is

19    based on what we've seen so far it appears that the requests

20    here are going to be extraordinarily broad.  The requests

21    that were attached to Wilmington Savings Fund's Rule 2004

22    motion went back seven years and they were exceedingly

23    broad.  They asked for essentially all documents relating to

24    the value of any assets or liabilities of the debtors and 20

25    something odd similar requests of that nature.

1          If that's going to be the type of discovery

2     requests that we get from the creditors' committee in 30

3     days it's going to be a substantial project to try to

4     resolve objections to those requests and if necessary come

5     to court and then go through the entire process of

6     collecting, reviewing, and producing documents in 60 days

7     may be quite difficult, it's going to depend on what the

8     requests are like and how easy it is to resolve objections

9     to those requests.

10          So what we've suggested to the creditors'

11     committee and we would as the Court to do, is simply to put

12     off the issue of deadlines so that once the requests are

13     served the parties can confer in good faith and decide what

14     they right deadline is.

15          And here I would just not that while there's some

16     suggestion in their reply that the EFH equity owners are

17     trying to stifle discovery, we've actually be inundated with

18     discovery requests since this case began on a number of

19     major contested matters.  We got discovery requests, we

20     produced documents extremely quickly.  On the DIP motion

21     Your Honor saw the number of the documents that were

22     presented as evidence came from the files of my client.

23          So there's no improper motive here, there's no

24     attempt to stifle anything.  We are simply concerned that

25     having a preimposed 60-day deadline when the request maybe

1   extremely broad and we have to deal with a lot of different

2   parties, may not be workable and a more rational approach,

3   which is the approach contemplated by Bankruptcy Rule 9016,

4   which requires reasonable time for compliance, is to see

5   what the requests are and then work out a deadline, and if

6   we can't work it out ourselves come to the Court.

7           We did have the document requests that were

8   attachable to the Rule 2004 motion.  But in the absence of

9   an objection process and meeting and conferring, other than

10  collecting an absolutely massive volume of documents, we

11  really haven't had the opportunity yet to do all the things

12  that are going to have to be done to comply with the

13  document requests including, first and foremost, narrowing

14  it to make it reasonable and then going through the arduous

15  process of reviewing all the documents.

16          So to sum up, Your Honor, we think the discovery

17  protocol is a step in the right direction.  It resolves the

18  issues that we had with the Rule 2004 motion.  The one issue

19  that remains is we do not think it's appropriate to have a

20  pre-imposed deadline ordered by the Court when we don't yet

21  know what the requests are and how long it's going to take

22  to work them out.

23          Thank you, Your Honor.

24          THE COURT:  You're welcome.  Thank you.

25          MR. EHRLICH:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. EHRLICH:  For the record, Andrew Ehrlich from

3     Paul Weiss for the TCEH first lien creditors.

4          Your Honor, the reason for our limited objection

5     to the discovery protocol is not with any -- for any issue

6     with the protocols terms as they are set out but rather its

7     application to the first liens.  The protocol purports to

8     resolve, and does resolve, with respect to the other

9     parties', we believe appropriately, the Rule 2004 motion.

10          The Rule 2004 motion had four schedules attached

11     to it:  a schedule request to the debtors; to the sponsors;

12     to the directors of the debtors; and then to the first

13     liens.  And the discovery protocol concerns Legacy

14     discovery.  And three of those parties indeed are involved

15     in the Legacy of how this company got here into these

16     Chapter 11 cases.  We'd respectfully submit that the first

17     liens really aren't.  And the best evidence of that, Your

18     Honor, are the items identified in paragraph 1 of the

19     Protocol Scope of Order which involve alleged mismanagement

20     of the debtors prior to the petition date, alleged conflicts

21     of interest of the debtors' senior management prior to the

22     petition date.  The only one cited by any of the parties

23     propounding the protocol today is "(c) pre-petition efforts

24     of the debtors' senior management to take actions" for the

25     benefit of my clients, the first liens, which even that, we

1    believe, is focused on the conduct of the debtors.

2         And it goes on from there.  Interdebtor claims,

3    fraudulent transfer or preferences with respect to

4    transactions between the debtors, transfers to the equity

5    owners of EFHC, debtors' practices and procedures concerning

6    various allocations, pre-petition allocation of overhead,

7    pre-petition negotiation of various shared service

8    agreements, solvency of the debtors prior to the petition

9    date, and, finally, the negotiation of the RSA which has now

10   been withdrawn.  But in all events, the Court will recall,

11   in response to arguments made by my partner, Mr. Kornberg, a

12   couple months ago, the Court ruled that the question of

13   whether the assumption of the RSA was the reasonable

14   business judgment of the debtors was, in fact, a question

15   for which discovery should be targeted to the debtors not

16   the first lien creditors.

17        So we believe that at the end of the day, in the

18   context of plan discovery, our clients will certainly be

19   required to produce discovery and we don't shrink from that.

20   But to the extent that there is some allegation that prior

21   conversations with respect to an RSA were motivated by some

22   impure motive, first of all, that proposal has been

23   withdrawn and the Court has already ruled on discovery

24   concerning it.  And what I've heard today, Your Honor,

25   really again, concerns the tax record -- from Mr.

1    Weisfelner, the tax records of the debtor, issues about the

2    NOLs of the debtor.  To the extent that there is an IRS

3    letter sought, the taxpayer that would be communicating with

4    the service and seeking the ruling would be the debtor.

5            So we really raise this objection because it

6    purports to resolve a motion, the protocol does, with

7    respect to Schedule IV to that motion.  And we think that

8    when you look at what is in the protocol, it's really not

9    properly applied to the first liens.

10           And the reason we assert it now -- I heard the

11   objection that we could, in due course, raise these points

12   once we get document requests is (1) we think it's clear

13   from the face of the protocol; and (2) paragraph 5(g) of the

14   protocol, if ordered by the Court -- and we support the

15   protocol as a concept or the efficient management of these

16   cases and discovery of Legacy parties -- requires us to

17   search for and produce documents as expeditiously as

18   reasonably practicable, and given the sixty day time period

19   and the fact that there are ten clients among our group, as

20   a practical matter, upon receipt of discovery requests, we

21   will begin to incur substantial costs in responding to those

22   requests pending resolving their propriety at this time

23   which is the reason that we raised this issue now for the

24   Court's consideration.

25           Unless the Court has any questions, thank you,

1    Your Honor.

2                THE COURT:  Thank you.

3                MR. WEISFELNER:  Your Honor, may I just have one

4    minute, please?

5                THE COURT:  Yes, of course, Mr. -- oh, I'm sorry.

6    Let me hear from the debtor first, please, Mr. Weisfelner.

7                MR. MCKANE:  Thank you, Your Honor.  And for the

8    record, it's Mark McKane, Kirkland & Ellis.

9                Just a few comments.  We do believe that the

10   protocol is a step in the right direction.  We've spent

11   weeks, months really, negotiating this with the creditor

12   constituencies and we are prepared to move forward.

13               With regard to Mr. Weisfelner's presentation, we

14   recognize there was a disconnect between some of the points

15   he was making and the protocol itself.  And the debtors are

16   not going to engage in some tit-for-tat rebuttal, but we

17   just note that the discussion as it relates to taxes and

18   what information we've been providing is, frankly, highly

19   misleading.  We've just -- our tax professionals met with

20   his tax professionals for an hour and a half yesterday alone

21   on this issue.  So there's tax discussions going forward and

22   there'll be discovery of Legacy tax issues along this

23   protocol.

24               With regards to Mr. Shore's and Mr. Kerr's

25   comments, we want to emphasize that it took this long

1    because of how much effort we put in to get it right.  And

2    we are committed to doing it right.  Discovery has been

3    ongoing both with the committee's first lien investigation

4    as well as other motion -- and it will -- the vine will pick

5    up considerably.  We agree with that.

6           We recognize the sixty/ninety day schedules.

7    We're putting in there -- we're going to work with them on

8    that.  They've made a commitment to us that they will work

9    with us on the scope and the volume of materials and we'll

10   address the schedule as it comes.  And even in advance of

11   the protocol being ordered, we've already been moving

12   forward internally as we recognized in our last status

13   conference to be in the position possible to get the

14   material out there, to allow the creditors to assess the

15   situation so we can all move forward as expeditiously as

16   possible.  And to the extent that we need to continue to

17   work together with dates, we expect that we will be able to

18   do so.

19           THE COURT:  Okay.  Thank you.

20           MR. MCKANE:  Thank you, Your Honor.

21           THE COURT:  Mr. Weisfelner?

22           MR. WEISFELNER:  Your Honor, very briefly, and

23   just in response to comments by the first lien creditors.

24   Your Honor, paragraph 8 of our original 2004 application

25   read as follows:  "The restructuring agenda seems all too

1    clear and all too common.  The trustee" -- meaning

2    Wilmington Savings Fund Society -- "believes that management

3    and the senior lenders hope to be able to extinguish junior

4    obligations and will award themselves with new

5    (indiscernible) underpriced equity predicated on an

6    intentionally depressed valuation measured at a historic

7    industry trough.

8              "Collusion between management and senior lenders

9    to deprive junior creditors of due value is not novel but

10   neither should it be condoned."  And there were citations to

11   a number of treatise, one of which is entitled "The

12   Bankruptcy Discount:  Profiting at the Expense of Others in

13   Chapter 11".  And the other is Professor Gillison's

14   treatise, "Valuation of Bankruptcy Firms".

15             "It's a tragedy that, if lets them check, distorts

16   the reorganization process to inequitably allocate value

17   according to management's self-interested agenda."

18             You can sit here and talk about the impact on the

19   debtor and what the debtor did and whether the debtor

20   management took its foot off the operational gas pedal in

21   this case.  We talked about the difference between retail

22   sales and wholesale sales.  We talked about dispatching --

23   efficiently and effectively dispatching the power producing

24   methodologies here.  We talked about the business plan and

25   how it was structured the first day of the case.  We talked

1    about the SG&A of this debtor as compared to others in their

2    industry, other comparable companies, and suggested that

3    their SG&A margin were out of this world relative to

4    everyone else.

5          Now some people would argue that it's in the best

6    interest of management and senior lenders not to fix the

7    operational issues least you boost the reorganization value

8    and you have to share it with more people.  To suggest that

9    the first liens ought to be immune from any discovery

10   relating to the extent to which they may or may not have

11   participated in discussions with the debtors' management

12   with regard to various operational issues that may have

13   impacted valuation, to me, is just borderline frivolous.

14   And I request that Your Honor overrule their objection.

15         MR. SHORE:  Needs to address one thing in response

16   to the first liens' arguments.  Again, Chris Shore from

17   White & Case on behalf of the TCH unsecured noteholders.

18         The only thing that's being authorized pursuant to

19   the protocol is the discovery that fits within paragraph 1

20   scope of the order.  If the creditors' committee obtains

21   requests from people to seek documents in the first liens

22   and they decide to propound discovery to the first liens, it

23   doesn't fit within scope 1 of the order, it's not authorized

24   and they will have an objection.  In fact, the discovery

25   related to the cash collateral stipulations is expressly

1    carved out.  And then we can get into the debate.  But from

2    a structural perspective in trying to set a protocol from

3    which all discovery can be managed appropriately, giving one

4    party an exclusion now and not anybody else an exclusion is

5    the wrong way to do it.  It sets the order.  The first liens

6    don't have any objection to what the scope of the order is.

7    They just want a proviso, I guess, in paragraph 1 that says

8    "And no discovery from the first liens absent further order

9    of the Court".  Their ability to come in and protest any

10   discovery that doesn't fit within scope 1 is preserved.

11             THE COURT:  Thank you.  Mr. Kerr -- is it Kerr?

12             MR. KERR:  Yeah.  Your Honor, Charles Kerr of

13   Morrison & Foerster again on behalf of the official

14   committee.

15             Just two quick points, Your Honor.  One is, I just

16   want to make sure the Court is clear, we share Mr. Shore's

17   commitment to the other parties that we've taken on the

18   responsibility of tendering or preparing and propounding

19   this discovery and we'll take a reasonable approach to

20   hearing people's concerns both in terms of scope and timing.

21   It's very important, however, to us, Your Honor, as we try

22   to manage this whole process, is to have set framework in

23   which to work.  And the suggestion by the EFH equity owners

24   that they should get a different system where we kind of

25   wait to talk (indiscernible) works.  And so, we make that

1     commitment but we think the structure as it is now was the

2     most efficient and effective way of getting this done.

3               Unless Your Honor has anything further, I --

4               THE COURT:  I do not.  Thank you.

5               MR. EHRLICH:  Your Honor, may I be heard very

6     briefly?

7               THE COURT:  Yep.

8               MR. EHRLICH:  Andrew Ehrlich from Paul Weiss for

9     the record for the first lien -- TCEH first lien creditors.

10              Your Honor, I emphatically reject the suggestion

11    by paragraph 8 of Mr. Weisfelner's motion and his comments

12    at this podium that there has been collusion -- improper

13    collusion between my clients and the debtors.  And if there

14    is -- collusion of any kind.  And if, and hopefully soon,

15    there is a plan before the Court, it will, I believe, be

16    appropriate to take discovery of the first lien creditors

17    concerning whether there is any aspect of that plan that is

18    impure.  But again, when one looks at the -- remember the

19    2004 motion was directed to four parties:  the debtors, the

20    directors, the sponsors and then the first liens.  And when

21    one looks at paragraph 1, it's not really conceivable to us,

22    for instance, that it would be appropriate to take discovery

23    of the first liens about the solvency of the debtor at this

24    point in time.

25              THE COURT:  So you don't have a problem, right?  I

1    mean, if you're -- discovery against your client isn't in

2    paragraph 1 then you can raise the issue with me and you

3    won't have a problem.

4            MR. EHRLICH:  Okay.  Well, we're just trying to be

5    efficient about this because we'll just, I fear, be back

6    here again, unfortunately, relatively soon.

7            THE COURT:  Well, that'll happen again or if it

8    happens, it happens.  No.

9            MR. EHRLICH:  Thank you, Your Honor.

10            THE COURT:  You're welcome.  I'm thinking of

11    issuing a flurry of opinions, you know, once a year.  I let

12    people know what I think.  And I noted the other day, three

13    out of the last five have been discovery matters.  So it's

14    what we do.  It's part of the job.

15            I'm going to overrule the objection.  I think the

16    discovery protocol is well balanced.  Obviously, the result

17    of tremendous amount of effort and negotiating its terms.  I

18    think the terms are intimately reasonable.  I think

19    extensive discovery on the topics in paragraph 1 in this

20    case are inevitable.  I think discovery is appropriate and

21    necessary on these topics.  And it needs to get done and it

22    needs to get done sooner rather than later.  I think this is

23    actually a particularly appropriate time so that the

24    (indiscernible) the earlier case issues have another -- you

25    know, they dealt with or have fallen away based on

1    developments in the facts or perhaps rulings from the Court.

2    And as a result, I think this is actually at a particularly

3    appropriate time to get started on this discovery which will

4    be expensive and extensive but that's the way it's going to

5    be.

6              In connection with the particular objections

7    dealing first with timing, I think the sixty to eighty day

8    timelines sound appropriate to me.  It's hard to tell.  I

9    think counsel is correct how much effort is going to be

10   required until you get a specific document request.  I think

11   it'll be fair to say it'll be a lot and it'll be

12   challenging.  But we have sophisticated clients with large

13   sophisticated law firms who can throw the appropriate of

14   effort to reach these deadlines.  And I think it's

15   particularly important that the paragraph starts -- 5(h)

16   starts with "Unless otherwise ordered by the Court or by

17   agreement of the Parties".  So if those time frames don't

18   work and the parties agree, they can extend them.  If those

19   time frames don't work and the parties disagree, that's what

20   I'm here for.  There is a, I thought, a very nice letter

21   submission procedure setup to bring issues to the Court.

22   And I'll deal with them at that time, if appropriate.

23             To a certain extent, it's the -- the argument that

24   will -- we don't know if sixty to eighty days makes sense

25   because we don't know what we're going to be asked -- really

1     cuts, I think arguably, the other way.  Sixty to eighty days

2     is the baseline.  By the way, thirty is the baseline under

3     the rules, so we've already doubled it.  Sixty to eighty

4     days is the baseline and we'll see what happens based on

5     what's actually propounded.  So I don't think there's any

6     prejudice at all here.  And I think that the baseline dates

7     are appropriate.  So I'll overrule that objection.

8              In connection with allowing discovery to proceed

9     against the TCEH -- excuse me -- the ad hoc committee of

10    TCEH first lien lenders, again, I think that discovery, to

11    the extent it's covered by paragraph 1, is appropriate.  The

12    point -- to the extent it's not covered by paragraph 1,

13    again, there's a procedure in place to object to it and

14    bring it to the Court's attention.  I can't make a decision

15    as I sit here today because, again, we don't know whether

16    there will be discovery propounded against the ad hoc

17    committee and its members, I suppose, but I'll just say the

18    ad hoc committee without making any other commitments -- on

19    the topics covered by paragraph 1.

20             To the extent it's covered, I think that the

21    protocol should apply.  I think the discovery should

22    proceed.  And I think the terms are reasonable.  To the

23    extent discovery is propounded that's beyond that scope,

24    there's a procedure for bringing it in front of me and I'll

25    make a decision.  So I don't think anyone's prejudiced.  And

1    certainly not the first lien lenders are prejudiced by

2    approving the protocol.

3            I will say that I believe, given my -- without

4    committing or ruling, but I believe that there are going to

5    be at least some areas of discovery propounded against the

6    first liens to which is appropriately in the scope of

7    paragraph 1 and to which they'll probably have to -- and, if

8    so, that they'll have to respond.  It may -- it certainly

9    won't be the full -- I wouldn't expect it to be the full

10   panoply of topics that the debtor is going to have to

11   respond to.  But I do foresee that it's probably going to be

12   the case that there is going to be some discovery, perhaps

13   limited, that is appropriately going to proceed under the

14   protocol in the scope of paragraph 1 against the ad hoc

15   committee TCH first lien lenders.

16           But in the event, having said all that without

17   actually committing to that as a ruling, I will nonetheless

18   overrule the objection.  To the extent these issues arise in

19   the future, there is a procedure in place to raise them.

20   Hopefully, dealing with them then as opposed to now, we'll

21   actually have the facts necessary to make discreet decisions

22   on discreet issues and it won't be overly problematic.  But

23   we'll see what happens.

24           So the protocol, I thought -- I think is a very

25   good compromise.  I think it creates a reasonable baseline.

1    And there are procedural protections for all parties both as

2    to scope, burden, timing, et cetera, for which you can seek

3    relief from the Court or agreement of the parties.  And so

4    as a result, no one's really being prejudiced by this.  I

5    think -- I'm very pleased to approve it.

6              Mr. Kerr, do you have an order?

7              MR. KERR:  Your Honor, the form of the discovery

8    protocol has attached to it as exhibit a copy of the

9    protective order that has now been entered.  So let me

10   reassemble it, if I can, and submit it to you a little later

11   today, if I can.  I apologize.

12             THE COURT:  That's fine.

13             MR. KERR:  I just want to make sure it's in

14   complete form.  Thank you.

15             THE COURT:  So you want a signed copy of the

16   protective order --

17             MR. KERR:  If that's not --

18             THE COURT:  -- to be attached?  Yes.

19             MR. KERR:  That is correct, Your Honor.  Yes.

20             THE COURT:  We'll get a copy of that for you.  It

21   would be the non-docketed copy.  Is that okay?

22             MR. KERR:  That's fine, Your Honor.

23             THE COURT:  All right.  Then you can assemble it

24   and hand it up at some point during the hearing.  Thank you,

25   Ms. Werkheiser.

1          Bar date?

2          MR. HUSNICK:  Yes.

3          THE COURT:  Go ahead.

4          MR. HUSNICK:  Thank you, Your Honor.  Chad Husnick

5     from Kirkland & Ellis LLP, proposed counsel to the debtors.

6          Your Honor, as you said, the next item on the

7     agenda this morning is the debtors' motion to establish a

8     claims bar date.

9          Your Honor, this is what I believe fairly

10    customary in large Chapter 11 cases.  The debtors filed

11    their schedules and statements on July -- or, I'm sorry --

12    June 30th, 2014.  The debtors set a date -- seek to set a

13    date of November 26, 2014, which is thirty days longer than

14    was originally proposed.  And the debtors seek to set the

15    bar date to apply to all claims as that term is defined in

16    Section 101.5 and as that term has been interpreted by the

17    Third Circuit in its recent precedent.

18          Your Honor, nothing extraordinary here, although

19    in this case, I think things have become extraordinary even

20    when they're not extraordinary.  There's no need for

21    extraordinary relief.  In fact, this order probably could

22    have been entered ex parte under the local rules had we

23    followed that process.  Instead, Your Honor, we filed the

24    motion on notice to the committee, the U.S. trustee and all

25    other parties that file requests for relief -- or for notice

1    in these Chapter 11 cases.

2              We've received a single objection from the law

3    firm -- from various personal injury law firms, collectively

4    represented by a single law firm here in Delaware,

5    Montgomery McCracken.  That objection, Your Honor, and given

6    the tone of that objection, I believe I need to address a

7    few of the things that we spoke to in our reply in a little

8    bit more detail from the podium if Your Honor will entertain

9    that.

10             Before I address the merits of the particular

11   objections, I think it's important to step back in this case

12   and understand why this relief is customary in this case as

13   opposed to other particular Chapter 11 cases that are

14   littered throughout the pleadings filed by the personal

15   injury law firms.

16             This case is not going to be driven by asbestos

17   liability.  The debtors here did not manufacture asbestos.

18   We didn't produce products with asbestos in it.  We didn't

19   construct large numbers of buildings or sell building

20   materials that contain asbestos.  Instead, the asbestos

21   liabilities associated with these debtors are associated

22   with certain of the plants that contain some asbestos in

23   them and discontinued operations at predecessors of certain

24   of the subsidiaries of EFH that were acquired prior to the

25   Chapter 11 cases.

1            In total, there's less than 400 pending cases in

2     which a debtor is a named defendant.  In true asbestos cases

3     like W.R. Grace, for example, hundreds of thousands, tens of

4     thousands of cases are typically filed against those

5     debtors.  Here, we have 392 asbestos cases that were

6     scheduled against the debtors.  And while the claims number

7     a little bit above, closer to 800, it's largely because

8     there were multiple plaintiffs in those cases.

9            Your Honor, the obligations of these debtors to

10    continue to put this into perspective, are relatively small

11    given the size of these cases.  I think we've discussed in

12    the papers that the value of the assets and the liabilities

13    here range between 30 and 40 billion depending upon which

14    box you're looking at.  Here the asbestos expenses of these

15    debtors have exceeded five million in a single year and it

16    generally ranges between two and three million or less.

17           Why do I give all this background?  It's because a

18    Section 524(g) injunction, which is an extraordinarily

19    protective remedy the debtors may seek if they satisfy

20    certain procedural requirements, is very unlikely in this

21    case.  And the debtors instead, Your Honor, as is customary

22    in a case of this type even when there's potential asbestos

23    liabilities, are seeking to set a bar date.  That's what

24    they're entitled to do under the bankruptcy rules and that's

25    what they're entitled to do until well settled Third Circuit

1   precedent.

2          Your Honor, there's two principle arguments that

3   come out of the papers filed by the personal injury law

4   firms.  The first argument is effectively a request for a

5   blanket rule that a bankruptcy court can never set a bar

6   date for unmanifested claims.  They argue instead that

7   Section 524(g), again, the channeling injunction provision

8   implemented by Congress, is an exclusive remedy to deal with

9   future asbestos claims.  That argument is simply

10  incompatible with the Third Circuit's decisions in Grossman,

11  incompatible with the Third Circuit's subsequent 2012

12  decision in Owens Corning.  It's incompatible with the plain

13  language of 524(g).

14         Let me take each of those in order.  Grossman's,

15  Your Honor, I'm sure, is very familiar with, but Grossman's,

16  like this case, was not a Chapter 11 case -- I'm sorry --

17  was not an asbestos case.  It did not set a 524(g)

18  injunction.  Grossman's instead applied a general bar date

19  to all claims.  And in Grossman's, the Third Circuit

20  revisited its prior formulation for the test of what

21  constitutes a claim, abandoned the Frenville test and moved

22  on to the new test and effectively held that exposure to

23  asbestos pre-petition constitutes a claim and provides that

24  claimant with a claim that needs to be asserted in the

25  Chapter 11 cases.

1           The Court went on to rule, though, that it wasn't

2     making a determination on due process.  But rather than, as

3     the plaintiffs here -- or the plaintiffs' law firms are

4     asking this Court to do, establishing a blanket rule that no

5     future claimant could ever be afforded sufficient due

6     process, the Court remanded it to the district court for

7     further proceedings to determine whether, in fact, that

8     future claimant received due process.  And in so remanding

9     that case, the Third Circuit articulated a non-exclusive

10    litany of fact specific issues that the district court could

11    consider on remand.  Ultimately, it settled and that issue

12    was not dealt with.

13          But what's clear, the clear takeaway from

14    Grossman's, is that a bar date is appropriate for all

15    claims.  While the Third Circuit expanded the definition of

16    claim, it did not then subsequently say you could not afford

17    due process.

18          So, to me, Your Honor, this case is directly on

19    point.  If the Court had meant to establish this blanket

20    rule, as you can imagine, remand would not have been

21    necessary and they could have dealt with it.

22          The second case, Your Honor, is Owens Corning.  So

23    a couple of years after Grossman's.  I believe -- if I

24    remember correctly, Grossman's was a major shift in Third

25    Circuit precedent.  And then Owens Corning came along.  And

1    what the Court said in Owens Corning is it reiterated its

2    earlier ruling that exposure to asbestos pre-petition would

3    constitute a claim.  And then it expanded upon that a little

4    bit and said exposure post-petition pre-confirmation could

5    constitute a claim that could be dealt with in a discharge.

6         But it also went on to comment on the due process

7    concerns that were earlier articulated.  But yet again, in

8    that case, it did not rule on any kind of blanket rule.  In

9    fact, after specifically mentioning that publication can

10   generally be sufficient to satisfy the due process concerns,

11   the Third Circuit went on, in footnote 7, to explicitly

12   refuse to draw a bright line rule.  What the Court said is

13   it's not expressing an opinion on a broader issue of whether

14   discharging unknown future claims comports with due process.

15   And it added "In this vain, and consistent with our

16   statement that whether due process has been provided,

17   depends on the circumstances of a particular case.  Our

18   holding is not a bright line rule that all persons with

19   unknown future claims once governed by Frenville could not

20   have been provided due process regardless of the adequate

21   notice to those future claimants."

22        That, Your Honor, deals with this objection.  It's

23   also consistent with Section 524(g) in the plain language.

24   The argument that 524(g) is the exclusive way to bar a

25   future asbestos claimant just has no merit.  In fact, 524(g)

1    says that a Court may enter an injunction "in accordance

2    with this subsection to supplement the injunctive effect of

3    a discharge under this section".  Key words being "to

4    supplement".  The section supplements; it does not supplant

5    the discharge.

6             Your Honor, 524(g), and just to build on this a

7    bit, actually provides additional safeguards for a debtor

8    who ultimately chooses to pursue that route.  The due

9    process concerns that would otherwise need to be raised

10   post-hoc if a claimant comes forward that alleges that it

11   did not receive sufficient due process are otherwise dealt

12   with in 5214(g) by the future claims representative which, I

13   understand, the plaintiffs' law firms here intend to request

14   and indeed, I think, have requested that the U.S. trustee

15   appoint a future claims representative.  But that's not here

16   before us today.  Suffice it to say, we -- the debtors do

17   not believe that 524(g) is mutually exclusive of the

18   discharged injunction.  Congress certainly could have done

19   that if it wanted to do and it chose not to using the term

20   "supplement".

21            Your Honor, these specific issues have recently

22   been dealt with in the Delaware bankruptcy court, Judge

23   Walsh in particular, in the Specialty Products case.  In

24   that case, Your Honor, it was a bit of a procedural

25   quagmire, but what happened is the debtors and the asbestos

1    committee represented by Montgomery McCracken filed

2    competing claims of reorganization.  And the asbestos

3    committee's plan included a 524(g) injunction while the

4    debtors' did not.  Ultimately, the debtors argued that a bar

5    date was appropriate under both Grossman's and Owens

6    Corning.  Particularly, because it was unclear whether,

7    under the plans, a 524(g) injunction would result in that

8    case.

9         While a bar date order has not been entered in

10   Specialty Products, and I understand, as of yesterday, that

11   the parties ultimately settled to avoid the entry of a bar

12   date order, it's very clear and I think persuasive for this

13   Court to know, that Judge Walsh, on separate occasions that

14   we addressed in the copies of the transcripts attached to

15   our reply, ruled emphatically that Grossman's changed the

16   situation and that a bar date was appropriate.

17        Your Honor, the Fifth Circuit in Placid Oil

18   reached the exact same conclusion.  And that's 753 F.3d 151.

19        At bottom, Your Honor, I think it's crystal clear

20   here in the Third Circuit that unmanifested claims can be

21   subject to the exact same bar date as all other claims.  And

22   Grossman's and Owens Corning and the plain language of

23   524(g) lead to that result.

24        One thing I would emphasize, though, Your Honor,

25   is the debtors are not seeking here today to cut off due

1   process rights of plaintiffs.  We recognize that the amount

2   of process that we give to future claimants may in the

3   future be challenged as not having been sufficient.  That's

4   the way that Owens Corning came up.  That's the way that

5   Grossman's came up.  And that's the way I expect if a future

6   claimant comes up and asserts that they did not get

7   sufficient notice, it will come up in this case.

8           But what I would say, Your Honor, if you establish

9   a blanket rule, you abandon the Third Circuit's recognition

10  that there could be circumstances.  And again, this is all

11  in footnote 7, which I'm sure you can read probably better

12  than I did.  But in footnote 7, the Third Circuit

13  articulated circumstances in which a future claim could be

14  barred even in the absence of a specific notice to that

15  future claimant.  So they did not want to articulate a

16  bright line rule and that's not appropriate in this case.

17          Moving on from that first argument, I'll turn to

18  the second argument.  And I promise to everyone in the

19  courtroom, it'll be much shorter.  The second argument is

20  that the form of the notice and the proofs of claim

21  procedures that the debtor filed were insufficient in

22  particular to address claims of folks that have been exposed

23  and maybe sit but have not yet identified who the particular

24  Court (indiscernible).

25          Your Honor, we filed last night modified forms of

1    order and a modified form of notice that addresses many, if

2    not almost all, not all, of the specific requests from the

3    plaintiffs' law firms.  In particular, we added notice to be

4    served on the known creditors and their counsel.  We had

5    always intended on doing that.  It's just when we scheduled

6    it, we only scheduled the known creditors so we expanded

7    that out and made that clear.

8           We've made clear that the debtors will do

9    additional searches internally regarding the historical

10   employee records.  We've made clear that the debtors will

11   publish multiple times in newspapers where that's possible.

12   As you can imagine, some newspapers or some publications

13   that we were publishing in are only quarterly.  So we're

14   going to do, to the extent possible, we're going to publish

15   three times before the bar date.

16          And we made clear that there won't be any

17   automatic disallowance for wrong debtor claims.  Instead,

18   the debtors just reserved their rights to move the Court to

19   have the claim moved to the correct debtor to the extent

20   it's filed against the wrong debtor.

21          All of these various protections were inserted at

22   the request of the plaintiffs' law firms and I believe all

23   address the procedural concerns that the law firms raised.

24          But I just stop short -- one more time.  The

25   debtors are not seeking to foreclose due process.  And we

1      recognize that Your Honor's approval of the forms of notice

2      here today is not approval of the fact that we've given are

3      not a blessing of each individual claimant to the extent

4      they come forward in the future has received due process.

5               Your Honor, there's a couple of other smaller

6      objections, one that the plaintiffs' law firms received

7      insufficient notice of the bar date motion.  As I said, Your

8      Honor, we served the motion on the parties who have

9      requested notice in this case.  And we also could have done

10     this ex parte so I believe that that objection is without

11     merit.  In particular, the rule that the plaintiffs' bar

12     cites for having required notice to all creditors is

13     actually notice of the bar date itself.  And we will, of

14     course, under the terms of this Court's order, if you enter

15     the order, comply with that restriction.

16               And finally, the argument that setting a bar date

17     for future claims will impose an unreasonable administrative

18     burden on this case, again, I'll emphasize that these are

19     not asbestos cases.  But nevertheless, to the extent there's

20     a burden on this Court to deal with those claims, I think

21     that's what we're here for is to deal with all claims

22     against the case.  And if there's additional administrative

23     burden, we will have to deal with it.

24               With that, Your Honor, unless you have any

25     questions, I believe that this is -- and I'll circle back --

1    a very simple motion, not extraordinary, and we'd

2    respectfully request that the Court enter the order.

3              THE COURT:  Thank you.

4              MR. SCHEPACARTER:  Just briefly, Your Honor.

5    Richard Schepacarter for the United States trustee.

6              I just want to clarify one of the points that Mr.

7    Husnick may -- he indicated that there's been a request for

8    the United States trustee to appoint a futures rep in this

9    case.  That's not the case.  The actual request was for the

10   appointment of an official committee of asbestos creditors

11   in the case.  The future rep would again would be appointed

12   by the Court but the U.S. trustee is the party or the one

13   that would appoint an asbestos creditors' committee in this

14   case, if necessary.

15             THE COURT:  Okay.  Thank you.  Important

16   distinction.

17             MS. RAMSEY:  Good morning, Your Honor.  Natalie

18   Ramsey, Montgomery McCracken Walker & Rhoads on behalf of

19   five asbestos personal injury law firms from across the

20   country who, in turn represent asbestos victims who have

21   pursued claims against various of the debtor entities for

22   asbestos injury.

23             One of our clients, Your Honor, Robert Paul, is a

24   plaintiff's attorney, a named partner, at Paul Reich & Myers

25   from Philadelphia.  He is in the courtroom today to be

1    present because these issues are so important to the

2    asbestos bar.

3          The debtors contend that this is a customary bar

4    date motion and in other respects, that is probably correct.

5    But with respect to the asbestos claimants, this is an issue

6    of first impression.  Other than the decision made by Judge

7    Walsh, which never worked its way into an order, and I'll

8    get back to that in a second.  We're aware of absolutely no

9    court that has ever entered an order prospectively in a case

10   in which a debtor had no asbestos liabilities, where the bar

11   date was entered intentionally seeking to discharge and bar

12   those future claims.

13         The cases that had been decided that were

14   addressed by debtor's counsel and that are discussed in our

15   papers all dealt with circumstances where the debtors did

16   not know they had any asbestos claims or had not been

17   subject to ever having paid an asbestos award, or an

18   asbestos settlement, and did not anticipate future asbestos

19   claims as part of their bar date process.

20         They entered a bar date, and subsequent to

21   confirmation, a future claim arose.  That was the

22   circumstance in Grossman's.  Grossman's had no asbestos

23   history whatsoever.

24         Subsequent to confirmation, the question before

25   the Court was, when faced with the issue of a debtor, who

1    published notice, did the best that they could under the

2    circumstances without that knowledge, and it happened to be

3    the case that subsequently there was an asbestos creditor

4    who came to their knowledge was the bar date notice on its

5    face ineffective.

6              And the issue there that the Court dealt with was

7    or the result the Court dealt with was, well for that

8    creditor there are two aspects of this, when does a claim

9    arise, and the claim arises, the Court decided in Grossman,

10   bringing the Third Circuit into line frankly with every

11   other circuit in the country, the claim arises when the

12   individual has the nexus with the debtor.

13             But the second question is the due process

14   question.  Did that claimant receive due process, and that's

15   the issue the Third Circuit remanded on in Grossman's.  But

16   with respect to the Court's decision that there could be a

17   bar date in the Grossman's case, the bar date didn't

18   contemplate this.

19             That's why we were so concerned when we saw the

20   bar date motion, there was an absolute lack of notice that

21   was calculated to make asbestos creditor or their

22   representatives or frankly the Court aware of the debtor's

23   intention to cut off the rights of asbestos creditors that

24   they know would assert claims in the future.

25             The creditors are unique in asbestos, as I know

1    the Court has experienced with asbestos bankruptcies before.

2    But the latency period for asbestos injury can be 20 to 50

3    years, and the most recent estimations that have been

4    conducted in the asbestos bankruptcies have been, and the

5    decisions accepted by the Courts have been that asbestos

6    injury will continue to manifest until 2049 or 2050.

7            For the first time in court this morning, I heard

8    the debtors give some numerical statistics on their history

9    for payment of asbestos claims.  And just assuming 35 years

10   of paying the same volume of claims that they've paid in the

11   past, I came up with the back of an envelope math of between

12   70 to $175 million of liability that the debtors would be

13   anticipated to have over the next 35 years.

14           In this bankruptcy, that may be a very small

15   amount of the total debt, but to the asbestos creditors who

16   are the victims, that's a significant amount of money, even

17   -- and that's not an estimation decision, Your Honor.  The

18   fact is that when asbestos claims have been estimated in

19   other cases, what the estimation experts have discovered is

20   that the future claims are going to be four to five times

21   what the past history has been, in terms of escalating over

22   time.

23           And that's largely because the asbestos creditors

24   have not pursued asbestos defendants like the debtors in the

25   numbers that they had when the primary asbestos

1    manufacturers were still in the tort system and paying

2    claims.

3            But with the absence of those companies and the

4    declining payment percentages in those trusts, the bar has

5    begun to pursue other entities that had asbestos liability,

6    but had either been smaller scale asbestos defendants, or

7    asbestos defendants and/or asbestos defendants like this --

8    these debtors, where there had been so many different

9    corporate changes, that it was very difficult to trace

10   through the corporate history and the asset transfers and

11   identify which of the entities actually had liability for

12   which of the asbestos injuries.

13           As a result, there was a very real threat that

14   this issue could have been missed altogether.  The official

15   committee appointed in the case was appointed at a time when

16   the debtors had announced their intention that legacy

17   asbestos liabilities would pass through the case unaffected.

18           And as a result, the official committee had been

19   appointed with no asbestos representative.  It contains only

20   institutional creditors in the PBGC.  Now, that the debtors

21   have changed course, and have determined that they're going

22   to attempt to bar these claims, they've also moved on such

23   an accelerated time frame that there's been very little time

24   for the representatives of those creditors to react.

25           So it's not our intention, it was never our

1   intention to come into this case and to try to divert

2   attention away from the financial issues that caused these

3   companies to seek bankruptcy relief in the first place, or

4   to try to turn this into an asbestos bankruptcy case.  But

5   we were put in a position where we had no choice once this

6   bar date motion was filed, but to come in, highlight these

7   -- attention to these issues, and to make a request of the

8   U.S. Trustee for appointment of a separate asbestos

9   committee.

10          Because we're only five law firms, and we don't

11   represent generally the interest of all asbestos creditors,

12   what we'd ask today is that the Court carve-out from the bar

13   date motion the asbestos issues, and defer consideration of

14   whether or not to enter an asbestos bar date until after the

15   United States Trustee's office has an opportunity to

16   consider our request for appointment of a special committee,

17   and then hopefully, address that issue at a time when there

18   will be a representative who can speak to this issue.

19          But the bar date motion implicates very serious

20   constitutional rights.  And even with respect to the

21   manifested claimants that exist, but have not asserted a

22   claim yet against the debtor, there are very serious,

23   complicated, and fact specific issues that have to be

24   addressed with respect to the requirements of providing

25   adequate notice to those parties, and the timing for the

1    provision of notice.

2          We don't have the facts before us today to address

3    those issues.  I can highlight for the Court some of the

4    concerns that we have, however, based upon the asbestos

5    notice that the debtor has now proposed as part of Exhibit

6    5, that was added in part, in response to our objection.

7          The notice provided doesn't identify -- it

8    purports to bar anyone who in the course of their employment

9    by one or more of the companies listed below, and provides a

10   long list, including as a contractor or someone who worked

11   in a power plant, owned, operated, designed, or constructed

12   by one of those debtors or their predecessors, we don't know

13   who the predecessors are.  How is the average individual to

14   know who -- which entities constructed or designed or

15   operated which plans?

16          The notice considerations are very complicated,

17   and in other cases where there has been a bar date that has

18   addressed asbestos related claims, the noticing that has

19   gone into it, the notice plans have been complicated, and

20   they have been carefully considered by the Court.

21          Getting back to Specialty Products, although Judge

22   Walsh had concluded that he believed that a bar date order

23   could be entered with respect to future claims, and that was

24   a hotly contested issue, and had that proceeded to an order

25   I think would have been appealed almost certainly by both

1       the committee and the SCR.

2               That order never was entered in part because Judge

3       Walsh was so concerned about the adequacy of notice, and had

4       required the parties to engage in a mandatory meet and

5       confer and it held a couple of hearings on the precise

6       notice to be given.

7               The reason I say this is an issue, therefore, of

8       truly first impression is because there has never been an

9       order entered that purports to bar future claims and

10      addresses what the provision would be for due process in

11      order to do that.

12              So this would be the first time that a Court would

13      get there, and as debtors' counsel said, there was a

14      settlement that was announced, it was actually announced a

15      couple of weeks ago, the Court was made aware of it, but the

16      first omnibus hearing before Judge Walsh to discuss the

17      settlement was yesterday.  The case was not settled as

18      debtors' counsel said to avoid to impact of the bar date.

19      There were a lot of issues in the case, including an

20      estimation decision for $1.1 billion that was on appeal.

21      But the case did settle in principle, and we are working

22      together toward a consensual plan.

23              So the bar date order will never be entered, and

24      the Court will never get to the consideration of -- even

25      under the judge's opinion that a bar date could be entered,

1    what would be required by way of notice in order to do that.

2            So, Your Honor, our first request would be to

3    defer this issue until after a committee is considered, and

4    if the Court is -- would prefer to go forward today, then I

5    would like to have an opportunity to address the further

6    specifics of our objection.

7            THE COURT:  Okay.  Thank you.

8            MR. HUSNICK:  Your Honor, again, Chas Husnick from

9    Kirkland & Ellis, I'll be very brief.

10           As a preliminary matter, I think the facts here

11   are even better, we know that there's potential asbestos

12   liability.  We followed the objection of plaintiffs' law

13   firms and beefed up the notice to an attempt to address any

14   due process concerns.

15           We're not seeking a ruling, as I said before, from

16   the Court on appropriate due process, and I think that would

17   be inappropriate for us to try and free bless what an

18   individual party is going to get as due process.

19           As for delaying the hearing on this, I think it's

20   inappropriate to set it aside, because that's some sort of

21   recognition that we may not ever have a bar date on this

22   issue.  A bar date is entirely appropriate for all claims,

23   that's what the Bankruptcy Code says, that's what Owens

24   Corning said, and that's what Grossman said, all claims, as

25   that term is defined under 1015.

1            So there's no need to further delay this.  We're

2    happy to work, once we have a bar date set with providing

3    any supplemental notice to the extent that the plaintiffs'

4    bar wants to comment to the stuff we've already provided,

5    but we don't think it's necessary at all to delay and wait

6    until there's an appointment on a committee to rule on

7    whether there's a blanket rule against bar dates, which I

8    submit, there clearly is not.

9            Your Honor, unless you have any further questions,

10   I'll rest on our papers and our original argument.

11           THE COURT:  Yes?  Any -- let me make my

12   preliminary ruling.

13           UNIDENTIFIED:  Yes.

14   *       THE COURT:  I think and I find that under

15   Grossman's and Owens Corning that these are asbestos claims,

16   and by that I mean, claims that as of the petition date

17   individuals have had, as you said, a nexus or been exposed

18   to asbestos, even if the disease has not yet manifested

19   itself.  Those are claims, they're prepetition, general

20   unsecured claims.

21           We can argue all day about whether the involuntary

22   tort claim should be general unsecured claims, but as the

23   law exists, they are.  As such, I think that use of a bar

24   date to require claimants to make those claims, and put them

25   before the Court, is appropriate.

1              However, these are special claims, this isn't

2    someone who's provided goods or services to a debtor under a

3    contract, and has knowledge of what it's owed and why it's

4    owed.  These are third party tort victims who may have no

5    idea, as they sit here today, whether they have a claim

6    against one of the debtor entities and whether or not they

7    worked for or worked at a plant that involved a debtor

8    entity.

9              So while a bar date is appropriate, the

10   documentation and notice as it deals with these types of

11   involuntary tort creditors is particularly important.  And

12   I'm -- we're going to address that in just a minute.

13             Having said that, I want to make it clear that

14   setting a bar date is just one set.  I'm not making any kind

15   of position as to whether a discharge would be appropriate.

16   I'm not approving or not approving a plan that deals with

17   these claims, it very well may be that these claims

18   ultimately are required or voluntarily passed through

19   unaffected by a plan, I don't know.

20             Today is dealing with a bar date, and requiring

21   filing of claims, for among other reasons, to give the

22   debtor a concept and the Court a concept as to what the

23   universe of claims might or might not be.

24             As such, and the debtor made this point, but to

25   make it again, you know, objections to discharge or any kind

1    of injunction, or any kind of discharge in a plan are fully

2    preserved.  Individual claimants' due process rights in the

3    future are fully preserved.  No provision whatsoever is

4    being asked for in connection with future claimants, parties

5    that may be exposed on a post-petition basis to whenever.

6    And, of course, there is no future claims rep that has been

7    appointed in the case, and no one's -- none's been asked

8    for.

9            Having said all that, that turns us to, you know,

10   what's the appropriate way to do this.  And before we get

11   into the specifics of what's been proposed, I have to say

12   that preliminarily, the debtor dealt with many of the issues

13   that were identified.

14           Fundamentally, though, I have a problem with

15   meshing an asbestos personal injury claims' notice and

16   claims process with the general claims process.  While I

17   applaud and appreciate the attempts to glom on the asbestos

18   language and notices to what has been proposed with the

19   general claims bar date, I have concerns.  I don't think

20   that'll work.  I think you need a separate notice for

21   asbestos, personal injury claimants.

22           Also, while the bar date has been extended out

23   until late November, the notice goes out in five days I

24   think, five business days from entry of the order to all the

25   claimants, but it also provides a 30-day process for the

1    debtors to identify and send out notice to the asbestos

2    claimants, which in effect reduces the bar date notice

3    period to more along the lines of 50 to 60 days.

4         And while that might be appropriate it seems a

5    little tight, and it's certainly tighter than everyone else

6    is getting.  And I think arguably, just the opposite might

7    be the more appropriate way to proceed.

8         So what I'm prepared to do today is approve the

9    originally requested bar date carving out the asbestos

10   issues for a separate notice and procedure.  And I think

11   that further discussions with the objector would be fruitful

12   in coming to an agreed bar date notice.

13        I'm not going to make any requirement that the

14   debtor wait until the U.S. Trustee makes a decision one way

15   or the other on the appointment of an official committee of

16   asbestos claimants, and I am in no way offering any kind of

17   input into whether I think that's appropriate or not.  That

18   is not my call, and I'm not going to say any more about

19   that.  Usually I talk too much, so I'm not going to say any

20   more about that.

21        So I think in connection with sort of the follow-

22   up objections you have as to what's been proposed, we can

23   either put them on the record now or you can continue to

24   negotiate, and we can come back at a later date if there are

25   further issues.

```
 1              But I am going to require a separate notice
 2    procedure for asbestos personal injury claimants, apart from
 3    the general procedure for general claims that was submitted,
 4    which I -- is uncontested, and I am happy to approve.  If
 5    that makes any sense.
 6              MR. HUSNICK:  That makes complete sense, Your
 7    Honor, and I take full blame for it because it was
 8    originally drafted as two separate and I told the associates
 9    and they could (indiscernible) so -- well, I'm one.
10              THE COURT:  Well, I blame the associates, don't
11    you?  I'm looking at one.
12              MS. RAMSEY:  Your Honor, we would like the
13    opportunity to come back and if we're --
14              THE COURT:  Let's carry this -- can we carry this
15    to September 4 which I think is our next omnibus?
16              MR. HUSNICK:  That's correct, Your Honor, and I
17    don't think there's much on the (indiscernible).
18              MS. RAMSEY:  Would we have an opportunity, Your
19    Honor, at that time, if necessary, to present evidence?
20    Will the Court take evidence at that hearing or can we make
21    a request?
22              THE COURT:  You can make a -- if appropriate, I'll
23    always hear evidence.  Whether or not it's appropriate or
24    not, I'll defer a decision until I hear why we need it.
25              MS. RAMSEY:  Okay.
```

1          MR. HUSNICK:  I just ask, Your Honor, that we want

2     move on to the merits but that's (indiscernible) had an

3     opportunity.

4          THE COURT:  My ruling is that a bar date is

5     appropriate.

6          MS. RAMSEY:  And, Your Honor, just as -- to

7     clarify, I believe I understood the Court to say that your

8     ruling is that a bar date is appropriate but the Court is

9     not ruling that -- on the due process issues in conjunction

10    with that ruling.

11         THE COURT:  Well, the due process issues that

12    individual claimants might assert at a future time.  If I'm

13    going to approve of -- if I approve a bar date procedure,

14    inherent in the approving any kind of procedure is I think

15    it's consistent with due process.

16         MS. RAMSEY:  And that was exactly where I was

17    going and I hadn't gotten to that part of my argument, Your

18    Honor, because I was looking to -- I was hoping that the

19    Court might defer for another representative so although I

20    did hear the Court rule and I don't want to belabor the

21    point, I would like to make a little bit additional argument

22    on that --

23         THE COURT:  Sure.

24         MS. RAMSEY:  -- implicit issue because I do think

25    that it is problematic.  I believe that both Grossmans and

1    Owens Corning did not address this issue.  They did not

2    address the issue of whether you can provide adequate due

3    process notice to individuals who don't know that they are

4    harmed when your notice is --

5              THE COURT:  We do that with other tort claimants

6    or we can do that all the other time when the Court like --

7              MS. RAMSEY:  And I agree with that, Your Honor.  I

8    absolutely agree that publication notice can be sufficient

9    for unknown claims.  The difference with future claims is

10   that future claimants have no injury and even if they went

11   to a medical specialist today, they couldn't be diagnosed.

12   So they're completely unknown to themselves as well as to

13   anyone else.  The debtors can't identify them but they can't

14   identify themselves.

15             THE COURT:  Oh, you know, what, I understand your

16   position and I will defer decision on this until we re-meet

17   in September.

18             MS. RAMSEY:  Thank you, Your Honor.

19             THE COURT:  I understand your argument and I'd

20   like to think about it.

21             MS. RAMSEY:  I appreciate it.  Thank you.

22             THE COURT:  And all parties' rights are preserved

23   in connection with making that argument.  Okay?

24             MR. HUSNICK:  That's a -- that's fine, Your Honor.

25   I just think we're re-litigating the same things.  There are

1    governments that can't give due process --

2              THE COURT:  Well, I think there's --

3              MR. HUSNICK:  -- it can't be done and that's what

4    the Court expressly said.  I don't think there needs to be

5    any more argument or evidence.

6              THE COURT:  Right.  We'll talk about it further on

7    the 4th and I am concerned about it and this isn't meant to

8    be pejorative either.  I don't want to get jammed on these

9    issues --

10             MR. HUSNICK:  I agree.  Understood.

11             THE COURT:  -- especially since I'm going to

12   bifurcate them out.

13             MR. HUSNICK:  Understood.

14             THE COURT:  So there's no rush to judgment.

15             MR. HUSNICK:  Okay.

16             THE COURT:  Okay.

17             MR. HUSNICK:  Thank you, Your Honor.

18             THE COURT:  So if you want to sort of carve back

19   to an -- to whatever you think would be appropriate for a

20   bar date notice that carves out all the stuff you added for

21   the asbestos as well as makes it -- as well as carves them

22   out of the -- make sure they're carved out.  I think we

23   should carve them specifically out of the --

24             MR. HUSNICK:  Of the definition of claim.

25             THE COURT:  Yeah, the definition.

1          MR. HUSNICK:  Okay.

2          THE COURT:  And, with those changes, you can

3     submit that or COC and I'll sign it.

4          MR. HUSNICK:  We had added the 30 days to

5     accommodate the grabbing of the names.  Given that the

6     original request was for the 30 days earlier, can we stick

7     with that bar date?

8          THE COURT:  Any objection?  Yes, you can.

9          MR. HUSNICK:  Thank you.  Okay.

10          MR. MCKANE:  Your Honor, I think that's all we

11     have on the agenda for today.  Oh, and, I'm sorry, there's

12     one other marking --

13          THE COURT:  Was there -- right.  Somebody's got a

14     jump rope here.

15          MR. MCKANE:  Sorry about that.

16          THE COURT:  Before we -- we're going to do two

17     things.  We're going to take a break before we turn to that

18     although a short one and I'm going to back up a minute on

19     the confidentiality agreement and stipulate a protective

20     order.  When I looked at it again -- well, I have --

21     actually, when Ms. Werkheiser (ph) looked at it and pointed

22     it out to me, what you handed up has no signatures on it for

23     the stipulation part.  So I don't know how I approve a

24     stipulated order without stipulated signatures and we can

25     either -- you can either do S slashes if you have people's

1    agreements or you can have them sign but I don't see if I --

2              MR. MCKANE:  I may pass the hat, Your Honor, if I

3    could take it to get back to -- get the actual signatures of

4    those people who are here in the courtroom?

5              THE COURT:  Yeah.  Here it is.  We've marked the

6    pages and once it's all fully executed or people decide not

7    to sign onto it, as I mentioned earlier, I'll get copies

8    made and you can attach it to the discovery protocol order.

9    Okay?  Let's take say ten, 15 minutes before we turn to the

10   next, final matter.

11        (Recess at 11:42 a.m.)

12              THE CLERK:  All rise.

13              THE COURT:  Please be seated.  Are we good on the

14   signatures?

15              MR. KERR:  Your Honor, Charles Kerr, official

16   committee.  We've got all signatures but two --

17              THE COURT:  Okay.

18              MR. KERR:  -- and so I don't know whether Your

19   Honor is comfortable entering it as it is without those two

20   additional signatures and they can sign on by the choice

21   when they -- or how you'd like to proceed.

22              THE COURT:  Well, I'd prefer to have a complete

23   document.

24              MR. KERR:  Okay.  So it's --

25              THE COURT:  Who are we missing?

```
1              MR. MCKANE:  Your Honor, we will undertake to get

2      those signatures today.  Specifically, the two parties that

3      we do not have are Tom for the two CH First Lien credit

4      agents and Evercore and we'll get those two back.

5              THE COURT:  Okay.  Thank you.

6              MR. MCKANE:  Excuse me.

7              THE COURT:  And now you can just send it over.

8      You don't need to COC.  Once it's complete, you can send it

9      over.

10             MR. MCKANE:  Very good.

11             THE COURT:  And then you can just -- you already

12     have my signature on it so when it's complete, just make a

13     copy, give it to Mr. Kerr and he'll have a complete document

14     he can send me.

15             MR. MCKANE:  We'll do that, Your Honor.

16             MR. KERR:  We'll work together.

17             THE COURT:  All right.

18             MR. MCKANE:  Thank you.

19             THE COURT:  Very good.

20             MR. PEDONE:  Good afternoon, Your Honor, Richard

21     Pedone on behalf of American Stock Transfer Company

22     indenture trustee for the unsecured notes at EFH Corp.  With

23     me is my partner, George Skelly, whose pro hoc papers are

24     pending so ahead of the bar.

25             Your Honor, the relief that the indenture trustee
```

Page 100

```
1    seeks is extraordinarily narrow.  We're looking for the

2    appointment of a first creditors' committee for a debtor

3    that does not have a committee.  The notice of appointment

4    with the asterisk makes it clear that no committee has been

5    appointed for EFH Corp.  As noted in our papers in a letter,

6    the U.S. Trustee initially indicated that they would solicit

7    for a committee for EFH Corp.  U.S. Trustee has reversed

8    course and now seeks additional time to evaluate the

9    situation.

10             U.S. Trustee won't commit to appointment to a

11    committee or the entry of an order requiring a committee for

12    EFH Corp.  Your Honor, the order that we're seeking is

13    pursuant to the plain language of 1102(a)(1).  It's an order

14    mandating the appointment of a committee to act as a

15    fiduciary and represent the interests of the unsecured

16    creditors of the EFH Corp. where not currently represented

17    by a committee.  At this time, we're not seeking any order

18    related to the composition of that committee.

19             While American Stock Transfer remains willing to

20    serve, we're not seeking at this time an order requiring

21    that we be appointed to the committee.  While the law

22    mandates that a committee with duties to all EFH unsecured

23    creditors be formed, issues regarding its composition,

24    except for the timing of that composition, remain with the

25    discretion of the U.S. Trustee in the first instance.
```

1          The asterisk footnote in the notice of appointment

2     leaves no question.  To date, there is no fiduciary

3     representing the interests appointed as a committee to EFH

4     creditors and the issue is now one of statutory

5     interpretation.

6          THE COURT:  Well, you'd agree with me, wouldn't

7     you, that, obviously, claim meaning is one thing but it has

8     its exceptions and that the Office of the U.S. Trustee does

9     not appoint committees in all Chapter 11 cases?  For

10    example, if no committee can be formed, the law doesn't

11    require the U.S. Trust -- Office of the U.S. Trustee to, you

12    know, appoint a committee of zero, appoint a committee of

13    one, I have discretion whether or not to appoint a

14    committee.  So it's not an absolute dictation by the statute

15    that in every Chapter 11 case, there must be an official

16    committee of unsecured creditors.

17         MR. PEDONE:  See, Your Honor, I believe it

18    actually is an absolute dictate by the statute that a

19    committee be appointed.

20         THE COURT:  Then how do you explain cases where no

21    committee is formed because no one wants it to be formed?

22         MR. PEDONE:  So in the first instance, we have a

23    statutory mandate that the United States Trustee take the

24    actions to form a committee.  We then have a very narrow

25    exception, statutory exception, showing us Congress thought

1       about what exceptions would be appropriate.  They carved out

2       small businesses.  Here, we have a situation where the

3       United States Trustee initially solicited the top 50

4       consolidated creditors for approximately 70 debtors.  Then a

5       few days before the formation meeting, notice went out to

6       the top 20 of certain other debtors and three days after

7       that notice went out to the top 20 of the certain other

8       debtors, the United States Trustee conducted the formation

9       meeting and issued its rule, its -- issued its decision

10      inserting the footnote.

11              I would submit that on those facts as laid out in

12      the U.S. Trustee's motion, that is not appropriate

13      solicitation for a committee in a case of this size.  The

14      statutory exception applies to small businesses.  We're at

15      the opposite end of a small business and I would submit if

16      it's -- if impossibility, a finding of -- an exception of

17      impossibility is surely built in to statutory mandates but

18      that burden must rest with the United States Trustee to

19      explain the steps that they took and those steps must be

20      reasonable and let them prove that impossibility provides

21      them with an exception and here we sit today some 30 --

22      nearly 30 days after the request was made that a committee

23      be appointed.  In most cases, within ten days, a committee

24      is appointed.  Here we are 30 days after the request and

25      three months into the case and there is no committee.

1          We're also, Your Honor, ten days after,

2     approximately 13 days after, the United States Trustee

3     stated that they would begin soliciting.  Now, solicitation

4     is different from appointment.  There is nothing in the

5     record to indicate that the United States Trustee has

6     actively agreed to commence soliciting to see if it's

7     possible -- re-soliciting to see if it is possible to form a

8     committee.  They simply are not in the process of

9     soliciting.  There's no notice pointed on the U.S. Trustee's

10    website saying that solicitation is currently taking place

11    to make their decision in the future.  There's no way for us

12    to send a notice out through DTC saying that the United

13    States Trustee is conducting a process, please express your

14    interest.  We're talking about a situation where the face

15    amount of the debt is 1.9 billion.  The majority --

16          THE COURT:  What about the -- what about this

17    question and --

18          MR. PEDONE:  Sure.

19          THE COURT:  -- this is a question of, I guess,

20    diminishing returns.  Who are we seeking to protect in the

21    concept of appointing general unsecured creditors?

22    Obviously, the underlying policy behind it is that you might

23    have a diverse group of creditors all of whom are owed a

24    relatively small amount in the greater scheme of things and,

25    as a result, don't have a financial incentive to participate

1    on their own in to protect their rights on their own.  So we

2    have a setup here where we appoint an official committee of

3    unsecured creditors to have one party which has both the

4    fiduciary incentive and also the financial wherewithal by

5    getting paid on the back of the debtor to protect the rights

6    of all general unsecured creditors.  All right.  Well, here

7    we have a situation where, I don't know, the math is a

8    little -- whether it's 85 or 90 percent but the super

9    majority of creditors at the EFH Corp. level are already

10   represented by counsel, sophisticated counsel, and have been

11   very active in protecting their rights and the indenture

12   trustee is actively involved in the case and serving

13   appropriately under the terms of its indenture and within

14   its scope as defined by the indenture doing what it needs to

15   do to represent these holders.  And unless I'm mistaken, the

16   only unsecured creditors at EFH are the note holders.  So

17   the entire universe of general unsecured claims at EFH are

18   already represented.  So does it make sense to force a

19   committee to be formed to represent people who are already

20   represented when the entire point of a committee is to

21   represent the unrepresented?

22        MR. PEDONE:  So, Your Honor, that drives at the

23   question of is there currently adequate representation.  So,

24   first, our position is that the existing -- there is no

25   existing committee with a fiduciary duty.

1          THE COURT:  No, I don't think it goes to adequate

2     representation, it goes to whether to require a committee to

3     be formed in the first place.  Let's posit a situation --

4          MR. PEDONE:  Sure.

5          THE COURT:  -- which I think it's fair to say is

6     EFH has no creditors today.  So the question isn't whether

7     we appoint an additional committee that would cover EFH, the

8     question is do we -- do I require the appointment of an EFH

9     committee and my question is and whether or not to require

10    an appointment -- and, again, you can rely on plain meaning

11    but there are exceptions to the plain meaning.  One of them

12    is absurd results, is it absurd to appoint a committee on

13    the back of the debtor's finances to represent parties that

14    are already represented?  What's the point?

15         MR. PEDONE:  I appreciate the question.  So, Your

16    Honor, that requires examining who the parties are and the

17    facts of the case.

18         THE COURT:  No, the factual issue.

19         MR. PEDONE:  Factual issues of the case which I --

20         THE COURT:  They're not -- and your response to

21    that would be we have no idea what the factual basis is

22    because the Office of the U.S. Trustee has never -- you

23    know, I don't know if they're required to but they've never

24    explained why they didn't form a committee to cover the

25    entire universe of the debtors.

1          MR. PEDONE:  But I think you're correct that it's

2     worth addressing the question of why a committee and do the

3     existing parties do the trick in these circumstances,

4     whether it's the indenture trustee, Fidelity or the existing

5     ad hoc group.  So committees' members have fiduciary duties

6     that don't change.  They don't get off the hook on their

7     fiduciary duties while they serve.  Ad hoc groups, including

8     a large holder who, under the RSA and the facts of this case

9     as explained in the Keglevic affidavit, has interest in

10    other part of the case and it's clearly balancing.  So

11    Fidelity is balancing interests and so I don't believe that

12    they serve as a substitute.

13          THE COURT:  So your answer would be well, we know

14    that, for example, Fidelity owns debt throughout the capital

15    structure and they could, arguably, make decisions as EFH

16    note holders that really don't go to the maximization of

17    their position as EFH note holders but go to the

18    maximization of their position in general in the panoply of

19    debtors that exist and that they own debt at different

20    structures.  So you can't rely on Fidelity to represent the

21    interests of general EFH note holders as a whole because

22    they might be taking positions that are good for them

23    because they own debt and other pieces of the structure but

24    might not be good for EFH note holders.  Okay.  I get that.

25          MR. PEDONE:  And that is -- that --

1          THE COURT:  Fidelity is not a fiduciary for

2     anybody else other than Fidelity and the ad hoc committee

3     represents the ad hoc committee members but I think my point

4     would be -- and you represent your holders as defined in

5     your indenture.  My point would be at that point, you don't

6     need to represent the group as a whole because every member

7     of the group is represented individually and is able to make

8     decisions based on its individual financial position and you

9     don't have to form a group as a whole --

10          MR. PEDONE:  So what's --

11          THE COURT:  -- because everybody -- you don't need

12     somebody to represent the interests of the greater good when

13     everybody encompassed in the greater good is looking after

14     themselves.

15          MR. PEDONE:  And, Your Honor, we identified two

16     individuals' withholdings who, based upon my understanding

17     of the size of their holdings, couldn't afford to play the

18     game the way the game is being played here and deserve a

19     fiduciary and all holders unless, even occasionally when

20     they're sitting on a committee, end up remaining free to

21     trade and there's a consistency of representation of

22     unsecured creditors that a creditors' committee serves in

23     the process.

24          THE COURT:  So let me ask you this -- okay.  Let

25     me ask you this question, why should I -- if I'm going to

1    say that the Office of the U.S. Trustee has not complied

2    with 1102(a)(1) because it has not appointed a committee for

3    all debtors, it has only appointed a committee for some

4    debtors and all debtors have to have a committee so these

5    currently unrepresented debtors need a committee but you

6    don't want a committee for everybody on the E side, you just

7    want a committee for the EFH note holders or the EFH

8    unsecured creditors alone.  If I'm going to require the

9    trustee to represent you, don't I have to require the

10   trustee, under your argument that it's a mandate that nobody

11   can get around, doesn't the order have to say you need to

12   appoint an E side committee or expand -- and I know the

13   official committee's position on the T side is that that

14   would be inappropriate but do you have to expand the

15   committee you already have or do I have to require them to

16   form a committee for everybody that's unrepresented and that

17   goes beyond EFH.  That's the whole E side of the equation.

18   What would your position on that be?

19           MR. PEDONE:  Your Honor, my position is we're the

20   only ones requesting it and where no party is requesting

21   that other aspects of the statute be enforced --

22           THE COURT:  Well --

23           MR. PEDONE:  -- and I realize Your Honor will

24   completely concede the difficulty of making that point but I

25   am also sensitive to the practicality of the issues that

1    you're driving at but that is the one factor that I can

2    point to.  We are the only ones requesting it and where it's

3    being requested, I believe it has to happen.

4              THE COURT:  Well --

5              MR. PEDONE:  So I'm not ignoring all of those

6    cases that we have all seen where a committee does not get

7    appointed.  So I'm not taking a position on whether EFIH

8    needs a committee.

9              THE COURT:  Sorry, I've lost my notes.  Okay?

10             MR. PEDONE:  It's okay.

11             UNIDENTIFIED MALE SPEAKER:  Well, isn't it true

12   that UMB kind of maybe supports the appointment of a

13   committee?

14             MR. PEDONE:  Your Honor, as UMB can't speak for my

15   client, I can't speak for UMB either.

16             THE COURT:  Okay.  I don't have any -- do you

17   have anything?  I don't have any further questions.

18             MR. PEDONE:  Let me just briefly look through my

19   notes, Your Honor.

20             THE COURT:  Yes, go ahead.

21             MR. PEDONE:  I got most of the points out of

22   order.  (Pause.)  Your Honor, the only final point that I'd

23   like to comment is on this, we don't believe the issues of

24   motive are at all relevant or there's a need for any fact

25   discovery on this.  We really do believe it's a narrow legal

1    issue.  I'd like to be able to respond --

2              THE COURT:  Well, that's the UMB point, right,

3    that it's a -- your client also has a charging lien as

4    indenture trustee?

5              MR. PEDONE:  We do under all of our indentures,

6    yeah.

7              THE COURT:  Right, and so you're going to get --

8    pay your fees, it's just a timing question but you're not --

9    your position isn't, you know, the alternative to forming a

10   committee, it is paying us on a current basis.  Your

11   position is a committee should be formed, period?

12             MR. PEDONE:  My position is on July 17th or

13   shortly before that, we concluded that a committee needed to

14   be formed and we've been pushing as hard as possible for

15   that to occur.

16             THE COURT:  All right.

17             MR. PEDONE:  We're receiving a bit of flack for it

18   but we believe that's what should occur.

19             THE COURT:  I received -- I read your reply.  I

20   understand.  Okay.

21             MR. PEDONE:  Thank you, Your Honor.

22             THE COURT:  Thank you.  Mr. Schepacarter.

23             MR. SCHEPACARTER:  Good afternoon, Your Honor.

24   Richard Schepacarter for the United States --

25             THE COURT:  You --

1            MR. SCHEPACARTER:  -- Trustee.

2            THE COURT:  Here's the point, you certainly could

3    have formed a committee that covered all debtors but didn't

4    have all debtors represented on it and that happens all the

5    time --

6            MR. SCHEPACARTER:  Uh-huh.

7            THE COURT:  -- but you didn't do that.  So doesn't

8    that create the situation that Americans dot Transfers

9    identified which is at least for half of the balance sheet,

10    no committee has been formed?

11            MR. SCHEPACARTER:  Well, I think it's an issue of

12    adequate representation.  I think Your Honor was drawing

13    counsel to the point where it really wasn't a mandatory

14    issue but, really, an adequate representation issue.  In

15    this case, there's no mystery to the fact that with respect

16    to the back group of creditors, the EFH creditors, even

17    though they indicate that it's about $1.92 billion, a good

18    portion of that -- and we set this forth in our papers -- a

19    good portion of that is held by EFIH and an insider.  That

20    boils it down to about $650 million.  Seventy-three percent

21    of that is, apparently, held by Fidelity.  Another portion

22    of that is the ad hoc committee members which boils it down

23    to -- and sort of my back of the envelope math as well --

24    somewhere around in the neighborhood of about a hundred to

25    $125 million of other notes.  So that's really where I think

1    that that's focused as to maybe the adequate representation

2    issue.

3            We've had no request -- let me back up a little

4    bit.  We solicited initially for a committee, as counsel

5    said.  Under (a)(1), we solicited.  We solicited the top 20

6    creditors for each of the stratas as we set forth in our

7    papers for EFH, EFIH, DCEH and the like and we were able to

8    form the committee that responded in this case.  Both

9    American Stock Transfer and UMB submitted questionnaires.

10   We interviewed them, we talked to them and, as a result, the

11   committee is formed as the committee is formed.

12   We've had no request from -- and several months have passed

13   and, as I think we highlighted in our paper, there was some

14   negotiations that have -- apparently, have taken place with

15   respect to the current payment of the indenture trustee's

16   fees.  I know that UMB -- and I attached the letter from Mr.

17   Kaplan.  That letter squarely sets forth the fact that they

18   were negotiating to have their fees paid in a currently

19   fashion.

20           In fact, in the order for the second lien DIP

21   financing, there was a paragraph that was, I don't want to

22   say slipped in, but there was a paragraph that was inserted

23   into that to have their fees to be paid.  That motion, along

24   with the RCA and everything else have been withdrawn, but

25   we've had no inquiries from any of the other creditors, in

1    fact, Fidelity, for whatever the reason has indicated point

2    blankly that there is no need for a committee.

3          I don't know what the position is of the ad hoc

4    committee, but the issue is one of adequate representation

5    and the issue is one of either adding them to the committee

6    or whether they're adequately represented.  It's an 8-2

7    issue.  And as a result of that, we need to be able to do

8    our due diligence as well.

9          That's why we've sort of indicated that we would

10   want to take discovery of some sort, but we need to do some

11   fact finding to be able to understand with respect to

12   whether a committee is necessary and there will be a similar

13   issue that I'm going to have with respect to the Asbestos

14   Creditors' Committee in the case.  There's been a request

15   for that and we'll go through a similar analysis with

16   respect to that, but that's sort of where we are.

17          So if Your Honor doesn't deny the motion, I know

18   the debtors have asked for it to be denied.  We just need

19   more time.  We may need 30 days; we may need additional time

20   to ascertain whether a committee is appropriate in this

21   case, just by the committee.

22          THE COURT:  Okay.

23          MR. SCHEPACARTER:  Thank you, Your Honor.

24          MR. HESSLER:  Good afternoon, Your Honor.  For the

25   record, Steve Hessler of Kirkland & Ellis on behalf of the

Page 114

1    debtors.  Your Honor, for all the reasons stated in our

2    objection, the debtors' position is the indentured trustee's

3    motion can be denied today on the merits.

4            That said, the United States Trustee we're

5    obviously cognizant of their request for additional time to

6    consider the issues of whether to make an additional

7    solicitation or conduct discovery or further consider the

8    request.

9            To the extent the Court is inclined to grant that

10   request for additional time, the debtors take no issue with

11   that.  So we would not oppose that.  To the extent Your

12   Honor is inclined to rule today, though, we believe the

13   motion should be denied.  And I won't belabor any points.  I

14   just want to kick off a few very quickly.

15           Your Honor, I don't think we need to go any

16   further into whether the appointment of a separate second

17   committee is mandatory.  I think that was covered off in

18   Your Honor's questions and obviously there are certainly

19   multiple instances where the U.S. Trustee in its discretion

20   makes the determination that a committee for a specific

21   debtor is not viable or not needed and therefore, obviously

22   that occurs, so I think on its face, the argument that a

23   committee has to mandatorily be appointed separately for EFH

24   is not persuasive.

25           Your Honor, so this does come down to we agree

1   with the United States Trustee, the issue of adequate

2   representation and whether or not a separate committee is

3   warranted.  And there's sort of only four key facts that we

4   would just touch upon here that demonstrate why a separate

5   independent committee is not warranted.

6           The first, Your Honor, is that Mr. Schepacarter

7   just said the United States Trustee has already solicited

8   EFH's creditors for their interests in serving on a

9   committee, and made the determination, which is in their

10  discretion, that those creditors are already adequately

11  represented, so it's already occurred once.  And so what

12  this really is, is a request to do it a second time and

13  there has not been any evidence introduced, we think, by the

14  indentured trustee as to why this needs to be done a second

15  time, some 60 to 90 days after it's already occurred once.

16          Secondly, Your Honor, as is noted, effectively all

17  of EFH's unsecured creditors are already represented either

18  through their own counsel directly or a small segment

19  through the indentured trustee's counsel who is representing

20  their interests.

21          The third point, Your Honor, builds on the second

22  point, which is the indentured trustee in this case, like

23  the counsel for Fidelity and the Kasowitz ad hoc group, the

24  indentured trustee's counsel is already very actively

25  engaged in this case on behalf of that small sliver of

1    "unrepresented counsel" or excuse me, unrepresented holders.

2         We've had multiple live and telephonic meetings

3    with counsel for the indentured trustee.  They have access

4    to the data room and they are already actively working to

5    represent those clients, which gets to the point that you

6    were asking about, who are we trying to -- who is

7    unrepresented that we are trying to make sure is represented

8    by a committee?  In this circumstance, we would pos that

9    there's no one left who is not already adequately

10   represented.

11        And then the last point, we'll just note for the

12   record, Your Honor, the PVGC is on the existing creditors'

13   committee.  We scheduled a claim on behalf of the PVGC

14   against EFH.  So there actually is a technical matter, is

15   EFH general unsecured creditor on the committee already?

16   There is the issue of the scope of the committee's

17   representation, which we don't take up today, but if we do

18   just mention the point that to the extent there is a

19   determination to either re-solicit or an expansion of the

20   committee, there's already and EFH general unsecured

21   creditor according, you know, this is before the bar dates'

22   been -- before the bar date process has concluded.  But

23   there is already, pursuant to the debtors' schedules, an EFH

24   general unsecured creditor on the committee.

25        In closing, Your Honor, we think that those four

1    points alone demonstrate that there is no need to cure any

2    purported inadequate representation of the general unsecured

3    creditors.  There would be no incremental benefit to

4    appointing a second independent committee.  So to the

5    contrary, we actually just think it would lead to additional

6    burden in the form of time and expense.  And it would be

7    directly a duplication of representation that is already

8    under way, so, the debtors would request that the motion be

9    denied, Your Honor.

10            THE COURT:  Thank you.

11            There's counsel behind you who wishes to be heard.

12            MR. HEBBELN:  Good afternoon, Your Honor.  Mark

13   Hebbeln from Foley and Lardner on behalf of UMB Bank,

14   National Association as indentured trustee.  First, let me -

15   - I know Mr. Kaplan's name has been mentioned.  It was

16   featured in a couple of the pleadings.  He would normally be

17   here, but he's on doctor's orders not to travel and he sends

18   his apologies for not being able to be here.

19            Your Honor, UMB is the indentured trustee for

20   about $1.6 billion in bonds at EFIH, which is made up of

21   approximately $1.5 plus billion in what have been referred

22   to as the pick notes and $1.9 million in what are 9.75

23   percent senior unsecured notes.

24            We filed a statement with respect to the motion

25   and as we said in that statement, we don't take a position

1    on the motion itself, which just as you noted, seeks a

2    committee for EFH and as a creditor of EFIH and EFIH

3    finance, we don't believe AST's motion directly implicates

4    our interests.

5            However, to the extent the issue of whether a

6    committee ought to be appointed for EFIH or EFIH Finance as

7    implicated by the motion, I just want to make clear, Your

8    Honor, our position is that such a committee is not

9    necessary at this time.

10           And I think a little background might be helpful.

11   The reason we take that opinion or that position, Your

12   Honor, is that shortly after the formation of the committee,

13   which we had applied to be on, we reached out to the debtors

14   to discuss what was a fairly unusual situation where you had

15   a huge swath of the debtors' corporate structure that wasn't

16   represented by a committee.  And I think that was somewhat

17   surprising to a lot of people.

18           Now, I'm not saying the U.S. Trustee decision

19   can't be supported; it's just that it placed us in a

20   somewhat unusual position of representing a large amount of

21   debt and not serving on a committee.  A large amount of

22   unsecured debt and that just usually doesn't happen.

23           In most cases when you serve on a unsecured

24   creditors' committee, the committee professionals interface

25   with the debtors, gather and analyze information, make

1    recommendations to the committee.  And when you work as an

2    indentured trustee sitting on a committee, we use that

3    information, those recommendations not only to discharge our

4    fiduciary duties to our bondholders, but it's also helpful

5    in discharging our prudent person duties to our -- I'm

6    sorry, to creditors -- it's also helpful in discharging our

7    prudent person duties to our bondholders under the Trust

8    Indenture Act and our indentures.

9            In this case where we weren't appointed to a

10    committee, we didn't have -- we will be doing really a lot

11    of the work that sometimes we lean on committee counsel and

12    committee financial advisors to do.  And in this case, we

13    were confronted right away with a second lien DIP motion, a

14    motion to assume an RSA, and settlements of make whole

15    claims.  Taken together they're arguably case dispositive

16    including determining, at least initially, equity splits on

17    the eastside.

18            So, as I said, Your Honor, we reached out to the

19    debtors to discuss this situation and how to ensure adequate

20    representation of the eastside creditors.  And what we and

21    the debtors agreed made most sense was for the indentured

22    trustees to take on some of the duties that the committee

23    professionals would normally take on and in recognition of

24    that fact, the debtors would seek to get current payment of

25    our fees and expenses.

1            We talked to the other eastside constituencies

2     about this, we talked to the committee about this and

3     understood from them that there was no -- there was general

4     agreement that this made sense.  We also let the U.S.

5     Trustee's office know on June 3rd that we were -- at least

6     those discussions were going on.

7            Now, I suppose, Your Honor, that we could have

8     moved for the appointment of a committee right after the --

9     an additional committee right after the committee was

10    appointed, but we didn't do that for a couple of reasons.

11           First, it was clear from the notice of appointment

12    that the U.S. Trustee filed, that they had clearly

13    considered this issue and decided that there didn't need to

14    be a committee to represent the EFIH creditors.  We may have

15    disagreed with that, but it was obviously a considered

16    decision.  And certainly I think reasonable people could

17    probably disagree on it.

18           Second, the committee was formed on May 2nd and at

19    that time, as I mentioned, there were any number of issues

20    being teed up for the next four to six weeks including for

21    the hearings in early June.

22           The debtors were planning on filing a Chapter 11

23    plan in mid-June and we thought it likely that any motion to

24    appoint a second committee would drag on probably beyond

25    that or likely beyond that.  And we didn't think it was a

1    good idea to pursue it or good use of resources.  So while

2    we didn't understand the U.S. Trustee's decision to appoint

3    the committee it did, we decided to live with it.

4            Having said all that, the issue of payment of our

5    fees and expenses on a current basis has not been resolved,

6    but we nonetheless believe that the appointment of a

7    committee at EFIH to the extent that's implicated by the AST

8    motion would not be prudent use of estate resources at this

9    time.  And that's all I have unless you have questions, Your

10   Honor.

11           THE COURT:  Thank you.

12           MR. WEISFELNER:  Your Honor, if you give me two

13   hours, I'll tie all this into taxes and conflicts.  I rise

14   on a separate issue.

15           Sitting here today, wouldn't take a position on

16   any of the papers that were filed, but I'm hearing things

17   and I'll assert it for the first time.  Look, I think this

18   is all about fee shifting and I think it's about fee

19   shifting in the most egregious fashion.  As Your Honor

20   indicated and indentured trustees have a charging lien.

21   There are indentured trustees and there are indentured

22   trustees.

23           On the eastside of the house, especially for UMB

24   at the EFIH level and in particular at the EFH level, if one

25   reads between the lines of what the so-called bid was from

1    Nextera.  There will be a corpus as against which those

2    liens can attach.  It may not be today.  You may have to

3    carry the case for a while, but anybody who has ever done

4    representation of an indentured trustee -- at least that I'm

5    aware of -- knows that that's the way it works.  You do your

6    work and you get paid -- assuming your constituency gets a

7    recovery -- and have a charging lien.

8              I represent that an indentured trustee, Mr. Shaw,

9    has an indentured trustee for his issue.  I better tell you

10   that neither my trustee nor his trustee have any assurance

11   that there will be a corpus as against which our charging

12   lien will attach.  I'm not getting paid through the estate.

13   Mr. Shaw is not getting paid through the estate.

14             The notion that the debtor or the debtors or some

15   of the debtors through their joint counsel have been talking

16   to an indentured trustee whose probably in the money about

17   front loading those fees -- I don't know, it just shook me a

18   little bit to hear that representation today.  That my

19   fiduciary's lawyer -- my fiduciary's lawyer is talking to an

20   indentured trustee about maybe cutting a deal so he gets up

21   front cash flow payments.

22             The other thing on the adequacy of representation

23   point that I think we glossed over is, not only is Fidelity

24   there representing Fidelity's interests, but Fidelity got

25   paid for that work.

1              You'll recall that immediately prior to filing the

2      petition, huge checks went out the door.  On the E side and

3      on the T side, Fidelity and whatever financial advisor they

4      were using got paid.  On the EFIH side, I think it was $10

5      million bucks got paid to the ad hoc committee counsel and

6      $10 million bucks got paid to their financial advisor.  The

7      estate's already paid for lots and lots of representation,

8      at least a lot; not including me, not including the ad hoc

9      committee of TCH unsecured creditors.

10             Enough with the fee shifting.  They have an

11     obligation; AST does, under their indenture to adequately

12     represent all of their constituents.  That's what they

13     should be doing.  Let them do their job.  They will get paid

14     for it under the terms of their indenture.  I think the

15     motion should be denied.

16             THE COURT:  (Indiscernible).  They're not done

17     with you.

18             MR. KAPLAN:  Good afternoon, Your Honor.  Gary

19     Kaplan from Fried Frank on behalf of Fidelity.  Your Honor,

20     we filed a very short joinder and so my argument will be

21     equally short.

22             One point that I wanted to highlight and it goes a

23     little bit to what Mr. Weisfelner said, which is when we're

24     talking about putting the fees on the back of the debtor,

25     what we're really talking about is ultimately these fees are

Page 124

1    going to be allocated to the respective estate.  And so if

2    there's an EFH only committee, likely the outcome will be

3    that the cost of that committee will be charged to the EFH

4    estate, which means that my client is going to pay .73 cents

5    on every dollar that's spent on a committee.  And Kasowitz's

6    group will pay the .15 cents.

7              And so what we're really talking about is in

8    addition to the indentured trustee with their legal advisors

9    and financial advisors, having a charging lien who will then

10   have an official committee representing some unknown

11   individual bondholders who have never spoken up in court

12   with us having to pay that to represent some unknown

13   interest that already had adequate represented.  So we join

14   in the debtors' objection and other objections and think

15   this should be denied.

16              MR. PEDONE:  I'll look around --

17              THE COURT:  I think you're it.

18              MR. PEDONE:  Your Honor, those unknown

19   bondholders, they believe and in every case of this size, it

20   happens that there is a creditors' committee looking out for

21   them.  That's what Congress provided.  When Congress wrote

22   the bankruptcy code it had the Trust Indenture Act in front

23   of it and it didn't say we don't need to have unsecured

24   creditors' committees where there are bondholders because

25   there are indentured trustees.  It said, there shall be

1    creditors' committees.

2            I'm glad that the second lien trustee got up and

3    spoke because the issues that they lay out in the discovery

4    they served at docket item number 6 and that they talked

5    about today at length, tax allocation, past transfers among

6    debtors.  They drive at the heart of the recovery that will

7    EFH bondholders will or will not get and those are exactly

8    the types of issues that a committee would be digging in for

9    today.

10           We heard about the velocity of these cases getting

11   ready to accelerate.  My analogy is the debtors are in the

12   process of loading up a slingshot and they have their round

13   2 plan on how to reorganize the company and a committee

14   representing all creditors as a fiduciary should be there at

15   the table.  And I appreciate the Court's recognition that as

16   of today, no committee exists for the EFH unsecured

17   creditors.  Thank you.

18           THE COURT:  You're welcome.

19           Mr. Schepacarter, I'll give you the last word.

20           MR. SCHEPACARTER:  Isn't that a TV show?  My joke

21   is not as funny as yours.

22       (Laughter)

23           MR. SCHEPACARTER:  I tried, but I can't do it.

24           A couple things.  One, I just wanted to clarify

25   for the record that Mr. Hebbeln indicated there was

1    something with respect to some June 3rd and I have no idea

2    what he's talking about with our office, so I don't know

3    what that meant.

4              And some of the issues that Mr. Weisfelner brought

5    up with respect to the fee shifting is exactly what we would

6    need the additional information on to get at the heart of

7    that, that issue.

8              And the last point is that I think we stated in

9    our papers that there was no committee formed for EFH and

10   the like because of lack of interest, but there are E-

11   creditors as Mr. Hessler pointed out.  PVGC is a creditor

12   across all of the debtors and with respect to the -- I guess

13   you want to say the E side that there isn't a creditor for

14   the EFH Services Corporation that's currently on a

15   committee.  Other than that, I have nothing else, Your

16   Honor.  Thank you.

17             THE COURT:  Thank you.  Well, a couple comments.

18   1102(a)(1) is not absolute.  It certainly says what it says

19   and if one were to say it had to be complied with by

20   absolute terms, here would be instances where its being

21   ignored and in an inappropriate way.

22             So, for example there are many in my smaller cases

23   -- much smaller obviously than this by several digits where

24   no committee is formed.  Often in a situation where you have

25   a quick sale, there's not a lot of interest in a committee

1    being formed and the office of the U.S. Trustee isn't

2    required to perform the impossible and appoint a committee

3    when no one wants to serve on it.

4            So, that's one example under 1102 where there's

5    obviously a exception to the rule.  And I think very much

6    another one would be as I discussed in the colloquy with

7    counsel, the question of diminishing returns.  Is there

8    anyone who actually benefits from the appointment of a

9    committee, other than committee counsel and committee's

10   financial advisors?

11           And I think if the U.S. Trustee were to decide

12   that it just wasn't worth the gain because people were

13   adequately represented or maybe they were to make a decision

14   based on motives, that would be perhaps one other exception.

15   And then there will be certainly -- there probably are other

16   -- and I'm not trying to limit the exceptions to the

17   absolute requirement under 1102(a)(1) that the committee be

18   formed for the debtors.

19           But we have a weird situation here.  This isn't a

20   case where the -- really where it's an adequate

21   representation argument where the office of the U.S. Trustee

22   appointed a committee for the entire debtor -- all the

23   debtors, but for example, assuming the committee we had had

24   been formed for all the debtors, but it had the same

25   creditors it has on it now, it wouldn't be a problem with

1    that.  1102(a)(1) would have been complied with and it would

2    be question of whether to appoint -- require the appointment

3    of others because there's inadequate representation or

4    whether to appoint an additional committee.  And that gets

5    us into questions that are clearly within the discretion of

6    the Office of the U.S. Trustee and my review of those

7    questions is really almost like a formal review by a judge

8    of a decision of an administrative agency.

9           There's a ton of -- there's a lot of deference

10   that would be afforded to the U.S. Trustee in the

11   composition of the committees.  Of course there should be,

12   otherwise we'd have motions in every case with disgruntle

13   creditors who didn't get on the committee wanting to be

14   represented.

15          But like he said, that's not really what happened

16   here.  What happened here is that there was a broader

17   solicitation and then a committee was formed for a subset of

18   debtors and there's another subset of debtors where a

19   committee wasn't formed.

20          And although there is a statement in the briefing

21   Mr. Schepacarter referred to that it was because of a lack

22   of interest at the E side debtors and by that I mean the

23   debtors where there was not a committee formed.  That's a

24   comment and I certainly take it as being an honest comment,

25   but it's a comment in a brief, it's not sort of an official

1    position, if you will.

2            So what we have here is, I think, on the face of

3    when I look at this is that 1102(a)(1) hasn't been complied

4    with because a committee has not been formed for the

5    debtors, just the subset of the debtors.

6            I'm not saying a committee needs to be formed.

7    I'm not saying that the current committee needs to be

8    expanded.  But I think -- I think what has to happen is one

9    of three things and I am going to continue the matter to

10   give the U.S. Trustee more time, because it really falls

11   into the Office of the U.S. Trustee's discretion.

12           And that is (indiscernible) expand the current

13   committee to include all debtors and whether that means you

14   had to add members to that committee or not, fine.  I don't

15   know.  I am taking no position, by the way, on what the best

16   answer to this question is.  I'm positing the possibilities.

17           The other is to form a committee for the E side

18   debtors and not just EFH, the unrepresented debtors.

19           Or the third is not to and to articulate to the

20   Court why.  And if it's because it's not worth the effort

21   because parties are already adequately represented, because

22   it's -- there's no interest, you know, there could be a

23   variety of reasons not to form that committee.  But I think

24   I'm going to require that the Office of the U.S. Trustee

25   articulate what that reason is to the Court and I will

1    review whatever that reason is like I would review any other

2    administrative decision made by the Office of the U.S.

3    Trustee and decide whether it's  an appropriate decision or

4    not based on the facts and circumstances.

5            But I don't think we can just say, like, the

6    debtor argues that, hey, 1102(a)(1) was complied with

7    because a committee was formed.  A committee wasn't formed

8    for all debtors.  And, hey Judge, this is just a request for

9    an additional committee under 1102(a)(2) and as a result you

10   should give it the deference and just ignore it or deny it.

11           I don't think that's quite the situation here.

12   It's  different situation.  On its face, in air quotes,

13   1102(a)(1) was not complied with in connection with the

14   debtors where no committee was formed.

15           The Office of the U.S. Trustee had an obligation

16   to comply with 1102(a)(1).  1102(a)(1) is not absolute.

17   There are certainly exceptions to it that I think are

18   consistent with plain meaning.  They may include the fact

19   that it's not worth the effort that the parties are already

20   adequately represented.  It may include that no one is

21   interested in being a member of the committee.  It may

22   include other reasons, so but I just need to know what they

23   are.

24           So I'm going to continue the matter to -- when did

25   you want Mr. Schepacarter?  The fourth seems soon.  What's

1    the other date?  Sixteenth?

2              MR. SCHEPACARTER:  Yes, Your Honor.  I would

3    continue the matter until at least the 16th.

4              THE COURT:  Yeah, let's do that.  Continue the

5    matter to the 16th.

6              MR. SCHEPACARTER:  That would be without prejudice

7    to request more time if we need it because the issues are

8    complex, to say the least.

9              THE COURT:  I'm certainly not trying to prejudice

10   your rights to seek a further continuance.

11             MR. SCHEPACARTER:  Thank you.  Thank you, Your

12   Honor.

13             THE COURT:  I think my ruling is hopefully fairly

14   clear.  So we'll continue the matter to the 16th and await

15   developments.  All right?  I don't think any order need be

16   entered at this point.

17             So we're continuing this to the 16th.  We're

18   continuing the Asbestos bar date to the 4th and I've

19   overruled the objections and approved the discovery protocol

20   in the stipulated order.  I'm going to await a stipulated

21   order with everybody's signature and a protocol order with

22   it attached.  That will come over when it comes over.

23             MR. MCKANE:  And to that, Your Honor, Mark McKane

24   Kirkland & Ellis, I can (indiscernible) I have all the

25   signatures.  I can provide a copy to Mr. Kerr and you should

1    have both the discovery protocol in its entirety and the

2    protective order this afternoon.

3              THE COURT:  All right.  Well, if you've got the

4    protective order, you can give it back because I signed it.

5    If you need -- can we just -- Mr. Kerr you want a copy?

6              MR. KERR:  That would be wonderful.

7              THE COURT:  We're going to break here in just a

8    second.  We'll bring out some copies for you.

9              MR. KERR:  Thank you.

10             THE COURT:  All right.  So this will be docketed

11   on its own and as an exhibit to the protocol.  Anything

12   else?  All right.  Very good, we're adjourned.  Have a good

13   day.

14        (A chorus of thank you)

15        (Whereupon, these proceedings concluded at 12:48 p.m.)

16

17

18

19

20                        * * * * *

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                                  Page

5     Debtors' Motion for Entry of a

6     Confidentiality Agreement and Stipulated

7     Protective Order [D.I. 1679; filed July 23,

8     2014]                                      24, 64

9

10    Motion of Wilmington Savings fund Society,

11    FSB for Leave to Conduct Discovery Pursuant

12    to Rule 2004 of the Federal Rules of

13    Bankruptcy Procedure of Energy Future

14    Holdings Corporation, its Affiliates, and

15    Certain Third Parties [D.I. 6; filed April

16    29, 2014]                                    66

17

18    Motion of EFH Notes Indenture Trustee

19    Pursuant to 11 U.C.S. §§ 1102(a)(1) and 105

20    for Appointment of an Official Committee of

21    Unsecured Creditors for Energy Future

22    Holdings Corp. [D.I. 1676; filed July 23,

23    2014]                                       126

24

25

Page 134

1    Motion of Energy Future Holdings Corp.,

2    et al., for Entry of an order (A) Setting

3    Bar Dates for Filing Non-Customer Proofs of

4    Claim and Requests for Payment Under Section

5    503(b)(9) of the Bankruptcy Code, (B)

6    Approving the Form of and Manner for Filing

7    Non-Customer Proofs of Claim and Request for

8    Payment Under Section 503(b)(9) of the

9    Bankruptcy Code, and (C) Approving Notice

10   Thereof [D.I. 1682; filed July 23, 2014]        94

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3      We certify that the foregoing transcript is a true and
       accurate record of the proceedings.

4

5

       _____

6    Dawn South
     AAERT Certified Electronic Transcriber CET**D-408

7

8

9      _____

     Lisa Beck

10     AAERT Certified Electronic Transcriber CET**D-486

11

12

13     _____

     Sheila Orms

14

15

16

17     _____

     Linda S. Foley

18

19    Veritext

20    330 Old Country Road

21    Suite 300

22    Mineola, NY 11501

23    Date:  August 13, 2014

24

25