**In re Dana Corp.,** *et al.***, Case No. 06-10354**

**Excerpt of Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

In re                                                         :          Chapter 11

                                                              :

Dana Corporation, *et al.*,                                    :          Case No. 06-10354 (BRL)

                                                              :

                                    Debtors.                  :          (Jointly Administered)

                                                              :

----------------------------------------------------------------x

---

## THIRD AMENDED DISCLOSURE STATEMENT

## WITH RESPECT TO

## THIRD AMENDED JOINT PLAN OF REORGANIZATION

## OF DEBTORS AND DEBTORS IN POSSESSION

---

JONES DAY
222 East 41st Street
New York, New York  10017
(212) 326-3939
Corinne Ball, Esq. (CB - 8302)
Heather Lennox, Esq. (HL - 3046)
Counsel to the Debtors and
Debtors in Possession

Dated:  October 23, 2007

Claims in Class 7B), of any remaining Disputed Unsecured Claims Reserve Assets.  Class 7B Claims are impaired.  Notwithstanding the foregoing, because the Debtors do not currently anticipate that holders of Class 7B Claims will receive any distribution pursuant to the Plan, and consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Class 7B Claim will be deemed to have rejected the Plan.

*Class 8:  Subsidiary Debtor Equity Interests* — On the Effective Date, the Subsidiary Debtor Equity Interests will be Reinstated, subject to the Restructuring Transactions.  Class 8 Interests are unimpaired.

3.      **Treatment of Asbestos Personal Injury Claims**

Dana and certain of the Debtors have been, and are expected to continue to be, named as defendants in cases relating to the exposure of people to asbestos (collectively, the "Asbestos Personal Injury Liabilities").  See "General Information About the Debtors—The Debtors Business and Strategic Alliances—Legal Proceedings."  Under the Plan, the rights, claims, causes of action and defenses of the individuals asserting asbestos-related person injury claims against Dana and its applicable subsidiaries (collectively, the "Asbestos Personal Injury Claims") will be Reinstated pursuant to Section II.B.6 of the Plan and will, therefore, be passed through the Chapter 11 Cases unimpaired and will be retained, as applicable, as liabilities of the defendants against whom such Asbestos Personal Injury Claims have been asserted or could have been asserted.  Liabilities related to Asbestos Personal Injury Claims are not being transferred or assigned to any other Debtor or any other entity.  On and after the Effective Date, Dana and the applicable Reorganized Debtors will continue to defend, settle and/or resolve pending and future actions relating to Asbestos Personal Injury Claims in the ordinary course of their businesses and consistent with past practices.  Dana's reasoning for Reinstating the Asbestos Personal Injury Claims is described below.

In the past, some but not all of the automotive gaskets that Dana sold contained asbestos, which was always in an encapsulated form.  Dana has been sued in numerous cases alleging personal injury from the use of those products.  Unlike the case of most of the other asbestos defendants that have filed for bankruptcy protection, however, asbestos claims were not a precipitating cause of the Chapter 11 Cases.  To the contrary, in the five years preceding Dana's filing, Dana's total payments for asbestos defense and indemnity, net of insurance recoveries, never exceeded $3.6 million annually.  Because Dana has both substantial defenses in the asbestos litigation and considerable insurance coverage for defense and indemnity payments, Dana intends to pass its asbestos liability through the bankruptcy cases.  The relevant emerging entities' financial position is expected to be more than sufficient to pay any asbestos litigation liabilities not covered by insurance.

Dana has important advantages compared to companies that have incurred large asbestos liabilities.  The product that has led to the overwhelming majority of claims against Dana (automotive gaskets) was used in far fewer types of settings, and by far fewer categories of workers, than were the products of many other defendants.  Moreover, unlike companies that sold raw fiber, insulation or construction products, Dana has demonstrated in various proceedings that its gaskets could be and were used without releasing hazardous volumes of asbestos fibers, unlike insulation or construction-type products.  Dana has also defended Asbestos Personal Injury Claims successfully on the ground that exposure to chrysotile asbestos, the type of fiber incorporated into the Dana gaskets at issue, is generally insufficient to cause mesothelioma, particularly at the low levels of exposure (if any) arising from the use of automotive gaskets.  Collectively, these defenses have limited the number of valid claims against Dana, the portion of those claims that Dana would be inclined to settle and the amounts required to settle those cases.

Moreover, the magnitude of asbestos litigation has declined substantially since the wave of asbestos-related bankruptcies in 2000-2003.  Over the past few years, state laws or judicial rulings have imposed significant limits on filings by unimpaired claimants, virtually eliminated mass consolidations of asbestos claims, curbed practices that concentrated asbestos claims from across the country in a few plaintiff-friendly jurisdictions and limited the extent of each defendant's potential liability.  Taken together, these changes have markedly reduced the volumes of new claims and of pending claims that are being actively litigated.

Based on these factors, Dana anticipates that, for the foreseeable future, both the number of claims that Dana will be required to defend and to pay and the sums that it will have to spend to defend and resolve cases generally will remain at the relatively low levels experienced prior to the commencement of the Chapter 11 Cases or even decline from those levels.

Moreover, unlike many companies that were driven into bankruptcy by their asbestos litigation, Dana continues to have a considerable amount of insurance available to help pay future asbestos defense and liability payments.  And, unlike many active asbestos defendants, the vast majority of Dana's insurance coverage is subject to coverage-in-place agreements

setting forth the manner in which the insurance company will pay asbestos related product liability claims. Thus, Dana anticipates that a substantial portion of its future asbestos defense and liability costs will be promptly paid by its insurers.

As of December 31,2006, statistical modeling performed at Dana's request estimated Dana's potential liability for indemnity and defense costs at $61 million for pending asbestos claims and at between $80 and $141 million for future asbestos claims through 2021. Since the outcomes within that range are equally probable, Dana has accrued for the lower end of that range. While the process of estimating future asbestos demands beyond 2021 is highly uncertain, Dana believes that there are reasonable circumstances under which its expenditures for asbestos claims after that date would be *de minimis*. Dana's probable insurance recovery for the projected liability for current and future claims is $71 million. Dana expects that its assets will be more than sufficient to pay those potential net liabilities.

The Bankruptcy Court authorized the Creditors' Committee's retention of Analysis, Research & Planning Corporation ("ARPC") as the asbestos advisor to the Creditors' Committee. Subsequent to ARPC's retention, and with the assistance of the Debtors, ARPC conducted an analysis of the Debtors' estimated current and future asbestos liabilities. ARPC's analysis differs materially from the Debtors' estimate on a number of fronts, particularly in connection with (i) the estimated defense costs that the Reorganized Debtors are likely to incur in the future and (ii) the number of years of projected liabilities. Based upon its analysis and its current understanding of the facts, ARPC estimates that the total indemnity and defense costs required in resolving all pending and future asbestos claims are likely to fall within a range between a low of $0.5 billion and a high of $1.5 billion over the next 45 years. These amounts have not been discounted to present value. The majority of these estimated total indemnity and defense costs (roughly 75%) are estimated to be defense costs. ARPC estimates that approximately 64% of the total estimated indemnity and defense costs will be covered by Dana's current insurance coverage.

**C.      Treatment of Allowed Secondary Liability Claims; Maximum Recovery**

The classification and treatment of Allowed Claims under the Plan take into consideration all Allowed Secondary Liability Claims. On the Effective Date, Allowed Secondary Liability Claims will be treated as follows:

1.      The Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by and assigned to another Debtor will be Reinstated.

2.      Except as provided in Section II.C.1 of the Plan, holders of Allowed Secondary Liability Claims against any Consolidated Debtor will be entitled to only one distribution in respect of the Liabilities related to such Allowed Secondary Liability Claim and will be deemed satisfied in full by the distributions on account of the related underlying Allowed Claim. Notwithstanding the existence of a Secondary Liability Claim, no multiple recovery on account of any Allowed Claim against any Consolidated Debtor will be provided or permitted.

3.      Notwithstanding any provision hereof to the contrary, holders of Allowed Secondary Liability Claims against a Consolidated Debtor and EFMG may not receive in the aggregate from all Debtors more than 100% of the value of the underlying Claim giving rise to such multiple Claims.

**D.      Treatment of Executory Contracts and Unexpired Leases**

**1.      Executory Contracts and Unexpired Leases to Be Assumed**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume or assume and assign, as indicated, each Executory Contract or Unexpired Lease listed on Exhibit II.E.1.a to the Plan; *provided*, *however*, that the Debtors and Reorganized Debtors reserve the right, at any time on or prior to the Effective Date, to amend such Exhibit II.E.1.a to the Plan to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to Section II.E.5 of the Plan; (b) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption or assumption and assignment pursuant to Section II.E.1.a of the Plan; or (c) modify the amount of the Cure Amount Claim. Moreover, pursuant to the Contract Procedures Order, the Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.E.1.a to the Plan to identify or change the identity of the Reorganized Debtor party that will be an assignee of an Executory Contract or Unexpired Lease. Each contract and lease listed on Exhibit II.E.1.a to the Plan will be assumed only to the extent that any

- 67 -

**In re Chemtura Corp., *et al.*, Case No. 09-11233**

**Excerpt of Transcript of August 17, 2009 Hearing**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11233

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHEMTURA CORPORATION, et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York


                August 17, 2009

                9:51 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

1    claimants and the Teamsters.  Your Honor, let me address the

2    points you raised and putting aside right now with respect to

3    what we had to say about being analogous to an asbestos case

4    and particular potential procedures that might follow in this

5    case.  Your Honor, we're only suggesting that as one possible

6    track the debtor might take with respect to dealing with these

7    sorts of claims including, particularly --

8           THE COURT:  Well, pause, please, Mr. Reinsel --

9           MR. REINSEL:  Yes.

10          THE COURT:  -- because if I recall the early Johns

11   Mansville case, the procedures that ultimately morphed into

12   524(g) were not then a matter of a statutory law.  And in other

13   cases, A. H. Robins may be one, I'm not sure.  I don't do this

14   as often as you do -- Courts have sometimes found it helpful to

15   craft -- to let debtors craft similar provisions.  But that's a

16   far cry from saying that they have to.

17          MR. REINSEL:  No.  And we're not suggesting it, Your

18   Honor, that that has to be the approach here.  We're simply

19   saying that that is one approach the debtor might choose to

20   take in this case since at this point, despite the fact that

21   it's been on file since March, there is no plan on file or

22   we're given to understand there's not even plan discussions, a

23   term sheet or anything else available as to reflecting how the

24   debtors intend to deal with both the current diacetyl claims as

25   well as those unknown and future claims that we know will

1    arise.  Until we see that, we think with respect to diacetyl, a

2    bar date may be simply premature, certainly not with respect to

3    other commercial claims that the debtor can certainly get its

4    arms around and deal with.

5         Let me get on to the tailoring, though, of the notice

6    that we're talking about because the important thing with

7    respect to the notice and what the case law says is the notice

8    has to be reasonably constructed, reasonably intended to reach

9    those folks whose rights are going to be affected and why we

10   think that's not here.

11        While the debtor has done a fair effort to attempt to

12   address certain specific geographic locations, let me describe

13   to you why we think that is inadequate.  And we have to come

14   back to how this particular product got into the stream of

15   commerce and who it ultimately affects.

16        This is a chemical product that's ultimately turned

17   into an imitation butter flavor.  The diacetyl chemical was

18   produced by the debtors' nondebtor subsidiary, Chemtura Canada.

19   Chemtura itself sold the chemical primarily, if not

20   exclusively, to one source, Citrus and Allied Freight --

21        THE COURT:  Again, I'm not going to put a sock in your

22   mouth.

23        MR. REINSEL:  Okay.

24        THE COURT:  But in proceedings --

25        MR. REINSEL:  All right.

1    through Citrus who put its own label on it who sent it to the

2    flavor company who made it into a butter flavor and that's the

3    ingredient that went to the popcorn company.  So nobody who

4    reads this notice is going to know that they even were exposed

5    to a Chemtura diacetyl product.

6        Last on that same issue of companies, Chemtura is a

7    defendant in a number of lawsuits.  The Campbell case I

8    mentioned, the Gerardo Solis case, which was supposed to be the

9    hardship hearing -- Chemtura's diacetyl primarily went to

10   flavor companies.  There are almost no flavor companies

11   identified in their notice list.  Even the very defendants that

12   are involved in the lawsuits that Chemtura is involved with are

13   not identified in any of the notices.  They would have had the

14   pure exposures to diacetyl.  Mr. Solis, the case that Chemtura

15   is involved with, worked at three pop -- or three flavor

16   company plants.  None of his plants are identified in the

17   notices.

18       What we're just asking is that there be an additional

19   amount of time to be able to sit down with the debtor so that

20   we can work out what a larger group of notices should be.

21       Lastly, on the issue of disease, the notice indicates

22   that if you think you may have a claim in the future, you're

23   supposed to file a proof of claim today.  This is not like a

24   car wreck case or even a chemical burn case where you get

25   exposed to a chemical and you immediately know that you've got

1    an injury.  Many doctors are not even recognizing this as a

2    disease.  In fact, NIOSH has published an article about

3    bronchiolitis obliterans masquerading as COPD or asthma.  And

4    the NIOSH scientists themselves have recognized that doctors

5    are misdiagnosing the disease.  So there are numbers of people

6    out there that may have breathing problems, that may have a

7    flavoring induced lung disease but they have not been diagnosed

8    by their doctor.  And this doesn't provide time --

9        THE COURT:  Yeah.  I understand that.  And the debtors

10   responded to that in their reply by pointing out your earlier

11   brief and associated affidavit that said there was a five

12   month -- gestation is the wrong word -- for the period between

13   exposure and manifestation of injury.  Are you disclaiming

14   those earlier statements that were made to me?

15       MR. CRICK:  I'm trying to explain that doctors are not

16   necessarily diagnosing the disease.  Just because someone has a

17   hard time walking up a flight of stairs or gets fatigued easily

18   doesn't mean a doctor is going to recognize it as a flavoring-

19   induced disease.  Oftentimes, particularly at the Jasper

20   popcorn plant, these folks were going to the doctor for a

21   period of several years before all of them actually got

22   together and their records were looked at by one occupational

23   medicine physician who recognized that this was bronchiolitis

24   obliterans.  This is a rare epidemic and they all worked at the

25   same plant.  At that point, he got the federal government

1    involved.  But up until that point, Barnes Hospital in St.

2    Louis, the Mayo Clinic in Minnesota, National Jewish Health

3    Center in Denver had seen these people at the Jasper popcorn

4    plant and had not recognized this disease.  So it's sort of an

5    emerging diagnosis.

6           Charles Campbell went to doctors for two years before

7    he found a doctor that actually was familiar with this even

8    disease.  I'm not saying when the disease manifested as the

9    issue.  I'm saying that doctors are not making the diagnosis.

10    That's been one of the main problems that Teamsters has had in

11    their attempts to investigate diacetyl at plants where their

12    members were.  And that's why they asked us to intervene or to

13    join -- file some suggestions on their behalf which was --

14    number one, Teamsters has a strong interest in trying to

15    protect their workers.  They even have a safety department.

16    And they've been trying to find out among all their member

17    plants around the country which employees -- which members

18    might have used a product that contained diacetyl.  But because

19    of the proprietary issues I mentioned, they're not always able

20    to find out what products their members may have used with

21    diacetyl; certainly, were not able to find out what the source

22    was.  But even to find out if the products contained it -- they

23    have plants that made cake mixes that they've now found contain

24    diacetyl.

25           But the employers aren't necessarily doing screenings

1    of their employees to determine if anyone has a lung related

2    issue.  So these are mostly blue collar workers.  They don't

3    often go to the doctor for this.  It's not a broken bone case.

4    So they oftentimes can work it without going to the doctor.

5    And when they finally do, doctors are diagnosing them as asthma

6    or COPD and they're not getting a clear diagnosis.

7         But under this, they would have to file a claim today.

8    And while counsel for the debtor indicated that future claims

9    are different -- the notice specifically says if you have a

10   claim that you may get in the future, you're obligated to file

11   your claim today.

12        We're primarily asking for an additional amount of

13   time to work with the debtor on this.  We understand that our

14   office represents certain individuals that have already filed

15   claims against the debtors.  And we can file proof of claims on

16   behalf of those clients who already brought claims against

17   Chemtura.  But with regard to others --

18        THE COURT:  You can also file proofs of claim on

19   behalf of people that have consulted you without blowing your

20   privilege in any way, can't you?

21        MR. CRICK:  Who have consulted us?

22        THE COURT:  You don't have to have filed a complaint

23   on behalf of one of your clients to file a proof of claim.

24        MR. CRICK:  Well --

25        THE COURT:  I mean, let's just say for sake of

52

1    standard as articulated in Mullane and its progeny is

2    reasonableness.

3           It was important to me that the debtors go beyond

4    notice to persons who had actually sued them or even to their

5    counsel and to go beyond generalized national publication.

6    That's why I welcomed their proposal to provide specific

7    supplemental notice geographically focused to areas where there

8    might be diacetyl claims and the debtors' efforts to make

9    disclosure in plain language of facts that would help

10   perspective claimants ascertain whether they might have a

11   claim.

12          If I had needed to, I might have expressly required

13   that but since the debtors were ahead of me in that regard,

14   there was no need or occasion for me to impose such a

15   requirement.  I think the debtors did it very well on their

16   own.

17          Most of the objecting claimants, who, of course, do

18   have notice which is why they're here, with respect to their

19   objections when those objections are viewed objectively, the

20   objections represent alternative perspectives as to how the

21   debtors' Chapter 11 case should be run.  And that's not a

22   satisfactory basis for objection on a motion of this character.

23   Their suggestion that even though this isn't an asbestos case

24   that the filing of this case wasn't asbestos or tort liability

25   driven and the debtors aren't seeking a channeling

1    injunction -- I should nevertheless require or expect the

2    debtors to craft a plan with a 524(g) injunction or other

3    claims channeling mechanism.  It's inconsistent with the

4    concept of Section 1121 of the Code which gives the debtors the

5    exclusive right to propose a plan during the period authorized

6    by law, subject to the rights of parties in interest who oppose

7    extensions of the debtors' exclusive period or to seek the

8    termination of that right.  At this juncture, the debtors are

9    free to propose a plan to meet their needs and concerns and the

10   concerns of what they believe will satisfy their unsecured

11   creditor community.  And we'll just see how they do.

12       I'm also aware of no basis in law for requiring

13   strangers to a Chapter 11 case to provide information to assist

14   in the noticing process, particularly where those strangers to

15   the case are asked to provide information that might be used to

16   assert claims against them.

17       The debtors and the creditors' committee have reminded

18   me, though I hardly needed to be reminded, of the importance of

19   keeping this case on the time track that's so important here,

20   particularly in light of the expense to debtors and, by

21   extension, their unsecured creditors.  That's unfortunately a

22   fact of life in dealing with secured lenders when extensions to

23   a timetable are sought assuming that such extensions can be

24   obtained at all.  The needs of this case don't permit the

25   luxury of deferring the establishment of a bar date or the

1    sending of notice to creditors for the leisurely period the

2    objectors advocate.

3           For the avoidance of doubt, I'll say that I considered

4    and rejected the objectors' argument that requiring proofs of

5    claim by people who consulted counsel with respect to

6    prospective claims but who didn't yet sue is unfair or

7    unlawful.  Even if that might be used by others whom those

8    claimants might sue as an indication that the statute of

9    limitations began to run against those people, since there

10   would likely be a year, if not considerably longer, to bring

11   suit against those others if such were deemed to be warranted,

12   I can't regard that as material prejudice.  But even if it

13   were, the diacetyl litigants have to understand that this case,

14   with billions of dollars of debt to be satisfied, can't be run

15   for their convenience or strategic preferences.

16          And I'm puzzled by the notion that the objectors

17   advocate, though they may have dropped this point by the time

18   of oral argument, that no bar date should be set at all.  I

19   don't need to decide today whether a bar date is mandatory in

20   all Chapter 11 cases, though I must say that in more than

21   thirty-five years of practice in bankruptcy cases as a lawyer

22   and then a judge, I've never seen a Chapter XI or Chapter 11

23   case without one.  I need simply find, and I do find, as a

24   factor, mixed question of fact and law, that a bar date is

25   necessary and appropriate here.  The debtors and their major

1    creditor constituencies -- and by that I mean at the least the

2    creditors' committee -- need to know the universe of potential

3    claims that must be satisfied.  Frankly, to suggest otherwise

4    is ludicrous.  I don't know how anyone with the slightest

5    knowledge of Chapter 11 practice could think or suggest

6    otherwise.

7           Finally, I agree, of course, that under the Rules

8    Enabling Act, a bankruptcy rule can't trump a statute.  But the

9    Code implies, if it does not also expressly require, creditors

10   to file proofs of claim unless the need for such has been

11   obviated by the debtors' scheduling of its debt, or where it's

12   meaningless, as where we have a no-asset case.

13          The legislative history notes to Section 501 Code

14   provide that the rules of bankruptcy procedure and practice

15   under the law will guide creditors as to when filing is

16   necessary and when it may be dispensed with.  In general,

17   however, unless a claim is listed in a Chapter 9 or a Chapter

18   11 case and allowed as a result of the list, a proof of claim

19   will be a prerequisite to allowance for unsecured claims,

20   including priority claims and the unsecured portion of a claim

21   asserted by the holder of a lien.

22          I will, however, require the following revisions to

23   the noticing scheme.  The debtors are to add to the notice a

24   sentence in Spanish that advises Spanish-speaking recipients of

25   a phone number or address by which they can be provided with a

**Gabauer v. Chemtura Corp. (In re Chemtura Corp.), Case No. 13-cv-02023**

**Excerpt of Brief of Appellants**

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | : |
|  | : |
| CHEMTURA CORPORATION, *et al.*, | : |
|  | : |
| Reorganized Debtors. | : |
|  | : |
|  | : |
| CARLE GABAUER, *et al.,* | : |
|  | : |
| Appellants, | : |
|  | : |
| vs. | : |
|  | : |
| CHEMTURA CORPORATION, *et al.*, | : |
|  | : |
| Appellees. | : |
|  | : |

Civil Action No.
1:13-cv-02023-JMF
ECF Case

On Appeal from the United States
Bankruptcy Court for the
Southern District of New York

---

## BRIEF OF APPELLANTS

---

Kenneth B. McClain (*pro hac vice* pending)
HUMPHREY, FARRINGTON
 & McCLAIN, P.C.
221 W. Lexington, Suite 400
Independence, MO 64050
Tel:  (816) 836-5050
Fax:  (816) 836-8966
kbm@hfmlegal.com
*Co-Counsel for Appellants*

Elihu Inselbuch
CAPLIN & DRYSDALE, CHARTERED
600 Lexington Avenue, 21st Floor
New York, NY 10022
Tel:  (212) 379-6000
Fax:  (212) 379-6001
einselbuch@capdale.com
*Co-Counsel for Appellants*

Dated:  April 19, 2013

Case 1:13-cv-07262-SMF   Document 7   Filed 04/15/13   Page 29 of 33

asbestos claims asserted against the settling insurers for Manville's asbestos torts.  *See id*. at 141-

42.  Years later, asbestos claimants sued Travelers, Chubb, and other insurance carriers for their

own independent wrongdoing as the insurers of asbestos defendants.  *See id*. at 142.  Travelers

asserted that these so-called "direct action" claims (which were not derivative of Manville's

asbestos liability) and the related contribution and indemnity claims of Chubb were enjoined by

the 1986 Orders.  *See id*. at 143.  Chubb argued in response that its claims were not subject to the

1986 Orders because it was not afforded constitutionally sufficient notice of the proceedings that

culminated in those orders.  *See id*. at 148.  Travelers, in turn, relied principally on the published

notices that led to the 1986 Orders to argue that due process had been satisfied.  *See id*. at 150

n.12.  The Second Circuit agreed with Chubb, stating that "there can be little doubt that the

publication notice employed by the bankruptcy court in 1984 was *insufficient to bind Chubb to

the … 1986 Orders*."  *Id*. at 157 (emphasis added).  The Second Circuit reasoned that Chubb did

not have the information and foresight that it would have needed at the time of the notices to act

in a manner that might have protected its potential claims against Travelers from being subject to

the 1986 Orders.  *See id*.  As the Second Circuit put it, "even if Chubb received the Notice

document, it *could not have anticipated* from the way the proceedings unfolded *that its

contribution and indemnity claims – which were abstract, 'unimaginable,' and inchoate at the

time – would be enjoined*.  Therefore, it cannot be said that Chubb had constitutionally sufficient

notice."  *Id*. at 158 (emphasis added).

  **B.**  **No Adequate Notice Could Have Been Given to the Firmenich Claimants
Because They Did Not Know That They Held Claims Against the Chemtura
Defendants Until After the Bar Date Had Passed and After the Plan Had
Been Confirmed**

  Here, as in *Manville* and *Waterman Steamship*, the Firmenich Claimants did not have the

information and foresight they would have needed at the time of the bar date notice to act in a

manner that might have protected their § 101(5) claims.  It was not until after the Plan went effective on November 10, 2010, that the Firmenich Claimants were first told by a doctor that they had a disease, *bronchiolitis obliterans*, caused by diacetyl exposure.  (Bankr. Doc. 5777-2, declarations ¶ 10).  Even to the extent some of them may have been experiencing non-diagnostic symptoms beforehand, such as shortness of breath, that hardly made them aware that they had a *diacetyl-induced* disease and therefore a claim.  Diacetyl-induced injury is a relatively new tort, as the link between butter-flavorings and respiratory disease was not discovered by the scientific and medical communities until about 1999-2000.  *See Watson*, 797 F. Supp. 2d at 1143.  So too, the Chemtura Defendants had not even been sued for diacetyl-induced injuries until March 2005.  (Adv. Doc. 1, ¶ 29).  The Firmenich Claimants went to work at the Firmenich plant not knowing that exposure to diacetyl, much less Chemtura diacetyl, could cause lung disease.  (Bankr. Doc. 5777-2, declarations ¶ 12).  They had never heard of the Chemtura Defendants, and had no knowledge that Chemtura diacetyl was even being used at the Firmenich Plainsboro plant.  *Id.* (¶¶ 5, 11).  It was simply unreasonable to expect the Firmenich Claimants to understand a bar date notice, even had they seen it, and to act in a manner that might have protected their *diacetyl-related* claims when they had no knowledge at the time that they had *diacetyl-induced* disease.  Accordingly, the claims of the Firmenich Claimants were not discharged.

## III.   The Bankruptcy Court Erred in Several Respects

### A.   The Bankruptcy Court's Due Process Ruling Was Contrary to *Manville* and *Waterman Steamship*

In its ruling below, the Bankruptcy Court attributed much significance to the fact that it had pre-approved the bar date noticing program, including the so-called "site-specific" newspaper notices.  (Bankr. Doc. 5818, at 40:13-19).  But *Manville* and *Waterman Steamship* also involved substantial noticing programs, including notices published in newspapers.  *See*

legal representative was appointed to protect the rights of unknown or future diacetyl claimants, such as the Firmenich Claimants, a point further addressed below.  Because the Firmenich Claimants were not in the same shoes as the unknown trust beneficiaries, *Mullane* is inapposite.

## IV.  If the Debtors Wanted to Deal with Future Diacetyl Claims Consistent with Due Process, They Should Have Sought the Appointment of a Future Claims Representative

In the proceedings below, the Debtors cited three cases to support their argument that publication notice was sufficient to discharge the future claims of tort victims.  *See In re Placid Oil Co.*, 463 B.R. 803 (Bankr. N.D. Tex. 2012);[10] *In re Chateaugay Corp.*, 2009 WL 367490 (Bankr. S.D.N.Y. Jan. 14, 2009); *Castleman v. Liquidating Trustee*, 2007 WL 2492792 (N.D.N.Y. Aug. 28, 2007).  These cases involved asbestos personal-injury claims, and they are distinguishable insofar as the debtors there had not faced any asbestos-related lawsuits prior to bankruptcy and there was no indication that they would face asbestos claims against them in the future.  *See Placid Oil Co.*, 463 B.R. at 817-18; *Chateaugay Corp.*, 2009 WL 367490, at *5; *Castleman,* 2007 WL 2492792, at *5.[11]

By contrast, when tort claims are asserted against a debtor prior to bankruptcy and the circumstances point to the prospect of similar claims being asserted against the debtor in the future, courts have regarded the appointment of a legal representative to protect the rights of future claimants as satisfying due process.  *See, e.g.*, *Placid Oil Co.*, 463 B.R. at 817-18; *In re Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.

---

[10]  The original *Placid Oil* opinion, reported at 450 B.R. 606, was revised and superseded by the opinion cited above.

[11]  Although not absolutely clear from the opinion, the case of *In re Best Products Co.*, 140 B.R. 353 (Bankr. S.D.N.Y. 1992), appears similarly distinguishable, as there was no indication that the debtor had faced the type of tort claim at issue there prior to bankruptcy or would face claims of that type in the future.  The case of *DePippo v. Kmart Corp.*, 335 B.R. 290 (S.D.N.Y. 2005), is distinguishable because it involved civil rights claims arising from an incident in which the plaintiff had been accused of shoplifting; no toxic tort claims were involved.  *See id.* at 292-93.

1987), *aff'd*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).  For example, in *Manville,* a future claims representative was appointed after Manville sought bankruptcy protection from the asbestos suits filed against it in the tort system and the suits that were anticipated to be filed in the future.  *See Johns-Manville Corp.*, 36 B.R. at 746, 759.[12]  While no futures representative was appointed in *Waterman*, the bankruptcy court there noted that "ample evidence existed for Waterman to conclude that an amorphous class of unmanifested asbestosis claimants … existed at the time Waterman filed its bankruptcy petition."  *Id.* at 557.  And, in the face of that evidence, the bankruptcy court in *Waterman* made clear that it was not tolerating efforts to "sandbag" asbestos claimants through publication notice "when Waterman simply could have appointed a representative to receive notice for, and represent the interests of, known but unidentifiable future claimants."  *Id.* at 558.

Here, the Chemtura Defendants were sued for their diacetyl-related torts before their bankruptcy filings, and faced the prospect of more diacetyl suits being filed against them in the future.  At the time of the March 2009 bankruptcy filings, there were approximately 15 diacetyl-related lawsuits against the Chemtura Defendants, involving approximately 50 claims.  In the proceeding to obtain injunctive relief, Chemtura acknowledged that, even though Chemtura Canada stopped manufacturing diacetyl in 2005, "there is still a likelihood of future suits." (Adv. Doc. 1, ¶ 44).  Chemtura even anticipated that future diacetyl claimants "may argue that although they were exposed to diacetyl prior to 2005, they did not learn of their injuries until later."  *Id*.  With a pre-bankruptcy track record of diacetyl suits and the likelihood that diacetyl claims would be asserted against them in the future, the Chemtura Defendants were in the same

---

[12]  Congress used the *Manville* reorganization as a model to enact § 524(g) of the Bankruptcy Code, which requires courts, *inter alia*, in advance of issuing or affirming an injunction that would channel present and future asbestos claims to a plan-created trust, to appoint a legal representative to protect the rights of persons who might assert asbestos claims in the future.  *See* 11 U.S.C. § 524(g)(4)(B)(i).

league as the debtors in *Manville* and *Waterman Steamship*, and situated differently from the debtors in *Placid Oil*, *Chateaugay*, and *Castleman*. To satisfy due process and protect the rights of future diacetyl claimants, the Chemtura Defendants should have asked the Bankruptcy Court to appoint a legal representative to protect the rights of future claimants, including the Firmenich Claimants. Publication notice by itself was insufficient to discharge the claims of the Firmenich Claimants. Because the Bankruptcy Court determined otherwise, its decision was in error.

The Debtors have argued, however, that they were not "required" to appoint a legal representative because their bankruptcies were not "mass-tort cases." But the Bankruptcy Code recognizes no distinction between cases that might be labeled "mass tort" and those cases that might not. The problem of affording future tort claimants due process remains the same regardless of the number of present tort claims asserted against the debtor in a Chapter 11 case. The Debtors had two options in handling future claimants: If they believed that the risks posed by future diacetyl claims were manageable enough not to threaten their reorganized business operations, their Chapter 11 plan should have "passed through" those future claims to the tort system, unaffected by the discharge, where plaintiffs would have been free to pursue their claims and have their day in court as if no bankruptcy had occurred. If, on the other hand, the Debtors believed that the risks posed by future diacetyl claims were of a magnitude to threaten their reorganized operations and possibly force them into Chapter 11 again, they should have sought the appointment of a legal representative to protect the rights of the future diacetyl claimants, including the Firmenich Claimants.

The Debtors, obviously, chose neither of these options. Instead, they followed the constitutionally untenable route of trying to rid themselves of countless future claims on the false premise that publication notice by itself was constitutionally sufficient. But the published notice

provided by the Debtors was mere gesture – pieces of paper that the Firmenich Claimants had no meaningful ability to understand or act upon – and "mere gesture is not due process." *Mullane*, 339 U.S. at 315; *cf. also Covey v. Town of Somers*, 351 U.S. 141, 144-46 (1956) (holding that notice by publication, posting, and mail afforded insufficient due process to a known incompetent who had no guardian or legal representative appointed for her at the time). In sum, the Firmenich Claimants have been deprived of their claims without due process.

Because the Debtors failed to seek the appointment of a futures representative, there was no party who could give voice to the rights of the Firmenich Claimants (and other future claimants) in the *Chemtura* bankruptcy case. The present unsecured claimants, including the diacetyl claimants who timely filed proofs of claim, could not have represented the rights and interests of the Firmenich Claimants. The interests of the present claimants were to maximize their own recoveries under a confirmed Chapter 11 plan; setting aside money in a trust fund to pay future diacetyl claimants could have diminished those recoveries, a prospect that the present claimants would not have welcomed. *See Waterman S.S. Corp.*, 141 B.R. at 557 ("[A]ll creditors in the Waterman bankruptcy and, to some extent the debtor itself, had interests antithetical to the future Asbestosis Claimants. Unsecured creditors had little incentive to invite another class of claimants to share in [their] pro rata recovery.").[13] Similarly, Chemtura's existing shareholders were in no position to speak for the Firmenich Claimants and other future creditors. In general, a corporate debtor's shareholders retain their shares, or receive value from the bankruptcy estate on account of their shares, only when the debtor's creditors have been paid in full. *See* 11 U.S.C.

---

[13] *Cf. also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 595 (1997) (stating in the context of an asbestos-related settlement class action that "[i]n significant respects, the interests of [the present and future asbestos claimants] within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.").

§ 1129(b)(2)(B) & (C).[14]  Thus, Chemtura's shareholders had every incentive to make sure that future claims remained unrecognized, and were deemed "discharged," in the bankruptcy case.

Without a futures representative, the Firmenich Claimants had no effective voice in the *Chemtura* bankruptcy proceedings, and no provision was made in the Plan for future diacetyl creditors, such as the Firmenich Claimants.  No representative was there to negotiate for a segregated fund that would have paid future diacetyl claimants once they learned of their claims, or to object to the Plan on grounds that it made no provision for future claimants.  The Firmenich Claimants thus had no adequate representation in the *Chemtura* bankruptcy proceedings.

## CONCLUSION

In the face of inadequate notice and no futures representative, constitutional due process was not afforded to the Firmenich Claimants.  Accordingly, this Court should reverse the decision of the Bankruptcy Court, thereby permitting the Firmenich Claimants to re-file their diacetyl-related claims against the Chemtura Defendants in state court, and grant such other and further relief as this Court deems just and appropriate.

*[Signature of counsel on following page]*

---

[14]  *See also, e.g., Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999) (stating that "fairness and equity require[] that the creditors … be paid before the stockholders could retain [their equity interests] for any purpose") (internal quotation marks omitted).