IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No. 14-10979 (CSS) |
| Debtors. | ) ) ) | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF JAMES KATCHADURIAN
IN SUPPORT OF THE APPLICATION OF THE DEBTORS FOR ENTRY
OF AN ORDER APPROVING THE EMPLOYMENT AND RETENTION OF
EPIQ BANKRUPTCY SOLUTIONS, LLC AS THE ADMINISTRATIVE ADVISOR
FOR THE DEBTORS, EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE**

I, James Katchadurian, being duly sworn, state the following under penalty of perjury:

1. I an Executive Vice President at Epiq Bankruptcy Solutions, LLC, which has a place of business at 757 Third Avenue, 3rd Floor, New York, NY 10017.

2. I submit this supplemental declaration pursuant to Bankruptcy Rules 2014(a) and 2016(b) on behalf of Epiq Bankruptcy Solutions LLC and its affiliate, Epiq eDiscovery Solutions (collectively, "Epiq") (the "Supplemental Katchadurian Declaration") in support of the application and supporting declaration (the "Application" and the "Katchadurian Declaration," respectively) pursuant to sections 327(a), 328, and 330 of the Bankruptcy Code authorizing the Debtors to employ and retain (a) Epiq Bankruptcy Solutions LLC as administrative advisor and (b) Epiq eDiscovery Solution as e-discovery vendor to the above-captioned debtors and debtors

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

in possession (collectively, the "Debtors") effective *nunc pro tunc* to the Petition Date.[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3.  No agreement or understanding exists between Epiq and any other person, other than as permitted by Section 504 of the Bankruptcy Code, to share compensation received for services rendered in connection with these cases, nor shall Epiq share or agree to share compensation received for services rendered in connection with these cases with any other person other than as permitted by Section 504 of the Bankruptcy Code.

### Additional Services to be Provided

4.  Paragraph 5 of the Katchadurian Declaration describes certain administrative services Epiq Bankruptcy Solutions LLC would provide to the Debtors (the "Administrative Services"). The Debtors now seek to retain Epiq eDiscovery Solutions to provide, among other things, the following additional services (the "Additional Services"), at the Debtors' request:

    (a) ESI and hosting services, including:

    i. loading of processed productions onto local servers;

    ii. storing hosted productions into a single data repository (the "Data Repository"); and

    iii. making available the Data Repository to a predefined group of creditors;

    (b) providing the Debtors with a defensibility binder; and

    (c) providing the Debtors with privilege log services.

5.  For the avoidance of doubt, pursuant to the work order governing the Additional Services (the "Work Order"), attached hereto as **Exhibit A**, Epiq eDiscovery Solutions will perform the Additional Services for all of the Debtors.

---

[2] Capitalized terms not otherwise defined in this Supplemental Katchadurian Declaration shall have the meanings ascribed to them in the Application and Katchadurian Declaration, as applicable.

**Professional Compensation for Additional Work**

6.     Paragraph 8 of the Katchadurian Declaration describes the fees Epiq Bankruptcy Solutions LLC will charge the Debtors in connection with the Administrative Services and the Work Order sets forth the fees Epiq eDiscovery Solutions will charge in connection with its Additional Services.  Epiq eDiscovery Solutions' rates are competitive and comparable to the rates Epiq's competitors charge for similar services and are reasonable given the quality of Epiq eDiscovery Solutions' services, and bankruptcy and ediscovery expertise.

7.     The Debtors will be responsible for payment of costs for all services performed by Epiq eDiscovery except for those limited exceptions set forth in the *Order Establishing Discovery Procedures in Connection with Legacy Discovery of Energy Future Holdings Corporation, Its Affiliates, and Certain Third Parties and Other Related Matters* [D.I. 1832] (the "Discovery Order").  Pursuant to the Discovery Order, each participant from the predefined group of creditors with access to the Data Repository shall be responsible for the cost of its respective seat license(s) and downloading from the Data Repository.

8.     Epiq Bankruptcy Solutions LLC, intends to apply to the Court, for allowance of compensation and reimbursement of out-of-pocket expenses it incurs in connection with the Administrative Services pursuant to the Engagement Letter and Epiq eDiscovery Solutions, intends to apply to the Court, for allowance of compensation and reimbursement of out-of-pocket expenses it incurs in connection with the Additional Services pursuant to the Work Order; in each case, subject to Court approval and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the guidelines established by the United States Trustee for the District of Delaware, and further orders of the Court.

**Additional Disclosures Regarding Retainer Payments**

9.      The following table summarizes payments that Epiq received from the Debtors in the 90 days preceding the Petition Date:

| Invoice Date | Invoice Amount | Payment Date | Payment Amount | Treatment | Retainer Balance |
|---|---|---|---|---|---|
| 03/20/2013 | $100,000 | 04/04/2013 | $100,000 | Retainer | $100,000 |
| 03/31/2013 | $12,947.20 | 3/18/2014 | $12,947.20 | Payment | $100,000 |
| 04/30/2013 | $14,632.92 | 3/18/2014 | $14,632.92 | Payment | $100,000 |
| 08/31/2013 | $5,096.00 | 3/17/2014 | $5,096.00 | Payment | $100,000 |
| 09/30/2013 | $3,874.40 | 3/17/2014 | $3,874.40 | Payment | $100,000 |
| 10/31/2013 | $74,694.33 | 3/17/2014 | $74,694.33 | Payment | $100,000 |
| 11/30/2013 | $6,546.06 | 1/21/2014 | $6,546.06 | Payment | $100,000 |
| 12/31/2013 | $1,474.00 | 3/17/2014 | $1,474.00 | Payment | $100,000 |
| 01/31/2014 | $5,696.90 | 3/17/2014 | $5,696.90 | Payment | $100,000 |
| 02/28/2014 | $111,927.04 | 3/21/2014 | $111,927.04 | Payment | $100,000 |
| 03/31/2014 | $334,166.20 | 4/18/2014 | $334,166.20 | Payment | $100,000 |
| 04/23/2014 | $221,361.99 | 4/18/2014 | $221,361.99 | Payment | $100,000 |
| 04/30/2014 | $152,028.46 | 4/25/2014 | $100,000 | $100,000 payment, $52,028.46 applied to retainer | $47,971.54 |

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September 16, 2014

*/s/ James Katchadurian*
James Katchadurian
Executive Vice President
Epiq Bankruptcy Solutions, LLC

**Exhibit A**

**Work Order**

KE 33183386.6



# EDISCOVERY WORK ORDER

1. **Client Name and Contact Information ("Client"):**

|   |   |
|---|---|
| Firm or Company Name: | Energy Future Holdings |
| Mailing Address: | 1601 Bryan Street, Dallas, TX 75201 |
| Attention: | Daniel Kelly, Vice President and Associate General Counsel |
| Telephone: | 214-812-7182 |
| Email: | Dan.Kelly@energyfutureholdings.com |

2. **Project Name and Description ("Project") and Estimated Duration:**

|   |   |
|---|---|
| Project Name: | EFH Production Repository |
| Project Description: | Hosting of EFH productions for predefined group of creditors |
| Estimated Project Duration: | 12 months |
| Estimated Project Size: | 500GB to load and host |
| Deliverables to be provided (if any): |   |

3. **Initial Project Scope and Services ("Services") – Check All that Apply:**

| | | | | |
|---|---|---|---|---|
| ✓ | ESI and Hosting Services | | ✓ | Additional Services |
| ☐ | Pre-Filtering and/or Processing | | ☐ | Collections / Forensics (See Rider) |
| ☐ | Epiq Analytics | | ☐ | Document Review (See Rider) |
| ☐ | DocuMatrix® Hosting | | | |
| ☒ | Third Party Hosting  Relativity | | | |

4. **Designated Contacts; Only Include Client Information If Different Than In #1 Above:**

| Business Contacts | |
|---|---|
| For Epiq: | For Client: |
| Lisa Schofield | [NAME] |
| Sr. Vice President | [TITLE] |
| Epiq eDiscovery Solutions | [COMPANY] |
| 1420 K Street, NW, 11th Floor | [ADDRESS] |
| Washington, DC 20005 | [ADDRESS] |
| Tel: 202-572-2179 | Tel: [TELEPHONE] |
| Email: lschofield@epiqsystems.com | Email: [EMAIL] |

| Billing Contacts | |
|---|---|
| For Epiq: | For Client: |
| Jaci Clark | Daniel Kelly |
| Manager, Finance | Vice President and Associate General Counsel |
| Tel: (913) 621-9530 | Energy Future Holdings |
| Email: ediscoverybilling@epiqsystems.com | 1601 Bryan Street |
| | Dallas, TX 75201 |
| | Tel: 214-812-7182 |
| | Email: Dan.Kelly@energyfutureholdings.com |
| | **Copyees:** |
| | ddempsey@kirkland.com and alevin@kirkland.com |



5. **General**: Epiq eDiscovery Solutions, Inc. and its affiliated ediscovery companies doing business as "Epiq eDiscovery Solutions" (collectively, "**Epiq**") agree to provide and Client agrees to purchase the Services set forth in this Work Order and its attachments (collectively, the "**Agreement**"), which including the Fee Schedule, other applicable Riders, and the Terms and Conditions (the "**Terms**"). Client agrees that any service requested by Client, including those initially selected in Section 3 above, and provided by Epiq will be billed pursuant to the Fee Schedule and the terms of this Agreement. By signing this document, the parties acknowledge and agree that they have read and understood, and agree to be bound by all the terms and conditions of this Agreement.

**AGREED TO BY:**

Epiq eDiscovery Solutions

By: *[signature]*
Title: SVP Finance
Name: Beth Armstrong
Date: 9-2-2014

Energy Future Holdings

By: *[signature]*
Title: Vice-President and Associate General Counsel
Name: Daniel Kelly
Date: 9/2/14

*Epiq Address for Notices:*
Epiq eDiscovery Solutions
90 Park Avenue, 8th Floor
New York, NY 10016
Attn: LEGAL DEPARTMENT
Fax: (212) 225-9201

*Client Address for Notices If Different Than In #1 Above:*
Energy Future Holdings
[ADDRESS]
[ADDRESS]
Attn: [NAME]
Tel: [TELEPHONE]
Fax: [FAX]
Email: [EMAIL]

*DWM 9/2/14*



## TERMS AND CONDITIONS

**1. EFFECTIVE DATE.** The effective date of this Agreement is the earlier of (i) the last date this Agreement is signed by the duly authorized representatives of each party; or (ii) the date Epiq commences the performance of Services (as defined below) (the "**Effective Date**").

**2. TERM AND TERMINATION.** This Agreement will commence on the Effective Date and terminate when the Project concludes, unless this Agreement is terminated earlier as set forth in this Section. Client may terminate this Agreement: (a) by providing Epiq at least thirty (30) days prior written notice; or (b) thirty (30) days after Epiq's receipt of written notice by Client to Epiq of Epiq's material breach provided that Epiq has not cured such breach within that thirty (30) day notice period. The parties agree that Client's ability to terminate this Agreement as set forth above has been provided in consideration for Client's willingness to exclude all other remedies related to such termination. Epiq may terminate this Agreement by providing the Client at least thirty (30) days prior written notice or upon Client's breach of any provision in this Agreement. If Client fails to pay timely any Invoice and/or Invoice Line Item (as defined below), without limiting Epiq's other remedies at law or in equity, Epiq may suspend or terminate any or all Services. Any reactivation of Services may require a reactivation fee to be paid by the Client to Epiq.

**3. EFFECTS OF TERMINATION; COMPLETION OF SERVICES.**

(a) Termination of this Agreement is without prejudice to any other right or remedy of the parties. Termination of this Agreement for any reason does not release either party from any liability which, at the time of termination, has already accrued to the other party, or which may accrue in respect of any act or omission before termination or from any obligation which is expressly stated to survive the termination.

(b) Upon termination of this Agreement, all payment amounts due under this Agreement shall become immediately payable by Client.

(c) Upon termination of this Agreement or completion of the Services provided hereunder, Client acknowledges that Epiq shall continue to host all Client CI (as defined below) until otherwise instructed in writing by Client to either delete, archive or return such Client CI and Client agrees to timely pay all hosting and related fees to Epiq reflected on any Invoice and/or Invoice Line Item and as set forth on the Fee Schedule (as defined below) until Epiq receives such instruction. Epiq has the automatic right without any liability to delete Client CI in the month following the last month Client fails to timely pay any Invoice and/or Invoice Line Item by the Due Date (as defined below) and in such event: (i) this Agreement shall be automatically terminated without any liability to Epiq, and (ii) Client shall remain obligated in the event of such termination to pay all outstanding (including accrued but unbilled) Invoices and/or Invoice Line Items and any costs of collection incurred by Epiq (including reasonable attorney's fees and costs) with respect to any unpaid amounts payable by Client to Epiq. In the event Client requests Epiq to delete or destroy all Client CI, Epiq agrees to delete or destroy all such Client CI; provided that Epiq may retain Client CI as required by applicable law, rule or regulation, and to the extent such copies are electronically stored in accordance with Epiq's policies or procedures then in effect. Provided Client is not in breach of this Agreement including with respect to its payment obligations to Epiq, any retained Client CI shall be kept confidential as required under this Agreement. Upon Client's request, and provided that Client has neither breached this Agreement nor violated any payment obligation, Epiq shall archive all Client CI at the completion the Services or move such Client CI from a hosting environment to archive at an additional fee as set forth on the Fee Schedule, and the Client may be required to pay for such services in advance.

**4. PERFORMANCE OF WORK.** Epiq warrants that the Services will be performed in a professional and workmanlike manner. The Services are being delivered on an "as-is" basis, and Epiq makes no other representation or warranty and disclaims all other express or implied conditions, representations and warranties including any implied warranties or conditions of merchantability, suitability, title, non-infringement or fitness for a particular purpose, including any warranty relating to third party products or third party services, or any warranty regarding the performance of any Epiq IP (defined below). With respect to the Software, Epiq specifically does not warrant that the Software, its functions, or the results of using the Software will be uninterrupted or error-free or that the Software will be secure from unauthorized access or hacking. Epiq's warranty in this Section does not apply to the extent the Services delivered by Epiq are affected by: (a) unauthorized actions by Client and/or its Agents (defined below) or third parties; (b) failure of or disruptions to Networks (defined below); (c) modification of the Services or Project without written approval by Epiq; (d) damage, disruption or malfunction of the Epiq Network or Epiq IP caused by Client or a third party; or (e) any Force Majeure Event (defined below). Where the performance of Services requires Epiq to have access to Client's facilities, Client agrees to use its best efforts to cooperate with Epiq. In connection with providing the Services hereunder, Epiq may transfer Client Data (as defined below) within the Network.

**5. CLIENT DATA.** Client will always retain the original version ("**Original Data**") of any data provided by or on behalf of Client to Epiq in a manner that would allow Client to promptly regenerate or duplicate all Client Data provided to Epiq. "**Client Data**" means copies of the Original Data delivered to Epiq during the performance of Epiq's Services and any work product created by Client and/or Client's Agents



derived from the Original Data. Client agrees to provide Epiq only that data that is necessary for the Services and related to the Project. Epiq shall not be liable for any Losses (defined below) arising out of or related to any data loss, damage or corruption to any Original Data or for any data provided to Epiq that is unrelated to the Project or of a data type of which Epiq is not made aware in writing by the Client. Client expressly acknowledges that the manner in which the Client Data is delivered to Epiq (for example, the media upon which it is stored, whether it is provided in encrypted format, etc.) may affect Epiq's delivery of Services. Neither party shall be liable to the other party for any Client Data transferred by email, through any third party tool or in any other unencrypted manner. Client agrees, represents and warrants to Epiq that, prior to collection and/or delivery of any Client Data to Epiq, Client has obtained binding consents and approvals from all necessary persons, authorities or individuals, and has complied with all applicable laws, rules, regulations and policies, to allow Epiq to collect and/or use all Client Data, hardware and software so provided by Client to Epiq in connection with the Services. Except for the purposes of copying, imaging, and/or other methods of data collection on-site at Client's facility, Client shall not transfer custody of Original Media (as defined below) to Epiq, including, but not limited to, servers, tablets, laptops, USB drives and other mobile devices ("**Original Media**"). Epiq explicitly disclaims any and all liability relating to any data or media provided to Epiq in violation of this Section 5.

**6. DATA PROTECTION MEASURES.** In connection with any specific legal compliance requirements (e.g., ITAR, EAR, HIPAA/HITECH, GLB, data privacy, PCI compliance) that may be required in connection with the Services, Epiq disclaims any related liability unless Client provides Epiq reasonable advance written notice of such requirements and Epiq agrees in writing to provide the requested Services in connection with such requirements.

**7. FEES FOR SERVICES.** The attached Fee Schedule governs the pricing for the Services (the "**Fee Schedule**"). Fee Schedule constitutes Confidential Information (as defined below) of Epiq and its affiliates, and therefore must not be used by Client or disclosed to any entity or person except as may be allowed by Section 11 below. The monthly fee for hosting Services (as set forth on the Fee Schedule) is incurred on a monthly basis, and not pro-rata, irrespective of the date on which the database is deleted or archived. Unless otherwise agreed to in writing, Client must provide written notice to Epiq no later than the 25th day of any month, of its request to discontinue hosting Services effective the following month.

**8. INVOICING.** Epiq shall present written invoices (each an "**Invoice**" and comprised of "**Invoice Line Items**"), and Client agrees to pay all Invoices and each of their Invoice Line Items in immediately available U.S. dollars within thirty (30) days after the date of each such Invoice ("**Due Date**"). Epiq shall use a third party billing tool ("**Billing Tool**") for submission of payment of any Invoice or Invoice Line Item if requested by Client; provided that Epiq agrees to use such Billing Tool in writing and Client agrees to bear the full expense of such Billing Tool. In the event the terms and conditions governing the utilization of such Billing Tool conflicts with this Agreement, the provisions of this Agreement shall govern. Client may in good faith dispute any Invoice Line Item on an Invoice, but only if Client provides Epiq written notice of the particular Invoice Line Item in dispute and the reason for such dispute by no later than the Due Date. The parties agree to promptly use their commercially reasonable best efforts to resolve such disputes. Such efforts shall not constitute a waiver of any other rights which Epiq may have at law or in equity. Past due balances shall accrue interest at 1.5% per month until paid. Epiq shall be entitled, in its sole discretion, to offset any and all amounts owed to Epiq by Client from any amounts due and payable by Epiq to Client under any Invoice properly issued pursuant to this Agreement. Client agrees that Client and no other party, including reimbursement to the Client by third parties such as an insurance company, is responsible to Epiq for the on-time payment of all Invoices. Client also agrees that each of the following in no way operates as a waiver by Epiq of Client's obligation to pay Epiq's Invoices: (i) any acceptance by Epiq of any payment with respect to any Invoice and/or any Invoice Line Item from any party other than Client; and/or (ii) communications between Epiq and any third party other than Client regarding the potential or actual payment of any Invoice and/or any Invoice Line Item.

**9. PROJECT RELATED ITEMS.** Client agrees: (1) to provide specifications and instructions for the Project and to participate in regularly scheduled status conference calls; (2) to provide timely responses to Epiq's requests for information and approvals from Client; (3) that estimated dates of delivery by Epiq to the Client are not guarantees and are subject to Client's prompt performance; (4) that all delivery of electronic media from Client must be communicated to Epiq prior to delivery and accompanied by identifying documentation in compliance with Section 5; and (5) that upon completion of the Project, the Client Data shall continue to be hosted by Epiq for the monthly hosting fee and/or storage fee as set forth on the Fee Schedule until Client provides written notice to Epiq to terminate the hosting services or Epiq terminates the hosting services, either as permitted herein. If Epiq or any of its employees are deposed or required to testify in any judicial, arbitral or administrative proceedings, or produce documents or records through a subpoena or otherwise, Client shall be solely liable for all of Epiq's related fees and expenses of Epiq as if Client had requested such services pursuant to this Agreement, regardless of whether the Agreement has terminated.

**10. SHIPPING.**
(a) In connection with any media handling and shipment, Client agrees to provide Epiq with all necessary instructions including: (i) Client's current shipping address; (ii) the name, telephone number, and valid email address of the Client-designated recipient; and (iii) Client's desired shipping method and delivery date/time. All shipments to Client will be at Client's expense. Epiq is not responsible for any delivery delay or non-delivery to Client. If Client's shipments from Epiq are



declared lost by the third party shipper/delivery agent, then Epiq will claim compensation for Client's shipment from the third party shipper/delivery agent, and Client agrees that Epiq's total liability will be limited only to the value of the hardware or other equipment shipped and not the data thereon or for any other Loss. Epiq shall not be responsible for any Loss to Client or any third party nor shall issue any refund provided that Epiq provides proof that Epiq passed custody of such shipment to the third party shipper/delivery agent as set forth in this Section.

(b) Client explicitly agrees that Client shall accept any of the following evidence as proof that Epiq passed custody of Client's package to Epiq's shipping agent: (1) any shipping document from Epiq's shipping agent with the name or details of Epiq's shipping agent, Client's shipping details, Epiq's company name/details, and the date Epiq's shipping agent assumed custody of Client's package; (2) any online tracking result of Client's package on the shipping agent's website that bears Client's package tracking number and indicates that the shipping agent assumed custody of Client's package; or (3) any email from the shipping agent to Epiq confirming that the shipping agent assumed custody of Client's package or regarding such shipping agent's efforts to track Client's package.

### 11. CONFIDENTIALITY; LIMITED LICENSE.

(a) In connection with this Agreement, each of Epiq and Client (each, a "**Disclosing Party**" or "**Discloser**") may disclose to the other party (the "**Receiving Party**" or "**Recipient**") certain information that is marked or otherwise identified in writing as confidential or proprietary information of the Disclosing Party prior to or contemporaneously upon receipt by the Receiving Party or which the Receiving Party reasonably should recognize from the circumstances surrounding such disclosure or the contents of such disclosure to be confidential or proprietary including this Agreement. All such information including, but not limited to, the Fee Schedule, Client Data and IP including Epiq IP, as defined below, are hereinafter collectively referred to as "**Confidential Information**" or "**CI**". Notwithstanding the foregoing, the term "Confidential Information" and "CI" does not include information that is or becomes generally available to the public through no action or inaction by (i) the Recipient or (ii) a source to which Recipient knows is bound by a duty or obligation of confidentiality (contractual, fiduciary or otherwise) with respect to such information. Each Receiving Party shall hold all CI in confidence, use such CI only for the purposes of fulfilling their obligations hereunder, and not copy, reproduce, sell, assign, license, market, transfer, give or otherwise disclose such information to third parties or use such information for any purposes whatsoever, without the express written permission of the other party, other than for the performance of obligations hereunder or as otherwise agreed to herein. Each Recipient agrees to disclose CI only to those Agents on a need to know basis provided they are bound by restrictions on confidentiality no less restrictive than those imposed herein and advise each of Recipient's Agents receiving the CI of their obligations to keep such information confidential. All CI provided or disclosed to the Recipient shall remain the sole property of the Discloser. Nothing in this Agreement shall be construed as either (a) granting or conferring any current or future right, title or interest in or to any CI or proprietary right now owned by Discloser to the Recipient or (b) obligating Discloser to disclose CI to Recipient.

(b) In the event Recipient or any individual or company to whom it transmits or transfers the CI whether pursuant to the provisions of this Agreement or otherwise, becomes legally compelled to disclose any of the CI, the party required to disclose such CI will advise Discloser as soon as possible so that the Discloser may either seek an appropriate remedy, including a protective order, or waive compliance with the provisions of this Agreement. In the event that any such protective order or other remedy is not obtained, or that compliance with this Agreement is waived, the party required to disclose the CI will furnish only that portion of the CI which, in the written opinion of its legal counsel, is legally required to be disclosed and will exercise reasonable efforts to obtain reliable assurances that confidential treatment will be accorded such CI.

(c) Each party agrees to use best efforts to protect the other party's intellectual property, including without limitation, all proprietary information and knowledge, patents, copyrights, trademarks inventions (whether or not patentable), instruction manuals, on-line help files, concepts, ideas, tools, processes, Software, Components (as defined below), trade secrets and know-how, whether in oral, written, graphic, electronic or machine-readable form (collectively, "**IP**"). As used herein, "**Epiq IP**" shall include IP owned, developed, or licensed by Epiq, including IP used by Epiq to deliver the Services, and every translation, portation, modification, correction, addition, extension, upgrade, improvement, compilation, abridgment or other form in which an existing work may be recast, transformed or adapted and also includes any software, technology, methods or processes that a person skilled in the arts would consider to be derived from the Epiq IP or from any Epiq technology, methods or processes protected by IP laws. Client on behalf of itself and its Agents agrees to use Epiq IP provided by Epiq solely for the purposes of the Project to the extent delivered through the Services. Any Epiq IP utilized or developed by Epiq during the course of this Agreement is the exclusive property of Epiq and its licensors who retain all rights, title and interest in and to the Epiq IP. Neither Client nor any of its Agents shall exercise any ownership or proprietary rights in, or represent to any third party that it has an interest in, any Epiq IP. During the term of this Agreement, and provided the Client is not in violation of this Agreement including any payment obligations hereunder, Epiq grants Client a limited, non-exclusive, non-transferable licensed right to use the Epiq IP provided by Epiq to the Client solely to the extent necessary for the Client to use the Services and solely for Client's internal business purposes in connection with the Project. Use of Epiq IP may require acceptance of a click-to-accept end user license agreement (a "**EULA**"). Notwithstanding anything provided in this Agreement, Client agrees to license restrictions applicable to any third party IP sublicensed by Epiq to Client or which is contained in any Epiq



IP. Epiq's delivery to Client of certain deliverables in connection with the Services in no way operates as a waiver of Epiq's rights under this Section. Client Data and Client's own work product created by Client shall be owned by Client.

(d) The Client and its Agents shall not, without proper authorization from Epiq, gain access to Epiq's software, equipment, network, cabling, servers, mobile or other devices, hardware, peripherals, device drivers or computer functional environment ("**Network**"), or interfere with, disrupt or violate any of Epiq's policies or procedures relating to the Services, including those affecting Epiq Networks. Epiq in its sole discretion reserves the right to immediately terminate and/or suspend Client's and any of its Agents use of the Services in such event or upon Epiq's reasonable belief that any of the foregoing is occurring, may occur or is threatened to occur.

**12. TAXES.** Unless Client furnishes Epiq with certificates or other evidence supporting applicable exemptions from sales, use or excise taxation, invoices shall include and list all applicable sales, use, or excise taxes that are a statutory obligation of Client (including all sales, use, ad valorem taxes assessed on the use or purchase of the services or products and similar fees now in force or enacted in the future imposed on the Services) as separate line items identifying each separate tax category and taxing authority with all such items to be paid by the Client. Client agrees to promptly reimburse Epiq for all taxes levied in accordance with the general statutes or other authoritative directives of the taxing authority on amounts payable by Client to Epiq pursuant to this Agreement; however, Client shall not be responsible for remittance of such taxes to applicable tax authorities. If invoices exclude sales, use or excise taxes that are subsequently determined to be a statutory obligation of the Client, Client agrees to be responsible for paying such taxes directly to the taxing authority or to promptly reimburse Epiq in an amount equal to the amount of any such excluded taxes (as determined in accordance with applicable law, rule or regulation). Client shall not be responsible for any income, gross receipts, franchise, privilege, employee or occupational taxes of Epiq.

**13. EXCUSABLE DELAY.** Except for the payment obligations of the parties hereunder, neither party shall be liable for any default or delay in the performance of its obligations hereunder if and to the extent such default or delay is the result of causes beyond the control of the performing party, such as riots, epidemics, war, government regulations, fire, acts of God, acts of terrorism, or interruptions of communications services by communications carriers ("**Force Majeure Events**"). NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NEITHER EPIQ NOR CLIENT SHALL BE LIABLE FOR LIABILITIES, COSTS, LOSSES, DAMAGES AND EXPENSES ARISING OUT OF OR RELATED TO A FORCE MAJEURE EVENT.

**14. IP RESTRICTIONS.** The Software may contain or rely on components ("**Components**") that are owned by Epiq or third parties which have been licensed to Epiq for distribution within the Software. Client or its Agents agree not to: (a) modify, adapt, translate or create derivative works of any Epiq IP; (b) sell, lease, rent, loan, distribute, assign, sublicense, convey or otherwise transfer, pledge as security or otherwise encumber the rights and licenses granted hereunder with respect to any Epiq IP; (c) translate, copy, reverse engineer, re-engineer, decompile, reverse compile, or disassemble any Epiq IP; (d) attempt to discover or create the source code from the object code for any Epiq IP; (e) use any Epiq IP for the benefit of any other person or entity; or (e) cause, assist or permit any third party to do any of the foregoing. Client shall only permit access to the Epiq IP to its Agents who have a need to know in connection with the license rights granted under this Agreement. Neither Client nor any of its Agents shall publish, disclose, display or otherwise make available any Epiq IP to others. Neither Client nor any of its Agents may use the Components in any way whatsoever other than through Client's or its Agents' permitted use of the Software pursuant to and during the term of this Agreement in connection with the Project. "**Software**" shall mean software including but not limited to the executable code and any object code to execute the software owned or licensed by Epiq and made available to Client or its Agents in connection with the delivery of the Services. Upon termination of this Agreement, Client and/or its Agents shall immediately return or destroy all Epiq IP made available to Client and its Agents in connection with the delivery of the Services, and Client and its Agents shall refrain from further using such Epiq IP for any purpose whatsoever.

**15. INTENTIONALLY OMITTED.**

**16. INTENTIONALLY OMITTED.**

**17. INTENTIONALLY OMITTED.**

**18. ENTIRE AGREEMENT AND AMENDMENTS.** This Agreement constitutes the entire agreement between the parties pertaining to its subject matter and supersedes all prior and contemporaneous agreements, communications, understandings, negotiations, and discussions whether oral or written or course of dealings between the parties. No modification or amendment of this Agreement shall be binding upon either party unless in writing and signed by the authorized representatives of both parties. Email approval of the Agreement or any modification or amendment thereto may be provided by Client on a temporary basis and Client agrees to promptly provide Epiq with a validly executed version of this Agreement or such modification or amendment after such approval is given. This Agreement may be executed in counterparts, each of which shall be deemed to an original, but all of which shall constitute one and the same agreement.

**19. GOVERNING LAW AND VENUE.** This Agreement shall be governed in all respects by the laws of the State of New York, without regard to conflicts of law. Venue for any litigation brought to enforce or determine the meaning of the rights of the parties under this Agreement shall be in the courts of the State of New York, located in the City and County of New York or in the United States District Court for the Southern District of New York; provided, however, that if any entity comprising the Client commences a chapter 11 case, all legal proceedings pertaining to this engagement arising after

go



such case is commenced shall be brought in the Bankruptcy Court handling such case.

**20. NOTICES.** All notices hereunder shall be in writing, postage prepaid, addressed to the party to whom service is to be given, and shall be served upon the other party either personally or by overnight mail to the address below each such party's signature. Notices are deemed delivered: (i) when received if provided by personal service; or (ii) on the actual delivery date, if fully paid for and posted with a reputable overnight carrier using the proper service address of the addressee.

**21. INTENTIONALLY OMITTED.**

**22. VALIDITY AND ENFORCEABILITY; CONTRACTING PARTIES.** All clauses and covenants in this Agreement are severable; in the event any or part of them are held or found to be invalid or unenforceable by any tribunal (including any court or arbitrator), any other clauses or covenants shall be valid and enforced to the fullest extent available. The parties are independent contractors. Except as expressly stated herein, neither party shall have any rights, power or authority to act or create an obligation on behalf of the other party. The descriptive headings of the sections of this Agreement are for convenience only and do not constitute a part of this Agreement.

**23. ASSIGNMENT.** This Agreement shall inure to the benefit of the parties and their successors and assigns. The Services delivered and rights and obligations hereunder (including access to Epiq's onward processing of Client Data) may be assigned, performed by, and/or delegated to Epiq's affiliates or any of Epiq's subcontractors. Except as set forth in this Section, this Agreement is entered into by the parties solely for the benefit of Epiq and Client (and no third party shall be deemed a beneficiary hereunder) and none of the rights and obligations hereunder may be assigned by either party without the other party's prior written consent except in connection with a sale of substantially all the assets or merger of such party; provided that the purchaser in such sale or successor entity in such merger is credit worthy and assumes all the obligations of such party under this Agreement.

**24. GENERAL.** This Agreement, to the extent validly signed and delivered by electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. The following order of precedence shall govern (with highest precedence stated first) with respect to the following documents that may be signed in connection with this Agreement or attached to this Agreement: the Work Order, Schedules and Riders to this Agreement, these Terms and Conditions, and any EULA pertaining solely to any Epiq-owned IP. Any valid and binding non-disclosure agreement between the parties prior to the date hereof shall govern the provision of confidential information prior to the date hereof. Client agrees not to solicit, induce, recruit, employ or encourage, directly or indirectly, any of Epiq's or its affiliates' employees for a period of one (1) year after the date of this Agreement, absent Epiq's express written consent. The pricing set forth in the Fee Schedule to this Agreement contains individual unit pricing for each service. The price listed for each service in the Fee Schedule represents a bona fide proposal for that service and the Client may accept separate service components or may accept the services listed in their entirety. Services will be provided when requested by Client. Services are mutually exclusive and are deemed delivered and accepted when provided by Epiq. If, on the date Client should allege a violation of this Agreement by Epiq, Client is itself in violation of any term of this Agreement, including the timely payment of Invoices, the maximum amount of Loss Client may recover for such violation by Epiq shall be the total amount paid by Client to Epiq for the particular Services which gave rise to the Losses in the immediate six (6) months prior to the date of the action giving rise to the alleged Loss. Client on behalf of itself and its Agents releases and forever discharges Epiq and its Agents from any Losses, known or unknown, with Client or its Agents may have had or may now have relating to matters occurring on or before the Effective Date of this Agreement. Upon termination of this Agreement, provisions which by their nature should survive termination, shall survive termination, including all of the payment obligations of Client hereunder. In no event shall Epiq's Services constitute or contain legal advice or opinion or constitute the provision of legal services, and neither Epiq nor its personnel shall be deemed to practice law hereunder.



**U.S. E-DISCOVERY WORK ORDER FEE SCHEDULE**
(Revised 4-28-2014)

## *Shared Services*
### Loading of Productions

| Code | Service | Price |
|---|---|---|
| HST142 | Loading Native Files, Scanned Files, Third Party Productions per GB | |
| PRO330 | Technical/Litigation Analyst per hour | |
| HST161 | OCR per page (only applies to loaded productions that have no text when loaded) | |



### Hosted Production Repository Database

HST150   HST756   Document Review Hosting per GB per month (Months 1-12 = ▊  Months 13+ = ▊)

## *Non-shared Services*
### User Access to Hosted Database

HST210   HST626   Review User Monthly Fee per user per month

Left codes are for Epiq's premier DocuMatrix® and related technologies; right codes are for generic tools. **User fees for generic tools are charged at the full monthly rate for any portion of the month used.**

### Input & Data Processing

| Code | Service | Price |
|---|---|---|
| PRO270 | Pre-Filtering per GB | |
| PRO201 | eDataMatrix® Native File Processing per GB | |
| PRO360 | Create Searchable Text for Processed Data per page | |
| HST165 | Machine translation from one language to another per file | |
| PRO480 | Near-Duplicate Detection, Email Threading, Inclusive Message ID per GB (**applies to native ESI files**) | |
| PRO486 | Near Duplicate Detection, Email Threading, Inclusive Message ID per Doc (**applies to loaded produced data**) | |
| PRO240 | Password Cracking Attempt per file | |
| PRO245 | Decryption of e-mail Container per file (client provides key) | |

### Technology Assisted Review (TAR)

PRO592   Equivio Relevance per GB
PRO602   Relativity Advanced Analytics per GB
CON109   TAR Consulting Services per hour



### Processing and Review Hosting Databases

| | | | |
|---|---|---|---|
| HST159 | HST651 | Early Case Assessment Hosting per GB per month | |
| HST150 | HST756 | Document Review Hosting per GB per month (Months 1-12 = ▊  Months 13+ = ▊) | |
| HST210 | HST626 | Review User Monthly Fee per user per month | |
| HST250 | n/a | Non Review Storage/processing database per GB per month (starts in month 7) | |



Left codes are for Epiq's premier DocuMatrix® and related technologies; right codes are for generic tools. **User fees for generic tools are charged at the full monthly rate for any portion of the month used.**

Non-Review storage rates will apply to the uncompressed storage footprint of Client Data that is ingested into an Epiq Processing database but not promoted to an Epiq Hosting database or a third party application. Non-review storage will be provided to Client at no cost for six (6) full months after ingestion of such Client Data after which non-review storage rates will apply unless Client provides Epiq with prior written notice to either delete or archive the Processing database. Please note: Partial archives of the Processing database are not available.



## Production & Output Services

| Code | Service | Price |
|---|---|---|
| PRO260 | Create TIFF Images, per page | |
| PRO110 | Stamping/Endorsement, per page | |
| PRO235 | Prepare Data, Text, Images, per page | |
| PRO238 | Prepare Native Files per file | |
| PRO250 | PDF from TIFF per page | |
| PRO251 | Searchable PDF from TIFF per page | |
| HST161 | OCR per page | |

## Media

| Code | Service | Price |
|---|---|---|
| PRO17X | CD or DVD Burning per media |  |
| Various | Flash and Magnetic Media | |

Shipping and courier fees for media are billed at actual cost.

## Collection and Forensic Services

| Code | Service per hour | Hourly |
|---|---|---|
| FIL200 | Data Collection | |
| FIL201 | Forensic Analysis and Consulting, Tier I | |
| FIL202 | Forensic Analysis and Consulting, Tier II | |
| FIL203 | Forensic Analysis and Consulting, Tier III | |
| FIL310 | Forensic Project Manager | |
| FIL405 | Oral Expert Testimony, Forensic Svcs | |
| FIL406 | Written Expert Testimony, Forensic Svcs | |

Travel time of two (2) hours per Epiq consultant per matter is included at no cost. Thereafter, travel time shall be billed at 50% the applicable hourly rate. On-site services have a four hour minimum per day or if cancelled within 24 hours. Actual, reasonable transportation, lodging, parking, meals and expenses billed at cost. Hourly rates are subject to annual increase.

## Professional Services

| Code | Service | Hourly |
|---|---|---|
| PRO330 | Technical/Litigation Analyst |  |
| HST200 | Trainer | |
| PRO310 | Project Manager | |
| PRO305 | Client Services Director | |

Hourly rates are subject to annual increase.

## Included at No Charge

1. Initial creation of project planning document
2. Initial Web-based Training – 2 Hours
3. Standard reporting package
4. Password resets
5. Telephone-based help desk

## Inactive Data Storage & Destruction

| Codes | | Service | Price |
|---|---|---|---|
| HST120 | HST686 | Archive per GB per year, no user access |  |
| HST125 | n/a | Export per GB (no bates, no stamps) | |
| HST124 | n/a | Forensic Data Deletion per GB | |
| HST121 | n/a | Standard Data Deletion per hour | |
| HST122 | n/a | Affidavit of Destruction | |
| PRO128 | n/a | Client Media Storage per media per month | |

Left codes are for Epiq's premier DocuMatrix® and related technologies; right codes are for generic tools. If Client does not choose from these options, Epiq has no obligation to retain Client Data or media. Archived databases may require up to 14 business days to restore at Technical/Litigation Analyst rates. Separate charges will be made for processing databases, hosting databases and production sets. Client Media Storage charges commence in the fourth calendar month following receipt at Epiq premises (i.e., up to three months of storage without incremental billings). Return shipping charges billed at cost.



## U.S. Document Review Services (DRS) Hourly Rates

| Code | Service | NEW YORK | WASH DC | PHOENIX | DALLAS |
|---|---|---|---|---|---|
| DRS210 | DRS Attorney Document Review | $■ | ■ | ■ | ■ |
| DRS310 | Document Review Project Manager | ■ | ■ | ■ | ■ |
| DRS312 | DRS Assistant Project Manager | ■ | ■ | ■ | ■ |

**Notes:**
More experienced staff, language skills, subject matter specialization, Consulting Services and/or Professional Services involvement will incur additional charges (as shown above). Weekend, overtime, and holiday work may require supplemental air conditioning heat, building security and/or increased rates.

Should Client also engage Epiq to support the review of documents either through direct staffing or via a managed review, Epiq will provide a **10% discount to all ESI services** provided during the period in which Epiq provided review staff or undertaking a managed review.



# EPIQ EDISCOVERY WORK ORDER
## Document Review Rider

The following terms and conditions shall apply for document review services requested by Client and provided by Epiq to Client. Defined terms used but not defined in this Rider have the meanings ascribed to such terms in the Epiq eDiscovery Work Order entered into between Client and Epiq in connection with this Rider.

1. **Facility to be utilized for the Project.**

    ☐ Client is providing its own facility and equipment at this location: [INSERT ADDRESS]; **OR**

    ☐ Client requests that Epiq provide facilities and equipment.

    City:
    Estimated Commencement date:
    Estimated Termination date:

2. **Personnel.**

    ☐ Client initially requests that Epiq provide the following personnel to Client for the Project ("**Personnel**") as set forth below.

    (a) **EXEMPT PERSONNEL:** Below is a chart listing the type of Service for exempt Personnel, the number of such Personnel requested by the Client, and the rate of premium pay, if any, to be paid by the Client for each of the Personnel. In the event the Client authorizes, at its option, Premium pay, which generally is an additional amount of pay for working over forty (40) hours per week, Client shall be responsible for such fees. Standard billing rates for the exempt Personnel are specified on the Fee Schedule.

| Type of Service (Exempt Personnel) | Estimated Number of Initial Personnel | Premium Pay | |
|---|---|---|---|
| | | If **No** Premium Pay is Authorized by the Client, Indicate "No" Below | If Premium Pay **is Authorized** by the Client, Indicate "Yes" Below and Specify the Rate of Premium Pay That Is Authorized |
| DRS Attorney Document Review (May Include First Pass Review) | | | |
| Document Review Project Manager | | | |
| DRS Assistant Project Manager | | | |
| DRS Supplemental QC | | | |
| DRS Privilege Log Review/Redaction | | | |
| DRS Project Oversight [INSERT INDIVIDUAL NAME] | | | |
| DRS Foreign Language Attorney Review Foreign Language(s) Required: [INSERT] | | | |

Each Project requires at least one Document Review Project Manager. DRS Assistant Project Manager can be added to support the Document Review Project Manager and DRS Supplemental QC personnel can be added to support both the Document Review Project Manager and the DRS Assistant Project Manager if supplemental management resources are required. Neither the DRS Assistant Project Manager nor DRS Supplemental QC personnel are stand alone services.



**(b) NON-EXEMPT PERSONNEL:** Below is a chart listing the type of Service for non-exempt Personnel, the number of such Personnel requested by the Client, and whether the Client is authorizing any non-exempt Personnel to work overtime hours. Standard billing rates for the non-exempt Personnel are specified in the Fee Schedule. **Please note that any services provided in California are categorized as non-exempt. Indicate in the below chart if the Client is authorizing overtime hours to be worked by any non-exempt Personnel.** If overtime hours are worked, then overtime rates will be governed by applicable state law, and Client agrees to pay for such overtime rates.

| Type of Service (Non-exempt Personnel) | Estimated Number of Initial Personnel | Is The Client Authorizing Overtime Hours To Be Worked by the Non-Exempt Personnel? Indicate Yes or No Below |
|---|---|---|
| Non-Attorney Review | | |
| Non-Attorney Redaction | | |
| California-based Attorney Review | | |
| Other Services: [Specify] | | |

3. **Training.**

| ✓ | Service |
|---|---|
| ☐ | Client will provide the Personnel training and does not request training from Epiq; **OR** |
| ☐ | Client requests that Epiq provide assistance in the development of the substantive methodology for training document reviewers, including development of written training materials and a training presentation. Fees for such Services are charged at an hourly rate. |

4. **Additional Services.** Fees for the following additional Services are charged at an hourly rate:

| ✓ | Service |
|---|---|
| ☐ | Client requests that Epiq provide a defensibility binder to Client |
| ☐ | Client requests that Epiq provide privilege log services to Client |

5. **General.** Unless the document review platform is provided by Epiq to Client in connection with this Agreement, Client shall provide Epiq appropriate training on the review platform including but not limited to training manuals and documentation concerning the review platform. Client acknowledges and agrees that Epiq's Services hereunder will be subject to general oversight, review and supervision by lawyer(s) with a direct relationship with the Client. Client agrees to approve all timesheets in accordance with Epiq's Timesheet Guidelines, a copy of which may be provided to Client upon request.

6. **Work Product.** Upon completion of the Project, and provided that Client has fully paid all Invoices, all work product that was custom created by Epiq for Client and excluding Epiq IP pursuant to this Agreement shall by operation of this provision be automatically assigned by Epiq to Client.