1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :   Chapter 11

6   ENERGY FUTURE HOLDINGS         :

    CORP.,  et al.,               :   Case No. 14-10979(CSS)

7                                 :

            Debtors.             :   (Jointly Administration

8   _____    :   Requested)

    CSC TRUST COMPANY OF DELAWARE,:

9   as INDENTURE TRUSTEE and       :

    COLLATERAL TRUSTEE,           :

10                                :

            Plaintiff,           :

11                                :

        v.                        :    Adv. Proc. No. 14-50410

12                                :    (CSS)

    COMPUTERSHARE TRUST COMPANY,  :

13  N.A., COMPUTERSHARE TRUST      :

    COMPANY OF CANADA, EPIQ        :

14  BANKRUPTCY SOLUTIONS, LLC,     :

    EPIQ SYSTEMS, INC., EPIQ      :

15  SYSTEMS ACQUISITIONS, INC.,   :

    THE DEPOSITORY TRUST COMPANY, :

16  and CEDE & CO.,               :

                                  :

17          Defendants.          :

    _____:

18

19

20                          United States Bankruptcy Court

21                          824 North Market Street

22                          Wilmington, Delaware

23

24                          September 16, 2014

25                          11:11 AM - 1:41 PM

1   B E F O R E :

2   HON CHRISTOPHER S. SONTCHI

3   U.S. BANKRUPTCY JUDGE

4

5

6

7

8   ECR OPERATOR:   LESLIE MURIN

9

10

11

12   HEARING re Joint Motion of CSC Trust Company of Delaware as

13   Indenture Trustee, and Certain EFIH 10% First Lien

14   Noteholders, for Confirmation that the Automatic Stay Does

15   Not Apply or, Alternatively, for Limited Relief from the

16   Automatic Stay, Solely Regarding Rescission of Acceleration

17   [D.I. 473; filed May 15, 2014]

18

19   HEARING re Application of Energy Future Holdings Corp., et

20   al., for Entry of an Order Authorizing the Debtors to Retain

21   and Employ PricewaterhouseCoopers LLP as Internal Audit,

22   Information Security, and Tax Consultants Effective Nunc Pro

23   Tunc to the Petition Date [D.I. 654; filed May 29, 2014]

24

25   HEARING re Application of Energy Future Holdings Crop., et

1    al. for Entry of an Order Authorizing the Debtors to Retain

2    and Employ Ernst & Young LLP as Providers of Tax Advisory

3    and Information Technology Services Effective Nunc Pro Tunc

4    to the Petition Date [D.I. 655; filed May 29, 2014]

5

6    HEARING re Motion of Energy Future Holdings Corp., et al.,

7    for Entry of an Order Authorizing the Debtors to (A) Pay

8    Certain Prepetition Amounts on Account of the Insider

9    Compensation Programs and (B) Continue the Insider

10   Compensation Programs in the Ordinary Course of Business on

11   a Postpetition Basis [D.I. 1792; filed August 8, 2014]

12

13   HEARING re Motion of Energy Future Holdings Corporation for

14   Entry of an Order Authorizing the Debtors to File Under Seal

15   the Certain Portions of Commercially Sensitive Information

16   Set Forth in the Debtors' Motion for Entry of an Order

17   Authorizing the Debtors to (A) Pay Certain Prepetition

18   Amounts on Account of the Insider Compensation Programs and

19   (B) Continue the Insider Compensation Programs in the

20   Ordinary Course of Business on a Postpetition Basis [D.I.

21   1795; filed August 8, 2014]

22

23   HEARING re Motion of Energy Future Holdings Corp., et al.,

24   for Entry of an Order Establishing Procedures to Make

25   Certain Capital Investments and Purchases [D.I. 1925; filed

1   August 26, 2014]

2

3   HEARING re Motion of Energy Future Holdings Corp., et al.

4   Approving the Stipulation by and Among Luminant Generation

5   Company LLC, Luminant Mining Company, LLC, Sandow Power

6   Company LLC, and Alcoa Inc. [D.I. 1928; filed August 26,

7   2014]

8

9   HEARING re Motion of Energy Future Holdings Corp., et al.,

10   for the Entry of an order Authorizing and Approving

11   Expedited Procedures to Reject or Assume Executory Contracts

12   and Unexpired Leases [D.I 1930; filed August 26, 2014]

13

14   HEARING re Application of Energy Future Holdings Corp., et

15   al., for Entry of an Order Authorizing the Debtors to Retain

16   and Employ Filsinger Energy Partners as Energy Consultant

17   Effective Nunc Pro Tunc to the Petition Date [D.I. 650;

18   filed May 29, 2014]

19

20   HEARING re Application of Energy Future Holdings Corp., et

21   al., for Entry of an Order Authorizing the Debtors to Retain

22   and Employ Evercore Group L.L.C. as Investment Banker and

23   Financial Advisor Effective Pro Tunc to the Petition Date

24   [D.I. 651; filed May 29, 2014]

25

1   HEARING re Application of Energy Future Holdings Corp., et

2   al., for Entry of an Order Authorizing the Debtors to Retain

3   and Employ KPMG LLP as Bankruptcy Accounting and Tax

4   Advisors Effective Nunc Pro Tunc to the Petition Date [D.I.

5   652; filed May 29, 2014]

6

7   HEARING re Application of Energy Future Holdings Corp., et

8   al., for Entry of an Order Authorizing the Debtors to Retain

9   and Employ Thompson & Knight LLP as Special Counsel for

10  Certain Tax-Related Matters, Effective Nunc Pro Tunc to the

11  Petition Date [D.I. 653; filed May 29, 2014]

12

13  HEARING re Application of Energy Future Holdings Corp., et

14  al., for Entry of an Order Authorizing the Debtors to Retain

15  and Employ Deloitte & Touche LLP as Independent Auditor

16  Effective Nunc Pro Tunc to the Petition Date [D.I. 656;

17  filed May 29, 2014]

18

19  HEARING re Motion of Energy Future Holdings Corp., et al.,

20  for Entry of an Order Establishing Procedures for Interim

21  Compensation and Reimbursement of Expenses for Professionals

22  [D.I. 658; filed May 29, 2014]

23

24  HEARING re Application of Energy Future Holdings Corp., et

25  al., for Entry of an Order Authorizing the Debtors to Retain

1    and Employ Richards, Layton & Finger, P.A. as Co-Counsel

2    Effective Nunc Pro Tunc to the Petition Date [D.I. 659;

3    filed May 29, 2014]

4

5    HEARING re Debtors' Application for Entry of an Order

6    Authorizing the Retention and Employment of Kirkland & Ellis

7    LLP as Attorneys for the Debtors and Debtors in Possession

8    Effective Nunc Pro Tunc to the Petition Date [D.I. 660;

9    filed May 29, 2014]

10

11   HEARING re Application of Energy Future Holdings Corp., et

12   al., for Entry of an Order Authorizing the Debtors to Retain

13   and Employ Alvarez & Marsal North America, LLC as

14   Restructuring Advisor Effective Nunc Pro Tunc to the

15   Petition Date [D.I. 661; filed May 29, 2014]

16

17   HEARING re Application of Energy Future Holdings Corp., et

18   al., for Entry of an Order Authorizing the Debtors to Retain

19   and Employ Gibson, Dunn & Crutcher LLP as Special Counsel

20   for Certain Corporate and Litigation Matters, Effective Nunc

21   Pro Tunc to the Petition Date [D.I. 662; filed May 29, 2014]

22

23   HEARING re Application of Energy Future Holdings Corp., et

24   al., for Entry of an Order Authorizing the Debtors to Retain

25   and Employ Epiq Bankruptcy Solutions, LLC as the

1    Administrative Advisor for the Debtors, Effective Nunc Pro

2    Tunc to the Petition Date [D.I. 663; filed May 29, 2014]

3

4    HEARING re Application of Energy Future Holdings Corp., et

5    al., for Entry of an Order Authorizing the Debtors to Retain

6    and Employ McDermott Will & Emery LLP as Special Counsel for

7    Certain Energy-Related Transactional Matters, Effective Nunc

8    Pro Tunc to the Petition Date [D.I. 664; filed May 29, 2014]

9

10   HEARING re Application of Energy Future Holdings Corp., et

11   al., for Entry of an Order Authorizing the Debtors to Retain

12   and Employ Sidley Austin LLP as Special Counsel for Certain

13   Corporate and Litigation matters, Effective Nunc Pro Tunc to

14   the Petition Date [D.I. 665; filed May 29, 2014]

15

16   HEARING re Application of the Official Committee of

17   Unsecured Creditors of Energy Future Holdings Corp., et al.,

18   for Entry of an order Pursuant to Sections 328(a) and

19   1103(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2014

20   for Authority to Retain and Employ Morrison & Foerster LLP

21   Effective as of May 12, 2014 [D.I. 1696; filed July 25,

22   2014]

23

24   HEARING re Application of the Official Committee of

25   Unsecured Creditors of Energy Future Holdings Corp., et al.,

1    for Entry of an order Pursuant to Sections 328(a) and

2    1103(a) and the Bankruptcy Rules 2014(a) and 2016(b)

3    Approving the Employment and Retention of Polsinelli PC Nunc

4    Pro Tunc to May 13, 2014, as Co-Counsel to the Official

5    Committee of Unsecured Creditors [D.I. 1698; filed July 25,

6    2014]

7

8    HEARING re Application of the Official Committee of

9    Unsecured Creditors of Energy Future Holdings Corp., et al.,

10   for Entry of an Order Pursuant to Sections 328(a) and

11   1103(a) of the Bankruptcy Code Authorizing the Employment

12   and Retention of FTI Consulting, Inc. as Financial Advisor

13   Effective as of May 19, 2014 [D.I. 1699; filed July 25,

14   2014]

15

16   HEARING re Application of the Official Committee of

17   Unsecured Creditors of Energy Future Holdings Corp., et al.,

18   for Entry of an Order (A) Authorizing the Employment and

19   Retention of Lazard Freres & Co., LLC as Investment Banker

20   Effective as of May 14, 2014, (B) Waiving Certain Time-

21   Keeping Requirements Pursuant to Local Rule 2016-2(h) , and

22   (C) Granting Related Relief [D.I.. 1700, filed July 25,

23   2014]

24

25   HEARING re Application of Fee Committee for Authorization to

1    Employ and Retain Godfrey & Kahn, S.C. as Counsel to the Fee

2    Committee, Nunc Pro Tunc to the Fee Committee's Appointment

3    [D.I. 1888; filed August 19, 2014]

4

5    HEARING re Motion of Energy Future Holdings Corp., et al.,

6    for Entry of an Order (A) Setting Bar Dates for Filing Non-

7    Customer Proofs of Claim and Requests for Payment Under

8    Section 503(b)(9) of the Bankruptcy Code, (B) Approving the

9    Form of and Manner for Filing Non-Customer Proofs of Claim

10   and Requests for Payment Under Section 503(b)(9) of the

11   Bankruptcy Code, and (C) Approving Notice Thereof [D.I.

12   1682; filed July 23, 2014]

13

14   HEARING re Motion of Energy Future Holdings Corp., et al.,

15   for Entry of an Order Extending the Debtors' Exclusive

16   Periods to File a Chapter 11 Plan and Solicit Acceptances

17   Thereof Pursuant to Section 1121 of the Bankruptcy Code

18   [D.I. 1683; filed July 23, 2014]

19

20   HEARING re Amended Complaint [Adv. D.I. 4; filed June 29,

21   2014]

22

23   HEARING re Motion of EFH Notes Indenture Trustee Pursuant to

24   11 U.S.C. §§ 1102(a)(1) and 105 for Appointment of an

25   Official Committee of Unsecured Creditors for Energy Future

1    Holdings Corp. [D.I. 1676, filed July 23, 2014]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

```
 1   A P P E A R A N C E S :

 2   KIRKLAND & ELLIS

 3        Attorneys for the Debtors

 4

 5   BY:  EDWARD SASSOWER, ESQ.

 6        BRIAN SCHARTZ, ESQ.

 7        MARK MCKANE, ESQ.

 8        DAVID DEMPSEY, ESQ.

 9        CHAD HUSNICK, ESQ.

10

11   RICHARDS, LAYTON & FINGER, P.A.

12        Attorneys for the Debtors

13

14   BY:  DANIEL J. DEFRANCESCHI, ESQ.

15        JASON M. MADRON, ESQ.

16

17   SIDLEY AUSTIN

18        Attorneys for the Debtors

19

20   BY:  MATT CLEMENTE, ESQ.

21        PAUL CARUSO, ESQ.

22

23

24

25
```

1    YOUNG CONAWAY STARGATT & TAYLOR, LLP

2          Attorney for Ad Hoc Committee of TCEH First Lien

3          Creditors

4

5    BY:  DREW MAGAZINER, ESQ.

6

7    BROWN RUDNICK

8          Attorney for Christiana Trust

9

10   BY:  JEFFREY L. JONAS, ESQ.

11

12   UNITED STATES DEPARTMENT OF JUSTICE

13          Attorneys for the U.S. Trustee

14

15   BY:  ANDREA B. SCHWARTZ, ESQ.

16          RICHARD L. SCHEPACARTER, ESQ.

17

18   SHEARMAN & STERLING

19          Attorneys for Duetsche Bank AG New York Branch

20

21   BY:  NED SCHADEK, ESQ.

22

23

24

25

1    POTTER ANDERSON & CORROON LLP

2        Attorneys for Deutsche Bank AG New York Branch

3

4    BY:  LAURIE SELBER SILVERSTEIN, ESQ.

5        R. STEPHEN MCNEILL, ESQ.

6

7    COUSINS CHIPMAN & BROWN, LLP

8        Attorneys for Ad Hoc Committee of EFIH Unsecured

9        Noteholders

10

11   BY:  SCOTT D. COUSINS, ESQ.

12        ANN M. KASHISHIAN, ESQ.

13

14   ROPES & GRAY LLP

15        Attorney for Delaware Trust Company

16

17   BY:  D. ROSS MARTIN, ESQ.

18

19   COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

20        Attorney for Delaware Trust Company

21

22   BY:  NORMAN L. PERNICK, ESQ.

23

24

25

```
 1   WHITE & CASE LLP

 2        Attorneys for Ad Hoc Group of TCEH Unsecured

 3        Noteholders

 4

 5   BY:  J. CHRISTOPHER SHORE, ESQ.

 6        TOM LAYTON, ESQ.

 7

 8   CROSS & SIMON, LLC

 9        Attorney for Fidelity Management & Research Company

10

11   BY:  MICHAEL JOSEPH JOYCE, ESQ.

12

13   POLSINELLI

14        Attorneys for the Committee

15

16   BY:  CHRIS WARD, ESQ.

17        SHANTI KATONA, ESQ.

18        JUSTIN ELDERSON, ESQ.

19

20   MORRISON & FOERSTER

21        Attorneys for the Committee

22

23   BY:  BRENT MILLER, ESQ.

24        LORENZO MARINUZZI, ESQ.

25        WILLIAM HILDBOLD, ESQ.
```

1   KLEHR HARRISON HARVY BRANZBURG LLP

2        Attorney for UMB Bank, Indenture Trust

3

4   BY:  RAYMOND H. LEMISCH, ESQ.

5

6   NIXON PEADOBY

7        Attorney for AST

8

9   BY:  RICHARD PEDONE, ESQ.

10

11  FOX ROTHSCHILD

12        Attorney for TCEH Unsecured Ad Hoc Group

13

14  BY:  JEFFREY SCHLERF, ESQ.

15

16  ASHBY & GEDDES

17        Attorney for WSFS, Trustee

18

19  BY:  GREG TAYLOR, ESQ.

20

21

22

23

24

25

1    PACHULSKI STANG ZIEHL & JONES

2         Attorneys for EFIH Second Lien Group

3

4    BY:  COLIN R. ROBINSON, ESQ.

5         LAURA DAVIS JONES, ESQ.

6         TIMOTHY CAIRNS, ESQ.

7

8    KRAMER LEVIN

9         Attorney for EFIH Second Lien Group

10

11   BY:  JOSHUA BRODY, ESQ.

12

13   PATTERSON BELKNAP WEBB & TYLER

14        Attorney for Law Debenture

15

16   BY:  DANIEL A. LOWENTHAL, III, ESQ.

17

18   SEWARD KISSEL

19        Attorney for Wilmington Trust

20

21   BY:  ARLENE ALVES, ESQ.

22

23

24

25

1   PAUL WEISS

2        Attorney for TCEH First Lien Group

3

4   BY:  JAKE ADLERSTEIN, ESQ.

5

6   FOLEY & LARDNER LLP

7        Attorney for UMB Bank, NA, As Trustee

8

9   BY:  MARK HEBBELN, ESQ.

10

11  BINGHAM MCCUTCHIN

12       Attorney for PIMCO

13

14  BY:  JEFFREY S. SABIN, ESQ.

15

16  BROWN RUDNICK

17       Attorney for WSFS, Trustee

18

19  BY:  JEFF JONAS, ESQ.

20

21  DRINKER BIDDLE & REATH

22       Attorney for Citibank, DIP Agent

23

24  BY:  HOWARD A. COHEN, ESQ.

25

1   FRIED FRANKK

2        Attorneys for Fidelity

3

4   BY:  GARY KAPLIN, ESQ.

5        MATT ROOSE, ESQ.

6

7   GITLIN & CO. LLC

8        Attorney for the Fee Committee

9

10  BY:  RICHARD GITLIN, ESQ.

11

12  GODFREY & KAHN, S.C.

13       Attorneys for the Fee Committee

14

15  BY:  KATHERINE STADLER, ESQ.

16       ERIN A. WEST, ESQ.

17

18  DEBEVOISE & PLIMPTON LLP

19       Attorney for Evercore Group LLC

20

21  BY:  DEREK ALEXANDER, ESQ.

22

23

24

25

1  AKIN GUMP

2      Attorney for the Ad Hoc Committee

3

4  BY:  SCOTT ALBERINO, ESQ.

5

6  MORRIS JONES LLP

7      Attorney for the Law Debenture

8

9  BY:  STEPHEN MILLER, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. SASSOWER:  Good morning, Your Honor.

5              THE COURT:  Just so you know, I do have to run off

6     the bench at noon for a short phone call, but I'll be back.

7              MR. SASSOWER:  Okay.  We actually may need a short

8     recess, so that --

9              THE COURT:  All right.

10             MR. SASSOWER:  -- should work out well.

11             For the record, Edward Sassower of Kirkland &

12    Ellis, proposed counsel to the debtors.

13             Your Honor, with your permission I'd like to

14    provide the Court with a brief update of the debtors'

15    progress since the last hearing on August 13th, and then I

16    will turn to today's agenda.

17             THE COURT:  Yes.

18             MR. SASSOWER:  As Your Honor is aware, the debtors

19    are in the midst of a bidding war on the E side of the

20    estate.

21             Since the last hearing the debtors have been

22    working diligently to maintain that momentum by nurturing

23    the bids that they have received and trying to attract new

24    bidders into the process.  Market conditions are favorable

25    and the debtors would like to lock in that value to the

1   greatest extent possible.

2           In the meantime the debtors have been working

3   closely with their creditor constituencies to develop a new

4   formal process that will govern this bidding war.  For

5   example, last week alone we had separate hour-long

6   conference calls to discuss the process with advisors to

7   each of the following constituents.  The TCH first lien ad

8   hoc committee, the creditors' committee, the ad hoc

9   committee for the TCH unsecured noteholders, the indenture

10  trustee for the TCH second lien note, the EFIH unsecured

11  group, otherwise known as the PICs, the EFIH second lien

12  group, the EFIH first lien group, Fidelity, the indenture

13  trustees for the EFIH and EFH notes, and the EFH unsecured

14  ad hoc committee and the EFH's equity holders.

15          And in the coming days or weeks the debtors plan

16  to launch a new formal process by filing a bidding

17  procedures motion, which we hope will be heard by this Court

18  on the October 17th, hearing date.

19          We've shared an advanced draft of that motion with

20  the parties that I just mentioned.

21          The bidding process -- the bidding procedures

22  motion rather will lay out the entire sales process between

23  now and the sale hearing; however, the bidding procedures

24  motion will not seek approval of a stalking horse bid.

25  Typically debtors conduct these stalking horse selection

1    process without court approval, and only file the bidding

2    procedures motion once they've selected the stalking horse.

3              Here, for a variety of reasons, including to

4    provide greater transparency, the debtors are taking the

5    additional step of seeking court approval of the stalking

6    horse selection process itself.

7              At the last hearing it was mentioned that Nextera

8    had publicly filed a revised bid on July 16th.  Since then

9    the debtors have had countless conversations with Nextera.

10   When the debtors notified Nextera that they were going to

11   launch a new formal process Nextera appropriately filed a

12   notice withdrawing their bid, which had been submitted in

13   connection with the old process.  We look forward to working

14   with Nextera in connection with the new process.

15             Additionally, several hearings ago I mentioned

16   that in an effort to aid the Court's understanding of the

17   complex tax issues that are involved in this case that the

18   debtors would prepare and file an explanatory memo or make a

19   court presentation.  I just wanted to reassure Your Honor

20   that we have not forgotten that pledge, and are hard at work

21   at preparing that memo and/or presentation and hope to be in

22   a position to share it with Your Honor in the coming weeks.

23             At this point, Your Honor, I would like to turn to

24   the agenda, unless you have any questions or comments about

25   the update.

1          THE COURT:  I do not.  Thank you for it though.

2          MR. SASSOWER:  Thank you.

3          Turning to today's agenda there are essentially

4     seven groupings of pleadings up for today.

5          The first grouping on the agenda involve as

6     proposed stipulated order between the debtors, the

7     creditors' committee, the ad hoc committee of the TCH

8     unsecured noteholders, and the indenture trustee for the TCH

9     second lien notes resolving any and all of their potential

10    objections to exclusivity and the debtors' retention

11    applications.

12         There is one objection to that proposed stipulated

13    order from the U.S. Trustee, and the debtors have filed a

14    reply to the UST's objection yesterday.

15         The second grouping on the agenda involves the

16    debtors' retention applications for ten professionals,

17    including Kirkland and Evercore.

18         Other than with respect to the U.S. Trustee's

19    objection to the proposed stipulated order the debtors have

20    resolved all open issues regarding these ten retention

21    applications, and to that end we filed several supplemental

22    declarations and have modified proposed orders to present to

23    the Court.

24         THE COURT:  And I have read those and reviewed the

25    orders.

1          MR. SASSOWER:  Thank you, Your Honor.

2          The third grouping on the agenda involves the

3    committees' application to retain Morrison & Foerster.  It's

4    my understanding that the committee has a modified order to

5    also present to the Court today.

6          The fourth item on the agenda is the retention

7    application for the fee committee's counsel, Godfrey & Kahn,

8    and it's my understanding that this motion is uncontested.

9          The fifth item on the agenda is the debtors'

10   interim compensation motion, and we've resolved all open

11   issues there as well, and we've got a modified proposed

12   order to present to the Court.

13         The sixth item on the agenda is the debtors'

14   exclusivity motion.  There's one objection to the

15   exclusivity motion from CSC, who's the indenture trustee for

16   the EFIH first lien notes, and that objection will be going

17   forward.

18         And finally, the seventh item on the agenda is the

19   EFH indenture trustee's motion to appoint an unsecured

20   creditors' committee at EFH, and I think that -- there'll be

21   an opportunity for parties to address the Court, but I don't

22   think that motion is going to need to go forward in light of

23   what we're going to hear from the United States Trustee.

24         Lastly, Your Honor, in order to accommodate

25   ongoing discussions with the United States Trustee's Office

1    the debtors have agreed to adjourn the bulk of the relief

2    requested in the debtors' insider compensation motion to the

3    October 8th hearing date.

4            THE COURT:  I'm sorry, I couldn't accommodate an

5    earlier hearing.  I just -- my schedule was -- between the

6    religious holidays and my schedule I just couldn't do it.

7            MR. SASSOWER:  We appreciate your finding that

8    additional hearing date for  us, Your Honor, and it is

9    important to us that that motion get granted as soon as

10   possible --

11           THE COURT:  I know it is.

12           MR. SASSOWER:  -- but we understand that's the

13   soonest you could do it, and we appreciate your moving

14   things around to accommodate us.

15           However, the debtors and the U.S. Trustee's Office

16   have reached consensus of one of the four insider

17   compensation plans, the Luminant commercial incentive plan,

18   which covers one insider, and we anticipate submitting an

19   order approving this plan under certification of counsel

20   after today's hearing.

21           THE COURT:  Okay.

22           MS. SCHWARTZ:  Excuse me, Your Honor, just to

23   clarification.  Andrea Schwartz for the U.S. Trustee.

24           We don't have consensus, but we don't object to

25   their going forward with that commercial incentive plan for

```
1    the one.
2              THE COURT:  Understood.  Yes, and I understand the
3    distinction.
4              MS. SCHWARTZ:  Thank you, Your Honor.
5              MR. SASSOWER:  With that, unless Your Honor has
6    any questions I'll turn to the first item on the agenda.
7              THE COURT:  Before you do that, which will be
8    fine, I just want to -- sorry, I had to find the right --
9    the asbestos bar date, and the only thing I want to address
10   there, obviously I continued the hearing to October 28th at
11   12:00.
12             I just wanted to make it clear for the record that
13   absent consent of the debtor that matter will go forward on
14   October 28th, contested or otherwise, regardless of the
15   status of any appointment of any additional committee.
16             So we can only wait so long, and I intend to go
17   forward on the 28th one way or the other, unless the debtor
18   otherwise consents.
19             MR. SASSOWER:  Thank you, Your Honor.
20             THE COURT:  I wanted to say that for the record.
21   I meant -- frankly meant to put that in the order and with
22   the press of business simply forgot, so I apologize.
23             MR. SASSOWER:  We appreciate that, Your Honor.  We
24   appreciate the distinction.
25             THE COURT:  All right.  Let's go to the agenda
```

1    then.

2              MR. SASSOWER:  So, I think where it makes sense is

3    to start with the stipulated order.  I just would like to

4    take the Court through the events that have kind of

5    (indiscernible - 11:21:08) up to today, then I do think

6    we're going to need to take a break there and not ask Your

7    Honor to rule on that yet, because I think there's one open

8    issue that we have a proposed fix for.

9              THE COURT:  Okay.

10             MR. SASSOWER:  But I do think just to keep things

11   in order it probably makes sense for me just to update you

12   on --

13             THE COURT:  All right.

14             MR. SASSOWER:  -- where we are there.

15             So, there's been a lot of talk in this case about

16   conflicts, maybe too much talk.  I say that because when we

17   started discussing the retention applications with the

18   various parties in interest it immediately became clear that

19   nobody was objecting to Kirkland or any other professional

20   being retained now, what people are concerned about is what

21   happens down the road if they have a potential conflict,

22   especially one involving an intercompany claim ripens into

23   an actual conflict.

24             Our answer to that was we'll cross that bridge if

25   we ever get to it.  That's not a novel approach.  My

1    partners and I have handled countless multi-estate

2    bankruptcies involving intercompany claims and that's the

3    standard operating procedure, and it's entirely consistent

4    with the Third Circuit's approach to conflicts and

5    retentions.

6              However, in the spirit of compromise and consensus

7    we decided to try to put some specificity or parameters

8    around that situation, and we are also dealing with the

9    exclusivity motion, so we started negotiated language with

10   White & Case, Morrison & Foerster, and Brown Rudnick, and

11   the successful result of that negotiation was embedded in a

12   proposed stipulated order, which we filed with the Court.

13             Then we started negotiating language with the

14   United States Trustee, and the successful result of that

15   negotiation is embedded in a revised proposed retention

16   order, which we've also filed with the Court.  And at that

17   point we thought we were done, but not quite.

18             The U.S. Trustee filed an objection to three

19   provisions in the proposed stipulated order that we

20   negotiated with the creditors, and the creditors asked for

21   additional language in the proposed stipulation to address

22   language that we negotiated with the United States Trustee.

23             So, we revised the proposed stipulated order to

24   address these issues raised by the creditors and raised by

25   the United States Trustee and we did resolve all of them

1    except for one issue, which is why we filed our reply in

2    response to the United States Trustee's objection.

3            The remaining objection at the time from the

4    United States Trustee was with respect to whether it was

5    proper for the debtors to consult with creditors before

6    hiring what we were calling an independent advisor.

7    However, after seeing how we resolved the other issues

8    raised by the Office of the United States Trustee, and after

9    clarifying that this is only a consultation right and not in

10   any way a consent or a veto right, the United States Trustee

11   has informed us that they were willing to withdraw that last

12   objection.

13           On the topic of the consultation right the EFIH

14   unsecured creditors saw that provision and have asked us and

15   asked me to inform the Court from the podium that we would

16   also consult with them, to the extent that EFIH decided to

17   hire an independent advisor, and although the EFH unsecured

18   creditors have not asked for that right we're happy to

19   consult with them too.

20           It's really not a big deal, we consult with all of

21   our creditors all of the time on all kinds of issues and

22   we're happy to do so in this instance as well.

23           In fact there's really nothing in the proposed

24   stipulated order that is that big of a deal in the sense

25   that the proposed stipulated order is really just

```
1    formalizing a whole bunch of stuff that the parties would

2    have more or less done on their own any way had there not

3    been a proposed stipulated order.  And the same can be said

4    for the language that we negotiated with the United States

5    Trustee.

6              So at that point we thought we were done; however,

7    upon comparing the stipulated order and the language we

8    negotiated with the United States Trustee there's an issue

9    of is there a conflict between those two languages and how

10   do we harmonize -- can we harmonize them a bit better?

11             And we are out in the hallway now and with a short

12   recess we have an idea of how to make those two -- those two

13   orders match up so there's not going to be any conflict.

14   There's a bunch of different approaches we've tried, we

15   think we've maybe stumbled upon the one that will work.

16             THE COURT:  You say two different orders, you

17   mean --

18             MR. SASSOWER:  The -- the language we negotiated

19   with the United States Trustee, which is embedded in all the

20   retention orders --

21             THE COURT:  Right.

22             MR. SASSOWER:  -- and the proposed stipulated

23   order that we negotiated with the creditors.

24             THE COURT:  Okay.

25             MR. SASSOWER:  There's a -- there's a question of,
```

1    well, which one controls in the event of a conflict.  We

2    think we have (indiscernible - 11:26:25) --

3              THE COURT:  All right.

4              MR. SASSOWER:  -- that eliminates any potential

5    conflict --

6              THE COURT:  Okay.

7              MR. SASSOWER:  -- and so that's -- that was by

8    more of kind of a status update.

9              I'll sort of at this point yield the podium if

10   people want to provide a status update, and then we can

11   hopefully come back to the Court with a -- a fully

12   consensual proposed stipulated order.

13             MS. SCHWARTZ:  Good morning, Your Honor, Andrea

14   Schwartz and Richard Schepacarter for Roberta DeAngelis, the

15   United States Trustee.

16             May it please the Court.  As the Court is aware in

17   the past four months since the debtors sought protection of

18   the U.S. bankruptcy laws in this court there have been a

19   number of motions, contested issues, and hearing time before

20   Your Honor that has been substantial.

21             As part of the process the U.S. Trustee has

22   reviewed and participated in achieving consensus and

23   resolution of issues consensually thereby obviating the need

24   for court time on objections.  We have seen this as a very

25   positive development and a way to proceed going forward.

1            Examples of that include uncontested trading

2      order, an uncontested non-insider compensation order, a

3      discovery protocol that was negotiated among many, many

4      parties.  And as we have stated previously to the Court, the

5      debtors and the official unsecured creditors' committee for

6      sure, and other parties to a lesser degree, have worked

7      tirelessly and cooperatively.

8            Before the Court today are some 15 retentions.  As

9      Your Honor is aware the review and commenting on retention

10     applications is squarely in the express charge of the U.S.

11     Trustee's Office, and we have spent enormous amounts of time

12     going through all of these retention applications.  Your

13     Honor has seen a host of supplemental declarations that have

14     addressed our concerns informally.  I'm sure Your Honor has

15     looked at some of these retention applications, many of

16     which are over 100 or 200 pages long, and can appreciate the

17     amount of time that we've been putting in with respect to

18     the retention applications.

19            Issues concerning Kirkland & Ellis' retention,

20     although not novel as Mr. Sassower noted, especially

21     concerning intercompany claims in large debtor cases, were

22     raised by unofficial groups of creditors at the outset of

23     the case, together with objections to the RSA and to the

24     second lien DIP, et cetera.

25            As Mr. Sassower stated we did in fact file an

1    objection to the protocol, and in essence what we said was

2    parties are free to contract, but these provisions are

3    overreaching and they infringe on essential Bankruptcy Code

4    provisions, and subsequent to filing that objection all of

5    our objections have been resolved by either, for example,

6    the infringing on the right to seek the examiner or trustee

7    taken out of the revised protocol.

8              With respect to the consulting rights debtors have

9    clarified that -- that there's no veto power, that the

10   independent members may hire counsel of their choice, it's

11   simply an advising of position to let people know who they

12   intend to hire and perhaps take recommendations, but that

13   the right and the ability of the debtors, through their

14   independent members, solely rests with the independent

15   members.

16             In addition -- I'm trying to think what the third

17   one was.  Oh, the third one was that there was no provision

18   in the protocol that additional retained professionals would

19   be seeking to be retained pursuant to court order, and that

20   is now clarified that professionals have to be retained by

21   court order.  I already mentioned that.

22             However, Your Honor, contemporaneously with

23   reviewing this protocol that was agreed to by the debtors

24   and others the U.S. Trustee was engaged in substantial

25   discussions with Kirkland & Ellis concerning its retention

1    application, and we did not only raise issues concerning

2    potential conflicts of interest, we raised a host of issues

3    concerning disclosures and other information and propriety

4    of declarations, which Kirkland addressed each and every one

5    of them.

6            The one issue that stuck out was this problem

7    concerning this when potential conflicts of interest may in

8    fact become actual conflicts of interest, and we spend a

9    great deal time dealing with Kirkland and addressing the

10   debtors' counsels concern that where there may be an actual

11   conflict there's a problem because debtors are also main

12   bankruptcy counsel, and how do they actually go forward and

13   propose a plan but be conflicted out of an actual matter?

14   And that was the rub, Your Honor.  And paragraphs 5, 6, and

15   7 of Kirkland & Ellis' proposed retention order actually

16   addressed that.  And if Your Honor doesn't have a copy I

17   have an extra copy handy for Your Honor.

18           THE COURT:  I have it, I just need to find it.

19           MS. SCHWARTZ:  Okay.

20           THE COURT:  Let's see.  Well, where the heck are

21   they?

22           MS. SCHWARTZ:  I have it.

23           THE COURT:  Okay.  That's fine, I --

24           MS. SCHWARTZ:  May I approach?

25           THE COURT:  Yes.  I've got every other

1    professional tab except Kirkland.  Sorry.  I guess we won't

2    be able to go forward.

3         (Laughter)

4              THE COURT:  Just kidding.  Just kidding.

5              Yes, go ahead.

6              MS. SCHWARTZ:  And I just want to mention, Your

7    Honor, that in working with Kirkland & Ellis, the U.S.

8    Trustee, Roberta DeAngelis, Mr. Sprayregan (ph), as I said,

9    we've had many discussions, but I want the Court to also

10   know that we were very mindful of the law of the Third

11   Circuit most recently expressed in Jade Management, 386 Fed.

12   Appendix 145 citing Marvel 140 F.3d 463; Pillowtex, 304 F.3d

13   246; First Jersey Securities, 180 F.3d 504; and DH&P, 949

14   F.2d 1300, which says that there's a pro se disqualification

15   for an actual conflict, but where there's a potential

16   conflict it's in the discretion of the Court as compared to

17   other circuits that have different standards for conflicts

18   of interest.

19              Applying that standard set forth by the Third

20   Circuit we came up with these three paragraphs that were

21   amenable and which actually essentially state the law but

22   also clarify that Kirkland & Ellis will be able to confer

23   with the debtors or debtors' conflicts counsel, advisors, et

24   cetera, when it's seeking to propose a plan, but it cannot

25   settle an actual conflict, it's out.  And it's very clear

1    that in the first sentence of paragraph 7, "K&E may not

2    represent the applicable debtors in litigating or otherwise

3    advising the applicable debtors with respect to the actual

4    conflict matter."

5          We also believe, Your Honor, that the legal

6    profession is self-policing and self-regulating.  Kirkland &

7    Ellis is a reputable law firm that as we can see from their

8    applications takes disclosure seriously, and at the prodding

9    also of the U.S. Trustee, makes many disclosures, and it

10   really is incumbent upon them, Your Honor, to be able to

11   determine when in fact they cannot, in accordance with the

12   law and their ethical obligations, represent the debtors due

13   to an actual conflict matter, or they may decide that a

14   matter is a potential conflict and they can't represent the

15   debtor in that -- in that matter.

16          This actual requirements in the order provide that

17   they're going immediately notify everyone.  They're going to

18   notify the Court, they're going to notify the U.S. Trustee,

19   they're going to notify all creditors by filing this notice

20   on the docket.  We thought this was a very reasonable

21   resolution of the potential conflict actual conflict issue.

22          That said, Your Honor, when we received the

23   protocol it was our understanding, and Kirkland had agreed,

24   that there wouldn't be an inconsistency between this

25   stipulation, which as Your Honor knows it's not resolving an

1    objection, it's just an agreement to forego litigation, that

2    there wouldn't be a stipulation presented for order by the

3    Court that would be inconsistent with the requirements

4    concerning actual conflicts that are contained in the order.

5    And the protocol that has been proposed does in fact

6    conflict.  And the reason it conflicts is because it

7    provides that the retained professional, as it stands and

8    was proposed to Your Honor, that the retained professional

9    may still participate in matters where there's an actual

10   conflict.  That is simply unacceptable to the U.S. Trustee.

11              And as of last night, Your Honor, at 8 o'clock, we

12   understood that matter to be resolved, that the offending

13   provisions in the potential -- in the protocol had been

14   deleted, and we were resolved.

15              It wasn't until this morning at 8:30 that we

16   learned that the -- a group -- an unofficial group of

17   creditors, the ad hoc group, decided that they were not

18   willing to make that change to this stipulation, we were

19   unable to determine why, and it's not acceptable to us.

20              So, I believe that's the issue that Mr. Sassower

21   was previewing for the Court that they believe they may in

22   fact have a way to resolve, and certainly we're willing to

23   consider what they have to say, but frankly, Your Honor, it

24   didn't seem right to us for the Court to enter one order

25   that specifically addresses in its appropriate place, the

1    retention order governing Kirkland & Ellis' retention, and

2    also, Your Honor, should be aware that Morrison & Foerster

3    has agreed also to that same language as to potential

4    intercompany conflicts between the TCEH debtors and EFH

5    Corporate Services.

6              As far as we're concerned there shouldn't be two

7    orders that are inconsistent and that you have to look at

8    one order and then go back to another order to see what that

9    order says, et cetera.

10             We understand there to be other than -- other

11   than the fact that the debtors were willing to sign a

12   stipulation in order to avoid litigation of its retention or

13   who knows litigation, just depositions really at this point,

14   when, as Your Honor knows, there are other official bodies

15   in this case, including the U.S. Trustee and the official

16   committee of unsecured creditors that have no objection to

17   Kirkland & Ellis' retention, and at the end of the day, Your

18   Honor, it's for the Court to determine whether or not the

19   provisions set forth in the order for Kirkland & Ellis'

20   retention are appropriate.

21             And to the extent that they conflict with this

22   protocol where Kirkland & Ellis has agreed to do additional

23   things like give notice and consult and all those other

24   things, you know, as we said, parties are free to contract,

25   not when they infringe on the Bankruptcy Code.

1              And so we'll look forward to hearing the proposed

2      fix from Kirkland & Ellis.

3              THE COURT:  The issue is paragraph 4 of the --

4              MS. SCHWARTZ:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MS. SCHWARTZ:  It's those two provided however

7      provisions.  And we had received a draft last night that

8      deleted those and said that -- that the -- the ability of

9      the retained professionals to represent the debtors would be

10     as set forth in the orders of their retention.

11             THE COURT:  Okay.  Thank you.

12             MS. SCHWARTZ:  Thank you very much, Your Honor.

13             THE COURT:  Mr. Shore?

14             MR. SHORE:  Good morning, Your Honor, Chris Shore

15     from White & Case on behalf of the ad hoc group of TCH

16     unsecured notes.

17             Obviously as Mr. Sassower has noted the protocol

18     in front of the Court was heavily negotiated at arms length

19     between sophisticated parties and it represents, as we

20     understand, it's the debtors' choice as to how they wish to

21     proceed with their retained professionals, and I understand

22     that the debtors are standing beside that.  But what may be

23     lost here is why we negotiated the protocol in the first

24     place.  So, if I can go into that and then address in

25     particular the U.S. Trustee's concern, which we understand

1    is essentially that the TCH creditors are somehow

2    inappropriately interfering with the debtors' right to

3    retain counsel.

4              As we noted since the beginning of the cases there

5    are significant unresolved interstate conflicts.  I don't

6    think anybody's disputing that.  Some of those are

7    historical disputes.  Whether -- for example, whether and to

8    what extent a $770 million intercompany claim from the T

9    side up to EFH is a legitimate claim.  That's a dispute

10   between estates.  Whether or not the T side has claims

11   arising out of the LBO.  Those are significant unresolved

12   issues that the Court has already authorized investigation

13   into under the 2004 protocol.

14             Some of the conflicts are perspective.  How are we

15   going to be dealing with this tax issue when it is a zero

16   sum game?  Someone may have to pay the tax and how that gets

17   apportioned between the estates is going to have to be

18   resolved at some point.  How you're going to disentangle the

19   estates and get rid of agreements that exist between the T

20   side and the E side if there's a deconsolidation.

21             As Mr. Sassower pointed out we tried to be

22   proactive on this, at least agree to some minimum terms

23   under which the parties were going to address those issues

24   going forward, and that largely had to do with notice.  Let

25   us know what's going on.  You can do certain things, we're

1    okay with that, but we want notice.

2            And in our protocol the most important thing was

3    that we always reserved the right to come back to the Court

4    to address the issues going forward once the parties

5    understood the nature and extent of the conflict and the

6    proposed solution.  It was on those issues that we agreed to

7    disagree at that point and address it in the context of

8    Marvel later.

9            Last night at 8 p.m., that's when we got the

10   redline which proposed striking out the provisos which were

11   negotiated, and we got back to the -- we said to the debtors

12   we'll get back to you in the morning, we reviewed it, we

13   talked about it, and got back to them this morning early,

14   7 o'clock or so saying we had a problem with that, but

15   proposed a fix.

16           And we all agree that between the protocol and the

17   order the most restrictive provision will apply.  In other

18   words the debtors have to comply with both.  It's not one or

19   the other, and if one is more restricted then they have to

20   work on that one, if the other one is more restricted they

21   have to work on that one.  We understand the U.S. Trustee

22   has rejected that approach and has insisted that the

23   protocol that was negotiated must be amended to provide that

24   the order controls.

25           The problem we have with the retention order is it

1    doesn't provide the opportunity to come back to the Court

2    and address what happens.  It attempts to resolve now what

3    the debtors may -- or sorry -- what K&E may and may not do

4    in the event that an actual conflict arises and says that

5    they may do certain things and it doesn't give anybody to

6    opportunity to address, for example, whether it is

7    appropriate for them to consult with independent counsel or

8    whether they have to stay silent on the issue, whether they

9    may have attorney/client communications between them and the

10   like.

11          But fundamentally let me address the criticism

12   that's been leveled by the U.S. trustee to what's going on.

13          They say, and they quote in their papers "that a

14   debtor should be given substantial deference in its choice

15   of counsel under 327(a)."  That may be a policy decision on

16   behalf of the U.S. Trustee as to how they approach 327

17   matters, but that's not the law.

18          The lead case they cite, David Cutler, in that

19   case the debtors sued some creditors.  A counsel came

20   forward to represent the creditors and the debtor in that

21   case sought to disqualify creditors' proposed counsel on the

22   basis that that proposed counsel had previously represented

23   the debtors.  In that case what the Bankruptcy Court did was

24   say that the creditor should be given substantial deference

25   in its choice of counsel.  And the reason and the

1   distinction between a debtor exercising its state law rights

2   and creditors coming forward under 327(a) is highlighted by

3   that case.

4        In a two-party dispute as the Third Circuit refers

5   to it in the Congolium (ph) case, you have counsel, you have

6   a current client, and you have a jilted client, and in that

7   case the courts have said there should be substantial

8   deference given to the current client in their choice of.

9        That's not the case here.  We don't have a jilted

10  client, we have T side debtors who want K&E and we have E

11  side debtors who want K&E.  They have retained them, they

12  want them to advise on all issues, they propose to do that

13  in the retention applications, and they had sought advise

14  and relied upon advise given from K&E to both the T side and

15  the E side on matters when they would otherwise be adverse.

16  That was the problem we were trying to fix.

17       327(a) is not the protection for a jilted client,

18  because in every instance the debtor is proposing to retain

19  counsel in conflict.  They know they are -- they are doing

20  it and they are consenting to do it by hiring that counsel

21  who would otherwise under state law have a conflict problem

22  if the T side said, no, you may not use them, or the E side,

23  no, you may not use them.  327 is not debtor protection,

24  it's protection for the Court who is charged with overseeing

25  the legitimacy of the proceedings before it, the creditors,

1    other parties in interest, and the U.S. Trustee.

2           To come in and say notwithstanding the debtors'

3    choice of counsel that they want to retain someone who is

4    not disinterested, that nonetheless the burden is upon the

5    counsel and the debtor to satisfy 327(a) or (e).

6           And in fact the Third Circuit in Congolium made

7    that clear that it's not even just creditors and parties in

8    interest, in that case a party who had no economic stake in

9    the matter, the insurers, the asbestos insurers there had

10   standing to come in and complain under 327(a) that even

11   though there was not a conflict that they could raise, they

12   were entitled to claim in that case that counsel was not

13   disinterested.

14          So, what we're trying to protect here is a

15   situation in which the client, T side and E side, has

16   already spoken, and parties in interest, not just the U.S.

17   Trustee, but any party in interest can come in and object

18   and say, I don't think you meet the standard for

19   disinterested.

20          So, what we did is we negotiated a stipulation

21   that essentially mirrors -- mirrors Marvel, we understand

22   that there's a problem, we're all going to be open about

23   that, we're going to talk about this, there's going to be a

24   disclosure with respect to this, there certainly isn't going

25   to be a situation where counsel is coming in and appearing

1    adverse to a debtor, that with respect to what we're going

2    to do later, what consultation rights they have, what

3    discussions they could have, what advise they have provide,

4    or anything else we're going to address later.

5            So, the proposed fix is either that we agree that

6    if there's a conflict between the two the most restrictive

7    applies, or if the U.S. Trustee is going to insist on their

8    overriding language, we must be given the right that we

9    negotiated for and that is important to us that we can come

10   back to the Court and seek to restrict it further.

11           I don't understand why the U.S. Trustee wants to

12   take the position that we are irrelevant in that dispute or

13   that somehow because we are not an estate fiduciary we're

14   not entitled to be heard.  As I said, the Third Circuit has

15   said that even parties who are not parties in interest in

16   the case have standing to come in under 327(a) and file an

17   objection.

18           So, hopefully we can work out the language, but in

19   the absence of being able to work out language we think that

20   under any circumstance our negotiated right to come back to

21   the Court and seek to address the issues of what they're

22   actually able to do once we see the size and nature of the

23   beast should be maintained.

24           THE COURT:  Thank you, Mr. Shore.

25           Anyone else before Ms. Schwartz speaks?

```
 1           Mr. Miller?

 2           MR. MILLER:  Thank you, Your Honor, Brett Miller,

 3   Morrison & Foerster, proposed counsel for the official

 4   committee of unsecured creditors of the T side debtors.

 5           There's also a side issue here related to our

 6   retention in that the same paragraphs that the conflict

 7   paragraphs that were added to Kirkland's order were added to

 8   our order, and in the version of the order that we filed

 9   last night we took out language, a reservation of rights,

10   that was negotiated with the ad hoc group, which we are

11   going to seek to put back into the order and we'll hand it

12   up to you at the appropriate time.  But I think it comes to

13   the same point of the U.S. Trustee having language that it

14   thinks complies with the Bankruptcy Code and then the

15   parties thinking and believing that we have negotiated

16   something also within the Bankruptcy Code that should not

17   conflict that should be able to be worked out hopefully at

18   the break, if not before you during the argument over the

19   retentions.

20           Thank you.

21           MS. SCHWARTZ:  First of all, Your Honor, I don't

22   think in any part of any presentation I made any statements

23   regarding the relevancy or non-relevancy of the unofficial

24   group of creditors, that is really -- I -- it appears their

25   own concerns.
```

1          However, Your Honor, a couple of things that were

2     mentioned I'd like to clarify and correct.

3          First of all, Mr. Shore advised the Court that the

4     most important part of this stipulation was notice.  They

5     wanted to get notice.  And if Your Honor looks at

6     paragraph 1 of the stipulated protective order and

7     paragraph 2 Your Honor will see that they are getting

8     notice.  They've put a whole host of provisions in there for

9     them to get notice.  So, I don't really think notice is an

10    issue.

11         The second thing is -- and we did not object to

12    that.  Again, Your Honor, if the debtors want to agree to

13    give them notice so be it.

14         The second thing is with this reservation of

15    rights.  There's a reservation of rights in the protocol.

16    They have their reservation of rights.  They're able to

17    object to anything if they get these -- if they get a notice

18    that says that Kirkland & Ellis is going to participate in

19    an actual conflict they already have their reservation of

20    rights in this -- in this protocol.  And, Your Honor,

21    frankly they always have their reservation of rights.

22         I mean with respect to additional counsel coming

23    in they have to get approved by the Court, and that will be

24    on notice under Rule 2002, everyone will be noticed, and

25    they will have their opportunity to come before the Court

1    and object to what other advisors there are.

2         So the fact that they put in a reservation of

3    rights is really six of one, half dozen of another.  They

4    have their rights any way.  If it makes them feel more

5    comfortable to put in an express reservation of rights we

6    don't see any issue with that.

7         But, Your Honor, there has to be some certainty to

8    retention applications, and as of today, Your Honor, there

9    no actual conflict that anyone has objected to for Kirkland

10   & Ellis.  Kirkland & Ellis, like all other professionals,

11   are entitled to present their applications to the Court and

12   for the Court to review them.

13        The U.S. Trustee is -- we spent a lot of time to

14   try to be able to meet what we saw as consistent with the

15   law and consistent with what the goals are of debtors'

16   counsel to work out a solution, which we thought was really

17   actually a very good solution, whereby the debtors' couple

18   could in a very complicated case with many intercompany

19   claims still achieve its goals of getting forth a

20   restructuring, transaction, et cetera, but could not be part

21   -- could not represent, that is advise, the debtors on an

22   actual conflict matter, and that is what they agreed to.

23        If Morrison & Foerster wants to put in their order

24   that there's some reservation -- if they feel that they must

25   in order to satisfy this other group of creditors put in an

1    express reservation of rights, like I said, Your Honor, if

2    Your Honor wants to sign an order with a reservation of

3    rights of rights they already have we have no objection to

4    that.  However, I think it's not accurate to say that their

5    rights aren't reserved and all they want is their

6    reservation of rights, because there's an express provision

7    right in the protocol.

8            Now, after I made by first presentation to Your

9    Honor Mr. Husnick from Kirkland & Ellis handed me a mark up

10   of the proposed fix, so I'm going take a look at that, and

11   if that works, then you know, we'll be happy to talk with

12   them.

13           The main thing, Your Honor, is that there

14   shouldn't be two conflicting orders out there, it doesn't

15   make any sense, and there's no basis for it.

16           If the main thrust of the protocol was to make

17   sure that these other creditor groups got notice they have

18   it.  If the main point was that they could reserve their

19   rights they have it.  Kirkland & Ellis has agreed to give

20   them notice 14 days of any conflict matter they're going to

21   be involved in.  They've agreed to consult with them, and

22   now consult with some other group which we're just learning

23   about.

24           THE COURT:  Okay.  Okay.  Enough.

25           MS. SCHWARTZ:  Thank you.

1           THE COURT:  No.  All right.

2           MR. SASSOWER:  I think since we're bumping up

3   against the hour it probably makes sense to let us confer in

4   the hallway, and then hopefully when you finish your call

5   we'll have consensus.

6           THE COURT:  All right.  Fine.  We'll take our

7   recess, and I'll look at the materials again in chambers.

8           MS. SCHWARTZ:  Thank you, Your Honor.

9           MR. SASSOWER:  Thank you.

10     (Recess at 11:55 a.m.)

11          THE CLERK:  All rise.

12          THE COURT:  Please be seated.

13          MR. SASSOWER:  For the record Edward Sassower of

14  Kirkland & Ellis, proposed counsel to the debtors.

15          Your Honor, the recess was successful, we do have

16  a proposed resolution, which we handed up to chambers.

17          THE COURT:  I've read it.

18          MR. SASSOWER:  And so if that is amenable with

19  Your Honor then we can submit a more fine copy to chambers

20  in just a bit.

21          THE COURT:  Okay.  Does anyone wish to be heard in

22  connection with the resolution?  Mr. Shore?

23          MR. SHORE:  Unfortunately we don't have the U.S.

24  Trustee here, but I'll --

25          THE COURT:  Where's Ms. Schwartz?

1          MR. SHORE:  I think she just stepped out to

2    (indiscernible - 2:37:33).

3          THE COURT:  Someone get Ms. Schwartz before

4    Mr. Shore puts anything on the record.

5       (Pause)

6          THE COURT:  Sorry about --

7          MS. SCHWARTZ:  I apologize, Your Honor.

8          THE COURT:  No, no, it's --

9          MS. SCHWARTZ:  We were trying to get some -- on

10   one of the other issues trying to get some --

11         THE COURT:  No worries, thank you.

12         MS. SCHWARTZ:  Sorry about that.

13         THE COURT:  The -- Mr. Sassower just announced

14   that the issue has been resolved by the mark up that was

15   sent into chambers and I had no objection with that, and I

16   just asked if someone wanted to be heard, Mr. Shore was

17   going to make some comments --

18         MR. SHORE:  Right.

19         THE COURT:  -- and we can proceed.

20         MR. SHORE:  Chris Shore from White & Case on

21   behalf of the TCH secured noteholder group.

22         The fix we've greed on is in paragraph 5 of the

23   protocol, which makes clear that once there's an actual

24   conflict the retention order applies, but is also subject to

25   further order of the Court.  In other words, if we get into

1    a Marvel situation the retention order says right now what

2    the debtors may or what K&E may do with respect to advising,

3    consulting and everything else, but that's always subject to

4    further order of the Court.

5              So our agreement to this is understanding that

6    even though the order right now says what they can do, any

7    party in interest or the Court on its own motion can

8    restrict what is set forth in the retention order to address

9    concerns that people have.

10             THE COURT:  Okay.  Anyone else?

11             All right.  With the changes, which have been

12   agreed to by all the parties in interest who've been

13   participating in connection with the case management order,

14   and as modified both prior to the hearing and during --

15   during the hearing I have no objection and am pleased to

16   sign the final version whenever it's available, and I will

17   approve it.

18             MR. SASSOWER:  Your Honor, we actually have an

19   execution copy.  Just one moment.

20        (Pause)

21             MR. SASSOWER:  May I approach, Your Honor?

22             THE COURT:  Yes.  Just give me a minute and make

23   sure it's consistent with the parties' agreement.

24        (Pause)

25             THE COURT:  Okay, I've reviewed it, all the

1    changes are in there, and all the parties have signed off.

2             MR. SASSOWER:  Thank you, Your Honor.

3             THE COURT:  And I'll sign it in just two seconds

4    here.

5         (Pause)

6             THE COURT:  I have signed that order.

7             MR. SASSOWER:  Thank you, Your Honor.

8             The next grouping of items on the agenda are the

9    debtors' proposed retention applications for ten

10   professionals, including Kirkland.

11            I know Your Honor said previously that you have

12   reviewed the proposed orders.  We have copies to hand up to

13   you for signature if you would like, or we can walk you

14   through the orders.

15            THE COURT:  No, you don't need to walk me through

16   the orders, unless there have been any further changes from

17   what you filed in the wee hours of the morning.

18            MR. SASSOWER:  There's just two quick fixes.  So

19   may I approach with Kirkland's, and then my partner, Brian

20   Schartz, with handle the remaining?

21            THE COURT:  Yes.  Okay.  No changes to the

22   Kirkland order, correct?

23            MR. SASSOWER:  Correct, Your Honor.

24            THE COURT:  All right.  Hang on.

25        (Pause)

1           THE COURT:  Okay, I've signed the Kirkland order.

2           MR. SASSOWER:  Thank you.

3           MR. SCHARTZ:  Thank you.  For the record, Your

4    Honor, Brian Schartz, I guess I can say counsel to the

5    debtors.

6           We have nine other retention applications.  None

7    changed from what we filed last night, but there are two

8    changes that I'd like to just hand up to the Court if I may.

9           One is for Epiq's work as a 327(a) applicant, as

10   well as work that KPMG is going to do in connection with

11   some information technology services.

12          So if you would, may I approach the clerk?

13          THE COURT:  Yes, you may.  Oh, I see what you're

14   saying.  All right.

15          MR. SCHARTZ:  So very quickly, what you have on

16   the redlines is one's handwritten cumulative top right-hand

17   corner, and I'm looking at the one for Epiq, and then behind

18   that is incremental, and you'll see that we just updated a

19   title to Epiq to reflect --

20          THE COURT:  Hang on.

21          MR. SCHARTZ:  No problem.

22          THE COURT:  I was in KPMG.  Okay.  You've -- go

23   ahead.

24          MR. SCHARTZ:  We updated title on Epiq to reflect

25   that we are in fact expanding their scope of services as an

1    E-discovery vendor.  We had meant to pick up a change that

2    one of their in-house people had made to the order, it

3    didn't get made last, and that's what's reconflicted in that

4    incremental redline, that's the only other change for Epiq.

5              THE COURT:  Just the change to the caption?

6              MR. SCHARTZ:  That's right.

7              THE COURT:  And --

8              MR. SCHARTZ:  And then --

9              THE COURT:  -- change from McDermott to Epiq in

10   paragraph 8.

11             MR. SCHARTZ:  Correct.

12             THE COURT:  No other changes.

13             MR. SCHARTZ:  Correct.

14             THE COURT:  Does anyone wish to be heard in

15   connection with the Epiq retention?

16             MS. SCHWARTZ:  No, yes or no.

17             THE COURT:  Okay.  So we're going to do this one

18   at a time to make sure I don't lose track, so.

19             I have signed the Epiq retention.

20             MR. SCHARTZ:  Thank you.  And then on the KPMG

21   retention application, I'm looking at the redline that's got

22   in the top right-hand corner incremental redline.

23             THE COURT:  Okay.

24             MR. SCHARTZ:  And if you flip to page 3 of that

25   redline you'll see we've added an expansion of the

1    engagement, that actually reflects a supplement that we

2    filed on September 5th, it was picked up in all of the

3    papers, but inadvertently was dropped from paragraph 3,

4    which is the most important provision, and it gives

5    operative effect to the supplemental materials they filed

6    with respect to KPMG's order.

7              THE COURT:  Okay.  Does anybody wish to be heard?

8              MS. SCHWARTZ:  No, Your Honor, we have no

9    objection.

10             THE COURT:  I have signed --

11             MR. SCHARTZ:  Thank you.

12             THE COURT:  -- the KPMG.

13             MR. SCHARTZ:  Your Honor, the other materials, the

14   seven applications, I don't know if you've got them printed

15   out, I've got printed clean and redline copies if you'd like

16   me to hand them up.  There are no changes from what we filed

17   last night.

18             THE COURT:  Yeah, I don't need the reds, just the

19   cleans, if you don't mind.

20             MR. SCHARTZ:  Why don't I spend just a second,

21   I'll hand them up, after I sit down at the podium.

22             THE COURT:  All right.  Can I ask you the question

23   before we do that then?

24             MR. SCHARTZ:  Sure, absolutely.

25             THE COURT:  Because I see that with regard to the

1    debtor that the Deloitte and the Richards retention

2    applications are continued.  What is -- what is the reason

3    for that?

4              MR. SCHARTZ:  So there are four retention

5    applications that we have continued.  PricewaterhouseCoopers

6    and Ernst & Young.

7              THE COURT:  As well.  Okay.

8              MR. SCHARTZ:  Yes.  We continued at the request of

9    the United States Trustee's Office, all four will be heard

10   on the October 28th hearing.

11             The United States Trustee had questions regarding

12   Ernst & Young and PWC's disinterestedness under 327(a), and

13   you know, we are hopeful that we can continue discussions

14   regarding those retentions in advance of the October 28th

15   hearing.

16             On Deloitte I understand from the U.S. Trustee's

17   Office they also had some questions, although I don't know

18   right off the top of my head what they were, but we also

19   agreed to kick those.

20             And then are RLF they've been having -- the U.S.

21   Trustee's Office has been having direct discussions with

22   Richards, Layton about the scope of their disclosure, and

23   we're hoping that that will be resolved in advance of the

24   October 28th hearing.

25             To the extent we can resolve any of these in

1    advance of that hearing we'll submit them under the

2    certificate of counsel.

3            THE COURT:  Okay.  I would like to get these

4    issues resolved as quickly as reasonable possible as we go

5    deeper and deeper into the case and we still have people not

6    officially retained.  It's problematic, so hopefully be able

7    to finish up the retention questions.

8            And with regard to the committee, FTI, and Lazard,

9    I assume it's a similar continuation?

10           MS. SCHWARTZ:  Yes, it is, Your Honor.

11           THE COURT:  Okay, that's fine.  Very good.

12           MR. SCHARTZ:  And, Your Honor, the company has the

13   same goal on that.

14           Before I sit down we should also spend just a

15   moment on the interim comp motion, which Mr. Sassower had

16   later on the agenda, but we can probably just address right

17   now.

18           THE COURT:  Which motion, I'm sorry?

19           MR. SCHARTZ:  The interim compensation.

20           THE COURT:  Oh, yes, all right.  Hang on.

21       (Pause)

22           MR. SCHARTZ:  If you'd like I have a redline

23   against what we filed last night.

24           THE COURT:  I just need to find my version.

25           MR. SCHARTZ:  No problem.

1                 THE COURT:  Give me a minute.

2          (Pause)

3                 THE COURT:  Okay.

4                 MR. SCHARTZ:  So, the interim compensation order

5      is very similar to what you've seen in orders done in

6      Delaware, with just a few notable changes.  The most

7      important of which that you'll see against what we filed is

8      the inclusion of the fee committee in this order, and that's

9      reflected in paragraph 2.

10                 THE COURT:  Uh-huh.  Yes.

11                 MR. SCHARTZ:  Of the redline, as well as

12     paragraph 3.

13                 THE COURT:  Uh-huh.

14                 MR. SCHARTZ:  And the concept is that fee

15     committee will receive notices of applications as they're

16     filed, but their review process will be dictated pursuant to

17     the fee committee order, not necessarily the time frame

18     that's in the interim compensation order.

19                 And then we've also expanded the parties that have

20     notice and will receive the applications and have the

21     opportunity on the timeline that's set forth in the interim

22     compensation order.

23                 So it's going to be a bit of a process in this

24     case, but we've worked really hard with all the parties to

25     get to a good place both on the fee committee order and

1     this, and I believe that we are resolved with everyone.

2             THE COURT:  All right.  Does anyone wish to be

3     heard?

4             MS. SCHWARTZ:  No objection, Your Honor.

5             THE COURT:  All right.  I reviewed it, I have no

6     questions.  I did want to -- and I will approve it.

7             Just a matter of how we're going go forward with

8     the wishes, to the extent they come in front of the Court,

9     and that is that I don't want any fee application matters to

10    be heard at omnibus hearings.  What you will do is obtain

11    from Ms. Gatson special hearing dates for fee app matters

12    only, and at that point I guess we're talking basically

13    interim fee hearings.  We'll schedule those for an hour.  If

14    it turns out we need more time -- or you need more time if

15    you could obviously as always inform the Court ahead of time

16    and we'll make sure we have sufficient time to deal with it.

17    And if it arises that you need a hearing on a monthly fee

18    app issue call Ms. Gatson, get a date, we'll deal with it

19    that the time, and I will consider them under certificate of

20    no objection.

21            If I have an issue I'll let you know and we'll set

22    a date and we can -- we'll have it heard then.

23            But I just wanted to put that out there that I

24    don't want them -- the agendas are long enough and we have a

25    lot to do at the omnibus hearings, and I think I have the

1    time to set aside special hearings for fee applications, I

2    think that'll be more efficient.  Okay.

3            MR. SCHARTZ:  Thank you.

4            THE COURT:  So, subject to those comments and

5    subject to the parties' agreement I will approve the order

6    as modified.

7            MR. SCHARTZ:  Thank you.  And, Your Honor, if I

8    may approach I have the seven cleans of the other retention

9    applications.

10            THE COURT:  All right.  You're welcome.

11        (Pause)

12            THE COURT:  Just a minute, I want to -- I know

13    it's a bit strange to just sit there and watch me sign

14    things, but just hang on, let me make sure I get them all

15    done.

16        (Pause)

17            THE COURT:  Okay.  Anymore interim comp order?

18        (Pause)

19            THE COURT:  Yes?  Thank you.

20        (Pause)

21            THE COURT:  Should we deal with Mr. Miller's

22    retention?

23            MR. SASSOWER:  The committee and the U.S. Trustee

24    have asked that we kick that to the very end of the agenda,

25    they're still working out one issue.

1              THE COURT:  Very good.

2              MR. SASSOWER:  And I was also recently informed

3    that Godfrey & Kahn's retention application was submitted by

4    CNO (sic), so I think that is with --

5              THE COURT:  I haven't seen that.  I don't know

6    when you did it, but I haven't seen it.  Well, seeing it's

7    CNO and we're in the morning is we might as well 'til the

8    hearing.

9              MR. SASSOWER:  Yeah, we'll get you a -- we'll get

10   you a copy.

11             THE COURT:  All right.  We'll kick that for a

12   while.

13             MR. SASSOWER:  Okay.  So that brings us to the

14   only (indiscernible - 12:58:24) interim comp -- that brings

15   us to the only contested matter today which is the

16   exclusivity motion.

17             THE COURT:  Okay.

18             MR. SASSOWER:  And again, for the record, Edward

19   Sassower of Kirkland & Ellis, counsel to the debtors.

20             THE COURT:  Okay.

21             MR. SASSOWER:  Your Honor, on July 23rd the

22   debtors filed the exclusivity motion, which seeks to extend

23   the exclusive period in which to file a plan through and

24   including February 23rd, and the exclusive period in which

25   to solicit votes on such plan through and including

1    April 25th.  That motion was originally scheduled to be

2    heard at the April 13th hearing date.

3              THE COURT:  August 13th.

4              MR. SASSOWER:  August 13th hearing date, correct.

5    Thank you.

6              The debtors agreed to adjourn that motion to

7    today's hearing, and in order to facilitate that adjournment

8    Your Honor entered an approximately one-month bridge order

9    extending the two exclusive periods to September 18th and

10   November 18th respectively.

11             The debtors received only one objection to the

12   exclusivity motion from CSC, the indenture trustee for the

13   prepetition EFIH first lien debt.

14             As the Court is well aware the EFIH first lien

15   debt has already been repaid in full.  The EFIH first lien

16   noteholders last remaining tether to this case is they're

17   alleged claim to a make-whole premium.  The debtors dispute

18   that claim and that claim is currently being litigated.

19             However, if this Court for some reason disagrees

20   with the debtors' assessment and then in that case the

21   debtors will satisfy that claim in full too.

22             No one in this case dispute that is the EFIH first

23   lien noteholders' claim -- alleged claim to a make-whole

24   premium, to the extent allowed, would be oversecured many

25   times over.

1              Section 1121(b) of the Bankruptcy Code permits the

2      Court to extend the debtors' exclusive periods for cause if

3      shown.  When determining whether there's cause courts often

4      rely on a ten factor test, and in the motion we walk through

5      each and every one of those factors.  I'm just going to

6      quickly touch on some of them now.

7              The first factor is the size and complexity of the

8      case.  This is the largest operating company ever to file to

9      Chapter 11 in Delaware, and the seventh largest Chapter 11

10     case by debt ever filed in history, and the size of the case

11     is matched by its complexity.

12             In our reply we included a chart listing the

13     initial exclusivity extensions granted in other

14     quote/unquote mega cases, and the debtors' question request

15     is squarely in line with that precedent.

16             A couple of the other factors going to how much

17     time the debtors have already been afforded, and as the

18     Court is well aware this is our very first request.

19             One factor goes into whether the debtors are

20     paying their debts as they become due, and we most certainly

21     are, and a couple of factors go into whether creditors are

22     being prejudiced or pressured by the extension.  No creditor

23     opposed the exclusivity motion, save the objector, and the

24     objector clearly wouldn't be prejudiced by the extension for

25     the reasons that I just mentioned.

1          The remaining factors essentially go into whether

2    the debtors have used the previous exclusivity period or

3    periods wisely and will make good use of the additional

4    time.

5          The first four and a half months of these cases

6    have been a success.  Our primary goal during this first

7    phase was to smoothly transition the company into Chapter 11

8    with little or no disruption to their businesses, its

9    customer base of nearly 1.7 million active customers, or its

10   employee base of over 5,000 employees.  This is no small

11   part due to the nearly 50 operational orders and two multi-

12   billion dollar DIP facilities that were approved by this

13   Court.

14          In addition, as I mentioned at the start of the

15   hearing, the debtors have been working closely with their

16   creditor constituencies to develop a new formal process that

17   will govern the bidding war that is broken out on the E side

18   of the estate, and the debtors are also continuing to work

19   with various creditor parties to generate consensus towards

20   a plan of reorganization.

21          In its objection CSC proposes to terminate the

22   debtors' exclusivity period to approximately six weeks from

23   today.

24          If sustained CSC's objection would require the

25   debtors to essentially file another request to extend

1    exclusivity within the next 30 days, respond to potential

2    objections to that request, and to the extent the debtors

3    can't resolve those objections, litigate the motion before

4    the Court.  Requiring me to come back to this Court in a few

5    weeks to repeat the same arguments I'm making right now is a

6    waste of estate and judicial resources and those resources

7    can be better spent elsewhere in these cases.

8              As a result, Your Honor, we would ask that you

9    overrule CSC's objection and grant the motion.

10             THE COURT:  All right.  Thank you.

11             MR. MARTIN:  Good afternoon, Your Honor, Ross

12   Martin of Ropes & Gray for Delaware Trust Company.

13             Just as a technical matter CSC Trust Company, as

14   Mr. Sassower referred to them, has just recently changed

15   their name to Delaware Trust Company.  It's the same entity

16   and we're still the same trustee, but I just thought I'd

17   clear that up, and we're in the process of making

18   appropriate changes on the docket.

19             Turning to the motion, and I too will be brief,

20   because I think the question here is very focused, and it's

21   not exactly the question as Mr. Sassower posed it.

22             We are not saying today that exclusivity should be

23   terminated in six weeks.  What we're saying is that the

24   question of whether it should be extended to April should be

25   decided six weeks from now after we see the very large

1    announcement that the debtors are going to make that

2    Mr. Sassower discussed at the opening of the hearing.

3            This is not like other big Chapter 11 cases where

4    the debtor comes in with their -- at this stage -- with

5    their first request for an extension of exclusivity and

6    says, we need another six months to work out what we're

7    going to do.  They've told you today, and they've actually

8    been saying this since July, we're coming with a major

9    process.  And interesting enough it's not just a process for

10   sale, it's a process for a plan, we think, they've said it's

11   for some sort of bidding procedure for a restructuring of

12   EFH and EFIH.

13           Now, what I want to assure the Court is that our

14   concern about exclusivity is not an abstract one here.  We

15   have a very specific point that I want to come to, and I can

16   come to it pretty quickly based on what we do now publicly.

17           What we know is that when Nextera made their bid,

18   which is filed on the docket at docket number 1593, their

19   last bid raised their prior bid by an amount of about

20   $500 million which I think this is a coincidence, but it

21   happens to be enough to pay our make-whole claim.

22           As this Court has noted in some of the procedural

23   skirmishing over the make-whole claim, that claim may be

24   dependent on whether or not the EFIH debtor is solvent, and

25   that's the thing that's going to happen later, but the

1    outcome of this bidding process may affect the amount of

2    that claim.

3            The Nextera bid interestingly enough was

4    structured to pay all the creditors of EFIH except the first

5    lien make-whole claim, essentially in full, and then pay

6    debts at the parent company level.  It specifically said

7    we're going to start bidding up at the parent level, above

8    our box as we refer to it.  And that bidding is going to

9    take place for stock at the parent box, and the money is

10   going to come down.

11           That structure, that's the structure we've seen,

12   there may be others, we don't know, there's going to be a

13   motion coming, we don't know, but that structure of money

14   coming in to EFIH from above so that the existing equity

15   holder of EFIH, the parent company here and its bondholders,

16   can retain equity in our debtor when creditors are not being

17   paid in full raises a very straightforward legal issue.

18   That's the legal issue raised in 203 North LaSalle.  That

19   looks to me like a new value plan.

20           Now, I'm not here to argue today whether it is,

21   because we haven't seen it yet, and that's been the point of

22   our objections.  But it -- but I'm not speculating either,

23   because the bid on the table or that was on the table did

24   exactly this, and that's the bid that caused the debtors to

25   move to this new process.

1          So here's the point I'm making.  The real effect

2     of today is going to be if the Court extends exclusivity for

3     nine months and then the debtor comes with the process and

4     we have to litigate an exclusivity issue because of the

5     structure of that process my client will be prejudiced

6     because the burden of proof will have shifted and the burden

7     of persuasion, and that matters.

8          Today for an extension -- for an extension for

9     whatever they want to do for the next nine months they have

10     the burden, but if they get the extension today and we're

11     litigating this issue six weeks from now they're going to be

12     back here saying Mr. Martin has the burden of persuasion.

13          So all I'm saying is we should defer that question

14     so the burden stays right where it is.

15          We know they're coming with something and they

16     should not be allowed to ask for the exclusivity objection,

17     file that other motion a week from now, tomorrow, we don't

18     know, and prejudice us by changing that burden.  That seems

19     inappropriate to us.  That's really what this is about.

20          It may very well be that whatever that process is

21     doesn't invoke it because maybe they've changed their mind

22     since then, but the evidence that we have today, because

23     they haven't brought that forward, and they say they're

24     going to -- they must have decided what they're going to do,

25     they say they're going to bring this eminently.  We should

1    have that, everyone should have that in front of them so

2    that we can address that issue appropriately without the

3    burden shift.  That's what this -- that's what this is

4    about.  It is not about us trying to immediately lift

5    exclusivity today, it's about having that determination

6    made, which is going to be a serious legal determination

7    appropriately with all the -- the whole process disclosed to

8    the Court and creditors.

9              That's what I have, Your Honor.

10             THE COURT:  Okay.

11             MR. SASSOWER:  For the record, Edward Sassower.

12   Your Honor, just a couple of remarks.

13             Sounded like Mr. Martin would be okay with

14   exclusivity if I just came in here and said I've got a lot

15   of stuff to do and I could assure Mr. Martin that beyond the

16   bidding procedures motion there's a lot of other stuff to

17   do.  I didn't say we're coming back to the Court in a few

18   weeks and filing a plan.

19             In addition to the bidding procedures motion

20   there's the plan that we need to work on and everything else

21   we're doing in these Chapter 11 cases.  And so, I think we

22   satisfy the standard as articulated by Mr. Martin.

23             I also neglected to move the declaration of

24   Michael Carter into evidence, it's document number 1684.

25             THE COURT:  Any objection?

1           MR. MARTIN:  We have no objection, Your Honor,

2     because as you can tell from the tenor of our argument it

3     doesn't really have to do with the question of what

4     happened, it's the question of what's going forward.

5           THE COURT:  Okay.  Thank you.  Submitted without

6     objection.

7        (Debtor's Exhibit was admitted)

8           MR. SASSOWER:  And based on the evidentiary record

9     and based on our argument we believe we've met the standard

10    as articulated in the case law for an extension.

11          And the last thing I just would point out,

12    Mr. Martin in his reply and at the podium keeps saying we're

13    seeking a nine-month extension of exclusivity.  It's the

14    first -- the (indiscernible - 1:11:43) to file a plan is

15    five months -- practically five months from today, so it's

16    not an additional nine months --

17          THE COURT:  I understand.

18          MR. SASSOWER:  -- from today to file the plan.

19          THE COURT:  Thank you.

20          MR. SASSOWER:  Thank you, Your Honor.

21          THE COURT:  Anyone else?

22          MR. MARINUZZI:  Good afternoon, Your Honor,

23    Lorenzo Marinuzzi, Morrison & Foerster, proposed counsel for

24    the official committee of unsecured creditors.

25          We filed a very brief pleading yesterday

1    supporting the debtors' exclusivity extension request.  We

2    entered into the protocol which fortunately the Court

3    approved today that went a long way to building a

4    relationship with the debtors going forward to try to have

5    plan negotiations.

6           When the committee signed off on the cash

7    collateral order at the beginning of this case we bought 18

8    months of runway to negotiate a better outcome for unsecured

9    creditors.  Our view is that continuing with the debtors

10   with exclusivity is preferable to opening it up to others

11   who can assert their own plan, file their own plan, and end

12   the negotiations prematurely.

13          So we agree that the debtors have met the burden,

14   we think that the Court should extend the exclusivity

15   deadline.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. MARTIN:  Your Honor, just very, very briefly

19   in response to Mr. Marinuzzi's comments.  Ross Martin of

20   Ropes & Gray again for the record.

21          I understand that dynamic entirely on the TCEH

22   side of them wanting the 18 months and all of that, but what

23   this is about as my remarks highlighted is the structure of

24   a transaction -- a plan transaction and the legal structures

25   on the E side.

1            Now, there may be some interrelationships between

2    those, but that's entirely our point.  Those things need to

3    be explored when we know what the transaction is.

4            Thank you, Your Honor.

5            THE COURT:  You're welcome.  I'm going to overrule

6    the objection and grant the extension of exclusivity.  I

7    think review of the relevant factors easily support an

8    extension of exclusivity.  I think that the now five months

9    to file a plan, approximately seven to solicit, is an

10   appropriate time frame, this is an extremely complex case,

11   there's a lot of things that are moving, dynamics have

12   changed, and even though there appears to be a path forward

13   for perhaps a quicker disposition of some assets of the

14   estate, the -- of the debtors' estates -- excuse me -- the

15   group of the debtors as a whole has a long way to go in

16   order to get to a plan of reorganization that is hopefully

17   confirmable whether on a global basis or in pieces.  I mean

18   that's one of the I'm sure very intense negotiations that'll

19   occur over the next months to try to figure out exactly what

20   an exit strategy for this debtor is.

21           I think that just a two month or three month even

22   extension of exclusivity won't accomplish anything, we're

23   going to be right back here having the same argument and

24   you're going to get the same ruling, provided things

25   continue to move.

1           I don't think the EFIH transaction in and of

2    itself should determine when exclusivity will or won't be

3    extended, it's one piece of a broader case.

4           I do believe that while there are significant

5    amounts of money that are at issue in connection with the

6    objectors, you can't deny the fact that a larger amount of

7    money has already been paid, and that while I understand

8    there may be technical issues -- and they're not technical

9    -- legal issues with regard to how the bid occurs and

10   whether or not that will make what everybody says is an

11   oversecured claim maybe not an oversecured claim, I think

12   that's something that we can deal with when it arises, and I

13   think it really makes the case for exclusivity because we

14   won't know exactly what the process is, and that's okay,

15   because part of the whole point of exclusivity is to allow

16   the debtors to figure out what the process is going to be

17   and not commit them at an overly early stage to a plan that

18   isn't going to work or a process that might not ultimately

19   work.

20          I think Mr. Shore and others would say they did

21   that nine months ago and that's part of what a lot of the

22   fights were in connection with the RSA.  That's dead and

23   gone and we don't need to worry about it, other than the

24   context that I think that the debtors should be given a

25   reasonable opportunity to move forward from that and figure

1    out exactly what transaction to do with EFIH, how to do that

2    transaction, how that plays in with the restructuring, and

3    that's just one piece of a still jointly administered group

4    of debtors that has to be dealt with and negotiated in the

5    context of the broader issues and the global issues in the

6    case which are challenging.

7             So I don't really even think it's a close call,

8    I'll overrule the objection and extend exclusivity.

9             MR. SASSOWER:  May I approach?

10            THE COURT:  Yes, you may.  Thank you.

11       (Pause)

12            THE COURT:  I have signed that order.

13            MR. SASSOWER:  Thank you, Your Honor.

14            The what was supposed to be last item on the issue

15   -- on the agenda and the last other than Morrison &

16   Foerster, is the indenture trustee's motion to appoint an

17   unsecured creditors' committee to EFH, and I think

18   Mr. Schepacarter would like to talk to the Court in

19   connection with that motion.

20            THE COURT:  All right.  Thank you.

21            MR. SCHEPACARTER:  Good afternoon, Your Honor,

22   Richard Schepacarter for the United States Trustee.

23            I'd like to take -- just take the opportunity to

24   report on both committee issues at this point.

25            At the last hearing Your Honor asked for us to

1   report on the EFH and the E side committee and I'll take the

2   opportunity report on both, and I'd like to start with the

3   asbestos committee first.

4           Just to report back on both aspects, the U.S.

5   Trustee has decided to solicit creditors for each of these

6   committees.

7           With respect to the asbestos committee we have

8   consulted both the debtors, we consulted with Ms. Ramsey and

9   her clients, as well as the official committee.  The debtors

10  have provided us with a list of asbestos claimants, probably

11  several hundred asbestos claimants represented by a number

12  of law firms, and we expect to send out our questionnaire

13  and notice by the end of the week.

14          Of course a solicitation does not necessarily mean

15  that the United States Trustee will appoint an asbestos

16  committee, but we are mindful of our mandate and we wanted

17  to start the process as soon as possible.

18          With respect to the E -- I'll call it the E side

19  committee.  We requested information from the debtors, a

20  list of the top 20 beneficial or actual noteholders for both

21  EFH and EFIH.  We got the information back from the debtors

22  that they do not have -- do not have that specific

23  information.  The information that they provided us with was

24  a list of loan noteholders, not necessarily beneficial

25  actual holders, noteholders, from a third-party vendor.  To

1    a certain extent that was outdated.  It was actually dated

2    November and October of 2013.

3              To reach the beneficial holders we believe that

4    the best solution is to post a notice on the United States

5    Trustee's website and the official debtors' website as well

6    as a website that's hosted by Epiq soliciting intent.  We

7    will place this notice also by the end of the week and we'll

8    be able to give the beneficial noteholders two weeks to

9    respond.

10             Again, we note that solicitation is not

11   necessarily the appointment, but it is a step in the

12   process.  Again, Your Honor, we are mindful of our mandate

13   and we're cognizant that the noteholder community, mostly

14   managed funds, is already largely represented in this case.

15             Thank you, Your Honor.

16             THE COURT:  You're welcome.  I think that --

17   sorry.

18             MR. DOWNEY:  Your Honor, Richard Downey for

19   America Stock Transfers, indenture trustee, the movant on

20   the motion.

21             So we would ask that the motion be continued to a

22   date that's convenient while the solicitation process goes

23   forward.  The motion was for the appointment, but we are

24   grateful for the steps that are being taken.

25             THE COURT:  I think we'll continue it without date

1   at this point.  If it arises that it becomes relevant to go

2   forward we can renotice it up for a hearing.

3          MR. DOWNEY:  Thank you, Your Honor.

4          MR. SCHEPACARTER:  Understood, Your Honor.

5          Just -- for the record, Richard Schepacarter for

6   the United States Trustee.  I think it would be our position

7   that the motion would be moot at that time since we are

8   going out to solicit.  But I just wanted to make that point

9   for the record.

10          THE COURT:  Well, yeah, I'll go back -- I'm going

11   to continue it without date, but I will go back to the

12   ruling I made on the record -- sort of a ruling -- which

13   basically asked the U.S. Trustee to go through the process

14   of -- you know, there were a variety of things I suggested

15   might work, and one of them was soliciting for a committee

16   and whether a committee should be formed or not formed is a

17   -- is an issue that the U.S. Trustee will make in the

18   exercise of her discretion.

19          So having just said I'm going to continue I'm

20   going reverse myself and I will deny the motion without

21   prejudice as moot at this point and it can be renewed in the

22   event that circumstances might support a motion compelling a

23   formation of a committee.

24          MR. SCHEPACARTER:  Thank you very much, Your

25   Honor.

1           MR. DOWNEY:  Thank you, Your Honor.

2           THE COURT:  You're welcome.  The Court will enter

3     an order.

4           I think that resolves everything except Morrison &

5     Foerster.

6           MR. SASSOWER:  Yeah.  Well, in the interim I was

7     able to get a copy of the Godfrey & Kahn retention

8     application, counsel to the fee committee.  May I approach?

9           THE COURT:  Yes.  Does anyone wish to be heard in

10    connection with the fee committee counsel's retention?

11          MS. SCHWARTZ:  No objection, Your Honor.

12          THE COURT:  Well, I'm not going to sign this

13    because it's got a caption at the top.  I mean if you put

14    that little thing at the top of something you give me and it

15    gets scanned in next time it gets printed it gets two of

16    them, and next time it gets printed it gets two of them, and

17    the next it gets printed it gets three of them, and I know

18    it's is stupid silly thing, but I don't sign orders that

19    have that.  Send over a clean one when you get a chance.

20    I'll approve it when I receive it.

21          MR. SASSOWER:  Thank you, Your Honor.

22          THE COURT:  Mr. Miller?

23          MR. MILLER:  Good afternoon, Your Honor.

24          THE COURT:  A greeting again, I didn't mean to do

25    it in that (indiscernible - 1:24:12) manner.

1          MR. MILLER:  We're down to one paragraph of our

2     retention order that I think it probably is best that I

3     leave it to the U.S. Trustee and the ad hoc committee to

4     argue over.

5          The committee is and Morrison & Foerster are fine

6     either way with the paragraph in there, and I'll -- if you

7     don't mind I'll hand you the paragraph.

8          THE COURT:  That's fine.  Is this -- I had it

9     earlier.  What was old paragraph 8?  Yeah, this is the

10    language you took out that --

11         MR. MILLER:  This was taken out as a result of

12    adding the Kirkland's language, and it had been agreed to

13    between my firm and the ad hoc group, and there was a

14    misunderstanding with the U.S. Trustee and the ad hoc group

15    as to what was staying in, and in the confusion here we are

16    now with paragraph 14 up for grabs.

17         My personal view is I just want to be retained, so

18    we can go either way.  But unless the Court has any

19    questions.

20         THE COURT:  I appreciate the moment of honesty.

21    Yeah, let's hear what she has to say.

22         MS. SCHWARTZ:  Good afternoon, Your Honor, Andrea

23    Schwartz for the U.S. Trustee.

24         Your Honor, as I think we said before we had not

25    been informed that this provision had been reinserted into

1    the MoFo order.  We learned of it this morning when

2    Mr. Miller advised the Court.  I've tried to reach the U.S.

3    Trustee with respect to this provision, I've been unable to

4    reach my client.

5              Let me tell you what the concern is, Your Honor,

6    and in as brief a matter -- a brief manner as possible.

7              It does not appear to be relevant or necessary to

8    the retention of Morrison & Foerster for there to be a

9    provision inserted in the retention order that says that the

10   parties' rights to object to any actions taken or sought to

11   be taken by the committee or Morrison & Foerster -- and I've

12   been advised that that means Morrison & Foerster as counsel

13   to the committee -- in connection with investigating claims

14   that the EFCH and TCEH may have against EFH Corporate

15   Services and the like.

16             Here, as I understand it from Mr. Miller and

17   Mr. Shore, but I'm sure Mr. Shore will correct me when he

18   has an opportunity to talk with you, Your Honor, and that

19   there's a concern that because there are creditors that are

20   creditors of the different debtors that there may be a

21   conflict among the actual members of the creditors'

22   committee and that action may be taken that other creditors

23   may have a problem with.  And that they didn't want to be

24   seen as not objecting to the Morrison & Foerster retention

25   application as somehow waiving their right to come before

1    the Court on proper notice, order to show cause, whatever it

2    is, to be able to come before Your Honor and say, Judge, we

3    don't like what the committee is doing and we don't think

4    they can take that action because it's a conflicted

5    committee.

6            We don't think this provision is necessary in the

7    order.  We understand Morrison & Foerster has agreed to it

8    because they think it's ice in the winter.  It doesn't

9    really have any teeth, it's not really going to impinge upon

10   their representation in the case.  And as Mr. Miller said,

11   they would like to get their retention approved today.

12           We believe it's unnecessary, it unnecessarily

13   restricts the creditors' committee, not just Morrison &

14   Foerster, any waiver of rights -- again, we get back to the

15   same issue, Your Honor, about this reservation of rights;

16   however, this provision seeks to modify, restrict the

17   actions taken by the committee, and we don't think it has

18   any place in the retention order for Morrison & Foerster.

19           THE COURT:  Thank you.

20           MR. SHORE:  Chris Shore from White & Case on

21   behalf of the ad hoc committee of TCH unsecured note.

22           I don't think I need to tell the Court that the

23   first few hearings in this case were less than smooth.

24           Part of the process of today is everybody coming

25   to terms of how things are going to move forward without as

1    much acrimony as went on in those early days and a lot of

2    court time we had to spend.  Part of today is the TCH

3    creditors coming to terms with what exactly the committee is

4    going to be doing in these cases.

5              It's been a dialogue since the beginning, since

6    the committee was appointed, and in particular the fact that

7    the committee actually straddles the T side and the E side.

8              The committees individuals each owe a fiduciary

9    duty to EFH Corporate Services as do they to unsecured

10   creditors of TCEH.  They're going to be issues there.  We've

11   been in a dialogue.  We've been working constructively with

12   Morrison & Foerster since they were appointed, and part of

13   this ice in winter, as it was referred to, is actually a

14   salve that allows people to kind of understand that those

15   issues are out there and we're going to have to deal with

16   them at some point.

17             To that end when this application was up more than

18   a month ago we negotiated the language, we understand that

19   language was circulated to the United States Trustee for her

20   approval weeks ago, if not more than a month ago.  The first

21   we heard that what we had agreed to as sort of ground rules

22   were coming out was over the weekend.  We said, we're not

23   okay with this coming out of the order, it's part of what's

24   allowing us to hold this piece together.

25             So what does it mean in the context of where we

1    are?  This is not like the debtors' retention of

2    professionals where counsel has a conflict.  There's only

3    one client here, the official committee of unsecured

4    creditors as constituted.

5            So Morrison & Foerster doesn't have a conflict in

6    advising the committee with respect to claims that TCEH

7    might bring against EFH Corporate Services.  It's not a

8    technical conflict, they're just representing one client.

9    But there is an inherent conflict in having the fiduciaries

10   who owe fiduciary duties both to EFH Corporate Services and

11   TCEH to be in on that and addressing and taking action with

12   respect to that.

13           So all we did is negotiate that language to make

14   clear we're not dealing with that issue today.

15           All issues with respect to what the committee can

16   and cannot do we're not restricting them in any way other

17   than to say people are going to have to come in and talk

18   about that.

19           The retention application as written makes clear

20   that Morrison & Foerster is being retained, to do among

21   other things, investigate claims and causes of action that

22   might exist between any of the debtors, including the

23   debtors who might -- who they owe fiduciary duties -- or the

24   creditors of the debtors to whom they owe fiduciary duties

25   even though they're in conflict.  That's just -- that's not

1    a counsel conflict issue.

2            But we're going to have to come deal with the

3    committee conflict issue at a later date, and this language

4    that was proposed is just intended to do that, just make

5    clear that we're not resolving that issue today, even though

6    the application would technically permit Morrison & Foerster

7    to provide that service to the committee.

8            THE COURT:  Thank you.

9            MS. SCHWARTZ:  Your Honor?

10           THE COURT:  Yes.

11           MS. SCHWARTZ:  Just one brief point, and that is I

12   think Mr. Shore makes it clear that they don't have any

13   issues with respect to conflicts of Morrison & Foerster,

14   that's what this application is about.  The application is

15   about retention of Morrison & Foerster.

16           And, Your Honor, I think it's not exactly accurate

17   to say all we want is an opportunity to do that, because if

18   Your Honor looks at the overriding actions that have taken

19   place getting up to this point it's not just this paragraph,

20   it's the protocol, it's the provisions that were initially

21   in the protocol, including the restrictions on seeking,

22   approving, or being able to seek an examiner.  I think Your

23   Honor has to look at it from the totality of the

24   circumstances.

25           We have no issue that Mr. Shore's clients have a

1    right to be heard and have in fact been heard at every

2    hearing, that's not the issue.  But at some point, Your

3    Honor, the regular -- the regular routine of a bankruptcy

4    court in terms of what the bankruptcy court provides, what

5    retention applications are supposed to be should be

6    followed.

7            In this case they have achieved a protocol to deal

8    with certain conflicts of interest of Kirkland's counsel,

9    and in exchange for that they withdrew their deposition

10   notices to take the deposition of Mr. Sassower, the 30(b)(6)

11   of Kirkland, et cetera.  That had to do with Kirkland's

12   retention.  That's what that protocol was.

13           This one, Your Honor, has nothing to do with

14   Morrison & Foerster's retention, and accordingly we submit

15   that it should not be in this application.

16           Any rights that Mr. Shore's group or any other

17   creditor for that matter may have with respect to actions of

18   the creditors are always reserved and they have this Court

19   to come and seek relief.

20           Thank you.

21           THE COURT:  Thank you.

22           Well, I agree with Ms. Schwartz, and I'm going

23   strike the provision.  I think that everything the provision

24   seeks to preserve is already preserved.  Simply nothing to

25   do with the retention of Morrison & Foerster in any way

1    impinges on parties' abilities to raise these type of issues

2    with the Court, I think everyone in this case is very aware

3    of the issue, and it is nothing that I think anyone is going

4    to forget or be surprised about if issues are raised.  And

5    it does preserve rights with the intention of actions of the

6    committee and Morrison & Foerster, but I agree with

7    Ms. Schwartz, it has nothing to do with the actual retention

8    of counsel.

9             So, I'm going to strike the paragraph.

10            MS. SCHWARTZ:  Thank you, Your Honor.

11            MR. MILLER:  Your Honor, I'll hand up a clean

12    version.  For the purpose of the record I will state to the

13    ad hoc group and Mr. Shore and Mr. Lauria, that the

14    committee does still continue to abide by what was agreed to

15    between the parties.

16            THE COURT:  Okay.  Thank you.  Give me a minute.

17        (Pause)

18            THE COURT:  I've signed the retention application.

19            MR. SASSOWER:  Your Honor, Mr. Gitlin, who's the

20    independent chair of the fee committee, has asked if he may

21    take a moment to address Your Honor.

22            THE COURT:  Of course he may.  Good afternoon.

23            MR. GITLIN:  Richard Gitlin, Gitlin & Company,

24    chairman of the fee committee.  Thank you, Your Honor.

25            I thought with so many professionals assembled and

1    having had their fees not paid for so long it might be

2    helpful that I just gave a little description of what we

3    might be doing as a fee committee, Your Honor.

4              THE COURT:  Very good.

5              MR. GITLIN:  The fee committee will issue a

6    protocol to supplement the fee process, which will outline

7    the policy procedures we'll follow.  We should have a draft

8    of that hopefully ready tomorrow, and although we have our

9    committee meeting on October 2nd, it will be our goal to

10   expedite that.

11             What I really would like to share with the

12   professionals is, although the time schedule outlined in the

13   orders takes us into February of next year, we as a

14   committee will do our best to try and expedite the process

15   for year-end if possible, but to do that we will really need

16   the cooperation of the professionals to file their

17   applications as early as possible and file them in a form

18   that makes it easier for us to do our review.

19             We will after we issue our policy have a call with

20   all the professionals so we can answer any questions about

21   the process, and Your Honor, we look forward to working with

22   all the professionals and yourself to help make sure the

23   fees comply with the laws, the rules, and do what we can to

24   assist the bench.

25             THE COURT:  Very good.  Thank you.

1        Let me just say from my perspective that I too am

2    not so far removed from private practice to not understand

3    the basic economics of how you run a law firm, and the Court

4    will do what it can to accommodate schedules in order to

5    extend appropriate -- approve fee applications prior to the

6    end of the calendar year.

7        I too need your cooperation, and will do what I

8    can, but the -- as always due process will be a large part

9    of what the Court has to consider, and also simple labor

10    involved even with a -- even with a fee committee to fulfill

11    our independent duty to make sure that the fee applications

12    that are being submitted should be appropriately granted.

13    So we'll do our best to -- to neat criteria and the time

14    frame.

15        Ms. Werkheiser got me a clean copy of the Godfrey

16    order and I have signed that order.  So I don't need any

17    further action in connection with that order.

18        And I think that exhausts the agenda for today and

19    for tomorrow, and I thank everyone for their presentations,

20    and we are adjourned.

21        (A chorus of thank you)

22        (Whereupon, these proceedings concluded at 1:41 p.m.)

23

24                          * * * * *

25

Page 90

1                        I N D E X

2                      E X H I B I T S

3      PARTY    NO   DESCRIPTION            ID.        EVID.

4    Debtor            Michael Carter

5                      Declaration              --          71

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                              RULINGS

4                                                        Page

5    Case Management Order                              52

6

7    Retention of Kirkland & Ellis                      54

8

9    Retention of Epiq                                  55

10

11   Retention of KPMG                                  56

12

13   Interim Compensation Order                         60

14

15   Seven other Retention Applications                 61

16

17   Exclusivity Motion                                 73

18

19   Motion to Approve Unsecured Creditors' Committee  78

20

21   Retention of Morrison & Foerster                   86

22

23   Retention of Godfrey & Hahn                        89

24

25

Page 92

1          C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6    Dawn South

7    _____

Digitally signed by Dawn South
DN: cn=Dawn South, o=Veritext,
ou, email=digital@veritext.com,
c=US
Date: 2014.09.18 08:53:17 -04'00'

8    Dawn South

9    AAERT Certified Electronic Transcriber CET**D-408

10

11   Veritext

12   330 Old Country Road

13   St. 300

14   Mineola, NY 11501

15   Date:  September 16, 2014

16

17

18

19

20

21

22

23

24

25