## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Hearing Date: October 17, 2014 at 9:30 a.m. (ET)** |
| | ) **Objection Deadline: October 3, 2014 at 4:00 p.m. (ET)** |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN AUCTION AND RELATED DEADLINES AND HEARINGS, AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") for the entry of an order substantially in the form attached hereto as

**Exhibit A** (the "Bidding Procedures Order") (a) approving bidding procedures for an

investment, in any form, to acquire any or all of the assets or the reorganized equity of Energy

Future Holdings Corp. ("EFH Corp.") or one or more of its direct and indirect subsidiaries

(the "Transaction") other than Energy Future Competitive Holdings Company LLC ("EFCH"),

Texas Competitive Electric Holdings Company LLC ("TCEH"), and TCEH's direct and indirect

subsidiaries (collectively, the "TCEH Entities"), substantially in the form attached to the Bidding

Procedures Order as **Exhibit 1** (the "Bidding Procedures"), (b) scheduling an auction for the

Transaction (the "Auction") and related deadlines and hearings, and (c) approving the form and

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

manner of notice of the Auction and related deadlines and hearings, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**  (the "Auction Notice").

In support of this Motion, the Debtors submit the *Declaration of William O. Hiltz in Support of the Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof*, filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully submit as follows.

## Preliminary Statement[2]

1.      By this Motion, the Debtors seek the approval of bidding procedures designed to maximize the value of the Debtors' estates.  As the Court is aware, the Debtors' prepetition Restructuring Support Agreement featured a proposed EFIH Second Lien DIP Facility that was convertible into the equity of reorganized EFH Corp. under a chapter 11 plan.  In advance of the hearing on that proposed investment, a bidding war broke out among several parties, in large part based on the value of its proposed conversion feature.  This bidding war culminated in a proposal from strategic bidder NextEra Energy that provided superior value to the EFIH Second Lien DIP Facility, and the Debtors ultimately terminated the Restructuring Support Agreement as a consequence.  Since then, the Debtors have had discussions with other parties regarding their potential interest in bidding on an investment in the Debtors' indirect ownership of Oncor.  The Debtors have worked diligently to develop the bids that they received, attract additional bids, and maintain the momentum of the bidding process.

---

[2]     Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings set forth elsewhere in the Motion.

2.    Accordingly, the Debtors and their advisors have spent the past several weeks developing a process—with input from key stakeholders—to capitalize on potential interest in this investment.  The Bidding Procedures, which are the result of these efforts, seek to balance the Debtors' two primary objectives:  first, limiting exposure to the risk that the market shifts and the Debtors are no longer able to find an investor at current indicative prices; and, second, providing sufficient time for potential bidders to conduct diligence and for the Debtors to run a robust process that maximizes value for the Debtors' estates.  To that end, the Debtors have already launched a marketing process:  concurrently with the filing of this Motion, the Debtors' advisors sent an initial process letter and teaser to interested parties to preserve the momentum and interest that has been building over the past several months.

3.    The Debtors designed the Bidding Procedures to maximize value for the Debtors' estates.  The Debtors will first conduct an extended bidding process to identify the Stalking Horse Bidder—designed to resemble a typical non-bankruptcy, two-stage auction—during which bids will be sealed in their entirety.  After selecting a Stalking Horse Bidder, the Debtors will file a motion with the Court seeking approval of the Stalking Horse Bid, followed by a period of open bidding and the Auction.  The Debtors will, before the hearing to approve the Stalking Horse Bid, provide stakeholders with a summary of the bid history sufficient to evaluate the decision-making process.

4.    The Debtors believe that seeking approval of the Bidding Procedures at this early stage in the process will maximize value.  In a typical chapter 11 sale, debtors conduct a stalking horse selection process without court approval and only then file a bidding procedures motion after selecting a stalking horse.  The Debtors have taken the extra step of coming to the Court at this early stage to provide transparency to creditors and the Court and to provide certainty to

participants and the market as to the deadlines and requirements of the process.  This Motion, the Debtors believe, will allow potential bidders to put forward their best offers with full confidence in the bidding process.

5.      The Debtors also believe it is important to start this process now to capitalize on the strong market for an investment in the Debtors' indirect ownership of Oncor.  Importantly, the Debtors are not seeking preapproval for any transaction, plan of reorganization, or allocation of value among creditors.  As the marketing process is ongoing, the Debtors will continue to engage in a process to develop a plan of reorganization with their stakeholders.  The Debtors intend to file and prosecute this plan, subject to all applicable confirmation requirements, at the appropriate juncture in the chapter 11 cases.

6.      Although the design of the Bidding Procedures has benefited from creditor feedback, there were two creditor requests that the Debtors were unable to accept for important reasons. First, certain creditors requested access to bids during the Stalking Horse Bidding Process.  The Debtors and their advisors believe that doing so risks the unauthorized disclosure of bids and would have a significant chilling effect on participation in the process.  Unlike a typical bankruptcy process, many of the potential bidders here are public companies that are hypersensitive to the potential negative consequences of their bids being publicized out of turn, including—potentially—triggering disclosure requirements and affecting the trading prices of their securities.  The Debtors thus wish to maintain the confidentiality of bids during this part of the process—consistent with a typical bankruptcy auction, in which the stalking horse bid and a summary of the previous bid history would only be made public after the debtors sought court approval of the bid.

7.      Second, certain creditors suggested that the Bidding Procedures should not dictate any particular transaction structure.  For the avoidance of doubt, the Bidding Procedures do not preclude any particular transaction structure.   The Debtors instead are open to all value-maximizing alternatives and will thus consider bids in any form.   Nonetheless, as this Court knows, the Debtors have done significant tax and structural analysis regarding a potential transaction, and believe that the optimal deal structure would be tax-efficient.   As a result, the Debtors reserve the right to share with bidders the structure that they believe maximizes the value of the estates, both in a form term sheet and other documentation and in discussions with bidders.  And the Debtors will evaluate potential bids in light of, among other things, the tax implications of the proposed structure.

8.      For these reasons and as explained in greater detail below, the Debtors believe that this bidding process comports with the Bankruptcy Code and will maximize value for the estates.   Accordingly, the Debtors respectfully request that the Court enter the Bidding Procedures Order.

## Jurisdiction and Venue

9.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection with this Motion consistent with Article III of the United States Constitution.

10.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.    The bases for the relief requested in this Motion are sections 105 and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Local Bankruptcy Rules 6004 and 9019.

### Relief Requested

12.    By this Motion, the Debtors request entry of the Bidding Procedures Order (a) approving the Bidding Procedures, (b) scheduling the Auction and related deadlines and hearings, and (c) approving the Auction Notice.

### Background

13.    On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court has entered a final order for joint administration of these chapter 11 cases. The Office of the United States Trustee for the District of Delaware formed an official committee of unsecured creditors in these chapter 11 cases on May 13, 2014 [D.I. 420].

### I.    EFIH and Oncor.

14.    EFIH is a holding company and a direct, wholly-owned subsidiary of EFH Corp. EFIH's primary asset is its 100% ownership of Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), which, in turn, owns approximately 80% of Oncor Electric Delivery Company LLC ("Oncor"). An unaffiliated investor, Texas Transmission Investment LLC, and certain members of Oncor management through a separate investment vehicle, own the

remaining equity interests in Oncor.  EFIH has no active business operations, and its equity value is largely derived from its indirect ownership of Oncor.



15.    Oncor is a rate-regulated utility and the largest provider of transmission and distribution services in Texas.  Oncor provides these services to retail electricity providers and electricity distribution companies, cooperatives, and municipalities.  Its transmission and distribution system covers more than 91 counties and over 400 incorporated municipalities in Texas, delivers electricity to more than 3.2 million homes and businesses, and operates more than 120,000 miles of transmission and distribution lines.  Oncor's rates are subject to detailed rate-setting proceedings before the Public Utility Commission of Texas (the "PUC"), which provides wide-ranging oversight of the Texas electricity market.

16.    To enhance credit quality, Oncor Holdings and Oncor have implemented certain structural and operational "ring-fencing" measures, including a requirement that the boards of managers of Oncor Holdings and Oncor are composed of a majority of directors that are

independent from EFH Corp., EFIH, EFCH, and TCEH.  Neither Oncor Holdings, Oncor, nor any of their respective subsidiaries are Debtors in the chapter 11 cases.

## II.      Entry Into and Termination of the Restructuring Support Agreement.

### A.      The Proposed EFIH Second Lien DIP Facility.

17.      To help execute deleveraging transactions at EFH Corp., EFIH, and TCEH, immediately before the Petition Date, the Debtors executed the Restructuring Support and Lock-Up Agreement on April 29, 2014 (the "Restructuring Support Agreement").    Under the Restructuring Support Agreement, an ad hoc group of holders of EFIH unsecured notes (the "EFIH Unsecured Group") backstopped a proposed EFIH second lien DIP facility that would have mandatorily converted into 60% of the reorganized EFH Corp. equity (the "EFIH Second Lien DIP Facility").

18.      After the Petition Date, the Debtors received a number of competing proposals for the EFIH Second Lien DIP Facility from the ad hoc group of holders of EFIH first lien notes (the "EFIH First Lien Group") as well as the ad hoc group of holders of EFIH second lien notes (the "EFIH Second Lien Group").    NextEra Energy, Inc. ("NextEra"), a publicly-traded, integrated utility based in Juno Beach, Florida, also joined in several of the EFIH Second Lien Group's proposals.    The Debtors engaged in good-faith negotiations with the EFIH First Lien Group, the EFIH Second Lien Group, NextEra, and the EFIH Unsecured Group concerning their respective proposals in the hopes of maximizing value for the Debtors and their constituents. The Court held initial hearings with respect to the EFIH Second Lien DIP Facility on June 30 and July 1, 2014.

19.      Following those hearings, on July 16, 2014, the Debtors received another revised offer from NextEra for an investment in the equity of reorganized EFH Corp.  That offer was the highest and best that had been received to that point and, importantly, reflected an increase in the

value of the Debtors' equity interest in Oncor when compared to the EFIH Second Lien DIP Facility's conversion feature. This, among other things, made clear that terminating the Restructuring Support Agreement was in the best interests of the estates.

**B.    The Decision to Continue Marketing the Transaction.**

20.    On July 24, 2014, the Debtors exercised their right to terminate the Restructuring Support Agreement under its "fiduciary out" provision. Shortly thereafter, the Debtors filed a notice with the Court announcing that termination and withdrawing the Debtors' motions for approval of the EFIH Second Lien DIP Facility and assumption of the Restructuring Support Agreement [D.I. 1697].

21.    At the August 13, 2014 omnibus hearing, the Debtors announced that they would undertake a comprehensive marketing process for the Transaction. The Debtors considered signing a definitive agreement with a bidder before seeking the Court's approval of bidding procedures and, after receiving NextEra's revised proposal for an equity investment on July 16, worked with NextEra with that goal in mind. But as an increasing number of potential bidders expressed interest in participating in the process, the Debtors instead decided to pursue the extended Stalking Horse Bidding Process embodied in the Bidding Procedures.

22.    That process contemplates a formal and extended marketing period for selecting a Stalking Horse Bidder that is designed to maximize the value received for the Transaction. This additional time should allow potential bidders to conduct sufficient due diligence to prepare their bids; in fact, several potential bidders expressly indicated to the Debtors that they believed they would benefit from additional time to put together a competitive proposal. Moreover, the Debtors believe, based on discussions with their stakeholders and market professionals, that potential strategic bidders would prefer an auction process similar to those typically used by companies outside of bankruptcy to select the Stalking Horse Bid. This process should not only

generate additional interest from strategic bidders but also preserve the traditional chapter 11 opportunity for a topping bid once the Debtors have selected a Stalking Horse Bidder.

23.     To that end, on August 26, the Debtors filed a notice with the Court announcing that they would request approval of a marketing process [D.I. 1919].  NextEra, in turn, filed a notice with the Court later that same day indicating that it had withdrawn its proposal [D.I. 1924], in light of the new process by which the Debtors would select a Stalking Horse Bidder.  Since then, the Debtors have commenced active discussions with a number of potential bidders that are currently engaged in due diligence and preparing potential bids, and are filing this Motion to formalize that process.

## III.    The Proposed Marketing Process and Bidding Procedures[3]

24.     By this Motion, the Debtors seek approval of the Bidding Procedures to maintain momentum toward a value-maximizing Transaction and take advantage of favorable market conditions.  To ensure robust participation in the bidding process, the Debtors have already contacted a broad range of potential bidders and informed them about the process, including the proposed dates and deadlines.  Evercore, the Debtors' financial advisor, has made contact with 26 potential strategic bidders and 25 potential financial bidders.  Evercore has also distributed to 22 potential bidders various versions of "teaser" materials (the most recent version attached as **Exhibit B**) and the Debtors' form confidentiality agreement.  At this time, ten potential bidders have entered confidentiality agreements and been given access to the Debtors' dataroom.  In addition, concurrently with the filing of this Motion, the Debtors distributed a form term sheet (attached as **Exhibit C**) and a formal process letter to potential bidders (attached as **Exhibit D**)

---

[3]    The summaries of the Bidding Procedures in this Motion are all subject in their entirety to the Bidding Procedures and, in the event of any discrepancy with the Bidding Procedures, the Bidding Procedures shall govern.

that entered into confidentiality agreements inviting initial bids and enclosing the Bidding Procedures in their proposed form.

### A.    The Stalking Horse Bidding Process.

25.    Under the Bidding Procedures, the Debtors have first embarked on a sealed bidding process to determine the Stalking Horse Bidder (the "Stalking Horse Bidding Process"). That process, consistent with the practice for auctions outside of bankruptcy, will proceed in two stages.  In the initial stage ("Round 1"), the Debtors will facilitate due diligence and accept bids in the form of letters of intent and illustrative term sheets outlining core business terms of the proposed Transaction.  In the second stage ("Round 2"), after narrowing the field of potential bidders based on quantitative and qualitative factors, the Debtors will work with a smaller group of potential bidders toward negotiating and submitting bids in the form of a substantially final stalking horse agreement.

26.    The Debtors formally commenced the Stalking Horse Bidding Process at essentially the same time as the filing of this Motion by distributing the process letter and teaser. Bidders seeking to participate in the Stalking Horse Bidding Process must meet the following deadlines, which are described more fully in the Bidding Procedures.

- **Round 1 Bid Deadline.**  Bidders must submit a Round 1 bid, in the form of an executed letter of intent and an illustrative term sheet setting forth the principal business terms and structure of the bid, so that it is **actually received** by the Debtors' representatives no later than **4:00 p.m. (prevailing Eastern Time) on October 23, 2014**.

- **Round 2 Initial Mark-Up Deadline.**  Bidders that are selected to proceed to Round 2 must submit initial marked versions of the Debtors' forms of definitive agreements so that they are **actually received** by the Debtors' representatives no later than **4:00 p.m. (prevailing Eastern Time) on November 7, 2014**.

- **Round 2 Bid Deadline.**  Bidders must then submit substantially final drafts of such definitive agreements so that they are **actually received** by

the Debtors' representatives no later than **4:00 p.m. (prevailing Eastern Time) on November 21, 2014**.

The timing of the Round 1 bid deadline reflects the weeks of effort the Debtors and bidders have spent in informal discussions and diligence efforts up to the filing of the Motion, and the approximately 30 days that will pass following the launch of the formal process before the deadline.  The Round 2 bid deadline will afford the parties adequate time to formalize their definitive documentation with the Debtors.  Following the Round 2 bid deadline, the Debtors will engage in additional negotiations to finalize such definitive agreements, after which they will select the highest or otherwise best bid in accordance with the Bid Criteria (as defined in the Bidding Procedures) to serve as the stalking horse bid (such bid, the "Stalking Horse Bid," and such bidder, the "Stalking Horse Bidder").  The Stalking Horse Bid will form the basis of the minimum value requirement (the "Minimum Value") for bids submitted in the Open Bidding Process.  And all subsequent overbids must be made in a minimum increment of at least $20 million as described in the Bidding Procedures (the "Overbid Increment").

27.     Until the Stalking Horse Bid is announced, bids will remain sealed, as is typical of stalking horse selection processes in bankruptcy.  As soon as reasonably practicable after the Stalking Horse Bidder has been selected, the Debtors will file a motion to approve the Stalking Horse Bid (the "Stalking Horse Motion").  As discussed further below, the Debtors will make available to stakeholders information sufficient to evaluate the decision-making process before the hearing on the Stalking Horse Motion.

**B.     The Open Bidding Process.**

28.     After determining the Stalking Horse Bidder, the Debtors will conduct an open bidding process to determine if there are any topping bids, culminating in the Auction (the "Open Bidding Process").  Importantly, participation in the Stalking Horse Bidding Process is not a

prerequisite to participation in the Open Bidding Process.  In addition, bidders that participated in the Stalking Horse Bidding Process but were not selected as the Stalking Horse Bidder will also be permitted to participate in the Open Bidding Process and continue to have reasonable due diligence access.

29.     During the Open Bidding Process, the Debtors will share bids (and the identity of bidders) with other bidders advancing to the Auction and with Reviewing Parties (as defined in the Bidding Procedures).  The Open Bidding Process will last between approximately one to two months, depending on whether the Stalking Horse Bidder requests early approval of a proposed Topping Fee (as defined in the Bidding Procedures), if any, as part of the Stalking Horse Motion. If the Stalking Horse Bidder does not require the Debtors to seek approval of the Topping Fee until after the Auction, the Debtors will immediately proceed to the Open Bidding Process. Otherwise, the Debtors will request the relief related to the Topping Fee under the Stalking Horse Motion for hearing consistent with applicable notice requirements.  Once that relief has been considered by the Bankruptcy Court, the Debtors will commence the Open Bidding Process.  As soon as reasonably practicable after the commencement of the Open Bidding Process, the Debtors will file and distribute the Auction Notice, which will specify the dates and deadlines for the Auction.

30.     At the conclusion of the Auction, the Debtors, in their sole discretion, will identify the highest or otherwise best Qualified Bid (as defined in the Bidding Procedures) (such bid, the "Successful Bid" and, the bidder submitting such bid, the "Successful Bidder"). Thereafter, at a subsequently scheduled hearing consistent with applicable notice requirements, the Debtors intend to request this Court's approval of the selection of the Successful Bid, the Auction, any Topping Fee not previously approved, if any, any remaining relief under the

Stalking Horse Motion (to the extent it has not been heard), and the manner in which the Bidding

Procedures were otherwise administered.  Under the Bidding Procedures, the Successful Bidder

must agree to remain obligated to consummate the Transaction until December 31, 2015 (subject

to the Debtors' extension of that deadline for up to six months in the event regulatory approvals

remain pending).  Before the closing of the Transaction and starting as soon as practicable after

the Auction, the Debtors will seek the approval of the PUC and all other applicable regulatory

approvals.

> **C.    The Sealing of Bids and the Structure of the Transaction.**

31.    The Debtors and their professionals designed the Bidding Procedures in light of

feedback from creditor groups, market participants, and other stakeholders.  Indeed, the Debtors

decided to employ an extended two-stage stalking horse process, partly in reaction to such

feedback.   There are, however, two features of the filed Bidding Procedures that drew criticism

from certain creditor groups:  the sealing of bids during the Stalking Horse Bidding Process and

the Debtors' approach to the structure of the Transaction.  The Debtors firmly believe, in their

sound business judgment, that their approach to these issues will maximize value for the

Debtors' estates.

> **i.    Sealed Bidding During the Stalking Horse Bidding Process.**

32.    During the Debtors' discussions with various stakeholders, certain creditor groups

suggested they should be entitled to special access to bid information in real-time and

consultation rights during the Stalking Horse Bidding Process.  Keeping bids sealed, however, is

necessary to maximize the value received for the Transaction.  Many of the potential bidders in

this process are public companies that are concerned with the potential negative consequences of

making public bids, including triggering public disclosure requirements and the effect on the

trading prices of their securities.  Indeed, the confidentiality agreements with many of the likely

participants in the process require the Debtors to seal such participant's bids in connection with this process.  Moreover, certain of the creditor groups themselves have indicated that they may participate in the process as bidders, which further counsels in favor of sealed bids.  A public or unsealed marketing process, or even simply the risk of an unauthorized disclosure stemming from the fact that bids might be shared with a number of stakeholder groups, could have a significant chilling effect on the Debtors' ability to maximize value.

33.    Sealed bidding is typical in both bankruptcy and non-bankruptcy processes.  In bankruptcy, debtors typically select a stalking horse bidder before seeking the Court's approval of bidding procedures.  Although creditors sometimes participate in this process, that participation is entirely at the discretion of the debtor in possession.  Likewise, bidding in the vast majority of two-stage non-bankruptcy auctions is sealed—and many of the likely participants in the Debtors' process expect that this process will be sealed, too.

34.    To provide transparency to creditor constituencies, the Debtors and their advisors will meet with each of the Debtors' major creditor groups at the conclusion of the Stalking Horse Bidding Process and provide a summary of the bid history on a no-names basis.  Moreover, the Debtors will include in the Stalking Horse Motion a summary description of the Stalking Horse Bidding Process—including material terms of significant bids received—without specifically identifying the bidders.  The Debtors respectfully submit that this process appropriately balances the need for transparency and the need to encourage as many bidders as possible to participate in the process.

### ii.    The Evaluation of Proposed Transaction Structures.

35.    Certain creditors suggested that the Bidding Procedures should not dictate any particular transaction structure.  Because the Debtors' primary goal is to maximize the value received for the Transaction, in whatever form, the Debtors agree that they should not require

any particular structure as part of the Bidding Procedures.  If any bidder believes that a particular structure will allow them to provide greater value to the estates, the Debtors will evaluate such a bid.  The Bidding Procedures provide the Debtors complete flexibility in this respect.

36.    Nonetheless, the Debtors have done significant tax and structural analysis regarding a potential transaction, and they believe the optimal deal structure would be an equity investment in reorganized EFH combined with a tax-free spinoff of TCEH.  This structure is reflected in the Debtors' form term sheet, and the Debtors reserve the right to share with bidders that they believe this structure maximizes the value of the estates.  Ultimately, the tax effects of bids across different structures will be an important part of the evaluation process, as is the case in many transactions both in and out of bankruptcy.  The Debtors will select the highest or otherwise best bid for the estates with these considerations, among others, in mind.

## Basis for Relief

### I.    The Bidding Procedures Should Be Approved Because They Will Maximize the Value Received for the Transaction.

37.    The Debtors respectfully submit that the Bidding Procedures will maximize the value received for the Transaction by enhancing competitive bidding.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized transactions outside the ordinary course of business when the transaction has a sound business purpose and is proposed in good faith.  *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

38.    Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code.  *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

39.    Under these principles, bidding procedures may be approved when they provide a benefit to the estate by maximizing the value of the assets.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-537 (3rd Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy*, 181 F.3d at 537; *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

40.     Here, the Debtors have proposed the Bidding Procedures to maximize the value received for the Transaction.  Given the substantial interest that the Debtors have already received with respect to the Transaction, the Debtors are seeking formal approval of the Bidding Procedures to select a Stalking Horse Bid in addition to the Successful Bid.  Based on initial indications, potential bidders have reacted positively to this development, indicating that the additional time afforded by the Bidding Procedures will allow them to put forth their most competitive proposals.  To that end, the Debtors have designed the Bidding Procedures to be highly inclusive and bidder and structure neutral, allowing virtually any value-maximizing proposal—from virtually any party—to emerge as the Successful Bid.

41.     Moreover, the Bidding Procedures contain salient features—including bid deadlines, auction procedures, and bid criteria—that are largely consistent with, or more inclusive than, other procedures previously approved by courts in this and other districts.  *See, e.g.*, *In re Ambient Corp.*, No. 14-11791 (Bankr. D. Del. Aug. 11, 2014); *In re Brookstone Holdings Corp.*, No. 14-10752 (Bankr. D. Del. Apr. 25, 2014); *In re Green Field Energy Servs.*, No. 13-12783 (Bankr. D. Del. Feb. 19, 2014); *In re Coda Holdings, Inc.*, No. 13-11153 (Bankr. D. Del. May 29, 2013); *In re Palm Harbor Homes, Inc.*, No. 10-13850 (Bankr. D. Del. Jan. 6, 2011); *In re Ultimate Escapes Holdings, LLC*, No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009); *In re VeraSun Energy Corp.*, No. 08-12606 (Bankr. D. Del. Feb. 19, 2009).[4]  Courts in this district have repeatedly approved bidding procedures that allow debtors to select a stalking horse bidder in the future.  *See, e.g.*, *In re*

---

[4]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

*Beacon Power Corp.*, No. 11-13450 (Bankr. D. Del. Dec. 27, 2011); *In re Mervyn's Holdings, LLC*, No. 08-11586 (Bankr. D. Del. Jan. 21, 2009); *In re SemCrude, L.P.*, No. 08-11525 (Bankr. D. Del. Nov. 24, 2008).   Likewise, courts have approved procedures for maintaining the confidentiality of bids when the Debtors have not already signed a stalking horse agreement. *See In re Eastman Kodak Co.*, No. 12-10202 (Bankr. S.D.N.Y. July 7, 2012).   There is no reason for this Court to treat these Bidding Procedures any differently.   Like those approved in other cases, the Bidding Procedures that the Debtors propose will help maximize the value received for the Transaction and, thus, maximize the value of the Debtors' estates.

**II.        The Minimum Value and Overbid Increments are Appropriate.**

42.      The Debtors seek to highlight two important components of the Bidding Procedures for the Court:   the Minimum Value and the Overbid Increment.   In the Debtors' business judgment, the Minimum Value, which is the minimum level for bids during the Open Bidding Process and is based on the Stalking Horse Bid, is necessary to ensure that the Debtors receive the highest or otherwise best value for the Transaction.   Absent such a bid floor to signal the requirements to bid for the Transaction, the Debtors may not otherwise be able to maximize value for their stakeholders.

43.      Once the Debtors have established this Minimum Value, all subsequent overbids must be made in a minimum increment of at least $20 million.   The Debtors believe that this Overbid Increment is reasonable under the circumstances and will enable the Debtors to maximize the value received for the Transaction, while limiting any chilling effect on the marketing process.

44.      Accordingly, the Debtors respectfully submit that the Minimum Value and the Overbid Increment reflect sound business purposes, are fair and appropriate under the circumstances, and should be approved.

**III.    The Form and Manner of the Auction Notice Should be Approved.**

45.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estates outside the ordinary course of business.    Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.

46.    This Motion does not request that the Court authorize the use or sale of property. To the contrary, the Transaction will only be consummated after a subsequent request for relief, subject to the requirements of the Bankruptcy Code.    Nevertheless, out of an abundance of caution, the Debtors seek approval of the Auction Notice as proper notice of the Auction.    The Debtors submit that notice of this Motion and the related hearing, together with service of the Auction Notice, constitutes good and adequate notice of the Auction and the related dates and deadlines.    Accordingly, the Debtors request that this Court approve the form and manner of the Auction Notice proposed herein.

<u>**Notice**</u>

47.    The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) (i) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); and (ii) counsel to the Official Committee of Unsecured Creditors; (c) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (d) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (e) American Stock Transfer & Trust Company, LLC, in its

capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (f) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (g) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (h) CSC Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (i) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (j) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (k) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (l) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (m) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (n) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (o) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (p) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (q) Oncor Holdings

and counsel thereto; (r) Oncor and counsel thereto; (s) the Securities and Exchange Commission; (t) the Internal Revenue Service; (u) the Office of the United States Attorney for the District of Delaware; (v) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (w) counsel to the Electric Reliability Council of Texas; (x) those parties that have requested notice pursuant to Bankruptcy Rule 2002; and (y) Texas Transmission Investment LLC.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

48.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated: September 19, 2014

/s/ William A. Romanowicz
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
William A. Romanowicz (No. 5794)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:      collins@rlf.com
          defranceschi@rlf.com
          madron@rlf.com
          romanowicz@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      edward.sassower@kirkland.com
          stephen.hessler@kirkland.com
          brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      james.sprayregen@kirkland.com
          chad.husnick@kirkland.com
          steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession