# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket No. 2087 |

## DECLARATION OF WILLIAM O. HILTZ IN SUPPORT OF
## THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
## FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES,
## (B) SCHEDULING AN AUCTION AND RELATED DEADLINES AND HEARINGS,
## AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

I, William O. Hiltz, declare as follows:

1. I am a Senior Managing Director of Evercore Group L.L.C. ("Evercore"), a financial advisory and investment banking firm with offices around the world and financial advisor and investment banker to the above-captioned debtors and debtors in possession (the "Debtors"). I submit this declaration (this "Declaration") in support of the *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* (the "Motion").[2]

2. Except where specifically noted, the statements in this Declaration are based on either my personal knowledge, information supplied or verified by the Evercore financial team

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

that I supervise or the Debtors' personnel and third-party advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

3.     I offer this declaration in support of the Debtors' motion requesting approval of the Bidding Procedures and related relief.

## Qualifications

4.     Evercore is one of the world's leading independent investment banking groups, with more than 20 offices in 8 countries, including an office located at 55 East 52nd Street, New York, NY 10055. Evercore has expertise in domestic and cross border restructurings, mergers and acquisitions, debt and equity capital markets transactions, and other financial advisory services. Evercore has served as an experienced bankruptcy and restructuring advisor to debtors, bondholders, creditors' committees, single creditor classes and secured creditors, shareholders, and boards of directors in a variety of industries. Evercore is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.     I am a Senior Managing Director of Evercore's corporate advisory business and head of the General Advisory Group. I am also Chairman of Evercore's Special Committee Execution Group, which oversees all of Evercore's Special Committee transactions. I joined Evercore in 2000 and have 38 years of experience in investment banking. Prior to joining Evercore, I was Head of the Global Energy Group at UBS Warburg and, prior to UBS' acquisition of Dillon Read & Co. Inc., Head of the Energy Group at Dillon Read since 1995. From 1982 to 1995, I was a Managing Director at Smith Barney where at various times I headed the Energy Group, the High Yield and Merchant Banking Group, the Transportation Group and

the General Industrial Group. I received an A.B. in History and Government from Dartmouth College and an M.B.A. from The Wharton School at the University of Pennsylvania.

6. I have worked on numerous mergers and acquisitions transactions, including the Chrysler and Fiat merger, the sale of Dell, the sale of McMoRan to Freeport-McMoRan, the sale of ACS to Xerox, the sale of EDS to Hewlett Packard, the CVS and Caremark merger, and the sale of Aquila to Great Plains, among others. In addition, I have worked on several restructurings, including General Motors, CIT, Northwest Airlines, Continental Airlines, and Eastern Airlines.

## Reasonableness of the Bidding Procedures

7. The Bidding Procedures are designed to maximize the value of the Debtors' estates. Since the termination of the Restructuring Support Agreement, the Debtors have had discussions with other parties regarding their potential interest in bidding on an investment in the Debtors' indirect ownership of Oncor. The Debtors have worked diligently to develop the bids that they received, attract additional bids, and maintain the momentum of the bidding process.

8. Accordingly, the Debtors and their advisors have spent the past several weeks developing a process—with input from key stakeholders—to capitalize on potential interest in this investment. I believe the Bidding Procedures, which are the result of these efforts, seek to balance the Debtors' two primary objectives: first, limiting exposure to the risk that the market shifts and the Debtors are no longer able to find an investor at current indicative prices; and, second, providing sufficient time for potential bidders to conduct diligence and for the Debtors to run a robust process that maximizes value for the Debtors' estates. To that end, the Debtors have already launched a marketing process: concurrently with the filing of the Motion, the Debtors'

advisors sent an initial process letter and teaser to interested parties to preserve the momentum and interest that has been building over the past several months.

9. Under the Bidding Procedures, the Debtors will first conduct an extended bidding process to identify the Stalking Horse Bidder—designed to resemble a typical non-bankruptcy, two-stage auction—during which bids will be sealed in their entirety. After selecting a Stalking Horse Bidder, the Debtors will provide stakeholders with a summary of the bid history sufficient to evaluate the decision-making process.

10. I believe that seeking approval of the Bidding Procedures at this early stage in the process will maximize value. I understand that, in a typical chapter 11 sale, debtors conduct a stalking horse selection process without court approval and only then file a bidding procedures motion after selecting a stalking horse. The Debtors have taken the extra step of coming to the Court at this early stage to provide transparency to creditors and the Court and to provide certainty to participants and the market as to the deadlines and requirements of the process. The Motion, I believe, will allow potential bidders to put forward their best offers with full confidence in the bidding process.

11. I also believe it is important to start this process now to capitalize on the strong market for an investment in the Debtors' indirect ownership of Oncor. Market conditions are currently favorable for potential sellers due to the availability and low cost of financing, and generally the strong trading levels in the equity markets. While these current market conditions may continue, there is also risk that they may shift. In addition, the Debtors have received strong indications of interest from potential bidders since the receipt of the NextEra proposal that confirm market conditions are currently favorable for a sale.

### **Good Business Reasons for the Stalking Horse Bidding Process**

12. The Debtors considered signing a definitive agreement with a bidder before seeking the Court's approval of bidding procedures and, after receiving NextEra's revised proposal for an equity investment on July 16, worked with NextEra with that goal in mind. But as an increasing number of potential bidders expressed interest in participating in the process, the Debtors instead decided to pursue the extended Stalking Horse Bidding Process embodied in the Bidding Procedures.

13. That process contemplates a formal and extended marketing period for selecting a Stalking Horse Bidder that is designed to maximize the value received for the Transaction. I believe this additional time should allow potential bidders to conduct sufficient due diligence to prepare their bids; in fact, several potential bidders expressly indicated to the Debtors that they believed they would benefit from additional time to put together a competitive proposal. Moreover, I believe, based on discussions with their stakeholders and market professionals, that potential strategic bidders would prefer an auction process similar to those typically used by companies outside of bankruptcy to select the Stalking Horse Bid. I believe this process should not only generate additional interest from strategic bidders but also preserve the traditional chapter 11 opportunity for a topping bid once the Debtors have selected a Stalking Horse Bidder.

14. To that end, on August 26, the Debtors announced that they would request approval of a marketing process. NextEra, in turn, announced later that same day that it had withdrawn its proposal, in light of the new process by which the Debtors would select a Stalking Horse Bidder. Since then, the Debtors have commenced active discussions with a number of potential bidders that are currently engaged in due diligence and preparing potential bids, and are filing the Motion to formalize that process.

### **Ongoing Marketing Efforts**

15. The Debtors seek approval of the Bidding Procedures to maintain momentum toward a value-maximizing Transaction and take advantage of favorable market conditions. To ensure robust participation in the bidding process, the Debtors have already contacted a broad range of potential bidders and informed them about the process, including the proposed dates and deadlines. Evercore, the Debtors' financial advisor, has made contact with 26 potential strategic bidders and 25 potential financial bidders. Evercore has also distributed to 22 potential bidders various versions of "teaser" materials and the Debtors' form confidentiality agreement. At this time, ten potential bidders have entered confidentiality agreements and been given access to the Debtors' dataroom. In addition, concurrently with the filing of the Motion, the Debtors distributed a form term sheet and a formal process letter to potential bidders that entered into confidentiality agreements inviting initial bids and enclosing the Bidding Procedures in their proposed form.

### **The Sealing of Bids**

16. During the Debtors' discussions with various stakeholders, certain creditor groups suggested they should be entitled to special access to bid information in real-time and consultation rights during the Stalking Horse Bidding Process. I believe keeping bids sealed, however, is necessary to maximize the value received for the Transaction. Many of the potential bidders in this process are public companies that I understand are concerned with the potential negative consequences of making public bids, including triggering public disclosure requirements and the effect on the trading prices of their securities. Indeed, the confidentiality agreements with many of the likely participants in the process require the Debtors to seal such participant's bids in connection with this process. Moreover, certain of the creditor groups

themselves have indicated that they may participate in the process as bidders, which further counsels in favor of sealed bids. I believe a public or unsealed marketing process, or even simply the risk of an unauthorized disclosure stemming from the fact that bids might be shared with a number of stakeholder groups, could have a significant chilling effect on the Debtors' ability to maximize value.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 19, 2014

William O. Hiltz
Senior Managing Director
Evercore Group L.L.C.