# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## OMNIBUS TAX MEMORANDUM

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 3

RELEVANT FACTUAL AND LEGAL BACKGROUND ..................................... 4

    I.    EFH's Corporate Structure and Business Activities ................................ 5

        A.    The Competitive Business ................................................... 6

        B.    The Regulated Business ...................................................... 6

    II.    Tax Basics: "Disregarded Entities" and Potential Tax Liabilities ......... 6

    III.    The Tax Sharing Agreements ................................................. 10

        A.    The Competitive TSA ...................................................... 10

        B.    The Regulated TSA ......................................................... 11

    IV.    Debt Structure ................................................................. 11

DISCUSSION ......................................................................................................... 12

    I.    The Problem: Avoiding a Double Deconsolidation that Results in a Significant Unpaid Tax Liability ........................................... 12

        A.    Expected Tax Consequences.............................................. 14

        B.    Vulnerability to IRS Challenge........................................... 15

        C.    Responsibility for Tax Liability........................................... 17

            1.    Change in IRS Position............................................ 17

            2.    State Law Theories of Liability ................................. 19

            3.    Claim Under the Competitive TSA............................. 19

        D.    Potential "Check-the-Box" Elections ................................... 20

    II.    First Path Forward: A Consolidated Reorganization ........................... 21

    III.    Current Proposed Path Forward: Tax-Free Deconsolidation.............. 22

        A.    Overview of Tax-Free Reorganization ................................. 23

            1.    The TCEH Reorganization ....................................... 24

i

2.       The Recapitalization ..................................................... 25

3.       Potential Acquisition of Reorganized EFH.................................. 26

B.     Applicable Tax Rules and Expected Tax Consequences .......................... 27

1.       G Reorganization Requirements ................................... 28

a.      Business Purpose ....................................... 29

b.      Continuity of Business Enterprise .................................... 29

c.      Continuity of Interest ...................................... 30

2.       Section 355 Distribution Requirements ......................... 31

C.     Tax Issues and Concerns............................................... 31

1.       Continuity of Interest .......................................... 33

a.      Section 368 COI Rules...................................... 34

b.      Applying the Section 368 COI Rules............................... 37

c.      Section 355 COI Rules...................................... 39

d.      Applying the Section 355 COI Rules............................... 40

e.      COI Implications of Potential Acquisition of Reorganized EFH ............................................... 40

2.       Gain Recognition on Certain Distributions (Section 355(d)) ....... 41

D.     Pending Private Letter Ruling Request.................................... 44

IV.    Avoiding Taxable Gains from a Potential Acquisition of Reorganized EFH....... 45

**CONCLUSION** ..................................................................................... **48**

## INTRODUCTION

As the Court is aware, the Debtors' reorganization implicates a host of complex tax issues.  Over the past several years, the Debtors and their legal advisors have, at extraordinary length, analyzed these issues and the viability of potential structures to address them. The Debtors have shared this analysis with each of their major stakeholder groups in numerous in-depth discussions as part of a considerable and ongoing effort to keep the parties in interest up to speed on these complex topics.  The Debtors now submit this Omnibus Tax Memorandum (the "Memorandum") to provide the Court and other parties in interest with the tax framework for the Debtors' chapter 11 reorganization and certain relief the Debtors may seek in these proceedings.  This submission is appropriate in light of the tax issues that various parties have raised on the record—including at the hearing regarding the second lien debtor-in-possession loan facility of Debtor EFIH (defined below)—and the Court's comments regarding the complexity of the tax principles at play in these chapter 11 cases.

The purpose of this Memorandum is to compile the relevant analysis in a single, publicly filed submission for the shared benefit of the Court and all parties in interest.  The Debtors seek, *first*, to familiarize the Court and all stakeholders with the federal income tax rules and principles relevant to evaluating the probable tax outcomes of the Debtors' reorganization, and, *second*, to describe the various legal constraints and considerations taken into account by the Debtors in evaluating the potential reorganization alternatives.  In doing so, the Debtors intend for this submission to help provide a framework for (i) tax discussions before the Court, (ii) relief the Debtors may seek in the future (including a plan of reorganization), and (iii) the chapter 11 cases in general.

As described in detail herein, the most significant federal tax issue confronted by the Debtors as they pursue a successful reorganization is that under current federal tax law, any

taxable disposition by EFH of the Debtors' assets (either through a confirmed reorganization plan or a pre-confirmation asset sale) likely would result in EFH being left with a potential tax liability of **$7 *billion* or more**.  Because EFH is a holding company that does not have, and will not have, sufficient assets to satisfy any meaningful portion of this potential tax liability, the Internal Revenue Service (the "IRS") likely would oppose any reorganization plan or asset sale that could result in such a large "stranded" tax liability.

In addition to providing a general overview of the federal income tax rules and principles relevant to evaluating various reorganization alternatives, this Memorandum describes the specific issues, constraints, and considerations taken into account by the Debtors in their initial proposed reorganization plan, *i.e.*, the Restructuring Support and Lock-Up Agreement ("RSA"). Although the RSA is no longer the operative path forward in the Debtors' proposed reorganization, certain key features of the plan contemplated in the RSA illustrate how the complex tax issues in this case can be navigated in any future plan of reorganization.

## RELEVANT FACTUAL AND LEGAL BACKGROUND

The federal tax issues implicated by the Debtors' proposed reorganization are complex, but the essential background necessary to understand these complex issues is relatively straightforward.  *First*, EFH is a holding company that conducts its business largely through two, wholly owned limited liability company ("LLC") subsidiaries and their subsidiaries.  *Second*, although the legal form of these LLCs is respected for state law purposes, they are "disregarded" as separate from EFH for federal income tax purposes.  This means that EFH, as the parent corporation, is liable for any federal income tax liabilities attributable to the income or gain generated by its disregarded LLCs, notwithstanding the fact that EFH is not the direct owner of the assets of those LLCs (and is not necessarily entitled either to their operating revenues or the proceeds from any sale of their assets). *Third*, to fairly allocate tax liabilities among EFH and its

4

various subsidiaries, including its disregarded LLCs, EFH and certain of its subsidiaries have entered into two tax sharing agreements that bear on how tax liabilities are addressed within the EFH corporate family. *Fourth*, and finally, because any successful reorganization must address the debt of EFH and its subsidiaries, it is critical to understand the Debtors' debt structure. Figure 1 below presents a simplified illustration of EFH's pre-reorganization corporate, tax, and debt structure.



Figure 1. EFH's Pre-Reorganization Corporate, Tax, and Debt Structure

# I.  EFH'S CORPORATE STRUCTURE AND BUSINESS ACTIVITIES

EFH is a holding company headquartered in Dallas, Texas, with a portfolio of competitive and regulated energy businesses across Texas. EFH currently conducts its operations principally through two wholly owned LLCs: Energy Future Intermediate Holding Company LLC ("EFIH") and Energy Future Competitive Holdings Company LLC ("EFCH"). EFCH owns all of the membership interests of Texas Competitive Electric Holdings Company

LLC ("TCEH"), and EFIH owns all of the membership interests of Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings").  Each of EFH, EFIH, EFCH, and TCEH (and certain of their respective subsidiaries, not including Oncor Holdings and its subsidiaries) is a Debtor in this proceeding.

### A.    The Competitive Business

EFH's competitive businesses are held through its wholly owned subsidiary, EFCH. EFCH's principal asset is its membership interest in TCEH, which, through its subsidiaries, is engaged in competitive electricity market activities in Texas, including electricity generation, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales.  The above-described activities of TCEH are referred to herein as the "Competitive Business."

### B.    The Regulated Business

EFH also owns approximately 80% of a regulated business through its wholly owned subsidiary, EFIH.  EFIH's principal asset is its 100% membership interest in Oncor Holdings. Oncor Holdings, in turn, owns an 80.03% membership interest in Oncor Electric Delivery Company LLC ("Oncor"), with Texas Transmission Investment LLC and Oncor management owning the remaining 19.97% of Oncor's membership interests.  Oncor is engaged in regulated electricity transmission and distribution operations.  Oncor operates the largest transmission and distribution system in Texas, delivering electricity to more than three million homes and businesses and operating more than 120,000 miles of transmission and distribution lines.  The above-described activities of Oncor are referred to herein as the "Regulated Business."

## II.    TAX BASICS: "DISREGARDED ENTITIES" AND POTENTIAL TAX LIABILITIES

Although EFH is the common parent of a "consolidated group" of corporations (the "EFH Group"), substantially all of its assets are currently held by EFIH, EFCH, TCEH (and its

subsidiaries), and Oncor Holdings which are all "disregarded entities" for federal income tax purposes.[1]  The fact that EFIH, EFCH, TCEH, and Oncor Holdings currently are disregarded entities means that they each are essentially ignored for federal income tax purposes; that is, each entity's assets and liabilities, together with any items of taxable income, expense, loss, gain, deduction, and credit attributable to those assets and liabilities, are treated as though they were owned and/or generated directly by EFH.[2]  It also means that none of these entities are required to file their own federal income tax return; instead, their income tax items are reflected on EFH's tax return.

However, the separate legal status of each of EFIH, EFCH, TCEH, and Oncor Holdings is still respected for *state* law purposes, with each entity being treated as owning its own assets and being responsible for its own *non-tax* liabilities and EFH enjoying the limited liability protection customarily afforded to direct and indirect owners of LLCs (at least with respect to non-tax liabilities).  As a result of this differential treatment of disregarded entities under federal income tax law versus state law, EFH generally *is not* liable for the non-tax obligations of its disregarded entities, but *is* liable for any federal income tax liability generated by a sale of the assets or equity of those entities.[3]  EFH's disregarded entities, on the other hand, generally are not liable for the obligations of EFH, including EFH's tax liabilities.[4]

---

[1]  Certain of TCEH's subsidiaries are corporations and not disregarded entities for federal income tax purposes. EFH's corporate subsidiaries (*i.e.*, its subsidiaries that are not disregarded entities), including TCEH's corporate subsidiaries, have relatively few assets.  These entities are also predominantly the successor legal entities to a very long-lived group of several hundred corporations that have been consolidated for federal income tax purposes under a common parent corporation, EFH (and its predecessor legal entities).

[2]  Treas. Reg. §§ 301.7701-3(a), 301.7701-2(a).  Oncor and Oncor Holdings are not Debtors in this proceeding. As a partnership, Oncor itself does not pay federal income taxes.  Rather, its items of taxable income, gain, loss, deduction, and credits are allocated to its partners, including Oncor Holdings.  I.R.C. § 701.  Those partners, in turn, include such items in the calculation of their taxable income.  I.R.C. § 702.  Because Oncor Holdings and EFIH are both disregarded entities, the partnership items allocated to Oncor Holdings in turn flow up to and are included in EFH's tax return.

[3]  A sale of 100% of the equity of a disregarded entity is treated as a sale of that entity's assets for federal income tax purposes.  *See* Rev. Rul. 99-5, 1999-1 C.B. 434.  This is because the owner of a disregarded entity is not

***For purposes of the Debtors' reorganization, it is important to keep in mind that these principles mean that any taxable disposition by EFH of EFIH or TCEH—including a transfer of the assets of, or the equity interests in, those entities—would generate a significant federal income tax liability that the IRS would seek to collect from EFH and not EFIH or TCEH (absent application of some state law doctrine or the making of a "check-the-box" election to treat EFIH or TCEH as a corporation (rather than a disregarded entity) for federal income tax purposes).***[5] The amount of this potential tax liability is dependent upon a number of variables, including the tax basis of the assets held by each entity, the fair market value of those assets, and whether any "tax attributes" (such as net operating losses) are available to offset any taxable gain. For these purposes, TCEH's estimated basis in its assets (including its interests in subsidiaries) is approximately $7.5 billion, and EFH's estimated basis in its assets (*i.e.*, its 80.03% indirect interest in the Oncor partnership) is approximately $6 billion on a gross basis, but is effectively a *negative* $1.7 billion on a net basis.[6]

The following, simplified example, illustrates how these principles would apply to a hypothetical sale of TCEH's and EFIH's assets. Assume that TCEH's assets are sold for $18 billion. In that situation, the difference between the sales price (*i.e.*, $18 billion) and TCEH's

---

treated as owning "interests" in the entity for federal income tax purposes, but instead is treated as owning the entity's assets directly. *Id.*

[4] Because certain of EFH's disregarded subsidiaries were once corporations (*i.e.*, regarded entities for federal income tax purposes), such entities may have residual liability for the tax liabilities of the EFH Group with respect to taxable periods for which they were corporations. Treas. Reg. § 1.1502-6.

[5] The tax consequences of a taxable sale of either EFIH or TCEH (or their assets) would be the same regardless of whether such sale occurs outside bankruptcy (*e.g.*, pursuant to a foreclosure by creditors) or in bankruptcy and, if in bankruptcy, whether it occurs under section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan.

[6] This $6 billion basis number is a "gross" number and includes the debt of Oncor that is allocated to EFH (through Oncor Holdings) under applicable tax rules. Without such allocation, EFH has, in effect, a "net" negative basis of approximately $1.7 billion in its Oncor interest. Said differently, if Oncor Holdings sold its interest in Oncor for $1, EFH would recognize gain of approximately $1.7 billion on such sale.

basis in its assets (*i.e.*, $7.5 billion) would constitute a "taxable gain" of $10.5 billion.[7]  This gain would in turn be subject to federal income tax at a rate of 35%, resulting in a federal income tax liability for EFH of approximately $3.7 billion.[8]  Similarly, a sale of EFIH's assets (*i.e.*, its 80.03% indirect interest in the Oncor partnership) for $8 billion would generate taxable gain of approximately $9.7 billion ($8 billion sales price *minus* "negative basis" of $1.7 billion), resulting in approximately $3.4 billion of federal income tax liability ($9.7 billion gain x 35%) for EFH.  If the values of TCEH and/or EFIH (or their assets) are higher than in this hypothetical example, the tax liability resulting from a taxable sale of TCEH and/or EFIH (or their assets) also would be higher.

As alluded to above, the taxable gain from a sale of TCEH and/or EFIH (or their assets) may be offset by any available "tax attributes," including net operating losses.  The Debtors expect the EFH Group to have available consolidated net operating loss (NOL) carryforwards of approximately $2.3 billion upon emergence.  As discussed below, although these tax attributes should be accounted for in assessing the tax consequences of a taxable reorganization of the Debtors, the effect of any offsets attributable to those attributes will likely be overwhelmed by the amount of gain generated on a taxable sale of TCEH and/or EFIH (or their assets).  By way of illustration, and continuing the example above, the EFH Group's available NOLs would reduce the $20.2 billion ($10.5 billion *plus* $9.7 billion) taxable gain on the hypothetical sale of TCEH and EFIH by $2.3 billion.  This would have the effect of reducing the aggregate federal income tax liability on those sales from $7.1 billion to $6.3 billion (($20.2 billion - $2.3 billion) x 35%).

---

[7]     This is a purely illustrative, and therefore simplified, example.  Calculating the actual amount of taxable gain that would be generated on a sale of TCEH's or EFIH's assets relies on variables beyond tax basis and sales price.  The assumed sales prices are not intended to be indicative of fair value.

[8]     Because corporations do not receive a reduced tax rate on capital gains, all of EFH's gain would be taxed at the 35% corporate tax rate.  *See* I.R.C. § 11.

## III.    THE TAX SHARING AGREEMENTS

As discussed above, because Oncor, Oncor Holdings, EFIH, EFCH, and TCEH are all either partnerships or disregarded entities, none of them are required to report or pay federal income taxes; rather, the items of income and expense generated by these companies "flow through" to EFH's tax return.[9]    To fairly allocate the tax burdens (and the associated potential obligation for EFH to make cash payments to the IRS), EFH and certain of its subsidiaries have entered into two tax sharing agreements: (1) the Federal and State Income Tax Allocation Agreement, dated May 15, 2012 and effective with respect to taxable years beginning after December 31, 2009, among EFH, EFIH, EFCH, TCEH, and various other subsidiary members of the EFH Group (the "Competitive TSA"), and (2) the Amended and Restated Tax Sharing Agreement, dated November 5, 2008, among EFH, Oncor, and Oncor Holdings (the "Regulated TSA," and together with the Competitive TSA, the "Tax Sharing Agreements").

### A.    The Competitive TSA

The Competitive TSA applies to the Competitive Business and includes EFIH, EFCH, and TCEH (and certain subsidiaries) as parties.    Under this agreement, the EFH Group's consolidated taxable income generally is allocated among the corporate members of the group (*i.e.*, those subsidiaries that are not disregarded entities) based upon the amount each such member would have owed if it were a standalone corporation.    Any amount allocated to a corporate member is then sub-allocated to any disregarded entity owned by that corporate member based on the income and losses generated by the disregarded entity.    The agreement further provides that EFH will compensate a member of the group to the extent the member's tax attributes (such as NOLs) are used to offset the taxable income of another member of the group.

---

[9]    Similarly, because EFH is the parent of an affiliated group of corporations filing a consolidated return, the income of EFH's corporate subsidiaries also flows through to EFH's consolidated return.  *See* Treas. Reg. § 1.1502-75, *et seq.*

### B.    The Regulated TSA

The Regulated TSA applies to EFH, Oncor, and Oncor Holdings.  In October 2007, in connection with the leveraged buyout transaction described below, the Public Utility Commission of Texas and credit ratings agencies required certain "ring-fencing" measures to enhance Oncor's financial separateness and protect ratepayers from potential financial instability within the EFH Group.  The Regulated TSA was executed as part of those protective "ring-fencing" measures.  Under the Regulated TSA, each of Oncor and Oncor Holdings generally (i) must calculate its taxable income and determine how much tax it would be required to pay if it were a standalone corporation and (ii) pay an amount equal to such hypothetical tax liability to its partners (including its approximately 80% indirect partner, EFH).  Because EFIH is not a party to the Regulated TSA, any payments made by Oncor or Oncor Holdings under the agreement are paid directly to EFH.

## IV.    DEBT STRUCTURE

Against this structural and tax backdrop, the Debtors are now working to restructure their debt.  EFH was formerly a publicly held corporation, but on October 10, 2007, it was acquired by a partnership of private investors (the "EFH Equity Investors") in the largest leveraged buyout transaction in U.S. history (the "LBO").  The LBO effectively "took EFH private" by redeeming all of the stock held by its former public shareholders.  The LBO was financed in substantial part by unsecured notes issued by EFH and TCEH to the public and first lien secured debt initially issued by TCEH.

The EFH Group's current debt structure, which includes both debt incurred in connection with the LBO as well as additional debt incurred subsequent to the LBO, consists of the following:

1.  approximately $0.6 billion aggregate principal amount of unsecured EFH debt (the "EFH Debt," the holders of which are referred to herein as the "EFH Creditors");

2.  a TCEH debtor-in-possession loan facility consisting of a $1.95 billion revolver and a $1.425 billion term loan;

3.  approximately $25.6 billion aggregate principal amount of TCEH first lien secured debt (the "TCEH First Lien Debt," the holders of which are referred to herein as the "TCEH First Lien Creditors");

4.  approximately $7.7 billion aggregate principal amount of unsecured and second lien TCEH debt (the "TCEH Junior Debt," the holders of which are referred to herein as the "TCEH Junior Creditors");

5.  an EFIH first lien debtor-in-possession loan facility consisting of a $5.4 billion term loan (the "EFIH First Lien DIP Facility"); and

6.  approximately $2.2 billion aggregate principal amount of second lien EFIH debt and approximately $1.6 billion aggregate principal amount of unsecured EFIH debt (together, the "EFIH Debt," the holders of which are referred to herein as the "EFIH Creditors").

## DISCUSSION

## I.    THE PROBLEM: AVOIDING A DOUBLE DECONSOLIDATION THAT RESULTS IN A SIGNIFICANT UNPAID TAX LIABILITY

Beginning in July 2012 and continuing for nearly two years, the Debtors engaged in extensive, good-faith negotiations with certain large creditors, including certain TCEH First Lien Creditors, certain EFIH Creditors, and certain EFH Creditors, to develop a consensual plan for restructuring the EFH Group's debt.  The principal goal of all the Debtors during the initial negotiations was to keep EFH, EFCH, TCEH, and EFIH together as a single consolidated group for federal income tax purposes and to *avoid* a taxable separation (sometimes referred to as a "deconsolidation") of TCEH and EFIH (or their assets) from EFH.  Specifically, the Debtors wanted to prevent each creditor group from foreclosing on or otherwise taking their respective collateral in a taxable transaction (a "Taxable Sale Transaction").  The Debtors were concerned that a Taxable Sale Transaction would trigger a tax liability of potentially $7 *billion* or more for EFH.  After any deconsolidation of EFH's main subsidiaries (*i.e.*, EFIH and TCEH), EFH would have little value left to satisfy the tax liability and, therefore, that liability would likely remain

"stranded" at EFH.  This scenario, which the Debtors have sought, and still seek, to avoid, would present significant litigation and regulatory risks to a successful reorganization of all the Debtors.

Certain creditor groups, on the other hand, initially *encouraged* the deconsolidation of TCEH and EFIH for two main reasons.  *First*, they argued that because TCEH and EFIH are disregarded entities, any liability arising from a taxable deconsolidation would be borne solely by EFH and, therefore, a Taxable Sale Transaction was in the best interests of the estates of EFIH and TCEH.  *Second*, these creditors argued that a Taxable Sale Transaction would generate significant value for EFIH and TCEH in the form of a "stepped-up" (*i.e.*, increased) tax basis in their respective assets, which would provide EFIH and TCEH with increased tax deductions and reduced tax payments over time.[10]   However, as discussed in the later sections of this Memorandum, after certain of these creditor groups began to understand the significant risks and costs associated with a Taxable Sale Transaction to *all* the Debtors, they supported a structure that would allow TCEH to separate from the EFH Group without triggering any material tax liability.[11]   Having said that, the Debtors understand that certain junior creditor groups—for reasons that are not clear to the Debtors—may in fact still support a Taxable Sale Transaction.[12]

---

[10]   As a practical matter, the benefits of these deductions may be somewhat limited.  In the case of both EFIH and TCEH, the additional deductions generally will be spread over a period of up to 20 years.  Additionally, in the case of EFIH, the Public Utility Commission of Texas—in setting Oncor's rates—would determine how the benefits of any stepped up basis are realized in rates collected by Oncor.  Moreover, as discussed below, the IRS could act to prevent the parties from benefitting from any stepped-up basis resulting from a transaction that left behind an unpaid (*i.e.*, stranded) tax liability.

[11]   The RSA had the support of approximately 43% of the TCEH First Lien Creditors, 34% of the first lien EFIH Creditors, 35% of the second lien EFIH Creditors, 70% of the unsecured EFIH Creditors, 73% of the EFH Creditors, and EFH Equity Investors representing approximately 99.36% of EFH's equity interests.

[12]   To the extent TCEH has intercompany claims against EFH, any deconsolidation tax liability at EFH would dilute the recoveries of such junior creditors.  Moreover, to the extent any junior creditors receive EFH equity interests in connection with a plan of reorganization that includes a taxable deconsolidation of either side of the EFH Group, the resulting deconsolidation tax liability at EFH would significantly diminish the value of those equity interests.

13

## A.    Expected Tax Consequences

A taxable sale of TCEH and/or EFIH (or their assets) in bankruptcy could occur under either section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan.  Regardless of its mechanics, none of the parties seriously contest that a Taxable Sale Transaction would result in a significant tax liability for EFH.[13]

By way of example, a taxable sale of TCEH in bankruptcy could take the form of the TCEH First Lien Creditors acquiring TCEH's assets using a credit bid in an amount up to approximately $24.5 billion (*i.e.*, the outstanding amount of TCEH First Lien Debt).[14]  This transaction would be classified for tax purposes as a taxable sale of TCEH's assets for their fair market value, with EFH recognizing taxable gain in an amount equal to the difference between that fair market value and EFH's approximately $7.5 billion of "inside tax basis" in TCEH's assets.[15]  While the actual amount of taxable gain generated depends upon a number of variables, including the value of TCEH's assets on the effective date and the ultimate sales price (including the amount of any credit bid), the Debtors expect that a taxable sale of TCEH (or its assets) would generate *at least* $9-10 billion of taxable gain.  Based on an estimated $10.5 billion of taxable gain, EFH's federal income tax liability resulting from a taxable sale of TCEH would be

---

[13]    The significant gain on a taxable sale of TCEH and/or EFIH (or their underlying assets) is largely attributable to the fact that the LBO was structured as a purchase of the stock of EFH and therefore did not result in a step-up in the tax basis of TCEH's or EFIH's assets at that time.  As a result, following the LBO, large amounts of untaxed (*i.e.*, built-in) gain remained with respect to TCEH's and EFIH's assets.  The tax consequences of a taxable sale of TCEH and/or EFIH (or their underlying assets) would be the same if it occurred outside of bankruptcy (*e.g.*, pursuant to a foreclosure by creditors) as if it occurred under section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan.

[14]    A third party also could submit a cash bid for TCEH's assets.  Regardless of whether the purchase is by the TCEH First Lien Creditors using a credit bid or a third party using cash or whether the sale involves TCEH equity or the underlying assets, the tax consequences as described herein are the same.

[15]    *See* I.R.C. § 1001.

approximately $3.7 billion, before taking into account any NOLs that may be available to offset such taxable gain.[16]

A taxable sale of EFIH's assets (*i.e.*, its partnership interest in Oncor) in bankruptcy also could be structured in a number of different ways, each of which would, similar to a sale of TCEH's assets, trigger taxable gain in an amount equal to the difference between the amount realized on the sale and EFIH's net tax basis in its partnership interest.[17]  The expectation is that a taxable sale of EFIH also would generate between $9-10 billion of taxable gain.  This, in turn, would result in $3-4 billion or more of federal income tax liability for EFH, before taking into account the effect of any NOLs that may be available to offset the taxable gain.

Because a taxable separation of either TCEH or EFIH (by way of a sale of either entity or its assets) would result in a *multi-billion* dollar tax liability for EFH, it is highly unlikely that the creditors of one side would be willing to take EFH equity in the event the other side was to deconsolidate from the EFH Group.  Accordingly, a single separation of *either* TCEH or EFIH could be expected to ultimately lead to a double separation of *both* TCEH and EFIH (a "double deconsolidation").

### B.     Vulnerability to IRS Challenge

There is a very real possibility that the IRS will anticipate the potential for a large stranded tax liability and therefore oppose, in the first instance, any plan of reorganization of EFIH or TCEH that includes a Taxable Sale Transaction.  Unless the IRS would agree to an

---

[16]   As noted above, the Debtors expect the EFH Group to have approximately $2.3 billion of NOLs available at emergence, which could reduce any deconsolidation tax liability by approximately $800 million ($2.3 billion x 35%).

[17]   I.R.C. § 741.  The amount realized upon the sale of a partnership interest consists of cash plus the fair market value of property received plus the selling partner's share of partnership liabilities assumed by the buyer or otherwise relieved in the transaction.  I.R.C. § 752(b).

impairment of its claim for the deconsolidation taxes, EFH would in that situation be forced to liquidate under chapter 7 because it would be unable to confirm a chapter 11 plan.[18]

This is more than a theoretical concern.  The IRS has, in fact, on at least three recent occasions attempted to prevent a sale in a bankruptcy proceeding that would leave behind a significant stranded tax liability: *In re LCI Holding Company, Inc.*, No. 12-13319 (KG) (Bankr. D. Del. Dec. 11, 2012) (section 363 sale); *In re Inner City Media Corp.*, No. 11-13967 (SCC) (Bankr. S.D.N.Y. Aug. 19, 2011) (section 363 sale); and *In re MSR Resort Golf Course LLC, et al.*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 1, 2011) (sale pursuant to a plan of reorganization).  In each of these cases, the debtor sought to transfer assets to either a cash purchaser or a secured creditor as part of a credit bid.  The sale or disposition would have resulted in a substantial taxable gain, but the liability for the tax would have been stranded at a taxpaying entity unable to pay the tax.  The IRS objected on a number of different grounds in these three cases, including that the principal purpose of the sale was to avoid paying taxes or that the sale would render the estates administratively insolvent.  The applicable court authorized the sale in each of these three cases because the taxpayer had not actually *intended* to strand the tax and there was no viable alternative to a taxable sale.  Although the IRS's objections were overruled in each of these cases, the IRS may continue to challenge such attempts to strand taxes under these or other potential legal theories.

Even if the IRS were to fail to block a Taxable Sale Transaction, as discussed below it still could potentially seek to prevent EFIH's or TCEH's new owners from enjoying the benefit of the stepped-up basis resulting from that transaction.  This could occur, for example, through a change in law—either by Congress, in the Internal Revenue Code, or by the Treasury

---

[18]    Taxes against a debtor resulting from a bankruptcy asset sale likely are entitled to administrative priority under section 503(b)(1)(B) of the Bankruptcy Code, and as such must be paid in full upon confirmation of a chapter 11 plan.  11 U.S.C.A. § 1129(a)(9); *In re Scott Cable Communications. Inc.*, 227 B.R. 596 (Bankr. D. Conn. 1998).

Department, in its regulations—to deny a basis step-up resulting from a stranded tax liability.[19]

A successful reorganization therefore requires accounting for the IRS's likely opposition to any course of action that results in a stranded tax liability, either by opposing plan confirmation in the first instance or by eliminating certain of the nominal tax benefits resulting from the same.

### C.    Responsibility for Tax Liability

As explained above, a double deconsolidation scenario resulting from a taxable sale of TCEH and EFIH (or their assets) would likely create a tax liability for EFH (and a bankruptcy claim for the IRS) of potentially $7 billion or more.  Because EFH does not and will not have sufficient assets to pay more than an insignificant amount of this claim, a Taxable Sale Transaction would likely lead to protracted litigation between the various interested parties— including the IRS—regarding who should be responsible for the so-called "stranded taxes."

#### 1.    Change in IRS Position

Certain creditors of EFIH and TCEH have argued that the IRS's position is that it generally cannot recover or otherwise satisfy a taxpayer's tax liability directly from the assets of a taxpayer's disregarded LLC, even if such liability is attributable to the LLC's assets or activities.[20]  The IRS has set forth this position in several Chief Counsel Advice Memoranda (or, CCAs), generally basing its view on the fact that state law determines a taxpayer's property interests for purposes of tax collection, and under state law the owner of an LLC only has an interest in the equity of the LLC, and not in the LLC's property.[21]  Faced with the prospect of an unpaid, multi-*billion* dollar tax claim in a high-profile bankruptcy case, however, the IRS might

---

[19]    As discussed below at Section I.C.1, this is a real possibility, as the IRS and Treasury Department have demonstrated that they are willing to change applicable tax principles to discourage or stop unwanted behavior.

[20]    *See, e.g.,* CCA 200338012 (Sept. 19, 2003); CCA 200235023 (Aug. 30, 2002); CCA 199930013 (Apr. 18, 1999) (each stating that the IRS does not have the right to collect a taxpayer's tax liability from a disregarded LLC unless the LLC has liability under a state law theory such as successor liability, alter ego, or reverse veil piercing).

[21]    *Id.*

change its position and seek to impose liability for the deconsolidation taxes directly on TCEH and EFIH. Moreover, the IRS could accomplish this change without undertaking any formal rule-making procedures, because IRS statements regarding the liability of a disregarded entity for its owner's income tax liability have to date been confined to Chief Counsel Advice Memoranda, which are informal and not binding precedent.[22]

The risk that the IRS may change its position to prevent a multi-billion tax loss is not just a theoretical concern. Indeed, the IRS has been willing to change its policies to discourage activities that result in lost revenue or that it deems inappropriate. As a very recent example, on September 22, 2014, the Treasury Department and the IRS issued Notice 2014-52 (the "Notice"), announcing their intention to issue regulations explicitly intended to discourage, if not stop altogether, so-called "inversion transactions," generally by limiting the economic benefits that can be obtained from those transactions.[23] The Notice even affects inversion transactions that were *signed or announced* (but not closed) prior to the date of the Notice.[24]

In the same way that the IRS and Treasury Department acted to target inversion transactions that they believed presented a potential for tax avoidance, in the context of a potential $7 billion (or more) unpaid tax liability in a high-profile transaction designed to generate a stepped-up tax basis to creditors, the IRS and Treasury Department could issue new regulations or guidance that would either discourage the transaction in the first instance, or eliminate the benefits resulting therefrom.[25] For example, the IRS and Treasury Department could issue new regulations or guidance that (i) treats the disregarded entity as if it were a

---

[22] I.R.C. § 6110(k)(3); Treas. Reg. § 301.6110-7(b).

[23] An inversion transaction frequently involves the relocation of a corporation's headquarters from the United States to a lower-tax foreign county, usually while retaining its material operations in the United States.

[24] Notice 2014-52 (Sept. 22, 2014).

[25] The IRS and Treasury Department also could amend their rules or guidance in such a way that the change would apply to a Taxable Sale Transaction even after it is completed.

corporation for federal income tax purposes or (ii) otherwise prevents the creditors from claiming a stepped-up tax basis from the transaction unless the attendant tax liability is first paid. While any such IRS or Treasury Department action might be viewed as unusual or aggressive, it is by no means inconceivable, and it was and is a relevant consideration for each of the Debtors as they consider potential reorganization alternatives.[26]

### 2. State Law Theories of Liability

Notwithstanding the general rule that disregarded entities do not have their own federal income tax liabilities, the IRS may nonetheless seek to hold TCEH and/or EFIH liable for the taxes of their owner (EFH), either by changing its existing policies, as discussed above, or by applying one or more state law liability theories for looking beyond the corporate form. These state law theories include piercing the corporate veil, alter ego, reverse veil piercing, and various other equitable doctrines such as nominee or transferee liability.[27]

### 3. Claim Under the Competitive TSA

A claim for EFH's deconsolidation tax liability could be asserted against EFIH, EFCH, and/or TCEH under the terms of the Competitive TSA.[28]  As discussed above at Section III.A, the Competitive TSA provides, in part, that the liability of a corporate member of the EFH Group is sub-allocated to its disregarded entities based on each such entity's relative income (arguably excluding capital gains).  Accordingly, any tax liability of EFH (a corporate member) resulting from a Taxable Sale Transaction could be sub-allocated to EFIH, EFCH, and TCEH (disregarded

---

[26]   The Debtors are not offering a view on whether it would be legally proper for the IRS to change its guidance or whether that effort would ultimately succeed, but rather are pointing out that the mere possibility of litigation on that issue is a relevant consideration for the Debtors as they consider reorganization alternatives.

[27]   *See, e.g.,* CCA 200338012 (Sept. 19, 2003); CCA 200235023 (Aug. 30, 2002); CCA 199930013 (Apr. 18, 1999).  The Debtors are not taking a position in this Memorandum about the likelihood of success of these theories, but rather are simply pointing out that the IRS has avenues available to it to litigate the issue of which entities should be liable for the "stranded" tax.

[28]   None of EFIH, EFCH, and TCEH are parties to the Regulated TSA, and thus that agreement does not present the same concerns as those described here with respect to the Competitive TSA.

entities) based on the relative amount of income generated by the taxable sale of each entity. EFH therefore could pursue a claim for reimbursement against EFIH, EFCH, and TCEH under the Competitive TSA, arguing that the agreement requires that the tax liability triggered by a taxable separation of such entities (or their assets) must be allocated to, and borne by, EFIH, EFCH, and TCEH.  If successful, this claim would dilute recoveries for unsecured creditors at EFIH, EFCH, and TCEH.

It should be noted that various creditor groups have taken the position that EFH would not have a claim under the Competitive TSA against EFIH, EFCH, or TCEH as a result of a taxable deconsolidation.  These creditors argue, in part, that the gain arising from a taxable deconsolidation would consist largely of capital gain and that the Competitive TSA specifically does *not* allocate the EFH's Group's tax liability based on the capital gain generated by an entity. Regardless of whether or not the Competitive TSA takes capital gains into account, the Debtors believe that *all* of the EFH Group's consolidated tax liability is allocated under the agreement, and that if it is not allocated based on relative amounts of capital gain, it should be allocated based on relative amounts of ordinary income.  At a minimum, the Debtors believe that under the terms of the Competitive TSA, each of EFIH, EFCH, and TCEH (or its subsidiaries) would be allocated a significant amount of the deconsolidation tax liability based solely on their ordinary income.  Having said that, the Court should be aware that certain creditors may disagree with that conclusion.

### D.    Potential "Check-the-Box" Elections

As discussed above, a double deconsolidation of the EFH Group could result in a potential "stranded" tax liability of $7 billion or more.  In the event a double deconsolidation becomes the operative path forward, a fiduciary for EFH may deem it necessary to make a "check-the-box" election for EFIH and/or TCEH (or its subsidiaries).  This election would cause

EFIH and/or TCEH (or its subsidiaries) to be taxable as corporations (rather than disregarded entities) for federal income tax purposes, such that they would become severally liable for the tax liability of the EFH Group.[29]   This, in turn, would strengthen the IRS's claim to recover the deconsolidation tax liabilities from EFIH and/or TCEH, thus mitigating the tax risk to EFH. Recent Third Circuit precedent strongly supports the position that a "check-the-box" election that causes a debtor to become a taxable corporation is not a violation of the automatic stay and does not constitute a transfer of property from the debtor's estate.[30]

While a check-the-box election would mitigate tax risk to EFH arising from a taxable deconsolidation (by potentially reducing the likelihood of such a deconsolidation), it may at the same time cause any cancellation of debt income triggered by the reorganization transactions to become taxable, thereby causing additional tax liability *even if* the EFH Group ultimately remains consolidated or pursues a tax-free separation.[31]   EFH, EFIH, and TCEH would likely be severally liable for that tax liability as well, further reducing the recoveries to the creditors of those entities.   As a result, the Debtors believe that a check-the-box election would be an adverse outcome for all parties.

## II.      FIRST PATH FORWARD: A CONSOLIDATED REORGANIZATION

To avoid the problems created by the potential stranded tax described above, the Debtors initially pursued a consensual, consolidated reorganization through negotiations with their creditors.   The Debtors and certain key creditors, over the course of more than one year,

---

[29]   Treas. Reg. § 1.1502-6.  An LLC with only one owner is treated as a disregarded entity for federal income tax purposes unless it affirmatively files a "check-the-box" election to be treated as a corporation for federal income tax purposes on IRS Form 8832.  Treas. Reg. §§ 301.7701-3(b)(1)(*ii*), -3(c).

[30]   *Majestic Star Casino, LLC v. Barden Dev. Inc.*, 716 F.3d 736 (3d Cir. 2013).

[31]   This result occurs because a check-the-box election would have the consequence of creating a large "excess loss account " in the stock of the "new" corporation equal to the excess of the liabilities of EFIH or TCEH, as applicable, over the tax basis of their assets.   An excess loss account is triggered into taxable income if the corporation realizes cancellation of debt income in certain situations.  *See* Treas. Reg. § 1.1502-19(c)(1)(*iii*)(B).

considered various consolidated reorganization proposals that would have preserved the status quo of the EFH Group's consolidated tax structure and resulted in EFH being predominantly owned by a combination of the TCEH First Lien Creditors and the unsecured EFIH and EFH Creditors. While these proposals would have avoided the potential stranded tax liability of up to $7 billion or more discussed above, they would not have delivered a basis step-up for EFIH's and TCEH's new owners.[32]

Because a consolidated reorganization framework would result in a significant portion of EFIH, TCEH, and potentially EFH debt being converted into EFH equity, the success of these proposals was dependent upon a high degree of consensus among these creditors. If the parties could not agree on the relative split of the equity of Reorganized EFH (as defined below), and either EFIH or TCEH were to separate in a taxable manner from the EFH Group, EFH would end up with a significant tax liability. EFH equity—saddled with tax liabilities—would become comparatively less valuable, thereby jeopardizing the viability of the reorganization for all parties.

Unfortunately, the Debtors were never able to garner the necessary level of support for a consolidated reorganization from the relevant stakeholders, due in large part to fundamental differences in opinion regarding valuation. As a result, the various stakeholders turned their attention to developing a deconsolidation transaction that would minimize the Debtors' consolidated tax liability and manage the difficult tax issues presented by a taxable deconsolidation.

## III. CURRENT PROPOSED PATH FORWARD: TAX-FREE DECONSOLIDATION

Following significant negotiations, the Debtors and certain key financial stakeholders entered into the RSA, pursuant to which the parties agreed to pursue a tax-free spin-off of

---

[32] A stepped-up basis generally is only available with respect to transactions that are taxable asset acquisitions for tax purposes, and thus would not result from a distribution of equity to creditors in exchange for their claims.

reorganized TCEH to the TCEH First Lien Creditors and a significant recapitalization of the EFIH and EFH Debt.[33]  Although the RSA was never approved by the Court, and the Debtors have since terminated the RSA, the reorganization contemplated by the RSA provides one path for a tax-efficient reorganization of all the Debtors.  Indeed, the Debtors and certain creditor groups still believe that this is the most efficient structure for a reorganization in this case.  The following subsections provide an overview of the reorganization transactions contemplated under the RSA (together with subsequent developments), the rules and principles governing their tax consequences, and the various tax issues they present.

### A.    Overview of Tax-Free Reorganization

The reorganization contemplated under the now-terminated RSA (the "Reorganization") had two key components: (1) the tax-free separation of the Competitive Business from the Regulated Business by means of a tax-free spin-off of Reorganized TCEH (as defined below) from the EFH Group[34] and (2) the recapitalization of EFIH and EFH (recapitalized EFH, "Reorganized EFH").  Immediately following the contemplated Reorganization, (i) 100% of the stock of Reorganized TCEH was to be owned by TCEH's First Lien Creditors; (ii) the stock of Reorganized EFH was to be owned primarily by one or more of a combination of the unsecured EFIH Creditors, the EFH Creditors, and the EFH Equity Investors; and (iii) Reorganized EFH was to continue to own EFIH, and EFIH was to continue to hold its interest in Oncor (through Oncor Holdings).  As discussed in detail below, if the Debtors' reorganization is accomplished in a tax-free manner as was contemplated under the RSA, the separation of Reorganized TCEH

---

[33]    To implement the pre-arranged Reorganization set forth in the RSA, EFH and certain of its subsidiaries, including TCEH, EFIH, and EFCH (but excluding Oncor and Oncor Holdings), filed voluntary petitions for reorganization under chapter 11 on April 29, 2014.  Although the RSA was terminated on July 31, 2014, pursuant to its terms the parties continue to negotiate in good faith regarding a reorganization that will include a tax-free spin-off of TCEH.

[34]    Unless the context requires otherwise, reference to a "tax-free separation" or a "tax-free spin-off" refers to a transaction that does not generate a cash tax liability for the Debtors.

from the EFH Group could be immediately followed by a third-party acquisition of Reorganized EFH. In such a situation, stock of the third-party acquirer of Reorganized EFH could constitute a portion of the consideration distributed in satisfaction of claims against the EFH and EFIH Debtors (or with respect to stock in EFH).[35]

### 1.    The TCEH Reorganization

A crucial element of the Reorganization contemplated under the RSA was that the reorganization of TCEH would have been a "tax-free" transaction. In other words, TCEH would have been spun off in a way that would have resulted in taxable gain in an amount no greater than the NOLs and other tax attributes available to EFH to reduce that gain to zero. Reorganized TCEH, in turn, would have enjoyed a "stepped up basis" in the amount of such taxable gain, which would have provided value to the potential owners of the Reorganized TCEH.[36] To accomplish this goal, the RSA contemplated that the tax-free separation of TCEH from the EFH Group generally would take place according to the following series of steps (or steps that are similar in substance) pursuant to the Debtors' Chapter 11 plan of reorganization (the "Plan"):

1. TCEH would form a wholly owned Delaware limited liability company ("Reorganized TCEH"), which would be treated as a disregarded entity of EFH for federal income tax purposes.

2. Reorganized TCEH would issue new debt (the "Reorganized TCEH Debt") to third parties (which may include the TCEH First Lien Creditors) for cash.

3. On the Plan's effective date (the "Effective Date"), the TCEH First Lien Debt and the TCEH Junior Debt would be cancelled under the Plan.

4. TCEH would transfer all of its assets (the "Transferred Assets") and certain liabilities, including the Reorganized TCEH Debt (the "Assumed Liabilities"), to Reorganized TCEH in exchange for (a) 100% of the common stock of Reorganized TCEH and (b) the cash proceeds of the Reorganized TCEH Debt.[37] The Transferred Assets and Transferred

---

[35]    It also is possible that the EFH Creditors and/or EFIH Creditors could directly exchange their claims for stock of a corporation acquiring Reorganized EFH in a manner that would receive the same economic and tax results.

[36]    The use of NOLs to offset taxable gain could give rise to a small amount of alternative minimum tax liability.

[37]    None of the TCEH First Lien Debt or TCEH Junior Debt would be assumed by Reorganized TCEH (as all such debt would have been cancelled immediately prior to this step).

Liabilities also are expected to include certain assets and liabilities of other Debtors that are related to the Competitive Business.

5. Immediately thereafter, Reorganized TCEH would convert to a Delaware corporation. For federal income tax purposes, the incorporation of Reorganized TCEH was intended to be treated as if EFH contributed the Transferred Assets to Reorganized TCEH (a corporation) in exchange for all of Reorganized TCEH's common stock and Reorganized TCEH's assumption of the Assumed Liabilities (the "Contribution").[38]

6. Immediately following the Contribution, TCEH would transfer all of the Reorganized TCEH common stock and the cash proceeds from the Reorganized TCEH Debt to the TCEH First Lien Creditors (the "Distribution," and together with the Contribution, the "TCEH Reorganization"). For federal income tax purposes, because TCEH and EFCH are disregarded entities, EFH would be treated as having made the Distribution directly to the TCEH First Lien Creditors (who are treated as creditors of EFH for federal income tax purposes).

2.    The Recapitalization

Any reorganization plan that seeks to separate Reorganized TCEH from EFH in a tax-free manner would also necessarily require a recapitalization of EFH's capital structure through the issuance of a combination of Reorganized EFH stock, cash, and potentially new debt. This transaction could be structured in any number of ways, but generally can be expected to result in:

1. the first lien EFIH Creditors receiving the proceeds of the EFIH First Lien DIP Facility in exchange for their share of the EFIH Debt;[39]

2. the second lien EFIH Creditors receiving cash (and possibly Reorganized EFH stock) in respect of their claims;

3. the unsecured EFIH Creditors and the EFH Creditors receiving cash (and possibly Reorganized EFH stock) in respect of their claims; and

4. the EFH Equity Investors receiving Reorganized EFH stock to the extent of the value, if any, of their interests (or claims) (the "EFH Recapitalization").[40]

---

[38]   As described in more detail below, this step would result in a "partial step-up" in the basis of Reorganized TCEH's assets.

[39]   The EFIH First Lien DIP Facility was funded on June 19, 2014, and approximately $4.0 billion of first lien EFIH Debt was repaid shortly thereafter. The EFIH First Lien DIP Facility will be repaid in full on the Effective Date.

[40]   The EFH Equity Investors would retain their existing shares in Reorganized EFH, but their percentage interest would be substantially diluted as a result of the Recapitalization. Depending on the outcome of negotiations, it is possible that certain creditors of TCEH may also receive Reorganized EFH stock with respect to the Plan.

The lynchpin of an EFH Recapitalization would be the infusion of cash in an amount necessary to satisfy all or a portion of the allowed claims of the first and second lien EFIH Creditors and, potentially, some or all of the unsecured EFIH Debt, the EFH Debt, and the EFIH First Lien DIP Facility.   This cash could come from a number of sources, including newly funded EFIH indebtedness or, as discussed below, a third-party acquirer in connection with an acquisition of Reorganized EFH.[41]   As discussed below, any reorganization plan that seeks to separate Reorganized TCEH in a tax-free manner must give careful consideration to the manner in which the various classes of EFIH Debt and EFH Debt are satisfied (*i.e.*, solely with stock, solely with cash, or with a combination of stock and cash), as the treatment of these creditors will determine the tax consequences of any TCEH Reorganization.

### 3.   Potential Acquisition of Reorganized EFH

The RSA did not contemplate a third-party acquisition of Reorganized EFH.   However, after EFH filed for bankruptcy, it became clear that a number of third parties were interested in acquiring the Regulated Business, culminating in the Motion to Approve Bidding Procedures.   If the Motion to Approve Bidding Procedures is approved and the auction process is undertaken, a third party may seek to acquire the equity of Reorganized EFH (or its assets), including as part of the Plan or substantially contemporaneously with the consummation of the Plan.   As described in greater detail below, the structure of any such acquisition and the consideration used will dictate not only whether such acquisition can be accomplished in a tax-free manner, but also whether such acquisition might adversely affect the intended tax consequences of the TCEH Reorganization.

---

[41]   It also is possible that the second lien EFIH Debt and the unsecured EFIH Debt and EFH Debt could be exchanged directly into the stock of an acquiring entity in a manner that would achieve the same economic and tax results described below in Section III.B.

### B.      Applicable Tax Rules and Expected Tax Consequences

The *sine qua non* of a successful, tax-efficient reorganization is the *tax-free* separation of the Competitive Business from EFH.  Achieving this goal requires navigating two complex and sometimes uncertain legal standards.  *First*, the TCEH Reorganization must qualify as a reorganization pursuant to Internal Revenue Code section 368(a)(1)(G) (a "G Reorganization"). *Second*, the Distribution (*i.e.*, the transfer of Reorganized TCEH stock to the creditors of TCEH in the G Reorganization) must qualify as a distribution pursuant to Internal Revenue Code section 355 (a "Section 355 Distribution").  Together, this G Reorganization and Section 355 Distribution would constitute what is known as a "divisive G Reorganization."

As a divisive G Reorganization, the Debtors generally would not recognize any gain or loss with respect to the TCEH Reorganization.  Although EFH would recognize gain on the Contribution to the extent the Assumed Liabilities exceed its tax basis in the Transferred Assets,[42] the RSA contemplated that the amount of this gain would be roughly equal to the amount of the EFH Group's tax attributes, including NOLs, available to offset that gain.  In that case, the taxable gain to EFH would be reduced to zero, but Reorganized TCEH would benefit from a partial step-up in the tax basis of its assets to the extent of the *unreduced* taxable gain (*i.e.*, the amount of taxable gain prior to being offset by tax attributes).[43]  This partial step-up in basis would generate value for Reorganized TCEH in the form of additional depreciation and amortization deductions (and corresponding reduced tax payments) in future years.

---

[42]    I.R.C. § 357(c)(1).

[43]    By way of example, assume that in connection with the Contribution, Reorganized TCEH assumes $9.5 billion of liabilities in exchange for the Transferred Assets.  EFH would, in that situation, recognize taxable gain equal to the difference between the amount of the Assumed Liabilities ($9.5 billion) and EFH's tax basis in TCEH's assets ($7.5 billion).  Assuming the EFH Group has $2.3 billion of NOLs available to offset this $2.0 billion ($9.5 billion - $7.5 billion) of taxable gain, the taxable gain realized by EFH would be reduced to zero and Reorganized TCEH would obtain a $2.0 billion step-up in the tax basis of its assets.

If, on the other hand, the TCEH Reorganization does *not* qualify as a divisive G Reorganization, the Debtor's tax-efficient reorganization would fail. The Contribution and Distribution would be fully taxable and EFH would face a multi-*billion* dollar tax liability. Moreover, Reorganized TCEH might be severally liable for that tax liability because Reorganized TCEH would be treated as a corporation for federal income tax purposes, and not a disregarded entity.

In light of these high tax stakes, as discussed below at Section III.D, EFH has requested that the IRS issue a private letter ruling confirming that the TCEH Reorganization (as contemplated under the now-terminated RSA) would qualify as a divisive G Reorganization. EFH intends to supplement this request as the terms of the current reorganization path develop. Given the importance of qualification for tax-free status, the following discussion seeks to familiarize the Court and parties with the requirements necessary for a transaction to qualify as a divisive G Reorganization.

### 1.    G Reorganization Requirements

A G Reorganization consists of the transfer of assets by a corporation to another corporation in a bankruptcy proceeding, but only if, as part of the "plan of reorganization,"[44] stock of the acquiring corporation is distributed in a transaction that qualifies under section 354, 355, or 356 of the Internal Revenue Code.[45]  The TCEH Reorganization as contemplated under the now-terminated RSA would meet such basic requirements because, for tax purposes, EFH (the transferor corporation) would be treated as transferring assets associated with the

---

[44]  The term "plan of reorganization" has a different meaning for tax purposes than it does for bankruptcy purposes. For tax purposes, the term refers to the steps undertaken to consummate a transaction defined as a reorganization within the meaning of section 368(a) of the Internal Revenue Code. Treas. Reg. § 1.368-2(g).

[45]  I.R.C. § 368(a)(1)(G). As discussed in more detail below, a distribution of stock will qualify as a Section 355 Distribution if one corporation distributes 100% of the stock of a subsidiary to the stockholders and security holders of the distributing corporation (provided various other technical requirements are satisfied).

Competitive Business (which are deemed owned by EFH for tax purposes) to Reorganized TCEH (the transferee corporation), and the stock of Reorganized TCEH would then be distributed in a transaction intended to qualify under sections 355 and 356 of the Internal Revenue Code (as discussed below).  In addition to these basic statutory requirements, to qualify as a G Reorganization the TCEH Reorganization would also need to satisfy the following non-statutory requirements, each of which is discussed below: (i) business purpose, (ii) continuity of business enterprise, and (iii) continuity of interest.[46]

### a.    Business Purpose

For the TCEH Reorganization to qualify as a G Reorganization, it must be supported by a business purpose.[47]  Here, the EFH Group's debt levels are unsustainable, and it is imperative (and inevitable) that its debt be restructured.  As described above, the Debtors have endeavored to structure the Reorganization in a manner that will avoid triggering tax liabilities that EFH will be unable to pay.  Because the Reorganization accomplishes the valid business purpose of restructuring the EFH Group's debt, the TCEH Reorganization would likely satisfy the business purpose requirement.

### b.    Continuity of Business Enterprise

Generally, continuity of business enterprise ("COBE") requires that the transferee corporation either (i) continue the transferor's historic business or (ii) use a significant portion of the transferor's historic business assets in a business.[48]  If the transferor corporation (EFH) has more than one business, the transferee corporation (Reorganized TCEH) only needs to continue a

---

[46]    Treas. Reg. § 1.368-1.

[47]    Treas. Reg. § 1.368-2(g).

[48]    Treas. Reg. § 1.368-1(d)(1).

"significant line" of the transferor's business to satisfy COBE.[49]    Prior to the TCEH Reorganization, EFH would be viewed as having at least two lines of business: the Regulated Business and the Competitive Business.[50]    After the TCEH Reorganization, Reorganized TCEH would continue the Competitive Business, which would likely meet the COBE standard for a "significant line" of EFH's business.    Accordingly, the COBE requirement would likely be satisfied.

*c.*     *Continuity of Interest*

In general, for a transaction to qualify as a G Reorganization, the pre-reorganization owners of the "proprietary interests" of the transferor corporation (EFH) must enjoy a direct or indirect continuity of interest ("<u>COI</u>") in such corporation through ownership in the transferee corporation (Reorganized TCEH).[51]    The COI concept is a judicially developed doctrine designed to distinguish transactions that are more akin to taxable sales from those transactions that should properly be afforded tax-free treatment.    The IRS has issued specific rules that establish whether COI exists, and those rules focus on the quantum and nature of the consideration used in a transaction and the identity of the recipient(s) of such consideration.[52]    As discussed in more detail below, the Debtors have endeavored (and will continue to endeavor) to structure any tax-free separation of TCEH in a manner designed to maximize the likelihood of obtaining a private letter ruling from the IRS that COI will be satisfied.

---

[49]    Treas. Reg. § 1.368-1(d)(5), Ex 1.

[50]    Because EFIH, EFCH, and TCEH are disregarded entities, EFH is treated for federal tax purposes as though it directly conducts both the Regulated and Competitive Businesses for these purposes.

[51]    Treas. Reg. § 1.368-1(e).   As discussed in detail below at Section III.C.1, the owners of the "proprietary interests" of a financially troubled corporation may include both equity and security holders.   In that regard, note that because TCEH and EFCH are disregarded entities, the TCEH First Lien Creditors are treated as secured creditors (*i.e.*, security holders) of EFH for federal income tax purposes.

[52]    Treas. Reg. § 1.368-1(e).   There is some uncertainty as to whether the section 368 COI requirement applies to a divisive G Reorganization.   Given this uncertainty, the discussion herein assumes that section 368 COI does apply.

2.      Section 355 Distribution Requirements

To qualify as a divisive G Reorganization, not only must the TCEH Reorganization satisfy the basic G Reorganization requirements set forth above, but the Distribution also must meet the requirements for a Section 355 Distribution. The Section 355 Distribution requirements are more difficult to satisfy than the requirements for a G Reorganization. A distribution of stock generally will qualify as a Section 355 Distribution if one corporation (EFH) distributes 100% of the stock of a subsidiary (Reorganized TCEH) to the stockholders and security holders (the TCEH First Lien Creditors) of the distributing corporation, provided certain statutory and non-statutory technical requirements are satisfied.[53] The statutory requirements for a Section 355 Distribution include that the distribution (i) not be used as a "device" to distribute earnings and profits, (ii) be of an active trade or business, and (iii) be a distribution of control.[54] The non-statutory requirements for a Section 355 Distribution include (i) business purpose, (ii) continuity of interest, and (iii) continuity of business enterprise.[55] Many of these statutory and non-statutory requirements overlap the requirements applicable to a G Reorganization, and thus would likely be satisfied for the same reasons set forth above. As discussed below, the continuity of interest requirement applicable to Section 355 Distributions, however, is applied somewhat differently and raises the most issues here.

C.      Tax Issues and Concerns

The transfer of Reorganized TCEH stock to creditors of TCEH contemplated under the now-terminated RSA was designed to, and likely would, satisfy the basic statutory requirements for a G Reorganization: it is a transfer of assets by a transferor corporation (EFH) to a transferee

---

[53]    I.R.C. § 355; Treas. Reg. § 1.355-1.

[54]    *Id.*

[55]    *See* Treas. Reg. §§ 1.355-1, -2, -3.

31

corporation (Reorganized TCEH) followed by a distribution of the stock of the transferee corporation to the stockholders or security holders (the TCEH First Lien Creditors) of the transferor corporation.[56]  The TCEH Reorganization also could be expected to satisfy the non-statutory requirements applicable to G Reorganizations that qualify as Section 355 Distributions, including business purpose, active trade or business, distribution of control, and that the distribution not be a device for distributing earnings and profits.  However, two principal issues remain.

As discussed in detail below, two specific and complex issues generate a degree of uncertainty surrounding whether the TCEH Reorganization (as contemplated under the RSA) will ultimately qualify for tax-free status:  (1) the differential application of the continuity of interest (or, COI) rules under Internal Revenue Code sections 368 and 355 and (2) whether section 355(d) might apply to trigger taxable gain on the Distribution.[57]  In light of these uncertainties, the Debtors have endeavored (and will continue to endeavor) to plan the reorganization in a manner designed to maximize the likelihood of obtaining a private letter ruling from the IRS that the TCEH Reorganization will qualify as a divisive G Reorganization. Any modifications to the transactions proposed under the now-terminated RSA, including a post-reorganization, third-party acquisition of Reorganized EFH, must be carefully considered to ensure that the Debtors are able to obtain a favorable ruling from the IRS.

---

[56]  As noted *supra* at fn.51, because TCEH and EFCH are disregarded entities, the TCEH First Lien Creditors are treated as security holders of EFH for federal income tax purposes.

[57]  Under Internal Revenue Code § 355(e), post-reorganization acquisitions of either party to a distribution under section 355 can trigger significant taxable gain with respect to what would otherwise be a Section 355 Distribution. However, section 355(e)(4)(B) provides that the section 355(e) restriction on post-distribution acquisition activity does *not* apply to distributions "made in a Title 11 or similar case."  Accordingly, section 355(e) is not a concern here.  The fact that section 355(e) is not applicable in the bankruptcy context permits each of Reorganized EFH and Reorganized TCEH to pursue strategic transactions that would not otherwise be possible, and creates a substantial opportunity for post-reorganization acquisition activity.

1.     Continuity of Interest

For the TCEH Reorganization as contemplated under the now-terminated RSA to qualify as a divisive G Reorganization, it must satisfy the COI rules applicable to both G Reorganizations and Section 355 Distributions.  Generally, the COI doctrine seeks to distinguish between transactions that should be accorded tax-free status because they are reorganizations and those that are more properly characterized as taxable sales.[58]  At a basic level, the doctrine looks to who holds the equity (or "proprietary interests") of a corporation before a reorganization transaction and whether those persons continue to retain a substantial portion of their investment in the form of equity after the transaction.  The receipt of cash as a significant portion of the overall consideration for the proprietary interests in some reorganization contexts can cause the transaction to resemble a sale and prevent the COI standard from being satisfied, thereby causing the transaction to be treated as a taxable sale in its entirety.

The COI requirements for section 368 (*i.e.*, a G Reorganization) and section 355 (*i.e.*, a Section 355 Distribution) are different.  The section 368 COI rules are specific (albeit highly technical) bright-line rules that focus on the type of compensation paid to creditors.  The section 355 COI rules, on the other hand, apply a different standard that looks to how much stock in the new entity continued to be held by the holders of the old proprietary interests after the distribution.  To qualify as a divisive G Reorganization, a successful reorganization must account for <u>both</u> of these COI rules.

---

[58]     Treas. Reg. § 1.368-1(e)(1).

<em>a. Section 368 COI Rules</em>

To recall, Internal Revenue Code section 368 dictates whether the TCEH Reorganization can qualify as a G Reorganization. The Treasury Regulations under section 368 state that COI "requires that in substance a substantial part of the value of the proprietary interests in the target corporation be preserved in the reorganization."[59] In the case of a financially solvent corporation, identifying the owners of the proprietary interests is relatively straightforward; in most cases, the corporation's stockholders own the proprietary interests. The issue becomes more complex when dealing with a financially troubled corporation. The seminal U.S. Supreme Court case *Alabama Asphaltic* stands for the proposition that the creditors of an insolvent corporation can be treated as holding an equity (or proprietary) interest in such corporation for COI purposes.[60] Treasury Regulations finalized in 2008 codify the principles of *Alabama Asphaltic*, providing as follows:

> A creditor's claim against a target corporation may be a proprietary interest in the target corporation if the target corporation is in a title 11 or similar case (as defined in section 368(a)(3)) or the amount of the target corporation's liabilities exceeds the fair market value of its assets immediately prior to the potential reorganization. In such cases, if any creditor receives a proprietary interest in the issuing corporation in exchange for its claim, every claim of that class of creditors and every claim of all equal and junior classes of creditors (in addition to the claims of shareholders) is a proprietary interest in the target corporation immediately prior to the potential reorganization to the extent provided in paragraph (e)(6)(ii) of this section.[61]

The section 368 COI regulations contain very technical rules for determining the value of a creditor's proprietary interest in the transferor corporation. In essence, these rules look to the consideration received by each group of creditors in the reorganization at issue. The rules can be summarized as follows:

---

[59] Treas. Reg. § 1.368-1(e)(1).

[60] *Helvering v. Alabama Asphaltic Limestone Co.*, 315 U.S. 179, 183-84 (1942).

[61] Treas. Reg. § 1.368-1(e)(6).

34

- If a creditor receives stock, such creditor and all junior creditors will be treated as having owned a proprietary interest in the corporation;

- If a creditor receives solely cash and no senior creditor receives stock, such creditor will not be treated as owning a proprietary interest; and

- If a creditor receives a combination of cash and stock and no senior creditor receives stock, such creditor will be treated as owning a proprietary interest equal to the value of the stock received and all junior creditors will be treated as owning a proprietary interest.[62]

The preamble to the regulations provides that "[t]he effect of this rule is that there is 100 percent continuity of interest if each senior claim is satisfied with the same ratio of stock to nonstock consideration and no junior claim is satisfied with nonstock consideration."[63]  The fact that one or more creditors are treated as holding a proprietary interest in a corporation does not prevent shareholders from also being treated as holding a proprietary interest.[64]

Once the holders of the pre-reorganization proprietary interests are identified and the values of those interests are calculated, the section 368 COI rules require a determination of whether those interests are "preserved" in the reorganization.  This determination requires an analysis of all the consideration received by holders of the "old" proprietary interests and the proportion of that consideration that consists of a "new" proprietary interest.  Although the exact quantum of new proprietary interests necessary to satisfy COI under section 368 is not entirely clear, most tax practitioners are satisfied if 40% of the consideration received for the old proprietary interests consists of new proprietary interests.[65]

---

[62]  The tax rules do not contain any clear guidelines for purposes of determining which claims represent a "senior" or "junior" claim when there is debt issued by multiple entities that are disregarded for tax purposes.  It is not entirely clear, for instance, whether an EFH unsecured creditor should be treated as holding a claim that is junior to an EFIH secured creditor.  It is theoretically possible for EFH to have sufficient assets to satisfy its creditors in full even if an EFIH creditor does not receive a 100% recovery.  The Debtors took such uncertainty into account in developing the Reorganization proposed under the RSA.

[63]  Preamble to T.D. 9434 (Jan. 26, 2009).

[64]  Treas. Reg. § 1.368-1(e)(6)(*iv*).

[65]  *See* Temp. Treas. Reg. § 1.368-1T(e)(2)(*v*), Ex. 1.

Whether section 368 COI is satisfied can vary significantly depending on the identity of the holders of the pre-reorganization proprietary interests.  As a simplified example, assume a corporate debtor in bankruptcy has three classes of creditors: first lien secured, second lien secured, and unsecured.  Further assume that pursuant to the plan of reorganization, the first lien secured creditors are paid $1,000 in cash, the second lien unsecured creditors receive debtor stock worth $500 and $2,000 of cash, and the unsecured creditors receive debtor stock worth $1,000 and $500 of cash.  Under these facts, the holders of the first lien debt (*i.e.*, the most senior claims) do not have a pre-reorganization proprietary interest in the debtor corporation because they did not receive any debtor stock pursuant to the plan.  The second lien creditors (who received stock and cash) have a pre-reorganization proprietary interest with a value of $500 and the entire claim of the unsecured creditors (because it is a junior claim to the second lien creditors) represents a pre-reorganization proprietary interest with a value of $1,500 (*i.e.*, the fair market value of the junior claim).[66]  Accordingly, the total value of the pre-reorganization proprietary interests in the debtor is $2,000, and the holders of such interests receive consideration consisting of stock with a value of $1,500 and cash of $500 with respect to such interests (this formula excludes the cash received by the creditors with the most senior claim that also received equity).  Under these facts, 75% of the debtor's proprietary interests are preserved ($1,500 ÷ $2,000) and, therefore, section 368 COI is satisfied.

If, on the other hand, the first lien secured creditors in this example receive $900 in cash and stock worth $100, then they too would be treated as holding a proprietary interest, as would all junior creditors (*i.e.*, the second lien and the unsecured creditors).  As a result, the pre-reorganization proprietary interests would have a value of $4,100 ($100 first lien claims, $2,500 second lien claims, and $1,500 unsecured claims), and the holders of those interests would

---

[66]    The value of the second lien proprietary interests is calculated as the value of their claim ($2,500) multiplied by 20% (*i.e.*, the value of the debtor stock ($500) divided by the value of all consideration received ($2,500)).

receive, in the aggregate, stock worth $1,600 and cash of $2,500.[67]  This would reflect a preservation of only 39% ($1,600 ÷ $4,100) of the debtor's pre-reorganization proprietary interests and, arguably, COI would not be satisfied.

These examples demonstrate the sensitivity of the section 368 COI rules to slight changes in the mix of consideration provided to the various creditor classes.  Because the type of consideration paid to each creditor group determines the identity of the pre-reorganization holders of proprietary interests, which in turn drives whether the section 368 COI rules are satisfied and whether a reorganization can qualify for tax-free status, careful attention must be paid to the types of consideration provided to each class of creditor in exchange for their claims.

> b.    *Applying the Section 368 COI Rules*

Because TCEH, EFCH, and EFIH are all disregarded entities, the creditors of TCEH and EFIH are treated as creditors of EFH (the transferor corporation) for federal income tax purposes.  Because EFH is a debtor in a title 11 case, any or all of the TCEH First Lien Creditors, the TCEH Junior Creditors, the EFIH Creditors, and the EFH Creditors (together with the EFH Equity Investors) *may* be treated as holding pre-Reorganization proprietary interests in EFH under *Alabama Asphaltic* and related Treasury Regulations.

Under the TCEH Reorganization contemplated under the now-terminated RSA, the TCEH First Lien Creditors would have received Reorganized TCEH common stock and cash (in the same ratio) in exchange for their claims; the TCEH Junior Creditors would have received a small amount of cash in exchange for their claims; the first and second lien EFIH Creditors would have received cash in exchange for their claims; and the unsecured EFIH Creditors, the EFH Creditors, and the EFH Equity Investors would have received Reorganized EFH stock (and potentially cash) in exchange for their claims (before taking into account any third-party

---

[67]    The value of the first lien proprietary interests is calculated as the value of their claim ($1,000) multiplied by 10% (*i.e.*, the value of the debtor stock ($100) divided by the value of all consideration received ($1,000)).

acquisition of Reorganized EFH).[68]   Accordingly, each of the TCEH First Lien Creditors, the TCEH Junior Creditors, the EFH Creditors, the unsecured EFIH Creditors (but *not* the first and second lien EFIH Creditors, if they receive solely cash), and the EFH Equity Investors would likely have been treated as holding pre-Reorganization proprietary interests in EFH.

In the context of a G Reorganization, a proprietary interest in the transferor corporation (EFH) is preserved if it is exchanged for a proprietary interest in the transferee corporation (Reorganized TCEH).   Under the TCEH Reorganization contemplated under the now-terminated RSA, the TCEH First Lien Creditors would have received the same ratio of stock and cash, and therefore would have been treated as holding a pre-Reorganization proprietary interest in EFH equal to the value of the Reorganized TCEH stock received.   In addition, the TCEH Junior Creditors (who would also be treated as holding a proprietary interest in EFH) would have received a small amount of cash.   Accordingly, the contemplated TCEH Reorganization would have resulted in a COI percentage slightly less than 100% with respect to the creditors of TCEH. With respect to the Recapitalization of the EFH Debt and the EFIH Debt, to the extent each creditor treated as holding a pre-reorganization proprietary interest in EFH receives consideration consisting entirely of Reorganized EFH stock with respect to such interest, there would be a COI percentage of 100%.   Any use of non-stock consideration to satisfy the claims of the unsecured EFIH and EFH Creditors must be carefully considered to ensure that it does not directly or indirectly create a COI concern.

While the Reorganization contemplated under the now-terminated RSA was structured to satisfy the section 368 COI requirements, *any* changes to the types (and relative proportions) of consideration provided to each creditor group in exchange for their claims could potentially

---

[68]    As noted throughout this Memorandum, the RSA has now been terminated and thus the nature and amount of consideration that will be paid to each creditor group in respect of their claims is uncertain and unknown at this point.

affect which of those groups are treated as holding pre-Reorganization proprietary interests and, by extension, what percentage of EFH's proprietary interests are preserved in the TCEH Reorganization (and ultimately whether the reorganization can qualify for tax-free status). Accordingly, the Debtors continue to carefully consider any such changes to ensure that the TCEH Reorganization will satisfy the section 368 COI requirement.

### c.    Section 355 COI Rules

A divisive G Reorganization also must satisfy the COI requirement of Internal Revenue Code section 355.  The section 355 COI requirement is aimed at a slightly different objective than the section 368 requirement, and therefore is applied differently.  Unlike the section 368 COI test, the section 355 test does not necessarily focus on the ratio of stock and non-stock consideration received in a transaction, but rather looks to the post-distribution percentage of stock ownership held by the holders of the old proprietary interests.  The regulations under section 355 state that "[s]ection 355 applies to a separation that effects only a readjustment of continuing interests in the property of the distributing and controlled corporations."[69]  To that end, the regulations provide that COI "requires that one or more persons who, directly or indirectly, were owners of the enterprise prior to the distribution or exchange own, in the aggregate, an amount of stock establishing a continuity of interest in each of the modified corporate forms in which the enterprise is conducted after the separation."[70]

The section 355 COI rules further provide that the requisite amount of continuing interest in the distributing (EFH) and controlled (Reorganized TCEH) corporations must exist immediately after the distribution, taking into account certain prearranged transfers of the equity

---

[69]    Treas. Reg. § 1.355-2(c)(1).

[70]    *Id.*

of the distributing or controlled corporation.  However, tax-free dispositions, even if prearranged, generally do not affect the COI analysis.

#### d.    Applying the Section 355 COI Rules

For the Distribution to satisfy the section 355 COI requirement, the pre-Distribution "owners of the enterprise" (*i.e.*, the pre-Distribution owners of EFH) must hold approximately 50% of the post-Distribution stock of Reorganized EFH *and* Reorganized TCEH immediately after the Distribution.[71]  Similar to the determination of COI under section 368, identification of the pre-transaction "owners of the enterprise" is an important part of determining whether there section 355 COI is satisfied.  Although the law is not entirely settled on this point, the principles set forth in *Alabama Asphaltic* regarding the treatment of creditors as proprietary interest holders of a corporation in the bankruptcy or insolvency context should apply equally in the section 355 context.  Accordingly, the TCEH First Lien Creditors, the TCEH Junior Creditors, the EFIH Creditors, the EFH Creditors, and the EFH Equity Investors likely would all be treated as pre-Distribution "owners of the enterprise" (*i.e.*, owners of EFH) under section 355's COI rules.

Immediately following the Reorganization contemplated under the now-terminated RSA (and before taking into account any third-party acquisition of Reorganized EFH), Reorganized TCEH would be owned 100% by the TCEH First Lien Creditors and Reorganized EFH would be owned 100% by the EFH Equity Investors, the EFH Creditors, and possibly the EFIH Creditors. Because, as described above, each of these groups likely would be treated as a pre-Distribution owner of EFH, the Distribution would satisfy the section 355 COI requirement.

#### e.    COI Implications of Potential Acquisition of Reorganized EFH

Unfortunately, the analysis does not end once the Reorganization is complete.  Any contemplated acquisition of Reorganized EFH *after* the Reorganization as part of the Plan or

---

[71]    The degree of continuity required is not certain, but the regulations provide by way of example that 20% COI is insufficient, whereas 50% COI is sufficient.  Treas. Reg. § 1.355-2(c)(2), Exs. 1-4

substantially contemporaneous with the consummation of the Plan could potentially affect whether the TCEH Reorganization satisfies the section 368 and 355 COI requirements.  If, for instance, as part of a pre-arranged plan, a third party acquires 100% of the stock of Reorganized EFH for cash in a taxable transaction, COI under section 355 would not be satisfied because Reorganized EFH would not be owned by any pre-Distribution "owner of the enterprise."  If, on the other hand, a third party acquires Reorganized EFH in exchange for acquirer stock in a tax-free reorganization described in Internal Revenue Code section 368(a)(1) (a "<u>Tax-Free Reorganization</u>"), COI rules should be satisfied, even if the acquisition is pre-arranged and even if the pre-Reorganization owners of EFH (the EFH Creditors, the EFIH Creditors, and potentially the EFH Equity Investors) own only a small percentage of the acquirer's outstanding stock.[72] This result follows because the exchanging stockholders of Reorganized EFH would maintain an indirect equity interest of equal value in Reorganized EFH by virtue of the stock received in the acquiring corporation.[73]  Any proposed acquisition of Reorganized EFH for a combination of cash and acquirer stock must be carefully considered to ensure that such acquisition does not adversely affect either the tax treatment of the Reorganization or the likelihood of receiving the private letter ruling requested from the IRS (*see* Section III.D).

### 2.    Gain Recognition on Certain Distributions (Section 355(d))

Even if a distribution satisfies the various requirements for a Section 355 Distribution, Internal Revenue Code section 355(d) requires recognition of corporate-level taxable gain by a

---

[72]    COI should be preserved so long as, following the acquisition, the exchanging stockholders own stock of the acquiring corporation that was received in exchange for Reorganized EFH stock representing 50% or more of the stock of Reorganized EFH by value; it does not matter if this is only a very small percentage of acquirer's outstanding stock.

[73]    This core principle is reflected in the *Morris Trust* decision, which held that a tax-free spin-off could be followed by a planned tax-free merger between the distributing corporation and an unrelated corporation. *Comm'r v. Morris Trust*, 367 F.2d 794 (4th Cir. 1966).  The IRS has adopted this principle in several rulings. *See* Rev. Rul. 68-603, 1968-2 C.B. 148; Rev. Rul. 70-434; *and* Rev. Rul. 78-251, 1978-1 C.B. 89 (all confirming the result in *Morris Trust*). *Compare* Rev. Rul. 55-103, 1955-1 C.B. 31 (subsequent taxable sale of the distributing company's stock caused the distribution to fail the "device" requirement).

distributing corporation (Reorganized EFH) if a distribution of subsidiary stock (stock of Reorganized TCEH) is a "disqualified distribution." A disqualified distribution is a distribution that would otherwise be a Section 355 Distribution if, immediately after the distribution, "any person" holds a 50%-or-greater interest (by vote *or* value) in "disqualified stock" of either the distributing (Reorganized EFH) or controlled (Reorganized TCEH) corporation.[74] Disqualified stock generally is stock that was "purchased" within the five-year period preceding the distribution.[75] If section 355(d) applies, the distributing corporation is required to recognize *all* gain in respect of the distributed stock, and not just the gain relating to the disqualified stock; here, that could mean a taxable gain in excess of $10 *billion*.[76]

Even if the Reorganized EFH and/or Reorganized TCEH stock were to be considered "disqualified stock," it is possible to avoid the application of section 355(d) by ensuring that no "single person" holds a 50%-or-greater interest in such stock following the Reorganization.[77] In this regard, no "single person" would be treated as holding a 50%-or-greater interest in stock of Reorganized EFH or Reorganized TCEH following the Reorganization (and prior to any third-party acquisition) *if* such stock is held by a range of persons who were creditors of EFIH, EFH, and/or TCEH.

The definition of a "single person" is relevant here. Internal Revenue Code section 355(d)(7)(B) treats a group of persons as a single person if such group acts "pursuant to a plan or arrangement with respect to acquisitions" of stock of the distributing or controlled corporation.

---

[74] I.R.C. § 355(d)(2).

[75] I.R.C. § 355(d)(3).

[76] I.R.C. § 355(d)(1).

[77] There are strong arguments to support the position that neither the Reorganized EFH stock that was to be received by the unsecured EFIH Creditors and the EFH Creditors nor the Reorganized TCEH Stock that was to be received by the TCEH First Lien Creditors under the now-terminated RSA should be treated as "disqualified stock."

There is, however, an exception to this rule that applies in the bankruptcy context. Treasury Regulation section 1.355-6(c)(4)(*ii*) provides that the receipt of stock by creditors in satisfaction of debt in a bankruptcy case does *not* cause the group of creditors to be treated as acting pursuant to a plan or arrangement. As a result, any existing creditors of EFH, EFIH, and TCEH that receive stock of Reorganized EFH and Reorganized TCEH pursuant to the Reorganization should not be aggregated for section 355(d) purposes. Accordingly, the fact that a Reorganization pursuant to the Plan may result in the existing creditors of EFH, EFIH, and TCEH together holding a 50%-or-greater interest in Reorganized EFH and Reorganized TCEH would likely not cause the Distribution to be treated as a "disqualified distribution."

Any contemplated acquisition of Reorganized EFH as part of the Plan or substantially contemporaneous with the consummation of the Plan should be evaluated in determining whether the Distribution will be treated as a "disqualified distribution." As discussed above, a key to the EFH Recapitalization is the infusion of cash in an amount necessary to satisfy the claims of the first and second lien EFIH Creditors, repay the EFIH DIP Facility, and potentially satisfy the claims related to a portion of the unsecured EFIH Debt and EFH Debt. It is anticipated that this cash could come from a third-party acquirer, potentially through a pre-Recapitalization purchase of Reorganized EFH stock. This could result in the shares of Reorganized EFH stock purchased by the acquirer being treated as "disqualified stock."[78] Thus, to avoid the Distribution being treated as a disqualified distribution, it may be necessary to limit any such third-party stock purchases to less than 50% of the interests in Reorganized EFH (by vote or value). However, Reorganized EFH could borrow additional cash (either from the acquirer or another lender) to fund additional distributions under the Plan.

---

[78] Depending on the reorganization structure, shares of Reorganized EFH stock acquired by a third party might be viewed as transitory and disregarded for purposes of section 355(d).

### D.    Pending Private Letter Ruling Request

As noted above, EFH submitted a request for a private letter ruling to the IRS on June 10, 2014, seeking various rulings related to the federal income tax treatment of the Reorganization contemplated under the now-terminated RSA (the "<u>PLR Request</u>").    The main purpose of pursuing a private letter ruling is to mitigate the risk that the IRS might later determine that the TCEH Reorganization did not qualify as a divisive G Reorganization and assess significant tax liabilities.    The PLR Request was subject to the review and approval of various creditor groups under the terms of the RSA.    In connection with the PLR Request, EFH was required to make certain factual representations, some of which were based on assumptions regarding post-Reorganization facts.    EFH must either ensure that these assumptions and representations remain accurate or advise the IRS of any material changes.

Although the IRS is actively reviewing the PLR Request, it is not expected to provide its formal views on the requested rulings until the transaction structure for the EFH and TCEH reorganizations has been solidified.    Until that occurs, EFH will need to supplement the PLR Request to reflect any changes to the Reorganization transactions, which could further extend the IRS's review process.    In particular, EFH intends to supplement and update the PLR Request to provide the IRS with information regarding any potential acquisition of Reorganized EFH.    As discussed above, the Reorganization contemplated under the now-terminated RSA was structured in a manner calculated to maximize the likelihood of obtaining the requested rulings from the IRS.    Any changes to the Reorganization transactions (including any third-party acquisition of Reorganized EFH) must be carefully considered to ensure they do not prevent the IRS from issuing a favorable ruling, or otherwise adversely affect the TCEH Reorganization's tax-free status.

## IV. AVOIDING TAXABLE GAINS FROM A POTENTIAL ACQUISITION OF REORGANIZED EFH

Should the Debtors ultimately pursue a tax-free separation of TCEH (similar to that contemplated under the now-terminated RSA), a third-party acquisition of Reorganized EFH would present specific issues that merit discussion here. Most notably, a third-party acquisition of Reorganized EFH could put pressure on the tax-free status of the TCEH Reorganization and create a risk that the IRS will not issue a favorable ruling in response to the pending PLR Request. Among other things, a third-party acquisition of Reorganized EFH could cause the TCEH Reorganization to fail to satisfy the applicable COI requirements (Section III.C.1, *supra*) or cause the Distribution to be treated as a taxable "disqualified distribution" under Internal Revenue Code section 355(d) (Section III.C.2, *supra*). Careful planning can mitigate these risks. Specifically, a third-party acquisition of all or a portion of the stock of Reorganized EFH as part of the Plan or substantially contemporaneous with the Plan could minimize these risks by satisfying each of the following tax parameters:[79]

- Following consummation of the Plan, and after taking into account any planned acquisitions of Reorganized EFH stock at that time, the pre-Reorganization "holders of the proprietary interests" in EFH will either (i) own stock of Reorganized EFH that represents 50% or more of the stock of Reorganized EFH by value or (ii) own stock of an acquiring corporation that was received in a tax-free reorganization in exchange for stock of Reorganized EFH that represented 50% or more of the stock of Reorganized EFH by value.[80]

- In the aggregate, at least 40% of the consideration received pursuant to the Plan by the holders of the pre-Reorganization proprietary interests in EFH (excluding creditors of TCEH) with respect to those interests will consist of Reorganized EFH stock.[81]

---

[79]    Although it may be possible to exchange the claims against EFH and EFIH directly into stock of the acquiring corporation, these parameters assume that such claims will instead be exchanged pursuant to the Plan for cash and/or Reorganized EFH stock prior to any acquisitive reorganization.

[80]    Any use of consideration other than stock in connection with such exchange must be carefully considered to ensure that it does not directly or indirectly create a COI concern.

[81]    It is expected that any transaction satisfying the first parameter would also satisfy this second parameter.

- Following consummation of the Plan, and after taking into account any planned acquisitions of Reorganized EFH stock at that time, any Reorganized EFH stock that is acquired by purchase by one person or entity (or by two or more persons or entities acting pursuant to a plan) will represent *less than* 50% of the stock of Reorganized EFH by vote or value.

The following hypothetical transaction serves as an illustrative example of a third-party acquisition of Reorganized EFH that likely would not jeopardize the tax-free status of the TCEH Reorganization.[82]  Under this hypothetical proposal, the third-party acquirer ("Parent") would form a disregarded entity ("Acquirer") and, pursuant to the Plan, Acquirer could acquire less than 50% of the stock of Reorganized EFH for a cash contribution to Reorganized EFH. Following the Distribution of Reorganized TCEH and the satisfaction of claims against EFH and EFIH for cash and/or Reorganized EFH stock consistent with the steps outlined above at Sections III.A.1 and III.A.2, Reorganized EFH would merge with and into Acquirer (the "Merger"), with Acquirer surviving the Merger as a wholly owned subsidiary of Parent.  As a result of the Merger, the stock of Reorganized EFH (representing more than 50% of Reorganized EFH) received by creditors of EFH and EFIH would be converted into stock of Parent.

In the Debtors' view, the TCEH Reorganization and subsequent acquisition of Reorganized EFH could be structured so as not to run afoul of either the COI rules or Internal Revenue Code section 355(d), thus preserving the TCEH Reorganization's tax-free status.  This could be done by ensuring that (i) any available cash at EFIH (including the cash supplied by Parent and any proceeds of an exit facility) is used to satisfy EFIH creditors in order of priority (*e.g.*, First Lien, Second Lien, unsecured); (ii) that holders of allowed claims against EFIH receive stock of Reorganized EFH with respect to their claims only if there is insufficient cash to satisfy such claims (and, in such a situation, that the stock of Reorganized EFH is received only by the holders of the most junior claims); and (iii) that the EFH creditors primarily receive stock

---

[82]   This example is provided solely for illustrative purposes.

of Reorganized EFH with respect to their claims and that the recovery, if any, by the existing holders of EFH stock is in the form of Reorganized EFH stock.

Assuming these parameters are satisfied, for purposes of identifying the existing holders of the proprietary interests in EFH, only those creditors of EFIH and EFH (and, if applicable, the existing holders of EFH stock) that receive stock of Reorganized EFH should be taken into account. Because the value of the Reorganized EFH stock received by such creditors under the hypothetical acquisition would far exceed the amount of any cash received by such creditors, the Debtors believe that COI would be preserved for purposes of Internal Revenue Code section 368. In addition, before taking into account the Merger, such creditors would hold 100% of the stock of Reorganized EFH, thereby preserving COI for purposes of Internal Revenue Code section 355. As described above, the fact that such creditors would receive a much smaller percentage of Parent stock in the hypothetical Merger should not change this result. Accordingly, the Debtors believe that the hypothetical Merger would not adversely affect the COI analysis that applies to the Distribution of Reorganized TCEH stock.

Debtors also do not believe the hypothetical Merger would result in a disqualified distribution under section 355(d), since Parent would acquire less than 50% of the stock of Reorganized EFH stock prior to the Distribution. Furthermore, although Parent would acquire 100% of the assets of Reorganized EFH as a result of the Merger, Reorganized EFH would itself be merged out of existence and its stock would cease to exist. Because Parent would not ultimately acquire 50% or more of the *stock* of Reorganized EFH, the hypothetical Merger should not result in a disqualified distribution under section 355(d).

As described above, there is a degree of uncertainty regarding the operation of the applicable tax rules to any post-Reorganization acquisition of Reorganized EFH. The Debtors recognize that any such acquisition transaction must be described in detail to the IRS in

connection with the PLR Request with the goal of obtaining a ruling from the IRS that such a transaction would not adversely affect the tax treatment of the Distribution of Reorganized TCEH.  The IRS may suggest or require certain modifications to the proposed transaction structure to facilitate a favorable ruling by the IRS.  As part of the auction process, potential bidders will be made aware of these considerations.

## CONCLUSION

As this matter proceeds toward a proposed plan and eventual confirmation, the Court and parties should keep in mind that there are significant, and significantly complex, tax issues to be considered and managed.  The Debtors are not wedded to any particular tax structure, and are willing to consider any value-maximizing alternative a creditor or potential third-party acquirer would like to present.  However, the Court and all parties should be aware that tax considerations will likely be a significant factor in evaluating potential reorganization alternatives, and thus will likely be a significant driver of whatever form the Debtors' reorganization eventually takes.

[*Remainder of page intentionally left blank.*]

Dated:  October 1, 2014
      Wilmington, Delaware

*/s/ Jason M. Madron*
_____

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:     collins@rlf.com
             defranceschi@rlf.com
             madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     edward.sassower@kirkland.com
             stephen.hessler@kirkland.com
             brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
             chad.husnick@kirkland.com
             steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession