# EXHIBIT A

# In The Matter Of:

## ENERGY FUTURE HOLDINGS CORPORATION, et al.

### DONALD L. EVANS - Vol. 1
*September 25, 2014*

## CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**MERRILL CORPORATION**
LegaLink, Inc.
1345 Avenue of the Americas
17th Floor
New York, NY 10105
Phone: 212.557.7400
Fax: 212.367.6178

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Chapter 11
Case No. 14-10979 (CSS)
Jointly Administered
on an Interim Basis
------------------------------------x
In re:

ENERGY FUTURE HOLDINGS CORPORATION,
et al.,

        Debtors.
------------------------------------x

        September 25, 2014
        9:08 a.m.

   CONTAINS HIGHLY CONFIDENTIAL INFORMATION

        Videotaped Deposition of DONALD
L. EVANS, Individually and as Corporate
Representative of Energy Future Holdings
Corporation, pursuant to Notice, at the United
States Department of Justice, Office of the
U.S. Trustee, 201 Varick Street, New York, New
York, before Frank J. Bas, a Registered
Professional Reporter, Certified Realtime
Reporter and Notary Public within and for the
State of New York.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
DONALD L. EVANS - 9/25/2014

Page 110

1    The question was that in light
2 of the -- in the summer of 2012, when the
3 company was bringing on other professionals to
4 advise it in a possible out-of-court/in-court
5 restructuring, earlier you testified that you
6 expanded the role of Towers Watson and you
7 brought on Mr. Filsinger. And the question
8 is, you know, was there any change in terms of
9 was the company -- did the company say, well,
10 maybe we need to cut back on compensation to
11 not only our executives, but our entire
12 workforce?
13    A.  Well, the executives have not
14 had a raise since December of 2012. The
15 executives are now being compensated well
16 below the average of compensation in their
17 peer group.
18          John Young is now about 35
19 percent below the average of his peer group,
20 when you look at his total compensation. He's
21 the CEO.
22          Paul Keglevic, who is the
23 second highest paid executive also in the
24 company, he's paid about 25 percent below
25 the -- his peer group compensation. 25

Page 111

1 percent below the average.
2          And so because we've taken
3 steps like not increasing compensation for the
4 executive officers since December of 2012,
5 their compensation now is below what we would
6 say that our target is, which is to have them
7 at the high end of the range -- 75th
8 percentile. They're well below that.
9          So in that sense the answer is
10 yes, we -- at the senior-most level, which I
11 think is kind of the important level to kind
12 of send the message to the organization that,
13 you know, we're going to be going through a --
14 a tough period, okay with not increasing our
15 salary.
16          And consequently, like I said,
17 what has happened is that they're now --
18 they're now paid -- they're paid within the
19 range, within the market range, but at the way
20 low end of it.
21    Q.  Okay. So let me see if I can
22 break that down a little bit.
23    A.  Sure.
24    Q.  You're saying that since the
25 end of 2013 they haven't had a raise, is that

Page 112

1 what you're saying?
2    A.  No, '12.
3    Q.  Since the end of 2012. So that
4 would be then for the fiscal year 2013?
5    A.  Fiscal and calendar year, which
6 is the same thing.
7    Q.  Okay. So they didn't get a
8 raise in 2013?
9    A.  Mm-hmm.
10    Q.  And as of 2014, where the
11 company is in bankruptcy, they haven't gotten
12 a raise either?
13    A.  They haven't gotten a raise
14 since December of 2012.
15    Q.  Right.
16    A.  Which meant that that went into
17 effect January of '13.
18    Q.  Right.
19    A.  So they don't have, or did not
20 get a raise in January of '14.
21    Q.  Oh, I am sorry. So in other
22 words, they got a raise in January -- for the
23 year 2013?
24    A.  They have not had a raise since
25 December, and I said December because --

Page 113

1    Q.  Oh, I am sorry. Let me see if
2 I understand you.
3    A.  Yeah.
4    Q.  The plan gets approved in 2012
5 for the next year, for '13, so they got a
6 raise in 2013, but --
7    A.  Right.
8    Q.  -- since January 1, 2014 they
9 have had not had their salary raised?
10    A.  That's correct.
11    Q.  Okay. So they didn't get a
12 raise in the year 2014. And that was -- and
13 that was a decision that was made by the O&C
14 with respect to going into the -- knowing that
15 you would be filing for bankruptcy?
16    A.  The decision was made by the
17 O&C.
18    Q.  Okay. Was there any other --
19 was there any reduction in their salary?
20    A.  No --
21    Q.  Compensation, excuse me.
22 Overall compensation.
23    A.  Well, I mean, that gets into
24 another discussion we'll probably have, with
25 respect to the metrics that we've changed with

29 (Pages 110 to 113)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
DONALD L. EVANS - 9/25/2014

Page 114

1  respect to the incentive-based program. We've
2  now made it more difficult for them to achieve
3  their threshold metric, or their target
4  metric.
5          So in that sense the answer is
6  yes, there was a reduction.
7      Q.  I hear you. We will get to
8  that. We'll talk about that in a little bit.
9      A.  Okay.
10     Q.  I am going to show you a
11 document, and I would like the court
12 reporter --
13         MS. SCHWARTZ: Can I give it to
14 you in this binder?
15         THE COURT REPORTER: We should
16 pull it out.
17         MS. SCHWARTZ: I would like to
18 give it to the witness -- okay.
19         ---
20         (UST Exhibit 3, Amended and
21 Restated Employment Agreement, dated March 31,
22 2014, between John Young and Energy Future
23 Holdings Corp. was marked for identification)
24         ---
25 BY MS. SCHWARTZ:

Page 115

1      Q.  This is document number -- that
2  has been marked as UST 3. Take a look at this
3  document and tell me whether or not you
4  recognize it.
5      A.  I do.
6      Q.  Okay. What is it?
7      A.  This is John Young's employment
8  agreement.
9      Q.  All right. And that agreement
10 is dated when?
11     A.  March of 2014.
12     Q.  Okay. And if we take a look,
13 sir, at the paragraph underneath where it says
14 "Witnesseth," it reflects that his employment
15 agreement was first -- his original effective
16 date of his employment agreement was January
17 6, 2008. Is that right?
18     A.  That's what it says.
19     Q.  Yes. Thank you.
20         And then it was amended, it
21 appears that it was amended in 2011 and 2012.
22 Is that right?
23     A.  That's correct.
24     Q.  Okay. And then it was again
25 amended and restated on March 31, 2014, one

Page 116

1  month before the bankruptcy filing? It's in
2  the first paragraph.
3      A.  The first paragraph --
4          MR. McKANE: Can I direct the
5  witness?
6          MS. SCHWARTZ: Sure.
7          MR. McKANE: It's over here
8  (indicating).
9      A.  Oh, up top? Yes. I am sorry.
10 Yes.
11     Q.  Okay?
12         I guess my first question to
13 you is why was this agreement amended one
14 month before the bankruptcy filing?
15     A.  I am not familiar with exactly
16 what changes were made.
17     Q.  Okay. Is the --
18     A.  I would have to go back and
19 review that.
20     Q.  Okay. Was the O&C Committee,
21 was the O&C Committee involved with any
22 changes to the employment agreements of the
23 SPC approximately a month before the
24 bankruptcy filing?
25     A.  I would have to go back and

Page 117

1  see. I guess what I'm wondering here, whether
2  or not that had to relate to the change in the
3  incentive-based compensation.
4      Q.  Okay.
5      A.  Which -- which I don't know.
6      Q.  All right.
7      A.  I would have to go back and
8  look.
9      Q.  Let me ask you this. Let's say
10 you weren't looking at that document.
11     A.  Mm-hmm.
12     Q.  It's correct that the O&C
13 Committee has to approve the compensation for
14 the members of the SPC, right?
15     A.  Correct.
16     Q.  So this employment agreement
17 would have to have been approved by the O&C,
18 is that right?
19     A.  Signed by me.
20     Q.  Right.
21     A.  Mm-hmm.
22     Q.  And you wouldn't sign a
23 document without reading it, right?
24     A.  That's right.
25     Q.  Okay. And really I think what

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
DONALD L. EVANS - 9/25/2014

Page 118

1  I am understanding you're saying is that
2  you're not really sure, like, what changes are
3  in this but you are familiar with this
4  employment agreement?
5      A.  I'm familiar. That's correct.
6      Q.  Okay. Take a look, please, at
7  paragraph 3 on page 2. And that states that
8  Mr. Young's base salary is $1.35 million, is
9  that correct?
10     A.  That's correct.
11     Q.  Now, is it your understanding
12 that that's below market?
13     A.  Well, it is my understanding
14 that his total compensation is below the
15 average of his peer group. It's about 35
16 percent below. I always think about it in
17 terms of total compensation.
18     Q.  Okay.
19     A.  Because if you -- you can pick
20 and choose, but you need to look at total
21 compensation.
22     Q.  What forms the basis of your
23 understanding? Why do you think that?
24     A.  Why do I think that he's below?
25     Q.  Yes.

Page 119

1      A.  From SEC records, SEC reporting
2  records of other companies in his peer group
3  that have to state the compensation of the
4  five highest paid executive officers.
5      Q.  Okay.
6      A.  So you go to those SEC
7  reports --
8      Q.  Right.
9      A.  -- you know, lay out the
10 compensation of the five highest paid, and
11 when you look at John Young's peer group, at
12 the five highest paid, from SEC reporting,
13 he's -- I am told by outside advisors that
14 he's roughly 35 percent below the average.
15     Q.  Okay. So you didn't go to the
16 SEC reports?
17     A.  No. No. No.
18     Q.  Your advisor informed you?
19     A.  No. Absolutely. Absolutely.
20     Q.  Okay. And who would the
21 advisor be that informed you of that?
22     A.  Friske. That would be Towers
23 Watson.
24     Q.  Okay. I just want to go over
25 this with you.

Page 120

1      At number 4 it says that
2  Mr. Young's, his annual -- Executive Annual
3  Incentive Plan target is 125 percent of his
4  base salary.
5      So that would be 125 percent of
6  $1.35 million?
7      A.  That's correct.
8      Q.  Right?
9      A.  Mm-hmm.
10     Q.  And that award, which we'll ask
11 a few questions more about the Executive
12 Annual Incentive Plan, can be modified by an
13 individual modifier?
14     A.  That's correct.
15     Q.  Right?
16     A.  That's correct.
17     Q.  And his individual modifier is
18 what, do you know?
19     A.  Well, it varies from year to
20 year. It can be as high as 150.
21     Q.  Right.
22     A.  Mm-hmm.
23     Q.  But do you know what his is --
24 his was?
25     A.  140.

Page 121

1      Q.  Right.
2          So under this scenario, the
3  total compensation, what's his total
4  compensation for the year 2014? What is the
5  maximum his total compensation can be?
6      A.  What I can tell you is from
7  last year, what I can tell you, when you
8  compare him with the others, his compensation
9  was about $5½ million, total compensation.
10     Q.  Right. That was for 2013?
11     A.  Now what I can tell you -- that
12 was 2013.
13         And I can tell you that the
14 average of the other peer group companies
15 looked at by the outside advisors was about
16 $8½ million. Total compensation.
17     Q.  And that's from information
18 they provided to you?
19     A.  That's from information they
20 provided.
21     Q.  Now, that was written
22 information or by oral information?
23     A.  It's in their declaratory
24 statement that they filed with the court.
25     Q.  Are you talking about the

31 (Pages 118 to 121)

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
DONALD L. EVANS - 9/25/2014

Page 130

1  out of bankruptcy, give us the opportunity for
2  a couple of years for gas prices and power
3  prices to come back, like the whole world
4  thought they would.
5       So this has got nothing to do
6  with the fact, in my judgment -- when I, you
7  know, make compensation decisions, it's kind
8  of interesting, maybe, that we haven't made a
9  profit since 2010, but what really matters is
10 why we didn't make a profit.  And it wasn't
11 because of the performance of the team.  In
12 fact, but for their performance we probably
13 would have filed two years ago, or a year ago.
14      And it's just, you've got to
15 get back to the fundamental reason this
16 happened, and the fundamental reason this
17 happened is because power prices went from $75
18 an MW per hour to $35.
19      Now, I don't care how smart you
20 are, how good you are, how talented you are,
21 you just can't overcome those economic forces
22 that you don't have any control over.
23      So what I evaluate, you know,
24 how good is this team at -- at doing the
25 things they can control, how good are they at

Page 131

1  performing things they are able to control.
2  And I go back, they're second to none.
3       Q.   I got that.  I guess where I am
4  trying to understand is not so much whether
5  things are in their control or not, but if the
6  bottom line of the company, the actual
7  maximization of the value of the company is
8  not growing, and in the contrary is
9  decreasing, I'm wondering whether that --
10 whether the O&C Committee believes that that
11 needs to be factored into executive
12 compensation?
13      A.   Well, I mean, I said earlier,
14 we've taken some steps.  The senior executives
15 have not had a raise since January of '13.
16 They did not get a raise in January '14.
17      Q.   January '14, right?
18      A.   Now, other -- other members of
19 the enterprise did.  The unions did, our field
20 employees did, other managers have some.
21      But in terms of the executive
22 team, the executive team said no raises for
23 us.  That's what they said.
24      And I would emphasize that was
25 the recommendation that came to us.  That

Page 132

1  wasn't me saying, hey, you know, we just ought
2  to freeze your salaries.  No.  No.  What they
3  said was, look, the right thing to do, the
4  right message to send, as we get ourselves
5  ready to go through this --
6       Q.   Right.
7       A.   -- is we shouldn't increase our
8  salaries.
9       Q.   Yeah.
10      Those salaries, except for not
11 having a raise in January of '14, were
12 market-based, is that right?
13      A.   Correct.
14      Q.   What is your understanding of
15 what point in the market, in the percentile,
16 did those salaries fall?  Did they meet the
17 above 75 percentile that you said earlier that
18 you wanted your salary -- the salaries of
19 executive compensation to be -- to fall in?
20      A.   Well, again, it's not a salary
21 thing to me.
22      Q.   Total compensation.  I
23 apologize.  I meant compensation.
24      A.   Yeah.  Total compensation.
25      That's our -- was our

Page 133

1  aspiration, to have them at that level.
2       Q.   Okay.
3       A.   It's clear to me --
4       Q.   Did you achieve that --
5       A.   It's clear to me --
6       Q.   Yeah.
7       A.   -- that they've drifted down
8  from that substantially, in terms of if we had
9  them there at one time, in the 60 or 75
10 percentile, then they're not there now.
11      Q.   Okay.  But were they there for
12 2013?
13      A.   I would have to go back and
14 look at all of the -- now you're trying to --
15 I think you're comparing the 2012 data, where
16 were they in 2012.  And certainly --
17      Q.   I am talking about total
18 compensation for the year 2013.
19      A.   Yeah, I would have to go back
20 and have, based on work that Towers Watson
21 would do for us that would be retroactive,
22 looking at what the compensation was for the
23 executive team vis-à-vis their peers in 2012
24 or '13, I would have to --
25      Q.   Okay.

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
DONALD L. EVANS - 9/25/2014

## Page 134

```
 1       A.   -- where were we.
 2            I know we're below now. I know
 3   in '13 we're below. Based on his declaration,
 4   and the work that he did.
 5       Q.   Let me ask you something, so I
 6   am really understanding.
 7       A.   Sure.
 8       Q.   And I sense from you this is a
 9   sensitive topic, and I'm just trying to
10   understand what the philosophy is and whether
11   or not certain factors have played into
12   decisions concerning compensation.
13            When you say 2013, the way I,
14   as like a layperson, not doing a budget cycle
15   and starting the -- when I think of 2013 I
16   think of it as how much total compensation
17   these executives are being paid in the year
18   2013.
19       A.   Mm-hmm.
20       Q.   And I understand that that's
21   set in 2012. But as far as what they actually
22   were being paid in 2013, what's your
23   understanding? Were you -- did you believe
24   that their salary was decreasing at that time,
25   or is it that, more correctly, that that's
```

## Page 135

```
 1   really now, because they didn't take their
 2   raises at the end of 2013, in 2014 their
 3   salary has decreased?
 4       A.   Yeah, I would have to go back
 5   and review the data.
 6       Q.   You have no idea about that?
 7       A.   Well, I have an idea that in
 8   2013 they were certainly below a 75
 9   percentile --
10       Q.   Oh, do you?
11       A.   -- if that's what you're
12   asking?
13       Q.   Yes.
14       A.   Yes, yes.
15            MR. McKANE: Andrea, just to
16   clarify, when he was giving the testimony
17   about it being below, that was 2013 he was
18   talking about. The record may reflect that
19   and you may want to go back and check. Just
20   to avoid the confusion on that one.
21            MS. SCHWARTZ: If someone is
22   confused, it's not me.
23            MR. McKANE: Okay.
24   BY MS. SCHWARTZ:
25       Q.   I'm sorry I was distracted.
```

## Page 136

```
 1            With respect to -- you said
 2   earlier that the company retained the advisors
 3   in the summer of 2012 because at that point it
 4   was -- you needed restructuring counsel.
 5            So I'm guess I'm kind of
 6   wondering, from that point in time, June of
 7   2012 through 2013, did the O&C take any
 8   measures at that time, between June 2012 and
 9   the end of June of the same year, to --
10       A.   June 2012 to...
11       Q.   -- to the end of June -- I
12   mean -- excuse me -- to the end of 2012, the
13   end of 2012, to modify downward the executive
14   compensation?
15       A.   No, I can't recall anything we
16   did to modify downward executive compensation,
17   but what I do recall, again, is in Doug
18   Friske's declaration he went through many
19   metrics for '13, and those many metrics in
20   '13 -- it depends if you're talking about the
21   LTIP program or you're talking about salaries
22   or whatever, or what group, is it seven of
23   them, is it five of them, is it -- or is it
24   CEO -- it consistently shows that that group
25   was below the average of its peers.
```

## Page 137

```
 1       Q.   Okay. I wasn't --
 2       A.   And so that's a 50 percent
 3   number to me and so it tells me, were they
 4   below the 75 percent? Yes.
 5       Q.   I think we would have to look
 6   at his actual declaration and see what time
 7   period he's talking about. I was asking about
 8   your understanding of that. But it sounds to
 9   me like you've answered the question. I got
10   your answer on the question.
11            MS. SCHWARTZ: Let's mark this
12   document, please.
13            ---
14            (UST Exhibit 4, Motion of
15   Energy Future Holdings Corp., et al., dated
16   August 8, 2014 was marked for identification)
17            ---
18   BY MS. SCHWARTZ:
19       Q.   I have given you a document
20   that has been marked as UST 4. Would you
21   please take a look at it and let me know
22   whether you recognize it?
23       A.   Yes, sir -- yes, ma'am. I sure
24   will.
25            ---
```

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
DONALD L. EVANS - 9/25/2014

Page 170

1  2007, what were the executive compensation
2  plans in existence? If any.
3      A.   Certainly we had plans in
4  place, the same kind of thinking in terms of
5  for the executives, a base salary plus some
6  incentive, both short- and long-term incentive
7  components to it.
8      Q.   Okay.
9      A.   Early on, in '08, as we brought
10 members into the executive committee, John
11 Young, Paul Keglevic, Mac McFarland,
12 et cetera, early on it was a -- it was a base
13 salary, it was an AIP program, and then there
14 was stock that was part of it.
15     Q.   That was the beginning part?
16     A.   That was in the beginning.
17     Q.   Okay.
18     A.   And the stock, you think about
19 that, you got an annual incentive plan, which
20 is the AIP --
21     Q.   Right.
22     A.   -- and then the stock you think
23 about in longer terms, because there's vesting
24 periods, and so you don't get it immediately,
25 necessarily. You may have to be there for

Page 171

1  three years, or five years, I can't remember
2  all of the exact parameters.
3          But three basic elements: A
4  base salary, an annual incentive program, and
5  then a longer term incentive program.
6      Q.   All right. So with respect to
7  the annual incentive plan, was there always a
8  different plan for the executives? You know,
9  your company now has an executive incentive
10 plan and an annual incentive plan for the more
11 rank and file employees, was that always the
12 case?
13     A.   Yes.
14     Q.   Okay. That's helpful. Thank
15 you.
16         MS. SCHWARTZ: Could you mark
17 this, what are we up to, 5?
18         THE COURT REPORTER: Exhibit 5,
19 yes.
20         ---
21         (UST Exhibit 5, EFH Executive
22 Annual Incentive Plan, Amended, Effective as
23 of January 1, 2010 was marked for
24 identification)
25         ---

Page 172

1  BY MS. SCHWARTZ:
2      Q.   Okay. Please take a look at
3  that document and tell me whether or not
4  you're familiar with it?
5      A.   Yes, ma'am. I am familiar with
6  it.
7      Q.   Okay. I would like you to take
8  a look -- oh, what is it? I am sorry.
9      A.   This is the EFH Executive
10 Annual Incentive Plan. We refer to it as the
11 EAIP.
12     Q.   Would you take a look, please,
13 at Article I. It's on page 1. And the second
14 paragraph says that: "The principal purposes
15 of the plan are to attract, motivate and
16 retain key employees."
17         Is that your understanding of
18 this plan?
19     A.   Yes, ma'am.
20     Q.   All right. Now, Article IV on
21 page 3 talks about the "Establishment of
22 Performance Goals"?
23     A.   Mm-hmm.
24     Q.   It says: For each Plan Year,
25 the O&C establishes the Financial Performance

Page 173

1  Criteria, the Operational Metrics and the
2  Target Incentive Pool.
3          Is that correct?
4      A.   That is correct. Let me
5  amplify it by saying we -- we are a part of
6  establishing the metrics, we absolutely
7  approved the metrics. So there's a lot of
8  other people involved in establishing the
9  metrics.
10     Q.   Okay.
11     A.   So we don't solely establish
12 them. There are others that participate in
13 that.
14     Q.   I would like to know a little
15 bit about that.
16         What is the O&C's role in terms
17 of establishing the financial performance
18 criteria?
19     A.   It comes out of the budget
20 process that I talked about earlier. There's
21 a long budgeting process that takes place
22 where there is management involvement and
23 board involvement. Once the board approves
24 the budget, then out of that comes what we
25 refer to as scorecards, which are metrics used

CONTAINS HIGHLY CONFIDENTIAL INFORMATION
DONALD L. EVANS - 9/25/2014

Page 174

1  to -- to determine, to gauge the performance
2  of each business unit: TXU Energy and
3  Luminant.
4        And so there's a process by
5  which management works very hard to develop, I
6  would call it a master scorecard. We'll take
7  Luminant for an example, where it's got six or
8  so metrics on it. The one that we give the
9  most weight to is EBITDA.
10       And then it's got generation
11 capacity for the shoulder months of the year,
12 and generation capacity for availability for
13 the summer months, which is when you make most
14 of your money. And then it's got fuel costs
15 and mining costs, and a few others.
16       But underneath there, feeding
17 into that master scorecard there are other
18 metrics that you watch. One very important
19 one is safety, and so we have a scorecard for
20 safety and how do you perform in safety, and
21 that goes into the master reporting card.
22       And so those get developed and
23 reviewed and looked at by management, and
24 then -- and I've sat through SPC meetings
25 before and watched management go at each

Page 175

1  other, challenging each other on the metrics,
2  with the idea that these need to be ambitious,
3  they need to be stretched, they don't need to
4  be lay-ups. The idea is they've got to be
5  incentive -- you know, they've got to be
6  incentivizing. We want them to kind of be
7  aligned with the stakeholders, or the
8  creditors, or the owners.
9        And then those scorecards come
10 from the SPC to O&C Committee, and it's our
11 opportunity to review and enter into a
12 discussion as to are they stretched enough,
13 are they ambitious enough, should maybe the
14 threshold be a little bit higher on a metric,
15 what's the balance between threshold metric
16 and superior metric and the target or baseline
17 metric.
18       And herein, a very important
19 concept to understand, once again the equity
20 owners are sitting in the room, the
21 individuals that have the most at stake,
22 particularly back in, let's say '08, in the
23 beginning, and '09 -- it's still true to this
24 day, I'm just trying to acknowledge the equity
25 value obviously has diminished seriously and

Page 176

1  creditors now have a much bigger stake in all
2  of this -- but in the development of this, and
3  all through the years the equity was always
4  present and participating in helping establish
5  what those final metrics would be, and then
6  approving the financial metrics. The O&C
7  would approve them.
8        So I think the important really
9  principle to understand there is, which is
10 unusual with our enterprise, is that you have
11 equity at the table, the equity that's got
12 vast knowledge of the industry itself, and
13 their bias would be to make those stretch
14 goals, to make sure that, you know, they're
15 really working hard to achieve the goals, to
16 reach the goals, or reach superior, or
17 whatever.
18       And so -- I mean, I saw a lot
19 of interaction on that, I saw metrics that got
20 changed because of that interaction, and so
21 the committee, it became clear, was anything
22 but a rubber-stamp committee. It wasn't going
23 to get the metrics from the management team,
24 okay, that's fine, we approve. It was going
25 to go through them and challenge them, talk

Page 177

1  about them, and make adjustments where the
2  committee felt appropriate.
3        Q.   I just want to refresh my
4  recollection. There's equity members that sit
5  on the O&C?
6        A.   Yes.
7        Q.   Currently?
8        A.   Yes. Ken Pontarelli would be
9  an example. He's with Goldman Sachs. So when
10 I say that, he's a sponsor, we call them
11 sponsors.
12       Q.   Right.
13       A.   They were one of the original
14 purchasers --
15       Q.   I understand.
16       A.   -- Goldman Sachs.
17            And then we also, as I earlier
18 may have stated, we have other equity members
19 that will attend the meetings.
20       Q.   Will attend, but they're not on
21 the committee, right?
22       A.   We have one on the committee.
23       Q.   Right. Okay.
24       A.   Now we have two. When all of
25 them -- when we really were putting our

45 (Pages 174 to 177)