# EXHIBIT C

10-K 1 efh-12312013x10k.htm FORM 10-K
<u>Table of Contents</u>

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2013**

— OR —

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 1-12833

# Energy Future Holdings Corp.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Texas | 46-2488810 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1601 Bryan Street, Dallas, TX 75201-3411 | (214) 812-4600 |
| (Address of principal executive offices) (Zip Code) | (Registrant's telephone number, including area code) |

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| 9.75% Senior Notes due 2019 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐   Accelerated filer ☐   Non-Accelerated filer ☒ (Do not check if a smaller reporting company)
Smaller reporting company ☐

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐ No ☒

At April 29, 2014, there were 1,669,861,383 shares of common stock, without par value, outstanding of Energy Future Holdings Corp. (substantially all of which were owned by Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp.'s parent holding company, and none of which is publicly traded).

## DOCUMENTS INCORPORATED BY REFERENCE

None

Table of Contents

### Item 11.  EXECUTIVE COMPENSATION

#### Organization and Compensation Committee

During 2013, the Organization and Compensation Committee (the "O&C Committee") of EFH Corp.'s Board of Directors (the "Board") consisted of four directors: Arcilia C. Acosta, Donald L. Evans, Marc S. Lipschultz and Kenneth Pontarelli. Mr. Lipschultz resigned from the Board, and the O&C Committee, effective January 17, 2014. The primary responsibility of the O&C Committee is to:

- determine and oversee the compensation program of EFH Corp. and its subsidiaries (other than the Oncor Ring-Fenced Entities), including making recommendations to the Board with respect to the adoption, amendment or termination of compensation and benefits plans, arrangements, policies and practices;
- evaluate the performance of EFH Corp.'s Chief Executive Officer (the "CEO") and the other executive officers of EFH Corp. and its subsidiaries (other than the Oncor Ring-Fenced Entities) (collectively, the "executive officers"), including John F. Young, President and Chief Executive Officer of EFH Corp.; Paul M. Keglevic, Executive Vice President, Chief Financial Officer and Co-Chief Restructuring Officer of EFH Corp.; James A. Burke, President and Chief Executive Officer of TXU Energy and Executive Vice President of EFH Corp.; M.A. McFarland, President and Chief Executive Officer of Luminant and Executive Vice President of EFH Corp.; and Stacey H. Doré, Executive Vice President, General Counsel and Co-Chief Restructuring Officer of EFH Corp. (collectively, the "Named Executive Officers"), and
- approve executive compensation based on those evaluations.

#### Compensation Risk Assessment

Our management team initiates EFH Corp.'s internal risk review and assessment process for our compensation policies and practices by assessing, among other things: (1) the mix of cash and equity payouts at various compensation levels; (2) the performance time horizons used by our plans; (3) the use of multiple financial and operational performance metrics that are readily monitored and reviewed; (4) the lack of an active trading market and other impediments to liquidity associated with EFH Corp. common stock; (5) the incorporation of both operational and financial goals and individual performance modifiers; (6) the inclusion of maximum caps and other plan-based mitigants on the amount of certain of our awards; and (7) multiple levels of review and approval of awards (including approval of our O&C Committee with respect to awards to executive officers and awards to other employees that exceed monetary thresholds). Following their assessment, our management team prepares a report, which is provided to EFH Corp.'s Audit Committee for review. After review and adjustment, if any, as determined by EFH Corp.'s Audit Committee, the Audit Committee provides the report to the O&C Committee. EFH Corp.'s management and Audit Committee have determined that the risks arising from EFH Corp.'s compensation policies and practices are not reasonably likely to have a material adverse effect on EFH Corp.

#### Compensation Discussion and Analysis

#### Executive Summary

#### Significant Executive Compensation Actions

EFH Corp.'s executive compensation programs are designed to implement our pay-for-performance compensation philosophy, which places an emphasis on pay-at-risk. As a result, our compensation programs balance long-term and short-term objectives and generally consist of salary, bonuses, equity, benefits and perquisites. In December 2012, following a review of our businesses' strong performance in 2012 despite the sustained decline in ERCOT wholesale electricity prices (primarily as a result of lower forward natural gas prices), the increased environmental regulatory requirements of the electricity generation industry, our position as a highly-leveraged, privately-owned company, and the analysis of our compensation practices and plans and accompanying discussions with an independent consultant, the O&C Committee approved an increase in the base salaries for our Named Executive Officers, and an increase in the annual cash bonus opportunity for Mr. Young to better align the compensation of our Named Executive Officers with the compensation of similarly performing executive officers in companies we consider our peer group. These adjustments, which became effective January 1, 2013, are described more fully herein.

199

Table of Contents

In 2013, TXU Energy and Luminant significantly outperformed the operational and financial targets previously established by the O&C Committee. TXU Energy surpassed its management EBITDA (as described herein) target and reduced operating costs while increasing customer counts and improving customer experience. Luminant achieved excellent operational performance while maintaining a culture of safety first while delivering on financial targets despite reduced credit capacity and lack of market liquidity. While achieving these operational successes, EFH Corp. continued its liability management negotiations with certain of its creditor groups and their advisors to restructure the company's approximately $43 billion in debt.

On April 29, 2014 (the Petition Date), EFH Corp. and the substantial majority of its direct and indirect subsidiaries, including EFIH, EFCH and TCEH but excluding the Oncor Ring-Fenced Entities, (the Debtors) filed voluntary petitions for relief (the Bankruptcy Filing) under Chapter 11 of the United States Bankruptcy Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (the Bankruptcy Court). During the pendency of the Bankruptcy Filing (the Chapter 11 Cases), the Debtors will operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code. The Bankruptcy Filing resulted primarily from the adverse effects on EFH Corp.'s competitive businesses of lower wholesale electricity prices in ERCOT driven by the sustained decline in natural gas prices since mid-2008. Further, the remaining natural gas hedges that TCEH entered into when forward market prices of natural gas were significantly higher than current prices mature in 2014. These market conditions challenged the profitability and operating cash flows of EFH Corp.'s competitive businesses and resulted in the inability to support their significant interest payments and debt maturities, including the remaining debt obligations due in 2014, and to refinance and/or extend the maturities of their outstanding debt.

The company had a strong operational and financial year, due, we believe, to the strength and attributes of our management team and employees, and we believe their continued contributions will be critical during our restructuring efforts. Therefore, in January 2014, the O&C Committee approved certain adjustments to our compensation program to align our incentive programs with goals and metrics that are tailored to the unusual circumstances faced by an organization during the pendency of a bankruptcy filing. Such adjustments are described more fully herein.

**Compensation Philosophy**

We have a pay-for-performance compensation philosophy, which places an emphasis on pay-at-risk; a significant portion of an executive officer's compensation is comprised of variable compensation. Our compensation program is intended to attract and motivate top-talent executive officers as leaders and compensate executive officers appropriately for their contribution to the attainment of our financial, operational and strategic objectives. In addition, we believe it is important to retain our top tier talent and strongly align their interests with our stakeholders by emphasizing long-term incentive compensation. Given the competitive nature of the unregulated market in ERCOT, the evolving regulatory environment, and our current restructuring efforts, we believe maintaining continuity and engagement of such talent is critical to our continued success.

To achieve the goals of our compensation philosophy, we believe that:

- compensation plans should balance both long-term and short-term objectives;
- the overall compensation program should emphasize variable compensation elements that have a direct link to overall corporate performance and stakeholder value;
- the overall compensation program should place an increased emphasis on pay-at-risk with increased responsibility;
- the overall compensation program should attract, motivate and engage top-talent executive officers to serve in key roles; and
- an executive officer's individual compensation level should be based upon an evaluation of the financial and operational performance of that executive officer's business unit or area of responsibility as well as the executive officer's individual performance.

We believe our compensation philosophy supports our businesses by:

- aligning performance measures with our business objectives to drive the financial and operational performance of EFH Corp. and its business units;
- rewarding business unit and individual performance by providing compensation levels consistent with the level of contribution and degree of accountability;
- attracting and retaining the best performers; and
- effectively aligning the correlation between the long-term interests of our executive officers and stakeholders.

200

Table of Contents

**Elements of Compensation**

The material elements of our executive compensation program are:

- a base salary, which was increased in 2013 for all of our Named Executive Officers to maintain a compensation package competitive with those offered by our peers, given the decrease in the value of our equity;
- the opportunity to earn an annual performance-based cash bonus based on the achievement of specific corporate, business unit and individual performance goals; and
- long-term incentive awards, primarily in the form of long-term cash incentive awards, which were modified in January 2014 as part of our normal compensation review process, as described more fully herein, and restricted stock units ("Restricted Stock Units") under and subject to the terms of the 2007 Stock Incentive Plan for Key Employees of EFH Corp. and Affiliates (the "2007 Stock Incentive Plan").

In addition, executive officers generally have the opportunity to participate in certain of our broad-based employee benefit plans, including our Thrift (401(k)) Plan and health and welfare plans, and to receive certain perquisites.

**Compensation of the CEO**

In determining the compensation of the CEO, the O&C Committee annually follows a thorough and detailed process. At the end of each year, the O&C Committee reviews a self-assessment prepared by the CEO regarding his performance and the performance of our businesses and meets (with and without the CEO) to evaluate and discuss his performance and the performance of our businesses.

While the O&C Committee tries to ensure that the bulk of the CEO's compensation is directly linked to his performance and the performance of our businesses, the O&C Committee also seeks to set his compensation in a manner that is competitive with compensation for similarly performing executive officers with similar responsibilities in companies we consider our peers.

**Compensation of Other Executive Officers**

In determining the compensation of each of our executive officers (other than the CEO), the O&C Committee seeks the input of the CEO. At the end of each year, the CEO reviews a self-assessment prepared by each executive officer and assesses the executive officer's performance against business unit (or area of responsibility) and individual goals and objectives. The O&C Committee and the CEO then review the CEO's assessments and, in that context, the O&C Committee approves the compensation for each executive officer.

**Assessment of Compensation Elements**

We design the majority of our executive officers' compensation to be linked directly to corporate and business unit (or area of responsibility) performance. For example, each executive officer's annual performance-based cash bonus is primarily based on the achievement of certain corporate and business unit financial and operational targets (such as management EBITDA, as discussed herein, cost management, generation output, customer satisfaction, etc.). In addition, each executive officer's long-term cash incentive award is based on achievement of certain operational and financial performance metrics. We also try to ensure that our executive compensation program is competitive with our peer companies in order to effectively motivate and retain our executive officers.

The following is a detailed discussion of the principal compensation elements provided to our executive officers and the amendments made thereto in 2013 and 2014. Additional detail about each of the elements can be found in the compensation tables, including the footnotes and the narrative discussion following certain of the tables.

201

Table of Contents

**Executive Compensation Evaluation and Adjustment**

In October 2012, the O&C Committee engaged Towers Watson & Co. ("Towers Watson"), an independent compensation consultant to review the compensation practices we implemented in February 2011 and to confirm whether such practices continue to be aligned with our compensation philosophy. In December 2012, Towers Watson delivered to the O&C Committee its report, which included market data for a peer group composed of the following companies:

| | | |
|---|---|---|
| Allegheny Energy, Inc. | Ameren Corp. | American Electric Power Co. Inc |
| Calpine Corp. | Constellation Energy Group Inc. | Dominion Resources Inc. |
| Duke Energy Corp.[1] | Edison International | Entergy Corp. |
| Exelon Corp. | FirstEnergy Corp. | PPL Corp. |
| NextEra Energy, Inc. | NRG Energy, Inc.[2] | Southern Co. |
| Xcel Energy Inc. | Public Service Enterprise Group Inc. | |

(1) In July 2012, Duke Energy Corp. acquired Progress Energy Inc., one of the entities evaluated as a peer.

(2) NRG Energy, Inc. is the successor by merger to GenOn Energy, Inc.

In December 2012, after a comprehensive review of the performance of our businesses in 2012, and taking into consideration the review of our compensation practices and plans by Towers Watson and its market analysis, the sustained decline in ERCOT wholesale electricity prices (primarily as a result of lower forward natural gas prices), the increased environmental regulatory requirements of the electricity generation industry, and our position as a highly-leveraged, privately-owned company, the O&C Committee approved increases to the base salaries for our Named Executive Officers described in the paragraph entitled "Base Salary" below and an increase in the target annual cash bonus opportunity of Mr. Young to 125% of his base salary, effective January 1, 2013. The O&C Committee implemented these changes to provide a total executive compensation package comparable to the executive compensation packages of executives with similar responsibilities at peer companies and to maintain a strong alignment between our Named Executive Officers and our stakeholders. The O&C Committee does not target any particular level of total compensation against the peer group; rather the O&C Committee considers the range of total compensation provided by our peers, together with our position as a highly-leveraged privately-owned company, in determining the appropriate level of total compensation for our executives.

In late 2012 and early 2013, respectively, we entered into amended and restated employment agreements with Mr. Young and Mr. McFarland. Mr. Young's amended and restated employment agreement incorporated his increase in base salary and the amendment to his target annual cash bonus opportunity. Mr. McFarland's amended and restated employment agreement reflected his position as President and Chief Executive Officer of Luminant. Additionally, in May 2013, we entered into an amended and restated employment agreement with Mr. Burke to reflect his appointment as Executive Vice President of EFH Corp., and in October 2013, we entered into an amended and restated employment agreement with Ms. Doré, which reflects her promotion from Senior Vice President to Executive Vice President of EFH Corp. and an increase in her 2015 LTIP Award opportunity (as described herein) to set her long term incentives at a level that is comparable to her peers on the company's management team.

The employment agreements of each of our Named Executive Officers were amended in March 2014 to reflect the addition of the Extended LTI Award (defined below), as described further herein.

*Base Salary*

We believe base salary should consider the scope and complexity of an executive officer's position and the level of responsibility required to perform his or her job. We also believe that a competitive level of base salary is required to attract, motivate and retain qualified talent.

The O&C Committee annually reviews base salaries and periodically uses independent compensation consultants to ensure the base salaries are market-competitive. The O&C Committee may also review an executive officer's base salary from time to time during a year, including if the executive officer is given a promotion or if his responsibilities are significantly modified.

Table of Contents

We want to ensure our cash compensation is competitive and sufficient to incent executive officers to remain with us, recognizing our high performance expectations across a broad set of operational, financial, customer service and community-oriented goals and objectives, as well as the additional demands placed upon our management team by our restructuring efforts. Effective January 2013, following the assessment of the compensation of our executive officers and the analysis of our compensation practices and plans by, and discussions with, Towers Watson, as discussed above, the O&C Committee determined the base salaries for our Named Executive Officers should increase. Beginning January 1, 2013, Mr. Young's base salary was increased to $1,350,000, Mr. Keglevic's base salary was increased to $735,000, Mr. Burke's base salary was increased to $675,000, Ms. Doré's base salary was increased to $600,000, and Mr. McFarland's base salary was increased to $675,000.

*Annual Performance-Based Cash Bonus - Executive Annual Incentive Plan*

The Executive Annual Incentive Plan ("EAIP") provides an annual performance-based cash bonus for the successful attainment of certain annual financial and operational performance targets that are established annually at each of the corporate and business unit levels by the O&C Committee. Under the terms of the EAIP, performance against these targets, which are generally set at levels to incent high performance (while at the same time balancing the needs for safety and investment in our business), drives bonus funding. As a general matter, target level performance is based on EFH Corp.'s board-approved financial and operational plan (the "Financial Plan") for the upcoming year. The O&C Committee sets high expectations for our executive officers and therefore annually selects a target performance level that constitutes above average performance for the business, which the O&C Committee expects the business to achieve during the upcoming year. Threshold and superior levels are for performance levels that are below or above expectations, respectively. Based on the level of attainment of these performance targets, an aggregate EAIP funding percentage amount for all participants is determined.

Our financial performance targets typically include "management" EBITDA, a non-GAAP financial measure. When the O&C Committee reviews management EBITDA for purposes of determining our performance against the applicable management EBITDA target, it includes our net income (loss) before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group, and restructuring costs, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with our CEO and Chief Financial Officer, including adjustments consistent with those included in the comparable definitions in TCEH's Senior Secured Facilities (to the extent considered appropriate for executive compensation purposes). Our management EBITDA targets are also adjusted for acquisitions, divestitures, major capital investment initiatives, to the extent that they were material and not contemplated in our Financial Plan. The management EBITDA targets are intended to measure achievement of the Financial Plan and the adjustments to management EBITDA described above primarily represent elements of our performance that are either beyond the control of management or were not predictable at the time the Financial Plan was approved. Given our Named Executive Officer's business unit responsibilities, our management EBITDA calculations for Mr. Young include Oncor, while management EBITDA calculations for the remaining Named Executive Officers exclude Oncor. Under the terms of the EAIP, the O&C Committee has broad authority to make these or any other adjustments to EBITDA that it deems appropriate in connection with its evaluation and compensation of our executive officers. Management EBITDA is an internal measure used only for performance management purposes, and EFH Corp. does not intend for management EBITDA to be an alternative to any measure of financial performance presented in accordance with GAAP. Management EBITDA is calculated similarly to Adjusted EBITDA, which is disclosed elsewhere in this Form 10-K and defined in the glossary to this Form 10-K, and reflects substantially all the computational elements of Adjusted EBITDA.

203

Table of Contents

*Financial and Operational Performance Targets*

The following table provides a summary of the weight given to the various business unit scorecards, which constitute the performance targets, for each of the Named Executive Officers.

| Name | EFH Corp. Management EBITDA[2] | EFH Business Services Scorecard Multiplier | Luminant Scorecard Multiplier | TXU Energy Scorecard Multiplier | Total | Payout |
|---|---|---|---|---|---|---|
| John F. Young[1] | 50% | 50% | | | 100% | 119% |
| Paul M. Keglevic | 50% | 50% | | | 100% | 120% |
| James A. Burke | 25% | | | 75% | 100% | 139% |
| Stacey H. Doré | 50% | 50% | | | 100% | 120% |
| M.A. McFarland | 25% | | 75% | | 100% | 128% |

(1) Mr. Young is measured on EFH Corp. Management EBITDA (including Oncor) while the remaining Named Executive Officers are measured on EFH Corp. Management EBITDA (excluding Oncor).

(2) The targeted EFH Corp. Management EBITDA (including Oncor) for the fiscal year ended December 31, 2013 was $4.612 billion. The targeted EFH Corp. Management EBITDA (excluding Oncor) for the fiscal year ended December 31, 2013 was $2.723 billion. The actual EFH Corp. Management EBITDA (including Oncor) for the fiscal year ended December 31, 2013 was $4.666 billion, which was above target. The actual EFH Corp. Management EBITDA (excluding Oncor) for the fiscal year ended December 31, 2013 was $2.758 billion, which was above target.

The following table provides a summary of the performance targets included in the EFH Business Services Scorecard Multiplier.

| EFH Business Services Scorecard Multiplier | Weight | Performance[1] | Payout |
|---|---|---|---|
| EFH Corp. Management EBITDA (excluding Oncor)[2] | 20.0% | 111% | 22% |
| Luminant Scorecard Multiplier[3] | 20.0% | 133% | 27% |
| TXU Energy Scorecard Multiplier[3] | 20.0% | 148% | 30% |
| EFH Corp. (excluding Oncor) Total Spend | 20.0% | 135% | 27% |
| EFH Business Services Costs | 20.0% | 110% | 22% |
| Total | 100.0% | | 128% |

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

(2) The targeted EFH Corp. Management EBITDA (excluding Oncor) for the fiscal year ended December 31, 2013 was $2.723 billion. The actual EFH Corp. Management EBITDA (excluding Oncor) for the fiscal year ended December 31, 2013 was $2.758 billion, which was above target.

(3) The performance targets included in the Luminant Scorecard Multiplier and the TXU Energy Scorecard Multiplier are summarized below.

204

Table of Contents

The following table provides a summary of the performance targets included in the Luminant Scorecard Multiplier.

| Luminant Scorecard Multiplier | Weight | Performance[1] | Payout |
|---|---|---|---|
| Luminant Management EBITDA | 37.5% | 109% | 41% |
| Luminant Available Generation - Coal (June-Sept. 15) | 10.0% | 200% | 20% |
| Luminant Available Generation - Coal (Jan.-May, Sept. 16-Dec.) | 10.0% | 120% | 12% |
| Luminant Available Generation – Nuclear | 7.5% | 133% | 10% |
| Luminant Operating Costs/SG&A | 15.0% | 127% | 19% |
| Luminant Capital Expenditures | 10.0% | 160% | 16% |
| Luminant Fossil Fuel Costs | 10.0% | 150% | 15% |
| Total | 100.0% | | 133% |

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

The following table provides a summary of the performance targets included in the TXU Energy Scorecard Multiplier.

| TXU Energy Scorecard Multiplier | Weight | Performance[1] | Payout |
|---|---|---|---|
| TXU Energy Management EBITDA | 40.0% | 148% | 59% |
| TXU Energy Total Costs | 20.0% | 135% | 27% |
| Contribution Margin | 15.0% | 153% | 23% |
| Residential Customer Count | 10.0% | 140% | 14% |
| Customer Satisfaction | 3.0% | 100% | 3% |
| Average Days Sales Outstanding | 3.0% | 167% | 5% |
| TXU Energy Energizing Event Success | 3.0% | 167% | 5% |
| TXU Energy Customer Satisfaction (Complaints) | 3.0% | 200% | 6% |
| TXU Energy System Availability (Downtime) | 3.0% | 200% | 6% |
| Total | 100.0% | | 148% |

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

*Individual Performance Modifier*

After approving the actual performance against the applicable targets under the EAIP, the O&C Committee and/or the CEO reviews the performance of each of our executive officers on an individual and comparative basis. Based on this review, which includes an analysis of both objective and subjective criteria, as determined by the O&C Committee in its sole discretion, including the CEO's recommendations (with respect to all executive officers other than himself), the O&C Committee approves an individual performance modifier for each executive officer. Under the terms of the EAIP, the individual performance modifier can range from an outstanding rating (150%) to an unacceptable rating (0%). To calculate an executive officer's final annual cash incentive bonus, the executive officer's corporate/business unit payout percentages are multiplied by the executive officer's target incentive level, which is computed as a percentage of annualized base salary, and then by the executive officer's individual performance modifier. Effective January 1, 2014, the O&C Committee increased Ms. Doré's target incentive level from 65% to 85%.

205

Table of Contents

*Actual Award*

The following table provides a summary of the 2013 performance-based cash bonus for each Named Executive Officer under the EAIP.

| Name | Target (% of salary) | Target Award ($ Value) | | Actual Award | |
|---|---|---|---|---|---|
| John F. Young [1] | 125% | $ | 1,687,500 | $ | 2,811,375 |
| Paul M. Keglevic [2] | 85% | $ | 624,750 | $ | 1,049,580 |
| James A. Burke [3] | 85% | $ | 573,750 | $ | 1,116,518 |
| Stacey H. Doré [4] | 65% | $ | 390,000 | $ | 655,200 |
| M.A. McFarland [5] | 85% | $ | 573,750 | $ | 1,028,160 |

(1) Mr. Young's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. (including Oncor) and EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier. In 2013, Mr. Young maintained the organization's focus on successfully executing its financial and operational business plan while educating and preparing our employees for a potential restructuring. In addition, he enhanced communication with the company's numerous stakeholders, which will be crucial during the pendency of the Bankruptcy Case. Given these and other significant achievements, the O&C Committee approved an individual performance modifier that increased Mr. Young's incentive award.

(2) Mr. Keglevic's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. (excluding Oncor) and EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier. In 2013, Mr. Keglevic improved the Company's tax position through the elimination of the ELA and DIG, controlled shared services costs while maintaining operational performance, extended the maturity date of the TCEH Revolving Credit Facility in connection with our liability management program, and managed our restructuring efforts. Given these and other significant achievements, the O&C Committee approved an individual performance modifier that increased Mr. Keglevic's incentive award.

(3) Mr. Burke's incentive award is based on the successful achievement of a financial performance target for EFH Corp. (excluding Oncor) and the financial and operational performance targets for TXU Energy and an individual performance modifier. In 2013, under Mr. Burke's leadership, TXU Energy successfully managed retail margins, while reducing residential attrition below prior year levels. TXU Energy continued to differentiate its brand through strong performance in new products and customer experience, resulting in record low complaint levels and strong sales performance, as well as lower overall costs to operate. Given these significant accomplishments, community involvement, and other achievements (including his continued commitment to foster TXU Energy's brand and reputation with its customers and stakeholders), the O&C Committee approved an individual performance modifier that increased Mr. Burke's incentive award.

(4) Ms. Doré's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. (excluding Oncor) and EFH Business Services and the financial and operational performance targets for Luminant and TXU Energy and an individual performance modifier. In 2013, Ms. Doré managed negotiations with certain of our creditor groups in anticipation of our restructuring, spearheaded legal efforts in connection with the elimination of the ELA and DIG, and continued to manage the successful defense of our pending environmental litigation. Given these and other significant achievements, the O&C Committee approved an individual performance modifier that increased Ms. Doré's incentive award.

(5) Mr. McFarland's incentive award is based on the successful achievement of the financial performance targets for EFH Corp. (excluding Oncor) and EFH Business Services, the financial and operational performance targets for Luminant and Luminant Energy and an individual performance modifier. In 2013, under Mr. McFarland's leadership, Luminant achieved excellent operational performance while maintaining a culture of safety first while delivering on financial targets despite reduced credit capacity and lack of market liquidity. Given these significant accomplishments and other achievements, the O&C Committee approved an individual performance modifier that increased Mr. McFarland's incentive award.

**Discretionary Cash Bonuses**

The O&C Committee, in its discretion, may from time to time provide special awards to our executive officers, including the Named Executive Officers, in connection with their contribution to our achievements. In June 2013, in recognition of Mr. Keglevic's leadership of our efforts to eliminate the ELA and DIG and effectively resolve the 2003-2006 IRS audit as well as

on-going contributions to our liability management program, the O&C Committee awarded a discretionary cash bonus of $375,000. In February 2013 and June 2013, in recognition of Ms. Doré's efforts leading to (i) the successful outcome of our CSAPR litigation and (ii) the elimination of the ELA and DIG, she was awarded discretionary cash bonuses of $150,000 and $200,000, respectively.

206

Table of Contents

***Long-Term Incentive Awards***

*Long-Term Cash Incentive*

Our long-term cash incentive awards are designed to provide incentive to our Named Executive Officers to achieve top operational and financial performance because the awards are based on either a percentage of the executive officer's annual performance-based cash bonus or the achievement of management EBITDA targets. The following long-term cash incentive awards affected our Named Executive Officers' total compensation for 2013:

- 2011 LTI Award - granted in 2011 and earned by each of our Named Executive Officers (other than Ms. Doré) in 2011, the 2011 LTI Award ("2011 LTI Award") entitled each such Named Executive Officer to receive an amount between $650,000 and $1,300,000 ($750,000 and $1,500,000 with respect to Mr. Young) based upon the amount of management EBITDA actually achieved by EFH Corp. as compared to the management EBITDA threshold and target amounts previously set by the O&C Committee for the 2011 fiscal year, one-half of which was paid on September 30, 2012, and one-half of which was paid on September 30, 2013 if such Named Executive Officer remained employed by EFH Corp. on such date (with exceptions in limited circumstances);

- 2015 LTI Award - granted in 2011 (other than Ms. Doré, who's award was granted in 2012), provides each Named Executive Officer the opportunity to earn between $500,000 and $1,000,000 ($1,350,000 and $2,700,000 with respect to Mr. Young, and $216,666 and $433,333 for Ms. Doré) in each of 2012, 2013, and 2014, with the amount of the award for each year to be determined based upon the amount of management EBITDA actually achieved by EFH Corp. as compared to the management EBITDA threshold and target amounts previously set by the O&C Committee, in each case, for the years ended December 31, 2012, 2013, and 2014 (as applicable). Payment of the 2015 LTI Award, to the extent earned, will be made in March 2015 and is conditioned upon the Named Executive Officer's continued employment with EFH Corp. on such date (with exceptions in limited circumstances);

- Additional 2015 LTI Award - granted in 2013 to Ms. Doré, provides her the opportunity to earn an additional amount between $300,000 and $600,000 in each of 2013 and 2014, with the amount of the award for each year to be determined based upon the amount of management EBITDA actually achieved by EFH Corp. as compared to the management EBITDA threshold and target amounts previously set by the O&C Committee, in each case, for the years ended December 31, 2013, and 2014 (as applicable). Payment of the Additional 2015 LTI Award, to the extent earned, will be made in March 2015, and is conditioned upon Ms. Doré's continued employment with EFH Corp. on such date (with exceptions in limited circumstances).

The tables below set forth the 2011 LTI Award earned by each Named Executive Officer (other than Ms. Doré) in 2011, and the amounts paid to each Named Executive Officer on September 30, 2012 and 2013 in connection therewith, as well as the portion of the 2015 LTI Award earned by each Named Executive Officer in 2012 and 2013 (for Ms. Doré, the 2013 portion of the 2015 LTI Award also includes the Additional 2015 LTI Award earned in 2013), and the amounts to be paid in March 2015 if such Named Executive Officer remains employed by EFH Corp. on such date (with exceptions in limited circumstances):

## 2011 LTI Award

| Name | 2011 LTI Award Previously Earned | Amount of 2011 LTI Distributed 9/30/2012 | Amount of 2011 LTI Distributed 9/30/2013 |
|---|---|---|---|
| John F. Young | $1,500,000 | $750,000 | $750,000 |
| Paul M. Keglevic | $1,300,000 | $650,000 | $650,000 |
| James A. Burke | $1,300,000 | $650,000 | $650,000 |
| Stacey H. Doré | N/A | — | — |
| M.A. McFarland | $1,300,000 | $650,000 | $650,000 |

Table of Contents

## 2015 LTI Award

| Name | 2012 Portion of 2015 LTI Award Previously Earned | 2013 Portion of 2015 LTI Award Earned[1] | 2014 Portion of 2015 LTI Award Earned[2] | Amount of 2015 LTI to be Distributed 3/2015[3] |
|------|-----|-----|-----|-----|
| John F. Young | $2,700,000 | $2,700,000 | TBD | $5,400,000 |
| Paul M. Keglevic | $1,000,000 | $1,000,000 | TBD | $2,000,000 |
| James A. Burke | $1,000,000 | $1,000,000 | TBD | $2,000,000 |
| Stacey H. Doré | $433,333 | $1,033,333 | TBD | $1,466,666 |
| M.A. McFarland | $1,000,000 | $1,000,000 | TBD | $2,000,000 |

(1) In the case of Ms. Doré, the column titled "2013 Portion of 2015 LTI Award Earned" includes $600,000 with respect to her Additional 2015 LTI Award.

(2) The 2014 portion of the 2015 LTI Award is currently an unknown amount as it will be earned in 2014. Once earned, this amount will be included in the column titled, "Amount of 2015 LTI to be Distributed 3/2015."

(3) The amount to be distributed in March 2015 represents the 2012 and 2013 portions of the 2015 earned to date by each Named Executive Officer. Once the amount of the 2014 portion of the LTI Award is earned, it will be included in the column titled, "Amount of 2015 LTI Earned to be Distributed 3/2015." This amount is subject, in limited circumstances, to pro-ration in the event of the Named Executive Officer's termination without "cause" or resignation for "good reason" (including following a change of control of EFH Corp.), or in the event of such Named Executive Officer's death or disability, as described in greater detail in the Named Executive Officer's employment agreement.

In connection with the grant of the 2011 LTI Award and 2015 LTI Award, and in consideration of the retention incentive that the 2011 LTI Award and the 2015 LTI Award provide to our Named Executive Officers, the O&C Committee approved the provision of irrevocable standby letters of credit under the terms of the TCEH Senior Secured Credit Facilities to each Named Executive Officer. These letters of credit support EFH Corp.'s payment obligations under the 2011 LTI Award and 2015 LTI Award.

The performance period for the 2015 LTI Award (and the Additional 2015 LTI Award) ends on December 31, 2014. We believe a lack of long term incentive compensation for our executive officers, including our Named Executive Officers, would disadvantage the company in its engagement and motivation of such executive officers. As a result, in January 2014, following the fiscal year end, the O&C Committee approved long-term cash incentive awards for each of our Named Executive Officers (the "Extended LTI Award"), which we believe align the goals of our Named Executive Officers to maintain excellent operational and financial performance while addressing the dynamic challenges we will face during the pendency of the Bankruptcy Filing. Unless earlier terminated in accordance with their terms, the Extended LTI Awards are based on the achievement of quarterly and cumulative annual performance goals established by the O&C Committee for each of 2015 and 2016 and provide each of our Named Executive Officers the opportunity to earn up to $250,000 in each quarter ($675,000 for Mr. Young) in 2015 and 2016, provided that he or she is employed by EFH Corp. or an affiliate on the last day of such quarter. The actual amount of the awards will be based upon quarterly and year-to-date performance of our businesses as compared to the base and threshold quarterly and year-to-date performance goals for such businesses established quarterly by the O&C Committee. The sum of each Named Executive Officer's awards under the Extended LTI Awards for each of 2015 and 2016 will not exceed $1,000,000 ($2,700,000 for Mr. Young). To the extent earned, the Extended LTI Awards will be distributed following each quarter and will terminate on the earlier of December 31, 2016 or the date on which the Named Executive Officer receives a grant under another long-term equity incentive plan adopted by EFH Corp.

*Long-Term Equity Incentives*

We believe it is important to strongly align the interests of our executive officers and stakeholders through equity-based compensation. The purpose of the 2007 Stock Incentive Plan, which was previously approved by our Board, is to:

- promote our long-term financial interests and growth by attracting and retaining management and other personnel with the training, experience and ability to make a substantial contribution to our success;
- motivate management and other personnel by means of growth-related incentives to achieve long-range goals; and
- align the long-term interests of our stakeholders and the interests of our executive officers through opportunities for stock (or stock-based) ownership in EFH Corp.

208

Table of Contents

Given the Bankruptcy Filing, our equity-based compensation has de minimis monetary value and we have amended our current compensation practices (as discussed above) to adjust for the minimal incentive value related to our equity. We believe such adjustments further align the compensation of our executive officers, including our Named Executive Officers, with the interests of all of our stakeholders, which will evolve during our restructuring, by emphasizing short term, measurable goals in recognition of the dynamic nature of the Bankruptcy Filing.

Because we are a privately-held company, our 2007 Stock Incentive Plan does not contain provisions, and we do not have any equity grant practices in place, designed to coordinate the granting of equity awards with the public release of material information. Please refer to the Grants of Plan-Based Awards - 2013 table, including the footnotes thereto, and the Outstanding Equity Awards at Fiscal Year-End-2013 table, including the footnotes thereto, for a more detailed description of the outstanding Restricted Stock Units held by each of the Named Executive Officers.

*Annual Grant of Restricted Stock Units*:

In 2013, each of our Named Executive Officers was entitled to an annual grant of Restricted Stock Units ("Annual RSUs"). The O&C Committee approved the Annual RSU grant for 2013 on February 13, 2013, which resulted in each Named Executive Officer receiving 500,000 Restricted Stock Units (1,500,000 with respect to Mr. Young and 250,000 with respect to Ms. Doré) on March 11, 2013. The Restricted Stock Units cliff vest on September 30, 2014 (with exceptions in limited circumstances). Pursuant to the terms of her employment agreement, Ms. Doré is entitled to an additional grant of 250,000 RSUs in 2014. The O&C Committee approved Ms. Doré's 2014 RSU grant on January 22, 2014. In the future, we may make additional discretionary grants of equity-based compensation to reward high performance or achievement. Please refer to the Grants of Plan-Based Awards - 2013 table, and the Outstanding Equity Awards at Fiscal Year-End-2013 table, including the footnotes to these tables, for a more detailed description of the RSUs granted to and held by each of the Named Executive Officers during, and at the end of, our last fiscal year.

**Other Elements of Compensation**

*General*

Our executive officers generally have the opportunity to participate in certain of our broad-based employee compensation plans, including our Thrift (401(k)) Plan, and health and welfare plans. Please refer to the footnotes to the Summary Compensation table for a more detailed description of our Thrift Plan, and the narrative that follows the Pension Benefits table for a more detailed description of our Supplemental Retirement Plan.

*Perquisites*

We provide our executives with certain perquisites on a limited basis. The perquisites are generally intended to enhance our executive officers' ability to conduct company business. These benefits include financial planning, preventive health maintenance, reimbursement for certain club memberships and certain spousal travel expenses. Expenditures for the perquisites described below are disclosed by individual in footnote 6 to the Summary Compensation Table. The following is a summary of perquisites offered to our Named Executive Officers that are not available to all employees:

**Executive Financial Planning:** We pay for our executive officers to receive financial planning services. This service is intended to support them in managing their financial affairs, which we consider especially important given the high level of time commitment and performance expectation required of our executive officers. Furthermore, we believe that such service helps ensure greater accuracy and compliance with individual tax regulations by our executive officers.

**Health Services:** We pay for our executive officers to receive annual physical health exams and we purchased an annual membership for Messrs. Young and Keglevic to participate in a comprehensive health plan that provides anytime personal and private physician access and health care. The health of our executive officers is important given the vital leadership role they play in directing and operating the company. Our executive officers are important assets of EFH Corp., and these benefits are designed to help ensure their health and long-term ability to serve our stakeholders.

**Club Memberships:** We reimburse certain of our executives for the cost of golf and social club memberships, provided that the club membership provides for a business-use opportunity, such as client networking and entertainment. The club membership reimbursements are provided to assist the executives in cultivating business relationships.

**Spouse Travel Expenses:** From time to time, we pay for an executive officer's spouse to travel with the executive officer when taking a business trip.

209

Table of Contents

*Payments Contingent Upon a Change of Control of EFH Corp.*

We have entered into employment agreements with each of our Named Executive Officers. Each of the employment agreements provides that certain payments and benefits will be paid upon the expiration or termination of the agreement under various circumstances, including termination without cause, resignation for good reason and termination of employment within a fixed period of time following a change in control of EFH Corp. We believe these provisions are important in order to attract, motivate, and retain the caliber of executive officers that our business requires and provide incentive for our executive officers to fully consider potential changes that are in our and our stakeholders' best interest, even if such changes could result in the executive officers' termination of employment. For a description of the applicable provisions in the employment agreements of our Named Executive Officers see "Potential Payments upon Termination or Change in Control."

*Other*

Under the terms of Mr. Young's employment agreement, we have purchased a 10-year term life insurance policy (to be paid to a beneficiary of his choice) in an insured amount equal to $10,000,000. In addition, under the terms of Mr. Young's employment agreement we have agreed to provide a supplemental retirement plan, with a value of $3,000,000 if Mr. Young remains employed by EFH Corp. through December 31, 2014 (with customary exceptions for death, disability and leaving for "good reason" or termination "without cause"). Each of these benefits was included as a part of Mr. Young's compensation package to set his compensation in a manner that is competitive with compensation for chief executive officers in companies we consider our peers.

## Accounting and Tax Considerations

### *Accounting Considerations*

Because our common stock is not registered or publicly traded, the O&C Committee does not generally consider the effect of accounting principles when making executive compensation decisions.

### *Income Tax Considerations*

Section 162(m) of the Code limits the tax deductibility by a publicly-held company of compensation in excess of $1 million paid to the CEO or any other of its three most highly compensated executive officers other than the principal financial officer. Because EFH Corp. is a privately-held company, Section 162(m) will not limit the tax deductibility of any executive compensation for 2013, and the O&C Committee does not take it into account when making executive compensation decisions.

### Organization and Compensation Committee Report

The O&C Committee has reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Form 10-K. Based on this review and discussions, the committee recommended to the Board that the Compensation Discussion and Analysis be included in this Form 10-K.

Organization and Compensation Committee
Donald L. Evans, Chair
Arcilia C. Acosta
Kenneth Pontarelli

210

Table of Contents

## Summary Compensation Table—2013

The following table provides information for the fiscal years ended December 31, 2013, 2012 and 2011 (only 2013 for Ms. Doré) regarding the aggregate compensation paid to our Named Executive Officers.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)[3] | Non-Equity Incentive Plan Compensation ($)[4] | Change in Pension Value and Non-qualified Deferred Compensation Earnings ($)[5] | All Other Compensation ($)[6] | Total ($) |
|---|---|---|---|---|---|---|---|---|
| John F. Young President & CEO of EFH Corp. | 2013 | 1,350,000 | — | 420,000 | 5,511,375 | — | 73,152 | 7,354,527 |
| | 2012 | 1,200,000 | — | 525,000 | 4,968,000 | 4,337 | 72,848 | 6,770,185 |
| | 2011 | 1,200,000 | — | 5,347,500 | 8,468,600 | 3,123 | 105,484 | 15,124,707 |
| Paul M. Keglevic [1] EVP, Chief Financial Officer & Co-CRO of EFH Corp. | 2013 | 735,000 | 375,000 | 140,000 | 2,049,580 | — | 54,037 | 3,353,617 |
| | 2012 | 650,000 | 50,000 | 175,000 | 2,009,418 | 4,403 | 4,326,288 | 7,215,109 |
| | 2011 | 650,000 | 1,050,000 | 1,782,500 | 3,890,744 | 3,788 | 73,437 | 7,450,469 |
| James A. Burke EVP-EFH Corp. & President & CEO of TXU Energy | 2013 | 675,000 | — | 140,000 | 2,116,518 | 6,227 | 29,203 | 2,966,948 |
| | 2012 | 630,000 | — | 175,000 | 2,033,783 | 82,916 | 32,977 | 2,954,676 |
| | 2011 | 630,000 | — | 1,637,250 | 3,946,709 | 89,310 | 55,298 | 6,358,567 |
| Stacey H. Doré [2] EVP, General Counsel, & Co-CRO of EFH Corp. | 2013 | 600,000 | 350,000 | 70,000 | 1,788,533 | — | 32,654 | 2,841,187 |
| | 2012 | — | — | — | — | — | — | — |
| | 2011 | — | — | — | — | — | — | — |
| M.A. McFarland EVP-EFH Corp. & President & Chief Executive Officer of Luminant | 2013 | 675,000 | — | 140,000 | 2,028,160 | — | 46,367 | 2,889,527 |
| | 2012 | 600,000 | 150,000 | 175,000 | 1,963,900 | — | 43,406 | 2,932,306 |
| | 2011 | 600,000 | 350,000 | 1,519,000 | 3,940,605 | — | 63,602 | 6,473,207 |

(1) The amount reported as "Bonus" in 2013 represents the discretionary cash bonus Mr. Keglevic was granted in connection with his contributions to the elimination of the ELA and DIG.

(2) The amount reported as "Bonus" in 2013 includes the $150,000 discretionary cash bonus Ms. Doré was granted in connection with her contributions to our environmental litigation efforts and the $200,000 discretionary cash bonus she was granted in connection with her contribution to the elimination of the ELA and DIG.

(3) The amounts reported as "Stock Awards" represent the grant date fair value of the 2013 Annual RSUs. These awards cliff vest in September of 2014. The expense for these awards will be recognized in accordance with FASB ASC Topic 718. Additional assumptions relating to the valuation are described in the footnotes to the Grants of Plan-Based Awards Table.

(4) The amounts in 2013 reported as "Non-Equity Incentive Plan Compensation" were earned by the executive officers in 2013 under the EAIP, and the 2015 LTI Award (and the Additional 2015 LTI Award for Ms. Doré). Though a portion of the 2015 LTI Award was earned in 2013, it will not be paid until March 2015 and is conditioned upon the Named Executive Officer's continued employment (with exceptions in limited circumstances). The amounts for each Named Executive Officer are as follows: (a) for Mr. Young, $2,811,375 for the EAIP and $2,700,000 for the 2015 LTI Award; (b) for Mr. Keglevic $1,049,580 for the EAIP and $1,000,000 for the 2015 LTI Award; (c) for Mr. Burke $1,116,518 for the EAIP and $1,000,000 for the 2015 LTI Award; (d) for Ms. Doré $655,200 for the EAIP, $433,333 for the 2015 LTI Award, $600,000 for the Additional 2015 LTI Award; and (e) for Mr. McFarland $1,028,160 for the EAIP and $1,000,000 for the 2015 LTI Award. The amount reported for Ms. Doré also includes $100,000 for the 2013 portion of an incentive award granted in 2010 (the "2010 Non-Executive Officer Award") under a plan applicable to certain non-executive officers. The deferred amounts of the 2015 LTI Awards (and the Additional 2015 LTI Award and 2010 Non-Executive Officer Award for Ms. Doré) are reported in the table entitled "Nonqualified Deferred Compensation - 2013" under the headings "Registrant Contributions in Last FY" and "Aggregate Balance at Last FYE."

(5) The amount for Mr. Burke in 2013 reported under "Change in Pension Value and Nonqualified Deferred Compensation Earnings" includes the aggregate increase in the actuarial value of his balance in the EFH Supplemental Retirement Plan. For a more detailed description of the Supplemental Retirement Plan, please refer to the narrative that follows the table entitled "Pension Benefits - 2013".

211

Table of Contents

(6) The amounts for 2013 reported as "All Other Compensation" are attributable to the Named Executive Officer's receipt of compensation as described in the following table:

| | | | | Perquisites[a] | | | | |
| Name | Matching Contribution to Thrift Plan[b] | Cost of Letter of Credit[c] | Premium Payments on Life Insurance Policy | Personal Physical Care[d] | Financial Planning[e] | Country Club Dues[g] | Executive Physical[h] | Total |
|---|---|---|---|---|---|---|---|---|
| John F. Young | $15,250 | $10,979 | $17,185[f] | $10,000 | $10,940 | $8,798 | — | $73,152 |
| Paul M. Keglevic | $15,300 | $4,420 | — | $15,000 | — | $19,317 | — | $54,037 |
| James A. Burke | $15,188 | $4,420 | — | — | $9,595 | — | — | $29,203 |
| Stacey H. Doré | $15,300 | $1,648 | — | — | $12,890 | — | $2,816 | $32,654 |
| M.A. McFarland | $15,300 | $4,420 | — | — | $1,720 | $21,390 | $3,537 | $46,367 |

(a) For purposes of preparing this table, all perquisites are valued on the basis of the actual cost to EFH Corp.

(b) Our Thrift Plan allows participating employees to contribute a portion of their regular salary or wages to the plan. Under the EFH Thrift Plan, EFH Corp. matches a portion of an employee's contributions. This matching contribution is 100% of each Named Executive Officer's contribution up to 6% of the named Executive Officer's salary up to the IRS annual compensation limit. All matching contributions are invested in Thrift Plan investments as directed by the participant.

(c) For a discussion of the Letters of Credit received by our Named Executive Officers, please see "Compensation Discussion and Analysis - Long-Term Incentive Awards - Long-Term Cash Incentive."

(d) For a discussion of the Personal Physical Care received by certain of our Named Executive Officers, please see "Compensation Discussion and Analysis - Other Elements of Compensation - Perquisites - Health Services."

(e) For a discussion of the Financial Planning received by certain of our Named Executive Officers, please see "Compensation Discussion and Analysis - Other Elements of Compensation - Perquisites - Executive Financial Planning."

(f) For further discussion of the life insurance policy purchased for Mr. Young pursuant to the terms of his employment agreement, please see "Compensation Discussion and Analysis - Other Elements of Compensation - Other."

(g) The amounts received by Mr. Keglevic and Mr. McFarland for the cost of a country club membership include a pro-rated portion of the initiation fee.

(h) The amounts received by Ms. Doré and Mr. McFarland include expenses related to medical examinations.

Table of Contents

## Grants of Plan-Based Awards – 2013

The following table sets forth information regarding grants of compensatory awards to our Named Executive Officers during the fiscal year ended December 31, 2013.

| Name | Grant Date | Date of Board Action | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards | | | All Other Stock Awards: # of Shares of Stock or Unit (#) | Grant Date Fair Value of Stock and Option Awards[3] |
| | | | Threshold ($) | Target ($) | Maximum ($) | | |
|---|---|---|---|---|---|---|---|
| John F. Young | 2/13/13[1] | | 843,750 | 1,687,500 | 3,375,000 | | |
| | 3/11/13 | 2/13/13 | | | | 1,500,000[2] | 420,000 |
| Paul M. Keglevic | 2/13/13[1] | | 312,375 | 624,750 | 1,249,500 | | |
| | 3/11/13 | 2/13/13 | | | | 500,000[2] | 140,000 |
| James A. Burke | 2/13/13[1] | | 286,875 | 573,750 | 1,147,500 | | |
| | 3/11/13 | 2/13/13 | | | | 500,000[2] | 140,000 |
| Stacey H. Doré | 2/13/13[1] | | 195,000 | 390,000 | 780,000 | | |
| | 3/11/13 | 2/13/13 | | | | 250,000[2] | 70,000 |
| | 4/20/13[4] | | 600,000 | | 1,200,000 | | |
| M.A. McFarland | 2/13/13[1] | | 286,875 | 573,750 | 1,147,500 | | |
| | 3/11/13 | 2/13/13 | | | | 500,000[2] | 140,000 |

(1) Represents the threshold, target and maximum amounts available under the EAIP for each Named Executive Officer. Each payment is reported in the Summary Compensation Table under the heading "Non-Equity Incentive Plan Compensation," and is described above under the section entitled "Annual Performance Bonus - EAIP".

(2) Represents grants of Annual RSUs, which cliff-vest September 30, 2014, as described above under the section entitled "Long-Term Equity Incentives." The vesting of the Annual RSUs is contingent upon the Named Executive Officer's continued employment with EFH Corp. on September 30, 2014, subject, in limited circumstances, to pro-ration in the event of the Named Executive Officer's termination without "cause" or resignation for "good reason," or in the event of such Named Executive Officer's death or disability, each as described in greater detail in the Named Executive Officer's employment agreement, and complete vesting in the event of a change in control (as that term is defined in the 2007 Stock Incentive Plan) of EFH Corp.

(3) The amounts reported under "Grant Date Fair Value of Stock and Option Awards" represent the grant date fair value of restricted stock units related to the grant of Annual RSUs.

(4) Represents the threshold and maximum amounts available under the Additional 2015 LTI Award for Ms. Doré. The portion of this award earned in 2013 is reported in the Summary Compensation Table under the heading "Non-Equity Incentive Plan Compensation" and is described above in the section entitled "Long Term Non-Equity Incentive - Additional 2015 LTI Award". The payment of the Additional 2015 LTI Award is contingent upon Ms. Doré's continued employment with EFH Corp. through March 2015(with exceptions in limited circumstances).

For a discussion of certain material terms of the employment agreements with the Named Executive Officers, please see "Assessment of Compensation Elements" and "Potential Payments upon Termination or Change in Control."

Table of Contents

### Outstanding Equity Awards at Fiscal Year-End– 2013

| Name | # of Shares or Units of Stock That Have Not Vested [1] | Market Value of Shares or Units of Stock That Have Not Vested [2] |
|---|---|---|
| John F. Young | 9,000,000 | — |
| Paul M. Keglevic | 3,000,000 | — |
| James A. Burke | 2,825,000 | — |
| Stacey H. Doré | 600,000 | — |
| M.A. McFarland | 2,700,000 | — |

(1) The amounts reported for each Named Executive Officer in the "# of Shares or Units of Stock that Have Not Vested" column include Restricted Stock Units ("RSUs") granted pursuant to our 2007 Stock Incentive Plan. The RSUs are scheduled to cliff vest on September 30, 2014 provided the Named Executive Officer has remained continuously employed by EFH Corp. through that date (with exceptions in limited circumstances) as described below in the section entitled "Potential Payments upon Termination or Change in Control."

(2) There is no established public market for our common stock. Given the Bankruptcy Filing, our common stock is deemed to have de minimis value as of December 31, 2013.

214

Table of Contents

### Pension Benefits – 2013

The table set forth below illustrates present value on December 31, 2013 of Mr. Burke's benefits payable under the Supplemental Retirement Plan, based on his years of service and remuneration through December 31, 2013:

| Name | Plan Name | Number of Years Credited Service (#) | PV of Accumulated Benefit ($) | Payments During Last Fiscal Year ($) |
|------|-----------|--------------------------------------|-------------------------------|--------------------------------------|
| John F. Young | Supplemental Retirement Plan | — | — | — |
| Paul M. Keglevic | Supplemental Retirement Plan | — | — | — |
| James A. Burke | Supplemental Retirement Plan | 6.9167 | 203,344 | — |
| Stacey H. Doré | Supplemental Retirement Plan | — | — | — |
| M.A. McFarland | Supplemental Retirement Plan | — | — | — |

The Supplemental Retirement Plan provides for the payment of retirement benefits, which would have otherwise been limited by the Code or the definition of earnings under our former Retirement Plan, which was terminated in 2012. The benefits under the Supplemental Retirement Plan were frozen in September, 2012 in connection with the termination of our former Retirement Plan. Participation in EFH Corp.'s Supplemental Retirement Plan was limited to employees of all of its businesses other than Oncor, who were employed by EFH Corp. (or its participating subsidiaries) on or before October 1, 2007. In connection with the freezing of benefits under the Supplemental Retirement Plan in 2012, additional contributions under the Supplemental Retirement Plan ceased; however, the amounts existing thereunder will be paid out in accordance with the terms of the Supplemental Retirement Plan. Benefits accrued under the Supplemental Retirement Plan after December 31, 2004, are subject to Section 409A of the Code. Accordingly, certain provisions of the Supplemental Retirement Plan have been modified in order to comply with the requirements of Section 409A and related guidance.

Mr. Burke is the only Named Executive Officer that participated in the Supplemental Retirement Plan.

215

Table of Contents

### Nonqualified Deferred Compensation – 2013

The following table sets forth information regarding certain plans of EFH Corp. that provide for the deferral of the Named Executive Officers' compensation on a basis that is not tax-qualified for the fiscal year ended December 31, 2013:

| Name | Registrant Contributions in Last FY ($)[1] | Aggregate Earnings in Last FY ($)[2] | Aggregate Withdrawals/ Distributions ($)[3] | Aggregate Balance at Last FYE ($)[4] |
|---|---|---|---|---|
| John F. Young | $2,700,000 | $46,435 | ($750,000) | $5,665,171 |
| Paul M. Keglevic | $1,000,000 | — | ($650,000) | $2,000,000 |
| James A. Burke | $1,000,000 | $37,747 | ($650,000) | $2,243,304 |
| Stacey H. Doré | $1,133,333 | — | — | $1,666,666 |
| M.A. McFarland | $1,000,000 | — | ($650,000) | $2,000,000 |

(1) The amounts reported as "Registrant Contributions in Last FY" include the portion of the 2015 LTI Award based on 2013 management EBITDA, which will be paid in March 2015 (subject to certain conditions and exceptions in limited circumstances) for all Named Executive Officers. The amount reported as "Registrant Contributions in Last FY" for Ms. Doré also includes the portion of the Additional 2015 LTI Award based on 2013 management EBITDA, which will be paid in March 2015 (subject to certain conditions and exceptions in limited circumstances) and the 2013 portion of the 2010 Non-Executive Officer Award, which is to be paid in September 2014 (subject to certain conditions and exceptions in limited circumstances). The company paid the 2010 Non-Executive Officer Award to Ms. Doré in January 2014; however, we may claw back such payment in the event of Ms. Doré's voluntary resignation or termination for cause on or before September 30, 2014.

(2) The amounts reported as "Aggregate Earnings in Last FY" include earnings or deferrals previously made under the EFH Corp. Salary Deferral Program. Deferrals are credited with earnings or losses based on the performance of investment alternatives under the Salary Deferral Program selected by each participant. At the end of the applicable maturity period, the trustee for the Salary Deferral Program distributes the deferred compensation and the applicable earnings in cash as a lump sum or in annual installments at the participant's election made at the time of deferral. Since 2010, the Named Executive Officers have not been eligible to defer additional compensation in the Salary Deferral Program. As of December 31, 2013, Messrs. Young, and Burke had balances in the Salary Deferral Program, which will be distributed according to the terms of the plan.

(3) The amounts reported as "Aggregate Withdrawals/Distributions" include the portion of the 2011 LTI Award that was distributed in September 2013 for each of Messrs. Young, Keglevic, Burke and McFarland.

(4) The amounts reported as "Aggregate Balance at Last FYE" include the following for all Named Executive Officers: (i) the portion of the 2015 LTI Award based on 2012 management EBITDA, (ii) the portion of the 2015 LTI Award based on 2013 management EBITDA, and (iii) any amounts earned under the Salary Deferral Plan. The amount reported as "Aggregate Balance at Last FYE" for Mr. Burke also includes the fair market value of deferred shares (443,474 shares with respect to Mr. Burke) that he is entitled to receive on the earlier to occur of the termination of employment or a change of control of EFH Corp (which given the Bankruptcy Filing, is deemed to have de minimis value as of December 31, 2013). The amount reported as "Aggregate Balance at Last FYE" for Ms. Doré also includes (x) the portion of the Additional 2015 LTI Award based on 2013 management EBITDA, and (y) the portions of the 2010 Non-Executive Officer Award earned in 2012 and 2013 that she is entitled to receive if she is employed by EFH Corp. on September 30, 2014 (with exceptions in limited circumstances). The company paid the 2010 Non-Executive Officer Award to Ms. Doré in January 2014; however, we may claw back such payment in the event of Ms. Doré's voluntary resignation or termination for cause on or before September 30, 2014.

Table of Contents

## Potential Payments upon Termination or Change in Control

The tables and narrative below provide information for payments to each of the Named Executive Officers (or, as applicable, enhancements to payments or benefits) in the event of his or her termination, including if such termination is voluntary, for cause, as a result of death, as a result of disability, without cause or for good reason or without cause or for good reason in connection with a change in control.

The information in the tables below is presented assuming termination of employment as of December 31, 2013.

### Employment Arrangements with Contingent Payments

As of December 31, 2013, each of Messrs. Young, Keglevic, Burke and McFarland and Ms. Doré had employment agreements with change in control and severance provisions. With respect to each Named Executive Officer's employment agreement, a change in control is generally defined as (i) a transaction that results in a sale of substantially all of our assets or capital stock to another person who is not an affiliate of any member of the Sponsor Group and such person having more seats on our Board than the Sponsor Group, (ii) a transaction that results in a person not in the Sponsor Group owning more than 50% of our common stock and such person having more seats on our Board than the Sponsor Group or (iii) a transaction that results in the Sponsor Group owning less than 20% of our common stock and the Sponsor Group not being able to appoint a majority of the directors to our Board.

Each Named Executive Officer's employment agreement includes customary non-compete and non-solicitation provisions that generally restrict the Named Executive Officer's ability to compete with us or solicit our customers or employees for his own personal benefit during the term of the employment agreement and 24 months (with respect to Mr. Young) or 18 months (with respect to Messrs. Keglevic, Burke and McFarland and Ms. Doré) after the employment agreement expires or is terminated.

Each of our Named Executive Officers has been granted long-term cash incentive awards, including the 2015 LTI Award (and the Additional 2015 LTI Award with respect to Ms. Doré), as more fully described above in "Long-Term Cash Incentive." In the event of such Named Executive Officer's termination without cause, resignation for good reason or termination due to death or disability (or in certain circumstances when the Named Executive Officer's employment term is not extended) the 2015 Award (and the Additional 2015 LTI Award with respect to Ms. Doré) will vest and become payable, to the extent earned, on a pro-rated basis. In the event of termination without cause or resignation for good reason following a change in control of EFH Corp., the 2015 LTI Award (and the Additional 2015 LTI Award with respect to Ms. Doré) will vest and become payable, to the extent earned, on the same pro-rata basis; however the pro-rata calculation will include the actual management EBITDA for any earned, but unpaid, fiscal years prior to termination and the target level of management EBITDA, for those periods without regard to the actual achievement of management EBITDA, for any subsequent applicable years.

Each of our Named Executive Officers received in 2013 a grant of Annual RSUs, following the approval of the O&C Committee at its February O&C Committee meeting. In the event of such Named Executive Officer's termination without cause, resignation for good reason or termination due to death or disability, such year's Annual RSUs will vest on a pro-rata basis based on a ratio, the numerator of which is the length of time of the executive officer's employment from the date of the grant of such year's Annual RSUs to his termination and the denominator of which is the length of time from the date of grant of the Annual RSUs to the original vesting date. In the event of a change of control of EFH Corp., all Annual RSUs (including Ms. Doré's 2014 Annual RSUs) will vest immediately prior to the change of control.

In 2011, each of our Named Executive Officers surrendered all of his existing stock options in exchange for a one-time lump sum grant of Restricted Stock Units (the "Exchange RSUs") granted pursuant to our 2007 Stock Incentive Plan that cliff-vest on September 30, 2014, with exceptions in limited circumstances in exchange for forfeiting all rights in respect of any and all options to purchase shares of EFH Corp.'s common stock that had been previously granted to the executive officers under the 2007 Stock Incentive Plan. As of December 31, 2013, each of our Named Executive Officers held Exchange RSUs. Under the applicable agreements governing these Exchange RSUs, in the event of such Named Executive Officer's termination without cause or resignation for good reason (or in certain circumstances when the Named Executive Officer's employment term is not extended) following a change in control of EFH Corp., such Named Executive Officer's Exchange RSUs would immediately vest as to 100% of the shares of EFH Corp. common stock subject to such Restricted Stock Units immediately prior to the change in control of EFH Corp. Additionally, in the event of such Named Executive Officer's termination without cause, resignation for good reason or termination due to death or disability (or in certain circumstances when the Named Executive Officer's employment term is not extended), such Named Executive Officer's Exchange RSUs will vest on a pro rata

basis based on a ratio, the numerator of which is the length of time of the Named Executive Officer's employment from the date of the grant of the Exchange RSU to his termination and the denominator of which is the length of time from the date of grant of the Exchange RSUs to the original vesting date.

217

Table of Contents

Mr. Burke is entitled to receive 443,474 shares of EFH Corp. common stock pursuant to the terms of his deferred share agreement, on the earlier to occur of his termination for any reason or a change in control of EFH Corp.

In the event of her death or disability or termination without cause or resignation for good reason following a change in control of EFH Corp., the portions of Ms. Doré's 2010 Non-Executive Officer Award earned in 2012 and 2013 will become payable immediately.

**Excise Tax Gross-Ups**

Pursuant to their employment agreements, if any of our Named Executive Officers is subject to the imposition of the excise tax imposed by Section 4999 of the Code, related to the executive's employment, but the imposition of such tax could be avoided by approval of our shareholders as described in Section 280G(b)(5)(B) of the Code, then such executive may cause EFH Corp. to seek such approval, in which case EFH Corp. will use its reasonable best efforts to cause such approval to be obtained and such executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Section 4999. If such executive fails to cause EFH Corp. to seek such approval or fails to cooperate and execute the waivers necessary in the approval process, such executive shall not be entitled to any gross-up payment for any resulting tax under Section 4999. Because we believe the shareholder approval exception to such excise tax will apply, the tables below do not reflect any amounts for such gross-up payments.

218

Table of Contents

## 1. Mr. Young

**Potential Payments to Mr. Young upon Termination as of December 31, 2013 (per employment agreement and restricted stock agreements, each in effect as of December 31, 2013)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $ 5,737,500 | $ 9,112,500 |
| Supplemental Retirement Benefit | | | $ 3,000,000 | $ 3,000,000 | $ 3,000,000 | $ 3,000,000 |
| EAIP | $2,008,125 | $2,008,125 | $ 2,008,125 | $ 2,008,125 | | |
| 2015 LTI Award | | | $ 5,400,000 | $ 5,400,000 | $ 5,400,000 | 5,400,000 |
| LTI Equity Incentive Award[1]: | | | | | | |
| - Annual RSUs | | | — | — | — | — |
| - Exchange RSUs | | | — | — | — | — |
| Health & Welfare: | | | | | | |
| - Medical/COBRA | | | | | $ 36,973 | $ 36,973 |
| - Dental/COBRA | | | | | $ 3,170 | $ 3,170 |
| **Totals** | **$2,008,125** | **$2,008,125** | **$10,408,125** | **$ 10,408,125** | **$ 14,177,643** | **$ 17,552,643** |

(1) Given the Bankruptcy Filing, we deemed our equity value to be de minimis as of December 31, 2013.

Mr. Young has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. Young's voluntary resignation without good reason or termination with cause:
   a. accrued but unpaid base salary and unused vacation earned through the date of termination;
   b. accrued but unpaid annual bonus earned under the EAIP for the previously completed year;
   c. unreimbursed business expenses; and
   d. payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled.
2. In the event of Mr. Young's death or disability:
   a. a prorated annual incentive bonus earned under the EAIP for the year of termination;
   b. value of supplemental retirement benefit for Mr. Young, payment of which would commence on December 31, 2014;
   c. the pro-rata 2015 LTI Award earned prior to the date of termination;
   d. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination; and
   e. payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled.
3. In the event of Mr. Young's termination without cause or resignation for good reason:
   a. a lump sum payment equal to (i) three times his annualized base salary and (ii) a prorated annual incentive bonus earned under the EAIP for the year of termination;
   b. value of supplemental retirement benefit for Mr. Young, payment of which would commence on December 31, 2014;
   c. the pro-rata 2015 LTI Award earned prior to the date of termination;
   d. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination;
   e. payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled; and
   f. certain continuing health care and company benefits.
4. In the event of Mr. Young's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
   a. a lump sum payment equal to three times the sum of (i) his annualized base salary and (ii) his annual bonus target under the EAIP;
   b. value of supplemental retirement benefit for Mr. Young, payment of which would commence on December 31, 2014;
   c. the pro-rata 2015 LTI Award earned prior to the date of termination;
   d. all Exchange RSUs;

    e.   all Annual RSUs;

    f.   payment of employee benefits, including equity compensation, if any, to which Mr. Young may be entitled; and

    g.   certain continuing health care and company benefits.

219

Table of Contents

**2. Mr. Keglevic**

**Potential Payments to Mr. Keglevic upon Termination as of December 31, 2013 (per employment agreement and restricted stock unit agreements, each in effect as of December 31, 2013)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $ 2,094,750 | $ 2,719,500 |
| EAIP | $ 749,700 | $ 749,700 | $ 749,700 | $ 749,700 | | |
| 2015 LTI Award | | | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 |
| LTI Equity Incentive Award[1]: | | | | | | |
| - Annual RSUs | | | — | — | — | — |
| - Exchange RSUs | | | — | — | — | — |
| Health & Welfare | | | | | | |
| - Dental/COBRA | | | | | $ 2,536 | $ 2,536 |
| **Totals** | $ 749,700 | $ 749,700 | $ 2,749,700 | $ 2,749,700 | $ 4,097,286 | $ 4,722,036 |

(1) Given the Bankruptcy Filing, we deemed our equity value to be de minimis as of December 31, 2013.

Mr. Keglevic has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. Keglevic's voluntary resignation without good reason or termination with cause:
   a. accrued but unpaid base salary and unused vacation earned through the date of termination;
   b. accrued but unpaid annual bonus earned under the EAIP for the previously completed year;
   c. unreimbursed business expenses; and
   d. payment of employee benefits, including equity compensation, if any, to which Mr. Keglevic may be entitled.
2. In the event of Mr. Keglevic's death or disability:
   a. a prorated annual incentive bonus for the year of termination;
   b. the pro-rata 2015 LTI Award earned under the EAIP prior to the date of termination;
   c. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination; and
   d. payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled.
3. In the event of Mr. Keglevic's termination without cause or resignation for good reason:
   a. a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus earned under the EAIP for the year of termination;
   b. the pro-rata 2015 LTI Award earned prior to the date of termination;
   c. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination;
   d. payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled; and
   e. certain continuing health care and company benefits.
4. In the event of Mr. Keglevic's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
   a. a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target under the EAIP;
   b. the pro-rata 2015 LTI Award earned prior to the date of termination;
   c. all Exchange RSUs;
   d. all Annual RSUs;
   e. payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled; and
   f. certain continuing health care and company benefits.

Table of Contents

**3. Mr. Burke**

**Potential Payments to Mr. Burke upon Termination as of December 31, 2013 (per employment agreement, deferred share agreement and restricted stock unit agreements, each in effect as of December 31, 2013)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $ 1,923,750 | $ 2,497,500 |
| Distribution of Deferred Shares (1) | — | — | — | | — | — |
| EAIP | $ 797,513 | $ 797,513 | $ 797,513 | $ 797,513 | | |
| 2015 LTI Award | | | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 |
| LTI Equity Incentive Award(2): | | | | | | |
| - Annual RSUs | | — | — | — | | — |
| - Exchange RSUs | | — | — | — | | — |
| Health & Welfare | | | | | | |
| - Medical/COBRA | | | | | $ 40,224 | $ 40,224 |
| - Dental/COBRA | | | | | $ 2,536 | $ 2,536 |
| Totals | $ 797,513 | $ 797,513 | $ 2,797,513 | $ 2,797,513 | $ 3,966,510 | $ 4,540,260 |

(1) The amount reported under the heading "Distribution of Deferred Shares" represents the de minimis value of the 443,474 shares of EFH Corp. common stock as of December 31, 2013 that Mr. Burke is entitled to receive, pursuant to the terms of his deferred share agreement, on the earlier to occur of his termination of employment for any reason or a change in the control of EFH Corp.

(2) Given the Bankruptcy Filing, we deemed our equity value to be de minimis as of December 31, 2013.

Mr. Burke has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances.

1. In the event of Mr. Burke's voluntary resignation without good reason or termination with cause:
    a. accrued but unpaid base salary and unused vacation earned through the date of termination;
    b. accrued but unpaid annual bonus earned under the EAIP for the previously completed year;
    c. unreimbursed business expenses; and
    d. payment of employee benefits, including equity compensation, if any, to which Mr. Burke may be entitled.
2. In the event of Mr. Burke's death or disability:
    a. a prorated annual incentive bonus earned under the EAIP for the year of termination;
    b. the pro-rata 2015 LTI Award earned prior to the date of termination;
    c. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination; and
    d. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled.
3. In the event of Mr. Burke's termination without cause or resignation for good reason:
    a. a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus earned under the EAIP for the year of termination;
    b. the pro-rata 2015 LTI Award earned prior to the date of termination;
    c. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination;
    d. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled; and
    e. certain continuing health care and company benefits.
4. In the event of Mr. Burke's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
    a. a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target under the EAIP;
    b. the pro-rata 2015 LTI Award earned prior to the date of termination;
    c. all Exchange RSUs;
    d. all Annual RSUs;
    e. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled; and

f.    certain continuing health care and company benefits.

221

Table of Contents

#### 4. Ms. Doré

**Potential Payments to Ms. Doré upon Termination as of December 31, 2013 (per employment agreement and restricted stock agreements, each in effect as of December 31, 2013)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $ 1,590,000 | $ 1,980,000 |
| 2010 Non-Executive Officer Award | | | $ 200,000 | $ 200,000 | | $ 200,000 |
| EAIP | $ 468,000 | $ 468,000 | $ 468,000 | $ 468,000 | | |
| 2015 LTI Award | | | $ 866,667 | $ 866,667 | $ 866,667 | $ 866,667 |
| Additional 2015 LTI Award | | | $ 600,000 | $ 600,000 | $ 600,000 | $ 600,000 |
| LTI Equity Incentive Award[1]: | | | | | | |
| - Annual RSUs | | | — | — | — | — |
| - Exchange RSUs | | | — | — | — | — |
| Health & Welfare | | | | | | |
| - Medical/COBRA | | | | | $ 40,224 | $ 40,224 |
| - Dental/COBRA | | | | | $ 2,536 | $ 2,536 |
| Totals | $ 468,000 | $ 468,000 | $ 2,134,667 | $ 2,134,667 | $ 3,099,427 | $ 3,689,427 |

(1) Given the Bankruptcy Filing, we deemed our equity value to be de minimis as of December 31, 2013.

Ms. Doré has entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances.

1. In the event of Ms. Doré's voluntary resignation without good reason or termination with cause:
   a. accrued but unpaid base salary and unused vacation earned through the date of termination;
   b. accrued but unpaid annual bonus earned under the EAIP for the previously completed year;
   c. unreimbursed business expenses; and
   d. payment of employee benefits, including equity compensation, if any, to which Ms. Doré may be entitled.
2. In the event of Ms. Doré's death or disability:
   a. a prorated annual incentive bonus earned under the EAIP for the year of termination;
   b. the amount of the 2010 Non-Executive Award earned in 2012 and 2013;
   c. the pro-rata 2015 LTI Award earned prior to the date of termination;
   d. the pro-rata Additional 2015 LTI Award earned prior to the date of termination;
   e. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination; and
   f. payment of employee benefits, including equity compensation, if any, to which Ms. Doré may be entitled.
3. In the event of Ms. Doré's termination without cause or resignation for good reason:
   a. a lump sum payment equal to (i) two times her annualized base salary and (ii) a prorated annual incentive bonus earned under the EAIP for the year of termination;
   b. the pro-rata 2015 LTI Award earned prior to the date of termination;
   c. the pro-rata Additional 2015 LTI Award earned prior to the date of termination;
   d. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination;
   e. payment of employee benefits, including equity compensation, if any, to which Ms. Doré may be entitled; and
   f. certain continuing health care and company benefits.
4. In the event of Ms. Doré's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
   a. a lump sum payment equal to two times the sum of (i) her annualized base salary and (ii) her annual bonus target under the EAIP;
   b. the amount of the 2010 Non-Executive Award earned in 2012 and 2013;
   c. the pro-rata 2015 LTI Award earned prior to the date of termination;
   d. the pro-rata Additional 2015 LTI Award earned prior to the date of termination;
   e. all Exchange RSUs;

f.    all Annual RSUs;

g.    payment of employee benefits, including equity compensation, if any, to which Ms. Doré may be entitled; and

h.    certain continuing health care and company benefits.

222

Table of Contents

**5. Mr. McFarland**

**Potential Payments to Mr. McFarland upon Termination as of December 31, 2013 (per employment agreement and restricted stock unit agreements, each in effect as of December 31, 2013)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance | | | | | $ 1,923,750 | $ 2,497,500 |
| EAIP | $ 734,400 | $ 734,400 | $ 734,400 | $ 734,400 | | |
| 2015 LTI Award: | | | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 |
| LTI Equity Incentive Award[1]: | | | | | | |
|   - Annual RSUs | | | — | — | — | — |
|   - Exchange RSUs | | | — | — | — | — |
| Health & Welfare | | | | | | |
|   - Medical/COBRA | | | | | $ 40,224 | $ 40,224 |
|   - Dental/COBRA | | | | | $ 2,536 | $ 2,536 |
| Totals | $ 734,400 | $ 734,400 | $ 2,734,400 | $ 2,734,400 | $ 3,966,510 | $ 4,540,260 |

(1) Given the Bankruptcy Filing, we deemed our equity value to be de minimis as of December 31, 2013.

Mr. McFarland entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. McFarland's voluntary resignation without good reason or termination with cause:
   a. accrued but unpaid base salary and unused vacation earned through the date of termination;
   b. accrued but unpaid annual bonus earned under the EAIP for the previously completed year;
   c. unreimbursed business expenses; and
   d. payment of employee benefits, including equity compensation, if any, to which Mr. McFarland may be entitled.
2. In the event of Mr. McFarland's death or disability:
   a. a prorated annual incentive bonus earned under the EAIP for the year of termination;
   b. the pro-rata 2015 LTI Award earned prior to the date of termination;
   c. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination; and
   d. payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled.
3. In the event of Mr. McFarland's termination without cause or resignation for good reason:
   a. a lump sum payment equal to (i) two times his annualized base salary, (ii) a prorated annual incentive bonus under the EAIP for the year of termination;
   b. the pro-rata 2015 LTI Award earned prior to the date of termination;
   c. the pro-rata amount of Exchange RSUs and Annual RSUs earned prior to the date of termination;
   d. payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled; and
   e. certain continuing health care and company benefits.
4. In the event of Mr. McFarland's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:
   a. a lump sum payment equal to two times the sum of (i) his annualized base salary and (ii) his annual bonus target under the EAIP ;
   b. the pro-rata 2015 LTI Award earned prior to the date of termination;
   c. all Exchange RSUs;
   d. all Annual RSUs;
   e. payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled; and
   f. certain continuing health care and company benefits.

223

Table of Contents

## Compensation Committee Interlocks and Insider Participation

There are no relationships among our executive officers, members of the O&C Committee or entities whose executives served on the O&C Committee that required disclosure under applicable SEC rules and regulations. For a description of related person transactions involving members of the O&C Committee, see Item 13, entitled "Related Person Transactions."

## Director Compensation

The table below sets forth information regarding the aggregate compensation paid to the members of the Board during the year ended December 31, 2013. Directors who are officers of EFH Corp. (other than our Executive Chairman or members of the Sponsor Group (or their respective affiliates) do not receive any fees for service as a director. EFH Corp. reimburses directors for reasonable expenses incurred in connection with their services as directors.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Arcilia C. Acosta (1) | 200,000 | 100,000 | — | 300,000 |
| David Bonderman | — | — | — | — |
| Donald L. Evans (2) | — | — | 2,600,000 | 2,600,000 |
| Thomas D. Ferguson | — | — | — | — |
| Brandon Freiman | — | — | — | — |
| Scott Lebovitz | — | — | — | — |
| Marc S. Lipschultz (3) | — | — | — | — |
| Michael MacDougall | — | — | — | — |
| Kenneth Pontarelli | — | — | — | — |
| William K. Reilly (1) | 200,000 | 100,000 | — | 300,000 |
| Jonathan D. Smidt | — | — | — | — |
| Billie I. Williamson (1)(4) | 171,667 | 100,000 | — | 271,667 |
| John F. Young | — | — | — | — |
| Kneeland Youngblood (1) | 200,000 | 100,000 | — | 300,000 |

(1) Mses. Acosta and Williamson and Messrs. Reilly and Youngblood each receive an annual equity award (paid in shares of EFH Corp. common stock) valued at $100,000 (the grant date fair value) for their service as a director, which is fully vested upon grant. The 2013 annual equity award was awarded on March 15, 2013. Given the de minimis value of EFH Corp.'s common stock as of March 2014, the board terminated the annual equity grant that would have been awarded to Mses. Acosta and Williamson or Messrs. Reilly and Youngblood.

(2) Effective March 6, 2013, we entered into an Employment Agreement with Mr. Evans, pursuant to which Mr. Evans receives an annual base salary of $2,500,000 for his service as Executive Chairman of the Board. Under the terms of the agreement, Mr. Evans also receives a payment by EFH Corp. of (a) $100,000 annually for office expenses and administrative support, (b) up to $200,000 annually in salary payments to a chief of staff, and (c) executive assistant services in Dallas and Midland, Texas. In April 2014, we entered into an Amended and Restated Employment Agreement, with Mr. Evans, effective March 6, 2013, to extend the initial term of his employment from December 31, 2015 to December 31, 2016. We had previously entered into a consulting agreement with Mr. Evans effective January 1, 2012 through March 5, 2013, pursuant to which Mr. Evans received these same fees. At December 31, 2013, Mr. Evans had 2,800,000 vested and 2,200,000 non-vested options to purchase common shares of EFH Corp for $0.50 per share.

(3) Mr. Lipschultz resigned from the Board effective January 17, 2014.

(4) Ms. Williamson was elected to the Board in February of 2013.

224

http://www.sec.gov/Archives/edgar/data/1023291/000102329114000008/efh-12312013x1...    10/2/2014