IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| ENERGY FUTURE HOLDINGS, | : | Case No. 14-10979 (CSS) |
|   CORP., *et al.,* | : |  |
|   Debtors. | : | Jointly Administered |
|  | : |  |

**Hearing Date: October 8, 2014, at 9:30 a.m.**
**Objections Due: October 2, 2014, by 4:00 p.m.**

-------------------------------------------------- x

### OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION (A) TO PAY PREPETITION BONUSES TO INSIDERS AND (B) TO CONTINUE INSIDER BONUS PLANS (D.I. 1792)

TO:    THE HONORABLE CHRISTOPHER S. SONTCHI,
         UNITED STATES BANKRUPTCY JUDGE:

Roberta A. DeAngelis, the United States Trustee for Region 3, respectfully submits this objection to the *Motion of Energy Future Holdings Corp., Et Al., for Entry of an Order Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of the Insider Compensation Programs and (B) Continue the Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis* (the "Insider Bonus Motion"). (D.I. 1792). In support hereof, the U.S. Trustee respectfully states:

## <u>Introduction</u>

The U.S. Trustee objects to the Debtors' request for authorization to pay more than $20 million in bonuses to their executives, as part of several insider bonus plans that could cost more than $40 million. The Debtors have not met their burden of proof to show that the Insider Bonus Plans are incentivizing. Rather, the bonuses, of which the majority may be awarded to the Debtors' top seven executives, appear to be "pay to stay" payments that must satisfy the rigorous strictures of section 503(c)(1) of the Bankruptcy Code. Congress enacted this section as part of the BAPCPA to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Global Home Prods., LLC,* 369 B.R. 778, 783-84 (Bankr. D. Del. 2007).

The Insider Bonus Plans do not represent ordinary-course transactions, as each was modified substantially prior to the Debtors' bankruptcy filings. Further, it appears that the "incentive" targets do not promote enhanced performance because most of them fall below the Debtors' actual performance in prior years. Even the Debtor's Chairman of the Board acknowledged that the targets look like "lay-ups."

In addition, the documents that underlie the Insider Bonus Plans and the Debtors' conduct pre-and post- bankruptcy show that the Debtors seek authorization to pay these bonuses primarily to retain key employees. Notably, the Debtors obtained the issuance of letters of credit pre-petition in excess of $18 million in an effort to assure payment of these bonuses to five of their top executives. The Debtors do not completely or directly address these letters of credit

2

or whether the proposed insider bonuses meet the requirements of section 503(c)(1). For all of these reasons, the U.S. Trustee respectfully requests that the Court deny the Insider Bonus Motion.

## Background

*The Chapter 11 Filings.*

1.    On April 29, 2014, Energy Future Holdings, Corp. ("EFH") and 70 affiliated debtors filed voluntary petitions in for relief under Chapter 11.

2.    The Debtors are the largest generator, distributor, and retail electricity provider in Texas. *See* Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., *et al.*, in Support of First Day Motions dated April 29, 2014 at ¶ 6. (D.I. 98).

3.    EFH has approximately 9,100 employees, approximately 5,700 of whom are employed by the Debtors. *Id.*

4.    On June 5, 2014, the Court entered a final order directing the joint administration of these cases for procedural purposes. (D.I. 849). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.    On May 12, 2014, the U.S. Trustee appointed the Official Committee of Unsecured Creditors for TCEH and its affiliated debtors, EFCH and EFH Corporate Services. (D.I. 420).

*The Debtors' Retention of Restructuring
  and Executive Compensation Professionals.*

6.      In or about June 2012 and December 2012, respectively, the Debtors

engaged restructuring and compensation professionals. Included among them, were

Kirkland & Ellis, LLP ("K&E"), as restructuring counsel, and Filsinger Energy

Partners, Inc. ("Filsinger"), as energy valuation and energy executive compensation

consultant. *See* Debtors' Application for Entry of an Order Authorizing the

Retention and Employment of Kirkland & Ellis LLP as Attorneys for the Debtors

and Debtors in Possession Effective *Nunc Pro Tunc* to the Petition Date (D.I. 660) at

¶ 19; Application of Energy Future Holdings Corp., *Et Al.*, for Entry of an Order

Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy

Consultant Effective *Nunc Pro Tunc* to the Petition Date (D.I. 650) at ¶ 8.

7.      In October 2012, the Debtors engaged Towers Watson Pennsylvania

Inc. ("Towers Watson") also to provide executive compensation consulting services.

Declaration of Douglas Friske in Support of Debtors' Motion for Entry of an Order

Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of the

Insider Compensation Programs and (B) Continue the Insider Compensation

Programs in the Ordinary Course of Business on a Postpetition Basis ("Friske

Decl.") at ¶ 1.

8.      A deposition of Donald L. Evans, Chairman of the EFH Board and

Chairman of the Organization and Compensation Committee (the "O&C"), a

subcommittee of the EFH Board charged with reviewing and approving executive

compensation, was conducted by counsel to the U.S. Trustee on September 25, 2014, Mr. Evans testified that the Debtors engaged K&E and compensation consultants in preparation for a bankruptcy or restructuring. Evans Tr. 59:23 – 60:10. A copy of the transcript of the Evans' deposition is annexed to the Declaration of Andrea B. Schwartz, dated October 2, 2014 ("Schwartz Declaration) at ¶ 4, **Exhibit A.**[1]

9.      In addition to hiring K&E, the Debtors also hired Filsinger for the purpose of learning how to set up their compensation plans and to help design a market-based, executive compensation program in light of a potential bankruptcy. Evans Tr. 99:5-11; 101:5-22. At the same time, the Debtors expanded the scope of the role of Towers Watson, with whom it had been consulting generally, on a more formal basis and with a more specific assignment with respect to how the Debtors needed to address its executive compensation programs as it faced the possibility of bankruptcy. Evans Tr. 60:1-10.

10.      Thereafter, in contemplation of filing the Insider Bonus Motion, the O&C reviewed the metrics for the Insider Bonus Plans. Mr. Evans testified that he was concerned that it looked like ". . . some of these metrics . . . are going to be pretty much a lay-up to reach them." Evans Tr. 208:5-8.

---

[1] The Debtors have requested that the U.S. Trustee agree to file the transcript with a redacted portion. As an accommodation to the Debtors, and mindful that the trial on the insider bonus motion is scheduled for October 8, 2014, the U.S. Trustee has agreed to file these documents in redacted form temporarily. The U.S. Trustee reserves all rights and intends to address the Debtors' requested redactions with the Court on October 8, 2014.

*The Insider Bonus Motion.*

11.    On August 8, 2014, the Debtors filed the Insider Bonus Motion seeking

authorization: (i) to pay prepetition bonuses and (ii) to continue post-petition four

bonus plans (the "Insider Bonus Plans") for senior executives.[2] Insider Bonus

Motion at 1 and ¶¶ 1 and 6.

12.    The Insider Bonus Plans include:

- 2014 Executive Annual Incentive Plan ("EAIP")[3];

- 2014 Key Leader Performance Program;

- 2014 Luminant Commercial Incentive Plan;[4] and

- SPC Long-Term Incentive Plan.

Insider Bonus Motion at ¶¶ 13, 20, 23, 26.

13.    Pursuant to these plans, the Debtors seek authorization to pay

bonuses to 25 executives and one executive's spouse. *Id.* at 6, and n.5.

14.    The eligible executives under the Insider Bonus Plans include the

Debtors' seven, most-senior executives, who are members of the "Strategy and

Planning Committee" (the "SPC"), namely: (i) the CEO of EFH, (ii) the CFO of EFH,

(iii) the CEO of Luminant, (iv) the CEO of TXU Energy, (v) the Debtors' General

---

[2] The Debtors recognize that all of the executives eligible for bonuses under the Insider Bonus Plans are "insiders," as that term is defined in section 101(31) of the Bankruptcy Code. Insider Bonus Motion at ¶ 38.

[3] Although the Debtors refer to the EAIP as the "2014" EAIP, the copy of the EAIP that the Debtors provided to the U.S. Trustee is dated "Amended, effective as of January 1, 2010." A copy is annexed to the Schwartz Decl. at ¶ 5, **Exhibit B.**

[4] The U.S. Trustee did not oppose the Debtors' request for authorization to continue this plan, which provided for one payment in the amount of $80,000.00 to one insider. Schwartz Decl. at ¶ 7. The Court approved this request at an omnibus hearing held on September 16, 2014. *Id.*

Counsel, (vi) the Debtors' Executive Vice President for Human Resources and (vii) the Debtors' Executive Vice-President for Public Policy and External Affairs. Insider Bonus Motion at ¶ 18.

15.     The other 19 eligible participants, with the exception of the executive's spouse (the "Additional Executives"), are at or above the senior vice president level. *See* Insider Bonus Motion at ¶ 13.

16.     All of the SPC members are eligible for bonuses under two plans, including the EAIP and the SPC LTIP.

17.     The Additional Executives also are eligible for bonuses under two plans, including the EAIP and the Key Leader Plan.

18.     The maximum cost of the authorization that the Debtors' seek (including prepetition unpaid amounts) exceeds $20 million. *Id.* at ¶ 7. This does not include bonuses for five SPC members that were funded pre-petition under letters of credit. *Id.* at ¶ 7, n.8. The maximum total cost of the Insider Bonus Plans exceeds $40 million.[5]

19.     The Debtors state that the Insider Bonus Plans represent an "ordinary-course," "continuation of the Debtors' historical practices and are consistent with industry standards." *Id.* at ¶¶ 1, 3 and 29.

20.     All bonuses that may be awarded under the Insider Bonus Plans are reviewed and approved by the O&C, whose members are: (i) Donald Evans, (ii)

---

[5] Upon information and belief, prior to the bankruptcy filings, the Debtors obtained the issuance of letters of credit from Citibank to assure payment of the Debtors' obligations for the maximum possible bonuses for five SPC members under the SPC LTIP. Upon information and belief, the aggregate amount of the letters of credit is approximately $18.6 million.

Arcilia Acosta, (iii) Ken Pontarelli (a Goldman Sachs appointee) and (iv) Hugh

Sawyer. *See* Schwartz Decl., Ex. A., Evans Dep. Tr. 64:24-25; 65:1-6.

21.    The Debtors state that each of the Insider Bonus Plans make bonus

awards based upon the "satisfaction of rigorous, difficult-to-attain performance

targets," and none "are retention-based." *Id.* at ¶ 38.

*The Three Insider Bonus Plans.*[6]

A.    **Plan I: The EAIP.**

(i)    <u>The Plan Document</u>.

22.    Subsequent to filing the Insider Bonus Motion, the Debtors provided

the U.S. Trustee with a copy of the EAIP document. *See* Schwartz Decl. at ¶ 5, Ex.

B.

23.    Article I of the EAIP describes the purposes of the plan:

The principal purposes . . . are to attract, motivate and retain key
employees; to align the interests of the Participants, Participating
Employers and Company shareholders by rewarding performance that
satisfies established performance goals; to motivate Participant
behaviors that drive successful results at the corporate, business unit
and individual levels; and to support collaboration across essential
organizational interfaces.

*Id.*, at Art. I.

24.    Article V provides that the establishment of awards occurs after the

end of the Plan Year.[7] *Id.* Article VII states that "[a]ll awards will be paid in cash to

---

[6] As stated *supra* at n.4, the Court has approved the Luminant Commercial Incentive Plan.
Accordingly, the U.S. Trustee does not address this plan in the Objection.

[7] "Plan Year" is defined as "the twelve (12) month period beginning January 1 and ending December
31." *Id.*, at Art. II.

Participants by March 15 of the year following the applicable Plan Year, subject to

applicable tax withholding requirements." *Id.*

25.    Article VIII governs termination of employment and partial awards.

Among other things, Article VIII states that:

> Participation in the Plan shall cease immediately upon a Participant's resignation or termination of employment for any reason (with or without cause). . . . In such event, the Participant may be eligible for a partial award for such Plan Year in accordance with and subject to the provisions of this Article VIII.

> \* \* \*

> If a Participant resigns or his/her employment with a Participating Employer is terminated (with or without cause) prior to the submission of an Award to payroll for payment for reasons other than death, Disability, Retirement, or transfer to an affiliate of the Company, such Participant shall forfeit any right to receive such Award.

*Id.*

(ii)    <u>Bonuses</u>.

26.    Under the EAIP, each executive may receive a bonus equal to a target

portion of his or her base salary (the "EAIP Target Payment") if the Debtors meet

certain metrics. Insider Bonus Motion at ¶ 13; *see also* Declaration of Todd Filsinger

in Support of Motion of Energy Future Holdings Corp. Et Al., for Entry of an Order

Authorizing the Debtors to (A) Pay Certain Prepetition Amounts on Account of the

Insider Compensation Programs and (B) Continue the Insider Compensation

Programs in the Ordinary Course of Business on a Postpetition Basis ("Filsinger

Decl.") at § 1 at 1.

27.    Actual payments under the EAIP are calculated at the end of the year by taking each executive's EAIP Target Payment and modifying it based on two factors: (a) the Debtor's actual performance relative to the operational and financial performance criteria; and (b) an individual performance modifier for each eligible employee. Insider Bonus Motion at ¶ 18. The individual performance modifier can range from 0 to 150% of the EAIP Target Payment. *Id.*

28.    Upon information and belief, the individual performance modifiers for each of the SPC members is 85%, with the exception of the Debtors' CEO, whose modifier is 125% of the target payment.

29.    For the fiscal year ending December 31, 2013, the cost of the EAIP bonuses to the 26 insiders was $12.4 million. Insider Bonus Motion at ¶ 19.

30.    The Debtors represent that the maximum cost of the EAIP bonuses to these executives for the fiscal year ending December 31, 2014, is $15,861,322. *Id.* at ¶ 7, n.6.

(iii)    Metrics.

31.    Prior to filing the Insider Bonus Motion, the Debtors increased the targets that must be achieved for bonuses to be awarded under the EAIP. Evans Tr. 206:5-208:10.

32.    Of the threshold targets for the 21 metrics, 18 were changed, including all of the Luminant metrics, eight of the nine TXU metrics, and three of the five "Business Services" metrics. Insider Bonus Motion at ¶ 15. The Debtors provide the following reason for these changes:

> Although the metrics represented stretch goals when developed, given
> that the Debtors now have over six months of performance in the
> books, the Debtors chose to proactively review mid-year the
> performance metric targets that trigger bonuses under the EAIP to
> account for year-to-date performance, updated commodity curves
> (using June 30, 2014 forward pricing), known one-off circumstances,
> and the passage of time.

*Id.*

33.    At his deposition, Mr. Evans testified that the Debtors never before had undergone a mid-year wholesale modification of the targets. Evans Tr. 98:14-25 and 99:180-100:1. Mr. Evans represented that these changes were made solely because of the bankruptcy filing.

34.    As stated *supra* at ¶¶ 8 and 9, Mr. Evans testified that, although the Debtors had engaged Towers Watson  in or about 2010, for independent advice concerning the Debtors' compensation programs, the scope of Tower Watson's engagement was broadened substantially in 2012, when the Debtors began considering a bankruptcy filing. Evans Tr. 98:14-25 and 99:180-100:1. Mr. Evans stated that the Debtors also retained Filsinger to address how its compensation programs would be treated in bankruptcy. *Id.* at Tr. 101:5-22.

35.    With respect to the risks that could affect the various metrics, as set forth in the Insider Bonus Motion at 10 and 11, Mr. Evans represented that the Debtors face the same risks every year. *Id.* at Tr. 151:14 – 152:1.

36.    When shown the targets under the 2014 EAIP as compared to the Debtors' historical performance date, Mr. Evans reflected on the comparison commenting "that looks like a lay-up." *Id.* at Tr. 272:6. Mr. Evans testified that he

was not surprised by these numbers because of a hedge program the Debtors had put into place in the fall of 2007. *Id.* at Tr. 270:1-273:8. Mr. Evans acknowledged that looking at the targets, without knowing the background, they are lay-ups, noting, "That's not hard." Evans Tr. 273:11-17.

37.    Mr. Evans further represented with respect to setting the targets, and that the Debtors' compensation decision at the board-level were heavily influenced by the sponsors (equity owners), noting that "they're laser focused on this kind of thing. They have vast resources behind them to look at issues like this, like compensation, just like they've got vast resources behind them to review budgets, brought to the board, which they do." *Id.* at Tr. 91:14-19; 272:24-273:6.

      (iv)   U.S. Trustee's Review of the Debtors'
           Historical Performance Data.

      **a.    Evaluation of Metrics.**

38.    Subsequent to filing the Insider Bonus Motion, the Debtors provided the U.S. Trustee with the Debtors' actual performance information for the past five years for the metrics used in the EAIP. Michael T. Panacio, an Auditor for the U.S. Trustee and Certified Public Accountant, reviewed the proposed EAIP targets for 2014 and compared them to the Debtors' actual performance to determine whether in fact the targets were "stretch" or difficult to achieve targets. *See* Declaration of

Michael T. Panacio dated October 2, 2014 (the "Panacio Declaration"),[8] at ¶¶ 3, 4-11.

39.    Mr. Panacio determined that EBITDA is the most heavily weighted of the Debtors' factors.[9] *Id.* at ¶ 7.

40.    Mr. Panacio also determined that the Debtors have met EBITDA Baseline Targets each year, with the exception of TXU Energy in 2011. *Id.* In fact EBITDA exceeded the Threshold, Baseline, and Superior targets by an average 28.65%, 6.85%, and 1.17% respectively. *Id.* This represents the average of all EBITDA figures compared to each of the targets. *Id.* at ¶ 7, n.3.

41.    The figures for the separate businesses are:

- Luminant Management EBITDA exceeding Threshold and Baseline by 20.86% and 4.74% respectively (Superior was not met);
- TXU EBITDA exceeding Threshold, Baseline, and Superior by 42.42%, 13.54%, and 3.52% respectively;

- Business Services EBITDA exceeding Threshold and Baseline by 22.68% and 2.26% respectively (Superior was not met).

*Id.* at ¶ 7, n.3.

42.    Mr. Panacio also compared the threshold target for each of the metrics to the Debtors' average actual results. *Id.* at ¶ 8. If the goal of the metric is to

---

[8] As noted in note 1, *supra*, the U.S. Trustee agreed to accommodate the Debtors' request to temporarily file her papers redacting certain other information, including the Luminant and TXU Energy EBITDA, and TXU Energy's Commercial Margin. The U.S. Trustee reserves all rights with regard to any papers filed in redacted form, and intends to address these issues on October 8, 2014.

[9] EBITDA is the heaviest weighted item in the TXU and Luminant programs. EBITDA carries the same weight as all other for Business Services (20%). However, the Luminant Factor (20%) and the TXU Factor (20%) are both derived from metrics in which EBITDA is the single heaviest weighted item. Panacio Decl. at ¶ 7, n.2.

enhance performance by maximizing a number (*e.g.*, EBITDA, Available Generation, Contribution Margin *etc.*) and the result is a negative number, then the target is not incentivizing. Alternatively, when enhancing performance involves minimizing a number (e.g., O&M/SGA, CapEx, Fuel Costs, Energy Costs, etc.) and the result is a positive number, then the target is not incentivizing. Mr. Panacio determined that the average of the metric performances other than EBITDA were lower than the 2014 threshold amounts (as found in the *Table 1-4 Metrics*) with the exception of the EFH Total Spend metric, found in the Business Services component.[10] *Id.* at ¶ 8.

43.    Mr. Panacio also compared the Superior target result for each of the metrics to average actual results (as described above in paragraph 6) using the same methods. The data illustrated the same results regarding the incentivizing nature of the Superior target. *Id.* at ¶¶ 9.

44.    In addition to project the full year results, Mr. Panacio then used the June YTD Actuals for each metric for Luminant, TXU and Business Service from Table 1-3 of the Filsinger Declaration. Mr. Panacio multiplied the June actual results by two to project the full year performance. Mr. Panacio determined that, absent a major unanticipated event, every one of the projections would result in a bonus being paid, with five of the ten annualized projections, across the Insider Bonus Plans analyzed, exceeding the Superior level of performance. *Id.* at ¶¶ 10, 11.

---

[10] Although the Threshold level is above the historical average, the YTD performance projected over the full year suggests that the Debtors will exceed the Superior performance level. *Id.* at ¶ 8, n.4.

b.     **Industry Comparables Analysis.**

45.     Mr. Panacio also prepared a spreadsheet providing a comparison of Operating Revenue and Net Income (Loss) amounts with Energy Future Holdings Corporation and the Company's Peer Group reported in the EFH Insider Compensation – Discussion Materials Powerpoint Presentation Dated August 6, 2014. *See* Panacio Decl., Ex. B.

46.     The source of the financial data was taken from the SEC annual reports, Form 10-K for the fiscal years 2011 through 2013. The entities American Electric Power Co., Inc. and Dominion Resources, Inc. were excluded due to the omission of SEC 10K reports.

47.     The review of the Peer Group companies for the past three fiscal years indicated these companies have consistently generated a net profit compared to EFH which in the last three years has incurred net losses. Moreover, EFCH which has the indirect ownership of TXU Energy and Luminant had incurred net losses for the past four years. In addition, EFCH had generated a negative working capital from 2009 through 2013. *See* Panacio Decl., Ex. C.

48.     Mr. Panacio determined that the data shows the following: (a) No other Peer Group company had net losses for the past three years; (b) 80% of the other Peer Group companies did not use EBITDA as a factor at all; (c) if the Debtors followed a similar structure as the Peer Group companies in weighting factors, the Debtors would have been unable to pay bonuses as proposed under the Plans.

B.    **Plan II: The Key Leader Performance Plan.**[11]

49.    On January 1, 2014, the Debtors implemented the Key Leader Performance Plan. Insider Bonus Motion at ¶ 20.

50.    The Debtors state that this plan is a "modified version of their previously-existing Owner/Operator Plan," which terminated at the end of December 2013. Insider Bonus Motion at ¶ 20, and ¶ 20, n.13.

51.    The eligible participants under the Key Leader Performance Plan are the Additional Executives. *Id.* The Debtors state that these are the same executives who historically participated in the Owner/Operator Plan. *Id.*

52.    Under the Key Leader Performance Plan, the executives' annual target award is similar to the annual target previously used in the Owner/Operator Plan. *Id.*

(i)    The "Owner/Operator" Plan.

53.    Subsequent to the filing of the Insider Bonus Motion, the Debtors provided the U.S. Trustee with a copy of this plan, which is annexed to the Schwartz Declaration at **Exhibit D.**

54.    Although the Debtors refer to this plan as the "Owner/Operator Plan," the document underlying the plan is called, the "EFH Corp. Retention Award Plan." Schwartz Decl. at Ex. D, at 1. The EFH Corp. Retention Award Plan provides that "key employees" are eligible to receive "Retention Awards" in accordance with the

---

[11] The "Key Leader Performance Plan" is provided to the Debtors' insiders as set forth in this Objection. The "Key Leader Plan" is provided to the Debtors' non-insiders, and was approved by the Court on July 1, 2013. (D.I. 1420).

terms of individual participation agreements ("Individual Participation Agreements"). Schwartz Decl. at Ex. D, ¶ 4 ("Eligibility").

55.     Under the EFH Corp. Retention Award Plan, 50% of the potential payments (which included equity and cash components) required the Debtors to hit certain EBITDA targets, and 50% of the potential payments required the key employees to remain employed with the Debtors through a certain date. Insider Bonus Motion at ¶ 20, n.13.

56.     The EFH Corp. Retention Award Plan prohibits the alienation, pledging or encumbering of the interests of the key employees eligible under the plan. *Id.* at ¶ 7(e) ("Nontransferability of Retention Awards").

57.     At the deposition of Mr. Evans, the Debtors produced a redacted copy of an Individual Participation Agreement, which is annexed to the Schwartz Declaration at **Exhibit E.**

58.     The Individual Participation Agreement provides for a "Retention Award," payable in two installments. *Id.* at 1. The "First Retention Payment" was to be paid on September 28, 2012, and the "Second Retention Payment" was to be paid on September 30, 2014. *Id.*

59.     Among other things, the Individual Participation Agreement contains the following provisions:

> Each Payment, if any, will be paid to you in a cash lump sum on the first regular pay date of the Company on or after the dates specified above (except as otherwise provided in Participation Agreement), provided that you have remained continuously employed by the

Company or one of its Affiliates through September 28, 2012 and
September 30, 2014, as applicable.

* * *

In the event that your employment with the Company is terminated
for any reason other than your death, Disability, or a Change in
Control Termination you will forfeit your right to receive any unpaid
and unearned portion of your Retention Award.

*Id.* at 1 and 2.

60.    The Debtors state that the EBITDA targets were met. *Id.* at ¶ 20, n.13.

Neither the EFH Corp. Retention Award Plan, the Individual Participation

Agreement nor the Insider Bonus Motion discloses the EBITDA targets under this

plan for 2013, or any other year.

61.    All of the employees eligible pre-petition under the EFH Corp.

Retention Award Plan (or "Owner/Operator Plan") were transitioned either to the

Key Leader Performance Plan (for insiders) or the Key Leader Plan (for non-

insiders). *See* Non-Insider Bonus Motion at ¶ 18, n.7; Insider Bonus Motion at ¶ 20

and ¶ 20, n.13.

(ii)    The "Key Leader" for Non-Insiders.

62.    On May 15, 2014, the Debtors filed a motion (the "Non-Insider Bonus

Motion"), among other things, seeking authorization to pay bonuses to their rank

and file under the Key Leader Plan. (D.I. 468).

63.    According to Carrie Kirby, the Debtors' Executive Vice President of

Human Resources and Administration, after review and based on input from

Towers Watson, the Debtors opted to modify the Owner/Operator Program for 2014.

18

*See* Declaration of Carrie Kirby, Executive Vice President of Human Resources and

Administration of Energy Future Holdings Corp., et al., in Support of the Non-

Insider Compensation Programs Motion and the Severance Relief Requested in the

Wages Motion dated June 29, 2014 (the "Kirby Declaration") at ¶ 22.

64.    Ms. Kirby stated that "the Key Leader Program, was implemented at

the beginning of 2014 for various reasons, including that a shorter program with

quarterly payments that was focused more on retention was more appropriate than

a multiple-year program [under the Owner/Operator Plan] given the uncertainty of

the Debtors' restructuring process." *Id.*

65.    Ms. Kirby represented that "[t]he Key Leader Program . . . maintains

the retention-based compensation structure provided by the Owner/Operator Plan .

. . as well as similar payment ranges—though it eliminates the incentive piece of

that bonus structure (as noninsiders already have an incentive-based bonus

structure in the AIP and EAIP)." *Id.*

66.    Ms. Kirby stated that "[t]he Debtors added approximately 30 [non-

insiders] . . . to the Key Leader Program to ensure that they do not lose key

employees who would be particularly difficult to replace during this critical period,

but otherwise the Key Leader Program is much the same as the Owner/Operator

Program. The Key Leader Program will be in place through the earlier of 2016 or

the implementation of a postrestructuring equity incentive plan. . . . *Id.*

(iii)    The "Key Leader" for Insiders.

67.    As stated above at ¶ 49, prior to the bankruptcy filing, the Debtors opted to terminate the "Owner/Operator/Retention Plan," and implement the "Key Leader" plans.

68.    Like the Key Leader Plan, under the Key Leader Performance Plan, the Debtors will make bonus payments to the Additional Executives on a quarterly basis subject to EBITDA and cost metrics. Insider Bonus Motion at ¶ 21. The metrics are the same as those in the EAIP. *Id.* If the metrics are met for the relevant quarter, the Additional Executives will earn 25% of the applicable annual target if the Additional Senior Executive is employed by the Debtors on the last day of each calendar quarter ending during the term. *Id.* If not, then the Additional Executives may still earn the full amount of the target payments from that quarter if cumulative year-to-date performance for subsequent quarters results in the Debtors' achieving the year-to-date EBITDA and cost metrics. *Id.*

69.    The Insider Bonus Motion provides that the Debtors expect the cost of the Key Leader Performance Plan for the remainder of 2014, to be up to approximately $2.56 million. *Id.* at ¶ 21. Upon information and belief, the maximum cost of this plan is approximately $3.35 million.[12]

---

[12] Pursuant to the Insider Bonus Motion, the Debtors seek authorization to pay insider bonuses under the Key Leader Performance Plan in the amount of $880,000.00 on account of second quarter 2014 performance. *Id.* at ¶ 22. The motion does not disclose the cost of this program for the first quarter of 2014.

C.    __Plan III: The SPC LTIP__.

70.    The Debtors seek authorization to continue making payments to the

seven members of the SPC pursuant to SPC LTIP.

71.    The Insider Bonus Motion provides that the SPC LTIP was adopted in

2009, and provides for three installments of payments for the SPC members who

were in their role during the performance periods under the SPC LTIP, with the

final payment for the final three years to be made in March 2015. Insider Bonus

Motion at ¶ 26.

72.    According to the motion, the Debtors have to achieve specified targets

for 2012-2014, for executives to receive bonuses under the SPC LTIP. *Id.* As with

the other Insider Bonus Plans, the incentive targets track the EBITDA and EAIP

Businesses scorecard approved by the O&C. *Id.*

73.    The metric for the 2015 SPC LTIP payment is/was the same

Competitive Management EBITDA targets as those in the EAIP scorecards for

2012, 2013 and 2014. *Id.*

74.    The Debtors estimate that up to $22.3 million in payments may be due

to the SPC members in 2015, for the years 2012, 2013 and 2014. *Id.* ¶ 27.

75.    The Debtors state that all but $1.825 million of their obligations under

the SPC LTIP were funded through irrevocable letters of credit at Citibank in favor

of each participant. *Id.* Pursuant to the motion, the Debtors only seek authority to

pay $1.825 million for 2013 and 2014 because those amounts were not funded by

pre-petition letters of credit. *Id.*

76.    Subsequent to filing the Insider Bonus Motion, the Debtors provided the U.S. Trustee with copies of the employment agreements for the SPC members. Annexed to each agreement is an exhibit that memorializes the SPC LTIP. A copy of the complete employment agreement for John Young, the Debtors' CEO, including the SPC LTIP exhibit, is annexed to the Schwartz Declaration as **Exhibit C.**

77.    The SPC LTIP provides in part:

> In addition to the benefits, perquisites and compensation set forth in the [Employment] Agreement . . .
>
> (a) Executive shall have the opportunity to earn the retention award set forth in this Exhibit I subject to the terms and conditions set forth herein:
>
> (i) Executive shall earn a long-term cash bonus award in an amount between [insert] and [insert] per fiscal year determined by the level of Competitive Management EBITDA actually achieved for fiscal years ended December 31, 2012, December 31, 2013, and December 31, 2014 for each respective fiscal year (the "***Retention Award***"). . . The Retention Award, if earned, shall be paid to Executive in a lump sum on March 13, 2015; provided, that, subject to the provisions of sub-paragraph (a)(iii) of this Exhibit I, Executive is employed by EFH Co., the Company or an Affiliate thereof on March 13, 2015.
>
> (ii) The process followed by the O&C Committee in establishing the Competitive Management EBITDA threshold and target amounts for purposes of the Retention Award shall be consistent with the O&C Committee's prior practice.

Schwartz Decl. at Ex. C, at Ex. I-I.

78.    The SPC LTIP provides that if the executive voluntarily resigns without "good cause" (as defined therein), the executive is not entitled to receive any portion of the Retention Award. *Id.*

22

      d.    <u>Post-2014 Insider Bonuses</u>.

79.    The Debtors state that the Insider Bonus Motion is limited to the Debtors' performance in 2014, and that they intend to implement similar insider bonus plans for 2015, and beyond. *Id.* at ¶ 28.

## **OBJECTION**

### *A.    Governing Law.*

    1.    <u>Standing</u>.

Section 307 of the Bankruptcy Code confers upon the U.S. Trustee the broad right to raise, appear and be heard on any issue in any case or proceeding under title 11. 11 U.S.C. § 307. The U.S. Trustee is not required to demonstrate any pecuniary or other interest. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (Congress was cognizant that the U.S. Trustee would have no pecuniary interest when it enacted Section 307 and conferred standing based upon traditional notions of public interest standing).

    2.    <u>11 U.S.C. § 503(c)</u>.

Section 503(c) of the Bankruptcy Code provides in pertinent part:

Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1)    a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that

(A)    the transfer or obligation is essential to retention of
the person because the individual has a bona fide
job offer from another business at the same or
greater rate of compensation;

(B)    the services provided by the person are essential to
the survival of the business; and

(C)    either –

(i)    the amount of the transfer made to, or
obligation incurred for the benefit of, the
person is not greater than an amount equal
to 10 times the amount of the mean transfer
or obligation of a similar kind given to
nonmanagement employees for any purpose
during the calendar year in which the
transfer is made or the obligation is
incurred; or

(ii)    if no such similar transfers were made to, or
obligations were incurred for the benefit of,
such nonmanagement employees during such
calendar year, the amount of the transfer or
obligation is not greater than an amount
equal to 25 percent of the amount of any
similar transfer or obligation made to or
incurred for the benefit of such insider for
any purpose during the calendar year before
the year in which such transfer is made or
obligation is incurred.

11 U.S.C. § 503(c).

Congress added section 503(c) to the Bankruptcy Code as one of the BAPCPA

amendments in 2005, to "eradicate the notion that executives were entitled to

bonuses simply for staying with the Company through the bankruptcy process." *In*

*re Global Home Prods., LLC,* 369 B.R. 778, 783-84 (Bankr. D. Del. 2007). The intent

of section 503(c) is to "limit the scope of 'key employee retention plans' and other

programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." 4 Alan N. Resnick & Henry J. Sommer (eds.), Collier on Bankruptcy ¶ 503.17 (15th ed. rev. 2007); *see also In re Foothills Texas, Inc.,* 408 B.R. 573, 577 (Bankr. D. Del. 2009) (stating that section 503(c) restricts debtors from making retention or severance payments to insiders unless applicable requirements of section 503(c) are satisfied); *In re AMR Corp.,* 497 B.R. 690, 696 (Bankr. S.D.N.Y. 2013) (finding that the language of Section 503(c) is prohibitive; if payments to insiders do not comply with the applicable 503(c) provisions, they "shall neither be allowed, nor paid").

Section 503(c) establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments to an insider for the purpose of inducing such person to remain with a debtor's business or payments made on account of severance. *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*"); 11 U.S.C. § 503(c)(1). By enacting the BAPCPA, Congress put into place " a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses could be paid. *In re Mesa Air Grp., Inc.*, Case No. 10-10018 (MG), 2010 WL 3810899, *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (citations omitted). The proponent of a bonus plan has the burden of showing that the plan is not a retention plan governed by Section 503(c)(1). *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).

Where section 503(c)(1) applies, the transfer cannot be justified solely on the debtor's business judgment. *See In re Borders Grp., Inc.*, 453 B.R. 459, 470-71

(Bankr. S.D.N.Y. 2011). If a proposed transfer falls within section 503(c)(1), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist. *Id.*; *Dana I*, 351 B.R. at 100; 11 U.S.C. § 503(c)(1).

To show that a bonus plan is not governed by section 503(c)(1), the debtors must prove by a preponderance of the evidence that the bonuses are a part of a "pay for value" plan that offers incentives based on performance rather than a "pay to stay" plan. *Global Home Prods.*, 369 B.R. at 783; *accord Residential Capital, LLC*, 478 B.R. 170 (Bankr. S.D.N.Y. 2012). If the debtors fail to meet their burden of proof, then the bonus plan cannot be approved. In addition, although any payment to an employee, including regular wages, has at least a partial purpose of retaining the employee, for bonus plans to fall outside the purview of section 503(c)(1), they must be primarily incentivizing. *In re Nellson Nutraceutical*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (bankruptcy court construed section 503(c)(1) to mean "'a transfer to ... an insider of the debtor for the [ primary ] purpose of inducing such person to remain with the debtor's business.'") (citation omitted; emphasis in original).

Further, a debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism; the circumstances under which the proposal is made and the structure of the compensation package control. *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012) ("Attempts to characterize what are essentially prohibited retention programs as incentive programs in order to bypass the requirements of section 503(c)(1) are looked upon

with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1).") (internal quotation marks and citations omitted); *see also Residential Capital,* 478 B.R. at 161 *(*finding that an incentive plan "should incentivize employees for their post-petition efforts, not compensate them for the work they did before the bankruptcy filing."*); Hawker Beechcraft*, 479 B.R. at 313 ("The concern in the type of motion presented ... is that the debtor has dressed up a KERP to look like a KEIP in the hope that it will pass muster under the less demanding 'facts and circumstances' standard in ... § 503(c)(3)."); *Dana I*, 351 B.R. at 102 n. 3 ("If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").

## B.    *The Insider Bonus Plans Are Not Ordinary Course Transactions.*

Despite some historical aspects of the Insider Bonus Plans, they are not ordinary-course transactions under section 363(c)(1).

First, as stated *supra* at ¶ 8, the Debtors engaged K&E in June 2012 for the purpose of providing the Debtors with restructuring counsel. Mr. Evans testified that the Debtors engaged K&E to be prepared if they had to enter bankruptcy or go through a restructuring. *See also* Evans Tr. 59:23-25; 60:1-3; 99:5-11; 101:5-22.

In addition to hiring K&E, the Debtors also hired Filsinger with the purpose of learning how to set up their compensation plans and to help design a market-based compensation program in light of a potential bankruptcy. Evans Tr. 99:5-11; 101:5-22. At the same time, the Debtors expanded the scope of the role of Towers

Watson, with whom it had been consulting generally, on a more formal basis and with a more specific assignment with respect to how the Debtors needed to address its compensation programs as it faced the possibility of bankruptcy. Evans Tr. 60:1-10.

Thereafter, in contemplation for filing the Insider Bonus Motion, the O&C reviewed the metrics for the Insider Bonus Plans. Mr. Evans testified that he was concerned that it looked like ". . . some of these metrics . . . are going to be pretty much a lay-up to reach them." Evans Tr. 208:5-8. Accordingly, the Debtors performed a mid-year analysis of the targets for the balance of 2014, to be sure that, in context of the bankruptcy cases, the Insider Bonus Plans would be considered primarily incentivizing and approved. Evans Tr. 208:22-25; 209:1-14. Mr. Evans acknowledged that the Debtors had never before evaluated the targets mid-year. Evans Tr. 211:5-12. Thus, the Insider Bonus Plans, with the modified targets, do not represent ordinary-course transactions.

The Debtors assert that the Key Leader Performance Plan was a continuation of the Owner/Operator Plan. Insider Bonus Motion at ¶¶ 20 and 31. As Mr. Evans testified, the Owner/Operator Plan had a cash component and a stock component to it in the beginning, but became increasingly a cash plan and eventually became the Key Leader Performance Plan. Evans Tr. 212:14-25; 213:1. As described herein at ¶¶ 35-47, the "Owner Operator Plan" was actually the EFH Corp. Retention Award Plan that was designed to help the Debtors retain key employees.

28

The Debtors have attempted to infuse incentives into the Key Leader Performance Plan by qualifying some of the insider bonuses with certain EBITDA and cost metrics.

Additionally, the O&C, being concerned that there may not be sufficient funds to make SPC LTIP awards and given the importance of retaining top management and assuring them that they would receive such bonuses, made the decision, after seeking advice, to secure payment of the SPC LTIP bonuses with letters of credit. Evans Tr. 225:9-12; 225:7-20; 227:1-3; 227:18-25; 228:1-5. The Debtors have proffered no evidence, and it is doubtful they will, to establish that obtaining the issuance of letters of credit in excess of $18 million is ordinary course. Accordingly, the Insider Bonus Plans may not be approved under section 363 of the Bankruptcy Code.

Moreover, to the extent that Court determines that these modifications to Insider Bonus Plans and their accompanying metrics were made in the ordinary course, that distinction does not obviate the application of section 503(c)(1) to the Insider Bonus Plans. *Nellson Nutraceutical*, 369 B.R. at 800-01 (holding that nothing exists in section 503(c)(1) of the Code that would limit its applicability to transactions or payments made outside the ordinary course of business and that the only limitation is that such transfers be "for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business."). Thus, the Court must determine if the transfers to the Debtors' insiders under the

Insider Bonus Plans are for the purpose of inducing such person to remain with the Debtors' business.

**C.    *The Insider Bonus Plans Are Not Primarily Incentivizing.***

As an initial matter, the Debtors acknowledge that all of the executives under the Insider Bonus Plans are insiders of the Debtors. Thus, to show that the more permissive section 503(c)(3) applies, the Debtors must establish by a preponderance of the evidence that each of the Insider Bonus Plans is at least primarily incentivizing and not primarily retentive. As discussed below, the Debtors have failed to meet their burden of proof for each of these plans.

A.    The EAIP.

Under the EAIP, each executive may an EAIP Target Payment if the Debtors meet certain metrics as set forth in the Insider Bonus Motion. Insider Bonus Motion at ¶ 15.

Actual payments under the EAIP are calculated at the end of the year by taking each executive's  EAIP Target Payment and modifying it based on two factors: (a) the Debtor's actual performance relative to the operational and financial performance criteria; and (b) an individual performance modifier for each eligible employee. Insider Bonus Motion at ¶ 18. The individual performance modifier can range from 0 to 150% of the EAIP Target Payment. *Id.*

Prior to filing the Insider Bonus Motion, the Debtors modified the targets that must be achieved for bonuses to be awarded under the EAIP. Insider Bonus Motion at ¶ 15. A review of the Updated Insider EAIP Metrics set forth in Table II-1

(p. 10) of the Insider Bonus Motion, reveals that EBITDA metrics were increased

mainly at the Threshold target level with only five Baseline and two Superior

targets having been increased.

However, as set forth in the Panacio Declaration, the Debtors have met

EBITDA Baseline Targets each year, with the exception of TXU Energy in 2011. *See*

Panacio Decl. at ¶ 7. In addition, Mr. Evans testified that with respect to the targets

under the 2014 EAIP as compared to the Debtors' actual numbers in prior years,

Mr. Evans agreed that it would not surprise him that the actual target amounts for

each of the years from 2009 through now were higher than what the actual target

"incentives" and that the metrics appear to be "layups." Evans Tr. 269: 21-25, 270:

1-4, 272: 6.

In order for the bonuses under the EAIP to not to run afoul of section

503(c)(1), the Debtors must demonstrate that the EAIP is not retention-based vis-à-

vis the insiders, but rather that it presents significant hurdles which are difficult to

achieve. *See Dana I*, 358 B.R. at 583 (court finding that benchmarks for the debtors'

long-term KEIP "are difficult targets to reach and are clearly not 'lay-ups'"); *In re*

*Nobex Corp.*, Case No. 05-20050, 2006 WL 4063024 at *3 (Bankr. D. Del. Jan. 19,

2006) (plan that provided for payments exclusively upon improvement to "stalking

horse" bid did not violate 11 U.S.C. § 503(c)(1)).

In this case, the EAIP metrics are tied to targets that appear to be retentive

in nature and, using the basketball analogy from *Dana I*, they may be "lay-ups."

The Debtors have not connected the EAIP bonuses to specific metrics that are

directly tied to challenging financial and operational goals for these businesses and that are tailored to the facts and circumstances of these cases. *See Residential Capital*, 478 B.R. at 173.

B.      The Key Leader Performance Plan and the SPC LTIP:

As stated above, the Key Leader Plan is a continuation of the "Owner/Operator Plan" which is actually the "EFH Corp. Retention Award Plan," a retention plan. Bonuses under the Key Leader Performance Plan are paid quarterly provided that the Debtors achieve certain EBITDA targets and cost metrics which metrics are the same as those in the 2014 EAIP program. Insider Bonus Motion at ¶ 21.

The same holds true for the SPC LTIP which target EBITDA metrics track the EBITDA in the EAIP Business Services scorecard approved by the O&C. The metric for the 2015 SPC LTIP payment is/was the same Competitive Management EBITDA targets as those in the AIP and EAIP scorecards for 2012, 2013, and 2014. Insider Bonus Motion at ¶ 26.

If the associated metrics are not incentivizing for the EAIP, they are likewise not incentivizing for the Key Leader Plan or the SPC LTIP. Infusing these two plans with easily-satisfied metrics to make the plans appear to be incentivizing so that they may slide past Section 503(c)(1) and fall under Section 503(c)(3) is not acceptable and fails to comply with the law. See Dana I, 351 B.R. at 102 n. 3 ("If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").

In addition, Carrie Kirby, the Debtors' Executive Vice President for Human Resources, recognized that the Key Leader Plan (which also was developed to "continue" the Owner/Operator plan and very similar to the Key Leader Performance Plan, was implemented at the beginning of 2014 for various reasons, including that a shorter program with quarterly payments that was focused more on retention was more appropriate than a multiple-year program [under the Owner/Operator Plan] given the uncertainty of the Debtors' restructuring process." Kirby Decl. at ¶ 22.

Not only do the Debtors fail to identify the EFH Corp. Retention Award Plan with its proper name, they also have failed to present to the Court the true nature of the SPC LTIP, which largely refers to the bonuses as "Retention Awards." *See* Schwartz Decl. at C. Like the bankruptcy court found in *Hawker Beechcraft*, this Court must be carefully scrutinize bonus motions for executives, to ensure that the Debtors have not dressed up a retention plan to look like an incentive plan with the hope that it will pass muster under the less demanding 'facts and circumstances' standard in ... § 503(c)(3)." *Hawker Beechcraft*, 479 B.R. at 313.

Because the Insider Bonus Plans do not include "stretch" targets and, therefore, are not truly incentivizing, and because the Debtors appear to have attempted to dress up their Insider Bonus Plans as incentive plans, despite the language of the actual plan documents, the Debtors have failed to meet their burden of proof to show that the plans do not fall within the purview of section 503(c)(1). Accordingly, the Insider Bonus Motion should be denied.

***E.    The Insider Bonus Plans Do Not Satisfy Section 503(c)(3).***

Section 503(c)(3) limits payments made to the Debtors' employees outside of the ordinary course unless such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Transactions outside the ordinary course of business and that relate to compensation must be analyzed under this provision, though courts have held that the "facts and circumstances" language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).[13] *See Borders*, 453 B.R. at 473.

In *In re Dana Corp., (Dana II)*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006), Judge Lifland listed several factors that courts consider when determining if the structure of a compensation proposal and the process for its development meet the business judgment test:

    •    Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

    •    Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

    •    Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

    •    Is the plan or proposal consistent with industry standards?

    •    What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key

---

[13] Section 363(b)(1) provides that debtors "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.

> employees need to be incentivized; what is available; what is
> generally applicable in a particular industry?
>
> •    Did the debtor receive independent counsel in performing due
>      diligence and in creating and authorizing the incentive
>      compensation?

358 B.R. at 576–77 (emphasis in original). *See Global Home*, 369 B.R. at 786

(evaluating an incentive plan under the business judgment standard of section 363

by applying the factors listed above); *Borders*, 453 B.R. at 474 (same); *but see In re

Pilgrim's Pride Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (standard for

approval under section 503(c)(3) is higher than the business judgment test; if

payments to employees outside the ordinary course were only subject to the

business judgment test, then the language of section 503(c)(3) would ostensibly be

rendered meaningless).

  If the Court finds that the Debtors establish that Insider Bonus Plans do not

fall within the parameters of section 501(c)(3), then the Debtors must establish that

bonuses are justified by "the facts and circumstances of the case." 11 U.S.C. §

503(c)(3). The Debtors have the burden of proof to satisfy this standard and they

have not done so in the Insider Bonus Motion. Accordingly, the U.S. Trustee

respectfully requests that the Court deny the motion.

## <u>CONCLUSION</u>

For all of these reasons, the U.S. Trustee respectfully requests that the Court

deny the Insider Bonus Motion.

Dated:       New York, New York                    Respectfully submitted,
             October 2, 2014

                                                   ROBERTA A. DEANGELIS
                                                   United States Trustee

                                                   By    */s/ Andrea B. Schwartz*
                                                           Andrea B. Schwartz
                                                           Richard L. Schepacarter
                                                           Timothy J. Fox, Jr.
                                                           U.S. Department of Justice
                                                           Office of the U.S. Trustee
                                                           J. Caleb Boggs Federal Building
                                                           844 King Street, Suite 2207
                                                           Lockbox 35
                                                           Wilmington, DE 19801
                                                           Tel. (302) 573-6491
                                                           Fax (302) 573-6497