## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This AMENDED AND RESTATED EMPLOYMENT AGREEMENT (the *"Agreement"*) dated March 31, 2014 is made by and between ENERGY FUTURE HOLDINGS CORP. (the *"Company"*) and JOHN YOUNG (*"Executive"*) (individually, each a *"Party"* and collectively, the *"Parties"*).

### WITNESSETH

WHEREAS, the Parties previously entered into an employment agreement dated January 6, 2008 and effective January 31, 2008 (*"Original Effective Date"*), amended and restated by an employment agreement dated October 17, 2011 and effective July 1, 2011, and most recently amended and restated by an employment agreement dated December 27, 2012 and effective December 26, 2012; and

WHEREAS, Executive has been granted an opportunity to earn supplemental incentive awards; and

WHEREAS, the Parties desire to amend and restate the employment agreement, in each case on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, covenants and obligations contained herein, the Company and Executive agree as follows:

1.　　**Term of Employment**. Subject to the provisions of Section 7 of this Agreement, this Agreement, as restated, and Executive's employment hereunder shall be effective as of January 22, 2014 (*"Effective Date"*) and shall end as of 11:59:59 P.M. on December 31, 2016 (the *"Initial Term"*). Subject to the provisions of Section 7 of this Agreement, this Agreement shall automatically renew for an additional one (1) year period commencing immediately following the last day of the Initial Term and each one (1) year period thereafter (each, a *"Renewal Term"*), unless, the Company or Executive provides the other Party written notice of non-renewal at least sixty (60) days prior to the end of the applicable term. The period during which Executive is employed by the Company hereunder is hereinafter referred to as the *"Employment Term."*

2.　　**Position and Duties**.

(a)　　During the Employment Term, Executive shall serve as Chief Executive Officer (*"CEO"*) of the Company.  Executive shall also serve as a member of the board of directors of the Company (as used herein, the term *"Board"* shall mean the board of directors of the Company or a committee designated by such board), without additional compensation.  In such position, Executive shall have such duties, authority and responsibilities as shall be determined from time to time by the Board, which duties, authority and responsibilities shall be customary for Executive's position in a business of similar size, type and nature to that of the Company.  Executive shall be the senior most executive officer of the Company and shall report to the Board with respect to his responsibilities to the Company.

(b)　　During the Employment Term, Executive will devote Executive's full business time and best efforts to performance of the duties described in Section 2(a) and will not

DAL:0103309/00001:2026208v31

1

EXHIBIT　 3　
WIT:　　ŪST
DATE:　9 / 25 / 14
FRANK BAS, RPR CRR

engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere, directly or indirectly, with performance of Executive's duties; provided, however, that nothing herein shall preclude Executive from participating in civic and charitable activities and boards and from serving on the outside board of directors of one other company and, subject to the prior approval of the Board which approval shall not be unreasonably withheld, from accepting appointment to or continuing to serve on such additional boards of directors or trustees of any other business or corporation; provided, further, that, in each case, such activities do not conflict or interfere with the performance of Executive's duties hereunder or conflict with Section 8.

3.    **Base Salary.** From the Effective Date and during the remainder of the Employment Term, the Company shall pay Executive a base salary of $1,350,000 annually, payable in regular installments in accordance with the Company's usual payment practices. Executive may be entitled to increases in his base salary in the sole discretion of the Board, which shall make such determinations following its annual review process for executives. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the *"Base Salary."*

4.    **Annual Bonus.** Beginning January 1, 2013 and with respect to each fiscal year during the remainder of the Employment Term, Executive shall have the opportunity to earn an annual bonus award (the *"Annual Bonus"*) pursuant to the terms and conditions of the EFH Executive Annual Incentive Plan (*"AIP"*) of 125% of Base Salary (*"Target Award"*). The amount of the Annual Bonus shall be based upon the achievement of annual business performance targets and Executive's individual performance, both as approved by the Board; provided, however, if the Company and/or Executive achieve superior performance targets as established by the Board, then Executive shall be eligible to receive a bonus award constituting 200% of his Target Award. Each Annual Bonus, if any, shall be paid to Executive within two and one-half (2½) months after the end of the applicable fiscal year.

5.    **Employee Benefits; Perquisites; Fringe Benefits.**

(a)    Welfare, Savings and Retirement Benefits. During the Employment Term, Executive shall be entitled to participate in the Company's group health, life, disability, and all tax qualified and nonqualified benefit plans, as in effect from time to time (collectively *"Employee Benefits"*), on a basis which is no less favorable than is offered to other members of the Strategy and Policy Committee, to the extent consistent with applicable law and the terms of the applicable plans.

(b)    Fringe Benefits; Perquisites. During the Employment Term, Executive shall be entitled to fringe benefits and perquisites consistent with the practices of the Company (including, without limitation, the Company's payment on behalf of Executive of monthly dues of a country club selected by Executive) to the extent the Company provides similar benefits or perquisites (or both) to other members of the Strategy and Policy Committee and Executive is otherwise eligible to participate.

(c)    At the beginning of each calendar year during the Employment Term, Executive shall be entitled to the greater of: five (5) weeks of paid vacation, or the maximum

DAL:0103309/00001:2026208v31

number of days Executive is entitled to under the Company's vacation or paid time off policy, as applicable. Executive shall be entitled to carry over up to five (5) days of unused vacation from one calendar year to the next; provided that, any carryover vacation days not used in the next calendar year shall be forfeited. Executive shall also be entitled to paid sick leave benefits in accordance with those provided to other similarly situated executives during the Employment Term.

(d)    Executive shall be entitled to the additional benefits and compensation set forth in Exhibits I, II, and III attached hereto, subject to the terms and conditions thereof.

6.    **Business Expenses**. Subject to the Company's standard policies and procedures with respect to expense reimbursement, the Company shall reimburse Executive for, or pay on behalf of Executive, reasonable and appropriate expenses incurred by Executive for business related purposes, provided claims for reimbursement are submitted timely and with appropriate supporting documentation.

7.    **Termination**. Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party will be required to give the other Party at least sixty (60) days advance written notice of termination of Executive's employment. Notwithstanding the foregoing, the Company may, in lieu of providing sixty (60) days advance written notice of termination, immediately terminate Executive's employment for Cause; provided, that, the Company provides Executive with the compensation and benefits then in effect at the time of such termination to which Executive would have been entitled had he continued employment with the Company for such sixty (60) day period. The provisions of this Section 7 shall exclusively govern Executive's rights upon termination of employment with the Company and its Affiliates (as defined in Section 8(c) below).

(a)    By the Company for Cause or by Executive Due to Voluntary Resignation without Good Reason.

(i)    Executive's employment may be terminated by the Company for Cause (as defined below) or by Executive's voluntary resignation without Good Reason (as defined below) and, in either case, Executive shall be entitled to receive:

(A)    within six (6) calendar days following the date of termination, accrued, but unpaid Base Salary and unused vacation, earned through the date of termination;

(B)    in accordance with Section 4 (except to the extent payment is otherwise deferred pursuant to any applicable deferred compensation arrangement with the Company), any accrued but unpaid Annual Bonus earned for any previously completed fiscal year;

(C)    in accordance with Exhibit III, any earned but unpaid portion of the Annual Supplemental Award for the immediately preceding quarter;

3

(D)     within sixty (60) days of Executive's claim for reimbursement, payment for any unreimbursed business expenses properly incurred by Executive in accordance with the Company's policies prior to the date of Executive's termination; provided that claims for reimbursement are accompanied by appropriate supporting documentation and are submitted to the Company within ninety (90) days following the date of Executive's termination of employment;

(E)     Employee Benefits and equity compensation, if any, as to which Executive may be entitled under the employee benefit plans of the Company and its Affiliates or any agreement between the Company (and/or its Affiliates) and Executive; and

(F)     any amounts payable or that may become payable pursuant to Section 7(g) and/or Section 9(g) (the amounts described in clauses (A) through (F) hereof being referred to as the "*Accrued Rights*").

Following termination of Executive's employment by the Company for Cause or voluntary resignation by Executive without Good Reason, except as set forth in this Section 7(a)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)     For purposes of this Agreement, the terms:

(A)     "*Cause*" shall mean (i) if, in carrying out his duties to the Company, Executive engages in conduct that constitutes (a) a material breach of his fiduciary duty to the Company or its shareholders (including, without limitation, a material breach or attempted breach of the provisions under Section 8), (b) gross neglect, or (c) gross misconduct resulting in material economic harm to the Company; provided that any such conduct described in (a), (b) or (c) is not cured within ten (10) business days after Executive receives from the Company written notice thereof; or (ii) Executive's conviction of, or entry of a plea of guilty or nolo contendere for, a felony or other crime involving moral turpitude.

(B)     "*Good Reason*" shall mean, provided that Executive has not previously given the Company his written consent, (i) a reduction in Executive's Base Salary or Executive's annual incentive compensation opportunity (other than a general reduction in base salary or annual incentive compensation opportunities that affects all salaried employees of the Company proportionately); (ii) a transfer of Executive's primary workplace by more than fifty (50) miles from the workplace on the Effective Date; (iii) a substantial adverse change in Executive's title, duties or responsibilities; (iv) any material breach of this Agreement; or (v) an adverse change in Executive's reporting responsibilities pursuant to the terms of this Agreement; provided, however, that any isolated, insubstantial and inadvertent failure by the Company that is not in bad faith and is cured within ten (10) business days after Executive gives the Company written notice of any such event set forth above, shall not constitute Good Reason.

(b)     Disability or Death.

4

(i)     Executive's employment shall terminate upon Executive's death and may be terminated by the Company if Executive has a Disability (as defined below) and, in either case, Executive or Executive's estate (as the case may be) shall be entitled to receive:

(A)     the Accrued Rights;

(B)     a portion of the Target Award that Executive would have been entitled to receive pursuant to Section 4 hereof for the fiscal year of termination, such portion to be determined by multiplying the Target Award by a fraction, the numerator of which is the number of days during which Executive was employed by the Company in the fiscal year of Executive's termination, and the denominator of which is 365 (the *"Pro-Rata Bonus"*), with such Pro-Rata Bonus payable to Executive pursuant to Section 4 as if Executive's employment had not terminated; and

(C)     any additional benefits and compensation set forth in Exhibits I, II, and III attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment due to death or Disability, except as set forth in this Section 7(b)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(ii)     *"Disability"* shall mean Executive's physical or mental incapacitation and consequent inability, with reasonable accommodation, for a period of six consecutive months to perform Executive's duties; provided, however, in the event the Company temporarily replaces Executive, or transfers Executive's duties or responsibilities to another individual, on account of Executive's inability to perform such duties due to a mental or physical incapacity which is, or is reasonably expected to become, a long-term disability, then Executive's employment shall not be deemed terminated by the Company and Executive shall not be able to resign with Good Reason. Any question as to the existence of a Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree on a qualified independent physician, each shall appoint a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of the Agreement and any other agreement with Executive that incorporates this definition of Disability.

(c)     By the Company Without Cause; Resignation by Executive for Good Reason. Executive's employment hereunder may be terminated by the Company without Cause (other than by reason of death or Disability) or upon Executive's resignation for Good Reason and, in either case (except as otherwise provided in Section 7(e)), Executive shall be entitled to receive:

(i)     the Accrued Rights;

(ii)     provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of

5

claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company):

(A)    a lump sum payment equal to: (I) three (3) times Executive's Base Salary, and (II) the Pro-Rata Bonus, payable as soon as practicable but no later than the earlier of: (a) March 15 following the calendar year in which termination occurs or (b) ninety (90) days following termination; and

(B)    Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (x) thirty (30) months from the date of termination of Executive's employment (the "*Severance Period*"), to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (y) until Executive is, or becomes, eligible for comparable coverage (determined on a coverage by coverage and benefit by benefit basis) under the group health plans of a subsequent employer. If Executive continues to receive benefits pursuant to this Section 7(c)(ii)(B) when, in the absence of the benefits provided in this Section 7(c)(ii)(B), Executive would not be entitled to continuation coverage under Section 4980B of the Internal Revenue Code of 1986, as amended (the "*Code*"), Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*"), Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

(iii)    any additional benefits and compensation set forth in Exhibits I, II, and III attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment by the Company without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, except as set forth in this Section 7(c) or otherwise provided in Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(d)    Expiration of Employment Term.

(i)    In the event Executive elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the Accrued Rights. Except as set forth in this Section 7(d)(i) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

DAL:0103309/00001:2026208v31

(ii)     In the event the Company elects not to extend the Employment Term pursuant to Section 1 and Executive's employment has not been earlier terminated pursuant to Sections 7(a), (b), (c), or (e), the Employment Term shall expire and Executive's employment hereunder shall terminate as of the end of the day immediately preceding the commencement of a subsequent Renewal Term, and Executive shall be entitled to receive the payments and benefits applicable to a termination of Executive's employment without Cause pursuant to Section 7(c) or Section 7(e), as applicable.  Except as set forth in this Section 7(d)(ii) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(e)     <u>Change in Control</u>. Notwithstanding any provision contained herein, if Executive's employment is terminated by the Company without Cause (other than by reason of death or Disability) or if Executive resigns for Good Reason, in either case, within twenty-four (24) months following a Change in Control (as defined in the 2007 Stock Incentive Plan for Key Employees of Energy Future Holdings Corp. and its Affiliates), Executive shall be entitled to receive:

(i)     the Accrued Rights;

(ii)     provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), a lump sum payment equal to three (3) times the sum of Executive's annualized Base Salary and Executive's Target Award, payable as soon as practicable but no later than the earlier of: (i) March 15 following the calendar year in which termination occurs or (ii) ninety (90) days following termination;

(iii)     provided Executive (x) does not violate the restrictions set forth in Section 8 of this Agreement and (y) executes, delivers and does not revoke a general release of claims against the Company and its Affiliates (excluding claims for indemnification, claims for coverage under officer and director policies, and claims as a stockholder of the Company), Executive, his spouse and eligible dependents (to the extent covered immediately prior to such termination) shall continue to be eligible to participate in all of the Company's group health plans on the same terms and conditions as active employees of the Company until the earlier of (A) termination of the Severance Period, to the extent that Executive was eligible to participate in such plans immediately prior to the date of termination, or (B) until Executive is, or becomes, eligible for comparable coverage (determined on a coverage by coverage and benefit by benefit basis) under the group health plans of a subsequent employer. If Executive continues to receive benefits pursuant to this Section 7(e)(iii) when, in the absence of the benefits provided in this Section 7(e)(iii) Executive would not be entitled to continuation coverage under Code Section 4980B, Executive shall receive reimbursement for all medical expenses no later than the end of the calendar year immediately following the calendar year in which the applicable expenses were incurred. The health care continuation coverage period under COBRA, Code Section 4980B, or any replacement or successor provision of United States tax law, shall run concurrently with the Severance Period; and

7

(iv)    any additional benefits and compensation set forth in Exhibits I, II, and III attached hereto, subject to the terms and conditions thereof.

Following Executive's termination of employment without Cause (other than by reason of Executive's death or Disability) or upon Executive's resignation for Good Reason, in either case, within twenty-four (24) months following a Change in Control, except as set forth in this Section 7(e) and for any rights to indemnification and claims for liability insurance coverage under officer and director policies, Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(f)    Notice of Termination. Any purported termination of employment by the Company or by Executive (other than due to Executive's death) shall be communicated by written Notice of Termination to the other Party in accordance with Section 9(j) hereof. For purposes of this Agreement, a *"Notice of Termination"* shall mean a notice indicating the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated.

(g)    Code Section 4999.

(i)    If, by reason of, or in connection with, any transaction that occurs after the Original Effective Date, Executive would be subject to the imposition of the excise tax imposed by Code Section 4999 related to Executive's employment with the Company, whether before or after termination of Executive's employment, but the imposition of such tax could be avoided by approval of shareholders described in Code Section 280G(b)(5)(B), then Executive may ask the Company to seek such approval, in which case the Company will use its reasonable best efforts to cause such approval to be obtained and Executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Code Section 4999. If Executive fails to request that the Company seek such approval, or if Executive does request that the Company seek such approval, but fails to cooperate and execute such waivers as may be necessary in the approval process, Section 7(g)(ii) shall not apply and Executive shall not be entitled to any gross-up payment for any resulting tax under Code Section 4999. If such approval, even if sought and obtained, would not avoid imposition of the excise tax imposed under Code Section 4999, then the provisions of Section 7(g)(ii) shall apply without any precedent obligation of Executive to seek such approval.

(ii)    Gross-Up Payment.

(A)    In the event it shall be determined that any payment, benefit or distribution (or combination thereof) by the Company, any Affiliate, or one or more trusts established by the Company or any Affiliate for the benefit of their employees, to or for the benefit of Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement, or otherwise) (a *"Payment"*) is subject to the excise tax imposed by Code Section 4999 or any interest or penalties are incurred by Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, hereinafter collectively referred to as the *"Excise Tax"*), Executive shall be entitled to receive an additional payment (a *"Gross-Up Payment"*) in an amount such that after payment by Executive of all taxes (including

8

any interest or penalties imposed with respect to such taxes), including, without limitation, any federal, state and local income taxes and employment taxes (and any interest and penalties imposed with respect thereto) and the Excise Tax imposed upon the Gross-Up Payment, Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments.

(B)    All determinations required to be made under this Section 7(g)(ii), including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by Deloitte & Touche LLP, Alvarez & Marsal, or such other nationally recognized accounting firm as may be designated by the Company (the *"Accounting Firm"*), which shall provide detailed supporting calculations both to the Company and Executive within ten (10) business days of the receipt of notice from Executive that there has been a Payment, or such earlier time as is requested by the Company; provided that for purposes of determining the amount of any Gross-Up Payment, Executive shall be deemed to pay federal income tax at the highest marginal rates applicable to individuals in the calendar year in which any such Gross-Up Payment is to be made and deemed to pay state and local income taxes at the highest effective rates applicable to individuals in the state or locality of Executive's residence or place of employment in the calendar year in which any such Gross-Up Payment is to be made, net of the maximum reduction in federal income taxes that can be obtained from deduction of such state and local taxes, taking into account limitations applicable to individuals subject to federal income tax at the highest marginal rates. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 7(g)(ii), shall be paid by the Company to Executive (or to the appropriate taxing authority on Executive's behalf) when due. If the Accounting Firm determines that no Excise Tax is payable by Executive, it shall so indicate to Executive in writing. Any determination by the Accounting Firm shall be binding upon the Company and Executive (subject to Section 7(g)(ii)(C)). As a result of the uncertainty in the application of Code Section 4999, it is possible that the amount of the Gross-Up Payment determined by the Accounting Firm to be due to (or on behalf of) Executive was lower than the amount actually due (*"Underpayment"*). In the event that the Company exhausts its remedies pursuant to Section 7(g)(ii)(C) and Executive thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred, and any such Underpayment shall be promptly paid by the Company to or for the benefit of Executive (but in any case no later than the calendar year following the calendar year in which such tax was payable).

(C)    Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of any Gross-Up Payment. Such notification shall be given as soon as practicable but no later than ten (10) business days after Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. Executive shall not pay such claim prior to the expiration of the thirty (30) day period following the date on which he gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies Executive in writing prior to the expiration of such period that it desires to contest such claim, Executive shall (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the

9

Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company, (iii) cooperate with the Company in good faith in order to effectively contest such claim and (iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold Executive harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 7(g)(ii)(C), the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct Executive to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one (1) or more appellate courts, as the Company shall determine; provided that if the Company directs Executive to pay such claim and sue for a refund, the Company shall advance the amount of such payment to Executive, on an interest-free basis, and shall indemnify and hold Executive harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; provided, further, that if Executive is required to extend the statute of limitations to enable the Company to contest such claim, Executive may limit this extension solely to such contested amount. The Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(D)   If, after the receipt by Executive of an amount paid or advanced by the Company pursuant to this Section 7(g)(ii), Executive becomes entitled to receive any refund with respect to a Gross-Up Payment, Executive shall (subject to the Company's complying with the requirements of Section 7(g)(ii)(C)) promptly pay to the Company the amount of such refund received (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by Executive of an amount advanced by the Company pursuant to Section 7(g)(ii)(C), a determination is made that Executive shall not be entitled to any refund with respect to such claim, and the Company does not notify Executive in writing of its intent to contest such denial of refund prior to the expiration of thirty (30) days after such determination, then such advance shall be forgiven and shall not be required to be repaid, and the amount of such advance shall offset, to the extent thereof, the amount of the Gross-Up Payment required to be paid.

(E)   For the avoidance of doubt, all payments to or for the benefit of Executive provided for in this Section 7(g)(ii) shall be made no later than the end of the calendar year in which the applicable Excise Tax has become due, or if as a result a tax audit or litigation, it is determined that no additional Excise Tax has become due, the end of the calendar year in which the audit is completed or there is a final and non-appealable settlement or other resolution.

10

8.    <u>**Restrictive Covenants**</u>.

(a)    In consideration of the Company entering into this Agreement with Executive and hereby promising and committing itself to provide Executive with Confidential Information and/or specialized training after Executive executes this Agreement, Executive shall not, directly or indirectly:

(i)    at any time during or after the Employment Term, disclose any Confidential Information pertaining to the business of the Company, the Sponsor Group, or any of their respective Affiliates, except when required to perform his duties to the Company or one of its Affiliates, or by law or judicial process, provided that Executive gives the Company reasonable notice of any legal or judicial proceeding requiring Executive to disclose Confidential Information and an opportunity to challenge the disclosure of any such information, and Executive agrees to provide such reasonable notice in writing to:

General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 41st Floor
Dallas, Texas 75201
(214) 812-5153 (facsimile);

(ii)    at any time during the Employment Term and for a period of twenty-four (24) months thereafter (the "*Non-Compete Period*"), directly or indirectly, act as a proprietor, investor, director, officer, employee, substantial stockholder, consultant, or partner in any Competing Business in Texas or any other geographic area in which Texas Energy Future Holdings Limited Partnership, the Company or any of their respective subsidiaries operates or conducts business; or

(iii)    at any time during the Employment Term and for a period of twenty-four (24) months thereafter, directly or indirectly (A) solicit customers or clients of the Company or any of its Affiliates to terminate their relationship with the Company or any of its Affiliates or otherwise solicit such customers or clients to compete with any business of the Company or any of its Affiliates, or (B) solicit or offer employment to any person who is, or has been at any time during the twelve (12) months immediately preceding the termination of Executive's employment, employed by the Company or any of its Affiliates;

provided that in each of (ii) and (iii) above, such restrictions shall not apply with respect to any member of the Sponsor Group or any of its Affiliates that is not engaged in any business that competes, directly or indirectly, with the Company or any of its subsidiaries in any geographic area where they operate. Notwithstanding the foregoing, for the purposes of this Section 8(a), (A) Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of the Company or its Affiliates that are publicly traded on a national or regional stock exchange or quotation system or on the over-the-counter market if Executive (I) is not a controlling person of, or a member of a group which controls, such Person and (II) does not, directly or indirectly, own 5% or more of any class of securities of such Person, and (B) Section 8(a)(ii) shall not be violated by reason of any exercise of tag-along rights under the Sale Participation Agreement, by and between the Company (and related parties) and Executive

11
