## Exhibit A

**RSA and Term Sheet**

**RSA, First Amendment to RSA, Second Amendment to RSA, and Amended Term Sheet,**
**as filed by the Debtors in connection with the** *Debtors' Proposed Order Authorizing the RSA*
*Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay*
**[D.I. 505-2]**

**THIS RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## *Restructuring Support and Lock-Up Agreement*

This RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT (including all exhibits and schedules attached hereto and in accordance with Section 2, this "**Agreement**") is made and entered into as of April 29, 2014, by and among the following parties:

i.    Energy Future Holdings Corp., a Texas corporation ("**EFH**");[1]

ii.    Energy Future Intermediate Holding Company LLC ("**EFIH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH;

iii.    EFH Corporate Services Company ("**EFH Corporate Services**"), a Delaware corporation and a direct, wholly-owned subsidiary of EFH;

iv.    EFIH Finance Inc. ("**EFIH Finance**,"), a Delaware corporation and a direct, wholly-owned subsidiary of EFIH;

v.    Energy Future Competitive Holdings Company LLC ("**EFCH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFH;

vi.    Texas Competitive Electric Holdings Company LLC ("**TCEH**"), a Delaware limited liability company and a direct, wholly-owned subsidiary of EFCH;

vii.    each of TCEH's direct and indirect subsidiaries listed on the signature pages hereto (the "**TCEH Subsidiaries**," and together with TCEH and EFCH, the "**TCEH Debtors**," and, together with each of the foregoing entities identified in sub-clauses (i) and (vii) a "**Debtor**" and, collectively, the "**Debtors**");

viii.    Texas Energy Future Holdings Limited Partnership ("**Texas Holdings**"), a Texas limited partnership, which holds approximately 99.26% of the outstanding Interests in EFH (the "**EFH Interests**");

ix.    Texas Energy Future Capital Holdings LLC, a Delaware limited liability company and the general partner of Texas Holdings ("**TEF**" and, together with Texas Holdings, the "**Consenting Interest Holders**");

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "**Term Sheet**"), subject to Section 2 hereof.

x.    the undersigned lenders or investment advisors or managers of discretionary accounts that hold claims[2] pursuant to the TCEH Credit Agreement against EFCH, TCEH, and the TCEH Subsidiaries under the TCEH Credit Agreement (such claims, the "**TCEH Credit Agreement Claims**" and, collectively, the "**Consenting TCEH First Lien Lenders**");

xi.    the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFCH, TCEH, and the TCEH Subsidiaries under the TCEH First Lien Notes issued pursuant to the TCEH First Lien Note Indenture (such claims, the "**TCEH First Lien Note Claims**" and, collectively, the "**Consenting TCEH First Lien Noteholders**" and, together, with the Consenting TCEH First Lien Lenders, the "**Consenting TCEH First Lien Creditors**");

xii.    the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH First Lien Notes issued pursuant to the EFIH First Lien Indentures (collectively, the "**Consenting EFIH First Lien Noteholders**");

xiii.    the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH  Second Lien Notes issued pursuant to the EFIH Second Lien Note Indenture (collectively, the "**Consenting EFIH Second Lien Noteholders**");

xiv.    the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFIH and EFIH Finance under the EFIH Unsecured Notes issued pursuant to the EFIH Unsecured Note Indentures (collectively, the "**Consenting EFIH Unsecured Noteholders**");

xv.    the undersigned holders or investment advisors or managers of discretionary accounts that hold claims against EFH, EFIH, and EFCH under the EFH Unsecured Notes issued pursuant to the EFH Unsecured Indentures, but excluding any EFH Unsecured Notes held by EFIH (collectively, the "**Consenting EFH Unsecured Noteholders**," and/or together with the Consenting TCEH First Lien Creditors, the Consenting EFIH First Lien Noteholders, the Consenting EFIH Second Lien Noteholders, and the Consenting EFIH Unsecured Noteholders, (in each case, as to their respective issuance, and to the extent still a party thereto, the "**Consenting Creditors**"); and

xvi.    each transferee who becomes a Permitted Transferee (as defined below) in accordance with Section 4.04 of this Agreement (each of the foregoing described in sub-clauses (i) through (xvi), a "**Party**" and, collectively, the "**Parties**"). Each Consenting Interest Holder, each Consenting Creditor, and each Permitted Transferee (if any) is a "**Restructuring Support Party**" and are collectively referred to herein as the "**Restructuring Support Parties**."

---

[2]    As used herein the term "**claim**" has the meaning ascribed to such term as set forth in section 101(5) of the Bankruptcy Code.

*RECITALS*

**WHEREAS**, the Debtors and the Restructuring Support Parties have negotiated certain restructuring and recapitalization transactions with respect to the Debtors' capital structure, including the Debtors' respective obligations under each of the following: (i) the TCEH Credit Agreement; (ii) the TCEH First Lien Notes; (iii) the TCEH First Lien Commodity Hedges (but without respect to any setoff rights that a counterparty to a TCEH First Lien Commodity Hedge may have against TCEH); (iv) the TCEH First Lien Interest Rate Swaps (but without respect to any setoff rights that a counterparty to a TCEH First Interest Rate Swap may have against TCEH); (v) the EFIH First Lien Notes; (vi) the EFIH Second Lien Notes; (vii) the EFIH Unsecured Notes; (viii) the EFH Unsecured Notes; and (ix) the claims arising under the indentures listed on **Exhibit B** hereto (such claims, the "**Notes Claims**");

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (such court, or another bankruptcy court of competent jurisdiction with respect to the subject matter, the "**Bankruptcy Court**") to effect the restructuring through a prenegotiated chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Plan**"), all of which shall be on the terms and conditions described in this Agreement (such transactions, the "**Restructuring Transactions**");

**WHEREAS**, those Restructuring Support Parties that are party to the commitment letter attached hereto as **Exhibit C** (collectively, the "**Commitment Parties**"[3] and such letter (including the exhibits thereto), the "**Commitment Letter**") have agreed in accordance with the terms and conditions specified in the Commitment Letter to fund the EFIH Second Lien DIP Financing in an amount of up to $2 billion (the "**Investment Commitment**"); and

**WHEREAS**, the Debtors and the Consenting Interest Holders, as the direct or indirect owners of EFH, EFIH, EFIH Finance, EFCH, TCEH, and the TCEH Subsidiaries, have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, the Commitment Letter, and the Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Agreement Effective Date.*  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the date on which:  (a)(i) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors; (ii) holders of at least 40% of the aggregate outstanding principal amount of the TCEH Credit Agreement

---

[3]    For the avoidance of doubt, as used herein, the terms "**Consenting Creditors** and "**Restructuring Support Parties**" include the Commitment Parties in their capacities as such.

Claims and the TCEH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (iii) holders of at least 70% of the outstanding principal amount of each of the EFIH Unsecured Note Claims and the EFH Unsecured Note Claims (in each case determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (iv) holders of at least 10% of the outstanding principal amount of the EFIH First Lien Note  Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement (the "**Consenting Fidelity EFIH First Lien Noteholders**"); (v) holders of at least 19% of the outstanding principal amount of the EFIH First Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by holders other than Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement (the "**Consenting Non-Fidelity EFIH First Lien Noteholders**"); (vi) holders of at least 25% of the outstanding principal amount of the EFIH Second Lien Note Claims (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code) held by Fidelity shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; and (vii) each of the Consenting Interest Holders shall have executed and delivered to the Debtors counterpart signatures of this Agreement; (b) each of the Commitment Parties shall have executed and delivered to the Debtors counterpart signatures to the Commitment Letter; (c) EFH and EFIH shall have paid the Execution Fee (as defined in the Commitment Letter); (d) the Debtors shall have paid all reasonable and documented fees and expenses incurred through the Agreement Effective Date (as defined below) for the professionals identified in Section 10 in the amounts set forth in **Schedule 1** attached hereto (including the request to increase or replenish the retainers as set forth on Schedule 1); and (e) the Debtors have given notice to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors in accordance with Section 11.11 hereof that each of the foregoing conditions set forth in this Section 1, in each case, has been satisfied and this Agreement is effective; in each instance, on or before April 29, 2014 (such date, the "**Agreement Effective Date**").[4]

**Section 2.** *Exhibits Incorporated by Reference*. Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits. In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

**Section 3.** *Definitive Documentation*. The definitive documents and agreements governing the Restructuring Transactions (collectively, the "**Plan Restructuring Documents**") shall

---

[4]    For the avoidance of doubt, the obligations and rights of the Consenting Creditors described in this Agreement shall apply to any postpetition claims acquired by such Consenting Creditors in accordance with the Restructuring Transactions.

consist of:  (a) the motion to assume this Agreement pursuant to sections 105(a) and 365 of the Bankruptcy Code and the performance by the Debtors of their obligations hereunder (the "**RSA Assumption Motion**") and the order approving the RSA Assumption Motion (the "**RSA Assumption Order**"); (b) the Plan (and all exhibits thereto); (c) the Confirmation Order and pleadings in support of entry of the Confirmation Order; (d) the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**"); (e) the documentation in respect of the EFIH First Lien DIP Financing (including related motions and orders); (f) the documentation in respect of the EFIH Second Lien DIP Financing (including related motions and orders); (g) the Oncor TSA Amendment; (h) the IRS Submissions and the Private Letter Ruling, (i) the Conversion Agreement (as defined in the Commitment Letter) (including any related order); (j) the motion (the "**Approval Motion**") and related orders to obtain entry of (i) an order (the "**Approval Order**") authorizing, among other things, (A) the EFIH First Lien Settlement, (B) the EFIH Second Lien Settlement; and (C) EFH and EFIH to perform their obligations under the Commitment Letter, including the payment of professionals' fees on the terms set forth in the Commitment Letter and (ii) an order (the "**Oncor TSA Amendment Order**") authorizing the Oncor TSA Amendment, all in a manner consistent with the terms of this Agreement; (k) the documentation in respect of the EFIH First Lien Settlement (including the related order); (l) the documentation in respect of the EFIH Second Lien Settlement (including the related order); (m) any pleadings or orders related to the EFIH First Lien Makewhole Claim and/or EFIH Second Lien Makewhole Claim (collectively, the "**Make-Whole Pleadings**"); (n) all other documents that will comprise the Plan Supplement; and (o) a motion seeking entry of an order and the resulting order restricting transfers of claims against the Debtors to the extent such transfers would adversely affect the Debtors' ability to obtain any required regulatory consents (the "**Trading Motion**").  The Plan Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and shall otherwise be in form and substance reasonably acceptable to each of (i) the Debtors, (ii) the Consenting Interest Holders, and (iii) the Required Consenting Creditors; provided, however, that, only EFH, EFIH, the Consenting Fidelity EFIH First Lien Noteholders, the Consenting EFIH Second Lien Noteholders, the Consenting EFH Unsecured Noteholders, and the Required EFIH Unsecured Consenting Creditors, and no other Restructuring Support Party, shall have the foregoing rights described in this Section 3 over those documents pertaining exclusively to the Restructuring Transactions and Chapter 11 Cases of EFH and EFIH; provided, further, that the Approval Order, the Oncor TSA Amendment Order, and the Make-Whole Pleadings shall be in form and substance reasonably satisfactory to EFH, EFIH, the Consenting Fidelity EFIH First Lien Noteholders, the Consenting EFH Unsecured Noteholders, and the Required EFIH Unsecured Consenting Creditors only (and no other Restructuring Support Party shall have the foregoing rights) provided, further, the new EFH/EFIH debt and equity documents (including the Conversion Agreement) and the EFH and EFIH corporate governance documents (including the selection of the board of directors and officers of such entities) shall be in form and substance satisfactory to the Required EFIH Unsecured Consenting Creditors only, in each case, subject to the terms and conditions specified in the Term Sheet, and the Required EFIH Unsecured

Consenting Creditors shall reasonably consult with the Consenting EFH Creditors in connection with the EFH and EFIH corporate governance documents; provided, further, that only TCEH and the Consenting TCEH First Lien Creditors, and no other Restructuring Support Party, shall have consent rights over those documents pertaining exclusively to the Restructuring Transactions and Chapter 11 cases of the TCEH Debtors.  Additionally, each Consenting Non-Fidelity EFIH First Lien Noteholder shall have reasonable consent rights over all definitive documentation (and orders) in respect of the terms and conditions not otherwise addressed in the Term Sheet regarding each of the EFIH First Lien DIP Financing (and related orders), the Approval Motion, the Approval Order, the RSA Assumption Motion, and the RSA Assumption Order.  As used herein, the term "**Required Consenting Creditors**" means, at any relevant time:  (a) at least three (3) members of the Ad Hoc TCEH Committee who collectively hold at least 50.1% of the TCEH First Lien Claims held by the members of the Ad Hoc TCEH Committee (the "**Consenting Ad Hoc TCEH Committee**"); (b) Consenting Creditors holding at least 50.1% of the EFIH First Lien Note Claims held by all Consenting Creditors; (c) Consenting Creditors holding at least 50.1% of the EFIH Second Lien Note Claims held by all Consenting Creditors; (d) Consenting Creditors holding at least 50.1% of the EFH Unsecured Note Claims held by all Consenting Creditors; and (e) at least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.67% of the EFIH Unsecured Note Claims held by all Consenting Creditors (the "**Required EFIH Unsecured Consenting Creditors**").

**Section 4.**      *Commitments Regarding the Restructuring Transactions.*

4.01.    Commitment of the Consenting Creditors.

(a)      During the period beginning on the Agreement Effective Date and ending on a Termination Date (as defined in Section 8.11) (such period, the "**Effective Period**"):

(i)      each of the Consenting Creditors that is entitled to accept or reject the Plan pursuant to its terms agrees that it shall, subject to the receipt by such Consenting Creditor of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

(A)      to the extent a class of claims is permitted to vote to accept or reject the Plan, vote each of its claims (including each of its TCEH First Lien Claims, EFIH Unsecured Note Claims, EFH Unsecured Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, the Notes Claims, the TCEH DIP Claims, the EFIH First Lien DIP Claims, the EFIH Second Lien DIP Claims, and any other claims against the applicable Debtor) (such Claims, together with the EFH Interests, the Texas Holdings Interests, and the TEF Interests, collectively, the "**Debtor Claims/Interests**") to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot; and

(B)      not change or withdraw (or cause to be changed or withdrawn) such vote;

(ii)    each Consenting Creditor further agrees that it shall not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, (B) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Restructuring Transactions, or (C) direct the Agents[5] (as applicable) to take any action contemplated in (A) and (B) of this Section 4.01(a)(ii); provided, however, that to the extent a Consenting Creditor directs the Agents (as applicable) not to take an action contemplated in (A) and (B) of this Section 4.01(a)(ii), such direction shall not be construed in any way as requiring any Consenting Creditor to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability, in connection with such direction; and

(iii)    upon the commencement by the Debtors of the Chapter 11 Cases, and subject to Section 8.12, the automatic stay is invoked and each Consenting Creditor agrees that, except to the extent expressly contemplated under the Plan and this Agreement, it will not, and will not direct the Agents (as applicable) to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Debtor Claims/Interests, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors; provided, however, that to the extent a Consenting Creditor directs the Agents (as applicable) to not take any action contemplated in the foregoing provision, such direction shall not be construed in any way as requiring any Consenting Creditor to provide an indemnity to the applicable Agent, or to incur or potentially incur any other liability, in connection with such direction; provided, further, however, that for the avoidance of doubt, upon (A) the termination of this Agreement or (B) termination of the automatic stay as to property or interests in property which secure any such claims upon motion by a person or entity other than a Consenting Creditor, each Consenting

---

[5]    For purposes of the Agreement, the term "**Agent**" means any of the following (and each of their respective successors and assigns): (a) Citibank, N.A., in its capacity as: (i) administrative agent under the TCEH Credit Agreement; (ii) administrative and collateral agent with respect to certain TCEH First Lien Claims pursuant to the Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of August 7, 2009 (as may be amended, restated, or supplemented); and (iii) senior collateral agent and representative with respect to certain TCEH First and Second Lien Claims pursuant to the Second Lien Intercreditor Agreement, dated as of October 6, 2010 (as may be amended, restated, or supplemented, the "**TCEH Second Lien Intercreditor Agreement**"); (b) The Bank of New York Mellon Trust Company, N.A., in its capacity as: (i) collateral trustee with respect to certain EFIH Second Lien Notes Claims pursuant to the Collateral Trust Agreement (as may be amended, restated or supplemented); (ii) indenture trustee with respect to certain EFIH Senior Toggle Note Claims pursuant to the EFIH Senior Toggle Note Indenture; (iii) indenture trustee with respect to certain EFIH Unexchanged Note Claims pursuant to the EFIH Unexchanged Note Indenture; (iv) indenture trustee with respect to certain TCEH First Lien Note Claims pursuant to the TCEH First Lien Note Indenture; (v) EFH Notes Trustee; (vi) EFH LBO Notes Trustee; (vii) indenture trustee with respect to certain EFIH Second Lien Note Claims; and (viii) initial second priority representative under the TCEH Second Lien Intercreditor Agreement; (c) CSC Trust Company of Delaware in its capacity as:  (i) collateral trustee with respect to certain EFIH First Lien Note Claims pursuant to the Collateral Trust Agreement (as may be amended, restated, or supplemented); (ii) collateral trustee with respect to certain EFIH First Lien Note Claims pursuant to that certain junior lien pledge agreement, dated as of April 25, 2011 (as may be amended, restated or supplemented); and (iii) indenture trustee with respect to certain EFIH First Lien Note Claims; (d) Wilmington Savings Fund Society, FSB, in its capacity as indenture trustee with respect to certain TCEH Second Lien Note Claims; (e) Law Debenture Trust Company of New York, in its capacity as indenture trustee with respect to certain TCEH Unsecured Note Claims; and (f) UMB Bank, N.A., in its capacity as: (i) indenture trustee with respect to certain EFIH Senior Toggle Note Claims pursuant to the EFIH Senior Toggle Note Indenture; and (ii) indenture trustee with respect to certain EFIH Unexchanged Note Claims pursuant to the EFIH Unexchanged Note Indenture.

Creditor may, after notifying counsel to the Debtors in accordance with Section 11.11(a), exercise such right or remedy.

(b)    The foregoing sub-clause (a) of this Section 4 will not limit any of the following Consenting Creditor rights, to the extent consistent with this Agreement:

(i)    to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay, or prevent consummation of the Restructuring Transactions;

(ii)    under any applicable credit agreement, indenture, other loan document or applicable law; or

(iii)    to take or direct any action relating to maintenance, protection, or preservation of any collateral.

(c)    (i) It shall not be a violation of this Agreement, and no Restructuring Support Party will assert that it is an "Event of Default" under the TCEH Cash Collateral Order, if the Ad Hoc TCEH Committee or any of its members, within the Challenge Period (as defined in the TCEH Cash Collateral Order), seeks standing to commence, and if granted standing, assert and prosecute any Claims, objections or other Causes of Action relating to the validity, allowability, enforceability, priority, avoidance, or subordination of the TCEH 2012 Incremental Term Loans or the liens and security interests that secure the TCEH 2012 Incremental Term Loans (other than against the holders of EFH Interests, the Debtors' directors, the Debtors' officers, and each of their respective affiliates), and (ii) if any Consenting Creditor(s) (or the Claims beneficially held by such Consenting Creditor) or Consenting Interest Holder(s) becomes the subject of any Cause of Action commenced, or for which court authority is requested to commence, including in respect of any Cause of Action set forth in clause (i) above, by any other person in connection with these Chapter 11 Cases or related to the Debtors, then such Consenting Creditors or Consenting Interest Holder(s) shall be entitled to assert (or seek authority to assert) and prosecute any and all defenses, counterclaims, cross-complaints, cross-claims, and other claims relating in any way to such Cause of Action (other than against the holders of EFH Interests, the Debtors' directors, the Debtors' officers, and each of their respective affiliates) (such Claims, objections, or other Causes of Action described in this Section 4.01(c), a "**Permitted Cause of Action**").

4.02.    Commitment of the Consenting Interest Holders.

(a)    During the Effective Period, each of the Consenting Interest Holders agrees that it shall not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions or (ii) propose, file, support, or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtors other than the Restructuring Transactions.

(b)    Each Consenting Interest Holder agrees to (i) support and take all necessary steps to effectuate the Restructuring Transactions, including timely providing all requisite consents and approvals as required in order for the Debtors to file for relief under chapter 11 of the Bankruptcy Code under that certain Amended and Restated Limited Liability Company

Agreement of Texas Energy Future Capital Holdings LLC, dated as of October 10, 2007, by and among the parties thereto and (ii)(A) to the extent it is entitled to accept or reject the Plan pursuant to its terms that it shall, subject to the receipt by such Consenting Interest Holder of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, vote to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote.

(c)     The foregoing sub-clause (a) and sub-clause (b) of this Section 4.02 will not limit any Consenting Interest Holder's rights to appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with the Restructuring Transactions and do not hinder, delay, or prevent consummation of the Restructuring Transactions.

4.03.     Commitment of the Debtors.

(a)     During the Effective Period and thereafter as required pursuant to clause (viii) below, the Debtors shall:  (i) take all steps necessary or desirable to obtain orders of the Bankruptcy Court in respect of the Restructuring Transactions, including obtaining entry of the Confirmation Order; (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the preparation and filing within the time-frame provided herein of the Plan Restructuring Documents; (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions; (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions; (v) complete the Restructuring Transactions within the time-frame provided herein; (vi) operate their business in the ordinary course, taking into account the Restructuring Transactions; (vii) not object to, delay, impede, or take any other action that is materially inconsistent with, or is intended or is likely to interfere in a material way with acceptance or implementation of the Restructuring Transactions; (viii) report income items to Consenting Creditors in a manner consistent with past practice; and (ix) file the Trading Motion at a time to be mutually agreed upon by the Debtors and the Required Consenting Creditors.

(b)     The Debtors represent and warrant to the Consenting Creditors and the Consenting Interest Holders that there are no pending agreements (oral or written) or understandings, with respect to any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring (other than the Restructuring Transactions) involving the Debtors, or any of their assets, properties or businesses (an "**Alternative Proposal**").  If the Debtors make or receive a written proposal or expression of interest regarding an Alternative Proposal, the Debtors shall promptly notify counsel to the Consenting Creditors and the Consenting Interest Holders of the receipt of any such proposal or expression of interest relating to an Alternative Proposal, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved.  The Debtors shall promptly furnish counsel

to the Consenting Creditors and the Consenting Interest Holders with copies of any written offer or other information that they make or receive relating to an Alternative Proposal and shall keep counsel to the Consenting Creditors and the Consenting Interest Holders fully informed of any material changes to such Alternative Proposal. The Debtors shall not enter into any confidentiality agreement with a party proposing an Alternative Proposal unless such party consents to identifying and providing to counsel to the Consenting Creditors and the Consenting Interest Holders (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 4.03(b).

(c) Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to the Restructuring Transactions to the extent such board of directors, board of managers, or such similar governing body determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

4.04. <u>Transfer of Interests and Securities</u>.

(a) During the Effective Period, no Consenting Interest Holder or Consenting Creditor shall sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership)[6] in the Debtor Claims/Interests unless it satisfies all of the following requirements (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

(i) the intended transferee executes and delivers to counsel to the Debtors on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit D** (a "**Transfer Agreement**") before such Transfer is effective (it being understood that any Transfer shall not be effective as against the Debtors until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to the Debtors, in each case, on the terms set forth herein); and

(ii) the intended transferee, the intended transferee's affiliates, and/or any unaffiliated third-party in which the intended transferee has a beneficial ownership, or any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4) (<u>provided</u>, <u>however</u>, that for purposes of this Section 4.04(a)(ii), none of the Consenting Interest Holders or Consenting Creditors will be treated as acting pursuant to a plan or arrangement as a result of participating in the Plan and Restructuring Transactions), will not, after giving effect to such Transfer, (A) have beneficial ownership of, in the aggregate, fifty percent (50%) or more of TCEH First Lien Claims, EFIH Second Lien DIP Claims, or the Texas Holdings Interests or TEF Interests or (B) have, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, beneficial ownership of, in the aggregate,

---

[6]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such Claims or Interests.

fifty percent (50%) or more of the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, or the Texas Holdings Interests or TEF Interests.

(b)      [Reserved.]

(c)      Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude any Consenting Creditor from settling or delivering securities or bank debt to settle any confirmed transaction pending as of the date of such Consenting Creditor's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Debtor Claims/Interests so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement), and (ii) a Qualified Marketmaker[7] (as defined below) that acquires any of the Debtor Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Debtors Claims/Interests, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within five (5) business days of its acquisition to a Consenting Interest Holder, Consenting Creditor, or Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and the transfer otherwise is a Permitted Transfer.

(d)      This Agreement shall in no way be construed to preclude the Consenting Interest Holders or Consenting Creditors from acquiring additional Debtor Claims/Interests; provided, however, that (i) any Consenting Interest Holder or Consenting Creditor that acquires additional Debtor Claims/Interests, as applicable, after the Agreement Effective Date shall promptly notify the Debtors of such acquisition including the amount of such acquisition and (ii) such acquired Debtor Claims/Interests shall automatically and immediately upon acquisition by a Consenting Creditor or Consenting Interest Holder, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Debtors).

(e)      This Section 4.04 shall not impose any obligation on any Debtor to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Interest Holder or Consenting Creditor to Transfer any Debtor Claims/Interests. Notwithstanding anything to the contrary herein, to the extent the Debtors and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information in connection with any proposed Restructuring Transactions (each such executed agreement, a "**Confidentiality Agreement**"), the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms.

---

[7]      As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

11

(f)     Notwithstanding anything to the contrary herein:  (i) following the funding in full of the EFIH First Lien DIP Financing, the Transfer of EFIH First Lien DIP Claims shall not be subject to this Section 4.04, but shall be subject only to the definitive documentation governing the EFIH First Lien DIP Financing; and (ii) each Consenting Non-Fidelity EFIH First Lien Noteholder and any funds managed by each Consenting Non-Fidelity EFIH First Lien Noteholder shall be bound by the transfer restrictions in this Section 4.04 only in respect of their EFIH First Lien Note Claims.

(g)     Any Transfer made in violation of this Sections 4.04 shall be void *ab initio*.  Any Consenting Interest Holder or Consenting Creditor that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

4.05.     Representations and Warranties of Consenting Interest Holders and Consenting Creditors.  Each Consenting Creditor and Consenting Interest Holder, severally, and not jointly, represents and warrants that:

(a)     it is the beneficial owner of the face amount of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtor Claims/Interests, as reflected in such Consenting Creditor's and/or Consenting Interest Holder's signature block to this Agreement, which amount each Party understands and acknowledges is proprietary and confidential to such Consenting Creditor and/or Consenting Interest Holder (such Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**");

(b)     other than with respect to a Consenting Non-Fidelity EFIH First Lien Noteholder, it will not beneficially or legally own, either directly or indirectly through its affiliates (but excluding any affiliates that are subject to an internal ethical wall or screen), any unaffiliated third parties in which it may hold a direct or indirect beneficial interest, or as part of any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4), provided, however, that for purposes of this Section 4.04(a)(ii), none of the Consenting Interest Holders or Consenting Creditors will be treated as acting pursuant to a plan or arrangement as a result of participating in the Plan and Restructuring Transactions), in the aggregate, fifty percent (50%) or more of (A) TCEH First Lien Claims, EFIH Second Lien DIP Claims, or the Texas Holdings Interests or TEF Interests or (B) the Reorganized TCEH Common Stock, the Reorganized EFH Common Stock, or the Texas Holdings Interests or TEF Interests;

(c)     it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Debtor Claims/Interests;

(d)     the Owned Debtor Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's or Consenting Interest Holder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(e)     (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act or (B) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or

12

(7) under the Securities Act of 1933, as amended (the "**Securities Act**") (C) a Regulation S non-U.S. person or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of any Debtor acquired by the applicable Consenting Creditor or Consenting Interest Holder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f)     as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

**Section 5.**     *Mutual Representations, Warranties, and Covenants*.  Each of the Parties represents, warrants, and covenants to each other Party:

5.01.  Enforceability.  It is validly existing and in good standing under the laws of the state of its organization, and this Agreement (and, to the extent applicable, the Commitment Letter) is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

5.02.  No Consent or Approval.  Except as expressly provided in this Agreement, the Plan, the Term Sheet, the Commitment Letter, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform the respective obligations under, this Agreement (and, to the extent applicable, the Commitment Letter).

5.03.  Power and Authority.  Except as expressly provided in this Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement (and, to the extent applicable, the Commitment Letter) and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement (and, to the extent applicable, the Commitment Letter).

5.04.  Governmental Consents.  Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), the execution, delivery and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

5.05.  No Conflicts.  The execution, delivery, and performance of this Agreement does not and shall not:  (a) violate any provision of law, rules or regulations applicable to it or any of its subsidiaries in any material respect; (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring Transactions.

**Section 6.**     *Acknowledgement*.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes

for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code. The Debtors will not solicit acceptances of any Plan from Consenting Creditors or Consenting Interest Holders in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 7.    *Certain Additional Chapter 11 Matters.***

7.01.    The Required Consenting Creditors shall have reviewed, commented on, and consented to the first-day pleadings identified on **Schedule 3** attached hereto (the "**First Day Pleadings**"). Additionally, during the Effective Period, the Debtors will use reasonable efforts to provide:  (i) draft copies of all material motions, pleadings and other documents other than the First Day Pleadings (including the IRS Submissions) that the Debtors intend to file with any court or regulatory body (including, the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring Transactions to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors at least two (2) business days before the date on which Debtors intend to file any such document; and (ii) copies of all documents actually filed by the Debtors with any court or regulatory body (including the Bankruptcy Court and the IRS) relating to the Chapter 11 Cases or the Restructuring Transactions to counsel to the Consenting Interest Holders and counsel to the Consenting Creditors promptly but not later than two (2) business days after such motions, pleadings, and other documents are filed; provided, however, that the Debtors will provide draft copies of all Plan Restructuring Documents to the Required Consenting Creditors three (3) business days before the date on which the Debtors intend to file such documents. To the extent such documents do not constitute Plan Restructuring Documents (which shall be consistent with Section 3), the Debtors shall consult in good faith with counsel to the Restructuring Support Parties regarding the form and substance of those documents.

7.02.    The Commitment Parties shall coordinate with Oncor Electric Delivery to obtain any necessary regulatory approvals from the Public Utility Commission of Texas related to the change in equity ownership at EFH ("**PUC Regulatory Approval**"). EFH and EFIH shall cooperate as reasonably necessary to obtain the PUC Regulatory Approval; provided, however, that the TCEH Debtors shall not have any obligation to participate in the process to obtain the PUC Regulatory Approval or agree to any conditions affecting the TCEH Debtors; provided, further, that EFH, EFIH, and the Commitment Parties agree to use commercially reasonable efforts to obtain a preliminary order from the PUC limiting the scope of the PUC Regulatory Approval proceeding to issues related to Oncor and the change in equity ownership at EFH and excluding consideration of any issues relating to the TCEH Debtors.

**Section 8.    *Termination Events*.**

8.01.    <u>Shared Consenting Creditor Termination Events</u>. This Agreement may be terminated as between: (a) the Consenting TCEH First Lien Creditors and the other Parties, (b) the Consenting Fidelity EFIH First Lien Noteholders and the other Parties, (c) the Consenting EFIH Second Lien Noteholders and the other Parties, (d) the Consenting EFH Unsecured Noteholders and the other Parties, or (e) the Consenting EFIH Unsecured Noteholders and the other Parties, in each case, by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, other than the Consenting Creditors

14

seeking to terminate this Agreement pursuant to this Section 8.01 (such Consenting Creditors, the "**Terminating Consenting Creditors**") of a written notice in accordance with Section 11.11 hereof by, as applicable:  (i) the Consenting Ad Hoc TCEH Committee; (ii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Creditors at such time; (iii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by the Consenting Creditors at such time; (iv) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Notes Claims held by the Consenting Creditors at such time; or (v) the Required EFIH Unsecured Consenting Creditors, in each case, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)     the Debtors shall not have commenced the Chapter 11 Cases on or before April 29, 2014;

(b)     the Debtors shall not have filed the RSA Assumption Motion with the Bankruptcy Court on or before the date that is seven (7) days from the Petition Date;

(c)     the Bankruptcy Court shall not have entered the RSA Assumption Order on or before the date that is forty-five (45) days from the Petition Date;

(d)     the Debtors shall not have submitted the Ruling Request in respect of the Private Letter Ruling (which shall, among other things, request the Required Rulings) or filed the Plan and Disclosure Statement with the Bankruptcy Court on or before the date that is forty-five (45) days from the Petition Date;

(e)     the Bankruptcy Court shall not have entered the Disclosure Statement Order on or before the date that is one-hundred and five (105) days from the Petition Date;

(f)     the Bankruptcy Court shall not have entered the Confirmation Order on or before the date that is two-hundred and seventy-five (275) days from the Petition Date;

(g)     the IRS shall not have issued a Private Letter Ruling acceptable to the Required Consenting Creditors on or prior to the Extended Outside Date;

(h)     the Bankruptcy Court otherwise grants relief that would have a material adverse effect on the Restructuring Transactions;

(i)     the effective date of the Plan (the "**Plan Effective Date**") shall not have occurred on or before the date that is thirty (30) days after the date that the Bankruptcy Court enters the Confirmation Order (the "**Initial Outside Date**"), it being understood that if all conditions to the Plan Effective Date other than receipt of any applicable regulatory approvals required to consummate the Plan and/or the Private Letter Ruling have been satisfied on or before the Initial Outside Date, the Initial Outside Date shall be automatically extended by an additional thirty (30) days (such extended date, the "**Extended Outside Date**");

(j)     the IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, whether orally or in writing, of its decision not to issue one or more of the Required Rulings;

(k)     the breach by any Party other than the Terminating Consenting Creditors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions or the recovery of any Consenting Creditor; provided, however, (i) that such Terminating Consenting Creditors shall transmit a notice to the Debtors, counsel to the Consenting Interest Holders and counsel to the other Consenting Creditors pursuant to Section 11.11 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 11.11 hereof) and, in either case,, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(l)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring Transactions or materially impacting the recovery of any Consenting Creditor; provided, however, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of the Restructuring Transactions that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the Required Consenting Creditors;

(m)     an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(n)     any Party other than the Terminating Consenting Creditors files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement;

(o)     the termination of this Agreement by (i)(a) the Consenting TCEH First Lien Creditors, (b) the Consenting EFH Unsecured Noteholders, (c) the Consenting EFIH Unsecured Noteholders, or (d) the Consenting Interest Holders or (ii)(a) the Consenting Fidelity EFIH First Lien Noteholders or (b) the Consenting EFIH Second Lien Noteholders, provided, however, solely with respect to subsection (ii) hereof, only to the extent Fidelity does not agree to remain bound to the terms of this Agreement and/or does not subsequently agree to re-execute this Agreement;

(p)     the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring Transactions or materially impacting the recovery of any Consenting Creditor; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would (i) allow consummation of a material portion of

the Restructuring Transactions, (ii) remedy the recovery of such Consenting Creditor in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement, or (iii) is otherwise reasonably acceptable to the Required Consenting Creditors;

(q)    the (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, or EFH Unsecured Note Claims unless such conversion or dismissal, as applicable, is made with the prior written consent of counsel to the Required Consenting Creditors;

(r)    any of the Plan Restructuring Documents shall have been modified in any material respect or withdrawn, without the prior written consent of the Required Consenting Creditors, subject to Section 3; or

(s)    the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors that would have a material adverse effect on the Restructuring Transactions, without the prior written consent of the Required Consenting Creditors.

8.02.    <u>EFIH Unsecured Noteholder, EFIH First Lien Noteholder, EFIH Second Lien Noteholder, and EFH Unsecured Noteholder Termination Events</u>. This Agreement may be terminated as between (a) the Consenting EFIH Unsecured Noteholders and the other Parties, (b) the Consenting Fidelity EFIH First Lien Noteholders and the other Parties, (c) the Consenting EFIH Second Lien Noteholders and the other Parties, and (d) the Consenting EFH Unsecured Creditors and the other Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by, as applicable: (i) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Creditors at such time; (ii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by the Consenting Creditors at such time; (iii) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held by the Consenting Creditors at such time; or (iv) the Required EFIH Unsecured Consenting Creditors, in each case, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors have not filed each of the EFIH First Lien DIP Motion, the EFIH Second Lien DIP Motion, and the Approval Motion on or before the date that is fourteen (14) days from the Petition Date;

(b)    the Bankruptcy Court shall not have entered each of the Approval Order, the order approving the EFIH First Lien DIP Motion (the "**EFIH First Lien DIP Order**"), and an order approving the EFIH Second Lien DIP Motion (the "**EFIH Second Lien DIP Order**") on or

before the date that is seventy-five (75) days from the Petition Date (it being understood that the Debtors will use commercially reasonable efforts to obtain entry of the EFIH First Lien DIP Order and the EFIH Second Lien DIP Order on or before the date that is forty-five (45) days from the Petition Date);

(c)    the Debtors shall not have consummated each of (i) the EFIH First Lien DIP Financing, (ii) the EFIH Second Lien DIP Financing, and (iii) the transactions and settlements contemplated by the Approval Order on or before the date that is five (5) business days after the date the EFIH First Lien DIP Order, the EFIH Second Lien DIP Order, and the Approval Order, as applicable, is entered; or

(d)    either the Commitment Letter or the Conversion Agreement is terminated according to its terms prior to consummation of the transactions contemplated therein.

8.03.    <u>Consenting TCEH First Lien Holders' Termination Events</u>.  This Agreement may be terminated as between the Consenting TCEH First Lien Creditors and the other Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors other than the Terminating Consenting Creditors of a written notice in accordance with Section 11.11 hereof by the Consenting Ad Hoc TCEH Committee, in the exercise of their sole discretion, upon the occurrence and continuation of any of an "Event of Default" under the TCEH Cash Collateral Order.

8.04.    <u>Consenting Non-Fidelity EFIH First Lien Noteholders</u>.  This Agreement may be terminated as between a Consenting Non-Fidelity EFIH First Lien Noteholder and the Debtors by the delivery to the Debtors of a written notice in accordance with Section 11.11 hereof by such terminating Consenting Non-Fidelity EFIH First Lien Noteholder, in the exercise of its discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors have not filed each of the EFIH First Lien DIP Motion and the Approval Motion on or before the date that is fourteen (14) days from the Petition Date;

(b)    the Bankruptcy Court shall not have entered each of the Approval Order and the EFIH First Lien DIP Order on or before the date that is seventy-five (75) days from the Petition Date;

(c)    the Debtors shall not have consummated each of (i) the EFIH First Lien DIP Financing, (ii) the transactions and settlements contemplated by the Approval Order on or before the date that is five (5) business days after the date the EFIH First Lien DIP Order and the Approval Order, as applicable, is entered;

(d)    the Bankruptcy Court otherwise grants relief on a final basis that would have a material adverse effect on the Restructuring Transactions;

(e)    the Plan Effective Date shall not have occurred on or before the Initial Outside Date, it being understood that if all conditions to the Plan Effective Date other than receipt of any applicable regulatory approvals required to consummate the Plan and/or the Private Letter Ruling have been satisfied or are capable of being satisfied on or before the Initial Outside Date, the Initial Outside Date shall be automatically extended to the Extended Outside Date;

(f)     the breach by any Party other than the Terminating Consenting Creditors of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions or the recovery of any Consenting Creditor; provided, however, (i) that such Terminating Consenting Creditors shall transmit a notice to the Debtors, counsel to the Consenting Interest Holders and counsel to the other Consenting Creditors pursuant to Section 11.11 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 11.11 hereof) and, in either case,, if such breach is capable of being cured, the breaching Party shall have twenty (20) business days after receiving such notice to cure any breach;

(g)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring Transactions; provided, however, that the Debtors shall have ten (10) business days after issuance of such injunction, judgment, decree, charge, ruling or order to obtain relief that would allow consummation of the Restructuring Transactions that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement or (ii) is otherwise reasonably acceptable to the applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s);

(h)     an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(i)     any Party other than the Terminating Consenting Creditors files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement; or

(j)     the entry of a ruling or order by the Bankruptcy Court or any other court with appropriate jurisdiction which, in each case, would have the effect of preventing consummation of the Restructuring Transactions or materially impacting the recovery of any Consenting Non-Fidelity EFIH First Noteholder ; provided, however, that the Debtors shall have ten (10) business days after issuance of such ruling or order to obtain relief that would (i) allow consummation of a material portion of the Restructuring Transactions, (ii) remedy the recovery of such Consenting Non-Fidelity EFIH First Lien Noteholder in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement, or (iii) is otherwise reasonably acceptable to the applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s).

8.05.    Consenting Interest Holders Termination Events.    This Agreement may be terminated as between the Consenting Interest Holders and the other Parties by the delivery to the Debtors and counsel to the Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by all of the undersigned holders of the Texas Holdings Interests and the TEF Interests, in the exercise of their discretion, upon the occurrence and continuation of any of the following events:

(a)    the Debtors shall not have commenced the Chapter 11 Cases on or before April 29, 2014;

(b)    the Plan Effective Date shall not have occurred by the Initial Outside Date or the Extended Outside Date, as applicable;

(c)    the breach by the Debtors of any of the representations, warranties, or covenants of the Debtors set forth in this Agreement that would have a material adverse effect on the Restructuring Transactions; provided, however, that (i) the Debtors shall undertake commercially reasonable efforts to provide the Consenting Interest Holders with prompt written notice of the occurrence of such breach and (ii)  the Consenting Interest Holders may transmit a notice to the Debtor (detailing a breach (while providing copies of such notice to the Consenting Creditors pursuant to Section 11.11 hereof) and, in either case, if such breach is capable of being cured, the Debtors shall have ten (10) business days after the date of providing or receiving notice, as applicable, to cure any breach; or

(d)    the (i) conversion of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, or EFIH Second Lien Note Claims to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of EFH, EFIH, TCEH, EFCH or any Debtor entity obligated under the TCEH First Lien Secured Claims, TCEH Second Lien Note Claims, EFIH First Lien Note Claims, or EFIH Second Lien Claims, unless such conversion or dismissal, as applicable, is made with the prior written consent of counsel to the Consenting Interest Holders.

8.06.    Debtors' Termination Events.  Any Debtor may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 11.11 hereof, upon the occurrence of any of the following events:  (a) the Plan Effective Date shall not have occurred by the Initial Outside Date or the Extended Outside Date, as applicable; (b) the breach by any of the Restructuring Support Parties of any material provision set forth in this Agreement that remains uncured for a period of fifteen (15) business days after the receipt by the Restructuring Support Parties of notice of such breach; (c) the board of directors, board of managers, or such similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties; or (d) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining the consummation of a material portion of the Restructuring Transactions.

8.07.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among all of the following:  (a) each of the Consenting Interest Holders;  (b) the Consenting Ad Hoc TCEH Committee;  (c) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by the Consenting Fidelity EFIH First Lien Noteholders at such time;  (d) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFIH Second Lien Note Claims held by all Consenting Creditors at such time;  (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held by the Consenting Creditors at such time;  (f) the Required EFIH Unsecured Consenting Creditors; and (g) each of the Debtors.

8.08.  Termination Upon Completion of the Restructuring Transactions.  This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

8.09.  Individual Consenting Creditor Termination.  Notwithstanding anything to the contrary herein:

(a)  If the Plan Effective Date does not occur by the earlier of (1) the Extended Outside Date and (2) three hundred thirty-five (335) days from the Petition Date, then each Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

(b)  If there are any changes to the terms of the TCEH Cash Collateral Order that have a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on a Consenting Creditor without such Consenting Creditor's prior written consent, then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

(c)  If the Plan (as it may be modified, amended or supplemented) includes terms in respect of the TCEH Incremental 2012 Term Loans that provide for a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on any Consenting Creditor that beneficially holds the TCEH Incremental 2012 Term Loans (including, without limitation, any disparate treatment with respect to the releases granted under the Plan), then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties hereto by providing notice of the same in accordance with Section 11.11 hereof.

(d)  If any person commences, or obtains standing to commence, a Permitted Cause of Action against a Consenting Creditor (or with respect to Claims beneficially held by such Consenting Creditor), then such Consenting Creditor may terminate its rights and obligations under this Agreement without affecting the other Parties' rights and obligations by providing notice of the same in accordance with Section 11.11 hereof.

8.10.   Fidelity Termination Events.  This Agreement may be terminated as between Fidelity and all Parties by the delivery to the Debtors, counsel to the Consenting Interest Holders, and counsel to the other Consenting Creditors, of a written notice in accordance with Section 11.11 hereof by Fidelity with respect to all Debtor Claims/Interests that Fidelity holds at such time, in the exercise of its discretion, upon the occurrence and continuation of any of the following events; provided, however, Fidelity shall not have the right to terminate this Agreement pursuant to this Section 8.10 if the Commitment Parties exercise their Call Right within ten (10) days of Fidelity's exercise of a termination right under this Section 8.10:

(a)   on the date that is ten (10) business days prior to the first day of the hearing for the Bankruptcy Court to approve entry of the Disclosure Statement Order (the "**Disclosure Statement Hearing**"), if the Debtors have notified Fidelity and all other Parties at least fifteen (15) days prior to the Disclosure Statement Hearing that the Debtors have determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15% (such notification, the "**EFH Minimum Recovery Notification**"); and

(b)   on the date that is ten (10) business days prior to the first day of the hearing for the Bankruptcy Court to approve entry of the Confirmation Order (the "**Confirmation Hearing**"), if (i) the Debtors did not make the EFH Minimum Recovery Notification and (ii) Fidelity notifies all other Parties at least ten (10) business days prior to the first day of the Confirmation Hearing that Fidelity has determined in good faith that the recovery for the EFH Non-Guaranteed Notes is expected to be less than 37.15%.

8.11.   Effect of Termination.  No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.  The date on which termination of this Agreement as to a Party is effective in accordance with Sections 8.01, 8.02, 8.03, 8.04, 8.05, 8.06, 8.07, 8.08, 8.09, and 8.10 shall be referred to as a "**Termination Date**".  Except as set forth below, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided, however, that the occurrence of a Termination Date as to a Party shall not affect the Debtors' obligations under Section 10 with respect to amounts accrued up to and including such Termination Date; provided, further, that Section 4.03(a)(viii) and Section 8.12 shall survive the termination of this Agreement.  Upon the occurrence of a Termination Date, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise.  Notwithstanding anything to the contrary in this Agreement or the Commitment Letter, the foregoing shall not be construed to prohibit the Debtors or any of the Restructuring Support Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement or the Commitment Letter that arose or existed before a Termination Date.  Except as expressly provided in this

Agreement (including as set forth in Section 8.12) , nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Interest Holder or Consenting Creditor, and (b) any right of any Consenting Interest Holder or Consenting Creditor, or the ability of any Consenting Interest Holder or Consenting Creditor to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor, Consenting Interest Holder, or Consenting Creditor.  Nothing in this Section 8.09 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 8.06(c).

8.12.   <u>No Violation of Automatic Stay</u>.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Restructuring Support Party from taking any action necessary to effectuate the termination of this Agreement pursuant to the terms hereof.

**Section 9.**      *Amendments*.  This Agreement, including the Term Sheet and the Plan, may not be modified, amended, or supplemented in any manner except in writing signed by all of the following:  (a) the Consenting Interest Holders, (b) the Consenting Ad Hoc TCEH Committee; (c) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of the EFH Unsecured Note Claims held at such time by the Consenting Creditors; (d) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by all Consenting Fidelity First Lien Noteholders at such time; (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate of each of the EFIH Second Lien Note Claims at such time; (f) the Required EFIH Unsecured Consenting Creditors; (g) each applicable Consenting Non-Fidelity EFIH First Lien Noteholder(s); and (h) each of the Debtors; <u>provided</u>, <u>however</u>, that if the proposed modification, amendment or supplement has a material, disproportionate (as compared to other Consenting Creditors holding Claims within the same Class as provided for in the Term Sheet) and adverse effect on any of the Restructuring Support Parties or the Claims held by such Restructuring Support Parties (including any disparate treatment with respect to the releases granted under the Plan), then the consent of each such affected Restructuring Support Party shall also be required to effectuate such modification, amendment or supplement; <u>provided</u>, <u>further</u>, <u>however</u>, that Section 8.09 and Section 9 shall not be amended without the consent of each Consenting Creditor.  Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 10.**      *Fees and Expenses*.  Subject to Section 8.11, the Debtors shall pay or reimburse when due the following reasonable and documented professional fees and expenses:  (a)(i) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, one (1) financial advisor, one (1) tax advisor, and one (1) technical and market advisor for, on a collective basis, all Consenting TCEH First Lien Creditors and (ii) the professionals identified on **Schedule 2** attached hereto, in each case, upon the Bankruptcy Court's entry of the RSA Assumption Order; (b) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, one (1) tax advisor, and one (1) financial advisor for, on a collective basis, all Consenting EFIH Unsecured Noteholders, upon the Bankruptcy Court's entry of the earlier of the Approval Order and the RSA Assumption Order; (c) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, and one (1) financial advisor for, on a collective basis, all Consenting EFH Unsecured Noteholders, Consenting Fidelity EFIH First Lien Noteholders (in connection with EFH

23

Unsecured Note Claims, EFIH First Lien Note Claims, and EFIH Second Lien Note Claims beneficially owned by Fidelity) upon the Bankruptcy Court's entry of the earlier of the Approval Order and the RSA Assumption Order; (d) one (1) primary counsel and one (1) local counsel for each of the Consenting Non-Fidelity EFIH First Lien Noteholders that are a Party as of the Agreement Effective Date; and (e) one (1) primary counsel, one (1) local counsel, one (1) regulatory counsel, and one (1) financial advisor for, on a collective basis, all Consenting Interest Holders upon the occurrence of the Plan Effective Date.    Additionally, EFIH may, in its reasonable discretion, pay the reasonable and documented fees and expenses of professionals retained by Consenting Non-Fidelity EFIH First Lien Noteholders that become a Party after the Agreement Effective Date.    Fees and expenses described in this Section 10 shall be allocated as described in the Term Sheet.

**Section 11.    *Miscellaneous*.**

11.01. <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

11.02. <u>Service on an Official Committee</u>.    Notwithstanding anything herein to the contrary, if an official committee is appointed in the Chapter 11 Cases and a Consenting Creditor is appointed to and serves on such official committee, then the terms of this Agreement shall not be construed to limit such Consenting Creditor's exercise of its fiduciary duties in its role as a member of such committee; <u>provided</u>, <u>however</u>, that serving as a member of such committee shall not relieve the Consenting Creditor of any obligations under this Agreement; <u>provided</u>, <u>further</u>, that nothing in the Agreement shall be construed as requiring any Consenting Creditor to serve on any official committee in these Chapter 11 Cases.

11.03. <u>Complete Agreement</u>.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.

11.04. <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

11.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF DELAWARE APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the District of Delaware or any Delaware State court (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or

proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; provided, however, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

11.06.  Confidentiality; Disclosure. The Debtors shall keep strictly confidential and shall not, without the prior written consent of the applicable Consenting Creditor, disclose publicly, or to any person (including any Restructuring Support Party) (a) the holdings of any Consenting Creditor, including the principal amount of TCEH First Lien Claims, EFIH Unsecured Note Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, and EFH Unsecured Note Claims and any other claims held against the applicable Debtor or (b) the identity of any Consenting Creditor or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives or agents as a party to this Agreement, in any public manner, including in the Solicitation Materials, the Plan, or any related press release; provided, however, that (x) the Debtors may disclose such names or amounts to the extent that, upon the advice of counsel, it is required to do so by any governmental or regulatory authority (including federal securities laws and regulations), in which case the Debtors, prior to making such disclosure, shall allow the Consenting Creditor to whom such disclosure relates reasonable time at its own cost to seek a protective order with respect to such disclosures, and (y) the Debtors may disclose the aggregate percentage or aggregate principal amount of (i) outstanding TEF Interests; (ii) outstanding Texas Holdings Interests; (iii) TCEH Credit Agreement Claims; (iv) TCEH First Lien Notes; (v) TCEH First Lien Commodity Hedges; (vi) TCEH First Lien Interest Rate Swaps; (vii) EFIH  First Lien Notes; (viii) EFIH Second Lien Notes; (ix) EFIH Unsecured Notes; and (x) EFH Unsecured Note Claims held by the Consenting Creditors (without naming such Consenting Creditors).  No Consenting Creditor or Consenting Interest Holder shall, without the prior written consent of the Debtors, make any public announcement or otherwise communicate (other than to decline to comment) with any person with respect to Restructuring Transactions or any of the transactions contemplated hereby or thereby, other than as may be required by applicable law and regulation or by any governmental or regulatory authority.  This Section 11.06 shall not apply with respect to any information that is or becomes available to the public other than as a result of a disclosure in violation of any Party's obligations under this Agreement.

11.07.  Trial by Jury Waiver.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.08.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

11.09.  Interpretation and Rules of Construction.  This Agreement is the product of negotiations among the Debtors, the Consenting Interest Holders, and the Consenting Creditors,

and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Debtors, the Consenting Interest Holders, and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

11.10.  <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

11.11.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Debtor, to:

Energy Future Holdings Corp*., et al*.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:  General Counsel
E-mail address:  stacey.dore@energyfutureholdings.com; and
andrew.wright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Richard M. Cieri, Edward O. Sassower, P.C., Stephen E. Hessler, and
Brian E. Schartz
E-mail addresses:  rcieri@kirkland.com, esassower@kirkland.com,
shessler@kirkland.com, and bschartz@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Chad J. Husnick and Steven N. Serajeddini
E-mail address: chusnick@kirkland.com and steven.serajeddini@kirkland.com

(b)    if to a Consenting Interest Holder, to:

Wachtell Lipton Rosen & Katz
51 W. 52nd Street
New York, New York 10019
Attention:  Richard G. Mason and Austin T. Witt
E-mail addresses:  rgmason@wlrk.com and awitt@wlrk.com

(c)     if to a Consenting TCEH First Lien Lender, Consenting TCEH First Lien Noteholder, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Alan W. Kornberg, Brian S. Hermann, and Jacob A. Adlerstein
E-mail addresses:  akornberg@paulweiss.com, bhermann@paulweiss.com, and jadlerstein@paulweiss.com

(d)     if to a Consenting EFIH Unsecured Noteholder, to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
Attention:  Ira S. Dizengoff and Scott L. Alberino
E-mail addresses:  idizengoff@akingump.com and salberino@akingump.com

(e)     if to a Consenting Fidelity EFIH First Lien Noteholder, Consenting EFIH Second Lien Noteholder, Consenting EFH Unsecured Noteholder (each in connection with EFH Unsecured Note Claims, EFIH First Lien Note Claims and EFIH Second Lien Note Claims beneficially owned by Fidelity), to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Brad Eric Scheler, Gary L. Kaplan, and Matthew Roose
E-mail addresses: brad.scheler@friedfrank.com, gary.kaplan@friedfrank.com, and matthew.roose@friedfrank.com

(f)     if to a Consenting Non-Fidelity EFIH First Lien Noteholder, to:

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022-4689
Attention: Jeffrey S. Sabin
E-mail address:  jeffrey.sabin@bingham.com

and

Bingham McCutchen LLP
One Federal Street
Boston, Massachussetts 02110-1726
Attention:  Julia Frost-Davies
E-mail address:  julia.frost-davies@bingham.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by delivery, mail, or courier shall be effective when received.

11.12.  <u>Access</u>.  The Debtors will provide the Restructuring Support Parties and their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice during normal business hours, to relevant properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors; <u>provided</u>, <u>however</u>, that the Debtors' obligation hereunder shall be conditioned upon such Plan Support Party being party to an executed Confidentiality Agreement with the Debtors.

11.13.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Party hereby confirms that its decision to execute this agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.

11.14.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

11.15.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

11.16.  <u>Several, Not Joint, Claims</u>.  The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

11.17.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

11.18. <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

[*Remainder of page intentionally left blank.*]

**Debtor Signature Page to the Plan Support and Lock-Up Agreement**

ENERGY FUTURE HOLDINGS CORP.
TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC
4CHANGE ENERGY COMPANY
4CHANGE ENERGY HOLDINGS LLC
BIG BROWN 3 POWER COMPANY LLC
BIG BROWN LIGNITE COMPANY LLC
BIG BROWN POWER COMPANY LLC
BRIGHTEN ENERGY LLC
BRIGHTEN HOLDINGS LLC
COLLIN POWER COMPANY LLC
DALLAS POWER AND LIGHT COMPANY, INC.
DECORDOVA POWER COMPANY LLC
DECORDOVA II POWER COMPANY LLC
EAGLE MOUNTAIN POWER COMPANY LLC
EEC HOLDINGS, INC.
EECI, INC.
EFH AUSTRALIA (NO. 2) HOLDINGS COMPANY
EFH CORPORATE SERVICES COMPANY
EFH FINANCE (NO. 2) HOLDINGS COMPANY
EFH FS HOLDINGS COMPANY
EFH RENEWABLES COMPANY LLC
EFIH FINANCE INC.
ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC
ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
GENERATION DEVELOPMENT COMPANY LLC
GENERATION MT COMPANY LLC
GENERATION SVC COMPANY
LAKE CREEK 3 POWER COMPANY LLC
LONE STAR ENERGY COMPANY, INC.
LONE STAR PIPELINE COMPANY, INC.
LSGT GAS COMPANY LLC
LSGT SACROC, INC.
LUMINANT BIG BROWN MINING COMPANY LLC
LUMINANT ENERGY COMPANY LLC
LUMINANT ENERGY TRADING CALIFORNIA COMPANY
LUMINANT ET SERVICES COMPANY
LUMINANT GENERATION COMPANY LLC
LUMINANT HOLDING COMPANY LLC
LUMINANT MINERAL DEVELOPMENT COMPANY LLC
LUMINANT MINING COMPANY LLC
LUMINANT RENEWABLES COMPANY LLC
MARTIN LAKE 4 POWER COMPANY LLC
MONTICELLO 4 POWER COMPANY LLC
MORGAN CREEK 7 POWER COMPANY LLC

NCA DEVELOPMENT COMPANY LLC
NCA RESOURCES DEVELOPMENT COMPANY LLC
OAK GROVE MANAGEMENT COMPANY LLC
OAK GROVE MINING COMPANY LLC
OAK GROVE POWER COMPANY LLC
SANDOW POWER COMPANY LLC
SOUTHWESTERN ELECTRIC SERVICE COMPANY, INC.
TCEH FINANCE, INC.
TEXAS ELECTRIC SERVICE COMPANY, INC.
TEXAS ENERGY INDUSTRIES COMPANY, INC.
TEXAS POWER AND LIGHT COMPANY, INC.
TEXAS UTILITIES COMPANY, INC.
TEXAS UTILITIES ELECTRIC COMPANY,   INC.
TRADINGHOUSE 3 & 4 POWER COMPANY LLC
TRADINGHOUSE POWER COMPANY LLC
TXU ELECTRIC COMPANY, INC.
TXU ENERGY RETAIL COMPANY LLC
TXU ENERGY SOLUTIONS COMPANY LLC
TXU RETAIL SERVICES COMPANY
TXU SEM COMPANY
VALLEY NG POWER COMPANY LLC
VALLEY POWER COMPANY LLC


By: _____
Name:
Title:

**Consenting Interest Holder Signature Page to
the Restructuring Support and Lock-Up Agreement**

TEXAS ENERGY FUTURE HOLDINGS LIMITED PARTNERSHIP

By: _____
Texas Energy Future Capital Holdings LLC, its General Partner


TEXAS ENERGY FUTURE CAPITAL HOLDINGS LLC

By: _____
Name:
Title:
Its:

**Consenting Creditor Signature Page to
the Restructuring Support and Lock-Up Agreement**

_____
Name:
Title:

Address:



E-mail address(es):
Telephone:
Facsimile:

If a Consenting Non-Fidelity First Lien Noteholder, Backstop Amount (if any):  $_____

| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
| --- | --- |
| EFH Interests (if any) | |
| Texas Holdings Interests (if any) | |
| TEF Interests (if any) | |
| TCEH Credit Agreement Claims (if any) | $ |
| TCEH First Lien Note Claims (if any) | $ |
| TCEH First Lien Commodity Hedge Claims (if any) | $ |
| TCEH First Lien Interest Rate Swap Claims (if any) | $ |
| TCEH Second Lien Note Claims (if any) | $ |
| TCEH 2015 Note Claims (if any) | $ |
| TCEH Senior Toggle Note Claims (if any) | $ |
| EFIH First Lien 2017 Note Claims (if any) | $ |
| EFIH First Lien 2020 Note Claims (if any) | $ |
| EFIH 2021 Note Claims (if any) | $ |
| EFIH 2022 Note Claims (if any) | $ |
| EFIH Senior Toggle Note Claims (if any) | $ |
| EFIH Unexchanged Note Claims (if any) | $ |
| EFH 2019 Note Claims (if any) | $ |
| EFH 2020 Note Claims (if any) | $ |
| EFH Series P Note Claims (if any) | $ |
| EFH Series Q Note Claims (if any) | $ |
| EFH Series R Note Claims (if any) | $ |
| EFH LBO Senior Note Claims (if any) | $ |
| EFH LBO Toggle Note Claims (if any) | $ |

# EXHIBIT 2

**First Amendment to the Restructuring Support Agreement**

*Execution Version*

**FIRST AMENDMENT TO RESTRUCTURING
SUPPORT AND LOCK-UP AGREEMENT**

**THIS FIRST AMENDMENT TO THE RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT** (this "**Amendment**") is made as of May 7, 2014 by and among all of the following: (a) the Consenting Interest Holders; (b) the Consenting Ad Hoc TCEH Committee; (c) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of EFH Unsecured Note Claims held at such time by the Consenting Creditors; (d) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by all Consenting Fidelity First Lien Noteholders at such time; (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate of each of the EFIH Second Lien Note Claims at such time; (f) the Required EFIH Unsecured Consenting Creditors; (g) each applicable Consenting Non-Fidelity EFIH First Lien Noteholder; and (h) each of the Debtors (each of the foregoing listed on the signature pages attached hereto and collectively, the "**Required Amendment Parties**") and amends that certain restructuring support and lock up agreement dated as of April 29, 2014 by and among the Restructuring Support Parties (as amended, the "**Restructuring Support Agreement**"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Restructuring Support Agreement.

WHEREAS, the Restructuring Support Parties desire to amend the Restructuring Support Agreement as set forth in this Amendment;

WHEREAS, Section 9 of the Restructuring Support Agreement permits the Restructuring Support Parties to modify, amend or supplement the Restructuring Support Agreement with the consent of the Required Amendment Parties as set forth above;

NOW, THEREFORE, in consideration of the mutual covenants and agreements and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Restructuring Support Parties hereto hereby agree to amend the Restructuring Support Agreement as follows:

1.     Amendments to the Restructuring Support Agreement.

1.01.     Section 4.04(c) of the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the following:

> Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude any Consenting Creditor from settling or delivering securities or bank debt to settle any confirmed transaction pending as of the date of such Consenting Creditor's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Debtor Claims/Interests so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement), (ii) a Qualified Marketmaker (as defined below) that acquires any of the Debtor Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Debtors Claims/Interests, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within five (5) business days of its acquisition to a Consenting Interest Holder,

Consenting Creditor, or Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and the transfer otherwise is a Permitted Transfer, and (iii) to the extent any Restructuring Support Party is acting in its capacity as a Qualified Marketmaker, such Restructuring Support Party may Transfer any Debtor Claims / Interests that it acquires from a holder of such Debtor Claims / Interests that is not a Restructuring Support Party to a transferee that is not a Restructuring Support Party at the time of such Transfer without the requirement that such transferee be or become a Restructuring Support Party.

1.02.    Section 8.01(b) of the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the following:

the Debtors shall not have filed the RSA Assumption Motion with the Bankruptcy Court on or before May 15, 2014.

1.03.    Section 8.02(a) of the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the following:

the Debtors have not filed each of the EFIH First Lien DIP Motion, the EFIH Second Lien DIP Motion, and the Approval Motion on or before May 15, 2014.

1.04.    Section 8.04(a) of the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the following:

the Debtors have not filed each of the EFIH First Lien DIP Motion, the EFIH Second Lien DIP Motion, and the Approval Motion on or before May 15, 2014.

1.05.    Exhibit A to the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the Amended and Restated Term Sheet, without reference to any of exhibits referenced in the Term Sheet or the Amended and Restated Term Sheet, attached to this Amendment as **Exhibit A**.

1.06.    Exhibit H to Exhibit A of the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the Amended and Restated EFIH Second Lien DIP Financing Term Sheet attached to this Amendment as **Exhibit B**.

2.    Ratification.  Except as specifically provided for in this Amendment, no changes, amendments, or other modifications have been made on or prior to the date hereof or are being made to the terms of the Restructuring Support Agreement or the rights and obligations of the parties thereunder, all of which such terms are hereby ratified and confirmed and remain in full force and effect.

3.    Effect of Amendment.  This letter agreement shall be effective on the date on which the Debtors have received all of the Required Amendment Parties' signature pages. Following the effective date, whenever the Restructuring Support Agreement is referred to in any agreements, documents, and instruments, such reference shall be deemed to be to the Restructuring Support Agreement as amended by this Amendment.

2

4.    <u>Waiver of Certain Termination Rights</u>.  Each of the Required Amendment Parties hereby waives, as applicable, the termination rights set forth in Section 8.01(b), Section 8.02(a), and Section 8.04(a) of the Restructuring Support Agreement that may exist as of the effective date of this Amendment.

[*Signature pages redacted*]

## __EXHIBIT 3__

**Second Amendment to the Restructuring Support Agreement**

*Execution Version*

## SECOND AMENDMENT TO RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT

**THIS SECOND AMENDMENT TO THE RESTRUCTURING SUPPORT AND LOCK-UP AGREEMENT** (this "**Amendment**") is made as of May 16, 2014 by and among all of the following: (a) the Consenting Interest Holders; (b) the Consenting Ad Hoc TCEH Committee (as amended below); (c) Consenting Creditors holding at least 50.1% in principal amount of the aggregate amount of EFH Unsecured Note Claims held at such time by the Consenting Creditors; (d) Consenting Fidelity EFIH First Lien Noteholders holding at least 50.1% in principal amount of the aggregate amount of the EFIH First Lien Note Claims held by all Consenting Fidelity First Lien Noteholders at such time; (e) Consenting Creditors holding at least 50.1% in principal amount of the aggregate of each of the EFIH Second Lien Note Claims at such time; (f) the Required EFIH Unsecured Consenting Creditors; (g) each applicable Consenting Non-Fidelity EFIH First Lien Noteholder; and (h) each of the Debtors (each of the foregoing listed on the signature pages attached hereto and collectively, the "**Required Amendment Parties**") and amends that certain restructuring support and lock up agreement dated as of April 29, 2014 by and among the Restructuring Support Parties and amended on May 7, 2014 (as amended, the "**Restructuring Support Agreement**"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Restructuring Support Agreement.

WHEREAS, the Restructuring Support Parties desire to amend the Restructuring Support Agreement as set forth in this Amendment;

WHEREAS, Section 9 of the Restructuring Support Agreement permits the Restructuring Support Parties to modify, amend or supplement the Restructuring Support Agreement with the consent of the Required Amendment Parties as set forth above;

NOW, THEREFORE, in consideration of the mutual covenants and agreements and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Restructuring Support Parties hereto hereby agree to amend the Restructuring Support Agreement as follows:

      1.    <u>Amendments to the Restructuring Support Agreement</u>.

      1.01.    Clause (a) of the definition of "**Required Consenting Creditors**" in Section 3 of the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the following:

      (a) at least three (3) members of the Ad Hoc TCEH Committee who are Consenting Creditors who collectively hold at least 50.1% of the TCEH First Lien Claims held by the members of the Ad Hoc TCEH Committee who are Consenting Creditors (the "**Consenting Ad Hoc TCEH Committee**");

      1.02.    Section 8.01(b) of the Restructuring Support Agreement is hereby deleted in its entirety and replaced with the following:

      the Debtors shall not have filed the RSA Assumption Motion with the Bankruptcy Court on or before May 16, 2014.

2.      Ratification.  Except as specifically provided for in this Amendment, no changes, amendments, or other modifications have been made on or prior to the date hereof or are being made to the terms of the Restructuring Support Agreement or the rights and obligations of the parties thereunder, all of which such terms are hereby ratified and confirmed and remain in full force and effect.

3.      Effect of Amendment.  This letter agreement shall be effective on the date on which the Debtors have received all of the Required Amendment Parties' signature pages. Following the effective date, whenever the Restructuring Support Agreement is referred to in any agreements, documents, and instruments, such reference shall be deemed to be to the Restructuring Support Agreement as amended by this Amendment.

4.      Waiver of Certain Termination Rights.  Each of the Required Amendment Parties hereby waives, as applicable, the termination rights as set forth in Section 8.01(b) of the Restructuring Support Agreement that may exist as of the effective date of this Amendment.

*[Signature pages redacted.]*

**<u>EXHIBIT A</u> to**
**the Restructuring Support and Lock-Up Agreement**

**Term Sheet**

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## AMENDED AND RESTATED RESTRUCTURING TERM SHEET

### INTRODUCTION

This term sheet (this "Term Sheet")[1] describes the terms of a restructuring of: (a) Energy Future Holdings Corp., a Texas corporation ("EFH"); (b) EFH's wholly-owned direct subsidiaries Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH") and Energy Future Competitive Holdings Company LLC, a Delaware limited liability company ("EFCH"); (c) EFIH's wholly-owned direct subsidiary, EFIH Finance Inc., a Delaware corporation; (d) EFCH's wholly-owned direct subsidiary, Texas Competitive Electric Holdings Company LLC, a Delaware limited liability company ("TCEH"); (e) TCEH's directly and indirectly-owned subsidiaries listed on Exhibit B; and (f) EFH's directly and indirectly-owned subsidiaries listed on Exhibit C (the entities listed in clauses (a) through (f) collectively, the "Debtors," and such restructuring, the "Restructuring").

The Debtors will implement the Restructuring through a prearranged plan of reorganization, which shall be consistent with the terms of this Term Sheet and the Restructuring Support Agreement (as it may be amended or supplemented from time to time in accordance with the terms of the Restructuring Support Agreement, the "Plan") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware or another bankruptcy court of competent jurisdiction with respect to the subject matter (the "Bankruptcy Court"). This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.

The governing documents with respect to the Restructuring will contain terms and conditions that are dependent on each other, including those described in this Term Sheet.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring, which remain subject to discussion and negotiation in accordance with the Restructuring Support Agreement. The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Term Sheet or the Restructuring Support Agreement. This Term Sheet is confidential and may not be released to any other party unless permitted under the Restructuring Support Agreement or in accordance with a Confidentiality Agreement (as defined in the Restructuring Support Agreement).

---

[1] Capitalized terms used but not otherwise defined in this Term Sheet have the meanings ascribed to such terms as set forth on **Exhibit A**.

## **OVERVIEW OF THE RESTRUCTURING**

In general, the Restructuring contemplates that:

(a)     The Debtors will implement the Restructuring in the Bankruptcy Court pursuant to the Plan on the terms set forth in this Term Sheet.

(b)     Holders of the TCEH First Lien Secured Claims will receive their Pro Rata share of (i) 100% of the Reorganized TCEH Common Stock, subject to dilution only by the Reorganized TCEH Management Incentive Plan; and (ii) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt.

(c)     Holders of General Unsecured Claims Against the TCEH Debtors (which shall include TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims) will receive their Pro Rata share of the TCEH Unsecured Claim Fund.

(d)     Pursuant to the EFIH First Lien Settlement, Settling EFIH First Lien Note Holders will convert their EFIH First Lien Note Claims to EFIH First Lien DIP Claims in an amount equal to the greater of (i) (A) 105% of the principal plus (B) 101% of accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing (which amount shall be deemed to include the original issue discount paid in respect of the EFIH First Lien DIP Financing); and (ii) (A) 104% of the principal plus (B) accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing, plus original issue discount paid in respect of the EFIH First Lien DIP Financing, it being understood that in connection with such loans, Settling EFIH First Lien Note Holders shall be entitled to interest in accordance with the EFIH First Lien DIP Financing, but shall not be entitled to any other fees (including commitment fees) paid in respect of the EFIH First Lien DIP Financing.  Any other Allowed EFIH First Lien Note Claims shall receive their Pro Rata share of cash in the amount of such Claims on the Effective Date or such other treatment as permitted under section 1129(b) of the Bankruptcy Code, as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors.

(e)     Pursuant to the EFIH Second Lien Settlement, Settling EFIH Second Lien Note Holders will receive their Pro Rata share of (a) principal plus accrued and unpaid interest at the non-default rate, through consummation of the EFIH Second Lien DIP Financing; and (b) 50% of the aggregate amount of the EFIH Second Lien Makewhole Claims. Fidelity may use the proceeds it receives on account of the EFIH Second Lien Settlement to participate in the EFIH First Lien DIP Financing in an amount up to $500 million.  The Debtors will initiate litigation to obtain entry of an order disallowing any EFIH Second Lien Makewhole Claim of Non-Settling EFIH Second Lien Note Holders, and Non-Settling EFIH Second Lien Note Holders will receive their Pro Rata share of cash on hand at EFIH or from the proceeds of the EFIH Second Lien DIP Financing and available cash at EFIH in an amount equal to the principal plus accrued and unpaid interest, through consummation of the EFIH Second Lien DIP Financing, at the non-default rate of such Holder's Claim (not including any premiums, fees, or Claims relating to the repayment of the EFIH Second Lien Note Claims).  Any other Allowed EFIH Second Lien Note Claims shall receive their Pro Rata share of cash in the amount of such Claims on the Effective Date or such other treatment as permitted under section 1129(b) of the Bankruptcy Code, as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors.

(f)     Pursuant to the Commitment Letter, certain Holders of EFIH Unsecured Note Claims will

commit up to $1,900 million in cash, which shall be utilized to backstop the EFIH Second Lien DIP Financing. On the Effective Date, EFIH Second Lien DIP Claims shall convert on a Pro Rata basis to Reorganized EFH Common Stock issued and outstanding as of the Effective Date pursuant to the Equity Conversion and the terms set forth in this Term Sheet.

(g) Holders of EFIH Unsecured Note Claims and EFH LBO Notes Guaranty Claims will receive their Pro Rata share of 91% of the Participation Rights and, on the Effective Date, Holders of General Unsecured Claims Against the EFIH Debtors will receive 98% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion.

(h) Holders of General Unsecured Claims Against EFH will receive their Pro Rata share of: (i) the Equity Conversion; (ii) on the Effective Date, 1% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion; and (iii) on the Effective Date, either: (A) if the Oncor TSA Amendment has been approved, (1) $55 million in cash from EFIH, *provided, however*, that if the Oncor tax payments received by EFIH under the Oncor TSA Amendment through the Effective Date are less than 80% of the projected amounts set forth in this Term Sheet, the $55 million shall be reduced dollar-for-dollar by such shortfall, and (2) cash on hand at EFH (not including the settlement payment in clause (1) hereof); or (B) if the Oncor TSA Amendment has not been approved, all EFH assets, including cash on hand and any Causes of Action, but excluding Interests in EFIH.

(i) Holders of General Unsecured Claims Against EFH Debtors Other Than EFH shall receive treatment in accordance with the priorities set forth in the Bankruptcy Code.

(j) Holders of EFH Interests will receive, on the Effective Date, their Pro Rata share of 1% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion.

| **GENERAL PROVISIONS REGARDING THE EFIH RESTRUCTURING** |
|---|

| **EFIH First Lien DIP Financing** | Consistent with the Restructuring Support Agreement, EFIH will file a motion (the "<u>EFIH First Lien DIP Motion</u>") or, to the extent necessary, commence an adversary proceeding to: |
|---|---|
| | (a) seek approval of the EFIH First Lien DIP Financing on the terms set forth in **Exhibit G**; |
| | (b) repay in full all outstanding principal and accrued and unpaid interest through consummation of the EFIH First Lien DIP Financing, at the non-default rate due and owing under the EFIH First Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims), held by Non-Settling EFIH First Lien Note Holders in cash from the proceeds of the EFIH First Lien DIP Financing in full satisfaction of such Holders' EFIH First Lien Note Claims; |
| | (c) exchange the EFIH First Lien Note Claims held by Settling EFIH First Lien Note Holders (and EFIH Second Lien Note Claims electing such treatment under the EFIH Second Lien Settlement, if any) for loans under the EFIH First Lien DIP Financing in accordance with the terms of the EFIH First Lien Settlement (and the EFIH Second Lien Settlement); and |

| | |
|---|---|
| | (d) obtain entry of an order or a judicial finding that no Allowed Claim exists on account of EFIH First Lien Makewhole Claims held by Non-Settling EFIH First Lien Note Holders. |
| **EFIH First Lien Settlement** | Consistent with the Restructuring Support Agreement, EFIH shall file a motion to: <br><br> (a) seek approval of a settlement with the Settling EFIH First Lien Note Holders (the "**EFIH First Lien Settlement**") on the terms set forth below; <br><br> (b) provide EFIH First Lien Note Claims held by Fidelity, PIMCO, and any other holders of EFIH First Lien Note Claims that are signatories to the Restructuring Support Agreement as of the date of the EFIH First Lien DIP Financing is consummated (such Holders, "**Settling EFIH First Lien Note Holders**") with, in connection with the EFIH First Lien DIP Financing, and as payment in full of their EFIH First Lien Note Claims, their Pro Rata share of an amount of loans under the EFIH First Lien DIP Financing equal to the greater of: (i) (A) 105% of the principal plus (B) 101% of accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing (which amount shall be deemed to include the original issue discount paid in respect of the EFIH First Lien DIP Financing); and (ii) (A) 104% of the principal plus (B) accrued and unpaid interest at the non-default rate on such principal, through consummation of the EFIH First Lien DIP Financing, plus original issue discount paid in respect of the EFIH First Lien DIP Financing, it being understood that in connection with such loans, Settling EFIH First Lien Note Holders shall be entitled to interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%) in accordance with the EFIH First Lien DIP Financing, but shall not be entitled to any other fees (including commitment fees) paid in respect of the EFIH First Lien DIP Financing; and <br><br> (c) seek approval of a commitment by PIMCO, in the amount of $1.45 billion, and Fidelity or WAMCO if they elect to commit any additional amounts set forth on such parties' signature page to the Restructuring Support Agreement (each, the "**Backstop Amount**," such Backstop Amount, collectively, the "**Backstop Commitment**," and such backstopping parties, the "**Backstop Parties**") to provide backstop EFIH First Lien DIP Financing (the "**Backstop Financing**") on the terms set forth below within five (5) calendar days of the date of the Restructuring Support Agreement, it being understood that in connection with such loans, the Backstop Parties shall be entitled to interest (in no event less than LIBOR plus 3.25% with a LIBOR floor of 1.00%) and original issue discount equal to the greater of (i) 1.00% or such original issue discount as may be paid to other lenders in the EFIH First Lien DIP Financing, and shall be restricted by the Clear Market Provision set forth below, but shall be entitled to commitment fees upon entry of final order consummating the EFIH First Lien DIP Financing, in the following amounts:  (i) 1.75%, if such Settling EFIH |

First Lien Note Holders enter into a commitment by executing the Restructuring Support Agreement before the petition is filed, or (ii) 1.00%, if such Settling EFIH First Lien Note Holders enter into a commitment by executing the Restructuring Support Agreement after the petition is filed, paid in respect of such Backstop Financing, and a ticking fee if and when one becomes payable to EFIH First Lien DIP lenders, and with closing conditions as set forth in **Exhibit I**, and as otherwise set forth in the EFIH First Lien DIP Financing.    The Backstop Financing shall be funded (x) first, by PIMCO in an amount equal to the lesser of:  (a) $768.871 million; or (b) (i) the maximum possible amount of the First Lien Exchange Financing (i.e., assuming all Holders of EFIH First Lien Note Claims participated in the EFIH First Lien Settlement) less the actual amount of the First Lien Exchange Financing at such time (the "**Unallocated First Lien Exchange Capacity**") plus (ii) an amount equal to $4,850 million less the maximum possible amount of the First Lien Exchange Financing (i.e., assuming all Holders of EFIH First Lien Note Claims participated in the EFIH First Lien Settlement); provided, however, in such event, any Backstop Financing funded in excess of the Unallocated First Lien Exchange Capacity shall not be entitled to any commitment fees; (y) second, by all Backstop Parties (on a pro rata basis based on each Backstop Party's individual remaining unused Backstop Amount) in an amount equal to the lesser of:   (A) the remaining amount of the Backstop Commitment, if any; and (B) the remaining amount of the Unallocated First Lien Exchange Capacity, if any;

(d) seek approval of a commitment by GSO to fund $50 million on the terms set forth in the EFIH First Lien DIP Financing, including original issue discount, but not including commitment fees.

The EFIH First Lien Settlement shall be governed by the following principles:

(a) **Eligibility**.  The EFIH First Lien Settlement may be offered or made available, at EFIH's election, to other Holders of EFIH First Lien Note Claims that sign the Restructuring Support Agreement; provided, however, that any such offering shall (1) be completed within twenty-five (25) business days after May 5, 2014 and (2) include a "step-down" in the exchange rate applicable to the exchange on the tenth (10) business day after the launch of such exchange (provided such "step down" date can be extended by up to three (3) business days).

(b) **Reservation of Rights**. The EFIH First Lien Settlement shall in no way affect EFIH's position with respect to Holders of EFIH First Lien Note Claims that do not enter into the EFIH First Lien Settlement (such holders, the "**Non-Settling EFIH First Lien Note Holders**"). Accordingly, as to the Non-Settling EFIH First Lien Note Holders, EFIH shall reserve all rights.

(c) **Effect; Most Favored Nation**. The EFIH First Lien Settlement shall be binding on Settling EFIH First Lien Note Holders in all respects and irrespective of the outcome of any litigation in respect of any other

5

| | |
|---|---|
| | EFIH First Lien Makewhole Claim; provided, however, that if EFIH reaches one or more voluntary settlements with a Non-Settling EFIH First Lien Note Holder in the period commencing on the Petition Date and ending on the date on which the EFIH First Lien DIP Financing is fully funded pursuant to a final order entered by the Bankruptcy Court, which provides a higher percentage recovery to a Non-Settling EFIH First Lien Note Holder does the EFIH First Lien Settlement, the EFIH First Lien Settlement shall be automatically amended to provide such higher percentage recovery to Fidelity and PIMCO, provided, further, that if the EFIH First Lien DIP Financing shall have been consummated by such date, such additional consideration may be in the form of cash, at the election of EFIH.<br><br>(d) **Clear Market Provision**.  The "**Clear Market Provision**" shall mean the requirement that the Settling EFIH First Lien Note Holders not syndicate or attempt to syndicate any portion of their commitment under the DIP Facility, prior to the earlier of (x) the date that the lenders under the EFIH First Lien DIP Financing no longer hold any of the EFIH First Lien DIP Financing (i.e., successful syndication date) and (y) in the event of an offering with respect to the EFIH First Lien Settlement, the 25th day after the end of any 'early' election period given to the holders of the EFIH First Lien Notes Claims.<br><br>(e) **Definitive Documentation**.  The final credit agreement consummating the DIP Financing shall be in form and substance, in all material respects, consistent with the draft credit agreement as modified by the draft DIP Financing term sheet, each as attached to this Term Sheet, and any material modification to such credit agreement (as modified by such DIP Financing term sheet) shall be approved by PIMCO (such approval not to be unreasonably withheld, delayed or conditioned). The final order consummating the DIP Financing shall be in form and substance reasonably acceptable in all material respects to PIMCO. |
| **EFIH Second Lien DIP Financing** | Consistent with the Restructuring Support Agreement, EFIH will file a motion (the "EFIH Second Lien DIP Motion") or, to the extent necessary, commence an adversary proceeding to:<br><br>(a) seek approval of the EFIH Second Lien DIP Financing on the terms set forth in **Exhibit H** in an amount up to $1,900 million;<br><br>(b) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate, through consummation of the EFIH Second Lien DIP Financing, due and owing under the EFIH Second Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH Second Lien Note Holders in cash from proceeds of the EFIH Second Lien DIP Financing and cash on hand at EFIH in full satisfaction of such Holders' EFIH Second Lien Note Claims;  and<br><br>(c) repay the EFIH Second Lien Notes held by Settling EFIH Second Lien Note Holders with cash on hand at EFIH, cash from the proceeds of the |

|  | EFIH Second Lien DIP Financing or, in the case of Fidelity, an exchange for participation in the EFIH First Lien DIP Financing in accordance with the terms of the EFIH Second Lien Settlement. |
|  | The Debtors will assert that no Allowed Claim exists on account of any alleged premiums, fees or claims relating to the repayment of the EFIH Second Lien Note Claims held by Non-Settling EFIH Second Lien Note Holders, but will litigate such Claims at a later date in the Chapter 11 Cases. |
|  | On the Effective Date, the EFIH Second Lien DIP Claims shall be subject to the Equity Conversion. |
| **EFIH Second Lien Settlement** | Consistent with the Restructuring Support Agreement, EFIH shall file a motion to: |

Consistent with the Restructuring Support Agreement, EFIH shall file a motion to:

(a) seek approval of a settlement with the Settling EFIH Second Lien Note Holders (the "**EFIH Second Lien Settlement**") on the terms set forth below; and

(b) provide settling Holders of EFIH Second Lien Note Claims, which shall include Fidelity, GSO, York, and Avenue and such other holders of the EFIH Second Lien Note Claims that are signatories to the Restructuring Support Agreement as of the date the EFIH Second Lien DIP Financing is consummated (such Holders, the "**Settling EFIH Second Lien Note Holders**"), as payment in full of their EFIH Second Lien Note Claims, their Pro Rata share of (i) an amount in cash equal to principal plus accrued but unpaid interest (including Additional Interest) on such principal at the contract non-default rate through the date of consummation of the EFIH Second Lien Settlement, plus (ii) 50% of the aggregate amount of the EFIH Second Lien Makewhole Claims calculated as of the date of consummation of the EFIH Second Lien Settlement and calculated without inclusion of Additional Interest, plus (iii) in the case of GSO, York, and Avenue, a settlement premium of $1.57 million in cash in the aggregate; *provided*, *however*, (1) Fidelity shall have the right to receive up to $500 million of its payment under the EFIH Second Lien Settlement in the form of EFIH First Lien DIP Financing to be implemented in a manner consistent with this Term Sheet and reasonably acceptable to Fidelity, it being understood that in connection with such loans, Fidelity shall be entitled to interest and original issue discount, if any, in respect of the EFIH First Lien DIP Financing plus a 1.75% commitment fee.

The EFIH Second Lien Settlement shall be governed by the following principles:

(c) **Eligibility**.  The EFIH Second Lien Settlement may be made available, at EFIH's election, to other Holders of EFIH Second Lien Note Claims that sign the Restructuring Support Agreement.

(d) **Reservation of Rights**. The EFIH Second Lien Settlement shall in no way affect EFIH's position with respect to Holders of EFIH Second Lien Note Claims that do not enter into the EFIH Second Lien Settlement (such holders, the "**Non-Settling EFIH Second Lien Note Holders**").  Accordingly, as to the Non-Settling EFIH Second Lien

<table>
<tr>
<td></td>
<td>Note Holders, EFIH shall reserve all rights.</td>
</tr>
<tr>
<td></td>
<td>

(e) **Effect; Most Favored Nation**. The EFIH Second Lien Settlement shall be binding on Settling EFIH Second Lien Note Holders in all respects and irrespective of the outcome of any litigation in respect of any other EFIH Second Lien Makewhole Claim; *provided*, *however*, that if EFIH reaches one or more voluntary settlements with either: (i) a Commitment Party or affiliate thereof on account of its EFIH Second Lien Note Claims (whenever acquired) at any time prior to a judgment on the merits of such Claims; or (ii) any other Non-Settling EFIH Second Lien Note Holder at any time prior to the earlier of (x) the date seven business days after the commencement of opening statements (or the equivalent) in any trial on the merits of the Second Lien Makewhole Claims and (y) the date upon which the Commitment Parties exercise and consummate the Call Right, and any such settlements, determined as of the final day of such period, provides a higher percentage recovery than does the EFIH Second Lien Settlement, then the EFIH Second Lien Settlement shall be automatically amended with respect to Fidelity to provide such higher percentage recovery to Fidelity, in its capacity as Settling EFIH Second Lien Note Holder; *provided*, *further*, that if the EFIH First Lien DIP Financing shall have been consummated by either such date, such additional consideration may be in the form of cash, at the election of EFIH.

(f) **Call Right**.  At any time before the Effective Date, any one or more Commitment Parties shall have the right to purchase from Fidelity all of its EFH Non-Guaranteed Notes for a purchase price equal to 37.15% of par plus accrued and unpaid interest through the Petition Date (the "**Call Right**").
</td>
</tr>
<tr>
<td>

**EFIH Second Lien DIP Financing Commitment**
</td>
<td>

Pursuant to the terms and conditions of the Commitment Letter, certain Holders of General Unsecured Claims Against the EFIH Debtors (the "Commitment Parties") have committed up to $1,900 million in available funds (the "EFIH Second Lien DIP Financing Commitment") which shall be utilized, in accordance with and subject to the terms and conditions of the Commitment Letter and related documentation, to backstop the EFIH Second Lien DIP Financing, which shall, subject to the terms of the Conversion Agreement, mandatorily convert into Reorganized EFH Common Stock pursuant to the Equity Conversion.

The Commitment Letter is attached to the Restructuring Support Agreement as Exhibit C.

The Participation Rights with respect to the EFIH Second Lien DIP Financing shall be provided as follows:

(g) All Holders of EFIH Unsecured Note Claims and EFH LBO Notes Guaranty Claims shall receive their Pro Rata share of 91% of the
</td>
</tr>
</table>

8

Participation Rights; and

(h) Fidelity, as a Holder of General Unsecured Claims of EFH, shall receive 9% of the Participation Rights and General Unsecured Claims Against EFH shall receive a Pro Rata share of 9% of the Equity Conversion on account of the Tranche A-3 Notes.  Moreover, Fidelity shall receive an $11.25 million payment from EFIH in connection with the exercise of any of its Participation Rights.  If at any time (a) the PLR Denial (as defined in the Restructuring Support Agreement) has occurred and (b) the Oncor TSA Amendment has not yet been approved, the Required EFIH Unsecured Consenting Creditors shall have the sole and exclusive right to require the Holders of any Tranche A-3 Notes to assign such notes to the Commitment Parties for a purchase price equal to the sum of (i) the par amount of such notes plus accrued and unpaid interest (including the paid-in-kind interest), which amount shall be payable on the purchase date, (ii) in the event such assignment is consummated before the payment of the one-time payment-in-kind fee, 10% of the par amount of such notes plus accrued and unpaid payment-in-kind interest, if any (but not, for the avoidance of doubt, any accrued and unpaid cash interest), which amount shall be payable on the purchase date, and (iii) a Pro Rata share of any Prepayment Fee (as defined in the EFIH Second Lien DIP Financing) subsequently paid on such Tranche A-3 Notes (which amount shall be paid by EFIH to the holders of the Tranche A-3 Notes immediately prior to such assignment and not the holders of the Tranche A-3 Notes as of the date that the Prepayment Fee is due and owing) ("**Tranche A-3 Redemption**").

The Debtors shall file a motion (the "**Approval Motion**") to obtain entry of

(a) an order (the "**Approval Order**") consistent with the Restructuring Support Agreement, authorizing, among other things, (i) the EFIH First Lien Settlement, (ii) the EFIH Second Lien Settlement, and (iii) EFH and EFIH to perform their obligations under the Commitment Letter; and

(b) an order (the "**Oncor TSA Amendment Order**") consistent with the Restructuring Support Agreement, authorizing the Oncor TSA Amendment.

| | |
|---|---|
| **Oncor TSA Amendment** | Consistent with the Restructuring Support Agreement, the Approval Motion shall also include a request for authority to amend, or otherwise assign the payments under, the Oncor Tax Sharing Agreement (the "Oncor TSA Amendment") to provide that any payment required to be made to EFH under the Oncor Tax Sharing Agreement after March 31, 2014, will instead be made to EFIH.  The Debtors agree to use commercially reasonable efforts to secure entry of the Oncor TSA Amendment Order.  Any tax payments received by EFH before the Bankruptcy Court enters or denies the Oncor TSA Amendment Order shall be deposited by EFH into a segregated account (the |

| | |
|---|---|
| | "Segregated Account") and shall not be disbursed until the earlier of (i) the date the Bankruptcy Court enters the Oncor TSA Amendment Order, in which case, such amounts shall be remitted to EFIH or (ii) the date the Bankruptcy Court denies entry of the Oncor TSA Amendment Order, in which case, such amounts shall be remitted to EFH.  After entry of the Oncor TSA Amendment Order, EFIH will reimburse EFH for cash taxes paid by EFH attributable to Oncor state taxes.

The Oncor TSA Amendment shall automatically terminate and be of no further force and effect in the event that the Commitment Letter is terminated by the Commitment Parties; *provided*, *however*, that any amounts that were paid to EFIH in accordance with the Oncor TSA Amendment before its termination shall be retained by EFIH if the Commitment Letter or EFIH Second Lien DIP Financing terminates or is not fully funded in accordance with its terms (i.e., except as a result of a breach by the Commitment Parties).  Neither EFH nor EFIH shall have the right to terminate or modify the Oncor TSA Amendment during the Chapter 11 Cases if the EFIH Second Lien DIP Financing is consummated.

The collateral under the EFIH First Lien DIP Financing and the EFIH Second Lien DIP Financing (if any) will include proceeds of payments under the Oncor TSA Amendment, as long as the Oncor TSA Amendment remains in effect.

If the Bankruptcy Court has not approved the Oncor TSA Amendment 90 days after the Petition Date, each Holder of EFIH Second Lien DIP Notes shall receive, in accordance with the EFIH Second Lien DIP Financing, 4.0% of additional interest with respect to the EFIH Second Lien DIP Notes, paid in kind and compounded quarterly on account of such Holder's EFIH Second Lien DIP Claim, from the date that is 90 days after the Petition Date.  If the Bankruptcy Court do not approve the Oncor TSA Amendment by May 1, 2015, each Holder of EFIH Second Lien DIP Notes shall receive, in accordance with the EFIH Second Lien DIP Financing, a one-time 10.0% paid in kind fee on account of such Holder's EFIH Second Lien DIP Claim. |
| **Private Letter Ruling** | Consistent with the Restructuring Support Agreement, EFH, on behalf of the Debtors, shall file with the IRS a written request (the "**Ruling Request**," and together with all related materials and supplements thereto to be filed with the IRS, the "**IRS Submissions**") that the IRS issue a private letter ruling (the "**Private Letter Ruling**") to EFH  that:

    1.  will provide that the Contribution and the Distribution qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code of 1986, as amended (the "**Code**") |

(collectively, the "**Intended Tax-Free Treatment**"); and

2. will include each of the other requested rulings set forth in Part IV of the Energy Future Holdings Corp. Pre-Submission Memorandum for Rulings Under Section 368(a)(1)(G) and 355 in the form attached as **Exhibit E** (the "**Pre-Submission Memo**").

Collectively, the rulings described in clauses (a) and (b) are the "**Required Rulings**."

Prior to filing the Ruling Request, EFH shall use its reasonable best efforts to arrange a pre-submission conference with the IRS (a "**Pre-Submission Conference**") by requesting such Pre-Submission Conference as soon as reasonably practicable following the Petition Date.  Such request must be made within 5 business days of the Petition Date.  For the avoidance of doubt, the Pre-Submission Memo shall (a) request that the IRS provide, *inter alia*, the Required Rulings, (b) constitute an IRS Submission and (c) be submitted to the IRS in advance of the Pre-Submission Conference.

EFH shall be responsible for the preparation and filing of the IRS Submissions. EFH shall provide tax counsel to the Consenting Creditors and Consenting Interest Holders (the "**PLR Participation Parties**") with a reasonable opportunity to review and comment on drafts of all IRS Submissions filed on or after the date of entry into the Restructuring Support Agreement; *provided, however*, that such rights shall not result in unreasonable delays in submitting the IRS Submissions to the IRS.  No IRS Submission shall be filed without the consent of the Required Consenting Creditors, which consent shall not be unreasonably withheld or delayed.  To the extent that EFH, in its good faith judgment, considers any information included in such IRS drafts to be confidential, EFH may require that any such documents provided to the PLR Participation Parties be redacted to exclude such information, but tax counsel to the PLR Participation Parties shall receive (and keep confidential) complete and unredacted copies of any IRS Submission.  Subject to the foregoing, EFH shall provide the PLR Participation Parties with copies of each IRS Submission promptly following the filing thereof.

EFH shall notify the PLR Participation Parties of any substantive communications with the IRS regarding the IRS Submissions and the Restructuring Transactions. Notwithstanding the foregoing, one representative from each PLR Participation Party (a "**PLR Participation Party Representative**") shall (a) be given the opportunity to participate in all scheduled communications with the IRS concerning the Ruling Request, including all scheduled conference calls and in-person meetings (including the Pre-Submission Conference); and (b) be updated in a timely fashion regarding any unscheduled communications with the IRS.  EFH and the PLR Participation Parties agree to cooperate and use their commercially reasonable efforts to assist in obtaining the Private Letter Ruling requested in the Ruling Request, including providing such appropriate information and representations as the IRS shall reasonably require in connection with the Required Rulings; *provided, however*, that (i) the representations are consistent with, or not more burdensome to the PLR Participation Parties than, those set forth in the Summary of Key Representations, attached as **Exhibit K**, and (ii) providing such information and representations does not restrict the liquidity of equity in Reorganized TCEH

11

|  |  |
|---|---|
|  | after the Effective Date or the Claims of the PLR Participation Parties against the Debtors prior to the Effective Date. Notwithstanding the foregoing, the Debtors, the Consenting Creditors and the Consenting Interest Holders acknowledge that certain of the Required Rulings set forth in the Pre-Submission Memo address matters for which the IRS does not commonly issue private letter rulings and, as a result, there is substantial uncertainty as to what representations the IRS may require from the Debtors, the Consenting Creditors and the Consenting Interest Holders. The Consenting Creditors and Consenting Interest Holders agree to reasonably consider in good faith any representations described in clause (i) above requested by the IRS in order to issue the Private Letter Ruling.<br><br>Other than as set forth in this Term Sheet (including, for this purpose, transactions described in the Pre-Submission Memo), the Debtors shall not take any action to change the entity classification for U.S. federal income tax purposes of any Debtor entity with material assets, by changing their legal form or otherwise, without the consent of the Required EFIH Unsecured Consenting Creditors, the Consenting Interest Holders, and the Ad Hoc TCEH Committee. |

## TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
|  | **Unclassified Non-Voting Claims Against the Debtors** |||
| N/A | **TCEH DIP Claims** | On the Effective Date, in full satisfaction of each Allowed TCEH DIP Claim, each Holder thereof shall receive (a) payment in full in cash or (b) such other less favorable treatment for such Holder as may be agreed to by such Holder and the TCEH Debtors. | N/A |
| N/A | **EFIH First Lien DIP Claims** | On the Effective Date, in full satisfaction of each Allowed EFIH First Lien DIP Claim, each Holder thereof shall receive payment in full in cash from the proceeds of New Reorganized EFIH Debt or cash on hand at EFIH up to the amount of such Holder's Claim. | N/A |
| N/A | **EFIH Second Lien DIP Claims** | On the Effective Date, in full satisfaction of each Allowed EFIH Second Lien DIP Claim, each Holder thereof shall receive its Pro Rata share of Reorganized EFH Common Stock in accordance with the terms of the Equity Conversion (or cash with respect to the Fidelity Repayment up to the amount of such Holder's Claim). | N/A |
| N/A | **Administrative Claims** | On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall | N/A |

| | | receive, in full satisfaction of its Claim, payment in full in cash. | |
|---|---|---|---|
| **N/A** | **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Claim, payments in cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the TCEH Debtors** | | | |
| **Class A1** | **Other Secured Claims against TCEH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable TCEH Debtor in consultation with the Ad Hoc TCEH Committee: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class A2** | **Other Priority Claims against TCEH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class A3** | **TCEH First Lien Secured Claims** | On the Effective Date, in full satisfaction of each Allowed TCEH First Lien Secured Claim, each Holder thereof shall receive its Pro Rata share of: (a) 100% of the Reorganized TCEH Common Stock, subject to dilution only from the Reorganized TCEH Management Incentive Plan; and (b) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt. | Impaired; entitled to vote. |
| **Class A4** | **General Unsecured Claims Against the TCEH Debtors** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against the TCEH Debtors, each Holder thereof shall receive its Pro Rata share of the TCEH Unsecured Claim Fund. | Impaired; entitled to vote. |
| **Class A5** | **TCEH Debtor Intercompany Claims** | On the Effective Date, unless otherwise provided for under the Plan, each TCEH Debtor Intercompany Claim shall either be Reinstated or canceled and released as mutually agreed by the TCEH Debtors and the Ad Hoc TCEH Committee. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| **Class A6** | **Non-TCEH Debtor Intercompany Claims** | On the Effective Date, Non-TCEH Debtor Intercompany Claims shall be canceled and released. | Impaired; deemed to reject. |
| **Class A7** | **Interests in** | On the Effective Date, Interests in the TCEH Debtors | Impaired; |

13

| | | | |
|---|---|---|---|
| | **TCEH Debtors other than TCEH and EFCH** | other than TCEH and EFCH shall either be Reinstated or canceled and released as mutually agreed by the TCEH Debtors and the Ad Hoc TCEH Committee. | deemed to reject or Unimpaired; deemed to accept |
| **Class A8** | **Interests in TCEH and EFCH** | On the Effective Date, Interests in TCEH and EFCH shall be canceled and released in accordance with the Tax-Free Spin-Off. | Impaired; deemed to reject. |
| **Classified Claims and Interests of the EFIH Debtors** | | | |
| **Class B1** | **Other Secured Claims against EFIH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable EFIH Debtor in consultation with the Required EFIH Unsecured Consenting Creditors:  (a) payment in full in cash; (b) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class B2** | **Other Priority Claims against EFIH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Class B3** | **EFIH First Lien Note Claims** | On the Effective Date, in full satisfaction of each Allowed EFIH First Lien Note Claim, and as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors, each Holder thereof shall receive payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. | Impaired; entitled to vote. |
| **Class B4** | **EFIH Second Lien Note Claims** | On the Effective Date, in full satisfaction of each Allowed EFIH Second Lien Note Claim, and as mutually agreed by EFIH and the Required EFIH Unsecured Consenting Creditors, each Holder thereof shall receive payment in full in cash or such other treatment as permitted under section 1129(b) of the Bankruptcy Code. | Impaired; entitled to vote. |
| **Class B5** | **General Unsecured Claims Against the EFIH Debtors** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against the EFIH Debtors, each Holder thereof shall receive its Pro Rata share of 98% of the Reorganized EFH Common Stock, subject to dilution on account of the Equity Conversion. | Impaired; entitled to vote. |
| **Class B6** | **EFIH Debtor Intercompany Claims** | On the Effective Date, unless otherwise provided in the Plan, EFIH Debtor Intercompany Claims shall either be Reinstated or canceled and released as mutually agreed by the EFIH Debtors and the Required EFIH Unsecured Consenting Creditors. | Impaired; deemed to reject or Unimpaired; deemed to accept. |

14

| Class B7 | **Non-EFIH Debtor Intercompany Claims** | On the Effective Date, Non-EFIH Debtor Intercompany Claims shall be canceled and released. | Impaired; deemed to reject. |
|---|---|---|---|
| Class B8 | **Interests in EFIH Debtors** | On the Effective Date, Interests in the EFIH Debtors shall be Reinstated. | Unimpaired, deemed to accept. |
| **Classified Claims and Interests of the EFH Debtors** | | | |
| Class C1 | **Other Secured Claims against EFH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Secured Claim, each Holder thereof shall receive, at the option of the applicable EFH Debtor in consultation with the Required EFIH Unsecured Consenting Creditors:  (a) payment in full in cash; (b) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class C2 | **Other Priority Claims against EFH Debtors** | On the Effective Date, in full satisfaction of each Allowed Other Priority Claim, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class C3 | **Legacy General Unsecured Claims Against EFH** | On the Effective Date, in full satisfaction of each Legacy General Unsecured Claim Against EFH, each Holder thereof shall receive:  (a) payment in full in cash; (b) Reinstatement; or (c) such other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| Class C4 | **General Unsecured Claims Against EFH** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against EFH, each Holder thereof shall receive its Pro Rata share of:  (a) 1% of the Reorganized EFH Common Stock, subject to dilution by the Equity Conversion; and (b) if the Oncor TSA Amendment has been approved, (i) all Cash on hand at EFH, not including the Oncor TSA Amendment Payment; and (ii) the Oncor TSA Amendment Payment; or (b) if the Oncor TSA Amendment has *not* been approved, the EFH Unsecured Claims Fund. | Impaired; entitled to vote. |
| Class C5 | **General Unsecured Claims Against the EFH Debtors Other Than EFH** | On the Effective Date, in full satisfaction of each Allowed General Unsecured Claim Against the EFH Debtors Other Than EFH, each Holder thereof shall receive treatment in accordance with the priorities set forth in the Bankruptcy Code. | Impaired; entitled to vote. |
| Class C6 | **EFH Debtor Intercompany Claims** | On the Effective Date, unless otherwise provided in the Plan, EFH Debtor Intercompany Claims shall either be Reinstated or canceled and released as mutually agreed | Impaired; deemed to reject or |

15

| | | by the EFH Debtors, the Required EFIH Unsecured Consenting Creditors, and Fidelity. | Unimpaired; deemed to accept. |
|---|---|---|---|
| **Class C7** | **Non-EFH Debtor Intercompany Claims** | On the Effective Date, Non-EFH Debtor Intercompany Claims shall be canceled and released, *provided that* if the Oncor TSA Amendment is not approved by the Bankruptcy Court, each EFH-EFIH Intercompany Claim shall not be canceled or released and shall receive its Pro Rata share of the EFH Unsecured Claims Fund in full satisfaction of such Claim. | Impaired; deemed to reject. |
| **Class C8** | **Interests in EFH Debtors Other Than EFH** | On the Effective Date, Interests in the EFH Debtors other than EFH shall either be Reinstated or canceled and released in the EFH Debtors' or Reorganized EFH Debtors' discretion. | Impaired; deemed to reject or Unimpaired; deemed to accept. |
| **Class C9** | **EFH Interests** | On the Effective Date, EFH Interests shall be Reinstated, subject to dilution by the issuance of Reorganized EFH Common Stock to Holders of General Unsecured Claims Against the EFIH Debtors, Holders of General Unsecured Claims Against the EFH Debtors, and the Equity Conversion. | Impaired; entitled to vote. |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Tax-Free Spin-Off. |
| **Tax-Free Spin-Off** | To preserve the Intended Tax-Free Treatment of the Restructuring Transactions and conditioned upon the receipt of the Private Letter Ruling with the Required Rulings, the Debtors shall undertake the Tax-Free Spin-Off as follows: |
| | (a) before the Effective Date, TCEH shall form a new subsidiary in the form of a limited liability company under the laws of Delaware ("**Reorganized TCEH**"); |
| | (b) on the Effective Date, the Claims against TCEH will be canceled in exchange for each Holder's right to receive its recovery in accordance with the terms of the Plan; |
| | (c) immediately following such cancellation, TCEH shall transfer all of its assets and its ordinary course operating liabilities, and the Debtors shall transfer assets and liabilities related to the Shared Services, to Reorganized TCEH (the "**Contribution**") in |

<table>
<tr>
<td></td>
<td>

exchange for which TCEH shall receive (i) 100% of the newly issued Reorganized TCEH equity interests and (ii) the cash proceeds of the New Reorganized TCEH Debt, subject to preserving the Intended Tax-Free Treatment of the Restructuring Transactions.  For the avoidance of doubt, no funded debt of TCEH, including the TCEH First Lien Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims will be assumed by Reorganized TCEH pursuant to the Contribution (as all such Claims will have been canceled immediately prior to the transfer of assets to Reorganized TCEH);

(d) immediately following the Contribution,  Reorganized TCEH shall convert into a Delaware corporation; and

(e) immediately following such conversion, TCEH shall distribute all of the Reorganized TCEH Common Stock it holds and the cash received from Reorganized TCEH to the Holders of TCEH First Lien Claims (the "**Distribution**").

EFH's earnings and profits will be allocated between Reorganized EFH and Reorganized TCEH pursuant to Treasury Regulations Section 1.312-10(a) in proportion to the fair market value of the business or businesses (and interests in any other properties) retained by Reorganized EFH and the business or businesses (and interests in any other properties) of Reorganized TCEH immediately after the Distribution.  For purposes of determining their relative fair market values and shares of earnings and profits, the valuation of Reorganized TCEH and Reorganized EFH shall be made, to the extent permitted by law, immediately following the distribution of Reorganized TCEH and prior to (i) Holders of EFIH and EFH General Unsecured Claims receiving Reorganized EFH Common Stock, and (ii) the conversion of EFIH Second Lien DIP into Reorganized EFIH Common Stock, provided that to the extent required under the Private Letter Ruling, an amount of EFIH and EFH General Unsecured Claims, if any, required to cause Reorganized EFH to be solvent at such time shall be deemed exchanged for Reorganized EFH Common Stock.

</td>
</tr>
<tr>
<td>

**Tax Basis of Reorganized TCEH**

</td>
<td>

Immediately following the Distribution, the aggregate tax basis, for U.S. federal income tax purposes, of the assets held by Reorganized TCEH shall be equal to the sum of (x) TCEH's aggregate tax basis, for U.S. federal income tax purposes, in the assets it transfers to Reorganized TCEH pursuant to the Contribution plus (y) 95% of the aggregate amount of deductions, net operating losses and capital losses (including carryforwards) available to the EFH consolidated group as of the Effective Date (determined (i) as if the EFH consolidated tax year ended on the Effective Date and (ii) without regard to any gain or income generated as a result of the Contribution), in each case as determined by the Debtors in good faith and in consultation with the Ad Hoc TCEH Committee no later than 60 days prior to the Effective Date (the amount set forth in clause (y), the "**Basis Step-Up**", and the sum of clauses (x) and (y), the "**Minimum Basis**").

After the Petition Date, the Debtors shall continue to operate their

</td>
</tr>
</table>

| | |
|---|---|
| | business in the ordinary course and shall not take any actions (other than as set forth in this Term Sheet) outside the ordinary course of business that will materially increase the taxable income of the EFH consolidated group (excluding any taxable income generated by TCEH and its subsidiaries) during the period from the Petition Date through the Effective Date. |
| **Tax Matters Agreement** | Reorganized EFH and Reorganized TCEH shall enter into a Tax Matters Agreement as of the Effective Date that shall govern the rights and obligations of each party with respect to certain tax matters. |

Specifically, the Tax Matters Agreement will address:

(a) the filing of tax returns by Reorganized EFH and Reorganized TCEH;

(b) tax indemnification obligations of Reorganized EFH and Reorganized TCEH;

(c) the conduct of tax proceedings by Reorganized EFH and Reorganized TCEH; and

(d) representations, warranties, and covenants with respect to the Intended Tax-Free Treatment of the Contribution and Distribution.

The Tax Matters Agreement will provide that:

(i) Reorganized TCEH will indemnify Reorganized EFH for (x) income taxes imposed on Reorganized EFH attributable solely to a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment as a result of a breach of one or more covenants (following the Distribution) by Reorganized TCEH, (y) any alternative minimum tax (A) arising from the resolution of IRS audits for periods (or portions thereof) ending on or before the Effective Date attributable to any business contributed to Reorganized TCEH or its subsidiaries, but in no event to exceed $15 million and (B) arising as a result of the utilization of NOL carryforwards to offset gain related to the portion (if any) of the Basis Step-Up in excess of $1.9 billion and (z) ordinary course non-income taxes for periods (or portions thereof) ending on or before the Effective Date attributable to any business contributed to Reorganized TCEH or its subsidiaries (but only to the extent such taxes are, consistent with past practice, payable by Reorganized TCEH, TCEH or its subsidiaries); and

(ii) Reorganized EFH will indemnify Reorganized TCEH for taxes that are not specifically covered by clause (i), including, without duplication, (w) taxes attributable to any business retained by Reorganized EFH or its subsidiaries, (x) EFH and Reorganized EFH's consolidated U.S. federal income taxes (and any affiliated, consolidated, combined, unitary, aggregate or similar state or local taxes), and (y) income taxes attributable to a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free

18

Treatment (except as described in clause (i) above); provided, however, that Reorganized EFH will be responsible for income taxes attributable to such failure only if such failure is as a result of the breach of any covenant by EFH or Reorganized EFH hereunder.  Nothing herein shall be interpreted to mean that any party other than EFH or Reorganized EFH shall be primarily liable for any taxes imposed on a failure of the Tax-Free Spin-Off to qualify for the Intended Tax-Free Treatment, except to the extent that such failure is as a result of the breach of any covenant by Reorganized TCEH as provided in clause (i) hereunder.

The Tax Matters Agreement will prohibit Reorganized EFH and Reorganized TCEH from taking those actions (or refraining from taking those actions) that are set forth below:

- For two years after the Distribution, Reorganized TCEH, Reorganized EFH, and Reorganized EFIH will not be permitted to:

    - cease, or permit  its wholly-owned subsidiaries listed on **Exhibit D** to cease, the active conduct of a business that was conducted immediately prior to the Distribution or from holding certain assets held at the time of the Distribution;

    - dissolve, liquidate, take any action that is a liquidation for federal income tax purposes or permit its wholly-owned subsidiaries listed on **Exhibit D** from doing any of the foregoing;

    - redeem or repurchase any of its equity if such redemption or repurchase could reasonably be expected to adversely impact the continuity of interest requirement set forth in Treas. Reg. Section 1.368-1(e) or 1.355-2(c)(1); and

    - merge with or into another corporation with such other corporation surviving in a transaction that does not qualify as a reorganization under Section 368(a).

For the avoidance of doubt, the Tax Matters Agreement shall contain no express or implied limitation on the transferability or issuance of the stock of Reorganized EFH or Reorganized TCEH following the Effective Date.

Nevertheless, Reorganized TCEH, Reorganized EFH, and Reorganized EFIH will be permitted to take any of the actions described above if Reorganized EFH obtains a supplemental IRS private letter ruling (or an opinion of counsel that is reasonably acceptable to Reorganized EFH and Reorganized TCEH) to the effect that the action will not affect the Intended Tax-Free Treatment of the Restructuring Transactions. Reorganized TCEH and/or Reorganized EFIH can require that Reorganized EFH seek such a supplemental IRS private letter ruling or opinion of counsel if Reorganized EFH does not seek one on its own.

The Tax Matters Agreement shall otherwise be in form and substance

| | acceptable to the Debtors, the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee. |
|---|---|
| **Shared Services** | Except as otherwise agreed by Reorganized TCEH, Reorganized EFH, and the Ad Hoc TCEH Committee, the TCEH Debtors and the EFH Debtors will transfer to Reorganized TCEH or its designee all operating assets, including executory contracts and liabilities owned by or asserted against the EFH Debtors, that are reasonably necessary to the continued operation of Reorganized TCEH (the "**Shared Services**") and that are not otherwise discharged, in exchange for the rights and benefits provided under the Plan, Restructuring Support Agreement, Term Sheet, and related commitments and settlements (which, for the avoidance of doubt, will not require Reorganized TCEH or the TCEH Debtors to make any cash payments to the EFH Debtors or Reorganized EFH Debtors); *provided, however*, Reorganized TCEH will cure and pay any and all amounts due and owing with respect to the Shared Services as of the Effective Date to the extent such payments are authorized pursuant to the Cash Management Order; *provided, further*, that employees of EFH and EFH Corporate Services must be transferred to Reorganized TCEH; *provided, further*, that Reorganized EFH shall retain liability, if any, for the Legacy General Unsecured Claims. |
| | The TCEH Debtors, the EFIH Debtors, the EFH Debtors, the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee will negotiate in good faith to reach an agreement on mutually acceptable terms regarding transition services reasonably necessary to the continued operation of Reorganized EFIH and/or Reorganized EFH relating to the foregoing assets, employees, executory contracts, and operating liabilities. |
| **Termination of Competitive Tax Sharing Agreement** | On the Effective Date, the Competitive Tax Sharing Agreement shall automatically terminate and all Claims and Causes of Action arising thereunder or in any way related thereto shall be forever discharged, cancelled and released. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring, including the Plan Restructuring Documents. |
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Term Sheet, the Plan will provide for the Debtors, in consultation with the Ad Hoc TCEH Committee and the Required EFIH Unsecured Consenting Creditors, to assume or reject, as the case may be, executory contracts and unexpired leases identified in the Plan Supplement to the extent that any such executory contracts and unexpired leases have not been otherwise assumed or rejected. |

| | |
|---|---|
| **Resolution of Contested Claims** | The Plan will provide for the resolution of Contested Claims. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in any order resolving a Cause of Action that is entered in a proceeding of the sort described in Section 4.01(c) of the Restructuring Support Agreement, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, this Term Sheet, the Disclosure |

| | |
|---|---|
| | Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final order to have constituted actual fraud or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Releases by Holders of Claims and Interests of the Debtors** | As of the Effective Date, and except as otherwise specifically provided in any order resolving a Cause of Action that is entered in a proceeding of the sort described in Section 4.01(c) of the Restructuring Support Agreement, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Liability Management Program, the Tax Sharing Agreements, the 2007 Acquisition, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, this Term Sheet, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Debtor, Reorganized Debtor, or Released Party that is determined in a final order to have constituted actual fraud or gross negligence. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |

| | |
|---|---|
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunctions** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Reorganized Debtors, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or |

23

| | interests released or settled pursuant to the Plan. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **TCEH DIP Financing** | The TCEH Debtors' Chapter 11 Cases shall be funded with the proceeds of the TCEH DIP Financing and the Consenting TCEH First Lien Creditors consent to use of cash collateral and priming by the TCEH DIP Financing on the terms set forth in the TCEH Cash Collateral Order. |
| **EFIH DIP Financing** | The EFIH Debtors' Chapter 11 Cases shall be funded with the proceeds of the EFIH First Lien DIP Financing and the EFIH Second Lien DIP Financing.  EFIH will seek authority to use the cash collateral of Holders of EFIH First Lien Note Claims and EFIH Second Lien Note Claims and to prime such Holders with the EFIH First Lien DIP Financing on the terms set forth on **Exhibit G**. |
| **Customer Obligations** | The Debtors shall honor all of their ordinary course customer obligations during the course of the Restructuring. |
| **Use of EFH and EFIH Cash During Chapter 11 Cases** | Unless otherwise agreed by EFH, EFIH, and the Required EFIH Unsecured Consenting Creditors, during the Chapter 11 Cases, EFH and EFIH shall only make payments, including professional fees, in the ordinary course of business consistent with prepetition practices based on benefit to their respective estates, including to each other under the EFIH Shared Services Agreement, as approved pursuant to first day motions in the Chapter 11 Cases, or as otherwise set forth in the Term Sheet; *provided, however,* that EFIH shall be entitled to enter into voluntary settlements from time to time with (i) Non-Settling First Lien Note Holders on economically equal terms to, or terms more favorable to the Estates than, the EFIH First Lien Settlement, so long as, except with respect to the EFIH First Lien Settlement, such terms provide for a settlement at no more than 102.25% of the principal amount of such Holders' EFIH First Lien Notes; and, (ii) with the consent of the Required EFIH Unsecured Consenting Creditors, Non-Settling Second Lien Note Holders on economically equal terms, or terms more favorable to the Estates than the EFIH Second Lien Settlement, except that such consent shall not be required with respect to the EFIH Second Lien Settlement. |
| **Excess EFIH Cash Upon Consummation** | The Required EFIH Unsecured Consenting Creditors shall, in consultation with EFH and EFIH, determine before the Effective Date how the Excess EFIH Cash will be used on and after the Effective Date. |
| **Allocation of Professional Fees** | Any professional fees (the "**Professional Fees**") incurred by professionals retained by the Debtors (the "**Debtors' Professionals**") shall be allocated to, and paid by, the applicable Debtors for whose direct benefit such Professional Fees were incurred (the "**Direct Benefit Fees**").  To the extent a Professional Fee is incurred for the collective benefit of the EFH Debtors, EFIH Debtors, and TCEH Debtors (the "**Collective Benefit Fees**"), such Professional Fees shall be allocated to each Debtor in the same proportion that the amount of Direct Benefit Fees incurred by such Debtor's Professional for such Debtor bears to the total amount of Direct Benefit Fees incurred by such Debtor's Professional for all of the Debtors, on a monthly basis in connection with the Debtor's Professional's fee application (the "**Collective Fee Allocation**").  In connection with any quarterly/interim or |

| | final applications for payment of Professional Fees, the Debtors shall, as amongst themselves, make any necessary intercompany transfers or other adjustments such that the total Collective Benefit Fees for each of the Debtor's Professionals for the applicable fee period is allocated in a manner consistent with the Collective Fee Allocation for such period. |
|---|---|
| | Any professional fees incurred by professionals retained by Fidelity for which the Debtors' have agreed to become liable shall be allocated on the following basis: (a) 50% to the EFH Debtors and (b) 50% to the EFIH Debtors.  Any professional fees incurred by professionals retained by the Commitment Parties for which the Debtors' have agreed to become liable shall be allocated 100% to the EFIH Debtors.  Any professional fees incurred by professionals retained by Holders of EFH Interests (together with the Professional Fees incurred by the Debtors' Professionals and all professional fees discussed in this paragraph, the "**Total Professional Fees**") for which the Debtors' have agreed to become liable shall be allocated 100% to the EFH Debtors. |
| | On the Effective Date, the first $7.5 million of the Total Professional Fees that would have otherwise been allocated to the EFH Debtors on the terms as set forth above shall instead be allocated to EFIH. |
| | After the Petition Date, all payment of Professional Fees, including any allocation formula, shall be subject to any applicable orders of the Bankruptcy Court (on an interim or final basis). |
| **Incentive Plans** | The Ad Hoc TCEH Committee and the Required EFIH Unsecured Consenting Creditors shall negotiate in good faith with the TCEH Debtors, the EFH Debtors, and the EFIH Debtors regarding the terms of key employee incentive plans for which the Debtors shall seek approval from the Bankruptcy Court during the Chapter 11 Cases. |
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Term Sheet, the Consenting Creditors consent to each of the Debtors' "first day" or "second day" motions relating to wages, compensation, and benefits, including executive compensation programs.  After the Effective Date, the Reorganized Debtors' wages, compensation, and benefit programs shall be acceptable, in the case of Reorganized TCEH, to the TCEH Debtors and the Ad Hoc TCEH Committee and, in the case of Reorganized EFH, to the EFH Debtors and the Required EFIH Unsecured Consenting Creditors. |
| | Additionally, employees who are party to employment agreements with the Debtors may receive new employment agreements with the applicable Reorganized Debtor, the terms and conditions of which shall be acceptable, in the case of Reorganized TCEH, to the TCEH Debtors and the Ad Hoc TCEH Committee and, in the case of Reorganized EFH, to the EFH Debtors and the Required EFIH Unsecured Consenting Creditors.  Until such time as these new employment agreements are fully executed, all employment agreements in place as of the Petition Date between the Debtors and their employees shall remain in place in accordance with the terms of such agreements pending the applicable Debtor's assumption or rejection of such agreements. |

| | |
|---|---|
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | Under the Restructuring, consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact and irrevocable and shall survive the effectiveness of the Restructuring.  For the avoidance of doubt, the TCEH Debtors and Reorganized TCEH shall not have any liability for, or any obligations in respect of, any indemnification provisions for the benefit of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the EFH Debtors or the EFIH Debtors, in their capacities as such and the EFH Debtors and Reorganized EFH shall not have any liability for, or any obligations in respect of, any indemnification provisions for the benefit of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the TCEH Debtors, in their capacities as such. |
| **Director, Officer, Manager, and Employee Tail Coverage** | On or before the Effective Date, the Debtors shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement; *provided*, *however*, that the costs of such policies shall be reasonably allocated among the Debtors in a manner reasonably acceptable to Required Consenting Creditors. |
| **Claims of the Debtors** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions outlined in this Term Sheet. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to Consummation of the Restructuring (the "**Conditions Precedent**"):<br><br>3.   the Debtors shall have consummated the EFIH First Lien DIP Financing;<br><br>4.   the Debtors shall have consummated the EFIH Second Lien DIP Financing and the Equity Conversion in accordance with the Commitment Letter;<br><br>5.   the Debtors shall have consummated the EFIH First Lien Settlement and the EFIH Second Lien Settlement in accordance with this Term Sheet;<br><br>6.   the Debtors shall have obtained entry of the Approval Order, which order shall be in full force and effect and not subject to a stay;<br><br>7.   Holders of EFH Non-Guaranteed Notes shall have received not less than 37.15% on account of such Claims under to the Plan, which condition is waivable only by Fidelity as holder of a majority of the |

EFH Non-Guaranteed Notes on a personal and non-transferable basis, and ceases at any time Fidelity holds less than a majority of the EFH Notes;

8. immediately following the Distribution, the aggregate tax basis, for federal income tax purposes, of the assets held by Reorganized TCEH shall be equal to the Minimum Basis and the Basis Step-Up shall be no less than $2.1 billion;

9. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including from the FERC, the NRC, and the PUC, as applicable; *provided*, *however*, that the PUC Regulatory Approval shall not be required to implement and effectuate the Plan as to the TCEH Debtors;

10. the Debtors shall have obtained the Private Letter Ruling from the IRS, which shall be in form and substance acceptable to the Required Consenting Creditors and shall include, *inter alia*, the Required Rulings;

11. the Debtors shall have entered into the Tax Matters Agreement, which shall be in form and substance acceptable to the Required Consenting Creditors;

12. other than as set forth in this Term Sheet (including, for this purpose, transactions described in the Pre-Submission Memo), the Debtors shall not have taken any action to change the entity classification for U.S. federal income tax purposes of any Debtor entity with material assets, by changing their legal form or otherwise, without the consent of the Required EFIH Unsecured Consenting Creditors and the Ad Hoc TCEH Committee; provided that the consent of the Ad Hoc TCEH Committee shall not be required with respect to the foregoing if such action by EFH, EFIH, or the Required EFIH Unsecured Consenting Creditors does not directly impact the TCEH Contribution and Distribution and does not prevent EFH from obtaining the Required Rulings; *provided*, *further*, that the consent of the Required EFIH Unsecured Consenting Creditors shall not be required with respect to the foregoing if such action by TCEH or the Ad Hoc TCEH Committee does not prevent EFH from obtaining the Required Rulings;

13. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement, this Term Sheet, and the Plan;

14. the Restructuring Support Agreement shall remain in full force and effect;

15. all professional fees and expenses approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in a professional fee escrow pending approval by the Bankruptcy Court;

16. the Bankruptcy Court shall have entered the Confirmation Order, which shall:

   i.   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   ii.  decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

   iii. authorize the Debtors, as applicable/necessary, to: (1) implement the Restructuring Transactions, including the Equity Conversion; (2) distribute the Reorganized EFH Common Stock, New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, and the New Reorganized EFIH Debt, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (3) make all distributions and issuances as required under the Plan, including cash, the Reorganized EFH Common Stock, New Reorganized TCEH Debt, the Reorganized TCEH Common Stock, and the New Reorganized EFIH Debt; and (4) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Reorganized TCEH Management Incentive Plan;

   iv.  authorize the implementation of the Plan in accordance with its terms; and

   v.   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the New Reorganized TCEH Debt, the New Reorganized EFIH Debt, and the New Reorganized EFIH Junior Debt, as applicable); and

17. the Debtors shall have implemented the Restructuring Transactions, including the Tax-Free Spin-Off and all transactions contemplated by the Commitment Letter, in a manner consistent in all material respects with the Restructuring Support Agreement, this Term Sheet, and the Plan.

| | |
|---|---|
| **Waiver of Conditions Precedent to the** | The Debtors, with the prior written consent of the Required Consenting Creditors and Required EFIH Unsecured Consenting Creditors (each acting |

| Restructuring | in their sole discretion), may waive any one or more of the Conditions Precedent to the Restructuring. |

| **CORPORATE GOVERNANCE PROVISIONS/SECTION 1145 EXEMPTION** | |
|---|---|
| **Charter; Bylaws; Corporate Governance** | Corporate governance for Reorganized TCEH, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, and the composition of the Reorganized TCEH Board shall be determined by the Ad Hoc TCEH Committee in consultation with (i) TCEH and, (ii) as appropriate, with other Holders of TCEH First Lien Notes. |
| | Corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, and the composition of the Reorganized EFH Board, the Reorganized EFIH Board, and the officers of Reorganized EFH and Reorganized EFIH shall be determined by the Required EFIH Unsecured Consenting Creditors in consultation with (i) EFH, (ii) EFIH, (iii) Fidelity, and (iv) as appropriate, with other Holders of EFIH Second Lien DIP Claims or EFIH Unsecured Note Claims that will receive greater than 15% of the Reorganized EFH Common Stock upon the Effective Date. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. |

[*Exhibits follow.*]

29

**Exhibit A to Term Sheet, Providing Definitions to Term Sheet, as filed by the Debtors in connection with the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp, et al., in Support of First Day Motions* [D.I. 98]**

**EXHIBIT A**

**DEFINITIONS**

| Term | Definition |
|---|---|
| **2007 Acquisition** | The 2007 transaction in which TEF and Texas Holdings and their direct and indirect equity holders became the direct and indirect equity holders of the Debtors. |
| **Ad Hoc TCEH Committee** | The ad hoc committee of certain unaffiliated Consenting TCEH First Lien Creditors (as defined in the Restructuring Support Agreement) that is represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Millstein & Co., L.P. |
| **Additional Interest** | Additional interest payable on the EFIH First Lien Notes or EFIH Second Lien Notes, as applicable, under the registration rights agreement associated with such notes so long as EFIH has not registered such notes in accordance with the Securities Act, on the terms set forth in such registration rights agreement. |
| **Administrative Claim** | A Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| **Affiliate** | As defined in section 101(2) of the Bankruptcy Code. |
| **Agreement Effective Date** | The effective date of the Restructuring Support Agreement, as such term is further defined in the Restructuring Support Agreement. |
| **Allowed** | Any Claim that is not a Contested Claim or a Disallowed Claim. |
| **Approval Motion** | As defined in the Term Sheet. |
| **Approval Order** | As defined in the Term Sheet. |
| **Avenue** | Avenue Capital Group and its affiliates. |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time. |
| **Bankruptcy Court** | As defined in the Term Sheet. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code, and the general, local, and chambers rules of the Bankruptcy Court. |
| **Bar Date** | The date established by the Bankruptcy Court by which Proofs of Claim must be filed with respect to such Claims, as may be ordered by the Bankruptcy Court. |
| **Basis Step-Up** | As defined in the Term Sheet. |
| **BNY** | The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under certain Indentures, described herein. |
| **Call Right** | As defined in the Term Sheet. |

| Term | Definition |
|---|---|
| **Cash Management Order** | An order of the Bankruptcy Court, in form and substance acceptable to the Ad Hoc TCEH Committee, authorizing the Debtors to, *inter alia*, continue using their existing cash management system, maintain certain existing bank account and continue certain intercompany transactions. |
| **Cause of Action** | Any claims, Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code. |
| **Chapter 11 Cases** | When used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court. |
| **Claim** | As defined in section 101(5) of the Bankruptcy Code against a Debtor. |
| **Claim Objection Deadline** | The deadline for filing objections to Claims as set forth in the Plan or in any Order of the Bankruptcy Court establishing a Bar Date. |
| **Class** | A category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **Code** | As defined in the Term Sheet. |
| **Collateral Trust Agreement** | That certain Collateral Trust Agreement, dated as of November 16, 2009, by and among EFIH, BNY, as trustee, and the other secured debt representatives party thereto. |
| **Collective Benefit Fees** | As defined in the Term Sheet. |
| **Commitment Letter** | That certain letter to EFH and EFIH from the Commitment Parties memorializing the EFIH Second Lien DIP Financing Commitment, dated as of April 29, 2014. |
| **Commitment Parties** | Those certain Holders of EFIH Unsecured Notes backstopping the EFIH Second Lien DIP Financing Commitment. |

| Term | Definition |
|------|-----------|
| **Competitive Tax Sharing Agreement** | That certain Federal and State Income Tax Allocation Agreement (as amended and restated from time to time), dated May 15, 2012, by and among EFH and certain of its direct and indirect subsidiaries. |
| **Conditions Precedent** | As defined in the Term Sheet. |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan and this Term Sheet. |
| **Confirmation Order** | The order entered by the Bankruptcy Court confirming the Plan. |
| **Consenting Creditors** | As defined in the Restructuring Support Agreement. |
| **Consenting Interest Holders** | As defined in the Restructuring Support Agreement. |
| **Consummation** | The occurrence of the Effective Date. |
| **Contested Claim** | A Claim (a) to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no Proof of Claim has been filed; (b) if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a Proof of Claim has been filed with the Bankruptcy Court, to the extent (i) the Proof of Claim amount exceeds the amount indicated in the Schedules, or (ii) the Proof of Claim priority differs from the priority set forth in the Schedules; (c) if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a Proof of Claim has been filed with the Bankruptcy Court; or (d) as to which an objection has been filed on or before the Claim Objection Deadline; provided, that a Claim (x) that is fixed in amount and priority pursuant to the Plan or by final order of the Bankruptcy Court or (y) with respect to which a Proof of Claim has been timely filed and no objection has been filed by the Claim Objection Deadline, shall not be a Contested Claim. |
| **Contribution** | As defined in the Term Sheet. |
| **Conversion Agreement** | That certain agreement governing the terms of the Equity Conversion, which shall be on the terms set forth on Exhibit B to the Commitment Letter. |
| **Conversion Shares** | Shares of Reorganized EFH Common Stock issued and outstanding as of the Effective Date which will be issued pursuant to the Equity Conversion. |
| **Debtors** | As defined in the Introduction. |
| **Disallowed Claim** | A Claim, or a portion thereof, that has been disallowed by a final order of the Bankruptcy Court. |

| Term | Definition |
|---|---|
| **Disclosure Statement** | The disclosure statement for the Plan, including all exhibits and schedules thereto and references therein that relate to the Plan that is prepared and distributed in accordance with this Term Sheet, the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law. |
| **Distribution** | As defined in the Term Sheet. |
| **EFCH** | As defined in the Introduction. |
| **EFCH 2037 Note Claims** | Any Claim derived from or based upon the EFCH 2037 Notes. |
| **EFCH 2037 Note Indenture** | That certain Indenture, dated as of December 1, 1995, by and among EFCH, as the issuer, and BNY, as trustee. |
| **EFCH 2037 Notes** | Collectively:  (a) the EFCH Fixed 2037 Notes; and (b) the EFCH Floating 2037 Notes. |
| **EFCH 2037 Note Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFCH 2037 Notes. |
| **EFCH Fixed 2037 Notes** | The 8.175% Unsecured Fixed Notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture. |
| **EFCH Floating 2037 Notes** | The 1.245% Unsecured Floating Rate Notes due January 30, 2037, issued by EFCH pursuant to the EFCH 2037 Note Indenture. |
| **Effective Date** | The date to be selected by the Debtors, in consultation with the Required Consenting Creditors, for the Consummation of the Plan, or as soon thereafter as reasonably practicable. |
| **EFH** | As defined in the Introduction. |
| **EFH 2019 Note Indenture** | That certain Indenture, dated November 16, 2009, by and among EFH, as issuer, and BNY, as trustee. |
| **EFH 2019 Notes** | The 9.75% unsecured notes due October 15, 2019, issued by EFH pursuant to the EFH 2019 Note Indenture |
| **EFH 2020 Note Indenture** | That certain Indenture dated January 12, 2010, by and among EFH, as issuer, and BNY, as trustee. |
| **EFH 2020 Notes** | The 10.0% unsecured notes due January 15, 2020, issued by EFH pursuant to the EFH 2020 Note Indenture. |
| **EFH Cash** | Cash on hand at EFH, including Oncor TSA payments if such is determined by the Bankruptcy Court, less $38 million. |
| **EFH Corporate Services** | EFH Corporate Services Company, a Texas corporation. |
| **EFH Debtor Intercompany Claim** | A Claim by an EFH Debtor against another EFH Debtor. |
| **EFH Debtors** | Collectively:  (a) EFH; and (b) EFH's direct and indirect subsidiaries listed on **Exhibit C**. |

32

| Term | Definition |
|---|---|
| **EFH-EFIH Intercompany Claims** | Allowed Non-EFH Debtor Intercompany Claims held by EFIH against EFH; *provided, however*, that if the Restructuring Support Agreement terminates, such claims shall be reduced on a dollar-for-dollar basis to account for any Oncor TSA payments actually received by EFIH; *provided*, *further*, that, for the avoidance of doubt, all rights, offsets, claims, and defenses of EFH will be preserved (in all cases, subject to any defenses) with respect to such Claims. |
| **EFH Interest** | Any Interest in EFH. |
| **EFH LBO Note Primary Claims** | Any claims against EFH arising on account of the EFH LBO Notes. |
| **EFH LBO Note Claims** | Any claims arising on account of the EFH LBO Notes, including the EFH LBO Note Primary Claims and the EFH LBO Note Guaranty Claims.  If the recovery to Holders of EFH LBO Note Claims under the Plan is greater than 100% of the amount of such Claims, any recovery on account of such claims shall be returned to EFH or EFIH on a Pro Rata basis based on the relative distributions from such Estates; *provided*, *further*, that if Holders of General Unsecured Claims Against the EFIH Debtors receive any postpetition interest on account of their Claims, Holder of EFH LBO Note Claims shall be entitled to postpetition interest before any such amounts are returned. |
| **EFH LBO Note Indenture** | That certain Indenture, dated as of October 31, 2007, by and among EFH, as the issuer, EFCH and EFIH, as guarantors, and BNY, as trustee. |
| **EFH LBO Notes** | Collectively:  (a) the EFH LBO Senior Notes; and (b) the EFH LBO Toggle Notes. |
| **EFH LBO Notes Guaranty Claims** | Any guaranty claims against EFIH arising on account of the EFH LBO Notes. |
| **EFH LBO Notes Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFH LBO Notes. |
| **EFH LBO Senior Notes** | The 10.875% senior notes due November 1, 2017, issued by EFH pursuant to the EFH LBO Note Indenture. |
| **EFH LBO Toggle Notes** | The 11.25%/12.00% toggle notes due November 1, 2017, issued by EFH pursuant to the EFH LBO Note Indenture. |
| **EFH Legacy 2014 Notes** | The 5.55% series P senior notes due November 15, 2014, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy 2024 Notes** | The 6.50% series Q senior notes due November 15, 2024, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy 2034 Notes** | The 6.55% series R senior notes due November 15, 2034, issued by EFH pursuant to the EFH Legacy Note Indenture. |
| **EFH Legacy Note Indenture** | That certain Indenture, dated November 1, 2004, by and among EFH, as issuer, and BNY, as trustee. |

| Term | Definition |
|---|---|
| **EFH Legacy Notes** | Collectively: (a) the EFH Legacy 2014 Notes; (b) the EFH Legacy 2024 Notes; and (c) the EFH Legacy 2034 Notes. |
| **EFH Non-Guaranteed Notes** | Collectively: (a) the EFH Unexchanged Notes; and (b) the EFH Legacy Notes. |
| **EFH Note Claim** | Any Claim derived from or based upon the EFH Notes. |
| **EFH Notes** | Collectively: (a) the EFH Unexchanged Notes; (b) the EFH Legacy Notes; and (c) the EFH LBO Notes. |
| **EFH Notes Trustee** | BNY, or any successor thereto, in its capacity as trustee under the EFH Notes. |
| **EFH Properties** | EFH Properties Company, a Texas corporation. |
| **EFH Unexchanged Notes** | Collectively: (a) the EFH 2019 Notes; and (b) the EFH 2020 Notes. |
| **EFH Unsecured Claim Fund** | All EFH assets, including the EFH Cash, and Causes of Action, but excluding Interests in EFIH, subject to all applicable rights and defenses of EFH. In connection with the creation of the EFH Unsecured Claim Fund, the Debtors shall request a determination from the Bankruptcy Court regarding whether the payments under the Oncor Tax Sharing Agreement are assets of the Estates of the EFH Debtors or the EFH Unsecured Claim Fund (as successor to the rights of EFH in such respect). |
| **EFIH** | As defined in the Introduction. |
| **EFIH Debtor Intercompany Claim** | A Claim by an EFIH Debtor against another EFIH Debtor. |
| **EFIH Debtors** | Collectively: (a) EFIH; and (b) EFIH Finance. |
| **EFIH Finance** | EFIH Finance Inc., a Delaware corporation. |
| **EFIH First Lien 2017 Note Indenture** | That certain Indenture, dated August 14, 2012, by and among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware, as successor trustee to BNY. |
| **EFIH First Lien 2017 Notes** | The 6.875% senior secured notes due August 15, 2017, issued by EFIH and EFIH Finance pursuant to the EFIH First Lien 2017 Note Indenture. |
| **EFIH First Lien 2020 Note Indenture** | That certain Indenture, dated August 17, 2010, by and among EFIH and EFIH Finance, as issuers, and CSC Trust Company of Delaware, as successor trustee to BNY. |
| **EFIH First Lien 2020 Notes** | The 10.0% senior secured notes due December 1, 2020, issued by EFIH and EFIH Finance pursuant to the EFIH First Lien 2020 Note Indenture. |
| **EFIH First Lien DIP Claims** | Any and all Claims derived from or based upon the EFIH First Lien DIP Financing. |

| Term | Definition |
|---|---|
| **EFIH First Lien DIP Financing** | The postpetition debtor-in-possession financing facility substantially on the terms set forth on **Exhibit G**. |
| **EFIH First Lien Indentures** | The EFIH First Lien 2020 Note Indenture and the EFIH First Lien 2017 Note Indenture. |
| **EFIH First Lien Makewhole Claim** | Any Claim derived from or based upon makewhole or other similar payment provisions under the EFIH First Lien Notes. |
| **EFIH Second Lien DIP Motion** | As defined in the Term Sheet. |
| **EFIH First Lien Note Claim** | Any Claim derived from or based upon the EFIH First Lien Notes. |
| **EFIH First Lien Notes** | Collectively:  (a) the EFIH First Lien 2017 Notes; and (b) the EFIH First Lien 2020 Notes. |
| **EFIH First Lien Settlement** | As defined in the Term Sheet. |
| **EFIH Second Lien 2021 Notes** | The 11.0% senior secured second lien notes due October 1, 2021, issued by EFIH and EFIH Finance pursuant to the EFIH Second Lien Note Indenture. |
| **EFIH Second Lien 2022 Notes** | The 11.75% senior secured second lien notes due March 1, 2022, issued by EFIH and EFIH Finance pursuant to the EFIH Second Lien Note Indenture. |
| **EFIH Second Lien Cash-Out Option** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Claims** | Any and all Claims derived from or based upon the EFIH Second Lien DIP Financing. |
| **EFIH Second Lien DIP Financing** | The postpetition debtor-in-possession financing facility substantially on the terms set forth on Exhibit A to the Commitment Letter. |
| **EFIH Second Lien DIP Motion** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Financing Commitment** | As defined in the Term Sheet. |
| **EFIH Second Lien DIP Roll Option** | As defined in the Term Sheet. |
| **EFIH Second Lien Makewhole Claim** | Any Claim derived from or based upon makewhole or other similar payment provisions under the EFIH Second Lien Notes. |
| **EFIH Second Lien Note Claim** | Any Claim derived from or based upon the EFIH Second Lien Notes. |
| **EFIH Second Lien Note Indenture** | That certain Indenture, dated April 25, 2011, by and among EFIH and EFIH Finance, as issuers, and BNY, as trustee. |
| **EFIH Second Lien Notes** | Collectively:  (a) the EFIH Second Lien 2021 Notes; (b) the EFIH Second Lien 2022 Notes. |

| Term | Definition |
|------|------------|
| **EFIH Second Lien Settlement** | As defined in the Term Sheet. |
| **EFIH Senior Toggle Note Indenture** | That certain Indenture, dated December 5, 2012, by and among EFIH and EFIH Finance, as issuers, and UMB Bank, N.A, as trustee. |
| **EFIH Senior Toggle Notes** | The 11.25%/12.25% unsecured senior toggle notes due December 1, 2018, issued by EFIH and EFIH Finance pursuant to the EFIH Senior Toggle Note Indenture. |
| **EFIH Shared Services Agreement** | That certain Shared Services Agreement, dated March 28, 2014, by and among EFIH, EFIH Finance, and EFH Corporate Services. |
| **EFIH Unexchanged Note Indenture** | That certain Indenture, dated November 16, 2009, by and among EFIH and EFIH Finance, as issuers, and BNY, as trustee. |
| **EFIH Unexchanged Notes** | The 9.75% fixed senior notes due October 15, 2019, issued by EFIH and EFIH Finance pursuant to the EFIH Unexchanged Note Indenture. |
| **EFIH Unsecured Note Claim** | Any Claim against EFIH derived from or based upon the EFIH Unsecured Notes. |
| **EFIH Unsecured Notes** | Collectively: (a) the EFIH Senior Toggle Notes and (b) the EFIH Unexchanged Notes. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Equity Conversion** | The mandatory conversion of the EFIH Second Lien DIP Financing, inclusive of any Commitment Fee (which for the avoidance of doubt, assumes a $1.9 billion funding amount and the Funding PIK Fee), into 177,658,788 Conversion Shares, plus an additional 89,052 Conversion Shares for each million dollars of EFIH Second Lien DIP Financing in excess of $1,995 million, and less 89,052 shares of Conversion Shares for each million dollars of EFIH Second Lien DIP Financing less than $1,995 million outstanding on the Effective Date; provided, however, that the stated plan value of the Conversion Shares is at least equal to the adjusted issue price of the EFIH Second Lien DIP Financing.[2] For the avoidance of doubt, this is a negotiated plan value solely for purposes of the deal embodied in this Term Sheet and the Restructuring Support Agreement and shall not be binding upon any party to the extent the Plan is not confirmed and consummated. |
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code. |

---

[2]    Calculated contemplated accrued interest as of April 30, 2014.

| Term | Definition |
|---|---|
| **Exculpated Parties** | Collectively, and in each case in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Consenting Interest Holders; (d) the DIP Agents; (e) the DIP Lenders; and (f) with respect to each of the foregoing entities in clauses (a) through (e), such Entity's current and former affiliates, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals. |
| **Extended Outside Date** | As defined in the Restructuring Support Agreement. |
| **FERC** | The Federal Energy Regulatory Commission. |
| **Fidelity** | Collectively, Fidelity Investments and its affiliates that execute the Restructuring Support Agreement before the Petition Date. |
| **Fidelity Repayment** | The cash payment by Holders of General Unsecured Claims Against EFH other than Fidelity that elected to participate in their Pro Rata share of up to 9% of the Equity Conversion, which shall be used by EFIH to repay in cash the applicable Second Lien DIP Notes held by Fidelity in respect of such share, simultaneously with the Equity Conversion. |
| **General Unsecured Claim Against EFH** | Any Unsecured Claim against EFH that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, including the EFH Note Claims and the EFH LBO Note Primary Claims, but excluding:  (a) Administrative Claims against the EFH Debtors;  (b) Intercompany Claims against the EFH Debtors; and (c) Other Priority Claims against the EFH Debtors. |
| **General Unsecured Claim Against the EFH Debtors Other Than EFH** | Any Unsecured Claim against one or more of the EFH Debtors other than EFH that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, excluding: (a) Administrative Claims against the EFH Debtors; (b) Intercompany Claims against the EFH Debtors; and (c) Other Priority Claims against the EFH Debtors. |
| **General Unsecured Claim Against the EFIH Debtors** | Any Unsecured Claim against one or more of the EFIH Debtors that is not otherwise paid in full pursuant to a separate order of the Bankruptcy Court, including the EFIH Unsecured Note Claims and the EFH LBO Notes Guaranty Claims, but excluding:  (a) Administrative Claims against the EFIH Debtors; (b) Intercompany Claims against the EFIH Debtors; and (c) Other Priority Claims against the EFIH Debtors. |

| Term | Definition |
|------|------------|
| **General Unsecured Claim Against the TCEH Debtors** | Any Unsecured Claim against one or more of the TCEH Debtors that is not otherwise paid in full pursuant to separate order of the Bankruptcy Court, including the EFCH 2037 Note Claims, TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims, but excluding: (a) Administrative Claims against the TCEH Debtors; (b) Intercompany Claims against the TCEH Debtors; and (c) Other Priority Claims against the TCEH Debtors. |
| **GSO** | GSO Capital Partners and its affiliates. |
| **Holder** | An Entity holding a Claim or Interest, as applicable. |
| **Impaired** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Incremental Amendment Agreement** | That certain Incremental Amendment No. 1, dated as January 4, 2013, by and among the Incremental 2012 Term Lenders (as defined therein), EFCH, TCEH, the Credit Parties (as defined therein) party thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent. |
| **Intended Tax-Free Treatment** | As defined in the Term Sheet. |
| **Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH against EFH or any direct or indirect subsidiary of EFH. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |
| **IRS** | The Internal Revenue Service. |
| **IRS Submission** | As defined in the Term Sheet. |
| **Legacy General Unsecured Claims Against EFH** | Any Claims against EFH arising from liabilities based on asbestos exposure and post-employment benefits relating discontinued operations of the Debtors and their Affiliates. |
| **Liability Management Program** | The various transactions, including debt buybacks, new debt issuances, debt exchanges, and maturity extensions, by EFH and its direct and indirect subsidiaries, and restructuring of such Entities' debt obligations completed before the Petition Date, as described in the Debtors' most recent annual SEC filing. |
| **Minimum Basis** | As defined in the Term Sheet. |
| **New Reorganized EFIH Debt** | The new long-term secured EFIH funded debt issued on the Effective Date on terms and conditions mutually acceptable to the EFIH Debtors and the Required EFIH Unsecured Consenting Creditors. |

| Term | Definition |
|------|------------|
| **New Reorganized TCEH Debt** | The new long-term secured TCEH debt, consistent with the terms set forth in this Term Sheet. The amount of the New Reorganized TCEH Debt issued on the Effective Date shall not be less than the Minimum Basis. |
| **Non-EFH Debtor Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH other than an EFH Debtor against an EFH Debtor, including EFH Note Claims held by EFIH. |
| **Non-EFIH Debtor Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH other than an EFIH Debtor against an EFIH Debtor. |
| **Non-Settling EFIH First Lien Note Holders** | As defined in the Term Sheet. |
| **Non-Settling EFIH Second Lien Note Holders** | As defined in the Term Sheet. |
| **Non-TCEH Debtor Intercompany Claim** | A Claim by EFH or any direct or indirect subsidiary of EFH other than a TCEH Debtor against a TCEH Debtor, including any Claim against a TCEH Debtor arising under or related to the Competitive Tax Sharing Agreement, but excluding any Claim derived from or based upon TCEH First Lien Notes held by EFH. |
| **NRC** | The Nuclear Regulatory Commission. |
| **Oak Grove Promissory Note** | The promissory note issued by Oak Grove Power Company LLC and secured by certain minerals and real property in Robertson, Texas. |
| **Oak Grove Promissory Note Claim** | Any Claim derived from or based upon the Oak Grove Promissory Note. |
| **Oncor Tax Sharing Agreement** | The amended and restated Tax Sharing Agreement, dated as of November 5, 2008, by and among EFH, Oncor Electric Delivery Holdings Company LLC, Oncor Electric Delivery Company LLC, Texas Transmission Investment LLC, and Oncor Management Investment LLC. |
| **Oncor TSA Amendment** | As defined in the Term Sheet. |
| **Oncor TSA Amendment Order** | As defined in the Term Sheet. |

| Term | Definition |
|---|---|
| **Oncor TSA Amendment Payment** | $55 million cash to be paid by EFIH to EFH on the Effective Date, which shall be paid to Holders of General Unsecured Claims Against EFH on the Effective Date; provided, however, that such payment from EFIH will be reduced dollar-for-dollar (for the avoidance of doubt, beginning with the first dollar of any shortfall) in the event that EFIH receives less than 80% of the amount shown below for the date that is nearest to the Effective Date: <br><br> Effective Date:      Projected EFIH Net Tax Receipts: <br> January 31, 2015      $254 million <br> February 28, 2015      $261 million <br> March 31, 2015      $261 million <br> April 30, 2015      $321 million <br> May 31, 2015      $328 million <br> June 30, 2015      $387 million <br> July 31, 2015      $387 million <br> August 31, 2015      $394 million <br> September 30, 2015      $453 million |
| **Other Priority Claim** | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim against any of the Debtors, including the Oak Grove Promissory Note Claims and Tex-La Obligations, but not including a: (a) TCEH First Lien Secured Claim; (b) TCEH Second Lien Secured Claim; (b) EFIH First Lien Note Claim; or (c) EFIH Second Lien Note Claim. |
| **Participation Rights** | The right to participate in the EFIH Second Lien DIP Financing as set forth in the Commitment Letter. |
| **Petition Date** | The date on which the Debtors commence the Chapter 11 Cases. |
| **PIMCO** | Collectively, funds and accounts under the management of Pacific Investment Management Company LLC and its subsidiaries, in each case solely to the extent that they hold EFIH First Lien Note Claims in the aggregate amounts set forth on PIMCO's signature page to the Restructuring Support Agreement. |
| **Plan** | As defined in the Introduction. |
| **Plan Restructuring Documents** | As defined in the Restructuring Support Agreement. |
| **Plan Supplement** | The compilation of documents and forms of documents, schedules, and exhibits to the Plan filed by the Debtors. |
| **PLR Participation Parties** | As defined in the Term Sheet. |

| Term | Definition |
|---|---|
| **PLR Participation Party Representative** | As defined in the Term Sheet. |
| **Pre-Submission Conference** | As defined in the Term Sheet. |
| **Pre-Submission Memo** | As defined in the Term Sheet. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Private Letter Ruling** | As defined in the Term Sheet. |
| **Professional Fees** | As defined in the Term Sheet. |
| **Proof of Claim** | A proof of Claim filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date. |
| **Pro Rata** | The proportion that a Claim or Interest in a particular Class bears to the aggregate amount of the Claims or Interests in that Class, or the proportion of the Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest under the Plan. |
| **PUC** | The Public Utility Commission of Texas. |
| **Reinstated** | (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim, or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation under a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim for any pecuniary loss incurred by such holder as the result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder thereof. |

| Term | Definition |
|---|---|
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Commitment Parties; (c) any Selected Partners (as defined in the Commitment Letter); (d) any Selected Investment Commitment Partners (as defined in the Commitment Letter); (e) the Consenting Interest Holders; (f) the lenders under the TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (g) the agents under the TCEH Credit Agreement, TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; and (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (g), such Entity and its affiliates, and such Entity and its affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party." |
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Commitment Parties; (c) any Selected Partners (as defined in the Commitment Letter); (d) any Selected Investment Commitment Partners (as defined in the Commitment Letter); (e) the Consenting Interest Holders; (f) the lenders under the TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (g) the agents under the TCEH Credit Agreement, TCEH DIP Financing, EFIH First Lien DIP Financing, and the EFIH Second Lien DIP Financing; (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (g), such Entity and its affiliates, and such Entity and its affiliate's current and former equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (i) all holders of Claims that are deemed to accept the Plan; (j) all holders of Claims who vote to accept the Plan; and (k) all holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan. |
| **Reorganized Debtors** | Collectively, and each in its capacity as such (and to the extent such Entity is a Debtor in the Chapter 11 Cases): (a) Reorganized EFH; (b) Reorganized EFIH; and (c) the Reorganized TCEH Debtors. |

| Term | Definition |
|------|------------|
| **Reorganized EFH** | EFH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized EFH shall be a corporation organized under the laws of the state of Texas. |
| **Reorganized EFH Board** | The board of directors of Reorganized EFH on and after the Effective Date. |
| **Reorganized EFH Common Stock** | The newly-issued common stock in Reorganized EFH, which shall consist of 100 million shares prior to the Equity Conversion and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any), which shall be issued in accordance with this Term Sheet. The number of shares of newly-issued Reorganized EFH Common Stock may be increased or decreased at the direction of the Required EFIH Unsecured Consenting Creditors, which shall result in the proportionate increase or decrease, as applicable, of Reorganized EFH Common Stock issued under the Equity Conversion. |
| **Reorganized EFIH** | EFIH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized EFIH shall be a limited liability company organized under the laws of the state of Delaware. |
| **Reorganized EFIH Board** | The board of directors of Reorganized EFIH on and after the Effective Date. |
| **Reorganized TCEH** | TCEH, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date, it being understood that, as of the Effective Date, Reorganized TCEH shall be a corporation organized under the laws of the state of Delaware. |
| **Reorganized TCEH Board** | The board of directors of Reorganized TCEH on and after the Effective Date. |
| **Reorganized TCEH Common Stock** | The newly-issued common stock of Reorganized TCEH, which shall be issued in accordance with this Term Sheet. |
| **Reorganized TCEH Debtors** | TCEH and each of its Debtor subsidiaries, or any successor thereto, by merger, consolidation, or otherwise, on and after the Effective Date. |
| **Reorganized TCEH Management Incentive Plan** | The Management Incentive Plan of Reorganized TCEH on terms and conditions to be determined on or after the Effective Date by the compensation committee of the Reorganized TCEH Board. The maximum amount of Reorganized TCEH Common Stock to be allocated to the Management Incentive Plan will be determined by the Ad Hoc TCEH Committee, in consultation with the TCEH Debtors, on or before the hearing date regarding approval of the Disclosure Statement. |
| **Required Consenting Creditors** | As defined in the Restructuring Support Agreement. |

| Term | Definition |
|------|------------|
| **Required EFIH Unsecured Consenting Creditors** | At least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the EFIH Unsecured Note Claims held by all Consenting Creditors. |
| **Required Rulings** | As defined in the Term Sheet. |
| **Restructuring** | As defined in the Introduction. |
| **Restructuring Support Agreement** | The Restructuring Support and Lock-Up Agreement to which this Term Sheet is attached as <u>Exhibit A</u>, pursuant to which the Debtors, the Consenting Interest Holders, the Consenting Creditors, and the Permitted Transferees (if any) (as defined in the Restructuring Support Agreement) agree to pursue and implement the Restructuring, including the transactions contemplated by the Commitment Letter, consistent in form and substance in all material respects with this Term Sheet and the Plan. |
| **Restructuring Transactions** | Those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors, the Consenting Interest Holders, and the Consenting Creditors reasonably determine to be necessary to implement the Plan. |
| **Ruling Request** | As defined in the Term Sheet. |
| **Rural Utilities Service** | An agency of the United States Department of Agriculture tasked with providing public utilities to rural areas in the United States through public-private partnerships. |
| **Schedules** | The schedules of assets and liabilities and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 |
| **SEC** | The Securities and Exchange Commission. |
| **Secured** | When referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Securities Act** | The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder. |

| Term | Definition |
|------|-----------|
| **Security** | A security as defined in section 2(a)(1) of the Securities Act. |
| **Selected Partners** | As defined in the Commitment Letter. |
| **Settling EFIH First Lien Note Holders** | As defined in the Term Sheet. |
| **Settling EFIH Second Lien Note Holders** | As defined in the Term Sheet. |
| **Shared Services** | As defined in the Term Sheet. |
| **Tax-Free Spin-Off** | The transactions required to preserve the Intended Tax-Free Treatment of the Restructuring Transactions, including the Contribution and the Distribution. |
| **Tax Matters Agreement** | The tax matters agreement entered into by Reorganized EFH and Reorganized TCEH as of the Effective Date which shall govern the rights and obligations of each party with respect to certain tax matters, including covenants to protect the Intended Tax-Free Treatment of the Restructuring Transactions and indemnity provisions if either party takes action that causes the Restructuring Transactions to fail to qualify for the Intended Tax-Free Treatment. |
| **Tax Sharing Agreements** | Collectively:  (a) the Competitive Tax Sharing Agreement; and (b) the Oncor Tax Sharing Agreement. |
| **TCEH** | As defined in the Introduction. |
| **TCEH 2012 Incremental Term Loans** | The TCEH First Lien Claims deemed to have been incurred pursuant to Section 1 of the Incremental Amendment Agreement. |
| **TCEH 2015 Notes** | The 10.25% fixed senior notes due November 1, 2015, issued by TCEH and TCEH Finance pursuant to the TCEH 2015 Note Indenture. |
| **TCEH 2015 Note Indenture** | That certain Indenture, dated as of October 31, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH subsidiaries, as guarantors, and Law Debenture Trust Company of New York, as successor trustee to BNY. |
| **TCEH Cash Collateral Order** | An order entered by the Bankruptcy Court approving the TCEH Debtors' use of the TCEH First Lien Creditors' cash collateral subject to the terms and conditions described therein, which order shall be in form and substance reasonably satisfactory to the Ad Hoc TCEH Committee. |
| **TCEH Credit Agreement** | The TCEH Credit Agreement, dated as of October 10, 2007, by and among TCEH, as the borrower; EFCH and certain TCEH subsidiaries, as guarantors; Wilmington Trust, N.A., as successor administrative and collateral agent to Citibank, N.A.; and the TCEH First Lien Lenders. |
| **TCEH Debtor Intercompany Claim** | A Claim by a TCEH Debtor against another TCEH Debtor. |

| Term | Definition |
|---|---|
| **TCEH Debtors** | Collectively:   (a) EFCH; (b) TCEH; and (c) the TCEH subsidiaries listed on **Exhibit B**. |
| **TCEH DIP Claims** | Any and all Claims arising under or related to the TCEH DIP Financing. |
| **TCEH DIP Financing** | The TCEH Debtors' $4,475 million debtor-in-possession financing facility on the terms set forth on **Exhibit F**. |
| **TCEH Finance** | TCEH Finance, Inc., a Delaware corporation. |
| **TCEH First Lien Claims** | Any Claim derived from or based upon:   (a) the TCEH Credit Agreement (including the term loan, revolver, and letter of credit facilities); (b) the TCEH First Lien Notes, including TCEH First Lien Notes held by EFH; (c) the TCEH First Lien Interest Rate Swaps; or (d) the TCEH First Lien Commodity Hedges. |
| **TCEH First Lien Commodity Hedges** | The commodity hedges entered into by TCEH and secured by the same collateral as Claims under the TCEH Credit Agreement and the TCEH First Lien Notes (but without respect to any setoff rights that a counterparty to a TCEH First Lien Commodity Hedge may have against TCEH). |
| **TCEH First Lien Deficiency Claims** | Any TCEH First Lien Claim that is not a TCEH First Lien Secured Claim. |
| **TCEH First Lien Interest Rate Swaps** | The interest rate swaps entered into by TCEH and secured by the same collateral as Claims under the TCEH Credit Agreement and the TCEH First Lien Notes (but without respect to any setoff rights that a counterparty to a TCEH First Lien Interest Rate Swap may have against TCEH). |
| **TCEH First Lien Lenders** | The lending institutions party from time to time to the TCEH Credit Agreement. |
| **TCEH First Lien Note Indenture** | That certain Indenture, dated as of April 19, 2011, by and among TCEH and TCEH Finance, as the issuers, EFCH and certain TCEH subsidiaries, as guarantors, and BNY, as trustee. |
| **TCEH First Lien Notes** | The TCEH first lien notes due October 1, 2020, issued by TCEH and TCEH Finance pursuant to the TCEH First Lien Note Indenture. |
| **TCEH First Lien Secured Claims** | Any TCEH First Lien Claim that is Secured.  TCEH First Lien Secured Claims shall be Allowed as Secured Claims in an amount to be determined by the TCEH Debtors with the reasonable consent of the Ad Hoc TCEH Committee. |
| **TCEH Second Lien Note Claims** | Any Claim derived from or based upon the TCEH Second Lien Notes. |
| **TCEH Second Lien Note Indenture** | That certain Indenture, dated as of October 6, 2010, by and among TCEH and TCEH Finance, as the issuers; Citibank, N.A., as administrative agent, EFCH and certain of TCEH's subsidiaries, as guarantors, and Wilmington Savings, as successor trustee to BNY. |

| Term | Definition |
|------|------------|
| **TCEH Second Lien Notes** | The TCEH Second Lien Notes due April 21, 2021, issued by TCEH pursuant to the TCEH Second Lien Note Indenture. |
| **TCEH Senior Toggle Note Indenture** | That certain Indenture, dated as of December 6, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY. |
| **TCEH Senior Toggle Notes** | The 10.50%/11.25% Senior Toggle Notes due November 1, 2016, issued by TCEH and TCEH Finance pursuant to the TCEH Senior Toggle Note Indenture. |
| **TCEH Unsecured Claim Fund** | Cash in an amount equal to the value of the unencumbered assets of TCEH. |
| **TCEH Unsecured Note Claims** | Any Claim derived from or based upon the TCEH Unsecured Notes. |
| **TCEH Unsecured Notes** | Collectively:  (a) the TCEH 2015 Notes; and (b) the TCEH Senior Toggle Notes. |
| **TEF** | As defined in the Restructuring Support Agreement. |
| **Term Sheet** | As defined in the Introduction. |
| **Tex-La** | Tex-La Electric Cooperative of Texas, Inc. |
| **Tex-La 2019 Obligations** | The payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 9.58% fixed notes due 2019 issued by Tex-La in the outstanding principal amount of $35 million. |
| **Tex-La 2021 Obligations** | The payment obligations of EFCH under the terms of the Tex-La Assumption Agreement with respect to the 8.254% Fixed Notes due 2021 issued by Tex-La in the outstanding principal amount of $37 million. |
| **Tex-La Assumption Agreement** | That certain Assumption Agreement, dated February 1, 1990, by and among EFCH, Tex-La, and the United States of America acting through the Administrator of the Rural Utilities Service, whereby EFCH agreed to assume certain payment obligations related to certain outstanding indebtedness of Tex-La that is guaranteed by the Rural Utilities Service. |
| **Tex-La Obligations** | Collectively:  (a) the Tex-La 2019 Obligations; and (b) the Tex-La 2021 Obligations, including any prepayment premiums and other costs and expenses due as full and final satisfaction of each of the foregoing. |
| **Texas Holdings** | As defined in the Restructuring Support Agreement. |
| **Total Professional Fees** | As defined in the Term Sheet. |
| **Tranche A-3 Redemption** | As defined in the Term Sheet |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |

| Term | Definition |
| --- | --- |
| **Unsecured Claim** | Any Claim that is not a Secured Claim. |
| **Wilmington Savings** | Wilmington Savings Fund Society, FSB, as successor trustee under the TCEH Second Lien Note Indenture. |
| **York** | York Capital Management LLC and its affiliates. |

**Exhibit B to RSA, Defining "Notes Claims, as filed by the Debtors in connection with the** *Debtors' Proposed Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay* **[D.I. 505-2]**

**EXHIBIT B to**
**the Restructuring Support and Lock-Up Agreement**

**Notes Claims**

As used herein, the defined term "**Notes Claims**" collectively refers to any and all obligations of the Debtors arising under any of the following:

i.    the 15% senior secured second lien notes due April 1, 2021 (the "**TCEH Second Lien Notes**") issued by TCEH and TCEH Finance, Inc. pursuant to an Indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of October 6, 2010, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain of the TCEH Subsidiaries, as guarantors; and Wilmington Savings Fund Society, FSB, as successor trustee to BNY (together with all Claims arising in connection with the TCEH Second Lien Notes, the "**TCEH Second Lien Note Claims**");

ii.   the 10.25% senior notes due November 1, 2015 (the "**TCEH 2015 Notes**") issued by TCEH and TCEH Finance, Inc. pursuant to an Indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of October 31, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain TCEH Subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY (together with all Claims arising in connection with the TCEH 2015 Notes, the "**TCEH 2015 Note Claims**"); and

iii.  the 10.50%/11.25% unsecured toggle notes due November 1, 2016 (the "**TCEH Senior Toggle Notes**" and, together with the TCEH 2015 Notes, the "**TCEH Unsecured Notes**") issued by TCEH and TCEH Finance pursuant to an Indenture, dated as of December 6, 2007, by and among TCEH and TCEH Finance, as the issuers; EFCH and certain of the TCEH Subsidiaries, as guarantors; and Law Debenture Trust Company of New York, as successor trustee to BNY (together with all Claims arising in connection with the TCEH Senior Toggle Notes, the "**TCEH Senior Toggle Note Claims**").

**Exhibit C to RSA, Providing a Copy of the Commitment Letter and Related Exhibits, as filed by the Debtors in connection with the *Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. for Entry of an Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry into and Payment of Fees under the Commitment Letter, and (F) Modifying the Automatic Stay* [D.I. 505-2]**

*Execution Version*

PRIVILEGED AND CONFIDENTIAL

April 28, 2014

Energy Future Holdings Corp.
Energy Future Intermediate Holdings Company LLC
Energy Plaza
1601 Bryan Street
Dallas, TX  75201

      Re:    Investment Commitment

Ladies and Gentlemen:

Reference is made to the Restructuring Support and Lock-Up Agreement, dated as of April 28, 2014 (the "Restructuring Support Agreement"), by and among Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), and certain of their affiliates (collectively, the "Debtors"), the other parties thereto, and parties listed on the signature pages hereto (the "Initial Commitment Parties"), and the term sheets and other documents attached to the Restructuring Support Agreement, pursuant to which EFH and EFIH intend to engage in a restructuring of their existing liabilities in accordance with the Bankruptcy Code (the "Restructuring").  Capitalized terms used in this letter agreement and not otherwise defined herein shall have the meanings provided in the Restructuring Support Agreement or the Restructuring Term Sheet attached thereto (subject to Section 2 of the Restructuring Support Agreement).

The Restructuring contemplates, among other things, that the Commitment Parties and the Selected Partners, if any (as defined below), will, severally and not jointly, backstop a second lien subordinated secured debtor-in-possession note facility in accordance with the terms of the Second Lien DIP Notes Term Sheet (as defined below) (the "Second Lien DIP Facility") that consists of (a) non-amortizing notes in an amount up to $1,900,000,000 (the "Tranche A Notes") and (b) non-amortizing, non-interest-bearing notes issued in full satisfaction of the Funding PIK Fee (as defined below) (the "Tranche B Notes" and, together with the Tranche A Notes, the "Second Lien DIP Notes").  The Debtors will offer the right to purchase the Tranche A Notes to (i) Holders of General Unsecured Claims Against the EFIH Debtors (such Tranche A Notes, the "Tranche A-1 Notes"), subject to ratable reduction from participation by Selected Partners (as defined below), if any, in an aggregate amount not to exceed $400,000,000 and (ii) General Unsecured Claims Against EFH held by Fidelity (such Tranche A Notes, the "Tranche A-3 Notes"), subject to the conditions set forth in the Restructuring Support Agreement and the term sheet attached hereto as Exhibit A (the "Second Lien DIP Notes Term Sheet") .

Upon the Effective Date, the Second Lien DIP Notes shall be subject to conversion to Reorganized EFH Common Stock (the "Equity Conversion"), on the terms set forth in the Restructuring Support Agreement, the term sheet attached hereto as Exhibit B (the "Equity

Conversion Term Sheet"), and the Conversion Agreement (as defined in the Equity Conversion Term Sheet).

To provide assurances that the issuance of the Second Lien DIP Notes will be consummated, the Initial Commitment Parties hereby, severally and not jointly, commit to backstop the Second Lien DIP Notes in the respective percentages set forth on Schedule I hereto, on the terms and conditions described herein (including in the Second Lien DIP Notes Term Sheet and the Equity Conversion Term Sheet) and the Restructuring Support Agreement; *provided*, *however*, that the aggregate amount of such backstop shall not exceed $1.9 billion ($1,900,000,000) (the "Investment Commitment").   The Required Commitment Parties (as defined below) may from time to time (in their sole discretion), up to the date of funding of the Second Lien DIP Facility, select certain partners to transfer the Participation Rights to or to participate in the Investment Commitment in an aggregate amount not to exceed $400,000,000 of the aggregate Investment Commitment, in each case on prior written consent of EFH and EFIH unless such party is included on Schedule III hereto (the "Selected Partners"); and any such inclusion of Selected Partners by the Required Commitment Parties shall ratably reduce each Commitment Party's portion of the Investment Commitment; *provided, however*, that such Selected Partner shall execute a joinder to this letter agreement, the Restructuring Support Agreement (in accordance with Section 4.04 thereof), and any applicable definitive document for the Second Lien DIP Notes; *provided*, *further*, that if a proposed transfer to a Selected Partner were to cause a Commitment Party to transfer more than 50% of its portion of the Investment Commitment (when taken in the aggregate with all other transfers of such Commitment Party's portion of the Investment Commitment in accordance with the below), then the Required Commitment Parties may choose to (x) reduce the amount of the Investment Commitment to be transferred to the Selected Partner to an amount in which such Commitment Party would no longer be transferring 50% (in the aggregate) of its portion of the Investment Commitment or (y) cancel the contemplated transfer of the Investment Commitment.   In addition, an Initial Commitment Party may in its sole discretion select a Selected Partner, or other party otherwise consented to by EFH and EFIH (the "Transferee Commitment Parties") to purchase all or a portion of an Initial Commitment Party's portion of the Investment Commitment; *provided*, *that*, with respect to an affiliate Transferee Commitment Party, the transferring Initial Commitment Party's obligations with respect to the transferred portion of the Investment Commitment shall remain; *provided*, *further*, all Transferee Commitment Parties shall execute a joinder to this letter agreement, the Restructuring Support Agreement (in accordance with Section 4.04 thereof), and any applicable definitive document for the Second Lien DIP Notes; *provided*, *further*, if such transfer were to cause such Initial Commitment Party to transfer more than 50% of its portion of the Investment Commitment (when taken in the aggregate with all other transfers of its portion of the Investment Commitment by such Initial Commitment Party), such proposed transfer shall be deemed null and void *ab initio*.   Subject to the foregoing, following any such sale or transfer by an Initial Commitment Party of all or a portion of its Investment Commitment, such Initial Commitment Party's obligations with respect to such sold or transferred Investment Commitment shall cease.   No Commitment Party other than an Initial Commitment Party shall be permitted to transfer any portion of the Investment Commitment.   For purposes of this letter agreement, (i) the term "Commitment Party" shall mean, collectively, the Initial Commitment Parties, the Selected Partners, and the Transferee Commitment Parties, and Schedule I hereto shall be updated accordingly to account for any additional Commitment Parties and (ii) the term

"Required Commitment Parties" shall mean, at any relevant time, three (3) Initial Commitment Parties (other than a Defaulting Commitment Party) that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the Investment Commitment. Notwithstanding anything to the contrary contained herein, the identity of each Commitment Party shall be reasonably acceptable to the Borrowers.

In consideration for the Investment Commitment and on the terms set forth in this Commitment Letter and the Restructuring Support Agreement, EFIH shall (A) pay Pro Rata based on the respective percentages set forth on Schedule II hereto an amount in cash equal to 0.46% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Execution Fee"), which such Execution Fee shall be paid upon execution of this letter agreement, (B) subject to entry of the Approval Order, pay Pro Rata based on the respective percentages set forth on Schedule II hereto an amount in cash equal to 0.54% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Approval Fee"), which Approval Fee shall be paid within 5 days of entry of the Approval Order, (C) subject to entry of the Approval Order and the funding of the Second Lien DIP Facility, pay GSO and Avenue an arranger fee of $1,000,000 each in cash (the "Arranger Fees"), which Arranger Fees shall be paid within 5 days of entry of the Approval Order, (D) subject to entry of the Approval Order and the funding of the Second Lien DIP Facility, pay Pro Rata based on the respective percentages set forth on Schedule I hereto an amount in cash equal to 1.0% of $1.9 billion ($1,900,000,000) to the Commitment Parties (the "Funding Cash Fee"), which Funding Cash Fee shall become due and be paid in full by EFIH simultaneously with the funding of the Second Lien DIP Facility, and (D) issue Pro Rata based on the respective percentages set forth on Schedule I hereto an amount equal to 5.00% of $1.9 billion ($1,900,000,000) to the Commitment Parties in the form of Tranche B Notes (the "Funding PIK Fee" and, collectively with the Execution Fee, the Approval Fee, the Arranger Fees, and the Funding Cash Fee, the "Commitment Fee"), which Funding PIK Fee shall become due and be paid in full by EFIH simultaneously on the funding of the Second Lien DIP Facility. EFH and EFIH agree that the Commitment Fee and the Alternative Transaction Fee shall be nonrefundable once paid on the terms set forth in this letter agreement and that the Commitment Fee, the Alternative Transaction Fee and any other payments hereunder shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim. For the avoidance of doubt, the Approval Fee, the Arranger Fee, and the Alternative Transaction Fee shall not be paid to any Defaulting Commitment Party.

If and to the extent that any one Commitment Party or multiple Commitment Parties do not satisfy its or their obligations in respect of its or their Pro Rata portion of the Investment Commitment (each such Commitment Party, a "Defaulting Commitment Party"), then each of the remaining non-defaulting Commitment Parties (the "Non-Defaulting Commitment Parties") shall have the right, but not the obligation (the "Default Purchase Right"), to assume all or a portion of the Investment Commitment that was to be funded by such Defaulting Commitment Party (the "Defaulted Investment Commitment"). To the extent that the Non-Defaulting Commitment Parties (in the aggregate) desire to assume more than the total amount of the Defaulted Investment Commitment, then such Defaulted Investment Commitment shall be allocated among the Non-Defaulting Commitment Parties electing to assume the Defaulted Investment Commitment Pro Rata based on the respective percentages set forth on Schedule I hereto; provided, however, that if a Non-Defaulting Commitment Party is a Selected Partner, then such Non-Defaulting Commitment Party may only assume such portion of the Defaulted

Investment Commitment so as not to exceed $400,000,000 of the Investment Commitment (calculated with all other Selected Partners). Each Defaulting Commitment Party shall immediately pay to each Non-Defaulting Commitment Party that elects to assume all or a portion of the Defaulted Investment Commitment, any portion of the Execution Fee, Approval Fee, and Arranger Fee received by such Defaulting Commitment Party, directly or indirectly, based on such Non-Defaulting Party's Pro Rata share of the Defaulted Investment Commitment so assumed by such Non-Defaulting Commitment Party. For purposes of the Commitment Percentages set forth on Schedule I hereto, the Commitment Percentage for each of the Non-Defaulting Commitment Parties electing to exercise the Default Purchase Right shall be adjusted accordingly to reflect the reallocation of the Defaulting Commitment Party's Commitment Percentage among the Non-Defaulting Committing Parties electing to exercise the Default Purchase Right (such that the total Commitment Percentage for the Non-Defaulting Commitment Parties shall equal 100%). In the event that the entire Defaulted Investment Commitment is not assumed by the Non-Defaulting Commitment Parties, the Required Commitment Parties may assign to a Selected Partner all or the remaining portion of the Defaulted Investment Commitment and following such assignment, Schedule I shall be accordingly adjusted as set forth in the immediately foregoing sentence.

Whether or not the transactions contemplated hereby are consummated, but subject to entry of the Approval Order, the Commitment Parties (other than any Defaulting Commitment Party and their respective affiliates and representatives, the "Indemnified Parties") shall be indemnified and held harmless by EFH and EFIH, on a joint and several basis, from and against any and all losses, claims, damages, liabilities and expenses as a result of a claim by a third party, which any such Indemnified Parties may incur, have asserted against it or be involved in as a result of or arising out of or in any way related to this letter agreement, the matters and transactions referred to herein, the proposed Investment Commitment contemplated hereby, the use of proceeds thereunder or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any of such Indemnified Parties is a party thereto, and to reimburse each of such indemnified persons for any legal or other expenses incurred in connection with any of the foregoing from the date of the execution of this letter agreement until the termination of this letter agreement (for the avoidance of doubt, any claim for indemnification made after termination of this letter agreement for any event arising prior to the termination of this letter agreement shall not thereafter be barred and all claims for indemnification hereunder shall survive until finally resolved); *provided*, *however*, that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they have resulted from the bad faith or willful misconduct of such indemnified person (as determined by a court of competent jurisdiction in a final and non-appealable judgment). The terms set forth in this paragraph shall survive termination of this letter agreement. This letter agreement is not assignable (a) by either of EFH or EFIH, without the prior written consent of the Required Commitment Parties (and any purported assignment without such consent shall be null and void *ab initio*), or (b) by any of the Commitment Parties, except to (i) its affiliates, subject to the terms and conditions contained herein (provided that such Commitment Party shall remain liable hereunder) or a Transferee Commitment Party as set forth above and (ii) the Commitment Parties may assign all or a portion of the Commitment Parties' obligations hereunder to the Selected Partners as set forth above. This letter agreement is intended to be solely for the benefit of the parties hereto and is

not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

The obligations of the Commitment Parties to fund the Investment Commitment are conditioned upon satisfaction of, inter alia, each of the conditions set forth herein, in the Restructuring Support Agreement and in the Second Lien DIP Notes Term Sheet.

This letter agreement shall terminate upon the termination of the Restructuring Support Agreement.  Subject to entry of the Approval Order, if EFIH enters into definitive documentation with respect to a reorganization, restructuring, merger, consolidation, share exchange, rights offering, equity investment, business combination, recapitalization or similar transaction (including the sale of all or substantially all of the assets of EFH, EFIH, or any other Debtor) involving EFIH on equal or better terms and conditions for EFIH than those contemplated in the Restructuring Support Agreement and the Term Sheet (such transaction, an "Alternative Transaction"), the Debtors shall pay Pro Rata based on the respective percentages set forth on Schedule II hereto, an amount in cash equal to 3.00% of $1.9 billion ($1,900,000,000) to the Initial Commitment Parties (the "Alternative Transaction Fee"), which Alternative Transaction Fee shall become due and be paid in full within 5 days Bankruptcy Court approval of such Alternative Transaction.  For the avoidance of doubt, the Alternative Transaction Fee shall not become due or be payable if the Debtors consummate an Alternative Transaction because of the failure of the Commitment Parties to fulfil their obligations under the Investment Commitment.

All rights and remedies provided in this letter agreement are cumulative and not exclusive of any other rights or remedies that may be available to EFH, EFIH, and the Commitment Parties, including (without limitation) all rights to specific performance, or as otherwise provided by law, equity, statute, or in any other agreement entered into in connection with any of the transactions contemplated hereunder, including as to any Defaulting Commitment Party.

Upon execution of this letter agreement, EFH shall or shall cause EFIH to promptly pay (i) Akin Gump Strauss Hauer & Feld LLP, by wire transfer of immediately available funds, an advance payment of $3,000,000 (the "Akin Gump Advance Payment") and (ii) Centerview Partners LLC, by wire transfer of immediately available funds an advance payment of $675,000 (the "Centerview Advance Payment," and together with the Akin Gump Advance Payment, the "Advance Payment").  In accordance with the terms of that certain amended and restated engagement letter with EFIH dated April 27, 2014 (as may be amended or modified from time to time, the "Centerview Engagement Letter"), EFH shall or shall cause EFIH to promptly pay Centerview an aggregate arrangement payment of $5,000,000, which shall be paid as follows (x) $1,250,000 shall be paid upon the execution of this letter agreement (the "Arrangement Payment I"), (y) $1,250,000 shall be paid simultaneously be paid within 2 days of entry of the EFIH Second Lien DIP Order (the "Arrangement Payment II") and (z) $2,500,000 shall be paid simultaneously with the funding of the Second Lien DIP Notes (the "Arrangement Payment III," and together with the Arrangement Payment I and Arrangement Payment II, the "Arrangement Payment").  Upon entry of the Approval Order, EFH and EFIH agree to pay, within 15 business days of delivery of an invoice (which shall include reasonable supporting detail, which may be redacted to protect privileged or confidential information), the unpaid reasonable and

documented fees and expenses of Akin Gump Strauss Hauer & Feld LLP, pursuant to that certain engagement letter with EFIH dated May 24, 2013 (as may be amended or modified from time to time), Centerview Partners LLC, pursuant to the Centerview Engagement Letter and, without limitation, all other out-pocket fees, costs and expenses of the Commitment Parties, including the fees and expenses of the Commitment Party Professionals incurred previously or in the future relating to the Restructuring or the Chapter 11 Cases, pursuant to applicable engagement letters entered into between such professionals and EFH or EFIH, as applicable (such fees and expenses, the "Professional Fees").    Payment of the Advance Payment, the Arrangement Payment and Professional Fees shall not be subject to allowance by the Bankruptcy Court; *provided*, *however*, that EFH and EFIH shall promptly provide copies of invoices received on account of the Professional Fees to the U.S. Trustee and counsel to any Committee appointed in the Cases, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the invoiced amount of the Professional Fees, which objections may only be raised within 15 business days after delivery of an invoice(s) therefor.    In the event that within 15 business days from delivery of such invoices EFH, EFIH, the U.S. Trustee, or counsel to the Committee raises an objection to a particular invoice, and the parties are unable to resolve such objection, the Court shall hear and determine such dispute; *provided that* payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court.    EFH and EFIH agree that the Advance Payment, Arrangement Payment and Professional Fees shall be nonrefundable and that the Advance Payment, Arrangement Payment and Professional Fees and any other payments hereunder shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim.    Notwithstanding anything to the contrary herein, the Debtors shall not be obligated for any of the professional fees or other obligations described in this paragraph incurred after this letter agreement terminates.

This letter agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.    By its execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this letter agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York.    By execution and delivery of this letter agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.    Notwithstanding anything to the contrary herein, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this letter agreement. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

This letter agreement may not be amended or waived except in a writing signed by EFH, EFIH, and the Initial Commitment Parties.    Notwithstanding the foregoing, this letter agreement

may be amended by the Initial Commitment Parties to add Selected Partners and Transferee Commitment Parties as Commitment Parties in accordance with the terms of this letter agreement.  This letter agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this letter agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

Notwithstanding anything contained herein, each Initial Commitment Party acknowledges that its decision to enter into this letter agreement has been made by such Commitment Party independently of any other Commitment Party.

This letter agreement (including the exhibits and schedules hereto), along with the Restructuring Support Agreement (including the exhibits and schedules thereto), constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter hereof, and shall become effective and binding upon (i) the mutual exchange of fully executed counterparts by the EFH and EFIH and all of the Commitment Parties, and (ii) payment by EFH or EFIH of the Execution Fee, the Advance Payment, the Arranger Fee, and the Arrangement Payment I in accordance with the above.

[SIGNATURE PAGES FOLLOW]

If the foregoing is in accordance with your understanding of our agreement, please sign this letter in the space indicated below and return it to us.

Very truly yours,

[INITIAL COMMITMENT PARTIES]

By:_____
Name:
Title:

AVENUE CAPITAL MANAGEMENT II, LP, on
behalf of certain investment funds it advises

By: Avenue Capital Management II GenPar, LLC, its
general partner

By: _____
Name: Marc Lasry
Title: Managing Member

YORK CAPITAL MANAGEMENT GLOBAL
ADVISORS, LLC, on behalf of certain funds
and/or accounts managed and/or advised by it
and/or its advisors

By: _____

Name:  John Fosina
Title:  Chief Financial Officer

GSO CAPITAL PARTNERS LP, on behalf of
certain funds and accounts it manages

By: _____

Name:

Title:

MARISA J. BEENEY

AUTHORIZED SIGNATORY

THIRD AVENUE MANAGEMENT LLC, on
behalf of certain funds it manages

By: _____
Name:  Vincent J. Dugan
Title:  Chief Financial Officer

P. SCHOENFELD ASSET MANAGEMENT LP,
an investment manager on behalf of certain of its
affiliated investment funds

By:
Name:
Title:

JOHN VASSALLO
DIRECTOR OF OPERATIONS
P SCHOENFELD ASSET MGMT LP

*Signature Page to Investment Commitment Letter*

**THE FOREGOING IS HEREBY**
**AGREED TO AND ACCEPTED:**

ENERGY FUTURE HOLDINGS CORP.

By: _____

Name:

Title: SVP & Treasurer

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

By: _____

Name:

Title: SVP & Treasurer

## EXHIBIT A

**Second Lien DIP Notes Term Sheet**

**ENERGY FUTURE HOLDINGS CORP.**
**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

AMENDED AND RESTATED SECOND LIEN SUBORDINATED
SECURED DEBTOR IN POSSESSION NOTES FACILITY TERM SHEET

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of April 29, 2014 (the "Commitment Letter"), to which this Term Sheet is attached, or the Restructuring Support Agreement (as defined in the Commitment Letter).*

| | |
|---|---|
| Issuers | Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc., a Delaware corporation (collectively, the "Issuers"). |
| Guarantors | All of the Issuers' direct and indirect domestic restricted subsidiaries that guarantee the EFIH First Lien DIP Financing (collectively, the "Guarantors") in the Chapter 11 Cases.  The Issuers and the Guarantors are referred to herein as "Note Parties" and each, a "Note Party."  All obligations of the Issuers under the Second Lien DIP Facility (as defined below) will be unconditionally guaranteed by the Guarantors. |
| Backstop Commitment | To be provided by the entities set forth on Schedule I to the Commitment Letter on the date hereof (and defined as Initial Commitment Parties therein) and such other parties that become Commitment Parties from time to time pursuant to the terms of the Commitment Letter.  The Commitment Parties will pursuant to the Commitment Letter, severally and not jointly, backstop the Second Lien DIP Facility in an amount not to exceed $1,900,000,000 (the "Backstop Commitment") based on the respective percentages set forth on Schedule I to the Commitment Letter. |
| Second Lien DIP Facility Rights Holders | The following persons shall have the right to participate in the Second Lien DIP Facility (such persons, the "Second Lien DIP Facility Rights Holder," and such rights, the "Participation Rights"): (i) (a) All Holders of EFIH Unsecured Note Claims and EFH LBO Notes Guaranty Claims shall receive their Pro Rata share of 91% of the Participation Rights; and (b) Fidelity shall receive their Pro Rata share of 9% of the Participation Rights which participation shall be in the form of Tranche A-3 Note; *provided*, *however*,  General Unsecured Claims Against EFH may participate in the Equity Conversion by purchasing such Tranche A-3 Notes held by Fidelity, if the Required Transfer as described below has not occurred.  Moreover, Fidelity shall receive an $11.25 million payment from EFIH in connection with the exercise of any Participation Rights.  If at any time (a) the IRS shall have denied the Debtors' Ruling Request or shall have informed the Debtors or their counsel, |

whether orally or in writing, of its decision not to issue one or more of the Required Rulings (the "PLR Denial") and (b) the Oncor TSA Amendment has not yet been approved, the Required Commitment Parties shall have the sole and exclusive right to require the holders of any Tranche A-3 Notes to transfer such notes to the Commitment Parties (the "Required Transfer") for a purchase price equal to the sum of (i) the par amount of such notes plus accrued and unpaid interest (including the PIK Interest (as defined below)), which amount shall be payable on the purchase date, (ii) in the event such assignment is consummated before the payment of the One-Time PIK Fee (as defined below), 10% of the par amount of such notes plus accrued and unpaid PIK Interest, if any (but not, for the avoidance of doubt, any accrued and unpaid cash interest), which amount shall be payable on the purchase date, and (iii) a Pro Rata share of any Prepayment Fee (as defined below) subsequently paid on such Tranche A-3 Notes (which amount shall be paid by EFIH to the holders of the Tranche A-3 Notes immediately prior to such assignment and not the holders of the Tranche A-3 Notes as of the date that the Prepayment Fee is due and owing).

The Participation Rights of Holders of EFIH Unsecured Note Claims and EFH LBO Notes Guaranty Claims shall be subject to ratable reduction from participation by Selected Partners (if any), in an aggregate amount not to exceed $400,000,000.

| | |
|---|---|
| Administrative Agent | To be determined. |
| Collateral Agent | To be determined. |
| DIP Facility | A second lien subordinated secured debtor-in-possession note facility that consists of (a) the Tranche A Notes, composed of (i) the Tranche A-1 Notes (the "Tranche A-1 Notes") issued to Holders of EFIH Unsecured Note Claims and EFH LBO Notes Guaranty Claims pursuant to the Second Lien DIP Procedures, (ii) the Tranche A-2 Notes (the "Tranche A-2 Notes") issued to each Commitment Party solely as a result of its obligation under the Investment Commitment, the Selected Partners, Post-Funding Partners and Specified Consultants, and (iii) the Tranche A-3 Notes (the "Tranche A-3 Notes" and, together with the Tranche A-1 Notes and Tranche A-2 Notes, the "Tranche A Notes") issued to Fidelity, as a Holder of General Unsecured Claims Against EFH, in each case, which will be available to be drawn in a single drawing on the Closing in an amount up to $1,900,000,000 to consummate the Second Lien Refinancing, and (b) the Tranche B Notes. |

2

Second Lien DIP Procedures

The procedures for offering Participation Rights to eligible Second Lien DIP Facility Rights Holders under the Second Lien DIP Facility shall be on terms and conditions which are consistent with this Term Sheet and otherwise satisfactory to the Required Commitment Parties, EFH and EFIH (the "Second Lien DIP Procedures") in advance of the consummation of the Second Lien DIP Facility.

The record date that shall determine the parties entitled to Participation Rights shall be the date of the commencement of the offering to eligible Second Lien DIP Facility Rights Holders.

The Second Lien DIP Facility shall be funded by any and all Second Lien DIP Facility Rights Holders that elect to participate in their Pro Rata share of the Second Lien DIP Facility and, with respect to any unfunded portion of the Second Lien DIP Facility, Pro Rata by the Commitment Parties in accordance with the terms of the Commitment Letter (such funding parties, together, with their successors and assigns, the "Note Purchasers"); *provided that* no Commitment Party shall be permitted or required to exercise any participation rights if, after giving effect to such participation, the aggregate principal amount of the Second Lien DIP Facility to be provided by such Commitment Party when aggregated with the aggregate principal amount of the Second Lien DIP Facility provided by affiliates of such Commitment Party would exceed such Commitment Party's Investment Commitment, *provided, however, that* such Commitment Party may exceed such Commitment Party's Investment Commitment to the extent necessary to satisfy any Commitment of a Defaulting Commitment Party; *provided, further, that* any party electing to exercise such participation shall execute a joinder to the Restructuring Support Agreement and Conversion Agreement as a precondition to any such participation becoming effective.

Second Lien DIP Facility
Termination Date

All Second Lien DIP Notes shall become due and payable on the DIP Facility Termination Date (as defined below), subject to the Equity Conversion.

The "DIP Facility Termination Date" shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) the consummation of any Section 363 sale, (c) the effective date of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court or (d) the acceleration of the notes and the termination of the commitment with respect to the Second Lien DIP Facility in accordance with the DIP Documents (as defined below).

3

"<u>Scheduled Termination Date</u>" means the date that is 24 months from the date the Second Lien DIP Facility is funded.

| | |
|---|---|
| Equity Conversion | Upon the Effective Date, the Second Lien DIP Notes shall be subject to conversion to Reorganized EFH Common Stock, on the terms set forth in the Restructuring Support Agreement, the Equity Conversion Term Sheet, and the Conversion Agreement (as defined in the Equity Conversion Term Sheet). |

If the Equity Conversion does not occur, the Tranche B Notes shall convert to Tranche A-2 Notes.

Use of Proceeds      Proceeds of the Second Lien DIP Facility will be used (together with cash on hand and proceeds of the EFIH First Lien DIP Financing) to (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing under the EFIH Second Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH Second Lien Note Holders and (ii) repay the EFIH Second Lien Notes held by Settling EFIH Second Lien Note Holders in accordance with the EFIH Second Lien Settlement (clauses (i) and (ii) collectively, the "<u>Second Lien Refinancing</u>").

DIP Documents      The Second Lien DIP Facility will be documented by a note purchase agreement (the "<u>Note Purchase Agreement</u>") and other guarantee, security, intercreditor, and other relevant documentation (together with the Note Purchase Agreement, collectively, the "<u>DIP Documents</u>") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance reasonably satisfactory to the Required Commitment Parties and the Issuers; *provided*, *however*, that such DIP Documents will be drafted in form and substance consistent with the documents governing the EFIH First Lien DIP Financing (the "<u>First Lien DIP Documents</u>"), with adjustments made to reflect this Term Sheet.  It is agreed that each "basket" or "cushion" set forth in the covenants and events of default contained in the DIP Documents shall be at least 15% more than the corresponding provision in the First Lien DIP Documents.

Transferability of Participation Rights      Subject to compliance with all applicable securities laws, unless otherwise agreed by the Issuers, the Participation Rights will only be transferable to affiliates of Second Lien DIP Facility Rights Holders and Selected Partners;  *provided*, *however,* the Participation Rights may not be transferred, and any such transfer shall be null and void *ab initio* if, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, the transferee and/or its affiliates of such transfer  were to obtain or have beneficial ownership of, in the aggregate, more than fifty percent (50%)

or more of the Reorganized EFH Common Stock.

Notwithstanding anything to the contrary herein, the Holders of EFIH Senior Toggle Notes shall not transfer such EFIH Senior Toggle Notes apart from the Pro Rata share of the Participation Rights attributable to such EFIH Senior Toggle Notes to any party other than affiliates or Selected Partners, and any such transfer shall be retroactively void.

For the avoidance of doubt, any transferee of the Participation Rights described above shall execute a joinder to the Restructuring Support Agreement and Conversion Agreement as a precondition to any transfer described above becoming effective.

| | |
|---|---|
| Transferability of Second Lien DIP Notes | Subject to compliance with all applicable securities laws, unless otherwise agreed by the Issuers, the Second Lien DIP Notes shall only be transferable to (i) affiliates of a Note Purchaser, (ii) other Note Purchasers and their respective affiliates, and (iii) such other Persons that are qualified institutional buyers or accredited investors, *provided, however*, that such transfers of Second Lien DIP Notes are not permitted if, in the reasonable business judgment of the Issuers and their legal and tax advisors, in consultation with the Commitment Parties, such transfers would adversely (a) affect or delay the Debtors' ability to obtain the Private Letter Ruling or violate the terms and conditions of the Private Letter Ruling or (b) affect or delay the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring Transactions, *provided*, *further*, that, any transfer described above shall be null and void *ab initio*, if, assuming the Restructuring Transactions were to be consummated immediately upon such Transfer, the transferee of such transfer (other than affiliates transfers) was to obtain beneficial ownership of, in the aggregate, more than fifty percent (50%) or more of the Reorganized EFH Common Stock.<br><br>Notwithstanding anything to the contrary herein, the Holders of EFIH Senior Toggle Notes that become Note Purchasers shall not transfer such EFIH Senior Toggle Notes apart from the Pro Rata share of the Second Lien DIP Notes attributable to such EFIH Senior Toggle Notes and any such transfer shall be retroactively void; *provided*, *however*, that any Tranche A-2 Notes purchased by a Commitment Party solely as a result of its obligation to do so under the Investment Commitment shall be transferrable separately from such Commitment Party's EFIH Senior Toggle Notes, that the Tranche B Notes shall be transferrable separately from the Commitment Parties' EFIH Senior Toggle Notes and that any Tranche A-1 Notes transferred to Post-Funding Partners or Specified |

Consultants pursuant to the provision below shall be transferrable separately from such Commitment Party's EFIH Senior Toggle Notes.

Notwithstanding anything herein to the contrary, at any time prior to the earlier of the DIP Facility Termination Date and the Equity Conversion, the Required Commitment Parties (determined based on the amount of their respective Investment Commitments immediately prior to the closing of the Second Lien DIP Facility) may require (i) each Note Purchaser holding Tranche A-1 Notes or Tranche A-2 Notes, except those held by Selected Partners, Post-Funding Partners (as defined below) or Specified Consultants, to sell, at a price of no less than par value of such Second Lien DIP Notes plus accrued but unpaid interest thereon, a Pro Rata portion of its Second Lien DIP Notes to partners selected by the Required Commitment Parties (the "Post-Funding Partners") in an amount such that after giving effect to all such sales, the Post-Funding Partners shall own no more than $400,000,000 of principal amount of Second Lien DIP Notes, after taking into account all Second Lien DIP Notes owned (if any) by the Post-Funding Partners immediately prior to any such sale and any Tranche A-1 Notes received by such Post-Funding Partners pursuant to the above shall automatically become Tranche A-2 Notes (ii) each Note Purchaser holding Tranche A-1 Notes or Tranche A-2 Notes, except those held by Selected Partners, Post-Funding Partners or Specified Consultants, to sell, at a price of no less than par value of such Second Lien DIP Notes outstanding as of the Closing less paid interest thereof, to date, a Pro Rata portion of its Second Lien DIP Notes to consultants to the Administrative Agent or Initial Commitment Parties ("Specified Consultants") in an amount up to $100,000,000 and any Tranche A-1 Notes received by such Specified Consultant pursuant to the above shall automatically become Tranche A-2 Notes.

For the avoidance of doubt, any transferee of Second Lien DIP Notes described above shall execute a joinder to the Restructuring Support Agreement as a precondition to any transfer described above becoming effective.

| Interest Rates | The Tranche A Notes will bear interest at a fixed rate of 8% per annum, payable in cash on the final business day of each quarter beginning on the first such day after the Closing. |

If the Bankruptcy Court has not entered an order approving the Oncor TSA Amendment as of the date that is 90 days from the Petition Date, the Tranche A Notes shall bear additional interest at a rate of 4% per annum compounded quarterly, paid in kind in additional Tranche A Notes, until such time as the

Oncor TSA Amendment is approved (the "PIK Interest").

| | |
|---|---|
| Default Interest | During the continuance of an event of default (as defined in the DIP Documents), overdue amounts on the Tranche A Notes will bear interest at an additional 2% per annum. |
| Fees | If the Bankruptcy Court has not entered an order approving the Oncor TSA Amendment by the date that is one year from the Petition Date, the Issuers shall pay a one-time fee in the amount of 10.00% of the Tranche A Notes and Tranche B Notes, as applicable, to the Note Purchasers, paid in kind in additional Tranche A Notes and Tranche B Notes, as applicable (the "One-Time PIK Fee"). |

If the Second Lien DIP Facility is repaid in cash without the consent of the Required Note Purchasers and other than upon acceleration, the Issuers shall pay an optional prepayment fee of $380 million (which payment may be waived upon the written consent of the Required Note Purchasers (as defined below) in their sole discretion, *provided, however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes) (the "Prepayment Fee") to the Note Purchasers.

Notwithstanding anything to the contrary herein, the Fidelity Repayment (as defined in the Equity Conversion Term Sheet) shall not constitute a repayment in cash of the Second Lien DIP Facility.

| | |
|---|---|
| Optional Prepayment | The Issuers may prepay the Second Lien DIP Notes subject to customary notice periods and payment of breakage costs and the Prepayment Fee (which payment may be waived upon the written consent of the Required Note Purchasers in their sole discretion, *provided, however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes). Notwithstanding anything to the contrary herein, the Fidelity Repayment (as defined in the Equity Conversion Term Sheet) shall not constitute an Optional Prepayment under the Second Lien DIP Facility and shall not result in the Prepayment Fee being due. |
| Mandatory Prepayments | The DIP Documents will contain mandatory prepayment provisions found in the EFIH First Lien DIP Financing; provided that, (a) notwithstanding anything to the contrary herein, the Second Lien DIP Notes shall not be mandatorily prepaid unless the EFIH First Lien DIP Financing is mandatorily prepaid first and in full and (b) application of mandatory prepayment amounts shall be subject to the provisions of the Intercreditor Agreement. |

| | |
|---|---|
| <u>Security and Priority</u> | All amounts owing by the Issuers under the Second Lien DIP Facility and the obligations of the Guarantors in respect thereof will be secured, subject to (i) the Carve-Out (as defined in the commitment letter dated as of the date hereof with respect to the EFIH First Lien DIP Facility among EFIH, Deutsche Bank Securities Inc., as Left Lead DIP Facility Arranger (as defined therein), and the other financial institutions party thereto  (the "<u>EFIH First Lien DIP Commitment Letter</u>")), (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents and (iii) all valid, perfected, enforceable and unavoidable liens as of the Closing (the "<u>Permitted Liens</u>"), by a second priority perfected security interest in all assets owned by the Issuers that secures the EFIH First Lien DIP Financing, including, without limitation, distributions pursuant to the Oncor TSA so long as the Oncor TSA Amendment is in effect (the "<u>Collateral</u>"). |

The liens granted under the Second Lien DIP Facility will be junior only to the (i) the Carve-Out, (ii) the liens granted to secure the EFIH First Lien DIP Financing and other liens and encumbrances permitted by the DIP Documents and (iii) the Permitted Liens.  The Issuers shall use commercially reasonable efforts to obtain the entry of an order providing that the liens under the Second Lien DIP Facility prime, and are in all respects senior to, any Allowed EFIH Second Lien Makewhole Claims of Non-Settling EFIH Second Lien Note Holders.

In the Chapter 11 Cases, the Note Purchasers will be granted in the DIP Order (as defined below) a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the Second Lien DIP Facility with priority above all other administrative claims, subject to the Carve-Out and the liens granted under the EFIH First Lien DIP Financing.

The Second Lien DIP Facility will be subject to an intercreditor agreement, which includes, among other things, customary payment block and standstill provisions (the "<u>Intercreditor Agreement</u>"), in form and substance reasonably acceptable to the lenders under the EFIH First Lien DIP Financing, the Issuers, and the Note Purchasers.

| | |
|---|---|
| <u>Conditions Precedent to the Closing</u> | The closing date (the "<u>Closing</u>") under the Second Lien DIP Facility shall be subject to satisfaction (or waiver) of the following conditions: |

18. The DIP Documents shall be in form and substance consistent with this Term Sheet and otherwise reasonably

satisfactory to the Required Commitment Parties, the Administrative Agent, the Issuers and each of their counsel.

19. The Chapter 11 Cases shall have been commenced by the Issuers and the Guarantors and the same shall each be a debtor and a debtor in possession.

20. The Restructuring Support Agreement shall be in full force and effect and the Issuers shall be in compliance with the Restructuring Support Agreement in all material respects as of the Closing.

21. Substantially concurrently with the Closing, the DIP Documents shall have been delivered, all applicable fees and expenses shall have been paid, and all applicable liens shall have been perfected.

22. Substantially concurrently with the Closing, proceeds of the EFIH First Lien DIP Financing, which shall be on the terms set forth in the Restructuring Support Agreement and the aggregate principal amount under the EFIH First Lien DIP Financing shall not exceed $5,400,000,000 (with such changes that are not materially adverse to the Note Purchasers) shall have been used (together with cash on hand) to (i) repay in full all outstanding principal plus accrued and unpaid interest at the non-default rate due and owing under the EFIH First Lien Notes (which shall not include any alleged premiums, fees or claims relating to the repayment of such Claims) to Non-Settling EFIH First Lien Note Holders and (ii) repay the EFIH First Lien Notes held by Settling EFIH First Lien Noteholders in accordance with the EFIH First Lien Settlement.

23. Substantially concurrently with the Closing, the Second Lien Refinancing shall have been consummated.

24. The Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in form and substance satisfactory to the Required Commitment Parties and the Issuers (the "DIP Order"), authorizing and approving the issuance of the Second Lien DIP Notes and the granting of the superpriority claims and liens and other liens referred to above under the heading "Security and Priority", which DIP Order shall not have been vacated, reversed, modified, amended or stayed, in a manner adverse to the Note Purchasers, without the consent of the Required Commitment Parties.

25. The Issuers shall have complied in all material respects with the terms and conditions of the Second Lien DIP

Procedures, and the Participation Rights shall have been allocated in accordance with the Second Lien DIP Procedures.

26. No default (or any event which with the giving of notice or lapse of time or both would be a default) under the EFIH First Lien DIP Financing is then existing, after giving effect to applicable grace periods or waivers, which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis.

27. The Administrative Agent shall have received a customary opinion of counsel to the Issuers.

28. There shall not have occurred any circumstance or conditions affecting the business, assets, operations, properties or financial condition of the Issuers and their subsidiaries taken as a whole, that would individually or in the aggregate, materially adversely affect the ability of the Issuers (taken as a whole) to perform their payment obligations under the DIP Documents to which they are a party, or the rights and remedies of the Agent and the Note Purchasers under the DIP Documents (other than, in each case, as a result of the events leading up to, and following commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not individually or in the aggregate constitute a Material Adverse Event), and *provided* that nothing disclosed in any of the following filings by EFIH and/or EFH (1) the Annual Report on Form 10-K for the year ended December 31, 2013, as filed on the date of the Commitment Letter (to the extent substantially the same in form and substance as the version provided to the advisors of the Initial Commitment Parties prior to the date of the Commitment Letter), (2) any filings on Form 8-K made through the date of the Commitment Letter and/or (3) any disclosure statement related to any plan of reorganization or liquidation of the Issuers provided to the Commitment Parties on or prior to the date of the Commitment Letter, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) be a Material Adverse Event (any of the foregoing being a "Material Adverse Event").

29. Any and all governmental consents and approvals necessary in connection with the Second Lien DIP Facility

shall have been obtained and shall remain in effect.

30. To the extent requested at least 5 business days prior to Closing, each Note Purchaser who has requested the same shall have received "know your customer" and similar information.

The Note Purchasers shall have a valid and perfected second priority lien on and security interest in the Collateral pursuant to the DIP Order.

31. (i) There shall exist no default under the DIP Documents, (ii) the representations and warranties of the Issuers and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding and (iii) the issuance of the Second Lien DIP Notes shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

32.

Representations and Warranties

The DIP Documents will contain representations and warranties consistent with those found in the First Lien DIP Facility and shall include representations and warranties with respect to: valid existence, compliance with law, requisite power, due authorization, approvals, no conflict with material postpetition agreements (to the extent enforceable post-petition) or applicable law, enforceability of the DIP Documents, ownership of subsidiaries and property, material accuracy of financial statements and certain other written information provided, litigation, absence of Material Adverse Event, taxes, margin regulations, no default under the DIP Documents, inapplicability of Investment Company Act, use of proceeds, insurance, labor matters, ERISA, environmental matters, security interests, necessary rights to intellectual property and ownership of properties, DIP Order, sanctioned persons, anti-corruption laws and Patriot Act.

Affirmative Covenants

The DIP Documents will contain affirmative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above) and shall include affirmative covenants with respect to:

A. Preservation of corporate existence.

B. Compliance with applicable laws (including ERISA and environmental laws).

11

C.  Conduct of business.

D.  Payment of taxes.

E.  Maintenance of insurance.

F.  Access to books and records and visitation rights.

G.  Maintenance of books and records.

H.  Maintenance of properties.

I.  Use of proceeds.

J.  Provision of additional collateral and mortgages.

K.  Delivery of certain reports and information.

L.  Transactions with affiliates.

M.  Certain bankruptcy matters.

N.  Limitations on changes to fiscal year.

O.  Further assurances.

<u>Negative Covenants</u>

The DIP Documents will contain negative covenants consistent with those found in the EFIH First Lien DIP Financing (subject to the principles set forth in "DIP Documents" above), which include negative covenants with respect to:

A.  Limitations on debt and guarantees.

B.  Limitations on liens.

C.  Limitations on loans and investments.

D.  Limitations on asset dispositions, including, without limitation, the issuance and sale of capital stock of subsidiaries; *provided that*, no sales, dispositions, or other transfers of equity interests in Oncor Electric Delivery Holdings Company LLC shall be permitted.

E.  Limitations on dividends, redemptions and repurchases with respect to capital stock.

F.  Limitations on cancellation of debt and on prepayments, redemptions and repurchases of pre-petition debt, except as expressly provided for in the DIP Documents or pursuant to "first day" or other orders entered by the

Bankruptcy Court.

G.  Limitations on fundamental changes.

H.  Limitations on material changes in business.

I.  Limitation on certain affiliate value transfers.

J.  Limitations on sale/leasebacks.

K.  Limitations on amendment of constituent documents except for modifications that could not reasonably be expected to materially and adversely affect the interests of the Note Purchasers.

L.  Limitation on amending, modifying, or terminating the Oncor TSA Amendment, to the extent such agreement is effective without consent of the Required Note Purchasers.

M.    Certain other bankruptcy matters.

| | |
|---|---|
| Financial Covenants | The DIP Documents will contain financial covenants consistent with those found in the EFIH First Lien DIP Financing, subject to a 15% cushion. |
| Reporting Requirements | The DIP Documents will contain reporting requirements consistent with those found in the EFIH First Lien DIP Financing. |
| Events of Default | The DIP Documents will contain events of default consistent with those found in the EFIH First Lien DIP Financing (which will be applicable to the Issuers, the Gurantors, and their respective restricted subsidiaries), which (subject, where appropriate, to grace periods and exceptions consistent with those in the EFIH First Lien DIP Financing and to the principles set forth in "DIP Documents" above) shall include events of default with respect to: |

A.  Failure to pay principal, interest or any other amount when due.

B.  Representations and warranties incorrect in any material respect when given.

C.  Failure to comply with covenants (with grace period as appropriate).

D.  Cross-acceleration against post-petition indebtedness in excess of an amount to be mutually agreed upon.

13

E.  Failure to satisfy or stay execution of final postpetition judgments in excess of an amount to be mutually agreed upon.

F.  The occurrence of certain ERISA events that result in a Material Adverse Event.

G.  Actual or asserted (by any Note Party or any affiliate thereof) invalidity or impairment of any DIP Document (including the failure of any lien to remain perfected).

H.  Change of ownership or control.

I.  (a) The entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code,

(b) the entry of an order appointing a chapter 11 trustee in any of the Chapter 11 Cases;

(c) the entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner materially adverse to the Administrative Agent or the Note Purchasers, without the prior consent of the Commitment Parties, the Second Lien DIP Facility or the DIP Order;

(d) the entry of an order in any of the Chapter 11 Cases appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code);

(e) the entry of an order in any of the Chapter 11 Cases denying  or terminating use of cash collateral by the Issuers and such order has not be stayed or superseded by an order granting use of cash collateral;

(f) the filing of any pleading by any Note Party seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (e) above;

(g) the entry of a final non-appealable order in the Chapter 11 Cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Note Purchasers or the commencement of other actions that is materially adverse to the Administrative Agent, the Note Purchasers or their respective rights and remedies under the Second Lien DIP Facility in any of the Chapter 11 Cases or inconsistent with the DIP Documents;

(h) the entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic

14

stay) so as to allow a third party to proceed against any material assets of the Issuers in excess of an amount to be mutually agreed upon in the aggregate;

(i) existence of any claims or charges, other than in respect of the Carve-Out, the EFIH First Lien DIP Financing or Second Lien DIP Facility or as otherwise permitted under the DIP Documents, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the Second Lien DIP Facility; and

(j) the Note Parties or any of their subsidiaries, or any person claiming by or through the Note Parties any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Note Purchasers relating to the Second Lien DIP Facility.

(k) a plan shall be filed or confirmed in any of the Chapter 11 Cases that does not provide for either (i) the indefeasible payment in full in cash of the obligations (other than indemnities and other contingent obligations not then due and payable) on the effective date of such plan or (ii) conversion to Conversion Shares on terms pursuant to the Equity Conversion.

| | |
|---|---|
| <u>Expenses and Indemnification</u> | The Issuers will indemnify the Administrative Agent, the Commitment Parties, the Note Purchasers, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold them harmless from and against all costs, expenses (in the case of legal counsel, limited to reasonable and documented fees, disbursements and other charges) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Issuers or any of its affiliates) that relates to the Second Lien DIP Facility or the transactions contemplated thereby; provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from its or its related parties' gross negligence, willful misconduct or bad-faith. The Issuer shall reimburse the Administrative Agent for their reasonable and documented out-of-pocket expenses incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any |

Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of legal counsel, financial advisors and third-party appraisers and consultants advising the Administrative Agent incurred in connection with the Agent's participation in the Chapter 11 Cases, limited in the case of legal counsel to one primary counsel (and (i) appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction, (ii) appropriate regulatory counsel and (iii) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to the affected indemnified persons similarly situated).  The Issuer shall reimburse the reasonable and documented out-of-pocket expenses of (i) Akin Gump Strauss Hauer & Feld LLP, (ii) Cousins, Chipman & Brown LLP, (iii) Ernst & Young LLP, (iv) Leidos, Inc., (v) Centerview Partners LLC, and (vi) such other advisors retained by the Required Commitment Parties, including any regulatory counsel, during these cases (collectively, the "Commitment Party Professionals") incurred in connection with the negotiation, documentation, syndication and administration of the Second Lien DIP Facility, any amendments or waivers with respect thereto, any Event of Default in respect of the Second Lien DIP Facility and any exercise of remedies in respect thereof (including reasonable and documented out-of-pocket prepetition and post-petition fees, charges and disbursements of Commitment Party Professionals incurred in connection with the Note Purchasers' participation in the Chapter 11 Cases).

| | |
|---|---|
| Required Note Purchasers | Note Purchasers managed and/or advised by three or more investment advisors holding at least 50.1% of the outstanding commitments and/or exposure under the Second Lien DIP Facility (the "Required Note Purchasers"). |
| Amendments | Required Note Purchasers, except for provisions customarily requiring approval by all directly and adversely affected Note Purchasers or all Note Purchasers, including the reduction of any portion of the principal amount of the Second Lien DIP Notes, the reduction of the interest rate (other than as a result of a default, events of default, or default interest) or the extension of the final maturity date, *provided, however*, that the Required Note Purchasers may waive the Prepayment Fee, *provided further*, *however, that* the Required Note Purchasers may not waive the Prepayment Fee with respect to the Tranche A-3 Notes. |
| Miscellaneous | The DIP Documents will include (i) standard yield protection provisions (including, without limitation, provisions relating to compliance with risk-based capital guidelines, increased |

costs and payments free and clear of withholding taxes (subject to customary qualifications)), (ii) waivers of consequential damages and jury trial, (iii) customary agency, set-off and sharing language and (iv) customary replacement of lender provisions.

| | |
|---|---|
| Governing Law and Submission to Non-Exclusive Jurisdiction | State of New York. |
| Counsel to Commitment Parties and Certain Note Purchasers | Akin Gump Strauss Hauer & Feld LLP. |
| Counsel to Administrative Agent | To be determined by Administrative Agent |

**<u>EXHIBIT B</u>**

**Equity Conversion Term Sheet**

*Execution Version*

# ENERGY FUTURE HOLDINGS CORP.

### EQUITY CONVERSION TERM SHEET

*Capitalized terms used but not defined herein shall have the meanings set forth in the letter agreement, dated as of April 28, 2014 (the "Commitment Letter"), to which this Equity Conversion Term Sheet is attached, or the Restructuring Support Agreement (as defined in the Commitment Letter).*

| | |
|---|---|
| Issuer | Reorganized Energy Future Holdings Corp. ("Reorganized EFH"). |
| Summary of Equity Conversion | The newly issued common stock of Reorganized EFH shall consist of 100 million shares prior to the Equity Conversion and the issuance of shares under the Reorganized EFH/EFIH Management Incentive Plan (if any).  In the Equity Conversion, the Second Lien DIP Notes shall be mandatorily converted to 177,658,788 Conversion Shares plus an additional 89,052 Conversion Shares for each million dollars of EFIH Second Lien DIP Financing in excess of $1,995 million, and less 89,052 shares of Conversion Shares for each million dollars of EFIH Second Lien DIP Financing of less than $1,995 million outstanding on the Effective Date, including on account of the Equity Conversion Fee, on the terms set forth herein (the "Equity Conversion").  Holders of General Unsecured Claims Against EFH other than Fidelity may elect to participate in their Pro Rata share (with all Holders of General Unsecured Claims Against EFH) of up to 9% of the Equity Conversion (such Holders, the "Equity Conversion Participants") provided that such Holders of General Unsecured Claims may only participate in the Equity Conversion by purchasing Tranche A-3 Notes held by Fidelity or any direct or indirect transferee thereof, if the Required Transfer (as defined in the Second Lien DIP Notes Term Sheet) has not occurred.  Such Holders shall fund such share in cash, the proceeds of which shall be used by EFIH to repay in cash Tranche A-3 Notes, Pro Rata, in respect of such share, simultaneously with the Equity Conversion (the "Fidelity Repayment"); *provided*, *further*, that the stated plan value of the Conversion Shares shall be at least equal to the adjusted issue price of the EFIH Second Lien DIP Financing; *provided*, *however*, that, for the avoidance of doubt, this is a negotiated plan value solely for purposes of the deal embodied in this Term Sheet and the Restructuring Support Agreement and shall not be binding upon any party to the extent the Plan is not confirmed and consummated. The number of Conversion Shares issued pursuant to the Equity Conversion shall be adjusted to the extent that Reorganized EFIH Equity Interests, or a combination of Reorganized EFH Common Stock and Reorganized EFIH Equity Interests are issued pursuant to the Equity Conversion. |
| Parties | The parties entitled to participate in the Equity Conversion shall be |

limited to the Note Purchasers under the Second Lien DIP Facility and the Equity Conversion Participants (the "Conversion Parties").

| | |
|---|---|
| Conversion Agreement | The parties acknowledge and agree that this Equity Conversion Term Sheet does not include all of the conditions, covenants, closing conditions, representations, warranties and other terms that would be contained in definitive documents for transactions of this type.  As such, the Commitment Parties and EFH shall no later than 30 days after the date of execution of the Commitment Letter, enter into a conversion agreement (the "Conversion Agreement") containing the terms and conditions set forth in this Equity Conversion Term Sheet, the Commitment Letter and other customary terms and conditions for transactions of this type, and which must be consistent with the Restructuring Support Agreement and reasonably satisfactory to at least three (3) investment advisors that manage and/or advise funds or accounts that beneficially own, collectively, at least 66.6% of the EFIH Unsecured Note Claims held by all Consenting Creditors (the "Required EFIH Unsecured Consenting Creditors") and EFH, which Conversion Agreement shall be incorporated by reference into the Note Purchase Agreement or shall be attached as an exhibit thereto. |
| Organizational Documents | Corporate governance for Reorganized EFH and Reorganized EFIH, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "Organizational Documents"), shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable) and the Tax Matters Agreement, shall be determined by the Required EFIH Unsecured Consenting Creditors in consultation with (i) EFH, (ii) EFIH, and, (iii) as appropriate, with other Holders of EFIH Second Lien DIP Claims or EFIH Unsecured Note Claims that upon the Effective Date will receive greater than 15% of the Reorganized EFH Common Stock. |
| Registration Rights | Reorganized EFH and any Conversion Parties that will constitute affiliates of Reorganized EFH under the Securities Act of 1933 after the Effective Date will enter into a registration rights agreement (the "Registration Rights Agreement"), which shall contain such terms and conditions reasonably satisfactory to the Required EFIH Unsecured Consenting Creditors and as necessary to comply with the terms of the Private Letter Ruling and provide for registration rights, including demand, piggyback and shelf registration rights, with the number of long form demand registration rights to be determined by the Required EFIH Unsecured Consenting Creditors. |
| Transferability of Converted Shares | The Conversion Shares will be transferable, subject to compliance with applicable securities laws (including the Securities Act of 1933, as amended) and the terms of the Private Letter Ruling. |

| | |
|---|---|
| Representations and Warranties: | The Conversion Agreement shall contain customary representations and warranties of EFH and the Commitment Parties for transactions of this type, consistent with the Second Lien DIP Facility. |
| Covenants | The Conversion Agreement will contain covenants of EFH and EFIH, as provided by, consistent with, and subject to the Restructuring Support Agreement. |
| Conditions Precedent to Closing | The Equity Conversion will be conditioned upon satisfaction of terms and conditions in the Conversion Agreement, as provided by, consistent with, and subject to the Restructuring Support Agreement, including, without limitation, the following: |

- The Restructuring Support Agreement shall be in full force and effect as of the closing of the Equity Conversion and shall not have been amended or modified without the prior consent of the Required EFIH Unsecured Consenting Creditors in violation of the terms of the Restructuring Support Agreement;

- The Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be in full force and effect and not subject to a stay;

- The Bankruptcy Court shall have entered the Confirmation Order, and such order shall be in full force and effect and not subject to a stay;

- The Registration Rights Agreement shall be in form and substance reasonably satisfactory to the Required EFIH Unsecured Consenting Creditors;

- Any and all governmental and third party consents and approvals necessary in connection with the Equity Conversion and the Plan Restructuring Documents shall have been obtained and shall remain in effect;

- The Private Letter Ruling shall have been obtained from the IRS;

- The Plan shall have become, or simultaneously with the issuance of the New Reorganized EFH Stock will become, effective;

- The covenants to be performed by EFH and EFIH in the Conversion Agreement shall have been performed and complied with in all material respects on the closing date of the Equity Conversion; and

- There shall not have been a continuing default (or any event which

with the giving of notice or lapse of time or both would be a default) under the Second Lien DIP Facility.

| | |
|---|---|
| Termination of Equity Conversion | All of the obligations of the Commitment Parties, Conversion Parties, EFH, and EFIH shall be of no further force or effect, upon the giving of written notice of termination by the Required EFIH Unsecured Consenting Creditors, in the event of: |

- a termination of the Restructuring Support Agreement by any party thereto, or the Commitment Letter; or

- an event of default, cancellation and/or acceleration of the Second Lien DIP Facility.

| | |
|---|---|
| Indemnification | EFH and EFIH shall, jointly and severally, indemnify and hold harmless each Conversion Party not indemnified under the Commitment Letter, and their respective affiliates, shareholders, members, partners, and other equity holders, general partners, managers and its and their respective Representatives, agents and controlling persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities, and costs and expenses that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the Plan, the Plan Restructuring Documents, the Equity Conversion, or any matter relating to the foregoing. |
| Amendments | Amendments to the Conversion Agreement will require the consent of the ; provided that, amendments relating to allocation percentages, fees, or otherwise disproportionately and materially adversely affecting a Conversion Party, shall require the consent such Conversion Party. |

**Exhibit D to RSA, Providing Provision for Transfer Agreement, and RSA Schedules,
as filed by the Debtors in connection with the *Debtors' Proposed Order Authorizing the RSA
Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay*
[D.I. 505-2]**

**EXHIBIT D to**
**the Restructuring Support and Lock-Up Agreement**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support and Lock-Up Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Energy Future Holdings Corp. ("**EFH**") and its affiliates and subsidiaries bound thereto, the Consenting Interest Holders, and the Consenting Creditors, including the transferor to the Transferee of any TCEH Credit Agreement Claims, EFH Interests, Texas Holdings Interests, TEF Interests, TCEH First Lien Note Claims, TCEH First Lien Commodity Hedge Claims, TCEH First Lien Interest Rate Swap Claims, EFIH First Lien Note Claims, EFIH Second Lien Note Claims, EFIH Unsecured Note Claims, EFH Unsecured Note Claims, TCEH DIP Claims, EFIH First Lien DIP Claims, EFIH Second Lien DIP Claims, or any other claims against the Debtors (including the Notes Claims, as described on the following page) (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Creditor**" or "**Consenting Interest Holder**," as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| EFH Interests (if any) | |
| Texas Holdings Interests (if any) | |
| TEF Interests (if any) | |
| TCEH Credit Agreement Claims (if any) | $ |
| TCEH First Lien Note Claims (if any) | $ |
| TCEH First Lien Commodity Hedge Claims (if any) | $ |
| TCEH First Lien Interest Rate Swap Claims (if any) | $ |
| TCEH Second Lien Note Claims (if any) | $ |
| TCEH 2015 Note Claims (if any) | $ |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| | |
|---|---|
| TCEH Senior Toggle Note Claims (if any) | $ |
| EFIH First Lien 2017 Note Claims (if any) | $ |
| EFIH First Lien 2020 Note Claims (if any) | $ |
| EFIH 2021 Note Claims (if any) | $ |
| EFIH 2022 Note Claims (if any) | $ |
| EFIH Senior Toggle Note Claims (if any) | $ |
| EFIH Unexchanged Note Claims (if any) | $ |
| EFH 2019 Note Claims (if any) | $ |
| EFH 2020 Note Claims (if any) | $ |
| EFH Series P Note Claims (if any) | $ |
| EFH Series Q Note Claims (if any) | $ |
| EFH Series R Note Claims (if any) | $ |
| EFH LBO Senior Note Claims (if any) | $ |
| EFH LBO Toggle Note Claims (if any) | $ |

**<u>Schedule 1</u> to
the Restructuring Support and Lock-Up Agreement**

**Professional Fees and Expenses to Be Paid on the Agreement Effective Date**

| Type of Advisor | Name of Firm | Invoiced Amount |
|---|---|---|
| *TCEH First Lien Noteholders* | | |
| **Primary Counsel** | Paul Weiss Rifkind Wharton & Garrison LLP, pursuant to that certain engagement letter dated February 1, 2013 | $774,286.00 |
| **Local Counsel** | Young Conaway Stargatt & Taylor, LLP | $44,403.12 |
| **Regulatory Counsel** | Winstead, P.C., pursuant to that certain engagement letter dated March 19, 2013 | $379.62 |
| **Financial Advisor** | Millstein & Co, pursuant to that certain engagement letter dated February 1, 2013 | $4,500,000.00 |
| **Tax Advisor** | PricewaterhouseCoopers LLP, pursuant to that certain engagement letter dated March 8, 2013 | $95,790.00 |
| **Technical and Market Advisor** | Navigant Consulting, Inc., pursuant to that certain engagement letter dated February 23, 2013 | $3,000.00 |
| *EFIH Unsecured Noteholders* | | |
| **Primary Counsel** | Akin Gump Strauss Hauer & Feld LLP, pursuant to that certain engagement letter dated May 24, 2013 | $4,508,874.09 |
| **Local Counsel** | Cousins, Chipman & Brown LLP pursuant to that certain engagement letter dated April 25, 2014 | $35,000.00 |

| | | |
|---|---|---|
| **Technical and Market Advisor** | SAIC Energy Environment & Infrastructure, L.L.C. (n/k/a Leidos Engineering LLC), pursuant to that certain engagement letter dated June 17, 2013 | $0.00 |
| **Tax Advisor** | Ernst & Young LLP, pursuant to that certain statement of work dated August 23, 2013 | $0.00 |
| **Regulatory Counsel** | Duggins Wren Mann & Romero, LLP pursuant to that certain engagement letter dated April 28, 2014 | $73,589.49 |
| **Financial Advisor** | Centerview Partners, pursuant to that certain engagement letter dated June 13, 2013 | $206,717.43 (advisory) $5,025,000.00 (transaction) |
| ***EFH Unsecureds, EFIH First Liens, EFIH Second Liens (beneficially owned by Fidelity)*** | | |
| **Primary Counsel** | Fried, Frank, Harris, Shriver & Jacobson LLP, pursuant to that certain engagement letter dated August 13, 2013 | $956,897.13 |
| **Local Counsel** | [TBD] | $0.00 |
| **Regulatory Counsel** | [TBD] | $0.00 |
| **Financial Advisor** | Perella Weinberg Partners, pursuant to that certain engagement letter dated October 16, 2013 | $0.00 |
| ***Consenting Non-Fidelity EFIH First Liens*** | | |
| **Primary Counsel** | Bingham McCutchen LLP pursuant to that certain engagement letter dated as of April 27, 2014 | $200,000.00 |
| **Local Counsel** | [TBD] | $0.00 |
| ***Interest Holders*** | | |
| **Primary Counsel** | Wachtell, Lipton, Rosen, & Katz, pursuant to that certain engagement letter | $9,000,000.00 |

| | dated March 3, 2013 | |
|---|---|---|
| **Local Counsel** | Morris, Nichols, Arsht & Tunnell | $1,200.000.00 |
| **Regulatory Counsel** | [TBD] | $0.00 |
| **Financial Advisor** | Blackstone Advisory Group L.P., pursuant to that certain engagement letter dated March 28, 2013 | $8,398,939.90 |

**Schedule 2** to
**the Restructuring Support and Lock-Up Agreement**

**Individual TCEH First Lien Creditor Advisor**

| TCEH First Lien Creditor | Name of Firm |
|---|---|
| Apollo | O'Melveney & Myers LLP, as primary counsel, pursuant to that certain engagement letter dated January 6, 2014 |
| | Cadwalader, Wickersham & Taft LLP, as counsel with respect to certain regulatory matters, pursuant to that certain engagement letter dated December 26, 2013 |
| | Moelis & Company, as financial advisor, pursuant to that certain engagement letter dated December 20, 2013 |
| Mason Capital | Wilkie Farr & Gallagher LLP, as primary counsel |
| Oaktree | Debevoise & Plimpton LLP, as primary counsel |
| Centerbridge | Schulte Roth & Zabel LLP, as primary counsel |

## Schedule 3 to
## the Restructuring Support and Lock-Up Agreement

1.  Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases

2.  Motion of Texas Competitive Electric Holdings Company LLC, *et. al.*, for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, and (E) Scheduling a Final Hearing

3.  Motion of Texas Competitive Electric Holdings Company LLC, *et al.*, for Entry of an Order Authorizing the TCEH Debtors to File Under Seal the Certain Fee Letter Related to Proposed Debtor-In-Possession Financing

4.  Motion of the TCEH Debtors for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing

5.  Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc., for Entry of Interim and Final Orders (A) Approving Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Granting Adequate Protection, (E) Authorizing the Repayment of Prepetition Debt, (F) Determining the Value of Secured Claims, (G) Modifying the Automatic Stay, and (H) Scheduling a Final Hearing

6.  Motion of Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. for Entry of an Order Authorizing the EFIH Debtors to File Under Seal the Certain Fee Letter Related to Proposed Debtor-In-Possession Financing

7.  Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Salaries, Reimbursable Employee Expenses, and Other Compensation, (B) Pay and Honor Employee and Retiree Medical and Similar Benefits, and (C) Continue Employee Compensation and Employee and Retiree Benefit Programs

8.  Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Overnight Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting Postpetition Intercompany Claims Administrative Expense Priority

9.  Motion of Energy Future Holdings Corp., *et al.*, for Entry of (A) an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs, (II) Honor Prepetition Obligations Related Thereto, (III) Pay Certain Expenses on Behalf of Certain Organizations, (IV) Fix Deadlines to File Proofs of Claim for Certain Customer Claims, and (V) Establish Procedures for Notifying Customers of Commencement of the Debtors' Chapter 11 Cases, Assumption of Customer Agreements, and the Bar Dates for Customer Claims and (B) an Order Authorizing the Debtors to Assume Customer Agreements

10.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims

11.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen

12.     Motion of Energy Future Holdings Corp., *et al.*, For Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangement

13.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services

14.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Authorizing the Debtors to Assume Certain Transmission and Distribution Service Agreements

15.     Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees

16.     Application of Energy Future Holdings Corp., *et al.*, for Entry of an Order Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors

17.     Motion of Energy Future Holdings Corp., *et. al.*, for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor

18.     Motion of Energy Future Holdings Corp., *et. al*., for Entry of an Order Authorizing the Debtors to Assume Certain ERCOT Participation Agreements[1]

---

[1]     Will not be heard at first day hearing.