**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 1792, 2305** |

**DEBTORS' REPLY IN SUPPORT OF MOTION**
**FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) PAY CERTAIN**
**PREPETITION AMOUNTS ON ACCOUNT OF THE INSIDER COMPENSATION**
**PROGRAMS AND (B) CONTINUE THE INSIDER COMPENSATION PROGRAMS IN**
**THE ORDINARY COURSE OF BUSINESS ON A POSTPETITION BASIS**

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply to the objection of the U.S. Trustee [D.I. 2305] (the "Objection" or "Obj.") in further support of the Debtors' motion for approval of certain insider compensation programs [D.I. 1792] (the "Motion" or "Mot.").[2]

## PRELIMINARY STATEMENT

1.      The Debtors' opening Motion sought approval of a handful of long-standing executive compensation programs that are completely consistent with industry standards—awarding market-based opportunities to senior management to increase their compensation if and only if the Debtors meet or exceed difficult-to-attain operational and financial metrics.  None of the Debtors' creditors, unions, shareholders, or other constituents—the direct economic stakeholders in these companies—have objected to the Debtors' requested relief.  In fact, TCEH's most senior creditors support the filing, and, in several instances, the Court has already approved the continuation of these or similar programs for non-insiders.

2.      Yet, the Trustee has lodged an objection to this Motion on the ground that the programs "*appear*" to call for "pay to stay payments" if the Debtors hit targets that "*may*" be "lay-ups."  (Obj. at 1, 31 (emphasis added).)  Equivocation aside, the Trustee never mentions the extensive evidence that the Debtors submitted in support of their Motion:  (1) a 67-page declaration from an independent energy expert, Todd Filsinger, who demonstrates in excruciating detail why the metrics are, in his words, "difficult to achieve, reasonable and fairly incentivize plan participants," (Filsinger Decl. at 7); and (2) a declaration from an independent compensation consultant, Doug Friske, who explains that the programs are consistent with market practice in design, structure, and amount of potential compensation.  (Friske Decl. ¶8.)

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Insider Compensation Motion.

1

RLF1 10906776v.1

It is on that basis—and the evidence that will be presented at trial—that this Court should allow the Debtors to continue their long-existing programs, without which the total compensation potentially available for the Debtors' senior-most management would lag well behind market. (Friske Decl. ¶ 25.)

3.      The core of the Trustee's objection is the argument that the Debtors "have not met their burden of proof to show that the Insider Bonus Plans are incentivizing."  (Obj. at 2.)  But the Trustee does not attempt to engage with the evidence that the Debtors set forth to answer that burden.  Nowhere does the Trustee address that the Debtors must meet or exceed industry averages for many metrics—for example, Coal Available Generation (Filsinger Decl. at 29-31); Nuclear Available Generation (*id.* at 31-32); Luminant and TXU Energy O&M and Capital Expenditures (*id.* at 33-34); Coal Fuel Costs (*id.* at 36-38); Contribution Margin (*id.* at 53); and Customer Complaints (*id.* at 61).  The Trustee has no response for the fact that several metrics require nearly-perfect performance—including Energizing Event Success (Filsinger Decl. at 59), Customer Complaints (*id.* at 61-62), and System Availability (*id.* at 62).  Nor does the Trustee explain why the Court should ignore the downside risks that Filsinger identifies for numerous metrics—all of which make clear that these targets are no guarantees.  (*See, e.g.*, Filsinger Decl. at 21-28 (Luminant EBITDA); 38 (Coal Fuel Costs); 46-49 (TXU EBITDA); 51-52 (TXU Total Costs); 58 (Customer Satisfaction); 59 (Average Days Sales Outstanding); 61-62 (Customer Complaints).  And the Trustee does not meaningfully engage with the fact that the Debtors ratcheted up their targets in light of year-to-date performance this summer—thus reinforcing the difficulty of each metric.

4.      Instead, the Trustee relied on back-of-the-envelope calculations performed by an analyst who is not an expert, with no knowledge of the Debtors' business or industry—

calculations that, as explained in detail below, have no basis in market fundamentals, no precedent in the industry, and no support in the governing case law.  The Trustee, moreover, claims that former Secretary of Commerce, Don Evans, Chairman of the Company's Organization and Compensation Committee, "acknowledged that the targets look like 'layups.'" (Obj. at 2.)  This claim is misleading and directly contrary to Evans' own words:  one of the "fundamental[]" goals of these programs, according to Evans, was "making sure that for the insiders [the targets are] *not* some lay-up, [are] *not* some gimme . . . .  Making sure it's performance-based and the goals are stretch goals, they're ambitious goals."  (D. Evans Dep. Tr. at 104:6-13 (Exhibit A to the A. Schwartz Decl. [D.I. 2310] ("D. Evans Dep. Tr.")) (emphasis added).)  Finally, the mere fact that one of the SPC LTIP plan documents, which was drafted years ago without the specter of a bankruptcy filing, describes potential compensation awards that are not up for approval now as "Retention Awards" (Obj. at 33 (citing Schwartz Decl. Ex. B, ¶¶ 22-23)) has no bearing on the question before the Court:  whether the metrics that trigger potential bonuses are primarily incentivizing and actually difficult to achieve.  The operative plan document up for approval calls the potential award a "Supplemental Incentive Award" and makes clear that the Debtors must "actually achieve[]" the "EFH Management threshold" in order to merit this compensation.

     5.     The Trustee also insinuates that the Debtors' insider compensation programs are "retentive" based on the fact that the Debtors issued letters of credit for certain potential payments that are *not* the subject of this Motion.  The Debtors do not seek any relief from this Court concerning the payments secured by these letters of credit; therefore, they are irrelevant to the Motion.  But more importantly, the method that the Debtors have chosen to *fund* certain payments to insiders reveals nothing about whether the underlying programs that authorize those

payments meet the legal standard to be applied by this Court. The Court should reject the Trustee's attempt to bootstrap to its objection an argument impugning letters of credit that are not before this Court and have been publicly disclosed in the Debtors' S.E.C. filings for several years.

6.      In the face of these problems, the Trustee next claims that the Debtors' incentive programs are outside the ordinary course *because* the Debtors took care to abide by the law—by hiring independent advisors (Obj. at 27); adjusting their performance metrics to eliminate any doubt that they are incentivizing in the face of year-to-date results (*id.* at 28); and revising one of the programs to remove any time-based award (*id*). None of these steps render these programs outside the ordinary course, and the Trustee does not cite a single case that stands for such a remarkable proposition. The record convincingly establishes that the programs under review by this Court are long-standing ordinary course compensation programs implemented and administered by the Debtors for years, long before the Debtors ever contemplated bankruptcy. In that context, bankruptcy courts do not punish debtors for doing the right thing in making adjustments to those programs that comport with the Bankruptcy Code—especially where, as here, the Debtors made the metrics harder to meet and the programs represent a continuation of pre-petition compensation plans and are consistent with market practice.

7.      Ultimately, these programs constitute a fair and reasonable exercise of the Debtors' business judgment. The performance metrics require top-tier results—exceptional performance—that will create value for the Debtors if achieved, which is presumably why no creditor has objected to this motion. The potential compensation, structure and design of these plans are all consistent with market practice. The decision to carry over these long-standing programs, moreover, resulted from an informed, arm's-length process involving the Debtors'

restructuring professionals, independent power experts at Filsinger Energy Partners, and independent compensation consultants at Towers Watson. The Debtors thus respectfully request that the Court approve the Debtors' continuation of these longstanding programs.

## BACKGROUND

8.     In the weeks before and after filing their insider compensation Motion, the Debtors engaged with their creditor constituencies to discuss the scope, total compensation, and metrics of these programs. The Debtors walked through the various programs, explaining their mechanics, metrics, and history, with restructuring and financial professionals representing a number of key creditor constituencies and representatives of the Trustee. All creditor constituencies, without exception, quickly concluded they would not object to the Motion. Notably, the Debtors held dozens of in-person and telephonic meetings with the Trustee concerning the relief requested in the Motion—including a session that spanned two days during which Filsinger and Friske met with the Trustee's office, and another at which the Trustee's counsel met with the CEOs of both Luminant and TXU Energy, the EVP for Human Resources, and the Debtors' General Counsel. In addition, the Debtors had dozens of phone calls and meetings with the Trustee's counsel in connection with this Motion and the Debtors' earlier non-insider compensation motion, which provided a great deal of information about the Debtors' overall compensation philosophy, governance structure, and budget-setting process. Finally, Debtors provided voluminous and detailed informal discovery to the office of the Trustee.

9.     In the wake of all of these meetings, no economic stakeholder has objected to the Motion, a major victory given the amount of litigation in these cases to date. In fact, the only objector is the Trustee, despite the Debtors' considerable efforts to address the Trustee's concerns. The Debtors are fully prepared to address that objection at trial—including with

testimony from Jim Burke, Chief Executive Officer of TXU Energy (live); Mac McFarland, Chief Executive Officer of Luminant (live); Todd Filsinger of Filsinger Energy Partners (live and by declaration); Doug Friske of Towers Watson (live and by declaration); as well as Don Evans (by videotaped deposition).

## ARGUMENT

### I.    The Insider Compensation Programs Are Primarily Incentivizing.

10.    As for that objection, the Trustee has not provided any persuasive evidence to rebut the ample testimony establishing that the Debtors' compensation programs are primarily incentivizing. The Debtors' performance metrics are not guarantees. They are not lay-ups. They are stretch goals. The compensation programs before the Court are "designed to motivate insiders to rise to a challenge" and do not require that management members "merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). The Trustee ignores the overwhelming evidence supporting that fact, and instead offers simple arithmetic calculations that, as explained below, the Court should not credit.

### A.    The Trustee Does Not Respond To Overwhelming Evidence That The Debtors' Performance Metrics Are Primarily Incentivizing.

11.    The Trustee has no answer for the overwhelming record that the Debtors' performance metrics are part of a "pay for value" plan. *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007). The Debtors submitted a 67-page declaration in which their independent energy expert—Filsinger—detailed the metrics, one by one, to explain why each constitutes a stretch goal based on his analysis and experience. The Debtors arranged for two separate meetings for the Trustee's office with Filsinger during which he explained why he believed that each metric is, in fact, difficult to achieve, and the Trustee has now had his

declaration for two full months.   But the Trustee's objection does nothing to undermine Filsinger's testimony—in fact, ***it does not address Filsinger's analysis at all***.

12.      The Trustee fails to mention, for example, that in addition to the EBITDA targets referenced in its objection, Filsinger examined and justified the ***sixteen*** separate Luminant and TXU Energy non-EBITDA performance metrics.   The Trustee fails to explain how or why it disagrees with Filsinger's opinion that, ***taken as a whole***, the Debtors' metrics are reasonable and incentivizing.   And the Trustee has no good answer for the fact that after months of on-site visits and industry analysis, Filsinger concluded that the Debtors' management team must overcome material risks in order to meet threshold performance levels.   These metrics are not guarantees; they are difficult-to-achieve, industry-leading performance targets.

13.      The Trustee offers no response or evidence to rebut simple and compelling facts justifying the Debtors' metrics.   As explained in Filsinger's declaration, and as the Debtors will demonstrate at trial:

- The Debtors must exceed the historical industry averages for reliability in order to achieve the threshold **Coal Available Generation** metric (Filsinger Decl. at 29-32):



**Figure 6-9:  Luminant Insider EAIP Coal Plant Non-Summer Availability Targets vs. Industry Historicals**

- The Debtors' nuclear facilities at Comanche Peak are world class, and they must continue to beat industry averages to achieve threshold (Filsinger Decl. at 32):



**Figure 6-11: Luminant Insider EAIP Nuclear Plant Availability Targets vs. Industry Historicals**

- The Debtors' O&M and Capital Expenditure targets at its coal and nuclear generation facilities require better-than-industry-median performance (for the coal plants) and top quartile performance (for the nuclear facilities), respectively (Filsinger Decl. at 35):



Figure 6-13: Comparison of Industry Average Combined O&M and CapEx Costs to 2014 Metrics

8

- A temporary mine closure or below-expectation lignite recovery that results in a ten percent decrease in lignite production would cause a miss on the threshold **Coal Fuel Costs** metric (Filsinger Decl. at 36), and the Debtors' threshold targets are lower than the industry standard for plants that burn both lignite and PRB coals (*id.* at 38);

- A mere two percent variance—in an extremely volatile commodity market—would result in Luminant missing its **Management EBITDA** threshold (Filsinger Decl. at 20, Tbl. 6-2);

- Since 2010, TXU Energy has earned more than $500 million of non-GAAP adjusted EBITDA than its next leading competitor, but TXU Energy nevertheless raised the **TXU Energy Management EBITDA** threshold metric by $38 million mid-year;

- Since 2009, TXU Energy has continually managed its total costs downward, and the **TXU Energy Total Costs** metric has followed—TXU Energy must match or exceed historical performance to meet the threshold level this year;

- TXU Energy's threshold **Contribution Margin** is higher than the market average, and to meet that metric TXU Energy's balance-of-year performance must be better than four out of the previous six years;

- To achieve the threshold **Residential Ending Customer Counts** metric, TXU Energy must acquire 87,000 new customers over the balance of the year—roughly 1.5% of all residential customers in ERCOT;

- To meet threshold on the **Average Days Sales Outstanding** metric during the balance of year, TXU Energy must beat the last five-year average for the same period by over 8%; and

- The **TXUE Energizing Event Success** metric has improved from 99.44% in 2010 to a best ever of 99.86% in 2013. TXU Energy nonetheless must beat this performance to achieve baseline (Filsinger Decl. at 60):



**Figure 6-28:  Energizing Event Success: TXU Energy 2014 Non-Insider AIP/ Insider EAIP vs. Company Actuals**

- TXU Energy has long had industry-leading performance with regard to its **Customer Complaints.**  (*See, e.g.*, Filsinger Decl. at 61 Figure 6-29).  To achieve threshold here, TXU Energy must beat its six-year trailing average for complaints from August to December by 39%.[3]

14.    According to Filsinger, an advisor whose qualifications and conclusions have gone unchallenged in the Trustee's objection, the Debtors must beat industry standards and are not guaranteed to achieve any of their metrics; therefore, the performance targets are incentivizing stretch goals.  This should be the beginning and the end of the Court's analysis.

---

[3]    The Trustee acknowledges that the "metrics [applicable to the Key Leader Performance Program] are the same as those in the EAIP," (Obj. ¶ 68) and the SPC LTIP "incentive targets track the EBITDA and EAIP Businesses scorecard approved by the O&C," (Obj. ¶ 73).  The Debtors agree.  Accordingly, this reply addresses the metrics applicable to these programs together.

**B.**   **The Testimony Of Evans Reinforces The Conclusion That The Debtors'
Performance Metrics Are Incentivizing.**

15.     In the face of this evidence, the Trustee attempts to attribute conclusions to Evans
that he did not reach.   The Trustee, for starters, suggests that Evans "acknowledged that the
targets look like 'lay-ups.'"  (Obj. at 2.)  This is not true, as the full testimony excerpts will show
when played for the Court at trial.

16.     The Trustee cites two portions of testimony from Evans that use the word "lay-
up" but fails to disclose the context for either portion, leading to a confusing recitation of the
testimony that distorts the facts.   In the first excerpt cited by the Trustee (D. Evans Dep. Tr. at
208:5-8), Evans answered the Trustee's questions about why the O&C Committee toughened the
2014 metrics mid-year before filing the Motion.  Evans responded:

> [B]y April, May of 2014, we realized that we were having a pretty good year, much
> better than we anticipated at that point in time.  Two big factors.  One, natural gas prices
> had spiked up, which helped.  And we had some weather events that meant the generation
> of a lot more electricity. . . .  And so we said, well, okay.  We're going to—we're going
> to file [the insider compensation motion], and some of these metrics, it now looks like,
> are going to be pretty much a lay-up to reach them. . . .  I listened to counsel, and it was
> clear to the committee that maybe an adjustment in those metrics for the insiders for the
> duration of 2014 was the appropriate thing to do.  Because we wanted to make it clear in
> the Bankruptcy Court that these plans that are going to be approved from, you know, the
> date they were filed until the end of the year, or for – for 2014, that these plans are
> incentivizing.

(*Id.* at 207:19-209:6.)  After this explanation, the Trustee asked Evans whether the 2014 targets,
as modified to make them tougher, "are in fact incentivizing."   Evans responded, ***"I think
they've always been incentivizing.  I thought they were incentivizing before we changed them.***"
(*Id.* at 209:15-21 (emphasis added).)  The Trustee fails to point out any of this testimony and
instead seizes on 3 out of 37 lines of transcript to claim that Debtors' metrics are not
incentivizing.

11

17.    The second portion of testimony that the Trustee cites to support its "lay-up" argument is at pages 269-273 of the Evans deposition transcript.  The Trustee claims that Evans "reflected on" the comparison between 2014 metrics and the Debtors' historical performance and concluded that the 2014 program "looks like a lay-up."  (Obj. ¶ 36 (citing D. Evans Dep. Tr. at 272:6).)  But again, the Trustee's office omits from its objection any discussion of the context for this response.  As the transcript makes clear, Evans was explaining to the Trustee during these five pages of testimony why an uninformed observer might conclude that the metrics look "like a lay-up" if the observer looks only at year-over-year performance.  He goes on to explain why that simplistic, uninformed view is *wrong*:  "But when you know the assumptions, when you know the background, what goes into the calculation and determining the metric, and then you know who is sitting in the room, because we want, by God, we want them to be stretched, we want them to have to work to get there, *you get very comfortable with the numbers . . . .*" (D. Evans Dep. Tr. at 273:19-274:2 (emphasis added).)  In other words, Evans explained to the Trustee in this portion of testimony why the Trustee is *wrong* about the metrics being a "lay-up"—not that the metrics were in fact a lay-up.

18.    Beyond the Trustee's incorrect characterization of Evans's testimony, the Objection also ignores his in-depth testimony elsewhere in the deposition about the rigor applied by the O&C Committee in designing and implementing the Debtor's compensation programs. Evans repeatedly testified that the O&C Committee "gave a lot of thought . . . to making sure that the plans for executives were incentive-based and . . . performance-based . . . because you're always trying to . . . maximize the value of the enterprise."  (*Id.* at 103:25-104:5.)  One of the "fundamentals" of the programs, according to Evans, was "making sure that for the insiders it's *not* some lay-up, it's *not* some gimme . . . .  Making sure it's performance-based and the goals

12

are stretch goals, they're ambitious goals." (*Id.* at 104:6-13 (emphasis added); *see also id.* at 175:2-8 (explaining that the philosophy is that the compensation targets "need to be ambitious, they need to be stretched, they don't need to be lay-ups. The idea is they've got to be incentive -- you know, they've got to be incentivizing. We want them to kind of be aligned with the stakeholders, or the creditors, or the owners.").) These metrics are, in fact, difficult, as Evans repeatedly testified: management made them "more than a lay-up. They're . . . stretch kind of targets." (D. Evans Dep. Tr. at 239:2-4.) In response to the Trustee's questions on the difficulty of achieving these metrics, Evans described them as a "7" or an "8" out of 10 in difficulty, "not a 5, not a 4, or not a 3." (*Id.* at 237:24-238:1.)

19.     The Debtors' robust process helped to ensure that the metrics are difficult to achieve. The Debtors hired Filsinger to "validate" whether the programs include "stretch" and "ambitious goals" that have been "tested against the industry" and "historic[al] performance." (*Id.* at 104:14-23.) He did so—in advising the Debtors and their Board, and in his extensive declaration. Moreover, the Company's Board provided another check. As Evans explained, the most at-risk investors in the capital structure—the sponsors who hold equity in EFH—sit on the Board and have "vast knowledge of the industry itself" and are "laser-focused on this kind of thing" because it is in the sponsors' financial interest to "make sure that they've got management really focused on hitting some ambitious targets, ambitious superiors for sure, and not giving them any lay-ups." (*Id.* at 91:10-19; 176:8-17; 199:11-19.)

20.     The Trustee ignores hours of testimony from Evans along similar lines. The Company adjusted its performance targets and made them ***more difficult*** before filing this Motion. (*Id.* at 209:7-14.) The Debtors ratcheted up all but one of the threshold targets, and made several baseline and superior targets tougher to achieve as well. (*Id.*) These changes buoy

the conclusion that the new targets are challenging.[4]  Moreover, as Evans concluded, the metrics were "incentivizing before" and "incentivizing after" that adjustment.  (D. Evans Dep. Tr. at 209:24-26.)  "[T]hey've always been incentivizing."  (*Id.* at 209:19-21.)

**C.      The Trustee's Comparison Of This Year's Metrics To Historical Averages Does Not Call Into Question The Targets' Difficulty.**

21.      The Trustee next intimates that the Debtors' 2014 performance metrics are not incentivizing because the Debtors have met their performance metrics in years past.  (Obj. ¶40.) As a preliminary matter, the Debtors reset their performance metrics each year based on assumptions and projections about market conditions and company performance for that particular year.  Thus, the fact that the Debtors achieved their metrics in the past reveals nothing about whether the current year's metrics are incentivizing or difficult to achieve.  The reality is that the 2014 metrics are difficult to achieve this year for a number of reasons.  ***First,*** the record is unrebutted that the Debtors' metrics require them to beat industry averages, and there is no legal requirement that the Debtors must make targets unrealistic simply because they have consistently performed well in the past.  ***Second***, in many instances, the Debtors have ratcheted up the metrics year after year to keep pace with their industry-leading performance—for example, TXU Energy's Total Costs targets have decreased every year for the past five years. ***Third***, as witnesses will testify at trial, the company pulled up the ladder on the performance metrics to make them more difficult twice in this year—first, in the fall of 2013, and second, based on year-to-date results in July.  These efforts buttress the conclusion that these targets are

---

[4]    The Trustee also ignores the ***reasons*** that the Company was outperforming a handful of the original 2014 metrics by mid-year—unexpected events, not poor budgeting or using "lay-ups" for metrics.  For example, after the original 2014 metrics were set, Luminant opted to return several out-of-operation coal units to service earlier than budgeted to take advantage of favorable market conditions during the first half of the year—and did so flawlessly.  (Filsinger Decl. at 6-30.)  This meant that, by July, Luminant's actual coal available generation reflected several months of potential generation that the company had not anticipated.  The Company accounted for that decision in its updated metrics—which now require Luminant to beat the trailing historical industry performance for the last five years just to achieve threshold.  (Filsinger Decl. at 31.)

tough to achieve, and differentiate this year's numbers from previous ones. **Finally**, the Debtors' independent energy experts at Filsinger Energy Partners provided significant input to the Company and Board this year specifically to ensure that these targets are primarily incentivizing. The Trustee's arguments to the contrary would penalize the Debtors' senior executives for outperforming their peers consistently over the past several years.

22.     Next, the Trustee recalculates the Debtors' financial and operational projections—based on analysis from one of its bankruptcy analysts, Michael Panacio—to argue that the performance metrics are lay-ups.[5]  First, Panacio "compared the Threshold target for each of the metrics" to the "average actual result" to assess the performance metrics. (Panacio Decl. ¶ 8.)  In the process, Panacio ignores that the energy market is highly dynamic and volatile from year to year, month to month, and day to day.  (*See, e.g.*, Filsinger Decl. at 15 (showing movement in natural gas prices since 2004)).  The market and the Debtors' businesses fluctuate with swings in the weather, power and gas prices, hedging availability and variability, consumer demand, outage schedules, mining and transportation costs, transmission constraints, environmental regulations, and more.  (*Id.* at 7.)  Just by way of example, balance of year around-the-clock power prices have ranged from $33.29 to $43.43—a full 30% swing—between May 30, 2014 and July 25, 2014 alone.  (*Id.* at 6-27.)  Moreover, as Evans extensively testified, the Debtors' corporate hedge program, implemented at a time of high power prices, for the most part rolled

---

[5]     The Debtors do not believe that Panacio is qualified to opine on whether the Debtors' targets are difficult to attain.  At deposition, Panacio agreed that he was not "an expert in executive compensation" and that he was not "an expert in energy." (*See* Declaration of Michael P. Esser In Support of the Debtors' Motion for Entry of an Order Authorizing the Debtors to (a) Pay Certain Prepetition Amounts on Account of the Insider Compensation Programs and (b) Continue the Insider Compensation Programs in the Ordinary Course of Business on a Postpetition Basis ("Esser Decl."), Ex. B, Panacio Tr. 168:18-25.)  But Panacio nevertheless indicated he may testify about "[v]ariance opinions, as far as numbers." (*Id.* 10:8-14).  While such opinion testimony is improper under Federal Rule of Evidence 701, for purposes of this Reply, the Debtors only address the problems with Panacio's methodology and conclusions.  The Debtors are prepared, however, to address Panacio's qualifications at trial.

off by 2014, and so prior year results—and thus five year averages—are higher than 2014 projections because the Debtors are now more exposed to commodity pricing fluctuations. (D. Evans Dep. Tr. at 270:4-274:2.)  The Court should draw no conclusions from the fact that the Debtors' 2014 EBITDA projections are lower than previous year actuals—the two numbers are derived from completely different market conditions and operating assumptions.

23.    The same is true of Panacio's "projections" of full-year results. (Panacio Decl. ¶¶ 10-11.)  Panacio "multiplied the June actual results by two" to estimate full-year metric results that would yield "a bonus being paid." (*Id.*)  Multiplying by two, however, is not a sound methodology for projecting complicated, full-year financial and operational metrics in the energy industry, and the Trustee cites no law supporting this approach.   While Panacio does acknowledge that simply doubling June actual results to project yearly results would not account for "a major unanticipated event," (*id.* ¶ 11), he fails to take into account large one-time EBITDA realizations that occurred only in the first half of the year, like the termination of hedges in connection with the bankruptcy filing, which accelerated the recognition of more than $400 million in financial derivatives in the second quarter.  Accepting Panacio's approach on its own terms and correcting for this double counting error, Luminant would ***miss*** its threshold EBITDA target if its first half results were doubled and Panacio's projections were to be believed.

24.    Panacio also lacks the data and expertise to understand that events triggering significant EBITDA swings are a routine occurrence.  For instance, in the span of 39 days between May and July, power prices moved $10.14/MWh; based on open power positions as of June 30, 2014, this power price shift equates to an EBITDA decline of ***$95 million***.  Moreover, Panacio's doubling methodology does not just ignore unanticipated events, it ignores a major

16

tenet of Debtors' business—seasonality.  Luminant generates more power in the summer months of June-August than any other time of the year, yet Panacio ignores this variability in generation levels and how that might affect the last six months of the year.  Similarly, his methodology ignores that TXU Energy's worst quarter is typically the third quarter of the year.  Thus, doubling Luminant's first-half-of-the-year financial performance overstates full-year numbers.

> **D.      The Trustee Ignores The Operative Provisions Of The Incentive Compensation Plans In Claiming That These Programs Are Retentive In Nature.**

25.     The Trustee argues that this Motion seeks approval of "pay to stay" programs because some of the plan documents mention the words "retain" or "retention" in their descriptions.  While "***any***  payment to an employee . . . has at least a partial purpose of retaining the employee," (Obj. at 26 (emphasis added)), the plan documents—which were drafted years ago without this bankruptcy in mind—do not suggest that this year's metrics are easy to achieve.

26.     The Trustee, to start, quotes the EAIP plan, which was designed to "attract, motivate, and retain key employees . . . by rewarding performance that satisfies established performance goals."  (Obj. ¶ 23; Schwartz Decl. Ex. B.)  The Trustee seems to believe that use of the word "retain" means that the EAIP's primary purpose is to retain.  The remainder of the paragraph, however, makes clear that this is not so:

> The principal purposes of the Plan are to attract, motivate and retain key employees; to align the interests of Participants, Participating Employers and Company shareholders by rewarding performance that satisfies established performance goals; to motivate Participant behaviors that drive successful results at the corporate, business unit and individual levels; and to support collaboration across essential organizational interfaces.

27.     Similarly, the Trustee emphasizes that the SPC LTIP "refers to the bonuses as 'Retention Awards.'"  (Obj. at 33; Schwartz Dec. Ex. C.)  In fact, the specific agreements concerning potential SPC LTIP awards that are at issue in this Motion specify that the potential

compensation is a "Supplemental Incentive Award"—not a retention award.  (*See* Esser Decl., Ex. A, S. Dore Employment Agreement at 1 ("Whereas, Executive has been granted an opportunity to earn supplement incentive awards"); at Ex. III-1 (defining the potential "long-term cash bonus award" as a "Supplemental Incentive Award.").)  Moreover, other language in that agreement—and all of the SPC LTIP plans—makes plain that management must "***actually achieve***[]" the "Competitive Management EBITDA" performance metrics to receive such an award.  (*Id*. at Ex. I(a)(ii).)  In other words, whether the SPC LTIP is actually incentivizing hinges on whether the metrics themselves are difficult to achieve—not whether the document memorializing the potential incentive payment that is up for approval also includes the word "retention."

28.     Finally, the Trustee mistakenly suggests that the "Key Leader Plan" is "focused more on retention" than its predecessor Owner/Operator plan based on a declaration submitted in connection with the ***non-insider*** compensation motion by Carrie Kirby, EFH's Executive Vice President of Human Resources.  (Obj. at 33 (citing D.I. 1231).)    Mrs. Kirby's declaration, however, referred to an entirely different program—the Key Leader Program—which is not the subject of this Motion, applies only to non-insiders, is entirely time-based, and has no performance metrics whatsoever.  By comparison, the "Key Leader ***Performance*** Program"—the program applicable to insiders before the Court now—is decidedly incentivizing.  It is based on two of the EAIP scorecard metrics, Competitive Management EBITDA and Competitive Total Spend, (*see* Filsinger Decl. at 6) and the Key Leader Performance Program purposefully eliminated a potentially retentive element from the predecessor Owner/Operator plan.  Payments under the Key Leader Performance Program are based entirely on performance metrics, while the former Owner/Operator Plan was 50% performance-based and 50% time-based.  The Trustee's

18

attempt to use Mrs. Kirby's declaration against the Debtors should be rejected. More importantly, the superficial label is not what matters. What matters is the substance. These plans are primarily incentivizing.

## II.    The Insider Compensation Programs Are Ordinary Course Continuations Of The Debtors' Historical Practices

29.    The remainder of the Trustee's objection attacks whether the compensation programs at issue are ordinary course transactions. Here, the Court should "look[] at the transaction from the horizontal and vertical dimensions." *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del. 2007). The test for the horizontal dimension "is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Id.* at 953. The Trustee does not question whether the Debtors' programs satisfy this test—and for good reason. As Friske explained in his opening declaration, the structure and design of the Debtors' plans are consistent with comparable companies, both in bankruptcy and the power industry. (Friske Decl. ¶¶ 16-19.) And the total potential compensation that might be awarded under these programs is consistent with—if not below—market practices in the energy industry. (*Id.* ¶¶ 22-34.) In other words, the programs are in line with competitive practice and thus satisfy the horizontal test. *In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving the continuation of incentive bonus plans as ordinary course transactions where the debtor had maintained the plans for many years prepetition and an incentive-based bonus plan was common to the industry).

30.    As for the vertical test, the question "is whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *In re Nellson Nutraceutical, Inc.*, 369 B.R. at 797 (internal quotation omitted). In this regard, a "debtor's pre-petition business practices and conduct is the primary focus of the vertical

19

analysis." *Id.* (internal quotation omitted).  The Debtors readily satisfy this test.  The EAIP and SPC LTIP have existed in substantially similar form for over six years, with the programs' participants, metrics, and total compensation remaining essentially the same year-over-year.  The Key Leader Performance Program, as the Trustee recognizes, is a continuation of the long-existing Owner/Operator plan.  It incorporates the same compensation targets, participants, and uses similar performance metrics, while making some modest modifications to account for the restructuring.

31.    In response, the Trustee contends that, because the Debtors received independent advice from Kirkland & Ellis, Filsinger Energy Partners, and Towers Watson, these programs are no longer ordinary course.  (Obj. at 27-28.)  The Trustee cites no support for this proposition. Responsible Debtors typically seek advice from their independent advisors about their compensation programs—doing so actually satisfies one of the *Dana* factors.  If the Trustee's argument were accepted, every debtor that sought compensation-related advice from restructuring advisors, including counsel, would be precluded from implementing ordinary course compensation programs.  The Court should reject such a rule: it would flip the law on its head and disincentivize debtors from getting compensation-related advice.

32.    The Trustee next claims that because the Debtors "performed a mid-year analysis of the targets for the balance of 2014, to be sure that, in context of the bankruptcy cases, the Insider Bonus Plans would be considered primarily incentivizing and approved," these transactions are not ordinary course.  (Obj. at 28.)  Again, the Trustee cites no law for this proposition—because there is none.  Even in the face of similar changes, courts have routinely upheld other compensation programs as ordinary course transactions.  *See, e.g.*, *In re Dana Corp.*, 358 B.R. 567, 579-81 (Bankr. S.D.N.Y. 2006) (approving incentive program for

employees in ordinary course as a revision of prepetition practices); *In re Visteon Corp.*, No. 09-11786 (Bankr. D. Del. Feb. 18, 2010) (approving annual incentive program with modified financial metrics as ordinary course); *In re Nellson Nutraceutical, Inc.*, 369 B.R. at 797 (approving postpetition modification to incentive plan as ordinary course).  As will be made clear at trial, the Debtors routinely revisit their metrics at year's end.  And they should not be punished for making their targets *tougher* mid-year in light of the bankruptcy process, especially since everything else about the plans—the categories of metrics, the plan participants, the compensation amounts, the structure of the programs, etc.—remained the same.  Put differently, these programs remain in line with the creditors' "reasonable expectations of what transactions the debtor in possession is likely to enter in the course of business."  *In re Nellson Nutraceutical, Inc.*, 369 B.R. at 797.

33.    The fact that the Debtors "infuse[d] incentives into the Key Leader Performance Plan" likewise does not render that program outside the ordinary course.  (Obj. at 28-29.)  As the Trustee recognizes, this plan is a continuation of the Owner-Operator plan; the Debtors merely adjusted its terms—by eliminating the time-based awards—in order to account for the bankruptcy filing.  Respecting the Court's limitations on insider compensation should not be held against the Debtors, especially when the program's participants, payment amounts, and focus on EBITDA targets are the same as the long-standing Owner-Operator plan.

34.    Finally, the Trustee misguidedly argues that the Debtors secured "payment of the SPC LTIP bonuses with letters of credit," which are not ordinary course transactions.  (Obj. at 29.)  As the opening Motion makes clear, the Debtors are not seeking approval of potential payments that are collateralized by letters of credit.  The subject of this Motion is only the non-collateralized potential payments under the SPC LTIP.  The letters of credit are thus a red

21

herring, and do not undermine the ordinary course nature of these non-collateralized LTIP payments.

### III.    The Insider Compensation Programs Are Justified By The Facts And Circumstances of These Chapter 11 Cases

35.    The compensation programs at issue in this Motion are ordinary course transactions and thus must be a reasonable exercise of the Debtors' business judgment to be approved.  But, even if they are not ordinary course, the Debtors' insider compensation programs are justified by the facts and circumstances of these cases.  The Trustee admits that these two standards—the business judgment and facts-and-circumstances tests—are "no different" than each other, (Obj. at 28), as Courts have repeatedly found, *see, e.g.*, *In re Velo Holdings, Inc.*, No. 12-11384, 2012 WL 2015870, at *9 (Bankr. S.D.N.Y. June 6, 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Borders Group, Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (same); *In re Global Home Prods.*, 369 B.R. at 783 ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *see* Mot. at 28 (collecting cases).

36.    Nonetheless, the Trustee summarily asserts that the "Debtors have the burden of proof to satisfy this standard and have not done so in the Insider Bonus Motion."  (Obj. at 35.) This argument does not undermine the Debtors' opening argument (*see* Mot. *passim*), and over 80 pages of declarations that explain why in fact these programs should be approved. Specifically:

37.    *The Insider Compensation Programs Are Calculated To Achieve Desired Performance.*  These programs are tied directly to financial, operational, and other business objectives that trigger payments if—and only if—the Debtors satisfy reasonable, stretch targets.

The Debtors tailored these scorecards to their business units—Luminant, TXU Energy, and Business Services—to reflect the performance drivers for each entity. Moreover, the Debtors revisited these metrics—which were already designed to be incentivizing—in the middle of the summer and made almost all of them more difficult in light of year-to-date results.

38.     The Trustee's only response is to suggest that the Debtors should be using net income (loss) as opposed to EBITDA as their primary performance metric. (Obj. at 15.) As will be made clear at trial, the Debtors have long used EBITDA as a financial metric, in large part because it focuses on the Debtors' *operating performance* independent of the impact of debt service. Net income includes interest expense, and given that the Debtors have annual interest payments in the billions of dollars, net income is a less appropriate metric for analyzing the pure operations of the portfolio. The Debtors' decision to use EBITDA, in other words, is well within their business judgment.

39.     *The Cost Of The Insider Compensation Programs Is Reasonable.* The Trustee does not contest that the cost of the Insider Compensation Programs is reasonable, market-based, and, in the context of the size and earning potential of the Debtors, appropriate. (Friske Decl. ¶¶ 8, 31-34.) At target, the total cost of the Debtors' incentive programs (the AIP, EAIP, and Key Leader Performance Program) is approximately 0.73% of EFH's projected 2014 revenues of $11.23 billion and approximately 1.11% of TCEH's projected 2014 revenues of $7.396 billion. The Debtors' anticipated costs are within the range of observed market practice: the median cost of annual incentive programs, based on general industry data, as a percentage of revenues is 0.69% and the 75th percentile is 1.15%. (*Id.*) The total compensation that might be awarded under these programs, moreover, is well in line with—if not below—market. (*Id.* ¶ 22.)

23

40.    ***The Scope Of The Programs Is Fair And Reasonable.***  Here again, the Trustee does not argue that these compensation programs are unreasonable.  Several of these programs largely mirror plans offered to non-insiders that have already been approved:  the EAIP is effectively the same plan as the AIP (just with different participants), and the Key Leader Performance Program is similar in many, but not all, respects to the Key Leader Program for non-insiders.  In fact, all of the Debtors' employees participate in some sort of incentive compensation program, and the programs at issue do not discriminate unfairly among the Debtors' employees.

41.    ***The Insider Compensation Programs Are Consistent With Industry Standards.***  The Debtors' compensation advisors at Towers Watson worked directly with the Debtors' executive team to ensure that the Debtors' existing compensation programs are consistent with market practices (Friske Decl. ¶¶ 12-17)—a fact that the Trustee does not contest.  Like other energy companies, the Debtors rely heavily on objective financial performance metrics, like EBITDA and cost savings metrics, which bankruptcy courts have repeatedly approved in recent chapter 11 cases.  (*Id.* at ¶¶ 16-17.)  In addition, the potential total compensation that the Debtors have targeted for members of the Strategic & Policy Committee is 15% below the 50th percentile of the Peer Group, while compensation for other insiders is 4% below that benchmark.  (*Id.* at ¶ 27.)  These programs, in other words, are in line with market practices.

42.    ***The Debtors Performed Due Diligence In Developing The Insider Compensation Programs.***  As Evans testified, the Debtors' senior management team engaged in a deliberate, iterative process with the O&C Committee to develop and benchmark the Debtors' incentive plans to market—including with input from multiple independent advisors.  The performance targets were developed on top of the budget as a part of an extensive process

24

involving several rounds of management review and input.  (*Id.* at ¶¶ 10–11; Kirby Proffer at 6/30/2014 Hr'g Tr. 35:17-20.)  And the Debtors developed the budget itself through an iterative, ground-up, long-range planning process.[6]

43.     ***The Debtors Received Independent Counsel In Developing The Insider Compensation Programs.***  Finally, as the Trustee highlights, the Debtors engaged several independent advisors—Kirkland & Ellis, Filsinger Energy Partners, and Towers Watson—to advise them concerning their pre- and post-petition compensation programs.  (Obj. at 27-28.) There should be no question as a consequence that the Debtors satisfy this prong of the facts-and-circumstances test.

44.     As a result, these programs, which are largely a carry-over of existing plans, are necessary to encourage their participants to drive these chapter 11 cases towards a value-maximizing reorganization.  These programs accordingly satisfy the "relatively light burden of establishing that [the Debtors] made a business judgment in good faith upon a reasonable basis," *In re Nellson Nutraceutical, Inc.*, 369 B.R. at 800, as well as the facts and circumstances test.

## Conclusion

45.     The Insider Compensation Programs are an important part of the Debtors' efforts to maximize value for these chapter 11 estates.  These programs satisfy the requirements of the Bankruptcy Code for precisely the same reasons that the Debtors' stakeholders are not objecting to them:  the programs constitute a permissible, cost-effective means to provide the Debtors' management team appropriate compensation opportunities for better-than-industry performance. Accordingly, the Debtors respectfully request that the Court approve the continuation of these

---

[6]  *See* Kirby Decl. ¶ 20 ("Like previous years, the incentive metrics for the . . . 2014 EAIP were developed as part of a comprehensive, bottoms-up, budgeting process that incorporates multiple rounds of input from the senior leadership team at each business unit, the SPC, and the O&C Committee.").

compensation programs as an ordinary course transaction or, if necessary, as justified by the facts and circumstances of this case.

[*Remainder of page intentionally left blank.*]

Dated: October 7, 2014
Wilmington, Delaware

/s/ Jason M. Madron
_____

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession