## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>Jointly Administered<br><br>Related to Docket No: 2087<br><br>**Obj. Deadline: October 10, 2014**<br>**Hearing Date: October 17, 2014** |

## OBJECTION OF WILMINGTON SAVINGS FUND SOCIETY, FSB
## TO MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL*, FOR
## ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES, (B)
## SCHEDULING AN AUCTION AND RELATED DEADLINES AND HEARINGS,
## AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 9

    I.     The Unresolved Conflicts Infecting The Debtors' Decision-Making Process ............ 9

    II.    Historic Manifestation Of Conflicts Amongst Estates And As To The Sponsor
          Group And TCEH Senior Creditors............................................................................. 12

    III.   The Failed RSA And Its Aftermath .............................................................................. 14

    IV.   The Tax-Driven Restructuring To Be Implemented Through The Bid Procedures
          To The Detriment Of TCEH Junior Creditors ............................................................ 15

          A.     The Bid Procedures' Depressive Effect On Oncor Value ............................. 17

          B.     The Rights And Entitlements Of "T-Side" Creditors To Be Affected
                 Outside Of A Plan Process And Without Participation By The Committee
                 Or The Oversight Of A True Independent Fiduciary..................................... 18

OBJECTION ..................................................................................................................... 20

    I.     The Motion Impermissibly Seeks To Set Up A Process To Sell
          Property That Does Not Exist, And Which, In Any Event, Would Not Be
          Property Of The Estate................................................................................................. 20

    II.    The Circumstances Surrounding The Motion Compel Heightened Scrutiny Of
          The Bid Procedures..................................................................................................... 27

    III.   The Failure Of TCEH's Board And The Purportedly Independent Director To
          Adequately Consider The Bid Procedures Weighs Heavily Against Approval
          Thereof........................................................................................................................ 30

    IV.   The Sale Process To Be Implemented Through The Motion Is Significantly
          Flawed And Will Not Maximize Value ...................................................................... 31

    V.    The Debtors Impermissibly Seek To Skew The Sale Process Towards A Plan
          Structure Materially Impairing The Rights Of TCEH Junior Creditors ................... 32

RESERVATION OF RIGHTS ......................................................................................... 35

NOTICE............................................................................................................................ 35

CONCLUSION.................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),
    92 B.R. 87 (Bankr. S.D.N.Y. 1988) ...................................................................27

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),
    181 F.3d 527 (3d Cir. 1999) ...........................................................................31

Cede & Co. v. Technicolor, Inc.,
    634 A.2d 345 (Del. 1993) ...............................................................................30

Citicorp Venture Capital, Ltd, v. Comm. of Creditors Holding Unsecured Claims (In re
    Papercraft Corp.),
    211 B.R. 813 (W.D. Pa. 1997) ........................................................................28

FDIC v. Castetter,
    184 F.3d 1040 (9th Cir. 1999) ........................................................................30

Galaxy Ventures, LLC v. Allen,
    No. 03-1236, 2005 WL 5988656 (D.N.M. Oct. 6, 2005) .....................................25

In re Bidermann Indus. U.S.A., Inc.,
    203 B.R. 547 (Bankr. S.D.N.Y. 1997) ..............................................................28

In re Blixseth,
    No. 09-60452-7, 2010 WL 716198 (Bankr. D. Mont. Feb. 23, 2010) .....................31

In re Capmark Fin. Grp. Inc.,
    438 B.R. 471 (Bankr. D. Del. 2010) (Sontchi, J.) ..............................................33

In re Chrysler LLC,
    576 F.3d 108 (2d Cir. 2009), vacated as moot, 592 F.3d 370 (2d Cir. 2010) .........33

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004) ...........................................................................20

In re Edwards,
    228 B.R. 552 (Bankr. E.D. Pa. 1998) . ............................................................31

In re Elpida Memory, Inc.,
    No. 12-10947, 2012 Bankr. LEXIS 5367 (Bankr. D. Del. Nov. 16, 2012) (Sontchi, J.).........24

In re Funneman,
    155 B.R. 197 (Bankr. S.D. Ill. 1993) ...............................................................21

In re Lazy Days' RV Ctr. Inc.,
    724 F.3d 418 (3d Cir. 2013)................................................................................27

In re Louise's, Inc.,
    211 B.R. 798 (D. Del. 1997)...............................................................................33

In re Metaldyne Corp.,
    409 B.R. 661 (Bankr. S.D.N.Y. 2009)...............................................................31

In re Murchison,
    54 B.R. 721 (Bankr. N.D. Tex. 1985)..........................................................21, 23

In re Pilgrim's Pride Corp.,
    401 B.R. 229 (Bankr. N.D. Tex. 2009)..............................................................27

In re President Casinos, Inc.,
    314 B.R. 784 (Bankr. E.D. Mo. 2004)...............................................................31

In re Pub. Serv. Co. of N.H.,
    90 B.R. 575 (Bankr. D.N.H. 1988)....................................................................34

In re Reliant Energy Channelview LP,
    594 F.3d 200 (3d Cir. 2010)...............................................................................31

In re Summit Global Logistics, Inc.,
    No. 08-11566, 2008 WL 819934 (Bankr. D.N.J. Mar. 26, 2008)...............24, 29, 33

In re Whitehall Jewelers Holdings, Inc.,
    No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008)..............29

Ivanhoe Partners v. Newmont Mining Corp.,
    535 A.2d 1334 (Del. 1987) ................................................................................29

Kahn v. Lynch Commc'n Sys., Inc.,
    638 A.2d 1110 (Del. 1994) ................................................................................27

Motorola, Inc. v. Official Comm. of Unsecured Creditors & JP Morgan Chase Bank,
    N.A. (In re Iridium Operating LLC),
    478 F.3d 452 (2d Cir. 2007)...............................................................................33

Mushroom Transp. Co., Inc. v. Ganz (In re Mushroom Transp. Co., Inc.),
    382 F.3d 325 (3d Cir. 2004)...............................................................................31

NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute
    Network, Inc.), 267 B.R. 46 (Bankr. D. Del. 2001)...........................................21

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated
    Res., Inc.),
    147 B.R. 650 (S.D.N.Y. 1992) ........................................................................26

Pepper v. Litton
    308 U.S. 295, 307 (1939) ..............................................................................28

Querner v. Querner (In re Querner),
    7 F.3d 1199 (5th Cir. 1993) ..........................................................................22

Scott v. Bierman,
    429 Fed. Appx. 225 (4th Cir. 2011) ..............................................................21

Seaver v. Klein-Swanson (In re Klein-Swanson),
    488 B.R. 628 (B.A.P. 8th Cir. 2013) ..............................................................20

TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),
    Nos. 13-20622, 13-20715, 2014 WL 4364894 (5th Cir. Sept. 3, 2014) ..........20, 22

Trans World Airlines, Inc. v. Texaco Inc. (In re Texaco Inc.),
    81 B.R. 813 (Bankr. S.D.N.Y. 1988) ............................................................22

Uranga v. Geib (In re Paso Del Norte Oil Co.),
    755 F.2d 421 (5th Cir. 1985) ........................................................................21

Victor v. Riklis,
    No. 91 Civ. 2897 (LJF), 1992 WL 122911 (S.D.N.Y. May 15, 1992) ..................21

**STATUTES**

11 U.S.C. § 105 ....................................................................................................2, 20

11 U.S.C. § 363 ....................................................................................................*passim*

11 U.S.C. § 541 ....................................................................................................21

11 U.S.C. § 1129 ..................................................................................................20, 33

**FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Rule 2004 ............................................................................................................9

Rule 9019 ............................................................................................................33

Wilmington Savings Fund Society, FSB ("WSFS"), as successor trustee under that certain indenture, dated as of October 6, 2010 (as amended or supplemented), among Texas Competitive Electric Holdings, LLC ("TCEH"), TCEH Finance, Inc., the guarantors party thereto (together with TCEH, TCEH Finance, Inc., the "TCEH Debtors"), and The Bank of New York Mellon Trust Co., N.A., as trustee (as amended or supplemented, the "Indenture"), by and through its undersigned co-counsel, hereby files this objection (the "Objection") to the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [Docket No. 2087] (the "Motion") and the bid procedures sought to be implemented thereby (the "Bid Procedures"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.        While the Debtors characterize the Motion as a mere procedural, market-driven next step to furthering a balance sheet restructuring that does not prejudice any party's fundamental rights, the demonstrable facts belie their disingenuous contentions. In reality, the Motion seeks unprecedented relief unmoored from any statutory predicate. Moreover, the Debtors present the Motion without first demonstrating that any TCEH fiduciary properly considered and then approved proceeding forward in the manner being proffered. Indeed, as the Debtors have already admitted, the filing and prosecution of the Motion was never voted on by any of the Debtors' boards, let alone any independent board member. This fact is particularly troubling since, if the Motion is granted it will set in stone a particular, and very controversial, tax-driven transaction that will absolutely dictate the critical terms of both an "E-Side" as well as a "T-Side" plan of reorganization. Furthermore, and highlighting the fundamental unfairness of

the process, the so-called "tax free" transaction that would be locked in place if the Motion were to be granted could well deprive TCEH creditors of billions of dollars of value.

2.    For similar reasons, these Debtors were forced to abandon their restructuring support agreement (the "RSA") and related EFIH Second Lien DIP proposal.  But, having misplayed their original and divisive game plan, the Debtors appear willing to try, once again, to dictate the outcome of these cases.   Rather than first proceeding to garner stakeholder approval for a consensual restructuring proposal, these Debtors seem hell-bent on trying, yet again, and over the objections of the vast majority of their creditors, to mandate the final parameters of any plan – all without the protections contemplated by the Bankruptcy Code.

3.    Despite the limitations of Sections 363 and 105 of the Bankruptcy Code, the Debtors have determined to sell an asset that does not currently exist and that none of them own.[1] The Debtors have not cited, and WSFS is not aware of, a single reported case where Sections 363 or 105 was used as the statutory basis for a sale of reorganized equity outside of a plan confirmation process.  Even accepting the untested and unproven contention that the market is somehow ideal for the marketing and sale of the Oncor stake now, it is neither Oncor assets nor the stock of Oncor that is being sold.  Rather, these Debtors seek to put a process in place that will lead to a so-called tax free "investment" in the to-be-created reorganized equity of EFH. Furthermore, the investment in reorganized EFH stock has to be structured "in order to preserve the tax free status of the TCEH Spin-Off."[2]  In other words, any bidder for Oncor would have to agree to both "invest" in reorganized EFH equity and ensure that the T-Side could be spun off in

---

[1]    See EFH-EVR090000362, September 12, 2014 Email from Sesh Raghaven of Evercore to prospective bidder (" ██████████████████████████ ██████████████ ") (Coffey Declaration at Exhibit 1).

[2]    See EFH-EVR090000013 through EFH-EVR090000025, July 2014 Teaser prepared by Evercore and transmitted to prospective bidders (Coffey Declaration at Exhibit 2).

a related tax free manner.  Consequently, the interest in Oncor could only be realized after the confirmation of a plan or plans for both the E-Side and T-Side estates, thus creating for the prospective bidder "execution risk" associated with such plan or plans being proposed and eventually confirmed.  Moreover, these cases would then be put on a fast track for resolution in an effort to satisfy the plan confirmation pre-condition of the winning bid.

4.      The Motion professes that the Debtors have now changed their proposed auction process to allow for asset or stock bids that do not conform to their "optimal" or preferred and "efficient" tax structure.  However, as the Debtors' own witnesses have admitted, in order to win the auction, a bidder will either have to conform to the Debtors' specific tax structure or bid at a value that would satisfy the significant stranded tax liability that the EFH estate could incur in a taxable transaction.  And, as the Evercore professional running the proposed auction process has already admitted, "I think it's very difficult to get a price in a taxable transaction that produces comparable economic value to the estate as a whole."[3]  Indeed, the change to allow bidders to

---

[3]      See October 6, 2014 Deposition of William O. Hiltz (the "Hiltz Depo.") (Coffey Declaration at Exhibit 3), 217: 12-15; see also id. at  216:15 – 218:20:

Q. What are the big issues?

A. Well, again, I think it primarily relates to the whole question of taxable versus tax-free, and then there's also an issue about whether now is, quote, the right time to sell the business. They seem to be the two predominant issues that have come out in our discussions with the creditors.

Q. And from your perspective, again, doing a taxable deal makes no sense, correct?

A. It does not maximize aggregate value to the estate as a whole.

Q. And therefore, it makes no sense, correct?

A. I leave it at what I said.

Q. And if someone were to submit a taxable transaction, in your opinion, they are unlikely to be the winner of the auction that you have set up?

A. Well, I think it's very difficult to get to a price in a taxable transaction that produces comparable economic value to the estate as a whole.

Q. And in fact, you have testified that at least one bidder has come to you and asked you, quote, how could a taxable deal work for you? Do you remember that testimony?

A. Yes, I do.

Q. Well, you didn't tell us how you responded to that prospective bidder. What, if anything, did you tell the prospective bidder who came to you and asked you, quote, how could a taxable deal work for you?

A. Well, I was not on that call. That was a call that someone else had who works for me, but so I don't know specifically what was said, but I think the idea was, and we have been telling people all along, that aggregate value net of any tax liability is the yardstick which we will use to evaluate bids.

Q. So if a bidder came to you, hypothetically, this afternoon after this deposition was over and said to you, Mr. Hiltz, how could a taxable deal work for you, what would your response be?

A. You have to pay a high enough price to give us comparable value after taking into account any tax liability.

Q. And you believe that no prospective bidder is likely to want to pay that high of a price, correct?

A. I believe that it's very difficult.

See also id. at 79:8 – 80:12 (emphases added):

Well, I mean, there -- if we are talking purely about the Oncor sale, again, the EFIH and EFH creditors will benefit from the largest possible proceeds. Again, we're looking at bids today that are capable of discharging all of the liabilities at the EFIH level as they currently exist, and so at the EFH level a taxable transaction results in a roughly $3.4 billion tax liability. **It is unlikely, in my judgment, that a buyer will pay enough to produce the same economic value in a taxable transaction as can be realized in a tax-free transaction.** With respect to the T side of the house, I understand that they are alleging claims against EFH or potentially against EFIH, but as it stands right now, no claims have been filed, and to the extent that those claims are filed against EFH, they also benefit from having the largest possible pie after tax; and we believe that results from the tax-efficient structure that we have outlined. **But again, if someone is interested in**

submit a taxable transaction was an afterthought, designed to mollify vocal creditors, that even

Evercore admits was not an important or material change.[4]

5.      In an effort to mandate their desired tax structure, the Debtors have argued that

current market conditions for moving forward on the proposed auction are close to

ideal. However, no analyses of potential changes in the merger market, interest rates, debt

markets or utility stock indices were performed or, for that matter, presented to the Debtors'

boards. Indeed, even Evercore is forced to admit that changes to current market conditions are

---

**paying -- they have to pay roughly a $5 billion higher price in a taxable transaction in order to produce the same net proceeds, and if you look at the multiples that that would imply for Oncor, it seems highly unlikely that anyone will do that.**

[4]    See Hiltz Depo. (Coffey Declaration at Exhibit 3), 84:25 – 85:21 (emphasis added):

Q. Do you consider the change from inviting bids for a non-taxable-only transaction to inviting bids for a transaction in any form an important and material change in the process Evercore was running?

A. I don't know whether I would characterize it as an important or material change. It was certainly a change. We let people know that. **Generally, the reaction that we've gotten from at least a number of people is, what are you talking about? Who would do this as a taxable transaction? It makes no sense at all.**

Q. And why does it make no sense?

A. For the reason that I stated, which is that, in order to produce an equivalent amount of value after taking into account taxes, the purchase price that would have to be paid in a taxable transaction is not realistic, and so it's at extremely, extraordinarily high multiples.

See also id. 86:9-16 (emphases added):

Well, again, they recognized that, **in order to win the auction, it's unlikely that a taxable transaction will allow them to be the winner,** because they look at it the same way we do, which is the price that you would have to pay to produce the same economic value **is a price that they wouldn't be willing to pay and that no person is likely to be willing to pay.**

not likely to be material even as much as twelve to eighteen months out.[5]  Clearly, there is no indication that Oncor is a "melting ice cube" warranting a sale outside the ordinary course of business and in advance of a plan.  To the contrary, projections for Oncor show steady improvements in its operational and financial metrics.

6.      The Debtors' response is that there are at least a handful of bidders anxious to participate in a bidding process now and they may not hang around until after a plan is fully baked.  Frankly, that argument is cold comfort.  The Debtors, in the now-abandoned EFIH Second Lien DIP proposal and RSA, put a value on Oncor that the market perceived was ridiculously low.  In that context, it should come as no surprise that bidders, sensing an unreasonably low initial valuation backed by the Debtors and other RSA signatories, would be willing to bid enough to beat that fire-sale price.  Common sense dictates that, rather than take advantage of "current" market conditions, where any bidder will have to factor plan execution risk into their proposed price, a higher or better price may be realized if the plan risk is removed and a Court-approved tax structure is adopted.

---

[5]      See Hiltz Depo. (Coffey Declaration at Exhibit 3), 280:18 – 281:9:

Q. All right. So do you have any sense, when we talk about market risk, are we talking about the possibility the Oncor stake could rise or fall 5 percent, rise or fall 10 percent, rise or fall 50 percent? What kind of volatility are you talking about in a utility stock?

A. I think it's probably in the 10 to 20 percent area.

Q. So you would be concerned about a 10 to 20 percent fall in the value of Oncor stock in the next 18 months?

A. Correct.

Q. And does that also imply that there could be a 10 to 20 percent rise in the value of Oncor stock?

A. Conceivably.

7.      Putting aside whether the Court would even have jurisdiction to consider this unprecedented sale of reorganized equity of a well-performing asset outside a plan, the fact of the matter is that the Debtors' dictated tax structure pits the interests of different estates and their respective creditors against each other.  The TCEH creditors would be forced to forego the value of a taxable transaction that could be worth billions of dollars were the assets of their estate to get a significant step-up in basis.  In addition, to mollify the concern of the TCEH first lien creditors[6] and get them to forgo a full step up in basis, the Debtors' proffered tax structure requires that significant tax attributes, that may be unencumbered property of the TCEH estate to which junior TCEH creditors also have a claim, be "contributed" for the exclusive benefit of those consenting secured creditors.  If the Motion is approved, the propriety of these transfers of value would become a forgone conclusion.

8.      The Debtors have chosen to file their long awaited omnibus tax memorandum (the "Tax Memorandum") [Docket No. 2296] during the consideration of the pending Motion.  The timing is not coincidental.  The Tax Memorandum serves as yet another one-sided advertisement for the Debtors' "optimal" tax structure.  The basic argument presented is that any taxable disposition of either the E-Side or T-Side assets giving rise to material stranded taxes at EFH will be met by potential Internal Revenue Service objections that could somehow prevent confirmation of any resulting plan of reorganization.  See Tax Memorandum, pp. 15-19.  In support of that argument, the Debtors cite to three cases where the IRS ***unsuccessfully*** opposed plans that resulted in "stranded" taxes.  See id. at p. 16.  Furthermore, and assuming, as Evercore does, that a disposition of Oncor in a taxable transaction could result in many hundreds of

---

[6]      Hereinafter referred to as the "TCEH Senior Creditors."

millions of dollars of value at EFH,[7] it is unclear why the IRS would necessarily oppose a plan that allowed it to receive that excess value as opposed to getting nothing in a tax free transaction.

9.      The Motion, if approved, would make a mockery of the typical chapter 11 process.  Most debtors work to: (a) produce a viable business plan; (b) have valuations based on that business plan vetted; (c) explore and debate (or if necessary litigate) a fair and workable tax structure; (d) attempt to build consensus around a viable plan of reorganization (or, at the least, allow dissenting creditors to have their day in court); and (e) confirm a plan that calls for either a sale or other plan disposition of its asset values.  Instead, these Debtors have yet to produce a business plan, articulate their views of value, allow for a debate of the tax issues that have plagued these cases from day one, do anything to build consensus on a plan or even provide the outlines of a plan.  Instead, as was the case under the RSA and the EFIH Second Lien DIP, the Debtors are driving toward a one-sided deal that has been dictated by the equity sponsors[8] controlling their boards.  The time has come to set these cases on the right track.

---

[7]      See Hiltz Depo. (Coffey Declaration at Exhibit 3), p. 235:12-18:

Q. The EFIH first liens, the EFIH second liens, and the PIKs, if you paid all those guys off –

A. U-huh.

Q. -- how much would you have left in terms of enterprise value?

A. $700 million, rough justice.

[8]      GS Capital Partners ("Goldman"), TPG Capital ("TPG") and KKR & Co., L.P. ("KKR" and, together with Goldman and TPG, the "Sponsors" or the "Sponsor Group").

## BACKGROUND

### I.    The Unresolved Conflicts Infecting The Debtors' Decision-Making Process.

10.    Since the Petition Date, WSFS has raised concerns regarding conflicts amongst the Debtors' boards (and professionals) and the lack of an independent fiduciary to protect the interests of junior TCEH creditors.[9] Those conflicts remain unresolved.

11.    Of the six directors on the TCEH/EFCH boards: (a) five are also on the board of EFH – the entity that, inter alia, would benefit from a tax free spin-off of TCEH; (b) three (Smidt, MacDougal and Lebovitz) have ties to the Sponsor Group; (c) two hold equity stakes in EFH made more valuable if a tax free spin off of TCEH occurs (Acosta – 486,029 shares and Young - 1,012,222 shares); and (d) two are employed by EFH (Young: Chairman of the Board, Chief Executive Officer, and President of EFH; and Keglevic: Executive Vice President and Chief Financial Officer of EFH (as well as co-Chief Restructuring Officer for all of the Debtors)).

12.    Prior to the Petition Date, presumably in recognition of the conflicts of interest that would be raised by parties adversely impacted by restructuring efforts unduly favoring the Sponsor Group and/or TCEH Senior Creditors, the Debtors added new "independent" members to the boards of certain of the Debtors.  On the T-Side side, Mr. Hugh Sawyer was nominated to the boards of TCEH and EFCH.  On the E-Side, Mr. Charles Cremens was nominated to the board of EFIH.

13.    Mr. Sawyer is to be paid over $200,000 per year to serve on the TCEH and EFCH boards.  See June 26, 2014 Deposition of Hugh Sawyer (the "Initial Sawyer Depo.") (Coffey

---

[9]    See, e.g., *Motion of Wilmington Savings Fund Society, FSB for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Energy Future Holdings Corporation, its Affiliates, and Certain Third Parties* [Docket No. 6] (the "WSFS 2004 Motion").

Declaration at Exhibit 4), 35:11 – 35:15.  Mr. Sawyer and the Debtors' lead restructuring counsel

have a long history of arranging lucrative engagements for each other.[10]    See Initial Sawyer

Depo. (Coffey Declaration at Exhibit 4), 19:19 – 20:4 (K&E proposed Mr. Sawyer for the board

of Edison Mission Energy, from which Mr. Sawyer earned $200,000/year); 22:10 – 22:16 (Mr.

Sawyer, in his capacity as chief administrative officer of Fisker Automotive, recommended K&E

as counsel for the company); 25:4 – 25:18 (K&E proposed Mr. Sawyer to serve on the board of

Paradise Holdings).[11]    When questioned about the now-abandoned RSA, Mr. Sawyer could not

recall whether the board ever discussed the propriety of K&E representing all Debtor parties to

the RSA.  See id., 39:6 – 39:13.  He never reviewed the Debtors' application to retain K&E, and

so was not aware that K&E also represents most of the TCEH Senior Creditors with whom the

Debtors negotiated the RSA (and to whom 100% of TCEH equity would be delivered under the

transaction structure still favored by the Debtors).  See id., 42:9 – 42:21.[12]

14.    In addition to his ignorance of, or indifference to, conflicts of interest, Mr. Sawyer

agreed to the RSA's proposed allocation of 100% of TCEH equity to the TCEH Senior Creditors

without obtaining (or even requesting) a valuation of TCEH.   Rather, he simply accepted

---

[10]    Likewise, Mr. Cremens has a longstanding relationship with K&E.  See October 8, 2014 Deposition of Charles Cremens ("Cremens Depo.") (Coffey Declaration at Exhibit 5), 17:2 – 19:4.

[11]    See also Declaration of Edward O. Sassower in Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis, LLP as Attorneys for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date [attached as Exhibit B to Docket No. 660] (the "Sassower Declaration"), ¶ 53 ("Hugh E. Sawyer, who serves as a director of TCEH LLC, has also served as an officer or on the boards of directors of other active and inactive K&E clients.").

[12]    When these conflicts of interest were brought to Mr. Sawyer's attention, he dismissed them on the basis that it would have been the conflicted law firms' obligation to bring the conflicts to his attention rather than his duty to determine whether the board was receiving advice free from conflict and bias.  See Initial Sawyer Depo., (Coffey Declaration at Exhibit 4) 40:15 – 48:17 and 48:13 – 48:16.

statements of management and the Debtors' investment banker to the effect that the TCEH Senior Creditors were undersecured, even though neither management nor Evercore produced any written valuation reports to back up such statements. See Initial Sawyer Depo. (Coffey Declaration at Exhibit 4), 61:23 – 62:10. Mr. Sawyer knows TCEH valuation will be "hotly contested" in these proceedings. See id., 191:5 – 191:10; 193:25 – 200:3. Yet, before signing off on the RSA, Mr. Sawyer never pressed management or Evercore on their valuation conclusions. See id., 190:25 – 191:10. Neither Mr. Sawyer, nor the balance of the TCEH board, asked for a written presentation as to the value assumptions built into the RSA. See id., 197:6 – 197:9.

15.    Mr. Sawyer's failure to protect the interests of junior TCEH creditors continues to this day. See, e.g., October 9, 2014 Deposition of Hugh Sawyer (the "October Sawyer Depo.") (Coffey Declaration at Exhibit 6), 336:22-341:9 (explaining that, although he has met with the TCEH Senior Creditors, he has not met with any junior TCEH creditor constituencies and does not "have any intention at this point" to do so; see id., 378:2 – 380:12 (supporting the Bidding Procedures because they "could potentially lead to a value maximizing event" but explaining that he has yet to consider "how that value will be allocated among the constituents" or whether T-side creditors will realize any value whatsoever); see id., 454:24-25 ("I don't know if the T-side creditors support the optimal transition . . . ."); see id., at 475:17 – 478:18 (testifying that he was unaware of his requirement to consult with TCEH creditor representatives regarding the selection of independent counsel, that TCEH is required to facilitate the investigation of potential claims against other Debtors, or the circumstances under which such investigation may take place).

## II.     Historic Manifestation Of Conflicts Amongst Estates
### And As To The Sponsor Group And TCEH Senior Creditors.

16.     Prior to the Petition Date, the Debtors pursued a "liability management" program, whereby they attempted to juggle debt financing expenses by extending debt maturities.[13]   Of particular concern is the amendment in January 2013 – a time period in which a bankruptcy filing should have been obvious to those leading the Debtors – to extend the maturity dates of the 2013 TCEH first lien revolving credit loans and 2013 TCEH first lien revolving credit commitments (together, approximately $645 million) to October 2016.   This extension was purchased from certain of the TCEH Senior Creditors for a $340 million extension fee (in the form of incremental term loan obligations incurred by TCEH) – a fee amounting to approximately **54%** of the face amount of the debt extended.[14]   While the January 2013 transaction was a particularly egregious example of the Debtors delivering significant value and benefits to the TCEH Senior Creditors, it was just one among many.   WSFS understands the Official Committee will soon seek standing to bring claims against the TCEH Senior Creditors, inter alia, for lien avoidance and the recovery of hundreds of millions of dollars in value diverted to the TCEH Senior Creditors prepetition by the same management group now seeking a tax free spin-off of TCEH and related transactions benefiting the TCEH Senior Creditors and the Sponsors.

17.     At the same time the Debtors were diverting value to the TCEH Senior Creditors, the Sponsor Group also enriched itself as the Debtors' businesses flailed.   In connection with, and following, the LBO, the members of the Sponsor Group paid themselves hundreds of

---

[13]     See EFH Annual Report (Form 10-K) (February 19, 2013) (Coffey Declaration at Exhibit 7), p. 48.

[14]     See EFCH Annual Report (Form 10-K) (February 19, 2013) (Coffey Declaration at Exhibit 8), p. 105.

millions of dollars in fees, including a $300 million charge for advising on the LBO, annual management fees, and as much as $59.3 million for consulting on debt deals.[15]  EFH paid annual management fees to the members of the Sponsor Group totaling $29 million, $38 million, $37 million, and $37 million for the years ended December 31, 2013, 2012, 2011, and 2010, respectively.[16]  In the year prior to the Petition Date, members of the Sponsor Group received fees totaling: (a) $5.3 million (GS Capital Partners); (b) $7.1 million (TPG Capital); and (c) $7.1 million (KKR & Co., L.P.).[17]

18.    In January 2013, fees paid to Goldman, Sachs & Co. ("GSC"), an affiliate of sponsor Goldman, for services related to debt exchanges totaled $2 million.[18]  For the year ended December 31, 2012, fees paid to GSC related to various amend/extend transactions totaled $10 million; a broker-dealer affiliate of KKR and an affiliate of TPG each received a total of $4 million.[19]  For the year ended December 31, 2011, fees paid to GSC related to debt issuances,

---

[15]    See Richard Bravo and Mark Chediak, *TXU Teeters as KKR et al. Reap $528 Million in Fees*, Bloomberg News (Oct. 22, 2012), *available at* http://www.businessweek.com/news/2012-10-22/txu-teeters-as-kkr-et-al-dot-reap-528-million-fees (Coffey Declaration at Exhibit 9).

[16]    See EFH Annual Report (Form 10-K) (Feb. 19, 2013) (Coffey Declaration at Exhibit 7) at 168; EFH Annual Report (Form 10-K) (Apr. 30, 2014) (Coffey Declaration at Exhibit 10) at 180.

[17]    While the Sponsor Group directed EFH to suspend management fee payments as of the December 31, 2013 payment, the Sponsor Group has reserved all rights to seek payment of the suspended amounts.  See EFH Annual Report (Form 10-K), (Apr. 30, 2014) (Coffey Declaration at Exhibit 10) at 180.

[18]    See EFH Quarterly Report (Form 10-Q) (Aug. 2, 2013) (Coffey Declaration at Exhibit 11) at 38.

[19]    See EFH Annual Report (Form 10-K) (Feb. 19, 2013) (Coffey Declaration at Exhibit 7) at 168.

exchanges, amendments, and extensions totaled $26 million; affiliates of KKR and TPG each received $5 million in connection therewith.[20] For the year ended December 31, 2010, fees paid to GSC related to debt issuances and exchanges totaled $11 million.[21] It appears that the hundreds of millions of dollars in fees paid to the Sponsors may have been funded through forced "upstream loans" from TCEH to EFH. These "loans," approved on behalf of TCEH by much the same board now allegedly protecting the interests of TCEH creditors, were at rates not reflective of the rates EFH would have been charged in arms' length transactions.

### III.    The Failed RSA And Its Aftermath.

19.    Prior to the Petition Date, the Debtors, the Sponsor Group, management, junior creditors of the Debtors' regulated business and certain of the TCEH Senior Creditors entered into negotiations to which none of WSFS, second lien lenders to TCEH (the "Second Liens") or general unsecured creditors of TCEH were allowed access. The result of those closed door negotiations was the RSA, which embodied the inflexible tax-driven restructuring agenda of the Debtors and the other parties to those negotiations. That agenda was, and seemingly remains, to protect EFH from tax liability at all costs. Such protection would be for the primary benefit of the Sponsor Group – desperate to avoid the reputational damage and potential liability associated with a "stranded" tax liability at EFH – with: (a) the acquiescence of TCEH Senior Creditors purchased through the delivery to them of an undervalued TCEH at the direct expense of junior creditors of the TCEH Debtors; and (b) the acquiescence of junior EFIH creditors (the "PIK Group") purchased through the proposed delivery to them of the Debtors' interest in the non-Debtor Oncor business at an artificially depressed valuation. Following the announcement of the

_____

[20]    See id.

[21]    See id.

RSA's terms, the M&A market provided evidence that the RSA parties had grossly undervalued the Oncor business that was to be handed to the PIK Group.  Eventually, the Debtors begrudgingly abandoned the RSA (while, at the same time, attempting to spin their dogged pursuit of the RSA as somehow being beneficial to junior TCEH Creditors who were slated to receive a pittance under the transaction).  Since that time, interest in the Oncor business has, according to the Debtors, continued to develop, no doubt in response to the low ball valuation embedded in the RSA and the linked EFIH Second Lien DIP proposal.

IV.    **The Tax-Driven Restructuring To Be Implemented Through
       The Bid Procedures To The Detriment Of TCEH Junior Creditors.**

20.    Although the RSA has been abandoned, the Debtors once again seek to lock the estates into a nearly identical tax-driven restructuring agenda: a) a reorganization of EFH/EFIH (this time, resulting in delivery to a third party purchaser of "reorganized" EFH equity that does not yet exist) so as to avoid EFH tax liability otherwise resulting from an outright sale of EFIH or EFIH's interests in Oncor; and b) a partial tax free spin off of the TCEH Debtors to the TCEH Senior Creditors (again utilizing certain tax attributes to give the TCEH Senior Creditors a partial step up in tax basis) – again, seeking to shift the avoided deconsolidation tax liability from EFH to TCEH.

21.    On October 1, 2014, the Debtors, without going to the TCEH board for prior approval,[22] filed the fifty page Tax Memorandum spelling out to bidders exactly the tax structure the Debtors are determined to achieve through the Bid Procedures, and making clear that bids deviating from the structure delineated in the Motion will not comport with the restructuring ends of those who will be selecting the stalking horse bid (in their "sole discretion").  While claimed to be for informational purposes and to facilitate a discussion of tax issues, the Tax

---

[22]    See October Sawyer Depo. (Coffey Declaration at Exhibit 6), 401:9-24.

Memorandum is clearly an advocacy piece and goes to great lengths to justify imposition of the

Debtors' favored tax structure. For purposes of this Objection, WSFS would note, inter alia, the

following:

- The Debtors claim there would be significant "litigation and regulatory risks" associated with leaving a "stranded" tax liability at the EFH level – their stated justification for pursuing their preferred structure for a sale of Oncor. But, the only reported precedent on this issue (as accurately cited in the Tax Memorandum) supports the conclusion that separate reorganizations of TCEH and EFIH (i.e., through taxable deconsolidations from EFH) could be effected apart from EFH, notwithstanding EFH's inability to satisfy any resulting tax liability.

- The Tax Memorandum overstates the ability or likelihood of the IRS to: (a) reverse decades of practice and policy so as to ascribe parent tax liability to subsidiary disregarded entities; (b) issue new regulations treating limited liability companies as corporations for taxation purposes; and (c) issue new regulations preventing a step up in tax basis upon a deconsolidation where the parent is unable to satisfy its resulting tax liability.

- In the eighteen pages of the Tax Memorandum devoted to the concept of "continuity of interest,"[23] the Debtors make very clear: (x) their motivation in seeking implementation of the Bid Procedures is to effect a final "reorganization in a manner designed to maximize the likelihood of obtaining a private letter ruling from the IRS that the TCEH Reorganization will qualify as a divisive G Reorganization," see Tax Memorandum, p. 32; and (y) obtaining that private letter ruling will rest on there being no deviation from the value allocations negotiated in connection with the now-abandoned RSA. While the Motion states that the Debtors are not seeking to lock in creditor entitlements to value, the Tax Memorandum belies that notion, positing that **any material deviation from, inter alia, a delivery of 100% of reorganized TCEH equity or other reorganization consideration to the TCEH Senior Creditors would jeopardize the requested spin-off ruling from the Internal Revenue Service.** See, e.g., Tax Memorandum, pp. 25, 27, 31-32, and 37-38.

- The Debtors downplay the significant dispute as to whether the TCEH tax allocation agreement (the "TAA") would allow EFH to assert even an unsecured claim against TCEH for tax liability arising from a taxable deconsolidation of TCEH from EFH. See id. at pp. 20-21. The Debtors also fail to note that the TAA, entered into in 2012, may itself be entirely avoidable.[24] The Debtors reveal

---

[23]    See Tax Memorandum, pp. 30-48.

[24]    This aspect of the Tax Memorandum is particularly troubling. When asked about this, Mr. Sawyer indicated that his views on the topic of EFH's ability to "push" tax liability down to TCEH was a topic on which he consulted only with K&E. He further testified

the significant potential tax liability that could accrue to EFH if it were to "check the box" to make TCEH a taxable entity (as has been threatened in the past by the Debtors' chief restructuring officer – also a purported fiduciary for TCEH creditors as a member of the TCEH board). See id. at p. 21.

22.     In addition to foisting onto TCEH creditors the tax free spin-off construct, the illustrative term sheet attached to the Motion (the "Term Sheet") would leave reorganized TCEH responsible for any tax liability resulting if the complicated tax structuring fails. See Term Sheet, Exhibit B, Reorganized TCEH Taxes, § (i).   Reorganized TCEH would also be responsible for any tax liability resulting from the use of tax attributes to engineer a partial step up in TCEH's basis. See id. at § (ii)(B). The Term sheet also contemplates the Oncor purchaser dictating plan terms via the negotiated merger agreement. See id., at Closing Conditions and Ex. A. Finally, for a period of two years, reorganized TCEH would be subject to restrictions on any activity that might jeopardize the tax structure of the transaction. See id., at Exhibit B, Covenants.

A.     **The Bid Procedures' Depressive Effect On Oncor Value.**

23.     The Debtors have made very clear that, notwithstanding statements in the Motion that they will entertain any proposed structure from any party, the reality is that the Debtors have clearly signaled to the marketplace that only bids adhering to the structure spelled out in the Tax Memorandum and the Term Sheet will be in the running to be selected as the stalking horse. This requirement limits the universe of bidders to those willing to structure their bids to meet the Debtors' stated preference.  Moreover, prospective bidders necessarily will take into account the following:

---

that he saw nothing improper about consulting with counsel on "both sides" of the issue and otherwise refused to divulge the substance of the advice based on assertions of the attorney-client privilege.  See October Sawyer Depo. (Coffey Declaration at Exhibit 6), 465:21 – 473:6.  And, Mr. Sawyer maintains his position that no conflict between EFH and TCEH has manifested itself to date. See id., 346:7 – 347:4.

- Bidders must be willing to commit significant capital for a period of *up to eighteen months* while the Debtors seek: (a) a private letter ruling from the Internal Revenue Service that tax professionals agree pertains to complex, unprecedented and uncertain tax issues; and (b) contested confirmation of plan(s) of reorganization necessary to effect their preferred tax structure.

- Under the Debtors' announced preferred structure, bidders would be required to use their listed, freely tradable stock as part of the consideration paid. This could well exclude from the process: (a) sovereign wealth funds; (b) private equity funds; and (c) bidders seeking to finance the transaction with cash or through the capital markets to take advantage of the low cost of capital.

- Having telegraphed the bid structure they prefer, the Debtors retain the "sole discretion" to: (a) modify the bid procedures without Court approval; (b) determine which parties participate in the process; (c) determine the scope, breadth and timing of diligence provided to each "Acceptable Bidder"; (d) select which bidders from "Round One" of the stalking horse selection process will be allowed to move on to "Round Two" of the process; (e) select which of the Round Two bidders with which to further negotiate towards selection of a stalking horse bid; (f) select the stalking horse bid; (g) determine which bidders are allowed to participate in the "open bidding" process following selection of the stalking horse bid; (h) announce additional procedures during the auction process; and (i) cancel the auction.

**B.      The Rights And Entitlements Of "T-Side" Creditors To Be Affected Outside Of A Plan Process And Without Participation By The Committee Or The Oversight Of A True Independent Fiduciary.**

24.      Under the Debtors' preferred structure, TCEH would be transferred, lock, stock and barrel, to the TCEH Senior Creditors, without consideration as to the value entitlements of junior TCEH creditors.  Moreover, that transfer would be pursuant to a partial tax free spin off of TCEH, effectively saddling TCEH with significant tax liability (gain) that would otherwise accrue to EFH upon a taxable disposition of the business.  Foregoing that step up in basis is estimated to result in a depression of TCEH enterprise value in the approximate amount of $2 billion (a meaningful amount when consideration is given to where WSFS resides in TCEH's capital structure).  Additionally, the Debtors will purchase the support of the TCEH Senior Creditors (a necessary component to implementation of the tax driven restructuring scheme) by engineering a partial step up in TCEH's basis through consumption of tax attributes and delivery

of undervalued reorganized TCEH equity to TCEH Senior Creditors.  To date, no determination has been made by TCEH's independent director[25] as to the source of those tax attributes.  And, again, absent a valuation of TCEH, it is not yet known what entitlement Second Liens may have to the value of those tax attributes or interests in reorganized TCEH.

25.    In addition, the Debtors' schedules acknowledge that TCEH holds claims against EFH totaling at least $773,729,458.98, making TCEH the single largest creditor of the EFH estate.  See TCEH Schedules [Docket No. 1294], p. 19 of 278.  If such claims are unencumbered by the liens of the TCEH Senior Creditors and Second Liens, they represent a significant source of potential value for TCEH unsecured creditors (including the Second Liens to the extent of any deficiency claim).  If such claims are part of the collateral packages of the TCEH Senior Creditors and Second Liens, their value must be taken into account in determining whether or to what extent the Second Liens' claims are secured.  If adequate value were to be generated from the sale of Oncor, such claims against EFH could be entitled to a 100% recovery – as such, the depression of Oncor value could have meaningful and deleterious effects on the recoveries of TCEH creditors.

26.    The scheduled TCEH claims against EFH reflect only some of the claims that may exist.  Significant additional TCEH claims against EFH and other Debtors (as well as potential claims for the value of Oncor itself, if it is determined to have been transferred to EFIH in an avoidable transaction) may be determined to exist once the Debtors fully respond to pending discovery, including requests attached to the WSFS 2004 Motion.  For example, WSFS is informed that TCEH made billions of dollars in prepetition payments to other Debtors under prepetition tax sharing agreements.  Investigation as to whether those tax sharing payments

---

[25]    See October Sawyer Depo. (Coffey Declaration at Exhibit 6), 432:3 – 435:2.

and/or obligations may be avoidable must be conducted, and could result in additional TCEH

claims against EFH (and more value for TCEH creditors).

## OBJECTION

I.     **The Motion Impermissibly Seeks To Set Up A**
       **Process To Sell Property That Does Not Exist, And**
       **Which, In Any Event, Would Not Be Property Of The Estate.**

27.     The Debtors seek approval of the Motion pursuant to Sections 363(b) and 105(a)

of the Code.[26]  Over the years, growing numbers of debtors have attempted to use Section 363(b)

to short-cut plan processes and avoid the burdens and protections imposed by Section 1129 and

to achieve results that may otherwise be impermissible under the Bankruptcy Code.   These

Debtors are attempting to do just that here.

28.     But, Section 363(b) has two significant limitations that preclude its use to

authorize the process and outcome proposed in the Motion.   First, Section 363(b) may be

invoked only to use, sell, or lease "property of the estate."   It is the proponent's burden to

establish that the relief sought pertains to property of the estate.  See TMT Procurement Corp. v.

Vantage Drilling Co. (In re TMT Procurement Corp.), Nos. 13-20622, 13-20715, 2014 WL

4364894, at *6 (5th Cir. Sept. 3, 2014) ("The party seeking to include property in the estate bears

the burden of showing that the item is property of the estate."); Seaver v. Klein-Swanson (In re

Klein-Swanson), 488 B.R. 628, 633 (B.A.P. 8th Cir. 2013) (same).   "Property of the estate" is

defined by Section 541(a)(1) to include "all legal or equitable interests of the debtor in property

---

[26]     Section 363(b) allows a debtor in possession to "use, sell or lease . . . ***property of the
estate*** . . . ." 11 U.S.C. §363(b)(1) (emphasis added).   As the Third Circuit has noted,
"the equitable powers authorized by § 105(a) are not without limitation, and courts have
cautioned that this section 'does not authorize the bankruptcy courts to create substantive
rights that are otherwise unavailable under applicable law, or constitute a roving
commission to do equity.'" In re Combustion Eng'g, Inc., 391 F.3d 190, 236 (3d Cir.
2004) (internal quotation and citation omitted).

as of the commencement of the case." In re Murchison, 54 B.R. 721, 725 (Bankr. N.D. Tex. 1985).  When a debtor seeks approval of a sale of property not owned by its estate as of the commencement of the case, it asks the Court to act beyond its subject matter jurisdiction.  See Scott v. Bierman, 429 Fed. Appx. 225, 231 (4th Cir. 2011) ("[A] bankruptcy court's jurisdiction does not extend to property not part of a debtor's estate."); NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network, Inc.), 267 B.R. 46, 59 (Bankr. D. Del. 2001) (same); In re Funneman, 155 B.R. 197, 199-200 (Bankr. S.D. Ill. 1993) (determining that partnership property was not property of the debtor-partner's estate, and, therefore, was outside the court's subject matter jurisdiction).

29.     The Motion seeks approval of Bid Procedures leading to an auction for the "equity of Reorganized EFH."  Reorganized EFH did not exist as of the commencement of the case, it does not exist today, and there is no actual and existing equity to sell.  The Debtors' unprecedented attempt to sell this so-called "asset" under Section 363(b) is purely and simply an attempt at gaming the plan process as well as the jurisdictional limitations of this Court.

30.     Moreover, even if reorganized EFH one day comes into existence as the result of a confirmed plan, EFH, the Debtor, will not own the equity in that entity.  That equity will belong to the EFH estate stakeholders, including secured and unsecured creditors, and if sufficient value remains after satisfaction of claims, perhaps the Sponsors (as legacy equity holders).  But EFH qua EFH will never own any of the equity of reorganized EFH, even for a second.   A corporation never owns its issued and outstanding stock; it is owned by its shareholders.  See Uranga v. Geib (In re Paso Del Norte Oil Co.), 755 F.2d 421, 424 (5th Cir. 1985) (holding that it is "widely recognized . . . that a corporation, even if a debtor in bankruptcy, has no property interest in the shares of its stock owned by shareholders"); Victor v.

Riklis, No. 91 Civ. 2897 (LJF), 1992 WL 122911, *4 (S.D.N.Y. May 15, 1992) ("it is well-established that a corporation has no interest in shares of its stock held by stockholders."). The fact that the Debtors have the right to formulate and prosecute a plan of reorganization does not turn something they did not own at the commencement of the case into property of the estate capable of being "sold" pursuant to Section 363(b).  See Trans World Airlines, Inc. v. Texaco Inc. (In re Texaco Inc.), 81 B.R. 813, 818 (Bankr. S.D.N.Y. 1988) ("The right to formulate and file a plan of reorganization is neither prepetition in nature, nor is it an interest in property of the estate within the meaning of 11 U.S.C. § 541.").  Simply put, neither reorganized EFH nor its putative equity existed at the commencement of the case; as of today (and until a plan of reorganization is filed, prosecuted and confirmed) there is no reorganized EFH or reorganized EFH equity, and the Debtors presently have no (and will never acquire) a property interest in the equity of reorganized EFH if that entity ultimately comes into existence.  As a result, the Motion asks this Court to exercise authority over something that transgresses its subject matter jurisdiction.  (i.e., a property interest that is not owned by the estate).  See TMT Procurement Corp., 2014 WL 4364894, at *4 ("whether something is 'property of the estate' is an inquiry also relevant to determining subject-matter-jurisdiction" for purposes of analysis under Bankruptcy Code Section 363).[27]

31.     The Debtors may argue that they are open to any possible investment in Oncor, not just the purchase of reorganized EFH equity.  Even if the Court indulges the bald face fiction that the Debtors would actually receive or entertain bids for so-called "taxable" transactions, what does that mean and how does that impact the scope of what the Court has jurisdiction to order under Section 363(b)?  To consider that question, one first needs to understand what is

---

[27]     Where a Court lacks subject matter jurisdiction, "its decisions, opinions and orders are void." Querner v. Querner (In re Querner), 7 F.3d 1199, 1201 (5th Cir. 1993).

ostensibly being sold. As the Debtors' papers repeatedly state, what they are "really" selling is Oncor. What is Oncor? Oncor Electric Delivery Company, LLC is a non-Debtor, regulated electrical transmission and delivery company. It is the operating company on the "E-Side" of the Debtors' business. But, it is not a Debtor in these proceedings and has, in fact, been purposefully "ring fenced" and excluded from these cases. Instead, 80% of Oncor is owned by yet another non-Debtor, Oncor Electrical Delivery Holdings Company, LLC ("Oncor Holding"). EFIH owns 100% of the ownership interests in Oncor Holding. And, EFH owns 100% of the ownership interests in EFIH. So, how does this ownership structure limit the Court's jurisdiction? Plainly, this remote ownership structure precludes the Court from exercising jurisdiction to approve the sale of either Oncor or Oncor Holding directly. See In re Murchison, 54 B.R. at 725-26 (debtor's equitable interest in entities which in turn owned other entities which in turn owned property was too indirect under Sections 363(b) and 541(a) to allow approval of sale of property as "property of the estate"). What the Court does have jurisdiction to approve, however, is the sale of EFH's 100% ownership interest in EFIH – a concededly taxable transaction. The Court can also approve the sale of EFIH's interest in non-debtor Oncor Holdings – another taxable transaction. If the Court were to limit the Motion to those two possibilities, WSFS will withdraw so much of its Objection that is based on the Court's lack of subject matter jurisdiction. And, if the Debtors are truly willing to entertain taxable transactions, as they disingenuously contend, such an Order would allow them to do so and should be acceptable to them. Alas, the Debtors will undoubtedly oppose any such limitation because it is anathema to their preferred tax structure, the approval of which is all the Motion is really about.

32.    The second limitation imposed by Section 363(b) is that a sale of "property of the estate" outside the ordinary course of business must be supported by a sound business

justification.  See In re Elpida Memory, Inc., No. 12-10947, 2012 WL 6090194, *5 (Bankr. D. Del. Nov. 20, 2012) (Sontchi, J.) (considering whether a sale of assets under Section 363(b) was supported by a sound business purpose).  The burden of proving such a justification rests with the Debtor.  The obvious reason for this requirement is that sales of assets, especially all of the assets of an estate, before a plan has been proposed or confirmed subjects creditors to the risk of serious impairment of their rights.

33.     The quintessential justification for approving a sale of all or substantially all of an estate's assets prior to plan confirmation is that the assets are wasting – the proverbial "melting ice cube."  See, e.g., In re Summit Global Logistics, Inc., No. 08-11566, 2008 Bankr. LEXIS 896, *28-29 (Bankr. D.N.J. Mar. 26, 2008) (noting that whether an asset is increasing or decreasing in value is, perhaps, the most important consideration) (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).  Putting aside that the Debtors are seeking to sell an asset they do not own (i.e., non-existent equity in a non-existent reorganized EFH), there is no melting ice cube in this case.  The operating entity here is non-debtor Oncor.  Oncor's business is thriving, and getting better.  It is a regulated utility monopoly with over $3.7 billion in gross revenues, $1.8 billion in EBITDA, and, $500 million in net profits.  See Motion, Ex. B (Teaser), p. 6.  The Debtors themselves project 20% - 30% growth in all of these metrics over the next four years.  See id.  Simply put there is no asset risk that precludes addressing the transfer or sale of ownership of Oncor in a plan process, where, after all, the Bankruptcy Code dictates it should be addressed.  And, the Debtors make no such argument that there is.  Indeed, they ignore it altogether.

34.     Instead, the Debtors assert that right now is a good time to sell.  Why?  First, because the Debtors have created a market with their bungled RSA/Second Lien DIP gambit

that, had it been approved as filed, would have resulted in the transfer of Oncor to the PIK Group for over $700 million less than what an unsolicited bidder offered in order to stop the transaction (which the Debtors actually resisted at the time). Second, the Debtors assert that the current interest rate environment is favorable to a transaction for Oncor. However, the Debtors can provide no credible evidence that there is a material risk of a near-term rise in interest rates.[28] Indeed, Mr. Hiltz has conceded he is not an expert on the future of interest rates.[29] Third, the Debtors say that M&A market is currently robust and utility stocks in particular are trading "near all-time highs." But, the Debtors can provide no credible evidence that the M&A market in general, or the utility equities market specifically, will suffer any material decline in the near-term. In short, the Debtors argue that today is a good time to sell, and tomorrow might not be. This is nothing more than rank speculation. It is just as easy to speculate that interest rates will remain low, as they have for years, and that the markets will remain robust. Certainly, the only credible evidence in the record is the Debtors' admissions that Oncor is a very profitable company that they project to improve by over 20% over the next four years. If anything, the evidence supports delaying any sale process.

35. The Debtors have actually considered this gap in their proof and have attempted to fill it with what they tout as a "one-way option." What the Debtors argue is that their bid procedures **will** result in the Debtors obtaining from bidders an option that compels the buyer to close even if Oncor's value plummets (i.e., specific performance), but allows the Debtor to

---

[28]  WSFS would note that, since the Petition Date, interest rates and interest rate forecasts have trended downward.

[29]  See Hiltz Depo, (Coffey Declaration at Exhibit 3) p. 192:13-15 ("Q. Do you consider yourself an expert on interest rates? A. No."). See also Galaxy Ventures, LLC v. Allen, No. 03-1236, 2005 WL 5988656, *2-*3 (D.N.M. Oct. 6, 2005) (supplemental expert report, in part based on prediction of interest rate levels in the future, stricken as speculative).

terminate any agreement for a 2% to 3% break-up fee if the value of Oncor goes up by more than

that amount, all at no cost to the price a purchaser is willing to bid for the "asset." There is

nothing in the Bid Procedures, Bid Requirements, or Bid Criteria that mandates the inclusion of

this provision in any final agreement to be reached with the winner of the auction. Rather, it is

an aspirational goal of the Debtors that will be realized, if at all, only after the negotiating takes

place in "Round Two" of the so-called stalking horse process. Of course, once the horse has left

the barn he is out running free and there may be no corralling him if the one-way option is not

obtained. In short, the Debtors' blithe assurance that their guesses about the future value of the

Oncor ownership interest is protected from error by the one-way option (i.e., otherwise known as

a fiduciary out) is nothing more than speculation on top of speculation.

36.     Further, the Court should "follow the money" and consider who benefits from

relief designed to lock in the Debtors' preferred tax structure. The Sponsors and TCEH Senior

Creditors have driven these cases for their own near exclusive benefit, and the Bid Procedures

are just the latest outgrowth of that reality. The Debtors cannot justify their failure to enter into

good faith restructuring dialogue with all constituents – rather than just those to whom directors

owe conflicting duties (e.g., the Sponsors) or with whom management wants to curry favor in

hopes of securing post-bankruptcy employment (e.g., the TCEH Senior Creditors).[30] In addition

to being unable to show that they acted on a fully informed basis, and in good faith and with due

care, the corporate decision-makers were impermissibly interested when developing the terms of

the Bid Procedures. Accord Official Comm. of Subordinated Bondholders v. Integrated Res.,

Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (in order to be shielded by

---

[30]     On August 8, 2014, the Debtors filed a request for approval of an incentive compensation program for senior management. See Docket No. 1792. The ad hoc group of TCEH Senior Creditors was the only creditor constituency that voiced support for the request. See Docket No. 1967 and 2327 (Notice of Agenda).

the business judgment rule's presumption, corporate decision-makers must show "disinterestedness," among other elements).

37.    Finally, by asking this Court to approve Bid Procedures, the Debtors are effectively asking the Court to issue an advisory opinion as to, inter alia: (a) value entitlements at the EFH level; (b) the viability of the Debtors' proposed tax engineering (including the tax free spin-off of TCEH); (c) the propriety of compelling EFH stakeholders (including TCEH, on account of significant intercompany claims) to exchange their EFH value entitlements for interests in an unknown third party purchaser; and (d) value entitlements at the TCEH level (as the Debtors' restructuring scheme is premised on 100% of TCEH equity being delivered to TCEH Senior Creditors). Here, too, the Court is without jurisdiction to do as the Debtors ask. See In re Lazy Days' RV Ctr. Inc., 724 F.3d 418, 421 (3d Cir. 2013) ("Federal courts have no jurisdiction to render advisory opinions. Put another way, they 'may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts.'") (citation omitted).

## II.    The Circumstances Surrounding The Motion Compel Heightened Scrutiny Of The Bid Procedures.

38.    Corporate decisions benefiting fiduciaries and insiders must be carefully scrutinized to avoid inappropriate overreaching. See C&J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (transactions with "fiduciaries are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse"); In re Pilgrim's Pride Corp., 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009) ("[W]hen a transaction is proposed between the debtor and its insiders, the court cannot simply rely on the debtor's business judgment to ensure creditors and the debtor's estate are being properly cared for."); see also Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1115-16 (Del. 1994).

39.    As the Supreme Court held in <u>Pepper v. Litton</u>:

> A director is a fiduciary.  So is a dominant or controlling stockholder or group of stockholders.  Their powers are powers in trust.  Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.  The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.  If it does not, equity will set it aside.

308 U.S. 295, 307 (1939) (citations omitted); <u>see also</u> <u>Citicorp Venture Capital, Ltd, v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)</u>, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoints of the corporation and those with interests therein.").

40.    A particularly instructive decision is Bankruptcy Judge Brozman's decision in <u>In re Bidermann Industries U.S.A., Inc.</u>[31]  In Bidermann, the court was asked to grant relief that would set in motion a leveraged buyout of the debtor that would result in significant benefits to, <u>inter alia</u>, the debtor's majority shareholder.  <u>See id.</u> at 549-50.  The <u>Bidermann</u> court noted that transactions with fiduciaries are not <u>per se</u> prohibited, but they are necessarily subjected to heightened scrutiny because of the possibility of abuse.  <u>See id.</u> at 551.  In a strongly-worded rebuke of the CEO, controlling shareholder and the creditors' committee (which, in the court's view, had not done enough to explore other options that might have benefited its constituents more), the court refused to approve the arrangement.  <u>See id.</u> at 553-54 (finding the transaction failed to satisfy the "searching inquiry" compelled by the sale to an insider/fiduciary, and

---

[31]    203 B.R. 547 (Bankr. S.D.N.Y. 1997).

ordering to debtor to show cause why an examiner with expanded powers should not be appointed).

41.     Under Delaware corporate law, if a majority of the directors comprising a board are not independent, courts will apply an entire fairness review.  See Ivanhoe Partners v. Newmont Mining Corp., 535 A.2d 1334, 1345 (Del. 1987) (board action taken by majority of independent directors is prerequisite to business judgment presumption) (citations omitted). Given that five of the six TCEH directors are not even argued to be independent (and issues have been raised as to the actual independence of the sixth), the decision to pursue Bid Procedures designed to implement, inter alia, a tax free spin-off of TCEH, must be carefully scrutinized.

42.     Even apart from transactions benefiting insiders or the absence of an independent board, transactions involving sales of significant assets early in chapter 11 proceedings, without the protections of the plan formulation and confirmation processes, are appropriately subject to heightened scrutiny.  See In re Whitehall Jewelers Holdings, Inc., No. 08-11261 (KG), 2008 WL 2951974, at *6 (Bankr. D. Del. July 28, 2008) (noting that "[w]hen a pre-confirmation [Section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be 'closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization'") (quoting Summit Global, 2008 WL 819934, at *9).

43.     Here, the Debtors' boards never voted to approve the Bid Procedures and the business judgment rule has no application.   Indeed, and assuming away the jurisdictional infirmities discussed above, the Motion must be subjected to heightened scrutiny.   The Bid Procedures were negotiated by, and are intended to effect significant benefits to, fiduciaries, insiders and affiliates of the Debtors.  The Debtors cannot establish the fairness or propriety of

such one-sided procedures to dispose of, essentially, all of the value of the "E-Side" of the Debtors' business and lock in a restructuring result on the "T-Side" this early in the Debtors' chapter 11 cases.

**III.    The Failure Of TCEH's Board And The Purportedly Independent Director To Adequately Consider The Bid Procedures Weighs Heavily Against Approval Thereof.**

44.    A board of directors must play "an active and direct role in the context of a sale of a company from beginning to end." Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 368 (Del. 1993) (instructing that "directors cannot be passive instrumentalities during merger proceedings") (citations omitted); see FDIC v. Castetter, 184 F.3d 1040, 1046 (9th Cir. 1999) (explaining that the business judgment rule "does not protect a director . . . where there is a conflict of interest" or where the director "has wholly abdicated his corporate responsibility, closing his or her eyes to corporate affairs") (citation omitted).

45.    Through the discovery process, it has become apparent that TCEH's board abdicated its fiduciary duties to TCEH creditors and provided no meaningful review of, or check on, the decision to pursue the Bid Procedures notwithstanding the material impacts on TCEH's reorganizational options. Moreover, no fiduciary to TCEH creditors has determined that a sale, let alone a very specific tax free sale, of Oncor is in the best interests of the TCEH estate and creditors. To date, these cases have been run for the benefit of the Sponsors and the TCEH Senior Creditors. Before any decision is made to lock in a restructuring agenda so highly prejudicial to TCEH junior creditors (and so beneficial to the Sponsors and TCEH Senior Creditors), the Bid Procedures and related relief should be subject to review by a truly unbiased and disinterested fiduciary. Until such time, approval of the Bid Procedures should be denied.

**IV.    The Sale Process To Be Implemented Through The Motion Is Significantly Flawed And Will Not Maximize Value.**

46.    The paramount goal in any proposed sale of property of the estate under Section 363 of the Bankruptcy Code is to maximize the proceeds received by the estate.  See In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010) (noting that bid procedures must not "give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition"); Mushroom Transp. Co., Inc. v. Ganz (In re Mushroom Transp. Co., Inc.), 382 F.3d 325, 339 (3d Cir. 2004) (discussing trustee's duty to maximize value of the estate) (citation omitted).  To ensure this outcome, courts must safeguard the bidding and sale process and approve only those procedures that will not chill bidder participation in the sale process.  See In re President Casinos, Inc., 314 B. R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests."); In re Metaldyne Corp., 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate.") (citation omitted).

47.    In order to be approved under Section 363, bid procedures must be reasonably designed to enhance bidding and maximize the value of the asset proposed to be sold.  See In re Blixseth, No. 09-60452-7, 2010 WL 716198, *10-11 (Bankr. D. Mont. Feb. 23, 2010) (declining to approve proposed procedures); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  Bankruptcy Code Section 363 requires that bid procedures be designed to encourage bidding, not suppress it.  See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring greater benefit to the estate).

48.    The Bid Procedures will not maximize value – but, as discussed above, value maximization is not the intent.[32]  The Debtors' announced preferred structure limits the pool of potential bidders to those who have the ability and desire to very quickly structure their acquisition of Oncor in the manner dictated by the Term Sheet.  Further, even for the parties remaining, bidders will formulate their offers and discount their purchase prices for the substantial execution risks, mindful of: (a) the need to tie up billions of dollars in capital for up to eighteen months; (b) closing will be dependent on effectuation of an untested tax structure involving multiple Debtors; (c) the potential for significant TCEH claims against EFH, which would affect the value of the reorganized EFH equity at issue; (d) the potential for avoidance claims reaching into the "ring fence" surrounding Oncor;[33] (e) not one class of creditors, at any level of the Debtors' capital structure, has voiced support for the Debtors' restructuring in the requisite number or amount for plan voting purposes; and (f) closing will be dependent on hotly contested plan confirmation.

## V.    The Debtors Impermissibly Seek To Skew The Sale Process Towards A Plan Structure Materially Impairing The Rights Of TCEH Junior Creditors.

49.    It has long been the law that Courts are not allowed to grant pre-approval of transactions that are, essentially, "sub rosa" plans.  The rule arises from the "fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of

---

[32]    WSFS is also concerned with the timelines set forth in the bid procedures and the lack of creditor involvement in a process the Debtors' claim is intended to promote transparency.  WSFS understands these issues will be addressed at length in the Official Committee's opposition to the Motion.  To avoid duplication, WSFS will not address such issues herein.

[33]    Indeed, junior creditors at the TCEH level have articulated claims that, if successful, could reach the value of Oncor within the ring fence and those claims as to the entirety of Oncor's value could be senior to any and all claims on the E-Side, rendering any "sale" of Oncor a nullity.

chapter 11 for confirmation of a reorganization plan." Motorola, Inc. v. Official Comm. of Unsecured Creditors & JP Morgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 455, 466 (2d Cir. 2007) (rejecting and remanding settlement where it stretched the boundaries of Rule 9019 without properly considering the protections afforded creditors under Bankruptcy Code Section 1129); see Summit Global, 2008 WL 819934, at *13 ("Sub rosa plans are prohibited because they violate the requirements of the Chapter 11 process.") (citation omitted). Courts fear that "one class of creditors may strong-arm the debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum." In re Chrysler LLC, 576 F.3d 108, 114 (2d Cir. 2009), vacated as moot, 592 F.3d 370 (2d Cir. 2010); In re Iridium Operating LLC, 478 F.3d at 466 ("The reason sub rosa plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.") (internal quotation and citation omitted). Courts are duty-bound to investigate the underlying purpose and effect of a proposed transaction, and must reject a transaction if, in reality, it is "a vehicle for [a creditor] to implement a plan of reorganization guaranteed to be more favorable to [that creditor] than all other interested parties." In re Louise's, Inc., 211 B.R. 798, 801-02 (D. Del. 1997) (rejecting settlement agreement that "exceed[ed] the boundaries of a Rule 9019 compromise and [was] really a proposed plan of reorganization disguised as a Rule 9019 compromise").

50.     When a proposed transaction has the effect of dictating the terms of a plan of reorganization, that transaction will constitute a prohibited sub rosa plan. See In re Capmark Fin. Grp. Inc., 438 B.R. 471, 513 (Bankr. D. Del. 2010) (Sontchi, J.) ("A settlement constitutes a sub

*rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11

plan."); <u>In re Pub. Serv. Co. of N.H.</u>, 90 B.R. 575, 581 (Bankr. D.N.H. 1988) (courts must reject

"the proposed transaction [if it] might improperly and indirectly lock the estate into any

particular plan mode prematurely, and without the protection afforded by the procedures

surrounding a disclosure statement and confirmation hearing, in a plan of reorganization").

51.     The relief sought through the Motion would lock in a rigid plan structure.  As set

forth in the illustrative term sheet sent to bidders and in the Tax Memorandum, the Bid

Procedures and the Debtors' "optimal" structure are purposefully designed to result in:

- A plan of reorganization implementing a tax free spin-off of TCEH, with TCEH Senior Creditors receiving 100% of reorganized TCEH's value and junior TCEH creditors receiving nominal recoveries (before any valuation of TCEH has been conducted), in furtherance of the Debtors' efforts to satisfy "continuity of interest" requirements associated with the Debtors' tax structure.
- TCEH being granted a partial step up in basis for the benefit of its new owners.
- For a period of two years following confirmation of the dictated plan of reorganization, TCEH will be subject to prohibitions against taking any act that might affect the tax treatment imposed under that plan.
- EFIH and EFH creditors will receive reorganized EFH equity and cash, and then being compelled to exchange their interests in reorganized EFH for the stock of whichever bidder is selected in the auction for Oncor.

52.     At this stage of the case, there has not been any plan dialogue between the

Debtors and TCEH junior creditors.  Nor has there be any adjudication or agreement as to the

value of TCEH to determine who is entitled to any particular recovery and/or whose voice

should be heard in connection with determining the course of TCEH's restructuring.  As such,

the Debtors should not be granted relief locking in any particular plan structure and the Motion

should be denied.

## RESERVATION OF RIGHTS

WSFS has engaged in good faith efforts to obtain discovery necessary to adequately evaluate the Motion. Such information is necessary not only for WSFS to determine its position *vis a vis* the relief sought; but also for the Court to have sufficient information for its consideration of the Bid Procedures. For the reasons that will be demonstrated at the hearing on the Motion, the Debtors have failed in their discovery obligations and, as a consequence, WSFS reserves all of its rights, including the right to supplement this Objection. In particular, the Debtors appear to have wrongfully withheld documents necessary for the deposition of William Hiltz, which deposition may be continued after the objection deadline for the Motion.

## NOTICE

Notice of this Objection has been given to: (a) counsel for the Debtors; (b) counsel for the Official Committee; (c) the Office of the United States Trustee; (d) counsel to certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates; (e) counsel to CSC Trust Company of Delaware; (f) counsel to EFIH Second Lien Indenture Trustee; (g) counsel to UMB Bank, N.A., as Indenture Trustee; (h) counsel to American Stock Transfer & Trust Company, LLC, as Indenture Trustee; (i) counsel to the Ad Hoc Committee of EFIH Unsecured Noteholders; (j) counsel to the TCEH First Lien Credit Agent; (k) counsel for the Sponsor Group; and (l) counsel for the Ad Hoc TCEH Noteholder Group. WSFS submits that no other or further notice is required.

## CONCLUSION

**WHEREFORE**, WSFS respectfully requests that the Court (i) deny the Motion, and (ii)

grant WSFS such other and further relief as is equitable and proper.

Dated: October 10, 2014
Wilmington, Delaware

ASHBY & GEDDES, P.A.

William P. Bowden (No. 2553)
Gregory A. Taylor (No. 4008)
500 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

- and -

BROWN RUDNICK LLP
Edward S. Weisfelner (admitted pro hac
vice)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and -

Jeffrey L. Jonas (admitted pro hac vice)
James W. Stoll (admitted pro hac vice)
Jeremy B. Coffey (admitted pro hac vice)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

*Counsel to Wilmington Savings Fund
Society, FSB, solely in its capacity as
successor Indenture Trustee for the Second
Liens*