# EXHIBIT 1

Pursuant to Paragraph 16(a) of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 1833], WSFS is filing the document batesed numbered EFH-EVR090000362 - EFH-EVR090000363 under temporary seal because it has been designated as confidential.

# EXHIBIT 2

Pursuant to Paragraph 16(a) of the *Confidentiality Agreement and Stipulated Protective Order* [D.I. 1833], WSFS is filing the document batesed numbered EFH-EVR090000013 - EFH-EVR090000025 under temporary seal because it has been designated as confidential.

# EXHIBIT 3

Page 1

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

     ------------------------------------------x

4    In Re:

     Energy Future Holdings Corporation, et.,

5

                         Debtors.

6

     Chapter 11

7    Case No. 14-10979

     Jointly Administered

8

9    ------------------------------------------x

10            * * *CONFIDENTIAL* * *

11        DEPOSITION OF WILLIAM O. HILTZ

12              New York, New York

13              October 6, 2014

14

15

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 85363

Page 78

CONFIDENTIAL - WILLIAM O. HILTZ
1
2   A.   Yes.
3   Q.   Where it states, "Should we discuss
4   option to acquire Oncor Holdings instead of
5   reorganized EFH even if tax issues make
6   transaction unfeasible?  Should we have a
7   minimum cash requirement for this deal?"
8       To the best of your recollection, is
9   that the first time that the Oncor -- that the
10  Evercore advisors had discussed the possibility
11  of doing -- permitting taxable bids?
12  A.   I can't recall if that's the actual
13  first time that that issue was raised.  I think
14  that it's been quite clear that we believe a
15  taxable transaction is unlikely to produce the
16  best value for the estate, but again, in
17  response to concerns by the varying creditor
18  groups that we not restrict the bidding to a
19  particular structure, we have sent out materials
20  now that indicate our willingness to consider
21  any structure.
22  Q.   You stated that you believe that a
23  taxable transaction is unlikely to produce the
24  best value for the estate.  What estate are you
25  referring to?

Page 79

CONFIDENTIAL - WILLIAM O. HILTZ
1
2   A.   The collective estate.
3   Q.   Do you have any understanding of the
4   different interests EFH, EFIH and TECH may have
5   with respect to a taxable transaction?
6   A.   I believe so.
7   Q.   And what is that understanding?
8   A.   Well, I mean, there -- if we are
9   talking purely about the Oncor sale, again, the
10  EFIH and EFH creditors will benefit from the
11  largest possible proceeds.  Again, we're looking
12  at bids today that are capable of discharging
13  all of the liabilities at the EFIH level as they
14  currently exist, and so at the EFH level a
15  taxable transaction results in a roughly $3.4
16  billion tax liability.
17      It is unlikely, in my judgment, that a
18  buyer will pay enough to produce the same
19  economic value in a taxable transaction as can
20  be realized in a tax-free transaction.
21      With respect to the T side of the
22  house, I understand that they are alleging
23  claims against EFH or potentially against EFIH,
24  but as it stands right now, no claims have been
25  filed, and to the extent that those claims are

Page 80

CONFIDENTIAL - WILLIAM O. HILTZ
1
2   filed against EFH, they also benefit from having
3   the largest possible pie after tax; and we
4   believe that results from the tax-efficient
5   structure that we have outlined.
6       But again, if someone is interested in
7   paying -- they have to pay roughly a $5 billion
8   higher price in a taxable transaction in order
9   to produce the same net proceeds, and if you
10  look at the multiples that that would require for
11  Oncor, it seems highly unlikely that anyone will
12  do that.
13  Q.   Now, going back to the first time
14  Evercore or the Debtors discussed opening the
15  bidding process to accept bids in any form, do
16  you have any reason to believe that the first
17  discussion of that occurred prior to August 26?
18  MS. O'CONNOR:  Object to form.
19  A.   I just can't recall.
20  Q.   Now, when did the Debtors decide to
21  accept bids of any form?
22  A.   I don't recall the exact date.
23  Q.   Do you recall the approximate date?
24  A.   Prior to filing the bidding procedures
25  motion, but I don't recall the exact date that

Page 81

CONFIDENTIAL - WILLIAM O. HILTZ
1
2   that decision was made.
3   Q.   Fair to say it was in September?
4   A.   Yes.
5   Q.   You're an advisor to the company and
6   not a decision-maker for the company; is that
7   correct?
8   A.   That's correct.
9   Q.   And it was not your ultimate decision
10  to accept bids in any form; is that correct?
11  A.   That's correct.
12  Q.   Did you advise the company to accept
13  bids in any form?
14  A.   I don't know that Evercore
15  particularly advised the company to accept bids
16  in any form, but again, I think it was obvious
17  that we were getting a lot of push-back from the
18  creditors, and in the interest of trying to
19  reach consensus, we agreed to accept bids in any
20  form.
21  Q.   You stated that you agreed to accept
22  bids in any form.  Did Evercore ever advise the
23  company that it would be prudent to accept bids
24  in any form?
25  A.   I don't recall.

21 (Pages 78 to 81)

Page 82

CONFIDENTIAL - WILLIAM O. HILTZ
1
2  Q.  Do you know who at the Debtors made
3  the decision to accept bids in any form?
4  A.  I would assume it was Paul and Stacey.
5  Q.  Do you know if any of the boards of
6  EFH, EFIH or TCEH voted on that change?
7  A.  I don't recall.
8  Q.  Do you know if the boards were
9  informed or consulted on the change to accept
10 bids in any form?
11 A.  I believe so, but I'm not sure.
12 Q.  What is the basis for that belief?
13 A.  I believe we reviewed -- I believe the
14 board reviewed the bidding procedures motion
15 prior to its filing.
16 Q.  Are you aware of any vote with respect
17 to the filing of the bidding procedures?
18 A.  No.  No.
19     (Hiltz Exhibit 12, an e-mail chain
20     bearing Bates Nos. EFH-EVR090000362 through
21     363, marked for identification, as of this
22     date.)
23 BY MR. DEVORE:
24 Q.  Mr. Hiltz, this is an e-mail from Sesh
25 dated September 12, 2014, to a prospective

Page 83

CONFIDENTIAL - WILLIAM O. HILTZ
1
2  bidder.  Do you see that?
3  A.  Yes.
4  Q.  And in this e-mail of September 12,
5  Sesh states, "This is not a 363 sale, but a sale
6  that would form part of the overall reorg. of
7  EFH."  Do you see that?
8  A.  Correct.
9  Q.  Does this refresh your recollection as
10 to whether the Debtors had determined to proceed
11 with an open bid process only after September
12 12?
13 A.  I'm not sure I understand your
14 question.
15 Q.  So this e-mail is -- indicates that
16 the debtors are seeking approval for what has
17 been formed -- what you refer to as the
18 efficient structure, correct?  And I get there
19 because it says "a sale that would form part of
20 the overall reorg. of EFH"?
21 A.  I'm not sure that that necessarily
22 implies a tax-free sale, but...
23 Q.  Do you have any reason to believe that
24 the decision to accept bids in any form was made
25 before September 12?

Page 84

CONFIDENTIAL - WILLIAM O. HILTZ
1
2  A.  I believe it was made before September
3  12.
4  Q.  And why do you believe that?
5  A.  Because what was the date that we
6  filed the bidding procedures motion?
7  Q.  It's dated on September 19.
8  A.  Well, it may not have been before the
9  12th then.  Obviously, it was before we filed
10 the bidding procedures motion and it was at
11 least several days, if not a week, before that.
12 I don't recall the exact date.
13 Q.  Mr. Hiltz, as of September 12, are you
14 aware of the Debtors or Evercore indicating to a
15 single prospective bidder that the Debtors would
16 accept bids for a taxable transaction?
17 A.  Not specifically.
18 Q.  Do you have any reason to believe
19 that, prior to September 12, a single bidder was
20 informed that the Debtors would be accepting
21 bids for a taxable transaction?
22 A.  Again, I can't recall the exact date
23 that we started telling people that we would
24 accept bids for a taxable transaction.
25 Q.  Do you consider the change from

Page 85

CONFIDENTIAL - WILLIAM O. HILTZ
1
2  inviting bids for a non-taxable-only transaction
3  to inviting bids for a transaction in any form
4  an important and material change in the process
5  Evercore was running?
6  A.  I don't know whether I would
7  characterize it as an important or material
8  change.  It was certainly a change.  We let
9  people know that.  Generally, the reaction that
10 we've gotten from at least a number of people
11 is, what are you talking about?  Who would do
12 this as a taxable transaction?  It makes no
13 sense at all.
14 Q.  And why does it make no sense?
15 A.  For the reason that I stated, which is
16 that, in order to produce an equivalent amount
17 of value after taking into account taxes, the
18 purchase price that would have to be paid in a
19 taxable transaction is not realistic, and so
20 it's at extremely, extraordinarily high
21 multiples.
22 Q.  When you state that there was a
23 concern that, quote, who would do this as a
24 taxable transaction, are you referring to the
25 buy side or the sell side?

22  (Pages 82 to 85)

Page 86

CONFIDENTIAL - WILLIAM O. HILTZ

1
2   A.   The buy side, and -- well, the sell
3   side. Excuse me.
4   Q.   You're referring to the sell side?
5   A.   Yes.
6   Q.   Did anyone from the buy side indicate
7   any preference for a taxable versus non-taxable
8   structure?
9   A.   Well, again, they recognized that, in
10  order to win the auction, it's unlikely that a
11  taxable transaction will allow them to be the
12  winner, because they look at it the same way we
13  do, which is the price that you would have to
14  pay to produce the same economic value is a
15  price that they wouldn't be willing to pay and
16  that no person is likely to be willing to pay.
17  Q.   Now, I would like to go back to when
18  the teaser was changed from providing for a
19  non-taxable-only transaction to a taxable -- to
20  permit taxable transactions.
21       You stated before that you do not
22  recall when the teaser was changed; is that
23  correct?
24  A.   Correct, I don't recall the exact
25  date.

Page 87

CONFIDENTIAL - WILLIAM O. HILTZ

1
2       (Hiltz Exhibit 13, an e-mail chain
3   bearing Bates Nos. EFH-EVR090000047 through
4   48, marked for identification, as of this
5   date.)
6   BY MR. DEVORE:
7   Q.   Mr. Hiltz, you have been handed what
8   has been marked as Exhibit 13. Do you see that?
9   A.   Yes.
10  Q.   And the second e-mail down is an
11  e-mail dated September 10 from Bo Yi?
12  A.   Yes.
13  Q.   And it states, "We haven't sent out an
14  updated teaser or other marketing materials to
15  any parties yet"?
16  A.   Yes.
17  Q.   Do you see that?
18       Does this indicate that no updated
19  teasers had gone out as of September 10?
20  A.   Yes.
21  Q.   So, to the best of your knowledge, the
22  teaser was not changed to provide for bids in
23  any form as of September 10, correct?
24  A.   Correct.
25  Q.   Now, when were the 12 prospective

Page 88

CONFIDENTIAL - WILLIAM O. HILTZ

1
2   bidders that signed NDAs as of the date of your
3   declaration informed of the change from inviting
4   bids for only non-taxable structures to inviting
5   bids for transactions in any form?
6   A.   I'm not sure.
7   Q.   Was it prior to September 19, the
8   filing of the motion?
9   A.   I believe so, but I can't state for
10  certain.
11  Q.   What's the basis for the belief?
12  A.   Well, we called people to tell them
13  that we were going to change the process, and I
14  can't recall if as part of those telephone
15  conversations they were alerted to the fact that
16  we would also accept taxable bids as well as
17  non-taxable bids.
18  Q.   And would that information be kept in
19  a call log?
20  A.   Not necessarily, no.
21  Q.   Would you expect that it may be in a
22  call log?
23  A.   I wouldn't think it would be.
24  Q.   And why not?
25  A.   Well, because the call log isn't

Page 89

CONFIDENTIAL - WILLIAM O. HILTZ

1
2   specific with respect to the content of the
3   conversation.
4       Again, we attempted to call everyone
5   once we had made a decision to change the
6   process, so I believe those calls started
7   perhaps late the week before Labor Day or early
8   the week following Labor Day. I can't recall if
9   those calls merely stated that we were giving
10  people more time and were going to a two-stage
11  process or whether it also referenced a
12  willingness to accept taxable bids.
13  Q.   So, sitting here today, you have no
14  knowledge of a communication, prior to September
15  19, a specific knowledge of a specific
16  communication informing prospective bidders that
17  the Debtors would accept bids in any form?
18  A.   That's correct.
19       (Hiltz Exhibit 14, an e-mail with
20  attachment bearing Bates Nos.
21  EFH-EVR090001062 through 1167, marked for
22  identification, as of this date.)
23  BY MR. DEVORE:
24  Q.   Mr. Hiltz, I have handed you what has
25  been marked as Exhibit 14, which is an e-mail

23   (Pages 86 to 89)

Page 190

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  Q.  Okay.
3  A.  But there's no formal analysis that's
4  been done, to my knowledge, on either the E side
5  for the T side.
6  Q.  Okay.  But in the informal analysis
7  that you saw, I'm trying to understand what data
8  was contained in that analysis; for example, did
9  it contain a discounted cash flow of what the T
10  side --
11  A.  No.
12  Q.  -- estate was worth?
13  A.  No.
14  Q.  Did it contain trading prices for the
15  T side bonds?
16  A.  No.
17  Q.  Did it contain comparable analysis of
18  other comparable companies in the segment?
19  A.  All I recall is that it contained an
20  assumption with respect to the value of the
21  assets on the T side and the implied recovery
22  for the T side creditors in the context of what
23  percentage of the spun off company they would
24  own.
25  Q.  What was the basis for the assumption

Page 191

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  of the valuation that gave rise to the
3  waterfall?
4  A.  I don't know.  This was, again, an
5  incidental part of what I was doing only so that
6  I would understand what was going on in the
7  context of the overall organization with respect
8  to the T side.  Obviously, the bulk of my effort
9  has been focused on Oncor and the E side.
10  Q.  Okay.  But again, you didn't ask Mr.
11  Ying what the basis for the valuation assumption
12  was?
13  A.  No.
14  MS. O'CONNOR:  Object to form.
15  A.  Because my -- the focus of what I'm
16  doing is on the E side.  I just wanted to, you
17  know, it was just a question of showing me what
18  was going on on the T side.  That's not what
19  I've been working on.
20  Q.  You mentioned a particular analysis or
21  maybe it was analyses that you saw, and you
22  talked about the source.  And I think this had
23  to do with interest rates, but I know you
24  mentioned Morgan Stanley.  I know you mentioned
25  Deutsche Bank.

Page 192

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  A.  Correct.
3  Q.  I think you talked about some
4  propriety Evercore materials?
5  A.  Non-proprietary Evercore materials,
6  no.
7  Q.  Okay.  But then there was a third --
8  A.  BAML.
9  Q.  -- financial institution?
10  A.  BAML.
11  Q.  BAML?
12  A.  Bank of America Merrill Lynch.
13  Q.  Do you consider yourself an expert on
14  interest rates?
15  A.  No.
16  Q.  What factors, if any, suggest to you
17  that this is the right time to sell a
18  reorganized EFH equity?
19  A.  Several.  Number one, the environment
20  for mergers and acquisitions generally is quite
21  robust.  You can see that by looking at the
22  level of merger and acquisition activity.
23  Year-to-date, there's been something north of
24  $1.2 trillion of M&A volume.  That compares to
25  about $984 million all year last year and about

Page 193

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  $900 million -- excuse me, billion dollars the
3  year before.  So it's an observable fact that
4  M&A activity is at a very high level right now,
5  which is a reflection of the fact that
6  conditions are very favorable.
7  Secondly --
8  Q.  Can we maybe do it one step at a time?
9  You know what, go ahead.  I'm keep
10  notes.
11  A.  Okay.  Secondly is the availability of
12  credit.  There is significant credit
13  availability both in the bank market and in the
14  bond market.  The level of interest rates, while
15  not as low as they have been over the course of
16  the past five years, they are certainly well
17  below the averages.
18  I want to say that for the ten-year,
19  the ten-year Treasury, average over the last
20  five years, about 3.4 percent.  We're currently
21  at about 2.5 percent on the ten-year Treasury.
22  So the cost and availability of money is quite
23  favorable.
24  Utility stocks have also performed
25  well.  Both the utility index and the comparable

49 (Pages 190 to 193)

Page 214

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2  there is opposition across the board to the
3  Debtors' motion from every E side creditor
4  constituency?
5      MS. O'CONNOR:  Object to form.
6      Q.   Go ahead.  You can answer.
7      A.   I don't think that that necessarily
8  increases execution risk.  I think that it's --
9  you know, I mean, either these bidding
10  procedures are going to be approved and we're
11  going to go forward as we planned or they're
12  not.  So I view that as a kind of a near-term
13  issue, if you will.
14      Q.   To your knowledge, has there been a
15  plan of reorganization that's been submitted for
16  consideration by the E side creditors?
17      A.   Well, there was a plan of
18  reorganization submitted by the PIKs at one
19  point or a proposal submitted by the PIKs,
20  correct.
21      Q.   And do you know whether or not the
22  rest of the E side creditors supported that
23  proposal?
24      A.   I don't know.
25      Q.   Let's turn to the T side of the

Page 215

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2  equation.
3      Which, if any, of the T side
4  creditors, to your knowledge, support the
5  pending motion?
6      A.   Again, I believe the first liens.
7      Q.   Are you aware of any creditors on the
8  T side that oppose the Debtors' motion?
9      A.   As I said earlier, I believe the two
10  varying committees of the unsecured creditors,
11  the official committee and the Ad Hoc Committee
12  and I assume the second liens.
13      Q.   At some point, and I can't remember
14  specifically the question, but I think you were
15  being asked to take a look at the bidding
16  criteria, and one of the criteria had something
17  to do with stakeholder consensus?
18      A.   Uh-huh.
19      Q.   And you were asked some questions
20  about how do you get stakeholder consensus if
21  they're not part of the process, and I think
22  your answer went something like you understood
23  the stakeholders' big issues.  I put "big
24  issues" in quotes.
25      And I think you gave as an example

Page 216

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2  knowing what the PIKs want or knowing what they
3  don't want, which is illiquid equity?
4      A.   Well, that was an example of where we
5  might consult with creditors prior to signing up
6  a stalking horse bid.
7      Q.   Okay.
8      A.   It wasn't with respect to what the
9  PIKs desired.
10      Q.   Okay.  But you did say that you
11  thought you had a good handle on what the
12  stakeholders' big issues were?
13      A.   The collective we, as opposed to me
14  personally.
15      Q.   What are the big issues?
16      A.   Well, again, I think it primarily
17  relates to the whole question of taxable versus
18  tax-free, and then there's also an issue about
19  whether now is, quote, the right time to sell
20  the business.  They seem to be the two
21  predominant issues that have come out in our
22  discussions with the creditors.
23      Q.   And from your perspective, again,
24  doing a taxable deal makes no sense, correct?
25      A.   It does not maximize aggregate value

Page 217

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2  to the estate as a whole.
3      Q.   And therefore, it makes no sense,
4  correct?
5      MS. O'CONNOR:  Object to form.
6      A.   I leave it at what I said.
7      Q.   And if the someone were to submit a
8  taxable transaction, in your opinion, they are
9  unlikely to be the winner of the auction that
10  you have set up?
11      MS. O'CONNOR:  Object to form.
12      A.   Well, I think it's very difficult to
13  get to a price in a taxable transaction that
14  produces comparable economic value to the estate
15  as a whole.
16      Q.   And in fact, you have testified that
17  at least one bidder has come to you and asked
18  you, quote, how could a taxable deal work for
19  you?  Do you remember that testimony?
20      A.   Yes, I do.
21      Q.   Well, you didn't tell us how you
22  responded to that prospective bidder.  What, if
23  anything, did you tell the prospective bidder
24  who came to you and asked you, quote, how could
25  a taxable deal work for you?

Page 218

CONFIDENTIAL - WILLIAM O. HILTZ

1
2      A.   Well, I was not on that call.  That
3  was a call that someone else had who works for
4  me, but so I don't know specifically what was
5  said, but I think the idea was, and we have been
6  telling people all along, that aggregate value
7  net of any tax liability is the yardstick which
8  we will use to evaluate bids.
9      Q.   So if a bidder came to you,
10  hypothetically, this afternoon after this
11  deposition was over and said to you, Mr. Hiltz,
12  how could a taxable deal work for you, what
13  would your response be?
14      A.   You have to pay a high enough price to
15  give us comparable value after taking into
16  account any tax liability.
17      Q.   And you believe that no prospective
18  bidder is likely to want to pay that high of a
19  price, correct?
20      A.   I believe that it's very difficult.
21      Q.   Hugh Sawyer is a member of which, if
22  any, of the Debtors' boards of directors?
23      A.   I don't recall.
24      Q.   You previously testified, or I think
25  your testimony implied, that he was the

Page 219

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  independent director on the EFH board?
3      A.   I know there are --
4      MS. O'CONNOR:  Object to form.
5      A.   I know there are independent directors
6  on the EFIH board around on the TCEH board.  I
7  can't recall the names of the individuals.
8      Q.   Fair enough.  Can you recall any
9  separate discussions you've ever had with either
10  Mr. Sawyer or Mr. Kremins about the bid
11  procedures?
12      A.   The only discussions I've had have
13  been discussions with the board as a whole.
14      Q.   When you talked about taxable versus
15  non-taxable transactions, you indicated that a
16  non-taxable transaction was in the best
17  interests of -- pardon me, may not have used the
18  words "best interests," but you indicated it was
19  a preferable transaction when viewed from the
20  perspective of all of the estates or the estates
21  taken as a whole.
22      A.   Correct.
23      Q.   And now I want to focus your
24  attention, if I can, on the benefits of a
25  non-taxable transaction when viewed from the

Page 220

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  perspective of the TCEH estate.
3      Who is the investment banker for the
4  TCEH Debtor?
5      MS. O'CONNOR:  Object to form.
6      A.   We are.
7      Q.   And Evercore is running the auction
8  process in part for the benefit of the TCEH
9  estate; is that your understanding?
10      A.   To the extent that they have claims,
11  yes.
12      Q.   And to the extent that I were to tell
13  you that there are no claims on the T side of
14  the house that impacts the E side of the house,
15  is it your view that the estate of TCEH has no
16  economic interest in this auction?
17      MS. O'CONNOR:  Object to form.
18      A.   Well, as the auction is part of the
19  overall plan of reorganization, yes, they do.
20      Q.   Well, how so?
21      A.   What do you mean?
22      Q.   If the T side has no claims against
23  the E side?
24      A.   Uh-huh.
25      Q.   And you're selling an E side asset or

Page 221

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  an E side soon-to-be-in-existence asset?
3      A.   Uh-huh.
4      Q.   How is it that the T side is impacted
5  one way or the other in this auction, assuming
6  that the T side has no claims against the E
7  side?
8      A.   To the extent that the plan of
9  reorganization is partially dependent upon the
10  sale of the asset, then the reorganization of
11  the T side creditors is impacted.
12      Q.   Because I can't get to a
13  reorganization without the E side asset being
14  sold?
15      A.   Without the E side also reorganizing
16  an overall plan.
17      Q.   Okay.
18      A.   Whether that can be accomplished
19  without the sale of the asset, I don't know.
20      Q.   Well, could it be accomplished without
21  a sale of EFH --
22      A.   I don't know.
23      Q.   -- reorganized equity?
24      MS. O'CONNOR:  Object to form.
25      A.   Theoretically.

56 (Pages 218 to 221)

Page 234

CONFIDENTIAL - WILLIAM O. HILTZ
1
2    Q.   Okay.
3    A.   I'm sorry, what was your question
4    again?
5    Q.   Well, you felt comfortable answering
6    the questions during your deposition, so I'm
7    trying to understand what you know, what you
8    or what you remember reading about the IRS's
9    ability to prevent confirmation of a taxable
10   plan?
11       MS. O'CONNOR:  Object to the form.
12   Q.   Go ahead.
13   A.   That there was a risk that the IRS
14   would litigate given the size of the stranded
15   tax liability.
16   Q.   Okay.  Now, you gave us a hypothetical
17   before about an $18 billion transaction on the E
18   side?
19   A.   Correct.
20   Q.   Do you recall that?
21   A.   Uh-huh.
22   Q.   Let's use that hypothetical.  If there
23   was $18 billion worth of value generated on the
24   E side?
25   A.   That was a TEV for Oncor.  It wasn't

Page 235

CONFIDENTIAL - WILLIAM O. HILTZ
1
2    the net number to the E side.
3    Q.   Got it.  So if you had a total
4    enterprise value of $18 billion and you
5    subtracted all of the E side debt below EFH --
6    A.   Uh-huh.
7    Q.   -- so the --
8    A.   About --
9    Q.   The TESA first liens that you think
10   support this deal, the TESA second liens that
11   you think support this -- not the TESA.
12       The EFIH first liens, the EFIH second
13   liens, and the PIKs, if you paid all those guys
14   off --
15   A.   U-huh.
16   Q.   -- how much would you have left in
17   terms of enterprise value?
18   A.   $700 million, rough justice.
19   Q.   Okay.  So now let me ask you a couple.
20   If you were the IRS, in a taxable transaction,
21   you would be looking at a massive stranded tax
22   liability and you might have -- what did you
23   say, round numbers?  5 or 600 million dollars
24   that you could glom onto, right?
25   A.   I said 7, I think, but...

Page 236

CONFIDENTIAL - WILLIAM O. HILTZ
1
2    Q.   Let's use 7.  If you were the IRS, you
3    could glom onto $700 million, in partial, but by
4    no means complete satisfaction of that debt?
5    A.   Uh-huh.
6    Q.   In a non-taxable optimal transaction,
7    talk to me about what the IRS is going to get
8    out of this case?
9    A.   Well, first of all, I think I misspoke
10   for a second.  There would actually, in a
11   taxable transaction, the $700 million ending up
12   at EFH --
13   Q.   Is the non-taxable?
14   A.   -- is the non-taxable transaction.
15   Q.   I got that.  I wasn't confused.  I
16   hope you weren't.
17   A.   Well, your subsequent question
18   confused me then.
19   Q.   So I'm saying the IRS, in a
20   non-taxable situation, gets what out of this
21   estate?  It's no stranded knocks?
22   A.   In a non-taxable situation, they don't
23   get anything.
24   Q.   They got nothing.  And in a taxable
25   situation where there is a huge stranded tax,

Page 237

CONFIDENTIAL - WILLIAM O. HILTZ
1
2    the IRS goes home with $700 million, right?
3    A.   Uh-huh.
4    Q.   Explain to me again why we're
5    concerned about the IRS opposing this
6    transaction?
7    A.   Again, I'm relying on the tax experts
8    who drafted the tax memo who cited this as a
9    risk.
10   Q.   But sitting here today based on your
11   years of experience, you can't respond to that
12   question, can you?
13   A.   No.
14       MR. WEISFELNER:  I think I'm done,
15   unless anybody else wants to whisper stuff
16   in my ear.
17       I pass the witness.
18   EXAMINATION BY
19   MR. SHORE:
20   Q.   Good afternoon, Mr. Hiltz.  I'm Chris
21   Shore from White & Case on behalf of the Ad Hoc
22   Group of TCH Unsecured Notes on the next level
23   down from Mr. Weisfelner's clients, the ones you
24   really believe are out of the money.
25       Let me just focus on taxable

60  (Pages 234 to 237)

Page 278

CONFIDENTIAL - WILLIAM O. HILTZ

1       CONFIDENTIAL - WILLIAM O. HILTZ
2  of your opinion?
3    A.  Well, again, the high level of M&A
4  activity.
5    Q.  Okay.  Anything else?
6    A.  No.
7    Q.  All right.  And when you say these
8  market conditions may continue.  Do you see
9  that?
10    A.  Uh-huh.
11    Q.  When you said "may," do you have a
12  view as to what a percentage likelihood?  "May"
13  could mean might or it means shall.  So,
14  somewhere in between, can you give me some color
15  on that?
16    A.  Yes, I would say the chances are that
17  market conditions two years from now are likely
18  to be modestly worse than they are today
19  primarily because of a rise in interest rates.
20    Q.  Okay.  Modestly worse.  What do you
21  mean by "modestly"?
22    A.  I think we're going to have a higher
23  interest rate environment.
24    Q.  Okay.  I'm just trying to get -- okay.
25  So how would that translate, in your view, into

Page 279

1       CONFIDENTIAL - WILLIAM O. HILTZ
2  a range of volatility for the Oncor stake?
3    A.  Well, again, I haven't done that
4  analysis, and I would say that, again, as I said
5  earlier in my testimony, the importance here of
6  the process and going forward now is to
7  establish a floor.  The floor protects against
8  an adverse change in market conditions, and the
9  cost of exercising the fiduciary out in the
10  event that conditions get much better and the
11  value of Oncor goes way up is quite modest
12  relative to the total enterprise value.
13    Q.  You said you haven't done that
14  analysis.  Was there anything that prevented you
15  from performing a volatility analysis on the
16  Oncor stake?
17    A.  What do you mean by a "volatility
18  analysis"?
19    Q.  An analysis by which Evercore made
20  some sort of prediction with respect to the
21  expected potential rise or fall in the value of
22  the Oncor stake over a particular period.
23    A.  No.
24    Q.  Okay.  And there's nothing that
25  prevented you from doing that?

Page 280

1       CONFIDENTIAL - WILLIAM O. HILTZ
2    A.  That's not a form of analysis that we
3  typically undertake.
4    Q.  Okay.
5    A.  I don't recall having seen that.
6    Q.  Are you aware of any kind of analyses
7  that would project the future volatility of an
8  equity stake?
9    A.  Well, I mean, yes, generally, if we
10  have multiple sets of projections that would
11  indicate a base case or a downside case
12  reflecting certain risks to the business, you
13  could perform that kind of analysis.
14    Q.  But you didn't do that here?
15    A.  No.
16    Q.  Did the company ask you to do that?
17    A.  No.
18    Q.  All right.  So do you have any sense,
19  when we talk about market risk, are we talking
20  about the possibility the Oncor stake could rise
21  or fall 5 percent, rise or fall 10 percent, rise
22  or fall 50 percent?  What kind of volatility are
23  you talking about in a utility stock?
24    A.  I think it's probably in the 10 to 20
25  percent area.

Page 281

1       CONFIDENTIAL - WILLIAM O. HILTZ
2    Q.  So you would be concerned about a 10
3  to 20 percent fall in the value of Oncor stock
4  in the next 18 months?
5    A.  Correct.
6    Q.  And does that also imply that there
7  could be a 10 to 20 percent rise in the value of
8  Oncor stock?
9    A.  Conceivably.
10    Q.  All right.  You say -- so let me get
11  to that.  You said "while these market
12  conditions may continue."  Is it also fair to
13  say while these market conditions may improve?
14    A.  I think it's less likely that market
15  conditions will improve from these levels.
16    Q.  All right.  So what's the percentage
17  likelihood that it's going up or down?
18    A.  I can't put a percentage on it.
19    Q.  Okay.  So somewhere over 50 percent
20  that it's going to worsen and somewhere nearing
21  50 percent that it's going to improve?
22    MS. O'CONNOR:  Object to form.
23    A.  Again, I think market conditions are,
24  by any historical standard, quite good right
25  now, and therefore, I would say there's a higher

# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
----------------------------------------X

In Re:

Energy Future Holdings Corporation, et al.


                    Debtors.

Chapter 11

Case No. 14-10979 (CSS)

Jointly Administered


----------------------------------------X



            ***HIGHLY CONFIDENTIAL***

        DEPOSITION OF HUGH SAWYER

              New York, New York

            Thursday, June 26, 2014




Reported by:

Rebecca Schaumloffel, RPR, CLR

Job No: 81363

1

2

3                    June 26, 2014

4                    9:15 a.m.

5

6

7

8          Deposition of Hugh Sawyer, held at

9   the offices of BROWN RUDNICK, Seven Times

10  Square, New York, New York, before Rebecca

11  Schaumloffel, a Registered Professional

12  Reporter, Certified Livenote Reporter and

13  Notary Public of the State of New York and

14  the State of New Jersey.

15

16

17

18

19

20

21

22

23

24

25

Page 17

H. SAWYER

1
2    Q.    And you submitted this in support
3    of the motion to assume the Restructuring
4    Support Agreement, correct?
5    A.    Yes.
6    Q.    You set forth your background in
7    paragraph 4 of the Declaration, sir.  I just
8    want to go through that a little bit with
9    you.  First of all, you are currently
10   employed by Huron Consulting?
11   A.    Yes.
12   Q.    What is the business of Huron
13   Consulting?
14   A.    Huron Consulting Group is a
15   publicly traded professional services company
16   that provides consulting services across a
17   broad range of industries.
18   Q.    And what is your position there?
19   A.    I am a managing director in the
20   business advisory group responsible for the
21   operational improvements sector of business
22   advisory.
23   Q.    And could you break that down a
24   little bit, of layman's terms, exactly what
25   is it that you do on a regular basis?

Page 18

H. SAWYER

1
2    A.    I help underperforming companies
3    improve performance.
4    Q.    What is your educational
5    background?
6    A.    I have a bachelors degree from
7    the University of Florida.
8    Q.    In what discipline?
9    A.    English.
10   Q.    Do you have any specific
11   financial training?
12   A.    No.
13   Q.    Do you have any higher education
14   beyond the bachelors degree?
15   A.    I spent a year in law school at
16   Stetson.
17   Q.    Decided better?
18   A.    I did.
19   Q.    You identified in paragraph 4
20   some of the companies who you have served in
21   the capacity either as a CEO, CRO, chief
22   restructuring officer or director.  Do you
23   see that?
24   A.    Yes.
25   Q.    I would just like to run through

Page 19

H. SAWYER

1
2    a couple of these with you.  One of the
3    companies you identify is Edison Mission
4    Energy, correct?
5    A.    Yes.
6    Q.    And are you currently an outside
7    director of Edison Mission Energy?
8    A.    I am currently an outside
9    director of EME Reorganization Trust.
10   Q.    And were you -- you say
11   "currently."  Were you prior to that an
12   outside director of Edison Mission Energy?
13   A.    I was.
14   Q.    When it was in bankruptcy?
15   A.    Pre petition and post petition.
16   Q.    And restructuring counsel for
17   Edison Mission Energy was Kirkland & Ellis?
18   A.    That's correct.
19   Q.    Did Kirkland & Ellis propose you
20   as the outside director prior to the
21   restructuring?
22   A.    To the best of my recollection,
23   yes.  Along with a slate of other potential
24   candidates.
25   Q.    And the compensation you received

Page 20

H. SAWYER

1
2    as an outside director of Edison Mission
3    Energy was $200,000 per year?
4    A.    That's my recollection.
5    Q.    Was there any additional
6    consideration?
7    A.    As I recall, there were per diem
8    fees.
9    Q.    And per diem fees for what?
10   A.    Meetings.
11   Q.    So if you would go to a board
12   meeting, there would be a per diem fee?
13   A.    Potentially, yes.
14   Q.    And if you testified, there would
15   be a per diem fee?
16   A.    I beg your pardon?
17   Q.    If you testified, there would be
18   a per diem fee?
19   A.    That's my recollection, yes.
20   Q.    Do you recall over what period of
21   time you served as an outside director for
22   Edison Mission Energy prior to the completion
23   of the bankruptcy?
24   A.    Can you restate that "prior to
25   the completion of the bankruptcy"?  You mean

Page 21

H. SAWYER

1    H. SAWYER
2    the entire tenure, counselor?
3        Q.    Yes.
4        A.    As to the best of my
5    recollection, it was roughly two years. I
6    don't remember specifically.
7        Q.    And do you recall the total
8    compensation that you received as an outside
9    director of Edison Mission Energy?
10        A.    I don't recall specifically.
11        Q.    But it was at least 200,000 per
12    year plus a per diem?
13        A.    Yes, sir.
14        Q.    You also identify Fisker, I will
15    get the name right, Fisker Automotive Inc. as
16    a company that you served as chief
17    administrative officer; is that right?
18        A.    Correct.
19        Q.    And you served in that capacity
20    prior to the company going into bankruptcy;
21    is that right?
22        A.    That's right.
23        Q.    And your job was to search for a
24    potential buyer or partner to avoid
25    bankruptcy?

Page 22

H. SAWYER

1    H. SAWYER
2        A.    A more precise characterization
3    of the role was to keep the company alive
4    long enough for the DOTE to monetize their
5    debt.
6        Q.    Okay.  Were you proposed as chief
7    administrative officer to the company by
8    Kirkland & Ellis?
9        A.    No.
10        Q.    Kirkland & Ellis was retained by
11    Fisker at the time you were serving as the
12    chief administrative officer, correct?
13        A.    That's correct.
14        Q.    Did you propose the retention of
15    Kirkland & Ellis for that capacity?
16        A.    I did.
17        Q.    Do you recall the fees that were
18    earned by you as chief administrative officer
19    of Fisker Automotive?
20        A.    Fees were not earned by me.  The
21    fees were earned by Huron Consulting.
22        Q.    I see.
23        A.    And I don't recall the number.
24        Q.    If I were to suggest 2.1 million,
25    would that sound correct?

Page 23

H. SAWYER

1    H. SAWYER
2        A.    I don't recall the number.
3        Q.    You identify Hines Horticulture
4    as a company in which you served as a -- as
5    an outside director?
6        A.    Yes.
7        Q.    Was Kirkland & Ellis
8    restructuring counsel behind Horticulture?
9        A.    Yes.
10        Q.    Did Kirkland & Ellis propose you
11    as the outside director?
12        A.    No.
13        Q.    Who proposed you as the outside
14    director in that case, do you know?
15        A.    To the best of my recollection,
16    it was Henry Miller at Miller Buckfire.
17        Q.    Miller Buckfire.  They were the
18    financial advisor?
19        A.    They were.
20        Q.    Do you recall the fees you earned
21    in that capacity?
22        A.    I don't.
23        Q.    If I suggested $100,000 over a
24    seven-month period, would that sound right?
25        A.    I really don't recall.

Page 24

H. SAWYER

1    H. SAWYER
2        Q.    You don't list on your -- strike
3    that.
4            Let me just read you a paragraph
5    from an Affidavit which is from
6    Mr. Edward Sassower.  Do you know who
7    that is?
8        A.    I do.
9        Q.    Who is Mr. Sassower?
10        A.    He is a partner in the
11    restructuring practice at Kirkland & Ellis.
12        Q.    This Affidavit has been filed in
13    connection with the retention applications,
14    which have been filed by the -- by Kirkland &
15    Ellis -- or by the debtor to retain
16    Kirkland & Ellis as yet to come up for
17    hearing.  And I can give you a copy of this
18    if you need it.
19            But let me just read it to you
20    the first instance.  This is paragraph 53 of
21    Mr. Sassower's Declaration.  It says that
22    "Hugh E. Sawyer who serves as a director of
23    TCEH LLC has also served as an officer or on
24    the Boards of Directors of other active and
25    inactive K&E clients.  Each of these other

1   H. SAWYER
2   matters has been unrelated to those -- to
3   these Chapter 11 cases or the debtors."
4          Other than the items that we have
5   just gone through, are there other instances
6   in which you have served as an officer or as
7   board -- as a director on other K&E clients?
8       A.   Paradise Holdings.
9       Q.   And when did you serve in that
10  capacity?
11      A.   It is within the last five years.
12      Q.   What was the -- what capacity did
13  you serve for Paradise Holdings?
14      A.   Independent director.
15      Q.   Were you proposed to Paradise
16  Holdings by Kirkland & Ellis?
17      A.   To the best of my
18  recollection, yes.
19      Q.   What was your compensation in
20  that role?
21      A.   I don't recall.
22      Q.   Do you think it was $200,000?
23      A.   I don't recall.
24      Q.   Where was -- was Paradise
25  Holdings a case that ended up in bankruptcy?

1   H. SAWYER
2       A.   No.
3       Q.   What was the nature of the
4   retention of us as outside director?
5       A.   Can you be more specific?
6       Q.   Sure.  Why were you retained --
7   why were you nominated to be an outside
8   director for Paradise Holdings?
9       A.   The company's parent, Kerzner,
10  was considering certain restructuring
11  options.
12      Q.   How long did you serve as an
13  outside director of Paradise Holdings?
14      A.   I don't recall the exact amount
15  of time.
16      Q.   Do you know basically when you
17  served, timeframe?
18      A.   Within the last five years.
19      Q.   Was there any litigation involved
20  in that matter that you were involved in?
21      A.   Not that I recall.
22      Q.   And you were compensated as an
23  outside director, you just don't recall the
24  amount?
25      A.   I don't.  Yes, and I don't.

1   H. SAWYER
2       Q.   Any other Kirkland & Ellis
3   clients that you served as either outside
4   director or officer in some capacity?
5       A.   Not to my recollection at this
6   time.
7       Q.   How about in your capacity as a
8   managing director of Huron Consulting, are
9   there any other Kirkland & Ellis clients that
10  Huron Consulting has worked for?
11          MS. O'CONNOR:  Object to form.
12      Just Huron or him?
13      Q.   Huron, in which you were
14  involved.
15      A.   Not to my recollection.
16      Q.   How about Great Atlantic and
17  Pacific Tea Company?
18      A.   I was not directly involved in
19  the Great Atlantic and Pacific Tea Company.
20  Another managing director at Huron had that
21  engagement.
22      Q.   Okay.  Any other clients that you
23  can think of at the moment that either you
24  individually or Huron Consulting provided
25  services to for a Kirkland & Ellis client?

1   H. SAWYER
2       A.   K&E was engaged for some period
3   of time at NUMMI, where Huron was involved in
4   serving as CRO.
5       Q.   Can you spell NUMMI?
6       A.   N-U-M-M-I.
7       Q.   Is that an acronym for a company
8   name?
9       A.   I don't know what it stands for.
10  I wasn't involved in the case.
11      Q.   Okay.
12      A.   That's another one that comes to
13  mind.  I don't recall any other areas at this
14  time.
15      Q.   Okay.  Now, Kirkland & Ellis
16  proposed you as an outside director in this
17  particular case; is that right?
18      A.   Yes.  Along to my knowledge and
19  belief, along with the slate of other
20  candidates.
21      Q.   And do you recall when you were
22  proposed to the board?
23      A.   To the best of my recollection,
24  it would have been around the summer of 2013,
25  roughly.

Page 33

H. SAWYER

1  equity holders of the -- of EFH controlled
2  the EFH board?
3      A.   No, I wouldn't use that
4  terminology "control."  I was aware that they
5  sat on the Board at the EFH level.
6      Q.   Were you aware that they
7  constituted a majority of the board members
8  at the EFH level?
9      A.   At the time that I interviewed
10 with the company, I eventually came to
11 understand that.
12     Q.   And were you aware that -- on the
13 TCEH board, that, which was an eight member
14 board, correct?
15     A.   I don't recall the exact number
16 at the time I interviewed.
17     Q.   Do you recall that four members
18 of the TCEH board were, individuals appointed
19 by the equity holders?
20     A.   I am aware there are two members
21 of the key board from KKR.  One member from
22 TPG and a member from Goldman.
23     Q.   And just to be specific,
24 Mr. Lebovitz is the board member from

Page 34

H. SAWYER

1  Goldman?
2      A.   Yes.
3      Q.   And Mr. McDougal is the board
4  member from TPG?
5      A.   Yes.
6      Q.   And Messrs. Schmidt and Woodloff
7  are the board members from KKR?
8      A.   That's right.
9      Q.   The balance of the TCEH board as
10 it's constituted now includes yourself,
11 correct?
12     A.   Yes.
13     Q.   Mr. Keglevic?
14     A.   Yes.
15     Q.   Mr. Young?
16     A.   Yes.
17     Q.   And Miss Acosta?
18     A.   Yes.  That's my recollection as
19 well.
20     Q.   At the time that you were
21 appointed to the Board of Directors for TCEH,
22 you entered into a letter agreement
23 establishing your compensation for the --
24 your service?

Page 35

H. SAWYER

1      A.   That's my recollection.
2      Q.   That's Exhibit 7, Exhibit 7 is
3  the letter agreement that memorializes your
4  retention -- or your compensation for your
5  service on the Board of Directors of TCEH?
6      A.   And for the clarity of our
7  record, it is actually a Board of Managers
8  for EFCH and TCEH.  And yes, this is the
9  letter that I recall executing.
10     Q.   And that sets forth your
11 compensation again as $200,000 annually?
12     A.   Yes.
13     Q.   With a per diem of $7500 per day?
14     A.   Yes, all payable in arrears.
15     Q.   And the per diem is payable in
16 connection with meetings that you attend?
17     A.   It is paid in connection, it's
18 specified in the letter, Counselor, as you
19 know.  Would you like for me to read the
20 letter?
21     Q.   You can tell me your
22 recollection, your knowledge?
23     A.   "You will be paid the per diem
24 for days on which you devote substantially

Page 36

H. SAWYER

1  all of your time providing testimony
2  regarding the company's restructuring
3  including attending depositions and hearings,
4  in which you may be a witness as well as days
5  on which the company's prior request you have
6  devoted substantially all of your time to
7  preparing for the same."
8      Q.   And so my question then is with
9  respect to the per diem, are you paid a per
10 diem for attending board meetings?
11     A.   No.
12     Q.   Or only for testifying?
13     A.   As I said --
14     Q.   I understand what it said in the
15 letter.  I am just asking you if in practice.
16     A.   Well, to the best of my
17 recollection, as of today, I haven't been
18 paid any per diem.
19     Q.   Okay.
20     A.   If that's the answer -- answers
21 the question you are asking.  And as to the
22 nature of the letter, it stipulates per diem
23 preparing for testimony and for depositions
24 and for appearing in a hearing.

Page 37

H. SAWYER

1         H. SAWYER
2    Q.  I take it you have -- have you
3  submitted any invoices to the company, to
4  TCEH, for compensation in connection with the
5  per diem?
6    A.  Yes.
7    Q.  What have you submitted?
8    A.  As I recall, it was approximately
9  $30,000.
10    Q.  And what did that invoice -- what
11  services does that invoice cover?
12    A.  The services specified by the
13  letter.
14    Q.  What testimony have you provided
15  in this case, so far?
16    A.  It was related to preparing for
17  testimony. The days on which I devote
18  substantially all of my time preparing for
19  depositions and hearings and preparing to be
20  a witness.
21    Q.  All right. So at some point you
22  prepared to testify in anticipation of
23  testimony that, at least at this moment, has
24  yet to occur?
25    A.  To the best of my knowledge and

Page 38

1         H. SAWYER
2  recollection, yes.
3    Q.  Now, when you first joined the
4  Board of TCEH and its, I guess, sister
5  company, ECH?
6    A.  EFCH, which is the --
7    Q.  Okay. Did you consider whether
8  there was conflicts of interest between the
9  various boards of the overall corporate
10  structure, meaning the EFH board, the EFIH
11  board and the TCEH board?
12    A.  Yes.
13    Q.  Okay. And what conflicts of
14  interest did you consider when you first
15  joined the board?
16    A.  Given my history over 37 years, I
17  am aware that conflicts could potentially
18  exist as issues ripen. I'm aware that
19  interested parties may diverge. So I have a
20  sensitivity to those issues.
21    Q.  I take it the -- one of the
22  concerns might be that a decision that might
23  be good for one entity might not be good for
24  another entity; is that fair?
25    A.  I can't address the legal issues.

Page 39

1         H. SAWYER
2  From a business judgment standpoint, those
3  potentials exist as issues ripen, but thus
4  far in my business judgment, the interests
5  have remained aligned.
6    Q.  Did you, at the time that you
7  first joined the Board of TCEH, did you
8  discuss at the Board level whether it was
9  appropriate for Kirkland & Ellis to represent
10  all of the various corporations within the
11  overall corporate structure?
12    A.  I don't recall if that issue was
13  discussed at the Board level.
14    Q.  Did you ever discuss it with
15  anybody other than at the Board level?
16    A.  I am very much aware that
17  Kirkland itself would be compelled to
18  identify those conflicts. I am aware that we
19  have a highly skilled general counsel at
20  Energy Future, who is a former litigator
21  herself. There are other very sophisticated
22  people, both on the Board and acting in
23  advisory roles, and I am comfortable -- I am
24  comfortable that we -- that those conflicts
25  do not exist today.

Page 40

1         H. SAWYER
2    Q.  Okay. And just to make sure I
3  am -- I understand at least what was
4  discussed, you said you never -- you don't
5  recall discussing any of the conflicts at the
6  Board level.
7    A.  I don't.
8    Q.  Do you recall discussing the
9  potential conflicts with anyone other than at
10  the Board level?
11    A.  I don't recall.
12    Q.  You didn't discuss it with
13  attorneys at Kirkland & Ellis as far as you
14  can recall?
15    A.  If those -- I don't recall. If
16  those conversations did take place, they
17  would have been highly informal, as you know,
18  Counselor, Kirkland would be compelled to
19  identify the conflict.
20    Q.  Okay. Were you aware, at the
21  time -- strike that.
22    I want to get your understanding
23  of the capital structure of TCEH. Do you
24  know who the parties are who are in the,
25  what's known, called the first lien position

1          H. SAWYER
2    for the TCEH capital structure?
3        A.    I don't recall all of the
4    parties, and I think about those parties as a
5    class rather than individual firms.
6        Q.    Are you aware that entities
7    controlled by Apollo are in the first lien?
8        A.    Yes.
9        Q.    Are you aware that entities
10   controlled by Centerbridge are in the first
11   lien structure?
12       A.    To the best of my recollection,
13   at this time, yes, I think Centerbridge is in
14   the first.
15       Q.    Are you aware that entities
16   controlled by Fortress are in the first lien
17   structure?
18       A.    To the best of my recollection at
19   this time, Fortress is in the first.
20       Q.    Are you aware that entities
21   controlled by King Street are in the first
22   lien?
23       A.    I don't recall that.
24       Q.    Are you aware that entities
25   controlled by Oaktree are in the first lien

1          H. SAWYER
2    structure?
3        A.    To the best of my recollection,
4    at this time, Oaktree was in the first.
5        Q.    Are you aware that entities
6    controlled by Och-Ziff were in the first lien
7    structure?
8        A.    I don't recall that.
9        Q.    Were you aware at the time that
10   you joined the Board and that you thereafter
11   considered restructuring options that each of
12   the clients I just identified was represented
13   actively in other matters by Kirkland &
14   Ellis?
15       A.    No.
16       Q.    Did you ever become aware of
17   that?
18       A.    No.
19       Q.    Have you read the retention
20   application filed by the debtor to retain
21   Kirkland & Ellis?
22       A.    I have not.
23       Q.    So if I were to represent to you
24   that those entities are all identified as
25   active clients of Kirkland & Ellis, that

1          H. SAWYER
2    would be news to you?
3        A.    That would be news to me.  But,
4    frankly, not particularly surprising. K&E,
5    as you well know, is a very large name, does
6    work in many areas other than restructuring.
7        Q.    So that was my next question.
8    Does it concern you at all with respect to
9    the proposed restructuring that is the
10   subject of the RSA Agreement that clients of
11   Kirkland & Ellis in the first lien structure
12   on the T side are to receive 100% of the
13   equity of the proposed restructuring?
14       A.    No, that doesn't concern me.
15       Q.    Okay.  Are you familiar with the
16   parties who are -- constitute what's referred
17   to as the unsecured creditors of the EFIH
18   capital structure?
19       A.    I don't recall those parties
20   specifically.
21       Q.    Are you aware that those parties
22   include Avenue Capital?
23       A.    I don't recall those parties
24   specifically.
25       Q.    Let me just list these parties

1          H. SAWYER
2    and tell me if you recognize any of them, GSO
3    Capital Partners?
4        A.    Recognize the name.
5        Q.    Do you recognize them as being
6    part of the unsecured creditors structure in
7    the -- on the EFIH side of the corporation?
8        A.    And as I testified earlier,
9    Counsel, I think about the class, rather than
10   the individual firms.
11       Q.    Understood.  So is that a no, you
12   don't recognize them as being in that
13   structure per se?
14       A.    I do not.
15       Q.    Okay.  How about PSAM, do you
16   recognize that entity?
17       A.    I don't.
18       Q.    How about Third Avenue?
19       A.    I recognize the firm.  Don't
20   recall that they were in that class.
21       Q.    How about York Capital?
22       A.    Recognize the firm.  I don't
23   recall that they were in that class.
24       Q.    Again, do you appreciate or
25   understand that each of the companies I just

Page 45

1          H. SAWYER
2  identified is an active client of Kirkland &
3  Ellis?
4      MS. O'CONNOR: Object to form.
5    A.  I have no knowledge of Kirkland's
6  relationship with those clients in that class
7  or the prior class.
8    Q.  And, again, you haven't read
9  either the Kirkland & Ellis retention
10  application or the supporting Declaration
11  from Mr. Sassower, correct?
12    A.  No.
13    Q.  And, again, would it concern you
14  at all that those particular entities are
15  active clients of Kirkland & Ellis?
16      MS. O'CONNOR: Object to form.
17    A.  No, it doesn't concern me. As I
18  testified earlier, as I think you understand,
19  Kirkland would be compelled to identify the
20  conflict and I believe they would.
21    Q.  And you understand that the -- I
22  will ask you if you understand. That the
23  unsecured creditors of the EFIH side of the
24  capital side of the corporate structure were
25  the moving parties, if you will, the

Page 46

1          H. SAWYER
2  proponents of the deconsolidation proposal
3  that is now a feature of the RSA?
4    A.  And I'm sorry, Counselor, you
5  said proponents?
6    Q.  Proponents.
7    A.  That's my understanding at this
8  time.
9    Q.  At any time while you were
10  sitting on the board, was the board presented
11  with conflict letters that the board was
12  asked to approve for signature involving any
13  of the clients -- any of the companies that
14  I've just identified in Kirkland and Ellis?
15    A.  Not that I recall at this time.
16    Q.  At any time while you were on the
17  board, did Kirkland and Ellis submit to the
18  board a conflict letter with respect to
19  Kirkland's representation of all of the
20  different corporate entities that formed the
21  overall EFH structure?
22    A.  Not that I recall at this time.
23    Q.  You are aware that Sidley and
24  Austin was retained by -- and I'll ask you
25  who exactly, by the company and -- do you

Page 47

1          H. SAWYER
2  know who Sidley and Austin was retained by?
3    A.  I don't.
4    Q.  Was it by TCEH?
5    A.  Not to my knowledge.
6    Q.  Was it by EFH?
7    A.  I don't recall specifically who
8  retained Sidley Austin.
9    Q.  But you know they were retained?
10    A.  I do.
11    Q.  Do you know what they were
12  retained to do?
13    A.  Yes.
14    Q.  Was that?
15    A.  Sidley Austin was retained to
16  consider potential claims related to the
17  sponsors.
18    Q.  Related to Goldman Sachs, TPG and
19  KKR?
20    A.  To the best of my recollection,
21  that's correct.
22    Q.  Were you aware at the time that
23  Sidley Austin was retained to perform this
24  work that each of those three companies,
25  Goldman Sachs, TPG, KKR were active clients

Page 48

1          H. SAWYER
2  of Sidley Austin?
3    A.  I was not aware of that, but
4  would not surprise me given the scale of the
5  firms and Sidley Austin.
6    Q.  Given the nature of the
7  representation that Sidley Austin was asked
8  to undertake, does that concern you that they
9  would represent actively the very clients
10  that they were potentially examining claims
11  against?
12      MS. O'CONNOR: Object to form.
13    A.  No, it doesn't concern me. As I
14  have testified, Sidley Austin would be
15  compelled to identify the conflict. And I
16  believe they would.
17    Q.  Okay.
18      (Whereupon, Sawyer Exhibit 8,
19    Common Interest/Privilege and
20    Information Sharing Agreement was
21    marked for identification as of this
22    date by the Reporter.)
23  BY MR. STOLL:
24    Q.  Mr. Sawyer, I have handed you
25  what we have marked as Exhibit 8 for this

1       H. SAWYER
2  meaning EFH and EFIH, correct?
3       A.   Yes.
4       Q.   And you were told that the first
5  liens on the T side of the organization were
6  impaired; is that fair?
7       A.   I was told that based on the
8  analysis that had been performed at that
9  time, that the first liens on the T side were
10  under secured by billions and, of course,
11  given my background, I was very much aware
12  that questions as to valuation would
13  ultimately be resolved by the court.
14       Q.   Specifically, what were you told
15  about the amount or degree that the first
16  liens were purportedly under secured on the T
17  side?
18       A.   As I recall, the directional
19  analysis was clear that it was billions.
20  Certainly under secured to the point where I
21  can exercise my business judgment in the
22  circumstance.
23       Q.   And were you provided any work
24  product prepared by Ever Core at the time you
25  were initially told this fact that

1       H. SAWYER
2  memorialized the conclusion that the first
3  liens were under secured?
4       A.   Not to my recollection.  But I
5  certainly did carefully consider reports
6  provided by Ever Core in their role as
7  professionals to the company.  I considered
8  the feedback provided by the CFO who is
9  highly competent and I considered the views
10  of other directors.
11       Q.   Did you -- who at Ever Core, by
12  the way did you interact with?
13       A.   David Ying.
14       Q.   Just David Ying?
15       A.   David Ying and his team, and I
16  don't recall all the names.
17       Q.   Did you ask Mr. Ying what
18  methodology he used to determine that the
19  first liens were under secured?
20       A.   I don't recall posing that
21  question to Mr. Ying.
22       Q.   Okay.  Did you ask Mr. Keglevic,
23  the CFO of EFH how he reached the conclusion
24  that the first liens were under secured?
25       A.   I don't recall that I asked him

1       H. SAWYER
2  that question.
3       Q.   Do you know who Mr. Filsinger is?
4       A.   Sorry.
5       Q.   Mr. Filsinger?
6       A.   I don't recall that name.
7       Q.   You don't recall Mr. Filsinger?
8       A.   Can you spell the name.
9       Q.   F-I-L-S-I-N-G-E-R?
10       A.   I don't recall the name.
11       Q.   You're not aware that he is
12  working for the company in connection with
13  this restructuring?
14       A.   I don't recall the name.
15       Q.   You don't, then, recall the fact
16  that he has been paid over $10 million to
17  perform work for the company in connection
18  with valuation issues?
19       MS. O'CONNOR:  Object to form.
20       A.   I don't recall the name.
21       Q.   Did you know that, up to the
22  point of the restructuring, Ever Core had
23  been paid over $17 million to perform work in
24  connection with valuing the companies?
25       MS. O'CONNOR:  Object to form.

1       H. SAWYER
2       A.   No.
3       Q.   In your role as a director of
4  Edison Mission Energy, did you become
5  familiar with various components of the
6  energy business that would impact a company's
7  existing and perspective operational --
8       A.   What specifically?
9       Q.   Do you know what a heat rate is?
10       A.   No.
11       Q.   If I were to suggest to you that
12  it was the measure of efficiency of
13  converting fuel to electricity, would that
14  mean anything to you?
15       A.   I am not familiar with the term.
16       Q.   Okay.  I take it -- let me ask
17  you, do you know what the term market heat
18  rate means?
19       A.   No.
20       Q.   If I were to suggest to you that
21  it is the implied relationship between the
22  wholesale electricity prices and natural gas
23  prices, would that mean anything to you?
24       A.   I can't speculate.
25       Q.   Do you know what the heat rate is

Page 189

H. SAWYER

1    issues that would confront the disinterested
2    director on the T side.
3         Q.    Well, in other words, you
4    understood when you got hired that it was --
5    there was some possibility that TCEH and EFCH
6    were going to be filing for bankruptcy
7    protection?
8         A.    As to the hiring component, I was
9    nominated and voted as to the board of
10   managers.  As to the potential for a
11   bankruptcy, I was aware that that could be a
12   potential outcome should the company fail to
13   restructure its obligations.
14        Q.    And did you understand that one
15   of the issues in the bankruptcy was going to
16   be a valuation of the assets of TCEH and
17   EFCH?
18        A.    In my experience, valuation is
19   often a function of the bankruptcy process.
20        Q.    Have you ever held a fiduciary
21   responsibility with any business engaged in
22   the energy space?
23        A.    Yes.
24        Q.    And what's that?

Page 190

H. SAWYER

1         A.    Edison Mission Energy.
2         Q.    And in connection with Edison
3    Mission Energy, did you form an understanding
4    as to how assets of a power generation or
5    retail sale company would be conducted?
6         A.    Can you be more specific?
7         Q.    Sure.  Do you have any previous
8    experience, beyond this case, in the
9    valuation of a power generation business?
10        A.    I am -- as I have already
11   testified, I am not an investment banker.  I
12   certainly do recognize that valuation will be
13   an aspect of this case.  And there are others
14   involved who are far more qualified to speak
15   to valuation.
16        Q.    All right.  And what efforts, if
17   any, did you undertake when you became a
18   director of EFCH or TCEH to understand the
19   manner in which power generation or retail
20   electricity sales businesses are valued?
21        A.    To the extent that I received
22   information from the investment bankers and
23   from the CEO and the management team.
24        Q.    Did you affirmatively seek any

Page 191

H. SAWYER

1    input from either the investment bankers or
2    the management team as to any aspects of the
3    valuation of the assets of TCEH or EFCH?
4         A.    Not to my recollection,
5    Counselor.  I felt that the valuation issues
6    would evolve and certainly be a hotly
7    contested issue during the trial and best
8    left to the experts, the litigators and the
9    court.
10        Q.    When did you first appreciate the
11   view of either management or the investment
12   bankers that TCEH had no equity in ownership
13   of TXU Energy or Luminant?
14        MS. O'CONNOR:  Object to form.
15        A.    Would you repeat that, TCEH had
16   no equity?
17        Q.    Yes.
18        A.    Can you be more specific?
19        Q.    Okay.  TCEH -- we have been
20   through this before -- owns the ownership
21   interest in TXU Energy, right?
22        A.    Yes.
23        Q.    And TXU Energy is the retail
24   sales business?

Page 192

H. SAWYER

1         A.    Yes.
2         Q.    And TXU -- and under the plan,
3    none of the value of that business is flowing
4    to unsecured creditors?
5         A.    That is correct, under the plan
6    that's currently contemplated by the RSA.
7         Q.    Even if the unsecured creditors,
8    as we pointed out, have claims directly
9    against the entities which own those assets
10   within TXU Energy?
11        MS. O'CONNOR:  Object to form.
12        A.    I think that will ultimately be
13   determined by the court.
14        Q.    Well, the RSA presumes that, and
15   presents a plan in which the unsecured
16   creditors of TXU Energy's debtors get no
17   recovery other than unencumbered assets?
18        A.    As you know, the RSA is a
19   starting point.  It is not a plan of
20   reorganization.
21        Q.    But you agree with me that it
22   contemplates that unsecured creditors will
23   get no recovery out of the liened assets
24   within those TXU Energy boxes?

H. SAWYER

1
2      A.    To my knowledge and belief at
3  this time, that would be accurate.
4      Q.    And the same is true with respect
5  to the assets of Luminant?
6      A.    To my knowledge and belief, at
7  this time, that would be accurate.
8      Q.    At any time after the
9  determination was made -- I will go back to
10  my earlier question.
11          At what point, did you understand
12  that it was the view of either management or
13  the investment bankers that that was the
14  current status quo, that TCEH was going to
15  get no value out of its liened assets?
16          MS. O'CONNOR: Object to form.
17          MR. BERNSTEIN: Object to form.
18      A.    I don't recall at this time.
19      Q.    Do you recall generally where it
20  was in relation to the execution of the RSA?
21          MS. O'CONNOR: Object to form.
22      A.    To the best of my recollection,
23  it would have been before the execution of
24  the RSA. But as you know, Counselor,
25  valuation evolves. It's going to be hotly

H. SAWYER

1
2  contested.
3      Q.    Can we focus on that period of
4  time in which you finally appreciated that
5  TXU -- I am sorry -- TCEH and EFCH were not
6  going to partake in the equity in any asset
7  which is the subject of the liens of the
8  secured lenders. Can you focus on that
9  period in time?
10      A.    By that, you mean the first?
11      Q.    Yes.
12      A.    As you'll recall, the company was
13  involved in extensive negotiations with
14  various constituencies throughout 2013 in an
15  effort to maximize value for the estate. So
16  to the best of my recollection at this time,
17  it would have been sometime between October
18  and March.
19      Q.    Okay. And once that -- once you
20  appreciated that fact, that the assets which
21  were subject to the liens were going to be
22  going to the first lien lenders with no
23  residual equity left over for anybody else,
24  what efforts, if any, did you, as an
25  independent director, make to preserve the

H. SAWYER

1
2  valve of unencumbered assets?
3      A.    As an independent director to
4  preserve the value of the estate, I approved
5  the RSA.
6      Q.    Other than approving the RSA, are
7  you aware of any efforts you took or any
8  other board member of TCEH or EFCH took to
9  preserve the value of unencumbered assets?
10      A.    Not to my recollection at this
11  time.
12      Q.    You got some questions from
13  Mr. Stoll earlier about unencumbered cash.
14  Did you understand that prior to the petition
15  date that TCEH, EFCH or certain of its
16  subsidiaries were holding cash which was not
17  subject to the liens of either the first lien
18  or second lien lenders?
19      A.    I don't recall.
20      Q.    And do you recall taking any
21  efforts or directing any efforts to preserve
22  the value of that cash for the TCEH or EFCH
23  estate?
24      A.    I don't recall.
25      Q.    So am I correct in your answer

H. SAWYER

1
2  that you were relying upon the investment
3  bankers and management of the -- of TCEH to
4  educate you with respect to the salient
5  factors in valuation of assets?
6          MS. O'CONNOR: Object to form.
7      A.    As I have already testified,
8  valuation evolves. Ever Core had conducted
9  extensive analysis; so had management. It
10  had been considered by the board. No final
11  conclusion had been reached. So the answer
12  is Ever Core management, discussion and
13  deliberations with the board as to valuation.
14          But as I have already testified,
15  I also understood at the time that valuation
16  would evolve during the pendency of a case,
17  particular a case that could potentially be
18  as long as this one. And I took comfort in
19  knowing that it would be a hotly contested
20  issue ultimately decided by the court.
21      Q.    What exactly -- first of all, at
22  any time, did you receive a written
23  presentation from Ever Core with respect to
24  its views on valuation of any aspects of
25  EFCH, TCEH or any of the guarantor

H. SAWYER

1  subsidiaries?
2  A.   I do not recall at this time
3  taking receipt of a written presentation from
4  Ever Core.
5  Q.   Are you aware of whether the
6  board of either TCEH or EFCH asked for a
7  written presentation?
8  A.   I don't recall at this time.
9  Q.   Do you have an understanding as
10 to why Ever Core has not made a written
11 presentation expressing its views of value in
12 a particular review that the first lien notes
13 are under water?
14 MS. O'CONNOR: Object to form.
15 A.   I cannot speak for Ever Core.
16 Q.   Other than that, can you answer
17 my question, do you know?
18 A.   Do I know what, Counselor?
19 Q.   Do you know why Ever Core has not
20 provided the board a written presentation on
21 its view of value of the assets of EFCH, TCEH
22 or any of the guarantor subsidiaries?
23 MS. O'CONNOR: Object to form.
24 A.   I believe what I said was I don't
25

H. SAWYER

1  recall that Ever Core provided such a report
2  and I cannot speak for Ever Core.
3  Q.   Did you do any diligence
4  personally into the qualifications of
5  Ever Core to do a valuation of the assets of
6  EFCH, TCEH or the guarantor subsidiaries?
7  MS. O'CONNOR: Object to form.
8  A.   In my business judgment,
9  Ever Core is a highly competent firm with
10 superb reputation in the marketplace.
11 David Ying is a highly qualified banker, as
12 I'm sure you know, and I took comfort,
13 actually that it was Ever Core. I think they
14 are more than qualified to do it.
15 Q.   All right. So as you sit here
16 today, independent of any written stuff which
17 you can't remember, can you remember anything
18 that David Ying said to the board of either
19 TCEH or EFCH with respect to the value of
20 those entities' assets or the assets of the
21 guarantor subsidiaries?
22 MS. O'CONNOR: Object to form.
23 A.   As I have testified, to the best
24 of my recollection at this time, Ever Core
25

H. SAWYER

1  indicated that the -- first, the T side were
2  under secured by several billion.
3  Q.   Okay. So I am just going to try
4  to provide more color on that. Was that oral
5  statement made in a meeting in which you
6  attended personally?
7  A.   To the best of my recollection,
8  yes.
9  Q.   Was it made in more than one
10 meeting?
11 A.   I can't recall the number of
12 times it was discussed.
13 Q.   Okay. Could it have been in
14 every board meeting? Different people have
15 different recollections on this, so I am just
16 trying to get yours.
17 A.   I don't recall the number of
18 times it was discussed in a board meeting.
19 Q.   How did the issue come up?
20 A.   In the normal course of
21 presentations from Ever Core to the board.
22 Q.   And can you --
23 A.   And from management.
24 Q.   And can you recall any of the
25

H. SAWYER

1  actual words which Mr. Ying spoke?
2  A.   No.
3  Q.   So I take it you are paraphrasing
4  your recollection of what he said when you
5  said he said the first liens are under water?
6  A.   I didn't say Mr. Ying. I said
7  Ever Core.
8  Q.   Okay. Who do you recall saying
9  that?
10 A.   As I recall, it would have been
11 David Ying.
12 Q.   Okay. Sorry, I assumed that it
13 was David Ying. Can you remember any of the
14 words that came out of David Ying's mouth?
15 A.   I do not.
16 Q.   And I take it you, based on your
17 prior answer, you have no notes of what
18 Mr. Ying said?
19 A.   I do not.
20 Q.   Do you recall asking any
21 questions testing the statement by Mr. Ying?
22 A.   I recall that the board
23 deliberated, that there were questions asked.
24 But I don't recall the specific questions
25

# EXHIBIT 5

1          CONFIDENTIAL - CHARLES CREMENS

2          UNITED STATES BANKRUPTCY COURT

3           FOR THE DISTRICT OF DELAWARE

4    ------------------------------X

     In Re:

5

     ENERGY FUTURE HOLDINGS

6    CORPORATION, et al.,

7                    Debtors.

8    Chapter 11

     Case No. 14-0979

9    Jointly Administered

     ------------------------------X

10

11

12        *** C O N F I D E N T I A L ***

13

14        VIDEOTAPED DEPOSITION

15                  OF

16            CHARLES CREMENS

17      Wednesday, October 8, 2014

18          Seven Times Square

19           New York, New York

20

21

22   Reported by:

     AYLETTE GONZALEZ, RPR, CLR, CCR

23   JOB NO. 85457

24

25

1        CONFIDENTIAL - CHARLES CREMENS
2   creditors lie.
3        Q.  And you stated that your objective
4   is to make sure that we maximize the value for
5   all stakeholders?
6        A.  Yes.
7        Q.  In addition to the EFIH creditors,
8   what stakeholders are you referring to?
9        A.  Well, hopefully we end up with
10  value that exceeds just the credit claims that
11  are at the EFIH level, which would then lead
12  us to look at or lead me to obviously be
13  considering the beyond that, which would be
14  EFH, and even beyond that possibly, we'll see.
15  But at the EFH level, there are creditors, as
16  well, which is the parent of EFIH.
17       Q.  Now, do you have any positions at
18  any of the debtor or non-debtor affiliates of
19  EFIH?
20       A.  Could you --
21       Q.  Do you have any --
22       A.  -- clarify?
23       Q.  Do you have any positions at any of
24  EFH, TCEH --
25       A.  "Positions" meaning what, I

1        CONFIDENTIAL - CHARLES CREMENS
2   don't --
3        Q.  Any position, director, employment?
4        A.  Oh, no, no, no, okay, I didn't
5   understand.  No, I have no -- I'm an
6   independent director at EFIH and have no other
7   responsibilities in the company other than
8   that.
9        Q.  Are there any other independent
10  directors at EFIH?
11       A.  Not that I'm aware, no.  There
12  are -- when you say "independent directors,"
13  let's make sure that we have a definitional
14  aspect to it.  I think, in my answer anyway, I
15  believe that there is no one that is not also
16  on another board.
17       Q.  So you're the only director at EFIH
18  that is not on a board of affiliate companies?
19       A.  I believe so, yeah.
20       Q.  Okay.  Have you served as a
21  director on the board of any company other
22  than EFIH?
23       A.  Yes.
24       Q.  And what boards were those?
25       A.  I went through this with your

1        CONFIDENTIAL - CHARLES CREMENS
2   colleague in July, so I'll have to remember
3   exactly.  I've served on many boards over the
4   last five, ten years.  The ones I serve on
5   presently are Capmark Financial, Patriot Coal,
6   and EFH, U.S. Steel Canada.
7        Q.  And those are the boards that you
8   presently serve on --
9        A.  Yes.
10       Q.  -- in addition to EFIH?
11       A.  Yes.  I -- I think I have them all
12  there, but...
13       Q.  What boards have you served on
14  previously?
15       A.  Again, I -- I wasn't prepared
16  exactly for this, so I'll try to remember
17  them.  I served on Kerzner International,
18  General Growth Properties, Specialty Brands,
19  Tactical Holdings, Conexant, Inc.
20           I'm sure I'm missing a couple, but
21  anyway, you've got it somewhere in the -- from
22  the last deposition.
23       Q.  The list that you gave here is all
24  that you can remember sitting here today?
25       A.  Yes.

1        CONFIDENTIAL - CHARLES CREMENS
2        Q.  When did you become an independent
3   director at EFIH?
4        A.  In February of 2014.
5        Q.  How did you become an independent
6   director the EFIH?
7        A.  I was contacted and I think I was
8   recommended by counsel and then contacted by
9   management.  And they were interviewing
10  various individuals, and so I went through
11  that process, met with directors, met with
12  management.
13       Q.  You say you were recommended by
14  counsel; who do you mean?
15       A.  Kirkland & Ellis, they were counsel
16  for the -- or are counsel for the debtors,
17  they recommended me.
18       Q.  Did you have a prior relationship
19  with Kirkland & Ellis?
20       A.  I've used them in the past, yeah.
21       Q.  On what matters?
22       A.  Bankruptcy matters, our -- our
23  restructuring situations; that's my
24  background.
25       Q.  And in what role were you in those

Page 18

CONFIDENTIAL - CHARLES CREMENS

1  prior matters when you engaged Kirkland &
2  Ellis?
3      A.  Chief restructuring officer
4  primarily, yeah.
5      Q.  And in what cases were you the
6  chief restructuring officer in which you
7  engaged Kirkland & Ellis?
8      A.  Conseco Finance and Spirit Finance,
9  those are two separate restructurings that I
10  did.
11      Q.  And do you recall who the principal
12  lawyers at Kirkland & Ellis were with respect
13  to Conseco Finance?
14      A.  Anup Sathy and James Sprayregen.
15      Q.  And who were the Kirkland & Ellis
16  lawyers that you primarily worked with in
17  Spirit Finance?
18      A.  There were many involved in that
19  case.  I would -- I would say that
20  James Sprayregen was the restructuring person
21  involved.  There was -- you know, there was
22  litigation counsel as well, Reed Oslan.
23      Q.  Were any of the Kirkland & Ellis
24  lawyers that are involved in this case, EFIH,

Page 19

CONFIDENTIAL - CHARLES CREMENS

1  also involved in either of those cases?
2      A.  Briefly.  Edward Sassower was
3  involved in the Spirit Finance one.
4      Q.  Do you have any understanding as to
5  why Kirkland & Ellis recommended you for the
6  independent board position?
7          MS. O'CONNOR:  Object to form.
8      A.  Humbly speaking I think that I've
9  had good experience and I'm pretty capable in
10  terms of this kind of a complex case.  So I
11  assume that they thought that I'd be able to
12  do a good job, that's why they recommended me.
13      Q.  Were you informed of the reasons
14  why an independent director was required?
15      A.  My understanding was at the time
16  that there was a number of discussions going
17  on as to whether or not how this -- this case
18  was going to be handled, that it had been in
19  discussion for a couple of years in fact, and
20  whether or not it was going to -- able to be
21  done in a one large restructuring or whether
22  there was going to be a possible separation of
23  operations.
24          And so that led to the idea that it

Page 20

CONFIDENTIAL - CHARLES CREMENS

1  may be best to have an independent director
2  because of the possibility of separation of
3  the entities.
4      Q.  And who informed you of this?
5      A.  Management when I met with them.
6      Q.  And who did you meet with at
7  management?
8      A.  John Young, Paul Keglevic,
9  Stacey Doré, primarily.
10      Q.  Did you have any prior
11  relationships with any of Mr. Young
12  Mr. Keglevic or Ms. Doré?
13      A.  No.
14      Q.  Do you have any prior relationships
15  with any of the equity sponsors, TPG, Goldman
16  Sachs, any of the private equity sponsors?
17      A.  No.
18      Q.  Have you served as an independent
19  director of any of the other boards that you
20  mentioned earlier?
21      A.  Did I -- could you repeat that
22  question?
23      Q.  You gave a list of other boards
24  that you have previously served on.

Page 21

CONFIDENTIAL - CHARLES CREMENS

1      A.  Yes.
2      Q.  Were you an independent director --
3      A.  Yes.
4      Q.  -- on any of those boards -- I'm
5  sorry, if you could wait for me to finish the
6  question, the court reporter --
7      A.  Sure.
8      Q.  -- won't yell at me then.
9          So to make the record clear, on any
10  of the boards that you previously testified
11  that you were members of, a member of, did you
12  serve as an independent director?
13      A.  Yes.
14      Q.  And which boards did you serve as
15  an independent director?
16      A.  My recollection is that virtually
17  all of them I was an independent director.
18      Q.  Mr. Cremens, since you became an
19  independent director at EFIH, has the board
20  delegated or conferred any special authority
21  to you with respect to any matter?
22      A.  No.
23      Q.  Has the board created any special
24  committees that you are aware of?

6 (Pages 18 to 21)

# EXHIBIT 6

Page 324

1              CONFIDENTIAL - HUGH SAWYER

2          UNITED STATES BANKRUPTCY COURT

3           FOR THE DISTRICT OF DELAWARE

4      -------------------------------X

   In Re:

5

   ENERGY FUTURE HOLDINGS

6  CORPORATION, et al.,

7                  Debtors.

8  Chapter 11

   Case No. 14-0979

9  Jointly Administered

   -------------------------------X

10

11

12      *** C O N F I D E N T I A L ***

13

14         VIDEOTAPED DEPOSITION

15                OF

16            HUGH SAWYER

17      Wednesday, October 8, 2014

18         Seven Times Square

19        New York, New York

20

21

22  Reported by:

   AYLETTE GONZALEZ, RPR, CLR, CCR

23  JOB NO. 85457

24

25

Page 333

CONFIDENTIAL - HUGH SAWYER

1       THE VIDEOGRAPHER:  Good morning.
2   This marks the start of tape label
3   number one of the continuing
4   videotaped deposition of Mr. Hugh
5   Sawyer in the matter of In Re:  Energy
6   Future Holdings Corporation, et al. in
7   the United States Bankruptcy Court for
8   the District of Delaware.
9       The deposition is being held
10  in the offices of BrownRudnick on
11  October 8, 2014, at approximately
12  9:15 a.m.
13      My name is Kevin Marth.  I'm the
14  legal videographer today representing
15  TSG Reporting.
16      Our court reporter today is
17  Ms. Aylette Gonzalez, also
18  representing TSG.
19      Counsel's appearances will be
20  noted on the stenographic record.
21      At this time, will the court
22  reporter please swear in the witness,
23  and you may proceed.
24      ****************

Page 334

CONFIDENTIAL - HUGH SAWYER

1   H U G H   S A W Y E R,
2       called as a witness, having been
3       duly sworn by a Notary Public
4       of the State of New York, was
5       examined and testified as follows:
6   EXAMINATION BY
7   MR. JONAS:
8       Q.  Good morning, Mr. Sawyer.  My name
9   is Jeff Jonas from BrownRudnick, and as you
10  probably know, we represent the TCEH second
11  liens.  Obviously, we are here for your
12  deposition today.  And the point of today's
13  deposition is for you to testify as completely
14  and truthfully as you can.
15      Accordingly, if you don't
16  understand any of my questions, if you don't
17  hear any of the questions, feel free to let me
18  know and we'll do the best we can to make sure
19  you understand.  Is that clear?
20      A.  Yes, thank you.
21      Q.  Is there any reason you don't think
22  you can testify completely or truthfully
23  today?
24      A.  No.

Page 335

CONFIDENTIAL - HUGH SAWYER

1       Q.  What did you do to prepare for
2   today's deposition?
3       A.  I read the Motion.  I read the term
4   sheet and met with counsel from
5   Kirkland & Ellis.
6       Q.  When you said the Motion, are you
7   referring to the Motion for Entry of an Order
8   of proving bidding procedures?
9       A.  I do mean that.
10      Q.  Now, which debtor entities are you
11  a director of?
12      A.  The T-side debtor entities.
13      Q.  And specifically, can you tell me
14  the names of the T-side debtor entities of
15  which you are -- when I say board of
16  directors, might be a board of managers.  Do
17  you understand what I mean?
18      A.  I do.
19      Q.  And specifically which entities are
20  you a director of?
21      A.  EFCH and TCEH.
22      Q.  Okay.  And just to be clear, TCEH
23  sits below the E-entity you mentioned?
24      A.  That's correct.

Page 336

CONFIDENTIAL - HUGH SAWYER

1       Q.  Okay.  Now, have you heard of
2   yourself characterized as the T-side
3   independent director?
4       (Whereupon, the referred to
5       question was read back by the
6       Reporter.)
7       A.  Yes.
8       Q.  And what does that mean to you?
9       A.  It means that I owe a fiduciary
10  duty solely to the T-side.
11      Q.  Okay.  When you say, "solely to the
12  T-side," can you amplify or explain that?
13      A.  To the stakeholders that are part
14  of the T-side debtors, the first, the second
15  and the unsecureds.
16      Q.  And who do you understand those
17  parties to be, in general?
18      A.  In general, they're the first
19  liens, the second liens and the unsecured
20  creditors on the T-side.
21      Q.  Since the bankruptcy case, have you
22  ever spoken with any T-side creditors?
23      A.  Not to my recollection.
24      Q.  So, you haven't talked to the

4  (Pages 333 to 336)

Page 337

```
 1        CONFIDENTIAL - HUGH SAWYER
 2   T-side first lien creditors?
 3        A.  There was -- forgive me, there was
 4   a meeting several months ago with the first
 5   lien creditors that took place at
 6   Kirkland & Ellis' offices.
 7        Q.  And that meeting was -- strike
 8   that.  Who was present at that meeting?
 9        A.  Attorneys from K&E and the
10   attorneys representing the first liens on the
11   T-side.
12        Q.  Would that be Mr. Kornberg?
13        A.  It was.
14        Q.  And was that meeting just among the
15   -- strike that.
16           If you could, specifically tell me
17   who was there by name.
18        A.  I don't recall specifically who was
19   there by name.  There were also participants
20   on a conference call, but the -- as I
21   remember, Edward Sassower from the company.  I
22   think Mark -- excuse me, from Kirkland.  I
23   believe Mark McCain was there, Alan Kornberg
24   was there and other stakeholders representing
25   the first lien creditors.
```

Page 338

```
 1        CONFIDENTIAL - HUGH SAWYER
 2        Q.  And do you recall what month that
 3   was in?
 4        A.  I don't.
 5        Q.  Do you think it was before the
 6   summer?
 7        A.  I just don't recall the exact
 8   timing.
 9        Q.  Was it in 2014?
10        A.  I believe it was in 2014.
11        Q.  And were you -- was that -- as far
12   as you know, was that meeting set up for you
13   as the independent director on the T-side?
14        A.  I don't recall what the catalyst
15   for the meeting was or who actually arranged
16   the meeting, but it was an opportunity to
17   engage and to have a conversation with the
18   first lien creditors.
19        Q.  And what was the nature of the
20   conversation you had with first lien creditors
21   at that meeting?
22        A.  We discussed a wide variety of
23   issues.  I don't remember specifically, but
24   including their desire to move forward with a
25   great deal of urgency and speed with the case
```

Page 339

```
 1        CONFIDENTIAL - HUGH SAWYER
 2   that we're now litigating.
 3        Q.  And did the first liens express to
 4   you their reasoning for why they wanted to
 5   move forward with great urgency?
 6        A.  Cost of the case.  I remember them
 7   mentioning that, but I don't recall the
 8   specific dialogue that took place.  It's been
 9   so long ago.
10        Q.  Do you recall whether at the time
11   of the meeting the RSA, the Restructuring
12   Support Agreement was in place?
13        A.  To my recollection, it was not in
14   place at that time, but I don't recall the
15   specific start of the discussions.
16        Q.  Do you recall if at that meeting
17   any of the E-side directors were present?
18        A.  To my knowledge, none of the E-side
19   directors were present.
20        Q.  And were any of the other T-side
21   directors present, other than yourself?
22        A.  As I recall, I was the only T-side
23   director that was present.
24        Q.  And is it would it be fair to
25   characterize anything as a conclusion at that
```

Page 340

```
 1        CONFIDENTIAL - HUGH SAWYER
 2   meeting?
 3        A.  Not -- I don't believe so, no.
 4        Q.  But what was your takeaway in terms
 5   of your understanding of what the firsts were
 6   looking for in this case at that time?
 7        A.  You know, I don't recall my
 8   specific takeaway.
 9        Q.  So other than that one meeting you
10   had with first lien creditors -- the T-side
11   first lien creditors a number of months ago,
12   have you met with any other T-side creditors
13   in this case?
14        A.  Not to my recollection.
15        Q.  Have you asked anybody to set up
16   those meetings for you?
17        A.  No.
18        Q.  Has it occurred to you that perhaps
19   you should meet with your constituents; that
20   is, T-side creditors?
21        A.  Not at this time.
22        Q.  That's never crossed your mind?
23        A.  Not at this time.
24        Q.  It's never crossed your mind to
25   reach out to the people that you say you have
```

5 (Pages 337 to 340)

Page 341

CONFIDENTIAL - HUGH SAWYER

1 a fiduciary duty to to inquire as to their
2 desires and how they see the case?
3 A. Not at this stage of the process.
4 Q. Is that something you intend to do?
5 A. I don't have any intention at this
6 point, but based on the advice of counsel or
7 the advisors or based on feedback from the
8 company management, I would consider it.
9 Q. Have you received any advice, to
10 date, from counsel as to whether or not you
11 should reach out to -- and let me clarify, I'm
12 not asking you to tell me the substance of the
13 advice. But have you received any advice from
14 counsel as to whether you should reach out to
15 T-side creditors, your constituency, in the
16 case?
17 MS. O'CONNOR: With the limitation
18 not to reveal any information you
19 received from attorneys.
20 A. To my recollection, no.
21 Q. Other than the deposition -- the
22 previous deposition and today's deposition in
23 this case, have you had any direct
24 communications with any T-side credit -- and

Page 342

CONFIDENTIAL - HUGH SAWYER

1 other than the meeting that you mentioned,
2 have you had any communications with T-side
3 creditors' representatives; that is, counsel
4 or financial advisors or others in this case?
5 A. No, not that I recall.
6 Q. And have you asked -- strike that.
7 Have you considered reaching out to
8 the professionals representing any T-side
9 creditors in this case?
10 A. I have not considered that.
11 Q. Now, you mentioned you reviewed the
12 debtors' Motion for an Order approving bidding
13 procedures, correct?
14 A. Yes.
15 Q. What do you understand the debtors
16 to seek to do by virtue of that Motion?
17 A. My understanding is they have two
18 basic objectives. First, to take advantage of
19 the momentum that's in the case and the
20 favorable market conditions. And additionally
21 to provide for robust process and enough time
22 for the potential bidders to conduct diligence
23 in an effort to maximize the value of any
24 potential transaction and the estate.

Page 343

CONFIDENTIAL - HUGH SAWYER

1 Q. Well, my question is: What do you
2 think the debtors are trying to sell pursuant
3 to that Motion?
4 A. I believe the debtors are
5 attempting to sell Encore.
6 Q. And when you say Encore, what do
7 you mean? What are they -- strike that.
8 Let's back up.
9 What do the debtors own in
10 connection with Encore?
11 A. EFH, as the debtor, owns EFIH
12 100 percent, which, in turns, owns 100 percent
13 of Oncor Holdings, which owns 80 percent of
14 Oncor Electric Company. I believe they're
15 attempting to sell Oncor Electric Company and
16 all the other entities associated.
17 Q. So is it your understanding the
18 debtors are trying to sell the stock of Oncor?
19 A. I don't think they've reached any
20 potential conclusion as to the structure of
21 the sale process.
22 Q. Well, you understand the debtors
23 have filed the Motion, correct?
24 A. Yes.

Page 344

CONFIDENTIAL - HUGH SAWYER

1 Q. Do you know what they're asking the
2 court for approval to sell specifically?
3 A. They're looking for the sale of the
4 assets of reorganized EFH.
5 Q. So you think it is an asset sale
6 that's being proposed?
7 A. They're asking for the sale of the
8 equity of the reorganized EFH.
9 Q. Now, have you -- are you familiar
10 with any other transactions in which a debtor
11 has sought to sell reorganized equity?
12 A. I am not.
13 Q. And have you -- does that concern
14 you that you're not familiar with any other
15 similar-type transactions?
16 A. Doesn't concern me at this point as
17 I am relying on the advice of our investment
18 bankers and counsel.
19 Q. When you say your investment
20 bankers and counsel, the "your" is who?
21 A. The Evercore and Kirkland & Ellis.
22 Q. And the "your" meaning the entity
23 they're representing is?
24 A. EFH.

6 (Pages 341 to 344)

Page 345

CONFIDENTIAL - HUGH SAWYER

1
2  Q.  EFH?
3  A.  Correct.
4  Q.  But you're an independent director
5  of TCEH, correct?
6  A.  Correct.
7  Q.  And does TCEH have any
8  professionals that are representing it or
9  representing its interest?
10  A.  Not at this time, no.
11  Q.  And so when you say you've received
12  advice from counsel with respect to the sale
13  of the reorganized equity here of the debtors,
14  that advice is not from counsel to TCEH, but
15  counsel to the E-side, correct?
16  MS. O'CONNOR:  Object to form.
17  A.  Yes.  The advice is coming from the
18  advisors to the holding company to EFH and
19  represents all of the entities of EFH,
20  including the T-side.
21  Q.  And that hasn't raised any concerns
22  for you?
23  A.  Not at this time.
24  Q.  Now, you said, "not at this time."
25  Has -- at any time since you've been involved

Page 346

CONFIDENTIAL - HUGH SAWYER

1  in this case, have you been concerned that
2  TCEH needed separate counsel or advice in
3  connection with these cases?
4  A.  No, I have not been concerned that
5  the T-side needs separate counsel and advice.
6  Q.  Okay.  Are you aware of any
7  conflicts that exist between the T-side and
8  the E-side?
9  A.  I'm aware of the potential for
10  conflicts, but I do not believe those
11  conflicts have manifested themselves at this
12  point.
13  Q.  And what potential conflicts do you
14  see?
15  A.  Could be conflicts around stranded
16  tax matters, for example.
17  Q.  And if you could be more specific
18  what do you mean by that?
19  A.  It could be a stranded tax at the
20  E-side or the EFH level.  EFH could
21  potentially -- a fiduciary of EFH could
22  potentially check the box and expose the
23  T-side entities to the stranded tax.  But
24  there could be any number of potential

Page 347

CONFIDENTIAL - HUGH SAWYER

1  conflicts or claims throughout the pendency of
2  the case.  At this point, those conflicts have
3  not manifested themselves.
4  Q.  Thank you for telling us about the
5  check the box.  I'd like to understand today
6  your complete knowledge with respect to what
7  you referred to as potential conflicts of
8  claims throughout the pendency of the case.
9  A.  I think as the stakeholders may be
10  aware, there are potential claims involved
11  here that have not yet been resolved.  Have
12  not yet been adjudicated and given that this
13  process is being conducted inside the
14  protection of the Chapter 11 process, I'm
15  confident those will be resolved.
16  And at this point, there is no
17  conclusion to reach as to the claims or plan
18  of reorganization or allocation of proceeds.
19  There's nothing yet to decide.
20  Q.  And you don't think that the
21  potential -- those potential claims cause any
22  concern for you today as to the advice you're
23  getting or from whom?
24  A.  I think I'm getting superb push

Page 348

CONFIDENTIAL - HUGH SAWYER

1  legal advice from Kirkland and equally good
2  advice from Evercore, and although I recognize
3  that a conflict could arise, I do not believe
4  a conflict has arisen today.
5  Q.  Let me ask you:  Has anybody told
6  you whether or not this type of transaction;
7  that is, a proposed sale of reorganized equity
8  that will exist in the future, has anybody
9  told you whether or not any similar-type
10  transactions have ever occurred?
11  A.  No, not that I recall.
12  Q.  Did you ever ask anybody whether
13  that was the case?
14  A.  I have not.
15  Q.  Do you know if anybody at a board
16  meeting or elsewhere has ever inquired as to
17  whether or not this type of proposed
18  transaction has ever taken place before?
19  A.  I don't know.
20  Q.  And if I were to tell you that this
21  is a novel transaction which has never
22  occurred before, would that cause you any
23  concern?
24  A.  Not at this time, no.

7  (Pages 345 to 348)

Page 377

CONFIDENTIAL - HUGH SAWYER

1 understand that up at the top, at EFH, there
2 are equity owners that are not debtors in this
3 case, right?
4     A.  Yes.
5     Q.  And isn't it the case that if tens
6 of billions of dollars more than anybody
7 anticipated was paid for the reorganized
8 equity on the E-side, wouldn't that ultimately
9 flow all the way up and out to those equity
10 owners?
11    A.  As I've said, during the course of
12 my testimony, I don't think we -- I have a
13 view yet as to how the proceeds -- I don't
14 have a view yet as to how the proceeds of this
15 transaction would be allocated by the court.
16 Depends on the plan of reorganization.
17 Depends on the litigation.  Occurs during the
18 bankruptcy process.  We don't know yet how the
19 proceeds will be allocated.
20    Q.  Well, do you have any inkling or
21 idea as to how that value would get over to
22 the T-side?
23    A.  I -- I don't have a view today on
24 how the value would get over to the T-side.

Page 378

CONFIDENTIAL - HUGH SAWYER

1     Q.  So when you were at a board meeting
2 and you were talking about the Motion and the
3 transactions contemplated thereby, you were
4 commenting or not commenting without any
5 understanding or view as to how the sale of
6 the reorganized E-side equity would in any way
7 benefit T-side creditors?
8         MS. O'CONNOR:  Object to form.
9     A.  I was deliberating with the board
10 as to the start of a process that could
11 potentially lead to a value maximizing event.
12 And when the time is right, to consider how
13 that value will be allocated among the
14 constituents I'll consider it, but it's still
15 very early in a process -- very early in the
16 case and there's no transaction -- there's no
17 plan of reorganization to review.  And we were
18 deliberating bidding procedures, not
19 allocation of value.
20    Q.  No, I understand that, but I'm just
21 trying to figure out why, as the
22 representative of fiduciary of T-side
23 creditors, if you can't figure out or have no
24 idea how value would ultimately get to the

Page 379

CONFIDENTIAL - HUGH SAWYER

1 T-side, why even care what's going on on the
2 E-side?  I guess is my basic question?
3         MS. O'CONNOR:  Object to form.
4         Go ahead.
5     A.  Thank you.  I care because value is
6 being created and there is the potential that
7 that value could, under the determination of
8 the court, enure to the benefit of the T-side
9 creditors.  So I'm certainly interested in any
10 value maximizing event, even if it has -- if
11 it has the potential of supporting the T-side.
12    Q.  Well, just tell me, as of today,
13 how do you -- if you have any idea at all,
14 maybe you don't, how that value would get over
15 to the T-side?
16    A.  It's just because we don't --
17        MS. O'CONNOR:  Object to form.
18    A.  Because we don't have a plan of
19 reorganization.  Because we don't have a
20 transaction to review and because the court
21 has not yet ruled, I can't speculate and
22 wouldn't speculate on how that value would
23 come be.  It's too early.
24    Q.  To date, in your role as the

Page 380

CONFIDENTIAL - HUGH SAWYER

1 independent T-side director, did you ever
2 raise either at a board meeting or with
3 anyone, the issue of, gee, how can I be
4 helpful in getting more value or some value to
5 T-side second liens and unsecured creditors?
6     A.  I'm, you know, in my role as the
7 independent director at T-side, I have not
8 raised the question in the manner that you
9 just characterized it.  I certainly have been
10 active in deliberations with the board and
11 with the advisors.
12    Q.  Well, what do you mean by active in
13 the deliberations?
14    A.  The deliberations that occur at the
15 board level between the board the CROs, the
16 general counsel and her role as general
17 counsel, the CFO and the advisors considering
18 what optionality may be available to the
19 debtor to maximize value.
20    Q.  Don't fault me for it because I'm a
21 little selfish, I only right now care for my
22 clients, the second liens.  And so, I'd like
23 to know what you're doing to benefit them.
24    A.  I'm selfish as well and recognize

15  (Pages 377 to 380)

Page 401

CONFIDENTIAL - HUGH SAWYER

1    CONFIDENTIAL - HUGH SAWYER
2    Q. Has there been any discussion that
3  that will be the case?
4    A. Not that I recall.
5    Q. Just give me one minute, I'm going
6  to try --
7    A. Sure.
8    Q. -- and expedite this for you.
9    Are you aware that the debtors have
10  filed recently what's been referred to as a
11  tax memorandum?
12    A. Yes, I think it's the Omnibus; yes.
13    Q. Okay. And is that -- have you read
14  that?
15    A. I have.
16    Q. Okay. Did you read it before it
17  was filed or after it was filed?
18    A. I read it after it was filed.
19    Q. Was that something that was
20  discussed at any TCEH board meetings or
21  informally with the board?
22    A. I don't re- -- I don't recall that
23  it was discussed either formally or informally
24  with the board.
25    Q. Do you understand that the debtors'

Page 402

1  proposed structure as set forth in the motion
2  requires confirmation of a plan of
3  reorganization for all of the debtors before
4  the proposed sale could close?
5    A. Yes.
6    Q. And does that concern you from an
7  execution risk point of view? And if you
8  don't know what I mean, please ask.
9    A. No, I don't think so. I don't -- I
10  think that any bidder for this asset is going
11  to be very well aware that the company's in
12  bankruptcy and will need to confirm a plan of
13  reorganization. These are sophisticated
14  bidders.
15    Q. And you -- do you believe -- strike
16  that.
17    You're not concerned that the
18  bidders are being asked to bid in connection
19  with an asset/transaction that won't close for
20  more than a year -- possibly won't close for
21  more than a year?
22    A. No, I'm not concerned because it's
23  a -- a regulated utility. My understanding is
24  that it could take as long as 12 to 18 months

Page 403

1    CONFIDENTIAL - HUGH SAWYER
2  to get all the regulatory approvals. And I am
3  certain that any bidder will be aware of that,
4  as well, given the level of sophistication of
5  these bidders.
6    Q. I want to show you what we're going
7  to mark as Exhibit 2, Sawyer 2, which is --
8  and I'll just wait till you get it.
9    (Sawyer Exhibit 2, Stipulation and
10    Agreed Order, Filed on 9/16/14 was
11    marked for identification, as of this
12    date.)
13  BY MR. JONAS:
14    Q. What's been marked as Sawyer
15  Exhibit 2 is a stipulation and agreed order
16  regarding a protocol for certain case matters.
17    This was filed with the Court on
18  September 16, 2014. I'll ask you to take a
19  look at that.
20    Have you seen this before?
21    A. I have not seen this.
22    Q. Okay. So I take it you never
23  familiarized yourself with the terms of the
24  stipulation?
25    A. I've testified I haven't seen it.

Page 404

1    CONFIDENTIAL - HUGH SAWYER
2    Q. Okay.
3    A. I don't know if the -- I haven't
4  read it, so I don't know if the protocols for
5  the case matters described herein have been
6  discussed with me previously, I'd have to look
7  at it.
8    Q. All right. Let's just take a look
9  at Paragraph 4.
10    A. Um-hum.
11    Q. And I'll just read the first
12  sentence or part of it.
13    "The independent directors of each
14  of EFIH, EFCH and TCEH and EFH respectively,
15  each an independent director, are authorized
16  to seek to retain separate advisors of his or
17  her choosing, each an independent advisor, to
18  advise or otherwise represent the applicable
19  debtor," and then it goes on, I just read a
20  part of it. Do you see what I just read?
21    A. Yes.
22    Q. Okay. And so now that you see
23  that -- and would you agree with me where it
24  says "independent director," that means you,
25  right?

21 (Pages 401 to 404)

## Page 429

CONFIDENTIAL - HUGH SAWYER

1  counsel to which company?
2
3      A.  To the EFH.
4      Q.  EFH?
5      A.  Yes.
6      Q.  Okay.  Is she also general counsel
7  to TCEH?
8      A.  She is general counsel to the
9  corporation EFH.  To my recollection, she is
10  not general counsel to the T-side.
11      Q.  Okay.  So I'm just curious, why
12  would you had consult with her as general
13  counsel to EFH if she had --
14      A.  She's one of the two co-CROs, so I
15  would seek her advice but would not
16  necessarily take it.
17          But in the normal course if I
18  believed there was a conflict, I'd talk to the
19  GC, I'd talk to the CROs, I'd talk to
20  Kirkland.  And if I -- if I felt it rose to
21  that level, I'd seek independent counsel.
22      Q.  And you'd talk to Kirkland as
23  Kirkland is counsel to whom?
24      A.  Kirkland is counsel to EFH and all
25  of its subsidiaries.

## Page 430

CONFIDENTIAL - HUGH SAWYER

1
2      Q.  Including TCEH?
3      A.  Yes.
4      Q.  We're going to move on to the next
5  exhibit.
6      A.  Can I take a two-minute break?
7      Q.  Sure.
8      A.  Thank you.  I'll be right back.
9          THE VIDEOGRAPHER:  Going off the
10  record at 11:17 a.m.
11          (Whereupon, at this time, a short
12  break was taken.)
13          THE VIDEOGRAPHER:  We're back on
14  the record at 11:23 a.m.
15          (Whereupon, an off-the-record
16  discussion was held.)
17          (Sawyer Exhibit 5, Summary of
18  Board Meeting, EFIH, Dated 7/30/14 was
19  marked for identification, as of this
20  date.)
21          (Sawyer Exhibit 6, Summary of
22  Board Meeting, TCEH, Dated 7/30/14 was
23  marked for identification, as of this
24  date.)
25  BY MR. JONAS:

## Page 431

CONFIDENTIAL - HUGH SAWYER

1
2      Q.  Mr. Sawyer, I want to -- before we
3  try and blow through some of these board
4  minutes pretty quickly, I just want to come
5  back to some of your earlier testimony,
6  particularly with respect to -- you probably
7  recall we talked about net operating losses?
8      A.  Um-hum.
9      Q.  And I think you said you were
10  generally familiar that there were net
11  operating losses?
12      A.  Yes.
13      Q.  And do you know the magnitude of
14  the debtors' net operating losses?
15      A.  I don't recall the specific amount.
16      Q.  Do you know where those net
17  operating losses derive from?
18      A.  The net operating losses as I
19  recall derive from the T-side.
20      Q.  Okay.  And in connection with the
21  proposed optimal transaction, do you know how
22  it is proposed that those NOLs would be used
23  or treated?
24      A.  I don't recall specifically how the
25  NOLs are proposed to be treated under the,

## Page 432

CONFIDENTIAL - HUGH SAWYER

1  quote, optimum transaction.
2      Q.  Okay.  Do you recall any discussion
3  relating to how the NOLs would be treated?
4      A.  I don't.
5      Q.  Do you know if you were any -- ever
6  provided with any analysis in that regard?
7      A.  I -- I don't remember that I was
8  provided any analysis in that regard.
9      Q.  Okay.  In connection with the
10  optimal transaction there will be a for--
11  there will be at least a partially foregone
12  step-up in basis, correct?
13          MS. O'CONNOR:  Object to form.
14      A.  It's not yet possible to predict
15  what the form of the transaction will be or
16  what the structure will be, but there could
17  potentially be a foregone step-up in basis for
18  the first.
19      Q.  Okay.  And -- and I just want to --
20  again, I just want to reference or focus on
21  the proposed optimal transaction, not an
22  alternative transaction.
23      A.  Okay.
24      Q.  And as proposed, at least as set

28  (Pages 429 to 432)

Page 433

CONFIDENTIAL - HUGH SAWYER

1 forth in the papers under that optimal
2 transaction, there will be some foregone
3 step-up in basis, correct?
4   MS. O'CONNOR: Object to form.
5   A. There could be some foregone
6 step-up in basis depending upon how all of
7 this is ultimately negotiated out, what the
8 allocation of proceeds may ultimately prove to
9 be by the Court. So it's certainly possible.
10   Q. And what is your understanding --
11 strike that.
12      What information do you have with
13 respect to the magnitude of that foregone
14 step-up in basis?
15   A. There have been some discussions
16 around the magnitude, but I don't recall
17 specifically what that magnitude is.
18   Q. No idea as you sit here what that
19 amount might be?
20   A. I -- I don't remember specifically,
21 but as we move through the process if it's --
22 I'm sure that among many other issues related
23 to the tax matters will be fully adjudicated.
24   Q. It is true, is it not, that

Page 434

CONFIDENTIAL - HUGH SAWYER

1 whatever the amount of that foregone step-up
2 in basis, if a taxable transaction was done
3 such that that step-up in basis was not
4 foregone, that additional step-up would be
5 available to the first lien creditors under
6 what's being proposed, correct?
7   A. Would you restate your question?
8   Q. Sure.
9   A. Thank you.
10   Q. If there was a taxable
11 transaction --
12   A. Right.
13   Q. -- that is, a transaction
14 alternative to the optimal transaction; you
15 with me so far?
16   A. Yes.
17   Q. Okay. And if in that -- if in
18 connection with that transaction there was not
19 any step-up in basis that was given up or
20 foregone; you with me?
21   A. Yes.
22   Q. Okay. That additional step-up in
23 basis would enure and vet to and benefit the
24 first lien creditors, correct?

Page 435

CONFIDENTIAL - HUGH SAWYER

1   A. Yeah, that is my understanding.
2   Q. Okay. And have you asked anybody
3 to do an analysis to figure out the magnitude
4 of that?
5   A. I have not, given that we're still
6 very early in the process.
7   Q. Okay. Well, do you think it's
8 important that you understand that?
9   A. It will be important at some point
10 in the process to understand the implications
11 and value that could potentially enure to the
12 T-side.
13   Q. And do you recall whether that
14 analysis was ever done in connection with the
15 RSA, the second lien debt?
16   MS. O'CONNOR: Object to form.
17   A. I don't recall if the analysis was
18 done around the RSA in the DIP.
19   Q. And it would be important -- in
20 connection with an alternative transaction, it
21 would be important for you to understand the
22 magnitude because if there was no -- strike
23 that.
24      If no step-up in basis was given

Page 436

CONFIDENTIAL - HUGH SAWYER

1 up -- and I think you've testified there was
2 additional value that could go to the first
3 liens -- that would ultimately enure to the
4 benefit also of creditors behind the first
5 liens; that is, seconds and unsecureds,
6 correct?
7   A. As it relates to an alternative
8 transaction.
9   Q. Correct.
10   A. That is -- my understanding is
11 that's correct.
12   Q. Okay. I want to quickly, and very
13 quickly, just go through some of these
14 materials.
15      And next we've marked what's been
16 marked as Exhibits 5 and 6. And these are --
17 as you'll see, looks like a summary of board
18 meetings that took place on July 30th; five is
19 for EFIH, six is for TCEH. Do you see those?
20   A. Yes.
21   Q. And I take it you recall attending
22 the July 30th board meeting?
23   A. I do.
24   Q. And was that by telephone?

29 (Pages 433 to 436)

Page 453

CONFIDENTIAL - HUGH SAWYER

1    heard the term used.
2    Q.   And have you heard the term used --
3    I won't ask you to disclose privileged
4    communications to the extent they are
5    privileged.  Have you heard the term used in
6    any way relating to or in connection with the
7    competitive TSA?
8        MS. O'CONNOR:  Object to form.
9        A.   I don't recall if it related
10   specifically to the competitive TSA or other
11   matters under consideration.
12       Q.   I want to come back to wrap up with
13   respect to the optimal transaction the debtors
14   have proposed; you know what I'm talking
15   about, right?
16       A.   Um-hum.
17       Q.   Do you know if any of the T-side
18   creditors support the proposed optimal
19   transaction?
20       MS. O'CONNOR:  Object to form.
21       A.   I don't know which of the T-side
22   creditors, if any, are in support of the
23   optimal transaction.  At this point we are, as
24   you know, highly focused on bidder support and

Page 454

CONFIDENTIAL - HUGH SAWYER

1    the opportunity to maximize the value of the
2    estate.
3        Q.   Let me ask you, would it be
4    meaningful to you if you knew that there was
5    not any T-side creditor that supported what
6    you -- strike that.
7            Supported the optimal transaction?
8        MS. O'CONNOR:  Object to form.
9        A.   I don't have that knowledge.  I'm
10   focused on any opportunity to maximize the
11   value of the estate and would be ready,
12   willing and able to consider any alternative
13   structure without regard to how ultimately the
14   engineering is done as to the allocation of
15   value, have an interest in anything that
16   maximizes value of the estate.
17       Q.   Okay.  As an independent director
18   who represents -- who has a fiduciary duty to
19   T-side creditors, do you think it's relevant
20   for you to know whether T-side creditors
21   support the optimal transaction?
22       MS. O'CONNOR:  Object to form.
23       A.   I don't know if the T-side
24   creditors support the optimal transaction,

Page 455

CONFIDENTIAL - HUGH SAWYER

1    it's early in the process, we may discover a
2    different structure that maximizes value in
3    excess of the optimal structure that has been
4    proposed by the debtor.
5            I would have an interest at some
6    point in this process, perhaps not today, but
7    I would have an interest as the process
8    evolves in knowing where the various creditors
9    on the T-side stands.
10       Q.   Okay, but as of today, you don't
11   think you should or need to know where your
12   constit- -- where your constituents stand on
13   the motion and the optimal transaction?
14       MS. O'CONNOR:  Object to form.
15       A.   What I believe is it's still early
16   days in the process, there's still wood to
17   chop and the positions of the various
18   creditors on the T-side will be well-known as
19   this process evolves.
20       MR. JONAS:  Okay.  I am finished.
21   I know there's other people that want
22   to question the witness.
23       MS. O'CONNOR:  Okay:
24       THE WITNESS:  I'm going to take

Page 456

CONFIDENTIAL - HUGH SAWYER

1    one minute to make a phone call, I'll
2    be right back.
3        THE VIDEOGRAPHER:  This marks the
4    end of Tape No. 2.  We're going off
5    the record at 11:49 a.m.
6        (Whereupon, at this time, a short
7    break was taken.)
8        THE VIDEOGRAPHER:  This marks the
9    start of Tape No. 3.  We're back on
10   the record at 11:53 a.m.
11   EXAMINATION BY
12   MR. SHORE:
13       Q.   Good morning, Mr. Sawyer.
14   Chris Shore again from White & Case on behalf
15   of the Ad Hoc Group of TCEH Unsecured Notes.
16       You've sat on a lot of boards of
17   directors and managers, right?
18       A.   Yes.
19       Q.   And a lot of those companies have
20   been Delaware corporations or Delaware limited
21   liability companies?
22       A.   Some have been, some have not.
23       Q.   All right.  I have just some
24   questions about corporate governance and one

34  (Pages 453 to 456)

Page 465

CONFIDENTIAL - HUGH SAWYER

1
2      Q.  Where did you hear that argument?
3      A.  I don't remember.
4      Q.  Okay.  And then there's a sentence
5  here which -- well, first of all, do you
6  recognize the import of that argument for TCEH
7  creditors; if it's true?
8      A.  I think so.  I think so.
9      Q.  What would it mean?
10     A.  The import is that the T-side
11  creditors would not be potentially liable for
12  the federal tax liability.
13     Q.  Right.  So they could sell all the
14  assets in a taxable transaction and receive
15  the benefit of the step up in basis?
16     A.  That's my understanding.
17     Q.  That would be a huge economic
18  benefit to TCEH creditors, right?
19     A.  That is my understanding of that
20  argument, yes.
21     Q.  Up to now, what have you done to
22  determine whether that argument has any merit?
23     A.  We have had extensive and
24  privileged tax advice from the tax partners at
25  Kirkland and I have considered that advice.

Page 466

CONFIDENTIAL - HUGH SAWYER

1
2      Q.  Now, you recognize Kirkland also
3  represents EFH, right?
4      A.  I do.
5      Q.  And you recognize that the flip
6  side of this huge benefit for TCEH creditors
7  would mean that EFH creditors would suffer all
8  of the economic loss associated with a taxable
9  transaction?
10     A.  Potentially that's my
11  understanding.
12     Q.  Right.  So Kirkland -- do you
13  understand Kirkland then is serving two
14  masters?
15     A.  I believe my view is that Kirkland
16  is serving one master, EFH, and all of EFH
17  subsidiaries.
18     Q.  With respect to this particular bit
19  of advice, you understand that advice that
20  Kirkland gave you with respect to the TSA
21  would necessarily have the benefit of
22  advancing the interest of one client and
23  truncating the rights of another client?
24     MS. O'CONNOR:  Object to form.
25     A.  I don't agree that -- I don't see

Page 467

CONFIDENTIAL - HUGH SAWYER

1
2  THAT there are two separate clients here.  And
3  I believe I view this as one client at this
4  point.  If I determine that the interests of
5  the parties had diverged, I would seek
6  independent counsel.
7      Q.  Well, have you ever been involved,
8  in all your business dealings, in a
9  contractual dispute?
10     A.  Yes.
11     Q.  Can you think of any instance in
12  which in a contractual dispute you hired a
13  lawyer?
14     A.  Yes.
15     Q.  Can you think of any instance in
16  all your business experience where there was a
17  business dispute and you hired a lawyer who
18  was also the lawyer for the party on the other
19  side of the dispute?
20     A.  No.
21     Q.  And do you see that there's a
22  conflict there that the lawyer trying to
23  provide advice with respect to the contract
24  has two different agendas that they need
25  advocate for?

Page 468

CONFIDENTIAL - HUGH SAWYER

1
2      A.  I can see that that -- Mr. Shore
3  that that potential conflict exists.  I do not
4  believe that that conflict has yet arisen.
5      Q.  Let's go to the next sentence then.
6      A.  Sure.
7      Q.  It says, "Regardless of whether or
8  not the competitive TSA takes capital gains
9  into account, the debtors believe all the EFH
10  groups consolidated tax liability is allocated
11  under the agreement."
12         What does that sentence mean to
13  you?
14     A.  The sentence means to me that the
15  debtors' current view, based on the advice of
16  counsel, is that all of the tax liability
17  exists at the EFH level.
18     Q.  I want to go -- let's break it into
19  pieces.  What do you take the words
20  "regardless of whether or not the competitive
21  TSA takes capital gains into account," what do
22  you think those words mean?
23     A.  The capital -- my understanding of
24  this, and I would seek the advice of counsel,
25  is that it relates to a potential capital

37  (Pages 465 to 468)

Page 469

CONFIDENTIAL - HUGH SAWYER

1  gains on a transaction.
2
3      Q.  I'm just focusing on the first
4  sentence. Maybe I'm reading it differently.
5      Would you agree that a fair reading
6  of that first clause in the sentence is, even
7  if the TSA only or even if the TSA does not
8  make EFH liable for the capital gains taxes,
9  right? That's a fair reading?
10      A.  I think so.
11      Q.  All right. Then it says the
12  debtors, nonetheless, believe that it was
13  always their intent that that would be the
14  case?
15      A.  I believe that's a fair reading of
16  that sentence.
17      Q.  As the only fiduciary for the
18  T-side of the house on any board, did you
19  authorize anyone to file a document in which
20  your interests and your beliefs with respect
21  to whether you should ignore a contract and
22  just go forward with some subjective intent,
23  anybody ask you for authorization to say that
24  to the court?
25      MS. O'CONNOR:  Object to form.

Page 470

CONFIDENTIAL - HUGH SAWYER

1
2      A.  I was not authorized or asked to
3  authorize the release of this document to the
4  court. I was not, but as I testified, I don't
5  believe that this issue has yet manifested
6  itself.
7      Q.  Let's just go to your experience in
8  a lawsuit. What would your reaction be -- I
9  know it's a hypothetical. What would your
10  reaction be if you hired a lawyer in a
11  contractual dispute and they filed a pleading
12  with the court that said even if Mr. Sawyer is
13  right, that's what the contract says, I don't
14  think he really believed that that would be
15  the case? What would your reaction be?
16      MS. O'CONNOR:  Object to form.
17      A.  It's hard to know what my reaction
18  would be since it is a hypothetical, but at
19  this stage of the process, this issue has not
20  yet manifested itself.
21      Q.  Well, what do you mean it has not
22  manifested itself? You understand that this
23  is a document that was filed with the court
24  signed on your behalf or on behalf of TCEH?
25      A.  I understand that, and I also

Page 471

CONFIDENTIAL - HUGH SAWYER

1
2  understand that these claims have currently
3  not yet been made.
4      Q.  Who would have the right to bring
5  the claim under the competitive TSA that says
6  that you can't force a capital gains tax on
7  TCEH?
8      MS. O'CONNOR:  Object to form.
9      Q.  It would be TCEH, right?
10      A.  Hypothetically, should that
11  circumstance arise at some point in the
12  process and the pendency of the bankruptcy,
13  the T-side, I believe, would have the right to
14  bring that case.
15      Q.  But have you -- since the beginning
16  even before this case started with the RSA,
17  you've been operating under the belief that
18  one of the risks you need to mitigate is the
19  risk that there's going to be a tax that's
20  pushed down from EFH down into TCEH, right?
21      A.  That's right. If a fiduciary of
22  the E-side were to check the box, so to speak,
23  on the T-side subsidiaries.
24      Q.  Right. But currently, isn't it
25  true that TCEH is operating its business in

Page 472

CONFIDENTIAL - HUGH SAWYER

1
2  seeking to support these bidding procedures
3  motions with the idea that there is a
4  substantial possibility that the tax can be
5  pushed down?
6      MS. O'CONNOR:  Object to form.
7      A.  There is a potential that a tax
8  could be pushed down by an E-side fiduciary.
9  There's also the potential that we could
10  identify an alternative structure through this
11  process that renders it moot.
12      Q.  So at what point -- at what point
13  now that since Sawyer number 12 doesn't rise
14  to the level of a live dispute, in your view,
15  at what point do you think TCEH should get to
16  the bottom of whether or not its contract,
17  which may say no tax can be -- no capital
18  gains could be pushed down, should be enforced
19  against EFH?
20      A.  It's certainly not today, in my
21  business judgment, but at some point in the
22  process when we have a larger body of facts,
23  when we have a transaction to review, when we
24  understand the nature and structure of that
25  transaction, whether it's a tax-free spin or a

38  (Pages 469 to 472)

Page 473

CONFIDENTIAL - HUGH SAWYER

1    CONFIDENTIAL - HUGH SAWYER
2    taxable transaction, when we have a plan of
3    reorganization underway at some point in the
4    process it will be important to understand all
5    of the tax implications to the T-. Side, but
6    that day is not today.
7        Q. You say "we," and as I understand
8    it, there's only a you; that is, you are the
9    only sole TCEH fiduciary. Can you testify
10   under oath now that when that issue comes,
11   you're going to be seeking independent legal
12   advice and aren't going to go to the lawyer
13   for the Defendant in that lawsuit to tell you
14   what the contract means?
15       MS. O'CONNOR: Object to form.
16       A. By "we," I mean the T-side board.
17   And I am not yet prepared to testify today
18   that I would be seeking independent advice. I
19   have no idea yet what this transaction is
20   going to look like or what the structure will
21   be whether it will be taxable or tax-free spin
22   up. I don't know yet.
23       Q. Can you open up Exhibit 2, the
24   Stipulation and Agreed Order Regarding a
25   Protocol for Certain Case Matters?

Page 474

1    CONFIDENTIAL - HUGH SAWYER
2        A. Which; I'm sorry?
3        Q. Exhibit 2.
4        A. Okay.
5        Q. First of all, let me ask some basic
6    questions. Do you know whether this
7    stipulation was ever presented to the TCEH
8    board or EFCH board for approval?
9        A. To my belief, it was not presented
10   for approval.
11       Q. All right. So if you turn to -- I
12   just want to know what you know. You got
13   asked about whether you knew you had a right
14   to get counsel. But I want to ask you through
15   some specific things.
16       Can you turn to page 2?
17       A. Okay.
18       Q. Were you aware that
19   Kirkland & Ellis was signing a document which
20   was going to bind the TCEH estates to certain
21   corporate governance matters?
22       MS. O'CONNOR: Object to form.
23       A. Which paragraph?
24       Q. Paragraph one. It says, "This
25   Stipulation and Order is intended to bind and

Page 475

1    CONFIDENTIAL - HUGH SAWYER
2    enure to the benefit of the parties."
3        You see that?
4        A. Um-hum.
5        Q. You understand one of the parties
6    here is TCEH?
7        A. Right.
8        Q. Were you aware that counsel was
9    signing a stipulation that was going to bind
10   TCEH?
11       A. And as I think I previously
12   testified, I was not aware of this document so
13   then, therefore, I was not aware.
14       Q. Can you turn to paragraph four,
15   please.
16       A. Okay.
17       Q. If you go down to -- after the
18   definition of "independent matters," there's a
19   sentence. You see that it's down five lines
20   up from the bottom. It says, "The independent
21   directors of EFCH and TCH shall consult with
22   the creditors' representatives regarding the
23   selection of an independent advisor or
24   independent advisors."
25       Were you aware that that on your

Page 476

1    CONFIDENTIAL - HUGH SAWYER
2    behalf you have been required to consult with
3    the TCH creditor representatives regarding
4    the selection of independent counsel?
5        A. I was not aware.
6        Q. If you turn to page 7 -- no, page
7    4, sorry, paragraph 7. Page 4, paragraph 7.
8        A. Okay.
9        Q. Down at the bottom, it says, "The
10   debtors and K&E will facilitate the TCH
11   creditors' representatives diligence of the
12   rights and potential claims, causes of action
13   and defenses of the TCEH debtors against or
14   with respect to other debtors."
15       You see that?
16       A. I do.
17       Q. Were you aware that TCEH has
18   committed to facilitating investigation of
19   TCEH claims?
20       MS. O'CONNOR: Object to form.
21       A. I'm sorry; will you restate that?
22       Q. Sure. Were you aware, until just
23   now, that TCEH, which is a debtor, has
24   committed to facilitate this side of the
25   table's investigation of TCH, whatever TCH

39 (Pages 473 to 476)

Page 477

CONFIDENTIAL - HUGH SAWYER

1    claims might be against other debtors,
2    insiders, the sponsors and third parties?
3
4        A.  I was not aware.
5        Q.  Have you done anything, to your
6    knowledge, to facilitate the investigation of
7    any of those claims?
8        A.  I have certainly participated in
9    privileged conversations with counsel
10    regarding the nature and value of those
11    potential claims.
12        Q.  Have you done anything to
13    facilitate the representatives -- TCH
14    representatives are, essentially, my group,
15    Mr. Weisfelner's group and the committee. The
16    official committee.
17        A.  Right.
18        Q.  Have you done anything to
19    facilitate our investigation of those claims?
20        A.  Not at this time.
21        MS. O'CONNOR:  Object to form.
22        Q.  Now, if you go to the next
23    paragraph, paragraph 8, paragraph 8, I'll just
24    give you a little background.  The concept
25    here, if we, in our investigation, figure out

Page 478

CONFIDENTIAL - HUGH SAWYER

1    that there's some claims to be brought, we
2    might bring a Motion to Seek Standing to
3    assert those claims on behalf of TCH against
4    other debtors, insiders or sponsors.  Okay?
5        A.  Okay.
6        Q.  Were you aware the TCEH debtors,
7    the two you are a board member for, EFCH and
8    TCEH, agreed not to obtain court approval to
9    set, resolve, modify or in other way treat
10    those claims unless a standing motion is
11    resolved?
12        A.  No, I was not aware.
13        Q.  And then paragraph 9, were you
14    aware that there were some dates set for us to
15    bring a standing motion that went through
16    February 28, 2015?
17        A.  No, I was not aware.
18        Q.  So I'll tell you right now, we have
19    until February 28, 2015 to investigate
20    potential claims that TCEH or EFCH can bring
21    against the parties that are laid out in
22    paragraph 7, okay?
23        A.  Yes.
24        Q.  You said before your testimony was
25

Page 479

CONFIDENTIAL - HUGH SAWYER

1    the TCEH claims that's a question of
2    allocation of proceeds.  You remember that
3    testimony?
4        A.  I think I said that the allocation
5    of proceeds, should there be proceeds, would
6    be decided through the course of this case.
7        Q.  Right.  Was it your intent to be
8    testifying that if TCH has claims that EFIH or
9    at EFIH, they'll be entitled to share in those
10    proceeds?
11        A.  My intent was only to testify that
12    through the process of the court, that the
13    court would determine how to best allocate
14    those proceeds.
15        Q.  And that your view was right now,
16    you should be maximizing the value of the sale
17    of the Oncor equity stake?
18        A.  Exactly; given that I think there
19    is certainly no downside for the T-side
20    creditors to maximize the value of the estate.
21        Q.  Let me ask you a question.
22        A.  Sure.
23        Q.  Were you aware that one of the
24    claims has been raised since the first
25

Page 480

CONFIDENTIAL - HUGH SAWYER

1    pleading, at least that we filed in this case,
2    that EFCH, in 2007, transferred the Oncor
3    business over to the E-side?
4        A.  I do recall that claim.
5        Q.  And do you understand that the
6    assertion has been made that that might lead
7    to a fraudulent conveyance claim that EFCH
8    could bring against the E-side?
9        A.  I do recall that assertion.
10        Q.  Do you understand that those claims
11    not only would be against EFIH but potentially
12    could be asserted against entities inside the
13    ring fence?
14        MS. O'CONNOR:  Object to form.
15        A.  I can't testify to that legal
16    matter.  That would be up to the attorneys in
17    the court.  I am aware that certain assertions
18    have been made.
19        Q.  And do you understand that one of
20    the consequences is that if EFCH were able to
21    go inside the ring fence and sue the entities
22    inside the ring fence, the EFCH claims would
23    be senior to the equity interests of EFIH?
24        MS. O'CONNOR:  Object to form.
25

40  (Pages 477 to 480)

# EXHIBIT 7

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### FOR THE FISCAL YEAR ENDED DECEMBER 31, 2012

— OR —

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 1-12833

# Energy Future Holdings Corp.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Texas | 75-2669310 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1601 Bryan Street, Dallas, TX 75201-3411 | (214) 812-4600 |
| (Address of principal executive offices) (Zip Code) | (Registrant's telephone number, including area code) |

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| 9.75% Senior Notes due 2019 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐  Accelerated filer ☐  Non-Accelerated filer ☒ (Do not check if a smaller reporting company)
Smaller reporting company ☐

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐ No ☒

At February 19, 2013, there were 1,681,031,995 shares of common stock, without par value, outstanding of Energy Future Holdings Corp. (substantially all of which were owned by Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp.'s parent holding company, and none of which is publicly traded).

### DOCUMENTS INCORPORATED BY REFERENCE
None

Table of Contents

*Liability Management Program* — At December 31, 2012, EFH Corp. and its consolidated subsidiaries had $38 billion principal amount of long-term debt outstanding. In October 2009, we implemented a liability management program designed to reduce debt, capture debt discount and extend debt maturities through debt exchanges, repurchases and extensions. Activities under the liability management program do not include debt issued by Oncor or its subsidiaries.

Amendments to the TCEH Senior Secured Facilities completed in April 2011 and January 2013 resulted in the extension of $16.4 billion in loan maturities under the TCEH Term Loan Facilities and the TCEH Letter of Credit Facility from October 2014 to October 2017 and $2.05 billion of commitments under the TCEH Revolving Credit Facility from October 2013 to October 2016.

Other liability management activities since October 2009 (including transactions in early 2013) include debt exchange, issuance and repurchase activities as follows:

| Security (except where noted, debt amounts are principal amounts) | Debt Acquired (a) | | Debt Issued/Cash Paid | |
|---|---|---|---|---|
| EFH Corp. 10.875% Notes due 2017 | $ | 1,967 | $ | — |
| EFH Corp. Toggle Notes due 2017 | | 3,126 | | 53 |
| EFH Corp. 5.55% Series P Senior Notes due 2014 | | 910 | | — |
| EFH Corp. 6.50% Series Q Senior Notes due 2024 | | 549 | | — |
| EFH Corp. 6.55% Series R Senior Notes due 2034 | | 459 | | — |
| TCEH 10.25% Notes due 2015 | | 1,875 | | — |
| TCEH Toggle Notes due 2016 | | 751 | | — |
| TCEH Senior Secured Facilities due 2013 and 2014 | | 1,623 | | — |
| EFH Corp. and EFIH 9.75% Notes due 2019 | | 252 | | 256 |
| EFH Corp 10% Notes due 2020 | | 1,058 | | 561 |
| EFIH 11% Notes due 2021 | | — | | 406 |
| EFIH 10% Notes due 2020 | | — | | 3,482 |
| EFIH Toggle Notes due 2018 | | — | | 1,392 |
| TCEH 15% Notes due 2021 | | — | | 1,221 |
| TCEH 11.5% Notes due 2020 (b) | | — | | 1,604 |
| Cash paid, including use of proceeds from debt issuances in 2010 (c) | | — | | 1,062 |
| Total | $ | 12,570 | $ | 10,037 |

(a) Includes an aggregate $2.228 billion principal amount of these securities held by EFH Corp. and EFIH, including $564 million of EFH Corp. debt held by EFH Corp. All other debt acquired has been canceled.

(b) Excludes from the $1.750 billion principal amount $12 million in debt discount and $134 million in proceeds used for transaction costs related to the issuance of these notes and the amendment and extension of the TCEH Senior Secured Facilities. All other proceeds were used to repay borrowings under the TCEH Senior Secured Facilities, and the remaining transaction costs were funded with cash on hand.

(c) Includes $100 million of the proceeds from the January 2010 issuance of $500 million principal amount of EFH Corp. 10% Notes due 2020 and $290 million of the proceeds from the October 2010 issuance of $350 million principal amount of TCEH 15% Senior Secured Second Lien Notes due 2021. The total $390 million of proceeds was used to repurchase debt.

In 2012, EFIH issued $2.253 billion principal amount of debt, the proceeds from which funded $1.630 billion in dividends to EFH Corp., with the remaining proceeds held as cash on hand. EFH Corp. used a portion of the dividends and cash on hand to repay the balance of the TCEH Demand Notes in January 2013. In 2012 and early 2013, EFIH issued $2.695 billion principal amount of debt in exchange for $3.027 billion principal amount of EFH Corp. debt and $139 million principal amount of EFIH debt. See Note 8 to Financial Statements for discussion of these and other debt-related transactions. Since inception, the transactions in the liability management program have resulted in the capture of $2.5 billion of debt discount and the extension of approximately $25.7 billion of debt maturities to 2017-2021.

Table of Contents

15.  **RELATED PARTY TRANSACTIONS**

The following represent our significant related-party transactions.

- We pay an annual management fee under the terms of a management agreement with the Sponsor Group, which we reported in SG&A expense totaling $38 million, $37 million and $37 million for the years ended December 31, 2012, 2011 and 2010, respectively.

- In 2007, TCEH entered into the TCEH Senior Secured Facilities with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners, which is a member of the Sponsor Group. Affiliates of each member of the Sponsor Group have from time to time engaged in commercial banking transactions with us and/or provided financial advisory services to us, in each case in the normal course of business.

- In January 2013, fees paid to Goldman, Sachs & Co. (Goldman), an affiliate of GS Capital Partners for services related to debt exchanges totaled $2 million, described as follows: (i) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange new EFIH 10% Notes for EFH Corp. 9.75% Notes, EFH Corp. 10% Notes and EFIH 9.75% Notes (collectively, the Old Notes) and as a solicitation agent in the solicitation of consents by EFH Corp. and EFIH and EFIH Finance to amendments to the Old Notes and indentures governing the Old Notes and (ii) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange EFIH Toggle Notes for EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes. See Note 8 for further discussion of these exchange offers.

  For the year ended December 31, 2012, fees paid to Goldman related to debt issuances totaled $10 million, described as follows: (i) Goldman acted as a joint book-running manager and initial purchaser in the February 2012 issuance of $1.15 billion principal amount of EFIH 11.750% Senior Secured Second Lien Notes (see Note 8) for which it received fees totaling $7 million, and (ii) Goldman acted as joint book-running manager and initial purchaser in the August 2012 issuance of $600 million principal amount of 11.750% Senior Secured Second Lien Notes and $250 million principal amount of EFIH 6.875% Senior Secured Notes (see Note 8) for which it received fees totaling $3 million. In the October 2012 issuance of $253 million principal amount of EFIH 6.875% Notes, Goldman acted as joint book-running manager and initial purchaser for which it was paid $1 million. A broker-dealer affiliate of KKR served as a co-manager and initial purchaser and an affiliate of TPG served as an adviser in all of these transactions, for which they each received a total of $4 million.

  For the year ended December 31, 2011, fees paid to Goldman related to debt issuances, exchanges, amendments and extensions totaled $26 million, described as follows: (i) Goldman acted as a joint lead arranger and joint book-runner in the April 2011 amendment and extension of the TCEH Senior Secured Facilities (see Note 8) and received fees totaling $17 million and (ii) Goldman acted as a joint book-running manager and initial purchaser in the issuance of $1.750 billion principal amount of TCEH Senior Secured Notes as part of the April 2011 amendment and extension and received fees totaling $9 million. Affiliates of KKR and TPG served as advisers to these transactions, and each received $5 million as compensation for their services.

  For the year ended December 31, 2010, fees paid to Goldman related to debt issuances and exchanges totaled $11 million, described as follows: (i) Goldman acted as an initial purchaser in the issuance of $500 million principal amount of EFH Corp. 10% Notes in January 2010 for which it received fees totaling $3 million; (ii) Goldman acted as a dealer manager and solicitation agent in EFH Corp. and EFIH debt exchange offers completed in August 2010 for which it received fees totaling $7 million; (iii) Goldman also acted as an initial purchaser in the issuance of $350 million principal amount of TCEH 15% Senior Secured Second Lien Notes (Series B) in October 2010 and received fees totaling $1 million.

- Affiliates of GS Capital Partners are parties to certain commodity and interest rate hedging transactions with us in the normal course of business.

- Affiliates of the Sponsor Group have sold or acquired, and in the future may sell or acquire, debt or debt securities issued by us in open market transactions or through loan syndications.

168

# EXHIBIT 8

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2012

— OR —

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number 001-34543

# Energy Future Competitive Holdings Company
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Texas** | **75-1837355** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1601 Bryan Street, Dallas, TX 75201-3411** | **(214) 812-4600** |
| (Address of principal executive offices)(Zip Code) | (Registrant's telephone number, including area code) |

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-Accelerated filer | ☒ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

Common Stock Outstanding as of February 19, 2013: 2,062,768 Class A shares, without par value and 39,192,594 Class B shares, without par value.

**Energy Future Competitive Holdings Company meets the conditions set forth in General Instructions (I)(1)(a) and (b) of Form 10-K and is therefore filing this report with the reduced disclosure format.**

DOCUMENTS INCORPORATED BY REFERENCE
None

Table of Contents

## 8. SHORT-TERM BORROWINGS AND LONG-TERM DEBT

### Short-Term Borrowings

At December 31, 2012, outstanding short-term borrowings totaled $2.136 billion, which included $2.054 billion under the TCEH Revolving Credit Facility at a weighted average interest rate of 4.40%, excluding customary fees, and $82 million under the accounts receivable securitization program discussed in Note 7.

At December 31, 2011, outstanding short-term borrowings totaled $774 million, which included $670 million under the TCEH Revolving Credit Facility at a weighted average interest rate of 4.46%, excluding certain customary fees, and $104 million under the accounts receivable securitization program.

### Credit Facilities

Credit facilities with cash borrowing and/or letter of credit availability at December 31, 2012 are presented below. The facilities are all senior secured facilities of TCEH.

| Facility | Maturity Date | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
|---|---|---|---|---|---|
| | | | December 31, 2012 | | |
| TCEH Revolving Credit Facility (a) | October 2013 | $ 645 | $ — | $ 645 | $ — |
| TCEH Revolving Credit Facility (a) | October 2016 | 1,409 | — | 1,409 | — |
| TCEH Letter of Credit Facility (b) | October 2017 (b) | 1,062 | — | 1,062 | — |
| Total TCEH | | $ 3,116 | $ — | $ 3,116 | $ — |

(a) Facility used for borrowings for general corporate purposes. Borrowings are classified as short-term borrowings. At December 31, 2012, borrowings under the facility maturing October 2013 bear interest at LIBOR plus 3.50%, and a commitment fee is payable quarterly in arrears at a rate per annum equal to 0.50% of the average daily unused portion of the facility. At December 31, 2012, borrowings under the facility maturing October 2016 bear interest at LIBOR plus 4.50%, and a commitment fee is payable quarterly in arrears at a rate per annum equal to 1.00% of the average daily unused portion of the facility. In January 2013, commitments maturing in 2013 were extended to 2016 as discussed below.

(b) Facility, $42 million of which matures in October 2014, used for issuing letters of credit for general corporate purposes, including, but not limited to, providing collateral support under hedging arrangements and other commodity transactions that are not secured by a first-lien interest in the assets of TCEH. The borrowings under this facility have been recorded by TCEH as restricted cash that supports issuances of letters of credit and are classified as long-term debt. At December 31, 2012, the restricted cash totaled $947 million, after reduction for a $115 million letter of credit drawn in 2009 related to an office building financing. At December 31, 2012, the restricted cash supports $764 million in letters of credit outstanding, leaving $183 million in available letter of credit capacity.

*Amendment and Extension of TCEH Revolving Credit Facility* — In January 2013, the Credit Agreement governing the TCEH Senior Secured Facilities was amended to extend the maturity date of the $645 million of commitments maturing in October 2013 to October 2016, bringing the maturity date of the entire commitment of $2.054 billion to October 2016. The extended commitments will have the same terms and conditions as the existing commitments expiring in October 2016 under the Credit Agreement. Fees in consideration for the extension were settled through the incurrence of $340 million principal amount of incremental TCEH Term Loan Facilities maturing in October 2017. In connection with the extension request, TCEH eliminated its ability to draw letters of credit under the TCEH Revolving Credit Facility. At the date of the extension, there were no outstanding letters of credit under the TCEH Revolving Credit Facility.

105

# EXHIBIT 9

Bloomberg Businessweek

# News From Bloomberg

http://www.businessweek.com/news/2012-10-22/txu-teeters-as-kkr-et-al-dot-reap-528-million-fees

# TXU Teeters as KKR et al. Reap $528 Million in Fees

By Richard Bravo and Mark ChediakOctober 22, 2012

KKR & Co. (KKR:US), TPG Capital and Goldman Sachs Capital Partners (GS:US), which took the former TXU Corp. private five years ago in the largest leveraged buyout in history, have paid themselves $528.3 million in fees, even as the electricity provider teeters toward a near-term bankruptcy or restructuring.

The payments consist of a $300 million charge for advising on the buyout, annual management fees totaling $171 million and as much as $57.3 million for consulting on debt deals, the Dallas-based company now called Energy Future Holdings Corp. said in regulatory filings. The private-equity firms' fees are as much as 25 times greater than average, based on data from law firm Dechert LLP and researcher Preqin Ltd.

Energy Future's long-term debt has soared to $42 billion since the buyout and the company is poised for its seventh straight quarterly loss as it struggles with natural gas prices 73 percent below their 2008 peak. Moody's Investors Service says the company may need to restructure next year and derivatives traders are pricing in a 95 percent chance of default within five years for its deregulated unit.

"This is a utility and its product is electricity that it sells to the public, but it really is a debt house," said Tom Sanzillo, finance director for the Institute for Energy Economics & Financial Analysis, a research group, and former deputy comptroller of New York who oversaw the state's $156 billion pension fund. "There are fees to be made in all that debt management."

## Technically Insolvent

The company, which traces its roots in North Texas to 1882, expects to post a third-quarter net loss of $407 million on operating revenue of $1.8 billion, according to an Oct. 18 filing. Energy Future plans to release its full earnings report on Oct. 30. Total liabilities (TXU:US) were $52.2 billion as of June 30, compared with total assets of $44.1 billion, according to data compiled by Bloomberg, indicating the company is technically insolvent.

The fees from Energy Future may allow KKR, TPG and Goldman Sachs to extract cash without infringing on the Delaware Limited Liability Company Act, which limits distributions from a firm if all its liabilities exceed the fair value of its assets, according to Chapter 18 of the law.

The company's Energy Future Intermediate Holdings Co. LLC, Texas Competitive Electric Holdings Co. and Oncor Electric Delivery Holdings Co. LLC units were incorporated in Delaware and are subject to the laws of that jurisdiction, Allan Koenig, a spokesman at Energy Future, confirmed in an e-mail.

## Default Swaps

Kristi Huller, a KKR spokeswoman, Owen Blicksilver, a spokesman for TPG with Owen Blicksilver Public Relations Inc., and Andrea Raphael of Goldman Sachs declined to comment.

Five-year credit default swaps tied to Texas Competitive have soared to 79 percentage points upfront as of Oct. 19, according to data provider CMA, which is owned by McGraw-Hill Cos. and compiles prices quoted by dealers in the privately negotiated market.

That's in addition to 5 percent a year, meaning it would cost $7.9 million initially and $500,000 annually to protect $10 million of its debt for five years. Credit swaps pay the buyer face value if a borrower fails to meet its obligations, less the value of the defaulted debt.

Texas Competitive's $1.8 billion of 10.25 percent bonds due November 2015 traded at 26 cents on the dollar last week from a high of 88.5 cents in January 2010, according to Trace, the bond-price reporting system of the Financial Industry Regulatory Authority.

## 'Pay Our Debts'

"We continue to pay our debts as they become due and have always been and remain in compliance with all of our debt covenants," Energy Future's Koenig wrote in an e-mail.

KKR, TPG Capital and Goldman Sachs took an $8.3 billion equity stake in Energy Future, according to a 2008 regulatory filing.

Fees and debt-funded dividends are among the ways private-equity firms can profit from a holding without actually improving the value of a target beyond its buyout price. Debt issued to fund such dividends, known as dividend recapitalizations, has reached $54 billion this year, according to Standard & Poor's Capital IQ LCD data, topping the record $40.5 billion in all of 2010.

"It's one of those things they do and it helps their returns," Steven Kaplan, a finance professor at the University of Chicago's Booth School of Business, said in a telephone interview in reference to private-equity firms. "It hurts their companies and it's money their creditors will not get."

## Income Sources

Private-equity managers have been seeking new ways to make money since deal-making sunk from the LBO boom that preceded the financial crisis. The largest firms, including Blackstone Group LP (BX:US), Carlyle Group LP, Apollo Global Management LLC (APO:US) and KKR, have started new lines of business including real estate investing, hedge fund management, credit lending and advisory services.

The firms sometimes charge initial transaction fees for advisory services to companies they purchase. The mean amount of such fees for deals from 2005 through 2010 was $11.9 million, according to a November 2011 report by Philadelphia-based Dechert and Preqin.

Private-equity firms also may charge a yearly monitoring, or management, fee for advisory services, the mean of which was $2.75 million during that six-year period, according to Dechert and Preqin, with offices in New York, London and Singapore. Energy Future's owners said they would receive $35 million annually, increasing 2 percent each year, according to a filing with the U.S. Securities and Exchange Commission in 2008.

## 'Kept Alive'

"The management contract allows them to milk these fees out and that's why the company is being kept alive," said Tom "Smitty" Smith, director of the Texas office of Public Citizen, a consumer group founded by Ralph Nader.

The fees report shows 19 percent of private-equity firms charge their portfolio companies for debt financing. Warburg Pincus LLC, for example, doesn't make the companies it owns pay transaction and monitoring fees, according to Kaplan. Ed Trissel, a spokesman for Warburg, confirmed it doesn't collect such payments.

When Energy Future was taken private for $43.2 billion, it was profiting from low power-generation fuel costs and rising natural gas prices. The company, under former Chairman and Chief Executive Officer C. John Wilder, posted a profit of $2.6 billion in 2006 after rebounding from a failed international expansion that left it on the verge of bankruptcy four years earlier.

## 'Blew Up'

Natural gas futures have fallen to $3.62 per million British thermal units from $6.88 on Oct. 11, 2007, the day KKR and TPG took Energy Future private, and a peak of $13.58 in July 2008, as a recession sapped demand and drilling expanded in the gas-rich Marcellus shale in the eastern U.S., creating a supply glut.

"A lot of investors bet on gas prices and it blew up," Andy DeVries, an analyst at debt research firm CreditSights Inc., said in a telephone interview. "They just didn't do it in the largest buyout in LBO history -- nobody did it with as much leverage as these guys."

As gas prices dropped, wholesale electricity prices plunged, hurting owners of independent generators such as Energy Future. TXU Energy, its retail business, lost 8 percent of its customers to competitors offering lower electricity rates in the first half of 2012 compared with the a year earlier.

The company had a net loss (TXU:US) of $696 million in the second quarter, after a deficit of $1.91 billion last year and $2.81 billion in 2010, Bloomberg data show. Operating income (TXU:US) at the energy producer last year was $383 million while interest expense on bonds was $4.2 billion.

## Sustainability Questioned

Energy Future's leverage, or ratio of consolidated total debt to earnings before interest, taxes, depreciation and amortization was 9.5 times at June 30, according to a July 31 filing with the SEC. That's higher than every U.S. utility that has more than $1 billion in debt, Bloomberg data show. Energy Future is restricted from paying dividends to its owners using net income if its leverage is greater than 7 times, according to the July filing.

The company's total liquidity was $3.8 billion as of Sept. 30, according to an Oct. 18 regulatory filing.

Energy Future's "capital structure is complex and, in our opinion, untenable which calls into question the sustainability of the business model and expected duration of its liquidity reserves," Moody's analysts James Hempstead and William Hess wrote in an August report. The ratings firm expects a "material balance sheet restructuring" as soon as 2013, they wrote.

To contact the reporters on this story: Richard Bravo in New York at rbravo5@bloomberg.net; Mark Chediak in San Francisco at mchediak@bloomberg.net

To contact the editors responsible for this story: Alan Goldstein at agoldstein5@bloomberg.net; Susan Warren at susanwarren@bloomberg.net

SPECIAL OFFER * SUBSCRIBE AND SAVE 69 %

©2014 Bloomberg L.P. All Rights Reserved. Made in NYC

# EXHIBIT 10

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### FOR THE FISCAL YEAR ENDED DECEMBER 31, 2013

— OR —

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 1-12833

# Energy Future Holdings Corp.

(Exact name of registrant as specified in its charter)

| Texas | 46-2488810 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1601 Bryan Street, Dallas, TX 75201-3411 | (214) 812-4600 |
| (Address of principal executive offices) (Zip Code) | (Registrant's telephone number, including area code) |

#### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| 9.75% Senior Notes due 2019 | New York Stock Exchange |

#### Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐   Accelerated filer ☐   Non-Accelerated filer ☒ (Do not check if a smaller reporting company)
Smaller reporting company ☐

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐ No ☒

At April 29, 2014, there were 1,669,861,383 shares of common stock, without par value, outstanding of Energy Future Holdings Corp. (substantially all of which were owned by Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp.'s parent holding company, and none of which is publicly traded).

#### DOCUMENTS INCORPORATED BY REFERENCE
None

Table of Contents

**17.  RELATED PARTY TRANSACTIONS**

The following represent our significant related-party transactions. Also see Note 2 for discussion of the Restructuring Support and Lock-up Agreement entered into in anticipation of the Bankruptcy Filing.

- On a quarterly basis, we have paid a management fee to the Sponsor Group under the terms of a management agreement. Related amounts expensed and reported as SG&A expense totaled $39 million, $38 million and $37 million for the years ended December 31, 2013, 2012 and 2011, respectively. Amounts paid totaled $29 million, $38 million and $37 million in the years ended December 31, 2013, 2012 and 2011, respectively. Beginning with the quarterly management fee due December 31, 2013, the Sponsor Group, while reserving the right to receive the fees, directed EFH Corp. to suspend payments of the management fees for an indefinite period.

- In 2007, TCEH entered into the TCEH Senior Secured Facilities with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners, which is a member of the Sponsor Group. Affiliates of each member of the Sponsor Group have from time to time engaged in commercial banking transactions with us and/or provided financial advisory services to us, in each case in the normal course of business.

- In January 2013, fees paid to Goldman, Sachs & Co. (Goldman), an affiliate of GS Capital Partners, for services related to debt exchanges totaled $2 million, described as follows: (i) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange new EFIH 10% Notes for EFH Corp. 9.75% Notes, EFH Corp. 10% Notes and EFIH 9.75% Notes (collectively, the Old Notes) and as a solicitation agent in the solicitation of consents by EFH Corp. and EFIH and EFIH Finance to amendments to the Old Notes and indentures governing the Old Notes and (ii) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange EFIH Toggle Notes for EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes. See Note 10 for further discussion of these exchange offers.

  For the year ended December 31, 2012, fees paid to Goldman related to debt issuances totaled $10 million, described as follows: (i) Goldman acted as a joint book-running manager and initial purchaser in the February 2012 issuance of $1.15 billion principal amount of EFIH 11.750% Notes for which it received fees totaling $7 million; and (ii) Goldman acted as joint book-running manager and initial purchaser in the August 2012 issuance of $600 million principal amount of 11.750% Notes and $250 million principal amount of EFIH 6.875% Notes for which it received fees totaling $3 million. In the October 2012 issuance of $253 million principal amount of EFIH 6.875% Notes, Goldman acted as joint book-running manager and initial purchaser for which it was paid $1 million. A broker-dealer affiliate of KKR served as a co-manager and initial purchaser and an affiliate of TPG served as an advisor in all of these transactions, for which they each received a total of $4 million.

  For the year ended December 31, 2011, fees paid to Goldman related to debt issuances, exchanges, amendments and extensions totaled $26 million, described as follows: (i) Goldman acted as a joint lead arranger and joint book-runner in the April 2011 amendment and extension of the TCEH Senior Secured Facilities and received fees totaling $17 million and (ii) Goldman acted as a joint book-running manager and initial purchaser in the issuance of $1.750 billion principal amount of TCEH Senior Secured Notes as part of the April 2011 amendment and extension and received fees totaling $9 million. Affiliates of KKR and TPG served as advisors to these transactions, and each received $5 million as compensation for their services.

- Affiliates of GS Capital Partners are parties to certain commodity and interest rate hedging transactions with us in the normal course of business.

- Affiliates of the Sponsor Group have sold or acquired, and in the future may sell or acquire, debt or debt securities issued by us in open market transactions or through loan syndications.

- TCEH made loans to EFH Corp. in the form of demand notes (TCEH Demand Notes) that were pledged as collateral under the TCEH Senior Secured Facilities for (i) debt principal and interest payments and (ii) other general corporate purposes (SG&A Note) for EFH Corp. The TCEH Demand Notes totaled $698 million at December 31, 2012, including $233 million in the SG&A Note, and are eliminated in consolidation in these consolidated financial statements. EFH Corp. settled the balance of the TCEH Demand Notes in January 2013 using $680 million of the proceeds from debt issued by EFIH in 2012 that had been held as restricted cash (see Note 19).

180

# EXHIBIT 11

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

### FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2013

— OR —

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 1-12833

# Energy Future Holdings Corp.

(Exact name of registrant as specified in its charter)

| Texas | 46-2488810 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1601 Bryan Street, Dallas, TX 75201-3411 | (214) 812-4600 |
| (Address of principal executive offices) (Zip Code) | (Registrant's telephone number, including area code) |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐   Accelerated filer ☐   Non-Accelerated filer ☒ (Do not check if a smaller reporting company)
Smaller reporting company ☐

Indicate by check mark if the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐ No ☒

At August 1, 2013, there were 1,669,861,383 shares of common stock, without par value, outstanding of Energy Future Holdings Corp. (substantially all of which were owned by Texas Energy Future Holdings Limited Partnership, Energy Future Holdings Corp.'s parent holding company, and none of which is publicly traded).

Table of Contents

## 11.  RELATED PARTY TRANSACTIONS

The following represent our significant related-party transactions.

- We pay an annual management fee under the terms of a management agreement with the Sponsor Group, reported in SG&A expense, totaling $10 million and $9 million for the three months ended June 30, 2013 and 2012, respectively, and $19 million for both the six months ended June 30, 2013 and 2012.

- In 2007, TCEH entered into the TCEH Senior Secured Facilities with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners, which is a member of the Sponsor Group. Affiliates of each member of the Sponsor Group have from time to time engaged in commercial banking transactions with us and/or provided financial advisory services to us, in each case in the normal course of business.

- In January 2013, fees paid to Goldman, Sachs & Co. (Goldman), an affiliate of GS Capital Partners, for services related to debt exchanges totaled $2 million, described as follows: (i) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange new EFIH 10% Notes for EFH Corp. 9.75% Notes, EFH Corp. 10% Notes and EFIH 9.75% (collectively, the Old Notes) and as a solicitation agent in the solicitation of consents by EFH Corp. and EFIH and EFIH Finance to amendments to the Old Notes and indentures governing the Old Notes and (ii) Goldman acted as a dealer manager for the offers by EFIH and EFIH Finance to exchange EFIH Toggle Notes for EFH Corp. 10.875% Notes and EFH Corp. Toggle Notes. See Note 5 for further discussion of these exchange offers.

  In February 2012, Goldman acted as a joint book-running manager and initial purchaser in the issuance of $1.15 billion principal amount of EFIH 11.750% Notes for which it received fees totaling $7 million. A broker-dealer affiliate of KKR served as a co-manager and initial purchaser and an affiliate of TPG served as an advisor in the transactions, for which they each received $1 million.

- Affiliates of GS Capital Partners are parties to certain commodity and interest rate hedging transactions with us in the normal course of business.

- Affiliates of the Sponsor Group have sold or acquired, and in the future may sell or acquire, debt or debt securities issued by us in open market transactions or through loan syndications.

- TCEH made loans to EFH Corp. in the form of demand notes (TCEH Demand Notes) that were pledged as collateral under the TCEH Senior Secured Facilities for (i) debt principal and interest payments and (ii) other general corporate purposes (SG&A Note) for EFH Corp. The TCEH Demand Notes totaled $698 million at December 31, 2012, including $233 million in the SG&A Note, and are eliminated in consolidation in these condensed consolidated financial statements. EFH Corp. settled the balance of the TCEH Demand Notes in January 2013 using $680 million of the proceeds from debt issued by EFIH in 2012 that had been held as restricted cash (see Note 13).

- As part of EFH Corp.'s liability management program, EFH Corp. and EFIH have purchased, or received in exchanges, certain debt securities of EFH Corp. and TCEH, which they have held. Principal and interest payments received by EFH Corp. and EFIH on these investments have been used, in part, to service their outstanding debt. These investments are eliminated in consolidation in these consolidated financial statements. At June 30, 2013, EFIH held $1.282 billion principal amount of EFH Corp. debt and $79 million principal amount of TCEH debt. At June 30, 2013, EFH Corp. held $303 million principal amount of TCEH debt. In the first quarter 2013, EFIH distributed as a dividend to EFH Corp. $6.360 billion principal amount of EFH Corp. debt previously received by EFIH in debt exchanges; EFH Corp. cancelled the debt instruments (see Note 5).

- TCEH's retail operations pay Oncor for services it provides, principally the delivery of electricity. Expenses recorded for these services, reported in fuel, purchased power costs and delivery fees, totaled $230 million and $238 million for the three months ended June 30, 2013 and 2012, respectively, and $455 million and $465 million for the six months ended June 30, 2013 and 2012, respectively. The fees are based on rates regulated by the PUCT that apply to all REPs. The balance sheets at June 30, 2013 and December 31, 2012 reflect amounts due currently to Oncor totaling $139 million and $53 million, respectively (included in net payables due to unconsolidated subsidiary), largely related to these electricity delivery fees. Also see discussion below regarding receivables from Oncor under a tax sharing agreement.

38