1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                    :

                              :      Chapter 11

6   ENERGY FUTURE HOLDINGS    :

    CORP.,  et al.,           :   Case No. 14-10979(CSS)

7                             :

            Debtors.          :    (Jointly Administration

8   _____:   Requested)

9

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15                              October 8, 2014

16                              10:04 AM

17  B E F O R E :

18  HON CHRISTOPHER S. SONTCHI

19  U.S. BANKRUPTCY JUDGE

20

21

22

23

24

25  ECR OPERATOR:  LESLIE MURIN

1   HEARING re Motion of Energy Future Holdings Corp., et al.,

2   for Entry of an Order Authorizing the Debtors to (A) Pay

3   Certain Prepetition Amounts on Account of the Insider

4   Compensation Programs and (B) Continue the Insider

5   Compensation Programs in the Ordinary Course of Business on

6   a Postpetition Basis [D.I. 1792; filed August 8,2014]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :
 2   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 3        Attorney for TCEH First Lien Group
 4
 5   BY:  BRIAN S. HERMAN, ESQ.
 6        PAULINE K. MORGAN
 7
 8   POTTER, ANDERSON & CORROON
 9        Attorney for Deutsche Bank New York
10
11   BY:  LAURIE SELBER SILVERSTEIN
12        R. STEPHEN MCNEILL
13
14   KIRKLAND & ELLIS
15        Attorney for the Debtors
16
17   By:  MARK MCKANE
18        EDWARD SASSOWER
19        DAVID DEMPSEY
20
21   POLSINELLI
22        Attorney for the Committee
23
24   BY:  JARRETT VINE
25
```

1   MORRISON & FOERSTER

2        Attorneys for the Committee

3

4   By:  LORENZO MARINUZZI

5

6   ASHBY & GEDDES

7        Attorneys for Trustee

8

9   BY:  GREG TAYLOR

10

11  U.S. TRUSTEE

12

13  BY:  JULIET SARKESSIAN

14       ANDREA SCHWARTZ

15       RICHARD SCHEPACARTER

16

17  PACHULSKI STANG ZIEHL & JONES

18       Attorney for Computershare Interactive Trust

19  (indiscernible)

20

21  BY:  COLIN R. ROBINSON

22

23  RICHARDS, LAYTON & FINGER

24       Attorney for the Debtor

25

Page 5

1  BY:  JASON M. MADRON

2

3  CHIPMAN BROWN CICERO & COLE LLP

4       Attorney for Adhoc Committee of EF14 Unsecured

5  Noteholders

6

7  BY: ANN KASHISHIAN

8

9  FOX ROTHSCHILD LLP

10       Attorney for TCEH Ad Hoc Group

11

12  BY: JOHN H. STROCK

13

14  COLE SCHOTZ

15       Attorney for Delaware Trust Company

16

17  BY: NORMAN L. PERNICK

18

19  CROSS & SIMON LLC

20       Attorney for Fidelity

21

22  BY: MICHAEL J. JOYCE

23

24  KLEHR HARRISON HARVEY BRANZBURG LLP

25       Attorney for UMB [INDUSTRY?] Trustee

1

2   BY: RAYMOND H. LEMISCH

3

4   ALSO PRESENT TELEPHONICALLY:

5   SCOTT L. ALBERINO

6   ARLENE R. ALVES

7   DESIREE M. AMADOR

8   NILAMAR AMAMOO

9   STEPHEN M. BALDINI

10  CAITLIN BARR

11  JON R. BERKE

12  ROBERT J. BOLLER

13  PEG A. BRICKLEY

14  MATTHEW BROD

15  JEREMY COFFEY

16  HOWARD COHEN

17  KENT COLLIER

18  LOUIS A. CURCIO

19  MICHAEL A. CUSTER

20  MICHAEL L. DAVITT

21  DANIEL DEFRANCESCHI

22  ADAM M. DENHOFF

23  IRA DIZENGOFF

24  MARITA ERBECK

25  BENJAMIN FEDER

1   JULIA FROST-DAVIES

2   CHES GARRISON

3   MEGGIE GILSTRAP

4   BRIAN GUINEY

5   KEELY HAMLIN

6   REBECCA HAYES

7   MARK F. HEBBELN

8   ANGELA K. HERRING

9   WILLIAM HIDBOLD

10   MARSHALL HUEBNER

11   CHRIS D. KENNY

12   STUART KOVENSKY

13   MEREDITH A. LAHAIE

14   MICHAEL LEE

15   HAL F. MORRIS

16   NAOMI MOSS

17   TUVIA PERETZ

18   MEREDITH PFISTER

19   JASON T. PRAGER

20   RAVI SARAWGI

21   JEFFREY M. SCHLERF

22   NED S. SCHODEK

23   MICHAEL SHEPERD

24   MATTHEW SMITH

25   AMER TIWANA

1    JACK TRACY

2    BRADY C. WILLIAMSON

3    APARNA YENAMANDRA

4    LINDSAY ZAHRADKA

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2           THE CLERK:  All rise.

3           THE COURT:  Please be seated.  I'll try version

4       2.0 here.  You may proceed.

5           MR. SASSOWER:  Thank you, Your Honor.  Good

6       morning, Your Honor.  For the record, Edward Sassower of

7       Kirkland & Ellis LLP, counsel to the debtors.  Your Honor,

8       as you know, I typically start hearings with a status

9       report, but today because we have so many witnesses I'm

10      going to keep it very short.  I'll simply note that this is

11      the first of three October hearings.  The first two hearings

12      are special purpose, special single purpose hearings and the

13      third hearing is the omnibus.

14           Today is reserved for insider comp.  October 17th

15      is reserved for our bidding procedures motion and October

16      28th is our monthly omnibus hearing.  The only other thing I

17      wanted to note before we move on to the motion is that we,

18      as promised, filed an informational tax brief which can be

19      found at Docket entry 2296 and that we will supplement that

20      tax brief with an in court PowerPoint presentation at the

21      next available hearing date which currently looks like

22      October 28th.

23           We think that this brief and the in court

24      presentation will provide Your Honor with context with which

25      to understand the complicated tax issues as they crop up

1    throughout the case.

2            THE COURT:  Okay.  Thank you.

3            MR. SASSOWER:  With that, Your Honor, we'll move

4    on to insider comp.  I think we're going to start with a

5    discreet ceiling issue before we move--before we get into

6    the openings.

7            THE COURT:  Okay.

8            MR. SASSOWER:  I'm going to yield the podium to my

9    partner David  Dempsey.

10           MR. DEMPSEY:  Good morning, Your Honor.  David

11   Dempsey from Kirkland & Ellis on behalf of the debtors.  The

12   debtors filed in connection with the motion for approval for

13   insider compensation a motion to seal certain information

14   which really falls into a couple of categories.

15           The first I'll call business information, business

16   planning information which includes, among other things, TXU

17   and Luminant, even the numbers in contribution margins.

18   Based on conversation in chambers, my understanding is that

19   at this time none of the parties, the trustee and certainly

20   not the debtors, intends to make that material public during

21   this proceeding and specifically those exhibits and the

22   materials in connection with the pleading itself remain

23   under seal.  The witnesses will be asked questions in ways

24   not to illicit that specific information.

25           There remains though, I understand, a second

1    bucket of information with regards to which we have a

2    dispute with the United States trustee and namely that is

3    compensation information of specific individuals beyond the

4    top five highest earning folks at the debtors.  The top five

5    folks, of course, their compensation is disclosed in SEC

6    filings.  We have no quarrel with that information becoming

7    public, even in specific nuances that might not be disclosed

8    in particular SEC filings.  But with regard to the materials

9    that we filed under seal, Your Honor, in connection with our

10   motion and then with regards to our exhibits today and the

11   questioning we would ask that the specific compensation of

12   these individuals be kept under seal.  We're not asking for

13   the courtroom to be sealed, we just think that the

14   questioning should be done and the record should be kept

15   such that that material is not made public.

16          To that end, Your Honor, we have a set of binders,

17   the demonstratives, a deposition designation spiral as well

18   as the hearing binders, the exhibits that the parties have

19   jointly agreed to.  If I could, Your Honor, I think it would

20   be helpful if I provided those to you.

21          THE COURT:  Yes.  Okay, thanks.

22          MR. DEMPSEY:  And, Your Honor, I'd like to turn

23   your attention to what I call the hot binder.  It's got a

24   parenthetical in the front as well as on the spine that says

25   "unredacted".

1            THE COURT:  All right, give me just a sec.

2            MR. DEMPSEY:  Sure.

3            THE COURT:  The redacted or the unredacted?

4            MR. DEMPSEY:  The unredacted so we can talk about

5     the specific information.

6            THE COURT:  All right.  Go ahead.

7            MR. DEMPSEY:  So, if you could, Your Honor, turn

8     to tab 20.  This is just exemplative of the sort of

9     information that we're trying to keep from being disclosed

10    publicly.  And if you'll look at it, Your Honor, what this

11    information is specifically is on an individual by

12    individual basis the base salary, short-term incentive

13    compensation, long-term incentive compensation and target

14    bonuses for these individuals dating from 2009 to 2013,

15    historical numbers, and then 2014 projections.

16            In addition, Your Honor, if you look at tab 21,

17    there are individual performance modifiers for individuals

18    beyond this top five.  And our concern, Your Honor, if what

19    those individual performances--modifiers are are effectively

20    the ratings for these individuals as conducted by the

21    debtors that are material to their compensation.  And while

22    it is certainly the case that we have no quarrel with

23    questioning regarding in general the total compensation, we

24    don't want these specific numbers disclosed and the reason

25    is two-fold.  Number one, Your Honor, this information is

1   kept confidential and the reason is because if it's

2   disclosed we run the risk of having competitors poach our

3   employees.

4           THE COURT:  Yeah, I'm sorry?

5           MR. DEMPSEY:  Fair and simple.  Number two, Your

6   Honor--

7           THE COURT:  What was the first one?  I apologize.

8   I didn't hear.

9           MR. DEMPSEY:  If this information is disclosed,

10  Your Honor, we run the risk that competitors will poach our

11  employees.  They will know the specific compensation amounts

12  of our top performers and they can come in and say, "Hey,

13  I'll offer you $50,000 more, $100,000 more.  You're getting

14  this in salary, this in incentive compensation, I can give

15  you this additional compensation to make you whole to switch

16  you job.  Come on over."

17          That's not the sort of thing that the debtors

18  think is fair.  It certainly is covered by statute here and

19  ought to be protected.

20          Reason number two, Your Honor, that we think that

21  this material should remain under seal is because it

22  detriments the debtors internally.  Even if it weren't the

23  case that competitively this material were sensitive, and it

24  is, this could very well cause internal morale issues if

25  everybody knows what other folks are making.  Your Honor,

1    you have sealed similar sorts of material in Vertis

2    Holdings, in Furniture Brands, in Delta Financial.  Judge

3    Shannon sealed very similar information very recently in

4    Brookstone in May.  This is squarely it's in the heartland

5    of the sort of material that's protected.  We don't think

6    that this impinges the trustee's ability to develop a record

7    in any respect whatsoever and certainly the competitive harm

8    that would befall the debtors in that regard vastly

9    outweighs that public's interest in this specific

10   information which is confidential otherwise.  That's all.

11            THE COURT:  Thank you.

12            MS. SCHWARTZ:  Good morning, Your Honor.  Andrea

13   Schwartz, the United States trustee.  Our first issue with

14   respect to the EBITDA information, I just want to clarify

15   for the Court that it is correct, that the U.S. trustee has

16   agreed with the debtors not to disclose the actual EBITDA

17   past performance numbers as well as the actual target

18   numbers.  But, for clarification, it's just that information

19   that's going to be redacted, not the whole exhibit.  For

20   example, one of the exhibits will be score cards, which are

21   call--use that nomenclature by the debtors when they put

22   together their metrics and targets.  So, there will just be

23   that line of the information for EBITDA for Luminant and TXU

24   Energy that will be redacted.  I just wanted to clarify

25   that.

1            With respect to the employment information, my

2    colleague Juliet Sarkessian will address the Court.

3            THE COURT:  Thank you.

4            MS. SARKESSIAN:  Good morning, Your Honor.  Juliet

5    Sarkessian on behalf of the U.S. trustee.  I just want to

6    briefly go over what has happened in connection with the

7    seal motions.  So, the debtor filed the seal motion and at

8    that time they were seeking to keep under seal portions of

9    the actual motion, portions of the supporting declaration,

10   Mr. Friske and the entirety of the declaration, Mr.

11   Filsinger, which was approximately 67 pages.

12           We filed our objection to the sealed motion and in

13   response yesterday the debtors filed the same materials that

14   significantly--that was significantly less redaction.  So,

15   the Friske declaration has now been publicly filed with no

16   redactions whatsoever.  The motion has significantly less

17   redactions.  The Filsinger declaration has now been filed in

18   the redacted format.  The redactions are limited to certain

19   subject matter.  So, there are, as has been discussed, a

20   number of things that remain redacted.

21           I think what we would say, other than the salary

22   issue which I'm about to address, with respect to the other

23   information that is redacted we don't necessarily agree that

24   everything falls under 107(b), however sufficient

25   information has now been made public that will allow us to

1    craft our examination of witnesses in a way that would not

2    be overly restricted.  So, with that in mind we're willing

3    to go ahead.  If there is an issue that comes up during the

4    questioning that relates to something being redacted then I

5    assume it would be okay with the Court if it's dealt with at

6    that moment in time.  Hopefully there won't be anything.

7              THE COURT:  That's fine.

8              MS. SARKESSIAN:  Okay.  With respect to the

9    compensation issue, so just so the Court understands, my

10   understanding is that there is a total of 26 insiders that

11   are the subject of this motion that will be getting bonuses

12   if the motion is approved.  Out of those 26 people there are

13   seven that are in the Strategy Planning Committee and they

14   are--my understanding is getting the bulk of that bonuses.

15   Out of those seven people the top five have their

16   compensation information, salary and bonuses filed with the

17   SEC filings and I understand the debtors don't have an issue

18   with us discussing that information.

19              But with respect to the other two members of the

20   Strategy Planning Committee, who is a Carrie Kirby and she

21   is the executive vice president of human resources at Energy

22   Futures Holding and a Mr. O'Brien who is executive VP of

23   public policy and external affairs as well as the remaining

24   insiders, they are objecting to that information being

25   disclosed, which of course means that it affects the

1    questioning of the witnesses with respect to that

2    information.

3           Now the two reasons that the debtors have proposed

4    for why they believe this information should be protected

5    under 107(b), the Bankruptcy Code, is that they're worried

6    about--that if this information becomes public that their

7    competitors will poach employees.  First of all, they do

8    have non-compete clauses with at least the two with Ms.

9    Kirby and Mr. O'Brien and they may well have them with

10   respect to the rest of them, but we know with those two

11   officers they have an 18-month non-compete provisions.  So,

12   that certainly is discouraging that type of poaching that

13   the debtors are concerned about.

14          In addition, it's my understanding that--well,

15   first of all, the top five--the compensation for the top

16   five are publicly available and there has been no evidence

17   that there have been any attempts to poach those people and

18   in fact Mr. Evans testified at his deposition that since

19   2012 they have only lost one executive, the former CEO of

20   Luminant.

21          In addition, you know, if somebody wants to poach

22   employees, even if they don't have the salary information,

23   I'm not sure what stops them from calling up the person and

24   saying, "Whatever you're making we'll pay you an extra

25   $100,000." Simply having that information does not truly

1    give competitors a significant edge in poaching employees.

2    Again, taking into consideration that these employees would

3    be violating, they would be in breach of contract if they

4    went to a competitor.

5           The second issue that they bring up is employee

6    morale.  So they argue that despite the fact that the

7    employees have available to them information about the top

8    five most highly compensated executives in the company,

9    whose compensation, as disclosed in the 10K for 2013 ranged

10   from $2.8 million to $7.3 million, so that information is

11   already out there for the employees, the debtors believe

12   that somehow getting this additional information about

13   officers that are actually a little bit lower on the scale

14   of compensation would somehow affect employee morale in a

15   different way than it has already been affected and there

16   really is no evidence to believe that's the case.

17          In addition, I really don't see how that reason

18   falls in any way within the purview of 107(b).  So, just to

19   go over, I won't spend a lot of time repeating what's in my

20   brief, but the Supreme Court, the Third Circuit, District

21   Courts in Delaware have all--recognize that it is very

22   important that the public have a general right to court

23   documents and in addition, in bankruptcy it's especially

24   important because it's not just the general public, it's the

25   debtor's creditors and other parties in interest who have

1    the right to have access to judicial records in bankruptcy

2    and in Continental Airlines the District Court for Delaware

3    said it was a strong presumption in favor of public access

4    to judicial records and papers.

5              So, there's only a very narrow exception to that

6    in 107(b) and that covers trade secrets, which nobody is

7    saying this is, confidential research and developments,

8    which the debtors is not saying this is, and confidential

9    commercial information and that is my understanding of what

10   the debtor says--this is confidential commercial

11   information.

12             The debtors have the burden of showing that they

13   fall within 107(b) and that to disclose this information

14   would result in serious injury to the debtors.  The Third

15   Circuit recognized that in Publicker Industries as well as

16   Cendant Corp.  These were not bankruptcy cases, but just in

17   general terms that the party seeking to seal must clearly

18   define the serious injury that will ensure from public

19   disclosure of the documents and that I'm quoting from

20   Cendant.

21             The debtors have filed for bankruptcy.  They have

22   certain obligations being a debtor that they would not have

23   if they were not a debtor and transparency is a very

24   important element.  Again, not just to the public, but to

25   their creditors and other parties in interest--especially in

1    a case like this and this motion where the debtors are

2    making the compensation of these individuals an issue.

3    That's what this motion is about.  They are asking for

4    approval to give additional significant bonuses to these

5    individuals and it certainly is something that is--what

6    their current compensation is and the bonuses that they

7    would get if the motion was approved is certainly relevant

8    to that inquiry and, you know, the U.S. trustee's trial

9    attorney should not be hampered in the way that they can ask

10   questions about that information.

11              Excuse me, Your Honor.  I'm sorry.

12              THE COURT:  It's okay.

13              MS. SARKESSIAN:  So, I will mention one other

14   thing with respect to the salaries.  There is a provision in

15   107(c) that talks about protection of information that could

16   result in--information about an individual that could

17   potentially result in identify theft.  I mean, that's not

18   the situation here.  The debtors aren't arguing that.  So,

19   while it might--somebody's salary might appear to be

20   something one could generally consider to be confidential in

21   sort of a general sense, again, when you're in bankruptcy

22   these are top officers, it's certainly nothing that would

23   have anything to do with identity theft and that's what

24   Congress focused on for individuals and that's not at issue

25   here.

1          So, the U.S. trustee does not believe that the

2   debtor has made its burden to establish that the disclosure

3   of the salaries and bonuses of both Ms.  Kirby and Mr.

4   O'Brien, who are again the top two below the five that are

5   already publicly disclosed, and the remainder of the

6   insiders would cause a serious injury to the debtors that

7   would outweigh the strong presumption under bankruptcy law

8   and federal common law to access by the public and by the

9   debtor's creditors and other parties in interest to the

10  judicial records and proceedings in this action.  Thank you,

11  Your Honor.

12          THE COURT:  You're welcome.  Thank you.

13          MR. DEMPSEY:  David Dempsey, Kirkland & Ellis on

14  behalf of the debtors for purposes of the record.  Your

15  Honor, I think I'd like to begin by level setting on the law

16  because I think U.S. trustee's office is borrowed largely

17  from the common law standards that do not apply with regards

18  to 107(b).  Specifically, United States Trustees Office has

19  quoted a number of times that the debtors have to show that

20  significant injury would befall them such that that injury

21  would outweigh the public right to access.

22          As an initial matter, we believe we meet that

23  standard.  But setting that aside, 107(b) doesn't say that.

24  Instead it says that confidential commercial information

25  shall be protected and the standard in that regard, the way

1    the courts have interpreted it, is--and I'm just reading

2    from a case, from Alterra Health from Bankruptcy Court here

3    in Delaware, the disclosure would result in an unfair

4    advantage to competitors or from global crossing.  The

5    information should not be disclosed to protect business

6    entities from disclosure of information that could--could

7    reasonably be expected to cause the entity commercial

8    injury.

9              Let's talk about that here.  The trustee's

10   solution, Your Honor, is to point to non-compete clauses in

11   the contracts of two employees, Mrs. Kirby and Mr. O'Brien.

12   That does not, by the way, cover the other 19 employees who

13   don't have such non-competes.  But setting that aside, those

14   employment agreements have yet to be assumed.  Those non-

15   competes probably aren't enforceable in these circumstances,

16   number one.  Number two, even if they were enforceable, Your

17   Honor, the debtors shouldn't be put to the test that a

18   competitor might come in and say, "Hey, why don't you sit on

19   the sidelines for a year and a half?  I'll make it up to

20   you.  I know how much your compensation is."

21             Moreover, the non-compete itself doesn't preclude

22   these employees necessarily from going to other companies

23   that might very well need the services, for example, of a PR

24   director, of an HR director at a large company.

25             Number two, the trustee's office has suggested

1    that there's no evidence that folks are leaving.

2    Specifically cited to Chairman Evans' deposition transcript

3    in which he mentions that the CEO of Luminant has left.  In

4    fact, people have left the firm, Your Honor.  A very

5    important person in the Treasury Department recently left.

6    The Chief Marketing Officer of TXU Energy recently left.

7    There are other folks who within the last week or two

8    specifically said that they are strongly considering

9    leaving.  We don't have the burden in these circumstances to

10   say people are leaving in droves.  All we have to show is

11   that it could reasonably be expected that folks might leave

12   if their confidential information is disclosed and

13   competitors use that against us.  That's all we have to

14   show.

15           Number four, the trustee argues that this should

16   be disclosed because of the public access and the need for

17   creditors to get at this information.  The creditors here

18   haven't joined to the trustee in the motion to unseal this

19   material.  Moreover, the creditors have access to this exact

20   information.  We provided it to them.  We've provided it to

21   them under a protective order and while they, of course, see

22   a need for that information, we're glad to provide it to

23   them, we want to do so within the bounds that are

24   appropriate to avoid manifest competitive harm that would

25   befall the debtors in these circumstances.

1          At the end of the day, Your Honor, this material

2     is indeed confidential.  If disclosed it will competitively

3     harm the debtors because a) competitors very likely will

4     have the opportunity to come in and poach these employees in

5     a highly competitive, highly competitive market and b) this

6     will affect employee morale.  It's not that employee morale

7     at the SPC level, the top seven executives, it's the

8     employee morale below them.  They see what their peers are

9     making.  They see what their direct reports are making and

10    they--their direct supervisors are making and they're

11    wondering why they're not making the same.  There's no need

12    for us to put on evidence in this regard, but what I will

13    say is that if Your Honor isn't satisfied, Mr. Burke and Mr.

14    McFarland are both available and can speak to these

15    particular issues.  That's all.

16          THE COURT:  Let me ask you about--you mentioned

17    the Strategic Committee and the top seven in terms of

18    employee morale, but only five of those are being currently

19    publicly made available.  Ms.  Kirby and Mr. O'Brien are

20    not.  What's--assuming that--I've--I would be inclined to

21    find the most "senior executives" compensation being

22    disclosed to be of perhaps more import than more junior ones

23    and, of course, you're required by the SEC in connection

24    with the five you've agreed to disclose.  Can you

25    particularize harm that would befall the debtor by

1    disclosing Ms.  Kirby and Mr. O'Brien's compensation,

2    especially since I think you just said that it's not an

3    issue of employee morale?

4            MR. DEMPSEY:  Specifically with regard to Mrs.

5    Kirby and Mr. O'Brien, and let me start actually with Mr.

6    O'Brien, he actually came over I believe from NRG Energy

7    recently.  He's the head of public relations government

8    affairs for the debtors and in that regard his services are

9    obviously highly sought after in this industry.  He worked

10   at a direct competitor of the debtors.  If this confidential

11   information is disclosed--he's moved once, there's no reason

12   to say that he's not going to move again in these

13   circumstances.

14            As for Mrs. Kirby, she's the head of HR for a

15   5,500 employee organization and while certainly she has

16   expertise with regard to this particular organization at

17   Luminant and all of its challenges, the PowerPoints and

18   (indiscernible) at TXU Energy with regard to the challenges

19   of retail energy provider, her services certainly, Your

20   Honor, are the sort of thing that in a large corporate

21   community like Dallas would be readily marketable for

22   competitors, not only within the energy industry, but also

23   elsewhere.

24            THE COURT:  Okay.

25            MR. DEMPSEY:  Mr. O'Brien specifically has PUC

1    relationship for this bankruptcy that are very, very

2    important and it's particular critical that he, of course in

3    addition to Mrs. Kirby, not leave.  Mrs. Kirby has also

4    helped develop all of the compensation programs in

5    connection with this motion or at least she's been involved

6    in seeing them through and it's important that she's around

7    to help with these materials.

8            The other thing that I'd like to say, Your Honor,

9    is that the SEC has set the rules for disclosure.  The top

10   five are those individuals whose compensation is in fact

11   disclosed and bankruptcy courts, including this one, have

12   typically abided by the strictures fashioned by the SEC in

13   that regard.  They've circled the top five and those are the

14   folks whose compensation is disclosed.  And just because of

15   the mere fact that the debtors have a Strategy and Policy

16   Committee that includes seven and not five we shouldn't be

17   punished.  Instead the law, with regard to SEC disclosures,

18   and the precedent that Your Honor has in (indiscernible)

19   Holdings, American Home Mortgage that happened in this Court

20   in Brookstone ought to be applied here with regard to this.

21           THE COURT:  All right.  Thank you.  Ms.

22   Sarkessian, anything further?

23           MS. SARKESSIAN:  Thank you, Your Honor.  Just

24   briefly again, Juliet Sarkessian for the U.S. trustee.  I

25   just wanted to follow up on a number of things that counsel

1   mentioned.  First of all, counsel was essentially giving

2   evidence on some issues regarding other individuals who left

3   since 2012.  Not only is he obviously not appropriate to be

4   giving evidence, in addition it's actually contrary to the

5   evidence that Mr. Evans gave at his deposition.  He was

6   specifically asked were there any other executives who left

7   since then and he said no and that I believe we have

8   designated.

9          In addition, with respect to the other people

10  below the top seven, while they are not as high up as the

11  top seven they are all--excuse me, they're virtually all

12  senior vice presidents so they're all very, very high

13  officers, very, very senior.  These are not--they're all

14  insiders and the debtor has no dispute that they are all

15  insiders, they are all top executives.

16         Also, Mr. Dempsey said something along the lines

17  of well the creditors have all this information.  The

18  creditors' committee has the information.  The creditors'

19  committee is not all the creditors.  There are many, many

20  other creditors and parties in interest out there that may

21  be interested in this information and not everybody has the

22  ability to retain a lawyer and enter an appearance and file

23  an objection to something like this and that's part of the

24  job of the United States Trustees Office.

25         In addition, with respect to the employment

1    contracts, excuse me, for Ms.  Kirby and Mr. O'Brien, while

2    it may be the case that they have not yet been assumed and

3    potentially I suppose these individuals could reject them, I

4    assume that if they want to get their bonuses they're going

5    to have to stay and enter into the non-compete agreements.

6    I may be wrong about that, but that's typical.

7              THE COURT:  I'd be shocked if the debtors would

8    take the position that, even though an executory contract

9    hasn't been assumed, they can't meet a standard if

10   appropriate to enforce non-debtor compliance with an

11   executory contract prior to assumption.

12             MS. SARKESSIAN:  Yes.  Understood, Your Honor.

13             THE COURT:  I don't really put a lot of weight to

14   that.  I'm sorry.

15             MS. SARKESSIAN:  So, and Your Honor, I don't think

16   we need to argue about exactly what the standard is.  We

17   both cited some of the same--many of the same cases and, you

18   know, Orion, which the debtors have cited, indicate that the

19   debtors, you know, have to--excuse me, the parties seeking

20   to seal have to show that the information if disclosed would

21   result in an unfair advantage to competitors and I think

22   that that's what we've been addressing here--the issue of

23   whether there is any unfair advantage to competitors.

24   Frankly, employment morale--I just don't know what that has

25   to do with unfair advantage to competitors.  I think it's a

1    red herring.  Thank you, Your Honor.

2             THE COURT:  You're welcome.  Okay, I've heard

3    enough.  Thank you.  I'm going to maintain the

4    confidentiality of the salary and bonus metrics for the

5    executives other than the top five that are currently

6    required to be publicly disclosed under the SEC regulations.

7    The information will be in the Court's record, but it will

8    be in a redacted form and the trustee I believe will have an

9    ability to effectively present its case in a public forum in

10   reference to redacted materials without having to have the

11   information specifically disclosed in the hearing itself.

12   This has been a common way to deal with these types of

13   issues.

14             I think 107(b) is applicable and I think--I don't

15   believe it's a "narrow exception".  I think that it is

16   designed to adapt the common law rule to the business

17   realities of Chapter 11 and bankruptcy in general, it

18   doesn't apply just in Chapter 11.  But more specifically,

19   and I think more importantly, Chapter 11 because you're

20   running a business under court supervision and every

21   business, publicly held or not, has confidential and

22   proprietary business information that it doesn't want its

23   competitors or even its customers or suppliers or anyone

24   outside the corporate family to know and 107 I believe is

25   designed to address the particular problems that arise when

1   you have a company that's under bankruptcy and subject to

2   public disclosure and scrutiny from the very fact it's in

3   bankruptcy.

4          That having been said, the same time of course

5   there is a public interest in disclosing--full disclosure of

6   bankrupt companies.  I think 107(b) is a pretty strong

7   statement by Congress that confidential information should

8   be protected and in this instance I find that protecting

9   this confidential information is important.  The information

10  is confidential.  Companies don't go around publishing,

11  internally let alone externally, salary numbers unless

12  required to do so by the law, bonus numbers unless required

13  to do so by the law.

14         Disclosing that information publicly will have

15  adverse internal and external consequences to the debtor and

16  put the debtors in a position where they may be harmed in

17  losing key employees or somehow negatively affecting morale.

18  So, I find there is a business interest.  I find that this

19  is confidential business information.  I find that it's

20  covered by 107(b) and that there isn't a sufficient adverse

21  or proposing argument to be made sufficient to overcome the

22  provision of the Bankruptcy Code that gives this information

23  confidential.

24         And at the end of the day, and this is important I

25  believe, I find that the trustee will be more than able to

1    adequately present its case to the Court without having to

2    disclose this information publicly during the hearing.  So,

3    to the extent I'm granting the motion at least in connection

4    with this part of it, I am doing so and overruling the

5    objection and we'll keep that information confidential for

6    purposes of the hearing.

7              MR. SASSOWER:  Thank you, Your Honor.  For the

8    record, Edward Sassower, Kirkland & Ellis on behalf of the

9    debtors.  Your Honor, at this point we'd like to proceed

10   with the opening.

11             THE COURT:  Okay.

12             MR. SASSOWER:  Your Honor, by this motion the

13   debtors are seeking court approval for insider compensation

14   plans that cover the 2014 performance period.  Three of them

15   were objected to by the Office of the United States Trustee.

16   The fourth, the Luminant commercial incentive plan, is

17   uncontested and we will submit an agreed order under

18   certification of counsel shortly.  This motion does not

19   cover the 2015 performance period or beyond.

20             The first of the three insider plans that is being

21   objected to is the executive annual insider plan or EAIP

22   which affects 26 individuals.  Your Honor previously

23   approved this plan as it relates to non-insiders.  As the

24   Court may recall, so as not to delay approval of payments to

25   non-insiders, senior management agreed to allow the non-

1    insiders to go first.  The EAIP would result in payments of

2    $5.95 million if the debtor's total scorecard hit the

3    threshold performance targets, $7.9 million if the debtor's

4    total scorecard hit baseline performance targets and $15.9

5    million if the debtor's total scorecard hit the superior

6    performance targets.  However, the debtors have never hit

7    the total scorecard at the superior level.

8            The second of these plans is the key leader

9    performance program which affects 19 individuals.  If the

10   debtor's total scorecard hit their performance metrics for

11   the rest of the year at the threshold level, this plan would

12   cost $1.72 million and if the debtor's total scorecard hit

13   performance metrics for the rest of the year at or above the

14   baseline level this plan would have a total cost of $2.56

15   million.

16           The third and last of the three plans that are

17   being objected to is the SPC long-term incentive plan or

18   LTIP.  This plan has seven participants.  If the plan hit

19   performance metrics, potential payments to five of those

20   seven individuals are fully covered by letters of credit and

21   those potential payments are not part of this motion.  For

22   two of the SPC members, Stacy Doray, the debtor's general

23   counsel, and Carrie Kirby, the debtor's head of HR, a

24   portion of their total potential LTIP payments are not

25   covered by LCs.  By this motion the debtors seek Court

1    approval for those uncovered portions to the extent they are

2    actually earned.  If the 2014 EBITDA goals are achieved,

3    approximately $1.825 million of SPC LTIP obligations that

4    are not covered by letters of credit will be owed to these

5    two individuals.

6            Your Honor, the debtors have always engaged in a

7    rigorous and iterative annual budgeting process that begins

8    in the spring of each year for the following calendar year.

9    Over the course of four to six months the debtors develop a

10   budget for the following year that is ultimately approved by

11   the EFH board of directors.  Then the debtors use that

12   budget to finalize scorecards that set performance metrics

13   to achieve incentive payments.

14           This robust and months' long planning process has

15   always been designed to incentivize debtor's employees to

16   maximize enterprise value and their own individual

17   performance.  For the 2014 period, the debtors supplemented

18   their already rigorous process with advice from three

19   professional firms.  The first of these professional firms

20   is Towers Watson, one of the preeminent executive

21   compensation firms in the country.

22           Doug Friske led a team that helped the company

23   ensure that compensation levels are market based when

24   compared to the debtor's industry and peer group as well as

25   other large Chapter 11 debtors.  Mr. Friske has submitted a

1    comprehensive declaration and will testify today.

2            The second of these professional firms is

3    Filsinger Energy Partners, one of the preeminent independent

4    power industry experts in the country.  Todd Filsinger has

5    played a major role in many other large Chapter 11 energy

6    cases, namely Calpine Energy and Merit.  Mr. Filsinger was

7    not retained for the sole or even primary purpose of

8    compensation.  To be sure you'll be seeing a lot of him when

9    we finally get to valuation, but he's played an important

10   role in the compensation process as well by helping the

11   company ensure that performance metrics for compensation are

12   set at levels that are difficult to reach and thereby

13   incentivizing.  Mr. Filsinger has submitted a comprehensive

14   declaration and is also here to testify today.

15           The third and last of these professional firms is

16   Kirkland & Ellis.  Your Honor, we have studied your

17   decisions in Nelson, Visteon, Furniture Brands and Vertis as

18   well as other important compensation decisions such as

19   Hawker, ResCap, Dana, Global Home, LCI and Borders.  We have

20   scrubbed the compensation plans to make sure that they

21   comply with these rulings and advised the debtors to modify

22   them when they did not.

23           We believe that we are presenting Your Honor with

24   perhaps one of the most complete evidentiary records that

25   has been put forth in a bankruptcy court in connection with

1   a compensation plan.  In addition to Mr. Frise and Mr.

2   Filsinger, Mr. Mac McFarland, the chief executive officer of

3   Luminant and Mr. Jim Burke, the chief executive officer of

4   TXU will testify today.  Furthermore, the Office of the

5   United States Trustee deposed former United States secretary

6   of commerce Donald Evans who is the chairman of EFH's board

7   of directors and chairman of the debtor's Organization and

8   Compensation Committee and portions of his videotaped

9   testimony will also be played today.

10          The debtors also understand that the Office of the

11  United States Trustee may have some questions for Miss

12  Carrie Kirby, the debtors' executive vice president of human

13  resources and Mrs. Kirby is available and present in the

14  courtroom today to extent her examination is necessary.

15          The evidence will show that each of the three

16  compensation plans are primarily incentivizing.  The

17  evidence will further show that the plans are ordinary

18  course.  Specifically they are consistent with those of the

19  debtor's peers, thereby satisfying the horizontal test, and

20  a continuation of the debtor's prepetition business

21  practices that have been in place for many years, thereby

22  satisfying the vertical test.  The EAIP has been in place

23  for over 10 years.  The SPC LTIP has been in place for over

24  six years and the Key Leader Performance Program is a

25  successor to the Owner Operator Plan which was put in place

1     over four years ago.

2              In fact, had the debtors not filed for bankruptcy

3     these plans would look exactly as they do now with two

4     notable exceptions.  First, the Key Leader Performance

5     Program is a modified version of the Owner Operator Plan

6     which covered the same compensation targets, the same

7     participants and similar performance metrics.  However,

8     under the Owner Operator Plan 50 percent of an employee's

9     payments were tied to an employee remaining at the company

10    until a certain date.  That is half of the Owner Operator

11    payments were purely time-based.

12             Given the Bankruptcy Code's disfavor of retention-

13    based payments to insiders, when implementing the Key Leader

14    Performance Program the debtor's prepetition eliminated the

15    retention-based provision and tied 100 percent of the

16    payments to incentivizing financial metrics.  The second way

17    in which these plans would look a little different had we

18    not filed for bankruptcy is that given that the debtors did

19    not file for bankruptcy until the end of April and the

20    connection with the U.S. trustee that the debtors delay the

21    filing of this motion so as to deal with non-insiders first,

22    the debtors reviewed their annual performance metrics before

23    filing this motion and made many of the metrics even harder

24    to meet to eliminate any doubt that the plans are and remain

25    incentivizing for the remainder of 2014.

1            Your Honor, in your Furniture Brands Holdings you

2    noted that creditor's support or a lack of creditor

3    objections was a compelling factor.  Specifically you noted,

4    and I quote, "The community in this case has been active to

5    say the least and as often as I can defer to the parties who

6    have an economic stake in the case to really carry the

7    water."

8            Here our largest creditor constituency, the TCEH

9    first liens, an ad hoc group, representing the interests of

10   more than $25.5 billion in debt, has filed a pleading

11   supporting the motion and no other creditor constituency has

12   protested this motion--not one.  Why is that?  Our creditor

13   community, like the creditor community in Furniture Brands,

14   has been very active to say the least.  The reason is

15   because in the weeks leading up to the filing of the motion

16   the debtor sat down with each creditor constituency and

17   presented them with this 70 plus page PowerPoint

18   presentation detailing for them every aspect of the three

19   compensation plans that are being objected to and then

20   answered each and every one of their questions in the days

21   that followed.

22           These creditor constituencies are armed with

23   sophisticated professionals who analyze the compensation

24   programs including the potential amounts payable, the

25   history of the programs and most importantly the metrics

1    driving the programs and the creditors ultimately concluded

2    that the plans are reasonable and align the interests of

3    management with the interest of the estates.

4              The creditors recognized that the senior

5    management team has a massive job of managing over 5,700

6    employees in a wildly complex business.  While the debtors

7    have other large peers, few if any of them are in as many

8    businesses as the debtors who must manage electricity

9    generation, mining operations, wholesale energy sales and

10   purchases, commodity risk, competitive retail electricity

11   sales as well as customer service.

12             The creditors further recognize that that massive

13   job is made infinitely more difficult by the restructuring.

14   There is no better example of that than today as Mr. Mac

15   McFarland and Mr. Jim Burke were required to spend countless

16   hours in connection with this motion while also excelling

17   and their day jobs.  And just last Friday Mr. Keglevic sat

18   through his fifth deposition in this case while also

19   performing his duties as CFO.

20             THE COURT:  He's not done.  Not by a longshot.

21             MR. SASSOWER:  That brings us to the Office of the

22   United States Trustee, the sole objector.  We also sat down

23   with them prior to filing the motion.  In fact we spent far

24   more time with them than any other party.  Throughout this

25   case we have effectively coordinated with the Office of the

1    United States Trustee and that is usually a result in our

2    being able to work out consensual resolutions and avoid

3    objections to motions.  We value that constructive working

4    relationship.  But unfortunately in connection with this

5    motion we must respectfully disagree with their position and

6    press forward with securing the Court's approval.

7            The U.S. trustee effectively raised seven

8    arguments or points in its objection.  I will quickly

9    address them now and then I'll cede the podium to Ms.

10   Schwartz for her opening argument.

11           First, the objection argues that because the

12   debtors, after consultation with their professionals,

13   modified the structure of the Owner Operator Plan and

14   toughened up the performance metrics before filing the

15   motion that the plans are no longer ordinary course.  This

16   objection epitomizes the phrase that no good deed goes

17   unpunished.  The plans before the Court contain the same

18   people, the same structure, the same metrics as they

19   contained before the debtors filed for bankruptcy.  All we

20   did was make some of the targets harder to reach and

21   eliminated the purely retentive element of the Owner

22   Operator Plan in its successor the Key Leader Performance

23   Program.  That's a good thing, not a bad thing and it does

24   not make the plans outside the ordinary course of business.

25   Besides, too much is probably being made of whether the

1    plans are inside or outside the ordinary course of business

2    because we easily meet the Dana factors for the reasons set

3    forth in the motion and the reply.

4            Second point raised in the U.S. trustee's

5    objection, that it repeatedly suggests that Secretary Evans

6    acknowledges that the metrics look like layups.  That turn

7    of phrase could not have been taken more out of context.

8    Secretary Evans used the word layup in two separate

9    contexts.  The first context is when he merely repeats what

10   the debtors state in the motion which is that although the

11   2014 targets were incentivizing at the time they were put in

12   place, when the debtors reassessed them prior to filing the

13   motion it appeared that some of them would be more easily

14   achievable by the end of the year and so the debtors

15   toughened them up to eliminate any argument that actual

16   performance midway through 2014 detracted by the

17   incentivizing nature of the programs.  Again, that's a good

18   thing.

19           The other context when Secretary Evans used the

20   word layup is when he explains that simply comparing 2014

21   EBITDA metric to prior years might cause an uninformed

22   observer to conclude that the 2014 EBITDA metric is a layup

23   because it is lower than prior years, but goes on to explain

24   that they are--that it is not a layup.

25           As Your Honor will recall from my first day

1   presentation, despite the fact that natural gas prices

2   cratered in late 2008, the debtors were largely shielded

3   from those market forces for many years afterwards because

4   of longstanding hedges that allowed the debtors to earn

5   revenues as if they were selling power at 2008 prices before

6   the bottom fell out.  But as those hedges have rolled off,

7   the debtors have been increasingly--have become increasingly

8   exposed to sustained low wholesale power prices.  As a

9   result the debtor's EBITDA has declined even though the

10  company is operating better than ever.  The metrics are

11  designed to reward the management team for operational

12  excellence and not penalize them for certain factors that

13  are beyond their control.

14          The third point raised in the objection is that

15  some of the plans use the word "retention".  That's because

16  these are old plans, which underscores the fact that they

17  were ordinary course and they were put in place long before

18  the company had ever heard of Section 503 of the Bankruptcy

19  Code.  Incidentally, the plans also use the words "motivate"

20  and "incentive", but more importantly, the question is not

21  what labels are used, but whether the plans themselves are

22  primarily retentive or primarily incentivizing.  The

23  evidence will show that you can only earn awards by hitting

24  complex and hard to achieve financial and operational

25  targets, not by merely sticking around.

1          Fourth, the objection quotes to Mrs. Kirby's

2     declaration submitted in connection with the non-insider

3     motion saying that the Key Leader Program was designed to

4     make sure that the company does not lose people.  Again,

5     this quote is taken out of context.  Mrs. Kirby is referring

6     to a different plan in the quoted declaration.  There are

7     two separate Key Leader Plans, one that deals with non-

8     insiders and one that deals with insiders.  Mrs. Kirby was

9     referring to the former and this motion is seeking approval

10    of the latter.

11          Of course Mrs. Kirby explains that the Key Leader

12    Plan for non-insiders is designed to be retentive.  It is

13    entirely a time-based program and it's not tied to

14    performance metrics.  But the Key Leader Performance

15    Program, as compared to the Key Leader Plan, before this

16    Court today is 100 percent performance-based and without a

17    doubt primarily incentivizing.

18          Fifth, the objection asserts that the debtor's

19    metrics are not incentivizing because the management team

20    has exceeded prior years' performance metrics in varying

21    degrees in the past.  That proves nothing.  This is an

22    exceptional management team so it's unsurprising that they

23    would consistently outperform.  In addition, in many

24    instances the debtor's metrics require the management team

25    to beat industry averages and in many instances the debtors

1    ratcheted up those metrics year after year, so the

2    management team must not only beat industry averages, but

3    also beat the prior year's performance.  But most

4    importantly, the only question before the Court today is

5    whether this year's metrics are incentivizing.  The debtors

6    have already introduced overwhelming evidence on this point

7    and the testimony from the witnesses today will only further

8    establish that point.

9            Six, the objection heavily relies on the

10   declaration of Mr. Panacio.  First, we don't think Mr.

11   Panacio is an expert in this area.  Mr. Panacio has admitted

12   that he is not a compensation expert or an energy industry

13   expert and the debtors intend to address Mr. Panacio's

14   qualifications when his testimony is offered.

15           Second, we think that Mr. Panacio is trying to

16   replace the debtor's business judgment with that of his own.

17   Third, Mr. Panacio's arguments ignore the realities of the

18   debtor's business and will be flatly contradicted by the

19   debtor's witnesses.  Fourth, Mr. Panacio, according to the

20   U.S. trustee's objection, seems to indicate that the debtor

21   should not be paying bonuses at all because they incurred

22   net losses once you take items like interest expense into

23   account.  If that were the case, then that would preclude

24   almost all the debtors from every implementing any insider

25   compensation programs.

1           The seventh and last point raised in the objection

2    involves blanket statements of how the debtors have not met

3    their burden, but as I mentioned moments ago, we believe

4    that the evidentiary record before the Court is

5    overwhelming.

6           In summation, Your Honor, the evidence will show

7    that the programs are primarily incentivizing and designed

8    to maximize value for the benefit of the debtor's

9    stakeholders.  The evidence will further show that these

10   programs are clearly ordinary course as they are

11   continuation of the debtor's prepetition compensation plans

12   and are consistent with market practice.  And even if they

13   are not ordinary course, they are justified by a sound

14   business purpose and are justified by the facts and

15   circumstances of these Chapter 11 cases.

16          Finally, although the debtor's (indiscernible)

17   creditors, the economic stakeholders in these cases

18   evaluated the debtor's compensation plans and decided not to

19   object to the (indiscernible) requested.  Accordingly, the

20   debtors submit that the Court deny the U.S. trustee's

21   objection and approve the motion.  With that I will turn the

22   podium over to Ms.  Schwartz.  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MS. SCHWARTZ:  Good morning again, Your Honor.

25          THE COURT:  Morning.

1          MS. SCHWARTZ:  For the record, Andrea Schwartz on

2     behalf of U.S. trustee Roberta DeAngelis.  With me here

3     today, Your Honor, for the record are my colleagues Richard

4     Schepacarter, you've already heard from Ms.  Sarkessian.

5     Also Timothy Fox, an attorney that has joined our office

6     recently and I also have today, Your Honor, bankruptcy

7     analysts from our office, Linda Logan and Mr. Panacio.

8          Your Honor, the case before the Court today

9     presents one question--whether the Court may authorize the

10    debtors to pay more than $20 million in bonuses to 26 senior

11    executives who represent less than one percent of the

12    debtor's employee pool.  The determination that the Court

13    has been called upon to make today is not whether these

14    executives work hard, whether they are skilled or whether

15    they are good people.  The evidence will show that these

16    executives are highly compensated with their salaries alone

17    ranging from not less than $170,000 to over $1.3 million.

18    Rather the issue before the Court arises as a result of

19    Congress' enactment of the BAPCPA which made significant

20    amendments to the Bankruptcy Code including the addition of

21    section 503(c) which severely restricts a debtor's ability

22    to pay retention bonuses to executives to get them to stay

23    with the company through the bankruptcy.

24          We understand that the payment of compensation

25    raises sensitive issues.  However, the U.S. trustee, like

1    the Court, is dedicated to protecting the integrity of the

2    system and making sure that all parties in bankruptcy

3    proceedings adhere to comply with the Bankruptcy Code as

4    enacted by Congress.

5            Your Honor mentioned earlier in ruling on the

6    ceiling motion that Congress has made clear that there are

7    businesses to be conducted in Chapter 11 and so forth and

8    there has been a lot of discussion and argument concerning

9    503(c) and how that interplay with the ability of a company

10   to operate its business.  However, whether one agrees with

11   section 503(c) or disagrees with it or finds that it's

12   making it more difficult for debtors to pay compensation

13   programs and make changes to get around the requirements and

14   the heavy hurdles of 503(c)(1), the bottom line is this is

15   the law and this is the law that Congress enacted and there

16   is no dispute that debtors have the burden to show that the

17   plans that they propose fall outside the very rigorous

18   strictures of 503(c)(1).

19           Given the importance of this issue to the debtors,

20   Your Honor, I and my colleagues here today have spent

21   innumerable hours meeting with the debtors and their

22   advisors and pouring over hundreds of documents.  And, you

23   know, Mr. Sassower mentioned in his opening remarks that

24   they have put in a significant amount of evidence.  They're

25   putting it in now, Your Honor, and Your Honor will get the

1    binders of a substantial amount of evidence.  Despite the

2    efforts however that we had, meeting with the debtors and

3    their professionals and also members of their executive

4    team, we have been unable to reach an agreement with respect

5    to the motion as we have done in this case on many, many of

6    the motions that have been filed.

7             Simply put, Your Honor, there remain very real

8    questions as to whether the proposed bonuses do in fact fall

9    outside the purview of Section 503(c)(1) and are justified

10   by the facts and circumstances of the case.  As Mr. Sassower

11   explained, there are three bonus plans that are going

12   forward in contention today, those including the EFH Annual

13   Executive Incentive Plan, the Key Leader Performance Plan

14   and the SPC Long-Term Incentive Plan.  The fourth plan, the

15   Luminant Commercial Incentive Plan, was not objected to by

16   the United States trustee after reviewing documentation from

17   the debtors and that information was presented to the Court

18   at the September 16th hearing.  We will have no objection to

19   an appropriate order being submitted to the Court with

20   respect to that plan.

21            I will however address briefly the evidence and

22   issues concerning each of these plans.  As I said, there is

23   no dispute that the debtors have the burden of proof to show

24   that the plans fall outside of 503(c)(1) for if they do not

25   then the debtors must satisfy challenging and high hurdles

1    to obtain the Court's authorization to pay them.

2              They have not addressed 503(c)(1) at all in their

3    papers.  It is their view that they don't need to address it

4    because there are other ways for the Court to authorize

5    these payments.  However, Your Honor, it is our view, based

6    on the information that we have reviewed as well as the

7    testimony of Mr. Evans, that the debtors could not, if they

8    sought to, meet the standards under 503(c)(1).

9              The debtors assert that their request to pay the

10   proposed executive bonuses represent ordinary course

11   transactions.  The evidence, however, belies this claim.

12   Specifically, the evidence will show that the proposed

13   bonuses and or plans are not ordinary course for at least

14   four reasons.  First, the debtors for the first time ever

15   hired outside advisors or enhanced the role of one of its

16   advisors, Towers Watson, to review and make recommendations

17   concerning these bonuses and how they will be treated in

18   bankruptcy.  The plans were all reviewed and they were all

19   modified as a result of these consultations in order to

20   attempt to have the plans reviewed and approved in a

21   bankruptcy.

22             Secondly, the debtors contend that the Key Leader

23   Performance Plan, which you will hear a lot about today,

24   Your Honor, is a continuation of a prior plan called the

25   Owner Operator Plan.  In his opening remarks, Mr. Sassower

1    made much of the fact that what a plan says and the plain

2    language of the plan really doesn't mean much.  So, if a

3    plan refers to retention awards and the bolded defined terms

4    of plans refer to retention awards, really Your Honor

5    shouldn't pay much attention to that because Your Honor

6    should understand the underlying intent of the plan.

7    However, Your Honor, there is no Owner Operator Plan.  When

8    we received the documents, the actual plan is called the EFH

9    Corp Retention Award Plan.  So, it does call into question

10   the argument that was made in opening that the language of

11   the plans doesn't really matter because then the question

12   becomes well why didn't the debtors actually call the plan

13   what it's called in the actual documents?  We didn't learn

14   that until we received them.

15            In addition, Your Honor, pursuant to the plain

16   language of the "Owner Operator Plan", the retention awards

17   are for key employees and, Your Honor, it reminded us of

18   Judge Bernstein's decision in Hawker Beechcraft and other

19   judges as well concerning attempts by debtors to dress up

20   what were key employee retention plans to satisfy now the

21   new rigorous requirements under 503(c).  And so that was a

22   question for us, Your Honor.  We would like to know why in

23   fact that was done and to understand the true nature of that

24   plan.

25            In addition, Your Honor, the debtors assert and

1    the evidence will who that they claim that this Owner

2    Operator Plan is a continuation now.  Now this Key Leader

3    Performance Plan, and I'm making hand gestures, Your Honor,

4    because I imagine that, you know, this is fairly new

5    information to the Court and I will tell the Court that we

6    spent a ton of time reviewing all these plan and it's

7    somewhat confusing or can be because it's just a massive

8    amount of information.  But the Owner Operator Plan actually

9    terminated in December 2013 and the debtors created two new

10   plans.  One, the Key Leader Performance Plan, which is

11   applicable to 19 of the 26 insiders subject to the motion

12   and the other plan is called the Key Leader Plan.

13        Now, the Key Leader Plan is for non-insiders.  And

14   when it was allegedly this continuation of the prior plan,

15   which was in fact a retention plan, the debtors realized

16   that they didn't really need to make much change with

17   respect to non-insiders because non-insiders are treated

18   differently than insiders.  So, the Key Leader Plan remained

19   as a retention plan.  This is the plan that was approved as

20   part of the non-insider compensation motion.

21        Initially, Your Honor, that Owner Operator Plan,

22   which is really called the EFH Corp Retention Award Plan,

23   provided bonuses for 128 of the debtor's employees.  Only 19

24   of that group are insiders and that's why the other

25   remaining professionals have their rank and file

1     compensation and bonuses approved.

2             In connection with that motion, and this is why

3     it's relevant, in connection with the motion for the non-

4     insider compensation, Mrs. Kirby submitted a declaration

5     that supported that motion.  One of the comments that she

6     made was one of the changes, not ordinary, but one of the

7     changes that was made for each of those Key Leader Plans,

8     however that declaration provided only for the Key Leader

9     Plan, that's for the non-insiders, was that it changed to be

10    quarterly payments as opposed to being annual payments.  So,

11    the reason, she said, was it would help retain them and

12    also--I'm just trying to think of the quote which is in our

13    papers--also help retain them in the uncertain circumstances

14    of bankruptcy.

15            Well, those same quarterly payments that are being

16    made under the Key Leader Program for the non-insder are

17    also being made for the Key Leader Performance Plan for the

18    insiders.  The other component, Your Honor, that the debtors

19    changed and now inserted in this Key Leader Performance Plan

20    for the insiders is that there is, the debtors contend, an

21    incentive component.  Yet, Your Honor, that incentive

22    component is the same exact incentive component for the

23    Executive Annual Incentive Plan.  Insiders have to do

24    nothing more for that second plan because they already have

25    to satisfy that target for the first plan.  So, if they

1    satisfy the targets for the first plan they automatically

2    get the bonuses under the second plan.  However, each plan

3    provision, and the evidence will who this, Your Honor,

4    requires that these professionals stay with the debtor in

5    order to receive their payments.  The evidence will show,

6    Your Honor, that each of these plans have actual provisions

7    that require them to stay with the debtor and that they

8    forfeit the entirety of their bonuses if they voluntarily

9    resign.

10          There are provisions in some of the plans that

11   provide for pro rata bonuses however, those are only awarded

12   under other circumstances, for example, disability, death,

13   etcetera but not for a voluntary resignation.  We cited the

14   exact plan provisions in our papers and those plans will be

15   admitted into evidence without objection so, Your Honor,

16   will have those to be able to look at what the plan

17   documents say.

18          In addition, Your Honor, shortly before filing the

19   motion, the debtors substantially modified nearly all of the

20   targets under the Executive Annual Incentive Plan and that

21   on the advice on counsel and Mssrs.  Filsinger and Friske,

22   who are the professionals that the debtors retained to help

23   them review and analyze and revise their plans so that they

24   would be able to be approved in the bankruptcy, the debtors

25   increased the values of 18 of the 21 targets.  You will see

1    on those scorecards that I was referring to there is an

2    aggregate number of 21 metrics and the threshold for 18 of

3    them were increased when the debtor submitted the plan.

4           The evidence will show that the debtors made these

5    changes to ensure that the Court found that their targets

6    were "primarily incentivizing", as Your Honor has held in

7    various decisions.  The evidence will show that the debtors

8    never before conducted a mid-year review, a wholesale review

9    of all their targets and that this was done solely for the

10   purpose of bankruptcy.  Mr. Evans will testify to that and,

11   Your Honor, with all respect to Mr. Evans, we do refer to

12   him as Mr. Evans in this case as opposed to Secretary Evans

13   because he is no longer secretary of commerce and he serves

14   in the role as his individual capacity as chairman here.

15           THE COURT:  I have to say I agree.

16           MS. SCHWARTZ:  Okay.  In addition, Your Honor, the

17   evidence will show that with respect to the SPC Long-Term

18   Incentive Plan, prior to the bankruptcy debtors obtained the

19   issuance of letters of credit to assure payment of bonuses

20   to five of their SPC members.  The aggregate amount of these

21   bonuses, excuse me, the aggregate amount of the letters of

22   credit is $18 million.  The debtors have not by this motion

23   sought authorization to make payments to the five SPC

24   members who have these guaranteed bonus amounts segregated

25   off in letters of credit because we believe they don't

1   believe they need authorization to do so.  That may be an

2   issue for another day.

3           However, Your Honor, we do think the Court needs

4   to factor in the totality of the circumstances for this

5   plan.  It's a five-year plan.  There were changes that were

6   made to it prepetition.  We believe that the evidence will

7   show that it's not ordinary course that companies obtain the

8   issuance of letters of credit to secure amounts so that the

9   top executives are assured that they will get payment of

10  their bonuses.  We submit that that's not ordinary course.

11  And, Your Honor, we also submit that the debtors are seeking

12  authorization to make the other payments under the SPC and

13  these are supplemental additions to the SPC for Mrs. Kirby

14  and Mrs. Doray because they don't have letters of credit for

15  them.  And even though the payments are not going to be due

16  until March of 2015--that's another thing that I want to

17  also address for the Court.  The evidence will show that

18  none of these plans are called the 2014 plan, the 2015 plan,

19  etcetera, it's one plan.  The debtor uses the terminology

20  2014, 2015 because that's the performance year under which

21  they're calculating the bonuses.  So I just want to make it

22  clear, there's not separate plans for each of these years.

23          Your Honor, in any event, even if the Court found

24  that the bonuses are ordinary course, it doesn't exempt them

25  from 503(c).  The debtors assert that the bonuses do not

1    fall under Section 503(c)(1) because the targets are

2    incentivizing and therefore outside 503(c)(1).  Although it

3    is true that the debtors will attempt through testimony of

4    Mr. Filsinger and Mr. Friske to show why these incentives

5    are stretch targets, a term that I learned through the

6    process of evaluating these plans, and consistent with

7    industry standards, there remains significant questions

8    about the opinions of these professionals.

9            Much has been made about Mr. Panacio and whether

10   or not his evaluation of the information provided by the

11   debtors in their scorecards is important or would be helpful

12   to the Court.  Mr. Panacio is a bankruptcy analyst with the

13   U.S. Trustee Program and a certified public accountant.  The

14   U.S. trustee is not planning on offering his testimony as

15   expert testimony.  They're offering it as lay opinion and he

16   will testify that he reviewed the debtor's actual

17   performance targets five years' history, 2009 through 2013,

18   under the various metrics from information provided by the

19   debtors.  He calculated the average performance over the

20   past five years and compared it to the targets that the

21   debtors have for this 2014 year.  He also took the numbers

22   that they have, the actual figures, and extrapolated them

23   out for the year.  So, it was a full year based on those

24   numbers and he found that all of the debtor's business,

25   including Luminant, TXU and what they call Business

1    Services, which is really the executives, management,

2    general counsel type positions, exceeded both the 2014

3    threshold and baseline targets.

4          So, the evidence is going to show, Your Honor,

5    that every year they exceed the thresholds and it presents

6    the question whether or not the threshold is easy to achieve

7    or a difficult stretch target and that is going to be

8    presented to the Court and that evidence, Your Honor, the

9    U.S. trustee was unable to determine based on the

10   information and the several meetings with the debtors that

11   they in fact are not in essence guaranteed bonuses so that

12   the picture that was presented was that the bonuses to be

13   paid to the executives were in essence guaranteed at 100

14   percent and then the question really came in whether or the

15   not the bonus was going to be increased over 100 percent.

16         Just for the Court's information, Your Honor, the

17   evidence will show that each of the employees is assigned a

18   target bonus.  So, in other words, an employee has a salary

19   and then they are assigned under the Executive Annual

20   Incentive Plan a percentage that would be their target

21   bonus.  So, for example, the SPC members have, the evidence

22   is going to show that Mr. Young, who is a top professional,

23   the CEO of the entire enterprise, his performance percentage

24   is 125 percent.  So, if the debtors reach the threshold then

25   Mr. Young is eligible for a bonus.  If the debtors reach the

1    baseline then Mr. Young earns 125 percent of his salary.

2    That's his 100 percent target.  That amount can be increased

3    up to 200 percent if they get to the superior level.  So,

4    the documents and the numbers show that the debtors are

5    consistently falling with their performance actual numbers

6    between the baseline and the superior every year which

7    presents the question, Your Honor, as to whether or not

8    these targets are in fact stretch and whether or not they

9    are incentivizing.

10          In addition, Mr. Evans, as chairman of the EFH

11   board and chairman of the Organization and Compensation

12   Committee was deposed by me in advance of this hearing and

13   we asked him a lot of questions.  He's a very knowledgeable

14   man and we asked him a lot of questions about these plans.

15   He's been the chairman of the board of EFH for seven years

16   and chairman of their Organization and Compensation

17   Committee which is the committee that approves all the

18   bonuses.  They call it the ONC.  He is the chairman of that.

19          We asked him a lot of questions, and Your Honor is

20   going to hear a lengthy video of a lot of his testimony.

21   But one of the things we asked him about, and we showed him

22   the numbers, we showed him the actuals and then we showed

23   him what the targets were and we asked him how could it be,

24   sir, that these are incentivizing when the numbers where the

25   targets called for a higher number, for example, EBITDA,

1    they'd have to exceed EBITDA and the numbers were lower so

2    they were already reached, how is it that they could be

3    incentivizing?  Look at these numbers and tell us what you

4    think.  And he said, and you will hear it, in the testimony

5    he said well, without knowing this process that goes through

6    for the budget, and we've quoted it accurately in our

7    papers, without knowing those assumptions they look like

8    layups.

9            Now I want to note for the record that other than

10   in the basketball context, in bankruptcy the only time I

11   ever heard the terminology layup was in terms of a keep or

12   occur.  So, it was pretty clear, and Your Honor will see

13   that from the testimony of Mr. Evans, he was very

14   knowledgeable about the treatment of bankruptcy plans--the

15   treatment of compensation plans in bankruptcy.  I would not

16   have known that terminology and I think that will be notable

17   for the Court.

18           Anyway, at the end of the day, the debtors have

19   the burden of proof to show to you, Your Honor, that the

20   targets are in fact incentivizing and that they aren't

21   retention plans.  If they make that showing and they're able

22   to establish that, then Your Honor will approve the plans.

23   It's not the goal of the U.S. Trustees Office to see that

24   the plans are not approved.  It's our goal, it's our oath,

25   it's our obligation to make sure that the law is complied

1    with and that in our review of applications we feel

2    comfortable and we've researched it and we've done our

3    diligence to determine whether or not the relief sought is

4    appropriate.  And as Your Honor knows from this case, which

5    has been going on since April, most of the applications that

6    the debtors have put in, in fact all of them with the

7    exception of that protocol, all of our issues have been

8    resolved with them.  We've taken it very seriously.  This is

9    not a knee jerk objection.  There was a lot of work that

10   went into this.  There was a lot of time that was reviewed.

11   We took a deposition of Mr. Evans and we still had

12   questions.

13          And so, the evidence is going to show for you,

14   Your Honor, and hopefully the debtors are going to answer

15   those questions.  I want to just make two brief points about

16   their witnesses.  First, the evidence is also going to sho--

17   one other thing I want to raise, I'm sorry.  The evidence is

18   also going to show, you read in Mr. Filsinger's report, if

19   you read Mr. Filsinger's report yet, it's a very detailed

20   report and in his report, and you'll hear testimony from Mr.

21   MacFarlane that there are significant risks that face these

22   debtors every day and that a slight movement off of the

23   calculation from the risk could completely blow the metric

24   and therefore it wouldn't be able to be achieved.  I don't

25   dispute it.  This is their business.  I don't dispute it and

1    I think they will testify to that.

2           But the issue is, Your Honor, that the risks are

3    the same every single year and that's what Mr. Evans

4    testified.  I showed him the list that is in the debtor's

5    papers.  I showed him every one of them.  In fact, he made

6    me read every single one of them out loud and I said, "Sir,

7    are these the same risks that are confronted by the company

8    every year?" "Yes they are" he said.  He said, "Looks like a

9    good list." I said, "Anything else?" "No."

10          So, the point is yes, there are risks.  Every

11   business has risk, but there shouldn't be any special weight

12   given to the risks that are present for this business

13   because they're the same every single year and every single

14   year they meet the threshold, they meet the baseline and the

15   bonuses are between baseline and superior.

16          Essentially, Your Honor, I just want to check one

17   thing.  I got it.  Your Honor, for all of those reasons the

18   United States trustee has objected to the motion and unless

19   the debtors can address all of these issues today to the

20   Court's satisfaction we respectfully request that the Court

21   deny the motion.

22          THE COURT:  Thank you.

23          MR. MCKANE:  Good morning, Your Honor.  For the

24   record, Mark McKane of Kirkland & Ellis on behalf of the

25   debtors.  We're prepared to proceed with evidence if this is

1    an appropriate time or you'd like to take a short break.

2              THE COURT:  Yeah, let's take just a couple of

3    minutes and then we'll kick right into the evidence.

4              MR. MCKANE:  Very good.  Thank you.

5              [BREAK]

6              THE CLERK:  All rise.

7              THE COURT:  Please be seated.

8              MR. MCKANE:  Your Honor, the debtors call Mr. Jim

9    Burke to the stand.

10             THE COURT:  Please take the stand, sir and remain

11   standing for your affirmation.

12             THE CLERK: Do you affirm you're (indiscernible) to

13   tell the truth, the whole truth and nothing, but the truth

14   (indiscernible)?

15             MR. BURKE:  I do.

16             THE CLERK: Please state and spell your name for

17   the record.

18             MR. BURKE:  Jim Burke, J-I-M B-U-R-K-E.

19             MR. MCKANE:  Good morning, Mr. Burke.

20             MR. BURKE:  Good morning.

21             MR. MCKANE:  Can you please--

22             THE COURT:  Sorry, for the record please identify

23   yourself.

24             MR. MCKANE:  Sorry, Your Honor.  Mark McKane of

25   Kirkland & Ellis on behalf of the debtors.

1            THE COURT:  It's just for the transcript.  Go

2     ahead.

3            MR. MCKANE:  Mr. Burke, can you please identify

4     yourself to the Court and explain your role at TXU Energy?

5            MR. BURKE:  Sure.  I'm Jim Burke, CEO of TXU

6     Energy.  I lead a team of approximately 1,000 people

7     competing in ERCOT to serve customers, (indiscernible)

8     customers electric power.

9            MR. MCKANE:  And sir, can you describe to the

10    Court your educational background and some of your

11    employment history before coming to TXU?

12           MR. BURKE:  Sure.  I have an undergraduate degree

13    in economics from Tulane University as well as an MBA.  I

14    joined Deloitte & Touche consulting.  I worked for the

15    Minute Maid Company, which is part of Coca Cola.  I entered

16    the electric power space in 2000 as Texas was becoming a

17    competitive marketplace.  I worked for one of our largest

18    competitors as well as a startup before joining TXU in 2004.

19    I'm a CPA and I hold the chartered financial analyst

20    designation.

21           MR. MCKANE:  And sir, before becoming the chief

22    executive officer of TXU Energy, what positions did you hold

23    in the power industry?

24           MR. BURKE:  So, one of our leading competitors I

25    was a senior vice president in charge of all of operations

1    after leading the marketing organization.  At one of the

2    startups I was the president.  It was a publicly listed

3    company and then for TXU Energy I started off as the senior

4    vice president in charge of the residential business and

5    then shortly after joining I became the CEO just over nine

6    years ago.

7              MR. MCKANE:  Let's briefly discuss this for a

8    moment.  What is the business of TXU Energy?  Can you

9    describe for the Court what a retail electricity provider is

10   in Texas?

11             MR. BURKE:  Absolutely.  So, the retail electric

12   provider, and there's dozens of retail electric providers in

13   the competitive Texas market, is responsible for serving end

14   use customers from residential up to large commercial and

15   industrial.  They are responsible for not only acquiring

16   customers, but competing to keep them for a time, retain

17   them and we are responsible for buying wholesale power from

18   a variety of suppliers as well as organizing for delivery of

19   that power through the transmission and distribution

20   utilities, which are regulated entities, where we sold the

21   customers at a particular price point that's a

22   (indiscernible) customer and we also (indiscernible) them

23   and collect monies over time, hopefully doing so profitably

24   over time.

25             MR. MCKANE:  And sir, what are your

1    responsibilities as chief executive officer of TXU?

2            MR. BURKE:  So, I lead a team, as I mentioned, of

3    approximately 1,000 folks that have a variety of

4    responsibilities that range from sales and marketing to

5    customer service, information technology, finance and

6    accounting and all of those folks work together to try to

7    compete against, as I mentioned, dozens of other companies

8    that are striving to grow their market share and

9    particularly look at our customer base as an opportunity for

10   growth.

11           MR. MCKANE:  And sir, what is your familiarity

12   with the incentive programs that are subject to the motion

13   before the Court today?

14           MR. BURKE:  I'm familiar with these programs.

15           MR. MCKANE:  And did you play a role in developing

16   these programs?

17           MR. BURKE:  I did.

18           MR. MCKANE:  And can you describe--and sir, how

19   long have you been with TXU?

20           MR. BURKE:  I've been with TXU for just over 10

21   years.  I had my anniversary last week.

22           MR. MCKANE:  And sir, for as long as you're aware

23   have the debtors always had employee incentive programs like

24   these?

25           MR. BURKE:  They have.

1            MR. MCKANE:  And from your perspective, sir, as

2     the CEO of TXU Energy, why does the company offer incentive

3     programs like these to senior management?

4            MR. BURKE:  Well, we're offering incentive

5     programs not only to senior management, but to all of our

6     associates.  We think it's important for us to have the

7     right metrics and goals to drive performance, not only in

8     the near term, but the long-term and so they're actually

9     very consistent throughout the organization in terms of the

10    type of metrics that we try to measure and hopefully meet or

11    exceed.

12            MR. MCKANE:  And sir, to assist you in testifying

13    today, did you prepare a set of demonstrative aids?

14            MR. BURKE:  I did.

15            MR. MCKANE:  If you can look in the binder in

16    front of you, the one that's labeled "debtor's demonstrative

17    aids" and turn to tab one.  Are you with me, sir?

18            MR. BURKE:  I am.

19            MR. MCKANE:  Sir, are these the demonstrative aids

20    you prepared to assist you in testifying today?

21            MR. BURKE:  They are.

22            MR. MCKANE:  And would using these assist you in

23    testifying?

24            MR. BURKE:  Yes.

25            MR. MCKANE:  Let's continue forward.  Sir, let's

1    turn to page one of the demonstrative aids.  Can you go over

2    for the Court the incentive plans that are before the Court

3    today at a high-level?

4              MR. BURKE:  Sure.  There are three plans before

5    the Court today.  The first, the Executive Annual Incentive

6    Plan covers roughly 26 people that we have as part of this

7    motion today for approximately $8 million.  The Key Leader

8    Performance Program has 19 folks at approximately $2.  5

9    million and the SPC Long-Term Incentive Plan, two folks for

10   just over $1.  8 million.

11             MR. MCKANE:  And so let me just ask you about that

12   Executive Annual Incentive Plan or sometimes we refer to it

13   as the EAIP.  Sir, approximately how long has the company

14   offered this plan?

15             MR. BURKE:  It's been in existence since the time

16   I've been with the company.  I don't know how long before

17   that, but it's been quite a while.

18             MR. MCKANE:  And how are individual payments

19   calculated under the Executive Annual Incentive Plan?

20             MR. BURKE:  So, we in last year's, this year has

21   been an exception as we'll talk about with the metrics being

22   adjusted, but we set a scorecard.  We set a scorecard before

23   the year begins.  Those scorecards have a variety of metrics

24   and I'm sure we'll spend time going through those metrics.

25   At the end of the year we assess our performance, we make a

1    recommendation to our senior leadership team at Energy

2    Future Holdings who then takes it to the board and the board

3    reviewed against how we performed against those metrics and

4    then each individual will have a target incentive and an

5    individual performance modifier and the product of your

6    salary, the individual performance modifier and the target

7    is how you would actually determine the payout.

8            MR. MCKANE:  And sir, this individual performance

9    modifier and this target, are either of those guaranteed in

10   any way?

11           MR. BURKE:  No they are not.

12           MR. MCKANE:  Sir, let's just turn to the next

13   program, the Key Leader Performance Program, are you

14   familiar with that?

15           MR. BURKE:  I am.

16           MR. MCKANE:  And can you describe that program to

17   the Court?

18           MR. BURKE:  So, similar to the EAIP, we've had a

19   variety of programs in the past that look very similar to

20   these Key Leader Performance Program, but recognizing that

21   the Owner Operator Program, which was its successor, did

22   complete in December of 2013, we needed to identify a third

23   component of compensation for these key leaders.  The three

24   components of compensation that we generally think about is

25   a base, a cash in or a bonus and usually with most companies

1     some form of equity compensation.

2            That's been very difficult in this environment to

3     actually incentivize with equity compensation so this third

4     component, the Key Leader Performance Program, we initiated

5     this year as a successor to the Owner Operator Program and

6     it's based purely on performance objectives, not with any

7     time component.

8            MR. MCKANE:  And sir, you specifically mentioned

9     that Owner Operator Program and you said it ended on its own

10    terms last year.  Is that correct?

11           MR. BURKE:  Actually from a performance

12    measurement period finished last year.

13           MR. MCKANE:  And so that's not before the Court in

14    any way, right?

15           MR. BURKE:  That is correct.

16           MR. MCKANE:  Sir, let me direct you to the

17    demonstrative.  In that second column it discusses the

18    participants at issue.  Do you see that, sir?

19           MR. BURKE:  Yes.

20           MR. MCKANE:  The first one, the EAIP program, it

21    has 26 individuals, right?

22           MR. BURKE:  That's correct.

23           MR. MCKANE:  And that's the 26 individuals who

24    have been identified as insiders.

25           MR. BURKE:  That's correct.

1              MR. MCKANE:  But the Key Leader Performance

2     Program has 19.

3              MR. BURKE:  That's correct.

4              MR. MCKANE:  Can you explain why the difference

5     between those two numbers?

6              MR. BURKE:  The difference between those two is

7     the seven members of the Strategy and Policy Committee.

8              MR. MCKANE:  And that's the senior most members of

9     the organization.

10             MR. BURKE:  That's correct.

11             MR. MCKANE:  Let's pause for a second and talk

12    about who those 19 members are.

13             MR. BURKE:  Okay.

14             MR. MCKANE:  All right, and just by title can you

15    give some understanding to the Court of below the SPC, the

16    most senior members of the team, who are these individuals?

17    What do they do?  What value do they provide?

18             MR. MCKANE:  So, for TXU Energy specifically we

19    had two in that group.  That's our chief operating officer.

20    He's responsible, as most chief operating officers would be,

21    for the day-to-day operations of the business that range

22    from all of the functions I just mentioned--sales and

23    marketing, (indiscernible) operations, (indiscernible)

24    collections and making sure that we're running the business

25    effectively.

1          The other is our chief financial officer and the

2     chief financial officer is our steward for not only the

3     business planning purposes, but also ensuring that we're

4     delivering on all the financial objectives of the business.

5     That's similar when you hear from Mac McFarland of the types

6     of positions he'll have.  He'll have a chief nuclear

7     officer.  He'll have a gentleman in charge of the fossil

8     operations.  He'll have a chief financial officer in

9     business services.  They're going to have folks that include

10    the direct reports to the chief financial officer, so a

11    treasurer, our controller, our chief risk officer and a

12    variety of positions that are critical to run an operation

13    of this type.

14          MR. MCKANE:  Okay.  Thank you, sir.  Sir, were

15    there revisions and modifications made to the Key Leader

16    Performance Program that made it similar to, but different

17    from in some ways, the Owner Operator Plan?

18          MS. SCHWARTZ:  Objection leading.

19          THE COURT:  Don't lead the witness.  Rephrase.

20          MR. MCKANE:  Sir, can you describe for the Court

21    how the Key Leader Program is similar--I'll do it another

22    way.  Can you describe the Key Leader Program, Key Leader

23    Performance Program to the Court and how it operates, what

24    the methods are?

25          MR. MCKANE:  Absolutely.  So the Key Leader

1    Performance Program is based on hitting two primary

2    performance objectives.  EBITDA is one of those objectives

3    and our cost structure, competitive cost structure is the

4    other objective.  It is measured on a quarterly basis.

5    There is a catch up provision if we fall short in a

6    particular quarter, but we have to reach the annual

7    objectives in order for them to receive the target payout of

8    that.  It's rated 60 percent towards EBITDA, 40 percent

9    towards costs and unlike the Owner Operator Program there's

10   no time component that's going to vest any of this award.

11   It is only earned if these performance metrics are achieved.

12              MR. MCKANE:  And sir, what is the total potential

13   payment that's subject to the motion to be made under this

14   program at the target level?

15              MR. BURKE:  $2.  56 million.

16              MR. MCKANE:  Sir, let's just turn briefly to the

17   SPC Long-Term Incentive Plan.  Are you familiar with that

18   program?

19              MR. BURKE:  I am.

20              MR. MCKANE:  Can you describe it for the Court

21   please?

22              MR. BURKE:  Absolutely.  So, this program, which

23   was put in place quite a while ago, had a very long date on

24   it.  Originally it was to measure the performance years of

25   '12, '13 and '14.  So, in order for us to set those

1   objectives what we knew from an SPC perspective is that we

2   are going to be measured against annual EBITDA targets that

3   had to be board approved and only upon meeting those

4   objectives would we actually earn the payout which would be

5   coming in March of '15.  So, it was a quite extended program

6   when initially provided.

7           MR. MCKANE:  And sir, I believe--how many

8   participants in that program are (indiscernible).

9           MR. BURKE:  Two.

10          MR. MCKANE:  And sir, what are the total projected

11  payments to be made at target--if the performance is met at

12  target under that plan?

13          MR. BURKE:  $1.  825 million.

14          MR. MCKANE:  Now sir, there's been some question

15  as to the characterization of that program, the Long-Term

16  Incentive Program.  Can you speak to how that program is

17  described within the business and its SEC filings?

18          MR. BURKE:  Well, for shorthand we just refer to

19  it as the LTIP.  That's the way we talk about it.  That's

20  the way we talk about it internally and I believe it meets

21  the (indiscernible) of the word incentive in that each year

22  we have to hit (indiscernible) EBITDA objectives.  Again,

23  the program was also conceived because the third component

24  of compensation which would include typically an equity

25  opportunity was no longer a motivator or an incentive for

1     most of our senior leaders or frankly anyone that's in the

2     Key Leader Programs and so this third component, which

3     because of the performance basis, hopefully it will achieve

4     those.  If we had equity that was valuable we would think

5     that by achieving these EBITDA measures you would be

6     tracking the kinds of financial performance that some of the

7     peer groups would actually be achieving and hopefully we

8     would exceed.  So, that was the nature and why that program

9     was initially put together.

10              MR. MCKANE:  Thank you, sir.  Each of these

11     programs have metrics that are used to drive performance, is

12     that right?

13              MR. BURKE:  That's correct.

14              MR. MCKANE:  And sir, can you describe for the

15     Court at a high level what the--how those metrics are

16     derived from the budgeting process?

17              MR. BURKE:  Absolutely.

18              MR. MCKANE:  Would page three--page two of the

19     slides of the demonstrative assist you in doing so?

20              MR. BURKE:  It would.  So, what we get to when we

21     get further into the discussion or the types of metrics that

22     will motivate the broader organization, and I'll save that

23     part for later, but I'm going to talk about the process of

24     how do we arrive at our plans and our metrics.

25              MR. MCKANE:  Why don't we do that by starting with

1    what is your role annually in the budget process?

2              MR. BURKE:  So, I'm responsible, Mac McFarland's

3    responsible for developing a high performance business plan.

4    So, we are looked upon by the senior leadership in Energy

5    Future Holdings as well as the board to develop, present and

6    deliver on a business plan and we do that each and every

7    year.  That process starts in the early spring.

8              MR. MCKANE:  Okay.  And at what point does a

9    proposed annual budget come to you at the CEO level of TXU

10   Energy?

11             MR. BURKE:  So, in the spring timeframe as our

12   folks are developing their bottoms up, which means that we

13   have literally dozens and dozens of people throughout our

14   business units working at a very detailed level because the

15   budget is not only just the financial plan, which will come

16   at the end of process, but it's all of the operating metrics

17   and all of the sales and marketing and other plans that we

18   also approve so that people have effectively their marching

19   orders to go out and deliver in the subsequent year.

20             So, we will actually get involved very heavily in

21   the summer and we will submit at the end of the summer to

22   the corporate team for their review and we then start going

23   through our own exercise of challenges with the corporate

24   team about why our plan is a high performance plan.

25             MR. MCKANE:  So, before it ever gets to the board

1    level or even the EFH senior management team level does it

2    have to get past your level?

3             MR. BURKE:  Absolutely.

4             MR. MCKANE:  All right.  And then after you're

5    satisfied with it, then it goes to what level?

6             MR. BURKE:  It will go to the corporate team.  So,

7    we will submit it to the corporate planning team who will

8    prepare a package of materials for our corporate CFO and our

9    corporate CEO for them to review (indiscernible) a variety

10   of their judgment from history, their experience elsewhere

11   as well as our most recent performance and the market

12   conditions going forward and then challenge whether we

13   actually have indeed a high performance plan that they're

14   prepared to submit to the board.

15            MR. MCKANE:  Well sir, you were in the courtroom

16   for opening statements, right?

17            MR. BURKE:  I was.

18            MR. MCKANE:  Did you hear the statement that the

19   risks of the company are the same every year?

20            MR. BURKE:  I did.

21            MR. MCKANE:  Are the risks--are the budget factors

22   the same every year?

23            MR. BURKE:  Well, the budget factors aren't the

24   same and even if some of the risk by title look to be the

25   same, they actually play out very differently year upon

Case 14-10979-CSS   Doc 2375   Filed 10/10/14   Page 76 of 297

Page 76

1   year.  So, for instance, weather is a risk in our business

2   and we would put weather on our risk chart every year.  But

3   the weather has been incredibly different year on year and

4   it's one of our biggest challenges that we have to overcome

5   as a business.

6          But some risks are new.  Restructuring is a risk

7   that's new this year.  All of our customers can switch

8   providers.  We have not had to manage the restructuring, but

9   we did not have any adjustments made to our metrics at the

10  time we filed the metrics originally and even at the mid-

11  year adjusting for downsize due to restructuring.

12         MR. MCKANE:  And sir, at some point in time the

13  board approves the budget process.

14         MR. BURKE:  That's correct.

15         MR. MCKANE:  What is the next step after the board

16  approves the budget to taking that data and turning it into

17  metrics?

18         MR. BURKE:  So, as I mentioned, even though we

19  start with this bottoms up process, there's a lot of focus

20  on the financial metrics when we get the plan approved, but

21  we then need to make that actionable to the broader

22  workforce.  The reason why we develop all the other metrics

23  is not only do they align with the financial objectives, but

24  they actually enable all of our workforce to relate to

25  something very specific to their day job.

1          It is extremely hard for everybody just to be

2     motivated around EBITDA.  So, when we develop these other

3     metrics we're developing them with the idea that if they

4     deliver on those metrics we would be able to achieve the

5     EBITDA target and those metrics then gain a lot of both

6     support as well as scrutiny in the fall when we finalize the

7     scorecard.

8          MR. MCKANE:  And these metrics, it's not just a

9     category, it's the specific amount that must be identified

10    and achieved in that year based on what you think the

11    business can do?

12         MS. SCHWARTZ:  Objection, leading.

13         MR. MCKANE:  Let me ask it another way.

14         THE COURT:  It's borderline, but rephrase.

15         MR. MCKANE:  I'm happy to rephrase, Your Honor.

16    Why don't you turn to the next demonstrative if you can?

17         MR. BURKE:  Sure.

18         MR. MCKANE:  Do you recognize the next

19    demonstrative, sir?

20         MR. BURKE:  I do.

21         MR. MCKANE:  What is it?

22         MR. BURKE:  So, this is a one-page recap of what

23    the metrics are on the three primary scorecards that

24    represent folks that we're seeking approval to pay in this

25    motion and those scorecards Luminant, TXU Energy and

1    Business Services and this is the detail of the metrics.

2    So, this is the expansion of the metrics beyond just the

3    financial ones that results in the process that we conclude

4    in the fall.

5            MR. MCKANE:  And sir, specifically with regards to

6    the TXU energy scorecard, are you directly involved in

7    developing what exactly the performance metrics should be

8    for that business for this year?

9            MR. BURKE:  Absolutely.

10           THE COURT:  So, just so I understand, so part of

11   your bottom up process is to establish targets for each of

12   these various line items like EBITDA, total cost, etcetera?

13           MR. BURKE:  That's correct.

14           THE COURT:  Okay.  And I guess you're going to

15   explain the weight, how that works.

16           MR. MCKANE:  I will.

17           THE COURT:  You--all right.

18           MR. MCKANE:  I'll cover that next.  Why don't we

19   go there now?  So, there's a weighting ascribed to each of

20   these performance metrics.  Can you describe how those are

21   set and what role you play in that?

22           MR. BURKE:  Absolutely.  So, over the years--we've

23   been a private company since the fall of '07--we've had a

24   similar structure to these scorecards during that timeframe.

25   We've had a few things, very small things, come on and off

1    the scorecard, but the weight has always had a very

2    significant financial component to it.  So, from our

3    scorecard if you look at the first three rows, those sum to

4    75 percent.

5              What that means is is that we believe that

6    aligning our value creation with stakeholders is represented

7    in the scorecard that has a very heavy financial weight to

8    it.  But the other metrics, which we believe are also

9    important because the residential (indiscernible) customer

10   account can be used more as a leading indicator on how the

11   franchise is performing over time and what long-term value

12   can be created.  But also the metrics down beneath it are as

13   much quality indicators.  If we do well on these other

14   metrics our customer experience is better.  If our customer

15   experience is better we should operate with lower cost,

16   should have good customer account performance and ultimately

17   achieve these financial metrics.

18             So, what we wanted to make sure with all of our

19   stakeholders is that we brought line of sight to the whole

20   workforce by putting more metrics on that just financial

21   ones, but they are still dominantly financially driven.

22             MR. MCKANE:  And sir, if you could turn to slide

23   four of your demonstrative package.  Are these threshold

24   baseline and superior listings the specific targets--metrics

25   that are ascribed for each of the individual components of

1   your TXU Energy scorecard?

2            MR. BURKE:  They are.  The distinction I would

3   make is that because we developed these scorecards last

4   fall, the non-insiders did not have adjustments to the

5   targets.  So, the highlighted component to this is that

6   these metrics were ones that for insiders we did change in

7   the middle of the year, but all of these numbers on here are

8   numbers that I was involved with preparing and involved

9   with, from the team's perspective, developing and presenting

10  to the corporate team for approval.

11           MR. MCKANE:  Just to make sure I understand and

12  the record is clear, the yellow highlighted cells, if you

13  will, of this chart are variables that were changed as part

14  of a mid-year adjustment.

15           MR. BURKE:  That's correct.  Everywhere there is a

16  yellow highlight that meant that the threshold targets

17  became tougher.  They were in essence made more challenging

18  and they did not change for the non-insiders, meaning the

19  vast majority of our people.  They stayed in place like they

20  have in all of the other years at the original levels that

21  were approved last fall.

22           MR. MCKANE:  All right.  So, last fall you had

23  this scorecard where you have the metrics and you have the

24  weightings set and then you have the specific cells

25  identified for what threshold baseline superior are and then

1    who finally approves those scorecards for each of the

2    business?

3              MR. BURKE:  Ultimately the O&C committee is

4    delegated with that responsibility from the board.

5              MR. MCKANE:  And who makes up the--the O&C is the

6    Organization and Compensation Committee?

7              MR. BURKE:  That's correct.

8              MR. MCKANE:  And that's the committee of the FH

9    board?

10             MR. BURKE:  That's correct.

11             MR. MCKANE:  And who are the members of that

12   committee, sir?

13             MR. BURKE:  So, our chairman Don Evans, a member

14   of Goldman Sachs Ken Pontarelli and an independent director

15   Arcilia Costa.

16             MR. MCKANE:  And so, the scorecard, if we could go

17   back there for a moment to slide three.

18             MR. BURKE:  Yes.

19             MR. MCKANE:  The scorecard, as we look at it, this

20   is the scorecard that's used for the Executive Annual

21   Incentive Program, right?

22             MR. BURKE:  That's correct.

23             MR. MCKANE:  Are subparts of this scorecard or

24   some of these metrics also used in the other programs?

25             MR. BURKE:  They are.

1            MR. MCKANE:  Can you explain to the Court which

2    metrics are used in the Key Leader Performance metrics?

3            MR. BURKE:  Yes.  I referenced earlier before we

4    turned to this page that the Key Leader Performance Plan is

5    driven by two primary metrics--the competitive management

6    EBITDA that you see in the business services scorecard,

7    which is summation effectively of the EBITDA of the limited

8    business, TXU Energy and a very small piece at business

9    services and then also competitive total spend.  So, that's

10   used and it creates alignment because the majority of the

11   competitive management EBITDA and the spend are driven

12   through our specific business units and so those two metrics

13   are used for that and for the SPC LTIP metric, it's driven

14   financially off of EBITDA.

15           MR. MCKANE:  Okay.  And so, sir, to understand

16   what drives the performance and how it's evaluated, all the

17   metrics that are covered by the plans under the motion today

18   are identified here on the demonstrative.

19           MR. BURKE:  That is correct.

20           MR. MCKANE:  Now sir, you mentioned a few moments

21   ago there is a mid-year adjustment to the metrics in 2004.

22           MR. BURKE:  Correct.

23           MR. MCKANE:  And were you involved in that

24   adjustment--

25           MR. BURKE:  Sorry, mid-2014?

1           MR. MCKANE:  Let me try that again.

2           MR. BURKE:  Okay.

3           MR. MCKANE:  Sorry about that.  There is a mid-

4    year adjustment to the metrics in the summer of 2014.

5           MR. BURKE:  That's correct.

6           MR. MCKANE:  And so were you involved in those

7    adjustments?

8           MR. BURKE:  I was.

9           MR. MCKANE:  What was your role?

10          MR. BURKE:  Well, I, among others on the SPC, if I

11   could just use that shorthand, had significant dialog--

12          THE COURT:  Can you identify the members of the

13   SPC for me if you don't mind?  I think you may have already

14   done so.

15          MR. BURKE:  I can.  So, John Young, our corporate

16   CEO of Energy Future Holdings, Paul Keglevic, our CFO, John

17   O'Brien, our head of public affairs, myself, Mac McFarland,

18   Carrie Kirby, Stacy Doray.

19          THE COURT:  Okay, thank you.  Go ahead.  I

20   interrupted you.

21          MR. MCKANE:  No, not at all.  You were describing

22   your role as a member of that SPC in evaluating whether to

23   make an adjustment and then--

24          MR. BURKE:  Correct.  This was a--absolutely.

25   This is a process I personally have never been through so

1    I'm not familiar with what the requirements are of the

2    (indiscernible) as it relates to annual incentive

3    compensation.  Typically from an accountability perspective

4    we set a plan in the fall of a particular year, and in this

5    case that would be September/October, and we would live with

6    how we achieved versus that plan, both good things and bad

7    things throughout the subsequent year.

8              Because of the filing in the April timeframe,

9    counsel has suggested that we think about revising some of

10   these metrics to make them even more challenging.  That was

11   not universally agreed upon by each of us as something that

12   we believe was necessary because we thought they were

13   actually very challenging.  But because this was the process

14   we're in and it's a process that, as I mentioned, I'm no

15   expert in, we did work through a process.  I worked through

16   it with the CFO and the COO of our organization.  So, we did

17   make the suggestions to increase the thresholds for the

18   insiders including the baseline for one of my metrics on

19   ending customer count and we presented that and debated that

20   at the SPC level as well as worked that ultimately through

21   the board.

22             MR. MCKANE:  And sir, was the process that was

23   used in the mid-year adjustment--how did it compare to the

24   process that was used in the fall to develop the year-long

25   projections?

1          MR. BURKE:  Well, it's similar in process.  The

2    difference is is our timeframe for measurement is different.

3    So, typically when we would develop a threshold, the

4    baseline and superior, we're projecting and closing a

5    scorecard in September/October of how do you think you're

6    going to do by the end of the following year at December

7    31st.

8          With this process we're looking at June results.

9    So we have a six month process--we have a six month set of

10   data already and we have to think about, knowing what we

11   know now, what are the range of outcomes that we could

12   foresee between basically July 1st and December 31st and

13   that's why the passage of time was one element and the

14   results achieved is why we could bring the threshold metrics

15   in many cases closer to baseline because the window of time

16   for performance and the amount of variation that should

17   occur in the final six months should be less than 15 months,

18   which is what our typical planning horizon would be at the

19   time that we would finalize the scorecard.

20         MR. MCKANE:  So, sir, did I understand you

21   correctly that the actual performance in the remaining and

22   the time consumed were variables that you took into

23   consideration in making that adjustment?

24         MR. BURKE:  That's correct.

25         MR. MCKANE:  And sir, based on that performance

1    did you ever--do you believe that the TXU Energy target

2    level is difficult to meet?

3              MS. SCHWARTZ:  Objection leading.

4              THE COURT:  Do you have a belief?  What is your

5    belief?

6              MR. MCKANE:  Sure.

7              THE COURT:  Don't suggest the answer to the

8    question.

9              MR. MCKANE:  I'm not trying to, Your Honor.  I

10   apologize.  Do you have a view about whether the original

11   projections when they were formed in the fall were

12   achievable?

13             MR. BURKE:  So, when we think about driving the

14   business, part of what we're responsible for is putting out

15   aggressive targets and meeting them, not putting out

16   aggressive targets and saying we can't achieve them.  So

17   that is part of what we show up to work to do.  I thought

18   the targets when we developed them were challenging.  I

19   thought they were tough to meet.  These targets are even

20   tougher to meet.  I still believe that even though this was

21   actually developed with June year-to-date results and we're

22   now in October, I still believe that.

23             MR. MCKANE:  All right, so let's go through some

24   of the targets, the TXU Energy specific targets.  Sir, is

25   the TXU Energy total cost metric one of your specific

1    targets?

2            MR. BURKE:  It is.

3            MR. MCKANE:  And sir, if you could turn to tab

4    five or page five of your demonstratives.  Can you describe

5    for the Court what the total cost metric is for TXU Energy?

6            MR. BURKE:  Absolutely.  So, what is the sum of

7    all of our selling general administrative cost?  So,

8    everything from our sales and marketing efforts to customer

9    service to information technology--all of those costs are

10   included as well as a very limited capital expenditure

11   budget primarily in the area of information technology, but

12   also a significant bad debt expense which is effectively,

13   since we're a competitive market and there's no rate of

14   return for being in a regulated industry, we'll have to

15   build customers and we have to successfully collect.  If we

16   don't collect there is no recovery mechanism so we put a lot

17   of focus on this metric by combining all costs of doing

18   business, pulling it together in one metric that we can hold

19   ourselves accountable.

20           MR. MCKANE:  Sir, could you specifically speak to

21   the bad debt expenses that you just mentioned and describe

22   to the Court what those are?

23           MR. BURKE:  So, the, let's call it the post-pay

24   category, you use the service, on like gasoline, you use the

25   service and you get billed.  Typically for an average

1    customer if they were not to pay an electric bill we're

2    about two and a half months in arrears for that customer by

3    the time you could actually disconnect power for non-

4    payment.  Of course our goal is to not disconnect power for

5    non-payment, but work on payment plans and workout terms

6    with customers.  But customers can actually choose any

7    provider in competitive ERCOT at a minimum by 5:00 o'clock,

8    but even by 7:00 p.  m.  on any given day and they could be

9    with a new provider that night and they do not actually have

10   to pay their current provider in order to switch.

11           So, it's a very, very competitive market and it's

12   extremely sensitive, our financial results, on being able to

13   manage credit risk, the billing and collections process to

14   ensure that we are not left with a lot of unpaid bills,

15   which is a key success indicator in our industry.

16           MR. MCKANE:  How has TXU performed over time with

17   regards to managing its costs?

18           MR. BURKE:  Fortunately, this has been an area

19   where we've done exceedingly well over the last six years.

20   We went through--after the completion of becoming a private

21   company we went through a very significant IT, information

22   technology, and functional transformation of service,

23   billing, all of our systems and platforms to serve

24   customers.  That gave us the efficiencies that we're now

25   achieving and have been on a downward trajectory since 2009

1   which has been very strong performance.

2           And bad debt, specifically this is something we're

3   in a retail sector, we'd be excited to have bad debt less

4   than two percent and we're less than half that and we're 37

5   percent better than our next leading competitor.  So, it's a

6   key mark of distinction I think in how the plan put together

7   years ago executed well by the team has delivered an

8   industry leading position, we believe, on costs, but also on

9   the data we have on bad debt as well.

10           MR. MCKANE:  And sir, can you specifically

11   describe how you arrived at the threshold baseline and

12   superior metrics for TXU Energy total costs?

13           MR. BURKE:  So, when we look at, again, there was

14   the process of looking at it last fall in the process that I

15   described earlier and then there is the fact that we looked

16   at it again in the middle of the year.  So we had it roughly

17   half the year behind us.  So, one of the things that I've

18   tried to emphasize with the team, my goal is not just simply

19   to spend less money, it's to spend money effectively.  If we

20   can bring more customers and spend more in sales and

21   marketing, we're going to do it.  When we do that we do not

22   get a scorecard adjustment for that.  We have to live within

23   our means.  But I want folks to pursue valuable efforts to

24   try to acquire and retain customers.

25   But if we achieve this threshold metric now that we've

1    revised it middle of the year, this higher metric would

2    mean that we would have lower SG&A than four of the last

3    five years and better bad debt performance in three of the

4    last five and we're not fully in control of the bad debt

5    metric.  As well as we try to operate, weather has a big

6    effect and competitive intensity has a big effect.  So, if

7    they're making huge efforts to try to acquire our

8    customers, the biggest risk to not being paid is a customer

9    that leaves us with a final bill.  So, those two metrics

10   have--that metric, in particular, has a lot of influence by

11   outside factors that we have to manage.

12                  MR. MCKANE:  And do those risks remain for

13   the remainder of the year?

14                  MR. BURKE:   Absolutely.

15                  MR. MCKANE:  And what is your view as to

16   whether this--the threshold or baseline targets are

17   achievable?

18                  MR. BURKE:  I think they're going to be

19   challenging.  This is a metric that has--we've actually

20   challenged with since the beginning of the year, there was

21   extreme weather at the beginning of the year in the Dallas-

22   Fort Worth area that made it exceedingly cold, but drove

23   bigger bills.

24                  It drove more bad debt and think they drove

25   more expenses for us to be managed in the call center

1    activity related to it.  We missed out another event last

2    Thursday where nearly 300,000 folks were without power.  It

3    drove higher calls, drove higher transactions through our

4    systems.  And so, we have to manage all of that.  So, it's

5    going to be bigger challenge to reach these measures.

6              MR. MCKANE:  Yeah, let's pause on that for a

7    second, because the issue of weather just came up and I

8    know it's--specifically, we're talking about the costs, but

9    can you--(indiscernible) some of this non-intuitive.  Can

10   you describe to the court how significantly unanticipated

11   weather events can directly impact your business in not

12   easily identifiable ways?

13             MR. BURKE:  Absolutely.  So, as I mentioned,

14   yeah, there is a risk, but it shows up in a lot of

15   different areas, if we wanted me to be specific to the

16   scorecard.  First and foremost, the beginning of the year,

17   the weather, as I mentioned was extremely cold.  One would

18   have to hedge our power as best we can anticipating what's

19   normal weather, as well as some level of extreme weather to

20   work with Mac McFarland and his team to do that.

21             And I think we actually, on balance, over

22   the years, have done that extremely well.  But you also

23   don't want to over hedge because it's costly.  There will

24   always be over hedge no matter the circumstance.  Or, the

25   (indiscernible) with two days in particular--one in

1    January, one in March; each day could have knocked us off

2    of our targets and we actually had both days occur at the

3    beginning of this year because we had to buy power in the

4    spot market.  Extra power because the customers are always

5    entitled to have as much power as they need at a moment's

6    notice.

7                    We're never allowed to be out of stock and

8    we're financially responsible for buying that power in the

9    spot market in making the product available to the

10   customer.  We may not get paid, which is also what

11   happened.  As the larger bills went out to customers,

12   particularly, all electric heat customers that rely on

13   electricity to heat their homes, saw the biggest bill

14   increases.  And we saw a direct correlation to folks that

15   left us without paying their bill, as well people who

16   wanted to stretch that payment out over many months which

17   we're happy to do, but that only affects bad debt.  If they

18   don't ultimately pay, it affects (indiscernible)

19   outstanding, which we'll talk about in a moment because we

20   have to stretch those receivables.

21                    Also, high bills are an agitator for

22   customers to shop around.  Even if the bill is high because

23   of usage and cold weather, it's a reminder that maybe I

24   need to be looking at my electric bill so when you have

25   extreme weather, you have more switching activity.  So,

1    that's just a simple example of an event and how it ripples

2    through our business in addition to just the cost to serve

3    customers.

4                    MR. MCKANE:  Thank you, sir.  Let's turn to

5    another one of the metrics that covers your business, and

6    that's specifically, the contribution margin metric.  Sir,

7    can you explain to the court what the contribution margin

8    metric is?

9                    MR. BURKE:  The contribution margin metric

10   is the variable measure of how much we are going to earn by

11   what we charge a customer and accounting for the

12   electricity costs which are primarily the wholesale power

13   costs, which is in the competitive marketplace, the

14   competitive wholesale market, as well as the regulated

15   delivery fees.  So, when you take your revenue minus your

16   cost of power, minus your cost of delivery, you can derive

17   this gross profit per unit of electricity sold.

18                   MR. MCKANE:  Thank you, sir.  And can you

19   describe how the--you arrived at the threshold baseline of

20   superior metrics per contribution margin?

21                   MR. BURKE:  I can.  So, this measure we

22   learned over time and I believe this--the industry has been

23   learning over time that the key to a successful business is

24   you can't always be the lowest cost provider and chase the

25   cheapest price offered in a market and except to actually

1    be in business for very long and we--some of that play out

2    over and over and over again.  However, you also can't

3    charge whatever you want for electricity when there's 280

4    offers out on the powertochoose.com that a customer can

5    avail themselves out of every zip code in Texas, and as I

6    said, switch that evening.

7                    So, we balance our contribution margin

8    objectives and we set the threshold, the target and the

9    superior to what we believe is a reasonable way to think

10   about the balance of trying to be a preferred provider

11   where you can earn a return that we believe is above the

12   industry average, but at the same time, satisfy the

13   customer base for the long-term so that we have a franchise

14   over time that's valuable for stakeholders.

15                    MR. MCKANE:  And sir, how is TXU Energy's

16   contribution margin measure--how do you form that measure

17   over time?

18                    MR. BURKE:  That measure has been one of our

19   strongest elements of performance.  And I'm happy to say

20   that we've been able to achieve it while also reducing the

21   amount of attrition in a customer business.  So, one can

22   only earn the contribution margin that customers allow us

23   to earn.  Since it's not a regulated industry, if we try to

24   earn more and the customer believes that there's a better

25   offer out there, they could call us and we can actually

1    talk about alternative plans that might fit their needs, or

2    they can switch to another provider.  But we've been able

3    to grow this by 33 percent from 2009 to 2013 and I believe

4    it's an industry (indiscernible) statistic.

5                    MR. MCKANE:  Okay.  And sir, without

6    disclosing what the statistic is, it's--could you describe

7    what would be necessary for TXU Energy to achieve the

8    threshold level for the contribution margin metric for this

9    year?

10                   MR. BURKE:  I can.  As you know, we have the

11   balance of the year, there's a lot of unknowns, particular

12   around the weather and what incremental supply.  And

13   there's less time to respond if the wholesale price

14   increases, there's less time for us to be adjusting our

15   price to the customer.  So, there's very, very narrow

16   window of opportunity to respond to any unforeseen events,

17   but if we do achieve it, it would be better than four of

18   the last six years that we performed on that metric at the

19   threshold level.

20                   MR. MCKANE:  And, sir, just to make sure I

21   understood that correctly.  The threshold level is set at a

22   level that you would have to beat performance out of four

23   of the last six years?

24                   MR. BURKE:  Correct.

25                   MR. MCKANE:  Okay.  And so, are there a cluster

1    of matrices that are used at TXU Energy to measure the

2    customer experience?

3              MR. BURKE:  There are.

4              MR. MCKANE:  And, sir, are those reflected on

5    slide 8 of the demonstrative?

6              MR. BURKE:  Absolutely.

7              MR. MCKANE:  At a general level, can you just

8    describe why you believe it--why you have customer

9    experience matrices in your scorecard?

10             MR. BURKE:  Absolutely.  I think fundamentally,

11   as I mentioned, the contribution margin is effectively, a

12   financial product, but being able to earn a return that the

13   customer is willing to provide to us for the services that

14   we deliver due them.  One of the leading indicators that we

15   look at is the set of customer experience metrics that

16   measure anything from customer satisfaction across a

17   variety of touch points which we can talk about.  The speed

18   with which we are able to collect the meter information

19   accurately and collect energizing event success, every time

20   a customer gets turned on or turned off, which we get over

21   200,000 activities during a given month.  We need to do

22   that properly because that is one of the biggest sources of

23   frustration from a customer standpoint.

24             Complaints, whether valid or not; a customer has

25   a right to submit complaints.  We measure that.  And our

1    system of availability which is an interesting statistic

2    because it isn't as customer facing as some of the others,

3    but we've learned is that as the industry has gone much

4    more to the web and to mobile devices, if our systems

5    aren't up, our customers are dissatisfied.  And we can't

6    simply say call back.  So, the system of availability piece

7    has grown in importance as the under strained consumer

8    behavior has shifted over time.

9              MR. MCKANE:  All right.  Sir, let's discuss some

10   of the specific customer experience matrices individually.

11   (Indiscernible) let's--can you describe for the court what

12   the average daily--average day's sales outstanding metric

13   is?

14             MR. BURKE:  Absolutely.  (Indiscernible) on the

15   post pay concept I made earlier that we have to deliver

16   power to the customer.  We do not get a meter read that's

17   billable every single day.  There's actually a period of

18   time where we'll get the official reads from the

19   transmission distribution utility.  And at that point, we

20   have provided power.  We do not have the meter read

21   information.  Once we get the meter read information, we

22   produce the bill.  Customers have a minimum of 16 days to

23   pay.

24             And we work with them frequently on extending

25   that, but in a business, you want to keep your cash cycle

1    as short as you can because we have to pay the wholesale

2    power bill.  And we have to pay the electric delivery, the

3    TDU is the Transmission of Distribution utilities.  We have

4    to pay them on-time regardless of whether we get paid.

5    There's no sharing in the bad debt; all of that that is on

6    the retailer.  So, we want to make this cycle as short as

7    it can be, once they'll provide some flexibility for the

8    customers.

9           MR. MCKANE:  And, sir, can you describe for the

10   court how you arrived at the threshold baseline superior

11   targets that are specifically identified for the average

12   day's sales outstanding metric?

13          MR. BURKE:  One of these we do, we look at the

14   historical performance and that has been a steadily

15   downward trend for our business.  So, it has been one of

16   the items that I think is consistent with what I mentioned

17   about the processes and the new technology, operating more

18   effectively, but we still want to keep pushing the metric.

19          So, what we did is we looked at wherever

20   (indiscernible) to date, it was negatively impacted as a

21   result of the extreme weather that I mentioned.  This is

22   the one metric where we did not suggest or recommend a

23   recommended change at the threshold level because there

24   was--it is and was a challenge to meet threshold given the

25   year-to-date activities.  But, in order for us to even hit

1    this at the threshold level, we have to beat the five-year

2    average by over eight percent given the balance of the year

3    which is almost four days which is a significant 10 percent

4    fewer days than where we've been.

5           MR. MCKANE:  All right.  And, sir, let's turn to

6    another customer metrics, specifically, the customer

7    complaint metric; I believe that's discussed on slide 10?

8           MR. BURKE:  That's correct.  Customer complaints

9    respectively are in two categories.  We honestly receive

10   hundreds of thousands of calls a month.  Instead of just

11   being an internal measure of whether we received a

12   complaint, we normally use a measure of two organizations.

13   The Public Utility Commission, receives complaints,

14   customers can complain online or a phone call and the

15   Better Business Bureau.

16           When we started this effort to change the way we

17   did business, we were a middle-of-the-pack performer in

18   complaints.  We weren't the best; we weren't the worst, but

19   we were middle of the pack.  Since 2009, after we were able

20   to get our new systems and our new, our partners in place

21   from a customer service, as well as we doubled our

22   workforce.  We went from 500 to 1,000 people primarily in

23   the areas of service to try to improve our services levels.

24   We've been able to drive an 82 percent decrease in

25   complaints and of any retailer of any size.

1   (Indiscernible) from the Public Utility Commission's

2   website, we're the top performer now on complaints.

3   There's a handful of very, very small players.  They're not

4   seen frequently, but of anybody of any size, we're the top

5   performer now.

6            MR. MCKANE:  And, sir, can you describe how you

7   arrived at the threshold baseline as purely metrics that

8   are at issue for the customer complaint measure?

9            MR. BURKE:  We also looked at the year-to-date

10  performance on complaints.  We unfortunately received about

11  30 complaints related to the extreme weather at the

12  beginning of the year because it drove higher bills.

13  Nevertheless, we actually tightened the threshold metric,

14  made it more difficult to achieve.  We had no idea what

15  externalities could affect us for the balance of the year,

16  but if we achieved the threshold, it'll be the second best

17  complaint performance over the past six years.

18           MR. MCKANE:  And, sir, can you express some of

19  the risk factors that may impact your ability to meet the

20  threshold baseline and superior targets for customer

21  complaints?

22           MR. BURKE:  Absolutely.  We operate--I'll tell

23  you about one that could happen as early as this weekend.

24  We operate a version software platform.  This means that

25  it's an enterprise-wide system and it needs to be upgraded.

1    We're in that upgrade process right now.  There is no

2    cushion in this metric.  There was no stipulation in this

3    metric that we'd have a buffer because that upgrade, for

4    some reason does not go smoothly.  Maybe they put a buffer

5    in there for any impacts due to restructuring or the

6    weather.

7            So, from this standpoint, I'll know better next

8    week whether I have any other externalities beyond just the

9    system upgrade, but those kind of issues because the

10   system, the one I'm talking about, is not only serving the

11   agents in our call centers, but it is also tied into our

12   billing and our mobile and web technologies and that needs

13   to go smoothly.

14           MR. MCKANE:  And, sir, can you just discuss at a

15   high level, the achievability of this metric for the

16   remainder of the year?  And what you must do to reach even

17   the threshold level?

18           MR. BURKE:  Well, as I mentioned, for us, at

19   least, the threshold level is going to be the second best

20   performance in the past six years.  In terms of what do we

21   have to do, what's taking care of 1.7 million customers

22   near flawlessly because, again, a complaint only really

23   needs to be received by the Public Utility Commission and

24   forwarded to us; same as the Better Business Bureau.  This

25   is not calling out complaints that are ultimately deemed to

1    be without merit.

2            So, it is--for us to be talking about whether

3    this--when you serve 1.7 million customers and you're

4    talking about 100 complaints be the difference between

5    threshold and baseline on a base of 1.7 million, it's

6    almost immeasurable what has to happen and what could go

7    wrong to miss that metric.

8            MR. MCKANE:  All right, you know, sir, if we

9    could go back to slide 8 for a minute.  I believe there are

10   three other customer experience metrics that were

11   identified.

12           MR. BURKE:  Yes.

13           MR. MCKANE:  Could you just speak generally about

14   the remaining three, the customer satisfaction percentage,

15   the energizing event success and the system availability

16   percentage?

17           MR. BURKE:  Yes, very quickly.  On the energizing

18   event success, as I mentioned, there's a couple hundred

19   thousand transactions a month where we have to turn

20   customers on or off properly, disconnect, reconnect

21   properly, or switched properly.  If that is not done

22   timely, it counts in our recordkeeping as a failure, so we

23   did not succeed in energizing that customer in a timely

24   fashion.  We're talking about having 200 or so of these go

25   awry on a 200,000 base--I mean, I'm sorry, 200,000

1    transaction base every single month.

2          That's a--this system upgrade that I mentioned?

3    It has direct relationship to the energizing event success,

4    customer complaints, certainly, system availability and

5    system availability just because we talk about complaints,

6    we're talking about 13 systems that need to be up

7    effectively 24/7.  If one system is bringing another system

8    down, those all count as two separate hours in our

9    measures.  We're measuring all the available hours the

10   systems can be up.  I would not quite say this is the same

11   as running a nuclear plant, but it's our equivalent for how

12   we think about our operations that this needs to be there

13   because it's the fundamental backbone of how information,

14   which we are effectively, a data-driven IT-intensive shop.

15         So, wrenching these metrics would be among the

16   best performance, if not, the best performance we've

17   achieved in our history.

18         MR. MCKANE:  Is there any assurance or guarantee

19   in any way that you would achieve even the threshold level

20   for these charts?

21         MR. BURKE:  No, there's no guarantee at all.

22         MR. MCKANE:  All right.  Sir, what were the

23   remaining metrics that you have is--what was referred to as

24   the residential ending customer count?  Are you familiar

25   with that?

1               MR. BURKE:  I am.

2               MR. MCKANE:  And sir, does your demonstrative on

3     page 11 discuss the residential and the customer account

4     metric?

5               MR. BURKE:  It does.

6               MR. MCKANE:  If you can explain to the court what

7     that metric is?

8               MR. BURKE:  Well, because we are in this

9     competitive marketplace, one of the things that we are

10    trying to measure is how are we doing with our customer

11    base through time.  We started off with the largest market

12    share company in a competitive market.  It's almost

13    inevitable the share goes down.  It's--everybody is

14    attacking.  You try to compete as effectively as you can,

15    but you also want to make sure as I mentioned earlier, that

16    you're balancing that with what are the right long-term

17    measures for success, which includes the contribution

18    margin, the cost structure, and ultimately serving

19    customers effectively.

20              So, we put this measure in.  It's less sensitive.

21    It has less of a driver of current year EBITDA.  There's a

22    lot of other things that actually are--will drive current

23    year EBITDA, but in terms of the long-term franchise value

24    of the business, we look at customer counts as a sign of a

25    health of the business as well and also the competitive

1    intensity.  So, we put this on the scorecard.  It was not

2    always on the scorecard.  I believe there was one year in

3    the last seven years it was not.

4            But I think it's an appropriate thing to be on

5    the scorecard because fundamentally, our people are excited

6    about serving customers.  And it puts much more of a

7    realistic alignment of what are our objectives are with the

8    objectives of a lot of our folks in our business to try to

9    keep every single customer we have as well as getting new

10   ones.

11           MR. MCKANE:  And sir, what are risk factors that

12   may impact particularly the availability--ability, excuse

13   me--ability to meet even threshold level of this goal?

14           MR. BURKE:  I would say competitive intensity is

15   the first driver.  We have seen in the past very, very

16   significant campaigns by major competitors as well as small

17   ones.  Many of them are taking advantage of what they

18   perceive to be dips in the wholesale power market.  They

19   may offer very short-term plans that might only be

20   guaranteeing price for 30 days, but if the customer

21   switches to that, we lose them.

22           But if they get a price increase later, it

23   doesn't necessarily mean they come back to us.  So, if we

24   don't sell those plans, those are now plans that we, from a

25   brand perspective stand behind, but many of our competitors

1    do.  So, one thing is the wholesale market that can lead to

2    competitive intensity.  The other is with our

3    effectiveness.  I mean, we still need to acquire an excess

4    of 80,000 new customers which is about 1.5 percent of the

5    available market in order to even hit this number.

6              MR. MCKANE:  Sir, can you just describe what you

7    think is necessary to achieve the threshold level of what

8    work is necessary for the remainder of the year to achieve

9    that level of success in terms of attracting and retaining

10   customers to satisfy this metric?

11             MR. BURKE:  Well, I mentioned earlier we have to

12   acquire 80,000 new customers.  It'd be the second highest

13   acquisition that we've had the past three years.  While I

14   can say that being in restructuring, you can argue if it's

15   a negative or not in the business, it's kind of hard to

16   argue it's a positive in the light of a competitive

17   marketplace.  So, we do the best we can to mitigate any

18   types of impacts that we see, particularly in the press and

19   among competitors.  But that doesn't mean it isn't out

20   there.

21             And we're one of the fastest markets to develop

22   from a competitive electric--the most competitive market in

23   the country.  And the (indiscernible) switching that I

24   mentioned means that even on media cycles, we can actually

25   end up with different customer behavior because of the ease

1    with which they can switch in this market.

2              MR. MCKANE:  And so, let's turn finally to the

3    TXU Energy management EBITDA target.  Sir, can you explain

4    what that management EBITDA target is?

5              MR. BURKE:  So, the management EBITDA target is

6    effectively the summation of hopefully a lot of work of a

7    thousand people that have done their role very, very

8    effectively.  So, we're embedding everything in our profit

9    and loss statement.  The reason we're measuring EBITDA at

10   this point is because it's before the interest expense.  We

11   tend to have very little depreciation and amortization

12   because we're not an asset-intensive business the way

13   Luminant is, but it's also for us, a very good proxy for

14   cash flow.

15             And so, that cash flow metric ultimately, if

16   you've done everything properly and customers value you as

17   a brand that they want to be with, you should have a

18   reasonable EBITDA return.  And that's why it's weighted the

19   heaviest on the scorecard.

20             MR. MCKANE:  And, sir, can you just describe what

21   steps were taken to arrive at the threshold baseline and

22   superior metrics for the TXU Energy management EBITDA?

23             MR. BURKE:  Well, the first thing we'd have to do

24   because EBITDA does embed a lot of costs of doing business,

25   some of which we have more a line of sight to, but it also

1    has the unknown factors.  We still have wholesale power

2    we've yet to procure.  We don't enter a year fully procured

3    100 percent because you can't manage the risk.  You might

4    have bought power too high or too low.

5              Also, because it's a competitive market, we have

6    a smaller customer base today than we did, say, six years

7    ago.  Once you consider that factor, that we have tried to

8    become a more superior service provider, a preferred brand

9    as we call it, if you normalize for the size business we

10   have, we have to earn effectively, $51 million more on

11   average than we did over the same period the last six

12   years.

13             And that's tough to do because everybody is still

14   wanting to compete and folks are still entering Texas as we

15   speak, start-ups, as well as folks from out-of-state.  So,

16   there's no line of sight that we're going to actually hit

17   this metric.  It's a challenging metric.  We upped the

18   threshold halfway through the year, so there's very little

19   room for error.  But, as I mentioned, it's our

20   responsibility to do what we can to try to meet it.

21             MR. MCKANE:  And, sir, can you specifically speak

22   to the competitive--the competition risk that you faced and

23   how that plays directly into the EBITDA metric?

24             MS. SCHWARTZ:  Objection; leading.

25             THE COURT:  Sustained.  You asked him to identify

```
 1    and then--

 2              MR. MCKANE:  Sure.

 3              THE COURT:  --suggested how it--

 4              MR. MCKANE:  I apologize.

 5              THE COURT:  --tied in.

 6              MR. MCKANE:  Is there a competitive--is there

 7    competition risk in your business?

 8              MR. BURKE:  There absolutely is.  In fact, when I

 9    mentioned the restructuring topic, one of the most

10    difficult things for us to have overcome and we work on it

11    every day, is the perceived risk of how stable are we as a

12    company to do business with.  Given the commercial space in

13    particular where they sign long-terms deals.  This has been

14    a very, very challenging area for us because many of the

15    larger commercial industry and small, medium businesses

16    would have a reluctance around signing long-term power

17    deals.  Our competitors know that.

18              And the brokers and the consultants and many in

19    the marketplace try to position other alternatives relative

20    to our business and we actually have to do everything we

21    can to dispel the notion that, in fact, we actually are a

22    very credit-worthy company, particularly, post-filing.

23    That isn't always intuitive through the marketplace that

24    it's thinking about, "I thought I just read this about you

25    in the paper?"  Competitors try to take advantage of that.
```

1          It's the nature of the marketplace that we're in,

2     but, in addition, they have their own work aspirations and

3     their goals and they're going to look for an area of

4     advantage if they can get it.

5          MR. MCKANE:  Sir, at one point in time in your

6     testimony a few minutes back about this EBITDA metric, you

7     testified about that you don't buy 100 percent of your

8     power going into the year.  Can you explain why that

9     decision creates risk on lot on the management EBITDA

10    metric?

11         MR. BURKE:  Absolutely.  Well, first and

12    foremost, since all 1.7 million customers in--could switch

13    away instantly, then I would not have a risk profile that

14    would say that I want to buy power as if I'm serving 1.7

15    million customers throughout the year, because I could find

16    myself purely holding the bag on a wholesale power position

17    with no customers ultimately to sell that power to.  The

18    flipside is that if I serve 1.7 million customers and I

19    have not bought any wholesale power, I'm purely at the whim

20    of the spot market.

21         And since our brand promises we won't charge you

22    a different price unless we give you advance notice of the

23    price change, which there is no other brand in the market

24    that is offering that brand promise, I need to buy

25    wholesale power in advance, so that I can financially

1    manage the risk of the fact that I'm going to serve

2    hopefully the vast majority of that 1.7 million.

3              But things like weather, customer attrition, and

4    even customer acquisition, new customers we bring on, we're

5    constantly evaluating and shaping how much we need to buy,

6    so that we're not, in financial terms, we're not too long

7    and we're not too short.  Because neither of those

8    positions can create a financial exposure and I work with

9    Mac's team to make sure we minimize it.

10             MR. MCKANE:  You view Mr. McFarland as a

11   wholesale distributor?

12             MR. BURKE:  Luminant provides 100 percent of our

13   needs through their commercial team, whether that is 100

14   percent coming from the Luminant assets or not, is a

15   Luminant position, what they manage because they would buy

16   from other third parties, just from their own plants.  We

17   may not directly go to the other wholesale generators in

18   contract.  We contract that through the Luminant Energy

19   Supply Team which is under the direction of Mac McFarland.

20             MR. MCKANE:  And sir, do you have a view as to

21   whether you will be able to achieve either the threshold

22   baseline or superior metric per a management EBITDA, as you

23   sit here today?

24             MR. BURKE:  As I mentioned, it's our

25   responsibility to try to hit these targets.  So, for me to

1    say that I'm not going to hit it, would have almost

2    effectively say it's October and I'm giving up.  But they

3    were challenging targets.  There are still a lot of unknown

4    for the balance of the year and especially since we

5    increased the threshold, the margin of error.  It's much,

6    much smaller than it was when we filed this last fall.

7              MR. MCKANE:  Thank you, sir.  Mr. Burke, have you

8    had an opportunity to review the United States Trustees'

9    objection to the pending motion?

10             MR. BURKE:  I have.

11             MR. MCKANE:  And, sir, did you also review Mr.

12   Panacio's Declaration in support of that motion?

13             MR. BURKE:  I did.

14             MR. MCKANE:  Sir, are you aware of the argument

15   the United States Trustee puts forward that the Debtor's

16   2014 metrics are not (indiscernible) by comparing those

17   targets through a five-year historical average?

18             MR. BURKE:  I am.

19             MS. SCHWARTZ:  Objection, Your Honor.  That's not

20   what the declaration says.

21             THE COURT:  I'll allow it for examination

22   purposes.

23             MR. MCKANE:  Yeah, Mr. Burke, can you speak to

24   whether as someone in the business, you view it as

25   appropriate to compare this year's targets to a five-year

1   historical average?

2           MR. BURKE:  I would not view that as appropriate.

3   We certainly look at historicals because we constantly are

4   wanting to strive to see if we can meet or exceed

5   historical levels of performance.  But fundamental market

6   conditions change rapidly, even our own capabilities and

7   expectations change rapidly, so it's an interesting data

8   set for us to look at and what has changed, but we would

9   not be using it as a basis of performance management.

10          MR. MCKANE:  And sir, that's not a basis on which

11  you manage the business today?

12          MR. BURKE:  That is correct.

13          MR. MCKANE:  And, sir, do you understand that the

14  United States Trustee also performs an analysis in which it

15  took the six-month results through the end of June and

16  multiplied them by two to forecast out a potential forecast

17  for remainder of the year?

18          MR. BURKE:  Correct.

19          MS. SCHWARTZ:  Objection; leading.

20          THE COURT:  Overruled, overruled.

21          MR. MCKANE:  All right, sir.  Can you describe,

22  is that how you at TXU Energy run a forecast for your

23  business?

24          MR. BURKE:  It is not how we run a forecast.  And

25  in fact, when you think about something like even our

1    financial metric which sounds like it's given a minus cost

2    equals contribution margin, we actually have thousands and

3    thousands of price plans that we have our customers on,

4    that even got different prices depending on the time of the

5    year.

6              And you have to factor in their consumption, and

7    you have to factor in what is the wholesale price of power

8    that you've actually procured and the time with which you

9    procured the wholesale power can change the cost you've

10   actually procured at because the forward curve for power

11   moves up and down through time.

12             So, in fact, on EBITDA, one of our heaviest

13   weighted metrics, the third quarter, is typically our

14   lowest quarter from a profitability standpoint even if we

15   actually sell the most power during the third quarter and

16   it's because of supply and demand.  The wholesale market is

17   actually the tightest.  Wholesale power prices can actually

18   be the highest in the third quarter on a forward curve when

19   you're purchasing in advance, they are the highest months

20   of the year.  So, even though we're selling more power,

21   it's at a much reduced margin.  So, if you took the first

22   half of the year and doubled it, you would be overstating

23   the annual performance.

24             MR. MCKANE:  And, sir, are you familiar with the

25   term "seasonality"?

1            MR. BURKE:  I am.

2            MR. MCKANE:  And can you describe for the court,

3    what--is there seasonality to your business and why?

4            MR. BURKE:  There's tremendous seasonality.

5    First and foremost, is the seasonality of even under normal

6    weather conditions, Texas is one of the highest per capita

7    consumption of power in the country, but it actually has

8    two distinct seasons to it.  It has a summer season, which

9    is predominantly a cooling season, but also the heating

10   season, almost half of our customers are electric heat.

11   That's unusual in a lot of parts of the country.  And some

12   of our biggest bills that are ever generated during the

13   year are in the winter months, not the summer months.

14            So, as I mentioned, in January and March, we had

15   two days that are more costly than probably any day we're

16   likely to experience given what we know about this year.

17   And that happens in January and March, whereas most people

18   would think that that would happen in the summer period.

19   So, that's under the normal weather conditions.  Underneath

20   that is the seasonality of what do you think about normal

21   power prices in a higher demand scenario, which is

22   typically going to be that third quarter.  And you're going

23   to see the shape of power.  If I were to go out and buy the

24   next 12 months in advance, I'll have relatively low power

25   prices until I get to July and August.

1            In July and August, ramp up at an extreme level

2      relative to the previous months, and then dip back down,

3      whereas I'm charging more or less a flat revenue rate.

4      There is some variation, but more or less. So, I have very

5      thin margins during that third quarter in getting that risk

6      management right and ultimate projecting the volume

7      accurately is the difference between making money and

8      losing money.

9            MR. MCKANE:  And, sir, sitting here today, can

10     you speak to your view as to whether the TXU Energy metrics

11     are achievable?  And if so, what's necessary to get it done

12     for the remainder of the year?

13           MR. BURKE:  Well, on--they're absolutely, in my

14     opinion, a challenging set of metrics to reach.  We have

15     had pretty good historical performance (indiscernible) even

16     been recognized, but these metrics reflect the fact that we

17     continue to expect higher and higher levels of performance.

18           So, these metrics are not static with where they

19     have been through time.  So, when I--where I look at this

20     today, we do not have much room for externalities of a

21     negative sort.  Rarely, do we get the positive

22     externalities.  They happen, but they're very uncommon

23     because you'd have to look for some areas where customers

24     are using a lot more power than expected, and for some

25     reason, much lower than expected power prices.

1          And those two tend to correlate with each other,

2     so there's very few, what I call big guys that just

3     surprise you in the business that we're in, but what we try

4     to do is manage as best we can through the--what generally

5     tend to be the negative or the unforeseen externalities

6     that cover this through the end of the year.

7          MR. MCKANE:  And, sir, could you give the court

8     some examples of what might be negative externalities that

9     you would face over the course of the second half of the

10    year?

11          MR. BURKE:  Absolutely.  So, I mentioned weather

12    is a significant one.  The winter effects that we talked

13    about before we've actually seen in December as well.  It

14    doesn't need to wait till January and March and of course,

15    that hits this calendar year.  The other effects that, I

16    wouldn't necessarily put as much in pure externalities

17    because what we live with is just the competitive intensity

18    in the marketplace.  We never know.

19          There are announcements happening all throughout

20    the country of even the mergers of what used to be separate

21    and distinct businesses where cell phones, cable companies,

22    and others were getting into power.  And that's been

23    happening in other markets.  It has not yet been announced

24    in Texas, but it's been announced in Pennsylvania.  We're

25    not even talking about competition that has to take place

1    among the known retail electric providers.  We don't have

2    room for a marketing budget.  We don't have room for us to

3    take that on and try to stake a claim against a better-

4    funded competitor.  Our plans--and if we did actually spend

5    the money at the recommendation that we think it's in the

6    right long-term interest, it would go against our

7    scorecard.

8              MR. MCKANE:  Your Honor, if I could have one

9    moment, please?

10             THE COURT:  Yes.

11             MR. MCKANE:  Your Honor, we have no further

12   questions for Mr. Burke at this time.

13             THE COURT:  Okay.  Thank you.  Cross?

14             MS. SCHWARTZ:  One second, Your Honor.  I just

15   want to get some room off your podium.  There's a lot of

16   binders.  Hey, you guys.  Are those your binders?  I just

17   need some space.  Thanks.  No problem.  Sorry, Your Honor.

18             THE COURT:  It's okay.  Take your time.

19             MS. SCHWARTZ:  Hello, Mr. Burke.

20             MR. BURKE:  Hi, Ms. Schwartz.

21             MS. SCHWARTZ:  Nice to see you today.  I have

22   some questions about your testimony today.  Now, you've

23   been employed at TXU since 2008; is that correct?

24             MR. BURKE:  2004.  I joined in October, early

25   October 2004.

1            MS. SCHWARTZ:  Did your role change in 2008?

2            MR. BURKE:  It did not.  It changed in the August

3    timeframe of 2005 when I became the CEO of TXU Energy.

4            MS. SCHWARTZ:  Okay.  And--

5            MR. BURKE:  And then as part of our becoming a

6    private company, effectively, was asked to stay on and

7    accepted staying on in that October of '07 timeframe.

8            MS. SCHWARTZ:  Okay.  Now, you testified in

9    response to questions by Mr. McKane that you were part of

10   the development of the plans that are subject of the

11   motion.  Is that right?

12           MR. BURKE:  Well, I would ask you to be more

13   specific on which plans--

14           MS. SCHWARTZ:  Sure.

15           MR. BURKE:  --because the role that I play in

16   those is different.

17           MS. SCHWARTZ:  Well, I guess my question was,

18   were you involved in developing the actual plans, or were

19   you involved in developing the metrics and the targets

20   under the plans?  There are three plans--

21           MR. BURKE:  Correct.

22           MS. SCHWARTZ:  --that are before the court today,

23   the EAIP, the Key Leader Performance and the SPC LTIP.  And

24   so, that what was my question was.  Were you involved in

25   actually drafting those plans or were you--or was your role

1    involved in setting targets or both?

2         MR. BURKE:  Definitely worked to help set the

3    targets; in terms of drafting, certainly not.  As part of

4    an SPC member, we are consulted about specifically aspects

5    of some plans.  So, for instance, I had more discussion

6    around the Key Leader Performance program because it

7    directly affected my direct reports, more so about the

8    programs that I'm just a participant in.

9         MS. SCHWARTZ:  Okay.  Now, you testified that the

10   Key Leader Performance Plan has no--it's completely

11   incentive.  It has no retention component at all; is that

12   right?

13        MR. BURKE:  What I meant is there's no time--

14   purely time-based component to it is what I meant by that

15   if that is how you interpreted my comments.  Is that

16   there's nothing that going to pay out merely through the

17   passage of time.

18        MS. SCHWARTZ:  Okay, so, in other words, and I

19   just really want to understand what your testimony was.

20   So, in other words, that it's not strictly by the passage

21   of time there's an incentive component, is that correct?

22        MR. BURKE:  I believe that's correct.

23        MS. SCHWARTZ:  Okay.  So, there is in fact a part

24   of that plan that requires the employees to stay through

25   the various quarters in order to receive payment, is that

1    right?

2           MR. BURKE:  Well, they do need to be there on the

3    day that the payment is made in order to receive it, but

4    they have to hit the performance objectives of EBITDA in

5    cost, which was unlike the predecessor plan which literally

6    had a performance objective and another component that was

7    only time-based.  This does not have that for the Key

8    Leader Performance program.

9           It is only performance-based and they need to be

10   there quarterly at the end of the quarter, approximately

11   one month after the end of the quarter to where if the plan

12   results get reviewed against the metrics and their payment

13   is approved, they'll receive the payment.

14           MS. SCHWARTZ:  Is it your view that staying for

15   the quarter is not time-based?

16           MR. BURKE:  I will start off saying that of my

17   goal, as a leader of the business, is try to motivate and

18   keep the team at a high performance level.  So, I would

19   expect they'd be there to collect their base salary and

20   their incentive payment, if earned.

21           MS. SCHWARTZ:  Move to strike as non-responsive.

22           THE COURT:  Overruled.

23           MS. SCHWARTZ:  What I'm trying to understand from

24   you about the time-based is that they cannot be paid.

25   Isn't it correct if they're not there after the quarter

1    when the payment is being submitted to payroll?  If they

2    leave, if they voluntarily resign irrespective of whether

3    or not they--you achieve your target, they cannot be paid;

4    isn't that right?

5            MR. BURKE:  If they act in that 30-day window?

6            MS. SCHWARTZ:  Yes.

7            MR. BURKE:  I believe that's how the plan is

8    written.

9            MS. SCHWARTZ:  Okay.  And similarly, if you

10   didn't reach a target in one quarter, they're still

11   eligible to get the payment if that's reached by the second

12   quarter or annually; is that right?

13           MR. BURKE:  It is and in fact, it's correct,

14   because what we don't want to have happen is someone miss a

15   quarter and then give up on the year, we're going to keep

16   the target relevant and out in front of them.  So, if

17   there's a way that they can catch up and hit the overall

18   target, we want that incentive to be out there for them.

19           MS. SCHWARTZ:  Okay.  But they still have to stay

20   in order--through the next quarter, in order to get that

21   payment; isn't that right?

22           MR. BURKE:  I believe it's about a 30-day lag

23   from the time that the measurement period ends and the time

24   that the payment is actually received by one of my team

25   members.

1            MS. SCHWARTZ:  Right.  So, they--the quarter

2    would be three months, and they'd have to stay four months

3    in order to get the payment that would come for the

4    quarter, right?

5            MR. BURKE:  No, they'd have to work and hit the

6    target for three months.

7            MS. SCHWARTZ:  Right.

8            MR. BURKE:  At that point, we would measure it.

9            MS. SCHWARTZ:  Mm hmm.

10            MR. BURKE:  And then if it were earned, they

11    would have to be there 30 more days because there's also an

12    administrator process--

13            MS. SCHWARTZ:  Right.

14            MR. BURKE:  --internally in governance where we

15    need to approve the payment and then make that available to

16    them.

17            MS. SCHWARTZ:  Right.  But if they left

18    voluntarily, they wouldn't get it during that quarter;

19    isn't that right?

20            MR. BURKE:  That's correct.

21            MS. SCHWARTZ:  Okay.  And our--another thing you

22    testified that you're familiar with the EAIP as well; is

23    that right?

24            MR. BURKE:  That's correct.

25            MS. SCHWARTZ:  And is it also true that in order

Page 124

1    to receive the payment on the annual basis, the employee

2    has to stay for the year, and if they voluntarily resign,

3    they don't get that payment?

4            MR. BURKE:  On the EAIP, I believe the provisions

5    of how that happens is in the employment agreements

6    themselves and I believe there's different circumstances on

7    the reasons for departure--

8            MS. SCHWARTZ:   Mm hmm.

9            MR. BURKE: --and how that might affect the

10   payment of that annual incentive.

11           MS. SCHWARTZ:  And if they voluntarily resign, as

12   one of the reasons for departure, and they don't stay for

13   the full year, what is your understanding as to their

14   entitlement to the bonus?

15           MR. BURKE:  My understanding is it would not be

16   earned and it therefore would not be paid.

17           MS. SCHWARTZ:  It would be forfeited.  Isn't that

18   right?

19           MR. BURKE:  That's not earned, so it's hard to

20   forfeit something that isn't earned.  It would not be

21   earned.

22           MS. SCHWARTZ:  Well, part--well, there are

23   provisions under plan for pro rata payments; isn't that

24   correct?

25           MR. BURKE:  Under different circumstances of

1    departure.

2          MS. SCHWARTZ:  Right.  So, if they voluntarily

3    leave, aren't they forfeiting it?

4          MR. BURKE:  I would say they're foregoing the

5    ability to earn that incentive.

6          MS. SCHWARTZ:  (Indiscernible) words.  Okay.  And

7    that's the same thing, isn't it, with respect to the SPC

8    LTIP?

9          MR. BURKE:  It is.  If you mean that there is a

10   performance measurement period, then there's a payout date

11   and departure under different circumstances can lead to

12   different payout scenarios.  But simply volunteering to

13   leave?

14         MS. SCHWARTZ:  Voluntarily resigning.

15         MR. BURKE:  I'm going to leave for a reason that

16   is not considered a good reason under the definition of the

17   employment agreement, then I would be forfeiting those

18   monies that had been earned for the first couple of years

19   at this point.  I would be foregoing, or forfeiting that

20   because there has been an earning period and I would be

21   departing before the payout period.

22         MS. SCHWARTZ:  Right.  And -- okay, I'll get to

23   that afterwards.  Now, would you please turn to tab 23 in

24   the binder?

25         THE COURT:  Which binder?

1            MS. SCHWARTZ:  It is the binder, Your Honor, that

2    is marked as--well, I have one called "Redacted Volume II",

3    but I believe that it's in the redacted binder, Your Honor.

4            THE COURT:  Okay.  You want him to look at the

5    redacted version?

6            MR. BURKE:  23?

7            MS. SCHWARTZ:  Yeah, tab 23, yeah.  It's not

8    redacted, but that's the binder that had some of the

9    redacted materials.

10           THE COURT:  Okay.

11           MS. SCHWARTZ:  This particular thing's not

12   redacted.  Okay.  And would you turn to page 2?  It's

13   titled "Jim Burke, CEO, TXU Energy Compensation Summary"?

14           MR. BURKE:  Yes, I'm here.

15           MS. SCHWARTZ:  Okay.  And Mr. Burke, your salary

16   for 2014 is $675,000, isn't that right?

17           MR. BURKE:  That is correct.

18           MS. SCHWARTZ:  And part of your compensation

19   package is that you are entitled to receive bonuses under

20   two executive bonus plans.  Isn't that right?

21           MR. BURKE:  There are two different--two distinct

22   incentive plans, AIP and the LTIP program.

23           MS. SCHWARTZ:  Right.  And you're eligible for

24   bonuses under both of those programs, isn't that right?

25           MR. BURKE:  I'm eligible under both those

1    programs.

2              MS. SCHWARTZ:  Okay.  And now, this year, you

3    received a bonus under the EAIP in the amount of $1,168,518

4    for the performance year 2013, is that correct?

5              MR. BURKE:  That's correct.

6              MS. SCHWARTZ:  Okay.  And based on this chart,

7    you've already earned $573,750 of going toward your 2014

8    performance year, is that right?

9              MR. BURKE:  Unfortunately, it doesn't work that

10   way.  I had not earned $573,750.  That would come if we

11   successfully meet the metrics at the end of the year--

12             MS. SCHWARTZ:   Mm hmm.

13             MR. BURKE:  --and we go through the review

14   process.  And then if something is awarded at the--at early

15   next year at target, it would be $573,750.

16             MS. SCHWARTZ:  Okay.  So that number was

17   calculated assuming that the overall target was met at the

18   baseline.  Is that right?

19             MR. BURKE:  That's correct.

20             MS. SCHWARTZ:  Okay.  And if the bonus plans here

21   are approved today, you could receive in excess of $1

22   million under the EAIP?  If the bonus plans are approved

23   today, as they are written, you could receive a bonus in

24   excess of $1 million.  Is that right?

25             MR. BURKE:  That's assuming that we exceeded the

1   baseline targets.

2          MS. SCHWARTZ:  Assuming that you met the baseline

3   targets.  If I met the baseline targets, is the question

4   would I receive an incentive payment of greater than $1

5   million if all I did was meet the baseline targets?

6          MS. SCHWARTZ:  Yes.  You would receive 100

7   percent of your percentage target.  Isn't that correct?

8          MR. BURKE:  Which would be $573,750.

9          MS. SCHWARTZ:  Oh, okay.  So, let's go back to

10  2014 then, for a minute.

11         MR. BURKE:  Okay.

12         MS. SCHWARTZ:  For 2014, you're saying you met

13  superior and that's why that's $1,116,000?

14         MR. BURKE:  We exceeded the baseline.  We did not

15  reach superior or across-the-board, but we did exceed

16  baseline on average.

17         MS. SCHWARTZ:  Okay.  And in 2013, did you also

18  exceed the baseline?

19         MR. BURKE:  I believe that to be true, yes.

20         MS. SCHWARTZ:  How about 2012?

21         MR. BURKE:  I would like to refer to the Exhibit,

22  if I may, to make sure if we're going to go through all of

23  these in sequence, I could address your question

24  specifically about the scorecard because there's two

25  components.  There's the scorecard and there's the

1    individual performance modifier--

2         MS. SCHWARTZ:  Right.

3         MR. BURKE:  --which is determined by my boss,

4    John Young, and the ONC.  So, what you're seeing here is a

5    factor of two outcomes.

6         MS. SCHWARTZ:   Mm hmm.  Could you just explain

7    for the court what the individual performance modifier is

8    and what the range is?

9         MR. BURKE:  So, the individual performance

10   modifier and all of our associates have individual

11   performance modifiers.  It's a structure of the--of our

12   plan which is consistent in the organization that everyone

13   has the ability to earn if the metrics are met.  How the

14   business unit has performed and how we determine that

15   individual has performed.  We have, over time, tried to use

16   the individual performance modifier to distinguish who we

17   think are extremely strong performers.  Some people who are

18   effectively meeting expectations, but maybe not quite as

19   strong.  And people that need improvement.

20        And we have found that it is incentivizing to

21   actually not only have everybody have a chance to earn some

22   multiple of that business unit outcome, but to vary by

23   individual.  And so that individual performance modifier,

24   that same logic holds true with us, with the SPC or John

25   Young's direct reports, in that there is a modifier to how

1    the overall business unit has performed.  That is

2    multiplied by how my business unit does.  In my business

3    unit, I have 75 percent of my business unit modifiers as we

4    call it, it's tied to TXU.  Twenty-five percent of it is

5    really tied to how Luminant performs, so we can actually

6    get a combined sort of effect of individual performance

7    modifier as something that is determined annually, much

8    like we determine for each of our people.

9             MS. SCHWARTZ:  Okay.  And what's the range of the

10   individual performance modifier?

11            MR. BURKE:  Well, it depends on the levels, but

12   they can go from effectively zero, if we actually choose

13   not to provide an incentive for somebody.  I believe, at

14   this point, we're in the 150 percent cap for individual

15   performance modifiers and we've seen everything in that

16   range.

17            MS. SCHWARTZ:  Okay.  Let's talk about your

18   potential compensation for 2014.

19            MR. BURKE:  Okay.

20            MS. SCHWARTZ:  Your salary is $675,000.  What is

21   your percentage target?  Is it 85 percent?

22            MR. BURKE:  It is 85 percent of base salary.

23            MS. SCHWARTZ:  Okay.  So, if the company reaches

24   the baseline, you will get, at a minimum, 85 percent of

25   your annual salary.  Is that right?

1           MR. BURKE:  Not at a minimum.  It depends on how

2    John Young and the Board evaluates my performance because

3    they could give me an individual performance modifier of

4    less than 100, which would make that $573,000 lower.

5           MS. SCHWARTZ:  Oh, let me see if I understand

6    that.  So, in other words, if your--in your target

7    percentage is 85 percent of your salary and the company

8    hits baseline, which is 100--which would be--

9           MR. BURKE:  A hundred percent.

10          MS. SCHWARTZ:  --potentially 100 percent of that

11   bonus amount, right?

12          MR. BURKE:  Correct.  That's the business unit

13   modifier.

14          MS. SCHWARTZ:  Okay.  And then you're saying that

15   the individual performance modifier could reduce that for

16   you?

17          MR. BURKE:  Or increase it.

18          MS. SCHWARTZ:  Okay.

19          MR. BURKE:  So, it would be a product of all of

20   those.  Base salary times 25, times the business unit

21   modifier, times individual performance modifier.

22          MS. SCHWARTZ:  And because--

23          MR. BURKE:  It yields the annual incentive

24   (indiscernible).

25          MS. SCHWARTZ:  Right.  And it could also increase

1    it.  Isn't that right?

2              MR. BURKE:  That's correct.

3              MS. SCHWARTZ:  And so, the potential under the--

4    for you, for your business under the Executive Annual

5    Incentive Plan is you could get the 85 percent of your

6    salary as your target, and then that can--could that be

7    increased by 150 percent?

8              MR. BURKE:  By my understanding, because there's

9    a product of the business unit modifier--

10             MS. SCHWARTZ:  Yeah.

11             MR. BURKE:  --(indiscernible) an individual

12   performance modifier, is that there's overall cap that the

13   Annual Incentive payment for SPC members cannot be more

14   than two times the target of 573--$573,000.

15             MS. SCHWARTZ:  Okay.  And do you know what your

16   possible bonus under the EAIP could be if the baseline was

17   met for the company for 2014?

18             MR. BURKE:  If the baseline were met, how big

19   could the 573 be?

20             MS. SCHWARTZ:  How big could your bonus be?

21   Yeah.

22             MR. BURKE:  If I were deemed to be extremely

23   high-performing and got a maximum individual performance

24   modifier, I believe it's 50 percent more than 573.

25             MS. SCHWARTZ:  And what would that amount be?

1            MR. BURKE:  I'd have to pull out my calculator.

2            MS. SCHWARTZ:  I'm sorry.  I thought that--I'm

3    sorry, I thought when I had--you can--oh, your bonus is

4    only going to be 50 percent of the 675?

5            MR. BURKE:  It'd be 50 percent more than the

6    573,000, so ballpark, call it $800,000.

7            MS. SCHWARTZ:  Okay, under that bonus plan?

8            MR. BURKE:  Under the scenario that you just

9    described.

10            MS. SCHWARTZ:  Right.  But it could be higher

11    than that?  Isn't it, if the--

12            MR. BURKE:  It could.  It could be upwards of two

13    times the 573,000, which is--

14            MS. SCHWARTZ:  In excess of $1 million?

15            MR. BURKE:  --in excess of $1 million which is

16    what happened in 2014.

17            MS. SCHWARTZ:  Okay.  And in addition to that

18    excess of $1 million that you could get if the bonus plans

19    are approved in possibility, you will also earn under the

20    LTIP, right?  You're eligible under that plan as well?

21            MR. BURKE:  That's correct.

22            MS. SCHWARTZ:  And as I understand it, and I'd

23    appreciate your confirmation that you would--the maximum

24    that you could earn under the LTIP for this year is $1

25    million.  Is that right?

1             MR. BURKE:  That's correct.

2             MS. SCHWARTZ:  And that money is already--has

3     already been obtained under letters of credit by the

4     company with Citibank.  Is that right?

5             MR. BURKE:  It has been secured by letters of

6     credit.

7             MS. SCHWARTZ:  Can you tell the court the

8     circumstances that led to the issuing of the letters of

9     credit for your bonus?

10             MR. BURKE:  See, back in the timeframe which I

11    will recall started in 2010, but the letters of credit were

12    put in place in 2011, there was a discussion about what is

13    the long-term incentive plan that we believe the senior

14    leadership team should have since there is no longer

15    appears to be invalid equity component to compensation.

16    The company felt that there was a possibility of creating a

17    long-term financial incentive since equity, in and of

18    itself, would not be (indiscernible) incentivizing to be in

19    a cash base form.  But also, because it was 2011, the

20    company wanted to put difficult hurdles to achieve and

21    could put it far out.

22             And so, it was stressed March 15 as the payout

23    date.  But when you're standing in 2011 and the business is

24    under a lot of pressure, both, competitive pressures, as

25    well as even financial pressures, you want to make sure

1    that the incentive is incentivizing.  One of the aspects of

2    an incentive being incentivizing is do you believe that you

3    will ultimately be paid if you indeed earn the incentive by

4    delivering on the metrics?  The company felt that this

5    would be a way that if the metrics were earned.

6              And those metrics weren't set yet because the

7    annual incentive process of faring out the EBITDA targets

8    was ultimately going to determine the benchmarks for the

9    EBITDA that this would also be measured by.  Those were

10   unknown.  So, we were looking at this as is this

11   incentivizing that was going to play out over time?  And

12   the security that the letters of credit provided was an

13   opportunity to say if these things are earned were indeed

14   be paid.

15             MS. SCHWARTZ:  And did that provide you with

16   assurance that the money would be there?

17             MR. MCKANE:  Objection, Your Honor.  The payments

18   under the letter of credit are not subject to this motion.

19   It's beyond the scope of this motion.  And therefore it's

20   not relevant to the issues raised today.

21             THE COURT:  Ms. Schwartz.

22             MS. SCHWARTZ:  Yes, Your Honor.  The subject of

23   the letters of credit are relevant to this motion because,

24   Your Honor is going to approve the continuation of this

25   plan.  As I stated in my opening, this is not a 2014 plan

1      to 2015 plan.  And the letters of credit, I think when Your

2      Honor is considering whether or not this is a retention

3      plan or an incentive plan, Your Honor needs to consider all

4      of the facts underlying it.  This was not disclosed in the

5      debtor's motion that there was an extremely large amount of

6      money that had already been--

7                    THE COURT:  Okay.  Is--

8                    MR. MCKANE:  Your Honor, may I? The scope of the

9      relief for this motion is only 2014.  That's in the

10     proposed order tends to clarify the record this was

11     disclosed in the motion.  It is not in the scope

12     (indiscernible).

13                    THE COURT:  Okay.  I'll overrule the objection.

14     I think it is relevant.  If you look at the Dana factors

15     among other things, I need to look at the larger picture of

16     the compensation structure.  So, I think it is relevant.

17     I'll allow the testimony to be brought out through cross-

18     examination.

19                    MS. SCHWARTZ:  Mr. Burke, did you request that

20     the company provide you with assurance that the bonuses

21     would be--you or the company would be able to pay you if

22     you stayed on with the company?

23                    MR. BURKE:  I was part of discussions where as a

24     member of the SPC, we described how a program with that

25     duration would be potentially more secure by having a

1    letter of credit.  If this had been all done in annual

2    increments, you meet annual EBITDA and you get paid $1

3    million, you meet at annual EBITDA, you get paid $1

4    million, then the notion of needing to secure would be a

5    different question.

6              But, unlike some of the programs where there was

7    more a line in sight, you earn it, you get paid, you earn

8    it, you get paid.  This one was earn it over time.  If you

9    didn't earn it, it didn't matter what the letter of credit

10   was there or not, but if you earned it, the company put out

11   a much longer data from which to be paid which was March of

12   '15, which was the longest of any of the dates of any of

13   the programs for any of our people that were put in place

14   at the time.

15             MS. SCHWARTZ:   Mm hmm.  And did you request as

16   part of--as you met part of your membership on the SPC that

17   the Board secure by letters of credit, the amounts that

18   would be paid under the LTIP in 2015?

19             MR. BURKE:  I know that it was one of the

20   considerations that the Board was considering.  I did not

21   request it of the Board.

22             MS. SCHWARTZ:  Did the SPC request it?

23             MR. BURKE:  To my knowledge, I don't know how the

24   request was actually made to the ONC committee.

25             MS. SCHWARTZ:  You said that you knew that the

1      request was being made.  How did you know that?

2              MR. BURKE:  No, I know we had discussed a variety

3      of alternatives of how to think about structuring the long-

4      term incentive plan.  I was not aware specifically of the

5      requesting date of the ONC and the form of that request

6      around letters of credit.

7              MS. SCHWARTZ:  Okay.  And did the fact of whether

8      or not the Board approved the letters of credit inform your

9      decision to stay with the company?

10             MR. BURKE:  It would inform my decision to

11     evaluate the total compensation package that was being

12     offered to me still based on the ability, hopefully, to

13     reach these objectives, which I have to make a

14     determination.  Can we reach these objectives?  These

15     objectives were still not set yet.  We were going to have

16     to go through the annual planning process and set the

17     metrics as we've discussed.

18             But in the context of does--is it more likely

19     that I would find TXU Energy and Energy Future Holdings a

20     more attractive place to work and be incentivized to

21     maximize performance, having a plan such as this, which

22     typically would be an equity plan, the answer is yes.

23             MS. SCHWARTZ:  I'm not sure you answered my

24     question, but the question was simply did this inform your

25     decision to stay with the company?

1           MR. BURKE:  I wasn't thinking of leaving the

2    company at that time, but each of us operates in a

3    competitive market where there is a request for talented

4    people, my team included.  Mac's team included.

5           So, I would have considered this as an element of

6    compensation that could be earned, so it would be just

7    another consideration in the set along with satisfaction

8    with role, scope of responsibilities and the other

9    considerations as to whether I would stay or leave.  And

10   those are still the considerations today.

11          MS. SCHWARTZ:  And at the time that the letters

12   of credit were issued, did--you had mentioned there was

13   financial pressure going on for the company at that time.

14   Did you discuss with your family whether or not you would

15   stay with the company?  Did--was there any discussion about

16   these letters of credit?

17          THE COURT:  No, I'm not going to allow what he

18   discussed with his family.  That's totally irrelevant.  If

19   you want to talk professionally, or his--

20          MS. SCHWARTZ:  Okay.

21          THE COURT:  --individual situation, I'll allow

22   that testimony.

23          MS. SCHWARTZ:  Okay.  You said it's one factor.

24   I mean, you said it's a very competitive market.  Have you

25   received other offers?  Did you receive other offers to go

1    somewhere else at the time?

2              MR. BURKE:  Over the period of the past six

3    years, I have received offers.

4              MS. SCHWARTZ:  How about in 2011 when the company

5    was experiencing financial pressure?

6              MR. BURKE:  I wouldn't--to be fair, I don't

7    recall which year that was that the offers I'm referring to

8    were provided, but I would tell you that I wouldn't

9    uniquely call out 2011 as the year we're experiencing

10   financial pressure.

11             MS. SCHWARTZ:  Oh, I'm sorry.  I thought that's

12   what you had said.

13             MR. BURKE:  Financial pressure has been with this

14   business really since the tail end of '08 and beginning of

15   '09 when we realized that the fundamental shift in the

16   wholesale power market and the actual gas market was

17   occurring.  And that if you remember the company completed

18   an (indiscernible) extend in the 2011 timeframe trying to

19   figure out if they could push out the maturity,

20   particularly $16 billion of a $20 billion maturity that was

21   in October of 2014.  The company was successful moving $16

22   billion for a later date, but still had $4 billion in front

23   of it in October of '14, which, for almost any size

24   business is still a very material maturity.

25             MS. SCHWARTZ:  Mr. Burke, would you not

1    acknowledge that the fact that the company secured this

2    money for your bonus was an important factor for you?

3              MR. BURKE:  It is a factor for me, but I would

4    also suggest that even our history of working as a

5    management team and a Board with our own people, it says we

6    set a scorecard in the beginning of the year.  If you hit

7    the metrics, you can have some degree of confidence you're

8    going to be paid is fundamental tenet of having an

9    incentive structure.  If there's any question that you

10   could hit the metrics and not get paid, it fails to be an

11   incentive.  So, I consider this to be consistent with the

12   structure that we have laid out as a philosophy with all of

13   our people.

14             MS. SCHWARTZ:  Earlier, Mr. McKane asked you

15   whether you thought that the metric, the targets, for TXU

16   Energy this year will be achievable.  I don't believe you

17   answered that.  Could you please answer that?

18             MR. BURKE:  I did answer, I believe, a couple

19   times that it's our responsibility to achieve them.  So I

20   believe they're achievable, but I also believe them to be

21   very challenging and after raising the stretch objectives,

22   the stretch targets at the threshold level, there's even a

23   greater probability--

24             MS. SCHWARTZ:  Right.

25             MR. BURKE:  --that we will not meet threshold on

1    metrics because we revised them upwards.

2            THE COURT:  Please don't interrupt during an

3    answer.

4            MS. SCHWARTZ:  Yeah.  And Mr. Burke, please

5    answer my question.  I just asked you whether you believe

6    that they're achievable.

7            MR. MCKANE:  Objection.  It's asked and answered.

8            THE COURT:  I agree.  He answered the question.

9            MS. SCHWARTZ:  No, I'm not asking it again.

10           THE COURT:  I agree--

11           MS. SCHWARTZ:  Okay.

12           THE COURT:  --that you asked that question and it

13   was answered.

14           MS. SCHWARTZ:  Yeah.

15           THE COURT:  Move on.

16           MS. SCHWARTZ:  Okay.  Mr. Burke, are you aware--

17   earlier, you were talking about the fixing of the metrics

18   and you were talking about how the company gets to the

19   numbers on the metrics.  And is it not a factor that the

20   company looks at whether or not the company has achieved

21   the targets in the prior years in when they determine the

22   target for the next year?

23           MR. BURKE:  We do look at historical performance

24   and even how we performed against prior metrics as we

25   evaluate what are the appropriate metrics at the target

1    threshold in superior levels when we develop the

2    scorecards.  I believe that's--I described that as part of

3    the process.

4              MS. SCHWARTZ:  Okay.  Thank you.  I'm sorry if I

5    didn't get that.  But are you also aware that for TXU

6    Energy, for TXU's EBITDA, the company achieved its--the

7    threshold that's set for 2014 is less than the average for

8    the past five years?

9              MR. BURKE:  I am aware of that.

10             MS. SCHWARTZ:  Okay.  And it's less than the

11   average for 2013?

12             MR. BURKE:  Less than--you mean less than the

13   actual for 2013?

14             MS. SCHWARTZ:  Yeah, the actual.  I'm sorry.

15             MR. BURKE:  Yes, yes.

16             MS. SCHWARTZ:  And, in fact, the baseline is less

17   than the average for--of the past five years.  Is that

18   right?

19             MR. BURKE:  That's correct.

20             MS. SCHWARTZ:  And in fact, the baseline is less

21   than the average for--of the past five years.  Is that

22   right?

23             MR. BURKE:  That's correct.

24             MS. SCHWARTZ:  And, in fact, the superior is less

25   than the average for the past five years?

1              MR. BURKE:  If you don't mind, I'd like to refer

2      to something real quick just to make sure.

3              MS. SCHWARTZ:  Sure.  Well, we have a chart that

4      we're using as a demonstrative.  I think it's--let's see.

5      It think it's 26, please.

6              MR. BURKE:  Same book?

7              MS. SCHWARTZ:  Yes.  Right.  Unfortunately, I

8      think the witness--does the witness have an unredacted

9      copy?

10             MR. MCKANE:  Yes.

11             MS. SCHWARTZ:  Okay.

12             MR. BURKE:  Okay.

13             MS. SCHWARTZ:  Okay.  So, this was a chart that

14     was put together by our analyst, Michael Panacio in our

15     office taking the numbers that were provided by the debtors

16     and your counsel has review all the numbers and there's no

17     disagreement that any of the numbers are accurate.  You

18     have said a couple of times that you think that the targets

19     under the--for the TXU component of the business are

20     difficult to achieve.

21             Can you square that for me with the fact the

22     targets for EBITDA for threshold baseline and superior at

23     which 200 percent of the actual bonus can be achieved are

24     all less than the average for the past five years and how

25     you have developed your opinion that that's hard to

1    achieve.

2            MR. BURKE:  I can't specifically--would you like

3    me to start with EBITDA?

4            MS. SCHWARTZ:  Sure.  I'd like you to explain it.

5            MR. BURKE:  So, over the last five years and

6    actually consistent with the macro factors that I was

7    describing around natural gas and power, those prices had

8    continued to decline in the Texas marketplace.  Really

9    would have been about a year of our deal concluding, so, by

10   the fall of 2008.

11           So, when you look at 2009 forward, and I'm not

12   going to call out specific numbers--what you see, has

13   generally been an increasing level of EBITDA as a result of

14   our wholesale cost of power that we procure for our

15   customers was consistently falling.  So, as that cost is

16   lower, we're going to actually achieve a higher

17   contribution margin, which can actually drive higher

18   EBITDA.  What happened in 2014 is we started to see the

19   uptick for the first time where power costs were no longer

20   on a consistent falling trajectory.  Costs actually turned

21   and we were having to buy power at a higher level than we

22   had in all the previous years.  This is not unique to our

23   company.  It'd actually be unique if you could look at the

24   books of almost any retailer, not the absolute levels of

25   profitability, but the trend in profitability has been a

1    similar one.

2            So, when we built our plan and, by the way, our

3    plan has to synchronize with Mac McFarland's plan, which

4    has to also to synchronize with how corporate planning

5    looks at risk in the business because we're very related in

6    his revenues become my costs to a certain extent.  This

7    type of phenomena, we carefully have to consider in

8    crafting the target.  This can't be disconnected.  So, what

9    I purchased wholesale power at--and my objective of a long-

10   term business is not simply to raise price on customers to

11   meet last year's EBITDA targets.

12           So, if I have to wear as one of the roles that a

13   retailer plays, if I have to wear higher wholesale cost and

14   even handle some spikes for the long-term, I might actually

15   have slightly lower profitability because the long-term

16   objective of holding on to the customers and achieving

17   higher profitability over time is weighed in developing

18   these plans.

19           MS. SCHWARTZ:  And how about with respect energy

20   costs?  It looks like the thresholds for 2014 for energy

21   costs is less than the average for the past five years for

22   threshold, baseline and superior.  Can you explain that?

23           MR. BURKE:  Yes.  Because it's total cost, you

24   know, the goal would be to have it be as far below the

25   five-year average as possible.  So, since costs are going

1    to be a negative impact to EBITDA, our goal has been, and

2    you can see the downward trajectory of total costs has been

3    pretty consistent from what was almost a high or $100

4    million number down through time to where, at this point in

5    time, I'm pleased to say we've continued to get more and

6    more efficient.  So, I'm actually happy to see that

7    trajectory.

8              MS. SCHWARTZ:  Yeah.

9              MR. BURKE:  But as I mentioned earlier, if we

10   have good projects and good marketing campaigns and good

11   technologies to invest in that actually drive some higher

12   costs because it can drive higher revenue, I want to invest

13   in that.  So, this metric doesn't stand alone, but against

14   the five-year average.  It's--you know, it's been in the

15   right trend line.

16             MS. SCHWARTZ:  Okay.  And how about some

17   (indiscernible) for contribution margin where the

18   thresholds is below the five-year average?  Can you explain

19   why that is?

20             MR. BURKE:  Yes.  You could see it's almost right

21   on.  I mean, it is very, very close to the five-year

22   average.  And what we've had to deal with there was some of

23   the price spikes that I mentioned earlier in the year where

24   we chose not to raise rates on customers simply to recover

25   the prize spikes of the extreme weather.  We knew that by

1    the time we updated these metrics in the middle of the year

2    because the January and March conditions had actually

3    already occurred.

4             So, we reflected that, but we still brought the

5    metric up from where it was previously was and we tightened

6    it for performance purposes, but you can see that our

7    objective at baseline is superior to where that five-year

8    average is.  And, again, we have to take this one in

9    context of what's the right answer for the long-term for

10   the business because even though this is measuring annual

11   incentive plan--

12             MS. SCHWARTZ:  Yes.

13             MR. BURKE:  --my assumption when I go for my

14   performance review is that John Young and the Board is

15   going to look at, that I make the right decisions to

16   maximize long-term value for the business, not just

17   maximize the short-term from the standpoint of an annual

18   scorecard.

19             MS. SCHWARTZ:  Okay.

20             MR. BURKE:  And that's why we made the decisions

21   not to price upwards just because of the spikes early in

22   the year.

23             MS. SCHWARTZ:  All right.  How about customer

24   satisfaction?  Your thresholds, your baseline and your

25   superior all fall below your five-year prior performance?

1            MR. BURKE:  In that one, and I think we didn't

2    have a chance to discuss this when we were--visited you in

3    New York, but the main difference there is in the first

4    three years of that benchmark, '09, '10 and '11--

5            MS. SCHWARTZ:  Mm hmm.

6            MR. BURKE:  --we were measuring only satisfaction

7    with an outbound call center question out to folks saying

8    "Overall, how satisfied are you with TXU Energy?"

9            MS. SCHWARTZ:  Okay.

10            MR. BURKE: What we revised in '12 and '13, is

11    we're now measuring four touch points, so we're getting

12    people satisfaction when they enroll with us on billing

13    questions, how they're doing on their--on our online

14    website.  We want to be able to measure that.  And they're

15    able to--what we found is that--a couple things.  One,

16    online scores tend to be lower than folks that you reach at

17    home on the phone, so we--

18            MS. SCHWARTZ:  Okay.

19            MR. BURKE:  --ended up with a different benchmark

20    when we reestablished--

21            MS. SCHWARTZ:  Yes.

22            MR. BURKE:  --the metric in '12.  So, if you look

23    at how we're doing relative to '12 and '13, we're in line,

24    but we're not, by any means, dramatically increasing.  We

25    certainly want to be, but we're in that mid-80s number,

1    which is where we were in '12 and '13 because the '09, '10

2    and '11, we still tracked that measure.  It's actually

3    still at those high levels, but we blended in three others

4    at this point.

5              MS. SCHWARTZ:  All right.  Similarly, you have

6    your customer satisfaction thresholds baseline.  The

7    threshold and baseline are below your average of five years

8    and your superior is just slight .3 percent higher--.3

9    higher.

10             MR. BURKE:  Well, customer sat--if you actually

11   do not include '09, '10 and '11, because they're actually

12   too different bases for composition then you would compare

13   '12 and '13, our last two years.  You would end up with an

14   average of about 85.3 which we put thresholds just below it

15   and baseline just above it.

16             MS. SCHWARTZ:  Okay.  And you said--what did you

17   say about the first three years?

18             MR. BURKE:  That was a single question or an

19   outbound call survey.  And we now are blending four

20   different measures.  In fact, I could go back to the

21   demonstrative if we need to as to what we're blending, but

22   the measure is apples and oranges, the first three years

23   versus the last two years.

24             MS. SCHWARTZ:  Okay.

25             MR. BURKE:  But it was on the scorecard and what

1    we decided to do was we actually struggled with our

2    satisfaction level of 88 and 90 percent because we didn't

3    really believe it.  So, we challenged ourselves and said

4    there's better ways to measure this.  We did actually

5    measure other parts of the business, not just one question.

6    So, I need to get real-time call center feedback, so when

7    you finish a call, you can go into the (indiscernible) and

8    you immediately score us as opposed to us waiting 30 days

9    to call you and recall how your experience was.  That's how

10   we did the first three years.  We toughen the measure,

11   actually our own results, by actually measuring more real-

12   time and getting four different measures blended in and

13   that's what we did in '12 and '13.

14             MS. SCHWARTZ:  Okay.  Now, earlier, you talked

15   about the budgeting process and I think the papers go into

16   the bottom up process.  And we've talked at great length

17   about the budgeting process, et cetera.  I just want to

18   clarify that while the budget is getting processed, there

19   is an assumption in the budget as to what the bonus is--the

20   maximum bonus pool is going to be; isn't that right?

21             MR. BURKE:  There is an assumption in the budget

22   of what the target would be at baseline.  We have to

23   account for all of our costs.  You know, and part of our

24   cost is compensation costs.

25             MS. SCHWARTZ:  Of course.

1           MR. BURKE:  So, our goal, as I mentioned earlier

2    is if we do our--we perform in a role successfully, we will

3    put out very difficult targets and hopefully we'll met

4    them.  Maybe we'll exceed them, but the assumption going in

5    is that we will be able to meet plan.  That's the

6    objective.  And accordingly, you have to put in the

7    appropriate compensation measures when you build the

8    budget, or else you would have a negative impact simply for

9    paying something that you had line of sight.  If you hit

10   the metrics, you're going to pay it, but there's more line

11   of sight at the time that you develop the plan with any

12   certainty that you're going to hit the metrics.  But, as we

13   talked in New York, you have to put a budget in for

14   incentive compensation, or else you don't have a complete

15   budget.

16           MS. SCHWARTZ:  Right.  I understood that.  I was

17   just talking about how you develop how much you put in the

18   budget.  In other words--

19           MR. BURKE:  The target.

20           MS. SCHWARTZ:  Yeah.  And so you put--so, you

21   don't put in the budget.  You don't figure in the amount

22   that's the superior amount?

23           MR. BURKE:  That's correct.

24           MS. SCHWARTZ:  Is that right?  So, how does that

25   additional funding get put into the budget?  Well, one of

1    the interesting dynamics that occurs when you have a good

2    year is you have to then increase your accruals for your

3    incentive compensation.  And that then increases your SG&A

4    expense, which then lowers EBITDA.  This then lowers your

5    payout.  So, any amount of incentive above target actually

6    lowers your target payout--lowers your actual payout

7    because you have to account for all of your dollars when

8    you close the books.  You need to account for it.  And in

9    that, you would revise your actual scorecard performance

10   because you recognize the higher compensation level.

11              MS. SCHWARTZ:  Okay.  Now, earlier you testified

12   that the total cost of the EAIP would be approximately

13   7.93.  That was for the baseline amount; isn't that right?

14              MR. BURKE:  That's correct.

15              MS. SCHWARTZ:  So, the maximum cost of that

16   program is $16 million, is that right?

17              MR. BURKE:  Approximately.

18              MS. SCHWARTZ:  Okay.  And the other numbers that

19   you gave relating to the Key Leader and the SPC were also

20   based on target amounts; is that right?

21              MR. BURKE:  Well, they work differently.  So, for

22   instance, the Key Leader, there's a maximum that you can

23   earn, but there's really no minimum and that was reflective

24   of actually meeting the objectives--

25              MS. SCHWARTZ:  Okay.

1           MR. BURKE:  --at the Key Leader Performance

2    program.  And the SPC long-term incentive plan, likewise,

3    there's an EBITDA target.

4           MS. SCHWARTZ:  Right.

5           MR. BURKE:  You could only earn less than that if

6    you happen to hit that target or exceed it, that number is

7    still that number.

8           MS. SCHWARTZ:  Yeah.  Mr. Burke, you've been the

9    energy business for how long?

10          MR. BURKE:  Since 2000.

11          MS. SCHWARTZ:  Right.  And you've been in various

12   other professional capacities since what time?  What year?

13          MR. BURKE:  1991.

14          MS. SCHWARTZ:  Okay.  I may have you beat.  And

15   in the course of your history as a professional person, has

16   the company ever obtained letters of credit to secure

17   bonuses that you may have been eligible for other than the

18   letters of credit in this case?

19          MR. BURKE:  I have never received a letter of

20   credit before.  As I mentioned earlier, I've never been

21   through a restructuring before.  But, no, I've not received

22   one before.

23          MS. SCHWARTZ:  Right.  And so the letters of

24   credit--I understand that--the letters of credit in this

25   case were related to the restructuring?

1          MR. BURKE:  No, I think they were related to the

2     fact that, one, we had a very challenging wholesale market

3     as I described--

4          MS. SCHWARTZ:  Okay.

5          MR. BURKE:  --which was therefore going to put

6     pressure on equity value.  That's even without the prospect

7     of a restructuring.  And this was meant to be a replacement

8     for the equity component.

9          MS. SCHWARTZ:  Mm hmm, okay.  You also talked

10    about the weather being an important risk factors in--or

11    elements that could affect the targets, whether the targets

12    are achieved, et cetera.  Now, the weather and weather

13    events--I like the way you called that--weather events have

14    occurred every year since, you know, that's something that

15    the company faces every year.  Isn't that right?

16          MR. BURKE:  Some years more than others, but

17    inevitably, I haven't figured out how to forecast the

18    weather perfectly, so it's part of managing the business.

19    It is.

20          MS. SCHWARTZ:  Right.  And there's been some

21    serious weather events that have occurred in Texas over the

22    past five years.

23          MR. BURKE:  Absolutely.

24          MS. SCHWARTZ:  Okay.  I don't have any furthers

25    questions.  Thank you, Mr. Burke.  I apologize, Your Honor,

1    for order.

2              THE COURT:  No (indiscernible).  Re-direct?

3              MR. MCKANE:  Very short re-direct, Your Honor.

4    Okay.  Mr. Burke, Ms. Schwartz, from the United States

5    Trustees Office asked you a series of questions about what

6    has been marked as Exhibit 23.  And in particular, your

7    historical compensation, which is on page 2 of Exhibit 23;

8    if you could go back there for a moment?

9              MR. BURKE:  Yes, I'm there.

10             MR. MCKANE:  Sir, you know, she was asking you

11   questions that under the compensation that's labeled for

12   2014.  Do you see that, sir?

13             MR. BURKE:  That's correct.

14             MR. MCKANE:  Was this compensation that you

15   earned as part of incentive programs in 2013?

16             MR. BURKE:  If I earned the $573,750, it will be

17   because we have successfully earned it out of this

18   performance year 2014, correct.

19             MR. MCKANE:  And in that far-right column, that's

20   the compensation, at least for the AIP program that's at

21   issue for today?

22             MR. BURKE:  That's correct.

23             MR. MCKANE:  Everything else has already been

24   paid been paid before filing for bankruptcy?

25             MR. BURKE:  That's correct.  All right.  We have

1    no furthers questions, Your Honor (indiscernible).

2              THE COURT:  Thank you.  You may step down.

3              MR. MCKANE:  Your Honor, we're (indiscernible)

4    the time.  Is this an appropriate time to take a break for

5    lunch?

6              THE COURT:  Any objection to taking lunch?

7              MS. SCHWARTZ:  No, Your Honor.

8              THE COURT:  Good answer.  No, thank you, sir.

9    Yes, we'll take a break for lunch.  We'll reconvene

10   promptly at 2:30 with our next witness.  And hopefully,

11   that's enough time to get through security.

12             MR. MCKANE:  Absolutely, sir.  Thank you.

13             THE COURT:  Very good.

14   (Recessed at 1:33 p.m.)

15             CLERK:  All rise. Please be seated.

16             MS. SCHWARTZ:  Your Honor, in light of time for

17   today and scheduling, we wondered if Your Honor would like

18   to consider the video deposition of Mr. Evans either in the

19   evening because it doesn't look like we're going to finish

20   today--so we thought in light of time and to save on court

21   time, if that would be something that Your Honor would want

22   to do, we would certainly be agreeable to that.

23             THE COURT:  So, you have, what, a DVD I could

24   watch?

25             MR. MCKANE:  We do. We have DVDs available for

1    you and your staff, and whether you view it tonight or in

2    the morning, depending on when we come back...

3            THE COURT:  All right, let me think about that.

4    Thank you. We may do that, yeah.

5            MR. MCKANE:  And, Your Honor, for the record,

6    Mark McKane of Kirkland & Ellis on behalf of the debtors.

7    Is there anything we need to address in the court

8    proceeding before our next witness?

9            THE COURT:  No.

10           MR. MCKANE:  Your Honor, the debtors call Mr.

11   Matt McFarland.

12           CLERK: (indiscernible) the truth, the whole

13   truth, and nothing but the truth... (indiscernible)

14           MR. MCKANE:  I do.

15           CLERK:  Please state and spell your name for the

16   record.

17           MR. MCFARLAND:  Sure. Matt McFarland. M-C-F-A-R-

18   L-A-N-D.

19           THE COURT:  Please be seated, Mr. McFarland.

20           MR. MCKANE:  Good afternoon, Mr. McFarland.

21           MR. MCFARLAND:  Afternoon.

22           MR. MCKANE:  Can you please introduce yourself to

23   the court and describe your role at Luminant?

24           MR. MCFARLAND:  Sure. My name is Matt McFarland,

25   CEO of Luminant.

1           MR. MCKANE:  And, sir, how long have you been the

2   CEO of Luminant?

3           MR. MCFARLAND:  Since January 2013.

4           MR. MCKANE:  And could you give a brief overview

5   for the court of your educational background and your work

6   history?

7           MR. MCFARLAND:  Sure. I have an undergraduate

8   degree from Virginia Tech, an engineering and an MBA from

9   the University of Delaware.

10          MR. MCKANE:  And, sir, how long have you worked

11  in the power industry?

12          MR. MCFARLAND:  Since 1999.

13          MR. MCKANE:  And where did you get your start in

14  the power industry?

15          MR. MCFARLAND:  I actually started with

16  Philadelphia Electric in 1999, which became Exelon.

17          MR. MCKANE:  And how long were you at Exelon,

18  sir?

19          MR. MCFARLAND:  About nine years till 2008.

20          MR. MCKANE:  And what positions did you hold

21  there?

22          MR. MCFARLAND:  Several finance and risk

23  management positions. Ultimately the Senior Vice President

24  of Mergers & Acquisitions.

25          MR. MCKANE:  And, sir, when did you join

1   Luminant?

2         MR. MCFARLAND:  July of 2008.

3         MR. MCKANE:  And what position did you hold in

4   July of 2008?

5         MR. MCFARLAND:  I was the chief commercial

6   officer when I joined Luminant.

7         MR. MCKANE:  And so, when were you elevated to

8   thee current position you old as Chief Executive Officer of

9   Luminant?

10        MR. MCFARLAND:  That was January, 2013.

11        MR. MCKANE:  And, sir, do you have familiarity

12  with the incentive plans that are the subject of the motion

13  here today?

14        MR. MCFARLAND:  I do.

15        MR. MCKANE:  And did you play a role in either

16  developing the plans or the metrics that underlie those

17  plans?

18        MR. MCFARLAND:  I did.

19        MR. MCKANE:  And as far as you were, have the

20  debtors had an employee incentive program like this for the

21  entire duration you've been there?

22        MR. MCFARLAND:  Yes, since I joined the company.

23  That's correct.

24        MR. MCKANE:  And so why does Luminant offer these

25  programs to senior management?

1            MR. MCFARLAND:  Competitive pay with the

2     industry.

3            MR. MCKANE:  Sir, you were in the courtroom when

4     Mr. Burke talked about the budget process?

5            MR. MCFARLAND:  I was.

6            MR. MCKANE:  I'd like to cover just the Luminant

7     part of the budget process, if that's okay.

8            MR. MCFARLAND:  Sure.

9            MR. MCKANE:  Could you describe for the court, as

10    you're developing the annual for the budget, what role

11    Luminant plays and what role in particular you play in that

12    process?

13            MR. MCFARLAND:  Sure, and I'm looking, if I can,

14    just for reference at Mr. Burke's page two of the

15    demonstrative.

16            MR. MCKANE:  Sure.

17            MR. MCFARLAND:  And going back to that and just

18    describing the Luminant process as Mr. Burke described, as

19    Jim described, Luminant does the same type of budgeting

20    process. We start from the bottom up. We do a plant by

21    plant model. We then aggregate the plant by plant

22    characteristics. We do this in the April timeframe. This

23    is--we'll get the right (indiscernible).

24            MR. MCKANE:  Okay.

25            MR. MCFARLAND:  That's okay. So in the spring

1    timeframe, as Jim described, we do a similar process at

2    Luminant where we go plant by plant, look at the plant

3    operating characteristics, look at the fuel type, fuel

4    blends that we're going to put in, look at our expected

5    capital expenditures, what type of preventive maintenance

6    we need to do, how we might need to adjust for

7    environmental regulations, and we start building a bottoms-

8    up plan. We do that site by site, plant by plant, aggregate

9    it together. My CFO leads that effort. When he brings that

10   aggregated plant in the late sprint timeframe, early summer

11   timeframe, we then bounce it off. So, he's been looking at

12   it, doing the bottoms-up check all the time. He then comes,

13   presents it to the senior leadership team at Luminant, my

14   direct reports, we evaluate it, and we push back on that.

15   We push back on it based off of assumptions that we set out

16   before we started the bottoms-up process, so let me

17   describe that for just a bit.

18            As Jim described, the financial plan, which

19   ultimately culminates in these metrics, is an outcome--but

20   what we also do in the springtime is we set strategic

21   objectives. So, we take a look at what the market

22   conditions are, we look at the environmental regs that are

23   out there, we think about what is it that we need to

24   optimize going forward. So, for example, this year we

25   looked at--there's been a significant shift in the market

1    to where power prices, as Jim mentioned earlier, are very

2    high in the summer. So, our availability needs to be very

3    high in the summer. Our plants need to run at their peak

4    performance in the summer. So we sent out a metric that

5    said that's what one of our goals is going to be as we

6    build that bottom-up process.

7              So, the CFO brings that aggregate process to me,

8    the SLC, we sit back and do an iterative process, a give

9    and take, where I challenge the assumptions, challenge the

10   cost, challenge the availability. I get pushed back on

11   sometimes as well.

12             MR. MCKANE:  Sure.

13             MR. MCFARLAND:  And we then culminate a plan

14   which we feel is comfortable. We take that plan, we then

15   balance it back and forth with the EFH CEO CFO in an

16   iterative process as well until we're all in agreement with

17   that's the plan that we'll present to the board that

18   ultimately drives the metrics, as Jim described, that goes

19   to the ONC Committees.

20             MR. MCKANE:  Okay, so does Luminant actually

21   forecast or model out the projected generation for each of

22   its facilities?

23             MR. SCHEPACARTER:  Objection, Your Honor, it's a

24   leading question.

25             THE COURT:  No, I disagree. It's not leading.

1              MR. MCFARLAND:  Yes, as part of the budgeting

2      process, as I mentioned, we go plant by plant. But realize

3      that at each plant we also have mines. And so we do a

4      complex--we call it a complex, a mine and a plant. We take

5      a forecasted revenue stream, which is the power prices by

6      hour. So, 8,760 hours per year, and we run a model we call

7      the PUM, which is Plant Utilization Model. That model

8      dispatches the coal plants.

9              MR. MCKANE:  Let me pause you there for a second.

10     What do you mean by dispatching the plant? Can you explain

11     that to the court?

12             MR. MCFARLAND:  Sure. It says that if the power

13     price is high enough versus our cost, the plant runs. If

14     the power price is lower than our variable cost, the plant

15     won't run. Now, it's not exactly that simple because you

16     can't shut a coal plant down--if you take it all the way

17     down, it takes three days to bring it back online. So it

18     looks at what is the startup cost to bring that back online

19     and determines the dispatch of the plant. We then take that

20     dispatch of the plant based off of the factors of the plant

21     or the characteristics of the plant, which include what's

22     its max capacity, what's its availability--in other words,

23     how often is it available to run? Because it's a big

24     complex machine, the plants don't run 100 percent of the

25     time. And that's a metric that we're going to talk about

1    later that we try to optimize.

2            We then take a look at the dispatch, compare it

3    to what can the mine produce? And if the mine can produce

4    the... At some of our sites we both mine coal and import

5    coal, and depending upon how much we can mine at a

6    particular site, we may need to import coal, which we do

7    from Wyoming. And so it optimizes bringing in coal, mining

8    coal, and then the dispatch for revenue.

9            MR. MCKANE:  All right, sir, in this entire

10   process I believe you said one of the key drivers was power

11   prices, is that right?

12           MR. MCFARLAND:  That's correct?

13           MR. MCKANE:  How do you decide what power prices

14   to use?

15           MR. MCFARLAND:  Well, for the plan we look at a

16   five-year horizon. The first year of that horizon is market

17   power prices. So, because we're in the wholesale marketing

18   and trading business, we have the ability to contact

19   brokers, deal with other people that are in the business--

20   we have what we call marks of power prices. We know what

21   the market power price is for the next year. Now, we don't

22   know it on an hourly basis. That's a proprietary model

23   where we take the price that we get from a broker and we

24   split it into the 8760. But we have a visibility to the

25   power prices for at least one year out.

1            MR. MCKANE:  And so, what power prices... And

2    when you say you project it for a year out, is that the

3    power price curve?

4            MR. MCFARLAND:  Yeah, again, we don't project it,

5    okay?

6            MR. MCKANE:  Right.

7            MR. MCFARLAND:  It's a market power price. It's

8    not a projection. We take the market price and back into

9    what it would look like on an hourly basis, obviously, but

10   it still sums to the same price that we can see in the

11   market. It's for one year out. So, when we were setting the

12   budget for '14 in the fall of Calendar 2013, we used the

13   end of August power prices.

14           MR. MCKANE:  Thank you, sir. And at the time that

15   you approved the Luminant budget, did you have a view as to

16   whether you could achieve that budget?

17           MR. MCFARLAND:  Achieve?

18           MR. MCKANE:  That the Luminant team could realize

19   the projections in the budget?

20           MR. MCFARLAND:  Well, the budget, when it's set

21   in the fall, it's done three months ahead of the calendar

22   year by which it's attempting to model, if you will. And

23   it's a model based off of a number of complex assumptions

24   associated with how much can we generate, how available are

25   our plants, will we hit mining projections at each of our

1    coal mines, will we be able to run the nuclear plant as we

2    say? And then, overall, will we be able to capture the

3    market prices?

4           And so, when you say achieve that, obviously our

5    goal is to always achieve the plan that we set forth. But

6    there is risk in achieving that plan.

7           MR. MCKANE:  Understood. And it's from that

8    budget that you then take the next step in an attempt to

9    assess what the metrics should be for that year?

10          MR. MCFARLAND:  That's correct. The metrics

11   essentially fall out of that budget.

12          MR. MCKANE:  And like Mr. Burke, did you develop

13   demonstrative aids that would assist you in testifying

14   today?

15          MR. MCFARLAND:  I did.

16          MR. MCKANE:  And, sir, is the demonstrative aids

17   you prepared contained in Tab 2 of the binder that says

18   "Demonstrative Aids"?

19          MR. MCFARLAND:  They are.

20          MR. MCKANE:  Okay. And if you can turn to Page 2-

21   -or Page 1, excuse me. Do you see the page that says

22   "Luminant metrics for the executive annual incentive plan"?

23          MR. MCFARLAND:  I do.

24          MR. MCKANE:  Are those the metrics for the EAIP

25   for 2014?

1             MR. MCFARLAND:  They are.

2             MR. MCKANE:  Can you describe what the categories

3      are for the performance metrics just at a high level as

4      they apply to Luminant?

5             MR. MCFARLAND:  Sure. It's not dissimilar to what

6      Jim mentioned for TXU Energy. If you look at it, ultimately

7      we have about two-thirds or 37.5 percent, that's the

8      weight; 37-1/2 percent of the scorecard is based off of the

9      ultimate financial outcome, which is Luminant EBITDA, which

10     is a measure of profitability of cash flow prior to capex

11     for us. We have more capex than Jim does. And then it looks

12     to--if we're going to align the business to drive that

13     EBITDA because each plant does not necessarily have an

14     EBITDA, we look at the operational drivers of business.

15            And so, if you look at the next six categories,

16     we look at the coal available generation, so a product of

17     how available are the plants? We separate that into a

18     summer period and a non-summer period, and I'll get into

19     that as we go further. We look at nuclear available

20     generation. Nuclear is different than our coal units

21     because we want it to produce essentially on a 7x24 basis.

22     Because the variable costs of the nuclear plant are very,

23     very low. So, we've got this huge capital cost, you want it

24     to generate every hour it can. So, that's the metric by

25     which you measure nuclear plants.

1             And then you look at the other things that the

2     business sites can control, the plants can control. You

3     look at our O&M and our SG&A. We have SG&A as well as

4     operating and maintenance expenses, and I'll describe those

5     in detail. But that's essentially our operating cost. And

6     then we have our coal fuel cost. Because we mine our own

7     coal--we mine about 30 million tons a year and then import

8     about 10 million more tons of coal from Wyoming, we look at

9     our coal fuel cost--because that determines our variable...

10    It's the primary component of our variable dispatch.

11             MR. MCKANE:  That variable cost of coal as a

12    fuel?

13             MR. MCFARLAND:  As a fuel, yes. So, it's measured

14    on a dollar per MMBTU. So, it's how much heat content can

15    you get per dollar? And the lower that is, the better off

16    you are, the more often you run, the higher margins you can

17    capture. We have gross margin--we don't measure quite like

18    Jim, but revenue less fuel cost would essentially be our

19    gross margins.

20             MR. MCKANE:  And then... I'm sorry, go ahead,

21    please.

22             MR. MCFARLAND:  Okay. The last one is Luminant

23    capex. As I mentioned, we have substantially--we have a lot

24    of capex relative to Jim's business, and that's because

25    this is a capital intensive business where we put back. So,

1    we run the machines, we have to do preventative

2    maintenance, we have to refurbish equipment, we have to go

3    through environmental control equipment on coal units, you

4    have to replace things like bag houses, the filters in a

5    bag house, etc.

6              MR. MCKANE:  I'm sorry. (indiscernible) You might

7    explain what a bag house is.

8              MR. MCFARLAND:  I saw the smiles. Bag houses are

9    put at the back end of coal plants in order to remove

10   particulate matter, and they also remove a couple other

11   different emissions. But it's essentially--think of it as a

12   big fabric filter. It works the same way a vacuum cleaner

13   does. As the air comes in, it goes through, the particles

14   get separated inside of a bag, and then you have an

15   exhaust. So, it's essentially that on a very large scale.

16             MR. MCKANE:  Thank you, sir.

17             MR. MCFARLAND:  Sorry about the lingo.

18             MR. MCKANE:  That's all right. Sir, looking at

19   Demonstrative One, there are a number of threshold baseline

20   and superior targets. Can you describe just generally for

21   the court, how the Luminant team develop the threshold

22   baselines of superior targets just as an overall exercise?

23             MR. MCFARLAND:  Sure. In general--and I know

24   we're going to get into each one of these--the process that

25   we go through in the fall, and the yellow here is an update

1    for this executive...

2           MR. MCKANE:  We'll come to that next.

3           MR. MCFARLAND:  But, in general, when we set the

4    threshold baseline in superior metrics, we look at what is

5    it that we think we can achieve and what are the risks

6    associated with achieving that? In doing that, when we look

7    at the risk, we also look to compare versus historical

8    performance, our own historical performance year over year,

9    as well as industry benchmarks. So, as an example, we look

10   to benchmark our nuclear unit versus similar nuclear units

11   on both a cost and generation performance. We then take a

12   look at our past performance and say, "How do we think we

13   should do in 2014?" But we also, in developing those, have

14   to update for knowns that are different year over year.

15          So, for example, with nuclear generation, this

16   year we have two refueling outages, one on each unit, one

17   in the spring and one in the fall. Last year we only had

18   one refueling outage. So, the numbers will be dissimilar

19   just because of a different operating parameter for the

20   year. So, we look at all of that and we analyze, we push

21   back, we go through this iterative process, and then look

22   at the risks that surround each of these targets.

23          MR. MCKANE:  Thank you, sir. Now, you did mention

24   that there was a midyear update in 2014. Were you part of

25   that?

1           MR. MCFARLAND:  I was.

2           MR. MCKANE:  Can you describe what your role was

3     in the midyear adjustment in 2014?

4           MR. MCFARLAND:  I adjusted these metrics.

5           MR. MCKANE:  In particular? You were directly

6     involved in that process?

7           MR. MCFARLAND:  I was directly involved in that.

8     AS described, we were told that what we needed to do was

9     take the 12-month process--so, back in the fall of last

10    year, we developed metrics that were for all those not in

11    the Executive Annual Incentive Plan. For the Annual

12    Incentive Plan, the AIP, the incentive plan for the rest of

13    the non-insiders, we developed those metrics in the fall.

14    That was for a 12-month period and risks and uncertainty

15    associated with a 12-month period. We took that same

16    process as of June and said we have a six-month process. We

17    have knowns as to what happened in the first six months and

18    we only have six months' worth of volatility left. So we

19    updated those metrics associated with--to accommodate those

20    factors.

21          MR. MCKANE:  And, sir, how does the demonstrative

22    show which of those metrics have been updated?

23          MR. MCFARLAND:  Those are the yellow highlighted

24    metrics. For all of the thresholds as well as the baseline

25    and superior for coal available generation as well as our

1    capex, for all three milestones.

2          MR. MCKANE:  So, were there any specific events

3    that had occurred in the first half of the year that drove

4    the decision to adjust these metrics?

5          MR. MCFARLAND:  I think probably the most

6    notable--and the reason why coal available generation Jan

7    through May, September 16 through December, which is what

8    we call balance of year non-summer, was adjusted up because

9    natural gas prices rose this winter. And when they rose,

10   power prices in Texas rose as well. And we had three units

11   in what we call seasonal operations--they were seasonally

12   laid up--they were not due to return to service until June.

13   But we brought those back, two in mid to late February and

14   one in early March. And so, they were not in our available

15   production metric this Jan through May period. And when we

16   brought them back, they had available generation of over

17   2,600 gigawatts, which is the metric that we're using--to

18   the right, those are gigawatt hours. So, when you added

19   that 2,600, we would've been through--I forget if we were

20   through--I'd have to look at the... But we needed to adjust

21   these metrics to accommodate for that. That is just

22   something that we didn't anticipate. It was actually... The

23   decision was a good one because it increased our potential

24   EBITDA because we were capturing market prices--however, it

25   had a negative impact on that we increased our O&M, we had

1    to spend more on O&M, which we're still holding to our

2    baseline number here. In fact, we upped our threshold--

3    reduced our threshold O&M spending.

4         MR. MCKANE:  And so after the update was made, in

5    midyear did you have a view as to whether Luminant would

6    achieve threshold baseline of superior levels?

7         MR. MCFARLAND:  Again, the word achieve--I mean,

8    we're going to strive to do the best we can. There's a lot

9    of assumptions in there. I think that there are challenging

10   metrics, you have to... I plan to highlight each metric--

11   what drives the challenge associated with it. But the way

12   that I'd like to describe it is in order to get through

13   threshold and hopefully achieve baseline, to use your term,

14   we have to fire on all cylinders. We have to hit the marks

15   on many of the different plans. I mean, I think that one of

16   the things that when we looked at changing these thresholds

17   is, is that we set plans with the desire to try to hit

18   them, but that doesn't mean that you always can. And that's

19   what our team's focused on, so...

20        MR. MCKANE:  Sir, one of the things I noticed on

21   this (indiscernible) metric is that there wasn't a specific

22   line item for safety. Can you explain to the court how you

23   account for safety in your business?

24        MR. MCFARLAND:  Sure. So, we have this plan and

25   then there are five individuals that are in the 26 that Jim

1    described. I have seven in that list of the non-SPC. The 19

2    of the 26, I have seven of those 19 that report to me. The

3    chief nuclear officer, chief fossil officer, three SBPs in

4    the fossil operations, our chief financial officer, and our

5    chief commercial officer. Of those seven, five of those

6    have this scorecard and then they have a portion of their

7    incentive compensation linked to safety metrics. Because we

8    actually view safety as first and foremost, and then these

9    metrics. And those are the key individuals for driving

10   safety, and so they're linked to those scorecards.

11           So, the fossil has 15 percent of their scorecard

12   linked to safety metrics, and the chief nuclear officer has

13   15 percent of his scorecard linked to personnel safety and

14   another 15 percent linked to nuclear safety, which measures

15   how did the nuclear reactor perform? Radiation exposure,

16   things of that nature. It's fairly technical. But it's

17   safety measures. And actually, I included a slide on the

18   next page...

19           MR. MCKANE:  Let me ask you, sir. On

20   Demonstrative 3, (indiscernible) Page 2 refers to a

21   Luminant safety program. Can you describe the Luminant

22   safety program to the court?

23           MR. MCFARLAND:  Sure. Our program entails looking

24   at leading and lagging indicators. This is the lagging

25   indicator and I present it here because it's the most easy

1    to understand. Because leading indicators are things such

2    as behaviors, and instilling behavioral-based safety which

3    leads to the lagging indicator, which is a decrease in

4    recordable incidents. And this is a decrease in recordable

5    incidents over a period of time. You can see where our

6    average was in the 2003-2006 in a number of recordables,

7    where it was in '07-'10. Didn't have the best of years in

8    '11, but you can see the trend is downward. And we believe

9    that this is all based off of our behavior-based safety

10   program which has--we call it Safety Zero, which is, our

11   focus is always on zero incidents. But we do work in

12   hazardous conditions, both in our minds and in our plants.

13   We always target zero, we want everybody to go home the

14   same way they came to work that day.

15            MR. MCKANE:  Thank you, sir. The largest weighted

16   performance metric is Luminant management EBITDA, is that

17   right?

18            MR. MCFARLAND:  It is.

19            MR. MCKANE:  And how long has management EBITDA

20   been a performance metric under the EAIP program?

21            MR. MCFARLAND:  I started in the program in 2008.

22   It was a half-year convention but since that timeframe. So,

23   all of 2008. I don't know what the company as before, and

24   Jim testified to that. But as far as Luminant is concerned,

25   since I've been there in 2008, EBITDA has been the metric.

1          MR. MCKANE:  And do you believe EBITDA is an

2     appropriate metric to measure your business?

3          MR. MCFARLAND:  I believe it is an appropriate

4     financial metric for our business. Because it measures the

5     operating cash flow of the business--so, it's how much cash

6     flow do the assets throw off from a profitability

7     standpoint after you've invested the capital? But then you

8     need to look at the capital that you have to reinvest in

9     the business, and that's why capex is our last metric. And

10    when you look at EBITDA, which is operating cash flow

11    before taxes, and you subtract capex, that's the cash

12    profitability of the business before financings, before

13    whatever tax positions you take--and then depreciation and

14    amortization, which is the DNA, are non-cash items. And so,

15    running a business, and doing this since '99, I think that

16    EBITDA is the best metric for operating performance.

17         MR. MCKANE:  Yeah. Let's go through the limited

18    metrics if you can. Sir, did you prepare a demonstrative to

19    discuss whole available generation generally?

20         MR. MCFARLAND:  Yes, it's on Slide 3.

21         MR. MCKANE:  And, sir, can you explain to the

22    court how the two coal availability generation metrics work

23    together, that Luminant has?

24         MR. MCFARLAND:  Sure. Simply, if you sum these up

25    in either of the columns, that would be the full year

1    availability metric. But we refine this metric and separate

2    it into two specific different targets--one for the summer

3    and one for the non-summer. The reason being is that if you

4    look at our operating performance--if you look at it from a

5    financial perspective, we generate two-thirds, give or

6    take, of our profitability, of our EBITDA in the June

7    through September period. And so, we wanted to refine this

8    metric to make sure that people were focused on providing

9    the megawatts during the summertime.

10            Because as Mr. Burke described earlier,

11   summertime has higher wholesale prices. When prices are

12   higher, our fuel costs remain fairly constant. They're

13   variable, but fairly. And you can just see that we make

14   more money in the summertime, okay? And so, the reason why

15   we split that into two is to have that focus that we have

16   to have the best availability in the summer. Not that we

17   don't want to have poor availability the rest of the time,

18   but it's just a more important profitability measure.

19            That really drove home to the business at the

20   station. So, we take each of these different metrics, and

21   while these are in aggregate, what we do behind the scenes-

22   -okay, but these are the scorecards--we take these metrics

23   and split them down into--if I go out to the Monticello

24   plant, at Monticello here's how you contribute to hitting

25   the 19-138 threshold. 19-898 baseline for summer gigawatts.

1    And so they have a specific target in generating. And at

2    that point, in the summertime, they essentially generate as

3    much as possible and that's where they get their

4    profitability. That means a lot to someone because they can

5    convert dollars into megawatts.

6              MR. MCKANE:  And, sir, can you describe how you

7    arrived at the threshold baseline superior levels that are

8    reflected here in (indiscernible)?

9              MR. MCFARLAND:  Sure. So, again, same as the

10   general, we take a look at historical performance, we look

11   at industry performance. If you look at the available

12   generation, we are versus the industry average, 1-2 percent

13   above on availability. That's at the threshold level. At

14   the baseline level we're 3-5 percent above the industry

15   average. But not only that--we look at our historical

16   performance year over year. So, if you were to look at coal

17   available generation, this target at baseline--I'll

18   (indiscernible) the numbers at baseline--this target for

19   coal available in the summertime last year was 92.6 percent

20   availability. But when power prices have the ability--so,

21   last year, power prices had a cap on them at $7,000 a

22   megawatt hour; this year they're going to have a cap of

23   $9,000--or did have a cap of $9,000. We took that 92.6 and

24   in this plan made it 93.8. So, we asked for an increase in

25   performance across the coal fleet over the summer period.

1    We did the same on the coal available generation. So, the

2    point being is that we look at industry but we also compare

3    ourselves against our own benchmark.

4              MR. MCKANE:  Yeah. Sir, let me ask you a question

5    about your coal fleet. Do you use lignite coal?

6              MR. MCFARLAND:  We do.

7              MR. MCKANE:  And how does your use of lignite

8    coal compare to the industry?

9              MR. MCFARLAND:  Sure. Let's see... So, in the

10   Eastern United States, you'll have coal--and these are just

11   numbers for point of reference--that would have heat

12   content of 12,000. The Wyoming coal that we import has a

13   content of 8,400. The lignite coal that we mine ourselves

14   has heat content somewhere between 5,800 and 6,500 on a

15   good day. And so you can see that it's a lower quality

16   coal. It has more dirt... I was just going to say--

17             MR. MCKANE:  The guys back in Texas aren't going

18   to be too happy with me right now.

19             MR. MCFARLAND:  It has more non-coal aspects to

20   it. More sand in it is really what it has. And that sand is

21   abrasive.

22             MR. MCKANE:  And so, what impact does the use of

23   lignite coal have on your coal availability generation

24   metric?

25             MR. MCFARLAND:  Well, it really has two impacts.

1    The first is that the sand is abrasive on the machines,

2    which means that it has the potential to break down the

3    equipment more often. And the second is that because of the

4    variability of lignite--when we order Wyoming coal, we

5    order 8,400 coal, we get 8,4000 coal. When we mine it

6    ourselves, sometimes we hit a seam that's 5,800, sometimes

7    we hit a seam that's 6,200, sometimes we hit 6,500. That

8    variability then requires different blendings and it has an

9    impact on the availability of our generation as well.

10          MR. MCKANE:  And, sir, factoring in all that you

11   know now, looking at the threshold baseline and superior

12   targets, do you have a belief as to whether they are

13   attainable for coal available generation?

14          MR. MCFARLAND:  I believe that if we operate

15   better than industry average for the balance of the year

16   that we'll be able to attain threshold. I think that we're

17   going to have to run--again, in order to hit baseline

18   numbers we would have to exceed that and be better than

19   industry average by 3-5 percent. We were behind in several

20   of these metrics--at least the summer metric going into--

21   after June.

22          MR. MCKANE:  And, sir, can you also address the

23   nuclear availability generation metrics?

24          MR. MCFARLAND:  I can.

25          MR. MCKANE:  And can you describe that, on Page

1    4, what's the measure that you use for nuclear generation?

2

3              MR. MCFARLAND:  It's essentially the same metric.

4    It's just specific to the nuclear plant--the two nuclear

5    units. And so it's the availability of the unit, how does

6    it perform, adjusting for the refueling outages. So, this

7    year we took the unit down in the spring, Unit 2, replaced

8    the fuel in the core--or part of the fuel core, and we

9    actually just started on Saturday, we took the other unit

10   down this past Saturday for the refueling outage for this

11   fall.

12              So, you exclude those two periods, and how does

13   the plant run the remainder of the time? And if you look at

14   it, availability--if you were 100 percent availability,

15   that would be perfect. We're expecting to be 99.75 percent-

16   -is sort of how you get to some of these--when you get past

17   baseline, which we'll be, and I can show you on the next

18   page, if I may. On Page 5 where you--

19              MR. MCKANE:  Why don't I stop you there for a

20   minute? You'll have a minute--and just--you mentioned

21   earlier, I believe, that you want the nuclear plant to run

22   as much as possible. Why is that? Why is that good for the

23   business?

24              MR. MCFARLAND:  Sure. When you build a nuclear

25   plant, most of the cost has been put into the plant into

1   the asset itself. Nuclear fuel--and this was the argument

2   to moving towards nuclear-based power--is, once you have

3   the plant built and you're performing, the fuel is actually

4   less expensive than any other fuel. And so, your dispatch

5   cost--so, if you ran it through that model, it would

6   basically tell you run this plant every hour that you can

7   because you're making money versus your variable cost to

8   contribute to recovering your capital cost. So, you want

9   this unit to run on a 7x24 basis.

10          MR. MCKANE:  And, sir, how does the Luminant

11  nuclear power plant, the Comanche Peak, perform vis-a-vis

12  the industry?

13          MR. MCFARLAND:  On Page 5 is a chart. One of the

14  things we have is the access to data. This is EUCG data,

15  which is industry data. And you can take a look at where

16  Comanche Peak Nuclear Power Plant, that's the CPNPP--the

17  further left and the further up the Y axis, the better off

18  you are. So, capability is essentially the availability

19  that I was just mentioning. 100 percent would be near

20  perfect. And then across the bottom is your operating cost

21  on a dollar per megawatt hour basis. So, how much did you

22  cost you in O&M per megawatt hour you generated? So,

23  there's two numbers that are going in there. If you're

24  generating really well, you get it divided into your cost--

25  somewhat of industry standard way of looking at things. And

1    then you can see the deciles, which is the top 10 percent

2    and the top quartile, which is the top 25 percent, and

3    where we stack up.

4              MR. MCKANE:  And, sir, just at a high level, how

5    does the Comanche Peak performance stack up to their peers?

6              MR. MCFARLAND:  It was the top two unit. There's

7    one stage--(indiscernible) stage three--it's the top two

8    unit nuclear plant in the country for the last several

9    years based off of these metrics. Based off of generation

10   output and cost.

11             MR. MCKANE:  And so, what risk factors may impact

12   Luminant's availability to satisfy its nuclear generation

13   metric?

14             MR. MCFARLAND:  Performance of the plant. We

15   have, as I mentioned--we just entered an outage on

16   Saturday. It is an outage that's currently scheduled for

17   24-1/2 days. It was planned to go in for 22 days. You can

18   see that industry top quartile in my first sub-bullet of

19   the second bullet--the top quartile is 31 days. But we have

20   to execute that outage in 24-1/2 days. There's risk to

21   that. We ran over by six days in the spring. And the margin

22   of error of achieving the goals on the prior page is very

23   small when you're looking at being in that upper quadrant.

24             MR. MCKANE:  Right.

25             MR. MCFARLAND:  And so, we have to essentially

1    execute the planned outage in a top quartile timeframe and

2    achieve top quartile operating availability for the balance

3    of the year in order to hit our numbers.

4          MR. MCKANE:  So, based on everything you know

5    now, for the second half of the year with this outage going

6    on, do you have a view as to whether Luminant will be able

7    to hit the threshold baseline or superior metric?

8          MR. MCFARLAND:  Again, we will always achieve--

9    try to achieve--we won't always achieve--we will always try

10   to achieve. I did daily updates on how we're doing on the

11   plan schedule of the nuclear outage, and as of Monday, we

12   were eight hours behind the 24-1/2 days. So, hopefully, we

13   can make some of that up and, hopefully, we don't have any

14   slippage. If we have slippage of the six days that we had

15   in the spring and we don't perform, it'll be very difficult

16   to achieve these.

17         MR. MCKANE:  And turning away from the generation

18   metrics, could you describe for the court with that the

19   Luminant O&M and SG&A metrics are?

20         MR. MCFARLAND:  Operation and Maintenance, Sales

21   General & Administrative. These are our operating costs.

22   It's a measure of the expenses related to our business. All

23   of our expenses related to our business that are not

24   capitalized. It includes everything that's non-fuel and

25   non-capex, essentially. So, that includes any of the

1    routine repairs, improvements, salaries, wages, benefits,

2    sales and marketing expenses associated with our Luminant

3    Energy, which is our wholesale marketing and trading, IT

4    cost, property taxes. I think that's a fairly exhaustive

5    list.

6            MR. MCKANE:  And, sir, can you describe how you

7    arrived at the threshold based on the superior metrics that

8    are identified on Slide 7 of the demonstrative?

9            MR. MCFARLAND:  Sure. Same as the other metrics.

10   We take a look at both our historical averages as well as--

11   or year over year averages, I should say, adjusting for

12   known factors; compare ourselves versus the industry, which

13   is difficult because coal plants are variable, nuclear

14   plants--and this is an aggregation of those. And we make an

15   adjustment.

16           MR. MCKANE:  Let me ask you this. Can you turn to

17   Page 8?

18           MR. MCFARLAND:  I can.

19           MR. MCKANE:  And, sir, do you recognize the

20   picture that's contained on Page 8 of the slides?

21           MR. MCFARLAND:  Sure.

22           MR. MCKANE:  Can you describe for the court what

23   that is and how that fits into the cost vision?

24           MR. MCFARLAND:  Yeah, when we set targets and I'm

25   going to describe this in just a second--we're always

1    trying to bend the cost curve, which is stable O inflation,

2    while adjusting for known changes year over year. And one

3    of the ways that we do this is, as I said before, it's not

4    as easy to take an EBITDA or a cost metric and drive it all

5    the way down to the 4,300 employees that we have. How do

6    you make a difference? And this is essentially on the glove

7    box of a truck in one of our mines. It shows the hourly

8    rates associated with different pieces of equipment. The

9    reason why is because if it sits idle, it's costing us

10   money and not producing BTUs in this case because it's in

11   the mine.

12          The same concept is true--which is, this is how

13   you drive this all the way down to the frontline in order

14   to attain the cost savings. It's just an example.

15          MR. MCKANE:  Yeah. Well, can you speak more

16   generally, sir, of what the risk factors are for Luminant

17   in terms of its ability to meet its O&M and SG&A goals?

18          MR. MCFARLAND:  Sure. Any changes in operations--

19   if we had a significant equipment either malfunction or

20   catastrophic event at one of our units that would put a

21   piece of equipment out, we would then--while that may be

22   covered by capex, a lot of times it's covered by O&M, okay?

23   And so, we would have to make the replacement. We would

24   have down time, we would have increased costs associated

25   with performing those types of activities. There's a number

1   of factors like that, that it just changes--there's

2   variables that change on a day to day basis. And, you know,

3   we try to adapt to those but sometimes they are just

4   unforeseen.

5           The other thing is that we have outages, and

6   during outages, while a lot of the dollars are capitalized

7   when we go in and do work, some of it is not. And sometimes

8   that can have the impact of increasing costs as well.

9           MR. MCKANE:  Sir, earlier in your testimony you

10  mentioned the cost curve and your efforts to bend the cost

11  curve. Can you describe what that means?

12          MR. MCFARLAND:  I can. If you turn to Page 9--

13  this is a little bit of this historical analysis that we

14  look at. What you have is O&M and SG&A broken down into

15  different years and in different components as you go

16  through time from 2011 to the current year with an estimate

17  for the current year of these pieces.

18          MR. MCKANE:  Sir, can you describe for the court

19  what the dotted black and the dotted, let's call it, gold

20  lines are and how that--what that is?

21          MR. MCFARLAND:  Sure. So, if you look at each of

22  these lines, the gold line is a 2-1/2 percent growth rate

23  off of 2011. So, if you started in 2011 with 905 and you

24  increased it 2-1/2 percent to 2012, then increased it

25  another 2-1/2 percent to 13, and once again to 14, you

1    would end up with $982 million worth of O&M expenses, all

2    else being equal, okay--with all else not exactly being

3    equal, as I mentioned, as year over year it changes. And if

4    you did the same at 3-1/2 percent you'd be at a billion

5    dollars of O&M.

6              MR. MCKANE:  So, in other words, sir, if you were

7    to extend out--you'd basically extrapolate that compound

8    annual growth rate from where you were in 2011, that's the

9    figures, the 1009 and 982, that's reflected in the upper

10   right hand corner?

11             MR. MCFARLAND:  That's correct.

12             MR. MCKANE:  Okay, and this phrase, "bend the

13   cost curve"--how does that fit in with the line you just

14   discussed?

15             MR. MCFARLAND:  Each year we're under cost

16   pressures, which is the cost curve--it's the increasing

17   costs associated with... Whether it be--in this green bar

18   on O&M, which is base project and outage work--that's

19   contractors, that's materials and supplies, that's

20   sometimes concrete, steel, components, things of that

21   nature that typically rise in the industry 2-1/2 to 3-1/2

22   percent. The same is true with labor at the top. We have

23   labor, we have labor agreements. Those agreements--typical,

24   without getting into what's in our labor agreements, have

25   cost inflators in there associated with the cost of living

1      increases, so basically, wage increases. Those are typical

2      type numbers.

3              And so, what we focus on is how can we do,

4      essentially, more with less from a dollar standpoint? So,

5      therefore, you're optimizing your cost structure.

6              MR. MCKANE:  Sir, you mentioned, this is a

7      historical analysis. How do you account for additional

8      costs that you incur in one year versus another year for

9      varying conditions?

10             MR. MCFARLAND:  Right. Well, if you look, I mean,

11     one example is the consumables line, which is the gold bar

12     in each of the years. It goes 52, 56, 57, 63. It actually

13     in preliminary views goes up even more next year. And so,

14     what are consumables? Consumables are items like limestone,

15     activated carbon. They're used in the environmental

16     controls. And as we get new environmental regulations--so,

17     we'll have environmental regulations that we started

18     adjusting for in 2014 that we didn't have in 2011, most

19     notably the new Mercury Rule, which goes into effect in the

20     spring of 2015. We're starting to do all of our testing,

21     and so we're having to spend more on consumables, have to

22     spend more on O&M associated with those activities.

23             MR. MCKANE:  And, sir, based on where you stand

24     right now, looking at the O&M and SG&A targets for

25     threshold based on its superior, do you have a view as to

1    whether they're going to be achievable for 2014?

2              MR. MCFARLAND:  Again, it's the same...

3              MR. MCKANE:  Same view?

4              MR. MCFARLAND:  Same view. Which is, we're going

5    to try our best but there's risks associated with all of

6    these.

7              MR. MCKANE:  Right. And, sir, this notion of

8    doing more with less, are you able to perpetually bend the

9    cost curve?

10             MR. MCFARLAND:  Not on all items. So, you're

11   working on some, knowing that you're going to have to

12   have... You have to have wage increases when you work in a

13   competitive environment for wages, all the way up and down.

14             MR. MCKANE:  Sir, let's turn to the Luminant

15   capex metric. Can you explain what are the types of capital

16   expenditures you undertake at Luminant?

17             MR. MCFARLAND:  Sure. Our capital expenditures

18   are investments in long-lived assets. So, whether it be

19   replacement of plant equipment, investments in new plant

20   computers, or new mines--as we open up a new mine. People

21   often think of a mine as you make an investment in the mine

22   and then everything becomes operating expense. We actually

23   open up a portion of a mine in five years and then expand

24   it every five years. And when you do that, you need new

25   capital for new haulers, dozers, new roads, new facilities,

1    etc. So, it's those types of investments--big investments

2    that you get to use over a longer period of time.

3              MR. MCKANE:  And, sir is there any connection at

4    all between your outage season and your capital

5    expenditures?

6              MR. MCFARLAND:  Typically, just like we make most

7    of our profits in the summertime, we spend most of our

8    money in the shoulders. And the shoulders we describe as

9    late March through May, and then this time of year through

10   November. Because electricity demand is down, and so those

11   are the lower-priced hours, as Jim described earlier. And

12   so, our units aren't as profitable, so that's when you

13   would--obviously, if you had to take a unit down for

14   maintenance, you would do the maintenance in those periods.

15             So, this year we have a little over 300 planned

16   outage days, which means across the fleet if you took each

17   unit, there's 300 days that a particular unit would be out.

18   We've completed about 175 of those, we have about 125 of

19   those left for the fall. And so, the capital coincides with

20   those periods because that's the period by which you're

21   making the investments. It's a little bit in front of that

22   because you spend money in preparation to get there, but

23   you spend the bulk of the dollars in the spring and the

24   fall.

25             MR. MCKANE:  And so what are the risk factors

1    that you're facing that may impact your ability to meet the

2    capital expenditure goals of threshold baseline superior?

3            MR. MCFARLAND:  Sure. When you go into an outage,

4    you have a lot of planned activities that you're going to

5    do. But also, when you go into an outage, one of the things

6    that you get is you get what we call discovery work. You

7    learn that something is broken or needs repair that you

8    didn't know of beforehand. So, it's been discovered during

9    the outage and it increases your capital costs, extends

10   your outage period potentially if it's on the critical

11   path--you can make it longer, for example. And so, it's if

12   we were to have to spend more money to adjust for something

13   that we didn't know and discovered--or discovered that we

14   should replace it because the probability that it might

15   fail before we get to the next outage was likely, we should

16   go ahead and put a new one in service.

17           MR. MCKANE:  Yeah. Well, sir, can you discuss how

18   the threshold level for Luminant capital expenditures for

19   2014 compares to prior years' capex targets?

20           MR. MCFARLAND:  It's on Slide 11. (indiscernible)

21   whether it's threshold baseline and superior, we've taken

22   down our capital expenditures. We've looked to optimize

23   capital expenditures across our fleet. And, in fact, we've

24   changed the metric on this for the insiders because--for

25   the EAIP program--because we have done some things that

1    have significantly reduced our capex during the year that

2    are not being taken credit for. The non-insiders have those

3    on their scorecard, but we've reduced by over $80 million

4    on this scorecard. And the reason being is that we've been

5    going through an effort to optimize cash flow, so we're

6    looking at where does the capex make most sense? And so,

7    we've deferred some mine development, and we've also

8    deferred some projects and outages. But those have been

9    adjusted for in these numbers.

10            MR. MCKANE:  And, sir, just if you could, the

11   deferrals that you're discussing, were those factored in in

12   the fall--in the midyear adjustment that was made for 2014?

13            MR. MCFARLAND:  They were. There was an $80

14   million--I believe is the number--adjustment to this

15   metric.

16            MR. MCKANE:  All right. And, sir, can you discuss

17   the coal fuel cost metric that Luminant has?

18            MR. MCFARLAND:  Yeah. Again, this is the blended

19   average dollar per MMBTU, so it's what is our variable cost

20   of fuel across the fleet? Just the coal fleet. It doesn't

21   include the nuclear. And it is a blend of the 30 million

22   tons that we--the 31 million tons that we plan to mine and

23   the, approximately, 10 million tons of Powder River Basin

24   coal that we're importing from Wyoming. That 40 million

25   tons blended together.

1           MR. MCKANE:  Can you discuss--or describe for the

2    court how you maximize... Let me say that again. Can you

3    describe for the court how you minimize the cost associated

4    with the fact that you're mining 30 million tons but you

5    also need to purchase, approximately, 10 million tons?

6           MR. MCFARLAND:  Sure. The first thing we do is

7    when we open a mine, we're always comparing is it a least

8    cost alternative versus importing coal from the Powder

9    River Basin? If we can mine it cheaper ourselves, we'll

10   mine it. And then once we've made that investment, it's

11   always a lower production cost because we've bought the

12   facilities, we've bought the haulers, the dozers, the

13   draglines, etc. So, we're trying to get as much coal on

14   production as we can running a 24x7 operation, but at the

15   least cost out of our mines. And then if that is not a

16   sufficient amount of coal, we then import coal from the

17   Powder River Basin.

18           MR. MCKANE:  Okay. And, sir, what are some of the

19   risk factors that you're currently facing in terms of your

20   ability to achieve this coal fuel cost metric?

21           MR. MCFARLAND:  Well, as I mentioned--so, there's

22   two things. The Powder River Basin coal--when you order

23   that coal and you say you want 8400 heat content, you get

24   8400 heat content. It has to meet the spec. There's the

25   commodity cost associated with Powder River Basin coal,

1    there's also the transport, which is the rail cost, and

2    then the rail also has a fuel adder. So, four or five years

3    ago they started saying, "With gasoline and diesel prices

4    going up, we're going to make you pay a per mile diesel

5    cost." And so, we have to manage those three aspects of the

6    Powder River Basin coal.

7            With respect to our own coal, we have to manage,

8    obviously, the personnel, the equipment, and then just

9    mining in general. And mining is not as much of an exact

10   science as one may want it to be. The coal is variable, and

11   each deposit's variable. Weather. Weather affects Jim in

12   different ways--but if it rains a lot, for us it slows down

13   our production because we have open mines that we have to

14   get the water out.

15           The biggest challenge that we're going through

16   right now is that we just opened a new mine at our Martin

17   Lake plant called Liberty, which is the second bullet from

18   the bottom. It's a new mine, it's a new deposit, it'll be

19   good for us in the long run but we just opened it in July,

20   put a few draglines in it, and we've come in contact...

21   Well, we've discovered that groundwater is getting into our

22   pits and causing production problems. And in order to hit

23   our production goals for the year, we have to get a million

24   tons out of there and that's a challenge right now.

25           MR. MCKANE:  And, sir, if you're unable to meet

1    that million ton production goal, what impact would that

2    have on your costs?

3              MR. MCFARLAND:  It will drive our costs up

4    because we will end up either not being able--it would do

5    one of two things: It will drive our costs up because we

6    won't run our coal plants as much and so, therefore, just

7    the ratio of PRB will go up--or we'll backfill that coal

8    with PRB, which means our costs are going to go up. Because

9    PRB costs are more like 2.50 (indiscernible) relative to

10   our dollars, and that's when you get the $1.68 average, if

11   you will. It'll drive our costs the wrong way--it'll drive

12   them to higher, which means further down the threshold

13   direction.

14             MR. MCKANE:  And, sir based on where you stand

15   right now, given the risk factors that you're facing, do

16   you have a view of whether you will be able to achieve the

17   threshold based on our superior metrics?

18             MR. MCFARLAND:  I think we're going to be

19   challenged depending upon how Liberty comes out. Depending

20   upon how weather... If we can get the water depression

21   around that mine to work, we have a good chance--but if

22   not, it's going to be a challenge.

23             MR. MCKANE:  And, sir, finally, could you speak

24   to the Luminant management EBITDA target that you have?

25             MR. MCFARLAND:  I can. So, management EBITDA, we

1    talked about it as the overall cash profitability of the

2    business. It's our revenues less our fuel cost and our

3    operating expenses. It does not include capital

4    expenditures.

5             MR. MCKANE:  And, sir, can you describe how you

6    arrived at the threshold baseline superior metrics--for the

7    Luminant management EBITDA metrics?

8             MR. MCFARLAND:  Sure. We take all those other six

9    that were below it, and that's why this is held for the

10   last--we take those other six components, we aggregate that

11   up--not the capex, but the five of the other six, and we

12   put it into our models, we look at where we think that if

13   we were to fire on all cylinders, we could be; compare

14   that, again, versus industry, versus year over year, and

15   then define the risks associated with achieving that

16   target. But this one has a different component than those

17   other ones, which is this has the revenue risk embedded in

18   it.

19            MR. MCKANE:  And can you discuss what the revenue

20   risk is, sir?

21            MR. MCFARLAND:  The revenue risk associated with

22   the wholesale business is--and it's been different year

23   over year because we used to have a hedging program and now

24   that hedging program has essentially terminated or rolled

25   off. So, we used to have--sold natural gas board, which

1    sets the power price in Texas. So, that's an effective way

2    to hedge your revenues, if you will. But we are exposed to

3    the power price in Texas. Our Luminant Energy group, which

4    manages the commodity supply for Jim Burke and TXU Energy--

5    so, supplying him what he sells to his customers, also

6    sells the supply from our power plants. They do that

7    forward, they also buy in the spot market, they're active

8    in the markets and they try to get the best price they can.

9    But as power prices go up or down, depending upon the price

10   of gas in Texas, we either make more money or lose more

11   money depending upon how we asset managed and where the

12   power prices go.

13             MR. MCKANE:  And, sir, how does the Luminant

14   management EBITDA target for 2004 at the threshold level

15   compare to some of the historical results you've had in the

16   past few years?

17             MR. MCFARLAND:  Versus historical results?

18             MR. MCKANE:  Yes, sir.

19             MR. MCFARLAND:  Let me just get to the redacted--

20   unredacted...

21             MR. MCKANE:  I apologize. To do that,

22   sir...maybe...

23             THE COURT:  Tab 3.

24             MR. MCKANE:  Can we go to Tab 3?

25             MR. MCFARLAND:  Of what?

```
 1            MR. MCKANE:  Of the unredacted exhibits?

 2            THE COURT:  Let's be mindful of our limitations

 3    here.

 4            MR. MCKANE:  Yeah, exactly, sir. Let me say it

 5    this way...

 6            THE COURT:  You know, can I make a suggestion?

 7    Which is if you go to Mr. Penacio's Exhibit B...

 8            MR. MCKANE:  Sure.

 9            THE COURT:  The unredacted version, so you can

10    look at that and it has Luminant EBITDA there.

11            MR. MCKANE:  Why don't we do that, sir? That's

12    Exhibit 26 of the unredacted binder. Tab 26.

13            THE COURT:  Okay.

14            MR. MCKANE:  And, so, the first page of Tab 26,

15    sir, it says "Luminant Scorecard Actuals Versus Current

16    Performance Matrix." Is that the page you're referring to?

17            MR. MCFARLAND:  That's the one I suggested to

18    answer the question with, yes.

19            MR. MCKANE:  So, without saying these figures out

20    loud, do you see the 2009-2013 actuals for Luminant

21    management EBITDA?

22            MR. MCFARLAND:  I do. So, if I could, I would

23    look at the threshold, which would be under the 2014

24    asterisk threshold.

25            THE COURT:  Got it.
```

1

2          MR. MCFARLAND:  With that number. And then to

3    answer your question, if you look back versus 2013 actual,

4    2012 actual, 2011 actual, it is lower than those actual

5    numbers.

6          MR. MCKANE:  And, sir, can you explain why the

7    EBITDA target at the threshold level of 2013 is lower than

8    the years... Let me try it again. Can you explain why the

9    EBITDA management threshold level for 2014 is lower than

10   2013, '12, and '11?

11         MR. MCFARLAND:  Yes. It's because in 2008 we put

12   a hedging program in place to hedge our revenues. That

13   program existed at essentially 100 percent of our natural

14   gas exposure through 2012. It then dropped to about 50

15   percent in 2013, hedging our revenues, and then dropped to

16   around 20 percent in 2014. And the value of those hedges

17   has substantially declined over time. And as they decline,

18   there's no way for us to replicate those hedges. And so,

19   it's just a matter of--we don't have those positions that

20   we can replicate any longer.

21         MR. MCKANE:  And, sir, I understand these are

22   public numbers. Can you describe the value of the hedges at

23   a high level per year from 2012 to 2013, to 2014?

24         MR. MCFARLAND:  Sure. And I'm going to round

25   these to the billions but these are in the Ks. In 2012, our

1    hedge program settled for $1.8 billion. Okay? And in 2013,

2    it settled for a billion dollars. It was 996 million--so,

3    essentially a billion dollars. In 2014, it's 462 million.

4    So, we went 1.8, 1.0, .46 in billions of dollars for each

5    of those different years. And so, because of that--because

6    we don't have that value, obviously we're not going to

7    generate as much profitability. Because natural gas... When

8    we put those hedges on, natural gas prices were at $7. So,

9    we effectively sold gas for $7. Natural gas prices are now

10   $4. And so, there's no way to get that value back.

11            And so, if you compared Luminant EBITDA in 2014

12   versus 2012, for example, we had 1.8 of hedges in 2014 and

13   let's call it a half a billion of hedges in 2014. Excuse

14   me--2012, 1.8; 2014, .5. You would have to take our actual

15   in 2012--and I can't repeat the number, but if you took the

16   actual in 2012, and you'd have to take it down by $1.3

17   billion... To put it on an apples by apples...

18            THE COURT:  I got it.

19            MR. MCFARLAND:  Apples to apples comparison.

20            MR. MCKANE:  Thank you, sir. Appreciate it. Now,

21   sir, when you were mentioning the value of the hedge

22   program in 2014, you said that it was $462 million.

23            MR. MCFARLAND:  I did.

24            MR. MCKANE:  And, sir, can you explain--that's a

25   pretty precise number--can you explain did the filing of

1    bankruptcy have any impact on the hedging program?

2            MR. MCFARLAND:  Typically, our hedges run, not

3    exactly, but they typically run--say, like, power prices,

4    where you've got a little more in the summertime and a

5    little less in the shoulders, but they're across a calendar

6    year. When we filed for bankruptcy, because of the nature

7    of the contracts and because people had exposure, they

8    terminated those contracts shortly after the filing on

9    April 29th.

10           MR. MCKANE:  So, when they terminated the

11   contract, what impact did that have in the first half of

12   the year EBITDA?

13           MR. MCFARLAND:  So, it basically settled all $462

14   million of that EBITDA in--I don't remember if we took it

15   in April or May, but it doesn't matter--it was in the first

16   half of the year.

17           MR. MCKANE:  And, sir, is that reflected in the

18   10Q for ESCH?

19           MR. MCFARLAND:  Yes, it is. It's in the June 30th

20   10Q.

21           MR. MCKANE:  Thank you, sir. And, sir, have you

22   had an opportunity to review the declaration in the

23   exhibits of Mr. Penacio?

24           MR. MCFARLAND:  I have.

25           MR. MCKANE:  And, sir, are you aware that as part

1    of the page you're looking at right, now, Mr. Penacio, in

2    addition to performing a five-year average also tried to

3    forecast what day of the year--what the full year

4    projection would be for 2014 based on the first half of the

5    year?

6              MR. MCFARLAND:  I'm aware of that analysis.

7              MR. MCKANE:  And, sir, do you agree with that

8    analysis--this multiplying the half year by two?

9              MR. MCFARLAND:  I do not.

10             MR. MCKANE:  Why not?

11             MR. MCFARLAND:  If I could... So I can speak the

12   actual numbers?

13             MR. MCKANE:  Sure.

14             MR. MCFARLAND:  If we could turn to--it's in the

15   same 26 as Mr. Penacio's. It's just the business services

16   scorecard, the last piece of paper.

17             MR. MCKANE:  All right. So, to assume your

18   testimony, you're asking to turn to Page 3 of Exhibit 26?

19             MR. MCFARLAND:  Yes, sir.

20             MR. MCKANE:  All right, sir, and you're going to

21   use the business services scorecard--so you'll use real

22   numbers?

23             MR. MCFARLAND:  If that's all right.

24             MR. MCKANE:  Please.

25             MR. MCFARLAND:  So, what I just said is that we

1    settled $462 million worth of hedges in the first half of

2    the year. If you look at this exhibit where it says

3    "Midyear June Year to Date" which is the third column from

4    the far right...

5             THE COURT:  Yeah.

6             MR. MCFARLAND:  ...and you look at the first

7    line, which is "Total Competitive EBITDA"--so, it's across

8    CXU and Luminant.

9             MR. MCKANE:  Across your business and Mr. Burke's

10   business.

11            MR. MCFARLAND:  Across the businesses. It says

12   1,215 million, so $1.215 billion of competitive EBITDA for

13   the year. And Mr. Penacio's methodology multiplies that by

14   two to get to 2430 and then compares that back against the

15   scorecard metrics several columns beforehand and says that

16   it exceeds superior. The issue and the reason why I do not

17   agree with his declaration and methodology is that that

18   2430 has double-counted $462 million.

19            MR. MCKANE:  And, sir, can you walk us through

20   why that is? Performance (indiscernible) million dollars is

21   the end of the hedge program?

22            MR. MCFARLAND:  Yes, and it's in the 1215. So,

23   when you've multiplied 1215 by 2, you've effectively

24   multiplied that 462 by 2. So, if you adjusted for that, the

25   2430 you would take down to 1970, give or take. Move 460

1    off of that. And at that 1970 level, rather than his

2    analysis--Mr. Penacio's analysis that it exceeds superior,

3    it would actually be below threshold.

4              MR. MCKANE:  And, sir, perhaps this is obvious

5    but the hedges rolling off, is that a one-time event or is

6    that something that could reoccur?

7              MR. MCFARLAND:  No, when the hedges rolled off,

8    again, there was no way to replace them and to replace that

9    value in the second half of the year.

10             MR. MCKANE:  And, sir, let's just step back from

11   that one issue more generally. Do you agree with the

12   proposition that you could double the results of half a

13   year to be able to forecast what the results would be for

14   the full year?

15             MR. MCFARLAND:  I do not.

16             MR. MCKANE:  And can you explain generally what

17   are the issues as it relates to the Luminant business with

18   that type of forecasting?

19             MR. MCFARLAND:  We have fairly significant

20   seasonability in our business. Jim described differences in

21   his business. I think that if you look at our businesses,

22   we have outages in the spring and the fall, we have higher

23   power prices in the summertime, we have different capital

24   expenditures, you have different mine plans across... So,

25   I'm trying to cover each of my metrics, but each of the

1    metrics at Luminant, I should say--and each of those

2    metrics, you can't just multiply by two. You can start

3    there perhaps, but you need to adjust for different factors

4    that occur at different points in time across the year.

5             MR. MCKANE:  And, sir, one (indiscernible) thing-

6    -you know, I'd ask you to speak to the overall risk factors

7    that you have to deal with at the Luminant business, given

8    the breadth of the businesses that you have.

9             MR. MCFARLAND:  Yeah, the way that I would say

10   with the risk factors--and I know there was discussion

11   earlier about Mr. Evans' testimony with the list of risk

12   factors--I think those are good categories, and I think

13   those factors exist in general all the time. But they

14   change on a year basis, they change on a seasonal basis,

15   they, in fact, sometimes change on a daily basis depending

16   upon the issues that we are confronting. Obviously, that's

17   what we're here to perform and to adjust for. But if you

18   look at our scorecard for the balance of the year, we've

19   got to pull off 125 days of outage, we've got to pull off a

20   nuclear outage on schedule, we've got to hit top quartile

21   performance in order to hit the numbers. We've got to

22   continue to get that mine up into production. That's only

23   one mine. We've still got to mine a total of 31 million

24   tons for the year, and a number of factors. We've got to

25   manage the capex associated with these outages and our

1   operating expenses.

2           MR. MCKANE:  And, sir, based on all of those risk

3   factors, do you have a view as to whether you will

4   definitively achieve the threshold baseline and superior

5   metrics that are in your scorecard?

6           MR. MCFARLAND:  I think we'll strive to attain

7   them but I do not think that we would definitively

8   achieve... I wouldn't describe anything as definitively

9   achieve. There's uncertainty associated with the outcomes

10  and we're going to try to manage through those

11  uncertainties.

12          MR. MCKANE:  And, sir, you included one final

13  demonstrative. On Page 14 of your demonstratives--can you

14  explain what you wanted to articulate to the court related

15  to Luminant operations?

16          MR. MCFARLAND:  Sure. It's just a clause--several

17  of our power plants and mines, as well as our operating

18  centers--just to provide some perspective of the size of

19  our operations, the 4,300 employees, and the day-to-day

20  risk factors that you talk about. You can see some of the

21  different size of the equipment and some of the power

22  plants that we're proud to operate.

23          MR. MCKANE:  We have no further questions for Mr.

24  McFarland at this time.

25          MR. SCHEPACARTER:  Just take a moment, Your

1  Honor.

2          THE COURT:  Take your time.

3          MR. SCHEPACARTER:  I think I need (indiscernible)

4  to help me just get this (indiscernible)... Good afternoon,

5  Mr. McFarland.

6          MR. MCFARLAND:  Good afternoon.

7          MR. SCHEPACARTER:  I just want to go over a

8  couple things on your testimony.

9          MR. MCFARLAND:  Sure.

10          MR. SCHEPACARTER:  And I think you testified as

11  to--in working on developing the metrics and the various

12  targets, that you relied upon historical data. Is that

13  correct?

14          MR. MCFARLAND:  It is one of the factors, one of

15  the datasets that we look at.

16          MR. SCHEPACARTER:  Okay. And I think you

17  testified that past performance was also something else

18  that you worked on--that you looked at that was important?

19          MR. MCFARLAND:  Yes, it's another one of the

20  factors.

21          MR. SCHEPACARTER:  Okay. And when you look at

22  past performance, how far back to you go?

23          MR. MCFARLAND:  Two, three, four years. It

24  depends on the metric and it depends on the issue. Because,

25  as I said, you have to adjust for different factors. And so

1    sometimes if you were to go too far back, you would not be

2    comparing apples to apples.

3              MR. SCHEPACARTER:  Okay, understood. Now, you

4    also talked about there's different risks that can be

5    unanticipated for the upcoming year, such as catastrophic

6    events and things of that nature, correct?

7              MR. MCFARLAND:  That's correct.

8              MR. SCHEPACARTER:  Okay, and weren't there such

9    catastrophic events or outages or unanticipated events that

10   took place in the three or four years prior to 2014?

11             MR. MCFARLAND:  There are events each year. We

12   have outages each year, yes.

13             MR. SCHEPACARTER:  So, those outages and all

14   those unanticipated events are factored into the actual

15   numbers, correct? I mean, they happen so that...

16             MR. MCFARLAND:  Yes and no. If I may--you have a

17   history of what happened but when you ratchet up... For

18   example, I mentioned taking the summer availability up from

19   92.6 to 93.8, when you do that you're essentially taking

20   out the opportunity to have unanticipated events because

21   you're increasing the availability. And so, while you might

22   be able to say that you've had events in the past that you

23   should plan for, you can't plan for them all. And then when

24   you take the measurements up, it becomes even--there's less

25   room for any of that.

1                MR. SCHEPACARTER:  With respect to the metrics,

2       you indicated that--or you testified that the metrics had

3       been adjusted midyear?

4                MR. MCFARLAND:  I did.

5                MR. SCHEPACARTER:  Okay. And what was the reason

6       for that?

7                MR. MCFARLAND:  The reason was--and if I repeat

8       myself, I apologize--we had a system by which we put

9       metrics in place for a full year basis. We were given

10      advice that in order to meet a standard, what we needed to

11      do was take that same process for a 12-month scorecard and

12      make it, essentially, a 6-month scorecard.

13               MR. SCHEPACARTER:  Okay. And when you say advice,

14      that was advice from...?

15               MR. MCFARLAND:  Kirkland & Ellis and our experts.

16               MR. SCHEPACARTER:  All right, understood. When

17      you say experts, would that include Filsinger Energy

18      Partners?

19               MR. MCFARLAND:  Yes, Filsinger Energy Partners

20      reviewed our scorecards. They did as well back in the fall

21      to look at where were we versus industry and attesting to

22      or looking at and examining whether or not we had a

23      competitive scorecard.

24               MR. SCHEPACARTER:  Okay. What about Towers

25      Watson?

1            MR. MCFARLAND:  I don't interact with Towers.

2            MR. SCHEPACARTER:  Okay. That's fine. You

3    indicated that there's a metric--and I guess it's subsumed

4    somehow into the plan with regard to, I guess it's called

5    the Personal Safety Index Metric?

6            MR. MCFARLAND:  Yes.

7            MR. SCHEPACARTER:  Okay. And that's based upon

8    safety at the plants, correct?

9            MR. MCFARLAND:  That's correct.

10           MR. SCHEPACARTER:  Okay. And these companies,

11   your plants and your nuclear plants, are regulated by

12   various entities, the Mine Safety Health...?

13           MR. MCFARLAND:  Yeah, we have--

14           MR. SCHEPACARTER:  OCEA and the like, correct?

15           MR. MCFARLAND:  Yes.

16           MR. SCHEPACARTER:  All right. And isn't there a

17   very great incentive to maintain safety other than with

18   respect to a metric that's developed? I mean, isn't there

19   an overriding goal to--as you indicated, everybody goes

20   home type thing--I mean, isn't that sort of a driving mode?

21           MR. MCFARLAND:  Yeah. Our goal is, again, safety

22   zero, which is that there's zero accidents. And so, we

23   start with that premise. I mean, if you were to attend a

24   Luminant meeting, we typically start with safety briefings

25   and our goal is always zero. Zero incidents, zero

1    recordable OCEAs. But it's more than that, it goes past

2    that, which is that we want people to go home the same way

3    they came to work.

4              MR. SCHEPACARTER:  Right.

5              MR. MCFARLAND:  In other words--or better. In

6    other words, that they're healthy. And sometimes, you know,

7    often times it's asked us to--well, then what about cost

8    metrics? But we put safety first. Always will put safety

9    first. And then our operational and financial metrics.

10             MR. SCHEPACARTER:  Okay. You testified as to a

11   difference between lignite coal and the Powder River Basin

12   coal, correct?

13             MR. MCFARLAND:  Right.

14             MR. SCHEPACARTER:  Okay. And you indicated that,

15   I think, one type of coal from Wyoming has a higher heat

16   index than the lignite coal that's mined in Texas, correct?

17             MR. MCFARLAND:  That's correct.

18             MR. SCHEPACARTER:  Okay. And the cost of burning

19   the lignite, is that even more expensive or less expensive

20   than the other type of coal?

21             MR. MCFARLAND:  Yeah, well, the answer is it

22   depends on the mine that you're opening, to be specific

23   about it. In other words, once you've made the investment

24   in the mine, the variable cost of lignite will always be

25   the importer cost because you've already essentially sunk

1    the dollars. But when we look at opening a new mine, we

2    look at the total cash cost of opening a new mine versus

3    the total cash cost of importing PRB, and we look for the

4    least cost alternative. But once you've sunk the dollars

5    into a mine, you have the assets, you have the employees,

6    you have the facilities, and then it's just the variable

7    operating expenses with mining the lignite.

8              And so, therefore, when you look at it on a

9    dollar (indiscernible) BTU on an expense basis for the

10   metric that we have, lignite will be cheaper. And that's

11   why when we have to import more PRB or have a higher blend

12   because we're not getting as much production out of our

13   mines, that hurts us in trying to achieve that metric

14   because we're having to use higher variable cost coal.

15             MR. SCHEPACARTER:  And aren't there other costs

16   associated with using the different types of coal, such as-

17   -when you burn it there's a sulfur dioxide that's put into

18   the air and there's a scrubbing process to the lake? Isn't

19   there a cost associated with that?

20             MR. MCFARLAND:  There is a cost associated with

21   that. That's part of the factors when we look at the total

22   cash cost difference, which is, when you burn PRB, which is

23   a lower-sulfur coal than lignite, you don't have to have as

24   many controls, so you don't have as much variable

25   consumables as you do with lignite. But we factor that into

1    the total cash costs associated with lignite when we do our

2    apples-to-apples comparisons.

3                MR. SCHEPACARTER:  And with respect to--I think

4    you testified that with respect to the industry average on

5    various metrics that you were, like, 3-5 percent ahead of

6    the industry average, correct?

7                MR. MCFARLAND:  Yes.

8                MR. SCHEPACARTER:  Okay. And isn't that factored

9    into the threshold, the baseline, and the superior targets?

10               MR. MCFARLAND:  Our ability to try to be 3-5

11   percent above industry average? Yes. I mean, that's what it

12   would take to hit the baseline, in that case, above the

13   industry average. Is it factored into there? No. Because

14   the industry average that is used there uses all the

15   different types of coal. So, there's eastern coal, there's

16   Wyoming coal, there's several different types of coal, but

17   then there's Texas coal. When you look at a coal plant,

18   coal plant data doesn't segregate into that. So, we're

19   looking at an average across all those different types of

20   plants, and that's where we beat that average.

21               The point that I was making is that it's more

22   difficult to meet that average with a lower-quality coal

23   because of the abrasiveness of the sand, because of the

24   different characteristics of it.

25               MR. SCHEPACARTER:  I want to turn your attention

1   to--you had testified quite a bit on Exhibit 26, which is

2   the Penacio chart?

3           MR. MCFARLAND:  Yes, sir.

4           MR. SCHEPACARTER:  Okay. And without going into

5   any of the numbers, at least on the top line...

6           MR. MCFARLAND:  Yes, sir?

7           MR. SCHEPACARTER:  ...if you kind of did the

8   math--if you compared the average, which is the top line

9   the sixth number from the left--do you see that?

10          MR. MCFARLAND:  I do.

11          MR. SCHEPACARTER:  Okay. And if you compare that,

12  versus the threshold, there's quite a bit of difference,

13  correct?

14          MR. MCFARLAND:  On this chart there's quite a bit

15  of difference, yes.

16          MR. SCHEPACARTER:  Okay. And the difference is

17  that the average is much higher than the threshold amount?

18          MR. MCFARLAND:  The average here is much higher

19  than the threshold amount as stated in that column, yes.

20          MR. SCHEPACARTER:  Okay. And the actual year to

21  date number, that number there is accurate, correct?

22          MR. MCFARLAND:  Yes.

23          MR. SCHEPACARTER:  Okay.

24          MR. MCFARLAND:  All these numbers feed into the

25  third page in this, which is the total competitive EBITDA.

1   We're not talking specifically about these because we don't

2   separate it into the two businesses, but the threshold that

3   you just described--our threshold is below the average,

4   okay? And I see the average, which is in the sixth column--

5   versus our threshold which is in the seventh number column.

6   And then you have this negative threshold versus average in

7   the ninth, tenth--eleventh column?

8              MR. SCHEPACARTER:   Correct.

9              MR. MCFARLAND:   That is the issue that I was

10  describing before associated with--the prior years have the

11  corporate natural gas hedge program at a billion-8 per

12  year. And in 2014 it only has $462 million. So it hasn't

13  been adjusted for an apples-to-apples basis.

14             MR. SCHEPACARTER:   Okay. When you say that, you

15  talk about the hedging, isn't it accurate to say that if I

16  pulled the monthly operating report, that the Luminant side

17  had a gain on its hedging for somewhere in the neighborhood

18  of half a billion dollars?

19             MR. MCFARLAND:   Yes. In 2014, we had a gain of

20  $462 million.

21             MR. SCHEPACARTER:   Okay.

22             MR. MCFARLAND:   The exception that I was taking

23  to this analysis is that the gain in 2013 was a billion, so

24  $500 million more; and the gain in 2012 was 1.8 billion, so

25  $1.3 billion more. And you can do that in 2011 and 2010,

1    and so it skews the five-year average to much higher. If

2    you were to normalize for those--and that's why I disagree

3    with this analysis.

4              MR. SCHEPACARTER:  If I look at the number, which

5    is the 2013 actual--there's a number there, correct?

6              MR. MCFARLAND:  Yes, sir.

7              MR. SCHEPACARTER:  And that number, even though

8    it's lower than the average, that number for last year is

9    still higher than the superior target, correct?

10             MR. MCFARLAND:  Yes. So, you're referring to the

11   midyear June year to date actual?

12             MR. SCHEPACARTER:  No, I'm actually referring to

13   the 2013 actual, that number.

14             MR. MCFARLAND:  Okay.

15             MR. SCHEPACARTER:  And you compare that to the

16   2014 superior target...

17             MR. MCFARLAND:  Correct.

18             MR. SCHEPACARTER:  There's a number there?

19             MR. MCFARLAND:  Yes.

20             MR. SCHEPACARTER:  And that superior target is

21   much lower than the 2013 actual.

22             MR. MCFARLAND:  Okay, so, just if I may--the

23   column, one, two, three, four--Column 5, you're comparing

24   that topline number--

25             MR. SCHEPACARTER:  Correct.

1            MR. MCFARLAND:  --which is column 9, top line

2    number? And the delta between those two is about $400

3    million. Correct? And the difference is that in 2013, we

4    had a billion dollar (indiscernible) hedges, and in 2014 we

5    only have 462, which is a half a billion dollars change.

6    So, if I was to add a half a billion dollars to the 2014

7    superior, it'd be well in excess of the 2016 actual.

8            MR. SCHEPACARTER:  Okay. I think your testimony

9    was it skews the average, correct?

10           MR. MCFARLAND:  My testimony was two or three-

11   fold, actually on the numbers. It was the year over year

12   comparisons, as well as the averages, as well as the year

13   to date. It skews those numbers.

14           MR. SCHEPACARTER:  And you read your--the motion

15   that was filed, correct? The motion that was filed that--

16           MR. MCFARLAND:  The motion seeking--in front of

17   the court (indiscernible).

18           MR. SCHEPACARTER:  Yes. And you read the U.S.

19   Trustee's objection, correct?

20           MR. MCFARLAND:  I did, yes.

21           MR. SCHEPACARTER:  And I'm also assuming that you

22   read the response that was filed in reply to the U.S.

23   Trustee's objection?  Correct?

24           MR. MCFARLANDE:  Yes, I did.

25           MR. SCHEPACARTER:  Okay.  Anywhere in there, is

1    there any indication of any of those--in any of those

2    pleadings talking about the hedging program and the--I

3    guess the decline in hedges and the decline in the ability

4    to account for the DS prices?

5              MR. MCFARLANDE:  It's--I don't recall

6    specifically, but we could take a look through them.  I do

7    know that the declaration supporting our motion from

8    Filsinger Energy Partners did have a discussion about the

9    hedge program in it, which is the energy expert talking

10   about the differences in the hedge program.

11             MR. SCHEPACARTER:  Okay.

12             MR. MCFARLANDE:  There's actually a chart that

13   shows the numbers that I just described.

14             MR. SCHEPACARTER:  Yeah.  All right.  Let me turn

15   your attention to some of the other numbers.  On the fourth

16   line down, you testified to the coal available June through

17   September.  That's the summer months.

18             MR. MCFARLANDE:  Yes, sir.

19             MR. SCHEPACARTER:  Okay.  And if you take those--

20   the average, which is, again, the sixth column, and you'll

21   see a number there--I think we can discuss that number.  I

22   don't think that's been redacted.

23             MR. MCFARLANDE:  Yeah, I--

24             THE COURT:  Which line item?

25             MR. SCHEPACARTER:  (indiscernible) line item for

1   (indiscernible) available generation for the summer months.

2   It's the fourth line down, and it's the sixth column over.

3           MR. MCFARLANDE:  I believe--yeah.

4           THE COURT:  It is not a redacted (indiscernible)

5   information.  So, yes, you may talk about real numbers.

6           MR. SCHEPACARTER:  Okay.  And you see the number

7   there, Mr. McFarlande?

8           THE COURT:  The only thing you have to worry

9   about is EBITDA and contribution margin.

10          MR. SCHEPACARTER:  Understood.  And with respect

11  to that number, it's 22.99, correct?

12          MR. MCFARLANDE:  Yes, that's the average.

13          MR. SCHEPACARTER:  And if you applied that number

14  somewhere between the threshold baseline and superior

15  targets, it would fall somewhere between baseline and

16  superior, correct?

17          MR. MCFARLANDE:  For 2014--if you're taking the

18  average of 12-13--

19          MR. SCHEPACARTER:  The average for--

20          MR. MCFARLANDE:  And comparing it to the 2014

21  baseline and superior, yes, sir, it would--that number,

22  22.99, falls between those two, yes, sir.

23          MR. SCHEPACARTER:  Okay.  And if I did the same

24  thing for the next line down, which is the--I think you

25  called them the shoulder months--

1              MR. MCFARLANDE:  Yes.

2              MR. SCHEPACARTER:  (indiscernible) available, if

3    I took that number, which is, again, the average, the

4    37.730, and plotted that somewhere among the targets, it

5    would actually exceed superior, correct?

6              MR. MCFARLANDE:  Yes, on this measurement system.

7              MR. SCHEPACARTER:  Okay.

8              MR. MCFARLANDE:  Just comparing numbers to

9    numbers.  But, again, I disagree with this analysis,

10   because it does not take into consideration factors such as

11   seasonality and changes year-over-year on how the plant's

12   run.  And I can provide a couple examples for those.  We

13   have, first and foremost, the availability--

14             MR. SCHEPACARTER:  Your Honor, I just wanted to--

15   I thought the witness was going to stop his answer.  I just

16   wanted to strike everything after he disagreed.  I mean,

17   that's something that could be on redirect.

18             THE COURT:  I'll allow it, but we don't need to

19   get into it further.  Okay?

20             MR. SCHEPACARTER:  Okay.  All right.

21             THE COURT:  I think Mr. Schepacarter is simply

22   trying to run you through the numbers.

23             MR. MCFARLANDE:  Okay.

24             THE COURT:  And I understand your qualification

25   on--

1           MR. MCFARLANDE:  Yes, sir.  Thank you, Your

2   Honor.

3           THE COURT:  Previous testimony on why you think

4   the numbers are wrong.

5           MR. MCFARLANDE:  Thank you, Your Honor.

6           THE COURT:  You're welcome.

7           MR. SCHEPACARTER:  Okay.  The next line down--or,

8   actually, it's the (indiscernible) generation line, which

9   is the sixth line down.

10          MR. MCFARLANDE:  Yes, sir.

11          MR. SCHEPACARTER:  And, again, if I plotted the

12  average of 19.889 and plotted that among the targets, that

13  would also fall above the superior target, correct?

14          MR. MCFARLANDE:  Yes, sir.

15          MR. SCHEPACARTER:  Okay.  And just a couple more.

16  With respect to Luminant, the ONM and the SGA, again, if

17  you took that average, that number, which is the 10.72, and

18  plotted it among the targets, it would fall between

19  baseline and superior, correct?

20          MR. MCFARLANDE:  Yes, sir.

21          MR. SCHEPACARTER:  Okay.  And with--the last one

22  I'll cover is the Luminant capex.  Again, if I took that

23  number for the average, which is the 5.48, and plotted it

24  among the targets, it would fall between the five--between

25  the baseline and superior, correct?

1              MR. MCFARLANDE:  Yes, sir.

2              MR. SCHEPACARTER:  Okay.  All right.  Let me

3    cover a couple other things.  Okay.  Now, you're covered

4    by--the plans that you're covered by are the EAIP--we'll

5    use an acronym--and the (indiscernible), correct?

6              MR. MCFARLANDE:  That's correct.

7              MR. SCHEPACARTER:  Okay.  And if I turn your

8    attention to--I believe it to be Tab 23 in the binders.

9    Just let me know when you're--okay, you're there?  Okay.

10             THE COURT:  Page five, for--you're looking for

11   his--

12             MR. SCHEPACARTER:  Yes, it's Mr. McFarlande.  I

13   do believe it to be page five, Your Honor.

14             MR. MCFARLANDE:  I have it in front of me.

15             MR. SCHEPACARTER:  Okay.  With respect to your

16   base salary for 2014, that's the 675,000, correct?

17             MR. MCFARLANDE:  Yes, sir.

18             MR. SCHEPACARTER:  Okay.  And then the AIP year

19   underneath that, that number, we went through some of this

20   with Mr. Burke, and I just want to run through it with you

21   as well.  That's in excess of a million, correct?

22             MR. MCFARLANDE:  Yeah, that--

23             THE COURT:  I'm sorry.  I lost you.  Where are

24   you?

25             MR. SCHEPACARTER:  It's the last number down,

1    Your Honor.  It's on the 2014.  It's the AIP year paid.

2              THE COURT:  Oh, thank you.  That's the 2013

3    number that you were paid in 2014.

4              MR. MCFARLANDE:  Yes, Your Honor.

5              MR. SCHEPACARTER:  Okay.  And that's what you

6    earned under the--under EAIP, correct?

7              MR. MCFARLANDE:  Yes, sir.

8              MR. SCHEPACARTER:  And in connection with your

9    salary?

10             MR. MCFARLANDE:  Yes.

11             MR. SCHEPACARTER:  And then, with respect to the

12   LTIP--let me strike that for a second.  So, the total under

13   2014, your salary and bonus for that year, would be around

14   1.7 million, correct?

15             MR. MCFARLANDE:  Yes.

16             MR. SCHEPACARTER:  Okay.  And then, if I turn

17   your attention to the 2015--you have your base salary,

18   correct?

19             MR. MCFARLANDE:  That's correct.

20             MR. SCHEPACARTER:  Okay.  And then you have a

21   figure there for the AIP, which is 85 percent of your

22   salary.

23             MR. MCFARLANDE:  That's correct.

24             MR. SCHEPACARTER:  That's just the number that's

25   figured in there.  And then there's the LTIP number, the

1    2015 LTIP amount, which is $3 million, correct?

2              MR. MCFARLANDE:  That's correct.

3              MR. SCHEPACARTER:  Okay.  And then, in 2015, you

4    would stand to earn somewhere in excess of about $4.2

5    million?

6              MR. MCFARLANDE:  In that year, I would be paid

7    4.2.  There's portions of that that were earned in prior

8    periods.

9              MR. SCHEPACARTER:  Right.  Right.  But your

10   testimony would be that--pretty much the same as Mr.

11   Burke's, with respect to the LTIP program, which means

12   that, on March 15th of next year, you would have to be

13   present as an employee of the company in order to be paid

14   that $3 million.

15             MR. MCFARLANDE:  I would have to earn the portion

16   contributed in 2014, and then I would have to be here after

17   we went through the administrative processes, by which it's

18   signed off, the numbers are validated that we hit it, and

19   then, yes.

20             MR. SCHEPACARTER:  Okay.  But (indiscernible)

21   that--

22             MR. MCFARLANDE:  (indiscernible) you have to be

23   present a certain period afterwards in order to be paid.

24             MR. SCHEPACARTER:  Right.

25             MR. MCFARLANDE:  Similar to all bonuses.

1          MR. SCHEPACARTER:  Okay.

2          MR. MCFARLANDE:  Incentive compensation.

3          MR. SCHEPACARTER:  And the EIAP, the number that-

4    -the EBITDA target for the EIAP for--I'm sorry, for the

5    LTIP, that's the same one that Mr. Burke had testified to

6    as well, correct?

7          MR. MCFARLANDE:  That's correct.  I believe it

8    was on that chart with the check marks on the right that

9    said, "Competitive EBITDA associated with the LTIP," in his

10   demonstrative.

11         MR. SCHEPACARTER:  Okay.  And is that the same--

12   is the--with respect to the Key Leader Program, the Key--

13   I'm sorry, the Key Leader Performance Plan, is the EBITDA

14   the same figures for that, if you know, for the EIAP?

15         MR. MCFARLANDE:  It's the same metric.  It just

16   has a 60-percent weighting because then there's also 40

17   percent associated with total competitive spend for that

18   Key Leader Program.  So, it's--and that was in that chart

19   as well, with the check marks on the right.

20         MR. SCHEPACARTER:  Right.  Okay.  And with

21   respect to the LTIP, your payment under the LTIP is also

22   secured by a letter of credit, correct?

23         MR. MCFARLANDE:  Yes.

24         MR. SCHEPACARTER:  Okay.  And the purpose of

25   using the security of the letter of credit, wasn't that to

1    secure not only payment but your, basically, performance

2    and ability to stay with the company?

3            MR. MCFARLANDE:  I would disagree with that

4    characterization of "stay with the company." It was

5    basically a funding mechanism for payment that was earned

6    across '12, '13, and '14, for performance metrics

7    associated with each of those years.

8            MR. SCHEPACARTER:  Okay.  And just a little bit

9    on the background: how long have you been in the energy

10   industry?

11           MR. MCFARLANDE:  I've been in the energy industry

12   since '99.  Prior to that time, however, I was a practicing

13   engineer for four-plus years, where I touched the energy

14   industry.  But that was--I had a stop-off of a couple years

15   in grad school and at IBM in between, but yeah.

16           MR. SCHEPACARTER:  Okay.  And--

17           MR. MCFARLANDE:  So, in 1999, I joined the

18   deregulated part of Philadelphia Electric, which then

19   became Exelon.

20           MR. SCHEPACARTER:  Okay.  Understood.  And while

21   you were at--either at PECO or Exelon or at--here at this

22   company, have any other of your bonuses ever been secured

23   by a letter of credit?

24           MR. MCFARLANDE:  No.

25           MR. SCHEPACARTER:  Okay.  All right.  Your Honor,

1    I don't think I have any further questions.  Just reserve

2    for re-cross in case I need it.

3              THE COURT:  Well, we're not going to do a re-

4    cross, so, if you have them, ask them now.

5              MR. SCHEPACARTER:  Okay.  That's fine, Your

6    Honor.  I understand.  Thank you.

7              THE COURT:  You're welcome.  Redirect?

8              MR. SCHEPACARTER:  Just give me a minute to--

9              THE COURT:  Oh, I'm sorry.

10             MR. SCHEPACARTER:  Clear out of here.

11             MR. MCKANE:  Your Honor, I have very little.

12             THE COURT:  All right.

13             MR. MCKANE:  But, Mr. McFarlande, I would ask you

14   to go to (indiscernible) six and--

15             THE COURT:  We're not going to pick you up, so

16   just give Mr. Schepacarter a minute.  We got time.  All

17   right.  Now it's your turn.

18             MR. MCKANE:  Thank you, Your Honor.  Just for the

19   record, Mark McKane, Kirkland & Ellis, for the debtor.  Mr.

20   McFarlande, if I could just redirect you back to page--the

21   Exhibit 26?

22             MR. MCFARLANDE:  Yes, sir.

23             MR. MCKANE:  And the Luminant scorecard page?

24             MR. MCFARLANDE:  Yes.

25             MR. MCKANE:  And you were asked a series of

1    questions about the five-year averages that are in Column

2    Six versus the threshold baselines for your targets that

3    are in Columns Seven, Eight, and Nine.  Do you recall those

4    questions?

5              MR. MCFARLANDE:  Yes, I do.

6              MR. MCKANE:  Sir, can you explain some of the

7    variables for why the coal generation availability average

8    for the non-summer seasons is where it is vis-à-vis the

9    threshold baseline and superior metrics you have for 2014?

10             MR. MCFARLANDE:  Sure.  The reason being is that

11   there's differences, year-over-year, in how our units run.

12   Okay?  So, first thing is recall that we took the average

13   availability up from 92.6 percent in 2013 up to 93.8 from

14   an availability in the summer timeframe.

15             So, the question legitimately would be, then, why

16   didn't the actual number of gigawatt hours go up year-over-

17   year if you increase the availability?  And the difference

18   is the characteristics of the units themselves.  The

19   characteristics of the units themselves change from year to

20   year.

21             So, for example, at Monticello One and Two, we're

22   going to be burning 100 percent powder river basin coal.

23   Or we did burn powder river basin coal.  We had planned to

24   and we did run 100-percent powder river basin coal.  When

25   you run powder river basin coal, because it's got a higher

1    heat content, that sounds like a good thing.

2            But when you put it through a boiler that's

3    designed to have fuel that goes into it that has less heat

4    content, you get a fireball that gets higher up in the

5    boiler.  When you get a fireball that gets higher up in the

6    boiler, you start to essentially overheat back into

7    equipment.  I know I'm getting technical, but this is just

8    one example.

9            And so, what you have to essentially do is, if

10   those units had a rating of 560 megawatts, you have to run

11   them as if they had a rating of 540 megawatts in order to

12   eliminate this fireball, which causes all this back-end

13   equipment.  Now, it's the right economic decision to make,

14   but it lowers--so, if you take the hours and you multiply

15   them by 540, you get less than if you took the same hours,

16   the same availability, and multiplied them by 560.  And we

17   had two units that do that.

18           The other thing is that we're running different

19   environmental equipment and different--it concerns some of

20   the things that Mr. Schepacarter had mentioned that are

21   differences.  That different environmental equipment, we're

22   in the preparation for preparing for the Mercury and Air

23   Toxic Standard, MATS, as I described.  So, there's

24   different environmental regulations.

25           And lastly, the other thing is that I described

1    the variability of fuel.  We had different mixes of fuel

2    this summer as well.  I described how PRB (indiscernible).

3    But also, when you have lignite that does not hit the fuel

4    quality, if I may restate something that I said, that

5    lignite can vary from 5800 to 6400, we try to--65 is really

6    good, Your Honor.  And we try to put all that best stuff on

7    the pile and in the boiler in the summertime, but it

8    doesn't always happen.  And so, we get fuel de-rates.

9            And when you use more lignite, which is actually-

10   -I described Monticello being all PRB; we're actually using

11   more lignite across the rest of the fleet.  And when you do

12   that, you change the characteristics.  And so, you cannot

13   make a direct comparison, at least on that metric.

14           The same is true on the coal available

15   generation, because you have to adjust for outages year-

16   over-year, which is--that's hard.  It's not as easy to

17   understand on the coal fleet because it's a number of

18   different units.  But if you were to go to the nuclear

19   fleet, for example, where--

20           MR. MCKANE:  And the nuclear fleet, the average

21   is the 19.89?

22           MR. MCFARLANDE:  The 19.89 (indiscernible),

23   that's correct.  And so, you have baseline 19.388 or

24   threshold 19.071.  Look at the baseline of 19.388, and it's

25   lower than the actual of 20.487 in the 2013 actual.

1           MR. MCKANE:  Yes, sir.

2           MR. MCFARLANDE:  But that--

3           MR. MCKANE:  Why is that, sir?

4           MR. MCFARLANDE:  That's because this year we have

5    a refueling outage in the spring and a refueling outage in

6    the fall.  Last year--because we're on 18-month cycles of

7    each of these refuelings.  So, only every three years do

8    you get two outages.  You only have one outage in 2014.

9    So, when you take a unit out for 24 or 26 days, you're just

10   going to have less--you know, you have to normalize for

11   these things.

12           And that's why I think it's a helpful fact set to

13   look at history.  But that fact set is just one data point

14   that has to be adjusted for known issues in the business.

15   The same--I don't know if you want me to go through--

16           MR. MCKANE:  Why don't we do one more, Your

17   Honor?  Is there--if he draws a distinction as it relates

18   to limited capex, and then we'll call it a day?

19           MR. MCFARLANDE:  Yeah, each year, we have to

20   adjust cap--let me find the--

21           MR. MCKANE:  So, we're talking the 548 for the

22   average of limited capex, vis-à-vis (indiscernible).

23           MR. MCFARLANDE:  Yeah, so it's sort of the third

24   set of numbers from the bottom.

25           MR. MCKANE:  Yes, sir.

1          MR. MCFARLANDE:  And the 548 average, which you

2    can go back and look at 2012, which is 785 million.  And I

3    could tell you that we're beating that number.  But I'd

4    also have to tell you that, during that year, we made

5    significant investments in our scrubbers, which is the

6    control equipment on the back end that controls SO2.

7          MR. MCKANE:  Mm hmm.

8          MR. MCFARLANDE:  And so, it's not a fair

9    comparison.  I would not compare ourselves to 785.  It's

10   just not a good number, because it's got--it has nearly

11   $300 million, or 200 and--I forget exactly, 260, I think,

12   something like that--of environmental control equipment.

13   We have environmental control equipment in the 2014

14   thresholds, baselines, and superiors, but it's different

15   control equipment.  It's associated with mercury controls

16   and mercury monitoring where that--those controls are

17   associated with sulfur dioxide.

18          And so, it's just a different--it's a helpful

19   look back, but you have to normalize for the fact--you

20   know, you have to normalize that fact set for the

21   (indiscernible).

22          MR. MCKANE:  Thank you.  Your Honor, we don't

23   have any further questions for Mr. McFarlande at this time.

24          THE COURT:  Okay.  So--and can he be excused?

25   I'm having--I'm sorry, I'm having trouble understanding how

1   774, 587, 785, 594 average out to 548.

2        MR. MCKANE:  Your Honor, that's an interesting

3   issue, and one we explored with Mr. Panacio.  If I may--and

4   we can cover this tomorrow with him--he would--there is a--

5        THE COURT:  There's a zero in there.

6        MR. MCKANE:  There was a zero, that's right.

7        THE COURT:  Oh, okay.

8        MR. MCKANE:  So--and so, he plugged the zero in

9   for one of the years, and therefore it came to a number for

10  capex that may not be consistent with reality.

11       THE COURT:  All right.  Okay.  I understand now.

12  You had no further questions, correct?  All right.  Thank

13  you, sir, very much.

14       MR. MCFARLANDE:  Thank you, Your Honor.

15       THE COURT:  Have a good day.

16       MR. MCKANE:  Your Honor, could Mr. McFarlande and

17  Mr. Burke be excused from the courtroom?

18       THE COURT:  They may.

19       MR. MCKANE:  Thank you, Your Honor.

20       MR. MCFARLANDE:  Thank you.

21       THE COURT:  Thank you.  Safe journey home.

22       MR. BURKE:  Thank you.

23       MR. MCKANE:  Your Honor, I'd like to cede the

24  podium to Mr. Dempsey to call our next witness.

25       THE COURT:  Okay.  Who's that going to be?

1              MR. MCKANE:  That's going to be Mr. Doug Friske.

2    He's going to be a much shorter witness than the two

3    witnesses we put on today, and he may be our last witness

4    for the day.  Is that--

5              THE COURT:  Okay.

6              MR. MCKANE:  Your schedule?

7              THE COURT:  That's fine.  Let's take a short

8    recess, though, so like literally five minutes.

9              MR. MCKANE:  Thank you, sir.

10             BAILIFF:  All rise.

11             THE COURT:  Please be seated.  Mr. Dempsey?

12             MR. DEMPSEY:  Good afternoon, David Dempsey,

13   Kirkland & Ellis, on behalf of the debtors.  Before we

14   begin, Your Honor, with Mr. Friske's testimony, briefly,

15   the parties--or rather the debtors and the United States

16   Trustee have agreed that the materials contained in the

17   exhibit binder are admissible and authenticated, and should

18   be admitted into evidence.

19             One reservation, Your Honor: Mr. Panacio's

20   declaration and exhibits, the debtors are reserving their

21   right to object to that material's admissibility.  And he

22   will be, of course, subject to cross and voir dire on that

23   particular issue.  But otherwise, I think we have no

24   quarrel with regard to the other materials.

25             THE COURT:  All right.  So, what exhibit numbers

1    are we talking about then?

2            MR. DEMPSEY:  So--my apologies--effectively it's

3    everything, Your Honor, except for--except for, for this

4    purpose right now, Index numbers 24 through 30.  So, for

5    purposes of the record, the parties, in other words, have

6    stipulated to the admissibility and authenticity of

7    documents--Exhibits 1 to 23.  Oh, my apologies; it's 24 to

8    31 is Panacio.  So, 1 to 23 we've stipulated to

9    (indiscernible).  32, 33, and 34.

10           THE COURT:  All right.  Any objection?

11           MS.SCHWARTZ:  No, Your Honor, none.

12           THE COURT:  All right.  They are admitted without

13   objection.

14           MR. DEMPSEY:  Your Honor, the debtors call Mr.

15   Doug Friske.

16           THE COURT:  Okay.

17           BAILIFF:  Do you affirm (indiscernible) that you

18   will tell the truth, the whole truth, and nothing but the

19   truth, (indiscernible) to your knowledge and ability?

20           MR. FRISKE:  Yes.

21           BAILIFF:  And state and spell your name for the

22   record.

23           MR. FRISKE:  Doug Friske, D-O-U-G, F-R-I-S-K-E.

24           BAILIFF:  Be seated.

25           MR. DEMPSEY:  Good afternoon, Mr. Friske.  Could

1    you please introduce yourself to the Court?

2              MR. FRISKE:  I'm Doug Friske, a managing

3    consultant, managing director with Towers Watson.

4              MR. DEMPSEY:  What does Towers Watson do, Mr.

5    Friske?

6              MR. FRISKE:  We are a global professional

7    services firm, specializing in areas related to human

8    resources, as well as risk mitigation and reinsurance.

9              MR. DEMPSEY:  What specifically is your role at

10   Towers Watson?

11             MR. FRISKE:  So, as I mentioned, managing

12   director in our executive compensation practice.  I am part

13   of the global leadership team for that practice.  I've

14   served in numerous leadership roles within the firm over

15   the last--over 24 years.  And I am also a consultant to a

16   number of companies around the world.

17             MR. DEMPSEY:  I understand you were retained by

18   EFH in this matter?

19             MR. FRISKE:  Yes.

20             MR. DEMPSEY:  When was that?

21             MR. FRISKE:  In October of 2012.

22             MR. DEMPSEY:  And are you familiar, Mr. Friske,

23   with the debtors' proposed compensation plans that are

24   subject to today's motion?

25             MR. FRISKE:  I am.

1            MR. DEMPSEY:  Were you asked by the debtors, Mr.

2    Friske, to analyze the proposed set of plans before the

3    Court to determine, one, whether the structure and design

4    of the plans, and, two, whether the compensation under

5    those plans, are comparable to market practices?

6            MR. FRISKE:  Yes.

7            MR. DEMPSEY:  Are you prepared to offer any

8    opinions today?

9            MR. FRISKE:  Yes.

10           MR. DEMPSEY:  We'll come back to those opinions

11   in a second.  Before we get there, I want to talk through

12   some of your background, if that's okay.

13           MR. FRISKE:  Okay.

14           MR. DEMPSEY:  How long have you been at Towers

15   Watson?

16           MR. FRISKE:  A little over 24 years.

17           MR. DEMPSEY:  And where, before you started at

18   Towers Watson, did you get your education?

19           MR. FRISKE:  I have a undergraduate degree in

20   finance from the University of Illinois, and I have my

21   Masters degree in finance from Northwestern University.

22           MR. DEMPSEY:  When you started at Towers Watson,

23   what sort of work did you do?

24           MR. FRISKE:  I started in our compensation

25   practice, out of Northwestern, and worked on a variety of

1     different areas of compensation, (indiscernible) executive

2     compensation.

3             MR. DEMPSEY:  Can you describe briefly, over your

4     24 years at Towers Watson, what sort of executive

5     compensation experience you've had?

6             MR. FRISKE:  I have worked with companies on

7     defining the competitive market for executive compensation

8     levels, designed numerous--hundreds of different incentive

9     plans, short-term incentive plans, long-term incentive

10    plans for companies across virtually all industries,

11    private companies, public companies.  Also, I helped in

12    transactions, any number of transactions that companies

13    experience with respect to executive compensation.  For

14    example, hiring executives, firing executives, mergers and

15    acquisitions, divestitures.  So, basically, anything that

16    has to do with executive compensation.

17            MR. DEMPSEY:  With regard to the types of

18    compensation plans that are at issue in this motion, how

19    many plans would you estimate you've advised clients about

20    that are similar to these programs in general?

21            MR. FRISKE:  From an incentive standpoint, as I

22    mentioned, probably hundreds, if not thousands, of programs

23    in general on incentives.  Specific to restructuring, I've

24    worked on over 30 different restructuring cases that had

25    programs that were similar to these that we're discussing

1    today.

2              MR. DEMPSEY:  Can you describe, at a high level,

3    which restructurings you're talking about?

4              MR. FRISKE:  Examples would be United Airlines,

5    American Airlines, Northwest Airlines, A&P,

6    (indiscernible), Lear, Reader's Digest, just to name a

7    handful.

8              MR. DEMPSEY:  So, I heard a lot of airlines in

9    there.  Do you have any energy experience?

10             MR. FRISKE:  I do, two in the restructuring

11   space, one, worked on (indiscernible), and actually

12   currently working on Longview Power.

13             MR. DEMPSEY:  Throughout the course of your 24

14   years at Towers Watson, have you made it a practice of

15   studying up on regular executive compensation in the

16   industry generally, Mr. Friske?

17             MR. FRISKE:  I have.  And one, as being the

18   leader of our business--and we're the largest executive

19   compensation consulting practice in the world--I have led

20   our research efforts and thought leadership as it relates

21   to executive compensation, which includes publishing,

22   speaking with media, speaking at national conferences,

23   among different activities.  We also are viewed as thought

24   leaders, and I've led that, in terms of best practices and

25   next-generation practices in the area of executive

1   compensation.

2            MR. DEMPSEY:  Mr. Friske, how does Towers Watson

3   go about evaluating and collecting data with regard to the

4   general market practices with regard to investment--

5   executive compensation?

6            MR. FRISKE:  A number of ways.  With respect to

7   pay levels, we maintain proprietary databases of executive

8   compensation levels.  So, what I mean by that is we

9   actively solicit compensation data from companies for

10  specific executive positions and maintain that data in a

11  database that we then use both in our consulting as well

12  and selling that information to organizations in our own

13  work.

14            We also maintain databases on the design of

15  incentive programs.  So, incentive metrics that are put

16  into incentive plans, or performance metrics, I should say,

17  that are in incentive plans, how such plans are designed,

18  equity incentives, how such plans are designed, and then

19  all the various types of transactional activities that I

20  referenced earlier.

21            MR. DEMPSEY:  So, you've got all this data.  What

22  is it actually that you do with it in particular client

23  engagements to help advise companies?

24            MR. FRISKE:  In simplest terms, we help companies

25  define the how and the how much in terms of their executive

1   compensation.  So, how they should structure their

2   programs, what--as I mentioned, what types of incentives,

3   how are they designing those incentives, how much they

4   should pay their executives, what would be reasonable from

5   the standpoint of typical market practices.  So, it falls

6   in, as I said, those two categories.

7            MR. DEMPSEY:  Let's turn specifically to this

8   engagement, Mr. Friske.  You said you were retained in

9   October 2012, I think?

10            MR. FRISKE:  October of 2012, yes.

11            MR. DEMPSEY:  Can you describe, in general, the

12   work that Towers Watson and you have done with regard to

13   this specific engagement?

14            MR. FRISKE:  It falls very much along the lines

15   that I described of our general work.  So, we have looked

16   at market pay levels for similar positions to those that

17   exist at EFH and the different operating groups, with

18   respect to how companies within the energy space pay those

19   types of executives.  So, we've provided that information

20   for positions at the vice-president level and above.

21            We've also looked at how companies in the energy

22   industry design compensation and incentive programs, so,

23   the short-term incentives, long-term incentives.  We've

24   also examined practices for companies that have undergone

25   an in-court restructuring and how they have designed

1    incentives in those cases.  And we've also looked at a

2    series of other issues, such as director compensation and

3    the terms and conditions in terminations and other

4    agreements.

5              MR. DEMPSEY:  You said you've provided advice to

6    the company.  Who specifically have you been advising at

7    the company?

8              MR. FRISKE:  We have worked both with management

9    as well as the ONC committee.  So, we have attended many,

10   if not most, of the ONC committee meetings since we've been

11   engaged a couple years ago, and regularly work with

12   management as well.

13             MR. DEMPSEY:  Have you provided advice to the ONC

14   committee about the structure and design of the programs at

15   issue in this motion?

16             MR. FRISKE:  Yes.

17             MR. DEMPSEY:  Mr. Burke already walked through

18   the programs in detail, so I don't want to retread that

19   ground.  But, Mr. Friske, did you prepare a demonstrative

20   to aid your testimony?

21             MR. FRISKE:  I did.

22             MR. DEMPSEY:  If you could turn to--I think it's

23   Tab Three of the demonstrative binder.

24             MR. FRISKE:  I have it.

25             MR. DEMPSEY:  Do you believe that this deck will

1      aid in your testimony, Mr. Friske?

2            MR. FRISKE:  I do.

3            MR. DEMPSEY:  If you could turn to Slide 1?

4            MR. FRISKE:  Okay.

5            MR. DEMPSEY:  A level (indiscernible).  Mr.

6      Friske, at a high level, I'd like you to describe these

7      programs that are before the Court today.

8            MR. FRISKE:  So, there are three listed.  First

9      is the Executive Annual Incentive Plan and Annual Incentive

10     Plan.  So, that is the--I've referred to it in my comments,

11     the annual or short-term plan for incenting the senior

12     management team, a plan that's been in place for a period

13     of time predating our involvement.  There is the Key Leader

14     Performance Program, which is the build-on program after

15     the so-called Owner-Operator Plan that was put in place.

16     And there's the SPC Long-Term Incentive Plan.  And, again,

17     that is a program that has been--that program also has been

18     in place for a number of years.

19           MR. DEMPSEY:  Based on your work since October

20     '12--2012, have you familiarized yourself with the

21     prepetition compensation practices of the debtors?

22           MR. FRISKE:  Yes.

23           MR. DEMPSEY:  What did you do?

24           MR. FRISKE:  We reviewed the plan documents that

25     were in place for those programs.  We reviewed the terms

1    and conditions, specifically the performance metrics that

2    were in place for those programs, the payment terms, the

3    terms of the duration of the performance cycles,

4    participants in those programs, and also, at a high level,

5    the payment amounts that were received.

6             MR. DEMPSEY:  How would you describe the

7    structure and design of the programs, prepetition, to those

8    before the Court now, today, post-petition?

9             MR. FRISKE:  I would say they're largely

10   consistent.

11            MR. DEMPSEY:  In what ways?

12            MR. FRISKE:  First up, on the Executive Annual

13   Incentive Plan and Annual Incentive Plan, those programs

14   are, I would say, entirely consistent.  So, with respect to

15   participants in those programs; with respect to the target

16   opportunities, so how much an individual could potentially

17   earn at target in those programs; the calculation with

18   respect to the targets, the performance factors, the IPM,

19   the individual performance modifier; all consistent.

20            And even the metrics are largely consistent.

21   Like any incentive plan, they may change from year to year,

22   slightly.  But, in general, they've been consistent, pre-

23   and post-petition.

24            MR. DEMPSEY:  How about the SPC Long-Term

25   Incentive Plan?

1           MR. FRISKE:  That plan is entirely consistent,

2      again, with all the same conditions, the target

3      opportunities, the metrics, et cetera.

4           MR. DEMPSEY:  And, rounding out the clock, the

5      Key Leader Performance Program, how does that compare to

6      prepetition practices?

7           MR. FRISKE:  Largely consistent, but there were a

8      couple changes to that program.  So, what was consistent--

9      first, what was consistent pre- and post-petition, which,

10     again, the target opportunities that people could earn, and

11     the measurement, performance measurement under that plan,

12     focusing on EBITDA, are consistent pre- and post-petition.

13          MR. DEMPSEY:  What about the participants?

14          MR. FRISKE:  Participants are also largely

15     similar.  There were a few additions to the plan post-

16     petition.  I don't remember the exact amount, but I believe

17     it was 10 to roughly 20 people, roughly.  But so, a few

18     additional participants in the plan.

19          MR. DEMPSEY:  Can you walk the Court a little

20     through the differences?

21          MR. FRISKE:  Sure.  I think there are two primary

22     differences pre- and post-petition on that plan.  First off

23     is, under the prepetition plan, the (indiscernible) what I

24     would call two components.  Half the program was based on

25     achieving the financial metrics, and the second half of the

1    program was based simply on being retained, being employed

2    with the company for the duration of the performance

3    period.  Post-petition, that latter portion, the portion

4    that was tied to simply being with the organization, was

5    eliminated.  And so, it's 100-percent tied to the

6    performance targets.  That was one.

7            The second is with respect to the performance

8    period itself.  So, under the prepetition plan, performance

9    was measured over a two-year period.  And under the post-

10   petition plan, the performance periods were truncated to

11   quarterly measurement periods.

12           MR. DEMPSEY:  Mr. Friske, have you read the

13   United States Trustee's objection to the debtor's insider

14   compensation motion?

15           MR. FRISKE:  I have.

16           MR. DEMPSEY:  And are you familiar that the

17   Trustee argues that the Key Leader Performance Program

18   that's at issue now is a, quote, "shorter program than the

19   Owner-Operator, with quarterly payments that are focused

20   more on retention," end quote, than the Owner-Operator?

21           MR. FRISKE:  I would agree with the statement

22   that it's shorter.  I mean, as I just mentioned, it is a

23   shorter period, the two years versus the quarterly period.

24   But I would say that actually it's more performance-

25   oriented than--and less retentive than the prior program,

1    given the sense that it's entirely performance-based, 100-

2    percent performance based, under this design versus for the

3    split between--50/50 between performance and time under the

4    legacy design.

5              MR. DEMPSEY:  What about the fact that the

6    payments are made quarterly?  Do you believe that makes it

7    more retentive?

8              MR. FRISKE:  No.  No, I don't think that has any

9    impact on the retentive nature of it, because, again, it

10   comes back to needing to achieve the performance objectives

11   that are laid out in order to receive payment.

12             MR. DEMPSEY:  In reading through the Trustee's

13   objections, did you understand that the Trustee argues that

14   these programs are not a continuation of previous programs

15   because the debtors updated their performance metrics, the

16   numbers, mid-year?  Do you understand that argument?

17             MR. FRISKE:  Yes.

18             MR. DEMPSEY:  Do you agree with that?

19             MR. FRISKE:  No.

20             MR. DEMPSEY:  Why not?

21             MR. FRISKE:  Because, first of all, companies--I

22   would say that the essence of the program has been

23   maintained.  And most companies, over time, change their

24   performance metrics, whether they change it annually,

25   whether they change it every couple of years.  For

1    companies that have shorter periods, every six months.  The

2    notion of simply changing the goals doesn't change the

3    program, in my opinion.

4              The program is represented by the metrics, the

5    participants, the target opportunities, the structure of

6    the program.  The goals themselves are constantly changing

7    in terms of--as companies go on, year to year, and revise

8    their goals based on the then-current business conditions.

9              MR. DEMPSEY:  Mr. Friske, you've talked about the

10   history of these programs of the debtors.  I now want to

11   turn to comparisons to the market.  And I believe you said

12   that you are prepared here to offer an opinion based on the

13   work you've done, your experience in the industry,

14   concerning the debtor's insider compensation programs

15   compared to market.  Is that right?

16             MR. FRISKE:  Yes.

17             MR. DEMPSEY:  And what are those opinions?

18             MR. FRISKE:  That, if the programs were to be

19   adopted, that were--the programs that are at issue today

20   are to be adopted, that, in total, across the group that

21   we're talking about, the compensation levels would be still

22   below median compensation levels for the peer group that

23   the company has used and that I believe is reasonable for

24   comparison purposes, so below the median of the market.

25             MR. DEMPSEY:  Any other opinions, Mr. Friske,

1    about the market design and structure?

2              MR. FRISKE:  Oh, I'm sorry.  With respect to the

3    design itself, the design, yes, the design is consistent

4    with--also with both energy industry practices as well as

5    restructuring practices.  And when I'm talking about

6    design, I am speaking specifically of types of metrics that

7    are used at the--those organizations with the notion of

8    having a range, the threshold/baseline/superior range, as

9    well as having multiple plans, having an annual plan and a

10   separate plan that would either be long-term or measuring

11   different periods of time.  So, all of that would be

12   consistent with the broader marketplace.

13             MR. DEMPSEY:  If it's okay, I'd like to unpack

14   each of those opinions, working backward, actually,

15   starting first with structure and design.  What analysis,

16   Mr. Friske, did you undertake to evaluate the overall

17   design and structure of these programs in the market?

18             MR. FRISKE:  A couple, and really based on

19   looking at it from two perspectives.  First is what is

20   typical in the energy industry space, and then, second,

21   what we typically see within restructurings.  So, with

22   respect to the former, the energy industry, as I mentioned,

23   there is a peer group that's been used by the organization

24   to assess the broader marketplace.  We focused on--

25             MR. DEMPSEY:  Let me stop you there.

1              MR. FRISKE:  Sure.

2              MR. DEMPSEY:  Are you aware how long the company

3      has used that particular peer group?

4              MR. FRISKE:  I believe it goes back to--I don't

5      know the exact time, but I know it predates us, or my

6      involvement, and I believe it goes back to the time of the

7      privatization, if not even before then.

8              MR. DEMPSEY:  Did you evaluate the reasonableness

9      of that peer group?

10             MR. FRISKE:  I did.

11             MR. DEMPSEY:  What work did you do?

12             MR. FRISKE:  We looked at the types of

13     organizations that were in the peer group and factors such

14     as the revenues of those organizations, the types of

15     operations, whether it be transmission, generation, retail

16     distribution of power, and how those factors compared to

17     the scope of the operations at the--at EFH, and to

18     determine whether or not they would be reasonable

19     comparators.  And my opinion was the fact is, yes, they

20     would be.

21             MR. DEMPSEY:  Once you had that peer group, how

22     did you go about compiling data with regard to those

23     specific companies?

24             MR. FRISKE:  We--as I mentioned earlier, we

25     maintain databases of incentive practices for companies.

1    And so, using that database, plus publicly available

2    information in proxy statements for publicly filed

3    companies, organizations describe their programs, how

4    they're structured, the payments, et cetera.  So, using a

5    combination of those two sources, our proprietary data, as

6    well as public data, we're able to paint a pretty clear

7    picture on how those programs are designed, meaning the

8    types of measures, the performance, how they design the

9    programs, et cetera.

10            MR. DEMPSEY:  Are the debtor's programs

11   consistent with practices in the energy industry?

12            MR. FRISKE:  Yes, they are.

13            MR. DEMPSEY:  In what ways?

14            MR. FRISKE:  As I mentioned, the types of metrics

15   that are used.  So, like profit-based metrics, starting

16   with that, whether it be EBITDA, whether it be earnings per

17   share, whether it be net income, some definition of profit

18   is virtually--is used by virtually all the energy

19   companies.  Most of the companies also used other measures

20   around the operations, whether it be safety, whether it be

21   generation, whether it be cost, but something beyond just

22   profitability.  So, that's also very common.  And what--

23            MR. DEMPSEY:  Mr. Friske, did you prepare a

24   demonstrative that shows that?

25            MR. FRISKE:  I did.  It would be--I think it's

1    Slide 3.

2            MR. DEMPSEY:  Yes.  Can you walk the Court

3    through this slide?

4            MR. FRISKE:  Sure.  So, this slide reflects both

5    annual and long-term incentives.  And, actually, this

6    information is even beyond the company's 15 peers.  This

7    reflects information for a broader group of energy

8    organizations, so 25 large U.S.-based energy organizations.

9    And, as it shows on the left-hand side, in terms of annual

10   incentive metrics, the most common being earnings per

11   share, and then you can read down the left and see that

12   EBITDA is used by roughly 20 percent of the companies.

13           Back to my earlier comments, in terms of

14   consistency with the broader marketplace, as I mentioned, I

15   would view the fact that there's a profit measure in use as

16   being what makes it consistent.  Whether some companies use

17   cash flow, EBITDA, net income, I think it is, again, more a

18   function of their capitalization, their ownership

19   structure, et cetera.  And EPS is a common measure for

20   publicly traded companies.  They have shares, publicly

21   traded shares, and so they can denominate in shares.  But

22   oftentimes, in private companies, you'll see cash flow or

23   EBITDA be a surrogate for that measure.

24           MR. DEMPSEY:  You may have already answered this,

25   but maybe not quite.  Do you understand, Mr. Friske, that

1    the United States Trustee suggests--or questions, rather,

2    the use of EBITDA as a metric by the debtors, right?

3              MR. FRISKE:  I do.

4              MR. DEMPSEY:  Do you agree with that criticism?

5              MR. FRISKE:  No, I think that--as I mentioned, I

6    think the focal point is looking at the profitability of an

7    organization.  And, in fact, another piece of research we

8    did that was related to this question is looked at other

9    restructurings.  And what are the typical metrics that you

10   see in incentives for restructurings?  And, in fact,

11   EBITDA, or cash flow, again, is by far the most common

12   metric.

13             And particularly in a financial restructuring,

14   why it's important is that oftentimes the interest expense

15   is one of the issues you're dealing with.  And you normally

16   want to focus on the key controllable operations, the

17   underlying operations of the entity during the

18   restructuring process to make sure they're as strong as

19   possible.  And hence you would focus on a metric like

20   EBITDA that is focused on those operations to judge whether

21   or not the company is performing.

22             MR. DEMPSEY:  Did you put together a

23   demonstrative on that particular issue?

24             MR. FRISKE:  I did, and I believe it's the prior

25   slide.

1           MR. DEMPSEY:  Yes, sir.

2           MR. FRISKE:  Slide 2?  Yeah.  So, what we did in

3    that respect is we looked at incentive plans that were put

4    in place during in-court restructurings for companies with

5    revenues in excess of $1 billion.  So, we wanted to focus

6    on larger case restructurings over the last five years.

7    And so, this is an example of organizations over that

8    period of time that have instituted in-court restructuring

9    incentives tied to EBITDA.

10           MR. DEMPSEY:  Based on your work in

11    restructurings, Mr. Friske, in your experience, is it

12    unusual for companies to pay out incentive bonuses to

13    executives even if they have net losses?

14           MR. FRISKE:  No.  In many cases, they have net

15    losses and there--as I said, they're tying it to EBITDA.

16    And, again, want to focus on the operational strength.  So,

17    no, it wouldn't be that unusual.

18           MR. DEMPSEY:  Have you looked more broadly

19    outside of restructurings as to whether or not it's unusual

20    for incentive bonuses to be paid out to executives even if

21    there are net losses?

22           MR. FRISKE:  We have.  We work in a number of

23    situations.  And so, just even looking at 2013, for

24    example, we were able to identify a number of cases where

25    companies had operating losses and paid bonuses.  And, in

1    fact, the median of these cases--we found roughly 30 cases

2    just in 2013 where companies had losses, net losses, and

3    paid bonuses.  And, on average, they paid close to target

4    bonuses in those cases.

5              MR. DEMPSEY:  I noticed, during Mr. Burke's

6    presentation, that the Key Leader and the SPC LTIP programs

7    both use EBITDA metrics just like the EAIP.  Are you

8    familiar with that?

9              MR. FRISKE:  Yeah, the same metric in both plans,

10   you're asking me?

11             MR. DEMPSEY:  Correct.

12             MR. FRISKE:  Yes.

13             MR. DEMPSEY:  Have you evaluated whether it's

14   unusual for companies to use similar metrics across

15   multiple programs?

16             MR. FRISKE:  I am familiar with that.  And so,

17   just from my experience, I would say that it's not uncommon

18   to do that.  And even looking at their own peer group,

19   there's a significant number of companies in the peer group

20   that use the same metric in both the annual and the long-

21   term incentive program.

22             MR. DEMPSEY:  Mr. Friske, did you also look into

23   whether companies more broadly have incentive compensation

24   that is forfeited if someone voluntarily resigns, in the

25   broader industry than just this particular company?

1          MR. FRISKE:  From my own experience, the question

2    of--yes.  90 percent-plus of companies have provisions that

3    would say, if you were to leave voluntarily before the end

4    of the performance period, you would forfeit the

5    opportunity to earn a bonus or whatever incentive that was

6    put in place.

7          MR. DEMPSEY:  Based on your experience, why is

8    that?

9          MR. FRISKE:  They're trying to drive performance.

10   And if you're not there during the performance period, then

11   you're not in a position to drive performance.  So, they

12   want to reinforce the nature or the notion of achieving the

13   objectives in order to pay the incentive.

14         MR. DEMPSEY:  Mr. Friske, based on the work that

15   you've done and your 24 years of experience at Towers

16   Watson, do you believe that the debtor's compensation

17   programs that are at issue in this motion are similar to

18   those in the broader market?

19         MR. FRISKE:  Yes.

20         MR. DEMPSEY:  I'd like to turn now, Mr. Friske,

21   to your second opinion.  I think you--or your first,

22   rather, working backward.  You compared the total

23   compensation for the participants in these plans to market.

24   Is that right?

25         MR. FRISKE:  Correct.

1          MR. DEMPSEY:  Can you describe for the Court what

2     analysis you did with regard to that (indiscernible)?

3          MR. FRISKE:  First analysis defined total

4     compensation.  So, how we define compensation is by looking

5     at the sum of base salaries, short-term incentive, and

6     long-term incentive, which is the typical construct for

7     U.S. companies, to have those three components.  And all of

8     those--or I should say the incentive pieces, we looked at

9     that from the standpoint of target.  And most companies

10    grant programs that have a target opportunity like EFH's

11    programs.  And you can earn more or less of that based on

12    performance.

13          So, our goal is to say:  let's look at,

14    structurally, how compensation levels compare at our target

15    organization, EFH in this case, and the marketplace.  So,

16    as a starting point, that's our focus.  Then the question

17    is: how do we define that market?  Well, we looked at the

18    peer organizations.  And, using the proprietary databases

19    that we have available to us, as well as public filings,

20    developed what the market pay levels are for similar

21    positions at those organizations, and then compared those

22    with the pay levels being proposed here.

23          MR. DEMPSEY:  And do you have a demonstrative

24    that demonstrates the results of those--that comparison?

25          MR. FRISKE:  I do.  I think it's--well, there's

1    several, I think.  The first is on Slide 4.

2              MR. DEMPSEY:  Sure.

3              MR. FRISKE:  Of the materials.

4              MR. DEMPSEY:  Let's first walk the Court through

5    this particular slide.  Can you describe generally the

6    analysis that you did?

7              MR. FRISKE:  Right.  So, first off, back to

8    defining the market, as I described.  So, we developed what

9    the market rate of pay was for different populations.  So,

10   first we looked at the seven SPC members, which is the top

11   line of this chart.  We also looked at samples of positions

12   within the balance of the 19, the 19 individuals that are

13   part of this.  And so, in total, that would be the 26

14   petitions.

15             So, we compared what the target opportunity of

16   compensation would be for those individuals, assuming that

17   the proposed motion is passed, and then compared that to

18   target opportunities among the peer companies, again,

19   similar positions.  So--

20             MR. DEMPSEY:  First, taking one at a time, how do

21   the SPC members, in terms of their total direct

22   compensation opportunity, compare to the peer group?

23             MR. FRISKE:  So, in total, their compensation was

24   15 percent below the median, which is the midpoint between

25   the highest paid and the lowest paid of the peer group, and

1    27 percent below the 75th percentile of that same group.

2              MR. DEMPSEY:  How about the remaining

3    participants who are subject to this motion?  How do they

4    compare to--

5              MR. FRISKE:  So, a little closer to the median.

6    So, roughly four percent below median for that group, and

7    17 percent below the 75th percentile.

8              MR. DEMPSEY:  And, in general, as an aggregate,

9    how do the insiders compare in terms of their total direct

10   compensation opportunity?

11             MR. FRISKE:  It would be 11 percent below median

12   and 24 percent 75th.  The reason that it's skewed that way,

13   it's not just the average of the two numbers, is this is a

14   dollar cost average, meaning that we added all the dollars

15   in compensation for both groups, and the SPC has higher

16   target opportunities both (indiscernible) and in the market

17   re-hire as well.  So, hence they're going to be weighted

18   more than the broader group.

19             MR. DEMPSEY:  You mentioned that you defined

20   total compensation as the sum of base salary, short-term

21   incentive, and long-term incentive programs, right?

22             MR. FRISKE:  Yes.

23             MR. DEMPSEY:  Does that include a pension?

24             MR. FRISKE:  No.

25             MR. DEMPSEY:  Do executives at peer companies for

1    these debtors typically have pensions?

2            MR. FRISKE:  They do.  Roughly 80 percent of the

3    peer organizations would or do provide some form of

4    pensions to their executives.

5            MR. DEMPSEY:  How about at EFH?

6            MR. FRISKE:  They do not.

7            MR. DEMPSEY:  Does this impact your view about

8    whether the debtor's total compensation is market?

9            MR. FRISKE:  That would be just another factor

10   when you look at these figures on Slide 4, and then also

11   take that into consideration.  It would suggest it's even

12   more conservative from a competitive standpoint, in terms

13   of total--the total reward value.

14           MR. DEMPSEY:  You said that you did a number of

15   analyses, and this was one of them.  I want to turn to the

16   next.  Did you, Mr. Friske, look at particularly the

17   debtor's top five senior-most management's compensation

18   relative to the peer group?

19           MR. FRISKE:  We did.  The reason being, as I

20   mentioned, the--for the top five individuals, that

21   information is public, for public companies as well as

22   companies that have public debt.  That is the requirement

23   of the SEC.  And so, a standard test that we would run, in

24   addition to doing the kind of benchmarking that I

25   referenced on this prior slide, is to look at that public

1    information and compare it across the board.  It's the most

2    transparent, easily to communicate; you can speak to

3    specific positions.  And we refer to that as "cost of

4    senior management."

5              MR. DEMPSEY:  How did the debtor's cost of senior

6    management, in terms of total target opportunities, compare

7    to the peer group?

8              MR. FRISKE:  They were low.  Similar to the

9    findings relative to our proprietary databases, it was a

10   similar set of findings, which would be roughly 15 percent

11   below the median and further below the 75th percentile.

12   And, in fact, in this case, even below the 20th percentile

13   of that group.

14             MR. DEMPSEY:  Mr. Friske, you were here when Mr.

15   McFarlande and Mr. Burke were posed a question about their

16   specific compensation, right?

17             MR. FRISKE:  Yes.

18             MR. DEMPSEY:  Did you look in general at the

19   compensation of the CEOs of business units compared to the

20   broader peer group market?

21             MR. FRISKE:  I did.

22             MR. DEMPSEY:  And how did Mr. Burke and Mr.

23   McFarlande's compensation compare to the peer group market

24   in that?

25             MR. FRISKE:  They were slightly below the median

1    of the marketplace.

2         MR. DEMPSEY:  Mr. Friske, based on these

3    benchmarking analyses and your judgment, do you believe

4    that the total compensation up for approval is within the

5    reasonable range of competitive practices in the industry?

6         MR. FRISKE:  Yes.

7         MR. DEMPSEY:  I'd like to turn now to the total

8    costs of the programs at issue.  If we can turn to Slide 6,

9    have you done any analysis, Mr. Friske, to compare the

10   total costs of these programs to market?

11        MR. FRISKE:  I have.

12        MR. DEMPSEY:  Can you describe the work that

13   you've done?

14        MR. DEMPSEY:  Yes.  So, we looked at, as you

15   mentioned, the total cost.  So, let me just compare this to

16   the prior analysis we have talked about.  That was at an

17   individual basis.  So, we wanted to test both the

18   individual competitiveness of compensation as well as the

19   cost in aggregate, and make sure that they're both

20   reasonable and they're reasonable from both perspectives.

21        So, in this particular analysis, we looked at

22   what we're referring to here as short-term incentives.  And

23   so, for this analysis, we took the EAIP, the--and the AIP,

24   and what were the overall costs for those programs, and

25   compared that to the costs for other organizations.  And

1    this is not specific to their peer group.  So, this is

2    looking at the broader general industry, as well as the

3    broader energy industry.

4            MR. DEMPSEY:  And you said you looked at the

5    short-term programs.  Did you also include the Key Leader

6    Program--Key Leader Performance Program as part of that

7    analysis?

8            MR. FRISKE:  Yes.

9            MR. DEMPSEY:  And, based on your analysis of the

10   short--the costs--the total costs of the short-term

11   programs, the AIP, the EAIP, the Key Leader Performance

12   Program, how did these programs compare to the general

13   industry?

14           MR. FRISKE:  They were within the range of

15   observed market practice.  And so, depending on which

16   aspect--or how you define the revenue of an organization,

17   whether you look at the entirety of EFH or focus strictly

18   on TCEH, the numbers as a percentage of revenue, the cost

19   as a percentage of revenue, which is a normal practice we

20   use to normalize data across a wide variety of companies of

21   size.

22           So, looking at it from that perspective, as I

23   mentioned, it's near the 50th percentile when looking at

24   the overall EFH revenues, up to the 75th percentile when

25   focusing strictly on the TCEH revenues.

1            MR. DEMPSEY:  Is comparing the total cost of

2    programs as a percentage of company revenue something that

3    you do in your general practice when advising clients?

4            MR. FRISKE:  Yes.

5            MR. DEMPSEY:  Why do you choose that particular

6    metric?

7            MR. FRISKE:  First, as I mentioned, it's helpful

8    to normalize by size, because, if you look at only the

9    dollar values, you lose the impact of much bigger

10   organizations.  And why revenue?  Because it's a measure--

11   it's a stable measure.  Profitability, market

12   capitalization, stock price are volatile from period to

13   period.  And oftentimes what we're trying to get at is, on

14   a relatively stable basis, are the overall costs at target

15   reasonable?

16           MR. DEMPSEY:  You said that the general--that the

17   debtor's total cost of these short-term programs is

18   comparable to the general industry.  How does it compare to

19   the energy industry specifically?

20           MR. FRISKE:  It's very, very consistent findings.

21   In fact, the normative data are not that different between

22   the general industry and the energy industry.  And so, the

23   findings are nearly identical to what I said earlier.  So,

24   near median when using the full revenues of EFH, and up to

25   the 75th percentile using TCEH.

1           MR. DEMPSEY:  Did you also do a similar analysis

2    with regard to the long-term incentive comp that the

3    debtors have?

4           MR. FRISKE:  I did.  And, in fact, it's maybe on

5    the next slide.  Yes.  So, Slide 7.  But it's a similar

6    concept.  So, in this case, we looked at the target

7    opportunity, this--or equal to the maximum opportunity for

8    the SPC program, given that these amounts are the maximum.

9    So, 22.3 million, which is the total value--and we realize

10   we're only talking about the subset of that in this motion,

11   but we felt it would be reasonable, appropriate, to look at

12   the overall cost in terms of trying to get a sense of the

13   value.

14          MR. DEMPSEY:  And why did you look at the overall

15   cost?  I mean why did you think that was appropriate?

16          MR. FRISKE:  Well, we're trying to size the

17   program, the long-term incentives, that program, to this--

18   to the broader marketplace.  And that just would be the

19   apples-to-apples comparison.  We would have been missing a

20   big part of it by not factoring in the other piece.

21          MR. DEMPSEY:  Can you explain the work that you

22   did in order to compare the total costs of this particular

23   program to the long-term incentive compensation offered by

24   peer group companies?

25          MR. FRISKE:  Yes.  Consistent with the work we

1    did on the Annual Incentive Plan, we took the costs of the

2    EFH program, looked at that as a percentage of revenue,

3    using the two revenue figures, similar to the short-term

4    plan, and then compared that to the same analyses for the

5    broader marketplace.  So, we would take the cost of long-

6    term incentives for the broader marketplace, divide that by

7    the revenue, and come up with the percentage.

8              MR. DEMPSEY:  And how does the total cost of the

9    SPC LTIP compare to the market?

10             MR. FRISKE:  It's significantly lower than the

11   market.  In fact, depending on which revenue figure you

12   use, it's either below the 25th percentile, if you're using

13   entire EFH revenues, or between the 25th percentile and the

14   median using the TCEH revenues.

15             MR. DEMPSEY:  Without these programs, Mr. Friske,

16   would the debtor's compensation structure, in total

17   amounts, (indiscernible) target opportunities, be

18   competitive with market?

19             MR. FRISKE:  Without these programs, you're

20   asking?

21             MR. DEMPSEY:  Yes.

22             MR. FRISKE:  No.  It would be below competitive

23   market levels.

24             MR. DEMPSEY:  Where would total compensation fall

25   relative to the market if these programs weren't in place?

1           MR. FRISKE:  It would be, in total, below the

2     25th percentile of the market.

3           MR. DEMPSEY:  No further questions, Your Honor.

4           THE COURT:  Okay.  Thank you.  Ms. Schwartz?

5           MS. SCHWARTZ:  Thank you, Your Honor.  Good

6     afternoon, Mr. Friske.

7           MR. FRISKE:  Hello, Ms. Schwartz.

8           MS. SCHWARTZ:  Hi.  I have a couple of questions

9     for you with respect to your testimony.  First, would you

10    please turn to Tab 2 in the binder?

11          MR. FRISKE:  In the binder, the demonstratives?

12          MS. SCHWARTZ:  Yes.  Or not--it's not in your

13    demonstratives; it's in the binder that--it's probably in

14    the redacted binder.  But I understand that the debtors

15    filed your declaration without any redaction, subsequently

16    filed that.

17          MR. FRISKE:  Okay.

18          MS. SCHWARTZ:  Tab 2 would be your declaration in

19    support of the motion.  Do you see that?

20          MR. FRISKE:  I do.

21          MS. SCHWARTZ:  Okay.  And is this in fact a

22    declaration that you signed at the back on August 8th?

23          MR. FRISKE:  Yes.

24          MS. SCHWARTZ:  And did you prepare this

25    declaration?

1           MR. FRISKE:  Yes.

2           MS. SCHWARTZ:  Okay.  And you read it very

3    carefully before you signed it?

4           MR. FRISKE:  I did.

5           MS. SCHWARTZ:  And everything contained in here

6    is accurate, is that right?

7           MR. FRISKE:  Yes.

8           MS. SCHWARTZ:  Okay.  There's no changes that you

9    need to make?

10          MR. FRISKE:  Not that I'm aware of.

11          MS. SCHWARTZ:  Okay, good.  Earlier, you

12   testified that you have a Masters in finance, is that

13   right?

14          MR. FRISKE:  Yes.

15          MS. SCHWARTZ:  In paragraph three of the

16   declaration, if you take a look at it, it says you have a

17   Masters degree in management.  Is that accurate?

18          MR. FRISKE:  Yeah, like, the Kellogg program,

19   they actually don't have an MBA.  It's called Master of

20   Management, with concentrations.

21          MS. SCHWARTZ:  Okay.

22          MR. FRISKE:  And so, for ease of explanation,

23   finance was my concentration.  They actually also had a

24   concentration in marketing and a concentration in

25   organizational design.

1                MS. SCHWARTZ:  Okay.  All right.  I just was

2        curious about that, when you said that.

3                MR. FRISKE:  Yeah.  That--yes.

4                MS. SCHWARTZ:  Okay.  Okay.  You testified that

5        you have been involved in design of hundreds of management

6        plans and employee incentive plans.  Is that right?

7                MR. FRISKE:  Yes.

8                MS. SCHWARTZ:  And you've been involved in two

9        bankruptcy cases for power companies, right?

10               MR. FRISKE:  Correct.

11               MS. SCHWARTZ:  Okay.  I'd like to turn, please,

12       to page four of your declaration and ask you some questions

13       here.  Okay.  Well, actually, let me see where it is.  Were

14       you--before we even turn to that, you had talked about this

15       peer group, right?  You did comparisons with a peer group.

16       And that peer group was actually formulated by the debtors.

17       Is that right?

18               MR. FRISKE:  Correct.

19               MS. SCHWARTZ:  And could you describe the work

20       that you did to evaluate whether or not that peer group was

21       in fact a quote/unquote "peer group"?

22               MR. FRISKE:  We looked at the type of operations

23       that those organizations had, as I mentioned, whether they

24       were in distribution of power, generation of power, retail

25       or power markets.  We looked at the revenue size of those

1    organizations.  We looked at their classification in terms

2    of their industry codes.  And that was primarily to make

3    sure that they would all--that all those factors would

4    align with what would make sense for the debtors.

5             MS. SCHWARTZ:  And when you say "we," you mean

6    you?

7             MR. FRISKE:  Well, I worked with a team.  So,

8    myself and several associates of mine that have worked

9    together throughout the case.

10            MS. SCHWARTZ:  Okay.  Who makes the ultimate

11   conclusion?  In other words, that's the--that it is a peer

12   group?  Would that be you?

13            MR. FRISKE:  Yes.

14            MS. SCHWARTZ:  Okay.  And you in fact did make

15   that conclusion, that it's a peer group?

16            MR. FRISKE:  Yes.

17            MS. SCHWARTZ:  Okay.  And are any of the--were

18   any of the companies in the peer group--have they

19   experienced losses for the past four years?

20            MR. FRISKE:  I don't recall.  I didn't go back

21   and check the last four years, so I don't know for a fact

22   if they did or didn't experience any losses.

23            MS. SCHWARTZ:  How about last year?

24            MR. FRISKE:  I--

25            MS. SCHWARTZ:  Net income loss?

1            MR. FRISKE:  I would be surprised if any of them

2    did.  But I didn't go back and check to ascertain whether

3    or not they had.

4            MS. SCHWARTZ:  And you didn't think that was an

5    important factor as to whether or not the companies were in

6    fact peer companies?

7            MR. FRISKE:  Not necessarily, no, I mean, because

8    go back to:  why would we have a peer in the first place?

9    What's the--why would you create a peer group?  It's to

10   look at talent markets.  What's the talent market that any

11   given organization needs to compete against for that

12   talent?

13           MS. SCHWARTZ:  Okay.

14           MR. FRISKE:  And, in any given year, in any given

15   sequence of years, a company could be highly profitable.  A

16   company could make a net loss.  A company could be going

17   through a number of circumstances.  The fact that they have

18   a loss in a given year, or a total shareholder return that

19   was negative, or any other factors, doesn't make them less

20   of a competitor for talent.  In fact, it arguably makes

21   them more of a competitor, because they might need talent

22   to come and turn the organization around in the case of a

23   net loss.

24           MS. SCHWARTZ:  But before I thought you said that

25   you considered the revenue side when you were determining

1    whether or not--so, wouldn't that be part of that?

2              MR. FRISKE:  Wouldn't what?

3              MS. SCHWARTZ:  Be part of your comparable?

4              MR. FRISKE:  Revenues?

5              MS. SCHWARTZ:  Yeah.

6              MR. FRISKE:  Yeah.

7              MS. SCHWARTZ:  And income would be part of that,

8    no?

9              MR. FRISKE:  No.

10             MS. SCHWARTZ:  It would not (indiscernible) that?

11             MR. FRISKE:  Yeah, again, the whole idea, as I

12   said, is the: what would be comparable scope and size of

13   operations?

14             MS. SCHWARTZ:  Mm hmm.

15             MR. FRISKE:  So, if you're looking to recruit an

16   individual from another organization, you want to be

17   assured that they've had the kinds of experiences, the kind

18   of scope, managed the kind of operations that you would.

19   And so, a proxy for that is often revenues.  If you have a

20   company that's 10 times the revenue, that usually is a good

21   proxy for they have much larger scope.  So, hence the use

22   of revenue and not income, as I mentioned earlier.

23             MS. SCHWARTZ:  Okay.  You--I would like you to

24   please turn, in your demonstrative, to your chart on page

25   three.  Now, you say here--well, actually, it says, at the

1    top of your demonstratives, "A majority of companies in the

2    energy industry use an earnings-based target--earnings per

3    share, EBITDA, net income--in their annual and/or long-term

4    incentive plans." That's your testimony, is that right?

5            MR. FRISKE:  Yes.

6            MS. SCHWARTZ:  Okay.  And here, your chart shows

7    that the majority of these companies in the energy industry

8    use earnings per share as their earnings-based target, is

9    that right?

10           MR. FRISKE:  Correct.

11           MS. SCHWARTZ:  Okay.  And only 20 percent use

12   EBITDA.

13           MR. FRISKE:  Yes.

14           MS. SCHWARTZ:  Okay.  So, there's no difference,

15   in your mind, when you're looking at and comparing energy

16   futures plans, where they use EBITDA--and, in fact, EBITDA

17   is this--by far the most heavily weighted metric--for their

18   companies to companies that use earnings per share?

19   There's no difference?

20           MR. FRISKE:  There's a difference in the metric.

21   But I think that, back to my earlier comments, the--when I

22   said it's comparable to markets, comparable to market in

23   the sense that there's a profit-based metric, that they're

24   focusing on profitability.  Now, whether they define that

25   as EPS, EBITDA, net income, operating income, it's going to

1    depend on the circumstances of the organization.

2            And, in this particular case, focusing on EBITDA

3    in restructuring makes sense from the standpoint of: what's

4    controllable?  If you go back, why would you have an

5    incentive?  An incentive is often to drive individuals to

6    achieve specific actions that are within their control,

7    within their line of sight.

8            MS. SCHWARTZ:  But that's not the only reason to

9    use that (indiscernible), right?

10           MR. FRISKE:  I know.  But that's largely--I mean,

11   my work, when we're often hired--

12           MS. SCHWARTZ:  Yeah.

13           MR. FRISKE:  That's normally what we're asked to

14   do: help us design incentives that'll help us achieve these

15   business objectives.  And the business objectives tend to

16   be financial, operational.  But that's--

17           MS. SCHWARTZ:  And retention.  Can't a business

18   objective be to retain employees?

19           MR. FRISKE:  Yes.  And I think any incentive plan

20   has some--particularly has some retentive component.  But

21   it's not the primary orientation.

22           MS. SCHWARTZ:  Well, there can be some retention

23   plans that that's the primary component, isn't that

24   correct?

25           MR. FRISKE:  Could be, yes.

1              MS. SCHWARTZ:  In fact, the Key Leader Program

2    that's not applicable to insiders has no incentive

3    component, isn't that right?

4              MR. FRISKE:  That's correct.

5              MS. SCHWARTZ:  That's strictly a retention plan,

6    isn't it?

7              MR. FRISKE:  Yes.  It is.

8              MS. SCHWARTZ:  Now, on page four of your

9    declaration, you state that, to do your analysis, you took

10   a representative sample of the participants in the insider

11   compensation programs.

12             MR. FRISKE:  Correct.

13             MS. SCHWARTZ:  I'm curious why you did that.

14   There's only 26 people in the plan.  Could you explain why

15   that is?

16             MR. FRISKE:  Sure.  The challenge in any

17   marketplace--and that's what we refer to these when we look

18   at data and prepare--

19             MS. SCHWARTZ:  Could you slow down a little?

20   Because I'm trying to follow you.

21             MR. FRISKE:  Sure.  So, when we look at market

22   data, and compare market data to pay for a company, it's

23   virtually impossible to be able to match every single job

24   that exists at a company to the broader marketplace.  The

25   reason for that is that companies create hybrid jobs.  They

1    create jobs that exist nowhere else in the world.  They

2    combine functions that just aren't normally combined in

3    other organizations.

4              And so, in our databases, we have benchmark jobs.

5    What that means is jobs that are fairly comparable across

6    companies: CFO, auditor, engineer.

7              MS. SCHWARTZ:  Treasurer.

8              MR. FRISKE:  Treasurer, accountant, too.  The

9    idea is you want to get pretty close--

10             MS. SCHWARTZ:  Trial attorney.

11             MR. FRISKE:  Trial attorney, very unique.  But

12   so, anyway, we have these benchmark jobs.  And so, you look

13   to see the positions that are in the organization.  You try

14   to match them to the best of your ability to match them.

15   They're comparable.  What you don't want to do is force-fit

16   jobs and say, "Well, this job--we have to find a match for

17   it, so let's find a match."  No.  We'll often have--in fact,

18   we always have no matches, non-matches.

19             That's the case here.  There are positions--of

20   the 26, I believe we matched 19 of them.  I believe there

21   are seven.  I don't recall which exact ones, but there were

22   seven that we just felt: you know what?  We don't have a

23   good match.  They're unique; the data isn't good.  So,

24   anyway, that's how we ended up doing this sample, as

25   (indiscernible) them all.

1           MS. SCHWARTZ:  I appreciate that.  That's

2    helpful.  Now, you were retained in October 2012, is that

3    right?

4           MR. FRISKE:  Yes.

5           MS. SCHWARTZ:  And what was the scope of your

6    engagement?

7           MR. FRISKE:  At that point, it was to work with

8    the ONC and management to review their compensation

9    programs within the context of any number of possible

10   restructuring scenarios.  So, what I mean by that is in

11   court, out of court, no restructuring in the sense of a

12   financial restructuring.  So, at that point, it was

13   unclear, the path that the organization was going to take.

14   So, how do we ensure that we continue to motivate and

15   incent employees, depending on which of these paths the

16   organization eventually follows?

17          MS. SCHWARTZ:  Was part of that work that you

18   did: how do we make sure we can actually pay the bonuses

19   under these plans if the company goes into bankruptcy?

20          MR. FRISKE:  Can you maybe define, "how do we

21   pay"?

22          MS. SCHWARTZ:  Make the payment.  How do we get

23   court authorization to make the payment?

24          MR. FRISKE:  Well, certainly there--a part of

25   this was understanding what are the laws in the bankruptcy

1    court.

2              MS. SCHWARTZ:  Okay.

3              MR. FRISKE:  And ensuring that the programs were

4    developed within that context.  So, yeah, that was part of

5    it.  Now, when you said, "making sure they got paid," well,

6    obviously, they are forms.

7              MS. SCHWARTZ:  No, I was inartful.  I meant get

8    authorization from the Court to pay.

9              MR. FRISKE:  Yeah.  Yeah.  So, yeah, that

10   certainly was part of--

11             THE COURT:  All right, time out.  If you talk

12   over each other, the transcript's a disaster.  She asks a

13   question; you answer; she asks a question.  Let's--I know

14   it's the way people normally speak, but it destroys the

15   transcript.  Let's just slow down a little.

16             MR. FRISKE:  Thank you.

17             MS. SCHWARTZ:  Okay.  Okay, so, let me just think

18   where we were.  Yes.  So, you said that part of the--part

19   of your job was to, among other things, make sure that--you

20   know, the company wanted to be able to be sure that they

21   would be able to pay the bonuses within the strictures of

22   the bankruptcy code.  Would that be right?

23             MR. FRISKE:  Yes.

24             MS. SCHWARTZ:  And, at paragraph 10 of your

25   declaration, on page four, you say that you have

1   familiarized yourself with the debtor's operations and

2   unique business, and restructuring challenges.  Do you see

3   that?

4            MR. FRISKE:  Yes.

5            MS. SCHWARTZ:  Can you tell me what you did to

6   familiarize yourself with the operations and unique

7   businesses?

8            MR. FRISKE:  Had discussions with different

9   parties of management, both in, you know, HR, legal

10  function, CEO, operations.  Talked to outside advisors, K&E

11  and others.  Did research online to understand the

12  business.

13           MS. SCHWARTZ:  Okay.  And, as part of your

14  evaluation of the debtor's plans, did you read the plan

15  documents?

16           MR. FRISKE:  Yes.

17           MS. SCHWARTZ:  And earlier, you testified that

18  the Key Leader Performance Plan was 100-percent incentive.

19  Do you recall that?

20           MR. FRISKE:  The Key Leader Performance Plan,

21  yes.

22           MS. SCHWARTZ:  Okay.  Are you--and you read that

23  plan document as well; is that right?

24           MR. FRISKE:  Yes.

25           MS. SCHWARTZ:  Okay.  Is it your understand that,

1    in order for the participants in that plan to get paid

2    under that plan, they have--there is a retention component

3    of that plan?

4         MR. FRISKE:  In the sense that they have to be

5    there at the end of the performance period?  Is that your--

6         MS. SCHWARTZ:  Yes.

7         MR. FRISKE:  Your question?  Yes.

8         MS. SCHWARTZ:  Okay.  I just wanted to clarify

9    that.  And similarly, with respect to the SPC LTIP, don't

10   the eligible employees have to be currently employed by the

11   company in order to receive payment?

12        MR. FRISKE:  Yes.

13        MS. SCHWARTZ:  And so, if they voluntarily resign

14   and don't stay with the company, they forfeit that payment.

15   Isn't that correct?

16        MR. FRISKE:  Yes.

17        MS. SCHWARTZ:  On paragraph 12--in paragraph 12,

18   you state--and I'm just going to read this, because I want

19   to ask you something about what you said--"I believe the

20   overall design and structure of the debtor's insider

21   compensation programs, in which incentive awards are paid

22   primarily on the basis of the debtor's achieving certain

23   EBITDA, operational, and other performance targets, are

24   generally consistent with market practice and properly

25   align employees--employee incentives with the debtor's

1    operating success." Why did you say generally consistent

2    and not consistent?

3              MR. FRISKE:  Because consistent might imply that

4    the exact structure of the program was comparable to

5    market.  So, for example, the weightings of the different

6    metrics would be the exact same between this program and

7    what you'd see in the marketplace, so how much weight was

8    put to EBITDA versus the operational metrics, or the

9    specific operational metrics that are being measured by the

10   debtor versus what you see in the marketplace.  They're not

11   the exact same.  They're generally consistent.

12             MS. SCHWARTZ:  And the consistency is what, the

13   types of metrics?  I'm trying to understand what's

14   consistent.

15             MR. FRISKE:  The fact that there's a

16   profitability metric.

17             MS. SCHWARTZ:  I'm sorry?

18             MR. FRISKE:  The fact there is a profitability

19   metric.  The fact that there are operational metrics, such

20   as cost measurements, customer satisfaction, those types of

21   measures.

22             MS. SCHWARTZ:  All right.  You are aware that

23   there are--there is a proxy--oh, by the way, when you did

24   the direct compensation target, that included bonuses at

25   the target baseline, is that right?

1           MR. FRISKE:  Correct.

2           MS. SCHWARTZ:  Okay.  So, you--that--those

3    numbers don't include if the company exceeds the baseline,

4    is that right?

5           MR. FRISKE:  That is correct, consistent with

6    market data.  The market data also was at target and would

7    not include the opportunity for the market comparators to

8    earn more than target.

9           MS. SCHWARTZ:  Okay.  But, in fact, the actual

10   plans here and the performance, based on the past

11   performance of this company, is that those targets have

12   been met and exceeded in the past five years.  Is that

13   correct?

14          MR. FRISKE:  Yes.

15          MS. SCHWARTZ:  In this case, you're aware that,

16   for the SPC LTIP, the company obtained the issuance of

17   approximately $18 million in letters of credit to assure

18   payment of the compensation in that plan, correct?

19          MR. FRISKE:  Yes.

20          MS. SCHWARTZ:  How many of the other plans that

21   you have evaluated, worked on, et cetera, in your

22   experience in 24 years--how many times have you seen

23   companies obtain letters of credit to assure payment?

24          MR. FRISKE:  None.

25          MS. SCHWARTZ:  Could you say that again?

1             MR. FRISKE:  None.

2             MS. SCHWARTZ:  None.  You also said that it was,

3     I guess, either common or not unusual for companies in

4     bankruptcy that have executive compensation plans to use,

5     as a metric, EBITDA.  Is that correct?

6             MR. FRISKE:  Yes.

7             MS. SCHWARTZ:  But this company used EBITDA

8     before the bankruptcy, isn't that right?

9             MR. FRISKE:  Yes.

10            MS. SCHWARTZ:  So, the fact that they're using

11    EBITDA and you're comparing them to companies in bankruptcy

12    isn't necessarily determinative, because they were always

13    using EBITDA.  Is that right?

14            MR. FRISKE:  I guess I'm not sure why it's not

15    determinative.  My comment was simply that it was a common

16    performance metric, both in bankruptcy and outside of

17    bankruptcy.

18            MS. SCHWARTZ:  And, in those bank--with respect

19    to the bankruptcy plans that you evaluated or helped

20    implement or develop, were those companies also using

21    EBITDA prepetition?

22            MR. FRISKE:  I can't recall.  I'm sure they all

23    weren't.  I don't recall the specifics, though, of each of

24    the individual cases.

25            MS. SCHWARTZ:  But you didn't look at that.

1          MR. FRISKE:  No.

2          MS. SCHWARTZ:  Earlier, Mr. Dempsey asked you

3     your view with--you--actually, he asked you some comments

4     about our objection, the U.S. Trustee, the objection we

5     filed on the behalf of the U.S. Trustee.  And he stated

6     that it was our view, although, frankly, in our papers, we

7     had quoted one of the debtor's professionals, Mrs. Kirby,

8     who had made a statement with respect to the non-insider

9     Key Leader Plan and the quarterly payment--devising of the

10    quarterly payments, that that was more retentive.  And you

11    said that you didn't agree with that.  Is that right?

12         MR. FRISKE:  I believe what I said was that the

13    very fact of the paying quarterly--

14         MS. SCHWARTZ:  Mm hmm.

15         MR. FRISKE:  Did that make--I believe Mr.

16    Dempsey's question, or at least I interpreted it to be,

17    wasn't the fact that it was a quarterly payment more

18    retentive?  That's what I said.  I didn't agree that,

19    simply because it was a quarterly payment, that that made

20    it more retentive.

21         MS. SCHWARTZ:  Okay.  With this company, you

22    familiarized yourself with the company, their plans, et

23    cetera.  And you said it's not uncommon for a company to

24    modify their targets during the course of the year,

25    correct?

1           MR. FRISKE:  No, I said that, over the course of

2    time of modifying targets, every year it was you'd have new

3    incentive programs; you would revise them.  So, that would

4    be the part that I was saying wouldn't be uncommon.

5           MS. SCHWARTZ:  Okay.  So, here, though, the

6    debtors did a--in essence, a wholesale revision of their

7    targets in June, midyear.  Is that correct?

8           MR. FRISKE:  I don't know if it was June.  I

9    can't recall the exact date.  I thought it was later, but

10   in summer.

11          MS. SCHWARTZ:  Okay.  And they have 21 metrics;

12   is that right?

13          MR. FRISKE:  That sounds about right.

14          MS. SCHWARTZ:  Okay.

15          MR. FRISKE:  I don't remember the exact number,

16   but yes.

17          MS. SCHWARTZ:  It would be your understanding

18   that almost all of them were modified in the midyear, is

19   that right?

20          MR. FRISKE:  To some degree, either threshold or

21   other--yes.

22          MS. SCHWARTZ:  And, based on your review of the

23   debtor's history with compensation and plans, had the

24   debtors ever done that before?

25          MR. FRISKE:  Not to my knowledge, no.

1           MS. SCHWARTZ:  You also testified that it's not

2    unusual for companies to pay executive compensation--to get

3    authorization to pay executive compensation programs in

4    bankruptcy, right?

5           MR. FRISKE:  Yes.

6           MS. SCHWARTZ:  But they're not authorized in

7    every case, are they?

8           MR. FRISKE:  No.

9           MS. SCHWARTZ:  And you've been in cases where

10   there haven't been executive compensation programs that

11   have been approved during a Chapter 11, isn't that right?

12          MR. FRISKE:  Yes.

13          MS. SCHWARTZ:  So, it varies, case by case.

14   Isn't that correct?

15          MR. FRISKE:  Yes.

16          MS. SCHWARTZ:  I know I have one more question in

17   the back of my head, but I can't think of it.  So, I will

18   conclude my cross at this time.  Thank you.

19          THE COURT:  Thank you.  Redirect?

20          MR. DEMPSEY:  Yes, Your Honor, briefly.  David

21   Dempsey, Kirkland & Ellis, on behalf of the debtors.  Mr.

22   Friske, two general topics I want to briefly explore.

23   Number one: you testified, with regard to the letters of

24   credit, that (indiscernible) a portion of the SPC LTIPs.

25   Are you aware--in your experience, have you seen other

1    mechanisms to secure funding that might be made at some

2    time out in the future with regard to compensation

3    programs?

4             MR. FRISKE:  Yes.

5             MR. DEMPSEY:  Can you describe some of those

6    programs?

7             MR. FRISKE:  The most common would be trusts,

8    whether it be a Rabbi trust, secular trust.  In both of

9    those cases, money is set aside to ensure that it's

10   available to be paid, again, as you said, at some point in

11   the future.

12            MR. DEMPSEY:  Are those sorts of Rabbi trusts or

13   other trusts generally common in the industry?

14            MR. FRISKE:  Based on our data, used by roughly

15   50 percent of the companies, so relatively common, yes.

16            MR. DEMPSEY:  You evaluated the particular--the

17   SPC LTIPs total cost (indiscernible) to market, including

18   those letters of credit, the secured amounts, correct?

19            MR. FRISKE:  Yes.

20            MR. DEMPSEY:  And why did you choose to factor in

21   the amounts that are backed by LCs, even if they're not the

22   subject of this motion?

23            MR. FRISKE:  Well, there's two reasons.  One, as

24   I had mentioned earlier, when looking at the overall cost

25   of the programs and the competitiveness--and that was the

1    nature of my analysis, was competitiveness--it made sense

2    to me to include them all.  To me, the letters of credit

3    are separate to what I am interested in primarily, which

4    is: are these incentivizing?  Are the total amounts

5    reasonable?  Are they competitive?

6             The letters of credit are the funding mechanism,

7    not about the competitiveness of the pay levels or the

8    structure.  So, hence they were secondary.  I knew of them.

9    But they weren't going to impact, again, whether the

10   (indiscernible), the how much, or the how--were within

11   lines of market.

12            MR. DEMPSEY:  Ms. Schwartz also asked you

13   questions about your choice of target compensation amounts

14   as opposed to the total possible amount that might be paid

15   under these programs.  Could you explain to the Court why,

16   in particular, you chose to compare the target compensation

17   opportunities of the debtors to those in their peer group?

18            MR. FRISKE:  Well, what I think is important when

19   companies are structuring their compensation programs--and

20   this is our standard operating practice--the goal, and I

21   think the right approach, is to say: do we have a pay

22   structure that's competitive?  Structure is defined by the

23   target opportunities that were put in place.

24            What's actually realized by those programs,

25   whether it's above or below target, is a function of the

1    performance of the company.  But if you don't have a

2    starting point, a structure that's competitive to begin

3    with, well, then, you can never really catch up.

4              So, you need to start by saying: is the structure

5    of the programs competitive?  Structure being defined by

6    the targets.  And then, over time, you can assess whether

7    or not the payouts that come from those are reasonable by

8    looking at the performance of the organization, how it

9    compares to peers, value created for stakeholders, and

10   other factors.

11             MR. DEMPSEY:  In comparing the total target

12   opportunities at the debtors to market, where do the

13   debtors stand relative to the industry?

14             MR. FRISKE:  Assuming the motion is passed?

15             MR. DEMPSEY:  Assuming the motion is passed.

16             MR. FRISKE:  Again, if you look at the overall

17   group of people that we're talking about, it's below the

18   median, 11 percent below the median for the combined group.

19             MR. DEMPSEY:  No further questions, Your Honor.

20             THE COURT:  Thank you.  Thank you, sir.  You may

21   step down.  Well, that's going to be it for witnesses

22   today.  We have Mr. Filsinger tomorrow, and perhaps Ms.

23   Kirby and Ms. (indiscernible), correct?

24             MR. MCKANE:  That's correct.  This is Mark

25   McKane, Kirkland & Ellis, for the debtors.  That's correct.

1    Those are the live witnesses that remain.

2            THE COURT:  All right.  I will--we will reconvene

3    tomorrow at 9:30.  I--if you will give me a DVD, I get in

4    about 7:20, so I have time to read or watch the DVD in the

5    morning.  So, I will do that, and we won't have to take up

6    court time with it, assuming it's--everybody's okay with me

7    doing that.  I want to make sure that's all right.

8            MR. MCKANE:  We have no objection, Your Honor,

9    for the debtors.

10           MS. SCHWARTZ:  Yeah, we are totally fine with

11   that.  It was our suggestion.  One thing just to note, for

12   the Court: when--yesterday, when the debtors were calling

13   chambers about the video and how long it was, and making an

14   effort to shorten it, et cetera, they did shorten part of

15   the actual DVD.  But we have a transcript that was in fact

16   highlighted so that you could see all of our, the U.S.

17   Trustee's designations, and all of the debtor's

18   designations.  That's not all on the videotape.  So, you

19   will have a hard copy to be able to follow with that.

20           MR. MCKANE:  Yeah.  And, just to be clear, sir,

21   originally we were at an hour.  We cut ours down to about

22   35 minutes.  And what has been cut was from the debtors.

23   So.

24           MS. SCHWARTZ:  Right.  And, Your Honor, we didn't

25   double designate.  In other words, when we received their

1    designation--

2              THE COURT:  Oh, I see.  Okay.

3              MS. SCHWARTZ:  Yeah.  But that's the point I'm

4    trying to make, Your Honor.

5              THE COURT:  There you go.

6              MS. SCHWARTZ:  Some of what they have now taken

7    out would have been part of our designation.

8              THE COURT:  All right.  So, I have a hard

9    transcript?

10             MS. SCHWARTZ:  Yes, sir.

11             THE COURT:  Okay.

12             MR. MCKANE:  And, Your Honor, we have both--

13   before I request to approach, one qualification.  What I

14   have in my hands, I am told, is a CD, not a DVD.  And

15   therefore, it can play on a computer but may not play on a

16   DVD player (indiscernible).

17             THE COURT:  All right.  It's going to play on my

18   computer.

19             MR. MCKANE:  May I approach?

20             THE COURT:  Yeah.  I'm not going to take it home

21   and put it on the big screen.

22             MS. SCHWARTZ:  (indiscernible) we have that, the

23   judge?

24             MAN:  I don't know.

25             MS. SCHWARTZ:  For the transcript?

1           THE COURT:  Mr. Evans in HD, I don't know if you-

2   -

3           MS. SCHWARTZ:  [UNINTEL PHRASE]

4           THE COURT:  I have it.  I actually--I have the

5   transcript notes with debtor in yellow and U.S. Trustee in

6   blue.

7           MR. MCKANE:  That's correct.

8           THE COURT:  All right.  I have it here.  Do you

9   have--you want a copy?  Mrs. (indiscernible) doesn't have

10  anything to do tonight after the kids go to bed, so we'll

11  let her have a copy.  Yeah.  So, you have this, too?  Okay.

12          MR. MCKANE:  We'll provide one as well.

13          THE COURT:  We're good.  All right.  You can

14  (indiscernible) leave your materials here, but I would ask

15  you to clean up the area as best you can.  If you could

16  dispose of your own trash, et cetera, not leave the boxes

17  all over the place, the cleaning crew does come through

18  tomorrow.  So, we'll have a nice, clean courtroom for the

19  hearing.

20          For tomorrow's agenda, I will start at 9:30 and

21  proceed.  I have a telephone conference at 1.  So, if we're

22  still in session at 1, we will have to take a break.  I

23  probably will do that over the lunch hour.  And we'll have

24  to clear the courtroom completely, so--because I can only

25  do--I have to do it up here, because it's going to be on

1    the record.  So, we'll clear the courtroom at that time,

2    and I can have my telephone conference, and we can continue

3    after if we're not done yet.  And we'll go--well, we'll see

4    how we proceed tomorrow.  I'm not going to make you any

5    promises.

6              MR. MCKANE:  Thank you, Your Honor.

7              THE COURT:  All right.

8              MR. MCKANE:  Appreciate your time.

9              THE COURT:  You're welcome.  We're adjourned

10   until tomorrow.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          * * * * *

2

3                          I N D E X

4

5                      W I T N E S S E S

6    WITNESS                 BY                          PAGE

7    PAUL KEGLEVIC           MR. SHORE                    *

8                            MR. MCKANE                   *

9

10

11                         I N D E X

12

13                      E X H I B I T S

14   NO.                IDENTIFICATION             RECEIVED

15   Plaintiff's:

16

17

18

19

20

21

22

23

24

25

Page 297

1                    C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certify that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya

7     Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2014.10.09 17:13:03 -04'00'

8

9     Veritext

10    330 Old Country Road

11    Suite 300

12    Mineola, NY 11501

13    Date:  October 8, 2014

14

15

16

17

18

19

20

21

22

23

24

25