1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :

                                    :    Chapter 11

6   ENERGY FUTURE HOLDINGS          :

    CORP.,  et al.,                 :   Case No. 14-10979(CSS)

7                                   :

             Debtors.              :    (Jointly Administered)

8   _____:

9

10                                  United States Bankruptcy Court

11                                  824 North Market Street

12                                  Wilmington, Delaware

13

14                                  October 9, 2014

15                                  10:54 AM - 5:17 PM

16

17

18  B E F O R E :

19  HON CHRISTOPHER S. SONTCHI

20  U.S. BANKRUPTCY JUDGE

21

22

23

24

25  ECR OPERATOR:  LESLIE MURIN

Page 2

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Authorizing the Debtors to (A) Pay

3    Certain Prepetition Amounts on Account of the Insider

4    Compensation Programs and (B) Continue the Insider

5    Compensation Programs in the Ordinary Course of Business on

6    a Postpetition Basis [D.I. 1792; filed August 8, 2014]

7

8    HEARING re Motion of Energy Future Holdings Corporation for

9    Entry of an Order Authorizing the Debtors to File Under Seal

10   the Certain Portions of Commercially Sensitive Information

11   Set Forth in the Debtors' Motion for Entry of an Order

12   Authorizing the Debtors to (A) Pay Certain Prepetition

13   Amounts on Account of the Insider Compensation Program and

14   (B) Continue the Insider Compensation Programs in the

15   Ordinary Court of Business on a Postpetition Basis [D.I.

16   1795; filed August 8, 2014]

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Penny Skaw, Melissa A. Looney

25

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorneys for the Debtors

4

5    BY:  DAVID DEMPSEY, ESQ.

6         EDWARD SASSOWER, ESQ.

7         MARK MCKANE, ESQ.

8

9    RICHARDS, LAYTON & FINGER, P.A.

10        Attorney for the Debtors

11

12   BY:  MARISA FERRANOVA, ESQ.

13

14   MORRISON & FOERSTER

15        Attorneys for the Committee

16

17   BY:  LORENZO MARINUZZI, ESQ.

18

19   POTTER ANDERSON CARROON LLP

20        Attorney for Duetsche Bank New York

21

22   BY:  R. STEPHEN MCNEILL, ESQ.

23

24

25

Page 4

1   FOX ROTHSCHILD

2        Attorney for TECH Unsecured Notes

3

4   BY:  JOHN BIRD, ESQ.

5

6   YOUNG CONAWAY STARGATT & TAYLOR, LLP

7        Attorney for Ad Hoc Committee of TCEH First Lien

8        Creditors

9

10  BY:  PAULINE K. MORGAN, ESQ.

11

12  PAUL, WEISS, RIFKIND, WHARTON & GARRISON

13       Attorneys for Ad Hoc Committee of TCEH First Lien

14       Creditors

15

16  BY:  BRIAN S. HERMANN, ESQ.

17

18  ASHBY & GEDDES

19       Attorney for WSFS, Trustee

20

21  BY:  GREG TAYLOR, ESQ.

22

23

24

25

1    KLEHR HARRISON

2         Attorney for UMB Bank, Indenture Trustee

3

4    BY:  RAYMOND H. LEMISCH, ESQ.

5

6    UNITED STATES DEPARTMENT OF JUSTICE

7         Attorneys for the U.S. Trustee

8

9    BY:  RICHARD L. SCHEPACARTER, ESQ.

10         ANDREA B. SCHWARTZ, ESQ.

11         TIMOTHY J. FOX, JR., ESQ.

12

13   COUSINS CHIPMAN & BROWN, LLP

14         Attorney for Ad Hoc Committee of EFIH Unsecured

15         Noteholders

16

17   BY:  ANN M. KASHISHIAN, ESQ.

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              THE COURT:  Please be seated.

 4              Good morning, before we restart just so the record

 5    is clear during the overnight recess I did both view the

 6    video deposition designations of Mr. Evans and Reed (ph),

 7    the designations out of a transcript, and just formally both

 8    of those items are admitted into evidence, I assume without

 9    objection since they were doubly designated, and that's part

10    of the record.

11         (Depositions were admitted)

12              THE COURT:  So now I think it's the debtors' next

13    witness.

14              MR. DEMPSEY:  Good morning, Your Honor.  David

15    Dempsey, Kirkland & Ellis on behalf of the debtors.

16              We'd call Mr. Todd Filsinger.

17              THE COURT:  Very good.

18              THE CLERK:  Please raise your right hand.

19         (Witness Sworn)

20              THE CLERK:  Please state and spell your name for

21    the record.

22              THE WITNESS:  Todd Filsinger.  T-O-D-D, last name,

23    F-I-L-S-I-N-G-E-R.

24              THE CLERK:  Thank you.  You may be seated.

25    DIRECT EXAMINATION
```

1    BY MR. DEMPSEY:

2    Q    Good morning, Mr. Filsinger.

3    A    Good morning.

4    Q    Could you please introduce yourself to the Court?

5    A    My name is Todd William Filsinger.

6    Q    Where do you work, Mr. Filsinger?

7    A    I am a senior managing director at Filsinger Energy

8    Partners.

9    Q    What general by does Filsinger Energy Partners do?

10   A    Filsinger Energy Partners is an advisor to the energy

11   and manufacturing sector.  We do things such as strategy,

12   planning, technical and financial due diligence around

13   energy and manufacturing assets and companies, which would

14   include doing buy side, sale side, analyze, supporting bids,

15   sales, looking a companies and plants, looking at their

16   valuations and looking at all the cost and gross margin and

17   EBIDTA and generating capability around those type of

18   assets.  We also do interim management and appraisal and

19   valuation.

20   Q    Come back and unpack that in a bit, but I understand

21   you were retained by EFH in the matter?

22   A    Yes.

23   Q    When was that?

24   A    It was in December of 2012.

25   Q    Are you familiar with the compensation plans that

1    interest the subject of today's motion?

2    A    Yes, I am.

3    Q    And have you been asked to evaluate the reasonableness

4    of the performance metrics that trigger incentive

5    compensation under these programs?

6    A    Yes, I have.

7    Q    Before we get to your opinions in that regard could you

8    please tell the Court about your educational background?

9    A    Yes, I have a bachelor's in mechanical engineering from

10   Colorado State University and an MBA from Colorado

11   University.

12   Q    Okay.  What did you do after leaving Colorado

13   University?

14   A    When I left I actually got my master's degree while I

15   was working at a company called R.W. Beck, which is now

16   called -- has been acquired SAIC, but it's one of the top

17   engineering -- independent engineering firms, does a lot of

18   diligence for the -- primarily for the banks and lenders

19   around generation, distribution, transmission type assets.

20   And I worked there for approximately 13 years, so I was

21   supporting the financial and technical due diligence.

22   Q    What did you do after leaving R.W. Beck?

23   A    When I left R.W. Beck I went to a company called Heglar

24   Vie (ph) out of Boulder, Colorado as a vice president, and

25   that company was soon thereafter purchased by a company

1    called P.A. consulting group.

2            At that company I -- which I was there up until

3    the current -- my current job at Filsinger Energy Partners,

4    I became the head of the energy -- the global energy

5    practice where we did work around, you know, a lot of

6    financing, market price forecasting, diligence round assets,

7    transmission and distribution planning.  Things on that

8    order.

9    Q    And how long were you at Heglar Vie and then P.A.

10   Consulting in total?

11   A    I believe it was around 11 years or so.

12   Q    You said you're now at FEP, can you describe how that

13   came about?

14   A    Yes.  FEP being the abbreviation for Filsinger Energy

15   Partners.

16           I formed that firm in 2010 -- June of 2010, I

17   brought together some of the leaders in the industry, I

18   brought in the chief risk officer from Calpine Corporation,

19   a VP of asset management from Dynegy, the head of Vatex

20   (ph), a major software provider for this sector, at the PHG

21   economist to run the market side, and I also brought in

22   utility directors from other utilities -- small utilities.

23           My overall -- my senior team has got about 150

24   years of collective experience, plus my approximately 28

25   years experience in the sector.

1  Q    Mr. Filsinger, can you describe for the Court any

2  experience that you have working with companies like EFH on

3  financial and operating metrics?

4  A    Well most everything that we do deals with the

5  operating cost, gross margin EBITDA generating capability of

6  different assets in companies.  We've worked with probably

7  -- or I personally have worked with probably over I would

8  say half of the utilities in the country and virtually all

9  the merchant power generators and a large number of the

10  retail providers on the regulated side, and then some of the

11  deregulated side.

12          Very -- I mean this company is unique because it's

13  -- as Mac (ph) explained and Jim explained I thought pretty

14  thoroughly, that they have the power side, they have the

15  retail side, and they have the mining side, one of the

16  largest miners in the country.  So that's a bit unique with

17  the size of the operation, but generally for a lot of the

18  utilities have those same -- you know, the same operations

19  minus that level of mining.

20  Q    Mr. Filsinger, can you tell the Court about any

21  specific experience you have in the Texas energy market?

22  A    Yes.  In Texas, you know, starting with the -- one of

23  the first merchant powered financings, and I look at

24  merchant power as really -- it's almost like the -- when

25  power got deregulated instead of selling your power in a

1    regulated market you had to find buyers for your power.

2           I worked on the financing for the first merchant

3    power unit, which was in Pasadena, Texas down on the Houston

4    ship channel with ING Capital, the lenders, and putting that

5    together in the late '90s in anticipation of deregulation in

6    the Texas market.  Again, that included doing all the

7    diligence around that asset.  It was one of its first, the

8    banks had to get comfortable with the -- you know, with the

9    ability that unit to produce, what capacity factor it would

10   be at or reliability so they could figure out how much

11   revenue and how much debt to support.

12          In addition not long after that I worked with one

13   of the retail providers on the implementation of Senate

14   Bill 7.  Senate Bill 7 is really -- was the driver behind

15   moving Texas from a wholesale market, which was starting to

16   be deregulated, to having also retail competition where the

17   customers, as Jim Burke explained, they'd start moving

18   around.  Senate bill 7 is what created that, and I worked on

19   the strategy for one of the retail providers on that.

20          In addition I worked with one of the first retail

21   providers start ups, it was actually a subsidiary of Excel

22   out of Minnesota, created a subsidiary in Texas to start a

23   retail service, and we developed all their pricing models

24   and helped them with strategy and hiring of their -- some of

25   their key employees.

1          In addition to that I've looked at a lot of the

2    merchant generators that have been built.  Texas is one of

3    the most aggressive markets with respect to new generation

4    being built.  We did a lot of the work and diligence around

5    those financings.  We also -- NRG, which is one of the

6    competitors in this situation, we worked on the assets that

7    they purchased that got them into Texas, we did a bid for

8    them for some of the equity players.  NRG ultimately won the

9    bid, but we analyzed all those particular assets.  So valued

10   all those -- you know, the energy, coal, the south Texas

11   nuclear plant, the other nuclear plant in the state.

12          And in addition I worked with Calpine Corporation,

13   which has -- which is one of the other very large players in

14   the Texas market.

15          So all in all I've probably looked at the -- and

16   been in a number of the facilities I would say half to three

17   quarters of the generating units in the State of Texas.

18   Q    Could you please describe for the Court any experience

19   that you have in particular advising company companies

20   within the context of restructuring in the private sector?

21   A    In the restructuring -- you know, one of the --

22   obviously one of the first energy companies to get into

23   distress was Enron, and we worked with -- I worked with

24   Enron before the Federal Energy Regulatory Commission

25   primarily with respect to their pricing issues.  We worked

1   on the NRG bankruptcy for the lenders, the (indiscernible-

2   11:04:46) bankruptcy for the creditor groups.  Worked on

3   Dynegy, some distress, not necessarily -- they weren't

4   bankruptcies -- Dynegy, Allegany, PGE National Energy Group,

5   which was a bankruptcy, Star Gas, and then we worked on -- I

6   worked on Hawkeye Growth, which was a distressed entity.

7   Q    Were you also on the team that worked on the Calpine

8   bankruptcy?

9   A    Yes, and on the Calpine bankruptcy we worked for the

10  debtor and -- in the bankruptcy period and post-bankruptcy

11  period.

12  Q    Can you tell me the Court about what work you did in

13  the post-bankruptcy period for Calpine?

14  A    Well with Calpine Corporation once they emerged the

15  board asked me to come on as the interim chief operating

16  officer to run the company in 2008, and I ran it up until I

17  believe it was around Memorial -- oh, excuse me -- Labor Day

18  when we at that time were able to recruit a CEO to take over

19  the company.

20  Q    In addition to your experience at Calpine do you have

21  other experience leading energy companies in the business

22  sector?

23  A    Yes, the other -- one of the other distressed companies

24  I spoke about was Hawkeye Growth, which is a large ethanol

25  producer, 220 million gallons in Iowa, had two separate

1    operating facilities.  I was asked by the Royal Bank of

2    Scotland to take over as a CEO and CFO of that company.

3    Q    And when was that?

4    A    That was in 2010.

5    Q    Mr. Filsinger, based on your experience broadly in the

6    energy market in Texas In particular in restructurings and

7    in the business sector, what experience do you have in

8    evaluating the types of metrics that are at issue here?

9    A    Well the types of metrics we're talking about here are

10   the reliability, the consumer satisfaction, EBITDA, cost,

11   everything we do encompasses those issues.  So when I'm

12   valuing a facility for a buyer I've got to look at all those

13   costs and make sure that we do the diligence around them.

14   In every restructuring we've done the diligence around the

15   budgets.

16          We've also done -- you know, built -- helped build

17   utilities from the ground up and developing budgets and

18   timelines and employees from the ground up.

19          So ever -- basically everything we do has

20   something to do with metrics, you know, metrics are the

21   operating -- financial and operating parameters within a

22   company, very similar to what you have here.

23   Q    I'm going talk now about the budgeting and metric

24   process if that's okay.

25   A    Okay.

1    Q    And we'll start first with the budgeting process, which

2    I think Mr. Burke and McFarland described in detail, so we

3    won't rehash that here.

4            Can you tell the Court though what your -- were

5    you involved in that budgeting process, Mr. Filsinger?

6    A    Yes, I was.

7    Q    Can you describe your involvement for the Court?

8    A    Yes, I was -- I'll describe it in two pieces.

9            First with respect to the budgeting process we

10   were involved with the ground up building of that budget, so

11   each individual business unit, I think as Mr. Burke and

12   Mr. McFarland described, the process of getting the

13   assumptions and everything else, we were in from the ground

14   up.

15           So, for example, at Luminant we were in the

16   meetings where they would have -- they would have each

17   individual plant would come in with their proposed budget

18   and go through the where they saw the operating cost, where

19   they saw they might need Cap X, where there might be issues

20   and they presented that to the Luminant management team.

21           I was in those meetings, that's when Mr. McFarland

22   would push back on them and have them go back to the drawing

23   tables and do things.  I was in those meetings from the

24   ground up.

25           In addition I was in -- when they rolled up after

1    those several iterations I was in the meetings with respect

2    to -- and my team were in the meetings where we talked about

3    when they finally got to the numbers that were going to be

4    presented to the larger SPC.

5          In the TXU side very similar situation, we were in

6    those meetings, of course it's a much different business

7    being retail, a lot less asset driven, but in there we --

8    the meetings were more based on, for example, the

9    residential sector.  So the residential piece had its

10   meetings about how much you're going spend on the

11   residential sector, where you saw the attrition, were you

12   saw the opportunities, and everything around that.  The same

13   thing with the commercial sector and the LCI, the large

14   commercial industrial customers.

15         So all that build up we were in that process to

16   learn how the company was doing things from their

17   perspective.

18         The second piece was really our independent

19   (indiscernible - 11:09:32) of the budget, which was really

20   we did both the budget and we looked at a longer range plan.

21         So in looking at that we developed from the ground

22   up our independent view of that, of course we were informed

23   by learning the company from all the meetings and

24   understanding and all their data and everything else, but we

25   developed our own basically models and developed the budget

1    from that perspective in addition.

2    Q    I'm going to come back to that, your independent work

3    in just a second, but taking a step back about -- and

4    talking about the debtors' budget -- budgeting process.

5            Based on your experience in the industry how would

6    you say the debtors' budgeting compares to other energy

7    companies?

8    A    I found that their process was very comparable, it's

9    definitely robust, they definitely have a large involvement

10   from all phases of the organization, which I found positive.

11   So they were getting, you know, all the issue boiled up, but

12   I found it very comparable and I would say robust.

13   Q    Please describe for the Court the work that you did,

14   independently modeled the debtors' budget along side their

15   work.

16   A    Okay.  So again two different business sectors.

17           First looking at TXU we developed models from the

18   ground up similarly to how the process as the company goes

19   through, so we looked at the weather, looked at what weather

20   we thought would go into our view, which I think, you know,

21   like 10-year, 20-year weather, looking at the averages how

22   weather changes, looking at the customer segments, looking

23   at the -- how the customers and how things have gone through

24   time, what was going on with the attrition, where the

25   customers were migrating too, looking at all the public

1    information, and deriving the forecast for each one of those

2    sectors, and then rolling that up into an overall forecast.

3          That was -- that was built on models that we

4    developed from the ground up specific to TXU, because it's

5    not something that there's a can model that you can do these

6    types of analyses with.

7          Luminant was a bit different, because with respect

8    to Luminant you've got power stations, you have, you know,

9    several inputs to that.  You've got the weather, you've got

10   gas prices, you've got load, you've got transmission

11   interconnections between all these plants.

12         So what we do, and this is what we do in -- any

13   time we look at a generating asset we use this consistent

14   methodology.  So we have a -- we develop a model, it's

15   really three different models.

16         The first model is what I would call is a

17   fundamental model, which really looks at the region and it

18   looks at all the different plants and where they're at, what

19   their heat rate is, what their fuel price is, all the

20   transmission interconnections, and then you look at the

21   load, and then you basically dispatch, which I think

22   Mr. McFarland explained, you know, figured out the marginal

23   price in any one hour, and it figures out which plant can it

24   start up.  Like Mr. McFarland said, if one of his plants,

25   are down even though it might be the most economical, it

1    can't start up.  The model takes all that into account.  The

2    ramp rates, how fast you can ramp that up.

3    Q    Does it do it on an hour by hour basis?

4    A    It does it on an hour by -- yeah, every single hour and

5    it looks at -- well because that's how the market works.

6            So from that perspective you come out and then

7    we've got additional models that look at some of the fixed

8    costs.  There's two other models that go through the process

9    to derive the overall gross margin.

10           But ultimately -- and that's the -- the model is

11   developed by a company called EPIS, it's a software model

12   that we then develop all the data and the inputs with

13   respect to that.

14   Q    Just so you can give the Court a sense of how large

15   this model is, how long does it take for a single run to

16   actually be executed?

17   A    Well, you know, it depends on what region you're in.

18   The good thing about ERCOT is, ERCOT, which is the Electric

19   Reliability Counsel of Texas, is electrically isolated, so

20   if you're doing it anywhere else, if you're doing it

21   anywhere else in the United States you've got all the

22   transmission interconnects all the way around those regions.

23           In Texas you don't have that, you really have a --

24   you know, not much power gets out of Texas, very little,

25   because it's electrically isolated on purpose.  So that one

1    it probably takes, you know, a day or two to run because you

2    don't have those interconnections.

3    Q    Mr. Filsinger, in addition to running modeling did you

4    go and visit any of the facilities of the debtors?

5    A    Yes.  Myself and members of my team visited the

6    facilities.  I visited I believe five facilities, my team

7    went to all the facilities, including all the power plants,

8    including the nuclear facility, all the gas plants, and the

9    mines.  And the purpose for that really was you can see a

10   lot on paper, and the one thing that we found in our

11   diligence exercise, which you know, we carried over from our

12   R.W. Beck or SAIC days is, you can see -- excuse me -- you

13   can see a plant on paper, but until you actually go in the

14   plant and see what you have it's -- you really don't have an

15   apples to apples comparison necessarily.

16              So, for example, you know, me and my team have

17   probably been in, I don't know, many, many hundreds, if not

18   thousands of plants across the university.  But you'll see

19   some plants, you'll walk in and it'll be dilapidated.

20   You'll see things leaking, it'll be very clear very quickly

21   what's going on at that facility.  The little things just as

22   you're walking up the rails and getting, you know, black

23   coal dust all over yourself, you know, how much that's

24   cleaned up.  By the way that can create a fire hazard for

25   sparks if you have that type of thing.  So that's an O&M

1    type issue.

2           We also see on the other side I've seen facilities

3    where an entity may be getting a lot of money out of rate

4    base and they sort of gold plate it, (indiscernible -

5    11:15:20) gold plated facility.  So it's in really good

6    condition.  Well you'd except that one that's in super

7    condition you can tell pretty quickly, you wouldn't really

8    eat off the floor, but it looks as though you could, it's

9    that -- some of them are that clean.  But from that

10   perspective you'll see -- you would expect to see very high

11   reliability but higher O&M and fairly high Cap X.

12          So what we did is we look at the facilities to see

13   is it reasonable.  Because in today's market of, you know,

14   sub $40 power prices you can't afford to be -- to have a

15   gold plated facility, you have to kind of balance the cost

16   and the reliability.

17          So we looked at the different facilities and

18   interviewed the O&M teams, the management teams to

19   understand where they're at and how they were functioning,

20   and also for comparability to other assets.

21          I should mention one thing that we did find with

22   these particular facilities is there's not much redundancy

23   at these particular facilities.  So you might go into one

24   facility and you have a feed water pump, which basically

25   feeds water into the boiler, and you'll have redundancy, so

1    you'll have three of them maybe with a 70 percent capacity

2    on each one.  So if one goes down you still have the

3    redundancy.

4              What we found at these facilities is there's not

5    as much redundancy.  So it puts more -- it will put -- it

6    puts a little bit more pressure on our reliability.  If one

7    of -- like I think it's Big Brown out of (indiscernible -

8    11:16:44) had one feed water pump, if that feed water pump

9    goes out then that plant is out.

10             So we did find, you know, those type of pressures

11   and understanding what sort of pressures are on the O&M as

12   well as the reliability.

13   Q    I'd like to turn now to talk about your work with

14   regard to the specific metrics here at issue with this

15   motion.  Were you involved in that process?

16   A    Yes, I was.

17   Q    Can you describe for the Court your involvement in

18   evaluating those metrics?

19   A    Well, I've explained some of it in the -- in the way we

20   looked at the facility and looked at the budget.

21             In addition to that we looked at -- we looked at

22   several things.  We did a risk analysis around the baseline,

23   we looked at industry performance, industry specific

24   performance of other entities, and we looked at -- we looked

25   at how the company has performed in the past.

1    Q    Let's walk through those one at a time.  You said you

2    looked at risk ranges around the performance.  Can you

3    describe the work that you did in that regard?

4    A    Yeah.  So we obtained -- we would look at each -- each

5    individual metric and then look at the risks around that.

6              You know, an easy one to describe is obviously

7    EBITDA.  We would take the -- we'd look at the EBITDA, we

8    would look at when you have the -- you know, if you use

9    Luminant for example, we would look at the model and look at

10   what changes in the load would do, changes in -- you know,

11   different stress points within that model.  One example is

12   wind generation.  As wind generation increases that has a

13   huge impact on coal facilities.  So we would look at those

14   different types of risk ranges.  And the same thing for TXU.

15   Q    You said as well that you looked at industry

16   performance relative to the companies.  Can you describe

17   what work you did to make that evaluation?

18   A    Yes, we looked at both public and private databases and

19   acquiring data on the facilities.  That -- those databases

20   include the Aurora EPIS database, which is used in our

21   fundamental model, that included the CEMs data, the

22   continuous emissions monitoring data that's reported to the

23   EPA by all facilities.  We looked at the NERC, North

24   American Electric Reliability Council PCGAR database.  And

25   we looked at the FERC filings, the data that's filed with

1    the Federal Energy Regulatory Commission.

2            We also looked at a database called Velocity Sweet

3    (ph) which subscribe to, which looks at -- accumulates data

4    from all -- a tremendous amount of the facilities and

5    contracts in the marketplace.

6    Q    Why did you compare the debtors' performance to

7    industry standards in evaluating these metrics?

8    A    Well in evaluating we wanted to see how they were

9    performing against their competitors in the marketplace or

10   similar assets in the marketplace.

11   Q    You also said that you looked at historical

12   performance.  Can you describe what you did to undertake

13   that analysis?

14   A    Well we looked at the data provided to us from the

15   company and examined how -- what that data was, and under --

16   you know, under -- what was under the data to make sure we

17   understood why something was changing or not changing.

18   Q    Mr. Filsinger, did you also look at the metric

19   categories?  Not the numbers themselves, but the categories

20   that are being evaluated?

21   A    Yes, we did.

22   Q    Are those categories similar to those used in the past

23   by the company?

24   A    Yes.  The company has used basically the same metrics

25   for five -- for at least five years.  Now there have been

1    some changes to those, which I think Mr. McFarland and

2    Mr. Burke explained.  Like, for example, Mr. McFarland

3    decided that it was important to break out the availability

4    in summer and winter, because as gas prices tightened and

5    the like you ended up with much -- you know, higher prices

6    in the summer and lower prices in the winter.  In fact

7    sometimes in the winter your plants aren't even profitable

8    to run.

9              I know that, for example, with that TXU they

10   revised their customer satisfaction metric, because I

11   believe in Mr. Burke's view he wasn't getting enough

12   information to understand that, and customer satisfaction is

13   so critical to them they wanted to expand that.

14             So I think that changed three years ago, if I've

15   got that correct.

16   Q    Are these metrics similar to those used at other energy

17   companies based on your experience, Mr. Filsinger?

18   A    Yes.  Generally companies in this sector will have

19   certain financial metrics, certain operational metrics,

20   safety metrics.  They're -- you know, they're similar to

21   what you see here.

22   Q    Mr. Filsinger, did you evaluate, based on your judgment

23   and experience, whether these metrics are appropriate to

24   use?

25   A    Yes, I think they -- I think they are very appropriate,

1    and if I just may add, I think when you look at these

2    entities and you look at Luminant, for example, when I

3    talked about when you visit the plant you look at how --

4    where that plant's at, there's a trade off between cost and

5    reliability, so you really need to look at both those

6    metrics.

7              At -- when we talked about TXU there's a trade off

8    between customer accounts and margin as well as, you know,

9    debt -- bad debt.

10             There's all these interconnections that it's

11   important that you keep an eye on any one so you're not

12   focused on just a metric that may not enhance the long-term

13   value of the enterprise.

14   Q    Mr. Filsinger, have you had the change to read the

15   United States Trustee's objection to the debtors' incentive

16   compensation motion?

17   A    Yes, I have.

18   Q    Do you understand that the U.S. Trustee suggests that

19   net income might be a more appropriate metric than EBITDA

20   for financial performance; is that right?

21   A    That's correct.

22   Q    Do you agree with that?

23   A    No, I don't agree, because it -- you know, part of when

24   you put something out there you want to have something that

25   one, that people have can control over that they have

1   change, and two, you -- if you didn't have income due to the

2   debt load it would be -- you'd be targeting a negative

3   number, which I think EBITDA is what you actually can drive

4   in this case, and ultimately the value of this enterprise is

5   going to be driven by that EBITDA.

6   Q    Based on the testimony of Mr. Burke and Mr. McFarland

7   we walked through the three different levels for these

8   targets.  Threshold, baseline, superior.  Are you familiar

9   with those different target levels?

10  A    Yes, I am.

11  Q    Is that sort of rationing up of metrics common in the

12  energy and history based on your experience?

13          MR. SCHEPACARTER:  Your Honor, I'd say it's a

14  leading question.

15          THE COURT:  Overruled.

16          THE WITNESS:  Unfortunately I didn't understand

17  the question, so if you could rephrase it for me it would be

18  helpful.  Sorry.

19  BY MR. DEMPSEY:

20  Q    Have you evaluated whether in the energy industry it's

21  common for different companies to have different thresholds

22  of performance for purposes of triggers potential incentive

23  opportunities?

24  A    Yes, in the energy sector you generally have what

25  ranges around the baseline target.  In fact I have -- I

1    can't think of a company that doesn't.  And the reason for

2    that is, is just because of the volatility in this business.

3    If you look at how gas prices move and you look at how all

4    the different things that happen in this business you don't

5    want to have a binary outcome, you want to have -- you know,

6    when I was at Calpine Corporation, for example, when I was

7    there during the bankruptcy before they had the right

8    incentives in place the head of operations was -- you know,

9    kept his -- didn't hedge his units, kept them around because

10   the summer before the prices were very high, and so it made

11   -- in his view it made sense to try to get a bunch of EBITDA

12   by leaving his portfolio open.  Well unfortunately that was

13   the year that we had a bunch of rain in Texas and it was a

14   very cool year and the EBITDA was off $250 million and it

15   was a similar sized company from a revenue perspective

16   because of that action.

17           So it's really important that you have the

18   parameters in place and that you have the ranges around then

19   to reflect the risk around that so that you -- people are

20   focused on what -- on the value of the enterprise and not

21   trying to reach or the like.

22   Q    Let's talk about the metrics themselves, Mr. Filsinger,

23   at a high level.

24           In the fall when the company was putting together

25   the metrics did you have the chance to have any

1    conversations with the company about potential changes to

2    those metrics?

3    A    Yes.  We -- as we talked about the (indiscernible -

4    11:25:22) recommendations with respect to the wristband --

5    excuse me -- the risk bands around those metrics.

6    Q    What were those recommendations?

7    A    I don't know if I can remember all of them, but I'll

8    tell you a few of them I can remember is on TXU EBITDA we

9    recommended that the -- the risk band around that be

10   reduced, I believe in about I think it would have been about

11   30 percent if I remember correctly.  We -- on the attrition

12   for customers we had recommended that that be tightened.

13   And at Luminant we recommended that the -- based on our risk

14   analysis around the cost that the cost risk bands be pulled

15   in.

16   Q    How did the company respond?

17   A    Oh, they had -- definitely had discussion back and

18   forth, but ultimately they agreed and implemented the

19   recommendations.

20   Q    And this was during the budgeting process?

21   A    This was right after the budgeting process.  Once you

22   get the budget done then you do the risk bands.

23   Q    Okay.  So fall 2013?

24   A    Yes, it would have -- I'm guessing September, October,

25   something like that.

1    Q    Mr. Filsinger, based on your experience and work

2    evaluating these metrics did you come to a conclusion

3    regarding whether the metrics sitting at the end of last

4    year constituted stretch goals for the remainder of the

5    year?

6    A    Yes.

7    Q    And what was that conclusion?

8    A    That they had -- that the goals were stretch goals and

9    difficult to achieve, particularly in this complex

10   environment.

11   Q    I want to come back to that in a bit, but I understand

12   from Mr. Burke and McFarland's testimony that the company

13   revisited the metrics in the middle of the summer; is that

14   right?

15   A    That is correct.

16   Q    Were you involved in that process?

17   A    Yes, I was.

18   Q    How so?

19   A    We basically were asked to redo our analysis as of the

20   six-month period taking into account the performance year to

21   date, the change in volatility of risk bands because now six

22   months is in the books, so you obviously have a reduced

23   wristband -- I'm sorry -- risk band, and we took into

24   account knowing circumstances, and lastly taking into

25   account the current commodity curves in relationship to the

1    proportion of the book that was still open.

2    Q    I want to unpack that a bit.  You said that the risk

3    bands were narrower.  Can you explain why that is sitting in

4    the middle of the year that the risk bands are narrower?

5    A    Well, and I should clarify.  When you're told by the

6    SPC and John Young that we were not -- what we were not able

7    to do when you're looking at this was we're not able to move

8    any metric more favorable than it was for the non-insiders

9    in the base program that the Court had approved earlier, so

10   that the management could not be getting rewarded before the

11   team, because they believe, and I agree, is they want to

12   keep the management team and the staff in lock step with

13   respect to what you're trying to achieve, and they didn't

14   want them -- so if you take the risk band, like if you

15   pulled up the ladder on EBITDA, because there was less risk,

16   the book head was more hedged, and there's less risk in the

17   book, so we pulled up the threshold.

18            We did not need the superior, even though you have

19   the same issue there, but if you did that -- if you did

20   bring superior in then the SPC and the group we're talking

21   about here on the insiders would be getting bonuses before

22   the rest of the staff.

23            So it is only pulled -- it was only making things

24   more difficult, we weren't allowed to change anything to

25   make it easier.

1    Q    You also said that you evaluated changes in the

2    commodity curves.  Which commodity curve did the company use

3    for the original budget and metrics?

4    A    For the original budget it was the 830 curves -- 830 to

5    13 curves.

6    Q    So what work did you do to evaluate or update those

7    curves?

8    A    We used the current available curves for the

9    (indiscernible - 11:29:39) for the balance of the year.

10   Q    And based on this work, Mr. Filsinger, did you make any

11   recommendations to the company about changes to their

12   metrics?

13   A    Yes, we recommended that the changes that you've seen

14   that were described by Mr. Burke and Mr. McFarland be made.

15   Q    So do the company's updated metrics reflect your input?

16   A    Yes, they do.

17   Q    Based on your experience and in work evaluating these

18   specific metrics, Mr. Filsinger, did you come to a

19   conclusion regarding whether the new metrics are reasonable

20   and difficult to achieve for Banns of the year?

21           MR. SCHEPACARTER:  Your Honor, I'm going to

22   object.  It's a I think a leading question again.

23           THE COURT:  Sustained.

24   BY MR. DEMPSEY:

25   Q    Mr. Filsinger, do you have a view about the

1    reasonableness of these objections sitting -- sorry, strike

2    that.  Don't laugh.

3            Mr. Filsinger, did you come to a conclusion -- did

4    you evaluate the new metrics sitting in the middle of the

5    summer?

6    A    Yes, I did, and I found that they were difficult and

7    more difficult to achieve than the ones that are there.

8    Q    In your opinion can the company be certain that it will

9    achieve its performance metrics for balance of the year?

10           MR. SCHEPACARTER:  Again it's a leading question,

11   Your Honor.

12           THE COURT:  No, that's not, he can answer yes or

13   no to that.  I don't think it suggests the answer.

14           THE WITNESS:  Would you repeat the question?

15   BY MR. DEMPSEY:

16   Q    Sure.  In your opinion can the company be certain that

17   it will achieve its performance metrics for balance of the

18   year?

19   A    No.

20   Q    All right.  Let's talk now about the specific metrics,

21   Mr. Filsinger.  Did you prepare a demonstrative that would

22   aid you in your testimony?

23   A    Yes, I did.

24   Q    Can you turn, please, to tab 4 in the demonstrative

25   binder, I think it's the smallest of the binders on your

1    podium.  Is this the presentation, Mr. Filsinger, that you

2    prepared?

3    A    Yes.

4    Q    Do you believe it'll aid you in your testimony?

5    A    Yes.

6    Q    If you could turn to page 1, please, Mr. Filsinger.

7              Before we talk at the metrics in detail could you

8    please provide the Court with a general overview of the

9    risks that affect Luminant's ability to generate revenue?

10   A    Yes.  I prepared this chart that was in my declaration.

11   The chart is to show some of the interrelationships between

12   the different factors, and you've heard Mr. McFarland talk

13   about a great number of these, but you have -- you know, you

14   have your inputs of coal prices, gas prices that impact

15   power prices, the weather and the load impact how much is

16   going to be pulled from the marketplace, and at the same

17   time you need to be available so if in fact you are going to

18   be called upon that you're there.

19             So when we think about this it's -- you know, it's

20   not only what the prices are but it's what -- how you

21   control your costs.  And I said earlier, for example, your

22   EBITDA and your dispatch not only is it due to availability

23   but you've got to make sure your costs are low enough that

24   you are below the cost curve so you can get dispatched.  So

25   that includes your fuel cost and your O&M and SG&A and the

1    other costs.

2    Q    We'll come back to this is a bit, but let's turn now to

3    the specific coal available generation metric.  What work

4    did you do, Mr. Filsinger, to evaluate that metric?

5    A    Well as I stated earlier, we went to the facilities and

6    evaluated the performance at the facility.

7              In addition we compared it to the industry.  And

8    if you look at page 3 of the demonstrative you can see how

9    it compares against the last five years of available data of

10   other like facilities.

11             Now, I should mention that this data is based on

12   coal facilities in the United States, and -- so as

13   Mr. McFarland mentioned, these are lignite plants so they're

14   going to have a little bit -- they are going to have -- in

15   general all else being held equal they're going to have

16   higher O&M and lower reliability than a typical coal

17   facility.

18             I don't know if you've ever seen coal but it comes

19   out as this real black nice looking almost -- almost like a

20   diamond before it turns clear.

21             So when you look at -- when you look at lignite it

22   looks literally as though you almost took and grabbed a

23   bunch of black dirt, and you could almost take it and if it

24   was wet and create a snowball and throw it out of dirt.

25             So it's a different product, so it creates more

```
1    pressure on the units, as Mr. McFarland said the sand and

2    the additional ash handling and everything that goes with

3    it.

4              So from here you can see that in the non-summer

5    they beat industry average by one percent, and in the summer

6    -- excuse me -- by over one percent, and in the summer by

7    approximately one percent, and that's with that other --

8    that other data being taken into consideration.

9    Q    From the perspective of the company's bottom line

10   financially what does it mean that the company must beat

11   industry average by one percent in the --

12   A    Well generally one percent doesn't seem like much, but

13   in this business if you look at the coal fleet, at Luminant,

14   one percent can mean -- well if you -- let's just look at --

15   well, I'll use two different examples.

16             One example is if you just look at -- if there's

17   one hour where you're able to produce an extra 1,000

18   megawatts in a tight condition when prices are at the cap it

19   could be $9 million in one hour.

20             The other way to look at it is from a longer

21   standing perspective, if you look at the whole years

22   1 percent can mean $30 million across the year.  Now clearly

23   -- and that's looking at a longer more average price versus

24   the cap obviously.

25   Q    Based on this analysis and your experience,
```

1    Mr. Filsinger, did you consider whether this metric is a

2    difficult stretch goal?

3    A    I believe this -- this metric is difficult -- difficult

4    to achieve, it's very complex operating equipment, and

5    there's no assurance they're going to make these targets.

6    Q    Let's move to the next metric, Mr. Filsinger.  Nuclear

7    available generation.  What work did you do to evaluate the

8    reasonableness of the targets for this metric?

9    A    Again in addition to visiting the facilities and

10   talking to the management team and understanding how this

11   facility was running we looked at how it compares to its

12   peers.

13   Q    And for purposes of the record what slide are you on?

14   A    I am on demonstrative number 5.

15   Q    Okay.  And based on your evaluation of Comanche Peaks

16   to peers what did you find?

17   A    Well one is when you look at Comanche Peak it's one of

18   the -- one of the if not the best run nuclear station in the

19   country.  There are 100 nuclear plants in the country of

20   which 35 are boiling water reactors and 65 which are

21   pressurized water reactors.  This is a pressurized water

22   reactor.

23         We compared this to the -- I'll abbreviate, PWR --

24   we compared this to the PWR plants in the U.S. and we didn't

25   include any of those plants that are going through -- that

1   have had an outage and found the problem, so we took those

2   out, the ones that are out for extended periods of time,

3   these are the ones that are operating.  And we found that

4   the threshold is three percent better than industry average,

5   and the baseline four percent better than industry average.

6           These are extremely tough targets.  Again, it is a

7   very well run nuclear plant, but as Mr. McFarland mentioned

8   earlier, keep in mind that one of these facilities currently

9   is in outage, and when nuclear plants in the United States

10  have like a 40 percent chance of having a top 25 outage

11  issue.

12  Q    What is a top 25 outage issue?

13  A    Well there's -- the top 25 things that will happen to a

14  nuclear facility whether it's a cracked head, things that

15  you won't see until you're in an outage.  So you can see a

16  nuclear plant running, but until you actually go it in, like

17  Crystal (indiscernible - 11:38:29) in Florida, for example,

18  is learning it had a fueling outage and they pulled it and

19  it had a cracked -- cracked concrete that was disintegrating

20  a cracked head.  Well once that happens then you've got the

21  NRC involved and that's how you get the extended outages

22  with nuclear facilities.  So, I believe these are very

23  difficult metrics.

24  Q    Based on your analysis and experience, Mr. Filsinger,

25  did you evaluate whether there's a meaningful chance that

1    Luminant misses its threshold baseline and superior targets

2    for this metric?

3    A    Yes, and I think there is a meaningful chance it's

4    really going to -- it's really -- this outage is extremely

5    important.

6    Q    Let's turn to the next metric.  And I see on the slides

7    you've prepared you've put O&M, SG&A, and Cap X together; is

8    that right?

9    A    Yes.

10   Q    Why is that?

11   A    Well when you look at -- when you look at O&M and Cap X

12   different entities will count these costs differently.  Mac

13   -- you heard Mac McFarland mention that if you're doing some

14   things in an outage and it's short-term, you know, things

15   that they're fixing a pump or something it may go into O&M,

16   where a southern company may take that and say, no, that's

17   Cap X.

18              So when we evaluate a company we generally take

19   Cap X and O&M together, because you may have a big

20   difference in one but then if you have the same dealt in Cap

21   X you got to make sure you've got those balanced.  So we put

22   those two together.

23   Q    What work did you do to evaluate the reasonableness of

24   these two metrics?

25   A    Well, and I hate to be repetitive, but the most

```
1    critical piece of this was going to the facilities and

2    looking at how they were operating, what was being done,

3    looking at the preventive maintenance, how the facility is

4    being done, making sure it wasn't gold plated, but yet that

5    it was kept in good operating condition so that it was clear

6    it was going to be on.

7            There are other issues -- you know, you might see

8    those leaking pumps and different things that we're going to

9    put the pressure on particularly in those peak hours.

10           In addition we looked at the -- the data from the

11   FERC (indiscernible - 11:40:32), and looking at other

12   assets, other steam assets, which is your gas -- I mean

13   excuse me -- yes, your gas and your coal assets and then

14   your nuclear assets, which are accounted for separately.

15   Q    Is that the analysis you show on slide 7,

16   Mr. Filsinger?

17   A    Yes, it is.

18   Q    Can you describe for the Court what that analysis

19   shows?

20   A    What this analysis shows, and it's broken down into --

21   I generally lock at everything in a per unit basis, so it's

22   looking at the cost on a per unit basis.

23           The threshold of $12.54 per megawatt hour is 15

24   percent below the industry average and 7 percent below the

25   median as shown in this chart.
```

1    Q    And just so it's clear, lower is better here, right?

2    A    Yes.  The lower your cost the more you're going to

3    dispatch.  And this is critical to your dispatch.  If you --

4    you know, sometimes half a penny, a penny can make a

5    difference in whether or not you're getting dispatched in

6    any one hour.

7    Q    How did the nuclear facility compare to industry

8    averages?

9    A    The nuclear facility was -- has a threshold of 21.59,

10   which represents the first cortel (sic) performance.  You

11   can see in the chart there that the threshold, baseline, and

12   superior are all in the first cortel.

13   Q    Based on your analysis and professional judgment,

14   Mr. Filsinger, did you come to a conclusion about whether

15   there's a meaningful chance that Luminant might miss its

16   threshold based on a superior metrics for this category?

17   A    Yes.  It's -- these can be (indiscernible - 11:42:09).

18   There's -- as Mac mentioned yesterday there are normally

19   days with outages left, many improvements to be made yet to

20   these facilities, and any unplanned outage can also come

21   into play that would increase these costs.

22            I also want to note though when I was up to this

23   chart and said that things interplay you need to take this

24   into account with the reliability.

25   Q    Why?

1    A    Well because part of -- if you -- you know, if I saw a

2    really good performance on the O&M but yet -- you know, so I

3    have this low cost on O&M but then I saw the degradation and

4    reliability then I would see the issue, but the issue is you

5    need to have your plants running when they're economic.

6              So there's an economic balance here to make sure

7    you -- you've got to have the cost down so you get

8    dispatched, be if you have them down too far and you don't

9    have any reliability it doesn't matter.  So it's a fine

10   line.

11             So if you look at the two in tandem you're

12   performing below the -- better than the industry on cost and

13   on reliability.

14   Q    The next term, Mr. Filsinger, to coal fuel costs.  Can

15   you describe the work that you did to evaluate this specific

16   metric?

17   A    Yes.  We looked at -- we looked at the fuel, the fuel

18   make up at the different facility, we visited the mines, as

19   well as the fuel handling facilities that go with that.

20             I think one of the -- some of the mines are right

21   by the plants, others have long conveyor belts, and I'm

22   talking, you know, tens of miles of conveyor belts, almost

23   like a big rubber band.  I'm trying to think of a good

24   comparison.  If you just think of big, huge conveyor belts

25   they're running the coal up to the -- the lignite up to the

1    facility.  They also have the Powder River Basin out of

2    Wyoming that gets shipped in by train -- it's hauled in by

3    train, and so they have fuel (indiscernible - 11:44:04)

4    facilities there.  So we reviewed -- we looked at all that

5    -- those assets.

6            We looked at the lignite, examined some as to

7    whether the pile -- you know, as Mr. McFarland mentioned you

8    have a lignite mine and you might mine that area that has a

9    certain heat rate.  When you get, you know, a few -- a

10   hundred yards away you may get a much different heat rate

11   and a different quality of fuel.  So we tried to look at

12   that for each one of the facilities.

13           And in addition also looked at how these compared

14   to the other lignite fuel facilities in the country.

15   Q    And based on your comparing Luminant's lignite

16   facilities to other lignite facilities in the country what

17   did your analysis show?

18   A    They're -- the threshold metric beats the industry

19   average, which is about a buck 84 by about 9 percent.

20           Now just to put it in perspective what nine

21   percent means.  Nine percent would be an $83 million fuel

22   delta, so an $83 million hit to EBITDA if you were at $1.84.

23   Every penny -- you know, we're talking about a dollar -- you

24   know, $1.68, which doesn't seem like much money, so think of

25   it as every penny that you save on fuel is worth -- for the

1     year is worth $5.2 million.  Every penny.

2     Q    Based on this analysis, Mr. Filsinger, and your

3     professional judgment, did you come to a view about whether

4     the coal fuel cost metrics threshold, baseline, superior are

5     reasonable stretch goals?

6     A    I think they are.  Yes, I do.  If you -- as I

7     mentioned, if you look at the difference in the market as

8     well as if you have -- if you have one -- an issue at a mine

9     like we had at Three Oaks -- that the company had at Three

10    Oaks late last year where they had -- so they were divvying

11    -- so basically this mining is -- it's really strip mining

12    so you've got -- you don't have to take that big drag line

13    that Mr. McFarland was talking about, you dig all the dirt

14    and (indiscernible - 11:46:13) it, and then you end up with

15    a seam so high, and then below that you dig again and

16    there's another seam.

17            Well when you're digging the hole you have

18    sloughing, so basically you start getting the wall creeping

19    back into the hole.  Well as soon as that's recognized you

20    have to shut that down because it's a huge safety issue.  So

21    that -- that had to be shut down.  And shutting down that

22    piece is not -- I just want to put it into perspective --

23    it's not that simple.

24            If you think of that drag line, and I try to -- I

25    try to visualize that the bucket on that drag line is

1     probably from the court's (indiscernible - 11:46:48) to

2     about that door and as high as the ceiling here, it will

3     fit, you know, a Chevy pickup inside, it'll fit a dump truck

4     inside, it's a very large thing.

5          You then have to move that to the next area that

6     you're going to have to mine, which costs, you know,

7     millions just to move the drag line.  So it's -- all those

8     risks are there.

9          Mr. McFarland talked about the new mine Liberty

10    that's being opened up and the production issues that he's

11    having there with water seepage and the like.

12         All those are risks with this metric that main it

13    difficult to attain.

14    Q   Let's turn to the last Luminant metric, EBITDA.  Did

15    the metrics that we just discussed, coal fuel costs,

16    availability, et cetera, impact Luminant's EBITDA numbers?

17    A   Yes.  All of them have some level of impact on EBITDA.

18         So what I've put here in these, and these -- is

19    looked at what the impact will be to the -- just the

20    remainder of the year, okay?  So if the coal point

21    availability decreases by 1 percent just for the remaining

22    part of the year due to the -- if the hours just get

23    extended, whatever the issue is, EBITDA would decline by

24    approximately 15 million.  If Comanche Peak is unavailable

25    for one day, if Mr. McFarland misses his outage by one day

1    it's going to cost $2 million if the entire facility is

2    down; $2 million.  If a 5 percent increase in forecasted O&M

3    and SG&A costs a 5 percent change would cost $28 million to

4    EBITDA, okay?

5            And keep in mind when the company does build these

6    budgets up one of the things that they do once they get it

7    all built up they don't add in management challenge, it's

8    just unnamed management challenge.

9            Every penny increase in fuel cost as I mentioned

10   for the year is 5.2 million, but for the 5 months it's

11   3 million.  The reason it's higher is you have more shoulder

12   production in the second half of the year.

13           And then a Luminant commercial team still needs to

14   create over $100 million in value in addition to liquidating

15   the plants in the market and exiting the current hedges.

16   That's an additional $100 million.

17   Q    Can you just hum a few more bars on what it is that the

18   commercial team does exactly?

19   A    Well the commercial team is the team that's responsible

20   for doing the hedging for both Luminant and TXU, buying and

21   selling power, taking positions, and creating economy value

22   around the assets.

23   Q    You also mentioned that Luminant adds an unknown

24   management challenge to its numbers.  Can you describe what

25   that is?

1    A    Well after they do the budget they add pieces in

2    different parts of the organization, whether it be in the

3    mining, in the -- in the SG&A, wherever it is they add an

4    additional stretch.  So they come up with a budget, they've

5    got all the line items, and then they call something they

6    don't have line of sight to.  So you just need to go in and

7    cut an additional $20 million throughout the year and they

8    just add that challenge in.

9    Q    Mr. Filsinger, you testified earlier that commodity

10   prices are also a risk to Luminant's EBITDA.  How is that

11   the case?

12   A    Well if you move to page 2 of the demonstrative

13   commodity prices are very critical to the EBITDA of the

14   company.  If I may have you take a look at page 623 of my

15   demonstrative it might explain it a little bit better.

16   Q    Is this in, Mr. Filsinger, your expert report or your

17   declaration?

18   A    It's -- on page 6-23 of my declaration.

19          MR. DEMPSEY:  So if you go, Your Honor, to the up

20   redacted binder tab 1.

21          THE WITNESS:  Okay.

22          THE WITNESS:  And, Your Honor, it's on page 6-23.

23          THE COURT:  I'm looking.  Hang on.  6-23?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Okay.  I have it.

```
 1              THE WITNESS:  Okay.
 2    BY MR. DEMPSEY:
 3    Q    Mr. Filsinger, can you describe --
 4              THE COURT:  Do we know --
 5              MR. DEMPSEY:  I'm sorry, Your Honor, I cut you
 6    off.
 7              THE COURT:  Do we know whether this information
 8    we're going to discuss is redacted information?  I don't
 9    believe it is, but --
10              MR. DEMPSEY:  I don't believe it is, but we can
11    check.
12    BY MR. DEMPSEY:
13    Q    Mr. Filsinger, if you can just testify without
14    specifying numbers here.
15              THE COURT:  No, that's okay, let's just see, I'd
16    rather have the number.  I think I have the old -- I don't
17    know if I have the -- Exhibit 1 to the redacted copy I have
18    is -- is that redacted as originally done or is that
19    redacted as modified by the reply?
20              MR. DEMPSEY:  The redactions, Your Honor, were as
21    modified by the reply.
22              THE COURT:  All right.  Then we won't have a
23    problem, because I know we didn't get into that.
24              MR. DEMPSEY:  Okay.
25              THE COURT:  Go ahead.
```

1          THE WITNESS:  Okay.  So if you look at the chart

2     on page 6-23 what this shows you is the Luminant EBITDA

3     excluding those gas hedges that Mr. McFarland was defining

4     yesterday.  So this does not include the gas hedges.

5          So if you look at the 2013 data you can see that

6     EBITDA just north of a billion, that does not include that

7     approximately billion dollars of gas hedges, okay, this is

8     just the debt gas hedges that was put in place, this is just

9     looking at the EBITDA.

10          And when we look at this EBITDA and then compare

11     that to the blue line which is the gas price, it's a monthly

12     average gas price, you can see how the EBITDA moves with the

13     gas price.

14          THE COURT:  Sure.

15          THE WITNESS:  That's really what I'm trying to

16     communicate.

17          If you then go back to page 10 of the

18     demonstrative what we show here is three periods in time of

19     the August 2014 balance of year prices.

20     BY MR. DEMPSEY:

21     Q    Can you -- let me stop you there real quick.  Why did

22     you choose these dates --

23          THE COURT:  Okay.  You said August 2013 or 2014?

24          THE WITNESS:  August 30 of '13.

25          THE COURT:  Okay.

1          THE WITNESS:  5/30 of '14.

2          THE COURT:  Right.

3          THE WITNESS:  6/30 of '14, and 7/25 of '14.  8/30

4    of '13 is when the original budget and metrics were done.

5    5/30 is when the update was -- plan update was done.  And

6    then 6/30 and 7/25 are two dates we were able to put in to

7    demonstrate what happened to prices in time for the report.

8          If you look at prices today, of course today it's

9    different because you can't really look at balance of year

10   for August because August is over, but the prices today for

11   balance of year are about 3350 to 3380, in that ballpark.

12   So it pretty -- they're in the ballpark to where they end at

13   August.

14   BY MR. DEMPSEY:

15   Q    So generally speaking, (indiscernible) curves moved

16   from August 30th, 2013 to July 25th, 2014?

17   A    Well, you can see that they moved up considerably in

18   May, and then they -- at the end of the year when the summer

19   really didn't -- when the summer didn't really pan out with

20   the weather, the market still has a lot of that.  In 2011,

21   it was a very hot year, the market still had a lot of 2011

22   priced in.  And you can see that a lot -- the market didn't

23   see those high prices, the market started falling off, and

24   not only for this year, but next year.

25          If I could use an example.  This week of -- I

1   think 7/25 is a Friday I believe, I'm not a hundred percent

2   sure about that, but that week in one day, in this one day,

3   this company lost $50 million in portfolio value due to the

4   shift in that balance a year curve and the gas curve, just

5   in one day.

6   Q    What then does that volatility mean for Luminant's

7   ability to capture that -- even the targets found in these

8   metrics?

9   A    Well, it makes it more difficult when prices are down.

10  It makes the job obviously much more difficult.  If you look

11  at the volatility, I mention that based on open positions as

12  of June 30, 2014, this shift would cause an EBITDA to climb

13  to 95 million.

14  Q    Based on your experience and judgment, Mr. Filsinger,

15  did you come to a view about whether or not Luminant's

16  EBITDA targets threshold baseline superior constitutes

17  stretch goals?

18  A    Yes, the (indiscernible) stretch goals.  It's a very

19  volatile environment, and there's a lot of things that you

20  don't have control of, that their mismanagement program as

21  you can burn through the portfolio is to try to maximize

22  your revenue.

23  Q    I'd like to turn now to TXU Energy.  What risks in

24  general, Mr. Filsinger, does TXU Energy face in operating

25  its business?

1    A    Well, TXU has a lot of the same risk, but it's in a bit

2    of a different position, and I think -- and I'll try not to

3    be competitive with what Mr. Burke said.  But the

4    interesting thing about TXU is, if you get, you know, at

5    Luminant I, if prices go up, as long as you're not hedged,

6    if you're fully hedged and prices go up that could be

7    detrimental, but if you're open, it's a benefit.

8           At TXU if prices go way up, it's a detriment.  I

9    think Mr. Burke explained this some of the polar vortex.  So

10   if prices go way up, you're providing your customer power at

11   somewhat of a fixed price.  Prices go to the cap at 9,000,

12   you're literally buying power for 9,000 and selling it to a

13   customer for your piece of it for probably, you know, 60 to

14   $80, something like that.

15          So it's a huge loss, and you're taking, you know,

16   TXU bears all that risk.  Now, the other thing that when I

17   look at all these (indiscernible) relationship, when you

18   think of that, so you go back to that polar vortex which is

19   really things that help TXU lose significant EBITDA, it's

20   not only that your cost of goods go way up, because you've

21   got to provide your customer the power, that's part of the

22   deal with the customer.

23          Second of all, when that happens, even though

24   you're taking a loss on all that extra power you're

25   providing, you and I who are getting that power don't see

1    that, we just know our bill went up, right, because our

2    assumption went up 20 percent.  So our bill still went up,

3    so I'm still angry.

4           Even though you lose the money I don't really know

5    about it, but my bill went up, so I'm angry.  I complain to

6    the PUC, I get more complaints.  And my bad debt goes way up

7    during these times.

8           Now, what does bad debt mean?  Bad debt means that

9    I don't get to -- not only did I have to pay this extra

10   money, but now I don't get to collect that revenue, but

11   there's one further detriment.  TXU bears all the risk

12   around selling megawatt hours, different from any other --

13   most other markets.

14          Most markets, like you have Encore here, who does

15   the delivery system.  In those markets, they would be the

16   ones collecting it, wearing that risk.  Here, TXU wears that

17   risk.  So if they -- if someone has a bad debt, the company

18   still has to pay Encore.

19          So not only do they not get paid, not only do they

20   pay higher prices, but now they've got to pay Encore the

21   bill.  So they bear all the risk around that.  And, you

22   know, it doesn't -- you would think that high weather, high

23   consumption is all positives for the company, but for TXU

24   it's more challenging.

25          The flip side is, is that they get too mild, and

1    consumption drops, it's negative EBITDA, because you're not

2    selling as many megawatt hours.  So it's kind of a --

3    they've got to do a real good job managing the energy supply

4    book, hedging and hopefully they get their hedge close to

5    right, so they don't have -- and there's not these weather

6    events that cause the issues.

7    Q    I'd like to turn now to the first metric for TXU Energy

8    contribution margin.  And remembering that this material is

9    confidential, Mr. Filsinger, can you describe the work that

10   you did to evaluate the contribution margin in TXU Energy.

11   A    Now, we obviously looked at the -- I'm going to be very

12   high level, but we looked at the company's numbers, we've

13   looked at the P&L by segment.  In addition, we compared it

14   to the rest of the market.  And I believe that's on page 653

15   of my declaration.

16          And what I'll say with respect to that is, on that

17   chart, the green bars are the market average, and then you

18   can see the threshold being the red, the dark red line.

19   Q    Uh-huh.

20   A    And I'll leave it there.

21   Q    Okay.  Based on this analysis, Mr. Filsinger, did you

22   come to a conclusion about whether TXU's contribution margin

23   targets' threshold baseline superior are stretch goals?

24   A    Yes.  They are stretch goals.  They are difficult to

25   attain, and as (indiscernible) went through the example

1    earlier, again, keep in mind is all those things, all those

2    things affect contribution margin.

3           MR. DEMPSEY:  Let's turn next to customer

4    experience, next slide.

5    Q    There are five metrics here, Mr. Filsinger.  Did you

6    evaluate all of those?

7    A    Yes, we did.

8    Q    In general at a high level, can you describe the work

9    that you did in this regard?

10   A    We looked at the performance of the company, how it's

11   changed over time with respect to how the satisfaction of

12   customers, taking into account what Mr. Jim Burke mentioned

13   about the -- you know, the changes in the customer's survey,

14   (indiscernible), the taking into account that -- and also

15   looking to the extent it was available looking at other data

16   that were reported by the PUC and others in ERCOT.

17   Q    Let's focus on one of the specific metrics, energizing

18   event success.  Mr. Filsinger, can you describe for the

19   Court what that metric is?

20   A    Yeah, what it is, but at least the way I like to think

21   about it is, I'm sitting there watching the football game

22   and the TV goes out.  But it's something that happens in a

23   connector disconnect a service.  Okay.

24           So something that something either gets

25   disconnected inappropriately, or you're getting connected

1    and not getting connected quick enough, that type of thing.

2            Approximately 2. I think 48 million transactions

3    per year where this type of event takes place, where there's

4    some change in service.  Now, this could be -- I believe

5    it's called standing where somebody gets the service cut off

6    inadvertently, but that still comes back to what they call a

7    -- it's called a lights out in error is the term that they

8    use is.

9    Q    Mr. --

10   A    I'm sorry, go ahead.

11   Q    Mr. Filsinger, what work did you do to evaluate the

12   reasonableness of the energizing event success metrics?

13   A    Well, we looked at the performance of the company in

14   '11, '12 and '13, and granted that also looked at the three

15   year average from that perspective.  And what we saw was a

16   -- this graphic is the higher the percentage is the success

17   rate.  So the higher the bar, the more successful or the

18   better.

19           You can see that the threshold is at your best

20   performance to date.  And it equals, just to put it in

21   perspective, threshold is equal to 304 complaints a month

22   out of 1.7 million customers.

23           So you have 1.7 million customers, and 304

24   complaints a month.  Meaning that you're nearly perfect, the

25   threshold would be nearly perfect.

1    Q    Based on this analysis, Mr. Filsinger, in your judgment

2    and experience, did you come to a view about whether or not

3    there was a meaningful risk that TXU might miss its metrics

4    in this category?

5    A    Yes, that is there a meaningful risk they'll miss it.

6    This is going to be difficult to attain.

7    Q    I'd like to turn next to customer complaints, and here

8    I'll be short because Mr. Burke talked about this before.

9    What analysis did you do, Mr. Filsinger, to evaluate the

10   customer complaint metric?

11   A    I looked at the historical complaints of the company,

12   as well as we were able to get data from the PUC on number

13   of complaints.  And so we compared them to the ERCOT market.

14   Q    So taking those one at a time, how did the companies'

15   targets compare to its historical actions?

16   A    The targets have declined from 11 to 13 and if you go

17   back in time, even as Mr. Burke explained I think it came

18   down even further than that if you go back in time.

19          If you look at the threshold (indiscernible) your

20   second best year, and well below the market.

21   Q    Yeah, let's talk through the market.  Based on your

22   analysis, how did the company's metrics compare to the

23   market averages?

24   A    If you look at the chart, you can see that the -- in

25   2013, the market is up around 10 (indiscernible) per 10,000

1    customers, and the company is at approximately or threshold

2    is approximately 3 complaints per 10,000.

3            MR. DEMPSEY:  And for the record, that's slide 17.

4            THE COURT:  Slide 17?

5            MR. DEMPSEY:  Yes, Your Honor.

6            THE WITNESS:  And that is an annual number.

7    BY MR. DEMPSEY:

8    Q    Based on this analysis, your experience and judgment,

9    Mr. Filsinger, do you believe that these targets cost to

10   regional stretch goals?

11   A    Yes.  They do.  I do want to bring up one thing, that

12   is the storm that you probably saw on CNN hit Dallas last

13   week, as Mr. Burke testified, tens of thousands of customers

14   were out.  That was because the delivery system Encore,

15   their system was down, the distribution was down, it had

16   nothing to do with (indiscernible) or TXU.  However, TXU was

17   not able to deliver its power to those customers, so they

18   lost revenue based on that.  But right now, the call volume

19   has gone up considerably since that, and my team with the

20   retail guys have said they don't know what the complaints

21   are going to be yet, but it's anticipated there's going to

22   be some complaints.  It's going to make this target very

23   difficult to achieve.

24   Q    Mr. Filsinger, I'd like to turn now to residential

25   ending customer account.  Can you describe for the Court the

1    market pressure that TXU Energy faces for its customer base?

2    A    Yes.  It's a ERCOT in my view is one of the most

3    competitive retail markets in the United States, if not the

4    world.  You can see from the demonstrative on the chart --

5    Q    This is on slide 19?

6    A    Yes, correct.

7    Q    Please describe for the Court what this chart shows?

8    A    You can see back in 2002, this is when retail

9    competition started.  So you had basically five incumbents

10   at the time, that doesn't include your municipal utilities.

11   This is the bigger players.

12           You went from that over time, you ended up with

13   over 50 competitors.  So you went up tenfold in the number

14   of people competing for each customer.  So that's your

15   bottom line, it shows the number of providers.  And there's

16   a very low book (indiscernible) entry, I think you have to

17   have 500 or $500,000 RLC, you -- and you have to have a

18   management team that has some retail, a certain number of

19   years of retail experience.  It's a fairly level barrier.

20           Now, at the other lines, you can see in people

21   line, is TXU's customers within the Encore service area, TXU

22   serves customers in other service areas also.  But this is

23   the number of customers they're serving that were theirs

24   within a limited timeframe.  You can see that they have

25   outperformed the market consistently since 2007.

1    Q    Based on this analysis, Mr. Filsinger, your experience

2    and judgment, do you come to a view about whether the

3    residential ending customer count metrics constitute stretch

4    goals?

5    A    It does constitute a stretch goal, particularly when

6    again, as I mentioned, all these metrics are interlinked.

7         When you take into account have you have a contribution

8    margin target, you have the cost target, so you can't just

9    spend all your money with the TV ads and everything else,

10   and you also have to maintain a certain contribution margin,

11   it becomes more difficult to maintain customers.  So it's a

12   very (indiscernible) poll, as these will be difficult to

13   attain.

14   Q    Turning next to total costs, slide 20, what work did

15   you do to analyze the total cost of metrics?

16   A    We looked at the cost and the derivation of cost, and

17   then the variability around those costs, such as additional

18   marketing costs, the potential bad faith, all the different

19   issues that make up the SG&A.

20   Q    At a high level, high level, please describe for the

21   Court some of the risks that TXU Energy faces in controlling

22   these costs?

23   A    Well, one is a lot of the competitors are out offering

24   deals like a $100 Visa or, you know, different things to try

25   to bring customers on.  The question is, will there have to

1    be any reaction to that.  There may particularly given the

2    -- and this isn't -- you know, based on the storms last

3    week, which then came through again this week, I believe it

4    was Monday, knocking some of the same customers that had

5    just got back on out again, and TXU is getting a lot of bad

6    press for that.  And TXU's the one that sells the power, but

7    TXU is not the delivery system, but then they have to do TV

8    advertising response to that.

9         TV advertising is obviously one of the most more

10   expensive costs that are there, and they need to do that in

11   response to different issues.  So that's another one.

12        Another one is there is a -- there's a $20 million

13   management challenge of which I believe 7 million is an SG&A

14   that has to be achieved, in addition to the budgets that are

15   set.

16   Q    Based on this analysis and risks in your professional

17   experience, Mr. Filsinger, did you come to a view about

18   whether there's a meaningful chance that TXU Energy might

19   miss its metrics on total cost?

20   A    They can very easily miss their metrics.

21   Q    Turning last with regard to TXU management EBITDA, Mr.

22   Filsinger, did the metrics that we just described for TXU,

23   like they do for Lumina, affect TXU's EBITDA numbers?

24   A    Yes, they do.

25   Q    How so?

1    A    Well, as I think I mentioned interlinked between all of

2    them, but if you just look at contribution margin, if it

3    performs at the threshold level, which is a stretch, you saw

4    that based on my page 653 in my declaration, that you would

5    be performing at less than threshold on EBITDA.

6         Degradation to the customer experience metrics can

7    result in higher customer attrition rates, as well as

8    potential bad debt.  Yes, (indiscernible) as I talked about

9    we believe the (indiscernible) is in the 10 to 20 million

10   range.

11        Any variations in weather which unfortunately is

12   when you get some of your largest bad debt expense, as Mr.

13   Burke mentioned when someone leaves TXU, they can go to the

14   new provider without showing that they've paid their

15   previous provider.

16   Q    Mr. Filsinger, sitting here today, do you have a view

17   about whether or not TXU's management EBITDA targets

18   constitute stretch goals?

19   A    Yes, they do.

20   Q    I'm going to turn now, Mr. Filsinger, to the last score

21   card, slide 22 of the demonstrative.  Did you also look, Mr.

22   Filsinger, at the business services score card?

23   A    Yes.

24   Q    Can you describe at a high level what those five

25   metrics are evaluating?

1    A    Well, the first four are a roll-up of the metrics we've

2    just been discussing, so the competitive management EBITDA

3    is a roll-up of the TXU and Luminant EBITDA.  The score card

4    multipliers are self-explanatory.  Those are the roll up of

5    the actual performance on those score cards.

6              And at the (indiscernible) is a roll-up of TXU,

7    Luminant, and business services.  And then the last one, EFH

8    business service cost are those costs at EFH for the

9    business service function.  That includes your IT, your

10   legal, your -- anything that -- the cyber security, your

11   CEO, your CFO, all those corporate functions, your

12   treasurer, your financing, all those are in that business.

13   Q    I want to get to the business services cost in just a

14   second.  But, Mr. Filsinger, were you in the courtroom when

15   Mr. Burke testified and there was a chart that had some

16   checkmarks by it with regard to the key leader program and

17   the SBCL Tip (ph) metrics?

18   A    Yes.

19   Q    Are those the metrics for the SBCL Tip in the key

20   leader programs also roll-ups of the EAIP score card?

21   A    Yes.

22   Q    How so?

23   A    The -- they are the competitive management EBITDA and

24   the competitive total spin.

25   Q    Okay.  Turning now to the business services cost, what

1    work did you do to evaluate the reasonableness of that

2    metric?

3    A    We reviewed the cost, and I've said, we've been on site

4    for a considerable amount of time and observed the action,

5    you know, the work that's being done.  I would say this is

6    the area where the -- you know, we're there long hours,

7    we're doing work on weekends, and (indiscernible) staff,

8    it's not (indiscernible) long, they're there.  They're

9    putting in -- the way they've -- they're making up for that

10   difference is with hours, and in addition, we looked at some

11   of the costs that are coming in, there's about a $15 million

12   IT spin that's coming in in the second half, with respect to

13   the separation of Encore from the IT system.

14   Q    Sitting here today, Mr. Filsinger, do you have a view

15   about whether or not EFH business services' costs metrics

16   constitute reasonable stretch goals?

17   A    Yes, they do.

18   Q    Mr. Filsinger, you said earlier that you had a chance

19   to review the United States Trustee's objection.  And you

20   understand that in that objection, the trustee multiplied

21   year to date results through June by 2, to project full year

22   performance; is that right?

23   A    It is one of the declarations, yes.

24   Q    You understand that's an analysis that Mr. Pinnachio

25   (ph) performed on behalf of the United States Trustee's

1   office; is that right?

2   A    Correct.

3   Q    Do you agree with this methodology for projecting EFH's

4   full year results?

5   A    No.  This business is far too complex to make that

6   simple of a change.  The most outstanding (indiscernible) I

7   think Mr. McFarland brought up as you had that hedge roll-

8   off in the first half of 462 million, which is somewhat

9   discussed in that table that I showed you earlier.  And so

10  by just doubling it, you're double counting $462  million as

11  one example.

12  Q    Are there other problems that you've found with that

13  analysis, Mr. Filsinger?

14  A    Yes.  It's just generally not accepted in this sector.

15  When you look at the -- you know, when I showed you the

16  power curves for example, the power curves are moving, your

17  open positions are moving all over the place.  There's a lot

18  of things that are different that you've got into account.

19          With TXU, your customer accounts are moving -- for

20  TXU their lowest EBITDA season is the summer season because

21  that's when prices are the highest, and they've got this

22  fixed prices.  So that's when they earn the least amount of

23  money, so doubling it would well overstate that also.

24          And with a lot of the metrics, same thing, a lot

25  of things have shape to them.  If you look at the bad debt,

1  bad debt a lot of your bad debt takes place closer to

2  Christmas.  So it's really back end loaded.

3  Q    Mr. Filsinger, you also understand that Mr. Pinnachio

4  took a five year historical average of the debtors' actual

5  performance with regard to these metrics, and compared it to

6  the threshold baseline and superior metrics; is that right?

7  A    Yes.

8  Q    Do you agree with that methodology for evaluating the

9  difficulty of these metrics?

10  A    No.  And I think the best example of that is back to

11  that chart on page 623, if I have that page from my

12  declaration, if you took a -- you can see the impacts of the

13  actual market on EBITDA is significant.  So taking an

14  average with the total different environment just doesn't

15  make any sense.

16          Also, if you look at the core plants, these plants

17  have in the last few years gone into seasonal operation, so

18  you can't compare seasonal operation to a standard, you

19  know, operations year round.

20          Another one is in the -- in Cap X.  If you compare

21  -- if you compared to Cap X of this company from five years

22  ago to the Cap X today, when they were building facilities,

23  you -- it would look like you had, you know, extremely low

24  Cap X, but that's not a fair comparison either.  You've got

25  to look at the circumstances.  You know, (indiscernible)

1    this year and last year, there was a lot of MATS (ph)

2    environmental work.  You know, next year, how much

3    environmental work will be done, that will have a

4    significant impact on the Cap X, the capital expenditures.

5          So you've really got to look at the circumstances

6    around each metric and what's going on.

7    Q    Mr. Filsinger, we're sitting here today it's October

8    9th, have you had a chance to review recent results from the

9    company with regard to these metrics here today?

10   A    I have seen results through September.

11   Q    Is there anything in those results, Mr. Filsinger, that

12   would change your view that the metrics as a whole are

13   reasonable stretch goals?

14   A    No.

15          MR. DEMPSEY:  No further questions.

16          THE COURT:  Thank you.  We'll take a break before

17   we do cross.  Mr. Schepacarter, will you be doing cross?

18          MR. SCHEPACARTER:  Yes, Your Honor.

19          THE COURT:  Okay.  Five or ten minutes.  I do need

20   a break 1:00-ish for a telephone conference.  It may be in

21   the middle of cross, it may not, that'll be when we take

22   lunch as well.  So, sir, because you're still under

23   examination, you may not discuss the substance of your

24   testimony with any person.  Understand?

25          THE WITNESS:  Yes, Your Honor.

1           THE COURT:  Very good, thank you.  We'll take a

2     short break.

3           (Recess at 12:19 p.m.)

4           THE CLERK:  All rise.

5           THE COURT:  Please be seated.

6           MR. SCHEPACARTER:  Good afternoon, Mr. Filsinger.

7     Richard Schepacarter for the United States Trustee.

8           I just want to go over some points on your

9     testimony.

10    CROSS EXAMINATION

11    BY MR. SCHEPACARTER:

12    Q    Now you had indicated that you had visited many of the

13    facilities; correct?

14    A    That is correct.

15    Q    Okay.  And with respect to visiting those facilities,

16    you looked the functionality of the facilities and the, what

17    you called, redundancy in the facilities, sort of the

18    operational aspects of each of the facilities.

19    A    Yes, Mr. Schepacarter, we looked at all aspects of the

20    operation, maintenance and condition of the facilities,

21    similar to what you do in a due diligence exercise.

22    Q    Okay.  And that's pretty much within the, so to speak,

23    the wheelhouse of your background over the years; correct?

24    That type of visiting facilities, analyzing the facilities

25    in that nature.

1    A    That's one of our many experiences, yes.

2    Q    Okay.

3    A    We have an engineering staff that's dedicated to that,

4    yes.

5    Q    And with respect to the facilities, and maybe you can

6    -- we can break it down a little bit, we'll say, with

7    respect to the coal plants, where they actually burn the

8    coal and they have the generation, did you find those

9    facilities above or below the industry standards?

10   A    We found them to be in very good operating condition,

11   very much consistent with the budgets and the reliability we

12   saw.  They were definitely not gold-plated.  From their

13   construction perspective, like I mentioned, they didn't have

14   some (indiscernible - 12:44:21) when they were constructed

15   but they were in good operating condition.

16   Q    Okay.  And you had indicated -- you had testified many

17   points where you said with respect to industry standards,

18   what industry standards were they again, if you could tell

19   us?

20   A    Well, if you compare them to some of the other

21   facilities, like I said, I've -- in many of the facilities

22   I've gone to, I've seen it from dilapidated to gold-plated

23   and these were very much -- they were definitely not gold-

24   plated but they very well maintained and you could see it in

25   the pride of the operations and staff and the cleanliness of

1    the facilities as well as the, you know, the general

2    condition -- we didn't see pumps leaking, we didn't see

3    things vibrating out of the norm; which, you would, you

4    know, at some places you would see.

5    Q    Okay.  If you were to score it from say and gold-plated

6    was a 10 and dilapidated was a 1, where would these

7    facilities generally, say, with respect to the coal fire

8    plants, where would they generally fall?

9    A    I don't know, Mr. Schepacarter, whether I could grade

10   them on that.  I'm -- I believe that they were in good

11   operating condition.  They clearly were well maintained.

12   But to score them against all the other -- you know, we

13   don't really use a scoring methodology when we do that from

14   an independent engineering perspective.

15   Q    Okay.  Would you say, just generally speaking, that you

16   would say they were above the industry average or above the

17   industry standard with respect to those facilities?

18   A    I thought their condition was at or above industry

19   standard.

20   Q    Okay.  All right.  Now when we look at your declaration

21   and your report, there's a number of items that you would be

22   an expert in but fill me in a little bit on compensation.

23   How many other cases have you been involved in where you've

24   come in as a compensation consultant?

25   A    You mean, as in evaluating the metrics?

1    Q    Well, evaluating compensation in general.  We can start

2    with the metrics.  We can start there.

3    A    Well, what I evaluated here were the metrics --

4    Q    Okay.

5    A    -- in this case.

6    Q    Okay.  Did you -- other than the -- when you say the

7    metrics, did you evaluate anything else with respect to

8    compensation, such as the salary amounts or anything of that

9    nature?

10   A    My task here was to evaluate the metrics.

11   Q    Okay.  Okay.

12            I'm going to turn to your -- I don't know if we

13   have the ability to pull that up again but the

14   demonstratives that you went through, there were a number of

15   them.  If not, I'm just going to sort of go through, one by

16   one.

17            Oh, we're back on the screen.  Wait a minute.

18   Hold on.

19            THE COURT:  I've been following in hard copy so --

20            MR. SCHEPACARTER:  You're following in hard copy?

21            THE COURT:  Yeah.

22            MR. SCHEPACARTER:  If it's --

23            THE COURT:  It's easier.

24            MR. SCHEPACARTER:  That's fine.

25            THE COURT:  I can see better.

1          MR. SCHEPACARTER:  Okay.  All right.  So can I.

2     BY MR. SCHEPACARTER:

3     A     I've got it in front of me, Mr. Schepacarter.

4     Q     Going to the first on, which talks about the Luminant's

5     Prospectus, sort of an overall picture of the company --

6     A     Yes, sir.

7     Q     -- correct?

8     A     Yes, sir.

9     Q     There are a number of boxes, or circles, I guess, call

10    them ellipticals that talk about what's sort out outside the

11    company control, partially within and within company

12    control.  You look like you just sort of quantify that.

13          With respect to the ones that are outside of the

14    control, how much outside of the control?  Is it totally

15    outside the control of the company or is there some ability

16    to sort of factor against that?

17    A     Well, the weather, for example, I would say is totally

18    out of the company's control.

19    Q     Okay.  All right.  What about with respect to gas

20    prices?  Are they totally without -- outside the company's

21    control?

22    A     The company does not control gas prices.

23    Q     Okay.  All right.  Now turning to some of the -- well,

24    it's not red color.  I don't know what that color is but the

25    partially within company control, you have here -- one of

1    which is hedging and trading.  Can you sort of explain that

2    to me how the -- what your understanding is of the company's

3    ability to hedge and trade?

4    A    The company has a commercial operations group that does

5    the hedging and trading and to the extent there's liquidity

6    and counterparties in the market, they can do hedging and

7    trading.

8    Q    Okay.  Now the hedging and trading, does that have any

9    effect on the company's purchase of gas, natural gas?  Or

10   the, I'm sorry, on gas prices at all?

11   A    They can hedge natural gas.

12   Q    Okay.  All right.  Do they?

13   A    Yes.

14   Q    Okay.  And they've done that in the past; correct?

15   A    Yes.

16   Q    Okay.  Are they still doing that?

17   A    Yes.

18   Q    Okay.  And in the past, let's say back maybe three

19   years ago, what was the nature, if you know, what was the

20   nature of the company's hedging activities vis-à-vis natural

21   gas?

22   A    Are you speaking of the corporate hedge program?

23   Q    Exactly.  How they treat their hedging and trading with

24   respect to natural gas.

25   A    It's -- excuse me.  I'm sorry.

1    Q    Go ahead.  That's fine.

2    A    The corporate hedge program was put back in place when

3    the company went private but the company regularly does

4    hedging and trading due to the fact they can't control gas

5    prices, they try to hedge prices when they're at different

6    levels, take positions, get in and out of positions,

7    periodically.

8    Q    Okay.  And you'd agree that the hedging trading

9    activities primarily mitigate the inherent risks that arise

10   from the debtors' assets and operations that result from

11   changes in the price or availability of commodities?

12   A    It's one method where they can try to control some of

13   that variability but they don't control the day-to-day

14   pricing, whether it be up or down --

15   Q    Un-huh.

16   A    -- or nor do they control the liquidity in the

17   marketplace.

18   Q    Okay.  And they hedge of number of commodities, such as

19   natural gas, coal, uranium for the nuclear plants, fuel oil;

20   correct?

21   A    They can trade any of those assets.

22   Q    Okay.  All right.  Would those assets, those types of

23   assets affect, the ones that I sort of just mentioned, they

24   would affect the Luminant's side?

25   A    Well, when they're hedging -- if you're hedging fuel

1    for the facilities, that would affect Luminant's, whatever

2    price you hedged at --

3    Q    Right.

4    A    -- whatever price you paid is what that would impact

5    your cost with respect to those units.

6    Q    Okay.  And that would be the same for coal, especially;

7    correct?

8    A    If you were buying coal, it would impact your coal

9    units or the price that they were achieving.

10   Q    Okay.  All right.  Let me turn your attention to the

11   next slide, which is the, I guess, it's number 2, the

12   Luminant EAIP.

13   A    Yes, sir.

14   Q    Okay.  Coal available generation.  Okay.

15        Now, you -- I think you indicated, I think your

16   testimony was that the metrics that are set forth therein,

17   they were compared to industry standards?

18   A    That's correct.

19   Q    Okay.  Were they -- were these thresholds at any time

20   compared to actual past performance?

21   A    We looked at past performance, as I testified, on all

22   the metrics.  We looked at past performance.

23   Q    Okay.  On each one of them?

24   A    We looked at all the historical data.

25   Q    Okay.  And how were they -- when you talk about

1    industry performance, if you're telling me that you've

2    looked at historical performance, or past performance, as

3    well, how does that compare to these metrics?

4    A    Well, let me refer you, in answering that question, to

5    my declaration, if I may.

6    Q    Okay.  Which page?

7    A    Give me one second, please.

8    Q    Okay.  Take your time.

9    A    If you go to page -- I believe it's 516 of my

10   declaration and you'll see a graph that says Monicela

11   capacity factor --

12   Q    Uh-huh.

13   A    Let me know when you're there.

14   Q    Hold on.  I just want to make sure I'm on the right

15   page.

16   A    My particular one doesn't show page number but I --

17   Q    All right.

18   A    -- 515 does show a page number.  I don't know if that's

19   just something that happened in the copies or not but --

20   Q    Okay.  Let me just make sure -- I want to make sure I'm

21   on the right page and I want to make sure --

22        I'm not sure it's -- Okay.  I'm sorry Mr. Filsinger.

23   A    Are you on that page?

24   Q    Yes, I am.

25   A    Okay.  If you look at this graph, the Monicela capacity

1    factor --

2    Q     Uh-huh.

3    A     -- you'll see it dropped off dramatically.  What the

4    issue is, what I'm trying to demonstrate here, is that many

5    of these units went into seasonal operations, particularly

6    Monicela and Martin Lake --

7    Q     Uh-huh.

8    A     -- so when those units went into seasonal operations,

9    mainly because, as commodity prices dropped off, those units

10   just became to the point where they were not competitive in

11   the shorter periods.  So they were taken off line.  So the

12   number of mega watt hours that you would see would be

13   significantly different because of that economic decision

14   that was made by the company.

15   Q     Okay.

16   A     And that would be different for each -- you know,

17   that's a recent phenomena and it changes year-by-year

18   depending on what your gas prices are.

19   Q     And the Monicela facility, it burns both lignite and

20   Powder River Basin coal?

21   A     That is correct.

22   Q     Okay.  And with respect to the coal that it burns, the

23   lignite that it gets, it gets from its own storage or its

24   own mines; correct?

25   A     Well, it gets it from (indiscernible - 12:56:22) mines.

1    Q     Okay.  And then the coal that comes in from Wyoming;

2    that's purchased, correct?

3    A     That is purchased and it's brought in by train, yes.

4    Q     Okay.  And to the extent that, if you can tell me, with

5    respect to coal that is brought in from the Powder River

6    Basin, are those purchases hedged in any way; do you know?

7    A     I don't know what the hedgable file is currently on the

8    PRB.

9    Q     Okay.  Do you know how much coal is brought in from

10   outside -- let's say outside of the Luminant mines?

11   A     It's significant.  I -- it's many, many tons.

12   Q     Okay.  But you don't know how those contracts for

13   purchase of that are hedged in any way?

14   A     I know they have contracts for the rail, which is 60 to

15   70 percent of the cost.

16   Q     Uh-huh.

17   A     And (indiscernible - 12:57:26) assumes that may be

18   hedged but generally the PRB's, is -- you know, it's not,

19   it's got about a 10 percent volatility associated with it.

20   Q     Okay.  When you volatility, you're saying price

21   volatility or --

22   A     That's correct.

23   Q     Okay.  All right.  Is the PRB selling it at below

24   market now or, maybe as of last month, was it around maybe

25   $13 a ton, or something like that?

1    A    Well, it probably is selling at market.

2    Q    Okay.

3    A    By definition.

4    Q    But the price has gone -- the price has gone down

5    recently.

6    A    It fluctuates.

7    Q    Okay.  Is it high -- is it lower now than maybe it was

8    a year ago?

9    A    I don't have that number in front of me.  I've got that

10   in my notes but I don't have that in front of me.

11   Q    All right.  Has it recently been trading at the number,

12   at say $13 a ton, or has it been higher than that in the

13   last few months?

14   A    I don't have that number in front of me.

15   Q    All right.  Now with respect to the -- let me turn to

16   the next slide, which is slide 3.  Okay.  With respect to

17   the chart that's here, you, again, indicate that Luminant

18   must beat the industry average to attain the threshold;

19   correct?

20   A    That is correct.

21   Q    Okay.  And the industry is that -- the industry average

22   is the one that you testified to what are -- which are the

23   other plans that are sort of some global body of industry

24   average that you've taken that data from?

25   A    That's U.S. plants.

1    Q    Okay.  And the orange bars or columns that are set

2    forth in the chart, if those were to be replaced with actual

3    performance, if you would compare it to actual performance

4    for those five years, would those bars, those orange bars be

5    higher than they are now?  Would they be closer to either

6    the threshold or some of the other targets?

7    A    I don't understand the question.

8    Q    Okay.  I'll just step you through it.  You have this

9    industry average; correct?

10   A    Correct.

11   Q    Okay.  If you replace the industry average with past

12   performance; okay?  And if you used that as your standard

13   here; would those columns, the numbers that basically have

14   to reach the different targets, would they be closer to the

15   targets?

16   A    I'm still not sure I -- I'm not following your

17   question.

18            THE COURT:  Your bar graph has as its vertical

19   axis what the "X" is -- what the industry average is for

20   those amounts.

21            THE WITNESS:  Okay.

22            THE COURT:  Mr. Schepacarter's asking you, if you

23   substituted 2008 industry averages as your "X", excuse me,

24   as your "Y" axis, but instead put in debtors' actual

25   performance --

1          THE WITNESS:  Okay.

2          THE COURT:  -- would they be closer or further

3    away from the threshold amounts?

4          THE WITNESS:  Okay.

5    BY MR. SCHEPACARTER:

6    A    If you used -- if you go back to that Monicela graphic,

7    prior to when that was taken offline --

8    Q    Uh-huh.

9    A    -- it's going to be -- you would see that volume being

10   higher.  You'd see the percentage availability, however,

11   wouldn't be that much different.  The volumes would be

12   different but the availabilities wouldn't be different, when

13   you're taking it offline for economic reasons.

14   Q    Right.  I'm not sure that that's the answer I was

15   looking for.

16        Let me step back a little bit.  If we took, let's just

17   take one year; okay?  And we'll just take 2012; okay.  And

18   if you took the past performance of what the debtor did in

19   2012 with respect to that metric, would that past

20   performance number, not compared -- not using industry

21   average, but the past performance with respect to the actual

22   company itself, the numbers that it did, would that number

23   exceed the industry average?  Would past performance exceed

24   industry average?

25   A    The -- I believe on -- again, this is volume.  If you

1    convert the volume to a availability factor, you'd apply

2    that availability factor to the market, you would be, I

3    believe, above.  Your performance would be above, I believe,

4    would be above industry average on a percentage basis.

5    Q    All right.  I think that's -- Okay.

6        All right.  Also with respect to that same chart, if

7    you substituted, as I indicated before, the actual

8    performance for, instead of using industry average, would

9    the targets be easier to reach?

10   A    No.  The targets are difficult to reach because of the

11   actual hard asset, the facility and the issues around that

12   facility.

13   Q    Okay.

14   A    That facilities furl (ph).

15   Q    Understood.

16        THE COURT:  Let me -- I mean, I think I know where

17   Mr. Schepacarter's going.  I have the same question.  If

18   you'd got a company like Luminant, which is generally a

19   company that historically has operated above average, what's

20   the utility of comparing the thresholds to industry average?

21        THE WITNESS:  Because, as we look at this, we're

22   looking at how they perform against the industry average.

23   That's difficult to achieve particularly with this type of

24   asset, being a lignite asset.  So the fact that they're

25   performing above average, you don't penalize them because

1    they're doing that performance.  There's only so much you

2    can pull out of a coal generating station.

3            THE COURT:  Well, the question would be, say you

4    set your threshold number at six percent above average,

5    industry average, but historically the debtor has operated

6    at five percent above industry average, the question is, in

7    thinking about whether something is a stretch incentive,

8    should I think of it in terms of, okay, they need to go from

9    five to six or do I need to think of it in terms of going

10   from zero to six since they've historically been able to

11   achieve five in the past?

12           THE WITNESS:  Your Honor, the way I look at it is,

13   you can look at it as a typical station and what it takes to

14   achieve availability in volumes.  And given the age and the

15   type of assets these are, there's only so much capacity you

16   can get out of them.

17           THE COURT:  Uh-huh.

18           THE WITNESS:  So you -- you know, the

19   (indiscernible - 1:05:26) station, as -- you're going to

20   have some of the complexities of -- or the operating of a --

21   if you were handling a lot things that the coal station

22   does, there's only so much, only so far you can stretch and

23   the harder you push that unit, at some point.

24           THE COURT:  So your argument would be, it's given

25   for a company who has a history of performing above average,

1   it's still reasonable to consider the targets as compared to

2   average because no matter who you are, or where you are, or

3   what your past performance is, you're still going to have to

4   do work that is excellent or above average type of work to

5   be able to suck that much extra out of the asset.  So that's

6   why you're not "punishing" them for doing well.  You can't

7   hold -- your point is, you can't -- it's not fair for

8   purposes of figuring how much blood you can get out of stone

9   to say, well, they've always been able to get some out of

10  the stone so we're not going to measure them as opposed to

11  what they've actually done in the past.  But we look at it

12  in terms of what someone else could do?

13          THE WITNESS:  Well, yes.  We look at it as what

14  they -- what they could do as compared to someone else

15  because ultimately we'd expect them to fall in the average,

16  particularly for these units.

17          So if you tried to, you know, to push this up by

18  10 percent, it's just not achievable like with the physical

19  constraints of the unit.  The fact that you can maintain

20  that unit and consistently beat the average is a stretch.

21  You would expect that you would years where you are below

22  average.

23          THE COURT:  So you get really diminishing returns

24  if you continue to set -- if you continue to look at past

25  performance and click it up, and past performance and click

1    it up, past performance and click it up because at some

2    point the click it up doesn't become achievable at all so it

3    isn't truly an incentive because it's impossible.

4            THE WITNESS:  That's correct, Your Honor.

5    BY MR. SCHEPACARTER:

6    Q    Let me just ask you one more question on that.  The

7    Monicela facility, has the capacity changed from last year

8    at all?

9    A    The rating?

10   Q    Well, the capacity to be able to produce, to generate

11   electricity.

12   A    So the mega watt hours, you mean, the volumes?

13   Q    Uh-huh.

14   A    The volumes have changed because it's been -- it was --

15   Monicela 1 and 2 were taken offline for economic reasons so

16   the volume is going to decline.

17   Q    All right.

18           MR. SCHEPACARTER:  Your Honor, I've actually been

19   watching the clock.  It's like 10 after one.  I know you had

20   a one o'clock.

21           THE COURT:  Yeah.  Let's -- I was going to wait

22   until about now to break anyway.  Yeah.  Let's break for

23   lunch.  I have a telephone conference and everyone needs an

24   opportunity to refuel.  No pun intended.

25           (Laughter)

1          THE COURT:  Wow.  So let's shoot for two ten, as

2     closely as possible.  You can leave your materials.  This is

3     on the telephone.  I'd ask you all to actually exit the

4     courtroom, please, so -- because the telephone conference

5     has to occur in Court in order to get it on the record and,

6     last but not least, sir, again, you're going to have

7     peaceful hour because you may not discuss the substance of

8     your testimony with any person during this break.

9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  Very good.  All right.  We're

11     adjourned until two ten.

12          MR. SCHEPACARTER:  Thank you, Your Honor.

13       (Recess at 1:09 p.m.)

14          THE CLERK:  All rise.

15          THE COURT:  Please be seated.

16     CROSS-EXAMINATION (Resumed)

17     BY MR. SCHEPACARTER:

18     Q    Mr. Filsinger, if you could in front of you I know you

19     have your declaration, correct?

20     A    Correct.

21     Q    Okay.  If you could turn to page -- it looks like 6-24

22     of your declaration.

23     A    Okay.

24     Q    Okay.  I'm going to ask you some questions about the

25     last paragraph there.  There is some, I believe, some

1   redacted information, so I'm going to ask you to avoid

2   discussing any of that.  But you have a statement that you

3   make in your declaration and I'll just read it to you.

4   Maybe you can explain it to me.

5           It states that Luminant currently estimates that

6   hedging and trading activities will contribute approximately

7   an additional -- something -- to 2014 EBITDA.  And then it

8   says, approximately -- another number -- of this value is

9   anticipated from gains on transactions that have not been

10  executed as of June 30, 2014.

11          And I just want to take those statements, sort of

12  the sentences one by one.  The first one that states that

13  we'll contribute an amount to 2014 EBITDA, can you explain

14  that to me?

15  A    Yeah.  That's the revenue that the commercial team must

16  deliver to Luminant.

17  Q    Okay.  When you say that revenue that the commercial --

18  how does that work and in what capacity?

19          Maybe I'll start a little slower.  There's an

20  amount that comes in and you say the commercial team -- is

21  it hedging activity attributable to proprietary trades or is

22  it some kind of hedging activity tied to Luminant's

23  business, such as coal prices or natural gas or some of

24  those other things that we had discussed earlier?

25  A    It's primarily trading around the assets.  It may be

1    taking positions.  It may be getting out of positions, but

2    it's trading around the assets.

3    Q    Okay.

4    A    And bringing in incremental value in addition to that

5    of liquidating the assets in the marketplace.

6    Q    Okay.  I think I can ask this question and I'm not

7    going to ask you for any dollar amounts, but of that -- when

8    you say it's primarily trading among assets, is it -- would

9    you be able to affix, sort of a percentage to what could be

10   proprietary trading that contributes to Luminant's EBITDA

11   versus trading around the assets that contributes to

12   Luminant's EBITDA?

13   A    If I had the book, I could probably define that for

14   you.

15   Q    Okay.  When you say the book --

16   A    The trading book.

17   Q    Oh, okay.  All right.  But your testimony is that you

18   don't know that answer?

19   A    My testimony is that they must bring in 267 of

20   incremental value by trading around the assets.

21   Q    Okay.  All right.  Without giving a dollar amount, can

22   you tell me that there is a portion that's coming in as of

23   June 30th, correct?

24   A    Correct.

25   Q    Okay.  And that amount it says it's anticipated.  And

1    again, without giving me any dollar amounts, has that

2    anticipation been met?  For example, what I'm saying is,

3    that anticipated amount has it been either exceeded or was

4    it -- did it fall far below that amount for Luminant

5    contributing to Luminant's EBITDA, again without giving me

6    any dollar amount?

7    A    Well, we don't know yet until the end of the year.

8    Q    Okay.  Well, it says as of June 30th, but you wouldn't

9    know that until the end of the year?

10   A    Let me read the sentence and make sure I'm answering

11   your question.  What it says --

12   Q    Again with no dollar amounts.

13   A    -- is approximately X of this value is anticipated from

14   gains on transactions that have not been executed as of

15   June 30th, 2014.  So we don't know whether that's going to

16   come to fruition or not yet.

17   Q    Okay.  Okay.  Then we have a statement that says these

18   metrics are aggressive and difficult to attain.  Can you

19   explain that to me?

20   A    That's a good amount of money to have to achieve from

21   the commercial team in trading in the market, particularly

22   given the current state of commodities in the marketplace

23   and some issues around what trading counterparties, some may

24   have pulled back and the like in the bankruptcy.

25   Q    Okay.  Has the trading -- the hedging and trading for

1    this year, for 2014, has it been above what's been

2    anticipated to contribute to EBITDA or has it been below

3    what's anticipated to contribute to the EBITDA?

4    A    Well, it's X -- using X as the last number.  It's X

5    below whether what's been anticipated for the year

6    (indiscernible - 2:37:46).

7    Q    Okay.  So it's --

8    A    What's been achieved for the year so far.

9    Q    So the target that was affixed to this number -- the

10   target that was affixed to this metric is based on a certain

11   amount of hedging and trading, correct?

12   A    Correct.

13   Q    Okay.  And the assumptions that underlie that, have

14   they - let me ask it as sort of a two-part question.  Has it

15   been met to date, if you know?

16   A    X of the total has been met.  X minus Y of the total

17   have been met.

18   Q    Okay.  All right.  Now, what about going forward?  Is

19   it anticipated with the hedging and trading activity --

20   because I understand the debtor continues to engage in that

21   activity, correct?

22   A    Correct.

23   Q    Okay.  So going forward, is it anticipated that the

24   debtor -- with respect to the EBITDA target and what that

25   hedging contributes to EBITDA, has that -- is it anticipated

1    that that will be met by the end of the year given the

2    contracts that the debtor has currently?

3    A    No.  What this says is of that total amount, the number

4    we're referring to as X is -- has not been achieved as of

5    June 30, 204.

6    Q    Okay.

7    A    So whether or not -- there's no trades that have been

8    executed for that amount.  That still work that has to be

9    done in the marketplace.

10   Q    All right.  But what about going forward? What about

11   going towards the end of the y ear?  Is there any

12   anticipation that X or another number for trades that might

13   take place after June 30th, that those will come to

14   fruition?

15   A    We just don't know.  It just depends on the liquidity

16   in the market, what the prices are and where the

17   opportunities are and how the traders do, so it's -- that's

18   the amount that has not be achieved that's left to achieve.

19   Q    Okay.  How much of the -- and we'll -- just stick with

20   Luminant, how much of the -- again, no dollar amounts -- how

21   much of EBITDA is made up from hedging and trading

22   activities?

23   A    Well, this target that is here would be included in the

24   Luminant EBITDA.

25   Q    Okay.

1    A     So it would just be the delta in those two numbers.

2    Q     Okay.

3    A     Without saying the numbers.

4    Q     All right.  Exactly.  Okay.  Now I want to turn your

5    attention to a footnote which I do not believe was redacted.

6    It's footnote 18 and it's on page 6-27.

7    A     Okay.

8    Q     And I'm certain there's nothing been redacted from

9    that.  Let me just check.  Okay.  It doesn't appear that

10   it's been redacted, okay.  Now, you state there in that

11   footnote -- this is a footnote to a paragraph above that

12   says, after accounting for the variance associated with the

13   termination of the corporate hedge book, Luminant year-to-

14   date EBITDA is 17 million below baseline expectations.

15   Okay.

16              I just want to take that a part a little bit.

17   What did you mean by the variance associated with the

18   termination of the corporate hedge book?

19   A     Well, the hedge book was terminated at the bankruptcy

20   and so you had a $462 million credit to EBITDA.

21   Q     Okay.  Was that -- that credit, was that reflected

22   anywhere?

23   A     Well, I discussed credit in the bigger on page 5-16, I

24   believe is the page number.

25   Q     5 -- you said 16?

1   A    Give me one second, please.  I show the EBITDA without

2   the corporate hedge program and discuss it on page 623, but

3   that's only for '13, not for '14.

4   Q    Okay.  Hold on.  Let me get there.  Okay.  All right.

5   I think I know where you are.  You had indicated there --

6   and there's a chart there again that's redacted -- that

7   there's -- are you talking about the -- I think your

8   testimony was with respect to the gas hedges, correct?

9   A    This is the corporate hedge program, yes.

10  Q    Okay.

11  A    And there's other gas, excuse me, there's other gas

12  hedges, but this is the corporate hedge program.

13  Q    Okay.  When you say the corporate gas hedges, can you

14  explain that to me?

15  A    The corporate hedge program?

16  Q    The corporate hedge program, I'm sorry.

17  A    That is the head program that was put in place at

18  the -- when the privatization took place.

19  Q    Okay.  So that's been in place since 2007?

20  A    I believe that's the right -- I believe --

21  Q    Okay.  And what is it?  I mean, can you explain it to

22  me?

23  A    The company entered into certain hedges at a gas price

24  that -- to hedge out, basically the gas exposure and that

25  number is declining over a period of time as was testified

1    by Mr. McFarland.

2    Q    Okay.  And you had indicated that the number here did

3    not include these gas hedges, the figure that you were --

4    the numbers that you were talking about at that point?

5    A    The figure I was speaking to, correct.

6    Q    Right.  Okay.  If it did include the gas hedges would

7    it be -- would there be some difference to it?

8    A    Mr. Schepacarter, there would definitely be

9    differences.  You would add on the corporate hedge program.

10   Q    Okay.  Now, the corporate hedge program, is that

11   different than the company's general hedge program?

12   A    Is it different than the hedging they do on a day to

13   day basis?

14   Q    Uh-huh.

15   A    Yes.

16   Q    Okay.  And explain that to me if you could?

17   A    Well, the company entered into long-term hedges at the

18   time of the privatization.  The company enters into day to

19   day transactions all the time at the current prices.  The

20   difference is the prices of the corporate hedge program were

21   set many years ago when gas was closer to $7 and today

22   they're being executed around today's market.

23   Q    Okay.  And when you say today's market, what do you --

24   what's that?

25   A    Well, I think today's market balance year is in the 380

```
 1    to 389 range for BTU for gas.

 2    Q    You mean 3.89?

 3    A    Yes.

 4    Q    Okay.  Let's turn back to that footnote again if we

 5    can.

 6    A    Okay.

 7    Q    Actually it's the sentence before the footnote.

 8    A    Okay.

 9    Q    Now, you talked about the corporate hedge book, is that

10    the corporate hedge program that you talked about or is that

11    something different?

12    A    The corporate hedge program is what I'm talking about.

13    Q    Okay. And is that the same as the corporate hedge book?

14    A    Where do you see corporate hedge book?

15    Q    It's on your sentence at the top of page 627.

16    A    Yes, that would be the corporate hedge program.

17    Q    Okay.  All right.  I believe that both Mr. McFarland

18    and Mr. Evans testified that comparing the EBITDA targets

19    with past performance is not a good comparable when

20    evaluating the target year-end performance because of the

21    hedge program.  Can you explain that?

22    A    Would you repeat that question for me again, please?

23    Q    Sure.  Absolutely.  Both Mr. McFarland and Mr. Evans

24    testified that comparing the EBITDA targets with past

25    performance is not a good comparable when evaluating whether
```

1    the target driven performance -- because of the hedge --

2    because of the hedge program?

3    A    Yeah, that was part of the testimony and that piece of

4    the testimony is -- yeah, you have a hedge program that was

5    for a certain amount of time.

6    Q    Uh-huh.

7    A    So it's similar if you have -- you have something you

8    have for a finite amount of time -- it has a finite life and

9    there's no -- you can't duplicate that at those prices

10   moving forward.  So you can't take the corporate hedge

11   program that contributed, I think, Mr. McFarland testified

12   in 2013 it was around a billion dollars.  You can't

13   duplicate that billion dollars moving forward, so to get

14   apples to apples, you need to look at what you have and what

15   you have, which are these assets and how you trade those in

16   the marketplace, but you no longer have the corporate hedge

17   program once it's cashed out.  And you can't replace it at

18   $7 gas.

19   Q    Let me ask you this question and it's on the footnote.

20   It says, for accounting purposes.  When you say accounting

21   purposes, what did you mean by that?

22   A    Well, looking at how they -- how you account for the

23   hedge program on the accounting basis.

24   Q    Right.  But was it like a book entry or some other type

25   of accounting?  When you say accounting purposes, I just

1    don't understand what that means.  I understand it's

2    accounted for, but in what way?

3    A    What is done is you're accounting for it to see how

4    much above or below budget you are.  If you just left -- if

5    you just assume you're going to get the 462, you'd be 462

6    million above budget until the -- until it rolled off month

7    to month.

8    Q    Okay.  Okay.  How did the hedges -- the unwinding of

9    the hedges at the bankruptcy effect the EBITDA in the first

10   six months of 2014?

11   A    You had a one-time gain of $462 million.

12   Q    Okay.  Okay so that number, the 462 was a one-time gain

13   you're saying?

14   A    That's correct.

15   Q    Okay.  Then indicate -- it said in the original LRP and

16   I'm guessing what's LRP mean?

17   A    Long range plan.

18   Q    Okay.  And the long range plan is some type of tool

19   that's used in what way in an overall corporate way or --

20   A    A long range plan is looking at five years of

21   projections.

22   Q    Five years of projections?

23   A    That's correct.

24   Q    Okay.  And do you know what five years you're talking

25   about?

1   A     In this case, you would be looking at '14, '15, '16,

2   '17 and '18.

3   Q     Okay.  So it's going forward?

4   A     That's correct.

5   Q     Okay.  Is that plan still in effect?

6   A     It was just -- it was a projection.

7   Q     Okay, but are those projections still in effect?

8   A     I'm not sure what you mean by in effect.

9   Q     Well, you indicate that in the original LRP these

10  terminated hedges were assumed to be in place during the

11  entire year.  So what I'm trying to ask you about is with

12  respect to the long range plan, there were some projections

13  that were based for this year, right?

14  A     Yes.  So in the long range plan if you didn't file for

15  bankruptcy, these hedges would remain in place for the

16  entire year.

17  Q     So now as a result of the bankruptcy is that long range

18  plan and those projections still in place?

19  A     Well, the corporate hedge program rolled off at the

20  filing.

21  Q     Okay.

22  A     Because the counterparties terminated.  So that piece

23  would no longer be in the projections.

24  Q     Okay.  Is there anything that replaced that program,

25  that hedge program?

```
 1    A    No.
 2    Q    Okay.  And those -- the things that were hedged in that
 3    program is it -- are you telling me that they're no longer
 4    being hedged?
 5    A    The natural gas hedge that was put in place has not
 6    been replaced.  The company continually has hedging and
 7    trading around power, gas and other commodities.  So they
 8    still trade commodities, but there's not another corporate
 9    hedge program.
10    Q    Okay.  It's true that the debtor still hedges and
11    trades in commodities, correct?
12    A    That is correct.
13    Q    Okay.  And are they -- is the debtor still earning a
14    profit from the result of those commodities being traded and
15    hedged?
16    A    Well, they're not -- probably not earning a profit on
17    every trade, but the -- you certainly have a goal of earning
18    a profit on the trading operation.
19    Q    Okay.  But overall, I mean, are they earning a profit?
20    A    Well, so far with respect to EBITDA, it's the number
21    that we just went over, the Y number.
22    Q    Okay.
23    A    Or excuse me, yes the Y number, Y minus X
24    (indiscernible - 2:54:28).
25    Q    Y --
```

1    A     Yes, I apologize.

2    Q     X minus Y.

3    A     Whichever it is.  It's those two numbers -- the

4    difference between those two numbers.

5    Q     Okay.  So using that calculation or whatever you want

6    to call it, if they're still trading, right, and there's

7    still revenue coming in on the trading, the proprietary

8    trading side or the commodity trading side, correct?

9    A     On their commodity trading?

10   Q     Right.  Okay.  And if there is a minus Y, it's possible

11   that Y could change and actually X -- become X again or X

12   could be X plus Y, correct?

13   A     The profit from the operation could go up or down, yes.

14   Q     Okay.  All right.  Is there any anticipation that

15   through the end of the year that that number will change and

16   that will become a profitable exercise?

17   A     I think the goal is for it to be profitable.  We won't

18   know -- and it's similar to the stock market.  When the

19   stock market goes down 250 points today and I don't -- if

20   you made an option on that you would lose money and so you

21   don't know day to day what's going to happen with the

22   commodities, but certainly the plan is to earn a profit.

23   Q     But there was some expectation with respect to the

24   corporate trading book with respect to Luminant's EBITDA,

25   correct?

1    A     I don't --

2    Q     That's factored in there?

3    A     Sorry for interrupting.

4    Q     That's all right.

5    A     Mr. Schepacarter, I don't think it's an expectation.

6    There is a plan -- there is a target to earn that much.

7    Q     But the target is different than an expectation.  A

8    target is a number that you want to reach, for example,

9    there's certain targets with respect to the clients that

10   we're talking about, correct, so there's certain targets.

11   A     Yeah.

12   Q     There's got to be some projections that we're going to

13   in our proprietary trades and the like, whatever commodities

14   we're trading, our goal is to make some X amount of money,

15   correct?

16   A     They have set targets for the commercial operations.

17   Q     Okay.  And those targets do you know how many targets

18   we're talking about?

19   A     Well, the target is what we just went over for the --

20   that's the baseline target.

21   Q     Okay.  But are there targets for the trading, such as

22   if they're going to trade in coal, if they're going to trade

23   in natural gas, if they're going to trade in some nuclear

24   material, if they're going to do all of that, aren't there

25   some goals that they want to reach with respect to trading

1    that they're going to say we're going to trade and we're

2    going to make X amount of dollars in our coal hedging

3    program or coal trading program?

4    A    It's pretty difficult with the volatility around

5    commodities to set a target by commodity.  You've got to see

6    what's going on with the commodities, where the

7    opportunities are and whether you're trading heat rate,

8    whether you're trading, I mean, primarily it's going to be

9    heat rate and gas.

10   Q    Right.

11   A    But if there was -- I'm sure if the traders felt there

12   was an opportunity to hedge some PRB, then I'm sure they

13   would take a look at that if they thought that made sense.

14   Q    Okay.  But given your statement as to the volatility of

15   the market and it's difficult to determine, how can you

16   determine EBITDA?  I mean, how can you be able to figure in

17   the hedging into the EBITDA targets?  Isn't that kind of

18   like a number that can't be fixed?

19   A    Well, Mr. Schepacarter, that's the way this business

20   is.  I mean, even if you go to the coal facilities, you can

21   hedge the power in the coal facilities and if you're plant

22   goes out and you've over hedged, you're now buying back from

23   the market to satisfy your hedge.  That's just the nature of

24   this business.  The commodities are no different.

25            You're taking positions on commodities.  If you

1    decide to hedge everything at a very low price and prices go

2    up, you're going to have your collateral issues and you're

3    going to -- and that's why you set targets so that you --

4    you try to plan for that baseline, understanding you have

5    these variances around it based on these volatilities in the

6    marketplace.

7    Q    Okay.

8    A    But coal is no different than the other commodity or

9    the rest of the operation.  The assets themselves are

10   positions in the marketplace.

11   Q    But let me ask you this, that's the way the business

12   is, how do you set the goals, the targets, to factor in the

13   -- for the threshold, a superior baseline and that.  How can

14   -- if you don't know what the trading portion is going to

15   be, how are you setting those targets?  I don't understand.

16   A    Well it's back to the process that I discussed earlier

17   today.  Each division has a ground up forecasting exercise

18   to see what they can commit to the business.  So they look

19   at the business.  They do forecasts.  They're forecasting

20   where the business is going to go and where they see the

21   opportunities and they come up with goals.

22   Q    Okay, but if hedging is a big part of that, how do they

23   -- and you've told me you sort of can't forecast that, I'm

24   not making the connection and I'm just not following.  I'm

25   sorry.

1    A    Okay.  I apologize for not being clearer.  What they do

2    is they look at the marketplace.  They look at the forward

3    prices and they take a view on where that market's going to

4    be and where they believe what they can achieve in the

5    marketplace.

6    Q    But does that include hedging?

7    A    Well, I'm talking about the trading operation.

8    Q    Okay.  All right.

9    A    So the trading operation takes the view on what they

10   can do given that asset mix, given what's open and what the

11   prices are and where they think the prices are going to go.

12   So they're going to take positions on that.

13          Now, some of those trades are going to go in the

14   money, some are going to go out of the money, but as a

15   trading operation, when I was at Calpine Corporation, for

16   example, and I was running the trading floor, I had a target

17   of so much money that I was going to make that floor.   And

18   I didn't -- I didn't have anything tangible to get there,

19   but I knew I had a forecast of the pricing.

20          I looked at the assets in the marketplace and I

21   had a -- on the floor at that time, I had a view of where

22   the market was going to go and we took positions -- we

23   traded our assets around that.  So if the price started

24   running up, for example, so let's say we -- at Calpine we

25   had about I think 6000 megawatts.  Let's say we had it fully

1    hedged, sold out, and the price started dropping off in

2    Texas.  I might liquidate that position because I have a

3    view, the weather is going to pick up and there's going to

4    be some outages and I see the price going the other way.

5            So I may actually back out of all those hedges and

6    open my portfolio back up so when the prices come back up, I

7    lock in again.  So I may trade in and out of positions based

8    on my view of the marketplace.

9            The gentlemen that does this, the ladies and

10   gentlemen that do this are very seasoned.  They do this

11   often and they have a feel for at they think they can

12   achieve year to year.  Is there a risk they're not going to

13   achieve it?  Absolutely.  Is there a risk that they're going

14   to lose money?  There's certainly that risk.  But there's a

15   risk policy that limits positions and the like and that's

16   why you keep a band on it too.  Like I say, when I was at

17   Calpine and the gentleman kept the portfolio totally open

18   because last year was a really solid year.  So he kept the

19   portfolio totally open.

20           Well, most people wouldn't see that as risky, but

21   that's really risky.  That's really no different than just

22   making a -- than going out and going along, or sure, you

23   have assets.  You've left them wide open for a period of

24   time, so you've left this risk open.  So if he had targets

25   that said you've got to be within this band, he probably

1    would have had that portfolio hedged up about 60 or 70

2    percent and kept some open to take advantage of the price

3    movement, but not all of it.

4              Do you understand where I'm coming from?

5              THE COURT:  I think we can move on, Mr.

6    Schepacarter.

7              MR. SCHEPACARTER:  Okay.  All right.

8    BY MR. SCHEPACARTER:

9    Q    All right.  Let me move on to some other issues here.

10   Let me just cover some other ground with you.  It's your

11   demonstrative number 5, it's the nuclear available

12   generation metric.

13   A    Okay.  I'm there, Mr. Schepacarter.

14   Q    Okay.  And I think your testimony was that there was an

15   -- I believe you said there was an outage with respect to

16   one of the plants?

17   A    That's correct.

18   Q    Okay.  And what was that outage as a result of?  Do you

19   know?

20   A    It's a refueling outage.

21   Q    Okay.  And refueling, that's a -- nuclear reactors are

22   refueled every 18 months, correct?

23   A    Well, these particular ones are, yes.

24   Q    Okay.  I understand.  So but that's been going on for -

25   - since they've been in place, correct?   Since they've been

1    built?  They refuel them every 18 months, they cram them

2    down.

3    A    Correct.

4    Q    Okay.  And so what about the -- with those outages,

5    they're kind of like planned outages, aren't they?

6    A    This particular outage is a planned -- yeah, refueling

7    outage is a planned outage.

8    Q    Okay.  So if you have a planned outage, wouldn't --

9    wouldn't you just take that into account with respect to the

10   target that's to be set here for the bonus plans?

11   A    Yes, Mr. Schepacarter, that's -- that is correct.  You

12   need to take into account a planned outage, but the

13   difference here is you -- how long is it planned for.  So

14   with respect to these units, there's a certain number of

15   days that they planned that outage for and that's what's in

16   the plan, so if the outage is extended, then that's not part

17   of the plan.  That's -- that was what Mr. McFarland was

18   explaining yesterday when he said so far -- I believe he

19   said they were eight hours behind schedule, which doesn't

20   sound like a lot, but every -- like I said, everyday is a

21   million dollars per unit or two million dollars total, or a

22   million dollars per unit.

23   Q    So the eight -- I mean when you say there's a planned

24   outage, there's hours that are associated with that,

25   correct?  You're going to be down for so many hours or so

1    many days or something like that?

2    A    Yeah, it's days/hours.  Yes.

3    Q    Okay.

4    A    But it's planned to the hour.

5    Q    Okay.  Okay.  Understood.  But there's some give and

6    take there, correct?  I mean, with respect to the outage?

7    Because you have to understand that and I think your

8    testimony was that with respect to an outage when you start

9    to refuel, you're checking for other things, so it's just

10   cracks and all that, correct?

11   A    That is correct.

12   Q    Okay.  So that's not taken into account when you have a

13   planned outage like that?

14   A    Well, it depends.  I mean, some entities do.  I mean,

15   some entities may have a 40 day outage because they are

16   trying to allow all this time, but Luminant has set targets

17   that says you -- we will accomplish this outage within this

18   number of days.  Okay.  And they keep that tight.

19            Now, there is a variance around -- some variance

20   around it for threshold and target and superior, but

21   ultimately, you have -- they have to meet top level industry

22   performance in that outage if they're going to make their

23   targets.

24            They are not -- Luminant has not planned that

25   they're going to find a crack somewhere.  They definitely

1    haven't planned any of that and we hope -- you always hope

2    that's not going to be the case, but with nuclear

3    facilities, like I said earlier, there's a 40 percent chance

4    in a top 25 outage issue with nuclear stations.

5              Now, that isn't to say that's going to be the

6    case, but the refueling outages, we go in here, they've got

7    all the contractors that Mr. McFarland talked about.  They

8    have them all lined up.  They've got it -- and they know the

9    pressure is on.  They know if they're going to meet their

10   targets, this is going to have to hit and they're going to

11   have to make it, okay.

12   Q    Uh-huh.

13   A    So they go down that path, they manage all the

14   contractors and as long as nothing goes wrong, there's no

15   issues, they have a chance of making that.  Now right now,

16   they're eight hours behind schedule and there haven't been

17   any major issues, but they have the very tight, I mean, I'm

18   trying to remember, I think it's 24.5 days for the -- I'll

19   have to check that to be sure, but you're talking about a

20   nuclear station and we have all these contractors on site,

21   you're doing all the refueling and assuming nothing goes

22   wrong.  But you could plan it longer, but they've chosen, I

23   mean, they are a top performer in the industry and they --

24   that's what they -- that's the plan they set forth and it is

25   -- I agree it's a very challenging goal.

1   Q    Okay.  But the threshold and the baseline are based on,

2   again, I think we covered this before, on industry averages,

3   correct?

4   A    Well, they're compared to industry averages.

5   Q    Okay.  So -- and your outage goal is based on an

6   industry average, correct?

7   A    Well, the outage goals compared to industry average.

8   Q    Right.

9   A    But no, they have -- the way that they set this -- I'm

10  trying to compare to industry average to give you an idea

11  how this management team is doing in their planning, but

12  when they go forth in their nuclear -- with the nuclear

13  planning, okay, when they did their piece, they looked at

14  (indiscernible - 3:09:11) and they looked at the outage.

15  They've looked -- they looked at a plan and figured how

16  tight can they make everything to deliver this unit to

17  service, okay.

18         Now, with the coal station this may not be as

19  critical if you do it at the right time of year.  The

20  problem with the nuclear station -- it's not a problem --

21  but the issue at the nuclear station is your profitable all

22  the time.

23         So that's why when Mr. McFarland said -- gave you

24  the outage down to the half hour, that half a day is

25  $500,000.  And every day is a million bucks.  So you want to

1     compress that outage as much as possible.  Coal station you

2     may have that extra day or not if you plan it the right time

3     of year might not be as big an issue.

4          So they do that from the ground up on what they --

5     they look at all the contractors, they put all the diagrams

6     in place, make sure you've got the critical path and

7     everything that goes from A to Z to get there.

8     Q    And has the debtor performed in the past -- about how

9     far above industry average has the debtor performed in the

10    past?  Has it been above the 3 percent or the 4 percent?

11    A    The debtor generally has performed in the top in the

12    industry.

13    Q    Okay.  So if they're in the top of the industry, do you

14    think it's a fair comparison to compare them to the industry

15    average and then just inch it up a couple percent?

16    A    Well, the nuclear stations in the United States have

17    pretty high capacity factors for the same reason.  And it's

18    sort of like when my daughter is at school getting straight

19    As, I'm not sure what else I can ask her for.

20    Q    Okay.

21    A    I mean, there's only so many megawatts you can get out

22    of the unit.

23    Q    Okay.  All right.  And there hasn't been any type of --

24    I think it was in your papers, a scram event or anything

25    like that at any of these reactors, correct?

1    A      No.   There was a -- no, nothing like that.   There was

2    an issue early in the year that caused an outage at one of

3    the units.   I can't remember the exact event --

4    Q      Okay.

5    A      -- that threw them behind target.

6    Q      Okay.   Let me turn your attention to your demonstrative

7    8 slot.

8    A      Okay.

9    Q      Okay.   And you testified that a number of things with

10   respect to the Luminant coal fuel cost metric.   You

11   indicated that you had visited the mines, correct?

12   A      Correct.

13   Q      And that the -- I think you talked about the -- let me

14   ask this question, the coal fuel costs are they compared

15   with the industry standards or with respect to past

16   performance?

17   A      They are compared to -- the comparison I do here is

18   compared to the industry average.

19   Q      Okay.   And the goal here, how far above the industry

20   average is it set?

21   A      It's not set by the industry average.

22   Q      Okay.

23   A      It's set by when they set the coal price they look at

24   what generate they anticipate from all the different coal

25   plants.

1    Q    Right.

2    A    They look at all the mining plans for all the different

3    mines, where they're at, where the heat rates are for the

4    seams that they're going to be going after, what costs they

5    may incur with respect to moving the drag line that I had

6    explained.  And looking at the mix and the other pieces, the

7    mix between PRB, the Powder River Basin coal and the

8    lignite.  And from there -- from there, they build a ground

9    up estimate.  So it obviously has many, many factors.

10   Q    Okay.

11   A    And I then compared that to what the industry were

12   seeing for similar pricing.

13   Q    And you also talked about the problem with sloughing.

14   Hasn't that always happened in the past as well?  Hasn't

15   that been always a problem when you mine?

16   A    No, sir.  This was -- this was an event where -- and

17   sloughing sounds like a soft word, but this was a very

18   dangerous event.

19            When they -- again when you think about it, when

20   they dig this pit, you have this very deep, deep pit and

21   when they dig the dirt before they get to the seam, they

22   basically build a wall around the pit, so the pit gets very,

23   very deep.

24            And as you get deep, you can then look and see the

25   different seams as -- that you dug in a mine as they get

1    deeper and deeper because once they get done with one, then

2    they move over and they start going the other way.  And then

3    they have to reclaim that land back into forest and lakes

4    and streams and et cetera.

5          But this -- in this event they had done it and

6    there was in that wall -- I'm not going to explain this

7    perfectly -- Mr. McFarland could explain it much better than

8    I, but you basically -- from a mechanical engineering

9    perspective, I look at it almost as a sheer plane so you

10   start getting a seepage of the wall into the pit.

11         So once that happens, you've got to stop.  You

12   can't mine that anymore until you can get that wall

13   reinforced or you could have fatalities (indiscernible -

14   3:15:44) the hole.  So no that doesn't happen very often, it

15   was fairly unique, but when that does happen, it, you know,

16   it's something you have to deal with (indiscernible -

17   3:15:55) with other issues that Mac McFarland that he

18   explained at the Liberty mine where he's getting water in

19   it, but that's different than sloughing.

20   Q    Okay.  Let me just ask you -- we'll now turn to the TXU

21   side of the company.

22   A    Okay.

23   Q    And I'll have you turn your attention to demonstrative

24   11.

25   A    Yes, sir.

1    Q    Okay.  Now, (indiscernible - 3:16:41) of the blue

2    circles the outside of the company control.  So you have

3    one, two, three, four, five, six, seven, eight, basically

4    nine risk factors --

5              THE COURT:  I'm sorry, I missed the page number.

6              MR. SCHEPACARTER:  I'm sorry, Your Honor.  it's

7    page 11.

8              THE COURT:  Okay.  Thank you.  My apologies.

9              MR. SCHEPACARTER:  Okay.

10   BY MR. SCHEPACARTER:

11   Q    So as I said there's, like nine risk factors that go

12   into TXU's EBITDA, correct?

13   A    That is correct.

14   Q    Okay.  If -- I count five that outside of the control

15   and three partially within the control, so if there's only

16   one that's within the company's control, which is the SG&A,

17   how is that incentivizing?

18   A    Well, the job of the company -- and I think that an

19   important part of these two graphics are the dotted line

20   that goes around it and it's the integrated risk management

21   frame or how you manage these risks.  Okay.

22              So when TXU looks at their customer mix, well --

23   maybe we can just use weather first for the example.  So

24   they look at weather, they look at a three year average

25   weather is what they use and they look and they plan for

1    that weather, okay.  And they make decisions as they go

2    through the year whether they hedge above or below that.

3           And as they do that, depending on how they execute

4    that hedge, what the timing is of the -- hedging for those

5    customers and then how they manage bringing on customers,

6    making sure they're at the right margin so they have that

7    ability to manage through those difficult times.  That's all

8    part of what they're doing in their operation.

9    Q    Okay.  Now you mention the word hedged, I think twice,

10   so I want to ask you about it.  When you say hedging on the

11   TXU side, how does that work?

12   A    Well, TXU is selling power to their customers and so

13   what they try to do is lock in some of their cost of goods,

14   try to lock in the cost of electricity.  So they will hedge,

15   they do kind of a wedge hedge where they hedge, I believe

16   it's 100 percent of the prompt months and 75 percent of the

17   next month's and they hedge it through time.

18          They do that because they have -- you can't do it

19   long term, because you don't want your customer -- as Mr.

20   McFarland, excuse me, Mr. Burke explained, those customers

21   can get online and literally switch by the next day, so you

22   can't hedge out for a year, because you don't know if

23   they're going to be there.  So you can't -- that's probably

24   not the best strategy.  So you plan some level of how long

25   you think you can rely on those customers and try to lock in

1    some of that cost of goods sold, because you are getting

2    somewhat of a fixed price for electricity.

3            MR. SCHEPACARTER:  Okay.  All right.  Let me --

4    I'm going to -- if you might, Your Honor, I would like to

5    present the witness with an exhibit.

6            THE COURT:  Okay.

7            MR. SCHEPACARTER:  I'll give one to counsel.  Your

8    Honor, how many copies would you need?

9            THE COURT:  Just one for me and one for Ms.

10   Werkeiser (ph).

11           MR. SCHEPACARTER:  Okay.  That'll work.  May I

12   approach, Your Honor?

13           THE COURT:  Yes.  Do we need to mark this for

14   identification?

15           MR. SCHEPACARTER:  Yes, Your Honor.

16           THE CLERK:  35.

17           THE COURT:  Okay.

18           MR. SCHEPACARTER:  Yes.

19           THE COURT:  All right.  This is marked as Exhibit

20   35 for identification.

21       (Exhibit 35, marked for identification)

22           MR. SCHEPACARTER:  Okay.  Let me just identify

23   this document.  This is a copy of the filed monthly

24   operating report by the debtors.  It was filed on August 8th

25   of this year and it's document number on the docket number

1    1790.  Okay.

2    BY MR. SCHEPACARTER:

3    Q    Mr. Filsinger, do you -- have you seen this document

4    before?

5    A    I don't believe I've seen it in this form, no.

6    Q    Okay.  Let me have you turn your attention to page 36

7    of 37.

8         THE COURT:  36?

9         MR. SCHEPACARTER:  Yes, it'll be page 36 of 37.

10        THE COURT:  Okay.

11   BY MR. SCHEPACARTER:

12   Q    The top of it should say MOR-2 rider schedule of

13   commodity hedging and trading activity for the period April

14   29th, 2014 to June 30, 2014.  Do you see that?

15   A    Yes, I do.

16   Q    Okay.  All right.  There's a number there for the

17   second column it's Luminant Energy Company, LLC.

18   A    Yes, I see that.

19   Q    You see that?  Okay.  And the number there appears for

20   Luminant appears to be a positive, correct?

21   A    That is correct.

22   Q    Okay. And if you could read that dollar amount.

23   A    It says 536944.

24   Q    Okay, so for Luminant, they had a positive -- from what

25   the report says -- a positive amount of hedging and trading

1    activity.

2         (Sneezes.)

3              THE COURT:  Excuse me.

4              MR. SCHEPACARTER:  Bless you.

5    BY MR. SCHEPACARTER:

6    Q    A positive amount of hedging and trading activity for

7    that period, basically from the date of filing through June

8    30th, correct?

9    A    That is correct.

10   Q    Okay.  All right.

11   A    I believe that probably includes -- that may include

12   the corporate hedge program also.

13   Q    Okay.  All right.  But you're not certain of that,

14   correct?

15   A    It looks as though it does, but I'm not certain.

16   Q    Okay.  All right.  So if the corporate hedge program

17   was the -- I believe it was 426 was the number?

18   A    Correct.

19   Q    Okay.  So my quick match, if that's true, then there's

20   $110,000 that was earned on hedging from basically for about

21   a two month period, correct?

22   A    Correct.

23   Q    And do you know what that might be attributable to?

24   A    Well, that would be from the commodity traders.

25   Q    Okay.  All right.  And do you know if that amount would

1    be on target, so to speak?

2    A    Well, that amount would be, excuse me, that amount

3    would be included in the number we discussed earlier, in the

4    earlier questioning.  That number is -- this number is

5    included in that number.

6    Q    Okay.

7    A    In those targets and in those results.

8    Q    And do you know --

9    A    Or the portion through the time of June 30.

10   Q    Okay.  All right.  And do you know if there is an

11   amount that going forward, there's based on that number, the

12   commodity trading, that there's an anticipation of an amount

13   of hedging activity that will be going forward for the next,

14   say, six months past June 30th?

15   A    As I testified earlier, there is a budget of trading

16   revenue that we discussed when we were discussing the X and

17   Y.

18   Q    Okay.  All right.  With respect to your position as a

19   consultant with the company, do you consult -- okay, are --

20   let me ask this question first and I'll get back to that.

21          There will be a monthly -- next monthly operating

22   report that will come up so are you aware of how much the

23   company earned in the third quarter, which will be the

24   quarter from July 1st through the end of September, how much

25   was earned as a result of hedging activities for Luminant?

1    A     I don't recall exactly what it is.

2    Q     Okay.  Do you have an idea of what it might be?  When

3    you say you don't recall, but the exact number, but do you

4    have an idea of sort of a round number?

5    A     I can't recall off the top of my head.

6    Q     Okay.  All right.  And in your position as an energy

7    consultant, let me ask you this question, I believe you had

8    some experience -- I think you said that when you worked at,

9    I think, Calpine, or worked with Calpine that you had some

10   experience with their hedging and trading desk?

11   A     I ran their commercial operations for some period of

12   time.

13   Q     Okay.  And are you involved in the commercial

14   operations for this debtor of hedging and trading?

15   A     No, I am not.

16   Q     Do you consult them at all with respect to that?

17   A     No, I do not.

18   Q     Okay.  Okay.  Again, without giving any numbers, and I

19   don't think you'll need to -- with respect to demonstrative

20   12 --

21   A     Just one second.  Okay.

22   Q     Okay.  And I think your testimony was that hedges

23   affect this target in some way, correct?

24   A     Well, hedges impact the business.  If you're able to

25   control your costs.

1    Q    Uh-huh.  But do they have a either positive or negative

2    effect on this metric itself?

3    A    It depends.  As with any trading activity, there's

4    upside and there's downside.  So for one example, where it

5    would be a positive would be you hedged your customers out

6    at a level they buy electricity and so you can plan your

7    margins pretty well.

8              The negative side is some weather comes -- some

9    weather comes in like the polar vortex or the storm that

10   came through last week and the assumption changes and it

11   exceeds your hedges and you now have to buy in the

12   marketplace that amount.  So perhaps you should have hedged

13   more.  Or volumes are down because it's a mild summer and

14   you hedged and your consumption is below the hedges.  Now,

15   you've got to sell back to the market and if consumption is

16   down, it's likely at lower prices than you hedged.

17             So my point is the commercial operations team who

18   does this on a day in and day out basis are doing that.

19   They're very experienced and their job is to do the best

20   they can in hedging -- doing a hedging strategy that's the

21   best for the business.  And if they do that, it's a positive

22   impact on contribution margin, but there are times where

23   it's going to be negative.

24   Q    Okay.  But that positive and negative fluctuates with

25   events whether at the end of the year, it comes out with a

1   certain number, correct?  After everything is accounted for.

2   A    Yeah.  At -- excuse me, yes.  At the end of the year,

3   it is what it is.

4   Q    Okay.  Let me ask you this question and I'm going to

5   skip up a little bit or down, I should say, to number 15 of

6   your demonstrative.

7   A    Okay.

8   Q    Okay.  And you sort of talked about the lights out in

9   our metric, correct?

10   A    Yes.

11   Q    Okay.  And this metric is only given 3 percent weight,

12   correct?

13   A    This metric is given 3 percent, yes, sir.

14   Q    Okay.  And with respect to TXU, the largest metric

15   would be weight wise is EBITDA, correct?

16   A    That is correct.

17   Q    Okay.  All right.  And I think that would be the same

18   with the TXU customer complaints that's only a 3 percent

19   weighted metric?

20   A    That is correct.

21   Q    And if I could turn your attention back to your

22   declaration --

23   A    Okay.

24   Q    -- and if you could go to page 1-5 and the table that's

25   on that -- with the updated metrics.

```
 1          (Pause)

 2     A    Table 1-5?

 3     Q    I'm sorry.  It's page 1-5, but it's Table 1-4.  It's at

 4     the top.

 5     A    Okay.  I'm there.

 6     Q    Okay.  Let's just go through some of the performance

 7     metrics here.  I'm not going to ask you about the targets,

 8     but I'm going to ask you the performance metrics.

 9               With respect to Luminant, and there's basically

10     seven metrics there, correct?

11     A    That's correct.

12     Q    Okay.  And hedging effects the EBITDA target, correct?

13     A    Your performance with respect to hedging could impact

14     your EBITDA target.

15     Q    Okay.  All right.  And does it -- does hedging impact

16     any of the targets that you can tell me?

17     A    It could impact your -- it could impact your fuel costs

18     if you -- as you see the performance of your hedging.

19     Q    Uh-huh.  Are they the only two for Luminant?

20     A    Yeah.  With respect to commodity hedging, yes.

21     Q    Okay.  Now with respect to TXU Energy, there are nine

22     metrics there, correct?

23     A    That is correct.

24     Q    Okay.  And in your words the hedging performance, that

25     would affect EBITDA for TXU, correct?
```

1    A    When you're hedging, that could impact your management

2    EBITDA --

3    Q    Okay.

4    A    -- the performance to your hedging program.

5    Q    Were there -- are there any other ones that -- that are

6    affected or impacted?

7    A    Well, any revenue issue or cost issue is going to

8    impact contribution margin as well.

9    Q    Okay.  So it would be contribution margin.  What about

10   energy total costs?

11   A    No.

12   Q    No?  Okay.  And none of the others would be affected by

13   the hedging?

14   A    I don't believe so.

15   Q    Okay.  Now we'll turn our attention to business

16   services.  There are five there, five metrics, correct?

17   A    That is correct.

18   Q    Okay.  And I thought it was your testimony that

19   competitive total spend and competitive management EBITDA

20   were, I think you said, roll-ups.  Is that -- am I saying --

21   stating your testimony, correctly?

22   A    That is correct.

23   Q    Okay.  All right.  So as a result of the roll-up,

24   wouldn't both of those numbers -- those amounts be affected

25   by hedging?

1    A    If you were hedging and the performance of your hedging

2    could impact your competitive EBITDA.

3    Q    Okay.  All right.  How much -- how much of an effect

4    would the hedging activity have on both of those business

5    services numbers that we just discussed?

6    A    It would depend on how you -- what your performance

7    was.

8    Q    Okay.

9    A    If you made a dollar, it would impact the dollar.

10   Q    Okay.  But with respect to the targets that are met

11   there, how much of the hedging activity went into those

12   targets?

13   A    Well, the company, as we mentioned, the X and Y numbers

14   --

15   Q    Uh-huh.

16   A    -- the targets, those are -- these are roll-ups, so

17   they would be in those targets.

18   Q    Okay.  But they would be in those targets?

19   A    That's correct.

20   Q    Okay.  All right.  So you're basically just --

21   basically the numbers that were in here, if you were able to

22   do the math, so to speak, you would be able to figure out

23   what percentage of hedging activity went into these targets?

24   A    Well, the commercial plan -- the commercial targets are

25   in these numbers as stated in the report.

1    Q    Okay.  Okay.  Now let me just ask you a couple of

2    questions here.  What's your understanding of the standard

3    in bankruptcy for approving insider bonus claims?

4    A    My understanding is that your -- they need to be

5    ordinary course or you need to have -- or they need to be

6    incentivizing --

7    Q    Okay.

8    A    -- and not retentive, or incentivizing versus

9    retentive.  But that calls for a legal conclusion which I am

10   not a lawyer.

11   Q    Understood.  I think there was testimony from other

12   witnesses that indicated that the -- there was a mid-year

13   change with respect to the targets that are here and I think

14   that's actually reflected in the exhibit that we just looked

15   at, correct?

16   A    That is correct.

17   Q    Okay.  And I think the testimony although -- also was

18   that there wasn't -- there was never a mid-year change

19   previously with respect to these plans, correct?  Is that

20   your understanding?

21   A    I don't remember hearing that testimony, but there's --

22        (Pause)

23   Q    Okay.  You indicated that incentivizing was -- I think

24   it was your testimony, doesn't it have to be primarily

25   incentivizing?

1          MR. DEMPSEY:  Objection, Your Honor.  That calls

2     for a legal conclusion.

3          MR. SHEPACARTER:  Your Honor, I --

4          THE COURT:  Go ahead.

5          MR. SHEPACARTER:  I think his -- the reason he was

6     retained was as a result of to try to make these plans

7     primarily incentivizing, and I think that's part of why the

8     changes were made mid-year was in order to make the plans

9     primarily incentivizing.

10         So I'm just asking him to confirm that his

11    understanding is that it -- that the standard is to be

12    primarily incentivizing and that's what he was charged

13    higher to do.

14         MR. DEMPSEY:  Your Honor, the question that he

15    asked was, doesn't it have to be primarily incentivizing.  I

16    didn't object to the first question, which was what is your

17    understanding of the standard, which is based on his own

18    understanding of reading the cases.  But this particular

19    question, the one that he's trying to seek or elicit

20    testimony on, calls exactly for the conclusion about that

21    legal standard.

22         THE COURT:  I agree.  Sustained.

23    BY MR. SHEPACARTER:

24    Q    You were hired to work with these plans and work with

25    these metrics and the targets, correct?

1    A    Well, as I described earlier in my testimony, I was

2    hired for the LRP, the budget and then the risk bands around

3    that to make sure that the targets were -- that they were

4    stretch targets.

5    Q    Okay.  And in your declaration there is a chart that

6    sets forth different targets and they deal -- or some of

7    those targets were increased, especially at the threshold

8    level, correct?

9    A    Yeah.  The only thing I would say is they were -- that

10   they were made more difficult.  Some were decreased,

11   depending on if they were cost or remnant.

12   Q    Okay.  And was it the purpose of -- increasing those

13   targets, was the purpose of that to make those targets and

14   the plans underlying those targets primarily incentivizing?

15   A    Well, I believe that the target -- I believe that the

16   plan that was put in place at the beginning of the year was

17   -- included stretch targets.

18   Q    Uh-huh.

19   A    What we were asked to do at mid-year was to revisit

20   those targets taking into account the performance year to

21   date as well as the change in commodity pricing, taking into

22   account the current position within the company, and any

23   volatile -- any known events in addition, and then the lack

24   of variance you would have because six months are now in the

25   books.

1    Q    But I think my question is that -- and this is the

2    point I want to make -- is that the changes that were made

3    were designed to make those plans primarily incentivizing?

4    A    As I have testified, I believe the plan was

5    incentivizing and they were stretched also to be put in

6    place.  What I was asked to do is now that you have six

7    months in the books --

8    Q    Uh-huh.

9    A    -- look at it from that point forward.  Take into

10   account that actual performance for the first six months,

11   the change in volatility and known events, like the

12   corporate hedge program, like the Monicela 1 and 2 coming

13   back in early, those types of things.

14   Q    Okay.  Let me just ask it one more time, and I'm

15   basically looking for either a yes or no answer.

16          The plans that were put in place, and there was a

17   mid-year change and the mid-year change, the purpose for

18   that was to make those plans primarily incentivizing, and I

19   want -- I'm just looking for a yes or no answer.

20   A    That was not the purpose of what I did.  I already

21   stated the purpose of what we did.

22   Q    Okay.  So is your answer no to --

23   A    My --

24   Q    -- that question?

25   A    My answer is no.  I've already stated the purpose in my

1    previous testimony.

2    Q    Okay.  All right.

3             MR. SHEPACARTER:  Let me just see if I have any

4    other questions.

5         (Pause)

6    BY MR. SHEPACARTER:

7    Q    All right.  Let me just ask a couple of questions --

8    additional questions.

9             Now in this case you are testifying in support of

10   insider bonus plans, correct?

11   A    I am testifying on these metrics.

12   Q    Okay.  But it's in -- but your declaration was given in

13   support of the motion to approve the insider bonus plans in

14   this case, correct?

15   A    Yes.  My declaration was in the motion to support the

16   metrics.

17   Q    Okay.  Have you ever testified against insider bonus

18   plans before?

19   A    No, I had not.

20   Q    Okay.  All right.

21            MR. SHEPACARTER:  Let me just check if I had some

22   more questions, Your Honor.  It will just take a moment.

23        (Pause)

24            MR. SHEPACARTER:  Your Honor, I just want to

25   confer with the analyst from (indiscernible - 3:44:40).  I

1    -- can I do that just for a few minutes?

2             THE COURT:  Your --

3             MR. SHEPACARTER:  I just want to confer with my

4    team for a second to make sure that we've covered

5    everything.

6             THE COURT:  All right.  Would you like a short

7    recess?

8             MR. SHEPACARTER:  I would like a short recess,

9    Your Honor.  I would say five minutes.

10            THE COURT:  Okay.

11            MR. SHEPACARTER:  Thank you.

12            MR. DEMPSEY:  Thank you, Your Honor.

13            THE COURT:  Let's try to keep it to that.

14            MR. SHEPACARTER:  All right.  Thank you.

15       (Recess at 3:44 p.m.)

16            THE CLERK:  All rise.

17            THE COURT:  Please be seated.

18            MR. SHEPACARTER:  Thank you, Your Honor, for that

19   --

20            THE COURT:  You're welcome.

21            MR. SHEPACARTER:  -- break.

22   BY MR. SHEPACARTER:

23   Q    Mr. Filsinger, I just have a couple more questions.

24            The corporate hedging team, do you know if they've

25   been able to consistently meet their goals over the past

1    five years with respect to their hedging activities?

2    A    They're -- their goals, as you've seen in the

3    commercial incentive plan, is a gradient scale and it's

4    varied throughout there.  I don't know the exact performance

5    around that, but I would presume -- well, I don't want to

6    guess, but the commodity -- I can tell you the commodity

7    curve has been quite different in that time frame.  And so I

8    would expect -- well, I'll just leave it at that --

9    Q    Okay.

10   A    -- without seeing it.

11   Q    All right.  Okay.  Now you had a couple of opinions and

12   one -- just a couple things.

13             Do you expect that the debtors will meet their

14   targets with respect to the incentives by the end of the --

15   continuing through to the end of the year?

16   A    Mr. Shepacarter, I'm not -- I think -- I'm not sure.  I

17   think with respect to their challenging goals, I think

18   they've got their work cut out for them.  I think, as Mr.

19   Burke and Mr. McFarland testified, a lot of things have got

20   to happen for them to get to threshold and target.

21   Q    Okay.  And just staying in that same vein, I think it

22   was your testimony probably at the end of your direct that

23   based on the third quarter numbers that the targets were

24   still stretch targets based on those third quarter numbers,

25   correct?  Wasn't that your testimony?

1    A    That is correct.

2    Q    Okay.  Then I -- earlier, on my examination, I asked

3    you with respect to some third quarter numbers that would be

4    placed into a monthly operating report regarding hedging

5    activity, but you were uncertain about what that number was.

6    Do you remember that?

7    A    Yeah.  I don't know what the -- I don't know exactly

8    what the hedging target is as of the third quarter.

9    Q    Okay.

10   A    I don't have that number memorized.

11   Q    So there's a little bit of a disconnect there and

12   you're saying in one spot, yes, those stretch targets are

13   still stretch targets and they still remain challenging, but

14   at the same time you're not understanding of what the

15   numbers were with respect to the hedging which goes into

16   (indiscernible - 4:00:06) of the targets mostly EBITDA which

17   is the heavily -- which is heavily weighted.

18            So if you could explain that to a certain extent.

19   A    I have seen high level results.  I haven't examined

20   every single line item of the results that has -- I think as

21   -- I think all parties have agreed that the commercial

22   incentive program and the commercial targets are

23   incentivizing, and my under -- again, with respect to where

24   they're at, I know where they're at firmly as of the date of

25   this report, and my testimony is where the company's at

1    generally.  I don't have that piece memorized.

2    Q    Okay.

3           MR. SHEPACARTER:  All right, Your Honor.  We're

4    done with this witness.  Thank you.

5           THE COURT:  You're welcome.

6           MR. DEMPSEY:  Good afternoon, again.  David

7    Dempsey, Kirkland & Ellis on behalf of the debtors.

8    REDIRECT EXAMINATION

9    BY MR. DEMPSEY:

10   Q    Mr. Filsinger, you said that you ran Calpine's Energy's

11   trading floor.  Is that right?

12   A    I ran Calpine's commercial operations as well as the

13   chief operating officer.

14   Q    I believe you testified earlier on cross that at one

15   point in time Calpine lost $250 million in the span of a

16   summer --

17   A    They were --

18   Q    -- from their trading operations?

19   A    They were $250 million below target.

20   Q    Were you at that time, Mr. Filsinger, running the

21   trading operation or the chief commercial officer?

22   A    No, I was not.

23   Q    Mr. Filsinger, can you turn to the document that's been

24   marked Exhibit 35, the monthly operating report?

25   A    Okay.

1    Q    And if you could, turn to page 36 of 37, the last --

2    the second to last in the document.

3    A    Okay.

4    Q    You testified earlier that you believed that the total

5    gain parenthetical loss for Luminant Energy Company of

6    $536,944,000 looked like it included the corporate hedge

7    program.  Why is that?

8    A    Well, just by the magnitude of the number.  It looks as

9    though it includes it.

10   Q    Mr. Filsinger, when you put together your declaration

11   did you take into account year to date results through June

12   30, 2014?

13   A    Yes, I did.

14   Q    And remember we had those numbers X and Y, which you

15   guys have been talking about a lot in that report.  Based on

16   those numbers do you believe that Luminant Energy Company is

17   actually $536 million ahead of -- that Luminant Energy has

18   created $536 million in incremental value?

19   A    No.

20   Q    In addition, Mr. Filsinger, in the far left column it

21   -- the row begins, unrealized gain and loss.  Can you

22   explain what unrealized gain and loss means for the Court?

23   A    It's a gain or loss that is not realized yet, meaning

24   it can still change.

25   Q    Would -- could that unrealized gain be sometime out in

1    the future beyond 2014, Mr. Filsinger?

2    A    Yes, it could.

3    Q    So with regard to the $544 million number under

4    Luminant Energy Company, can you say with any certainty that

5    that amount is specifically tied to 2014 trades or trades

6    that will be realized in 2014 rather?

7    A    No, I can't attribute it to 2014.

8    Q    Based on your experience in the Calpine restructuring,

9    Mr. Filsinger, can you speak to the difficulty of operating

10   a trade floor in the weeks and months leading up to a

11   bankruptcy?

12   A    Well, it's very difficult in the weeks and months

13   leading up to as well as during bankruptcy.  You end up with

14   a lot of counterparties that are hesitant to trade -- to

15   trade with you.  You saw that some when a lot of the hedges

16   rolled off once they filed.  At times, the bid ask spread,

17   the bid ask where you can make money starts squeezing.  You

18   start getting -- the cost to do business goes up, basically,

19   because the folks that deal with you want to pound the flesh

20   so to speak.

21   Q    Have you, Mr. Filsinger, had conversations with members

22   of the Luminant trading team about the ways in which the run

23   up to the bankruptcy affected their trading operations?

24   A    Yes.

25   Q    And based on those conversations is it your

1    understanding that Luminant for 2014 has had similar

2    difficulty?

3    A    Yes.

4    Q    How would you say based on your experience and work

5    with the company the trading operation -- how would you say

6    that the environment for the trading operation has varied

7    from 2013 to 2014 when the company filed for bankruptcy?

8    A    Well, it's a tougher environment because you're in

9    restructuring and people know it, so it's harder that -- the

10   universe of trading partners shrinks as well as, like I say,

11   the -- your ability, you know, to -- your ability to make

12   money on some of that shrinks.  It's just business becomes

13   more difficult.  It takes more work to -- you know, to get

14   where you need to go.

15   Q    You were asked, Mr. Filsinger, a lot of questions about

16   where Luminant Energy stands relative to its budgeted

17   trading number.  Let's just assume that Luminant were to hit

18   that number for full year.  Do you believe sitting here

19   today that the Luminant management EBITDA number still

20   contains significant risk setting aside the portion

21   associated with the trading?

22   A    Absolutely.

23   Q    Why?

24   A    Well, as I explained when I answered that question is

25   you've got a lot -- you know, you have the coal assets that

1   have the same type of -- you know, have similar risks.  It's

2   technical risk that they have.  They have the risk, also.

3   There's all these different risks in the company that may

4   not come to fruition.  We talked about the nuclear station.

5   We talked about, you know, the coal.  We talked about the

6   costs.  It's all those items, they're all at risk in this

7   complex environment.

8   Q    Let's again assume that Luminant Energy hits its

9   trading numbers.  Do you believe that there are -- it's a

10  material risk that the company won't hit the rest of its

11  metrics even assuming that you're going to -- Luminant is

12  going to hit the bogey for -- in terms of its incremental

13  value?

14  A    Yes.

15  Q    Why?

16  A    Well, the trading is only -- you know, trading around

17  the assets is only one -- one piece.  And just because --

18  if you made that piece, that doesn't assure you're going to

19  make anything else.  You can still have -- you can still

20  have outages at the facility.  You can still have -- the

21  amounts that are currently opened you're still dealing with

22  those.  There's all -- everything I've explained today, all

23  those issues, all those risks are still there.

24          MR. DEMPSEY:  One moment.

25      (Pause)

1    BY MR. DEMPSEY:

2    Q    Mr. Filsinger, you testified earlier that the corporate

3    hedge program rolled off on -- right at the time of the

4    bankruptcy filing.  Is that right?

5    A    Right.

6    Q    Is that corporate hedge program replicable for the

7    second half of 2014?  Are those trades replicable?

8    A    No.  I mean, you can hedge gas at $3.00 or four -- you

9    know, at the current gas price, but that's not going to --

10   there's not going to be any value to that.  That's at

11   market.

12           MR. DEMPSEY:  No further questions.

13           THE COURT:  Thank you.

14           Thank you, sir.  You may step down.

15           THE WITNESS:  Thank you, Your Honor.

16           THE COURT:  Mr. McKane, did that close your

17   presentation?

18           MR. SHEPACARTER:  Your Honor, it -- just for the

19   exhibit that was presented to the witness, it's the debtors'

20   monthly operating report, I just wanted to move that into

21   evidence.

22           THE COURT:  Any objection?

23           MR. MCKANE:  No objection.

24           THE COURT:  All right.  35 is --

25           MR. SHEPACARTER:  Thank you.

1          THE COURT:  -- admitted without objection.

2       (Debtors' Exhibit Number 35 was admitted)

3          MR. MCKANE:  Your Honor, that would be our case in

4    chief.  We would have a motion to file -- that we would --

5    an oral motion to file to address Mr. Pinnachio.  We would

6    move to exclude his testimony at the start of their case

7    that we would like to present orally under Rule 701 and 702

8    of the Federal Rules of Evidence if you're prepared to hear

9    that at this time.

10         THE COURT:  Well, I think we're going to hear from

11   Ms. Kirby.

12         MR. SCHWARTZ:  Your Honor, we have decided that we

13   are not going to call Ms. Kirby.  So we -- that is not an

14   issue.

15         THE COURT:  What is the status of Mr. Pinnachio's

16   ability to appear?

17         MR. SCHWARTZ:  Thank you, Your Honor.

18         He is not available tomorrow.  Without going into

19   any details, Your Honor knows that there's -- there has been

20   an exigent situation and we are not clear yet whether he'll

21   be available on Monday.  But we hope to be able to talk to

22   him later today.

23         THE COURT:  All right.  Thank you.

24         MR. MCKANE:  And, Your Honor, the issues that we

25   would raise in the motion have nothing to do with those

1    exigent circumstances.  It is strictly his ability to

2    provide any testimony under 701 and 702.  It would obviate

3    the need to either consider his testimony at all or consider

4    any request for an adjournment.

5            We would also, you know, depending on your ruling

6    on that first motion, have a follow up motion as well.

7            THE COURT:  Well, depend -- a follow up motion?

8            MR. MCKANE:  To the extent that there's going to

9    be a request for -- to adjourn the hearing, we had an

10   alternative proposal to the extent you would --

11           THE COURT:  Right.

12           MR. MCKANE:  -- take his testimony at all.

13           THE COURT:  All right.

14           Okay.  I'll hear your motion.

15           MR. MCKANE:  Thank you, Your Honor.

16           Your Honor, to do the -- to present this -- I

17   would like to present the -- move forward with the

18   highlighted deposition transcript that -- of his deposition.

19   I will -- if you will receive it just so you can follow

20   along.

21           THE COURT:  Okay.

22       (Pause)

23           THE COURT:  Thank you.

24           MR. SCHWARTZ:  Your Honor --

25           THE COURT:  Yes.

1         MR. SCHWARTZ:  Obviously, I'm --

2         THE COURT:  Are you picking her up?

3         MR. SCHWARTZ:  Oh, I'm sorry, Your Honor.  I'm

4    sorry.

5         THE COURT:  That's okay.

6         MR. SCHWARTZ:  I only received notice at the lunch

7    break that they were going to be making this motion.  And

8    the deposition testimony is usually hearsay when it's being

9    offered as part of this form -- as part of a motion.  And

10   particularly in light of the situation that Mr. Pinnachio is

11   unavailable, I'm not -- I'm not sure that the use of this

12   deposition testimony is appropriate given that as we -- as

13   we have said that if they wanted to conduct a voir dire with

14   respect to Mr. Pinnachio, then he should be here and they

15   should do it.

16        They haven't sought permission to use this

17   deposition testimony and it's not that he falls under a

18   "unavailability rule" under the rules of evidence.  This is

19   his -- this is an unplanned absence and he is not completely

20   unavailable for appearance here, Your Honor.

21        MR. MCKANE:  Your Honor, under a motion to exclude

22   under Rule 702 or 701 of the Federal Rules of Evidence you

23   may consider the sworn declaration, his prior deposition

24   testimony to evaluate what his credibility would be.  They

25   could make a proffer as to what his testimony may be if he

1    were to be called.  Of course, his sworn declaration is a

2    strong indication as to what that would be.

3            We are prepared to move forward and address, based

4    on our understanding of that -- what that testimony would be

5    of how he can provide no evidence as an expert or as a lay

6    opinion witness.

7            MR. SCHWARTZ:  May I respond, Your Honor?

8            THE COURT:  Yes.

9            MR. SCHWARTZ:  Your Honor, he has never been

10   offered as an expert.  So Rule 702 just doesn't apply with

11   respect to Mr. Pinnachio.

12           THE COURT:  Uh-huh.

13           MR. SCHWARTZ:  And, again, Your Honor, I mean, I

14   haven't -- I don't see any brief.  I don't see any law that

15   says that the rules provide that he can use deposition

16   testimony in order to support a motion to exclude a witness

17   because it's hearsay.

18           MR. MCKANE:  Your Honor, under Rule 701 a --

19   opinion testimony by a lay witness cannot cover under Rule

20   701(c) cannot be based on scientific, technical or other

21   specialized knowledge within the scope of 702.

22           The committee minutes states that a witness must

23   be scrutinized under the rules regulating expert opinion to

24   the extent that the witness is providing testimony based on

25   a scientific, technical or a specialized knowledge within

1    the Rule 702.

2            Our argument, if we want to get into it right now,

3    is the United States Trustee is attempting to circumvent

4    Rule 702 and the prohibition provided by it and Daubert to

5    try to get into that same area of scientific knowledge and

6    testimony through a lay witness and they can't do that.

7            So let me just be very precise.  And, Your Honor,

8    if I can -- I can lay the predicate through the declaration

9    that they've tried to move into evidence already, and I can

10   go into it with the additional admissions that we elicited

11   in the deposition or not.

12           MR. SCHWARTZ:  Just for clarification, Your Honor,

13   we haven't moved the declaration into evidence.

14           MR. MCKANE:  There was a request to move the

15   entire exhibit binder and the declaration -- what we are

16   moving to exclude, Your Honor, is his testimony and Exhibits

17   24 to 31.  That is his written direct testimony, his

18   supplemental direct testimony and all the exhibits that were

19   attached thereto.

20           THE COURT:  That's not into evidence, though.

21           MR. MCKANE:  It is not into evidence yet.  But it

22   has been filed on the docket in support of their objection.

23           THE COURT:  Well --

24           MR. MCKANE:  Your Honor, whether I did this orally

25   or I did it through the filing of a motion, it -- we would

1     be supporting the motion to exclude the testimony based on

2     our understanding of what he purports to present, and that

3     would be through his declaration --

4               THE COURT:  All right.  I'll allow it.

5               MR. MCKANE:  -- and the deposition.

6               THE COURT:  I'll allow it.  Go forward.

7               MR. MCKANE:  Thank you, Your Honor.

8               Your Honor, the trustee has repeatedly assured the

9     debtors and now the Court that Mr. Pinnachio is not offering

10    expert testimony, but he is offering a lay opinion one.  But

11    those assurances should give the Court no comfort.

12              In his deposition, Mr. Pinnachio admitted that

13    while he works at the United States Trustee's Office he did

14    not get involved in this case until September of this year;

15    that he has no personal knowledge as to how the budget

16    process works or how the metrics were developed; that he did

17    not review the 2013 or 2014 budgets; that he did not

18    participate in the interviews of the United States Trustee

19    conducted with the CEO of the TXU -- the CEOs of TXU Energy

20    or Luminant, and that he did not independently review any of

21    the compensation programs of any of the peer groups of the

22    debtors.

23              He did not base his analysis of the peer group of

24    the debtors based on anything other than a review of the

25    debtors' presentation to the United States Trustee on August

1    6th of 2014.  He did not have any input or insights from

2    anyone who discussed that presentation in performing his

3    analysis; that he had no prior working experience for

4    getting the issues related to the access to power

5    transmission facilities; that he has no prior working

6    knowledge or experience regarding safety concerns specific

7    to power generation facilities; that he has no prior working

8    knowledge or experience regarding the nature or the impacts

9    of current or future environmental regulations on companies

10   that operate in the Erkhart (ph) market -- ERCOT market,

11   excuse me.

12              He is an auditor and he has been an accountant for

13   30 years.  And in his 30 years of experience as an

14   accountant he has not designed compensation plans; that he

15   has not chosen the metrics to use within incentive

16   compensation plans; that he has never done any analysis

17   before this case to evaluate an incentive compensation

18   program motion; that he has never done analysis to evaluate

19   an insider compensation motion prior to this one.

20              He has never worked in the energy industry.  He

21   has no prior knowledge or experience regarding commodity

22   price volatility, and he has no prior working knowledge

23   regarding the supply and demand forces involving

24   commodities, work force or industrial markets.

25              He does not have any prior working knowledge or

1    experience regarding power generation assets.  He does not

2    have any prior working knowledge or experience regarding the

3    fuel methods used by the generating assets at EFH.

4            In his 30 years of experience as an accountant he

5    has never been involved in the budgeting process of a power

6    company.  He has never been qualified by a court or

7    testified to a court as an expert before, and he has never

8    testified as a witness in connection with an incentive

9    compensation package before.

10           He has never rendered an opinion regarding

11   incentive compensation packages.  He does not consider

12   himself an expert in energy or power, and he does not

13   consider himself an expert in executive compensation.  He is

14   not an expert in providing any type of evaluation as to what

15   the appropriate metric to use between EBITDA and net income

16   is to evaluate incentive compensation, and he does not have

17   an opinion as it relates to whether EBITDA or net income is

18   the appropriate metric here.

19           He is not prepared to say whether net income is a

20   better metric as opposed to EBITDA, and he has not rendered

21   an opinion as to whether incentive compensation should be

22   paid if a company has a net loss for a year.  He has only

23   been retained as an accountant in this case, and -- but --

24   excuse me.  His opinions are based on his experience as an

25   accountant, but his opinions and analysis are not based on

1    any rule of accounting.  They're not based on any guideline

2    of accounting.  They're not based on any gap principal, and

3    they're not based on any accounting treatise.

4            His opinions are based solely on whether you can

5    compare five-year averages to metrics to determine whether

6    they are higher, lower or equal.  And he would say that

7    they're based solely on a mathematical analysis.  And he

8    agrees that that math is simple.

9            Your Honor, based on that we then move forward and

10   in his own words in Exhibit 24, proposed Exhibit 24,

11   paragraph 7 of proposed exhibit 24 he says, I compared the

12   averages to the base, threshold and superior amount targets

13   for Luminant, TXU and business services to "determine

14   whether, in fact, the targets were stretched or difficult to

15   achieve targets."  That's paragraph 7.

16           In paragraph 8 of proposed Exhibit 24 he then

17   compared the threshold target for each of the metrics to the

18   average actual results by subtracting the threshold target

19   from the average actual results to determine the difference.

20           He then concludes that the -- in two different

21   situations that in his opinion the target is "not

22   incentivizing."  He does the same thing in --

23           MR. SCHWARTZ:  Objection --

24           MR. MCKANE:  -- paragraph 9 --

25           MR. SCHWARTZ:  I object.

1            MR. MCKANE:  -- as it relates to superior targets.

2            MR. SCHWARTZ:  That's not what he says in his

3     declaration.  I'm sorry, Your Honor, to interrupt.  But he

4     doesn't conclude that.  What he actually says is, he says

5     that -- well, I'll let him finish, but I just want to put my

6     objection on the record.

7            THE COURT:  Very good.

8            MR. MCKANE:  Your Honor, if we could just go

9     paragraph -- sorry -- proposed Exhibit 24.  Proposed Exhibit

10    24 is the proposed declaration of Mr. Pinnachio, and in

11    paragraph 7 where I quoted he said, "I compared the average"

12    -- this is the first sentence -- "the averages to the

13    threshold, baseline and superior targets for Luminant, TXU

14    and business services from the table," and that's

15    specifically the Table 1.4 we've seen from Mr. Filsinger.

16    That's Exhibit 2.

17            He then goes on -- and why does he do that?  It's

18    to determine whether, in fact, the targets were "stretched

19    or difficult to achieve targets."  That's the language I

20    quoted.

21            Then in paragraph 8, again, I quoted the first

22    sentence, "I then compared the threshold target for each of

23    those metrics to the average actual results as described

24    above in paragraph 6 by subtracting the threshold target

25    from the average actual results to determine the

1    difference."

2            He then proceeds to provide two different

3    scenarios under which he then concludes that they are not

4    incentivizing.  Specifically, in the second sentence of that

5    paragraph he says, "If the goal of the metric is to enhance

6    performance by maximizing a number" -- and then he provides

7    some examples of what he's referring to like EBITDA and

8    contribution margin, "the result is -- and the result is a

9    negative number, then the target is not incentivizing."

10   That is the conclusion he reaches based on that math.

11           He then provides another scenario in which he does

12   -- he reaches the same conclusion:  "Alternatively, when

13   enhancing performance involves minimizing a number" --

14   presumably costs -- "like O&M and SG&A or Cap X, and the

15   result is a positive number, then the target is not

16   incentivizing."  He reaches the conclusion whether something

17   is incentivizing or not based on that simple math.

18           And he does that as it relates to threshold

19   targets in eight and he does it as it relates to superior

20   targets in paragraph 9.

21           And then to go further what Mr. Pinnachio does,

22   and this is a quote from paragraph 10:  "In order to project

23   the full year results I used the general year to date actual

24   metric for Luminant, TXU and business services from the

25   Filsinger declaration.  I multiply the June results by two

1    to project the full year performance."

2          All right.  When the trustee claims that

3    Mr. Pinnachio is only offered as a lay opinion, his

4    declaration demonstrates flatly otherwise.  702 -- Rule 702

5    of the Rules of Evidence governs as the advisory committee -

6    - the advisory committee notes to 701 make clear --

7          THE COURT:  Slow down a little.

8          MR. MCKANE:  I apologize.  I apologize.

9          Rule 701 plainly states, 701 advisory committee

10   notes:

11         "A witness testimony must be scrutinized under the

12   rules regulating expert opinion to the extent that the

13   witness is providing testimony based on scientific,

14   technical, or other specialized knowledge."

15         Projecting full year results, assessing whether

16   those targets are difficult to achieve requires specialized

17   knowledge.

18         We've heard for nearly two days testimony from

19   industry experts who have just that sort of skill and

20   experience.  They spoke to the risks associated with energy

21   commodity prices, they discussed how to manage significant

22   assets like power plants and mines, the balancing act

23   necessary to optimize the debtors' retail business and so

24   on.  Projections like these require sophisticated personnel

25   with skill and experience and modeling.

1              Luminant has its own modeling utilization -- the

2      plant utilization model as an example of this type of

3      evaluation process.  Mr. Filsinger testified about his own

4      independent modeling analysis.

5              Projections like these require deep experience in

6      and understanding of the energy markets.

7              Mr. Pinachio, with all due respect, does not have

8      that specialized knowledge.  Mr. Pinachio respectfully is

9      not an expert in these fields, and he admits it, and the

10     trustee doesn't offer him up as one.  But again, you go back

11     to the advisory notes of 701, they're dispositive.

12             What the trustee is trying to do is evade the

13     expert witness requirements by calling a witness to testify

14     to expert issues into the guise of lay opinion testimony.

15             In circumstances like this the Court should

16     concern the notes of 701, that you must channel testimony --

17     this is a quote from the advisory committee notes to 701 --

18     that in this type of circumstance "You must channel the

19     testimony that is actually expert testimony to 702."  And

20     this requires Mr. Pinachio to meet the Daubert requirements

21     on reliability, and he actually has to be qualified to

22     render an opinion on such a complicated topic as this, and

23     he cannot meet either burden and they do not purport to try.

24             Admittedly, what Mr. Pinachio has done is what we

25     all recognize as simple math, to average the last five

1    years' results and multiply the first half of this years'

2    results by two, but it's not enough to scrub that ultimate

3    conclusion to which Mr. Pinachio leaps based on that

4    arithmetic.  The jumping off point is still highly

5    problematic, it's not enough the strike the conclusions.

6            Rule 701 on its face requires three things.  (A),

7    that the testimony rationally is based on the perception of

8    the witness.  (B), that that testimony is helpful to

9    determining a fact at issue.  And (C), that it's not based

10   on scientific, technical, or specialized knowledge.

11           Mr. Pinachio's testimony does not satisfy any of

12   these requirements of Rule 701 for lay opinion testimony.

13   I'll take all three of them.

14           First, Mr. Pinachio's work is not based on his

15   personal knowledge.  It is true a witness can offer lay

16   opinion testimony, but they first have to be a fact witness.

17   Mr. Pinachio has no firsthand knowledge of the actual or

18   forecasted numbers of the debtors' budget process, of the

19   debtors' projections for 2014 performance, of the hedging

20   programs, or of the one-time offense in 2014 that might have

21   affect his analysis, or really anything else about those

22   projections.  He came in after the fact.

23           Second, to be admissible Mr. Pinachio's math has

24   to be helpful to quote "clear" -- has to be helpful to

25   clearly understanding the witness's testimony or determining

1     a fact at issue.  That's what the rule requires.  And

2     according to the Third Circuit this means that his work must

3     be "reasonably reliable."  Right?  That's the (indiscernible

4     - 4:26:33) decision, but that's the circuit's law for years.

5              Even if Mr. Pinachio's basic work looking at it

6     for what it is it's riddled with errors.  There are -- we've

7     already heard about the problems with EBITDA and the

8     calculations of a one-time event and how it exceeds the

9     threshold, baseline, and superior because of the double

10    count of the one-time event.  There's an additional double

11    count of his inclusion of what he refers to as business

12    services EBITDA on paragraph 7, footnote 5.  There's no such

13    thing as business services EBITDA, it's a cost center, and

14    he acknowledged as much in his deposition.

15             Third, his averaging is off.  You saw it yourself,

16    Your Honor.  He had a Cap X number that was negative in the

17    first year of a five-year average, and rather than working

18    with the four numbers that he could verify he just plugged a

19    zero and pulled the four-year average down.

20             It is these type of errors that would

21    independently bar him from testifying, because it's not

22    reasonably reliable.

23             And then thirdly, Your Honor, under (C) the

24    opinions that he's offering are squarely the realm of expert

25    testimony.  His assessments of the incentivizing nature of

1    -- let me say it again -- his assessment of the

2    incentivizing nature of performance metrics in the power

3    industry, his development of a full year forecast for coal

4    power generators, nuclear generators, mining interests, and

5    retail electric providers like Luminant and TXU Energy, and

6    his assessment of the appropriate metrics for incentive

7    compensation pay, are all the realm of expert testimony.

8    But Mr. Pinachio is not an expert, and therefore there is no

9    need for him to seat in the witness chair and serve as a

10   human calculator.

11          We all understand the issues, but his testimony

12   cannot be presented under 701, he does not satisfy one of

13   the three elements that are necessary to present lay opinion

14   testimony, he must satisfy all three before he is qualified

15   to sit.

16          And for all of these reasons, Your Honor, the

17   debtors ask that the Court preclude that the United States

18   Trustee's efforts to sidestep expert testimony by presenting

19   Mr. Pinachio, and we ask that you exclude not only his

20   testimony, but Exhibits 24 through 31, which they've put

21   forward.

22          THE COURT:  Thank you.  Ms. Schwartz, would you

23   like to reply?

24          MS. SCHWARTZ:  Yes, Your Honor.

25          Okay.  In Merit versus Logan (ph), Your Honor, the

1    Third Circuit decision, the Third Circuit made it absolutely

2    clear that this Court has broad discretion as to what

3    evidence the Court will hear.

4            As the Court knows that with respect to whether

5    evidence is competent or not a court, and particularly a

6    bankruptcy court, where we don't have a jury and there's no

7    prejudice with respect to that, can hear evidence but simply

8    cannot rule on evidence that it finds incompetent.

9            All of that being as the predicate here, Your

10   Honor, Mr. Pinachio's declaration was filed in support of

11   the motion.

12           As Your Honor knows the debtors have the burden of

13   proof to show that their plans do not fall within 503(c)(1),

14   that are in the ordinary course, whatever legal theory that

15   they wish to seek to get authorization from the Court.  It's

16   their burden of proof.

17           All of the information that Mr. Pinachio used to

18   do his calculations was provided by the debtors.  He used

19   the debtors' numbers.

20           We made it clear to the debtors both verbally, as

21   well as at his deposition, that we were not offering

22   Mr. Pinachio as an expert witness.  He did not do scientific

23   work.  We certainly were not trying to evade with Rule 702

24   by seeking to put in expert opinion through 701.  I can tell

25   you that flat out.

1           Your Honor, our goal is to submit evidence or to

2     submit declarations that will help the Court, that's the

3     purpose.  The idea here is to help the Court understand the

4     facts of the motion or declaration and so forth.

5           I think it's absolutely clear, Your Honor, based

6     on the amount of time that the Court has spent considering

7     the debtors' motion that there was quite a lot of

8     information that the debtors had to present to the Court

9     with respect to their incentives.

10          Looking at their numbers, Your Honor, as they

11    provided them to us in their score cards, there were real

12    questions about those numbers.  We believed that

13    Mr. Pinachio was an appropriate person, he is an accountant,

14    he's an auditor for the U.S. Trustee, he took their numbers

15    and made various calculations to be able to show the Court

16    and be helpful in support of your position, when we filed

17    our motion, that they hadn't demonstrated that the plan fell

18    out of 503(c)(1), that better than having a declaration from

19    attorneys performing those things we used our analyst who

20    had in fact as the declaration states, reviewed a host of

21    the information personally.

22          He reviewed at paragraph 3 the debtors' motion.

23    He reviewed the PowerPoint presentation, the 72-page

24    PowerPoint presentation which has been admitted into

25    evidence.  He reviewed Mr. Filsinger's declaration.  He

1    reviewed Mr. Frisky's declaration.  And he reviewed all of

2    the score cards.  He did not present to the Court

3    information of a scientific technical nature.

4            What he did was set forth in his exhibits a

5    spreadsheet, a spreadsheet of the numbers provided by the

6    debtors.  And Your Honor may recall that the debtors' own

7    witness requested to look at Mr. Pinachio's chart, because

8    it laid the numbers out, it was helpful.

9            Your Honor, the Third Circuit has held that

10   accountants can provide lay testimony regarding lost

11   profits.  They're allowed to provide information to the

12   Court based on their -- based on their calculations.  If

13   there were errors in the attachment not only one are the

14   debtors not prejudiced because they've already addressed

15   everything in Mr. Pinachio's charts and declaration, but he

16   should have the opportunity to plain to the Court.

17           For example, Mr. McKane says, well, Mr. Pinachio

18   put a zero in one of those columns.  Well there's a reason

19   for that, and he's going to explain that to you, Your Honor.

20   He should have that opportunity.

21           I understand that we have spent two days of Court

22   time, I am very well aware of it, and it's very unfortunate

23   that he's not available today or -- today, because we didn't

24   get to the close of their case until today, it's very

25   unfortunate.  We're hoping he's going to be available on

1    Monday.

2           However, as I said, courts have allowed in this

3    type of information for the Court under 701, the Court has

4    broad discretion to hear it.  I believe it is competent

5    evidence, but even at some point in time the Court didn't

6    find it to be helpful the Court doesn't have to render a

7    ruling on that.

8           And I want to make something else very clear, in

9    paragraph 8 of Mr. Pinachio's declaration, which Mr. McKane

10   had cited to, Mr. Pinachio did not offer an opinion as to

11   whether or not the targets are incentivizing.  What he

12   actually says is in sentence number 2 of paragraph 8, "If

13   the goal of the metric is to enhance performance by

14   maximizing a number, which ..." -- and he uses the debtors'

15   metrics, EBITDA, available generation, contribution margin,

16   et cetera.  And I want to explain to the Court that the

17   reason why he said if the goal is to -- if the goal is to

18   enhance performance those numbers would require the debtors

19   to exceed those numbers.  Then -- and the result is a

20   negative number, then the target is not incentivizing.

21          So he doesn't say, well, this is a good metric,

22   these metrics are accurate, all he says is if the goal of

23   the metric is to beat it then the number is lower and

24   therefore it's not incentivizing.

25          He doesn't pick the metric, he didn't pick the

1    numbers, he didn't even render his own opinion.  It's not

2    like -- there's no dispute, he's not an executive

3    compensation consultant, he's not an energy consultant,

4    notwithstanding the fact that he had to endure an hour of

5    questioning at his deposition about all the things that he

6    wasn't.  Notwithstanding that we made it very clear to the

7    debtors he wasn't being offered for that purpose.  Question

8    after question after question.  You don't have any knowledge

9    of coal generation, you don't have any knowledge of this.

10   There was no dispute about it.

11            The simple point here, Your Honor, is that we

12   submitted his declaration to aid the Court in determining

13   whether or not the motion should in fact be granted or

14   denied and whether or not the debtors had in fact, as

15   they're required under the law, to meet their burden of

16   proof to show that their plans comply with the law.

17            We thought the information was helpful,

18   Mr. Pinachio is an accountant, he did calculate percentages

19   for the Court, and when -- Your Honor, even Mr. Evans when

20   he was shown these numbers and asked at his deposition,

21   Mr. Evans, how do you explain this, how do you explain the

22   fact that actual performance numbers are higher than your

23   thresholds?  Mr. Evans testified that, well, without

24   understanding the assumptions and without understanding the

25   hedging program they look like lay ups (sic).

1          So we're not the experts, we're not the debtors.

2     It's their burden.  We've been doing or level best to

3     understand everything that they have put before the Court,

4     but someone who's not in that background, an accountant who

5     looks at the numbers shows there are questions, and those

6     questions have to be answered by the debtors, and they

7     weren't answered until they put their evidence on.  So in

8     fact it was helpful.

9          And I would -- I would ask the Court respectfully

10    to deny that motion.

11          THE COURT:  Thank you.

12          MR. MCKANE:  Your Honor, briefly.

13          With regards to this notion of -- that anyone can

14    just put forward lay opinion testimony.  Even in the -- in

15    the amendments and in the commentary to Rule 702 in the

16    Federal Rules of Evidence, specifically they refer to the

17    case of Lighting Lube versus Whitco (ph), that's Third

18    circuit decision from 1993, Fed. F.3d 1153, and the decision

19    there was there was no abuse of discretion in permitting the

20    plaintiff's owner to give lay opinion testimony on an issue

21    like damages or numbers here based on his own knowledge or

22    participation in the day-to-day affairs of the business.

23    Why?  Such opinion testimony is admitted not because of the

24    experience, training, or specialized knowledge within the

25    realm of the expert, that's the area where you have to go to

1    702, but because of the particularized knowledge that the

2    witness has by virtue of his or her position in the

3    business.

4           In other words, Your Honor, you start with the

5    fact of why do you have this knowledge in the first place?

6    You have to be a -- you have to have a percipient witness

7    knowledge.  He didn't have that, he comes in after the fact

8    just like a financial advisor, just like, for example,

9    Mr. Filsinger in evaluating things after the fact as well.

10          The issue here, Your Honor, isn't whether they

11   were justified in raising concerns in their objections,

12   we're far past that.  The question is are you going to admit

13   this testimony that does not satisfy the rules under 701 or

14   702 now at trial?

15          And Mr. Evans, when the issue was raised, and

16   maybe it was helpful to help the United States Trustee's

17   Office frame their objection or frame their questions for

18   today, and they posed those questions to Mr. Evans, and you

19   saw this morning the answer.  Mr. Evans painstakingly walked

20   through why when you understand the hedging program and you

21   understand how it rolls off its result.

22          The issue, Your Honor, is when you look at the

23   declaration he is making normative judgments, and

24   specifically in 8, the language that she cites, he created

25   that (indiscernible - 4:39:49).  If the goal of the metric

1    is to enhance, and I'm going to insert my rational or my

2    theory as to how the calculate if that's true, then it's not

3    incentivizing.  That's the conclusion that he reaches.  We

4    challenge the connection there.  That analysis of what's the

5    proper way to do that, that's expert testimony.  And it's

6    not just in paragraph 8.  In paragraph 14 when he

7    evaluates --

8         (Pause)

9             MR. MCKANE:  In paragraph 14 he does an analysis

10   of the peer group companies.  He looks at their 10-K's and

11   then he looks at one page of a preparation that we did that

12   was ultimately demonstrative views by Mr. Frisky from Powers

13   Watson.  And based on a review of did they have that income

14   on that page he makes the following conclusion in 14(c).

15   "If the debtors followed a similar structure as the peer

16   group companies in wading factors the debtors would have

17   been unable to pay bonuses as proposed under the plans."

18   Your Honor, he can't make that conclusion based on what he

19   looked at or based on what his experience level is.  He

20   never even looked at the underlying plans, he didn't know

21   what those peer group companies looked at.

22             He's again making a normative judgment about what

23   is or is not appropriate or what could or could not happen.

24   That's in the realm of 702 expert witness, it's clearly

25   technical skilled area, that's why there's an executive

1    compensation expert and that's why we put forward

2    Mr. Filsinger.

3          The United States Trustee we understand they're

4    the gatekeepers to the system and they -- and we understand

5    they have to put us through our paces, and they've done so

6    for two full days, but now this is the start of their

7    affirmative case, and in their affirmative case they have to

8    present evidence consistent with the Federal Rules of

9    Evidence, and they cannot do so, because under 701 he hasn't

10   satisfied any of the three elements.

11         THE COURT:  All right.

12         MR. MCKANE:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         MS. SCHWARTZ:  Your Honor --

15         THE COURT:  Yes, Ms. Schwartz.

16         MS. SCHWARTZ:  -- just very briefly?

17         THE COURT:  Please.

18         MS. SCHWARTZ:  I'm sorry, I didn't address that

19   paragraph 14.

20         Your Honor, just with respect to that last

21   paragraph.  Prior to trial, Your Honor, we had the debtors

22   review the numbers that Mr. Pinachio had taken from the

23   10-K's of what the debtors and Mr. Frisky had identified as

24   peer companies, and also the demonstrative that they're

25   referring to with respect to what earnings per share, what

1    income generating method was used by peer companies as part

2    of targets for their incentive plans.

3            We agreed prior to the trial that the information

4    contained in the exhibit from Mr. -- Mr. Pinachio, from the

5    10-K's was all accurate, and that we would not have the

6    obligation to put in 10-K's -- all these 10-K's into

7    evidence today.

8            So I just want to Court know that we in fact dealt

9    with that and agreed.  The only thing that within the agreed

10   was this issue that they may raise to seek to exclude

11   Mr. Pinachio.

12           But the other thing I wanted to say again, Your

13   Honor, what he did in paragraph 14 was he looked at the --

14   he looked at the debtors' information and he looked at the

15   information from the 10-K's, and he noted and provided

16   information to the Court, which the debtors do not dispute,

17   that no other peer company had net losses for the past three

18   years.  Eighty percent of the other peer companies did not

19   use EBITDA, that's on their own -- that's on their own

20   demonstrative.  And if the debtors followed a similar

21   structure, companies wading, the debtors would not be able

22   to pay it.

23           The reason he drew that conclusion, Your Honor,

24   was because the debtors had had a net loss for the past four

25   years.  So that target, that metric, would not be able to be

1    used as the same as the peer companies.

2            But the point again, Your Honor, is that you do

3    not have before you a scientific, technical document with

4    information.  In fact we didn't move it in.  This is the

5    information that he would testify to.  He did calculations,

6    he took the numbers from the debtors.  No dispute about

7    that.  And he shows to the Court why those -- why there are

8    question with respect to those numbers.

9            And respectfully, Your Honor, as I said, I think

10   that, you know, it is true the United States Trustee -- I

11   wouldn't say we're the gatekeepers of the system -- I would

12   say that we have an obligation under our mission in order to

13   make sure that debtors comply with the law and that

14   applications that we review we raise issues in an effort to

15   make sure that there's integrity in the system.

16           We don't have a host of expert witnesses, Your

17   Honor.  In fact I was quite interested to see that the judge

18   in the -- in the Detroit bankruptcy actually hired an

19   expert.  We don't have experts, we have professionals that

20   can provide information to be helpful to the Court, and it

21   certainly does satisfy the requirements under 701.

22           We respectfully request that you deny that motion.

23           THE COURT:  All right.  All right, thank you.

24           I'm going to take a recess and think about it.

25           (Recess at 4:45 p.m.)

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.

3          I'm going deny the debtors' oral motion and allow

4    Mr. Pinachio to testify as a lay witness.

5          I think that the debtors make a very strong

6    argument, and I don't think there's any question that

7    Mr. Pinachio's testimony probably stretches the limits or

8    comes very close to crossing the limits of what the Court

9    can consider proper lay opinion testimony; however, I don't

10   believe that the type of math or analysis performed by

11   Mr. Pinachio and the conclusions that he's reached as a

12   result really rise to the level of expert testimony in that

13   there's no specialized knowledge, if you will, that's being

14   applied here other than really looking at some debtor

15   information and applying some simple mathematical analysis,

16   and that's pretty much it.

17         Certainly the debtors will cross-examine

18   Mr. Pinachio, given an opportunity, and will explore

19   vigorously I'm sure, as they have the last few days, as to

20   why that analysis is incorrect and not helpful, but I think

21   it's sufficiently -- makes at least as a preliminary matter

22   the requirement that it not be specialized or expert

23   testimony, that it be based on the perception of the

24   informations given, and that it will be helpful to the Court

25   in crystallizing the analysis of the performance metrics

1    that are at issue in the case.

2              Now, I also need to add, and I think it's

3    important, that we're talking at a witness being presented

4    by the Office of the United States Trustee.  They do not

5    have the ability to go out and hire Mr. Frisky or

6    Mr. Dillinger -- Filsinger, I am so sorry, sir.  You've been

7    here all day and I messed up your name.  Mr. Filsinger.

8    They have to rely on the professionals they have, the

9    analysts they have, the attorneys they have, and it creates

10   a difficult task when arrayed against a debtor who can

11   afford -- and I'm not -- nothing improper about this -- but

12   a debtor that can afford to hire the types of experts the

13   debtors have put forth in this trial.

14             So, I say that because I think it's important to

15   note the limitations that the Office of the Trustee has to a

16   certain extent and their role, which is very important, in

17   preserving the integrity of the bankruptcy process.

18             So as an evidentiary matter, for purposes of lay

19   testimony or expert testimony and figuring out whether or

20   not I'm going to hear Mr. Pinachio's testimony, I take that

21   into account, and I think it's appropriate to take that into

22   account in deciding whether to allow that testimony to be

23   put before the Court.

24             Now we've said all that we have to deal with the

25   fact that (a), it's 5:10 p.m., so even were Mr. Pinachio

1    available we would not be hearing him today, (b), he has a

2    personal issue of import that the Court is sensitive to and

3    is not going force a situation unnecessarily, (3), however,

4    this issue has been sitting out there since summer and time

5    is ticking away, and the Court needs to make its decision

6    when the facts and circumstances and testimony is still

7    fresh in my find.  If I wait too long I'm simply not going

8    to be in a position to make a decision.

9            So what I am inclined to do -- Monday is a court

10   holiday, so we can't be heard Monday in any event -- What

11   I'm inclined to do is to continue the hearing to a day early

12   next week and with the hopes Mr. Pinachio is able to

13   testify, but that's when the hearing will be, and if he's

14   not available the Court will consider his declaration, his

15   amended exhibits, the cross-examination deposition

16   transcript, and I will give -- Ms. Schwartz I'll give you a

17   little -- additional latitude in closing given that you'll

18   be dealing with an incomplete record.

19           So, I'm going -- when I set this date, we can talk

20   about when that will be, preferably Tuesday or Wednesday at

21   the latest, depending on what peoples' calendars look like,

22   that's going to be the hearing, and hopefully Mr. Pinachio's

23   situation will resolve itself favorably.

24           MS. SCHWARTZ:  Thank you, Your Honor.

25           THE COURT:  If not so be it.

1          MR. MCKANE:  Your Honor, given the issues that

2     we've been struggling with, the fact that it has been since

3     this summer, would you consider in lieu of given that we

4     don't know when Mr. Pinachio would arrive, the debtors would

5     be absolutely fine with -- I accept your ruling --

6          THE COURT:  I --

7          MR. MCKANE:  Sorry, Your Honor.

8          THE COURT:  Go ahead.

9          MR. MCKANE:  We would just propose that you take

10    the declaration --

11          THE COURT:  Ms. Schwartz has -- Ms. Schwartz has

12    to have an opportunity to present her witness the way

13    Ms. Schwartz thinks her witness should be presented, and you

14    know, there have been amendments to his exhibit, the --

15    there's been an ongoing trial, and I think it would be --

16    ultimately it may be that we're going to rely on that, but I

17    think I'm going to give her a bite at the apple to try to

18    present the testimony.

19          So, I don't know if we can do this on the fly or

20    prefer to do it on the fly, I'm available Tuesday afternoon

21    and I can fit you in pretty much any time on Wednesday.

22    I'll have to move things around, but this is a priority.

23    Can we -- can we do Tuesday?

24      (Pause)

25          THE COURT:  Ms. Schwartz, I'm not going to do

1    Friday, but I see you people for another reason on Friday.

2            UNIDENTIFIED SPEAKER:  Just one second, Your

3    Honor.

4            MS. SCHWARTZ:  That works for the United States

5    Trustee, Your Honor.

6            THE COURT:  Tuesday?

7            MS. SCHWARTZ:  Yes.

8        (Pause)

9            MR. MCKANE:  Your Honor, I apologize, and I very

10   much apologize because it's my personal conflict, but I have

11   an obligation in New York on Tuesday morning.  My -- I could

12   be in Wilmington probably by 3 o'clock.

13           THE COURT:  Well --

14           MR. MCKANE:  And the question then becomes is that

15   enough time for Tuesday?

16           THE COURT:  Let's do Wednesday then.

17           MR. MCKANE:  Wednesday.

18           THE COURT:  Is Wednesday acceptable?  Can we do it

19   in the morning?

20           MS. SCHWARTZ:  Sure, Your Honor.

21           MR. MCKANE:  Yes.

22           THE COURT:  9:30 -- or oh, I have a meeting at

23   8:30.  10 o'clock Wednesday.

24           MR. MCKANE:  All right, thank you, Your Honor.

25           MS. SCHWARTZ:  Thank you, Your Honor.

1           THE COURT:  I'll have to move some stuff, but

2     that's fine.  All right, let me put that --

3           MR. MCKANE:  Oh, I apologize for that conflict,

4     Your Honor.

5           THE COURT:  It's all right.

6        (Pause)

7           THE COURT:  What did I just say, 10 a.m.?

8           MR. MCKANE:  10 a.m. on Wednesday, Your Honor.

9           THE COURT:  Thank you.  And that'll be -- that

10    will be for Mr. Pinachio's testimony, if available, and

11    followed by closing arguments and a ruling.  So, we'll have

12    an answer on the 15th.  And I'm going need to move some

13    things around, but that's too bad for them.

14           All right.  Now because I have hearings on Tuesday

15    we're going to need to have the courtroom cleared of all

16    your goods and whatnot.  We have our binders, et cetera, so

17    we're good there.  We'll hang onto the witness binders for

18    you, the ones that are at the witness stand, and otherwise

19    if you could clear up your stuff as much as possible to make

20    it easy on the support staff and cleaning staff I would

21    truly appreciate it.

22           Yes, Ms. Schwartz?

23           MS. SCHWARTZ:  Yes, sorry, Your Honor.

24           I just didn't fully explain when I had said that

25    we weren't calling Carrie Kirby, it was because, Your Honor,

1    we're going to rely on -- in on closing on plan documents

2    that are already in evidence.  I just didn't -- I wanted to

3    make that clear for Your Honor.

4              THE COURT:  All right.  Is there anything further

5    for today?  No?  All right.

6              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

7              UNIDENTIFIED SPEAKER:  Thank you, Your Honor, for

8    your time.

9              THE COURT:  This very much.

10             MS. SCHWARTZ:  Thank you, Your Honor.

11             THE COURT:  We're adjourned.

12             MS. SCHWARTZ:  Thank you very much, Your Honor.

13             UNIDENTIFIED SPEAKER:  Thank you.

14        (Whereupon these proceedings were concluded at 5:17 PM)

15

16

17                           *  *  *  *  *

18

19

20

21

22

23

24

25

1                      I N D E X

2                  W I T N E S S E S

3     WITNESS                BY                      PAGE

4     Todd Filsinger         Mr. Dempsey              7

5                            Mr. Schepacarter         68

6                            Mr. Dempsey             135

7

8

9                      I N D E X

10                 E X H I B I T S

11    PARTY    NO   DESCRIPTION          ID.      EVID.

12                  Declarations of Mr.

13                  Evans and Mr. Reed     --        6

14    Debtor   35   Monthly Operating

15                  Report               117      141

16

17

18                      I N D E X

19

20                     RULINGS

21                                               PAGE

22    Oral Motion                                 168

23

24

25

1                    C E R T I F I C A T I O N

2

3    We, Dawn South, Penny Skaw, and Melissa A. Looney certify

4    that the foregoing transcript is a true and accurate record

5    of the proceedings.

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o=Veritext, ou,
                   email=digital@veritext.com, c=US
7    _____    Date: 2014.10.10 14:37:45 -04'00'

8    Dawn South

9    AAERT Certified Electronic Transcriber CET**D-408

10   Penny Skaw    Digitally signed by Penny Skaw
                   DN: cn=Penny Skaw, o=Veritext, ou,
                   email=digital@veritext.com, c=US
11   _____    Date: 2014.10.10 14:38:22 -04'00'

12   Penny Skaw

13   Melissa Looney    Digitally signed by Melissa Looney
                       DN: cn=Melissa Looney, o=Veritext, ou,
                       email=digital@veritext.com, c=US
14   _____    Date: 2014.10.10 14:38:50 -04'00'

15   Melissa Looney

16   AAERT Certified Electronic Transcriber CET**D-607

17

18   Veritext

19   330 Old Country Road

20   Suite 300

21   Mineola, NY 11501

22

23   Date:  October 10, 2014

24

25