**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| _____ | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 14-10979 (CSS) |
| Energy Future Holdings Corp., *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re: Docket No. 2087** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY
OF AN ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING
AN AUCTION AND RELATED DEADLINES AND HEARINGS, AND
(C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ........................................................................................1

II.    BACKGROUND ..........................................................................................................5

    A.    The Bidding Procedures......................................................................................7

    B.    The Debtors' Presentation to Prospective Investors ................................................9

    C.    The Term Sheet.................................................................................................9

III.    ARGUMENT ...............................................................................................................11

    A.    The Committee Has a Demonstrable Interest in the Oncor Sale Process and Bidding Procedures Because the Debtors Are Forcing a Tax-Free Spinoff of TCEH .......................................................................................................11

    B.    The Bidding Procedures Should Not Be Approved Because They Have Not Been Endorsed by an Independent Fiduciary of the TCEH Entities ......................15

    C.    The Bidding Procedures Should Not Be Approved Because Any Transaction Presupposes a Highly Uncertain Plan Process and Will Be a Waste of Estate Resources ......................................................................................................19

    D.    The Debtors' Proposed Bidding Procedures Are Not Fair and Reasonable ..........23

        1.    The Bidding Procedures Should Be Modified to Provide More Transparency During the Stalking Horse Bidding Process ......................24

        2.    The Sale Timeline is Unreasonable and Will Limit Competitive Bidding.........................................................................................26

        3.    The Bidding Procedures Improperly Provide the Debtors with Unfettered Discretion to Consider Any Factors and Amend the Bidding Procedures Without Notice .......................................................27

IV.    CONCLUSION...........................................................................................................28

V.    RESERVATION OF RIGHTS ......................................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Calpine Corp. v. O'Brien Envtl. Energy, Inc.*,
  181 F.3d 527 (3d Cir. 1999) ............................................................................ 23

*In re American Capital Equipment LLC*,
  688 F.3d 145 (3d Cir. 2012) ............................................................................ 19

*In re American Safety Razor Company, LLC*,
  (Bankr. D. Del. Sept. 30, 2010) (Case No. 10-12351) (MFW), Tr. at 132-33 ........................ 23

*In re Broadstripe, LLC*,
  444 B.R. 51 (Bankr. D. Del. 2010) ............................................................... 15

*In re Edwards*,
  228 B.R. 552 (Bankr. E.D. Pa. 1998) ............................................................ 23

*In re eToys, Inc.*,
  331 B.R. 176 (Bankr. D. Del. 2005) ............................................................. 15

*In re Innkeepers USA Trust*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) ............................................................ 16

*In re President Casinos, Inc.*,
  314 B.R. 784 (Bankr. E.D. Mo. 2004) ............................................................ 23

*In re Residential Capital, LLC*,
  No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) ........................... 15

*In re Trados Inc. S'holder Litig.*,
  73 A.3d 17 (Del. Ch. 2013) ................................................................. 15, 16

*Reis v. Hazelett Strip-Casting Corp.*,
  28 A.3d 442 (Del. Ch. 2011) ................................................................... 16

The Official Committee of Unsecured Creditors (the "**Committee**") of Energy Future Competitive Holdings Company LLC ("**EFCH**"), EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("**TCEH**") and their direct and indirect subsidiaries, and EFH Corporate Services Company, by and through its undersigned counsel, hereby files this objection (the "**Objection**") to the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [Docket No. 2087] (the "**Bidding Procedures Motion**" or the "**Motion**").[2]  In support of the Objection, the Committee submits the declaration of David S. Kurtz (the "**Kurtz Decl.**") and the declaration of Charles L. Kerr (the "**Kerr Decl.**"), and respectfully represents as follows:

## I.   PRELIMINARY STATEMENT

1.     The Committee would support maximizing the value of the Debtors' indirect ownership of Oncor but believes that the Debtors, once again, are mandating outcomes that properly should be the subject of a consensual plan process.  Contrary to the Debtors' benign characterization, the Bidding Procedures are much more than a procedural mechanism to establish appropriate bidding and auction rules.  In reality, the Bidding Procedures are designed to ensure a Transaction premised on the Debtors' preferred plan structure (a sale of their Oncor interest through an equity investment in reorganized EFH combined with a tax-free spinoff of TCEH).  That structure requires confirmation of a plan of reorganization for TCEH under which the TCEH creditors would be required to forgo, for no consideration, a significant step-up in tax basis, and deplete favorable tax attributes, which could collectively be worth <u>billions</u> of dollars.  Moreover, it kicks the difficult question of inter-affiliate rights and claims down the road, again

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Motion or the Bidding Procedures, as applicable.

to the disadvantage of TCEH creditors. These creditors are being asked to sit on the sidelines and accept their fate while the Debtors engage in a marketing process for reorganized EFH Corp. equity without any consensus—in fact, before negotiations have even begun—around the terms of a plan or how a plan can be confirmed that will actually deliver that equity to a prospective buyer.

2.    By the Bidding Procedures Motion, the Debtors have announced to the world that they are committed to selling Oncor as well as their preferred—and effectively one and only— structure for such a transaction. While the Bidding Procedures pay lip service to a bidder's right to propose an alternative structure, that is an illusory option. Any bidder that actually wants to succeed in the auction has no choice but to make a bid that conforms to the Debtors' preferred structure and tax strategy.[3]

3.    More importantly, the Debtors acknowledge that there is disagreement among the various creditor groups about how the Debtors' preferred tax strategy may or may not impact their individual recoveries. (*See* Tax Memorandum at 20.) Though the Debtors have performed their own tax analysis, the Committee, as independent fiduciary for the TCEH Entities, needs to fully understand all of the ramifications of a tax-free spinoff of TCEH (some of which are noted below) in order to evaluate the Transaction and determine whether the Debtors' proposed structure is best for creditors of the TCEH Entities. Approving these Bidding Procedures now, however, in effect compels a tax structure that may well be disadvantageous to creditors of the TCEH Entities.

---

[3] The Debtors' *Omnibus Tax Memorandum* [Docket No. 2296] (the "**Tax Memorandum**"), filed with the Court on October 1, 2014, goes so far as to lay out a tax "roadmap" for a bidder that accepts the Debtors' preferred structure while purporting (in a footnote) to be "solely for illustrative purposes." (*See id.* at 46-48 ("The following hypothetical transaction serves as an illustrative example of a third party acquisition of Reorganized EFH that likely would not jeopardize the tax-free status of the TCEH Reorganization.").) Notably, the Tax Memorandum did not provide a "roadmap" for any alternative structures.

ny-1159164

4.      Further supporting the need for review by an independent TCEH fiduciary, the Debtors filed the Bidding Procedures Motion without seeking the approval of the TCEH Board of Directors, let alone its independent director, and without providing the TCEH Board of Directors with any analysis as to whether the transactions contemplated by the Bidding Procedures will maximize value for the TCEH Entities.  The failure of the TCEH Board of Directors to analyze these questions fully or determine that the Bidding Procedures are in the best interest of the TCEH Entities is enough to deny the relief the Debtors are seeking.  The Bidding Procedures should not be approved, and the Debtors should not be authorized to engage in an auction process, before any independent fiduciary has evaluated potential alternative transaction structures.

5.      Pursuing a structurally predetermined sale in the context of these Chapter 11 Cases, before the framework of a plan of reorganization has been negotiated, is simply inappropriate and prejudicial.  The Bidding Procedures presuppose a plan structure (without any creditor support for that structure) and are based upon assumptions of how complex and contentious tax and other restructuring disputes will be negotiated or otherwise resolved, including, among other things, that creditors of the TCEH Entities should be required to forgo significant value to achieve a tax-free spinoff of TCEH and that EFH Corp./EFIH creditors will be willing to accept stock in the acquirer as payment on their claims.  Conducting an auction at this time for reorganized EFH Corp. equity, well in advance of any realistic discussions regarding how to confirm a plan of reorganization for any of the Debtor entities, ignores the realities of these Chapter 11 Cases, wastes estate resources, and repeats the mistakes of the Debtors' prior, ill-fated Restructuring Support Agreement.

6.      Indeed, the Bidding Procedures themselves are a vestige of that defunct Restructuring Support Agreement and the EFIH Second Lien DIP.  Those agreements set in

3

motion a preliminary "bidding war" for the Debtors' interest in Oncor based on an artificially low valuation set by the Debtors.  The Debtors are, in effect, seeking to resuscitate parts of the Restructuring Support Agreement through the Bidding Procedures, but without the support of a single creditor group for their proposed restructuring.  Had the Debtors not entered into those flawed agreements prior to the Petition Date, the Debtors would have undoubtedly proceeded differently in this bankruptcy, seeking to gain consensus around a plan before conducting an auction for a plan sponsor.  In essence, the Debtors are seeking to sell an asset that does not currently exist—reorganized EFH Corp. equity—and which will only exist, if at all, after formulation of a confirmable plan.  Moreover, in light of the significant contingencies to a successful sale of yet-to-be created EFH Corp. equity, the Debtors are not really locking in any guaranteed value by proceeding now.

7.      Compounding these flaws, the Debtors are proposing to conduct a closed bidding process without allowing even the statutory Committee to participate until it is too late.  As noted in the Bidding Procedures Motion, the Debtors and other stakeholders view the Stalking Horse Bidding Process as the most important aspect of an auction process.  That is because potential bidders in this market typically do not want to be seen as bidding against one another.  Under circumstances where the Debtors are pushing a specific transaction structure, the Committee submits that, if the Bidding Procedures are approved, at a minimum, it or its advisors must be given real-time access to information during any Stalking Horse Bidding Process and full consultation rights to safeguard the process and act as a watchdog for all creditors of the TCEH Entities.  Absent the Committee being "under the tent," nobody other than the Debtors, who have already subscribed to a single and controversial version for how these Chapter 11 Cases should conclude, will be a participant at critical stages of the negotiations.

## II.    BACKGROUND

8.    Since the outset of these Chapter 11 Cases, the Debtors have been publicly proclaiming their desire to consummate a restructuring in what they term a "tax-efficient" manner through a "tax-free" spinoff of TCEH and a reorganization of EFH Corp. and EFIH. (*See Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [Docket No. 98] ¶ 15.)  In fact, the Restructuring Support Agreement was premised on a tax-free spinoff of TCEH that would separate TCEH from EFH Corp. and avoid the incurrence of what the Debtors believe is in excess of $6 billion of deconsolidation-related tax liabilities. (*Id.* ¶¶ 17-18.)  The plan contemplated by the Restructuring Support Agreement required TCEH stakeholders to forgo the full step-up in basis and the subsequent tax benefits of increased depreciation deduction, and instead provided a "partial" step-up in the tax basis in the TCEH assets.  (*Id.* ¶ 16.)

9.    In accordance with the Restructuring Support Agreement, the Debtors sought approval of a $1.9 billion EFIH Second Lien DIP that would have mandatorily converted into 60% of the reorganized EFH Corp. equity.  However, after filing the motion that sought approval of the EFIH Second Lien DIP Facility, as a result of the Debtors' artificially low valuation, the Debtors received additional financing proposals from the EFIH First Lien Group, EFIH Second Lien Group, and strategic partner NextEra that implied a valuation of EFIH that would potentially render EFIH solvent and provide additional cash consideration to EFH Corp. creditors.  (*See Omnibus Objection of the Official Committee of Unsecured Creditors to (I) The Motion of Energy Future Intermediate Holding Company and EFIH Finance Inc. For Entry of An Order (A) Approving Postpetition Second Lien Financing, (B) Granting Lien and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D)*

5

*Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry Into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay and (II) The Motion of Energy Future Holdings Corp., et al., For Entry of Orders Approving Certain EFIH Settlements and the Oncor TSA Amendment* [Docket No. 1090] ¶ 25.)  The last bid the Debtors received from NextEra and the Second Lien Group on July 16, 2014, contemplated the acquisition of approximately 41% of the equity of reorganized EFH Corp. for a cash payment equal to $1.625 billion pursuant to a plan of reorganization in the form of a mandatorily convertible second lien debtor in possession facility [Docket No. 1590].  After testimony and cross-examination of the Debtors' witnesses revealed numerous flaws in the Debtors' analysis and process, the Debtors abandoned their efforts, terminated the Restructuring Support Agreement, and went back to the drawing board—or so it seemed.

10.     Even before the Bidding Procedures Motion was filed with the Court and the auction process publicly disclosed, Evercore, the Debtors' financial advisor, contacted several potential bidders and conveyed the Debtors' desire to sell their interest in Oncor.  On or about July 25, 2014, without any prior discussion with the Committee, Evercore distributed materials to several potential bidders, explaining the Debtors' desire to seek an investment for the purchase of reorganized EFH Corp. equity premised on a tax-free spinoff of TCEH.   Thereafter, concurrently with the filing of the Bidding Procedures Motion, Evercore distributed updated versions of "teaser" materials to 51 potential financial and strategic investors.  (Mot. ¶ 24.)  At the time that the Bidding Procedures Motion was filed, ten potential bidders had entered into confidentiality agreements with the Debtors and were given access to the Debtors' data room. (*Id.*)  The Debtors also distributed to potential participants a form term sheet, attached to the Bidding Procedures as Exhibit C (the "**Term Sheet**"), along with a formal process letter.  (*Id.* ¶

6

26.)  The Debtors now seek retroactive approval of these documents and entry of a Court order approving the Bidding Procedures.

### A.    The Bidding Procedures

11.    Under the Bidding Procedures, the Debtors have elected to undertake a closed Stalking Horse Bidding Process with no creditor input or oversight in two stages (Round 1 and Round 2), and, only then, conduct an Open Bidding Process in consultation with the Debtors' major creditor constituencies.  In Round 1 of the Stalking Horse Bidding Process, which effectively commenced when the Debtors distributed the Term Sheet and process letter to potential bidders, the Debtors will facilitate due diligence and accept bids in the form of letters-of-intent and illustrative term sheets for a proposed Transaction.  (Bidding Procedures § G.) Round 1 Bid Documents must be submitted to the Debtors no later than October 23, 2014, at 4:00 p.m., only six calendar days after the Court holds a hearing on the Motion.  (*Id.*)  As soon as reasonably practicable after the Round 1 Bid Deadline of October 23, 2014, the Debtors, in their sole discretion and without disclosure or input from any party in interest, will identify those Round 1 Bidders that are selected to advance to Round 2.  (*Id.*)

12.    Upon commencement of Round 2 of the Stalking Horse Bidding Process, the Debtors will distribute, but not file with the Court or provide to any party in interest, a form of definitive documentation to effectuate the Bid.  (*Id.* § H.)  Round 2 Bidders must then submit an initial marked version of the Round 2 Bid Documentation only two weeks later—by November 7, 2014—and a substantially final draft of Round 2 Bid Documentation by November 21, 2014. (*Id.*)  The Debtors will then select the Stalking Horse Bidder, execute Round 2 Bid Documentation, and file a notice with the Bankruptcy Court announcing the Stalking Horse Bidder.  (*Id.*)

13.     Unless otherwise agreed to with the Stalking Horse Bidder, within five days of executing the Stalking Horse Agreement, the Debtors will file the Stalking Horse Motion that will contain a "description of the Stalking Horse Bidding Process, including summary of the Bids and related significant terms." (*Id.*) Though not required by the Bidding Procedures, the Motion states that the Debtors will also provide after-the-fact "transparency to creditor constituencies" by agreeing to "meet with each of the Debtors' major creditor groups at the conclusion of the Stalking Horse Bidding Process and provide a summary of the bid history on a no-names basis." (Mot. ¶ 34.) However, nothing in the Bidding Procedures requires the Debtors to consult with or provide real-time information to parties in interest (or their professionals on a confidential basis) during the Stalking Horse Process. Only after a Stalking Horse Bidder is selected will the Committee be given limited access to the information the Debtors used to make their determination.

14.     Upon entry of an order approving the Stalking Horse Motion and any Stalking Horse Topping Fee, the Debtors will commence an Open Bidding Process to solicit Qualified Bids for a period of at least 30 days. (Bidding Procedures § I.) Following the submission of bids during the Open Bidding Process, the Debtors will consult with the Reviewing Parties, which includes the advisors and counsel to the Committee, and determine which bidders should be permitted to participate at the Auction. (*Id.* § J.) The Debtors will then select, in consultation with the Reviewing Parties, the Starting Bid at the Auction and, if more than one Qualified Bid is received by the Bid Deadline, then the Debtors will conduct the Auction. (*Id.* § K.) If an Auction is conducted by the Debtors, the Debtors, in their sole discretion, but in consultation with the Reviewing Parties, will identify the highest or otherwise best Bid and identify a Successful Bidder. (*Id.* § O.)

ny-1159164

### B.      The Debtors' Presentation to Prospective Investors

15.      In connection with the Bidding Procedures Motion, the Debtors have distributed to potential bidders a "Presentation to Prospective Investors," attached as Exhibit B to the Bidding Procedures (the "**Teaser**"), that explains, among other things, the Debtors' intent to "reach out to potential acquirers and investors to participate in an investment, in any form, to acquire any or all of the assets or the reorganized equity of EFH or one or more of its direct and indirect subsidiaries other than EFCH, TCEH, and TCEH's direct and indirect subsidiaries." (Teaser at 1.)  In addition to explaining the nature of the Debtors' ownership interests in Oncor, the Teaser provides an overview of Oncor's business and certain select financial information. The Teaser describes Oncor's business profile and characteristics, explaining that Oncor is the "largest transmission and distribution company in Texas," has "low costs and high reliability," "no commodity exposure," a "supportive regulatory environment," and "strong reliability and safety performance."  (*Id.* at 4.)  The Teaser further touts the stability and growth potential for Oncor, noting its status as a "regulated monopoly" with a "strong credit profile, protected by PUCT-Monitored Ring-Fencing Provisions," and the fact that it "achieved or exceeded market performance protocols in 12 out of 14 PUCT market metrics in 2013."  (*Id.* at 5.)

### C.      The Term Sheet

16.      Contemporaneously with the filing of the Bidding Procedures Motion, the Debtors distributed to potential bidders the Term Sheet, which sets forth, among other things, the Debtors' preferred transaction structure and a number of material closing conditions.  (Mot. ¶ 26.)  While the Term Sheet contains a statement at the outset that "Bidders May Propose Any Alternative Structures," the Term Sheet that bidders have been provided describes in detail the Debtors' preferred transaction structure, which contemplates a tax-free spinoff of Reorganized TCEH and would require EFH Corp./EFIH creditors to accept stock in the acquirer as part of the

9

consideration under a plan of reorganization.  (Term Sheet at 1.)

17.    The Term Sheet contains the following material provisions:

| Structure | The acquisition of the equity interests in one or more of the EFH Debtors will take place (i) in accordance with the steps set forth below; (ii) pursuant to a definitive agreement (the "Merger Agreement"); and (iii) as part of a confirmed and effective Chapter 11 plan of reorganization (the "Plan of Reorganization").  The following steps shall occur substantially contemporaneously on the Closing Date (as defined below). |
|---|---|
| | **Step 1**: **Equity securities of Reorganized TCEH shall be distributed to TCEH creditors in furtherance of a tax-free spin-off of Reorganized TCEH (the "TCEH Spin") and in accordance with a private letter ruling from the Internal Revenue Services (the "Private Letter Ruling") and the Plan of Reorganization**; provided, that the Private Letter Ruling will be requested by the EFH Debtors (and obtained from the IRS) in a form reasonably satisfactory to the Parent and the EFH Debtors. |
| | **Step 2**: Reorganized EFH will issue a number of shares of its common stock to certain creditors and/or equityholders of the EFH Debtors in satisfaction of their allowed claims against the EFH Debtors as set forth in, and pursuant to, the Plan of Reorganization (the "Issuance").  Other allowed claims against the EFH Debtors will be satisfied in exchange for the right to receive cash consideration (the "Repayment Amount") as provided for in the Plan of Reorganization (which cash shall be paid as described in Step 3). |
| | **Step 3**: Reorganized EFH will merge with and into Merger Sub in a tax-free reorganization under section 368(a)(1)(A) of the Internal Revenue Code of 1986, as amended (the "Code") pursuant to the Plan of Reorganization (the "Merger"). As a result of the Merger, Merger Sub will acquire all of the assets and liabilities of Reorganized EFH.  The merger consideration shall consist of a number of shares of Parent common stock to be issued to the holders of Reorganized EFH equity (other than Parent or Merger Sub) with an aggregate value equal to $[●] (such stock consideration, the "Merger Consideration" and, together with the Repayment Amount, the "Plan Value").  Simultaneous with the Merger, and in accordance with the Plan of Reorganization, the Repayment Amount shall be paid from cash on hand at EFH and EFIH as of the Effective Date and $[●] of cash supplied by Parent and Merger Sub. |
| **Drop Dead Date** | December 31, 2015, subject to extension by the EFH Debtors for up to six (6) months in the event that any necessary or advisable regulatory approval has not been received as of such date. |
| **Closing Conditions** | The obligation of Parent and EFH to effect the Closing will be subject solely to the satisfaction (or waiver) of the following conditions:<br>…<br>• EFH shall have obtained a Private Letter Ruling related to the TCEH Spin from the IRS to the reasonable satisfaction of EFH and Parent;<br>• The TCEH Spin shall have occurred in accordance with the Private Letter Ruling. |

III.    **ARGUMENT**

   A.    **The Committee Has a Demonstrable Interest in the Oncor Sale Process and Bidding Procedures Because the Debtors Are Forcing a Tax-Free Spinoff of TCEH**

18.    As an independent fiduciary for the TCEH Entities, the Committee has a demonstrable interest in the Bidding Procedures and the potential Transaction for the sale of the Debtors' indirect interest in Oncor.  The Bidding Procedures Motion (filed on behalf of *all* 71 Debtors), the Bidding Procedures, and Term Sheet unequivocally tilt the outcome of the bidding process to the Debtors' preferred transaction structure: a tax-free or, in the Debtors' words, a "tax efficient" spin-off of TCEH that requires the TCEH creditors to forgo potentially billions of dollars of value in the form of a full step-up in the tax basis of the TCEH Entities' assets.[4]  As a result, the Bidding Procedures Motion is not the narrow and procedural motion the Debtors present to the Court for approval.

19.    The Debtors' stated intention to consider any and all transaction structures is belied by their prior statements and interactions with market participants.  Well in advance of the distribution of the Teaser and Term Sheet to potential bidders contemporaneously with the filing of the Bidding Procedures Motion, the Debtors distributed written materials to, and told potential bidders that, a tax-free spinoff of TCEH was the <u>only</u> acceptable transaction structure.  On July 25, 2014, just one day after the Restructuring Support Agreement was terminated, marketing materials were sent to potential bidders (many of whom are likely active participants in the process now), in which Evercore marketed the Transaction as follows:

████████████████████████

---

[4] The Debtors recognize the TCEH Entities' interest in the transaction. *See* October 6, 2014 Hiltz Deposition Tr. ("**Hiltz Dep.**"), attached as Ex. 3 to the Kerr Decl., at 221:4-11 ("Q: How is it that the T side is impacted one way or another in this auction assuming that the T side has no claims against the E side?  Hiltz: To the extent that the plan of reorganization is partially dependent upon the sale of the asset, then the reorganization of the T side creditors is impacted.").



(*See* EFH-EVR090000013-25, attached as Exhibit 1 to the Kerr Decl.)

20.     On the same day, Evercore prepared "suggested talking points" for John Young and Paul Keglevic that ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮" (*See* EFH90009231-2, attached as Ex. 2 to the Kerr Decl.)  As a result, the clear message that the Debtors sent to potential bidders between July 25, 2014, and the filing of the Bidding Procedures Motion is that a tax-free spinoff of TCEH must be a component of a Transaction, and bidders must bid into that structure.  Now, however, paying lip service to concerns from various stakeholders that certain creditors are not prepared to agree to a tax-free

spinoff at this time, the Debtors claim to have done an about-face and profess that they are willing to consider alternative transaction structures.[5]

21.    The assurances provided by the Debtors in the Bidding Procedures Motion to consider alternative structures are also contradicted by the Bidding Procedures themselves. Specifically, the way that the Debtors have structured the timing for bids in the Bidding Procedures all but assures that no alternative transaction structures will be proposed.  For example, Round 1 Bid Documentation, which must identify "the structure proposed for undertaking the Transaction," must be submitted by October 23, 2014, only six calendar days after the Court holds a hearing on the Bidding Procedures Motion.  (Bidding Procedures § G.) Moreover, the Debtors will only have two weeks after the submission of Round 1 Bids—from October 23, 2014 to November 7, 2014—to analyze any alternative transaction structures.  (*Id.* § H.)

22.    Further supporting the inference that the Debtors have constructed the Bidding Procedures to avoid consideration of alternative structures, the Bidding Procedures require that that Round 1 Bidders "specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or the extent of any incremental tax liabilities to be incurred <u>by the Debtors</u> under the Bid."  (Bidding Procedures, § E.1.d. (emphasis added).)  It will take potential bidders months, if not more, to fully determine the tax impact of an alternative

---

[5] The Debtors did not inform potential bidders that they would consider alternative transaction structures until the Bidding Procedures Motion was filed, giving bidders an unreasonably short time to furnish alternative tax structures. October 7, 2014 Horton Deposition Tr. ("**Horton Dep.**"), attached as Exhibit 4 to the Kerr Decl., at 38:13-39:2 ("Q: Have you ever discussed the tax-free spin structure with the bidders in your conversations?  Horton: That conversation has occurred.  Q: Have you ever discussed a taxable structure in your conversations with the bidders? Horton: After the filing of the motion, we had Evercore reach out to the potential bidders and explain to them that any structure that they feel like brings more value to the estate, they feel like that brings more value to their bid, is acceptable."); Hiltz Dep. 89:13-18 ("Q: So sitting here today, you have no  knowledge of a communication prior to September 19, a specific knowledge of a specific communication informing prospective bidders that  the Debtors would accept bids in any form?    Hiltz: That's correct.").

transaction on the Debtors as potential bidders will need to understand, among other things, the Debtors' current tax position, the existence and potential usage of tax attributes to offset any taxable gain, and the impact of the Competitive Tax Allocation Agreement (the "**Competitive TSA**") and the Oncor Tax Sharing Agreement on potential claims that may be asserted against each specific entity in the organizational structure.[6]

23.     To be sure, while under appropriate circumstances it could be reasonable for the Debtors to implement appropriately tailored, Court-supervised procedures to market their indirect interests in Oncor, if they choose to do so in a manner that impacts the TCEH Entities—including potentially divesting the TCEH Entities of the value associated with a full step-up in tax basis that could yield billions of dollars of value for TCEH creditors—as the Debtors' preferred structure does, the Debtors must do so by a means that also maximizes value for the TCEH Entities.  Moreover, creditors of the TCEH Entities will inevitably face the argument at the hearing on the Stalking Horse Motion, at the Auction Approval Hearing, and perhaps at a plan confirmation hearing, that the sale must be entitled to proceed because the process was "successful" and the Court should not let this opportunity pass as it could otherwise prejudice parties in interest.  Because the Debtors' desire to conduct a tax-free spinoff of TCEH is fully and finally entrenched in the process, and the Debtors have all but required parties to conform to their preferred transaction structure, the Bidding Procedures Motion is far more than the simple process motion the Debtors make it out to be, and, if approved, will prejudice creditors of the TCEH Entities.

---

[6] Indeed, the Debtors' Tax Memorandum specifically notes that the Debtors have conducted tax diligence for "several years" and have analyzed the tax implications of a restructuring "at extraordinary length."  (*See* Tax Memorandum at 3.)

**B.**    **The Bidding Procedures Should Not Be Approved Because They Have Not Been Endorsed by an Independent Fiduciary of the TCEH Entities**

24.    The Bidding Procedures should not be approved because they seek to use estate resources outside the ordinary course of business and no independent fiduciary of the TCEH Entities has sanctioned the Bidding Procedures or even analyzed the implications of a tax-free spinoff of TCEH.[7]  Courts have recognized that transactions among interested parties must be evaluated with a heightened level of scrutiny or an "entire fairness" standard.  *See In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) ("However, in interested party transactions, an entire fairness/heightened scrutiny analysis applies."); *see also In re Broadstripe, LLC*, 444 B.R. 51, 106 (Bankr. D. Del. 2010) ("'The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing entire fairness, sufficient to pass the test of careful scrutiny by the courts.'" (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983))); *In re eToys, Inc.*, 331 B.R. 176, 200 (Bankr. D. Del. 2005) ("'When faced with . . . divided loyalties, directors [and officers] have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts.'" (quoting *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (alteration in original)); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) ("Entire fairness, Delaware's most onerous standard, applies when the board labors under actual conflicts of interest.").  A heightened level of scrutiny should be applied here, particularly in the absence of independent consideration by a fiduciary of creditors of the TCEH Entities and without any analysis as to how the Bidding Procedures will impact the TCEH Entities.

---

[7] The Debtors have previously threatened to undertake a stalking horse bidding process without Court approval. (*See* Docket No. 2294 at 2 ("In a typical chapter 11 sale, the Debtors would undertake the first step—the stalking horse selection process—*without court approval* and only then file a bidding procedures motion to govern the

25.    In applying the heightened standard, "courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."  *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010); *see also Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) ("Entire fairness is Delaware's most onerous standard" where "'the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders.'" (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006))).  The business judgment rule, on the other hand, "shields corporate decision makers and their decisions from judicial second-guessing only when the following elements are present: (i) a business decision, (ii) disinterestedness, (iii) due care, (iv) good faith, and (v) according to some courts and commentators, no abuse of discretion or waste of corporate assets."  *Innkeepers*, 442 B.R. at 231.  Because the Debtors cannot demonstrate a business decision by any of the Boards of Directors, disinterestedness, or that the Debtors acted with the requisite care in proceeding with the Bidding Procedures, the Debtors should not be permitted to rely on the business judgment standard to justify the Bidding Procedures Motion.  In addition, as discussed in Section C below, the Bidding Procedures are a waste of corporate assets.

26.    While the Debtors repeatedly take the position that, as drafted, the process will result in a value-maximizing Transaction that will benefit of all of the Debtors' estates, *see* Mot. ¶¶ 1, 8, 24, 37, the Bidding Procedures will deprive the TCEH Entities of a potentially

---

ultimate auction after the stalking horse bidder was already selected.  Here, the Debtors have filed the Bidding Procedures Motion at the outset of the process—before selecting a stalking horse bidder—to provide additional transparency to creditors and to the Court and to provide certainty to bidding participants and to the market as to the deadlines and requirements of the process.").)  However, it is clear that the Debtors' atypical auction process, combined with the transaction structure the Debtors are imposing on the TCEH Entities, is outside the ordinary course of business and requires Court approval.

significant asset without taking any reasonable steps to protect the interests of the TCEH Entities.  Incredibly, even with a sharp focus on potential conflicts between and among the Debtors' estates as a result of potentially divergent interests, the Debtors still continue to lump the interest of all of their estates together and, for whatever reason, fail to ensure that multi-Debtor transactions are appropriately scrutinized from the perspective of each Debtor.  Indeed, the Debtors failed to seek the approval of the TCEH Board of Directors to verify that an unbiased TCEH representative has come to the conclusion that the transaction structure the Debtors have effectively imposed upon potential bidders is in the best interests of the TCEH Entities.[8]

27.     The Debtors also failed to even ascertain whether Hugh Sawyer, the independent director of TCEH, believed that the proposed transaction structure represents the best path forward for the TCEH Entities.[9]  Moreover, neither Evercore nor Paul Keglevic, the Debtors' Co-Chief Restructuring Officer, ever met separately with Mr. Sawyer to discuss the Bidding Procedures.[10]

---

[8] October 3, 2014 Keglevic Deposition Tr. ("**Keglevic Dep.**"), attached as Exhibit 5 to the Kerr Decl., at 112:22-113:4 ("Q: But with respect to the bid procedure motions that we're talking about today, no board vote was taken at any of the Debtor entities, correct?  Keglevic: That's correct, although I would tell you there was substantial involvement and advisement before we filed."); Keglevic Dep. at 192:11-15 ("Q: Okay, so just so I'm clear, were any of the board below TCEH, that is, TCEH, the entity, consulted with respect to whether or not to support the bid procedures motion.  Keglevic: I don't believe so."); Horton Dep. at 16:16-18 ("Q: Do you recall any board votes?  Horton: There were no board votes that I recall."); Horton Dep. at 94:8-23 ("Q: Just, first of all, if you could answer yes or no, do you recall there being a discussion at either of the board meetings as to whether a vote should be taken?  Horton: Yes.  Q: And what was the explanation given?  Horton: There wasn't a question as why.  The question was do we need to take a vote, and the answer was no.  Q: And who answered that?  Horton: Ms. Doré.  Q: And was there any explanation as to why she said no?  Horton: No.").

[9] October 8, 2014 Sawyer Deposition Tr. ("**Sawyer Dep.**"), attached as Exhibit 6 to the Kerr Decl., at 363:14-23 ("Q: But did you – did you ask for any analysis on what impact would be on the T-side creditors if the transactions contemplated by the Motion were effective?  Ms. O'Connor: Object to form.  Sawyer: I did not and my business judgment, it's early.  We don't – we don't have a transaction.  We don't have a plan of reorganization.  All we have before us are bidding procedures."); Sawyer Dep. at 386:4-8 ("Q: And did the TCEH board vote on launching a marketing process?  The TCEH board along with the EFH board deliberated the process that was described by Evercore, but we did not vote it.").

[10] Sawyer Dep. at 501:18-21 ("Q: Did you ever personally meet separately with Evercore to discuss the bidding

17

28.    Apparently, the Debtors determined to proceed with the Bidding Procedures on behalf of all Debtors without <u>any</u> analysis as to whether that path will maximize value for the TCEH Entities.[11]  In the absence of an independent review and assessment of the numerous significant tax issues associated with the Debtors' restructuring and, in particular, a tax-free spinoff of TCEH, it is impossible for TCEH creditors to determine whether to support a tax-free or a taxable transaction at this time.  As is evident from the Debtors' recent submission of the Tax Memorandum, the complex tax issues here place a shroud over the Debtors' ability to achieve a consensual restructuring.  And while the Debtors have clearly indicated their preference for a tax-free spinoff of TCEH to avoid the incurrence of tax liabilities, it may well be that a taxable transaction where the TCEH creditors take the full step-up in tax basis is more beneficial for the TCEH Entities.[12]

---

procedures?  Sawyer: Not that I recall."); Keglevic Dep. at 113:10-20 ("Q: Did you have any personal one-on-one conversations with Mr. Sawyer regarding the bid procedure motion at any time from the point that the NextEra bid was withdrawn and the filing of the motion?  Keglevic: I made, with Ms. Doré and with our counsel and advisors, several presentations to the board in which Mr. Sawyer asked questions.  Some of them were specifically of me.  But outside of board meetings, I did not have any specific discussions with Mr. Sawyer.").

[11] Keglevic Dep. at 278:2-4 ("Q: Have you had any discussion with anyone as to whether the preferred deal structure will maximize value to TC[E]H?  Keglevic: I have not.").

[12] Though the Committee will respond to the Tax Memorandum at the appropriate time, suffice it to say that the Debtors' feigned surprise that "certain junior creditors" may still support a taxable sale transaction for TCEH "for reasons that are not clear to the Debtors" is exactly why the tax issues must be resolved before a sale of Oncor and a tax-free spinoff of TCEH can occur.  (Tax Memorandum at 12.)  The Debtors' statement that a tax-free transaction is, by definition, preferable because any deconsolidation tax liability at EFH Corp. would dilute recoveries for TCEH junior creditors embodies the Debtors' oversimplification of the critical tax issues.  At this juncture, it is entirely unclear what impact a deconsolidation tax liability would have on recoveries of TCEH creditors and, assuming the Competitive TSA is not avoidable in and of itself, the nature and extent of the potential claims that may be asserted against the TCEH Entities.  The Debtors continue to group the TCEH Entities together as if they are a single entity in their tax analysis.  In reality, multiple TCEH Entities are parties to the Competitive TSA, and can be separately allocated tax or payments on account of the use of tax attributes under the agreement.  Thus, a much more exacting analysis must be conducted before the impact of potential tax liabilities is fully known.

ny-1159164

C. **The Bidding Procedures Should Not be Approved Because Any Transaction Presupposes a Highly Uncertain Plan Process and Will Be a Waste of Estate Resources**

29.     Similar to a court refusing to approve a disclosure statement because soliciting that plan would be a waste of estate resources, the Court should not approve the Bidding Procedures because they are premised on a comprehensive restructuring of all of the Debtors that lacks the necessary support to realize that outcome.  The Third Circuit recently held in *In re American Capital Equipment LLC*, 688 F.3d 145 (3d Cir. 2012) that a bankruptcy court may exercise its equitable powers under 11 U.S.C. § 105 to "control its own docket," particularly when the court does so in an effort to avoid the "time-consuming and expensive" litigation.  *Id.* at 154.  While *American Capital* dealt with approval of a disclosure statement, the same reasoning applies here, and the Court should deny approval of the Bidding Procedures as a waste of estate resources.

30.     Prior to commencing these Chapter 11 Cases, the Debtors spent over a year attempting to orchestrate a restructuring agreement among certain of its creditors, pursuant to which their businesses would be held intact.  This was called "Project Olympus."  This approach reflected the Debtors' view that separating the Oncor business from TCEH was not the best way to maximize value.  Only upon the failure to achieve sufficient consensus among the creditors on relative valuations of the businesses and distributions under a restructuring plan did the Debtors shift to pursuit of a restructuring plan predicated on separation of the businesses, as initially reflected in the Restructuring Support Agreement.  (*See* Kurtz Decl. ¶ 7.)

31.     After abandoning the Restructuring Support Agreement, the Debtors informed the Committee that they had begun a process to market Oncor for sale.  The Debtors proposed to proceed by first selecting a stalking horse bidder based upon a brief marketing process, to be followed by a longer marketing and auction process.  Lazard did not believe that the process

19

initially proposed by the Debtors was the best process to maximize the value of Oncor, if it were to be sold.  Instead, Lazard was of the view that, because in this particular industry strategic bidders may not be willing to attempt to outbid each other after announcement of a stalking horse bidder, if and when Oncor were to be marketed for sale, a better process would be to conduct an extended marketing process prior to selecting a stalking horse bidder, to be followed by a brief subsequent auction period.  This view is reflected in the Debtors' proposed Bidding Procedures. (*See* Kurtz Decl. ¶ 8.)

32.    However, the Debtors' proposed strategy and process to market and sell Oncor at this time goes far beyond a typical section 363 transaction.  Here, the sale of Oncor will be premised and conditioned upon assumptions regarding a host of complex, contentious issues that have not been negotiated or fully analyzed by the Debtors' constituents, and the resolution of which will ultimately form the building blocks of a plan of reorganization.  Normally, these issues are dealt with in connection with a plan process.  As such, the Debtors are not simply proposing to market an asset for the highest price they can obtain.  Rather, they are proposing to move quickly toward a sale transaction that unilaterally prejudices many of the key issues in these Chapter 11 Cases.  (*See* Kurtz Decl. ¶ 9.)

33.    As evidenced by the Term Sheet for an Oncor sale transaction that the Debtors have distributed to potential bidders, as well as the Tax Memorandum, the Debtors have assumed that the only plan of reorganization that can be pursued in these Chapter 11 Cases is one premised upon a tax-free spinoff of TCEH.   Accordingly, the proposed procedures to sell Oncor strongly encourage bidders to bid for the pro forma equity of reorganized EFH Corp., conditioned upon the effectiveness of a subsequent plan of reorganization built around the tax-free spinoff of TCEH.  (*See* Kurtz Decl. ¶ 10.)

34.     As set forth in the Tax Memorandum, a tax-free spinoff of TCEH would eliminate a full step-up in basis for the TCEH Entities.  That basis step-up could be valued in excess of $2 billion.  The Debtors' proposed structure would strip TCEH of a substantial portion of this value without any compensation being paid to the TCEH Entities.  The Debtors assert that there are numerous tax issues and claims that would be asserted against various Debtor estates, if a taxable transaction were to occur; however, the Committee has not had a sufficient opportunity to diligence and analyze these issues and the hypothetical tax claims or their consequences for each individual estate.  (*See* Kurtz Decl. ¶ 11.)

35.     Among the issues that are appropriate for determination under a plan of reorganization, but that the Debtors' proposed process prejudices are:

- whether Oncor should be sold to a third party purchaser rather than held;

- whether a reorganization that keeps EFH Corp., TCEH, and EFIH together is no longer feasible, preferable, or value-maximizing;

- whether the Debtors' chosen tax structure is in the best interests of the TCEH Entities;

- whether TCEH obligations under the Competitive TSA (if they exist at all), or the Competitive TSA itself, are not avoidable;

- whether TCEH creditors will vote for a plan premised upon a tax-free spinoff of TCEH without the full basis step-up;

- whether creditors of EFH Corp./EFIH (including certain TCEH Entities—and by extension their creditors) are willing to accept equity in the Oncor acquirer under a plan of reorganization; and

- whether it is appropriate for TCEH to lose the full basis step-up for no contemporaneous consideration.[13]

(*See* Kurtz Decl. ¶ 12.)

---

[13] In addition to these complex tax restructuring questions, an adversary proceeding, Docket No. 2313, was recently commenced by certain holders of EFIH Unsecured Notes against Fidelity arising from a call right to purchase EFIH Non-Guaranteed Notes under the Restructuring Support Agreement, which may have an impact on the sale process.

36.     In sum, the process now proposed by the Debtors contains many of the same flaws that plagued the Restructuring Support Agreement.  The Debtors are again seeking to move expeditiously down a path in these Chapter 11 Cases that is premised upon a specific plan structure before the issues embedded in that plan structure have begun to be negotiated by, at least, the Committee, or determined by the Court.  A better, more appropriate process would be to address any potential sale of Oncor in the context of a reorganization plan.  Only in the context of a plan process will the Debtors' constituents be given requisite time and opportunity to fully and fairly assess the issues, be allowed an opportunity to negotiate and attempt to reach consensus, and have their rights and interests sufficiently considered and protected.  (*See* Kurtz Decl. ¶ 13.)

37.     Indeed, delaying the process until the framework of a plan of reorganization has been negotiated or agreed to will not cause the Debtors any harm.  Unlike in traditional bankruptcy sales, Oncor is not a "melting ice cube" that needs to be sold at this time before significant value is impaired.  To the contrary, Oncor is the largest transmission and distribution utility in Texas and, in the Debtors' own words, is "supported by critical T&D operations and stable, predictable cash flows."  (Teaser at 3.)  Based upon the Debtors' schedules, TCEH is currently the largest unsecured creditor of EFH Corp.[14]  As a result, TCEH has the most to lose if there is any drop in the value the Debtors expect to receive for the Oncor assets and, thus, TCEH creditors' views on the timing of the sale should be given considerable weight.  In any event, there are simply no exigencies requiring the Debtors' to sell their indirect interest in Oncor and

---

[14] Schedule F to the EFH Corp. Schedules of Asset and Liabilities reflects an "Intercompany Payable" in favor of "Texas Competitive Holdings Company LLC" in the amount of $773,729,458.98.  (*See* Docket No. 1237, Sch. F.)

certainly no financial need to sell the assets before the consequences of a tax-free spinoff of TCEH can be fully analyzed and plan discussions have commenced.[15]

### D.    The Debtors' Proposed Bidding Procedures Are Not Fair and Reasonable

38.    Generally stated, bidding procedures in the context of bankruptcy sales should enhance competitive bidding.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests.").  Courts have recognized that "the purpose of procedural bidding orders is to facilitate an *open and fair public sale* that is designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (emphasis added).  In addition, court-approved bid procedures must provide, among other things, for a fair and efficient resolution of a debtor's bankruptcy, and they must also be fair and reasonable for all of the parties.  *See In re American Safety Razor Company, LLC* (Bankr. D. Del. Sept. 30, 2010) (Case No. 10-12351) (MFW), Tr. at 132-33 ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule.  I need not accept the debtors' business judgment with respect to process.  The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters for the debtor – for the Court's determination as to what is fair and reasonable.  In fact, I think that's my only role in this case: to determine what is fair for all the parties.").

---

[15] Indeed, the Debtors' treasurer has indicated that the Debtors receive regular indications of interest for Oncor. Horton Dep. at 75:3-15 ("Q: Are you aware of any instance prior to the petition date in which any potential acquirer came forward to seek to buy some or all of the Oncor stake?  Horton: There have been lots of conversations over the years about selling Oncor, spinning off Oncor.  We got that question continuously as part of the investor relations dialogue, and the answer was we at that point in time had figured out no way where it was economic to lock in the value of Oncor due to the tax leakage.").

39.     If the Court is inclined to approve the Bidding Procedures, then, at a minimum, certain material modifications must be made to the procedures.  Rather than facilitating an "open and fair public sale" that will "enhance competitive bidding," the Debtors have constructed the Bidding Procedures in a manner largely out of public view that will chill bidding.  In addition, the Bidding Procedures give the Debtors unreasonable discretion to evaluate bids and make changes to the Bidding Procedures without any approval or oversight by creditors or the Court.

1.      **The Bidding Procedures Should Be Modified to Provide More Transparency During the Stalking Horse Bidding Process**

40.     First, as drafted, the Bidding Procedures improperly allow the Debtors to conduct a private Stalking Horse Bidding Process without creditor consultation, analysis, or input. Indeed, the Debtors attempt to justify the private nature of the Stalking Horse Bidding Process by arguing that potential bidders are "public companies that are concerned with the potential negative consequence of making public bids, including triggering public disclosure requirements and the effect on the trading prices of their securities" and "many of the likely participants in the Debtors' process expect that this process will be sealed, too."  (Mot. ¶¶ 32-33.)  However, if the Debtors are permitted to market these assets at this time, the Committee does not support a closed Stalking Horse Bidding Process whereby the statutory Committee will be shut out of the process until it may be too late for the Debtors and bidders to consider alternatives.

41.     The Debtors' attempt to remedy the lack of disclosure and transparency during the Stalking Horse Bidding Process by promising to "meet with each of the Debtors' major creditor groups at the conclusion of the Stalking Horse Bidding Process and provide a summary of the bid history on a no-names basis," is unavailing.  (Mot. ¶ 34.)  By the time the Debtors communicate with creditors regarding the bids made during the Stalking Horse Process, the Debtors will have spent several months with the bids and bidders and, at that point, will have a

24

stalking horse agreement in hand and publicly filed.  Giving creditors a summary of the bid history at that stage will be futile because it may be too late for creditors to do anything with the information.

42.    The fallacy in the Debtors' approach is further highlighted by the fact that it is the Stalking Horse Bidding Process—and not the Open Bidding Process—that will likely be the "main event" where most of the competitive bidding will take place.  (*See* Kurtz Decl. ¶ 8.) ("[I]n this particular industry strategic bidders may not be willing to attempt to outbid each other after announcement of a stalking horse bidder . . . .").  As the Debtors point out in the Bidding Procedures Motion, potential bidders for the Debtors' indirect interest in Oncor will likely only participate in a closed auction.  Moreover, assuming the Stalking Horse Bidding Process is conducted properly (which, again, nobody outside of the Debtors will know for certain), interested bidders will have already made their highest and best bid as part of that process and would have little reason to participate in the subsequent Open Bidding Process.  Thus, the Debtors' offer to consult with the Reviewing Parties, including the Committee, during the Open Bidding Process is completely illusory and puts creditors at a significant informational disadvantage.  In essence, the Bidding Procedures seek approval for the Debtors to conduct a marketing process for what could be a $20 billion asset outside of the purview of the Court and without the input of *any* other party in interest.

43.    In sum, if the Debtors are given authority to proceed with a sale process, this sale should not be treated any differently than other bankruptcy sales where key creditors are given real-time access to information regarding the bidding process and the Debtors' selection of bidders.  At a minimum, the Committee, as an independent fiduciary for TCEH creditors, should be brought into the fold on a confidential basis as early as possible, particularly in light of the fact that the Debtors have clearly stated their preference for a transaction that is tax-free, which

will ultimately require TCEH creditor consensus.  In addition, the Committee must be permitted to communicate with potential bidders to ensure that the interests of creditors of the TCEH Entities are being considered and protected.

### 2.    The Sale Timeline Is Unreasonable and Will Limit Competitive Bidding

44.    Second, the deadlines imposed by the Bidding Procedures are unreasonably short and do not give potential bidders sufficient time to conduct due diligence and to submit competing bids that could include an alternative transaction structure.  As currently structured, the Bidding Procedures provide Round 1 Bidders with only six calendar days after the hearing on the proposed Bidding Procedures to prepare a Round 1 Bid that must, among other things, include a description of "whether it is intended to be structured in a tax-free manner or the extent of any incremental tax liabilities to be incurred by the Debtors under the Bid."  (Bidding Procedures §§ E.1.d., G.)  Thereafter, the Debtors will only have a maximum of two weeks to analyze proposed alternative transaction structures and give Round 2 Bidders sufficient time to submit an initial marked version of the Round 2 Bid Documentation due to the Debtors' professionals on November 7, 2014.  (*Id.* § H.)  Particularly in the absence of any suggestion that the Debtors would be harmed by a longer Stalking Horse Bidding Process, the Committee submits that the Debtors have, at present, failed to meet their burden on the timing of the proposed sale.[16]

---

[16] Hiltz Dep. at 352:4-15 ("Q: And so if a bid comes in with a different tax structure that is proposed under the efficient tax structures you have described, [the] Debtors would have to evaluate whether to let that to go to round two within a couple of days, is that your testimony?  Hiltz:  Well, what I said was it will probably be a couple of days.  I said if there are complex bids it could conceivably take longer and obviously if there was some very unusual tax structure, that would be one of the circumstances under which it might take longer.").

ny-1159164

3.    **The Bidding Procedures Improperly Provide the Debtors with Unfettered Discretion to Consider Any Factors and Amend the Bidding Procedures Without Notice**

45.    The Bidding Procedures permit the Debtors to undertake an auction process with virtually no limitations.  The Bidding Procedures lists out the "Bid Criteria" that the Debtors may consider in evaluating Bids "for any purpose under these Bidding Procedures."  (Bidding Procedures § N.)  In addition to taking into account, among other things, "Consideration and Value," "Likelihood of Closing," and "Tax Implications," the Debtors would also be permitted to consider "Other Factors" that they determine, in their sole discretion, are "relevant."  Given the importance of the sale process to the ultimate restructuring of both EFH/EFIH and the TCEH Entities, the Bidding Procedures must be modified to provide that the Debtors are required to consult with the Committee regarding any "Other Factors" they determine are relevant when selecting a Bid and describe in reasonable detail the basis for such factors.

46.    In addition, the "Reservation of Rights" provision of the Bidding Procedures gives the Debtors the unqualified ability to modify the Bidding Procedures without Court approval or notice to any party.  (Bidding Procedures § Q.)  As a result of this broad reservation, the Debtors are permitted, without notice to any party or the Court, to modify the Bidding Procedures and effectively change the rules of the road.[17]  The Bidding Procedures should be modified to provide that Debtors must obtain the Committee's consent or further order of the Court before modifications under this Paragraph Q are instituted.

---

[17] Hiltz Dep. at 348:14-17 ("Q: The Debtors would not have to go back to the court for approval of those changes to make those changes; is that correct?  Hiltz:  That's correct.  Q: And there's nothing that would require the Debtors to disclose any such changes in the bidding procedures, correct?  Hiltz: Correct.  Q: For example, the bid procedures for choosing a stalking horse could change; is that correct?  Hiltz.  They could.").

ny-1159164

**IV.    CONCLUSION**

47.    For the reasons discussed herein, the Bidding Procedures as proposed must be denied or, failing that, the Debtors should be compelled to modify the Bidding Procedures to as set forth herein.

**V.    RESERVATION OF RIGHTS**

48.    The Committee expressly reserves its right to assert, amend, modify, or supplement any objection to the Bidding Procedures, the Stalking Horse Bidding Process, the Open Bidding Process, or the Auction and to seek discovery and/or present evidence at any hearing in connection with the foregoing.

28

Dated: Wilmington, Delaware
      October 10, 2014

**MORRISON & FOERSTER LLP**
James M. Peck
Brett H. Miller
Lorenzo Marinuzzi
Todd M. Goren
Daniel J. Harris
250 West 55th Street
New York, New York 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:      jpeck@mofo.com
             brettmiller@mofo.com
             lmarinuzzi@mofo.com
             tgoren@mofo.com
             dharris@mofo.com

      -and-

*/s/ Christopher A. Ward*
**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile:  (302) 252-0921
E-mail:      cward@polsinelli.com
             jedelson@polsinelli.com
             skatona@polsinelli.com

*Attorneys for The Official*
*Committee of Unsecured Creditors*