**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Energy Future Holdings Corp., *et al.,*[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 2087** |

**DECLARATION OF CHARLES L. KERR  IN SUPPORT OF OPPOSITION TO
MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.,* FOR ENTRY OF AN
ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN
AUCTION AND RELATED DEADLINES AND HEARINGS, AND
(C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

I, Charles L. Kerr, declare under penalty of perjury:

1.      I am a member of Morrison & Foerster LLP ("**Morrison & Foerster**"), counsel for the Official Committee of Unsecured Creditors of Energy Future Competitive Holdings Company LLC ("**EFCH**"), EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC, and their direct and indirect subsidiaries, and EFH Corporate Services Company (the "**Committee**").  I am duly authorized to make this declaration on behalf of Morrison & Foerster and in support of the Committee's objection (the "**Objection**") to the *Motion of Energy Future Holdings Corp.,* et al*., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [Docket No. 2087].

2.      Attached are true and correct copies of the following documents relied upon or cited to in the Objection:

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

(a)     The documents produced as bates numbers EFH-EVR090000013-25, annexed hereto as <u>Exhibit 1</u>.   These documents were designated as "Confidential" under the terms of the Confidentiality Agreement and Stipulated Protective Order, dated August 13, 2014 [Docket No. 1833] (the "**Protective Order**");

(b)     The documents produced as bates numbers EFH90009231-2, annexed hereto as <u>Exhibit 2</u>.   These documents were designated as "Highly Confidential" under the terms of the Protective Order;

(c)     Select pages from the Deposition Transcript of William O. Hiltz, dated October 6, 2014, annexed hereto as <u>Exhibit 3</u>;

(d)     Select pages from the Deposition Transcript of Anthony Horton, dated October 7, 2014, annexed hereto as <u>Exhibit 4</u>;

(e)     Select pages from the Deposition Transcript of Paul M. Keglevic, dated October 3, 2014, annexed hereto as <u>Exhibit 5</u>; and

(f)     Select pages from the Deposition Transcript of Hugh Sawyer, dated October 8, 2014, annexed hereto as <u>Exhibit 6</u>.

3.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 10, 2014                    /s/ Charles L. Kerr
       New York, New York                  Charles L. Kerr

# Exhibit 1

**Redacted Pursuant to Protective Order**

## Exhibit 2

**Redacted Pursuant to Protective Order**

## Exhibit 3

1      CONFIDENTIAL - WILLIAM O. HILTZ

2  UNITED STATES BANKRUPTCY COURT

3  FOR THE DISTRICT OF DELAWARE

   -----------------------------------------x

4  In Re:

   Energy Future Holdings Corporation, et.,

5

                    Debtors.

6

   Chapter 11

7  Case No. 14-10979

   Jointly Administered

8

9  -----------------------------------------x

10          * * *CONFIDENTIAL* * *

11       DEPOSITION OF WILLIAM O. HILTZ

12            New York, New York

13            October 6, 2014

14

15

16

17

18

19

20

21

22

23  Reported by:

24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25  JOB NO. 85363

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    specific with respect to the content of the

3    conversation.

4          Again, we attempted to call everyone

5    once we had made a decision to change the

6    process, so I believe those calls started

7    perhaps late the week before Labor Day or early

8    the week following Labor Day.  I can't recall if

9    those calls merely stated that we were giving

10   people more time and were going to a two-stage

11   process or whether it also referenced a

12   willingness to accept taxable bids.

13        Q.    So, sitting here today, you have no

14   knowledge of a communication, prior to September

15   19, a specific knowledge of a specific

16   communication informing prospective bidders that

17   the Debtors would accept bids in any form?

18        A.    That's correct.

19              (Hiltz Exhibit 14, an e-mail with

20        attachment bearing Bates Nos.

21        EFH-EVR090001062 through 1167, marked for

22        identification, as of this date.)

23   BY MR. DEVORE:

24        Q.    Mr. Hiltz, I have handed you what has

25   been marked as Exhibit 14, which is an e-mail

1          CONFIDENTIAL - WILLIAM O. HILTZ

2  an E side soon-to-be-in-existence asset?

3      A.    Uh-huh.

4      Q.    How is it that the T side is impacted

5  one way or the other in this auction, assuming

6  that the T side has no claims against the E

7  side?

8      A.    To the extent that the plan of

9  reorganization is partially dependent upon the

10 sale of the asset, then the reorganization of

11 the T side creditors is impacted.

12     Q.    Because I can't get to a

13 reorganization without the E side asset being

14 sold?

15     A.    Without the E side also reorganizing

16 an overall plan.

17     Q.    Okay.

18     A.    Whether that can be accomplished

19 without the sale of the asset, I don't know.

20     Q.    Well, could it be accomplished without

21 a sale of EFH --

22     A.    I don't know.

23     Q.    -- reorganized equity?

24         MS. O'CONNOR:  Object to form.

25     A.    Theoretically.

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     A.     Oh, the numbering is at the top.

3 Sorry.

4     Q.     I apologize.

5     A.     I was looking at the number on the

6 bottom.

7            Yes.

8     Q.     And he asked you questions about the

9 fact that, under this proposed order, once the

10 order is entered, the Debtors are authorized, in

11 certain circumstances, to change or modify the

12 bidding procedures?

13     A.     That's correct.

14     Q.     The Debtors would not have to go back

15 to the court for approval of those changes to

16 make those changes; is that correct?

17     A.     That's correct.

18     Q.     And there's nothing that would require

19 the Debtors to disclose any such changes in the

20 bidding procedures; is that correct?

21     A.     Correct.

22     Q.     For example, the bid procedures for

23 choosing a stalking horse could change; is that

24 correct?

25     A.     They could.

1          CONFIDENTIAL - WILLIAM O. HILTZ

2      A.    My understanding is for quite a while,

3  but I don't know the exact timeframe.

4      Q.    And so if a bid comes in with a

5  different tax structure than is proposed under

6  the efficient tax structures you have described,

7  the Debtors would have to evaluate whether to

8  let that go on to Round 2 within a couple of

9  days; is that your testimony?

10     A.    Well, what I said was it will probably

11  be a couple of days.  I said if there are

12  complex bids, it could conceivably take longer,

13  and obviously, if there was some very unusual

14  tax structure, that would be one of the

15  circumstances under which it might take longer.

16     Q.    Under the bid procedures, however, the

17  Debtors have to determine who should go to Round

18  2 by what date?

19     A.    There's no specific date specified.

20     Q.    Under the bid procedures, again, I'll

21  refer to you page 14 of 24, the Round 2 bidders

22  must substantially submit a final draft of their

23  Round 2 bid documentation by November 21, 2014,

24  correct?

25     A.    I'm sorry, what --

## Exhibit 4

Page 1

1

2    IN THE UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

4    Chapter 11

5    Case No. 14-10979 (CSS)

6    ----------------------------------x

7    In Re:

8       ENERGY FUTURE HOLDINGS CORP., et al.,

9                        Debtors.

      ----------------------------------x

10                       October 7, 2014

11                       9:34 a.m.

12

13        Videotaped Deposition of ANTHONY

14    HORTON, pursuant to Notice, held at the

15    offices of Ropes & Gray LLP, 1211 Avenue

16    of the Americas, New York, New York,

17    before Todd DeSimone, a Registered

18    Professional Reporter and Notary Public of

19    the State of New York.

20

21

22

23

24

25

1                      HORTON
2       Q.        And you said you were reviewing
3    Evercore and Kirkland's development of
4    those procedures?
5       A.        That's correct.
6       Q.        Did you participate in any
7    board meetings regarding these procedures?
8       A.        I listened in to all the board
9    meetings, or I attended all the board
10   meetings, as these were being developed.
11   There were at least a couple of board
12   meetings that I recall discussing the path
13   of whether we should go through -- go down
14   this path of these bidding procedures,
15   this timeline.
16      Q.        Do you recall any board votes?
17      A.        There were no board votes that
18   I recall.
19      Q.        Do you recall whether those
20   were board meetings of EFH?
21      A.        My view was it was an EFH board
22   meeting.  It had members of the TCH board
23   present, for example, the independent
24   director of TCH, the independent director
25   of EFIH.

1                    HORTON

2        Q.        Have you ever talked to any of

3    the bidders about conducting a transaction

4    at EFIH?

5        A.        I think I have had brief

6    conversations, but it has been very brief,

7    very high level, very superficial.  I

8    think the bidders at this point in time

9    are continuing to do their homework and

10   their due diligence.  There have been

11   several tax calls amongst the tax experts

12   at both the bidders and the company.

13       Q.        Have you ever discussed the

14   tax-free spin structure with the bidders

15   in your conversations?

16       A.        That conversation has occurred.

17       Q.        Have you ever discussed a

18   taxable structure in your conversations

19   with the bidders?

20       A.        After the filing of the motion

21   we had Evercore reach out to the potential

22   bidders and explain to them that any

23   structure that they feel like brings more

24   value to the estate, they feel like that

25   brings more value to their bid, is

```
 1                    HORTON
 2   acceptable.
 3       Q.        And that's more value in your
 4   mind to the overall estates together; is
 5   that correct?
 6       A.        More value of however you guys
 7   want to define that, however they want to
 8   define it.  We have given them full
 9   latitude, bring us a transaction that you
10   feel brings a higher price, higher value,
11   for the sale or the buy -- excuse me, for
12   the acquisition of the E assets, whether
13   it is at EFIH, if it is at Oncor Holdings,
14   if it is at restructured E.  If it brings
15   a higher price and higher value to the
16   estate, please bring it to us.
17       Q.        Attached to the bidding
18   procedures is a term sheet for a
19   transaction; is that right?
20       A.        That's correct.
21       Q.        And that's for a tax-free
22   transaction; is that correct?
23       A.        That's correct.
24       Q.        Has the company ever
25   disseminated a term sheet to any potential
```

1                          HORTON
2       A.        I'm not aware of any.
3       Q.        Are you aware of any instance
4    prior to the petition date in which any
5    potential acquirer came forward to seek to
6    buy some or all of the Oncor stake?
7       A.        There have been lots of
8    conversations over the years about selling
9    Oncor, spinning off Oncor.  We got that
10   question continuously as part of the
11   investor relations dialogue, and the
12   answer was we at that point in time had
13   figured out no way where it was economic
14   to lock in the value of Oncor due to the
15   tax leakage.
16      Q.        Let me go back -- thank you for
17   that.  Let me go back to more specifically
18   my question.
19                Had any potential acquirer ever
20   approached EFIH to purchase some or all of
21   the Oncor stake?
22      A.        I don't know off the top of my
23   head.  We could find that out for you.
24      Q.        Now, let's go to -- you
25   testified before with respect to I think

```
 1                    HORTON
 2  form.
 3      A.      I would ask you -- that's a
 4  conversation that the general counsel, the
 5  chairman of the board, the corporate
 6  secretary, they would have to answer that
 7  question.
 8      Q.      Just, first of all, if you
 9  could answer yes or no, do you recall
10  there being a discussion at either of the
11  board meetings as to whether a vote should
12  be taken?
13      A.      Yes.
14      Q.      And what was the explanation
15  given?
16      A.      There wasn't a question as why.
17  The question was do we need to take a
18  vote, and the answer was no.
19      Q.      And who answered that?
20      A.      Ms. Dore.
21      Q.      And was there any explanation
22  as to why she said no?
23      A.      No.
24      Q.      Was there any discussion at
25  either of those board meetings where a
```

## Exhibit 5

CONFIDENTIAL

Page 1

1            PAUL KEGLEVIC

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

     -----------------------------------------x

4    In Re:

     Energy Future Holdings Corporation, et.,

5

                    Debtors.

6

     Chapter 11

7    Case No. 14-10979

     Jointly Administered

8

9    -----------------------------------------x

10         DEPOSITION OF PAUL M. KEGLEVIC

11              New York, New York

12              October 3, 2014

13

14         **  CONFIDENTIAL  **

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 85349

CONFIDENTIAL

1                        PAUL KEGLEVIC

2        A.     Correct.

3        Q.     And as chief restructuring officer,

4   you're the person responsible for making the

5   day-to-day decisions regarding the bankruptcy

6   and the restructuring along with your advisors,

7   correct?

8        A.     Yes.  Significant decisions we consult

9   with the board on, but I think it's fair to say

10  on a lot of the day-to-day more insignificant

11  matters we make the decisions.

12       Q.     Right.  Some decisions you might have

13  to take to the board for a vote, correct?

14       A.     A vote or advisement.

15       Q.     But you're the guy in charge of the

16  bankruptcy, correct?

17              MR. McKANE:  Objection to form.

18       A.     I don't look at it that way.  I mean,

19  Ms. Doré and I are "co's," and at the end of the

20  day, we report to our board, so I think they're

21  in charge.

22       Q.     But with respect to the bid procedure

23  motions that we're talking about today, no board

24  vote was taken at any of the Debtor entities,

25  correct?

CONFIDENTIAL

1                    PAUL KEGLEVIC

2       A.     That's correct, although I would tell

3  you there was substantial involvement and

4  advisement before we filed.

5       Q.     Okay.  With respect to the various

6  boards, you have testified earlier about those

7  boards and the independent directors, Mr. Sawyer

8  and Mr. Kremins, correct?

9       A.     I did.

10      Q.     Did you have any personal one-on-one

11 conversations with Mr. Sawyer regarding the bid

12 procedure motion at any time from the point that

13 the NextEra bid was withdrawn and the filing of

14 the motion?

15      A.     I made, with Ms. Doré and with our

16 counsel and advisors, several presentations to

17 the board in which Mr. Sawyer asked questions.

18 Some of them were specifically of me.  But

19 outside of the board meetings, I did not have

20 any specific discussions with Mr. Sawyer.

21      Q.     Okay.  You testified that at some

22 point during the process the company decided

23 that it would no longer limit the marketing to a

24 transaction that would result in a tax re-spin

25 and a double deconsolidation; do you recall

CONFIDENTIAL

1                    PAUL KEGLEVIC

2    it's documented.

3              So I would include EFH, EFIH, EFCH,

4    TCEH, EFIH finance and TCEH finance.  There may

5    have been more boards, but those are the ones

6    that I have recollections of that we

7    specifically -- because there was a vote around

8    the termination of the RSA, so there was

9    actually those boards were called and there was

10   a vote.

11      Q.    Okay.  So, just so I'm clear, were any

12   of the boards below TCEH, that is, TCEH, the

13   entity, consulted with respect to whether or not

14   to support the bid procedures motion?

15      A.    I don't believe so.

16      Q.    Okay.  And just so we're clear, when

17   we talk about taxes and generation of NOLs and

18   anything else, where does all the tax activity

19   occur on the T side?

20              MR. McKANE:  Objection to form.

21      Q.    Where are taxes incurred?

22              MR. McKANE:  Overbroad.

23      A.    Well, every entity on the -- below

24   TCEH has either income or expense, unless it's

25   a -- there may be some entities that have no

CONFIDENTIAL

1              PAUL KEGLEVIC

2      Q.     Have you had any discussions with

3  anyone as to whether that preferred deal

4  structure will maximize value to TCH?

5      A.     I have not.

6      Q.     You haven't spoken about that with Mr.

7  Sawyer?

8      A.     I think Mr. Sawyer is aware that

9  there's a, you know, that this form of

10 transaction causes no tax to be incurred, but we

11 never -- he's seen some analysis of the former

12 NextEra bid, which effectively was in that

13 structure and what that resulted in, but the

14 fact that we opened up the bidding process, we

15 want to see what others look like and then we

16 will decide whose is the best.

17           So he saw that versus the PIKs, that

18 type of information, but you know, we're not --

19 we've never been in a position to say this is

20 the maximum one since we picked the PIK

21 structure way back when.

22           (Keglevic Exhibit 13, Presentation

23      bearing Bates Nos. EFH90009346 through 9359,

24      marked for identification, as of this date.)

25 BY MR. LAWRENCE:

## **Exhibit 6**

1          CONFIDENTIAL - HUGH SAWYER

2         UNITED STATES BANKRUPTCY COURT

3          FOR THE DISTRICT OF DELAWARE

4    -------------------------------X

     In Re:

5

     ENERGY FUTURE HOLDINGS

6    CORPORATION, et al.,

7                  Debtors.

8    Chapter 11

     Case No. 14-0979

9    Jointly Administered

     -------------------------------X

10

11

12      *** C O N F I D E N T I A L ***

13

14       VIDEOTAPED DEPOSITION

15              OF

16          HUGH SAWYER

17     Wednesday, October 8, 2014

18        Seven Times Square

19         New York, New York

20

21

22   Reported by:

     AYLETTE GONZALEZ, RPR, CLR, CCR

23   JOB NO. 85457

24

25

1      CONFIDENTIAL - HUGH SAWYER

2   the perspective of T-side creditors.

3      Q.   Well, my question is:  Did you ask

4   any questions relating to this Motion?

5      A.   The discussions that we had at the

6   time related to the process, not the specific

7   Motion.  And we discussed the effort underway

8   by Evercore and by Kirkland to move this

9   process forward -- the bidding process forward

10  in order to take advantage of market

11  conditions and momentum.  And to the extent

12  possible, to identify a value enhancing

13  transaction.

14     Q.   But did you -- did you ask for any

15  analysis on what the impact would be on T-side

16  creditors if the transactions contemplated by

17  the Motion were effective?

18        MS. O'CONNOR:  Object to form.

19     A.   I did not and my business judgment,

20  it's early.  We don't -- we don't have a

21  transaction.  We don't have a plan of

22  reorganization.  All we have before us are

23  bidding procedures.

24     Q.   Well, tell me from the perspective

25  of the representative of T-side creditors how

1          CONFIDENTIAL - HUGH SAWYER

2    termination of the RSA?

3          A.   As best as I can remember.

4          Q.   And did the TCEH board vote on

5    launching a marketing process?

6          A.   The TCEH board, along with the EFH

7    board deliberated the process that was

8    described by Evercore, but we did not vote it.

9          Q.   When you say, deliberate the

10   process, tell me as best you can remember

11   specifically what took place.

12         A.   At the board level?

13         Q.   Sure.

14         A.   Just a general description of the

15   two-step, two-stage process to identify a

16   stalking horse and then open bidding

17   thereafter.

18         Q.   And so that was described to you by

19   professionals?

20         A.   Yes.

21         Q.   And then you say there were

22   deliberations.  What were the nature of those

23   deliberations?

24         A.   Basic discussions around how broad

25   the contact base would be.  How long we

1          CONFIDENTIAL - HUGH SAWYER

2   the T-side debtors against EFH?

3          A.   I have not.

4          Q.   And since the termination of the

5   RSA, have you asked anyone to conduct for you

6   a new or further investigation into potential

7   claims by the T-side debtors against Oncor?

8          A.   I have not.

9          Q.   Let me go back.  Let me change the

10  topic again, Mr. Sawyer.  Just again talking

11  about the dealings with Evercore, I don't

12  think this was asked of you.  I want to make

13  sure I got your understanding.

14              Did the EFCH and TCH boards ever

15  meet separately with just Evercore to discuss

16  the bidding procedures?

17         A.   No, not that I recall.

18         Q.   Did you ever personally meet

19  separately with Evercore to discuss the

20  bidding procedures?

21         A.   Not that I recall.

22         Q.   Did Evercore ever advise the boards

23  that with respect to the bidding procedures

24  the interest of the E-side debtors and the

25  T-side debtors were identical?