**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| *Debtors.* | (Jointly Administered) |
| | **Re:  D.I. 2087** |

**OBJECTION OF DELAWARE TRUST COMPANY,
AS INDENTURE TRUSTEE, TO DEBTORS' MOTION
FOR APPROVAL OF BIDDING PROCEDURES**

**ROPES & GRAY LLP**
Keith H. Wofford
Mark R. Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704

D. Ross Martin
Andrew G. Devore
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600

**COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, P.A.**
Norman L. Pernick (DE 2290)
J. Kate Stickles (DE 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801

Warren A. Usatine
25 Main Street, P.O. Box 800
Hackensack, NJ 07602

**DRINKER BIDDLE & REATH LLP**
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714

*Counsel for Delaware Trust Company,
as successor indenture trustee*

TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ........................................................................................... 1

**ARGUMENT** ....................................................................................................................... 3

I.   THE BIDDING PROCEDURES MOTION SEEKS FAR MORE THAN PROCEDURAL
     RELIEF; IT SEEKS TO VALIDATE A PROCESS THAT HAS EFFECTIVELY
     CONCLUDED, EXCLUDING CREDITOR INPUT AND ACCESS, AND
     PREDETERMINING THE FORM OF A TRANSACTION ...................................................... 4

    A.   The Debtors Exclusively Demanded a Particular Structure During Months of
          Contact with Bidders, Until the Time the Motion Was Filed, and then Proclaimed
          They Wanted the Nontaxable Structure. ............................................................... 5

    B.   The Debtors Have Done Nothing Meaningful to Solicit Alternative Structures,
          and the Debtors Are Immediately Winnowing Out Bids, Not Seeking to Bring
          More Into the Process. .......................................................................................... 6

    C.   The Debtors Are Precluding Bidders from Speaking with Creditors, Preventing
          Any Real Interest by Bidders in Alternative Structures ......................................... 7

    D.   A 30-Day Open Auction Window Is Insufficient for Later Creditor Involvement. 8

II.  THERE ARE THREE INTERWOVEN, MULTI-BILLION DOLLAR CONFLICTS THAT
     MUST BE CONSIDERED IN ANY SALE PROCESS FOR EFIH'S INTERESTS IN
     ONCOR ........................................................................................................................... 9

    A.   There Are Two Fundamental Deal Structures for the Disposition of the Oncor
          Asset: A "Nontaxable" Post-Reorganization Equity Deal at EFH or a "Taxable"
          Asset Deal at the EFIH Level. ............................................................................... 9

    B.   The Price Many Buyers Would Pay in the EFIH Structure Is $2 Billion Higher
          than the EFH Structure .......................................................................................... 10

    C.   An EFIH Deal Would be a "Taxable Deal," But Only Leading to Tax at EFH,
          With at Best Some Risk of Intercompany Claims at the EFIH Level. ................. 11

    D.   The Proposed EFH-Level Transaction Only Matters In Situations Where the
          TCEH First Lien Lenders Consent to the Tax-Free Spin, Setting Up a Situation
          that Could Divert Significant Proceeds for an EFIH Asset Away from EFIH
          Creditors ................................................................................................................ 12

III. THE DEBTORS' MANAGEMENT, INDEPENDENT DIRECTORS, AND FINANCIAL
     ADVISORS HAVE IGNORED – NOT BALANCED – THE MULTI-BILLION DOLLAR
     CONFLICTS OF INTEREST IN ANY ONCOR SALE PROCESS ................................... 13

    A.   Mr. Paul Keglevic, Chief Financial Officer of EFIH (and EFH) and Co-Chief
          Restructuring Officer of EFIH (and EFH) . .......................................................... 13

    B.   Mr. William Hiltz, Lead Financial Advisor for the Bidding Procedures ............. 14

    C.   Mr. Charles Cremens, Sole Independent Director of EFIH ................................. 15

    D.   Mr. Anthony Horton, Treasurer of EFIH (and EFH) .......................................... 18

    E.   Mr. Hugh Sawyer, Independent Director of TCEH ............................................. 20

F.     The Complete Lack of Proper Corporate Approvals of the Bidding Procedures Call for Creditor Participation in Any Go-Forward Process. ............................... 22

IV.  THE REQUESTED RELIEF IS ALSO ADVISORY BECAUSE THE DEBTORS SEEK ADVANCE APPROVAL FOR ANY CHANGE TO THE PROCEDURES, IN THEIR SOLE DISCRETION ......................................................................................................... 22

V.   SPECIFIC REMEDIES ARE NEEDED TO PREVENT THE PROCESS FROM WASTING SIX MONTHS AND LEADING TO A PREORDAINED OUTCOME ............................. 25

A.     There Must Be Information Sharing with Creditors, and Consultation with Creditors Regarding Bids, and there Is No Showing of Incremental Risk to the Debtors. ............................................................................................................. 26

B.     The Debtors Cannot be Permitted to Eliminate Bidders After Round 1 .............. 27

C.     The Order Must Permit Bidders that Desire to Speak with Creditors to Do So, Notwithstanding any Confidentiality Agreements ................................................ 27

D.     The Duration and Timing of the Open Auction Process and Bidding Protections Must Be Determined on Separate Motion After Selection of a Proposed Stalking Horse. .................................................................................................................. 28

E.     The Break-Up Fee for Any Non-Taxable Transaction Through Post-Reorganized EFH Equity Must Be Payable by EFH, Not EFIH ................................................. 28

F.     The Order Should Require Bids to Be Submitted With Both an EFIH-Level Transaction Price (Including Faster Process) and an EFH-Level Transaction Price. .............................................................................................................................. 29

G.     The Order Should Not Permit the Debtors to Alter Any of the Procedures in Their Sole Discretion ..................................................................................................... 29

H.     The Order Should Preserve the Rights of all Parties to Challenge the Selection of the Stalking Horse Bidder. ................................................................................... 29

I.     Delaware Trust Must be Included as a Reviewing Party. ..................................... 30

J.     Clarity as to Transaction Consideration. ............................................................. 30

Delaware Trust Company ("Delaware Trust"), as Indenture Trustee (the "10% Indenture Trustee") for the 10% Senior Secured Notes Due 2020 (the "EFIH First Lien 10% Notes") issued by Energy Future Intermediate Holdings LLC ("EFIH") and EFIH Finance Inc. ("EFIH Finance," and together with EFIH, the "EFIH Debtors") under the Indenture dated as of August 17, 2010 (together with all supplements, amendments, and exhibits, the "10% Indenture"), by and through its undersigned counsel, hereby objects to the *Motion of Energy Future Holdings Corp., et al. for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving Form and Manner of Notice Thereof* [D.I. 2087] (the "Bidding Procedures Motion" or "Motion").  In support thereof, the 10% Indenture Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Bidding Procedures Motion tries to cloak itself as seeking procedural relief.  It does far more.  What it seeks are two things:  (i) confirmation and ratification from this Court of a marketing process that will end just six days after the October 17 hearing and has been ongoing for nearly three months in a manner rife with conflicts and no intercession by estate fiduciaries, and (ii) go-forward approval from this Court for EFIH to participate in the arrangement of a proposed $18 billion (or more) transaction without any regard for the specific interests of EFIH creditors.

2. There is no dispute about which debtor owns this asset.  All agree that the proposed transaction involves one particular asset – the 80% indirect interest in non-debtor Oncor – owned by one particular debtor in these cases – EFIH.  Yet, the Debtors (plural) have pursued a strategy designed to secure a particular possible benefit for EFH (a benefit that will be useful only if a certain contingency comes to pass), without regard to the possible detriment to

1

EFIH, or alternative structures that could specifically benefit EFIH with billions of dollars more of purchase price.

3.    Delaware Trust has three direct interests in a process to sell the Oncor asset, which it would generally support with the correct procedures. *First*, the maximization of sale proceeds at EFIH, the owner of the asset to be sold, will create a better environment for the resolution of disputed claims at EFIH and thus naturally increases the chances for a consensual plan on the "E-side," preferably with a plan on the T-side but without it if necessary or appropriate. *Second*, and relatedly, the Debtors' proposed transaction (and any transaction at the EFH level) presents a substantial risk that sale proceeds from EFIH's asset will be diverted to the estates of other Debtors. *Third*, while Delaware Trust believes that the holders of the EFIH First Lien 10% Notes are entitled to a make-whole payment in any event in light of EFIH's redemption of those notes at the outset of these Chapter 11 cases, it is possible that this entitlement will depend of EFIH's solvency. And, while Delaware Trust also believes that EFIH's solvency is clear, the Debtors may dispute that assertion especially if value for EFIH's assets – its 80% interest in Oncor – is attributed to other Debtors. Simply put, the level of bids and the tax structure of the transaction could implicate EFIH's solvency, unless all amounts funded by a purchaser are attributable to EFIH, since it owns the asset being sold.

4.    To be clear, Delaware Trust is not at this point taking a definitive position as to whether a taxable or non-taxable transaction will maximize the value for the EFIH estate. Two things are clear: (i) that in many of the potential paths of this case, the taxable transaction could be better for EFIH, and (ii) neither EFIH nor the Debtors are doing anything, and will not do anything, to actively explore and encourage bids in that form. Their conduct to date has been to pre-bake the market for one specific kind of transaction, and then only to make general

statements that they will take any form of bid, while frustrating creditor attempts to facilitate other forms of bids for obvious contingencies, such as the T-side of the case not coming to a consensual resolution.  The evidence shows an advanced stage of the marketing process together with an announced and constantly reiterated Debtors' preference for non-taxable EFH-level bids.

5.      The Debtors say that creditors can register their complaints later.  This case does not need another six-month period of a Debtor-proposed process with little, if any, creditor support.  The proper course of action is a set of specific remedies that ensures EFIH creditor involvement in the process on a carefully controlled basis.  Alternatively, the Court could enter an order providing that, whether generally or solely for purposes of the EFIH First Lien Notes make-whole litigation, all E-side transaction value paid to any recipient is deemed value of the Oncor Holdings equity, which is the EFIH economic asset (and collateral of Delaware Trust) being sold.

## ARGUMENT

6.      At least one court in this District has held that debtors are not entitled to deference in seeking approval of bidding procedures based on any assertion of business judgment.  Instead, the Bankruptcy Court should assess the proposed procedures based on an independent "fair and reasonable" standard.  Court-approved bid procedures must be fair and reasonable to all parties, and a debtor's business judgment is *not* determinative of the issue.  *See In re Am. Safety Razor Co., LLC* (Bankr. D. Del. Sept. 30, 2010) (Case No 10-12351) (MFW), Transcript, *132-133 ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule.  I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters for the debtor – for the Court's determination as to what is fair

and reasonable. In fact, I think that's my only role in this case: to determine what is fair for all the parties.").

7.    In any event, the proposed Bidding Procedures concern transactions in which there are fundamental conflicts of interest among the Debtors here.  *See, e.g.*, *In re Los Angeles Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (business judgment does not apply where directors are not disinterested or independent).  There are inherent, multi-billion-dollar conflicts of interest among the overlapping EFH and EFIH boards and management in any sale of Oncor due to the tax implications of various transactions structures.

I.    THE BIDDING PROCEDURES MOTION SEEKS FAR MORE THAN PROCEDURAL RELIEF; IT SEEKS TO VALIDATE A PROCESS THAT HAS EFFECTIVELY CONCLUDED, EXCLUDING CREDITOR INPUT AND ACCESS, AND PREDETERMINING THE FORM OF A TRANSACTION

8.    This is no ordinary bidding procedures motion.  This Court is familiar with the normal kind, which seeks a period in which the debtor will send out marketing materials to new potential buyers, make diligence information to all those potential buyers, and have a bid deadline at the end of that process.  Even with the most distressed, cash-flow negative debtors, that process lasts at least a month.  For even much smaller cases, it can ordinarily last for several months.

9.    This is a transaction for at least $18 billion of enterprise value, as the prior NextEra bid demonstrated.  The Debtors must think that the value exceeds even that bid, because they admit in the Motion that they adopted their current process based on expressions of interest received after the NextEra bid.

10.    The Bidding Procedures Motion is quite coy when it describes "Round 1" and "Round 2" bidding.  What the Motion does not emphasize at all is that the Round 1 bids are due a mere six days after the October 17 hearing.  And what the Motion does not say at all – but

has been expressly stated to creditors in meetings  – is that the Debtors will eliminate bidders from consideration shortly after the Round 1 deadline on October 23, leaving as few as two bidders remaining.  *See* Hiltz Dep. at 106:14-107:16.

11.     After the October 23 deadline, no further bidders will be allowed into the process until a Potemkin "Open Bidding Period" discussed below.  Not in 120 days; not in 60 days; not in 30 days.  In six days after the hearing.  This is not a "formal and extended marketing period."  Motion ¶ 22.  It is a period in which the Debtors will take the existing bids, solicited in a particular form, and cull them down.  The undisputed testimony also is that the Debtors will not do any further marketing for new bidders after entry of their Proposed Bidding Procedures Order.  Keglevic Dep. at 33:20-34:4.

12.     The Debtors apparently have warned that there is a very good chance that no bidders may come forward later.  *See* Hiltz Dep. at 125:15-126:21.  As a result, the so-called stalking-horse selection process is the actual auction.  The point is not that the Debtors have reached out to insufficient potential buyers.  The problem is that the Debtors reached out to bidders with one particular structure, the process will be over immediately after the hearing if the Debtors have their way, and creditors will have had no input into that process.  The bidders have been told to make the bids one particular way, and have no reason (and are getting no help from the creditors to whom this issue matters) to consider doing it other ways.

A.     The Debtors Demanded One Particular Structure During Months of Contact with Bidders, Until the Time the Motion Was Filed, and then Stated They Still Wanted the Non-Taxable Structure

13.     The Debtors began to market the Oncor asset on July 25, 2014.  For two months – until the day they filed the Bidding Procedures Motion – the Debtors exclusively marketed a non-taxable transaction.  *See, e.g.*, Hiltz Dep. at 387:14-388:2; *see also id.* at 68:8-14 (testifying that all prospective bidders with access to the data room, except one that just engaged,

received teaser materials for a post-reorganization EFH equity transaction).  All the evidence is that even conversations that the Debtors' CEO had with the CEOs of prospective purchasers emphasized that the Debtors "needed" a non-taxable structure at the EFH level, and these conversations were designed to be the initial contact that the Debtors made to those particular purchasers.  *Id.* at 83:5-84:5.

14.    Only on September 19, with the filing of the Bidding Procedures Motion – after marketing solely a non-taxable transaction for two months – did the Debtors announce that they would accept bids "in any form."  And in the same breath, in that same motion, the Debtors repeatedly state that they believe a non-taxable transaction to be the best path forward.  They intoned the phrase "optimal deal structure."

15.    Then, if prospective bidders even started to think about a taxable bid, just seven business days later on October 1, the Debtors filed the long-awaited 50-page tax memorandum.  This discussed in detail all of the reasons why the Debtors (plural) viewed a non-taxable transaction as ideal.  *See* Omnibus Tax Memorandum [D.I. 2296] at 23.  These same Debtors propose in the Bidding Procedures Motion to select the stalking horse bidder in their sole discretion and with no creditor input, and have so informed the bidders.

B.    <u>The Debtors Have Done Nothing Meaningful to Solicit Alternative Structures, and the Debtors Are Immediately Winnowing Out Bids, Not Seeking to Bring More Into the Process</u>

16.    Based on discovery provided to date, the method by which the Debtors first told bidders that bids could come "in any form" was by doing no more than emailing a copy of the Bidding Procedures Motion – without calling out in the email that there was no longer a limitation on the form of bids that could be submitted.  *See* Hiltz Dep. at 89:13-18.  Of course,

when a prospective bidder reviewed the motion, the bidder would read the Debtors' desire for a non-taxable transaction.[1]

17.     The mere *acceptance* of bids "in any form" does nothing to rebut the announced (and structural) presumption against the ultimate *selection* of a taxable bid.   A prospective purchaser – who may be indifferent between taxable or non-taxable bids – will be influenced by the Debtors' announced bias for a non-taxable bid, particularly in a stalking horse process where the selection of the stalking horse is to be left to the Debtors' unfettered discretion.   The mere acceptance of bids "in any form" is nothing but a fig leaf – a last-minute effort to shield objections to a fundamentally flawed marketing process.

18.     To reiterate a point made above, the Debtors will eliminate bidders from consideration after the Round 1 deadline on October 23, leaving as few as two bidders remaining.  *See* Hiltz Dep. at 106:14-107:16.  The Debtors' CFO has testified that following the approval of the bidding procedures, the Debtors will not send new teasers and will not solicit new bidders.  Keglevic Dep. at 33:20-34:4.

C.     The Debtors Are Precluding Bidders from Speaking with Creditors, Preventing Any Real Interest by Bidders in Alternative Structures

19.     The Debtors have sought to prevent bidders from communicating with the very creditors who might encourage taxable bids and other alternative transaction structures.  In their proposed non-disclosure agreements with prospective purchasers, the Debtors have prohibited communications by prospective bidders with creditors.  *See* Hiltz Dep. at 134:17-136:25 (testifying that Evercore and Kirkland inserted into the form NDA the preclusion of any

---

[1] *See* Bidding Procedures Motion ¶ 7 ("[T]he Debtors have done significant tax and structural analysis regarding a potential transaction, and believe that the optimal deal structure would be tax efficient."); ¶ 36 ("[T]he Debtors have done significant tax and structural analysis regarding a potential transaction, and they believe the optimal deal structure would be an equity investment in reorganized EFH combined with a tax-free spinoff of TCEH. This structure is reflected in the Debtors' form term sheet, and the Debtors reserve the right to share with bidders that they believe this structure maximizes the value of the estates.").

communications by bidders with creditors without the consent of EFH and EFIH).  Even more

telling is that the Debtors removed this prohibition when asked by bidders.  Hiltz Dep. at 139:5-

15.  This demonstrates that the Debtors tried to use that prohibition – knowing it could not be

justified – to prevent as many bidders as possible from considering alternative transaction

structures.  This is striking in light the "Bid Criteria" of "Stakeholder Consensus" that the

proposed Bidding Procedures discuss as a consideration in weighing bids.  Bidding Procedures at

11.  Of course, the Debtors announced that criteria <u>after</u> they had been signing as many

nondisclosure agreements as possible that prevented bidders from finding out whether their

structures would garner creditor consensus.

    D.    <u>A 30-Day Open Auction Window Is Insufficient for Later Creditor Involvement</u>

    20.    The Debtors' proposed cure-all is a 30-day open auction process after

stalking horse bidder selection.   The Debtors have attempted to justify shutting out creditors

from the so-called stalking horse selection process because of alleged bidder concerns about

avoiding public auction processes.  Yet somehow a short public auction, as the only window for

creditor involvement, is supposed to provide a realistic "market check" and address all of the

issues surrounding conflicts among the Debtors based on different deal structures, as discussed

below.

    21.    It is inconceivable that 30 days is enough time.  In its first iteration, the

Debtors themselves marketed a single deal structure for two months before filing the Bidding

Procedures Motion, provided another month for letters of intent, and still two more months

before they will unveil a completed stalking horse bid of their choosing.  Creditors, with no prior

access to bidders, or other bidders, or even prior bidders coming back to the auction, cannot

possibly put competing binding offers with completed definitive documentation together in 30

days if it took the Debtors five months.

II.     THERE ARE THREE INTERWOVEN, MULTI-BILLION DOLLAR CONFLICTS
        THAT MUST BE CONSIDERED IN ANY SALE PROCESS FOR EFIH'S INTERESTS
        IN ONCOR

            22.     Three inter-related, multi-billion dollar issues create conflicts among the

Debtors in any process for the sale of EFIH's primary asset, its interest in Oncor.  *First*, a

purchaser would pay over $2 billion more in a taxable transaction at EFIH for EFIH's indirect

interest in Oncor where the purchaser obtains the benefit of a step-up in basis.  *Second*, a taxable

transaction at EFIH (a disregarded entity for tax purposes) would result in a multi-billion tax at

EFH (not at EFIH), and the persons approving the bidding procedures completely misevaluated

the theories of indirect EFIH liability for such tax, while pushing the market for a non-taxable

transaction that benefits EFH in certain circumstances.  *Third*, a non-taxable transaction exists

principally to facilitate a different transaction, the tax-free spin on the T-side, and that transaction

can only go forward with the consent of the TCEH first lien lenders.  Following the demise of

the RSA they are under no obligation to agree to a tax-free spin, and the Debtors are providing

them with an opportunity to extract value from an EFIH asset.

            23.     However, the important point at this bidding procedures stage is not who

is correct about these disputes, but rather that the Debtors did not consider these issues at all

from the perspective of EFIH in determining the bidding procedures and conducting a process

that excludes an entire set of options.  Nevertheless, a brief discussion is in order.

    A.      There Are Two Fundamental Deal Structures for the Disposition of the Oncor
            Asset: A "Non-Taxable" Post-Reorganization Equity Deal at EFH or a "Taxable"
            Asset Deal at the EFIH Level

            24.     The Debtors' so-called "optimal deal structure" is a transaction by which

a purchaser either (i) acquires all of the equity in reorganized EFH (after the tax-free spin-off of

TCEH) for a combination of cash and stock of the acquirer, or (ii) acquires a minority interest in

reorganized EFH for cash and distributes the remaining equity of reorganized EFH to creditors.

*See* Bidding Procedures Motion ¶ 7; Deposition Transcript of William O. Hiltz (Oct. 6, 2014)

("Hiltz Dep.")[2] at 68:20-25, 69:17-70:20 (describing Exhibit 9, a July 25, 2014 teaser sent to

prospective investors outlining the optimal deal structure).

        25.     A taxable transaction, on the other hand, could be effected in a number of

different ways, most simply through a Section 363 sale of EFIH's equity in Oncor.  An important

difference between a taxable transaction and a non-taxable transaction is that a non-taxable

transaction may <u>only</u> be effected through a chapter 11 plan of reorganization at the EFH level,

which would require a global resolution of all these chapter 11 cases.  A taxable transaction, on

the other hand, could be accomplished through a Section 363 sale at EFIH alone, without the

execution risk involving a global chapter 11 plan.

       B.     <u>The Price Many Buyers Would Pay in the EFIH Structure Is $2 Billion Higher</u>
<u>than the EFH Structure</u>

        26.     The Debtors have said much about the potential increase in tax liability for

EFH.  They have said nothing publicly (even in pleadings signed by EFIH) about the real

difference in price between different transaction structures.  Mr. Hiltz, the investment banker

leading this transaction for the Debtors, testified at deposition that a purchaser would pay $2

billion more for a step-up in basis in an EFIH-level transaction.  Hiltz Dep. at 102:18-103:12.

This price difference creates a conflict between different Debtors, particularly between EFIH, on

the one hand, and EFH and perhaps the T-side Debtors, on the other hand.

        27.     Furthermore, even the relative complexity of transaction structures could

lead to a difference in price.  Simpler, less contingent, and possibly faster structures at EFIH

might attract bidders in a different way than the Debtors' so-called one-way option that is

contingent on complex reorganization plans.

---

[2] Excerpts of the cited portions of the deposition transcript of Mr. Hiltz are attached as <u>Exhibit A</u>.

C.    An EFIH Deal Would be a "Taxable Deal," But Only Leading to Tax at EFH,
With at Best Some Risk of Intercompany Claims at the EFIH Level

28.    The potential increase by $2 billion in a purchase price must, from the

perspective of the EFIH estate, be viewed in the context of any potential claims to be asserted

against EFIH.  The Debtors' new Tax Memorandum makes much of this, but all of it is in

dispute.

29.    *First*, the Tax Memorandum admits that EFIH is a disregard entity for tax

purposes and, accordingly, would normally have no tax liability.  While the Tax Memorandum

suggests that the IRS *might* assert claims against EFIH, it admits that the IRS has lost this

argument in court every time that the IRS has tried.  Tax Memorandum at 15-16 ("Although the

IRS's objections were overruled in each of these cases, the IRS may continue to challenge such

attempts to strand taxes under these or other potential legal theories.").  *Second*, the Tax

Memorandum also suggests that EFH might assert claims for indemnity for any tax liability

against EFIH under the tax sharing agreement. But the tax liability here is one for capital gains,

and the tax sharing agreement does not expressly apply to capital gains.  *Id.* at 20.  Further,

whether the tax sharing agreement is even enforceable (or is avoidable) is a significant open

issue.  And *third*, even if EFH could assert an unsecured claim against EFIH for the

deconsolidation tax, EFIH is among the largest, if not the largest, creditor of EFH.  EFIH holds

$1.2 billion in bonds issued by EFH that EFIH purchased in the open market, which could be

setoff against any unsecured tax sharing claim; the setoff might be higher based on other

avoidance-type claims of EFIH against EFH.

30.    Again, the issue at the moment is not the merits of these tax issues.  At this

stage the issue is the existence of the conflicts and a process whereby each estate's interests are

properly considered, which means that those conflicts have to be addressed in the manner the Debtors solicit and consider bids for the Oncor asset.

D.    The Proposed EFH-Level Transaction Only Matters In Situations Where the TCEH First Lien Lenders Consent to the Tax-Free Spin, Setting Up a Situation that Could Divert Significant Proceeds for an EFIH Asset Away from EFIH Creditors

31.    The central issue that ties these conflicts together is that, according to the Debtors, a tax-free spin of the T-side is only possible with the consent of the TCEH First Lien Lenders.  *See, e.g.*, Hiltz Dep. at 69:17-70:18; Horton Dep. at 46:2-47:2, 57:3-12.  If there is ultimately no agreement with the TCEH lenders for the tax-free spin off, the restructuring on the T-side alone would trigger a tax at EFH of $4-6 billion, which would make irrelevant for all practical purposes the incremental $3 billion tax resulting from a taxable transaction at EFIH.

32.    Thus a major difficulty with the proposed sale procedures, and their pre-loaded structure, is that planning for a non-taxable transaction at EFIH does not matter at all until the parties know whether the TCEH First Lien Lenders will consent to a tax-free-spin.  Instead, the proposed process will waste six months proceeding in a fashion that will place the EFIH creditors at the mercy of some consent payment needing to be made out of the transaction that has emerged.  The Bidding Procedures, allowing the Debtors to select in their sole discretion a so-called stalking horse transaction that requires consent of the TCEH First Lien Lenders, sets up a "ransom" scenario in which transaction proceeds for the Oncor asset, which belongs to EFIH, are instead paid to the estates of other Debtors.  This will destroy EFIH value rather than realizing upon it.

III.    THE DEBTORS' MANAGEMENT, INDEPENDENT DIRECTORS, AND
        FINANCIAL ADVISORS HAVE IGNORED – NOT BALANCED – THE MULTI-
        BILLION DOLLAR CONFLICTS OF INTEREST IN ANY ONCOR SALE PROCESS

        33.    Inexplicably, none of the Debtors' officers, directors or financial advisor

deposed in connection with this motion see any of these massive conflicts arising in the context

of the proposed sale process.  This can be seen without argumentation, by looking at their own

words from their depositions.

        A.    Mr. Paul Keglevic, Chief Financial Officer of EFIH (and EFH) and Co-Chief
              Restructuring Officer of EFIH (and EFH)

        35.    For example, Mr. Keglevic, the CFO and co-CRO, testified that he would

need to consult with counsel to even identify a conflict:

> Q. Mr. Keglevic, are you aware of any conflicts of interest among
> the EFH, EFIH, and TCEH estates with respect to a sale of the
> Oncor asset?
>
> [Objection: calls for a legal conclusion]
>
> A. I'm not aware of any, but I would consult my attorneys before
> answering because it does sound like it's a legal matter.
>
> . . .
>
> Q: Do you believe that the triggering of a $3 billion tax at EFH
> could lead to a conflict of interest between EFIH and EFH?
>
> [Objection: calls for a legal conclusion]
>
> A: Before answering that, I would have to consult with my
> counsel.

Deposition Transcript of Paul M. Keglevic (October 3, 2014) ("Keglevic Dep.")[3] at 59:5-13;

60:4-10.

        36.    With respect to which Debtors would be able to change the Bid Criteria,

Mr. Keglevic testified that the "consolidated Debtors" would be able to change the criteria.  As

---

[3] Excerpts of the cited portions of the deposition transcript of Mr. Keglevic are attached as Exhibit B.

to how the "consolidated Debtors" would determine this issue, Mr. Keglevic could not answer this question:

> Q. Now, paragraph 9 states that the Debtors determine in their sole discretion, right?
>
> A. Yes.
>
> Q. Which Debtors does this refer to?
>
> A. I think I have answered this. That I would -- it's the consolidated Debtors that we would take into consideration.
>
> Q. And you don't know whether it would be a majority vote, you know, hundred percent consensus, or any other process for determining whether other factors would be considered in evaluating bids?
>
> A. No, I think I indicated that you should ask that question of Mr. Hiltz, but I have not been -- I have not thought through exactly how that debtor process will work . . . .

Keglevic Dep. at 48:17-49:9.

B.    <u>Mr. William Hiltz, Lead Financial Advisor for the Bidding Procedures</u>

38.    Mr. William Hiltz is a Senior Managing Director of Evercore, the Financial Advisor to the Debtors.  Mr. Hiltz was the architect of the currently proposed bidding procedures.  He could not even see how some creditors might prefer a taxable structure:

> Q. And are you aware that creditors, depending on where they sit, may prefer a taxable versus a non-taxable transaction?
>
> A. I have yet to understand why that's the case, but I am aware that some people are asserting that.

Hiltz Dep. at 104:17-22.  Mr. Hiltz explained later in his deposition that he wasn't sure whether these contrary points of view would rise to the level of conflicts:

> Q. So, sitting here today, you do not think that there will be any conflicts in connection with bidding procedures going forward?
>
> [Objection]
>
> A. Well, I understand the objections that have been raised by -- primarily, by the out-of-the-money T side creditors with respect to this process.

Q. So conflicts issues have been raised?

A. Well, I'm not sure they're conflicts.  They're different points of view as to what the right way forward is.

Q. And do you --

A. But I'm not sure that there is a conflict of interest.

Q. And do you understand that the differing views of different creditor constituencies may reflect the different views of those estates?

A. Well, again, I understand that they are making objections to, for example, favoring a taxable transaction. I don't see how that is in their benefit, but that's just me.

Hiltz Dep. at 148:11-149:10.

C.     Mr. Charles Cremens, Sole Independent Director of EFIH

40.     As for EFIH itself, it has one independent director: Mr. Charles Cremens.

He is the sole independent fiduciary for EFIH creditors.  He denies even the possibility of

conflicts arising:

Q: Do you have any understanding of a process for resolving any conflicts that could arise in connection with selection of a stalking horse bidder?

A. I don't know what conflicts could arise, so I don't -- I mean, we've already talked about my view of dealing with potential conflicts.

Q. Sitting here today, are there any potential conflicts you can identify with respect to the proposed transaction that is to be set forth -- that is to come forth pursuant to the bidding procedures?

A. No.

Deposition Transcript of Charles Cremens (Oct. 8, 2014) ("Cremens Dep.")[4] at 94:2-15.  As to

the potential for direct or indirect EFIH liability for any tax, Mr. Cremens stated:

Q: You understand that the tax sharing claim would be an unsecured claim against EFIH?

A. I am generally aware that there's a difference in security issues, yeah.

---

[4] Excerpts of the cited portions of the deposition transcript of Mr. Cremens are attached as Exhibit C.

. . .

Q. Are you aware that creditors have argued that the tax sharing agreement does not allocate tax liability to EFIH based on the capital gains generated by EFIH?

A. I'm not aware of that.

Q. Would you consider it important to know the likelihood of claims being asserted against EFIH under the competitive tax sharing agreement?

[Objection]

A. I'd like to know of any claims that could be asserted against EFIH.

Q. Have you asked anyone about the likelihood of claims being asserted against EFIH with respect to a deconsolidation tax?

A. No.

Q. Do you have any understanding concerning potential challenges that the IRS could bring if there's a stranded tax liability at EFH?

A. If there are challenges that the IRS could bring, I'd like to understand them, yes.

Q. Have you asked anyone about the likelihood of the IRS being able to challenge a transaction that leaves stranded tax liability at EFH?

A. No.

Q. Do you have any understanding of the likelihood of changes in the law or treasury regulations that would impact the step up in basis in a taxable transaction?

A. No.

Q. Have you asked anyone?

A. No.

Q. Do you have any understanding of the likelihood of success of state law theories of liability to make EFIH liable for any stranded tax?

A. No.

[Objection]

Q. Mr. Cremens, has EFIH's board received any advice concerning the likelihood of EFIH becoming liable for deconsolidation tax?

A. Yes, there was a presentation I think made a long time ago on that one. At least -- let me put it differently. There was a -- I believe a discussion, anyway, around it. But it goes back to, you

know, early in the -- early in my involvement. So I'm aware of it
and that's how I got to the comment about the tax liability.

Q. Do you recall approximately when that presentation was?

A. No. As I said, it was a discussion at the very least.

Q. Do you recall who was involved in that discussion?

A. No.

Q. Do you recall if that discussion was before or after the
bankruptcy case was filed?

A. I don't.

Q. Mr. Cremens, what is your understanding of the reasoning for
doing a transaction at the EFH equity level instead of the EFIH
level for a sale of the Oncor assets?

[Objection]  Go ahead.

A. I can't remember specifically.

Cremens Dep. at 71:3-74:12.  In permitting the Debtors' management and advisors to market for,

and then declare a strong preference for, only non-taxable transactions, which will not matter at

all if there is no deal between the TCEH First Lien Lenders and the Debtors, the only

independent fiduciary of EFIH had no understanding of any of these issues.

41.     And that is not all.  Apparently Mr. Cremens, that supposedly independent

fiduciary, did not even understand the price that could be paid for the primary asset of EFIH –

the Oncor stock:

Q.  Mr. Cremens, are you aware that if there is a transaction done
at EFIH that was taxable that that would result in a step up in basis
for the purchaser?

A.  I am not aware of the specifics.

Q. Generally speaking, if a purchaser achieves a step up in basis
and is able to realize the benefits of a basis step up, are you aware
whether a purchaser will, generally speaking, pay more for an asset
than if it did not receive a step up?

A. I don't know. There certainly is a possibility of a tax associated
with it.

. . .

17

Q. Has anyone advised EFIH's board with regard to the likelihood of a purchaser paying a higher price in a taxable transaction?

A. No, but I don't think that's a limitation. So if somebody wanted to come in and pay a -- take a run at any of the assets, we'll look at it.

. . .

Q. Would it surprise you to learn that Mr. Hiltz testified on Monday that a prospective purchaser would pay $2 billion more for the step up in basis that would be achieved in a taxable transaction?

[Objection]

Q. Would that surprise you?

[Objection]

A. I don't know. I haven't done the analysis and --

. . .

Q. If I were to tell you that EFIH is not liable for the deconsolidation tax and EFIH could receive $2 billion more in a taxable transaction, what would you want to know in order to evaluate that transaction?

[Objection]

A. I don't know. That's too hypothetical for me. I don't know. I haven't -- again, at the end of the day, I want to know how much value is being provided for the estate. What somebody else, gets I'm not interested.

Cremens Dep. at 75:9-21, 75:24-76:7, 77:18- 78:3, 79:11-22.  In his own words, Mr. Cremens

was "less interested" in what the purchaser would pay for EFIH's asset, and more concerned

about EFH's tax liability.  *Id.* at 76:8-77:8.

D.    Mr. Anthony Horton, Treasurer of EFIH (and EFH)

43.    Mr. Horton, the treasurer of EFIH and EFH who was more involved than

Mr. Keglevic, Keglevic Dep. at 58:13-20, also testified that he was unaware of any conflicts:

Q. In your view, do claims that EFH might have against EFIH under that tax sharing agreement give rise to a conflict between EFH and EFIH?

A. I'm not aware of any conflicts.

Deposition Transcript of Anthony Horton (Oct. 7, 2014) ("<u>Horton Dep.</u>")[5] at 48:20-24.

44.    Instead, Mr. Horton, believes that the tax consequences that give rise to billions of dollars in conflicts are the same for the various estates, and believes that it is better to avoid the tax for the "total estate":

> Q. The tax-free spin of TCEH and the sale of EFH, or of Oncor as you describe it, is the so-called optimal deal structure of the debtors that is described in the bidding procedures motion; is that right?
>
> A. I don't know if it is the optimal, you know, but it is certainly I think our preferred path given, if you read the tax memorandum, just the tax consequences of a taxable transaction. So, you know, it is our experience and our belief that it is better for the estate and to maintain the value of the estate to not pay tax, to have a tax-free transaction that we believe is approvable and confirmable.
>
> Q. And that's the EFH estate; is that correct?
>
> A. It is the total estate.
>
> Q. Is there any difference in the amount of tax that each of the estates would pay?
>
> A. Again, you would have to refer to the tax memorandum which outlines if you -- and it depends on what scenario you are talking about. In the tax memorandum, they talk about a deconsolidation, TCH being sold, EFIH or E side being sold, and the tax implications, potential tax implications of that.
>
> Q. Are those tax implications different for the different estates?
>
> A. I think, again, you would need to talk to the tax lawyers about it. Conceptually from my perspective, my chair, I mean, it is the same -- it is the same consequence.

Horton Dep. at 21:22-23:11.

45.    Given Mr. Horton's understanding that there is a "total estate" in this case, perhaps unsurprisingly, Mr. Horton testified that EFH alone will select the stalking horse bidder for EFIH's interest in Oncor:

---

[5] Excerpts of the cited portions of the deposition transcript of Mr. Horton are attached as <u>Exhibit D</u>.

Q. You will see there that it says that the debtors will select the round two bidder that has submitted the highest and best bid to be the stalking horse bidder, if I paraphrased that correctly; is that right?

A. Uh-huh.

Q. Which debtor is going to choose?

A. I think that would be adecision that will ultimately be made by the EFH board, but, look, you would need to talk to our general counsel and others who run the corporate governance of ultimately who would make that decision. But I think "the debtors" was used collectively more illustratively than specifically a debtor, a specific debtor. More generally is probably the right word.

Horton Dep. at 67:10-68:4.

        E.      <u>Mr. Hugh Sawyer, Independent Director of TCEH</u>

47.      Mr. Sawyer does not owe duties to Delaware Trust, which is an EFIH creditor.  Nevertheless, his testimony corroborates the foregoing and shows that these problems are endemic, even with a director marginally more engaged than Mr. Cremens.  Deposition Transcript of Hugh Sawyer (October 8, 2014) ("<u>Sawyer Dep.</u>")[6] at 346:14-347-4 ("Could be conflicts around stranded tax matters . . . . At this point, those conflicts have not manifested themselves.").  Mr. Sawyer testified that he viewed Kirkland & Ellis and Evercore as advisors only to EFH, and that TCEH actually has no, and needs no, advisers:

Q. When you say your investment bankers and counsel, the "your" is who?

A. The Evercore and Kirkland & Ellis.

Q. And the "your" meaning the entity they're representing is?

A. EFH.

Q. EFH?

A. Correct.

Q. But you're an independent director of TCEH, correct?

---

[6] Excerpts of the cited portions of the deposition transcript of Mr. Sawyer are attached as <u>Exhibit E</u>.

A. Correct.

Q. And does TCEH have any professionals that are representing it or representing its interest?

A. Not at this time, no.

Sawyer Dep. At 344:20-345:10.

48.     Mr. Sawyer was completely unaware of the recent stipulation approved by this Court, which authorized him to obtain independent advice, but also constrained his choice of counsel.  Sawyer Dep. at 475:17-476:5; *see also* Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters ¶ 4 [D.I. 2051].  He played no role in that stipulation regarding governance of an EFH subsidiary.  Sawyer Dep. at 411:11-18.  He was completely unaware of the Debtors' Tax Memorandum until after it was filed on behalf of TCEH.  Sawyer Dep. at 401:9-18.  Mr. Sawyer based his view of the bidding procedures' value to TCEH on concerns that EFH could "check the box" and impose tax liability on TCEH.  Sawyer Dep. at 368:12-369:4.  Yet he undertook no inquiry regarding that issue.  Sawyer Dep. at 509:5-10, 511:13-16.  Mr. Sawyer agreed that the Tax Memorandum undermines that premise regarding EFH "checking the box" because the memorandum states that such action would also harm EFH creditors, making it untenable for EFH to consider doing so.  Sawyer Dep at 512:3-513:12.

49.     Mr. Sawyer also testified that he has direct familiarity with a very similar tax situation from his service as an independent director of another multi-billion-dollar chapter 11 debtor.  Sawyer Dep. at 515:25-516:20.  In that case he authorized certain actions on behalf of his corporate debtor to address tax issues similar to those here.  Sawyer Dep. at 516:14-518:10.  In this case, and notwithstanding his recent personal experience, he did not consider taking those actions at all.  Sawyer Dep. at 518:11-20.

F.    <u>The Complete Lack of Proper Corporate Approvals of the Bidding Procedures
Call for Creditor Participation in Any Go-Forward Process</u>

50.    If the management and board cannot even identify the billions of dollars in conflicting interests, there can be no reasonable expectation that they will balance the conflicting interests in a sale process without direct creditor oversight.

51.    It is perhaps unsurprising that, in light of the Debtors' and their advisors' apparent blindness to massive conflicts of interest, no board votes even occurred regarding the proposed bidding process and proposed bidding procedures. *See* Cremens Dep. at 84:15-19. The boards met jointly even when being informed regarding the bidding process, although Mr. Keglevic testified that previously the boards routinely met separately. *See* Cremens Dep. at 41:2-10 (testifying that there were no separate board meetings after termination of the RSA); Keglevic Dep. at 284:20-285:22. The boards were only generally apprised of the proposed procedures. In fact, it is not clear that any officers or directors, or even any group of them, took responsibility for approving the procedures: Mr. Keglevic testified that his co-CRO (Ms. Dore) "probably" approved the filing of the motion. Keglevic Dep. at 52:25-54:14. Both Mr. Kegevic and the Debtors' Treasurer Mr. Horton (who was more involved than Mr. Kegevic) described their roles merely as "reviewing" the procedures. *Id.*; Horton Dep. at 15:22-25.

IV.    THE REQUESTED RELIEF IS ALSO ADVISORY BECAUSE THE DEBTORS SEEK
ADVANCE APPROVAL FOR ANY CHANGE TO THE PROCEDURES, IN THEIR
SOLE DISCRETION

52.    The Debtors' proposed order seeks even more relief than the (i) validation of their marketing efforts to date that have solely focused on a specific type of transaction, and (ii) giving the Debtors carte blanche to pick any investor they want without any creditor input. The proposed order also seeks, in its paragraph 7 and in two particular provisions of the Bidding Procedures, to give the Debtors free reign <u>to change even the Bidding Procedures for which</u>

approval is sought, in any way the Debtors see fit.  These provisions would make the Courts'

approval entirely illusory.

53.    Specifically, paragraph 7 of the proposed order would confer authority on

the Debtors to change any aspect of the Bidding Procedures "in their sole business judgment."  It

is inappropriate to seek relief from this Court for a set of procedures and at the same time purport

to obtain unilateral authority to change those procedures.  As a result, neither creditors nor the

Court has any idea what they are signing up for, or approving.

54.    Two of the Debtors' principal participants in the formulation and review

of the Bidding Procedures Motion disagree about what paragraph 7 means.  Mr. Keglevic, the

Chief Financial Officer and Co-Chief Restructuring Officer of each of the Debtors, testified at

deposition that he reviewed the Bidding Procedures Motion and that there was some unspecified

limit to this authority to change procedures:

> Q. But sitting here today, you cannot identify anything in those
> procedures that the Debtors would be unable to change following
> the entry of the order?
>
> A. I would think **the order indicates there would be limited**
> **situations** where we would have discretion for good, specific
> reasons, so I would not expect that we're looking to change
> procedures unless there was something that came up that allowed
> us to -- that, in our business judgment, allowed us to change the
> procedures in the pursuit of getting the highest and best value for
> the auction.

Keglevic Dep. at 25:25-26:13 (emphasis added).

55.    At the same time, Mr. Hiltz of Evercore, the actual person who formulated

the Bidding Procedures, testified that the Debtors could change any provision of the Bidding

Procedures:

> Q. What I want to know, is there anything in those bidding procedures the Debtors couldn't change in their sole discretion?
>
> A. I think **the language would give us the ability to change whatever we wished**, but again, I'll repeat that as we sit here today, I don't anticipate us changing any material aspect of the bidding procedures unless there's some unforeseen event or circumstance.

Hiltz Dep. at 132:15-23 (emphasis added).

56.     Mr. Hiltz also testified that this was "typical language that we put in every document that we create like this in the context of an out-of-bankruptcy auction." *Id.* at 130:16-23.  Those are situations where creditors are being paid in full and the company has full control, without ongoing court supervision, of the process.  It is entirely inappropriate here, especially with different Debtors that have differing interests.

57.     When the Company itself cannot agree on the relief sought, creditors and the Court cannot be made to guess, or be subjected to an undefined program.  The Debtors have not considered how any such changes would be agreed among the three principal Debtors – EFH, EFIH, and TCEH – which have differing interests.  Keglevic Dep. at 30:23-32:7; Hiltz Dep. at 133:16-134:16.  Indeed, such authority to make changes even runs counter to the Debtors' own stated goal of "transparency" to bidders.

58.     The same applies to two specific paragraphs of the Bidding Procedures themselves.  Item 9 of the "Bid Criteria" (p.12 of the Bid Procedures) allows the Debtors to add any other factors for consideration of bidders: presumably such factors could be positive or negative factors in consideration of a bid.  Section "Q" of the Bid Procedures repeats the blanket authority of the Debtors to change any aspect of those procedures.  Paragraph 7 of the proposed order, as well as these two provisions of the proposed Bidding Procedures, should be stricken.

V.     SPECIFIC REMEDIES ARE NEEDED TO PREVENT THE PROCESS FROM
       WASTING SIX MONTHS AND LEADING TO A PREORDAINED OUTCOME

59.     The Debtors contend that the Bidding Procedures Motion seeks procedural relief and that this Court should delay all consideration of the conduct of the marketing process and comparison of bid structures to dates to be determined in January-March of 2015, six months hence.  The implication is that if creditors are correct in their complaints, the Debtors will not obtain approval of the ultimate sale transaction, and the transaction process can start again.  But, in this context, the procedure has substantive effects and there are simple and sound economic reasons not to take that approach.

60.     Taking the risk of starting a process over after wasting six months will cost the EFIH estate significant amounts of money.  For example, the $2.2 billion principal amount of EFIH Second Lien Notes accrues interest at 11% or more: a wasted six months increases that claim by $125 million dollars, making settlement and resolutions of the EFIH case that much harder.  In the event that the EFIH PIK Noteholders receive contract-rate post-petition interest (at a rate over 12%), that is another $100 million.  Even the make-whole claim of Delaware Trust accrues interest, and in six months that amount is over $20 million.  It is far better to involve creditors now.

61.     As a result, it makes no economic sense, and no sense from a case-management perspective, to let the Debtors proceed with an entirely discretionary process (which is what they ask for).  Delaware Trust proposes the following specific remedies and changes to the requested relief.  Delaware Trust expects to file a revised proposed order prior to the hearing.

A.    There Must Be Information Sharing with Creditors, and Consultation with
      Creditors Regarding Bids, and there Is No Showing of Incremental Risk to the
      Debtors

62.    The Debtors' concerns about confidentiality are entirely unsupported.

First, so-called "attorneys-eyes' only" confidentiality provisions have already been negotiated in

this case, and they encompass financial advisors.  *See* Confidentiality Agreement and Stipulated

Protective Order [D.I. 1833].  Second, the Debtors admit that, even though the Debtors have not

provided any of this information to creditors, there have been significant leaks regarding the

bidding process already (including the identity of various bidders), and the Debtors have not

undertaken any internal inquiry regarding the leaks:

> Q. Upon your learning of these prospective bidders being
> identified in the press, did you undertake any investigation to
> determine how these names had been made public?
> A. I did not.

Keglevic Dep. at 40:4-8; *see also id.* at 36:13-38:5, 40:4-18 ("I think I've expressed general

frustration throughout this entire process as to how so much information got public and

constantly asked for assurance from my advisors and counsel that we were not providing any

information . . . .").  The Debtors cannot impose their inability to maintain confidentiality on

creditors.  It is routine in chapter 11 cases for creditor professionals to handle sensitive deal

information, and for clients such as indenture trustees to do so as well.  There is no evidentiary

foundation or actual reason for excluding creditors from the process.

63.    As described above, the Debtors have made their so-called "Stalking

Horse" process into the actual auction.  Creditors must have access to information and full

consultation rights during this process.  This must include access to all bids and material

communications with bidders.  Such information should be subject to the existing Attorneys-

Eyes-Only confidentiality arrangements (which permit access to such information by financial

advisors).  In addition, and in order to allow creditor groups to take appropriate action if needed

during the process (including seeking the assistance of this Court), third-party indenture trustee,

collateral agent and bank-facility agent clients (but not actual debtholders) must be allowed

access to this information.  Indenture trustees and similar agents do not trade in the Debtors'

securities or the securities of potential bidders, and act (within the scope of power and with

protections) as afforded by their various debt documents.  If particular debtholders seek to obtain

such information, satisfactory arrangements could be agreed with the Debtors (including

information screening walls and other commitments not to act as bidders) or such holders could

seek relief in this Court.

B.    The Debtors Cannot be Permitted to Eliminate Bidders After Round 1

64.    Creditors have had no input into this process, but bidders are to be

eliminated after October 23.  Bidders have had no chance to speak with creditors, even though

"Stakeholder Consensus" is among the Bidding Criteria.  In conjunction with the other relief

sought below, the Debtors should be required to keep all bidders in the process until Round 2

(November 21), except with creditor consensus, and bidders should be allowed to change the

form and structure of their bids between Round 1 and Round 2.  This will prevent disruption of

any bidder "expectations" about the current October 23 deadline.  If for some reason there are

excessive or disruptive bids, that can be addressed consensually with creditors or on further

motion to the Court.

C.    The Order Must Permit Bidders that Desire to Speak with Creditors to Do So,
       Notwithstanding any Confidentiality Agreements

65.    The Debtors, particularly EFIH, have no shown no interest in encouraging

taxable bids.  Directly to the contrary, the Debtors (including EFIH) are consistently seeking

non-taxable bids in a particular EFH-level structure and preclude discussions among bidders and

creditors.  Any order at this stage should (i) expressly permit bidders to speak with creditors (e.g., state that paragraph 5 of the proposed order does not prohibit conversations between bidders and creditors), and (ii) preclude the Debtors from enforcing any provisions of non-disclosure agreements (or any other agreement) that would preclude a bidder from speaking with a creditor or signing any agreement with a creditor.

      D.      <u>The Duration and Timing of the Open Auction Process and Bidding Protections Must Be Determined on Separate Motion After Selection of a Proposed Stalking Horse</u>

      66.      The Debtors also seek significant relief for the period after their selection of a stalking horse bid.  Even on their own terms, they want advance approval for a mere 30-day auction period, an overbid requirement, competing bid requirements, and auction procedures. Those matters are all appropriate for consideration after a stalking horse is selected, not now. That the Debtors are mixing and matching what they want approved now and that shows the unusual nature of the requested relief.  Any relief in the Bidding Procedures Order relating to the duration or conduct of the "Open Bidding Process" and the "Auction"– the period after selection of the Stalking Horse, should be denied, without prejudice to the Debtors' seeking relief in a motion to approve a stalking horse bidder.  The Debtors can seek such relief in connection with approval of their stalking horse bid.

      E.      <u>The Break-Up Fee for Any Non-Taxable Transaction Through Post-Reorganized EFH Equity Must Be Payable by EFH, Not EFIH</u>

      67.      If any the requested relief is granted with respect the Open Bidding Process or the Auction, the Bidding Procedures Order should also require that any breakup fees, termination fees or expense reimbursement, of any bid structured as a transaction at EFH, should be payable solely by EFH.

F.      The Order Should Require Bids to Be Submitted With Both an EFIH-Level
        Transaction Price (Including Faster Process) and an EFH-Level Transaction Price

68.     Because of the conflicts of interest among the estates arising from a

taxable structure (a straightforward Section 363 sale of the stock of Oncor Holdings owned by

EFIH) and a non-taxable structure, and the Debtors' encouragement of their so-called optimal

structure, any bid in Round #1 or Round #2 that substantially utilizes the so-called Debtors'

optimal structure should also be required to submit a bid in a taxable structure.  Bidders would

remain free to state whatever price and other terms they choose.

G.      The Order Should Not Permit the Debtors to Alter Any of the Procedures in Their
        Sole Discretion

69.     The Court should strike, in their entirety, each of Paragraph 7 of the

Proposed Order and Item 9 of the Bid Criteria in the Bidding Procedures.  If the Debtors seek

any modification of the Bidding Procedures, they should be required to provide the proposed

change in writing on not less than three business days' notice to those advisors who are entitled

to information sharing, and such creditors shall be entitled to an emergency hearing as to the

propriety of those changes, if they object within such three day period.  If the Debtors seek a

change on shorter notice, they should be required to obtain prior Court approval, which may

occur on reasonable notice in light of the changes being sought.

H.      The Order Should Preserve the Rights of all Parties to Challenge the Selection of
        the Stalking Horse Bidder

70.     The Bidding Procedures Order should expressly preserve all rights of

creditors to make any objection, including regarding conflicts of interest among the Debtors, in

the selection of the Stalking Horse Bidder; that is, the selection of the Stalking Horse Bidder

shall not be committed to the discretion of the Debtors (or any one or combination of them).

I.        <u>Delaware Trust Must be Included as a Reviewing Party</u>

71.      Section J of the Bidding Procedures omits Delaware Trust as a reviewing party in connection with the "Open Bidding Process."  Delaware Trust, both as Indenture Trustee and as Collateral Trustee, must be included as a Reviewing Party under the Bidding Procedures, if any post-Stalking-Horse selection period is covered by the order entered by this Court.

J.        <u>Clarity as to Transaction Consideration</u>

72.      As an alternative to the foregoing, the Court could enter an order providing that, whether generally or solely for purposes of the EFIH First Lien Notes make-whole litigation, all E-side transaction value paid to any recipient is deemed value of the Oncor Holdings equity, which is the EFIH economic asset (and collateral of Delaware Trust) being sold.

WHEREFORE, Delaware Trust requests that this Court approve bidding procedures only if modified as requested herein.

Dated: October 10, 2014

Cole, Schotz, Meisel, Forman
& Leonard, P.A.


/s/ Norman L. Pernick
Norman L. Pernick (DE 2290)
J. Kate Stickles (DE 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

    Warren A. Usatine
25 Main Street,
P.O. Box 800
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

  --and--

Ropes & Gray LLP
Keith H. Wofford
Mark R. Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

    D. Ross Martin
Andrew G. Devore
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

  --and--

Drinker Biddle & Reath LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

*Counsel for Delaware Trust Company,
as successor indenture trustee*