# EXHIBIT A

1      CONFIDENTIAL - WILLIAM O. HILTZ

2  UNITED STATES BANKRUPTCY COURT

3  FOR THE DISTRICT OF DELAWARE

   ----------------------------------------x

4  In Re:

   Energy Future Holdings Corporation, et.,

5

               Debtors.

6

   Chapter 11

7  Case No. 14-10979

   Jointly Administered

8

9  ----------------------------------------x

10          * * *CONFIDENTIAL* * *

11       DEPOSITION OF WILLIAM O. HILTZ

12            New York, New York

13            October 6, 2014

14

15

16

17

18

19

20

21

22

23  Reported by:

24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25  JOB NO. 85363

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2    Q.   Do you know which classes are impaired
3 here?
4    A.   Well, I don't think we can answer that
5 question yet.
6    Q.   And why not?
7    A.   I think it'll be partially a function
8 of the proceeds from the sale of Oncor.
9    Q.   And in testifying that you can't
10 answer yet which classes are impaired here, are
11 you referring to both the E side and the T
12 sides?
13    A.   Well, I think it's likely that the T
14 side creditors are all impaired.  With respect
15 to the E side, that's a more difficult
16 determination.
17    Q.   And why do you say that?
18    A.   Well, because, again, we don't know
19 what the proceeds will be from Oncor.
20    Q.   What is your understanding of the T
21 side creditors' interests in this transaction?
22         MS. O'CONNOR:  Object to form.
23    Q.   Sorry.  Do you have any understanding
24 of the T side creditors' interests in this
25 transaction?

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2         MS. O'CONNOR:  Object to form.
3    A.   Only to the extent that they're
4 alleging claims against the E side, but I'm not
5 aware that any of those claims have been
6 formalized or substantiated at this point.
7    Q.   Mr. Hiltz, the Debtors have announced
8 an optimal deal structure with respect to a
9 transaction by which the sale transaction would
10 occur through the post-reorg. EFH equity,
11 correct?
12         MS. O'CONNOR:  Object to form.
13    A.   Correct.  And I object to your use of
14 the term "optimal."
15    Q.   That's what the Debtors use in the
16 motion so that's where it comes from.
17    A.   All right.
18         MS. O'CONNOR:  Object to form.
19    Q.   You reviewed the motion before it was
20 filed?
21    A.   Yes.  I didn't recall that they used
22 the word "optimal."
23    Q.   So you never objected to the use of
24 the word "optimal"?
25    A.   I think we have designed what we

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2 believe is an efficient structure.  I'm not sure
3 it's the optimal structure.  Someone may come up
4 with a structure that's better than ours.
5    Q.   Now, the efficient structure that you
6 refer to contemplates a transaction through
7 post-reorganized EFH equity?
8    A.   Yes.
9    Q.   Now, you understand that there are
10 creditors at the EFH level, correct?
11    A.   Correct.
12    Q.   And creditors at the EFIH level,
13 correct?
14    A.   Correct.
15    Q.   And you understand that the creditors
16 at the EFH level are structurally junior to the
17 creditors at the EFIH level, correct?
18    A.   Yes.
19    Q.   So you're -- am I correct in
20 understanding that your efficient transaction
21 structure, as you referred to it, contemplates
22 paying creditors at the EFIH level in full?
23    A.   Yes.
24    Q.   Mr. Hiltz, back to the sale process
25 that we were discussing before earlier, when did

CONFIDENTIAL - WILLIAM O. HILTZ
1  
2 Bank of America Merrill Lynch become involved in
3 the sale process?
4    A.   Bank of America Merrill Lynch was
5 involved at the time that I became involved.
6 I'm not sure exactly when they became involved.
7    Q.   Do you know if they became involved
8 before or after you?
9    A.   I just said they were involved when I
10 became involved, so that, by definition, means
11 they were involved before.
12    Q.   To your knowledge, who approached Bank
13 of America Merrill Lynch?
14    A.   I don't know the answer to that.
15    Q.   Do you have any understanding of why
16 Bank of America Merrill Lynch was brought in?
17    A.   My understanding was that the company
18 felt that two sets of eyes might be better than
19 one.
20    Q.   Do you have any understanding why Bank
21 of America Merrill Lynch did not become engaged?
22    A.   I believe it was felt that they had a
23 conflict because of their participation in one
24 of the DIP facilities.
25    Q.   And that conflict was not identified

---

CONFIDENTIAL - WILLIAM O. HILTZ

1  advisors that they felt the process we
2  were conducting with NextEra was too short, that it
3  would not allow adequate time for other bidders.
4       We had received similar feedback from
5  bidders themselves who said that they didn't
6  have enough time, needed more time, or in fact,
7  refused to participate in the process because
8  they didn't feel we were allowing enough time.
9       So, for all of those reasons, as well
10 as the fact that, as we negotiated with NextEra,
11 we believed we didn't have much leverage with
12 NextEra from a negotiating standpoint; we were
13 not making progress on a number of the
14 contractual issues that were important to us.
15      So, for all of those reasons, i.e.,
16 input from creditors that they were going to
17 object if we did sign up NextEra, input from
18 buyers that they needed more time or felt that
19 time was too short, and difficulties in
20 negotiating with NextEra all combine to lead to
21 the decision to go to a two-step process.
22      Q.   And the concerns that were expressed
23 concerning insufficient time was with respect to
24 participation in the stalking horse selection

---

CONFIDENTIAL - WILLIAM O. HILTZ

1  process?
2       A.   Correct.
3       Q.   Correct?
4            As distinct from an open auction
5  process?
6       A.   Correct.
7       Q.   This change to a two-step process was,
8  in your view, an important change?
9       A.   Yes.
10      Q.   And did you think that it was
11 important enough to inform all of the
12 prospective bidders that the process had changed
13 to a two-step process?
14      A.   Yes.
15      Q.   In fact, Evercore communicated this
16 change to every prospective it was then in
17 contact with?
18      A.   I believe so.
19      Q.   How was this communicated?  All by
20 e-mail?
21      A.   No, phone calls as well.
22      Q.   And do you have a log of those phone
23 calls?
24      A.   I do not.

---

CONFIDENTIAL - WILLIAM O. HILTZ

1       Q.   Do you know if anyone at Evercore has
2  a log of those phone calls?
3       A.   Not that I'm aware of.
4       Q.   But it is your understanding that
5  every prospective bidder was informed of that?
6       A.   That's my understanding.
7       Q.   Mr. Hiltz, going back to the now -- to
8  the 12 original NDAs that were signed as of the
9  date of your declaration, the prospective
10 bidders that entered into those 12 NDAs all
11 received teaser materials prior to signing the
12 NDA; is that correct?
13      A.   I believe so.
14           (Hiltz Exhibit 9, an e-mail chain with
15      attachment bearing Bates Nos.
16      EFH-EVR909999913 through 25, marked for
17      identification, as of this date.)
18 BY MR. DEVORE:
19      Q.   Mr. Hiltz, I have handed you what has
20 been marked as Exhibit 9, which again is an
21 e-mail from Sesh, this time dated July 25 to a
22 prospective bidder attaching teaser materials;
23 is that correct?
24      A.   Correct.

---

CONFIDENTIAL - WILLIAM O. HILTZ

1       Q.   Is this the version of teasers that
2  went out to prospective bidders in July?
3       A.   I believe it is.
4       Q.   And this is -- are you aware of the
5  next version of a teaser?
6       A.   Yes, I am.
7       Q.   And what is the date of that?
8       A.   I don't recall the date.
9       Q.   August?
10      A.   Might be early September.
11      Q.   Now, if we turn to page 1 of the
12 presentation, which is a few slides back with
13 the Bates number ending in 018, are you on that
14 page?
15      A.   Uh-huh.
16      Q.   Now, turning your attention to the
17 third bullet point, it states that, "The company
18 is pursuing a restructuring transaction, the TCH
19 spinoff, whereby, on the emergence date, TCH
20 will separate from EFH on a tax-free basis and
21 reorganized EFH would continue to own 100
22 percent of EFH and its 80 percent interest in
23 Oncor."  Do you see that?
24      A.   Yes.

---

18 (Pages 66 to 69)

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  Q.   And then on page 2, the next page, it
3  states, "Any acquisition of reorganized EFH
4  stock will need to be structured in order to
5  preserve the tax-free status of the TCH
6  spinoff," do you see that?
7  A.   Yes.
8  Q.   Now, this is what has been referred to
9  in the Debtor's bidding procedures motion as the
10 optimal deal structure, which you are referring
11 to as the efficient structure?
12 A.   Correct.
13 Q.   And the essence of that structure is
14 to provide for a transaction at the post-reorg.
15 EFH equity level in order to permit a tax-free
16 spin of the T side and also permit a tax-free
17 acquisition of the E side?
18 A.   Correct.
19 Q.   Is that an accurate statement?
20 A.   Yes.
21 Q.   Do you know how many prospective
22 bidders this teaser for solely a tax-free
23 transaction was sent to?
24 A.   This initial teaser?
25 Q.   Correct.

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  A.   I don't recall the exact number, but I
3  would add that every party has received a
4  subsequent teaser that obviously is not specific
5  with respect to tax structure.
6  Q.   We'll get to that in due course.  I
7  just want to walk through the process.
8  A.   Yes.
9  Q.   Now, returning your attention back to
10 Exhibit 5, which was that July 25 contact log?
11 A.   Yes.
12 Q.   And if you turn to the first page of
13 the actual log with Bates number ending 236,
14 there's a column in the middle that says Teaser
15 Sent.  Do you see that?
16 A.   Yes.
17 Q.   And there is four prospective bidders
18 that are identified as having received a teaser
19 on July 25, correct?
20 A.   Uh-huh.
21 Q.   And the teaser that you have in front
22 of you dated July 25, which is Exhibit 9, is
23 that the teaser that would have been sent to
24 these four prospective bidders?
25 A.   I believe so.

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  Q.   Was this contact log, to your
3  knowledge, updated after July 25?
4  A.   I would imagine so.
5  Q.   Was it your practice to keep a contact
6  log with respect to teasers sent?
7  A.   Yes.
8  Q.   So you believe that there is such a
9  contact log?
10 A.   I would think so, yes.
11 Q.   Have you done any search for the
12 contact log in preparation for document
13 production?
14 A.   I have not personally.
15 Q.   Has anyone from Evercore asked you if
16 a contact log existed -- I'm sorry, anyone at
17 Kirkland asked you if a contact log existed?
18 A.   Not that I recall.
19 MR. DEVORE:  We had requested
20 specifically in a request for production
21 that all contact logs be produced, and to
22 date, we have only received a contact log as
23 of July 25 and request that that be
24 immediately produced.
25 Q.   The last line of the cover e-mail with

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  the contact log -- again, we're on Exhibit No.
3  5, and if you go down to the second page?
4  A.   Uh-huh.
5  Q.   It lists four prospective bidders, and
6  it says, "Evercore is waiting for John Young to
7  make the first call," correct?
8  A.   Yes.
9  Q.   And earlier you testified that you
10 don't know who Mr. Young is?
11 A.   I do recall.
12 Q.   You now do recall?
13 A.   Yes.
14 Q.   And who is Mr. Young?
15 A.   I don't know his title, but I know he
16 works for EFH, and I've met with him on at least
17 one occasion.
18 Q.   Now, Mr. Hiltz, the bottom e-mail --
19 (Hiltz Exhibit 10, an e-mail chain
20 bearing Bates Nos. EFH90009231 through 9232,
21 marked for identification, as of this date.)
22 BY MR. DEVORE:
23 Q.   Now, Mr. Hiltz, if you look at Exhibit
24 10, the second e-mail down -- I'm sorry, the
25 third e-mail down, it's an e-mail from David

CONFIDENTIAL - WILLIAM O. HILTZ
1
2     A.   The buy side, and -- well, the sell
3  side.  Excuse me.
4     Q.   You're referring to the sell side?
5     A.   Yes.
6     Q.   Did anyone from the buy side indicate
7  any preference for a taxable versus non-taxable
8  structure?
9     A.   Well, again, they recognized that, in
10  order to win the auction, it's unlikely that a
11  taxable transaction will allow them to be the
12  winner, because they look at it the same way we
13  do, which is the price that you would have to
14  pay to produce the same economic value is a
15  price that they wouldn't be willing to pay and
16  that no person is likely to be willing to pay.
17     Q.   Now, I would like to go back to when
18  the teaser was changed from providing for a
19  non-taxable-only transaction to a taxable -- to
20  permit taxable transactions.
21         You stated before that you do not
22  recall when the teaser was changed; is that
23  correct?
24     A.   Correct, I don't recall the exact
25  date.

1         CONFIDENTIAL - WILLIAM O. HILTZ
2         (Hiltz Exhibit 13, an e-mail chain
3     bearing Bates Nos. EFH-EVR090000047 through
4     48, marked for identification, as of this
5     date.)
6  BY MR. DEVORE:
7     Q.   Mr. Hiltz, you have been handed what
8  has been marked as Exhibit 13.  Do you see that?
9     A.   Yes.
10     Q.   And the second e-mail down is an
11  e-mail dated September 10 from Bo Yi?
12     A.   Yes.
13     Q.   And it states, "We haven't sent out an
14  updated teaser or other marketing materials to
15  any parties yet"?
16     A.   Yes.
17     Q.   Do you see that?
18         Does this indicate that no updated
19  teasers had gone out as of September 10?
20     A.   Yes.
21     Q.   So, to the best of your knowledge, the
22  teaser was not changed to provide for bids in
23  any form as of September 10, correct?
24     A.   Correct.
25     Q.   Now, when were the 12 prospective

1         CONFIDENTIAL - WILLIAM O. HILTZ
2  bidders that signed NDAs as of the date of your
3  declaration informed of the change from inviting
4  bids for only non-taxable structures to inviting
5  bids for transactions in any form?
6     A.   I'm not sure.
7     Q.   Was it prior to September 19, the
8  filing of the motion?
9     A.   I believe so, but I can't state for
10  certain.
11     Q.   What's the basis for the belief?
12     A.   Well, we called people to tell them
13  that we were going to change the process, and I
14  can't recall if as part of those telephone
15  conversations they were alerted to the fact that
16  we would also accept taxable bids as well as
17  non-taxable bids.
18     Q.   And would that information be kept in
19  a call log?
20     A.   Not necessarily, no.
21     Q.   Would you expect that it may be in a
22  call log?
23     A.   I wouldn't think it would be.
24     Q.   And why not?
25     A.   Well, because the call log isn't

1         CONFIDENTIAL - WILLIAM O. HILTZ
2  specific with respect to the content of the
3  conversation.
4         Again, we attempted to call everyone
5  once we had made a decision to change the
6  process, so I believe those calls started
7  perhaps late the week before Labor Day or early
8  the week following Labor Day.  I can't recall if
9  those calls merely stated that we were giving
10  people more time and were going to a two-stage
11  process or whether it also referenced a
12  willingness to accept taxable bids.
13     Q.   So, sitting here today, you have no
14  knowledge of a communication, prior to September
15  19, a specific knowledge of a specific
16  communication informing prospective bidders that
17  the Debtors would accept bids in any form?
18     A.   That's correct.
19         (Hiltz Exhibit 14, an e-mail with
20     attachment bearing Bates Nos.
21     EFH-EVR090001062 through 1167, marked for
22     identification, as of this date.)
23  BY MR. DEVORE:
24     Q.   Mr. Hiltz, I have handed you what has
25  been marked as Exhibit 14, which is an e-mail

CONFIDENTIAL - WILLIAM O. HILTZ

1  said, which is when we discussed a taxable
2  transaction, one of the factors that's been
3  discussed is if a buyer did achieve a step up,
4  there was a question as to whether the PUC would
5  allow them to receive the full benefit of that
6  step up or whether rates would be adjusted to
7  give part or all of that benefit to the rate
8  payors.
9      Q.   What I'm trying to understand is what
10  is the basis for that statement?  Was it
11  conversations that Mr. Ying had or -- I'm sorry,
12  Mr. Keglevic had with the PUCT?
13     A.   I don't know.
14     Q.   You have no understanding of where
15  that comes from?
16     A.   No.
17     Q.   Has any analysis been performed with
18  respect to the value that a prospective bidder
19  would pay for a step up in basis?
20     A.   Yes.
21     Q.   And what is that analysis?
22     A.   I had some junior people for me run
23  the present value of the step up in basis that
24  would occur.

CONFIDENTIAL - WILLIAM O. HILTZ

1      Q.   And what is the value of that step up
2  in basis as calculated by Evercore?
3      A.   It's about $2 billion.
4      Q.   So, based on this analysis from the
5  perspective -- the perspective of the purchaser,
6  they would pay $2 billion more for this asset
7  with the step up in basis?
8      A.   Assuming the step up was in the
9  depreciable assets as opposed to the stock of
10  Oncor and assuming that they were able to keep
11  the full benefit of that step up.
12     Q.   And do you think that is the likely
13  scenario in this transaction?
14     A.   I don't know.  I'm not a tax lawyer,
15  so it's unclear to me whether they can actually
16  achieve a step up in basis in the assets as
17  opposed to getting their increased basis in the
18  stock of Oncor.
19     Q.   But if they were to achieve that step
20  up, that would be a $2 billion increase in the
21  purchase price?
22     A.   Correct.
23          (Discussion off the record.)
24     A.   But they have to pay roughly $5

CONFIDENTIAL - WILLIAM O. HILTZ

1  billion more to produce equivalent value to the
2  Debtors.
3      Q.   I'm sorry, I didn't mean to talk over
4  you.  They have to pay $5 billion more?
5      A.   To get the same result for the Debtor
6  as the tax-free transaction, that's correct.
7      Q.   So there's a disconnect, correct,
8  between --
9      A.   No, there's not.  There's not a
10  disconnect at all.  That's the circumstance you
11  always have with buyers and sellers.  It's the
12  seller who is making the decision as to which
13  party to sell to.  The fact that one buyer might
14  like a taxable transaction has nothing to do
15  unless he can offer equivalent value.
16     Q.   And are you aware that creditors,
17  depending on where they sit, may prefer a
18  taxable versus a non-taxable transaction?
19     A.   I have yet to understand why that's
20  the case, but I am aware that some people are
21  asserting that.
22     Q.   I'd like to go back to your earlier
23  testimony when you referred to difficulties in
24  negotiating with NextEra which caused the

CONFIDENTIAL - WILLIAM O. HILTZ

1  Debtors to change course to the -- call it the
2  two-step process.
3          What difficulties are you referring
4  to?
5      A.   Oh, two, primarily.  There was one
6  that was economic where some -- they were
7  backing off their purchase price a little, and
8  secondly, was the "regulatory out" language,
9  which is an important component to the contract.
10     Q.   And what is your understanding of the
11  issue on the "regulatory out" language?
12         MS. FLOM:  Objection.  The judge has
13  ruled on the extent that any negotiations
14  with the bidders --
15         MR. DEVORE:  Fair enough.  I withdraw
16  the question.
17         Can you just identify yourself for the
18  record?
19         MS. FLOM:  This is Beret Flom from
20  Chadbourne.
21  BY MR. DEVORE:
22     Q.   Mr. Hiltz, changing topics.  The
23  bidding procedures contemplate Round 1 bids for
24  the stalking horse position to be submitted on

CONFIDENTIAL - WILLIAM O. HILTZ

1
2 October 23; is that right?
3      A.   Yes.
4      Q.   And if an interested party does not
5 submit its bid by October 23, that party is
6 precluded from participating in the stalking
7 horse selection process?
8      A.   Correct.
9      Q.   And around October 23, the Debtors are
10 going to cut down the bids submitted to a subset
11 that will then proceed to Round 2; is that
12 correct?
13      A.   Correct.
14      Q.   How many bids do the Debtors
15 anticipate participating in Round 2?
16      A.   It really depends.  One would like to
17 have optimally at least three or four.
18 Obviously, I would not expect all bidders to
19 proceed to Round 2, but the exact number will be
20 largely a function of how closely clustered
21 those bids are.  To the extent they are closely
22 clustered, there would be a larger number of
23 people in Round 2.
24      Q.   Do you recall being on a call with the
25 EFIH first lien noteholders' advisors, including

CONFIDENTIAL - WILLIAM O. HILTZ

1
2 Capstone and Ropes & Gray, regarding this
3 process?
4      A.   I had so many of those calls I don't
5 specifically recall, but I may have been.
6      Q.   Do you recall being asked the number
7 of bids that it would be cut down to?
8      A.   Not specifically.
9      Q.   Do you recall indicating that the bids
10 would be cut down to two to four bids?
11      A.   I'm sure that I gave the same -- I
12 would be very surprised if I didn't say exactly
13 the same thing I just said now, which it could
14 be two to four.  I said, optimally, three to
15 four, but it would be more to the extent that
16 bids were tightly clustered.
17      Q.   Did anyone else ask about these
18 cut-downs?
19      A.   Oh, I'm sure someone else asked.  We
20 had six or seven of those calls with varying
21 creditor constituencies.  It's hard to remember
22 the specifics of any given call.
23      Q.   Sitting here you don't remember who
24 may have asked?
25      A.   No.

CONFIDENTIAL - WILLIAM O. HILTZ

1
2      Q.   Now, the Debtors believe that
3 submitting Round 1 bids by October 23 was
4 reasonable based on the Debtors' extensive
5 marketing process to this point, is that
6 correct?
7      A.   Correct.
8      Q.   And just so I understand it, based on
9 the dates of these NDAs, at least eight of the
10 bidders currently involved in this process have
11 been involved since July or August, does that
12 sound right?
13      A.   Yes.
14      Q.   And three more were provided access in
15 September, does that sound right?
16      A.   Yes.
17      Q.   Will interested parties not moving on
18 to Round 2 be able to conduct diligence during
19 Round 2?
20      A.   I'm not sure.  I don't recall.
21      Q.   Do you recall the --
22      A.   Actually, yes.  I'm sorry.  Yes, I
23 believe they will.  I believe any qualified
24 bidder continues to have access to the due
25 diligence.

CONFIDENTIAL - WILLIAM O. HILTZ

1
2      Q.   And what is the basis for that belief?
3      A.   Looking at the bidding procedures
4 motion.
5      Q.   Could you point us to a provision?
6      A.   Is that Exhibit 1?
7      Q.   Correct.
8      A.   Bottom of page 12, top of page 13.
9 "Importantly participation in the stalking horse
10 bidding process is not a prerequisite to
11 participation in the open bidding process.  In
12 addition, bidders that participated in the
13 stalking horse process but were not selected as
14 a stalking horse bid will also be permitted to
15 participate in the open bidding process and
16 continue to have reasonable due diligence
17 access."
18      Q.   Okay.  Thank you.  Now, that's in the
19 motion?
20      A.   Yes.
21      Q.   I apologize, there was confusion.  I
22 was thinking of the procedures.
23           Do you know if that provision is in
24 the procedures?
25      A.   I don't recall.

1      CONFIDENTIAL - WILLIAM O. HILTZ
2  horse process but would be interested in
3  participating in the open auction process?
4      A.   In the earlier process, the shorter
5  process, I believe there was at least one bidder
6  who said he would wait for the open auction
7  process.
8      Q.   But now that it's been changed to an
9  extended stalking horse process, there's been no
10  such indication from a bidder?
11      A.   I can't recall whether that party is
12  still in the process now or not.
13      Q.   But there's only one that may have
14  said that?
15      A.   That's all that I'm aware of.
16      Q.   Do you have any reason to believe that
17  prospective bidders will participate in the open
18  auction process if they didn't participate in
19  the stalking horse process?
20      A.   If they did not participate?  It's
21  conceivable.  I would doubt it, but it's
22  conceivable.
23      Q.   Mr. Hiltz, the Debtors started
24  marketing this asset in July, correct?
25      A.   That's correct.

1      CONFIDENTIAL - WILLIAM O. HILTZ
2      Q.   And you gave prospective bidders until
3  October 23 to submit non-binding letters of
4  intent with illustrative terms?
5      A.   Yes.
6      Q.   Now, selected Round 1 bidders must
7  submit initial marked versions of documentation
8  by November 7?
9      A.   Correct.
10      Q.   And then there would be negotiations
11  over the documentation until around November 21;
12  is that correct?
13      A.   Correct.
14      Q.   So, as of the completion of
15  documentation around November 21, the bidders
16  that have entered into NDAs, the vast majority
17  of them, will have been involved in this process
18  for two to three months; is that right?
19      A.   Yes.
20      Q.   Now, one of the rationales for having
21  only a 30-day open auction process is because of
22  the longer initial stalking horse process?
23      A.   Correct.
24      Q.   Correct?  Now, if the Debtors or
25  Evercore had missed a prospective bidder, how

1      CONFIDENTIAL - WILLIAM O. HILTZ
2  can 30 days be sufficient for submitting a bid
3  when other parties have been given access for
4  over two to three months?
5      MS. O'CONNOR:  Object to form.
6      A.   Well, I don't think it's a question of
7  missing the bid.  It is no secret that this
8  asset is for sale.  We have gotten
9  over-the-transom calls, as I mentioned earlier,
10  from -- we don't think it's a likely bidder, but
11  from a bidder.
12      He's holding up a sign for you.
13      We've gotten over-the-transom calls.
14  Anyone who is a likely bidder is certainly aware
15  of this process, and we would have expected
16  would have contacted us.  So I don't think it's
17  a very likely case at all that someone wakes up
18  when we announce a stalking horse bid and says,
19  oh, my gosh, I wish I had been looking at this
20  and now I have only got 30 days.  I just don't
21  see that as being a realistic scenario.
22      Q.   Now, are you planning to speak to
23  bidders prior to Round 2 -- of the world that
24  submits bids in Round 1, are you planning to
25  talk to them before they -- before Round 2 to

1      CONFIDENTIAL - WILLIAM O. HILTZ
2  try to increase their bids?
3      A.   Of course.
4      Q.   And how do you envision that process
5  playing out, generally?
6      A.   Well, it's the way it always plays
7  out, which is you talk to them, you say, gee,
8  you know, you just barely made it into Round 2,
9  you're going to have to be a lot more
10  aggressive; if there are particular elements to
11  their bid that we don't find attractive, we'll
12  talk to them about that, but it's the normal
13  thing you do in negotiating in the context of an
14  auction.
15      Q.   And were you aware that Mr. Ying
16  informed Mr. Keglevic that one of the dynamics
17  in the energy market is that if you select a
18  stalking horse, the other bidders won't show up
19  for the auction?
20      MS. O'CONNOR:  Object to form.
21      A.   I think that what he has said, and
22  certainly what I would say is that, first of
23  all, it was Lazard that originally raised this
24  problem, and Lazard's contention -- and this was
25  in the context of them saying they would object

1    CONFIDENTIAL - WILLIAM O. HILTZ
2  if we went ahead with NextEra -- their
3  contention was that utilities are very
4  conservative, they won't jump another person's
5  deal, so that it was Lazard's contention that
6  selection of a stalking horse in effect
7  represented the end of the auction.
8      And they based that judgment on the
9  fact that there are relatively few -- not none,
10  but relatively few examples where utilities have
11  jumped a strategic deal by another party.  That
12  is fact.  I think our view is that Lazard's
13  concerns have some merit.  We wouldn't say that
14  absolutely no utility will jump another deal,
15  particularly in the context of an open
16  bankruptcy auction, which is a little different
17  than outside of bankruptcy, but we do feel that
18  there is some concern that you would have --
19  that there will be some utilities who would not
20  be prepared to jump another deal in an open
21  auction.
22      Q.   I think you said that that -- our
23  view?
24      A.   Yes.
25      Q.   Whose view was that?

1    CONFIDENTIAL - WILLIAM O. HILTZ
2      A.   Mine and David's.
3      Q.   And Mr. Ying has more experience in
4  this sector than you do?
5          MS. O'CONNOR:  Object to form.
6      A.   Modestly more.
7          MR. DEVORE:  This may be a good point
8  to break with the tape.
9          MS. O'CONNOR:  Okay.
10          THE VIDEOGRAPHER:  The time is 11:57
11  a.m.  We are coming off the record.
12          (Recess.)
13          THE VIDEOGRAPHER:  The time is 12:10
14  p.m.  We are going back on the record.
15  BY MR. DEVORE:
16      Q.   Mr. Hiltz, I would like to go back to
17  the bidding procedures that were attached to the
18  bidding procedures motion, which is Exhibit 1.
19      A.   Yes.
20      Q.   Annex -- or Exhibit 1 to Exhibit A.
21          Now what was your role in developing
22  those bidding procedures?
23      A.   Well, I mean, I was one of the key
24  participants in the development of the bidding
25  procedures.

1    CONFIDENTIAL - WILLIAM O. HILTZ
2      Q.   Was anyone more involved than you in
3  developing these procedures?
4      A.   I would say Kirkland & Ellis was
5  certainly as involved as I was.
6      Q.   But from Evercore, you were the
7  primary person?
8      A.   Yes.
9      Q.   Now, you testified earlier that you do
10  not know who approved the filing of these
11  bidding procedures; is that correct?
12      A.   Correct.
13      Q.   Now, I would like to turn to the
14  proposed order approving the bidding procedures
15  that's Exhibit A to the motion.
16      A.   Okay.
17      Q.   Are you there?
18      A.   Yes, I think so.
19      Q.   If you turn to page 7 -- I'm sorry,
20  paragraph 7.  The proposed order states, "The
21  Debtors are authorized, following consultation
22  with their advisors, to modify the bidding
23  procedures in any manner they determine, in
24  their sole business judgment, will best promote
25  the goals of the bidding process," and it goes

1    CONFIDENTIAL - WILLIAM O. HILTZ
2  on from there.  Do you see that?
3      A.   Yeah.  Yes, I do.
4      Q.   Now, and this paragraph of the order
5  provides that the Debtors are authorized to make
6  changes to the process, that's a fair summary?
7      A.   Yes.
8      Q.   Now, if you turn to the list of
9  examples towards the end of paragraph 7, after
10  it says "including, without limitation," the
11  first thing in that list is it says that the
12  Debtors will be authorized to change the bid
13  requirements.  Do you see that?
14      A.   Uh-huh.
15      Q.   So, if approved, would the Debtors be
16  able to tighten or loosen the bid requirements
17  to get past the Phase 1 cut-down?
18      A.   Yes, we could.
19      Q.   And that would be in their sole
20  discretion?
21      A.   That's correct.
22      Q.   The second item listed there is that
23  the Debtors could change the open bid
24  requirements, do you see that?
25      A.   Yes.

CONFIDENTIAL - WILLIAM O. HILTZ
1
2  Q.  So, if approved, the Debtors would be
3  able to tighten or loosen the requirements for
4  participation in the 30-day open bidding
5  process; is that correct?
6  A.  That's correct.
7  Q.  And the third item that's listed there
8  is "adjourning the auction at the auction and/or
9  adjourning the auction approval hearing in open
10  court without further notice canceling the
11  auction."  Do you see that?
12  A.  Yes.
13  Q.  Does this mean that we could go
14  through this entire process and there would be
15  no auction?
16  A.  That's theoretically possible, but as
17  I sit here today, I would not anticipate any
18  change to the bidding process.  This is
19  typical language that we put in every document
20  that we create like this in the context of an
21  out-of-bankruptcy auction, just giving us the
22  flexibility to deal with unanticipated changes
23  in circumstances or events.
24  Q.  Are you aware --
25  A.  But again, as I sit here today, I see

1  CONFIDENTIAL - WILLIAM O. HILTZ
2  no reason why we will change any part of the
3  process.
4  Q.  Are you aware of whether this is
5  typical in bankruptcy auctions?
6  A.  I'm not.
7  Q.  The fourth item listed is rejecting
8  any or all qualified bids, correct?
9  A.  Correct.
10  Q.  If approved, does this mean that the
11  Debtors could reject bids even if they are
12  otherwise qualified?
13  A.  Well, a qualified bid has nothing to
14  do with whether it's the best bid.  So, I mean,
15  we would -- of course, they're going to be
16  qualified bids that we are going to reject, by
17  definition.
18  Q.  But this states that you could reject
19  any qualified bids before considering them in
20  the final selection process, correct?
21  A.  I don't think it says anything about
22  whether or not we have considered them.  I mean,
23  I will give you an example, okay?  Suppose we
24  had a bid that was otherwise attractive but
25  imposed a 45-day drop-dead date to the contract.

1  CONFIDENTIAL - WILLIAM O. HILTZ
2  We would reject that bid because that bid
3  realistically would have no chance of closing.
4  Q.  Mr. Hiltz, could you identify anything
5  in the bidding procedures that are attached to
6  the order that the Debtors would be unable to
7  change after this order is entered?
8  Because the language says "the Debtors
9  are authorized to modify the bidding procedures
10  in any manner."
11  A.  Yes.
12  Q.  And it goes on "including, without
13  limitation"?
14  A.  Yes.
15  Q.  What I want to know, is there anything
16  in those bidding procedures the Debtors couldn't
17  change in their sole discretion?
18  A.  I think the language would give us the
19  ability to change whatever we wished, but again,
20  I'll repeat that as we sit here today, I don't
21  anticipate us changing any material aspect of
22  the bidding procedures unless there's some
23  unforeseen event or circumstance.
24  Q.  In your view, will creditors be able
25  to come back to the Bankruptcy Court after these

1  CONFIDENTIAL - WILLIAM O. HILTZ
2  procedures are approved to challenge any
3  decision the Debtors make with respect to this
4  process?
5  MS. O'CONNOR:  Object to form.
6  A.  They will have an opportunity to do
7  that after we have signed a stalking horse bid
8  and before such bid is approved by the court.
9  Q.  That's only after the stalking horse
10  is selected?
11  A.  Correct.
12  Q.  Now, paragraph 7 that we have been
13  talking about states that the "Debtors are
14  authorized," and it goes on from there?
15  A.  Right.
16  Q.  Which Debtors does this refer to as
17  authorized to modify the bidding procedures,
18  EFH, EFIH, TCEH, none of the above?
19  A.  I'm not clear whether a change in
20  bidding procedures would require the approval of
21  the EFH board along with the independent
22  directors representing the T side and EFIH.
23  Q.  Do you --
24  A.  I would expect, as a matter of course,
25  that were we to make a material change in these

1     CONFIDENTIAL - WILLIAM O. HILTZ
2 procedures, that we would discuss that with the
3 board.
4     Q.   And have you considered how any
5 inter-estate conflicts would be revolved in
6 connection with any proposed changes to the
7 bidding procedures?
8     A.   I'm sorry, any what conflicts?
9     Q.   Have you considered how any
10 inter-estate conflicts would be resolved in
11 connection with any proposed changes to the
12 bidding procedures?
13     MS. O'CONNOR:  Object to form.
14     A.   Again, I'm not sure I see any
15 conflicts with respect to the bidding
16 procedures.
17     Q.   Now, if you could turn to paragraph 8
18 of the order, this states that, "Each bidder
19 must acknowledge in writing that it has not
20 engaged in any collusion with respect to any
21 bids," do you see that?
22     A.   Yes.
23     Q.   In your view, does this provision
24 preclude discussions by a bidder with creditors
25 concerning a potential transaction?

1     CONFIDENTIAL - WILLIAM O. HILTZ
2     A.   Discussions?  Well, again, as I think
3 you know, we are limiting discussions between
4 bidders and creditors without our consent.  We
5 are also preventing any exclusive arrangements
6 between bidders and creditors because we believe
7 that that is not conducive to producing the best
8 possible value.
9     Q.   And this is the result of the NDAs; is
10 that right?
11     A.   Correct.
12     Q.   Now, if the turn to the NDAs, which
13 are Exhibit 6 --
14     A.   Yes.
15     Q.   -- if we go to what is marked as
16 Exhibit 6B, which is a confidentiality agreement
17 dated August 8; are you on the same one?
18     A.   Yes.
19     Q.   If you turn to the second page in the
20 middle of the paragraph, there's language that
21 states, "Notwithstanding anything to the
22 contrary herein, (i) neither you nor your
23 Representatives shall contact any debt financing
24 source or any creditor of one or more of the
25 Company Parties without the prior written

1     CONFIDENTIAL - WILLIAM O. HILTZ
2 consent of the Company Parties (such consent not
3 to be unreasonably withheld)"?
4     A.   Yes.
5     Q.   Is that the provision that you are
6 referring to?
7     A.   Yes.
8     Q.   Now, you mentioned earlier that some
9 of -- one or more prospective purchasers had
10 required creditor confidentiality restrictions;
11 is that correct?
12     A.   I'm sorry, say that again.
13     Q.   You mentioned earlier that this
14 language was added at the request of prospective
15 bidders; is that right?
16     MS. O'CONNOR:  Objection.  Objection
17 to form.
18     A.   No, I didn't say that.
19     Q.   Who inserted this language into the
20 form NDA?
21     A.   The language you just referred to
22 regarding contact with creditors and exclusive
23 arrangements with creditors?
24     Q.   Yes.
25     A.   Evercore and Kirkland & Ellis.

1     CONFIDENTIAL - WILLIAM O. HILTZ
2     Q.   Did any bidder request that they be
3 precluded from contacting creditors?
4     A.   Not to my knowledge.
5     Q.   Now, this provision requires the
6 consent of the company parties; is that correct?
7     A.   Yes.
8     Q.   And company parties are defined to be
9 both EFH and EFIH, correct?
10     A.   I'm not sure.
11     Q.   If you go to the first page?
12     A.   Yes.
13     Q.   First paragraph, where its starts
14 little (i)?
15     A.   I see it.
16     Q.   And that indicates both EFH and EFIH?
17     A.   Yes.
18     Q.   Why do both EFH and EFIH have to
19 consent to creditor communications?
20     A.   Well, I don't know why those specific
21 entities both are included there.  Again, this
22 was drafted -- this was not drafted by me, but
23 again, the concept here is that we want to
24 control the process.  We want to know who's
25 talking with who, and it's a very slippery slope

35 (Pages 134 to 137)

CONFIDENTIAL - WILLIAM O. HILTZ

1  from talking with creditors to making an
2  exclusive arrangement with creditors, and there
3  is a bit of a gray area there that again we
4  believe isn't necessarily helpful in terms of
5  producing maximum value.  So that's the reason
6  why we want to control the contact between
7  bidders and creditors.
8      Q.  Now, are you aware that, in connection
9  with the second lien DIP financing transaction
10  that was proposed prior to your involvement,
11  that a bidding war broke out between -- among
12  creditor constituencies teamed up with some
13  strategics?
14      A.  Yes.
15      Q.  Does that preclude that type of a
16  transaction?
17      A.  It -- it puts us in a position they
18  can't have an exclusive arrangement with any
19  creditor group.  It doesn't prevent them from
20  talking and submitting a bid, but it does
21  prevent them from having any kind of exclusive
22  arrangement.
23      Q.  Well, I'm confused because the
24  language says, "You shall not contact any
25

CONFIDENTIAL - WILLIAM O. HILTZ

1  creditor without the prior written consent of
2  the company parties"?
3      A.  Correct.
4      Q.  So I want to know if I'm a creditor
5  and I want to engage in a joint bid with a
6  strategic investor, how do I do that?
7      A.  You come to us and ask for permission
8  to have a discussion, and in fact, my
9  recollection is that there have been parties who
10  have asked to talk with creditors, and we have
11  not prevented any of those discussions from
12  taking place.
13      Q.  You have permitted those discussions?
14      A.  Yes.
15      Q.  Now, I would like you to go back just
16  a moment for the requested approval of the
17  procedures on October 17 and then the submission
18  of round -- Round 1 bids by October 23, six days
19  later?
20      A.  Yes.
21      Q.  Assuming the proposed procedures are
22  approved, are the Debtors going to be sending
23  any additional marketing materials out to
24  prospective bidders?
25

CONFIDENTIAL - WILLIAM O. HILTZ

1      A.  No.
2      Q.  Do you anticipate reaching out to any
3  prospective bidders that have not already been
4  identified?
5      A.  No.  Unless someone comes in over the
6  transom, as happened last week.
7      Q.  The bidding procedures preclude
8  creditor involvement in consultation -- in
9  connection with the stalking horse approval
10  process; is that right?
11      A.  Yes.
12      Q.  And you testified earlier that this
13  was the result of concerns about
14  confidentiality; is that correct?
15      A.  Correct.
16      Q.  And these were largely concerns of the
17  company as well as the bidders?
18      A.  Yes.
19      Q.  Was one side more concerned than the
20  other regarding confidentiality concerns?
21      A.  I think each side is concerned.
22  Certainly the company has significant concerns
23  about that, and I, as the advisor to the
24  company, have significant concerns about that.
25

CONFIDENTIAL - WILLIAM O. HILTZ

1      Q.  Did you inform your employees at
2  Evercore of the need to maintain the
3  confidentiality of the prospective bidders'
4  identities?
5      A.  Yes.
6      Q.  Are you aware of whether that same
7  caution was given to employees at the Debtors?
8      A.  I'm not aware, but I assume it has.
9      Q.  Do you believe that these NDAs that
10  were signed up adequately protect against the
11  risk of public disclosure?
12      A.  They never adequately protect against
13  the risk of public disclosure.  You know, leaks
14  in merger and acquisition transactions are
15  common despite the fact that, you know, in
16  almost every circumstance, there's a similar
17  document to this that's signed.
18      Q.  And is it safe to assume that your
19  view is that giving creditors access to this
20  information under an NDA provides an increase in
21  the incremental risk?
22      A.  Provides an enormous incremental risk.
23      Q.  Are you aware that there's a
24  protective order entered in these cases
25

1    CONFIDENTIAL - WILLIAM O. HILTZ
2  take stock in a reorganized company that does
3  not publicly trade, under that set of
4  circumstances, because there's no objective
5  measure of a value as there is with a public
6  company's securities that are trading, under
7  that set of circumstances, it's conceivable that
8  we would have a consultation with creditors.
9    Q.   And by creditors, you mean a small
10  subset of those creditors?
11    A.   Yes, correct.
12    Q.   Now, going back to the bid criteria,
13  number 9 is Other Factors, any other factors
14  that the Debtors, in their sole discretion,
15  determine are relevant; do you see that?
16    A.   Uh-huh.
17    Q.   If approved, these procedures mean
18  that the Debtors could tighten or loosen the bid
19  criteria in their sole direction, correct?
20    A.   Correct.
21    Q.   Same question as before, what Debtors
22  could do that?
23    A.   Again, I would assume we would only do
24  that after having discussed it with the board of
25  EFH, including the independent directors of EFIH

1    CONFIDENTIAL - WILLIAM O. HILTZ
2  and the T side.
3    Q.   What I want to know is a conflict
4  arises --
5    A.   What conflict?
6    Q.   Inter-estate conflicts.
7    A.   I don't understand.  When you say an
8  inter-estate conflict in the context of these
9  bidding procedure motions, I'm not sure what you
10  are referring to.  Could you be more specific?
11    Q.   Have you considered at all how these
12  procedures will be changed if conflicts arise?
13    A.   I don't -- without understanding what
14  conflicts you're referring to, I can't answer
15  your question.  Be specific about a conflict.
16    Q.   You're the chairman of Evercore's
17  Special Committee practice, correct?
18    A.   Correct.
19    Q.   Conflicts arise in various ways,
20  correct?
21    A.   Well, again, I don't see a conflict
22  here.  What we're doing in this process is to
23  maximize the economic value of the 80 percent
24  ownership in Oncor, taking into account any tax
25  liability that results.

1    CONFIDENTIAL - WILLIAM O. HILTZ
2    The E stack of the creditors, again,
3  you know, benefit very directly by the
4  maximization of value.  The T side creditors, at
5  least as we sit here today, have no established
6  claims against the E side.  To the extent that
7  they do have claims, they as well benefit by
8  maximizing the after-tax value.
9    So I'm just not sure that I understand
10  what kinds of conflicts you're referring to.
11    Q.   So, sitting here today, you do not
12  think that there will be any conflicts in
13  connection with bidding procedures going
14  forward?
15    MS. O'CONNOR:  Object to form.
16    A.   Well, I understand the objections that
17  have been raised by -- primarily, by the
18  out-of-the-money T side creditors with respect
19  to this process.
20    Q.   So conflicts issues have been raised?
21    A.   Well, I'm not sure they're conflicts.
22  They're different points of view as to what the
23  right way forward is.
24    Q.   And do you --
25    A.   But I'm not sure that there is a

1    CONFIDENTIAL - WILLIAM O. HILTZ
2  conflict of interest.
3    Q.   And do you understand that the
4  differing views of different creditor
5  constituencies may reflect the different views
6  of those estates?
7    A.   Well, again, I understand that they
8  are making objections to, for example, favoring
9  a taxable transaction.  I don't see how that is
10  in their benefit, but that's just me.
11    Q.   I would like to go back to, actually,
12  the very beginning of our deposition.
13    A.   Yeah.
14    Q.   And you mentioned that you reviewed
15  various documents in preparing for today's
16  deposition, correct?
17    A.   Correct.
18    Q.   You said you reviewed the levels of
19  M&A activity?
20    A.   Yes.
21    Q.   What form of this -- did you review
22  this information in?
23    A.   What do you mean, what form?
24    Q.   Was it Evercore e-mails?  Press
25  reports?

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  Q.   Correct?
3  A.   Uh-huh.
4  Q.   Have you seen any term sheets that
5  describe the T side plan or any of its elements?
6  A.   Not over and above what I just
7  articulated.
8  Q.   What do you know about the litigation
9  between Avenue and a bunch of other bondholders
10 and Fidelity?
11 A.   I'm notionally familiar with it.
12 Q.   Tell us what you know about it.
13 A.   That there is litigation over a call
14 option that would entitle them to buy a piece of
15 Fidelity's paper at a discounted price.
16 Q.   Have any of the prospective bidders
17 talked to you about that litigation?
18 A.   Not to me, no.
19 Q.   To your knowledge, have any of the
20 prospective bidders talked to anybody on the
21 Debtors side about that litigation?
22 A.   I don't know the answer.
23 Q.   Do you believe that that litigation
24 presents any execution risk for a potential
25 bidder?

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  A.   I don't see that that is particularly
3  relevant unless it impacts the timing of the
4  plan of reorganization.
5  Q.   Do you believe that it impacts the
6  timing of the plan of reorganization?
7  A.   I don't know the answer to that.
8  Q.   You're aware that there is opposition
9  to the bidding procedures motion from various
10 creditors on the E side of the equation?
11 A.   Yes.
12 Q.   Which creditors on the E side of the
13 equation have threatened to object to the
14 bidding procedure?
15 A.   The varying committees for the
16 unsecured creditors, and I can't recall whether
17 the second liens.  Probably the second liens as
18 well, but I'm not sure.
19 Q.   Can you think of any constituency on
20 the E side of the equation that supports the
21 Debtors' bidding procedures.
22 A.   I believe the first lien, first lien
23 holders on the E side do.
24 Q.   On the E side do?
25 A.   Yeah, but again, that's just

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  anecdotal.  I haven't spoken with them myself.
3  Q.   Which creditors on the T side of the
4  equation, if you know, support the Debtors'
5  motion?
6  A.   As far as I know, all the creditors on
7  the E side support it.
8  Q.   Let me break it down for you again?
9  A.   Okay.
10 Q.   Because I think one of us is confused.
11     MS. O'CONNOR:  I think you just may
12 need to repeat the question?
13 Q.   I need to start again.  To your
14 knowledge, which, if any, creditors on the E
15 side --
16 A.   Uh-huh.
17 Q.   -- support the Debtors' bidding
18 procedures motion?
19 A.   I believe the first lien TCEH
20 creditors.
21 Q.   Okay.
22 A.   Again, I've just been told that
23 anecdotally.  I haven't been told that myself.
24 Q.   Either you're not listening or I'm not
25 making myself clear.

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  A.   Oh, you said the E side?
3  Q.   So now let's start all over again
4  since you have succeeded in making the record a
5  mess, or we both have.
6     To your knowledge, which, if any,
7  creditors on the E side of the business supports
8  the Debtors' pending motion?
9  A.   As far as I know, they all do.
10 Q.   So you believe that the EFIH first
11 liens support this motion?
12 A.   I believe so.
13 Q.   What's the basis of that belief?
14 A.   That's what I've been told.
15 Q.   Who told you that?
16 A.   I think David Ying told me that.
17 Q.   And what about the EFIH second lien?
18 A.   Again, to my knowledge, there's no
19 significant opposition to the bidding procedures
20 from any of the creditors on the E side, to the
21 best of my knowledge.
22 Q.   What, if any, reaction would you have
23 as the guy who's running the auction and has to
24 deal with prospective bidders' execution risk
25 were you to find out that, as we sit here today,

54 (Pages 210 to 213)

1    CONFIDENTIAL - WILLIAM O. HILTZ
2  or Sesh regarding this topic?
3         MS. O'CONNOR:  Object to form.
4      A.   That's correct.
5      Q.   If we turn to page 7, which has
6  category 8 on it?
7      A.   Uh-huh.
8      Q.   This is, again, this is an EFIH
9  Unsecured Topic 1, which is actually EFIH first
10 lien trustee.  You stated that you reviewed a
11 summary of the marketing process; is that
12 correct?
13     A.   Correct.
14     Q.   Did you have any communications with
15 Mr. Ying or Sesh regarding this topic?
16     A.   Yes.
17     Q.   And when were those communications?
18     A.   As recently as this morning.
19     Q.   And what was said in those
20 discussions?
21     A.   It was basically just going over a
22 schedule that was prepared that showed, again,
23 the number of parties contacted initially, the
24 number of NDAs that were signed, the identity of
25 the parties, then where that process stood as of

1    CONFIDENTIAL - WILLIAM O. HILTZ
2  the filing of the motion, i.e., the number of
3  parties that had been contacted, the number of
4  NDAs that had been signed, and where that stood
5  as of this morning.
6      Q.   Now, to save time, I'm going to ask
7  you a series of questions, and for each one if
8  you could tell me if you specifically know the
9  answer to that; and, if not, who you would need
10 to talk to to get an understanding in order to
11 provide an answer to that question.
12        Do you understand what I'm getting at?
13     A.   Yes.
14     Q.   During what period between July 1 and
15 today were teasers that provided only for a
16 non-taxable transaction sent to prospective
17 bidders?
18     A.   I believe I know the answer to that.
19     Q.   And what is that period?
20     A.   It was the 16th of July, when I
21 believe the initial teaser was dated, and I
22 don't think any additional teasers that were
23 changed were sent out until the filing of the
24 motion.
25     Q.   On September 19?

1    CONFIDENTIAL - WILLIAM O. HILTZ
2      A.   Correct.
3         MS. O'CONNOR:  Okay.  I'm just going
4  to -- I don't know how many of these you're
5  going to do, but if you're asking --
6  re-asking substantive questions that's about
7  what he did to prepare, I think we've -- you
8  had several hours this morning.
9         If it's other than what he did to
10 prepare, if it's re-asking substantive
11 questions, I don't think 6:45 tonight is the
12 time to restart your examination.
13        MR. DEVORE:  Well, actually, the
14 answers have changed a bit from I don't know
15 to now I know, and based on his
16 representation that he communicated with
17 people, I'm trying to find out if he knows
18 the answers to my questions or not and who
19 he needs to talk to to get the answers.
20        MS. O'CONNOR:  We're not going to redo
21 your exam from this morning.
22        MR. DEVORE:  Are you going to instruct
23 the witness not to answer?
24        MS. O'CONNOR:  No, but we're going to
25 cut the deposition off at a reasonable time.

1    CONFIDENTIAL - WILLIAM O. HILTZ
2         MR. DEVORE:  I have five questions on
3  this.  They're very short and to the point,
4  and I think it'll be very efficient to
5  create a record as to whether this witness
6  adequately testified with respect to the
7  topics I'm concerned about.
8  BY MR. DEVORE:
9      Q.   When was the first teaser that
10 provided for -- strike that.  You answered that.
11 I can skip that.
12        On what date did the Debtors determine
13 to accept bids in any form?
14     A.   I don't know that there is a precise
15 date.
16     Q.   And in order to figure that out, who
17 would you need to talk to?
18     A.   I'm not sure who I would talk to to
19 figure that out.
20     Q.   Would you talk with company
21 management?
22     A.   Well, again, I mean, this was a topic
23 that was discussed and discussed over a number
24 of days.  I can't recall the precise date that
25 we decided to do that.