# EXHIBIT B

CONFIDENTIAL

Page 1

1              PAUL KEGLEVIC
2   UNITED STATES BANKRUPTCY COURT
3   FOR THE DISTRICT OF DELAWARE
    ------------------------------------------x
4   In Re:
    Energy Future Holdings Corporation, et.,
5
                        Debtors.
6

    Chapter 11
7   Case No. 14-10979
    Jointly Administered
8
9   ------------------------------------------x
10         DEPOSITION OF PAUL M. KEGLEVIC
11              New York, New York
12               October 3, 2014
13
14         **  CONFIDENTIAL  **
15
16
17
18
19
20
21
22
23  Reported by:
24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25  JOB NO. 85349

Page 22

PAUL KEGLEVIC
2  A. Yes.
3  Q. Now, the first item listed that the
4  Debtors can change in their sole discretion is
5  the bid requirements, correct?
6  A. Correct.
7  Q. Now, if approved, would the Debtors be
8  able to tighten or loosen the bid requirements
9  to get past the Phase 1 cut-down?
10  A. Could you restate your question?
11  Q. Earlier, we had discussed the fact
12  that, after Phase 1, bids would be cut down from
13  the initial stalking horse submissions in order
14  to proceed to round 2. Do you recall that?
15  A. Yes.
16  Q. So my question is, based on this
17  provision in paragraph 7 of the order, would the
18  Debtors be able to tighten or loosen the bid
19  requirements to get past Phase 1 in their sole
20  discretion?
21     MR. McKANE: Object to the phrase "in
22     their sole discretion." It's inconsistent
23     with the order.
24  A. I'm not sure whether that is what is
25  intended by these words. I think, you know, Mr.

Page 23

PAUL KEGLEVIC
2  Hiltz is probably in a better position to answer
3  that.
4  Q. To your knowledge, are the Debtors
5  seeking authority to be able to change the bid
6  procedures at a later point in time in order to
7  establish what bids will get past round 1?
8  A. Same answer. I think you're going to
9  have to talk to Mr. Hiltz as to what he had in
10  mind with those specific words.
11  Q. You reviewed this before it was filed,
12  correct?
13  A. I did.
14  Q. The second item that is listed that
15  the Debtors can change is the open bid
16  requirements. Do you see that?
17  A. Uh-huh.
18  Q. If approved, would the Debtors be able
19  to tighten or loosen the requirements for
20  participation in the 30-day open bidding
21  process?
22  A. Yes, I believe that's true.
23  Q. And that would be in their sole
24  discretion?
25     MR. McKANE: Objection to the form of

Page 24

PAUL KEGLEVIC
2  the question.
3  A. You know, as indicated, following
4  consultation and, if the business judgment
5  indicated to achieve our objectives that was
6  necessary, yes.
7  Q. Now, the third item is adjourning the
8  auction at the auction and/or adjourning the
9  auction approval hearing in open court, without
10  further noticing, canceling the auction, do you
11  see that?
12  A. Yes.
13  Q. Does this mean that we could go
14  through this entire process and there would be
15  no auction?
16  A. Well, yes, I think we've indicated
17  that, you know, we might not get any additional
18  bids. That would be one reason there would be
19  no auction.
20  Q. Now, the fourth item listed is
21  rejecting any or all qualified bids, do you see
22  that?
23  A. Yes.
24  Q. If this order is approved, does this
25  mean that the Debtors can reject bids even if

Page 25

PAUL KEGLEVIC
2  the bids are otherwise qualified?
3  A. Yes, I believe it does.
4  Q. And this would be in the Debtors' sole
5  discretion?
6     MR. McKANE: Object to the form of the
7     question.
8  A. As previously indicated, after
9  consultation and if it's our best business
10  judgment to achieve the objectives of the
11  process, yes.
12  Q. Now, Mr. Keglevic, could you turn to
13  the bidding procedures which are attached to the
14  order as Exhibit 1 immediately following the end
15  of the order. And you reviewed these procedures
16  before they were filed?
17  A. Correct.
18  Q. Is there anything in these procedures
19  that you can identify that the Debtors would not
20  be able to change following approval of the
21  bidding procedures?
22  A. I would think Mr. Hiltz is in a better
23  position to answer that question. I have not
24  thought that through.
25  Q. But sitting here today, you cannot

7 (Pages 22 to 25)

Page 26

1    PAUL KEGLEVIC
2  identify anything in those procedures that the
3  Debtors would be unable to change following the
4  entry of the order?
5    A.  I would think the order indicates
6  there would be limited situations where we would
7  have discretion for good, specific reasons, so I
8  would not expect that we're looking to change
9  procedures unless there was something that came
10 up that allowed us to -- that, in our business
11 judgment, allowed us to change the procedures in
12 the pursuit of getting the highest and best
13 value for the auction.
14   Q.  You testified that you don't expect
15 that -- strike that.
16     MR. McKANE:  You want to read it back?
17   Q.  You testified that you are not
18 expecting that you're looking to change the
19 procedures at this point; is that correct?
20   A.  Right.  As we sit here today, there
21 hasn't been an event that would cause us to
22 change these procedures.
23   Q.  But is there anything in those
24 procedures that the Debtors would be unable to
25 change, in your view?

Page 27

1    PAUL KEGLEVIC
2     MR. McKANE:  Objection.  Asked and
3  answered.
4    A.  I think Mr. Hiltz is better able to
5  answer that, but as I said, it would only be
6  based on an event and, in our business judgment,
7  to better achieve the objectives of the process.
8    Q.  But what I'm asking is regarding the
9  specific provisions in the document.  Can you
10 point to any specific provision that the Debtors
11 could not change?
12     MR. McKANE:  Objection.  Asked and
13 answered.
14   Q.  Sitting here today?
15   A.  As we sit here today, I can't -- I
16 wouldn't -- I can't point to any that I believe
17 we would change.
18   Q.  But can you point to any that you
19 would be unable to change?
20   A.  I think that will be subject to the
21 interpretation of the words in the order.  As I
22 said, my understanding is to give us flexibility
23 in the event something occurred that caused us
24 that a change would be appropriate to maximize
25 the outcome of the auction.

Page 28

1    PAUL KEGLEVIC
2    Q.  Now, in your view, would creditors be
3  able to come back to the Bankruptcy Court after
4  the procedures are approved to challenge any
5  change that the Debtors would consider
6  appropriate to maximize the outcome of the
7  auction?
8      MR. McKANE:  Objection.  Calls for a
9  legal opinion.
10   A.  I -- I'm not sure what recourse
11 Debtors would have during the process --
12 creditors.  Excuse me.
13   Q.  In your view, are any changes the
14 Debtors make to maximize the outcome of the
15 auction finally authorized by the court order?
16     MR. McKANE:  Same objection.
17   A.  I think that's a legal interpretation.
18 I will let the Court decide that.
19   Q.  Do you know whether the Debtors are
20 seeking authority to finally make changes to the
21 proposed order?
22   A.  I think we are looking for authority
23 to make changes to maximize objectives within
24 the limited situations that I describe.
25   Q.  Mr. Keglevic, if we can turn back to

Page 29

1    PAUL KEGLEVIC
2  paragraph 7 of the proposed order, and if you
3  can let me know when you're there?
4    A.  I'm there.
5    Q.  Okay.  Mr. Keglevic, paragraph 7 of
6  the order provides that modifications of the
7  bidding procedures may be made to "best promote
8  the goals of the bidding process."
9      Do you see that?
10   A.  Yes.
11   Q.  Mr. Keglevic, what are the goals that
12 are referred to here?
13   A.  I think they have been referred to
14 previously in the exhibit, but I think there are
15 primarily two goals.  One is to maximize the
16 value of the auction and the other one is to
17 effectively reduce market risk and to, you know,
18 obtain a one-way option through a stalking horse
19 bidder that provides a floor to the amount we'll
20 receive under the bidding procedures.  Those are
21 the two primary objectives that I recall.
22   Q.  One primary objective that you just
23 mentioned was to maximize the value of the
24 auction, correct?
25   A.  Correct.

Page 30

1  PAUL KEGLEVIC
2  Q. Does this goal include maximizing the
3  value at EFIH?
4      MR. McKANE: Object to the form of the
5  question.
6  A. I think specifically we're looking at
7  to maximize the value of the entire auction, and
8  by doing that, I would assume it maximizes the
9  value at EFIH.
10 Q. Do any of these goals include
11 establishing the standalone value of EFIH?
12 A. No.
13 Q. And why not?
14 A. It's not a goal of the auction
15 process, but I would think, and we are in
16 discussions with our financial advisor now,
17 before we pick a stalking horse, we would have
18 additional information related to the value of
19 the E side businesses that would go to our board
20 before they determine which stalking horse to
21 pick. We have not determined yet what form that
22 will be as we sit here today.
23 Q. Mr. Keglevic, paragraph 7 concerning
24 the various changes the Debtors may make to the
25 bidding procedures begins with the phrase "the

Page 31

1  PAUL KEGLEVIC
2  Debtors are authorized," do you see that?
3  A. Yes.
4  Q. Which Debtors does this refer to as
5  authorized to modify the bidding procedures?
6      MR. McKANE: Objection. Calls for a
7  legal opinion.
8  A. Yes, I would leave that to counsel or
9  to the Court. I'm not sure. Mr. Hiltz might
10 have a more specific answer.
11 Q. Mr. Keglevic, sitting here today, do
12 you know who the Debtors are seeking authority,
13 which Debtors the Debtors -- strike that. Let
14 me start that question over.
15      Sitting here today, do you know which
16 Debtors are seeking authority to make these
17 changes that are identified in paragraph 7 of
18 the order?
19 A. I would assume it's the consolidated
20 group of Debtors.
21 Q. Do all three, EFH, EFIH and TCEH, have
22 to agree on each change?
23 A. I'm not --
24      MR. McKANE: Objection.
25 A. -- the expert on the process. Mr.

Page 32

1  PAUL KEGLEVIC
2  Hiltz is our expert. I've not thought of that
3  question.
4  Q. You don't know if it's a majority
5  vote?
6  A. I don't know how the process will take
7  place.
8  Q. Mr. Keglevic, if you could turn your
9  attention to the bottom paragraph on that page,
10 which is paragraph 8 of the proposed order.
11     Are you there?
12 A. Uh-huh.
13 Q. Now, this states that, "In accordance
14 with the bidding procedures, each bidder must
15 acknowledge in writing that it has not engaged
16 in any collusion with respect to any bids."
17     Do you see that?
18 A. Yes.
19 Q. Does this provision preclude
20 discussions by a bidder with creditors
21 concerning a potential transaction?
22     MR. McKANE: Objection. Calls for
23 legal opinion.
24 Q. Mr. Keglevic, in seeking approval of
25 this order, are the Debtors seeking to preclude

Page 33

1  PAUL KEGLEVIC
2  creditor discussions with bidders concerning a
3  potential transaction?
4  A. I would refer the answer to that to
5  Mr. Hiltz.
6  Q. So you don't know?
7  A. I don't recall whether that is
8  specifically asked for.
9  Q. Now, I would like to go back for a
10 moment to the requested approval of the
11 procedures on October 17 and the submission of
12 round 1 bids six days later.
13     Assuming the proposed procedures are
14 approved, do the Debtors anticipate sending any
15 additional marketing materials or bid materials
16 to prospective investors?
17 A. Assuming there are no changes to the
18 procedures, I would not expect us to send any
19 additional information.
20 Q. Now, assuming the procedures are
21 approved, and after that point, do you
22 anticipate reaching out to any prospective
23 investors that have not already been contacted
24 by the Debtors?
25 A. I would not anticipate that. I think

Page 34

1  PAUL KEGLEVIC
2  we believe we have the right population
3  identified and have been in contact with that
4  population.
5      Q.  And when was that population
6  identified?
7      A.  I don't recall the exact date, but
8  sometime in -- if I was guessing, I think it was
9  early August.
10     Q.  As of early August, the world of
11 prospective bidders, in the Debtors' view, had
12 been identified?
13     A.  At least initially identified, yes.
14 It was supplemented through discussions with
15 creditor groups as we went along.
16     Q.  Without revealing the identity of any
17 prospective bidder, after early August, were any
18 prospective bidders added to that initial list?
19         MR. McKANE:  It's a yes or no
20     question, Paul.
21     A.  I believe the answer is yes.
22     Q.  Do you know how many?
23     A.  I don't recall.
24     Q.  Do you know in order of magnitude?
25 More than five?

Page 35

1  PAUL KEGLEVIC
2      A.  I would think it probably not more
3  than five.
4      Q.  Mr. Keglevic, you are aware that the
5  bidding procedures preclude creditor involvement
6  or consultation in connection with the stalking
7  horse bidding process, correct?
8      A.  Yes.
9      Q.  Now, the preclusion of creditor
10 involvement or consultation in the stalking
11 horse bidding process is the result of concerns
12 that creditors would not maintain the
13 confidentiality of prospective bidders, correct?
14         MR. McKANE:  Can you read that back,
15     please?
16         (Record read.)
17         MR. McKANE:  Objection to form.
18         Go ahead.
19     A.  I think that's one of the reasons.
20     Q.  And to date, no creditors have been
21 provided with any information concerning the
22 identity of bidders or the contents of their
23 bids; is that correct?
24     A.  Not since we launched this marketing
25 process, but previously, because the PIKs were

Page 36

1  PAUL KEGLEVIC
2  involved in the bid process and had a right to
3  receive bids, they were aware of the NextEra
4  bid, I think as everybody was eventually since
5  they filed with the Court.
6      Q.  And that was at the time of around
7  June, the end of June, during the second lien
8  DIP financing transaction hearing?
9          MR. McKANE:  Object to the form.
10     A.  It was in the June and July timeframe.
11 I think NextEra made a final bid sometime in the
12 July timeframe that was made available to all.
13     Q.  Are you aware that seven bidders have
14 been identified -- at least seven bidders have
15 been identified in press reports as being
16 engaged in discussions with the Debtors for this
17 transaction?
18     A.  I don't know the exact number, but I
19 know there have been press reports.  I know
20 there were some that were accurate and some that
21 were not and...
22     Q.  Now --
23         MR. McKANE:  It all depends on what
24     you mean by the "press."  Do bloggers count?
25     Q.  Mr. Keglevic, are you aware that

Page 37

1  PAUL KEGLEVIC
2  Berkshire Hathaway has been publicly identified,
3  without confirming or denying whether they're in
4  the process?
5      A.  Yes, I think I've read that they were
6  in one of the news sources.
7      Q.  CenterPoint?
8      A.  Yes, I believe they have been
9  identified.
10     Q.  Iberdola?
11     A.  Iberdrola.
12     Q.  Sounds right.
13     A.  Yes, I've heard their name as well.
14     Q.  ITC Holdings?
15     A.  Yes.
16     Q.  NextEra, obviously, yes?
17     A.  I don't know.  I think -- frankly, I
18 don't recall the press release.  NextEra
19 withdrew their bid, so I don't know if there was
20 speculation that they were coming back or
21 staying out.  I think there might have been some
22 of each.
23     Q.  Are you aware that Sempra Energy was
24 publicly identified?
25     A.  I didn't remember that one.  I did not

10 (Pages 34 to 37)

Page 38

PAUL KEGLEVIC

remember that one.
 Q. Are you aware that the Hunt Family was publicly identified?
 A. Yes.
   MR. McKANE: I think the question is publicly identified as what? As a potential bidder? As participating in the process? As what?
 Q. Mr. Keglevic, if you don't understand a question that I ask, feel free to ask for clarification, and I will do so.
 A. Thank you.
 Q. Upon learning of the public disclosure of these bidders' identity, would you ask the bidder if they had made the disclosure?
   MR. McKANE: Objection to form. It supposes that they are bidders, which goes exactly to what you cannot get into at this point in time.
 A. And I would also answer that I wouldn't make a conclusion as to what their legal disclosure requirements would be. That's for them to determine, not me.
 Q. So it's your understanding that

Page 39

PAUL KEGLEVIC

whether or not a prospective bidder can be publicly identified is determined on a case-by-case basis?
   MR. McKANE: Objection to form.
 A. I don't know -- I'm sorry. I don't follow your question. Determined by whom?
 Q. In the prior answer, you said that you couldn't make a conclusion as to what their legal disclosure requirements would be. Do you recall that testimony?
 A. Yes.
 Q. By that testimony, do you mean that individual bidders can decide whether or not to make public disclosure of their prospective interest in the Oncor asset?
 A. No, that's not really what I mean. I think individual bidders have a legal requirement to determine whether the disclosure requirements under the SEC rules, et cetera, are appropriate. As a general rule, I would think an acquisition this size, if it became public, there would -- my knowledge as a CFO would say that would be a -- my presumption would be they would have to make public and have disclosure

Page 40

PAUL KEGLEVIC

requirements as a result of being named as a bidder.
 Q. Upon your learning of these prospective bidders being identified in the press, did you undertake any investigation to determine how these names had been made public?
 A. I did not.
 Q. Did you ask any of the Debtors' advisors how these names became public?
 A. I think I've expressed general frustration throughout this entire process as to how so much information got public and constantly asked for assurance from my advisors and counsel that we were not providing any information and that we, you know, we're sure our communication protocols, et cetera, were not, you know, leading to leaks.
 Q. Did you express this frustration during the time in which creditors did not receive any bid information?
 A. I don't recall if I specifically did during that period of time.
 Q. Mr. Keglevic, sitting here today, can you identify any harm that could come from

Page 41

PAUL KEGLEVIC

providing stalking horse bid information on an "attorneys eyes only" basis with respect to prospective bidders that have already been publicly identified?
   MR. McKANE: Objection to form. Presupposes facts about whether these are or are not bidders.
 A. That's a hypothetical that I think would draw -- you know, we are generally concerned that leaks, especially leaks from credible sources or from the company or creditors, could lead to public disclosure and affect the trading prices of potential bidders, and as a result, we think it would reduce the amount of potential bidders and be bad, would be counterproductive toward achieving our goals and maximizing the price we receive in the auction.
 Q. Mr. Keglevic, do you understand that if confidential information is provided on an "attorneys eyes only" basis, that a protective order can be entered enforceable by sanctions of the Bankruptcy Court for violations of the protective order?
 A. I would seek my counsel's advice on

11 (Pages 38 to 41)

TSG Reporting - Worldwide    (877) 702-9580

Page 46

PAUL KEGLEVIC
A. By virtue of these procedures that are public and have been provided.
Q. Are these the only criteria that have been provided to prospective bidders?
A. I believe so and, you know, I think everything is in this package that they have seen.
Q. So, prior to sending this package out, was any similar list of criteria sent to prospective bidders?
MR. McKANE: Objection to form.
A. I'm not aware of specific criteria that were sent other than these criteria, but once again, I'm relying substantially, as is the company and the board, on Mr. Hiltz and his team. He may have some knowledge that I don't, but I believe, from my seat, the answer would be no.
Q. Now, we were just discussing that these were the bid criteria that will be considered in connection with this bidding process. Now, I would like to turn -- and these are the criteria that were provided to prospective bidders.

Page 47

PAUL KEGLEVIC
If you could turn to paragraph 5 of the proposed order.
MR. McKANE: Paragraph 5 of the proposed order?
Q. Of the proposed order. Sorry. Go back a few pages. If you keep your finger at the procedures, I'm going to go right back to them.
Are you at paragraph 5 of the proposed order?
MR. McKANE: Page 4 of 24.
A. Yes.
Q. Now, paragraph 5 of the proposed order provides that the bidding procedures attached as Exhibit 1 are approved. Do you see that?
A. Yes.
Q. Now, if you turn to page 12 of the bidding procedures, in these criteria that we are just discussing, number 9, which is on the following page, bid criteria 9 states, "Any other factors that the Debtors, in their sole discretion, determine are relevant." Do you see that?
A. Yes.

Page 48

PAUL KEGLEVIC
Q. If approved, this means that the Debtors could tighten or loosen the bid criteria in their sole discretion, correct?
MR. McKANE: Objection to form. Calls for a legal conclusion.
Q. Mr. Keglevic, by seeking approval of these procedures, are the Debtors seeking authority to tighten or loosen the bid criteria in their sole discretion?
MR. McKANE: Asked and answered.
A. The number that you see at number 9, I think, and, you know, any other factors I would think would be to add factors, not to tighten, at least that's the paragraph you referred me to.
Q. Now, paragraph 9 states that the Debtors determine in their sole discretion, right?
A. Yes.
Q. Which Debtors does this refer to?
A. I think I have answered this. That I would -- it's the consolidated Debtors that we would take into consideration.
Q. And you don't know whether it would be

Page 49

PAUL KEGLEVIC
a majority vote, you know, hundred percent consensus, or any other process for determining whether other factors would be considered in evaluating bids?
A. No, I think I indicated that you should ask that question of Mr. Hiltz, but I have not been -- I have not thought through exactly how that debtor process will work. I would assume the Debtors are going to be aligned to maximize the amount of the bid to lock in a floor for the transaction to mitigate market risks, as I have indicated, and at the end of the day, whether or not we could get, you know, debtor consensus is up to anybody's judgment, but we'll be guided by our business judgment and our fiduciary duties at each entity and in combination.
Q. Going back to consultation, Mr. Keglevic, are the Debtors providing the TCH first lien lenders with any access to the bidding process such as copies of the bids being submitted?
A. No, I believe the prohibitions that we've been discussing apply to all creditors.

13 (Pages 46 to 49)

Page 50

1  PAUL KEGLEVIC
2  Q. Are the Debtors or, to your knowledge,
3  their advisors in any discussions with the TCH
4  first lien creditors over access to the process?
5  A. Not to my knowledge.
6  Q. Would you consider giving the TCEH
7  first lien lenders access to the process?
8  A. It would be inconsistent with what
9  approach we're taking and the position we're
10 taking here. So, no.
11 Q. Speaking of TCEH, was TCEH a
12 tax-paying corporation at some point?
13    MR. McKANE: Objection. Relevance.
14 A. I don't recall, but it may have been.
15 I know for a fact we have a -- well, we have
16 years under audit and we have had some AMT taxes
17 that were generated at the TCH level, but it's
18 information that's, you know, publicly available
19 and probably in the data room, and I just don't
20 recall specifically by year since it was formed.
21 Q. Do you know whether EFIH was ever --
22 do you know whether EFEH has always been a
23 tax-paying entity?
24 A. I'm sorry, which entity are you asking
25 me about?

Page 51

1  PAUL KEGLEVIC
2    MR. McKANE: EFIH?
3  Q. I'll rephrase this.
4  A. And actually, can I expand on my past
5  answer? The tax-paying entity is EFH. TCEH,
6  the amounts I'm talking about with respect to
7  payments would have been under the tax sharing
8  agreement, if any, that they would have made to
9  EFH and reimbursement of EFH payments to the
10 government, but they wouldn't be direct payments
11 from TCEH or EFIH to the federal government for
12 taxes.
13 Q. Okay. So my question is -- we're
14 focusing on TCH -- did that change; at some
15 point in time was TCH previously a tax-paying
16 corporation?
17 A. Not post-merger. They have been a
18 disregarded entity.
19    MR. DEVORE: If you would like a
20 break, we can break now or we can -- I'm at
21 a -- switching topics, so if you would like
22 a break, this would be a good opportunity.
23    THE WITNESS: Take like a two-minute.
24    MR. McKANE: Five minutes.
25    THE WITNESS: Thank you.

Page 52

1  PAUL KEGLEVIC
2    (Recess; Time Noted: 10:23 a.m.)
3    (Time Noted: 10:30 a.m.)
4  BY MR. DEVORE:
5  Q. Mr. Keglevic, you are the chief
6  restructuring officer, correct?
7  A. Correct.
8  Q. Do you have that title at EFH?
9  A. Yes.
10 Q. Do you have that title at EFIH?
11 A. Yes, I believe.
12 Q. And at TCEH?
13 A. I believe that's correct.
14 Q. And Mr. Keglevic, are you a board
15 member at EFH?
16 A. No.
17 Q. At EFIH?
18 A. Yes.
19 Q. At TCEH?
20 A. Yes.
21 Q. Mr. Keglevic, what is your role in the
22 development of the bidding procedures?
23 A. I would say I was in a review
24 capacity.
25 Q. Who at the Debtors approved the

Page 53

1  PAUL KEGLEVIC
2  bidding procedures?
3  A. It probably be myself and my co-CRO,
4  Ms. Doré. We had input and assistance from our
5  teams, of course, and we had board meetings
6  where we presented the overview of the proposed
7  bid procedures, but I don't believe we had them
8  formally vote on it. But they were certainly
9  aware of the approach, and all of it was in
10 heavy reliance on our advisors, both legal and
11 financial, where we directed them to develop
12 procedures, design procedures to achieve the
13 objectives that I previously indicated, that is,
14 to maximize the value from the auction and to
15 create a one-way option or a floor, you know,
16 through the stalking horse mechanism that would
17 help mitigate potential market risk.
18 Q. Mr. Keglevic, you started your answer
19 stating, "It probably would be myself and my
20 co-CRO, Ms. Doré." Did you approve the bidding
21 procedures?
22 A. I said I was -- I recommended that we
23 file them to the board. I don't think we had an
24 official approval process.
25 Q. Do you know who the last person was

14 (Pages 50 to 53)

Page 54

1  PAUL KEGLEVIC
2  that said, "yes, authorize to file," if anyone?
3        MR. McKANE: Authorize to file the
4     motion with the bid procedures in it; is
5     that what you're asking?
6     Q.  Did you understand my question, Mr.
7  Keglevic?
8     A.  No, I -- generally, but I would like
9  clarification.
10    Q.  Mr. Keglevic, do you know who the last
11 person was at the Debtors that said yes to
12 authorize the filing of the bidding procedures
13 motion?
14    A.  It would probably be Ms. Doré.
15    Q.  In consultation with you?
16    A.  Yes, and other members of our
17 management team that we would review it and say
18 we're good.
19    Q.  Along the process, but Ms. Doré was
20 probably the final sign-off?
21    A.  Yes, she is generally, before we file
22 a motion, the final sign-off.
23    Q.  Do you know whether Ms. Doré was
24 acting on behalf of EFH in authorizing the
25 filing of the bidding procedures motion?

Page 55

1  PAUL KEGLEVIC
2     A.  I think Ms. Doré was acting on behalf
3  of the Debtors.
4     Q.  All of them?
5     A.  Yes.
6     Q.  Mr. Keglevic, earlier you testified
7  that you were on the board of EFIH. Who are the
8  other directors on the EFIH board?
9     A.  Chuck Kremins, Kneeland Youngblood,
10 John Young. I know one or two of the sponsors
11 as well. I'm sorry, I don't -- I don't recall
12 exactly who was on which board.
13    Q.  Are any of the directors on the EFIH
14 board independent directors?
15    A.  Yes, Chuck Kremins is an independent
16 director, and he is independent in the New York
17 Stock Exchange meaning of the word but also
18 independent in that he is not on the EFH board.
19 Kneeland Youngblood is an independent director
20 within the meaning of the New York Stock
21 Exchange rules, but also a member of the EFH
22 board. So he is not a disregarded director.
23    Q.  Mr. Keglevic, do you know if there are
24 any independent directors of the EFH board?
25    A.  Yes. Billy Williamson is an

Page 56

1  PAUL KEGLEVIC
2  independent director at the EFH board. Kneeland
3  Youngblood, Arcilia Acosta I think are all
4  independent directors.
5     Q.  You also testified that you're a
6  member of the TCEH board?
7     A.  That's correct.
8     Q.  Who are the other TCEH board members?
9     A.  Hugh Sawyer, John Young, I believe
10 it's Scott Leibowitz, Jonathan Schmidt, and
11 Arcilia Acosta, but I'm not sure that's
12 complete. There's public information that will
13 support that. I apologize. I just can't recall
14 off the top of my head.
15    Q.  Are any of the directors at TCEH
16 independent directors?
17    A.  Yes, Arcilia Acosta and Hugh Sawyer
18 are both independent directors.
19    Q.  Within the meaning of the New York
20 Stock Exchange rules?
21    A.  Within the meaning of the New York
22 Stock Exchange rules.
23    Q.  You made a distinction earlier on the
24 EFIH board member with Mr. Kremins stating that,
25 not only was he within the meaning of the New

Page 57

1  PAUL KEGLEVIC
2  York Stock Exchange rules, but as independent
3  because he was not on the EFH board?
4     A.  I don't think having -- I don't think
5  independence is defined that way, but I know, in
6  this situation, Mr. Sawyer is not on the EFH
7  board, where Ms. Acosta, who was independent as
8  well, is on both boards.
9     Q.  So Mr. Sawyer would be the
10 corresponding person to Mr. Kremins --
11    A.  That's correct.
12    Q.  -- on that distinction?
13       I'm going back to the EFIH board. Has
14 the EFIH board delegated any authority to its
15 independent director, Mr. Kremins, with respect
16 to the sale process?
17    A.  Not that I'm aware of. I think the
18 board continues to be involved as a board over
19 all the processes that may impact EFIH.
20    Q.  Are you aware whether the EFIH board
21 has delegated any authority to Mr. Youngblood,
22 who you had indicated was another independent
23 director?
24    A.  I do not believe so.
25    Q.  Has the EFIH board delegated or

Page 58

1  PAUL KEGLEVIC
2  conferred any authority to Mr. Kremins or Mr.
3  Youngblood with respect to any issues in the
4  bankruptcy case?
5      A.  I don't recall, but I can't remember
6  that if they specifically did that for any
7  issue.  There may have been some.  I just don't
8  recall.
9      Q.  Do you have any reason to believe that
10 there was any such delegation or conference of
11 authority?
12     A.  As I said, I'm not able to recall any.
13     Q.  By the way, what was Tony Horton's
14 role in this process?
15     A.  Tony Horton's role was generally also
16 review.  As I said, it was led by our advisors,
17 and Tony was probably slightly more into the
18 details than I was, but I would still say it's a
19 review.  He didn't develop the procedures or
20 write the motion.
21     Q.  In taking those actions, do you know
22 whether he was representing any particular
23 debtor?
24     A.  I don't think he was representing any
25 particular debtor.  I think he's an officer of

Page 59

1  PAUL KEGLEVIC
2  the EFIH, EFH and TCEH and does his best to
3  exercise his fiduciary obligations associated
4  with each individually.
5      Q.  Mr. Keglevic, are you aware of any
6  conflicts of interest among the EFH, EFIH, and
7  TCEH estates with respect to a sale of the Oncor
8  asset?
9          MR. McKANE:  Objection.  Calls for a
10     legal conclusion.
11     A.  I'm not aware of any, but I would
12 consult my attorneys before answering because it
13 does sound like it's a legal matter.
14     Q.  Mr. Keglevic, you do understand that
15 independent directors are often put in place to
16 address intercompany conflict issues, correct?
17     A.  Yes.
18     Q.  Now, you understand that the Debtors
19 have asserted that a $3 billion tax claim -- at
20 least a $3 billion tax claim could be triggered
21 at EFH for an E side transaction that provided a
22 gain on sale, correct?
23     A.  Correct.
24     Q.  Would you --
25     A.  That's an estimate.  We won't know

Page 60

1  PAUL KEGLEVIC
2  until we have a transaction and determine if
3  it's taxable or not taxable.
4      Q.  Understood.  Do you believe that the
5  triggering of a $3 billion tax at EFH could lead
6  to a conflict of interest between EFIH and EFH?
7          MR. McKANE:  Objection.  Calls for a
8      legal conclusion.
9      A.  Before answering that, I would have to
10 consult with my counsel.
11     Q.  Mr. Keglevic, what is your
12 understanding of a conflict of interest between
13 intercompany estates?
14         MR. McKANE:  Same objection.
15     Q.  Would you agree that an inter-estate
16 conflict would exist if pursuing one course of
17 action would benefit one estate to the detriment
18 of another estate?
19         MR. McKANE:  Same objection.
20     A.  That's a hypothetical, and I would
21 have to see the specific transaction and consult
22 with counsel before I determined whether it was
23 a conflict or not, and I would assume I would
24 have that discussion in the presence of the
25 boards themselves and their opinions whether it

Page 61

1  PAUL KEGLEVIC
2  was a conflict would be important.
3      Q.  Mr. Keglevic, is it your understanding
4  that there would be a higher purchase price on
5  the Oncor sale if a taxable transaction was done
6  at EFIH?
7          MR. McKANE:  Sorry.  Can you read that
8      back?
9          (Record read.)
10     A.  That is not my understanding.
11     Q.  Your understanding is that the
12 purchase price would be the same?
13     A.  I don't know what the purchase price
14 would be under different structures.  That's why
15 we're going to go through this process.
16     Q.  Mr. Keglevic, are you aware that there
17 could be an intercompany claim under the tax
18 sharing agreement by EFH against EFIH if the $3
19 billion gain on sale tax was triggered?
20         MR. McKANE:  Same objection.
21     A.  I know that the tax sharing agreement
22 provides rights to EFH.
23     Q.  Do you know the specifics of those
24 rights?
25     A.  I don't recall the specifics.

16 (Pages 58 to 61)

Page 282

PAUL KEGLEVIC
Q. So there's draft minutes currently?
A. I would guess.
Q. Is your phone up yet, Mr. Keglevic?
A. It is, and unfortunately, it doesn't tell me whether I was there or not.
Q. Fair enough.
A. I don't know why. It's my daughter's birthday. I hope I wasn't there, but I'm pretty sure I was, at least telephonically.
   MR. McKANE: Is your purpose to ask if he was there whether he participated in the meeting? Because it probably was telephonic.
   MR. LAWRENCE: I was just seeing if it was on his calendar to see whether he participated.
BY MR. LAWRENCE:
Q. Did you participate at the meeting? You seem to have --
A. It's not on my calendar, which I'm surprised, because I can't think of a reason I wouldn't have participated.
Q. The minutes would show whether you participated, wouldn't they?

Page 283

PAUL KEGLEVIC
A. Yes, absolutely.
Q. And the minutes would show who else participated, wouldn't they?
A. Yes.
Q. And the minutes would show what was discussed?
A. Yes.
   MR. SHORE: Just so we're clear, while we're in a lull here, we ask that even the drafts or whatever the latest draft of the board minutes with respect to anything relating to the bidding procedures be produced.
   MR. LAWRENCE: We'll second that. But that's for Mark and not for you, Mr. Keglevic.
   (Keglevic Exhibit 14, Presentation bearing Bates Nos. EFH90009426 through 9444, marked for identification, as of this date.)
BY MR. LAWRENCE:
Q. Mr. Keglevic, showing you what has been marked as Exhibit 14, do you recognize this as a presentation to the boards of EFCH and TCEH --

Page 284

PAUL KEGLEVIC
A. Yes.
Q. -- on July 30, 2014?
A. Sorry. Yes, I do.
Q. And did you receive this presentation through the same method, through this BoardVantage method?
A. Yes.
Q. And did you attend this meeting?
A. Unfortunately, for some reason, my calendar is not listing anything. I don't know if it wipes out some of the prior things. I could probably -- the minutes will say if I did. I believe I did.
Q. You have no recollection sitting here today whether you attended or not?
A. We had so many meetings, I don't, but given the topic, I can't imagine that I wasn't at this meeting.
Q. And this is a separate meeting of just the EFCH and TCH boards, correct?
A. That's what it appears to be, yes.
Q. Is that common to have a meeting of just those two boards without all the other boards together?

Page 285

PAUL KEGLEVIC
A. Yeah, we routinely have meetings of different boards. Sometimes for convenience we, and depending on the topic, we can have them together but then, you know, vote as individual boards. But yes, it's not unusual at all to have separate company meetings.
Q. And what was the purpose here on July 30 of having that separate company meeting?
A. I don't recall. My -- I shouldn't guess, but I will. Given the date of this, typically around the quarterly, you know, every quarter we have face-to-face board meetings and we typically at those have separate meetings of each of the sub-boards. So, just looking at that date, my guess is that this was a face-to-face meeting, and where we have the opportunity to have face-to-face in individual meetings, we do that at least quarterly. So my guess is that's why we did that on July 30. I would almost be positive that's the case.
Q. And are minutes prepared of the TCEH and EFCH board meetings?
A. Yes.
Q. And the same folks at the company