# EXHIBIT C

Page 1

1          CONFIDENTIAL - CHARLES CREMENS

2          UNITED STATES BANKRUPTCY COURT

3           FOR THE DISTRICT OF DELAWARE

4      --------------------------------X

       In Re:

5

       ENERGY FUTURE HOLDINGS

6      CORPORATION, et al.,

7                    Debtors.

8      Chapter 11

       Case No. 14-0979

9      Jointly Administered

       --------------------------------X

10

11

12        *** C O N F I D E N T I A L ***

13

14          VIDEOTAPED DEPOSITION

15                   OF

16            CHARLES CREMENS

17        Wednesday, October 8, 2014

18           Seven Times Square

19           New York, New York

20

21

22     Reported by:

       AYLETTE GONZALEZ, RPR, CLR, CCR

23     JOB NO. 85457

24

25

Page 38

1    CONFIDENTIAL - CHARLES CREMENS
2       Q.  You understand that the debtors are
3  seeking to preclude creditor involvement in
4  the selection of a stalking horse bid,
5  correct?
6       MS. O'CONNOR:  Object to form.
7       A.  Let me make sure I understand your
8  question.  You want to try it again or do you
9  want me to --
10      Q.  The question that I asked was:  You
11 understand that the debtors are seeking to
12 preclude creditor involvement in the selection
13 of a stalking horse bid in this case, correct?
14      MS. O'CONNOR:  Same objection.
15      A.  My view on that is that it isn't
16 that they're seeking to preclude the
17 creditors, but rather that there is a
18 responsibility for the debtor to make a
19 decision hereto in the process.
20      So in a traditional bankruptcy
21 situation, like the Conseco and others, that,
22 you know, usually there's a stalking horse
23 that is put forth and then there are people --
24 then there are people that bid against that.
25      In this -- in this case the debtor

Page 39

1    CONFIDENTIAL - CHARLES CREMENS
2  is putting forth bidding procedures in a -- in
3  a process to maximize that value.  I don't
4  think it is with the intention of exclusion,
5  but rather to maximize value.
6       Q.  Do you understand whether the
7  procedures the debtors are seeking approval of
8  are typical in bankruptcy cases?
9       MS. O'CONNOR:  Object to form.
10      A.  I -- you know, I -- I would say
11 based upon my experience this is a very
12 competitive robust process.  You're talking
13 about, again, a process that -- in the bidding
14 procedures that are put forth here have a
15 fairly long stalking horse process and then an
16 additional open book bidding process before
17 you even get to the auction.
18      That is I think a relatively
19 unique, very competitive process from my
20 experience.  So I would say it's a more
21 fulsome, more robust, competitive process than
22 what I've seen in the past.
23      Q.  Are you aware of any case in which
24 a debtor sought approval of procedures to
25 select a stalking horse bidder?

Page 40

1    CONFIDENTIAL - CHARLES CREMENS
2       A.  A debtor sought approval; could you
3  repeat for me?
4       MR. DEVORE:  Could you read back
5    the question, please.
6       (Whereupon, the referred to
7    question was read back by the
8    Reporter.)
9       A.  No.
10      Q.  Now you testified earlier to the
11 termination of the restructuring support
12 agreement in July.  Do you recall that?
13      A.  I do.
14      Q.  Do you recall that the -- do you
15 recall when the debtors determined to
16 terminate the restructuring support agreement?
17      A.  Well, there was a lot of
18 discussion, I think we were meeting, certainly
19 weekly at least, in July, and I think the
20 ultimate determination was the last week in
21 July, something like July 24th or -5th, it was
22 the quarterly board meeting.  And then I
23 think -- the reason why I said July 31st is I
24 think it was five days after that, that it
25 actually became effective.

Page 41

1    CONFIDENTIAL - CHARLES CREMENS
2       Q.  So now I want to focus your
3  attention on the time period between July 24th
4  or 25th when the debtors determined to
5  terminate the RSA and today.
6       During that time period of
7  July 24th or 25th and today, has the EFIH
8  board ever met separately from the EFH board?
9       A.  I don't recall that.  No, I don't
10 believe that that did occur.
11      Q.  The best of your recollection is
12 that all of the board meetings since the
13 termination --
14      A.  Oh, actually, well, you know, I --
15 I want to re- -- correct that one.  I know
16 that there was -- there was a separate meeting
17 as it related to the -- the vote I believe on
18 the EFH termination, individual boards did
19 meet.  So I believe when we were actually in
20 Dallas there was separate board meetings.
21      Q.  And there were separate board
22 meetings with respect to the termination of
23 the RSA?
24      A.  I believe that was the case.
25      Q.  Okay.  So I want to focus on the

11 (Pages 38 to 41)

Page 70

1      CONFIDENTIAL - CHARLES CREMENS
2  80 percent of Oncor Holdings.
3      Q.  It's your understanding that EFIH
4  owns an 80 percent interest in Oncor Holdings?
5      A.  Yes, that's my...
6      Q.  Mr. Cremens, as the independent
7  director at EFH, why do you consider the tax
8  liability -- the deconsolidation tax liability
9  important?
10     A.  I'm an independent director at
11 EFIH, and tax liability is important because
12 we want to make sure that we can have a
13 confirmable plan and -- for everyone, and we
14 don't want to end up with a -- creating a
15 $6 billion liability that somehow doesn't
16 allow for a confirmable plan for any of the
17 debtors.
18     Q.  What is your understanding of the
19 potential liability of EFIH in connection with
20 a deconsolidation tax?
21     A.  My understanding is that there's a
22 possibility that the tax ends up at EFH, and
23 because of the way the tax sharing agreement
24 has worked, that there is the possibility that
25 the tax then ends up also at EFIH or the

Page 71

1      CONFIDENTIAL - CHARLES CREMENS
2  possibility of it at EFIH.
3      Q.  You understand that the tax sharing
4  claim would be an unsecured claim against
5  EFIH?
6      A.  I am generally aware that there's a
7  difference in security issues, yeah.
8      Q.  Are you aware that creditors have
9  argued that claims under the TSA into the EFIH
10 box would not be permitted under the TSA?
11     A.  You'll have to repeat that one
12 again, there's too many acronyms and you lost
13 me.
14     Q.  Are you aware that creditors have
15 argued that the tax sharing agreement does not
16 allocate tax liability to EFIH based on the
17 capital gains generated by EFIH?
18     A.  I'm not aware of that.
19     Q.  Would you consider it important to
20 know the likelihood of claims being asserted
21 against EFIH under the competitive tax sharing
22 agreement?
23         MS. O'CONNOR:  Object to form.
24     A.  I'd like to know of any claims that
25 could be asserted against EFIH.

Page 72

1      CONFIDENTIAL - CHARLES CREMENS
2      Q.  Have you asked anyone about the
3  likelihood of claims being asserted against
4  EFIH with respect to a deconsolidation tax?
5      A.  No.
6      Q.  Do you have any understanding
7  concerning potential challenges that the IRS
8  could bring if there's a stranded tax
9  liability at EFH?
10     A.  If there are challenges that the
11 IRS could bring, I'd like to understand them,
12 yes.
13     Q.  Have you asked anyone about the
14 likelihood of the IRS being able to challenge
15 a transaction that leaves stranded tax
16 liability at EFH?
17     A.  No.
18     Q.  Do you have any understanding of
19 the likelihood of changes in the law or
20 treasury regulations that would impact the
21 step up in basis in a taxable transaction?
22     A.  No.
23     Q.  Have you asked anyone?
24     A.  No.
25     Q.  Do you have any understanding of

Page 73

1      CONFIDENTIAL - CHARLES CREMENS
2  the likelihood of success of state law
3  theories of liability to make EFIH liable for
4  any stranded tax?
5      A.  No.
6         MS. O'CONNOR:  Object to form.
7      Q.  Mr. Cremens, has EFIH's board
8  received any advice concerning the likelihood
9  of EFIH becoming liable for deconsolidation
10 tax?
11     A.  Yes, there was a presentation I
12 think made a long time ago on that one.  At
13 least -- let me put it differently.  There was
14 a -- I believe a discussion, anyway, around
15 it.  But it goes back to, you know, early in
16 the -- early in my involvement.  So I'm aware
17 of it and that's how I got to the comment
18 about the tax liability.
19     Q.  Do you recall approximately when
20 that presentation was?
21     A.  No.  As I said, it was a discussion
22 at the very least.
23     Q.  Do you recall who was involved in
24 that discussion?
25     A.  No.

Page 74

1 CONFIDENTIAL - CHARLES CREMENS
2 Q. Do you recall if that discussion
3 was before or after the bankruptcy case was
4 filed?
5 A. I don't.
6 Q. Mr. Cremens, what is your
7 understanding of the reasoning for doing a
8 transaction at the EFH equity level instead of
9 the EFIH level for a sale of the Oncor assets?
10 MS. O'CONNOR: Object to form.
11 Go ahead.
12 A. I can't remember specifically.
13 Q. Sitting here today, what is your
14 understanding of the rational for doing a
15 transaction at EFH instead of at the EFIH
16 level for the Oncor assets, if you have one?
17 MS. O'CONNOR: Object to form.
18 Same question.
19 A. For specifically the Oncor assets,
20 you know, there could be and as the bidding
21 procedures even allow, someone could
22 prospectively make an offer. They would have
23 to be looked at if only parts of EFH were put
24 forth as a bid so it would be looked at.
25 Obviously, our objective, which you started

Page 75

1 CONFIDENTIAL - CHARLES CREMENS
2 with the questioning on it from a fiduciary
3 standpoint is to maximize the value of the
4 estate and so to the extent that where the
5 stock is at is at EFH. And I believe from a
6 tax benefit basis, I think this is the reason
7 why they believe the opportunity is to sell at
8 EFH will allow for maximizing --
9 Q. Mr. Cremens, are you aware that if
10 there is a transaction done at EFIH that was
11 taxable that that would result in a step up in
12 basis for the purchaser?
13 A. I am not aware of the specifics.
14 Q. Generally speaking, if a purchaser
15 achieves a step up in basis and is able to
16 realize the benefits of a basis step up, are
17 you aware whether a purchaser will, generally
18 speaking, pay more for an asset than if it did
19 not receive a step up?
20 A. I don't know. There certainly is a
21 possibility of a tax associated with it.
22 Q. Did anyone --
23 A. From the sellers' standpoint.
24 Q. Has anyone advised EFIH's board
25 with regard to the likelihood of a purchaser

Page 76

1 CONFIDENTIAL - CHARLES CREMENS
2 paying a higher price in a taxable
3 transaction?
4 A. No, but I don't think that's a
5 limitation. So if somebody wanted to come in
6 and pay a -- take a run at any of the assets,
7 we'll look at it.
8 Q. Has Evercore provided the board
9 with any information concerning any increase
10 in price that a purchaser would pay if it was
11 able to get a step up in basis?
12 MS. O'CONNOR: Object to form.
13 A. I think you're looking at it from
14 my perspective as a director. I'm looking at
15 what the value is to the seller, not as it
16 relates to the value to the buyer. To the
17 extent that there is a tax as a seller that is
18 substantial, that would to be a deduction from
19 maximizing our value by the amount of the tax.
20 So looking at it from my
21 standpoint, I'm less interested in what the
22 buyer pays. I'm more interested in what the
23 value is that exists from the sellers'
24 standpoint.
25 Q. And who is the seller that you're

Page 77

1 CONFIDENTIAL - CHARLES CREMENS
2 referring to?
3 A. I'm referring to the debtors, EFH
4 and EFIH or depends on who is putting forth a
5 bid for what. If somebody does put forth a
6 bid for EFIH alone, that will be looked at in
7 terms of what value does it bring to the
8 overall estate and look at that.
9 Q. Would it surprise you to learn --
10 start with this. Do you know who Mr. Hiltz
11 is?
12 A. Yes, I do.
13 Q. And who is Mr. Hiltz?
14 A. He works for Evercore.
15 Q. And what is Mr. Hiltz's role?
16 A. His role is one of the senior
17 people involved in the M&A side at Evercore.
18 Q. Would it surprise you to learn that
19 Mr. Hiltz testified on Monday that a
20 prospective purchaser would pay $2 billion
21 more for the step up in basis that would be
22 achieved in a taxable transaction?
23 MS. O'CONNOR: Object to form.
24 Q. Would that surprise you?
25 MS. O'CONNOR: Same objection.

Page 78

1    CONFIDENTIAL - CHARLES CREMENS
2       A.  I don't know.  I haven't done the
3    analysis and --
4       Q.  In engaging in a marketing process
5    would you want to know whether the purchaser
6    would pay more in a taxable transaction in
7    determining how to market the assets?
8       A.  I would be more inclined -- I am
9    more interested in knowing what the value is
10   to me as a seller than I am the value to the
11   buyer.  So on a net basis, what am I
12   receiving.
13      Q.  So what I'm trying to figure out is
14   you keep talking about you as being as a
15   seller and I'm trying to figure out what hat
16   you're wearing as a seller.  Are you --
17      A.  I've tried several times to tell
18   you, Andrew.  I'm wearing the hat as an EFIH
19   independent director and am trying to maximize
20   the overall value of the estate.
21          At the same time, to the extent
22   that we have a fiduciary responsibility and in
23   this case it looks like the opportunity exists
24   that we're going to exceed the creditor levels
25   at EFIH and we should be looking at --

Page 79

1    CONFIDENTIAL - CHARLES CREMENS
2    certainly up at the EFH level anyway.
3          So the overall value of the -- of
4    the situation here, from my standpoint, is
5    something that we're trying to maximize.
6          And, again, to connect the dots, we
7    want to make sure that we have a confirmable
8    plan at the end of the day.  So we're
9    interested in all debtors.  I am interested in
10   all debtors.
11      Q.  If I were to tell you that EFIH is
12   not liable for the deconsolidation tax and
13   EFIH could receive $2 billion more in a
14   taxable transaction, what would you want to
15   know in order to evaluate that transaction?
16          MS. O'CONNOR:  Object to form.
17      A.  I don't know.  That's too
18   hypothetical for me.  I don't know.  I haven't
19   -- again, at the end of the day, I want to
20   know how much value is being provided for the
21   estate.  What somebody else, gets I'm not
22   interested.
23      Q.  Mr. Hiltz -- I'm sorry;
24   Mr. Cremens, are you aware that the claims
25   pool at EFIH has not been determined?

Page 80

1    CONFIDENTIAL - CHARLES CREMENS
2       A.  The claims pool.  Specifically
3    define that term for me.
4       Q.  Mr. Cremens, you previously
5    testified that it is your understanding that
6    it looks like all of the creditors at EFIH
7    will be paid in full.  Is that a fair summary
8    of your testimony?
9       A.  Yes.
10      Q.  With respect to the creditors that
11   EFIH --
12      A.  Yes.
13      Q.  -- do you know whether that pool of
14   creditors is determined today?
15      A.  There are -- I was talking about
16   the overall principal owed on the notes and
17   so, no, there are still some contingent
18   aspects that are outstanding.
19      Q.  My clients assert that they're
20   entitled to what's called a make whole
21   premium.
22      A.  I'm aware of it.
23      Q.  Okay.  Do you contemplate paying
24   the make whole premium in full?
25          MS. O'CONNOR:  Object to form.

Page 81

1    CONFIDENTIAL - CHARLES CREMENS
2       A.  I think that's in litigation.
3       Q.  So that's a disputed claim?
4       A.  Disputed claim.
5       Q.  Are you aware that the T-side
6    creditors have asserted claims against EFIH or
7    threatened to assert claims against EFIH?
8       A.  I'm unaware of that.
9       Q.  Would you want to know what the
10   world of claims will be against EFIH in
11   deciding whether or not to pursue a taxable
12   transaction?
13      A.  I think that's -- well, to pursue a
14   taxable transaction, I'm not -- I think,
15   again, we're trying to pursue a transaction
16   that will maximize the value to the estate
17   such that we can handle whatever claims are
18   ultimately codified.
19      Q.  So what I want to know is claims
20   come in against EFIH that are so large that
21   there's no possibility of any value going up
22   to EFIH.  Should you consider a taxable
23   transaction in your view?
24          MS. O'CONNOR:  Object to form.
25      A.  I don't know.  Very hypothetical.

21 (Pages 78 to 81)

Page 82

1       CONFIDENTIAL - CHARLES CREMENS
2   I know of no claims that would occur at this
3   point in time.
4       Q.  Have you had any discussion with
5   Mr. Sawyer outside of the context of board
6   meetings?
7       A.  No.  I know Hugh Sawyer, so over
8   the years I've had discussions with him.
9       Q.  Have you had discussions with
10  Mr. Sawyer concerning the bankruptcy case
11  since it was filed outside of the context of
12  board meetings?
13      A.  I assume I've had discussions or
14  two, but not anything recently.  Not in 90
15  plus days.
16          You're killing me here, Andrew.
17  Come on, baby, wrap it up.
18      Q.  It's no fun being in this chair
19  either.
20          Did you review the Bidding
21  Procedures Motion before it was filed?
22      A.  No.
23      Q.  Was the board informed of the
24  contents of the Bidding Procedures Motion
25  before it was filed?

Page 83

1       CONFIDENTIAL - CHARLES CREMENS
2          MS. O'CONNOR:  Object to form.
3       A.  Well, we were on a specific --
4   there had been a substantial amount of
5   discussion about moving to a process of -- on
6   the bidding side, yes.  So there had been a
7   lot of discussion about it.  Evercore and
8   Kirkland and management making pitches to the
9   board around whether to have an extensive
10  stalking horse period or shorter stalking
11  horse period and so on.  So there was a lot of
12  discussion around it.
13      Q.  Was the board informed about any
14  specifics of the bidding procedures other than
15  a timeline for the process?
16          MS. O'CONNOR:  Object to form.
17      A.  Well, there were -- there's been a
18  lot of discussion because we had -- like we
19  had the NextEra bid, which we had contemplated
20  as a possibility as a stalking horse so there
21  had been reviews of criteria that could be
22  potentially used that ended up in the -- in
23  the bidding procedures.  So there has been --
24  there was discussion beyond timeline, yes.
25      Q.  And what's your recollection of the

Page 84

1       CONFIDENTIAL - CHARLES CREMENS
2   specifics of the bidding procedures that were
3   discussed at the board meeting?
4       A.  I can't remember all of them, but I
5   know as an example there would be need for
6   reciprocal due diligence if a stalk was to be
7   used as a currency.  That there would be no
8   financing contingency.  There would be a need
9   to make sure that there would be financial
10  capability.  There would be a possibility of a
11  topping fee requirement.
12          So there was a lot of discussion
13  back and forth about specifics, but it was a
14  general discussion.
15      Q.  Did the board vote to approve the
16  filing of the procedures?
17      A.  The specific bidding procedures?
18      Q.  Correct.
19      A.  No.
20      Q.  Do you know why not?
21          MS. O'CONNOR:  Object to form.
22      A.  I don't think it was necessary.  I
23  don't think it was a required need.
24      Q.  Changing topics for a second, is
25  Evercore the only financial advisor that EFIH

Page 85

1       CONFIDENTIAL - CHARLES CREMENS
2   has consulted with in connection with a
3   transaction involving, you know, the matters
4   we have been discussing?
5       A.  Depends on who you consider to be
6   EFIH.  If it's management, management talks to
7   a lot of different advisors as it relates to
8   this specific process and, you know, we are,
9   you know, we're using Evercore to affect it.
10      Q.  Are you aware of whether Bank of
11  America, Merrill Lynch has been involved in
12  this process at all?
13      A.  I think there was discussions with
14  them.  My understanding is they have a pretty
15  good utility group and there were discussions
16  around their thoughts on various stuff, but I
17  don't think we engaged Bank of America at any
18  time for this assignment.
19      Q.  Do you know why Bank of America,
20  Merrill Lynch was contacted in connection with
21  the transaction?
22          MS. O'CONNOR:  Object to form.
23      A.  Again, my understanding is that
24  management has relationships with a number of
25  bankers.

TSG Reporting - Worldwide      877-702-9580

Page 94

1     CONFIDENTIAL - CHARLES CREMENS
2     Q.  Do you have any understanding of a
3 process for resolving any conflicts that could
4 arise in connection with selection of a
5 stalking horse bidder?
6     A.  I don't know what conflicts could
7 arise, so I don't -- I mean, we've already
8 talked about my view of dealing with potential
9 conflicts.
10     Q.  Sitting here today, are there any
11 potential conflicts you can identify with
12 respect to the proposed transaction that is to
13 be set forth -- that is to come forth pursuant
14 to the bidding procedures?
15     A.  No.
16     Q.  Mr. Cremens, has any board member,
17 to your knowledge, asked any questions
18 concerning the process to address conflicts
19 with respect to those transactions?
20     A.  No.
21     Q.  Was a process for resolving
22 conflicts or disagreement among the different
23 debtor estates ever discussed at board
24 meetings?
25     MS. O'CONNOR:  Object to form.

Page 95

1     CONFIDENTIAL - CHARLES CREMENS
2     A.  There hasn't been a conflict that I
3 know that's come up where there's been a need
4 for that discussion, no.
5     Q.  What I'm talking about is potential
6 conflicts that might arise in the future.
7     Has there been discussion about
8 procedures that could be set up to address
9 those conflicts?
10     A.  No.  Other than the document you
11 showed me earlier, no.
12     Q.  I'm sorry; just for the clarity of
13 the record, what document are you referring
14 to?
15     A.  The document you put forth with the
16 idea that that states that there's an
17 opportunity to pursue independent counsel.
18     Q.  Going back to the stalking horse
19 bidder, the procedures contemplate that the
20 debtors will be selecting a stalking horse
21 bidder, correct?
22     Let me ask the question again.
23     The bidding procedures contemplate
24 that the debtors will be selecting a stalking
25 horse bidder, correct?

Page 96

1     CONFIDENTIAL - CHARLES CREMENS
2     A.  Correct.
3     Q.  And the stalking horse bid is
4 contemplated to have a break up fee?
5     A.  It's possible.
6     Q.  Would you expect that a stalking
7 horse bidder that commits itself for 12 months
8 would require a break up fee?
9     A.  I don't know what the competitive
10 landscape will drive.
11     Q.  Do you have any understanding of
12 the expected amount of a break up fee?
13     A.  No.  I know what marketplace 2 to
14 3 percent kind of break up fee.  But in this
15 situation, we got a pretty robust process, so
16 I don't know how or what it -- what it will
17 drive.
18     Q.  Mr. Hiltz testified that he would
19 expect 150 million to 200 million break fee to
20 be required.  Is that consistent with your
21 understanding?
22     A.  I think that was a number --
23 numbers in that range were tossed about in the
24 past when we were talking about stalking
25 horses.

Page 97

1     CONFIDENTIAL - CHARLES CREMENS
2     Q.  What is your understand, if any, of
3 which debtor would pay the break up fee, EFH,
4 EFIH, TCH?
5     MS. O'CONNOR:  Object to form.
6     A.  I don't know exactly how that will
7 play out.  I want to bring -- there are
8 reasons why we would be -- why they would be
9 paying a break up fee and, believably, it's
10 because we've chosen a different course that's
11 more valuable.
12     Q.  Is it your understanding there
13 would only be a break up fee if the debtors
14 choose, in your words, a different course?
15     A.  Yes.  That's what I'm saying.  So
16 believably, there's a reason why we're doing
17 it and so it's worth paying that break up fee.
18     Q.  Is it your understanding that the
19 process that has been put forward, the course
20 that has been put forward here in the Bidding
21 Procedures Motion, would not result in a
22 commitment to pay a break fee?
23     MS. O'CONNOR:  Object to form.
24     A.  No, I'm not saying that.
25     Q.  So we might be talking past each

TSG Reporting - Worldwide    877-702-9580