# EXHIBIT D

Page 1

1
2  IN THE UNITED STATES BANKRUPTCY COURT
3  FOR THE DISTRICT OF DELAWARE
4  Chapter 11
5  Case No. 14-10979 (CSS)
6  ------------------------------------x
7  In Re:
8    ENERGY FUTURE HOLDINGS CORP., et al.,
9              Debtors.
   ------------------------------------x
10             October 7, 2014
11             9:34 a.m.
12
13     Videotaped Deposition of ANTHONY
14  HORTON, pursuant to Notice, held at the
15  offices of Ropes & Gray LLP, 1211 Avenue
16  of the Americas, New York, New York,
17  before Todd DeSimone, a Registered
18  Professional Reporter and Notary Public of
19  the State of New York.
20
21
22
23
24
25

Page 14

1   HORTON
2   Q. You testified you reviewed them
3 to see if it was something you felt would
4 work in the context of an M&A process.
5 Are you familiar with M&A processes?
6   A. I have some experience in M&A.
7 For example, I sold TXU Gas, TXU
8 Australia, TXU, the fuel company. I did
9 the 20 percent sale-down of Oncor. I was
10 involved in the sale of the company back
11 in '07 as part of the LBO. I have sold
12 some generation assets as well.
13       So I have generally worked on,
14 you know, large transactions. I'm not an
15 M&A expert, as my title says, I'm the
16 treasurer, but I have been involved on the
17 deal teams somewhat in a lead capacity on
18 those transactions.
19   Q. And those transactions were all
20 either sales or purchases by the
21 enterprise TXU; is that correct?
22   A. Yes, sir.
23   Q. And were any of those
24 transactions distressed transactions?
25   A. The only transaction that I

Page 15

1   HORTON
2 was, and I was remotely related or
3 involved in, was the sale of TXU Europe as
4 it was beginning to go into
5 administration, but I would say I was just
6 remotely involved in that transaction.
7   Q. Did TXU Europe have separate
8 debt?
9   A. Yes.
10   Q. Do you know how much that was?
11   A. I'm doing this from memory, and
12 that occurred in 2002, but my recollection
13 it was around 4 billion pounds, something
14 like that.
15   Q. Do you know whether those
16 creditors were paid in full?
17   A. I am not aware of that.
18   Q. That was the only one of those
19 transactions that was bankruptcy or
20 distressed related?
21   A. Yes, sir.
22   Q. Would you consider the role you
23 had with respect to the bidding procedures
24 a role of reviewing them primarily?
25   A. Yes, sir.

Page 16

1   HORTON
2   Q. And you said you were reviewing
3 Evercore and Kirkland's development of
4 those procedures?
5   A. That's correct.
6   Q. Did you participate in any
7 board meetings regarding these procedures?
8   A. I listened in to all the board
9 meetings, or I attended all the board
10 meetings, as these were being developed.
11 There were at least a couple of board
12 meetings that I recall discussing the path
13 of whether we should go through -- go down
14 this path of these bidding procedures,
15 this timeline.
16   Q. Do you recall any board votes?
17   A. There were no board votes that
18 I recall.
19   Q. Do you recall whether those
20 were board meetings of EFH?
21   A. My view was it was an EFH board
22 meeting. It had members of the TCH board
23 present, for example, the independent
24 director of TCH, the independent director
25 of EFIH.

Page 17

1   HORTON
2   Q. So there were single meetings
3 where all the directors of the three
4 entities were present?
5   A. I can't say all the directors.
6 I know that there were members of the TCH
7 board. There were members -- it was
8 members of the EFH board and of the EFIH
9 board. I can't tell you who all was
10 there. I just don't know.
11   Q. Do you recall any separate
12 meetings of the EFIH board that you
13 attended?
14   A. No, sir.
15   Q. Any that you attended
16 telephonically?
17   A. No, sir.
18   Q. Are you aware of whether any
19 separate meetings occurred of those
20 boards?
21   A. I am not aware.
22   Q. Do you have any reason to
23 believe that separate meetings of those
24 boards occurred?
25   A. I have no knowledge of that.

5 (Pages 14 - 17)

Page 18

1         HORTON
2    Q.    How would you describe
3 Mr. Keglevic's role with respect to these
4 procedures in comparison to yours?
5    A.    I think it would be similar to
6 mine, but you would need to ask him.
7    Q.    Would you say your role was
8 more detailed and day to day than his was?
9    A.    I don't think so.
10   Q.    Who is Charles Cremens?
11   A.    He is the independent board
12 member at EFIH.
13   Q.    Have you ever spoken with him
14 one on one regarding these procedures?
15   A.    No, sir.
16   Q.    Have you ever spoken with him
17 regarding these procedures outside a board
18 meeting?
19   A.    No, sir.
20         (Horton Exhibit 3 marked for
21 identification.)
22   Q.    Mr. Horton, do you recognize
23 this e-mail?
24   A.    I do.
25   Q.    Do you see there at the top

Page 19

1         HORTON
2 this was sent from David Ying to you and
3 Michael Carter?
4    A.    That's correct.
5    Q.    And who is Michael Carter?
6    A.    He is the senior vice president
7 of corporate planning at EFH.
8    Q.    So he is one of your colleagues
9 who works directly for Mr. Keglevic?
10   A.    Yes, sir.
11   Q.    And what was his role in
12 developing these procedures?
13   A.    I don't know.
14   Q.    Did you ever communicate with
15 him about these procedures?
16   A.    I did not.
17   Q.    Do you recall getting this
18 e-mail at the time in July 26th -- on July
19 26th?
20   A.    I remember the approximate
21 date, yes.
22   Q.    And you see the e-mail below is
23 from John Young to David Ying and Paul
24 Keglevic, the next e-mail down?
25   A.    I see it from John Young to

Page 20

1         HORTON
2 David Ying and Paul Keglevic.  It says
3 "Thanks."  I see Mr. Ying's e-mail, it
4 appears to be to John, giving him talking
5 points.
6    Q.    Do you see the second talking
7 point that Mr. Ying lists that starts with
8 "Our plan to reorganize EFH has always"?
9    A.    Uh-huh.
10   Q.    Just take a look at that bullet
11 point.
12   A.    Yes, absolutely.
13   Q.    Now, there is a grammar error
14 in that it says "contemplates" instead of
15 "contemplated," but that is fine.
16   A.    You noticed.  I didn't.
17   Q.    But does this talking point
18 indicate that the plan to reorganize EFH
19 has always contemplated a tax-free spin
20 transaction for TCEH?
21   A.    "Always" is an extreme use of
22 grammar of course.  You guys are familiar
23 with the process that we went through, you
24 know, 12, 14 months of trying to, Project
25 Olympus, of trying to keep the companies

Page 21

1         HORTON
2 together to avoid, you know, a
3 deconsolidation tax.  So to use that term
4 "always" I think is kind of an
5 overstatement.
6    Q.    Following the company's work on
7 Project Olympus, was it the company's
8 intent always to do a tax-free spin
9 transaction?
10   A.    Following Project Olympus, as I
11 recall, there was a lot of work done by
12 our legal advisors, tax advisors, on
13 alternative transactions and structures,
14 and ultimately the perspective has been
15 that we would do -- and obviously we filed
16 the tax memorandum that suggests that we
17 would do a tax-free spin of TCEH and that
18 we would contemplate a sale of the
19 restructured E side of the house.  So I
20 think this is a generalization and
21 overstatement by Mr. Ying.
22   Q.    The tax-free spin of TCEH and
23 the sale of EFH, or of Oncor as you
24 describe it, is the so-called optimal deal
25 structure of the debtors that is described

Page 22

1                HORTON
2  in the bidding procedures motion; is that
3  right?
4      A.     I don't know if it is the
5  optimal, you know, but it is certainly I
6  think our preferred path given, if you
7  read the tax memorandum, just the tax
8  consequences of a taxable transaction.
9             So, you know, it is our
10 experience and our belief that it is
11 better for the estate and to maintain the
12 value of the estate to not pay tax, to
13 have a tax-free transaction that we
14 believe is approvable and confirmable.
15     Q.     And that's the EFH estate; is
16 that correct?
17     A.     It is the total estate.
18     Q.     Is there any difference in the
19 amount of tax that each of the estates
20 would pay?
21     A.     Again, you would have to refer
22 to the tax memorandum which outlines if
23 you -- and it depends on what scenario you
24 are talking about.  In the tax memorandum,
25 they talk about a deconsolidation, TCH

Page 23

1                HORTON
2  being sold, EFIH or E side being sold, and
3  the tax implications, potential tax
4  implications of that.
5      Q.     Are those tax implications
6  different for the different estates?
7      A.     I think, again, you would need
8  to talk to the tax lawyers about it.
9  Conceptually from my perspective, my
10 chair, I mean, it is the same -- it is the
11 same consequence.
12     Q.     Did you review the tax
13 memorandum before it was filed?
14     A.     I did.
15     Q.     Did you play a role in the
16 development of the tax memorandum?
17     A.     I did not.
18     Q.     What was the first time you saw
19 a draft of it, without disclosing the
20 contents of the draft, before it was
21 filed?
22     A.     I can't recall.
23     Q.     Was it more than a week before
24 it was filed?
25     A.     Yes.

Page 24

1                HORTON
2      Q.     Did you provide comments on
3  that draft?
4      A.     I did not.
5      Q.     Now, going back to Mr. Ying's
6  e-mail with the talking points, these were
7  talking points he provided to Mr. Young to
8  reach out to prospective bidders; is that
9  correct?
10     A.     That's correct.
11     Q.     And do you know how many
12 bidders Mr. Young reached out to?
13     A.     I don't know the precise
14 number.  I would say four to six bidders.
15     Q.     And why was Mr. Young reaching
16 out to bidders at that time?
17     A.     I believe the rationale behind
18 that is that Mr. Young had relationships
19 with these counterparties and it was a
20 good way to open the door to the process
21 itself.
22     Q.     And so would you say he was
23 making the first call to those four to six
24 parties?
25     A.     I would suggest so, but that's

Page 25

1                HORTON
2  speculation.
3      Q.     Do you know whether Mr. Young
4  called potential investors other than the
5  four to six that you say he had
6  relationships with?
7      A.     I'm not aware of others.
8      Q.     Do you know whether Mr. Young
9  used these talking points?
10     A.     I do not.
11     Q.     Did you ever hear back any --
12 without disclosing the contents of what he
13 may have told you, did you ever hear back
14 any report on his conversations with those
15 bidders?
16     A.     I did not.
17     Q.     Did Mr. Young ask for these
18 talking points to be prepared?
19     A.     I do not know that.
20     Q.     The request to have Evercore
21 prepare them did not come through you?
22     A.     No, sir.
23     Q.     Who is Evercore's primary
24 contact inside the company for these
25 bidding procedures?

Page 46

1     HORTON
2  Q.  So sitting here today, you
3 don't know whether the transaction
4 proposed by the bidding procedures is
5 entirely contingent on the consent of the
6 TCEH first lien lenders?
7     MS. O'CONNOR: I object to
8 form.
9  A.  My belief is it does require
10 their consent but I would need to and feel
11 more comfortable getting further
12 confirmation of that. That's my
13 recollection.
14  Q.  Does the company have that
15 consent today?
16     MS. O'CONNOR: I object to
17 form.
18  A.  Again, I do not think at this
19 point in time that we have a transaction
20 to present to the TCH side to say is
21 this -- or the E side -- to say is this
22 transaction a transaction we want to
23 execute. I know that a point in time as
24 part of the RSA we had agreement with a
25 group of TCH first lien holders that they

Page 47

1     HORTON
2 would support a tax-free spin.
3  Q.  That was a minority of the TCH
4 first lien lenders; is that correct?
5  A.  It was a minority, yes.
6  Q.  What about entering into this
7 process and selling the Oncor asset
8 through a restructuring at EFH would make
9 it more likely that the TCEH first lien
10 lenders would allow confirmation of a plan
11 at TCEH?
12     MS. O'CONNOR: I object to
13 form.
14  A.  Would you mind repeating the
15 question?
16  Q.  Sure.
17     What about entering into this
18 bid process and selling the Oncor asset
19 through a restructuring at EFH would make
20 it more likely that the TCEH first lien
21 lenders would allow confirmation of a plan
22 at TCEH?
23  A.  What about what specific terms,
24 is that what you are asking me about this
25 transaction? I think it is the tax-free

Page 48

1     HORTON
2 nature and the risk that is outlined in
3 the tax memorandum.
4  Q.  Why do the TCEH first lien
5 lenders care about the tax-free nature of
6 the transaction at EFH?
7  A.  I think there is risk around
8 the timing of exiting bankruptcy. There
9 is risk of changes in law, changes in
10 regulations. Again, it is outlined in the
11 tax memorandum.
12  Q.  Mr. Horton, are you familiar
13 with what is called the competitive tax
14 sharing agreement in the tax memo?
15  A.  I'm aware of it.
16  Q.  Did you play any role in
17 drafting or formulating that when it was
18 put into place in 2012?
19  A.  No, sir.
20  Q.  In your view, do claims that
21 EFH might have against EFIH under that tax
22 sharing agreement give rise to a conflict
23 between EFH and EFIH?
24  A.  I'm not aware of any conflicts.
25  Q.  Do you recall in the board

Page 49

1     HORTON
2 meetings that you attended any debate or
3 discussion about conflicts between the
4 estates?
5  A.  Not as part of these bidding
6 procedures, no.
7     (Horton Exhibit 4 marked for
8 identification.)
9     MS. O'CONNOR: This is from --
10     MR. MARTIN: It is from your
11 data room.
12     MS. O'CONNOR: Did you give us
13 notice that you were planning to use this
14 in the deposition? Because if not, that's
15 one of the terms of the NDA is if you have
16 access to the data room you are supposed
17 to give us notice so that we can get it
18 Bates numbered to see if it is appropriate
19 for the --
20     MR. MARTIN: It is Bates
21 numbered.
22     MS. O'CONNOR: I'm sorry, I
23 see.
24     MR. MARTIN: You turned this
25 over to us. No problem.

13 (Pages 46 - 49)

Page 54

1  HORTON
2  A. No, sir.
3  Q. Did you ever discuss with
4  Evercore conversations they had with
5  bidders regarding tax considerations?
6  A. I've had conversations with
7  Evercore regarding the tax structure, yes.
8  Q. More specifically, though, have
9  you ever gotten reports from Evercore
10 about what the bidders are saying about
11 the tax considerations?
12 A. I have no -- have had no
13 conversations with Evercore regarding what
14 bidders are saying about the tax structure
15 and tax consideration. I had
16 conversations with Sesh regarding him
17 reaching out to counterparties and
18 informing them that we were open to all
19 forms and structures and would review
20 those and evaluate those seriously.
21 Q. Did you do anything other than
22 that generalized statement in having him
23 reach out to people and make that
24 statement?
25 A. That was the conversation we

Page 55

1  HORTON
2  had. I also had a conversation with David
3  Ying, incidentally, that was along those
4  same lines of them reaching out to the
5  counterparties. I can't recall if Will
6  was going to be on those calls or not.
7  Q. Did you ever have a
8  conversation like that with Mr. Hiltz?
9  A. I did not. I think I read in
10 this e-mail Sesh is kind of spearheading
11 the coordination of the company and
12 Evercore on this process. My main contact
13 is David Ying and Sesh at this point.
14 Q. Not Mr. Hiltz?
15 A. At this point.
16 Q. And are you the principal day
17 to day person at the company managing this
18 process?
19 A. Myself, along with other team
20 members, are running due diligence and the
21 data room and so forth.
22 Q. But you are the most senior
23 among those people which you described?
24 A. That's correct.
25 Q. Mr. Horton, would you agree

Page 56

1  HORTON
2  that from the debtor's perspective, they
3  believe the stalking horse process
4  provides a one-way option for the company?
5  A. Our intent is, through these
6  bidding processes and the procedures, is
7  to get the lowest cost option that we
8  possibly can for the estate to lock in as
9  much certainty as we possibly can for the
10 estate of a transaction at the highest
11 value.
12     So we are trying to create a
13 floor. We are going to try to provide as
14 much certainty as we possibly can. We
15 will bring that to the court. There will
16 be a hearing. Everyone will have an
17 opportunity to review that stalking horse,
18 the terms and conditions, and at that
19 point in time hopefully we will have
20 brought to the estate a very low-cost
21 option to avoid the market risk as we go
22 through the regulatory process that's
23 required to get this transaction approved
24 and to continue to work through the
25 confirmation issues through the bankruptcy

Page 57

1  HORTON
2  and restructuring process.
3  Q. Does that mean that this is
4  essentially an option for the company to
5  sell to a buyer at a floor, if you can
6  lock it in, if the TCEH first liens agree
7  to the tax-free spin?
8  A. I think, again, ultimately we
9  are going to need the TCEH side of the
10 house to agree, the TCEH first lien
11 lenders to agree to the tax-free
12 structure.
13 Q. Is there an option in the
14 company's structure for EFIH to get out of
15 whatever deal is signed up if there is no
16 tax-free spin?
17 A. Yes, I believe so. I would
18 like to verify that, but I believe so.
19     Again, we don't have a
20 transaction today that is fully
21 negotiated, and, again, it is a little bit
22 difficult to be doing this under
23 deposition, but our intent would be to
24 have as much optionality on our side of
25 the table and to have as much certainty on

15 (Pages 54 - 57)

Page 66

1       HORTON
2  conversation occurred?
3     A.   I don't know precisely.  It
4  seems like the first part of August, you
5  know, but I'm doing this from very vague
6  memory.
7     Q.   So why did the debtors
8  ultimately decide not to use BofA Merrill
9  as a second advisor on this?
10    A.   So Merrill, BofA Merrill, have
11 holdings at TCH, quite significant
12 holdings at TCH in the DIP facilities as
13 well as EFIH.  They are market makers on
14 both EFIH and TCH debt securities.
15         And we felt that it would be
16 important for them to sell down those
17 positions, and the cost of them selling
18 those down was more than any fees they
19 were going to make from us from the M&A
20 side, so ultimately we released them.
21    Q.   If you can go back to Exhibit 2
22 real quick.
23    A.   The one you just handed me?
24    Q.   The big one, the motion.
25         If you can go toward the back,

Page 67

1       HORTON
2  it is page 8 of the Bidding Procedures, it
3  is labeled 15 of 24 at the top.  It is
4  sort of halfway in.
5     A.   I got you.  Okay.
6     Q.   You see the -- if you could
7  just read the first paragraph there.
8         (Witness perusing document.)
9     A.   Okay.
10    Q.   You will see there that it says
11 that the debtors will select the round two
12 bidder that has submitted the highest and
13 best bid to be the stalking horse bidder,
14 if I paraphrased that correctly; is that
15 right?
16    A.   Uh-huh.
17    Q.   Which debtor is going to
18 choose?
19    A.   I think that would be a
20 decision that will ultimately be made by
21 the EFH board, but, look, you would need
22 to talk to our general counsel and others
23 who run the corporate governance of
24 ultimately who would make that decision.
25         But I think "the debtors" was

Page 68

1       HORTON
2  used collectively more illustratively than
3  specifically a debtor, a specific debtor.
4  More generally is probably the right word.
5         MR. MARTIN:  That's all I have.
6         THE VIDEOGRAPHER:  We are now
7  going off the record at approximately
8  10:53 a.m., the end of disk one.
9         (Recess taken.)
10        THE VIDEOGRAPHER:  This is the
11 beginning of disk number two.  We are
12 going back on the record approximately
13 11:04 a.m.
14 EXAMINATION BY MR. SHORE:
15    Q.   Good morning, Mr. Horton.  I'm
16 Chris Shore from White & Case on behalf of
17 the Ad Hoc Group of TCEH Unsecured Notes.
18    A.   I have heard your name.
19    Q.   Good or bad?
20    A.   It is great.
21    Q.   Good.
22         Let me ask you a few questions
23 about EFIH prior to the bankruptcy filing.
24         When did you first take a role
25 with EFIH?

Page 69

1       HORTON
2     A.   I think I have been the
3  treasurer of EFIH since day one,
4  Mr. Shore.
5     Q.   So 2007?
6     A.   Yeah.  That's when we formed
7  it, so yeah.
8     Q.   And I take it that as treasurer
9  of EFIH you kept yourself fully apprised
10 of all the business metrics relating to
11 EFIH?
12    A.   Yes.
13    Q.   Prior to the filing date, had
14 you ever heard of anybody within EFIH,
15 including the EFIH board -- well, let me
16 make a definition here first.
17         EFIH, as you understand it, its
18 sole material asset is its indirect
19 ownership in 80 percent of the stock of
20 Oncor, right?
21    A.   Oncor Electric Delivery
22 Holdings, yes.
23    Q.   And I will refer to that as the
24 Oncor stake, okay?
25    A.   Not a problem.

18 (Pages 66 - 69)