# EXHIBIT E

1        CONFIDENTIAL - HUGH SAWYER
2        UNITED STATES BANKRUPTCY COURT
3         FOR THE DISTRICT OF DELAWARE
4   ---------------------------------X
    In Re:
5

    ENERGY FUTURE HOLDINGS
6   CORPORATION, et al.,
7              Debtors.
8   Chapter 11
    Case No. 14-0979
9   Jointly Administered
    ---------------------------------X
10
11
12      *** C O N F I D E N T I A L ***
13
14         VIDEOTAPED DEPOSITION
15                 OF
16             HUGH SAWYER
17       Wednesday, October 8, 2014
18           Seven Times Square
19           New York, New York
20
21
22  Reported by:
    AYLETTE GONZALEZ, RPR, CLR, CCR
23  JOB NO. 85457
24
25

Page 341

1  CONFIDENTIAL - HUGH SAWYER
2  a fiduciary duty to to inquire as to their
3  desires and how they see the case?
4      A.  Not at this stage of the process.
5      Q.  Is that something you intend to do?
6      A.  I don't have any intention at this
7  point, but based on the advice of counsel or
8  the advisors or based on feedback from the
9  company management, I would consider it.
10     Q.  Have you received any advice, to
11 date, from counsel as to whether or not you
12 should reach out to -- and let me clarify, I'm
13 not asking you to tell me the substance of the
14 advice.  But have you received any advice from
15 counsel as to whether you should reach out to
16 T-side creditors, your constituency, in the
17 case?
18         MS. O'CONNOR:  With the limitation
19     not to reveal any information you
20     received from attorneys.
21     A.  To my recollection, no.
22     Q.  Other than the deposition -- the
23 previous deposition and today's deposition in
24 this case, have you had any direct
25 communications with any T-side credit -- and

Page 342

1  CONFIDENTIAL - HUGH SAWYER
2  other than the meeting that you mentioned,
3  have you had any communications with T-side
4  creditors' representatives; that is, counsel
5  or financial advisors or others in this case?
6      A.  No, not that I recall.
7      Q.  And have you asked -- strike that.
8          Have you considered reaching out to
9  the professionals representing any T-side
10 creditors in this case?
11     A.  I have not considered that.
12     Q.  Now, you mentioned you reviewed the
13 debtors' Motion for an Order approving bidding
14 procedures, correct?
15     A.  Yes.
16     Q.  What do you understand the debtors
17 to seek to do by virtue of that Motion?
18     A.  My understanding is they have two
19 basic objectives.  First, to take advantage of
20 the momentum that's in the case and the
21 favorable market conditions.  And additionally
22 to provide for robust process and enough time
23 for the potential bidders to conduct diligence
24 in an effort to maximize the value of any
25 potential transaction and the estate.

Page 343

1  CONFIDENTIAL - HUGH SAWYER
2      Q.  Well, my question is:  What do you
3  think the debtors are trying to sell pursuant
4  to that Motion?
5      A.  I believe the debtors are
6  attempting to sell Encore.
7      Q.  And when you say Encore, what do
8  you mean?  What are they -- strike that.
9  Let's back up.
10         What do the debtors own in
11 connection with Encore?
12     A.  EFH, as the debtor, owns EFIH
13 100 percent, which, in turns, owns 100 percent
14 of Oncor Holdings, which owns 80 percent of
15 Oncor Electric Company.  I believe they're
16 attempting to sell Oncor Electric Company and
17 all the other entities associated.
18     Q.  So is it your understanding the
19 debtors are trying to sell the stock of Oncor?
20     A.  I don't think they've reached any
21 potential conclusion as to the structure of
22 the sale process.
23     Q.  Well, you understand the debtors
24 have filed the Motion, correct?
25     A.  Yes.

Page 344

1  CONFIDENTIAL - HUGH SAWYER
2      Q.  Do you know what they're asking the
3  court for approval to sell specifically?
4      A.  They're looking for the sale of the
5  assets of reorganized EFH.
6      Q.  So you think it is an asset sale
7  that's being proposed?
8      A.  They're asking for the sale of the
9  equity of the reorganized EFH.
10     Q.  Now, have you -- are you familiar
11 with any other transactions in which a debtor
12 has sought to sell reorganized equity?
13     A.  I am not.
14     Q.  And have you -- does that concern
15 you that you're not familiar with any other
16 similar-type transactions?
17     A.  Doesn't concern me at this point as
18 I am relying on the advice of our investment
19 bankers and counsel.
20     Q.  When you say your investment
21 bankers and counsel, the "your" is who?
22     A.  The Evercore and Kirkland & Ellis.
23     Q.  And the "your" meaning the entity
24 they're representing is?
25     A.  EFH.

Page 345

1     CONFIDENTIAL - HUGH SAWYER
2      Q.  EFH?
3      A.  Correct.
4      Q.  But you're an independent director
5  of TCEH, correct?
6      A.  Correct.
7      Q.  And does TCEH have any
8  professionals that are representing it or
9  representing its interest?
10      A.  Not at this time, no.
11      Q.  And so when you say you've received
12  advice from counsel with respect to the sale
13  of the reorganized equity here of the debtors,
14  that advice is not from counsel to TCEH, but
15  counsel to the E-side, correct?
16         MS. O'CONNOR:  Object to form.
17      A.  Yes.  The advice is coming from the
18  advisors to the holding company to EFH and
19  represents all of the entities of EFH,
20  including the T-side.
21      Q.  And that hasn't raised any concerns
22  for you?
23      A.  Not at this time.
24      Q.  Now, you said, "not at this time."
25  Has -- at any time since you've been involved

Page 346

1     CONFIDENTIAL - HUGH SAWYER
2  in this case, have you been concerned that
3  TCEH needed separate counsel or advice in
4  connection with these cases?
5      A.  No, I have not been concerned that
6  the T-side needs separate counsel and advice.
7      Q.  Okay.  Are you aware of any
8  conflicts that exist between the T-side and
9  the E-side?
10      A.  I'm aware of the potential for
11  conflicts, but I do not believe those
12  conflicts have manifested themselves at this
13  point.
14      Q.  And what potential conflicts do you
15  see?
16      A.  Could be conflicts around stranded
17  tax matters, for example.
18      Q.  And if you could be more specific
19  what do you mean by that?
20      A.  It could be a stranded tax at the
21  E-side or the EFH level.  EFH could
22  potentially -- a fiduciary of EFH could
23  potentially check the box and expose the
24  T-side entities to the stranded tax.  But
25  there could be any number of potential

Page 347

1     CONFIDENTIAL - HUGH SAWYER
2  conflicts or claims throughout the pendency of
3  the case.  At this point, those conflicts have
4  not manifested themselves.
5      Q.  Thank you for telling us about the
6  check the box.  I'd like to understand today
7  your complete knowledge with respect to what
8  you referred to as potential conflicts of
9  claims throughout the pendency of the case.
10      A.  I think as the stakeholders may be
11  aware, there are potential claims involved
12  here that have not yet been resolved.  Have
13  not yet been adjudicated and given that this
14  process is being conducted inside the
15  protection of the Chapter 11 process, I'm
16  confident those will be resolved.
17         And at this point, there is no
18  conclusion to reach as to the claims or plan
19  of reorganization or allocation of proceeds.
20  There's nothing yet to decide.
21      Q.  And you don't think that the
22  potential -- those potential claims cause any
23  concern for you today as to the advice you're
24  getting or from whom?
25      A.  I think I'm getting superb push

Page 348

1     CONFIDENTIAL - HUGH SAWYER
2  legal advice from Kirkland and equally good
3  advice from Evercore, and although I recognize
4  that a conflict could arise, I do not believe
5  a conflict has arisen today.
6      Q.  Let me ask you:  Has anybody told
7  you whether or not this type of transaction;
8  that is, a proposed sale of reorganized equity
9  that will exist in the future, has anybody
10  told you whether or not any similar-type
11  transactions have ever occurred?
12      A.  No, not that I recall.
13      Q.  Did you ever ask anybody whether
14  that was the case?
15      A.  I have not.
16      Q.  Do you know if anybody at a board
17  meeting or elsewhere has ever inquired as to
18  whether or not this type of proposed
19  transaction has ever taken place before?
20      A.  I don't know.
21      Q.  And if I were to tell you that this
22  is a novel transaction which has never
23  occurred before, would that cause you any
24  concern?
25      A.  Not at this time, no.

Page 365

CONFIDENTIAL - HUGH SAWYER

2  Q. Well, is it fair to say that you
3  don't have enough facts to determine whether
4  the Motion is good or bad for T-side
5  creditors?
6      MS. O'CONNOR: Object to form.
7  A. I think -- no, I think the Motion
8  is potentially favorable for the T-side
9  creditors if it enhances the overall economic
10 value of the estate depending, of course, on
11 how the court ultimately allocates proceeds
12 and on the plan of reorganization.
13 Q. Let's talk about that. There's
14 really two components to the transactions
15 contemplated by the Motion. There's the tax
16 free spin on the T-side, correct?
17 A. Yes.
18 Q. And there's the sale of the
19 reorganized E-side equity, correct?
20 A. Yes.
21 Q. Those are the two substantive
22 components of the transactions contemplated by
23 the Motion, correct?
24 A. Partially correct, but the Motion
25 is also very explicit that the debtor has not

Page 366

CONFIDENTIAL - HUGH SAWYER

2  precluded alternative structures and the
3  Motion is also clear that as to any tax
4  matters there would be need to be negotiations
5  among the stakeholders of the debtor.
6      So while the debtor has expressed
7  its bias for the tax free spin, it certainly
8  doesn't preclude other alternative structures.
9  And, in fact, is quite transparent throughout
10 the documentation that we welcome any other
11 structure -- any other bidders that would
12 enhance and maximize the value of the estate.
13 Q. Fair enough. Let me -- let me put
14 it this way: The -- you -- you understand
15 that the debtors have, within the Motion,
16 referred to what is called as an optimum or
17 optimal transaction, correct?
18     MS. O'CONNOR: Object to form.
19 A. The debtors have expressed through
20 their filings, their view of a tax-free spin
21 of the T-side. However, they've also, I
22 think, been explicit in all of their filings
23 that that does not preclude a different
24 structure. And indeed, I believe they would
25 -- we have been clear we would welcome

Page 367

CONFIDENTIAL - HUGH SAWYER

2  alternatives if it would maximize values of
3  the estate.
4  Q. You don't need to look, I'll just
5  -- I'll quote you on page 16 of the Motion.
6  It says, "they," referring to debtors,
7  "believe the optimal deal structure would be
8  an equity investment in reorganized EFH
9  combined with a tax-free spin of TCEH."
10     Correct?
11     MS. O'CONNOR: Object to form.
12 Q. So I just want to come back -- I
13 want to make sure we're on the same page,
14 which is that what the debtors in the Motion
15 have proposed, if you will, or referred to an
16 optimal transaction, that has two major
17 components which is the tax-free spin on the
18 T-side and the sale of the reorganized E-side
19 equity; is that right?
20 A. Based on the advice we've received
21 from Evercore and Kirkland, and based on the
22 view of company management, that is the
23 optimal structure today.
24     However, that does not mean that
25 some other alternative may not be identified

Page 368

CONFIDENTIAL - HUGH SAWYER

2  or could be identified that would maximize
3  value greater than what's contemplated today.
4  And we welcome any other alternative
5  structures that would maximize the value of
6  the estate.
7  Q. We'll talk about that in a little
8  bit. I want to continue to focus on what's --
9  I think we've now at least tried to agree on
10 what the debtors referred to as the optimal
11 structure.
12     So my question is: Let's just
13 break it down. On the T-side where they'll be
14 a tax-free spin, how does that enure to the
15 benefit of T-side creditors?
16     MS. O'CONNOR: Object to form.
17 A. Well, the -- as you know, the IRS
18 has not yet issued any ruling on any of the
19 tax structure. This tax structure is
20 extraordinary complexed and there's been
21 concern that a fiduciary on the EFH company
22 could potentially check a box and expose the
23 T-side entities to the federal income tax
24 liability. So rather than the tax being
25 stranded at EFH, expose the T-side entities.

Page 369

CONFIDENTIAL - HUGH SAWYER

So based on the research that has been done to date, the tax-free spin would, in fact, benefit the T-side creditors.
Q. Which creditors?
A. The T-side creditors.
Q. All of them?
A. It's too early to determine whether it would benefit all of them or the first or the second or the unsecureds. In my view, my business judgment, very early in this process. We just don't know yet.
Q. Well, I want to just explore what you said, which is -- I think in my words what you said was, if there's a tax free -- if the tax-free spin is done creditors on the T-side hopefully don't have to worry about a severe tax consequence. Is that generally correct? It lessens the worry of a severe tax consequence?
MS. O'CONNOR: Object to form.
A. Of course we don't have a ruling from the IRS and the outcome remains uncertain, but based on the work that has been done to date, the view of the debtor is a

Page 370

CONFIDENTIAL - HUGH SAWYER

tax-free spin is advantageous.
Q. And how does that help the second liens in the unsecured creditors on the T-side?
A. Depending on the -- because we don't have -- we don't yet know what value will be created. We don't know what a plan of reorganization will look like. We don't know how proceeds will be allocated by the court. It's not yet possible to know how or if it will benefit all of the creditors.
Q. Okay. But are you aware that at least to date the debtors' position has been that the second liens in the unsecured and T-side are out of the money?
MS. O'CONNOR: Object to form.
A. I've heard that terminology used, but I don't think, in my business judgment, we don't know yet what the outcome will be.
Q. You, yourself, haven't reached any conclusion as to whether or not the second liens, the unsecured on the T-side, are out of the money?
A. I have not reached a conclusion yet

Page 371

CONFIDENTIAL - HUGH SAWYER

as to what the -- what the ultimate outcome of this case will be, that's correct.
Q. But you understand that the debtors; that, is the debtors' professionals, have taken the position publicly that the second liens and the unsecured on the T-side are out of the money?
MS. O'CONNOR: Object to form.
A. I understand they've taken that position. The case has not yet been adjudicated. We don't know what value will be created. We don't know what the plan of reorganization will look like.
Q. Well, when you say value created, where is that value going to be created?
A. Well, value could potentially be created through the sale of this Encore asset.
Q. Well, that's the only place, right, because on the T-side what's being proposed is a tax-free spin. That's not going to create any value for the second liens or unsecured, right?
A. Well, we would potentially avoid the destruction of value, as we've discussed,

Page 372

CONFIDENTIAL - HUGH SAWYER

related to the tax matters. But we don't yet -- I'm not comfortable with the characterization that it's the only place value would be created. I don't think we know yet.
Q. Well, let me ask you just your understanding as an independent board member on the T-side. If, in fact, as the debtors have taken the position, the second liens and unsecureds are out of the money, would it be your expectation that their recoveries will be zero or minimum?
A. I don't yet have an expectation as to the amounts of recoveries. Having lived through other bankruptcies, it's not yet possible to know what the recoveries will be.
Q. Do you recall what the debtors had proposed as recoveries for the second liens and unsecured when the RSA was in place?
A. I don't recall.
Q. And if I were to tell you it was minimal, something less than 1 or 2 percent, does that refresh your recollection in that regard?

13 (Pages 369 to 372)

Page 401

1  CONFIDENTIAL - HUGH SAWYER
2  Q. Has there been any discussion that
3  that will be the case?
4  A. Not that I recall.
5  Q. Just give me one minute, I'm going
6  to try --
7  A. Sure.
8  Q. -- and expedite this for you.
9  Are you aware that the debtors have
10 filed recently what's been referred to as a
11 tax memorandum?
12 A. Yes, I think it's the Omnibus; yes.
13 Q. Okay. And is that -- have you read
14 that?
15 A. I have.
16 Q. Okay. Did you read it before it
17 was filed or after it was filed?
18 A. I read it after it was filed.
19 Q. Was that something that was
20 discussed at any TCEH board meetings or
21 informally with the board?
22 A. I don't re- -- I don't recall that
23 it was discussed either formally or informally
24 with the board.
25 Q. Do you understand that the debtors'

Page 402

1  CONFIDENTIAL - HUGH SAWYER
2  proposed structure as set forth in the motion
3  requires confirmation of a plan of
4  reorganization for all of the debtors before
5  the proposed sale could close?
6  A. Yes.
7  Q. And does that concern you from an
8  execution risk point of view? And if you
9  don't know what I mean, please ask.
10 A. No, I don't think so. I don't -- I
11 think that any bidder for this asset is going
12 to be very well aware that the company's in
13 bankruptcy and will need to confirm a plan of
14 reorganization. These are sophisticated
15 bidders.
16 Q. And you -- do you believe -- strike
17 that.
18 You're not concerned that the
19 bidders are being asked to bid in connection
20 with an asset/transaction that won't close for
21 more than a year -- possibly won't close for
22 more than a year?
23 A. No, I'm not concerned because it's
24 a -- a regulated utility. My understanding is
25 that it could take as long as 12 to 18 months

Page 403

1  CONFIDENTIAL - HUGH SAWYER
2  to get all the regulatory approvals. And I am
3  certain that any bidder will be aware of that,
4  as well, given the level of sophistication of
5  these bidders.
6  Q. I want to show you what we're going
7  to mark as Exhibit 2, Sawyer 2, which is --
8  and I'll just wait till you get it.
9  (Sawyer Exhibit 2, Stipulation and
10 Agreed Order, Filed on 9/16/14 was
11 marked for identification, as of this
12 date.)
13 BY MR. JONAS:
14 Q. What's been marked as Sawyer
15 Exhibit 2 is a stipulation and agreed order
16 regarding a protocol for certain case matters.
17 This was filed with the Court on
18 September 16, 2014. I'll ask you to take a
19 look at that.
20 Have you seen this before?
21 A. I have not seen this.
22 Q. Okay. So I take it you never
23 familiarized yourself with the terms of the
24 stipulation?
25 A. I've testified I haven't seen it.

Page 404

1  CONFIDENTIAL - HUGH SAWYER
2  Q. Okay.
3  A. I don't know if the -- I haven't
4  read it, so I don't know if the protocols for
5  the case matters described herein have been
6  discussed with me previously, I'd have to look
7  at it.
8  Q. All right. Let's just take a look
9  at Paragraph 4.
10 A. Um-hum.
11 Q. And I'll just read the first
12 sentence or part of it.
13 "The independent directors of each
14 of EFIH, EFCH and TCEH and EFH respectively,
15 each an independent director, are authorized
16 to seek to retain separate advisors of his or
17 her choosing, each an independent advisor, to
18 advise or otherwise represent the applicable
19 debtor," and then it goes on, I just read a
20 part of it. Do you see what I just read?
21 A. Yes.
22 Q. Okay. And so now that you see
23 that -- and would you agree with me where it
24 says "independent director," that means you,
25 right?

Page 409

CONFIDENTIAL - HUGH SAWYER

the case in an effort to resolve those parties' objections to the retention of certain professionals?

A. I have been kept, through privileged conversations, very well informed by Kirkland as to the concerns of the T-side creditors.

Q. Well, are you aware that this stipulation was done?

A. As I've previously testified, I was not aware that the stipulation had been filed. I may be aware of the content, but -- for example --

Q. Okay.

A. -- that I have -- that I have the right to select independent advisors.

Q. But I'm not asking whether you're aware that generally you have the right to independent advisors.

I'm asking if you knew at the time or any time since then that the professionals in this case; that is, those that have signed this stipulation, bargained for and obtained the -- the -- the right for you to retain

Page 410

CONFIDENTIAL - HUGH SAWYER

separate advisors?

MS. O'CONNOR: Object to form.

A. No.

Q. Okay.

A. But as I've testified, I understood that I had that right.

Q. Okay. But nobody had a specific -- no one in this case has had a specific discussion with you that if you determined it's necessary or prudent to do so with respect to any -- what's defined here as notice matter, then you can retain independent counsel, nobody's advised you of that?

MS. O'CONNOR: Object to form.

A. What I've said is, I've answered yes to your previous question that I've had conversations that are privileged.

Q. That's not my question.

My question is, that as set forth in this stipulation where a specific right was obtained for your benefit effectively, that if you determined it was necessary or prudent to do so with respect to any notice matter, you are authorized to seek to retain separate

Page 411

CONFIDENTIAL - HUGH SAWYER

advisors; my question is, whether or not anyone has discussed that fact with you?

MS. O'CONNOR: Object to form.

A. I can't reveal privileged conversations. As I've testified, I'm very well aware and was aware of --

Q. I'm not asking -- sir, I'm not asking you to reveal the content of privileged communications.

Have you discussed with counsel the fact that this stipulation provides that you are authorized to seek to retain separate advisors if you determine it's necessary or prudent to do so with respect to any notice matter. That's a yes or no?

A. I have not discuss with counsel this stipulation.

Q. Okay. So I take it you haven't discussed with counsel or anyone else and you're not aware that this stipulation provides that if you determine that a potential conflict has become an actual conflict under applicable law, that you're authorized to seek to obtain separate advisors

Page 412

CONFIDENTIAL - HUGH SAWYER

of your choosing, correct?

A. I'm very well aware that I'm authorized to seek separate counsel of my choosing.

Q. Again, my question, sir, is, you're not aware that a few weeks ago -- and no one's told you in this case, that a few weeks ago the debtors bargained for and negotiated a right for you where you determined that a potential conflict has become an actual conflict, you are authorized to seek to retain separate advisors of your choosing, no one's made you aware of that, have they?

MS. O'CONNOR: Objection to form. And I think he's answered this question a couple of times.

Q. Well, we can get one more yes or no.

A. I do not recall that I was advised that the T-side debtors had negotiated this stipulation and order. However, I believe that I have this right without the stipulation and order.

Q. Okay. I don't want to be belabor,

Page 473

CONFIDENTIAL - HUGH SAWYER

taxable transaction, when we have a plan of reorganization underway at some point in the process it will be important to understand all of the tax implications to the T-. Side, but that day is not today.

Q. You say "we," and as I understand it, there's only a you; that is, you are the only sole TCEH fiduciary. Can you testify under oath now that when that issue comes, you're going to be seeking independent legal advice and aren't going to go to the lawyer for the Defendant in that lawsuit to tell you what the contract means?

MS. O'CONNOR: Object to form.

A. By "we," I mean the T-side board. And I am not yet prepared to testify today that I would be seeking independent advice. I have no idea yet what this transaction is going to look like or what the structure will be whether it will be taxable or tax-free spin up. I don't know yet.

Q. Can you open up Exhibit 2, the Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters?

Page 474

CONFIDENTIAL - HUGH SAWYER

A. Which; I'm sorry?

Q. Exhibit 2.

A. Okay.

Q. First of all, let me ask some basic questions. Do you know whether this stipulation was ever presented to the TCEH board or EFCH board for approval?

A. To my belief, it was not presented for approval.

Q. All right. So if you turn to -- I just want to know what you know. You got asked about whether you knew you had a right to get counsel. But I want to ask you through some specific things.

Can you turn to page 2?

A. Okay.

Q. Were you aware that Kirkland & Ellis was signing a document which was going to bind the TCEH estates to certain corporate governance matters?

MS. O'CONNOR: Object to form.

A. Which paragraph?

Q. Paragraph one. It says, "This Stipulation and Order is intended to bind and

Page 475

CONFIDENTIAL - HUGH SAWYER

enure to the benefit of the parties."

You see that?

A. Um-hum.

Q. You understand one of the parties here is TCEH?

A. Right.

Q. Were you aware that counsel was signing a stipulation that was going to bind TCEH?

A. And as I think I previously testified, I was not aware of this document so then, therefore, I was not aware.

Q. Can you turn to paragraph four, please.

A. Okay.

Q. If you go down to -- after the definition of "independent matters," there's a sentence. You see that it's down five lines up from the bottom. It says, "The independent directors of EFCH and TCH shall consult with the creditors' representatives regarding the selection of an independent advisor or independent advisors."

Were you aware that that on your

Page 476

CONFIDENTIAL - HUGH SAWYER

behalf you have been required to consult with the TCH creditor representatives regarding the selection of independent counsel?

A. I was not aware.

Q. If you turn to page 7 -- no, page 4, sorry, paragraph 7. Page 4, paragraph 7.

A. Okay.

Q. Down at the bottom, it says, "The debtors and K&E will facilitate the TCH creditors' representatives diligence of the rights and potential claims, causes of action and defenses of the TCEH debtors against or with respect to other debtors."

You see that?

A. I do.

Q. Were you aware that TCEH has committed to facilitating investigation of TCEH claims?

MS. O'CONNOR: Object to form.

A. I'm sorry; will you restate that?

Q. Sure. Were you aware, until just now, that TCEH, which is a debtor, has committed to facilitate this side of the table's investigation of TCH, whatever TCH

Page 509

CONFIDENTIAL - HUGH SAWYER

companies against the parents or the parents against the individual companies. There were any number of claims reviewed.

Q. Did you get any independent advice about the economic effects on EFH? Not TCEH, but EFH of checking the box?

MS. O'CONNOR: Object to form, but go ahead.

A. Not that I recall.

Q. So you didn't do that to determine whether the threat of checking the box was real or a bluff economically?

A. I've had advice from Kirkland. I've had advice from Sidley. The advice is privileged as to the legal matters related to the opportunity to check the box. And as I've previously testified, we don't have a position yet from the IRS on any of these complex matters.

And in my view, it's still early on in the process to retain independent third-party economic advice.

MR. WEISFELNER: I'm going to impose an objection on the assertion

Page 510

CONFIDENTIAL - HUGH SAWYER

of privilege, once again for the record.

I don't believe any consultation this witness had with either Kirkland or with Sidley about the enforceability or inability to check the box, or fences thereto, could possibly constitute privileged communication. And if necessary, we'll involve the course in forcing this witness to answer the question.

MS. O'CONNOR: Which question are you --

MR. WEISFELNER: Any question that has been asked about the advice he got from Kirkland or Sidley. He's asserted a privilege. I don't think that assertion of privilege is justifiable and we'll ask the court to rule on it either before or during the trial.

And by the way, will you be making Mr. Sawyer available as a trial witness?

Page 511

CONFIDENTIAL - HUGH SAWYER

MS. O'CONNOR: On the bidding procedures motion? We can address that after his deposition.

MR. WEISFELNER: Well, I'm telling you now that we want him as a trial witness. So you can either tell us --

MS. O'CONNOR: Okay. I'm telling you right now we'll get back to you on that. Thank you for letting us know.

MR. WEISFELNER: Sure.

BY MR. MARTIN:

Q. Was there any written advice to the TCEH board about the check the box issue prior to the tax memorandum being filed?

A. Not that I recall.

Q. Can you point out the tax memo? I forget which Exhibit Number it is.

MS. O'CONNOR: 12.

Q. If you go to page 21, please.

A. Okay.

Q. If you read the middle paragraph, the first full paragraph on that page, "While a check the box election," if you could read that for a moment.

Page 512

CONFIDENTIAL - HUGH SAWYER

A. Okay.

Q. Do you understand the second to last sentence of that paragraph to say that checking the box would also be disadvantageous to the creditors of EFH?

A. That's what it says, yes.

Q. Did Kirkland give you that advice before filing the tax memorandum?

A. I don't recall if Kirkland gave me this advice before filing the tax memorandum.

Q. Did they give you that advice before the bidding procedures were filed?

A. As to this last sentence that a check the box would be an adverse outcome for all parties, I have received that advice certainly before the bidding procedures were filed.

Q. By all parties you understood at that time the advice was given to include EFH?

A. That a check the boxy election would be an adverse outcome for all parties. That was my understanding, yes.

Q. And that all parties included an adverse result for EFH, not just TCEH?

48 (Pages 509 to 512)

Page 513

CONFIDENTIAL - HUGH SAWYER

A. I don't recall if I specifically focused on EFH. I was focused on the T-side.

Q. In other words, you were not focused on the question of whether EFH would have, in its own interest, actually checked the box?

A. I was focused on the hypothetical situation that EFH could or a fiduciary of EFH could check the box to protect the interest of EFH. And I was certainly focused on the potential detrimental impact on the T-side.

Q. Did Sidley give any advice on these topics?

A. I don't recall any specific advice that Sidley may have given on these topics.

Q. Did any other law firm or tax advisor give any advice to you on this question of whether EFIH would be adversely -- I'm sorry; EFH would be adversely affected by a check the box either before the bidding procedures were filed or before TCEH signed the tax memorandum?

MS. O'CONNOR: Object to form.

A. The substantial tax advice I had

Page 514

CONFIDENTIAL - HUGH SAWYER

gotten in this circumstance has come from Kirkland.

Q. When were you first aware of concerns relating to EFH checking the box with respect to TCEH?

A. I don't recall the date at which I became concerned.

Q. When did you become a director of TCEH?

A. In the fall.

Q. And did you become aware of the check the box issue before or after the filing of the bankruptcy?

A. I don't recall.

Q. You've been involved in large Chapter 11 cases before; is that correct?

A. Yes. Depending on your definition of large.

Q. Multi billion dollar cases.

A. Yes.

Q. And have any of those cases been in the energy sector?

A. Yes.

Q. And are you aware that there's a

Page 515

CONFIDENTIAL - HUGH SAWYER

stay -- an automatic stay or injunction of actions that arises when the bankruptcy case is filed?

A. Yes.

Q. Did you consider whether TCEH might have gone to court to determine whether EFH could check the box after a bankruptcy filing?

A. I don't recall that I did consider that.

Q. Do you have any reason to believe you did consider that?

A. I have reason to believe that Sidley, in its role as third-party counsel, considered any number of potential actions that might be available to all the parties to this case.

Q. But you didn't consider that?

A. I think I testified I don't recall.

Q. You don't have any reason to think you did consider it?

A. I may have considered it in my review of potential claims with Sidley. I just don't recall.

Q. Are you familiar with a Chapter 11

Page 516

CONFIDENTIAL - HUGH SAWYER

case called Edison Mission Energy?

A. I'm familiar.

Q. Did you have a position with Mission?

A. I did.

Q. What was that?

A. The -- I was the independent director -- excuse me, one of the independent directors.

Q. How many independents directors were there?

A. There were two.

Q. Did Edison Mission Energy have a parent company?

A. They did.

Q. Were there substantial tax disputes between the two companies as part of the Chapter 11 case?

A. Yes.

Q. Did Edison Mission seek to block its parent company from taking certain tax actions that could be adverse to Edison Mission during that bankruptcy case?

A. To my recollection, yes.

49 (Pages 513 to 516)

Page 517

CONFIDENTIAL - HUGH SAWYER

Q. As an Edison Mission director, did you vote on and approve the filing of the Edison Mission reorganization plan in that case?
A. Yes.
Q. Was the authority to approve that plan delegated to the independent directors in that case?
A. Can you be more specific as to the authority?
Q. Sure. Did the full board of Edison Mission delegate the authority to approve the plan to a special committee consisting of the independent directors or to the independent directors?
A. There were only three board members. One of those board members was the president of Edison Mission. The other two board members were independents.
Q. Thank you. And that plan included an injunction to block EME's parent company from taking certain tax actions that could have been adverse to the debtor; is that correct?

Page 518

CONFIDENTIAL - HUGH SAWYER

A. That's my recollection.
Q. Who was counsel to Edison Mission in that case?
A. Kirkland & Ellis.
Q. When was that case?
A. That case took place over the last few years.
Q. The last two years?
A. That's about right.
Q. Can you give me any reason why you wouldn't consider something like that in this case?
A. Something like what?
Q. TCEH seeking to block EFH from checking the box.
A. Facts and circum -- I think as I previously testified, I have not yet considered to my recollection that alternative here. Although I may have considered it in consultation with Sidley, the facts and circumstances are different in both of these cases, as I'm sure you understand.
And as to your question, I can't speculate as to what I may or may not do over

Page 519

CONFIDENTIAL - HUGH SAWYER

the pendency of this case.
Q. Did you ever consult with Sidley outside of a board meeting?
A. Yes.
Q. On how many occasions?
A. On one occasion.
Q. Do you recall when that was?
A. I don't.
Q. Before or after the bankruptcy case was filed?
A. I don't recall the exact timing of the discussions. I really don't.
Q. Do you recall how long a meeting that was?
A. Several hours.
Q. And that was just you and Sidley?
A. Sidley, myself, Kirkland & Ellis and representatives of the company.
Q. So any discussion with Sidley about this topic would have occurred either in a board meeting or at that meeting?
A. The discussions that I participated in with Sidley occurred in a private session outside the board meeting.

Page 520

CONFIDENTIAL - HUGH SAWYER

Q. Have you ever been in a board meeting where Sidley gave advice on these topics?
A. Not that I recall.
Q. So as far as you know, Sidley has never given anyone advice on these topics to the TCEH board?
A. As I previously testified, Sidley gave advice on a wide range of potential claims to the independent director of the TCEH board.
Q. In that one meeting you had with them?
A. That's right.
Q. And Kirkland & Ellis was present for that meeting?
A. That's right.
Q. Are you aware that first round bids are due under the bidding procedures on October 23rd?
A. Yes.
Q. And that's just six days after the debtors are seeking approval of the bidding procedures; is that correct?

50 (Pages 517 to 520)

TSG Reporting - Worldwide    877-702-9580