## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 2087 |

### OBJECTION OF THE AD HOC GROUP OF TCEH UNSECURED NOTEHOLDERS TO THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN AUCTION AND RELATED DEADLINES AND HEARINGS, AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

The ad hoc group of certain holders (the "Ad Hoc Group of TCEH Unsecured Noteholders") of approximately $2.6 billion of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued by Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc., by and through its undersigned counsel, hereby files its objection (the "Objection") to the Motion of EFH Corp., *et al.*, for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof [D.I. 2087] (the "Motion").[2] In response to the Motion, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      By the Motion, all 71 of the Debtors are seeking authority for Energy Future Intermediate Holding Company LLC ("EFIH") and Energy Future Holdings Corp.

---

[1]      The last four digits of Energy Future Holdings Corp.'s federal tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which the debtors have been granted joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion and the exhibits thereto.

MIAMI 1027266

("EFH") to market and pursue the sale of those two estates' assets pursuant to a set of allegedly

"transparent" Bidding Procedures leading up to a contemplated Auction. At times, the Debtors

have described the Motion as "unnecessary," "ordinary course," "merely procedural" and "non-

controversial." They have also protested that any and all objections to the substance of any

proposed sale can be tabled at this time and raised only if and when they come to agreement with

a bidder. It is hardly that simple, and creditors are entitled to a determination whether, at this

time, the Debtors should even be marketing assets, much less selling them.

      2.     Discovery has shown that the Debtors' management teams, in fact, are

seeking to implement within the next eighteen months a radical, unprecedented, non-ordinary

course transaction in which they are actively and currently marketing for sale, on a forward

basis, billions of dollars of not-yet-existent post-reorganization equity of EFH, in a one-way put

option, without a plan on file, without the support of any of their pre-petitioncreditor

constituencies for the "tax-free spin" required by such a transaction, and without any bidder

having yet agreed to any deal, much less the entirely one-sided deal that they think might

exist. Whether such a deal exists in reality or is feasible is, at this time, entirely hypothetical

and, as set forth herein, the Ad Hoc Group of TCEH Unsecured Noteholders remains frustrated

with the Debtors' pattern of allocating massive resources to the hunt for financial "unicorns" and

away from doing the substantial work necessary to begin negotiating a plan with all of their

creditor constituencies, as they so recently committed to do.

      3.     In this Objection, we will attempt to focus less on the unclear motives of

management in pursuing the Motion and the unfortunate chilling effects that the Motion is

having, and will have, on the plan process and instead focus more on the following five points.

4.    <u>First</u>, despite the Debtors' protests to the contrary, this Court's express authority <u>is</u> required for the Debtors to market their post-reorganization equity in a post-petition sale process. Mr. Paul Keglevic, the Debtors' Chief Financial Officer and Co-Chief Restructuring Officer, has admitted that neither EFIH nor EFH had ever placed any of its assets on the market prepetition, and that neither holding company is generally engaged in the business of selling its assets, much less post-reorganization equity. Thus, under section 363(b) of the Bankruptcy Code, the Debtors (a) must obtain express Court approval to expend any estate assets to conduct their marketing efforts, and (b) bear the burden of demonstrating that they made an informed decision to market and sell with a sound business purpose and in good faith.

5.    <u>Second</u>, in reviewing any decision and the Debtors' evidence, the Court should employ the entire fairness standard and assess the evidentiary record with strict scrutiny. As set forth in Section I.D, <u>infra</u>, the Sale Team's decision to hunt its unicorn at this time is fraught with inter-estate conflicts, including the necessary adversity between the "T-side" and "E-side," and even between EFIH and EFH, regarding the tax consequences of any sale of assets. Most notably, the structure of the "optimal" deal that the Debtors reference in the Motion is based entirely on conflicted legal advice regarding potential tax liabilities under certain sale scenarios and the contention that subsidiary Debtors will bear post-petition liability for taxes incurred by EFH. Even assuming, however, that the traditional business judgment rule were to apply to management's decision to market, the Debtors do not come close to meeting that standard. The decision at issue was never approved by any board of directors, nor was any authority expressly delegated to the relevant officers for them to market all of the two Debtors' assets. Under the relevant organizational documents and applicable Texas and Delaware law, advance, express board approval was necessary for management to take the assets of EFH and

EFIH to market, and it is hard to conceive how a decision to place all of those companies' assets on the block was made without any affirmative board action. Even then, management failed to inform themselves sufficiently to make a sound decision to sell. As set forth below, their fundamental explanation for the Debtors' decision to market now—that EFIH's residual interest in 80% of the stock of Oncor Electric Delivery Company LLC ("Oncor") "could" decline in value while a plan is negotiated—was (and is) unsupported by any survey, study, or written analysis presented to management or any board. Instead, that decision appears to have been based entirely on gut instinct, the existence of multiple bidders vying for the Oncor stake and the advice of a new investment banker in the deal who had first heard of Oncor four weeks into the marketing process. Delaware and Texas law explicitly require the managers of a limited liability company and the directors of a corporation, respectively, to "inform themselves of all material and reasonably available information" before taking corporate action. That clearly did not happen here.

6.      _Third_, even had the decision to market been supported with a demonstrable record of market risk relating to the Oncor stake, the contemplated risks here are not of the sort that requires the drastic forward sale of stock that does not yet exist. Discovery has confirmed that none of the purported risks that are driving the sale process are particular to Oncor's operations. Instead, all are exogenous, generalized market risks applicable to all U.S. companies that might seek to conduct an M&A transaction—the potential increase in interests rates, a potential constriction in the availability of cheap debt and equity financing, and a potential decline in the number of suitors in the market for Oncor. These are exactly the types of risks that face all Debtors while they are in chapter 11 and that all creditors accepted when they lent to the Debtors. The Bankruptcy Code expressly contemplates that, rather than take

extraordinary action to lock in present value, a debtor will continue to operate its business in the ordinary course while it, among other things, negotiates a plan during its exclusive periods. The Bankruptcy Code places no requirement on a debtor to insure against generalized market risks, and indeed countenances against a debtor's use of potential recoveries of one creditor class to insure against another's potential loss. Perhaps the most proper resolution to the Motion here is for the Court to counsel the Debtors and their advisors to focus on the plan process first and the sale of post-reorganization equity later. Indeed, if the risk of loss with respect to the Oncor stake were so great, one would have expected the Debtors to quantify that risk in some demonstrable way and use it to bring parties to the table for an accelerated plan solution. Instead, by pursuing the Motion, the Debtors have simply dismissed the views of their entire capital structure—all of which is populated with sophisticated parties well versed in assessing and managing risk—and pursued a path in the face of universal objection.

7.    <u>Fourth</u>, even if the members of management had fully informed themselves and had a good faith belief that the Oncor assets were at <u>some</u> risk, there is no record that the proposed solution here—a forward sale of post-reorganization equity—presents a tangible fix to that problem. The Debtors readily admit that they have considered <u>no</u> alternatives for assessing risk other than their unprecedented forward sale of stock that will not exist for a year, if it ever exists at all. And, despite the desire for that sale, not one bidder has agreed with the Debtors' insistence on a low-cost one-way "put" option with asymmetrical remedies. There is substantial doubt in the creditor body that any bidder will commit tens of billions of capital for eighteen months with an upside recovery capped at some nominal sum during the option period while at the same time risking an unlimited downside with locked-in specific performance remedies. That asymmetrical product, however, is exactly what the Debtors are seeking, albeit

admitting that it is "impossible to speculate" at this time whether it exists.  As set forth in Section

III, infra, this Court can only provide relief within the bounds of section 363 of the Bankruptcy

Code and the U.S. Constitution.  Given the nature of the beast here— the financial unicorn —

there are substantial questions as to whether there is a live case or controversy requiring practical

relief.  The mere hope that some bidder might appear to buy some asset on some hypothetical

terms does not necessarily justify the Court's time reviewing, understanding and approving

procedures premised on the existence of an actual bidder for an actual asset.  Even if the Court

were inclined to give the Debtors some leeway for their hunt, any bidding procedures should

require that the Debtors produce a signed commitment in the first round and bring that to the

Court before proceeding any further.  There is far too much time, effort and money being spent

on what are now hypothetical risks and speculative solutions.

8.    Fifth, even if there were an informed, authorized, good faith, justifiable

business decision to go to market and a tangible basis for believing an effective transaction is

possible, it would still be too early for the Debtors to pursue a sale given their preexisting written

commitments to the Court and their creditors.  In particular, the Debtors recently obtained a five-

month extension of exclusivity based on an express representation that "the Debtors [would] use

the additional time to further develop a restructuring transaction with the input of their

stakeholders . . . and . . . continue to be[ ] actively engaged in global plan negotiations."

Discovery has shown that, at the same time they were making those representations to the

creditor body and the Court, the Debtors' CROs and advisors were actively marketing the sale of

EFH equity pursuant to a single, specific form of plan—a tax-free spin on the "T-side" with the

"E-side" flipping into reorganized EFH—without ever consulting creditors or soliciting their

views as to such a plan.  From that creditor-hostile movement forward, the Debtors have placed

the plan process, including the necessary diligence process leading up to negotiations, on

indefinite hold.  In other words, almost all of the Debtors' current extension of exclusivity,

premised on plan discussions, will be devoted to pursuing the Debtors' unilateral plan agenda.

Beyond that exclusivity commitment, in connection with the Stipulation and Agreed Order

Regarding a Protocol for Certain Case Matters [D.I. 2051] (the "Case Matters Protocol"), the

Debtors also committed to provide time and assistance to "T-side" creditors seeking to

investigate conflict matters and provide advance notice of filings affecting conflict matters.  It is

entirely unclear how the Debtors have decided to sell the economic interest in the Oncor stake

before they have educated "T-side" creditors as to claims that the "T-side" has against Oncor that

may be potentially senior to the equity interests at issue.  By the Motion, the Debtors seek to sell

the Oncor stake weeks before creditors even have to disclose whether claims exist.  Moreover, in

pursuing their particular sale structure, the Debtors continue to show an alarming tone-deafness

to conflicts, among other ways, by publishing a "tax memorandum" in furtherance of the process

that is materially prejudicial to the "T-side" without any independent legal or financial advice.

    9.  In sum, while there may be a natural tendency for management and

professionals in large chapter 11 cases to have some path forward at all times, it is far too early

for the Debtors here to pursue their "sale first, plan later" agenda, particularly in the face of

opposition from the parties the Debtors purport to be protecting from themselves.  The Court

should deny the Motion.

## RELEVANT FACTS

### The Cases

    10.  On April 29, 2014 (the "Petition Date"), each of the Debtors filed a

voluntary petition with the Court for relief under chapter 11 of the Bankruptcy Code.  Since that

time, the Debtors have operated their businesses and managed their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court entered a final order directing joint administration of the Debtors' chapter 11 cases on June 5, 2014.

11.    On May 12, 2014, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Creditors' Committee") of Energy Future Competitive Holdings Company LLC ("EFCH"), TCEH, its direct and indirect subsidiaries that are Debtors (together with EFCH and TCEH, the "TCEH Debtors") and EFH Corporate Services Company.

12.    By the Motion, the Debtors seek approval of the Bidding Procedures, which are purportedly designed to maximize the value of "the Debtors'" estates. Motion ¶ 1. "The Debtors" contend that, in order to do so, they must undertake now to auction their "E-side" business comprised of EFH's and EFIH's indirect ownership of 80% of the equity of non-Debtor Oncor. Id. In "the Debtors'" view, the optimal (i.e., "tax-efficient") means for selling that equity interest is an auction of the right to invest in the post-reorganization equity of EFH, which will have "spun-off" to TCEH's historical creditors EFH's "T-side" business comprised of the operating subsidiaries of TCEH. See Motion ¶ 7; Ex. C (the "Term Sheet") at 1-2.

**The Discovery Process**

13.    Given the broad and substantive relief sought by the Motion, the filing of the Motion sparked intense interest from all corners of the creditor constituency in these chapter 11 cases. Within days of the Debtors' filing of the Motion, numerous creditors on both the "T-side" and "E-side" issued requests for written discovery and depositions of the individuals involved in designing the Bidding Procedures.

14.    The Debtors staunchly resisted these efforts, including making an unsuccessful attempt to prevent depositions of the independent member of the board of managers of EFCH and TCEH, Mr. Hugh Sawyer, and the independent member of the board of managers

of EFIH, Mr. Charles Cremens.  See Declaration of Gregory M. Starner in support hereof (the

"Starner Decl.") Ex. 1 (Oct. 2, 2014 Hr'g Tr. at 10:7 – 11:2; 59:23 – 60:1).  In addition to the

court-ordered depositions of Mr. Sawyer and Mr. Cremens, the Debtors made three additional

witnesses available for deposition: Mr. Keglevic, Mr. Anthony Horton, and Mr. William Hiltz.[3]

Relevant portions of their deposition transcripts are attached to the accompanying declaration of

Gregory M. Starner.

        15.     With respect to documents, the Debtors declined to produce large

categories of responsive documents until only after depositions had begun and, even then, made

only sporadic productions almost always in the early hours of the morning immediately before

depositions.  Ultimately, besides a download of the bidding documents stored in the data room

referenced in the Motion, the Debtors produced only 397 documents concerning the Motion—94

of them before the start of depositions concerning the Motion, with nearly all of the remainder

produced in the overnight hours between depositions.  Last evening, for example, the Debtors

produced nearly 600 pages of financial analysis by Evercore.  The Debtors have designated all of

these documents (save for multiple copies of the as-filed Motion itself) as Confidential or Highly

Confidential.  Those documents relevant to this Objection are also attached to the accompanying

declaration of Mr. Starner and will be filed under temporary seal pursuant to the Confidentiality

Agreement and Stipulated Protective Order [D.I. 1833], entered August 13, 2014.

**The Shift From The Restructuring Support Agreement**

        16.     The story uncovered in the creditors' discovery begins with the Debtors'

contemplation of termination of the Restructuring Support Agreement beginning in June, 2014.

---

[3]     Mr. Keglevic and Mr. Hiltz were deposed in both their individual capacities and as corporate representatives of the Debtors pursuant to Federal Rule of Civil Procedure 30(b)(6).  Incidentally. the parties have agreed to continue the deposition of Mr. Hiltz until Tuesday, October 14, 2014, following the revelation that the Debtors had not produced prior to the start of Mr. Hiltz's deposition certain responsive materials created in connection with his deposition preparations.  The Ad Hoc Group of TCEH Unsecured Noteholders reserves the right to supplement this Objection following the completion of Mr. Hiltz's deposition.

At that time, a small, core group of the Debtors' officers and advisors—Mr. Keglevic, Ms.

Stacey Doré, the Debtors' General Counsel and Co-Chief Restructuring Officer, Mr. Edward

Sassower, the Debtors' lead bankruptcy counsel, and Mr. David Ying, the Debtors' lead financial

advisor (collectively, the "Sale Team")—huddled to identify a new path forward. See Starner

Decl. Ex. 2 (Oct. 3, 2014 Deposition of Paul M. Keglevic (the "Keglevic Dep.") Tr. at 185:14 –

186:9) ("Q. Right. The initial decision to sell was made by a team . . . and then brought to a

board or boards for review, right? A. Yes. Q. Okay. Who was part of that initial decision team?

A. What I would say our normal restructuring team internally: Carla Howard, Tony Horton,

myself, Stacey Doré, probably Andy Wright, who is the assistant general counsel on her team.

Q. Okay. A. The Kirkland team. . . Sassower. Hessler. I think Rick Cieri was involved then. . . .

Husnick. There may be a few more on that side and Ying obviously had some support on his

side of the house."). Without having yet approached the various Debtors' boards, almost

immediately after the termination of the Restructuring Support Agreement on July 24, 2014, the

Sale Team resumed negotiations to sell the same asset the Debtors had just attempted to sell

pursuant to the Restructuring Support Agreement—the post-reorganization equity of EFH.

████████████████████████████████████████████████████

████████████████████████████████████████ The

Debtors' various boards neither took a vote to approve that action nor delegated any authority to

the Sale Team ██████████. See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 112:22 – 113:2)

("Q. But with respect to the bid procedure motions . . . no board vote was ever taken at any of the

Debtor entities, correct?  A. That's correct . . . ."); id. at 195:15 – 196:4 ("Q. . . . Did any of the

boards delegate to either the decision team or the process team . . . the responsibility for pursuing

the bidding procedures motion? . . .  In other words, what do you understand your authority to be

with this? . . .  A. We brought every relevant consideration and the final timeline and the

substance of the motion to the board before we filed it.").

**Early Marketing Efforts**



      17. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

      18. ██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████



19.    The Sale Team's marketing process continued throughout late July and

August. ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████    No board

approved these actions, adopted the preferred structure or delegated authority to the Sale Team █

████████████.[4]  See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 112:22 – 113:2); id. at 195:15 –

196:4.

20.    Although Mr. Ying attended these early board meetings as financial

advisor to the Debtors, there was no written financial analysis presented to any board.  During

this period, Evercore contacted approximately twelve bidders who had signed nondisclosure

agreements and began conducting diligence for a transaction outlined in the teaser that, by

definition, would only be considered if it complies with the Sale Team's preferred tax

structure.  See Starner Decl. Ex. 10 Oct. 6, 2014 Deposition of William O. Hiltz (the "Hiltz

Dep") (Tr. at 68:8 – 69:11) ("Q. Mr. Hiltz, going back to the now -- to the 12 original NDAs that

_____

[4] ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

were signed as of the date of your declaration, the prospective bidders that entered into those 12

NDAs all received teaser materials prior to signing the NDA; is that correct?  A. I believe so. . . .

Q. Mr. Hiltz, I have handed you . . . an email from Sesh, this time dated July 25 to a prospective

bidder attaching teaser materials; is that correct?  A. Correct.  Q. Is this the version of teasers that

went out to prospective bidders in July?  A. I believe it is.  Q. And this is -- are you aware of the

next version of a teaser?  A. Yes, I am.  Q. And what is the date of that?  A. I don't recall the

date.  Q. August?  A. Might be early September."); id. at 87:25 – 88:18 ("Q. Now, when were the

12 prospective bidders that signed NDAs as of the date of your declaration informed of the

change from inviting bids for only non-taxable structures to inviting bids for transactions in any

form?  A. I'm not sure.  Q. Was it prior to September 19, the filing of the motion?  A. I believe

so, but I can't state for certain. . . . Q. So, sitting here today, you have no knowledge of a

communication, prior to September 19, a specific knowledge of a specific communication

informing prospective bidders that the Debtors would accept bids in any form?  A. That's

correct.").

**The Addition Of Mr. Hiltz**

        21.      At some point in the renewed sale process, it appears that the Sale Team

may have lost some confidence in the existing slate of Evercore professionals.  To that end, the

Sale Team first undertook to retain Bank of America Merril Lynch ("BAML") as investment

banker.  See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 48:24 – 49:19).  No board authorized the

Sale Team to hire BAML.  At or about the end of August, however, BAML withdrew as

proposed advisor in light of concerns over conflicts of interest arising from BAML's

participation in the Debtors' DIP financing.  See id. at 49:20 – 24; Starner Decl. Ex. 2 (Keglevic

Dep. Tr. at 92:25 – 93:25).  Frustrated in their efforts to hire BAML as an outside advisor to

assist with the sale process, the Sale Team turned to expanding the existing team at Evercore

with additional personnel.  In the third week in August, five weeks into the process, Evercore added Mr. William Hiltz as a new advisor to its team.  See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 18:19 – 23) ("Q. Mr. Hiltz, when did you first become involved in this matter?  A. Oh, I don't recall the exact date, but I would say it was the third -- third week in August.").  Ostensibly, Mr. Hiltz was added to the team to supplement Mr. Ying in light of his experience as an investment banker conducting auctions for large companies outside of bankruptcy.  Missing from Mr. Hiltz's prior career experience, however, is any significant prior experience concerning transactions in the power and utilities industry.  See id. at 37:18 – 24) ("Q. And within your M&A experience, the vast bulk of that experience is outside the power asset and utility sectors?  A. The bulk of it is, yes.").  Mr. Hiltz likewise lacked any prior knowledge of the Oncor enterprise, despite Oncor's large presence in the utility sector and near constant mention in the press relating to these chapter 11 cases.  See id. at 260:19 – 21 ("Q. All right.  When was the first time you heard of Oncor?  A. When I got involved in the process.").  Most glaringly, Mr. Hiltz lacked any prior experience advising on stalking horse sales in chapter 11.  See id. at 262:24 – 265:6 ("Q. [P]rior to those discussions [with Kirkland & Ellis], did you have any understanding about a typical Chapter 11 sale?  A. With respect to a stalking horse process?  Q. Yes.  A. No.").  Specifically, Mr. Hiltz:

- Has not testified in any court since 1993, id. at 15:20 – 22;

- Has no experience with the utility sector, id. at 39:8 – 10;

- Has never advised a bidder in a bankruptcy auction, id. at 245:7 – 9;

- Has never advised a creditor in a bankruptcy auction, id. at 245:10 – 12;

- Has never read a book or article on bankruptcy auctions, id. at 245:13 – 15;

- Has no prior knowledge of risks unique to bankruptcy sales; id. at 248:11 – 22.

- Has never sold post-reorganization equity, id. at 245:22 – 25; and

- Does not know what concerns debtors, creditors or bidders generally have with respect to post-reorganization equity. Id. at 249:11 – 250:7.

22.    Even after joining the Evercore team late in the process and knowing nothing about Oncor, Mr. Hiltz undertook slim diligence to familiarize himself with the actual equity interests he was charged with marketing.  He was unaware of which entity actually owned the Oncor stake, believing EFIH directly held the 80% Oncor stake. Id. at 254:14 – 16 ("Q. So, it's your understanding that a Debtor EFIH owns an 80 percent stake in Oncor? A. Yes."). Ultimately, Mr. Hiltz's diligence consisted of reviewing Oncor's business plan, its balance sheet and other financial information available to bidders. See id. at 268:20 – 270:5 ("Q. . . . So what did you do in the first 30 days of your involvement in this matter to become an expert in the performance of Oncor? A. I reviewed Oncor's financials and forecasts. Q. . . . [W]hat do you mean? A. . . . The forecast, really, and -- their balance sheet and their forecast. Q. . . . The stuff that's in the data room? . . . A. Yes. . . . Q. . . . [D]id you do anything else to inform yourself as to Oncor's performance? A. I read the teaser materials. Q. And again . . . those materials are obviously available to potential bidders as well? A. Yes.").  Specifically, Mr. Hiltz:

- Has never asked to speak, or spoken, with any Oncor employee, id. at 252:15 – 19;

- Has never asked to speak, or spoken, with any Oncor officer or director, id. at 251:12 – 16; 252:20 – 22;

- Does not know who the directors and officers of EFIH or Oncor are, id. at 252:23 – 25; 253:8 – 10;

- Does not understand the nature of any of Oncor's dividend restrictions, id. at 261:8 – 10; and

- Did not review the Oncor tax sharing agreement, id. at 261:11 – 13.

23.    Following his quick-and-dirty on Oncor, however, Mr. Hiltz determined to endorse the course of action already launched by Mr. Ying and the others to sell.  See id. at 261:21 – 262:4 ("Q. Have you done any investigation specifically into bidders, into determining what their M&A appetite is at this time?  A. Well, [one of my analysts] has done quite a bit of that work.  Q. Have you done any of that work personally?  A. No.").  Mr. Hiltz then appeared with the Evercore team twice before the boards of the various Debtors, ███████████████

███, the last meeting concerning the bidding process.  See ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 355:16 – 21) ("Q. . . . [H]ave you met with the board of directors at EFH to describe the bid procedures process?  A. Telephonically, yes.  Q. And how many times have you done that?  A. I want to say twice.").  At no point during these meetings did any member of the various Debtors' boards vote or ratify the marketing process begun by Evercore or the Bidding Procedures contemplated by the Motion.  See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 356:12 – 16) ("Q. And what was discussed about the bidding process during these board meetings?  A. Basically, just Evercore went through our rationale for creating the process that we did. . . ."); id. at 82:16 – 18 ("Q. Are you aware of any vote with respect to the filing of the bidding procedures?  A. No. No.").

**The Shifting Characterization Of Risk**

24.    With the shifting personnel, there has also been a shifting over time in the rationale for pursuing a sale of the Oncor stake.  At the hearing on the proposed EFIH second lien DIP financing, Mr. Ying indicated to this Court that the value of the Oncor stake is highly interest rate sensitive.  See Starner Decl. Ex. 12 (July 1, 2014 Hr'g Tr. at 125:17 – 20) ("Q. So

the question is whether the interest rates will affect the valuation of Oncor, is that the primary concern? A. Well, obviously, interest rates could adversely affect the value of Oncor."); id. at 253:6 – 254:4 ("Q. . . . [Y]ou had started to refer to a relationship between interest rates and the value of Encore [sic]. Do you recall that? A. Yes, I do. Q. And what was it you were attempting to say then . . . ? A. . . . [W]e experienced a period of rising interest rates, and that led to a decline in the valuation metrics that one would use to value Encore [sic]. . . . A. All right. And you observed a relationship between interest rates and Encore's [sic] value? A. Yes, we did. As interest rates rose, Encore's [sic] value did decline. And the valuation metrics we looked at like multiples of earnings did go down during that period."). Although there are no documents to support Mr. Ying's interest rate correlation analysis, "interest rate sensitivity" appears to have remained the working assumption for the sale of Oncor up until Mr. Hiltz was added to the Evercore team. Upon Mr. Hiltz becoming involved, however, there was a noticeable shift in the assumptions and perceived risks cited as justification for selling the post-reorganization equity of EFH forward. In essence, Mr. Hiltz advised the boards—again without any written support—that it was an opportune time to sell the Oncor stake because "market conditions were attractive." See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 283:5 – 284:16) ("Q. Did anybody at the Debtors ask you to opine or provide your advice on the issue of whether or not it was an opportune moment to sell the Oncor stake? A. Yes. . . . Q. . . . [W]hat did you say? A. I said the same thing that I've got in my declaration, that we thought the market conditions were attractive, that the availability of credit was high, the cost of credit was low, that utility stocks generally had performed well and were at relatively high levels of valuation, and we had a series of interested bidders. Q. Okay. Anything else? A. No.").

25.     Yet, Mr. Hiltz arrived at his conclusion without ever having quantified the market volatility on the Oncor stake or valued Oncor, despite numerous opportunities to do so. See id. at 280:6 – 17 ("Q. Are you aware of any kind of analyses that would project the future volatility of an equity stake? A. Well, I mean, yes, generally, if we have multiple sets of projections that would indicate a base case or a downside case reflecting certain risks to the business, you could perform that kind of analysis. Q. But you didn't do that here? A. No. Q. Did the company ask you to do that? A. No."); id. at 284:17 – 285:5 ("Q. Has Evercore done a valuation of the Oncor stake? A. No. Q. Has Evercore done a valuation of Oncor? A. Not yet, no. Q. Okay. Is there anything that would prevent Evercore from performing a valuation of the Oncor stake? A. No. Q. Anything to prevent Evercore from doing a valuation of Oncor? A. No."). To date, Mr. Hiltz, whose advice to the boards have has had very little to do with Oncor specifically, did not present management with a single document in connection with that advice. See id. at 283:17 – 23 ("Q. . . . [D]id you provide -- did anyone at Evercore provide a written response to [whether it was an opportune moment to sell the Oncor stake]? A. No. Q. Were you asked to provide a written response? A. No.").

26.     Moreover, from the perspective of the Debtors' board members, Mr. Hiltz's advice regarding the need to sell may have, at best, been tepid. Mr. Sawyer, the independent member of the EFCH and TCEH boards of managers who were briefed by Mr. Hiltz, took away this sentiment: "It may not be the best moment [to sell], but it's a good moment." See Starner Decl. Ex. 13 (Oct. 8, 2014 Deposition of Hugh Sawyer (the "Sawyer Dep.") Tr. at 357:25 – 358:5).

27.     Despite the lack of a demonstrable need to sell, the Debtors have shown a remarkable persistence in pursuing that agenda. In that regard, Mr. Keglevic testified in his

capacity as a Rule 30(b)(6) deponent on the issue of whether the Debtors considered "[a]ny assessment, evaluation, consideration, or analysis concerning transaction structures not premised on a purchase of the assets or equity of EFH Corp. and/or a tax free spinoff of the TCEH Entities." He made clear that the only path considered and pursued by the Sale Team was to sell the post-reorganization equity of EFH forward. See Starner Decl. Ex. 2 (Keglevic Dep. Tr. 263:13 – 22) ("Q. . . . So it was always premised on we're going to sell the asset, right; the EFH reorganized equity. . . . A. . . Yes."). Not once did the Debtors' boards discuss whether the marketing process was justified by the risk associated with such a sale, whether creditors had assumed general market risks, or whether there were any alternatives to the marketing or bid procedures for the sale contemplated by the Motion. See id. at 262:6 – 16 ("Q. This market risk, which is, you know the possibility that either bidders won't show up or there will be a change in market such that the price gets depressed, what alternatives did you look at besides running this process and going out and buying this kind of option? A. I specifically did not look at alternative processes. We asked Mr. Hiltz what he thought the best way to achieve the objectives, and this is the process he came back to me with.").

**The Debtors' Purported Willingness To Accept "All Offers For Any Assets"**

28.     Despite the material shift in team and conception of risk, there has been little shift in what the Debtors are pursuing by adopting the Bidding Procedures. Following the September 5, 2014 board meeting—the last board meeting at which the Bidding Procedures were discussed—it appears that Evercore continued to inform potential bidders that the only acceptable bid structure was one for a sale of post-reorganization equity of EFH that conformed with the Debtors' preferred tax structure. ███████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████   It was

not until the week of September 19, 2014 that Mr. Keglevic and Ms. Doré—without any board

vote—finally decided to revise the marketing materials to indicate that the Debtors would be

open to, and evaluate, bids relying on alternative transaction and tax structures. See Starner

Decl. Ex. 10 (Hiltz Dep. Tr. at 82:2 – 4) ("Q. Do you know who at the Debtors made the

decision to accept bids in any form?  A. I would assume it was Paul and Stacey."); id. at 84:8 –

12 (indicating that the Debtors decided to accept alternate bids "at least several days" before

filing the bid procedures motion on September 19, 2014).  Nothing exists, however, to indicate

that Evercore had any specific communications to any prospective bidder of this about-face by

the Debtors prior to the filing of the Motion itself on September 19, 2014.  See id. at 89:13 – 18)

("Q. So, sitting here today, you have no knowledge of a communication, prior to September 19 .

. . informing prospective bidders that the Debtors would accept bids in any form?  A. That's

correct."); Motion ¶ 12 ("Concurrently with the filing of this motion the Debtors' advisors sent

an initial process letter and teaser to interested parties to preserve the momentum and interest

that has been building over the past months.").

        29.     Given that record, as well as the Debtors' 50-page Omnibus Tax

Memorandum [D.I. 2296] (the "Tax Memorandum") that explains in exceptional detail exactly

what "the Debtors" are looking for from bidders, there is little doubt that the Debtors will

consider only one form of bid and that the likelihood of any bidder providing an alternative bid

structure to the Debtors' liking at this time is "remote."  See Starner Decl. Ex. 16 (Oct. 8, 2014

Deposition of Charles Cremens Tr. at 135:10-137:10).  The Debtors are not even selling what the

Motion broadly described as "all assets" of the two Debtors.  Mr. Keglevic made clear that the
only asset being sold is the economic interest in Oncor, and not assets such as intercompany
claims.  See Starner Decl. Ex. 2(Keglevic Dep. Tr. at 150:12 – 20) ("The assets that we're
referring to selling would be the stock, not the assets in the ringfencing.").

**The Debtors' Financial Unicorn**

        30.      The exact dimensions of the bids being solicited have been fairly
consistent as well.  Mr. Keglevic testified that the Debtors were specifically looking for a "one-
way option."  See Starner Decl. Ex 2 (Keglevic Dep. Tr. at 29:13 – 21).  Mr. Hiltz characterized
it as an "insurance policy."  See Starner Decl. Ex 10 (Hiltz Dep. Tr. at 320:15 – 22).  Both agree
that whatever bid is accepted will have to be decidedly Debtor-favorable to be able to address the
perceived risk on the Debtors' side.  See Starner Decl. Ex 2 (Keglevic Dep. Tr. at 140:22 –
141:7) ("Q. Have you asked anyone to quantify what the expected risk is of the market for either
regulated utilities or debt financing to move in a direction that would negatively impact the value
of the Oncor assets? . . .  A. I have not specifically asked for that, but a one-way option and a
floor eliminates that risk."); Starner Decl. Ex 10 (Hiltz Dep. Tr. at 320:15 – 23) ("Q.  So how
would you translate, in your view, into a range of volatility for the Oncor stake?  A. Well, again,
I haven't done that analysis, and I would say . . . the importance here of the process and going
forward now is to establish a floor.  The floor protects against an adverse change in market
conditions, and the cost of exercising the fiduciary out in the event that conditions get much
better and the value of Oncor goes way up is quite modest relative to the total enterprise value.")
The Sale Team's purported need to protect against market volatility that could negatively impact
the value of the Oncor stake by locking in a one-way option has been touted as the primary
motivation behind the auction process.  See id. at 252:5 – 8 (noting the need to protect against

market volatility); Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 29:11 – 20) (noting that a primary goal is to "obtain a one-way option").

31.     To ensure that such an option is not illusory, however, Mr. Hiltz recognized that the Debtors would not be able to accept a liquidated break fee that would allow the buyer to walk if the value of the Oncor stake fell.  Rather, he testified the Debtors must have a specific performance remedy in any purchase contract such that the Debtors could hold a purchaser to its commitment even to the extent a market downturn prior to closing renders the transaction unpalatable to the purchaser.  See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 307:15 – 17) ("A. We would look for a contract with specific performance as opposed to a liquidated damages provision.").  To the extent the Debtors ultimately fail to obtain a bidder's agreement to specific performance, Mr. Hiltz admitted that the Debtors would be unwilling to continue pursuing the sale.  See id. at 323:25 – 324:12) ("Q. . . . Let's assume you can't get an asymmetrical damages provision, that is, where you get specific performance but the buyer has a -- faces a fiduciary out.  Let's assume that what you get is a bilateral break fee.  You walk, you pay this; we walk, we pay that.  Okay, do you understand that?  A. Well, I understand the situation you're positing.  That would be most unusual, and I doubt we would be prepared to go forward on that basis.").  At the same time that the buyer will have to put its capital at risk for the full purchase price, the Debtors will reserve the right to walk away from the transaction if the Oncor stake appreciates more than the two- to three-percent that they anticipate having to agree to pay as a break-up fee.  See Starner Decl. Ex 2 (Keglevic Dep. Tr. at 223:20 – 24) ("Q. And you want the ability to walk for a 2 to 3 percent amount, at the most, if the value has gone up and somebody else is willing to do it?  A. That's correct.").

32.     Not surprisingly, given the Debtors' wish list, there is substantial doubt as to whether the contemplated transaction can ever materialize.  Mr. Sawyer called the possibility of an acceptable bid "hypothetical" and conceded that it is "impossible to speculate what the specific terms and conditions of an acquisition agreement might include."  See Starner Decl. Ex. 13 (Sawyer Dep. Tr. at 358:16 – 359:22; 527:15 – 528:12).  Mr. Keglevic acknowledged that no one could tell the likelihood of the requisite plan confirmation by December 31, 2015.  See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 242:21 – 243:5).  Mr. Hiltz agreed: "Q. All right. So, just so I understand it, and maybe it was asked, if someone comes forward and says what's the likelihood that TCEH won't be able to get a plan done, you can't answer that question, right?"  A. "I can't, no."  Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 328:22-329:3).  To date, not a single bidder has presented a fully-baked, acceptable transaction in a firm bid.  See id. at 350:21 – 23 ("Q. But has there been a bid submitted in final form as a stalking horse bid?  A. No.").

## OBJECTION

33.     The central question presented by the Motion is as follows:  Is the Sale Team's decision, without board approval, to expend substantial estate resources to market all of the assets of EFH and EFIH pursuant to the Bidding Procedures a proper exercise of business judgment taken in good faith that should be approved under section 363 of the Bankruptcy Code.  As set forth below, it is not.

### I.    There Is No Proper Exercise Of Business Judgment To Support The Bidding Procedures Motion

34.     As an initial matter, before getting to the "soundness" of the decision, there are three threshold questions to address:  (1) were those who made the decision to market authorized to do so, (2) how did they educate themselves to make that decision, and (3) why exactly did they make the decision.

**Relevant Standards**

35.     The Motion seeks relief pursuant to sections 105 and 363(b) of the

Bankruptcy Code.  While section 105 of the Bankruptcy Code confers upon the Court the power

to "issue any order, process, or judgment that is necessary to carry out the provisions of this

title[ ]" (11 U.S.C. § 105(a)), section 363(b) of the Bankruptcy Code is the operative provision

pursuant to which approval of the Bidding Procedures is sought.  Section 363(b) of the

Bankruptcy Code authorizes the use of "property of the estate" other than in the ordinary course

of business.  See 11 U.S.C. § 363(b).

36.     In his deposition, Mr. Keglevic acknowledged that an auction of the type

contemplated by the Bidding Procedures is not something the Debtors have ever done before.

See Starner Decl. Ex2 (Keglevic Dep. Tr. at 180:25 – 181:11) ("Q. . . . [H]ave you ever, as CFO,

or while you have been CFO, have any of the Debtors ever gone out to market and told the

market that you have put all of the assets of any particular company on the block?  A. No. . . . Q.

And have you ever gone out and told the market that you're going to sell all the assets pursuant

to a set of procedures that you're telling to the market?  A. Have not.").  As such, the marketing

of EFH's and EFIH's assets is necessarily a transaction outside the ordinary course of the

Debtors' business that requires this Court's approval.  See Sportsman's Warehouse, Inc. v.

McGillis/Eckman Invs. (In re Sportsman's Warehouse, Inc.), 457 B.R. 372, 339-40 (Bankr. D.

Del. 2011) (finding that debtor's purchase failed to satisfy the vertical element of the ordinary

course of business test where debtor, who was in the business of selling goods, sought to buy

multi-million dollar properties); In re G.S. Distrib., Inc., 559 B.R. 552, 559 (Bankr. S.D.N.Y.

2005) (finding that where debtor had limited experience in the jewelry industry and absolutely no

experience with private sales, that debtor's proposed private sale of more than 1,000 pieces of

jewelry with wholesale value of over $5 million failed to satisfy the vertical test and was a non-ordinary course of business transaction).

37.    In assessing whether to approve the decision to market, the Court should assess whether (i) there is a sound business purpose for doing so, and (ii) the decision was made in good faith.  See In re Montgomery Ward Holding Corp., 242 B.R. 147, 155 (D. Del. 1999) (concluding that in determining whether to authorize or approve the use, sale or lease of property of the estate outside the ordinary course of business, courts require the trustee or debtor in possession to show that a sound business purpose justifies such actions); In re Bella Vista Assocs., LLC, No. 07-18134 (JHW), 2007 WL 4555891, at *13 (Bankr. D.N.J. Dec. 18, 2007) (courts considering whether to approve a transaction outside the ordinary course of business consider whether the transaction is proposed in good faith); see also In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987) ("We believe that 'good faith' must be an element of all sales under § 363(b), whether pre-confirmation or post-confirmation, and irrespective of whether all or most of a debtor's assets are sold, or whether only a portion of assets are sold outside of the ordinary course of business.").  As this Court has recognized, the sound business purpose and good faith inquiries are necessarily tethered: "[i]f a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interest of the estate . . . ."  In re Filene's Basement, LLC, No. 11-135111 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (citing In re MF Global, Inc., 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012)).

38.    The burden rests on the Debtors to justify their decision to use or sell estate assets.  See In re Fed. Mogul Global, Inc., 293 B.R. 123, 126 (D. Del. 2003) (stating that

"[a]s applied in the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction," and noting that this standard requires a finding that the purchaser has acted in good faith) (citing <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 396 (3d Cir. 1996); <u>In re Abbotts Dairies of Pa., Inc.</u>, 788 F.2d 143 (3d Cir. 1986)); <u>In re Decora Indus., Inc.</u>, No. 00-4459 JJF, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) ("Generally, a debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment."); <u>In re Scimeca Found., Inc.</u>, 497 B.R. 753, 771 (Bankr. E.D. Pa. 2013) ("Court approval of the trustee's motion to sell is warranted when the trustee has demonstrated sound business judgment in requesting the sale. The proper exercise of such judgment is shown when the purchase price is fair and reasonable and the sale process has been conducted in good faith by the trustee and by the prospective purchaser.") (citing <u>In re Abbotts Dairies of Pa.</u>, 788 F.2d at 149-50).

      39.     Normally, in deciding whether to approve a transaction outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, a bankruptcy court should defer to the business judgment of the debtor. <u>See</u> <u>In re Scimeca Found., Inc.</u>, 497 B.R. at 771-72 (noting that the trustee's decision to execute a sale is entitled to respect and deference from the court so long as the burden of giving sound business reasons is met); <u>In re Efoora, Inc.</u>, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) (stating that the bankruptcy court reviews the debtor in possession's business judgment "to determine independently whether the judgment is a reasonable one," but "should not substitute its judgment for the trustee's.") (quoting 3 COLLIER ON BANKRUPTCY ¶ 363.02[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

40.    Where co-debtors' estates are in conflict with respect to the transaction, however, the Court should apply a strict scrutiny standard. See, e.g., Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.), 335 B.R. 22, 28 (S.D.N.Y. 2005) (stating that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under section 363(b) of the Bankruptcy Code); In re Ozark Rest. Equip. Co., 850 F.2d 342, 345 (8th Cir. 1988) (noting that a sale arranged by an insider must withstand close scrutiny). As set forth below at Section I.D, infra, the estates of EFH and EFIH, on the one hand, and the TCEH Debtors, on the other, are in direct conflict with respect to the Debtors' decision to market the assets of EFH and EFIH. In addition, under Delaware law, a transaction between a corporation and its controlling shareholder is always subject to review for its entire fairness, even where the entire board of the corporation or a special committee of that board is independent and non-interested. Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1117 (Del. 1994); Kahn v. Tremont Corp., 694 A.2d 422, 428 (Del. 1997). Here, the actions of the members of the Sale Team, each of whom owes duties to EFH, EFIH and TCEH, to support the relief sought by the Motion must have been "entirely fair" to all estates.

41.    In order to make that showing, the Debtors must demonstrate that (i) the decision was the product of fair dealing, and (ii) the process yielded a fair price. Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993); Tremont Corp., 694 A.2d at 430; Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983). Taken together, these elements require the Debtors to "present evidence which demonstrates that the cumulative manner in which it discharged all of its fiduciary duties produced a fair transaction." Tremont Corp., 694 A.2d at 432. The question is whether the process that took place was an "effective proxy for arm's-length bargaining, such

that a fair outcome equivalent to a market-tested deal resulted." In re Loral Space & Commc'ns

Inc., C.A. Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *22 (Del. Ch. Sept. 19, 2008).

### A. The Sale Team Never Obtained Requisite Board Approval For The Decision To Market, And Thus, There Is No "Decision" For This Court To Consider

42.     As discussed above, independent of actually selling, the marketing of all

the assets of EFH and EFIH for sale is a transaction not in the ordinary course of EFH's or

EFIH's business. Notwithstanding that, the decision to go to the market and announce a process

to sell any and all assets of EFH and EFIH to any bidder, at any price, was never submitted to the

Debtors' boards for a vote. See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 53:5-8) ("[W]e had

board meetings where we presented the overview of the proposed bid procedures, but I don't

believe we had [the boards] vote on it."); Starner Decl. Ex. 17 (Oct. 7, 2014 Deposition of

Anthony Horton ("Horton Dep.") Tr. at 32:4 – 6) (Q. Am I correct, though, that there was no

vote? A. You are correct."). Instead, the Debtors' decision to pursue to the Motion was made by

officers common to each of the Debtors—Mr. Keglevic and Ms. Doré—without any independent

fiduciary. See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 52:5 – 53:4) ("Q. Who at the Debtors

approved the bidding procedures? A. . . . [M]yself and my co-CRO, Ms. Doré.").

43.     The by-laws of EFH and the limited liability company operating

agreement of EFIH confer upon the officers thereof only those powers normally attendant to

their respective positions under applicable state corporate law. See Starner Decl. Ex 18 (Bylaws

of Energy Future Holdings Corp. § 13) ("The officers of the Corporation shall have such powers

and duties as usually pertain to their offices, respectively, as well as such powers and duties as

may from time to be time be conferred by the board of directors."); Starner Decl. Ex. 19 (Second

Amended and Restated Limited Liability Company Agreement of Energy Future Intermediate

Holding Company LLC §§ 2.1; 2.2) ("Management of the Company shall be vested in the Board

of Managers.  The Board of Mangers shall have . . . all powers . . . possessed by managers of a

limited liability company under the laws of the State of Delaware. . . . Unless the Board of

Managers decides otherwise, if the title is one commonly used for officers of a business

corporation formed under the Delaware General Corporation Law, the assignment of such title

shall constitute the delegation to such person of the authorities and duties that are normally

associated with that office.").

      44.    Under Texas law, the decision whether to approve a sale of all or

substantially all assets of the corporation is to be made by the directors and shareholders of the

corporation.  See Tex. Bus. Orgs. Code § 21.455; see also Harrison v. City of San Antonio, 695

S.W.2d 271, 275 (Tex. App. 1985) ("A president of a corporation, merely by virtue of his office,

has no inherent power to bind the corporation except as to routine matters arising in the ordinary

course of business.") (citing Templeton v. Nocona Hills Owners Assn., Inc., 555 S.W.2d 534,

538 (Tex. App. 1977)).  Under Delaware law, the same decision is to be made by the directors

and shareholders of the corporation.  See Del. Code Ann. Gen. Corp. Law 8, § 271; see also

Keogh Corp. v. Howard, Weil, Laouisse, Friedrichs Inc., 827 F. Supp. 269, 271-72 (S.D.N.Y.

1993) (stating that under Delaware law, "[t]he president of a corporation is presumed to have

certain more or less limited powers in the transaction of the usual and ordinary business of the

corporation" and that "[p]owers of a president in excess of power over the ordinary course of

business must be specifically given") (citations omitted).

      45.    As a result, the members of the Sale Team that decided to market all of

EFH's and EFIH's assets do not appear to have had the requisite corporate authority to proceed

without board approval or express board delegation.  In the absence of requisite corporate

authority, there is no decision for this Court to approve pursuant to section 363(b) of the

Bankruptcy Code. See Cal. Pub. Employees' Retirement Sys. v. Coulter, No. Civ. A. 19191,

2002 WL 31888343, at * 10-11 (Del. Ch. Dec. 18, 2002) (holding that the business judgment

rule may not be invoked to shelter unauthorized board actions).

### B. Even If The Officers Could Supplant Board Action, They Failed To Educate Themselves Sufficiently To Make An Informed Decision

46.     Even if Mr. Keglevic and Ms. Doré, as Co-Chief Restructuring Officers,

were authorized under general corporate principles to put all of the assets of EFH's and EFIH's

estates on the auction block, their decision to do so was not, in any event, a proper exercise of

business judgment.  Under Delaware law, it is well-settled that an officer must act on an

informed basis.  Cede & Co, 634 A.2d at 367 ("The duty of directors of a company to act on an

informed basis . . . forms the duty of care element of the business judgment rule."); Smith v. Van

Gorkom, 488 A.2d 858, 872 (Del. 1985) ("Under the business judgment rule there is no

protection for directors who have made an unintelligent or unadvised judgment.") (internal

quotation omitted); Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) ("[T]o invoke the rule's

protection directors have a duty to inform themselves, prior to making a business decision, of all

material information reasonably available to them."), rev'd on other grounds, Brehm v. Eisner,

746 A.2d 244, 253-54 (Del. 2000); In re Novell, Inc. S'holder Litig., C.A. No. 6032 (VCN),

2013 WL 322560, at *15 (Del. Ch. Jan. 3, 2012) (stating that the business judgment presumption

applies only if the directors are properly informed).  While a fiduciary need not know every

single fact related to a transaction, it must consider "material facts that are reasonably available"

and those that are "relevant and of a magnitude to be important to directors in carrying out their

duty of care in decisionmaking."  Eisner, 746 A.2d at 260 n.49.

47.     Here, the record demonstrates an almost willful attempt on management's

part not to educate themselves about the risks to the Oncor stake.  The Motion clearly states that

the decision to auction the right to purchase the reorganized equity of EFH was made as a means of minimizing the risk that the value of the Debtors' interest in Oncor would decline in value during these chapter 11 cases. See Motion ¶¶ 1-2. The Motion further states that the consideration was premised on the Debtors' perceived risk that market conditions will decline during that intervening period. See Declaration of William O. Hiltz in Support of the Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof [D.I. 2088] ¶ 11 ("I also believe it is important to start this process now to capitalize on the strong market for an investment in the Debtors' indirect ownership in Oncor. Market conditions are currently favorable for potential sellers due to the availability and low cost of financing, and generally the strong trading levels in the equity markets. While these current conditions may continue, there is also risk that they may shift.").[5]

48.     Despite the claimed perception of risk, management never sought to inform themselves by undertaking to analyze any specific risk or seeking a quantification of risk from their advisors. See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 140:22 – 141:7) ("Q. Have you asked anyone to quantify what the expected risk is of the market for either regulated utilities or debt financing to move in a direction that would negatively impact the value of the Oncor assets? . . . A. I have not specifically asked for that, but a one-way option and a floor eliminates that risk."); id. at 142:5 – 11) ("Q. Okay. So, just so I understand it, there has been no evaluation, written report by Evercore or anyone else that tries to project or estimate the risk of the market negatively shifting as that term is used in paragraph 2 of the motion? A. That's correct.").

---

[5]     Mr. Hiltz confirmed in his deposition that by "shift" he meant shift up or shift down. See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 281:2 – 9) ("Q. So you would be concerned about a 10 to 20 percent fall in the value of Oncor stock in the next 18 months? A. Correct. Q. And does that also imply that there could be a 10 to 20 percent rise in the value of Oncor stock? A. Conceivably.").

Evercore, the Debtors' financial advisor, was never asked by the Debtors to opine on the

expected volatility of the value of the Oncor stake. See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at

282:18 – 283:4) ("Q. Did Mr. Keglevic or anybody else at the Debtors ask you personally to

opine on the volatility of Oncor stock? . . . A. Not the volatility per se.  Q. Okay.  Did . . . Mr.

Keglevic or anybody employed by the Debtors ask you to opine on the range of potential rise or

fall in Oncor stock over an 18- to 24-month horizon? . . . A. No.").  Instead, Evercore was merely

asked if it was an opportune time to sell the Debtors' interest in Oncor.  See id. at 283:5 – 23

("Q. Did anybody at the Debtors ask you to opine or provide you advice on the issue of whether

or not it was an opportune moment to sell the Oncor stake? . . . A. Yes.  Q. And who asked you?

A. In can't remember specifically, but it was a topic that was discussed amongst Paul, David

Ying, myself, perhaps Stacey as well. . . . Q. Okay.  And did you provide a written response to

that question?  A. No.  Q. Were you asked to provide a written response?  A. No.").  And in

response, Evercore could orally opine only with vague generalizations regarding the M&A

market.  See id. at 284:5 – 14 ("Q. . . . [W]hat did you say?  A. I said the same thing that I've got

in my declaration, that we thought the market conditions were attractive, that the availability of

credit was high, the cost of credit was low, that utility stocks generally have performed well and

were at relatively high levels of valuation, and we had a series of interested bidders.").  Notably,

despite maintaining that their perception of risk was based on Evercore advice, management

made no attempt to determine whether Mr. Hiltz was even qualified to answer any question as to

utility volatility.  See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 199:5-13) ( "Q. What effort did

you or are you aware anybody at the Debtors making to understand Mr. Hiltz's expertise in the

area of marketing and selling power assets?  A. When Evercore suggested he came on the team, I

think it was either Roger Altman or David Ying or both gave me a summary of his background, and I think my recollection was we shared that with our board.").

49.     Instead, the Sale Team has simply proceeded on the basis that, whatever risks exist, the combination of (i) a right to "put" the equity of reorganized EFH to the Successful Bidder in twelve to eighteen months and, (ii) a fiduciary out, confers upon the Debtors a free option to hedge any risk.  See id. at 304:16 – 21 ("Q. And the idea is that what you want in the contract is the ability to put that equity to the buyer, right?  A. Correct.  Q. Within the next 18 months?  A. Within 12 to 18 months."); id. at 308:15 – 17 ("A. We would expect to have a fiduciary out that would allow us to terminate the contract for the payment of a termination fee.").

50.     At the very least, proceeding in such an uninformed manner disqualifies the decision to purchase a "put" right with respect to the post-reorganization equity of EFH from the protective deference afforded by the business judgment rule.  See In re Trados Inc. S'holder Litig., 73 A.3d 17, 43 (Del. Ch. 2013) (stating that the business judgment rule presumes that, in making a business decision, the directors or a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company) (citing Aronson, 473 A.2d at 812).  And, without any evidentiary record on which to support the decision, the Court should put an end to the marketing process.  See, e.g., In re Bridgeport Holdings, Inc., 388 B.R. 548, 569 (Bankr. D. Del. 2008) (declining to apply business judgment presumption where directors and officers failed to inform themselves of all material and reasonably available information concerning the sale of the company's most valuable assets).

**C. The "Decision" To Market The Assets of EFH And**
**EFIH Does Not Appear To Have Been Made In Good Faith**

51.     As discussed above, the decision to market the assets of EFH and EFIH was not put to the boards of those entities, and the decision of the Sale Team in that regard was uninformed. There was never any substantive analysis of risk. Creditors weren't polled as to their tolerance for risk. There were no alternatives assessed for managing risk. Indeed, as Mr. Keglevic admitted, he could not point to a single document indicating that this is the right time to sell the Oncor stake. See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 253:23-254:7). The lack of any thoughtful analysis, supported with a written record, begs the question as to why the Sale Team chose to market the assets of EFH and EFIH in the first place. Rather than pursuing a sale to lock in volatility (of an asset class with a beta below 1), the actions of the Sale Team suggest that they are motivated by a strong desire to lock in the course originally charted by the Restructuring Support Agreement—a tax-free spin on the "T-side" with the "E-side" flipping into reorganized EFH.

52.     To the extent that "RSA 2.0" is the goal, the decision to sell the assets of EFH and EFIH as a means of bootstrapping that plan suffers from the same maladies as the Restructuring Support Agreement. For example, by agreeing to sell the post-reorganization equity of EFH through a plan (that must be a tax-free spin plan for all the Debtors) and dictating the timing in which both the closing of the sale and the effective date of the plan must occur, the Debtors are again trying to steamroll over the TCEH Debtors whose equity value they suspect will never flow back to EFH and whose chapter 11 cases are far more complex that those of the "E-side."

53.     While the Debtors say they are willing to consider alternatives to the Term Sheet transaction structure, such as one that would not drag along TCEH, their actions have

spoken louder than their words.  Until the filing of the Motion, the Debtors made no sincere

effort to communicate to bidders their purported willingness to consider alternative structures.

The Term Sheet included with the Motion, which strictly defines a stand-alone plan for TCEH as

"step one," is the only guidance potential bidders have been given regarding transaction

structure.  The Tax Memorandum screams loudly and clearly that the Debtors are beyond

predisposed to accept only a "tax-efficient" transaction structure that leaves TCEH behind.  And,

the Bid Criteria and other Bidding Procedures give the Debtors more than adequate cover to

reject out of hand any taxable transaction structures proposed by bidders.  Even assuming the

Debtors find a buyer, the Term Sheet transaction and the roadmap drawn by the Tax

Memorandum for those parties that would oppose anything but a "tax-efficient" transaction, put

up substantial obstacles to any plan for the TCEH Debtors other than one that implements the

"tax-free" spin-off of the "T-side" Debtors.

54.      Again, given all of this, one has to ask, what is really being done here and

is it being done in good faith or rather to create an excuse for "the Debtors" to shunt aside the

TCEH Debtors.  Phantom risk of generalized market risks that already exist and were assumed

by creditors that invested in the capital structure of EFIH and EFH certainly cannot justify

locking in a bad result for the "T-side."  Indeed, if there were real risk, the Debtors would be

approaching the entire problem differently.  They would have required that their advisors prepare

and provide an analysis of the risk at least as thorough as the analyses presented by the Debtors

in the now-famed "Filsinger Declaration" which, in 72 pages, justifies the expenditure of less

estate resources on bonuses than will likely be spent on advisors pursuing the Bidding

Procedures.  If there were a real risk of loss, the Debtors would have considered <u>many</u>

alternatives, not <u>one</u>.  They would not be shifting their explanation of risks or changing

personnel mid-stream. They would have explained all of this fully and in writing to the boards

whose express approval for a course of action would have been sought. And, most importantly,

if there were real risk, the Debtors would have briefed their creditors and, instead of ignoring

them, would have brought the parties together to discuss plan alternatives.

### D. The Court Should Not Approve The TCEH Debtors' "Decision" To Market The Assets Of EFH And EFIH

55.    Regardless of whether the Sale Team's decision to sell may be appropriate

for some Debtors, it is not in the TCEH Debtors' best interests to participate in this process. As

discussed above, Mr. Keglevic and Ms. Doré—officers of all of the relevant Debtors—were the

decision makers for all Debtors. Therefore, it cannot be said that EFH, on the one hand, and

EFCH and TCEH, on the other, transacted at arm's-length in designing the Bidding Procedures,

conducting the marketing, or even in deciding whether to seek approval of the Bidding

Procedures. Given this profoundly flawed process, it is not surprising that no fiduciary has been

protecting the interests of the TCEH Debtors' estates, let alone ensuring that they receive a "fair

price" for their support of the Motion, which carries with it only burdens for the TCEH Debtors.

See HMG/Courtland Props., Inc. v. Gray, 749 A.2d 94, 118 (Del Ch. 1999) (finding the absence

of a proper negotiator undercut defendants' assertion that the price was fair).

56.    At no time during the process has TCEH received the advice of

unconflicted counsel with respect to the Motion. Instead, the TCEH Debtors have heard only the

advice of their common counsel to support the "optimal" Term Sheet transaction. See Starner

Decl. Ex. 13] (Sawyer Dep. Tr. at 423:5 – 8) ("A. I think, you know, that Evercore and -- and

Kirkland have a view today that a tax-free spinout is clearly the -- as they characterize it, the

optimum structure . . . . "). This advice has been given uniformly to all of the Debtors

notwithstanding that, as described in the Tax Memorandum, there is a live dispute as to whether

EFH would be able to assert a claim against EFIH, EFCH or TCEH for the federal income tax liability arising from a taxable transaction that results in a deconsolidation of the TCEH and/or EFIH from EFH.  See Tax Memorandum at 20.  While the Debtors "believe" that any resulting tax liability could be allocated in its entirety to EFIH, EFCH and TCEH, that belief appears to be, on its face, directly contrary to the written contract.  If the contract prevails, as it should, a transaction may not need to be "tax-efficient" in order to maximize the value of EFIH's indirect ownership interest in Oncor.  Rather, a transaction at the EFIH-level that triggers taxable gain at EFH but not at EFIH (for example, a sale of the EFIH's equity interest in Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") (Oncor's immediate parent) pursuant to section 363 of the Bankruptcy Code) may elicit higher bids than a sale of the reorganized equity of EFH, due to the reduced execution risk attendant the Term Sheet transaction structure, thereby maximizing the value of EFIH's estate.  In that case, no plan for the TCEH Debtors would be necessary.

57.    The Bidding Procedures further benefit EFH and EFIH at the expense of the TCEH Debtors.  First, the Bidding Procedures contemplate that the Successful Bid need remain binding and irrevocable until December 31, 2015 (the "Outside Date"), unless extended by the Debtors for six months in the event a necessary or advisable regulatory approval has not been obtained.  See Motion, Ex. 1 to Ex. A at 5.  Because the transaction contemplated by the Term Sheet cannot be effectuated other than through a plan of reorganization that provides for the spin-off of reorganized TCEH to the TCEH Debtors' historical creditors, the Outside Date for closing the Successful Bidder's investment will necessarily also be the latest possible effective date of a plan of reorganization for the TCEH Debtors.  See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 62:17 – 63:1) ("Q. Now, an Oncor tax-free transaction is required for the

tax-free spin-in order to avoid a $6 billion or so gain on sale tax on the T side; is that right? . . .

A. They are not independent transactions. They have to be coordinated transactions to get the

tax-free treatment that we sought under the RSA."). As set forth in Section IV.B, infra, the

TCEH Debtors' chapter 11 cases will take far longer to resolve—the time to investigate claims

does not run out until the end of February, 2015.

58.    Moreover, the Term Sheet transaction would obligate the TCEH Debtors

to undertake certain burdensome obligations in connection with that "optimal" transaction, as

well as certain post-reorganization burdens. Those obligations that would have to be undertaken

by the TCEH Debtors are described in Exhibit A ("Obligations Included in the Plan of

Reorganization") to the Term Sheet and include being party to a plan of reorganization the terms

of which conform to the Term Sheet transaction. See Motion, Ex. A to Ex. C. That plan, in turn,

would require the reorganized TCEH Debtors to be party to a tax matters agreement which

would impose its own set of onerous obligations on the reorganized TCEH Debtors for two years

following plan confirmation. These obligations would require the reorganized TCEH Debtors to

refrain from:

- Abandoning any of their trades or businesses;

- Liquidating or selling assets which would trigger the "continuity of interest" requirements of the Internal Revenue Code;

- Merging or consolidating with certain persons for two years post-reorganization; and

- Redeeming or repurchasing their equity under certain circumstances for two years post-reorganization.

See id. Ex. B to Ex. C.

59.    Not only was there no fiduciary to negotiate for TCEH, these obligations

are to be undertaken by TCEH for no consideration. In light of this, it is difficult to discern why

the TCEH Debtors' estate fiduciaries would agree to support the Motion.  More to the point,

there is no record to support any business decision to do so.

## II.    The Record Lacks Any Evidence Of A Proper Justification To Sell Post-Reorganization Equity Forward

60.    Even if one were willing to give the Sale Team benefit of the doubt that

they sincerely believed that the stake of a publicly regulated utility is volatile, there is no link

between the existence of some risk to that asset and the need to act to mitigate all risk.  In other

words, a business decision made in good faith still has to be "proper" under the circumstances.

See Filene's Basement, 2014 WL 1713416, at *12.

### A.  The Purported "Analysis" Fails To Establish A Material Risk To The Assets Of Any Debtor

61.    The record here is devoid of any evidence of the actual volatility of the

Debtors' interest in Oncor.  The Debtors did not even ask Evercore to analyze whether Oncor is a

volatile asset likely to decline in value in the foreseeable future.  See Starner Decl. Ex. 10 (Hiltz.

Dep. Tr. at 282:23 – 283:4) ("Q. Okay. . . . [D]id Mr. Keglevic or anybody employed by the

Debtors ask you to opine on the range of potential rise and fall in Oncor stock over an 18- to 24-

month horizon?  A. No."); Starner Decl. Ex. 17 (Horton Dep. Tr. at 92:9 – 15) ("Q. Do you recall

any discussion at the meeting which quantified the volatility of the Oncor stake, that is

expressing a view as to the range of potential upward and downward movements over the next

12 to 18 months?  A. No.").  As a result, Evercore didn't see fit to perform any such analysis.

See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 278:16 – 279:12) ("A. Yes, I would say the chances

are that market conditions two years from now are likely to be modestly worse than they are

today primarily because of a rise in interest rates.  Q. Okay.  Modestly worse.  What do you

mean by 'modestly'?  A. I think we're going to have a higher interest rate environment.  Q.

Okay. . . . So how would you translate that, in your view, into a range of volatility for the Oncor stake.  A. Well, again, I haven't done that analysis . . . .").

62.    Instead, the Debtors purported "analysis" that supports their decision to market the post-reorganization equity of EFH is comprised of only their own opinions and Evercore's generalized view of market conditions, including the potential increase in interest rates, constriction in the availability of debt and equity financing and a potential decline in the number of suitors interested in acquiring the Debtors' interest in Oncor.  See id. at 266:5 – 15) ("A. I'm saying generally market conditions are favorable. . . . Q. . . . What conditions?  A. The availability of financing. . . . A. The cost of financing.  The overall level of equity values.  Those are the general conditions."); Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 245:6 – 246:20) (identifying buyer identity and strategy, availability and cost of debt and the value of Oncor itself as risks considered).

63.    As a result, the Debtors are not marketing their interest in Oncor to address an identified risk that the value of Oncor may decline, but rather in a needless effort to test the market.  See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 316:10 – 19) ("Q. -- why are the Debtors selling now? . . . A. To establish a floor. . . . Q. Why -- why would the Debtors need to establish a floor?  A. Why wouldn't they want to establish a floor?").  In the absence of an articulation of actual risk, there is no need to market and sell the Debtors' interest in Oncor at this time.

### B.   The Identified Risks Are Those Which Every Debtor Faces And All Creditors In These Cases Accepted

64.    Moreover, the risks identified by the Debtors and their financial advisors as justification for proceeding to market the Debtors' interest in Oncor at this time (i.e., the potential for an increase in interest rates, reduced availability of debt and equity financing and

fewer interested buyers) are not the type of risks that require mitigating through a pre-plan sale process. In fact, the <u>lack</u> of risk with respect to Oncor's operations may be one of the reasons the Debtors' financial advisors think it's a good time to sell. <u>See id.</u> at 267:22 – 268:3) ("A. Oncor is performing reasonably well, it's forecast to continue to perform well, and obviously, we have a large number of interested strategic buyers for Oncor. So those are matters specific to Oncor that support the belief that it's a good time to sell."); <u>see also</u> Starner Decl. Ex. 17 (Horton Dep. Tr. at 70:2 – 17) ("Q. At any time up to the filing, had you ever heard anybody within EFIH, including the board, refer to the Oncor stake as a volatile asset? A. No. . . . A. When I answered your question in terms of volatile, what I was referring to is in terms of the business operations, their revenue streams, their net income, that's a fairly stable, predictable business."). Rather, the risks to the Oncor stake are the same risks considered by all potential sellers when considering whether to conduct an M&A transaction in the U.S. They are also the same risks confronted by nearly every debtor in chapter 11 that must juggle the timing of its emergence from chapter 11 and negotiating—in some cases for a protracted period of time—with creditors as to the terms of the plan of reorganization necessary to emerge. Fiduciary duties do not require that a company cease operating its business in the ordinary course of business and liquidate its assets just to address generalized market risks. <u>See</u> <u>Trenwick Am. Litig. Trust v. Ernst & Young, LLP</u>, 906 A.2d 168, 218 (Del. Ch. 2007) (stating that it was not a breach of fiduciary duty for an insolvent corporation to opt in favor of a particular business strategy when other, less risky strategies were also available to it, as the decision was made in good faith and with due regard for the interests of creditors); <u>see also</u> <u>N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla</u>, 930 A.2d 92, 101 (Del. 2007) (stating that even decisions made by officers and directors of an insolvent firm that turn out poorly may be covered under the business judgment rule); <u>Prod. Res. Grp.,</u>

LLC v. NCT Grp., Inc., 863 A.2d 772, 788 n.52 (Del. Ch. 2004) ("[T]he business judgment rule

remains important and provides directors with the ability to make a range of good faith, prudent

judgments about the risks they should undertake on behalf of troubled firms.").

> 65.    Importantly, generalized market risks such as increase in debt funding

costs were assumed by the creditors of EFH and EFIH when they elected to invest in the "E-

side" capital structure, the only asset of which is the Debtors' interest in Oncor. See Starner

Decl. Ex. 17 (Horton Dep. Tr. at 82:18 – 83:10) ("A. I think a valuation of Oncor is somewhat

correlated to interest rates. Q. And that has been true since 2007? A. Probably longer than that.

Q. In fact, it has been true since the people who bought the EFIH first lien, second lien, and PIK

paper have been around? A. Probably. Q. . . . [T]he value of the Oncor stake has always been

correlated to what people are willing to pay for similar public utilities, right? A. Obviously there

[are] some exceptions, but yeah."). No pre-petition creditors, including those creditors of EFH

and EFIH, are complaining that the Debtors should be selling forward the post-reorganization

equity of EFH instead of first doing what chapter 11 debtors are supposed to do—educate their

creditors and then negotiate with them over the terms of a plan of reorganization. Instead, nearly

all creditors, including creditors of TCEH—a large creditor (on account of its scheduled

intercompany claim) of EFH—oppose the Motion.[6]  As the creditor entitled to a material share of

the residual value of the Oncor stake after payment of all claims against EFIH, TCEH—and its

own creditors—should not be deprived of its recovery because the Debtors, in their claimed

effort to mitigate undefined risk, are willing to bargain away certain of the up-side value of the

Oncor stake to protect EFIH creditors.

---

[6]      Pursuant to EFH's schedules of assets and liabilities [D.I. 1237], TCEH holds a non-continent, liquidated
and undisputed claim against EFH in the amount of $773,729,458.98 on account of an intercompany payable.

### III. The Record Lacks Evidence That The Decision To Market Will Lead To A Tangible Solution

66.     Even assuming an actual perception of a well-defined, extraordinary risk requiring action right now, there is still no evidence that the Bidding Procedures will help. Beyond the issue of whether the unicorn exists, there are numerous contingencies that must all be satisfied before a Successful Bidder will be able to acquire the post-reorganization equity of an "E-side" that has been disentangled from the "T-side." See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 156:3 – 9 ("A. Whether it's best chance or not, we believe the [transaction structure embodied in the term sheet attached to the bid procedures motion] would meet the criteria with all the qualifications associated with getting private letter rulings, et cetera. Q. Right. There's lots of conditions that have to happen? A. Lots of conditions."). Those contingencies include, but are not limited to:

- Confirmation—likely over the objection of substantially all of the unsecured and secured creditors of the TCEH Debtors—of the plan of reorganization to be proposed by the Debtors that effectuates the Successful Bidder's investment in the reorganized equity of EFH and the spin-off of reorganized TCEH;

- Regulatory approval of the Successful Bidder's indirect ownership of 80% of the equity of Oncor;

- Receipt of the Private Letter Ruling with respect to the spin-off of TCEH; and

- The occurrence of that spin-off, which requires that historical creditors of TCEH receive the equity of reorganized TCEH.

See Motion, Ex. C at 3-4.

67.     Unless those contingencies are all satisfied, a sale of the post-reorganization equity of EFH is illusory, and that equity can at best be described as a hypothetical asset at this time. See Starner Decl. Ex. 10 (Hiltz Dep. Tr. at 332:8 – 11) ("Q. Yes,

but that's a competitive process for an asset which currently has an overhang on it with respect to plan visibility?  A. Correct.").

68.     Like they did in connection with the Restructuring Support Agreement, the Debtors are again claiming to maximize value by structuring an "option" to purchase an asset that does not, and may never, exist.  See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 127:19 – 24) (A. "Obviously, markets can go up and they can go down.  One of the things that we like about the stalking horse process is we can lock in a floor and protect against markets going down but leave open fiduciary out to take advantage of markets that rise.").  Until (i) there is greater certainty that the asset to be sold will in fact exist and (ii) a buyer willing to purchase that asset on the Debtors' terms steps forward, any relief with respect to the Motion would require the Court to impermissibly render a judgment based on a hypothetical set of facts.  See, e.g., The Bank of N.Y. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 307 B.R. 432,441-42 (Bankr. S.D.N.Y. 2004) (finding there to be no justiciable case or controversy where substantial uncertainty existed as to whether plan that enforced subordination when making distributions of common stock would be confirmed thereby giving rise to issue as to interpretation of "X Clause."); see also Wash. Mut. v. XL Specialty Ins. (In re Wash. Mut.), Adv. No. 12-50422 (MFW), 2012 WL 4755209, at *6 (Bankr. D. Del. Oct. 4, 2012) (concluding that request for declaratory judgment was premature because it required the assumption of future, hypothetical events that had yet to occur) (citing Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 561 (3d Cir. 2002)).

## IV.     The Debtors Should Not Be Permitted To Breach Their Written Commitments To Creditors

69.     Even if there were a real risk here, and even if management had done everything right, there is one last additional problem with the Motion.  Prior to its filing, the

Debtors made several commitments to their creditors regarding how these chapter 11 cases would proceed following termination of the Restructuring Support Agreement. Unfortunately, having now gained the benefit of a "cease fire" with respect to inter-Debtor claims, exclusivity and retention of professionals, the Debtors have decided to disregard their commitments to pursue the sale of the Debtors' interest in Oncor through the Bidding Procedures in the face of universal creditor revolt. The Debtors cannot do that.

### A. The Bidding Procedures Are At Odds With Commitments With Respect To Exclusivity

70.     In connection with seeking an extension of their exclusive period for filing a plan of reorganization by 180 days, the Debtors expressed a willingness to "continue the productive tenor of discussions with all parties in interest as [the Debtors] direct their efforts toward filing a plan of reorganization and a disclosure statement." Motion of Energy Future Holdings Corp., *et al.*, for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code [D.I. 1683] (the "Exclusivity Motion") ¶ 31. In fact, the Debtors stated that their "primary focus . . . [would be] to continue fostering an open dialogue with the goal of generating consensus around a plan of reorganization that maximizes the value of the Debtors' estates for the benefit of all those parties who hold an interest in such estates." Exclusivity Motion ¶ 34.

71.     The promise of good faith negotiations was a material consideration in the Ad Hoc Group of TCEH Unsecured Noteholders' decision to support the requested extension of exclusivity. See Exclusivity Motion ¶ 45 ("Given the Debtors' ongoing productive negotiations with their creditor constituencies, the Debtors would use the time provided by an extension of the Exclusivity Period to continue seeking such parties' support for a plan of reorganization."); Reply of Energy Future Holdings Corp., *et al.*, to the Objections of CSC Trust Company of

Delaware to the Debtors' Motion for Entry of an Order Extending the Debtors' Exclusive

Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of

the Bankruptcy Code [D.I. 1994] (the "Exclusivity Reply") ¶ 8. ("If the Court grants the Debtors'

extension request, the Debtors will use the additional time to further develop a restructuring

transaction with the input of their stakeholders. . . . [T]he Debtors have been, and will continue to

be, actively engaged in global plan negotiations."); Statement of the Ad Hoc Group of TCEH

Unsecured Noteholders in Support of the Motion of Energy Future Holdings Corp., *et al.*, for

Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit

Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code [D.I. 1998] ¶ 3 ("[I]n

reliance on the Debtors' commitments to meaningful negotiations, the Ad Hoc Group of TCEH

Unsecured Noteholders supports the requested extension of exclusivity."); see also Starner Decl.

Ex. 20 (Sept. 16, 2014 Hr'g Tr. at 73:18 – 20; 74:20 – 23) (THE COURT: "I'm sure very intense

negotiations [will] occur over the next months to try to figure out exactly what an exit strategy

for this debtor is. . . . I think Mr. Shore and others would say they did that nine months ago and

that's part of what a lot of the fights were in connection with the RSA. That's dead and gone and

we don't need to worry about it . . . .").

      72.    Notwithstanding these statements of the record, and even while they were

being made, the Sale Team was out marketing the post-reorganization equity of EFH pursuant to

the very plan that was contemplated in the terminated Restructuring Support Agreement.

Notably, as detailed above, the first teaser was finalized and the first calls to potential bidders

were made in the week immediately following the filing of the Exclusivity Motion on July 23,

2014. During the time spent marketing, the Debtors have not engaged in any promised "global

plan negotiations." Nor have they "generat[ed] consensus around a plan of reorganization." If

the Bidding Procedures are approved, rather than engaging in the promised negotiations to reach

agreement on a consensual plan, the Debtors will continue to use the extension of exclusivity

they received to pursue a transaction that no pre-petition creditor has supported to push forward a

plan agenda that no bas bought into.  In short, the Debtors' conduct has been, and may continue

to be, flatly contrary to the commitments that they would educate and then negotiate with their

stakeholders to garner support for a global plan, and no bidding process should go forward until

after they have lived up to those commitments.

**B. The Bidding Procedures Breach The**
**Protocol Regarding Certain Case Matters**

73.     As discussed above, in addition to their exclusivity commitments, the

Debtors agreed with the Ad Hoc Group of TCEH Unsecured Noteholders, the Creditors'

Committee and Wilmington Savings Fund Society FSB ("WSFS" and, together with the Ad Hoc

Group of TCEH Unsecured Noteholders and the Creditors' Committee, the "TCEH Creditor

Representatives"), to the Case Matters Protocol that gives each TCEH Creditor Representative

until the latest of (a) February 28, 2015, (b) fifteen days after approval of a disclosure statement,

and (c) such later date as mutually agreed to by the Debtors and the applicable TCEH Creditor

Representative, to file a motion requesting standing to prosecute material claims or causes of

action of the TCEH Debtors.  See Case Matters Protocol ¶ 9.  By the Case Matters Protocol, the

Debtors agreed that creditors of the TCEH Debtors would be afforded sufficient time to

investigate, seeking standing to prosecute (where necessary) and prosecute, claims and causes of

action for the benefit of creditors those creditors.

74.     The Debtors also committed to "facilitate the TCEH Creditor

Representatives' diligence of the rights and potential claims, causes of action, and defenses of

the TCEH Debtors against or with respect to other Debtors . . . and third parties."  Id. ¶ 7.

Included among those claims are claims against Oncor that may be senior to EFIH's equity. <u>See</u> Preliminary Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of the TCEH Debtors for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases With Those of the Oncor Debtors [D.I. 222] ¶¶ 29-31 (describing certain claims arising from the transfer of the equity of Oncor by EFCH).

75.     Despite those commitments, the TCEH Debtors are pursuing the Term Sheet transaction structure (i) before the TCEH Creditor Representatives have been able to research, much less, identify their claims and (ii) that can be implemented only pursuant to a plan of reorganization for all of the Debtors that will undoubtedly resolve any claims and causes of action brought by the TCEH Debtors against EFH, EFIH, Oncor Holdings or Oncor.  Although Mr. Sawyer was aware of such potential claims as the EFCH and TCEH independent board member, he was not aware of any of the commitments made pursuant to the Case Matters Protocol when he was considering the Bidding Procedures. <u>See</u> Starner Decl. Ex. 13 (Sawyer Dep. Tr. at 479:24 – 481:3) ("Q. Were you aware that one of the claims that has been raised . . . [is] that EFCH . . . transferred the Oncor business over to the E-side? A. I do recall that claim. Q. And do you understand that the assertion has been made that that might lead to a fraudulent conveyance claim that EFCH could bring against the E-side? A. I do recall that assertion. . . . Q. And do you understand that one of the consequences is that if EFCH were able to go inside the ring fence and sue the entities inside the ring fence, the EFCH claims would be senior to the equity interests of EFIH? . . . A. I understand that assertion has been made."); <u>id.</u> at 403:14 – 25 ("Q. . . . Have you seen [the Case Matters Protocol] before?  A. I have not seen this. Q. Okay. So I take it you have never familiarized yourself with the terms of the stipulation? A. I've testified I haven't seen it."); <u>id.</u> at 475:8 – 13 ("Q. Were you aware that counsel was signing a

stipulation that was going to bind TCEH?  A. And as I think I previously testified, I was not

aware of this document so then, therefore, I was not aware.").[7]

76.    Also as part of the Case Matters Protocol, the Debtors committed to

(i) provide the TCEH Creditor Representatives reasonable (but not less than ten days') notice of

their intent to file with the Court, among other things, any pleading that treats material potential

claims or causes of action of the TCEH Debtors, including, but not limited to, inter-debtor issues,

rights, claims or defenses, and (ii) consult periodically with the TCEH Creditor Representatives

regarding those matters.  See Case Matters Protocol ¶¶ 2-3.  Notwithstanding those

commitments, the Debtors, in an effort to lay further groundwork for their eventual decision to

pursue only those bids that conform to the Term Sheet transaction structure and Bid Criteria,

filed the Tax Memorandum without providing the advance notice or consultation required by the

Case Matters Protocol.  Remarkably, the Tax Memorandum, among other things, draws a

"roadmap" for parties in interest that would prefer to see any tax liability resulting from a taxable

transaction be asserted against the TCEH Debtors and/or EFIH rather than "stranded" at EFH.

See Tax Memorandum at 16-20.  It is indisputable that in doing so, the Tax Memorandum treats

inter-Debtor issues, claims or defenses subject to the Case Matters Protocol.  Notwithstanding

this, the Debtors chose not to honor their commitment to the TCEH Creditor Representatives by

providing advance notice or separate counsel, and it appears the Debtors have little intention of

doing so going forward.  See Starner Decl. Ex. 13 (Sawyer Dep. Tr. at 466:18 – 467:2 ("Q. With

respect to this particular bit of advice, you understand that advice that Kirkland gave you with

respect to the TSA would necessarily have the benefit of advancing the interest of one client and

---

[7]    Later in his deposition, Mr. Sawyer clarified his earlier testimony regarding the Case Matters Protocol.  See Starner Decl. Ex. 13 (Sawyer Dep. Tr. at 541:2 – 11) ("A. And if I could clean up one other dangling issue while I'm still on the record. I think this -- I think I testified earlier that this stipulation and agreed order, the protocol of these case matters as I've sat here, and apologies for the senior moment, I think I probably -- as I sat here and thought about it, I think I did receive this at some point. It just had been some time since I thought about it . . . .").

truncating the rights of another? . . . A. I don't agree that – I don't see that there are two separate clients here.").

V.      **To The Extent The Court Approves Some
        Procedures, It Should Require Certain Modifications**

        77.     If, notwithstanding all of the foregoing, the Court is inclined to grant the Motion, the Bidding Procedures should be modified to ensure the process to be implemented is effective in eliciting bids, transparent, and balanced in terms of the transactions that may be proposed and will be considered.  In addition, given that, as discussed above, the TCEH Debtors will derive no benefit from the relief sought by the Motion, the Bidding Procedures should be modified to make clear that the TCEH Debtors are undertaking no obligations at this time with respect any transaction the Bidding Procedures might yield and reserve all rights to challenge whatever Stalking Horse Bid, Successful Bid or form of transaction results from the Debtors' implementation of the Bidding Procedures.

        A.  **The Initial Mark-up Deadline Should Be Extended**

        78.     Notwithstanding the Debtors' proclaimed willingness to consider all forms of transaction structures (see Motion ¶ 7), the Bidding Procedures make the transaction contemplated by the Term Sheet a near certainty to occur.  As the Bid Criteria and the Tax Memorandum suggest, the Debtors are strongly inclined to effectuate the Term Sheet transaction and avoid the incurrence by EFH of a "stranded tax liability" of several billion dollars.  See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 145:15 – 146:4) ("Q. . . . So, as part of the bid procedure motion, . . . what is attached as Exhibit C is the preferred structure that the Debtors would hope to achieve, fair?  A. Yes.  I think if you read this, it says this is an illustrative -- you know, for illustrative purposes only, but we have not shifted our views.  We have not yet been

convinced that a taxable transaction is better for the estates, each of which, by the way, EFIH,

EFH and TCEH, who have unsecured creditors, than a tax-free transaction.").

79.    The Bidding Procedures contemplate a period of not more than 15 days for

Round 1 Bidders (who will, at that point, have submitted only non-binding letters of intent and

illustrative term sheets) to review, mark-up and submit the form of definitive documentation to

be provided by the Debtors only after the Round 1 Bid Deadline (October 23, 2014).  See

Motion, Ex. 1 to Ex. A at 7.  Given the size and complexity of the investment or purchase to be

made, this short period of time—together with the Debtors' stated preference for a "tax-efficient"

transaction—makes it a near fait accompli that the bids submitted by the Initial Mark-up

Deadline (November 7, 2014) will take the form of the Term Sheet transaction.

80.    The period between the Round 1 Bid Deadline (October 23, 2014) and the

Initial Mark-up Deadline (November 7, 2014) is a critically important one because, during that

period, the Debtors will determine what form the sale of the Debtors' interest in Oncor will take.

During that period, the Debtors will not only have to review the Round 1 Bids received to

determine which of those Round 1 Bids best satisfy the Bid Requirements such that they should

proceed to definitive documentation, but also provide a form of definitive documentation for

each such bid.  If the Debtors receive a Round 1 Bid premised upon a structure other than the

preferred Term Sheet transaction structure, the Debtors will have to prepare and provide to the

Round 1 Bidder that offered up that alternative transaction a form of definitive documentation

that implements a transaction structure that the Debtors have not yet considered.  See Starner

Decl. Ex. 2 (Keglevic Dep. Tr. at 157:5 – 10) ("Q. Has the Debtor evaluated any other

transactional structures short of the one that is embodied in the term sheet that would achieve

what it believes is the same tax treatment or tax results as the preferred structure?  A. No, I don't

think we did."). That Round 1 Bidder will then have to comment on that newly-devised form of definitive documentation and submit a mark-up before the Initial Mark-up Deadline passes.

81.    Fifteen days is simply not a sufficient amount of time for all of that to occur. As discussed above, the insufficiency of this period virtually guarantees that the Stalking Horse Bid will take the form of the Term Sheet transaction. If the Debtors are genuinely committed to considering alternative transaction structures, the period between the Round 1 Bid Deadline and the Initial Mark-up Deadline must be increased.

### B.    The Debtors Must Identify With Greater Specificity The Assets Being Sold

82.    The Motion lacks a precise description of what assets the Debtors propose to sell. Any value derived from a Successful Bid should be attributable just to EFIH's indirect ownership of 80% of the equity interests in Oncor. Monetizing EFIH's equity interest in Oncor Holdings pursuant to a standard section 363 sale process is therefore a possible alternative value-maximizing transaction (with substantially less execution risk). Yet the Debtors have stated their preference to sell the equity of reorganized EFH in order that the transaction be "tax-efficient." See Debtors' Notice Regarding Marketing Process dated August 26, 2014 [D.I. 1919] ("The Debtors believe that these proposed procedures will help ensure that they obtain the highest or otherwise best bid for Reorganized EFH"). The preference for this structure is motivated by the same tax concerns that drove "the Debtors'" pursuit of the Restructuring Support Agreement—selling the reorganized equity of EFH, rather than EFIH's equity interests in Oncor Holdings, would, in the Debtors' view, "be the optimal deal structure" from a tax perspective because "this structure maximizes the value of the estates." Motion ¶ 36.

83.    Because the Bidding Procedures do not limit the asset up for bid to EFIH's equity interests in Oncor Holdings, the Bidding Procedures must provide greater specificity with respect to what estate property (other than cash on hand, which is specifically excluded) is—and

is not—being sold.  In other words, what assets of the "E-side" business will remain with EFH and EFIH when the Successful Bidder invests in the post-reorganization equity of EFH?  Mr. Keglevic has already testified that certain assets are not for sale.  See Starner Decl. Ex. 2 (Keglevic Dep. Tr. at 208:25 – 209:7) ("Q. . . . So am I correct to say . . . that there are certain . . . assets . . . [t]hat are not for sale?  A. I would agree with that.").  Absent greater specificity—which is otherwise unlikely to emerge until such time as definitive documentation is agreed upon with the Stalking Horse Bidder—other bidders and parties in interest are unable to discern exactly what is being bid upon and, as a result, the Bidding Procedures could result in substantially dissimilar bids in terms of the assets to be conveyed and the value to be received.  In that event, it will be difficult to evaluate the bids received on an "apples to apples" basis.

**C.  A Status Conference With The Court**
**Should Be Held At The Conclusion Of Round 2**

84.     The Bidding Procedures would authorize the Debtors to execute all Round 2 Documentation upon which the Stalking Horse Bid was made and file a notice with the Court announcing the Stalking Horse Bid.  See Motion, Ex. 1 to Ex. A at 8.  Given the contract terms the Debtors have generally described as necessary for them to enter into an agreement to sell the post-reorganization equity of EFH, creditors and the Court should have an opportunity to review and discuss the terms of the proposed Stalking Horse Agreement before the Debtors proceed to the Open Bidding Process.  If the actual terms obtained by the Debtors are something less than what the Debtors have to this point maintained are necessary, creditors and the Court should have the opportunity to assess the status quo before the estates are put to the expense of the Opening Bidding and Auction process.

### D.  The Form Of Definitive Documentation Must Be Put Forward Earlier

85.    Given the risks associated with the Term Sheet transaction structure and the very short period of time between the Round 1 Bid Deadline and the Initial Mark-Up Deadline, the form of definitive documentation (which presumably will be substantively consistent with the Term Sheet) proposed to be provided by the Debtors only after the submission of Round 1 Bids (see Motion, Ex. 1 to Ex. A at 7) should be provided to Acceptable Bidders in advance of the Round 1 Bid Deadline.  Requiring that the form of definitive documentation be provided earlier will substantially increase the likelihood that whichever Round 1 Bidders are selected to proceed as Round 2 Bidders have adequate time to mark up that that form to provide for a transaction structure other than the Term Sheet transaction structure, if those bidders so choose.  As discussed above, permitting the Debtors to delay providing the form of definitive documentation until after the Round 1 Bid Deadline substantially increases the likelihood that all bids will conform to the Term Sheet transaction structure, a result adverse to the interests of the TCEH Debtors' estates.

### E.  The Bidding Procedures Must Be Balanced As To All Transaction Structures, And The Highest Taxable Bid Must Be Disclosed

86.    Notwithstanding the Debtors' protestations to the contrary, it cannot be credibly said that the Bidding Procedures are neutral as to transaction structure.  The Term Sheet, Bid Criteria and Tax Memorandum make clear that the Debtors are only interested in a "tax-efficient" Term Sheet transaction structure to be implemented through a plan of reorganization. See, e.g., Motion, Ex. 1 to Ex. A at 11 (including among the Bid Criteria, (i) the likelihood of confirmation of a plan of reorganization and (ii) whether the bid "is intended to be structured in a tax-free manner or the extent of any incremental tax liabilities to be incurred by the Debtors . . . ."); Motion, Ex. C at 3-4 (describing, as conditions to closing, (i) Court approval of the a plan of

reorganization and the Merger Agreement, (ii) receipt of the Private Letter Ruling,

(iii) occurrence of the TCEH Spin in accordance therewith, and (iv) receipt of an opinion that the

Merger qualifies as a reorganization within the meaning of section 368(a) of the Internal

Revenue Code).

87.     Although it may be difficult—if not impossible—to "un-ring the bell" in

terms of what the Debtors have conveyed to potential bidders in this regard, the Bidding

Procedures should nonetheless be amended to (i) make clear that alternative transaction

structures, including, but not limited to, a sale of EFIH's equity stake in Oncor Holdings

pursuant to section 363 of the Bankruptcy Code, will be considered, (ii) provide the Reviewing

Parties greater rights to participate in the consideration of bids at every stage of the bidding

process, and (iii) require that the highest taxable bid be disclosed to the Reviewing Parties,

thereby ensuring that the Debtors' predisposition to accept only bids premised on the "tax-

efficient" Term Sheet transaction structure is balanced by the desires of creditors of the various

Debtors' estates to maximize the value of their particular obligor-Debtors' estates, even if that

comes at the expense of EFH, the Debtor against which a federal income tax liability will be

asserted, at least in the first instance.

**F.  Bids Must Be Shared With Creditors Earlier In The Process**

88.     The Bidding Procedures require the Debtors to disclose the terms of the

bids received (but not the identities of the bidders) to the Reviewing Parties for the first time as

part of the Stalking Horse Motion, which will be filed only after the Debtors have conducted two

rounds of bidding to identify the Stalking Horse Bidder and the form of the Stalking Horse Bid.

See Motion, Ex. 1 to Ex. A. at 8.  This disclosure is anticipated to occur in late November or

early December of 2014.  Thereafter, the Debtors will consult with the Reviewing Parties

regarding which bids constitute Qualified Bids, which Qualified Bid shall be the Starting Bid, and which Qualified Bid is the Successful Bid. See id. at 9-10; 12.

89.     Delaying the disclosure of bids until after the Debtors have conducted two rounds of bidding to identify the Stalking Horse Bidder and form of the Stalking Horse Bid is inappropriate in these cases. Here, the structure of the transaction contemplated by the Stalking Horse Bid may be as important as the identity of any bidder or the amount of any bid. Granting the Debtors unchecked discretion to choose the form of the transaction contemplated by the Stalking Horse Bid nearly guarantees that all other bidders will have to conform their bids to the Debtors' preferred "tax-efficient" Term Sheet transaction structure in order to be considered at the Auction.

### G. The Debtors Cannot Be Permitted To Alter The Bidding Procedures In Their Sole Discretion

90.     In their current form, the Bidding Procedures permit the Debtors, after consultation with the Reviewing Parties, "to modify the Bidding Procedures in any manner that they determine will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customary terms and conditions on the Transaction . . . .". Id. at 12-13. While retention of some discretion of the type described is not uncommon in bidding procedures (e.g., the ability to adjourn the Auction and/or the Auction Approval Hearing), the discretion proposed to be retained by the Debtors here is tantamount to an ability to rewrite—nearly in their entirely—the Bidding Procedures approved by the Court. Specifically, the Debtors wish to retain the right to reset the deadlines contemplated by the Bidding Procedures, reframe at any time the criteria to be used to evaluate the various types of bids to be submitted at the different stages of the process, and impose additional "customary terms and conditions" on the transaction. The Debtors should not be permitted this level of discretion as it renders the

Bidding Procedures largely illusory both in the eyes of the bidders and creditors, thereby calling into question the efficacy of the Bidding Procedures in bringing to the table all interested bidders and achieving the maximum price for the "E-side" business.

### H. The Debtors Must Make Clear That The TCEH Debtors Are Undertaking No Obligations And Reserve All Rights

91.     As discussed above, all 71 Debtors have sought authority for EFIH and EFH to market and pursue the sale of those two estates' assets pursuant to the Bidding Procedures. Although the Term Sheet transaction contemplates the TCEH Debtors incurring certain burdensome obligations for the benefit of EFH and EFIH, the assets of the TCEH Debtors are not the subject of the Motion. Accordingly, the Bidding Procedures should be amended to make clear that, nothing in the Bidding Procedures shall be construed as an authorization by the Court, under section 363 of the Bankruptcy Code or otherwise, for any TCEH Debtor to participate in, or incur, any claim arising out of or related to the Bidding Procedures or actions taken pursuant thereto, and the TCEH Debtors reserve all rights to challenge the Stalking Horse Motion, the Successful Bid and any plan of reorganization that is premised upon that Successful Bid.

### CONCLUSION

92.     Based on the foregoing, the Ad Hoc Group of TCEH Unsecured Noteholders respectfully requests that the Court (a) deny the Motion and (b) grant such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank.]*

Dated: October 10, 2014
      Wilmington, Delaware

FOX ROTHSCHILD LLP

By:  */s/ L. John Bird*_____
Jeffrey M. Schlerf (No. 3047)
John H. Strock (No. 4965)
L. John Bird (No. 5310)
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone:  (302) 654-7444
Facsimile:  (302) 463-4971
jschlerf@foxrothschild.com
jstrock@foxrothschild.com
lbird@foxrothschild.com

and

WHITE & CASE LLP
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
tlauria@whitecase.com
mbrown@whitecase.com

J. Christopher Shore (admitted *pro hac vice*)
Gregory M. Starner (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
cshore@whitecase.com
gstarner@whitecase.com

*Counsel to the Ad Hoc Group of TCEH Unsecured
Noteholders*