# EXHIBIT 2

Page 1

1                      PAUL KEGLEVIC

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

     ----------------------------------------x

4    In Re:

     Energy Future Holdings Corporation, et.,

5

                       Debtors.

6

     Chapter 11

7    Case No. 14-10979

     Jointly Administered

8

9    ----------------------------------------x

10          DEPOSITION OF PAUL M. KEGLEVIC

11               New York, New York

12               October 3, 2014

13

14          **  CONFIDENTIAL  **

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 85349

CONFIDENTIAL

1                    PAUL KEGLEVIC

2    paragraph 7 of the proposed order, and if you

3    can let me know when you're there?

4         A.    I'm there.

5         Q.    Okay.  Mr. Keglevic, paragraph 7 of

6    the order provides that modifications of the

7    bidding procedures may be made to "best promote

8    the goals of the bidding process."

9              Do you see that?

10        A.    Yes.

11        Q.    Mr. Keglevic, what are the goals that

12   are referred to here?

13        A.    I think they have been referred to

14   previously in the exhibit, but I think there are

15   primarily two goals.  One is to maximize the

16   value of the auction and the other one is to

17   effectively reduce market risk and to, you know,

18   obtain a one-way option through a stalking horse

19   bidder that provides a floor to the amount we'll

20   receive under the bidding procedures.  Those are

21   the two primary objectives that I recall.

22        Q.    One primary objective that you just

23   mentioned was to maximize the value of the

24   auction, correct?

25        A.    Correct.

1              PAUL KEGLEVIC

2          (Recess; Time Noted:  10:23 a.m.)

3          (Time Noted: 10:30 a.m.)

4    BY MR. DEVORE:

5       Q.    Mr. Keglevic, you are the chief

6    restructuring officer, correct?

7       A.    Correct.

8       Q.    Do you have that title at EFH?

9       A.    Yes.

10       Q.    Do you have that title at EFIH?

11       A.    Yes, I believe.

12       Q.    And at TCEH?

13       A.    I believe that's correct.

14       Q.    And Mr. Keglevic, are you a board

15    member at EFH?

16       A.    No.

17       Q.    At EFIH?

18       A.    Yes.

19       Q.    At TCEH?

20       A.    Yes.

21       Q.    Mr. Keglevic, what is your role in the

22    development of the bidding procedures?

23       A.    I would say I was in a review

24    capacity.

25       Q.    Who at the Debtors approved the

1           PAUL KEGLEVIC

2  bidding procedures?

3       A.    It probably be myself and my co-CRO,

4  Ms. Doré.  We had input and assistance from our

5  teams, of course, and we had board meetings

6  where we presented the overview of the proposed

7  bid procedures, but I don't believe we had them

8  formally vote on it.  But they were certainly

9  aware of the approach, and all of it was in

10 heavy reliance on our advisors, both legal and

11 financial, where we directed them to develop

12 procedures, design procedures to achieve the

13 objectives that I previously indicated, that is,

14 to maximize the value from the auction and to

15 create a one-way option or a floor, you know,

16 through the stalking horse mechanism that would

17 help mitigate potential market risk.

18      Q.    Mr. Keglevic, you started your answer

19 stating, "It probably would be myself and my

20 co-CRO, Ms. Doré."  Did you approve the bidding

21 procedures?

22      A.    I said I was -- I recommended that we

23 file them to the board.  I don't think we had an

24 official approval process.

25      Q.    Do you know who the last person was

1                    PAUL KEGLEVIC

2        Q.      Are you aware that the Debtors have

3   indicated in publicly filed pleadings that there

4   is a risk that EFH could, quote, check the box

5   for TCEH and/or EFIH; are you aware of that?

6             MR. McKANE:   Objection to form.

7        Misstates the pleading.

8        A.      Yes, I'm aware that's an option that

9   EFH has always had.

10        Q.      And if that option was permissible,

11   that would create co-liability for the $3

12   billion tax claim at EFIH?

13             MR. McKANE:   Calls for a legal

14        conclusion.

15        A.      I would like to see the specifics

16   before I answer that question.

17        Q.      Now, an Oncor tax-free transaction is

18   required for the tax-free spin in order to avoid

19   a $6 billion or so gain on sale tax on the T

20   side; is that right?

21             MR. McKANE:   Sorry.

22             (Record read.)

23        A.      They are not independent transactions.

24   They have to be coordinated transactions to get

25   the tax-free treatment that we sought under the

1                     PAUL KEGLEVIC

2  RSA.

3      Q.    Now, in order to have these, as you

4  term, coordinated transactions, the Debtors

5  believe that they would need to obtain a TCEH

6  lender agreement; is that right?

7      A.    We would need a plan of reorganization

8  that contemplated all aspects of the

9  transactions.

10     Q.    Sitting here today, is there a deal

11 with the TCEH lenders for the tax-free spin?

12     A.    No.

13     Q.    And the EFH transaction is predicated,

14 in part, on preserving that tax-free spin,

15 correct?

16          MR. McKANE:  Objection to form.

17     A.    Yes, it's -- a coordinated transaction

18 is the transaction we put forth in the RSA.

19 There could be other forms of transactions, but,

20 you know, we can't predict all that will come

21 through the auction process and how they might

22 affect others in the case.

23     Q.    Mr. Keglevic, have you given any

24 consideration of how these various issues -- the

25 tax issues, the TCH lender deal, checking the

1                    PAUL KEGLEVIC

2    second set of eyes, a second-seat financial

3    advisor to conduct the auction.

4         Ultimately, we and they decided not to

5    go forward with that assignment, so we never

6    paid them anything nor did we sign a job

7    arrangement letter.

8         Q.    What work did they do while they were

9    involved in the process for a few weeks?

10        A.    I'm not specifically aware.  I know

11   they attended maybe a meeting or two with

12   potential bidders around due diligence, I think,

13   primarily, and I know they sat in a meeting that

14   I, at least, participated in for a part of the

15   time as the bidding procedures and timelines

16   were being developed.

17        Q.    Why did the Debtors seek to add Bank

18   of America Merrill Lynch as a financial advisor?

19        A.    As I said, we were considering it just

20   to determine if a second set of eyes would be

21   valuable to the process.

22        Q.    Why did you consider a second set of

23   eyes might be valuable to the process.

24        A.    We ultimately didn't.

25        Q.    Was it the Debtors or Bank of America

1          PAUL KEGLEVIC

2    Merrill Lynch that determined not to proceed

3    with the engagement?

4        A.    I would say it was a joint decision.

5    I don't know who decided first, but it was not a

6    controversial decision from either point of

7    view.  They always knew when we were considering

8    them that we would have to explore -- they had

9    challenges, you know, with respect to potential

10   conflicts.  You know, they owned some of our DIP

11   facility, et cetera, and we wanted to think

12   through those conflicts, and I think they -- we

13   just jointly determined that, one, it wasn't --

14   we didn't see a particular value at the end of

15   the day in getting a second set of eyes at

16   additional cost and there were also some

17   challenges, so it was a combination of those

18   issues that we jointly agreed to move on.

19       Q.    I should have asked this question

20   before.  When was this time period in which Bank

21   of America Merrill Lynch was involved for a few

22   weeks, approximately?

23       A.    I would have guessed end of August

24   maybe or early September to just before the

25   filing of the bid motion.  That may have been

<sup>1</sup>                    PAUL KEGLEVIC

<sup>2</sup>        A.    Correct.

<sup>3</sup>        Q.    And as chief restructuring officer,

<sup>4</sup>  you're the person responsible for making the

<sup>5</sup>  day-to-day decisions regarding the bankruptcy

<sup>6</sup>  and the restructuring along with your advisors,

<sup>7</sup>  correct?

<sup>8</sup>        A.    Yes.  Significant decisions we consult

<sup>9</sup>  with the board on, but I think it's fair to say

<sup>10</sup>  on a lot of the day-to-day more insignificant

<sup>11</sup>  matters we make the decisions.

<sup>12</sup>        Q.    Right.  Some decisions you might have

<sup>13</sup>  to take to the board for a vote, correct?

<sup>14</sup>        A.    A vote or advisement.

<sup>15</sup>        Q.    But you're the guy in charge of the

<sup>16</sup>  bankruptcy, correct?

<sup>17</sup>            MR. McKANE:  Objection to form.

<sup>18</sup>        A.    I don't look at it that way.  I mean,

<sup>19</sup>  Ms. Doré and I are "co's," and at the end of the

<sup>20</sup>  day, we report to our board, so I think they're

<sup>21</sup>  in charge.

<sup>22</sup>        Q.    But with respect to the bid procedure

<sup>23</sup>  motions that we're talking about today, no board

<sup>24</sup>  vote was taken at any of the Debtor entities,

<sup>25</sup>  correct?

1                    PAUL KEGLEVIC

2       A.    That's correct, although I would tell

3   you there was substantial involvement and

4   advisement before we filed.

5       Q.    Okay.  With respect to the various

6   boards, you have testified earlier about those

7   boards and the independent directors, Mr. Sawyer

8   and Mr. Kremins, correct?

9       A.    I did.

10      Q.    Did you have any personal one-on-one

11  conversations with Mr. Sawyer regarding the bid

12  procedure motion at any time from the point that

13  the NextEra bid was withdrawn and the filing of

14  the motion?

15      A.    I made, with Ms. Doré and with our

16  counsel and advisors, several presentations to

17  the board in which Mr. Sawyer asked questions.

18  Some of them were specifically of me.  But

19  outside of the board meetings, I did not have

20  any specific discussions with Mr. Sawyer.

21      Q.    Okay.  You testified that at some

22  point during the process the company decided

23  that it would no longer limit the marketing to a

24  transaction that would result in a tax re-spin

25  and a double deconsolidation; do you recall

1                    PAUL KEGLEVIC

2            MR. McKANE:  We could.  I think

3        there's been a request for certain NDAs and

4        I think we're going through that process,

5        but there are also other ways to provide

6        that information without divulging the

7        identity of the bidders if you wanted to go

8        through alternative means.

9    BY MR. STOLL:

10        Q.    So let's look at the first primary

11   objective of the company in filing the motion,

12   which is to limit the exposure to the risk that

13   the market shifts and the Debtors are no longer

14   able to find an investor at the current

15   indicative prices.  Do you see that?

16        A.    Yes.

17        Q.    What does the motion mean by the "risk

18   that the market shifts"?

19        A.    Obviously, markets can go up and they

20   can go down.  One of the things that we like

21   about the stalking horse process is we can lock

22   in a floor and protect us against markets going

23   down but leave open fiduciary out to take

24   advantage of markets that rise.

25            We see that, you know, the markets are

CONFIDENTIAL

1                    PAUL KEGLEVIC

2  and the debt markets that you were -- that the

3  company was referring to?

4      A.    As I said, we relied heavily on Mr.

5  Hiltz, so it would be interesting to see -- you

6  know, I didn't specifically ask him in his mind

7  what else.  I had specifically spoken to him

8  about the ones we have talked about.  He might

9  have some other indices or things in mind with

10  those words.  I did not write the words.

11      Q.    Okay.  The motion refers to the risk

12  that the market shifts.  What is meant by the

13  market shifting?

14      A.    I think meaning the market going

15  lower.

16      Q.    And what is the risk of the market

17  going lower, as you understand it?

18      A.    I think simply meant here is it could,

19  if the market goes downward, it could reduce our

20  ability to maximize the auction, maximize the

21  proceeds from the auction.

22      Q.    Have you asked anyone to quantify what

23  the expected risk is of the market for either

24  regulated utilities or debt financing to move in

25  a direction that would negatively impact the

CONFIDENTIAL

1                    PAUL KEGLEVIC

2    value of the Oncor assets?

3              MR. McKANE:  Objection to form.

4              Go ahead.

5        A.    I have not specifically asked for

6    that, but a one-way option and a floor

7    eliminates that risk.  And that's what we're

8    trying to do, and I should bring -- I think I

9    mentioned it before, but also, as I think of the

10   market, I mentioned in my prior testimony that

11   we know we have willing buyers today.  That

12   could be a market shift too.  There might not be

13   willing buyers in -- pick your period of time in

14   the future.

15       Q.    Have you evaluated or asked anyone to

16   evaluate the possibility that Oncor will be more

17   valuable a year from now than it is today based

18   on Oncor's own operational aspects?

19       A.    I think our process allows us to take

20   advantage, given the fiduciary out, of a market

21   going up.  And the process is intended to

22   eliminate the risk of it going down.  So I

23   didn't feel a need to make any determination as

24   to how high the market might go, as long as I

25   had the opportunity to capture it and the

¹                        PAUL KEGLEVIC

² opportunity to lock in, as I said, what are much

³ closer to highs than to lows that we have seen

⁴ in this business.

⁵      Q.    Okay.  So, just so I understand it,

⁶ there has been no evaluation, written report by

⁷ Evercore or anyone else that tries to project or

⁸ estimate the risk of the market negatively

⁹ shifting as that term is used in paragraph 2 of

¹⁰ the motion?

¹¹      A.    That's correct.

¹²      Q.    Now, what asset does the company think

¹³ it is selling, or at least having bid procedures

¹⁴ put in place for the possibility of selling,

¹⁵ pursuant to the motion?

¹⁶      A.    I believe the words we said "any or

¹⁷ all."

¹⁸      Q.    And what are those assets?

¹⁹      A.    They are assets that are from EFH down

²⁰ all the way through the ringfence, and

²¹ obviously, one of the largest assets on that

²² side of the company is the 80 percent stock

²³ ownership in Oncor.

²⁴      Q.    Aside from -- and we'll get to that a

²⁵ second -- the 80 percent stock ownership in

1                     PAUL KEGLEVIC

2      attached as one of the exhibits Exhibit --

3          A.    Exhibit C?

4              MR. McKANE:  Are you looking for the

5          illustrative term sheet?

6              MR. STOLL:  Right.

7              THE WITNESS:  I might have actually

8          found something first.

9              MR. McKANE:  28-87-4.

10             THE WITNESS:  It's page 2 of 13?

11             MR. McKANE:  Yes, 2 of 13.

12             THE WITNESS:  I would just like that

13         on the record that I found it first.

14     BY MR. STOLL:

15         Q.    There you go.

16              So, as part of the bid procedure

17     motion, as part of the bid procedure motion,

18     what is attached as Exhibit C is the preferred

19     structure that the Debtor would hope to achieve,

20     fair?

21         A.    Yes.  I think if you read this, it

22     says this is an illustrative -- you know, for

23     illustrative purposes only, but we have not

24     shifted our views.  We have not yet been

25     convinced that a taxable transaction is better

Page 146

1                    PAUL KEGLEVIC

2  for the estates, each of which, by the way,

3  EFIH, EFH and TCEH, who have unsecured

4  creditors, than a tax-free transaction.

5          But this is a procedural motion and

6  we'll get an opportunity when we get those bids

7  and before one is picked, I'm sure, to argue

8  that point, if needed, in front of the Court.

9      Q.   And we talked about this already this

10 morning, that the earlier teaser materials that

11 were sent out specifically informed bidders that

12 the -- originally, that the bids must be

13 structured in a way that achieves the tax-free

14 transaction?

15          MR. McKANE:  Objection to form.

16     Q.    Fair?

17          MR. McKANE:  Misstates prior

18     testimony.

19     A.    The initial teasers did indicate only

20 a tax-free transaction.

21     Q.    Was the document that is attached as

22 Exhibit C to the bidding procedures motion ever

23 delivered to bidders prior to the filing of the

24 motion?

25          MR. McKANE:  Just for the record, when

CONFIDENTIAL

1                    PAUL KEGLEVIC

2        A.      That's correct.

3        Q.      And it's Oncor Electric Delivery

4    Holdings Company that owns the membership

5    interests or stock, whichever way you want to

6    refer to it, of Oncor Electric Delivery LLC,

7    correct?

8        A.      That's correct.

9        Q.      And that is the operating company,

10   correct?

11       A.      That is the operating company.

12       Q.      Is it your understanding that EFH has

13   the ability to sell the assets of Oncor Electric

14   Delivery LLC outside of a plan of reorganization

15   that is confirmed by the Court?

16           MR. McKANE:   Objection.   Calls for a

17       legal conclusion.

18       A.      The assets that we're referring to

19   selling would be the stock, not the assets in

20   the ringfencing.

21       Q.      Right.   Do you think -- is it your

22   understanding that EFH has the ability, the

23   right to sell Oncor Electric Delivery Holding

24   Company LLC's ownership interest in Oncor

25   Delivery -- Electric Delivery Company outside of

1                        PAUL KEGLEVIC

2    treatment, fair?

3         A.    Whether it's best chance or not, we

4    believe that transaction would meet the criteria

5    with all the qualifications associated with

6    getting private letter rulings, et cetera.

7         Q.    Right.  There's lots of conditions

8    that have to happen?

9         A.    Lots of conditions.

10        Q.    Right.  Has the Debtor evaluated a

11   direct purchase by a bidder of the EFIH

12   membership interests to determine whether that

13   transaction would achieve the same tax treatment

14   that the Debtor believes could be achieved by

15   selling the EFH restructured equity?

16            MR. McKANE:  Can you read that back?

17            MR. STOLL:  Let me just strike it.

18            MR. McKANE:  Do you want to do it

19      again?

20            MR. STOLL:  Yes, let me try again.

21   BY MR. STOLL:

22        Q.    We've talked about the Debtors'

23   evaluation of the transactional structure that's

24   embodied in the term sheet, right?  Correct?

25        A.    Correct.

CONFIDENTIAL

Page 157

1          PAUL KEGLEVIC

2      Q.     And that's been going on now basically

3  for a year, correct, give or take?

4      A.     Yes.

5      Q.     Has the Debtor evaluated any other

6  transactional structures short of the one that

7  is embodied in the term sheet that would achieve

8  what it believes is the same tax treatment or

9  tax result as the preferred structure?

10      A.     No, I don't think we did.  I think,

11  you know, and I'm using that structure as a --

12  there can still be some variances in the family

13  of those structures in terms of, depending how

14  big your bid is, how much stock and how much

15  debt, but in terms of that structure, we have

16  not found another way in our work that would

17  achieve a tax-free outcome.

18      Q.     And is it your expectation that in the

19  timeframe set forth in the bid procedures, that

20  the Debtor could thoroughly evaluate a different

21  transaction and reach a conclusion as to its tax

22  structure viability?

23      A.     I think the work we've put in

24  positions us to do just that.

25      Q.     Because you'll have, under the bid

<sup>1</sup>                    PAUL KEGLEVIC

2      A.    I'm not sure yet.

3            MR. McKANE:  That's yet to be

4      determined.

5      Q.    Okay.  What's the cost?  This one-way

6 option is not going to be free, is it?

7      A.    Well, there's always a chance we can

8 get a bidder to go for a zero, but I -- I would

9 think it's likely we're going to have a cost of

10 a fiduciary out.

11     Q.    As chief financial officer, do you

12 have a view as to the range that the cost of

13 this one-way option is likely to cost it?

14           MR. McKANE:  Objection.  Calls for

15     speculation.

16     A.    Yeah, obviously it doesn't -- it

17 doesn't matter what range I think it is.  It

18 matters what I can negotiate with the other

19 party.

20     Q.    I understand that, but has anyone

21 given you any analysis, any indication, orally

22 or in writing, as to what the appropriate range

23 for a debtor-in-possession to spend in order to

24 achieve what you have characterized as a one-way

25 option?

CONFIDENTIAL

1                    PAUL KEGLEVIC

2      A.    Yes, and obviously we'll evaluate the

3  cost versus the benefit once we see how big the

4  bid is too, right?  But the, generally speaking,

5  the numbers that, you know, at least in our

6  negotiations and that we think are, you know,

7  market-based are probably in the range of 3

8  percent of the consideration.

9           So, generally speaking, when I say

10  consideration, this is important to point out,

11  it's around the -- in the NextEra bid, that was

12  around $4 billion.  It's not the $18 billion

13  enterprise value or -- you know, you have to

14  subtract out all the debt to get to what they're

15  really coming up with, the piece of cash and

16  piece of common stock.

17           So we kind of think, if that's the

18  consideration range, that's a reasonable range

19  of a one-way out, that math would be around $120

20  million.  So we hope to do better than that, but

21  we think that's not an unreasonable amount if

22  the bid tops the NextEra bid.

23      Q.    Have you seen any analysis or any

24  studies that suggest to you that the market

25  shift that you have previously testified to is

1                     PAUL KEGLEVIC

2   likely in the next year and a half to equal or

3   exceed $120 million impact on the value

4   available to EFH from the transaction you're

5   currently contemplating?

6       A.    No, but I'm sensitive that on an $18

7   billion enterprise, that's less than 1 percent

8   of a total market shift, which means a small

9   shift can quickly eat up $120 million, but

10  beyond that, we have not done the calculation.

11           I would also tell you, during the

12  process, as we were having discussions with

13  NextEra, there was a decline in their stock that

14  they used to roll back how much they were

15  willing to pay, and their stock almost went down

16  7, 8, 9 percent in a matter of days.

17      Q.    Suggesting that perhaps the market

18  shift that you are concerned about may have

19  already taken place?

20      A.    No, it's come mostly back, but the

21  market is volatile.  So, you know, it's the

22  latest volatility we have seen and, you know,

23  all the other things that could happen that say,

24  like you said, we want to evaluate can we get a

25  reasonably priced one-way option for the -- it's

CONFIDENTIAL

1              PAUL KEGLEVIC

2    an insurance policy.  Is the cost of the

3    insurance policy worth, you know, the bid that

4    we have, and we'll make that determination when

5    we get the stalking horse bid.  But we believe

6    having procedures that allow for the ability to

7    search and study that topic is the right way to

8    go.

9       Q.    To focus back on the necessity for

10   pursuing a transaction and Court approval for

11   bidding procedures now as opposed to some point

12   in the future when -- let me strike all that.

13          Do you, as the CFO and co-chief

14   restructuring officer, have a current vision as

15   to what an appropriate plan of reorganization

16   would look like for the E side of the house?

17          MR. McKANE:  Objection to form.

18      A.    I think it's difficult to come to that

19   determination just looking at the E side of the

20   house given the T side's indications to me

21   personally and in front of the Court that there

22   potentially are claims or other matters that

23   could, you know, cause them to want to reach

24   into that value.

25          So the concept here, and it's another

1          PAUL KEGLEVIC

2     baton.

3          (Recess; Time Noted:  1:32 p.m.)

4          (Time Noted:  1:41 p.m.)

5  EXAMINATION BY

6  MR. SHORE:

7     Q.    Good afternoon, Mr. Keglevic.  I'm

8  Chris Shore from White & Case on behalf of the

9  Ad Hoc Group of TCH Unsecured Notes.

10     A.    Good afternoon.

11     Q.    I'm going to ask you some very basic

12  questions that didn't get asked yet.  First,

13  would you consider the sale of all of the assets

14  of EFH and EFIH to be in the ordinary course of

15  the business of either of those Debtors?

16          MR. McKANE:  Objection.  Calls for a

17     legal conclusion.

18     A.    I don't know what the definition of

19  "ordinary course" is.

20     Q.    Have you ever done it before in your

21  experience --

22     A.    No.

23     Q.    -- as the CFO?

24     A.    I have not.

25     Q.    Would you consider, just have you

1          PAUL KEGLEVIC

2  ever, as CFO, or while you have been CFO, have

3  any of the Debtors ever gone out to market and

4  told the market that you have put all of the

5  assets of any particular company on the block?

6       A.    No, sir.

7       Q.    And have you ever gone out and told

8  the market that you're going to go sell all the

9  assets pursuant to a set of procedures that

10  you're telling to the market?

11       A.    Have not.

12       Q.    Okay.  Would you agree with me that

13  the sale of all, or substantially all, of the

14  assets of EFH and EFIH require expertise?

15       A.    Yes.

16       Q.    Would you agree it requires utility

17  expertise?

18       A.    Yes.

19       Q.    Would you agree it requires M&A

20  expertise?

21       A.    Yes.

22       Q.    Bankruptcy expertise?

23       A.    Yes.

24       Q.    Marketing expertise?

25       A.    I would probably consider that in the

1                    PAUL KEGLEVIC

2   lot shorter if you just tell me who at Evercore,

3   who at K&E, who at employed by any Debtor?

4        A.    Well, there were several names at

5   Evercore.  I mean, it's David Ying, primarily.

6        Q.    David Ying was involved.

7        A.    Hiltz became involved at another

8   point.

9        Q.    Hang on.  I'm going to break this down

10  very tiny.

11       A.    Yes.  Yes.

12       Q.    The decision to sell, you said --

13       A.    The initial decision.

14       Q.    Right.  The initial decision to sell

15  was made by a team, as I understood it, and then

16  brought to a board or boards for review, right?

17       A.    Yes.

18       Q.    Okay.  Who was part of that initial

19  decision team?

20       A.    What I would say our normal

21  restructuring team internally:  Carla Howard,

22  Tony Horton, myself, Stacey Doré, probably Andy

23  Wright, who is the assistant general counsel on

24  her team.

25       Q.    Okay.

Page 186

1                         PAUL KEGLEVIC

2      A.    The Kirkland team -- would you like

3 names?

4            Sassower.  Hessler.  I think Rick

5 Cieri was involved then.  He has since made a

6 decision to retire.  I don't think they're

7 related.  Husnick.  There may be a few more on

8 that side and Ying obviously had some support on

9 his side of the house.

10      Q.    And but we're clear that it was Mr.

11 Hiltz involved in the decision to sell?

12      A.    Probably on the initial decision to

13 sell, Hiltz was not yet involved.

14      Q.    Was there anybody else who brought to

15 bear any of that expertise you said was

16 necessary to make a determination to sell?

17      A.    No, other than the individual board

18 members who participated in the process.

19      Q.    All right.  So let's go there.  So the

20 team that -- let's talk about this.  I'll define

21 it as the decision team.  Okay?

22            The decision team, they brought that

23 to a board or boards, right?

24      A.    Yes.

25      Q.    Okay.  And when did they do that?

1                    PAUL KEGLEVIC

2      Q.    But other than those, with that

3  additional one, those are the only ones that

4  even met to discuss whether or not bidding

5  procedures in the sale of E side assets is

6  appropriate?

7      A.    That's correct.

8      Q.    All right.  And when you say the

9  Debtors and debtors-in-possession, you

10  understand --

11            MR. McKANE:  Hold on.  Do you want to

12      go off the record for a second?

13            (Discussion off the record.)

14  BY MR. SHORE:

15      Q.    All right.  Did any of the boards

16  delegate to either the decision team or the

17  process team, as we've defined them, the

18  responsibility for pursuing the bidding

19  procedures motion?

20            MR. McKANE:  Objection to form.  Calls

21      for a legal conclusion.

22      Q.    In other words, what do you understand

23  your authority to be with this?

24            MR. McKANE:  Same objection.

25      A.    We brought every relevant

PAUL KEGLEVIC

1

2  consideration and the final timeline and the

3  substance of the motion to the board before we

4  filed it.

5       Q.    Okay.  You understand there are risks

6  in any marketing process?

7       A.    Sure.

8       Q.    So, for example, you understand, for

9  example, it's important to make every statement

10 you make to the market as accurate as possible,

11 right?

12            MR. McKANE:  Objection.  Form.

13      A.    I'm sure that would be your objective,

14 yes.

15      Q.    Right, because you understand that if

16 the market understands you're not providing them

17 with accurate information, it creates an

18 overhang on the price they're willing to trade,

19 right?

20      A.    It could.  It depends on the

21 information and the significance of it to their

22 bid.

23      Q.    Right.  And if it's really significant

24 information and you get it wrong, that could

25 have a depressive effect on the price that

1          PAUL KEGLEVIC

2     person you primarily relied upon for M&A and

3     marketing experience?

4          A.    Yes.

5          Q.    What effort did you or are you aware

6     anybody at the Debtors making to understand Mr.

7     Hiltz's expertise in the area of marketing and

8     selling power assets?

9          A.    When Evercore suggested he came on the

10    team, I think it was either Roger Altman or

11    David Ying or both gave me a summary of his

12    background, and I think my recollection was we

13    shared that with our board.

14         Q.    Okay.  And are you aware of whether he

15    has any expertise in buying or selling power

16    assets?

17         A.    I believe he's had some in buying and

18    selling power assets, but he's also supplemented

19    by Mr. Ying, who is a power expert.  So,

20    together, I think they have the right skills.  I

21    think most of the M&A that Mr. Hiltz has done

22    probably in fairness of dollars is not in our

23    sector, but Mr. Ying we thought made up for

24    that.  That's why we supplemented him and didn't

25    eliminate Mr. Ying from the process.

CONFIDENTIAL

1          PAUL KEGLEVIC

2      Q.    Well, that's what I don't understand.

3  Are they up for auction or not?  I'm not asking

4  you whether you're going to accept the bid; I'm

5  just asking whether they're in the auction?

6      A.    No, they're not in the auction.

7      Q.    And what about the next line item,

8  which is line item 35 on page 14 of 305.  Other

9  personal property, $144 million, is that up for

10  auction?

11      A.    I'm sorry, I can't find it on that

12  next page.

13      Q.    It's on page --

14      A.    Okay.  Here it is.

15      Q.    -- 14 of 305.

16      A.    I think those are assets primarily

17  related to TCEH employee pension plans and other

18  post-employment benefits, so the answer to those

19  would be no.

20      Q.    Okay.  And things that aren't on the

21  schedules, claims and causes of action that EFH

22  might own against officers, directors,

23  shareholders, are those up for auction?

24      A.    No.

25      Q.    Okay.  So am I correct to say, if you

1                          PAUL KEGLEVIC

2    go back to the beginning of Exhibit 3, that

3    there are certain -- certain bids, right?  There

4    are certain assets?

5         A.    That are not for sale.

6         Q.    That are not for sale?

7         A.    I would agree with that.

8         Q.    And have you told anybody in the

9    market that certain assets aren't for sale?

10        A.    Everybody that we've gone through in

11   due diligence, we walked them through the

12   schedule and talked to them about our plan and

13   what we believe the disposition of those assets

14   will be.

15        Q.    Okay.  And you understood that these

16   buyers were told these particular assets weren't

17   for sale?

18        A.    Yes.

19        Q.    Even though the motion says that they

20   are for sale?

21        A.    I think they rely more on what we tell

22   them than what the motion said.

23        Q.    Right.  So have you kept any record of

24   everything you've been telling your potential

25   bidders about what is and is not for sale and

CONFIDENTIAL

1                    PAUL KEGLEVIC

2    market evidence about the reasonableness of that

3    month.

4        Q.    But, but you will agree with me that

5    the -- well, first of all, have you had any

6    discussion or do you have any belief that you're

7    going to be able to get somebody to -- to take a

8    put option from the company at any price at any

9    cost?

10              MR. McKANE:  Objection.

11       Q.    So let's talk about what the option is

12   just so we're clear on the record, right.  You

13   have got post-reorg. equity that you want to

14   the, because of market volatility, be able to

15   put to somebody at a specific price?

16       A.    Right.

17       Q.    At the closing date, right?

18       A.    That's correct.

19       Q.    All right.  And you recognize that

20   your ability to put at that price is only as

21   strong as your ability to force them to take the

22   equity at that time, right?

23              MR. McKANE:  Objection to form.

24   Overbroad and calls for speculation.

25       A.    Yeah, I mean, they're committed to

CONFIDENTIAL

1                    PAUL KEGLEVIC

2            Do you have an understanding as to

3    whether you will be able to get somebody else to

4    take the risk if you can't get a plan confirmed?

5            MR. McKANE:  Can you just read that

6        back?  I'm not certain you said what you

7        meant to say.

8        A.    Yeah, I would ask that you rephrase.

9    I want to make sure I answer it correctly.

10       Q.    Sure.  Sure.  Again, we got to get to

11   what the terms are of this option and allocating

12   risks, right?

13           So the idea is what you want is the

14   ability to put the post-reorg. equity to

15   somebody at a later date, right?

16       A.    Right.

17       Q.    Regardless of what the actual value is

18   of the Oncor stake at that time, right?

19       A.    Correct.

20       Q.    And you want the ability to walk for a

21   2 to 3 percent amount, at the most, if the value

22   has gone up and somebody else is willing to do

23   it?

24       A.    That's correct.

25       Q.    Okay.  And on the other side, you want

CONFIDENTIAL

1                PAUL KEGLEVIC

2  somebody to put in a deposit of a not

3  insignificant sum, right?

4       A.    Right.

5       Q.    Tie up their M&A ability for the next

6  18 months, right?  Because they're going to have

7  to have commitments to you to take down the

8  post-reorg. equity in 18 months, right?

9            MR. McKANE:  Object to form.  Calls

10      for speculation.

11      A.    Right.

12      Q.    And if the price has plummeted, you

13 want to be able to force them to take the equity

14 even if that causes them to lose billions of

15 dollars?

16      A.    That's correct.

17      Q.    Right?  Because in the end, what you

18 are doing is you are shifting all the risk of

19 loss on the Oncor investment to the prospective

20 purchaser for the next 18 months?

21           MR. McKANE:  Objection to form.

22      Calls --

23      Q.    Right?

24           MR. McKANE:  It calls for a legal

25      conclusion.

CONFIDENTIAL

1        PAUL KEGLEVIC

2   of a $40 billion company, that you have at least

3   a working view as to how option pricing works?

4       A.    Yes.

5       Q.    Good.  Now, with respect to option

6   pricing, when things that all of the -- and I

7   think you said this before, just to make

8   clear -- all of those things that affect option

9   pricing play off each other, right?

10      A.    Yes.

11      Q.    Right.  So that, for example, when the

12  duration goes out, the price might have to come

13  down, right?

14          MR. McKANE:  Objection to form.  Calls

15      for speculation.

16      A.    Depends, right.

17      Q.    Right.  It could.  So one of the

18  things that could happen here is, as you ask

19  people to write these options and take on a put

20  obligation in the future that puts their entire

21  balance sheet on the line for a transaction that

22  can't close for 18 months, one thing, one thing

23  that might happen is that the price they're

24  willing to pay, the strike price, is going to be

25  depressed?

CONFIDENTIAL

1               PAUL KEGLEVIC

2          MR. McKANE:  Objection.  It's an

3     incomplete hypothetical.

4     A.     I was going to say there's many things

5     that can happen.

6     Q.     Right.

7     A.     I will accept that could be one of

8     them, but your characterization that they're

9     entire balance sheet on hold isn't true for many

10    of the strategics we're dealing with.

11    Q.     No, I'm saying they're putting their

12    entire balance sheet on the line.  Let me give

13    you an example?

14    A.     They're not putting their entire

15    balance sheet on the line.

16    Q.     Let's be clear.  Let's be clear.  You

17    have, under the terms as I have read them, you

18    have promised to sell them the EFH equity.  All

19    right?  If in fact, just so I understand how

20    this option works, if in fact you get to the

21    closing and you've done a plan here and

22    everything's done except Oncor, Oncor is now

23    worth $500 million, is that an "out" of this

24    option?

25    A.     No.

1                    PAUL KEGLEVIC

2        A.    As part of the optimum procedures,

3    yes.  I mean, that's what was in the number, but

4    that's what's in the filing, but that's to be

5    negotiated.

6        Q.    All right.  So let me just ask you as

7    a CFO and an option, if I told you that the

8    chance of getting to the plan by 12/31/15 was

9    zero, how would that affect your willingness to

10   tie up your capital for 12 months?

11             MR. McKANE:    Objection.

12       A.    It would be something I would have to

13   consider.

14       Q.    Right.  Can you think of any

15   circumstance in which you would commit your

16   capital where you would have to pay on the

17   option if the possibility you were going to be

18   able to take the asset was zero?

19       A.    Well, it's a hypothetical that how do

20   we know it's zero?

21       Q.    Right, and you can't -- I can't tell

22   you whether it's zero.  Mr. Qureshi can't tell

23   you whether it's a hundred.  Nobody at this

24   table can tell you what the likelihood is that

25   we're going to get the plan confirmation by

CONFIDENTIAL

1          PAUL KEGLEVIC

2    12/31/15, right?

3         A.    Correct.  I think the buyer's going to

4    have to make his own determination of what that

5    risk is.

6         Q.    Right.  And one of the things we

7    talked about, just to bring this around, if they

8    form a view as to the likelihood the plan is

9    going to get done is 10 percent, that's going to

10   affect the other things in the option.  It could

11   affect the cost, it could affect the price,

12   right?

13        A.    It could.  The preliminary bids have

14   not indicated that's the case.  I mean, it's

15   hard to say that we're getting bids that are at

16   close to market highs and that these potential

17   risks have been weighing on the value of that

18   bid.

19        Q.    Have you told people that you get a

20   walk right and that if this plan doesn't get

21   confirmed by 12/31/15 you walk away for no cost?

22        A.    Well, it's in these procedures; I

23   think that's what it indicates.

24        Q.    Where does it in the procedures

25   indicate that the Debtors bear no responsibility

1          PAUL KEGLEVIC

2          (Record read.)

3          MR. SHORE:  I think I'll rephrase

4     that.

5     BY MR. SHORE:

6     Q.    Is there any reason you're out seeking

7     this put, which is essentially what it is, other

8     than your concern with respect to the volatility

9     of the asset?

10     A.    Yes, that there are willing buyers

11     today, so even if the asset isn't volatile, who

12     knows that there could not be buyers, for

13     whatever reason, even at the same value.

14     Q.    Does it matter whether you have 100

15     buyers at one price or 3 buyers at one price?

16     A.    I, my assumption, we could end up with

17     zero buyers at this price.

18     Q.    Right, which means the value has

19     fallen because you can't get a willing buyer to

20     take the asset?

21     A.    Not necessarily.  It could be buyer

22     strategies have changed; it could be something

23     that happened at their companies that reduced

24     their financial wherewithal.

25     Q.    All right.  So buyer identity, right?

1                    PAUL KEGLEVIC

2        A.      Right.

3        Q.      Identity and strategy?

4        A.      Right.

5        Q.      And market?

6        A.      And included in market, debt markets.

7        Q.      Okay.  So market would be interest

8    rates?

9        A.      I didn't say interest rates.

10       Q.      Okay.

11       A.      But --

12       Q.      Well, that's the debt, right?

13       A.      You make it to debt.  It's twofold.

14   If I can finish, I was going to say availability

15   of debt and at what price.

16       Q.      Okay.

17       A.      And then, obviously, the value of

18   Oncor itself is another capital market risk.

19   Those are the three I believe I have testified

20   to today.

21       Q.      Okay.  Value of Oncor in the market.

22               Okay.  Who did you rely upon or who on

23   either the decision team or the process team did

24   you rely upon to provide you advice with respect

25   to whether or not there are going to be buyers

CONFIDENTIAL

1        PAUL KEGLEVIC

2    A.    It's sporadic, as needed.  It's really

3 being driven by Evercore and their

4 professionals, and we don't -- we don't have any

5 people per se dedicated to the process.

6    Q.    This market risk, which is, you know,

7 the possibility that either bidders won't show

8 up or there will be a change in market such that

9 the price gets depressed, what alternatives did

10 you look at besides running this process and

11 going out and buying this kind of option?

12    A.    I specifically did not look at

13 alternative processes.  We asked Mr. Hiltz what

14 he thought the best way to achieve the

15 objectives, and this is the process he came back

16 to me with.

17    Q.    Well, let's be clear about what you

18 asked him.  Did you ask him what's the best way

19 to go out and buy this option, or did you ask

20 him what's the best way to mitigate against the

21 risk that Oncor falls or the bidders dry up?

22        MR. McKANE:  Hold on a second.  Which

23    question do you want him to answer?  That's

24    three questions.

25        MR. SHORE:  Objection to form.

CONFIDENTIAL

1                    PAUL KEGLEVIC

2            I got it.

3  BY MR. SHORE:

4       Q.    I'll break it into pieces.  What

5  exactly do you remember asking Mr. Hiltz?

6       A.    We asked him to design a process that

7  would achieve the two objectives that we've

8  talked a lot about today.

9       Q.    Which were what?

10      A.    That to give us a floor or a one-way

11 option to reduce market risk and to maximize the

12 value to the estate of the auction.

13      Q.    Okay.  So it was always premised on

14 we're going to sell the asset, right; the EFH

15 reorganized equity, we're going to sell it now,

16 and that's the way you're going to mitigate the

17 risk that the -- that equity won't be worth as

18 much at a later date, your price will be --

19      A.    I think that's fair, with the

20 understanding that is this a good time to sell?

21 Yes.  And if we sell now, what's the best way to

22 structure the process to meet these objectives?

23      Q.    Okay.  Other than this, you know,

24 going out and buying an option to put

25 reorganized equity 18 months out, did you

CONFIDENTIAL

1                    PAUL KEGLEVIC

2   it in; if not, have a process that allows me to

3   capture it.

4       Q.    What analysis have you done besides

5   looking at the multiples to tell you you're

6   selling at the best price now as opposed to a

7   good price?

8       A.    That some of these were at all-time

9   high and they have exceeded the averages over

10  the last reasonable period of time.

11      Q.    Okay.  But did you do any -- I said

12  what analysis have you done.  Is there an

13  analysis there?

14      A.    You mean did I write it down and put

15  it on a piece of paper?

16      Q.    Yes.

17      A.    I did not.

18      Q.    My son sold GoPro the other day, to

19  his horror, because it was at an all-time high

20  and it's gone up 30 bucks since then, and he's

21  learning now about the analysis of whether it's

22  at a high price means the best price.

23          Is there anything, any document at all

24  you can point to -- a valuation, analyst report

25  or anything else -- that says this is the right

CONFIDENTIAL

1              PAUL KEGLEVIC

2  time to sell?

3      A.    No, other than the information that I

4  have said and the consultation I've had with

5  them, and before we lock in a stalking horse, we

6  will have additional information to make that

7  decision.

8      Q.    Is there any reason why you wouldn't

9  have instructed the people who were talking to

10 bidders to take notes of what they're saying to

11 the bidders?

12     A.    It didn't occur to me and I would

13 imagine that my -- I don't -- I'm not familiar

14 with a situation where that kind of level of

15 detail is done in connection with a typical bid

16 process.

17     Q.    Right.  Well, you've never been

18 involved in an auction, right?

19     A.    I've not as a CFO, but I was an

20 auditor of companies that were going through

21 mergers and acquisitions and I saw their

22 documentation.

23     Q.    All right.  So you got some questions

24 about conflicts before.  Can you say whether you

25 did anything at all during the process we