# EXHIBIT 10

1          CONFIDENTIAL - WILLIAM O. HILTZ

2   UNITED STATES BANKRUPTCY COURT

3   FOR THE DISTRICT OF DELAWARE

    -----------------------------------------x

4   In Re:

    Energy Future Holdings Corporation, et.,

5

                    Debtors.

6

    Chapter 11

7   Case No. 14-10979

    Jointly Administered

8

9   -----------------------------------------x

10          * * *CONFIDENTIAL* * *

11       DEPOSITION OF WILLIAM O. HILTZ

12           New York, New York

13           October 6, 2014

14

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 85363

1            CONFIDENTIAL - WILLIAM O. HILTZ

2    assessing those recoveries?

3        A.    This is, you know, 25 years ago.  I

4    don't recall exactly.  I mean, I worked on the

5    Eastern case and was testifying as to what I

6    thought the potential recoveries to the

7    unsecured creditors would be.

8        Q.    How long ago was your testimony in the

9    tax court?

10       A.    30-some-odd years ago.

11       Q.    And what was the topic of your

12   testimony in the Continental case?

13       A.    I don't recall, but I believe it was

14   regarding the sale of Continental to David

15   Bonderman, Air -- which is now at TPG, then the

16   predecessor to TPG, Air Partners, and Air

17   Canada.

18       Q.    And when was that testimony?

19       A.    Would have been 1993.

20       Q.    Since 1993, have you testified in any

21   court?

22       A.    No.

23       Q.    Have you ever testified in deposition

24   before today?

25       A.    Many times.

1          CONFIDENTIAL - WILLIAM O. HILTZ
2    under number 6, which is transactions that I
3    have worked on; and I may have made some other
4    small language changes, but that's about it.
5          Q.    But the substance came from Kirkland &
6    Ellis?
7          A.    Well, the substance came --
8                MS. O'CONNOR:  Object to form.
9          A.    The substance came from me and was
10   written up by Kirkland & Ellis.
11         Q.    And when you say the substance came
12   from you, did you have conversations with
13   Kirkland & Ellis regarding the content of the
14   declaration before it was drafted?
15         A.    Yes.
16         Q.    The declaration was true and accurate
17   when you signed it?
18         A.    Yes.
19         Q.    Mr. Hiltz, when did you first become
20   involved in this matter?
21         A.    Oh, I don't recall the exact date, but
22   I would say it was the third -- third week of
23   August.
24         Q.    And prior to the third week in August,
25   had you been involved in this matter at all?

1           CONFIDENTIAL - WILLIAM O. HILTZ

2    on behalf of the Debtors with certain topics for

3    which you have knowledge, you are here to

4    testify in your personal capacity pursuant to

5    this deposition notice, correct?

6         A.    This is the first time I've seen this

7    deposition notice.

8         Q.    Are you aware that you are testifying

9    here in your personal capacity in addition to as

10   a 30(b)(6) witness?

11        A.    No.

12        Q.    Do you have any concern testifying

13   today in your personal capacity?

14        A.    No.

15        Q.    Mr. Hiltz, your expertise is in the

16   M&A sphere; is that accurate?

17        A.    That's correct.

18        Q.    And your expertise is more in the M&A

19   field than in restructurings?

20        A.    That's correct.

21        Q.    And within your M&A experience, the

22   vast bulk of that experience is outside the

23   power asset and utility sectors?

24        A.    The bulk of it is, yes.

25        Q.    What experience do you have in M&A in

1                 CONFIDENTIAL - WILLIAM O. HILTZ

2        A.     Advise the board.

3        Q.     Of the seller or the buyer?

4        A.     Of the seller.

5        Q.     And I take it that was not in a

6   bankruptcy situation?

7        A.     No, it was not.

8        Q.     So you have no experience in the power

9   asset or utility sector in bankruptcy?

10       A.     That's correct.

11       Q.     Mr. Hiltz, Mr. Keglevic testified on

12  Friday that most of the M&A that you have done

13  is not in our sector, meaning --

14       A.     That's correct.

15       Q.     -- business, but that Mr. Ying did

16  have that experience?

17       A.     I think that --

18              MS. O'CONNOR:  Object to form.

19       A.     I think that would more accurately be

20  Sesh.

21       Q.     Does Mr. Ying have experience in the

22  power asset and utility sectors that you are

23  aware of?

24       A.     I believe he does.

25       Q.     Fair to say that he has more

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    believe is an efficient structure.  I'm not sure

3    it's the optimal structure.  Someone may come up

4    with a structure that's better than ours.

5        Q.    Now, the efficient structure that you

6    refer to contemplates a transaction through

7    post-reorganized EFH equity?

8        A.    Yes.

9        Q.    Now, you understand that there are

10   creditors at the EFH level, correct?

11       A.    Correct.

12       Q.    And creditors at the EFIH level,

13   correct?

14       A.    Correct.

15       Q.    And you understand that the creditors

16   at the EFH level are structurally junior to the

17   creditors at the EFIH level, correct?

18       A.    Yes.

19       Q.    So you're -- am I correct in

20   understanding that your efficient transaction

21   structure, as you referred to it, contemplates

22   paying creditors at the EFIH level in full?

23       A.    Yes.

24       Q.    Mr. Hiltz, back to the sale process

25   that we were discussing before earlier, when did

CONFIDENTIAL - WILLIAM O. HILTZ

1   Bank of America Merrill Lynch become involved in

2   the sale process?

3       A.    Bank of America Merrill Lynch was

4   involved at the time that I became involved.

5   I'm not sure exactly when they became involved.

6       Q.    Do you know if they became involved

7   before or after you?

8       A.    I just said they were involved when I

9   became involved, so that, by definition, means

10  they were involved before.

11      Q.    To your knowledge, who approached Bank

12  of America Merrill Lynch?

13      A.    I don't know the answer to that.

14      Q.    Do you have any understanding of why

15  Bank of America Merrill Lynch was brought in?

16      A.    My understanding was that the company

17  felt that two sets of eyes might be better than

18  one.

19      Q.    Do you have any understanding why Bank

20  of America Merrill Lynch did not become engaged?

21      A.    I believe it was felt that they had a

22  conflict because of their participation in one

23  of the DIP facilities.

24      Q.    And that conflict was not identified

1          CONFIDENTIAL - WILLIAM O. HILTZ

2      Q.    Do you know if anyone at Evercore has

3  a log of those phone calls?

4      A.    Not that I'm aware of.

5      Q.    But it is your understanding that

6  every prospective bidder was informed of that?

7      A.    That's my understanding.

8      Q.    Mr. Hiltz, going back to the now -- to

9  the 12 original NDAs that were signed as of the

10  date of your declaration, the prospective

11  bidders that entered into those 12 NDAs all

12  received teaser materials prior to signing the

13  NDA; is that correct?

14      A.    I believe so.

15          (Hiltz Exhibit 9, an e-mail chain with

16      attachment bearing Bates Nos.

17      EFH-EVR909999913 through 25, marked for

18      identification, as of this date.)

19  BY MR. DEVORE:

20      Q.    Mr. Hiltz, I have handed you what has

21  been marked as Exhibit 9, which again is an

22  e-mail from Sesh, this time dated July 25 to a

23  prospective bidder attaching teaser materials;

24  is that correct?

25      A.    Correct.

1              CONFIDENTIAL - WILLIAM O. HILTZ

2         Q.     Is this the version of teasers that

3    went out to prospective bidders in July?

4         A.     I believe it is.

5         Q.     And this is -- are you aware of the

6    next version of a teaser?

7         A.     Yes, I am.

8         Q.     And what is the date of that?

9         A.     I don't recall the date.

10        Q.     August?

11        A.     Might be early September.

12        Q.     Now, if we turn to page 1 of the

13   presentation, which is a few slides back with

14   the Bates number ending in 018, are you on that

15   page?

16        A.     Uh-huh.

17        Q.     Now, turning your attention to the

18   third bullet point, it states that, "The company

19   is pursuing a restructuring transaction, the TCH

20   spinoff, whereby, on the emergence date, TCH

21   will separate from EFH on a tax-free basis and

22   reorganized EFH would continue to own 100

23   percent of EFH and its 80 percent interest in

24   Oncor." Do you see that?

25        A.     Yes.

Page 82

CONFIDENTIAL - WILLIAM O. HILTZ

1

2     Q.     Do you know who at the Debtors made
3  the decision to accept bids in any form?
4     A.     I would assume it was Paul and Stacey.
5     Q.     Do you know if any of the boards of
6  EFH, EFIH or TCEH voted on that change?
7     A.     I don't recall.
8     Q.     Do you know if the boards were
9  informed or consulted on the change to accept
10  bids in any form?
11     A.     I believe so, but I'm not sure.
12     Q.     What is the basis for that belief?
13     A.     I believe we reviewed -- I believe the
14  board reviewed the bidding procedures motion
15  prior to its filing.
16     Q.     Are you aware of any vote with respect
17  to the filing of the bidding procedures?
18     A.     No.  No.
19          (Hiltz Exhibit 12, an e-mail chain
20     bearing Bates Nos. EFH-EVR090000362 through
21     363, marked for identification, as of this
22     date.)
23  BY MR. DEVORE:
24     Q.     Mr. Hiltz, this is an e-mail from Sesh
25  dated September 12, 2014, to a prospective

1          CONFIDENTIAL - WILLIAM O. HILTZ

2      A.     I believe it was made before September

3    12.

4      Q.     And why do you believe that?

5      A.     Because what was the date that we

6    filed the bidding procedures motion?

7      Q.     It's dated on September 19.

8      A.     Well, it may not have been before the

9    12th then.  Obviously, it was before we filed

10   the bidding procedures motion and it was at

11   least several days, if not a week, before that.

12   I don't recall the exact date.

13     Q.     Mr. Hiltz, as of September 12, are you

14   aware of the Debtors or Evercore indicating to a

15   single prospective bidder that the Debtors would

16   accept bids for a taxable transaction?

17     A.     Not specifically.

18     Q.     Do you have any reason to believe

19   that, prior to September 12, a single bidder was

20   informed that the Debtors would be accepting

21   bids for a taxable transaction?

22     A.     Again, I can't recall the exact date

23   that we started telling people that we would

24   accept bids for a taxable transaction.

25     Q.     Do you consider the change from

1          CONFIDENTIAL - WILLIAM O. HILTZ

2              (Hiltz Exhibit 13, an e-mail chain

3         bearing Bates Nos. EFH-EVR090000047 through

4         48, marked for identification, as of this

5         date.)

6    BY MR. DEVORE:

7         Q.    Mr. Hiltz, you have been handed what

8    has been marked as Exhibit 13.  Do you see that?

9         A.    Yes.

10        Q.    And the second e-mail down is an

11   e-mail dated September 10 from Bo Yi?

12        A.    Yes.

13        Q.    And it states, "We haven't sent out an

14   updated teaser or other marketing materials to

15   any parties yet"?

16        A.    Yes.

17        Q.    Do you see that?

18              Does this indicate that no updated

19   teasers had gone out as of September 10?

20        A.    Yes.

21        Q.    So, to the best of your knowledge, the

22   teaser was not changed to provide for bids in

23   any form as of September 10, correct?

24        A.    Correct.

25        Q.    Now, when were the 12 prospective

CONFIDENTIAL - WILLIAM O. HILTZ

1  bidders that signed NDAs as of the date of your

2  declaration informed of the change from inviting

3  bids for only non-taxable structures to inviting

4  bids for transactions in any form?

5       A.    I'm not sure.

6       Q.    Was it prior to September 19, the

7  filing of the motion?

8       A.    I believe so, but I can't state for

9  certain.

10      Q.    What's the basis for the belief?

11      A.    Well, we called people to tell them

12 that we were going to change the process, and I

13 can't recall if as part of those telephone

14 conversations they were alerted to the fact that

15 we would also accept taxable bids as well as

16 non-taxable bids.

17      Q.    And would that information be kept in

18 a call log?

19      A.    Not necessarily, no.

20      Q.    Would you expect that it may be in a

21 call log?

22      A.    I wouldn't think it would be.

23      Q.    And why not?

24      A.    Well, because the call log isn't

1          CONFIDENTIAL - WILLIAM O. HILTZ

2   specific with respect to the content of the

3   conversation.

4          Again, we attempted to call everyone

5   once we had made a decision to change the

6   process, so I believe those calls started

7   perhaps late the week before Labor Day or early

8   the week following Labor Day.  I can't recall if

9   those calls merely stated that we were giving

10  people more time and were going to a two-stage

11  process or whether it also referenced a

12  willingness to accept taxable bids.

13      Q.    So, sitting here today, you have no

14  knowledge of a communication, prior to September

15  19, a specific knowledge of a specific

16  communication informing prospective bidders that

17  the Debtors would accept bids in any form?

18      A.    That's correct.

19          (Hiltz Exhibit 14, an e-mail with

20      attachment bearing Bates Nos.

21      EFH-EVR090001062 through 1167, marked for

22      identification, as of this date.)

23  BY MR. DEVORE:

24      Q.    Mr. Hiltz, I have handed you what has

25  been marked as Exhibit 14, which is an e-mail

CONFIDENTIAL - WILLIAM O. HILTZ

1
2          Number two, there have been a series
3  of telephone conversations with a number of the
4  bidders, a couple of which I have participated
5  in, that have occurred over the course of the
6  last ten days to make it explicit to those
7  parties that we're prepared to consider other
8  transactions.
9          It was in the context of those calls
10  that people have expressed surprise that we
11  would consider a taxable transaction because
12  it's not viewed as being an efficient way of
13  creating value.
14      Q.    Is there a reason Evercore didn't call
15  out in the cover e-mail that the transaction
16  process had changed?
17      A.    Well, it's quite evident in the
18  bidding procedures that -- no particular reason
19  to call that out as well as anything else.
20      Q.    You didn't consider it an important
21  change that prospective investors would want to
22  be informed about?
23      A.    There are a whole lot of changes to
24  the process that are important.  We're not
25  calling out in the cover letter that you have

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    third Continental bankruptcy to David Bonderman

3    and Air Partners and Air Canada.

4          Q.    All right.  Have you ever -- did you

5    run that bankruptcy auction?

6          A.    Yes.

7          Q.    Have you ever advised a bidder in a

8    bankruptcy auction?

9          A.    No.

10          Q.    Have you ever advised a creditor in a

11    bankruptcy auction?

12          A.    No.

13          Q.    Have you ever read a book or article

14    on bankruptcy auctions?

15          A.    No.

16          Q.    Okay.  Do you understand that in

17    certain times experts will read in the area of

18    their expertise?

19          A.    Yes.  Again, I'm not here as a

20    bankruptcy expert.  I'm here as a general merger

21    and acquisition expert.

22          Q.    Did you ever advise any entity with

23    respect to the purchase or sale of post-reorg.

24    equity?

25          A.    No.

CONFIDENTIAL - WILLIAM O. HILTZ

1

2      Q.    All right.  Have you ever read any

3  case law on bankruptcy auctions or

4  post-reorganization equity?

5      A.    No.

6      Q.    You're going to have to let me finish

7  my question and then you can say no.

8          Do you understand that there are

9  differences between a bankruptcy auction and a

10 general M&A marketing process?

11     A.    Yes, I do.

12     Q.    So, for example, a bankruptcy auction

13 has court supervision?

14     A.    And has -- generally, has this open

15 auction concept at the end of the process.

16     Q.    What other differences do you know

17 about?

18     A.    Those would be the primary ones.

19     Q.    Are you aware that bidders, for

20 example, have potential criminal penalties if

21 they collude in the bankruptcy auction?

22     A.    No, I'm not.

23     Q.    Are you aware that Bankruptcy Court

24 can provide a free and clear order with respect

25 to a sale that you couldn't get outside of

1              CONFIDENTIAL - WILLIAM O. HILTZ

2   concerns are of a Debtor in an auction that

3   don't exist with respect to an out-of-court M&A

4   process?

5       A.    Well, I mean, in my view, it's how

6   that process fits into the overall plan of

7   reorganization.

8       Q.    And this is based upon your one

9   auction that you participated in?

10      A.    Correct.

11      Q.    Okay.  And do you understand what the

12  particular concerns are of a bidder in a

13  bankruptcy process that don't exist in the

14  normal M&A process?

15      A.    Only with respect to the execution

16  risk associated with a bankruptcy.

17      Q.    Okay.  But you don't know any other

18  concerns because you have never represented a

19  bidder in an auction process --

20      A.    Correct.

21      Q.    -- bankruptcy auction process?

22      A.    Correct.

23      Q.    Do you have any understanding of what

24  the general concerns are of creditors in a

25  bankruptcy when a Debtors' assets are being sold

CONFIDENTIAL - WILLIAM O. HILTZ

1
pursuant to an auction?

3     A.    I think I have a layman's
4 understanding of that.

5     Q.    What's that?

6     A.    Concern that you're getting the best
7 possible price for the asset.

8     Q.    And are you aware of any other
9 concerns that exist?

10     A.    No.

11     Q.    Do you have any understanding of the
12 specific concerns about post reorganization --
13 or, the sale of post-reorganization equity
14 before a plan is filed?

15     A.    I'm sorry.  State the question again.

16     Q.    Sure.  Are you aware of any specific
17 concerns that exist with respect either from the
18 Debtors side, creditors side, bidders side when
19 you are selling post-reorganization equity
20 before a plan is on file?

21     A.    Well, only to the extent that the
22 buyer obviously needs to know what liabilities
23 and assets he is purchasing.  So, to the extent
24 that that's going to be driven by the plan of
25 reorganization, there are issues surrounding

1            CONFIDENTIAL - WILLIAM O. HILTZ

2    that.

3         Q.    All right.  Are you aware of any

4    instance in which anybody's ever marketed and

5    sold post-reorganization equity before a plan

6    has been put on file?

7         A.    Not personally, no.

8         Q.    Did you ever ask anybody whether it's

9    ever been done?

10        A.    No.

11        Q.    Just to get a sense of your due

12   diligence, can you identify the sponsors of EFH?

13        A.    TPG.  I can't recall who else.

14        Q.    Okay.  Did you ask to meet with any of

15   the sponsors as part of your process of --

16        A.    No, the only --

17        Q.    You got to let me finish my question.

18              As part of your process of forming

19   opinions about whether or not to sell the

20   post-reorg. equity at this time, did you ask to

21   meet with any sponsor?

22        A.    No.

23        Q.    Okay.  Can you identify --

24        A.    Other than the members of the sponsors

25   who were on the board of directors, and I've met

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    with them only in the context of board meetings.

3          Q.    And who are those people?

4          A.    The two guys from TPG, David

5    Bonderman, and the name of the other one is

6    escaping me at the moment.

7          Q.    Can you identify the CEO, CFO, COO or

8    treasurer of Oncor?

9          A.    The CFO is Paul Keglevic.  The

10   treasurer is Tony Horton.  The general counsel

11   is Stacey Doré.  I have not met with CEO.

12         Q.    And that's your view of the senior

13   management of Oncor?

14         A.    Oh, I'm sorry.  Of Oncor.  I'm sorry,

15   I misspoke.  EFH.  No, I have not met any of

16   those individuals at Oncor.

17         Q.    Did you ask to meet with any of them?

18         A.    No.

19         Q.    Do you have any doubt that as the

20   investment banker for the entity which holds an

21   80 percent stake in Oncor, that if you had asked

22   to meet with any of those people, you would have

23   been given an audience with them?

24         A.    That's probably correct.

25         Q.    All right.  Do you know who the CEO,

```
 1            CONFIDENTIAL - WILLIAM O. HILTZ
 2    CFO, COO, or treasurer is of Luminant?
 3         A.    No, I don't.
 4         Q.    TXU Energy?
 5         A.    No, I don't.
 6         Q.    Did you ask to meet with any of those
 7    people?
 8         A.    No.
 9         Q.    Do you know the identity of any
10    employee of EFIH?
11         A.    No.
12         Q.    Did you ask to meet with any employees
13    of EFIH?
14         A.    No.
15         Q.    Do you know the identity of
16    employees -- any employee of Oncor?
17         A.    No.
18         Q.    Did you ask to meet with any of them?
19         A.    No.
20         Q.    You talked about the EFH board.  Have
21    you met with any board member of Oncor?
22         A.    No.
23         Q.    Do you know who's on the board of
24    Oncor?
25         A.    No.
```

1            CONFIDENTIAL - WILLIAM O. HILTZ

2      Q.    Did you meet with anybody on the board

3  of EFIH?

4      A.    The representative of EFIH that's on

5  the EFH board.

6      Q.    Okay.  Anybody else?

7      A.    No.

8      Q.    Do you know who's on the board of EFIH

9  besides that representative?

10     A.    No.

11     Q.    Did you meet with anybody on the board

12  of TCEH?

13     A.    No.

14           MS. O'CONNOR:  Objection.

15           Sorry.  Go ahead.

16     Q.    Did you meet with anybody from any of

17  the operating companies?

18     A.    No.

19     Q.    Did you ask to meet with anybody from

20  any of the operating companies --

21     A.    No.

22     Q.    -- of EFH?

23     A.    No.

24     Q.    For exactness, we keep talking about

25  the Oncor stake, do you know which entity owns

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    the 80 percent interest in Oncor?

3         A.    Oncor Holdings.

4         Q.    Okay.  And do you know how Oncor

5    Holdings relates to EFIH?

6         A.    I'm not sure I understand what you

7    mean by that.

8         Q.    Do you know who owns Oncor Holdings?

9         A.    Yes.

10        Q.    Who?

11        A.    EFIH owns 80 percent of Oncor Holdings

12   and the other 20 percent is owned by the two

13   infrastructure funds.

14        Q.    So it's your understanding that a

15   Debtor EFIH owns an 80 percent stake in Oncor?

16        A.    Yes.

17        Q.    All right.  So I'm going to go through

18   some of these questions quickly because Mr.

19   Weisfelner got some of them.  But is it your

20   understanding that Oncor is only regulated by

21   the Texas PUC, but do you understand they have

22   other regulators?

23        A.    I don't recall.

24        Q.    Do you know whether Oncor has any open

25   rate proceedings?

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     A.    Don't recall.

3     Q.    Do you know what a rate proceeding is?

4     A.    Yes, I do.

5     Q.    What's your understanding of what a

6  rate proceeding is?

7     A.    A rate proceeding is a proceeding

8  where the company is applying for new rates or

9  where the PUC has opened a proceeding to try to

10  reduce their rates.

11     Q.    So I take it did you ask whether Oncor

12  has any open rate proceedings?

13     A.    I did not, no.

14     Q.    Did you ask anybody to ask?

15     A.    Not since I've become involved in the

16  case, no.

17     Q.    Do you have an understanding as to the

18  size of Oncor's rate base?

19     A.    I know I've read it, but I can't

20  recall it at the moment.

21     Q.    Do you know what a rate base is?

22     A.    Yes, I do.

23     Q.    What's that?

24     A.    It's the property, plant, and

25  equipment base against which the return on

1             CONFIDENTIAL - WILLIAM O. HILTZ

2             MS. O'CONNOR:  Take your time on

3      either side.

4      Q.     Do you know what the difference is

5 between a transmission mile and a distribution?

6      A.     No.

7      Q.     Do you know what a gigawatt hour is?

8      A.     Not exactly.

9      Q.     Do you know what the billed volume is

10 of Oncor's of gigawatt hours?

11      A.     No, I don't.

12      Q.     Do you know what billed value is?

13      A.     No.

14      Q.     Okay.  Do you know what the LTM

15 revenues are for Oncor?

16      A.     About $5 billion.  A little over $5

17 billion.

18      Q.     And do you know how that -- how that

19 has progressed, either up or down, over the last

20 five years?

21      A.     Yes, it's been up at a modest rate.

22      Q.     Okay.  And do you know what the

23 five-year projections are?

24      A.     I've reviewed them, yes.

25      Q.     And what do you understand them to

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    producers are or can you name any of the five

3    biggest power producers in Texas other than EFH?

4         A.    Power producers?

5         Q.    Uh-huh.

6         A.    I would suspect Dynegy.  I'm not sure

7    who else.

8         Q.    Other than suspecting, can you tell

9    me?

10        A.    No.

11        Q.    Okay.  Do you know who the five

12   biggest end-users are in Texas?

13        A.    No.

14        Q.    Do you know who the five biggest

15   transmission utilities are in Texas other

16   than --

17        A.    No.

18        Q.    -- Oncor?

19              All right.  When was the first time

20   you heard of Oncor?

21        A.    When I got involved in this process.

22        Q.    Have you done any diligence into the

23   Oncor ringfence measures?

24        A.    I understand what they are.

25        Q.    What do you understand them to be?

CONFIDENTIAL - WILLIAM O. HILTZ

1

2      A.      Well, Oncor has been ringfenced with

3  respect to both its credit rating and its

4  governance.  So it has a separate board of

5  directors.  It obviously is not a party to the

6  bankruptcy, and that arrangement is intended to

7  stay in place.

8      Q.      What do you understand about the

9  dividend restrictions that Oncor is under?

10     A.      I don't recall.

11     Q.      Did you review the Oncor tax sharing

12 agreement?

13     A.      No.

14     Q.      Did you ask anybody to review that for

15 you?

16     A.      Only reviewed it to the extent that it

17 was discussed in the tax memo.

18     Q.      I don't understand.  Did you ask

19 somebody to review it for you?

20     A.      No.

21     Q.      Have you done any investigation

22 specifically into bidders, into determining what

23 their M&A appetite is at this time?

24     A.      Well, Sesh has done quite a bit of

25 that work.

1          CONFIDENTIAL - WILLIAM O. HILTZ

2      Q.    Have you done any of that work

3  personally?

4      A.    No.

5      Q.    So do you have any basis to testify

6  about any particular bidders' appetite to do the

7  transaction now versus 8 months ago versus 18

8  months from now?

9      A.    I can testify with respect to two

10  bidders in that regard.

11      Q.    Okay.  And what about the others?

12      A.    No.

13          MR. SHORE:  All right.  All right.

14      That's a good breaking spot.  I know we got

15      to change the tape.  But why don't we just

16      stay in situ, or do you want to take a short

17      break?

18          MS. O'CONNOR:  If you don't mind, take

19      five minutes.

20          THE VIDEOGRAPHER:  It's 3:25 p.m.  We

21      are coming off the record.

22          (Recess.)

23          THE VIDEOGRAPHER:  The time is 4:28

24      p.m.  We are going back on the record.

25  BY MR. SHORE:

CONFIDENTIAL - WILLIAM O. HILTZ

1

2    Q.    All right.  Sorry about that, Mr.

3    Hiltz.  Could you pull out Exhibit 2, please,

4    which is your declaration?

5    A.    Yes.

6    Q.    All right.  Who drafted this document?

7    A.    Kirkland & Ellis.

8    Q.    Okay.  And I take it that you were

9    given an opportunity to provide comments?

10   A.    Yes.

11   Q.    And do you recall making comments?

12   A.    Yes.

13   Q.    And what do you recall commenting?

14   A.    I think I answered this question

15   earlier in the deposition.

16   Q.    You just got to answer my questions.

17   A.    I added some correct information about

18   Evercore, I added some information about my

19   personal background and transactions that I have

20   worked on, and I made some other modest language

21   changes.

22   Q.    Okay.  So if I could draw your

23   attention to page 4 of your declaration.

24   A.    Uh-huh.

25   Q.    Do you recall making any changes to

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     paragraph 10?

3          A.    No.

4          Q.    Okay.  And it says in the second

5     sentence, "I understand that, in a typical

6     Chapter 11 sale..."

7               What was the basis of your

8     understanding?

9          A.    Discussions with both my restructuring

10    people and with Kirkland & Ellis.

11         Q.    Okay.  And when were those discussions

12    relative to your declaration?

13         A.    I mean, obviously, sometime prior to

14    my declaration, but I can't recall exactly the

15    date.

16         Q.    Okay.  Just so I understand the

17    timeline, you came in around the third week of

18    August.  You filed this declaration a month

19    later.

20               Were those discussions about what

21    happens typically in a sale between the time you

22    started and the time you filed your declaration?

23         A.    Yes.

24         Q.    Okay.  And prior to those discussions,

25    did you have any understanding about a typical

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    Chapter 11 sale?

3        A.    With respect to a stalking horse

4    process?

5        Q.    Yes.

6        A.    No.

7        Q.    All right.  Now, paragraph 11, do you

8    recall making any changes to that paragraph?

9        A.    Not that I recall, but it's possible.

10       Q.    All right.  And it says in the second

11   sentence, it makes a reference to market

12   conditions?

13       A.    Yes.

14       Q.    What market?

15       A.    The market for the sale of companies

16   generally and, specifically, Oncor.

17       Q.    Okay.  Generally companies.  U.S.

18   companies?  Foreign companies?

19       A.    U.S. companies.

20       Q.    Okay.  So the market is for U.S.

21   companies.  Large cap?  Small cap?

22       A.    All.

23       Q.    All.  Any -- any company in the United

24   States, the market is favorable for a potential

25   sale?

CONFIDENTIAL - WILLIAM O. HILTZ

1

2      A.      No, you can't make a statement that

3  that would be true for any company.

4      Q.      Okay.

5      A.      I'm saying generally market conditions

6  are favorable.

7      Q.      Okay.  And what about the market

8  conditions are favorable, in your reference here

9  when you say, "Currently favorable."  What

10  conditions?

11      A.      The availability of financing.

12      Q.      Okay.

13      A.      The cost of financing.  The overall

14  level of equity values.  Those are the general

15  conditions.

16      Q.      Okay.  And you said before that the

17  market is the Oncor stock, too.  Were you

18  expressing to the Court an expert opinion that,

19  in your view, market conditions are currently

20  favorable for the sale of EFH

21  post-reorganization equity?

22      A.      Yes.

23      Q.      And what do you understand about the

24  market in the United States for

25  post-reorganization equity?

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     A.    Well, I'm referring to the sale of its

3  interest in Oncor, and I believe conditions are

4  favorable for the sale of its interest in Oncor.

5     Q.    Okay.  So let's break that into

6  pieces.  Do you have any basis for testifying

7  that it's currently favorable to sell

8  post-reorganization equity?

9     A.    As a general class?

10    Q.    Yes.

11    A.    Post-reorganization equity?  No.

12    Q.    So let's focus now on just the sale of

13 the Oncor estate.  What -- what is it about the

14 Oncor stake that makes it different than any

15 other company in the United States?

16    A.    Well, there are -- I mean, every

17 company is different, and there are certainly

18 companies, for example, who might be performing

19 poorly at this particular moment in time where

20 it would not be a good idea to sell the company.

21    Q.    Okay.

22    A.    Oncor is performing reasonably well,

23 it's forecast to continue to perform well, and

24 obviously, we have a large number of interested

25 strategic buyers for Oncor.  So those are

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    matters specific to Oncor that support the

3    belief that it's a good time to sell.

4          Q.    Anything else?

5          A.    No.

6          Q.    So is it your testimony that any

7    company, large cap or small cap, in the United

8    States that is performing well and that has bids

9    as a favorable market for selling itself?

10          MS. O'CONNOR:    Object to form.

11          A.    Again, you can't -- I wouldn't

12    generalize it to the degree that you have

13    generalized it.  I would say that it's a

14    function of not only how the company is

15    performing, but the perceived cycle within a

16    given industry.

17          So that there may be industries that

18    are cyclical and for whom now would not be a

19    terrific time to sell.

20          Q.    Okay.  So what did you do in the first

21    30 days of your involvement in this matter to

22    become an expert in the performance of Oncor?

23          A.    I reviewed Oncor's financials and

24    forecast.

25          Q.    Financials and forecast.  When you say

1          CONFIDENTIAL - WILLIAM O. HILTZ

2   financials, what do you mean?

3       A.    I mean the stock price, you know,

4   other financial -- excuse me, not stock price.

5   The forecast, really, and -- their balance sheet

6   and their forecast.

7       Q.    Okay.  Balance sheet and forecast.

8   The stuff that's in the data room?

9       A.    I didn't view it in the data room,

10  but...

11      Q.    Do you understand that --

12      A.    Yes.

13      Q.    -- you reviewed anything that's not in

14  the data room?

15          MS. O'CONNOR:  Object to form.

16      A.    I'm not aware that I reviewed anything

17  that's not in the data room.

18      Q.    And you didn't talk to any Oncor

19  employees about Oncor, right?

20      A.    No.

21      Q.    And other than looking at the

22  financials and the forecast, did you do anything

23  else to inform yourself as to Oncor's

24  performance?

25      A.    I read the teaser materials.

1          CONFIDENTIAL - WILLIAM O. HILTZ

2      Q.    And again, that -- those materials are

3   obviously available to potential bidders as

4   well?

5      A.    Yes.

6      Q.    And what did you do, if anything, in

7   those first 30 days to determine whether or not

8   the -- the reason why bidders were coming

9   forward?

10     A.    Other than talking generally with Sesh

11  and based on commentary that NextEra made,

12  nothing particularly.

13     Q.    Do you understand how it was that

14  NextEra came forward?

15     A.    I'm not sure I understand what you

16  mean by that question.

17     Q.    Okay.  Do you know why NextEra made a

18  bid?

19     A.    I assume NextEra made a bid because

20  they thought that the restructuring support

21  agreement and the convertible feature in the DIP

22  valued the company at a low value, and they were

23  willing to pay more.

24     Q.    And what did you do to inform yourself

25  as to whether or not the price set in the

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     of your opinion?

3          A.    Well, again, the high level of M&A

4     activity.

5          Q.    Okay.  Anything else?

6          A.    No.

7          Q.    All right.  And when you say these

8     market conditions may continue.  Do you see

9     that?

10         A.    Uh-huh.

11         Q.    When you said "may," do you have a

12    view as to what a percentage likelihood?  "May"

13    could mean might or it means shall.  So,

14    somewhere in between, can you give me some color

15    on that?

16         A.    Yes, I would say the chances are that

17    market conditions two years from now are likely

18    to be modestly worse than they are today

19    primarily because of a rise in interest rates.

20         Q.    Okay.  Modestly worse.  What do you

21    mean by "modestly"?

22         A.    I think we're going to have a higher

23    interest rate environment.

24         Q.    Okay.  I'm just trying to get -- okay.

25    So how would that translate, in your view, into

1            CONFIDENTIAL - WILLIAM O. HILTZ

2    a range of volatility for the Oncor stake?

3        A.    Well, again, I haven't done that

4    analysis, and I would say that, again, as I said

5    earlier in my testimony, the importance here of

6    the process and going forward now is to

7    establish a floor.  The floor protects against

8    an adverse change in market conditions, and the

9    cost of exercising the fiduciary out in the

10   event that conditions get much better and the

11   value of Oncor goes way up is quite modest

12   relative to the total enterprise value.

13       Q.    You said you haven't done that

14   analysis.  Was there anything that prevented you

15   from performing a volatility analysis on the

16   Oncor stake?

17       A.    What do you mean by a "volatility

18   analysis"?

19       Q.    An analysis by which Evercore made

20   some sort of prediction with respect to the

21   expected potential rise or fall in the value of

22   the Oncor stake over a particular period.

23       A.    No.

24       Q.    Okay.  And there's nothing that

25   prevented you from doing that?

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     A.    That's not a form of analysis that we

3  typically undertake.

4     Q.    Okay.

5     A.    I don't recall having seen that.

6     Q.    Are you aware of any kind of analyses

7  that would project the future volatility of an

8  equity stake?

9     A.    Well, I mean, yes, generally, if we

10 have multiple sets of projections that would

11 indicate a base case or a downside case

12 reflecting certain risks to the business, you

13 could perform that kind of analysis.

14    Q.    But you didn't do that here?

15    A.    No.

16    Q.    Did the company ask you to do that?

17    A.    No.

18    Q.    All right.  So do you have any sense,

19 when we talk about market risk, are we talking

20 about the possibility the Oncor stake could rise

21 or fall 5 percent, rise or fall 10 percent, rise

22 or fall 50 percent?  What kind of volatility are

23 you talking about in a utility stock?

24    A.    I think it's probably in the 10 to 20

25 percent area.

1          CONFIDENTIAL - WILLIAM O. HILTZ

2      Q.    So you would be concerned about a 10

3   to 20 percent fall in the value of Oncor stock

4   in the next 18 months?

5      A.    Correct.

6      Q.    And does that also imply that there

7   could be a 10 to 20 percent rise in the value of

8   Oncor stock?

9      A.    Conceivably.

10     Q.    All right.  You say -- so let me get

11  to that.  You said "while these market

12  conditions may continue."  Is it also fair to

13  say while these market conditions may improve?

14     A.    I think it's less likely that market

15  conditions will improve from these levels.

16     Q.    All right.  So what's the percentage

17  likelihood that it's going up or down?

18     A.    I can't put a percentage on it.

19     Q.    Okay.  So somewhere over 50 percent

20  that it's going to worsen and somewhere nearing

21  50 percent that it's going to improve?

22          MS. O'CONNOR:  Object to form.

23     A.    Again, I think market conditions are,

24  by any historical standard, quite good right

25  now, and therefore, I would say there's a higher

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    likelihood that market conditions are somewhat

3    worse than somewhat better.

4         Q.    Okay.  But you can't --

5         A.    No.  And again, that's the importance

6    of creating the floor value here.  Creating the

7    floor value protects you from the downside but

8    doesn't materially take away your upside.

9         Q.    Okay.  So let's -- I'm going to come

10   to that and talk about this -- this sale of

11   post-reorg. equity and how you're trying to fix

12   that problem, but let me focus a little more on

13   the Debtors.

14          Do you understand that the Debtors

15   here have to exercise their business judgment,

16   right?

17        A.    Uh-huh.

18        Q.    Did Mr. Keglevic or anybody else at

19   the Debtors ask you personally to opine on the

20   volatility of Oncor stock?

21          MS. O'CONNOR:  Object to form.

22        A.    Not the volatility per se.

23        Q.    Okay.  Did the -- did Mr. Keglevic or

24   anybody employed by the Debtors ask you to opine

25   on the range of potential rise and fall in Oncor

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    stock over an 18- to 24-month horizon?

3          MS. O'CONNOR:  Object to form.

4    A.    No.

5    Q.    Did anybody at the Debtors ask you to

6    opine or provide your advice on the issue of

7    whether or not it was an opportune moment to

8    sell the Oncor stake?

9          MS. O'CONNOR:  Object to form.

10   A.    Yes.

11   Q.    And who asked you?

12   A.    I can't remember specifically, but it

13   was a topic that was discussed amongst Paul,

14   David Ying, myself, perhaps Stacey as well.

15   Q.    And who asked it?

16   A.    I can't remember.

17   Q.    Okay.  And did you provide -- did

18   anyone at Evercore provide a written response to

19   that question?

20   A.    No.

21   Q.    Were you asked to provide a written

22   response?

23   A.    No.

24   Q.    And who answered on behalf of

25   Evercore?

1        CONFIDENTIAL - WILLIAM O. HILTZ

2        A.    Well, I think at varying points of

3   time, probably each of myself, David Ying and

4   Sesh, and perhaps Roger Altman as well.

5        Q.    Okay.  And what, since I have you

6   here, what did you say?

7        A.    I said the same thing that I've got in

8   my declaration, that we thought the market

9   conditions were attractive, that the

10  availability of credit was high, the cost of

11  credit was low, that utility stocks generally

12  had performed well and were at relatively high

13  levels of valuation, and we had a series of

14  interested bidders.

15       Q.    Okay.  Anything else?

16       A.    No.

17       Q.    Has Evercore done a valuation of the

18  Oncor stake?

19       A.    No.

20       Q.    Has Evercore done a valuation of

21  Oncor?

22       A.    Not yet, no.

23       Q.    Okay.  Is there anything that would

24  prevent Evercore from performing a valuation of

25  the Oncor stake?

CONFIDENTIAL - WILLIAM O. HILTZ

1
2     A.    No.

3     Q.    Anything to prevent Evercore from

4  doing a valuation of Oncor?

5     A.    No.

6     Q.    Okay.  So when you say the market's

7  attractive, I just want to focus on two theses.

8          One of theses is that the bid price in

9  the -- in the RSA was substantially below market

10  and that it pulled buyers out from everywhere

11  who were willing to say, you know what?  I'll

12  hit that bid all day long.  And another thesis

13  is that somehow the market, since the RSA was

14  signed and the present, has improved radically.

15          Do you have, first, a belief as to

16  which thesis is correct or that neither is?

17     A.    Well, I take premise -- take issue

18  with your premise.  The premise is that buyers

19  have come forward because of the price in the

20  RSA.  The only buyer that came forward before

21  the price in -- before -- based on the price in

22  the RSA was NextEra.

23     Q.    What's your basis for saying that?

24     A.    What's my basis for saying it?

25  Because all the other buyers have essentially

1          CONFIDENTIAL - WILLIAM O. HILTZ

2          Mr. Keglevic on a number of occasions

3    talked about the Debtors going out and getting a

4    one-way option.  Are you familiar with that,

5    that goal here?

6          A.    Well, I think what he's referring to

7    is similar to the establishment of a floor, has

8    been the term that I've been using.

9          Q.    Okay.  And that floor is pursuant to a

10   contract, right?

11         A.    Correct.

12         Q.    All right.  And that contract would be

13   for the purchase of EFH post-reorganization

14   equity?

15         A.    Correct.

16         Q.    And the idea is that what you want in

17   that contract is the ability to put that equity

18   to the buyer, right?

19         A.    Correct.

20         Q.    Within the next 18 months?

21         A.    Within 12 to 18 months.

22         Q.    Right, 12 to 18.

23         And as Mr. Keglevic was talking about,

24   it sounded to me like he was saying you want the

25   ability to put it to them, hell or high water;

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    is what's the penalty if you don't close.

3          I take it the Debtors, from Mr.

4    Keglevic's testimony, that the Debtors would

5    prefer a structure in which there was no

6    limitation on liability such that --

7     A.    Correct.

8     Q.    -- if they chose not to close, that

9    their whole balance sheet would be on the line?

10         MS. O'CONNOR:  Object to form.

11    A.    Correct.

12    Q.    Okay.  And that's the belief -- that

13    is the Debtors' hope in going out to the market

14    right now?

15    A.    We would look for a contract with

16    specific performance as opposed to a liquidated

17    damages provision.

18    Q.    Okay.  And what's your understanding

19    with respect to the availability of a specific

20    performance remedy in a merger agreement?

21    A.    In many merger agreements we have

22    specific performance.  Liquidated damages is a

23    little more common when we're dealing with

24    financial buyers.

25    Q.    And when specific performance, do you

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    mean a unilateral specific performance or a

3    bilateral specific performance?

4         A.    I think of it only in the context of

5    when I'm representing the seller.

6         Q.    Well, have you -- have you seen any

7    instance in which a merger agreement outside of

8    bankruptcy had a provision which forced the

9    buyer to take hell or high water but permitted

10   the seller to get out for a liquidated damage

11   sum?

12        A.    Well, yes.  I mean, quite frequently,

13   in fact, in virtually all merger contracts, you

14   have a fiduciary out, and that's the importance

15   here.  We would expect to have a fiduciary out

16   that would allow us to terminate the contract

17   for the payment of a termination fee.

18        Q.    Okay.  And do you have any basis for

19   opining with respect to the availability of a

20   specific performance remedy in a -- in the sale

21   of an asset by a Debtor?

22        A.    No.

23        Q.    And are you aware of any of the

24   litigation that's gone on in the last ten years

25   with respect to specific performance remedies

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    mean a unilateral specific performance or a

3    bilateral specific performance?

4        A.    I think of it only in the context of

5    when I'm representing the seller.

6        Q.    Well, have you -- have you seen any

7    instance in which a merger agreement outside of

8    bankruptcy had a provision which forced the

9    buyer to take hell or high water but permitted

10   the seller to get out for a liquidated damage

11   sum?

12       A.    Well, yes.  I mean, quite frequently,

13   in fact, in virtually all merger contracts, you

14   have a fiduciary out, and that's the importance

15   here.  We would expect to have a fiduciary out

16   that would allow us to terminate the contract

17   for the payment of a termination fee.

18       Q.    Okay.  And do you have any basis for

19   opining with respect to the availability of a

20   specific performance remedy in a -- in the sale

21   of an asset by a Debtor?

22       A.    No.

23       Q.    And are you aware of any of the

24   litigation that's gone on in the last ten years

25   with respect to specific performance remedies

1          CONFIDENTIAL - WILLIAM O. HILTZ

2      A.    Correct.

3      Q.    Okay.  So what have you done

4  personally to determine whether or not that

5  product exists in bankruptcy?

6      A.    Whether it exists in bankruptcy, I

7  haven't done anything.

8      Q.    I take it you have no basis to opine

9  that such a product exists, that is, that you

10  are not out selling a unicorn, but you're

11  actually selling an actual asset?

12      A.    Well, again, outside of bankruptcy,

13  everything I've described there is quite

14  typical.

15      Q.    So let's understand what the effect --

16  I take it that, and when I talked with Mr.

17  Keglevic about this, that depending upon the

18  various terms of the put/call option, you're

19  going to have an impact; each term is going to

20  impact the other terms, right?

21      A.    Yes.

22      Q.    In other words, so if you -- if you

23  gave the buyers a bilateral $200 million walk

24  right, they might be willing to pay more for the

25  asset?

1          CONFIDENTIAL - WILLIAM O. HILTZ

2    Bankruptcy Court risk over an 18-month period?

3         A.    No.

4               MS. O'CONNOR:  Object to form.

5         Q.    And I take it that the reason you are

6    selling -- well, let me ask you this then.

7    Other than the possibility of Oncor volatility,

8    the 10 percent, the 20 percent drop --

9         A.    Uh-huh.

10        Q.    -- why are the Debtors selling now?

11        A.    Why are the Debtors selling now?

12        Q.    Yes.

13        A.    To establish a floor.

14        Q.    So what?

15        A.    What do you mean, so what?

16        Q.    Why -- why would the Debtors need to

17   establish a floor?

18        A.    Why wouldn't they want to establish a

19   floor?

20        Q.    Okay.  Every Debtor owns assets.  Are

21   you saying that no other Debtors' assets are

22   volatile?

23        A.    No, I'm not saying that.

24        Q.    Okay.  So if every Debtor owns assets

25   that have a certain amount of volatility in

CONFIDENTIAL - WILLIAM O. HILTZ

1

2    A.    Well, but you're only going to do that

3    to the extent that values have risen more than

4    $150 million.

5    Q.    I understand.  I understand.

6    A.    So 150 million bucks is the cost of

7    ensuring your downside.

8    Q.    Right.

9    A.    And it's a cost that you only realize

10   in the event that values go way up, and in fact,

11   if values go down, there's no cost to ensuring

12   your out, your downside.

13   Q.    Well, except for this process?

14   A.    Well, yeah.

15   Q.    And you; we have to pay you your fee

16   as well.

17         Right, I get it.  That's a good way of

18   putting it.  You're buying an insurance policy,

19   spending $150 million of estate assets,

20   potentially, to protect from the possibility

21   that the Oncor stake actually does the other

22   thing, which is drop 10 to 20 percent?

23   A.    Correct.

24   Q.    Okay.  Just --

25   A.    And you're not spending that 150 if in

1              CONFIDENTIAL - WILLIAM O. HILTZ

2    that point in time.

3         Q.    Well, do you understand whether the

4    Debtors in filing their motion submitted any

5    other declaration?

6              MS. O'CONNOR:  Object to form.

7         Q.    No?

8         A.    I'm not sure.

9         Q.    Anybody else who's gone on the record

10   opining with respect to the risk of market

11   moves?

12        A.    Not that I'm aware of.

13        Q.    Are you aware of the Debtors making

14   available to any of the creditors any of the

15   statistics around that would support your view

16   of market conditions?

17        A.    No.

18        Q.    Anything from which the creditors

19   could form their own opinion with respect to the

20   possibility that the value of the Oncor stake

21   could go down or up 20 percent over the 18-month

22   period?

23        A.    No.

24             MS. O'CONNOR:  Object to form.

25        Q.    Now, let's clear up something that Mr.

1         CONFIDENTIAL - WILLIAM O. HILTZ

2    Keglevic testified.  Let's assume you can't get

3    an asymmetrical damages provision, that is,

4    where you get specific performance but the buyer

5    has a -- faces a fiduciary out.  Let's assume

6    that what you get is a bilateral break fee.  You

7    walk, you pay this; we walk, we pay that.  Okay,

8    do you understand that?

9         A.    Well, I understand the situation

10   you're positing.  That would be most unusual,

11   and I doubt we would be prepared to go forward

12   on that basis.

13        Q.    Okay.  I just want to clear that up.

14   Can you imagine any situation in which the

15   Debtors can fix their problem, the 10 to 20

16   percent volatility in the stock, without a

17   specific performance provision?

18        A.    Well, yes, you could do it with a

19   liquidated damages provision.

20        Q.    Of how much?

21        A.    It just has to be, you know, generally

22   three to five times the normal break fee.

23        Q.    And so that's what I'm saying.  Do you

24   have any reason to believe that anybody is going

25   to come forward with a liquidated damage

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     period --

3          A.    12 to 18 months.

4          Q.    -- 12- to 18-month period with the

5     possibility that any time over that 18-month

6     period the Debtors can walk for no penalty at

7     all if they don't get a plan done?

8          A.    Correct.

9          Q.    Okay.  And have you spoken to any

10    bidder, without identifying them by name, where

11    that bidder has said they're willing to do that

12    transaction?

13         A.    I believe there are two bidders that

14    are willing to do that transaction in some form.

15         Q.    What do you mean by "in some form"?

16         A.    Well, there hasn't been a final

17    negotiation of those items yet, but that's

18    certainly what they're expecting.  And the other

19    thing I would point out is that, you know,

20    utilities outside of bankruptcy do this all the

21    time.  There are many examples of utility

22    transactions that are going to take a comparable

23    amount of time to close.  I'll grant you there's

24    the additional element of risk of needing a plan

25    confirmation here, but there are many, many

1                CONFIDENTIAL - WILLIAM O. HILTZ

2    utility transactions that sit out there for 18

3    months with exactly -- with a fiduciary out and

4    with exactly the kind of termination fees that

5    we're talking about here.

6         Q.    Right.  But in each of those cases, a

7    sophisticated utility buyer can go to its own

8    counsel and ask what's the likelihood that the

9    PUC is going to turn this down, what's the

10   likelihood that FERC is not going to approve

11   this, right?

12        A.    Correct.

13        Q.    And the only ones that you know that

14   sit out there for 18 months have to do with

15   regulatory conditions that haven't been met,

16   right?

17        A.    Correct.

18        Q.    No one gets to sign up for the

19   transaction given 18 months to put their

20   financing together, for example?

21        A.    That's correct.

22        Q.    All right.  So, just so I understand

23   it, and maybe it was asked, if someone comes

24   forward and says what's the likelihood that TCEH

25   won't be able to get a plan done, you can't

1              CONFIDENTIAL - WILLIAM O. HILTZ

2     answer that question, right?

3         A.    I can't, no.

4         Q.    So who do you send them to?

5         A.    Again, to Kirkland & Ellis, to David

6     Ying, our restructuring advisor, to people at

7     the company.

8         Q.    Okay.  And do you have -- you haven't

9     asked, but do you have any reason to believe

10    that they're going to give you a percentage

11    likelihood between zero and 100 percent that

12    you're going to be able to get a TCEH plan done

13    in that period?

14        A.    Well, I don't know that they will give

15    me a percentage likelihood, but, you know,

16    obviously, again, we have got a relatively large

17    number of buyers who understand the

18    circumstances that we are in, understand that

19    the transaction is dependent upon a successful

20    plan of reorganization, and who are spending

21    time and money in the data room as we speak.

22        Q.    Do you understand that their

23    willingness to pay a certain price for the asset

24    could be affected by their own view of the

25    likelihood that the deal will close?

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     A.     It's possible, but again, it's not

3 apparent to me, and again, the whole purpose of

4 conducting the stalking horse process, as we are

5 suggesting, is to create a competitive process

6 and to minimize -- to find a buyer who is going

7 to minimize that element.

8     Q.     Yes, but that's a competitive process

9 for an asset which currently has an overhang on

10 it with respect to plan visibility?

11    A.     Correct.

12    Q.     Right?  It's the same as selling a

13 company before a litigation is resolved and

14 after a litigation is resolved, right?

15         MS. O'CONNOR:  Object to form.

16    A.     Yes.

17    Q.     And sometimes people pay less for the

18 asset when they don't know what's going to

19 happen in the litigation if the litigation is

20 against the company?

21    A.     And sometimes people who have a view

22 on the outcome of that litigation use that as an

23 opportunity to buy the asset.

24    Q.     Right.  So that's where I'm getting

25 to.  What, what have the Debtors been doing to

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     EFIH.

3          Q.    And if the independent directors of

4     the T side disagree with the additional factors

5     the Debtors are using to examine -- to use the

6     bid criteria, what can that independent director

7     do?

8          A.    He can vote against the transaction.

9          Q.    Other than that, does he have any

10    other authority to stop the transaction?

11         A.    Not that I'm aware of.

12         Q.    So let's turn to, again, to the Bid

13    Procedures section, pages 8 of 24.  Actually,

14    let's go to -- let me take you to a different

15    page, to 13 of 24, which is the Stalking Horse

16    Bidding Process.

17              By the way, Mr. Hiltz, have the

18    Debtors received any stalking horse bids at this

19    point in time?

20         A.    We have received indications, yes.

21         Q.    But has there been a bid submitted in

22    final form as a stalking horse bid?

23         A.    No.

24         Q.    And assuming the court grants this

25    motion and approves the bidding procedures on

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     there has been a reluctance of utilities to

3     trump other deals.  There is a relatively small

4     number of circumstances where that has happened.

5          So I don't think Lazard's concerns are

6     completely ill-founded.  I don't feel quite as

7     strongly as Lazard does.  I think there are some

8     people who would be willing to play in an open

9     auction, for instance, NextEra, but I can't say

10    that we would have as many people in an open

11    auction as we would in a closed stalking horse

12    process.  And that's part of the reason for

13    having a longer and more formalized stalking

14    horse process, is to maximize the number of

15    participants.

16         Q.    Okay.  Mr. Hiltz, have you met with

17    the board of directors at EFH to describe the

18    bid procedures process?

19         A.    Telephonically, yes.

20         Q.    And how many times have you done that?

21         A.    I want to say twice.

22         Q.    Do you remember the dates on which you

23    had that telephonic meeting?

24         A.    No, I don't.  I don't.

25         Q.    And were both those meetings prior to

1          CONFIDENTIAL - WILLIAM O. HILTZ

2     the date for filing this motion on September 19?

3          A.    Yes.

4          Q.    And did Evercore provide the board

5     with any written materials about the bidding

6     process as part of those board meetings?

7          A.    Only a timeline.

8          Q.    And who prepared that timeline?

9          A.    I can't recall who actually physically

10    prepared it.  It was included as a page within

11    their board books.

12         Q.    And what was discussed about the

13    bidding process during those board meetings?

14         A.    Basically, just Evercore went through

15    our rationale for creating the process that we

16    did, and there was discussion around the

17    specific dates and what was an appropriate

18    balance between giving bidders enough time to

19    submit their bids while at the same time not

20    exposing ourselves to a long -- an elongated

21    period of market risk.

22         Q.    Did the board object to the process

23    described by Evercore, proposed by Evercore?

24         A.    No.  There were questions about it and

25    some discussion, but no, there was no, quote,