# EXHIBIT 13

1         CONFIDENTIAL - HUGH SAWYER
2         UNITED STATES BANKRUPTCY COURT
3         FOR THE DISTRICT OF DELAWARE
4    ---------------------------------X
     In Re:
5

     ENERGY FUTURE HOLDINGS
6    CORPORATION, et al.,
7                Debtors.
8    Chapter 11
     Case No. 14-0979
9    Jointly Administered
     ---------------------------------X
10
11
12        *** C O N F I D E N T I A L ***
13
14           VIDEOTAPED DEPOSITION
15                   OF
16               HUGH SAWYER
17        Wednesday, October 8, 2014
18            Seven Times Square
19            New York, New York
20
21
22   Reported by:
     AYLETTE GONZALEZ, RPR, CLR, CCR
23   JOB NO. 85457
24
25

1              CONFIDENTIAL - HUGH SAWYER
2         A.   I listened to the advice of
3    Evercore and the company's management team and
4    Kirkland.  And to come to the conclusion --
5    the business judgment that, you know, this may
6    not be the opportune moment to enter the
7    markets, but it's a good moment to enter the
8    markets and to determine the value of this
9    asset and, of course, with maximum flexibility
10   in these bidding procedures and with the
11   fiduciary out, I view this as an opportunity
12   to set a floor.
13        Q.   And somebody said to you there
14   could be a war so we have to sell this asset
15   now?
16             MS. O'CONNOR:  Object to form.
17        A.   No, no one said that to me.
18        Q.   Well, when I asked, you said one of
19   your concerns was that there could be a war
20   that would be catastrophic and then you said
21   you got some advice or there's some --
22   provided to you by Evercore.  I'm wondering
23   specifically what the nature of that was.
24             MS. O'CONNOR:  Object to form.
25        A.   Yes.  I'm sorry; I thought you also

1      CONFIDENTIAL - HUGH SAWYER
2  asked for my opinion.  My opinion of the
3  markets are that it's an opportune moment.  It
4  may not be the best moment, but it's a good
5  moment.  We have relative calm in the debt and
6  equity markets.  I'm comfortable it's a good
7  time to attempt to set the floor.
8      Q.   Tell me what you mean when you say,
9  set the floor?
10     A.   For the value.  The floor for the
11 value of this asset and, of course, with the
12 fiduciary out.  If there's a better
13 opportunity, we'll take it.
14     Q.   Well, let me explore that with you.
15     A.   Sure.
16     Q.   When you say, set a floor is, it
17 your view that once a buyer commits to the
18 proposed transaction, you've assured yourself
19 of obtaining whatever value they commit to as
20 a floor?
21     A.   Well, it's impossible to speculate
22 what the specific terms and conditions of an
23 acquisition agreement might include.  An
24 aspect of the bidding procedures as you know,
25 they're committed through December of 2015.  I

1         CONFIDENTIAL - HUGH SAWYER
2   think we're going to learn here through the
3   process what the market will bear for this
4   asset.  That's what I mean.
5        Q.   But you don't have -- well, let me
6   ask:  Do you have an expectation that if a
7   bidder commits to pay -- just make up a number
8   -- 18 billion and a year later when it comes
9   down time to close or gets close to closing
10  time, for whatever reason there's been a
11  catastrophic event or otherwise, and the
12  "asset" is worth $2 billion, you're not -- are
13  you expecting that you will have locked in the
14  buyer so, ineffectively -- effectively, you
15  will achieve that value?
16       A.   Well, as I said, we don't have the
17  specific terms and conditions related to an
18  acquisition agreement, and I can't speculate
19  today what those terms and conditions may be.
20  I do know that through the bid process,
21  they're committing to their proposal through
22  December of 15.
23       Q.   Okay.  But setting a floor, as you
24  say, was one of the primary drivers in filing
25  the Motion, right?

1      CONFIDENTIAL - HUGH SAWYER
2  to get all the regulatory approvals.  And I am
3  certain that any bidder will be aware of that,
4  as well, given the level of sophistication of
5  these bidders.
6      Q.   I want to show you what we're going
7  to mark as Exhibit 2, Sawyer 2, which is --
8  and I'll just wait till you get it.
9           (Sawyer Exhibit 2, Stipulation and
10          Agreed Order, Filed on 9/16/14 was
11          marked for identification, as of this
12          date.)
13  BY MR. JONAS:
14      Q.   What's been marked as Sawyer
15  Exhibit 2 is a stipulation and agreed order
16  regarding a protocol for certain case matters.
17           This was filed with the Court on
18  September 16, 2014.  I'll ask you to take a
19  look at that.
20           Have you seen this before?
21      A.   I have not seen this.
22      Q.   Okay.  So I take it you never
23  familiarized yourself with the terms of the
24  stipulation?
25      A.   I've testified I haven't seen it.

1 CONFIDENTIAL - HUGH SAWYER

2 I've not discussed it specifically with them.

3 Q. Well, what have they told you about

4 alternative transactions?

5 A. I think, you know, that Evercore

6 and -- and Kirkland have a view today that a

7 tax-free spinout is clearly the -- as they

8 characterize it, the optimum structure, but I

9 don't think any of the advisors or the debtor

10 want to -- want to preclude any potential

11 structure or bidder that has the potential to

12 maximize the value of the estate.

13 Q. When you say "Evercore," are you

14 referring to Mr. Hiltz?

15 A. Not -- not solely Mr. Hiltz. I'm

16 referring to the firm which includes a team of

17 professionals.

18 Q. Well, who made the presentation to

19 you that you referred to or the comments at a

20 board meeting with respect to an alternative

21 transaction?

22 A. I don't think I testified that any

23 specific individual at Evercore commented on

24 an alternative transaction or the potential

25 value of an alternative transaction.

1           CONFIDENTIAL - HUGH SAWYER
2      Q.   Now, you recognize Kirkland also
3  represents EFH, right?
4      A.   I do.
5      Q.   And you recognize that the flip
6  side of this huge benefit for TCEH creditors
7  would mean that EFH creditors would suffer all
8  of the economic loss associated with a taxable
9  transaction?
10     A.   Potentially that's my
11 understanding.
12     Q.   Right.  So Kirkland -- do you
13 understand Kirkland then is serving two
14 masters?
15     A.   I believe my view is that Kirkland
16 is serving one master, EFH, and all of EFH
17 subsidiaries.
18     Q.   With respect to this particular bit
19 of advice, you understand that advice that
20 Kirkland gave you with respect to the TSA
21 would necessarily have the benefit of
22 advancing the interest of one client and
23 truncating the rights of another client?
24          MS. O'CONNOR:  Object to form.
25     A.   I don't agree that -- I don't see

1  CONFIDENTIAL - HUGH SAWYER
2  THAT there are two separate clients here.  And
3  I believe I view this as one client at this
4  point.  If I determine that the interests of
5  the parties had diverged, I would seek
6  independent counsel.
7     Q.  Well, have you ever been involved,
8  in all your business dealings, in a
9  contractual dispute?
10    A.  Yes.
11    Q.  Can you think of any instance in
12 which in a contractual dispute you hired a
13 lawyer?
14    A.  Yes.
15    Q.  Can you think of any instance in
16 all your business experience where there was a
17 business dispute and you hired a lawyer who
18 was also the lawyer for the party on the other
19 side of the dispute?
20    A.  No.
21    Q.  And do you see that there's a
22 conflict there that the lawyer trying to
23 provide advice with respect to the contract
24 has two different agendas that they need
25 advocate for?

1    CONFIDENTIAL - HUGH SAWYER

2 enure to the benefit of the parties."

3    You see that?

4    A.  Um-hum.

5    Q.  You understand one of the parties

6 here is TCEH?

7    A.  Right.

8    Q.  Were you aware that counsel was

9 signing a stipulation that was going to bind

10 TCEH?

11   A.  And as I think I previously

12 testified, I was not aware of this document so

13 then, therefore, I was not aware.

14   Q.  Can you turn to paragraph four,

15 please.

16   A.  Okay.

17   Q.  If you go down to -- after the

18 definition of "independent matters," there's a

19 sentence.  You see that it's down five lines

20 up from the bottom.  It says, "The independent

21 directors of EFCH and TCH shall consult with

22 the creditors' representatives regarding the

23 selection of an independent advisor or

24 independent advisors."

25   Were you aware that that on your

1           CONFIDENTIAL - HUGH SAWYER
2    the TCEH claims that's a question of
3    allocation of proceeds. You remember that
4    testimony?
5        A.    I think I said that the allocation
6    of proceeds, should there be proceeds, would
7    be decided through the course of this case.
8        Q.    Right. Was it your intent to be
9    testifying that if TCH has claims that EFIH or
10   at EFIH, they'll be entitled to share in those
11   proceeds?
12       A.    My intent was only to testify that
13   through the process of the court, that the
14   court would determine how to best allocate
15   those proceeds.
16       Q.    And that your view was right now,
17   you should be maximizing the value of the sale
18   of the Oncor equity stake?
19       A.    Exactly; given that I think there
20   is certainly no downside for the T-side
21   creditors to maximize the value of the estate.
22       Q.    Let me ask you a question.
23       A.    Sure.
24       Q.    Were you aware that one of the
25   claims has been raised since the first

1            CONFIDENTIAL - HUGH SAWYER
2    pleading, at least that we filed in this case,
3    that EFCH, in 2007, transferred the Oncor
4    business over to the E-side?
5         A.   I do recall that claim.
6         Q.   And do you understand that the
7    assertion has been made that that might lead
8    to a fraudulent conveyance claim that EFCH
9    could bring against the E-side?
10        A.   I do recall that assertion.
11        Q.   Do you understand that those claims
12   not only would be against EFIH but potentially
13   could be asserted against entities inside the
14   ring fence?
15             MS. O'CONNOR:  Object to form.
16        A.   I can't testify to that legal
17   matter.  That would be up to the attorneys in
18   the court.  I am aware that certain assertions
19   have been made.
20        Q.   And do you understand that one of
21   the consequences is that if EFCH were able to
22   go inside the ring fence and sue the entities
23   inside the ring fence, the EFCH claims would
24   be senior to the equity interests of EFIH?
25             MS. O'CONNOR:  Object to form.

1        CONFIDENTIAL - HUGH SAWYER
2    A.   I understand that assertion has
3 been made.
4    Q.   Now, you understand also that TCEH
5 is supporting a motion right now which will
6 have the EFIH equity sold before
7 February 28th?
8         MS. O'CONNOR:  Object to form.
9    A.   My understanding is that the
10 bidding procedures contemplate a process that
11 will take months.
12   Q.   Right.  Do you understand that the
13 contemplation is that this -- that whatever is
14 being sold is going to be sold some time in
15 January or February?
16   A.   I -- my understanding is that it
17 will take months to get the regulatory
18 approvals, let alone, a confirmation by the
19 court closing transaction.
20   Q.   So let's go over at least what your
21 understanding is.  Bidding procedures say
22 you're going to go out and try to get a
23 potential bidder and you're going to try to
24 negotiate some definitive documentation,
25 right?

1   CONFIDENTIAL - HUGH SAWYER

2    A.   I did.

3    Q.   And are you aware of the fact that
4   the old NextEra bid conformed to the optimum
5   tax structure?

6    A.   I was aware that the bid, as it
7   existed at that time, did largely conform with
8   that tax structure.

9    Q.   And are you generally familiar with
10  the values that would have been available to
11  the E-side of the house pursuant to that old
12  NextEra bid?

13    A.   I reviewed it at that time.  I
14  don't recall those values today.

15    Q.   I want to give you a hypothetical.
16  If the NextEra bid in the form that you were
17  familiar with were to be submitted today in a
18  fashion that gave rise to a taxable
19  transaction, in order for that bid from a
20  value creation perspective to equal or exceed
21  the old NextEra bid, which was consistent with
22  the optimum tax structures, by how many more
23  dollars would NextEra have to bid?

24    MS. O'CONNOR:  Object to form.

25    A.   That is -- thank you for

1    CONFIDENTIAL - HUGH SAWYER
2  identifying it as a hypothetical question
3  because it's clearly hypothetical. But at a
4  -- without all the other attributes of what
5  that transaction might involve, including the
6  ability to get it confirmed, the ability to
7  get it closed, the ability to get past the
8  regulatory hurdles, without considering all of
9  those factors, we have been concerned, as you
10 know, all along about the potential for a
11 $7 billion stranded tax at the E-level -- EFH
12 level.
13       Q.   I'm not sure that I understand your
14 answer, so am I to assume, therefore, that
15 everything else being equal, regulatory
16 approvals, ability to confirm a plan of
17 reorganization, that just comparing the old
18 NextEra bid to any new bid that may come in,
19 that instead of being non-taxable is now
20 taxable?
21       A.   Right.
22       Q.   Are you telling me that the taxable
23 bid, in order to be a winning bid, would have
24 to be $7 billion higher in value?
25       A.   No.  Thank you.  I'm not suggesting

1      CONFIDENTIAL - HUGH SAWYER
2      A.   And if I could clean up one other
3 dangling issue while I'm still on the record.
4 I think this -- I think I testified earlier
5 that this stipulation and agreed order, the
6 protocol of the case matters as I've sat here,
7 and apologies for the senior moment, I think I
8 probably -- as I sat here and thought about
9 it, I think I did receive this at some point.
10 It just had been some time since I thought
11 about it, so...
12         MR. SHORE:  I have a follow-up
13     questions on that.
14 EXAMINATION BY
15 MR. SHORE:
16     Q.   First of all, if you had received
17 it, how would you have received it?
18     A.   If I had received it, it probably
19 would have come in under board vantage.
20     Q.   Or in an e-mail to you?
21     A.   I don't recall if it would have
22 been e-mailed or not.
23     Q.   Has there been any instance in
24 which you've been given a paper relating to
25 this case other than through board vantage or