# EXHIBIT 17

Page 1

1

2    IN THE UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

4    Chapter 11

5    Case No. 14-10979 (CSS)

6    ----------------------------------x

7    In Re:

8      ENERGY FUTURE HOLDINGS CORP., et al.,

9                    Debtors.

     ----------------------------------x

10                    October 7, 2014

11                    9:34 a.m.

12

13        Videotaped Deposition of ANTHONY

14    HORTON, pursuant to Notice, held at the

15    offices of Ropes & Gray LLP, 1211 Avenue

16    of the Americas, New York, New York,

17    before Todd DeSimone, a Registered

18    Professional Reporter and Notary Public of

19    the State of New York.

20

21

22

23

24

25

Page 27

 1                    HORTON

 2      A.       That's correct, capital raise,

 3   fundraising.

 4      Q.       Who has the final say on those

 5   decisions historically within EFH?

 6      A.       The board.

 7      Q.       And at EFIH?

 8      A.       It depends on at which entity

 9   that we are raising those funds.  So if I

10   were raising capital at EFIH, it would be

11   the EFIH board.  If it were at EFH, it

12   would be at EFH, although EFH ultimately,

13   you know, has an umbrella view into what

14   is going on with the subsidiaries.

15   Raising capital at TCH, it would also be

16   at the TCH board.  And many occasions at

17   EFH, you may see dual authorization.

18      Q.       Now, you said that you reviewed

19   these bidding procedures and the motion;

20   is that correct?

21      A.       That's correct.

22      Q.       Who at the company approved

23   them?

24      A.       I would suggest that the

25   executive management, including the

1                    HORTON

2    stalking horse process under these bidding

3    procedures.

4        Q.        Am I correct, though, that

5    there was no vote?

6        A.        You are correct.

7        Q.        What's the most pointed

8    question that occurred in those board

9    meetings that you recall?

10       A.        I think the most pointed

11   question was around the market risk that

12   we were taking by going down a path of

13   longer time period.  We had some parties

14   who were very interested in entering into

15   the stalking horse agreement.  So there

16   was a lot of dialogue around that risk,

17   should we be taking that risk for the

18   estate of not going ahead and locking in a

19   stalking horse at this point in time and

20   then later on continuing through an

21   auction process.

22                 Those were the most pointed

23   conversations that I recall.

24       Q.        Do you recall who asked those

25   questions?

1              HORTON
2      Q.        At any time up to the filing,
3  had you ever heard anybody within EFIH,
4  including the board, refer to the Oncor
5  stake as a volatile asset?
6      A.        No.
7      Q.        In words or substance, I don't
8  mean it doesn't have to say volatile, that
9  the Oncor stake was subject to significant
10  moves in valuation within a definitive
11  period?
12      A.        When I answered your question
13  in terms of volatile, what I was referring
14  to is in terms of the business operations,
15  their revenue streams, their net income,
16  that's a fairly stable, predictable
17  business.
18              Obviously any business is
19  subject to general market volatility,
20  depending on interest rates, growth rates;
21  heck, that company was formed in '07, and
22  I'm sure you lived through '08.
23      Q.        Sure.  Isn't it true that every
24  business was volatile in '08, right?
25      A.        Right.  It is market

1                       HORTON

2     500?

3          A.        Or the, you know, utility

4     index.  Nobody mentioned the utility

5     index.  I'm saying specifically --

6          Q.        So general stock market

7     movement?

8          A.        Equity market movements.

9          Q.        Okay, equity market movements.

10                   Was any risk identified that

11    didn't exist for EFIH since you joined

12    with respect to the Oncor stake?

13         A.        What do you mean?

14         Q.        Well, I think your testimony

15    was since you joined EFIH in 2007, the

16    Oncor stake has been subject to interest

17    rate risk?

18         A.        I think a valuation of Oncor is

19    somewhat correlated to interest rates.

20         Q.        And that has been true since

21    2007?

22         A.        Probably longer than that.

23         Q.        In fact, it has been true since

24    the people who bought the EFIH first lien,

25    second lien, and PIK paper have been

1                    HORTON
2    around?
3        A.        Probably.
4        Q.        And then trading multiples, the
5    Oncor stake, the value of the Oncor stake
6    has always been correlated to what people
7    are willing to pay for similar public
8    utilities, right?
9        A.        Obviously there is some
10   exceptions, but yeah.
11       Q.        Which exceptions are those?
12       A.        Well, Oncor is unique in that
13   it doesn't have retail customers.  It
14   doesn't have generation.  It is a, you
15   know, pure delivery infrastructure
16   business.
17       Q.        So that would mean you just
18   have to pick your comparables when you are
19   looking at multiples correctly because
20   this is a pure-play transmission utility?
21       A.        You need to look at many
22   comparables.
23       Q.        And general equity market
24   movements, I take it that since 2007 the
25   value of the Oncor stake has always been

1                    HORTON

2   meetings that the stakeholders, the

3   parties who were going to receive the

4   economic value of the sale of Oncor, had

5   all accepted general market risk when they

6   decided to lend to either EFIH or EFH?

7        A.        No.  I think we operated under

8   the general principle that I discussed.

9        Q.        Do you recall any discussion at

10  the meeting which quantified the

11  volatility of the Oncor stake, that is

12  expressing a view as to the range of

13  potential upward and downward movements

14  over the next 12 to 18 months?

15       A.        No.

16       Q.        Did anybody discuss that, in

17  other words, was there any way for a board

18  member of EFIH or EFH to know what another

19  board member was thinking of as to the

20  risk, the actual amount of risk?

21                 MS. O'CONNOR:  I object to

22  form.

23       Q.        Let me explain it.

24                 Is it possible in your mind

25  that based on what you have been saying