IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 ) |
| | ) Case No. 14-10979 (CSS) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) (Jointly Administered) ) |
| Debtors. | ) Re: D.I. 2087 |
| | ) Hearing Date: Oct. 17, 2014 @ 9:30 a.m. (ET) |

**RESPONSE OF THE AD HOC COMMITTEE OF EFIH UNSECURED NOTEHOLDERS TO MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING AN AUCTION AND RELATED DEADLINES AND HEARINGS, AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

The Ad Hoc Committee of EFIH Unsecured Noteholders[2] files this response (the "Response") to the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [ECF No. 2087] (the "Bidding Procedures Motion"). In support of this Response, the Ad Hoc Committee of EFIH Unsecured Noteholders respectfully submits as follows:

---

[1] The last four digits of Energy Future Holdings Corp.'s ("EFH") tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] The "Ad Hoc Committee of EFIH Unsecured Noteholders" means the ad hoc committee of holders of 11.25%/12.25% unsecured senior toggle notes due December 1, 2018 (the "EFIH Unsecured Notes") issued pursuant to that certain Indenture, dated December 5, 2012, by and among Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc., as issuers, and UMB Bank, N.A., as successor trustee.

## PRELIMINARY STATEMENT[3]

1. Through the Bidding Procedures Motion, the Debtors seek approval of formal bidding procedures by which they intend to conduct an auction in an attempt to establish the value of EFIH's indirect equity interest in 80.03 percent of Oncor Electric Delivery Company LLC (the "Oncor Equity"). The proposed procedures continue a process started by EFH following the July 2014 EFIH Second Lien DIP hearings, and are designed to test an important thesis now supported by the Debtors and many creditor constituencies in this case—that the value of the Oncor Equity is sufficient to satisfy 100% of the debt at EFIH and provide recoveries to EFH stakeholders. The Ad Hoc Committee of EFIH Unsecured Noteholders, whose members are the beneficial owners of approximately 83 percent of the EFIH Unsecured Notes, are supportive of the Debtors' decision to determine whether there is residual equity value in the Oncor Equity for EFH stakeholders, but nonetheless request certain modifications to the Debtors' proposed procedures.[4]

2. In order to meet the "fair and reasonable" standard of review for approval of the proposed procedures, the Ad Hoc Committee submits that the proposed procedures should be modified to address the following issues. First, the procedures should impose a minimum Bid Requirement which requires that there be sufficient distributable value to pay all asserted EFIH claims (to the extent allowed) in full and in cash. As previously demonstrated, the members of the Ad Hoc Committee of EFIH Unsecured Noteholders are prepared to provide the necessary

---

[3] Capitalized terms used but not defined in this Response shall have the meanings set forth in the Bidding Procedures Motion or Bidding Procedures, as applicable. Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed below or in the Bidding Procedures Motion or Bidding Procedures, as applicable.

[4] The Ad Hoc Committee of EFIH Unsecured Noteholders has been working with the Debtors and their advisors in an attempt to resolve the issues raised herein and will continue to work toward resolution of such issues prior to the hearing. The Ad Hoc Committee of EFIH Unsecured Noteholders reserves all rights with respect to any subsequent hearing seeking approval of a Stalking Horse Bid or Successful Bid.

capital to deleverage EFIH and convert their EFIH Unsecured Notes to equity if the Debtors cannot generate sufficient value in the sales process to ensure the payment in full in cash of all allowed EFIH claims.[5] Furthermore, the members of the Ad Hoc Committee of EFIH Unsecured Noteholders have not consented to any impairment of their legal rights as holders of the EFIH Unsecured Notes. If Bidders are not prepared to transact at a level sufficient to satisfy all asserted EFIH claims in full in cash (to the extent allowed), there is no reason for the estate to incur millions of dollars of professional fees chasing an illusory transaction when the Ad Hoc Committee of EFIH Unsecured Noteholders is prepared to take ownership of the Oncor Equity and deleverage EFIH.

3. <u>Second</u>, the Debtors' decision to exclude creditors and their advisors from the stalking horse selection process renders the procedures unfair and unreasonable. There is no credible justification for the Debtors to not consult with advisors to EFH and EFIH creditors regarding both Round 1 and Round 2 Bids and selection of a Stalking Horse Bidder. Decisions concerning, among other things, which Bids to advance from Round 1 to Round 2, material terms and conditions of the Bids, topping fees and breach remedies, and the negotiation of definitive documentation, should not be the exclusive province of the Debtors. These decisions should be made in consultation with the creditor groups who are the principal beneficiaries of this process and not dictated unilaterally by the Debtors. Furthermore, given the potential for conflicts of interests in these cases, it is imperative that EFIH unsecured creditors, through their advisors, are given meaningful access to the process for oversight purposes. In fact, the Debtors

---

[5] Using the Debtors' current cash flow projections, in order to satisfy all asserted EFIH secured and unsecured claims in full and in cash as of December 31, 2015, a Bid must be structured to provide for distributable value to EFIH creditors of at least $11.2 billion adjusted to reflect (i) any difference between projected pre-emergence cash and actual pre-emergence cash, (ii) emergence costs (e.g. exit financing fees, etc.) to be paid by the EFIH estate, and (iii) adjustments to EFIH allowed claims amounts based on the actual emergence date.

and prospective Bidders may benefit from increased creditor involvement in the process by ensuring that issues and concerns are addressed during Bid negotiations rather than during hostile court hearings. EFH and EFIH creditors and their advisors are all sophisticated parties who have an interest in maximizing value and are familiar with the use of protective orders to ensure confidentiality. The Court should require the Debtors to fairly balance the Debtors' interest in minimizing disclosure of Bid terms with the goal of transparency and creditor oversight by incorporating reasonable consultation and access rights with creditors, either directly or through their advisors.

4. _Third_, the Debtors should not be permitted to use their Form Confidentiality Agreement to separate Bidders from creditor groups in these cases. The Form Confidentiality Agreement sent to potential Bidders explicitly bars Bidders from speaking with creditor groups without consent of the Debtors. As the Court has witnessed, however, bidders have seen value in working with various creditor groups to submit bids and will need to work with creditors on the terms of any EFH or EFIH plan. Erecting barriers to coordination between Bidders and creditor groups is more likely to diminish participation in the auction process than to encourage bidding. The Bidding Procedures must provide a mechanism to permit Bidders to consult and work with the creditor groups in connection with formulating proposed Bids. Given the complex tax issues, intercreditor disputes and claim allowance issues, such discussions are necessary to enable Bidders to realistically formulate bids given the unique concerns that must be addressed to confirm a chapter 11 plan for EFH and EFIH and to close on any proposed transaction.

5. _Finally_, the Court should not approve aspects of the Bidding Procedures that are designed to govern the public Auction prior to approval of a Stalking Horse Bid. Approval of these procedures must be based upon the form and structure of the Stalking Horse Bid, and thus

approval is premature at this time. Rather, parties should be given the opportunity to review the selected Stalking Horse Bid and weigh in on the proposed Auction procedures once the Stalking Horse Bid is announced.

6. The modifications requested by the Ad Hoc Committee are designed to balance the interests of EFIH unsecured creditors with the interests of prospective Bidders who, understandably, may be reluctant to participate in a bankruptcy process characterized by litigious court proceedings and contentious intercreditor disputes. While the Debtors' objective through this process is laudable, if the proposed process does not result in a credible and reliable indicator for Oncor Equity value, then the process itself will have been a failure and a tremendous waste of both time and estate resources. Consequently, it is of paramount importance that the Debtors get the process right. The Ad Hoc Committee of EFIH Unsecured Noteholders submits that the limited modifications requested herein will encourage bidding and enhance the integrity of the process, and, therefore, should be ordered as a condition to approval of these procedures.

## BACKGROUND

### I. General Background

7. On April 29, 2014, certain of the Debtors including EFH, EFIH, Energy Future Competitive Holdings Company LLC and TCEH entered into a restructuring support agreement (the "RSA") with many of the Debtors' key stakeholders. See *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay* [ECF No. 505] (the "RSA Assumption Motion"). At EFIH, the RSA contemplated a substantial infusion of $1.9 billion in new money (the "Investment Commitment") in the form of a debtor-in-possession financing facility (the "EFIH Second Lien DIP"). See RSA Assumption Motion, ¶ 4. With respect to the TCEH

Debtors, TCEH would spin-off into a stand-alone entity through a tax-free deconsolidation transaction that would have avoided the incurrence of taxable deconsolidation liability.[6] See RSA Assumption Motion, ¶ 24.

8. On July 16, 2014, during the Debtors' prosecution of the RSA and EFIH Second Lien DIP, an ad hoc group of holders of EFIH second lien notes (the "EFIH Second Lien Group") partnered with strategic investor NextEra Energy, Inc. ("NextEra") together filed a strategic proposal (the "Strategic Proposal"), which like the RSA and EFIH Second Lien DIP, was also premised on a tax-free transaction—an investment in the equity of reorganized EFH and tax-free spin-off of TCEH (the "Optimal Structure"). [ECF No. 1593]. Further, the Strategic Proposal proposed to satisfy all EFIH Unsecured Notes claims in full.

9. Due to their belief that the Strategic Proposal was a higher and better proposal than that embodied in the RSA, on July 24, 2014, the Debtors terminated the RSA and withdrew the motion to approve the EFIH Second Lien DIP. [ECF No. 1697]; see Bidding Procedures Motion, ¶¶ 1, 19. Immediately following termination of the RSA, the Debtors initiated a two-prong process: (a) negotiate definitive documentation with respect to the Strategic Proposal; and (b) commence a marketing process to solicit competing bids premised upon a non-taxable structure. See Keglevic Dep., Oct. 3, 2014, 68:23-70:16 (excerpts attached hereto as Exhibit A). According to the Debtors' investment banker, the Debtors were unable to finalize documentation with respect to the Strategic Proposal and, while the Debtors received indications of interest from other potential bidders, certain bidders were not comfortable participating in the proposed bidding process as it was too short and lacked transparency. See Hiltz Dep., Oct. 6, 2014, 57:21-

---

[6] Holders of the TCEH first lien secured claims would have received the equity in reorganized TCEH.

6

58:11, 65:22-66:22; 104:23-105:10 (excerpts attached hereto as <u>Exhibit B</u>); Keglevic Dep., Oct. 3, 2014, 121:4-22 (excerpts attached hereto as <u>Exhibit A</u>).

10. On August 26, 2014, the Debtors filed a notice to inform parties-in-interest that they would pivot from supporting the Strategic Proposal to seeking Court approval of the proposed Bidding Procedures. [ECF No. 1919]. In light of this announcement, on the same day, the EFIH Second Lien Group and NextEra withdrew the Strategic Proposal. [ECF No. 1924]; <u>see</u> Bidding Procedures Motion ¶ 23. On September 19, 2014, the Debtors filed the Bidding Procedures Motion, pursuant to which the Debtors seek court approval of the procedures governing the previously commenced closed two-step Stalking Horse Bidding Process and the subsequent Open Bidding Process. While the Debtors now propose to solicit Bids premised upon any structure, the Debtors believe that non-taxable bid structures will generate the most distributable value. Bidding Procedures Motion, ¶ 36. Further, on October 1, 2014, the Debtors filed the *Omnibus Tax Memorandum* [ECF No. 2296] (the "<u>Tax Memo</u>"), further explaining the Debtors' view on the complex tax considerations that guide any restructuring in these cases.

## ARGUMENT

**I.     Legal Standard**

11. Bankruptcy Code section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). In determining whether to authorize a transaction under Bankruptcy Code section 363, courts in this Circuit and elsewhere require the debtor to establish a "sound business purpose" for the proposed action. <u>See, e.g.</u>, <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) ("[A] debtor applying under § 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization…"); <u>In re Montgomery Ward Corp</u>, 242 B.R. 147, 153, 155 (D. Del 1999); <u>In re The SCO Group, Inc.</u>, 07-

11337 (KG), 2009 WL 2425755, at *4 (Bankr. D. Del. Aug. 5, 2009) (noting that a sale under Bankruptcy Code section 363(b)(1) "requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith") (citing In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991)).

12.   The overriding goal in the sale of estate property is to maximize the proceeds received by the estate for the benefit of all creditors. In re Reliant Energy Channelview LP, 594 F.3d 200, 210 (3d Cir. 2010) (noting that debtors-in-possession have a duty to maximize the value of the estate) (citation omitted). The purpose of procedural bidding orders is to "facilitate an open and fair public sale designed to maximize value for the estate." In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); see also In re Wintz Co., 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring the sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets") (citations omitted); In re Integrated Res., Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); In re President Casinos, Inc., 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004), ("[s]tructured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests.").

13.   In fact, these very principles of openness and disclosure are core tenants of the bankruptcy process. See In re Gordon Properties, LLC, 514 B.R. 449, 460 (Bankr. E.D. Va. 2013) ("[T]he hallmark of every bankruptcy case is transparency—the full, fair and timely disclosure of information that affects the administration of the estate. A debtor in possession is not fulfilling his obligations if he inhibits or delays the flow of information that should be

available to the creditors, the United States Trustee or the court."); In re eToys, Inc., 331 B.R. 176, 187 (Bankr. D. Del. 2005) ("Disclosure goes to the heart of the integrity of the bankruptcy system.") (citations omitted).

## II. The Bidding Procedures Cannot Be Approved Without Modification

14. The Debtors have not shown that it is fair or reasonable to: (a) consider Bids that do not provide sufficient distributable value to pay all asserted EFIH claims (to the extent allowed) in full and in cash; (b) deny advisors to the EFIH unsecured creditors consultation or advisory rights during the Stalking Horse Bidding Process; or (c) erect a wall between Bidders and creditor groups during the Stalking Horse Bidding Process. Further, the procedures regarding the Open Bidding Process, including those governing the Auction, should not be approved prior to the selection of a Stalking Horse Bid and should thus be struck from the Bidding Procedures.

### A. *Consideration of Bids that Do Not Provide Sufficient Distributable Value To Pay All Asserted EFIH Claims (To The Extent Allowed) In Full And In Cash Is Unreasonable*

15. As the Bidding Procedures provide that the closing of any Successful Bid will be conditioned upon confirmation of a plan of reorganization, neglecting to impose a minimum bid requirement that requires Bidders to provide sufficient distributable value to pay all asserted EFIH claims (to the extent allowed) in full and in cash is unreasonable. The members of the Ad Hoc Committee of EFIH Unsecured Noteholders, who hold in excess of 83% of the EFIH Unsecured Notes, have not consented to any impairment of their claims. Further, the Debtors state that they initiated this process based on the assumption that higher and better offers than the Strategic Proposal—which would have satisfied all EFIH creditors in full—exist in the current market. See Bidding Procedures Motion, ¶¶ 1, 19. In fact, the Debtors believe that the value provided by the Strategic Proposal has set a *de facto* floor for the market in the Stalking Horse

Bidding Process. See Cremens Dep., Oct. 8, 2014, 130:19-131:24 (excerpts attached hereto as Exhibit C). While it is true that the Auction could generate bids in excess of the Stalking Horse Bid, it makes no sense for the estates to risk potentially hundreds of millions of dollars in liability for a break-up fee on account of a Stalking Horse Bid that is insufficient to pay EFIH unsecured claims in full and in cash. Adoption of a minimum bid requirement is thus fair and reasonable at this juncture.

> B. *Denying Consultation Rights to EFIH Unsecured Creditor Representatives is Unfair and Unreasonable*

16. As drafted, the Bidding Procedures provide that the Debtors will run the Stalking Horse Bidding Process without *any* creditor input, leaving the review of Round 1 Bids and selection of both Round 2 Bids and an ultimate Stalking Horse Bid in the Debtors' sole discretion. As this process will ultimately determine EFIH unsecured creditors' recoveries, shutting out their advisors from the Stalking Horse Bidding Process is unreasonable.

17. Under the Bidding Procedures, the Debtors characterize their proposed closed, two-step Stalking Horse Bidding Process as a "typical non-bankruptcy, two-stage auction." See Bidding Procedures, ¶ 3. The Debtors allege that permitting creditor access to Bidders "risks the unauthorized disclosure of bids and would have a significant chilling effect on participation in the process" because "many of the potential bidders here are public companies that are hypersensitive to the potential negative consequences of their bids being publicized out of turn[.]" See Bidding Procedures Motion, ¶ 6. Mr. Hiltz, the Debtors' investment banker who oversees the Stalking Horse Bidding Process, has provided no more than conclusory assertions on this point. See *Declaration of William O. Hiltz in Support of the Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of*

*Notice Thereof* [ECF No. 2088] (the "Hiltz Declaration"), ¶ 16; Hiltz Dep., Oct. 6, 2014, 119:7-120:12 (excerpts attached hereto as Exhibit B).

18.  In bankruptcy auctions, however, unsecured creditor representatives are commonly given consultation rights over the selection of a stalking horse bidder.[7] See, e.g., In re Filene's Basement, LLC, Case No. 11-13511 (KJC) (Bankr. D. Del. Apr. 9, 2012) [ECF No. 1076] (consultation rights to official committee in selecting stalking horse); In re Delta Petroleum Corp., Case No. 11-14006 (KJC) (Bankr. D. Del. Jan. 11, 2012) [ECF No. 184] (same); In re Beacon Power Corp., Case No. 11-13450 (KJC) (Bankr. D. Del. Dec. 27, 2011) [ECF No. 176] (same); In re Semcrude, L.P., Case No. 08-11525 (BLS) (Bankr. D. Del. Nov. 24, 2008) [ECF No. 2329] (same). Given the lack of any official committee for the EFIH estate and the fact that the Ad Hoc Committee of EFIH Unsecured Noteholders represents more than 80 percent of all unsecured claims at EFIH, it is unreasonable to categorically exclude its representatives from the process. The Debtors should be required to draft appropriate procedures to balance the competing interests of inadvertent disclosure with necessary and customary creditor oversight.

    C.    *Inhibiting Communications Between Bidders and Creditor Groups is Unreasonable Given the Facts and Circumstances of These Cases*

19.  Further, the Debtors seek to bar Bidders from contacting any of the Debtors' creditor constituencies during the Stalking Horse Bidding Process without the Debtors' consent through the form Confidentiality Agreement (the "Form Confidentiality Agreement") already distributed to potential Bidders. See Hiltz Dep., Oct. 6, 2014, 134:23-135:11 (excerpts attached hereto as Exhibit B). As the Court is well aware, there are numerous outstanding issues in these

---

[7] Mr. Hiltz testified that he had very little experience conducting mergers and acquisitions transactions in a bankruptcy setting. See Hiltz Dep., Oct. 6, 2014, 244:19-248:22 (excerpts attached hereto as Exhibit B).

11

cases headed toward future litigation including, but not limited to, value allocation, intercompany claim, tax, regulatory, and confirmation issues. Inhibiting Bidders from working with creditor groups to resolve these issues risks timely confirmation of an eventual plan of reorganization—a condition precedent to the consummation of the ultimate Successful Bid.[8] Further, confirmation of a plan of reorganization will ultimately require *some* level of creditor consent. For example, to execute the Optimal Structure: (a) TCEH first lien creditors must take the equity of reorganized TCEH and forgo a basis step-up, and (b) certain EFH and/or EFIH creditors may need to consent to receiving certain forms of non-cash consideration, among other possibilities.[9] Thus, it is not surprising that the two comprehensive restructuring proposals to date—the RSA and the Strategic Proposal—have all been premised upon creditor partnerships in order to overcome confirmation obstacles in addition to regulatory and tax hurdles. In recognition of this fact, the Debtors should remove this restriction from the Form Confidentiality Agreement, and waive their right to enforce such provision to the extent included in previously executed Confidentiality Agreements.

       D.     *The Proposed Procedures Regarding the Auction Process are Premature and Must Not Be Approved at this Time*

      20.    Finally, all proposed procedures relating to the Open Bidding Process should be struck as they are premature and will inhibit a competitive bidding process. The Debtors correctly note that it is not typical for a debtor to seek Court approval of the proposed Stalking Horse Bidding Process. See Bidding Procedures Motion, ¶ 4. However, it is typical to seek Court approval of procedures that govern an auction process where a stalking horse bidder is

---

[8] Under the Bidding Procedures, consummation of any transaction is dependent upon confirming a chapter 11 plan of reorganization by December 31, 2015.

[9] In his deposition, Mr. Hiltz recognized the fact that a bid value that includes equity of a private company would require discussions with creditor groups. See Hiltz Dep., Oct. 6, 2014, 145:8-146:11 (excerpts attached hereto as Exhibit B).

12

chosen, but only after such stalking horse bidder has been selected. See In re Coda Holdings, Inc., Case No. 13-11153 (CSS) (Bankr. D. Del. May 29, 2013) [ECF NO. 188]; In re THQ, Inc., Case No. 12-13398 (MFW) (Bankr. D. Del. Jan. 11, 2013) [ECF No. 152]; In re Champion Enter., Inc., Case No. 09-14019 (KG) (Bankr. D. Del. Feb. 9, 2010) [ECF No. 386]; In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009) [ECF No. 85]. The Debtors propose that "[a]fter selecting a Stalking Horse Bidder, the Debtors will file a motion with the Court seeking approval of the Stalking Horse Bid, followed by a period of open bidding and the Auction." See Bidding Procedures Motion, ¶3. Procedures governing topping bids, however, are customarily negotiated following the selection of a stalking horse bidder in order to appropriately tie such procedures to the structure of the stalking horse bid. Furthermore, an important consideration for the rules governing the Auction is whether the Debtors move forward with a taxable or tax-free transaction, a distinction the Debtors have yet to incorporate into the proposed Bidding Procedures. The rules governing the Auction will need to be adjusted to take this into account to allow for "apples to apples" bidding.[10] Thus, while such procedures will be necessary to conduct the Auction, it is inappropriate to fix them at this time. The Debtors simply have no basis to set a minimum bid level for the public Auction at this time, and doing so only introduces further uncertainty into the Bidding Procedures, which will only discourage Bidder participation.

*[remainder of page intentionally left blank]*

---

[10] As noted above, the Debtors "have been telling people all along[] that aggregate value net of any tax liability is the yardstick which [they] will use to evaluate bids." See Hiltz Dep., Oct. 6, 2014, 218:5-8 (excerpts attached hereto as Exhibit B).

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Ad Hoc Committee of EFIH Unsecured Noteholders respectfully request that this Court (i) order the Debtors to revise the Bidding Procedures consistent with the objections raised herein, and (ii) grant such other and further relief for the Ad Hoc Committee of EFIH Unsecured Noteholders as this Court may deem just, proper and equitable.

Dated: October 10, 2014
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

/s/ *William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Ann M. Kashishian (No. 5622)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:  (302) 295-0195
Facsimile:  (302) 295-0199
Email:  chipman@chipmanbrown.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
Email:  idizengoff@akingump.com
  mlahaie@akingump.com

Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue
Washington, DC 20036-1564
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288
Email:  salberino@akingump.com

*Co-Counsel for the Ad Hoc Committee of EFIH Unsecured Noteholders*