## <u>EXHIBIT A</u>

**Paul M. Keglevic Deposition Transcript Excerpts**
**October 3, 2014**

1              PAUL KEGLEVIC

2 UNITED STATES BANKRUPTCY COURT

3 FOR THE DISTRICT OF DELAWARE

-----------------------------------------x

4 In Re:

Energy Future Holdings Corporation, et.,

5

                   Debtors.

6

Chapter 11

7 Case No. 14-10979

Jointly Administered

8

9 -----------------------------------------x

10        DEPOSITION OF PAUL M. KEGLEVIC

11          New York, New York

12          October 3, 2014

13

14       **  CONFIDENTIAL  **

15

16

17

18

19

20

21

22

23 Reported by:

24 KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25 JOB NO. 85349

CONFIDENTIAL

Page 66

PAUL KEGLEVIC
1       PAUL KEGLEVIC
2       Q.   The issues that we were discussing
3   previously, the tax -- the deconsolidation
4   taxes, checking the box, the tax-free spin?
5       A.   Yes, I -- each of the individual
6   boards has received throughout the prior two and
7   throughout the bankruptcy case background,
8   education, considerations from our counsel on
9   those matters.
10      Q.   So what I'm focusing in on is
11  independent advice, meaning advice that's
12  provided by a specific law firm for a specific
13  entity.  The counsel that you were referring to
14  before, are you referring to, for example,
15  Kirkland & Ellis, that gave advice to all the
16  entities?
17      A.   I am referring to Kirkland & Ellis
18  that they gave advice to all the entities.
19      Q.   Are you aware of any counsel that
20  provided -- any counsel other than Kirkland &
21  Ellis -- that would have provided advice for a
22  single debtor entity?
23      A.   I know we engaged Sidley & Austin to
24  review certain potential litigation matters.
25      Q.   And without going into the substance

Page 67

1       PAUL KEGLEVIC
2   of --
3       A.   Yes.
4       Q.   -- what advice and what they were
5   consulted with, was Sidley's retention with
6   respect to individual Debtors or all of the
7   Debtors, or was it a litigation-by-litigation
8   issue?
9       MR. McKANE:  Yes or no.
10      A.   I don't recall exactly how they broke
11  up their engagement, but that's the only outside
12  counsel, other than Kirkland, that I was aware
13  that has consulted with our board.
14      Q.   And Sidley was not providing advice on
15  the issues we discussed earlier, such as the
16  deconsolidation taxes, the tax-free spin, and
17  the other issues?
18      MR. McKANE:  I'm going to instruct you
19  not to answer because it goes into the
20  contents of the advice.  You just said you
21  weren't going to ask that question.
22      MR. DEVORE:  I'm not going into the
23  contents of the advice.  I'm Asking if they
24  retained independent counsel for the issues.
25  He already answered that question.

Page 68

1       PAUL KEGLEVIC
2       MR. McKANE:  He said he knew Sidley
3   was involved.  He didn't know what for
4   beyond the litigations, potential
5   litigations.
6   BY MR. DEVORE:
7       Q.   Do you have any reason to believe that
8   Sidley was involved in providing advice with
9   respect to the issues we discussed such as the
10  deconsolidation tax?
11      A.   I don't specifically recall the entire
12  scope of their service.
13      Q.   Mr. Keglevic, I would like to turn now
14  to the Debtors' marketing process since the
15  recess of the hearing for approval of the second
16  lien DIP transaction at the end of June.
17      In July, the Debtors terminated the
18  restructuring support agreement, correct?
19      A.   Correct.
20      Q.   And that was on July 24, do you recall
21  that?
22      A.   Sounds about right.
23      Q.   Now, what did the Debtors do in July
24  after the termination of the RSA on or about
25  July 24 with respect to marketing the Oncor

Page 69

1       PAUL KEGLEVIC
2   asset?
3       A.   I can give a broad overview.  Mr.
4   Hiltz probably can give more specific actions
5   that may have been taken.
6       After the RSA was terminated, we
7   continued to -- and I think it's fair to say one
8   of the major reasons it was terminated is we got
9   a substantially higher bid from NextEra that was
10  publicly announced.  So I know we began pushing
11  them and negotiating them and seeing what we
12  could get out of the bid process and considered
13  strongly at that point whether we should lock
14  them up as a stalking horse.
15      In fact, many of our creditors, or at
16  least several, indicated that that was their
17  desired approach.  Other creditors had different
18  points of view and thought if we lock up one
19  stalking horse, it may chill the bid and we
20  would be better off to have a longer stalking
21  horse process, which is eventually the process
22  that we selected.
23      So it was primarily dedicated to
24  working with NextEra, but during that process,
25  we also received other indications of interest

18  (Pages 66 to 69)

CONFIDENTIAL

PAUL KEGLEVIC

1    PAUL KEGLEVIC
2    which supported extending the stalking horse
3    process, and in fact, received another bid
4    during that process.
5        So we were confronted at that point
6    with we had three bidders, and those three
7    bidders, we continued to try to keep them warm
8    until we made a decision as to what our final
9    process would be, which is the one that's
10   embodied in here.
11       Other than that, we received incoming
12   calls of interest, in which case we sent them
13   the teaser, and I think we probably -- we may
14   have signed some NDAs with some new potential
15   bidders and may have given them some early
16   access on some due diligence information.
17   Q.   Okay.  And the Debtors also sent
18   teasers to these prospective investors --
19   A.   Yes.
20   Q.   -- in July?
21   A.   Yes.
22       (Keglevic Exhibit 4, an e-mail with
23   attachment bearing Bates Nos. EFH0009170
24   through 9181, marked for identification, as
25   of this date.)

1    PAUL KEGLEVIC
2    BY MR. DEVORE:
3    Q.   Mr. Keglevic, this is an e-mail from
4    Michael Carter at EFH.com to you forwarding an
5    e-mail from Bo Yi, and the e-mail includes an
6    attached marketing materials teaser, correct?
7    A.   Yes.
8    Q.   Who is Michael Carter?
9    A.   Michael Carter is the senior
10   vice-president of Financial Planning and he
11   reports to me.
12   Q.   And who is Bo Yi?
13   A.   Bo Yi is a -- he works for Evercore.
14   I'm sorry, I don't recall his title.
15   Q.   And is this the final version of the
16   teaser that went out to prospective investors in
17   July?
18   A.   I have no reason -- it looks like it
19   is, but I would have to compare it to -- you
20   would have to probably ask Mr. Hiltz to compare
21   it to what he actually mailed since I was not
22   involved in that process.
23   Q.   Do you know if there were multiple
24   versions of a teaser sent to prospective
25   investors in July?

1    PAUL KEGLEVIC
2    A.   Once again, you would have to ask Mr.
3    Hiltz.
4        (Keglevic Exhibit 5, an e-mail with
5    attachment bearing Bates Nos.
6    EFH-EVR0900000013, marked for
7    identification, as of this date.)
8    BY MR. DEVORE:
9    Q.   Mr. Keglevic, Exhibit 5 is an e-mail
10   from Evercore to CenterPoint Energy attaching a
11   teaser.  Do you see that?
12   A.   Yes.
13   Q.   So, to be consistent, let's use this
14   version of the teaser as it went to a
15   prospective investor.
16       Are you aware of any changes to this
17   teaser that were made in sending marketing
18   materials to prospective investors in July?
19   A.   I can't recall specific changes to the
20   teaser.  I know, in substance, it looks like
21   it's the same type of information, all these
22   documents.
23   Q.   Are you aware of any marketing
24   materials other than these teasers that were
25   being used in July for marketing the Oncor

1    PAUL KEGLEVIC
2    asset?
3    A.   Once again, Mr. Hiltz would know for
4    sure.  I -- there may have been.  I can't recall
5    any as I sit here today.
6    Q.   Do you recall any other marketing
7    materials that would have been sent in August?
8    A.   Same answer.
9    Q.   Now, if we turn to page 1 of the
10   presentation, which is Bates number ending in
11   018 --
12       Are you on the same page as I am?
13   A.   Yes.
14   Q.   Now, the third bullet says, "The
15   Company is pursuing a restructuring transaction
16   (the TCEH Spin-Off) whereby, on the emergence
17   date, TCEH will separate from EFH on a tax-free
18   basis and 'Reorganized EFH' would continue to
19   own 100 percent of EFIH and its 80 percent
20   interest in Oncor."
21       Do you see that?
22   A.   Yes.
23   Q.   And then on the next page, it states
24   in the third bullet point, "Any acquisition of
25   Reorganized EFH stock will need to be structured

Page 118

PAUL KEGLEVIC
1
2  Debtors filed identifies the parties that were
3  approached, the parties that received various
4  versions of the teaser materials that were
5  discussed earlier, and the parties that had --
6  the number of parties that had signed NDAs,
7  correct?
8        MR. McKANE:  Can I direct him to the
9  right page?
10       MR. STOLL:  Yes.  I thought I did
11  that.
12    A.   I just didn't remember the page.
13    Q.   Oh, paragraph 24.
14    A.   Sorry.  I don't know why we typed that
15  number.  If they put a number in there, I would
16  probably remember ten.
17       And that was my general recollection.
18  I think that's correct.
19    Q.   Okay.  And all of this was done prior
20  to the filing of the motion?
21    A.   That's right.
22    Q.   And the motion that's filed now, the
23  motion that's filed now seeks -- asks the Court
24  to approve bidding procedures that will result,
25  ultimately, in leading to the selection of a

Page 119

PAUL KEGLEVIC
1
2  stalking horse bidder and then ultimately an
3  auction following the receipt of the stalking
4  horse bidder, correct?
5    A.   That's correct.
6    Q.   And the motion does not seek
7  permission to sell any assets, correct?
8    A.   I think the motion indicates that
9  we'll consider a straight sale of assets.  "Any
10  or all" I think was the term in different parts
11  of the motion.
12    Q.   The motion that you filed now is not
13  necessary for the Debtor to continue marketing
14  the assets, is it?
15       MR. McKANE:  Objection.  Calls for a
16  legal conclusion, but you can give your
17  understanding.
18    A.   No, we had, you know, marketed the
19  assets before we had this motion.
20    Q.   Right.  And would you agree with me
21  that it's -- it's not typical for a party, a
22  Debtor to file a motion asking the Court to
23  approve the pursuit of the stalking horse
24  bidder?
25       MR. McKANE:  Objection to form.

Page 120

PAUL KEGLEVIC
1
2    A.   I'm not the expert on what's normal in
3  the bankruptcy process.  I'm sure Mr. Hiltz is.
4    Q.   And if Mr. Hiltz said it was not
5  normal, you would agree with that?
6        MR. McKANE:  Objection to form.  Calls
7  for speculation.
8    A.   I believe -- I respect his opinion.
9    Q.   So if a motion is not necessary for
10  the company to market its assets, what is the
11  purpose of the motion?
12    A.   We thought the benefit of having a
13  motion to -- since we had a prior process and
14  since we had a second lien process, would be to
15  clarify what the process was, give comfort to
16  potential bidders that there was a process, that
17  it was Court-supervised and approved, and we
18  thought that was -- and in fact, my advisor, who
19  I relied heavily on, thought -- and all my
20  advisors, not just the financial, my legal
21  advisors, that that would be the best way to
22  maximize potential value.
23    Q.   You testified earlier that you spoke
24  with certain bidders during the process, the
25  preprocess of prior to filing the motion,

Page 121

PAUL KEGLEVIC
1
2  correct?
3    A.   Yes.
4    Q.   Did any of those bidders tell you that
5  they would only continue to bid on Oncor assets
6  if there was a Court-approved process in place?
7    A.   Not specifically, but in the bidders
8  that I had talked to before we had a formal
9  process, we had different bidders all requesting
10  different timelines and different processes.
11  All of them were suspicious of, you know, that
12  the other bidder was getting the timeline they
13  wanted that played to their benefit, and we just
14  want to put transparency around it and make
15  everybody -- give them as much comfort as we
16  could that it was going to be transparent,
17  Court-supervised, and nobody had an inside track
18  or an unfair advantage, especially given the
19  fact that it had been disclosed that a creditor
20  group could be a potential bidder or, you know,
21  several creditor groups might be potential
22  bidders.
23    Q.   In the absence of the motion filed by
24  the Debtor for which it seeks approval, there's
25  nothing that would have prevented the Debtor

**<u>EXHIBIT B</u>**

**William O. Hiltz Deposition Transcript Excerpts**
**October 6, 2014**

1        CONFIDENTIAL - WILLIAM O. HILTZ

2    UNITED STATES BANKRUPTCY COURT

3    FOR THE DISTRICT OF DELAWARE

-----------------------------------------x

4    In Re:

Energy Future Holdings Corporation, et.,

5

                    Debtors.

6

Chapter 11

7    Case No. 14-10979

Jointly Administered

8

9    -----------------------------------------x

10           * * *CONFIDENTIAL* * *

11        DEPOSITION OF WILLIAM O. HILTZ

12              New York, New York

13              October 6, 2014

14

15

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 85363

Page 54

CONFIDENTIAL - WILLIAM O. HILTZ

1  substantially finalized?
2
3      A.   I don't recall the exact date.
4      Q.   The approximate date?
5      A.   Prior to the -- shortly prior to the
6  bidding procedures motion being filed.
7      Q.   How was this list identified?
8      A.   I'm not sure I understand your
9  question.
10     Q.   How did Evercore come up with this
11 list?
12     A.   Working with Sesh and with some input
13 from some of the other professionals
14 representing the varying creditor
15 constituencies.
16     Q.   So what types of parties were
17 identified?
18     A.   Well, I mean, in two broad categories,
19 strategic buyers and financial buyers.
20     Q.   Now, without revealing the identity of
21 any prospective bidders, can you walk us through
22 how the list went from around 31 in the August
23 timeframe to approximately 52 or 53 shortly
24 prior to filing the bidding procedures motion?
25     A.   Primarily, as a result of input from

Page 55

CONFIDENTIAL - WILLIAM O. HILTZ

1  the creditor committee representatives.
2
3      Q.   And what type of prospective
4  purchasers did those creditor constituencies
5  suggest be added?
6      A.   Well, both.  Both some strategic
7  buyers as well as some financial buyers.
8      Q.   Did you believe that those additions
9  were beneficial to the list?
10     A.   Only modestly some.
11     Q.   You had expected that the 31 that you
12 had identified would be your most likely
13 candidates?
14     A.   Correct.
15     Q.   You believe that the chances that you
16 may have missed someone in those 31 candidates
17 identified in August that would ultimately be
18 interested in the Oncor asset would be small,
19 correct?
20     A.   I would think so, but you never know.
21     Q.   Do you have any reason to believe that
22 someone in that initial list of 31 would
23 ultimately be interested in the asset?
24     A.   Do I have any reason to believe that
25 someone in the initial list of 31 would be

Page 56

CONFIDENTIAL - WILLIAM O. HILTZ

1  interested?  Yes, I do.
2
3      Q.   Someone that was not listed in the
4  initial list of 31?
5      A.   Not particularly.
6      Q.   Now, going to the list of 51, which is
7  now 52 to 53 that was identified shortly before
8  filing the motion, only 22 of those prospective
9  bidders received teaser materials; is that
10 correct?
11     A.   Again, I believe that now some 30-odd
12 have received teaser materials.
13     Q.   It went up to 30?
14     A.   Some 30, 31, 32, something like that.
15     Q.   When did the number go from 22 to 30?
16     A.   You're talking about the list of 51,
17 correct, not whether the initial list of 31?
18     Q.   So taking the list of 51 --
19     A.   Right.
20     Q.   -- that were identified prior to the
21 filing of the motion --
22     A.   Yes.
23     Q.   on September 19, and understanding
24 it went up by one or two?
25     A.   Yes.

Page 57

CONFIDENTIAL - WILLIAM O. HILTZ

1
2      Q.   To 52 to 53?
3      A.   Correct.
4      Q.   What I'm trying to understand is how
5  many of those received teaser materials?
6      A.   I think it's a number around 31 or 32.
7      Q.   Why did the number go from 22 on the
8  filing of the motion to 31 or 32?
9      A.   Because people came back and expressed
10 interest in receiving a teaser.
11     Q.   Did they say why they came back?
12     A.   I've not been the person handling
13 those discussions.
14     Q.   And who has been handling it?
15     A.   Sesh and Brendan Panda.
16     Q.   Do you have any reason to believe that
17 parties came back to the process because of a
18 change in transaction structure?
19     A.   Yes.
20     Q.   What is the basis for that belief?
21     A.   Well, several parties who in the
22 initial process with NextEra refused to sign
23 NDAs or participate in the process because they
24 felt the timing was too short, several of those
25 parties have now signed NDAs and are actively

## Page 58

CONFIDENTIAL - WILLIAM O. HILTZ
participating in the process. We had only six
NDAs signed until we changed the process. We
now have 12.
    Q.   And by changing the process, what are
you referring to?
    A.   Going from a very short, typical
stalking horse process to the process that we
have outlined, which is giving bidders more time
and conducting the stalking horse portion in a
two-staged auction.
    Q.   Going back to the request from
approximately ten prior parties to receive
teaser materials, do you follow where I am?
    A.   Ten prior parties?
    Q.   Your declaration states 22 parties
received prospective -- teaser materials, and
that number went up to 31 or 32, you testified?
    A.   31 or 32 have been sent out, yes,
correct.
    Q.   Now, what I want to know is have -- is
there any reason to believe that additional
parties requested teaser materials because of an
announced change in the transaction structure
from a -- the optimal deal structure or the

## Page 59

CONFIDENTIAL - WILLIAM O. HILTZ
efficient structure, as you call it, to a
proposal inviting transactions in any form?
    MS. O'CONNOR:  Object to form.
    A.   I have no reason to believe that that
is the reason why additional people have
requested teasers.
    Q.   Now, when the number went from 22
parties receiving teasers to 31 or 32, had all
of the incremental increase in number been
previously identified in the list of 51 parties?
    A.   I believe so.
    Q.   You state in your declaration that, as
of the date of your declaration, only ten
potential bidders entered into confidentiality
agreements --
    A.   Uh-huh.
    Q.   -- and were given access to the data
room, correct?
    A.   Yes.
    Q.   That number has increased to 12 since
the filing?
    A.   Yes.  And actually, I misstated there.
I believe it's actually 13 as of this morning.
There was another one over the weekend.

## Page 60

CONFIDENTIAL - WILLIAM O. HILTZ
    MR. DEVORE:  The 13th NDA has not been
produced and we would request that it be
promptly produced.
    MS. O'CONNOR:  We will follow up on
that that they received this weekend and get
it produced to you, if it's available.
    I would note that you're getting those
NDAs with redactions of the identity, so
presumably the language is exactly the same
as the prior 12 that you have received, but
we will get it to you.
    MR. DEVORE:  Actually, there's very
interesting changes among the 12 NDAs, which
is why we would like the copy.
    MS. O'CONNOR:  Okay.
BY MR. DEVORE:
    Q.   Were those three bidders that entered
into NDAs after the submission of your
declaration, were those all identified in your
initial list of 51 bidders?
    A.   I don't know the answer to that.
    Q.   Do you know whether the 13 prospective
bidders that have entered into NDAs were
initially identified in your list of 31 from

## Page 61

CONFIDENTIAL - WILLIAM O. HILTZ
August?
    A.   I don't know the answer to that.
    Q.   Do you have any reason to believe that
there are new members?
    A.   I have no reason to believe that, but
I'm not sure.  I believe that one of the NDAs --
it may be the one that was executed this
weekend -- was to a party who was not in the 51
who came in over the transom.
    MR. DEVORE:  If you want to take a
break, this might be a good opportunity.
    THE VIDEOGRAPHER:  The time is 10:35
a.m.  We're coming off the record.
    (Recess.)
    (Hiltz Exhibit 6A-6L, Confidentiality
Agreements, marked for identification, as of
this date.)
    THE VIDEOGRAPHER:  The time is 10:44
a.m.  We are going back on the record.
BY MR. DEVORE:
    Q.   Mr. Hiltz, I am handing you what has
been marked as Exhibits 6A through 6L, which are
12 redacted NDAs.  Do you know whether these are
the 12 NDAs that the Debtors executed with

Page 62

CONFIDENTIAL - WILLIAM O. HILTZ
1
2  prospective bidders?
3      A.   I don't.
4      Q.   Now, if I can turn your attention to
5  the dates of the NDAs, the dates are listed as
6  July 29, August 8, August 12, August 14, August
7  14, August 25, August 27, August 28, September
8  12, September 19, September 22 and August 1; is
9  that correct?
10     A.   Yes.
11     Q.   Does that sound about the right
12 sequence of the dates on which prospective
13 bidders signed NDAs and gained access to the
14 data room?
15     A.   It seems right.
16     Q.   And a 13th was executed over this
17 weekend, you said?
18     A.   That's my understanding.
19     Q.   Have any of the 12 prospective bidders
20 that signed NDAs indicated that they are no
21 longer interested in the asset or that they
22 would not be submitting a bid?
23     A.   I can't recall.
24     Q.   Do you have any reason to believe that
25 any of the parties that signed NDAs --

Page 63

CONFIDENTIAL - WILLIAM O. HILTZ
1
2      A.   There is one party who has indicated
3  that they are not submitting a bid, but I can't
4  recall whether they in fact signed an NDA.
5      Q.   Mr. Hiltz, in running an M&A process,
6  is it your and Evercore's practice to promptly
7  inform prospective bidders of important or
8  material changes to the bidding or selection
9  process?
10     A.   Yes.
11     Q.   Prior to proposing the current
12 procedures, the Debtors contemplated selecting a
13 stalking horse before seeking court approval of
14 auction procedures; is that right?
15     A.   Correct.
16     Q.   And that was the structural change
17 that you testified to earlier?
18     A.   That's not the only change, but yes.
19          (Hiltz Exhibit 7, an e-mail chain
20     bearing Bates Nos. EFH-EVR0900000359 through
21     361, marked for identification, as of this
22     date.)
23          (Hiltz Exhibit 8, an e-mail chain
24     bearing Bates Nos. EFH-EVR090000356 through
25     358, marked for identification, as of this

Page 64

CONFIDENTIAL - WILLIAM O. HILTZ
1
2  date.)
3  BY MR. DEVORE:
4      Q.   Mr. Hiltz, you have been handed what
5  have been marked as Exhibit 7 and Exhibit 8,
6  which are e-mails from Evercore dated September
7  2.
8      A.   Yes.
9          MS. O'CONNOR:  Sorry.  Just so I can
10     be clear.  And the 7 is the 7:41 a.m. and
11     the 8 is 3:31 p.m.?
12         THE WITNESS:  I think it's the
13     reverse.
14         MR. DEVORE:  It's the reverse.
15         MS. O'CONNOR:  Okay.  Sorry.
16 BY MR. DEVORE:
17     Q.   So if we start with Exhibit 7, which
18 is the top e-mail of September 2 at 3:31 p.m.,
19 are you on that exhibit?
20     A.   Yes.
21     Q.   If you go down to the third e-mail,
22 this is an e-mail from Sesh to Borealis
23 informing them that you're conducting the sale
24 process as a traditional two-step auction, do
25 you see that?

Page 65

CONFIDENTIAL - WILLIAM O. HILTZ
1
2      A.   Yes.
3      Q.   And this was Evercore informing a
4  prospective bidder that the process had changed?
5      A.   Yes.
6      Q.   And Exhibit 8 is a similar e-mail from
7  Sesh from September 1, the second e-mail down,
8  informing another prospective bidder that the
9  process had changed?
10     A.   Yes.
11     Q.   When did the Debtors determine to make
12 this change to a two-step process of having a
13 formal process for the selection of a stalking
14 horse and a subsequent open auction?
15     A.   It was the -- I don't recall the exact
16 date, but I would say it was the week before
17 Labor Day.
18     Q.   So shortly prior to these e-mails?
19     A.   Correct.
20     Q.   Can you explain why there was a shift
21 to a two-step process?
22     A.   Well, there were many reasons for a
23 shift to a two-step process, the first of which
24 was we had gotten input, as I mentioned earlier,
25 from varying creditor constituencies and their

Page 66

CONFIDENTIAL - WILLIAM O. HILTZ
advisors that they felt the process we were
conducting with NextEra was too short, that it
would not allow adequate time for other bidders.
     We had received similar feedback from
bidders themselves who said that they didn't
have enough time, needed more time, or in fact,
refused to participate in the process because
they didn't feel we were allowing enough time.
     So, for all of those reasons, as well
as the fact that, as we negotiated with NextEra,
we believed we didn't have much leverage with
NextEra from a negotiating standpoint; we were
not making progress on a number of the
contractual issues that were important to us.
     So, for all of those reasons, i.e.,
input from creditors that they were going to
object if we did sign up NextEra, input from
buyers that they needed more time or felt that
time was too short, and difficulties in
negotiating with NextEra all combine to lead to
the decision to go to a two-step process.
     Q.    And the concerns that were expressed
concerning insufficient time was with respect to
participation in the stalking horse selection

Page 67

CONFIDENTIAL - WILLIAM O. HILTZ
process?
     A.    Correct.
     Q.    Correct?
          As distinct from an open auction
process?
     A.    Correct.
     Q.    This change to a two-step process was,
in your view, an important change?
     A.    Yes.
     Q.    And did you think that it was
important enough to inform all of the
prospective bidders that the process had changed
to a two-step process?
     A.    Yes.
     Q.    In fact, Evercore communicated this
change to every prospective it was then in
contact with?
     A.    I believe so.
     Q.    How was this communicated?  All by
e-mail?
     A.    No, phone calls as well.
     Q.    And do you have a log of those phone
calls?
     A.    I do not.

Page 68

CONFIDENTIAL - WILLIAM O. HILTZ
     Q.    Do you know if anyone at Evercore has
a log of those phone calls?
     A.    Not that I'm aware of.
     Q.    But it is your understanding that
every prospective bidder was informed of that?
     A.    That's my understanding.
     Q.    Mr. Hiltz, going back to the now -- to
the 12 original NDAs that were signed as of the
date of your declaration, the prospective
bidders that entered into those 12 NDAs all
received teaser materials prior to signing the
NDA; is that correct?
     A.    I believe so.
          (Hiltz Exhibit 9, an e-mail chain with
     attachment bearing Bates Nos.
     EFH-EVR909999913 through 25, marked for
     identification, as of this date.)
BY MR. DEVORE:
     Q.    Mr. Hiltz, I have handed you what has
been marked as Exhibit 9, which again is an
e-mail from Sesh, this time dated July 25 to a
prospective bidder attaching teaser materials;
is that correct?
     A.    Correct.

Page 69

CONFIDENTIAL - WILLIAM O. HILTZ
     Q.    Is this the version of teasers that
went out to prospective bidders in July?
     A.    I believe it is.
     Q.    And this is -- are you aware of the
next version of a teaser?
     A.    Yes, I am.
     Q.    And what is the date of that?
     A.    I don't recall the date.
     Q.    August?
     A.    Might be early September.
     Q.    Now, if we turn to page 1 of the
presentation, which is a few slides back with
the Bates number ending in 018, are you on that
page?
     A.    Uh-huh.
     Q.    Now, turning your attention to the
third bullet point, it states that, "The company
is pursuing a restructuring transaction, the TCH
spinoff, whereby, on the emergence date, TCH
will separate from EFH on a tax-free basis and
reorganized EFH would continue to own 100
percent of EFH and its 80 percent interest in
Oncor."  Do you see that?
     A.    Yes.

Page 102

CONFIDENTIAL - WILLIAM O. HILTZ

1 said, which is when we discussed a taxable
2 transaction, one of the factors that's been
3 discussed is if a buyer did achieve a step up,
4 there was a question as to whether the PUC would
5 allow them to receive the full benefit of that
6 step up or whether rates would be adjusted to
7 give part or all of that benefit to the rate
8 payors.
9     Q.   What I'm trying to understand is what
10 is the basis for that statement?  Was it
11 conversations that Mr. Ying had or -- I'm sorry,
12 Mr. Keglevic had with the PUCT?
13     A.   I don't know.
14     Q.   You have no understanding of where
15 that comes from?
16     A.   No.
17     Q.   Has any analysis been performed with
18 respect to the value that a prospective bidder
19 would pay for a step up in basis?
20     A.   Yes.
21     Q.   And what is that analysis?
22     A.   I had some junior people for me run
23 the present value of the step up in basis that
24 would occur.

Page 103

CONFIDENTIAL - WILLIAM O. HILTZ

1     Q.   And what is the value of that step up
2 in basis as calculated by Evercore?
3     A.   It's about $2 billion.
4     Q.   So, based on this analysis from the
5 perspective -- the perspective of the purchaser,
6 they would pay $2 billion more for this asset
7 with the step up in basis?
8     A.   Assuming the step up was in the
9 depreciable assets as opposed to the stock of
10 Oncor and assuming that they were able to keep
11 the full benefit of that step up.
12     Q.   And do you think that is the likely
13 scenario in this transaction?
14     A.   I don't know.  I'm not a tax lawyer,
15 so it's unclear to me whether they can actually
16 achieve a step up in basis in the assets as
17 opposed to getting their increased basis in the
18 stock of Oncor.
19     Q.   But if they were to achieve that step
20 up, that would be a $2 billion increase in the
21 purchase price?
22     A.   Correct.
23         (Discussion off the record.)
24     A.   But they have to pay roughly $5

Page 104

CONFIDENTIAL - WILLIAM O. HILTZ

1 billion more to produce equivalent value to the
2 Debtors.
3     Q.   I'm sorry, I didn't mean to talk over
4 you.  They have to pay $5 billion more?
5     A.   To get the same result for the Debtor
6 as the tax-free transaction, that's correct.
7     Q.   So there's a disconnect, correct,
8 between --
9     A.   No, there's not.  There's not a
10 disconnect at all.  That's the circumstance you
11 always have with buyers and sellers.  It's the
12 seller who is making the decision as to which
13 party to sell to.  The fact that one buyer might
14 like a taxable transaction has nothing to do
15 unless he can offer equivalent value.
16     Q.   And are you aware that creditors,
17 depending on where they sit, may prefer a
18 taxable versus a non-taxable transaction?
19     A.   I have yet to understand why that's
20 the case, but I am aware that some people are
21 asserting that.
22     Q.   I'd like to go back to your earlier
23 testimony when you referred to difficulties in
24 negotiating with NextEra which caused the

Page 105

CONFIDENTIAL - WILLIAM O. HILTZ

1 Debtors to change course to the -- call it the
2 two-step process.
3     What difficulties are you referring
4 to?
5     A.   Oh, two, primarily.  There was one
6 that was economic where some -- they were
7 backing off their purchase price a little, and
8 secondly, was the "regulatory out" language,
9 which is an important component to the contract.
10     Q.   And what is your understanding of the
11 issue on the "regulatory out" language?
12     MS. FLOM:  Objection.  The judge has
13 ruled on the extent that any negotiations
14 with the bidders --
15     MR. DEVORE:  Fair enough.  I withdraw
16 the question.
17     Can you just identify yourself for the
18 record?
19     MS. FLOM:  This is Beret Flom from
20 Chadbourne.
21 BY MR. DEVORE:
22     Q.   Mr. Hiltz, changing topics.  The
23 bidding procedures contemplate Round 1 bids for
24 the stalking horse position to be submitted on

Page 118

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  Q.  As an advisor to a seller, if you were
3  truly interested in receiving bids for various
4  transaction structures, would you publicly
5  announce your preferred structure and file a
6  50-page tax memorandum supporting that position?
7  MS. O'CONNOR:  Object to form.
8  A.  Well, if we have a preferred structure
9  that we think is tax-efficient, we would
10 certainly let buyers know that that's an
11 efficient structure.  We have also made it quite
12 clear that we don't feel we have a monopoly on
13 smarts, and if someone can come up with a
14 structure that produces better value, we're
15 happy to entertain it.
16 Q.  Now, the Debtors also believe it is
17 critical to this process to preclude creditor
18 access to the bids in Phase 1 and Phase 2; is
19 that correct?
20 A.  That's correct.
21 Q.  Why is that?
22 A.  Obviously, you haven't run auctions
23 before.
24 Q.  In bankruptcy, I have.
25 A.  Well, okay, bankruptcy is a little

Page 119

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  different kettle of fish.  There are two
3  elements to wanting to have a sealed bid
4  process, the first of which is not to reveal the
5  names of the bidders, and the reason for that is
6  very straightforward.
7  Most bidders insist that their name
8  not be revealed, and in fact, I think all but
9  one of the NDAs that we have signed have that
10 confidentiality provision in there at the
11 request of the bidder, number one.
12 And the reason for that is very
13 simple.  Most of these bidders are public
14 companies, they're concerned about creating
15 disclosure obligations.  To the extent that
16 they're pursuing a very large acquisition, which
17 this is, it can impact the trading prices of
18 their securities, potentially in a negative way,
19 and if you are bidding with stock as a component
20 of your bid, having your stock go down as a
21 result of this being leaked is actually -- it
22 hurts your chances of success.  So there are an
23 enormous number of reasons why we want to keep
24 the names confidential, not the least of which
25 is we have a legal obligation to do based on the

Page 120

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  NDAs.
3  With respect to the level of bids, and
4  that's even more obvious, which is if there are
5  leaks with respect to the levels of the first
6  round bids, you may not get someone to bid what
7  he might have been prepared to bid if he didn't
8  know what those first round bids are.  So there
9  are very good economic reasons for not wanting
10 to publish the level of the first round bids or,
11 for that matter, the second round bids until a
12 final bid has been accepted.
13 Q.  Now, the Debtors are also proposing a
14 30-day open auction process to commence upon the
15 selection and approval of the stalking horse,
16 correct?
17 A.  That's correct.
18 Q.  And this will be an open auction
19 process in that creditor groups will have access
20 to the bids?
21 A.  Yes.
22 Q.  Now, you just listed numerous concerns
23 about public access to the bids?
24 A.  Uh-huh.
25 Q.  Do you have any reason to believe that

Page 121

CONFIDENTIAL - WILLIAM O. HILTZ

1
2  the bidders will participate in the 30-day
3  auction process when those bids are being
4  disclosed to creditors?
5  A.  Well, I think it will be a subset of
6  the people who are willing to participate in the
7  earlier process.  I mean, there will be --
8  Q.  In other words --
9  A.  There will be some bidders like
10 NextEra, okay?  NextEra is obviously comfortable
11 having their bid public.  They publicized their
12 own bid.  So I would assume that if NextEra is
13 not the winner, they will at least -- and
14 assuming that they were prepared to pay a higher
15 price, they will be happy to participate in the
16 open auction process.
17 So I don't think you can make a
18 blanket statement, but I would make the
19 statement that I think the number of
20 participants is likely to be less than in the
21 private process.
22 Q.  Now, of the 51 or so prospective
23 bidders that Evercore initially identified, has
24 anyone indicated that they would not be
25 interested in participating in the stalking

Page 134

CONFIDENTIAL - WILLIAM O. HILTZ
1  procedures, that we would discuss that with the
2  board.
3    Q.   And have you considered how any
4  inter-estate conflicts would be revolved in
5  connection with any proposed changes to the
6  bidding procedures?
7    A.   I'm sorry, any what conflicts?
8    Q.   Have you considered how any
9  inter-estate conflicts would be resolved in
10  connection with any proposed changes to the
11  bidding procedures?
12    MS. O'CONNOR:  Object to form.
13    A.   Again, I'm not sure I see any
14  conflicts with respect to the bidding
15  procedures.
16    Q.   Now, if you could turn to paragraph 8
17  of the order, this states that, "Each bidder
18  must acknowledge in writing that it has not
19  engaged in any collusion with respect to any
20  bids," do you see that?
21    A.   Yes.
22    Q.   In your view, does this provision
23  preclude discussions by a bidder with creditors
24  concerning a potential transaction?

Page 135

CONFIDENTIAL - WILLIAM O. HILTZ
1    A.   Discussions?  Well, again, as I think
2  you know, we are limiting discussions between
3  bidders and creditors without our consent.  We
4  are also preventing any exclusive arrangements
5  between bidders and creditors because we believe
6  that that is not conducive to producing the best
7  possible value.
8    Q.   And this is the result of the NDAs; is
9  that right?
10    A.   Correct.
11    Q.   Now, if the turn to the NDAs, which
12  are Exhibit 6 --
13    A.   Yes.
14    Q.   -- if we go to what is marked as
15  Exhibit 6B, which is a confidentiality agreement
16  dated August 8; are you on the same one?
17    A.   Yes.
18    Q.   If you turn to the second page in the
19  middle of the paragraph, there's language that
20  states, "Notwithstanding anything to the
21  contrary herein, (i) neither you nor your
22  Representatives shall contact any debt financing
23  source or any creditor of one or more of the
24  Company Parties without the prior written

Page 136

CONFIDENTIAL - WILLIAM O. HILTZ
1  consent of the Company Parties (such consent not
2  to be unreasonably withheld)"?
3    A.   Yes.
4    Q.   Is that the provision that you are
5  referring to?
6    A.   Yes.
7    Q.   Now, you mentioned earlier that some
8  of -- one or more prospective purchasers had
9  required creditor confidentiality restrictions;
10  is that correct?
11    A.   I'm sorry, say that again.
12    Q.   You mentioned earlier that this
13  language was added at the request of prospective
14  bidders; is that right?
15    MS. O'CONNOR:  Objection. Objection
16  to form.
17    A.   No, I didn't say that.
18    Q.   Who inserted this language into the
19  form NDA?
20    A.   The language you just referred to
21  regarding contact with creditors and exclusive
22  arrangements with creditors?
23    Q.   Yes.
24    A.   Evercore and Kirkland & Ellis.

Page 137

CONFIDENTIAL - WILLIAM O. HILTZ
1    Q.   Did any bidder request that they be
2  precluded from contacting creditors?
3    A.   Not to my knowledge.
4    Q.   Now, this provision requires the
5  consent of the company parties; is that correct?
6    A.   Yes.
7    Q.   And company parties are defined to be
8  both EFH and EFIH, correct?
9    A.   I'm not sure.
10    Q.   If you go to the first page?
11    A.   Yes.
12    Q.   First paragraph, where its starts
13  little (i)?
14    A.   I see it.
15    Q.   And that indicates both EFH and EFIH?
16    A.   Yes.
17    Q.   Why do both EFH and EFIH have to
18  consent to creditor communications?
19    A.   Well, I don't know why those specific
20  entities both are included there.  Again, this
21  was drafted -- this was not drafted by me, but
22  again, the concept here is that we want to
23  control the process.  We want to know who's
24  talking with who, and it's a very slippery slope

Page 142

CONFIDENTIAL - WILLIAM O. HILTZ

1    CONFIDENTIAL - WILLIAM O. HILTZ
2    enforceable by Bankruptcy Court ordered
3    sanctions that addresses maintaining
4    confidentiality of sensitive information?
5        A.    I'm not specifically aware of that.
6        Q.    So you have no reason to believe
7    whether or not the protective order would be
8    sufficient to address these confidentiality
9    concerns?
10       A.    Well, since the varying Wall Street
11   news rags have been commenting on the
12   participants in the process already, it would
13   appear that it's not very effective.
14       Q.    And in fact, the news articles have
15   identified at least six or seven bidding
16   participants; is that correct?
17       A.    Some number, yes.  I don't recall
18   whether it's quite six or seven, but a number of
19   bidding participants.
20       Q.    And that's before any creditors have
21   been provided any information about the bids; is
22   that correct?
23       A.    I don't know.
24           MS. O'CONNOR:  Object to form.
25       Q.    Have any creditors been provided

Page 143

1    CONFIDENTIAL - WILLIAM O. HILTZ
2    information about the bids --
3        A.    About --
4        Q.    -- to your knowledge?
5        A.    -- the identity of the bidders?
6        Q.    Correct.
7        A.    I'm not sure.
8        Q.    Would you turn back to the motion on
9    the bidding procedures that are attached to the
10   motion?
11       A.    That's 14?
12       Q.    1.  The motion procedures attached.
13       A.    I'm sorry, where are we turning to?
14       Q.    In the procedures.
15       A.    Yeah.
16       Q.    Page 10.  I'm sorry, page 11.
17       A.    Okay.
18       Q.    And in the procedures on page 11,
19   there's a heading Bid Criteria, do you see that?
20       A.    Yes.
21       Q.    Now, these are the criteria for
22   cutting down the bids after the Phase 1
23   submissions; is that right?
24       A.    I don't think that it's necessarily
25   Phase 1.  I think it's both Phase 1 and Phase 2.

Page 144

1    CONFIDENTIAL - WILLIAM O. HILTZ
2        Q.    My point is that these are the bid
3    criteria that are being used --
4        A.    Yes.
5        Q.    -- throughout the entire process?
6        A.    Correct.
7        Q.    When were these criteria first
8    communicated to prospective bidders?
9        A.    I believe with the sending of this
10   document.
11       Q.    On or around September 19?
12       A.    Right.
13       Q.    Now, under the Debtors' proposed
14   procedures, the Debtors will not provide
15   creditors with any information regarding the
16   bids in Phase 1; we have established that,
17   correct?
18       A.    Correct.
19       Q.    And the Debtors will not consult with
20   the creditors in cutting down the Phase 1 bids
21   to proceed to Phase 2?
22       A.    Correct.
23       Q.    Now, nor will the Debtors consult with
24   creditors in selecting the stalking horse; is
25   that correct?

Page 145

1    CONFIDENTIAL - WILLIAM O. HILTZ
2        A.    Correct.
3        Q.    And in fact, the Debtors will not
4    provide any information to creditors about the
5    bids until the stalking horse motion is filed,
6    correct?
7        A.    Correct.
8        Q.    Now, criteria 2 --
9        A.    Uh-huh.
10       Q.    -- of the bidding criteria stakeholder
11   consensus, how are the Debtors going to consider
12   stakeholder consensus if the stakeholders aren't
13   provided any access to the process?
14       A.    I think we understand what the big
15   issues are amongst the stakeholders.
16       Q.    Is that it?
17       A.    Yes.
18       Q.    But you would not be reaching out to
19   stakeholders regarding alternative transaction
20   structures that surface, correct?
21       A.    With one possible exception.
22       Q.    What is that?
23       A.    Where -- well, for example, if the
24   PIKs and the Hunts team up and there's a
25   circumstance where creditors are being asked to

CONFIDENTIAL - WILLIAM O. HILTZ
take stock in a reorganized company that does
not publicly trade, under that set of
circumstances, because there's no objective
measure of a value as there is with a public
company's securities that are trading, under
that set of circumstances, it's conceivable that
we would have a consultation with creditors.
    Q.    And by creditors, you mean a small
subset of those creditors?
    A.    Yes, correct.
    Q.    Now, going back to the bid criteria,
number 9 is Other Factors, any other factors
that the Debtors, in their sole discretion,
determine are relevant; do you see that?
    A.    Uh-huh.
    Q.    If approved, these procedures mean
that the Debtors could tighten or loosen the bid
criteria in their sole direction, correct?
    A.    Correct.
    Q.    Same question as before, what Debtors
could do that?
    A.    Again, I would assume we would only do
that after having discussed it with the board of
EFIH, including the independent directors of EFIH

CONFIDENTIAL - WILLIAM O. HILTZ
and the T side.
    Q.    What I want to know is a conflict
arises --
    A.    What conflict?
    Q.    Inter-estate conflicts.
    A.    I don't understand.  When you say an
inter-estate conflict in the context of these
bidding procedure motions, I'm not sure what you
are referring to.  Could you be more specific?
    Q.    Have you considered at all how these
procedures will be changed if conflicts arise?
    A.    I don't -- without understanding what
conflicts you're referring to, I can't answer
your question.  Be specific about a conflict.
    Q.    You're the chairman of Evercore's
Special Committee practice, correct?
    A.    Correct.
    Q.    Conflicts arise in various ways,
correct?
    A.    Well, again, I don't see a conflict
here.  What we're doing in this process is to
maximize the economic value of the 80 percent
ownership in Oncor, taking into account any tax
liability that results.

CONFIDENTIAL - WILLIAM O. HILTZ
    The E stack of the creditors, again,
you know, benefit very directly by the
maximization of value.  The T side creditors, at
least as we sit here today, have no established
claims against the E side.  To the extent that
they do have claims, they as well benefit by
maximizing the after-tax value.
    So I'm just not sure that I understand
what kinds of conflicts you're referring to.
    Q.    So, sitting here today, you do not
think that there will be any conflicts in
connection with bidding procedures going
forward?
    MS. O'CONNOR:  Object to form.
    A.    Well, I understand the objections that
have been raised by -- primarily, by the
out-of-the-money T side creditors with respect
to this process.
    Q.    So conflicts issues have been raised?
    A.    Well, I'm not sure they're conflicts.
They're different points of view as to what the
right way forward is.
    Q.    And do you --
    A.    But I'm not sure that there is a

CONFIDENTIAL - WILLIAM O. HILTZ
conflict of interest.
    Q.    And do you understand that the
differing views of different creditor
constituencies may reflect the different views
of those estates?
    A.    Well, again, I understand that they
are making objections to, for example, favoring
a taxable transaction.  I don't see how that is
in their benefit, but that's just me.
    Q.    I would like to go back to, actually,
the very beginning of our deposition.
    A.    Yeah.
    Q.    And you mentioned that you reviewed
various documents in preparing for today's
deposition, correct?
    A.    Correct.
    Q.    You said you reviewed the levels of
M&A activity?
    A.    Yes.
    Q.    What form of this -- did you review
this information in?
    A.    What do you mean, what form?
    Q.    Was it Evercore e-mails?  Press
reports?

Page 214

CONFIDENTIAL - WILLIAM O. HILTZ

1  
2  there is opposition across the board to the
3  Debtors' motion from every E side creditor
4  constituency?
5      MS. O'CONNOR:  Object to form.
6      Q.   Go ahead.  You can answer.
7      A.   I don't think that that necessarily
8  increases execution risk.  I think that it's --
9  you know, I mean, either these bidding
10  procedures are going to be approved and we're
11  going to go forward as we planned or they're
12  not.  So I view that as a kind of a near-term
13  issue, if you will.
14      Q.   To your knowledge, has there been a
15  plan of reorganization that's been submitted for
16  consideration by the E side creditors?
17      A.   Well, there was a plan of
18  reorganization submitted by the PIKs at one
19  point or a proposal submitted by the PIKs,
20  correct.
21      Q.   And do you know whether or not the
22  rest of the E side creditors supported that
23  proposal?
24      A.   I don't know.
25      Q.   Let's turn to the T side of the

Page 215

CONFIDENTIAL - WILLIAM O. HILTZ

1  
2  equation.
3      Which, if any, of the T side
4  creditors, to your knowledge, support the
5  pending motion?
6      A.   Again, I believe the first liens.
7      Q.   Are you aware of any creditors on the
8  T side that oppose the Debtors' motion?
9      A.   As I said earlier, I believe the two
10  varying committees of the unsecured creditors,
11  the official committee and the Ad Hoc Committee
12  and I assume the second liens.
13      Q.   At some point, and I can't remember
14  specifically the question, but I think you were
15  being asked to take a look at the bidding
16  criteria, and one of the criteria had something
17  to do with stakeholder consensus?
18      A.   Uh-huh.
19      Q.   And you were asked some questions
20  about how do you get stakeholder consensus if
21  they're not part of the process, and I think
22  your answer went something like you understood
23  the stakeholders' big issues.  I put "big
24  issues" in quotes.
25      And I think you gave as an example

Page 216

CONFIDENTIAL - WILLIAM O. HILTZ

1  
2  knowing what the PIKs want or knowing what they
3  don't want, which is illiquid equity?
4      A.   Well, that was an example of where we
5  might consult with creditors prior to signing up
6  a stalking horse bid.
7      Q.   Okay.
8      A.   It wasn't with respect to what the
9  PIKs desired.
10      Q.   Okay.  But you did say that you
11  thought you had a good handle on what the
12  stakeholders' big issues were?
13      A.   The collective we, as opposed to me
14  personally.
15      Q.   What are the big issues?
16      A.   Well, again, I think it primarily
17  relates to the whole question of taxable versus
18  tax-free, and then there's also an issue about
19  whether now is, quote, the right time to sell
20  the business.  They seem to be the two
21  predominant issues that have come out in our
22  discussions with the creditors.
23      Q.   And from your perspective, again,
24  doing a taxable deal makes no sense, correct?
25      A.   It does not maximize aggregate value

Page 217

CONFIDENTIAL - WILLIAM O. HILTZ

1  
2  to the estate as a whole.
3      Q.   And therefore, it makes no sense,
4  correct?
5      MS. O'CONNOR:  Object to form.
6      A.   I leave it at what I said.
7      Q.   And if the someone were to submit a
8  taxable transaction, in your opinion, they are
9  unlikely to be the winner of the auction that
10  you have set up?
11      MS. O'CONNOR:  Object to form.
12      A.   Well, I think it's very difficult to
13  get to a price in a taxable transaction that
14  produces comparable economic value to the estate
15  as a whole.
16      Q.   And in fact, you have testified that
17  at least one bidder has come to you and asked
18  you, quote, how could a taxable deal work for
19  you?  Do you remember that testimony?
20      A.   Yes, I do.
21      Q.   Well, you didn't tell us how you
22  responded to that prospective bidder.  What, if
23  anything, did you tell the prospective bidder
24  who came to you and asked you, quote, how could
25  a taxable deal work for you?

Page 218

1    CONFIDENTIAL - WILLIAM O. HILTZ
2        A.    Well, I was not on that call.  That
3    was a call that someone else had who works for
4    me, but so I don't know specifically what was
5    said, but I think the idea was, and we have been
6    telling people all along, that aggregate value
7    net of any tax liability is the yardstick which
8    we will use to evaluate bids.
9        Q.    So if a bidder came to you,
10   hypothetically, this afternoon after this
11   deposition was over and said to you, Mr. Hiltz,
12   how could a taxable deal work for you, what
13   would your response be?
14       A.    You have to pay a high enough price to
15   give us comparable value after taking into
16   account any tax liability.
17       Q.    And you believe that no prospective
18   bidder is likely to want to pay that high of a
19   price, correct?
20       A.    I believe that it's very difficult.
21       Q.    Hugh Sawyer is a member of which, if
22   any, of the Debtors' boards of directors?
23       A.    I don't recall.
24       Q.    You previously testified, or I think
25   your testimony implied, that he was the

Page 219

1    CONFIDENTIAL - WILLIAM O. HILTZ
2    independent director on the EFH board?
3        A.    I know there are --
4            MS. O'CONNOR:  Object to form.
5        A.    I know there are independent directors
6    on the EFIH board around on the TCEH board.  I
7    can't recall the names of the individuals.
8        Q.    Fair enough.  Can you recall any
9    separate discussions you've ever had with either
10   Mr. Sawyer or Mr. Kremins about the bid
11   procedures?
12       A.    The only discussions I've had have
13   been discussions with the board as a whole.
14       Q.    When you talked about taxable versus
15   non-taxable transactions, you indicated that a
16   non-taxable transaction was in the best
17   interests of -- pardon me, may not have used the
18   words "best interests," but you indicated it was
19   a preferable transaction when viewed from the
20   perspective of all of the estates or the estates
21   taken as a whole.
22       A.    Correct.
23       Q.    And now I want to focus your
24   attention, if I can, on the benefits of a
25   non-taxable transaction when viewed from the

Page 220

1    CONFIDENTIAL - WILLIAM O. HILTZ
2    perspective of the TCEH estate.
3            Who is the investment banker for the
4    TCEH Debtor?
5            MS. O'CONNOR:  Object to form.
6        A.    We are.
7        Q.    And Evercore is running the auction
8    process in part for the benefit of the TCEH
9    estate; is that your understanding?
10       A.    To the extent that they have claims,
11   yes.
12       Q.    And to the extent that I were to tell
13   you that there are no claims on the T side of
14   the house that impacts the E side of the house,
15   is it your view that the estate of TCEH has no
16   economic interest in this auction?
17           MS. O'CONNOR:  Object to form.
18       A.    Well, as the auction is part of the
19   overall plan of reorganization, yes, they do.
20       Q.    Well, how so?
21       A.    What do you mean?
22       Q.    If the T side has no claims against
23   the E side?
24       A.    Uh-huh.
25       Q.    And you're selling an E side asset or

Page 221

1    CONFIDENTIAL - WILLIAM O. HILTZ
2    an E side soon-to-be-in-existence asset?
3        A.    Uh-huh.
4        Q.    How is it that the T side is impacted
5    one way or the other in this auction, assuming
6    that the T side has no claims against the E
7    side?
8        A.    To the extent that the plan of
9    reorganization is partially dependent upon the
10   sale of the asset, then the reorganization of
11   the T side creditors is impacted.
12       Q.    Because I can't get to a
13   reorganization without the E side asset being
14   sold?
15       A.    Without the E side also reorganizing
16   an overall plan.
17       Q.    Okay.
18       A.    Whether that can be accomplished
19   without the sale of the asset, I don't know.
20       Q.    Well, could it be accomplished without
21   a sale of EFH --
22       A.    I don't know.
23       Q.    -- reorganized equity?
24           MS. O'CONNOR:  Object to form.
25       A.    Theoretically.

TSG Reporting - Worldwide    877-702-9580

Page 242

CONFIDENTIAL - WILLIAM O. HILTZ

1  answers -- and you can feel free to
2  supplement -- is that Evercore is bringing any
3  particular expertise in utilities or in the sale
4  of utility assets. Do you believe that Evercore
5  is bringing that expertise to the Debtors?
6      A.  I do.
7      Q.  Okay. And who at Evercore is bringing
8  that expertise?
9      A.  Well, with respect to mergers and
10  acquisitions, generally, it's myself. With
11  respect to utility transactions, it is David and
12  Sesh -- primarily Sesh, who is our utility
13  expert.
14      Q.  And what industries, if any, do you
15  consider yourself an expert in?
16      A.  A wide number.
17      Q.  Okay. Like?
18      A.  Well, I mean, I'm a generalist at
19  Evercore, so I work across a variety of
20  industries. By background, I've been an oil and
21  gas banker for a large portion of my career
22  prior to joining Evercore. I've done many large
23  transactions in the energy space. I just did
24  the spinoff of Occidental Petroleum's California

Page 243

CONFIDENTIAL - WILLIAM O. HILTZ

1  business that was announced earlier this week.
2      I did the auction of the Jonah Field
3  for Encana that was a $1.8 billion transaction
4  earlier this year. I did the sale of McMoRan to
5  Freeport McMoRan, and I've done many other
6  energy transactions over the course of my
7  career.
8      I've done a fair amount in the
9  technology space. I've represented the Special
10  Committee of Dell and ran the go-shop process
11  for Dell. I represented EDS in the sale to
12  Hewlett-Packard. I represented ACS in the sale
13  to Xerox.
14      I've done a lot in the food space. I
15  acquired Pillsbury for General Mills. I sold
16  Häagen-Daz for General Mills. I sold Snack
17  Ventures Europe for General Mills.
18      I've done a lot with CVS, the drug
19  store retailer. I did their acquisition of
20  Albertsons free-standing drug stores, I did
21  their acquisition of Savons free-standing drug
22  stores, and I did the $27 billion merger between
23  CVS and Caremark.
24      I've done stuff in the FIG space. I

Page 244

CONFIDENTIAL - WILLIAM O. HILTZ

1  represented Swiss Re in their acquisition of
2  GE's insurance businesses. I represented Credit
3  Suisse in the sale of Winterthur, their
4  insurance business, to AXA.
5      I've done a variety of other deals in
6  the food space. Sale of AIPC, American Italian
7  Pasta Corporation. The split-up of Kraft, doing
8  a sale of a company called Daymon Worldwide
9  that's basically in the food space.
10      So, again, I've worked across a fairly
11  wide variety of industries. I've also done some
12  stuff in telecom. I represented AT&T in their
13  acquisition of Leap Wireless last year.
14      Q.  And I take it as part of all that
15  process you have spent a lot of time meeting
16  CEOs and CFOs of your clients?
17      A.  Yes.
18      Q.  Another thing I didn't hear you in
19  your answer about what you're bringing to the
20  table for the Debtors is any experience in
21  bankruptcy auctions. Who on the Evercore team
22  is bringing that expertise?
23      A.  Well, David Ying, primarily. Although
24  I did, as I said, I sold Continental out of the

Page 245

CONFIDENTIAL - WILLIAM O. HILTZ

1  third Continental bankruptcy to David Bonderman
2  and Air Partners and Air Canada.
3      Q.  All right. Have you ever -- did you
4  run that bankruptcy auction?
5      A.  Yes.
6      Q.  Have you ever advised a bidder in a
7  bankruptcy auction?
8      A.  No.
9      Q.  Have you ever advised a creditor in a
10  bankruptcy auction?
11      A.  No.
12      Q.  Have you ever read a book or article
13  on bankruptcy auctions?
14      A.  No.
15      Q.  Okay. Do you understand that in
16  certain times experts will read in the area of
17  their expertise?
18      A.  Yes. Again, I'm not here as a
19  bankruptcy expert. I'm here as a general merger
20  and acquisition expert.
21      Q.  Did you ever advise any entity with
22  respect to the purchase or sale of post-reorg.
23  equity?
24      A.  No.

Page 246

CONFIDENTIAL - WILLIAM O. HILTZ

1
2   Q.   All right.  Have you ever read any
3   case law on bankruptcy auctions or
4   post-reorganization equity?
5   A.   No.
6   Q.   You're going to have to let me finish
7   my question and then you can say no.
8   Do you understand that there are
9   differences between a bankruptcy auction and a
10  general M&A marketing process?
11  A.   Yes, I do.
12  Q.   So, for example, a bankruptcy auction
13  has court supervision?
14  A.   And has -- generally, has this open
15  auction concept at the end of the process.
16  Q.   What other differences do you know
17  about?
18  A.   Those would be the primary ones.
19  Q.   Are you aware that bidders, for
20  example, have potential criminal penalties if
21  they collude in the bankruptcy auction?
22  A.   No, I'm not.
23  Q.   Are you aware that Bankruptcy Court
24  can provide a free and clear order with respect
25  to a sale that you couldn't get outside of

Page 247

CONFIDENTIAL - WILLIAM O. HILTZ

1
2   court?
3   A.   Actually, yes, I am aware of that.
4   Q.   Okay.  Do you understand the issues
5   that relate to execution risk within a
6   bankruptcy and the appellate process, for
7   example?
8   A.   To some degree.
9   Q.   What's the extent of your knowledge on
10  that?
11  A.   I'm not sure what you mean by the
12  appellate process.
13  Q.   Okay.  Well, you said "to some
14  degree."  What did you mean by "to some degree"?
15  A.   Restate the question again.
16  Q.   Sure.  Do you understand that in a
17  bankruptcy auction there are particular risks
18  related to the appellate process?
19  A.   I don't think that's actually what
20  your question was.  You said do I understand
21  that there are risks in execution, and I said to
22  some degree, and I do understand that there are
23  execution risks.  I do not understand the
24  appellate process.
25  Q.   Can you tell me what the primary

Page 248

CONFIDENTIAL - WILLIAM O. HILTZ

1
2   concerns are of a Debtor in an auction that
3   don't exist with respect to an out-of-court M&A
4   process?
5   A.   Well, I mean, in my view, it's how
6   that process fits into the overall plan of
7   reorganization.
8   Q.   And this is based upon your one
9   auction that you participated in?
10  A.   Correct.
11  Q.   Okay.  And do you understand what the
12  particular concerns are of a bidder in a
13  bankruptcy process that don't exist in the
14  normal M&A process?
15  A.   Only with respect to the execution
16  risk associated with a bankruptcy.
17  Q.   Okay.  But you don't know any other
18  concerns because you have never represented a
19  bidder in an auction process --
20  A.   Correct.
21  Q.   -- bankruptcy auction process?
22  A.   Correct.
23  Q.   Do you have any understanding of what
24  the general concerns are of creditors in a
25  bankruptcy when a Debtors' assets are being sold

Page 249

CONFIDENTIAL - WILLIAM O. HILTZ

1
2   pursuant to an auction?
3   A.   I think I have a layman's
4   understanding of that.
5   Q.   What's that?
6   A.   Concern that you're getting the best
7   possible price for the asset.
8   Q.   And are you aware of any other
9   concerns that exist?
10  A.   No.
11  Q.   Do you have any understanding of the
12  specific concerns about post reorganization --
13  or, the sale of post-reorganization equity
14  before a plan is filed?
15  A.   I'm sorry.  State the question again.
16  Q.   Sure.  Are you aware of any specific
17  concerns that exist with respect either from the
18  Debtors side, creditors side, bidders side when
19  you are selling post-reorganization equity
20  before a plan is on file?
21  A.   Well, only to the extent that the
22  buyer obviously needs to know what liabilities
23  and assets he is purchasing.  So, to the extent
24  that that's going to be driven by the plan of
25  reorganization, there are issues surrounding

## EXHIBIT C

**Charles Cremens Deposition Transcript Excerpts**
**October 8, 2014**

1          CONFIDENTIAL - CHARLES CREMENS
2          UNITED STATES BANKRUPTCY COURT
3           FOR THE DISTRICT OF DELAWARE
4    -------------------------------X
     In Re:
5
     ENERGY FUTURE HOLDINGS
6    CORPORATION, et al.,
7                    Debtors.
8    Chapter 11
     Case No. 14-0979
9    Jointly Administered
     -------------------------------X
10
11
12       *** C O N F I D E N T I A L ***
13
14         VIDEOTAPED DEPOSITION
15                   OF
16          CHARLES CREMENS
17        Wednesday, October 8, 2014
18          Seven Times Square
19           New York, New York
20
21
22   Reported by:
     AYLETTE GONZALEZ, RPR, CLR, CCR
23   JOB NO. 85457
24
25

1     CONFIDENTIAL - CHARLES CREMENS
2 bid, they can put in a bid.
3    Q.  That wasn't my question.  The
4 question is if the process --
5    A.  Yes, I think there's a possibility
6 if you start to create specific terms
7 associated with alternative bidding structure
8 like that, I think there's a possibility that
9 it creates an issue.  In other words, you're
10 now saying that there are threshold levels
11 that have to be met and that if you don't meet
12 those levels, then it may occur to have a
13 different approach.
14    Q.  So what would be wrong
15 communicating to other potential bidders, hey,
16 if you're first round bid is not high
17 enough --
18    A.  First of all --
19    Q.  Can I finish the question?
20     First of all, if your first round
21 bid is not high enough to pay EFIH unsecured
22 creditors in full, then those creditors will
23 also be permitted to bid; wouldn't that create
24 a more competitive process and result in
25 potentially higher round one bids?

1     CONFIDENTIAL - CHARLES CREMENS
2    A.  I don't think so.
3    MS. O'CONNOR:  Object to form.
4    Q.  Why not?
5    A.  Because right now I think that the
6 marketplace would think that the NextEra bid
7 is a threshold bid and the NextEra bid
8 certainly paid, in my view, the EFIH
9 creditors.  So I would be looking at it and
10 saying that putting in a potential threshold
11 that is lower than that just creates a
12 confusion.  I wouldn't do it.
13    Q.  When you say the market views
14 NextEra as a threshold bid, I want to make
15 sure I understand what you mean by that.  Is
16 it your expectation that round one bids will
17 come in at least as high as where NextEra was?
18    A.  I would hope so.
19    Q.  And that's what you mean by the
20 NextEra bid being a threshold?
21    A.  I said I would think that the
22 market would see the NextEra bid and that was
23 the last bid and the company actually didn't
24 take them as the stalking horse.
25    Q.  Let me just switch to one last area

1     CONFIDENTIAL - CHARLES CREMENS
2 which shouldn't take too long, Mr. Cremens.
3     Have you given any consideration
4 whether, in conjunction with pursuing the sale
5 process that the debtors have commenced, it
6 would be in the interest of EFIH to replace
7 their existing second lien debt with a less
8 expensive second lien DIP without any
9 conversion, just a straight DIP?
10    A.  I think we looked at that and we
11 looked at it back at the time on the RSA
12 situation in terms of whether or not to -- to
13 -- and we determined that it wasn't
14 economically beneficial in terms of the
15 tradeoffs.
16    Q.  I understand that's the conclusion
17 the company came to at that point in time.  My
18 question is a little different.
19     Sitting here today now with the
20 sales process having been commenced, I'll ask
21 you to assume that the possibility existed
22 that EFIH could cut its interest expense on
23 its second lien by $100 million over the
24 course of one year, okay.
25     Can you think of any reason why,

1     CONFIDENTIAL - CHARLES CREMENS
2 again, in your capacity as an EFIH director,
3 it would not make sense for EFIH to do that
4 transaction to replace second lien debt with a
5 less expensive DIP in conjunction with a sales
6 process that's already been set forth?
7    MS. O'CONNOR:  Object to form.
8    A.  I can't -- if you're asking me
9 should we cut interest expense by $100 million
10 and that's the equation then, yes, we should,
11 but I don't think that that was the analysis
12 that has been put forth to date.
13    MR. QURESHI:  That's all I have.
14 Thank you.
15    THE WITNESS:  Thank you very much.
16 EXAMINATION BY
17 MR. WEISFELNER:
18    Q.  Mr. Cremens, my name is Ed
19 Weisfelner and I'm counsel to TCEH, the
20 indenture trustee for the second liens on the
21 T-side.
22     Now I think you testified that
23 you're generally familiar with what's been
24 referred to as the optimum tax structure?
25    A.  Yes, generally.