**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Docket Ref. No. 2087** |

**LIMITED OBJECTION OF THE AD HOC COMMITTEE OF TCEH FIRST
LIEN CREDITORS TO THE MOTION OF ENERGY
FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN
ORDER (A) APPROVING BIDDING PROCEDURES, (B) SCHEDULING
AN AUCTION AND RELATED DEADLINES AND HEARINGS,
AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

The ad hoc committee of certain unaffiliated holders of first lien senior

secured claims against the TCEH Debtors[1] (the "Ad Hoc Committee of TCEH First Lien

Creditors"), by and through its undersigned counsel, hereby files this limited objection to

the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving

Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings,

and (C) Approving the Form and Manner of Notice Thereof* [Docket No. 2087] (the

"Motion") and respectfully represents as follows:[2]

**LIMITED OBJECTION**

1.      The Ad Hoc Committee of TCEH First Lien Creditors supports the

Debtors' efforts to capitalize on current market conditions by seeking to monetize Energy

---

[1]     As used herein, the term "TCEH Debtors" means, collectively, Texas Competitive Electric Holdings
Company LLC ("TCEH"), Energy Future Competitive Holdings Company LLC ("EFCH"), and
TCEH's direct and indirect subsidiaries that are debtors and debtors-in-possession in the above-
captioned cases.

[2]     Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the
Motion.

Future Holdings Corp.'s ("EFH") indirect equity interest in Oncor Electric Delivery Company LLC (together with its ring-fenced subsidiaries and affiliates, "Oncor"). Any additional value that a purchaser of Oncor can contribute to the Debtors' restructuring efforts will be critical in facilitating the resolution of contested issues and, therefore, the Debtors' expeditious emergence from chapter 11 protection. This is in the best interests of all of the Debtors' stakeholders.

2.    Unfortunately, the proposed Bidding Procedures are not constructed to maximize the likelihood of a successful sale of Oncor. This is because the Debtors seek authority to conduct a two-round sealed stalking horse bidding process in which they do not intend to provide any real-time information to creditors (including the TCEH first lien creditors) whose consent will likely be required to effectuate a sale transaction. For the reasons discussed below, the Bidding Procedures should only be approved if revised slightly (consistent with the proposed markup attached hereto as Exhibit A) to require enhanced real-time creditor input and involvement from those creditors whose consent to the sale will likely be required, while appropriately balancing the Debtors' desire to maintain the confidentiality of the bidders' identities.

3.    Transparency is a virtue in any chapter 11 sales process, and information sharing and creditor consultation rights are thus foundational elements of any court-approved bidding process. Transparency and stakeholder involvement provide more than mere procedural protections – they are also critical in developing consensus and coalescing creditor support for a given transaction. By providing stakeholders with real-time access to information, and by consulting with and incorporating the input of stakeholders at important decision points, a debtor can often more easily navigate the thicket of intercreditor disputes that typically arise in the context of a transformative sale

01:16124734.1

transaction.  Failing to do so, on the other hand, can have draconian consequences, as a debtor risks going too far down the path of a given transaction without the support of the stakeholders for whose benefit the transaction is purportedly being pursued, which can result in significant waste, delay and uncertainty.

4.      This is an especially acute concern in the instant case.   As set forth in the term sheet attached to the Motion, the preferred asset that EFH is currently seeking to sell is the equity in "reorganized EFH," an asset that can only be sold pursuant to a confirmed plan of reorganization.[3]  Any plan pursuant to which the sale of equity in reorganized EFH is tied to a "tax-free spin" of TCEH will necessarily require the support of the TCEH first lien creditors.  And while the Ad Hoc Committee of TCEH First Lien Creditors remains open to the possibility of a tax-free spin, its willingness to consider such a transaction is dependent, in significant part, on (i) the Debtors consummating a restructuring expeditiously, and (ii) the allocation for the benefit of TCEH first lien creditors of some portion of the value created through the sale of EFH's indirect equity interest in Oncor.[4]

5.      This is therefore the prototypical case in which the Bidding Procedures should provide for robust real-time information and creditor consultation rights, as it is in all parties' best interests that EFH not blindly pursue the sale of an asset

---

[3]    While the Debtors declare their willingness to consider any bid structure, including "tax-free" and "taxable" transactions, it is clear from their proposed term sheet, their plan negotiations prepetition and their recently-filed *Omnibus Tax Memorandum* [Docket No. 2296], that a sale of Oncor coupled with a "tax-free spin" of TCEH is their desired outcome.  The Ad Hoc Committee of TCEH First Lien Creditors reserves all rights with respect thereto, including the positions taken by the Debtors in their *Omnibus Tax Memorandum*.

[4]    In addition, there will be a variety of "transition" matters that will need to be worked through between any buyer of Oncor and the real economic stakeholders in TCEH in connection with any sale that results in a deconsolidation of the companies.

that it cannot ultimately deliver because of an inability to obtain timely confirmation of a plan of reorganization. The estates' and each potential bidder's best protection against such a result is to ensure that the Debtors' key economic stakeholders whose approval of any such transaction is likely to be required (including the Ad Hoc Committee of TCEH First Lien Creditors) are given a reasonable opportunity to review bid information and consult with the Debtors' advisors regarding certain critical strategic decisions. If the Debtors' stakeholders whose consent is required have concerns or preferences regarding the Stalking Horse Bid, EFH and its constituents should understand and try to address those concerns and preferences prior to consummation of the Stalking Horse Bidding Process.

6.      Rather than embrace this need for – and the resulting benefits arising from – transparency, the Debtors have instead chosen to shroud their sales process in a cloak of secrecy, freezing out their largest stakeholders from any meaningful participation or real-time information. They have done so ostensibly out of a concern that a completely open bid process would chill participation, as potential bidders with publicly-traded securities may decline to participate if details of their involvement could become publicly known.

7.      Putting aside whether, as a factual matter, the Debtors are correct that bidders would flee if their involvement in the Stalking Horse Bidding Process were to become public,[5] the degree of information sharing does not have to be a binary choice of all or nothing. Rather, these competing concerns can reasonably be balanced with

---

[5]    Ironically, the need for a Stalking Horse Bidding Process was spurred by the active and public participation of NextEra Energy, a publicly-owned strategic investor, in EFIH's second-lien DIP process, during which NextEra made two unsolicited public bids to acquire EFH's indirect equity interest in Oncor.

minor modifications to the Bidding Procedures that would permit the limited disclosure of certain basic bid information (subject to the recipient's execution of a reasonable and appropriate confidentiality agreement with the Debtors), while protecting the Bidders' identities from disclosure. A proposed markup of the Bidding Procedures that reflects these modest changes is attached hereto as <u>Exhibit A</u>.[6] Such proposed changes appropriately address the Debtors' stated concerns regarding bidder confidentiality, while also facilitating the Ad Hoc Committee of TCEH First Lien Creditors' involvement in the sale of one of the Debtors' most valuable assets.

8.      Capitalizing on current market conditions to try to lock-in a favorable valuation and disposition of EFH's indirect equity interest in Oncor is a prudent step that could ultimately facilitate the Debtors' emergence from chapter 11 protection. However, if EFH persists on maintaining its singular focus on implementing such a sale in conjunction with a tax-free spin of the TCEH Debtors, then any such sale will necessarily remain contingent on obtaining the support of the TCEH first lien creditors. As a result, it would be counterproductive for the Debtors to deny the Ad Hoc Committee of TCEH First Lien Creditors the ability to provide real-time input into the Stalking Horse Bidding Process – continuing down such a path will only be at the estates' peril.

---

[6]     The Ad Hoc Committee of TCEH First Lien Creditors believes that a determination of whether other creditors should also be included as "Stalking Horse Reviewing Parties" (as defined in the revised Bidding Procedures attached as <u>Exhibit A</u> hereto) should be made on a case-by-case basis.

WHEREFORE, the Ad Hoc Committee of TCEH First Lien Creditors respectfully

requests that the Court approve the Motion subject to the revised Bidding Procedures

reflected in the markup attached hereto as <u>Exhibit A</u> and grant such other and further

relief as is appropriate under the circumstances.

Dated: October 10, 2014
      Wilmington, Delaware

*/s/ Ashley E. Markow*

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Pauline K. Morgan (Bar No. 3650)
Ryan M .Bartley (Bar No. 4985)
Andrew Magaziner (Bar No. 5426)
Ashley E. Markow (Bar No. 5635)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Alan W. Kornberg (admitted *pro hac vice*)
Kelley A. Cornish (admitted *pro hac vice*)
Brian S. Hermann (admitted *pro hac vice*)
Jacob A. Adlerstein (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Counsel to the Ad Hoc Committee of TCEH First Lien Creditors*

**EXHIBIT A**

01:16124734.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## TRANSACTION BIDDING PROCEDURES

On [_____], 2014, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order approving these bidding procedures (these "Bidding Procedures," and such order, the "Bidding Procedures Order"),[2] in the jointly-administered chapter 11 cases (the "Chapter 11 Cases") of EFH Corp. ("EFH Corp.") and certain of its affiliates (collectively, the "Debtors"). The Bankruptcy Court will have jurisdiction with respect to any dispute that may arise with respect to these Bidding Procedures.

These Bidding Procedures set forth the process by which the Debtors are authorized to solicit proposals ("Bids" and, the persons or entities submitting such Bids, "Bidders") for an investment, in any form, to acquire any or all of the assets or the reorganized equity (the "Transaction") of EFH Corp. or one or more of its direct and indirect subsidiaries, including Energy Future Intermediate Holding Company LLC ("EFIH"), other than Energy Future Competitive Holdings Company LLC ("EFCH") and its direct and indirect subsidiaries (collectively, the "TCEH Entities") to be sold or issued (as applicable) in accordance with title 11 of the United States Code (the "Bankruptcy Code").

Under these Bidding Procedures, the Debtors**, in consultation with the Stalking Horse Reviewing Parties (as defined below),** will select the Stalking Horse Bid (as defined below) after a two-stage closed bidding process (the "Stalking Horse Bidding Process"). After announcing the Stalking Horse Bid, the Debtors will conduct a round of open bidding (the

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

"Open Bidding Process") culminating in an auction intended to obtain a higher or otherwise best bid for the Transaction (the "Auction").

> Copies of the Bidding Procedures Order or other documents related thereto are available on the website of the Debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## A.    Submissions to the Debtors.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "Debtors' Representatives"):

1.    **Counsel.**    Counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Edward O. Sassower, P.C. (esassower@kirkland.com), Stephen E. Hessler (shessler@kirkland.com), Brian E. Schartz (brian.schartz@kirkland.com), Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Chad J. Husnick (chad.husnick@kirkland.com) and Steven N. Serajeddini (steven.serajeddini@kirkland.com), and Kirkland & Ellis LLP, 600 Travis Street, Suite 2400, Houston, Texas 77002, Attn.: Andrew Calder, P.C. (acalder@kirkland.com) and Amber Meek (ameek@kirkland.com); and

2.    **Financial Advisor.**    Financial advisor to the Debtors, Evercore Group L.L.C., 55 East 52nd Street, New York, New York 10055, Attn.: William Hiltz (hiltz@evercore.com), David Ying (ying@evercore.com), Stephen Goldstein (stephen.goldstein@evercore.com), Brendan Panda (panda@evercore.com), and Sesh Raghavan (sesh.raghavan@evercore.com).

## B.    Participation Requirements.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in making the Transaction (a "Potential Bidder") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion, preliminary proof by the Potential Bidder of its financial capacity to close the proposed Transaction, which proof may include, current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (including, if the Potential Bidder is an entity formed for the purpose of making the Transaction, an equity commitment letter and guarantee from the party that will backstop all obligations of the Potential Bidder and bear liability for any breach by the Potential Bidder), the adequacy of which the Debtors will determine in their sole discretion; and

The Debtors will determine and notify each Potential Bidder whether such Potential Bidder has submitted documentation so that such Potential Bidder may submit a Bid (each, an "Acceptable Bidder").

**C.    Obtaining Due Diligence Access.**

To conduct due diligence, an Acceptable Bidder must execute a confidentiality agreement (a "Confidentiality Agreement") acceptable to the Debtors.  **No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement.**  The Debtors will provide each Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives reasonable access to due diligence information with respect to EFH Corp., its subsidiaries, and Oncor Electric Delivery Holdings Company LLC and its subsidiaries ("Oncor") in accordance with the applicable Confidentiality Agreement.  The Debtors and their advisors, in their sole discretion, shall determine the scope, breadth and timing of due diligence information that is provided to each such Acceptable Bidder.

The Debtors and their advisors, in consultation with Oncor, shall coordinate all reasonable requests for, and access to, additional due diligence information from such Acceptable Bidders. The Debtors may at any time decline, however, to provide information to any such Acceptable Bidder who, in the Debtors' reasonable business judgment, has not continued to establish that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate the Transaction.

> The Debtors have designated the financial advisor to the Debtors listed in section A.2 of these Bidding Procedures to coordinate all reasonable requests for additional information and due diligence access.  Unless otherwise directed expressly in writing, no Acceptable Bidder shall directly contact any officer, employee or director of EFH Corp. and its subsidiaries (other than Oncor) with respect to due diligence matters.

**D.    Due Diligence from Acceptable Bidders and Confidentiality.**

If an Acceptable Bidder proposes to use its own or an affiliate's securities as all or part of the financial consideration in its Bid, the Acceptable Bidder shall comply with all reasonable requests for information by the Debtors and their advisors regarding the Acceptable Bidder (the "Bidder Due Diligence Information").  Failure by an Acceptable Bidder to comply with reasonable requests for information may be a basis for the Debtors and their advisors to determine that such bidder no longer qualifies as an Acceptable Bidder.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any Bidder Due Diligence Information in accordance with any applicable Confidentiality Agreement and shall not publicly disclose the identity of any Bidders participating in the Stalking Horse Bidding Process or the terms and conditions of any Bid submitted as part of the Stalking Horse Bidding Process (such information, the "Bidder Confidential Information"), except in accordance with the terms set forth in these Bidding Procedures.  Each recipient of Bidder Confidential Information agrees to use, and to instruct their advisors and representatives to use, such Bidder Confidential Information only in connection with the evaluation of Bids during the Bidding Process or otherwise in connection with the Chapter 11 Cases or in accordance with the terms of any applicable Confidentiality Agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and their advisors and representatives may disclose Bidder Confidential Information:  (i) with the prior written consent of such Bidder; (ii) to Oncor; (iii) as otherwise required or allowed by any applicable Confidentiality Agreement or other agreement, law, court or other governmental order, or regulation, including, as appropriate, in consultation with Oncor, to regulatory agencies; and (iv) in accordance with the Open Bidding Process as set forth in sections I and J of **these Bidding Procedures; and (v) to the Reviewing Parties and the Stalking Horse Reviewing Parties to the extent set forth in** these Bidding Procedures.  In conducting the Stalking Horse Bidding Process, the Debtors and their advisors and representatives may (a) inform any Acceptable Bidder of the existence or submission of one or more competing Bids and (b) provide Acceptable Bidders and their advisors and representatives with general guidance on improving their Bid in light of the general terms and conditions of competing Bids, either of which may constitute Bidder Confidential Information; *provided* that **except as otherwise provided in these Bidding Procedures,** the Debtors shall not, and shall instruct their advisors and representatives not to, disclose (x) the identity of any Bidders in the Stalking Horse Bidding Process or (y) the express terms of any specific Bid submitted by a particular Acceptable Bidder in the Stalking Horse Bidding Process.

**E.    Bid Requirements.**

Except as otherwise provided below, all Bids in both the Stalking Horse Bidding Process and the Open Bidding Process must comply with the following requirements (the "Bid Requirements").

  1. **Consideration and Structure.**

    a. **Total Consideration.**  The Bid must identify the form and amount of the total consideration to be provided to the Debtors in cash, debt, securities, or similar consideration (the "Bid Value").

    b. **Sources of Financing**.  The Bid must indicate the source of cash consideration and non-cash consideration, including (i) proposed definitive funding commitments with respect to any cash consideration and (ii) any proposals for assuring liquidity and/or value protection in connection with any non-cash consideration, and confirm that such consideration is not subject to any contingencies.  The Bid should include a detailed sources and uses schedule.

    c. **Structure.**  The Bid must identify the structure proposed for undertaking the Transaction, including the specific assets or reorganized equity of EFH Corp. and/or one or more of its direct or indirect subsidiaries (other than the TCEH Entities) to be acquired, the proposed steps to accomplish such acquisition and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

d.    **Tax Structure.**  The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or the extent of any incremental tax liabilities to be incurred by the Debtors under the Bid.

e.    **Debt Incurred at Closing.**  The Bid must identify the total amount of debt, if any, proposed to be incurred by any Debtors (other than the TCEH Entities) at closing of the Transaction (the "Closing").

f.    **Assumption.**  The Bid must specify which, if any, of the obligations of the Debtors the Bidder proposes to assume.

g.    **Cash on Hand.**  The Bid must provide that the Bidder will not receive or retain any cash on hand at the Debtors.

h.    **Minority Investor.**  The Bid must indicate plans, if any, regarding treatment of the minority investor in Oncor to be proposed in connection with the Bid.

2.    **Other Requirements.**

a.    **Topping Fee**.  The Bid must identify the dollar amount of the topping fee, if any, to be payable in connection with the Bid (the "Topping Fee") and when the Debtors are required to seek Bankruptcy Court approval of the Topping Fee, which Topping Fee shall apply only to events after such approval.  Subject to Bankruptcy Court approval as set forth in section H of these Bidding Procedures, the Topping Fee will become due and payable solely upon the occurrence of both:  (i) either (A) the Bankruptcy Court approving a Successful Bid by a person or entity other than the Bidder or its affiliates, or (B) the EFH Corp. board of directors determining that consummation of the Transaction is reasonably likely to be inconsistent with its fiduciary duties to the Debtors' stakeholders; and (ii) the Debtors consummating the alternative transaction for which they have terminated the Transaction.

b.    **Binding and Irrevocable**.  The Bid, other than a Round 1 Bid, must by its terms remain binding and irrevocable until December 31, 2015, subject to extension by the Debtors for up to six (6) months in the event that any necessary or advisable regulatory approval has not been received as of such date; *provided*, *however*, that if the Bid is not selected as the Successful Bid, the Bid may be revoked after approval of such Successful Bid by the Bankruptcy Court.

c.    **Regulatory Approvals and Covenants.**  Approval from the Public Utility Commission of Texas ("PUCT") is required in advance of any change in control of Oncor.  The Bid must contain the affirmative representation of Bidder that Bidder understands and agrees that prior PUCT approval of any change in control of Oncor is required and

Bidder's confirmation that the Bidder will cooperate with the Debtors and Oncor in seeking approval of the transaction by the PUCT.  Each Bid must describe in detail (i) the efforts that each party must utilize in connection with seeking and obtaining all regulatory approvals required to complete the transaction and (ii) any limitations on the Bidder's obligation to take all actions necessary or advisable to obtain such regulatory approvals.

d.     **Employees.**  The Bid must detail the treatment of (i) the employees of EFH Corp. and its subsidiaries (other than the TCEH Entities), to the extent such employees are not offered employment by the TCEH Entities, and (ii) the employees of Oncor.

e.     **Conditions to Closing.**  The Bid must identify with particularity each and every condition to Closing.

f.     **No Financing, Approval, or Diligence Outs.**  The Bid, other than a Round 1 Bid, must not be conditioned on obtaining any of the following:  (i) financing; (ii) board of directors or other similar approval; or (iii) the outcome or completion of a due diligence review by the Acceptable Bidder.

g.     **Due Diligence Acknowledgement.**  The Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Transaction before making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Transaction in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Transaction or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's proposed form of definitive agreement.

h.     **No Collusion.**  The Bidder must acknowledge in writing that it has not engaged in any collusion with respect to any Bids or the Transaction and agrees not to engage in any collusion with respect to any Bids, the Auction, or the Transaction.

i.     **Good Faith Offer.**  The Bid must constitute a good faith, bona fide offer to make the Transaction.

j.     **Identification Information.**  The Bidder must fully disclose the identity of each entity or person that will be bidding for the Transaction or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the

Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties.

k.    **Consent to Jurisdiction.**  The Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Transaction documents and the Closing, as applicable.

## F.    Stalking Horse Bidding Process.

Under the two-stage Stalking Horse Bidding Process, in the initial stage ("Round 1"), Acceptable Bidders may submit preliminary Bid materials to the Debtors (a "Round 1 Bid"), and the Debtors will**, in consultation with the Stalking Horse Reviewing Parties,** select certain Acceptable Bidders, based on the Bid Criteria, to advance to the second stage ("Round 2").  During Round 2, Round 2 Bidders (as defined below) will prepare and submit definitive documentation, and the Debtors and certain selected Round 2 Bidders will continue to negotiate the terms of such definitive documentation.  At the conclusion of this process, the Debtors will select**, in consultation with the Stalking Horse Reviewing Parties,** the highest or otherwise best Bid to serve as the Stalking Horse Bid (as defined below).

## G.    Round 1.

To submit a Round 1 Bid, an Acceptable Bidder must deliver to each of the Debtors' Representatives  an executed non-binding letter of intent and illustrative term sheet (the word version of which the Debtors will provide to each Acceptable Bidder upon request) setting forth the principal business terms and structure of such Acceptable Bidder's Bid and complying with each of the Bid Requirements (collectively, the "Round 1 Bid Documentation") so that it is **actually received** no later than **4:00 p.m. (prevailing Eastern Time) on October 23, 2014** (such deadline, the "Round 1 Bid Deadline," and each such Acceptable Bidder, a "Round 1 Bidder").  The Bid need not be structured consistent with the form of illustrative term sheet provided by the Debtors and attached to the Motion.

The Round 1 Bid Documentation should be submitted both as an executed PDF and in word version.  Round 1 Bid Documentation may not be submitted or modified after the Round 1 Bid Deadline.

As soon as reasonably practicable after the Round 1 Bid Deadline, the Debtors will determine in their sole discretion and notify each**: (a) provide the Stalking Horse Reviewing Parties (other than any Stalking Horse Reviewing Party that is or represents a** Round 1 Bidder whether such**) with a summary (the "Round 1 Bid Summary") of the material terms and conditions of each Round 1 Bid submitted in advance of the Round 1 Bid Deadline, which summary shall include for each such Round 1 Bid a description of, among other things, (1) the Bid Value, (2) the sources of financing, (3) the proposed structure for undertaking the Transaction, including the tax structure and whether the Transaction is intended to be structured based upon a "tax-free" or "taxable" deconsolidation of the TCEH Entities, (4) the proposed capital structure of reorganized**

**EFH Corp. and reorganized EFIH** *pro forma* **for consummation of the Transaction, (5) any material conditions to closing, (6) the requested Topping Fee (if any), and (7) any required regulatory approvals and related covenants; and (b) determine, in consultation with the Stalking Horse Reviewing Parties, whether each** Round 1 Bidder, based on the Bid Criteria, has been selected to advance to Round 2 (each, a "Round 2 Bidder").

**Notwithstanding anything herein to the contrary, without the prior written consent of a Round 1 Bidder, the Round 1 Bid Summary shall not include the identity of such Round 1 Bidder or any information that the Debtors believe, in consultation with their advisors, could reasonably be expected to reveal the identity of such Round 1 Bidder.**

## H.    Round 2.

As soon as reasonably practicable after the selection of Round 2 Bidders, the Debtors will distribute to all Round 2 Bidders a form of definitive documentation to effectuate the Bid (collectively, the "Round 2 Bid Documentation").

Round 2 Bidders that wish to participate in Round 2 must submit an initial marked version of the Round 2 Bid Documentation to each of the Debtors' Representatives so that it is **actually received** no later than **4:00 p.m. (prevailing Eastern Time) on November 7, 2014** (the "Initial Mark-Up Deadline"). The Debtors will engage in further negotiation with each of the Round 2 Bidders regarding the Round 2 Bid Documentation following the Initial Mark-Up Deadline. Round 2 Bidders must submit a substantially final draft of their Round 2 Bid Documentation to each of the Debtors' Representatives so that it is **actually received** no later than **4:00 p.m. (prevailing Eastern Time) on November 21, 2014** (the "Round 2 Bid Deadline"). The Round 2 Bid Documentation should be submitted both as an executed PDF and in word version, along with a marked version of all Round 2 Bid Documentation against the form provided by the Debtors. Round 2 Bids must also specify whether the Topping Fee must be approved either: (i) at the Auction Approval Hearing; or (ii) in advance of the Auction Approval Hearing (the "Stalking Horse Topping Fee").

As soon as reasonably practicable after the Round 2 Bid Deadline, the Debtors will**: (a) provide the Stalking Horse Reviewing Parties (other than any Stalking Horse Reviewing Party that is or represents a Round 1 or Round 2 Bidder) with a redacted version of the Round 2 Bid Documentation submitted by each Round 2 Bidder in advance of the Round 2 Bid Deadline, which the Debtors shall redact to remove any references in such Round 2 Bid Documentation to the identity of the Round 2 Bidder or any information that the Debtors believe, in consultation with their advisors, could reasonably be expected to reveal the identity of such Round 2 Bidder;** *provided, however***, that the Debtors may, with the prior written consent of the applicable Round 2 Bidder, provide the Stalking Horse Reviewing Parties with an unredacted version of any Round 2 Bid Documentation; and (b)** evaluate the Round 2 Bid Documentation submitted by each Round 2 Bidder based on the Bid Criteria and engage in additional negotiations to finalize such Round 2 Bid Documentation with one or more Round 2 Bidders ~~in their sole discretion.~~**, in each case in consultation with the Stalking Horse Reviewing Parties. The Debtors shall regularly update the Stalking Horse Reviewing Parties regarding any developments**

**that arise in connection with such additional negotiations with the Round 2 Bidders regarding the Round 2 Bid Documentation.**

Following the additional negotiations to finalize the Round 2 Bid Documentation, the Debtors will**, in consultation with the Stalking Horse Reviewing Parties,** select the Round 2 Bidder that has submitted the highest or otherwise best Bid in accordance with the Bid Criteria to serve as the stalking horse bid (such Bid, the "Stalking Horse Bid," and such Bidder, the "Stalking Horse Bidder").  At such time, the Debtors will execute all Round 2 Bid Documentation upon which such Stalking Horse Bid was made (the "Stalking Horse Agreement") and file a notice with the Bankruptcy Court announcing the Stalking Horse Bidder.

If the Stalking Horse Agreement does not require the Debtors to obtain approval of the Stalking Horse Topping Fee in advance of the Auction Approval Order, the process will follow the "Advanced Auction Schedule."  Otherwise, the process will follow the "Traditional Auction Schedule."

Unless otherwise agreed with the Stalking Horse Bidder, within five business days of execution of the Stalking Horse Agreement, the Debtors will file a motion (the "Stalking Horse Motion") requesting the Bankruptcy Court enter (i) an order approving, among other things, the Stalking Horse Topping Fee and (ii) an order authorizing entry into the Stalking Horse Agreement (which shall be filed in unsealed form as an exhibit to the Stalking Horse Motion), to be heard at the Auction Approval Hearing; *provided*, *however*, that under the Traditional Auction Schedule, the relief requested in the order approving the Stalking Horse Topping Fee will be heard as soon as practicable on notice consistent with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules and, until entry of such order, the Debtors shall not actively market the Transaction or facilitate any bidding with respect thereto, except as may be required under section R of these Bidding Procedures.

The Stalking Horse Motion will contain a description of the Stalking Horse Bidding Process, including summary descriptions of Bids and related significant terms, received in connection with the Stalking Horse Process (provided that the identity of Bidders will be redacted).

**I.      Open Bidding Process.**

Upon entry of the Stalking Horse Order under the Traditional Action Schedule or upon filing the Stalking Horse Motion, under the Advanced Auction Schedule, the Debtors will commence the Open Bidding Process to solicit Qualified Bids (as defined below) for a period of at least 30 days.

As part of the Open Bidding Process, the Debtors, their advisors, and Oncor will facilitate due diligence on the part of Acceptable Bidders in accordance with sections B, C, and D of these Bidding Procedures.  The Open Bidding Process will conclude in the Auction (as defined below) in which the Stalking Horse Bidder and any other Qualified Bidders (as defined below) will participate for the purpose of determining the highest or otherwise best Bid for the Transaction in accordance with the Bid Criteria.

**J.      Open Bid Requirements.**

The Debtors will only consider Bids during the Open Bidding Process from Acceptable Bidders that satisfy the Bid Requirements set forth above.  In addition, Acceptable Bidders during the Open Bidding Process must satisfy the following requirements (the "Open Bid Requirements"):

1.    **Minimum Value**.  The Bid must provide for Bid Value equal to: (a) the Bid Value set forth in the Stalking Horse Bid, plus (b) the Overbid Increment (as defined below), plus (c) the Stalking Horse Topping Fee, if any (provided that such Stalking Horse Topping Fee must be paid in cash), plus (d) any other amounts payable under the Stalking Horse Bid.

2.    **Documentation.**  The Bid must include a marked version of the Stalking Horse Agreement.

3.    **No Other Bid Protections.**  A Bid may not propose any bid protections, other than a Topping Fee (the "Open Bidding Topping Fee") or provisions for reimbursement of expenses, which the Debtors will consider on a case-by-case basis.

Bids submitted during the Open Bidding Process and fulfilling all of the Bid Requirements and Open Bid Requirements may, at the Debtors' ~~sole~~ discretion**, in consultation with the Reviewing Parties**, be deemed to be "Qualified Bids," and those parties submitting Qualified Bids may, at the Debtors' ~~sole~~ discretion**, in consultation with the Reviewing Parties**, be deemed to be "Qualified Bidders."  To be eligible to be selected as a Qualified Bidder, Acceptable Bidders must submit a Bid that is **actually received** no later than **4:00 p.m. (prevailing Eastern Time) on the date that is 30 days after the commencement of the Open Bidding Process** (the "Bid Deadline") by each of the Debtors' Representatives.  Acceptable Bidders that do not submit a Bid by the Bid Deadline will not be eligible to be selected as Qualified Bidders.

By no later than one business day after the Bid Deadline, the Debtors shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and counsel ~~to~~**and advisors to, and members (and their separate counsel and advisors, as applicable) of**:  (i) Oncor; (ii) the official committee of unsecured creditors; (iii) the ad hoc group of holders of EFIH unsecured notes; (iv) the ad hoc group of holders of EFH Corp. notes; (v) the ad hoc ~~group~~**committee** of holders of TCEH first lien ~~notes~~**claims**; (vi) the ad hoc group of holders of TCEH second lien notes; the ad hoc group of holders of TCEH unsecured notes; (vii) American Stock Transfer & Trust Company, LLC, as indenture trustee for the EFH Corp. notes; (vii) UMB Bank, N.A., as indenture trustee for the EFIH unsecured notes; (viii) certain holders of equity in Texas Energy Future Holdings Limited Partnership; (ix) Fidelity Investments, and (x) any such other stakeholders the Debtors deem to be reasonable or appropriate, provided such parties listed in (i) through (x) have executed a Confidentiality Agreement in a form **reasonably** acceptable to the Debtors (collectively, the "Reviewing Parties"), and will notify the Acceptable Bidders whether bids submitted constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction.  Any

bid that is not deemed a Qualified Bid shall not be considered by the Debtors.  The Stalking Horse Bid shall constitute a Qualified Bid.  **The term "Stalking Horse Reviewing Parties" shall refer to those parties (and their respective advisors and counsel) set forth in clause (v) above, provided that such parties have executed a Confidentiality Agreement in a form reasonably acceptable to the Debtors.**

**K.      Selection of the Starting Bid.**

In advance of the Auction, the Debtors, in consultation with the Reviewing Parties, shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best Bid (the "Starting Bid").  At least one business day prior to the date of the Auction, the Debtors shall notify and provide a copy of the Starting Bid to all Qualified Bidders.

**L.      No Qualified Bids.**

If the Debtors have received no more than one Qualified Bid as of the Bid Deadline, then the Auction will not occur and such Qualified Bid, if any, will be deemed the Successful Bid (as defined below).  The Debtors reserve all rights to extend the Bid Deadline, ~~after~~**in** consultation with the Reviewing Parties, to such later date that the Debtors believe is necessary~~, in their sole discretion,~~ to obtain additional Qualified Bids.

**M.      Auction.**

If two or more Qualified Bids are received by the Bid Deadline, then the Debtors will conduct the Auction.  The Auction will commence on a date as soon as practicable after the Bid Deadline, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such other time or place as the Debtors will timely notify each Qualified Bidder.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures").

1.      **Starting Bid.**  Bidding will begin at the Starting Bid.

2.      **Overbid.**  Subsequent Bids must be made in minimum increments of $20 million (the "Overbid Increment").

3.      **Previous Bids.**  Each Qualified Bidder will be informed of the terms of the previous Qualified Bids.

4.      **Qualified Bidders.**  Only Qualified Bidders will be entitled to bid at the Auction.

5.      **In Person.**  The Qualified Bidders must appear at the Auction in person or through duly-authorized representatives appearing in person.

6. **Permitted Persons.**  Only such authorized representatives of the Debtors, each of the Qualified Bidders, each of the Reviewing Parties, and each of the respective advisors of the foregoing will be permitted to attend the Auction.

7. **Transcription.**  The Auction will be transcribed to ensure an accurate recording of the bidding at the Auction.

8. **Final Bids.**  Absent irregularities in the conduct of the Auction or reasonable and material confusion during the bidding, each as determined by the Bankruptcy Court, the Bankruptcy Court will not consider Bids made after the Auction has been closed.

9. **Additional Procedures.**  The Auction will be governed by such other Auction Procedures as may be announced by the Debtors, in ~~their sole discretion~~**in consultation with the Reviewing Parties**, from time to time on the record at the Auction, *provided* that any such other Auction Procedures will not be inconsistent with any order of the Bankruptcy Court.

10. **Cancelation of Auction.**  Notwithstanding anything herein to the contrary, the Debtors may at any time, ~~and in their sole discretion~~**in consultation with the Reviewing Parties**, choose to cancel the Auction, adjourn the Auction, or modify the Auction Procedures.

The Debtors will serve all parties in interest, and other parties that request notification, a notice of the Auction and all deadlines related thereto (the "Auction Notice").  The Auction Notice will provide notice to all interested parties that to participate in the bidding process and the Auction and to be deemed a Qualified Bidder, each Potential Bidder must meet the Bid Requirements and the Open Bid Requirements.

**N. Bid Criteria.**

In evaluating Bids for any purpose under these Bidding Procedures, the Debtors may, in ~~their sole discretion~~**in consultation with the Reviewing Parties**, consider the following criteria (the "Bid Criteria"), each as determined by the Debtors:

1. **Consideration and Value.**  The Bid Value, Open Bidding Topping Fee, net cash proceeds, implied equity value, implied enterprise value, or any other measure of consideration or value;

2. **Stakeholder Consensus.**  The level of support for the Bid among the Debtors' stakeholders, including in particular those stakeholders the support of which the Debtors deem critical to the confirmation of one or more value-maximizing plans of reorganization;

3. **Likelihood of Closing**.  The likelihood of Closing if the Bid were accepted;

4.    **Likelihood of Confirmation.**  The likelihood of confirmation of a plan of reorganization by the Debtors if the Bid were accepted, including with respect to feasibility and valuation issues;

5.    **Tax Implications.**  The tax implications of the Bid, including whether it is intended to be structured in a tax-free manner or the extent of any incremental tax liabilities to be incurred by the Debtors under the Bid, and any related implications for plan confirmation;

6.    **Regulatory Approvals.**  The likelihood of obtaining any regulatory approvals reasonably required or advisable in connection with the Transaction, including under a plan of reorganization, and the Bidder's willingness to accept conditions imposed by the applicable regulatory authority as a requirement to such approvals;

**7.**    **Conditionality.**  The strength and conditionality of the commitment, including the likelihood of closing the Transaction with the Bidder;

8.    **Litigation.**  The nature and existence of any ongoing litigation between the Bidder and the Debtors; and

9.    **Other Factors.**  Any other factors that the Debtors, in ~~their sole discretion~~**consultation with the Reviewing Parties**, determine are relevant.

**O.    Acceptance of the Successful Bid.**

Upon the conclusion of the Auction (if conducted), the Debtors~~, in their sole discretion~~, in consultation with the Reviewing Parties, will identify the highest or otherwise best Qualified Bid (the "<u>Successful Bid</u>" and, the Bidder submitting such Bid, the "<u>Successful Bidder</u>").

The Successful Bidder and the Debtors will, as soon as reasonably practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid was made.  After the Successful Bid is identified, the Debtors will file a notice of the Successful Bid with the Bankruptcy Court.

If the Auction is held, the Debtors will be deemed to have accepted a Qualified Bid only when (1) such Bid is declared the Successful Bid and (2) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon Bankruptcy Court approval of the Successful Bid at the Auction Approval Hearing (as defined below) or any other hearing conducted for such purpose, and receipt of any applicable regulatory approvals.

**P.    Auction Approval Hearing.**

A hearing to consider approval of the selection of the Successful Bid, the Auction, the Stalking Horse Motion, and the manner in which these Bidding Procedures were otherwise administered (the "<u>Auction Approval Hearing</u>") will be scheduled to take place within seven (7) days of the Auction, or as soon as reasonably practicable thereafter, before the Honorable

Christopher S. Sontchi at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom 6, Wilmington, Delaware 19801; *provided*, *however*, that if the Stalking Horse Bid is not the Successful Bid, the Debtors will not seek approval of any outstanding relief under the Stalking Horse Motion and will seek approval of entry into the Successful Bid, including any Open Bidding Topping Fee, as soon as reasonably practicable on notice consistent with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules. The Auction Approval Hearing may be continued to a later date by the Debtors by filing a notice on the electronic docket of the Bankruptcy Court or sending notice prior to, or making an announcement at, the Auction Approval Hearing. No further notice of any such continuance will be required to be provided to any party. Any Bankruptcy Court approval of the Successful Bid, the Auction, or any related matters will remain subject to confirmation and regulatory approvals, as necessary.

**Q.    Reservation of Rights.**

The Debtors reserve their rights, following consultation with their advisors and the Reviewing Parties (to the extent reasonably practicable), to modify the Bidding Procedures in any manner that they determine will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customary terms and conditions on the Transaction, including, without limitation, modifying the Bid Requirements or the Open Bid Requirements, extending the deadlines set forth in the Bidding Procedures, adjourning the Auction at the Auction, and/or adjourning the Auction Approval Hearing in open court without further notice, canceling the Auction, and rejecting any or all Qualified Bids, in the Debtors' business judgment. Nothing in these Bidding Procedures shall prejudice the right or ability of any party in interest, including the Reviewing Parties, to at any time object to the Transaction, its structure, or the Debtors' selection of one Transaction structure over another.

**R.    Fiduciary Out.**

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

[*Remainder of page intentionally left blank*]