**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  D.I. 2087, 2368, 2377, 2379, 2385, 2389,** |
| | ) | **2390, 2392, 2395** |

**DEBTORS' OMNIBUS REPLY TO**
**OBJECTIONS TO BIDDING PROCEDURES MOTION**

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## Table of Contents

Preliminary Statement................................................................................................1

Background ...............................................................................................................4

Argument ..................................................................................................................6

I.    The Bidding Procedures Are Fair, Reasonable, and an Appropriate Exercise of
      Business Judgment...........................................................................................6

      A.    The Motion Seeks Narrowly-Tailored Procedural Relief. .......................6

      B.    The Bidding Procedures Are Governed by the Business Judgment
            Standard. ...............................................................................................6

      C.    The Bidding Procedures Have a Sound Business Purpose and Were
            Proposed in Good Faith. ......................................................................10

      D.    The Debtors' Business Judgment Was Exercised with Good Process,
            Proper Authority, and Free of Conflict.................................................12

      E.    The Remaining Business Judgments Raised by the Objectors Are Outside
            of the Scope of the Motion; Nonetheless They Are Supported by the
            Debtors' Sound Business Judgment......................................................14

II.   The Requested Modifications to the Bidding Procedures Are Unnecessary and/or
      Inappropriate. ................................................................................................16

      A.    The Sealing of Bids Is Appropriate Under the Relevant Legal Standards. ..........16

      B.    The Remaining Proposed Modifications to the Bidding Procedures Are
            Unnecessary and Inappropriate............................................................18

Conclusion ..............................................................................................................22

RLF1 10930302v.1

## Table of Authorities

**Statutes**

11 U.S.C. § 107(b)(1) ................................................................ 16

11 U.S.C. § 1107(a) .................................................................. 14

11 U.S.C. § 363 ........................................................................ 18

**Cases**

*C & J Clark of Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 88 (Bankr. S.D.N.Y. 1988) ............................................................. 8

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ........................... 7, 13

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998) .................................................. 8

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ....................... 6

*Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) ......................... 16

*Harrison v. City of San Antonio*, 695 S.W.2d 271, 275 (Tex. App. 1985) ................... 13

*In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) ........... 8

*In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011) ....................... 10

*In re Clamp-All Corp.*, 233 B.R. 198, 207 (Bankr. D. Mass. 1999) .......................... 14

*In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) ....................... 6

*In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 507 (Bankr. E.D. Mich. 2012) ....... 14

*In re eToys, Inc.*, 331 B.R. 176, 200 (Bankr. D. Del. 2005) ............................... 7

*In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) ............................. 6

*In re Handy Andy Home Imp. Centers, Inc.*, 199 B.R. 376, 380 (Bankr. N.D. Ill. 1996) ..... 16

*In re Innkeepers USA Trust*, 442 B.R. 227, 232 (Bankr. S.D.N.Y. 2010) .................... 9

*In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236 (Bankr. N.D. Tex. 2009) .................. 8

*In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) ........................................................ 8

*In re Silver Bros. Co., Inc.*, 179 B.R. 986, 1010 n.14 (Bankr. D. N.H. 1995) .............................. 14

*In re Texaco, Inc.*, 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988) ........................................................ 14

*In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) ......................................................... 8

*Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1343 (Del. 1987) ............................... 9

*Jacoway v. Anderson (In re Ozark Rest. Equip. Co., Inc.)*, 850 F.2d 342, 345 (8th Cir. 1988) ..... 8

*Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994) ........................................... 9

*Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) .................................................................. 9

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ................................................... 6

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
    147 B.R. 650, 656 (S.D.N.Y. 1992) ........................................................................................... 7

*Official Comm. of Unsecured Creditors v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28
    (S.D.N.Y. 2005) .......................................................................................................................... 8

*Official Unsecured Creditors' Comm. v. Broadstripe, LLC (In re Broadstripe, LLC)* .................. 9

*Pepper v. Litton*, 308 U.S. 295, 298 (1939) ..................................................................................... 9

*Quadrant Structured Prods. Co. v. Vertin*, No. 6990-VCL, 2014 WL 5020273, at *20 (Del. Ch.
    Oct. 1, 2014) ............................................................................................................................... 7

*Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011) ....................................... 9

*Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 127 (3d Cir. 1998) ................................ 12

*The Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330
    B.R. 67, 75 (Bankr. D. Del. 2005) .............................................................................................. 7

*U.S. Bank N.A. v. Wilmington Trust Co. (In re Spansion, Inc.),* 426 B.R. 114, 139-40 (Bankr. D.
    Del. 2010) ................................................................................................................................. 14

**Rules**

Fed. R. Bankr. Proc. 7026 ............................................................................................................... 16

Fed. R. Bankr. Proc. 9014(c) ......................................................................................................... 16

Fed. R. Civ. Proc. 26(c) .................................................................................................................. 16

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this omnibus reply (this "Reply") to the objections to the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 2087] (the "Motion")[1] filed by (a) the indenture trustee under the 10.00% EFIH first lien notes (the "EFIH First Lien Trustee") [D.I. 2385]; (b) the indenture trustee under, and an hoc group of holders of, the EFIH second lien notes (the "EFIH Second Lien Group") [D.I. 2379]; (c) the ad hoc group of holders of EFIH unsecured notes (the "EFIH Unsecured Group") [D.I. 2390]; (d) the ad hoc committee of holders of TCEH first lien debt (the "TCEH First Lien Committee") [D.I. 2395]; (e) the ad hoc group of holders of TCEH second lien notes (the "TCEH Second Lien Group") [D.I. 2368]; (f) the Official Committee of Unsecured Creditors (the "Creditors' Committee") [D.I. 2377]; (g) the ad hoc group of holders of TCEH unsecured notes (the "TCEH Unsecured Group") [D.I. 2389]; and (h) the joinder filed by the indenture trustee for certain TCEH unsecured notes [D.I. 2392] (collectively, the forgoing objecting parties, the "Objectors," and, the foregoing objections, the "Objections"). In support of this Reply, the Debtors respectfully state as follows.

## Preliminary Statement

1.    Approval of the Bidding Procedures is in the best interests of the Debtors' estates. It will provide certainty to potential bidders in the market and facilitate the Debtors' ongoing efforts to maximize the value of the economic interests in Oncor—and thus secure the greatest possible benefits for all of the Debtors' stakeholders. The Motion does not seek approval of a particular transaction or even a particular form of transaction. Instead, the discrete matter at

---

[1]    Capitalized terms used but not defined in this Reply have the meanings ascribed to them in the Motion.

issue is the narrow relief sought in the Motion:  whether employing a typical marketing process—including certain dates, bidding requirements, and other conventional criteria—is a sound exercise of the Debtors' business judgment.

2.      The Objectors' attacks on the Debtors' decision-making process are unfounded. The Debtors' boards—informed by years of experience and analysis related to this restructuring—approved the decision to set aside the proposed EFIH Second Lien DIP Facility and move to an auction of the economic interests in Oncor—and thus those boards understood and supported the fundamental tenets of the Bidding Procedures.  But their duties did not require them to draft or approve the actual Bidding Procedures or authorize the Motion implementing their decision to conduct an auction.  To assert otherwise, as certain of the Objections do, is a hyper-formal (and unsupported) take on corporate law and restructuring practice.  Assertions of potential conflicts with respect to the Bidding Procedures similarly lack support.  Each of the Debtors' estates quite plainly benefits from providing certainty to auction participants regarding the timing and ground rules for the marketing process, all of which are intended to maximize value.

3.      Yet in an effort to find fault with the Bidding Procedures, a number of the Objections seek to cast the Bidding Procedures as something more than what they are.  These Objections incorrectly assert that the Motion seeks approval of a transaction or sale of the economic interests in Oncor, that the Bidding Procedures foreclose future alternatives, or that the Bidding Procedures are somehow burdened by an "entrenched" structure.  The Motion does none of these things.  The Debtors are *not* seeking authority to "sell" anything today—much less something that does not yet exist or that they do not "own."  Equity investment procedures are

2

common and, based on the Debtors' discussions with bidders, the market understands what the Debtors are marketing:  the right to the economic interests in Oncor.

4.      The Debtors do not (and need not) dispute that any bid may impose certain limitations on the ultimate form of their restructuring.  The Debtors are well aware of these potential limitations, and, in forming their views, they have carefully charted a course to what they believe will be a confirmable, value-maximizing, and hopefully consensual chapter 11 plan. This is their statutorily-mandated prerogative as debtors in possession with the exclusive right to propose a plan of reorganization.  In the Debtors' considered view, the time for conducting this marketing process is now.  This is not simply an attempt to secure a long-term "put" option—it is a necessary step to advance this restructuring.

5.      And it is precisely because the Bidding Procedures represent a key step forward in the Debtors' restructuring that the Objections follow a predictable pattern.  The bulk of the opposition to the Bidding Procedures comes from parties who have made it abundantly clear they intend to try and increase their litigation leverage by attempting to thwart the Debtors' forward progress.  More specifically, the broadest and most vociferous arguments come from a lender group whose principal and interest the Debtors have already repaid in full, and whose only remaining stake in the case is a contingent makewhole claim that is massively oversecured (the EFIH First Lien Trustee) and from junior creditors of an estate that does not even own the economic interests being marketed, but which will benefit in any event from the Debtors obtaining the greatest possible distributable value though the bidding process (the TCEH junior creditors).  Put simply, these parties oppose the Bidding Procedures in furtherance of their own option value, but at a cost to the Debtors' estates and those stakeholders who benefit most directly from a successful bidding process.

3

6.      The remaining Objectors generally support the sale process but have narrow issues with certain features of the Bidding Procedures, which the Debtors are working to resolve. And, most importantly, there is not one objection from a creditor of EFH Corp., the estate that most acutely bears the risk of the marketing process.

7.      As explained in the Motion and further below, the Bidding Procedures are justified by the Debtors' sound business judgment. And for these reasons, the Debtors respectfully request that the Court approve the Motion.

## **Background**

8.      The Debtors filed the Motion on September 19.  The Motion requests the Court's approval of bid deadlines, bid requirements, and bid criteria for the disposition of the Debtors' economic interests in Oncor.  Since long before the filing of the Motion, the Debtors' boards, management, and advisors have been discussing and analyzing potential transaction structures— including in consultation with the Objectors.  Bidding for the reorganized EFH Corp. equity began organically in the spring of 2014, within the context of the proposed EFIH Second Lien DIP Facility.  In mid-June, the Debtors received the first third-party bid for this equity from NextEra in the form of an alternative proposal for the EFIH Second Lien DIP Facility.  The Debtors were able to leverage the NextEra proposal and other proposals to substantially improve the terms of the proposed EFIH Second Lien DIP Facility.

9.      At the hearing to approve the EFIH Second Lien DIP Facility, many of the same Objectors to this Motion argued that the Debtors had neither run a sufficiently extensive marketing process for the economic interests in Oncor nor obtained Court approval of this process.  They alleged the absence of a "market test for the Oncor asset" and suggested that the Debtors should be "going out and knocking on doors and trying to market this."  Opening

4

Statement of Counsel to the TCEH Unsecured Group, Hr'g Tr. June 30, 2014, at 129; *see also* Creditors' Committee's EFIH Second Lien DIP Objection [D.I. 1090], at 4 (citing the "complete lack of any marketing process" for the EFIH Second Lien DIP Facility); EFIH First Lien Group's EFIH Second Lien DIP Objection [D.I. 1068], at 17 (calling for a "true market test" of the transactions contemplated by the Restructuring Support Agreement).   In their objections at the time, these same Objectors implicitly acknowledged the value of court-ordered deadlines and a marketing process for reorganized EFH Corp. equity.  *See. e.g.*, Cross Examination by Counsel to the TCEH Unsecured Group, Hr'g Tr. July 1, 2014, at 185-86 ("And you know how, for example, you can go then to potential buyers and tell them the Court has ordered bids by certain dates? . . . And that in [that] sense establishing bidding procedures gives the debtors more power than you thought you had in this process?").  Those Objectors are now being given exactly what they requested—sensible and reasonable bidding procedures.

10.    After adjourning the motion to approve the EFIH Second Lien DIP Facility, on July 23, 2014, the Debtors' boards of directors and managers voted to terminate the Restructuring Support Agreement and pursue a marketing process and auction for the economic interests in Oncor.  In response, additional potential bidders then began expressing interest in the transaction.   In light of this interest and after numerous discussions with each of their stakeholders, the Debtors' management and advisors designed, and filed the Motion for Court approval of, a process to market the economic interests in Oncor.  Management, including the Debtors' co-chief restructuring officers, and their advisors met regularly with the boards to inform them of progress on and filing of the actual Bidding Procedures and the Motion—both of which facilitated the boards' decision to pursue the marketing process and auction embodied in the Bidding Procedures and Motion.

## Argument

I.    **The Bidding Procedures Are Fair, Reasonable, and an Appropriate Exercise of Business Judgment.**

A.    **The Motion Seeks Narrowly-Tailored Procedural Relief.**

11.    A number of the Objections rely primarily on the faulty premise that the Bidding Procedures constitute some form of extraordinary relief.  They do not.  The Bidding Procedures are a series of deadlines, bid requirements and criteria, and other related processes.  The Motion does *not* seek approval of a structure, a plan, a sale, or a transaction.[2]  Without this straw man argument, most of the challenges to the Debtors' business judgment underlying the Bidding Procedures fall away.

B.    **The Bidding Procedures Are Governed by the Business Judgment Standard.**

12.    The standard of review for the relief requested in the Motion is the business judgment test.  In the Third Circuit, courts have authorized transactions outside the ordinary course of business when the transaction has a sound business purpose and is proposed in good faith.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  In evaluating whether this business purpose exists, "courts consider a variety of factors, which essentially represent a 'business judgment test.'  . . . [A] bankruptcy judge must not blindly follow the hue and cry of the most vocal [creditor] groups . . . ." *Montgomery Ward*, 242 B.R. at 153.  The business

---

[2]    Contrary to the TCEH Second Lien Group's unsupported assertions, the Debtors are not seeking authority to sell, pursuant to 363(b), reorganized EFH Corp. equity.  If and when the Debtors select a winning bid in the Auction, they will file a *new motion*, the nature of which will depend on the bid, to seek appropriate relief.  The TCEH Second Lien Group's primer on asset sales versus reorganizations is unhelpful.  *See* TCEH Second Lien Group Objection ¶¶ 27-37.

judgment rule is the "presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." *Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005). In general, "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

13.     The Objectors' attempts to appeal to a higher standard are misplaced at best. There is no "self-interest" somehow furthered by the Bidding Procedures even remotely suggestive of bad faith. All of the Debtors will benefit from a Court-approved marketing process that will likely result in the highest or otherwise best offer for the economic interests in Oncor. And that is the *only* relief the Debtors seek in the Motion. Indeed, the entire fairness standard cited by some of the Objections cannot even logically be applied here. Entire fairness review inquires whether a debtor's agreement to enter into a *transaction* was the result of "fair dealing" and resulted in a "fair price." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). The cases are clear that the entire fairness standard does not apply in the absence of *a transaction*. *See In re eToys, Inc.*, 331 B.R. 176, 200 (Bankr. D. Del. 2005) ("In this case, there was no transaction between the Debtors and ADA. Therefore, the Court need not determine if the dealings between the two were fair and for a fair price."). Moreover, the business judgment rule cannot be rebutted by abstract assertions of conflicts or bad faith, including the simple fact that directors sit on multiple boards. *Quadrant Structured Prods. Co. v. Vertin*, No. 6990-VCL, 2014 WL 5020273, at *20 (Del. Ch. Oct. 1, 2014) ("It is not enough . . . simply to argue in the abstract that a particular director has a conflict of interest or is acting in bad faith because she is

7

affiliated with a particular type of institution that may be pursuing a particular business strategy or have a particular interest.").

14.    Nonetheless, with these fundamental mischaracterizations in tow, the Objections wade through an extensive body of inapposite case law.  For example, the Objections cite a number of cases involving inside deals for decision-makers that give rise to conflicts. *Official Comm. of Unsecured Creditors v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005) (request for approval to pay for certain employees' lawyers); *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236 (Bankr. N.D. Tex. 2009) (motion to approve consulting agreements with former board members); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) (motion to approve a transaction in which management would be "selling the businesses to themselves"); *C & J Clark of Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 88 (Bankr. S.D.N.Y. 1988) (sale of assets to any entity controlled by the chairman of the debtors' board); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 45-47 (Del. Ch. 2013) (applying entire fairness to a transaction in which a majority of directors had a personal, pecuniary interest in the transaction).  Here, quite simply, the Debtors' management, board, and advisors are not receiving any benefit from the Bidding Procedures.

15.    Next, the Objectors cite cases applying heightened scrutiny to sales of assets from one affiliate to another or transactions with controlling shareholders.  *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998) (equitably subordinating claims against the debtor purchased by an affiliate); *Jacoway v. Anderson (In re Ozark Rest. Equip. Co., Inc.)*, 850 F.2d 342, 345 (8th Cir. 1988) (stating that there should be "close scrutiny" of transfers of assets between two related companies); *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (declining to

8

apply heightened scrutiny to a situation where an affiliate was on both sides of the transaction because the transaction was born of a court-supervised process); *Official Unsecured Creditors' Comm. v. Broadstripe, LLC (In re Broadstripe, LLC)*, 444 B.R. 51, 106 (Bankr. D. Del. 2010) (considering challenges to restructuring transactions entered into with a controlling shareholder); *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) ("[I]n a challenged transaction involving self-dealing by a controlling shareholder, the substantive legal standard is that of entire fairness . . . ."); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994) ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness."). The Bidding Procedures neither contemplate nor constitute a sale of an asset to an insider, and the Debtors are not requesting that the Court approve any such transaction.[3]

16.    Indeed, the transactions that courts reviewed in many of the cases cited by the Objectors were subject to heightened scrutiny specifically because of the *absence* of a robust process. *See, e.g.*, *In re Innkeepers USA Trust*, 442 B.R. 227, 232 (Bankr. S.D.N.Y. 2010) ("The Debtors did not run any marketing process, and in fact . . . the Debtors' investment banker[] was told not to pursue other bidders or transactions."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 460 (Del. Ch. 2011) ("When a controlling stockholder uses a reverse split to freeze out minority stockholders *without any procedural protections*, the transaction will be reviewed for entire fairness . . . ." (emphasis added)).

---

[3]    Taking this to the extreme, the TCEH Second Lien Group quotes at length from a 1939 Supreme Court opinion in which a bankrupt con artist used "one-man corporations" to sell assets to himself with the help of a corrupt sheriff. *Pepper v. Litton*, 308 U.S. 295, 298 (1939). The TCEH Second Lien Group also cites an opinion stating that the approval of a majority of independent directors *enhances* business-judgment protection for the quite different proposition that business-judgment protection *requires* approval by a majority of independent directors. *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1343 (Del. 1987) ("[W]ith the independent directors in the majority, proof that the board acted in good faith and upon reasonable investigation is materially enhanced."). Once again, none of these cases apply.

9

17.     Lastly, certain Objectors quote a transcript from a sale hearing where a court considered after the fact whether a Debtor was entitled to a finding that it had run a fair process.  *In re Am. Safety Razor Co.*, No. 10-12351, Hr'g Tr. at *132-33 (Bankr. D. Del. Sept. 30, 2010).  Irrespective of the merits of this ruling, this is not a sale hearing and the process is not complete—the Debtors here are seeking the Court's prior approval of the Bidding Procedures and will return to the Court at a later date for appropriate findings of fact.

18.     In sum, the Objectors fail to cite a single precedent that compels heightened scrutiny of procedural relief such as this.

### C.     The Bidding Procedures Have a Sound Business Purpose and Were Proposed in Good Faith.

19.     The Bidding Procedures satisfy the business judgment standard under section 363(b).  In making this determination, courts have considered the fact that the use of estate assets will be "relatively small in light of the Debtors' total assets."  *In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011).  Here, the relatively minimal cost involved in implementing the Bidding Procedures represents an inconsequential use of estate assets.  Further, regardless of whether the Debtors pursued approval of the Bidding Procedures as reflected in the Motion at this time, the Debtors intend to continue pursuing a process to secure an investor for the economic interest in Oncor and subsequently negotiate a plan of reorganization.  Therefore, the Bidding Procedures as pursued here represent a negligible incremental use of estate property.

20.     At the same time, the Bidding Procedures will provide significant benefits to the estates—most importantly, certainty as to the bidding process—to justify this negligible use of estate property.  First, the Bidding Procedures will provide certainty with respect to deadlines. Counsel for certain of the Objectors suggested the very same on numerous occasions at the

10

Second Lien DIP hearing.[4]  Second, the Bidding Procedures will provide bidders with certainty regarding when and in what form their Bids will be disclosed.  Third, the Bidding Procedures make clear the Debtors' expectations of bidders as to the timing, details, and documentation of bids.  Together, each of these forms of certainty will translate to value for the estates.  If the Bidding Procedures are not approved, the Debtors will be forced to pursue a similar process but potentially with lesser participation and, potentially, lesser value for the Debtors' estates as a result.  This is clear and defensible business judgment to support approval of the Bidding Procedures.

21.     The Bidding Procedures themselves are reasonably calculated to result in a value-maximizing bid.  Indeed, the Debtors have previously received bids that satisfy many if not all of the requirements set forth in the Bidding Procedures.  As the Debtors' financial advisors have shown, and as conceded by the Creditors' Committee itself, the two-stage, two-step marketing process is readily understood and appreciated by the market.  *See* Creditors' Committee Objection ¶ 31.  Nor is there any basis to question the timing of the Bidding Procedures or that the Debtors are moving too quickly, as certain Objectors do.  The Debtors' chapter 11 plan negotiations will be informed by this process and determining the future owner at this time will facilitate the Debtors' emergence from chapter 11 on a reasonable timeframe.  Last, the deadlines embodied in the Bidding Procedures are reasonable and reflect significant input from the Debtors' advisors, who each have significant experience in this area.

---

[4]     *See, e.g.,* Cross Examination by Counsel to TCEH Unsecured Group, Hr'g Tr. July 1, 2014, at 185-86 ("And you know, for example, you can go then to potential buyers and tell them the Court has ordered bids by certain dates?").

11

**D.      The Debtors' Business Judgment Was Exercised with Good Process, Proper Authority, and Free of Conflict.**

22.      The Debtors' corporate process to exercise this judgment was appropriate given the scope of relief sought in the Motion.  Certain of the Objectors make much of the fact that the Debtors' boards did not formally approve the actual Bidding Procedures.  *See, e.g.*, TCEH Second Lien Group Objection ¶¶ 43-45; TCEH Unsecured Group Objection ¶¶ 42-45.  But it is black-letter corporate law, and a basic feature of the restructuring process, that boards may delegate responsibilities to their officers.  *See Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 127 (3d Cir. 1998) ("Beyond the board of directors, the corporation may validly act through its directors and officers as authorized corporate agents.").  Indeed, this "ability to delegate is the essence of corporate management" and "may be express or implied."  *Id.*

23.      Here, the Debtors are not an operating company that suddenly put itself "in play"—all chapter 11 debtors are "in play."  Instead, the Debtors have been pursuing restructuring alternatives for the past several years.  The Debtors' boards appointed co-chief restructuring officers in October 2013 to take necessary and appropriate actions to advance the Debtors' restructuring and authorized the retention of restructuring professionals to support these officers.  In doing so, the Boards unambiguously delegated to these parties the authority to develop restructuring alternatives.  If and when these efforts yield a potential transaction—as they did with the Restructuring Support Agreement—the Debtors and their advisors will present these alternatives to the Debtors' boards for consideration.

24.      On July 23, 2014, the Debtors' boards met jointly to consider the path forward in these chapter 11 cases in light of the ongoing bidding war for the economic interests in Oncor.  Given the potential value represented by the improved NextEra proposal, and the likelihood that greater value could be obtained through further marketing, the boards approved the termination

12

of the Restructuring Support Agreement, including the equity investment inherent in the EFIH Second Lien DIP Facility.  The filing of the Bidding Procedures and the Motion, which the boards expressly considered and discussed, was the culmination of this decision.  Cremens Dep. Tr. 83:3-12 (stating that "there was a lot of discussion around" the Bidding Procedures); Sawyer Dep. Tr. 361:20-23 ("There were discussions around the process.  There were deliberations at the board level as to the nature of the bidding process as to timing, contacts, criteria . . . .").  It is a red herring to fixate on the fact that the boards did not vote to approve the ministerial step of filing the Motion when they approved the substantive imperatives that underlie the Motion and the Bidding Procedures.  The Objectors cite no legal authority for the proposition that a board must approve every procedural motion filed by chapter 11 debtors.  And for good reason:  that rule would bring every complex case to a screeching halt.

25.    Moreover, the cases cited by the Objectors in this context again rely on the fiction that there is currently a transaction before the Court.  *See, e.g.*, *Cede*, 634 A.2d at 368 (business judgment rule requires directors to be fully informed "*before voting on a proposed plan of merger or sale*" (emphasis added)); *Harrison v. City of San Antonio*, 695 S.W.2d 271, 275 (Tex. App. 1985) (concerning the authority of a union structured as a corporation to "*bind the corporation*" to a collective bargaining agreement (emphasis added)).  These cases are inapposite.  As the Debtors have repeatedly informed the various creditor groups, the boards will formally vote on the selection of the Stalking Horse Bidder and creditors have an express opportunity to challenge that decision.

13

E.     **The Remaining Business Judgments Raised by the Objectors Are Outside of the Scope of the Motion; Nonetheless They Are Supported by the Debtors' Sound Business Judgment.**

26.     The Motion was not an invitation to hold a referendum on any particular transaction or the Debtors' restructuring as a whole.  Certain of the Objections, however, argue that the Debtors' preference for a tax-free spin is somehow "entrenched" in the Bidding Procedures.  Creditors' Committee Objection ¶ 23.  This statement is inaccurate.  As the Debtors have made very clear, the Bidding Procedures do not seek to require any particular tax structure.[5] But there is no doubt that the Bidding Procedures are an integral component of the Debtors' restructuring strategy—and rightly so.  Under black-letter bankruptcy law, the Debtors currently have the exclusive right to chart the course of their restructuring.

27.     The Bankruptcy Code instills a debtor in possession with the rights, obligations, functions, and duties of a chapter 11 trustee.  11 U.S.C. § 1107(a).  This includes not only the exclusive right to file a plan during the exclusivity periods set forth in section 1121 of the Bankruptcy Code, but also the right to control the restructuring process as a whole.   Courts have explained this critical concept as follows:

> The purpose of the exclusivity period is to provide a debtor, at the outset of a chapter 11 case, with the unqualified opportunity to negotiate a settlement and propose a plan of reorganization *without interference from creditors and other interests*. . . .   [C]ompelling them to reconceptualize their reorganization would deprive the Debtors of their exclusive right to formulate and propose their manner of reorganization as they see fit, subject, of course, to the limitations of the Bankruptcy Code.

---

[5]     Bidding Procedures § E.1.c ("The Bid must identify the structure proposed for undertaking the Transaction, including the specific assets or reorganized equity of EFH Corp. and/or one or more of its direct or indirect subsidiaries (other than the TCEH Entities) to be acquired . . . ."); Motion, Ex. C, Form Term Sheet, at 1 ("**THE STRUCTURE SET FORTH IN THIS TERM SHEET IS FOR ILLUSTRATIVE PURPOSES ONLY. BIDDERS MAY PROPOSE ANY ALTERNATIVE STRUCTURE(S).**").

14

*U.S. Bank N.A. v. Wilmington Trust Co. (In re Spansion, Inc.),* 426 B.R. 114, 139-40 (Bankr. D. Del. 2010) (citing *In re Texaco, Inc.*, 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988)) (emphasis added); *see also In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 507 (Bankr. E.D. Mich. 2012) (same); *In re Clamp-All Corp.*, 233 B.R. 198, 207 (Bankr. D. Mass. 1999) (holding that the exclusivity periods give debtors "the opportunity to retain control over the reorganization process").

28.     The Debtors are both entitled and expected to have a preferred plan structure.  As the Omnibus Tax Memorandum explains, the Debtors have done an extraordinary amount of analysis regarding potential structures over the past several years [D.I. 2296].  Each Debtors' board has considered these alternatives at great length.  And the boards—including each of the boards of EFIH and TCEH—have concluded that a restructuring that does not seek to strand a multi-billion dollar tax liability is most likely in the best interests of their estates based on the structures of which they are aware.  They held this view when they pursued a consolidated restructuring, when they approved entry into the Restructuring Support Agreement, and to this day.  This position is both informed and considered.  But this position is not up for debate or consideration at this time; the Debtors are *not* seeking approval of a transaction or a plan.

29.     Nonetheless, the Bidding Procedures are clear that the Debtors will consider any structure.  Indeed, the Debtors have benefitted over the past several years from countless candid and informed discussions with both their creditor constituents and potential bidders regarding transaction structures.  These discussions have informed the Debtors' decisions and analysis to date.  And the Debtors look forward to similar discussions in the future.  The Debtors must, however, consider the execution risk associated with each bid, including the risk that the bid triggers a multi-billion dollar tax that derails these chapter 11 cases.  To that end, the Debtors

15

continue to believe that a tax-free transaction has the lowest execution risk and will maximize the value of the estates, individually and as a whole.

## II. The Requested Modifications to the Bidding Procedures Are Unnecessary and/or Inappropriate.

### A. The Sealing of Bids Is Appropriate Under the Relevant Legal Standards.

30.     The Bankruptcy Code and the Bankruptcy Rules recognize the need for debtors to maintain the confidentiality of information in certain situations.  *See* Fed. R. Bankr. Proc. 9014(c) (incorporating by reference Fed. R. Bankr. Proc. 7026, which incorporates by reference Fed. R. Civ. Proc. 26(c)); *In re Handy Andy Home Imp. Centers, Inc.*, 199 B.R. 376, 380 (Bankr. N.D. Ill. 1996); *see also* 11 U.S.C. § 107(b)(1) (authorizing the bankruptcy court to "protect an entity with respect to a trade secret or confidential research, development, or commercial information").  The standard for issuing a protective order, for example, is that the movant show "good cause," which is a showing that "disclosure will cause a clearly defined and serious injury."  *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).

31.     It is standard and common practice for a debtor to conduct a stalking horse process on its own terms, exercising its discretion as to the appropriate time to share bids with creditors.  Here, creditors will have an opportunity to object, on full notice, to any substantive sale decision made by the Debtors after the Debtors file the motion requesting the applicable relief.

32.     As the Debtors have stated previously, the sealing of bids is necessary to ensure that the Debtors receive the highest or otherwise best bid for the economic interests in Oncor.  Here, the need to seal is straightforward:  publicizing bids will harm the estates.  Requiring large public companies, the type of bidders the Debtors expect to participate in the marketing process, to risk disclosure of their consideration of and specific strategy for a major strategic acquisition

16

could deter participation.  Moreover, public disclosure of the terms of bids could severely hamper the Debtors' ability to negotiate with bidders.  Although the Debtors are not accusing any particular group of creditor advisors of leaking information, it strains credulity that disclosures to the more than 15 sets of stakeholder professionals presently designated as Reviewing Parties would not significantly increase the risk of public leaks.  Regardless, the simple ability of creditors to easily inject themselves into negotiations with bidders to advance their own special interests, so that at any one time, a potential stalking horse bidder has over 30 professional firms' voices in its ear, could confuse the process and chill bidding.  Instead, the Debtors will speak to bidders with one voice, focused on obtaining the highest or otherwise best bid for the estates—*i.e.*, the purpose of this process.  As the Court has found in support of protecting this information so far, the wholesale disclosure of this information to creditors is not value-maximizing.  *See* Hr'g Tr. Oct. 2, 2014, 62:4-12 ("At this time, I do not believe it would be value maximizing and constructive or helpful in any way to require the debtors to disclose the identity of bidders and bid details.").

33.     Similarly, certain Objectors have objected to the Debtors' form confidentiality agreement.  *See, e.g.*, EFIH Second Lien Group Objection ¶¶ 6-7.  For the avoidance of doubt, the Debtors' confidentiality agreements are not part of the Bidding Procedures, the Bidding Procedures Order, or the Motion—and therefore are not before the Court for approval. Moreover, the Debtors are entitled in their business judgment to enter into any confidentiality agreements they negotiate at arm's length with sophisticated potential bidders who are represented by their own counsel.  Nonetheless, the modest limitations in these agreements on communications with creditors are designed to achieve the same aims as the sealing process. The Debtors will focus on maximizing value through the process with bidders, while

17

simultaneously negotiating with creditors to allocate value as part of a chapter 11 plan and in accordance with the strictures of the Bankruptcy Code.  Importantly, the Debtors can and will waive these communication restrictions where doing so is likely to maximize value.

34.    The restrictions on exclusivity arrangements are also important for many of the same reasons.  If a bidder "locks up" a particular creditor group, that could have a preclusive effect on the competitive process.  Indeed, in light of this process, the nonexclusivity provisions are designed to avoid a situation in which a bidder runs afoul of the Bankruptcy Code's strict prescription against collusive bidding.  *See* 11 U.S.C. § 363(n).  For these reasons, the Debtors' confidentiality agreements are completely appropriate and are an important component to maximizing value.

**B.    The Remaining Proposed Modifications to the Bidding Procedures Are Unnecessary and Inappropriate.**

35.    The Objectors request a variety of changes to the Bidding Procedures themselves. Each of these requests have been carefully considered by the Debtors, but are inappropriate for the reasons set forth below.

- **Round 1 Bid Deadline.** The Creditors' Committee argues that the October 23 deadline for initial bids is too soon because it is only six days after the hearing.  Creditors' Committee Objection ¶ 44.  But the Debtors intentionally set the deadline six days after the hearing to allow any Court-ordered modifications to the procedures to be implemented in the marketing process.  For potential bidders, the Round 1 deadline is months, not days, after they began this process.  Bidders have long been conducting due diligence, and the Debtors formally commenced the marketing process on September 19—over a month before the initial deadline, and discussions with some potential bidders began much earlier. There is no reason that Court approval of bidding procedures that have been publicly available for weeks requires a lengthy waiting period before bids are due.  Providing certainty to the process—which shifting deadlines threatens—is a much more important consideration.

- **Initial Mark-Up Deadline.** The TCEH Unsecured Group proposes that the Court should (a) require the Debtors to supply the forms of definitive

documentation to bidders before the October 23 initial bid deadline and (b) extend the November 7 deadline for initial markups of the documentation. TCEH Unsecured Group Objection ¶¶ 79, 85. Otherwise, they argue, bidders will not have enough time to mark up the documentation for alternative structures. But two weeks is ample time for sophisticated counsel to provide an initial markup of a transactional document or to substitute alternative documentation—and, here as well, no existing or potential bidders have joined these Objections on the grounds the Bidding Procedures are too expedited (or otherwise problematic).

- **Elimination of Bids.** The EFIH First Lien Trustee argues that the Bidding Procedures should not permit the Debtors to eliminate bids until after the November 21 deadline for final proposals to serve as the Stalking Horse Bidder. EFIH First Lien Trustee Objection ¶ 64. But the entire purpose of the two-stage Stalking Horse Bidding Process is to progressively narrow down the pool of bids. In any event, it is the prerogative of the Debtors to decline proposals for transactions at any time. The EFIH First Lien Trustee will be able to object to the selection process at the hearing to approve the Stalking Horse Bid. And, again, no potential bidder has objected to this feature of the process. Last, the Bidding Procedures provide that any bidder, even those that participated in the Stalking Horse Bidding Process, may submit a bid to participate in the Open Bidding Process and the Auction.

- **Status Conference.** The TCEH Unsecured Group proposes that the Court schedule a status conference to review the selection of the Stalking Horse Bid. TCEH Unsecured Group Objection ¶ 84. But the Bidding Procedures unambiguously state that the Debtors will file a motion for approval of the Stalking Horse Bid. Parties can object to the Stalking Horse Bid at the hearing on that motion, which will occur before the Auction.

- **Breakup Fee.** Without explaining why, the EFIH First Lien Trustee submits that, if the transaction is structured as a sale of reorganized EFH Corp. equity, the Court should mandate that only EFH Corp. be liable for any breakup fee. EFIH First Lien Trustee Objection ¶ 67. The Debtors are not requesting approval of any breakup fee at this time, and the EFIH First Lien Trustee will have the ability to object to the structure of any breakup fee at the hearing to approve the Stalking Horse Bid. Moreover, the Debtors are *not* limiting the potential transaction to a sale of reorganized EFH Corp. equity.

- **Open Bidding Process.** Various Objectors argue that the Court should not set procedures for the Open Bidding Process at this time because doing so is premature. EFIH First Lien Trustee Objection ¶ 66; EFIH Unsecured

19

Group Objection ¶ 20.  Yet the Objectors fail to provide any valid basis for characterizing these procedures as premature.  Setting these procedures provides bidders with certainty.  The EFIH First Lien Trustee also suggests that the Open Bidding Process is too short—i.e., that new bidders will be unable to put a bid together in a 30-day window.  EFIH First Lien Trustee Objection ¶¶ 20-21.  This ignores that by the time the Open Bidding Process begins, bidders will have been developing bids and conducting due diligence for months.  Given the length and rigor of the Stalking Horse Bidding Process, the Debtors believe that the Open Bidding Process is entirely sufficient to market test the Stalking Horse Bid.

- **Timeline to Closing.**  Certain Objectors argue that bidders will be loath to commit to a transaction with potentially 18 months to closing. TCEH Second Lien Group ¶ 48.  But an extended period before closing the transaction is not unusual in the regulated utility industry—which is likely why no potential bidder has objected to this feature.  As the Debtors' financial advisor stated at his deposition based on a recent market analysis, the average regulated utility transaction takes over 12 months to close plus a four to five month regulatory extension.  Hiltz Dep. Tr. 202:6-9.

- **Discretion to Modify.**  Various Objectors argue that the Debtors should not have discretion to modify the Bidding Procedures.  Creditors' Committee Objection ¶ 45; TCEH Unsecured Group Objection ¶ 90; EFIH First Lien Trustee Objection ¶ 69.  But this does not render the relief requested "illusory" or "advisory."  To the contrary, the Bidding Procedures will set forth a Court-approved process that the Debtors, creditors, and bidders can rely on.  Providing a debtor discretion to modify bidding procedures is common and is designed to ensure the debtor has the flexibility to adjust to unforeseen circumstances and modify procedures as necessary in accordance with its fiduciary duties.[6]  Moreover, any party can object at a later date if they believe the Bidding Procedures have been improperly modified—indeed, the Bidding Procedures expressly provide for *an entire hearing* devoted to airing those types of objections.

- **Minimum Bid Requirement.**  The EFIH Unsecured Group suggests that the Bidding Procedures should require that bids provide at least enough distributable value to pay all EFIH claims in full.  EFIH Unsecured Group Objection ¶ 15.  As it stands, measures of a bid's form of consideration and value are significant bid criteria.  *See* Bidding Procedures § N.1.  And, as the EFIH Unsecured Group notes, the Debtors have already previously received offers that would satisfy the proposed minimum

---

[6]   *See, e.g.*, *Ambient Corp.*, No. 14-11791 (Bankr. D. Del. Aug. 11, 2014) [D.I. 52, Ex. I, at 10-11]; *In re Coda Holdings, Inc.*, No. 13-11153 (Bankr. D. Del. May 29, 2013) [D.I. 188-6, at 12]; *AstroPower, Inc.*, No. 04-10322 (Bankr. D. Del. June 25, 2004) [D.I. 326, Ex. A, at 8].

requirement.  The Debtors want to have the opportunity to consider all bids of whatever amount and structure before they narrow down the best bids for Round 2.

- **Specificity.**  The TCEH Unsecured Group suggests that the Bidding Procedures must be open-ended in structure but also provide more specificity so that bidders can "discern exactly what is being bid upon."  TCEH Unsecured Group Objection ¶ 83.  Aside from being contradictory, the TCEH Unsecured Group's suggestion is misplaced.  The Bidding Procedures do not prescribe any particular structure.  Bidding Procedures § E.1.c.  And sophisticated bidders will have little trouble proposing the relatively straightforward alternatives—like a purchase of EFIH's assets.

- **TCEH Debtors.**  The TCEH Unsecured Group argues that the Bidding Procedures must be modified so as to be clear that the TCEH Debtors are not undertaking the "burdensome obligations" presently contemplated by the form term sheet.  TCEH Unsecured Group Objection ¶ 91.  But no Debtor has executed the term sheet or any definitive documentation, and the TCEH Unsecured Group can object to any obligations  it deems burdensome if and when the Debtors seek approval of a definitive agreement.

- **Dual-Structure Bids.**  Again, without giving a reason, the EFIH First Lien Trustee suggests that the Bidding Procedures should require that bids be submitted in both taxable and tax-free form.  EFIH First Lien Trustee Objection ¶ 68.  The Debtors believe bidders should structure their bids as they see fit.

- **Reservation of Rights.**  The EFIH First Lien Trustee argues that the Bidding Procedures Order should expressly reserve the right of parties in interest to challenge the selection of the Stalking Horse Bidder.  EFIH First Lien Trustee Objection ¶ 70.  But the Bidding Procedures expressly state that the Debtors will request subsequent Court approval of the Stalking Horse Bid.  Any party will have the right to object to this request for relief at the appropriate time; this will not be an *ex parte* hearing.

- **Transaction Consideration.**  The EFIH First Lien Trustee urges that the Court should enter an order providing that the proceeds of any transaction will be treated as an EFIH asset.  EFIH First Lien Trustee Objection ¶ 72.  But the EFIH First Lien Trustee has not even established *a claim* on which it is entitled to payment.  Moreover, this demand is inconsistent with its demand that EFH Corp. bear all of the liability for the breakup fee.  And it is symptomatic of the deeply misguided concern that seems to motivate the EFIH First Lien Trustee's entire Objection:  that somehow the Debtors will not distribute the proceeds of a multi-billion dollar

21

transaction to monetize EFIH's stake in Oncor in accordance with the absolute priority rule.

### **Conclusion**

For the reasons set forth above and in the Motion, the Debtors respectfully request that the Court deny the Objections and grant the relief requested in the Motion.

Dated: October 14, 2014
Wilmington, Delaware

        */s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    defranceschi@rlf.com
    madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
    stephen.hessler@kirkland.com
    brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    chad.husnick@kirkland.com
    steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession