1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :   Chapter 11

6   ENERGY FUTURE HOLDINGS        :

    CORP.,  et al.,               :   Case No. 14-10979(CSS)

7                                 :

            Debtors.              :   (Jointly Administered)

8   _____

9

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15

16

17                              October 21, 2014

18                              9:35 AM - 4:51 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTECHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Extending the Period Within Which the

3    Debtors May Remove Luminant Generation Company, LLC v. Titus

4    County Appraisal District [D.I. 1990; filed September 10,

5    2014]

6

7    HEARING re Motion for Entry of an Order Authorizing

8    Wilmington Savings Fund Society, FSB to File Under Seal (I)

9    an Unredacted Version of its Objection to Motion of Energy

10   Future Holdings Corp., et al., for Entry of an Order (A)

11   Approving Bidding Procedures, (B) Scheduling an Auction and

12   Related Deadlines and Hearings, and (C) Approving the Form

13   and Manner of Notice Thereof and (II) Exhibits 1 and 2 to

14   the Declaration of Jeremy B. Coffey in Support of the

15   Objection [D.I. 2370; filed October 10, 2014]

16

17   HEARING re Motion of Energy Future Holdings Corp., et al.,

18   for Entry of an Order (A) Approving Bidding Procedures, (B)

19   Scheduling an Auction and Related Deadlines and Hearings,

20   and (C) Approving the Form and Manner of Notice Thereof

21   [D.I. 2087; filed September 19, 2014]

22

23   Transcribed by:  Dawn South, Sheila Orms, Linda Foley and

24   Pamela A. Skaw

25

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorneys for the Debtors

4

5   BY:   MARK MCKANE, ESQ.

6         STEVE HESSLER, ESQ.

7         BRIDGET O'CONNOR, ESQ.

8         BRYAN STEPHANY, ESQ.

9         EDWARD SASSOWER, ESQ.

10

11  RICHARD LAYTON & FINGER

12        Attorneys for the Debtors

13

14  BY:   DANIEL J. DEFRANCESCHI, ESQ.

15        JASON M. MADRON, ESQ.

16

17  BROWN RUDNICK

18        Attorneys for WSFS

19

20  BY:   EDWARD WEISFELNER, ESQ.

21        JEFFREY L. JONAS, ESQ.

22        JONATHAN MARSHALL, ESQ.

23

24

25

1   AKIN GUMP STRAUSS HAUER & FELD LLP

2        Attorney for Ad Hoc Committee of EFIH Unsecured

3        Noteholders

4

5   BY:  SCOTT ALBERINO, ESQ.

6        ABID QURESHI, ESQ.

7        ROB BOLLER, ESQ.

8

9   SHEARMAN & STERLING

10       Attorneys for Duetsche Bank AG New York Branch

11

12  BY:  FREDRIC SOSNICK, ESQ.

13       NED SCHODEK, ESQ.

14

15  POTTER ANDERSON & CORROON LLP

16       Attorneys for Deutsche Bank AG New York Branch

17

18  BY:  JEREMY RYAN, ESQ.

19       R. STEPHEN MCNEILL, ESQ.

20

21

22

23

24

25

1   ROPES & GRAY LLP

2        Attorneys for CSC Trust Company of Delaware

3

4   BY:  D. ROSS MARTIN, ESQ.

5        ANDREW DEVORE, ESQ.

6        KEITH WOFFORD, ESQ.

7

8   DRINKER BIDDLE & REATH LLP

9        Attorney for Citibank, N.A.

10

11  BY:  HOWARD A. COHEN, ESQ.

12

13  BINGHAM MCCUTECHEN LLP

14       Attorney for Pacific Investment Management Co. LLC

15

16  BY:  JEFFREY SABIN, ESQ.

17

18  WHITE & CASE LLP

19       Attorneys for Ad Hoc Group of TCEH Unsecured

20       Noteholders

21

22  BY:  J. CHRISTOPHER SHORE, ESQ.

23       TOM LAURIA, ESQ.

24

25

1   POLSINELLI

2         Attorneys for the Committee

3

4   BY:  CHRIS WARD, ESQ.

5         JUSTIN EDELSON, ESQ.

6

7   MORRISON & FOERSTER

8         Attorneys for the Committee

9

10  BY:  CHARLES KERR, ESQ.

11        BRETT MILLER, ESQ.

12        ALEX LAWRENCE, ESQ.

13        DAN HARRIS, ESQ.

14        TODD GOREN, ESQ.

15

16  KLEHR HARRISON HARVY BRANZBURG LLP

17        Attorney for UMB Bank, Indenture Trust

18

19  BY:  RAYMOND H. LEMISCH, ESQ.

20

21  THE HOGAN FIRM

22        Attorney for the Ad Hoc Committee EFH Legacy

23

24  BY:  GARVAN MCDANIEL, ESQ.

25

1   NIXON PEADOBY

2       Attorney for AST

3

4   BY:  RICHARD PEDONE, ESQ.

5

6   FOX ROTHSCHILD

7       Attorney for TCEH Unsecured Ad Hoc Group

8

9   BY:  JEFFREY SCHLERF, ESQ.

10

11  ASHBY & GEDDES

12      Attorney for Christiana Trust

13

14  BY:  AARON STULMAN, ESQ.

15

16  KRAMER LEVIN

17      Attorneys for EFIH Second Lien Group

18

19  BY:  GREG HOROWITZ, ESQ.

20      ALICE BYOWITZ, ESQ.

21

22  MORRIS JAMES LLP

23      Attorney for Law Debenture

24

25  BY:  STEPHEN M. MILLER, ESQ.

1   PATTERSON BELKNAP WEBB & TYLER

2        Attorney for Law Debenture

3

4   BY:  DANIEL A. LOWENTHAL, ESQ.

5

6   FOLEY & LARDNER

7        Attorney for UMB Indenture Trustee

8

9   BY:  MARK HEBBELN, ESQ.

10

11  SEWARD KISSEL

12       Attorney for Wilmington Trust

13

14  BY:  ARLENE ALVES, ESQ.

15

16

17  CHIPMAN BROWN

18       Attorney for the Ad Hoc Committee of EFIH Unsecured

19       Noteholders

20

21  BY:  MARK OLIVERE, ESQ.

22

23

24

25

1   LANDIS RATH & COBB

2        Attorneys for NextEra Energy Resources

3

4   BY:  ADAM LANDIS, ESQ.

5        MATTHEW MCGUIRE, ESQ.

6

7   WOMBLE CARLYLE

8        Attorney for Fluor

9

10  BY:  KEVIN MANGAN, ESQ.

11

12  CONNOLLY GALLAGHER LLP

13        Attorney for PIMCO

14

15  BY:  N. CHRISTOPHER GRIFFITHS, ESQ.

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE BAILIFF:  All rise.

3              THE COURT:  Please be seated.  Yes.

4              MR. MCGAAN:  Good morning, Your Honor, Andrew

5    McGaan for the debtors.

6              I just wanted to talk if I could briefly before

7    the continuation of Mr. Keglevic's cross about scheduling.

8              We've been in a discussion with the objectors

9    about how to get this in today, and we're not in complete

10   agreement, but I wanted to share with Your Honor briefly

11   here what's left to go and talk about Your Honor's schedule

12   both today and God forbid after today.

13             What's left to go is -- is our understanding is

14   the creditors intend to call next the objectors Hugh Sawyer,

15   TCEH director, then Charles Cremens, an EFIH director, and

16   then David Kurtz, the official committees' financial advisor

17   from Lazard.

18             The EFIH first liens had intended to call Tony

19   Horton, the debtors' treasurer, and we were able to work out

20   with them and they made a proposal to designate some of his

21   -- a small amount of his deposition testimony, which we

22   agreed could go in without him having to appear live and

23   without any counter-designation, so that's very helpful and

24   it saves some time.

25             But given the pace so far we're concerned about

1    still getting this all in today, and so we've got a proposal

2    that would carve up the day and would get all this testimony

3    in and give at least an hour or more for each of the

4    remaining witnesses, including the conclusion of

5    Mr. Keglevic's cross, we anticipate a very, very brief

6    redirect in his case.

7              So, I just wanted to share that with Your Honor

8    and inquire whether -- well first, how long, if you know,

9    sitting here right now, how long you intend to go today, and

10   if we should continue to pound away at an effort to get it

11   all in.  Because it can be done, and I've got a proposed

12   schedule here that would get these witnesses in.  At the

13   same time we're continuing to talk about whether there's any

14   aspect of some of the remaining witnesses that could go in

15   by declaration or designation to save more live witness

16   time.

17             THE COURT:  Well, I, due to other commitments,

18   have got to leave the office no later than 5:30, so I was

19   intending to go to 5:00, maybe 5:15 at the latest, with a

20   break for lunch.

21             I have no more time this week at all.  I have been

22   operating at least since yesterday under the impression that

23   we would not finish today, and I have some time next week.

24   I know we have an omnibus on Tuesday, but I have time Monday

25   afternoonish starting maybe 11:30, and I have all day next

1    Wednesday the 29th, and then my schedule jams up again.

2           So that was my intent on how far and how much we

3    can get done today and where I would -- how I would, if

4    necessary, sandwich you around your omnibus next Tuesday,

5    with time on Monday and Wednesday, if necessary.

6           MR. MCGAAN:  And are we set for all day next

7    Tuesday on the omnibus or --

8           THE COURT:  No, you start at noon.

9           MR. MCGAAN:  Okay.

10          THE COURT:  I have a commitment in the morning,

11   and that -- the only real -- I don't remember what's on the

12   omnibus other than we're going to deal with the asbestos bar

13   date, I made a commitment to do that.  I wouldn't want to

14   contaminate, inner quotes, the omnibus with this matter,

15   this is discreet and if we get bleed over that'll be a mess.

16          So that's where I am.  Has the other side agreed

17   to your schedule?

18          MR. MCGAAN:  No, sir.  I got no response

19   basically, which I don't take as a good sign.

20          THE COURT:  Let's -- let's finish -- let's move

21   forward, let's finish Mr. Keglevic, and you know, next time

22   we take a break maybe you can take five minutes to see if

23   you can come to an agreement, but I'm going to -- I can tell

24   you I'm going give them opportunity to develop their case.

25          MR. MCGAAN:  Sure.  And our intent is absolutely

1    not to curtail that, Your Honor, we just -- in light of the

2    witnesses coming up there's going -- there's a risk of some

3    repetition and there's a way to save some time, but we're

4    not looking to jam anybody, so --

5              THE COURT:  All right.

6              MR. MCGAAN:  Thank you.

7              THE COURT:  All right.  Let's get started then.

8    Mr. Keglevic, your affirmation from yesterday is still in

9    place.

10             THE WITNESS:  Thank you.

11        (Witness previously sworn)

12    CROSS-EXAMINATION (Resumed)

13    BY MR. SHORE:

14    Q    Good morning, Mr. Keglevic.

15    A    Good morning, Mr. Shore.

16    Q    We were on the July 23rd board meeting when we left

17    yesterday, that was a telephonic board meeting, right?

18    A    Yes, it was.

19    Q    And do you have any recollection now as to whether the

20    board took a vote?

21    A    No, my recollection -- my recollection hasn't changed

22    because I haven't been able to talk to anybody.

23    Q    Okay.  And your recollection hasn't changed, you don't

24    have any recollection as to whether there was a specific

25    delegation by the board to the officers and directors?

1    A     Like I said, I certainly felt like they delegated it, I

2    don't know if they did it through a resolution or it was

3    just verbal.

4    Q     Okay.  And -- well, have you had any instance in the

5    past when the board gave you a formal delegation of

6    responsibilities orally?

7    A     Well --

8    Q     As in followed up with some sort of resolution?

9    A     You used the word "formal".  No, if it was formal there

10   would have been a resolution, but they have delegated, you

11   know, activities to the management team frequently.

12   Q     And do you recall that they delegated the

13   responsibility of taking the Oncor stake out to market

14   informally?

15   A     I don't remember if it was in the resolution or if it

16   was informal.

17   Q     Okay.

18   A     That's the problem.  Sorry, I don't have that

19   recollection.

20   Q     Okay.  So just so we're clear, you don't have personal

21   knowledge from which you can testify that the following

22   statement is true.  "On July 23rd, 2014 the debtors' boards

23   of directors and managers voted to pursue a marketing

24   process and auction for the economic interest in Oncor"?

25   A     I can't say the word voted.

1    Q    All right.  Now, at this board meeting no financial

2    data was presented to the board from which they could assess

3    whether or not to take the assets out to market, right?

4    A    There was -- I believe there was information on the

5    bids that we had at that point in time that were presented

6    together with the multiples associated with the bids.

7    Q    Okay.  Was there any written material that went to the

8    boards with respect to multiples?

9    A    I believe the -- and I'm trying -- it was a telephonic

10   meeting, I'm trying to remember.  On most of these meetings

11   we presented the bid data and then at the bottom of the bid

12   data was the implied multiple.

13           So there weren't as compared to market multiples,

14   but the market multiple assumed in the bid itself the price

15   compared to other bids and the resulting multiples that they

16   implied were in those comparisons that we presented

17   virtually at every meeting.

18   Q    Okay.  And so it's your recollection that at the

19   meeting on the 23rd there was a board presentation, the

20   package that was given to the board?

21   A    I believe my recollection we sent out bid analysis data

22   as I just indicated.

23   Q    And do you have any explanation as to why if it's true

24   that the documents weren't produced that they weren't

25   produced?

1    A    I'm not involved in the document production.

2    Q    Okay.  All right.  Was there any data that was

3    presented to the board on any risks of not accepting the --

4    or not pursuing a sale process?

5    A    Well sure, because we were terminating the RSA, so we

6    had -- at the July 23rd meeting we talked about the value of

7    keeping the RSA in place, which then wouldn't have taken us

8    to the bid procedure approach that we've now adopted.

9    Q    Okay.  Let me rephrase my question and be clear.

10             Was there any data presented to the board first in

11   written form which explained to any of the boards the -- or

12   quantified in any way the risks of not seeking to sell the

13   assets whether through the RSA or through a marketing

14   process?

15   A    I don't believe there were any materials, I think it

16   was verbal considerations were shared.

17   Q    And who provided those verbal considerations?

18   A    It probably would have been a combination of myself and

19   counsel and Evercore.

20   Q    Okay.  And when you say Evercore that was Mr. Ying at

21   that meeting, right?

22   A    That was Mr. Ying at that meeting.

23   Q    Right.  Because Mr. Hiltz hadn't joined by that point.

24   A    That's correct.

25   Q    All right.  In your deposition you told me -- I asked

1    you the question of who decided to sell the assets.  Do you

2    recall telling me who decided to sell the assets?

3    A    Not -- I don't recall who -- I think we made a

4    decision, the co-CROs, to go with Evercore and counsel to

5    make that recommendation to the board.

6    Q    Right.  And when you say Evercore and counsel you mean

7    Mr. Sassower and Mr. Hessler from Kirkland?

8    A    Yes.

9    Q    And Mr. Ying from Evercore?

10   A    Yes.

11   Q    And that was the decision team who decided to take the

12   assets out to market?

13   A    We made the recommendation to the board.

14   Q    When you say you made the recommendation to the board

15   for a vote, are you recalling now that there was a

16   recommendation that was given to the board that the board

17   was supposed to vote on?

18   A    No, we made the recommendation to the board that that's

19   the course of action that we would like -- we should pursue.

20   Q    Okay.  But you don't recall whether the board ever

21   assented in the form of a vote?

22   A    That's the part I don't recall.

23   Q    All right.  And then right after that board meeting the

24   decision team took the assets out to market by sending

25   teasers out to 22 market participants, right?

1    A    I don't remember the number, but teasers were sent out.

2    Q    Okay.  And can you turn to Exhibit 14 in your book?

3    A    I'm here.

4    Q    If you look at the document attached, which is the

5    teaser that went out, did you present this to the board at

6    the meetings, a draft of this?

7    A    I don't recall if we presented the draft of the teaser

8    to the -- to the board.

9    Q    Okay.

10   A    We may have just verbally covered that we were going to

11   sent it.

12   Q    Okay.  So turn to page 2, which lists investment

13   process in those bullet points there.  Would you agree with

14   me that that sets forth what the company intended to do in

15   the marketing process at that point in time?

16   A    Would you direct me to which bullet you're talking?  I

17   just want to make sure I get this right.

18   Q    Each of the -- each of to four bullets on page --

19   A    Okay.  You're talking about all the bullets.

20   Q    Yeah.

21   A    Yes.

22   Q    Right.  And you can't tell the Court whether or not the

23   board reviewed and approved the message that you set forth

24   here?

25   A    Well, I didn't say that, I think I said that I don't

1    know that the board saw the actual teaser, but I don't have

2    doubts that the board knew that we were going to continue to

3    pursue a tax-free sale at that point in time and that we

4    were going to conduct that process.  We had reviewed with

5    them, you know, obviously, you know, what that meant when we

6    said we were going cancel the RSA and we were going to go

7    market the assets, we had a lot of discussion on how and in

8    what form.

9    Q    You're going to have to listen to my question carefully

10   and let's go back over my definition yesterday or the

11   definition you gave me.  The board approves actions by

12   voting, right?

13   A    The board approves actions by voting.

14   Q    Right.  So you can't tell me whether the board of any

15   of the debtors approved the message that within the teaser

16   that was sent out, because you can't recall whether the

17   board ever voted.

18   A    I can't recall if the board voted.  I will tell you we

19   presented this information to the board, that's my point.

20   Q    And how did you present the information to the board,

21   in this package that wasn't produced?

22   A    Yes, we -- it's not that difficult to present four

23   bullet points verbally to a board, especially when, as we've

24   discussed many times during my cross-examination, that the

25   fundamental tax-free part of it was consistent generally

1  with how we were going to pursue the RSA.

2  Q    The -- so now I want to get to as best you can recall.

3  Let's -- I got to work through two things look, and it'll

4  make it clear to you.  What I'm trying to do is figure out

5  what the -- whoever made the decision, what they were

6  looking at at the time they made the decision.  So let's

7  walk the path that maybe the board was the one who approved

8  the marketing process.

9             At the time the boards had received advice with

10  respect to the tax memorandum, right?

11  A    Yes.

12  Q    Or sorry, with respect to the taxes -- tax issues,

13  which are set forth in the tax memorandum?

14  A    That's a better way of saying it.  They had reviewed

15  the potential arguments associated with all the elements of

16  our transaction.

17  Q    And is it fair to say that any of the boards at that

18  time only had access to Kirkland & Ellis to provide them the

19  advice with respect to the tax issues?

20  A    Well they had our internal tax team as well, but it was

21  a combination of our internal tax team and the tax Kirkland

22  & Ellis.

23  Q    All right.  And the internal tax team owed duties to

24  all of the debtors as well, right?

25  A    Yes.

1    Q    So at the time that the teaser went out the board --

2    none of the boards had advice from counsel who was advising

3    the individual debtor estates?

4    A    They did not, but -- and you know, not to continue to

5    make this point, but I think it's an important one, that --

6          MR. SHORE:  Your Honor, if he could just answer

7    the questions, especially if we're trying to finish this

8    quickly.

9          THE COURT:  Do you feel you need to explain?

10          THE WITNESS:  Yes, I feel I need -- I think I did

11    answer the question, but I do think the -- there needs to be

12    emphasis that the presentation given to the independent

13    director by themselves was from their estate only's (sic)

14    perspective so that they were informed as -- in that meeting

15    what the arguments were from their particular estate

16    standpoint.

17    BY MR. SHORE:

18    Q    Sir, do you have any personal knowledge of what

19    occurred during those meetings?

20    A    I was not in those meetings, but I was told personally

21    that that was the basis of the presentation.

22          MR. SHORE:  Motion to strike, Your Honor, as

23    hearsay.

24          THE COURT:  Sustained.

25    BY MR. SHORE:

```
 1   Q    Okay.  The -- now, so they, the boards at the time of

 2   the July 23rd meeting had the tax advice.

 3            Now with respect to data.  As best you can tell me

 4   right now what did the boards have as far as hard data

 5   regarding the value of the Oncor stake?  Let me ask you

 6   first, did they have a valuation of the Oncor stake?

 7   A    No.

 8   Q    Did they have data regarding the bids that were in

 9   front of them?

10   A    Yes.

11   Q    And what form was that data?

12   A    I believe it was in a form of bid comparisons showing

13   enterprise value, assumed debt, you know, the structural

14   value, net proceeds that would result from the transaction,

15   implied multiples that resulted from the bid, and I believe

16   that's primarily what was there.

17   Q    And were they given any data regarding market

18   multiples?

19   A    They were not at that meeting, but they had of course

20   many discussions leading up to the RSA before that about

21   market multiples, and we certainly covered the point that we

22   thought this was a good bid.  They had the prior PIC bid to

23   compare this to, and they had the implied multiple, and

24   there was the discussion of whether this multiple

25   represented, as I've said, closer to highs than lows, and we
```

1    had that dialogue when they got the bid.

2    Q    Okay.  And who told them it was closer to highs than

3    lows?

4    A    I'm sure I did, and Evercore supported me.

5    Q    When you say Evercore --

6    A    Mr. Ying.

7    Q    -- you mean Mr. Ying.  Okay.  Now, let's talk about

8    that because you talked about multiples.

9         Has Evercore ever shared with you their view of

10   market multiples?

11   A    Yes.

12   Q    And in what form did that take?

13   A    I've seen a document that I think has since been

14   discovered that basically showed historical multiples on

15   both an EBIDTA and a PE basis, and we had many verbal

16   discussions, because frankly I could look up at a screen and

17   say, hey, these multiples are high, and yeah, they've been

18   running nice.  I mean we had many discussions on that, as we

19   did with the board.

20   Q    Okay.  Let me ask you this question.  Do you consider

21   yourself a valuation expert?

22   A    I do not.

23   Q    Have you had any specialized training in picking what

24   the is an appropriate multiple for doing any valuation

25   analysis?

1    A    I think my knowledge as a CFO in seeing valuation

2    information shows me the range of the types of multiples

3    that are used to value utilities.

4    Q    Do you have any specialized training in determining

5    what is an appropriate market multiple for the purposes of

6    comparing valuation metrics between companies?

7    A    I've had training when I was with Arthur Andersen on

8    how utilities determine rates of return and different

9    methodologies that are in play, but that was it.

10   Q    Okay.  So no specialized valuation training of any sort

11   -- of any form?

12   A    Probably not to the depth that the question implies.

13   Q    All right.  The -- so you had in your mind a set of

14   comparables to -- to the Oncor enterprise, right?

15   A    Yes.

16   Q    And you understood Evercore told you verbally that they

17   had a set of comparables in mind, right?

18   A    Yes.

19   Q    And you said you saw a written document.  When did you

20   see the written document that laid out their view of market

21   multiples?

22   A    Much after that.

23   Q    So much after the decision was made to sell the assets?

24   A    Right.

25   Q    And much after the July 23rd board meeting, right?

1    A    Yes.

2    Q    Was it after the motion was filed?

3    A    It may have been.

4    Q    Okay.  So can you testify under oath that at any time

5    prior to the filing of this motion that Evercore had showed

6    you a written analysis of market multiples and how they

7    compared to the bids that were being received for the Oncor

8    stake?

9    A    They never showed me anything in writing, it was

10   verbal.

11   Q    And did you ever ask for anything in writing?

12   A    I didn't because it was fairly easy for me to check the

13   multiples myself independently.

14   Q    But you do understand that part of checking multiples

15   is making adjustments to EBIDTA or other metrics to make

16   sure the comp set matches up, right?

17   A    I do, and I don't think the adjustments to EBIDTA, and

18   you know, frankly, that's just one of the multiples we're

19   talking about, there's price earnings, which is probably the

20   multiple that most bankers commonly they would use and reply

21   upon to evaluate a regulated utility, not an EBIDTA

22   multiple.

23   Q    And so do you know what adjustments need to be made to

24   price earnings ratios to make the comp set comparable?

25   A    When we did our valuations using Duff & Phelps in the

1   past for Oncor other than taking out the revenues and the

2   effect of the securitization that Oncor was going through,

3   there were no adjustments made to the multiples, and they

4   did three or four valuations for us.

5   Q    Okay.  So your basis for testifying as to whether or

6   not from a valuation perspective you need to make

7   adjustments to price earnings ratios on a comp set is based

8   upon your review of four Duff & Phelps valuations that were

9   done for the company for the purposes of an impairment

10  analysis?

11  A    Yes.  I'm not aware that there's any adjustments that

12  need to be made to make that analysis valid.

13  Q    So, now let's be clear about this.  I asked about what

14  you know.

15          Do you know whether any of the boards of the

16  debtors were given any written analysis -- market analysis

17  by Evercore prior to the filing of the motion?

18  A    I don't believe they were.  I would believe that it

19  would go through me if it was going to the board.

20  Q    So then let's come to the August 26th meeting.  Do you

21  have any understanding as to why there hadn't been minutes

22  for that meeting yet?

23  A    I don't.  Only that they're probably going through the

24  draft and review process.

25  Q    Okay.  Have you reviewed those minutes?

A I don't recall specifically if I've reviewed those minutes, but I was in the meeting.

Q Do you recall that that was a telephonic meeting on August 26th?

A I do.

Q All right. And in that meeting was there any vote taken by any of the boards of directors?

A There was no vote taken, but I think I testified Sherman Evans 9ph) polled the individual board members to make sure they were okay with the approach.

Q And the approach was the filing of the bid procedures motion?

A It was basically to go to as we describe path B as reflected in the bid procedures motion and then ultimately file the motion, correct.

Q Was there any vote taken as to whether or not you should go out to market at all versus do nothing?

A As I said, to the extent there was a vote taken to go out to market it would have been at that July 23rd meeting. I don't recall whether there was a formal vote. There was no -- that question was not raised at the August 26th meeting.

Q And I take it that the question -- the question -- the following question was not raised at the August 26th meeting either, should we just take the asset off the market now?

1    A    No, I think there was a strong point of view that

2    putting the asset on the market was the right business

3    judgment.

4    Q    Right.  But did you -- was -- did anybody ask the

5    question in form or substance at the meeting, hey, should we

6    even be out in the market right now?

7    A    Well the discussion I would put that question on it

8    heads, is now the right time to sell, do we all agree this

9    is the right approach to pick?  And when you say that it by

10   definition indicates that you don't agree to take the asset

11   off the market.

12   Q    When you say the right time to sell I think you

13   testified before it's a good time to sell.

14   A    Yeah, I think it's a good time to sell.

15   Q    Did anybody advise any of the boards that it's the

16   right time to sell, in other words it's the optimum time to

17   be selling the asset?

18   A    I think we said that this was closer to highs than

19   lows, locking in a floor with the opportunity that if the

20   market went up to take advantage of that, gave us the

21   flexibility and protected us against the markets going down.

22   Q    Can you answer my question?  Did anybody advise the

23   board that it was the optimum time to sell the assets?

24   A    I don't have recollection as to whether we used the

25   word optimum.

1   Q    Well anything in form or substance like optimum, the

2   correct time, the time we must sell, the best time, anything

3   like that?

4   A    Well a good time, you know, that -- I remember

5   specifically that I said it's a good time to sell, I don't

6   remember using any other words.

7   Q    Okay.  And do you recall Mr. Hiltz being asked at that

8   meeting whether it was his view that it was a good time to

9   sell?

10  A    I don't recall if Mr. Hiltz was asked specifically at

11  that meeting, I know I specifically asked Mr. Hiltz that

12  question.

13  Q    Okay.  And do you recall he told you yes?

14  A    Yes.

15  Q    And did you ask for any data to support that conclusion

16  at that time, any written materials?

17  A    No, he shared with me the information that Mr. Ying had

18  shared with me that he had spoken with Mr. Ying, he had

19  spoken to -- and I apologize -- Sesh, I forget his last

20  name, the utility expert at Oncor.

21  Q    Ragubon (ph)?

22  A    Ragubon, thank you very much.  Sorry, Sesh.  And some

23  of his associates were also in the meeting, the guys who had

24  done the work, and we -- it was a joint meeting where we all

25  sat there and everybody pitched in, and Mr. Hiltz was there,

1    and he said, I concur -- you know, I've been through it with

2    my team and I agree with the assessment they've made.

3    Q    Where do you recall that conversation occurring

4    relative to the August 26th board meeting, before or after?

5    A    I'm sorry I just don't recall if it was before or

6    after.  I think it was -- I just don't recall the exact date

7    of that conversation.  I think it was before --

8    Q    All right.

9    A    -- but I don't have a specific recollection of what

10   date that was.

11   Q    All right.  So do you understand that Mr. Hiltz joined

12   the team around August 17th?

13   A    That sounds about right.

14   Q    At the time you asked him the question whether it's a

15   good time to sell did you know that he had not heard of

16   Oncor the prior week?

17   A    I knew he had just come on board the team, but I know

18   he's a experienced expert and he had spent a lot of time

19   with his team to get up to speed.

20   Q    Can you answer my question?  Do you -- did you know

21   that --

22   A    I --

23   Q    -- he had never heard of Oncor?

24   A    I didn't ask him if he ever heard of Oncor, I knew he

25   was new to the team on August 17th.

1    Q    Okay.  And do you know what analysis he had done in

2    that first week that would get him up to speed to be able at

3    a provide you advice with respect to whether now is a good

4    time to sell a utility asset?

5    A    I -- he relied heavily on what his team had provided

6    him.

7    Q    Okay.  And so you understood that what he had done was

8    talk to some people during the week?

9    A    And reviewed some information.

10   Q    And did you ask to see the information he reviewed?

11   A    I didn't.

12   Q    At the time you're relying upon Evercore in their

13   advice in going through this you knew that they would get a

14   $9 million fee to be paid if a transaction went forward?

15   A    If a transaction closed, yes.

16   Q    Did you make any special effort at any time up until

17   the time of the -- the motion was filed to question

18   Evercore, to ask them to provide you data to support their

19   advice which would allow you to test exactly why they were

20   advising you to sell the company?

21   A    As I said, we had many discussions around the

22   appropriate valuation, the benchmarks, the indices that they

23   were looking at that that corroborated by beliefs.  I did

24   not specifically then ask for all of it in writing.

25   Q    You didn't ask for any of it in writing.

1   A    I did not.

2   Q    Okay.  So by the time you got to the filing of the

3   motion there was nothing you could point to in the record

4   which set forth any written analysis to support the advice

5   that was given by Evercore that you should be out selling

6   the Oncor stake now, independently of a plan?

7   A    I think I've answered the information we looked at.

8   Q    There was none.

9   A    The only valuation was the bid analysis that showed

10  what was implied in the bid, and as I've said, the last bid,

11  the one we're talking about that's important, the NextEra

12  bid is at a 26 plus PE multiple and you can't find another

13  utility or an indices that indicates that that isn't a great

14  deal.

15  Q    Okay.  We're going to come back to this concept that it

16  is a great deal a little bit later.  But to be clear, in

17  order to determine whether or not as a matter of fact it's a

18  great deal one thing you could have done is a valuation?

19  A    Certainly we could have done a valuation.  We intend to

20  have Evercore do substantially more work before we lock in

21  any deal.

22  Q    Now let's talk about the highly sophisticated board

23  that you've been talking about.

24        Would you expect highly sophisticated boards to

25  make a decision such as to whether or not to market all of

1    the assets of EFIH and EFH except for the things excluded

2    based on gut instinct alone?

3    A    I'm sure they had their own basis of determining based

4    on information provided whether they shared the conclusions

5    of our experts.

6    Q    Can you answer my question?  You testified about a

7    sophisticated board, I want to know your view.

8              Would you expect your sophisticated board to

9    approve taking the assets out to market based on gut

10   instinct?

11   A    I don't make determinations of what they -- if they

12   wanted additional information they could have asked for it.

13   I'm not in their heads as to what the appropriate -- what

14   they did or did not do.

15   Q    Okay.  And would you expect sophisticated boards to

16   base their decision to take the assets out to market without

17   any written material?

18   A    I think in our situation the business judgment given

19   the level of the bid and the historical nature of that

20   pricing gave enough information to put out procedures and to

21   market an asset but not lock in a transaction until we get

22   more information.

23   Q    Sir, when you say historic cause, have you gone back to

24   look back at the data as to where the comps that are in your

25   head were trading back in 2007, 2008?

1   A     I've looked from 2008 forward.

2   Q     Did you look at 2007?

3   A     I don't remember if I looked at 2007.

4   Q     And do you recall when the transaction that was done

5   that led to the debt structure that the debtors currently

6   have in place?

7   A     Yeah, it was October 2007.

8   Q     Okay.  So when you're saying -- when you say they're

9   trading close to historical highs you mean historical highs

10  from 2008 forward?

11  A     Yes.  I mean we sold 20 percent of Oncor in 2008 at a

12  substantially lower value than what the NextEra bid is.  So

13  pre-financial dislocation I think that was a different

14  world.  I think looking at comparisons that go way back in

15  time beyond that I think fundamentally you can argue that

16  the world has changed, the banking regulations have changed,

17  the markets have changed, and I don't think that's the

18  appropriate benchmark, I think it's since then.

19  Q     So when you said trading near historical highs you've

20  always had in your mind history starting in 2008?

21  A     Yeah, at least the last five years.

22  Q     Okay.  And are you aware that Evercore could pull

23  together information and give you data with respect to

24  multiples -- or sorry -- stock trading price of comparables

25  prior to 2008?

```
 1   A     Sure, and I was alive and practicing in those prior

 2   periods and I think the multiples are still very attractive

 3   as compared to those prior periods as well based on my

 4   knowledge.

 5   Q     Based on --

 6   A     They may not have been the ultimate high, but they're

 7   way closer to the -- higher than the averages have been for

 8   long historical periods of time.

 9   Q     I guess that's what I'm saying.  The comparables you

10   have in your mind -- leave aside whatever -- whatever

11   Evercore has got in their mind -- the multiples you have in

12   your mind have traded higher than they are now historically?

13   A     There may have been some years at some points in time,

14   but on average for many -- over most periods of time I think

15   you'd be hard pressed to find multiples that are higher than

16   what this bid implies.

17   Q     Okay.  Just so we're clear, because I've been asking

18   about Evercore.  You, as the CFO, didn't provide any written

19   material to the board that set forth your views with respect

20   to any of the market data around whether or not to go out to

21   market?

22   A     No, I did provide prior to the RSA information around

23   valuation of Oncor and Newco under the RSA, and you know,

24   looking at cash flows and, you know, comparatives at that

25   basis, and that was presented to the board probably in the
```

1    January, February, March time frames, and we also implied if

2    somebody made it a REIT what that would do to value, et

3    cetera.  So that information was provided.

4    Q    That was provided prepetition.

5    A    It was provided prepetition.

6    Q    And nothing would have prevented you providing the

7    board with that again postpetition so that they could assess

8    that situation and use that as input for their

9    determination, if they made one, to take the assets out to

10   market in July or August?

11   A    Well that's fair.  I verbally updated and gave them my

12   recommendation, but I didn't update the materials that I had

13   used previously.

14   Q    Now in either of these board meetings or any of these

15   board meetings in July -- from July 23rd forward there were

16   no considerations presented to the boards as to any

17   alternative for managing any kind of risk for the Oncor

18   stake other than pursuing this sale forward of the EFH

19   reorganized equity, right?

20   A    And, Mr. Shore, just to clarify, you're talking about

21   the risks that the value of Oncor could go down?

22   Q    Uh-huh.

23   A    No, that was the -- that was the option we considered.

24   Q    Right.  And in fact no one from the company considered

25   an option other than set forward selling the EFH reorganized

1    equity to manage any perceived risk in the Oncor stake?

2    A    Actually I did.  One of my -- Mr. Nutt in fact, I know

3    his name was brought up, sent me an email and asking if we

4    should enter into an interest rate hedge that could have

5    effectively protect the downside of Oncor's value given

6    there is some correlation between interest rates and we're a

7    utilities trade, and that's primarily because the ten-year

8    treasury has looked at a risk-free rate and if utilities

9    yields are above that most people think utilities have very

10   little risk, so you know, there is some correlation.  But I

11   never pursued that, because in fact there is not a

12   substantial correlation between interest rate hedge and

13   where utility valuations go, so we didn't think that was an

14   appropriate way to hedge it.

15   Q    Right.

16   A    So we're not aware of any other way.

17   Q    So let's get to that, because the information you were

18   working with from Evercore as to whether it was a good time

19   to sell back when you went out to market was from Mr. Ying,

20   right?

21   A    Correct, and his team.

22   Q    Yeah.  And do you recall that Mr. Ying came into this

23   court and said that one of the things you should be doing is

24   selling Evercore because there is a correlation between

25   interest rates and the value of Oncor?

1          THE COURT:  You said selling Evercore, you meant

2    Oncor.

3    BY MR. SHORE:

4    Q    Selling Oncor.

5    A    I don't -- yes, there is -- and I said there is --

6    there is some correlation, but there's not enough

7    correlation to enter into a hedge, meaning without the

8    correlation sometimes it goes the same direction, sometimes

9    it doesn't.

10          Recently when the ten-year treasury went down I

11   guarantee you the value of Oncor didn't spike up as a result

12   of that short-term move, that's why I didn't want to do the

13   interest rate hedge.

14   Q    Uh-huh.

15   A    There's some correlation, but not enough are squared I

16   think to make a bet on a derivative.

17   Q    Okay.  So let's be very clear, and I don't need you to

18   remember what Mr. Ying said, but there was -- one of the

19   reasons to sell the asset now is not that the utilities are

20   so sufficiently tied to interest rates that you're concerned

21   that a rise in interest rates would drive down the value of

22   the Oncor stake?

23   A    Well, I -- there is correlation, it's not high

24   correlation.

25          So historically, going back as long as you want to

1    go, lower rate environments have produced higher utility

2    multiples, but short-term swings do not necessarily

3    correlate in valuation.  Over long periods of time I think

4    that is a fair correlation.

5    Q    Okay.  But just so we're clear, with respect to the

6    decision to sell was the correlation, whatever it might be

7    between interest rate rise and the value of the Oncor stake,

8    material to your decision to take the assets out to market

9    now?

10   A    The interest rate discussion we had now was around the

11   interest rates that would be available to sellers to finance

12   the transaction, not the risk of Oncor -- if interest rates

13   rise, but we had previously talked a lot to the board about

14   lower interest rates environment are better than high

15   interest rate environments for utility valuations, but I

16   don't recall a specific discussion that we were concerned

17   about interest rate increases being the risk that could make

18   the valuations go down.

19   Q    Okay.  So other than this consideration of putting a

20   hedge in place on interest rates to minimize whatever

21   correlation is there, were there any other alternatives

22   considered to just going -- to managing risk by forward

23   selling the post-reorg equity?

24   A    I don't recall any specific proposals or discussion of

25   alternatives.

1   Q    In fact from your view the termination of the RSA was

2   always premised on selling EFIH reorged equity forward,

3   right?

4   A    I think they went hand in hand.  As I think I testified

5   that when we terminated the RSA we weren't prepared to

6   terminate that until we knew what we were going to do next.

7   Q    At any time up to the filing of the motion did you --

8   did anybody at Evercore tell you this they had data which

9   showed that their view of comps or the trading prices of

10  their comp set was less volatile than treasuries over the

11  last two years?

12  A    No.

13  Q    Okay.  And I take it you've never seen any chart that

14  they've prepared that shows that treasuries are more

15  volatile than their view of the comps?

16  A    I've seen that chart.

17  Q    Okay.  But they didn't tell you -- they didn't show you

18  that before we got -- before the motion was filed?

19  A    No, I -- you know, I had my own view of utility

20  volatility and I'm not surprised that, you know, in the

21  recent period certainly the treasuries had more volatility

22  than utilities have.

23  Q    Uh-huh.

24  A    In fact I think one of the reasons utilities are

25  trading really well right now is there's a little bit of a

1    fight to quality and a flight away from volatility, and I

2    think that's another good reason why we should go now.

3    Q    But you don't have any -- you haven't performed any

4    analysis of where you expect utility stocks to be trading in

5    the 12- to 18-month period have you?

6    A    No, fortunately I'm not in the business of having to

7    forecast stock prices.

8    Q    All right.  Can you turn to Exhibit 51 in your binder,

9    please.

10            Actually before we get there let me just kind of

11    tie this off, because we were at the August 26th board

12    meeting.

13            Was there any -- we're going to come to the final,

14    the September 5th meeting, which is the last board meeting

15    before the motion was filed.  Did the board vote on anything

16    at that board meeting, any of the boards?

17    A    I don't believe there was a vote taken at September 5th

18    meeting.

19    Q    Okay.  Now, we've gone through the process, and let's

20    talk about delegation.

21            Do you recall any specific delegation that was

22    given to you regarding marketing the Oncor stake?

23    A    And I assume you mean by specific delegation a

24    resolution or -- from the board.  I don't recall.

25    Q    Do you recall that the board gave you authorization to

1    negotiate -- pursue the RSA transaction?

2    A     I don't recall the form it took.

3    Q     Okay.  So can you tell -- or can you testify what it

4    was you believed to be your authority with respect to going

5    out to the market and telling them about the types of

6    transactions you're willing to do?

7    A     I believe the board was fully informed and supportive

8    of us carrying out the process that we carried out,

9    including the filing of the motion.

10   Q     And when you say supported they gave -- they didn't

11   tell you you couldn't do it?

12   A     That we specifically recommended that we do it and the

13   board, and this is -- I don't mean to get back to this point

14   -- I don't recall if they voted or not, but they certainly

15   assented and even went around and he polled the group and

16   everybody was okay with us moving forward.

17   Q     Okay.  So, let me ask you with respect to the board if

18   they made the decision at some point to send the assets out

19   to market.

20          At any time before the filing of the motion are

21   you aware of whether any of the boards was presented any

22   written material regarding market risks to the Evercore

23   stake?

24   A     I believe all the -- any market risk discussion was all

25   made verbally, nothing in writing.

1    Q    Okay.  And do you recall if they were given any written

2    material on the state of the market being a good market for

3    taking the Oncor stake out?

4    A    We verbally went through the -- well they saw the

5    implied multiple and we talked about where the indexes were

6    trading and -- today and historically.

7    Q    And can you explain why for a $20 million bonus process

8    there was the Filsinger tome which was presented --

9    presented to the EFH board and there was nothing in writing

10   to explain to the board why they should be approving a sale

11   of the Oncor stake right now?

12   A    Well first, I think Mr. Filsinger's work was over the

13   entire bonus programs of all the people, not just the

14   insiders, which was $100 million, and we advised early on

15   that we needed an expert to, you know, to look at that.

16        In this situation we -- you know, the board

17   followed the advice we received from counsel and believed

18   there was enough information provided to go forward.  I --

19   that's all I know.

20   Q    Just so we're clear.  Did counsel advise you that you

21   shouldn't create a written record of what the board was

22   looking at in considering when making a determination, if in

23   fact they made the determination to pursue the sale of the

24   Oncor stake?

25        MR. MCKANE:  Objection.  The form of the question

1    clearly calls for the disclosure of privileged

2    communications.

3              THE COURT:  You asked what K&E advised the board.

4    I mean that's clearly privileged.

5              MR. SHORE:  No, I asked him -- his answer was we

6    were acting on board advice -- or counsel's advice, and I

7    just want a yes or no answer, did they advise you not to

8    make a written record?

9              MR. MCKANE:  Your Honor --

10             THE COURT:  A yes or no question did they do

11   specifically something is actually soliciting what they did

12   or didn't do as to substance.

13             MR. SHORE:  All right, so let me ask it a

14   different way.

15   BY MR. SHORE:

16   Q    Did you create -- was the decision not to create a

17   written record of the -- of anything that the boards were

18   considering regarding the marketing of the Oncor asset based

19   in any way on specific advice from Kirkland & Ellis?

20             MR. MCKANE:  Same objection, Your Honor.

21             THE COURT:  Yeah, sustained.  I'm not going let

22   you get to that.

23   BY MR. SHORE:

24   Q    All right.  Now Exhibit 51.

25             THE COURT:  Is this the protocol?

1          MR. SHORE:  Yeah.

2          THE COURT:  It should be in Volume II.

3          THE WITNESS:  I'm there, Mr. Shore.

4   BY MR. SHORE:

5   Q    All right.  This is the document you mentioned in I

6   think your cross yesterday with Mr. Weisfelner?

7   A    Yes.

8   Q    Okay.  You knew about the protocol before it was filed

9   with the court, right?

10  A    I saw -- I think I may have seen a draft, but this is

11  really Ms. Doré's venue, not mine.

12  Q    Okay.  Did you in any way approve the filing of the

13  protocol?

14  A    I did not.

15  Q    Okay.  Were you asked to approve whether or not to file

16  the protocol?

17  A    I was not.

18  Q    Are you aware of whether any of the boards were asked

19  whether or not the debtor should agree to the protocol?

20  A    I was not involved in that process, so I don't know the

21  answer as to what board involvement.

22  Q    At the time of the protocol did you understand that one

23  of the purposes of the protocol was to resolve issues

24  regarding the exclusivity?

25  A    That was my understanding.

1    Q    And did you also understand that one of the purposes of

2    the protocol was to reinvolve issues with respect to

3    retention applications, in particular conflicts?

4    A    Yes.

5    Q    And did you understand that the protocol was important

6    to the parties who signed it to lay out exactly how the

7    cases should proceed?

8    A    I'm sure the parties wouldn't have signed it unless

9    they agreed with it.

10   Q    Okay.  And can you turn to paragraph 4.  Do you

11   understand that part of the protocol provides that the

12   independent directors may obtain independent counsel?

13   A    Yes.

14   Q    Did you ever have a discussion with Mr. Sawyer as to

15   whether or not he should be retaining independent counsel?

16   A    No, Mr. Sawyer does not consult with me in governance

17   matters.

18   Q    Well he is a board member with you on the TCEH board,

19   right?

20   A    He is, but he can make that decision independently as I

21   understand the protocol, he doesn't need to consult with me.

22   Q    I just -- at any time in any of your board meetings has

23   there been a discussion of obtaining independent counsel?

24   A    Yeah, I've heard Mr. Sawyer ask questions as to, you

25   know, whether it was an appropriate time or, you know, does

1   he have the ability to do that, but we didn't specifically

2   discuss -- he had no discussions with me about it.

3   Q    Okay.  When were those discussions?

4   A    I don't recall.

5   Q    Were they after the -- the protocol was approved by the

6   Court in September?

7   A    No, I think since they came on board they asked

8   questions about their ability if they felt the case needed

9   to hire independent counsel, and I think we were always

10  under the assumption that we were willing to follow that,

11  even before the protocol was put in place.  We never wanted

12  to put the independents in a position that they were

13  uncomfortable with.

14  Q    Okay.  Do you recall if you've had such a postpetition

15  communication?

16  A    I don't.  I would think it's -- most of what I'm

17  referring to was probably prepetition as they came on the

18  board.

19  Q    Okay.  Can you turn to paragraph 7, it's on page 4 of

20  Exhibit 51.

21  A    I'm there.

22  Q    All right.  Do you understand that one of the things

23  that the debtors did to resolve exclusivity and retention

24  objections was to commit -- to facilitate diligence of

25  claims?

1    A    Yes, I was generally aware of that.

2    Q    Okay.  And including with respect to tax matters?

3    A    Sure.

4    Q    Okay.  Now if you turn to paragraph 9 did you also

5    understand that what the debtors had committed was to give

6    until January 31st, 2015 for any TCEH creditor

7    representative to seek standing to assert any claims?

8    A    I remember -- yes, I remember that date.

9    Q    And that they'd have until the later of February 28th,

10   their disclosure statement, to actually file something?

11   A    Yes, those dates have been presented to our board and

12   explained.

13   Q    Okay.  So you're out pursuing a transaction right now

14   which has an assumed resolution of tax issues between the

15   estates, right?

16   A    I don't think the transaction closes until much later

17   than these dates.

18   Q    Just -- I'm just --

19   A    Well, no, I don't -- I don't agree.

20   Q    You're pursuing an assumed -- a transaction which has

21   an assumed tax resolution, which is your assumption that the

22   subsidiary estates, EFIH and EFCH down, owe capital gains

23   taxes to the parent in the event of a deconsolidation?

24   A    We have an illustrative transaction, we don't have an

25   assumed transaction, and we don't have a closing until

1    significantly later than these dates.

2    Q    The transaction you're pursuing right now is a forward

3    sale of post-reorged equity, right?

4    A    Right, taxable or non-taxable.

5    Q    Right.  But we went through it I thought yesterday that

6    what you're pursuing is a non-taxable transaction, but you

7    could be convinced otherwise, right?

8    A    Well we're pursuing a stalking horse motion and to get

9    soliciting of bids under either taxable or non-taxable.  I

10   indicated my preference.  It doesn't mean we're pursuing

11   only non-taxable transaction.  We're pursuing any

12   transaction in the form that the bid motions lay out.  So I

13   -- I'll stop there.

14   Q    Okay.  And you're pursuing a sale of the Oncor stake,

15   right?

16   A    Yes.

17   Q    All right.  And are you aware of at least allegations

18   that EFCH has claims into the ring fence for assets that

19   were pushed down into the ring fence?

20   A    I've heard it in the courtroom, but I've never seen

21   anything in writing to appropriately evaluate the validity

22   of those claims.

23            But I will, you know, also suggest that, you know,

24   our -- I have been advised of various claims that may be

25   coming and that our legal counsel has analyzed and talked to

1    the board about.

2    Q    Okay.  So just so we're clear.  You understand that the

3    claim is that the assets were pushed over and down through

4    EFIH, right?

5    A    Well, I -- you said to be clear, I've heard a little

6    bit about that, but I'd love to see it in writing so I could

7    read it and understand what it is you're worried about.

8         But yes, I generally have an understanding that in

9    2004 Oncor was shifted as a sister company to TCEH down to

10   where it is today, and that somehow there's some legal

11   theory that it can penetrate the ring fencing.

12   Q    Do you understand that you have -- you've undertaken an

13   obligation to facilitate that -- that investigation?

14   A    I believe the debtors have, and I'm certainly willing

15   to help any way I can.

16   Q    Other than provide documents into a data room in

17   response to written discovery are you aware of anything the

18   debtors have done to facilitate any of those investigations?

19   A    Mr. Shore, I don't believe -- if you have some

20   information you need from me I'm happy to facilitate it, but

21   since I don't know all the claims, I don't know how to

22   facilitate something that I'm not aware of.

23   Q    And let's go through the -- the timing of this.

24        The intention right now is to get to a signed

25   agreement with a prospective purchaser of the Oncor stake by

1    when?

2    A    Probably in December to be approved by the Court in

3    January, but subject to the fiduciary out until we close.

4    Q    Okay.  Just so I'm clear then, that you right now are

5    pursuing a sale of the economic interest in Oncor before you

6    have said that TCEH creditor representatives can assert

7    claims in accordance with the protocol.

8    A    Well, I think this is the drop dead date, you can go

9    sooner.

10   Q    So -- well, I just want to understand the thought

11   process here.  The thought process from the debtors'

12   perspective is to sell the asset in December or January and

13   then have the TCEH creditor representatives come forward and

14   articulate the claims after the investigation has been

15   facilitated that would --

16   A    We are not selling the assets, we're locking in a

17   stalking horse to be approved by the Court in January.  Then

18   there's a bid -- 30-day bid process and a selection of a

19   final bidder, even then we have the opportunity if there is

20   a different plan of reorganization based on the alleged

21   claims to walk away without paying anything for that

22   transaction because we have not satisfied the plan of

23   reorganization completion by December 31st.

24        So, you know, I don't think we have forestalled

25   any creditors' rights to make any claims that they think are

1    appropriate, we're just trying to establish a floor so that

2    the net proceeds are as high as they can be to satisfy

3    creditors' claims.

4    Q    Up until now have you given any consideration to the

5    prospect of delaying the sale process until the claims

6    investigation has had a chance to run its course?

7    A    Yes.

8    Q    And when was that?

9    A    I -- you know, my -- I talked to my counsel about this

10   for a while before we filed the bid procedure motion, and

11   one of my concerns is that we wait for -- even though the

12   claims are filed I'm sure they're going to be claims that

13   are going to have a wide degree of differences in terms of

14   whether they're appropriate claims, or you know, that -- you

15   know, if you assert the 2004 transaction I'm sure there's a

16   big number that you're going to suggest is a claim to the E

17   side of the house.  There is no way based on what I've been

18   advised by my counsel that we would support that point of

19   view, and I'm sure that would be a subject of a bunch of

20   litigation that would take a long time.

21          MR. SHORE:  Objection.  Motion to strike with

22   respect to what counsel has advised him with respect to the

23   claims unless they're going to then reveal what counsel has

24   advised with respect to the claims.

25          MR. MCKANE:  Well, I'll support that limited final

1    two sentence motion to strike and just caution the witness

2    not to divulge attorney/client communications.

3              THE COURT:  All right.

4              THE WITNESS:  Can I try that again?

5              THE COURT:  Well, let me strike it first.  I'm

6    going to strike the answer.  I'm not sure you -- sorry --

7    the answer is stricken in connection with advice of counsel.

8              MR. MCKANE:  So just the last sentence or so.

9              THE COURT:  Yeah.

10             MR. MCKANE:  Thank you, Your Honor.

11             THE COURT:  And, Mr. Shore, if you want to ask

12   another question, go ahead.  Mr. Keglevic, if they want to

13   get into that on redirect they can.

14   BY MR. SHORE:

15   Q    The mode of operating you've undertaken then is to sell

16   the asset now, get to an asset purchase agreement, and see

17   where the claims shake out later?

18   A    To contract to sell the asset now and see where the

19   claims shake out.

20   Q    Right.  And that is despite the commitment that you

21   have agreed to in the form of the protocol, Exhibit 51, that

22   the TCEH creditors would have until January 31st to describe

23   the claims, and February 28th to bring a motion with respect

24   to the claims?

25   A    I'm sorry, Mr. Shore, I don't see any linkage between

1    the two, and I don't think they're inconsistent.

2    Q    All right.  So let's talk about the other risks.

3            Would you agree with me that one of the risk of

4    the transaction is that a claim is brought forth inside the

5    ring fence, right?

6    A    Yes.

7    Q    Okay.  Another risk with this process is just that you

8    can't get requisite E side votes to support an E side plan

9    which can deliver the equity, right?

10   A    When given the levels of the bid I think that is a very

11   low risk.

12   Q    Well -- okay, it's a risk.  And has any E side creditor

13   signed up a plan support agreement that says we will support

14   a plan which has this structure?

15   A    They have not, but as we get closer to par I think

16   that's a much easier task.

17   Q    When you say closer to par you mean the EFIH notes or

18   the EFH obligations?

19   A    Both.

20   Q    Okay.  And what consideration can you tell me that the

21   TCEH board gave to the impact on the TCEH intercompany claim

22   in the EFH regarding the -- the bid procedures?

23   A    The same approach we've talked about before, getting

24   the highest amount of proceeds would maximize the value of

25   every creditors' claims.

1    Q    And did you take into particular consideration that the

2    last creditors in the stack would be the ones who suffer the

3    break-up fee if it has to be paid?

4    A    Well, I don't believe any creditor is going to pay the

5    break-up fee, because by definition we would only pay it if

6    as a result of paying it the net proceeds were higher than

7    we were before we paid it, so that every creditor would be

8    advantaged, not disadvantaged.

9    Q    Well let's -- we're going to talk about the break fee

10   in a second.  Can you answer my question though?

11            Was there any specific consideration by the TCEH

12   board has to the fact that if the break-up fee has to be

13   paid that will be suffered by TCEH as one of the largest

14   creditors of EFH?

15   A    The TC -- our discussion with the TCEH board is that

16   the break-up fee we are pursuing -- and by the way we don't

17   one --

18   Q    Uh-huh.

19   A    -- so we're all talking about hypotheticals here, that

20   we control whether we pay it and we would only pay it, for

21   example, if there's a hundred million dollar break-up fee,

22   the bid would have to be $101 million higher before we paid

23   it, meaning there'd be $1 million higher net proceeds for

24   all the creditors so that we don't believe it's paid by the

25   last creditor in the stack.  We believe it advantages the

1    last creditor in the stack.

2    Q    Well, that's -- when you say you believe, that's not

3    based on any written analysis of the risk that the assets

4    are going to go up or down over the next 18 months.

5    A    Well, if it -- the only way we'd pay a topping fee is

6    if it comes up.  If it doesn't go up, we don't have to pay

7    the topping fee and it's irrelevant.

8    Q    Right.  But if you have to pay the -- look, if you do

9    nothing now and the value goes up, right, the one think

10   we're certain you won't have to do if you don't enter into a

11   contract right now is pay a topping fee, right?

12   A    Fair enough.  The net proceeds would be higher in that

13   situation.  But the --

14   Q    So the last creditor would be the one who gets the

15   benefit of all that money that isn't paid as a topping fee,

16   right?

17   A    In that hypothetical, that is correct.

18   Q    Okay.

19   A    But it's also correct that that'd be the creditor

20   harmed if it goes down and we haven't locked in a floor.

21   Q    Right.  And you haven't locked in a floor.  So your

22   ability to protect the creditors from the loss in value is

23   dependent upon this one way option you've talked about in

24   your deposition, right?

25   A    Yes, creating the floor.

1    Q    And the strength of your ability to do that, right?

2    A    That's correct.

3    Q    All right.  So let's talk about, because I was kind of

4    there, what the risks are that you might not be able to lock

5    in the floor.  One of the risks is that the E side creditors

6    won't support this, right?

7    A    You mean that we don't get to a plan of reorganization.

8    Q    A plan of reorganization that approves the transaction

9    that you're entering into.

10   A    Yes.

11   Q    Okay.  And one of the risks is that the T side

12   creditors won't vote, right?

13   A    That's right.

14   Q    And one of the risks is that how the inter-debtor

15   claims work out that we've been through, right?

16   A    Well, I think the only debtor claim that you've

17   referred to as a penetration of the ring funds, you know,

18   that could affect the transaction.  I don't know other

19   inter-creditor claims affect the transaction if they're

20   resolved as part of the plan of reorganization.

21   Q    Right.  But how the inter-debtor claims work out

22   affects how the plan of reorganization was going to work,

23   right?

24   A    Right, the part and parcel of the same thing, that was

25   my point.

1    Q    And one of the things that's going to affect whether

2    your one way option has any value is whether the IRS even

3    supports the transaction that's laid out in the --

4    A    That's right.

5    Q    Right?  And one of the thing that could affect whether

6    or not you close the transaction is which estate is actually

7    liable for which taxes, right?

8    A    Well, not if the transaction is non-taxable.

9    Q    Right.  Non-taxable to a particular estate.

10   A    Well, there's no tax created by our illustrative

11   transaction to any estate.

12   Q    Oh, I see.  Okay.  So -- but if it's a taxable -- well,

13   let's get -- we'd get into that then a bit.

14            There could be a situation, couldn't there, in

15   which a taxable transaction benefits one estate but harms

16   another?

17   A    I'd like to not -- I'd like to understand what exactly

18   you're referring to before I answer that question.

19   Q    Okay.  So if a legal determination was made that TCEH

20   is in no way liable for any of the taxes, any capital gains

21   taxes that are created in a deconsolidation of the T side

22   from the E side.

23   A    Okay.

24   Q    If that determination is made, that will affect the

25   value which is distributable at TCEH, right?

1    A    That's correct.

2    Q    Right.  And in that case, TCEH would not want to be

3    supporting a plan in which the -- in which it was giving up

4    its step up in bases to support a deconsolidation, right?

5    A    Yes, if that were hopefully resolved and cleared that

6    they had a clear path to step up in bases.  I don't know you

7    can do that upon exit.  I think that risk carries on past

8    bankruptcy, but all that was cleared up and you knew that

9    was the answer, I would agree with your hypothetical.

10   Q    Right.  So that, in fact, a determination of what the

11   tax sharing agreement means relative to the estates could

12   impact whether or not you're going to be able to close a

13   transaction which is taking -- takes on the optimal tax

14   structure.

15   A    A tax sharing agreement is one element of risk

16   associated with that transaction, not all of them.

17   Q    Right.  And another thing you could do is if the IRS

18   filed a claim, TCEH could object to the claim and say we're

19   not liable for that tax, right?

20   A    Sure.

21   Q    Okay.  So when we talk about what you're doing with

22   this one way option, the one way option doesn't address any

23   of those risks I've just laid out to your ability to close

24   this transaction, right?

25   A    No, that's right.  But I think a lot of those risks are

1    present regardless of the timing of when if we pursue a

2    sales option.  The only one that potentially I've heard is

3    not, is the risk of the plan of reorganization.

4    Q    And so the only risk you're protecting the last

5    creditor in the stack from, is the risk that the Oncor stake

6    drops in value between now and then?

7    A    That's -- I don't know if that's the only risk, I'd

8    have to think about that, but I know it is a risk that we

9    are attempting to protect them from, yes.

10   Q    Can you think of any other risk that you protect from?

11   A    I can't as I sit here now.

12   Q    And to be clear, there hasn't been any written analysis

13   or even oral analysis that sets forth what the range of

14   expected loss might be during the period that we're talking

15   about, 12 to 18 months.

16   A    Right.  We've not forecasted what the range of loss

17   might be.

18   Q    So you could be protecting the 2 percent volatility or

19   a 25 percent volatility?

20   A    Yes, and if we protect any down side volatility, I

21   would think it would be good for the creditors.

22   Q    Okay.  Would you agree with me that if it was a --

23   there was only an expected 1 percent volatility in the Oncor

24   stake over the next 18 months, getting -- agreeing to pay 2

25   to 3 percent break fee to get out of the contract doesn't

1    make any sense, does it?

2    A    We don't pay anything if there's downward volatility.

3    Q    Ah.  No, but you're protecting, what you're doing is

4    you're going out and you're risking ten hundred million

5    dollars of estate assets if the value goes up to protect

6    some down side, right?

7    A    Well, we don't know what the numbers are going to be,

8    we're going to get a chance to do -- bite at that.  You've

9    heard the asymmetrical deposit versus break-up fee that we

10   expect to be able to get, and being informed by what the

11   bids have been today, and what, you know, we get in the

12   market.

13          But -- so at the end of the day we think that to

14   the extent we still have an opportunity to get the up side

15   and we protect the down side, is a reasonable business

16   judgment.  I think -- my understanding is, if we're putting

17   aside timing, if we had a part of reorganization, we might

18   still follow the exact same approach, we'd set up a stalking

19   horse to protect the down side, while we were going out and

20   launching the asset.  I think that's a normal way that

21   financial professionals would think about protecting high

22   valuations.

23   Q    And let's go back to my question.  You're protecting

24   the -- you're going to agree, I think Mr. Hiltz is -- you

25   heard him testify he's expecting you're going to have to pay

1   some sort of topping fee, right?

2   A    Yes.

3   Q    So you're going to put yourself in a situation, you're

4   heading into a process in which you understand you're going

5   to be committing to trim the up side of the last creditor by

6   the amount of the topping fee, right?

7   A    In your hypothetical that I would not -- if I waited

8   and somehow magically I wouldn't have to pay a topping fee

9   and still maximize the fees.

10  Q    Well, you would -- no, not magically.  Let's make clear

11  of this, if you did something, you pulled the bid procedures

12  motion --

13  A    Yeah.

14  Q    -- we all went home this afternoon, and 18 months from

15  now it turned out the Oncor estate has appreciated beyond

16  the bids you had right now, right, you wouldn't have to pay

17  a break-up fee because you never entered into an agreement,

18  right?

19  A    Right, but that's based on a big assumption that it's

20  just going to go up as a result of waiting.

21  Q    I'm just breaking it into two pieces.

22  A    Okay.  I agree that if in that scenario I wouldn't have

23  to pay a break-up fee.

24  Q    Right.  So all that value that you're expecting to pay

25  as some sort of topping fee, would otherwise be distributed

1    to the creditors, right?

2    A    That's right.  So if I pay a small topping fee as

3    insurance for a downside risk, we're going to get an

4    opportunity to look at the stalking horse bid and see if

5    that topping fee, the cost of insurance, is worth the

6    potential decline and the benefit that we would get if there

7    is a decline.

8    Q    Right.  Okay.  Good.  Now, if you don't know the

9    volatility, you haven't formed a view as to the volatility

10   of the asset during the period, would you agree with me that

11   agreeing to pay a topping fee to protect 1 percent

12   volatility doesn't make sense?

13   A    Depending --

14   Q    In other words, you buy insurance for every risk that's

15   out there?

16   A    No, not for every risk, but for risks that could be

17   substantial.  There's -- nobody knows what the volatility of

18   this individual specific investment is going to be.  It

19   could be 25 percent, and then you would be delighted with my

20   business judgment to pay it.  If I pay a small insurance fee

21   and in your situation there's a 1 percent decline of

22   enterprise value, then I'm paying 100 to protect 200, that's

23   still a pretty good return, two times money on money, a lot

24   of guys in this courtroom that are your clients like that

25   kind of return.

1  Q    Okay.  So let's get to it.  When you said business

2  judgment, you didn't ever ask anybody to perform an analysis

3  for you which would show that the expected volatility

4  between now and 12 months from now justifies paying the

5  topping fee.

6  A    Given our expectation of a small topping fee, even a

7  minor volatility, would result in a positive business

8  result.  So I don't know how much more analysis I have to do

9  on that point.

10  Q    Other than getting a written analysis from somebody.

11  A    You know, there's a lot of things that aren't written

12  that end up being great decisions.

13  Q    And do you have any -- well, it's like written, you

14  haven't gotten an oral analysis either of the expected

15  volatility.

16  A    We have not -- I heard Mr. Hiltz testify that he's not

17  aware of a situation where somebody presents a report of

18  expected volatility going forward.  It's something I've

19  never seen.  I can look at historical volatility, I don't

20  know anybody that's going to give, you know -- the only

21  volatility index I know is the VICs (ph).

22  Q    Okay.  So let's talk about what I mean by volatility.

23  Have you done any analysis, let's use your insurance

24  example.  Have you done -- asked for any analysis of the

25  actuarial table that would justify spending the topping fee

1    for whatever perceived risk is out there?

2    A    I have -- I am aware of the topping fees negotiating

3    and I can do my own math that even a 1 percent and $20

4    billion is that I would expect a topping fee to be less than

5    have a very small decline in the value of the business, and

6    that's why I think it's a reasonable exercise of business

7    judgment and a good return on the investment.

8        If the topping fee we negotiate is substantially higher

9    than that, and as we -- the transaction, we may come to the

10   conclusion that that's not a fair trade and reject the

11   transaction.  You'll have the opportunity to object to that.

12   Q    But what you're doing right now, and because you say --

13   well, your analysis leaves out --

14            MR. SHORE:  I'm sorry for doing the cross open

15   like this, Your Honor, I wanted to keep it a little tighter.

16   Q    The analysis you're doing right now is that the topping

17   or that the insurance premium in this example is there.  In

18   other words, that there is going to be if the downward event

19   occurs, there's going to be a payment on the insurance

20   policy, right?

21   A    I'm presuming that the decline is enough that we would

22   pay it, because it would produce more net proceeds, yes.

23   Q    But what you haven't done is factor in the fact that

24   that there are multiple events that can occur between now

25   and then which will cause this policy to be void, such for

1    example as you can't get a plan done.

2    A    No, we did consider that, and I testified that that's a

3    risk.

4    Q    Right.  So you agree with me, your pay out on the

5    insurance policy you're going to get has to be discounted by

6    all these other risks that are out there, which would cause

7    the insurer, this bidder to not have to pay on the policy.

8    A    So far we have not seen any evidence in the bids that

9    that's the case.

10   Q    Have you done any analysis which would risk adjust your

11   insurance payment?

12   A    I gave you -- I have described to the best of my

13   ability the analysis we've done that a small topping fee

14   protects against a small decline.  I think if we had waited

15   until the end of the plan of reorganization and were going

16   to market this asset, we would like enter into a stalking

17   horse with a topping fee for the exact same reasons.

18   Q    All right.  But by that time, you'd at least have a --

19          THE COURT:  I think we've -- let's -- I think

20   you've -- A) I think we've asked the same question now many

21   times; B) I think you've made your point, now let's move on.

22   BY MR. SHORE:

23   Q    Now, you gave testimony yesterday that the -- they were

24   your lay reasons to take the market or take the assets out

25   to market now, one is the existence of bidders now, right?

```
 1    A    Yes.

 2    Q    And you don't know whether any of those bidders will be

 3    here in 12 months, right?

 4    A    Correct.

 5    Q    And you don't know whether there will be more bidders

 6    in 12 months.

 7    A    I don't know how many bidders will be there.  We're --

 8    we know the bidders that are there now.

 9    Q    And in assessing the risk that bidders would be here,

10    you talked to Mr. Hiltz and Mr. Yang (ph), right?

11    A    Yes.

12    Q    But they gave you no written analysis of any of the

13    bidders, right?

14    A    (No response)

15    Q    In other words, to assess whether or not any of those

16    bidders had reasons why they wouldn't be here in 12 months.

17    A    No, other than general business reasons as to why

18    companies move on.

19    Q    Okay.  And you didn't ask them for an analysis of

20    bidders to determine the factors which would affect their

21    being there in 12 months.

22    A    I did not.

23    Q    And as of your depo, you hadn't had any discussions

24    with any bidders as to why they're bidding now, or whether

25    they'd be here in 12 months.
```

1   A    That's correct.  Well, I knew at least why a couple of

2   them were there now, their stated reasons, but I don't know

3   that those reasons were time sensitive to -- whether they

4   would be there in the future.

5   Q    Okay.  And, in fact, you didn't have discussions with

6   them, you heard about what they had said, right?

7   A    Heard why they were interested now.  I had discussions

8   with them.

9   Q    And heard why they were interested now, but you never

10  asked them, are you going to be around in 12 months?

11  A    That's fair.

12  Q    All right.  And then this issue of why the bidders are

13  here now, again without an Oncor valuation, bottoms up

14  valuation, you don't have a way of determining whether the

15  bidders are here now because the asset is hot or because you

16  put it on the block in the form of a second lien DIP too

17  low.

18  A    I think the bidders that are here now are all bidding

19  off of the NextEra bid, not -- has nothing to do with the

20  RSA and the prior deal.

21  Q    Right.  But the -- what you're putting out here first,

22  no one has signed up to any deal, right?

23  A    No, that's right.

24  Q    All right.  So the first bid you accept is going to be

25  your first accepted bid.

1    A    I can't argue with that.

2    Q    All right.  And you haven't now done a valuation which

3    would let you know whether any of the proposed bids exceeds

4    what an expert views as the fair market value of the asset.

5              MR. MCKANE:  Your Honor, I'm going to object,

6    asked and answered.  He's asked the valuation question at

7    least ten times.

8              THE COURT:  All right.  Not in this context,

9    overruled.

10              THE WITNESS:  May I answer?

11              THE COURT:  Yes.

12              THE WITNESS:  Yeah, we would expect to do a

13    valuation before we accept that bid, Mr. Shore.

14    BY MR. SHORE:

15    Q    Okay.  What's the purpose of that valuation?  Mr. Hiltz

16    referred to it as a fairness opinion.  Is that your

17    intention of getting a fairness intention with respect to

18    bids?

19    A    We haven't worked it out, but I think it would be close

20    or -- if not a fairness opinion, very close to it.

21    Q    Right.  So your intention is to actually have a bid in

22    hand and sending that out to Evercore to tell you whether

23    that bid comports with their view of the fair market value?

24    A    We're having Evercore begin that work now as we are

25    accumulating bids and doing the other work.

```
1    Q    And are you asking -- is it your belief that that

2    information will be provided to either you or any of the

3    boards prior to the selection of any of the bids in this

4    first round?

5    A    In the first round, I just want to be sure we're

6    talking the same thing.  You mean narrow -- in October 23rd

7    when we received bids, and before we asked to -- give people

8    a merger agreement, and asked them to mark it up?  You're

9    saying the very first step before we narrow the bidders down

10   will we have that valuation work?

11   Q    Yes.

12   A    No.  We have some information that I think has been

13   discovered that has been provided that includes the

14   historical multiples and all that kind of stuff and we'll

15   get more as we go, but not as we narrow the first round.

16   Q    And just because you referred to it as discovered, did

17   Evercore provide you the materials that they had produced in

18   discovery for the purpose of educating you about their views

19   on the market, or was it that you got it because they had

20   been produced in discovery?

21   A    No, it was -- I received it before it was discovered,

22   but I know it has since been discovered.

23   Q    And do you have an understanding as to why it was

24   provided to you before it was discovered?

25   A    It was information that had been put together that, you
```

1    know, no, I mean there was no specific reason, other than

2    they just handed it to me to support the conversations we've

3    had in the past.

4    Q    And that was handed to you after the bid procedures

5    motion was filed.

6    A    I believe so.

7    Q    Okay.  Let me not touch on valuations, let's talk about

8    some other analyses that are out there.  As of right now, or

9    sorry, as of your deposition, let's put it there, there

10   hasn't been any analysis of the market for regulated utility

11   assets presented to -- oh, God, I've got to rephrase that,

12   excuse me.

13         Up to the filing of the bid procedures motion, no

14   one at the company had received any analysis of the market

15   for regulated utility assets that was used in any way to

16   make a determination as to whether or not to pursue

17   marketing at this time.

18   A    That's a very broad question because obviously we get

19   many industry reports all the time that's sent by bankers

20   about transactions and the utility space.  For example,

21   Exxon and Pepco, bankers are very good about highlighting

22   that they were involved in a transaction and the analysis of

23   the transaction, the multiples.  We get daily reports, we

24   get Bloomberg shot, I mean, we get a lot of information

25   tracking both sides of our businesses and how valuations are

1    occurring.

2    Q    I don't think you answered my question.  Was there any

3    analysis which was -- any of that analysis used in the

4    determination to take the asset from market?

5    A    It was all a part of the knowledge that I brought to

6    the board meetings when we discussed about why -- that my

7    belief as to why this was a good time.

8    Q    You referenced data there, was there any compilation of

9    that data in some form of analysis, market analysis of

10   regulated utilities?

11   A    Well, we get reports from various people that show

12   indices, you know, and break the groups down to regulated

13   utilities versus non-regulated, but -- so I don't know

14   exactly what you mean by analysis, but you know, I would

15   think they'd be offended if I said it was just data.  I

16   think they would think it's analysis of trends in the

17   market.

18   Q    And was any of that written material ever provided to

19   the boards?

20   A    I don't recall any of it being specifically provided to

21   the board.  We certainly talk about some of the things in

22   the report, but I don't know that I provided any hard pieces

23   of paper.

24   Q    Okay.  And are you aware of any analysis prior to the

25   filing of the motion of the volatility in the debt capital

1   markets?

2   A     No.

3   Q     All right.  And to be clear, there's no report or other

4   analysis substantiating the data around that this is a good

5   time to sell?

6   A     Just as I previously testified to.

7   Q     That's there isn't any.

8   A     Well --

9         MR. MCKANE:  Objection, Your Honor, that's asked

10  and answered.

11        THE COURT:  Yeah, we had been over this.

12        MR. SHORE:  Withdrawn.  I believe that is it, Your

13  Honor.  Just let me -- I believe that is it for my

14  questions.

15        THE COURT:  All right.  And it's Mr. Alexander

16  next?

17        MR. LAWRENCE:  Yes, Mr. Lawrence that has

18  (indiscernible - 10:59:18).

19        THE COURT:  Oh, you know, and I apologize because

20  I actually double-checked before I came out to get it right.

21        MR. LAWRENCE:  That's fine, Your Honor.

22        THE COURT:  So let's -- you get set up, we'll take

23  a short recess and we'll reconvene in five to ten minutes.

24  (Recess at 10:59 a.m.)

25        THE BAILIFF:  All rise.

1          THE COURT:  Please be seated.  Mr. Lawrence.

2          MR. LAWRENCE:  Thank you, Your Honor.

3     CROSS-EXAMINATION

4     BY MR. LAWRENCE:

5     Q     Mr. Keglevic, good morning.

6     A     Good morning, Mr. Lawrence.

7     Q     Good to see you again.

8     A     Nice to see you.

9     Q     Mr. Keglevic, first off I want to get some clarity on

10    something that I believe you testified to yesterday and I

11    apologize if I misheard you, I don't have the transcript

12    yet, but I believe you testified that the TECH first lien

13    committee had made an offer of settlement to the TECH

14    unsecured creditors.

15    A     That was my understanding.

16    Q     Okay.  And then immediately after that, and again, I

17    don't have the transcript, so if I misheard you, I

18    apologize, but you said something along the lines that

19    neither party wanted to make the first offer, and I'm trying

20    to reconcile those two statements.

21    A     Yes.  Yeah, I think the original TECH discussions and

22    offer were predated, you know, maybe several months ago.

23    Q     Okay.

24    A     There are some entrees, you know, in a discussion.

25    Since the bid procedure motion and since we've been

1    encouraging creditor groups to get together and seek

2    settlement, my understanding was there was a -- potentially

3    that offer was off the table, and there was an impasse as to

4    who went first.

5    Q    Do you have any personal knowledge that such an offer

6    was made?

7    A    I don't, that's just what I had heard, and it's

8    probably more than second-hand.

9    Q    And you could be mistaken about that?

10   A    I could be.

11   Q    Mr. Keglevic, you submitted a declaration on the first

12   day of these proceedings, correct?

13   A    Yes.

14   Q    And in your declaration, you discussed negotiations

15   that took place leading up to the filing of these bankruptcy

16   cases, correct?

17   A    Yes.

18   Q    And you referred to certain tax consequences of certain

19   restructuring outcomes that had created a challenging

20   negotiation dynamic.  Do you recall that?

21   A    If we were going to keep going into the declaration,

22   I'd love to see it.

23   Q    You can, certainly.  It's actually Exhibit 37 in your

24   binder, Volume I if you'd like to turn to it.

25   A    Do you have a cite, Mr. Lawrence?

1    Q    Yes, sir.  It's paragraph 15.

2    A    Okay.  I'm there.

3    Q    Have you had a chance to read it Mr. Keglevic?

4    A    Yes, sir.

5    Q    Does that refresh your recollection of your --

6    A    It does, thank you.

7    Q    And you also refer to certain restructuring outcomes

8  having a tax consequence that could be in excess of $6

9  billion, correct?

10   A    Correct.

11   Q    And that the debtors and various stakeholders had

12  different views as to who would be liable for those taxes.

13   A    Correct.

14   Q    And you testified in your declaration that in light of

15  those diversion views over the last year, the debtors have

16  been focused on a non-taxable transaction, correct?

17   A    That's correct.

18   Q    And to date, the debtors haven't shifted their views in

19  connection with what type of transaction would be optimal,

20  correct?

21   A    No.  We've seen no evidence indicating that that --

22  that a shift would be the best answer for the estates.

23   Q    And I believe you testified yesterday that the debtors

24  had a bias for a non-taxable structure, correct?

25   A    I might have used bias, but yeah, I think that's fair.

1    We certainly have said, you know, the illustrative term

2    sheet indicates the tax free transaction, and as you know,

3    the early teasers had a tax free transaction, and I believe

4    I would speak -- I'll speak for myself, in my latest

5    discussions with our board, I think we all still believe

6    that's the correct transaction structure until we see

7    something that is better.

8    Q    And the debtors have submitted to the IRS a request for

9    a letter ruling with respect to this optimal deal structure?

10   A    We have.

11   Q    Okay.  And this optimal deal structure as we've gone

12   through previously is set forth in the teaser that was sent

13   out to prospective bidders in July of this year, setting

14   forth that that was the structure that the debtors were

15   pursuing.

16   A    Yes, on a high level basis, but yes, it clearly said

17   that that was the transaction we were pursuing before we

18   made the change recently.

19   Q    And you were sent a copy of that teaser before it went

20   out to prospective --

21   A    Yes, I was.

22   Q    And this optimal deal structure, it's also described in

23   the talking points that were prepared by Evercore for

24   executives to communicate to prospective bidders.

25   A    Well, it was prepared by John Young I executive and

1    yes, but it did indicate that was the structure we were

2    pursuing.

3    Q    And you received a copy of those talking points as

4    well, correct?

5    A    I did too, but I never used them, and never reached out

6    to anybody, so the only -- they were specifically for the

7    purpose of Mr. Young's relationship with other CEOs in the

8    industry, to call them, tell them to take Evercore's phone

9    call and Mr. Young has told me that he didn't even need the

10   talking points.

11   Q    Because you haven't personally involved in

12   communications with perspective bidders, correct?

13   A    I have.

14   Q    Oh, you have?

15   A    I've spoken to a few of them, yes.

16   Q    Okay.  Many conversations?

17   A    Less than ten.

18   Q    Okay.

19   A    Well, excuse me, you know, the PICs obviously to the

20   extent they were a bidder, and you know, going back to the

21   RSA, it would be many, many more conversations with them,

22   but excluding them, it's a handful of conversation with

23   prospective bidders.

24   Q    Post July 2014 is a handful, correct?

25   A    Yes.

1  Q    And this optimal deal structure is what's referenced in

2  the illustrative term sheet that's attached to the motion,

3  correct?

4  A    Yes, it is.

5  Q    And this optimal deal structure is also described in

6  the omnibus tax memorandum which the debtors recently filed,

7  correct?

8  A    That's correct.

9  Q    And you'd have no doubt that prospective bidders have

10 reviewed that omnibus tax memorandum?

11 A    I don't know what prospective bidders would do, but my

12 assumption would be they would take note of that, yes.

13 Q    And you'd agree that the debtors have made it clear

14 that the preferred structure is the so-called optimal deal

15 structure, correct?

16 A    I don't want to bandy words with you, Mr. Lawrence, but

17 we have said we'll take at this point any tax structure they

18 want, so we don't use the word preferred anymore to

19 reference the structures.

20 Q    Okay.

21 A    We, in the past, we clearly were talking about that was

22 the structure we wanted them to consider, but since then, we

23 have put that language in check.

24 Q    And that was clarified in the motion that was filed by

25 the debtors, correct, that you're now accepting any deal

1    structure, taxable or non-taxable?

2    A    That's right.  It was in the motion, and then the

3    motion and all of its attachments, including the teaser,

4    were then sent out to the interested parties.

5    Q    Okay.  And you'd agree, though, that the bidders rely

6    more on what your team tells them than what's in the motion.

7    A    Well, the motion is pretty comprehensive, and outlines

8    the official point of view of the company.  I don't know --

9    you know, a lot of due diligence questions and data room

10   access rely on my team, but I don't know how much my teams

11   have to supplement what's in the motion.  I don't know that

12   I can say that they rely more on my team with respect to the

13   basics that are in the motion than they do the motion

14   itself.  I don't know how to assess that.

15   Q    Mr. Keglevic, do you have a copy of your deposition

16   transcript?

17   A    I do.

18   Q    It's tab 3 and I'll --

19             THE COURT:  Do I?

20             MR. LAWRENCE:  May I approach, Your Honor?

21             THE COURT:  Well, is in the binder?

22             MR. LAWRENCE:  I don't believe it's in the exhibit

23   binder, we have a separate binder that has it.

24             THE COURT:  Okay.  I don't have that.

25             MR. LAWRENCE:  May I approach, Your Honor?

1          THE COURT:  Yes.  We've got binders if you could

2     make one available for his --

3     BY MR. LAWRENCE:

4     Q    Yeah, page 209.

5     A    Okay.

6     Q    Do you see where you're asked a question about the

7     motion and you answered on line 21,

8              "I think they rely more on what we tell them

9              than what the motion said."

10             Do you see that?

11    A    I do.  But, Mr. Lawrence, to be fair, that was with

12    respect to the -- you know, the whole questioning around

13    individual assets that were for sale, not -- I don't know

14    what your question went to.  I would believe this answer is

15    right with respect to the asset for sale, specifically as

16    we've talked about there's some liabilities we're hoping

17    that the buyer will assume, including asbestos and OPAB.

18    And there was -- this whole line of questioning was our

19    claims for sale, is intercompany stuff for sale, and I said,

20    in that situation, because it's driven by due diligence,

21    they rely more on my team.  But I stand by that answer.  I

22    didn't interpret your question as asking me with respect to

23    the bid procedures, do they rely more on what my team tells

24    them, or what the procedures say.  I would think it would be

25    what the procedures say supplemented by my team.

1    Q    Okay.  For some things, they rely more on what your

2    team tells them, but for other things, they rely more on

3    what's the motion -- what's in the motion, is that --

4    A    That's because -- yes.  Because, for example, with

5    respect to assets and due diligence, there's not a lot in

6    the motion with respect to, you know, the procedures

7    themselves, there's a lot more in the motion.

8    Q    Okay.  And just to be clear, for what your team is

9    telling the bidders, the creditors aren't privy to those

10   discussions, are we?

11   A    No.

12   Q    Mr. Keglevic, you testified about a path A and a path

13   B, correct?

14   A    Yes, sir.

15   Q    And just to understand this, initially the debtors were

16   just considering the path A, right?

17   A    Yes, we were and just to make sure everybody's

18   following the path A, it was just to lock up NextEra as the

19   stalking horse bidder and file that as the motion.

20   Q    And then subsequently the debtors began to consider the

21   path B, right?

22   A    Correct.

23   Q    And that's the path of marketing the asset, correct?

24   A    That's correct.

25   Q    And you'd agree that there are a lot of issues that

1   need to be resolved before a plan can be confirmed here,

2   correct?

3   A    Yes.

4   Q    And I believe you testified that it was a healthy list

5   of issues.

6   A    Yes, I said it's a healthy list.

7   Q    And you agree that this healthy list of issues creates

8   closing risks for potential bidders, correct?

9   A    Sure.  There is some risk associated with getting to a

10  plan of reorganization by the time frame.

11  Q    And that was your answer in your deposition when I

12  asked that question, it was sure, it creates closing risks,

13  right?

14  A    I'm delighted I'm consistent.

15  Q    Good.  And you'd agree that in addition to path A and

16  path B, that there's also a path C here, correct?

17  A    I'm sure there could be multiple other paths, I haven't

18  thought about any other than A and B, but I'm happy to hear

19  about your path C.

20  Q    Well, path C would be to resolve some of this healthy

21  list of issues that could be resolved before plan

22  confirmation and then to sell the asset.

23  A    Well --

24  Q    That's a potential path, correct?

25  A    Sure.  And we did consider that.

1    Q    Mr. Keglevic, I just want to shift gears real quick to

2    a line of questioning regarding this August 26th board

3    meeting.  You referred to some polling that took place by

4    Chairman Evans, correct?

5    A    Yes.

6    Q    And this was a telephonic board meeting.

7    A    It was.

8    Q    You were there on the phone.

9    A    Yes, I was on the phone.

10   Q    And Mr. Sawyer was on the phone as well.

11   A    You know, it's difficult for me to remember who was on

12   the phone, but I believe Mr. Sawyer was on the phone.

13   Q    Okay.  Which leads me to my next question, when this

14   polling took place, was Mr. Sawyer polled regarding his

15   views?

16   A    Once again, I don't have the minute -- if you have a

17   copy of the minutes that show who participated, I'd be happy

18   to answer that, but whoever was on the phone was polled.

19              THE COURT:  Every time you refer then to the

20   minutes that they don't have, you're really poking 'em.

21              THE WITNESS:  I'm sorry, Your Honor, there's a

22   reason we write it down so I don't have to remember all

23   this.

24              THE COURT:  I understand.

25   BY MR. LAWRENCE:

1    Q    So you don't recall what Mr. Sawyer said in connection

2    with being polled?

3    A    Well, I do recall that the polling that basically

4    everybody just said, you know, I'm good, or I agree.  Once

5    the polling took place, all the discussion had already gone

6    ahead of it, so there was very little said other than some

7    assent, an indication of assent.

8    Q    Do you specifically recall Mr. Sawyer expressing his

9    assent?

10   A    I do not.  I assented, I remember that.

11   Q    Okay.

12         MR. LAWRENCE:  No further questions, Your Honor.

13         THE COURT:  Very good, thank you.

14   CROSS-EXAMINATION

15   BY MR. MARTIN:

16   Q    Good morning, Mr. Keglevic.

17   A    Good morning, Mr. Martin.

18   Q    Let's see.  Mr. Keglevic, so this transaction was

19   marketed as only a non-taxable deal until the filing of the

20   motion if I have this correct.

21   A    Yeah, that's exactly correct.

22   Q    And you say now that you've abandoned the word -- the

23   use of the word preferred; is that right?

24   A    Well, they -- I think the records speaks as to they

25   know we have illustrative term sheets, so they can clearly

1  conclude that that's our preferred structure, since it's the

2  only structure we've provided.  But, you know, I don't want

3  to indicate that we're saying a word that overrides the --

4  what the bid motion says, which we'll accept the bid in any

5  form.

6  Q    Right, I understand the bid motion says that.  My next

7  question is simply that the bid motion, rather than the term

8  preferred, uses the word optimal; is that correct, to

9  describe the --

10 A    And I think it's optimal from a tax standpoint, not

11 necessarily from a bid standpoint.

12 Q    It does say the debtors' optimal tax structure if I

13 recall correctly.

14 A    Optimal tax structure.

15 Q    Okay.

16 A    Not optimal bid.

17 Q    At the time you gave your deposition, and the

18 deposition in connection with this motion just to clarify,

19 which is after the filing of the motion, you were not aware

20 of an analysis that had indicated a buyer might pay, might

21 pay as much as $2 billion more in a taxable transaction;

22 isn't that correct?

23 A    Yeah, I'm not aware of that analysis, but I don't

24 believe that would ever be the case.

25 Q    Okay.

1    A    I'm happy to explain why.

2    Q    No, you can focus on my questions.

3         If you'd go to your deposition page 61, please.

4    A    Page 61?

5    Q    Yeah, 61.  And if you'd look at starting at line 3, do

6    you recall the following questions and answers.

7         "Q   Mr. Keglevic, is it your understanding that

8         there would be a higher purchase price on the Oncor

9         sale if a taxable transaction was done at EFIH.

10             "MR. MCKANE:  Sorry, can you read that

11        back.

12        "A   That is not my understanding.

13        "Q   Your understanding is that the purchase

14        price would be the same?

15        "A   I don't know what the purchase price

16        would be under different structures, that's why

17        we're going through this process."

18        Do you recall that testimony?

19        MR. MCKANE:  Objection, Your Honor, this is

20   neither impeachment nor refreshment of recollection, it's an

21   improper use of the transcript.

22        THE COURT:  Mr. Martin.

23        MR. MARTIN:  It's impeachment because what he

24   testified to, Your Honor, is that he had a reason he thought

25   no one would ever pay, and this says at this time, he didn't

1    actually know which it would be.  And it's impeachment for

2    that reason.

3              MR. MCKANE:  Your Honor, anything is consistent

4    sufficient to that.  I mean any way --

5              THE COURT:  All right.  I think you can

6    rehabilitate on redirect, if it's necessary.  Objection

7    overruled.

8              THE WITNESS:  Do you want to --

9    BY MR. MARTIN:

10   Q    The question pending is only, do you recall those

11   questions and answers?

12   A    I recall that I said it's not my understanding and

13   there'd be a higher purchase price.

14   Q    Okay.  The -- now I'd like to turn to a slightly

15   different topic, Mr. Keglevic.

16              You testified, I think it was yesterday that --

17   and maybe again today, that there were several risks that

18   could lead to EFIH being liable for tax at the EFH level; is

19   that correct?

20   A    Yes.

21   Q    Okay.  And one of those risks that you talked about

22   with Mr. Weisfelner was the risk of EFH, a fiduciary to --

23   or EFH I think you said, checking the box with respect to

24   EFIH.  Do you recall that?

25   A    I do.

```
 1    Q    Okay.  Now, if you go to Exhibit 55, which is the tax

 2    memorandum.

 3    A    Okay.

 4    Q    Yesterday there was a lot of discussion about page 20,

 5    do you recall that, I think both Mr. Weisfelner and Mr.

 6    Shore were talking to you about that one.  Do you recall

 7    that?

 8             UNIDENTIFIED SPEAKER:  What page?

 9             MR. MARTIN:  I'm sorry, page 20, excuse me.

10             THE WITNESS:  Yes, the first full paragraph on

11    page 20.

12    BY MR. MARTIN:

13    Q    That's correct.  Okay.  And I think you had testified

14    that you recall having read that paragraph prior to the memo

15    being filed or previously.  Okay.  I'd like to now talk to

16    you about page 21.

17    A    Okay.

18    Q    Now and specifically with respect to checking the box.

19    Do you see that first full paragraph on page 21 of the memo,

20    it's in the middle of the page?

21    A    Yes.

22    Q    Okay.  And that last sentence that says, EFH, EFIH and

23    TCEH would likely be severally liable for that tax

24    liability, and it's actually referring to a different kind

25    of tax liability that would happen if the box was checked.
```

1    A    Yes.

2    Q    Further reducing recoveries to the creditors of those

3    entities, and that includes EFH; is that correct?

4    A    Yes.

5    Q    Okay.  And therefore, the conclusion of this paragraph

6    is that EFH would, in fact, not check the box because it

7    would harm EFH creditors, is that your understanding of that

8    paragraph?

9    A    As -- I mean, the last sentence says, "the debtors

10   believe that a check the box selection would be adverse

11   outcome for all parties."  I'm just -- you know, I was not

12   the author of the memorandum, it says what it says.

13   Q    Now, in your testimony yesterday, you reported on board

14   members' deliberations at various of these meetings that

15   there's this demonstrative about; is that right?

16   A    Yes.

17   Q    Okay.  And some of those meetings were joint, in fact,

18   all the ones listed on the demonstrative are joint, except

19   one set of meetings at the end of July, right?

20   A    That's correct.

21   Q    Now, you're a board member at EFIH; is that correct?

22   A    Yes.

23   Q    Okay.  But you're not a director at EFH; is that

24   correct?

25   A    That's correct.

1    Q    All right.  As a member of the EFIH Board, do you know

2    whether the EFIH Board has ever delegated any authority with

3    respect to this sale process to its independent directors or

4    created any special committee?

5    A    I believe that has not taken place.

6    Q    And it's your view that when the debtors over the next,

7    let's call it ten days if we go by Mr. Hiltz' sort of

8    outside dates by which they make prime one cuts, that all

9    the debtors collectively are going to make those cuts to

10   what's left in round two?

11   A    I -- we haven't created -- I have not heard what the

12   governance process is going to be.  I would guess that all

13   of the estates would be involved at some level.

14   Q    Okay.  So EFH is going to be involved in that decision;

15   is that right?

16   A    I would assume, yes.

17   Q    Okay.  So therefore, one thing we can say about that

18   governance process is that EFIH is actually not going to be

19   in full control of the disposition of its own asset; is that

20   correct?

21   A    Well, since EFIH is owned a hundred percent by EFH, I

22   guess I would say that that's correct.

23   Q    Just to repeat my question, I'm not trying to be

24   argumentative with you.  My question was, isn't it the case

25   then that EFIH is not going to be in sole control of the

1    disposition of its own asset?

2    A    I think I said correct, I don't think any hundred

3    percent owned subsidiary is in sole control of its assets

4    because it's owned by somebody else.

5    Q    Okay.  And you just said now, you don't know how the

6    governance process is going to work around that.

7    A    I don't.

8    Q    Now, one of the things that your counsel has mentioned

9    during the course of these hearings is that they're revising

10   the proposed bidding procedures order and the bid procedures

11   to allow some information to go creditors during round one

12   and round two; do you recall that?

13   A    Yes.

14   Q    Now, one of the concerns driving this is the

15   confidentiality requested by prospective bidders, or that

16   you're assuming they'll want because some of them are public

17   companies.  Do I understand that correctly?

18   A    Correct.

19   Q    Now -- so keeping, you know, keeping that desire in

20   mind, you haven't -- and the company hasn't supplied any

21   information about the bidders to creditors to this point; is

22   that correct?

23   A    That's correct.

24   Q    Okay.  Now, notwithstanding the fact that the creditors

25   have not been provided with the identity of the bidders, and

1    I'm asking not to identify the identity of any bidders, and

2    which may or may not be, the identities of some bidders

3    have, in fact, been revealed in press reports; isn't that

4    correct?

5    A    Well -- by the way, I don't -- in some respects, we

6    should check our language here, because we don't have any --

7    we have all potential bidders.

8           MR. MCKANE:  Can I assert an objection, Your

9    Honor?  To the extent that he goes farther in his answer and

10   gives some verification as to whether any of those press

11   reports are true as to ones of potential bidders to actual

12   bidders, you're narrowing the subset, we're getting into

13   (indiscernible - 11:38:10) the Court in its discrepancy.

14          MR. MARTIN:  Let me refrain (sic) that question

15   because actually I'm not interested in that.

16   BY MR. MARTIN:

17   Q    As to the identity of people as potential bidders, and

18   without identifying which ones are true and which ones are

19   not, is it your understanding that the identity of some of

20   the potential bidders has been revealed in the press?

21   A    Well, there's speculation in the press of who might

22   bid, I will agree with that.

23   Q    Okay.  Can we go to your deposition, page 36, please?

24   A    I'm there.

25          MR. MCKANE:  Your Honor, with regards to how --

1    first of all, I don't think it's proper after impeachment

2    here because I don't think it's been inconsistent, but to

3    the extent that that question and answer is read into the

4    record, it would raise the exact issue I'm concerned about,

5    which is whether any of the reports may or may not be

6    accurate, and therefore, it would actually identify some of

7    the potential identities of potential bidders.

8              And, in particular, what I'm looking at line 20 of

9    page 36.

10             THE COURT:  Why are we pointing him to the

11   deposition, Mr. Martin?

12             MR. MARTIN:  For the simple reason, Your Honor,

13   that whatever -- assuming for the moment that some of this

14   information has leaked out, and none of it was in creditor

15   hands, their concern about it getting into creditor hands

16   and leaking is not a basis, is not putting in creditor

17   hands.  There's no incremental risk over that.  And so

18   that's the only point I'm trying to make, Your Honor.

19             THE COURT:  Are we talking about line 13 through

20   21?

21             MR. MARTIN:  That's exactly what we're talking

22   about, Your Honor.  Which was -- and I understand -- I don't

23   have an objection to Mr. McKane raising it now, though he

24   did not raise it in the -- I only express that he didn't

25   raise it in the deposition.

1           THE COURT:  The deposition was done confidential.

2           MR. MARTIN:  It was.  He -- well, I won't argue

3     the point here, Your Honor, because I'm not -- I've told you

4     where I'm going now.

5           THE COURT:  All right.  Let's do it this way, I've

6     read the question and answer, to the extent it's offered for

7     impeachment, I don't think it is, because you didn't ask a

8     question that's inconsistent with what was asked and

9     answered in the deposition.  But I have read the question

10    and the answer, and understand the question and answer and I

11    think that's sufficient for the record.

12          MR. MARTIN:  That's certainly sufficient for us,

13    Your Honor.

14          THE COURT:  Very good.

15    BY MR. MARTIN:

16    Q    Mr. Keglevic, moving on on this topic, you understand

17    that the bankruptcy court has entered a stipulated

18    protective order that governs highly confidential

19    information being provided to professionals on an attorney's

20    eyes only, and I should say all financial advisors' only

21    basis; is that correct?

22    A    I'm generally aware of that, yes.

23    Q    Okay.  And at least as of the date of your deposition,

24    you had not considered whether the identity and price

25    information regarding bids could be provided on an

1     attorney's eyes only basis.

2     A     That's correct.

3     Q     Okay.  So that was after the filing of the motion; is

4     that right?

5     A     That's correct.

6     Q     Okay.  And do you have any reason to believe that such

7     a protective order, which would obviously provide for

8     sanctions of this Court would not adequately protect

9     information?

10    A     I have to consult with counsel, that seems like a legal

11    question.

12    Q     Now, do you recall, sir, that the bidding procedures

13    include bid criteria.  It says, debtor provides for bidders

14    to look at the way the debtors are going to evaluate the

15    bids.

16    A     Yes.

17    Q     Do you recall that one of those, in fact, it's the

18    second one, is stakeholder consensus, and if you want to

19    refer back to --

20    A     No, I think I do remember.  That was -- we've talked

21    about that earlier, yes.

22    Q     Now, you were here for Mr. Hiltz' testimony, and I want

23    to know if you recall that he testified that the debtors

24    will need to balance tradeoffs on various contract terms,

25    okay.  And in some cases, some of those provisions, the size

1    of liquidated damages clause, I think you used as an

2    example, would need to be evaluated in relation to the

3    overall bid price.  Do you recall that testimony?

4    A    Not specifically.  I know the discussion of liquidated

5    damages took place.

6    Q    Okay.  Does it make sense to you that various contract

7    terms might be more or less acceptable to the debtors or

8    creditors depending on what the overall price of a

9    particular bid is?

10   A    Sure.  But I -- if I may, I think what Mr. Hiltz was

11   talking about with that respect, was getting an evaluation

12   of, you know, the value of that risk.  You can assess the

13   value or the risk of a specific item without understanding

14   the price.  We can, with the information about value and

15   risk of each attribute, do the projection to the price, and

16   I still can come up with a reasonable conclusion that would

17   satisfy the creditor.  I don't know that, you know, we need

18   to get every aspect of -- you know, the bid to the creditors

19   to get some informed consensus on some of the provisions.

20   Q    Yeah, I'm actually not asking about the every last

21   piece of everything has to go to them.  My question is,

22   based on where you sit now, and I think you've said, you

23   don't have the bids in hand yet, but it could very well be

24   the case that some of the tradeoffs and decisions that have

25   to be made on these particular terms really are meaningful

1     or a material part of the analysis of them is also the

2     overall price of the bid, and where that particular

3     contingency or particular term or size of liquidated damages

4     clause is, you know, comparing two different bids with two

5     different prices and two different sets.

6              Does that make sense that that could be the case?

7     A    Sure.  There can be scenarios where you'd like more

8     information than what we're proposing to provide.

9     Q    Okay.  So in those circumstances, in fact, the

10    creditors are not going to be able to provide you with

11    meaningful feedback on the stakeholder consensus.

12    A    Well, I don't think it's -- I think we can get

13    meaningful feedback, whether it'll be optimum feedback or

14    not, I don't know.  It depends on the situation.

15    Q    Right.  But if that situation arises where that bid

16    information is needed on those tradeoffs creditors under the

17    debtors' even revised proposal are not going to have that

18    information; is that correct?

19    A    And they have the opportunity to object if we made the

20    wrong tradeoffs when we bring a stalking horse bid to the

21    Court.

22              MR. MARTIN:  That's all I have, Your Honor.

23              THE COURT:  Thank you.  Redirect?

24              MR. MCKANE:  Thank you, Your Honor.  For the

25    record, Mark McKane, Kirkland & Ellis on behalf of the

1    debtors.

2    REDIRECT EXAMINATION

3    BY MR. MCKANE:

4    Q    Mr. Keglevic, I'm going to try to do this somewhat in

5    time, based on when you were asked the cross-examination

6    questions, but I apologize, I'll do my best to kind of frame

7    the issue the best I can.

8              Sir, you were asked I think by almost every cross-

9    examiner questions about valuation.  The process that you're

10   undergoing through bid procedures, are you familiar with the

11   term market test?

12   A    Yes.

13   Q    What is a market test?

14   A    A market test is basically to go, you know, and get

15   different bids and see, you know, what the market says the

16   asset is worth.

17   Q    Sir, I recognize you said you're not a valuation

18   expert, but are you familiar with whether a market test is a

19   form of valuation?

20   A    It's one of the forms of valuation, sure.

21   Q    And, sir, is the process you're undertaking a market

22   test?

23   A    Yes.

24   Q    You've been asked about why you don't have a formal

25   valuation report from Evercore.  Sir, as part of the bid

1    procedures, is there a public auction process?

2    A    Yes.

3    Q    Sir, do you have a view as to whether it'd be helpful

4    or harmful to have a publicly disclosed valuation report

5    from Evercore on the value of the asset that you're trying

6    to auction?

7    A    I don't think any seller would ever want that to be

8    public.

9    Q    And why is that, sir?

10   A    It gives information to the marketplace and might set a

11   ceiling.

12   Q    Okay.  Sir, there's been some suggestion by a number of

13   the questioners that the debtors would not engage in

14   negotiations on a plan of reorganization while this process

15   is proceeding; do you recall that?

16   A    Yes.

17   Q    Do you agree with that assertion?

18   A    No.  In fact, I'm trying to get my schedule set up for

19   -- as soon as possible, to continue those discussions, and I

20   know our board is actively interested in us pursuing that

21   and filing a plan of reorganization as quickly as we can.

22   Q    Sir, Mr. Weisfelner, Mr. Shore and I believe Mr. Martin

23   all asked you about the tax memorandum.  And in particular,

24   they asked you about potential claims that could arise

25   between the debtors.  Do you recall that?

1    A    Yes, I do.

2    Q    Beyond potential tax claims that could arise between

3    the debtors, has the IRS taken a position on what potential

4    claims they may assert?

5    A    Yes.  I think the IRS has indicated that they will

6    oppose any transaction that strands a tax.

7    Q    And, sir, what potential actions could the IRS take

8    independent of any actions between the debtors?

9    A    They could easily pass regulations to eliminate this

10   potential opportunity to strand the tax and get a potential

11   basis write-up.

12   Q    And are there --

13          MR. WEISFELNER:  Object, Your Honor, move to

14   strike, he has no basis to know what it is the IRS can --

15          THE COURT:  We're not getting your objection, you

16   need a microphone.

17          MR. WEISFELNER:  Your Honor, objection, move to

18   strike, witness has no basis to give the prior answer.

19          MR. MCKANE:  Your Honor, this witness has

20   evaluated and part of his co-chief restructuring officer

21   evaluated potential actions that could be taken by parties

22   to develop what is the appropriate form of reorganization.

23   He's been evaluating these issues for months if not over a

24   year.

25          THE COURT:  Yeah, I'll allow the answer.

1   BY MR. MCKANE:

2   Q    Sir, there are other steps that you believe the IRS may

3   take that could impact a potential triggering of attack

4   liability at levels below EFH.

5   A    Yes, I think they're fairly well outlined.  I think

6   there are state law clauses, there's TSA pursuit, we've

7   talked about check the box, and we've talked about change

8   regulations, those are the four that come to mind.

9   Q    Mr. Shore asked you some questions regarding whether

10  you're able to resolve the IRS claim, or let me ask this

11  another way.

12          Mr. Shore in his questioning of you suggested that

13  some of these tax claims could be resolved before a plan of

14  reorganization, or as part of a plan of reorganization.  Do

15  you recall that?

16  A    Yes.

17  Q    Does the IRS have the ability and is it your

18  understanding, that the IRS has the ability to raise these

19  tax claims even after a plan of reorganization?

20          MR. WEISFELENER:  Objection.

21          MR. SHORE:  Objection to the form.  He's asking a

22  witness to speculate about what the IRS might be able to do,

23  whether he's speculated about that before or not, if he

24  wants to say, we've speculated that the IRS can do this,

25  whether that's probative to Your Honor is one thing.

1              I also question the witness -- the wisdom of all

2     these questions talking about what a contingent litigation

3     claimant might do if they came into court and started

4     asserting claims.  But my objection is one -- personal

5     knowledge of the witness.

6              MR. MCKANE:  Your Honor, setting aside the notion

7     that he's been asked to render what he -- what may or may

8     not happen in the future for the last two days based on

9     cross-examination, the basis of his knowledge is the

10    analysis that he has done together with his team about what

11    potential claims could exist as they tried to develop the

12    proper path forward.  He has testified at length about the

13    issues as it relates to inter-debtor.  Let's look at the

14    other half of the page.

15             THE COURT:  I agree.  I think it was opened

16    extensively on cross and he can give his understanding based

17    on how he's educated himself just like I'll give my

18    understanding based on how I've educated myself.

19    BY MR. MCKANE:

20    Q    So, Mr. Keglevic, what is your understanding of whether

21    there are potential actions the IRS could take even after a

22    plan of reorganization?

23    A    And I believe I did testify to this during the cross

24    that I think it's a two-step process, that the IRS can come

25    in and object to the plan of reorganization.  They --

1    obviously, they could lose and the plan of reorganization go

2    forward and we know there were a few cases, much smaller,

3    that that's happened and there has been a stranded tax but,

4    ultimately, your ability to claim the tax basis doesn't take

5    place until you file the first tax return associated with

6    the newly-formed entity that is claiming a basis write-up.

7    So if we emerge from bankruptcy on January 1st, 2015 -- and

8    I should say December 31st just to make -- tie into my bid

9    procedures.  On January 1st, we have a 15 taxable year that

10   we filed a tax return in 2016 in September.  When that is

11   filed with the IRS, at that point, the IRS can do an audit

12   of that tax return and argue that that basis that it was

13   taken, the depreciation that was taken in that tax return,

14   is not consistent with their rules and regulations and

15   disallow the basis right up at that time and that has been a

16   held belief of us and that has been, you know, for the last

17   year and before the RSA was signed.

18   Q    Mr. Keglevic, you know, you recall you were asked some

19   questions by Mr. Weisfelner regarding fees that were paid

20   pre-petition to RSA parties.  Do you recall that, sir?

21   A    Yes, I do.

22   Q    Were those fees part of a -- triggering some form of

23   breakup?  Was it a breakup fee or a topping fee?

24   A    No.

25              MR. SHORE:  I'm sorry, I missed the --

1          MR. MCKANE:  Sorry, I'll -- let me orient the

2     court.  Mr. Weisfelner asked Mr. Keglevic about a lot of

3     payments made to RSA parties immediately before pre-

4     petition.  This is when he was referring to the hundred

5     million dollars paid.

6          THE COURT:  I remember.  I just didn't catch your

7     question.

8          MR. MCKANE:  Oh, I'm sorry.  Apologize.  The

9     question is whether that was some form of breakup fee or

10    topping fee as suggested by Mr. Weisfelner.

11         THE COURT:  I still didn't catch it.

12         MR. MCKANE:  Sorry.  Mr. Weisfelner in his

13    questioning was asking whether those payments were made in

14    some form of a topping fee or a breakup fee because he was

15    saying you didn't have to pay a breakup fee to exercise your

16    fiduciary out because you already paid them a hundred

17    million dollars.  That was the assertion that Mr. Weisfelner

18    made.  I'm asking if that's accurate.

19         THE COURT:  Now I understand.

20         THE WITNESS:  It was not a topping fee or a

21    breakup fee.

22    BY MR. MCKANE:

23    Q    Okay.  And so were those expense reimbursements?

24    A    Yes, it was associated with fees and expenses

25    associated with either services provided or contracts for --

1   that we had entered into with those parties.

2   Q    And as part of the July 23 board meeting, was there a

3   decision -- or a vote to terminate the RSA?

4   A    Yes.

5   Q    And was that an exercise of a fiduciary out?

6   A    Yes.

7   Q    And, sir, can you explain whether there are any fees

8   or payments associated with the exercise of that fiduciary

9   out?

10  A    I'm not aware of any fees or payments that were made

11  associated with us making that vote and terminating the RSA.

12  Q    Why did the debtors exercise their fiduciary out to

13  terminate the RSA?

14  A    Because we believe that the -- there was higher value

15  path available to the debtors and it was a exercise of our

16  fiduciary duties to get the highest possible value for the

17  Oncor asset for the benefit of the estates.

18  Q    And what was that higher path available to the debtors?

19  A    It was basically to market the economic interest in

20  Oncor or, as we're calling it now, Reorganized EFH.

21  Q    Mr. Keglevic, as part of your testimony in answering a

22  question to Mr. Shore, you -- I believe you testified that

23  the termination of the RSA was hand in hand with the

24  decision to market the Oncor asset.  Do you recall that?

25  A    Yes.

1    Q     What did you mean by that?

2    A     That the board was not -- we were not in a position to

3    say no to the RSA without knowing what our path forward was.

4    So the decisions were made together that we terminated the

5    RSA and put the asset up for sale and that the discussion

6    leading up to it was joint about both of those issues.

7    Q     All right.

8              MR. MCKANE:  Your Honor, if we could -- if I could

9    approach, take down the boards so the screen can be visible?

10             THE COURT:  Yes.

11   BY MR. MCKANE:

12   Q     Mr. Keglevic, I've asked that that demonstrative aid be

13   put back on the screen identifying some of the board

14   meetings.  These were board meetings that you had in July,

15   correct?

16   A     Well, from July through October 16th.

17   Q     Or starting in July.  I apologize.  Better question.

18   And Mr. Shore asked -- started his questions with the

19   meeting on July 23rd.  You see that?

20   A     Yes.

21   Q     You had three meetings before that, three joint board

22   meetings, correct?

23   A     Correct.

24   Q     And, sir, the July board meetings, were those the first

25   board meetings that the debtors had had since filing pre-

1    petition?

2    A    No, we've had board meetings continuously.

3    Q    And, sir, do you recall in the late June and July time

4    period, you were in the midst of the motion to approve this

5    second lien DIP?

6    A    Yes.

7    Q    Did you receive a number of competing bids during that

8    time period?

9              THE COURT:  Late June?

10             MR. MCKANE:  Late June.  I apologize.

11             THE WITNESS:  Well, we basically had at that point

12    two bidders and multiple bids from each of the two bidders.

13    BY MR. MCKANE:

14    Q    And, sir, as part of the -- were there board meetings

15    that were held in late June to evaluate each of the bids as

16    they were coming in and the potential merits of those bids?

17    A    Yes, every time we -- we generally have a standing

18    board call every Friday and it only does not take place if

19    we decide to cancel it because there's a lack of activity.

20    If we had received a bid, we certainly would have gone forth

21    with the board meeting and shared it with the board either

22    on that date or sooner if we thought it needed action

23    sooner.

24    Q    And, sir, can you describe the -- and were there

25    presentations made to the board in the June time period as

1    relates to the bids for Oncor that you had -- were receiving

2    at that time?

3    A    Yes, they -- we always presented what the bid was, what

4    enterprise value, multiple, et cetera, it represented, how

5    it compared to prior bids of the same bidder, how it

6    compared to prior bids of the other bidder and, you know,

7    gave us much analysis on the bids themselves as we could to

8    the board members.

9    Q    And so that analysis was for the same asset that you

10   were going to the market with as of July 23rd?

11   A    Yes, it's basically the same transaction with a little

12   different tax approach.

13   Q    And, in particular, what type of market multiples were

14   presented in the June time period as the debtors -- as the

15   board -- debtors' board for evaluating the potential bids at

16   that time for this same asset?

17   A    Obviously, they -- they've risen during the first of

18   the bid process.  I don't recall where we started but the --

19   we were probably in the, you know, low twenties on PE and in

20   the nine -- low nines on EBITDA and those eventually have

21   gone to the last public bid that was NextEra, I think, is

22   26-1/2 on a PE and right at 10 on an EBITDA multiple.

23   Q    And, sir, did -- can you describe for the Court the

24   discussions that happened at that time that either you or

25   the Evercore team provided about the state of those bids as

1    you were evaluating whether to move forward with the second

2    lien then?

3    A    Well, we compared to -- you know, similar to the cross-

4    examination, we looked at the multiple implied in the bid

5    and we talked about historical multiples and where the

6    market was trading and, you know, the same type

7    characteristics, how the debt markets were, would they, you

8    know, facilitate financing, you know, how good the price was

9    at the end of the day and how executable they were, the

10   bids.

11   Q    And, sir, as a member of the EFI's corps, did you

12   consider that information as you were evaluating whether to

13   terminate the RSA and move forward with the marketing

14   process?

15   A    Yes, I -- all board members considered it on behalf of

16   their estate and, ultimately, we talked about it again at

17   the face-to-face meeting when we had the separate board

18   meetings at the end of July.

19   Q    Yeah.  Sir, based on your experience sitting on these

20   boards and presenting to these boards, have you put every

21   management recommendation to the board in writing?

22   A    No.

23   Q    Can you explained the process and the interactions that

24   you've had with the members of the VHA board in terms of

25   governance and in terms of recommendations?

1   A    That's a fairly broad question.

2   Q    Just let me say that with regards to this transaction,

3   can you describe what was done in the practice that you

4   employed?

5   A    Well, we certainly presented the bids, answered any

6   questions, gave our views -- and when I say our, I'll say

7   the management team as well as Evercore and Kirkland and

8   Ellis and then talked about the process forward, where we

9   expected the bidding to go, what the likelihood of

10  increasing the bids, you know, a full, wide range of

11  discussion about how -- you know, how to auction the asset

12  and the price we were likely to get and how to move forward.

13  Q    Okay.  Mr. Keglevic, I want to transition to something

14  else.  You were asked a series of questions by Mr. Shore

15  about the -- whether there is a relationship between the

16  process to sell the asset and get it -- and a price and the

17  resolution of claims.  Do you recall those questions, sir?

18  A    Yes.

19  Q    Sir, do you have a view at all as to whether the

20  process for raising the funds and to regain the highest

21  price possible for an asset, does that have any relationship

22  at all to the process of settling claims?

23  A    No, in fact, I believe they're -- they are separate.

24  Ultimately, the net proceeds will be used to settle the

25  claims but I don't believe we're forestalling any, you know,

1   rights that creditors have to prosecute their claims.

2   Q    All right.  And, sir, Mr. Shore asked you a series of

3   questions about your ability to forecast volatility out 12

4   to 14 months.  Do you recall that, sir?

5   A    I do.

6   Q    And there is some suggestion as to whether you should

7   be starting the process now as opposed to waiting until the

8   plan of reorganization potentially 12 or 15 months away.

9   A    Yes, I remember that.

10  Q    Sir, if you didn't start a sales process until 12 to 15

11  months away, based on your experience with utility assets,

12  when would those -- when would that sale close?

13  A    Twelve to 18 months after I start.

14  Q    Is there a benefit to the estates of not having to wait

15  24 to 36 months for resolution of a sale of the Oncor

16  assets?

17  A    Well, I think yes because today we know there's

18  bidders, we know there are prices that are closer to

19  historical highs.  The reason -- you know, we have a good

20  debt market.  For the reason we said, I think there's more

21  certainty in what we could get now, especially with an

22  upside opportunity than there would be one in -- down the

23  road where we can't forecast what the market conditions

24  might be like.  I think it also -- from a plan of

25  reorganization standpoint, if we didn't start for 12 or 18

1    months, I don't know if it'd be the debtor conducting the

2    sale.  We'd be out of our exclusivity period and who knows

3    when -- who would be the person directed to do that auction.

4    Q    Mr. Keglevic, I apologize, there was a question -- a

5    series of questions by Mr. Weisfelner earlier on in his --

6    as he tried to walk through actual steps of the transaction

7    that would be necessary to effectuate this tax respin, do

8    you recall that, sir?

9    A    Yes.

10   Q    And there was -- there -- and this is -- I don't want

11   to get too technical but there was some question that

12   there'd be an intermediate step, a -- an intercompany loan.

13   You recall that?

14   A    Yeah, intercompany might be a bad term for that.  It's

15   really a loan from the buyer.

16   Q    Yeah.

17   A    So it -- you know, I -- obviously, it's between their

18   company and EFH but it's not intercompany between any of the

19   -- well, I'm sorry, the chart's down but any of the entities

20   that exist today within EFH.

21   Q    All right.  And so could just at a high level explain

22   to the Court, you know, basically, how this transaction

23   would close after -- you know, if we were satisfied all the

24   closing conditions, as necessary.

25   A    Yeah, so we basically borrow money from the potential

1    seller -- and let me just use an example because I find I

2    think it's easier if you do it and I think I walked Mr.

3    Weisfelner through this with numbers that there be enough

4    cash available to pay off the EFH second lien debt, the EFIH

5    -- I'm sorry, let me say that -- the EFIH second lien debt,

6    the EFIH PIC unsecured debt and let's say 50 percent left or

7    about $300 million left for the EFH box to deal with and I'm

8    not going to get into claims and who might be there.  Let's

9    just assume that represented 49 percent of the debt at EFH.

10   We could use all of that cash and pay off those debtors.

11   Ultimately then, EFH would then merge into reorganized EFH

12   also, a disregarded entity that would be established by the

13   seller and the remaining --

14             THE COURT:  Buyer.

15             THE WITNESS:  By the seller.  The seller creates a

16   new co.

17             THE COURT:  All right.  Okay.  Thank you.  Sorry.

18             THE WITNESS:  And the reorganized EFH merges with

19   that entity and that entity pays the remaining

20   consideration.  Let's assume there's another $300 million

21   that would be available and remaining consideration in the

22   stock of the buyer to those creditors.  So my analysis is

23   the purchase price was -- in the net proceeds were available

24   to pay everybody in cash except for 50 percent of the EFH

25   unsecured debt holders and they ultimately get the other 50

1    percent or 50.01 percent in stock.  That would satisfy both

2    the Section 355 concerns and the continuity of interest

3    concerns and it's laid out specifically, I think, on page 43

4    of the tax memorandum how that works and I'm sorry that -- I

5    don't think there's a simpler way to explain it.

6    BY MR. MCKANE:

7    Q    I don't -- I got all that, sort of, but -- as best I

8    can but the -- I don't -- I didn't hear how the intercompany

9    loan kicks into that.

10   A    So it -- the -- it's a loan from the buyer.  So, you

11   know, since we've used NextEra, let's say NextEra loans us

12   that money.  Once the merger happens between reorganized EFH

13   and the new co that NextEra established, that loan can then

14   be forgiven by the new co or refinanced by the new co but at

15   that point, whatever they do with that financing has no

16   impact on the tax elements of the transaction.  So in our --

17   Q    And the proceeds of the intercompany loan would be used

18   to, among other things, pay the cash portion of the $300

19   million you were talking about in your example to the EFH

20   stakeholders?

21   A    Yes, and the full payment of the second lien debt and

22   the full payment of the PIC debt.

23   Q    Okay.

24   A    So if the bid is at that level, we would expect a very

25   small element of stock from the strategic buyer to be

1    consideration.  Most of the consideration, if we get that

2    kind of bid level where we were with the NextEra bid to be a

3    very small component of stock.

4    Q    All right.  And, sir, with regards to that component of

5    stock, there were some questions about whether it's the

6    debtors' intention to, essentially, trade or exchange the

7    volatility of Oncor for the volatility of the buyer's equity

8    because of that insertion of the buyer's stock.  Do you

9    recall that?

10   A    Yes, I was a little troubled by that question and

11   answer because, certainly, we would agree that even though

12   there's a small -- you know, in my example, there would only

13   be a small component of stock, during our bid discussions,

14   we would want that to be a variable number of shares based

15   on when we close what the value of the stock was trading at

16   so that the only volatility -- you know, the day that the

17   transaction closed, the creditors would get stock valued at

18   at least the average of the most recent few days that it was

19   trading on the New York Stock Exchange and, therefore, you

20   know, mitigate that potential volatility.  So we never

21   thought about taking a fixed number of shares at a price

22   today.  We always were going to take a variable number of

23   shares and whatever their market price was and -- was going

24   to be their market price and that was not inconsistent with

25   the discussions but, of course, we don't have a deal yet so

1    we'll -- but we would certainly push for that key element.

2    Q    All right.  And so let's talk about some other key

3    elements that are to be negotiated.  So you recall a series

4    of questions from Mr. Shore about what analysis the debtors

5    had done about the liquidated -- to be negotiated liquidated

6    damages provision vis-à-vis the liquidated -- the breakup

7    fee.  Do you recall those questions?

8    A    Yes.

9    Q    Sir, recognizing what analysis has been done, do you

10   anticipate there will be further analysis done about the --

11   about that -- the value that may be provided from those

12   terms in a proposed term sheet when you actually have a bid?

13   A    Yeah, I -- we're going to focus on all the key elements

14   of the bid and that's certainly the breakup fee and whether

15   we get liquidated damages or a deposit will be a key

16   analysis and a key part of our evaluation procedures.

17   Q    And once that decision has been made and what -- will

18   you be coming back to the -- presenting the board and then

19   coming back to court?

20   A    Yes, we're going to get -- we'll get the valuation work

21   done, we'll present our analysis to our board, get board

22   approval and then file it with the court and I should say

23   and on the key terms based on the negotiation, we will do

24   some consultation with creditors and seek to get input on

25   how they value different terms vis-à-vis each other.

1    Q    Yeah.  Mr. Keglevic,  I apologize but could we just

2    double back to that intercompany loan for a second?  So that

3    that loan is part of the --

4    A    The poorly-named intercompany loan?

5    Q    The improperly-characterized intercompany loan.

6    A    Yes.

7    Q    Can you describe, as part of the closing conditions,

8    how long would that loan be outstanding?

9    A    Just a matter of probably a day.  It would be, you

10   know, funded just before, you know, closing or maybe even

11   contemporaneously with closings so it might not even be the

12   whole day.

13   Q    It's not like some new DIP that's going to come in or

14   --

15   A    No, no, no, no, it's just -- we just have to do it in

16   two steps in the way we describe to avoid the tax but it's

17   going to be very close to the closing date.

18   Q    Sir, Mr. Martin asked you about some governance issues

19   in terms of how you would -- who would be evaluating the

20   bids.  Do you recall that, sir?

21   A    I do.

22   Q    Sir, if a bid is higher than the EFIH claims, which

23   entity is going to have the fulcrum?

24   A    The entity -- EFH, presumably, depending on the bid or

25   the -- in your example, I assume it's the next creditor

1    group.

2    Q    And, sir, does the size of the bids impact in some ways

3    some of the governance issues that will be to be discussed

4    and evaluated going forward?

5    A    Sure.

6    Q    And Mr. Martin also mentioned some good questions about

7    whether you thought a tax -- a -- whether you thought a

8    bidder would be $2 billion more to -- in a taxable

9    transaction.  Do you recall that question?

10   A    I do.

11   Q    And, sir, you didn't have an opportunity to explain why

12   you did not think that was going to happen.

13   A    Yeah, in my deposition, I said I didn't think that was

14   going to happen and here's the reason -- and I think this is

15   important because it's not a, quote, unquote, tax issue.

16   We've covered the tax issue.  All the tax issues are the

17   same in terms of the IRS potential remedies and how the EFIH

18   might argue against those potential remedies.  Even assuming

19   EFIH is successful and no tax gets pushed down and the tax

20   is stranded at EFH, it is a very different situation in the

21   value of the tax basis write-up of EFIH than it is at TCEH

22   and the reason is the regulatory process.  The assets that

23   would get written up that would, you know, ultimately be

24   designed to create higher depreciation and tax deductions do

25   not exist at EFIH or at Oncor Holdings.  They exist at

1    Oncor.  They are rate-regulated assets of which are paid by

2    the rate payer.  It pays the recovery of the depreciation,

3    the return on -- that's the return for debt and equity --

4    and the rate payers today get the tax consequences of those

5    assets.  So to have rates remain the same for the Oncor

6    customers --

7              MR. MARTIN:  Objection, Your Honor.

8              THE WITNESS:  Okay.  Can I finish, Your Honor?

9              THE COURT:  Well, let the witness finish the

10   answer, please.

11             THE WITNESS:  So to -- the assumption that this

12   extra depreciation would not be considered in the rate

13   making formula, it would not lower rates to Oncor, is a

14   conclusion that none of the strategics that we have talked

15   to or my over 30 years of regulated experience would

16   support.  I think it would violate the regulatory premise

17   and would be a significant risk because of the existence of

18   the regulatory premise on top of the tax issues.  So,

19   therefore, if there's -- if the value of the extra

20   depreciation is going to go to the customers, there's no

21   value to the buyer and, therefore, the buyer will not

22   provide extra bid.  And, ironically, in this situation, one

23   of the people who would intervene in the rate case would be

24   the T side, is that TXU Energy, we are the largest customer

25   of the Oncor rates and we would not pay recovery of taxes

1    that are phantom taxes and don't exist because that's

2    effectively what you're asking the rate payer to do, pay the

3    existing level of taxes and ignore that the tax basis write-

4    up has occurred and lowers the tax bill to the ultimate

5    owner.  That would be a value shift from the rate payers to

6    the ultimate owner and would be heavily contested by TXU

7    Energy.  That's why we don't think it has the same value on

8    both sides of the house.  That regulatory process does not

9    exist for TCEH.

10                THE COURT:  That's fine.

11                MR. MARTIN:  I had two questions when I stood up

12   and now I have three based on the rest of the answer after I

13   said objection.  The first is that as to most of this, it

14   goes to what a regulator would or would not do.  That's got

15   to be embedded with legal advice as to what the regulator

16   would or would not do.  It's very similar to the tax issue

17   and we're going to have a whole issue about that.

18                Secondly and related to that, it's beyond the

19   scope of direct.  They know about this $2 billion issue.  We

20   raised it in our objection and raising it now on redirect is

21   out of bounds.  We asked of those specific question about

22   whether he had evaluated that, had seen the evaluation that

23   Mr. Hiltz has done.  That was the only scope of the cross.

24                The third is that as to his entire answer, the end

25   of his answer shows that, in fact, sitting here as a

1    director of PCEH and EFIH and an officer of both, the answer

2    might very well be conflicted because he says that, in fact,

3    PCEH might be the one asserting this rate case.

4              THE COURT:  Well, that --

5              MR. MARTIN:  So I've got -- sort of got three

6    problems with the answer because now I can't --

7              THE COURT:  Well, as to the third one, I don't

8    think that's a proper objection.  As to the first -- or I

9    believe it was the first, maybe it was the second, regarding

10   beyond the scope of direct and cross --

11             MR. MCKANE:  Could I be heard, Your Honor?

12             THE COURT:  Yes.

13             MR. MCKANE:  Very briefly, as to the first one

14   which is it's embued with legal experience, this man's got

15   30 years in the regulated utility industry.

16             THE COURT:  Right.

17             MR. MCKANE:  He has been dealing with that for

18   years and then as to whether it's beyond the scope of the

19   direct, two things.  One, this -- Mr. Kegelvic has been

20   identified as a witness in both people's cases.  That's why

21   we did not object at all that crosses went beyond the direct

22   and, therefore, I am allowed to, just as far as the

23   redirect, to cover things in cross.

24             THE COURT:  All right.  I see it.  All right.  Now

25   you got to let him make cross.

1           MR. MCKANE:  No, the burden's still ours.

2           THE COURT:  But the manager said that you're --

3    it's okay for you to put new information on redirect because

4    it's in the nature of cross, of their cross, which was in

5    the nature of direct.  So now I've got to let the other side

6    do cross.

7           MR. MCKANE:  No, Your Honor, that's not what I'm

8    saying.  Let me be more precise.  They absolutely opened the

9    door specifically to this question in their question.  I

10   didn't go beyond the scope.  It was expressly elicited and

11   Mr. Keglevic wanted to respond as to why he did not believe

12   someone would pay $2 billion.  I know we don't have a

13   transcript because this is all been done live but it's

14   specifically in response to a question that Mr. Martin asked

15   about why they would or would not and he said no.  That's

16   why we got up and we had this question about whether there

17   is improper impeachment and so they absolutely opened the

18   door to this with his cross.

19          THE COURT:  All right.  With regard to his ability

20   to give that answer, I think that the witness has testified

21   to having sufficient experience in the utilities -- well, in

22   the energy business but -- and, more specifically, the

23   utilities business that he is competent in giving an answer

24   along those lines very similar to his ability to give his

25   understanding of the tax structure.

1             With regard to the issue of beyond the scope, I

2     don't have the answer but I'm going to allow regards on that

3     issue so we'll have an opportunity to get into it on cross

4     if you wish, Mr. Martin.

5             MR. MARTIN:  Okay.

6             MR. MCKANE:  Just on that issue, Your Honor?  I --

7             THE COURT:  Well, there is another issue I'm

8     thinking about too here.

9             MR. MCKANE:  All right.

10            MR. MARTIN:  Thank you, Your Honor.

11            THE COURT:  I'm not going to hide the ball on

12    that.  I'm probably going to allow recross on the June board

13    meetings --

14            MR. MCKANE:  Okay.

15            THE COURT:  -- if desired.

16            MR. MCKANE:  Your Honor, if I could confer with my

17    co-counsel?

18            THE COURT:  Yes.

19            MR. MCKANE:  Your Honor, just a -- one final line

20    of questions just to wrap up.  It won't be long.

21    BY MR. MCKANE:

22    Q    Mr. Keglevic, I believe on cross-examination, you were

23    asked a series of questions about the RSA potentially being

24    the starting point for putting a potential sale of the Oncor

25    assets.  Do you recall that, sir?

```
1    A    Yes.
2    Q    And, sir -- and that was because the RSA had some
3    relationship to the second lien DIP loan, correct?
4    A    Correct.
5    Q    And then there was a -- since the RSA was signed,
6    you've had a series of EFIH board meetings evaluating the
7    second lien DIP, correct?
8    A    Correct.
9    Q    Sir, can you please explain to the Court whether your
10   -- the board's analysis and your recommendation to the board
11   on July 23rd whether to terminate the RSA and proceed
12   forward with a marketing process, did that -- was that built
13   on all the analysis that you had done to date and the
14   board's -- and considered to date from the start of the RSA
15   forward?
16            MR. WEISFELNER:  Objection, leading.
17            THE COURT:  Sustained.
18            MR. MCKANE:  Okay.
19   BY MR. MCKANE:
20   Q    Sir, can you please explain to the Court the -- whether
21   the basis of your analysis was solely on that meeting or
22   based on more?
23            THE COURT:  Don't -- you can't ask -- you can't
24   suggest the answer and --
25            MR. MCKANE:  I'll rephrase it.  I apologize.
```

1              THE COURT:  Did he do it?  Yes.  What did you

2       consider?  Explain.

3              MR. MCKANE:  Yeah, I understand, Your Honor.

4              MR. WEISFELNER:  The problem is, again, and now

5       talking about going beyond the scope, he's already suggested

6       the answer.  He's already had the question overruled as

7       being improper.  Now whatever the witness answers --

8              THE COURT:  But, it's --

9              MR. WEISFELNER:  -- is (indiscernible - 12:19:58)

10      been wrong.

11             THE COURT:  Well, okay.  But let's go back to

12      Evidence 101.  That's -- there is a problem.  I hereby

13      instruct the jury to disregard the previous question and --

14      you may ask the question.

15             MR. MCKANE:  Thank you.

16      BY MR. MCKANE:

17      Q    Mr. Keglevic, can you explain to the Court what was the

18      basis for the -- in total of the board's decisions to

19      terminate the RSA and move forward with the marketing of the

20      Oncor assets?

21      A    Well, the RSA basically contemplated a separation, a --

22      you know, a separation of the companies, if you will, of

23      sale of Oncor to the PIC's on a tax free basis.  So that

24      analysis was done prior to the RSA.  It included a second

25      lien DIP feature.  When we eliminated the RSA, we certainly,

1    you know, considered that feature, decided that feature was

2    not worthwhile as we had thought and moved to a full

3    marketing of the asset but many of the -- as we talked

4    about, the fundamental tax and the fundamental separation or

5    the move away from Olympus was incorporated into the

6    original RSA.  So we did -- you know, I would call it more

7    evolutionary than a revolutionary decision because the RSA

8    had many of the same elements.

9            MR. MCKANE:  No further questions, Your Honor.

10           THE COURT:  Thank you.  All right.  I -- at this

11   point, as I just said, I will allow on recross on two

12   issues.  One, the general board meetings that you underlined

13   were really moved past the money, if you will, and the other

14   is the issue about the interplay between the depreciation

15   and utility rate payers if you all wish to ask those

16   questions.

17           MR. SHORE:  If I may be heard on one other issue,

18   Your Honor?

19           THE COURT:  Yes.  You don't need to -- I was going

20   to say I'm not requiring questions on this.

21           MR. SHORE:  I can do this in sort of one or form

22   questions.

23   RECROSS-EXAMINATION

24   BY MR. SHORE:

25   Q    Let's deal with the June board meetings first.  Was

1    there anything in the June board meetings which constituted

2    a written analysis of the M&A market for the purposes of

3    determining whether or not to be selling at that time?

4    A    No, Mr. Shore.

5    Q    Was there any written analysis of any of the market

6    data around where comparables were traded which were

7    provided to the board in the June meetings?

8    A    Not that I recall.

9    Q    Okay.  Can you think of anything that they were

10   presented in -- the boards were presented in writing which

11   is any different than what they looked at in the July

12   meetings and August meetings?

13   A    I can't recall anything specific that was in writing.

14            MR. SHORE:  Now, if I may be heard on one other

15   issue, Your Honor, which is this -- what was elicited on

16   redirect with respect to the over -- or the going out to the

17   market now because that shortens the time for the regulatory

18   approval and that they don't have to do it 18 months later.

19   That was a new issue which was raised and it certainly

20   wasn't one of the explanations the witness gave on direct as

21   to why the debtors were pursuing the process now as opposed

22   to later.

23            MR. MCKANE:  Your Honor, that is not a new issue.

24   In fact, it was a response to Mr. Shore's questioning

25   specifically as to that issue.  He was suggesting all along

1    the way that the volatility and the window that you'd have

2    to be evaluating is 12 to 15 months and that we should be

3    postponing this to a later point in time.  The witness did

4    testify on direct specifically about the duration of time

5    necessary to close an M&A transaction like this in the

6    utility space in the -- and the -- as a result of that, the

7    PUC approval.  All the question elicited was if you're going

8    to push it out and you have this fairly fixed PUC approval

9    process, what impact does that have to the closing date on

10   the PUC approval process.  That was what the question

11   elicited and that's what the testimony was.  Therefore,

12   there's nothing new but should it --

13          MR. SHORE:  But the assumption behind that in the

14   question which was one which was never raised which is

15   you're actually cutting it short, the delay, the post-

16   confirmation delay, if you're doing it now and those are the

17   questions I want to ask this witness.

18          MR. MCKANE:  And, Your Honor, specifically on

19   issue, Mr. Keglevic touched on this and Mr. Hiltz touched on

20   this, that this is a -- that one benefit of selling now is

21   that you run into a parallel process.  You can a POR process

22   and a PUC process.

23          THE COURT:  I'm going to allow questions on the

24   assumption.

25   BY MR. SHORE:

1    Q    First, sir, any plan that you go forward outlined in

2    the bids you're expecting to get right now is going to

3    require a T side plan, right?

4    A    Yes.

5    Q    And a T side plan is going to need the approval of the

6    NRC, right?

7    A    Yes.

8    Q    And it's going to need the approval of the FERC?

9    A    Yes.

10   Q    And it's going to need, potentially, any trust

11   approvals and everything else, right, that's associated with

12   a transaction in which the ownership of TCEH is going to be

13   transitioned to some third party?

14   A    If that was the case, I assume that may be a

15   requirement.

16   Q    Well, and isn't the assumption of the T side tax free

17   spin that the ownership of TCEH is going to be turned over

18   to some third party?

19   A    Yes, the creditors.

20   Q    Right.  So then you're going to need to have a

21   regulatory process if the after-8 plan is confirmed here

22   before you can get to an effective date that requires all of

23   that T side approval as well, right?

24   A    Yeah, I just didn't recall the last regulatory

25   approval.  Certainly, the first two are the same.

1          MR. SHORE:  Okay.  No further questions.

2          THE COURT:  Thank you.  Mr. Martin, do you want to

3     question on that issue?

4          MR. MARTIN:  Just a couple, hopefully, Your Honor,

5     and I apologize if this has to be a little bit open rather

6     than as tight as I might like it to be but --

7     RECROSS-EXAMINATION

8     BY MR. MARTIN:

9     Q    Mr. Keglevic, you're familiar with the other tax

10    sharing agreement, obviously, right, the Oncor tax sharing

11    agreement that was at issue -- although I don't think it

12    actually came before the Court in connection with the RSA?

13    A    Yes, I am.

14    Q    Okay.  And in that tax sharing agreement, Oncor

15    actually made payments from inside the ring fence up to EFH,

16    is that correct?

17    A    Correct.

18    Q    Okay.  And --

19          THE COURT:  Let's see where he's going.  Let's see

20    where he's going.

21          MR. MARTIN:  Okay.

22    BY MR. MARTIN:

23    Q    And --

24    A    Your Honor, I'm sorry, when my counsel stood up, I had

25    a little more that I'd like to answer.

1           THE COURT:  No, he was about to say this was

2    beyond the scope of what I said you could ask questions

3    about.  So I would -- I was --

4           THE WITNESS:  Well, I just wanted to expand a

5    little bit on the answer I gave.

6           THE COURT:  Oh, very good.  I understand.

7           THE WITNESS:  I -- on the -- yes, amounts that

8    were paid up from Oncor to EFH based on actual -- based on a

9    calculation of actual taxes paid on a stand-alone base -- as

10   if they were a stand-alone company.

11   BY MR. MARTIN:

12   Q    Right, it's the -- it was based on the amount of tax --

13   not actual taxes paid but the amount of taxes that would

14   have been paid if Oncor was a stand-alone company.

15   A    Right, based on the attributes of Oncor including the

16   depreciation of the assets that they own.  So that stand-

17   alone calculation would have to consider whether or not the

18   basis write-up was allowed.

19   Q    That's right but the actual agreements that the PUCT

20   authorized -- okay -- were, in fact, not used for taxes,

21   they were used to make coupon payments, right, to any old

22   structure?

23   A    I disagree with that.  I think the -- what's in rates

24   is the same calculation as what they pay us.  They have a --

25   what's been allowed in rates at the PUCT is a stand-alone

1    calculation as if they were a corporation that paid taxes

2    based on the attributes of the assets they own.

3    Q    Well, I agree with that at the Oncor level.  I'm not

4    disagreeing with you on that but the money is actually not

5    paid to the IRS, it's actually paid to EFH?

6    A    That's correct.

7    Q    Okay.  And EFH may have a different tax situation

8    because it's got other things going on coming out from TCEH,

9    for example?

10             MR. MCKANE:  Objection, Your Honor.  Now I think

11   we have crossed beyond the depreciation/regulatory issue

12   into what is the use of historical Oncor tax hearing

13   payments.  I think we're beyond the scope of the recross.

14             MR. MARTIN:  I'm only going to the following, Your

15   Honor, one, they testified that their process now since

16   filing the motion is one that they want to be wide open and

17   consider every structure.  Previously, under the old

18   structure, they had an arrangement where the PUCT was

19   allowing money to be paid -- okay -- that was not -- under

20   tax sharing agreements, it was not used for tax.  My only

21   question is is he's already decided at this point.  I'm

22   going to ask questions about -- not to get ahead but have

23   they taken independent advice on this question.  You know,

24   as a PCH board member, would he object to this.  The

25   question is not what is the substantive answer today.  The

1    question for today is not what is the substantive answer to

2    this question.  The question is have they taken independent

3    advice and all I'm doing with this line is showing that

4    there are things that could be explored here.  That --

5    that's the only place I'm trying to go with this.  I don't

6    think we have to have a substantive answer to this question

7    today.  I think the question is has EFIH taken independent

8    advice on this from EFH or TCU.

9             THE COURT:  I don't think we need -- no, no, I

10   don't think we need to get into that.  The issue was one of

11   substance.  I think you've explored it.

12            MR. MARTIN:  Okay.  Thank you, Your Honor.

13            THE COURT:  You're welcome.  All right.  Any

14   further from the debtor -- debtors?

15            MR. MCKANE:  No, Your Honor, nothing further.

16   We'd just ask that Mr. Keglevic be excused from the

17   courtroom so that he can return to Dallas.

18            THE COURT:  Is there an objection to him leaving?

19   Very good.  Next one?  Sir, thank you very much.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  Hope you have a safe flight.

22            THE WITNESS:  Thanks.

23            THE COURT:  Do you want to save putting in

24   documentary evidence until the close of all testimony?

25            MR. MCKANE:  Your Honor, my understanding is that

1    even though we have these voluminous binders that members of

2    the debtors' team are working with members of the creditors'

3    teams to identify what would be a, hopefully, unopposed list

4    of exhibits that should go in so, yes, I would like to push

5    that off until the end of the hearing.

6              THE COURT:  That's fine.

7              MR. MCKANE:  Oh, yes, actually, Your Honor, as

8    part of the efforts to try to shorten the hearing, the

9    debtors and the EFIH first lien noteholders were able to

10   resolve whether it was necessary to call Mr. Horton to the

11   stand and last night, they were able to identify a very

12   short amount of deposition designations that they had

13   identified.  I mean, literally no less than 30 lines and, as

14   a result of that, Your Honor, we have no objection to

15   submitting the deposition designations of the EFI,

16   especially note holders of Mr. Horton, in lieu of his live

17   testimony.

18             THE COURT:  Okay.

19             MR. MARTIN:  How many copies would the Court like?

20             THE COURT:  One for me and one for Ms. Werkheiser

21   and one for the record so three.

22             MR. MARTIN:  Can I approach, Your Honor?

23             THE COURT:  Yes.

24             MR. MARTIN:  These are highlighted, Your Honor.

25             THE COURT:  Thank you.  Can you direct me?

1          MR. MARTIN:  They're a little bit interspersed,

2     Your Honor, because I think, as Your Honor asked at the

3     opening of the hearing, there's -- they had a question of

4     who Mr. Horton was and so we have a few questions about that

5     --

6          THE COURT:  Oh, yeah.

7          MR. MARTIN:  -- and then there are just a few

8     places --

9          THE COURT: Okay.

10         MR. MARTIN:  -- that -- but they're all

11    highlighted so they should be easy to find.

12         THE COURT:  All right.  Mr. Shore.

13         MR. SHORE:  I just have one evidentiary issue

14    while we're dealing with designations.  I'd just like to

15    read a request into the record from Mr. Keglevic's

16    deposition of October 3rd, 2014 which will make perfect

17    sense in light of the testimony.  On page 283 at line 9, I

18    said --

19         MR. MCKANE:  Your Honor?

20         MR. SHORE:  -- just so we're clear while we're in

21    a lull here, we ask that even the drafts or whatever the

22    latest draft of the board minutes with respect to anything

23    relating to the bidding procedures be produced.  I just want

24    a statement in the record that on October 5th, the debtors

25    were asked for the deposition -- or, sorry, the drafts of

1    any board minutes that Mr. Keglevic has testified he's

2    reviewed.

3              MR. MCKANE:  And, Your Honor, there was a response

4    by the debtors, by my partner, Ms. O'Connor, specifically,

5    as it relates to whether those draft minutes had legal

6    advice.  They are being prepared.  We objected to the

7    production of those draft minutes at that time.  That issue

8    was never taken forward by any of the creditors.  We all

9    know you're available with very little notice to get on a

10   phone call to resolve these types of discovery disputes so

11   that issue was engaged and then suspended.  So we do object

12   to the suggestion now that this wasn't an issue that had

13   been kind of at least initially framed.

14             THE COURT:  All right.  The record's clear as to

15   what happened and what the response was.  Just so the

16   record's clear, I've marked for identification Mr. Horton's

17   deposition transcript at 79.  I think that's where we are.

18   Okay.  Mr. McKane?

19             MR. MCKANE:  Thank -- and interim again from the

20   debtors, Your Honor, we'd like to leave just briefly our

21   record on our case open.  We're conferring with our client.

22   There may be one small evidentiary matter we need to

23   address.  We'll find out very shortly but I didn't want to

24   move to the objector's case without flagging that and I can

25   report back to the Court, hopefully.

1            THE COURT:  All right.  Well, my proposal was

2    going to be to break for lunch and then to turn to Mr.

3    Sawyer for his direct and --

4            MR. MCKANE:  That's hopeful.

5            THE COURT:  -- so before we re-start, it at the

6    end of lunch, you can tell me what -- what's going on --

7            MR. MCKANE:  Okay.

8            THE COURT:  -- and, if possible, confer to the

9    other -- with the other side.

10           MR. MCKANE:  We'll do that first.

11           THE COURT:  Okay.  So when you're out, we'll

12   reconvene at 1:30.  Okay?

13           MR. MCKANE:  Thank you.

14       (Recess at 12:33 p.m.)

15           THE BAILIFF:  All rise.

16           THE COURT:  Please be seated.  Go ahead.

17           MR. MCGAAN:  Andrew McGaan for the debtors, Your

18   Honor.

19           We don't have we don't have an issue remaining

20   open like I had thought.  So nothing to talk about.

21           THE COURT:  Thank you.

22       (Pause)

23           THE COURT:  Okay.  Sorry, Mr. Jonas?

24           MR. JONAS:  Good afternoon, Your Honor.  Jeff

25   Jonas from Brown Rudnick, and we would call Hugh Sawyer.

```
 1            THE COURT:  All right.

 2            THE CLERK:  Please raise your right hand.

 3       (Witness Sworn)

 4            THE CLERK:  Please state and spell your name for

 5   the record.

 6            THE WITNESS:  Huge, H-U-G-H, middle initial, E,

 7   last name Sawyer, S-A-W-Y-E-R.

 8            THE CLERK:  Thank you.

 9            THE WITNESS:  Thank you.

10   DIRECT EXAMINATION

11   BY MR. JONAS:

12   Q    Good afternoon, Mr. Sawyer.

13   A    Good afternoon.

14   Q    I think you know I'm Jeff Jonas from Brown Rudnick

15   representing WSFS as the T side second lien indenture

16   trustee.

17            Has anyone discussed with you or in your presence

18   anything relating to yesterday or this morning's trial?

19   A    They have not.

20   Q    Okay.  Have you met with Kirkland & Ellis lawyers last

21   night or this morning to prepare for your testimony?

22   A    I have not.

23   Q    Okay.  You were an outside director of Edison Mission

24   Energy, correct?

25   A    That's right.
```

1    Q    And Kirkland & Ellis was restructuring counsel to

2    Edison Mission Energy, correct?

3    A    That's correct.

4    Q    Kirkland & Ellis proposed you as an outside director

5    for that company, correct?

6    A    To the best of my recollection that is correct.

7    Q    Okay.  You were an independent director for another

8    company, Paradise Holdings, correct?

9    A    Correct.

10   Q    Kirkland & Ellis proposed you as an independent

11   director of that company, correct?

12   A    Yes.

13   Q    For Fisker Automotive Inc. you were chief administrator

14   officer, correct?

15   A    Yes, and, Counselor, chief restructuring officer until

16   the time the bonds were sold by the DOE.

17   Q    Thank you.  In that role you proposed that the company

18   hire Kirkland & Ellis as restructuring counsel, correct?

19   A    I did.

20   Q    And that company hired Kirkland & Ellis as

21   restructuring counsel, correct?

22   A    The board of directors and company management did hire

23   Kirkland & Ellis.

24   Q    On your recommendation?

25   A    Correct.

1  Q    You were an outside director for Heinz Horticulture,

2  correct?

3  A    Correct.

4  Q    Kirkland & Ellis was Heinz Horticulture's restructuring

5  counsel, correct?

6  A    They were.

7  Q    Mr. Sawyer, you're now an outside director of EFCH and

8  TCEH, correct?

9  A    Correct.

10 Q    Kirkland & Ellis proposed you as an outside director

11 for EFCH and TCEH, correct?

12 A    My understanding is yes, along with a slate of other

13 candidates.

14 Q    So Kirkland & Ellis proposed you as an outside

15 director, correct?

16 A    Yes.

17 Q    Okay.  You're the sole independent director on the

18 T side, correct?

19 A    That's right.

20 Q    And when I say T side you understand what I mean?

21 A    I do.

22 Q    Okay.  That's TCEH and the other entities on the --

23 what we refer to the T side of the corporate structure?

24 A    Yes.

25 Q    Okay.  As the -- as the independent director of the T

1    side you owe a fiduciary duty solely to the T side, correct?

2    A    Correct.

3    Q    T side means, in your view, stakeholders that are part

4    of the T side debtors, that is the first liens, the second

5    liens, and unsecured creditors, correct?

6    A    That has been my testimony, yes.

7    Q    Okay.  Now you appreciate, do you not, that my clients,

8    the second liens and other T side creditors, are depending

9    on you to take your fiduciary duties very seriously?

10   A    Yes, and I do.

11   Q    And you appreciate, do you not, that it is critically

12   important to T side creditors that you exercise due care and

13   spend all the time necessary to carry out your fiduciary

14   duty?

15   A    I do.

16   Q    And you appreciate, do you not, that it is also

17   critically important that you be well informed and focus,

18   focus on and understand key issues affecting T side -- the

19   T side and T side creditors, correct?

20   A    Yes, I do understand that.

21   Q    Do you know what the total T side companies revenues

22   were in 2013?

23   A    I do not know.

24   Q    Do you know what the total T side companies EBIDTA was

25   in 2013?

1    A    I do not know.

2    Q    Do you know how many total employees the T side

3    companies have?

4    A    I don't.

5    Q    Do you know how many T side locations or facilities

6    there are?

7    A    I do not know.

8    Q    Do you know how much debt is on the T side?

9    A    Roughly on the T side there is 34 billion, rough math.

10   Twenty-six billion at the first liens, roughly a billion six

11   in the second, and roughly 6 billion in the unsecureds.

12   Q    I just want to come back.  We talked about 2013, do you

13   know what the total T side companies revenues have been in

14   2014 to date?

15   A    I don't recall.

16   Q    How about EBIDTA to date in 2014?

17   A    I don't recall.

18   Q    Okay.  When you joined with EFCH and TCEH boards you

19   were told that the T side first lien creditors were

20   unsecured or under water by billions of dollars, correct?

21   A    Counselor, the T side first lien creditors, is that

22   your question?

23   Q    Well, I'm referring to effectively all creditors on the

24   T side you were told -- strike that.  Let me restate the

25   question.

1          When you first joined the EFCH and TCEH boards you

2     were told that the T side first lien creditors were

3     undersecured or under water by billions of dollars, correct?

4     A    I was told that the T side creditors were potentially

5     undersecured by billions of dollars, yes.

6          MR. JONAS:  Just bear with me, Your Honor, one

7     second.

8          THE COURT:  May I interrupt for just a moment,

9     because I meant to say it when I took the bench.

10         Just so the record is clear, I reviewed the

11    designated portions of Mr. Horton's transcript during the

12    lunch break.  Sorry to interrupt.

13         MR. JONAS:  That's fine.  Thank you, Your Honor.

14    BY MR. JONAS:

15    Q    Mr. --

16         MR. JONAS:  If I can approach, Your Honor, I have

17    some transcripts I'd like to hand up.

18         THE COURT:  All right.

19         MR. JONAS:  I'm going to put both in and we'll go

20    back and forth.

21         (Pause)

22    BY MR. JONAS:

23    Q    Mr. Sawyer, you were deposed twice in this case so far,

24    correct?

25    A    Yes, correct.

1  Q    It was on June 26th, correct?

2  A    Correct.

3  Q    And again on October 8th?

4  A    Yes.

5  Q    Okay.  And I handed you both transcripts, that is the

6  deposition transcript from both June 26th and October 8th.

7        I'd like you to look at the June 26th transcript,

8  page 61, line 4.  Do you see where I ask the question

9  beginning on line 4, "And you were told that the first liens

10 on the T side of the organization were impaired; is that

11 fair?"

12       Can you read your answer beginning on line 7, sir?

13       MR. MCGAAN:  Your Honor, object, this is not in

14 (indiscernible - 1:44:05) testimony.  There's certainly no

15 problem with the Court reading it as well as Mr. Sawyer, but

16 it's not -- but it's not -- I apologize -- but it's not

17 proper impeachment.

18       MR. JONAS:  May I respond, Your Honor?

19       THE COURT:  Yes.

20       MR. JONAS:  Your Honor, I apologize if I'm a

21 stickler for detail, but I think it's important in this

22 case.  His answer was he was told that first lien creditors

23 were potentially under water by billions of dollars, which

24 is not what he said at his deposition, and I think that's

25 relevant and important.

1        MR. MCGAAN:  His response refers to what he was

2    told and he continues to say that he was aware of the

3    questions since the valuation would be resolved by the

4    Court, which communicates to the questioner at the

5    deposition that there was no final answer and he didn't have

6    a final toons that.  So it's not inconsistent.

7        THE COURT:  Well, I disagree, I'll allow it.

8    BY MR. JONAS:

9    Q    Sir, beginning on line 7, could you read your answer to

10   my question, which I'll repeat again.  "And you were told

11   that the first liens on the T side of the organization were

12   impaired; is that fair?"

13   A    "I was told that based on the analysis that had been

14   performed at that time that the first liens on the T side

15   were undersecured by billions, and of course given my

16   background I was very much aware of the questions as of

17   valuation would ultimately be resolved by the Court."

18   Q    Sir, that means that when you first joined these boards

19   you were told that the second liens and unsecured creditors

20   were completely out of the money, correct?

21   A    It means that, it also means that I'm aware that

22   questions as to valuation will ultimately be resolved by

23   this Court.

24   Q    Sir, when you were told that the second liens and

25   unsecureds were completely out of the money did you ask for

1    any back up or documentation to support that contention?

2    A    I did not at that time, and nor did I predetermine that

3    outcome, Counselor, it's very early in the case.

4    Q    Mr. Sawyer, since this bankruptcy began other than a

5    single meeting several months ago with the T side first lien

6    creditors you've never spoken with any T side creditors,

7    correct?

8    A    I have spoken with their representative during

9    depositions.  I have not spoken directly to the T side

10   second lien or unsecured creditors.

11   Q    And you've never asked anybody to set up meetings with

12   any T side creditors, correct?

13   A    No.  As a former CEO in bankruptcy and former CRO in

14   bankruptcy I'm very well aware of the delegation of duties

15   that I've given to the two CROs in this case.

16   Q    In fact it's never crossed your mind to reach out to

17   the people that you say you have a fiduciary duty to to

18   inquire as to their desires and how they see this case,

19   correct?

20   A    I believe my testimony, Counselor, was it has not

21   crossed my mind at this time, because I have certainly

22   delegated duties to the CROs.

23   Q    But it's never crossed your mind to reach out to your

24   constituents; is that right?

25   A    Not at this time because I've delegated the reach out

1    to the CROs and their advisors.

2    Q    You don't have any intention of reaching out to

3    creditors on the T side do you?

4    A    I testified previously, Counselor, that at this time I

5    have not reached a conclusion as to the reach out because

6    I'm very well aware of the fact that I've delegated to the

7    two CROs and to the advisors to move this process forward on

8    behalf of the debtor.

9    Q    Well let me see if I got that right.  As we sit here

10   today in your mind you don't have any intention to try and

11   find out what your constituents think or want in this case,

12   right?

13   A    I think I have good knowledge of what the constituents

14   think.  I've certainly read your motions.  And to date it

15   has not occurred to me to reach out because I've delegated

16   my duties to the CROs and to the advisors, and I'm also, as

17   a former CRO and a former CEO, I'm extraordinarily sensitive

18   to stepping into the shoes of the CROs or the advisors in

19   this circumstance in compromising the duties that have been

20   delegated.

21   Q    Sir, which CROs have you reached out to?  I'm sorry,

22   strike that.  Which CROs have you delegated that duty to to

23   reach out to creditors?

24   A    We have two CROs in this case, Counselor, as I'm sure

25   you're well aware, they were appointed by the board in

```
1    October of 2013, two extraordinarily gifted CROs.  Stacey
2    Doré and Paul Keglevic.
3    Q    And which entities are they CROs of, sir?
4    A    EFH and all of their subsidiaries, the debtor.
5    Q    So they're CROs for the T side and the E side?
6    A    Yes, and I'm certainly not troubled by that, there are
7    no claims or issues that have ripened to this point.
8    Q    You don't -- you haven't had any direct communication
9    with any T side creditors' representatives I guess other
10   than at depositions, correct?
11   A    As I've previously testified, Counselor, I have had
12   conversations with the first lien creditors on the T side.
13   Q    And that was at that one meeting several months ago?
14   A    With Mr. Kornberg and participants on the first lien
15   side, yes.
16   Q    And you've never considered reaching out to the
17   professionals representing any T side creditors, correct?
18   A    As I've testified, I think consistently up until this
19   time, I believe that the CROs and their advisors are
20   representing the debtor and representing it well.
21   Q    Mr. Sawyer, let's just try my question, yes or no.
22        You've never considered reaching out to the
23   professionals representing any T side creditors, correct?
24   A    Up until this time I think no.
25   Q    Mr. Sawyer, Evercore and Kirkland & Ellis, they
```

1    represent EFH, correct?

2    A    They do and all of the debtors' subsidiaries.

3    Q    Well let me ask you, TCEH, the entity for which you're

4    an independent director, that entity does not have any

5    professionals representing it or its interest in your

6    opinion, correct?

7    A    I think Kirkland and Evercore represent the T side and

8    the constituents of the T side.

9    Q    Well now I'd like you to look at your deposition

10   transcript from October 8th.  Page 345.  We're going to look

11   at lines 7 through 10.  I'm going to read the question, I'd

12   like you to read the answer back.

13            "And does TCEH have any professionals that are

14   representing it or representing its interests -- interest?"

15   Could you read your answer at line 10, sir?

16   A    When I finds page 345 I will do so.

17   Q    Please take your time.

18   A    Yep.  And my answer was, "Not at the time, no."

19            And by that --

20   Q    Thank you, sir.

21   A    And by that I meant --

22   Q    Thank you, sir, your counsel will have an opportunity

23   to ask you further questions on your direct?

24   A    You're welcome.  Thank you.

25            MR. MCGAAN:  Your Honor, he answered the question

1    directly, but the witness just wants to explain

2    (indiscernible - 1:51:44).

3           THE COURT:  Well, generally I allow witnesses to

4    explain their answers if they so desire, and I generally

5    don't like counsel to interrupt witnesses while they're

6    answering.

7           MR. JONAS:  I'm sorry, Your Honor.

8           THE COURT:  If you'd like to answer -- or expand

9    upon your answer you may.

10          THE WITNESS:  Thank you, Your Honor.

11          My answer was in the context of the deposition

12   that the T side creditors do not have independent third-

13   party counsel at this time.  I fully recognize, Counselor,

14   they're being represented by K&E and by Evercore.

15   BY MR. JONAS:

16   Q    Mr. Sawyer -- I'm sorry, are you done?

17   A    Thank you.

18   Q    Thank you.

19          Mr. Sawyer, you don't know how much time on

20   average per week you spend in your role as an independent

21   director on the T side do you?

22   A    I believe I've previously testified that I do not

23   record my hours.

24   Q    And my question, sir, was you really don't have any

25   idea how much time per week you spend on T side matters as

1    an independent director?

2    A     I do not, no.

3    Q     For example, in September when the bid procedures

4    motion was being finalized and filed you have no idea how

5    much time you spent in your role as a T side director?

6    A     Well, I certainly am aware, Counselor, and thank you

7    for that question, that we had nine board meetings in July

8    and August, so I certainly spent that time, and I have taken

9    whatever time was necessary to fully inform myself as to

10   these matters.

11   Q     Well take a look at your transcript from October 8th,

12   page 350.  And by the way, we'll talk about the board

13   meetings quite a bit in a while, but let's --

14   A     Okay.

15   Q     -- take a look at page 350.

16   A     Sure.

17   Q     And if you look at line 13, and I asked the question,

18   "Okay.  And if I would ask you about the month of September

19   do you have any idea how much time you spent?"  And what was

20   your answer, sir, on line 16?

21   A     Almost there.

22   Q     Take your time.  Page 350, line 16.

23   A     The answer was, "I don't."

24   Q     Are you done?

25   A     Yeah.

1          THE COURT:  You don't need to be snarky.

2    BY MR. JONAS:

3    Q    At the board meetings you attended you never took any

4    notes, correct?

5    A    That's correct.

6    Q    In fact you never write anything down at all during

7    board meetings, correct?

8    A    That's right.

9    Q    You voted in favor of terminating the restructuring

10   support agreement in late July, correct?

11   A    Yes, I enthusiastically voted in favor of terminating

12   the RSA.

13   Q    When the debtors launched the marketing process in

14   August no board votes were taken approving that, correct?

15   A    To my recollection there were no votes taken approving

16   the marketing process, although the limited motion before

17   this Court clearly reflects the view of the board over these

18   nine meetings in July and August.

19   Q    Well if the boards didn't vote then the boards didn't

20   authorize initiation of an Oncor marketing process, correct?

21   A    The -- I don't agree with that.  I think the board

22   certainly did express its will to the management team and to

23   the advisors and to the CROs that we very much wanted this

24   marketing process to go forward in an attempt to maximize

25   the value of this estate, create optionality.

1    Q    I just want to go back for a minute to termination of

2    the RSA.  You recall that, correct?

3    A    I do.

4    Q    Okay.  And that was in July at some point?

5    A    On or about late July, that's right.

6    Q    Sir, since that time you haven't voted on anything else

7    at any board meetings or otherwise, correct?

8    A    No, and that's not in my judgment unusual, the process

9    is under way, the CROs and the advisors are doing their

10   work, the work that we've delegated to them.

11   Q    You're aware that the debtors have filed a bid

12   procedures motion, correct?

13   A    I am aware.

14   Q    You didn't read the bid procedures motion before it was

15   filed, right?

16   A    No, which is not at all unusual, it's the granular

17   aspects of the blocking and tackling of the process that's

18   under way.  It's not unusual that the board would not read

19   the bid procedures.  It absolutely reflects the

20   deliberations of the board and the determination of the

21   board to move to process forward.

22   Q    Sir, if you didn't read it before it was filed, at the

23   time it was filed how do you know that it reflected anything

24   the board had talked about or the board's wishes or anything

25   else?

```
1    A     Over nine board meetings and the give and take between

2    a board and advisors and management it was very clear that

3    they got it and understood the direction of this board.

4    Q     Do you recall participating -- I think you said it was

5    by telephone -- in the September 5th TCEH board meeting,

6    correct?

7    A     Yes.

8    Q     That was the final meeting at which the bid procedures

9    motion and the transactions contemplated thereby were

10   discussed before the filing in mid September, correct?

11   A     Yes.

12   Q     How long did that meeting last?

13   A     As I recall that meeting lasted an hour, but prior to

14   that meeting there had been extensive deliberation around

15   these issues over the course of roughly nine board meetings.

16   Q     You don't remember whether there were any PowerPoints

17   or other materials used at the September 5th board meeting

18   do you?

19   A     No, I don't remember, but that's not all that unusual,

20   Counselor, we'd had extensive conversation about the bid

21   procedures and the expanded marketing process.

22   Q     In connection with the September 5th meeting as an

23   independent director you didn't have any separate or private

24   meetings from the joint E and T side board meeting, correct?

25   A     No.  No, I didn't.  And again, not unusual, there's no
```

1    transaction contemplated here, there's no plan of

2    reorganization, there are no claims that have ripened.  No.

3              MR. JONAS:  Your Honor, may I approach, I just

4    want to turn that blow up around.

5              THE COURT:  I'm not sure if he was finished.

6              THE WITNESS:  I am, Your Honor.

7              THE COURT:  Okay.  Sorry.

8              MR. JONAS:  Sorry, Your Honor.

9              THE COURT:  No, that's all right.  Yeah, that's

10   fine.  Just recall if you're not at a microphone we won't

11   get you on the record.

12             UNIDENTIFIED SPEAKER:  (Indiscernible - 1:58:33).

13             THE COURT:  Oh, excellent.  Thank you.  Thank you.

14        (Pause)

15   BY MR. JONAS:

16   Q    Mr. Sawyer, I'd like you to take a look at what's Joint

17   Exhibit 27, which you have in front of you and I've blown up

18   there, which is still hard to read.  That's the board agenda

19   from the September 5th board meeting that we've been talking

20   about, right?

21   A    It is.

22   Q    And is that representative of an agenda that would be

23   prepared for any board meeting?

24   A    In part, yes.

25   Q    Well, I want to take a look at this one consist with

1    the meeting -- the final meeting before the bid procedures

2    were filed.  And if you just take a look with me on the

3    right-hand side down below there, do you recall those eight

4    lawyers from Kirkland & Ellis present at the meeting?

5    A    There are so many lawyers involved, Counselor, on both

6    sides of this, I don't recall if all eight were

7    participating in this call.

8    Q    Do you recall the eight people that are listed here

9    from Evercore, were they -- did they participate in the

10   meeting?

11   A    Oh, there they are.  I don't recall if each of the

12   Evercore participants listed here were in the meeting, but

13   given the record here I think they -- that the key

14   principals were a part of this discussion.

15   Q    And did --

16   A    And certainly -- Counselor, certainly had been for

17   weeks and hours leading up to this one discussion.

18   Q    And by the way, if you ever -- if I stop to interrupt

19   you please just speak up and I'll step back.  I --

20   A    Thank you.

21   Q    -- I apologize for that.

22   A    No worries.

23   Q    Just take a look at this piece of paper -- well, one

24   more -- I just want to confirm.

25            The T side and the E side, all those boards, they

```
1    were all at this meeting and on the call together, right?

2    A    Yes, they were, but not unusual since we were

3    discussing a process that could potentially generate value

4    for the entire estate.  Not unusual.

5    Q    I just want to take a look at the attendees.  Now under

6    the TCEH EFCH board, that's the board -- the boards on which

7    you are the independent director, right?

8    A    That's correct.

9    Q    And Mr. Young, he's on both the T side and the E side

10   boards, right?

11   A    That's right.

12   Q    And Mr. Acosta, he's on both the E side and the T side

13   boards, right?

14   A    Ms. Acosta --

15   Q    I'm sorry?

16   A    -- is on both boards, yes.

17   Q    And Mr. Keglevic, he's on both a T side board and an E

18   side board, right?

19   Q    He is?

20   A    Mr. Lebovitz, he's on both a T side board and an E side

21   board, right.

22   A    He is.

23   Q    Do you know, he is a managing director at Goldman

24   Sashs, one of the equity sponsors or owners of these

25   companies?
```

1    A    Yes, he is.

2    Q    Now, Mr. Michael MacDougall, he's on both the E side

3    and T side boards, right?

4    A    He is.

5    Q    And he's a partner at TPG, another equity owner, right?

6    A    He is.

7    Q    Mr. Ridlaw (ph), he's a director of KKR, right, you

8    know that?

9    A    I do know that.

10   Q    Okay.  Now, Jonathan Schmidt (ph), he's on both the T

11   side and the E side boards, right?

12   A    That's right.

13   Q    You know he's a partner at KKR?

14   A    I do know that.

15   Q    KKR is an owner or equity sponsor here?

16   A    That's correct.

17   Q    Okay.  Let's just take a peek quick at the other board

18   members on the EFH board side, Mr. Bonderman, he's a partner

19   at TPG, an equity owner, right?

20   A    That's correct.

21   Q    Mr. Ferguson, he's a managing director at Goldman

22   Sachs, an equity owner, right?

23   A    That's my understanding, yes.

24   Q    Mr. Freeman, he's a director at KKR, an equity owner,

25   right?

1    A    My understanding is yes.

2    Q    Mr. Pontarelli, he's a managing director at Goldman

3    Sachs, an equity owner, right?

4    A    My understanding is yes.

5    Q    The TCEH board -- just to confirm -- never voted on

6    filing the bid procedures, right?

7    A    No, they did not vote on filing the bidding procedures,

8    the narrow relief that the debtor is seeking here today.

9    Again, not at all unusual in my experience.

10   Q    The TCEH board never voted on the -- what's been

11   referred to as the optimal transaction structure set forth

12   in the bid procedures, correct?

13   A    No, and that optimal tax structure had been discussed

14   with the board on numerous occasions over many meetings

15   since last fall.

16   Q    The TCEH board never voted on the specific timing of

17   bidding as set forth in the bid procedures, correct?

18   A    Did not vote it, but we certainly did discuss it in our

19   deliberations over nine board meetings.

20   Q    TCEH board never voted on the mechanics of accepting

21   various bids at different stages as set forth in the bid

22   procedures, right?

23   A    I'm sorry, would you repeat that question, Counselor?

24   Q    Sure.  The TCEH board never voted on the mechanics of

25   accepting various bids at different stages as set forth in

1    the bid procedures motion?

2    A    Thank you.  No, we did not vote it, but we certainly

3    did discuss it at length during our deliberations.

4    Q    And you've stressed it a few times so I just want to

5    confirm that the fact that there were nine board meetings

6    around the Oncor sale to view the generalization, that seems

7    to be very important to you.

8    A    It is important to me in my role as a T side

9    independent director to carefully consider any potential

10   transaction or structure that would generate value, increase

11   the size of the pie for the estate, and furthermore to

12   consider any structure alternative that might impact the

13   success of a restructuring on the T side.

14   Q    Do you --

15   A    So yes, these discussions were important to me.

16   Q    You wouldn't miss any of these meetings would you?

17   A    No.

18   Q    Now it's true that in connection with the bid

19   procedures you never asked that a vote be taken on the

20   motion of the transactions contemplated thereby; that's

21   right isn't it?

22   A    That is right.  I considered it the blocking and

23   tackling of this process.

24   Q    If -- I'm sorry.

25   A    The early days of a process that would lead to a court

1    supervised process.

2    Q    It never even crossed your mind to ask that a vote be

3    taken, right?

4    A    No, in my experience it would be unusual for a board to

5    vote on bid procedures.

6    Q    Okay.  Well, we've talked about you, but in fact nobody

7    ever suggested that a vote be taken on the bid procedures

8    motion or the transactions contemplated thereby, correct?

9    A    That's correct, but the will of the board was well

10   known to the advisors and to the CROs.

11   Q    In fact none of all of these professionals, none of

12   them provided any advice as to whether or not it was

13   appropriate that there be a vote on the bid procedures; is

14   that right?

15   A    To my recollection that is correct.

16   Q    And there was no discussion among anyone at any time

17   relating to whether or not a vote should be taken on the bid

18   procedures or the transactions contemplated thereby?

19   A    To my recollection there was no discussion as to the

20   need to take a vote on the bid procedures, which we viewed

21   as a step in the process forward.

22   Q    Mr. Sawyer, when the bid procedures motion was

23   discussed at the September 5th board meeting you didn't say

24   a board did you?

25   A    I don't recall if I said a word or more than a word at

1    this particular meeting, but there had been much discussion

2    over the nine meetings in July and August, Counselor.

3    Q    Okay.  But this meeting was about six weeks ago; is

4    that right?

5    A    That's right.

6    Q    And you can't tell us as our fiduciary, that is

7    fiduciary for the T side creditors, whether you said one

8    word or not at that meeting?

9    A    I don't have a photographic memory as to what I said or

10   may have said in that meeting, but I certainly was an active

11   participant in the discussions along the path in July and

12   August.

13   Q    And you know what, I don't want to ask you about what

14   you said, I just want to know if you said anything at all.

15   A    Over the July and August meetings, Counselor --

16   Q    At the September 5th --

17   A    -- or the September 5th meeting?

18   Q    At the September 5th meeting, right before the bid

19   procedures got filed.

20   A    The September 5th meeting was the culmination of

21   several weeks of work and several hours of work.  I don't

22   recall today whether I said anything in the September 5th

23   meeting.  I think I've already testified that I was an

24   active participant in these discussions.

25   Q    Well, let me ask you, sir.  You never asked for any

1   analysis on what the impact would be on T side creditors if

2   the transactions contemplated by the bid procedures motion

3   were effective or occurred; that's isn't it?

4   A    That is correct, because we don't have a transaction to

5   contemplate today.  There is no transaction.  There no plan

6   of reorganization.  It's the narrow issue of the bid

7   procedures.

8   Q    So over these nine meetings that you say you've

9   participated in you never said, hey, I have to look out for

10  the T side creditors, I'd like to see some analysis that if

11  this transaction goes forward what the impact is going to be

12  on my constituents, you never did that?

13  A    I did not do it, because as I've already testified,

14  Counselor, I think it's premature, it's an illustrative

15  transaction.  When the time is right I'll consider the facts

16  in front of me.

17  Q    You never saw any analysis with respect to the

18  likelihood that an alternative transaction, that is

19  alternative to the tax-free spin on the T side, and when I

20  say that you know what I'm referring to?

21  A    I do.

22  Q    Okay.  So you never saw any analysis with respect to

23  the likelihood that an alternative transaction could be

24  successful, correct?

25  A    I did not, and as I've testified I think its early

1  days, we don't have a transaction in front of us, and when

2  the time is right I'll consider those issues.

3  Q    Sir, there was never any discussion in that regard was

4  there?

5  A    In regard to what, Counselor?

6  Q    Whether an alternative transaction could be successful?

7  A    I think that there have been much discussion along the

8  way, we don't have a transaction to discuss yet.  The term

9  sheet and the -- is very clear that it's an illustrative

10  term sheet, illustrative tax matters.  This is the narrow

11  issue of the bidding procedures.  There is no transaction to

12  consider today.

13  Q    Mr. Sawyer, I'd like to take a look at your deposition

14  transcript from October 8th, page 390, I'm going to start at

15  line 21 through the next page 391, line 16.  And let me just

16  read it and the see if you recall this testimony.

17          THE COURT:  All right, give me a minute.  390?

18          MR. JONAS:  Judge, it's 390, line 21, the

19  question, and it runs through 391, line 16.

20          THE COURT:  Okay.

21  BY MR. JONAS:

22  Q    Mr. Sawyer, are you there yet?  I just want to make

23  sure you get there.

24  A    391, Counselor?

25  Q    390?

```
 1    A    Okay, I got it.

 2    Q    Line 21.

 3    A    Yes, thank you.

 4    Q    Okay.

 5             "Q   Okay, have you seen any analysis with respect

 6         to the likelihood that an alternative transaction, that

 7         is a transaction alternative to the tax-free spin on

 8         the T side could be successful?

 9             A    I have not seen that analysis.

10             Q    And was there -- do you recall any discussion

11         in that regard?

12             A    No.

13             Q    And accordingly I take it as far as you

14         recall, none of the professionals provided you with --

15         again, I'm not asking for the substance -- but none of

16         them provided you with analysis of their opinions as to

17         the likelihood of success of an alternative

18         transaction?"

19             Ms. O'Connor objected to form.

20             You answered, question "No."

21             And I asked, "Did anybody ask for that?"

22             And you said, "No, not that I recall."  Do you see

23    that?

24    A    I do.

25    Q    So over these nine -- just to confirm -- over these
```

1    nine meetings that took place with respect to the

2    transaction that's before the Court today, nobody thought

3    about, asked questions, gave analysis, did anything with

4    respect to whether or not with -- strike that -- with

5    respect to the likelihood that an alternative transaction

6    could be successful, correct?

7    A    That is correct, but it does not trouble me, Counselor.

8    We have no idea sitting here today what this transaction may

9    ultimately look like, where the IRS may weigh into this

10   process.  It is still early days.  And as we have greater

11   visibility as to the transaction we'll consider the facts at

12   that time.

13   Q    Sir, you never suggested that someone analyze whether

14   or not the E side and the T side could be kept together,

15   that is to avoid the deconsolidation task whether or not

16   through a plan or otherwise the whole company could be kept

17   together have you?

18   A    I did not request that.  I've received extensive

19   feedback from K&E, which is reflected in the omnibus tax

20   filing, but no, I did not ask for that.

21   Q    You never got any advice with respect to the likelihood

22   of receiving a taxable bid that would provide more value

23   than a bid under the optimal tax structure, correct?

24   A    No, but I'm very open to any alternative structure and

25   any bidder as the debtors' filings clearly illustrate.  Any

1    bidder, any structure.

2    Q    Sir, at least as of last week -- two weeks ago I guess

3    at this point -- at your deposition you didn't know if even

4    a single T side creditor supported the quote/unquote optimal

5    transaction; isn't that right?

6    A    That's correct, and I think I also testified that I was

7    also very interested in the bidder reaction, and I have been

8    encouraged by the reaction of potential bidders, and as I

9    understand it we now have 12 NDAs under review.

10   Q    Are you more interested in the bidder reaction than the

11   concerns of your constituents?

12   A    Of course not, but I'm interested in any opportunity to

13   enhance the economic value of the estate that could

14   potentially inure to the benefit of the T side creditors

15   under the direction of this Court and the process that's

16   under way.  I have faith in the process that's under way.

17   Q    Do you understand that some of the T side creditors are

18   very sophisticated financial players?  Do you understand

19   that?

20   A    Yes, I do.

21   Q    Okay.  And wouldn't it help you to know what they think

22   about the transaction here today?

23   A    Any feedback from the T side is helpful, and I've read

24   the motions and think I have an understanding of those

25   motions and where they sit today.

1    Q    Sir, EFH is owned by among others TPG, KKR, and Goldman

2    Sachs, right?

3    A    They were the sponsors, that's correct.

4    Q    And generally in a bankruptcy, if you know, after

5    creditors are paid in full owner or equity get any remaining

6    proceeds, right?

7    A    Creditors are paid first in a bankruptcy subject to the

8    review of this Court and how the Court ultimately determines

9    to allocate those proceeds, and I'm certainly not going to

10    predetermine what the Court may do here.

11    Q    Okay.  But after the creditors get paid the general

12    rule is anything that's left would go up to equity, right?

13    A    The absolute priority rule that's typically the case,

14    subject to the administration of this Court.

15    Q    If the proposed Oncor sale or the sale of EFH

16    reorganized equity is widely successful and there's billions

17    of dollars of unanticipated proceeds from that sale, are you

18    with me?

19    A    I am.

20    Q    You don't have any inkling or idea how that value would

21    get over to the T side and T side creditors do you?

22    A    No, and there's a good reason for that.  We don't have

23    a transaction today, we don't have a plan of reorganization,

24    and it's in the Court's determination as to how to engineer

25    and allocate those proceeds to the various constituents.

1   I'm not going to predetermine what this Court may do.

2   Q    But that's the beautiful they thing of a hypothetical.

3   I'm asking you to assume that the transaction that's before

4   the Court goes forward.  Judge allows it, it proceeds,

5   widely successful, billions and billions of dollars more

6   than anybody expects.

7            How -- I'm asking you as the fiduciary for the

8   T side creditors -- how will any of that value that goes up

9   to E side and gets to the top and then you've got all the

10  equity over there, how is that money going to come benefit

11  your constituents before it goes out to the equity?  That's

12  my question.

13           MR. MCGANN:  Objection, Your Honor (indiscernible

14  - 2:17:39).

15           THE COURT:  I don't think I got a full answer.

16  Overruled.

17           THE WITNESS:  Thank you, Your Honor.

18           I think, you know, Counselor, that it's early in

19  this process, the outcome is yet uncertain.  I'm not going

20  to predetermine any outcomes.  I intend to maintain all

21  optionality as to how that value may be engineered to the

22  T side, and ultimately it's in the determination of the

23  Court and the process that's under way as it evolves, and as

24  other constituents step into the process, including the

25  bidder that's ultimately selected and the IRS to determine

1    those outcomes, it's up to the Court.  And as I've

2    previously testified, I have faith in the process.

3    BY MR. JONAS:

4    Q    You don't recall when the debtors launched the

5    marketing process in August, that is a determination of the

6    NextEra bid, if only the optimal tax transaction was being

7    proposed to bidders, correct?

8    A    And by that you mean proposed by the CROs and the

9    advisors?

10   Q    Whoever was talking to bidders.  You don't -- let me

11   just rephrase the question and make it easier.

12              You don't know if those folks, whoever they were,

13   when they were talking to potential bidders, you don't know

14   whether they were only suggesting the optimal transaction do

15   you?

16   A    Thank you.  I don't know if they did and I don't know

17   if they did not, but frankly, Counselor, I'm not concerned

18   about it, these are extraordinarily sophisticated bidders

19   who have their own advisors and all of the debtors'

20   documents are very clear that this debtor will consider any

21   structure, any alternative, any bidder.

22   Q    Well, let me try it this way.  Do you know whether at

23   the time the bid procedures motion was filed whether at any

24   time prior to that the debtors had expressed to bidders any

25   willingness to accept alternative transactions?

1    A    I don't know, and I think as I've testified, I don't

2    think it's consequential.  You know, these are very

3    sophisticated bidders, and the documents are extraordinarily

4    clear.  Any bidder, any structure.

5    Q    Wasn't this stuff getting discussed at all these board

6    meetings?

7    A    During the nine board meetings that took place we

8    discussed any number of issues, including the broadening the

9    marketing process, the bid criteria, the timing.  It all got

10   discussed.  But as to the specific conversations that

11   Evercore may have had or the CROs may have had with

12   individual participants, I wasn't on those calls, I don't

13   know what they told them.

14           But as I've testified, I don't think it's

15   particularly consequential to this process, the documents

16   are very clear, and clear, and they are extraordinarily

17   sophisticated bidders, they'll come to their own

18   conclusions.

19   Q    In the bid procedures motion there's a statement, and

20   this is at page -- I'm not going to show it to you -- but

21   it's at page 4, paragraph 5, I'll just quote it.  "The

22   debtors will continue to engage in a process to develop a

23   plan of reorganization with their stakeholders."

24           As the independent director on the T side you have

25   no knowledge whatsoever on what specifically the debtors

1    have done in connection with "engaging in a process to

2    develop a plan of reorganization with their T side

3    creditors," correct?

4    A    I don't, and as I've previously testified I'm

5    comfortable that I've delegated to the CROs and to

6    management to engage with the professionals and the T side

7    creditors, that is after all their duty, it's not the duty

8    of the board to step into those shoes.

9              As to the plan of reorganization and my opinion,

10   every step of this process moves us closer to a plan of

11   reorganization, and that's why I'm enthusiastic in support

12   of these bidding procedures.  It's an opportunity to move

13   the process forward, Counselor.

14   Q    You've never suggested that the debtors' professionals

15   sit down with the second lien and unsecured professionals to

16   develop a plan of reorganization, correct?

17   A    I haven't suggested that, I have great faith in the

18   sophistication of the advisors and of the two CROs, and

19   every step in this process potentially moves us closer to a

20   plan of reorganization.

21   Q    But, sir, do you understand that these people to whom

22   you've delegated all these duties, they're not fiduciaries

23   solely to T side creditors like you are?  Do you understand

24   that?

25   A    Yes, of course I understand that.

1  Q    Okay.  You're aware that on October 1st the debtors

2  filed their omnibus tax memorandum, correct?

3  A    I am.

4  Q    The tax memorandum was never discussed at all with the

5  TCEH board, correct?

6  A    The tax memorandum itself, and by that I think you're

7  referring to the omnibus tax memorandum, was not discussed

8  specifically with the board, but Counselor, over many, many

9  months the elements of that filing were discussed with the

10  board.

11  Q    You didn't review or read the tax memorandum until

12  after it was filed, right?

13  A    That's correct.  I read it after it was filed, but

14  there were no surprising -- surprises in the document.  We

15  had discussed the elements of that document for months.

16  Q    Okay.  So let me make sure I understand.  Your

17  testimony now is that you read -- strike that -- that the

18  substance of the tax memorandum was discussed with you, you

19  understood it, you had an opportunity to ask questions, and

20  you were satisfied with everything that was put forth in the

21  tax memorandum when it was filed.  Is that your testimony?

22  A    I don't think that's what I said.  I think I said that

23  the elements -- the key elements of that tax memorandum had

24  been discussed with the board, I was delighted that the

25  company filed it, I think it helps facilitate the

1    transparency in the process that's under way.  We did not

2    approve the filing, we did not vote it.  I don't think it

3    rose to that level.

4    Q    Well, I don't -- I don't want to hide anything from you

5    and I don't have a transcript, but let me try this out on

6    you --

7    A    Sure.

8    Q    -- and I'll do the best I can, but just bear with me.

9              Mr. Keglevic said -- and I wrote it down, I hope

10   it got it right -- that you as the independent TCEH director

11   carefully reviewed and considered the tax memorandum and its

12   implications for T side creditors.  Do you think that's

13   accurate testimony?

14   A    As you know --

15             MR. MCGAAN:  Your Honor, I object.

16             THE WITNESS:  -- I wasn't a part of the --

17             MR. MCGAAN:  Judge, I don't think that's what the

18   testimony was.  I think that he's referring to

19   Mr. Keglevic's testimony.

20             MR. JONAS:  Yes.

21             MR. MCGAAN:  And it fairness to the witness who

22   they asked to sequester, he wasn't here to hear that.  And

23   he ought to be asked what his views are.  If they think it's

24   different from something Mr. Keglevic said they can argue

25   that --

1          THE COURT:  Well --

2          MR. MCGAAN:  -- but the test is --

3          THE COURT:  Well --

4          MR. MCGAAN:  -- (indiscernible - 2:25:15).

5          THE COURT:  Can we simply ask the question without

6    -- whether you agree with it without attributing it to

7    someone?

8          MR. JONAS:  Absolutely, Your Honor.

9          THE COURT:  All right.  So why don't you reread

10   the question.  Mr. Shore?

11         MR. SHORE:  I might just add, it doesn't help to

12   sequester the witness, and what ends up happening we have a

13   speaking objection in front of the sequestered witness that

14   reveals the information ahead of time.

15         So next time if there's an objection I would just

16   ask that Mr. McGaan make the objection and then we can

17   discuss it outside the presence of the witness, otherwise we

18   just -- there's no point in (indiscernible - 2:25:55).

19         MR. MCGAAN:  Your Honor, that's hardly fair.  All

20   I said was the question mischaracterized the prior

21   testimony.

22         THE COURT:  All right.

23         MR. MCGAAN:  I did not say anything of substance

24   beyond that.  That's an absolutely proper objection, even in

25   the presence of a sequestered witness.

1              THE COURT:  Okay.  I do think that you said a

2      little more than that, so -- certainly not anything that I

3      would consider necessarily improper, but let's be careful of

4      that.  Now to a certainly extent the other side opened the

5      door by quoting -- or attempting to quote testimony that was

6      outside the witness's experience.  So the question itself

7      talks to the witness, the objection talks to the witness,

8      you know, it's sort of six of one, half dozen of the other.

9              But let's back it up, why don't you to re-ask the

10     question and simply ask the witness whether he agrees with

11     your statement, and then of course you can follow up.

12             MR. JONAS:  Happy to do that, Your Honor.

13     BY MR. JONAS:

14     Q    Mr. Sawyer, as the independent director on the T side

15     did you carefully review and consider the substance of the

16     tax memorandum and its implications for T side creditors?

17     A    No, I did not review the substance of the tax

18     memorandum itself, and by that I think you mean the omnibus

19     tax memorandum.  I certainly had been involved in many

20     discussions with the board and with K&E and the tax advisors

21     at K&E as to the substantial portion of that tax memorandum

22     over a period of months.

23     Q    And I really do want to move on, but I just -- I need

24     to have a clear record.

25             So the answer to that question as to whether or

```
 1    not as the independent TCEH director -- I'm sorry -- T side

 2    director you had carefully reviewed and considered the

 3    substance of the tax memorandum and its implications of the

 4    T side creditors, your answer was no?

 5    A    I want to be as clear as I can be, Counselor.  I had

 6    not read the actual tax memorandum before it was filed.  I

 7    certainly had considered the elements of the tax memorandum

 8    during numerous board meetings.  I hope that's clear.

 9    Q    Sir, you understand that there's a tax sharing

10    agreement between EFH and the T side entities, correct?

11    A    I do.

12    Q    The TCEH board has never considered its ability to

13    reject that tax sharing agreement, correct?

14    A    Not at this time, that has not been considered.

15    Q    Well it's never been considered, right?

16    A    Not up until the present day it has not been

17    considered.

18    Q    Do you know is it under consideration right now at the

19    TCEH board?

20    A    Not at this very moment, no.

21    Q    But it hasn't been up until this very moment?

22    A    No.

23    Q    Okay.  And the TCEH board has never considered whether

24    the tax sharing agreement might be a fraudulent conveyance,

25    right?
```

1    A    The TCEH board has considered any number of potential

2    claims that are part of this case.  As the independent

3    director I have received advice from both Sidley and from

4    K&E as to potential claims.  In my judgment those claims

5    have not yet ripened.

6    Q    Well who does K&E represent in this case?

7    A    As I've previously testified K&E represents all of the

8    debtors in the case, EFH and all of its subsidiaries.

9    Q    So your testimony is that in connection with the tax

10   sharing agreement K&E has given you advice as an independent

11   director of TCEH; is that right?

12   A    I believe I said that K&E has given advice as to

13   potential intercompany claims that might arise during the

14   pendency of this case.  Sidley has given advice as to

15   potential sponsor-related claims that might arise during the

16   pendency of this case.  I have concluded that those claims

17   have not yet ripened.

18   Q    Was Sidley representing solely TCEH?

19   A    Sidley was representing EFH and all of its

20   subsidiaries.

21   Q    Okay.  So just like --

22   A    And --

23   Q    I'm sorry.

24   A    That is my understanding.

25   Q    Okay.  So just like K&E, Sidley represents E side and T

1    side?

2    A    Yes.  But, Counselor, I'm not troubled by that in any

3    way at all at this point.  These are very potential

4    conflicts, they're not yet conflicts that have ripened to

5    the point where I have a concern.  I'm getting excellent

6    advice from K&E and I got superb advise from Sidley.

7    Q    Well, let me ask you.  Let's just talk about -- let's

8    break it down, the tax sharing agreement, right?

9    A    Uh-huh.

10   Q    That is a contract between parties, right?

11   A    That's right.

12   Q    And on one side is EFH, right?

13   A    Okay.

14   Q    And then the other side is TCEH, right?

15   A    Yes.

16   Q    And that contract provides contractually how taxes get

17   shared or allocated among the entities, right?

18   A    That's right.

19   Q    So if there was a claim on the TCEH side that the --

20   that the tax sharing agreement in one way or the other could

21   be undone, whether it's a fraudulent conveyance, whether

22   it's something else, any way it can get undone that's going

23   to have -- that's going to negatively impact the

24   counterparty, which is EFH, right?

25   A    Yes, hypothetically that's all correct, but you know,

1    as I've testified that claim has not yet ripened, if it does

2    I'll consider the facts and circumstances at that time and

3    my duties as the T side director.

4    Q    But you said you've already gotten some advice about

5    claims and rights relating to the tax sharing agreement from

6    either Sidley or K&E, right?

7    A    I have -- I think what I said, Counselor, is that I'd

8    received advice from Sidley as to sponsor-related claims,

9    and from K&E as to potential intercompany claims, but to be

10   clear, none of those conflicts have yet arisen where these

11   are hypothetical claims that are not in front of me today.

12   Q    Let's just talk about the tax sharing agreement.

13   A    Uh-huh.

14   Q    (Indiscernible - 2:32:27) the substance of the advice.

15        As the independent director on the T side did you

16   get any advice as to whether or not the tax sharing

17   agreement -- strike that -- with respect to the tax sharing

18   agreement?

19   A    I have gotten advice from K&E on any number of

20   intercompany claims, and of course as I'm sure is abundantly

21   clear to the Court, there's nothing in this limited motion

22   for the bidding procedures that precludes any future claims

23   that may ripen, Counselor.

24   Q    All right.  Well, let's -- I hear you, and I think

25   you're right, so let's look at the omnibus tax memorandum.

1    A    Okay.

2    Q    And before we get there just a couple leading

3    questions, then we'll take a look at it.

4         You're aware that certain of your constituents,

5    that is T side creditors, have asserted that the gain

6    arising from a taxable deconsolidation would consist largely

7    of capital gain and that the TSA, the tax sharing agreement,

8    does not allocate EFH's tax liabilities based on capital

9    gain, correct?

10   A    I am aware that that's been asserted.  I'm also aware

11   that the debtors' position is that all of the claims related

12   to tax matters are the responsibility of EFH, and if it's

13   not capital gains it could be an ordinary income gain.  But

14   as I think I've also testified it's still early days,

15   Counselor, we don't know where the IRS is yet on any of

16   these issues.

17   Q    You understand that if that was the case the T side

18   assets could be sold or spun off in a taxable transaction

19   and receive the benefit of a step up in basis, correct?

20   A    I believe that is correct, Counselor, up to the limits

21   of whatever capital gains were not deferred or removed.

22         But as I've also testified, I have been concerned

23   from the beginning of the case 'til today as to the IRS's

24   position in all of this.  We don't get to know what the IRS

25   may do, up to and including removing the benefit of any

1    potential step up in tax basis.  It is early, that issue is

2    not in front of me yet.

3    Q    Okay.  Well, you agree that if that was the case it

4    would be a huge economic benefit to TCEH creditors, right?

5    A    Hypothetically speaking under the jurisdiction of this

6    court and if the IRS did not change the tax laws

7    hypothetically it could be a potential gain to the T side,

8    but we don't know yet how that will be resolved.

9    Q    But that -- you'd be excited about that, right?  Those

10   are your constituents.  So wouldn't it be great if there was

11   a huge economic benefit to the TCEH creditors?

12   A    I'm also a realist, Counselor, I recognize that the IRS

13   will ultimately have to review all of this and will have to

14   determine it in collaboration with this Court.  I'm excited

15   about anything that potentially adds value to the T side

16   estate, assuming that we can get to a confirmed plan.

17   Q    See here's the thing, I don't want to take -- I don't

18   want to talk about the IRS at all, because I don't think we

19   need to talk about them right now.  I just want to talk

20   about the contract, the tax sharing agreement, your

21   testimony between EFH and TCEH.  Are you are me?

22   A    I am.

23   Q    Okay.  Now, certainly TCEH creditors have said that

24   their reading of the tax sharing agreement would result in

25   EFH not having the ability to effectively push tax down.

1    Are you with me?

2    A    I am.

3    Q    Now, don't you understand that -- strike that.  Doesn't

4    that pit the T side entities against EFH?

5    A    Potentially, it could.  It has not yet arisen today.

6    Those circumstances have not ripened.  I am also aware that

7    the debtor, to their credit, in my view, Counselor, was

8    extraordinarily transparent in the omnibus tax filing in

9    disclosing those issues in their filing that there are two

10   sides to these issues, that they're very complex and we

11   don't yet know how the IRS may opine.

12   Q    Well, let's take a look at the tax memorandum at

13   page 20.

14              MR. JONAS:  May I approach, Your Honor?  It's

15   Volume III, Your Honor, Exhibit 55.

16              THE COURT:  Thank you.

17   BY MR. JONAS:

18   Q    Page 20?  It's Exhibit 55, Volume III.

19   A    I'm sorry, Counselor, 20, page 20 --

20   Q    It's Exhibit 55 --

21   A    Yeah.

22   Q    -- and page 20.

23   A    Okay.  Thank you.

24   Q    And I just want you to follow along with me.  There's a

25   statement there about halfway down.  Starts on the left-hand

1    margin.

2    A    Okay.

3    Q    Regardless of whether or not the competitive TSA takes

4    capital gains into account, the debtors believe that all of

5    the EFH groups' consolidated tax liability is allocated

6    under the agreement and that if it is not allocated based on

7    relative amounts of capital gain, it should be allocated

8    based on relative amounts or ordinary income.  Do you see

9    that?

10   A    I do.

11   Q    Just want to read one more sentence.  Then it goes on

12   to state at a minimum, the debtors believe that under the

13   terms of the competitive TSA, each of EFIH, EFCH and TCEH or

14   its subsidiaries would be allocated a significant amount of

15   the deconsolidation tax liability based solely on their

16   ordinary income.  Do you see those statements?

17   A    I do.

18   Q    Now, when it says the debtors in both of those

19   sentences, that means all of the T side debtors and all of

20   the T side debtors, right?

21   A    That's right.

22   Q    And then when it refers to, at a minimum, the debtors

23   believe that under the terms of the TSA, each of -- and then

24   it refers to the debtors you're the independent director of,

25   EFCH and TCEH, they'd get stuck or allocated with the tax,

```
 1    right?

 2    A    Potentially under this hypothetical scenario, yes.

 3    Q    Well, here's my question, would you agree with me that

 4    these statements are adverse to EFCH and TCEH and to the

 5    T side creditors?

 6    A    No.

 7    Q    You don't think those statements are adverse and that

 8    these statements will yield a negative result; that is, the

 9    huge economic gain that you testified to?  If it was not

10    this case, they won't get the -- that benefit?

11    A    I -- Counselor, I did not think at the time I reviewed

12    this document that the statements were adverse.  I thought

13    they were transparent.  They went on to say the Court should

14    be aware that certain creditors may disagree with that

15    conclusion and I was particularly moved by the end of the

16    document where the debtor said they're not wedded to any

17    particular tax structure, we're willing to consider any

18    value-maximizing alternative a creditor or potential third

19    party acquirer would like to present.  I thought that was

20    transparent.

21    Q    And did you reach that conclusion by yourself or did

22    you have the benefit of some legal advice?

23             MR. MCGAAN:  Your Honor, object just to the form

24    of the question.  To the extent the examiner wants to

25    elicit, as he's been doing on occasion, that the witness met
```

1    with legal advisors, we don't have an objection but I think

2    this treads towards the content of advice that may have been

3    given and that's my objection to the form of the question.

4              MR. JONAS:  Not at all, Your Honor.  I don't want

5    to know the substance at all.  I just want to know when he

6    reached the conclusion he reached that these statements are

7    not adverse --

8              THE COURT:  Well --

9              MR. JONAS:  -- whether he had the benefit of legal

10   advice.  Maybe he did, maybe he didn't.

11             THE COURT:  All right.  I'll allow it.  Overruled.

12   BY MR. JONAS:

13   Q    Sir, when you reached the conclusion you testified to

14   regarding this paragraph on page 20 of the tax memorandum,

15   did you have the benefit of any legal advice?

16   A    I've had extensive legal advice from K&E's tax group

17   throughout my term here as an independent director.  As to

18   this specific matter, I reached my own informed conclusion

19   given that it's early days in the process, we don't have a

20   transaction.  We don't even know what the structure will be,

21   whether it'll be taxable or not taxable nor has the IRS

22   opined.  So, in answering your question, Counselor, I didn't

23   think this one statement was particular adverse in the

24   context of the entire tax memorandum.

25   Q    And last question, I'll move on, when you got that

1   advice from Kirkland and Ellis, were they representing EFH

2   or TCEH?

3   A    I think, as I've previously testified, Kirkland and

4   Ellis is representing EFH and all of its subsidiaries in

5   this matter.

6   Q    So you were advising both sides of the contract, the

7   TSA, on their rights and then being --

8          THE COURT:  Thought that was your last question,

9   you were going to move on.

10          MR. JONAS:  Fair enough, Your Honor.  Fair enough,

11   I'll move on.

12          THE COURT:  You're asking three, four times the

13   same thing.

14          MR. JONAS:  I apologize, Your Honor.  I will move

15   on.

16   BY MR. JONAS:

17   Q    Separate topic, tax related but completely separate,

18   you're not aware that the -- strike that.  You are aware

19   that the T side of the debtors' business produces net

20   operating losses, correct?

21   A    Yes.

22   Q    You don't know the magnitude of those NOLs, do you?

23   A    My understanding, Counselor, is the magnitude could be

24   in excess of two billion.

25   Q    Okay.  But fair -- at your deposition a week or so ago,

1    do you recall when I asked you, you said you didn't know the

2    magnitude?

3    A    And I have refreshed my recollection.

4    Q    Fair enough.  And at least at your deposition a week or

5    so ago, you didn't know how those NOLs are proposed to be

6    treated in connection with the debtors' optimal transaction,

7    right?

8    A    At the time of my deposition, I did not recall.

9    Q    Okay.  And you don't recall any discussion at the board

10   level about how those billions of dollars of NOLs would be

11   treated, correct?

12   A    I do not recall specifically but I certainly do recall

13   there has been much discussion as to these tax matters over

14   months of board meetings.

15   Q    Okay.  But you don't recall any discussions about the

16   NOLs, the billions of dollars of NOLs?

17   A    Not with specificity, Counselor.

18   Q    Okay.  And you were never provided any analysis

19   relating to the NOLs, correct?

20   A    I was not provided any analysis.  I have been informed

21   during the course of our deliberations that the potential

22   NOLs here would be overwhelmed by the gains but, of course,

23   as I've already testified, early days, we don't have a

24   transaction, we don't know what the structure will be.

25   Q    Mr. Sawyer, if an alternative transaction -- that is,

1    alternative to the optimal transaction -- got done such that

2    no step-up in tax basis was given up, that additional step-

3    up in basis would benefit the TCEH first liens, correct?

4    A    That's right, assuming the IRS did not act or the

5    treasury did not act in some way to remove that benefit.

6    Q    Nor to ask anybody to do an analysis to figure out the

7    magnitude of that, correct?

8    A    I have not personally asked for that analysis, that's

9    correct.

10   Q    So since you've been an independent director at TCEH,

11   you've never sought any independent advice; that is, advice

12   from professionals who are not also representing E side

13   debtors, correct?

14   A    I have not sought advice on these matters other than

15   from K&E and Evercore and at this point, I'm very satisfied

16   with the advice I've received.

17   Q    And, in fact, you've never considered seeking to attain

18   separate advisors as an independent director, correct?

19   A    I have certainly considered it in other circumstances,

20   Counselor, but not in this circumstance although I recognize

21   the potential where claims exist, those claims, in my view,

22   have not yet ripened.

23   Q    When you say other circumstances, what are you

24   referring to?

25   A    Oh, in my 37-year career as a CEO or CRO or board

1    member.

2    Q    Okay.  So just so we have a clean record, in this case,

3    you've never thought about getting independent legal advice

4    or other advice?

5    A    No, I don't think those conflicts have yet ripened.

6    Q    Okay.  And the way you're going to determine if a

7    conflict, to use your word, has ripened is when Evercore and

8    Kirkland and Ellis tell you there's a conflict.  Isn't that

9    your previous testimony?

10   A    As I recall, that's a portion of my testimony,

11   Counselor.  I -- Evercore and Kirkland would have a duty and

12   obligation in this circumstance to identify the potential

13   conflicts but after many decades of this, I believe that I

14   am perfectly capable of identifying when the conflicts

15   ripen.

16   Q    So are you now aware that a stipulation and agreed

17   order regarding a protocol for certain case matters was

18   filed with the Court on September 16th in connection with

19   resolving various objections to the debtors' retention of

20   certain professionals in other matters, right?

21   A    I am aware.

22   Q    Well, that stipulation was never presented to the TCEH

23   board, your board, for approval, right?

24   A    It was not and, as I've previously testified, I was not

25   troubled by that.  I think it's the CROs and the advisors

1  doing their work.

2  Q    The stipulation provides that you, as the independent

3  director at TCEH, are authorized to retain separate advisors

4  including separate from Kirkland and Ellis.  You're aware of

5  that?

6  A    I am.  They essentially negotiated a right that I

7  already knew that I had.

8  Q    Okay.  But I think as of a week ago at your deposition

9  which was about a month after the stipulation was filed, you

10  had never discussed the stipulation and your right to retain

11  separate advisors with any -- anybody, right?

12  A    No, I think if you'll read further in that deposition,

13  I did say that I've had privileged conversations with K&E as

14  to my right to retain independent third-party counsel but,

15  as I've also testified, I've known for many, many years,

16  Counselor, that I have that right.

17  Q    Well, let's just take a look at your October 8th

18  deposition, page 412.  That's your October 8th deposition,

19  page 412, and we're going to look at line -- it's page 412,

20  line 18 -- I'm sorry, to give it context, I'll have to back

21  up to line 6 and I'm just going to read this to you and see

22  if you recall this.  Question: "Again, my question, sir, is

23  you're not aware that a few weeks ago and no one's told you

24  in this case that a few weeks ago, the debtors bargained for

25  and negotiated a right for you.  Where you deter -- where

1    you determined that a potential conflict has become an

2    actual conflict, you are authorized to seek to retain

3    separate advisors of your choosing.  No one's made you aware

4    of that, have they?"  Was an objection to form and you said,

5    "Well" -- I'm sorry, and I said "Well, we can get one more

6    yes or no."  And you said "I do not recall that I was

7    advised that the T side debtors had negotiated this

8    stipulation and order.  However, I believe that I have the

9    right without the stipulation and order."  And I said "Okay.

10   I don't want to belabor this but now you said I don't recall

11   so I just want to know whether you don't recall within the

12   last few weeks anybody's advised you about the stipulation

13   or the answer is no, no one's discussed it with you."  And

14   your answer:  "I do not remember if anyone has discussed it

15   with me.  I do not believe that they have.  With or without

16   regard to the stipulation, I knew I had this right."  That

17   was your testimony?

18            MR. MCGAAN:  Objection, Your Honor, not

19   inconsistent.

20            THE COURT:  I agree.

21            MR. JONAS:  Well, I think it is inconsistent, Your

22   Honor.  He said he -- when I asked the question the first

23   time, he said that he had, in fact, discussed the substance

24   of the stipulation with Kirkland and Ellis and he already

25   says he didn't.

1           MR. MCGAAN:  The problem is --

2           MR. JONAS:  Sorry.

3           MR. MCGAAN:  The problem is, Your Honor, that Mr.

4    Jonas is confused discussing his -- Mr. Sawyer's discussion

5    of his right as an independent director to retain

6    independent counsel as opposed to discussing the actual

7    stipulation at this time.

8           THE COURT:  I agree.  I'll strike the question.

9    It's not inconsistent.

10   BY MR. JONAS:

11   Q    Mr. Sawyer, the stipulation also provides -- this is at

12   page 4, paragraph 7 -- that the debtors and Kirkland and

13   Ellis will facilitate the TCEH creditors' representatives'

14   diligence of the rights and potential claims, causes of

15   action and defenses of the TCEH debtors against or with

16   respect to other debtors.  At least as of your deposition

17   last week, you had no idea that that was the case, correct?

18   A    I believe I testified, Counselor, that I was not aware

19   that that specific stipulation but it's the sleeves off our

20   vest.  It's certainly consistent with my view of the way the

21   debtor should interact with seconds and the unsecureds.

22   Q    You've done nothing to facilitate the TCEH creditors'

23   representatives' diligence or investigation of any such

24   claims, correct?

25   A    I think, as I've previously testified as a former CEO

1    in bankruptcy and CRO, I'm particularly sensitive to the

2    roles and duties and obligations here.  In my view, the

3    debtors and the CROs and the advisors to the company should

4    certainly engage but I do not believe it would be wise for

5    me to step into those shoes.

6    Q    I'm going to change topics, Mr. Sawyer.  On July 17th,

7    you participated in a TCEH board meeting by telephone,

8    right?

9    A    Yes, I believe I did.

10   Q    And at that July 17th meeting as an independent

11   director, you had no private or separate meetings from the

12   full inside T side board meetings, correct?

13   A    Not that I recall.

14   Q    Do you recall attending a July 30th -- and I think it

15   rolled over to July 31st -- board meeting in Dallas,

16   correct?

17   A    I do.

18   Q    And at those meetings, as an independent director, you

19   had no private or separate meetings from the full E side/T

20   side boards, correct?

21   A    Not that I recall.

22   Q    You recall participating in an August 15th board

23   meeting, correct?

24   A    I do.

25   Q    Can I ask you with that meeting as an independent

1    director, you didn't have any separate or private meetings

2    form the full E side/T side board meetings, correct?

3    A    No, but that meeting culminated the weeks of prior

4    meetings, the nine prior meetings, and I did not have a

5    private session at that time.

6    Q    And, again, on September 5th, I think you've already

7    testified, just to wrap it up, no separate or private

8    meetings at that meeting?

9    A    No, because we were moving forward with the limited

10   motion before this Court to proceed with bidding procedures

11   and an expanded marketing process that had my support.

12   Q    Well, now, going back through July 17th which is the

13   first meeting I asked you about a few seconds ago, the only

14   board meetings you're aware of were on July 17th, July 30th

15   and 31st, August 15th and September 5th, correct?

16   A    As I recall, Counselor, in July and August, there were

17   roughly nine board meetings.  I believe that's correct.

18   Q    Well, I -- let me just be clear, I'm only talking about

19   July 17th, July 30-31 which we can count as one or two,

20   August 15th and September 5th.  That's only four or five and

21   my question, sir, is those particular meetings are the only

22   board meetings you're aware of or participated in, correct?

23   A    No, since my -- the time of my deposition, I've

24   refreshed my memory as to dates, Counselor, and I believe

25   during the July and August period, there were nine board

1    meetings.

2    Q    Okay.  But at your deposition about a week or so ago,

3    when I asked that specific question, whether those were the

4    only meetings you attended, July 17th, July 30-31,

5    August 15th, September 5th, your answer was "yup, those were

6    the only meetings", right?

7    A    At that time that was my recollection and, as I've

8    testified, I've refreshed my memory since that time.

9    Q    And I think you know the reason I asked you that

10   question was because we only had materials from those

11   meetings and I just wanted to make sure we weren't missing

12   anything.  Do you understand that?

13   A    I understand your question, yes.

14   Q    Okay.  Well, do you appreciate that because -- until --

15   I guess until the reply was filed late last week, to be

16   fair, when it made reference to a bunch of other meetings,

17   do you appreciate that your constituents couldn't prepare

18   for today's hearing because we didn't even know about the

19   rest of these nine board meetings you've testified to today?

20            MR. MCGAAN:  Object, Your Honor.  I don't know how

21   he would know about a corporation.  I mean --

22            MR. JONAS:  I can ask it another way, Your Honor.

23            THE COURT:  Okay.

24   BY MR. JONAS:

25   Q    If your constituents, people to whom you have a

1    fiduciary duty, were not informed about more than half of

2    the very important nine board meetings that support the

3    motion that is before the Court today, if we were not

4    informed about those meetings until effectively this

5    hearing, does that seem fair to you as a fiduciary for those

6    constituents?

7    A    I first believe that the T side creditors are

8    extraordinarily well representative, counsel, White and Case

9    and Brown Rudnick are very capable firms.  I can't --

10   because I'm not a lawyer, I can't speak to the fairness

11   question.  I don't know when you did or did not receive

12   those documents but, given my experience of -- with law

13   firms of this caliber, if you ultimately did receive them,

14   if you did, my expectation would be that you could review

15   those documents very rapidly.

16   Q    And what if we never, never until right now still

17   haven't seen anything relating to the meetings that took

18   place on, let's see, July 23rd, August 22nd, August 26th, if

19   we haven't got -- if there -- strike that.  Were there any

20   materials that you received with respect to the meetings on

21   July 23rd, August 22nd or August 26th?

22   A    I don't recall if I received Power Points or documents

23   in those meetings, Counselor.  I don't recall.

24   Q    Would you have gotten an agenda?

25   A    I believe I would have, yes.

1    Q    Okay.  Would you have gotten maybe some Power Points?

2    A    I don't recall if I did or did not.

3    Q    Do you ever get minutes after a meeting to review?

4    A    Yes.

5    Q    Did you get any meeting -- minutes from July 23rd,

6    August 22nd, August 26th?

7    A    I don't recall if I have yet received those minutes.

8    Q    So let me come back to my question --

9    A    Sure.

10   Q    -- and then I'll move on, I promise.  If we have not --

11   if your constituents have not received any documentation or,

12   in fact, any knowledge that board meetings took place that

13   support the motion that the debtors are putting forth --

14   hey, these meetings are very important, they're an

15   evidentiary foundation to the motion that's before the Court

16   today -- if we were kept in the dark about those meetings

17   and any materials used at those meetings, as our fiduciary,

18   do you think that's fair?

19            MR. MCGAAN:  Objection, Your Honor.  It's

20   argumentative and there's no foundation.  If they have a

21   complaint about the discovery process, they ought to take it

22   to the Court as they've done previously in their run-up to

23   this motion but I don't think it's fair to ask this witness

24   about the discovery process and whether it was fair to

25   counsel.

1           THE COURT:  Yeah, I --

2           MR. JONAS:  I'll move on, Your Honor.

3           THE COURT:  Okay.

4           MR. JONAS:  Well, if I have one minute, I think I

5     can wrap up.

6           THE COURT:  All right.

7           MR. JONAS:  I'm through, Your Honor.  Thank you

8     very much, Mr. Sawyer.

9           THE COURT:  Thank you.

10          THE WITNESS:  Thank you, Your Honor.

11          MR. SAWYER:  Actually, as -- can we take just like

12    five minutes --

13          THE COURT:  Sure.

14          MR. SAWYER:  -- and I'll get my own water.

15       (Recess at 3:00 p.m.)

16          THE CLERK:  All rise.

17          THE COURT:  Please be seated.  Thank you for your

18    patience.

19    CROSS-EXAMINATION

20    BY MR. SHORE:

21    Q    Good afternoon, Mr. Sawyer.  Chris Shore from White and

22    Case on behalf of the TCEH unsecured note holders ad hoc

23    group.  I want to go through some words we've been using

24    here and just get your definitions so that we understand

25    what your answers are.  With respect to what it means to be

1    an independent board director at TCEH and EFCH, you have no

2    special voting privileges as an independent director, do

3    you?

4    A    As an independent in a sense the director, not to my

5    knowledge.

6    Q    All right.  And you have no veto rights over any action

7    which TCEH or EFC -- the TCEH or EFCH board decides to take?

8    A    Not to my knowledge.

9    Q    And you've been given no special delegation over any

10   particular committees on either the TCEH or EFCH boards?

11   A    Not to my knowledge, no.

12   Q    And as of now, you don't have separate counsel?

13   A    That's correct.

14   Q    And as of now, you don't have separate advisors?

15   A    By that you mean financial advisors?

16   Q    Financial advisors --

17   A    That's correct.

18   Q    -- or tax advisors or anybody else?

19   A    That's right.

20   Q    Is there anything more to your independence, the

21   statement of your independence than that, unlike the other

22   directors on the EFCH and TCEH committees, you don't also

23   owe duties to E side estates and creditors?

24   A    As you know, I don't have a financial stake in this

25   outcome.  I don't have -- don't represent any of the other

1    sponsor companies.  I am disinterested and independent.

2    Q    Okay.  But there are other -- well, like Liz Acosta

3    fits that definition, doesn't she?  She's an independent

4    director of EFH, right?

5    A    But she's also conflicted given her duties to EFH.

6    Q    Right, so the difference between you and Ms. Acosta is,

7    unlike Ms. Acosta who owes duties to both E side estates and

8    T side estates, you only owe duties to T side estates?

9    A    I only owe a duty to the T side estates.

10   Q    Right.  Then you said -- one of the things you said,

11   it's too early in the case to address value of the TCEH

12   side.  When, in your view, is the right time for TCEH to be

13   understanding what the value are of its assets to be

14   distributed out to its creditors?

15   A    As the process matures, Mr. Shore, and, as we have a

16   transaction to consider, as we have greater clarity on the

17   tax matters, as we know where the IRS stands on certain of

18   these issues, there'll be a day and a time when we certainly

19   should consider value along with many other criteria that

20   will determine the outcome of this case.

21   Q    Was it too early then for you to have, as a TCEH and

22   EFCH board member, approve the RSA?

23   A    It was not too early to start a process, in my view.

24   The RSA was a process that began to move the company forward

25   to a confirmable plan.

1   Q    Uh-huh.

2   A    So no, it wasn't too early.

3   Q    Right, well, just so I understand what you understand

4   about the RSA, there's no creditor -- none of these

5   creditors came up and objected to the RSA.  Was it your view

6   that what was going to happen was the plan was going to

7   confirm based upon the metrics in the RSA?

8   A    My view was that the RSA served the purpose for which

9   it was intended.

10  Q    So, in other words, what you did was you said we're

11  going to turn over all the assets to the TCEH secured

12  creditors but if somebody comes forward to object to that on

13  the basis that that's based on a faulty valuation premise,

14  then those parties will be able to object in front of Judge

15  Sontchi?

16  A    I believe my testimony has been, Mr. Shore, that the

17  RSA was a catalyst to begin a process where the outcome was

18  as yet uncertain, that it would be a court-supervised

19  process and the RSA fulfilled its purpose.  It was a

20  catalyst.  We received a bid from NextEra so terrific.

21  Q    So what I'm saying is so I understand this, your agree

22  -- no, back up.  You understand that, as a director of TCEH

23  and EFCH, you approved an RSA transaction which would have,

24  absent some objection, turned the assets over on the T side

25  to the first lien creditors leaving unencumbered value to be

1    split up among all the rest of the unsecured credits?

2    A    And, as I've testified as to the allocation of that

3    value, that's in the purview of the Court.  The RSA was the

4    beginning of a process.  It was not the end of a process.

5    It was not a plan of reorganization, Mr. Shore.

6    Q    How would that process have changed in your mind if

7    none of the creditors stood up and said I think you got the

8    values wrong?  How would that process have changed?  Was it

9    in your -- and so let me, sorry, just ask a different

10   question.  In your mind, were you contemplating filing the

11   RSA and if some -- at some other time, you had done a

12   valuation, you were just going to pull the RSA even if

13   nobody had objected?

14   A    Mr. Shore, in my mind, it was too early in the process

15   to complete a -- a valuation.  Evercore had not yet

16   completed its valuation and we were still early days in the

17   process.

18   Q    But even without a valuation and even though it was

19   early days in the process, you committed EFCH and TCEH to a

20   transaction -- when I say you, the boards committed TCEH and

21   EFCH to a transaction which would have turned over all the

22   assets to the first lien lenders and you voted, as the

23   independent director, in support of that RSA?

24   A    I voted in support of the RSA.

25   Q    Okay.  And then you used the word ripened with respect

1    to conflicts.  What do you mean by ripened?

2    A    The conflicts are potential.  Those conflicts have not

3    yet ripened.  To my knowledge, the claims have not been

4    filed and, Mr. Shore, I'm aware of nothing in these limited

5    big procedures that would prohibit my constituents from

6    filing their claims and adjudicating to a result in this

7    Court.  As I've also testified, I have faith in that

8    process.

9    Q    I'm just asking for your definition, sir.  I said what

10   does ripened mean.  You gave me one thing, that a claim has

11   -- a claim would need to be filed for it to be ripe.  Is

12   there anything else that would have to happen for a

13   potential conflict to ripen to an actual conflict?

14   A    If you're asking for a legal definition, I'm not

15   qualified to give you that legal definition, Mr. Shore.

16   Q    Sir, you answered the question which was the claims

17   haven't ripened.  I just need to know in your mind, what did

18   you have in mind as to what has to happen to take a

19   potential conflict and make it a ripe conflict?

20   A    In my experience, the conflict ripens when a suit is

21   filed.

22   Q    Okay.  Anything else that needs to be done to take a

23   potential claim -- or potential conflict and make it a ripe

24   conflict besides a suit being filed?

25   A    That's a pretty good example, Mr. Shore.

```
1    Q    Anything else?  What about a determination as to

2    whether to even file a suit?  Did that present a ripe

3    conflict?

4    A    And can you expand on that, please?

5    Q    Sure.  If PCH were having to determine whether or not

6    to pursue claims against its affiliated debtor, just the

7    consideration, would that be a ripe conflict?

8    A    Potentially and depending on the facts and

9    circumstances at the time --

10   Q    Uh-huh.

11   A    -- depending on standing motions that may have been

12   filed with this Court and we'll consider the facts and

13   circumstances when they're in front of us.

14   Q    Okay.  How about filing a pleading with the Court in

15   which you're asserting or waiving a defense that TCEH has?

16   A    I don't know the answer to that question.

17   Q    Okay.  So it's in your mind possible that there would

18   not be a conflict if one of the fiduciaries who owed

19   conflicting duties to two estates came out in court in a

20   filing and made representations with respect to the strength

21   or weakness of one party's legal defense, one debtor's legal

22   defense?  That's not a ripe conflict to you?

23   A    It may not be a ripe conflict, Mr. Shore.  I would

24   depend  advice of counsel and advice of the other advisors.

25   I would depend upon advice of the general counsel to the
```

1    company, all of whom have a duty to identify those conflicts

2    and then make decisions on the facts and circumstances at

3    that time.

4    Q    That's what I'm getting at.  From the perspective of

5    you, as an independent director, what you think happens in

6    your mind is until the fiduciary with conflicting duties

7    comes to you and tells you there is a conflict here, you're

8    going to operate in your normal course as if a conflict

9    doesn't exist?

10   A    I don't think I said that.  I think I testified earlier

11   today that after 30 odd years at this, I think I'm able to

12   identify when the conflicts have arisen.

13   Q    But though that's why I asked you, because you said

14   certainly, when a suit has been filed but you can't give me

15   any more definitiveness to an act which definitely would

16   lead to a ripening of a conflict beyond the actual filing of

17   the suit?

18   A    And, of course, we're speaking here about hypothetical

19   circumstances, Mr. Shore.

20   Q    Uh-huh.

21   A    I don't have the facts and circumstances in front of

22   me.

23   Q    All right.  Another word you used was you used two

24   words, board approval and board votes.  Is there a

25   distinction in your mind between what a board approves and

1   what a board votes on?

2   A    And can you give me the context, please?

3   Q    Sure.  Is it possible in your mind that the board of

4   TCEH or EFCH could approve a corporate action without voting

5   on that action?

6   A    In my experience, the board certainly can express its

7   will.  It can express its view of circumstances.  It can

8   direct and delegate the management teams and to CROs without

9   direct -- without taking a formal vote.

10  Q    Okay.  So I get the delegation.  In your experience,

11  you've delegated specific board responsibilities to officers

12  and directors of corporations, right?

13  A    Certainly.

14  Q    Okay.  And you've been in situations in which you vote

15  on certain actions, corporate actions, to be taken, right?

16  A    Yes.

17  Q    All right.  So what's this middle concept which is

18  expressing your will?  How does a board express its will

19  other than through a vote to take a corporate action or a

20  delegation of a duty to some -- have someone else take the

21  corporate action?

22  A    In this circumstance dating back to October of 2013, I

23  think the board did delegate to the two CROs the

24  responsibility to move this case forward and I think that's

25  precisely what they're doing.

1    Q    And that was -- going back there, that was the

2    delegation to the CROs to pursue the RSA, right?

3    A    No, not in my opinion.  It was the delegation to the

4    CROs to pursue the plan or reorganization to move the case

5    forward.

6    Q    Okay.  And were there any restrictions on the ability

7    of the co-CROs to pursue a plan in this case that required

8    them to come back to the board for anything?

9    A    I don't recall the specific nature of the delegation of

10   duties or if at that time the board defined in the normal

11   course the circumstances under which the CROs would come

12   back.  However, over the pendency of this case, they have

13   come back on innumerable occasions to update this board and

14   to discuss the case.

15   Q    Okay.  So I'm clear, can you recall an instance in

16   which post petition, either TCEH or EFCH delegated to either

17   of the two CROs the responsibility for marketing the assets

18   of Oncor?

19   A    I don't recall that we specifically delegated the

20   responsibility for marketing the assets of Oncor.  However,

21   in my view, that's the normal process that occurs inside of

22   a bankruptcy and was an aspect of the duties of the CROs and

23   the advisors.

24   Q    Okay.  And leave aside delegation for a second, at any

25   time did the board vote, the TCEH or EFCH board vote to

1    authorize the corporate action of taking the Oncor stake and

2    marketing it?

3    A    Not to my recollection.  We did not vote.

4    Q    Okay.  And a number of these meetings have been joint

5    meetings so let me ask you, as a -- sitting in the joint

6    meetings, do you recall that any of the debtors' boards were

7    asked to vote on whether or not to take the assets, the

8    Oncor stake, and market it?

9    A    I don't believe we did and at that point, my judgment

10   was that the interests of the estates were aligned in an

11   attempt to maximize the economic value of Oncor.

12   Q    Let me read you a sentence and ask you if you can agree

13   with it.  On July 23rd, 2014, the debtors' boards of

14   directors and managers voted to pursue a marketing process

15   and option for the economic interests in Oncor.  Is that a

16   true statement?

17   A    I don't recall that that vote took place.

18   Q    So you can't tell me whether it's true or not?

19   A    I cannot.

20   Q    All right.  So let's talk about the -- I was talking

21   about the decision to take the assets out to market.  At no

22   time have you heard any deliberation at -- well, sorry.

23   Have any of the boards voted post petition not to market the

24   assets at this point?

25   A    No.

1    Q    Okay.  And you don't recall any discussion at the board

2    levels as to whether or not you should just not pursue a

3    sale of the Oncor stake at this time?

4    A    I think the boards determined, as I've previously

5    testified, that it was a good time to proceed to market.

6    Q    Right, and it was not -- you can't say that it's the

7    optimum time to proceed to market, right?

8    A    Nobody can predict the future, Mr. Shore.

9    Q    Right, but you believe that after getting the advice

10   you got, you came to the conclusion that it's a good time to

11   market?

12   A    I did.  It's a good time.  The --

13   Q    Now, can you answer my question, at any time did the

14   boards consider the issue of whether not to -- as an

15   alternative to going out and marketing, just not taking the

16   Oncor asset out to market right now and waiting until the

17   plan process, for example, developed further?

18   A    In our deliberations at the board level, we considered

19   any number of potential alternatives up to and including the

20   NextEra bid and the timing of potential marketing.

21   Q    Well, and those are -- considering the timing, the

22   marketing and the NextEra bid are related to a marketing

23   process, right?

24   A    Yeah.

25   Q    I'm asking a different question.  At any time, did the

1    boards consider just you know what, let's just not do this

2    right now, we don't need to pursue the sale of the Oncor

3    stake, let's just get on with the case?

4    A    I don't recall that we did because, on the advice of

5    Evercore and the -- our CROs, we felt that this was

6    certainly a good time to move the process forward in an

7    attempt to get to a confirmable plan.

8    Q    Let's -- let me understand when we talk about the

9    pursuit of the transaction and the IRS.  Just from your

10   perspective, everything you know as a board member, if the

11   IRS had come out -- you understand that, as part of the RSA,

12   the IRS was questioned as to whether they would approve

13   certain types of tax-free transactions?

14   A    I understand that the debtor has asked for a private

15   letter ruling.

16   Q    If the I -- maybe -- I know it's a hypothetical

17   question but maybe you can answer for me.  If the IRS had

18   come back today and said we are not approving any

19   transaction like this, is it your view that the board would

20   be out marketing the Oncor stake in a tax-free transaction

21   right now?

22   A    I -- that is a hypothetical question that's not in

23   front of me today and I have not considered that question.

24   Q    Well, I just -- what I'm trying to get at is I take it

25   that your belief that you can do a tax-free spin is one of

1    the material considerations you've given to deciding to take

2    the assets out to market right now, right?

3    A    Yes, but, equally as important, Mr. Shore, was the

4    emphasis to begin the process, get the asset into the market

5    and, as I've testified here already today, I've made no pre-

6    determined outcome.

7    Q    No, can I --

8    A    I don't know if this transaction will be taxable.  I

9    don't know if it will be tax-free spin.  Let's see what the

10   market will bear.

11   Q    Well, but I'm coming -- that's what I'm getting at.  If

12   the only thing the board could do right -- let me start --

13   let me back up.

14   A    Uh-huh.

15   Q    Do you have -- have you heard anything at the board

16   level as to whether the Oncor stake is a melting ice cube or

17   an asset at substantial risk of devaluation in the near

18   term?

19   A    I have not but I certainly have heard that it could

20   take 12 to 18 months to get regulatory approvals.  So,

21   knowing that this is a good time --

22   Q    Uh-huh.

23   A    -- to enter the market, I'm very much in favor of

24   beginning this process and want to begin the process.

25   Q    Okay.  So you understand that one of the ways in which

1   a debtor can dispose of its assets is in a 363 sale, right?

2   A    I do understand that.

3   Q    And, just so I understand it, did the -- either of the

4   boards, either the TCEH or the EFCH boards or any of the

5   boards under whom -- with whom you had joint meetings, was

6   there ever a discussion we need to sell this Oncor stake in

7   a 363 sale, tax consequences notwithstanding?

8   A    Not that I recall.

9   Q    Okay.  So I'm getting at it, isn't the question of tax,

10  what tax gets generated, where that tax lies and everything

11  else, part of the material determination in whether or not

12  to even seek to market this asset right now?

13  A    No, I think it's more relevant to determine what the

14  transaction will be and then understand what tax

15  consequences of the proposed transaction is all within the

16  supervision of this Court.  So the IRS is not going to rule,

17  Mr. Shore, on a hypothetical circumstance.

18  Q    Uh-huh.  No, but what I'm trying to get at is how much

19  of the -- this tax issue we need to chop wood on right now

20  which is it sounds like what you're saying if the only thing

21  before the board right now was a 363 sale leading to a

22  taxable transaction and a triggering of a capital gain on

23  the E side of the house, the boards wouldn't be seeking to

24  -- or, sorry, the debtors wouldn't be seeking to sell this

25  asset right now?

1    A    I think what I said was that in order to determine

2    where the IRS stands --

3    Q    Uh-huh.

4    A    -- on the tax issues, we need to have a transaction to

5    present to the IRS and it's very likely that the structure

6    and the alternatives could evolve as the IRS opines on the

7    application of the taxes here.

8    Q    All right.  Can you turn to the tax memorandum, is, I

9    think, 55, and page 20?  I just want to ask one follow-up --

10   or not one follow-up but a couple of follow-up questions

11   and, again, it's that full paragraph on page 20.

12   A    Yup.

13   Q    I asked you about this at your deposition, right?

14   A    You did.

15   Q    And in that sentence that begins regardless of whether,

16   isn't it a fair characterization of that statement, at least

17   from your view, that what it says is even if the TSA does

18   not make EFIH liable for the capital gains taxes or EFIH and

19   TCEH liable for the capital gains taxes, the debtors believe

20   their in intent was always that that would be the case?

21   A    And I think I testified at the time during my

22   deposition that it was a fair reading.  I think I testified

23   to that fact.

24   Q    Uh-huh.  Now, just so we're clear, in your mind, the

25   statement of counsel for both TCEH, EFIH and EFH about what

1    the contract does or does not say and what their subjective

2    intent was all along is not a ripe conflict?

3    A    I do understand that and I think the debtor has also

4    taken the position that ordinary income could be forced into

5    this docket and I think the document itself is

6    extraordinarily clear that we don't know yet, no one knows

7    yet.  No one knows what the IRS is going to do here.

8    Q    Can you answer my question?

9    A    Okay.

10   Q    In your definition of ripe, is that a ripe conflict

11   right now?

12   A    I do not yet believe this is -- this conflict has

13   ripened.

14   Q    All right.

15   A    And nor do I believe that the issue before this Court

16   in any way would limit claims to be filed by the T side.

17   Q    So I understand this concept, you haven't taken a vote

18   on the taking the assets out to market but -- and I want you

19   to be careful and I can repeat the question if you need to,

20   did the directors of any of the debtors exercise their

21   business judgment to have the debtors taking corporate to

22   begin marketing the Oncor estate or was that business

23   judgment exercised by the officers of the company?

24   A    Over the course of those nine board meetings, the

25   expanded marketing was well known and highly deliberated by

1   all of the boards.  The advisors and the CROs gave extensive

2   advice to the board.  Whether it was approved or voted, the

3   motion that's before this Court is extraordinarily clear and

4   representative of the will of the board.

5   Q    Well, let's start this, you understand that

6   corporations can only act through people, right?

7   A    I understand that.  Thank you.

8   Q    All right.

9   A    Yeah.

10  Q    And do you understand that the -- what's before the

11  Court is the question of whether the debtors exercised their

12  business judgment in seeking to take the assets out to

13  market?

14  A    I believe the CROs had been delegated the authority to

15  move this process forward and I think this -- the motion

16  before this Court, this narrow issue before the Court, was

17  certainly within the authority of the CROs to proceed to

18  market those assets and to submit those bidding procedures,

19  all of which were entirely consistent with the imperative of

20  the board.

21  Q    Right.  So just so I can get the answer that's posed,

22  whatever, did -- as I understand your testimony, the boards

23  expressed their will, right, and their approval but the

24  business judgment as to whether to take the assets out to

25  market right now as opposed to some other time in the future

1    was made by the CROs as far as you know?

2    A    And in this circumstance, how are you defining business

3    judgment?

4    Q    The corporation is taking an action.  You understand

5    that it's been out to market already, it's sent teasers out

6    to people, it's met with people, it's got call logs going on

7    and all that.  That's corporate action.  Who decided that

8    that corporate action would be taken?

9    A    I believe, I think, as I've testified, that the CROs

10   and the advisors, with the full knowledge and understanding

11   of the board --

12   Q    Uh-huh.

13   A    -- proceeded to market those assets.

14   Q    Okay.  So it was the officers who made the business

15   determination, in your view?

16   A    It was the CROs of the company in full collaboration,

17   full knowledge, full understanding, of the board, Mr. Shore.

18   Q    But -- okay.  I mean, I don't mean to be semantic,

19   you're a professional board member, right?

20   A    No.

21   Q    How many boards do you sit on right now?

22   A    Three.

23   Q    Okay.  And how many boards have you sat on over time?

24   A    Thirteen.

25   Q    Okay.  And so in the context of 13 boards, do you

1    understand there's a distinction between the knowledge of

2    the board and the assent of the board or the will of the

3    board and an actual corporate resolution voted on by board

4    members?

5    A    I do.

6    Q    One puts you in the hot seat -- that is, that when you

7    take a vote, you're in the hot seat -- and the other means

8    somebody else is in the hot seat, right?

9    A    Yes.

10   Q    Okay.  And here, who's in the hot seat on the decision

11   to take the assets out to market?

12   A    Well, I'm feeling the hot seat today, Mr. Shore --

13   Q    Sorry.

14   A    -- just for the clarity of our record --

15   Q    Uh-huh.

16   A    -- but the CROs fulfilled their duty and their

17   obligation with the full knowledge and will and direction of

18   the board.

19   Q    Can you answer my question?  Does that mean the CROs

20   here on the hot seat on this one?

21   A    I'm a little uncomfortable with that characterization

22   --

23   Q    Sorry.

24   A    -- but there was no resolution, there was no vote taken

25   to my knowledge.

1    Q    How about this one, let's get away from the hot seat,

2    the buck stops with the CROs on this one?

3    A    I -- my understanding is the buck will stop with the

4    CROs and the board, ultimately, as to the adjudication of

5    this process.

6    Q    Not just, again, the process.  We're going to get to

7    it.  If the -- there's no board resolution on the approval

8    of a stalking horse agreement, we're going to have a whole

9    separate issue.  I assume the board's going to do that.  I'm

10   talking about the decision to take it out to market.

11   A    My recollection, Mr. Shore, is the decision to proceed

12   with the marketing --

13   Q    Uh-huh.

14   A    -- was made with the full knowledge and agreement of

15   this board.

16   Q    By --

17   A    The CROs after full discussion, disclosure,

18   deliberation at the board.

19   Q    Okay.  As a board member in giving your assent or

20   approval or your will with this transaction, on whom did you

21   rely for financial advice regarding the state of the

22   markets?

23   A    I relied on the CROs and Evercore.

24   Q    Okay.  And on whom did you rely for legal advice on tax

25   issues?

1    A    Kirkland.

2    Q    And on whom did you rely for legal advice that claims

3    that TCEH might have against other debtors?

4    A    As I've previously testified, Kirkland.

5    Q    On whom did you rely for the rationality of the bid

6    procedures?

7    A    I relied on the advisors and I relied on the CROs.

8    Q    And on whom did you rely for financial advice on any --

9    with respect to the risks of not selling Oncor at this time?

10   A    I relied on the CROs and on Evercore but, as I've -- as

11   we've already -- as I've already testified, Mr. Shore, there

12   is no transaction.  There is no transaction.  There is no

13   plan of reorganization.  There are no claims that have

14   ripened, to my knowledge.  We don't have a ruling from the

15   IRS.  These -- this narrow issue of the bid procedures is a

16   start to the process that, in my view, will lead to a

17   conclusion on all these matters.

18   Q    What did you do to educate yourself with anything about

19   the fee structure for Evercore if this transaction is

20   consummated?

21   A    I have not educated myself as to the fee structure at

22   this time.  Once I have a transaction to review, I'll

23   consider it.

24   Q    Well, you -- Evercore has been telling you, have they

25   not, that the company should be marketing the Oncor stake?

1    A    Yes and so have the CROs in this circumstance and so   -

2    - and I believe Kirkland also broadly considers that view as

3    well.

4    Q    Okay.  I just want to focus on Evercore for a bit.  Do

5    you understand Evercore has also been talking to the CROs

6    with respect to whether or not to sell the assets right now?

7    A    Yes.

8    Q    Okay.  And do you have any idea how much Evercore is

9    going to earn if a transaction is pursued here?

10   A    I do not know specifically, no, no do I nor -- nor do I

11   know how much the attorneys will earn in this circumstance.

12   Q    Just to clarify, as a board member, have you seen any

13   written analysis of any risks to the Oncor stake if you

14   don't market it now?

15   A    I have not.

16   Q    Have you seen any written analysis which sets forth any

17   of the metrics around this being a good market such as any

18   analysis of the credit markets or the equity capital markets

19   or anything like that?

20   A    I haven't nor have I seen anything to the contrary from

21   the advisors but I'm well aware that the debt markets are

22   flush and equity markets are stable and, as I think I've

23   previously testified, it's a good time as evidenced by 12

24   NDAs.  Ultimately, Mr. Shore, the proof's in the pudding.

25   There are 12 NDAs under consideration so that's encouraging.

1    Q    Okay.  So we're going to come to the proof in the

2    pudding.  Do you have any idea how the price was set for the

3    EFH post reorg equity in the second lien DIP motion?

4    A    I don't although I know that's -- you know, we're open

5    here to any alternative transaction.  It may be equity in

6    reorganized EFH, it may not be.

7    Q    Do you know who negotiated the split of reorganized EFH

8    equity between the EFIH estate and the EFH estate in the

9    second lien DIP which was a part of the RSA?

10   A    I don't recall.

11   Q    Okay.  Are you aware of whether there's ever been a

12   valuation of the Oncor stake presented to any board of

13   directors?

14   A    There have been indications of value but, to my

15   recollection, there has not been a full valuation performed.

16   Q    And those indication of value, those are indications of

17   value based upon the bids that are being received, right?

18   A    My recollection is that there were indications of value

19   in the early days of my tenure as a independent board member

20   at EFH.  I do not recall specifically if they relate to the

21   bids under consideration.  I don't know what those bids are.

22   We don't have any bids yet.

23   Q    Well, I'm a little confused so, first of all, you're

24   not independent -- you've never been an independent director

25   of EFH which is, I think, what you said.

1    A    I'm an independent director of the T side.

2    Q    Right.  So did -- but there -- just answer my question

3    because I think you said as a independent director of EFH.

4    A    I did.  I stand corrected.

5    Q    All right.  And what analysis have you see as to the

6    value of the Oncor stake?  First of all, have you seen any

7    post petition?

8    A    I have not.

9    Q    Okay.

10   A    Not from my recollection.

11   Q    Okay.  And pre-petition, did you see valuations of the

12   Oncor stake?

13   A    I don't recall specifically.

14   Q    Okay.  So with respect to the proof in the pudding on

15   the bidders, can you state to the Court under oath that the

16   reason the bidders are here is because it's a hot market

17   versus that the debtors put their assets on the block at a

18   substantial discount to fair market value?

19   A    I don't think I said that.  I said it was encouraging

20   that we've -- have 12 NDAs.  I think that's what I said.

21   I'm aware that this is a somewhat unique asset.  I'm aware

22   that we have a robust process under way.

23   Q    Could it also be discouraging to you, as a board

24   member, that -- or if it were the case that the Oncor -- or

25   the TEV implied by the equity split in the second lien DIP

1    was so low that 14 people came -- or 14 bidders have come

2    forward and said I can beat that price?  Would it be

3    discouraging to you?

4    A    Actually, no, I have the opposite reaction.  That was

5    encouraging that the RSA served a useful purpose.  It became

6    a catalyst for this interest and I think the process that's

7    now under way.

8    Q    So I -- just so I understand it, are you saying that

9    the people who came forward to object to the RSA and start

10   -- and get this process forward have served a purpose for

11   the estates?

12   A    I don't think I said that.  I think what I said was --

13   Q    I didn't think you did.  That's why I was clarifying.

14   A    I think what I said was that the RSA

15   served a useful purpose and I think I said that I was

16   encouraged that we have 12 MBAs under consideration.

17   Q    Alright.  Now if you could do the -- if you could look

18   at Exhibit 51.  I just got to clarify this.

19   A    Sure.

20   Q    It's the case protocol.

21   A    Case protocol.

22   Q    The stipulation.  Alright.  Let's go over what happened

23   here.

24         You're aware now, aren't you, that Ms. Doré had

25   emailed this document to you in draft form before your

1    deposition?

2    A    I am aware of that.

3    Q    Okay.  And during your deposition you -- I took you

4    threw each of these provisions and that was the first time

5    you had really paid attention to what any of that was;

6    right?

7    A    I believe that, Mr. Shore, that I read the executive

8    summary and Ms. Doré's email.

9    Q    Okay.

10   A    I did not recall having read the actual document;

11   you're correct.

12   Q    Right.  So I take it that what the disconnect here is

13   that the general counsel sent you a document.  Did she ask

14   you to read it?

15   A    Not that I recall but, then again, she described the

16   document in the email.

17   Q    Okay.  So when -- so what happened here is Ms. Doré

18   sent this to you but you didn't open up the attachment to

19   actually read the document?

20   A    I don't recall if I actually read the document.

21   Q    So that's what I'm getting at because you told me you

22   had a senior moment in your deposition; remember?

23   A    Which may be the most accurate thing I've said today.

24   I likely did have a senior moment.  I did receive the email.

25   I do not recall reading the attachment.

```
1    Q    Okay.  But that's what I'm saying.  And is it possible

2    that you read the attachment and then testified to me

3    without saying I don't recall or anything else, I've never

4    seen this before?

5    A    I don't think so, Mr. Shore.  I think I had not read

6    the document.

7    Q    Okay.  And just so we're clear, if you go to paragraph

8    9 on page 5 --

9    A    Yep.

10   Q    -- you understand now, don't you, that the TCEH

11   creditors have asserted that there are potential claims

12   inside the ring fence; right?

13   A    Yes.

14   Q    And you understand that -- it's always been your view

15   that the TCEH debtors should be assisting the creditors in

16   understanding what those claims are.

17   A    I do believe that.

18   Q    And you believe the TCEH should be given as long as

19   possible to investigate those claims consistent with their

20   ability to do so with a raft of lawyers; right?

21   A    I do believe the TCEH and its representatives should be

22   given the opportunity to fully investigate its claims.  I

23   don't know that I would agree with the characterization, as

24   long as possible.

25   Q    Oh, well, as long as necessary to do a thorough job;
```

1    right?

2    A    I believe the document that you have placed in front of

3    me sets the timelines and I believe this was agreed to by

4    the T side so --

5    Q    And just so --

6    A    -- (indiscernible - 3:50:10) was agreed to, everyone

7    must have felt comfortable that the time lines were

8    appropriate.

9    Q    Now and do you know when the bid procedures motion was

10   filed relative to this document?

11   A    As I recall, the bid procedures motion as to the issues

12   that are before the Court today was late September, about

13   September the 19th --

14   Q    Right.  That's three days after the case protocol was

15   signed; right.

16   A    Yes.

17   Q    Okay.  And just so we're clear, you do understand right

18   now that what the debtors are trying to do is sell the -- or

19   is commit to a signed contract with a purchaser of the

20   economic stake in Oncor; right?

21   A    Yes.  And I'm also aware that it could take 18 months

22   to get those regulatory approvals.

23   Q    Right.  But just so I understand, you're -- the intent

24   is to sign a contract subject to a whole host of conditions;

25   right?

1    A    The approval of the Court, the IRS's involvement, all

2    of the issues that we've discussing here today.

3    Q    Right.  And as you sit here today, do you understand

4    that it's the debtors' intent to sign that document prior to

5    the date that the debtors agreed the TCEH representatives

6    would have to analyze and articular their claims?

7    A    I am aware that the debtors intend to identify a

8    stalking horse, go to open bids, go through an auction and

9    potentially sign a transaction whose form and structure is

10   not known to us today.  And I recognize that this document

11   stipulates the timing for investigation of the claims.

12   Q    Right.  And I just want to -- do you understand that

13   the first part of your answer, that all that stuff that the

14   debtors are trying to do with the -- on the E side is

15   intended to be finished before January 31st, 2015?

16   A    I do understand that.

17            MR. SHORE:  Okay.  I have no further questions,

18   Your Honor.

19            THE COURT:  Thank you.  Mr. Kerr.

20   CROSS-EXAMINATION

21   BY MR. KERR:

22   Q    Good afternoon, Mr. Sawyer.  Charles Kerr of Morrison

23   and Forester.

24   A    Yes, sir.

25   Q    On behalf of the official committee.  I just have a few

1    follow up questions.

2           You've been asked a series of questions about

3    whether or not the T side debtors have separate advisors.

4    A    Yes.

5    Q    And I -- my understanding is that the T side does not

6    have separate advisors; is that correct?

7    A    Yes, sir.  That is correct.

8    Q    Okay.  But you have turned to Evercore for at least

9    financial advice in connection with the bidding procedures

10   motion; is that fair?

11   A    That's right.  Yep.

12   Q    The EFCH board and the TCEH board never met separately

13   with Evercore, just alone, to discuss the bidding process;

14   is that correct?

15   A    Not to my recollection, no.

16   Q    And you have never personally sat down and met with

17   Evercore alone to discuss the bidding process?

18   A    Not as to the specific bidding process, no.

19   Q    Okay.  So if I could have, in your binder, turn to

20   Exhibit 52, which is the bidding motion itself.

21   A    Okay.

22   Q    And I think you testified you did not read this before

23   it was filed but you read it afterwards; correct?

24   A    Exactly, although it is very indicative of the

25   direction of the board.

1    Q    Okay.  It's indicative of the direction of the board.

2    I think you also testified that you thought this was,

3    frankly, very clear so bidders would know exactly what the

4    debtors were looking for in terms of the bid; isn't that

5    correct?

6    A    I don't know if I used the word, clear.  I think I've

7    testified previously that this brought certainty to the

8    process as to timing and documentation and criteria.

9    Q    Okay.  So debtors -- for purposes of this bidding

10   motion, the debtors proposed structure for the sale of

11   reorganized equity for EFH described in the bidding motion

12   requires confirmation of a plan of reorganization of all the

13   debtors; correct?

14   A    Yes, which I don't think would be surprising to any of

15   these sophisticated bidders.

16   Q    And this would include a plan of reorganization for the

17   T side debtors; correct?

18   A    Yes.

19   Q    Okay.  So if we could look in this motion, at the back

20   of it, and I'm going to give you the page numbers on the top

21   so you can file it.

22   A    Okay.  Thank you.

23   Q    This would be the illustrative term sheet.  It says

24   document 2087-4, it starts at page 2 of 13.  Tell me when

25   you get there.

1   A    I'm there.

2   Q    Okay.  And this term sheet -- help me out here, Mr.

3   Sawyer.  Is it your understanding that this term sheet in

4   this bid package was sent out to all of the still active

5   prospective bidders on or about September 19th, when this

6   motion was filed?

7   A    I don't know the exactly timing of when this structure

8   or the illustrative term sheet was shared with all the

9   bidders.  I don't know the exact timing.

10  Q    Okay.  But for the time, it's your understanding that

11  the bidding motion, itself, once it was filed, was sent to

12  all of the then prospective bidders.

13  A    That's my understanding.

14  Q    Okay.  Now the term sheet, this illustrative term

15  sheet, provides for a structure that says the transaction

16  will be done pursuant to a merger agreement and as part of a

17  Chapter 11 plan of reorganization; correct?

18  A    That's what it says, yes.

19  Q    Okay.  And this term sheet outlines some closing

20  conditions; does it not, if you turn to page 4 of 13?

21  A    Yes.

22  Q    And if you -- give me one second.

23       MR. KERR:  One second, Your Honor.  I just got to

24  find my folder.

25  BY MR. KERR:

1    Q    And if you look at the first closing condition, the

2    first bullet point there, that provides that the terms and

3    conditions of the plan of reorganization should not be

4    inconsistent in any material respect with the provisions set

5    forth in the merger agreement that's going to come out of

6    this bidding process; correct?

7    A    That's what it says, yes.

8    Q    Okay.  Now the terms of the merger agreement is what's

9    going to be negotiated as part of this bidding process;

10   correct?

11   A    That's what it says.

12   Q    And that's going to be negotiated actually as part of

13   the stalking horse bidding process; correct?

14   A    That's correct.

15   Q    And that part of the stalking horse bidding process

16   that -- your understanding is that while there could be some

17   information provided to creditors, the creditors are not

18   going to have -- be fully under the tent, so to speak with

19   that process; is that fair?

20   A    Yes, but it's also my understanding that the board will

21   vote the stalking horse and there'll be a motion for the

22   stalking horse hearing, here in front of this Court, and my

23   expectation is all of the T side constituents will have an

24   opportunity to render their views at that time.

25   Q    Okay.  But that they ultimately -- one of the closing

1    conditions of this bid process is that whatever ultimate

2    plan of reorganization that's going to be done cannot not

3    materially inconsistent with that merger agreement; correct?

4    A    Under this illustrative term sheet, that's correct.

5    But, as I've previously testified, I think the debtors have

6    been clear that they will consider any structure, any

7    alternative, any bidder, to maximize the economic value of

8    Oncor.

9    Q    Okay.  But -- and so under this bid procedure that the

10   debtors have sent out to all of the bidders, if you turn to

11   page 6 of 13, which refers to termination.  Do you see that?

12   A    I do.

13   Q    And that set -- that part of -- this term sheet

14   provides the circumstances under which this entire deal

15   could be terminated; isn't that correct?

16   A    It does.

17   Q    Okay.  And if you look --

18          MR. KERR:  Again, give me one second, Your Honor.

19          THE COURT:  Sure.  Oh, sorry.

20   BY MR. KERR:

21   Q    If you look at item F --

22          THE COURT:  I'm here.

23          MR. KERR:  Okay.  She just disappeared, Your

24   Honor.  I apologize.

25   BY MR. KERR:

```
 1   Q     If you look at item F --

 2   A     Yes.

 3   Q     And that provides that this merger agreement can be

 4   terminated if the Bankruptcy Court enters an order -- again

 5   this is on page 6 of 13; do you see it?

 6   A     I do.

 7   Q     Okay.  So at item F on page 6 of 13, it says; this

 8   merger agreement can be terminated if the Bankruptcy Court

 9   enters an order approving a reorganization that is

10   materially and adversely inconsistent with the merger

11   agreement.  Is that correct?

12   A     That's what this illustrative term sheet says.  It also

13   indicates, in various places, that the debtor will consider

14   any other structure or any bidder that will maximize the

15   value of the Oncor asset.  And, furthermore, the debtor has

16   its fiduciary outs here should a better deal come along.

17   Q     Okay.  Well, but you'd agree with me at least with

18   respect to this term sheet, which the debtors have said is

19   their -- is the term sheet they would prefer to enter into,

20   what they've sent to all the bidders --

21   A     Yes.

22   Q     -- if the merger agreement that comes out of this,

23   which the debtors will have negotiated in connection with

24   the stalking horse process, and in connection with the sale

25   of E side economic interests, that will dictate what the
```

1   plan of organization could be on the T side.  Would you

2   agree with that, sir?

3   A    I understand that that's what the illustrative term

4   sheet says.

5            MR. KERR:  Okay.  I have no further questions,

6   Your Honor.

7            THE COURT:  Thank you.  Mr. Martin.

8            MR. MARTIN:  I do not have any questions for this

9   witness.

10           THE COURT:  Okay.  Cross.  Do you need a -- would

11   you like a break or are you ready to go?

12           MR. MCGAAN:  If I could have two minutes.

13           THE COURT:  Yeah.  We'll take a very short break

14   since we're up against it.

15           (Recess - 4:00:53 - 4:09:42)

16           MR. MCGAAN:  Andrew McGaan for the debtors, Your

17   Honor.  I put a binder up on the bench in case I need to

18   refer to some documents.

19           THE COURT:  Okay.

20   CROSS-EXAMINATION

21   BY MR. MCGAAN:

22   Q    Mr. Sawyer, Mr. Jonas asked you some questions, some

23   limited questions about your background when he began his

24   examination; correct?

25   A    Yes.

1  Q    You mentioned a number of time during your testimony

2  that you have something like 37 years' experience in and

3  around restructuring companies?

4  A    In a 37 year career, I've served as either the

5  president or CEO of eight companies, some public, some

6  private.  That's correct.

7  Q    And you served as a CEO, you say, of eight different

8  companies?

9  A    Either the CEO or the president of eight different

10  companies, some of those companies were public, some were

11  private.

12  Q    In all instances, companies involved with restructuring

13  challenges, including the Chapter 11 process?

14  A    All involved in underperforming matters, not meeting

15  stakeholder expectations, some bankruptcies, some out of

16  court.

17  Q    And you have experience in serving as an independent

18  director in the sense that you're serving as an independent

19  director for debtors in these cases?

20  A    I have served, as I think I previously testified, I've

21  served on 13 boards over -- during the course of my career.

22  Q    You also served as a financial advisor to companies

23  undergoing restructuring challenges, including the Chapter

24  11 process?

25  A    I do.  I'm a managing director in Huron (ph)

1    Consultings business advisory practice and in that role I

2    will advise companies that are undergoing restructuring

3    challenges.  Yes, that's correct.  So I have served as an

4    independent board member.  I've served as a president or

5    CEO.  I've served as a CRO and I've served as an advisor in

6    these circumstances.

7    Q    So when you talk, as you have in your testimony, about

8    -- and your roles as an independent director in these cases,

9    when you talk about interacting with management, the CEO and

10   the CRO and the financial advisors for the debtors, you've

11   served yourself in each of those roles; true?

12   A    I have.  I have served as a CRO for a debtor and I have

13   served as a CEO.  So it is accurate to say that it's in my

14   DNA to have empathy for the process and for the management

15   teams frankly for the frontline employees who are involved

16   in this process.

17   Q    What do you mean by that, when you say, empathy for,

18   among other things, the frontline employees?  What are you

19   referring to?

20   A    It's difficult to describe, you know, how this plays

21   out at the frontline of a business system.  This isn't just

22   about the math, although it clearly is about the math.  It

23   also impacts the very soul of a company and so I understand

24   what it's like to stand up on a midnight to eight shift and

25   try to explain to hourly employees what it means for their

1    company to be in bankruptcy.  I very well understand that.

2    Q    And other than empathy, say for the management and

3    advisors, do you have an understanding of their duties and

4    responsibilities in interacting with the board as you've

5    done in other capacities, in other engagements?

6    A    I certainly do having served as a CRO and a CEO in

7    Chapter 11.  I do understand the duties of those roles and

8    the necessity for role clarity in these circumstances.

9    Q    Have you had experience in dealing with restructuring

10   situations where it unexpectedly took longer to get to the

11   restructuring process than anybody anticipated at the

12   outset?

13   A    Yes.

14   Q    Has that ever -- well, please describe for the Court

15   what issues that has presented in those cases and whether

16   they're informing your views here.

17   A    The original filing of Allied Holdings where I served

18   as CEO and CRO took much longer than we had anticipated and

19   I saw in a very live and real way how it impacted the lives

20   of the employees in the company.  So that embedded in me a

21   desire to move the process forward to a confirmable plan and

22   under the supervision of the Court.

23   Q    You were the CEO and CRO of Allied Holdings when it

24   went through Chapter 11?

25   A    I was.

1   Q    And it went through Chapter 11 a second time; true?

2   A    It did.

3   Q    After you left?

4   A    That's correct.

5   Q    And that ended up in this Court; correct?

6   A    It did end up in this Court.

7   Q    And --

8           MR. KERR:  I thought Judge Sontchi might remember

9   that.

10          THE COURT:  Oh, I do.

11  BY MR. KERR:

12  Q    Were you selected for those roles in that case, the

13  roles you served by Kirkland and Ellis?

14  A    No.  I was selected by the Allied Holdings board of

15  directors on a pre-petition basis and then in consultation

16  with that board we ultimately reached a determination to

17  file that company after the catastrophic downturn of the

18  OEMs and Detroit and on the west coast.

19  Q    And who served as counsel to the debtor in that case?

20  A    I recommended to the board that we retain Troutman

21  Sanders and Jeff Kelly, who leads the national restructuring

22  practice for Troutman and I also believe is well known to

23  this Court.

24  Q    Did you play a role in the Eddie Bauer bankruptcy?

25  A    I did.  I was one of the three independent board

1    members who led the restructuring committee for the filing

2    of Spiegel and Eddie Bauer.

3    Q    Was Kirkland and Ellis involved in that case?

4    A    No, they were not.  My friend, Jim Garrity, who at the

5    time was a partner at Sherman led that restructuring effort

6    on behalf of Spiegel.

7    Q    Did you provide restructuring advice to the State of

8    Michigan at any point in time in connection with the City of

9    Detroit's bankruptcy filing?

10   A    I provided certain advice regarding matters in Detroit

11   to the Treasury Department and to the Governor of Michigan

12   related to the potential restructuring and the challenges

13   associated with Detroit.

14   Q    Did Kirkland and Ellis have anything to do with your

15   engagement in that matter?

16   A    No, they did not.  I had turned to Jones Day for pro

17   bono advice related to the Detroit matter.

18   Q    Do you have a position with EuroMax (ph) Holdings?

19   A    I do.

20   Q    What is that?

21   A    I am serving as the interim president of EuroMax.

22   Q    Are you -- is EuroMax facing restructuring challenges?

23   A    EuroMax has public debt and private equity.  They were

24   an underperforming company and they're 10X levered.  They

25   are facing certain challenges and Kirkland is not involved.

1   Q    Let me ask you about the bidding procedures motion

2   that's before the Court today that you've been examined

3   about already.

4           One thing you said during the earlier examination

5   is that you have faith in the process that's underway.  Do

6   you recall saying that?

7   A    I do.

8   Q    What do you mean by that?

9   A    Having lived through the bankruptcy process as a board

10  member, a CEO and a CRO, I have grown to have a belief that

11  the process will move forward and go through its natural

12  course and I have faith in the Court.  I believe the right

13  outcomes will be reached.

14  Q    And I made a note during your testimony that with

15  respect specifically to the proposed bidding procedures, you

16  said you were enthusiastic in your support of that process.

17  Why is it -- what leads you to be enthusiastic about your

18  support for the proposed bidding procedures here?

19  A    I feel strongly that it's time to move forward with the

20  process.  I believe that the bidding procedures hold the

21  opportunity to enhance the overall economic value of the

22  estate, which certainly could inure to the benefit of the T

23  side potentially.  I believe a broadened marketing process

24  is the right and best thing to do and I think it's a good

25  time to enter the market.

1    Q    Are you concerned at all, Mr. Sawyer, that approval of

2    the bidding procedures motion, if the Court's inclined to do

3    that, locks the debtors into a particular plan of

4    reorganization?

5    A    Should the Court approve the limited motion, I do not

6    believe it will lock us into any specific plan of

7    reorganization, no specific structure, no specific

8    transaction.  It is only what it is and it is the bidding

9    procedures to begin a process that I think, as I've

10   testified, that I have faith will ultimately lead to a good

11   outcome for the estates.

12   Q    Do the proposed bidding procedures contain any elements

13   that provide comfort to you as an independent director that

14   you can change direction if circumstances change?

15   A    The bidding procedures themselves, as you well know,

16   are highly flexible and, furthermore, there's an opportunity

17   to exercise the fiduciary out should the board determine, on

18   advice of counsel, that it would be right and appropriate to

19   do so.

20   Q    You testified that you have come to the conclusion it

21   was a good time to market the economic interests in Oncor;

22   is that right?

23   A    I did.  I relied upon the advice I received from

24   Evercore and from the CROs and from Kirkland.  But, then

25   again, I'm not a child.  I am aware that the credit markets

1   are flush.  That the equity markets are stable.  No one can

2   predict the future.  Is there a better time at some future

3   date?  I can't predict that.  But I know this is a good time

4   and I know it's right and good to start the process.

5   Q    When did you join the board at EFIH?

6   A    In the Fall of 2013.

7   Q    And --

8        (Inaudible - 4:19:57 - 4:20:01).

9        MR. KERR:  Thank you.  I did.  I misspoke.  I'll

10   ask it again.

11   BY MR. KERR:

12   Q    When did you join the board of TCEH?

13   A    I joined the board of EFCH and TCEH in the Fall of

14   2013.

15   Q    Was the company engaged, at that time, in a process

16   referred to as Project Olympus?

17   A    It was.

18   Q    And where was it, just in general, where was it in its

19   state of maturation?

20   A    It's difficult to describe at what point the process

21   had reached.  But ultimately it did not prove to be

22   successful and the board did what boards do.  We looked for

23   other options and other alternatives.  My experience in this

24   process is optionality is important and not predetermining

25   outcomes is important to reach a successful conclusion.

1    Q     And a principal feature of Project Olympus was a

2    pursuit of a plan that would keep the company consolidated;

3    right?

4    A     It was.

5    Q     When you moved away from it, did the boards make a

6    decision at some point then to move to a sale of the

7    economic interests in Oncor?

8    A     They moved initially to the RSA which we viewed -- I

9    viewed as a catalyst, the start of a process, not the end,

10   as I've already testified today.

11   Q     And the transaction contemplated under the RSA through

12   the second lien DIP and the proposed equity conversation

13   feature, what would have happened to the economic interests

14   in Oncor had that been approved and closed?

15   A     Well, as to the economic interests of Oncor and the

16   allocation of the proceeds related to that economic

17   interest, my view, as I've testified earlier, is the

18   allocation of those proceeds, the engineering is up to the

19   purview of this Court.

20   Q     Did the board vote, at some point, to approve the

21   contemplated sale of the economic interests in Oncor in

22   connection with the RSA?

23   A     My recollection is we did.

24   Q     And what was your vote?

25   A     My vote was affirmative.

1    Q    Now there's been testimony then that the RSA was

2    terminated in July of this year; right?

3    A    Yes.

4    Q    And what was your vote on that?

5    A    My vote was affirmative.

6    Q    What happened then to the plan to sell the economic

7    interests in Oncor at that point?

8    A    Well, as I have previously testified, the company

9    received the interests from NextEra which, in my view, was

10   evidence that the RSA had served a useful purpose and was a

11   catalyst for the process that is now underway.

12   Q    When you say the process now underway; what

13   specifically are you talking about?

14   A    Broadened marketing process and the bid procedures that

15   are before the Court.

16   Q    Alright.  With respect to the broadened marketing

17   process for Oncor that continued after the July vote, and

18   the bidding procedures now before the Court, you had said,

19   during your testimony earlier, that it expresses the will

20   and I think you said desire of the board; is that right?

21   A    Yes.

22   Q    Is that -- does it express your will and desire as an

23   independent director of TCEH?

24   A    Yes.

25   Q    And how does it do that?

1    A    As I testified, I have very strong feelings that it's

2    in the economic interest of the estate.  It's in the

3    interest of the employees of the company.  It's in the

4    interests of all the constituents to move the process

5    forward.  I believe it's still early days.  I think the

6    outcome remains uncertain.  I don't think these bid

7    procedures diminish in any way optionality.  They don't

8    preclude claims which may be brought by the T side.  We

9    don't yet know where the IRS stands.  But it's a good time

10   to move the process forward and let's see where that process

11   takes us.

12   Q    And setting aside any particular legal advice, what

13   advice and information did you receive during your service

14   on the board that led you to conclude that this was a good

15   time to engage in this process?

16   A    I received advice from Evercore that it was a good time

17   to proceed.  I received advice from the CROs that it was a

18   good time to proceed.

19   Q    Did you feel, when you had endorsed and expressed your

20   approval of the sale process, that you lacked any particular

21   information that you would have liked to have had about the

22   timing of pursuing the sale of the economic interests in

23   Oncor?

24   A    No, I didn't because I think, you know, it's very well

25   known that that market is flush.  It's known that we've had

1    a relatively stable equity market.  No one can predict the

2    future, whether the markets will be better or worse a year

3    from now.

4              I was also very sensitive to the timing required

5    for the regulatory approvals.  So I was comfortable this was

6    a good time to begin and I did not require other analysis or

7    data to reach that conclusion.

8    Q    How did the board express to management and its

9    advisors, its approval of this process?

10   A    After deliberation over nine separate board meetings,

11   we told them to go do it.

12   Q    Was there any dissent?

13   A    No.

14   Q    Did any member of the board in the meetings you

15   attended express the need to have more information or

16   analysis before expressing approval to embark upon the

17   bidding procedures motion?

18             MR. JONAS:  Objection, Your Honor.  I'm going to

19   object to any testimony by this witness about the board

20   meetings, I think there were three or four board meetings,

21   to which he was asked about then in his deposition.  We

22   never received any documentation -- we didn't know about the

23   board meetings effectively and I think it's unfair and

24   prejudicial to us to have him testify now about what might

25   have taken place at meetings which he previously testified

1    didn't take place.

2           MR. MCGAAN:  I don't recall the witness testifying

3    that meeting did not take place and --

4           MR. JONAS:  Your Honor, may I read the transcript?

5           THE COURT:  Can you not interrupt?

6           MR. JONAS:  Sorry.

7           MR. MCGAAN:  The issue of the information that the

8    board considered and the judgment exercised by the debtors

9    here is squarely an issue in this case and they've had

10   robust discovery here and simply because Mr. Jonas thinks

11   that he should have got a document he didn't get, can't

12   preclude this witness from providing relevant evidence to

13   the Court.  And I think the objection should be overruled.

14          THE COURT:  Can you read to me from the

15   deposition?

16          MR. JONAS:  Your Honor, this is at the -- I'm

17   sorry, the October 8th transcript page 446, line 19.  That's

18   page 446, the October 8th transcript, line 19.

19          Question:

20          UNIDENTIFIED SPEAKER:  (Indiscernible - 4:26:57).

21          MR. JONAS:  I'm sorry.  446 --

22          UNIDENTIFIED SPEAKER:  Yes.

23          MR. JONAS:  Line 19.  Okay.

24          UNIDENTIFIED SPEAKER:  Yep.

25          MR. JONAS:  Okay.  Okay.  Then let me ask you,

1   other than the board, at least going back to July 17th,

2   which I think was the first board materials we looked at and

3   we've covered a number of board meetings since that time,

4   including July 30th and 31st, August 15th and now

5   September 5th.  So for that period of time, do you believe

6   that there were any other board meetings that we haven't

7   discussed or seen materials from?

8           I don't remember any other board meetings or

9   materials.

10          MR. MCGAAN:  You Honor, the question stands.  He

11  has been asked repeatedly during the adverse examinations

12  about what he relied on, what information he did or didn't

13  have and that clearly opens the door to asking him what

14  information he did have and what he did rely upon.  We can't

15  -- it can't be a one way street here.

16          THE COURT:  Alright.  I'm going to allow the

17  testimony but I believe that the answers go to credibility.

18  BY MR. KERR:

19  Q    I take it you don't have the question in mind; or do

20  you?

21  A    I think you asked me if any of the other members

22  opposed the bidding procedures.  My recollection, they

23  certainly did not.

24  Q    Then -- and let me ask you a slightly different way,

25  without regards specifically to the bidding procedures

1    motion, the decision to market the Oncor asset at this time,

2    generally, was there dissent expressed at any meeting that

3    you recall by any board member?

4    A      There were deliberations but I do not recall dissent.

5    Q      And did any board member, at any meeting you recall

6    attending, express the view that he or she needed more

7    information or analysis to move forward?

8    A      No.

9    Q      Did the boards receive with respect to the wisdom of

10   moving forward at this time to market the economic interest

11   in Oncor, did the board receive contrary advice, that is,

12   contrary to the proposition that this is a good time to move

13   forward in this way?

14   A      No.

15   Q      You were asked questions about the omnibus tax

16   memorandum and, in the course of your testimony regarding

17   that, you said on a number of occasions you -- that you

18   regarded it as transparent and balanced.  Do you remember

19   that?

20   A      I do.

21   Q      And what are you referring to?  Can you elaborate on

22   what you mean when you describe that as transparent and

23   balanced?

24   A      Well, the debtor in the filing was careful to identify

25   those specific topics and issues where the creditors may

1    have disagreement.  I thought they were also transparent in

2    stipulating that these tax matters were complex and the

3    IRS's involvement would ultimately be consequential to the

4    structure of any sale of the economic interests in Oncor.

5    Q    After you read the tax memorandum as filed, did you

6    come to the conclusion that in any way it limited your

7    freedom as an independent director to protect the interests

8    of the stakeholders that you represent?

9    A    No.

10   Q    Why not?

11   A    As I previously testified, we don't have a transaction

12   to consider yet.  We don't have a plan of reorganization.

13   We're inside the supervision of this Court.  We have a

14   fiduciary out and the bidding procedures themselves, in my

15   view, are flexible.

16   Q    How frequently during the time you've served as an

17   independent director here has the boards deliberated on the

18   tax-free strategy, if we can call it that?

19   A    The board has deliberated on the advice of Kirkland's

20   tax counsel from the beginning of my involvement on this

21   board.

22   Q    Have you endorsed or not endorsed the pursuit of the

23   tax-free deconsolidation strategy that it's envisioned in

24   the bidding procedures motion?

25   A    I am not aware, Counselor, of a better alternative at

1    this time.  I have endorsed the notion of a tax-free spin.

2    However, I've also been very clear in my testimony that I

3    have not limited my options.  I have not precluded any other

4    alternative or bidder and I'm open to any structure or any

5    bidder that will maximize the value of the economic

6    interests of Oncor.

7    Q    Across the board meetings you've attending with respect

8    to the tax-free strategy, has -- have board members

9    expressed dissent from the wisdom of pursuing that strategy?

10   A    The board members have deliberated around that strategy

11   but they have not expressed dissent and, as I've testified,

12   as the independent T side director, I'm open to any

13   structure, any alternative that will maximize value.

14   Q    When you reviewed the omnibus tax memorandum, was it

15   consistent or inconsistent with the tax strategy that had

16   been deliberated upon by the board, as you've described it?

17   A    It was consistent with the tax advice we had received

18   from Kirkland up to and including that there may be

19   alternative views.

20   Q    When you reviewed the bidding procedures motion as

21   filed, was there any aspect of the bidding procedures motion

22   that's inconsistent with the strategy endorsed by the board?

23   A    No.

24   Q    You were asked whether -- you were asked about meeting

25   with T side creditors; right?

Case 14-10979-CSS   Doc 2520   Filed 10/22/14   Page 254 of 269

Page 254

1    A    Yes, I was asked that question.

2    Q    And you had a meeting with TCEH first lien creditors?

3    A    I did.

4    Q    Who asked for that meeting?

5    A    I have refreshed my recollection since the deposition.

6    The T side asked for the meeting for us.

7    Q    And you testified that you have not met with

8    representatives of the TCEH second lien group or the TCEH

9    unsecured creditors; correct?

10   A    That's right.

11   Q    To your knowledge, have they asked to meet with you?

12   A    Not to my knowledge.

13          MR. KERR:  Thank you.  That's all I have, Your

14   Honor.

15          THE COURT:  Okay.  Mr. Jones, questions?

16   Mr. Shore?

17   RECROSS-EXAMINATION

18   BY MR. SHORE:

19   Q    Mr. Sawyer, just a quick couple of questions and I'm

20   just going to go in the order you got asked.

21          You testified about your empathy for the people

22   involved in this process.   Have you heard that this whole

23   restructuring we're talking about is a balance sheet

24   restructuring that's not supposed to impact the employees on

25   a daily basis?

VERITEXT REPORTING COMPANY

212-267-6868          www.veritext.com          516-608-2400

1    A    I have not heard that but having lived through these as

2    a CEO, I am very well aware that it does have an impact on

3    frontline employees.  It does.

4    Q    Okay.  And is that why you're interested in moving this

5    process along?

6    A    I'm interested in moving the process along in an

7    attempt to get to a confirmable plan of reorganization.

8    Q    As quickly as possible?

9    A    That's right under the supervision of this Court.

10   Q    And when you say, as quickly as possible, as quickly as

11   possible for which estates?

12   A    My duty and obligations here are to the T side.

13   Q    Okay.  So what work have you done, personally, on

14   formulating a plan of reorganization for the T side, such

15   that that's moving forward?

16   A    As I previously testified, I am highly sensitized to

17   the role of clarity and to the duties and obligations of the

18   CROs and their advisors and I don't think it would be wise

19   for me to step into the shoes of those CROs and their

20   advisors.

21   Q    Okay.  But have you even educated yourself as to what

22   the issues are on a T side plan?

23   A    I know there are any number of potential issues on the

24   T side plan so --

25   Q    Like a valuation; right?

1    A     Valuation is one issue.  Regulatory approvals are an

2    issue.  A confirmable plan of reorganization, a transaction

3    that will actually close, the IRS's private ruling letter.

4    There are many issues that yet need to be determined.  My

5    view is that beginning these bidding procedures will move

6    that process forward so that we can get some answers to all

7    of these issues.

8    Q     Other than moving forward with the bidding procedures,

9    what are you doing that's -- or what -- as far as you know,

10   what are your delegees doing to drive a TCEH plan process

11   forward?

12   A     I believe the bidding procedures themselves will help

13   move this process forward.

14   Q     Okay.  Other than the bidding procedures, what do you

15   understand the TCEH delegees to be doing to be driving

16   forward a plan at TCEH or for -- well, sorry, for EFCH of

17   any of its subs?

18   A     The advisors and the CROs are moving the process

19   forward at an appropriate pace in my judgment.  And I have

20   certainly been highly deliberative as to all of the issues

21   that have come before the board.

22   Q     Can you -- other than filing and prosecuting the

23   bidding procedures, can you tell me one tangible act that

24   your delegees, the CROs, are doing to drive a plan process

25   forward to TCEH or any of its subsidiaries?

1   A     Well, there's one simple example.  I think the efforts

2   that's been made by the CROs and the advisors to seek and

3   receive the Court's support for the compensation plans were

4   very important to the preservation of value to the T side.

5   Q     Okay.  What other -- besides seeking the Court's

6   approval on compensation for advisors and filing the bidding

7   procedures motions, what acts are your delegees taking to

8   drive a plan process forward at TCEH?

9   A     The TC -- the T side advisors and their counselors are

10  moving the process forward in the normal course,

11  Mr. Shore.

12  Q     What tangible acts beyond filing and prosecuting the

13  inside comp motions and filing and prosecuting the bidding

14  procedure motions, are you aware of your TCEH delegees, the

15  people to whom you say should be driving the process

16  forward, what tangible acts have they done to drive a plan

17  process forward at TCEH?

18  A     Well, the retention protocol motion, I think, was

19  another forward step in this process (indiscernible -

20  4:38:39).

21  Q     Any other tangible acts besides those three things?

22  A     Not that I'm prepared to testify to today.

23  Q     Okay.  You talk about a catalyst of the RSA and that it

24  served its purpose, is it your understanding that the

25  purpose of the RSA was to raise issues such that we brought

1    bidders to market and got the process moving forward?

2    A    I think I testified that the RSA was not a plan of

3    reorganization.  It was, in my view, a start to a process

4    that could potentially lead to a confirmable plan of

5    reorganization.

6    Q    Okay.

7    A    It certainly surfaced the NextEra bid and that's led to

8    the issue that's before the Court today.

9    Q    What has the RSA done for TCEH or any of its

10   subsidiaries?

11   A    I don't know the answer to that question.

12   Q    Okay.  And are you aware of the costs that TCEH paid to

13   the people who agreed to the RSA?

14   A    I don't remember the specific number.  But, in the

15   context of the overall value of this case, I'm satisfied

16   that moving forward with the broadened marketing process is

17   the right and best thing to do.

18   Q    And your understanding as to the size of the payments

19   that were made to professional advisors on the days before

20   the bankruptcy filing, when those advisors signed the RSA on

21   behalf of their groups, how much money went out the door?

22   A    I don't know how much money went out the door.  I don't

23   know.

24   Q    Okay.  Do have an understanding as to the size of the

25   -- are you aware that the TCEH receivables financing had

1    over $300 million of unencumbered cash prior to the petition

2    date?

3    A    I do recall that fact.

4    Q    And are you aware that by the time of filing, there was

5    only a $150 million in unencumbered cash?

6    A    I remember that that has been alleged, yes.

7    Q    And -- well, did you ask anybody to provide you, as the

8    independent TCEH board member to explain where a 150 --

9    where the money went, the unencumbered cash went that was

10   there but wasn't there by the time of the petition date?

11              MR. MCGAAN:  Your Honor, I have an objection.

12   This is beyond the scope.

13              I'm sorry.  Objection, Your Honor.  This is beyond

14   the scope.  This issue wasn't raised on either the initial

15   examinations or mine.

16              MR. SHORE:  This is the question before; the

17   witness testified to, is that the RSA was worth the effort.

18   I just want to know from a TCEH only perspective, was it

19   worth the effort?

20              THE COURT:  Alright.  I'll allow it.

21   BY MR. SHORE:

22   A    I do recall that the issue was raised.  I do recall

23   that it was discussed at the board meeting.  I don't recall

24   the outcome of the discussion.

25   Q    Okay.  Do you have an understanding that the RSA

1    process -- no.  Withdraw the question.

2              You say you're not -- you know, one of the reasons

3    to go forward is you're not diminishing optionality.  I want

4    to focus on something narrower.  You are aware that by

5    pursuing the bidding procedures, you are incurring costs in

6    this whole process; right?

7    A    I am aware -- I am very much aware that we are

8    incurring costs.  I view them as inconsequential to the

9    overall case and to the potential benefit that could inure

10   by maximizing the economic value of Oncor.

11   Q    And have you see any budget for what this is -- what

12   pursuing the --

13   A    I have not.

14   Q    You've got to let me finish my question.

15   A    I apologize.

16   Q    Because otherwise I'll then switch the question on you

17   and you'll -- have you ever seen the budget for a can of

18   tomatoes?

19        (Laughter)

20   Q    The question -- no, seriously, the -- have you ever

21   seen a budget for what it's going to cost the debtors to

22   pursue the bidding process from the time you started the

23   market to the time you get through this contract that you

24   hope appears?

25   A    I have not and I wasn't troubled -- I'm not troubled by

1    that given the overall potential economic value to be

2    realized.

3    Q    Now, with respect to these board meetings, I think you

4    testified in response to Mr. McGaan's question, that you

5    recall an affirmative vote then; right?

6    A    I don't recall what I specifically said to Mr. McGaan.

7    Q    Well, do you recall now, as you sit here today, that

8    Chairman Evans polled you at some time for a vote with

9    respect to bidding procedures?

10   A    We did, as I think I have previously testified, there

11   was no resolution.  We did not vote it.

12   Q    But you say you don't recall Chairman Evans ever

13   polling?

14   A    I don't recall and don't think it rose to that level.

15   Q    Okay.  Just so I'm clear, Chairman Evans is not a

16   director at EFCH or TCEH, right?

17   A    That's right.

18   Q    So as far as you know, there was never anybody who

19   polled TCEH or EFCH as to whether or not to support any kind

20   of marketing process, the directors of them?

21   A    I don't recall the specific poll being taken but I do

22   recall clearly expressing my support for the broadened

23   marketing process and the bid procedures.

24            MR. SHORE:  I have no further questions.  Thank

25   you.

1          THE COURT:  Thank you.  Mr. Jonas.  Mr. Kerr.

2          MR. KERR:  Nothing further, Your Honor.

3          THE COURT:  Alright.  Mr. McGaan?

4          MR. MCGAAN:  No, sir.

5          THE COURT:  Very good.  Thank you.

6          MR. MCGAAN:  Thank you, Your Honor.

7          THE COURT:  I wasn't but I thought I'd ask anyway.

8     Thank you, sir.  You may step down.

9          Alright.  So I spoke with Ms. Werkheiser during

10    the break and I understand that the parties have agreed to

11    submit Mr. Cremens under deposition designations.

12          MR. MARTIN:  I believe so, Your Honor.  We were

13    trying to do that very quickly on the fly in the break, to

14    have that discussion.  I anticipate we will and we'd try to

15    do that in the next day or so.

16          MR. MCKANE:  Yeah, Your Honor, so in other words,

17    they've agreed just within the last few minutes that they

18    will do that but there are designations yet.  We have to put

19    them together and we will get them to you as quickly as

20    possible, well before the weekend.

21          THE COURT:  Okay.  But there's agreement that

22    designations will be the way we do this and Mr. Cremens will

23    not be called?

24          MR. MARTIN:  Yes, Your Honor, that's right.

25          THE COURT:  Okay.  And that leaves Mr. Kurtz on

1  behalf of the committee and my understanding is that

2  Mr. Kerr, you're going to be the only person doing direct

3  testimony of Mr. Kurtz?

4            MR. KERR:  That's correct.  When we put Mr. Kurtz

5  on, we've had some discussions.  It's a quarter to five and

6  I'm concerned about --

7            THE COURT:  We can't leave him open --

8            MR. KERR:  Yes.

9            THE COURT:  -- over the -- because I have no more

10  time this week.

11            MR. KERR:  Okay.

12            THE COURT:  So when we -- so at some point in the

13  future, between now and when we reconvene, I'll get

14  deposition designations, I assume, in written form?

15            MR. MARTIN:  Yes, Your Honor.

16            THE COURT:  Alright.  That's good.  And I'll

17  review those and then we'll have Mr. Kurtz and that'll close

18  the testimony and we'll have closings.  Okay.

19            I have the following time available next week.  We

20  can do Monday, the 27th, from noon to the end of the day or

21  we can do Wednesday, the 29th, pretty much I have the whole

22  day free except for a lunch commitment.  It probably makes

23  sense, and my suggestion would be, to take Monday, noon and

24  five and in a hopefully highly unlikely scenario that we'd

25  need to kick it again, which doesn't sound like that's the

1    case, I certainly don't want that to be the case if at all

2    possible.  Then we'll have the safety valve of Wednesday.

3              MR. MCKANE:  Your Honor, for what it's worth, the

4    debtors have a strong preference of Monday over Wednesday

5    because --

6              THE COURT:  Alright.

7              MS. MCKANE:  -- there is a regularly scheduled

8    board meeting that starts on Wednesday in Dallas.

9              THE COURT:  Alright.  Then Monday.  Monday?  We'll

10   have to do Monday.  Alright.  Monday at noon.  I have a

11   morning commitment I can't break.

12             Otherwise there is --

13             MR. MCGAAN:  I'm sorry.

14             THE COURT:  That's okay.  I just want you --

15   otherwise there is an issue which is that the Phase I bid

16   deadline is Monday; correct?

17             MR. MCGAAN:  I'm sorry, Your Honor.  We're -- I'm

18   sorry.  I apologize.  We're just --

19             UNIDENTIFIED SPEAKER:  We're trying to do -- make

20   sure we're scheduling (indiscernible - 4:47:37).

21             THE COURT:  Okay.

22             MR. MCGAAN:  In the hopes of getting it done on

23   Monday.

24             THE COURT:  Yes.  Let's stop that for a second --

25             MR. MCGAAN:  We will.

1          THE COURT:  -- because I want to raise this issue.

2     The Phase 1 bid deadline is Monday as to the post; correct?

3          MR. MCGAAN:  It's Thursday, Your Honor.

4          THE COURT:  Not the 27th?

5          MR. MCGAAN:  The 23rd.

6          THE COURT:  Oh, I -- I'm sorry.  You're right.  I

7     apologize.  Okay.  Well here's what I'm going to say about

8     that.  I am not going to approve that bid deadline nunc pro

9     tunc because having not made a ruling yet, I am concerned

10    that a ruling after the 23rd that, and I have not made a

11    decision, that might include a expansion of the bid

12    deadlines, as requested by the parties, we would be put in

13    place where we've created a deadline, maybe create a later

14    deadline and that that possibility we might not get the

15    response we're hoping for on the first deadline or we might

16    be creating confusion  and disgruntledness by bidders.  So

17    my inclination is to continue the 23rd deadline to a date to

18    be determined when I rule on the motion.

19         MR. HESSLER:  We will comply with the Court's

20    inclination, Your Honor.

21         THE COURT:  Okay.  And you'll let your bidders

22    know, obviously.

23         MR. HESSLER:  We will do that.

24         THE COURT:  They probably already know.

25         MR. HESSLER:  We will do so again.

1            THE COURT:  We have time.  Okay.  I just wanted to

2      get that out there.

3            Anything else we need to discuss before we break?

4            MR. MCGAAN:  Sorry for talking while you were

5      talking.

6            THE COURT:  Okay.

7            MR. MCGAAN:  We're going to try to work it out so

8      that we can get this all in on Monday.  I think there's, I

9      would hope, a shared interest after all this time to do

10     that.

11           THE COURT:  I would hope so.  I mean --

12           MR. KERR:  I'll work with Mr. McGaan.

13           THE COURT:  Alright.  Okay.  Now at all our court

14     hearings, and actually this- -- there's all sorts of stuff

15     going on in this ring tomorrow that has nothing to do with

16     me.  So I'd ask Clarice to clean up all your trash, et

17     cetera and pack out what you packed in if you could just

18     because we have some things going on here and I want to make

19     sure that we're in a situation where they can set up the

20     equipment they have to set up, et cetera.

21           So if you could make an extra effort -- and, by

22     the way, your mothers would be proud.  You've been very good

23     guests and we -- I truly appreciate it, believe me.

24           Alright.  So we will reconvene at noon on Monday,

25     the 27th.  To the extent possible, I hope you enjoy  your

1   weekend.

2        (A chorus of thank you)

3        (Whereupon, the proceedings concluded at 4:51 PM)

4                          * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                        W I T N E S S E S

3    WITNESS                  BY                        PAGE

4    PAUL KEGLEVIC            MR. SHORE                  15

5                            MR. LAWRENCE               75

6                            MR. MARTIN                 85

7                            MR. MCKANE                 99

8                            MR. SHORE                 127

9                            MR. MARTIN                130

10

11   HUGH E. SAWYER          MR. JONAS                 139

12                            MR. SHORE                200

13                            MR. KERR                 229

14                            MR. MCGAAN               236

15                            MR. SHORE                254

16

17

18

19

20

21

22

23

24

25

Page 269

1                    C E R T I F I C A T I O N

2

3     I, Dawn South, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5     Dawn       Digitally signed by Dawn South
                  DN: cn=Dawn South, o=Veritext,
                  ou, email=digital@veritext.com,
6     South      c=US
                  Date: 2014.10.22 10:05:21 -04'00'
      _____

7     Dawn South

8     AAERT Certified Electronic Transcriber CET**D-408

9

10    Veritext

11    330 Old Country Road

12    Suite 300

13    Mineola, NY 11501

14    Date:  October 22, 2014

15

16

17

18

19

20

21

22

23

24

25