**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**
Energy Future Holdings Corp. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
Grand Central Station, P.O. Box 4613
New York, NY 10163-4613

# PROOF OF CLAIM

**COURT USE ONLY**

| Name of Debtor: Energy Future Holdings Corp. et al | Case Number: 14-10979 |
|---|---|

**NOTE:** Do not use this form to make a claim for an administrative expense that arises *after* the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.

Name and address where notices should be sent:

BAR(23) MAIL ID *** 0000834886666 ***
EFH POC 05-15-2014 (CREDITOR.CREDNUM) 1000544143
GERALD EDWARDS
PO BOX 430438
HOUSTON, TX 77243

Telephone number: 713-858-6957   Email: gerod429@gmail.com

❑ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**
_____
*(If known)*

Filed on: _____

❑ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

Telephone number:   Email:

COURT USE ONLY

**5.  Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

❑  Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

❑  Wages, salaries or commissions (up to $12,475), earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier — 11 U.S.C. § 507(a)(4).

❑  Contributions to an employee benefit plan — 11 U.S.C. § 507(a)(5).

❑  Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use — 11 U.S.C. § 507(a)(7).

❑  Taxes or penalties owed to governmental units — 11 U.S.C. § 507(a)(8).

❑  Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$ _____

**1.  Amount of Claim as of Date Case Filed:**   $ _____
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
If all or part of the claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
❑  Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest charges.

**2.  Basis for Claim:** _____
(See instruction #2)

**3.  Last four digits of any number by which creditor identifies debtor:** 4458, 2352, , ,
**3a.** Debtor may have scheduled account as:  CUSTOMER NO. 24293451
(See instruction #3a)

**4.  Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:**
❑ Real Estate   ❑ Motor Vehicle   ❑ Other
**Describe:**
**Value of Property: $**
**Annual Interest Rate** ___ %  ❑ Fixed  or  ❑ Variable
(when case was filed)

**Amount of arrearage and other charges, as of time case was filed, included in secured claim, if any:**

$ _____

**Basis for perfection:** _____

**Amount of Secured Claim:**  $ _____

**Amount Unsecured:**  $ _____

**6.  Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $** _____   (See instruction #6)

**7.  Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8.  Documents:** Attach **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8 and definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**9.  Signature:** (See instruction #9)   Check the appropriate box:
❑ I am the creditor.   ☑ I am the creditor's authorized agent.   ❑ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ❑ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)
(Attached a copy of power of attorney, if any.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: DeAnna Edwards
Title:
Company:
(Signature) DeAnna Edwards
(Date) 10/23/2014

Address, telephone number, and email (if different from notice address above):
PO Box 580
Princeton, La 71067
Telephone number: 318-676-2244
Email: deanna.edwards@gmail.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

* All rights reserved.

Bk      Vol     Pg

00003940    OR      1124    634

## GENERAL AND DURABLE POWER OF ATTORNEY
## AMMENDED

STATE OF TEXAS

COUNTY OF WALKER

BE IT KNOWN, that this day before me, the undersigned authority, a Notary Public in and for Walker County, personally came and appeared:

GERALD D. EDWARDS of Harris County, Texas whose current mailing address is PO Box 430438, Houston, Texas 77243 as Attorney-in-fact and agent for GERALD D. EDWARDS and FLOYD B. EDWARDS of Fayette County, Georgia.

Who declared that Appearer has and does by thee presents substitute, nominate, authorize, constitute and appoint:

DEANNA LORRAINE EDWARDS-STODDARD of Bossier Parish, Louisiana whose current mailing address is PO Box 580 Princeton, Louisiana 71067 hereinafter referred to as "Agent", as true and lawful agent and attorney-in-fact for GERALD D. EDWARDS referred to as "Appearer" and in Appearer's name, place and stead, to:

1. Do, perform, conduct, manage and transact all and singular the affairs, business, concerns, and matters of whatever nature or kind, without any exception or reservation whatsoever, of Appearer;

2. To make and endorse promissory notes in the name of Appearer, and to bind Appearer by acknowledgment of debt, promises to pay, and engagements of all kinds;

3. To make, to endorse on behalf of and to deposit drafts, bills of exchange, acceptances, checks and notes or other obligations, for collection in any bank or financial institution; and to deposit all monies collected and received for the account of Appearer to Appearer's credit in any bank or banks, wherever located;

4. To withdraw from any bank or banks in which Appearer has an account or accounts, whether savings or checking, any sums of money, at pleasure, by check, or otherwise; and any bank or financial institution in which Appearer has such account or assets or any kind is authorized to honor checks thereon, and other forms of withdrawals signed on behalf of Appearer by Appearer's duly appointed Agent;

5. To have free access to any safe deposit box, post office box, or boxes in the name of Appearer in any, but not limited to, bank, financial institution, or holding company in the State of Louisiana or in any other state, with the right to unrestricted entry into said box and the unrestricted right to withdraw anything found in said box. All of this may be done without the necessity of Appearer's presence;

6. To pledge and pawn all, or any part or parts, of a property of Appearer's , including without limitation, corporation stock, and to make and give note or notes which may be necessary from time to time for the renewal of same;

7. To have full power over any account of any kind of nature Appearer has in any building and loan association in the City of Shreveport or Bossier City, Louisiana or elsewhere; with authority to deposit any funds therein, and make withdrawals therefrom, or receive dividends or interest therefrom, as fully as Appearer would personally do;

8. To invest and reinvest all funds, properties, and income therefrom, whether such property be movable or immovable, real, personal, or mixed, in any stocks, bonds, notes, or other properties of any kind that the agents of Appearer may think proper and to the best advantage of Appearer, and without restriction or limitations of any kind as to the nature of said investments and reinvestments; and to retain any part of the estate of property of Appearer, whether invested, reinvested, or not, without liability or responsibility for depreciation or loss by reason of or in respect of such retention;

9. To contract loans and to borrow money in the name of Appearer from any bank or banks, building and loan associations insurance company or companies, or other financial institutions wherever located, on the notes or obligations of Appearer drawn for Appearer by said Agent, and to execute notes or obligations from time to time for the renewal of all such or any part or parts thereof, the amount to be borrowed, the interest rate to be paid and all other terms and conditions of the loan being within the unrestricted discretion of said Agent:

10. To encumber and hypothecate all or any part or parts of the property belonging to Appearer, of any nature and kind, and whether now owned or subsequently acquired, and wherever located, whether in Texas, Caddo or Bossier Parish, Louisiana, or in any other parish, state, or territory –said Agent being given full power to mortgage said property for any sum and on any terms and conditions which said Agent deems fit, and to sign any necessary mortgages and notes in Connection therewith, containing such clauses and stipulations and as said Agent may agree to;

11. To make and execute income tax returns, estimates and any other reports and returns of any kind or nature to the Internal Revenue Service, the Department of Revenue of the State of Louisiana or any other taxing or governmental authority, and which may be required from time to time; and to pay amounts required to be paid by such returns or estimates or reports;

12. To buy and purchase all property of every kind movable or immovable, weather situated in Bossier Parish, Louisiana or in some other parish in the State of Louisiana, or elsewhere, in the name of Appearer, for such price and upon such terms and conditions as said Agent may seem fit and deem advantageous; to pay the price therefor and to sign and execute all acts, mortgages and deeds necessary in the premises, with whatever clauses said Agent may deem advisable. This is intended to give said Agent and attorney in fact the widest latitude in purchasing said property in the Agent's own discretion and upon whatever terms and stipulations said agent sees fit;

13. To lease let or hire for such time and for such price as said Agent may see fit, all or any of the property belonging to Appearer, or which Appearer may hereafter acquire, and to receive a receipt for the rent and wages therefor, as the same shall fall due. Sid Agent is given full power and discretion to make any terms and agree to any stipulations as may seem to be desirable to said Agent in connection with the making of such leases. Also to put an end to any said leases and to give the necessary notice to vacate according to law and make all repairs and pay all expenses necessary for the preservation of the property of Appearer;

14. To ask, demand, have, take, and sue for and by all lawful ways and means, to recover and receive of any from all and every person or persons whomsoever, body or bodies corporate, all and every such sum and sums of money, goods, debts, property and effects whatsoever, as not is, or may hereafter be in his, her or their custody or possession, due, owing or belonging to said Appearer; to adjust, compromise and settle all accounts and debts owing to Appearer, and to make good and give such discharge and acquaintances therefor;

Bk        Vol        Pg
00003940    OR        1124      636

15. To appear before all courts of law and equity, and to do, sue, prosecute, and defend, as the occasion shall require arbitration or otherwise, as said Agent shall in said Agent's discretion think fit; also, to apply for and obtain any and all attachments, sequestrations injunctions, and other conservatory and extraordinary writs, to take appeals, give the necessary security and bonds in any law suit and generally to represent Appearer in all litigation in which it may be necessary for Appearer to appear either as plaintiff, defendant intervener and third opponent or in any other capacity. Also, to compromise any matter, not in Court, in which Appearer is interested;

16. To sell, transfer assign and convey to any and all person or persons, corporations, or other purchases, with all legal warranties, for such price and upon such terms and conditions as said Agent may think best which such stipulations as said Agent may agree to, the title to the whole, or any part of, the interest and title to Appearer in and to any real and personal property owned by Appearer in Caddo Parish, Louisiana, in Bossier Parish, Louisiana, or in any other parish in the State of Louisiana, State of Texas, or elsewhere. Said Agent is empowered with, and given full discretion and authority to, make any such sale of real or personal property belonging to Appearer wherever located as may seem to said agent to be advantageous for Appearer, and said Agent is given the widest latitude to agree to any price, terms, and stipulations in accomplishing said sale, and to sign any act of sale or other instrument which may be required in connection therewith, and to receive the consideration delivered to Appearer in connection with such sale;

17. To make and execute oil, gas and mineral leases on any property of Appearer, or in which Appearer has an interest, wherever located, on such terms and conditions as said Agent shall deem proper in said Agent's sole and uncontrolled discretion, and receive and receipt for the bonuses, rents and proceeds thereof, as the same shall fall due; and to make and execute mineral and royalty deeds, either selling or buying mineral or royalty rights of any kind or nature; and to assign and purchase mineral leases and rights of any kind or nature, including royalty rights of any kind or nature; and to assign and purchase minerals and/or leases and rights of any kind of nature, including royalty rights; and to execute unitization and pooling agreements for the exploration and development of mineral rights; and to sign division orders –all of these powers to be exercised by said Agent upon such terms and conditions and for such considerations as said Agent deems appropriate. This shall include dealing in any transaction permitted and contractible under the Mineral Code of the State of Louisiana.

18. To sell and transfer any and all shares of the capital stock of any corporation owned by Appearer and to receive and receipt for the dividends due or to become due thereon including stock dividends; and to pledge an pawn all or any shares of stock in any corporation owned by Appearer; and to appear for Appearer and represent Appearer at any and all meetings of the stockholders of any corporation with which Appearer owns stock, and to vote at said meeting or to execute a proxy, if need be, in favor of others to vote in the name of Appearer on all questions or matters which may be submitted at such meeting;

19. To represent Appearer judicially and otherwise, in all successions and estates in which Appearer may be or become interested, including any acceptance or renunciation thereof; to apply for the administration or executorship thereof, and to demand, obtain, and sign any pleadings in judicial proceedings otherwise in all successions and estates in which Appearer may be or become interested including any acceptance or renunciation thereof; to apply for the administration or executorship thereof, and to demand, obtain, and sign any pleadings in judicial proceedings in said succession proceedings, as Agent may deem proper; to settle, compromise and liquidate Appearer's interest therein, to take steps to place Appearer in possession of any properties to which Appearer may be entitled in said succession and to receipt for

all properties and assets to which Appearer may be entitled in respect to said successor or estates;

20. To make any medical decisions or whatever nature if Appearer is rendered unconscious and unable to do so himself.

Without in any way limiting the powers of said Agent enumerated in the numbered paragraphs set forth above which are not intended to restrict said Agent only to the exercise of the powers therein listed and stated, said Agent is also granted full power and authority to do and perform each and every act and thing whatsoever that the Agent, in the Agent's uncontrolled discretion, may deem to be necessary in the premises or requisite to carry on the affairs, business, or administration of the assets of the principal, with the same validity as if such act had been particularly stated and expressly provided for herein; and as fully as Appearer might or could if personally present; with full power of substitution and revocation, Appearer hereby ratifies and confirms all that said Agent shall lawfully do or cause to be done in the premises by virtue of this act of procuration.

THUS DONE AND PASSED at Walker County, Texas before me Notary, in the presence of the two undersigned competent witnesses, who have hereunto signed their names with Appearer, and me, Notary, after due reading of the whole on this the 6th day of June, 2014.

_____
GERALD D. EDWARDS
PRINCIPAL

BE IT KNOWN, that this day before me, the undersigned authority, a Notary Public in and for Walker County ally came and appeared:

DEANNA LORRAINE EDWARDS-STODDARD of Bossier Parish, Louisiana, whose mailing address is PO Box 580, Princeton, Louisiana 71067, accepts the appointment of Agent and attorney- in-fact for GERALD D. EDWARDS and FLOYD B. EDWARDS.

_____
DEANNA LORRAINE EDWARDS-STODDARD
Attorney-in-fact

WITNESSES:

_____

_____

_____
NOTARY PUBLIC

SONJA TENNANT
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES:
10-29-2015

Kari A. French, Walker County Clerk
Walker County

Jun 06,2014

STATE OF TEXAS
I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded in the named records of Walker County in the volume and page of the named records of Walker County as stamped hereon by me.

COUNTY OF WALKER

Filed for Record in:
Walker County
On: Jun 06,2014 at 03:19P
As a
Recordings
Document Number:
00003940
Amount:
38.00
Receipt Number - 85146
By:
Kathy Cook

STATE OF LOUISIANA                335615

PARISH OF _____WEBSTER_____

KNOW ALL MEN BY THESE PRESENTS:

THAT, GERALD DEE EDWARDS and his wife Elizabeth Chance Edwards, whose mailing
address is Dubberly, Louisiana.

_____

_____

Grantor (whether one or more), for and in consideration of the sum of $ 100.00 & OVC
cash in hand paid, the receipt and sufficiency of which is hereby acknowledged, does
hereby grant and convey unto

NELSON OIL & GAS, INC.

Grantee, its successors and assigns, a right-of-way and easement to lay, install, main-
tain, operate, replace, change and remove one or more pipe lines and appurtenances
thereto for the transportation of oil, gas, water or any other fluid or substances
(either or all) and to erect, maintain, operate, replace, change and remove, in con-
nection with the conduct of its business, telegraph, telephone, power lines, electrical
protection units and appurtenances thereto, on, over and through the following des-
cribed lands situated in _____WEBSTER_____ Parish, State of Louisiana, to-wit:

A strip of land 20 feet in width in the NW/4 NW/4 of Section 19
Township 18 North, Range 8 West as shown on Exhibit "A" attached
hereto and made a part hereof.



together with the right of ingress and egress for all purposes incident to said grant
and the right to do any and all things which may be requisite to the enjoyment of the
rights herein granted.

All pipe laid and all lines erected under this grant shall be on routes selected
by the Grantee, its successors or assigns.

The Grantor is to fully use and enjoy the said premises except for the purposes
herein granted; provided, the Grantor shall not construct or maintain or permit to be
constructed or maintained any building or other obstruction on or over or that will
interfere with the maintenance or operation of any line or appurtenances constructed
hereunder and will not change the grade over such pipe.

The rights of either party hereunder may be assigned in whole or in part and the
provisions hereunder shall extend to the heirs, executors, administrators, successors
and assigns of the respective parties.

It is understood and agreed that the consideration recited above and receipt of
which has been acknowledged by Grantor, is also full, complete and final payment for
any and all injuries and damages that have been or may be inflicted upon or to these
premises and Grantor's property thereon by Grantee, in the enjoyment and use by Grantee
of its rights hereunder and Grantor hereby covenants that any and all claims that they
have or may have because of Grantee's operations hereunder have been and are paid and
satisfied in full.

CONV.BK. 670:718

And Grantor does hereby bind themselves, their heirs, executors and administrators to warrant and forever defend, all and singular, the said premises unto the said Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

This instrument embodies the entire agreement between the parties hereto, including the consideration paid or to be paid therefor.

TO HAVE AND TO HOLD unto the Grantee so long as the rights and easements herein granted, or any of them, shall be used by or useful to the Grantee, its successors and assigns, for the purposes herein granted.

WITNESS THE EXECUTION HEREOF on this _17th_ day of _November_ , 19_86_.

WITNESSES:

_Kathy D. McManus_

_Betty F. Logan_

_Cathy D. McManus_

_Betty F. Logan_

_Gerald Dee Edwards_
GERALD DEE EDWARDS

_Elizabeth Chance Edwards_
ELIZABETH CHANCE EDWARDS

STATE OF _Louisiana_

Parish OF _Webster_

On this _17th_ day of _November_ , 19_86_, before me personally _Gerald Dee Edwards & Elizabeth Chance Edwards_ to me known to be the person_s_ described in and who executed the foregoing instrument, and acknowledged that _they_ executed it as his/their free act and deed.

_Alma Jo Warlick_
NOTARY PUBLIC IN AND FOR _Webster_
_Parish Louisiana_

CONV.BK. 670::719



CONV. BK. 670: 720

NW/4
NW/4

JW Hendryx 1.25 Ac.

Cecil R. Miller et al

R.T. Bell

W.T. Randle elux

Johnnie N. Hayes

Village of Dubberly .14 Ac.

1 Ac.

J.T. Matthews 1 Ac.

J.M. Matthews 6.53 Ac.

CATALPA LN.

R E Skinner 1 Ac.

R.C. Plunkett et ux 2 Ac.

W.A. Humphrey 2.23 Ac.

W.C. Vinson 1.77 Ac.

G.D. Edwards 2 Ac.

R.A. Robinson 1.07 Ac.

R C Plunkett 2 Ac.

Catalpa Ln.

C M Robinson 1.01 Ac.

Gerard D. Edwards 16.59 Ac.

I. C. R. R.

Hwy. 532

Proposed Extension

Gibbs Tract 20 Ac.

Sec. 19 - 18N - 8W
1" = 500'

(Existing Power Line)

1320

Claiborne Electric Coop Line

Proposed 3" Gas Line

Gibbs Tract 80 Ac.

Arkla Pipeline

to D White well

800'

420.75'    420.75'    420.75'    420.75'    420.75'    420.75'

1320'

Proposed 20' R.O.W.

Anita W. Brown, et al

Frances W. Adams

Iola W. Smith

David R. Wheeler, Jr., et al

Anita W. Brown, et al

James H. Worsham

SW/4
SW/4

SE/4
SW/4

- E X H I B I T    A -

831-222

Se Reg # 402491
Correction
5.15.96
R. Wrae

247676
CREDIT DEED

FILED & RECORDED
WEBSTER PAR. LA.

## STATE OF LOUISIANA

Parish of WEBSTER

PARISH OF POINTE COUPEE

'74 SEP 24 AM 11 19

DEPUTY CLERK & RECORDER

BE IT KNOWN, That this day before me, the undersigned authority, a Notary Public in and for the said Parish, duly commissioned and sworn, came and appeared

ELIZABETH S. ROBERTS, a widow, whose mailing address is Rt. 1, Box 10A-C, Holden, Louisiana 70744 and Gertrude Stewart Morgan, a widow, whose mailing address is Box 7, New Roads, Louisiana 70760:

who declared that they do by these presents, GRANT, BARGAIN, SELL, CONVEY AND DELIVER, with full guarantee of title, and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property herein conveyed, together with all rights of prescription, whether acquisitive or liberative, to which said vendor may be entitled, unto

GERALD DEE EDWARDS, husband of Elizabeth Chance Edwards, whose mailing address is Rt. 1, Box 15-A, Dubberly, Webster Parish, Louisiana,

the following described property, to-wit:

North Half of Southwest Quarter of Northwest Quarter (N 1/2 of SW 1/4 of NW 1/4), Section 19, Township 18 North, Range 8 West, Webster Parish, Louisiana, being twenty (20) acres, more or less.

Vendors reserve unto themselves a one-fourth (1/4th) mineral interest each subject to the following conditions:

1. This mineral reservation shall terminate at the end of ten (10) years from the date of this sale. This termination date will be effective even should the above property be under production on that date.

2. Vendee shall have the exclusive right to negotiate and grant mineral leases or make mineral sales upon the above described property.

3. Vendee shall have the first option to purchase the mineral rights of either or both vendors and must be given thirty (30) days written notice of their intent to sell in which time he must exercise his option.

4. In the event of death of either vendor while the ten (10) year mineral reservation is in effect, that vendor's mineral reservation will terminate immediately and her one-fourth (1/4th) mineral interest will accrue to vendee.

551

TO HAVE AND TO HOLD said described property unto said purchaser,    his    heirs and assigns forever.

This sale is made for the consideration of the sum of   – – TEN THOUSAND AND NO/100 – – – – – – – – – – ($10,000.00) – – – – – – – – – – – – – – – –    Dollars, payable as follows: – – – – – THREE THOUSAND AND NO/100 – – – – – ($3,000.00) – – – – – – – – –    Dollars cash in hand paid, the receipt of which is hereby acknowledged, and the balance in  one (1)    note of said purchaser/ in the amount of $7,000.00 , dated with this act, to order of this purchaser Vendors her xxxxxxxx and due and payable as follows:

$3,500.00 plus $560.00 interest on June 1, 1975

$3,500.00 plus $280.00 interest on June 1, 1976

which note    bear    eight per cent per annum interest from on the unpaid balance from date /until paid and furnished "Ne Varietur" of this date by me, Notary, to identify the same herewith.

552

In the event of failure to pay any of said notes or said installments when due, or the failure to pay interest promptly when due, or failure to pay the taxes on said property before delinquent or failure to keep said buildings insured, then, and in that event, each and all notes shall immediately become due and collectible at the option of the holder.

And in order to secure the payment of said note , interest, costs and attorney's fees, a special mortgage and vendor's privilege is hereby stipulated on said property in favor of said vendor, or any future holder of said note , said purchaser agreeing not to alienate, deteriorate or encumber said property to the prejudice of the mortgage.

In event of suit for collection of said note or any other amount which may be due under this contract, or when said claims are placed in the hands of an attorney for collection, such purchaser agrees to pay the fees of such attorney at law who may be employed for that purpose, which fees are hereby fixed at ten per cent (10%) on the amount to be collected; and the holder of said note of notes shall be entitled to the appointment of a receiver of the rents and revenues of said premises.

This mortgage waiving benefit of appraisement and importing confession of judgement.

The certificate of mortgage is hereby waived by the parties, and evidence of the payment of taxes produced.

The vendee takes cognizance of all past due and/or current year's taxes and agrees to pay the same.

STATE OF LOUISIANA
PARISH OF WEBSTER

I hereby certify that the above is a true and correct copy of the original as same appears of record in the office of state on September 24, 1974 at 11:19 o'clock A. M. Registered 247676 and of record in 247676 Record Vol 438 page 551.

Given under my hand and seal of office at Minden La. this 13th day of September 20 11.

CLERK OF COURT

BY _Kimberly Morgan_
DEPUTY CLERK, DISTRICT COURT

of Pointe Coupee

DONE AND PASSED at my office, in said Parish in presence of the undersigned competent witnesses and me, Notary, on the sixth (6th) day of September A. D. Nineteen Hundred and Seventy-four (1974).

ATTEST:

_Louise Guidroz_
Louise Guidroz

_Emerson P. Comeaux_
Emerson P. Comeaux

_Elizabeth S. Roberts_
Elizabeth S. Roberts

_Gertrude Stewart Morgan_
Gertrude Stewart Morgan

_Eugene L. Gill_
Eugene L. Gill,     Notary Public.

DONE AND PASSED at my office in Webster Parish, Louisiana, in the presence of the undersigned competent witnesses and me, Notary, on this 21st day of August , 1974.

ATTEST:

_Mary T. Conrad_

_Beverly Fairfield_

_Gerald Lee Edwards_
Gerald Lee Edwards

NOTARY PUBLIC IN AND FOR WEBSTER PARISH, LOUISIANA

553

2720-J                    DIVISION ORDER

**ARKANSAS LOUISIANA GAS COMPANY,**
Shreveport, Louisiana.

Effective_____7:00 a.m., May 1, 1976
Date as of_____June 10_____19 76

The undersigned, and each of them, represent, guarantee, and warrant that they are the legal owners, in the proportions set out below, of the gas, condensate, gasoline, and all liquid hydrocarbons, except oil and casinghead gas, produced and to be produced from all wells, Nos. 1 and up, on the unit or lease in the _____Sibley_____ Gas Field, located in _____Webster_____ Parish, State of_____Louisiana_____ and more particularly described as follows:

SEE EXHIBIT "A"

and until further written notice you or your assignee, nominee or vendee are authorized, for your own account to receive and purchase said gas, condensate, gasoline and all liquid hydrocarbons, except oil and casinghead gas therefrom in the usual conduct of your business, and pay the owners in accordance with the terms of contract dated_____January 25_____19 50, between_____The Atlantic Refining Co._____ as _____Seller_____ and Arkansas Louisiana Gas Company, as_____Buyer_____, and any renewal, extension or amendments thereto covering the purchase and sale of said products, for their respective interests, stated and guaranteed as follows:

| NAME | ADDRESS | INTEREST |
|---|---|---|
| Gerald Dee Edwards, this interest terminates ten (10) years from date of sale and will accrue to Gerald Dee Edwards, or at death of vendor. | Rt. 1 Box 15A Dubberly, LA | .006492 RI |

This Division Order pertains only to the interest shown above, being a division of those interests heretofore credited Elizabeth Stewart Roberts, deceased, and Gertrude Stewart Morgan.

It is agreed and understood that the Arkansas Louisiana Gas Company may account for the interest as shown above, without liability, until written notice is furnished Arkansas Louisiana Gas Company at this office in Shreveport, Louisiana, to the contrary.

Payment according to the foregoing provision for said products taken from the above described land during any calendar month shall be made on or before the 28th day of the following month, except that payment of sums of less than $5.00 per month may be made annually in December.

The undersigned severally agree to notify the Arkansas Louisiana Gas Company of any change of ownership, it being understood that any vendee or assignee of said wells or the production therefrom shall take the same subject to the terms hereof.

It is understood and agreed that in case of adverse claim of title to land from which any such products may be produced or adverse claim of title to any products sold and produced in pursuance of this Division Order, the Arkansas Louisiana Gas Company may retain purchase price of such products until such adverse claim is fully settled and determined or until the party or parties claiming to be the owners thereof shall furnish satisfactory indemnity against such adverse claim or claims. And the undersigned hereby agree to indemnify and hold said Arkansas Louisiana Gas Company, its nominee or Vendee harmless against any claim which may be asserted or any action which may be brought on account of any products taken under terms hereof.

WITNESS:

_____
_____
_____                    Gerald Dee Edwards

2720-J

## EXHIBIT "A"

### RICHARD B. NELSON - Gibbs Unit No. 1

249.2 acres, in Section 19, Township 18 North, Range 8 West, Webster Parish, Louisiana, described as follows:

The Northwest Quarter, (NW/4), and the West Half of West Half of the Northeast Quarter (W/2 of W/2 of NE/4), and the Southwest Quarter (SW/4), LESS AND EXCEPT a tract of land containing 43.9875 acres more particularly described as follows:

Beginning at the Southwest Corner of Section 19; thence North 198.0 feet to a point in the West line of said Section 19; thence in a Northeasterly direction to the Northeast Corner of the South Half of the Southwest Quarter (S/2 of SW/4); thence South 1320 feet to South-east corner of the South Half of the Southwest Quarter (S/2 of SW/4); thence West to point of beginning;

also LESS AND EXCEPT a tract containing 50 acres, more or less, des-cribed as follows:

Begin at the Northwest Corner of the Northwest Quarter of the Northwest Quarter of Section 19, Township 18 North, Range 8 West, Webster Parish, Louisiana, and run East along the North line of said Section a distance of 3300 feet; thence run South 660 feet; thence run West 3300 feet; thence run North 660 feet to the point of beginning of the tract here-in described, containing 50 acres, more or less, ONLY INSO-FAR as pertains to production from the Sub-Anhydrite Zone of the Rodessa Formation.

## TRANSFER ORDER

2720-J

_____ July 6 _____ 19 76

To   ARKANSAS LOUISIANA GAS COMPANY

      The undersigned, having transferred, as indicated below, the oil and gas production of wells numbered____

_____on the__RICHARD B. NELSON - Gibbs Unit No. 1___Farm, more particularly described, as:

_____SEE EXHIBIT "A"_____

_____

_____

_____

_____

_____

covered by division order heretofore executed, you are hereby authorized, beginning at 7 o'clock A. M. on the

___1st___day of_____May_____19 76 , and until further notice, to give credit for oil and

gas received on account of said interest so transferred as follows.

| Credit To | Transferred Interest | Address |
|-----------|---------------------|---------|
| SEE EXHIBIT "B" | | |
| | | |
| | | |
| | | |

WITNESSES:

_____     _____

_____     _____

      The undersigned transferee__hereby join__in the above, and agree__to the terms and conditions of said division order.

WITNESSES:

_____     _____

_____     _____

2720-J

<u>EXHIBIT "A"</u>

249.2 acres in Section 19, Township 18 North, Range 8 West, Webster Parish, Louisiana, described as follows:

The Northwest Quarter (NW/4) and the West Half of West Half of the Northeast Quarter (W/2 of W/2 of NE/4), and the Southwest Quarter (SW/4), LESS AND EXCEPT a tract of land containing 43.9875 acres more particularly described as follows:

Beginning at the Southwest Corner of Section 19; thence North 198.0 feet to a point in the West line of said Section 19; thence in a Northeasterly direction to the Northeast Corner of the South Half of the Southwest Quarter (S/2 of SW/4); thence South 1320 feet to Southeast Corner of the South Half of the Southwest Quarter (S/2 of SW/4); thence West to point of beginning;

also LESS AND EXCEPT a tract containing 50 acres, more or less, described as follows:

Beginning at the Northwest Corner of the Northwest Quarter of the Northwest Quarter of Section 19, Township 18 North, Range 8 West, Webster Parish, Louisiana, and run East along the North line of said Section a distance of 3300 feet; thence run South 660 feet; thence run West 3300 feet; thence run North 660 feet to the point of beginning of the tract herein described, containing 50 acres, more or less, ONLY INSOFAR as pertains to production from the Sub-Anhydrite Zone of the Rodessa Formation.

2720-J

## EXHIBIT "B"

| Credit To | Transferred Interest | Address |
|-----------|---------------------|---------|
| Gerald Dee Edwards | .002164 RI | Rt. 1 Box 15A Dubberly, LA  71029 |
| Gerald Dee Edwards | .002164 RI | |
| Gerald Dee Edwards | .002165 RI | |
| *Gertrude Stewart Morgan | .002164 RI | |

*It is agreed and understood that the Arkansas Louisiana Gas Company is under no obligation to keep a record of amounts due or paid on the above listed revisionery interest and it is further agreed and understood that the Arkansas Louisiana Gas Company may account for the interest as shown above until written notice is furnished at Shreveport, Louisiana, that the ownership is to be changed.

WITNESSES:

_____

_____

_____
Gertrude Stewart Morgan

_____
Elizabeth Stewart Roberts (Deceas

    The undersigned transferee hereby joins in the above, and agreed to the terms and conditions of said division order.

WITNESSES:

_____

_____

_____
Gerald Dee Edwards

_____
S.S.#

_____

_____
Gertrude Stewart Morgan

_____
S.S.#

(Page 1 of 1)

REGISTRY NO.

406189

CLERK OF COURT
WEBSTER PARISH, LA

00 MAR - 1  PM 3: 02

NACOLE WAFER
DEPUTY CLERK

## BILL OF SALE

STATE OF LOUISIANA

PARISH OF POINTE COUPEE

    Before me, the undersigned authority, personally came and appeared Mrs. Gertrude S. Morgan who declared that for the sum of $100.00 (one hundred dollars), receipt of which is acknowledged, she does hereby sell with full guaranty of title and with complete transfer of all rights unto Gerald Edwards, the following described property, to wit:

    1 lot - 90 x 60 ft. Main Street, Dubberly, La. as described on 1978 Tax Notice, Webster Parish, La.

_Gertrude S. Morgan_
Seller

SWORN TO AND SUBSCRIBED BEFORE ME, this the 1st day of March, 1979,

_Ilene D. Roberts_
Notary Public
Parish of Pointe Coupee

My commission expires at death.

CONVEYANCE
BOOK     PAGE
0906     157



# ARKANSAS LOUISIANA GAS COMPANY
### P.O. BOX 1734 • SHREVEPORT, LOUISIANA • 71151

July 6, 1976

Re:  File No. 2720-J  -  RICHARD B. NELSON
Gibbs Unit No. 1

Mr. Gerald Dee Edwards
Rt. 1 Box 15A
Dubberly, LA

Dear Mr. Edwards:

We wish to acknowledge receipt of the recorded deed in which
you acquired the interest of Elizabeth Stewart Roberts and
Gertrude Stewart Morgan under the captioned unit.

We are enclosing a transfer order which will reflect the change
of interest.  We ask that you and Gertrude Stewart Morgan sign
the order before two witnesses; thereafter, one completed copy
should be returned to this office with the correct address and
social security number indicated thereon.

In reviewing our records we do not find an interest in the name
of Oliver M. Howell, Jr.  If he had minerals or interest, we
should be furnished evidence of how he acquired the interest.

Very truly yours,

ARKANSAS LOUISIANA GAS COMPANY

By _____
Walter M. White
Land Department

WMW:lgp
Enclosures

NOV-30-2010 08:37A FROM:
OCT-18-2010 02:12P FROM:

TO:13187470179      P:1/1
TO:13187470179      P:1/3

TO: Deanna

8 37-2--
In Rgt # 402 491
correction
5-15-96
R. Warren

227675

FILED & RECORDED
WEBSTER PARISH, LA.
'74 SEP 26 AM 11:18

AFFIDAVIT OF DEATH AND HEIRSHIP

STATE OF LOUISIANA

PARISH OF Webster

BEFORE ME, the undersigned authority, personally came and appeared
F. LaVelle Perryman and M.C. Perryman
who, after being first duly sworn, deposed:

That they were well acquainted with T. A. Stewart and his wife,
Annie Fille Stewart ; that they know of their own personal knowledge
that they were married but one time and then to each other; that to this marriage
two children were born, namely:

Elizabeth Stewart Roberts
Gertrude Stewart Morgan.

That T. A. Stewart died June 2, 1940 and his
wife Annie F. Stewart died December 22, 1966, leaving
surviving them as their sole heirs the two daughters above named; that the
decedents never had any other children and never adopted anyone.

F. LaVelle Perryman

M.C. Perryman

SWORN TO AND SUBSCRIBED before me, Notary, on this the 21st day of August,
1974.

Aubrey A. Halley
NOTARY PUBLIC

550

335234

# ICG 15002

Nov 14  IT 44 AM '86

WESTERN ENGR
BY.

## ASSIGNMENT

THIS AGREEMENT, dated as of this //₄₄ day of July, 1986
("this Assignment"), by and between ILLINOIS CENTRAL GULF
RAILROAD COMPANY, hereinafter called "ICG", a Delaware
corporation, and MIDSOUTH RAIL CORPORATION, hereinafter called
"Railway", a Delaware corporation.

### W I T N E S S E T H:

WHEREAS, ICG and AT&T Communications, Inc., 300 S. Riverside
Plaza, Chicago, Illinois 60606, ("AT&T"), entered into an
Agreement, dated March 29, 1985 (the "Agreement") covering the
grant of an easement for a fiber optic cable system in the States
of Illinois and Indiana on ICG's lines of railroad and property,
herewith collectively referred to herein and therein as the "Rail
Corridor";

WHEREAS, ICG and AT&T supplemented the Agreement by First
Supplemental Agreement dated November 11, 1985 to include
additional fiber optic installations on 54.3 miles of ICG's line
of railroad and property, identified in said supplemental
agreement as "Additional Rail Corridor" in Mississippi and
Louisiana, and further supplemented the Agreement by Third
Supplemental Agreement dated March 21, 1986 to include additional
fiber optic installations on 27.5 miles of ICG's line of railroad
and property, identified in said supplemental agreement as
"Additional Rail Corridor" in Louisiana;

WHEREAS, the fiber optic installations covered by the
aforesaid Supplemental Agreements dated November 11, 1985 and
March 21, 1986 are located on a portion of the property ICG has
conveyed to the Railway, and the parties hereto desire that
Railway become the ICG's successor and assignee of all the rights
and obligations of ICG in and to the aforesaid Supplemental
Agreements dated November 11, 1985 and March 21, 1986, subject,
however, to the express reservation set forth below:

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) cash in hand paid by each party to the other, the premises herein contained and the mutual benefits that will flow from this Assignment, it is hereby mutually agreed as follows:

1. ICG does hereby transfer and assign to Railway, and Railway shall succeed to, all of the rights and obligations of ICG under the Agreement dated March 29, 1985 as it relates to the First Supplemental Agreement dated November 11, 1985 and the Third Supplemental Agreement dated March 21, 1986, except for those rights to compensation recited in Section 2.3 at Page 4 of the Agreement, indicated on Exhibit A attached hereto, which rights are reserved by ICG, its successors or assigns.

2. In order to enable the parties to determine ICG's rights to compensation as recited in the aforesaid Section 2.3, Railway agrees that it will aid in the arbitration procedures, if necessary, to the extent of allowing representatives of ICG, including appraisers, on the property of Railway for reasonable appraising requirements.

3. This Assignment supersedes any and all past understandings and/or disputes, written or oral, between the parties hereto relative to the respective rights and obligations under the Agreement dated March 29, 1985 and the First and Third Supplemental Agreements dated November 11, 1985 and March 21, 1986, but it does not otherwise impact on any of the documents applicable to the closing on March 31, 1986 of the transactions contemplated in the Purchase and Sale Agreement entered into by and between ICG and Railway dated November 12, 1985.

4. This Assignment shall be effective from the 11th day of July, 1986, but its execution shall not affect any

CONV.BK. 668::807

2

right or obligation which occurred under the Agreement

prior to said effective date.

IN WITNESS WHEREOF, the parties have caused this Assignment

to be executed on the day and year first above written.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY

By: _____

Senior Vice President-Law and
Real Estate

Assistant Secretary

MIDSOUTH RAIL CORPORATION

By: _____

Edward L. Moyers, President and
Chief Executive Officer

ATTEST:

_____
John A. Scotto, Secretary

STATE OF ILLINOIS

COUNTY OF _COOK____

Personally appeared before me, the undersigned authority in

and for said County and State, within my jurisdiction, the within

named _ANDREW F. REARDON_ and _W.H. SANDERS_____; duly

identified before me, who acknowledged that they are
_SENIOR VICE PRESIDENT-LAW_
_AND REAL ESTATE_ and _ASSISTANT SECRETARY_, respectively, of Illinois

Central Gulf Railroad Company, a Delaware corporation, and that

for and on behalf of said corporation, and as its act and deed,

they signed and delivered the above and foregoing instrument for

the purposes mentioned on the day and in the year therein

mentioned, after first having been duly authorized by said

corporation so to do.

Given under my hand and official seal on this _10TH_ day of

_SEPTEMBER___, 1986.

_____
NOTARY PUBLIC

My Commission Expires:          COMM. EX. 668.808

My Commission Expires
February 25, 1989

3

STATE OF MISSISSIPPI

COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for said County and State, within my jurisdiction, the within named Edward L. Moyers and John A. Scotto, duly identified before me, who acknowledged that they are President and Chief Executive Officer and Secretary, respectively, of MidSouth Rail Corporation, a Delaware corporation, and that for and on behalf of said corporation, and as its act and deed, they signed and delivered the above and foregoing instrument for the purposes mentioned on the day and in the year therein mentioned, after first having been duly authorized by said corporation so to do.

Given under my hand and official seal on this 23rd day of August ~~July 1986~~.

Lynn C. Whitlow
NOTARY PUBLIC

My Commission Expires:

My Commission Expires Oct. 30, 1989

# EXHIBIT "A"

2.3   The Easement granted AT&T shall be in perpetuity.  AT&T shall on the 24th anniversary of the Agreement give to the RAILROAD notice that it will either abandon the Fiber Optic Cable System or continue the use of their Fiber Optic Cable System in the Rail Corridor. Along with said notice, if continuance of the Cable System is desired, AT&T shall include an appraisal report (by a qualified right-of-way appraiser) setting forth the fair market value of the Easement.  If the price is not acceptable to RAILROAD, it shall notify AT&T within sixty (60) days of AT&T's original notice that said appraisal is unacceptable to RAILROAD.  RAILROAD shall have sixty (60) days after its notice to secure and deliver to AT&T a second appraisal report indicating fair market value of the Easement as determined by a qualified right-of-way appraiser of RAILROAD's choice.  If both parties cannot agree on the price based upon the two appraisal reports, they shall, within sixty (60) days of RAILROAD's appraisal, instruct both appraisers to select a mutually agreeable third qualified right-of-way appraiser who will review both appraisal reports and determine the fair market value of the Easement within thirty (30) days of his appointment.  In the event the two (2) appraisers cannot reach agreement on the third appraiser, the issue of the third appraiser shall be submitted to the American Arbitration Association.  The determination of the third appraiser shall be final.  AT&T may accept continuance at the value set forth by the third appraiser.  The parties agree to share the cost of the third appraiser and the costs of the American Arbitration Association, if used, equally.  For each of the appraisals provided for above, the instructions to the appraiser(s) shall be to determine the fair market value of twenty-five (25) years additional occupancy, without reference to the value of AT&T's Fiber Optic Cable System installed thereon, or to the revenues derived therefrom by AT&T.  The same procedure shall also apply on the 49th anniversary of this agreement. Compensation shall be made to the RAILROAD on the 25th and 50th anniversary of this agreement.  Upon expiration of the 75th anniversary of the Agreement, no additional compensation shall be required.  RAILROAD agrees to execute such document(s) as may be required to grant to AT&T in perpetuity all rights of usage and occupancy of the easement premises as are set forth in this Agreement.  If AT&T decides to abandon the Fiber Optic Cable System, no additional compensation shall be required by RAILROAD.

CONVEX 668:810

STATE OF _MISSISSIPPI_

PARISH/COUNTY OF _HINDS_

    On this _13th_ day of _OCTOBER_ , 1986,

before me, the undersigned authority and in the presence of the

undersigned competent witnesses, personally came and appeared

EDWARD L. MOYERS and JOHN A. SCOTTO, who, being by me duly sworn,

did say that they are the President and Chief Executive Officer

and Secretary, respectively, of MidSouth Rail Corporation, and

that the foregoing "ASSIGNMENT" was signed on behalf of the

corporation by authority of its Board of Directors and that

Edward L. Moyers and John A. Scotto acknowledged the instrument

to be the free act and deed of the corporation.

WITNESSES:

    _John W. Frey_

    _J. A. Rawle_

                                _Edward L. Moyers_
                                EDWARD L. MOYERS, PRESIDENT AND
                                CHIEF EXECUTIVE OFFICER, MIDSOUTH
                                RAIL CORPORATION

                                _John A. Scotto_
                                JOHN A. SCOTTO, SECRETARY,
                                MIDSOUTH RAIL CORPORATION

                        _Sylvia W. Halland_
                                NOTARY PUBLIC
                                My Commission Expires August 11, 1990

STATE OF ___ILLINOIS_____

PARISH/COUNTY OF ___COOK_____

    On this __30th___ day of ___September_____, 1986,

before me, the undersigned authority and in the presence of the

undersigned competent witnesses, personally came and appeared

ANDREW F. REARDON and W. H. SANDERS, who, being by me duly sworn,

did say that they are the Senior Vice President - Law and Real

Estate and Assistant Secretary, respectively, of Illinois Central

Gulf Railroad Company, and that the foregoing "ASSIGNMENT" was

signed on behalf of the corporation by authority of its Board of

Directors and that Andrew F. Reardon and W. H. Sanders

acknowledged the instrument to be the free act and deed of the

corporation.

WITNESSES:

_____    _____
                              ANDREW F. REARDON, SENIOR VICE
_____    PRESIDENT - LAW AND REAL ESTATE,
                              ILLINOIS CENTRAL GULF RAILROAD
                              COMPANY

                              _____
                              W. H. SANDERS, ASSISTANT
                              SECRETARY, ILLINOIS CENTRAL GULF
                              RAILROAD COMPANY

                              _____
                              NOTARY PUBLIC

                              My Commission Expires
                              February 25, 1989

STATE OF LOUISIANA }
PARISH OF OUACHITA }
   I hereby certify this to be a full and true copy of an
original instrument filed in my office on the date and hour
and under the Registry Number stamped hereon to
            { Conveyance _____
be recorded in the { Mortgage _____ } Records.
            { Chattel Mortgage ____
Given under my hand and seal of office on said date of
filing.
        _____
        DEPUTY CLERK & EX-OFFICIO DEPUTY RECORDER

335234

                95-1325
              FILED & RECORDED
              CLERK & RECORDER
            OUACHITA PARISH, LA.

           Nov 13  12 48 PM '86
           BY _____
          Cm ___ BK 395 P ___ DY

RECEIVED & FILED
WINFRED L. TINKLEY
CLERK OF COURT

Nov 14  11 44 AM '86
                    CONVEY. 668 812
WEBSTER PARISH

_____ BY ___

ELIZABETH STEWART ROBERTS

OIL & GAS LEASE TO                                    REGISTER NO. 136944

THE ATLANTIC REFINING CO.

    THIS AGREEMENT made this 20th day of November, 1952, between ELIZABETH STEWART ROBERTS,
GERTRUDE STEWART MORGAN and BETTY ANNE STEWART lessor (whether one or more), and THE ATLANTIC
REFINING COMPANY lessee, WITNESSETH:

    1. Lessor in consideration of TEN AND NO/100 Dollars ($10.00), in hand paid, of the
royalties herein provided, and of the agreement of lessee herein contained, hereby grants
leases and lets exclusively unto lessee for the purposes of investigating, exploring, pros-
pecting drilling and mining for and producing oil, gas and all other minerals, laying pipe
lines, building tanks, power stations, telephone lines and other structures thereon to pro-
duce, save take care of, treat, transport and own said products and for dredging and main-
taining canals, constructing roads and bridges, and building houses for its employees, and,
in general, for all appliances, structures, equipment, servitudes and privileges which may be
necessary, useful or convenient to or in connection with any such operations conducted by
lessee thereon, or on any adjacent lands, the following described land in Webster Parish,
Louisiana, to-wit:

    Being a tract of 0.12 acres of land situated in the SW/4 of the NE/4 of Section 24,
Township 18 North, Range 9 West, Webster Parish, Louisiana, and being more particularly des-
cribed as follows:

    BEGINNING at the Southwest corner of Lot 17, Block "E" of the Townsite of Dubberly,
Louisiana, as recorded in Map Book One, page 45 of the Records of Webster Parish, Louisiana,
the Northwest corner of the most Westerly of two 0.33 acre tracts in the name of M. T. Worsham,
the Northwest corner of this tract; THENCE S 04 deg. 29' W 90.0 feet with the East line of
said Westerly Worsham tract to its Southeast corner on the North line of a 2.90 acre tract in
the name of H. D. Kniveton, the Southwest corner of this tract; THENCE N5 deg. 31' E 60.0
feet with the North line of said Kniveton tract to theSouthwest corner of the most Easterly of
two 0.33 acre tracts in the name of M.T. Worsham, the Southeast corner of of this tract; THENCE
N 04 deg. 29' E 90.0 feet with the West line of said Easterly Worsham tract to its Northwest
corner, the Southeast corner of Lot 18 of said Block E the Northeast corner of this tract;
THENCE N 35 deg. 31' W 60.0 feet with the South line of Block "E" to the place of beginning,
and containing 0.12 acres of land, more or less. This is a five year paid up lease and no de-
lay rentals are payable hereunder.

    This lease also covers all lessor's rights, reversionary or otherwise, in any mineral
rights now owned by others in the leased lands and which might be hereafter acquired by lessor,
his heirs or assigns, during the term of the lease and the lease shall, without further evi-
dence thereof, immediately attach to and affect any and all rights, titles and interest in the
described land hereafter acquired by or inuring to lessor, his successors and assigns.

    For all purposes of this lease the described premises shall be treated as comprising
0.12 acres, whether there be more or less.

    2. Subject to the other provisions herein contained, this lease shall be for a term
of five years from this date (called "primary term") and as long thereafter as oil, gas or
other mineral is produced from said land or land with which said land is pooled hereunder.

    3. The royalties to be paid by lessee are:

    (a) On oil, and other hydrocarbons which are produced at the well in liquid form by
ordinary production methods, 1/8 of that produced and saved from said land, same to be deliver-
ed at the well in tanks provided by lessor, or to the credit of lessor into the pipe line to
which wells may be connected; lessee may from time to time purchase any royalty oil or other

liquid hydrocarbons in its possession, paying the market price thereof prevailing for the
field where produced, on the date of purchase;

(b) On gas, including casinghead gas and other vaporous or gaseous substances produc-
ed from said land as follows:

First: In case lessee shall itself use gas in the manufacture of gasoline or other
petroleum products therefrom, 1/8 of the sale price at the plant of the gasoline or other
petroleum products manufactured or extracted therefrom and which are saved and marketed,
after deducting a fair and reasonable cost for extracting or manufacturing said gasoline or
other substance, and 1/8 of the market value of residue gas sold or used by lessee in opera-
tions not connected with the land herein leased. No deduction for extraction costs shall be
made for liquid hydrocarbons recovered by use of drip, separator or similar apparatus on the
flow line of wells, and except as to gas being used for repressuring or recycling purposes,
upon written request by lessor, lessee shall, prior to the sale or use of gas from such wells,
install and use such apparatus on any well or wells capable of producing liquid hydrocarbons
in paying commercial quantities.

Second: In the event lessee shall sell gas at the wells, 1/8 of the amount received
from such sales.

Third: In all other cases when sold or used off the premises, the price received
at the well for 1/8 of the gas sold or 1/8 of the fair value of gas used.

(c) Where gas from a well producing gas only is not sold or used because of no mar-
ket or demand therefor, lessee may pay as royalty $50.00 per well, per year, payable quar-
terly, and upon such payment it will be considered that gas is being produced within the mean-
ing of Article 2 of this contract.

(d) On all other minerals or kindred products mined, manufactured and marketed, 1/8
either in kind or value at the well or mine, at lessee's election, except that on sulphur the
royalty shall be 50¢ per long ton.

(e) Such gas, casinghead gas, residue gas, or gas of any other nature or description
whatsoever, as may be disposed of for no consideration to lessee, through unavoidable waste
or leakage, or in order to recover oil and other liquid hydrocarbons, or returned to the
ground, shall not be deemed to have been sold or used off the premises, within the meaning,
expressed or implied, of any part of this lease.

The down cash payment is consideration for this lease according to its terms and shall not
be allocated as mere rental for a period. Lessee, or any assignee hereunder, may at any time
execute and deliver to lessor, or to the depository above named, or place of record, a re-
lease or releases covering any portion or portions of the premises held by him, and thereby
surrender this lease as to such portion or portions and thereafter that rentals payable by
him shall be reduced proportionately.

5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee
should drill a dry hole or holes thereon, or if after discovery of oil, gas, sulphur or
other mineral, the production thereof should cease from any cause, this lease shall not termi-
nate if lessee commences operations for additional drilling or reworking within sixty days
thereafter or (if it be within the primary term) commences additional drilling operations or
commences or resumes the payment or tender of rentals on or before the rental paying date
next ensuing after the expiration of three months from date of completion of dry hole or
cessation of production.If during the last year of the primary term and prior to the dis-
covery of oil, gas, sulphur or other minerals on said land lessee should drill a dry hole
thereon, no rental payment or operations are necessary in order to keep the lease in force
during the remainder of the primary term. If at the expiration of the primary term oil, gas
or other mineral is not being produced on said land but lessee is then engaged in drilling

or reworking operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and draining the leased premises, lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances.

6. Lessee at its option, is hereby given the right and power without any further approval from Lessor to pool or combine the acreage, royalty, or mineral interest covered by this lease, or any portion thereof, with other land, lease or leases, royalty and mineral interests in the immediate vicinity thereof, when in Lessee's judgment, it is necessary or advisable to do so in order to properly develop and operate said premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises or to comply with the spacing order of any Regulatory Body of the State of Louisiana or the United States having jurisdiction. The term "Regulatory Body" shall include any governmental tribunal or group (civil or military) issuing orders governing the drilling of wells or the production of minerals, irrespective of whether said orders are designed to promote conservation or to conserve materials or equipment for National Defense or similar purposes. Such pooling shall be of tracts which will form one contiguous body of land for each unit and the unit or units so created shall not exceed substantially forty (40) acres each surrounding each oil well and substantially six hundred forty (640) acres each surrounding each gas and condensate well, unless larger drilling units have been fixed and established by an order of a Regulatory Body of the State of Louisiana or of the United States, in which event the unit or units may be of the size fixed by said order. In this connection, gas and condensate shall be considered to be all products obtained and produced from a well or wells which were in a gaseous state in the reservoir prior to the first withdrawal of any production therefrom. Lessee shall execute and record in the Conveyance records of the Parish in which the land herein leased is situated an instrument identifying and describing the pooled acreage; and upon such recordation, the unit or units shall thereby become effective. In lieu of the royalties elsewhere herein specified and subject to the provisions of Paragraph 10 hereof, Lessor shall receive from production from the unit so pooled only such portion of the royalties stipulated herein as the amount of his acreage placed in the unit, or his royalty interest therein, bears to the total acreage so pooled in the particular unit involved. Drilling or reworking operations on or production of oil, gas, sulphur or other minerals from land included in such pooled unit shall have the effect of continuing this lease in force and effect during or after the primary term as to all of the land covered hereby (including any portion of said land not included in said unit) whether or not such operations be on or such production be from land covered hereby. Lessee shall have the right and power to reduce and diminish the extent of any unit created under the terms of this paragraph so as to eliminate from said unit any acreage or lease upon which there is or may be an adverse claim; and Lessee may also increase any unit to conform with an order of a Regulatory Body issued after said unit was originally established. Such revision of the unit shall be evidenced by an instrument in writing executed by Lessee, which shall identify and describe the lands included in the unit as revised and shall be recorded in the Conveyance records of the Parish where the lands herein leased are situated.

7. Lessee shall have free use of oil, gas and water from said land, except water from lessor's wells, for all operations hereunder, and the royalty on oil and gas shall be computed after deducting any so used. Lessee shall have the right at any time during or af-

158

ter the expiration of this lease to remove all property and fixtures placed by lessee on said land, including the right to draw and remove all casing. When required by lessor, lessee will bury all pipe lines below ordinary plow depth, and so well shall be drilled within two hundred feet of any residence or barn now on said land without lessor's consent, if any other location is practicable. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for domestic use in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns of the parties hereto, but no change or division in ownership of the land, rentals or royalties however accomplished shall operate to enlarge the obligations or diminish the rights of lessee; and no such change in ownership shall be binding on lessee nor impair the effectiveness of any payments made hereunder until lessee shall have been furnished, forty-five (45) days before payment is due, a certified copy of recorded instrument evidencing any transfer, inheritance, sale, or other change in ownership. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties other than the original lessor become entitled to royalty hereunder, lessee may withhold payment of royalty to such parties unless and until furnished with a recordable instrument executed by all of such parties designating an agent to receive payment for all.

9. After production of oil, gas sulphur or other mineral has been secured from the land covered hereby or land pooled therewith, this lease shall not be subject to forfeiture or loss either in whole or in part for failure to conduct operations in compliance with this contract except after judicial ascertainment that Lessee has failed to conduct such operations and has been given a reasonable opportunity after such judicial ascertainment to prevent such loss or forfeiture by complying with and discharging its obligations as to which Lessee has been judicially determined to be in default. In case of cancellation or termination of this lease for any cause, lessee shall have the right to retain under the terms hereof forty (40) acres of land around each well producing, being worked on, or drilling, hereunder, unless, in order to comply with an order, rule or regulation of governmental authority or agency, more than forty (40) acres has been allotted to each well, in which case, Lessee, shall have the right to retain around each such well the number of acres so allotted to each well. The tract so retained shall be designated by Lessee in as near a square from as practicable.

10. Lessor hereby warrants and agrees to defend the title to said land and agrees that lessee at its option may discharge any tax, mortgage or other lien upon said land and in event lessee does so, it shall be subrogated to such lien with the right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty, it is agreed that if Lessor owns less than the entire undivided interest in the lands or in the mineral rights relating thereto, whether such interest is herein specified or not, the rentals and royalties herein fixed shall be reduced proportionately to the interest of Lessor. Failure of Lessee to so reduce rentals shall not affect Lessee's right to reduce royalties; and all outstanding royalty rights shall be deducted from the royalties herein provided for. In the event rentals are so reduced and Lessor thereafter acquires a greater interest in the mineral rights because of lapse of outstanding mineral rights or otherwise, Lessee shall not be obligated to increase rentals to cover such interest until the rental paying date next ensuing after such acquisition and after Lessor shall have furnished Lessee thirty (30) days written notice thereof.

11. All terms and express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such law, Order, Rule or Regulation.

12. This agreement shall be binding on each of the above named parties who sign the same, regardless of whether it is signed by any of the other parties.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

WITNESSES,

O. A. Griffey, Jr.                                              Elizabeth Stewart Roberts

R. A. Wolerhour???                                              Bettie Anne Stewart

O. A. Griffey, Jr.                                              Gertrude Stewart Morgan

R. A. Wolerhour

H. J. Hines

Mrs. H. F. Hines

STATE OF LOUISIANA

PARISH OF POINTE COUPEE

BEFORE ME, Hazel M. Langlois a Notary Public in and for Pointe Coupee Parish, Louisiana, on this 8th day of December 1952, personally came and appeared Gertrude Stewart Morgan who in the presence of me, said authority, and H.F. Hines and Mrs. H. F. Hines competent witnesses, declares and acknowledges that she is the identical person who executed the foregoing instrument in writing, that her signature thereto is her own true and genuine signature, and that she executed said instrument of her own free will, and for the purposes and considerations therein expressed.

Thus done and passed on the day and date hereinabove written, in the presence of the before named and undersigned competent witnesses, who have hereunto subscribed their names, together with said appeared, and me, said Notary, after reading the whole.

WITNESSES:

Mrs. H. F. Hines                                               Gertrude Stewart Morgan

H. F. Hines                                                    Hazel M. Langlois

                                                               Notary Public.

STATE OF LOUISIANA

PARISH OF CADDO

BEFORE ME, the undersigned authority, this day personally appeared O. A. Griffey, Jr. to me personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness, who being first duly sworn, on his oath, says: That he subscribed his name to the foregoing instrument as a witness, and that he knew Elizabeth Stewart Roberts and Bettie Anne Stewart the Grantors named in said instrument, to be the identical persons described therein, and who executed the same, and saw them sign the same as their voluntary act and deed, and that he, the said O. A. Griffey, Jr. subscribed his name to the same at the same time as an attesting witness.

                                                               O. A. Griffey, Jr.

Sworn to and subscribed before me, this 16th day of December, 1952

                                                               B. B. McCaa

                                                               Notary Public in and for Caddo

                                                               Parish, Louisiana

Endorsed: Filed T. J. Campbell Clerk of Court & Recorder 1953 Jan 7 PM 4:16

By: E. H. Campbell Dy. Clerk of Court & Recorder Webster Parish, La.

n the record this the 20th day of January, 1965

Clerk and Official Recorder

T.A.Stewart

Oil and Gas Lease to

Emerald Oil & Gas Co.

Register No. 9293

State of Louisiana

Parish of Webster.

KNOW ALL MEN BY THESE PRESENTS: That I,T.A.Stewart a married man whos_ wife was Miss Annie Fields of the Parish of Webster,State of Louisiana,hereinafter called "Lessor" (whether one or more) has and by these presents does,hereby.lease unto Emerald Oil Company. a corporation,with office at Winfield ?Kansas hereinafter styled "Lessee".

WITNESSETH:That lessor,in consideration of Two Hundred Fifty & no/100 Dollars cash bonus in hand paid by the lessee,the receipt of whichis hereby acknowledged,and of the covenants and agreements hereinafter contained has granted,demised,leased and let,and by these presents does grant,demise,lease and let unto the said lessee,for sole and only purpose of operating for and producing oil,gas,coal and other minerals thereon and therefrom,together with rights of way and servitudes for pipelines,telephone and telegraph lines,for tanks,power house,stations and fixtures,for producing such products and housing employees and all other privileges incident thereto or convenient for the economical operation of said land alone, or conjointly with neighboring~lands,with the right to use free oil,gas or water,but not from lessor's water wells ,for such purposes,and with the right of removing,either during or after the term hereof,all and any property and improvements placed or erected on the premises by lessee,including the right to pull and remove all casing:said land being situate in the Parish of Webster,State of Louisiana,and more particularly described as follows:

Being the North Half (N½) of the South West Quarter (SW¼) of the North West Quarter (NW¼) of Section 19,Township 18,Range 8.West. And being the same 20 acres deeded to T.A.Stewart by W.W.McCoy. of Section ---Township-----Range----,containing 20 acres,more or less.

(1) It is agreed that this lease shall remain in force for a term of ten years from this date and as long thereafter as oil or gas is found in paying quantities.

(2) Lessee agrees to deliver  to the credit of lessor,free of cost,into the pipe line with which it may connect its wells,the equal one-eighth part,of all oil produced and saved from the leased premises,the lessee may purchase the oil os delivered into the pipeline to the credit of lessor,at the market price being paid within the field at the time and day of delivery.

(3) Lessee agrees to pay the lessor at the rate of Two Hundred Dollars each year,payable annually in advance,for the gas and vapors from each well where gas only is found,while the same is being used or sold by lessee,except for fuel on said lease and the said lessor shall have gas free of cost from any such well for all stoves and inside lights in the principal dwelling house on said land during the same time,such gas to be delivered to lessor at the month of the well at lessor's own risk and expense.

(4) If coal is found the lessee agrees to pay to lessor eight cents per ton for every ton of the same that is mined and marketed.

(5)Lessee agrees to pay lessor for gas and vapor produced from any oil well and used or sold by lessee,except for fuel on said land,at the rate of Fifty Dollars per year for the time during which the same shall be used,said payments to be made quarterly.

(6) If operations for the drilling of a well for oil or gas are not begun on saidland on or before the 25th day of September 1920 this lease shall terminate as to both parties unless the lessee on or before that date shall pay or tender to the lessor,or deposit to the credit of T.A.Stewart in the First National Bank at Minden,Louisiana (which shall continue as the depository regardless of changes in ownership of the land) the sum of

$ 50.00 Dollars,as rental which payment or tender may be made by the check or draft of the lessee,and,however made,shall operate to confer on the lessee the privilege of deferring the commencement of such well for six months from said date.Thereafter in like manner and upon like payment or tenders of said amount,the commencement of said well may be deferred for additional periods of six months successively for said term of ten years. The commencement of a well shall operate to suspend all rental payments and the completion of a paying well shall operate as a full liquidation of all rentals under this provision during the remainder of the term of this lease.

(7) Should the first well drilled be a dry hole,then,beginning 12 months from the next succeeding rental paying date,the lessee shall resume the payment of rentals hereunder (unless drilling operations are resumed);otherwise this lease shall terminate as to both parties,Lessee shall not be bound by any change in the ownership of said land,or the assignment of the rentals or royalties thereon,until furnished with the original instrument of conveyance or a duly certified copy thereof,at least 30 days before said rentals or royalties are due,otherwise payment to the purchasor's predecessor in title shall bind such purchaser.If at the time of the execution of this lease,said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals herein provided shall be paid the lessor only in the proportion which his interest bears to the whole and undivided fee.

(8) The location of wells,and strata to which wells may be drilled,extent of operations,and all matters incidental thereto, shall be only such as lessee deems best. Lessee shall be entitled to conduct operations under this lease on said lands,or any part retained by it,as an entirety,and pay royalties due as a whole and not as to a particular part or portions thereof.When requested by lessor,lessee shall bury its lines crossing cultivated lands below plow depth.No well shall be drilled nearer than two hundred feet of the house or barn now on said premises.Lessee shall pay for damages caused by its operations to growing crops on said lands.Lessee shall have the right to assume any mortgage or lien on said land or any part thereof,and thereby become subrogated to the rights of said mortgagee or lien holder and reimburse itself any payments due lessor under this lease.It is further agreed and understood that there are not implied covenants binding upon lessee or lessor.

(9) As an additional consideration for the execution of this lease,and for the right to exercise all options by the lessee to continue this lease on force,lessee hereby agrees that if during the period of this lease,or during any period for which drilling has been delayed by the payments herein provided,for,there shall be drilled on adjacent land and within three hundred feet of any line of said leased land,a paying oil or gas well,the said lessee will,with reasonable diligence,begin and prosecute the drilling of an offset well on said leased land;provided however,that if said well on the adjacent land is a paying gas well, producing gas only,the said lessee may pay to the lessor the same amount of royalty as herein provided for a gas well on the leased premises in lieu of drilling an offset well.

(10) It is understood and agreed that all the considerations recited herein,cover, not only the privileges granted to the date when the first well is to be commenced,but also the lessee's option to extend this lease from time to time,and any and all other rights conferred.

(11) The lessee shall have the right to assign this lease or any interest therein or any portion of the acreage covered thereby,in which last event the lessee shall be liable only for royalties accruing from operations on the acreage retained by it,and be liable only for such proportions of the rentals due under said lease as the acreage

56

Clerk of Court
410 Main Street
P. O. Box 370
Minden, LA  71058
(318) 371-0366

**Received From :**
NELSON, RICHARD B
401 EDWARDS ST
SUITE 1500
SHREVEPORT, LA  71101

**First VENDOR**

DUKE ENERGY FIELD SERVICES LP

**First VENDEE**

NELSON ENERGY INC

| | |
|---|---|
| Index Type :  Conveyances | File Number :   479469 |
| Type of Document : Assignment | Book :  996      Page : 77 |
| Recording Pages :          6 | |

## Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Webster Parish, Louisiana

On (Recorded Date) : 06/14/2005

At (Recorded Time) : 10:55:25 AM

**NACOLE WAFER**

Deputy Clerk

Doc ID - 000605960006

State of Louisiana §

This Assignment and Bill of Sale of Rights of Way ("Assignment") is e ffective a s o f 12:01 a.m. on May 2, 2005 ("Effective Time"), regardless of the date of execution. For One and NO/100th dollars ($1.00) and other value received, the receipt and sufficiency of which is acknowledged, **DUKE ENERGY FIELD SERVICES, LP** with a mailing address at 5718 Westheimer, Suite 2000, Houston, Texas 77057 ("Seller") do by these presents sell, assign, transfer, and set over unto **NELSON ENERGY, INC.** with a mailing address at 401 Edwards St., Suite 1500, Shreveport, Louisiana 71101 ("Buyer"), the following pipeline and related realty easements, interests, and permits (the "Pipeline"):

> A 4" pipeline located in Section 19-T18N-R8W, Webster Parish, Louisiana beginning at Airport Road and continuing in a northwest (NW) direction approximately 1550' as shown on Exhibit "A" attached hereto and incorporated herein, together with all appurtenances, improvements, pipelines, flowlines, gathering lines, measurement stations, cathodic protection, and any related equipment, easements, permits, licenses, rights-of-way, surface leases, and any other grants or surface rights pertaining to or used in connection with the ownership or operation of the Pipeline, as further described in Exhibit "B" attached hereto and incorporated by reference herein.

1.      Seller warrants title to the Pipeline as against the claims of all claiming by, through, or under Seller and not otherwise, and subject to restrictions in place or of record. **SELLER DOES NOT WARRANT, EITHER EXPRESSLY OR IMPLIEDLY, THE MERCHANTABILITY, CONDITION OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE OF THE PIPELINE, ANY SUCH WARRANTY BEING HEREBY EXPRESSLY NEGATED. BUYER, BY ACCEPTANCE OF THIS ASSIGNMENT, HEREBY ACKNOWLEDGES THAT IT HAS MADE A COMPLETE INSPECTION OF THE PIPELINE AND IS IN ALL RESPECTS SATISFIED WITH ITS CONDITION, AND BUYER AGREES TO ACCEPT THE SAME "AS IS, WHERE IS" AND "WITH ALL FAULTS."**

2.      As between the parties, Buyer hereby assumes and agrees to pay, perform and discharge a ll o bligations o r l iabilities arising under or in connection with the Pipeline and all related assigned easements and interests in realty effective as of the Effective Time. **AS BETWEEN THE PARTIES, BUYER ASSUMES ALL RISK AND LIABILITY FOR OPERATIONS ON AND AFTER THE EFFECTIVE TIME CONNECTED WITH THE PIPELINE AND EASEMENTS, AND AGREES TO RELEASE, DEFEND, INDEMNIFY, AND HOLD SELLERS, THEIR AFFILIATES, AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS (COLLECTIVELY THE "SELLER INDEMNIFIED PARTIES"), HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, LAWSUITS, FINES, PENALTIES, LIABILITIES, COSTS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND COURT COSTS), INCLUDING WITHOUT LIMITATION FOR INJURY TO OR DEATH OF ANY PERSON, DAMAGE TO OR DESTRUCTION OF ANY PROPERTY RESULTING DIRECTLY OR INDIRECTLY FROM, OR IN CONNECTION WITH, STRICT LIABILITY OR THE EXISTENCE, CONDITION, FITNESS, OPERATION OR USE OF THE PIPELINE DURING THE PERIOD O N A ND A FTER T HE E FFECTIVE T IME. BUYER ALSO ASSUMES, AND WILL DEFEND, INDEMNIFY, AND HOLD THE SELLER INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL LIABILITIES (INCLUDING REASONABLE ATTORNEYS' FEES AND COURT**

COSTS), INCLUDING WITHOUT LIMITATION FOR INJURY TO OR DEATH OF ANY PERSON, DAMAGE TO OR DESTRUCTION OF ANY PROPERTY RESULTING DIRECTLY OR INDIRECTLY FROM, OR IN CONNECTION WITH, STRICT LIABILITY OR THE EXISTENCE OR CONDITION OF THE PIPELINE RELATING IN ANY WAY TO COMPLIANCE OR NONCOMPLIANCE WITH LAWS AND REGULATIONS GOVERNING HUMAN AND ANIMAL HEALTH OR THE PROTECTION OF THE ENVIRONMENT, INCLUDING WITHOUT LIMITATION ENVIRONMENTAL CONTAMINATION CAUSED BY OR RELATED TO THE PIPELINE AND ANY RELATED NONCOMPLIANCE WITH LAWS AND REGULATIONS RELATING TO PROTECTION OF THE ENVIRONMENT WHICH OCCURRED OR OCCUR AT ANY TIME, WHETHER BEFORE OR AFTER THE EFFECTIVE TIME.

3.    AS BETWEEN THE PARTIES, WITH THE EXCEPTION OF ALL MATTERS RELATING TO COMPLIANCE OR NONCOMPLIANCE WITH ENVIRONMENTAL LAWS AND REGULATIONS AND AD VALOREM TAXES (WHICH ARE COVERED EXCLUSIVELY IN SECTION 2 ABOVE), SELLER RETAINS ALL RISK AND LIABILITY FOR OPERATIONS PRIOR TO THE EFFECTIVE DATE CONNECTED WITH THE PIPELINE AND EASEMENTS.

4.    The interpretation and performance of this Assignment shall be governed by and construed by the laws of the state of Texas, except for any rule of law of the state of Texas that might make the law of any other jurisdiction applicable.

5.    The terms and provisions of this Assignment shall extend to and inure to the benefit of and be binding upon the parties, their respective successors and assigns.

6.    The representations, warranties, and indemnities contained or made in this Assignment shall survive the Effective Time.

IN WITNESS WHEREOF, this Assignment has been executed by the duly authorized representatives of the parties on the dates indicated in the acknowledgements below, effective as of the Effective Time.

WITNESSES:

Printed Name: _Nick McHillad_

Printed Name: _Alice Peña_

WITNESSES:

Printed Name: _Cheryl Harris_

Printed Name: _Rita Fruge'_

SELLER:

DUKE ENERGY FIELD SERVICES, LP

By: _____

DAVID F. GARRETT
Vice President

BUYER:

NELSON ENERGY, INC.

BY: _____

## ACKNOWLEDGEMENTS

THE STATE OF LOUISIANA          §
                                §
PARISH OF _Caddo_               §

   BEFORE ME, the undersigned, a Notary Public in and for the county and state aforesaid, personally appeared _Richard B. Nelson_, to me personally known, who being by me duly sworn, did say that _he_ is the _President_ of NELSON ENERGY, INC. and that said instrument was signed on behalf of said corporation, and the said _Richard B. Nelson_ acknowledged said instrument to be the free act and deed of said corporation for the uses and purposes therein set forth.

   GIVEN UNDER MY HAND AND SEAL OF OFFICE the _13th_ day of _June_, 2005.

                              _Susan A. Kramer_
                              Notary Public, State of _Caddo_

                              SUSAN A. KRAMER, NOTARY PUBLIC
                              CADDO PARISH, LOUISIANA
                              MY COMMISSION IS FOR LIFE
                              NOTARY ID # 51093


STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §


   BEFORE ME, the undersigned, a Notary Public in and for the county and state aforesaid, personally appeared **DAVID F. GARRETT**, to me personally known, who being by me duly sworn, did say that he is the Vice President of **DUKE ENERGY FIELD SERVICES, LP**, and that said instrument was signed on behalf of said LP by authority of its Board of Directors, and the said **DAVID F. GARRETT** acknowledged said instrument to be the free act and deed of said LP for the uses and purposes therein set forth.

   GIVEN UNDER MY HAND AND SEAL OF OFFICE the _7th_ day of _JUNE_, 2005.

                              _Dan Reeds O'Dell_
                              Notary Public, State of Texas



EXHIBIT "A"

EXHIBIT B TO ASSIGNMENT AND BILL OF SALE
OF PIPELINE AND RIGHTS OF WAY

ASSIGNED RIGHTS OF WAY AND EASEMENTS

WEBSTER PARISH, LOUISIANA

May 2, 2005

GRANTOR:            J. B. Price, et ux
GRANTEE:            Arkansas Louisiana Gas Company
DOCUMENT DATE:      January 26, 1956
DOCUMENT TYPE:      Right of Way Agreement
RECORDED:           Volume 267, Page 22, #144204
                    Webster Parish Clerk of Court
DESCRIPTION:        SE/4NW/4, Section 19-T18N-R8W
                    Webster Parish, Louisiana


GRANTOR:            Claude Burson, Jr., et al
GRANTEE:            Arkansas Louisiana Gas Company
DOCUMENT DATE:      January 27, 1956
DOCUMENT TYPE:      Right of Way Agreement
RECORDED:           No recording information
DESCRIPTION:        NE/4SW/4, Section 19-T18N-R8W
                    Webster Parish, Louisiana

# Webster Parish Cover Sheet

**Holli Vining**
**Clerk of Court**
410 Main Street
P. O. Box 370
Minden, LA  71058
(318) 371-0366

**Received From :**
RECONTRUST COMPANY NA
2575 WEST CHANDLER BLVD
CHANDLER, AZ  85224-9739

**First VENDOR**

GOVERNMENT NATIONAL MORTGAGE ASSOCIATION

**First VENDEE**

BANK OF AMERICA NA

**Index Type :**   Conveyances                           **File Number :** 534359

**Type of Document :** Power Of Attorney

                                                         **Book :** 1139      **Page :** 820
**Recording Pages :**          5

### Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Webster Parish, Louisiana

On (Recorded Date) : 08/02/2012

At (Recorded Time) : 11:57:55AM

MARLO F. JACKSON
_____
Clerk of Court

Doc ID - 002771010005

**Return To :**
RECONTRUST COMPANY NA
2575 WEST CHANDLER BLVD
CHANDLER, AZ  85224-9739

Do not Detach this Recording Page from Original Document

---

(AREA ABOVE IS RESERVED FOR COUNTY – RECORDING INFORMATION)

## (Limited Power of Attorney)

( I.A ) Webster
   State             County/Town

**Grantor:** Government National Mortgage Association
451 7th Street SW 6th Floor
Washington, DC 20410

**Grantee:** Bank of America, N.A. successor by merger to BAC Home Loans
Servicing, LP
2575 W. Chandler Blvd.,
Mail Code: AZ1-804-02-11
Chandler, AZ 85224

Prepared By: ReconTrust Company, N.A

---

AFTER RECORDING, RETURN BY MAIL TO:
**RECONTRUST COMPANY, N.A**
**2575 W. Chandler Blvd., Rd, MS: AZ1-804-02-11**
**Chandler, AZ 85224**



# Webster Parish Cover Sheet

**Holli Vining**
**Clerk of Court**
410 Main Street
P. O. Box 370
Minden, LA 71058
(318) 371-0366

**Received From :**
MCCONNELL AND SLATTERY
ATTORNEYS AT LAW
P O BOX 887
SPRINGHILL, LA 71075

**First VENDOR**
BANK OF NEW YORK MELLON

**First VENDEE**
BANK OF AMERICA N A

| | |
|---|---|
| **Index Type :** Conveyances | **File Number :** 533384 |
| **Type of Document :** Power Of Attorney | |
| | **Book :** 1137    **Page :** 549 |
| **Recording Pages :** 2 | |



**Recorded Information**

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Webster Parish, Louisiana

On (Recorded Date) : 06/14/2012

At (Recorded Time) : 1:54:11PM

# Kimberly Morrow

Clerk of Court

Doc ID - 002755250002

**Return To :**
MCCONNELL AND SLATTERY
ATTORNEYS AT LAW
P O BOX 887
SPRINGHILL, LA 71075



RECORD AND RETURN
BANK OF AMERICA
2505 W CHANDLER BLVD
CHDLR-D3
CHANDLER, AZ 85224                    POWER OF ATTORNEY

The undersigned, as Trustee under the Pooling and Servicing Agreements (as defined below) hereby constitutes and appoints Bank of America, NA, Successor by merger to BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing LP and its authorized officers (collectively, "CHL Servicing") and each of them, its true and lawful attorneys-in-fact and agents, with full powers of substitution and resubstitution, for and in its name, place and stead, in any and all capacities, for the limited purpose of executing and recording any and all documents necessary to effect (i) a foreclosure of a Mortgage Loan, (ii) the disposition of an REO Property, (iii) an assumption agreement or modification agreement or supplement to the Mortgage Note, Mortgage, or deed of trust, and (iv) a reconveyance, deed of reconveyance or release or satisfaction of mortgage or such instrument releasing the lien of a Mortgage in connection with the transactions contemplated in those certain Pooling and Servicing Agreements (the "Pooling and Servicing Agreement") by and among the undersigned, CHL Servicing, CHL, and CWALT, Inc. The undersigned also grants unto said attorneys-in-fact and agents, and each of them, the full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as might or could be done in person to effect items (i), (ii) and (iii) above, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or their substitutes, may lawfully do or cause to be done by virtue hereof. Any capitalized term not otherwise defined herein shall have the meaning assigned to such term in the Pooling and Servicing Agreements.

THE BANK OF NEW YORK MELLON F/K/A
THE BANK OF NEW YORK, as Trustee

Witness                                      By:

Jonathan McKenna

Steven Chrysanthis
Vice President

Witness                                      By:

Antonia Depinto

Melissa J. Adelson
Managing Director

STATE OF: New York
COUNTY OF: Queens

On the 11th day of January in the year 2012 before me, the undersigned, personally appeared Steven Chrysanthis and Melissa J. Adelson, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

IN WITNESS THEREOF, I have hereunto set my hand and affixed by official seal the day and year in this certificate first above written.

Notary Public

Norman Yu
NOTARY PUBLIC
STATE OF NEW YORK
Qualified in Queens County
LIC# 01YU6183731
COMM. EXP. 3-24-2012

# Webster Parish Recording Page

**Holli Vining**
**Clerk of Court**
410 Main Street
P. O. Box 370
Minden, LA 71058
(318) 371-0366

**Received From :**
  BANK OF AMERICA

**First VENDOR**
CTC MINERALS INC

**First VENDEE**
BANK OF AMERICA N A

| | |
|---|---|
| **Index Type :** Conveyances | **File Number :** 513624 |
| **Type of Document :** Power Of Attorney | **Book :** 1090    **Page :** 645 |
| **Recording Pages :**    3 | |

## Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Webster Parish, Louisiana

On (Recorded Date) : 07/15/2009

At (Recorded Time) : 2:00:08PM

*Kimberly Monow*
Deputy Clerk

Doc ID - 002205820003

**Return To :**
  BANK OF AMERICA
  MINDEN, LA 71058

Do not Detach this Recording Page from Original Document

<u>**LIMITED POWER OF ATTORNEY**</u>

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

CTC Minerals, Inc. ("CTC"), acting by and through its co-chief executive, Catherine C. Joyce, Social Security Number XXX-XX-5422, hereby MAKES, CONSTITUTES and APPOINTS **BANK OF AMERICA, N. A.**, as its true and lawful attorney-in-fact and to act in its name and stead to perform the following actions:

    1.    To negotiate and make oil, gas and other mineral leases covering any land, mineral or royalty interest.

    2.    To pool and unitize part or all of the land, mineral leasehold, mineral, royalty, or other interest with land, mineral leasehold, mineral, royalty, or other interest of one or more persons or entities for the purpose of developing and producing oil, gas, or other minerals, in making leases or assignments granting the right to pool and unitize.

    3.    To enter into contracts and agreements concerning the installation and operation of plants or other facilities for the cycling, repressuring, processing or other treating or handling of oil, gas or other minerals.

    4.    To conduct or contract for the conducting of seismic evaluation operations.

    5.    To drill or contract for the drilling of wells for oil, gas, or other minerals.

    6.    To contract for and to make a dry hole and bottom hole contributions of cash, leasehold interest, or other interest towards the drilling of wells.

    7.    To use or contract for the use of any method of secondary or tertiary recovery of any mineral, including the injection of water, gas, air, or other substances.

    8.    To purchase oil, gas, or other mineral leases, leasehold interests, or other interests for any type of consideration, including farmout agreements requiring the drilling or reworking of wells or participation therein.

    9.    To enter into farmout contracts or agreements to assign oil, gas or other mineral leases or interests in consideration for the drilling of wells or other oil and gas or mineral operations.

    10.    To negotiate the transfer of and to transfer oil, gas or other mineral leases or interests for any consideration, such as retained overriding royalty interests of any nature, drilling or reworking commitments, or production interests.

    11.    To execute and enter into contracts, conveyances, and other agreements or transfers considered necessary or desirable to carry out these powers, whether or not the action is now or subsequently recognized or considered as a common or proper practice by those engaged in the business of prospecting for, developing, producing, processing, transporting, or marketing minerals, including entering

{N0182556}

into and executing division orders, oil, gas or other mineral sales contracts, exploration agreements, processing agreements, and other contracts relating to the processing, handling, treating, transporting, and marketing of oil, gas, or other mineral production and to receive and receipt for the proceeds thereof on my behalf.

CTC's attorney-in-fact may exercise this power of attorney at any time and from time to time. Said attorney-in-fact is granted full power and authority to do and perform all and every act and same for whatsoever requisite, necessary and proper to be done in the exercise of any rights and powers herein granted, as fully to all intents and purposes that CTC might do or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that CTC's attorney-in-fact or his substitute or substitutes shall lawfully do or cause to be done by virtue of this power of attorney and the rights and powers herein granted.

This instrument is to be construed and interpreted as a limited power of attorney. This power of attorney may be voluntarily revoked only by CTC's written revocation filed of record in the Deed Records of the counties or parishes wherein the oil, gas and other mineral property are located.

WITNESS its hand, this _29_ day of _May_, 2009.

CTC, Minerals, Inc.

By: _Catherine C. Joyce_
Name: Catherine C. Joyce
Its:    Co-Chief Executive Officer

WITNESSES:

_Pamela J. Cline_
Printed Name _PAMELA J. CLINE_

_Elena Ahlin_
Printed Name _ELENA AHLIN_

_Henry A. King_
Notary Public
Printed Name: _____
Notary No.: _____

HENRY A. KING
NOTARY PUBLIC
STATE OF LOUISIANA
BAR NO. 7393
COMMISSION ISSUED FOR LIFE

{N0182556}

-2-

# Webster Parish Recording Page

**Holli Vining**
**Clerk of Court**
410 Main Street
P. O. Box 370
Minden, LA  71058
(318) 371-0366

**Received From :**
　BANK OF AMERICA

**First VENDOR**

 CTC MENERALS INC

**First VENDEE**

BANK OF AMERICA

Index Type :   Conveyances

Type of Document : Power Of Attorney

Recording Pages :　　　3

File Number : 513625

Book : 1090　　　Page : 648

## Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Webster Parish, Louisiana

On (Recorded Date) : 07/15/2009

At (Recorded Time) :  2:10:00PM

*Kimberly Morrow*
Deputy Clerk



Doc ID - 002205840003

**Return To :**
　BANK OF AMERICA
　MINDEN, LA  71058

Do not Detach this Recording Page from Original Document

## LIMITED POWER OF ATTORNEY

STATE OF LOUISIANA

PARISH OF ORLEANS

      CTC Minerals, Inc. ("CTC"), acting by and through its co-chief executive, Roland J. Joyce, Social Security Number XXX-XX-8141, hereby MAKES, CONSTITUTES and APPOINTS BANK OF AMERICA, N. A., as its true and lawful attorney-in-fact and to act in its name and stead to perform the following actions:

      1.     To negotiate and make oil, gas and other mineral leases covering any land, mineral or royalty interest.

      2.     To pool and unitize part or all of the land, mineral leasehold, mineral, royalty, or other interest with land, mineral leasehold, mineral, royalty, or other interest of one or more persons or entities for the purpose of developing and producing oil, gas, or other minerals, in making leases or assignments granting the right to pool and unitize.

      3.     To enter into contracts and agreements concerning the installation and operation of plants or other facilities for the cycling, repressuring, processing or other treating or handling of oil, gas or other minerals.

      4.     To conduct or contract for the conducting of seismic evaluation operations.

      5..     To drill or contract for the drilling of wells for oil, gas, or other minerals.

      6.     To contract for and to make a dry hole and bottom hole contributions of cash, leasehold interest, or other interest towards the drilling of wells.

      7.     To use or contract for the use of any method of secondary or tertiary recovery of any mineral, including the injection of water, gas, air, or other substances.

      8. ..     To purchase oil, gas, or other mineral leases, leasehold interests, or other interests for any type of consideration, including farmout agreements requiring the drilling or reworking of wells or participation therein.

      9.     To enter into farmout contracts or agreements to assign oil, gas or other mineral leases or interests in consideration for the drilling of wells or other oil and gas or mineral operations.

      10.     To negotiate the transfer of and to transfer oil, gas or other mineral leases or interests for any consideration, such as retained overriding royalty interests of any nature, drilling or reworking commitments, or production interests.

      11.     To execute and enter into contracts, conveyances, and other agreements or transfers considered necessary or desirable to carry out these powers, whether or not the action is now or subsequently recognized or considered as a common or proper practice by those engaged in the business of prospecting for, developing, producing, processing, transporting, or marketing minerals, including entering

into and executing division orders, oil, gas or other mineral sales contracts, exploration agreements, processing agreements, and other contracts relating to the processing, handling, treating, transporting, and marketing of oil, gas, or other mineral production and to receive and receipt for the proceeds thereof on my behalf.

CTC's attorney-in-fact may exercise this power of attorney at any time and from time to time.

Said attorney-in-fact is granted full power and authority to do and perform all and every act and same for whatsoever requisite, necessary and proper to be done in the exercise of any rights and powers herein granted, as fully to all intents and purposes that CTC might do or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that CTC's attorney-in-fact or his substitute or substitutes shall lawfully do or cause to be done by virtue of this power of attorney and the rights and powers herein granted.

This instrument is to be construed and interpreted as a limited power of attorney. This power of attorney may be voluntarily revoked only by CTC's written revocation filed of record in the Deed Records of the counties or parishes wherein the oil, gas and other mineral property are located.

WITNESS its hand, this _28_ day of _May_, 2009.

CTC Minerals, Inc.

By: _Roland Joyce_
Name: Roland Joyce
Its: Co-Chief Executive Officer

WITNESSES:

_Pamela J. Cline_
Printed Name _Pamela J. Cline_

_Elena Ahlin_
Printed Name _Elena Ahlin_

_Henry A. King_
Notary Public
Printed Name:_____
Notary No.:_____
HENRY A. KING
NOTARY PUBLIC
STATE OF LOUISIANA
BAR NO. 7393
COMMISSION ISSUED FOR LIFE

{N0182557}

-2-

# Pacific Coast Architecture Database (PCAD)

- Architects
- Structures
- Images
- Partners
- Exhibits
- Publications

## Structures

### ARCO Plaza, Downtown, Los Angeles, CA

**ID:** 148

**Alt. Name:** Bank of America South Tower, Downtown, Los Angeles, CA
Atlantic Richfield Company, Plaza, Downtown, Los Angeles, CA

**Construction Date:** Start Date: 1972
End Date: 1973

**Notes:** Tel: (213) 489-0289;
Alteration Note: In 1986, A.C. Martin and Associates designed the YMCA Main Building #2, known as the Stuart M. Ketchum Downtown YMCA, on top of the Arco Plaza parking garage. Thomas Properties announced $125 million renovation plan, July 2003. Changes would include: office renovations directed by the project's original architects, A.C. Martin Partners, extensive landscaping changes by Laurie Olin of Olin Partnership, two new restaurants to replace the lobbies facing Fifth and Sixth Streets, and new signage by Sussman/Prejza of Santa Monica. Additionally, retail spaces and special lighting have been added during this renovation; City National Bank of Beverly Hills announced its intention to lease 310,000 square feet in the Arco Plaza South Tower, in November 2003; the complex would be renamed City National Plaza in September 2005;

**Building History:** Atlantic Richfield Company built Arco Plaza in 1972-1973 as its world headquarters and the Southern California headquarters of Bank of America; John Follis and Associates did the signage; (Follis was also well-known as a designer for the Architectural Pottery Company); Shuwa Investment Corporation of Japan bought the 2.7 million-square-foot twin towers for $650 million in 1986, an enormous sum at the time. The complex was bought in January 2003 by Thomas Properties Group, headed by James A. Thomas; the south tower has 52 stories and is 699

feet in height;

**Structure Size:** Number of Floors: 52

**Structure Type:** built works - commercial buildings - office buildings

**Locations:** Structure:

505, 555 South Flower Street

Los Angeles, CA

USA

map latlong or map of street number

**Architects:** Martin, Albert Carey, Jr. (1291)

Martin, J. Edward, (3166)

Olin, Laurie , (725)

Prejza, Paul , (928)

Sussman, Deborah , (927)

**Partners:** Martin, A.C. and Associates, Architects (98)

Olin Partnership (401)

Sussman/Prejza (592)

Turner Construction Company (1198)

**Publications:** Vrana, Debora, "Arco Plaza Wins Star Tenant", *Los Angeles Times*, C1-C2, 11/20/2003.

Redstone, Louis G., *New Downtowns*, 60-61, 158-160, 1976.

"BP America 700 stores to be sold during the next 2 years", *Seattle Times*, D2, 11/16/2007.

**Websites:** Bank of America Tower (41) Bricks and Mortar: L.A. Revival May Boost Sale of Arco Plaza (40) Thomas Unveils $125M Makeover Plan for Arco Plaza (42)

© 2005-2014 Alan Michelson

About | Contact

# Wells in STR by Parish

*Well #215057 in Sec.19 18N 8W*
*sec 19, 18 5 of Chattel #303310*

| PC | Parish | Section | Township | Range | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60 | WEBSTER | 019 | 18N | 08W | | | | | | | |
| Cnt | Well Serial | Well Name | Well Num | Org ID | Field | Field Name | Status | Permit Date | S-T-R | Total Depth | |
| 1 | 55158 | GIBBS | 001 | 4469 | 8270 | SIBLEY | 30 | 07-JAN-55 | 019-18N-08W | 6818 | |
| 2 | 109923 | ANNIE C SMITH ETAL | 001 | 4195 | 8270 | SIBLEY | 29 | 23-JUN-65 | 019-18N-08W | 6250 | |
| 3 | 142897 | HOSS B SUS;DORIS WHITE | 001-ALT | N054 | 8270 | SIBLEY | 30 | 26-JUN-73 | 019-18N-08W | 10862 | |
| 4 | 145159 | DORIS WHITE | 001D | N054 | 8270 | SIBLEY | 30 | 05-APR-74 | 019-18N-08W | 10862 | |
| 5 | 181305 | J M MATTHEWS | 001 | 4464 | 8270 | SIBLEY | 30 | 26-MAY-82 | 019-18N-08W | 7000 | |
| 6 | 183293 | SUB ANHY SUA;J M MATTHEWS | 001-D | 4464 | 8270 | SIBLEY | 30 | 10-JUL-82 | 019-18N-08W | 7000 | |
| 7 | 204891 | HOSS A SUS;WORSHAM HEIRS | 001 | N054 | 8270 | SIBLEY | 10 | 07-NOV-86 | 019-18N-08W | 9000 | |
| 8 | 215057 | PET SUH;GIBBS ETAL | 001 | N054 | 8270 | SIBLEY | 10 | 13-OCT-92 | 019-18N-08W | 9050 | |
| 9 | 219228 | HOSS B SUS;ROBINSON | 001-ALT | N054 | 8270 | SIBLEY | 10 | 12-JUN-96 | 019-18N-08W | 9080 | |
| 10 | 220910 | HOSS B SUS;MCDONALD | 001-ALT | N054 | 8270 | SIBLEY | 10 | 29-JUL-97 | 019-18N-08W | 9208 | |
| 11 | 222179 | SUB ANHY SUA;ROBINSON A | 001 | N054 | 8270 | SIBLEY | 30 | 01-JUN-98 | 019-18N-08W | 5900 | |
| 12 | 222849 | PET SUH;GIBBS ET AL A | 001-ALT | N054 | 8270 | SIBLEY | 10 | 17-DEC-98 | 019-18N-08W | 9106 | |
| 13 | 228926 | HOSS B SUS;EUGENE ROBINSON | 001-ALT | N054 | 8270 | SIBLEY | 10 | 08-DEC-03 | 019-18N-08W | | |
| 14 | 228963 | HILL RB SUH;WHITE | 001-ALT | A093 | 0016 | ADA | 10 | 17-DEC-03 | 019-18N-08W | | |
| 15 | 229864 | HOSS B SUS;TALTON ETAL | 001-ALT | N054 | 8270 | SIBLEY | 10 | 09-JUL-04 | 019-18N-08W | | |
| 16 | 230057 | HOSS B | 001-ALT | N054 | 8270 | SIBLEY | 10 | 23-AUG- | 019- | | |

| | | | | | | | | | 04 | 18N-08W | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SUS;WOODARD ETAL | | | | | | | | | |
| 17 | 230058 | HOSS B SUS;WORSHAM 19 | 001-ALT | N054 | 8270 | SIBLEY | | 10 | 23-AUG-04 | 019-18N-08W | |
| 18 | 233000 | HILL RB SUH;BUTLER 19 | 001-ALT | A093 | 0016 | ADA | | 10 | 07-MAR-06 | 019-18N-08W | |

## EXHIBIT "A"

*Pg of Chattel # 303318*
*# ~~????~~    18N 9W*

THE WELL(S) COVERED BY THE INSTRUMENT TO WHICH
THIS EXHIBIT "A" IS ATTACHED ARE DESCRIBED AS
FOLLOWS:

| | |
|---|---|
| Well Name: | Gibbs, et al., No. 1-Alt. |
| Serial No.: | 215057  *See check stub* |
| Operator: | Nelson Oil & Gas, Inc. |
| Location: | 2050 feet from the North line and 660 feet from the West line of Section 19, Township 18 North, Range 9 West. _____ |
| Field: | Sibley |
| Parish: | Webster |
| State: | Louisiana |
| Unit: | HOSS B SU S, established by Louisiana Department of Conservation Order No. 148-J-37, comprising all of Section 19, Township 18 North, Range 9 West. |

Unit Working Interest:          .14361607

Unit Net Revenue Interest:        .10549770

It is the intention of Mortgagor/Grantor for the instrument to which this exhibit is attached to cover all of the Mortgagor's/Grantor's right, title and interest in and to the mineral leases described below, presently owned and hereinafter acquired, INSOFAR AND ONLY INSOFAR as said mineral leases are attributable to the above described well(s), the equipment associated therewith and the production therefrom, together with such rights of Mortgagor/Grantor in and under the mineral leases that are necessary and useful to the operation and production from said wells, including rights of ingress and egress in connection therewith. The instrument to which this exhibit is attached shall not cover other wells drilled on lands covered by the mineral leases or on lands pooled therewith.

A - 5

(Donald)
pas/nelson1.shr

## EXHIBIT "A"

*Pg of Chattel# 303318*
*#21?... 18N 9W*

### THE WELL(S) COVERED BY THE INSTRUMENT TO WHICH THIS EXHIBIT "A" IS ATTACHED ARE DESCRIBED AS FOLLOWS:

| | |
|---|---|
| Well Name: | Gibbs, et al., No. 1-Alt. |
| Serial No.: | 215057   *See check Stub* |
| Operator: | Nelson Oil & Gas, Inc. |
| Location: | 2050 feet from the North line and 660 feet from the West line of Section 19, Township 18 North, Range 9 West. _____ |
| Field: | Sibley |
| Parish: | Webster |
| State: | Louisiana |
| Unit: | HOSS B SU S, established by Louisiana Department of Conservation Order No. 148-J-37, comprising all of Section 19, Township 18 North, Range 9 West. |

Unit Working Interest:              .14361607

Unit Net Revenue Interest:        .10549770

It is the intention of Mortgagor/Grantor for the instrument to which this exhibit is attached to cover all of the Mortgagor's/Grantor's right, title and interest in and to the mineral leases described below, presently owned and hereinafter acquired, INSOFAR AND ONLY INSOFAR as said mineral leases are attributable to the above described well(s), the equipment associated therewith and the production therefrom, together with such rights of Mortgagor/Grantor in and under the mineral leases that are necessary and useful to the operation and production from said wells, including rights of ingress and egress in connection therewith. The instrument to which this exhibit is attached shall not cover other wells drilled on lands covered by the mineral leases or on lands pooled therewith.

A - 5

(Donald)
pas/nelson1.shr

**Webster Parish, Louisiana Clerk of Court - Holli Vining**                                                     **DeAnna Stoddard**

**SEARCH CRITERIA   Kinds** POWER OF ATTORNEY   **Firm/Last Name** BANK OF AMERICA (CONTAINS)

Name Search

Displaying records 1 - 9 of 9 at 7:46 PM on 3/27/2013

| | Index | Date | Kind | VENDORS | VENDEES | Description | File Number | Book/Page | Ref | Images |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CON | 07/15/2009 | POWER OF ATTORNEY | CTC MINERALS INC | BANK OF AMERICA N A | | 513624 | 1090 / 645 | | 3 |
| 2 | CON | 07/15/2009 | POWER OF ATTORNEY | CTC MENERALS INC | BANK OF AMERICA | | 513625 | 1090 / 648 | | 3 |
| 3 | CON | 12/07/2009 | POWER OF ATTORNEY | ROBERTS, DAVID | BANK OF AMERICA AMERICA BANK OF | | 516606 | 1098 / 813 | | 6 |
| 4 | CON | 02/01/2010 | POWER OF ATTORNEY | MARTIN, ROGIS | BANK OF AMERICA N A | LIMITED POWER OF ATTORNEY | 517674 | 1101 / 384 | | 6 |
| 5 | CON | 12/06/2010 | POWER OF ATTORNEY | CHANLER, FRANKIE CARL  CHANLER, MONA RUTH HUDDLESTON | BANK OF AMERICA NA | LOTS 35-37 P/LOT 34 PLEASANT LAKE ESTATES SUBD | 523559 | 1115 / 282 | | 6 |
| 6 | CON | 06/14/2012 | POWER OF ATTORNEY | BANK OF NEW YORK  BANK OF NEW YORK MELLON | BANK OF AMERICA N A | | 533384 | 1137 / 549 | | 2 |
| 7 | CON | 08/02/2012 | POWER OF ATTORNEY | GOVERNMENT NATIONAL MORTGAGE ASSOCIATION | BANK OF AMERICA NA | | 534359 | 1139 / 820 | | 5 |
| 8 | CON | 09/17/2012 | POWER OF ATTORNEY | U S BANK NATIONAL ASSOCIATION | BANK OF AMERICA NA | POA | 535155 | 1141 / 686 | | 9 |
| 9 | CON | 12/26/2012 | POWER OF ATTORNEY | GOVERNMENT NATIONAL MORTGAGE ASSOCIATION | BANK OF AMERICA NA  BAC HOME LOANS | LIMITED | 536821 | 1145 / 753 | | 4 |

© 2007 - 2013 Cott Systems,
Inc.
Version 1.3.16.6

| | Index | Date | Kind | Party Ones | Party Twos | Description | File Number | Book/Page | Ref | Images |
|---|---|---|---|---|---|---|---|---|---|---|
| 24 | CON | 05/30/1985 | JUDGMENTS | ILLINOIS CENTRAL GULF RAILROAD CO<br>BRUNSON, CAROLYN M<br>BURFORD, BERTHA LEE G<br>BURFORD, WILLIAM T<br>FRANKS PETROLEUM INC [+] | ILLINOIS CENTRAL GULF RAILROAD CO<br>BRUNSON, CAROLYN M<br>BURFORD, BERTHA LEE G<br>BURFORD, WILLIAM T<br>FRANKS PETROLEUM INC [+] | [ COPY JUDG ] SEE ORIGINAL [Dt of Inst: 1 4 82] | 324060 | 640 / 209 | | 4 |
| 25 | CON | 03/24/1986 | RIGHT OF WAY | ILLINOIS CENTRAL GULF RAILROAD COMPANY | A T & T COMMUNICATIONS INC | [ EASEMENT AGREEM ] SEE ORIGINAL | 330379 | 657 / 291 | | 2 |
| 26 | MTG | 03/31/1986 | RELEASE | ILLINOIS CENTRAL RAILROAD COMPANY | -MORGAN GUARANTY TRUST CO OF NY | SEE ORIGINAL | 330505 | 311 / 414 | | 4 |
| 27 | CON | 03/31/1986 | DEED | ILLINOIS CENTRAL GULF RAILROAD CO | MIDSOUTH RAIL CORPORATION | [ DEED ] TRS 18-8; 18-9; 18-10 | 330506 | 657 / 506 | | 13 |
| 28 | CON | 11/14/1986 | ASSIGNMENT | ILLINOIS CENTRAL GULF RAILROAD COMPANY | MIDSOUTH RAIL CORPORATION | [ ASSGN COPY ] SEE ORIGINAL | 335234 | 668 / 806 | | 7 |
| 29 | MTG | 05/12/1987 | RELEASE | ILLINOIS CENTRAL GULF RAILROAD COMPANY | -FIRST NATIONAL BANK OF COMMERCE | REF 200-634;244952 | 338785 | 327 / 615 | | 2 |
| 30 | CON | 05/24/1989 | QUITCLAIM DEED | ILLINOIS CENTRAL RAILROAD COMPANY | CTC MINERALS INC | [ QUITCLM ] SEE ORIGINAL | 353547 | 717 / 403 | | 15 |
| 31 | MTG | 12/20/1989 | MORTGAGE | ILLINOIS CENTRAL RAILROAD COMPANY | -MORGAN GUARANTY TRUST COMPANY | SEE ORIGINAL | 357241 | 356 / 365 | | 16 |
| 32 | CON | 01/29/1990 | MERGER | ILLINOIS CENTRAL RAILROAD COMPANY | ILLINOIS CENTRAL TRANSPORTATION CO | [ MERGER ] | 357855 | 729 / 532 | | 1 |
| 33 | CON | 08/23/1990 | AMENDMENT | ILLINOIS CENTRAL GULF RAILROAD COMPANY | ILLINOIS CENTRAL RAILROAD COMPANY | [ AMEND CERTIFI ] CHANGE CORPORATE NAME | 361616 | 740 / 62 | | 1 |

| | Index | Date | Kind | Party Ones | Party Twos | Description | File Number | Book/Page | Ref | Images |
|---|---|---|---|---|---|---|---|---|---|---|
| 25 | CON | 04/10/1989 | CERTIFICATE | CT CORPORATION SYSTEM PITTS P LIMITED PARTNERSHIP WESSON ENERGY CORPORATION | CT CORPORATION SYSTEM PITTS P LIMITED PARTNERSHIP WESSON ENERGY CORPORATION | [ CERTIFI ] | 352754 | 715 / 352 | | 1 |
| 26 | CON | 05/24/1989 | QUITCLAIM DEED | ILLINOIS CENTRAL RAILROAD COMPANY | CTC MINERALS INC | [ QUITCLM ] SEE ORIGINAL | 353547 | 717 / 403 | | 15 |
| 27 | MTG | 11/26/1990 | RESOLUTION | LOUISIANA DISTRICT COUNCIL OF THE ASSEMBLIES OF GOD INC | -THOMAS M MCMAHAN | AUTHORITY | 363329 | 365 / 138 | | 2 |
| 28 | CON | 12/10/1990 | NOTICE | LOGAN DUNHAM INC | CT CORPORATION SYSTEM C T CORPORATION SYSTEM | [ NOTICE ] CHANGE REGISTER OFFICE & AGENT | 363581 | 745 / 201 | | 1 |
| 29 | CON | 07/08/1991 | AGREEMENT | CT CORPORATION SYSTEM INLAND CANYON RIDGE LIMITED PARTNERSHIP | CT CORPORATION SYSTEM INLAND CANYON RIDGE LIMITED PARTNERSHIP | [ PARTNER REGISTER ] | 367172 | 754 / 336 | | 4 |
| 30 | CON | 12/12/1991 | OIL/GAS LEASE | CTC MINERALS INC C T C MINERALS INC | SONAT EXPLORATION COMPANY | [ O & G LEASE ] TR 17-18-8 | 369950 | 761 / 665 | | 7 |
| 31 | CON | 02/19/1992 | AMENDMENT | MANVILLE FOREST PRODUCTS CORPORATION RIVERWOOD INTERNATIONAL CORPORATION | CT CORPORATION SYSTEM | REGISTERED AGENT | 371107 | 764 / 506 | | 6 |
| 32 | MTG | 07/01/1993 | RELEASE | MORRIS, THEODIS | -US DISTRICT COURT - WESTERN DISTRICT OF LA | | 381050 | 392 / 253 | | |
| 33 | MTG | 07/01/1993 | RELEASE | MORRIS, THEODIS | -US DISTRICT COURT - WESTERN DISTRICT OF LA | | 381050 | 392 / 253 | | 1 |
| 34 | CON | 08/16/1993 | AMENDMENT | TORCH ENERGY ASSOCIATES LTD | CT CORPORATION SYSTEM | CERTIFICATE PARTNER SHIP | 381836 | 788 / 333 | | 1 |
| 35 | MTG | 03/29/1994 | MORTGAGE | C T C MINERALS INC CTC MINERALS INC | -BEARER | SEE ORIGINAL | 386325 | 400 / 669 | 8M RIMCO Boston | 24 |
| 36 | MTG | 03/29/1994 | MORTGAGE | C T C MINERALS INC | -BEARER | SEE ORIGINAL | 386325 | 400 / 669 | | |



# NOTICE OF SEIZURE
## SHERIFF'S OFFICE

**Suit No:** (08) 143374   **Serial #:** 22

**Date:** Wednesday, February 5, 2014

BANK OF AMERICA NA
VS
DEANNA L STODDARD A/K/A DEANNA
STODDARD AND GERALD D EDWARDS A/K/A
GERALD EDWARDS

**JULIAN C. WHITTINGTON, SHERIFF**
P.O.Box 850
BENTON, LA 71006

**Parish of Bossier**
26th Judicial District Court
State of Louisiana

---

TO:   **VERGIS, MICHAEL J., CURATOR FOR EDWARDS, GERALD D. A/K/A GERALD
EDWARDS
509 MILAM STREET
SHREVEPORT, LA 71101**

NOTICE is hereby given that I am this day seizing, in accordance with the provisions of R.S. 13:3851 through R.S. 13:3861, the following described immovable property, to wit:

**LOT NINE (9), GRAY LAKE ESTATES, A SUBDIVISION OF BOSSIER PARISH, LOUISIANA, AS PER PLAT THEREOF RECORDED IN BOOK 808, PAGES 310-313 OF THE CONVEYANCE RECORDS OF BOSSIER PARISH, LOUISIANA**

As the property of **DEANNA L STODDARD A/K/A DEANNA STODDARD AND GERALD D EDWARDS A/K/A GERALD EDWARDS**, under a writ of **SEIZURE AND SALE**, issued on the **23rd day of December, 2013**, by the Civil District Court for the Parish of Bossier, in the matter entitled BANK OF AMERICA NA vs DEANNA L STODDARD A/K/A DEANNA STODDARD AND GERALD D EDWARDS A/K/A GERALD EDWARDS, docket no. 143374, to satisfy a claim of $**77,457.15**, interest and costs, this **5th day of February, 2014**. This matter is scheduled for sheriff's sale on the **9th day of April, 2014**, at 10:00 A.M. Please be aware that the sheriff's sale date may change. You may contact the sheriff's office to find out the new date when the property is scheduled to be sold. The new sale date will also be published in the local newspaper in accordance with R.S. 43:203. If the seized property is residential property, you may be afforded the opportunity to bring your account in good standing by entering into a loss mitigation agreement with your lender, or by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account.You are strongly encouraged to seek legal counsel. If you cannot afford to pay an attorney, you may be able to qualify for free legal services. Foreclosure prevention counseling services through a housing counselor, including loss mitigation, are provided free of charge. To find a local housing counseling agency approved by the U S Department of Housing and Urban Development, you may contact the U S Department of Housing and Urban Development or the Louisiana Housing Corporation.

JULIAN C. WHITTINGTON-SHERIFF &
EX-OFFICIO TAX COLLECTOR
BOSSIER PARISH

BY: _Pat Taylor_____

PAT TAYLOR

Service Copy

EDWARDS TIGER TOOTH MANUFACTURING CO., INC.


CERTIFICATE OF CORPORATE RESOLUTION


WE, GERALD D. EDWARDS, President, and ELIZABETH C. EDWARDS, Secretary-Treasurer, of EDWARDS TIGER TOOTH MANUFACTURING CO., INC., a Texas Corporation duly organized and existing under the laws of the State of Texas; that all franchise and other taxes required to maintain its corporate existence have been paid when due and that no such taxes are delinquent; that no proceedings are pending for the forfeiture of its Certificate of Incorporation or for its dissolution. voluntary or involuntary; that it is duly qualified to do business in the State of Texas and is in good standing in such state; that there is no provision of the Articles of Incorporation or by-laws of said Corporation limiting the powers of the Board of Directors to pass the resolution set out below and that the same is in conformity with the provisions of said Articles of Incorporation and by-laws; that the Secretary-Treasurer is the keeper of the records and minutes of the proceedings of the Board of Directors of said Corporation and that on the _28_ day of _____May_____, 1968, at 2:00 P.M. there was held a special meeting of the Board of Directors of said Corporation, which was duly called and held in accordance with the laws and the by-laws of the Corporation, at which meeting all of the Directors were present in person; accordingly, a quorum was declared and remained in attendance throughout the meeting; and that at said meeting the following resolution was discussed and duly and legally passed and adopted in conformity with the by-laws, which in turn allow a majority of the Board of Directors to pass such resolutions, and that the same has not been altered, amended, rescinded or repealed and is now in full force and effect; and that the resolution is as follows:

BE IT RESOLVED by a majority of the Board of Directors of EDWARDS TIGER TOOTH MANUFACTURING CO., INC., being a quorum of all directors of said Corporation, that a certain License Agreement, a copy of which is attached hereto and made a part of this Resolution for all purposes, is hereby granted by EDWARDS TIGER TOOTH MANUFACTURING CO., INC. to EDLO, INC., a Texas Corporation with offices at 2002 Continental Life Building, Fort Worth, Texas, for the use and application of the rights to the heavy equipment digging teeth, and adapters, called "tiger teeth", according to the tenure, terms and provisions as set out in the attachment; and said License Agreement as attached hereto is in all things approved by the Board of Directors of this Corporation, at the meeting recited hereinabove.

We further certify that the following persons are the officers of EDWARDS TIGER TOOTH MANUFACTURING CO., INC., and are the persons authorized to act and sign the foregoing Resolution:

|  |  |  |
|---|---|---|
| Gerald D. Edwards | - | President |
| Floyd B. Edwards | - | Vice-President |
| Elizabeth C. Edwards | - | Secretary-Treasurer |

Page2.jpg

IN WITNESS WHEREOF, we have hereunto set our hands as President and Secretary-Treasurer, respectively, of said Corporation, and have attached hereto the official seal of said Corporation this *28* day of _____ *May* , 1968.

ATTESTED:

*Elizabeth C Edwards*

ELIZABETH C. EDWARDS
Secretary Treasuerer

_____
GERALD D. EDWARDS - President

The undersigned, constituting all directors of EDWARDS TIGER TOOTH MANUFACTURING CO., INC., hereby certify that we and each of us waived notice of the time, place and purpose of the foregoing meeting, and hereby ratify, affirm and confirm all actions had and taken thereat.

*Gerald E Edwards*                    *5-31-68*
GERALD E. EDWARDS                       date

*Floyd B Edwards*                     *6-11-68*
FLOYD B. EDWARDS                        date

*Elizabeth C Edwards*                 *5/31/68*
ELIZABETH C. EDWARDS                    date

Page3.jpg

## LICENSE AGREEMENT

Agreement by and between EDWARDS TIGER TOOTH MANUFACTURING CO., INC., a corporation of the State of Texas, having its principal office at 415 Freda Drive, South Houston, Texas, (hereinafter referred to as licensor) and EDLO, INC., a corporation of the State of Texas, having its principal office at 2002 Continental Life Building, Fort Worth, Texas, (hereinafter referred to as licensee) made and entered into as of and dated the _29_ day of _May_, 1968, WITNESSETH:

WHEREAS, licensor is the sole owner of United States Letters Patents Nos: 3,055,128 issued September 25, 1962 to Floyd B. Edwards,

WHEREAS, licensee desires to acquire with reference to the inventions of the aforesaid letters patent, certain rights as hereinafter specified,

NOW, THEREFORE, for and in consideration of the covenants and the premises hereinafter recited and to be faithfully performed and the sum of Five Hundred and No/100 ($500.00) Dollars by licensee paid in hand to licensor, and of other good and valuable considerations, receipt of which is hereby acknowledged, it is agreed and understood as follows:

1. Grant: Licensor hereby grants to licensee a nonseverable, exclusive right and license, under the said letters patent, to manufacture or have manufactured produce, assemble use and sell all types of digging teeth used on drag lines, crawler-dozers and related types of digging equipment and adapters embodying said letters patent for the entire life of said letters patent, throughout the world and licensee shall have the right to further develop, said equipment digging teeth, and adapters (but is not under any obligation to further develop said equipment digging teeth and adapters).

The licensor hereby further grants licensee the right, during the term of this agreement and subject to all the conditions hereof, to use the name "Tiger-Tooth", and any derivative thereof, referring particularly herein to any and all types of digging teeth and adapters used on drag lines, crawler-dozers and related types of digging equipment.

2. Royalties: (a) During the life of this agreement the licensee shall pay to the licensor a royalty of the sum equivalent to two per cent (2%) of the gross sales (total sales minus sales returns and allowances) of the Tiger Tooth line of products, paid on a quarterly basis, based on a calendar quarter, such payment to be made within thirty (30) days after the close of each calendar quarter in cash, check or money order. The first such royalty payment shall be due and payable to licensor at the end of the calendar quarter in which this Agreement is executed and effected. It is expressly understood and agreed that the licensor will allow licensee to use the name "Tiger Tooth" or any derivative thereof if licensee so desires, as its corporate assumed name.

SUBJECT, however, to the further provision that any completed, marketable digging teeth and adapters that the licensor has on hand at the time this Agreement is effected shall be taken immediately on a consignment basis by licensee, and

upon sale and collection of the proceeds from each sale, the gross profit shall be determined (by subtracting manufacturing costs from selling price), and such gross profit shall be divided equally between the licensor and licensee, payable by licensee to said licensor on or before thirty (30) days after the collection of the proceeds of each sale. This arrangement shall affect only those digging teeth and adapters which are a part of the inventory of the licensor on the date this Agreement is effected.

(b)  The provisions as to payment of royalties shall not apply to a device embodying the subject-matter of any patent claim which has theretofore been finally held to be invalid or so construed as not to cover such device by a court of final competent jurisdiction from which an appeal is not taken within the time specified by law, or embodying the subject-matter of any patent claim which has theretofore been finally awarded to another party in an interference involving said patent claim by a tribunal of final competent jurisdiction, or by a final decision of a lower tribunal of competent jurisdiction from which an appeal is not taken within the time specified by law, unless such device also embodies the invention of some other patent claim under which this license is granted.

3.  PRODUCTION ASSISTANCE:

The licensor agrees to provide licensee with shop drawings and other instructions as may be necessary for the development and production of the equipment digging teeth and adapters made the subject of this Agreement. However, nothing in this or any other paragraph of this Agreement shall be construed as giving an incidence of title to the legal patent rights to said digging teeth and/or adapters or copyright to the term "Tiger-Tooth" to licensee or any third party, for it is expressly understood and agreed by the parties hereto that the patent and copyrights shall remain the exclusive property of, and under the control and possession of said licensor subject only to this exclusive license granted licensee hereby.

4.  TERM:

This Agreement shall commence on the date first recited hereinabove, and shall remain in full force and effect so long as licensee shall remain an active business concern. In the event that it is determined by the management of licensee that it is no longer feasible to continue the operation of the corporation and so notifies the licensor, licensee will immediately relinquish all licenses and rights hereunder to the licensor. In the event of termination of this Agreement for any reason whatsoever, it is expressly understood and agreed by the parties hereto that licensee shall continue to make royalty payments to the licensor according to the terms and provisions hereof, until the remaining inventory of digging teeth and/or adapters or any related equipment are fully marketed and sold by licensee or, alternatively, if licensee shall for any reason become unable to continue the sale of tiger teeth and/or adapters after the termination of this

Agreement, and in lieu of the foregoing royalty payments, the parties agree
that they will, within a reasonable time, inventory all digging teeth and/or
adapters and related equipment which licensee may have in stock or on consignment
as of the date of termination of this Agreement, and said Licensor shall have
the right of first refusal to purchase said digging teeth and/or adapters and
any related equipment from licensee for a price then to be agreed upon, less an
agreeable reasonable allowance for depreciation and deterioration of such
equipment.

It is expressly understood and agreed by these parties that bankruptcy,
receivership or other evidence of insolvency of licensee shall be grounds for
termination of this Agreement where the licensor first gives notice in writing,
be registered mail, to licensee at least ten (10) days in advance of the anticipated
date of termination and where the licensor recites the exact grounds for such
termination in its writing.

   5.  AGENCY:

Licensee further agrees that it is in no legal sense an agent of and
for the licensor, but hereby expressly refuses the same, and that as between them,
licensee is an independent contractor as that term is defined in law, and bears the
sole responsibility for its actions.  Further, it is expressly understood and
agreed by the parties hereto that licensee will hold the licensor harmless in any
claim or litigation wherein it is alleged, for any purpose whatsoever, that licensee
is either an agent, legal representative or employee of the licensor, but this
hold harmless agreement is expressly limited to any claim or litigation wherein
licensee is claimed or alleged to be "an agent, legal representative or employee"
or the licensor, and not otherwise.  Likewise, the licensor agrees to hold licensee
safe, and render it harmless, in any and all claims and suits arising out of
alleged patent and/or copyright and/or trademark infringements, and licensor agrees
to defend any such suits and/or claims as they may pertain to the patent subject
equipment or its trade name, "Tiger-Tooth".

   6.  INVALIDITY OF PROVISIONS:

In the event that any part of this Agreement between these parties shall
be found to be illegal, or a violation of public policy, or for any other reason
unenforceable in law, such finding shall in no event invalidate the other parts
of this Agreement.

   7.  ENTIRE AGREEMENT:

This Agreement between the licensor and licensee encompasses all of
the terms and conditions and representations made by either party and supersedes any
other arrangements discussed by the parties.

   8.  APPLICABLE LAW:

This Agreement has been made in Fort Worth, Tarrant County, Texas,
and shall be interpreted and construed in accordance with the laws of that State;
further, by agreement of the parties hereto, the Courts of Tarrant County, Texas,
shall have the exclusive venue and jurisdiction of any litigation arising from
this Agreement.

Page6.jpg

9. <u>NOTICES:</u>

All notices required to be exchanged or mailed between these parties shall be sent by registered or certified mail, addressed to either party, or both, at the address designated hereinbelow:

Licensor
Edwards Tiger Tooth Manufacturing
Co., Inc.
415 Freda Drive
South Houston, Texas

Licensee
EDLO, INC.
2002 Continental Life Bldg.
Fort Worth, Texas

IN WITNESS WHEREOF, the parties have executed this Agreement on the date stated above.

ATTEST:

_Secretary_

EDWARDS TIGER TOOTH MANUFACTURING CO. INC.
"Licensor"

By: _Gerald Edwards_
    Duly Authorized Officer or Agent

ATTEST:

_Secretary_

EDLO, INC.
"Licensee"

_G B Long_
Duly Authorized Officer or Agent

I, being the record owner of United States Letters Patents Nos. 3,055,128 issued September 25, 1962, to Floyd B. Edwards, hereby give my consent and approval, if necessary, to the above mentioned agreement.

_Floyd B. Edwards_
FLOYD B. EDWARDS

Page7.jpg

CORPORATE ACKNOWLEDGEMENT

THE STATE OF TEXAS           X
                             X
COUNTY OF TARRANT            X

    BEFORE ME, the undersigned authority in and for said County and State,
on this day personally appeared  *GERALD Edwards*  the
*PRESIDENT*                      of EDWARDS TIGER TOOTH MANUFACTURING CO.,
INC. known to me to be the person and officer whose name is subscribed to the
foregoing instrument and acknowledged to me that the same was the act of the said
corporation, and that he executed the same as the act of such corporation for
the purposes and consideration therein expressed, and in the capacity therein
stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this the  *29*  day of  *May*,
A.D., 1968.

                              *Morgan le Williams*
                              Notary Public in and for Tarrant County,
                              Texas
                              My Commission Expires:  June 1, 1969

CORPORATE ACKNOWLEDGEMENT

THE STATE OF TEXAS           X
                             X
COUNTY OF TARRANT            X

    BEFORE ME, the undersigned authority in and for said County and State,
on this day personally appeared  *G. B. Long*               the
*VICE President*                  of EDLO, INC. known to
me to be the person and officer whose name is subscribed to the foregoing instrument
and acknowledged to me that the same was the act of the said corporation, and that
he executed the same as the act of such corporation for the purposes and considera-
tion therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this the  *29*  day of  *May*,
A.D., 1968.

                              *Morgan le Williams*
                              Notary Public in and for Tarrant County,
                              Texas
                              My Commission Expires:  June 1, 1969

SINGLE ACKNOWLEDGEMENT

THE STATE OF  ~~TEXAS~~ *North Carolina*
COUNTY OF  ~~TARRANT~~ *Haywood*  X

    BEFORE ME, the undersigned authority in and for said County and State,
on this day personally appeared FLOYD B. EDWARDS known to me to be the person
whose name is subscribed to the foregoing instrument, and acknowledged to me that
he executed the same for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this the  *11*  day of  *June*,
A.D., 1968.

                              *Judy S. McIlroy*
                              Notary Public in and for ~~Tarrant~~ County, *Haywood*
                              ~~Texas~~ *County, North Carolina*
                              My Commission Expires:  ~~June 1, 1969~~
                                                      *Aug 12, 1968*

-3-



*N⁰*

3,055,128

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**Whereas**      Floyd B. Edwards,

of

Salisbury,            North Carolina,

PRESENTED TO THE **Commissioner of Patents** A PETITION PRAYING FOR THE GRANT OF LETTERS PATENT FOR AN ALLEGED NEW AND USEFUL INVENTION THE TITLE AND A DESCRIPTION OF WHICH ARE CONTAINED IN THE SPECIFICATION OF WHICH A COPY IS HEREUNTO ANNEXED AND MADE A PART HEREOF, AND COMPLIED WITH THE VARIOUS REQUIREMENTS OF LAW IN SUCH CASES MADE AND PROVIDED, AND

**Whereas** UPON DUE EXAMINATION MADE THE SAID CLAIMANT IS ADJUDGED TO BE JUSTLY ENTITLED TO A PATENT UNDER THE LAW.

Now THEREFORE THESE **Letters Patent** ARE TO GRANT UNTO THE SAID

Floyd B. Edwards, his heirs

OR ASSIGNS

FOR THE TERM OF SEVENTEEN YEARS FROM THE DATE OF THIS GRANT

RIGHT TO EXCLUDE OTHERS FROM MAKING, USING OR SELLING THE SAID INVEN-
THROUGHOUT THE UNITED STATES.

*In testimony whereof I have hereunto set my hand and caused the seal of the Patent Office to be affixed, at the City of Washington this* twenty-fifth *day of* September, *in the year of our Lord, one thousand nine hundred and* sixty-two, *and of the Independence of the United States of America the one hundred and* eighty-seventh.

*Attest:*

*Ernest W. Snider*
*Attesting Officer.*

*David L. Ladd*
*Commissioner of Patents.*

# United States Patent Office

**3,055,128**
**Patented Sept. 25, 1962**

---

## 1

3,055,128
**POINTS FOR DIGGING BUCKETS**
Floyd B. Edwards, P.O. Box 199, Salisbury, N.C.
Filed Apr. 13, 1959, Ser. No. 805,798
5 Claims. (Cl. 37—142)

This invention relates to buckets of power shovels and more especially to removable and replaceable points or teeth for such buckets.

Buckets of power shovels, back hoes, and the like are conventionally provided with a plurality of pick-like teeth or points that are more or less sharp so as to enter as easily as possible into, and loosen, the earth so the bucket may be filled by forward movement into the earth. The teeth used on such buckets are conventionally solid forgings, of considerable mass, to give strength to their pick-like shape. Such pick-like teeth, while having certain earth penetrating ability, possess little break-out action, and they are expensive to make and to maintain.

It has been found that teeth or points made in accordance with the present invention have great strength compared to their weight, are less expensive to make, and to maintain, and have greater break-out action than conventional teeth or points.

It is, therefore, a primary object of the present invention to provide a novel tooth or point for the buckets of power shovels or back hoes and the like that is more effective in penetration and break-out action than previous points.

It is a further object to provide points that are inexpensive to make and easy to install and to replace, and that stay effectively sharp even as they wear.

Other and further objects and advantages will appear from the following specification taken with the accompanying drawing in which like characters of reference designate like parts in the several views and in which:

FIG. 1 is a perspective view of a tooth or point exemplifying the present invention;

FIG. 2 is a section taken at 2—2 of FIG. 1;

FIG. 3 is a side elevation of such a tooth or point mounted on a bucket;

FIG. 4 is a side elevation similar to FIG. 3 illustrating a modification.

The point of the present invention is made of an angle-bar shaped piece of metal. A body portion of angle bar provides wings 1 and 2 cut back at an angle of preferably about 35° to provide long slanting leading edges 3 and 4 leaving a sharp point at 5. The edges 3, 4, 5, of course, is the earth penetrating edge of the point and it will be noted that the surface 3, 4, 5 is a plane so that the outer edges of surfaces 3 and 4 are sharp.

Extending forward from the rearward or trailing edge of the "point" are aligned slots 6, 7 leaving a rearwardly extending V-shaped portion 8 to underlie and bear against the outer lower surface of bucket 9. The upper or wing portions 10 and 11, bounding slots 6 and 7, respectively, will, in use, tend to clamp bucket 9 against portion 8, and will be supported by the upper surface of bucket 9 to prevent flattening out of the angle.

A single bolt hole 12 is in FIGS. 1, 2 and 3 shown as being provided in the portion 8 to align with a corresponding hole in bucket 9 to receive a bolt 13 held fast by a nut 14. Other securing means than a bolt and nut may be used, such as a rivet. For extraordinarily heavy duty the ends of wing portions 10 and 11 may be somewhat extended and twisted to each present a portion lying flat on bucket 9 as indicated at 10'. These portions may then each be bolted down as seen at 13' in FIG. 4.

It will be noted that the angle portion between parts 1 and 2, extending rearwardly as portion 8 forms a very strong spine for the tooth. The raked back edges 3 and

## 2

4 are substantially sharp even after considerable hard usage.

The point of the present invention may be made of hard steel or alloy steel and may be formed, prior to heat treatment, by rolling, forging, or any other manufacturing process. The thickness of the arms 1, 2 of the angle may be of any suitable thickness which will, of course, depend on the particular service to which the points are to be put. Lighter weight teeth, that is, teeth having relatively thin arms or wings 1, 2 will be particularly suitable for digging in soil that is full of roots and free of rock.

The angle between wings 1, 2 is preferably 90 degrees. Other angles, however, may be selected, a wider angle giving a sharper edge at 3 and 4 at the same time angle of edges 3 and 4 with respect to the length of the "point," and less vertical strength, while a narrower or sharper V will give greater vertical strength and a somewhat blunter edge along 3 and 4. The angle of rake of surface 3, 4, 5, with respect to the bottom edge 5' of the tooth or point, is preferably approximately 35°, thus it is seen that the point 5 and the edges of 3 and 4 are quite sharp but, at the same time, are backed up by the mass of the tooth, and are easily resharpened, when rounded by wear, since, as pointed out above, the surface 3, 4, 5 is a plane.

I claim:

1. In combination a digging bucket having a forward digging edge to be forced into material to be dug, and a digging tooth, said digging tooth comprising an elongated tooth body V-shaped in transverse section composed of two wing portions merging at one edge to form said V-shaped body, said body being shaped to provide a forward sharpened end and a rearward notched end, the notch in said rearward end being shaped to embrace the forward digging edge of the digging bucket.

2. The combination of claim 1 in which the angle between the wings of the V is substantially 90 degrees and in which the forward sharpened end is formed by a plane surface lying at an angle of approximately 35° to the axis of the tooth.

3. In combination a digging bucket having a forward digging edge to be forced into material to be dug and a plurality of combined penetrating and scooping teeth mounted in side by side relation on said forward edge of said bucket, said teeth each comprising an elongated body portion of substantially V-shape in cross section and having leading and trailing edges and with the apex of the V-shaped body portion defining the bottom surface of the tooth, the sides of the body portion being inclined upwardly and cut back rearwardly from the apex of the V-shaped body portion to provide said leading edges, and aligned slots in said trailing edges extending forwardly toward said leading edge and embracing the forward edge of the digging body.

4. In combination a digging bucket having a forward digging edge to be forced into material to be dug and a plurality of combined penetrating and scooping teeth mounted in side by side relation on said forward edge of said bucket, said teeth each comprising an elongated body portion of substantially V-shape cross section and having leading and trailing edges and with the apex of the V-shaped body portion defining the bottom surface of the tooth, the sides of the body portion being inclined upwardly and cut back rearwardly from the apex of the V-shaped body portion to provide said leading edges, and aligned slots in said trailing edges extending forwardly toward said leading edge and shaped to accurately conform to and embrace the surfaces of sand digging body whereby deformation of said tooth increasing the angle of said V-shape of said tooth provides clamping stresses between said tooth and said digging body.

5. The device of claim 1 in which the portions of said

Sept. 25, 1962              F. B. EDWARDS                3,055,128

POINTS FOR DIGGING BUCKETS

Filed April 13, 1959



FIG. 1

FIG. 2

FIG. 3

FIG. 4

INVENTOR

**FLOYD B. EDWARDS**

BY *Frederick W. Turnbull*

ATTORNEY

3,055,128

## 3

rearward notched end of the tooth embracing the forward digging edge of the bucket remote from the apex of said V-shaped body are twisted to be in close engagement with the upper surface of said digging edge, and securing means are provided to secure said portions to said digging bucket.

**References Cited** in the file of this patent

UNITED STATES PATENTS

83,656    Patterson ------------------ Nov. 3, 1868   10

## 4

709,147    Fay ------------------ Sept. 16, 1902
800,637    Gallimore ------------------ Oct. 3, 1905
1,154,357    West ------------------ Sept. 21, 1915

FOREIGN PATENTS

343,202    Great Britain ------------------ Feb. 19, 1931
832,349    Germany ------------------ Mar. 27, 1952



№ 4329798

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**Whereas,** THERE HAS BEEN PRESENTED TO THE

### Commissioner of Patents and Trademarks

A PETITION PRAYING FOR THE GRANT OF LETTERS PATENT FOR AN ALLEGED NEW AND USEFUL INVENTION THE TITLE AND DESCRIPTION OF WHICH ARE CONTAINED IN THE SPECIFICATION OF WHICH A COPY IS HEREUNTO ANNEXED AND MADE A PART HEREOF, AND THE VARIOUS REQUIREMENTS OF LAW IN SUCH CASES MADE AND PROVIDED HAVE BEEN COMPLIED WITH, AND THE TITLE THERETO IS, FROM THE RECORDS OF THE PATENT AND TRADEMARK OFFICE IN THE CLAIMANT(S) INDICATED IN THE SAID COPY, AND WHEREAS, UPON DUE EXAMINATION MADE, THE SAID CLAIMANT(S) IS (ARE) ADJUDGED TO BE ENTITLED TO A PATENT UNDER THE LAW.

NOW, THEREFORE, THESE Letters Patent ARE TO GRANT UNTO THE SAID CLAIMANT(S) AND THE SUCCESSORS, HEIRS OR ASSIGNS OF THE SAID CLAIMANT(S) FOR THE TERM OF SEVENTEEN YEARS FROM THE DATE OF THIS GRANT, SUBJECT O THE PAYMENT OF ISSUE FEES AS PROVIDED BY LAW, THE RIGHT TO EXCLUDE ERS FROM MAKING, USING OR SELLING THE SAID INVENTION THROUGHOUT THE ED STATES.

*In testimony whereof I have hereunto set my hand and caused the seal of the* **Patent and Trademark Office** *to be affixed at the City of Washington this eighteenth day of May in the year of our Lord one thousand nine hundred and eighty-two, and of the Independence of the United States of America the two hundred and sixth.*

Attest:

*Attesting Officer.*

*Commissioner of Patents and Trademarks.*

**U.S. Patent**                    May 18, 1982                    4,329,798



FIG. 1.

FIG. 2.

FIG. 3.

FIG. 4.

FIG. 5.

# United States Patent [19]

## Edwards

[11]    **4,329,798**

[45]    **May 18, 1982**

[54] **TOOTH CONSTRUCTION FOR DIGGING BUCKETS**

[76] Inventor:    **Gerald D. Edwards,** Rte. 1, Box 15A, Dubberly, La. 71024

[21] Appl. No.: **173,253**

[22] Filed:    **Jul. 29, 1980**

[51] Int. Cl.³ ................................................. E02F 9/28
[52] U.S. Cl. ..................................... 37/142 R; 299/91
[58] Field of Search ............. 37/141 R, 141 T, 142 R,
37/142 A; 172/719, 724, 766, 713, 730;
D15/29; 299/91

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 190,335 | 5/1961 | Livermore | 37/142 R |
| D. 207,448 | 4/1967 | Wilson | D15/29 |
| D. 207,451 | 4/1967 | Wilson | D15/29 |
| 790,724 | 5/1905 | Pearce et al. | 172/724 |
| 1,959,847 | 5/1934 | Van Buskirk | 37/141 T |
| 2,623,309 | 12/1952 | Frye | 37/142 R |
| 3,888,028 | 6/1975 | White | 37/142 R |
| 4,083,605 | 4/1978 | College et al. | 37/142 R X |
| 4,117,611 | 10/1978 | Hemphill | 37/142 R |

### FOREIGN PATENT DOCUMENTS

723054    4/1980    U.S.S.R. ........................... 37/142 R

*Primary Examiner*—E. H. Eickholt
*Attorney, Agent, or Firm*—James A. Wong

[57]    **ABSTRACT**

A digger tooth for a power digging bucket or the like including an operating portion and an attachment portion, the operating portion comprising in combination:
a back wall having an upper end, a lower end, and an upper surface extending forwardly and downwardly from the upper end to the lower end;
a lower edge extending forwardly from the lower end of the back wall to a leading end;
first and second sidewalls extending upwardly and diverging from the lower edge to define an open cavity, the first and second sidewalls each having a rear edge integral with the back wall and a forward edge, the forward edges together defining a front end opening; and
a wing-like flange extending laterally outwardly from each of the sidewalls from the respective upper edges thereof, each of the wing-like flange also merging at a trailing end thereof with the upper end of the back wall.

**9 Claims, 5 Drawing Figures**



4,329,798

**1**

# TOOTH CONSTRUCTION FOR DIGGING BUCKETS

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to an improved tooth construction for the pick-like teeth of digging buckets which include a plurality of teeth elements assembled on a lower surface thereof.

2. Description of the Prior Art

Of the prior art known to Applicant, U.S. Pat. Nos. 3,055,128; 4,028,823; Des. 215,953; and Des. 243,843 are believed to constitute the most relevant prior art with respect to the inventive concept disclosed and claimed herein. None of the prior art patents cited above show or suggest the novel features of the improved digger tooth construction described and claimed hereinbelow. Each of the patents listed above disclose digger tooth of known V-shape construction having a point with rearwardly extending, upwardly inclined upper edges along adjacent intersecting sidewalls. U.S. Pat. No. 4,028,823 also discloses an improved digger tooth construction having a pair of laterally spaced points formed along parallel outer walls and centrally directed inner walls.

## SUMMARY OF THE INVENTION

With prior knowledge of the construction disclosed in the patents cited above, Applicant has devised the improved digger tooth construction disclosed herein to increase the material holding capacity of the bucket member in which the improved digger tooth is incorporated.

It is another object of this invention to provide an improved digger tooth construction which will shield and protect the lip of the bucket.

It is a further object of this invention to provide an improved digger tooth construction which in cooperation with other teeth of like construction will form a leading edge to take the brunt of the initial digging force.

It is yet another object of this invention to provide an improved digger tooth construction which will effect a better cut at the sides of a ditch and with greater facility.

It is, moreover, an object of this invention to provide an improved digger tooth construction which will enable a digger bucket to maintain and stay in any desired strata, such as in the case of a large drag bucket in a strip mining operation.

Still another object of this invention is to provide an improved digger tooth construction which will aid in knife-like rip-out and breakout actions, such as in wooded areas where roots are a problem or in frozen formations where the nose of the tooth will function as a pick and the wings will produce unheaval in ice structure.

Another object of this invention is to provide an improved digger tooth construction which will allow the digger bucket to maintain a more precise grade than possible with known digger tooth constructions.

An additional object of this invention is to provide an improved digger tooth construction which will enable a digger bucket to move more material in back-dragging operations.

**2**

## BRIEF DESCRIPTION OF THE DRAWINGS

The disclosed invention will be more clearly understood when considered in view of the accompanying drawings in which:

FIG. 1 is a view in perspective showing two digger tooth members, according to my inventive concept, assembled on a digger bucket with a third member in position to be assembled on the bucket;

FIG. 2 is a sectional view taken through the plane 2—2 in FIG. 1 while looking in the direction of the arrows;

FIG. 3 is a front elevational view of the digger tooth illustrated in FIG. 2;

FIG. 4 is top plan view of the digger tooth illustrated in FIGS. 2 and 3 but with a modified version of the wing-like flange construction; and

FIG. 5 is a rear elevational view of the yet unassembled tooth illustrated in FIG. 1.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now in detail to the drawings, the reader will readily appreciate in FIG. 1 a yet to be assembled digger tooth 10, according to this invention, is in position to be assembled on a digging bucket 12 like the other tooth members 10, 10 on opposite sides thereof. Each digger tooth 10, according to the present invention, for assembly on a power digging bucket 12 or the like includes an operating portion 14 and an attachment portion 16 with the operating portion 14 comprising in combination: a back wall 18 having an upper end 20, a lower end 22, and an upper surface 24 extending forwardly and downwardly from the upper end 20 to the lower end 22; a lower edge 26 extending forwardly from the lower end 22 of the back wall 18 to a leading end 28; first and second sidewalls 30, 32, respectively, extending upwardly and diverging from the lower edge 26 to define an open cavity 34, the first and second sidewalls 30, 32, each having a rear edge 36, 38 integral with the back wall 18, an upper edge 40, 42 and a forward edge 44, 46, the forward edges 44, 46 together defining a front end opening 48; and a wing-like flange 50, 52 extending laterally outwardly from each of the sidewalls 30, 32 from the respective upper edges 40, 42 thereof, each of the wing-like flanges 50, 52 also merging at a trailing end 54, 56 thereof with the upper end 20 of the back wall 18. The attachment portion 16 of digger tooth 10 as seen in FIGS. 2 and 5 comprises a socket 58 formed on a lower surface 60 of the back wall 18 on a side opposite from the upper surface 24 of the back wall 18 and facing rearwardly of the operating portion 14. As seen in FIG. 4, back wall 18 is generally in the shape of an isosceles triangle with upper end 20 being the base of such triangle. Each of the wing-like flanges 50, 52 forms an obtuse angle with the respective sidewall 30, 32 from which it extends in a plane above the horizontal, as may be readily seen in FIG. 3. Each of the wing-like flanges 50, 52 includes a leading edge 62, 64 extending rearwardly from the respective sidewall 30, 32 from which such wing-like flanges 50, 52 extend. Additionally, each of the wing-like flanges 50, 52 includes a trailing edge 66, 68 extending forwardly from the respective sidewall 30, 32 from which such wing-like flanges 50, 52 extend.

To enable or facilitate installation of each digger tooth 10 on digging bucket 12, a leading portion of which is illustrated as having been broken away from

4,329,798

**3**

the major body portion not illustrated, an adapter lug 70 having rearwardly extending jaws 72, 74 spaced apart from each other by a slot 76, and a forwardly protruding nose portion 86 is provided for engagement with digging bucket 12. In accordance with the known practice, adapter lug 70 is applied to digging bucket 12 by clamping jaws 72, 74 over the floor of bucket 12 with the inner edge of slot 76 snug against the forward edge of the bucket floor, as may be seen in FIG. 2. Preformed apertures 78, 80 are provided in jaws 72, 74 so as to be brought into registration with a cooperating aperture 82 in the floor of bucket 12 for receiving retaining means in the form of bolts, pins 84, or the like. Socket 58 is adapted to be disposed over nose portion 86, which is provided with a bore 88. When socket 58 is firmly placed around nose portion 86 with preformed apertures 90, 92 provided on the walls of socket 58 in registration with bore 88, securing means such as pin 94 may be inserted through apertures 90, 92 and bore 88 to effect assembly of digger tooth 10 on bucket 12.

While the digger tooth 10 illustrated in FIGS. 1 and 3 are formed with wing-like flanges 50, 52 of which the leading edges 62, 64 extend rearwardly from the respective sidewalls 30, 32, the digger tooth 10 modified within the inventive concept disclosed herein and illustrated in FIG. 4 is characterized in that leading edges 62′, 64′ of wing-like flanges 50, 52 extend transversely and outwardly from the respective sidewalls 30, 32 to provide square outside corners thereat to effect a different or improved cut of a ditch and/or the sides thereof. Other variations of the disclosed digger tooth 10 may be embodied in raising or lowering the wing position on the body as much as a quarter of an inch from that illustrated in the accompanying drawings. It is also within the contemplation of the inventive concept that length of wings may be modified so as to have increased and/or decreased length and/or width from the dimensions as illustrated. Also, the digger teeth 10 may be assembled on digging bucket 12 so that adjacent teeth 10 are in contact or almost in contact which will form a leading edge to take the brunt of the initial digging force and also shield and protect the lip of the bucket. From the foregoing description, it may be readily understood that the tooth construction with my improved wing-like flanges 50, 52, mounted on the corners or ends of the bucket, will cut the sides of a ditch much better than the conventional V-shape digger teeth. Further, the wing-like flanges may be formed or mounted in various positions and angles to the tooth to enable the bucket to be maintained in desired strata. The wing-like flanges may be formed so as to be sharp around the edges to provide knife-like, rip-out, and breakout actions. The wing-like flanges may be welded, molded, forged or even cast on the tooth body. The wing-like flanges may also be formed on relatively lower positions on the tooth body to enable the digging bucket to maintain a more precise grade or level than permitted by the conventional V-shape digger teeth.

It will be obvious to those skilled in the art that various changes may be made without departing from the scope of the invention and the invention is not to be considered limited to what is shown in the drawings and described in the specification.

What is claimed is:

1. A digger tooth for a power digging bucket or the like including an operating portion and an attachment portion, said operating portion comprising in combination:

**4**

a back wall having an upper end, a lower end, and an upper surface extending forwardly and downwardly from said upper end to said lower end;

a lower edge extending forwardly from said lower end of said back wall to a leading end;

first and second sidewalls extending upwardly and diverging from said lower edge to define an open cavity, said first and second sidewalls each having a rear edge integral with said back wall and a forward edge, said forward edges together defining a front end opening; and

a wing-like flange extending laterally outwardly from each of said sidewalls from the respective upper edges thereof, each of said wing-like flange also merging at a trailing end thereof with said upper end of said back wall and extending forwardly to merge with the forward edge of the respective sidewall.

2. A digger tooth as defined in claim 1, wherein said attachment portion comprises a socket formed on a lower surface of said back wall on a side opposite from said upper surface of said back wall and facing rearwardly of said operating portion.

3. A digger tooth as defined in claim 1, wherein said back wall is generally in the shape of an isosceles triangle with said upper end being the base of such triangle.

4. A digger tooth as defined in claim 1, wherein each of said wing-like flanges forms an obtuse angle with the respective sidewall from which it extends.

5. A digger tooth as defined in claim 4, wherein each of said wing-like flanges extends from the respective sidewall associated therewith in a plane above the horizontal.

6. A digger tooth as defined in claim 1, wherein each of said wing-like flanges includes a leading edge extending rearwardly from the respective sidewall from which such wing-like flange extends.

7. A digger tooth for a power digging bucket or the like including an operating portion and an attachment portion, said operating portion comprising in combination:

a back wall having an upper end, a lower end, and an upper surface extending forwardly and downwardly from said upper end to said lower end;

a lower edge extending forwardly from said lower end of said back wall to a leading end;

first and second sidewalls extending upwardly and diverging from said lower edge to define an open cavity, said first and second sidewalls each having a rear edge integral with said back wall and a forward edge, said forward edges together defining a front end opening; and

a wing-like flange extending laterally outwardly from each of said sidewalls from the respective upper edges thereof, each of said wing-like flange also merging at a trailing end thereof with said upper end of said back wall;

wherein each of said wing-like flanges includes a trailing edge extending forwardly from the respective sidewall from which such wing-like flange extends.

8. A digger tooth for a power digging bucket or the like including an operating portion and an attachment portion, said operating portion comprising in combination:

a back wall having an upper end, a lower end, and an upper surface extending forwardly and downwardly from said upper end to said lower end;

4,329,798

5

a lower edge extending forwardly from said lower end of said back wall to a leading end;

first and second sidewalls extending upwardly and diverging from said lower edge to define an open cavity, said first and second sidewalls each having a rear edge integral with said back wall and a forward edge, said forward edges together defining a front end opening; and

a wing-like flange extending laterally outwardly from each of said sidewalls from the respective upper edges thereof, each of said wing-like flange also merging at a trailing end thereof with said upper end of said back wall;

wherein each of said wing-like flanges includes a trailing edge extending forwardly and a leading edge extending rearwardly from the respective sidewall that such wing-like flange extends.

9. A digger tooth for a power digging bucket or the like including an operating portion and an attachment portion, said operating portion comprising in combination

6

a back wall having an upper end, a lower end, and an upper surface extending forwardly and downwardly from said upper end to said lower end;

a lower edge extending forwardly from said lower end of said back wall to a leading end;

first and second sidewalls extending upwardly and diverging from said lower edge to define an open cavity, said first and second sidewalls each having a rear edge integral with said back wall and a forward edge, said forward edges together defining a front end opening; and

a wing-like flange extending laterally outwardly from each of said sidewalls from the respective upper edges thereof, each of said wing-like flange also merging at a trailing end thereof with said upper end of said back wall;

wherein each of said wing-like flanges includes a leading edge extending transversely and outwardly from the respective sidewall from which such wing-like flange extends to provide said wing-like flanges with square outside corners.

*    *    *    *    *

5

10

15

20

25

30

35

40

45

50

55

60

65



4028823

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### Gerald D. Edwards

**Whereas,** THERE HAS BEEN PRESENTED TO THE

#### Commissioner of Patents and Trademarks

A PETITION PRAYING FOR THE GRANT OF LETTERS PATENT FOR AN ALLEGED NEW AND USEFUL INVENTION THE TITLE AND DESCRIPTION OF WHICH ARE CONTAINED IN THE SPECIFICATIONS OF WHICH A COPY IS HEREUNTO ANNEXED AND MADE A PART HEREOF, AND THE VARIOUS REQUIREMENTS OF LAW IN SUCH CASES MADE AND PROVIDED HAVE BEEN COMPLIED WITH, AND THE TITLE THERETO IS, FROM THE RECORDS OF THE PATENT AND TRADEMARK OFFICE IN THE CLAIMANT(S) INDICATED IN THE SAID COPY, AND WHEREAS, UPON DUE EXAMINATION MADE, THE SAID CLAIMANT(S) IS (ARE) ADJUDGED TO BE ENTITLED TO A PATENT UNDER THE LAW.

NOW, THEREFORE, THESE Letters Patent ARE TO GRANT UNTO THE SAID CLAIMANT(S) AND THE SUCCESSORS, HEIRS OR ASSIGNS OF THE SAID CLAIMANT(S) FOR THE TERM OF SEVENTEEN YEARS FROM THE DATE OF THIS GRANT, SUBJECT TO THE PAYMENT OF ISSUE FEES AS PROVIDED BY LAW, THE RIGHT TO EXCLUDE OTHERS FROM MAKING, USING OR SELLING THE SAID INVENTION THROUGHOUT THE UNITED STATES.

In testimony whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed at the City of Washington this   fourteenth   day of   June   in the year of our Lord one thousand nine hundred and   seventy-seven, and of the Independence of the United States of America the two hundredth and   first.

*Attest:*

*Attesting Officer.*

C. Marshall Dann

*Commissioner of Patents and Trademarks.*



FIG.1.



FIG.2.

FIG.3.

# United States Patent [19]

## Edwards et al.

[11]    **4,028,823**

[45]    **June 14, 1977**

---

[54]  **DIGGING TOOTH**

[76]  Inventors: **Gerald D. Edwards**, Rte. 1, Box 15a, Dubberly, La. 71024; **Floyd B. Edwards**, Rte. 3, Box 436, Canton, N.C. 28716

[22]  Filed:        **Oct. 31, 1975**

[21]  Appl. No.: **627,686**

[52]  **U.S. Cl.** ............................. 37/142 R; 172/719; 172/766

[51]  **Int. Cl.²** ........................................... E02F 9/28

[58]  **Field of Search** ......... 37/142 R, 142 A, 141 R, 37/141 T; 172/713, 724, 726, 730, 761, 766, 769, 770, 719

[56]              **References Cited**

### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 289,797 | 12/1883 | Ball | 172/719 |
| 383,402 | 5/1888 | Martin | 172/724 |
| 1,237,610 | 8/1917 | Brenno | 172/766 X |
| 1,346,261 | 7/1920 | Schmutte | 172/766 X |
| 2,013,818 | 9/1935 | Wiese | 172/719 |
| 2,642,305 | 6/1953 | Butler | 172/766 |
| 3,202,222 | 8/1965 | Norris | 172/719 X |
| 3,203,488 | 8/1965 | Eastwood | 172/713 |
| 3,736,676 | 6/1973 | Sturgeon | 172/713 |
| 3,923,104 | 12/1975 | Tibbs | 172/730 |

### FOREIGN PATENTS OR APPLICATIONS

| | | | |
|---|---|---|---|
| 125,442 | 12/1967 | Czechoslovakia | 37/142 |
| 80,317 | 6/1952 | Norway | 172/713 |
| 281,268 | 7/1970 | U.S.S.R. | 37/142 R |

### OTHER PUBLICATIONS

"Steel Castings to Meet Industry's Requirements", Foundry Management & Technology; p. 29, Sept. 1975.

*Primary Examiner*—E. H. Eickholt
*Attorney, Agent, or Firm*—Frederick W. Turnbull

[57]            **ABSTRACT**

A digging tooth provided with two points for use especially at the corners of a power digging bucket so that the shovel cuts better at its corners resulting in less binding of the bucket when making a second cut. This also results in better corners at the bottom of a narrow ditch.

**3 Claims, 3 Drawing Figures**



4,028,823

1

## DIGGING TOOTH

The leading edge of digging buckets for power shovels, back hoes, and similar devices are filled with spaced teeth. It has been found that pointed teeth such as disclosed in U.S. Pat. No. 3,055,128 are especially desireable.

The two sides of a digging bucket, however, using a pointed tooth will not provide a sharp corner on the ditch being dug, and the edge of the bucket itself will become eroded as it will be found that the bucket teeth, not cutting to the full width of the bucket, the bucket edge is scraped by the saids of the ditch being dug. The tooth of the present invention is also of especial use for "scrubbing" for the removal of bushes and other plants from an area being cleared by a front loader.

It is an object of the present invention, therefore, to provide a tooth to be used especially at the two edges of a digging bucket that will cut accurately to the edge or corner of the cut in the earth made at each pass of the bucket, and which will be especially effective in "scrubbing" land with a front loader.

Other and further objects and advantages will appear from the following specification taken with the accompanying drawing in which like reference characters refer to similar parts in the several views and in which:

FIG. 1 is a fragmentary front perspective view of a corner of a digging bucket showing the tooth of the present invention and one other tooth.

FIG. 2 is a section taken on line 2—2 of FIG. 1; and

FIG. 3 is an exploded view showing how the tooth may be mounted on the bucket.

The front edge or lip of a digging bucket is provided with a plurality of spaced sockets 10, 10a, and so forth. The number of sockets being a function of the width of the bucket. An adapter 12 may be mounted in each socket, and a tooth 14 is mounted on the front of the adapter. While the tooth 14 is especially useful at the extreme edges of the bucket they may be used in other locations as along the lip of a front loader to be used for scrubbing.

The tooth 14 is provided with two points 16 and 18 and there is a deep cleft between them. Points 16 and 18 are mirror images of each other about the plane of the center of the tooth. The side surfaces of the tooth preferably, but not necessarily, flare slightly outwardly so that the point 16, as seen in FIGS. 1 and 3, or point 18 when the tooth is used on the other corner of a digging bucket, will project at least to the plane of the outside edge of the bucket. The top surface of the tooth

2

slopes downwardly from the rearward to the forward portion of the tooth, and the bottom surface lies generally parallel to the outer bottom surface of the bucket. The bottom surface may be slightly curved downwardly. The top surface of the tooth is provided with a depression 20 so that the top edges of the tooth present a generally W shape when viewed from above.

While the point 16 of tooth 14 cuts to an accurace corner, it will be noted that if only point 16 were provided, excessive forces would bear on point 16 which would tend to turn it outwardly. By having the second point 18, the thrust against the tooth is axial of the tooth so will not exert an outward or sideways thrust on the tooth. The stresses on the double pointed teeth at the corners of the bucket will, therefore, be the same as the stresses transmitted to the other teeth along the bucket lip.

The double pointed tooth of the present invention may be used in lieu of other shaped teeth along the lip of a digging bucket and along the lip of front end loaders especially when used for scrubbing as it gives exceptionally good penetration and scooping action. It may be used also on any earth moving equipment such as scarifiers and wheel ditchers where penetration of the earth is required.

Having thus disclosed my invention I claim:

1. A tooth for a power digger having a socket to receive a shank mounted on a digging bucket or the like comprising a rearward portion in which the socket is formed and a forward portion, a top, a bottom and two side surfaces, said top surface sloping downwardly to meet said bottom surface at the forward end of said forward portion, said forward portion comprising two elongated forwardly extending points separated by a cleft, the outer sides of said tooth points being substantially parallel. Said top surface being also formed with a depression extending across said rearward portion and having a portion of said depression extending forwardly in the top surfaces of said elongated points whereby the tooth presents a generally W form when viewed from a position toward which it is moved when in use.

2. The tooth for a digging bucket as in claim 1 in which said side surfaces flare slightly from said rearward portion to the ends of said elongated points.

3. The tooth for a digging bucket as in claim 1 in which said bottom surface curves downwardly from said rearward portion to said points.

*    *    *    *    *