Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS        :

     CORP.,  et al.,               :    Case No. 14-10979(CSS)

7                                  :

            Debtors.               :    (Jointly Administered)

8    _____

9

10

11

12                                 United States Bankruptcy Court

13                                 824 North Market Street

14                                 Wilmington, Delaware

15

16

17                                 October 20, 2014

18                                 11:14 AM - 5:33 PM

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECR OPERATOR:  LESLIE MURIN

1   HEARING re Motion of Energy Future Holdings Corp., et al.,

2   for Entry of an Order Extending the Period Within Which the

3   Debtors May Remove Luminant Generation Company, LLC v. Titus

4   County Appraisal District [D.I. 1990; filed September 10,

5   2014]

6

7   HEARING re Motion for Entry of an Order Authorizing

8   Wilmington Savings Fund Society, FSB to File Under Seal (I)

9   an Unredacted Version of its Objection to Motion of Energy

10  Future Holdings Corp., et al., for Entry of an Order (A)

11  Approving Bidding Procedures, (B) Scheduling an Auction and

12  Related Deadlines and Hearings, and (C) Approving the Form

13  and Manner of Notice Thereof and (II) Exhibits 1 and 2 to

14  the Declaration of Jeremy B. Coffey in Support of the

15  Objection [D.I. 2370; filed October 10, 2014]

16

17  HEARING re Motion of Energy Future Holdings Corp., et al.,

18  for Entry of an Order (A) Approving Bidding Procedures, (B)

19  Scheduling an Auction and Related Deadlines and Hearings,

20  and (C) Approving the Form and Manner of Notice Thereof

21  [D.I. 2087; filed September 19, 2014]

22

23

24  Transcribed by:  Dawn South, Sheila Orms, and Lisa Beck

25

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3        Attorneys for the Debtors

4

5    BY:  MARK MCKANE, ESQ.

6        STEVE HESSLER, ESQ.

7        BRIDGET O'CONNOR, ESQ.

8        BRYAN STEPHANY, ESQ.

9        EDWARD SASSOWER, ESQ.

10

11   RICHARD LAYTON & FINGER

12       Attorneys for the Debtors

13

14   BY:  DANIEL J. DEFRANCESCHI, ESQ.

15       JASON M. MADRON, ESQ.

16

17   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

18       Attorneys for Ad Hoc Committee of TCEH First Lien

19       Creditors

20

21   BY:  ALAN W. KORNBERG, ESQ.

22       JACOB ADLESTEIN, ESQ.

23

24

25

```
1   BROWN RUDNICK

2        Attorneys for Christiana Trust

3

4   BY:  EDWARD WEISFELNER, ESQ.

5        JEFFREY L. JONAS, ESQ.

6        JONATHAN MARSHALL, ESQ.

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9        Attorneys for the U.S. Trustee

10

11  BY:  W. BRADLEY RUSSELL, ESQ.

12       ELLEN SLIGHTS, ESQ.

13

14  AKIN GUMP STRAUSS HAUER & FELT LLP

15       Attorney for Ad Hoc Committee of EFIH Unsecured

16       Noteholders

17

18  BY:  SCOTT ALBERINO, ESQ.

19       IRA DIZENGOFF, ESQ.

20       ABID QURESHI, ESQ.

21       ROB BOLLER, ESQ.

22

23

24

25
```

1   SHEARMAN & STERLING

2        Attorney for Duetsche Bank AG New York Branch

3

4   BY:  FREDRIC SOSNICK, ESQ.

5

6   POTTER ANDERSON & CORROON LLP

7        Attorneys for Deutsche Bank AG New York Branch

8

9   BY:  JEREMY RYAN, ESQ.

10       R. STEPHEN MCNEILL, ESQ.

11

12  ROPES & GRAY LLP

13       Attorneys for CSC Trust Company of Delaware

14

15  BY:  D. ROSS MARTIN, ESQ.

16       ANDREW DEVORE, ESQ.

17       KEITH WOFFORD, ESQ.

18

19  COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

20       Attorneys for CSC Trust Company of Delaware

21

22  BY:  KATE STICKLES, ESQ.

23       WARREN USATINE, ESQ.

24

25

1   DRINKER BIDDLE & REATH LLP

2        Attorneys for Citibank, N.A.

3

4   BY:  HOWARD A. COHEN, ESQ.

5        ROBERT K. MALONE, ESQ.

6

7   BINGHAM MCCUTCHEN LLP

8        Attorney for Pacific Investment Management Co. LLC

9

10  BY:  JEFFREY SABIN, ESQ.

11

12  WHITE & CASE LLP

13       Attorneys for Ad Hoc Group of TCEH Unsecured

14       Noteholders

15

16  BY:  J. CHRISTOPHER SHORE, ESQ.

17       TOM LAURIA, ESQ.

18

19  CROSS & SIMON, LLC

20       Attorney for Fidelity Management & Research Company

21

22  BY:  MICHAEL JOSEPH JOYCE, ESQ.

23

24

25

1   POLSINELLI

2        Attorneys for the Committee

3

4   BY:  CHRIS WARD, ESQ.

5        JUSTIN EDELSON, ESQ.

6

7   MORRISON & FOERSTER

8        Attorneys for the Committee

9

10  BY:  CHARLES KERR, ESQ.

11       BRETT MILLER, ESQ.

12       ALEX LAWRENCE, ESQ.

13       DAN HARRIS, ESQ.

14       TODD GOREN, ESQ.

15

16  KLEHR HARRISON HARVY BRANZBURG LLP

17       Attorney for UMB Bank, Indenture Trust

18

19  BY:  RAYMOND H. LEMISCH, ESQ.

20

21  THE HOGAN FIRM

22       Attorney for the Ad Hoc Committee EFH Legacy

23

24  BY:  GARVAN MCDANIEL, ESQ.

25

1   NIXON PEADOBY

2        Attorney for AST

3

4   BY:  RICHARD PEDONE, ESQ.

5        LEE HARRINGTON, ESQ.

6

7   FOX ROTHSCHILD

8        Attorney for TCEH Unsecured Ad Hoc Group

9

10  BY:  JEFFREY SCHLERF, ESQ.

11

12  ASHBY & GEDDES

13        Attorney for Christiana Trust

14

15  BY:  GREG TAYLOR, ESQ.

16

17  PACHULSKI STANG ZIEHL & JONES

18        Attorneys for EFIH Second Lien Group

19

20  BY:  LAURA DAVIS JONES, ESQ.

21        COLIN R. ROBINSON, ESQ.

22

23

24

25

1   KRAMER LEVIN

2        Attorneys for EFIH Second Lien Group

3

4   BY:   TOM MAYER, ESQ.

5        GREG HOROWITZ, ESQ.

6        ALICE BYOWITZ, ESQ.

7

8   MORRIS JAMES LLP

9        Attorney for Law Debenture

10

11  BY:   STEPHEN M. MILLER, ESQ.

12

13  PATTERSON BELKNAP WEBB & TYLER

14        Attorney for Law Debenture

15

16  BY:   BRIAN GUINEY, ESQ.

17

18  FOLEY & LARDNER

19        Attorney for UMB Indenture Trustee

20

21  BY:   MARK HEBBELN, ESQ.

22

23

24

25

1   SEWARD KISSEL

2        Attorney for Wilmington Trust

3

4   BY:  ARLENE ALVES, ESQ.

5

6   BROWN & CONNERY

7

8   BY:  DONALD LUDMAN, ESQ.

9

10  YOUNG CONAWAY STARGATT & TAYLOR

11       Attorney for First Lien Creditors

12

13  BY:  PAULINE K. MORGAN, ESQ.

14

15  CHIPMAN BROWN

16       Attorney for the Ad Hoc Committee of EFIH Unsecured

17       Noteholders

18

19  BY:  MARK OLIVERE, ESQ.

20

21  LANDIS RATH & COBB

22       Attorney for NextEra Energy Resources

23

24  BY:  ADAM LANDIS, ESQ.

25

1    CHADBOURNE & PARKE

2         Attorney for NextEra Energy Resources

3

4    BY:  HOWARD SEIFE, ESQ.

5

6    WOMBLE CARLYLE

7         Attorney for Fluor

8

9    BY:  KEVIN MANGAN, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4    Anything before we start with Mr. Shore's cross?

5              UNIDENTIFIED SPEAKER:  No, Your Honor.

6              THE COURT:  Mr. Hiltz, if you'd please take the

7    stand, and your affirmation from last week is still in

8    place.  All right.

9    CROSS-EXAMINATION (Resumed)

10   BY MR. SHORE:

11   Q    Good morning, Mr. Hiltz.

12   A    Good morning.

13   Q    All right.  I think we ended last week on this issue of

14   whether any alternative to sell had been considered.  You do

15   recognize that one alternative to what's going on right now

16   is the debtors just don't put anything on the market and

17   move forward with a plan?

18   A    I understand.

19   Q    And as far as you know that was never considered?

20   A    My understanding and from discussions with Mr. Ying

21   that was that there were many discussions back months ago

22   about a stand-alone plan, but there was no agreement amongst

23   the creditors.

24             MR. SHORE:  Motion to strike hearsay, Your Honor.

25             THE COURT:  Sustained.

1    BY MR. SHORE:

2    Q    All right.  You don't have any personal knowledge of

3    any such consideration do you?

4    A    No, I don't.

5    Q    All right.  Now, you can't tell the Court that if in

6    fact the debtors pursued that path that it would harm any

7    debtor?

8    A    No, I can't.

9    Q    Right.  Because the value could go up, for example, in

10   the interim?

11   A    It could.

12   Q    All right.  And I think you said before you performed

13   no valuation of the Oncor stake right now, right?

14   A    No formal valuation.

15   Q    So you have to base to testify as a valuation expert

16   that the -- any bid that's come in right now exceeds the

17   fair market value of the Oncor stake, can you?

18   A    No.

19   Q    And you performed no volatility analysis on the Oncor

20   stake have you?

21   A    I've never heard of a volatility analysis.

22   Q    Well you've done nothing that would predict in a paper

23   form the range of where you might expect the Oncor stake to

24   travel over the next 18 months?

25   A    I've never seen an analysis like that in my entire

1    career.

2    Q    Are you aware that the debtors have a trading operation

3    whose business is to predict volatility in the energy

4    markets?

5    A    I'm aware they have a trading operation.

6    Q    Okay.  I take it that you never spoke to anybody in the

7    debtors' trading operation at all to discuss trying to come

8    to some view as to the volatility of the Oncor stake?

9    A    No, I did not.

10   Q    Do you know who Mr. Nutt is?

11   A    No, I do not.

12   Q    Okay.  And so we're clear, there's nothing about

13   Oncor's current performance, which is driving a decision to

14   sell as far as you know, right?

15   A    It's performing well, but no, nothing specific.

16   Q    Okay.  So if the debtors do nothing but negotiate a

17   plan right now and then distribute the economy value of the

18   Oncor stake to existing holders, just this status quo

19   scenario, it could do so without having to exercise a

20   fiduciary out, right?

21   A    That's correct.

22   Q    Or pay any taxes?

23   A    To the best of my knowledge.

24   A    Or spend any time in court or otherwise justifying a

25   decision to take this asset out to market now.

1   A    That's correct.

2   Q    But as I understand the current debtors' position there

3   is a perceived risk that by the time we get 12 to 18 months

4   out there may be a drop in the economic value of the Oncor

5   stake?

6   A    There's a risk that that could happen.

7   Q    All right.  All right.  And I take it that the decision

8   to take the asset out to market now, the economic stake in

9   Oncor, is a way of managing that risk?

10  A    Partially.

11  Q    All right.  Now, I think we went through this last week

12  on the chart that's no longer here, but let's talk about and

13  maybe summarize for the Court the things that could happen

14  between now and 12 to 18 months out that would cause this

15  process to have been fruitless, okay?  That is something

16  could happen that causes the debtors not to close whatever

17  transaction they have negotiated, okay?

18  A    Okay.

19  Q    One of these things is that the E side may just reject

20  any plan that delivers the asset to the buyer?

21  A    The -- I'm sorry, say that again?

22  Q    Sorry.  Creditors of EFIH or EFH could just decide to

23  vote down a plan which delivered the assets to the

24  prospective buyer?

25  A    They could decide that, but as long as we're clearing

1    the EFIH stack it seems unlikely that the holders at EFH

2    would vote that plan down.

3    Q    Okay.  And when you say the holders at EFH you're

4    talking about who?

5    A    The unsecured debt.

6    Q    And that includes the TCEH stake that we talked about

7    last week, the 770 plus million dollar --

8    A    Right.

9    Q    Okay.  And as of right now, as far as you know, there's

10   no written support for a plan which delivers an asset to a

11   particular bidder?

12   A    Correct.

13   Q    Okay.  And that there's a possibility that the T side

14   debtors might -- or the T side -- sorry.  There's a

15   possibility that the creditors of a T side debtor would vote

16   down a plan which delivered assets to the bidder?

17   A    It's possible.

18   Q    And to be clear, if the T side creditors vote down a

19   plan and you don't confirm a T side plan any bid that you're

20   expecting is going to have to go away, right?

21   A    That's correct.

22   Q    Right.  There's a possibility, we went through it, that

23   the intercompany -- or inter-debtor claims could work out in

24   a way that causes the debtors to have to rethink how they

25   were structuring the transaction?

1    A    It's possible.

2    Q    And there's a possibility that there would be enough

3    value on the T side that instead of breaking the company

4    into two you could do an Olympus type transaction that kept

5    all of the EFH corporate structure together?

6    A    That's possible.

7    Q    Okay.  And there's a possibility that the IRS, even if

8    you get all the way to closing the IRS won't deliver the

9    opinions necessary to allow this transaction to close with a

10   bidder?

11   A    That's possible.

12   Q    And it's possible that when you get to a determination

13   as to what estate is liability for what taxes the debtors

14   may have to rethink how they're structuring the transaction

15   that you're going out to market with right now, right?

16   A    Well since the transaction that we're going out to

17   market with right now doesn't cause any taxes I'm not sure I

18   agree with that.

19   Q    Right.  But we went through it last week that there is

20   a possibility that under certain scenarios a taxable

21   transaction might be better for an EFIH estate that has

22   material T side claims?

23   A    Only to the extent that we're unable to clear the EFH

24   stack and that EFIH is not found liable for any tax under

25   the tax sharing agreement.

1    Q    Right, but that was my premise.  If EFIH is found not

2    liable for the tax and you have a material inter-debtor

3    claim that gets allowed at EFIH the debtors would have to

4    reconceptualize this transaction?

5    A    If our -- if the proceeds from the tax-free transaction

6    were not sufficient to clear the stack.

7    Q    Right.  And there's of course the possibility that the

8    value of Oncor will rise in which case the debtors will have

9    to make a determination as to whether to exercise a

10   fiduciary out?

11   A    That's correct.

12   Q    All right.  So those -- so we went through if the

13   debtors do nothing, we went through it.

14           Now if the debtors decide to go forward with this

15   process you would agree with me there are a lot of factors

16   that could impact whether or not the debtors will actually

17   close the transaction?

18   A    That could impact, yes.

19   Q    Okay.  And you haven't set forth before the Court any

20   analysis of the likelihood of any of those events occurring,

21   have you?

22   A    No.

23   Q    All right.  And when you talk about what the

24   consequence is that under the current conceptualization in

25   your belief that you're going have to agree that the debtors

1    will pay a break-up fee, if any of those eventualities comes

2    to the floor by the time you get to closing of this

3    contemplated transaction the debtors are actually going have

4    to pay money?

5    A    No, that's incorrect.

6    Q    The debtors currently are of the belief that in any

7    transaction they come forward with they will have to agree

8    to some form of break-up fee?

9    A    Again, you would pay the break-up fee in the event that

10   you accepted a superior offer before the drop dead date of

11   the merger, you'd pay a break-up fee in the event that you

12   actually consummated a stand-alone plan within that time

13   frame, but if you were merely unable to reach agreement on a

14   plan and you hit the drop dead date I don't believe you pay

15   the termination fee.

16   Q    Right.  So that's -- so what we're getting to is

17   there's plan risk routing now and the debtors'

18   conceptualization is the agreement that they're going get is

19   that if for any reason they are unable to confirm the plan

20   that they're promising to a bidder they will be able to walk

21   without compensation?

22   A    My belief is that if we go past the drop dead date and

23   have been unable to confirm a plan we're not liable for the

24   termination fee.

25   Q    Uh-huh.  And so can you describe for the Court or any

1    -- well withdraw the question.

2              Have you talked to any bidders about the

3    likelihood that the debtor is going to be able to get to a

4    plan by 12/31/15?

5    A    There have been some general conversations about that.

6    They're certainly all aware that the structure that we

7    propose is contingent upon the debtor achieving -- having a

8    plan.

9    Q    Right.  So one of the things you're asking the bidders

10   to absorb is the risk that the transaction doesn't close?

11   A    That's correct.

12   Q    Because the debtors are unable to negotiate a plan that

13   meets the specifications that are set forth in the teaser?

14   A    That's correct.

15   Q    All right.  And in that case -- in that case what's

16   you're requiring a bidder to is put up $10 billion or more

17   of their capital for a 12- to 18-month and commit that

18   firmly to this transaction, right?

19   A    That's correct.

20   Q    And you're asking them in providing the amount of

21   consideration they're willing to up for that to absorb the

22   risk that they could get out a year and they will get

23   nothing because the debtors have been unable to negotiate a

24   plan with any creditors?

25   A    That's correct.

1    Q    And isn't it possible that what will happen then is

2    that the bids that come in will be less than a bid that

3    would come in if the debtors were committing firmly to have

4    a plan confirmed by 12/31?

5    A    That's possible.

6    Q    Now talk about -- I just want to clear up some things

7    on the concept of what the debtor -- or sorry -- what the

8    bidders' issues -- or what the bidders' requirements will

9    be.

10             You've testified on direct I think that there's a

11   possibility that the debtors will accept the break fee from

12   the potential bidder?

13   A    If what you're suggesting -- or if what you're asking

14   is a liquidated damages provision as opposed to specific

15   performance --

16   Q    Yes.

17   A    -- then the answer is yes.

18   Q    And but if your view that liquidated damage provision

19   would have to be three to five times what the debtors are

20   contemplating they're going to be committing?

21   A    It's normally an amount like that.  I don't want to

22   specify what we're prepared to accept right now until I see

23   actual bids.  It's conceivable that we would have a bid that

24   was high enough that would cause us to take a somewhat lower

25   liquidated damages provision --

1    Q    Right.  Well --

2    A    -- but I can't speculate on that until I've seen the

3    bids.

4    Q    What that's what I want to clarify.  If the debtors are

5    trying to manage downside risk does it make any sense that

6    they accept a $200 million liquidated damage provision?

7    A    I wouldn't think so, but again, it would depend on the

8    level of bids.  You can't analyze bids solely along that one

9    criteria.  We're looking at a combination of criteria that

10   includes not just value, not just our downside protection,

11   it includes the risk of not closing given the regulatory

12   condition that exists, the definition of a MAC clause.

13   Again, there are a wide -- whether or not the price is in

14   fact hedged.  For example, if we get someone's stock and

15   we're taking market risks that's different than if somebody

16   is pricing their stock right prior to the confirmation of

17   the plan.

18            So there are all sorts of elements that go into

19   evaluating any particular bid, and I can't speculate what

20   kinds of tradeoffs we're going to be prepared to make until

21   we see the bid.

22   Q    Well, I want to focus on one thing, and I'm going to

23   come back to this concept of stock price.  Thank you for

24   your expansive answer.

25   A    You're welcome.

1    Q    With respect to the liquidated damage provision it's

2    your belief that a potential acquirer will act economically

3    rationally, right?

4    A    Yes, it is.

5    Q    And in the event that the Oncor stake falls -- the

6    value of the Oncor stake falls by 20 percent is it your --

7    it's your view isn't it, that the buyer will just choose to

8    pay whatever the liquidated damages are as long as the

9    liquidated damages are below the difference between the

10   contract price and the market value at the time of closing?

11   A    Yes.

12   Q    Okay.  So your downside protection that we're doing

13   this bidding process for is only as good as the amount of

14   the remedy which you can impose on the bidder?

15   A    That's correct.

16   Q    Right.  So when you say it's possible that the debtors

17   would take a liquidated damage provision of $200 million do

18   you mean that what we're doing here is trying to protect a

19   -- let me withdraw the question.

20         What percent is 200 million of 10 billion?

21   A    It's about two percent.

22   Q    Okay.  So we're going -- I would normally do that and

23   then I'd be wrong and then you'd say you're wrong and then

24   I'd ask you what the math is, so I just cut the corner.

25         So are we here protecting two percent volatility

1   in Oncor's stock?

2   A    I have not testified that we would accept a

3   $200 million liquidated damages provision.

4   Q    Right.

5   A    I think it's highly unlikely that we would.  But I

6   don't want to speculate about one aspect of an offer that we

7   don't have in front of us yet.

8   Q    But the one aspect of the offer on the liquidated

9   damages is the downside protection that the debtors are

10  saying they're out in the market for.

11  A    That's one of the reasons we're out in the market.

12  Q    But if --

13  A    I'm telling you I don't think it's likely we're going

14  to accept a $200 million liquidated damages provision.

15  Q    Right.  So let's go back to my earlier question.  You

16  believe it's have to be three to five times what the debtors

17  are going to be paying in order for there to be an

18  acceptable remedy, just in your mind, for protecting from

19  volatility?

20  A    Well, again, that's the typical relationship that you

21  see between a fiduciary out and a liquidated damages

22  provision.

23  Q    All right.  Now, you said that what the debtors would

24  be looking at also is the possibility of accepting a

25  purchase price that's calculated off the acquirer's stock

1    price?

2    A    Well, as you know, this transaction requires that a

3    portion of the purchase price be in stock.  Now that stock

4    may be effectively hedged and be a cash equivalent to us.

5    For instance, you know, we could have the stock priced at --

6    it could be a fixed dollar amount payable in stock with a

7    number of shares to be determined based on the trading price

8    just prior to closing -- or confirmation of a plan.

9             On the other hand someone could offer us a bunch

10   of stock today that would have a value today but where we

11   would be at risk over the balance of the period.

12   Q    Right.  So let's focus on that other one, because I'm

13   not sure I understood that the debtors were seeking that.

14            So NextEra debtor comes in -- you're saying the

15   NextEra debtor could come in in that second proposal and

16   just offer up a fixed number of its shares to be delivered

17   12 to 18 months provided that the debtors meet their

18   conditions?

19   A    They could.

20   Q    And all you're doing at that point is exchanging Oncor

21   volatility for NextEra volatility?

22   A    I didn't suggest that we would accept an offer that was

23   structured that way, but we could get offers, and one of the

24   inputs we're going to ask from the creditors is how they see

25   the tradeoff between, for example, one offer that's several

1    hundred million dollars more another but is unhedged versus

2    hedged.  That's a tradeoff that we're going to have to judge

3    and we've offered to consult creditors with that regard.

4    Q    Right.  But you agree with me that that -- that

5    structure, the accepting a fixed number of shares of an

6    acquirer's stock isn't going to protect you from the

7    volatility of the Oncor stake, it's just going to substitute

8    volatility?

9    A    Well, I think -- no, it's not a straight substitution,

10   that's not correct.  I mean let's use some math here.  Let's

11   assume that we took a billion dollars worth of stock in the

12   context of our $10 billion transaction.

13   Q    Uh-huh.

14   A    And let's further assume that the bid that is unhedged

15   is $300 million more than the hedged bid.  That would mean

16   that the acquirer's stock price would have to go down by

17   30 percent for those two offers to be equal.  It's --

18   there's not a 30 percent change in the value of Oncor's

19   stake, it's a much smaller change.

20   Q    That's just because of the cash stock mix.

21   A    Well that's correct.

22   Q    Okay.

23   A    But my point is that it's not a straight substitution

24   of risk.  We could have a 30 percent downside in the

25   acquirer's stock and have a far lower diminution on a

1    percentage basis in value of what we're selling.

2    Q    Right.  So when you answered my question before about

3    the two types of structures what you meant to say was one

4    structure is to accept a value, one structure is to accept a

5    number of shares, and a third structure, the one you just

6    laid out, is a mixture of stock and cash consideration?

7    A    Well, again, our structure has always contemplated a

8    mix of stock and cash consideration.

9    Q    All right.  While we're on the subject of volatility

10   and the analysis you'd never seen let's give you -- if I can

11   mark --

12        (Pause)

13   Q    I'll represent to you that Exhibit 78 now is a page

14   from Exhibit 69 in the debtors' -- or in the joint exhibit

15   list right now.  But, Mr. Hiltz, this is a document you've

16   seen before, right?

17   A    Yes, it is.

18   Q    And we talked about this at your deposition?

19   A    Correct.

20   Q    The second one?

21   A    Correct.

22   Q    This was in the materials that weren't produced at your

23   first deposition, right?

24   A    That's correct.

25   Q    Okay.  And this -- this chart was prepared for you by

1    your team, right?

2    A    That's correct.

3    Q    And this was part of the set of materials you reviewed

4    leading up to your first deposition?

5    A    That's correct.

6    Q    Okay.  Now this -- this chart sets forth the, as you

7    understand it, the relationship between treasuries in the

8    dotted line and some other T&B participants?

9    A    Correct.

10   Q    Okay.  Now on the right side, let's focus on those

11   participants.  You didn't pick any of the companies to be

12   compared to Oncor did you?

13   A    I did not personally.

14   Q    No.  And in fact you didn't -- in your deposition you

15   didn't know whether Pepco was even a T&B utility, right?

16   A    That's correct.

17   Q    You didn't know whether it had any generation assets or

18   any transmission assets?

19   A    That's correct.

20   Q    Okay.  And what this chart -- I think we went over --

21   sets out is that the movement in the -- the index movement

22   of treasurers has shown greater volatility over the period

23   than the index of any of the T&B comps?

24   A    That's correct.

25   Q    So just so we're clear, 4/20 -- focus on 4/25/13, just

1    that period of time forward.  Had the debtors just sold

2    their Oncor stake and transformed it into treasuries the

3    Oncor stake would have, if the comp said is right, then more

4    volatile than treasuries over the last year?

5    A    I'm sorry, repeat the question?

6    Q    Sure.  If you accept that the other four utilities that

7    are listed there are comps, right, then had the -- and that

8    Oncor followed the volatility of those comps over that

9    period, had the debtors liquidated the entire Oncor stake in

10   April of 2013 and put it in treasuries, those treasuries

11   would have been more volatile than the Oncor stock itself?

12   A    More volatile and more valuable.

13   Q    And just -- do you have any basis for testifying to the

14   Court with respect to -- I'll withdraw the question.

15             Have you ever performed a valuation of a utility?

16   A    Not personally.

17   Q    Have you ever used the capital asset pricing model?

18   A    Yes.

19   Q    Do you know what a beta is?

20   A    Yes.

21   Q    Can you tell me where utilities are relative to the

22   mean in a beta?

23   A    They're generally below.

24   Q    Right.  And in fact have you ever testified before that

25   the example -- a proper example for a low volatility

1    business with a lower beta in a capital asset pricing model

2    is a utility?

3    A    I don't know that I've every testified to that.

4    Q    Do you know that to be true?

5    A    Yes.

6    Q    All right.  Now what I need to do is get a better sense

7    of the timeline, because -- whatever, we're going to get to

8    a lot of timeline issues I think today with other witnesses.

9    But let me focus on, you joined the third week in August?

10   A    That's correct.

11   Q    And at that time you started -- you had never heard of

12   Oncor before?

13   A    That's correct.

14   Q    So you asked for a bunch of information to be provided

15   to you about Oncor?

16   A    That's correct.

17   Q    And in that first two weeks you were there you -- or

18   two weeks you were on the matter you reviewed Oncor

19   financials?

20   A    In summary form.

21   Q    A balance sheet and income statement?

22   A    Correct.

23   Q    And you reviewed the Oncor plan?

24   A    Correct.

25   Q    Up to that point had you seen in a first two weeks --

1    had you seen any of the trading multiple matters?

2    A    Yes, I saw those quite early because one of my

3    questions was, was the NextEra offer attractive, and so I

4    looked at comparable trading multiples quite early in the

5    process.

6    Q    Okay.  All right.  Let's go then to -- in your binder

7    there it's exhibit -- it is Exhibit 69.

8    A    Which binder?

9    Q    (Indiscernible - 11:39:27) three binder.  Because I was

10   going to get you -- if I may approach.

11   A    Sure.

12        (Pause)

13   A    Yeah.

14   Q    Could you identify that document?

15   A    This is the valuation multiples that are updated I

16   believe on a weekly basis by a member of the team.

17   Q    Right.  And this was --

18        THE COURT:  I'm sorry -- I'm sorry to interrupt.

19   Can you move the binders somewhere --

20        MS. O'CONNOR:  Oh, sorry.

21        THE COURT:  -- the ones you're not using somewhere

22   else?  So I can actually see the witness.  There we go.

23   Thank you.

24   BY MR. SHORE:

25   Q    All right.  This is as of October 2nd, this is --

1    A    Correct.

2    Q    -- for any weeks after you did your initial due

3    diligence?

4    A    Correct.

5    Q    All right.  And then so we can look at the page 3 -- or

6    page 1, the first chart, the T&B analysis.

7    A    Yes.

8    Q    You didn't do any of this work did you?

9    A    No.

10   Q    And you didn't select the comp set?

11   A    No.

12   Q    And you don't even know how the comp set was selected?

13   A    Well, I know that they were selected on the basis of

14   being the companies that they felt were most comparable to

15   Oncor.

16   Q    When you say they felt, that's other people on your

17   team?

18   A    That's our utility folks.

19   Q    All right.  And then if you'd look at the -- if you'd

20   look at page 2.

21   A    Yes.

22   Q    The multiples, just so we're clear.  You don't know --

23   look at the bottom left chart, the forward multiples.

24   A    Yes.

25   Q    You don't know how any adjustments were made to EBIDTA

1    to come up with any kind of multiples there, right?

2    A    Well, I know there's an adjustment made to take into

3    account any securitization transactions that removes both

4    the debt related to the securitized assets and their

5    underlying EBIDTA contributions.

6    Q    All right.  But you didn't know that at the time of

7    your second deposition?

8    A    I think I did know that at the time of my second

9    deposition.

10   Q    All right.  I'm going come to your deposition in a bit

11   then.

12           The -- and you didn't know why Pepco was a

13   potential -- or why it was set off on the right with a

14   dotted line did you?

15   A    No.

16   Q    Okay.  Now can you -- can you state with specificity

17   which of these analyses you had seen in your first two weeks

18   that are included in Exhibit 69?

19   A    I believe I saw page 1, and I can't recall whether I

20   saw page 2.

21   Q    Okay.  What about the rest?

22   A    In the first couple of days when I looked at this I

23   would say no.

24   Q    Okay.  And with respect to -- and this is why I had

25   pulled it apart -- there's a bunch of material that's

1    included after page 4, do you see the IPP analysis?

2    A    Yes.

3    Q    I take it that that form had no impact on your views

4    with respect to whether or not to market the Oncor stake?

5    A    That's correct.

6    Q    All right.  Okay.  So now, in the first -- those first

7    two weeks you're on board the -- you've looked at the --

8    some form of trading analysis?

9    A    Correct.

10   Q    The -- and some of the Oncor financials?

11   A    And I also discussed precedent transactions with Sesh.

12   Q    But that wasn't -- that wasn't based on any review of

13   any written material you were given?

14   A    I can't recall whether I say it in written material --

15   in written format or not.

16   Q    And in those first few weeks the -- you did not speak

17   to any Oncor employee?

18   A    That's correct.

19   Q    And you didn't speak to any Oncor officer or director?

20   A    That's correct.

21   Q    Or any member of the Oncor board?

22   A    That's correct.

23   Q    Or review any of the Oncor operative agreements?

24   A    That's correct.

25   Q    Or even understand what the dividend restrictions were,

1    if any, of Oncor in dividending money up to EFIH?

2    A    That's correct.

3    Q    And you did not review the Oncor tax agreement?

4    A    Well, again, depending on the timing I read the -- oh,

5    no the tax sharing agreement?

6    Q    Yeah.

7    A    No.

8    Q    Okay.  But by the time you got into those first two

9    weeks the decision had already been made to go out to

10   market, right?

11   A    A decision was made roughly a month before I became

12   involved.

13   Q    Well that's your belief is that it was made a month

14   before?

15   A    Well, no, I know we began sending out teasers on

16   July 25th, so that's almost exactly a month before I got

17   involved.

18   Q    Yeah.  If you have -- do you have your skinny binder?

19   If you turn to Exhibit 14 in the back.

20   A    Yes.

21   Q    Okay.  To be clear, this exhibit, which is the initial

22   teaser that was sent out, was send out without any knowledge

23   on your part, right?

24   A    That's correct.

25   Q    And without you providing any input as to whether it

1    was appropriate to send out Exhibit 14 at the time it was

2    sent out?

3    A    I'm not sure what you mean by whether it was

4    appropriate.

5    Q    Well no one ever asked you before sending out

6    Exhibit 14 should we be sending out a teaser right now?

7    A    Well, again, when a decision is made to market the

8    company it's normal course to send out a teaser to elicit

9    interest in a transaction.

10   Q    When you say normal course is it normal course in

11   bankruptcy?

12   A    I don't know the answer to that.

13   Q    All right.  So you don't know whether people come in to

14   seek court approval as to whether or not to go out and

15   market all of their assets outside of a plan?

16   A    My understanding is that they do not.

17   Q    But your understanding is purely based on what people

18   have told you, right?

19   A    Correct.

20   Q    And people who are not here testifying, right?

21   A    Correct.

22   Q    Okay.  Okay.  So now you've reviewed these materials

23   and you said you attended -- let's leave aside the board

24   meeting that occurred just before the hearing started -- you

25   attended two board meetings, right?

1    A    Telephonically.

2    Q    Right.  And to be clear nobody asked you to prepare any

3    materials for those board meetings, right?

4    A    That's correct.

5    Q    And you got on the phone on one of the board meetings

6    and recall that somebody, a male or a female, asked a

7    question to you as to whether or not it was appropriate to

8    be out marketing the assets?

9    A    It was a question of whether I concurred that it was a

10   good time to be marketing the assets.

11   Q    And other than that, that someone asked you whether it

12   was a good time, you don't have any specific recollection

13   about what exactly was asked of you?

14   A    Again, this was an offhand question, gee, you agree

15   it's now -- it's a pretty good time to sell this now don't

16   you?  And I answered yes.

17   Q    Okay.  And you didn't provide the board, whoever asked

18   that, with any kind of detailed explanation as to why you

19   were saying yes?

20   A    I don't recall whether I did or not.

21   Q    All right.  And you didn't provide the board with any

22   kind of written explanation for why you concurred that it

23   was a good time?

24   A    No.

25   Q    And again -- and maybe I asked it -- no one asked you

1    there to answer such a question?

2    A    No, the decision to move forward with the sale had been

3    made, as I said, about a month before I became involved.

4    The focus of the questions that I was asked was around the

5    design of the two-stage auction process and whether that was

6    a good process.

7    Q    Okay.  So I take it then that while it was off the cuff

8    that someone asked you a question, it was also out of the

9    blue for you, right?

10   A    That's correct.

11   Q    And you had no conception that you were going to walk

12   into that board meeting and be asked to give your opinion as

13   to whether it was a good time to be selling the assets?

14   A    That's correct.

15       (Pause)

16   Q    Oh, I see, I've got to clear up to issue on the EBIDTA

17   multiples I asked you.

18           I asked you on the exhibit -- what was it 69 --

19   whether you knew what the adjusts were to EBIDTA.  You

20   haven't seen any kind of written analysis which sets forth

21   anything beyond what's set forth in those trading multiple

22   charts?

23   A    That's correct.

24   Q    And you recognize that adjustments to EBIDTA, for

25   example, could be critical in determining what the

1    appropriate multiple is, right?

2    A    That's correct.

3    Q    And I take it that by the time you get to doing an

4    Oncor valuation that a great deal of analysis will be done

5    around what are the appropriate adjustments to EBIDTA to be

6    able to come up with a comparable multiple?

7    A    I'm sure that is already being done by my utility guys,

8    but no, I did not review any written set of adjustments, but

9    I did know again that there was this adjustment with respect

10   securitization transactions.

11   Q    Okay.

12            MR. SHORE:  I think that's it for me.

13   BY MR. SHORE:

14   Q    When you joined back at the beginning when did you

15   first become aware of what Oncor -- or what Evercore's fee

16   arrangement for this process?

17   A    Actually I'm not aware of it today.

18   Q    Do you have any understanding as to whether -- whether

19   Evercore will be obtaining a separate fee if the transaction

20   that's set forth in -- or contemplated by the bidding

21   procedures goes forward?

22   A    I assume we will, but I have no knowledge specifically

23   of that or of its magnitude.

24   Q    You understand David Ying would have that knowledge?

25   A    I would assume so.

```
 1   Q     Okay.

 2              MR. SHORE:  I have no further questions.

 3              THE COURT:  Thank you.

 4              Mr. Kerr?

 5   CROSS-EXAMINATION

 6   BY MR. KERR:

 7   Q     Still good morning, Mr. Hiltz.

 8              Mr. Hiltz, because I come at this part of your

 9   cross-examination I can stand on the shoulders of giants as

10   I said before and keep my questions short.

11              But I'd like to have you turn first to the motion,

12   which is Exhibit 52 in your binder.  I think it's the third

13   binder.

14        (Pause)

15   A     Yeah.

16   Q     And again, these are the bidding procedures that you

17   helped to develop; is that correct?  Attached to this

18   motion?

19   A     That's correct.

20   Q     Okay.  If you could refer to -- attached to this motion

21   is a proposed order, and it's -- at the top it is -- says

22   2087-2.

23   A     I see it.

24   Q     Okay.  And if you could turn to page 4 of 24 of that

25   order.
```

```
1    A    Yes.

2    Q    And paragraph 7.  You were asked about this paragraph

3    at your deposition weren't you?

4    A    Yes.

5    Q    And under this paragraph the debtors would be able to

6    make changes to the process -- the bidding process after the

7    order is entered, correct?

8    A    That's correct.

9    Q    And the debtors would be able to modify the bid

10   requirements, for example, Phase I of the stalking horse bid

11   after the order is entered?

12   A    That's correct.

13   Q    And for Phase II of the stalking horse bid; isn't that

14   correct?

15   A    That's correct.

16   Q    And in fact the language of the order would allow the

17   debtors in their discretion to change anything in the

18   bidding procedures after the order is entered?

19   A    That's correct.

20   Q    And the debtors could change the conditions the bidders

21   need to make?

22   A    That's correct.

23   Q    And the debtors could change the tax structure that

24   would be required in any bid?

25   A    Yes.
```

1   Q     And the debtors would not need to get court approval to

2   make those changes; isn't that correct?

3   A     That's correct.

4   Q     And the debtors would not need to disclose to the

5   creditors any of those changes in the bidding procedures?

6   A     That's correct.

7   Q     And before the stalking horse bidding process -- well,

8   strike.

9           Because the stalking horse bidding process is

10  secret the debtors could change the bidding procedures using

11  that process and not have to reveal that to the creditors;

12  isn't that that's correct?

13  A     That's correct.

14  Q     And if you could -- if you could turn to page -- again

15  same bidding motion, but if you could now turn to -- at the

16  top it says doc 2087-2, but page 18 of 24.  Actually let me

17  -- let me refer you to the start of this document.  If you

18  could go to page 8 of 24 at the top.

19  A     Yes.

20  Q     These are the proposed transaction bidding procedures,

21  correct?

22  A     That's correct.

23  Q     Okay.  So if you could now turn to page 18 of 24, which

24  is also part of the proposed transaction bidding procedures.

25  Do you see that?

1    A    Yes, I do.

2    Q    And there's a Section N that says bid criteria?

3    A    Yes.

4    Q    And the bid criteria is what the debtors have proposed

5    will be used to evaluate bids?

6    A    That's correct.

7    Q    And these bid criteria are to be used for both the

8    stalking both in the open bidding process; isn't that

9    correct?

10    A    That's correct.

11    Q    And you include this list of bid criteria's so that

12    everyone will know what factors the debtors are going to use

13    to evaluate the bids; is that correct?

14    A    Yes.

15    Q    Okay.  So if you could turn to the next page, which is

16    page 19 of 24.

17    A    Yes.

18    Q    Item 9, which is listed other factors?

19    A    Yes.

20    Q    And under that paragraph of part N of the bid criteria

21    the debtors could change or consider any other factors that

22    they want to in considering a bid; isn't that correct?

23    A    That's correct.

24    Q    And the debtors would not be required to disclose any

25    new factors they chose to rely upon as part of the bid

1    criteria; is that correct?

2    A    That's correct.  Although, you know, as we said and as

3    I said in my deposition, it's our intention to file or to

4    provide creditors -- once a stalking horse has been selected

5    it was our intention to provide creditors with detailed

6    information, not the identity of the bidders, but in fact

7    the level and structure of all the first lien bids, what it

8    was -- the bids that were eliminated, the subsequent bidding

9    in the second round with respect to both level and structure

10   so that they would have an opportunity to object prior to

11   the approval of the stalking horse bid if they felt that our

12   process was faulty.

13   Q    And at that point you, however, Mr. Hiltz, who have

14   already decided upon what the debtors thought to be the

15   appropriate stalking horse bid; is that correct?

16   A    Correct.

17   Q    And so prior to that point, Mr. Hiltz, the debtors

18   could change the factors they considered as part of the bid

19   criteria; isn't that right?

20   A    That's correct.

21   Q    And they would not have to -- up to that point they

22   would not have to disclose that to any of the creditors;

23   isn't that correct?

24   A    That's correct.

25            The only other point I would make is that this

1    language with respect to changing the -- anything about the

2    bid criteria or the process is normal language that's

3    virtually always included in any process letter and it's

4    designed to give us the flexibility to respond to

5    unanticipated events, and as I stated I think yesterday, as

6    I sit here today, I don't anticipate making any change to

7    the bidding procedures.

8    Q    And, sir, you, given you experience of not being

9    involved in restructuring to the great extent, are you -- do

10   you know -- can you give an opinion -- testimony to the

11   Court whether those types of flexibility of bid -- change in

12   bid factors are used in bankruptcy without revealing them to

13   the creditors?

14   A    No, I can't.

15   Q    Okay.  So, Mr. Hiltz, you were asked on Friday by

16   Ms. O'Connor for your opinion whether the bidding procedures

17   in the debtors' motion will maximize the value of the

18   economic interests in Oncor; do you remember that?

19   A    Yes, I do.

20   Q    And you responded they would and you explained at least

21   one of the basis for that opinion is, and I'm quoting, "It's

22   why they demonstrated outside of bankruptcy that a two-stage

23   auction process is an effective method for achieving the

24   best possible value."  Do you remember that testimony?

25   A    Yes.

1    Q    But you also stipulated in your testimony that you're

2    not a restructuring expert; isn't that correct?

3    A    That is correct.

4    Q    So you're not providing an opinion about how running

5    this type of auction process within a bankruptcy when

6    there's been no agreed upon plan structure might or might

7    not impact achieving the best possible value; isn't that

8    correct?

9    A    Well, again --

10   Q    Yes -- could you answer my question, Mr. Hiltz?

11   A    Would you --

12   Q    You want me to repeat question?

13          So you're not providing an opinion about how

14   running this type of auction process within a bankruptcy

15   when there's been no agreed upon plan structure might or

16   might not impact achieving the best possible value?

17   A    I still believe this process will achieve the best

18   possible value.

19   Q    Okay.  Could you answer my -- answer my question?  Are

20   you providing that opinion to the Court?

21   A    Yes.

22   Q    Okay.  And you're not providing an opinion about

23   whether running this type of auction process within a

24   bankruptcy when there's been no agreed upon plan structure

25   is an effective method for all the creditors to achieve the

1    best possible value are you?

2    A    I think it is.

3    Q    Okay.  Now you testified that -- that one of the

4    conditions for post-sale of interest in Oncor contemplated

5    by these bidding procedures is obtaining regulatory approval

6    for the transaction, correct?

7    A    Correct.

8    Q    And one of the other conditions for the proposed sale

9    contemplated by these bidding procedures is for the approval

10   of a plan of reorganization for the E side creditors,

11   correct?

12   A    Correct.

13   Q    As well as a plan of reorganization for the T side

14   creditors, correct?

15   A    Correct.

16   Q    And you anticipate there'll be certain termination

17   triggers in the deal documents; isn't that correct, for this

18   deal?

19   A    Correct.

20   Q    And those are reflected in the term sheet -- the

21   proposed term sheet attached to the motion, and I will --

22   let me strike that.

23          Let me refer you to page 2087-4, page 6 of 13 at

24   the top.

25   A    Just a second.

```
 1              THE COURT:  I'm sorry, where are you?

 2              MR. KERR:  Again, in the bidding motion, Your

 3    Honor.

 4              THE COURT:  Which --

 5              MR. KERR:  I'm just referring -- I'm going by the

 6    top numbering system.  It's -- it says doc 2087-4, page 6 of

 7    13.

 8              THE WITNESS:  And which page, sorry?

 9    BY MR. KERR:

10    Q    Page 6 of 13 at the top, Mr. Hiltz.

11    A    Yes.

12    Q    And listed on that page are some of the terms under

13    which the merger agreement may be terminated at any time

14    prior to the closing; isn't that correct?

15    A    Yes.

16    Q    Okay.  And one of those is that if the closing of the

17    transaction has not been consummated by the drop dead date

18    the deal can be terminated, either side can walk away; isn't

19    that correct?

20    A    Correct.

21    Q    Okay.  And that drop dead date is December 31st, 2015,

22    correct?

23    A    That's correct.

24    Q    Okay.  Now what happens if you go through this bidding

25    process and accept a bid and enter into an agreement and you
```

1    get to December 31st, 2015 and you don't have regulatory

2    approval?

3    A    We've got the ability to extend for up to six months

4    for regulatory approval.

5    Q    And what happens if you go through this bidding process

6    and accept a bid and enter into an agreement and then you

7    get to December 31st, 2015 and the Court has not approved a

8    plan of reorganization for both the E side and the T side?

9    A    The transaction would be terminated.

10           MR. KERR:  I have no further questions, Your

11   Honor.

12           THE COURT:  Thank you.

13           Mr. Martin.

14   CROSS-EXAMINATION

15   BY MR. MARTIN:

16   Q    Mr. Hiltz, I get to be the first one to say good

17   afternoon today I guess.

18           Mr. Hiltz, I don't think we've met before, I'm

19   Ross Martin with Ropes & Gray representing Delaware Trust

20   Company, which is the indenture trustee for the EFIH first

21   lien ten percent notes.  And do you recall that your

22   deposition was taken by my colleague, Mr. Devore?

23   A    I do.

24   Q    Mr. Hiltz, you testified on Friday that a buyer that is

25   able to realize the benefits of a step up in basis could pay

1   more than $2 billion more per taxable transaction than a

2   non-taxable transaction; is that correct?

3   A    Putting aside other factors, yes, he could.

4   Q    Okay.  And if you could turn to Exhibit 33.

5        (Pause)

6   A    Yes.

7   Q    And this is the document that you and your team used to

8   calculate that $2 billion amount; is that right?

9   A    That's correct.

10  Q    Okay.  Now --

11            THE COURT:  I'm sorry, I missed the answer, yes?

12            THE WITNESS:  Yes, that's correct.

13            THE COURT:  Thank you.  I'm sorry, I just didn't

14  hear it.

15  BY MR. MARTIN:

16  Q    And if I understand your testimony correctly, the

17  $2 billion increase purchase price does not make up for the

18  tax the seller would be obligated to pay in a taxable

19  transaction, that's your view?

20  A    That's correct.

21  Q    Okay.  Now that's because EFIH would be liable for the

22  tax, that's right, that's your view?

23  A    Whether it's EFIH pursuant to the tax sharing

24  arrangement or EFH didn't -- I wasn't concerned about that

25  per se.  What I was saying was that the tax liability that

1   was created is $3.4 billion roughly, the value of the step

2   up to the buyer is only 2-, so the buyer will never be able

3   to pay a high enough price to offset the tax liability that

4   the seller will incur, which is why I don't think it's

5   likely that we will receive proposals for a taxable

6   transaction.

7   Q    Right.  And so EFH -- we all agreed that EFH would be

8   liable for the tax so that calculus would work at the EFH

9   level, right?

10  A    Correct.

11  Q    But whether EFIH is liable for the tax is disputed,

12  correct?

13  A    That's correct.

14  Q    So maybe that calculus doesn't work at the EFIH level,

15  right?

16  A    Well, that's correct, but again, we've got other issues

17  here like whether the IRS would even permit such a

18  transaction to go forward.  I think they got up in court the

19  other day and said they would object to any transaction that

20  cans resulted in a stranded tax liability at the EFH level.

21  Q    Right.  Are you aware, sir, that the tax memorandum

22  says the IRS has tried that three times before and failed

23  each time?

24  A    I do recall that, yeah.

25  Q    Okay.  Now, Mr. Hiltz you testified on Friday that the

1    debtors could go back if there's not -- a plan doesn't come

2    together could go back six months from now and try to

3    propose to bidders to do a taxable transaction?

4    A    Yeah.  So, I think what I said was that if we found

5    ourselves in the circumstance where we were not clearing the

6    EFIH stack and it became apparent that for the benefit of

7    EFIH creditors you needed a taxable transaction you could go

8    back to the winner and propose that he switch to a taxable

9    transaction.

10   Q    So at that point under your bidding procedures the

11   bidder will have gone their board of directors to get

12   approval for the lower price transaction; is that correct?

13   A    Correct.

14   Q    Okay.  So you expect them to go back and pony up

15   another $2 billion that the point?

16   A    No, I don't think they would pony another $2 billion.

17   I don't think the bidder would pony up $2 billion if we

18   offered a taxable transaction today.

19   Q    Okay.  Speaking of which, Mr. Hiltz, did anyone from

20   EFIH on EFIH's behalf ever ask a prospective bidder to date

21   if they would pay more for a taxable transaction?

22   A    Again, we've told bidder that is we would take any form

23   of transaction, but I'm not aware that anyone has been asked

24   what they will pay in a taxable transaction.

25   Q    Let me ask my question again.  Has anyone from EFIH or

1    on behalf of EFIH affirmatively asked a prospective bidder

2    if they would pay more in a taxable transaction?

3    A    No.

4    Q    Who does Evercore represent?

5    A    Represent all the estate as a whole and all of the

6    creditors.

7    Q    Does it represent EFIH?

8    A    Yes, it does.

9    Q    But as a whole with the rest of the estates?

10   A    Yes.

11   Q    Okay.  Have you ever attended a separate board meeting

12   for EFIH?

13   A    I have not.

14   Q    Have you ever attended a special committee meeting of

15   the EFIH board?

16   A    No, I have not.

17   Q    Now if I recall, Mr. Hiltz, at the time of your

18   deposition you did not know that Mr. Cremens was the

19   independent director of EFIH; is that right?

20   A    That's correct.

21   Q    Okay.  So at no time during any of the -- strike that

22   that question.

23          At no time up until your deposition had you given

24   Mr. Cremens any separate briefing regarding your views on

25   the sale process?

1    A    No.

2    Q    Now considering this as a whole in one sense do you

3    recall testifying on Friday I think in response to one of

4    Mr. Shore's questions, that Mr. Weisfelner's chart was

5    actually incorrect in showing only $600 million of bonds at

6    EFH.  Do you recall that?

7    A    Yes.

8    Q    Okay.  And do you recall agreeing with Mr. Shore when

9    he said that in fact the largest claim at EFH might be an

10   asserted claim from the TCEH side of $700 million?

11   A    I recall that.

12   Q    Okay.  Are you aware that EFH owes over $1.2 billion to

13   EFIH in respect of ordinary corporate bonds held by EFIH?

14            THE COURT:  Can you repeat?  Sorry.

15            MR. MARTIN:  Sure.

16            THE COURT:  I just missed it.

17            MR. MARTIN:  Sure, Your Honor.

18   BY MR. MARTIN:

19   Q    Are you aware, sir, that EFH owes over $1.2 billion to

20   EFIH in respect of ordinary corporate bonds that EFIH holds?

21   A    No.

22   Q    If that were the case would that $1.2 billion make EFIH

23   in fact the largest creditor of EFH?

24   A    If that was the case it would.

25   Q    Now change the subject just a minute, Mr. Hiltz.

1           Do you understand that the debtors have taken the

2    position that the TCEH first lien creditors would have to

3    consent to the tax-free spin on the TCEH side?

4    A    Yes.

5    Q    Okay.  And do you understand that whether or not the

6    TCEH side produces a taxable transaction and a tax at EFH is

7    a separate question from whether the disposition of Oncor

8    produces a tax at EFH?

9    A    I understand.

10   Q    Okay.  Now Mr. Weisfelner on Friday I think referred

11   you to the limited objection filed by the TCEH first lien

12   lenders.  Do you recall that?

13   A    Not specifically, but --

14   Q    Okay.  Let's go Exhibit 71, which is probably in

15   Volume 3.  I'm guessing, okay?  And if you'd go to page 3,

16   paragraph 4.  And you see that last sentence that starts,

17   "And while the ad hoc committee ..."?  Page 3, paragraph 4,

18   I'll let you get there a second.

19   A    I think on page 3, number 4?

20   Q    This is a --

21   A    "This is an especially acute concern ..."?

22   Q    Yes, it's -- yes, that's the paragraph, and I'd like

23   you to go to the last sentence which starts, "And while the

24   ..." -- it's about half way down.

25   A    Okay.

1    Q     "And while the ad hoc committee ...?  Do you see that?

2    A     Yeah.

3    Q     Okay.  Just take a look a the that a second.

4    A     I see that.

5    Q     Okay.  And you see little two -- little Roman ii says

6    that the TCEH creditors would only consent if they're

7    allocated some benefit from this transaction; is that right?

8    A     I see that.

9    Q     Okay.  Do you have any sense of how big a hold up

10   payment is going to be required to get to consent?

11   A     I do not.

12   Q     Now also on Friday you testified that you had made some

13   assumptions -- you didn't say what they were -- but you had

14   testified you had made some assumptions about this

15   transaction paying all the EFIH creditors in full; do you

16   recall that?

17   A     Correct.

18   Q     Okay.  Did those assumptions include any payment to the

19   TCEH first lien creditors from the transaction?

20   A     With respect to analyzing whether the NextEra bid would

21   clear the EFIH stack it assumes that no payment is made for

22   the first lien creditors under their make-whole.

23   Q     And have you done any analysis like that with respect

24   to any of the other bids that you have knowledge about?

25   A     Yes.

1    Q    And is your -- do you have a sense of whether with a

2    TCEH first lien consent payment it would still pay the EFIH

3    creditors in full?

4    A    Your Honor, can I get some guidance here?

5              THE COURT:  Yeah.

6              THE WITNESS:  I'm a little reluctant to speculate

7    about what other bids --

8              THE COURT:  Yeah, I don't want him to get into

9    what other bids are.  We're not going allow cross on that.

10             MR. MARTIN:  Your Honor, that's fine.  I wasn't

11   actually trying to get to the numbers.  I understand --

12             THE COURT:  But you can back into the numbers is

13   the problem.  I think you've made your point.

14             MR. MARTIN:  Okay.  That's fine, Your Honor.

15   BY MR. MARTIN:

16   Q    Mr. Hiltz, is it your analysis that when a buyer pays

17   in this transaction, cash and stock, if I understand

18   correctly, that because those are proceeds of the sale of

19   Oncor that they flow to EFIH first?

20   A    Yes.

21   Q    And that only after the value remaining -- only any

22   value remaining after the EFIH creditors are paid in full

23   would flow up to EFH?

24   A    That's correct.

25   Q    Okay.  Now if the TCEH creditors do not consent to a

1  tax-free spin are you aware that the debtors have asserted

2  that the taxable -- the tax generated EFIH from the T side

3  could be as much as 4 to $6 billion?

4  A    I think it was a little lower than that.  I believe

5  it's also in about the 3 to $4 billion range.  I think the

6  aggregate was about 7 from both sides.

7  Q    So is it your view that there is no theory on which the

8  EFIH side could be liable for those taxes generated on the T

9  side?

10  A    I'm not a tax expert.

11  Q    Okay.  If we could go now to the motion which is

12  Exhibit 52, I think we've had that up before.  It may even

13  be in your small binder.

14  A    I think it's in my small binder.

15  Q    And I'd like to specifically go to the bidding

16  procedures that are part of Exhibit A, and page 11 of those.

17  A    Page 11 of 24 or what the pages are actually numbered?

18  Q    It's 18 of 24 --

19  A    Okay.

20  Q    -- at the top and it's page 11 at the bottom.

21  A    Okay.  Got it.

22  Q    Sorry.  Now, all the questions are coordinated on which

23  page numbers we're using.  And you see the section, and bid

24  criteria?

25  A    I do.

1    Q    Okay.  I think Mr. Kerr was asking you about item 9 in

2    that just a few minutes ago.

3    A    Correct.

4    Q    Okay.  I'd like to ask you about item 2.

5    A    Yes.

6    Q    Stakeholder consensus.  Is it your view that the

7    debtors are going to determine stakeholder consensus in

8    cutting down bidders and choosing the stalking horse bidder

9    based on the debtors' own understanding of what stakeholders

10   want?

11   A    We think we're going -- yes.  The answer to that is

12   yes.

13   Q    Now, the round one bids are due in just three days from

14   today; is that right?

15   A    Correct.

16   Q    And you testified on Friday I think that after

17   receiving the round one bids, the debtors plan to cut the

18   bids down to between two and four bidders, maybe it'll be a

19   little more if there's some clustering around that; is that

20   right?

21   A    That's correct.

22   Q    And you currently have about 12 or 13 I think people in

23   the NVA process.

24   A    That's correct.

25   Q    Now, after this cut down to let people into round two,

1   there's about a two week period, if I have the dates right,

2   for people to submit sort of their initial draft of

3   definitive documentation.

4   A    Yes.  We are going to provide each of the people who

5   get into round two with our draft, and we're asking them to

6   mark it up and give it back to us by the 7th of November.

7   Q    And the draft of that, I take it, there must already be

8   a draft of that.  Without telling me what it is, there must

9   be some draft of that circulating around all the, because

10  the definitive documentation is probably voluminous and

11  that's going to go out in three or four days; is there

12  right?

13  A    There is a draft.  There was a call this weekend to go

14  over issues in the draft that I was not allowed to

15  participate in.

16  Q    So any drafted definitive documentation for a taxable

17  bid?

18  A    Not that I'm aware of.

19  Q    Okay.  So the only draft is in the debtors' optimal

20  deal structure; is that right?

21  A    That's correct.

22  Q    Now, following that initial two week period, then

23  there's another two week period where you sort of work

24  through with the bidders from that initial cut at the

25  definitive documentation that they submit to you --

1   A     Yes.

2   Q     -- to the final.  Okay.

3         Now -- and so that's sort of two weeks and two weeks to

4   get all the way from non-binding term sheet to the

5   definitive documentation with a number of bidders; is that

6   right?

7   A     That's correct.

8   Q     And if against all odds, and I understand you say this

9   isn't going to happen because of where we are in the

10  process, an alternatively structured bid did come in later

11  this week, okay?

12  A     Uh-huh.

13  Q     The debtors would have to evaluate that tax structure,

14  right, however if somebody comes in with a taxable bid and

15  what the distributable value is, right?

16  A     Correct.

17  Q     Okay.  They'd have to advise the various boards about

18  that, right?

19  A     Correct.

20  Q     Okay.  And independent directors like Mr. Cremens,

21  right, you now know he's an independent director, right of

22  EFIH?

23  A     Correct.

24  Q     He might have to get independent counsel, right?

25  A     Again, just because we receive a taxable bid, it's not

1   clear to me that he needs independent counsel, but.

2   Q    Okay.  But let's assume for the moment that he wanted

3   to hire independent counsel, okay.

4   A    Uh-huh.

5   Q    You'd have to do that all in time to get that tax --

6   that persons of any taxable bid to get them to put in

7   definitive documentation in two weeks; is that right?

8   A    It's not that tough to change the documentation to

9   contemplate a taxable bid.  I mean, most of the issues that

10  we're talking about here would be common to both a tax free

11  and a taxable bid.

12           The items that we're soliciting input from bidders

13  on are things like the regulatory out, issues like that.

14  It's actually I think quite simple to change the

15  documentation to contemplate a taxable transaction.  I don't

16  view that as being a particularly hurdle for any bidder who

17  wanted to propose a taxable structure.

18  Q    Do you have any idea, I know you weren't on the call,

19  do you have any idea how long the call was this weekend?

20  A    No, I don't.

21  Q    Do you have any idea how long those drafts have been

22  circulating around for the non-taxable structure?

23  A    No.

24  Q    You don't know whether that's been sort of more than a

25  week or more than two weeks?

1    A    I can't recall.  I haven't really been involved right

2    up now on those drafts, so.

3    Q    Now, setting aside how quickly all that documentation

4    could be termed, okay, you're going to tell people that so

5    they can get working on that and get back to you on all

6    those things promptly after the October 23rd, right?

7    A    Well, I'm sorry, rephrase your question or restate your

8    question.

9    Q    Maybe more simply, when would you normally think you

10   would -- how quickly would you normally think you would make

11   the round one cut pass to the two to four bidders?

12   A    I think we only get within one week of receipt of the

13   bids.

14   Q    And so then people will have only one week once they

15   hear that to submit that definitive documentation form, for

16   which there's no draft yet; is that right?

17   A    Well, again, they will be provided a draft as soon as

18   we make the decision as to who has made it into the second

19   round.  And then we're ask for them to give us a mark-up a

20   week later.

21   Q    Okay.

22   A    On November 7th, which might be as little as a week

23   later.

24   Q    Which debtor is going to decide on the round one cut

25   downs?

1   A   I believe it'll be the EFIH board along with the two

2   independent directors who will make that decision.

3   Q   EFH --

4   A   No, I misspoke, the EFH board.

5   Q   Okay.  And when you say along with the two independent

6   directors, does that mean that they'll have input in that

7   EFH board meeting?

8   A   Yes.

9   Q   Does TCEH get any input, because I know Mr. Shore is

10  going to want to ask that question in a minute.  I might as

11  well ask it for him.

12  A   Again, the T side independent director is there as

13  well.

14  Q   So there's three, right.  So we've got EFH, and we've

15  got EFIH and we've got TCEH, okay?

16  A   Yes.

17  Q   What happens if they disagree, majority vote?

18  A   We'll have to see, I'm not sure what would happen under

19  that circumstance.

20  Q   Are you aware that on the TCEH side, there's actually

21  sort of TCEH and there's EFCH which has guaranteed a lot of

22  that debt, you're aware of that?

23  A   Yes.

24  Q   Do they get two votes in that decision?

25  A   I don't know the answer to that.

1   Q     Now, after stage two, okay --

2   A     Yes.

3   Q     -- you've got that month long process, and then you're

4   going to pick a stalking horse at the end of that, and sort

5   of tune up, if I understand correctly, the definitive

6   documentation after you pick the stalking horse.

7   A     To the extent that there are any open issues, yes.

8   Q     Okay.  And at that point, once you're done picking a

9   stalking horse, you're asking the Court, that is the debtors

10  are asking the Court to today, approve a 30-day open auction

11  period or go shop period; is that right?

12  A     That's correct.

13  Q     Okay.  Now, you testified on Friday that you agreed,

14  but not quite -- didn't feel quite as strongly with the

15  concerns that Lazard, the committee's financial advisor had

16  expressed, that potential investors utilities would not be

17  willing to participate in an open auction.  Do you recall

18  that testimony?

19  A     I do.  I think what I said was, there might be a more

20  limited number of parties that would be prepared to

21  participate in the open auction as opposed to the stalking

22  horse process.

23  Q     Okay.  And the reason for that, if I understand it

24  correctly, is a historical reluctance of utilities to trump

25  other strategic utility appeals in kind of an open way.

1    A     That's correct.

2    Q     Now, when -- I want to go back to when Lazard raised

3    that concern.  Did they -- do you know whether they raised

4    that concern -- you may have testified to this, and I can't

5    recall.  Did they raise that concern before or after you

6    came into the team?

7    A     Before.

8    Q     Okay.  And in response to that, you had members of your

9    team go try to identify situations in which utilities had

10   topped other utilities; is that right?

11   A     That's correct.

12   Q     Okay.  And if you would turn to Exhibit 73, please,

13   again Volume 3 I think.  Now, this is a document done by

14   Evercore dated August 21st.  Do you see that on the first

15   page?

16   A     Yes.

17   Q     Now, at your deposition you had not seen this document

18   before; is that correct?

19   A     No, I had seen it before.

20   Q     You had seen it before, okay.

21         Now, in response to Lazard's concern about utilities

22   being unwilling to top another utility, this is the document

23   that was prepared by your team?

24   A     I believe so.

25   Q     When did you first see this?

1    A    Probably on or about the 21st of August.  This was

2    prepared at my request.

3    Q    Okay.  And so you saw that at that time?

4    A    Yes.

5    Q    And you reviewed it at that time?

6    A    Correct.

7    Q    Okay.  Let's talk about these examples just very

8    briefly.  We'll look at the first one, Gaz Metro (ph), see

9    that?

10   A    Yes.

11   Q    And there the -- ultimately Gaz Metro came in and

12   bought Central Vermont Public Service; is that right?

13   A    Yes.

14   Q    And the initial bidder was Fortis; is that right?

15   A    Yes.

16   Q    And Fortis is a regulated utility; is that right?

17   A    I don't believe they are.

18   Q    They're a financial buyer --

19   A    Correct.

20   Q    -- is that right?

21        Okay.  So now the second example Blackstone was bidding

22   for Dynegy, do you see that?

23   A    Yes.

24   Q    Okay.  And the two bidders for Dynegy were Blackstone

25   and Carl Icahn; is that right, according to this analysis?

```
 1   A    I'm sorry, my -- I'm having trouble reading.

 2   Q    Go ahead.

 3   A    I'll take it that that's the case, I just can't read

 4   this small print, sorry.

 5   Q    Okay.  Well, you know who Blackstone is, right?

 6   A    I do.

 7   Q    And you know who Carl Icahn is, right?

 8   A    Yes.

 9   Q    Okay.  So I'll represent to you that this is what this

10   says here.  Blackstone and Carl Icahn are both regulated

11   utilities, right?

12   A    Obviously not.

13   Q    Okay.  They're both financial buyers, right?  Okay.  So

14   now we'll go to the third one which is Electricite de

15   France, presumably a French utility company bought minority

16   interest in certain assets, nuclear generation, nuclear

17   assets of Constellation Energy; is that right?

18   A    Correct.

19   Q    Okay.  Now, again, let me know if you can't read this,

20   but you'll see that this -- on the right-hand side, there's

21   a summary of events, it talks about what happened there; is

22   that right?

23   A    Uh-huh.

24   Q    Okay.  And did you go through this at the time with

25   your team?
```

1    A    Yes.

2    Q    Okay.  So you see there that on September 20th of 2008,

3    Constellation announced a -- actually a merger agreement

4    with another public utility, MidAmerica --

5    A    With MidAmerica.

6    Q    -- right?  Okay.  Now, was there anything else going on

7    in the world, say September 20th, 2008?

8    A    Well, obviously.

9    Q    That you recall.

10   A    I mean, obviously, we were in the beginnings of a

11   meltdown of the financial crisis.

12   Q    Right, Lehman had just filed for bankruptcy the week

13   before; is that right?

14   A    Right.

15   Q    Okay.  So first thing that happens is right around

16   Constellation announces a merger with MidAmerican, and then

17   two days later, so literally a week, I guess that's the

18   Monday, the week after Lehman filed for bankruptcy, there

19   was some sort of competing offer by KKRTPG in conjunction

20   with Electricite de France, do you see that?

21   A    I can't read it, but I'll accept that you're reading it

22   correctly.

23   Q    So now, I'll concede that EDF is a strategic, but they

24   were doing that in conjunction with two financial bidders;

25   is that correct?

1    A    Right.

2    Q    Okay.  Now, that went away, there was no topping or

3    anything there, right, according to this, about a week later

4    Constellation announced that it was proceeding with a

5    MidAmerican bid, do you see that?

6    A    Uh-huh.

7    Q    Now, they didn't ultimately end up doing a deal with

8    MidAmerican, right?

9    A    Correct.

10   Q    Are you aware that at the time, Constellation Energy

11   was in severe liquidity -- had severe liquidity problems

12   because of the financial crisis and what that did to its

13   hedges?

14   A    I'm not specifically aware.

15   Q    Okay.  So your team didn't inform you of that at the

16   time?

17   A    Not at the time, no.

18   Q    And do you know then whether when Constellation

19   ultimately did the deal in December of 2008, which is the

20   last point here, whether Constellation described that final

21   offer or that final actual transaction I should say that got

22   done as an unsolicited bid, unsolicited proposal, excuse me,

23   from PDF?

24   A    I don't know whether they described it that way.

25   Q    Your team did not inform you of that.

1   A     Correct.

2   Q     And do you know whether as part of that EDF proposed

3   transaction, they provided substantial liquidity relief and

4   assistance on Constellation?

5   A     Again, I'm not familiar with the details of the

6   transaction.

7   Q     Okay.  Let's turn to the last one, Columbia Energy and

8   -- I guess it's Nisource.

9   A     Correct.

10  Q     Okay.  Now, again, I'll represent to you that in the

11  summary of events, there's no other entity listed there,

12  other than Nisource and Columbia Energy.  Okay.  There's no

13  third bidder, okay?

14  A     Okay.

15  Q     All right.  If that's the case, this is not an example

16  of a utility topping another utility; is that correct?

17  A     Correct.

18  Q     So you had your people look for utility stock and

19  utilities and this is the list you came up with.

20  A     I believe so.

21  Q     And the market check here are creditors only remedied

22  because you're not going to include them in the process is

23  this 30-day open auction period that you want the Court to

24  determine now; is that right?

25  A     No, that's not the case.

1    Q    So the only other option would be for creditors to just

2    have the whole deal rejected; is that right?

3    A    Correct.

4    Q    Okay.  And at that point, the thing will have been

5    shopped, and bidders will have gone to their boards and

6    they'll have done all those things and expended all that

7    effort; is that right?

8    A    Correct.

9    Q    And the company will have done all of that, right?

10   A    Right.

11   Q    Okay.  I just wanted to make sure.

12        Now, you became involved in this the third week of

13   August; is that right?

14   A    Correct.

15   Q    Of the matter.  Okay.  And I think you testified on

16   Friday that you had a lot to absorb, not surprisingly, when

17   you came on board.

18   A    Correct.

19   Q    About how long do you think it took you, would you say

20   it took you to get up to speed?

21   A    I mean, with respect to what issues?

22   Q    Just generally, how long would it take you to get up to

23   speed in this situation?

24   A    I don't think I can answer that because I think I got

25   up to speed on, for example, the reasons that the NextEra

1  bid was attractive, what the bidding procedures had been up

2  until my involvement quite quickly.  By the same token, I

3  don't think I got up to speed as quickly on certain other

4  issues, so I think it depends.

5  Q    Okay.  So let's break that down.  How long do you think

6  it took you to get up to speed on the value of the NextEra

7  bid?

8  A    Not very long.

9  Q    Ah, would that be a couple of three days?

10 A    Two or three days.

11 Q    Okay.  And on whether the bidding procedure, how you

12 wanted to construct the bidding procedures, about how long

13 did that take you?

14 A    Again, the first several days.

15 Q    Just a few days?

16 A    Yes.

17 Q    So you were up to speed at that point on the tax issues

18 in the case?

19 A    Generally.

20 Q    Would you say you were fully up to speed on the tax

21 issues?

22 A    I was up to speed with respect to the fact that a

23 taxable transaction would produce a large tax liability at

24 the EFH level.

25 Q    Were you up to speed on the disputes over the tax

1   sharing agreement?

2   A    Not at that time, no.

3   Q    Okay.  Were you up to speed on various creditor

4   arguments about why TCEH or EFIH would not be liable for the

5   tax?

6   A    Well, again, I understood that dispute existed, but I

7   didn't know the details.

8   Q    Okay.  It still took about three days to get up to

9   that, right?

10  A    I would say something like that, yeah.

11  Q    And you were able to consult with Kirkland and your

12  existing Evercore team to help you get up to speed on all

13  that?

14  A    That's correct.

15  Q    Okay.

16          MR. MARTIN:  I just have a few more, Your Honor.

17  BY MR. MARTIN:

18  Q    Just two more quick topics.  One, I think Mr. Kerr

19  stole most of my thunder on the modifications.  You recall

20  he asked you a bunch of questions about the debtors' right

21  to modify the bidding procedures.

22  A    Yes.

23  Q    Okay.  And your testimony was again, change everything,

24  although you don't currently anticipate changing anything.

25  A    That's correct.

```
1    Q    Are you aware that -- well, let me ask you this

2    question.  Did you read the debtors' reply brief to the

3    Court before it was filed?

4    A    Yes, I did.

5    Q    Okay.  And are you aware that they cited several cases

6    to support your notion that it's common for the debtor to

7    have discretion to modify the bidding procedures?

8    A    I recall they cited a lot of cases, I don't

9    specifically recall the cases they cited in that regard.

10   Q    Let's just take a quick brief look at the reply just to

11   see if it jogs your memory.

12              UNIDENTIFIED SPEAKER:  Are we going to the agenda?

13              MR. MARTIN:  I'm sorry, Your Honor, I thought we

14   had that one in the binder.  Could I approach, Your Honor,

15   just to hand the witness a copy of this?

16              THE COURT:  Yes.

17              MR. MARTIN:  Okay.

18              THE COURT:  Which page are we going to be on, Mr.

19   Martin?

20              MR. MARTIN:  It's 20, I believe, Your Honor.

21   BY MR. MARTIN:

22   Q    Do you see those parts that I've highlighted, which is

23   the sentence before footnote 6 and footnote 6 itself?

24   A    Yes.

25   Q    Okay.  And so you see there, the text is, and I'm
```

1   paraphrasing because I don't have a copy in front of me that

2   -- you know, it's common for debtors to have authority to

3   modify the bidding procedures, and then there's a footnote

4   that defines, that cites three cases.

5   A    I see that.

6   Q    Do you recall seeing that?  Do you recall whether you

7   noticed that at the time you read the draft?

8   A    Well, I wouldn't have paid any attention to the

9   footnotes citing specific cases, I'm not a lawyer, those

10  cases mean nothing to me, but I would've read the text.

11  Q    Okay.  So therefore, you're not aware that in the

12  second of those cases cited there, Coda Holdings --

13  A    I'm not aware of any of these cases.

14  Q    You're not aware that in that case, the secured

15  creditors had a consent right over the modifications and the

16  unsecured creditor's committee had the right to consult over

17  there, you're just not aware of that then?

18  A    No, I'm not.

19          MS. O'CONNOR:  Excuse me, Your Honor, he's said he

20  (indiscernible - 12:35:41) the cases.

21          THE COURT:  Well, he can ask.  The objection is

22  overruled and the answer was no, correct?

23          THE WITNESS:  Correct.

24  BY MR. MARTIN:

25  Q    I'd like to go back --

1          MR. MARTIN:  And this is my last stop, Your Honor,

2     I just have a few more questions.

3     Q    -- to the small binder that the debtors had for you,

4     Exhibit 14, that teaser.

5     A    Yes.

6     Q    And you'll see on page 2, I'll wait till you're there.

7     A    I don't -- okay, yeah.

8     Q    Do you see that?

9     A    Yeah.

10    Q    So on page 2 of the teaser, and this is just to reset

11    ourselves here, this is the teaser that went out in July and

12    early August --

13    A    Correct.

14    Q    -- originally.  Okay.

15         And you'll see the third bullet point there on that

16    page, says that, "any acquisition of reorganized EFH stock

17    will need to be structured."  Do you see that?

18    A    Yes.

19    Q    Okay.  And that says need, not preferred, right?

20    A    Correct.

21    Q    If you'll then turn to Exhibit 24, which is in

22    Volume --

23    A    1.

24    Q    -- 1, okay.  And this is an email from Brandon Panda at

25    -- on your team to some folks at Bank of America/Merrill

1    Lynch, right?

2    A    That's correct.

3    Q    This is just right around the time you became involved;

4    is that right?

5    A    I became involved probably a week before this.

6    Q    Okay.  And have you seen this email before?

7    A    I don't recall.

8    Q    Okay.  Can you turn to the attachment, which is sort of

9    the second page of this exhibit, which is a draft of a

10   process letter to go out to bidders, do you see that?

11   A    Yes.

12   Q    Have you ever seen this before?

13   A    I've seen a number of drafts, I can't recall whether I

14   saw this specific draft.

15   Q    Let me point you to one specific thing which I want to

16   see whether you've seen it before, which is in the third

17   paragraph, halfway in the middle, you'll see there's a

18   bracketed and italicized sentence that says "should we

19   discuss the option" -- "should we discuss option to acquire

20   Oncor Holdings instead of reorganized EFH, even if tax

21   issues make transaction unfeasible?"  Do you see that?

22   A    I see it.

23   Q    Does that refresh your recollection whether you've ever

24   seen this?

25   A    Again, I don't recall whether I've seen it before, but

1    I'm sure this is, you know, a draft that was in existence at

2    that time.

3    Q    Right.  And this draft was made to go out, mentioning

4    you down below as the senior person on the transaction.

5    A    That's correct.

6    Q    Okay.  Without needing to turn back to it, there's a

7    term sheet attached to the motion and -- that you're sending

8    out, or strike the question.

9         There's a term sheet attached to the motion, right, a

10   form of transaction terms.

11   A    That's correct.

12   Q    Okay.  And that's been sent out to all the prospective

13   bidders, that term sheet.

14   A    That's correct.

15   Q    Okay.  And that is for the nontaxable optimal deal

16   structure, right?

17   A    Well, again, I think the most recent term sheet that

18   was sent out does two things.  Number one, it states that

19   we're prepared to consider any form of proposal that they

20   want to make, but also shows them a structure that we think

21   works and is efficient.

22   Q    But my question is, the substance of the term sheet is

23   only for the optimal non-taxable deal; is that right?

24   A    That's correct.

25   Q    So just like there's been no preparation for definitive

1    documents for a taxable deal, there's never been a form of

2    term sheet for a taxable deal sent out; is that right?

3    A    Well, again, there's -- the answer to that is no, but a

4    taxable deal is quite simple to structure.  It's not as

5    complicated as the tax screen structure.

6              MR. MARTIN:  That's all I have, Your Honor.

7              THE COURT:  All right.  Thank you.  I assume you

8    have redirect?  Okay.  Yes?

9              MS. O'CONNOR:  Yes.

10             THE COURT:  All right.  Let's take a short recess

11   then before we do redirect, five to ten minutes.

12        (Recessed at 12:40 p.m.)

13             THE COURT:  Please be seated.  Ms. O'Connor?

14             MS. O'CONNOR:  Good afternoon.

15   REDIRECT EXAMINATION

16   BY MS. O'CONNOR:

17   Q    Mr. Hiltz, a few questions.  It's Bridget O'Connor with

18   Kirkland & Ellis on behalf of the debtors.

19             Mr. Hiltz, we have a few questions on redirect.

20   First, let's start with the last question you were asked

21   before the break.  You mentioned that it was easier to

22   document a taxable structure than it would be to do so with

23   a tax free structure.  Can you explain why that is?

24   A    Well, again, I think the taxable structure is fairly

25   straightforward.  The tax exempt structure is more complex.

1    It would not be difficult to take our contract and quickly

2    turn it into one that contemplated a taxable purchase.  So,

3    for example, EFIH.

4    Q    Turning to your role within the Evercore team

5    engagement?

6    A    Yes.

7    Q    Could you explain specifically, what is your role in

8    particular within the Evercore team?

9    A    Well, again, my role, in particular, was helping to

10   design the bidding procedures, to manage the process for

11   soliciting bids and eventually to be part of both the

12   company and Kirkland & Ellis in negotiating terms with the

13   specific bidder.

14   Q    And was that with respect to the M&A portion of this

15   process?

16   A    That's correct.

17   Q    And generally speaking, who from the Evercore team is

18   the ongoing and primary contact with the boards at EFH?

19   A    David Ying and Roger Altman are chairmen but David Ying

20   on a day-to-day basis.

21   Q    So similarly, when it comes to questions of corporate

22   governance or the process that might apply going forward

23   with respect to which boards may participate or who would

24   vote on particular issues, is that something that you are

25   involved in in your role?

1    A    No, it's not.

2    Q    So, and have you been involved in conversations or

3    meetings to make decisions with respect to those topics?

4    A    No, I have not.

5    Q    Turning to a discussion of the teaser from Friday, you

6    were asked about the initial teaser that came up again today

7    and whether an updated teaser was sent out to potential

8    bidders.  Do you recall that?

9    A    Yes, I do.

10   Q    Did the Evercore team send out the bidding procedures

11   motion to potential bidders once that motion was filed?

12   A    Yes, we did.

13   Q    If you could turn to that first tab in the notebook

14   that I handed you on Friday with the motion.  And Exhibit B

15   to the motion which starts at the page at the top -- it's

16   2087-3.

17   A    Yes.

18   Q    When the motion materials were sent to potential

19   bidders at the time that the motion was filed, do you have

20   an understanding as to whether that would include Exhibit B

21   with the motion?

22   A    Yes, it did.

23   Q    And can you identify what that Exhibit B is?

24   A    It's an updated teaser.

25   Q    And do you have an understanding as to who was sent or

1    what group of recipients was sent those motion materials

2    when they were sent out?

3    A    Anyone who had received the first teaser as well as new

4    parties to the transaction.  I think there were 36 some odd

5    sent out.

6    Q    You were also asked a number of questions in or around

7    the idea of that bids or bidders would be dropped in the

8    next six days, it was as of Friday.  Do you recall questions

9    along those lines?

10   A    Yes.

11   Q    First, how long has the first phase of this process

12   been open?

13   A    Again, since around the 25th of July.

14   Q    And when that first round ends, what is the next phase?

15   What will occur in the second phase of the process?

16   A    Well, again, I mean, at the end of the first phase,

17   we're merely going to narrow down the number of bidders that

18   we're negotiating with.  As I said, it would be probably

19   between two and four that we would continue with, although

20   it could be more people if the bids are tightly clustered.

21   That second stage of the process, number one, allows them to

22   continue with their due diligence, including meetings with

23   management.  Obviously, we're going to get feedback from

24   them in terms of the markup of their contract so we

25   understand what their contractual terms are.  And, of

1   course, we will be pushing them to increase their value

2   during that second period.

3   Q    You were asked today a series of questions about the 12

4   to 18-month window during which various approvals may need

5   to occur of a transaction that's selected through this

6   process.

7   A    Yes.

8   Q    Is the restructuring process the only process that will

9   be transpiring during that window?

10  A    No.  The regulatory approval process.

11  Q    Is that something that you and your team accounted for

12  in assessing this bidding procedures process and that window

13  of time that would be afforded for approvals?

14  A    Yes.  We try to have a process where the two time

15  frames would essentially overlap, i.e., the normal time

16  frame for a utility merger drop dead date is about 12

17  months.  That's the same as we have here.  And it was

18  anticipated that that would provide time to come to a

19  consensus with respect to a plan of reorganization.

20  Q    And does the time that was provided for those

21  approvals -- do you have a view as to whether that time that

22  was allowed will have an impact or would have an impact on

23  the bids that would be received as a result of this effort?

24  A    Well, again, I think the time frame is quite consistent

25  with all -- or with most out of bankruptcy utility

1    transactions.  And again, we went back and looked at some 20

2    odd of the most recent utility transactions.  I think the

3    average drop dead date was 12.4 months.

4    Q    Finally, Mr. Hiltz, on the last topic I'll ask you

5    about again today, you were asked about the benefit of the

6    bidding procedures process to managing risk through a

7    potential transaction.  Do you recall that?

8    A    Yes.

9    Q    Do you have a view as to whether there is also a

10   benefit to the debtors in this process to defining the value

11   of the assets through the transaction?

12   A    I think having a definitive value for the asset would

13   help spur negotiations on a plan of reorganization.

14   Q    And does that definition of the value of those

15   assets -- does that also provide information to the

16   availability of those proceeds to creditors?

17   A    Yes.

18            MS. O'CONNOR:  Thank you.  That's all I have.

19            THE COURT:  Now I'm not going to allow recross.

20   Thank you, sir.

21            THE WITNESS:  Thank you.

22            THE COURT:  We're just going to do direct, cross,

23   redirect with all the witnesses.

24            MR. MCKANE:  Your Honor, for the record,

25   Mark McKane, Kirkland & Ellis, on behalf of the debtors.

1    We're prepared to call our next witness but we're also

2    cognitive of the time.  Is it appropriate to take 45 minutes

3    for lunch?

4              THE COURT:  Yeah.  Mr. Shore?

5              MR. SHORE:  Maybe if we can understand maybe how

6    long the witness is.  We started late today and it'd be

7    easier for us, since we're going to be hearing this

8    testimony for the first time, if we could hear it and then

9    we can kind of tighten up the cross depending on what comes

10   out.

11             THE COURT:  All right.  I'm --

12             MR. MCKANE:  We estimate it's going to probably

13   run 30 to 45 minutes.

14             THE COURT:  All right.  That's fine.  We'll work

15   that way.  That makes some sense.

16             MR. MCKANE:  We'll proceed both with direct and

17   then --

18             THE COURT:  Yeah.  We'll go direct.  We'll take a

19   lunch break and that will allow, hopefully, for as organized

20   a cross as possible.  But they've all been organized.  So

21   that won't be a problem.

22             THE COURT:  Mr. Keglevic?  Let's do an

23   affirmation.  Go ahead.

24        (Witness sworn)

25             THE COURT:  Please state and spell your name for

1    the record.

2            THE WITNESS:  Paul Keglevic, K-E-G-L-E-V-I-C.

3            THE CLERK:  Thank you.

4    DIRECT EXAMINATION

5    BY MR. MCKANE:

6    Q    Good afternoon, Mr. Keglevic.

7    A    Good afternoon.

8    Q    Sir, did you prepare some demonstrative aides to assist

9    you in testifying today?

10   A    I had them prepared.  I did not personally prepare

11   them.

12   Q    Understood, sir.  And they would help you to testify

13   today if you had them in front of you?

14   A    I believe they would.

15   Q    All right.

16           MR. MCGAAN:  Your Honor, may I approach?

17           THE COURT:  Yes.

18   BY MR. MCGAAN:

19   Q    Mr. Keglevic, can you just -- so it's a one-page side,

20   sir.  Can you tell me what this demonstrative aide is?

21   A    Yes.  It's the board meetings that were conducted

22   beginning July 7th and through the current date.

23   Q    All right.  Thank you, sir.  And over the course of

24   your examination, I may refer back to that over time, okay?

25   A    Okay.

1    Q    Sir, do you recall when the debtors terminated the

2    restructuring support agreement approximately?

3    A    Yes.  It's around the end of July.  I think it was

4    just -- in connection with the July 23rd board meeting.

5    Q    Okay.  And, sir -- and, sir, were you involved in the

6    discussion on whether to terminate the restructuring support

7    agreement?

8    A    Yes, I was.

9    Q    Sir, why did the debtors elect to terminate that

10   agreement?

11   A    Primarily two reasons.  One, the RSA itself was

12   terminable and we heard from several creditor groups that

13   they were likely not to amend it.  And secondly, the fact

14   that we had gotten the higher NextEra bid and some other

15   indications of interest from the market that indicated that

16   the value that we had placed on the E side of the company or

17   the economic interest in the Oncor stock that we owned was

18   going to be higher if we went to a stalking horse bid type

19   process than continuing to pursue and execute the RSA.  And

20   obviously, we had also received comments from the Court

21   leading up to that process which were also important in that

22   determination.

23   Q    And so, was one of the indications of interest that you

24   received the publicly filed NextEra bid?

25   A    Yes.  That's what I was referring to.

1   Q     And so, why was the NextEra bid a factor in terminating

2   the RSA?

3   A     Primarily, just the amount was substantial and

4   reflective of a good starting point for a further process.

5   Q     And, sir, did the restructuring support agreement

6   provide for a fiduciary out for the debtors to exercise?

7   A     Yes.

8   Q     And did the debtors elect to exercise that fiduciary

9   out?

10  A     We did.

11  Q     And was there a breakup fee or topping fee or

12  termination fee of any sort that the debtors had to pay?

13  A     There was not.

14  Q     Now let me direct you to the demonstrative, sir.  Were

15  there telephonic board meetings to discuss the potential

16  termination of the RSA?

17  A     Yes.

18  Q     And did you participate in those telephonic board

19  meetings?

20  A     Yes.  I participated in, I believe, all of these board

21  meetings with the exception of October 16th, the one we just

22  had.

23  Q     And that's the board member update that occurred the

24  day before the hearing started?

25  A     Yes.

1    Q    All right.  Sir, what role did the EFH boards play in

2    the decision to terminate the RSA?

3    A    The EFH board?

4    Q    All of the boards.  What role did the boards in total

5    play in a decision to terminate the restructuring support

6    agreement?

7    A    All the boards voted to terminate the RSA.

8    Q    And specifically, when you say all the boards, sir,

9    which boards are you referring to?

10   A    I'm referring to EFH, EFIH, TCEH, EFCH, EFIH Finance

11   and TCH Finance.  I believe that's all of our boards.

12   Q    And at that same time, sir, did the boards also make a

13   decision to market the assets covered by the NextEra bid?

14   A    Yes.  At that point, we made a decision to take the --

15   to go through some process to market the 80 percent of stock

16   that we owned of Oncor.

17   Q    And, sir, did the debtors take any steps with regards

18   to the NextEra bid immediately after terminating the

19   restructuring support agreement?

20   A    Yes.  We immediately began discussions with NextEra to

21   see how willing they were to improve their bid with the

22   thought being that we may be able to get their bid to a

23   point that we could elect to file a motion with them as the

24   stalking horse.

25   Q    And, sir, during the time when the debtors were meeting

1    with and negotiating with NextEra, did you also meet with

2    creditor groups?

3    A    Yes.  We met with the creditor groups upon the

4    termination of the RSA immediately thereafter, I believe the

5    following week.  And then, maybe a week or so in early

6    August, I -- as well to get input from them on where do we

7    go from here and to indicate to them that we thought the

8    NextEra bid was a good jumping up point for us to market the

9    asset.

10   Q    And, sir, in addition to those two steps, did the

11   debtors take any steps to invite other potential bidders to

12   evaluate whether they wanted to be a potential stalking

13   horse?

14   A    Yes.  I think as Mr. Hiltz has testified, we, at the

15   end of July, also then sent out teaser materials to a

16   broader group in the marketplace.  As I indicated, it was

17   not only the NextEra bid itself but we also got some

18   indication from the market that others might be interested

19   in participating.  So we substantially opened up the bidding

20   process, I think, to about 25 strategics and 26 financial

21   buyers -- or I might have those numbers reversed.  But it

22   was close to 50 different bidders we started the marketing

23   process with.

24   Q    And, sir, if I could redirect your attention back to

25   the demonstrative, there -- in the middle of the page there,

1    there's a series -- three board meetings from July 30th

2    through July 31st.  Do you see those, sir?

3    A    I do.

4    Q    And, sir, can you describe for the Court why there were

5    three board meetings over three days -- over two days --

6    excuse me -- during that time period?

7    A    That's our normal quarterly week for board meetings.

8    In fact, next week is the third quarter board meetings.  And

9    at those board meetings, we have two full days of face-to-

10   face board meetings where we meet with the committees on the

11   first day, on the subsidiary boards on the first day.  And

12   then the following day have the EFH board meeting take

13   place.  That's typically the structure.

14   Q    And did you personally participate in all of those

15   board meetings?

16   A    Yes, I did.

17   Q    Was the stalking horse process and potential timeline

18   discussed at those board meetings?

19   A    Yes.  Absolutely.  It was one of the key items of

20   discussion at the board meeting.  As I said, when we had the

21   boards vote to terminate the RSA, they also knew that we

22   were going to move down the road to market the assets.  So

23   we informed them as to that marketing had taken place.  And

24   we started talking about how -- whether we'd go a stalking

25   horse route or whether we'd go stalking horse and auction.

1    And we started kicking around all the various approaches we

2    had to moving forward with a sales/auction of Oncor.

3    Q    And, sir, was there an Evercore representative that

4    participated in those board meetings as well?

5    A    Yes.

6    Q    Who was that, sir?

7    A    Well, it was David Ying and some of his associates.

8    I'm trying to recall if Roger Altman was there at those

9    meetings.  He may have been but I know at least David and

10   his team as well as our counsel from Kirkland attended those

11   meetings.

12   Q    And, sir, were there any decisions made at that time

13   after those board meetings based on the input you received

14   from the advisors and the board members?

15   A    Yes.  At that time, I think the conclusion was we were

16   making good progress with NextEra and we were going to

17   pursue a -- just locking up NextEra as the stalking horse

18   bid and file NextEra as the stalking horse.  We thought we

19   could get them to a substantial price and terms that that

20   made sense to lock them in as the floor but then still

21   conduct an open bid auction process on the back end.

22   Q    Okay.  Sir, after those board meetings, sir, did there

23   come a time when the debtors began to consider extending the

24   initial period for a stalking horse bidder other --

25          MR. MCKANE:  Let's do it again.

1    BY MR. MCKANE:

2    Q    After those board meetings, did there come a time when

3    the debtors began to consider extending that stalking horse

4    selection process?

5    A    Yes.  Shortly thereafter, we, as part of meeting with

6    the various creditor groups and soliciting input -- and I

7    think Mr. Hiltz has already testified about this, that

8    Lazard specifically had concerns that just locking up one

9    stalking horse might chill the bid and reduce the number of

10   strategics that would get engaged.  So what we did at that

11   point -- you know, so one of the things we strongly

12   considered and ultimately adopted was to go to an approach

13   that extended the stalking horse process so as not to reduce

14   the numbers that might participate in that process while

15   still retaining the open bid and the auctions for those that

16   would be willing to jump a stalking horse bid.  In our mind,

17   it was getting the best of both worlds and making sure that

18   we were covered regardless of whether that assertion was

19   correct or not.

20   Q    All right.  Let's pause for a second before we get to

21   that final decision and those paths and tease some things

22   out for a minute.

23       You said a couple times you met with creditor groups.

24   Just to put a final point on that, during that period of

25   time in late July and early August, did you meet with the

1    official committee of unsecured creditors?

2    A    Yes.

3    Q    Did you meet with the TCH first liens?

4    A    Yes.

5    Q    Did you meet with the TCH second liens?

6    A    Yes.

7    Q    Did you meet with the ad hoc group at TCH --

8         (Sudden emergency siren interruption)

9    A    Wrong answer.

10        THE COURT:  Hang on.

11   (Off the record as courthouse is evacuated)

12        THE CLERK:  All rise.

13        THE COURT:  Please be seated.  Sorry for the

14   interruption.

15        MR. MCKANE:  Your Honor, Mark McKane, Kirkland &

16   Ellis, on behalf of the debtors.  May I proceed?

17        THE COURT:  Yes.

18   DIRECT EXAMINATION (Resumed)

19   BY MR. MCKANE?

20   Q    Mr. Keglevic, we were discussing some of the creditor

21   groups that the debtors had met with in the weeks of -- end

22   of July and early August.  Do you recall that?

23   A    Yes.

24   Q    And, sir, I believe that the question was pending of

25   did you have a meeting with the TCH ad hoc group of

1   unsecured noteholders.

2   A    Yes.  But I should clarify that when you say the

3   creditor groups, it was their advisors.  So we met with the

4   official committee, which then also inclu -- and which had

5   their advisors which then included the second lien TCEH

6   advisors and the ad hoc committee advisors.  And we met with

7   them all together.

8   Q    And, sir, did you also have separate meetings with

9   creditor group advisors on the E side?

10  A    We did.

11  Q    And can you identify for the Court which advisors you

12  met with for creditor groups on the E side?

13  A    Yes.  We met with the EFH unsecured creditors.  We met

14  with the EFIH PIK unsecured creditors.  And I think also the

15  EFIH second lien creditor group.

16        MR. MCKANE:  Thank you, Your Honor.

17  BY MR. MCKANE:

18  Q    And -- thank you, sir.  If we could go back to the

19  demonstrative, I do have one follow-up question.  You had

20  discussed the in-person board meetings at the end of July?

21  A    Yes.

22  Q    And, sir, do you see at the July 31st EFH board

23  meeting, there's a double asterisk?

24  A    Yes.

25  Q    It notes on the bottom there that Mr. Cremens and

1    Mr. Sawyer attended the EFH board meeting as observers.  You

2    see that?

3    A    I do.

4    Q    Is that a common practice for Mr. Sawyer and

5    Mr. Cremens?

6    A    Yes.  Mr. Cremens and Mr. Sawyer attend the -- their

7    respective boards, the EFIH in the case of Mr. Cremens and

8    the TCEH in the case of Mr. Sawyer, in person and

9    individually.  But then they also sit in to the discussion

10   at the EFH board meeting as observers as it indicates.

11   Q    And, sir, in part, based on feedback that you received

12   from creditor constituencies, was there a discussion in mid-

13   August about how to best structure the bidding process?

14   A    Yes.  That was the time -- and I think I previously

15   answered this, that we started to -- as we were thinking

16   about the stalking horse process, we were getting input that

17   going just with NextEra as a stalking horse might not be the

18   correct approach because utilities are a more conservative

19   bidding group in general and, therefore, having electing to

20   pick NextEra as the stalking horse and granting any other

21   bidders -- potential bidders as becoming the stalking horse

22   might reduce the number of ultimate bidders you got in the

23   process.  So --

24   Q    Let me stop you there for a second.  Are you familiar

25   with the term "path A" as it was used by the debtors during

1    this time period?

2    A    I think I invented "path A" and "path B" --

3    Q    All right.  Sir --

4    A    -- at the board meetings.  And I'll be happy to explain

5    them if you'd like me to.

6    Q    I would.

7    A    Path A was simply to move forward with NextEra, to lock

8    in their bid as the stalking horse and to file that motion

9    with the Court.  Path B was to take some creditor input to

10   expand the amount of time and opportunity for other bidders

11   to become stalking horse bidders and then also to file those

12   procedures, as we ultimately have, with the Court for

13   approval to provide transparency and to -- in the hope that

14   that would also give confidence to other conservative

15   utility buyers to participate in the process even though

16   they hadn't been involved in the process to date.

17   Q    And, sir, you mentioned that creditor input was a

18   factor in evaluating whether to go through path A or path B.

19   Did you receive any input from the market from potential

20   bidders?

21   A    Yes.  The other thing was that we got some --

22   effectively some indications of interest.  And this was that

23   came through Evercore that there were others who would like

24   to compete to be stalking horse bidders.  So that was

25   another significant amount of intelligence in making that

1    decision.

2    Q    And, sir, did you, in addition to input from the market

3    and input from creditors, receive input from your advisors?

4    A    Yes.  Absolutely.  And we -- you know, I think at that

5    point in time, we were getting Mr. Hiltz involved, Evercore,

6    as well as Kirkland & Ellis were all evaluating based on

7    board direction to recommend to the board which approach

8    would be the one most likely to have success and most

9    appropriate given the input that we had received from

10   creditor groups from the Court which dates back to the --

11   you know, the second lien DIP hearing and then ultimately

12   from the market.

13   Q    And, sir, you mentioned direction from the board.  Did

14   you also receive input from board members during this debate

15   as raised, do we proceed down path A versus path B?

16   A    Yes, we did.  Absolutely.  It was a, you know,

17   substantial debate.  I think there were some board members

18   that thought the NextEra bid was pretty good and if we

19   went -- if we hobbled to path B, which is the motion we

20   filed here, that we could lose NextEra and end up with a

21   lower bid and that would be bad for the estates.  So that

22   debate was, you know, fulsome and occurred at each of the

23   August 15th, August 22nd and culminated in the August 26th

24   meeting.

25   Q    And, sir, that was exactly where I was heading.  So --

1    and the demonstrative reflects that there were three joint

2    board meetings in that 11-day span.  Was this issue the path

3    on which you were going to proceed on bidding procedures the

4    subject of those three board meetings?

5    A    Yes.  In fact, while there might have been another

6    brief subject, I think it was generally the subject for all

7    of those meetings.  And it encompassed how we were doing

8    with NextEra, what other bid indications we were getting and

9    our advisors thinking around the various approaches that we

10   may take.

11   Q    And, sir, you mentioned Mr. Hiltz was someone you

12   received input from.  Did you receive input from others at

13   Evercore as well?

14   A    Yes.  Well, we continually -- you know, in all these

15   board meetings, I should point out that -- I can't remember.

16   I would bet all of these board meetings we had participation

17   from both Evercore and Kirkland & Ellis.  And I believe

18   Mr. Ying has been at virtually all the board meetings that

19   we've had.  And it is routine in the board meetings for our

20   chairman, Chairman Evans -- he's the chairman of EFH -- to

21   ask specifically those two to speak up and give their points

22   of view.  Those two groups, both Kirkland & Ellis and

23   Evercore.

24   Q    And, sir, when did the boards reach a conclusion -- or

25   the debtor to --

1          MR. MCKANE:  Say it again.

2    BY MR. MCKANE:

3    Q    When did the debtors reach a conclusion as to whether

4    they were going to proceed under path A or path B?

5    A    It was the August 26th meeting.

6    Q    And, sir, was there a specific vote taken at that time

7    or what level of input did you receive from the board in

8    making that decision?

9    A    There was no official vote taken at that time.  But I

10   do recall that, once again, it was a healthy discussion

11   where we reviewed the approaches.  Evercore and

12   Kirkland & Ellis weighed in and, I believe, at that meeting,

13   Chairman Evans also went around and kind of went to each

14   board member and said, you know, "Any problems?"  So he kind

15   of polled the board but did not ask them to vote.

16   Q    And did the debtors file a notice to creditors

17   regarding the marketing process after making the decision to

18   proceed down path B?

19   A    Yes.

20   Q    And now, sir, after the debtors chose this more

21   extended stalking horse selection process, did the debtors

22   develop bidding procedures in a timeline for that process?

23   A    Yes, we did.

24   Q    And were you involved in developing those bidding

25   procedures?

1    A    I certainly reviewed them.  We relied heavily on

2    Evercore and Mr. Hiltz and Kirkland & Ellis to develop the

3    procedures.  But I was certainly -- reviewed them as did the

4    other members of the board.

5    Q    And, sir, specifically, what role did you view Mr.

6    Hiltz as playing in developing those bidding procedures?

7    A    You know, given -- at that point, I would say it was

8    his primary responsibility.  And we looked to him as being

9    the M&A expert.  But, of course, we looked at the entire

10   Evercore team.  We don't just look at Mr. Hiltz on one thing

11   and Mr. Ying on the other -- we look at the entire team.

12   And, in fact, many cases have the chairman of their firm

13   present and we get the Evercore point of view, not

14   necessarily just the Mr. Hiltz point of view or the Mr. Ying

15   point of view.

16   Q    And, sir, were you satisfied with the input you were

17   getting from the Evercore team as a whole?

18   A    Yes.  Absolutely.

19   Q    Did there ever come a time where the debtors considered

20   potentially expanding the group of advisors beyond Evercore

21   to bring in a second advisor?

22   A    Yes.  For a period of time, because, you know, I think

23   most of our board, especially the board members with private

24   equity background, are used to having typical M&A

25   transactions having two bankers involved.  And, in fact, I

1    think virtually all the bidders from the utility strategic

2    group that we have today have engaged two investment bankers

3    to help them with the transaction.  So we kicked around

4    whether, in fact, we needed a banker to be a second set of

5    eyes to Evercore.  And, you know, they -- so Bank of

6    America/Merrill Lynch was involved for two weeks, maybe

7    three weeks on a periphery but we never got to the point

8    where we had an engagement letter with them.  And we never

9    actually engaged Bank of America/Merrill Lynch.

10   Q    And what did the debtors ultimately conclude as to why

11   they didn't feel they needed Bank of America/Merrill Lynch?

12   A    Two things.  One is, you know, we knew hiring any

13   banker would mean clearing conflicts.  And we knew because

14   of our debt structure and the -- you know, that there's --

15   it's very difficult to find somebody who is clean of our

16   debt structure and hasn't participated somewhere in a DIP

17   loan or otherwise.  So Merrill Lynch -- Bank of

18   America/Merrill Lynch also knew that and agreed that if they

19   kind of shadowed this process for a couple weeks that

20   there'd be no fees and we'd walk away.  And ultimately, we

21   thought, jointly with Merrill Lynch, that those conflicts

22   probably didn't provide the benefit.  We were also looking

23   at additional fees that might be incurred.  And with no

24   disrespect to Bank of America and Merrill Lynch, we also

25   didn't see substantial new ideas or input that indicated to

1    us that the second set of eyes would offset the higher fees

2    or it would be worthwhile to try to deal with the conflicts

3    that we might have to clear.

4    Q    Sir, before we broke, you used the phrase "best of both

5    worlds".  Do you recall that?

6    A    I believe so.

7    Q    Okay.  Sir, can you explain to the Court what you meant

8    by what is the best of both worlds?

9    A    I simply meant it in this respect.  That, you know, you

10   could lock up a stalking horse bidder or have a process that

11   allowed potentially more than one stalking horse to be

12   involved.  And that went back to the Lazard concern that if

13   we locked up NextEra, that may preclude other good potential

14   buyers of this asset to be involved.  And if they weren't

15   involved in the stalking horse process, the fact that we had

16   an open bidding process and an auction on the back end, they

17   might -- certain utilities might not want to participate on

18   the back end only if they have the chance to be the stalking

19   horse.  So what we did was, okay, let's make the stalking

20   horse process wider but still retain the back end because,

21   as we know, there's no such thing as an ultimate conclusion

22   about who will participate.  Nobody knows.  And, in fact, as

23   we know, NextEra jumped the second lien DIP bid without

24   being invited into the process.  So it's certainly not

25   without precedent that they would do that.  But to be

1    cautious and, in my words, the best of both worlds would be

2    to invite as many bidders in whatever part of the process

3    they wanted to participate in with our primary goal being to

4    maximize value.

5    Q    And, sir, why file a motion seeking approval of the

6    proposed bid procedures?

7    A    Well, similarly, one of the things about a conservative

8    group like the utility industry is -- and the reason they

9    don't like to jump bids -- you know, we had gone through a

10   very public process with the second lien -- or, I'm sorry --

11   with the unsecured PIKs.  And they knew NextEra was

12   involved.  So many of the questions we received were is this

13   a closed process, is this a done deal, are we wasting our

14   time.  So we thought that input from the market together

15   with some of the creditors also saying the fact that we had

16   done the second lien DIP and the RSA without a lot of

17   creditor input -- I'm sure people would agree with that --

18   that, you know, a more open process where we seek to receive

19   input from the creditors is a better way to go to ultimately

20   get to the plan of reorganization.  And I took that, as did

21   Mike Cerchiaro and our board and our team, very, very

22   seriously.

23        So when we put all those things together, we thought

24   that the creditors would be happier with transparency over

25   the process, that the bidders that you really can't get

1    better assurance to the market that it'll be an open process

2    and that everybody has a fair shot than to have the Court

3    oversee it.  So when we put those together, ultimately,

4    Evercore, Kirkland and our team thought that that was the

5    best way to take that input and act on it.

6    Q    And, sir, just turning to the substance of the bidding

7    procedures for a moment, what's your understanding the

8    process provided for in the bid procedures just as a higher

9    level?

10   A    Well, at a high level, it's to have the process that we

11   have undertaken to date and that is to give bidders an

12   opportunity to become the stalking horse, to narrow down

13   stalking horse bids, have them mark up term sheets, and

14   ultimately, get to a definitive agreement with a stalking

15   horse that we would then file in a motion with the Court for

16   approval.  And then upon that approval, we would open an

17   open bidding process of 30 days culminating with an auction.

18   Q    And, sir, is it your understanding under the bid

19   procedures order that the debtors could potentially modify

20   those procedures?

21   A    Yes.

22   Q    What's the current thinking on the debtors of whether

23   any modification is necessary?

24   A    As of today, we would not modify any of the procedures

25   but sitting in court over the last couple days and just

1    hearing different types of transactions and taxable

2    transactions and potential conflicts, there's just too many

3    potential variables here to say that we will only apply

4    these evaluation procedures and not need some flexibility to

5    make sure we exercise our fiduciary duty and maximize the

6    values to the estate.

7    Q    And, sir, after the decision at the board meeting on

8    August 26th to go for path B instead of path A, were there

9    other additional board meetings?

10   A    Yes.  The -- so I think that brings us to August 26th

11   when we -- I think the next day we notified the Court of the

12   path we were going to take.  I think Mr. Sassower did that

13   verbally.  I also went from that board meeting and told

14   NextEra that we are changing paths.  Shortly thereafter,

15   they formally withdrew their bid, as we expected them to.

16   And then I believe, it was after Labor Day that we continued

17   meetings with the creditor group and received some more

18   input that, while I think -- I won't characterize what they

19   thought of the approach we were taking with respect to the

20   bid procedure motion.  There were a lot of questions about

21   it, of course, that we tried to answer.

22           But the one significant piece of input that I

23   recall that occurred at that point was that we should

24   solicit taxable bids.  And that was the main change that we

25   made just before we filed the motion in whenever it was --

1    mid-September.

2    Q    And, sir, you mentioned the August meetings with the

3    creditor groups.  Sir, did you meet with all the creditor

4    groups in September that you did in August?  Meaning, their

5    advisors of those creditor groups.

6    A    Yes.

7    Q    Did you also have a meeting with some principals as

8    well?

9    A    We did.

10   Q    And was -- including a meeting with the principals for

11   the official committee of unsecured creditors?

12   A    Yes, we did.

13   Q    And, sir, what board involvement was there in the final

14   decision to expand to consider taxable transactions?

15   A    We had informed the board, I believe on the September

16   5th meeting, that we were going out to meet with creditor

17   groups.  But ultimately, the decision to go to a taxable --

18   you know, to solicit taxable transactions as well was not

19   the subject of a board meeting but was the subject of a

20   board update by Ms. Doré.  She signed an email telling them

21   that we had received that input and that's the approach we

22   recommended taking and that we were available to answer any

23   questions that the board might have.

24          MR. SHORE:  Objection, Your Honor.  Motion to

25   strike that last answer.  They can't not produce the emails

1    in discovery based upon privilege and then have the witness

2    just come out and say there's an email that responds to

3    counsel's questions.

4              MR. MCKANE:  Your Honor, there's nothing of a

5    substance of that communication that was important other

6    than what you would put on a privilege log which is that the

7    general counsel communicated to the board of directors an

8    update regarding the bid procedures.  That was all that was

9    elicited.

10             THE COURT:  And solicited -- no.  There is

11   something substan -- and we won't answer any questions if

12   you have them.  That's a substantive communication.

13             MR. MCKANE:  Well, yeah.  I wasn't trying to

14   elicit the substance of --

15             THE COURT:  But you did.

16             MR. MCKANE:  I'll reask it and --

17             THE COURT:  All right.  Answer stricken.

18   BY MR. MCKANE:

19   Q    All right.  So let's be precise here, Mr. Keglevic.

20   All I want to know is the manner in which the board was

21   updated regarding the status of the bid procedures.

22   A    For that last change which I believe was the last

23   substantive change that we made before filing and since we

24   had updated the board on September 5th, there was an email.

25   Q    Thank you.  Sir, in evaluating the overall bid

1    procedures, what factors in your own mind make you

2    comfortable with the fact that these bid procedures are

3    reasonable?

4    A    Look, we're relying heavily on our counsel and our

5    advisor and their backgrounds and their knowledge of not

6    only the bankruptcy process but of capital markets, merger

7    and acquisition processes to come up with them.  We also

8    have a board that is quite experienced in mergers and

9    acquisitions and, in fact, some of them have been involved

10   in bankruptcy.  So we have a, I would think, one of the

11   highest financial acumen boards out there.  And, you know,

12   I've been in finance for a long time myself.  So I think as

13   we, as a company, looked at it, it looked like a reasonable

14   process.  Further, as we shared the process and the market

15   got the updated process, we didn't receive any comments that

16   the market objected to the process.  So, in fact, we were

17   adding bidders, not subtracting bidders as a result of the

18   process which was the intended result.

19   Q    And today, are you aware of any complaints from

20   potential bidders about the procedures of the timing?

21   A    No.

22   Q    And, sir -- let me just pause here.  Can you just

23   describe to the Court what exactly are the debtors selling?

24   A    The debtors are selling the equity in reorganized EFH

25   which, fundamentally, would be -- the way I would describe

1    it in laymen's terms is clean title to the their ownership

2    through the chain of EFIH and Oncor Holdings of the 80

3    percent stock of Oncor.  That allows whoever buys

4    reorganized EFH to get that asset with, generally speaking,

5    no other liabilities, no other assets and to retain the

6    economic interest in the 80 percent of Oncor.

7    Q    And, sir, if -- are you open to any and all manners in

8    which in that proposed acquisition can come in?

9    A    Yes.  We wouldn't have set out the bidding procedures

10   if we weren't.

11   Q    And, sir, how do the debtors view the objectives of the

12   bid procedures process?

13   A    Primarily, two-fold.  And that is to maximize the value

14   for the estates and to minimize market risk going forward

15   and set a floor to do that.

16   Q    And, sir, how do you understand the debtors propose to

17   minimize the risk going forward including a potential floor?

18   A    Just by selecting a stalking horse bidder at a price

19   and with terms that we can hold them to.

20   Q    And, sir, how do you evaluate the risk associated with

21   the market going down -- or the value of Oncor to declining?

22   A    You know, I don't know that anybody can say which way

23   markets are going to go up or down.  At the end of the day,

24   we are much closer to historic highs than we are at historic

25   lows.  So locking in somewhere close to a historic high with

1    a modest, although we don't have any deal so we don't know

2    what the fiduciary out or the topping fee would be, I think

3    is an appropriate business judgment for the estate to make.

4    Q    And, sir, you mentioned that the market is closer to

5    historic highs than historic lows.  Specifically, what are

6    you referring to in terms of what is closer to historic

7    highs?

8    A    Well, the multiples we've seen in the bids that we

9    received -- and I'll just use, since we don't want to

10   disclose any bid information other than the NextEra bid, the

11   NextEra roughly worked out at about a 26 times price

12   earnings multiple.  And that is substantially higher than

13   where the indexes are trading now.  The general index is

14   trading now higher than it has been over the last five

15   years.  So it's -- you know, while -- I won't suggest that I

16   have the foresight into what the markets are going to do in

17   the future.  Everything else being equal when looking at

18   historical data, I think there's more asymmetrical risk down

19   than there is up.

20   Q    And, sir, are there other variables that the debtors

21   took into consideration in terms of why they are commencing

22   the sales process for that Oncor asset now?

23   A    Primarily, to maximize the value to the estates and to

24   provide an opportunity to hopefully have creditors

25   understand what the amount of proceeds will be available to

1    split up.

2    Q    Is the existence of interested potential buyers a

3    factor?

4    A    Yes.  Certainly, the fact that we have today buyers, we

5    have a good price.  We have a capital market -- the capital

6    markets are at historically low interest rates so we have an

7    ability to finance at low cost -- or the buyers have the

8    ability to finance at low cost.  All those things weigh into

9    why now would seem like a good time.

10   Q    And, sir, did you discuss whether this is a good time

11   to potentially put the Oncor asset up for sale with anyone

12   other than Oncor -- excuse me -- anyone other than Evercore?

13   A    Yes.  It was a discussion at the board meetings

14   routinely as we got rid of -- well, first, when the RSA went

15   away and we were receiving topping bids from both the PIKs

16   and from NextEra, obviously, we discussed with the board the

17   fact that the market was headed in a very positive direction

18   and others were bidding higher amounts than we had

19   anticipated and we should take advantage of that trend and

20   try to lock one in with the opportunity that if a better bid

21   came on, have a modest topping fee.  And that was, I think,

22   the primary discussion and, as I said, we've got a very high

23   IQ finance type board who will have followed during the

24   course of the -- since the merger the value of Oncor,

25   whether it be through valuations we receive from Duff &

1    Phelps or compensation agreements that we had with the Oncor

2    management where values of the company were discussed and

3    set, that everybody knew that these multiples were

4    attractive.

5            MR. SHORE:  Objection to the form and extent he's

6    talking about what's in other people's head on the board.

7            THE COURT:  Speak just to yourself, Mr. Keglevic.

8    BY MR. MCKANE:

9    Q    Mr. Keglevic, just to make precise your testimony, to

10   the extent that you are reporting input from the board, is

11   that because there were specific board discussions over time

12   including in June of this year about whether the proposals

13   that you were receiving were attractive bids for Oncor?

14   A    Yes.  Certainly, my answer went to what I believe.  But

15   there were other board members who, you know, chimed in and

16   echoed that they believed it was a good price.

17           MR. MARTIN:  Objection.  Hearsay.

18           MR. MCKANE:  Your Honor --

19           THE COURT:  Overruled.

20   BY MR. MCKANE:

21   Q    And, sir, have the debtors evaluated the potential cost

22   and benefits of pursuing this marketing process at this

23   time?

24   A    We have not done a specific study or analysis of the

25   cost of all parties.  But as we look at this, eventually,

1    until a different structure or transaction comes up, we are

2    eventually going to sell this asset.  Whether it's taxable

3    or non-taxable, we think that given the way the market is

4    valuing assets and given the first liens continuously have

5    refused any ability to continue discussions of Olympus, we

6    think that's where we're going and that this work is going

7    to be work and time and effort that people would need to put

8    in.  So, you know, fundamentally, we don't see this in the

9    scheme of things and in locking in an attractive bid that

10   there's a substantial cost associated with this process.

11   Once again, also assuming that the topping bid is, you know,

12   a modest topping bid.

13   Q    Yeah.  Let me go --

14   A    Excuse me.

15   Q    Let me go back on something you said, sir.  I believe

16   you said words to the effect of, essentially, we will sell

17   this asset.  Sir, why is that given the debtors' prior

18   efforts to do a structure like Olympus?

19   A    We spent a year and a half on Olympus and, at the end

20   of the day, it takes various groups of creditors to agree to

21   that structure.  And we do not have groups that are willing

22   to agree to the structure as we sit here today.  We were, in

23   fact, told, after we made the November 2013 interest

24   payment, never to use that word again in discussions with

25   either of the groups.  And they were just far apart on value

1    and we had substantially different types of investments

2    that, you know, some people want volatility and beta and

3    some people want a lower volatility and beta.  And as I sit

4    here today, I have not been able to convince anyone to

5    resurrect that concept.

6    Q    And, sir, you're aware that the Exhibit C to the bid

7    procedures order is a form of term sheet with an elicit

8    structure.  You're aware of that, right?

9    A    Yes.

10   Q    So why put in a proposed or elicit a structure of a

11   term sheet that -- with the bid procedures motion?

12   A    And I think, as I heard Mr. Hiltz testify, it's very

13   easy to do a taxable bid.  And I'm happy to elaborate on

14   that.  I'm sure we'll get into that in cross-examination.

15   But it's much more difficult and complex to do a non-taxable

16   transaction.  So we wanted to share the benefits of the

17   study that we had done with respect to the transaction.

18   Plus, as we -- once again, as we sit here today, the

19   valuation we did of incurring the tax before we signed the

20   RSA, and that was a valuation done by all the boards and the

21   independents on the boards, we still have a bias that we

22   believe the best transaction for the estates based on our

23   fiduciary duties would be non-taxable.  But, you know, that

24   doesn't mean that there is a better -- there's not a better

25   mouse trap out there and we're willing to see what -- and

1    evaluate whatever bids come in.

2    Q    And, sir, you mentioned the boards' consideration of a

3    taxable or a non-taxable transaction with the RSA.  Can you

4    expand on what evaluation the debtors' boards did before

5    entering into the RSA transaction on that issue?

6    A    Yes.  I know that each of the independent boards met

7    with counsel and -- with the independent board member for

8    each board and met with counsel and reviewed the

9    situation -- you know, that situation based on their

10   fiduciary duty thinking of that estate only and concluded

11   that it was still in the best interest of the estate not to

12   incur the tax.  And that was of the individual estates,

13   EFIH, EFH and TCEH.  So that process was undertaken before

14   we signed the RSA in probably beginning after the first of

15   the year in 2014 and culminating in the filing of bankruptcy

16   in April.

17   Q    Okay.  And, sir, is the structure that's included in

18   the proposed term sheet the only structure the debtors will

19   consider?

20   A    No.  We're happy to consider any structure, taxable or

21   non-taxable, that bidders come up with that ultimately

22   achieve our objectives here, and that's to maximize the

23   value of the estate, hopefully establish a floor that can be

24   the jumping off point for another bid auction process.

25   Q    And, sir, are the debtors concerned at all that the

1    inclusion of that term sheet would chill bidding in any way?

2    A    We've not gotten that input from the market.  The

3    market understood the non-taxable nature of it.  And we

4    think it is a very painful -- or painless -- I got to repeat

5    that -- painless --

6    Q    Freudian slip when you're testifying.

7    A    -- process for them to bid.  So we think it's -- we

8    received great feedback and, as I said, in most deals that

9    you look at, especially mergers, they're designed to not

10   incur the tax because ultimately it's a shift from the buyer

11   who potentially gets a tax basis write-up and the seller who

12   has to pay the tax.  The tax is paid on day 1.  And the

13   benefit of the tax basis through depreciation occurs over,

14   in the case of utility assets, generally 20 years or more.

15   So it's fundamentally, a shift of value between the two

16   parties that is very difficult to negotiate why I would sell

17   you something and pay more for your benefit and your benefit

18   alone.  And so, these utility buyers are highly

19   sophisticated and, like I said, the bid we got from NextEra

20   was, in fact, a tax free bid that took the RSA approach and

21   effectively spun it a little bit and, while generally

22   consistent with the tenants of the RSA bid, evolved it

23   further and I think made it more attractive to the market

24   where we could actually use third party NextEra stock which

25   was traded on the New York Stock Exchange in lieu of

1    reorganized EFH stock which wouldn't have a market value.

2    So that was a concept that they came up with without

3    consultation from us and that was reflected in their bid

4    that we have since adopted and reflected in the bid that was

5    attached to the bid procedures -- or the --

6    Q    Term sheet.

7    A    -- term sheet.  Thank you.

8    Q    Now, sir, are you aware that any proposed sale may not

9    close until December 2015 or later?

10   A    I think the date we had in the term sheet is December

11   31st.  That's to be negotiated but, sure, I -- you know, we

12   will -- we certainly understand that while utilities are

13   used to waiting a period of time to get their asset, that we

14   need time to get the plan of reorganization done and get the

15   regulatory approvals done.  And I don't think that's an

16   unreasonable estimate.

17   Q    And, sir, can you expand on your experience in

18   observing utility transactions about the delay that may be

19   incurred because of regulatory approval?

20   A    It's -- and I think Mr. Hiltz testified to this, but

21   generally speaking, it's not unusual for 12 to 18 months.  I

22   think he testified it was the last x number of deals they

23   looked at was 12.4 months or something.  But that's my

24   experience as well over the 30 some years I've spent in the

25   utility industry.  Each jurisdiction that you're buying

1   assets has different periods of time.  It depends on the

2   nature of the assets.  But six to twelve months for

3   regulatory approvals is not uncommon.

4   Q    And, sir, can you just explain to the Court why, in the

5   debtors' business judgment, it is in the best interest of

6   all the debtors to go forward with the bid procedures at

7   this time?

8   A    As I said, the market -- you know, we have buyers who

9   want to buy now.  We have capital markets that will finance

10  the cost of the acquisition at reasonable terms.  So there

11  is credit capacity as well as good rates.  We have high --

12  you know, closer to the highs than the lows in terms of

13  valuations based on the bids we have.  And we believe,

14  ultimately, the case is enhanced by having all the creditors

15  understand what kind of net proceeds there are to divide in

16  the plan of reorganization.

17          MR. MCKANE:  Your Honor, can I have one moment?

18  Your Honor, we have no further questions at this time.

19          THE COURT:  Okay.  Thank you.  All right.  We're

20  going to take a break and then we'll commence with cross

21  after lunch.  During the break, sir, you may not communicate

22  with anyone orally or in writing in connection with the

23  substance of your testimony.

24          Let's try to hit 3:15 on the nose if we can.  We

25  have a hard stop today at 5:30.  And, of course, I have all

1    of tomorrow available.  You know, we have a lot to do; I

2    realize that.  All right?  So we're in recess till 3:15.

3              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

4              MR. MCKANE:  Thank you, Your Honor.

5         (Recess at 2:08 p.m.)

6              THE CLERK:  All rise.

7              THE COURT:  Please be seated.  You may proceed.

8    CROSS-EXAMINATION

9    BY MR. WEISFELNER:

10   Q    Good afternoon, Mr. Keglevic.

11   A    Good afternoon, Mr. Weisfelner.

12   Q    I want to take you back to some of your direct

13   testimony, and I want to start with Project Olympus.

14             You testified that the debtors worked for, I think

15   you said a year or over a year, on trying to convince

16   various creditor constituents to support Project Olympus; do

17   you recall that?

18   A    Yes, sir.

19   Q    And Project Olympus was a structure that the debtor was

20   attempting to get consensus on which would have permitted

21   for a plan of reorganization pursuant to which there'd be no

22   deconsolidation or spin off either on the E side or the T

23   side, correct?

24   A    That's correct.

25   Q    And creditors would ultimately be sharing the value of

1    the EFH reorganized equity, correct?

2    A    Correct.

3    Q    And it would be an EFH reorganized entity that

4    continued to own indirectly the economic interests in Oncor,

5    correct?

6    A    That's correct.

7    Q    And that same set of creditors would continue to own

8    the economic interests on the T side of the equation, that

9    being Luminant and the other operating companies on the

10   T side of the equation?

11   A    That's also correct.

12   Q    And one of the benefits of Project Olympus, had it been

13   successful, it would have avoided a disconsolation tax,

14   correct?

15   A    That's correct.

16   Q    And I think you said that the problems you had at -- or

17   during Project Olympus was a disagreement among creditor

18   constituents regarding relative valuations, correct?

19   A    That was certainly the center -- central disagreement,

20   yes.

21   Q    Okay.  Let's see if we can't better understand who the

22   parties in interest were that couldn't come to an agreement

23   on the valuation on the E side versus a valuation on the

24   T side.

25           So you were involved at that point, were you not,

1    with representatives of the T side first lien creditors,

2    correct?

3    A    That's correct.

4    Q    And other than the T side first lien creditors, is it

5    fair to say that neither the second liens on the T side nor

6    the general unsecured bondholders on the T side were

7    actively involved in the prepetition Project Olympus

8    discussions?

9    A    That's correct.

10   Q    They focused primarily, at least on the T side, if not

11   exclusively, on the first lien creditors?

12   A    That's right.

13   Q    Okay.  Moving over to the E side of the equation am I

14   correct in recalling that the primary drivers of discussion

15   towards Project Olympus on the E side were first the EFIH

16   PIC notes, the general unsecured on the E side; is that

17   right?

18   A    That's correct.

19   Q    What other EFIH creditors, if any, were involved in the

20   Project Olympus dialogue?

21   A    No other EFIH creditors.

22   Q    Okay.  And I take it that there was some activity at

23   the EFH level, correct?

24   A    There was.  We -- they were also involved in the

25   discussions on the valuation.

1          And, Mr. Weisfelner, if I may, we did have

2     discussions with the EFIH first and second liens about

3     selling the make-whole claims, but I believe the assumption

4     was that we would -- they'd get paid in cash, that's why

5     they weren't involved in the valuation aspect of Olympus,

6     but they were involved in settling their credit claims.

7     Q    So tell me if this is a fair characterization.  As to

8     the battle on value I take it that the E side creditors,

9     primarily in the form of the EFIH PICs, were in the context

10    of a plan Olympus, ascribing a value for Oncor that was

11    higher than what the T side creditors were prepared to

12    accept.  Is that accurate?

13    A    That's correct.

14    Q    So again, the PICs were advocating a higher value for

15    Oncor than the T side first lien lenders were prepared to

16    acknowledge?

17    A    Yes.

18    Q    Okay.  And is it likewise the case that the T side

19    creditors were advocating for a higher value of what the

20    T side assets were worth than the E side PIC creditors were

21    prepared to acknowledge?

22    A    Originally that was the case, but ultimately Olympus

23    evolved and the last probably four to six months of

24    negotiation was that the T side creditors would have

25    effectively buy out the impaired creditors and own both the

1    E side and the T side.  So at that point the T valuation

2    really didn't matter, but early on it was going to be, as

3    you described, that both sides had a value, you put it

4    together, and based on those values that would tell you the

5    ownership up at EFH.

6    Q    Okay.  So with that clarification is it fair then to

7    characterize the failure of Project Olympus as centering

8    around disagreements over the value of Oncor?

9    A    Yes, that was probably the central problem.

10   Q    Okay.  Now, once the debtor -- and I think you then

11   told us that once the debtor made the determination

12   prepetition to pay the coupon, I think it was in November of

13   2013, that was due and owing to the unsecured T side

14   bondholders, you were then informed by the first lien

15   creditors that they were done having any discussions with

16   you surrounding Project Olympus.  Is that a fair

17   recharacterization of your testimony?

18   A    Yes, it is.

19   Q    Okay.  And at that point I assume the debtors then went

20   into full drive on what ultimately became -- came to be

21   known as the RSA, correct?

22   A    That's correct.  If -- we went and tried to determine

23   if there was a way we could split the company and do it in

24   an efficient manner.

25   Q    Okay.  And by efficient you mean a tax efficient

1    manner, correct?

2    A     A tax efficient manner.

3    Q     Because at that point the prime objective from the

4    debtors' perspective, isn't it the case, was the avoidance

5    of a massive multi-billion dollar stranded tax at the EFH

6    level?

7    A     Yes, that would be triggered by both sides separation.

8    Q     Okay.  And the concerns regarding a massive stranded

9    tax at EFH -- I just want to make sure that I've carefully

10   considered everything that the debtors were considering at

11   the time -- was having a multi-billion dollar stranded tax

12   at EFH could give rise to substantive objections by the

13   Internal Revenue Service that would impede, if not block,

14   any reorganization that the debtors were to pursue?

15   A     That was one of the issues, the other issues that were

16   considered were the risks associated with the TCEH estate

17   and the EFIH estate, and I think the tax memorandum

18   describes the various causes of action the IRS right take

19   either under state law or pursuing the RSA or the check the

20   box by some fiduciary.

21          So it wasn't only an EFH estate concern, as I

22   indicated, and the independent directors on both TCEH and

23   EFIH evaluated from their estate standpoint that tax too

24   before we sign onto the RSA.

25   Q     Okay.  And this tax evaluation that went on, as you

1    just indicated, took place prior to the RSA?

2    A    Yes.

3    Q    So it would have been at some point prepetition that

4    it's your testimony that the directors, including the

5    independent directors, passed on the tax structure that

6    ultimately became rolled into the RSA?

7    A    That's correct.

8    Q    Okay.  And just to make sure that we fully understand

9    what the risks are, and I'll approach this, but I'll make

10   sure the judge's line of sight isn't interrupted, one of the

11   concerns was a stranded tax at the EFH corporate level,

12   correct?

13   A    Yes, it -- they're the taxpayer, so for sure it would

14   be an EFH tax.

15   Q    Okay.  And the people most directly affected by a

16   stranded tax at the EFH corporate level, assuming no

17   opportunity either by the debtors to push down the tax or by

18   the IRS to somehow after the fact convert pass-through

19   entities from non-tax paying status to tax paying status,

20   and assuming no opportunity by the EFH board to check the

21   box and convert these into taxpayers, to take all that out

22   of the equation the concern at EFH corporation was having a

23   stranded tax that could adversely impact the interests of

24   the sponsors, correct?

25   A    Yes, of EFH shareholders, but you know, I do have to

1    elaborate, you just eliminated three risks that we

2    substantially, you know, believe are significant.

3    Q    And I'm going to go through them again --

4    A    Okay.

5    Q    -- just that you don't feel cheated out of an

6    opportunity to talk about them.

7              The risks are, and I agree with you that I

8    overlooked them completely, we're going to get back into it,

9    but risk number one is that EFH could check the box on the

10   disregarded entities down below on both the E side and the

11   T side, correct?

12   A    EFH or a fiduciary.

13   Q    Okay.  So this brings us back to one of my favorite

14   cross-examinations by Mr. Shore where he said, so in other

15   words, you being the CFO of both EFH and the T side, you in

16   effect righten yourself that you're going to check the box

17   on yourself to push the tax down.  Do you remember that sort

18   of line of questions about the risk associated with the

19   check the box?

20   A    I do remember, but I rarely have those kind of

21   discussions in my head.  When we had those discussions we

22   had a process where the independent director at each of

23   those boxes --

24   Q    Right.

25   A    -- was -- you know, had a meeting with our counsel --

1    Q    Right.

2    A    -- who reviewed with him the risk.

3    Q    Okay.  Now let's just focus again on check the box.

4         You would agree with me, would you not, that in

5    the tax memorandum that was recently filed by the debtors,

6    that tax memorandum addresses, does it not, among other

7    risks, the likelihood that EFH would seek to check the box

8    against either the T side or the E side of the house,

9    correct?

10   A    Yes, it raises that as a risk that some fiduciary at

11   EFH can make that decision.

12   Q    And then it goes through a whole bunch of reasons why

13   no fiduciary at EFH would seek to check the box against

14   either the T side or the E side.  Isn't that what the tax

15   memorandum does?

16   A    I think the memorandum tries to lay out both sides of

17   the coin and be as objective as possible with respect to the

18   risk.

19   Q    Okay.  Now the other risk that was identified in the

20   tax memorandum, and it's been around since RSA days, is the

21   risk that under the applicable tax sharing agreement, and

22   there's a separate tax sharing agreement on the Oncor side

23   and a separate tax sharing agreement on the TCEH side, the

24   other risk that's always been identified is that under those

25   tax sharing agreements EFH Corporation would be able in

1    effect to push the taxes down or charge the tax liability to

2    its subsidiaries under the preexisting tax sharing

3    agreements.  Is that a fair summary?

4    A    Yes, or pursue collection of those taxes from its

5    subsidiaries.

6    Q    Okay.  Now, all of those risks and all of those issues

7    and all of those potentially conflicting pulls and tugs

8    between the various estates, all of that I think you

9    testified on your direct were considered by the boards in

10   connection with the prepetition agreement to approve the

11   RSA, correct?

12   A    That's correct.

13   Q    Okay.  And that has to be true because the tax

14   structure that was embedded in the RSA is the same tax

15   structure, maybe with some recent improvements, but it's

16   basically the same tax structure as commonly underscores the

17   marketing effort that we're in court today on, correct?

18   A    Yes, it's generally takes advantage of a tax-free spin

19   in keeping the E side in place on assuring continuity of

20   interests.

21   Q    Okay.  So in that regard -- and I know you were here

22   during opening arguments, I saw you paying very careful

23   attention during all of them -- you heard at least I

24   characterize the current motion as in effect RSA 2.1.  Do

25   you recall that?

1    A    I did.

2    Q    Okay.  And you wouldn't disagree with me, would you, at

3    least as I relates to tax structuring the proposal that

4    you're moving forward on today, the sale of reorganized EFH

5    stock, has the exact same tax structure and perceived

6    benefits as the old RSA, correct?

7    A    That's correct.

8    Q    Okay.  Now, let's go back to the RSA.

9            In the RSA that was negotiated prepetition, and

10   let's just remind the Court and for the record, who the

11   parties to the RSA were.  All of the debtors -- all of the

12   debtors signed the RSA, correct?

13   A    Correct.

14   Q    Now on the T side, the first liens, you got a sign off

15   on behalf of the ad hoc committee of first lien holders,

16   correct?

17   A    That's right.

18   Q    And it's true, is it not, that the ad hoc group of

19   first lien lenders who signed onto the RSA represented less

20   than a majority of the first lien lenders on the T side?

21   A    Yes, I think it was 45 percent or so.

22   Q    Okay.  And you got a pretty healthy dose of folks on

23   the E side signing on, you got the PICs to sign on, correct?

24   A    That's right.

25   Q    And you got Fidelity and the rest of the EFH and EFIH

1     known creditors to sign off, correct?

2     A     I don't believe anybody up at EFH other than Fidelity

3     signed.

4     Q     Okay.  But at EFIH you had -- who, if anyone, at EFIH

5     among the seconds were signed onto the RSA?

6     A     We had some of the first and second lien holders at

7     EFIH, Fidelity had a position, Pimco had a position.  Those

8     are the two that I recall off the top of my head.

9     Q     Okay.  So when we refer back to your demonstrative in

10    terms of all the board meetings and update calls since July,

11    in point of fact even before the July board meeting that's

12    first listed here the board had generally considered and

13    approved in some form or another the existing tax structure,

14    the optimum tax structure, the efficient tax structure

15    that's being considered today?

16    A     That's correct.

17    Q     Okay.  So going through these board minutes we're not

18    changing anything about the tax structure when viewed from

19    the perspective of the boards?

20    A     Not from a global perspective that the RSA was

21    supporting a transaction to separate the company and not

22    incur tax, and the current approach is to separate the

23    company and not incur tax, although obviously we have, you

24    know, potentially -- obviously we're going to have an open

25    bid, and as you indicated earlier, a slightly enhanced tax

1    structure, but on the basic fundamentals of not incurring

2    the tax being in the best interest of the individual estates

3    our opinion has not changed.

4    Q    Okay.  Now, I just want to make sure that we all

5    understand one of the pieces of engineering for this tax-

6    free transaction with a particular focus on the T side.

7              Now, assuming that there is a successful

8    transaction on the E side pursuant to the current motion and

9    you get a buyer and court approval for in effect the sale

10   forward of EFH reorganized equity, that will then require on

11   the T side that there be the tax-free spin off that's

12   described in the tax memorandum, correct?

13   A    That's correct.

14   Q    And in particular what's going to happen is the first

15   lien creditors in order to compensate the T side of the

16   house for loss in step up in basis the debtors have managed

17   to engineer a process pursuant to which the first lien

18   lenders are going to get, I think it's been described as a

19   partial step up in basis, you've heard that terminology

20   before?

21   A    I have, and I can describe it if you'd like.

22   Q    And the partial step up in basis occurs for the benefit

23   of the first lien creditors because we're going to allow

24   them to utilize NOLs before we incur cancellation of

25   indebtedness income.  Is that your basic understanding?

1   A    Yes, that basically to the extent you have -- and we

2   would have NOLs at the EFH level and to the extent that TCEH

3   -- reorganized TCEH takes on more debt than the tax basis

4   associated with those assets, that is -- where there's a

5   step where we convert TCEH into a Delaware corporation which

6   then allows us to trigger by virtue of higher debt than tax

7   basis, a gain, that gain being offset by the NOLs at EFH,

8   makes it a basis write up without incurring any current

9   taxes.

10  Q    And just so we're all crystal clear, the engineering

11  that you're talking about where you incur debt in order to

12  change the basis so that the NOLs get used all of that and a

13  whole bunch of other aspects of the overall tax structure

14  was the subject of request to the IRS for I think it was 12

15  or 14 specific elements of an overall letter ruling.  Is

16  that -- is my recollection correct?

17  A    Your recollection is correct that we filed a memorandum

18  in support of a request for a private letter ruling with the

19  IRS.  I apologize, I probably should know, but I don't

20  recall exactly how many rulings were in that request, but it

21  was several.

22  Q    You said you filed a memorandum in support of a request

23  for a letter ruling.  It's true, is it not, that that

24  memorandum has never been shared with the junior T side

25  creditors?

1    A    I'm not aware if it has or has not been shared.

2    Q    Was the memorandum shared with the board of directors?

3    A    Certainly the board of directors is aware of the

4    requests, we reviewed with them the general content, the

5    preparation was done, I just don't recall if physically we

6    sent them a copy of the final memorandum, but I would say

7    the high points and the substance were reviewed with our

8    board.

9    Q    And just so we're clear, the timing of when this all

10   took place was before the filing of the petition, right?  In

11   other words there was a discussion and a negotiation, was

12   there not, between the first lien creditors and the debtors

13   as to what the substance of the tax ruling was going to be?

14   A    Yes, but we did not file with the IRS until after

15   filing for bankruptcy, because the IRS generally speaking

16   will not consider hypothetical transactions, they wanted to

17   see that there was an RSA and a bankruptcy, so we went

18   forward on that basis.

19   Q    Okay.  And as best as you can recall, when did the

20   debtor file their petitions?

21   A    April 29th, I believe.

22   Q    And how soon after filing the petitions did the debtor

23   go to the IRS with this request for letter rulings and its

24   support of memorandum?

25   A    I don't recall, but it was -- it might have been a

1    month or -- it wasn't long after we filed.  Obviously we

2    were interested in getting the clock started as soon as we

3    could, so we -- I just don't recall the date.

4    A    Okay.  And again, are you aware of any analysis to the

5    board regarding this tax memorandum, any board meeting at

6    which the substance of that tax memorandum and requested

7    ruling was presented to and approved and by the boards of

8    directors.

9    A    I recall several meetings where we had presentations to

10   the boards about the tax.  As you stated, under Olympus the

11   boards could evaluate not incurring the tax, and we changed

12   the structure, we went back to the boards after the January

13   time frame or before we filed to educate them on the new

14   structure, and then also before we filed our petition for

15   bankruptcy or restructuring we had those individual meetings

16   with the independent board members that I did not attend,

17   but those also occurred I think within, you know, weeks of

18   filing.

19   Q    Okay.  I'll tell you why I'm asking the question.  I'll

20   represent to you that none of the junior creditor

21   representatives have ever seen board minutes, board

22   presentation, board vote, board agenda that deals with the

23   tax-free structure that you're now making reference to.

24             MR. MCKANE:  Your Honor, I'm going to object to

25   that representation, because as you may recall there was

1    substantial discovery at the beginning of these bankruptcy

2    filings about our efforts to assume the RSA, and I can

3    represent to the Court that there were board presentations

4    that were produced and minutes that were produced in

5    redacted form to protect privilege as necessary that

6    specifically addressed the tax issues that are referring

7    this, including back in November and in January and in

8    April.

9              So, I think it's -- I object to the form of the

10   question because I know for a fact it is inaccurate.

11             MR. WEISFELNER:  I'm going to withdraw the

12   objection and try it this way.

13   BY MR. WEISFELNER:

14   Q    Have you seen the board minutes, the board

15   presentations, or the board agendas that were produced by

16   the debtors to the junior creditors on the T side consistent

17   with their discovery requests?

18   A    I have not.  I obviously saw the unredacted original

19   versions, but I have not seen the ones provided in

20   discovery.

21   Q    By the way, the effort to keep all of the companies

22   together and avoid deconsolidation you refer to as Project

23   Olympus.

24   A    Yes.

25   Q    Was there a project name given to the alternative which

1    underscored the RSA when the case filed?  Did you call it by

2    a different project name?

3    A    No, we did not.

4    Q    Okay.

5    A    We got out of the naming business after that.

6    Q    Okay.

7         (Laughter)

8    Q    For ease of reference would it be okay with you if we

9    refer to the alternative structure, the one that's reflected

10   in the tax memorandum, as the optimal --

11   A    Sure.

12   Q    -- structure?  Okay.

13            Now here's what I want to explore.  If the

14   debtors' motion were to be granted and you move forward and

15   anointed a stalking horse and had an auction and the winner

16   of the auction was the entity that paid the highest price

17   under the best deal terms for reorganized EFH securities, I

18   want to explore with you in that scenario, what, if any,

19   plan structures will be foreclosed to the debtors and their

20   creditors?  Are you with me as to what the purpose of this

21   next line of questioning would be?

22   A    I think I understand.

23   Q    Okay.  Absent the debtors exercising a fiduciary duty

24   out and paying a break-up fee, if we got to the end of this

25   process you would have foreclosed the option of getting back

1   the Project Olympus, correct?

2   A    Well, I want to make sure I understand the premise,

3   Mr. Weisfelner.  So you threw in there that we paid a break-

4   up fee.  I think the way we've described it as a topping

5   fee, but we only pay the topping fee if we close with

6   another bidder.  So in your scenario is it that we've

7   actually contracted and sold the E side?

8   Q    Let's take the confusion out of it, okay?  Assume that

9   the payment of the break-up fee is irrelevant.

10  A    Okay.

11  Q    Whether you trigger one or you don't trigger one.  All

12  I'm saying is if you get to the end of the current --

13  currently contemplated sale process, you select a winning

14  bidder for reorganized EFH stock, at that point, absent

15  throwing out the whole auction process, you'd be foreclosed,

16  would you not, from ever going back to Project Olympus?

17  A    I don't think necessarily so.  If -- we can't close

18  until we have a plan of reorganization.  If the creditors

19  are only willing to sign onto a keep the company together

20  Project Olympus approach, and especially in your example

21  where you don't have to pay anything to make the winning

22  bidder go away, I would assume we could emerge with that as

23  the plan of reorganization.

24  Q    But that's not the path on which you're currently

25  embarked, nor is it the path that any of the boards of

1    directors have currently contemplated, let alone approved,

2    correct?

3    A    Well to say we haven't contemplated Olympus in this

4    scenario we assume the parties aren't willing, but we

5    haven't foreclosed it, and if somebody brought us -- and I

6    heard the assumption that if somebody had an idea I'm happy

7    to hear it -- and at the end of the day we need a plan of

8    reorganization that the creditors sign on to, vote for, and

9    for emerge from bankruptcy, and if that's what it takes I

10   think this process -- assuming that's not the path we're

11   going to take -- but doesn't foreclose it if turned out to

12   be the preference of the creditors.

13   Q    Well here's what I'm confused about.  Going back to

14   Project Olympus you told us that the reason for its failure

15   was a disagreement among the EFIH PICs and the TCEH first

16   liens on the value of Oncor, right?

17   A    Right.

18   Q    And you told us that the PICs were ascribing more value

19   to Oncor than the TCEH first lien holders, correct?

20   A    That's correct.

21   Q    And now that the NextEra bid -- or not -- I don't want

22   to say now.  Strike that, move back.

23        When the NextEra bid came forward that represented

24   from the debtors' perspective the opportunity in effect to

25   have more value on the E side of the equation, correct?

1    A    That's right.

2    Q    Making it in your judgment more or less likely once

3    NextEra emerged to try and get back to a Project Olympus?

4    A    Based on the discussions I had, and I had substantial

5    discussions and negotiations between those two groups, the

6    PICs and the TCEH first liens, the TCEH first liens have

7    never indicated that they'd be willing to pay the price that

8    we see coming forward from NextEra and potentially other

9    bidders.

10   Q    What do you mean pay the price?

11   A    They would not assign the same value to the E side that

12   a strategic outside third party is willing to assign, and

13   that's why we moved down this path.

14   Q    Even after the NextEra bid just came on board?

15   A    Especially after the NextEra bid.  The NextEra bid was

16   substantially in excess of what the TCEH first lien holders

17   believed Oncor was worth to them.

18        Now obviously there are more financial buyers and

19   have different cost of capital than a NextEra or a strategic

20   would be, there could be a lot of reasons they came to that

21   conclusion, but at the end of the day, you know, to satisfy

22   the most creditors I could to get the highest price we think

23   the strategic, you know, bidder or maybe a financial bidder

24   or NextEra, other than the first lien lenders, is the best

25   path to go as we sit here today.  It doesn't foreclose the

1    first lien lenders for stepping up to the plate and making a

2    bid.  We'd love to have all the credit groups bid.

3    Q    Okay.  So among -- let me just make sure I understand

4    this.  So among the reasons why we now believe that Project

5    Olympus is not likely is because the first lien lenders on

6    the T side don't ascribe as high a value to Oncor if they

7    were to own it as the new owners of reorganized EFH equity

8    as they believe a strategic will ascribe to Oncor, they'd

9    rather have the cash proceeds than be stuck with the equity?

10   A    At the price that NextEra is bidding, that's correct.

11   Q    Okay.  Now, again, I want to get back to the thought

12   processes that the board went through.

13              So again, I think we've established that in terms

14   of pursuing a sale for reorganized EFH equity the program

15   we're embarking on from a tax structure is identical to the

16   program that underscored the RSA, correct?

17   A    It is -- both of them are tax free.  You know, I guess

18   fundamentally they're the same because they're both tax

19   free, they both contemplate a spin off, but as I said,

20   they're slightly different because of the enhancement that

21   we've received from the NextEra bid.

22   Q    Now when the board considered prepetition the wisdom of

23   the RSA they were simultaneously, were they not, considering

24   the wisdom of the second lien DIP facility as part and

25   parcel of the RSA, correct?

1    A    Well they considered -- you know, I think all elements

2    of the RSA could be independently, you know, considered.  I

3    can't speak for what, you know, percentage or what weight

4    each of the elements, but I think -- I know they considered

5    tax, I assume they also considered another element, the

6    second lien DIP.

7    Q    Okay.  Maybe you didn't hear or understand my question.

8    I apologize.  Let me try it again.

9         The second lien DIP was part and parcel of the

10   RSA, in other words the debtors having agreed to the RSA

11   were then committed, were they not, to pursue the second

12   lien DIP facility?

13   A    Yes, that was part of the RSA.

14   Q    Okay.  Now before I go further in my line of

15   questioning, you then said you thought that the RSA might be

16   considered independent of the second lien DIP depending on

17   creditor perspective.

18   A    Well, no, excuse me, but the part I was trying to

19   communicate is you can fundamentally decide as an

20   independent director, and I believe this is the way they

21   considered the problem, the tax impacts of each of the

22   estates and what that means to your fiduciary duties and to

23   creditor groups and the risks, you know, that we've talked

24   about previously, et cetera, whether or not you had an

25   element of the second lien DIP or not.  It happened to be a

1    feature of the RSA, but they weren't independent of each

2    other.

3    Q    Got it.  So now when the debtor came forward with the

4    second lien DIP it was -- and by the way, the PICs under the

5    RSA and pursuant to the second lien DIP, the concept then

6    was for the second lien DIP -- the second lien -- strike

7    that.

8              The concept under the RSA and the second lien DIP

9    facility was to have the EFIH PIC holders in effect obtain

10   the economic interests in Oncor on a post-reorganized basic,

11   correct?

12   A    That's right.  They effectively would have been the --

13   together with a small piece of the sponsors and some to the

14   EFH unsecured the majority owner of reorganized EFH equity.

15   Q    Okay.  And they were being facilitated in their efforts

16   in that regard by a particular entity who had both strategic

17   and financial implications.  I'm not sure whether you'd

18   characterize them as purely strategic, purely financial.

19   How would you have characterized them?

20   A    You know, because they have operations in Texas and I

21   guess I would probably have put them this strategic, but I

22   think the entity does many financial investments as well.  I

23   think in this case they were strategic the way I would have

24   thought about them, and they were also -- there was another

25   partner that I don't believe ever became public, maybe it

1    did, that was a pure financial as part of that group.  So

2    maybe that's the other thing that leans me toward calling

3    them a strategic.

4    Q    Okay.  Now in connection with the development of the

5    RSA there was no independent formal valuation --

6    A    That's correct.

7    Q    -- that was provided to the boards -- any of the

8    boards, correct?

9    A    That's correct.

10   Q    By the way, do you recall when the independent

11   directors, Mr. Sawyer or Mr. Cremens, undertook their roles

12   -- they respective roles?

13   A    I don't recall.

14   Q    Do you recall if it was pre or post-petition?

15   A    It was pre.

16   Q    Okay.  And --

17   A    And then I recall them -- and my memory might be wrong

18   here -- but I recall them being around when we -- in

19   November when we made the interest payment.

20   Q    Do you recall if they were around when you were

21   pressing for Project Olympus?

22   A    Oh, yes.

23   Q    Okay.  So then it had to predate November, because I

24   think you testified that once you made the interest payment

25   in November Project Olympus, at least from the perspective

1    of the first lien TCEH creditors, was gone.

2    A    Well they weren't around -- you're -- we explained to

3    them what had failed and brought them up to speed on the

4    Project Olympus negotiations, discussions why we had to

5    explore another alternative, so they weren't necessarily as

6    involved as the other directors because it had been going on

7    for a long time, but they certainly got up to speed as to

8    where we had been and why we were moving into a different

9    direction.

10   Q    Okay.  So now you're at a point -- I just want to sort

11   of get you situated -- you're at a point in time where the

12   petition has been filed, Project Olympus is gone, you've

13   developed this new optimum tax structure, and it's embedded

14   within the RSA and the second lien DIP.  Now at some point

15   during that process NextEra emerges and appear to be

16   offering a higher value than was implied in the second lien

17   DIP, correct?

18   A    Yes, at least a higher purchase price.

19   Q    Okay.  And by higher purchase price do you have a

20   recollection or order of magnitude how much higher NextEra's

21   now withdrawn bid gave you as a purchase price versus the

22   implied value in the second lien DIP proposal?

23   A    The last NextEra bid that with your withdrawn, so it

24   wasn't the first one, but I think the last one was roughly

25   on an enterprise value --

1          MR. MCKANE:  Your Honor, I apologize, but can I

2     just instruct the witness to only describe the NextEra bid

3     that was filed publicly in mid July and not any subsequent

4     negotiations (indiscernible) moment?

5          THE COURT:  (Indiscernible - 3:58:03).

6          MR. MCKANE:  Thank you.

7          THE WITNESS:  I understood the question.  So the

8     filed bid roughly we assigned an enterprise value of roughly

9     $18 billion, I believe the PIC valuation would have been in

10    the range if I -- and, I'm sorry, it's been a while -- 16.5.

11    BY MR. WEISFELNER:

12    Q    Okay.  So this mispricing of the value, if you will,

13    wasn't something that was picked up at the board level when

14    they signed onto the RSA or second lien DIP, right?

15    A    No, you know, we had just gone through lengthy

16    negotiations with the first lien lenders as to what they

17    thought the company was worth, and the PIC lenders as to

18    what they thought a company was worth, and I'll tell you

19    both -- and the EFH unsecured lenders as to what they

20    thought the company was worth, so we weren't alone.  I think

21    none of us assumed we could get the price in the multiple

22    that we ended up getting from NextEra.

23    Q    Do you in retrospect think that had you asked Evercore

24    to give you a formal valuation of Oncor before you entered

25    into the RSA and second lien DIP you could have avoided the

1    surprise of NextEra's bid at higher values and higher

2    multiples?

3    A    I've thought often about that.  I think the problem a

4    lot of times with valuation is you get caught up into the

5    specifics as market multiples, and where we got to with

6    NextEra was substantially above a multiple range that you

7    would have expected based on typical valuation work and my

8    experience them to get.  And, you know, I don't know if

9    that's potentially we didn't understand from a strategic

10   standpoint the right cost of capital, we certainly

11   considered whether a buyer would go to a REIT structure,

12   which would eliminate income taxes, which could create

13   higher value, but frankly, the multiples back then that we

14   were looking at were not supporting that.

15              Now, maybe, but my -- you know, my understanding

16   of, you know, that I got everything but the pieces of paper,

17   and I think I have testified to in the past, that Mr. Ying

18   talked about that he thought that was a fair value that we

19   were getting for the PIC based on normal multiples and some

20   valuation work.  He -- potentially had we gone the full

21   route we may have gotten a different answer, but --

22   Q    Here's the thing --

23   A    -- I think a lot of very smart financially savvy people

24   were surprised at the level of interest and the bids we're

25   currently getting, and that's why we changed course.

1   Q    See let me tell you where I'm confused.  When we were

2   talking about Project Olympus from the perspective of the

3   first lien lenders you pointed out something that I guess

4   hadn't really occurred to me before, and you said that when

5   viewed from their perspective as a group of financial

6   players and distressed hedge funds at that, they viewed the

7   value of Oncor that they were going to own in a Project

8   Olympus as being different and worth less to them than Oncor

9   might be worth to some strategic buyer or maybe even some

10  combination of a strategic and financial buyer.  Did I --

11  A    That's one of the things I think happened.  I think

12  they -- to be clear, I don't know what was in head other

13  than they were focused on PE multiples, and based on PE

14  multiples they could not get to the Oncor valuation that the

15  PICs or we were ascribing.

16          And, you know, as I've learned since and tried to

17  evaluate why a strategic might be bidding higher, that's my

18  thinking that obviously one of the things that lesson

19  learned might be that different people with different cost

20  capital, different interest, different elements of the bid,

21  that assets are worth more to some people than they are to

22  others, because there's unique, you know, intrinsic issues

23  associated with potentially another utility in Texas that

24  might have, you know, (indiscernible - 4:20:18) energies

25  that obviously the first liens wouldn't have, et cetera.

1   Q    Okay.

2   A    So, you know, we're -- before we finish this process

3   and decide on the stalking horse and make the decision as to

4   whether it's an appropriate bid we are going to go through

5   all those pieces of paper to make sure before we're

6   committed we think we got a good deal.

7   Q    Okay.  And again, and then I want to move away from

8   this topic, but there was nothing stopping you when you

9   considered the RSA to getting all of those pieces of paper

10  together and getting a formal written valuation from

11  Evercore was there?

12  A    There was not.

13  Q    And before you came into court with this bidding

14  procedures motion there was nothing that stopped you from

15  asking Evercore to give you a formal written valuation of

16  Oncor was there?

17  A    No, there was not, but if I may add, Your Honor, just

18   -- I think frankly because we had multiple bids, market

19  knowledge, we had more information this time around than we

20  did last time.

21  Q    Okay.  And again, in your mind that helps understand

22  why you're still not going to Evercore to ask them for a

23  formal valuation, although you do intend to do Evercore to

24  get a formal valuation before the boards are asked to

25  approve a stalking horse bid, right?

1    A    That's correct, we're going to get that before we lock

2    anything in.  This was a procedural motion and we thought we

3    had enough information as to why now, but we don't have

4    enough information to lock in, you know, a contract and set

5    a floor.

6    Q    Okay.  So now we're in the period of time, the July

7    time frame, the debtor withdraws the RSA, and the reason --

8    among the reasons you've identified for withdrawing the RSA

9    was the existence of the NextEra bid, correct?

10   A    Correct.

11   Q    Okay.  Now, you go back to the board and at that point

12   the only thing the board is being asked to consider -- well,

13   let me run through the issues.  The board is then being

14   asked to consider should we formally withdraw the RSA,

15   correct?

16   A    That was the first question, correct.

17   Q    And in connection with that determination should we

18   withdraw the RSA they were simultaneously considering what

19   do we do with the NextEra bid, correct?

20   A    Yes, the where do we go from here question.

21   Q    Okay.  And the real issue in front of the board at that

22   point was do we do Keglevic's plan A or plan B, that being

23   the choice between let's take all the noise out of this

24   equation, let's sit with NextEra, let's get them to be the

25   stalking horse, figure out what the terms are, we'll come

```
 1   into court, we'll get that approved.  That was where -- I
 2   can't remember if that was path A or path B.
 3   A     That's A.
 4   Q     That's A.  Okay.  So they were considering path A
 5   versus path B, path B being the one informed by Lazard's
 6   opinion that utilities don't jump each others bids, so if
 7   you really want to make sure you have a robust auction have
 8   an auction for the stalking horse position versus having an
 9   open auction after you've picked the stalking horse, right?
10   A     Yes.  Let me just -- but to make sure we're in the
11   right time frame.  When -- the meeting where we said no RSA
12   and where do we go from here, it was only path A.
13   Q     Okay.
14   A     Path B only came up as we got a little more market
15   knowledge, Lazard input, et cetera.
16   Q     Thank you.
17         Now, when the boards were going through these
18   deliberations and discussions, it's true, is it not, that
19   they didn't give any consideration following the termination
20   or in connection with the termination of the RSA to changing
21   the optimal tax structure?
22   A     No, they did not.
23   Q     All they were considering was the methodology for
24   moving forward on the sale of reorganized EFH and a tax-free
25   spin for the T side of the equation, right?
```

1    A    That's true, their opinions on the advisability of tax

2    free versus taxable had not changed since we signed the RSA.

3    Q    Okay.  Now, you said to me -- or you said during your

4    direct -- one more question, I'm sorry.  Go back to the RSA.

5         Were there any deadlines under the RSA for getting

6    to a confirmed plan or plans for both the T side and the

7    E side?

8    A    Yes.

9    Q    Where were those deadlines embedded, where do we see

10   them?

11   A    Well, I remember in my mind that, you know, there were

12   different dates that made the RSA -- you know, that were

13   walk rights if we didn't achieve certain milestones, and I

14   want to say there was an April 1st, you know, 2014, so

15   basically, you know -- and then maybe with some contingency

16   -- so it was basically a year plan to get to confirmation is

17   my recollection of what the RSA said.

18   Q    Okay.  Well when you say it was your plan, can you

19   remember what the outside drop dead date was in the RSA?

20   A    I think it was a year or so, but I know there were

21   some, you know, potential add-ons to the last date under

22   certain circumstances.

23   Q    So under the RSA you were looking at an April 2015 walk

24   away right for the creditors who signed on in the event

25   there was no plan by that date, right?

1   A    That's my general understanding, and like I said, I'm

2   not sure if there was some conditional extensions that we

3   could have invoked.

4   Q    Okay.

5   A    But it was a significantly shorter time frame than

6   December 31st, 2015.

7   Q    Okay.  Now you also testified during direct that when

8   the RSA got terminated there were no break-up fees or

9   termination fees.  Do you recall giving us that testimony?

10  A    Yes.

11  Q    Oh, but in point of fact you had already prepaid all

12  the fees under the RSA; isn't that right?

13  A    I don't know what fees you're referring to.

14  Q    Okay.  The $100 million estimated that you paid to a

15  combination of -- and I'll list them, and you tell me if

16  I've missed anybody -- the first lien law firm that

17  represents the ad hoc, you paid them, right?  Prepetition?

18  A    I believe we did.

19  Q    You paid their financial advisors didn't you?

20  A    I believe so.

21  Q    Okay.  You believe so or you know so, which is it?

22  A    It's been a long time, I'm -- I'm -- you know, if

23  you're willing to tell me that's what we did I'm sure I can

24  accept that.  I don't recall exactly who we paid and who we

25  didn't pay.

1   Q    Here's question I have for you.  Prior to the filing of

2   the petition and in connection with securing the RSA the

3   debtors paid approximately $100 million in fees to third

4   parties.  Do you recall that?

5   A    I know we paid fees to third parties, I don't know that

6   I actually saw the list that equals $100 million.

7   Q    Okay.  But you're not debating me that you --

8   A    I'm not debating you.  It might have been in that

9   range.

10  Q    Okay.

11  A    We paid our advisors, we paid some creditor advisors,

12  especially the parties that had signed onto the RSA, that's

13  correct.

14  Q    You paid the sponsors' lawyers and their advisors too,

15  right?  They were part of the people that got paid for

16  entering into the RSA?

17  A    Yeah, I believe we were required to under the contract

18  we have with the sponsors.

19  Q    Okay.  And you paid the PICs and their advisors, right?

20  A    Yes, they're a party to the RSA.

21  Q    Okay.  The only parties that didn't get paid as part of

22  the RSA were the junior T side creditors, correct?

23  A    I'm not sure we paid the other EFH creditors, and there

24  might have been some of the first lien and second lien.  I'm

25  sure we didn't pay all the first lien, second lien on EFIH.

1    So there was more at the party than just the T side juniors.

2    Q    You mean more that weren't invited to the party, right?

3    A    Well, I didn't say it was a happy party, but --

4    Q    Okay.  Now, I'd like to see if I can't get you the

5    clear up some confusion that I was left with after

6    Mr. Hiltz' testimony, and it goes into a little bit of the

7    weeds on the tax structure.

8           I guess as I understood it, getting into the weeds

9    of the tax structure that you anticipate receiving and you

10   anticipate blessing, the buyer would be paying or making

11   available its own stock, correct, as part of the purchase

12   price?

13   A    Yes, there's probably going to be some stock associated

14   with the purchase price.

15   Q    And it was also going to be making valuable some cash

16   as part of the purchase price?

17   A    Yes.

18   Q    And then I thought I heard Mr. Hiltz explain for the

19   first time, at least to my knowledge, that there may be a

20   brand new wrinkle where the bidder didn't have to pay or use

21   any of its stock, it could do it all in cash.  Is that

22   accurate?

23   A    I didn't hear Mr. Hiltz say that, but that's not the --

24   and I'm happy to go through this with you -- that's not the

25   transaction that I think we contemplate.

1    Q    Okay.  So in fact the transaction --

2    A    There'd be some element of stock as I understand it.

3    Q    Okay.  And by the way, in terms of the amount of

4    reorganized EFH stock that's available, the bidder cannot

5    acquire, can it, more than a majority of the reorganized EFH

6    stock, correct, in the first step?

7    A    Yes, in the first step that's terrific that you know

8    the first step.  Yes, that's correct.

9    Q    Okay.  And the subsequent steps, as I understand it, is

10   the stock that at least for an instant is going out the door

11   to E side creditors, that stock is subject, if you will, to

12   a call by the successful bidder so that at the end of the

13   day the successful bidder gets the less than a majority of

14   stock that it got in step one, plus whatever claws back from

15   EFIH creditors in step two.  Is that accurate?

16   A    I'd rather restate that my way for you, and I know

17   Mr. Hiltz also talked about the intercompany loan, which if

18   with your permission, I don't think it'll take very long.

19   Q    I'll tell you what, I think only given the time of

20   day --

21   A    Okay.

22   Q    -- I'm going to leave that to any questions the judge

23   may have, other people may have, I want to move on to

24   something else because I know it's very comply indicated.  I

25   just wanted to clear up that one issue that I got confused

1    from in Mr. Hiltz' testimony where he seemed to suggest that

2    we've now developed a brand new wrinkle where we could take

3    100 percent of the purchase price in cash.

4    A    No, that's -- I think Mr. Hiltz must have misspoke if

5    he said that.

6              At the end of the day whatever the group is that

7    is the impaired class let's say, so if we clear the EFIH

8    stack and then the bid somehow ends in the middle of the EFH

9    unsecured stack that stack can receive up to 49 percent in

10   cash and the rest of the consideration has to be equity.

11             If it clears the EFH unsecured stack and is at the

12   sponsor level, at least for a moment for claims and other

13   things might be adjudicated and considered, whatever that

14   amount is has to have the same relationship of 49 percent

15   and 51 percent; 49 percent cash, 51.

16             So in the scenario that I'm sure, you know, that

17   people have thought about, if the T side had claims at that

18   level from the sponsors that claim is to be settled in what

19   the sponsors get, which would be 49 percent cash and 51

20   percent equity.

21             Now the bidder might bid a higher percentage of

22   stock, but at the end of the day that continuity of interest

23   requires that kind of set up.

24   Q    Okay.  Thank you for that.

25             I want to get back to again clarify what I

1    understood from your direct versus Mr. Hiltz' direct, and

2    that is the reasons why plan B was developed and opted for

3    versus plan A.  And just so the record is plan, why you

4    decided to go to a two-step process where you have an

5    auction for the stalking horse position and then you go down

6    the road.

7              You talked about two issues, and I thought

8    Mr. Hiltz talked about three, so I want to make sure I'm

9    clear.

10             What I heard you talk about was that we went to a

11   two-stage process because you got creditor input that

12   strategics in this area don't like to jump each others

13   deals, right?  And number two, there wasn't enough time,

14   because if people were going to compete to be the stalking

15   horse in an out-of-court process they didn't feel as though

16   they had -- they didn't know what the time frames were and

17   they thought it was too short.  Those are the two issues I

18   heard you testify to.

19             Isn't it the case that the other major reason why

20   you decided to go to a two-step process was because

21   negotiations with NextEra weren't going that well?

22   A    That's a qualitative, you know, assessment.  You know,

23   I don't know that I ever have negotiations that go as well

24   as I want them to go.

25             We had higher expectations in our negotiations

1    with NextEra than we were able to deliver on, but you know,

2    had we not had the other two issues that I mentioned we

3    might have been able to continue those and get to the right

4    spot.

5             So that's why I didn't mention it, it -- you know,

6    you can't go in the middle of negotiations and take the

7    temperature that day and say whether they're going to end up

8    good or not, and they certainly weren't as where I wanted

9    them to be at that date, that might have put more pressure

10   to continue with the stalking horse, it alleviated some of

11   the pressure, but I still stand by my directive, it was the

12   other two reasons were the more primary reasons.

13   Q    Well now let me see if I understand this.  When

14   Mr. Hiltz was testifying, and I think even when you were

15   testifying, you talked about the timing of presenting to

16   whatever prospective bidders are left your draft form

17   contract for them to consider a mark up.  Do you recall that

18   testimony?

19   A    Yes.

20   Q    Okay.  Now the timing of when the debtors currently

21   anticipate making their form contract available to

22   prospective bidders is on or about when?

23   A    By November 7th I think is the date in the motion.

24   Q    Okay.  So it is fair then to assume --

25   A    I'm sorry, Mr. Weisfelner, we're going to give it as

1   soon as we pick the -- you know, the final list, and then

2   they have to November 7th to get back to us with a mark up.

3   Q    Okay.  So in fact you're going deliver something for

4   people to review and mark up some time before November 7th?

5   A    Yes, sir.

6   Q    Okay.  Now may I safely assume therefore that you've

7   seen drafts at least of the contract that your team will

8   ultimately be presenting to prospective bidders?

9   A    Yes.

10  Q    And again, we want to be very careful not to identify

11  names of bidders or dollar amounts, but it's true, is it

12  not, that the debtors have yet to share that form contract

13  in draft form with any of the junior T side creditors?

14  A    Once again, I don't know what's been shared with you,

15  but I would not be surprised if that's the case since we

16  haven't finalized it among ourselves as a management team or

17  shared it with our board.

18  Q    And again, since you need to deliver it before

19  November 7th, so I'm going to give you the benefit of the

20  doubt and say you want to deliver it a week before the

21  deadline, so that's the end of this month and we're about 11

22  days before the end of this month, so wouldn't that next

23  11-day period, when is it that you suppose you're going to

24  get firm enough on this proposed contract that's not going

25  to have any bidder name in it, isn't going to have any

1    bidder dollar amount in it, where you would then feel

2    comfortable sharing it with your creditor constituency?

3    A    I'd have to talk to my legal team about when we share

4    it, but I think that document will be complete here in the

5    next few day.

6    Q    Okay.  Have you talked to your legal team about the

7    propriety or benefits to be derived in sharing the contract

8    with your creditor constituency?

9    A    I've not specifically asked that question, but as I

10   said, we've attempted to have a lot of discussions with

11   creditor groups and get input on types of language, types of

12   things they were concerned about, et cetera.  I'll be happy

13   to ask them that question.

14   Q    Okay.  You haven't had a single solitary conversation

15   with the second lien lenders or any of their representatives

16   about what the contract ought to contain by way of a

17   material adverse change clause have you?

18   A    I have not.

19   Q    You haven't had a single solitary discussion with any

20   representative of the second lien creditors about what the

21   size of an appropriate break-up fee is, have you?

22   A    No.

23   Q    You haven't had a single solitary communication with

24   any of the T side junior creditors as to whether or not you

25   ought to shoot for a specific performance versus a reverse

1    break-up fee, have you?

2    A     We have not.

3    Q     And you haven't talked to any of the T side junior

4    creditors about the relative size of the break-up fee, the

5    reverse break-up fee that you'd want the bidder to pay for

6    failure to close, relative to the size of the break-up fee

7    that you'd be agreeing to, have you?

8    A     No.  But I think we're relying on our experience, that

9    we wanted it to be maximum terms, and I would assume we'd

10   align pretty closely on what the best terms possible should

11   be in those areas.

12   Q     But again, I'm asking you sitting here today, what is

13   the reason for the failure to have any communication within

14   the next -- you're, under best terms, 11 days away from

15   being able to produce a document to your perspective

16   bidders.  Tell me the reason why you haven't bothered to go

17   to any T side junior creditors before today to talk to us

18   about any of our views about any of those topics?

19   A     (No response).

20   Q     How about we write it off you've just been too busy.

21   Do you want to tell us that that's the reason?

22   A     I'm under oath.

23   Q     Okay.  Then tell us the real reason.

24   A     I don't -- I have not specifically thought about doing

25   that.  Like I said, we've solicited general feedback, we're

1    relying on experts to give us best possible deal terms, and

2    it's fundamentally at the end of the day it's a draft to be

3    negotiated.  So if we do a bad job, and we bring you a bad

4    deal, it doesn't have the right terms, then you don't have

5    to approve it.

6    Q    Right.  Let me go back to the chart, and I want to talk

7    to you about other potential plans that may be obviated or

8    knocked out of the box in terms of what happens if you go

9    forward and you sell forward to EFH equity in connection

10   with this tax free deal which requires plans on both sides,

11   and a tax free spin on the T side.

12          Now, yes or no, and I want to be very careful

13   here, because I don't want to tread on attorney/client

14   privilege.  So this, I'm warning you, you should only answer

15   yes or no, not the substance.

16          Has anybody from your team told you anything about

17   Momentive?

18   A    Yes.

19   Q    Okay.  Do you understand that under the decision that's

20   been recently filed in the Momentive case, there's a theory

21   under which one could restructure on a standalone basis and

22   absent the consent of first lien lenders, you could effect a

23   cram-up on the first lien lenders with low interest rate

24   paper?  Are you aware that that's what people commonly refer

25   to when they say Momentive?

1          MR. MCKANE:  Okay.  The second half of that

2  section is not the first half of that question -- the first

3  half of the question was are you aware of, and what it was

4  getting into was the substance of the communication --

5          THE COURT:  How do you -- to the first half.

6  BY MR. WEISFELNER:

7  Q    So let me try this again.  If your creditors had

8  exclusivity or alternatively if your T side creditors were

9  to enter into an agreement with you pursuant to which we

10  were going to collectively pursue a plan of reorganization,

11  the elements of which are we're going to provide the first

12  lien creditors with paper instead of cash or equity, we're

13  going to give them new debt with an interest rate in the 2

14  to 3 percent range.

15          Isn't it true that your sale of EFH reorganized

16  security would be antithetical to that plan moving forward,

17  yes or no?

18          MR. MCKANE:  Your Honor, I have to object there's

19  speculation there.  He's posing hypotheticals about things

20  that we would not have all the facts on, and he is not an

21  expert on this issue, he would consult with the experts.

22          THE COURT:  Response?

23          MR. WEISFELNER:  Your Honor, this is the witness

24  who's telling us that pursuit of this sale is in the best

25  interest of these estates, and he's the co-chief

1    restructuring officer who's had the benefit of restructuring

2    counsel and he's telling us this is the best alternative.

3            If I want to know if considered, they meaning the

4    management of the board, other what I think are obvious

5    available alternatives and the extent to which those

6    alternatives would be foreclosed.

7            I guess I could just ask the question, then leave

8    the rest for argument.

9    BY MR. WEISFELNER:

10   Q    Have you considered a Momentive type alternative plan,

11   yes or no?

12           MR. MCKANE:  And, Your Honor, Mr. Weisfelner in

13   his first two sentences said it all.  This is about a sale,

14   this is not about a sale.  This is a bid procedures motion,

15   and we are so far beyond whether -- about proper bid

16   procedures, we're discussing a hypothetical sale that we are

17   going to come back to you on for a later motion.  And to the

18   extent that we want to have a debate about whether they

19   consider the Momentive issue, we are months away from having

20   that hearing.

21           So I again object.  It's calling for speculation,

22   and to the extent he wants to talk about what he's

23   considered, he's going to pierce the privilege.

24           THE COURT:  I agree.

25           MR. WEISFELNER:  Okay.  Let me move on.

1    BY MR. WEISFELNER:

2    Q    Mr. Hiltz wasn't able to answer this question, maybe

3    you can.

4         It's true, is it not, that if the sale of

5    reorganized EFH equity occurs, Evercore will earn an

6    additional $9 million fee under the terms of their retention

7    agreement, right?

8    A    That's correct.

9    Q    Okay.  Let's talk about costs.  You understand, do you

10   not, as the chief restructuring officer that a debtor in

11   possession may not utilize estate property outside the

12   ordinary course without bankruptcy court approval?  Are you

13   generally aware of that restriction?

14   A    I am generally aware of that.

15   Q    Okay.  Carefully look around the courtroom, tell me how

16   many Kirkland & Ellis partners can you identify in the court

17   today?

18        THE COURT:  Should we compare notes?

19        THE WITNESS:  Yeah, it might be associates versus

20   partners, but I see five.

21   BY MR. WEISFELNER:

22   Q    Five partners?

23   A    Yes, sir.

24   Q    Are you counting Mr. Kieselstein?

25   A    No.

1    Q    That would be six, right?

2    A    Yes, that'd be six.

3    Q    Okay.

4    A    Sorry.

5    Q    Anybody else beyond the first row?

6              THE COURT:  All right.

7    BY MR. WEISFELNER:

8    Q    Do you know what the average blended hourly rate is for

9    the K&E lawyers that are representing the debtors in the

10   courtroom today?

11   A    Roughly.

12   Q    What is it?

13   A    I would -- yeah, I haven't blended them together for a

14   while, but I would think it's over -- probably over a

15   thousand dollars.

16   Q    Okay.  And can you give us an estimate, or have you

17   ever given the board an estimate of how much time it took to

18   put together the sale procedures that are currently before

19   the Court for its consideration, with all the advisors from

20   K&E and all the advisors from Evercore?

21   A    Evercore, I don't believe we're paying anything

22   incremental, subject to the success fee if they close the

23   deal.  Then we get a flat monthly amount for whatever we

24   have them do, so we try to make them do as much as we can

25   for that amount.

1          Kirkland & Ellis does charge us on the hourly

2     basis, so I -- but I have not done that, and in fact, I

3     don't see their invoices.  Ms. Doré keeps me away from the

4     legal costs.

5     Q    Do you have an estimate within any kind of range as to

6     how much in the way of legal fees the debtors have incurred

7     in formulating and prosecuting the current sale procedures

8     motion?

9     A    I don't, but I think in the scheme of the entire value

10    we could derive from this process, I don't think it's

11    substantial.

12    Q    You don't think it's substantial?  Have you ever given

13    the analysis to the board of directors for them to make the

14    business judgment as to whether it's substantial?

15    A    I have not given that information to the board of

16    directors.

17    Q    Oh.  Have you ever asked Ms. Doré who's responsible for

18    the bills, and you're kept away from the bills to provide

19    you or the board with an analysis of what this process is

20    costing the estate in terms of money?

21    A    I've never calculated this.  I know what the overall

22    costs we're expecting from Kirkland that was in the DIP

23    budgets that we presented to the Court --

24    Q    Uh-huh.

25    A    -- but I don't know what this incremental effort is.

1    Once again, I would stand by my answer.

2    Q    Are you telling me that the prosecution of this sale

3    procedures motion was part and parcel of the DIP budget that

4    was originally presented to the Court and creditors?

5    A    No, I'm not.  I'm saying, I was aware what our

6    estimates were for Kirkland & Ellis to be used over the

7    course of the case.  And I don't know in that budget, you

8    know, we filed the RSA, there was at some point that we were

9    going to separate the companies and do the tax work and a

10   lot of the work that's entailed in doing the bid procedure

11   motion.

12   Q    It's already, in effect, been done.

13   A    Yes.

14   Q    At some time, because it's the same process as we had

15   in the RSA.

16   A    Right.  So I don't debate with you, Mr. Weisfelner,

17   that there's incremental costs associated with the bid

18   procedures motion.  But once again, as we sit here today,

19   until we see an alternative transaction, we think we're

20   going to sell that side of the business.  And the only

21   question is whether we sell it nor or as, you know, you

22   suggested or others have suggested potentially after the

23   plan of reorganization is completed.

24            In either case, we're going to incur the Kirkland

25   & Ellis fees as long as we're on that path.

1   Q    And again, I don't mean to be facetious and if you

2   don't know the answer, you don't know the answer.  Looking

3   out in the courtroom, you obviously can see the overflow, do

4   you know what additional professionals, other than Kirkland

5   & Ellis, the debtors have obligated themselves to pay --

6   A    No, I do not.

7   Q    -- for professional fees?

8            Well, you know you're obligated or the estate's

9   obligated to pay for the fees and expenses of the unsecured

10  creditor's committee, right?

11  A    Yes.

12  Q    And you know you've agreed on a going forward basis to

13  pay the fees and expenses of the first lien lenders on the T

14  side, haven't you?

15  A    I'm not aware of our arrangement with the first lien

16  after the RSA went away.

17  Q    And -- well, you do know, don't you, that as part of

18  the cash collateral agreements that you pay the first liens

19  approximately $100 million a month in the form of adequate

20  protection payments, right?

21  A    I do know that.

22  Q    And you are aware that over and above the $100 million

23  a month, you also pay all the professional fees, right?

24  A    Now that you mention it, I do have that recollection.

25  Q    Okay.

1           MR. WEISFELNER:  Your Honor, I was hoping for a

2      five minute break, not because I think I'm getting to -- you

3      know what, let me just keep babbling if Your Honor doesn't

4      mind.

5           THE COURT:  Okay.  I'm not sure what you asked,

6      but.

7           MR. WEISFELNER:  That makes two of us.

8           THE WITNESS:  I'm not the only one that debates

9      with myself, Mr. Weisfelner.

10          MR. WEISFELNER:  Apparently not.

11     BY MR. WEISFELNER:

12     Q    You indicated that you're at a point in this process

13     where you want creditor input into the process to get to a

14     plan.  I think I wrote down what you said as part of your

15     direct.

16     A    Well, you've got that correctly, I agree -- I hope I

17     said it like that, I agree with that statement.

18     Q    Now, you didn't seek creditor input into a process to

19     get to a plan in connection with the RSA, did you?

20     A    No.  Hopefully we learned from that, and this process

21     has been substantially more inclusive of creditors, as I

22     indicated on my direct.

23     Q    Okay.  Now, when you say the process has been more

24     inclusive of creditors, you haven't had, nor have any of

25     your professionals had to, to your knowledge, a single

1   solitary substantive plan discussion with any of the T side

2   junior creditors, have you?

3   A    You're talking about a plan of reorganization?

4   Q    Yes.

5   A    No, but we have -- we have not had plan of

6   reorganization discussions, but we are planning to continue

7   to prosecute and have those discussions as soon as we can.

8   I think somebody testified or stated that during this bid

9   auction process, we were not going to continue to work on a

10  plan of reorganization and that -- I think you won't have to

11  worry about cross-examining me if I don't get that done

12  simultaneously as we're trying to do the bid.  Our

13  expectation as we continue to move forward and come to

14  consensus, and in fact, I know we've had discussions with

15  you, we've encouraged the first lien to have discussions

16  with you, we've encouraged the E side of the house to have

17  those discussions, and you know, we're continuing to try to

18  play the honest broker role best we can to get those things

19  done.

20  Q    And I'm just wondering, when do you intend for that

21  process to start since it hasn't happened yet?

22  A    As soon as I get off the stand, I'm happy to -- I think

23  we talked about having a dinner this week or starting

24  immediately thereafter with different groups, and I'll let

25  -- Mr. Sassower is arranging that for me, so we haven't

1    calendared anything, but I believe that there is nothing our

2    board wants more or the management team wants more than to

3    come up with a consensus and a plan of reorganization to

4    exit bankruptcy, and I am under oath.

5    Q    I just want to hit you up with a couple of real quick

6    ones, and then I'm going to let somebody else take over.

7              You've had no independent discussions with Mr.

8    Sawyer, the T side independent director regarding the

9    bidding procedures, have you, outside of general board

10   meetings?

11   A    I can't recall if I had any specific discussions like

12   -- it's probably correct that I did not have any specific

13   discussions with Mr. Sawyer outside of the seven board

14   meetings, where he asked questions and I answered a lot of

15   them.

16   Q    There is no report asked for, or for that matter

17   provided to the boards, that sought to analyze the market

18   for regulated utility assets; isn't that right?

19   A    There was no report provided.  As I said, it was all

20   based on the other type of information that I believe I

21   testified to.

22   Q    But you do intend to provide that sort of information

23   to the board for the first time in connection with selecting

24   a stalking horse, right?

25   A    Yes, sir.

1    Q    You've likewise seen no analysis of the risks of

2    markets for debt financing or utilities moving in any

3    direction; isn't that right?

4    A    No, we've made no projections about the potential of

5    those markets.  We instead have relied upon their

6    attractiveness as compared to historical levels.

7    Q    Have you ever sold a stock at a high point only to see

8    it go even further up?

9    A    I'm sure I have as an individual.

10   Q    Okay.  You haven't done any study or analysis on

11   whether the value of Oncor is going up or down, right?

12   A    No, I have not specifically done that, and I think it's

13   very difficult to assume the factors that could make it go

14   up and make it go down, and then probability the weight of

15   the possibility of either of those occurring.

16   Q    Well then, I must assume therefore, that there's been

17   no evaluation or report by Evercore or anyone else for that

18   matter that tries to project or estimate the risk of the

19   market negatively shifting in the next 12 to 18 months.

20   A    Well, as I said, my answer went to positively or

21   negatively, and we're relying a lot on the fact that the

22   attractiveness of this multiple.

23   Q    There's been no evaluation or report by Evercore, or

24   for that matter anyone else, that indicates that if Oncor

25   were marketed as part of a plan of reorganization six months

1    or a year from now, that the number of potential bidders

2    would be higher or lower than the number of bidders you have

3    today?

4    A    There has been no such report prepared, and I don't

5    know anybody could prepare such a report.  We do -- we have

6    not gotten that feedback from the market.  We think the fact

7    that we have 12 NDAs is pretty good evidence that there's a

8    robust enough group of buyers to help us maximize price.

9    Q    And my question to you is, do you have any reason to

10   believe sitting here today that the same robust level of

11   interest won't exist after you've finalized or at least

12   provided some guidance as to what a plan or plans would look

13   like, and how difficult or easy it may be to achieve

14   confirmation?

15   A    That's true, I do not.

16   Q    No one's told you that Oncor's going to be worth more

17   or less a year from now, have they?

18   A    They have not.

19   Q    By the way, if NextEra buys Oncor today or in the

20   conclusion of this sale process, do you suppose NextEra

21   thinks that Oncor will be worth more or less a year from

22   now?

23   A    I'm sure NextEra --

24            MR. MCKANE:  Objection, Your Honor, that's pure

25   speculation on his part, there is -- the question calls for

1    the witness to get inside NextEra's head about what their

2    bidding strategy is.

3              MR. WEISFELNER:  Okay.  But he can -- it's

4    speculation to ask the chief restructuring officer if he

5    thinks that NextEra is buying the asset today, they think

6    that the asset's going to be worth more a year from now.

7    That's speculation?

8              MR. MCKANE:  Your Honor, this witness can

9    articulate what NextEra or its agents had told to him as to

10   what their overall strategy is as to why the asset is

11   attractive or not, but to specifically to put this witness

12   in their head in something that hasn't been articulated,

13   that's pure speculation.

14             MR. WEISFELNER:  It's 20 to 5, I withdraw the

15   objection, it's not worth it, okay, I'll ask a different

16   question.

17   BY MR. WEISFELNER:

18   Q    Have you ever given any advice to the boards or heard

19   anyone else give advice to the boards about whether NextEra

20   believes that the asset is going to be more valuable 12

21   months from now than it is today?

22   A    The advice we gave to the board is we believed it was a

23   good time to sell for the reasons I've previously testified.

24   We did not try to speculate why -- what NextEra thought,

25   whether it be strategic or synergies or what reasons they

1   had for buying the asset.

2   Q    You identified the population of probable bidders,

3   because I know we get confused about the number of NDAs, but

4   the population of probable bidders were already identified,

5   were they not, in early August?

6   A    My only hesitation is I don't recall exactly when they

7   were identified.  Actually, it was all speculation -- it's

8   always speculation until they show up with a bid.  So I

9   don't know that that's true.  Early calls by Evercore

10  indicated that some said we're in, we want to be a stalking

11  horse, we're going to come later, we got a lot of that

12  input, but it's not worth anything to me until they show up,

13  so.

14  Q    But didn't you tell us at your deposition that there

15  were not more than five potential bidders identified after

16  early August?

17  A    Not more than five identified after early August?

18  Q    Yeah.

19  A    That might be true that there were more five identified

20  after early August, I don't know how I stated it, but if

21  you'd please read it back to me, I'd like to hear how I said

22  it, and I'll tell you whether I --

23           MR. MCKANE:  Your Honor, could he approach and

24  show the witness his testimony?

25           THE COURT:  He can read it to him.

1          MR. WEISFELNER:  I'll read it to him.

2     BY MR. WEISFELNER:

3     Q    I'm looking at page 34 of your deposition.  And if I

4     get there --

5     A    I'll race you.

6     Q    -- see who gets to go first.  Okay.

7          This is the question:

8               "And when was that population identified?

9               "A   I don't recall the exact date, but I think

10          some time, and then if I were guessing, I think it was

11          early August.

12               "Q   As of early August, the world of perspective

13          bidders in the debtors' view had been identified.

14               "A   At least initially identified, yes.  It was

15          supplemented through discussions with creditor groups

16          as we went along.

17               "Q   Without revealing the identity of any

18          prospective bidder after early August, were any

19          prospective bidders added to the initial list?

20               "A   I believe the answer is yes.

21               "Q   Do you know how many?

22               "A   I don't recall.

23               "Do you know order of magnitude, more than five?

24               "A   I would think it probably not more than

25          five."

```
1    A    Yeah, I think we started with an initial population of

2    51, so 10 percent more is probably about right.  I don't

3    think we have gotten more than five or so.

4    Q    Okay.  Now, the next question I want to ask you is,

5    based on everything that you've heard, and all the

6    discussions you've had, today do you believe that two to

7    four bidders is the reasonable range of bidders we're going

8    to expect to get through step one of the stalking horse

9    selection process, correct?

10   A    I have not drawn that conclusion.  I heard Mr. Hiltz

11   say that -- I think that was his opinion.  And, you know, he

12   has been actively working with bidders as has his team, I

13   get reports from him, so I'm not in a better position to

14   evaluate that than he would be.

15   Q    Okay.  Going back to the first lien lenders and the

16   RSA, I think you told us that again the tax structure that's

17   currently embedded in the bidding procedures is the same

18   relatively speaking tax structure that was embedded in the

19   RSA, and in the RSA, you had sign-on by some less than half

20   of the first lien lenders, correct?

21   A    Yes, at least initially that was who signed up to the

22   RSA.

23   Q    Okay.  And as far as the current game plan, that being

24   for a tax free spin-off of the T side of the equation, you

25   don't have a deal today on a tax free spin-off even from the
```

1   same group of first lien lenders that signed on to the RSA,

2   correct?

3   A    No, they've signed on to the bidding procedures motion,

4   but they haven't signed on to the tax respent.

5   Q    Okay.  And that's even the same group that signed on to

6   the RSA are now telling you that they're not signed on to

7   the tax free spin on the T side, right?

8   A    That's correct.

9   Q    And you recognize, do you not, that you'd have to get

10  their vote absent a cram-up on them, you'd have to get their

11  vote in order to get to a plan on the T side, right?

12  A    That's correct.

13  Q    Okay.  As reflected in the objection they filed

14  originally to these bidding procedures, by the way, did you

15  review that objection?

16  A    I believe I at least skimmed it.

17  Q    Okay.  Did you talk to any advisors for the first liens

18  about the objection that they filed?

19  A    I don't believe I had that discussion.

20  Q    Okay.  Did you understand what they were saying was,

21  unless and until we get spillover value from the sale of

22  Oncor directed to us the first lien lenders, we're going to

23  hold hostage our vote in favor of a tax free spin?  Didn't

24  you understand that that's the position they were taking?

25  A    I had that communicated to me by some of the principles

1    of that group, yes.

2    Q    Okay.

3    A    Not in connection with the bidding procedure objection,

4    but in other discussions we had where we've attempted to try

5    to get consensus among the T side creditors.

6    Q    And that risk of the T side creditors holding hostage

7    their vote in favor of a tax free spin-off is among one of

8    the so-called execution risks that a buyer sitting out there

9    today would have to consider in formulating its bid.  Is

10   that a fair statement?

11   A    Sure.  I think bidders are going to look at execution

12   risks.

13   Q    Okay.  And another execution risk is the difficulty in

14   knowing what an E side plan was going to look like, if for

15   no other reason, and there are claims by the T side that

16   runs into the E side, right?

17   A    Well, that part of it I have a little different view.

18   I think the bidders in the way that we've talked to them,

19   and the way that we're thinking this will work, and of

20   course, we don't have a transaction today, so we'll

21   ultimately find out, is that they will pay a fixed price and

22   that will create proceeds, and those proceeds will be

23   distributed consistent with the plan of reorganization.

24          So they do not seem at all concerned about that

25   element of the structure.  I think they also have had the

1    feedback we've gotten on the tax risk is, their tax

2    attorneys looked at it, and at least they believe it works

3    from a tax standpoint, but they do recognize that the T side

4    has to also sign on to the plan of reorganization.

5    Q    Is a risk that -- I thought you told us, and I'm asking

6    if you still believe that from an execution risk perspective

7    there is a quote, healthy list, end quote of issues?

8    A    Sure.  I think any time you're selling an $18 billion

9    business, there's a healthy list.

10   Q    Well, I'm talking about healthy list of execution risks

11   that relate to the need to get a T side and E side done.

12   A    Well, I think there's the healthy list in any

13   transaction.  I think any time you have regulatory approval

14   that's a major issue, but I think these are sophisticated

15   buyers that have assessed the risk and are willing to buy at

16   good prices.

17   Q    Did you tell us at your deposition that lack of

18   creditor consensus on the optimal tax structure is among the

19   risks that buyers will have to consider as part of execution

20   risks?

21   A    Sure.

22   Q    Did you likewise tell us that a risk to getting to

23   agreement on a plan of reorganization is an execution risk

24   that the buyers are going to have to consider?

25   A    I did.

1    Q    And did you tell us that the risk associated with

2    getting regulatory approvals was the risk the buyers were

3    going to have to consider?

4    A    I sure did.

5    Q    And did you tell us that the risk associated with

6    getting the IRS to issue a private letter ruling is among

7    the risks that the buyer is going to have to consider?

8    A    I believe I did.

9    Q    And would you agree with me that all of those risks

10   would be dissipated if not resolved were the plan to come

11   first, the plan being the plan of reorganization?

12   A    The task risk, the regulatory approval risk would not

13   necessarily be set aside with a plan of reorganization.  The

14   risk specific to the reorganization plan obviously would --

15   could potentially be impacted.  But I think it's fair to say

16   that the feedback we've gotten today is not that people are

17   afraid of this deal.  We've got, you know, interested buyers

18   at good prices, and it's a good market.

19         So it's hard for us to see the evidence of that,

20   Mr. Weisfelner, and I guess when we get the final bid and we

21   get a chance to approve the transaction, we'll, you know,

22   see whether it stands up to that scrutiny or not.  But I

23   still think it's the right time to go forward.

24   Q    From a bidder's perspective, would you agree with me

25   that you have to reduce your bid in connection with

1    execution risks?

2    A    I'd be -- once again, I'd be putting my head, you know,

3    me inside of their heads.  Certainly I do think that bidders

4    consider risk, but as I said, we have not seen substantial

5    evidence that the reorganization risk is something top of

6    mind for the bidders that we've been speaking with.

7    Q    Last line of questioning for me anyway, are you aware

8    of any conflicts or potential conflicts that have arisen

9    among the boards or board members in consideration of the

10   optimal tax structure?

11   A    I am not aware of any risks that have arisen as a

12   result of the optimal tax structure.

13   Q    I asked you about conflicts.

14   A    I'm not -- I'm sorry.  I meant to answer, I'm not aware

15   of any conflicts that have arisen as a result of the optimal

16   tax structure.

17   Q    Okay.  I'm going to ask you at risk of Mr. Shore

18   kicking me, if you could find the tax memorandum that was

19   filed in the case.  I have no idea what -- I have it as --

20          MR. SHORE:  You're asking me to tell you what

21   exhibit it is?

22          MR. WEISFELNER:  No, I was asking anybody.

23          UNIDENTIFIED SPEAKER:  55.

24   BY MR. WEISFELNER:

25   Q    It's Exhibit 55 in your book.  And before we get to the

1   page, I want to ask a little bit again about the tax

2   memorandum.  Did you see it before it got filed?

3   A    Yes.

4   Q    Were you asked to approve its filing?

5   A    I certainly supported its filing, but I don't know if

6   it was an official approval.

7   Q    Do you know if any of the boards were asked to review

8   it before it got filed?

9   A    I don't think the board was asked to review it, but I

10  am highly confident that based on meetings I attended and

11  presentations either I made or that other of our tax counsel

12  have made, that the substance of this memo is very well

13  understood by our board.

14  Q    Okay, good.  And you're not aware of any board member

15  telling you in consideration of the tax memo or the

16  positions espoused therein, that they're concerned about the

17  existence of either a perceived or an actual conflict of

18  interest?

19  A    Well, I think our board, the reason we did the process

20  that I described earlier, where the independents met with

21  counsel without anybody else in the room was to make sure

22  they were thinking about their fiduciary duties as

23  standalone and determining whether or not they had a

24  conflict before they signed on to the RSA.

25  Q    This was during prepetition times?

1    A    It was during -- it was before we filed, correct.

2    Q    Okay.  Now, here's the issue I want to ask you about

3    specifically before we get into the detail of the tax memo.

4    There is a TSA that runs between EFH Corporation and the T

5    side of the house, correct?

6    A    That's correct.

7    Q    And --

8    A    And it also covers EFIH.

9    Q    Understood.

10   A    Okay.

11   Q    And among the issues in the TSA, or do you know that

12   among the issues in the TSA, is the question of the

13   enforceability of that TSA.  In other words, have you heard

14   or had described to you the contention that the TSA itself

15   may be avoidable as a fraudulent conveyance?

16            MR. MCKANE:  Your Honor, can I just instruct the

17   witness, that's a yes or no question.

18            THE WITNESS:  Yes.

19   BY MR. WEISFELNER:

20   Q    Okay.  So you're aware of that issue, independent of

21   what advice you may have gotten from anybody, you're aware

22   that that's an open issue?

23   A    Yes, what I believe as a board member I've heard about,

24   you know, claims or assertions that parties may make in

25   connection with the TSA.

1    Q    Okay.  So just to put a finer note on it, you

2    understand that T side creditors or certain T side creditors

3    may openly take the position that the tax sharing agreement

4    is itself avoidable as a fraudulent conveyance, yes?

5    A    Yes, I think that's one of the risks we've evaluated.

6    Q    And just so people understand the relevancy, it's

7    pursuant to the tax sharing arrangement that theoretically

8    EFH could push the stranded tax liability down to the T side

9    of the equation, right?

10   A    Yes.  That's one of the causes of action that EFH could

11   take.

12   Q    Okay.  And if the TSA, the tax sharing arrangement were

13   avoidable, then the risk of EFH being able to push down

14   those tax liabilities pursuant to the TSA would be limited

15   or gone, right?

16   A    With respect to that issue, that's correct.

17   Q    Okay.  Now, are you likewise aware that certain of the

18   junior creditors on the T side of the house have taken the

19   position that in interpreting the TSA, by its own language,

20   that EFH may not pursue this side of the house under the TSA

21   for -- I'm going to forget which tax it is --

22           UNIDENTIFIED SPEAKER:  For capital gains.

23   Q    -- for capital gains tax.

24   A    We have not --

25   Q    It's a yes or --

1    A    For the record, we've not seen a complete list of what

2    the junior creditors on the T side believe or don't believe.

3    I've heard it said in court, but that's the case, and I know

4    I've been informed that the issue that the tax sharing

5    agreement does not specifically speak to the allocation of

6    capital gains tax.

7    Q    Okay.  So you're --

8              THE COURT:  Are you --

9              MR. MCKANE:  I'm asserting a standing objection to

10   this line of questions as to what potential relevancy could

11   possibly be about potential evaluations of the TSA claims in

12   a bid procedures motion where we don't even have a sale

13   pending yet.  I think it's -- I think we're getting far

14   beyond the scope of this motion, given the limitations we've

15   had in the past as it relates to taxes.

16             THE COURT:  Well, I don't see how you can avoid a

17   conversation about tax implications even at the bidding

18   procedures level.

19             MR. MCKANE:  Understood, and we've probed it

20   fairly deeply.  My concern here, Your Honor, is if we go

21   much further the witness is going to be impaired.

22             THE COURT:  This is in the tax memo, it talks

23   about capital gains --

24             MR. MCKANE:  I understood.

25             THE COURT:  -- point in the memo.

1          MR. MCKANE:  And, Your Honor, I'll apologize, I

2     didn't mean to speak over you.

3          THE COURT:  That's my fault.

4          MR. MCKANE:  All I was trying to emphasize is if

5     we go beyond the tax memo to the next level down in the

6     analysis, it's undeniably going to go into the privilege.

7     And so if we keep it at the tax memo level, that's fine, but

8     I have concerns about the witness' ability to go beyond the

9     tax memo in articulating --

10          THE COURT:  I haven't heard anything to ask him to

11     do that yet, we'll keep an eye on that.

12          MR. MCKANE:  Thank you, Your Honor.

13     BY MR. WEISFELNER:

14     Q    All right.  So that we don't stray beyond the tax memo,

15     I want you -- now that you've testified that you understand

16     the issue about the enforceability of the TSA having been

17     raised by junior creditors at the T level, and you likewise

18     understand the contention that the TSA even if it's not

19     avoidable, may nevertheless be limited because it doesn't

20     deal with or allow EFH to seek capital gains tax

21     reimbursement from the T side, you're at least aware of

22     those two arguments.

23     A    I am aware of it, and I'm also aware that the tax memo

24     says that the capital gains are not the basis of allocation,

25     that there's an argument that it should be a taxable income

1    allocation, which would largely result in the same approach

2    that the tax would go back to T.  I think that's also raised

3    in that memo.

4    Q    Okay.  I want you to take a look, and now I'm only

5    focused on the contention that there are no conflicts and no

6    potential conflicts, and to give you and your counsel a

7    better sense, I'm asking these questions and I think they're

8    relevant in terms of the fairness of the process, and the

9    extent to which the board members have or haven't been given

10   proper direction or asked appropriate questions.

11            Please turn to page 20 of the tax memo.  And I'd

12   like you to read yourself or out loud, whichever you prefer,

13   the only full paragraph on that page, the one that begins,

14   "It should be noted that."

15   A    Yes, I've read it before and I think it's what we were

16   just talking about including the last sentence, what I just

17   added on, that "in the absence of capital gain, the debtors

18   believe."

19   Q    All right.  Now, I want to go down to the sentence that

20   begins, "regardless of whether or not the competitive TSA

21   takes capital gains into account, the debtors believe that

22   all of the EH groups consolidated tax liability is allocated

23   under the agreement."  Do you see that?

24   A    Yes.

25   Q    Okay.  Now, I want to know in light of the concerns

1   that you're aware of, regarding creditor contentions, which

2   debtors believe that all of the consolidated tax is

3   appropriately allocated under the agreement?

4   A    I believe each of the debtors have evaluated the

5   competitive tax sharing agreement, have reviewed the risks,

6   and I do not -- I'm not aware of any conflicts in that

7   statement that exists today.  Mr. Weisfelner, I also want to

8   take the opportunity, I don't think I testified that there

9   aren't any potential conflicts that can't come down the

10  road.  And I know that's why we have a -- you know, a

11  protocol that individual independent board members can hire

12  counsel if they needed to deal with conflicts.

13          But you asked about existing conflicts, and I know

14  that this information and this issue was presented to those

15  independent directors, and I'm not aware of any outstanding

16  conflicts associated with that conclusion.

17  Q    I want to just make sure I'm crystal clear and then

18  before Mr. Shore's head pops, I'm going to quit and let him

19  take over.

20          Is it your testimony that this particular issue,

21  the enforceability of the tax sharing arrangement has been

22  considered by the independent director on the T side, Mr.

23  Sawyer?  Is that your testimony?

24  A    I think Mr. Sawyer is aware of this issue.

25          MR. WEISFELNER:  No further questions, Judge.

1          THE COURT:  Two zero.  Mr. Shore.

2          MR. SHORE:  I get my 15 minutes.  And I'll try

3    to --

4          THE COURT:  Have a -- you can have a half an hour

5    but that's it.

6    CROSS-EXAMINATION

7    BY MR. SHORE:

8    Q    Let's stay on page 20.  I just want to work through

9    that language.

10   A    55?

11   Q    Exhibit --

12   A    Yeah.

13   Q    -- 55, page 20.  "Regardless of whether or not the

14   competitive TSA takes capital gains into account".  Is it a

15   fair reading of that statement that that means that

16   notwithstanding what the contract actually says?

17   A    From a layman's standpoint, I think that's a fair

18   assessment of what that says.

19   Q    Okay.  And then the second sentence is even if we -- so

20   in context, it means even if that's what we wrote in the

21   contract, the debtors have always believed something

22   different.

23   A    I think the debtors believe that we would not enter

24   into a tax sharing agreement that doesn't allocate all of

25   the tax.  I can't think of a business reason that we would

1    have said we're going to allocate all of this tax but we're

2    going to ignore one element of tax.  It was an oversight in

3    my mind.

4    Q    Okay.  So let's keep that in mind.  Now, first of all,

5    you knew that this tax memorandum was going to be signed by

6    the attorneys for all of the parties to the TSA, right?

7    A    I don't know if I knew that.

8    Q    Who did you think they were filing it for then?

9    A    Well, I think we filed it in response to -- I'm sorry.

10   Ask me your question again.

11   Q    What debtors did you understand would be filing a tax

12   memorandum with the Court?

13   A    All the debtors.

14   Q    All right.  So you understood that counsel for all of

15   the debtors was going to be filing this memorandum.

16   A    Correct.

17   Q    Okay.  You've got a contractual dispute going on right

18   now on the E side, right, whether or not the first liens or

19   the second liens are entitled to their make-wholes, right?

20   A    Yes.

21   Q    And you -- you hired counsel to represent you in that

22   dispute to come to the Court and say exactly what your view

23   is of what the contract is, right?

24   A    Yes.

25   Q    And notwithstanding what the contract actually says,

1    what your views are as to what your beliefs were, right?

2    A    Well, I don't know that it's notwithstanding what the

3    contract says what our beliefs are.  I think our beliefs are

4    informed by what the contract says and the intent of the

5    contract.

6    Q    Okay.  And what you wanted in that suit was someone to

7    come advocate your position to the Court, right?  That's why

8    you're paying Kirkland & Ellis all of the fees to come in

9    and litigate that suit for you, right?

10   A    That's right.

11   Q    That is your advocate.

12   A    Yes.

13   Q    Okay.  And in connection with the tax memorandum you

14   had -- well, I'll leave aside the tax memorandum you had

15   filed.  Kirkland & Ellis is also the debtors' -- they're

16   counsel to Luminant, right?

17   A    They are.

18   Q    How long would you leave them in your employ?  If

19   someone from Kirkland & Ellis on behalf of Luminant filed a

20   brief in the first lien make-whole litigation that said

21   regardless of what the contract says, the EFIH debtors have

22   never believed that they didn't have to pay the make-whole?

23   A    I wouldn't make that decision by myself.  But I would

24   tell you that I also think that today, as we sit here, we're

25   contemplating a transaction and bid procedures that'll sell

1    and not incur the tax, so this would be a moot point.  So

2    the conflict today doesn't arise to the extent we get a

3    capital gain to be allocated and the independent director

4    believes there is some ambiguity of the words, they have, I

5    believe, based on what we agreed to associated with Kirkland

6    & Ellis retention, that they can hire independent counsel

7    and advocate on behalf of their estate for that point.

8    Q    Right.  But you're pursuing right now a bid procedures

9    motion which you believe is going to lead to an efficient

10   tax structure bid based on the belief that the subsidiary

11   estates, EFIH and EFCH down, are liable for capital gains

12   taxes that would be generated if there were a taxable event.

13   A    Absolutely, because it's not just this risk.  The IRS

14   tomorrow can change the regulations.  That's a pretty big

15   risk to the estate for unsecured creditors to take on a

16   three billion dollar tax.

17   Q    I understand.  In the EFIH dispute, there's a

18   possibility the Third Circuit could come down and say --

19   give all sorts of rules as to what is payable in a make-

20   whole which are going to affect that suit, too, right?

21   A    Right.  We evaluate risk.  And we're here talking about

22   one risk and whether it's been appropriately evaluated.  And

23   I understand it.  But this is not the sole risk that was

24   considered in determining whether a tax efficient

25   transaction is the right way for an independent director to

1    vote on behalf of its fiduciary responsibilities of the

2    estate.

3    Q    Let's go back to my question.  If Kirkland, on behalf

4    of Luminant, filed a brief in your first lien dispute that

5    said notwithstanding what they're staying in court, that

6    Paul Keglevic has never believed that he didn't have to pay

7    the make-whole, would you think that Kirkland & Ellis was

8    acting as your advocate?

9    A    I would like to consult with my counsel before I made

10   that conclusion.  My general counsel doesn't let me make

11   legal determinations on conflicts.  I certainly don't make

12   them alone and absent board consultation.  So I understand

13   your point but I'm not prepared to answer that question

14   alone.

15   Q    And do you also understand my point that the people who

16   are -- well, let's talk about this for a second.  If TCEH

17   were not liable for capital gains taxes, you do understand

18   that that would create potentially a huge amount of value on

19   the T side in the form of the ability to step up the basis

20   in the assets.

21   A    Your question presumes that it was only the capital

22   gains allocation under the TSA that presented a risk to the

23   TCEH tax basis write-up.  And I'm suggesting there's

24   substantially more as indicated in this memorandum and other

25   sections.

```
1    Q    But if you got rid of the capital gains issue, that
2    would remove one of the hurdles.
3    A    It's just one.
4    Q    Okay.  And that would lead to more distributable value
5    on the T side.
6    A    Yes.  It could potentially lead to more distributable
7    value on the T side.
8    Q    Okay.  And who advocated for the T side's position in
9    that fight when the tax memorandum got filed?
10   A    I think we had our independent director look at all the
11   risks.  And they were all outlined for him and we went
12   through them before:  state tax issues, IRS intervention,
13   the TSA.  And beyond that, the IRS -- even if you, in the
14   plan of reorganization, get that plan approved, that does
15   not mean you forestall the IRS from coming in after the fact
16   and arguing the first time you file a tax return on a new
17   tax basis write-up.
18   Q    And that would be one of the risks that creditors who
19   voted for such a plan would have to accept if that's what
20   they wanted to do.
21   A    Fair enough.
22   Q    All right.  Now just so I understand, Mr. -- 'cause Mr.
23   Sawyer is going to testify.  Do you believe that he's going
24   to say that what he did is he reviewed -- he was told to
25   review this memorandum and view it purely from the
```

1    perspective of TCEH?

2    A    I'm sorry, Mr. Shore.  You said Mr. Shore is going to

3    testify.

4    Q    Mr. Sawyer.  Mr. Sawyer.

5    A    And that's why I didn't want to answer yes.  Mr. Sawyer

6    will testify exactly as you -- I mean, he'll -- he's going

7    to get on the stand and say whatever he thinks.  I

8    believe -- I know the process.  I know Mr. Sawyer went

9    through the process.  And he can speak for himself as to

10   what he was thinking at the time.

11   Q    Okay.  When you say he went through the process, who

12   were his lawyers in that process?  You keep saying that the

13   independent director had a separate board meeting.  Who were

14   his advisors in that meeting?

15   A    His advisors were Kirkland & Ellis.

16   Q    And the general counsel.

17   A    I'm not sure whether Ms. Doré was in there.  She can

18   answer that herself.  I know I was not invited to that

19   meeting.

20   Q    Okay.  Just so we're clear, is it your belief that Mr.

21   Sawyer, as an independent director, has a responsibility to

22   read and interpret the tax memorandum as a matter of law?

23   A    I think it's his responsibility to understand the key

24   issues that affect his estate.

25   Q    And isn't he entitled to have legal advice to help him

1   interpret what all that means?

2   A     Yeah.  I believe --

3              MR. MCKANE:  Objection, Your Honor.

4              THE WITNESS:  -- we agreed to that protocol.

5              MR. MCKANE:  Objection.  Halt, please.  Your

6   Honor, at some level, what Mr. Shore is asking is what this

7   lay witness thinks Mr. Sawyer's fiduciary duties are.  And

8   at that level, he's calling for legal conclusions and

9   analysis.

10             MR. SHORE:  I'm just responding to what the

11  witness says which he believes the witness has done this.

12  And I want to understand what the -- or Mr. Sawyer has done

13  this.  And I want to understand what the basis is for him

14  believing that Mr. Sawyer has done it.

15             MR. MCKANE:  Your Honor, what Mr. Shore just said

16  are factual questions about what he knows about Mr. Sawyer

17  did or did not do pre-petition, that's perfectly fair game.

18  Asking him what he thinks Mr. Sawyer's obligations are or

19  duties are, that's a legal conclusion.

20             THE COURT:  I agree.  Let's narrow it down.

21  BY MR. SHORE:

22  Q    Do you understand -- other than -- put it this way.

23  Other than the independent board meetings which occurred

24  pre-petition with respect to the two independent directors,

25  are you aware of any other instance in which the independent

1   directors have had post-petition independent meetings?

2   A    I don't know if they've had them or not.  I don't

3   recall.  I'm sure there's documentation if they have.

4   Q    And are you aware of whether either of them has had

5   access to counsel who could advise them solely with respect

6   to tax matters?

7   A    I know, as I suggested, Mr. Shore, that I think as part

8   of the protocols we agreed with that they have the ability

9   to engage independent counsel if they feel it's necessary.

10  But I don't know if they've undertaken any of those steps.

11  I don't believe they have but they may have.

12  Q    And just so we're clear about the tax memorandum and

13  the timing of the tax memorandum, the tax memorandum got

14  filed while you're out communicating with the market about

15  the efficient tax structure, right?

16  A    Yes.

17  Q    Okay.  And you have no doubt that potential bidders are

18  going to be reading and understanding the tax memorandum in

19  preparing their bids, right?

20  A    Yeah.  I'm sure they've read it.

21  Q    All right.  Let me turn to one other area to follow up

22  on some of -- Mr. Weisfelner's other things.  And then I've

23  got one area I'd like to complete beyond that tonight.

24          You got an extension of exclusivity on September

25  16th.  Okay?  And the motion was filed on the 19th.  I'll

1   give you those two dates.  All right?  And I think you

2   testified in response to Mr. Weisfelner's questions one of

3   the things you were trying to do was learn from your

4   mistakes in the RSA and get some creditor consensus, right?

5   A    Right.

6   Q    Okay.  When you'd be -- before you met with any

7   creditor to discuss bidding procedures, hadn't you already

8   sent 22 teasers out to the market?

9   A    Yeah, we had.

10  Q    And those teasers were the ones that said -- I think

11  they would have been presented in an exhibit -- the debtors

12  will only consider -- be considering the tax efficient

13  structure?

14  A    Yes.  We did that at the end of July when the NextEra

15  came out.  By the way, we had a meeting with -- I shouldn't

16  say any creditors.  We were talking to -- at least I'll say

17  the official committee.  You and Mr. Weisfelner were not in

18  this meeting.  It was some portion of the official

19  committee.  I think their financial advisor and legal

20  advisor.  And we were indicating that we were having

21  discussions with NextEra pursuant to their bid and got at

22  least some unofficial input from them.

23  Q    And that was before the teasers were sent out?

24  A    It was -- if the teasers were sent out, it was within

25  days.

1    Q    All right.  So just so I understand, when you had these

2    meetings, do you recall that one of the first things you did

3    is you sat down and the debtors explained, we're going

4    out -- we've been out to market to sell the assets and this

5    is what we're going to do with respect to bid procedures.

6    Here are the dates and times of filings.  Right?

7    A    Yes.

8    Q    And did any creditor, when you said that's what we're

9    doing, say sign me up.  We want you to go out and market

10   these assets right now.

11   A    Yes.

12   Q    And which one was that?

13   A    Fidelity.

14   Q    Okay.  And other than Fidelity?

15   A    I'm trying -- we got some feedback that has been

16   recanted since then --

17   Q    Uh-huh.

18   A    -- from the unofficial committee that they -- they said

19   unofficially they thought it was a good bid and should lock

20   it up as soon as possible.  So we got some of that.

21          And the point here, I don't know that we ran a

22   perfect process, but we're trying to get input.  We're

23   trying to take it into consideration.  And I think we did a

24   reasonable job of making this motion consider as much input

25   as we reasonably thought balanced with our fiduciary

1    responsibility --

2    Q    So --

3    A    -- and our business judgment.

4    Q    So just so we're clear, creditor consensus was not a

5    prerequisite to the filing or going out to market for the

6    assets.

7    A    Well, if we could get creditor consensus, we could file

8    the plan of reorganization.

9    Q    Right.

10   A    So we wanted -- but we wanted input.  And we wanted to

11   make sure we understood where everybody was and try to pick

12   a process that got as much consensus as we possibly could.

13   But the reality is the creditors are on very different pages

14   with respect to a lot of issues as we sit here today.

15   Q    And one of the other issues that they've been in

16   opposition with you on are the actual bid procedures, right?

17   A    Yes.  That clearly -- although we got a few more on

18   board before we filed taking into consideration their

19   thoughts and transparency and sharing some of the elements

20   of bids without names and prices.

21   Q    Just so we're clear, when you say before you filed, you

22   mean before you started the hearing.

23   A    I'm sorry.  Thank you, Mr. Shore.  Before we filed

24   the -- or started the hearing.

25   Q    Okay.  And was creditor consensus a sine qua non to

1    filing the bidding procedures?

2    A    I don't like to interpret Latin so if you would tell

3    me --

4    Q    Yeah.  Was it a prerequisite to filing bidding

5    procedures was getting some number of creditors on board?

6    A    Well, we were trying to get as many as possible.  But

7    at the end of the day, we had to come up with a process that

8    we thought worked based on what our duties are as the debtor

9    and based on our fiduciary duties.

10   Q    Okay.  And so did you consult any creditors with

11   respect to filing a tax memorandum before you did that?

12   A    No.

13   Q    And has any creditor come out and vocally supported the

14   tax memorandum?

15   A    I don't recall.  I've actually not gotten a lot of

16   calls and creditors that were upset with us filing the tax

17   memorandum either, though.  I have not received that input.

18   Q    Do you have an understanding as to why creditors of

19   subsidiaries, EFIH and EFCH down, would be disappointed with

20   the statements regarding the liability of those estates for

21   capital gains taxes?

22   A    I think -- look, we tried to make this as balanced as

23   possible.  All we said was what the debtors' perspective is

24   here.  We didn't -- we also said there's another

25   perspective.

1    Q    But just so we're clear, when you say that, in giving

2    perspective, that's not advocacy, is it?  That's just saying

3    stuff.

4    A    That's fair.

5    Q    Okay.  You said one of the other things you wanted to

6    do was foster plan negotiations.  What has prevented you

7    between the time you got the exclusivity extension and right

8    now from engaging?

9    A    We have engaged.

10   Q    With whom?

11   A    With -- well, we've been at several meetings with you

12   and Mr. Weisfelner and the official committee.  We've talked

13   about -- we've talked about settlement.  We've talked to

14   your financial advisor of the official committee about what

15   settlement would be.  Our understanding is there was an

16   offer made from the TCH first liens.  My understanding is

17   right now, as we sit here today, neither side wants to go

18   first and put the first offer on the table.  So I'm going to

19   see if I can't help that out and that's what -- when I

20   referred to this next week or this week, whenever we're done

21   with this process, we're going to continue to work hard to

22   get that done.  We've not excluded anybody.  We're

23   interested in making it happen.  And we're delighted to hear

24   your thoughts.  First time I've heard Momentive and the

25   thoughts of Olympus were yesterday.  I've not gotten any

1    feedback from a creditor as to the path forward but we're --

2    doors are open and we're happy to hear them.

3    Q    Have you called for an all hands creditor meeting?

4    A    We have not but we've contemplated doing that.  We've

5    been told by several creditors that we don't think the time

6    is right.  And several creditors have testified that once we

7    know how much is at play from the bid process or you lock in

8    a stalking horse, that might provide the incentive for

9    everybody to come to the table.  Others have said, you know,

10   we're not prepared to come to the table because we haven't

11   evaluated claims.  So we're trying to take all that

12   disparate input and move forward.  As I said, any suggestion

13   you have on that front, we're happy to listen.

14   Q    Let me get a couple of understandings here from you

15   about what it means to be on a board.  And you've used a

16   couple of words today and I just want to understand what

17   they mean.  And they are "decided", "approved",

18   "authorized", "delegated" and "voted".  So let me kind of

19   break that down.  How do you -- you sit on a number of the

20   debtors' boards, right?

21   A    I sit on four of them, EFIH, TCEH and the EFIH Finance

22   and TCEH Finance.

23   Q    How do you understand those boards to act?

24   A    I'm not sure I fully understand what you're asking me.

25   Q    All right.  So if the company needs to take an action

1    that requires board approval, how do you understand that to

2    be done?

3    A    We -- a resolution is brought to the board typically

4    with a presentation explaining what it is and the board

5    votes.

6    Q    Okay.  And you understand that any of those boards you

7    sit on takes an action other than through the presentation

8    of a resolution and a affirmative vote?

9    A    I believe that's the official way the board acts.

10   Q    Is there an unofficial way any of the boards act?

11   A    I think -- yes.  I think boards get informed all the

12   time and delegate responsibility for decisions to

13   management.

14   Q    Okay.  So let's talk about "delegate".  In your

15   experience on the boards, how do the boards go about

16   delegating responsibility?

17   A    We have a risk management policy and system when it

18   indicates delegations of authority for expenditures, for

19   decision making and, obviously, we have an evolving

20   organization that's an enterprise.  Things change.

21   Different risks call themselves.  But generally, we have

22   those rules of the road that we determine what goes to the

23   board and what doesn't.  And when we're in doubt, we go

24   to -- I go to my co-CRO.  And I'm sure, in many cases, she

25   checks with outside counsel.

1    Q    So with respect to how the board goes about delegating,

2    do you understand that the board issues a resolution and

3    again votes to delegate certain board responsibilities to

4    one or more officers of the company?

5    A    Yeah.  And I think our boards have generally authorized

6    the risk management delegation of authority processes that

7    we have in place at the company.

8    Q    So there will have been a board resolution with

9    respect -- so, if for example, you were taking over a new

10   responsibility that would otherwise be subject to the board,

11   we should find a resolution from the board and a delegation

12   to you to perform that responsibility.

13   A    In general respects, yes.  We rely on -- I'm not the

14   person that does the compliance audit.  We rely on legal

15   counsel to drive that process.  But generally speaking, that

16   is the case that we try to get the overall delegation of

17   risk management and process authorization and we go from

18   there.

19   Q    Okay.  So let's focus now on really what we're here on

20   with this motion.  I want to deal first with you said this

21   motion is merely procedural.  Let me ask you two questions.

22   Prior to the petition date, has any of the debtors gone out

23   to the market and put all or substantially all of their

24   assets up for sale?

25   A    No.

1    Q    Okay.  And prior to the petition date, had any of the

2    debtors gone out and sought to sell their assets pursuant to

3    bidding procedures for an auction?

4    A    No.

5    Q    Now you would agree with me that the process of taking

6    the Oncor stake out to market requires expertise, right?

7    A    Yes.

8    Q    And among other things, you've engaged Evercore to

9    provide you with expertise as to how to go about maximizing

10   the value of the Oncor stake in a marketing process?

11   A    Yes.

12   Q    Now no debtor board, if I'm correct, has voted on the

13   filing of the bidding procedures motion.

14   A    That's correct.

15   Q    And no debtor board has voted on the bid procedures

16   themselves.

17   A    That's correct.

18   Q    No debtor board below TCEH has taken any vote with

19   respect to the sale of the Oncor stake, right, as far as you

20   know.

21   A    Right.  They -- those boards are all -- I believe, are

22   all inside management and there's no independent directors

23   on those boards.

24   Q    But as far as you know, there's been no board vote of

25   any kind down there, resolution, anything, with respect

1    to --

2    A    Yes.  As far as I know, there has not been.

3    Q    Okay.  Now, just so we're clear based upon your

4    testimony earlier, had any of the debtors' boards voted on

5    whether or not to take the Oncor stake out to market?

6              THE COURT:  I'm sorry.  I need a moment.

7         (Pause)

8              THE COURT:  Go ahead.  I apologize.  You better

9    repeat the question.

10             MR. SHORE:  Yeah, sure.

11   BY MR. SHORE:

12   Q    Just trying to focus on your testimony earlier.  Had

13   any of the debtors' boards voted to market the Oncor stake?

14   A    Once again, from a layman's standpoint, they voted to

15   terminated the RSA and authorized us to begin marketing the

16   asset.

17   Q    What does that mean?

18   A    They basically said where do we go from here.  We said

19   we think, given the NextEra bid, that's the right approach

20   to take.  They said we agree.  Go develop some procedures

21   and approaches as to how to maximize value.  Come back with

22   the objectives on how you're going to do it.

23   Q    Okay.  Now I'm beginning to be clear about this.  Do

24   you understand that the board minutes have not been produced

25   yet for the July 23rd meeting?

1    A    I'll accept your representation on it.  Sorry.  I don't

2    know the discovery.

3    Q    Okay.  Well, have you reviewed any minutes as a board

4    member to approve what happened at the July 23rd meeting?

5    A    I have previously read them but I don't know that I've

6    approved them.

7    Q    Okay.  Well, let's be clear then.  The resolution.  Did

8    the board vote to allow management to send teasers out to

9    the market that said that they were -- that the debtors

10   would only be accepting a tax -- or tax free bid?

11   A    No.  I don't think there was a vote.  I'm just telling

12   you as a management member, I felt directed by the board to

13   undertake this process.  I don't know if there was a

14   resolution and a vote that went with it, but I took that as

15   the authority to go do what we did.

16   Q    Well, that's what I mean.  Was there a vote that

17   said -- that where the board was asked should be sell the

18   Oncor stake in an open market transaction and the board said

19   yes?  Any of the boards.

20   A    I don't believe it was a formal vote.  I think it was

21   as I described it, and I think I earlier testified, that on

22   August -- excuse me for referencing this.  I know on the

23   August 26th meeting that Chairman Evans went around the room

24   and polled board members, were they okay with this approach.

25   Q    I want to focus on July 23rd, sir.  Was there a vote --

1    and --

2             MR. SHORE:  Let me withdraw my question.

3    BY MR. SHORE:

4    Q    Is there a difference between a vote and a formal vote

5    of a board?

6    A    I don't believe so.

7    Q    Okay.  So was there any vote by which the board said we

8    hereby direct that the officers of the company pursue a sale

9    of the economic stake of Oncor pursuant to procedures or

10   otherwise?

11   A    I thought I testified that I don't believe there was a

12   vote but I am not positive.

13   Q    All right.  So let me read you a sentence from the

14   debtors' brief, the reply brief, at page 5.  And you tell me

15   whether you can tell me whether this is an accurate

16   statement because you are the board member I have in front

17   of me right now.

18   A    Okay.

19   Q    "After adjourning the motion to approve the EFIH Second

20   Lien DIP Facility, on July 23, 2014, the Debtors' boards of

21   directors and managers voted to terminate the Restructuring

22   Support Agreement and pursue a marketing process and auction

23   for the economic interests in Oncor."  Can you state under

24   oath that that is a true statement?

25   A    I recall voting.  I recalled certainly the termination

1    of the RSA.  And as I said, certainly I believe the intent

2    was the latter, but I don't remember if the resolution

3    included the latter statement.  I just don't recall but we

4    can go check the board minutes.  I'm sorry.

5    Q    You can check the board minutes.

6    A    I'm happy to check them for you and tell you what they

7    say.

8    Q    All right.  Well, why --

9         MR. SHORE:  I don't even know whether to ask for

10   them at this point.  It's 5:30, Your Honor.  This is a good

11   point to break for me.

12        THE COURT:  Yeah.  Good.  All right.

13        MR. MCKANE:  Your Honor, could I ask just for an

14   estimate as to how much Mr. Shore thinks he has.  And to the

15   extent that Mr. Lawrence -- I'm sorry.  I said Alexander; I

16   apologize.  Mr. Lawrence has and Mr. Martin.  I apologize.

17   I'm just trying to gauge where we are.

18        MR. SHORE:  We'll --

19        THE COURT:  Have this discussion --

20        MR. SHORE:  Yes.  We'll do it off the record.

21        THE COURT:  -- in 30 seconds after we go off the

22   record.

23        We're going to break until tomorrow at 9:30.  You

24   can leave things here, if you will, but if you could

25   generally clean the area, I would appreciate it so the

1   custodial staff can do their job.  You may not communicate

2   orally or verbally regarding the substance of your testimony

3   between now and then.  So you get the evening off.

4              THE WITNESS:  Thank you, sir.

5              THE COURT:  As if, right?  And please remind your

6   staff that there's no access to this floor until 8 a.m.  I

7   don't have guards before then.  And you're free to come in

8   after that time.

9              MR. HESSLER:  Just one very quick housekeeping,

10  Your Honor.  Steve Hessler, Kirkland & Ellis, on behalf of

11  the debtors.  Just want to apprise the Court and the

12  parties-in-interest in the courtroom may know this, but

13  during the afternoon session, we did file the revised

14  bidding procedures order and the revised bidding procedures

15  themselves.  So those are now on the docket at 2511.  I have

16  a courtesy copy for Your Honor.  If you'd like, I could hand

17  it up here.  And we have a limited number of copies in

18  court.

19             MR. WEISFELNER:  Your Honor, one other thing.  As

20  Your Honor may or may not know, the debtors agreed at the

21  outset of the hearing to sequester their two independent

22  directors, Mr. Sawyer and Mr. Cremens.

23             THE COURT:  Did not know that.

24             MR. WEISFELNER:  Well, then let me be the first to

25  let you know that we asked and the debtors agreed to

1   sequester Mr. Sawyer and Mr. Cremens.  And I would ask that

2   a direction be given that there be no communication with the

3   outside directors regarding the substance of any testimony

4   that took place in court today by anyone.

5                THE COURT:  Any objection?

6                MR. MCGAAN:  Andrew McGaan for the debtors, Your

7   Honor.  No problem with what Mr. Weisfelner is asking but we

8   certainly do intend to meet with our witnesses to continue

9   to prepare them to testify.  But we don't intend to relay to

10  them the content of testimony that took place during the

11  time we agreed voluntarily that they wouldn't be in the

12  courtroom.

13               MR. WEISFELNER:  Your Honor, I'm going to object.

14  First of all, neither Mr. Sawyer nor Mr. Cremens are the

15  debtors' witnesses.  They're our witnesses.  They're being

16  called as adverse witnesses.  The debtor started the hearing

17  last Friday.  The danger associated with them prepping their

18  witnesses when they've already been sequestered, I think is

19  so great that we're entitled to a directive that at this

20  point, since they could have gone on the stand today but for

21  how long it took, that the whole purpose of sequestration is

22  to ensure that there is no communication that flows to the

23  sequestered witness about what took place in court.  And I

24  think it's very dangerous to allow preparation of witnesses

25  that aren't even their witnesses that could have gone on

1    today to take place post-sequestration.

2         MR. MCGAAN:  Your Honor, there's no precedent for

3    that.  These witnesses have not been on the stand.  They're

4    not under examination.  This request Mr. Weisfelner made to

5    me was in the beginning of the day today or maybe it was in

6    the middle of the day.  This was not raised before the

7    hearing began.  We had no opportunity to address Your Honor

8    on it.

9         THE COURT:  All right.  I'll allow you to meet

10   with the witness to prepare the witness.  But I view it no

11   differently than what I just cautioned Mr. Keglevic to do.

12   You can go back and tell him, hey, Paul, the answers need to

13   be shorter.  You know, stick to the point or be expansive or

14   whatever you want to say.  That's proper.  Talking about,

15   hey, you might want to rethink when you said you didn't do

16   this when, remember, you told me you did and maybe we can

17   fix it.  That you can't do.  Right.  The same thing with a

18   sequestered witness.  Okay?  You can certainly talk to him

19   about the nature of testifying, the nature of being a

20   witness.  But if you're going to start getting into

21   substance, I think that's out of bounds.

22        MR. MCGAAN:  We'll follow your direction.

23        THE COURT:  All right.  Very good.  Anything

24   before we break?  All right.  Very good.  We'll see you

25   tomorrow morning at 9:30.

Page 218

1          (Whereupon these proceedings were concluded at 5:33 PM)

2

3

4

5

6

7                              *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                 W I T N E S S E S

3   WITNESS                BY                    PAGE

4   WILLIAM O. HILTZ       MR. SHORE              12

5                          MR. KERR               40

6                          MR. MARTIN             49

7                          MS. O'CONNOR           80

8

9   PAUL KEGLEVIC          MR. MCKANE             87

10                         MR. WEISFELNER        121

11                         MR. SHORE             193

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 220

1           C E R T I F I C A T I O N

2

3   I, Dawn South, Sheila Orms, and Lisa Beck certify that the

4   foregoing transcript is a true and accurate record of the

5   proceedings.

6   Dawn South    Digitally signed by Dawn South
                  DN: cn=Dawn South, o=Veritext, ou,
                  email=digital@veritext.com, c=US
7   _____    Date: 2014.10.21 13:45:38 -04'00'

8   Dawn South

9   AAERT Certified Electronic Transcriber CET**D-408

10

11  Shelia G. Orms    Digitally signed by Shelia G. Orms
                      DN: cn=Shelia G. Orms, o=Veritext, ou,
                      email=digital@veritext.com, c=US
12  _____    Date: 2014.10.21 13:47:20 -04'00'

13  Sheila Orms

14

15  Lisa Beck    Digitally signed by Lisa Beck
                 DN: cn=Lisa Beck, o=Veritext, ou,
                 email=digital@veritext.com, c=US
16  _____    Date: 2014.10.21 13:53:47 -04'00'

17  Lisa Beck

18  AAERT Certified Electronic Transcriber CET**D-486

19  Veritext

20  330 Old Country Road

21  Suite 300

22  Mineola, NY 11501

23

24  Date:  October 21, 2014

25