Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :    Chapter 11

6   ENERGY FUTURE HOLDINGS        :

    CORP.,  et al.,               :    Case No. 14-10979(CSS)

7                                 :

            Debtors.              :    (Jointly Administered)

8   _____

9

10

11

12                              United States Bankruptcy Court

13                              824 North Market Street

14                              Wilmington, Delaware

15

16

17                              October 27, 2014

18                              12:08 AM - 5:01 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTECHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

Page 2

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Extending the Period Within Which the

3    Debtors May Remove Luminant Generation Company, LLC v. Titus

4    County Appraisal District [D.I. 1990; filed September 10,

5    2014]

6

7    HEARING re Motion for Entry of an Order Authorizing

8    Wilmington Savings Fund Society, FSB to File Under Seal (I)

9    an Unredacted Version of its Objection to Motion of Energy

10   Future Holdings Corp., et al., for Entry of an Order (A)

11   Approving Bidding Procedures, (B) Scheduling an Auction and

12   Related Deadlines and Hearings, and (C) Approving the Form

13   and Manner of Notice Thereof and (II) Exhibits 1 and 2 to

14   the Declaration of Jeremy B. Coffey in Support of the

15   Objection [D.I. 2370; filed October 10, 2014]

16

17   HEARING re Motion of Energy Future Holdings Corp., et al.,

18   for Entry of an Order (A) Approving Bidding Procedures, (B)

19   Scheduling an Auction and Related Deadlines and Hearings,

20   and (C) Approving the Form and Manner of Notice Thereof

21   [D.I. 2087; filed September 19, 2014]

22

23

24

25   Transcribed by:  Dawn South, Sheila Orms, and Linda Foley

1  A P P E A R A N C E S :

2  KIRKLAND & ELLIS

3      Attorneys for the Debtors

4

5  BY:  MARK MCKANE, ESQ.

6       STEVE HESSLER, ESQ.

7       BRIDGET O'CONNOR, ESQ.

8       BRYAN STEPHANY, ESQ.

9       EDWARD SASSOWER, ESQ.

10

11  RICHARD LAYTON & FINGER

12      Attorneys for the Debtors

13

14  BY:  DANIEL J. DEFRANCESCHI, ESQ.

15       JASON M. MADRON, ESQ.

16

17  BROWN RUDNICK

18      Attorneys for WSFS

19

20  BY:  EDWARD WEISFELNER, ESQ.

21       JEFFREY L. JONAS, ESQ.

22       JONATHAN MARSHALL, ESQ.

23

24

25

1  AKIN GUMP STRAUSS HAUER & FELD LLP

2       Attorney for Ad Hoc Committee of EFIH Unsecured

3       Noteholders

4

5  BY:  SCOTT ALBERINO, ESQ.

6       IRA DIZENGOFF, ESQ.

7       ROB BOLLER, ESQ.

8

9  SHEARMAN & STERLING

10       Attorneys for Duetsche Bank AG New York Branch

11

12  BY:  FREDRIC SOSNICK, ESQ.

13       NED SCHODEK, ESQ.

14

15  POTTER ANDERSON & CORROON LLP

16       Attorneys for Deutsche Bank AG New York Branch

17

18  BY:  JEREMY RYAN, ESQ.

19       R. STEPHEN MCNEILL, ESQ.

20

21

22

23

24

25

1    ROPES & GRAY LLP

2         Attorneys for CSC Trust Company of Delaware

3

4    BY:  D. ROSS MARTIN, ESQ.

5         ANDREW DEVORE, ESQ.

6

7    DRINKER BIDDLE & REATH LLP

8         Attorney for Citibank, N.A.

9

10   BY:  HOWARD A. COHEN, ESQ.

11

12   BINGHAM MCCUTECHEN LLP

13        Attorney for Pacific Investment Management Co. LLC

14

15   BY:  JEFFREY SABIN, ESQ.

16

17   WHITE & CASE LLP

18        Attorneys for Ad Hoc Group of TCEH Unsecured

19        Noteholders

20

21   BY:  J. CHRISTOPHER SHORE, ESQ.

22        JASON A. BARLETT, ESQ.

23        ERIN SMITH, ESQ.

24

25

1    POLSINELLI

2         Attorneys for the Committee

3

4    BY:  CHRIS WARD, ESQ.

5         JUSTIN EDELSON, ESQ.

6

7    MORRISON & FOERSTER

8         Attorneys for the Committee

9

10   BY:  CHARLES KERR, ESQ.

11        BRETT MILLER, ESQ.

12        ALEX LAWRENCE, ESQ.

13        DAN HARRIS, ESQ.

14        TODD GOREN, ESQ.

15

16   KLEHR HARRISON HARVY BRANZBURG LLP

17        Attorneys for UMB Bank, Indenture Trust

18

19   BY:  RAYMOND H. LEMISCH, ESQ.

20        SEAN M. BRENNECKE, ESQ.

21

22   THE HOGAN FIRM

23        Attorney for the Ad Hoc Committee EFH Legacy

24

25   BY:  GARVAN MCDANIEL, ESQ.

1

2   FOX ROTHSCHILD

3        Attorney for TCEH Unsecured Ad Hoc Group

4

5   BY:  JEFFREY SCHLERF, ESQ.

6

7   ASHBY & GEDDES

8        Attorney for Christiana Trust

9

10  BY:  GREG TAYLOR, ESQ.

11

12  KRAMER LEVIN

13       Attorneys for EFIH Second Lien Group

14

15  BY:  GREG HOROWITZ, ESQ.

16       ALICE BYOWITZ, ESQ.

17

18  SEWARD KISSEL

19       Attorney for Wilmington Trust

20

21  BY:  ARLENE ALVES, ESQ.

22

23

24

25

1   CHIPMAN BROWN

2        Attorney for the Ad Hoc Committee of EFIH Unsecured

3        Noteholders

4

5   BY:  ANN M. KASHISHIAN, ESQ.

6

7   WOMBLE CARLYLE

8        Attorney for Fluor

9

10  BY:  KEVIN MANGAN, ESQ.

11

12  CONNOLLY GALLAGHER LLP

13       Attorney for PIMCO

14

15  BY:  N. CHRISTOPHER GRIFFITHS, ESQ.

16

17  PAUL, WEISS, RIFKIND, WHARTON & GARRISON

18       Attorney for the Ad Hoc Committee TCEH

19

20  BY:  JASON ADLERSTEIN, ESQ.

21

22  YOUNG CONAWAY TARGATT & TAYLOR, LLP

23       Attorney for the Ad Hoc Committee TCEH

24

25  BY:  RYAN BENTLEY, ESQ.

1  KASOWITZ, BENSON, TORRES & FRIEDMAN

2       Attorney for the Ad Hoc Group of EFH Corp.

3

4  B:  NII-AMAR AMAMOO, ESQ.

5

6  CROSS & SIMON

7       Attorney for Fidelity

8

9  BY:  MICHAEL JOYCE, ESQ.

10

11  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

12       Attorneys for Fidelity

13

14  BY:  GARY L. KAPLAN, ESQ.

15       MATTHEW M. ROOSE, ESQ.

16       BRAD SCHELER, ESQ.

17

18  MORRIS JAMES LLP

19       Attorney for Law Debenture, Trustee

20

21  BY:  STEPHEN MILLER, ESQ.

22

23

24

25

1    PATTERSON BELKAMP LLP

2         Attorney for Law Debenture, Trustee

3

4    BY:  DANIEL LOWENTHAL, ESQ.

5

6    COLE SCHOTZ

7         Attorney for the Delaware Trust Company

8

9    BY:  KATE STICKLES, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2              THE BAILIFF:  All rise.

3              THE COURT:  Please be seated.  Anything before we

4       begin?

5              MR. MCGAAN:  Yes, Your Honor, good morning -- good

6       afternoon.  Andrew McGaan for the debtors.

7              The objectors next and final witness is to be

8       called this morning, Mr. Kurtz, and we just wanted to talk

9       about batting order.  You asked briefly at the conclusion of

10      the hearing when we were last here how many directs there

11      are there were going to be, and that the indication from

12      Mr. Kerr on behalf of the committee, there was going to be a

13      single direct from the committee.  I understand there may be

14      an interest for some additional -- an additional direct or

15      directs.

16             Our position is because the objectors are

17      similarly situated here and opposing the bidding procedures

18      motion there ought to be a single direct and then a cross

19      and a redirect, if necessary.

20             THE COURT:  All right.  Well, what's the plan?

21             MR. KERR:  Your Honor, Charles Kerr for the

22      committee.

23             I'm doing a direct of Mr. Kurtz, and I don't know

24      whether anybody among the objectors wants to do anything

25      further, but I'm doing the direct.  So --

1          MR. WEISFELNER:  Judge, it's up to you.  I mean I

2     can't imagine having more than one or two questions at most,

3     but we're at Your Honor's disposal.

4          THE COURT:  Well, let's keep it at -- Mr. Shore,

5     are you going to --

6          MR. SHORE:  I had no position right now

7     (indiscernible - 12:09:29).

8          THE COURT:  Yeah.  Let's go through the direct,

9     see if there are anymore questions, and we'll address it at

10    that time, but I would certainly hope we can get the

11    majority of the lifting done through the committee, or we're

12    going run out of time again.

13         So let's call Mr. Kurtz.  Oh, we got to get him a

14    better seat.  We got to get you a better seat, Mr. Kurtz.

15    You have the best one in the house now.  Please remain

16    standing.

17         THE CLERK:  Raise your right hand.

18    (Witness Sworn)

19         THE CLERK:  Please state and spell your name for

20    the record.

21         THE WITNESS:  David Steven Kurtz, K-U-R-T-Z.

22         THE CLERK:  Thank you.

23         THE COURT:  Go ahead.  Thank you.

24         MR. KERR:  May I proceed, Your Honor?

25         THE COURT:  Yes, you may.  Thank you.

1    DIRECT EXAMINATION

2    BY MR. KERR:

3    Q    Good afternoon, Mr. Kurtz?

4    A    Good afternoon.

5    Q    Mr. Kurtz, where are you employed?

6    A    Lazard.

7    Q    And what is your current position at Lazard?

8    A    I am vice chairman of investment banking and head of

9    the global restructuring group.

10   Q    And generally, Mr. Kurtz, what are your duties --

11   general duties as the vice chair and head of the

12   restructuring group at Lazard?

13   A    I manage the restructuring group on a full-time basis

14   in addition to advising on my own matters.

15   Q    And how many professionals report to you in your

16   position?

17   A    In excess of 50.

18   Q    And how long have you been employed by Lazard?

19   A    Approximately 14 years -- a little over 14 years.

20   Q    So approximately -- joined in approximately 2000?

21   A    April of 2002.

22   Q    Okay.  I want to turn to your background for a minute,

23   Mr. Kurtz.  Where did you go to school?

24   A    Case Western Reserve University.

25   Q    And what degrees do you have from Case Western Reserve

1    University?

2    A    A B.A. and J.D..

3    Q    And what was your B.A. in?

4    A    Biology.

5    Q    And what did you do before you joined Lazard?

6    A    I was an attorney.

7    Q    And where did you practice as an attorney?

8    A    Going in reverse, chronological order, my last

9    affiliation as a lawyer was with Skadden Arps.  Prior to

10   that I was a partner at Jones Day.  Prior to that I was a

11   partner at Mayer Brown & Platt.  And prior to that I worked

12   at a firm called (indiscernible - 12:12:14), which was a

13   bankruptcy specialized boutique.

14   Q    And with respect to your work at Skadden Arps, did you

15   have an area of practice you focused in?

16   A    Bankruptcy.  All of my professional experience has been

17   in the world of bankruptcy and restructuring.

18   Q    That would be true at Skadden Arps, at Jones Day, and

19   at Mayer Brown & Platt as well?

20   A    All 35 years of my career, yes.

21   Q    Well, let me ask you this question, Mr. Kurtz.  Could

22   you describe for the Court in general terms what your

23   experience is in the area of restructuring a bankruptcy?

24   A    Well over the course of 35 years I've probably done it

25   all, but if you -- if you were to categorize by subareas of

1   specialization I would estimate that 80 plus percent of my

2   time, both as a lawyer and as a financial advisor, would be,

3   and would have been, advising companies through Chapter 11

4   proceedings.

5   Q    And can you give us some examples and give the Court

6   some examples of some of the bankruptcy proceedings you have

7   personally worked on?

8   A    Sure.  As a financial advisor starting with the

9   District of Delaware I was the financial advisor to Smurfit

10  Stone Container Corporation, R.H. Donnelley, Tribune

11  Company, and Oglebay Norton.  In the Southern District --

12  excuse me -- Southern District of New York I advised A&P as

13  well as Eastman Kodak Corporation.  In the Eastern District

14  of New York I was the financial advisor to Sungage.

15  Q    Mr. Kurtz, in connection to some of your work have you

16  acted as advisor both to the debtors and to creditors?

17  A    Yes, I've also led three significant creditor committee

18  assignments as a financial advisor, one of which would be

19  this EFH case, I was also the financial advisor to the

20  creditors' committee for Northwest Airlines, as well as the

21  financial advisor to the creditors' committee of Calpine,

22  Inc.

23  Q    Okay.  And, Mr. Kurtz, do you have any experience

24  giving M&A advise in Chapter 11 proceedings?

25  A    Yes.

1    Q    Could you describe for the Court again in general terms

2    what your experience was in giving M&A advice in Chapter 11

3    proceedings?

4    A    I would estimate that over the course of the last 20

5    years or so I have probably had occasion to provide M&A

6    advice in approximately 20 situations.  I would say the

7    majority of those situations were as a financial advisor at

8    Lazard, and the remainder would have been as a lawyer.

9    Q    And have you had any recent experience in providing M&A

10   advice in the last year or two in connection with Chapter 11

11   proceedings?

12   A    I advised Kodak -- Eastman Kodak Company in connection

13   with the sale of their digital imaging portfolio, which

14   occurred during the pendency of their Chapter 11 case.

15   Q    Okay.

16   A    That would have taken place in 2012.

17   Q    And that was in the Southern District of New York,

18   correct?

19   A    Correct.

20   Q    In your experience, Mr. Kurtz, are there many

21   successful M&A transactions done in -- by debtors in

22   Chapter 11 proceedings?

23   A    What I found is that M&A is a frequently discussed

24   topic, but rarely utilized.

25   Q    And why is it rarely utilized?

1  A    It is rarely viewed as a value maximizing proposition

2  given the complexities of effectuating an M&A transaction in

3  bankruptcy, and more times than not it is the conclusion of

4  companies, as well as for the most part creditors, that if

5  M&A is the right answer the better time to do it is after

6  the company emerges from bankruptcy rather than attempting

7  to effectuate the M&A transaction in bankruptcy.

8  Q    In your experience has there been times where M&A

9  transactions in connection with bankruptcy have been

10  successful?

11  A    Well Kodak was an example of a successful transaction,

12  the sale of the digital imaging portfolio.  I have been

13  involved in other situations where an M&A transaction was

14  successful.  But in I believe each one of those instances

15  there was a compelling business reason for selling within

16  the bankruptcy proceeding, and it was either the fact of a

17  business or an asset that was declining in value, and so

18  there is company could not wait until it emerged from

19  bankruptcy, it would have been value destructive to do that.

20  The other situation I've seen is where the company actually

21  needed the cash to continue to operate through the

22  conclusion of its Chapter 11 case.

23  Q    And was Kodak an example of what you've just described?

24  A    So Kodak was a perfect example of what I just

25  described.  Kodak literally needed the money -- proceeds of

1    the digital imaging sale in order to continue in operation.

2    Q    One final thing on your background, Mr. Kurtz.  Are you

3    familiar with the American College of Bankruptcy?

4    A    Yes.

5    Q    And what involvement, if any, have you had with the

6    American College of Bankruptcy?

7    A    I am a fellow of the American College of Bankruptcy and

8    I served for approximately six years as a member of the

9    board of directors for the organization.

10   Q    So let me turn now, Mr. Kurtz, to Lazard's role in this

11   case, the EFH case.  What is Lazard's role in these cases?

12   A    We're the financial advisor to the unsecured creditors'

13   committee.

14   Q    And what has been your personal role in connection with

15   Lazard's work as financial advisor to the official

16   committee?

17   A    My personal role?

18   Q    Yes.

19   A    I am a leader of the team from Lazard.  We have a

20   fairly deep and extensive team working on this engagement as

21   you can imagine, but I am the team leader.

22   Q    And who -- who also at Lazard is working on this matter

23   principally?

24   A    We have a number of people.  George Valasik (ph) is

25   involved.  George is also a vice chairman at Lazard.  George

1    runs our utilities practice, among other things.  Tim Pole

2    (ph), another managing director is actively involved.  Tyler

3    Cowan (ph) a director.  Spends a considerable amount of his

4    time working on this.  There are members of George Valasik's

5    group, the utility group that are involved, and then there

6    are a number of more junior people who are working on the

7    engagement as well.

8    Q    In connection with Lazard's work as financial advisor

9    to the official committee, have you -- and you personally --

10   been involved in meetings and discussions with the debtors

11   about these cases?

12   A    Yes.

13   Q    And in connection with Lazard's work as a financial

14   advisor for the official committee have you been involved in

15   discussions and meetings where the debtors' financial

16   advisors talked about these cases?

17   A    Yes.

18   Q    In connection with your work on this matter have you

19   heard of something called Project Olympus?

20   A    Yes.

21   Q    In general terms what is your understanding of what

22   Project Olympus involved?

23   A    I have been led to understand that Project Olympus was

24   an initiative on the part of the company to effectuate at

25   least the framework of a restructuring that would be

1    implemented in bankruptcy pursuant to which the existing

2    corporate structure would retain in tact.

3    Q    When you said the existing corporate structure are you

4    referring to?

5    A    What I'm referring to is all of the companies that

6    currently comprise the EFH family of companies, but more

7    specifically in relation to what we're all here today to

8    talk about, that would not have been a split of the

9    regulated business from the unregulated business.

10   Q    And was Project Olympus ultimately successful?

11   A    It was not.

12   Q    And after Project Olympus what -- what is your

13   understanding as to what the debtors did to come up with

14   some type of restructuring plan -- a potential restructuring

15   plan?

16   A    Again, this is during the pre-bankruptcy period.  My

17   understanding is that at some point the company concluded to

18   abandon Project Olympus because they were not able to

19   galvanize a sufficient level of support among the various

20   creditor constituencies.

21            Then they moved to a different structure, which

22   was ultimately incorporated into the RSA, that the debtors

23   filed along with their Chapter 11 positions, pursuant to

24   which is non-regulated side of the business, the T side of

25   the business, TCEH, if you will, would be spun off on a tax-

Case 14-10979-CSS   Doc 2581   Filed 10/28/14   Page 21 of 182

1    free basis and the remainder of the company would be

2    reorganized in tact.

3    Q    And what happened to the restructuring agreement?

4    Q    It was terminated by the company?

5    Q    And do you know approximately when it was terminated by

6    the company?

7    A    July of this year.

8    Q    And after -- in connection with considering whether to

9    terminate the RSA was there any potential interest in

10   potential sale of any of the debtors' assets?

11             MR. MCGAAN:  Objection, Your Honor.

12   (Indiscernible - 12:21:53).

13             THE COURT:  Yeah, I thought a little vague, I

14   didn't follow.

15             MR. KERR:  I'm just trying to --

16   BY MR. KERR:

17   Q    Are you familiar with the NextEra bid, Mr. Kurtz?

18   A    Yes, I am.

19   Q    And what is your understanding of what the NextEra bid

20   is?

21   A    There was a bid by a company named NextEra essentially

22   for the Oncor business in the approximate amount of

23   $18 billion or so.

24   Q    And after the debtors decided to terminate the

25   restructuring support agreement in July what do you

VERITEXT REPORTING COMPANY

212-267-6868          www.veritext.com          516-608-2400

1    understand that the debtors decided to do in connection with

2    the NextEra bid?

3    A    Ultimately the debtors decided not to accept the

4    NextEra bid and to move quickly to a sale process for Oncor.

5    Q    Okay.  And how did you learn about that sale process

6    for Oncor?

7    A    I attended a meeting on I believe it was August 6th, it

8    was a very large meeting, the committees' professionals

9    participated, along with professionals for TCEH ad hoc group

10   of creditors, along with Mr. Weisfelner on behalf of the

11   indenture trustee for the second lien group.  The company

12   was present as well.  And at that meeting the company

13   advised all of us in the room that it had maybe a few days

14   or a week or so before it initiated a sale process for

15   Oncor.

16   Q    And prior to that meeting on August 6th had you met

17   with the debtors to discuss what might -- what they might do

18   with the NextEra bid?

19   A    There was a brainstorming session that took place at

20   the end of July, and if my recollection is correct, it was

21   during the period between when NextEra made its offer and

22   when the debtors decided to terminate the RSA.

23   Q    And based on that meeting in July did you have an

24   understanding of whether the debtors were going to include

25   the creditors in the planning of any sale process involving

1   Oncor?

2   A    It was my understanding that there was to have been a

3   conversation between the company and the group that I just

4   mentioned that participated in the August 6th meeting with

5   respect to next steps regarding Oncor.  It was my

6   understanding that that was in fact the purpose of the

7   meeting on August 6th.  At the meeting we learned that the

8   company had launched the process for Oncor without informing

9   us prior to that meeting.

10  Q    So let's focus on that meeting.  What did you learn

11  that the meeting, Mr. Kurtz?

12  A    What I learned was that the company had initiated a

13  sale process for Oncor by sending out, you know, what I'll

14  call teaser materials to a group of potential buyers that

15  they had selected.

16  Q    And at that meeting, Mr. Kurtz, did you express any

17  concerns about the process that they described for you?

18  A    I and others expressed concern that they were heading

19  down the wrong path and that -- well, first people were

20  surprised and I think it's fair to say at least a little bit

21  upset that the company had decided to initiate this process

22  unilaterally without having a conversation with us.

23            I remember expressing a view that the matter of

24  Oncor and whether or not it should be sold at all was

25  something that should be done in the context of the plan of

1    reorganization discussions and that perhaps we could use the

2    potential for the Oncor sale as an inflection point to drive

3    those negotiations.  But the plan should determine whether

4    or not there was a sale, the sale shouldn't drive the terms

5    of the plan.  I wasn't the only one who expressed that view

6    at that meeting.

7    Q    Either at the meeting or following the meeting,

8    Mr. Kurtz, did you have any further discussions with the

9    debtor about the sale process that they had initiated?

10   A    I had a conversation with Evercore.

11   Q    And what --

12   A    And other members of my team I believe also spoke to

13   members of Evercore and quite possibly certain members of

14   the Kirkland & Ellis team.

15   Q    Well focusing on your conversations, what did you

16   discuss with Evercore about the sale process that the debtor

17   (inaudible - 12:26:15)?

18   A    What we discussed with Evercore -- or what I discussed

19   with Evercore was the sequencing of the sale, how to run the

20   sale.  We were concerned that the manner that -- the manner

21   of managing the sale of the company had indicated to us at

22   the August 6th meeting was intending to utilize was not the

23   what I'll call value maximizing approach, and after

24   consultation with George Valasik, our you know, utility

25   expert and members of his team and based upon the guidance

1    that we received from them, it was our view that rather than

2    moving to a relatively quick selection of a stalking horse

3    bidder, which the company has indicated to us it was

4    planning to do prior to the end of August, there should be

5    an elongated process for selecting the stalking horse buyer.

6    Basically running your, you know, private auction, if you

7    will, before selecting the stalking horse as opposed to

8    quickly selecting the stalking horse and then opening the

9    process up to competing bids thereafter.

10   Q    Okay.  Mr. Kurtz, if I could refer you, there's a

11   binder on your desk and it has some exhibits we've been

12   looking at.  If you could open that.  It's the big binder

13   right to your left.

14   A    Okay.

15   Q    And Exhibit 52, which is the -- which is the bidding

16   procedure motion you've been referring to.

17   A    Yeah.

18   Q    Do you have it in front of you?

19   A    I do.

20   Q    Could you just identify for the record what the

21   document is?

22   A    This is the motion of EFH or entry of an order

23   approving bidding procedures, scheduling, and auction, and

24   related deadlines and hearings.

25   Q    And have you reviewed the proposed bidding procedures

1    that the debtors have outlined in this motion?

2    A    Yes.

3    Q    And do these bidding procedures make any assumptions

4    about whether a transaction would require the approval of a

5    plan of reorganization?

6    A    These bidding procedures assume that any transaction

7    would be contingent upon confirmed plans both for what I'll

8    call the E side as well as the T side.  The regulated

9    business as well as the unregulated business.

10   Q    Okay.  And based on your experience in Chapter 11

11   proceedings, Mr. Kurtz, is it common to try and market and

12   sell assets like Oncor at this stage of a Chapter 11

13   bankruptcy proceeding?

14   A    It is not common.

15   Q    Okay.  Have you had an opportunity, Mr. Kurtz, to

16   review the revised form of order that the debtors submitted

17   to the Court last week reflecting changes in the bidding

18   process?

19   A    Yes.

20   Q    Okay.  And have you had a chance to review the changes

21   the debtors have made to procedures about what information

22   they are going to provide to the creditors?

23   A    Yes.

24   Q    Do you have a view as to whether as a general matter

25   confidentiality is important in these types of bidding and

1    auction processes?

2    A    I think confidentiality is always important in

3    connection with a sale process.

4    Q    And why do you think confidentiality is important in

5    this type of process?

6    A    Well it's important to the potential buyers, and

7    frankly, it's important to the debtors as potential sellers

8    as well.

9          From the buyer's perspective Itch buyers

10   frequently do not want it to be publicly known that they are

11   interested in potentially making a bid for an asset under

12   circumstances where it may turn out that they conclude not

13   to, so they're not surprisingly very concerned about

14   maintaining confidentiality.

15         The debtor also has a very strong interest in

16   maintaining confidentiality.  The debtor doesn't want the

17   buyer universe to know who is bidding and who is

18   participating in the process and who is not.

19         And so one of the things you want to attempt to do

20   as a buyer is to through management of information to

21   instill the belief on the part of potential buyers that

22   there is robust competition for the asset even under

23   circumstances where there may not be.

24   Q    Now, I think you testified before you have experience

25   advising companies in M&A issues in bankruptcy, correct?

1    A    Yes.

2    Q    In light of that experience do you have a view whether

3    the amount of information the debtors have agreed to provide

4    to the creditors is appropriate in light of these concerns

5    over confidentiality?

6    A    I think these procedures are built upon an

7    inappropriate level of secrecy.

8    Q    And what do you mean by inappropriate level of secrecy?

9    A    Well, as you know from my prior answer I fully

10   recognize and understand the importance of maintaining

11   confidentiality through a sale process.  There's no question

12   about that in my mind; however, there needs to be a balance

13   struck, and I believe that there is a legitimate interest on

14   the part of creditors to have access to real-time

15   information, at least in a limited way.

16          So there's a balance that needs to be struck

17   between absolute confidentiality, nobody else knows anything

18   at all ever, and a completely open process where all

19   constituencies, all creditors have an opportunity to in

20   real-time have access to information.  That can never work.

21          And I believe if there is a middle ground that can

22   be struck and has been struck in other situations where

23   confidentiality was an important, concern I believe these

24   procedures are (indiscernible - 12:32:02) biased in favor of

25   secrecy at the expense of creditor access, which frankly I

1    think is not conducive to the best possible process.

2    Q    And, Mr. Kurtz, let me ask you, how is it possible to

3    balance the desire by creditors to have information about

4    the process and provide input with the desire for

5    confidentiality?

6    A    Well, I have wrestled with this very question in

7    connection with the Kodak case, which I referred to a few

8    moments ago.

9              In connection with Kodak the company ran an

10   auction for its portfolio of digital imaging patents, the

11   potential buyers were all of the largest tech companies in

12   the world, and you can imagine who all the names are.  These

13   are companies that are obsessed with secrecy and with

14   confidentiality, and so we -- it was very important to us to

15   be able to offer a process to the marketplace that would

16   give potential buyers the comfort that if they chose to

17   participate in the process their -- the fact of their

18   participation would be held in confidence.

19             On the other hand we had a group of creditors who

20   had a strong desire to participate in the process, and the

21   way we struck the balance was by creating the concept of a

22   reviewing creditor.  The reviewing creditors were

23   essentially a select group of professionals for each of the

24   creditor constituencies, in Kodak I believe we had four

25   different creditor constituencies, who were allowed in the

1    tent, if you will, in terms of the company sharing

2    information with them.  It was understood that they would

3    never interface with potential buyers, so the company would

4    maintain control of the dialogue with potential buyers, but

5    frankly we felt it was in the best interest of the process

6    to have them in the tent rather than out.  And there were

7    two reasons for that primarily.

8              Number one, we actually welcomed their input, and

9    believe it or not there were times when the creditors

10   actually had a good idea or two that we were able to

11   incorporate into our process and we welcomed that.

12             Number two, and maybe even more importantly, what

13   we found was being able to address the issues that arose in

14   connection with the sale process, and there are always

15   twists and turns, and you know, unexpected events that occur

16   in these processes, matters that cannot be foreseen, by

17   having a chance to talk to them about the appropriate

18   response of the company before the company made a decision

19   we were able to there completely mitigate and actually

20   eliminate any disputes between the company and the creditors

21   over the process itself, which, you know, I seriously would

22   have been the case if we would have adopted the mode of

23   unilateral decision maker.

24             So, I think Kodak is a good example of a situation

25   where the right balance was struck between the need for

```
1    confidentiality on the other hand, but also the appropriate

2    need for creditors to be involved in the process and

3    decision, making at least in terms of providing input to the

4    company, the company is free to ignore the input, but at

5    least providing input to the company as and when decisions

6    are made.

7    Q    And in connection with Kodak in the Kodak circumstance

8    was real-time information provided to the actual creditors

9    or just the to the creditors' advisors or what?

10             MR. MCGAAN:  Excuse me, Your Honor.  I have an

11   objection to this line of questioning.

12             We're gone a couple steps down the path here, and

13   what counsel is doing is asking Mr. Kurtz to offer in effect

14   an expert opinion about the way confidentiality is handled.

15             There's been no disclosure, certainly not in

16   Mr. Kurtz' declaration, there's been no disclosure of any

17   underlying data to support this opinion.  So we're hearing

18   this for the first time now.

19             And if they intend to offer a legal argument that

20   they'd prefer to have a different balance in the case that's

21   an argument counsel can make from the podium, but I don't

22   think this satisfied evidence Rule 702 for two reasons.

23   One, there's been no disclosure again of any underlying

24   data, nor is the Court supervision of the proposed bidding

25   procedures here that we believe requires expert opinion to
```

1    tell Your Honor about the degree of confidentiality.  But

2    we've had no disclosure of what underlies this opinion we're

3    hearing here for the first time.

4              MR. KERR:  Well, Your Honor, I don't -- I disagree

5    with that.  Mr. Kurtz has been involved with Kodak, that was

6    -- they asked him -- could have asked him that at his

7    deposition, there's been no secret about that whatsoever.

8              I'm not -- I'm only asking Mr. Kurtz to reflect

9    and respond to the amended notice of confidentiality, which

10   they served on us last week.

11             And so I've simply asked Mr. Kurtz whether he's

12   had experience in different forms of confidentiality, I

13   think this is a legitimate and it's perfectly appropriate in

14   light of the shifting order they provided to us after

15   Mr. Kurtz filed his declaration in this case.

16             And I'll move on, Your Honor, but you know, it's

17   a point that think needed to be made and it was appropriate

18   to be made here.

19             MR. MCGAAN:  Yeah, so there's no disagreement that

20   there was no disclosure of any underlying data or

21   information that was going to support an opinion like this,

22   in fact we asked -- we asked explicitly before Mr. Kurtz'

23   deposition if there were any analysis or data he was relying

24   on, and we were told with the exception of one spreadsheet

25   that's referred to in his declaration, which has nothing to

1    do with this.  We were told there was no analysis or data

2    that he was intending to rely on, and you can't simply

3    because of his experience if we offer an opinion without

4    having disclosed in advance what it was going to be based

5    upon.  This opinion, for example, doesn't appear in his

6    declaration, the opinion itself.

7         The real problem is you can't offer an opinion

8    like this under Rule 702 without having disclosed any of the

9    data or information to show that some work was done that we

10   could have tested in advance about comparative degrees of

11   sharing confidentiality in other Chapter 11 proceedings.

12        MR. KERR:  Your Honor, what I'm responding to was

13   last week they changed their form of order, they submitted a

14   new form of order that provided some additional disclosure

15   but not what we -- the committee said in its objection that

16   disclosure should be.

17        Mr. Kurtz has personal experience, which he has

18   described, worked with Kodak, he could be here to be cross-

19   examined about that experience.  I think it's perfectly

20   legitimate and perfectly appropriate.

21        THE COURT:  I'll allow it.

22        First of all, again, this is a contested matter so

23   the right, if you will, to addition -- advanced testimony in

24   reports for experts is limited.

25        Second, I have no problem distinguishing, you

1    know, what this opinion is or isn't based on.  Obviously

2    it's based on personal experience in one case, certainly

3    colored by an extensive and impressive career, but I'm

4    capable, I believe, of taking it frankly for what it's worth

5    and I'll allow the testimony, but I think you've made the

6    point.  So we can move on rather quickly I would hope.

7              MR. KERR:  I will move on, Your Honor.

8    BY MR. KERR:

9    Q    Referring back to the bidding procedures motion,

10   Mr. Kurtz, have you seen a reference in that motion to what

11   the debtors are calling the optimal tax structure?

12   A    Yes.

13   Q    And what is -- are you a tax expert, Mr. Kurtz?

14   A    No.

15   Q    Okay.  What is your general understanding of the

16   optimal tax structure?

17   A    My general understanding is that the company has

18   invested a lot of time and energy in advocating for a

19   G reorganization, which would -- G reorganization under the

20   Internal Revenue Code -- that would contemplate the spin off

21   of the TCEH business on a tax-free basis leaving in tact the

22   E side of the capital structure and thereby avoiding the

23   incurrence of what could be a very significant tax liability

24   at the EFH level.

25   Q    And what impact, if any, Mr. Kurtz, does structuring

1   this transaction as a tax-free spin off of a TCEH entities

2   have on the TCEH creditors?

3   A    If that were to occur then the creditors of reorganized

4   TCEH, and there is a reorganization of TCEH that is

5   contemplated as part of the sale procedure for the Oncor

6   business, there would be a conversion of debt to equity at

7   the TCEH level, the creditors would lose the benefit of a

8   step up in basis that would occur if TCEH were to be

9   reorganized outside of the context of a G reorganization.

10  Q    You have -- do you have any sense of the quantity of

11  that potential loss of step up in basis?

12  A    Yes.  It ultimately depends upon the value of the TCEH

13  business and the capital structure that is utilized.  And by

14  capital structure I mean the amount of debt that is put on

15  TCEH when it emerges from bankruptcy.

16          But having said that, it's clear to me based upon

17  the analysis that's been done that the potential value of

18  the loss -- or the value lost in the event that the basis

19  step up is foregone would be in excess of -- or could be in

20  excess of $2 billion.

21  Q    Okay.  Mr. Kurtz, turning back to your work in these

22  cases.  What issues, if any, need to be addressed as part of

23  any plan of reorganization of these debtors in general

24  terms?  Just in general terms.

25  A    Well there are a number of issues that would need to be

1    addressed in connection with the reorganization of these

2    companies.

3            It seems to me maybe the first and foremost given

4    where we are today sitting here in this courtroom is whether

5    Oncor should be sold at all or whether or not we should

6    revert back to at least the structure that was the

7    foundation of Project Olympus whereby the corporate entity

8    would remain in tact, and is there a good reason to sell

9    Oncor at all and is there a good reason to sell Oncor today?

10           There are a number of very complicated tax issues

11   that exist here, some of which I eluded to a moment or two

12   ago.

13           There has been testimony in the case regarding the

14   tax sharing agreements, and there is a difference of

15   interpretation, at least at the moment among the tax

16   experts, as to whether the tax sharing agreements would

17   under circumstances where the TCEH company were reorganized

18   on a non-tax-free basis, so we now we trigger the tax

19   liability at EFH, whether the tax sharing agreements would

20   provide for a push down after a portion of that liability to

21   the T side.  So there's a contractual interpretation issue

22   that needs to be dealt.

23           There is a question as to whether the tax sharing

24   agreement that TCEH is a party to is avoidable in the

25   context of a bankruptcy case.  My understanding is that that

1    tax sharing agreement was entered into in 2012 and so there

2    is an avoidance associated with that.

3            There's a fundamental question regarding the right

4    reorganization structure for TCEH.  If this sale is approved

5    as contemplated in the term sheet pursuant to the

6    G reorganization structure then the structure and format of

7    the T side reorganization will be determined by that sale.

8    And so what will be eliminated, for example, is some kind of

9    a stand-alone reorganization for TCEH pursuant to which TCEH

10   would be recapitalized in its own right, or a reorganization

11   of the entire corporate entity under circumstances where the

12   T side and the E side remain together under the umbrella of

13   the ultimate corporate parent EFH.

14   Q    Mr. Kurtz, do you have an opinion whether the potential

15   sale of the debtors' economic interest in Oncor should go

16   forward at this time?

17   A    No, in my opinion this is not the right time to move

18   forward with this sale.

19   Q    And what is the basis of that opinion, Mr. Kurtz?

20   A    Well there are a number of bases upon which I have

21   reached that opinion.

22            Number one, I believe that this is not the most --

23   assuming that Oncor were to be sold -- let's just assume for

24   the moment, which is not the case, but assume that there

25   were general consensus around that -- the question I ask

1   myself is would you do it now or would you do it later?  And

2   it seems like now is a particularly inopportune time to

3   launch a sale for Oncor.

4            The reason I say that is, you know, the company is

5   in a very weak position to offer certainty of outcome to

6   potential buyers, and in my experience over the years in

7   dealing with potential M&A partners what I have found is

8   that maybe the biggest optical to actually getting M&A deals

9   done in bankruptcy is that potential buyers are concerned

10  that even though they played by the rules and they're the

11  high bidder at the end of the game they will get embroiled

12  in bankruptcy process, bankruptcy litigation, plans of

13  reorganization, and that they won't end up with the asset.

14  It's a much messier process than a typical non-bankruptcy

15  M&A sale.

16            And here if you think about it in addition to the

17  normal contingencies associated with a sale of an asset like

18  Oncor needing regulatory approval and the like, we have at

19  least five conditions, each of which will have to be

20  satisfied I believe that will be unique to these

21  proceedings.

22            Number one, I'm assuming that anyone who's

23  prepared to step up as a stalking horse will want there to

24  be bid protections.  So there will have to be a hearing on

25  whether those bid protections should be granted.

1          Then there'll have to be a hearing on whether the

2     sale should be approved.  So that's contingency number two.

3          Then there will have to be a reorganization plan

4     confirmed for the E side prior to December 31st, 2015.  So

5     that's another contingency.

6          Number five, would be the confirmation of a plan

7     of reorganization for the T side.

8          And then last but not least will be the approval

9     by the IRS of the G reorganization letter ruling that has

10    been sought.

11         My concern is that as the company goes out into

12    the marketplace attempting to maximize value of Oncor it is

13    going have a very difficult time convincing the fullest

14    possible universe of buyers to step into the process when

15    there are so many ways, just given the uncertainties of any

16    bankruptcy proceeding, but exacerbated by the size and

17    complexity of this proceeding, that anyone of these

18    conditions might not be satisfied in which case

19    notwithstanding that they were the high bidder and they

20    stood out for a period of many months, committed to a

21    transaction, they may never get the deal.  I think that

22    could well have a dampening impact on the company's ability

23    to maximize the value of Oncor.  That's number one.

24         Number two, I believe that watching this process

25    this way, and I do recognize that the company has made it

1    very clear, which we appreciate, that it is not absolutely

2    wedded to the tax structure that is outlined in the -- in

3    the bidding materials.  I think at a minimum it would be

4    difficult to conclude that at least as of now the company

5    isn't strongly biased in that direction, but assuming that

6    things proceed as contemplated there will be matters --

7    there will be provisions of that sale as set forth in -- in

8    that structure that will have a preclusive impact on what a

9    plan of reorganization for the T side will look like.

10            And so as I said before, we know that there will

11   be a loss of basis step up, we know that there will be no

12   opportunity to recapitalize the T side, and we know that

13   there will have to be a debt for equity conversion, we know

14   that the T side will have to obligate itself for tax

15   indemnities that are laid out in the bidding materials.  And

16   so before any of those matters have been negotiated at all.

17            And so it's my view for these reasons as well, a

18   second reason, that the better -- the better way to handle

19   this would be to address these issues in the context of a

20   plan of reorganization and then we can determine whether in

21   the context of those negotiations whether the sale of Oncor

22   now really is the right, correct, and value maximizing

23   decision.

24   Q    A couple of final questions, Mr. Kurtz.

25            With respect to marketing of the Oncor stake is it

1    possible that the process could potentially cause harm to

2    that asset if the process is not done in a certain way?

3    A    Right.  I think it is conventional wisdom among

4    professionals who manage M&A processes that, you know, you

5    don't want to have to do it again after you fail the first

6    time.  It's -- the reasons are almost obvious, but the most

7    significant of which is that you're inviting the potential

8    buyer universe into your sale now, and if for some reason

9    the sale stumbles because we couldn't meet a condition many

10   of those potential buyers could be unwilling to invest the

11   time, the energy within their companies, the cost of paying

12   professionals, lining up capital that will be required in

13   order for them to participate fully in this process.

14          So for (indiscernible - 12:51:33) sale process,

15   and this is advice that I would give to my clients, you want

16   to do it once at the time that is best designed to maximize

17   value and you never want to be in a position where you have

18   a sale -- a failed process and then you have to start over

19   again a second time later.

20   Q    One last question, Mr. Kurtz.

21          In light of the issues that you've identified that

22   have yet to be resolved do you have a view as to whether if

23   the sale process goes forward now as provided in the bidding

24   motion how that could impact future plan negotiations?

25   A    Well it will have to impact future plan negotiations if

1    the company adheres to the, you know, what I'll call my

2    words, preferred structure that is outlined in the bidding

3    materials.

4          MR. KERR:  No further questions, Your Honor.

5    Thank you.

6          THE COURT:  Mr. Weisfelner, do you wish to ask

7    some questions?

8          MR. WEISFELNER:  I'm going to try and get done by

9    1 o'clock.

10          THE COURT:  All right.  Please be brief.  Thank

11    you.

12    CROSS-EXAMINATION

13    BY MR. WEISFELNER:

14    Q    Mr. Kurtz, in your 35 years of experience how often

15    have you seen debtors go through a 363 transaction on an

16    asset that is not deteriorating in value?

17    A    Mr. Weisfelner, I went back over each one of the

18    matters that I've been involved in over the last 20 years

19    and I couldn't find one where this has been done.  So at

20    least in my experience the answer is I've never seen it

21    before.

22    Q    And in your 35 years of experience can you list for the

23    Court all of those occasions where the debtor sought to sell

24    an asset that doesn't existed?

25    A    As I said, I've never -- I can't recall seeing exactly

1    this done before in the context of a 363 sale.

2    Q    And in your experience can you tell the Court how many

3    times you've seen the debtor seek to sell an asset that

4    doesn't exist at the current time?

5    A    Again, same answer, I have not seen it.  I have not

6    seen it.

7    Q    And by the way, understanding the optimal tax structure

8    what's being sold is reorganized EFH securities, correct?

9    A    That is my understanding.

10   Q    Okay.  And upon confirmation of a plan of

11   reorganization which of the debtor entities will own EFH

12   reorganized security?

13   A    Which of the debtor entities?

14   Q    Yeah.

15   A    Well none of the debtor entities with over EFH --

16   Q    Okay.

17   A    -- reorganized securities.

18   Q    So again, just to be clear, have you ever seen a

19   transaction under 363 of the Bankruptcy Code where a debtor

20   was selling an asset that it didn't own, that doesn't exist,

21   and now will never own in the future?

22   A    I have not seen that.

23   Q    One last question.

24        You talked about future plan negotiations.

25   Recount for the Court, if you will, how many substantive

1    plan of negotiation discussions has financial advisor to the

2    official committee you've been involved in in this case to

3    date?

4    A    I'd say zero.

5              MR. WEISFELNER:  No further questions.

6              THE COURT:  Mr. Shore, any questions?

7              MR. SHORE:  None, Your Honor.

8              THE COURT:  Mr. Martin?

9              MR. MARTIN:  None, Your Honor.

10             THE COURT:  Okay.  We're going take a very short

11   break and then we'll do cross.  Okay, very Short.

12       (Recess at 12:55 p.m.)

13             THE COURT:  Please be seated.

14             MR. MCGAAN:  Thank you, Your Honor.  Andrew McGaan

15   for the debtors.

16   CROSS-EXAMINATION

17   BY MR. MCGAAN:

18   Q    Good afternoon, Mr. Kurtz.

19   A    Good afternoon.

20   Q    Got a few questions for you.

21             I want to go back to the NextEra bid.  I think you

22   testified on direct that you recall -- you're familiar with

23   the fact that NextEra made a bid at the time the debtors or

24   after the time the debtors had proposed a second lien DIP at

25   EFIH with an equity conversion feature, correct?

1    A    Correct.

2    Q    And at the time Lazard took at look at that bid and

3    concluded that the implied value of Oncor from the NextEra

4    bid was about I think you said $18 billion, right?

5    A    Correct.

6    Q    Also at that time it was Lazard's view that the company

7    could do better for Oncor than 18 billion, right?

8    A    That it potentially could do better than 18 billion,

9    yes.

10   Q    Right.  And Lazard's view at the time was that it was

11   wrong for the debtors to be, in your words, handing Oncor

12   over to a group of creditors or that group of creditors

13   without a market test; isn't that right?

14   A    In the context of the second lien DIP motion, yes.

15   Q    Right.  And so -- so your belief at the time was that

16   it was wrong for the debtors to be, in your words, handing

17   over the Oncor asset to a group of creditors without a

18   market test, right?

19   A    Right.

20   Q    And that's because consistent with your view that the

21   company could do better, the view that you had at the time,

22   a market test might produce a better or higher value than

23   what was implied by the NextEra bid, right?

24   A    Yes.

25   Q    At that time Lazard had done no work to determine what

1    the fair market value of Oncor was, right?

2    A    There was no valuation done, right.

3    Q    Well, so my question is, Lazard had not done work the

4    arrive at a view about the fair market value of Oncor at

5    that time, right?

6    A    There was no specific analysis done.

7    Q    By you or Lazard?

8    A    Correct.

9    Q    And that's true even today.  Sitting here today Lazard

10   has not arrived at a conclusion about Oncor's market fair

11   value, correct?

12   A    There is no specific analysis done.

13   Q    Right.  And so you sitting here today you don't have a

14   view about what Oncor's fair market value is, right?

15   A    Do I David Kurtz have a view?  No.

16   Q    You or your team at Lazard, because --

17   A    Well, as I indicated in my direct testimony, I spoke to

18   Mr. Valasik who is the head of our utility group, he's very

19   familiar with this asset by virtue of our work for the

20   committee and potential buyers, and it was his view that the

21   value implied in the second lien DIP offer was low in

22   relation to what that asset was worth.

23          There was no specific analysis done however, that

24   was his view based upon his expertise in the utility

25   industry and his understanding of the facts.

1    Q    Okay.  But my question is sitting here today Lazard

2    doesn't have a view on what Oncor's fair market value is,

3    correct?

4    A    We've not done a valuation.

5    Q    All right.  Now you testified a few moments ago on

6    direct that you believe that the circumstances under which

7    the bidding procedures -- or I should strike that.

8              I should say you believe that the proposed bidding

9    procedures contemplate a sale of Oncor that may have a, if I

10   got your words correct, a dampening impact on value, right?

11   A    That may not lead to maximizing value.

12   Q    Okay.  And that it may -- this may not be the best time

13   to maximize value.  I made a note that those were your words

14   as well, right?

15   A    Right.

16   Q    Lazard hasn't done any analytical work as of today to

17   demonstrate that that's the case, true?

18   A    I don't know how you word true.

19   Q    No one at Lazard has done any analytical work to be

20   able to show the Court that Oncor would be worth something

21   greater at some future point in time, true?

22   A    No, I don't know how one could do an analysis that

23   would predict the future outcome.

24   Q    Well whether you know how to do it or not the answer is

25   that no one at Lazard has done work, analytical work, to

1    come into court today to show the judge that Oncor would be

2    worth more value at some later point in time, true?

3    A    True.

4    Q    All right.  And there's been testimony -- did you get a

5    chance to watch or sit in for any of the hearing that we've

6    had thus far?

7    A    Some of it.

8    Q    All right.  So you're familiar at least generally that

9    there's been some testimony about current market conditions,

10   that is M&A market conditions and whether they're -- whether

11   it's a good time to market Oncor from an M&A perspective.

12   Are you familiar generally that there's been testimony on

13   that?

14   A    Yes.

15   Q    And Lazard's done no work itself to determine whether

16   market conditions for a sale of Oncor will be better at any

17   time in the future, right?

18   A    I think that's what I testified to, yes.

19   Q    So you agree with me, that --

20   A    The Lazard work -- no work has been done to predict the

21   future, that is correct.

22   Q    All right.  You've mentioned others on your team in the

23   utility group, correct?

24   A    Yes.

25   Q    And a Mr. Valasik?

1    A    Valasik, yes.

2    Q    You yourself are not an expert in the valuation of

3    utility stocks, right?

4    A    Right.

5    Q    I want to turn now to TCEH.  You testified that there

6    was a risk with the contemplated sale of Oncor that some

7    value to TCEH creditors would be lost, true?

8    A    True.

9    Q    And you put a number on it, you said I think it may be

10   greater than $2 billion in a loss tax basis step up; is that

11   right?

12   A    $2 billion of value lost if the tax basis step up does

13   not occur.

14   Q    Okay.  And you gave us in advance of your testimony

15   something called an illustrative assessment of potential

16   TCEH basis step up, correct?

17   A    Yes.

18   Q    And that was intended to show the basis for your

19   testimony with respect to the value or potential value of

20   that lost step up, right?

21   A    Correct.

22   Q    All right.  If you turn to the binder we have that

23   here, and it's in front of you behind tab 3e, it should be.

24   And tell me if I'm wrong about that, but that's where it

25   should be.

1    A    Okay.

2    Q    Okay?

3    A    I have it.

4    Q    Okay.  And you didn't prepare this analysis did you?

5    A    I did not.

6    Q    Someone else at Lazard did?

7    A    Yes.

8    Q    All right.  And so there's data in here that you

9    weren't responsible for selecting or including in the

10   assessment, right?

11   A    I'm not personally responsible for anything that's in

12   here.

13   Q    Okay.

14   A    Not directly.  Maybe indirectly because --

15   Q    All right.

16   A    -- it was done by people who work for me, but I didn't

17   choose any of the numbers that are in this little piece of

18   work product.

19   Q    Okay.  So, for example, I think -- and that was my

20   understanding -- there's an identification of some

21   purportedly comparable companies that appears in the last

22   page here.  You didn't make the selection of the comparable

23   companies to support this analysis, right?

24   A    Right.

25   Q    Let's turn to -- and I'll use for ease of reference the

1    Bate stamp in the lower right-hand corner -- let's turn to

2    Bates number 516.

3    A    Okay.

4    Q    And there it says in the second bullet point your --

5    your piece here reads, "Illustratively assumes TCEH has an

6    enterprise value of 18 to 26 billion."  Did I read that

7    correctly?

8    A    You did.

9    Q    And if we turn to the next bait, Bates 517, there at

10   the top it says, "Assuming TCEH is illustratively valued at

11   20 billion."  Did I read that correctly, and it goes on from

12   there?

13   A    Yes.

14   Q    All right.  And so while on the prior page you're

15   talking about an illustrative assumption of a range of

16   enterprise value, on page 517 you settle on a specific

17   illustrative value of 20 billion for purposes of the

18   analysis laid out here, correct?

19   A    I didn't settle on it, the people who prepared these

20   materials settled on that number.

21   Q    Okay.  The illustrative assessment itself settles on a

22   specific illustrative value here on page 517, right?

23   A    Yeah, now I agree with you.

24   Q    All right.  Now the values -- you understand that the

25   value, to the extent there's a value to any potential tax

1    basis step up at TCEH, depends at least in part on the sales

2    price for TCEH for assuming it sold, correct?

3    A    It depends on the value of TCEH.  TCEH does not have to

4    be sold, if you will, in order for that to occur.  There

5    could be a reorganization of TCEH.

6    Q    Okay.  So you've got to at least have an assumed sales

7    price or an assumed value in order to move forward and make

8    assumptions about a tax basis step up, right?

9    A    Correct.  As I testified earlier the greater the value

10   of TCEH, as determined either through a sale or through a

11   valuation process, will have an impact on the value of the

12   basis step up.

13   Q    Right.  And the way the analysis is laid out here with

14   respect to making some kind of estimate about the value of a

15   lost tax basis step up, that number changes if you plug a

16   different number in here for TCEH's assumed value, correct?

17   A    Correct.

18   Q    And Lazard is writing in this paper illustrative in a

19   number of the pages here to modify value, it's using the

20   term illustrative because it doesn't know what the value of

21   TCEH is today, correct?

22   A    There's been no valuation done for TCEH, that is

23   correct.

24   Q    And that means Lazard has done no work prior to coming

25   here today, done no work to determine a fair market value

1    for TCEH, correct?

2    A    There's been no valuation done.

3    Q    All right.  You mentioned on -- well before I move on,

4    if that's the case, then if Lazard has not done a valuation

5    of TCEH you can't with certainty tell the Court what the tax

6    step up basis -- the value of the tax step up basis would be

7    if there were a transaction involving TCEH because you

8    simply don't know what it's worth, right?

9    A    Well that's why you have to make assumptions and then

10   you run the math off of the assumptions to develop an

11   illustrative number, which is what we were doing here.

12   Q    Okay.  You've mentioned on your direct that you're not

13   an expert in tax, right?

14   A    Right.

15   Q    But you provided some testimony about issues

16   surrounding something called the tax sharing agreement,

17   right?

18   A    I answered -- I spoke to the tax sharing agreement.

19   Q    Right.  And you said that one of the issues that needed

20   to be resolved was whether the tax sharing agreement or

21   contract interpretation issues surrounding the

22   implementation of the tax sharing agreement and whether the

23   tax sharing agreement was voidable, right?

24   A    Right.

25   Q    And first though you've never even read the tax sharing

1    agreement, right?

2    A     I have not.

3    Q     All right.  Lazard has done no work to come in here and

4    tell the Court what the potential tax on EFH or any entity

5    within EFH would be from an assumed sale of Oncor or TCEH,

6    correct?

7    A     No, Lazard is not providing tax advice to the

8    committee.

9    Q     Okay.

10   A     So that is correct.

11   Q     All right.  So you don't have a view and can't tell the

12   Court where the tax would reside within the structure or

13   what the tax amounts would be, the tax liabilities at

14   different entities within EFH, correct?

15   A     Anything I know about the tax situation is what I have

16   been told by the tax experts both at Kirkland & Ellis as

17   well as for the creditors' committee.

18   Q     Okay.  And as far as you know Lazard, and you

19   personally, Mr. Kurtz, have not been made aware of any

20   potential purchaser of Oncor who said that it doesn't have

21   sufficient time to understand the tax issues in order to

22   make a bid for Oncor; isn't that right?

23   A     Right, we're not speaking to potential buyers with

24   respect to Oncor, so that is correct.

25   Q     So you're not aware of any potential bidder who has

1    expressed any concern about its ability to get its arms

2    around and understand the tax issues here sufficiently

3    enough to make a bid for Oncor if it so chooses?

4    A    Well, as I said, we're not speaking to them and so the

5    answer is you are correct.

6    Q    One of the things that you did speak to the debtors

7    about was the list of targets or potential purchasers to

8    whom the debtors were proposing through Evercore to send

9    teaser materials and invite to consider bidding for Oncor,

10   right?

11   A    Yes.

12   Q    And they've shared that, that is the debtors, shared

13   that list with Lazard for Lazard's review and comment,

14   correct?

15   A    Ultimately, yes.

16   Q    All right.  And Lazard provided feedback, including the

17   identity of additional potential bidders that Lazard

18   proposed the debtors should include on the list, right?

19   A    Correct.

20   Q    Okay.  And the debtors did that, they took Lazard's

21   suggestions and included them among the group who were being

22   solicited to make bids, right?

23   A    I have no reason to believe that the debtors did not

24   take our suggestions in that regard.

25   Q    Okay.  So with respect to any potential bidder that

1   Lazard thought should be considered among those to whom

2   teaser materials would be sent and invitations to bid would

3   be sent you didn't express a concern then that they wouldn't

4   -- though they should be on the list -- they wouldn't have

5   the ability to understand tax issues sufficiently to make a

6   bid for Oncor, right?

7   A    That is not right.  What we expressed to Evercore was a

8   belief that now was not the right time to conduct the sale;

9   however, if you were going to conduct the sale at least

10  conduct the best possible sale that you can from the

11  standpoint of structure and from the standpoint of including

12  as many potential buyers as possible.  So if you're going to

13  do it do it right.

14  Q    Okay.  So we're in agreement that in order to pursue

15  that goal of Lazard's that you just described, Lazard

16  offered additional names and the debtors accepted them,

17  right?

18  A    As I said, I have no reason to believe the debtors did

19  not accept them.

20  Q    All right.  There's been some testimony, you may have

21  heard some of it, about utility stock price volatility.  Do

22  you recall that's come up during this hearing?

23  A    I do.

24  Q    And it's true that Lazard hasn't done any projection of

25  utility stock price volatility in connection with its

1    engagement in these cases, true?

2    A    Predicting the future volatility, is that what you're

3    asking me?

4    Q    I'm just asking you whether it's true to say that

5    Lazard has not done any projection of utility stock price

6    volatility in this engagement, right?

7    A    Right.

8    Q    And not prepared any analysis of utility stock price

9    volatility in this engagement, right?

10   A    Projected, that is true.

11   Q    And you believe that it wouldn't be helpful to the

12   Court in analyzing the bidding procedures motion to look at

13   utility stock price -- projected utility stock price

14   volatility, right?

15   A    I'm not aware of any time Lazard has done an analysis

16   that projects value or volatility.  So, I think the answer

17   is right, I don't think it would be helpful because it's not

18   something I've ever seen.

19   Q    Okay.  But so to be clear, Lazard has not done any work

20   to come in here and provide the Court with any projected

21   utility stock price volatility in connection with its

22   consideration of the bidding procedures, right?

23   A    Right.

24   Q    And that's because you believe, as you've just said,

25   that it wouldn't be helpful in your view to the Court in

1    considering whether to approve the bidding procedures?

2    A    Well it would be helpful if it could be done.  I don't

3    know how one would go about doing it.

4    Q    All right.  Now another suggestion that Lazard made to

5    the debtors regarding the proposed bidding procedures had to

6    do with the time for the solicitation of stalking horse

7    bids, correct?

8    A    Yes.

9    Q    And that's something I think you described on direct

10   examination, that it should be -- the time should be

11   lengthened and that's a suggestion that Lazard made to the

12   debtors?

13   A    Correct.

14   Q    And they adopted your suggestion to lengthen that time

15   period in their proposed procedures, right?

16   A    Right.

17   Q    You also testified about the importance of

18   confidentiality in a bidding process like this one, right?

19   A    Right.

20   Q    And you gave some of the reasons that potential buyers

21   may not want it to be known that they're interested in or

22   submitting a bid for an asset, right?

23   A    Yes.

24   Q    And it would be important to foster a sense if it were

25   possible that there's a robust competition for the asset and

1    it's better if bidders don't know who's in and who's not in,

2    right?

3    A    Correct.

4    Q    And the reason that confidentiality is important -- and

5    we didn't get to this in your direct -- but the reason is

6    that if that -- those confidentiality concerns are respected

7    you can maximize the value of the asset through the process,

8    right?

9    A    I think you have a better chance of maximizing the

10   value, yes.

11   Q    All right.  Your declaration, and let's turn to that,

12   it's in the binder at tab 2?

13            THE COURT:  Let me interrupt for a moment.  Just

14   for the record should we mark the illustrative assessment

15   for purposes of the record or is it already in the binder?

16            MR. MCGAAN:  It's in the binder, and we should

17   mark it.  What -- it's Exhibit 77.  So I want to make that

18   clear for the record.  Thank you, Your Honor.

19            MR. KERR:  No, it's not 77.

20            MR. MCGAAN:  Oh, I'm told -- I'm misinformed.

21            MR. KERR:  We'll get the right -- I think it's --

22   I think it's 79.

23            THE COURT:  No, that's Mr. Horton's deposition.

24   We -- we'll mark it in the future.  I just want to make sure

25   it's clear.

1          MR. MCGAAN:  Well, there's some confusion about

2     what the number is.  Your Honor, we'll bookmark that, before

3     we close the record we'll insert the exhibit number for the

4     Lazard illustrative with respect to the TCEH tax basis step

5     up.

6          All right, thank you, Your Honor.

7     BY MR. MCGAAN:

8     Q    All right.  So let's turn to your declaration, which is

9     in tab 2, it's in front of you?

10    A    Yes.

11         (Pause)

12         THE COURT:  We're looking at the declaration?

13         MR. MCGAAN:  Yes, sir.

14         THE COURT:  Okay.  Thank you.

15         MR. MCGAAN:  And specifically -- thank you, Your

16    Honor.

17    BY MR. MCGAAN:

18    Q    Paragraph 12 on page 6.

19    A    Okay.  Okay.

20    Q    Now you eluded to and mentioned at least some of the

21    seven items here that are bullet pointed in your

22    paragraph 12, correct?

23    A    Yes.

24    Q    And these are issues that as you say in your

25    declaration that you believe should be determined under a

1    plan of reorganization, right?

2    A    Right.

3    Q    And your view is that the debtors' pursuit of approval

4    of the bidding procedures motion here in your word

5    "prejudices" these issues, true?

6    A    Could well prejudice issues, yes.

7    Q    And you say could well because we're in agreement that

8    if the Court were to approve the bidding procedures motion

9    it doesn't actually determine any of these seven issues;

10   isn't that right?

11   A    No, it doesn't determine legal issues, it does

12   determine the company's course of conduct.

13   Q    Right.  And I'm going to do it one step at a time, and

14   so my more narrow question, Mr. Kurtz, is that we're in

15   agreement that if the Court approving the bidding procedures

16   motion that's in front of it today it's not determining any

17   of these seven issues in your paragraph 12, correct?

18   A    Correct.

19   Q    And you'll agree that if the Court were to grant the

20   bidding procedures motion it's not determining any

21   substantive rights of the committee, correct?

22   A    Not that I'm aware of.  I mean unless you consider

23   participation through access a substantive right I'd say the

24   answer is no.

25   Q    You were asked some questions on direct about your

1    experience in the sale of assets under Section 363 of the

2    Code.  Do you recall that?

3    A    Yes.

4    Q    And is it your perception that the sale of the economic

5    interest in Oncor that are being contemplated by the debtors

6    here is a sale of assets under 363 or rather the sale of an

7    economic interest under -- or pursuant to a plan?

8    A    I believe that this is the former.  You are marketing

9    the sale of assets under 363.  I have thought of it that

10   way.

11   Q    Okay.  So based on your review of the bidding

12   procedures motion and the associated materials, the

13   conclusion you arrived at is what the debtors are proposing

14   with respect to the ultimate sale of the economic interest

15   of Oncor it would be under Section 363, that's the

16   conclusion you drew?

17   A    No, the sale is contingent upon the plan of

18   reorganization.  It will ultimately be effectuated pursuant

19   to the terms of the plan.  But the process that you are

20   about to run now that will result in granting of a stalking

21   horse, committing the company to pay a break-up fee, my

22   understanding is that the being done pursuant to

23   Section 363.

24   Q    On the ground.  So we're in agreement then that the

25   proposed sale is envisioned down the road of the economic

1    interest of Oncor is pursuant to a plan of reorganization,

2    that's the intent expressed, correct?

3    A    Well it's conditioned upon a plan.

4    Q    You were also asked about -- whether you'd ever heard

5    of the sale of an asset that didn't exist yet, and I think

6    your testimony was in the bankruptcy process you never heard

7    of that.

8    A    I have never experienced it.

9    Q    Have you participated in rights offerings in your

10   experience?

11   A    I have.

12   Q    And they involve the sale of equity interest that don't

13   exist at the time the rights offering is consummated,

14   correct?

15   A    Rights offerings are effectuated pursuant to a plan.

16   Q    Right, but they involve the sale of -- a process that

17   involves consummating a sale before the equity interest

18   exists, correct?

19   A    Well there are different kinds of rights offerings, so

20   there are many rights offerings that do not occur until

21   after the plan of reorganization is confirmed.

22            MR. MCGAAN:  That's all I have, Your Honor.  Thank

23   you.

24            THE COURT:  Thank you.  Redirect?

25            MR. MCGAAN:  Your Honor, I think redirect should

1    be limited to the parties and counsel that examined on

2    direct.

3              THE COURT:  No.  No.  No.  This is a

4    (indiscernible - 1:26:53) process.

5    CROSS-EXAMINATION

6    BY MR. SHORE:

7    Q    Good afternoon, Mr. Kurtz.

8    A    Good afternoon.

9              MR. MCGAAN:  I get that.

10             MR. SHORE:  Chris Shore from White & Case on

11   behalf of the ECEH unsecured noteholders group.

12   BY MR. SHORE:

13   Q    You got asked some questions about your illustrative

14   example, which will be some exhibit number at some point,

15   and the use of a $20 billion valuation for the TCEH side.

16   Just so we're clear on the math.

17             If TCEH is determined at confirmation to be worth

18   $35 billion, using the example you gave, is the step up

19   bigger or smaller than the $2 billion you referred to in

20   your direct testimony?

21   A    Larger.  So the greater the value the greater the value

22   of the loss of step up.

23   Q    Right.  And if you used a $35 billion number for your

24   illustrative example rather than 20- that would -- that

25   would lead to a larger step up that is being lost if TCEH

1   can't reorganize on its own and utilize the step up?

2   A    You are correct.

3   Q    All right.  You got some questions about protective --

4   or about projected volatility.  You've done valuations

5   before?

6   A    Right.

7   Q    And you know what a beta is?

8   A    Right.

9   Q    Do you understand that there is utility in looking at

10  the historical volatility of an asset class in determining

11  the value of an asset in that class at any particular period

12  in time?

13  A    Looking at historical datas?

14  Q    Yes.

15  A    Yes.

16  Q    And what is the utility of doing that?

17  A    The utility of doing that is to build up to a valuation

18  as of a moment in time.

19  Q    Okay.  And if an asset class such as utility stocks has

20  been historically non-volatile can that affect a decision

21  whether or not to go out and market an asset outside the

22  context of a plan?

23  A    Yes.

24  Q    And how would it be useful for either the debtors'

25  management, its board, or the Court in assessing whether or

1    not to take an asset out to market?

2    A    Well in order to determine whether to take an asset out

3    to market the company would have to -- I mean the management

4    would have to make a judgment as to their view as to the

5    future prospects of that company if they don't sell it, and

6    you know, it's a business judgment, and so that

7    determination would have to be made.

8    Q    And what utility would historical trading or volatility

9    in an asset class have in that decision making process?

10   A    I think it would be an important component part of the

11   decision.

12   Q    Okay.

13           MR. SHORE:  Thank you.

14           THE COURT:  Mr. Kerr?

15           MR. KERR:  Your Honor, Charles Kerr for the

16   official committee.

17   REDIRECT EXAMINATION

18   BY MR. KERR:

19   Q    Just a couple of questions, Mr. Kurtz.

20           Mr. McGaan asked you some questions about comments

21   that Lazard made to the bidding process.  Do you recall

22   that?

23   A    Yes.

24   Q    And he asked you about suggestions Lazard made to

25   linked in the stalking horse process.  Do you recall that?

1    A    Right.

2    Q    And he also asked you questions about looking at the

3    list of potential bidders.  Do you recall that?

4    A    Yes.

5    Q    And I think in -- and I wrote this down, I may not have

6    it quite right -- but in response to those questions you

7    said, it was not the right time to consider the sale, but if

8    you're going to do it do it right.  What did you mean by

9    that?

10   A    Well what I meant was if they -- well the company had

11   made a determination to go out and market Oncor and in fact

12   that were -- they had initiated a process to market Oncor,

13   so that determination had been made and it was made clear to

14   us through our conversations with Evercore that there was no

15   revisiting that decision on the part of the company.

16   Although they would be open minded to suggestions we might

17   have as to how the process could be run.  And so with a view

18   toward running the best possible process that the company

19   could we provided that input and much of it was accepted.

20   Q    And in providing that input, Mr. Kurtz, did you suggest

21   to the company that you were changing your view that it was

22   the right time to sell Oncor?

23   A    To the contrary, I made certain that Evercore knew that

24   we were not changing our view and our willingness to comment

25   on the sale process should not in any way be interpreted as

1   an endorsement of their decision to market Oncor now.

2          MR. KERR:  No further questions, Your Honor.

3          THE COURT:  All right, thank you.  You may step

4   down.

5          MR. KERR:  Your Honor, I think on behalf of the

6   objectors I think there's some exhibits that we have spoken

7   to the debtors about about moving into evidence.  I don't --

8   we don't have any other witnesses unless any other objectors

9   do, so subject to putting those exhibits in, Your Honor,

10  that's our only issue.

11         THE COURT:  Any further witnesses by any party?

12  All right, I hear none.

13         MR. MCGAAN:  The housekeeping matter that came up

14  during the cross, the illustrative assessment prepared by

15  Lazard is Exhibit 77.  I understand we --

16         MR. KERR:  I don't -- my apologizes, Your Honor, I

17  had the number wrong.

18         MR. LAWRENCE:  Just make sure that it's in the

19  binder, Your Honor.

20         MR. KERR:  I don't have -- I don't think I have

21  that in the binder.

22         MR. LAWRENCE:  If you don't, Your Honor, we will

23  -- we'll make sure the binder is supplemented so that it's

24  included.

25         (Pause)

1                THE COURT:  My binder stops at 76.

2                MR. LAWRENCE:  We will get you copies of

3      Exhibit 77, Your Honor.

4                THE COURT:  Well, I have it here, I just need to

5      mark it as such.

6           (Pause)

7                THE COURT:  But we'll need a copy for the official

8      record too.

9           (Pause)

10               THE COURT:  Mr. Martin?

11               MR. MARTIN:  Your Honor, just for the record, Ross

12     Martin for Delaware Trust Company.

13               On Friday I believe that deposition designations

14     were delivered of the testimony of Mr. Charles Cremens, I

15     wanted to make sure the Court had those for the official

16     record.

17               THE COURT:  I have received them, I was out of

18     town on Friday, I have not had an opportunity to read them

19     yet.  I was going to read them at some point prior to making

20     a ruling.

21               MR. MARTIN:  Okay.  I can either hand up

22     additional copies, I just -- logistically I wanted to make

23     sure.

24               THE COURT:  Yeah, let's -- why don't you --

25               MR. MARTIN:  I can bring three easily, Your Honor,

```
 1    if that's -- or more.

 2            THE COURT:  Well, I don't need a copy, I have

 3    mine, but why don't we have a copy for -- should we have a

 4    copy for the record?  All right.  If you could just -- a

 5    couple copies -- yeah, right over here.  Thank you.  Let's

 6    for purposes of identification let's mark that 90.

 7            MR. MARTIN:  Thank you, Your Honor, that's what I

 8    was told a minute ago.

 9            THE COURT:  Okay.  So we're going to do exhibits?

10            MR. LAWRENCE:  Yes, Your Honor.  Your Honor, I

11    would --

12            THE COURT:  We have agreement, right?

13            MR. LAWRENCE:  We do, Your Honor.

14            THE COURT:  Excellent.

15            MR. LAWRENCE:  Alex Lawrence for the official

16    committee.

17            Over the last few days we've come together and

18    narrowed the exhibits that we will be seeking to move into

19    evidence, and there are no objections to the exhibits, Your

20    Honor.  They are Exhibit 2, Exhibit 9, 10, 11, 14.

21            THE COURT:  Slow down.

22            MR. LAWRENCE:  Yes.

23            THE COURT:  Go ahead.  Fourteen.

24            MR. LAWRENCE:  Fourteen.  Twenty, 21, 22, 27, 33,

25    37, 40, 41, 51, 52, 55, 62, 69, 71, 72, 73.  We've already
```

1    mentioned 77.  And I believe 79 was already admitted into

2    evidence, that was the court and designations, but that was

3    on the list as well, Your Honor.

4              THE COURT:  All right.  Any --

5              MR. SHORE:  We've got one addition just because we

6    had a confusion on the numbers, because I thought we had

7    marked that the one page, which is now in here as 78, which

8    is the T&D analysis of Evercore, it was the one chart that I

9    had showed to Mr. Hiltz during his deposition.  That's

10   right.

11             THE COURT:  Okay.

12             MR. SHORE:  And that is on our list now as 78.

13             THE COURT:  Yes.  Okay.

14        (Pause)

15             THE COURT:  All right.  I'm just going to say them

16   again to make sure I have an agreement with what you had,

17   which is 2, 9, 10, 11, 14, 20, 21, 22, 27, 33, 37, 40, 41,

18   51, 52, 55, 62, 69, 71, 72, 73, 77, 78, and 79.

19             MR. LAWRENCE:  And 80, Your Honor.

20             THE COURT:  And 80.

21             MR. LAWRENCE:  And with that, Your Honor, we'd

22   move to the admission of those exhibits.

23             THE COURT:  All right.  They're admitted without

24   objection.

25        (Committee's Exhibits 2, 9, 10, 11, 13, 20, 21, 22,

1    27, 33, 37, 40, 41, 51, 52, 55, 62, 69, 71, 72, 73, 77, 78,

2    79, 80 were admitted)

3          MR. LAWRENCE:  Thank you, Your Honor.

4          THE COURT:  Okay.  Anything else for the record

5    before I close the evidentiary record?  All right, I hear

6    nothing, that'll close the evidentiary record.

7          How do you propose proceeding for closings

8    generally speaking?

9          MR. HESSLER:  Good afternoon, Your Honor.  For the

10   records of Steve Hessler of Kirkland & Ellis on behalf of

11   the debtors.

12         We did make a proposal late last week, which we

13   proposed again this morning, to do something similar with

14   regard to duration that we did with the openings.  Which

15   would be let's call it 20 minutes for the debtors, I think

16   it was maybe 15 minutes each for the principal objectors,

17   and 10 minutes for the others.  I don't believe that we had

18   gotten a response to that proposal.

19         THE COURT:  It's too tight I assume for the

20   objectors.  Okay, that's fine.  I -- we have some time and

21   there's a lot to say and a lot to cover so we'll impose an

22   artificial deadline, at some point I may interrupt you and

23   say you've got four or five more minutes to give you an

24   opportunity to wrap up if it's going on too long, and that

25   could apply to anybody.  I assume we're going to start with

1    the debtors and then move over to the objectors, it's their

2    motion.

3            MR. HESSLER:  That'd be the debtors' preference,

4    Your Honor.

5            THE COURT:  All right.  Okay.  I have a short

6    meeting to attend and -- which is a perfect time to stop.

7    We will reconvene at 2:00 as promptly as possible at 2:00,

8    and we will commence with closing argument.

9            MR. HESSLER:  Thank you, Your Honor.

10       (Recess at 1:39 p.m.)

11           THE COURT:  Please be seated.  At your

12   convenience.

13           MR. HESSLER:  Thank you, Your Honor.  Again, for

14   the record, Steve Hessler of Kirkland & Ellis on behalf of

15   the debtors.

16           With Your Honor's permission, we did put together

17   a PowerPoint for our closing.

18           THE COURT:  Okay.

19           MR. HESSLER:  May I approach?

20           THE COURT:  Yes.  Okay.

21           MR. HESSLER:  And, Your Honor, for convenience, we

22   do have copies for -- a limited number of copies for folks

23   in court if they --

24           THE COURT:  Okay.

25           MR. HESSLER:  Your Honor, there are three

1   principle points of focus that we would like to engage upon

2   our closing today.

3           The first is the debtors' business judgment, and

4   to reiterate that this is the standard governing the limited

5   relief requested by our motion, and Your Honor, to walk

6   through the evidence as to why we believe that the debtors

7   have overwhelmingly satisfied that standard.

8           The second point, Your Honor, involves the

9   objector's arguments, challenging the debtors' governance.

10  We believe these arguments are incorrect on the law and on

11  the facts, and we will clarify both for the Court, Your

12  Honor.

13          Finally, the objectors stated preferred strategy

14  do nothing, is neither responsible nor prudent, and we

15  certainly do not believe it's persuasive.  It is the

16  debtors' prerogative to move these cases forward, which we

17  are seeking to do through the bidding procedures.

18          First, Your Honor, focusing on his misjudgment.

19  As in our opening, we think it's important to level set what

20  is before the Court.  First is the limited relief that we

21  are seeking through the motion up for approval today.  Your

22  Honor, we have requested approval of bid deadlines, bid

23  requirements and related procedures, and that is essentially

24  the sum and substance of the bidding procedures.

25          THE COURT:  Well, wasn't Mr. Hiltz' testimony

1    pretty clear that this is it.  When we get to a stalking

2    horse, the game's over, this is the marketing process.  So

3    to say it's just bidding procedures, this is the marketing

4    process for the asset.

5           MR. HESSLER:  This is the marketing process, Your

6    Honor, I certainly don't intend to minimize the importance

7    of the bidding procedures.  The point I'm making by

8    emphasizing the limited nature of relief is a significant

9    portion of what is being objected to involves relief that

10   comes through a stalking horse motion or a sale approval

11   motion, Your Honor.  And there will be additional

12   opportunities to object to facts that are not yet developed

13   or not yet before the Court.

14          Your Honor, the standard governing our request to

15   propose bidding procedures is business judgment.  To

16   reiterate what is business judgment?  It is a presumption

17   that the Board acted on an informed basis and in good faith

18   in honest pursuit of the corporation's best interests.

19          Your Honor, we believe this is what we need to

20   satisfy --

21          THE COURT:  Are you talking about the corporate

22   defense asserted to limit liability of corporate directors,

23   or are you talking about 363(b) which requires a reasonable

24   exercise of the debtors' business judgment?

25          MR. HESSLER:  I'm talking about both, Your Honor,

1   but beginning first with demonstrating that -- 363(d) which

2   also requires the satisfying business judgment, but I

3   believe both turn on showing that the Board was informed,

4   and that the Board acted in good faith.

5            To that point, Your Honor, we want to revisit the

6   evidence as to an informed Board acting in good faith.

7   We've argued first that the bidding procedures would provide

8   certainty as to the ground rules for bidding.

9            Mr. Keglevic and Mr. Hiltz' testimony that Court

10  approval of procedures would provide certainty to bidders,

11  that limited testimony itself was uncontroverted.

12           Next, Your Honor, we would argue that the bidding

13  procedures themselves would provide transparency regarding

14  the process in timing for marketing the economic interests

15  in Oncor.  Your Honor, no one has challenged that limited

16  evidence, presumably because it is so straight forward.

17  That Court approved procedures will make the process and

18  timing of the marketing effort transparent to both the

19  bidders and all parties in interest.

20           Lastly, Your Honor, we've argued that the design

21  of the procedures, specifically the timeline and the format

22  will maximize value.  Of course, Your Honor, the objectors

23  have challenged timing to the extent that they do not want

24  the marketing process to go forward at all right now.  But

25  they have not undermined the more specific rationale

1    provided by the debtors that the two stage process itself

2    and the actual timing of both stages are designed

3    appropriately to maximize value.

4             THE COURT:  Well, I think they've raised the issue

5    with -- at least with regard to timing that the stage one or

6    what it's called, Phase 1 or I can't remember how it's

7    described, that would have passed last week maybe to the

8    extent you're talking about your tax preferred or tax

9    optimal structure, there's been a lengthy period.  But this

10   idea that there's been a sufficient period for a shopping or

11   marketing of a non-tax preferred transaction, I think they

12   would take issue with.

13            MR. HESSLER:  To clarify, Your Honor, so -- I

14   believe what you're referring to is Round 1 bidding and

15   Round 2 bidding --

16            THE COURT:  Round 1, yes.

17            MR. HESSLER:  -- as part of the (indiscernible -

18   2:13:11) process.

19            THE COURT:  Yeah.

20            MR. HESSLER:  And there was some examination on

21   cross that was the time at the close of Round 1 bidding and

22   the submission of definitive documentation, was that enough

23   time.  I believe that was -- at least that's my

24   recollection, Your Honor, of the questioning on that front.

25            The point I would offer -- you're -- then they

1    make challenge to the timing, Your Honor.  What I would say

2    is, there has been no contrary evidence introduced that any

3    bidders are somehow confused by the bidding procedures as

4    filed, or that any bidders are having any difficulty

5    complying with the process.  To the contrary, we believe our

6    witnesses indicated all of the bidders that they are

7    conferring with appropriately understand the intent and

8    operation of the procedures.

9            So to the extent, Your Honor, that I was offering

10   that the evidence is uncontroverted on that point, they

11   certainly may take exception with it and they did on some

12   limited basis.  But I do not believe we heard, Your Honor,

13   any contrary evidence, or even really any sustained

14   challenge to what is fundamentally the two staged process

15   that the debtors have designed.

16           So to summarize just on this point, Your Honor,

17   certainty, transparency and value maximizing design.  The

18   debtors offered extensive testimony that the bidding

19   procedures themselves further these goals, and the objectors

20   did not offer any contrary evidence on those points, Your

21   Honor.

22           Governance, Your Honor.  So what have the

23   objectors offered, what have they argued, and they had waged

24   a three day assault on the debtors' governance process.

25   They have isolated certain specific allegations that we

1    believe are neither factually correct, nor specifically

2    legally relevant to argue against relief that again the

3    debtors are not yet seeking at the bidding procedures stage.

4            Again, Your Honor, we believe the business

5    judgment standard requires us to show that the Board was

6    informed, and that the Board acted in good faith.

7            THE COURT:  When did they act?

8            MR. HESSLER:  I'm going to turn right to that,

9    Your Honor.  Given the objector's focus on governance, we

10   are compelled to clarify both the law and the record.

11           Your Honor, the objector's first major argument is

12   that the Board did not vote to authorize the actual filing

13   of the bidding procedures motion.  As a threshold matter,

14   Your Honor, and in direct answer to your question of a

15   moment ago, here are the actions that the Board did take.

16   They voted to appoint co-chief restructuring officers.  They

17   voted to terminate the RSA and to pursue a sale process for

18   the economic interests in Oncor.

19           THE COURT:  Is there any evidence in the record

20   about the and you just added?

21           MR. HESSLER:  The and as to pursue a sale process?

22           THE COURT:  Yes.

23           MR. HESSLER:  Yes, there is, Your Honor.  I'm

24   going to turn to it in a moment.

25           THE COURT:  Okay.

1          MR. HESSLER:  And then thirdly, they approved the

2    marketing process after deliberating over the course of nine

3    meetings.

4          But equally importantly, Your Honor, we think the

5    law does not require that every corporate action requires a

6    quote/unquote vote.  Authority may be expressly or impliedly

7    delegated, and it may be conferred in multiple different

8    ways.  And this black letter law, Your Honor, we believe

9    actually dovetails with the business judgment standard,

10    which requires that the Board was informed and acted in good

11    faith.

12          So returning to Your Honor's question, what does

13    the evidence show regarding the Board's actions.  First,

14    Your Honor, we believe it shows that the directors were

15    informed as to all material features of the bidding -- of

16    the marketing process.

17          I turn to the testimony of Mr. Sawyer of ECH and

18    TCEH independent board member.

19              "Q   Did any board member at any meeting you

20              recall attending express the view that he or she

21              needed more information or analysis to move

22              forward?

23              "A   No.

24              "Q   When you reviewed the bidding procedures

25              motion a filed, was there any aspect of the

1              bidding procedures motion that's inconsistent

2              with the strategy endorsed by the Board?

3              "A    No."

4         Second, Your Honor, the Board members agreed that

5    undertaking the marketing process now was the right course

6    of action.  We believe we offered unanimous and

7    uncontroverted testimony on this point from two independent

8    directors, and the debtors' co-CRO, that they all agreed

9    undertaking the marketing process now was the appropriate

10   course of action to move forward in these cases.

11        Third, Your Honor, the Board members provided

12   feedback and approval of the actions of the co-CROs over

13   many meetings here as well, both independent directors Mr.

14   Sawyer and Mr. Cremens, and the debtors' co-CRO, Mr.

15   Keglevic, they all testified that the Board was deeply

16   engaged in the decision to market the economic interests in

17   Oncor, and to do so under the specific design of these

18   bidding procedures.  And again, Your Honor, we do believe

19   that this testimony itself is uncontradicted.

20        Your Honor, there are certainly other key points

21   that we believe refute the objector's arguments on

22   governance.  As Mr. Sawyer testified approximately a year

23   ago, the debtors' boards appointed co-CROs with the

24   responsibility and the direction to move the cases forward.

25        To the extent there is any ambiguity whether the

1   bidding procedures were authorized, and we believe the

2   testimony is quite clear that the Board did expressly

3   authorize the bidding procedures, the CROs also had, and did

4   exercise the delegated authority to move forward on those

5   procedures.

6           Your Honor, further to your question, more express

7   actions of the Board.  On July 23rd, the Board -- the Boards

8   terminated the RSA, in favor of a process to sell the

9   economic interests in Oncor.  Your Honor, this action

10  necessarily included authorization to withdraw the proposed

11  EFIH second lien debt embodied in the RSA, in favor of a

12  marketing process.  And we believe, Your Honor, that there

13  was extensive testimony on that point in addition.

14          Your Honor, turning to -- I'm on slide 14 now --

15  more express actions of the Board.  On August 26th, the

16  Board met and agreed that the proper course of action was to

17  request Court approval of a two staged marketing and auction

18  process.

19          Your Honor, the filing of the bidding procedures

20  motion was nearly the next logical and effectively

21  ministerial step in carrying out the direction from the

22  Board to go forward and get Court approval of the two stage

23  marketing process.

24          Slide 15, Your Honor, more express actions of the

25  Board.  The testimony establish there were multiple board

1    meetings over the course of two and a half to three months,

2    at which the debtors -- excuse me, at which the debtors'

3    directors debated the marketing process, and they instructed

4    the co-CROs and advisors to move forward and implement that

5    marketing process.

6            Your Honor, turning to slide 16.  The second major

7    challenge by the objectors with regard to governance that

8    there were no "written materials" provided to the Board, and

9    they focused upon no valuation analysis and no "volatility

10   analysis."

11           As a threshold matter, Your Honor, the testimony

12   establishes that the Board reviewed appropriate and relevant

13   written materials.  For instance, Mr. Keglevic testified and

14   I quote, the Boards -- well, we inserted the Boards agreed,

15   but what they agreed, Your Honor, was quote bid comparisons

16   showing enterprise value, assumed debt, the structural

17   value, net proceeds that would result from the transaction

18   and implied multiples that resulted from the bid.

19           Your Honor, what about --

20           THE COURT:  So I'm clear --

21           MR. HESSLER:  Yes, Your Honor.

22           THE COURT:  -- were any such materials provided to

23   the other side in discovery?

24           MR. HESSLER:  To the extent that the materials

25   themselves were contained in the draft Board minutes that

1    were otherwise privileged and not produced, Your Honor, I

2    don't think so.  To the extent that they were, Your Honor,

3    I'll confirm and if I have an opportunity to rebut, I'll --

4                THE COURT:  All right.

5                MR. HESSLER:  -- make that point.

6                Your Honor, slide 17, what about valuation

7    materials that we heard a lot about from the objectors?  The

8    testimony of Mr. William Hiltz of Evercore, the debtors'

9    lead M&A advisor established two points.

10               First, Your Honor, it is consistent with industry

11   practice to present the Board with a valuation analysis in

12   connection with the approval of an actual transaction.

13               Secondly, Your Honor, a quote volatility analysis

14   is not customary or needed to embark upon a marketing

15   process, and indeed we just heard Mr. Kurtz, financial

16   advisor to the creditor's committee today effectively

17   testify the same.

18               Your Honor, the objectors claim that the Board did

19   not review written materials is not correct.  And the claim

20   that the Board didn't review valuation materials or a

21   volatility analysis we believe is a red herring, Your Honor.

22               This brings us to the third point of our close,

23   Your Honor, which is do nothing.  So what do the objectors

24   recommend that we do?  Nothing.  The urge, Your Honor, that

25   instead of pursuing a marketing process the debtors should

1    do nothing.  As we stated at the outset, or as I stated at

2    the outset of this presentation, we don't believe that's

3    responsible, we don't believe it's prudent to adopt a course

4    of inaction.

5            Your Honor, we think it's appropriately within our

6    prerogative as debtors in possession that presently have the

7    exclusivity to determine and pursue a path forward to

8    maximize value for all shareholders.  To be clear, Your

9    Honor --

10           THE COURT:  Is it a -- and I certainly see the

11   quotations and I remember them.  Is it an argument that you

12   should do nothing and allow time to tic or is it an argument

13   that you should do nothing now in connection with the E

14   side, other than negotiate a plan of reorganization with

15   your creditors?

16           MR. HESSLER:  No, that's correct, Your Honor, it's

17   the point I was going to make, that I do not think that they

18   would literally say that we should do absolutely nothing in

19   this case.  But it is key as to the sequencing that they're

20   saying with regard to the marketing of this asset, I do

21   believe they mean that we should be doing nothing with

22   regard to the marketing of this asset until there has been

23   opportunity for them to pursue all matter of intercompany

24   claims, to have plan negotiations, until we ultimately

25   arrive at confirmation, Your Honor.

1          And here's how I would further explain, that we

2     think that that is the flatly incorrect strategy.  Again,

3     Your Honor, to be clear, we do not simply prefer an action

4     over inaction in the abstract.  There are strong business

5     reasons for marketing the economic interests in Oncor at

6     this time.  Here as well, we want to return to the evidence

7     before the Court on this point.

8          Your Honor, we argue that proceeding to market now

9     allows the debtors to determine the value of Oncor under

10    positive market conditions.  There was extensive testimony

11    from Mr. Hiltz on this point.  He testified to the

12    (indiscernible - 2:25:10) of M&A transactions, the

13    availability of credit, the large number of parties involved

14    in this process.

15         Critically, Your Honor, we do not believe the

16    objectors have undermined this testimony.  They have not

17    introduced any contrary evidence.  They have instead argue

18    that we somehow need to disprove a hypothetical negative

19    that they have not even identified.  They're arguing that we

20    need to simply show that these positive conditions that Mr.

21    Hiltz testified to, that they're somehow not to become even

22    more positive.

23         And, of course, it's impossible for the debtors to

24    do that.  It would be impossible to do in the context of any

25    sale process.  We also would argue, Your Honor, the business

1    judgment standard does not include anything resembling any

2    such requirement.

3              Furthermore, Your Honor, the objectors -- I will

4    concede they will not -- they're respondent, they don't

5    literally mean do absolutely nothing in the context of this

6    case.  They will respond we should confirm a plan first and

7    then run the marketing process.

8              But, Your Honor, we believe this ignores this

9    testimony and also what Your Honor could probably take on

10   judicial notice that obtained clarity sooner rather than

11   later through a marketing process in the context of this

12   case, that's going to facilitate plan negotiations.

13             And the party most appropriate to make this

14   determination, Your Honor, are the debtors; debtors in

15   possession with exclusivity and the prerogative, and in

16   fact, the obligation to move these cases forward responsibly

17   and quickly as possible.

18             Your Honor, something that Mr. Keglevic testified

19   on the third day of trial, or I guess maybe it was the

20   second, proceeding at this time, would help ensure that a

21   lengthy regulatory process do not delay emergence.  On this

22   point as well, the sooner we have clarity as to who will own

23   the economic interests in Oncor, the sooner we can begin the

24   process and obtaining regulatory approval necessary for the

25   effective date of a plan.

1            If we need to wait, Your Honor, until confirmation

2    of a plan to even begin the marketing process, the plan

3    effective date could be delayed months if not years.  We

4    believe that is not in the best interest of any stakeholders

5    in this case, Your Honor.

6            And again we return to the point that it's

7    appropriately within the debtors' business judgment to make

8    that determination.  And we believe that the testimony we've

9    offered support that business determination.

10            Your Honor, I want to update a slide that we had

11    at our opening argument that shows the status of objections

12    for the bidding procedures motion.

13            As we highlighted at the outset, we were able to

14    resolve three objections, and the resolution itself turned

15    primarily on what we're calling the limited information

16    sharing protocol regarding bids.

17            Your Honor, Mr. Kurtz testified today that even

18    with the limited information sharing protocol that his --

19    it's his judgment that the limited amount being shared

20    remains insufficient, that it's not yet enough.  We would

21    want to take -- we would ask the Court to take note that,

22    you know, many of the other key stakeholders, the one who

23    supported the motion from the outset, as well as those of

24    whom we've resolved their objections, they believe that we

25    have struck the right balance between access and information

1    to bids, and maintaining the integrity and confidentiality

2    of the process.

3            So as we are here today, we have the remaining

4    objections of the TCEH second liens, the ad hoc group of the

5    TCEH unsecured creditors, the unsecured creditor's

6    committee, and the EFIH first liens, but we think this chart

7    demonstrates, however, are the most direct economic

8    stakeholders in this process all support moving forward.

9            And I believe you're going to hear, Your Honor,

10   after I cede the podium, there's actually three parties that

11   want to speak in favor of the bidding procedures motion.  I

12   think it may make sense to take that before we turn to the

13   objections.

14           But we do want to highlight that point, Your

15   Honor, to indicate what we do think is very significant

16   support for the bidding procedures that the Board approved,

17   that the debtors are now pursuing.  And also, Your Honor, to

18   reiterate that the vast majority of the objections that were

19   offered, the substance of the objections that were offered,

20   they will have full opportunity to prosecute those arguments

21   at the stalking horse motion phase and/or the auction

22   approval phase, Your Honor.

23           If Your Honor has no further questions, I believe

24   we'll turn the podium over to counsel for the TCEH first

25   lien lenders.

1          THE COURT:  Okay.

2          MR. ADLERSTEIN:  Good afternoon, Your Honor, Jake

3     Adlerstein, Paul Weiss Rifkind Wharton & Garrison on behalf

4     of the ad hoc committee of TCEH first lien creditors.

5          As Your Honor may remember, we initially filed the

6     limited objection to the bid procedures based on certain

7     transparency concerns, as Mr. Hessler just noted, we worked

8     constructively with the debtors to resolve those issues,

9     with the inclusion of additional information and

10    consultation rights in connection with the stalking horse

11    selection process.  As revised, we now fully support

12    approval of the bid procedures.

13         Now, just to echo a few of the comments Mr.

14    Hessler just made, while the questioning over the past

15    several trial dates has been wide ranging, we think it's

16    important for the Court to remember that the requested

17    relief currently before the Court is actually quite limited

18    and narrow.  There is no sales transaction currently before

19    the Court, and there may never be one.

20         We believe the debtors have carried their burden

21    in demonstrating that it is an appropriate exercise of their

22    business judgment, to test the market now to see if they can

23    lock in a favorable floor for the Oncor value.

24         If the debtors determine at the conclusion of that

25    marketing process that in consultation with their key

1    creditor constituents, it makes sense to proceed with a

2    given sale transaction.  That transaction will remain

3    subject to further Court approval, and all of the parties

4    that are here today will have an opportunity to probe the

5    merits of that specific transaction and if necessary object.

6    No rights are being prejudiced in that regard.

7              In addition, it's important to remember, and I

8    think the objectors have strenuously made these points, that

9    a successful transaction from this process will not resolve

10   all the issues in these cases.  As the objectors have

11   argued, there is still much work to do including the filing

12   and prosecution of a Chapter 11 plan.  And on this point, we

13   completely agree.  We have urged the debtors to make

14   material progress on the negotiation and prosecution of a

15   plan, but we believe that should be done in tandem with an

16   Oncor sales process.

17             Doing so and proceeding on parallel track will

18   preserve estate assets, streamline these efforts and all

19   without prejudicing any creditor's rights.

20             Now, the objectors on the other hand, have pursued

21   at every turn, what we believe is an agenda of delay that's

22   not in the best interests of the debtors' estates, and now

23   as applied here risk jeopardizing significant potential

24   value that could come from a sale of Oncor at a very

25   advantageous point in time.

1          They contend that the mere specter of potential

2     claims demands that this marketing process not go forward

3     and that these cases instead grind to a halt.  But approval

4     of the bid procedures will not impair any creditor's rights

5     to pursue claims, the objectors will undoubtedly have their

6     day in court, and any and all legitimate claims, major

7     company, derivative direct would necessarily have to be

8     resolved in connection with confirming the Chapter 11 plan.

9          But litigating or otherwise resolving those

10    potential claims, whatever they may be, is not a threshold

11    case issue that must first be addressed at the expense of

12    otherwise making forward progress.

13         Indeed, one of the key benefits to pursuing the

14    potential sale of Oncor now, is that any additional value

15    that a future purchaser may be able to contribute to these

16    cases, could itself be a critical asset in resolving

17    contested issues and potentially obviating the need for

18    expense of time consuming litigation.

19         And we believe that will ultimately expedite the

20    debtors' emergence from Chapter 11 protection, which is in

21    the best interests of all of the debtors' stakeholders.  For

22    these reasons, Your Honor, we support entry of the proposed

23    order currently before the Court, and we believe that

24    approval of the bid procedures is an important step in

25    maximizing the value of the debtors' estates, and advancing

1    these cases toward a successful resolution.

2              THE COURT:   Thank you.

3              MR. PEDONS:   Good afternoon, Your Honor, Richard

4    Pedone for American Stock Transfer, indentured trustee for

5    the unsecured bonds at EFH.

6              Your Honor, we're trustee for approximately $2

7    billion in bonds, 700 million of them are held by third

8    parties.   American Stock Transfer supports the process that

9    the debtors are conducting.

10             Your Honor, the objectors have discussed their

11   potential claims, they've talked about claims they may

12   bring, might bring months from now against the E side, but

13   they haven't brought those claims yet.

14             The objectors are probably, in many cases,

15   considerably underwater or totally out of the money, and

16   they are pursuing a process of delay here.

17             This delay and attempt to delay is an attempt to

18   delay the debtors' efforts to come up with a reorganization

19   plan.   It's not an attempt to confirm the plan, it's not an

20   attempt to define or finalize or seek approval of a specific

21   sale process.   These debtors are within the exclusivity

22   period, the objectors, all of them, I believe, assented to

23   the extension of the exclusivity period.

24             American Stock Transfer as a trustee for the bonds

25   that the holding company request that this Court allow the

1    debtors' motion and afford the debtors the time to go

2    through this process, identify potential purchasers, and we

3    ask that the Court keep in mind that the process the debtors

4    propose doesn't define a specific purchaser, it ends with an

5    open option process months from now at which any party can

6    come forward, and then it proceeds through a plan process at

7    which other alternatives can be done.

8              And we ask that that whole process proceed as

9    quickly as possible.  Thank you.

10             THE COURT:  Thank you.

11             MR. KAPLAN:  Good afternoon, Your Honor, Gary

12   Kaplan from Fried Frank Harris Shriber & Jacobson on behalf

13   of Fidelity Management and Research Company and its

14   affiliates.

15             Your Honor, I'll be very brief.  We obviously

16   support the relief requested.  We think that the evidence

17   that the debtors put on and frankly the lack of any

18   compelling contrary evidence shows that this was an exercise

19   of the debtors' business judgment.

20             And there are two questions that Your Honor asked

21   Mr. Hessler that I just want to focus on.  The first one was

22   you said, well, wasn't Mr. Hiltz' testimony that this is the

23   end, that what Your Honor is approving now is kind of the

24   end of the process.  And frankly, Your Honor, I don't think

25   that's quite what Mr. Hiltz said.

1           I think what Mr. Hiltz said was once you get to

2    the process of selected a stalking horse, and Your Honor has

3    approved it, and we've moved down this direction, we've

4    moved down, that may be the end, although he also was very

5    clear that A, we don't yet know what the terms of the break-

6    up fee will be, and B, that there may very well be a

7    fiduciary out that may allow for an Olympus dial or some

8    other transaction.

9           So I think that -- and when we actually go through

10   the testimony and Mr. Keglevic made this point very clear

11   too, was that this isn't the end, that all this is doing, is

12   getting one very, very important piece of information, which

13   is what is the value of Oncor today, so that we can then

14   decide the debtors and its creditors can decide what are the

15   appropriate next steps.

16           THE COURT:  Well, we can get an idea of the value

17   of Oncor, somebody in this case would perform a valuation of

18   the assets of the debtor.

19           MR. KAPLAN:  You know what, frankly, Your Honor, I

20   think that a valuation right now would be irrelevant.  And

21   the reason that I say that is we have a marketing process.

22   We had Mr. Keglevic testify that where he had seen in his, I

23   think he said 35 years of experience, that this is at the

24   high end of the multiples that he had seen utilities trade

25   at.

1          So if people are going to use a valuation based on

2     current multiples, if they're going to use historical

3     multiples, we end up with a lower number.  But all that

4     would give us at the end of the day is we'd have probably

5     five valuations from this side of the room, some other

6     valuations from this side of the room, everybody would have

7     their own view, but we really wouldn't know what it is that

8     we're fighting about.

9          And I think, you know, again there was testimony

10    by a couple of the witnesses is the reason that Olympus fell

11    apart --

12          THE COURT:  Yeah.

13          MR. KAPLAN:  -- was because there was -- the

14    parties couldn't get together and agree on valuation.

15          THE COURT:  Yeah, that's a fair point.

16          MR. KAPLAN:  And so this will give us something.

17    And then just to the last point about whether it's a do

18    nothing or negotiate the plan now or get to, you know, and

19    then do marketing later.

20          Is that until we know the size of the pie, there's

21    so many constituents here who each one have their own

22    independent views of value and everything else, which assets

23    they want and which assets they don't.  If we actually get

24    to a process, maybe we'll be proved wrong, maybe the next

25    bid disappears, everything else disappears and there's a

1    different value, maybe there's a lot more activity, but

2    we'll at least know what the size of the pie is that people

3    are fighting about.

4              And doing that, I think will help move this case

5    around, rather than having a whole bunch of theoretical

6    fights over everybody's investment banker's views of

7    valuation.  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MR. HOROWITZ:  Good afternoon, Your Honor, Gregory

10   Horowitz from Kramer Levin Naftalis and Frankel on behalf of

11   the EFIH second lien ad hoc noteholders and indentured

12   trustee.

13             Your Honor, Mr. Hessler is correct that we have

14   withdrawn our objection on the basis of changes that the

15   debtors agreed to make to the bid procedures.  We are not

16   affirmatively supporting, Your Honor, we're reserving our

17   rights, and I want to take just a moment to explain our

18   position, Your Honor.

19             As Your Honor knows from the second lien DIP

20   hearing, we believe that the debtors are delinquent in

21   having subjected these assets to a full and fair market

22   test, that they should indeed have done so prior to the

23   petition date, and that they failed to do so at that time.

24             It was only through the second lien noteholders'

25   efforts that the manifestly inadequate deal that was

1    represented by the RSA was terminated.  Mr. Sawyer presented

2    some, and I think somewhat amusing revision as to history,

3    the RSA was not a brilliantly conceived step to instigate a

4    bidding process.  The debtors had to be compelled through

5    our litigation efforts to even engage with the second lien

6    noteholders and others over competing DIPS.

7            When they did engage, we partnered with NextEra to

8    bring forward a proposal what used to be called the second

9    lien noteholder NextEra DIP proposal.  But in these

10   proceedings, has somehow just become the NextEra proposal.

11           And just as an aside, Your Honor, it was only

12   because we were able to talk to a bidder and NextEra was

13   able to talk to us that we were able to bring this

14   opportunity to the estate, and help maximize value.

15           Our original objection -- our objection was very

16   largely premised on the fact that the debtor was entering

17   into confidentiality agreements that would prohibit bidders

18   from talking to creditors.  It was the debtors' agreement to

19   remove that prohibition that has caused us to withdraw our

20   objection.

21           We think that the ability of bidders to talk to

22   creditors especially in a circumstance where the debtors

23   recognize creditor consensus is a key component, is an

24   important improvement in the procedures.

25           The debtors now recognize that the proposal, the

1  second lien noteholder NextEra proposal that resulted when

2  the debtors started talking to us was a -- represents a very

3  good deal that would've paid off all of the EFIH creditors

4  in full with extra value to EFH, and that the technology,

5  the tax technology that was represented by that bid is what

6  is concluded -- that caused the debtor to conclude that they

7  can open up a marketing process to new third -- to third

8  parties.

9          But even after we came forward with this very good

10  bid, Your Honor will recall the debtors did continue to try

11  and move forward with the RSA and rejected our bid.  We had

12  to have two days of contested hearing, which wasn't even

13  completed before the debtors concluded that the RSA was the

14  wrong way to go, and are now embarking on a marketing

15  process.

16          In principal, we agree these assets need to be

17  exposed to a full and fair market test to establish value.

18  And we are not objecting to the process, but we do have some

19  skepticism that under the current circumstances, for reasons

20  that the objectors will start to raise, and also because

21  there's so much noise raised by the objections, we have some

22  concern that under these circumstances that this process may

23  not result in a deal that represents full and fair market

24  value for the assets in question.  And therefore, we are

25  reserving our rights until -- and unless and until such time

1    as the debtors bring forward an actual deal, we're certainly

2    not committing ourselves to take the position that whatever

3    the result of this process is, is indeed a solid market test

4    establishing values.

5            Similarly, Your Honor, there are aspects of the

6    bid procedures that we did not explicitly -- we did not

7    agree to, and we are not committing to, for example, there's

8    a concept of a cash equivalent value that might be -- that

9    represented by a bid -- by a bidder offering stock with some

10   price protections, we're not committing to this, we're

11   reserving our rights on any bid that comes in.

12           THE COURT:  Okay.

13           MR. HOROWITZ:  Thank you, Your Honor.

14           THE COURT:  Who's next?

15           MR. WEISFELNER:  If it pleases the Court.

16           THE COURT:  Yes.

17           MR. WEISFELNER:  Edward Weisfelner, Brown Rudnick

18   on behalf of WSFS and an ad hoc group of second lien

19   bondholders.

20           Your Honor, let me start where the debtors started

21   on their opening argument, and that's with regard to what

22   the proper standard of review is.  We've argued in our

23   papers that the rights standard of review is one of

24   heightened scrutiny and the debtors continue to insist that

25   this is a matter of business judgment.

1        Your Honor, it's our view that given the conflicts

2   that abound in this case, and the benefits to be realized by

3   insiders and the lack of fundamental fairness that surrounds

4   the debtors' collective decision-making process, and we

5   think the evidence fully supports the need to review this

6   motion using a heightened level of review, and I'd like to

7   be able to come back to that in a second, or maybe not a

8   second, but eventually.

9        Your Honor, what isn't debated is that the debtors

10  have the burden of proof on this motion regardless of what

11  the standard of review is.  And, Your Honor, we've heard

12  lots of testimony on the question of whether there was a

13  proper authorization to put Oncor on the market now.

14        The uncontroverted evidence is that there was no

15  vote taken to put Oncor on the market.  Citations are the

16  October 17th transcript, Mr. Hiltz' testimony beginning at

17  page 128, lines 18 through 20; Mr. Keglevic at his October

18  20th hearing, in particular page 210, line 12 through 212,

19  line 24.

20        Even Mr. Sawyer acknowledges no vote was taken by

21  the Board to put Oncor on the market, and that's at page

22  153, lines 13 through 18.

23        Now, we've been treated today to the

24  countervailing theory, and that is that we had authorization

25  given to the CROs to move this process forward.  Well,

1    unfortunately, however, for the debtor is the record is to

2    the contrary.

3              Uncontroverted evidence that there was no vote

4    delegating corporate authority to the co-CROs or the outside

5    advisors to put Oncor on the market.  Citation for that

6    proposition, the October 20th transcript of Mr. Keglevic's

7    live testimony beginning at pages 212, line 7 through 213,

8    line 12.  No Board delegation of authority to the co-CROs.

9              The only testimony that suggested that there was

10   authorization came from Mr. Sawyer, who testified that he

11   believed the CROs received a general delegation of all

12   restructuring duties prepetition.  That doesn't suffice,

13   that doesn't meet their burden of proof.

14             We heard lots of testimony on whether it's a quote

15   good time, end quote to sell from the perspective of the

16   market, and by market, I think by now we all know what the

17   debtors' evidence shows.

18             The witnesses spoke to things like current

19   interest rate environment, current status of the debt

20   markets, current status of the M&A market, historic utility

21   multiples, but has been admitted, and as I think Your Honor

22   can conclude, no one has a crystal ball, and no one knows

23   where those markets may be, six months, a year, or two years

24   from now.  Mr. Hiltz admitted that fact, Mr. Keglevic

25   admitted that fact, even Mr. Sawyer acknowledged that fact.

1              Indeed because no one can predict the future, we

2       know that the value of Oncor may indeed rise in the future.

3       That's what Mr. Hiltz told us on October 20th, page 18,

4       lines 7 through 11 of his testimony.

5              What you were basically told, Your Honor, and I

6       don't think this is the debtors' fulfillment of its burden

7       of proof, is a fairly unremarkable contention.  We have a

8       possibility of obtaining more value now, and that's better

9       than the risk of having less value in the future maybe,

10      possibly, we're not sure, no one knows.

11             I want to focus on the evidence that Your Honor

12      didn't hear, again to support my contention that these

13      debtors have failed in their burden of proof.

14             And I want to focus on the evidence you didn't

15      hear when viewed from the perspective of my debtors'

16      estates, TCEH.

17             What evidence did you hear, did the debtors put

18      forward on the risks and rewards to moving forward when

19      viewed from the limited perspective of TCEH?  Well,

20      according to Mr. Sawyer, my single independent fiduciary,

21      you potentially get more value on the E side of the house,

22      at least more value when measured against the inherent value

23      in the now abandoned RSA second lien DIP transaction.

24             That is, Mr. Sawyer admitted on the stand, there's

25      no current path that he knows of forgetting that value over

1   to the T side.  That's Mr. Sawyer's deposition at page 169,

2   line 15 through 171, line 2.

3             And I marvel at the presentation you got from Paul

4   Weiss' counsel to the first liens on the T side.  Because

5   you have to compare that argument to what he said in his

6   papers.

7             What he said in his papers was, we expect on an

8   $18 billion valuation represented by the now withdrawn

9   NextEra bid, we're going to be able to satisfy all of the

10  claims on the E side of the equation, all of them,

11  principal, interest, premium, make whole, questions about

12  whether or not they accrue at a contract rate versus a

13  federal judgment rate, and then you have value buttling (ph)

14  up the EFH.  An estimated value, according to Mr. Hiltz of

15  some $700 million.

16            And what Paul Weiss told you in the pleadings,

17  what they didn't repeat today is, their position is unless

18  and until we get that 700,000 in value -- 700 million in

19  value, we will not support the tax free spin on the T side

20  which causes us to give up billions of value on a step up in

21  basis.

22            So it's nice that they're here supporting the

23  motion, but they're here with a threat.  The threat is, it

24  belongs to me, I get it, or I withhold my consent to a tax

25  free spin.  Spin is the operative word.  I think we're all

1    spinning in an effort to figure out what we're doing and why

2    we're doing it.

3           And while there's no clear path as Mr. Sawyer

4    testified to getting any of this excess value over to the T

5    side, that's the reward side of the equation when viewed

6    from my estates' perspective, we already know the risks

7    inherent to my estate.  The risk is, that we suffer a loss

8    worth some $2 billion or more depending on the ultimate

9    value of the T side, in the form of a loss of a step up in

10   basis.

11          The testimony is also clear that the other thing

12   we lose is the value of the NOLs that are being handed over

13   to the first lien creditors to give them the partial step up

14   in basis that's been promised.

15          So we have no clear path for a benefit, but we

16   know the give-ups and the risks we're being forced to

17   assume.

18          I want to next focus on another bit of evidence

19   that you didn't hear from the debtors, and why as a

20   consequence, we believe that they've failed to meet their

21   burden of proof.

22          Your Honor, you heard no evidence that supports

23   selling the Oncor stake now, outside a plan of

24   reorganization, no evidence that concern was even addressed

25   should we move forward to market and sell Oncor or to be

1    more precise, the reorganized equity of EFH.

2            Not only did no Board approve that specific issue,

3    we should sell now outside of a plan, but you heard no

4    evidence that any Board even considered the issue.

5    Especially at the TCEH -- the TECH level.

6            In fact, when you think about it, it's no surprise

7    that the debtors failed to carry their burden of proof here.

8    Because they presented no bankruptcy expert, they presented

9    an M&A expert, Mr. Hiltz.

10           Mr. Ying was nowhere near this motion.  Sat in

11   court most of the days, could be in the overflow room, as

12   far as I know, but they didn't present his declaration, and

13   they didn't make him available to Your Honor.  And I think

14   that that's critical.

15           Now, you've got to remember their chosen

16   professional from Evercore came on board after the decision

17   to market Oncor had already been made, that's the October

18   17th transcript of Mr. Hiltz at page 91.  And let's remember

19   that Mr. Hiltz came on board after the decision to market

20   Oncor through the optimal or efficient tax structure was

21   already in place.

22           Hiltz' focus, therefore, was on whether it makes

23   sense to market an asset when the markets are in the all-

24   time high, is there some level of market interest, and the

25   values that may be obtained to appear higher than the values

1    ascribed to Oncor in the narrow band in RSA.

2           And, Your Honor, frankly if you put aside the need

3    to obtain proper corporate authority, based on the proper

4    analysis and study by directors who are truly looking for

5    the failure to a fiduciary duties of loyalty and care,

6    especially at the TCEH level, maybe Mr. Hiltz could be right

7    if this transaction were viewed from the narrow perspective

8    of his expertise, non-Chapter 11 M&A process.

9           What Hiltz did not and could not competently

10   testify to was whether in a multi-debtor Chapter 11 case it

11   makes sense to put all of one estate's assets up for a

12   forward sale within a preferred tax structure, which has

13   major implications for all debtors, all before any plan of

14   reorganization has been outlined, filed, subjected to

15   negotiation, disclosure or voting.

16          The propriety of marketing Oncor outside of a plan

17   was according to the testimony never even considered.

18   That's exactly what Mr. Sawyer testified to on October 21st

19   at pages 211, line 13 through 212, line 7.

20          THE COURT:  Isn't the response to that, well,

21   deciding to market implicitly means people have decided not

22   to market?

23          MR. WEISFELNER:  Deciding to market means people

24   have expressly decided --

25          THE COURT:  Implicitly decided not to market.  In

1    other words, you say, you know, nobody made a decision, an

2    affirmative decision or considered even an affirmative --

3    making an affirmative decision of not to put the asset on

4    market, and the response to that might be, well, they

5    considered whether to put it on market, and said yes, and

6    implicit in that is, well, the no would've been don't -- do

7    you understand?

8              MR. WEISFELNER:  Yeah, I do, and I'm on a

9    different level.  I agree that there's one issue, we get

10   proper corporate authority --

11             THE COURT:  Right, right.

12             MR. WEISFELNER:  -- to put Oncor on the market.

13   I'm beyond that.  I don't know that that really matters how

14   that issue gets resolved, I'm concerned that we didn't have

15   the proper --

16             THE COURT:  All right.  Then I didn't follow what

17   your point was.

18             MR. WEISFELNER:  Here's my point.  My point is,

19   and it gets back to my jurisdictional concern, when a debtor

20   has an asset, and in particular, an asset that's not

21   depreciating in value, it's not a melting ice cube, every

22   indication, all of its own internal projections show

23   improvements in revenue and earnings potential.

24             When you've got that kind of an asset, you would

25   think a debtor in possession in Chapter 11, you're now out

1    of the ordinary M&A process, you're in Chapter 11, doesn't

2    my debtor have an obligation to me to make a determination

3    as to whether or not disposition of the asset, call it a

4    sale, makes sense outside of the protective provisions of

5    Chapter 11 and a plan process.

6              You heard no evidence that now is the right time

7    to sell Oncor, not on a market basis, multiples and M&A

8    market and great interest rates, and terrific debt markets,

9    but whether these debtors should be moving forward to sell

10   Oncor outside of a plan.

11             THE COURT:  Okay.

12             MR. WEISFELNER:  And I need to focus on what I

13   mean by outside of a plan.

14             Today, Your Honor, there was a material

15   development in these cases, and I'd ask Your Honor because

16   the record's closed, to take judicial notice of the fact

17   that the U.S. Trustee appointed today an EFIH official

18   creditor's committee.

19             THE COURT:  I saw that.

20             MR. WEISFELNER:  Your Honor, what do I mean when I

21   talk about outside of a plan?

22             Judge, there's been no business plan by either the

23   T side or the E side.  Your Honor asked the question well,

24   when is it ever going to be appropriate to get a valuation.

25   Well, one of the ways that you get a valuation is you take

1    the business plan and you make certain presumptions

2    regarding value based on the business plan.  We don't have a

3    business plan from these debtors, we don't have a valuation

4    from these debtors.  What else don't we have?  We don't have

5    a plan outline.

6              Nothing that the debtors have said to any of the T

7    side creditors, at least the junior creditors is what their

8    view or vision of a plan ought to be.

9              No attempt to resolve the intra-estate claims that

10   they know are coming, that have been asserted that have been

11   scheduled, no effort to resolve the tax issues, they filed a

12   tax memorandum.

13             Now, Your Honor, I guess I thought that you could

14   file a couple of things in bankruptcy.  You could file a

15   motion, you could file an adversary proceeding, you could

16   file a whole bunch of stuff under the federal bankruptcy

17   rules.  I don't know what authorized or justified the filing

18   of a tax memorandum.

19             THE COURT:  I think I asked for it, so that might

20   be.

21             MR. WEISFELNER:  No, I think what Your Honor asked

22   for was some elucidation of the tax issues.

23             THE COURT:  I did, yes.

24             MR. WEISFELNER:  I don't know that you asked for

25   an advertisement in the middle of a sales process on the

1    preferred tax structure without affording the creditors the

2    opportunity to give you their countervailing view about the

3    enforceability or interpretation of tax sharing agreements,

4    the likelihood of the IRS interposing objections, the

5    likelihood of the IRS for the first time in history making

6    after the fact changes to regulations.

7              But, Your Honor, my point is that we've got the

8    debtors taking a position on behalf of all of their estates

9    from a tax perspective that hasn't had the opportunity to

10   have any creditor input, any creditor debate.

11             When I talk about we're outside of a plan, this is

12   where Mr. Keglevic's testimony, I suggest, is critical.  We

13   asked him whether or not there's been a single solitary

14   substantive plan meeting between the debtors on the one hand

15   and any of the junior creditors on the T side on the other

16   hand.  And he quite honestly acknowledged no, there hasn't

17   been one, but don't worry, because Mr. Keglevic is directed

18   the folks from K&E to set up a dinner.  Hasn't happened yet,

19   I didn't get a call, I don't know if any of my colleagues

20   have, but we haven't been invited to the first meeting in

21   this case to talk about a plan.

22             Let's talk about what we're really here doing.

23   What we're really here doing is we had an RSA and a second

24   lien DIP facility that was negotiated prepetition.  Then the

25   RSA and the second lien failed, and I'm glad that we had

1    someone step up to the podium and try and clarify the

2    revisionist history that you heard.  NextEra's bid was live

3    and pending and notwithstanding the debtors moved forward on

4    two full days of contested hearings trying to get the RSA

5    and the second lien DIP approved, notwithstanding the

6    existence of NextEra.

7            While once the debtor was forced to throw in the

8    towel on the RSA and the second lien DIP, the only thing

9    they then considered was how do we move forward with our

10   RSA, in some other form or fashion, which is a euphemism for

11   saying, how do we advance our existing tax thesis, which is

12   a euphemism for saying, how do we ensure that we avoid at

13   all costs any strand of tax at EFH.

14           So Mr. Keglevic told you that the Board once they

15   yanked the RSA considered two and only two paths.  Path A

16   was, we're going to continue to negotiate with NextEra,

17   we'll anoint them as a stalking horse, and then we'll come

18   to the Court.

19           Path B developed only after creditor push back

20   was, well, we understand that utilities don't like to jump

21   each other's bids, so appointing somebody as a stalking

22   horse are going to drive those guys away.  The debtor opened

23   up the stalking horse process, that's all you had, Plan A

24   and Plan B; Path A, Path B.  You never had a Path C.

25           Should the debtor in the exercise of its fiduciary

1    duty to all of its constituencies take an asset that's not

2    diminishing in value and before we've had a single solitary

3    step towards a plan put it up for sale.

4            In a situation where that sale, if successful,

5    will lock in elements of a plan of reorganization, and

6    prejudice certain creditor's rights with regard to value

7    that would be predetermined based on their preferred optimal

8    tax thesis, even Mr. Hiltz was forced to admit that he saw

9    no harm to pursuing a plan, and that values could go up in

10   that context because bidders would not have to take into

11   account execution risks.

12           Even Mr. Hiltz admitted that resolution of the

13   contested issues surrounding enforceability of the tax

14   sharing agreement, intra-estate claims, could in effect,

15   scuttle the entire sale process and require the debtors to

16   go back to the winner at the auction to renegotiate the

17   deal.

18           I harken back to Mr. Kurtz' testimony that if you

19   don't do this right the first time, you are hurting the

20   market and hurting the asset and diminishing value.

21           Even Mr. Hiltz admitted that if the T side has a

22   claim into the ring fence, he's asking Your Honor for

23   authority to sell ice in winter.

24           And finally, Your Honor, I've been practicing

25   bankruptcy almost as long as Mr. Kurtz, not quite as long,

1    and the record should reflect I still have all of my hair,

2    this is the first time I've ever seen a sale forward of an

3    economic interest of one estate in a particular tax manner

4    with implications for all of the debtors' estates outside

5    the context of a plan.

6           Not a single solitary plan discussion has taken

7    place that involves the official creditor's committee's

8    constituency.  That's Mr. Keglevic, October 20th transcript,

9    page 171, line 23 through 173, line 19.  But we're going to

10   have a dinner, we're going to get invited to it then.

11          Mr. Sawyer has testified that meeting with anyone

12   of his constituents, other than the first lienholders,

13   quote, never even crossed his mind.  That's the October 21st

14   transcript, 147 is the page reference, line 16.

15          And, Your Honor, I must tell you that I think

16   we've all been treated to the most disingenuous presentation

17   I can recall.  According to Mr. Sawyer, my independent

18   fiduciary and according to counsel's closing arguments,

19   these debtors will consider any transaction in any form,

20   it's not over today, nobody's locked in, the debtors

21   announced a deferred tax structure notwithstanding, we don't

22   know what kind of offers we're going to get, and everyone is

23   going to have a chance to bring the circus back in town,

24   once they anoint the stalking horse.

25          And if that doesn't work, we can bring the circus

1    back into town when they ask you to approve a sale.  Let's

2    get one thing crystal clear based on the evidence.  Hiltz

3    told you in no uncertain terms, that a transaction that's

4    different than the transaction that the debtor has outlined

5    in the bidding procedures, they're optimal preferred

6    transaction, anything other than that is a pure fantasy.

7              And I can cite to his transcript from the first

8    day of this hearing at page 75 through 76, page 153 through

9    154, page 155, page 156, and on the October 20th transcript,

10   page 50, line 21 through 51, line 6.

11             In fact, Mr. Keglevic told you it's a fantasy to

12   expect any stalking horse that doesn't bid consistent with

13   their preferred tax structure.  That was on the October 21st

14   transcript, page 86, line 17 through 24.

15             Your Honor, if allowed to go forward, the only

16   transaction we're going to see here is a conditional bid for

17   reorganized EFH equity that requires a tax-free spin on the

18   T side, we all know that.

19             Only Mr. Sawyer seems to be of the view that it's

20   quote early days, we'll look at any transaction, any

21   structure, that's what he wants Your Honor to believe,

22   notwithstanding the testimony that came from Mr. Hiltz and

23   Mr. Keglevic.

24             And, Your Honor, once we call a spade a spade

25   notwithstanding Mr. Sawyer's disingenuous testimony, the

1    next legal focus is there's a forward sale of Oncor under

2    this tax structure dictate plan terms.

3              Even Mr. Sawyer has already told you that the

4    forward sale of Oncor under the optimal tax structure, which

5    is what we're all about here, is going to dictate the terms

6    of any eventual plan of reorganization.  That's a direct

7    quote from Mr. Sawyer.  The October 21st transcript, page

8    233, line 25 to 236 line 4.

9              But not to worry Mr. Sawyer tells us, it's early

10   days and he has quote, faith in the process.  Faith in the

11   process?  A process where our independent director sees no

12   ripe -- that was his word -- conflict of interest.

13             He isn't bothered at all when his debtor estate

14   through a common set of lawyers advocates in the omnibus tax

15   memo for an interpretation of the important tax sharing

16   agreement that's directly contrary to the views of the T

17   side junior creditors, and supportive of the view of EFH.

18   That's not a ripe conflict.  That's the same fiduciary that

19   voted enthusiastically, I might add, for the RSA.  Despite

20   the fact that by its terms it wipes out his entire

21   constituency, other than the first lienholders.

22             And he determined that the junior creditors were

23   out of the money and should be wiped out under the RSA, not

24   on any kind of formal valuation or analysis, but based on

25   the all advice of Mr. Ying, who's supposed to represent all

1    of the debtors' estates, and by extension all of the

2    creditors.

3            And why did Mr. Sawyer tell us at this trial that

4    it was okay to sign on to an RSA that wiped this all out?

5    His answer, because the RSA was just the catalyst, Your

6    Honor, for a process, and my independent fiduciary has faith

7    in that process.

8            Which brings me back to the first point that the

9    debtors opened with, and that is what's the right standard

10   of review.  Your Honor, we would respectfully submit that

11   the right standard of review requires a determination of

12   whether we're looking at a transaction that benefits

13   insiders, this one does, it helps to preserve for the

14   sponsors avoidance of stranded taxes.  That's been the

15   single minded purpose underscoring all of the debtors'

16   activities from prepetition days up through and including

17   today.

18           That's what underscored the RSA and the second

19   lien DIP, avoid stranded taxes, EFH's stranded taxes, avoid

20   having the sponsors saddled with those taxes.

21           Now, you're being told the reason we're moving

22   forward on a tax-free deal is, we need to all worry about

23   the IRS.  They'll object to a plan except for the

24   proposition that is their own tax memo shows you, every

25   time, three times that I know of in reported cases that the

1    IRS has come forward and said, you can't approve this plan

2    because its purpose is tax avoidance, the IRS lost.

3            The other thing I don't understand is the common

4    sense view that the IRS would oppose a deal with a stranded

5    tax, filed the money and the logic.  Hiltz tells you,

6    there's enough value in Oncor to clear all of the claims on

7    the E side of the equation, including make wholes, including

8    premiums, including incurring the claims at a contract rate

9    instead of a federal judgment rate.

10           And he says, there will be 700 million that flows

11   up to EFH, maybe more if we do an open auction, maybe more

12   if we sell the estate pursuant to a plan.  But focus on the

13   700 million, the debtor tells you that we should expect the

14   IRS to object, because when they have a choice of taking

15   $700 million as a priority creditor at EFH in a taxable

16   transaction, they're going to say, nope, I don't want that

17   700 million.  I'd rather have a tax-free transaction as

18   Uncle Sam and take zero, nothing.

19           Now, I understand and acknowledge there may be

20   forced during a process or an institutional prejudice

21   against stranded tax, but I'll tell Your Honor to quote Mr.

22   Sawyer, it's early days for any one of us to suggest to Your

23   Honor or for Your Honor to conclude how the IRS is going to

24   come out.

25           Your Honor, I want to make sure you understand our

1    position.  We're not foreclosing any tax structure here.

2    Taxable, nontaxable, we just think it's too early to tell if

3    that's the right way to go.

4             Your Honor, what we ultimately want is a decision

5    that's going to further these cases, and in particular,

6    further discussion among the parties towards a consensual

7    plan.  Two or three of the folks that support the debtors'

8    motion tried to characterize us as the out of the money

9    constituency that has no option other than to stand up here

10   and say no, go away.  What?  This is what you want to do?

11   We don't like it.  If it doesn't allow us to delay the

12   process any further, we're just going to say no, like

13   they're President Obama and the Republican Congress.

14            Your Honor, we've done a lot to demonstrate that

15   we're not interested in delay, we're interested in a fair

16   process.  We negotiated a protocol for discovery that

17   resolved our first day motion for Rule 2004 investigation.

18   Took us a long time to get there, but we got there.

19            We negotiated a protocol for investigating estate

20   claims, took us a long time, but we got there, and we're

21   early days in that protocol.  But rather than give the

22   debtor -- rather than have the debtors give us what we

23   thought we bargained for, assistance on pursuing intra-

24   estate claims, assistance on looking at potential claims

25   against the first lien lenders, assistance on helping us to

1    pursue claims, or at least investigate claims against the

2    sponsors themselves.

3              The debtors chose to ignore the protocol.  They

4    didn't even tell my independent director that it existed.

5    Instead, they want to put forward a sale transaction that

6    will dictate plan terms, that depend for its success on

7    those claims being ignored, set aside or disallowed.

8              Judge, we think that a decision that endorses the

9    debtors' decision will at a minimum make it less likely that

10   the debtors will have changed its stripes, and are now

11   interested, as they profess late in the game, to be

12   negotiating a plan of reorganization.  Why would they have

13   to?

14             They had an RSA that they negotiated prepetition.

15   It failed.  So they bumped into a wall, like a rumba vacuum,

16   they're backing up and they're going in another direction

17   but they're going to back into the same wall.  They haven't

18   had a single conversation and our prediction is, if a

19   motion's granted, they won't.

20             And if the motion's granted, the reality is, we

21   are talking about the exact same tax structure, the only bid

22   the witnesses have all told you you're going to see is a bid

23   that conforms to their tax-free transaction.  That will give

24   rise to the same set of objections, but more so on the

25   jurisdictional grounds when they come to approve a stalking

1    horse bid.  They need statutory authority for the relief

2    they're requesting.

3            If it's not 363, what is it?  Is it 1129?  Then

4    why don't they wait to get a plan done before they sell

5    forward the equity in a reorganized entity?

6            Your Honor, we want to see active competent plan

7    negotiations moving forward.  If the debtor is given a

8    signal today, take the RSA 2.0, run it up the flag pole yet

9    again, let's see what happens on this record, where the

10   testimony you got from my independent director, they will

11   quite likely conclude, no reason to talk to the creditor

12   group that from day one, my professionals, the guys retained

13   by my estate, have said, but never supported, we're out of

14   the money, ignore us.

15           Your Honor, for all those reasons, I think the

16   debtors have to be told thoroughly and loud, wrong way to

17   go, guys.  If you want to sell Oncor, sell Oncor once you've

18   got a plan of reorganization that makes sense.  Once you

19   have leading the one with the official committee of

20   unsecured creditors on the EFIH side of the equation.  Thank

21   you, Judge.

22           THE COURT:  You're welcome.

23           MR. SHORE:  I too have a deck, Your Honor, and a

24   couple of loose documents along with it.  May I approach?

25           THE COURT:  Yes, you may.  Thank you.

1           MR. SHORE:  Your Honor, Chris Shore from White &

2    Case on behalf of the ad hoc group of TCEH unsecured notes.

3    I'm going to, as I said at the beginning, try to stick to

4    the facts and the law, and show that based on the days of

5    testimony and the exhibits that have been moved into

6    evidence the debtors haven't met their burdens.

7           I've laid out the standard again.  Again, it's

8    clear, the debtors need to show a sound business

9    justification, they also need to show good faith, or as I

10   like to boil it down, the debtors must show that there was a

11   proper decision taken for a proper purpose.  That's what

12   they need to show in order to get relief for -- under 363

13   for a transaction outside the ordinary course.

14          And on the next slide, page 2 as I said in my

15   opening, there are a couple of key factual inquiries the

16   Court needs to make.  One, whether an appropriate decision-

17   maker made a decision; two, whether that decision-maker

18   properly exercised the duties of care and loyalty; three,

19   whether the decision provides some tangible benefit to the

20   estate that outweighs the risk, that's the sound portion of

21   the sound business justification, and at least, the debtors

22   must clearly articulate why they're doing it.  That is, come

23   to the Court and be frank, this is what we need.

24          And I'll show you what we finally got.  I said at

25   the beginning, there was some lack of clarity as to why the

1    debtors were going forward, and there were two camps out

2    there, was this about minimizing risk, was this about

3    driving the plan process forward.  The motion says, this is

4    all about maximizing the value of the Oncor estate.

5              What we got from Sawyer on the last day of the

6    debtors' case was his frank statement as to why they are

7    doing this.  It is an opportunity to move the process

8    forward.  That is the clearest articulation that the debtors

9    have given to date with respect to what they are doing here.

10             They've gone back and forth, we're minimizing

11   risk, we're trying to test the market, this is an

12   opportunity to find things, anything else, this is the clear

13   statement from a board member as to what they were seeking

14   to do.  I raise it now because it affects how the Court

15   should be looking at the facts.

16             And the question is, how did we get to the

17   disconnect here between the Franks statement from the board

18   member as to what they're doing, kind of a duh moment, of

19   course, this is RSA 2.0, and all this other verbiage you've

20   been given about risks, and managing risks and maximizing

21   the value and all of that.

22             And I think it starts, and I'm going to answer the

23   question you gave, which is why the debtors, or did the

24   debtors ever consider not selling.  The genesis of all of

25   this, this motion is the RSA.

1              The RSA decision and whatever delegation happened

2    prepetition with respect to that was not a decision to sell

3    the Oncor stake.  It was a decision as part of a second lien

4    DIP to use post reorganization equity as a means of paying

5    off a DIP.  That was not any decision by a board to take the

6    asset now and sell it forward and then build the plan around

7    it, it was a payment mechanism.

8              So when we get to what Mr. Keglevic is saying

9    here, this was evolution, not revolution.  The debtors

10   weren't saying, well, we're going to pull the RSA off the

11   table, and now we'll try to make a determination, should we

12   be selling this asset, should we not be selling this asset,

13   no.  The decision was made, let's continue with the RSA

14   process, we're just going to fix the mistake that we made in

15   doing it.

16             And one of the mistakes we -- they made in doing

17   this was in telling the Court, we're trying to drive the

18   plan forward.  They didn't come in here and say in their

19   motion, we're trying to drive a plan forward, it's all

20   wrapped in this 363 verbiage of we can -- we're trying to

21   maximize the value of the asset.

22             And the goal -- and this is why, I think this

23   gives you the explanation as to how we ended up here with

24   such vague corporate governance and vague board materials

25   and everything else.  We included at Exhibit 9, Your Honor,

1    the testimony from Mr. Ying at the RSA hearing.

2              And what he explained in response to my

3    questioning was, that the reason they needed to get Oncor

4    out now was because they were observing a correlation

5    between the trading or the value of the Oncor stake or the

6    multiples, and the rise in interest rates.

7              This idea that as yields rose in the market,

8    people would turn away from a low volatility, good yield

9    investment and search higher yields.  That was the operating

10   assumption, I don't know when that operating assumption

11   ended, because we don't have any of the board materials.  If

12   that's what Mr. Ying was advising the Board, I can

13   understand if we have a projection in the rise of interest

14   rates, then maybe we need to deal with this volatility, and

15   then quite frankly, when the motion came, I was expecting

16   some kind of analysis of where interest rates are going to

17   be in the future.

18             And then I've handed up to Your Honor an exhibit.

19   Let's go to Exhibit 72, it's underneath the deck, it's

20   something you haven't seen yet, and I put it up on the slide

21   redacted, the debtors didn't want it in in an unredacted

22   basis.

23             This is an August e-mail from Mr. Nutt who's the

24   Vice-President of Risk Management for the debtors, it's sent

25   eight weeks after Mr. Ying testified to you about the

1    correlation of interest rates in Oncor values, six weeks

2    into the sale process.

3              And Mr. Nutt is explaining to Mr. Keglevic that

4    there might be an alternative with respect to managing the

5    risk of the asset, to the extent that it is tied to interest

6    rates.  And asked and concludes, let me know if you want to

7    discuss further.

8              And you heard Mr. Keglevic's testimony about that,

9    when he got there, Mr. Keglevic said, that there was no --

10   turns out there was no correlation, or it was a minor

11   correlation, or the correlation wasn't substantiated or what

12   not, and said, ultimately we considered no alternatives.

13             We went straight from the assumption that the

14   Oncor asset is at risk is we must sell the asset now, no

15   consideration of any alternatives.  So that answers your

16   question as to whether it was implied, no, if the

17   alternative to selling now is not selling, they didn't

18   consider it.

19             So we come to the E side plan process, but this

20   slide is for Your Honor, is an addition to some things that

21   were left out of the original presentation from the debtors.

22   This is slide --

23             THE COURT:  This is Keglevic?

24             MR. SHORE:  Yeah, and this is our slide 6.  No,

25   this was given to you at direct and then I've added in in

1    the bold other facts.

2              THE COURT:  Oh, okay.

3              MR. SHORE:  It was given in the opening.

4              THE COURT:  Oh, thank you, all right.

5              MR. SHORE:  I want to focus on some dates, date

6    two or July 17th.  There is no testimony in the record with

7    respect to any vote there or any materials that are given.

8    And when the debtors said in opening, well, we wanted to

9    make this more creditor friendly, one of the things that we

10   wanted to fix about the RSA process.

11             It's clear that the teaser was distributed to the

12   market before they ever met with any of the creditors.  They

13   went out to the market, and we'll come back to Board

14   authorization in a bit, before they ever -- and told the

15   market, we will only accept tax-free transactions before

16   they ever spoke to any creditor constituency.

17             If you'd turn to the next page, the August 26th

18   date, and we saw it again in the closing.  I don't know why

19   we're getting this -- these different terms.  It said -- the

20   debtor said that the Board's decided, and again they said it

21   again, the Board's decided.  No, the Boards met on that

22   date, there is no evidence that the Boards decided, because

23   what the Boards decide by is in voting.  That's how a Board

24   expresses its decision.

25             THE COURT:  Well, their argument would be they did

1    not formally vote, but they made a decision I guess

2    implicitly and as evidence of that, Mr. Evans polled the

3    room and had everyone basically have an opportunity to

4    either assent or dissent as to the implicit authority that

5    he was putting together.

6            MR. SHORE:  Let's put be clear about what that

7    was.  No, he polled them, should we go with the one step

8    plan --

9            THE COURT:  Plan A or Plan B, right.

10           MR. SHORE:  Right.  But that's not should we even

11   be out marketing right now.  They were out marketing, let's

12   be clear.  That before the Board -- before the issue was

13   ever brought to the Board about whether to be out marketing,

14   management is out marketing, 22 teasers are out in the

15   market at the time that Mr. Evans is being polled, just with

16   respect to whether they should go to Plan A or Plan B, not

17   with respect to whether the asset should even be on the

18   market at this time.

19           And let me clear up one thing as well, the

20   September 25th to October 4th, where Mr. Hiltz requests

21   summary analyses, and that's that Exhibit 78 which I'll get

22   to in a bit, the volatility analysis.

23           Let's be clear about what the debtors had, what

24   the debtors' boards had and what they didn't have.  They

25   never saw any market analysis.  Period, the end.  What they

1    saw was an Evercore mark-up of what the bids coming in

2    implied.  So, in other words, if a bid came in from NextEra,

3    the boards would be told, that implies a TEB of Oncor of $18

4    billion, that implies this, implies that.

5           In fact, the next question from the quote that is

6    included on -- at page 15 I think of the closing deck he

7    gave you was, were there any other written materials

8    regarding the market?  No.  They got written materials by

9    the boards, but they didn't get any of the analyses that Mr.

10   Hiltz asked for in preparation for his deposition.

11          In fact, what we got, and I think I've beat this

12   horse to death in cross-examination, a paperless record of

13   conclusory advice.  Mr. Keglevic clearly admitted, there was

14   nothing you could point to in the record which set forth any

15   written analysis to support the advice that was given by

16   Evercore.

17          They didn't get anything that said this is where

18   the market is trading, this is where interest rates are,

19   this is where we see interest rates going, this is the M&A

20   volumes by year.

21          Now, if it was easy to do and quite frankly Mr.

22   Hiltz was able to do it later, then why didn't they give

23   that to the Board?  That's one of these disconnects that

24   there's no explanation for other than it's hard to explain

25   what you're doing and why you're doing it if you're not sure

1   why you're doing it, or what you're going to be telling the

2   Court about why you're doing it.  They maintained the

3   optionality of coming up with an explanation for what

4   they're doing, in contrast to the record that was created on

5   the insider comp motion.

6           The Filsinger report has scatter graphs, it has

7   charts, it has a clear explanation of what the debtors are

8   doing, and why they're doing it, and what the support is for

9   that.  There is nothing here.  The debtors have permitted

10  themselves to come in front of this Court and say whatever

11  they want about what their reasoning is for going forward

12  with this motion, and that's how you can get to a

13  disconnect, between the stated purpose of the motion which

14  is to maximize the value of the Oncor estate through a sale

15  now, and what Mr. Sawyer told you, which this is a means of

16  driving the process forward, because we don't have any of

17  the material that would set forth exactly what the debtors

18  are doing, and why they're doing it.

19          Instead we got something they see every once in a

20  while in 363 motions, what I'd call the blind squirrel

21  defense, which is based on the adage, of course, every once

22  in a while even a blind squirrel will find a nut.

23          What the debtors have done here, is they brought

24  somebody in post hoc out of the blue who had never heard of

25  Oncor, and we lay out all the deficiencies in Mr. Hiltz'

1    ability to understand the asset he's selling.

2              After -- long after the decision was made, they

3    gave him the Oncor business plan, the balance sheet and

4    income statement, and some trading and comparable utility

5    stocks, and then some Board member came forward at some

6    point, we don't know which one, asked him out of the blue

7    for an off the cuff response, is this the right time to sell

8    and he said yes.

9              But what they do when they put forward the blind

10   squirrel defense, is they take out good faith.  In fact, the

11   debtors didn't even cite that in their closing materials.

12   They have an obligation to show why they're doing this.

13   It's not enough to come in and say, well, we're doing it for

14   some purpose, but we'll bring in an M&A expert with no

15   bankruptcy experience, and we'll tell you that regardless of

16   why we did it, it's at least a justifiable response.  It's

17   not an appropriate defense on the 363 motion.

18              In fact, they told you, I thought that the

19   redirect of Mr. Hiltz, the first questions out of counsel's

20   mouth were an attempt to distance Mr. Hiltz from the actual

21   decision-makers, it's on page 81 and 82 of that first day

22   transcript, where what they do is immediately come back and

23   say, generally speaking, who from the Evercore team is the

24   ongoing and primary contact with the Boards at EFH.  Answer,

25   David Ying and Roger Altman.  And similarly, when it comes

1    to questions of corporate governance or the process that

2    might apply going forward with respect to which boards may

3    participate, who was it, it was somebody else.

4              They're already to distance themselves from the

5    person they brought in to bless the process.  Mr.

6    Weisfelner's exactly correct, where is Mr. Ying in this

7    process?  If this is a process to drive the plan forward,

8    why didn't we have testimony from someone saying, this is

9    the right time to drive the plan forward, here are the

10   analyses we've done that support how we're looking at the

11   plan process.

12             Instead you get this kind of look over there, and

13   look at this witness for a bit, and we'll try to continue to

14   operate on the RSA 2.0 while you're distracted with the data

15   that's been kicked out on good M&A market.  That's not what

16   this motion was about.

17             So let's come to the four factual inquiries,

18   first, whether an appropriate decision was made by -- or

19   made by an appropriate decision-maker made the decision.

20             Implied authority or not and I could have some

21   questions with respect to their implied authority case, with

22   respect to how one runs good corporate governance, it's not

23   how you run good corporate governance, you have votes, you

24   have resolutions, you write them down, and then we don't

25   have to get into the he said/she said with respect to the

1   process.

2           But importantly, no one is owning the decision.

3   No one came in front of you and said I got it, I'm the one

4   who made the decision, and I believe this is an appropriate

5   decision.  Instead, you've got the debtors' reply brief,

6   which wasn't supported by anybody in the record that said

7   that the decision was made on July 23rd, actually it wasn't

8   a decision, they actually said it was voted.  That's not

9   supported anywhere in the record.

10          You had Mr. Hiltz who said, I thought it was

11  Keglevic and Dore'.  You had Mr. Keglevic say, I thought I

12  testified I don't believe there was a vote, but I'm not

13  positive.  In other words, yeah, maybe it was me all along.

14  And Mr. Sawyer saying the CROs did it.

15          Why, why don't we have a clean record, that the

16  hallmark of a 363 motion is good corporate governance.  If

17  it's as simple as they say, and if it's as procedural as

18  they say, and no harm as they say where is the corporate

19  governance that would just clearly articulate that with

20  someone sitting in the stand, and saying I own it, I'm in

21  the hot seat, I exercised my fiduciary duty, and I made the

22  right decision.  You didn't hear that from one single

23  witness.  It all went like that, somebody else was invested

24  with that decision.

25          Now, let's be clear on one thing, there was no

1    subsidiary debtor who voted to approve this motion.  All the

2    testimony you heard were that the holding companies, EFIH

3    Finance, EFIH, EFH, EFCH and TCEH voted on this.  There was

4    no record and no witness testified that any of the op cos

5    where we all have claims, or at least the first liens, the

6    second liens and the TCEH unsecureds, we all have claims

7    down there.  That's where the assets are, and we have no

8    idea why none of these boards voted to approve a motion,

9    which is brought on behalf of the debtors and seeks to

10   commit that all TCEH debtors, which is EFCH down to a

11   particular plan.

12           And with respect to the hold cos on the minutes,

13   let me address this for a second.  I get it.  And I often

14   raise the issue that draft minutes are work product, that's

15   fine.  We're three months after some of these board minutes,

16   board meetings.  Why the debtors didn't see fit to waive the

17   work product by finalizing the minutes is completely

18   unexplained in the record, as is their decision not to pull

19   Mr. Keglevic off the stand after his cross-examination

20   closed, refresh his recollection with the minutes and find

21   out the answer that he said I can't really tell, because I

22   can't recall what the minutes said.

23           Why they can't just give us the answer?  Why can't

24   they give us the minutes?  They have willfully decided to

25   proceed in front of this Court today without actually giving

1    you the corporate records with respect to what they did even

2    though this issue was raised weeks ago.

3            The second factual inquiry, whether the decision-

4    maker properly exercised the duties of care and loyalty.  It

5    doesn't matter, I guess, whether it's Mr. Keglevic and Ms.

6    Dore' on the one hand or the boards on the other, somebody

7    had to exercise the duty of care.

8            The Chancery Court came out with the Rural Metro

9    case, which is, of course, set the investment advisor world

10   on fire, including the decision two weeks ago to award $75

11   million of damages against Barclays for their advice, but

12   the Court reiterated the standards with respect to what the

13   officers or what the directors of a corporation should be

14   doing.  Texas law is substantially the same.

15           And the Delaware Supreme Court has expressly held

16   that fiduciary duties of care and loyalty are owed by the

17   officers of a corporation as well.

18           What I've laid out for you is the record on the

19   duty of care.  And I -- look, I'll come back to this in a

20   minute.  I'm not trying to show that the debtors have

21   breached the fiduciary duty or anything else, I'm just

22   wondering how we got here in the process in one of the

23   largest pending bankruptcies on an issue of great import

24   that we allowed the factual record to be this on this

25   motion.

1          The Board did not make a decision to launch the

2     sale process.  The team is operating without any clear

3     expression of authority.  I don't know what we're talking

4     about, about a prepetition delegation to negotiate an RSA

5     somehow authorizing these officers to be out selling the

6     company and making representations to the market about what

7     kind of tax structure the company will and will not accept.

8          There has been no record in this case as to why

9     we're moving at this speed.  And I'll come back to that in a

10    bit.  There's an obvious preference for one type of

11    transaction over another.  Evercore is interested in this

12    process, the decision whether or not to sell is a $9 million

13    issue for Evercore.

14         If the debtors decided to just go ahead with the

15    plan process, they don't get this fee.  There's no written

16    valuation right now.  It's maintaining this optimum

17    flexibility.  I'll make a prediction, I bet you Evercore's

18    fairness opinion comes out pretty close to exactly what the

19    bid is that the Boards are being asked to approve.  We know

20    that's what fairness opinions are, it's not a fresh look at

21    what the value of the asset is, it's a fresh look as to

22    whether or not the bid implies a fair value for the asset.

23         The Board never considered whether or not to sale,

24    and Evercore has made frank disclosure of relevant facts to

25    the decision-makers, and I'll come back to that in a bit.

1          The holding in Rural Metro was a finding that RBC

2     aided and abetted a breach of fiduciary duty, and it was

3     premised on that the directors of the company had, in fact,

4     breached their fiduciary duties, and particularly the duty

5     of care, which we all know is a minimum standard, but there

6     are still things that must be met.

7          And importantly, the Court noted the interest of

8     the agent in this case, Evercore, and the principal diverge

9     over whether to take the deal in the first place.  The agent

10    only gets paid if the deal happens, but for the principal,

11    the best value may be not doing the deal at all.

12         They must educate themselves as to why they are

13    going forward with the process.  And let's come to this

14    slide and this stuff about the volatility analysis or

15    anything else.

16         Evercore is in possession, and has been in

17    possession of an analysis that shows very clearly,

18    graphically and as subscribed by the witness, that

19    treasuries had been more volatile over the last two years

20    than the comps.

21         If the whole point of the exercise, if the debtors

22    want to stick with their story, we're trying to get a one

23    way option that locks in a floor, we're going to have to pay

24    some money, but it protects us from a down side, how can

25    they operate without what Mr. Kurtz called on the stand, an

1    important part of the analysis, which is, what's the

2    historical volatility of these assets.

3          We're not selling internet stocks.  These debtors

4    do not possess internet stocks, where you see crazy datas in

5    a valuation.  What these debtors, EFIH owns, is an 80

6    percent stake in a regulated utility, which as the data show

7    are low volatility assets.

8          How is it that the boards were not given advice by

9    Evercore, that over the last two years, USA Treasuries have

10   been more volatile than the assets which Evercore is

11   advising them they need to get out on the market now.

12   Again, I'm not trying to show that the debtors have breached

13   their fiduciary duties or anything else.  And there are

14   differences to the Rural Metro case.

15         But the first question is, how are we here on this

16   record?  How is it the process is so flawed right now, and

17   that we're just showing bad -- such bad corporate governance

18   that what the debtors tell you in their closing is, well,

19   you can just imply authority from the Board of Directors,

20   even though we know how to give them express authority, or

21   we can just overlook the fact that nobody really understands

22   who is responsible for making the decision, because somebody

23   is responsible for making the decision.

24         But it also raises an important question of why

25   we're up objecting now.  If we're going to do a sale

process, and if there is a record to do the sale process, they should do it on the right foundation. They should start this process on the right foundation, with a clear articulation as to what they want to do that is frank with the Court, if this is about pushing the plan forward.

They’re going to tell you how it helps to do that, they’re going to give you an analysis of the costs and benefits. They’re going to discuss potential alternatives, they’re going to have a full disclosure of the facts, they’re going to have Board votes, or explicit designations, and they’re going to tell you what the strategy is. That’s what needs to be done if they’re going to come forward and say, we want to start a process to sell a $10 billion asset.

Then there also has to be, of course, a duty of loyalty, and a cognition of the conflicts. No one has disputed that the estates are in conflict, both on a historical basis with respect to claims or even on an active basis, it was dizzying testimony from Mr. Keglevic when he was talking about how if Oncor wanted to pass on the excess taxes to its rate payers, TCEH would have to intervene in that rate proceeding to assert that they were as the largest customer of Oncor, they were interested in not seeing the rates rise.

And with respect to conflicts let’s be clear, the independent directors have no independence at all in the

1    sense that they can't stop anything.  They have one vote,

2    they are given no delegation of any kind of authority to

3    act, they haven't availed themselves of the ability to get

4    independent counsel at this point or independent advisors.

5            And in some, I guess I would say, managed, highly

6    managed testimony we heard that Mr. Sawyer believes that

7    there are no ripe conflicts at this point.  Look, the issue

8    of ripe conflicts and whether or not that is a question of

9    state law or a question of disinterestedness, I'm not sure

10   how the debtors got themselves comfortable with publishing a

11   tax memorandum where Your Honor is being given their view of

12   the legal merits of a dispute, including the data discussion

13   of subjective intent.

14           I think, what I thought, and what I understood the

15   tax memorandum to be would be like a foreign law declaration

16   that you would see in Chapter 15 or something like that.

17   Here's the law.  What we got instead was, here are the law,

18   here are the facts as we believe them, here's what other

19   people say the law is, and why you should reject it, and

20   hear what -- here's our response to all these facts.

21           One is educating the Court about the law.  The

22   other, his coming out and telling the market at the time the

23   bidding procedures are going on, exactly why the debtors

24   only want to get one form of bid, and ultimately putting us

25   all in a position where we'll have to respond.  And we will

1    ultimately respond.

2            And there are real conflicts beyond the ongoing

3    business conflicts.  There are unresolved inter debtor

4    claims, and in accordance with the stipulation, the issue

5    was raised in one of the joinders, that well, we haven't

6    brought these claims yet.  Somehow that our ability to say

7    no to the sale process would be dependent upon our having

8    articulated the claims.

9            The debtors committed to us over no objection from

10   anybody in the creditor body that we would be given

11   assistance, time to look at the claims and time to assert

12   the claims.  This is not a process where you bring a

13   standing motion without documents, and we're going to have

14   to come back at some point, and talk about the legacy

15   discovery protocol and everything else, and what that

16   process is.  It's for today, but there is a bargained for

17   time during which there will be assistance and the ability

18   to formulate and assert claims, and the debtors have been

19   unapologetic in telling you that their intent is to sell the

20   asset before those claims are even -- or before those claims

21   even have to be articulated much less the subject of a

22   standing motion.

23           In addition, there is a conflict driving this

24   process, which is the unresolved tax issue of which estates

25   are liable for which kind of taxes.  And the only

1    explanation for that was, as Mr. Keglevic lays out on slide

2    25, the basic fundamentals of not incurring the tax being in

3    the best interests of the individual estates, our opinion

4    has not changed.

5           Well, of course, it hasn't changed, because they

6    haven't gotten, ever gotten unconflicted advice with respect

7    to what the individual estates' liabilities might be for any

8    pre or post-petition taxes.

9           And let's not lose sight of this.  The issue of

10   whether or not there is even a -- such a thing as a tax-free

11   spin is completely hypothetical at this point.  We know

12   there is one way to avoid taxes, keep Olympus together, I'll

13   come back to that.

14          We don't know whether this entire process is ever

15   going to be signed off by the IRS as constituting a tax-free

16   transaction.  The third factual analysis, whether the

17   decision provides some tangible benefit to the estate that

18   outweighs the risk.  Let's give the debtors the benefit of

19   the doubt, that they really do want a one-way option.  This

20   isn't about driving a plan process for, this isn't a

21   rhetorical device for getting back at the first liens who

22   say I'm not going to negotiate, this is really an attempt to

23   minimize the risk that the Oncor asset, this low volatility,

24   safer than treasury investment is going to lose value over

25   the next 12 to 18 months.

1           They say clearly they want a one way option, but

2    the testimony was clear that no one even knows whether such

3    an option exists, this in a bankruptcy case a specific

4    performance remedy for a plan sponsor where your best case

5    scenario in a down side case is that you're going to stuff

6    the post reorg equity at a third party and force them to

7    become the owner of the company and then distribute their

8    shares out to the creditors of the existing company.

9           Mr. Kurtz testified that as a restructuring

10   professional, he's never seen it, and importantly, it isn't

11   a free option.

12          First, they keep saying it's a free -- I heard

13   that we want to expose it to a marketing process.  We're

14   going to go out and see what the market says about the

15   number.  I can't believe the fiduciaries are saying, you

16   know what, let's -- we'll -- we don't know what the value

17   is, so let's go out and let's take our 22 market

18   participants who might be interested in buying our asset,

19   ask them to go to the trouble of preparing a bid and

20   submitting a bid, then we'll see what it says.  We'll get a

21   number and then we can talk to people about, do you want to

22   do a plan around this number, do you not want to do a plan

23   around this number.

24          That's not an appropriate use of 363, and that's

25   not a good faith use of 363 to go out to the market and

1    force them to tell you what an asset might be worth.

2           But they haven't attempted to quantify at all what

3    the down side is.  I don't care what you call it, a

4    volatility analysis, a range of expected trading prices,

5    anything.  Tell me that what you're doing is not buying an

6    insurance for a risk that doesn't exist.  Because we're

7    spending money.

8           There are significant actual costs continuing

9    beyond 4 o'clock p.m. in this case on this motion.  They're

10   the fees and costs of all the advisors, they're the fees and

11   costs of the estate professionals, and the other creditor

12   groups too, and the debtors have committed to pay their fees

13   as they stand up and say, we support the motion.  We are

14   converting management resources, we keep hearing about how

15   management is spending all the time in this case.

16          Well, if they were spending time doing other

17   things but bidding procedures we wouldn't have that problem.

18   There is unrebutted testimony from Mr. Kurtz that you can't

19   just keep doing this, going out to the market and then

20   pulling the asset.  You are risking the value of the asset.

21          In other words, the only witness to testify on the

22   free option, said that the option isn't free, it comes at a

23   cost.  I'm going to come back to the delay and the plan

24   process that this is occasioning and the fact -- let's be

25   clear, we're -- obviously can't predict the future, but the

1    debtors are going forward on the assumption that they are

2    going to get a contract, and their best case scenario is

3    they're going to have to pay 150 to 250 or 150 to $200

4    million to get out of a transaction if something comes

5    forward.

6            I said it at the beginning of this case.  It is

7    going to be hard enough to put together a takeout deal that

8    puts Olympus back together, to raise 30 to $40 billion of

9    debt and equity finance to do that.  We don't need at this

10   point in the case to be out there in a process which is

11   intended and which is known to present a $200 million hurdle

12   to a successful plan process.

13           And then finally, what is good faith?  I think

14   there are two aspects of good faith that the Court should be

15   taking into consideration when analyzing what's going on

16   here.  One is the concept that the debtors in fairness have

17   to faithfully honor their pre-existing commitments, and two,

18   that they need to be frank with the Court about what they're

19   doing.

20           Throughout the couple of days of testimony,

21   there's been no excuse for the debtors' attempt to ignore

22   their past.  There's not -- there wasn't even an explanation

23   on the close.  I didn't hear a mention of how they got the

24   extension of exclusivity or why they signed the protocol.

25           There have been no meetings.  You got an answer

1    very clear on that, besides Mr. Keglevic saying, I think I'm

2    going to have a meeting, or I think maybe people have been

3    talking, you got Mr. Kurtz' frank answer, there have been no

4    discussions, plan negotiations, and Mr. Keglevic said there

5    have been no creditor wide plan negotiations.

6           But the TCEH independent had to say, of course, is

7    that what he's done to drive, or what he knows his estates

8    have done to drive the process forward is filing and

9    prosecuting the insider comp motion, filing and prosecuting

10   the bidding procedures motion, and the retention protocol

11   motion, that's his assessment of what TCEH has been doing to

12   continuing to work with various creditor parties to generate

13   consensus towards a plan of reorganization.

14          We -- as I noted before, we have the case protocol

15   where the debtors have said, that they will facilitate the

16   diligence of rights and potential claims, and that we have

17   until January 31, 2015 to do that.  They're completely

18   ignoring that commitment that was been given (sic).  How can

19   they faithfully be helping us do that while at the same time

20   they're trying to sell the asset which is going to be

21   subject of claims?

22          And then finally, this concept of being frank with

23   the Court.  What I've laid out here are two totally

24   different things that require two totally different

25   analyses.  If the debtors want to stick with their

1    explanation that they are seeking a one way option to

2    provide a floor, that is significantly flawed and can't be

3    granted on the record that is in front of Your Honor.

4           They don't have anything that would let you know

5    that the appropriate decision-maker made the process that it

6    was based upon a faithful fulfillment of the duty of care

7    and duty of loyalty, and that actually serves a purpose that

8    there is some way to provide a floor.

9           But what they're really here doing I think is

10   they're here to drive a plan process forward.  And when they

11   say to Your Honor, we're here to drive a plan process

12   forward, they've got to say it at the motion time, we should

13   be permitted to take discovery with respect to that, and

14   then we should come in and have a real discussion about this

15   is the way to do it.

16          Look, we get it, I know debtors want a plan, they

17   want a path out.  And I understand their frustration that as

18   Mr. Keglevic said, the first set I don't ever want to hear

19   about Project Olympus again, we're not going to deal with

20   this, we're not going to consent to any of this, they're in

21   a box for 18 months with the cash collateral stipulation

22   that was entered.

23          And even if that's the case that they feel like

24   the FERCs are driving this process, or people aren't

25   engaging on the east side, or anything else, they can do it

1    the old fashioned way as I said at the opening.  They can do

2    it with disclosure, engaging with creditors and negotiation.

3    All of that can be done without 363 approval, all of which

4    has been done successfully in every case that's ever ended

5    up in a consensual plan of reorganization.

6              They don't need to sell forward the asset to make

7    a point, or to drive a deal through, or come up with a

8    number which they can then use to convince creditors that

9    since this was the highest bid, you're going to have to come

10   up with a plan structure that hits that number.

11             As Mr. Sawyer said he's not a child, we're not

12   children either.  We don't need to be threatened with a sale

13   if you don't come to a table, or we don't need a sugar

14   coating that we don't think we're going to ever be able to

15   get to a deal with you, so we're not going to deal with you.

16   If that's their view, they should come in and say it.  They

17   should file a motion that says, in order to drive the plan

18   process forward, we want to forward sale our post

19   reorganization equity in a tax-free spin, and then we can

20   have that debate in front of the Court, and we can talk

21   about whether it's the right time to do it.

22             Is TCEH making money in bankruptcy, is anybody

23   really losing any money in bankruptcy, why do we need to

24   come out now, why do we need to have these plan negotiations

25   now.  Why do we have to have plan negotiations before we

1    give you any of the documents on which the plan negotiations

2    are going to be based.

3            So if the story is, we need to buy a one way

4    option, there isn't a record; and if the story is, we're

5    going to drive the plan process forward that's an

6    inappropriate use of Section 363.  Thank you, Your Honor.

7            THE COURT:  Thank you, Mr. Shore.  I'm going to

8    take a short recess, Mr. Miller, and then I'll hear from

9    you.

10       (Recessed at 4:03 p.m.)

11   THE CLERK:  All rise.

12           THE COURT:  Please be seated.  Mr. Miller?

13           MR. MILLER:  Thank you, Your Honor.  Brett Miller,

14   Morrison and Foerster for the official committee of

15   unsecured creditors.  Mr. Weisfelner and Mr. Shore covered

16   business judgment and governance in terms of the three

17   points raised by Mr. Hessler in his closing so I'll focus on

18   do nothing which Your Honor pointed out that's not --

19   probably not what we mean in terms of our strategy.  In

20   fact, it's very different.  We have a lot to do and I

21   mentioned some of it in the opening and Mr. Shore mentioned

22   some of it during his closing.  We have an 11/28 deadline to

23   bring first lien claims.  We have a January 31st deadline

24   for our investigation of inter-debtor claims and other

25   third-party claims.

1          The debtors filed a tax memo as was just

2     discussed.  We have a differing view on tax and to the

3     extent that -- as I understand, there's not going to be a

4     tax presentation tomorrow which is good because prior to

5     whatever date is scheduled for a tax presentation to Your

6     Honor, the committee would like to, in coordination with the

7     other objectors, file their own tax memo explaining things

8     as we see them in terms of the T side and the effect on the

9     T side of taxes.  So that will, presumably, be sometime in

10    November, December, whenever Your Honor schedules that.

11          We don't want to do nothing.  We want to

12    accomplish many of these points as we move forward towards a

13    plan.  The sale can't occur without a confirmed plan.  We

14    think the process is being done backwards.  Mr. Kurtz said

15    it best before when he said a sale shouldn't drive the terms

16    of the plan.  That is exactly what they're trying to do.

17    They're trying to force us into a plan structure based upon

18    the sale process.  Mr. Kurtz has been, as far as I can tell,

19    the only qualified restructuring expert called as a witness.

20    He also talked about how his partner, Mr. Dolsick, was the

21    one who convinced the debtors' advisors to change the sale

22    process to a two-stage process with the first stage being

23    the long process to pick a stalking horse, not something

24    that we normally see in a bankruptcy but, as Lazard

25    explained to the debtors, that's the best way to do this to

1    get the best value for Oncor but, again, it wasn't Lazard's

2    testimony that we need to do that now, it's when we decided,

3    when the right time, when it's ripe to sell, we should use

4    that process.

5              There's got to be a framework that comes together

6    after there have been discussions between the parties.

7    There were comments on both sides as to whether there have

8    been any meetings.  There actually was a dinner last week.

9    It did not include Mr. Weisfelner or anyone from the second

10   liens.  I believe Mr. Shore's partner was at the dinner, one

11   of my partners was at the dinner as was Mr. Weisfelner and

12   some of the restructuring professionals.  I understand --

13             THE COURT:  Oh, nobody ever called Weisfelner in

14   from the bar?

15             MR. MILLER:  He was smoking outside amidst it.  So

16   I understand at the dinner, there was a discussion about

17   getting the process started.  It was a kick-off dinner, it

18   wasn't a substantive conversation.  So to correct the

19   record, there has been one dinner.  Didn't really amount to

20   much other than we may end up with a motion that gets

21   approval, we may end up with a motion that gets denied but

22   either way, we need to work together and towards a

23   consensual plan.

24             So, with that, if Your Honor does approve the

25   process, as Mr. Kurtz testified, we believe there needs to

1    be more access to creditors.  Certainly, the fiduciary for

2    the T side and now today, we have fiduciary for the E side.

3    Who knows when they'll organize and pick counsel but we

4    believe that, just as Lazard has played an important role in

5    moving forward with the bidding procedures, Lazard, as

6    certainly the professional for the unsecured creditors

7    committee, would be the right party to be under the tent to

8    provide input and to work with the parties going forward.

9            We were handed the revised bidding procedures

10   order that some of the former objecting parties agreed to in

11   terms of getting partially under the tent.  We don't think

12   that goes far enough.  We would want to sit down and discuss

13   the Kodak procedures with Kirkland and expand on that if

14   Your Honor does approve the motion which, again, the

15   committee, along with the other objectors, do not think the

16   time is ripe to approve this motion.  We think we need more

17   time to work on a plan.  We think we need to get a framework

18   done.  It's not a melting ice cube and at the appropriate

19   time, we probably would get on board with the sale process

20   but today we're not there and I don't think the evidence

21   showed that the debtors have dotted all the I's and crossed

22   all the T's to get there either.  Thank you.

23           THE COURT:  Thank you, Mr. Miller.

24           MR. MARTIN:  Good afternoon, Your Honor.

25           THE COURT:  Afternoon, Mr. Martin.

1          MR. MARTIN:  Ross Martin for Delaware Trust

2    Company as indentured trustee for the 10 percent EFIH first

3    lien notes and that's where I'd like to begin and I'll

4    probably be relatively brief today but I'd like to just note

5    at the outset of my presentation that we are talking about a

6    EFIH asset here, just a level set, but TCH folks may think

7    they have an interest in this and I understand they've got

8    dates by which they want to assert that and I'm sure we'll

9    talk about that in the case but you heard from Mr. Horowitz

10   that the E side, the EFIH seconds, and, for the matter, the

11   EFIH price -- although they withdrew their objection to the

12   bid procedures -- are not up here as one of the parties

13   affirmatively supporting the process much ballyhooed by the

14   debtors.  So I'd like to talk about this focused on the

15   E side.

16          We're the realities of a bankruptcy case that

17   occurs when debtors try to unilaterally move the process

18   forward because sometimes we, unfortunately, have to deal

19   with the reality on the ground and I think that might be the

20   situation we find ourselves in.  It would have been

21   preferable for the debtors to have talked to the creditors

22   committee before they launch their sale process.  Now, let's

23   keep in mind that the creditors' committee, represented by

24   Morrison and Foerster and Mr. Kurtz, does not represent the

25   E side but they weren't even spoken to by the debtors before

1    this marketing process was launched and neither was -- were

2    we, at least the EFIH first liens.

3           The -- it would have been nice if the debtors had

4    talked to any of us before they had their CEO call around to

5    those folks he knows in the utility industry with a set of

6    talking points that focused on one particular structure but

7    those things have all happened and we are here today and, as

8    Your Honor observed last week, the debtors had brought this

9    motion on with only a few days at -- I think at the time, a

10   week or 10 days before the bidding deadline.  That, in

11   itself, is a little bit unusual for bidding procedures and

12   now we've actually run past that bid deadline so there'll be

13   some new bid deadline but, presumably, it will be in the

14   relatively near future if this motion were to be approved as

15   the debtors request.

16          All of the facts that they've done all those

17   things, Your Honor, does not mean -- which is, essentially,

18   what the creditors are saying is that creditors in this

19   Court should accept a fait accompli.  That's essentially

20   what we're -- we -- we've been presented with.  Mr. Hiltz

21   saying on the stand that, you know, these are the folks that

22   are going to come forward, we've solicited everybody,

23   Round 1 bids originally due, you know, a week after the

24   hearing, cut-downs a week after that and, originally, no

25   creditor involvement at all.  They essentially wanted to

1    present us all with a fait accompli and, instead, what I

2    think we, as creditors and the Court, need to focus on is

3    what's the right thing to do given a little bit of the

4    unfortunate nature of where we are.

5              So, with that, I'd like to turn to just a little

6    bit of the record evidence of -- from the E side as to where

7    we are and then turn back to precisely what we're asking for

8    which I would note we laid out in our objection and with a

9    proposed order and red line filed with the Court.

10             First, this process is, in many important ways,

11   over in a way that's unusual for bidding procedures.

12   Normally when a debtor comes in in what we normally think of

13   as a 363 process when we see these things -- and I

14   understand they're selling reorganized equity and that's not

15   really my point.  What we normally see is a stalking horse

16   bidder is identified, there's testimony about what happened

17   in the selection of the stalking horse bidder and what we're

18   arguing about is how long is the go-shop period and what are

19   the go-shop rules.

20             That's not -- it's not exactly the posture we're

21   in today because the debtors won't tell us yet about the

22   bidders, the nature of the bidders, what the bids are.

23   They're proposing not to really tell us a lot of that until

24   later and yet they're asking for a whole series of relief,

25   some of which will cover Round 1, Round 2, but some of which

1      actually covers the period after they name the stalking

2      horse bidder and I want to come back to that.

3              But, in essence, you know, I think the testimony

4      is pretty uniform -- it's not entirely uniform -- that the

5      universe of -- this is not the usual case where we're

6      arguing about can we identify additional bidders, can we

7      bring additional bidders into the process that are not

8      already in it yet.  That's the format we normally see this

9      in and that's simply not the situation that we're in today.

10             The other thing that's unusual here that I'd like

11     to talk about are -- is the nature of this multi-debtor

12     case.  As Your Honor observed at one of the recent hearings,

13     you know, we all have multi-debtor cases.  There are big

14     multi-debtor cases.  Multi-debtor cases don't mean we

15     immediately invoke the most extreme remedies under the code

16     but in this case, as we pointed out in our objection,

17     there's something unusual going on which is we have a multi-

18     debtor case in which there's not even an attempt to balance

19     the interest of the debtors.  There's no process to try to

20     balance the interests of the debtors in what the debtors are

21     proposing.  There -- there's a -- the process here has

22     entirely ignored the interests of the different debtors and

23     that calls for some remedies given where we are in the

24     process and may continue to do so going forward.

25             Now, you've heard a lot from the other objectors

1    about the TCEH/EFIH conflicts but the evidence is equally

2    clear that there are conflicts between the EFIH estate and

3    the EFH estate.  That is, specifically, one thing we pointed

4    out in our objection is the potential for structures for

5    this transaction if it's being done at the EFH level where

6    parties may try to divert proceeds of our asset elsewhere.

7    That fear was realized, at least as a threat, in the

8    objection of the TCEH first lien objectors and in their

9    opening.  So that's -- the issues and the conflicts that we

10   see that can develop out of the way this transaction could

11   be structured are clear.

12           Now, we do disagree with the TCEH side objectors

13   that the process should be stopped entirely unless it's

14   going to remain in its entirely unsatisfactory state and I

15   want to talk about what would make it satisfactory.  I think

16   those things jump off from the evidence so, as an example,

17   you heard from various estate fiduciaries that the fear and

18   in the tax -- excuse me, you heard from various estate

19   fiduciaries that a part of what was driving the structure

20   was a fear of EFH checking a box.

21           Their own tax memo signed by all three debtors --

22   and we've heard a lot about that -- expressly says that EFH

23   won't check the box.  So where is the -- what that

24   demonstrates is there's just a disconnect between the advice

25   being given and what the fiduciaries are thinking about and

1    that's a real concern when you have these kinds of conflicts

2    that operate at a structural level in the transactions.

3            The debtors' answer to this, essentially, is let's

4    just proceed and litigate these questions later but the

5    problem with that is, as I first pointed out, that the

6    process is in many important ways over and they're seeking

7    to foreclose other pieces of it today.  One thing I'd like

8    to point out on that is one of the pieces of relief that

9    they're seeking today is a 30-day go-shop period.  They want

10   the Court as -- there are pages and pages in the bidding

11   procedures devoted to the subject of what happens after they

12   pick a stalking horse.  They want the Court to set the

13   auction rules now.  They want, as I said, that period to be

14   set at 30 days.

15           As far as I can tell, there is no evidence in the

16   record about why 30 days is the right number.  The evidence

17   that they point to is that maybe someone will come in.

18   Right?  In fact, Mr. Hiltz's testimony is maybe that nobody

19   will come in, likely nobody will come in but there's no

20   testimony at all about the propriety of the 30-day period.

21   In fact, the testimony is a little bit to the contrary --

22   and I'll connect this back in a second -- as Mr. Hiltz

23   testified with his firm's own charts that that they did of

24   potential utility topping bids but, in fact, they're not

25   aware of any.  They tried to come up with some and they

1    actually came up with no potential topping bids at all.

2            So with respect to that, why is the 30 days

3    objectionable and why are the auction procedures

4    objectionable now.  I would submit, Your Honor, that it's an

5    attempt to set the train in motion.  You heard some of that

6    from the TCEH side.

7            What they're going to try to come back and do

8    after they pick a stalking horse is say we already got pre-

9    approval for a 30-day auction process which, of course, any

10   bidder would take shorter rather than longer and then have

11   an entire litigation about again moving the next step based

12   on that 30-day window and what we would submit, Your Honor,

13   is that the time to litigate the length of that go-shop and

14   the time to litigate the length of that auction, those

15   auction procedures, is not now, it's later.  So when we

16   actually have the record we usually have when we decide

17   those things, who's the stalking horse, what was the process

18   to pick them, what actually is the prospect of other bidders

19   coming in at that point, who's hanging around the hoop and,

20   maybe most importantly in this case since the debtors have

21   brought it up themselves with their notion of a fiduciary

22   out that might let them do some other plan, they want to

23   pick a stalking horse, get approval for that bidder within

24   30 days, when that bid is conditioned on the outcome of a

25   plan process that, by their own concept, their own structure

1    here, isn't going to be approved for another 10 months, 11

2    months, 12 months when we're next back here.  There's no

3    reason to set the -- set now that next compressed litigation

4    schedule.  Come back with the stalking horse, let's see

5    where it is and let's see how it integrates into the plan

6    process.  Their process is integrated into the plan, let's

7    measure it at that time.

8              Now, a couple of things as to other remedies --

9    and I want to use some of the evidence to jump off from and

10   I won't go into nearly the detail that Mr. Shore and Mr.

11   Weisfelner went into but I'd like to point out a couple of

12   things just to specifically refer to the record.  I know

13   Your Honor has not had time yet to review the Cremens

14   designation so I'd just like to point two things with

15   respect to that.

16             Exhibit 2 which we've put into the record is a

17   copy of the LLC agreement of EFIH itself and we put that in

18   to demonstrate one simple thing and other options may be

19   available as well but it's -- we wanted to show something

20   that had not occurred here.  Section 2.1c of the LLC

21   agreement -- it's at page 5 of 20 -- has a very simple

22   provision that's in, frankly, lots of Delaware corporate

23   governance documents and it allows any member of the board

24   of EFIH to call a board meeting.  I think Mr. Shore pointed

25   out correctly that currently, the independent directors, Mr.

1    Sawyer on the T side and Mr. Cremens in the E side, have no

2    special authority but they do have a right that directors

3    typically have in Delaware which is to call a meeting.  No

4    one's called it.  They'd never called a meeting.  There's no

5    special committee formed.

6              Mr. Cremens, for example, on the E side could --

7    he hasn't thought about it when you look at his testimony,

8    has not even thought about the notion of calling a meeting

9    and proposing a resolution to form a special committee

10   either to make recommendations to the board or to actually

11   decide the question of who's going to be cut down at

12   Round 1, something that on the debtors' plan is going to

13   happen in the next seven or 10 days very rapidly.  He has no

14   independent counsel to advise him today, not in the future,

15   not an unripe conflict in the future, to -- he has no

16   independent advice today as to whether to invoke this right

17   to protect us by calling a meeting and asking for that,

18   frankly, quite common corp -- Delaware corp governance

19   vehicle of a special committee.

20             How long is it going to take independent counsel

21   to get up to speed on tax issues?  You know, the debtors say

22   that it's taken them months and, obviously, they'll have --

23   people will have some benefit of the debtors but that

24   independent counsel can't rely on the debtors.  They have to

25   form an independent judgment and there are decisions that

1    are going to have to be made very rapidly.

2           Now, you may say okay, Mr. Cremens calls for the

3    meeting.  He's not the only director and they vote him down.

4    So they don't take away the -- they don't delegate to a

5    special committee either to seek recommendations or to make

6    the actual decision.  Whether Round 1, Round 2, ultimate

7    selection of the stalking horse, whatever the case may be,

8    that alone, Your Honor, Mr. Cremens having asked and been

9    told no by the EFIH board whose other members are

10   conflicted, would be an important data point for those of us

11   who are EFIH creditors.

12          Under Delaware corporate governance, just the

13   asking which he has not done makes the difference and would

14   make a difference when this Court has to consider the things

15   going forward.  So I wanted to focus on that one -- there

16   are other corporate governance devices potentially available

17   but that's just an example of the kind of thing they have

18   not done at all.

19          Now, again, because the Court indicated it had not

20   quite yet had an opportunity to review the designations and

21   we tried to cut them down pretty significantly so it

22   shouldn't take long, I would direct the Court particularly

23   to pages 70 through 74 of the Cremens deposition.  And I'm

24   not going to read them all because I'm simply going to read

25   the last question and answer that has been designated.  "Mr.

1    Cremens, what is your understanding of the reasoning for

2    doing a transaction at the EFH equity level instead of the

3    EFIH level for a sale of the Oncor assets?"  Ms. O'Connor

4    objected to form.  "I can't remember specifically" was the

5    answer.  You should read the whole four pages in advance of

6    that but there has been no consideration of these matters

7    that basis fundamental elements of Delaware corporate

8    governance should bring to bear.  And it's an issue today.

9    It's not an issue in January when they pick a stalking

10   horse.  It's an issue today because of the Round --

11   potential Round 1 cut-downs.

12            Now, I'd like to point the Court just to one more

13   piece of evidence before I talk about remedies and that is

14   Exhibit 62.  There's been a lot of discussion by the T side

15   creditors and by the debtors about what board minutes

16   recently of the debtors' nine board meetings that they

17   started this hearing discussing, what board minutes are

18   available, what board minutes are not available, but Mr.

19   Keglevic in his testimony, one of the things that he

20   mentioned was that in his mind, as a fiduciary, as the

21   supposed fiduciary to whom all this power had been

22   delegated, this all stemmed back to meetings that he knew

23   that Mr. Cremens and Mr. Sawyer had before the bankruptcy

24   where they were independently briefed on the tax issues.

25   That was his -- that was Mr. Keglevic's testimony.  And he

1    even said I -- he wasn't there but he knew those had

2    happened.  So we have the minutes.  Minutes we do have are

3    those minutes and that's Exhibit 62 and it's a one-hour

4    meeting and it's on the eve of the bankruptcy case.  It's on

5    April 25th and what that makes clear is that Sidley and

6    Austin -- and Court knows this because it's approved their

7    retention -- was, in fact, brought in as independent counsel

8    to advise on issues vis-à-vis the sponsors but, in fact,

9    Kirkland advised on inter-company issues in connection with

10   the RSA.  So the very meeting in which Mr. Keglevic is

11   saying happened, that's the good corporate governance, that

12   was the independent meeting without us in the room.  The

13   minutes of that meeting which are redacted in the -- you

14   know, for the actual advice given make clear that they knew

15   how to get independent counsel but they didn't get it for

16   these inter-company issues even when it mattered.  And,

17   lastly on that, Your Honor, I would point out that it was

18   not a meeting alone with Mr. Cremens even with Sidley or

19   even with Kirkland.  Mr. Keglevic was not there but his co-

20   chief or structuring officer who serves for all the debtors

21   was present for the meeting.  I understand Mr. Keglevic

22   believes it was an independent meeting but it was not

23   independent either with respect to outside counsel or inside

24   counsel.

25           Now, the question is is what do we do about this

1    today because, unfortunately, I'm sure we've got bidders

2    probably listening on the phone.  As the Court indicated at

3    the last hearing, the Court's going to have to make a

4    decision if it does want to approve the bidding procedures

5    motion in some form about when to set deadlines.  The

6    question is what do we do now.  I have a list.  I'm going to

7    try to provide a list and, as I said, we have a form of

8    order.  I have some extra redlines.  It's a little bit dated

9    given what's gone on but it is on the docket and I can hand

10   up a copy at the end if that would be held or submit it to

11   the clerk afterwards.

12           One, information on the process.  You heard Mr.

13   Kurtz testifying that it is entirely common to have

14   creditors in the process and, interestingly enough, Delaware

15   Trust is the last E side creditor who is standing to be able

16   to get access to information in the process.  And maybe it

17   doesn't have to be available to every creditor on both

18   sides.  There's a creditors' committee on the other side for

19   those junior creditors.  I'm not suggesting that we would

20   agree that a creditors committee on the E side would

21   adequately represent out interests because it may cover both

22   EFH and EFIH but there are limits that could be placed to

23   not make this a 10-party access to information.

24           I would submit that there's no evidence at all

25   that an attorney's eyes only/financial advisors only regime

1    which is quite common could not work.  Kirkland and Evercore

2    had big teams.  They thought about bringing in an -- yet

3    another financial advisor or there's no reason that a

4    reasonable number of additional people cannot have that real

5    time access to the process.  One thing the debtors have

6    done, obviously, is concede that bidders can speak to

7    creditors so that request of ours was taken care of.

8               I'd like now to, just briefly because I've touched

9    on it a fair bit already, this -- a whole large section of

10   the relief they're seeking is at -- is entirely

11   inappropriate for today.  All of the relief for the period

12   after they choose a stalking horse bidder should just be out

13   of bounds for today.  There's, frankly, no record to support

14   why it's appropriate at all and it is, not to beat a dead

15   stalking horse, I guess, the -- it's entirely appropriate to

16   deal with how long should the go-shop be, what should the

17   auction procedures be and, frankly, in this case, something

18   unusual, how does that integrate into the plan process that

19   is going to be part of this process should all be decided in

20   January.  None of that should be decided today and if you

21   take a look at our proposed form of order, a great deal of

22   the marking is literally just taking out those sections that

23   have to do with that post-stalking horse relief which should

24   not be granted today.

25               Next, Your Honor, there should be some what I'll

1   call guidance at this point from the Court with respect to

2   the break fee and I'm asking for a lot less than that sounds

3   like.  I'm not asking for guidance on -- that the Court

4   should set guidance as to amounts, as to triggers or

5   anything like that.  What there should be guidance on is --

6   and -- is the following.  The Court should add to the list

7   of bid requirements that the bidders expressly say where the

8   break fee's going to come from and which debtor gets to

9   exercise the fiduciary out.  If you actually look at their

10  form of terms sheet, it's only EFH that gets to exercise the

11  fiduciary out.  EFIH doesn't get -- if the -- it turns out

12  there's no tax free spin so it kind of doesn't matter

13  whether it's a taxable transaction or not, EFIH can't get

14  out of the deal.  Their argument is this is -- this one-way

15  option is worth doing because it'll cost the break fee and

16  we have a fiduciary out.  The bidders should have -- should

17  just be told that they need to link up where the break fee

18  is going to be payable from, what they think the triggers

19  are and proof and exercise the fiduciary out and that, I

20  think, is something that the Court could profitably add to

21  the requirement of the bids that would help, frankly,

22  clarify those issues which are going to come back later and

23  get the bidders, frankly, focused on that issue in a way

24  that the debtors have every incentive to kind of mash

25  together and have shown, as a corporate governance matter,

1    this is going to make point time after that every

2    inclination to just kind of mash it together.  And if you

3    put it out there for the bidders, the bidders who are

4    sophisticated but don't necessarily look at it from the

5    perspective of creditors will get the point and make it.

6              Your Honor, I wanted to go back to something, the

7    -- maybe the first question asked when Mr. White -- maybe

8    Mr. Hessler was up which is there's an interesting question

9    here about whether what they're asking for is business

10   judgment in terms of approving the bidding procedures or in

11   terms of the Delaware standard of exculpation under -- as a

12   corporate governance matter and it might be appropriate

13   under these circumstances given the corporate governance

14   record that the bidding procedures order will be formulated

15   on the basis that I started my remarks which is we are where

16   we are, unfortunately, and that the bidding procedures order

17   not be able to be used to exculpate anyone or made --

18   probably more importantly, that it not be used as a jumping

19   off point at the next hearing, that the Court approve these

20   particular -- by approving the bidding procedures, the Court

21   said that whatever happened before in dealing with these

22   bidders from July 25th to now is okay.  Rights really ought

23   to be clearly reserve on that question.  We did not get

24   discovery into that.  The debtors have consistently told us

25   that's for January.  So let's make clear that we're -- if

1    the motion's going to be approved, that it's being approved

2    because we are, unfortunately, where we are today and the

3    rest of it is reserved.

4            As to modifications of the bid procedures, given

5    the corporate governance methods, I'll call it, that have

6    been used here, it is entirely inappropriate to give the

7    debtor discretion to make changes to these bid procedures if

8    the Court approves them and it should simply be the case

9    that the debtors have to give three business days' written

10   notice to creditors if they're going to change them.  We

11   understand, we've all been on both sides of this, if a

12   critical bidder has a critical decision maker who has a

13   family emergency or they have a critical thing with a

14   financing source or something else, it's a little hard for

15   me to imagine that anybody among this sophisticated creditor

16   group is going to try to come into court and use that as a

17   leverage issue.  It's not going to work to anybody advantage

18   from a credibility perspective.  Three days advanced written

19   notice, if there's really a problem, gives people plenty of

20   time to pick up the phone if the Court is available.

21           And then I would note that the debtors have agreed

22   to include Delaware Trust both as indentured trustee and

23   collateral trustee as a reviewing party and I believe that

24   change is being made to their proposed order.  And then,

25   lastly, Your Honor, something that we did ask for in our

1    objection just to make clear why Delaware Trust is here and

2    why we're objecting is, again, coming back to these

3    conflicts of structuring and a potential diversion of

4    proceeds of the EFIH asset, all of this could be avoided if

5    we have certain protections.  I understand the debtors are

6    unwilling to give us those protections today.  We may be

7    back here in January talking about appropriate protections

8    for the measurements of solvency of EFIH or other use of our

9    proceeds but we have tried to give sort of an alternative

10   way to deal with both of those problems.  I understand they

11   don't want to do that.  That may be tied to the request for

12   the TCH first lien lenders.  It will be what it will be and

13   maybe we'll be back here in January on that.

14              THE COURT:  All right.

15              MR. MARTIN:  That's all I have, Your Honor.

16              THE COURT:  Thank you.  Mr. Hessler?

17              MR. HESSLER:  Thank you, Your Honor.  Again, for

18   the record, Steve Hessler, Kirkland and Ellis, on behalf of

19   the debtors.  Your Honor, I will endeavor to keep rebuttal

20   brief in an attempt to limit it to incremental points as to

21   what was argued arisen at closing.

22              I do want to begin, Your Honor, with the questions

23   that you posed to the debtors during the close.  The first

24   is Your Honor asked about evidence in discovery and what was

25   produced to the objectors that otherwise demonstrated the

1    board's deliberations.  Your Honor, I'm going to begin to

2    highlight some of them but I won't endeavor to go through

3    the entire exhibit list but Exhibit 10 and Exhibit 11 are

4    both admitted into evidence.  Those are the July 17th board

5    minutes and the July 17th board presentation.

6              Exhibits 17 and 23, those are July 30th and

7    August 15th board presentations.  They were not admitted

8    into evidence but they were produced to the objectors.  Your

9    Honor, the exhibit list, in addition to those, we've got 18,

10   19, 20, 21, 27.  It goes on and we did produce a wealth of

11   material to the objectors that had the board deliberations

12   to the extent they were non-privileged.  So we produced to

13   the extent that we could, Your Honor, and we believe that's

14   entirely appropriate and I'm going to come back to discovery

15   because I'm going to walk through some of the objections in

16   sequential order, Your Honor.

17             Your Honor, second question, you asked about

18   valuation.  You said why doesn't a party in this case do a

19   valuation.  As an initial matter, we agree with Mr. Kaplan's

20   point that we think at this point, flooding the Court with

21   multiple competing valuations from financial advisors on all

22   sides quite likely would be of limited probity to this Court

23   if, in fact, we just had multiple competing valuations now.

24             We also want to talk about the history of how we

25   got here.  We heard certain objectors say there had been no

1    discussion of how we got here today.  At the opening

2    presentation, I put up a time line and I walked forward from

3    the filing, the first lien dip, the second lien dip how we

4    got here today and I believe we've acknowledged how we got

5    here today.  We moved forward with a proposed second lien

6    dip that was the best available alternative at that point in

7    time.  What happened?  An auction broke out.  A robust

8    auction broke out for the economic interest in Oncor.  Once

9    there was, for instance, a file bid for NextEra, an

10   approximately $18 billion bid, to at that point in time

11   speed up the valuation work that Evercore already had under

12   way for the purposes of what would otherwise be potentially

13   artificially establishing a floor, that would not have been

14   helpful to the Court.  It would not have been helpful to

15   this process.  The best indication of value at this point in

16   time given that there was -- an auction is already under way

17   -- and I think that all of the evidence before the Court is

18   that an auction is already under way, doing a valuation at

19   this point in time, the best indicator of valuation is going

20   to be the marketing process, what are the parties willing to

21   pay for the asset and we will be back before the Court on a

22   stalking horse and on a sale approval and everybody can make

23   all their valuation-based arguments at that point in time.

24          Thirdly, Your Honor, with regard to sequencing and

25   pace, I do observe through the very, very, very

1    contradictory argument being put forward on the timing and

2    the sequence of this case, Mr. Weisfelner, for instance,

3    made two points.  He said we are so far along in these case

4    -- in these cases, it's incomprehensible that there haven't

5    been robust multiple consensual planned negotiations.  How

6    could we be so far along in this case that the debtors

7    aren't meeting with us more about a plan?  We then hear a

8    little bit later it's so early in this case, how can we be

9    marketing the Oncor asset.  We need more time.  These types

10   of significant issues in this case should not be decided

11   this prematurely and this early on.  And, Your Honor, they

12   can't have it both ways.  They cannot argue that both ways.

13            Quickly, Your Honor, there was this argument, I

14   guess, that was brought up this afternoon about the dinner

15   last week and the dinner.  We're glad they appreciate Mr.

16   Miller's comments, that at least, clarifying the record, of

17   at least one meeting that had occurred where there were

18   substantively planned negotiations with the debtors with the

19   advisors of the creditors committee, with the advisors to

20   the ad hoc group of TCHS occurs.  Your Honor, we're not

21   going to make an argument that one dinner is the end all, be

22   all.  This is not about one or more meetings.  There will --

23   we have had tons of meetings on the professional level.

24   We've had a certain number of meetings with the actual

25   principal but, Your Honor, I think the record is -- if not

1    the record, it's certainly going to be obvious to this Court

2    these objectors are going to be opposing most everything

3    that we do until the last confirmation objection is

4    overruled or there otherwise is a resolution of their claims

5    but, in the interim, it is not going to be one meeting, a

6    weekly meeting.  We already have a weekly protocol meeting

7    where we have -- it's a conference call that tends to happen

8    on Monday afternoons that we have on a professional basis.

9    There's lots of access.  There's lots of interaction.  We

10   don't have a consensual plan yet and so they're objecting

11   and that is their prerogative but there is not insufficient

12   access or insufficient dialog.

13            Your Honor, turning to Mr. Shore's presentation,

14   he put up this slide.  I don't -- there's not a page number

15   on it so I don't know how to reference it but the E side

16   plan process to date and he pointed to July 17th, made the

17   argument there's no evidence that on the July 17th board

18   meeting, there was consideration of the marketing process.

19   This slide has a citation to Exhibits 10 and 11.

20   Exhibits 10 and 11 which were admitted into evidence were

21   the board minutes as well as the presentation to the board.

22   Significant portions of that are redacted as is entirely

23   proper because it's privileged material and privilege

24   information.  That does not mean that there was not

25   sufficient discussion of these issues.  This slide also

1    points out no vote was taken on July 17th at the bidding

2    procedure -- on July 17th regarding the bidding procedures.

3    Notwithstanding the fact that the bidding procedures

4    themselves weren't filed for another subsequent two months,

5    we come back to the point we said before.  The law does not

6    require a vote in order for a board to express its

7    direction, in order for it to authorize its management and

8    its advisors to move forward a restructuring responsibly and

9    deliberately.

10            Next, there was some discussion also by Mr. Shore

11   of discovery and some more allegations of insufficient

12   production which centered around what we otherwise withheld

13   for privilege on the basis of draft minutes not being

14   produced or minutes being produced that otherwise had

15   significant redactions for privilege.  Nobody has come forth

16   that there's no agendas, there's no minutes, there's no

17   materials, this board was uninformed, this board didn't have

18   sufficient written data in front of it.  We think that's

19   improper and we think they actually went up to the edge of

20   the argument that there should be an adverse inference taken

21   by the Court, that there was an absence of materials and an

22   absence of deliberation.  Again, what we have produced we

23   think refutes that notion and what we have withheld we

24   withheld on defensible grounds and that also, Your Honor, we

25   believe, refutes that notion.

1          Next, Your Honor, the arguments that we have an

2    uninformed board we believe are borderline outrageous.  We

3    really do.  Your Honor, if three directors testify directly

4    at deposition and in this Court at length about the extent

5    to which they believe they were fully informed, this

6    argument somehow has to turn on these directors are so

7    uninformed, they don't even recognize how uninformed they

8    are.  They're unable to make the determination that they are

9    uninformed.  They testified, two of the three testified at

10   length in this hearing and they testified about the extent

11   of their knowledge.  They testified that they believed they

12   were fully informed and that they were fully authorizing

13   these procedures.  I believe there was a slide that someone

14   put up that no one owned this process.

15          Your Honor, in the presentation that I put up at

16   closing, we put forward the testimony of the three

17   directors.  Mr. Sawyer on October 21st, quote, "I think the

18   board certainly did express its will to the management team

19   and to the advisors and to the CROs that we very much wanted

20   this marketing process to go forward in an attempt to

21   maximize the value of this estate."  Mr. Cremens and Mr.

22   Keglevic testified in substance to the same thing.  How can

23   there be an allegation that no one owned this process when

24   we have at least three directors saying the board did own

25   this process?

1              Next, Your Honor, you heard today for the first

2     time a new conspiracy theory that somehow under Rural Metro,

3     the directors that testified live in this Court that they've

4     somehow been hoodwinked into a sale process that they don't

5     understand, that they've somehow been hoodwinked by Evercore

6     for the purposes of earning a success fee.  Your Honor,

7     these are serious allegations and there's not a shred of

8     evidence to support that, none, and we would respectfully

9     request that the Court provide zero credence to that

10    argument.

11             Lastly, Your Honor, there has been a lot of

12    argument around the significant and potential costs of

13    moving forward now, what was cited amongst other things,

14    professional fees, case band width, court band width,

15    management distraction.  Now, we've heard a lot of

16    allegations from the objectors that we've made disingenuous

17    arguments.  I think this argument is the height of

18    disingenuousness.

19             When we try and move forward on significant case

20    events, we get hit with waves of discovery and objections

21    and cross-examinations not even on significant case events.

22    The objectors wanted to have a contested evidentiary hearing

23    on our joint administration motion, much less on the major

24    events such as moving forward on the bidding procedures.

25    Your Honor, this is their prerogative.  They certainly have

1    the right to do so and this is a key play out of their play

2    book which they have every right to do but they should not

3    be heard then to argue that it is an indictment of our

4    process that there's so much fighting in this case and

5    there's so much discovery going on and there's so much

6    tumult and there's these very loud hearings when they are

7    generating most of that.  And, again, we're not -- they can

8    do that.  That is entirely their prerogative.  However, it's

9    the debtors' prerogative, it's the debtors' obligation, to

10   move forward with these cases and so we have to fight

11   through that when it happens and we're committed to doing so

12   and we appreciate the Court giving us the time to be able to

13   do so but, Your Honor, those arguments of creating a lot of

14   distraction and tumult should not be seen as an indictment

15   of the process and they cannot be a justifiable reason for

16   denying our forward progress and we would respectfully

17   request that they are not a justifiable reason to deny this

18   motion, Your Honor.

19            THE COURT:  Thank you.

20            MR. HESSLER:  Thank you, Your Honor.

21            THE COURT:  All right.  I want to thank everyone

22   for their submissions.  There's a lot to digest.  There's a,

23   obviously, extensive record, extensive testimony and

24   documents and oral argument.  So you're not going to get a

25   ruling today and here's what we're going to do.  We're going

1    to reconvene and you can participate by phone at 1 o'clock

2    next Monday and I'll give my ruling, my oral ruling, on the

3    bidding procedures motion.

4              I simply -- obviously, this is unusual to take

5    this kind of time period for this Court to pretty much do

6    anything, certainly, on something that would normally be

7    done on an expeditious time frame, something like bidding

8    procedures or sale procedures, but I believe that the record

9    is sufficiently there.  The issues are sufficiently

10   important that I need some time to digest that and to make a

11   reasoned ruling.  So I sort of apologize for the delay but I

12   think it is important to having a, hopefully, full and

13   understandable ruling by the Court that I intend to, as I

14   did with the executive compensation motion, I'll read my

15   ruling into the record.

16             So that's it.  I believe I have everything.  As we

17   gather our materials tomorrow, if I'm missing anything, I'll

18   let people know and I'll ask for supplements but I believe I

19   have all the depositions and all the exhibits and I will

20   have all the transcripts.  So I thank everyone very much for

21   their efforts today and I will see some of you tomorrow at

22   noon and the others we'll either see or be on the phone

23   together Monday, November 3rd at 1:00 p.m.  All right?

24   Thank you.  We're adjourned.

25             UNIDENTIFIED SPEAKER:  Thank you.

Page 180

1              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2         (Whereupon, the proceedings concluded at 5:04 PM)

3                          * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                         W I T N E S S E S

3    WITNESS                  BY                        PAGE

4    DVID STEVEN KURTZ        MR. KERR                    13

5                             MR. WEISFELNER              42

6                             MR. MCGAAN                  44

7                             MR. SHORE                   64

8                             MR. KERR                    66

9

10

11                        E H I B I T S

12     PARTY    NO   DESCRIPTION          ID.       EVID.

13   Committee - 2, 9, 10, 11, 14, 20, 21, 22,

14              27, 33, 37, 40, 41, 51, 52,

15              55, 62, 69, 71, 72, 73, 77,

16              78, 79, 80                   --        71

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, Dawn South, Sheila, certify that the foregoing transcript

4    is a true and accurate record of the proceedings.

5    Dawn        Digitally signed by Dawn South
                 DN: cn=Dawn South, o, ou,
                 email=digital1@veritext.com,
6    South       c=US
                 Date: 2014.10.28 10:45:43
                 -04'00'
     _____

7    Dawn South

     AAERT Certified Electronic Transcriber CET**D-408

8

9

10   Sheila      Digitally signed by Sheila Orms
                 DN: cn=Sheila Orms, o, ou,
11               email=digital1@veritext.com,
     Orms        c=US
12               Date: 2014.10.28 10:46:26 -04'00'
     _____

13   Sheila Orms

14   Linda S     Digitally signed by Linda S Foley
                 DN: cn=Linda S Foley, o, ou,
15               email=digital1@veritext.com,
     Foley       c=US
16               Date: 2014.10.28 10:47:06 -04'00'
     _____

     Linda S. Foley

17

     Approved Electronic Transcriber

18

19

     Veritext

20

     330 Old Country Road

21

     Suite 300

22

     Mineola, NY 11501

23

24

     Date:  October 28, 2014

25