Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                        :

                                  :   Chapter 11

6   ENERGY FUTURE HOLDINGS        :

    CORP.,  et al.,               :   Case No. 14-10979(CSS)

7                                 :

            Debtors.              :   (Jointly Administered)

8   _____

9

10

11

12                               United States Bankruptcy Court

13                               824 North Market Street

14                               Wilmington, Delaware

15

16

17                               November 3, 2014

18                               1:06 PM - 1:34 PM

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTECHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  LESLIE MURIN

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Extending the Period Within Which the

3    Debtors May Remove Luminant Generation Company, LLC v. Titus

4    County Appraisal District [D.I. 1990; filed September 10,

5    2014]

6

7    HEARING re Motion for Entry of an Order Authorizing

8    Wilmington Savings Fund Society, FSB to File Under Seal (I)

9    an Unredacted Version of its Objection to Motion of Energy

10   Future Holdings Corp., et al., for Entry of an Order (A)

11   Approving Bidding Procedures, (B) Scheduling an Auction and

12   Related Deadlines and Hearings, and (C) Approving the Form

13   and Manner of Notice Thereof and (II) Exhibits 1 and 2 to

14   the Declaration of Jeremy B. Coffey in Support of the

15   Objection [D.I. 2370; filed October 10, 2014]

16

17   HEARING re Motion of Energy Future Holdings Corp., et al.,

18   for Entry of an Order (A) Approving Bidding Procedures, (B)

19   Scheduling an Auction and Related Deadlines and Hearings,

20   and (C) Approving the Form and Manner of Notice Thereof

21   [D.I. 2087; filed September 19, 2014]

22

23

24

25   Transcribed by:  Dawn South

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorney for the Debtors

4

5    BY:  EDWARD SASSOWER, ESQ.

6

7    RICHARD LAYTON & FINGER

8         Attorneys for the Debtors

9

10   BY:  DANIEL J. DEFRANCESCHI, ESQ.

11        JASON M. MADRON, ESQ.

12

13   BROWN RUDNICK

14        Attorney for WSFS

15

16   BY:  JEFFREY L. JONAS, ESQ.

17

18   POTTER ANDERSON & CORROON LLP

19        Attorney for Deutsche Bank AG New York Branch

20

21   BY:  JEREMY RYAN, ESQ.

22

23

24

25

1  ROPES & GRAY LLP

2       Attorneys for CSC Trust Company of Delaware

3

4  BY:  D. ROSS MARTIN, ESQ.

5       KEITH HOWARD WOFFORD, ESQ.

6

7  POLSINELLI

8       Attorney for the Committee

9

10  BY:  CHRIS WARD, ESQ.

11

12  THE HOGAN FIRM

13       Attorney for the Ad Hoc Committee EFH Legacy

14

15  BY:  GARVAN MCDANIEL, ESQ.

16

17  FOX ROTHSCHILD

18       Attorney for TCEH Unsecured Ad Hoc Group

19

20  BY:  JOHN STROCK, ESQ.

21

22  ASHBY & GEDDES

23       Attorney for Christiana Trust

24

25  BY:  GREG TAYLOR, ESQ.

1

2   CHIPMAN BROWN

3        Attorney for the Ad Hoc Committee of EFIH Unsecured

4        Noteholders

5

6   BY:  ANN M. KASHISHIAN, ESQ.

7

8   WOMBLE CARLYLE

9        Attorney for Fluor

10

11   BY:  KEVIN MANGAN, ESQ.

12

13   MORRIS JAMES LLP

14        Attorney for Law Debenture, Trustee

15

16   BY:  STEPHEN MILLER, ESQ.

17

18   PATTERSON BELKAMP LLP

19        Attorney for Law Debenture, Trustee

20

21   BY:  DANIEL LOWENTHAL, ESQ.

22

23

24

25

1    COLE SCHOTZ

2         Attorney for the Delaware Trust Company

3

4    BY:  KATE STICKLES, ESQ.

5

6    CIARDI CIARDI & ASTIN

7         Attorney for Atmos

8

9    BY:  JOSEPH J. MCHAHON, JR., ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Okay.  Thank you.

4              Today is the time and date I've set to give my

5    ruling on the pending bid procedures motion, which I will

6    read into the record.  At the conclusion I'll open it up for

7    my questions.  Hopefully there aren't any, but there

8    probably will be some, so there we are.

9              Before the Court is the debtors' motion to an

10   order (a), approving bidding procedures, (b), scheduling an

11   auction and related deadlines and hearings, and (c),

12   approving the form and manner of notice thereof, which is

13   Court will refer to as the bidding procedures motion.

14              A number of parties objected to the bidding

15   procedures motion, but several of them have resolved those

16   objections.

17              The remaining objections were filed by (1), the

18   official committee of unsecured creditors of TCEH and EFH

19   Corp.; (2), the ad hoc group of TCEH unsecured noteholders;

20   (3), Wilmington Saving Fund Society, the trustee for the

21   TCEH second lien notes, and (4), Delaware Trust Company as

22   the EFIH first lien note indenture trustee.  Collectively

23   I'll refer to the remaining objectors as the objectors.

24              There is an additional important party that was

25   not formed until last week, and that's the official

1   committee of unsecured creditors of EFIH.

2            The Court conducted a four-day evidentiary

3   hearing on October 17, 20, 21, and 27, 2014.  During the

4   evidentiary hearing the Court heard live testimony from four

5   witness.  One, William Hiltz, one of the debtors' financial

6   advisors at Evercore; two, Paul Keglevic, the debtors' chief

7   financial officer and co-restructuring officer; three, Hugh

8   Sawyer, a member of the board of directors of TCEH, and

9   David Kurtz, one of the TCEH committees' financial advisors

10  at Lazard.

11           In addition the parties submitted cross-

12  designations from the depositions of Charles Kerns, a member

13  of the board of directors of EFIH, and Anthony Horton, the

14  debtors' treasurer and senior vice president.

15           The parties also submitted numerous exhibits that

16  were admitted into evidence without objection.

17           As the parties are well aware the debtors'

18  corporate structure is a bit of an alphabet soup.  The

19  bidding procedures motion involves the following entities.

20  UFH Corp., the debtors' ultimate parent; EFCH, which is a

21  holding company on the T side of the debtors' balance sheet;

22  EFCH as a wholly-owned subsidiary of EFH Corp.; TCEH, which

23  owns the operating subsidiaries on the T side of the

24  debtors' balance sheet, TCEH is a wholly-owned subsidiary of

25  EFCH; EFIH, which is a holding company on the E side of the

1    debtors' balance sheet, and EFIH is a wholly-owned

2    subsidiary of EFH Corp.; Oncor Electric Delivery Holdings

3    Company or Oncor Holdings, which is a non-debtor holding

4    company on the E side of the debtors' balance sheet, and

5    Oncor Holdings is a wholly-owned subsidiary of EFIH; and

6    finally Oncor Electric Delivery Company, or Oncor, which is

7    a non-debtor operating company engaged in regulated

8    electricity transmission and distribution operations.

9          Oncor Holdings owns approximately 80 percent of

10   Oncor with approximately 20 percent of Oncor owned by Texas

11   Transmission Investment LLC and a trace amount owned by

12   management.

13          Oncor operates the largest transmission and

14   distribution system in Texas delivering electricity to more

15   than 3 million homes and businesses and operating more than

16   120,000 miles of transmission and distribution lines.

17          Oncor Holdings and Oncor are non-debtor entities

18   which serves to ring fence the Oncor business from the

19   debtors' bankruptcy.

20          Through the bidding procedures motion the debtors

21   seek to establish procedures to "solicit proposals for an

22   investment in any form to acquire any or all of the assets

23   or the reorganized equity of EFH Corp. or one or more of its

24   direct and indirect subsidiaries, including EFIH, but

25   excluding EFCH and its direct and indirect subsidiaries."

1      In other words, the debtors seek to market and ultimately to

2      sell the debtors' interest in the Oncor business.

3             The debtors estimate that the Oncor business may

4      be worth up to $18 billion.

5             The debtors' bidding procedure motion calls for

6      the following timeline.  One, September 19, 2014 debtors

7      filed the bidding procedures motion and distributed process

8      letters to bidders.

9             Two, October 17, 2014, which is the beginning of

10     the hearing on the bidding procedures motion.

11            Three, October 23, 2014 round one bid deadline,

12     which debtors submit a letter of intent and marked term

13     sheet.  The debtors then select a subset of bidders to

14     advance and to receive form definitive agreements.

15            Four, November 7, 2014 debtors provide selected

16     bidders with mark up of term sheet and proposed definitive

17     agreement.

18            November 21, 2014 round two bid deadline in which

19     bidders submit final form of definitive agreement.

20            The debtors then select a stalking horse bidder

21     and execute a final agreement.

22            The motion to approve the stalking horse bidder

23     and any break-up fee under the stalking horse agreement is

24     to be filed within five days after signing of that

25     agreement.

1          Approximately January 12, 2015 entering on

2    approval of stalking horse agreement and break-up fee.

3               Approximately February 12, 2015 auction

4    followed immediately by sale hearing and confirmation of the

5    plan of reorganization pursuant to the sale by December 31,

6    2015.

7          The Court previously ruled that the proposed

8    October 23, 2014 round one bid deadline would need to be

9    extended to allow the Court to conclude the evidentiary

10   hearing and make a ruling on the bidding procedures motion.

11         The evidentiary record regarding the prepetition

12   and post-petition events leading to the bidding procedures

13   motion is extensive and complex.

14         Given the short amount of time that the Court has

15   had to prepare this ruling it will not provide a recitation

16   of all the pertinent facts.  That said, there are a few

17   factual points the Court wishes to highlight.

18         One, Mr. Keglevic was a very credible witness,

19   although his memory regarding the actions at the various

20   board meetings in July and August were somewhat murky.

21         Mr. Hiltz and Mr. Kurtz were credible witnesses.

22   Mr. Hiltz is clearly an experienced expert in M&A

23   transactions; however, we has in effect no restructuring or

24   bankruptcy experience.  That lack of experience was a factor

25   in the formulation of the debtors' bid procedures which are

1    inconsistent with procedures typically used in bankruptcy

2    and contain some fundamental flaws.

3            Mr. Sawyer and Mr. Cremens were less credible.

4    Both witnesses were very well prepared but evasive.  Mr.

5    Sawyer in particular simply refused to answer questions on

6    several occasions.

7            More importantly, however, their repeated

8    insistence that the RSA was a good starting point of a

9    process was revisionist history.

10           The RSA with which we started this case was not a

11   starting point, it was a proposed beginning that

12   (indiscernible - 1:13:58) that was aggressively pursued by

13   the debtors.

14           There's nothing inherently wrong with the debtors

15   entering into a restructuring support agreement and pursuing

16   it post-petition, but let's recognize it for what it is or

17   was.  Mr. Sawyer and Mr. Cremens' insistence otherwise hurt

18   their credibility.

19           Mr. Horton's testimony was not material.

20           Two, Mr. Hiltz testified credibly that it is

21   unlikely the debtors will receive bids other than some

22   version of the debtors' preferred tax structure.

23           He also testified credibly that all the actions,

24   so to speak, in the bid process, with happen prior to the

25   selection of a stalking horse bidder.

1          Three, this is not RSA 2.0.  There can be no

2    question that the debtors' proposed tax structure that calls

3    for a complicated tax-free deconsolidation of the E side and

4    T side of the balance sheet was the fundamental element of

5    the RSA, and is the debtors' preferred structure for the

6    sale of the Oncor business, but there are important elements

7    of the RSA that have been abandoned.

8          One is the EFIH second lien DIP, a second is the

9    timely milestones contained in the RSA.  Under the RSA we

10   would already be well on our way to confirmation.  Although

11   the debtors are hoping to confirm a plan by the end of 2015,

12   it was nothing remotely like the timeline with which we

13   started the case.

14         Four, the debtors' written records regarding the

15   various board meetings in July and August were frustratingly

16   sparse.  This hurt the debtors' case.

17         As will be discussed shortly, it is the debtors'

18   burden to establish that the bidding procedures motion was a

19   reasonable exercise of the debtors' business judgment, i.e.,

20   the judgment of the directors and/or the officers.  Without

21   information as to what occurred it is difficult for the

22   Court to evaluate that decision.  This contributed to the

23   concerns with corporate governance that I will discuss

24   shortly.

25         Five, regardless of the merits of the debtors'

1    preferred tax structure upon which I offer no opinion one

2    way or the other, there can be no question that it raises

3    actual internal conflicts among the debtors' estates.  I am

4    in no way suggesting that those conflicts are irreconcilable

5    or fatal to the debtors' proposal strategy, but the

6    continued insistence by the debtors, Mr. Sawyer, and

7              Mr. Cremens that these conflicts are only

8    potential ignores reality.

9              Six, there can be no question that determining the

10   value of the Oncor business would be helpful in moving this

11   case forward.  It is also without question in my mind that

12   the most accurate way to determine value is to offer an

13   asset for sale, provided that market and other conditions,

14   including those specific to the bankruptcy case are

15   favorable, and the process is designed to maximize value.

16   That is the nub of the issue before the Court.  Should the

17   Court endorse the debtors' business judgment that this is

18   the right time and manner to market the Oncor business?

19             In addition to the extensive factual record before

20   the Court the arguments submitted by the debtors, the

21   debtors' supporters, and the objectors, are too immense to

22   address in detail, thus the Court will limit its ruling to

23   those arguments it considers material to the outcome.  Any

24   arguments not addressed in this ruling are not deemed

25   sufficiently material to merit further discussion.

1          I will start with the legal standard, but first I

2     want to address the specific objection relating to what is

3     it that the debtors are seeking here.

4          Several of the objectors have argued that the

5     debtors are seeking to sell the equity in reorganized EFH

6     Corp. which is an asset that doesn't currently exist and

7     that the debtors do not and will never own.  That is an

8     inaccurate description of what is going on here.

9          The debtors are seeking competitive bids to enter

10     into a transaction of any type with regard to Oncor.  They

11     have made it clear however that they favor their preferred

12     tax plan, so it is fair to view the motion as seeking a

13     transaction that would serve as the basis for a

14     reorganization plan.  In that instance they are not

15     specifically selling an asset, but Section 363(b) is not

16     limited to the sale of assets.  It states that a debtor may

17     use, sell, or lease property.

18          Here the debtors are auctioning off the right to

19     enter into a contract that will serve as the basis for a

20     proposed plan of reorganization.  That is clearly within the

21     ambit of Section 363.  Excuse me.

22              Moving on.  The bidding procedures motion and

23     the proposed bidding procedures are clearly outside the

24     debtors' ordinary course of business and require Court

25     approval after notice and a hearing.

1            Let me pause here and address the point that the

2    debtors are seeking something they normally would not.

3    Advance approval of bidding procedures to select a stalking

4    horse bidder.

5            Implicit in that argument is that the Court could

6    provide greater deference to the debtors' proposed action.

7    The Court disagrees.  Even were the debtors not to have

8    sought prior Court approval of bidding procedures for

9    selection of a stalking horse that decision, i.e., the

10   selection of the stalking horse, would require Court

11   approval and would be integral to the Court's decision as to

12   whether to approve the stalking horse.

13           The question then would be how did we get here?

14   In other words, the stalking horse bidding procedure would

15   be subject to Court scrutiny either ahead of time as here or

16   afterwards as is normally done.

17           Moreover, the evidence here strongly suggests that

18   all of the bidding action is likely to occur prior to the

19   selection of a stalking horse bidder.  Thus Court and

20   creditor involvement at this stage is important.

21           To approve the motion the Court must find that the

22   debtors have satisfied the business judgment standard under

23   363(b)(1), i.e., is the proposed action supported by a sound

24   business reason and based on a sound exercise of business

25   judgment?

1              The business judgment test here differs from the

2    general corporate law business judgment rule which protects

3    corporate directors are liability when they have exercised

4    due care and are not self-interested in the transaction.

5              Here by contrast the Bankruptcy Court reviews the

6    debtors' business judgment to determine independently

7    whether the judgment is a reasonable one.

8              The Court should not substitute its judgment for

9    the debtors; however, but should determine only whether the

10   debtors' judgment was reasonable and whether a sound

11   business justification exists supporting the transaction and

12   its terms.

13             That said, in making the Court's determination it

14   might import where appropriate principals of state law

15   governing the exercise of fiduciary duties such as requiring

16   a debtor to demonstrate the entire fairness of a proposed

17   transaction where the directors and/or management are self-

18   interested.

19             The Court does not find however that the debtors

20   need satisfy the entire fairness standard in connection with

21   the bidding procedures motion, rather the Court finds that

22   the debtors have satisfied the business judgment standard

23   under Section 363(b) and will grant the bidding procedures

24   motion subject to several significant and important

25   conditions.

1            The Court finds that the business decision to

2    market the Oncor business and prosecute the bidding

3    procedures motion was the result of flawed and insufficient

4    corporate governance.

5            The implied authority given to the co-chief

6    restructuring officers was insufficient in the context of a

7    transaction of this magnitude and with such -- excuse me --

8    and with such a significant impact on the bankruptcy.

9    Chairman Evans' informal polling of the members of the

10   various boards was insufficient as well.

11           In order for the Court to approve the bidding

12   procedures as modified in this ruling the debtors must go

13   back to the boards of EFH Corp., EFCH, TCEH, and EFIH and

14   receive each boards' approval through a formal vote

15   assenting to the bid procedures as modified.

16           Based upon the conflicts involved at the TCEH and

17   EFIH levels that vote must be by that boards' independent

18   directors, which the Court understands to be Mr. Sawyer and

19   Mr. Cremens, respectively.

20           The assent of the boards of directors must be

21   communicated to the Court in a mechanism to be determined

22   before the Court's approval of the bidding procedures motion

23   and the modified bidding procedures will be effective.

24           Each boards' approval by vote, and in the case of

25   TCEH and EFIH, an independent vote will also have to be

1    obtained to approve the stalking horse and the ultimate

2    winning bidder.

3            The record is murky as to the details of the

4    various meetings of the various boards with regard to the

5    marketing and sale of the Oncor business.  We certainly know

6    that the various boards met several times and that these

7    issues were discussed at many, if not all, the meetings.

8    The testimony of Mr. Keglevic, Sawyer, and Cremens

9    establishes that at the EFH Corp. level, the directors in

10   all likelihood have satisfied their fiduciary duty of care.

11           The record is insufficient for the Court to make

12   such an observation at the TCEH and EFIH level.

13           Mr. Sawyer and Mr. Cremens occupy important

14   positions in this bankruptcy case as the independent

15   directors of TCEH and EFIH respectively.  It is incumbent

16   upon them to act vigorously in those roles.

17           Next, the Court finds that the bidding procedures

18   are not transparent and are inappropriate in a bankruptcy

19   case.  The procedures must allow for the substantive

20   involvement of some creditors on a real-time basis with the

21   ability for those creditors to communicate directly with

22   potential bidders.

23           The Court however is very sensitive to the

24   potential pitfalls associated with having two many cooks in

25   the kitchen, and especially when dealing with bidders that

1    may be publicly held companies.

2            Thus the Court will limit the creditors'

3    participation to the two official committees of unsecured

4    creditors.  The longstanding TCEH committee and the newly

5    formed EFIH committee.  That participation will be limited

6    to a professional eyes only basis, and the number of

7    professionals under the tent, so to speak, will be limited

8    to a small number of legal and factual -- excuse me -- legal

9    and financial advisors, i.e., no more than five total

10   persons per committee.

11           Also the debtors' proposed cart blanche authority

12   to modify the bid procedures is unacceptable.  Any material

13   modification of the bid procedures will require either

14   consent of the official committees for Court approval which

15   can be sought on an in camera basis.

16           Finally, the proposed timelines must be stretched

17   somewhat to allow for sufficient time for any interested

18   party to develop an alternative transaction to the debtors'

19   preferred tax structure and the EFIH committee to select

20   advisors and at least start to get up to speed.

21           The Court notes that it does not consider its

22   review of the proposed bidding procedures as opposed to the

23   decision to pursue a proposed transaction as meriting

24   deference under the business judgment standard.

25           When the Court's authority is requested to

1    establish bid procedures the Court has an independent duty

2    to review those procedures on their merits with special

3    attention to questions of fairness and due process.  The

4    Court exercises its independent judgment in reviewing bid

5    procedures while keeping in mind that the Court is in no way

6    an expert at marketing or selling anything.

7            We are not reinventing the wheel here.  We all

8    know how to market and sell an asset in a bankruptcy.  The

9    immense size of this case in an $18 billion is certainly

10   unusual, and the involvement of public companies as bidders

11   is a complicating factor, but there is no reason to depart

12   with well-established practices that have been developed to

13   address the unique context of selling an asset in

14   bankruptcy.

15           Creditor and Court oversight of the debtors'

16   action outside the ordinary course of business, including

17   asset marketing and sales, is not only appropriate, but is

18   required by the law.

19           To that end I find the debtors' proposed provision

20   in the bid procedures and order to give them unfettered

21   discretion to amend the bid procedures to be frankly

22   offensive.  I cannot imagine a set of circumstances in which

23   I would knowingly approve such a transaction -- or provision

24   -- excuse me.

25           I'm not going to rule on the specifics of the bid

1    procedures on an item by item basis, my ruling is that the

2    official committees must be substantive involved on a real-

3    time basis, have the ability to speak directly with

4    potential bidders, and have consent rights to changes in the

5    procedures.

6            As to timing, in order for the debtors' statement

7    that they are open to any transaction to be anything more

8    than lip service more time must be provided to allow any

9    such transaction to be formulated.  I believe that Mr. Hiltz

10   is probably correct that such an alternative transaction is

11   unlikely, but the debtors have made a point of being open to

12   such transactions and I'm going to hold them to it.

13           Also, I believe that the time periods between

14   rounds one, round two, and the entering into a stalking

15   horse agreement are too tight in a bankruptcy context.

16   While I'm sure they are probably appropriate in a normal M&A

17   transaction, more time is needed to deal with the

18   complexities involved in bankruptcy, including the

19   involvement of the creditors.

20           Finally some limited amount of time is required to

21   allow the EFIH official committee to be in a position to

22   participate meaningfully in the process.

23           I am looking to the TCEH official committee and

24   the debtors to work out the details as to the bid procedures

25   based on my rulings.

1          The EFIH committee should participate to the

2     extent it is sufficiently organized to do so in a timely

3     manner.

4          At the same time I want to make it clear that I am

5     not overruling or altering any accommodations that the

6     debtors have already made to resolve objections.

7          Also, I am not allowing the objectors, other than

8     the official committees, under the tent.  I understand their

9     passion on this issue and their significant financial stake,

10    but that is outweighed by my concern over confidentiality.

11    The risk of leaking of confidential information expands

12    exponentially as parties are added to the process, and the

13    risk of that exposure might lead an otherwise interested

14    bidder from participating, which would be harmful to the

15    process.

16          That said, my ruling with regard to limiting

17    involvement in the process to the debtors and the official

18    committees is limited to the period relating to selection of

19    a stalking horse.

20          Access to information, involvement, et cetera,

21    during the open marketing process should be more robust.

22    That can be addressed either at this point, which would

23    require the input of all the objectors, or at the stalking

24    horse hearing.

25          Circling back to the corporate governance issue.

1          I am also reluctant to specify the exact manner in

2     which the debtors are to inform the Court and the parties

3     regarding whether the various boards have voted to approve

4     the bids procedures as modified.  I think that either board

5     merits or certifications specifying the action taken in the

6     manner in which the issue is determined, i.e., who was

7     present, were presentations made, et cetera, should be

8     sufficient.  I look to the debtors and the objectors to work

9     out a reasonable procedure.  If you cannot work it out I

10    will get involved in the process.

11          It probably makes sense to codify that procedure

12    in a court order, and it may make sense to have a bidding

13    procedures order that contains as a condition to its

14    effectiveness submission of that information.  Again, the

15    Court will look to the objectors and the debtors on this.

16          Just to be clear, however, we are not going to

17    have another hearing on the merits of the decision.  If the

18    Court is unsatisfied with the submission of the results of

19    the boards' deliberations either in form or substance the

20    Court will inform the parties.

21          Similar submissions will need to be made in

22    connection with approval of stalking horse agreement and the

23    ultimate winning bidder.

24          There was a tremendous amount of evidence elicited

25    by the objectors in an attempt to challenge not just the

1   process by which the debtors made their decision to pursue

2   marketing the Oncor business, which I previously addressed,

3   but the substance of that decision as well.

4           The objectors argue that the debtors are making a

5   critical error in pursuing their preferred tax transaction

6   at all, marketing Oncor prior to even beginning negotiations

7   over a plan with the creditors, freezing out creditors in

8   the process, and several other arguments.

9           Moreover, the objectors assert that the filing and

10  pursuit of this motion drastically undercuts the progress

11  that had been made over the summer in establishing the

12  protocols regarding investigations of claims, et cetera.

13          At heart the objectors take issue with the

14  debtors' entire reorganization strategy.

15          In making its ruling the Court is specifically not

16  opining on the merits of the debtors' -- the merits of the

17  debtors' proposed course of action nor its preferred tax

18  structure.  The business judgment standard correctly

19  requires deference to a debtor's business and reorganization

20  strategy, especially during exclusivity.  There is no where

21  near a sufficient record before the Court for it to take the

22  extraordinary step of overruling the debtors' proposed

23  decision to market its assets or to pursue a specific

24  negotiation strategy in developing its proposed plan of

25  reorganization.

1            That said, I do not believe the objectors are

2       being obstructionists here.  While they clearly have a

3       different view of this case than the debtors, and many, if

4       not most of the other creditors, they have limited their

5       objections and actions to issue core to their theory of the

6       case.  There have been numerous motions, including the

7       insider compensation motion to which they have either

8       assented or not objected.

9            Finally, the Court strenuously urges the parties

10      to begin plan negotiations as soon as possible.  Some issues

11      will necessarily need to be put off.  For example, time is

12      necessary to allow for the ongoing investigation by the T

13      side creditors into potential causes of action, et cetera,

14      to be completed, but opening that dialogue sooner rather

15      than later, even over a dinner, can only be beneficial for

16      all parties.

17            That concludes the Court's ruling.  The floor is

18      open for my questions.  But if you are participating by

19      phone please make sure to identify yourselves on the record.

20            All right, I hear none.

21            Obviously there'll be work to be done before an

22      order can be submitted to the Court, which ultimately I

23      suppose would be done under certification of counsel.

24            As I indicated, to the extent difficulties arise

25      in coming up with a procedure and the details of an order

1    implementing the Court's ruling I'll make myself available

2    to resolve any duties.  All right?

3              Mr. Sassower?

4              MR. SASSOWER:  Thank you.

5              THE COURT:  You're welcome.  Thank you very much.

6    We're adjourned.

7              (Whereupon, the proceedings concluded at 1:34 PM)

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 28

I N D E X

RULINGS

| | Page | Line |
| --- | --- | --- |
| Court's Ruling | 7 | 9 |

Page 29

1                  C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6    Dawn South
_____

Digitally signed by Dawn South
DN: cn=Dawn South, o=Veritext,
ou, email=digital@veritext.com,
c=US
Date: 2014.11.04 09:23:10 -05'00'

7    Dawn South

     AAERT Certified Electronic Transcriber CET**D-408

8

9    Veritext

10   330 Old Country Road

11   Suite 300

12   Mineola, NY 11501

13

14   Date:  November 3, 2014

15

16

17

18

19

20

21

22

23

24

25