**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Obj. Deadline:  11/17/14 at 4:00 p.m. (Requested)** |
| | ) | **Hearing Date:  11/20/14 at 12:00 p.m. (Requested)** |

**MOTION OF ENERGY FUTURE HOLDINGS CORP.,
*ET AL.*, CLARIFYING CERTAIN RELIEF GRANTED IN
THE NON-PROPRIETARY TRADING ORDER AND SEEKING
ENTRY OF AN ORDER AUTHORIZING CERTAIN DEBTORS TO ENTER
INTO NON-PROPRIETARY HEDGING AND TRADING ARRANGEMENTS
WITH A TENOR BEYOND DECEMBER 31, 2015 AND SUBJECT TO HEDGE
AND TENOR LIMITATIONS CONSISTENT WITH HISTORICAL PRACTICE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) clarifying certain relief granted in the *Final Order (Re: Non-Proprietary Trading and Hedging Transactions Involving the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 860] (the "Non-Proprietary Trading Order") with respect to (i) the hedge limitations that govern hedging and trading arrangements entered into by

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

certain of the Debtors, specifically, Luminant Energy Company LLC, Luminant ET Services Company, and Luminant Generation Company LLC (the "Hedging and Trading Entities") to hedge price and delivery risk related to fuel inputs and electricity (such hedging and trading arrangements, the "Non-Proprietary Hedging and Trading Arrangements")[2] for calendar year 2015, (ii) the inapplicability of the Internal Hedging Policy to Non-Proprietary Hedging and Trading Arrangements that relate to uranium and Powder River Basin Coal, and (iii) the applicability of the Non-Proprietary Trading Order to transactions the Debtors may enter into (including Non-Proprietary Hedging and Trading Arrangements the Hedging and Trading Entities may enter into) to hedge their retail obligations and (b) authorizing the Hedging and Trading Entities to (i) enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 and (ii) utilize "rolling" hedging and tenor limitations with respect to such Non-Proprietary Hedging and Trading Arrangements, in accordance with the Debtors' business judgment and as approved by the audit committee for the board of directors for Energy Future Holdings Corp. ("EFH") (the "Audit Committee") from time to time in the ordinary course of business (as described herein, the "Approved Limits").[3]  In support of this Motion, the Debtors submit the *Declaration of Terry L. Nutt, Senior Vice President and*

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Motion of Energy Future Holdings Corp.*, et al., *for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 41] (the "Hedging and Trading Motion") and the Non-Proprietary Trading Order, as may be applicable.

[3] The Debtors do not seek any relief with respect to hedging and trading arrangements the Debtors enter into, from time to time, for the primary purpose of generating profits and, in some instances, limiting losses and locking in profits from existing proprietary trades (such hedging and trading arrangements, the "Proprietary Hedging and Trading Arrangements."). Nothing in this Motion, the Nutt Declaration, or the Order shall affect the Proprietary Hedging and Trading Arrangements, which shall be governed solely by the *Final Order (Re: Proprietary Trading Transactions That Do Not Involve the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Proprietary Trading Transactions Subject to Internal Risk Management Guidelines* [D.I. 1309] (the "Proprietary Trading Order").

RLF1 11028373v.1

*Controller of EFH Corp., in Support of the Motion of Energy Future Holdings Corp., et al., Clarifying Certain Relief Granted in the Non-Proprietary Trading Order and Seeking Entry of an Order Authorizing Certain Debtors to Enter Into Non-Proprietary Hedging and Trading Arrangements with a Tenor Beyond December 31, 2015 and Subject to Hedge and Tenor Limitations Consistent with Historical Practice* (the "<u>Nutt Declaration</u>") and respectfully state as follows.

## Jurisdiction and Venue

1. The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Bankruptcy Rules</u>") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested in this Motion are section 363 title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## Relief Requested

4. Pursuant to the Non-Proprietary Trading Order, the Debtors are not permitted to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December

31, 2015 without further order of the Court. By this Motion, the Debtors seek entry of the Order authorizing the Hedging and Trading Entities to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor that extends beyond December 31, 2015 in accordance with the Approved Limits. Additionally, the Debtors seek clarity regarding certain relief granted in the Non-Proprietary Trading Order.

**Background**

5.      On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Court has entered a final order for joint administration of these chapter 11 cases [D.I. 849]. The Court has not appointed a trustee. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors of Energy Future Competitive Holdings Company LLC ("EFCH"), Texas Competitive Electric Holdings Company LLC ("TCEH"), the direct and indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate Services Company (the "TCEH Creditors' Committee") on May 13, 2014 [D.I. 420] and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee") on October 27, 2014 [D.I. 2570]. Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98].

6.      On the Petition Date, the Debtors filed the Hedging and Trading Motion, seeking authority to continue performing under Proprietary Hedging and Trading Arrangements and Non-Proprietary Hedging and Trading Arrangements and honoring related prepetition

4

obligations (including collateral obligations) and to enter into new Proprietary Hedging and Trading Arrangements and Non-Proprietary Hedging and Trading Arrangements in the ordinary course of business. The Court entered final relief with respect to Non-Proprietary Hedging and Trading Arrangements on June 6, 2014 [D.I. 860] and final relief with respect to Proprietary Hedging and Trading Arrangements on June 30, 2014 [D.I. 1309].

7. As described in the Hedging and Trading Motion, the Debtors use rigorous Risk Management Guidelines to ensure that Non-Proprietary Hedging and Trading Arrangements are closely monitored to minimize enterprise risk and maximize the value of the Debtors' estates. In addition to the Risk Management Guidelines — which focus on governance and operational accountabilities surrounding transactions undertaken under the Non-Proprietary Hedging and Trading Arrangements — the Debtors utilize an Internal Hedging Policy. Generally, the Internal Hedging Policy restricts the Hedging and Trading Entities' ability to enter into Non-Proprietary Hedging and Trading Arrangements that would result in the Hedging and Trading Entities hedging more than 100% (in the aggregate) of the Debtors' projected exposure to certain commodities for a particular calendar year. As part of the Debtors' corporate governance process, the Internal Hedging Policy is, at minimum, reviewed annually by the Audit Committee, which is appointed annually by the EFH board of directors.

8. The scope of the Internal Hedging Policy is limited in two ways. *First*, the Internal Hedging Policy applies to certain commodities (that is, natural gas, power, and heat rate). *Second,* the Internal Hedging Policy implements hedge limits (i.e., the percent up to which the Hedging and Trading Entities can hedge the Debtors' exposure with respect to various types of commodities) for specific periods. These hedge limits are referred to as a "Hedging Ceiling" in the Hedging and Trading Motion. The Approved Limits include a

Hedging Ceiling for Non-Proprietary Hedging and Trading Arrangements with a tenor that extends past December 31, 2015, but the Non-Proprietary Trading Order does not authorize the Debtors to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015.  As a result, the Debtors are seeking the relief described herein.

**I.    Clarifications of Relief Granted in Non-Proprietary Trading Order.**

    **A.    The 2015 Hedge Ceiling for Non-Proprietary Hedging and Trading Arrangements.**

9.    Hedge limits are generally determined on a rolling-forward basis from a particular date from which an assessment regarding exposure is made (such date, a "Reference Date").  As a result, under the Approved Limits, the percentage up to which the Hedging and Trading Entities may hedge the Debtors' exposure through a Non-Proprietary Hedging and Trading Arrangement changes depending on the Reference Date.  Generally, the Hedging and Trading Entities gradually increase the percentage of the Debtors' exposure that is hedged as the Reference Date approaches the specified period of exposure (e.g., in January 2014 (Reference Date 1), the Hedging and Trading Entities might hedge less than 50% of December 2015 exposure, but by January 2015 (Reference Date 2), the Hedging and Trading Entities might have hedged up to 100% of December 2015 exposure).  This is due to the inherent increase in commodity price volatility, and related cash flow volatility, as a period is closer to the Reference Date (i.e., spot markets and near-term markets for commodities have more price volatility than longer-term markets).  Simply stated, the Hedging and Trading Entities hedge a greater percentage of near-term exposure than they do long-term exposure.

10.    In the Hedging and Trading Motion, the Debtors noted that for calendar year 2015, the Internal Hedging Policy provides a Hedging Ceiling that is less than 70% for the period 13-24 months after any Reference Date.  *See* Hedging and Trading Motion, ¶ 45.  The

Non-Proprietary Trading Order holds that "[t]he Debtors shall not be permitted to amend the tenor and hedge limitations set forth in the Internal Hedging Policy, including, without limitation, the Hedging Ceiling, in a manner that varies materially from the Debtors' historical hedging practices over the past two years without further order of the Court." *See* Non-Proprietary Trading Order, ¶ 20.

11. Although the Hedging and Trading Motion referenced a 70% Hedging Ceiling for a Reference Date *looking forward* 13-24 months, it was silent on the Hedging Ceiling that would apply where a period is less than 13 months away from the Reference Date. The Hedging and Trading Entities' historical practice has been to increase the Debtors' hedged exposure to up to 100% once a period is less than 13 months away from the Reference Date.

12. In light of these considerations, and consistent with the Debtors' historical hedging practices, the Debtors recently obtained approval from the Audit Committee for the Hedging and Trading Entities to hedge up to 100% for 2015, under the continued rigor of the Risk Management Guidelines. This limit accounts for the manner in which hedge limits change on a roll-forward basis as the Reference Date changes. This practice is based on the Debtors' need to protect near-term cash flow as commodity prices fluctuate, and the Debtors' use of power sales from their generation business to support the Debtors' retail obligations (which sales account for approximately 50% of the Debtors' exposure to natural gas and heat rate).

13. Given this historical practice and the Approved Limits, the Debtors believe the Hedging and Trading Entities are authorized under the Non-Proprietary Trading Order to hedge up to 100% of the Debtors' exposure for 2015 because doing so would be consistent with the Debtors' historical practices over the last two years. However, because the Hedging and Trading Motion was silent on this issue, and to avoid any mistaken conclusion that the Hedging

7

and Trading Entities have an absolute limit of 70% for calendar year 2015, the Debtors seek an order clarifying that the Hedging Ceiling increases on a rolling basis as a particular Reference Date approaches, consistent with the Approved Limits.

      **B.    The Internal Hedging Policy Does Not Apply to Uranium or Powder River Basin Coal**.

14. The Internal Hedging Policy historically has not applied to all commodities. In particular, Non-Proprietary Hedging and Trading Arrangements with respect to uranium and Powder River Basin coal have historically not been subject to the Internal Hedging Policy due to the physical characteristics of those commodity markets which require a longer procurement cycle than other commodities. *See* Hedging and Trading Motion, ¶ 45 ("The Internal Hedging Policy generally restricts the Debtors' ability to enter into Hedging and Trading Arrangements with respect to commodities *other than uranium and Powder River Basin Coal* . . . In addition, the Internal Hedging Policy generally includes a restriction on the Debtors' ability to hedge or manage its exposure with respect to commodities *other than uranium or Powder River Basin Coal*. . .") (emphasis added). That being said, other aspects of the Risk Management Guidelines (including other internal policies and procedures) apply to Non-Proprietary Hedging and Trading Arrangements with respect to uranium and Powder River Basin Coal.

15. The Non-Proprietary Trading Order provides that "*subject to the Internal Hedging Policy* (including any subsequent modification to such policy in a manner consistent with such Internal Hedging Policy and this Order), the Debtors shall not enter into wholesale Hedging and Trading Arrangements with a tenor beyond December 31, 2015." *See* Non-Proprietary Trading Order, ¶ 20 (emphasis added).

16. Reading paragraph 45 of the Hedging and Trading Motion with paragraph 20 of the Non-Proprietary Trading Order, the Debtors wish to clarify that because the tenor

limitations set forth in the Internal Hedging Policy do not apply to uranium or Powder River Basin coal (but other limitations set forth in the Risk Management Guidelines do apply), the limitations set forth in paragraph 20 of the Non-Proprietary Trading Order and in this Order do not apply to Non-Proprietary Hedging and Trading Arrangements related to uranium or Powder River Basin Coal. Accordingly, the Debtors seek an Order providing that the Hedging and Trading Entities may enter into Non-Proprietary Hedging and Trading Arrangements with respect to uranium and Powder River Basin coal in the ordinary course of business and in a manner consistent with the Risk Management Guidelines.

**II. Non-Proprietary Hedging and Trading Arrangements With Tenors That Extend Beyond December 31, 2015 and Applicable Tenor Limitations**.

17. As described above, the Non-Proprietary Trading Order does not permit the Hedging and Trading Entities to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 without further order of the Court. *See* Non-Proprietary Trading Order, ¶ 20. As a core part of the Debtors' risk management controls, the Hedging and Trading Entities do not enter into Non-Proprietary Hedging and Trading Arrangements that extend into a particular year if the Audit Committee has not approved hedge limits for such year. For example, the Hedging and Trading Entities could not enter into a Non-Proprietary Hedging and Trading Arrangement with a tenor that extended into 2014 before the Audit Committee approved the hedge limits for transactions entered into for calendar year 2014.

18. As noted above, the Debtors' Audit Committee formally reviews the Internal Hedging Policy on at least an annual basis to determine appropriate hedge and tenor limits. In late October 2014, the Audit Committee authorized the Approved Limits for Hedging and Trading Arrangements with a tenor that extends beyond December 31, 2015. The Approved Limits operate on a 27-month cycle and provide hedge limits and targets applicable to certain

periods within the cycle, adjusted forward each calendar quarter.  Under this rolling plan, the Debtors will be able to hedge up to 100% for forward months 4-15 (from any Reference Date) with a target of 50% for forward months 16-27 (from any Reference Date), all subject to the Hedging Ceiling set forth in the Approved Limits.

19. That being said, the tenor limitations contained in the Approved Limits do not apply to Non-Proprietary Hedging and Trading Arrangements entered into to hedge the Debtors' retail obligations.  This arrangement reflects the realities of the Debtors' retail operations —the Debtors might enter into long-term arrangements to provide power or gas to certain of their customers but might not have generation assets in the location in which the power must be provided.  This requires the Debtors (via the Hedging and Trading Entities) to purchase such products in the open market from unaffiliated third parties.  In other words, if the Hedging and Trading Entities did not enter into a Non-Proprietary Hedging and Trading Arrangement with respect to the Debtors' corresponding long-term retail obligations, the Debtors might, in the future, be required to procure product to satisfy those retail obligations at prices that exceed the retail sales price, exposing the Debtors' business to significant risk.  Importantly, the Hedging and Trading Entities only enter into these types of Non-Proprietary Hedging and Trading Arrangements when there is a corresponding retail obligation and for the exposure created by such corresponding retail obligation.

20. The Approved Limits are consistent with hedging and trading practices in the Debtors' industry, as there is generally more concern related to the risk of volatility in commodity prices in the near term.  In addition, the Approved Limits will allow the Debtors to protect near-term cash flow in an environment where commodity prices may be volatile.

21. Because the Audit Committee has approved the hedge limits governing

transactions under Non-Proprietary Hedging and Trading Arrangements that extend beyond December 31, 2015 (through the Approved Limits), the Debtors' Risk Management Guidelines and internal control processes now permit the Hedging and Trading Entities to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor that extends beyond December 31, 2015. As required by paragraph 20 of the Non-Proprietary Hedging and Trading Order, the Debtors are now seeking Court authority permitting the Hedging and Trading Entities to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 in accordance with the Approved Limits and in a manner consistent with the Risk Management Guidelines.

22.  Without the ability to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond 2015, and without the ability to transact using the Approved Limits (which reflect both the Hedging and Trading Entities' historical practices and industry practice), the Debtors are at risk of losing significant value to the business based on volatile price fluctuations that strip economic value from the Debtors' operations. The Debtors will be at a competitive disadvantage with respect to other companies in the energy industry if the Debtors cannot continue their historical risk management practice of utilizing Non-Proprietary Hedging and Trading Arrangements to protect against price and delivery risk. For these reasons, the Debtors seek authority permitting the Hedging and Trading Entities to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor that extends beyond December 31, 2015 and utilize the Approved Limits.

11

RLF1 11028373v.1

**Basis for Relief**

**I.    Section 363(c) of the Bankruptcy Code Authorizes the Debtors to Enter Into Hedging and Trading Arrangements with a Tenor Beyond December 31, 2015 and Impose Hedge Limitations on a Rolling Basis.**

23.    Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(l).  To maximize the value of the Debtors' estates, the Hedging and Trading Entities should be permitted to enter into Hedging and Trading Arrangements with a tenor beyond December 31, 2015 and utilize the Approved Limits.

24.    Section 363(c)(1)'s ordinary course of business standard was intended to allow a debtor in possession the flexibility to run its business.  *Moore v. Brewer (In re HMH Motor Servs., Inc.)*, 259 B.R. 440, 448–49 (Bankr. S.D. Ga. 2000).  A debtor in possession may therefore use, sell, or lease property of the estate without the need for prior court approval if the transaction is in the ordinary course of business.  *See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course of business use of estate property does not require a prior hearing); *James A. Phillips*, 29 B.R. at 394 (holding that where a debtor in possession is merely exercising the privileges of its status, there is no general right to notice and a hearing concerning particular transactions conducted in the ordinary course of business).

25.    The Bankruptcy Code does not define the "ordinary course of business."  *In re Commercial Mortg. & Fin. Co.*, 414 B.R. 389, 393 (Bankr. N.D. Ill. 2009).  The two tests ordinarily applied by the courts to determine the ordinary course of business are the "horizontal" test and the "vertical" test.  *Denton Cnty. Elec. Co-Op., Inc. v. Eldorado Ranch (In re Denton Cnty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 and n.12 (Bankr. N.D. Tex. 2002).  "The

'horizontal test' focuses on the way businesses operate within a given industry. The 'vertical test' focuses on the expectations of creditors." *Denton Cnty. Elec. Co-Op.*, 281 B.R. at 882 n.12.

26. Under both the horizontal test and the vertical test, entry into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 and allowing the Hedging and Trading Entities to utilize the Approved Limits is in the Debtors' ordinary course. *See Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (finding that "ordinary course of business" is meant "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business") (quoting *In re Watford*, 159 B.R. 597, 599 (M.D. Ga. 1993)); *In re Roth American, Inc.*, 975 F.2d 949, 952 (3rd Cir. 1992) (stating that section 363 of the Bankruptcy Code is designed to allow a debtor in possession "flexibility to engage in ordinary transactions without unnecessary…oversight"); *In re Coordinated Apparel, Inc.*, 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995).

27. Under the horizontal test, companies in the Debtors' industry routinely enter into hedging and trading transactions similar to those contemplated by the Non-Proprietary Hedging and Trading Arrangements. *See*, *e.g.*, *In re Patriot Coal Corp.*, No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012) (granting authority to enter into and perform under coal sales contracts); *In re Dynegy Holdings, LLC*, No. 11-38111 (Bankr. S.D.N.Y. Nov. 9, 2011) (granting authority to enter into and perform under derivative contracts); *In re Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y. Sept. 23, 2010) (granting authority to enter into and perform under its hedging and purchase and sale contracts); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 21, 2005) (granting authority to enter into and perform under its derivative contracts, including

13

forward, futures, and options contracts); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Aug. 28, 2003) (same); *In re NRG Energy, Inc.*, No. 03-13024 (Bankr. S.D.N.Y. June 30, 2003) (same).[4]  Indeed, this Court granted the Debtors authority to continue the Hedging and Trading Entities' activities under Non-Proprietary Hedging and Trading Arrangements under the Non-Proprietary Trading Order.  The Debtors' Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 are similar to the Non-Proprietary Hedging and Trading Arrangements entered into by other energy companies, and are further regulated by both the Debtors' Audit Committee and the Risk Management Guidelines.

28.     Under the vertical test, creditors' reasonable expectations of a debtor's "ordinary course of business" are based on the debtor's specific prepetition business practices and norms, and the expectation that the debtor will conform to those practices and norms while operating as a debtor in possession. *In re Garofalo's Finer Foods, Inc.,* 185 B.R. 414, 425 (N.D. Ill. 1995). Thus, a fundamental characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice.  *Marshack v. Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc)*, 184 B.R. 74, 79 (9th Cir. B.A.P. 1995); *James A. Phillips*, 29 B.R. at 394.  The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to determining whether the transactions at issue are ordinary.  *U.S. ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592, 598 (M.D. Tenn. 1990); *Johns-Manville Corp.*, 60 B.R. at 617.  "Accordingly, a postpetition transaction undertaken by the debtor that is similar in size and nature to prepetition transactions undertaken by the debtor would be within the ordinary course of business." *Garofalo's*, 186 B.R. at 426.

29.     Here, the Hedging and Trading Entities seek to enter into Non-Proprietary

---

[4]  Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

14

Hedging and Trading Arrangements that are similar to existing Non-Proprietary Hedging and Trading Arrangements. The Debtors' creditors are aware that the Debtors' hedging and trading operations represent a significant source of value to the Debtors' enterprise and expect the Debtors to continue their historical hedging and trading practices in an effort to preserve the value of the estate. In addition, the "rolling" nature of the Approved Limits appropriately reflects the fact that the markets in which the Debtors operate have increased market volatility as a Reference Date approaches.

30. Accordingly, and under the authority provided by section 363(c)(1) of the Bankruptcy Code, the Debtors submit that entry into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 2015 and utilizing the Approved Limits is appropriate and in the best interests of their estates and all parties in interest in these chapter 11 cases.

## II. The Debtors' Have a Sound Business Purpose for Entering Into Hedging and Trading Arrangements with a Tenor Beyond December 31, 2015.

31. To the extent the relief sought herein is not within the Debtors' ordinary course of business, section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In the Third Circuit, courts have authorized transactions outside the ordinary course of business when the transaction has a sound business purpose and is proposed in good faith. See *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

32. Here, entry into Non-Proprietary Hedging and Trading Arrangements with a

tenor beyond December 31, 2015 and utilizing the Approved Limits will allow the Hedging and Trading Entities to continue their historical practices (at all times subject to the Risk Management Guidelines) to limit economic exposure to their businesses caused by commodity price fluctuations.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

33. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

34. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Order is intended or should be construed as: (a) an admission as to the validity or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) an admission that any agreement to which one or more of the Debtors may be party constitutes a Non-Proprietary Hedging and Trading Arrangement or a Proprietary Hedging and Trading Arrangement. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

35. The Debtors shall provide notice of this Motion on the date hereof via first class mail to: (a) the U.S. Trustee; (b) counsel to official committee of unsecured creditors appointed on May 13, 2014; (c) the individuals appointed to the official committee of unsecured creditors on October 27, 2014; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under: (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under: (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under: (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the

RLF1 11028373v.1

10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002; and (z) all parties the Debtors reasonably believe are counterparties to the Hedging and Trading Arrangements. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**Prior Request**

36.     Certain of the relief sought in this Motion and the Order seeks to clarify relief granted by the Court pursuant to the Non-Proprietary Trading Order.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Wilmington, Delaware
Dated:   November 6, 2014

/s/ William A. Romanowicz
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
William A. Romanowicz (No. 5794)
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701
Email:   collins@rlf.com
            defranceschi@rlf.com
            madron@rlf.com
            romanowicz@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:   edward.sassower@kirkland.com
            stephen.hessler@kirkland.com
            brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   james.sprayregen@kirkland.com
            marc.kieselstein@kirkland.com
            chad.husnick@kirkland.com
            steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

RLF1 11028373v.1