**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 2710** |

**DECLARATION OF TERRY L. NUTT, SENIOR VICE PRESIDENT AND CONTROLLER OF EFH CORP. IN SUPPORT OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, CLARIFYING CERTAIN RELIEF GRANTED IN THE NON-PROPRIETARY TRADING ORDER AND SEEKING ENTRY OF AN ORDER AUTHORIZING CERTAIN DEBTORS TO ENTER INTO NON-PROPRIETARY HEDGING AND TRADING ARRANGEMENTS WITH A TENOR BEYOND DECEMBER 31, 2015 AND SUBJECT TO HEDGE AND TENOR LIMITATIONS CONSISTENT WITH HISTORICAL PRACTICE**

Pursuant to 28 U.S.C. § 1746, I, Terry L. Nutt, declare as follows:

1. I am over the age of 18 and duly authorized to execute this declaration (the "Declaration") on behalf of the Debtors in support of, the *Motion of Energy Future Holdings Corp.,* et al.*, Clarifying Certain Relief Granted in the Non-Proprietary Trading Order and Seeking Entry of an Order Authorizing Certain Debtors to Enter into Hedging and Trading Arrangements with a Tenor Beyond December 31, 2014 and Subject to Hedge and Tenor Limitations Consistent with Historical Practice* (the "Motion"),[2] filed contemporaneously herewith.

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2. I am the Senior Vice President and Controller of EFH Corp. I have been with the Debtors since 2007 serving in several roles, including the Vice President of Risk Management for EFH Corporate Services Company for the past three years, before taking my current role. I have been employed in various finance and risk management positions in the wholesale energy marketing and trading industry for over 13 years, with the predominant amount of that time spent with firms engaged in wholesale electricity and natural gas marketing and trading activities.

3. The facts in this Declaration are based on my personal knowledge and review of information, my experience with the Debtors' operations (and specifically, with respect to its Hedging and Trading Entities' operations), and my experience and knowledge of the industry and general market conditions. If called to testify, I would testify to the facts set forth herein.

**I.      Background.**

4. On April 29, 2014, the Debtors filed the Hedging and Trading Motion, seeking authority to continue performing under the Debtors' Proprietary Hedging and Trading Arrangements and Non-Proprietary Hedging and Trading Arrangements and honoring related prepetition obligations (including collateral obligations) and to enter into new postpetition Proprietary Hedging and Trading Arrangements and Non-Proprietary Hedging and Trading Arrangements in the ordinary course of business. The Court entered final relief with respect to the Debtors' Non-Proprietary Hedging and Trading Arrangements on June 6, 2014 and final relief with respect to the Debtors' Proprietary Hedging and Trading Arrangements on June 30, 2014.

5. As described in the Hedging and Trading Motion, the Debtors use rigorous Risk Management Guidelines to ensure that Non-Proprietary Hedging and Trading Arrangements are closely monitored to minimize enterprise risk and maximize the value of the Debtors' estates.

In addition to the Risk Management Guidelines — which focus on governance and operational accountabilities surrounding transactions undertaken under the Non-Proprietary Hedging and Trading Arrangements — the Debtors utilize an Internal Hedging Policy.  Generally, the Internal Hedging Policy restricts the Hedging and Trading Entities' ability to enter into Non-Proprietary Hedging and Trading Arrangements that would result in the Hedging and Trading Entities hedging more than 100% (in the aggregate) of the Debtors' projected exposure to certain commodities for a particular calendar year.  As part of the Debtors' corporate governance process, the Internal Hedging Policy is, at minimum, reviewed annually by the Audit Committee, which is appointed annually by the EFH board of directors.

6. The scope of the Internal Hedging Policy is limited in two ways. *First*, the Internal Hedging Policy applies to certain commodities (that is, natural gas, power, and heat rate).  *Second,* the Internal Hedging Policy implements hedge limits (i.e., the percent up to which the Hedging and Trading Entities can hedge the Debtors' exposure with respect to various types of commodities) for specific periods.  These hedge limits are referred to as a "Hedging Ceiling" in the Hedging and Trading Motion.  The Approved Limits include a Hedging Ceiling for Non-Proprietary Hedging and Trading Arrangements with a tenor that extends past December 31, 2015, but the Non-Proprietary Trading Order does not authorize the Debtors to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015.

## II.    The 2015 Hedge Ceiling for Non-Proprietary Hedging and Trading Arrangements.

7. Hedge limits are generally determined on a rolling-forward basis from a Reference Date.  As a result, under the Approved Limits, the percentage up to which the Hedging and Trading Entities may hedge the Debtors' exposure through a Non-Proprietary Hedging and Trading Arrangement changes depending on the Reference Date.  Generally, the

Hedging and Trading Entities gradually increase the percentage of the Debtors' exposure that is hedged as the Reference Date approaches the specified period of exposure (e.g., in January 2014 (Reference Date 1), the Hedging and Trading Entities might hedge less than 50% of December 2015 exposure, but by January 2015 (Reference Date 2), the Hedging and Trading Entities might have hedged up to 100% of December 2015 exposure). This is due to the inherent increase in commodity price volatility, and related cash flow volatility, as a period is closer to the Reference Date (i.e., spot markets and near-term markets for commodities have more price volatility than longer-term markets). Simply stated, the Hedging and Trading Entities hedge a greater percentage of near-term exposure than they do long term exposure.

8.  The Hedging and Trading Entities' historical practice has been to increase the Debtors' hedged exposure to up to 100% once a period is less than 13 months away from the Reference Date. In light of these considerations, and consistent with the Debtors' historical hedging practices, the Debtors recently obtained approval from the Audit Committee for the Hedging and Trading Entities to hedge up to 100% for 2015, under the continued rigor of the Risk Management Guidelines. This limit accounts for the manner in which hedge limits change on a roll-forward basis as the Reference Date changes. This practice is based on the Debtors' need to protect near-term cash flow as commodity prices fluctuate, and the Debtors' use of power sales from their generation business to support the Debtors' retail obligations (which sales account for approximately 50% of the Debtors' exposure to natural gas and heat rate).

**III.    The Internal Hedging Policy Does Not Apply to Uranium or Powder River Basin Coal.**

9.  The Internal Hedging Policy historically has not applied to all commodities. In particular, Non-Proprietary Hedging and Trading Arrangements with respect to uranium and Powder River Basin coal have historically not been subject to the Internal Hedging Policy due

4

to the physical characteristics of those commodity markets which require a longer procurement cycle than other commodities. *See* Hedging and Trading Motion, ¶ 45 ("The Internal Hedging Policy generally restricts the Debtors' ability to enter into Hedging and Trading Arrangements with respect to commodities *other than uranium and Powder River Basin Coal* . . . In addition, the Internal Hedging Policy generally includes a restriction on the Debtors' ability to hedge or manage its exposure with respect to commodities *other than uranium or Powder River Basin Coal*. . .) (emphasis added). That being said, other aspects of the Risk Management Guidelines (including other internal policies and procedures) apply to Non-Proprietary Hedging and Trading Arrangements with respect to uranium and Powder River Basin Coal.

**IV.    Non-Proprietary Hedging and Trading Arrangements With Tenors That Extend Beyond December 31, 2015 and Applicable Tenor Limitations.**

10. As a core part of the Debtors' risk management controls, the Hedging and Trading Entities do not enter into Non-Proprietary Hedging and Trading Arrangements that extend into a particular year if the Audit Committee has not approved hedge limits for such year. For example, the Hedging and Trading Entities could not enter into a Non-Proprietary Hedging and Trading Arrangement with a tenor that extended into 2014 before the Audit Committee approved the hedge limits for transactions entered into for calendar year 2014.

11. As noted above, the Debtors' Audit Committee formally reviews the Internal Hedging Policy on at least an annual basis to determine appropriate hedge and tenor limits. In late October 2014, the Audit Committee authorized the Approved Limits for Hedging and Trading Arrangements with a tenor that extends beyond December 31, 2015. The Approved Limits operate on a 27-month cycle and provide hedge limits and targets applicable to certain periods within the cycle, adjusted forward each calendar quarter. Under this rolling plan, the Debtors will be able to hedge up to 100% for forward months 4-15 (from any Reference Date)

with a target of 50% for forward months 16-27 (from any Reference Date), all subject to the Hedging Ceiling set forth in the Approved Limits.

12.  That being said, the tenor limitations contained in the Approved Limits do not apply to Non-Proprietary Hedging and Trading Arrangements entered into to hedge the Debtors' retail obligations.  This arrangement reflects the realities of the Debtors' retail operations — the Debtors might enter into long-term arrangements to provide power or gas to certain of their customers but might not have generation assets in the location in which the power must be provided.  This requires the Debtors (via the Hedging and Trading Entities) to purchase such products in the open market from unaffiliated third parties.  In other words, if the Hedging and Trading Entities did not enter into a Non-Proprietary Hedging and Trading Arrangement with respect to the Debtors' corresponding long-term retail obligations, the Debtors might in the future be required to procure product to satisfy those retail obligations at prices that exceed the retail sales price, exposing the Debtors' business to significant risk.  Importantly, the Hedging and Trading Entities only enter into these types of Non-Proprietary Hedging and Trading Arrangements when there is a corresponding retail obligation and for the exposure created by such corresponding retail obligation.

13.  The Approved Limits are consistent with hedging and trading practices in the Debtors' industry, as there is generally more concern related to the risk of volatility in commodity prices in the near term.  In addition, I believe the Approved Limits will allow the Debtors to protect near-term cash flow in an environment where commodity prices may be volatile.

14.  Because the Audit Committee has approved the hedge limits governing transactions under Non-Proprietary Hedging and Trading Arrangements that extend beyond

December 31, 2015 (through the Approved Limits), the Debtors' Risk Management Guidelines and internal control processes now permit the Hedging and Trading Entities to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor that extends beyond December 31, 2015.

15. Without the ability to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond 2015, and without the ability to transact using the Approved Limits (which reflect both the Hedging and Trading Entities' historical practices and industry practice), I believe the Debtors are at risk of losing significant value to the business based on volatile price fluctuations that strip economic value from the Debtors' operations. I believe that hedging short and near-term commodity exposure is consistent with the practice of other companies in the Debtors' industry and is a routine risk management tactic employed by such companies. In addition, I believe that counterparties to the Non-Proprietary Hedging and Trading Arrangements recognize that the Debtors' hedging and trading operations represent a significant source of value to the Debtors' enterprise and expect the Hedging and Trading Entities to continue their historical practices.

**V.    The Debtors' Have a Sound Business Purpose for Entering Into Hedging and Trading Arrangements with a Tenor Beyond December 31, 2015.**

16. To maximize the value of the Debtors' estates, I believe the Hedging and Trading Entities should be permitted to enter into Hedging and Trading Arrangements with a tenor beyond December 31, 2015 and utilize the Approved Limits. I believe entry into Hedging and Trading Arrangements with a tenor beyond December 31, 2015 and utilizing the Approved Limits, will allow the Hedging and Trading Entities to continue their historical practices (at all times subject to the Risk Management Guidelines) to limit economic exposure to their businesses caused by commodity price fluctuations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Wilmington, Delaware
Dated: November 6, 2014

                                               */s/ Terry L. Nutt*
                                               Terry L. Nutt
                                               Senior Vice President and Controller
                                               EFH Corp.