**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 2664** |

**SUPPLEMENT TO MOTION OF ENERGY FUTURE
HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER AUTHORIZING
CERTAIN DEBTORS TO ENTER INTO AGREEMENTS REGARDING MHI'S
WITHDRAWAL FROM THE COMANCHE PEAK JOINT VENTURE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this supplement (this "Supplement") to the *Motion of Energy Future Holdings Corp.,* et al., *for*

*Entry of an Order Authorizing Certain Debtors to Enter into Agreements Regarding MHI's*

*Withdrawal from the Comanche Peak Joint Venture* [D.I. 2664] (the "MHI Withdrawal

Motion")[2] (a) providing additional detail regarding the relief requested pursuant to the MHI

Withdrawal Motion and (b) requesting limited modifications to the relief requested in the MHI

Withdrawal Motion, as reflected in the order (the "Order"), attached hereto as **Exhibit A**.[3] In

support of this Supplement, the Debtors submit the *Declaration of Robert Frenzel, Senior Vice*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the MHI Withdrawal Motion.

[3] Attached hereto as **Exhibit B** is a redline showing the changes in the Order as compared to the requested order that was filed with the MHI Withdrawal Motion.

*President and Chief Financial Officer of Luminant Generation Company LLC, in Support of the Supplement to Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing Certain Debtors to Enter Into Agreements Regarding MHI's Withdrawal from the Comanche Peak Joint Venture* (attached hereto as **Exhibit C**, the "Supplemental Frenzel Declaration"). In further support of the Motion, the Debtors respectfully state as follows.

### Jurisdiction and Venue

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Supplement to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested in this Supplement are section 363 of title 11 of the United States Code (the "Bankruptcy Code") and rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Relief Requested

4. By this Supplement, the Debtors seek to modify the relief requested pursuant to the MHI Withdrawal Motion to permit Luminant to make certain annual payments going forward related to (a) preserving the suspended status of the License Application with the NRC and

(b) property taxes arising from the proposed site of the New Units, all as further described below, and in an aggregate annual amount estimated to be approximately $100,000 per year and not to exceed $125,000.

## I.    **Background**.

5.      On October 30, 2014, certain of the Debtors (specifically, EFH Corp., TCEH LLC, and Luminant) filed the MHI Withdrawal Motion seeking authority to enter into certain Withdrawal Agreements that provided for MHI's withdrawal from the Comanche Peak Joint Venture.

6.      As described in the MHI Withdrawal Motion, in September 2008, Luminant formed a number of wholly-owned Delaware limited liability companies, including the non-Debtor NEFH I and NEFH II. These entities, along with Luminant and EFH Corp. formed a limited liability company for the purpose of developing two new nuclear generation units (such units referred to as the "New Units" in the MHI Withdrawal Motion) and memorialized the limited liability company by entering into a limited liability company agreement.

7.      In January 2009, the limited liability company agreement was amended and restated to admit MHI as a member and create the Comanche Peak Joint Venture for the purposes of further developing the New Units using a new nuclear reactor technology developed by MHI (such technology referred to as the "US-APWR" technology in the MHI Withdrawal Motion) (such limited liability company agreement referred to in the MHI Withdrawal Motion as the LLC Agreement).  With the addition of MHI, the limited liability company was renamed Comanche Peak Nuclear Power Company LLC (referred to in the MHI Withdrawal Motion as Comanche Peak LLC).  In connection with the development and licensing of the New Units and the US-AWPR, Luminant, Comanche Peak LLC, and MHI filed applications for NRC review —

3

Luminant and Comanche Peak LLC filed the License Application and MHI filed the Design Application.

8.  ***License Application***.    The License Application seeks NRC approval for the construction and operation of the New Units utilizing the US-AWPR technology.  For reasons that are further discussed below, the License Application specifies that Comanche Peak LLC will be the owner of the New Units and Luminant will be the operator of the New Units.  Under the LLC Agreement, the costs associated with pursuing the License Application, and seeking NRC approval of the relief sought therein, were to be funded by the Comanche Peak Joint Venture. Because the Comanche Peak Joint Venture has no independent source of revenues outside of its members, the LLC Agreement set forth the agreed-upon funding obligations of the members, MHI and NEFH II, including the funding obligations of the Comanche Peak Joint Venture with respect to the License Application.

9.  ***Design Application***.  The Design Application, filed under MHI's name, seeks NRC approval for the use of the US-AWPR technology itself.  The Design Application is not site-specific (*i.e.*, MHI can use the NRC-approved US-AWPR technology at various nuclear plant sites in the United States, including sites unaffiliated with the Debtors).  As a result, MHI agreed to pay 100% of the costs associated with maintaining the Design Application and seeking NRC approval of the relief requested therein.

10.  In connection with various macroeconomic factors described in greater detail in the MHI Withdrawal Motion, MHI, Luminant, and NEFH II decided to first suspend development and licensing activities related to the New Units and ultimately to allow MHI to withdraw from further participation in the Comanche Peak Joint Venture.  As part of MHI's withdrawal from the Comanche Peak Joint Venture, the parties negotiated various Withdrawal

4

Agreements.  The Withdrawal Agreements are described in further detail in the MHI Withdrawal

Motion and were filed under seal with the Court [D. I. 2664].

**II.    Preservation of Status Quo Regarding License Application and Related Costs**.

11.    As described below in further detail, MHI's withdrawal from the Comanche Peak

Joint Venture affects neither the NRC suspended review status of the License Application, nor

Luminant's relationship to the License Application (as the operator of the New Units).  As a

result, Luminant, on behalf of itself and NEFH II (which has no independent source of revenues),

has certain payment obligations to the NRC in order to maintain the License Application in its

suspended condition.

12.    As a preliminary matter, MHI's withdrawal from the Comanche Peak Joint

Venture does not terminate development of the New Units.  As noted above, MHI, Luminant,

and NEFH II decided to suspend development activities related to the New Units as of the fourth

quarter of 2013 and requested that the NRC suspend further reviews of the License Application.

Luminant and NEFH II did not, however, withdraw the License Application because leaving the

License Application open would allow Luminant and NEFH II to potentially restart licensing and

development of the New Units in the future if macroeconomic conditions change in a favorable

way, *without* having to start the NRC's review process of the License Application from scratch.

13.    The license application process is a multi-phase approach that approves different

aspects of the license applications in phases over several years.  The NRC has already approved

many aspects of the Comanche Peak LLC License Application.  If Luminant and NEFH II were

to resume licensing and development of the New Units utilizing the US-APWR technology,

much of the existing License Application would still be relevant and would reduce the time and

cost to restart.

5

14.     In addition, the NRC has already approved a number of aspects of the License Application that are site-specific (*e.g.*, the geological and environmental aspects of the property on which the New Units would be developed).  If the License Application is preserved in a suspended state, Luminant and NEFH II could restart development of the New Units with any approved NRC technology in the future without obtaining approval of (or paying the associated costs of) certain site-specific aspects of the License Application that have already been approved by the NRC (*i.e.*, those aspects that are specific to the site of the New Units as opposed to chapters that are directly tied to the reactor technology that would be utilized at the New Units).

15.     To streamline the NRC review process at the outset, the License Application originally specified Luminant as both the owner and operator of the New Units.  After MHI was admitted to the Comanche Peak Joint Venture, Comanche Peak LLC became the owner of the New Units in the License Application, but Luminant continued as the designated operator of the New Units in the License Application because Luminant is recognized by the NRC as an experienced nuclear power plant operator.  Since 1992, Luminant has owned and operated two nuclear units.  If, in the future, Luminant and NEFH II decide to relaunch licensing and development of the New Units, the NRC review process will be less burdensome with Luminant as the operator of the New Units under the License Application.  As a result, the Debtors did not alter Luminant's status as the operator of the New Units under the Withdrawal Agreements.

16.     Although the License Application is in Luminant's name (as operator) and Comanche Peak LLC's name (as owner), the costs associated with preserving the License Application have historically been the obligation of the members of the Comanche Peak Joint Venture, as specified in the LLC Agreement.  Consistent with historical practice, the ongoing

License Application fees are anticipated to be approximately $80,000 per calendar year in the aggregate, although the NRC has the right to modify fees.

17.     In connection with MHI's withdrawal from the Comanche Peak Joint Venture, the parties terminated the LLC Agreement.   Under the new limited liability company agreement, NEFH II is the sole member of Comanche Peak LLC.   Therefore NEFH II, as the sole member of Comanche Peak LLC, has the obligation to pay the costs associated with maintaining the License Application.   As noted above, however, NEFH II has no independent source of revenues to pay such costs outside of capital contributions from its sole member, NEFH I, who has no independent source of funding and whose sole member is Luminant.

18.     Because (a) Luminant, in an exercise of its business judgment, determined to keep the License Application in a suspended state for the reasons stated above and determined to maintain its status as the operator of the New Units under License Application, and (b) NEFH II has no independent source of revenues outside of capital contributions from its member (NEFH I, who also has no source of independent funding other than Luminant), Luminant anticipates paying approximately $80,000 on an annualized basis to satisfy such costs.[4]   Indeed, if Luminant does not pay the costs associated with preserving the License Application, the NRC may, *sua sponte*, terminate the License Application.   Consequently, pursuant to the Order, the Debtors seek authority to permit Luminant to pay the annual costs of preserving the License Application.

---

[4]   In addition, as described in the MHI Withdrawal Motion, MHI has committed to keep the Design Application open as well (in a suspended status).  Because the Design Application seeks approval for the use of MHI's proprietary US-AWPR technology, MHI will bear 100% of the costs of keeping the Design Application open.

**III.        Property Taxes and Fees Related to Site of New Units**.

19.        Prior to formation of the Comanche Peak Joint Venture, Luminant owned the real property that was contemplated to be the site of the New Units and any future development of the New Units (the "New Unit Property"), and was thus obligated to pay the associated property taxes and any fees related to the New Unit Property.  In connection with the formation of the Comanche Peak Joint Venture, Luminant contributed the New Unit Property to NEFH I and NEFH I leased the New Unit Property to Comanche Peak LLC.  As part of the modifications of the joint venture agreements governing the Comanche Peak Joint Venture that were entered into and approved by the Court earlier this year, Comanche Peak LLC assigned its rights and obligations as tenant under the lease of the New Unit Property to NEFH II.[5]

20.        Although the New Units are not currently being developed, it is still beneficial for NEFH I to continue to own the New Unit Property and for NEFH II to continue to lease the New Unit Property because the New Unit Property would be used for any future development should macroeconomic factors permit the Debtors to restart development of the New Units in the future. Moreover, finding a third-party buyer for the New Unit Property would be extremely difficult and selling the property would not be in the best interests of the Debtors due to the potential interference that such a sale would likely have on Luminant's existing nuclear plants' operations. The New Unit Property is completely surrounded by property Luminant owns and uses to operate its existing nuclear plants that is within the "secure area" required by the NRC for all nuclear plants.  Thus, separating the New Unit Property from the Luminant-owned real property

---

[5] *See Order Authorizing Entry into Amendments to the Comanche Peak Joint Venture Agreements* [D.I. 1619].  Additional information regarding the relief granted pursuant to such order may be found in the *Motion of Energy Future Holdings Corp.* et al., *Authorizing Entry into Amendments to the Comanche Peak Joint Venture Agreements* [D.I. 1227].

used for operation of Luminant's existing nuclear plants would be difficult from a practical, operational, and regulatory standpoint.

21.    Because the New Unit Property is owned by NEFH I and leased to NEFH II, and neither NEFH I nor NEFH II has any independent source of revenues outside of capital contributions from their sole members, which are Luminant and NEFH I, respectively, the Debtors seek authority by this Supplement to permit Luminant to pay the annual property taxes that are due on the New Unit Property, which are estimated to be approximately $15,000 per year for 2014 property tax year, consistent with historical practices, however, county tax policies can be variable.

22.    In short, following MHI's withdrawal from the Comanche Peak Joint Venture, the Debtors seek authority permitting Luminant to pay approximately $100,000 annually in costs related to the Comanche Peak Joint Venture.  These costs are largely associated with preserving the suspended status of the License Application, which will save the Debtors significant expense and time in the long-term if macroeconomic factors permit the Debtors to restart development of the New Units in the future.

### Basis for Relief

23.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b) (1).  The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when there is a "good business reason" that justifies such action.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the

estate under this section, courts require the debtor to show that a sound business purpose justifies such actions.").

24.    When a valid business justification exists, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

25.    Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See In re Crystalin, L.L.C.*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (finding that the court need not "place itself in the position of the trustee or debtor-in-possession") (citation omitted); *see also Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion."); *In re Psychrometric Sys., Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) ("The trustee's business judgment is to be given 'great judicial deference.'") (quoting *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

26.    Here, the Debtors have determined in the exercise of their sound business judgment that paying the costs necessary to preserve the License Application in a suspended

10

status (with Luminant as the operator under the License Application), and paying the property taxes related to the site of the New Units is in the best interest of their estates. ***First***, preserving the License Application in Luminant's name will allow the Debtors to efficiently restart NRC review of the License Application in the future, if the Debtors decide to restart development of the New Units. ***Second***, Luminant historically paid the portion of the License Application maintenance fees allocable to NEFH II under the LLC Agreement and if these fees are not paid because of NEFH II's lack of funds, the NRC may terminate the License Application. ***Third***, if Luminant does not pay the property taxes associated with the site of the New Units (which is a site that would otherwise be difficult to sell to a third-party buyer without overcoming onerous practical and regulatory hurdles), the relevant property tax jurisdictions could impose a lien. Accordingly, the Debtors submit that modifying the relief requested in the MHI Withdrawal Motion, as set forth in **Exhibit A**, attached hereto, is in the best interests of the Debtors' estates.

### Notice

27.     The Debtors shall provide notice of this Motion on the date hereof via overnight delivery to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy

notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of

12

the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>Prior Request</u>**

28.    The relief requested in Supplement modifies the relief requested pursuant to the MHI Withdrawal Motion.

*[Remainder of page left intentionally blank.]*

13

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested in this Supplement and the MHI Withdrawal Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: November 17, 2014
      Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701
Email:   collins@rlf.com
           defranceschi@rlf.com
           madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:   edward.sassower@kirkland.com
           stephen.hessler@kirkland.com
           brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   james.sprayregen@kirkland.com
           marc.kieselstein@kirkland.com
           chad.husnick@kirkland.com
           steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*