**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Re:  D.I. 2015, 2662, 2771** |

**DEBTORS' REPLY TO TARRANT REGIONAL WATER
DISTRICT'S OBJECTION TO MOTION OF ENERGY
FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN
ORDER AUTHORIZING LUMINANT GENERATION COMPANY,
LLC TO REJECT A WATER CONTRACT WITH TARRANT REGIONAL
WATER DISTRICT EFFECTIVE *NUNC PRO TUNC* TO THE PETITION DATE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this reply (this "Reply") to the objection filed November 14, 2014 [D.I. 2771] (the "Objection")

of the Tarrant Regional Water District ("TRWD") to the Debtors' *Motion of Energy Future*

*Holdings Corp.,* et al.*, for Entry of an Order Authorizing Luminant Generation Company, LLC*

*to Reject a Water Contract with Tarrant Regional Water District Effective* Nunc Pro Tunc *to the*

*Petition Date* [D.I. 2662] (the "Motion").  The Motion requests entry of an order authorizing the

Debtors to reject the Agreement, dated March 15, 1976, regarding access to certain water rights

(the "Water Contract"),[2] between Luminant Generation Company (as successor in interest to

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The
location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large
number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the
debtors and the last four digits of their federal tax identification numbers is not provided herein.  A
complete list of such information may be obtained on the website of the debtors' claims and noticing
agent at http://www.efhcaseinfo.com.

[2]  Under the terms of the Water Contract, Luminant was given the rights to:  (a) "intercept and
impound" a contractually-determined amount of water run-off of Caney Creek in Henderson County,
Texas, that would otherwise flow into the Cedar Creek Reservoir, (b)  "divert, use, and consume" a

Texas Power & Light Company) ("Luminant") and Tarrant Regional Water District (previously known as Tarrant County Water Control and Improvement District Number One) ("TRWD"), effective *nunc pro tunc* to the Petition Date (as defined in the Motion), to the extent the Water Contract is executory.  In support of the Reply, the Debtors submit the *Declaration of Michael Carter in Support of the Debtors' Reply to Tarrant Regional Water District's Objection to Motion of Energy Future Holdings Corp.,* et al*., for Entry of an Order Authorizing Luminant Generation Company to Reject a Water Contract with Tarrant Regional Water District Effective* Nunc Pro Tunc *to the Petition Date* (the "Declaration").  In further support of the Reply, the Debtors respectfully state as follows.

### Background

1.     On October 30, 2014, the Debtors filed the Motion, attached to which was a proposed order approving the rejection of the Water Contract (the "Order").  On November 14, 2014, TRWD filed the Objection to Luminant's rejection of the Contract.

2.     In the Objection, TRWD argues that (a) Luminant did not effectively terminate the Water Contract prior to the Petition Date; (b) the alleged pre-petition breach of the Water Contract renders the Motion moot because rejection of the Water Contract is also deemed a pre-petition breach of the subject agreement; (c) Luminant did not use sound business judgment in making its determination to reject the Water Contract; and (d) Luminant must restore the natural flow of Caney Creek by removing the Forest Grove Reservoir Dam (the "Dam"), and (e) the Court should defer ruling on the Motion until the conclusion of some state administrative process

---

contractually-determined amount of water from the Cedar Creek Reservoir,  and (c) "install and maintain on Caney Creek, on land owned or leased by [Luminant] such facilities as the Texas Water Right Commission may permit in order to construct a reservoir (hereinafter called Forest Grove Reservoir) . . . ."

TRWD believes it is entitled to pursue while ordering the parties to "confer and agree upon a discovery schedule." *See* Objection ¶ 30.

3.    As explained further below, TRWD's arguments are inapposite to the question of whether Luminant may reject the Water Contract and should be rejected by this Court.  For the following reasons, this Court should reject TRWD's arguments and issue the Proposed Order *First*, even if the Court declines to find that Water Contract was terminated prior to the Petition Date, Luminant's sound business judgment justifies rejecting the Water Contract.  *Second*, rejection of the Water Contract precludes TRWD from being entitled to any specific performance of any provisions in the Water Contract, including any alleged obligation to restore the natural flow of Caney Creek and/or remove the Dam.  *Finally*, while Luminant does not oppose TRWD's request for relevant discovery, any deferral of a hearing on the Motion should be limited in duration with any discovery ordered by the Court confined to relevant bankruptcy issues, if any, related to the Motion.

## Argument

### I.    The Motion to Reject Should Be Granted Because Luminant Used Sound Business Judgment in Requesting Rejection of the Water Contract.

4.    Contrary to TRWD's allegations in its Objection, Luminant clearly exercised sound business judgment in seeking to reject the Water Contract.  It is well settled that "a debtor's decision to reject an executory contract *must be summarily affirmed* unless it is the product of bad faith, or whim or caprice." *In re Trans World Airlines, Inc.,* 261 B.R. 103, 121 (Bankr. D. Del. 2001) (emphasis added); *see also In re Caribbean Petroleum Corp*., 444 B.R. 263, 268 (Bankr. D. Del. 2010).  Furthermore, a Delaware bankruptcy court held that sound business justification for rejecting a contract need not prove that maintenance of the contract will work a severe hardship or burden on the debtor's estate, thus giving great deference to the

debtor's business judgment. *See In re Fed. Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003). "'Business judgment' is defined as '[t]he presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest." *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005), citing *Black's Law Dictionary* 212 (8th ed. 2004). As discussed below, Luminant clearly satisfied the business judgment test.

   **A.    Informed Basis.**

   5.    Luminant made the decision to reject the Water Contract on an informed basis, well aware that by doing so, TRWD would continue to claim that Luminant has no water rights independent of the Water Contract and that rejection and/or termination would somehow trigger an obligation to remove the Dam. *See* Declaration ¶ 6. As discussed herein in Section III, there is no requirement to remove the Dam. And, like TRWD's argument the Dam removal is required, its argument that Luminant's water rights are dependent upon the continued existence of the Water Contract are also wishful thinking rather than based in law or fact.

   6.    Under applicable Texas law, Luminant's water rights under the Certificate of Adjudication No. 08-4983 issued May 5, 1987 in favor of Luminant as "OWNER," attached as Exhibit A to the Declaration of Michael Carter (the "COA Rights" or "Certificate")—which TRWD does not reference, much less come to grips with, in its Objection—are separate and distinct from the Water Contract.[3] *See* Declaration ¶ 9 and Exhibit A to the Declaration. The

---

[3] In point of fact, the permits referenced in the Objection have been superseded by COA Rights, which TRWD curiously failed to mention or reference in its Objection. This "omission' is likely due to the fact that the Certificate clearly controverts TRWD's claim that termination of the Water Contract terminates Luminant's right to divert or impound Caney Creek runoff. More specifically, while the first "WHEREAS" clause in the Certificate, referencing the "Final Decree" attached as Exhibit D to the Declaration of Dan Buhlman that TRWD filed in support of the Objection, noted that "a right was

COA Rights continued after Luminant's termination of the Water Contract in October 2011 and will continue if this Court approves rejection of the Water Contract. And, Luminant carefully analyzed this issue prior to terminating the Water Contract in October 2011 and prior to filing its Motion.

7.        Luminant also thoughtfully considered the risk that it could be required to remove the Dam and concluded, in its informed business judgment and for the reasons described above, that the benefits of rejecting the Water Contract outweigh the costs. Luminant has thoroughly considered both the advantages and disadvantages of rejecting the Water Contract. *See* Declaration ¶ 10.

### B.    Good Faith and Honest Belief.

8.        Luminant also made the decision to seek Court authority to reject the Water Contract in good faith. *See* Declaration ¶ 9. The business judgment test dictates that a court shall approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion. *Fed. Mogul*, 293 B.R. at 126. TRWD does not make any allegations in its Objection that Luminant acted in bad faith or abused its discretion in terminating the Water Contract. TRWD has, instead, sought to substitute its own analysis of the

---

recognized under Permit  3270 authorizing [Luminant] to appropriate waters (as set forth in the Certificate), Luminant's rights to impound, divert or use the runoff from Caney Creek are clearly delineated in the Certificate.  See *Certificate*, p.1. ,    Section 1 of the Certificate, styled "IMPOUNDMENT", authorized Luminant to "maintain an existing dam and ( the Forest Grove ) reservoir on Caney Creek and impound … [a specified amount] of water  per annum from the run off of Caney Creek." *Id*.  Section 2 of the Certificate, styled "USE", authorizes [Luminant]  to "divert, circulate, and recirculate (a specified amount of water) for industrial . . . purposes."  Section  3 of the Certificate, styled "DIVERSION", authorizes Luminant to divert Caney Creek runoff at "a point on the perimeter of the. . .reservoir" at the rate specified therein. *Id.*  Notably, Permit 3270, which was granted by the Texas Water Rights Commission in favor of Luminant on February 3, 1975, and authorized essentially the same impoundment, diversion and use of Caney Creek runoff  as was set forth in the Certificate, provided that same was "issued subject to [CP-341] based on the [Water Contract] provided, however, that  Paragraph 2, USE, (was) subject to this provision". See *Permit 4270*, § 6. Accordingly, while Section 3 of  CP-341 provides that it "shall expire upon termination of the [Water Contract]," Section 6 of Permit 4270 makes it clear that only Section 2 of Permit 4270 is subject to CP-341. *Id.*

benefits and burdens of rejecting the Water Contract for that of the Debtor's. Luminant made the decision to reject the Water Contract, to the extent it has not already been terminated, in good faith because rejection of the Water Contract offers the greatest cost-savings benefit to the Debtor's estate. *See* Declaration ¶ 9.

9.      Luminant made the decision to request authorization from the Court to reject the Water Contract in the honest belief that its actions were in Luminant's best interest. As stated in the Motion, prior to its termination of the Water Contract in 2011, Luminant spent an average of $2.3 million annually for subordination and other rights under the Water Contract, rights which Luminant has not taken advantage of as contemplated by the Water Contract. Motion ¶ 13. Luminant rightfully and rationally determined that was in its best interest to stop paying millions of dollars annually for the continued availability of a commodity in amounts that it has not required for almost 30 years.

10.      As set forth above, because the Motion was not filed in bad faith, or on a whim or caprice, but on the contrary, delivered to this Court after Luminant's thorough deliberations of the business implications of either assuming or rejecting the Water Contract (to the extent it has not already been terminated), the Court should grant Luminant's Motion and authorize the rejection of the Water Contract.

**II.      Rejection of Water Contract Precludes Specific Performance Relief Pursuant to 11 U.S.C. § 365(g).**

11.      TRWD boldly asserts that "even if the Court approves the proposed rejection, Debtors are not relieved of their obligations under the contract. Rather, the rejection merely constitutes a prepetition breach." See Objection, ¶ 23. TRWD's assertion is contradicted by Bankruptcy Code black letter law as well as years of related caselaw. Specifically, as stated above, section 365(g) of the Bankruptcy Code provides that "the rejection of an executory

6

contract or an expired lease of the debtor constitutes a breach of such contract or lease (where same has not been previously assumed)…" while section 502(g) allows properly asserted rejection claims to be allowed as pre-petition claims against a debtor's bankruptcy estate.[4] Accordingly, whether the Water Contract is deemed rejected *nunc pro tunc* or not, specific performance of provisions in a rejected executory contract, including, but not limited to, any alleged obligation to "restore the natural flow of Caney Creek and its watershed into Cedar Creek," cannot be enforced or required.  *See In re CB Holding Corp*., 448 B.R. 684, 690 (Bankr. D. Del. 2011); *see also In re Cont'l Airlines, Inc.,* 236 B.R. 318, 324 (Bankr. D. Del. 1999) *aff'd sub nom. In re Cont'l Airlines,* No. 90-932, 2000 WL 1425751 (D. Del. Sept. 12, 2000) *aff'd sub nom. In re Cont'l Airlines, Inc.*, 279 F.3d 226 (3d Cir. 2002) (reducing all claims for specific performance of seniority integration provisions of collective bargaining agreement, asserted by pilots of airline acquired by debtor prepetition, to claims for monetary damages discharged by debtor's plan);  *In re Am. Home Mortgage, Inc.*, 379 B.R. 503, 524 (Bankr. D. Del. 2008) (creditor not entitled to specific performance of requiring the debtors to transfer property of the estate (i.e., the right to service of the mortgage loans under the contract) to creditor); *see also In re Kaonohi Ohana Ltd.*, 873 F.2d 1302, 1306 n. 5 (9th Cir. 1989) ("Specific performance of a rejected executory contract cannot be required."); *In re Waldron*, 36 B.R. 633, 642 n. 4, *rev'd on other grounds*, 785 F.2d 936 (Bankr. S.D. Fla. 1984) ("The Code does not permit specific performance resulting from the rejection of an executory contract."); *Midway Motor Lodge of Elk Grove v. Innkeeper's Telemanagement & Equip. Corp.*, 54 F 3d. 406, 407 (7th Cir.

---

[4] 11 U.S.C. § 502(g) provides in pertinent part that a "claim arising from the rejection, under section 365 of this title, of an executory contract or unexpired lease of the debtor (that has not been assumed)…shall be determined,(allowed or disallowed, as the case may be under  subsections (a)- (e) of section 365)  as if such claim had arisen before the date of the filing of the petition."

1995) ("Rejection avoids specific performance, but the debtor assumes a financial obligation equivalent to damages for breach of contract.").

12.    Delaware bankruptcy courts have held that rejection of an executory contract only allows for a pre-petition claim for rejection damages, and leaves the creditor with no right to specific performance.  For example, in *CB Holding*, the debtor was a restaurant owner who leased the restaurant premises and had given the landlord a right of first refusal for the liquor license at the set price of $100,000 in the lease.  448 B.R. at 686.  After the court granted the debtor's motion to reject the lease *nunc pro tunc* to the petition date, the landlord tried to enforce the right of first refusal, but the court ordered that the license be sold at auction.[5]    *Id.* at 685. The court, quoting *Collier on Bankruptcy* for support, held that "rejection deprives the nondebtor party of a specific performance remedy that it might otherwise have under applicable nonbankruptcy law for breach of the contract or lease."[6] *Id.* at 689-90.  Ultimately, the payment of monetary damages, in the form of the allowance of an unsecured rejection claim, is the legally enforceable alternative to specific performance of any contractual obligation under a rejected executory contract or unexpired lease. *See*, *e.g.*, *Am. Home Mortgage*, 379 B.R. at 524.

13.    Therefore, any equitable remedy TRWD believes it is entitled to is limited to a right of payment and/or a claim within the meaning of 11 U.S.C. § 101(12)(B).  *See In re Nickels Midway Pier, LLC*, 255 F. App'x 633, 637-38 (3d Cir. 2007); *see also In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 305 (3d Cir. 1999).  For instance, in *Midway Pier*, Wild Waves, a water park that leased the pier from the debtor-pier owner, tried to assert its entitlement to specific

---

[5] When the court ordered the license to be sold at auction, it reserved the landlord's right to argue that it had a right of first refusal. At auction, the landlord was the successful bidder (at $407,500), and the Court approved the sale.

[6] 3 Collier on Bankruptcy § 365.10[1], at ¶ 365–78.

performance of a contract to sell the pier to Wild Waves.  225 F. App'x at 637-38. The Third

Circuit Court of Appeals upheld the district's court rejection of the agreement to sell the pier,

and held that Wild Waves was not entitled to specific performance of the sale contract to satisfy

its claim for rejection damages, citing the rule that "equitable relief may be treated as a claim for

purposes of the Bankruptcy Code when granting monetary damages is a 'viable alternative.'" *Id.*

(citing *Ben Franklin Hotel,* 186 F.3d at 305–06).  Accordingly, any monetary damages asserted

by TRWD in this regard are simply part of TRWD's unsecured pre-petition claim for rejection

damages under 11 U.S.C. § 365(g).

14.     TRWD, citing 11 U.S.C. § 365(g) and *Republic Underwriters Ins. Co. v. DBSI*

*Republic, LLC* 409 B.R. 720, 731 (Bankr. D. Del. 2009), contends that Luminant's alleged pre-

petition breach of the Water Contract renders the Motion a moot issue because rejection only

results in a pre-petition breach.  See *Objection*, ¶ 23, ¶ 28.  TRWD asserts that since a pre-

petition breach has already occurred, "there is no need for rejection." See *Objection*, ¶ 23, ¶ 28.

In short, TRWD's reasoning leads to the absurd result that a bankruptcy debtor cannot assume,

assign or reject any contract that it has breached pre-petition. Clearly, this cannot be the law.

*See*, *e.g.*, *In re Kemeta, LLC*, 470 B.R. 304, 325 (Bankr. D. Del. 2012) (debtor's material,

prepetition breach did not render its contract nonexecutory).  Rejection of the Water Contract is

not moot because rejection of the Water Contract constitutes a pre-petition breach of the subject

agreement for unsecured claim allowance purposes.[7]   There are several deficiencies with

TRWD's rather novel argument.

15.     First, section 365(g) of the Bankruptcy Code provides that "rejection of an

executory contract or unexpired lease constitutes a breach of such contract or lease if such

---

[7] To the extent that TRWD agrees that the Water Contract was terminated prior to the Petition Date, we concede that the Motion is moot.

contract or lease has not been assumed under this section or under a [chapter 9, 11, 12 or 13

plan] immediately before the date of the filing of the petition." 11 U.S.C. § 365(g). The effect

of that provision is to ensure that any properly asserted breach of contract damages claims that

the non-debtor counter party to such agreement or lease may have are treated as a pre-petition

unsecured claims. *See DBSI*, 409 B.R. at 731, citing, e.g., *In re Cont'l Airlines, Inc.,* 146 B.R.

520, 532 (Bankr. D. Del. 1992) ("Because the rejection constitutes a pre-petition breach, the

damages are paid with other general unsecured claims.").

16.     Second, *DBSI* does not support TRWD's claim that the Motion is unnecessary

due to any alleged prepetition breach by Luminant. In that case, Judge Walsh merely rejected the

claim that rejection of an unexpired lease constituted a termination of the subject lease as

reflected in the following excerpt:

> Republic contends that the rejection of the DBSI Republic Masterlease
> provided for in the Sale Approval "resulted in the termination of the
> [DBSI Republic Masterlease]. By operation of law, the termination of the
> [DBSI Republic Masterlease] effected an automatic termination of the
> [Republic Lease]." Republic's position is wrong. It is well-settled that the
> rejection of a lease pursuant to § 365 results in a prepetition breach; it does
> not constitute a termination of the lease. Indeed, § 365(g) explicitly
> provides that "the rejection of an executory contract or unexpired lease of
> the debtor constitutes a breach of such contract or lease." 11 U.S.C. §
> 365(g).
>
> *Id.* (citations omitted).

17.     As such, even if it were assumed that Luminant had breached the Water Contract

pre-petition, which Luminant does not concede, nothing in the Bankruptcy Code, the Objection

or the sources cited by TRWD in its Objection, substantiates TRWD's claim that the Motion is

moot.

III.    **Applicable Non-Bankruptcy Law Does Not Require Removal of the Dam to Restore the Natural Flow of Caney Creek into Cedar Creek.**

18.    Furthermore, TRWD's claim that Luminant must restore the natural flow of Caney Creek by removing the Dam is not supported by the current factual circumstances, much less applicable non-bankruptcy case law.  *See, e.g.* Objection ¶ 22.[8]  In fact, TRWD fails to cite a particular section of the Texas Water Code or other law that imposes an obligation to remove the Dam.

19.    All of TRWD's arguments regarding restoration of natural flow hinge on one key erroneous, unsupported assumption—that there is some circumstance under which Luminant was or would be required to remove the Dam. TRWD's arguments are incorrect. Specifically, TRWD assumes that it could obtain legal or administrative relief that requires Luminant to remove the Dam.  This assumption does not hold water.

20.    In reality, Texas courts have not insisted that a dam be removed to restore natural flow. *See*, *e.g.*, *Nolte Irr. Co. v. Willis*, 180 S.W.2d 451, 454 (Tex. Civ. App. 1944), *writ refused W.O.M.* (Sept. 27, 1944).  In *Nolte*, the complaining party contended that the natural flow of the surface waters was unlawfully diverted and the surface waters were unlawfully impounded by dams and embankments that had been constructed across gullies and depressions. *Id.* The Court found, however, that the extraordinary remedy of removal of three dams would be inequitable, absent a showing of serious injury or threatened injury.  *Id.* at 455.  Further, the court in *Nolte* found that simply making and maintaining adequate openings and spillways in each of the dams would be too extreme of a remedy to enforce. *Id.*; *but see Damron v. Till*, 2002 WL 32344943, at *2 (Tex. App.—Eastland  2002, not published) (injunction upheld to the extent it required the

---

[8]  TRWD, in fact, argues without any contractual or statutory basis that Luminant will be required to remove the Dam upon expiration of the Water Contract.  *See* Objection ¶ 22l

removal of the dam from extending over the property boundary line and compliance with Section 11.086 of the Water Code).[9] Indeed, under Texas state law, the monetary damages would be readily measurable in terms of money just as in *Nolte*.  180 S.W.2d at 454.

21.    Inasmuch as the Dam, unlike the dams in question in *Nolte*, contains an opening and spillway, applicable non bankruptcy law fails to support TRWD's claim that restoration of the natural flow by removal of the Dam is required.

22.    Thus, TRWD's assertion that removal of the Dam is required in *any* circumstance—whether as a precondition to an effective termination of the Water Contract pre-petition, or as a result of a rejection of the Water Contract post-petition, or if this Court does not allow rejection and the Water Contract terminates by its own terms in 2016, or if the Water Contract no longer exists as a result of some unspecified "administrative process"—is either patently incorrect or highly conjectural.  Either way, this Court should not give TRWD's vague arguments to the contrary any merit.

**IV. TRWD's Discovery and Deferral Requests Merit Limited Consideration By the Court.**

23.  To the extent that TRWD seeks a deferral of a hearing on the Motion for the purpose of relevant discovery related to pertinent issues raised in the Motion, while Luminant has no objection, Luminant asserts that based on the facts which have not been controverted to date by TRWD, any deferral should be limited in duration and any discovery ordered should be confined to issues relevant to whether or not the Water Contract is subject to rejection under section 365 of the Bankruptcy Code.

---

[9]    "(a) No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.

(b) A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow." Tex. Water Code Ann. § 11.086 (West).

## **Conclusion**

24.    For the reasons set forth above, the Debtors respectfully request that the Court overrule the Objection, deem the Water Contract terminated prior to the Petition Date, or alternatively, authorize the rejection of the Water Contract *nunc pro tunc* to the Petition Date and enter the Order.

[*Remainder of page intentionally left blank.*]

13

Dated: November 18, 2014
       Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession