1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    ENERGY FUTURE HOLDINGS        :

     CORP.,  et al.,               :    Case No. 14-10979(CSS)

7                                  :

             Debtors.             :    (Jointly Administered)

8    _____:

9

10                                United States Bankruptcy Court

11                                824 North Market Street

12                                Wilmington, Delaware

13

14

15                                October 15, 2014

16                                10:15 AM - 5:19 PM

17

18   B E F O R E :

19   HON CHRISTOPHER S. SONTCHI

20   U.S. BANKRUPTCY JUDGE

21

22

23

24

25   ECR OPERATOR:  LESLIE MURIN

Page 2

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Authorizing the Debtors to (A) Pay

3    Certain Prepetition Amounts on Account of the Insider

4    Compensation Programs and (B) Continue the Insider

5    Compensation Programs in the Ordinary Course of Business on

6    a Postpetition Basis [D.I. 1792; filed August 8, 2014]

7

8    HEARING re Motion of Energy Future Holdings Corporation for

9    Entry of an Order Authorizing the Debtors to File Under Seal

10   the Certain Portions of Commercially Sensitive Information

11   Set Forth in the Debtors' Motion for Entry of an Order

12   Authorizing the Debtors to (A) Pay Certain Prepetition

13   Amounts on Account of the Insider Compensation Program and

14   (B) Continue the Insider Compensation Programs in the

15   Ordinary Court of Business on a Postpetition Basis [D.I.

16   1795; filed August 8, 2014]

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Penny Skaw, Jamie M. Gallagher,

25   and Melissa Looney

```
1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS

3         Attorneys for the Debtors

4

5    BY:  DAVID DEMPSEY, ESQ.

6         EDWARD SASSOWER, ESQ.

7         MARK MCKANE, ESQ.

8         CHAD HUSNICK, ESQ.

9

10   RICHARDS, LAYTON & FINGER, P.A.

11        Attorneys for the Debtors

12

13   BY:  DANIEL J. DEFRANCESCHI, ESQ.

14        JASON M. MADRON, ESQ.

15

16   FOX ROTHSCHILD

17        Attorney for TECH Unsecured Notes

18

19   BY:  L. JOHN BIRD, ESQ.

20

21   YOUNG CONAWAY STARGATT & TAYLOR, LLP

22        Attorney for Ad Hoc Committee of TCEH First Lien

23        Creditors

24

25   BY:  PAULINE K. MORGAN, ESQ.
```

```
1   ASHBY & GEDDES

2        Attorney for WSFS, Trustee

3

4   BY:  STACY  NEWMAN, ESQ.

5

6   KLEHR HARRISON

7        Attorney for UMB Bank, Indenture Trustee

8

9   BY:  RAYMOND H. LEMISCH, ESQ.

10

11  UNITED STATES DEPARTMENT OF JUSTICE

12       Attorneys for the U.S. Trustee

13

14  BY:  RICHARD L. SCHEPACARTER, ESQ.

15       ANDREA B. SCHWARTZ, ESQ.

16       TIMOTHY J. FOX, JR., ESQ.

17       JULIET SARKESSIAN, ESQ.

18

19  COUSINS CHIPMAN & BROWN, LLP

20       Attorney for Ad Hoc Committee of EFIH Unsecured

21       Noteholders

22

23  BY:  MARK O. OLIVERE, ESQ.

24

25
```

1  POLSINELLI

2       Attorney for the Committee

3

4  BY:  JUSTIN K. EDELSON, ESQ.

5

6  PACHULSKI STANG ZIEHL & JONES

7       Attorney for Computershare

8

9  BY:  JAURA DAVIS JONES, ESQ.

10

11  ALSO PRESENT TELEPHONICALLY:

12

13  BRIAN S. HERMANN

14  PEG A. BRICKLEY

15  MATTHEW BROD

16  MICHAEL L. DAVITT

17  ADAM M. DENHOFF

18  CRAIG W. DENT

19  MARITA ERBECK

20  BENJAMIN FEDER

21  KEELY HAMLIN

22  MARK F. HEBBELN

23  WILLIAM HILDBOLD

24  NAOMI MOSS

25  NED S. SCHODEK

1   APARNA YENAMANDRA

2   ROBERT MALONE

3   PATRICK STRAWBRIDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4     Anything before we begin?  No?  All right.

5              Ms. Schwartz, call your witness.

6              MS. SCHWARTZ:  Good morning, Your Honor.  Andrea

7     Schwartz for the United States Trustee.  My colleague,

8     Ms. Sarkessian, will be doing Mr. Panacio's direct.

9              THE COURT:  Okay.  Thank you.

10             MS. SCHWARTZ:  Thank you, Your Honor.

11             THE COURT:  Mr. Panacio, please take the stand.

12    There you are.

13             THE CLERK:  Please raise your right hand.

14         (Witness Sworn)

15             THE CLERK:  Please state and spell your name for

16    the record.

17             THE WITNESS:  My name is Michael Panacio, P as in

18    Peter, A-N-A-C-I-O.

19             THE CLERK:  Thank you.

20             MS. SARKESSIAN:  Okay.  Good morning, Your Honor.

21    Juliet Sarkessian on behalf of the U.S. Trustee.

22    DIRECT EXAMINATION

23    BY MS. SARKESSIAN:

24    Q    Mr. Panacio, with whom are you employed?

25    A    The U.S. Trustee's Office.

1    Q    And what is your position there?

2    A    I'm a bankruptcy auditor.

3    Q    Okay.  How long have you held that position?

4    A    Fourteen years.

5    Q    Somewhat your education?

6    A    I have a bachelor in science degree in accounting and

7    economics.

8    Q    Do you hold any licenses?

9    A    I hold a CPA license with the State of Pennsylvania in

10   good standing.

11   Q    When was that license issued?

12   A    1995.

13   Q    And approximately how long have you been practicing

14   accounting?

15   A    Accounting since 1982.

16   Q    Now, did you submit a declaration in these cases in

17   connection with the debtors' motion to pay certain bonuses

18   to officers?

19   A    I did.

20   Q    Were there certain exhibits attached to that

21   declaration?

22   A    There were.

23          MS. SARKESSIAN:  Your Honor, I have marked an

24   additional exhibit, which I have provided to opposing

25   counsel.  I would like to provide the Court with a copy and

1    also hand that to the witness, if it pleases the Court.

2              THE COURT:  Yes.  Any objection?

3              MR. MCKANE:  No objection, Your Honor.

4              THE COURT:  Thank you.  Do you have a copy for

5    Ms. Werkheiser?

6        (Pause)

7              THE COURT:  Is this an unredacted copy?

8              MS. SARKESSIAN:  That is correct, Your Honor.

9    Yes, Your Honor, this is an unredacted copy, and this is not

10   something that we have filed, and I will have Mr. -- I will

11   have Mr. Panacio explain exactly what this is.

12             THE COURT:  Very good.

13             MR. MCKANE:  Your Honor, for the purpose of this

14   -- Mark McKane, Kirkland & Ellis for the record.  For the

15   purposes of the record could we have this new Exhibit 36

16   included with the unredacted binder set as to not have any

17   confusion down the road as to whether -- which set it should

18   be included in?  We can supplement that binder.

19             THE COURT:  No, I have it here.  We will -- we

20   will do so.  Thank you.

21             MR. MCKANE:  Thank you, Your Honor.

22             MS. SARKESSIAN:  I apologize, I realize that the

23   copies are not hole punched.  If that causes any problem we

24   can send over hole punched copies.

25             THE COURT:  It's fine.

1    BY MS. SARKESSIAN:

2    Q    So, Mr. Panacio, I show you what has been marked as

3    Trial Exhibit 36 and ask if you recognize that document?

4    A    I do.

5    Q    Okay.  And can you please -- well first of all who --

6    do you know who created this document?

7    A    I did.

8    Q    And can you explain whether this document has any

9    relation to any of the exhibits that were attached to your

10   declaration?

11   A    This is in relation to Exhibit B to my declaration.

12   Q    And can you explain how -- what the relation is?

13   A    Well actually this is a revised updated version of

14   Exhibit B to my declaration.

15   Q    And in what way has it been revised?

16   A    Just two corrections.  The one correction is regarding

17   the Luminant scorecards.  There was some confusion on my

18   part reading those scorecards on the Luminant --

19   Q    Well let's just stop for a minute, I just want to

20   identify --

21           MS. SARKESSIAN:  And actually if I could point out

22   to the Court and opposing counsel as well, we have put in

23   larger font the numbers that have been changed just for ease

24   of reference so everybody knows what that is.

25           THE COURT:  Oh, thank you.

1           MS. SARKESSIAN:   Okay.

2      BY MS. SARKESSIAN:

3      Q    So actually, Mr. Panacio, I will -- we'll come down to

4      that in due course.

5      A    Okay.

6      Q    I just wanted to highlight that there were a few

7      changes.

8      A    Right.

9      Q    Okay.  Now, can you -- what I would like to do with

10     this document is I would like to go from the left column

11     over to the right column.

12     A    Okay.

13     Q    And in each instance I'm going ask you the type of

14     information that is contained there as well as where the

15     information comes from.  Do you understand?

16     A    I understand.

17     Q    Okay.  And I'm going to caution you to be careful not

18     to provide any numbers that appear on this chart unless I

19     specifically ask you, and we'll wait and give debtors'

20     counsel a moment if they have any issue with it.  Do you

21     understand that?

22     A    I understand.

23     Q    Okay.  So starting with the far left column that has

24     the heading metric, could you explain what that information

25     is?

1    A    These are the various performance metrics utilized by

2    the debtor.  In this particular instance I'm looking at

3    Luminant, these are the various --

4    Q    I'm sorry, Mr. Panacio, could you speak up a little

5    bit?

6    A    Sorry about that.

7    Q    Okay.

8    A    These are the various performance metrics.

9    Q    Of the debtors, correct?

10   A    Of the debtors, correct.

11   Q    And where did you obtain this information?

12   A    I obtained the information from the specific scorecards

13   for each of the debtors.

14   Q    Okay.  And I would like to turn your attention to an

15   exhibit that is in evidence, it's Trial Exhibit 3 in your

16   binder, it should be the second item of the tab that says 3.

17   And I would ask you, is that the document you are referring

18   to as scorecards?

19   A    Yes, it is.

20   Q    Okay.  And what years do those scorecards cover?

21   A    They range from 2009 through 2013.

22   Q    Then moving to the -- to the right we have five

23   columns, this is -- again, this is on Exhibit 36.

24   A    Okay.

25   Q    You have five columns with the heading 2009 actuals

1    through 2013 actuals.  And again, without stating any of the

2    numbers that appear there, could you explain in general

3    terms what that information is?

4    A    Yeah.  They are the actual amounts that were provided

5    in the scorecards, based on the number of metrics were used

6    I calculated an average.

7    Q    Okay.  Well let's -- I'm not at the average yet.

8    A    Oh, sorry.

9    Q    Okay.

10   A    These are the actual figures taken from the scorecards.

11   Q    Okay.  And by actual you mean actual performance?

12   A    Actual performance, right.

13   Q    Okay.  And scorecards again are referring to Trial

14   Exhibit 3, correct?

15   A    Correct.

16   Q    Now, when we get to the column that says average,

17   again, without mentioning any particular figures, can you

18   explain what that information is and where it came from?

19   A    Okay.  The column represents the actual average based

20   on the number of years the metric has been used.  Again,

21   these are numbers taken from the Luminant scorecards.

22   Q    Okay.  Did you do any type of calculation to come up

23   with the average?

24   A    For example --

25   Q    I'm sorry, just -- that's a yes or no.

1    A    Oh, yes.

2    Q    Okay.  And then proceed.

3    A    Again, I'm not going to mention EBIDTA, but for

4    example, EBIDTA was used for five years, I totaled the

5    amount of each of the years, made a total, divided by five,

6    and calculated an average.

7    Q    Now, moving over further to the right there are three

8    columns headed 2014 threshold, 2014 baseline, and 2014

9    superior.  Can you explain in general terms what -- what the

10   figures under those columns represent?

11   A    Okay.  These were the metric levels that I obtained

12   from the Filsinger table 1- -- I believe it was 1-4.

13   Q    1-4?

14   A    Right.

15   Q    And that's the debtors' expert witness, correct?

16   A    Correct.

17   Q    Okay.  Then the next column says weight.  Can you

18   explain where those figures came from?

19   A    Yeah.  The figures came from the actual scorecards as

20   well.

21   Q    And what -- what does that term weight, what does that

22   -- what is your understanding of what that term means?

23   A    It's my understanding it's the percentage associated

24   with the various metrics in calculating their bonuses.

25   Q    So if you add up the weight column all the figures it

1   should total 100 percent, correct?

2   A    It should add -- right, 100 percent.

3   Q    Okay.  Now we get to the next column that says

4   threshold versus average.  And could you first clarify

5   whether this is an number that you obtained from a document

6   or whether you calculated this?

7   A    This is a number I calculated.

8   Q    Okay.  And could you explain how you calculated this

9   and what it represents?

10  A    For this particular column I took a threshold metrics

11  and subtracted from the actual average amounts.

12  Q    Okay.  And by the threshold metrics you mean for 2014?

13  A    For 2014, correct.

14  Q    And then the average is for the five years prior,

15  correct?

16  A    Correct.

17  Q    Okay.  And then the next column -- oh, and let me just

18  clarify.

19          With respect to dollar figures on this -- on this

20  chart do we need to add any zeros to get it to the actual

21  figure?

22  A    Yes.

23  Q    How many zeros do you need to add?

24  A    Regarding dollar figures it's six zeros, I mean

25  billions.

1   Q    And the next column says superior versus average.

2   Could you clarify is this a number you calculated or did you

3   receive it from some source?

4   A    This is number I also calculated using the same

5   methodology I did with the threshold versus the average.

6   Q    And in this instance you were comparing the 2014

7   superior target, correct?

8   A    Correct.

9   Q    To the average --

10  A    Correct.

11  Q    -- for five years?

12  A    Correct.

13  Q    And the next column to the right the heading is mid-

14  year June YTD actual.  Could you explain what those numbers

15  are and where they came from?

16  A    Yeah.  These were figures I had taken from the

17  Filsinger declaration.  I believe it was table 1-3.

18  Q    And what do these figures represent?  What are they

19  showing?

20  A    They're showing actual year to date as of June -- June

21  30th.

22  Q    Performance -- actual year to date performance for each

23  of the metrics?

24  A    Correct.

25  Q    Okay.  And the next column next to that says projection

1    for full year.  Could you explain, is that something you

2    calculated?

3    A    Yeah.  In this column -- I did calculate this column.

4    It's --

5    Q    Can you explain what it is and how you calculated it?

6    A    Yeah.  It was taken mid-year June year to date actual

7    and multiplying by two.

8    Q    And that -- your goal in doing that was to project

9    numbers for the -- for the full year of 2014?

10   A    Right.  I took from the standpoint all things

11   considered equal for the first half of the year, I just

12   projected it out to the end of the year.

13   Q    And then we come to the final column, it's projection

14   versus target.  Could you explain what this intends to show

15   and where this came from?

16   A    It's our projection in the column previous to that

17   exceeding the highest metric level whether it be threshold,

18   baseline, or superior.

19   Q    Okay.  So just to clarify, you took the column before

20   that, the projection that you made for the full year --

21   A    Right.

22   Q    -- and you compared that to the 2014 threshold,

23   baseline, and superior?

24   A    Correct.

25   Q    Okay.  Now, with respect to the EBIDTA figures -- I'm

1    sorry, let me back up.

2         You have one chart -- is it correct you have one

3    chart for Luminant and then the second page relates to TXU,

4    correct?

5    A    Correct.

6    Q    And then the third page relates to the Business

7    Services, correct?

8    A    Correct.

9    Q    Okay.  So just keeping with the Luminant page for the

10   time being, when you look at the various metrics that the

11   debtors consider for determining bonuses which item is the

12   most heavily weighted?

13   A    The EBIDTA.

14   Q    Okay.  And that's the 37.5 percent for Luminant,

15   correct?

16   A    Correct.

17   Q    Okay.  And what's the percentage for TXU?

18   A    I believe that was 40 percent.

19   Q    Okay.  Now, going back to the far left column where the

20   metrics are, I would like you to distinguish, if you can,

21   between those metrics that are revenue driven and those that

22   are cost driven.  So looking at this Luminant page can you

23   -- can you break that up a little for us?

24   A    Yeah.  I believe that the revenue-driven metrics are

25   EBIDTA, the available generation line items, coal -- the

1    coal available generation and a nuclear generation line.

2    Q    So with respect to those numbers would a company

3    typically want to see those revenue-driven numbers go up or

4    down?

5    A    Obviously going up.

6    Q    Okay.  And then are there some items -- some metrics

7    that are listed here that are cross-driven metrics?

8    A    Correct.

9    Q    Okay.  And which ones are those?

10   A    Okay.  They're the Luminant O&M/SGA, the Luminant Cap

11   X, the Luminant fossil fuel costs.

12   Q    And the bottom one there it looks like there was only

13   figures for a couple of years?

14   A    Yeah, the bottom -- the Luminant management EBIDTA

15   that's Cap X or Oak Road and Sandel (ph), I believe it's

16   just used for 2009.

17   Q    Okay.  Now keeping with Luminant what I would like to

18   focus now is on the column that is headed threshold versus

19   average.  Okay?

20   A    All right.

21   Q    And you've testified that that's a calculation that you

22   did preparing the 2014 thresholds with the average past

23   five-year actual performance, correct?

24   A    Correct.

25   Q    Okay.  And I am now going to ask you to focus on

1    certain numbers that are in that column, and I'm going to

2    ask debtors' counsel if they have any problem with those

3    numbers being stated in court.  They were not redacted on

4    the copy that was filed?

5              MR. MCKANE:  Your Honor, if I could just confer

6    with my client.  I don't think that there's a problem

7    because it's a five-year average and I don't think he can

8    back into any one of the -- one of the five-year actuals by

9    comparing a threshold to a five-year average.  So, I don't

10   think we have a problem, but I just want to confer.

11             THE COURT:  Well the threshold amount is not.

12             MR. MCKANE:  The threshold amount is not, but if

13   you could -- and basically you can confer -- you can back

14   out what the five-year average is by using the threshold and

15   the difference.

16             THE COURT:  Right, so you have a problem with it.

17             MR. MCKANE:  And then I want to confirm that is

18   the five-year average itself sufficiently problematic?  I

19   think it is because we redacted it previously, so I'd ask

20   that --

21             MS. SARKESSIAN:  Well, no --

22             MR. MCKANE:  -- directionally discussed the

23   number --

24             THE COURT:  Ms. Sarkessian (indiscernible -

25   10:32:17).

1          (Bench Conference)

2               THE COURT:  May I make a suggestion?

3               MS. SARKESSIAN:  I think we've figured it out.

4               MR. MCKANE:  Please, Your Honor.

5               THE COURT:  Okay.  Due to the sensitive nature I

6     think I have the numbers in front of me, I think we can

7     identify them by reference without ever actually having to

8     -- with EBIDTA and contribution margin.

9               MS. SARKESSIAN:  Your Honor, I do understand that,

10    I think we -- I think we've clarified.  They thought that

11    they there certain numbers, the target numbers, they thought

12    those had been disclosed and they have not, they've been

13    redacted and will be filed.  So I think that we don't have

14    any issue.

15              MR. MCKANE:  Your Honor, we're more comfortable

16    with the approach that you just recommended given, that it's

17    easier for everyone and it's more precautionary.

18              THE COURT:  Right.  Well if you tell me -- if I

19    know what the average is --

20              MR. MCKANE:  Right.

21              THE COURT:  -- and I know the delta between --

22              MR. MCKANE:  That's right.

23              THE COURT:  -- and you tell me what the delta is

24    between average and threshold it's a simple mathematical

25    exercise to know what threshold is.  So that's the problem.

1          MS. SARKESSIAN:  No, Your Honor, because we're not

2    going to say what the average is, we're not going the say

3    what any of the targets are.  The only thing we're going say

4    is what the -- the delta are between the threshold and the

5    average.

6          MR. MCKANE:  And, Your Honor, just to be clear,

7    while it may be a redaction on this page the actual -- the

8    thresholds are -- have been disclosed throughout the

9    hearing.  So if you put out what the difference is you can

10   back into the average.

11         THE COURT:  Yeah, let's not use numbers in

12   connection with EBIDTA and contribution margin.  I think you

13   can adequately make your record by referencing what's there.

14         MS. SARKESSIAN:  Okay, Your Honor.  I will --

15         THE COURT:  And I can see and follow.

16         MS. SARKESSIAN:  Okay.  I will proceed in that

17   manner.

18   BY MS. SARKESSIAN:

19   Q    So --

20         MS. SARKESSIAN:  I'm sorry, Your Honor, I just

21   have to take a moment to make sure --

22         THE COURT:  That's fine.

23         MS. SARKESSIAN:  -- that I phrase questions

24   correctly.

25   BY MS. SARKESSIAN:

1  Q    So, Mr. Panacio, focusing on the EBIDTA number for

2  Luminant and the column that is threshold versus average,

3  okay, and we've already established that for all the dollar

4  figures on this page you need to add six zeros, correct?

5  A    Correct.

6  Q    Okay.  And if a number that appears in that column is

7  in parentheticals can you explain what that means?  Again,

8  without giving any figures what that means.

9  A    I want to be careful too.  It's the difference between

10  threshold and average.

11  Q    So if the number is negative --

12  A    It's a negative.

13  Q    What is that -- if the number is negative what does

14  that mean?

15  A    Well for this particular metric your performance level

16  has dropped.

17  Q    Okay.  The -- well is it the -- you're comparing the

18  target for 2014 --

19  A    EBIDTA level has dropped.

20  Q    The target --

21  A    The target levels.

22  Q    -- the target is lower by the number appearing in that

23  column --

24  A    Right.

25  Q    -- as compared with what the average performance was

1    for the last five years?

2    A    Correct.

3    Q    Okay.  Now --

4              MS. SARKESSIAN:  Your Honor, if I can have a

5    moment?

6              THE COURT:  Uh-huh.

7              MS. SARKESSIAN:  Your Honor, I just want to put on

8    the record that with respect to the Luminant page the

9    debtors don't have any issue with any of the other numbers

10   appearing in that column, so --

11             THE COURT:  Okay.

12             MS. SARKESSIAN:  -- since nobody has an objection

13   I'm going to proceed with Mr. Panacio, and I will tell you

14   if you can actually state the figure, okay?

15             THE WITNESS:  Okay.

16   BY MS. SARKESSIAN:

17   Q    All right.  Dropping down now to -- there's no -- you

18   didn't do the comparison for the next -- next two things,

19   correct?

20   A    Correct.

21   Q    Permanent base load and coal available generation?

22   A    Correct.

23   Q    Because -- what was the reason for that that you didn't

24   do that comparison?

25   A    Well a couple reasons.  One, the weight of the

1    percentage scale has changed, or two, there wasn't

2    sufficient enough data to make that complete average.

3    Q    And are they still -- is the debtor still using those

4    as metrics as far as you know based on the scorecards?

5    A    Those two no.  Those specific line items, no.

6    Q    Okay.  So then let's go down to the next one, which is

7    coal available generation June through September 15.  You

8    see that?

9    A    I do.

10   Q    Okay.  So if we go down to the column that says

11   threshold versus average can you translate that figure --

12   now you can give the figure -- say what that figure is,

13   please?

14   A    Right.  Well yeah, I took the threshold number of

15   19130 --

16   Q    Well, whoa, whoa, whoa, whoa, whoa, whoa, whoa.  No,

17   no, no, no, no, no, wait.  Sorry.  Oh, wait, that's not --

18            MS. SARKESSIAN:  I'm sorry, Your Honor.

19            THE WITNESS:  That's available.

20   BY MS. SARKESSIAN:

21   Q    That is --

22   A    Not EBIDTA or contribution.

23   Q    That's not EBIDTA.  Okay.  I'm sorry.  You can say that

24   number.  Excuse me.  Sorry, I'm a little extra paranoid, but

25   it's better to be a little extra careful.

1           Okay.  So I'm sorry, you said that under 2014

2    threshold, right, that number is what, translated with the

3    extra zeros?

4    A    It's 19,138,000.

5    Q    Okay.  And you compared that number to --

6    A    And the average of 20,299,000.

7    Q    Okay.  And when you'd make that comparison what number

8    do you get?

9    A    It's about 1.1 negative.  It was a negative --

10   Q    1.1 billion --

11   A    In the negative.

12   Q    -- negative.  And when you say negative then that means

13   that the threshold for 2014 for that metric is $1.1 billion

14   less than average actual for the last five years, correct?

15   A    Correct.

16   Q    Okay.  Going down to the next metric, which is coal

17   available generation, January through May and September 16

18   through December.  Do you see that?

19   A    I do.

20   Q    Okay.  So then the 2014 threshold for that is -- that's

21   36 billion and change, correct?

22   A    Correct.

23   Q    Okay.  And you compared that to again the -- what

24   number?

25   A    The -- in this case we did a two-year average of

1    37 billion -- 37.7 billion.

2    Q    And that was because you only had two years of

3    information, correct?

4    A    Correct.

5    Q    Okay.  And when you do that math what is -- what is the

6    difference, again, shown in the column that says threshold

7    versus average?

8    A    Again it's -- I'm kind of rounding the number -- it's a

9    negative $1.4 billion.

10   Q    Okay.  So again, that's showing that the 2014 threshold

11   is 1. -- approximately 1.4 billion less than the average

12   five-year actual performance of the debtors, correct?

13   A    Correct.

14   Q    Okay.  And then the next item is nuclear generation,

15   and again, if you could just explain the figure that appears

16   there.  What's that number?

17   A    Okay.  I believe these are units, not dollars.  It'd be

18   19 -- like 19 billion and change, subtracting from the

19   average or 19.8 --

20   Q    And that --

21   A    -- and the difference is a negative 818,000,000.

22   Q    So again, the threshold in that instance is 818- less

23   than the average actual performance for the last five years,

24   correct?

25   A    Correct.

1    Q    Okay.  Now when we move down to Luminant O&M/SGA.  You

2    see that, correct?

3    A    I do.

4    Q    Okay.  Now, could you explain the number that's

5    threshold versus average there?

6    A    Okay.  Again, I took the threshold amount -- 2014

7    threshold amount, subtracted from the average, and I obtain

8    a positive 70 -- well, a positive 70.25.

9    Q    Okay.  And that would be 70 million?

10   A    Seventy million.

11   Q    Right.  Seventy million.  Now that is -- that's a cost

12   number, correct?

13   A    That -- correct.

14   Q    Okay.  So is that a number -- cost number, would you

15   want that number to be higher or lower?

16   A    Ideally you want the number obviously to be lower to

17   enhance performance.

18   Q    So in this instance the threshold is actually

19   70 million higher than the average last five years, correct?

20   A    Correct.

21   Q    Okay.  Now we get to the next column which is Luminant

22   Cap X.

23   A    Correct.

24   Q    Okay.  Now let me just pause for a minute, because this

25   is one where you'll see under average that the font is

1    bigger indicating this was something that was corrected,

2    right?

3    A    This was corrected, yes.

4    Q    Okay.  And could you explain -- well first of all

5    explain the 685-, what is that an average of?

6    A    Well the 685- is an average from the year 2010 through

7    2013.

8    Q    Okay.  And you added those together and divided by

9    four, correct?

10   A    Yeah, then divide by four, correct.

11   Q    Okay.  Now previously can you just explain what the --

12   why the number was different previously?

13   A    It's based on a scorecard, I guess the original score

14   card for 2009, I mistakenly included Luminant management

15   EBIDTA less Cap X.  The very last line item I included a

16   negative 410- and that was again I wanted to make the

17   correction.

18   Q    Okay.  Because in 2009 they actually did not track the

19   Luminant Cap X on the scorecard?

20   A    That particular item they did not, right.

21   Q    Now, if you look here for that line item, threshold

22   versus average --

23   A    Yes.

24   Q    -- that is a negative 123 million, correct?

25   A    Correct.

1    Q    Okay.  Now that's a figure you would want to be lower,

2    correct?

3    A    Right, reducing cost, right.

4    Q    Okay.  So in this instance the threshold for Luminant

5    Cap X is actually lower than the average actuals for the

6    past four years, correct?

7    A    Correct.

8    Q    Okay.  And then we get to the very last one here on

9    this page, which is Luminant fossil fuel costs, and this is

10   -- again, this is a cost, correct?

11   A    Correct.

12   Q    And the number that appears under threshold versus

13   average is .04 and that's a positive number, correct?

14   A    Correct.

15   Q    Okay.  And that means that the 2004 threshold is

16   slightly higher than the average for the past five years,

17   correct?

18   A    Correct.

19   Q    Okay.  Now, I also want to just go for a moment before

20   we leave the Luminant chart --

21   A    All right.

22   Q    -- and focus on the last three columns to the right.

23   And I will remind you that the EBIDTA numbers shall not be

24   stated, okay?

25   A    Correct.

1    Q    And I just want -- going to your last column where

2    you've testified you've compared the projection that you

3    made for the full year by taking the half year and

4    multiplying it by two, and you compared that to the

5    threshold, the baseline, and the superior.

6              So with respect to Luminant what did that end up

7    being in terms of exceeding -- let's see -- either being

8    above or below the threshold, baseline, superior numbers?

9    A    Yeah.  Well we had four of the performance metric line

10   items where they exceeded either baseline or threshold or

11   superior.

12   Q    Okay.  And that's what's indicated in that column?

13   A    Correct.

14   Q    Okay.  Now, I'd like to turn to the next page, which is

15   TXU.

16   A    Okay.

17   Q    And some of these metrics are different, correct, than

18   the Luminant?

19   A    Yes.

20   Q    Okay.  So let's start with the EBIDTA numbers, again,

21   reminding you that no -- no numbers shall be stated.

22   A    Right.

23   Q    But focusing on your column threshold versus average.

24   This is a -- we've established that the numbers in

25   parentheticals mean less -- that the threshold is less than

1    the average, correct?

2    A    That's correct.

3    Q    Okay.  And you add the six zeros to every number,

4    correct?

5    A    Correct.

6    Q    Okay.  And then you do the similar with respect to

7    superior and average the same thing, right?

8    A    Correct.

9    Q    Okay.  Now let's go down to TXU total energy costs.  So

10   now, first let's clarify, is this a revenue-driven item or a

11   cost-driven item?

12   A    It is a cost-driven item.

13   Q    Okay.  So with respect to cost-driven items you want

14   those numbers to be lower rather than higher, correct?

15   A    Right, ideally you want them lower, right.

16   Q    Okay.  So in this instance, and these are numbers that

17   can be stated, so in this instance when you compare the

18   threshold to the average you have -- you're showing that the

19   threshold for 2014 is actually $53 million lower than what

20   the average was for the last five years, correct?

21   A    Correct.

22   Q    Okay.  And then the superior is 105 million below,

23   correct?

24   A    Correct.

25   Q    Okay.  When we get to contribution margin, and these

1    are numbers that we're not going to say, but the

2    contribution margin, is that revenue driven or cost driven?

3    A    It's revenue driven.

4    Q    Okay.  So in that instance you would want a positive --

5    the higher number --

6    A    A higher number.

7    Q    -- than the lower number, right?  Okay.  And we --

8    without saying the number we see what the number is in that

9    line.

10   A    Right.

11   Q    Going down to residential ending customer account.  Do

12   you have a general understanding of what that is?  What that

13   figure -- what that represents essentially?

14   A    Right.  I would -- it's a metric or performance metric

15   which you want to enhance.

16   Q    Right.  We want to have more customers not --

17   A    And more customers, right.

18   Q    Okay.  So there when you compared the threshold against

19   -- the threshold for 2004 against the average actual for the

20   last five -- no three years -- four years, excuse me.

21   A    Four years.

22   Q    Four years, the threshold is actually 168 units less

23   than the average, correct?

24   A    Correct.

25   Q    And then for the superior versus the average the

1    superior figure is 125 units less than the average, correct?

2    A    Correct.

3    Q    Okay.  Now the next item is customer satisfaction, so

4    that would be something you would want to increase, right?

5    A    Right.

6    Q    Okay.  So here when you compare the threshold for 2014

7    against the -- let's see -- the average for -- I'm sorry.

8    I'm starting to -- I think I need to take a ruler to make

9    sure they're right.  Make sure I'm getting the right numbers

10   here.

11            Okay.  So there when you made a comparison the

12   threshold is slightly less, 2.82 as compared with the

13   average for the last five years, correct?

14   A    Correct.

15   Q    Okay.  And superior is slightly above what the average

16   is, right?

17   A    Slightly above, right.

18   Q    Okay.  Now the TXU average day sales outstanding, do

19   you have an understanding of whether that's a number that we

20   would want higher or lower?

21   A    Well you want that lower as far as -- regarding AR to

22   tax or collection.

23   Q    Okay.

24   A    That's my understanding.

25   Q    All right.  And here's it's -- the average is slightly

1    -- slightly higher than the -- I'm sorry -- the threshold is

2    slightly higher than the average, correct?

3    A    Correct.

4    Q    TXU energizing event success, that's the next metric.

5    Is that something you want higher or lower in your

6    understanding?

7    A    My understanding is it'd be obviously something higher.

8    Q    Okay.  And it's here the threshold is very slightly

9    higher compared to the average, correct?

10   A    Correct.

11   Q    Okay.  Then we get to the TXU customer complaints.  Now

12   this is one where a number was corrected for the 2014

13   threshold, correct?

14   A    That's correct.

15   Q    Okay.  And previously you had a number that -- what was

16   the number you were using previously?

17   A    We were -- we used the non-insider metric.

18   Q    Okay.  That was -- was that on purpose on an accident?

19   A    That was accidental.

20   Q    Okay.  Customer complaints I think we'd all agree you'd

21   want that number lower rather than higher, right?  Oh, but

22   you did not --

23   A    Right.

24   Q    -- you went through an average here because --

25   A    Right.

1    Q    -- right, because there wasn't -- I see --

2    A    Yeah, sufficient --

3    Q    -- sufficient --

4    A    -- historical data, and we didn't do that.

5    Q    And one --

6            THE COURT:  I'm sorry.  Wait a minute, I'm sorry,

7    you talked over each other and you tailed off at the end,

8    so.

9            MS. SARKESSIAN:  I'm sorry, let me ask the

10   question again.  I apologize, Your Honor.

11   BY MS. SARKESSIAN:

12   Q    So in this instance for this number you did for the do

13   a comparison of the threshold versus average or superior

14   versus average, correct?

15   A    That's correct.

16   Q    And why didn't you do that comparison?

17   A    Because in 2012 there's actually a percentage figure

18   stated on a scorecard, in 2013 there was an actual number.

19   Q    Okay.  So you --

20   A    But it wasn't consistent so I didn't feel comfortable

21   doing any type of average on that.

22   Q    Okay.  Then when we get to TXU system availability, is

23   that a number you would want to have a higher number or a

24   lower number?

25   A    Higher number.

1    Q    Okay.  And here we when you compared threshold versus

2    average it's very slightly lower than -- the threshold is

3    very slightly lower than the average, correct?

4    A    Correct.

5    Q    Okay.  And then just stopping momentarily on the last

6    column, which is again the projection for the full year

7    versus the targets, you've indicated in a number of cases

8    whether it exceeds a particular threshold, correct?

9    A    Right.  The highest metric -- the highest threshold --

10   the highest level above the metric.

11   Q    Then we're going turn to the last page, which is for

12   Business Services.  Again we won't mention EBIDTA numbers,

13   but -- and I would focus your attention on the column that

14   says threshold versus average, and this shows you the

15   difference between the 2014 threshold target and the average

16   performance for the last five years, correct?

17   A    Correct.  Correct.

18   Q    And you add six zeros to the end, right?

19   A    Correct.

20   Q    Okay.  We then have the next -- the next two figures --

21   I'm sorry -- the next two metrics, Luminant's scorecard

22   multiplier and TXU's scorecard multiplier, and these are in

23   percentages, right?

24   A    Correct.

25   Q    Okay.  And if you compare -- do you have a -- do you

1    have a general understanding of what these metrics are meant

2    to reflect?

3    A    A general understanding, yes.

4    Q    Okay.  Could you -- could you just explain that in

5    terms of --

6    A    Well the Luminant scorecard multiplier it's my

7    understanding it's taking into consideration the various

8    weighted scales on those Luminant performance metrics, and

9    the same scenario with the TXU Energy scorecard as well.

10   Q    So when you look at the targets for like 2014

11   threshold, for example, Luminant's scorecard multiplier is

12   50 percent, that is -- you're showing that as being 80

13   percent lower than what the average was for the last five

14   years, right?

15   A    Correct.

16   Q    And then when you go down to the last total, the EFH

17   total spend and the EFH Business Services SG&A direct costs,

18   those are dash those are cost-driven figures, correct?

19   A    Correct, they're cost driven, right.

20   Q    Okay.  So you want those figures to be lower rather

21   than higher, right?

22   A    Right.

23   Q    And in fact for the EFH total spend the numbers -- when

24   you compare the threshold to the average and the superior

25   average it is actually lower, correct?

1    A    They are actually lower, right.

2    Q    Okay.  But then when you get down to the direct cost

3    it's a little bit higher, right?

4    A    Slightly higher, right.

5    Q    Okay.  You can put that exhibit aside for the moment.

6         I would like to ask you, did you do any

7    calculations relating to the debtors' metrics for EBIDTA

8    that were not reflected on the charts?

9    A    I did.

10   Q    Okay.  And what did you compare?

11   A    I compared the actual EBIDTA to the threshold,

12   baseline, and superior targets for each of the years of 2009

13   through 2013 for Luminant, TXU, and Business Services.

14   Q    Okay.  So you looked at each year separately, right?

15   A    Yes.

16   Q    Okay.  And you -- for each year you were comparing the

17   actual results with the threshold, baseline, superior

18   targets that were set for that particular year, right?

19   A    Correct.

20   Q    Okay.  How did you -- so -- okay.  So you put -- you

21   got those figures and then did you average them in some

22   fashion?

23   A    Right, I took the actual EBIDTA, subtracted the

24   threshold amount, and obtain a difference, and I did that

25   for each, you know, consecutive years.  Took a five-year

1    average and converted it to a percentage.

2    Q    Okay.

3              MS. SARKESSIAN:  Your Honor, may I ask counsel a

4    question?

5              THE COURT:  Yeah.

6         (Pause)

7    BY MS. SARKESSIAN:

8    Q    So I've clarified it's not a problem with you giving

9    these numbers -- testifying to these numbers.  So I'm going

10   to ask you, could you tell us when you -- when you looked at

11   the Luminant EBIDTA -- when you looked at the actual results

12   compared to the threshold targets for each year and then you

13   average them over the five years what -- what figure did you

14   get?

15   A    Yeah, for the Luminant -- for Luminant management

16   EBIDTA it exceeded threshold amounts by 20.86 percent.

17   Q    Okay.  By 20.86?

18   A    20.86.

19   Q    All right.  And how about the -- how about the

20   baseline, when you compared the baseline target for each

21   year against the actual and then averaged it out what was

22   that number?

23   A    It exceeded by 4.74 percent.

24   Q    Okay.  The target -- I'm sorry -- the actuals exceeded

25   the target?

1   A    The actuals exceeded baseline target, right.

2   Q    Okay.  And then how about for the superior target?

3   A    The superior was not met.

4   Q    Okay.  And then the same question with respect to TXU

5   when you looked at the actual EBIDTA for each separate year

6   and you compared it to what the threshold target was and

7   then you average it over the five years what -- what number

8   did you get?

9   A    Well the TXU EBIDTA exceeded threshold levels by 42.42

10  percent.

11  Q    And how about the baseline?

12  A    Exceeded baseline by 13.54 percent.

13  Q    And how about superior?

14  A    3.52 percent.

15  Q    Okay.  So the -- just to clarify, so on average with

16  respect to TXU the actuals in every instance exceeded not

17  only the threshold, baseline, and superior as well?

18  A    For TXU, yes.

19  Q    Okay.  Now with respect to the Business Services EBIDTA

20  when you compared -- when you did that calculation for the

21  threshold targets what did you find?

22  A    The EBIDTA exceeded threshold amount -- the threshold

23  metric amounts by 22.68 percent.

24  Q    Okay.  And how about baseline targets?

25  A    2.26 percent.

1    Q      Is that exceeded or on --

2    A      Exceeded.  It actually exceeded the baseline.

3    Q      Okay.  And then how about superior?

4    A      And the superior was not met.

5    Q      If you looked at -- now you were just talking about

6    your averages over the last five years, but if you looked at

7    each one of the five years separately for 2009 to 2013 was

8    there any year in which Luminant, TXU, or Business Services

9    did not -- that their actual performance did not exceed the

10   threshold EBIDTA target?

11   A      Threshold -- they met the threshold consistently every

12   year.

13   Q      Okay.  So -- but never below the threshold?

14   A      But never below threshold.

15   Q      Okay.  And then again looking at each five years

16   separately were there any years in which Luminant, TXU, or

17   Business Services did not meet the baseline EBIDTA target,

18   the next higher target?

19   A      Yeah, I believe TXU Energy in 2011 did not meet the

20   baseline target.

21   Q      But the rest of the years they did --

22   A      Yeah.

23   Q      -- exceed baseline?

24   A      Yes.  Right.

25   Q      Okay.  Now, Mr. Panacio, I'm going draw your attention

1    to an exhibit that I believe has already been entered into

2    evidence, Exhibit 34 -- Trial Exhibit 34, and that should be

3    in your binder.

4    A    Okay.

5    Q    Okay.  Do you have that?

6    A    I do.

7    Q    Okay.  Do you recognize this document?

8    A    I do.

9    Q    Okay.  And who created this document?

10   A    I did.

11   Q    Does it have any relationship to any of the documents

12   that were attached to your declaration?

13   A    It's an exhibit attached to my declaration I believe.

14   Q    Are there any changes in this version as compared to

15   what was attached to your declaration?

16   A    There was some changes regarding rounding differences

17   and there was one entity, we had a transposition error on

18   Exelon Corporation, you do see the corrected amount for 2012

19   at 2.5-.

20   Q    Okay.

21   A    Million.  Net income of 2.5 million.

22   Q    Now can you explain in general terms what -- what this

23   document shows?

24   A    Reading the Frisky (ph) declaration and reading the EFH

25   insider compensation PowerPoint presentation they referred

1    to peer group companies using the basis for -- you know, for

2    generating their bonus programs.  But I wanted so see if

3    these peer group companies were actually comparable to EFH.

4    Q    So the -- in other words the company that's on the top

5    of the first page that is EFH, correct?

6    A    That's correct.

7    Q    Okay.  And --

8            THE COURT:  Are we -- I missed what exhibit we're

9    on.

10           MS. SARKESSIAN:  Oh, I'm sorry, Your Honor, it's

11   Exhibit --

12           THE COURT:  That's my fault.

13           MS. SARKESSIAN:  -- 34, which my understanding has

14   already been admitted into evidence on consent.

15           THE COURT:  It's the MOR?  No, okay.

16           MS. SARKESSIAN:  No, it's --

17           THE COURT:  Okay.  I see it.  Thank you.  Sorry,

18   my apologies.  You better actually back up then.

19           MS. SARKESSIAN:  Yeah, we'll back up.

20           THE COURT:  My apologies.

21           MS. SARKESSIAN:  Okay.

22   BY MS. SARKESSIAN:

23   Q    So, I think -- let me back up too.

24           So what -- is you already testified that this

25   document was attached to your declaration but it just had a

1    few corrections, right?

2    A    Correct.

3    Q    Okay.  So -- and then I asked you what the intention of

4    this document is.  What do you -- what do you show on this

5    document, if you could just repeat that for the judge now

6    that he has it in front of him.

7    A    Sure.  Based on my reading of the Frisky declaration

8    and EFH insider compensation PowerPoint presentation, I

9    think it was August 6th, they reference peer group

10   companies, which EFH kind of mirrors developing their own --

11   the bonus programs for executives.  So I wanted to see if

12   these peer group companies are actually comparable to EFH.

13   Q    Okay.  So on the first page at the top you actually

14   have EFH, correct?

15   A    I do.

16   Q    Okay.  Now the rest of the companies that are shown

17   here, where did you get the names of these companies?

18   A    Well the names -- two places actually.  From the Frisky

19   declaration and from the EFH insider compensation PowerPoint

20   presentation.

21   Q    And I'm just going call your attention to that

22   document, which is also in evidence as Exhibit 5, that

23   should be in your binder.  And ask if this is the insider

24   compensation document you were referring to?

25   A    Yes.

1    Q    Okay.  And do you recall what page actually showed the

2    -- the peer group companies?

3    A    It is page 63.

4    Q    Okay.  Now, I'd like to, while you're on that document,

5    I would also ask you is there a page in this document that

6    indicates from the companies that are listed on page 63 what

7    type of metrics they use?  For example, if they use EBIDTA

8    as a metric.  Do you recall there being something in this

9    document --

10   A    In this particular document, page 61 --

11   Q    Uh-huh.

12   A    -- the energy related companies use these various

13   metrics as a model in calculating their bonus programs.

14   Q    Okay.  And what does it show in terms of what

15   percentage of the companies -- these -- what we'll call peer

16   group companies --

17   A    Uh-huh.

18   Q    -- used EBIDTA as a metric in connection with the bonus

19   program?

20   A    Right.  Well again, understanding the -- this

21   particular page from the Towers Watson's study looking at

22   the year 2013, 20 percent of these companies use EBIDTA.

23   Q    Okay.  Now going back to the document you created,

24   which is Exhibit 34.

25   A    Okay.

1    Q     So the information with respect to the debtors and the

2    various other companies that are listed there, the operating

3    revenues, the net income or loss, and the long-term debt,

4    where did you get that information from?

5    A     From the SEC 10-K reports.

6    Q     Okay.  And were there any companies that were listed as

7    peer groups in the -- excuse me -- EFH insider compensation

8    materials from August 6, 2014?  Where there any in there

9    that you did not conclude on this chart?

10   A     I did not include American Electric Power Company and

11   the Dominion Resources, Inc.

12   Q     And why did you not include them?

13   A     I could not find any information on the -- you know,

14   regarding the SEC reports, the 10-Ks.

15   Q     Now looking at the column for net income or loss,

16   obviously numbers that are in parentheticals indicate

17   losses, correct?

18   A     Correct.

19   Q     And are these numbers also in billions?

20   A     They are in billions.

21   Q     Okay.  And the debtor shows net losses for those three

22   years shown, correct?

23   A     Correct.

24   Q     Okay.  Are there any other companies listed from this,

25   you know, peer group, that show net losses for any of these

```
 1    years?

 2    A     There are a few companies in specific years that have

 3    had a net loss.

 4    Q     Okay.

 5    A     But for the most part consistently they had a net

 6    income.

 7    Q     Okay.  So I see Cap Line for 2011 had a loss, and I

 8    think the only other one I see on the last page is NRG --

 9    I'm sorry, second to the last page -- NRG Energy has a loss

10    in 2013, correct?

11    A     Correct.

12    Q     And the rest of them for all the rest of the years

13    they're showing a net income gain, correct?

14    A     Correct.

15    Q     Okay.  Now are there any companies on this chart that

16    have the same -- approximate same amount of long-term debt

17    as the debtor does?

18    A     The closest on comparable is Duke Energy Corporation.

19    Q     Okay.  And that's the bottom of the first page, right?

20    A     That's the bottom of the first page, yeah.

21    Q     All right.  And if you compare the years 2013 for that

22    Duke Energy versus EFH and the numbers are -- look to me to

23    be exactly the same, right?

24    A     Virtually the same, right.

25    Q     38.2 billion, correct?
```

1    A    Correct.

2    Q    Okay.  Yet Duke Energy has shown net income -- positive

3    net income for the last three years, correct?

4    A    Correct.

5    Q    Okay.  So can you just explain why it was that wanted

6    to look at net income for these companies, these other

7    companies?

8    A    Well, I wanted to see the -- the financial condition of

9    these comparable companies, did they have the ability to

10   consistently pay bonuses of various -- to the various

11   executives, and I wanted to see if they actually can -- to

12   be able to service their long-term debt as well.

13   Q    I'm going to ask you to turn to what's been marked as

14   Exhibit 28, so that should also be in your binder?

15              THE COURT:  28?

16              MS. SARKESSIAN:  28.

17              THE COURT:  Thank you.

18        (Pause)

19              MS. SARKESSIAN:  Has Your Honor found that?

20              THE COURT:  I have.

21              MS. SARKESSIAN:  Okay.

22              THE COURT:  Thank you.

23   BY MS. SARKESSIAN:

24   Q    Mr. Panacio, have you seen this document before?

25   A    Yes.

1    Q    And who created this document?

2    A    I did.

3    Q    Okay.  And does this document have any connection to

4    the exhibits that were attached to your declaration?

5    A    Yes.

6    Q    Okay.  This was Exhibit D to your declaration, correct?

7    A    Correct.

8    Q    Okay.  And were there any changes that have been made

9    to this as far as you know?

10   A    This particular exhibit, no.

11   Q    Okay.  Now, could you just explain the information

12   that's on this exhibit, what this shows?

13   A    Well EFCH obviously it stands for Energy Future

14   Competitive Holdings Company, which has an indirect

15   ownership interest in Luminant and TXU.

16   Q    And then you also show information for EFH as well?

17   A    And information from the year 2009 through the year

18   2013 providing operating revenues, net income, in this case

19   net losses for most part, the working capital, and the long-

20   term debt.

21   Q    Mr. Panacio, I'd like to ask you what documents you

22   reviewed to put together the exhibits to your declaration

23   and also the information that is reflected in your

24   declaration, which some of which you've testified to today.

25   And I assume nobody has any objection he will actually look

1    at his declaration to refresh your recollection.  Is that --

2    would that be helpful?

3    A    That'd be helpful, yes, it would.

4    Q    Okay.  So your declaration is -- is marked as

5    Exhibit 24.

6    A    Right.

7    Q    Okay.  That is not in evidence.  It's just marked

8    currently for purposes of using it in court.

9    A    Okay.  I looked at the debtors' motion to pay certain

10   prepetition amounts on accounting insider compensation

11   programs, and continuing insider compensation programs in

12   the ordinary course of business.  I looked at the EFH

13   insider compensation discussion materials PowerPoint

14   presentation.

15   Q    And we've identified that as Exhibit 5, correct?

16   A    Correct.

17   Q    Sorry.  Go ahead.

18   A    I took a look at the declaration of Todd Filsinger in

19   support of the debtors' motion, the declaration of Douglas

20   Frisky in support of the debtors' motion, and --

21   Q    Maybe you could summarize --

22   A    -- and I looked over various scorecards for Luminant,

23   TXU, and business services from 2009 through 2013.

24   Q    Okay.  Anything else?

25   A    The SEC reports, 10-Ks.

1    Q    Okay.  If you'd just look at the top of page 3 just to

2    refresh your recollection, did you look the those documents

3    of paragraph 4?

4    A    Oh, correct.  With the Filsinger declaration I did look

5    -- obviously look at table 1-4 and 1-3.

6    Q    And that had what kind of information?

7    A    That had the actual (indiscernible - 11:12:14) June

8    results for the second half of the year and actually had the

9    insider metric performance levels.

10   Q    Okay.  Is that it?

11   A    That's it.

12   Q    Okay.  I'm sorry, I'm not finished yet, I just want to

13   make sure your answer was.  Okay.

14           Mr. Panacio, were you in court last Wednesday when

15   Mr. McFarland testified?

16   A    Mr. McFarland, yeah, I was.

17   Q    Okay.  Do you recall him testifying to the amount of

18   hedging gains -- or gains from -- hedging gains for the

19   years 2012 and 2013?  Do you recall he gave some testimony

20   on that?

21   A    I do recall that.

22   Q    Okay.  Do you recall in particular what numbers he

23   gave?

24   A    Again, just based on memory, I believe in the year 2012

25   it was somewhere in the neighborhood of like 1.8 billion,

1    and in 2013 I guess -- I think it was close to a billion

2    dollars.

3    Q    Okay.  Now do you recall seeing anything in any of the

4    debtors' public filings that would refer to gains made in

5    connection with hedging?

6    A    The only document I noticed that was in the 10-K --

7    Q    Okay.

8    A    -- 2013.

9    Q    Okay.

10         MS. SARKESSIAN:  And, Your Honor, I would like to

11   provide copies of that to the Court and the witness, please.

12         THE COURT:  Okay.

13        (Pause)

14   BY MS. SARKESSIAN:

15   Q    So the document that I've handed you, which I've marked

16   as Exhibit 37, is -- could you identify this document,

17   please.

18   A    This is the form 10-K for Energy Future Competitive

19   Holdings Company LLC.

20   Q    Okay.  And do you recall seeing this document

21   previously?

22   A    Yes, previously.

23   Q    Okay.  Because this is such a large document and if

24   there's no objection I would like to call the witness's

25   attention to particular pages so he doesn't have to rifle

1    through.

2              THE COURT:  No objection.

3              MR. MCKANE:  No objection.

4    BY MS. SARKESSIAN:

5    Q    Now, I'd first like to call your attention --

6              THE COURT:  By either of us.  I apologize.

7         (Laughter)

8              MR. MCKANE:  You stole my line.

9    BY MS. SARKESSIAN:

10   Q    I'd first I call your attention -- I would like to

11   first call your attention to page 159 -- it's 159 of 325 it

12   says in the upper right corner.

13   A    Okay.  I got it.

14   Q    Just give everybody a minute to get there.

15             And is there any information -- well first of all

16   what are we -- what are we looking at on this page?

17   A    We are looking at the income statement.

18   Q    Okay.

19   A    For Energy Future Competitive Holdings Company LLC.

20   Q    Okay.  So is there any information on this page that

21   relates to gains or losses from hedging activity?

22   A    The third line item net gain loss from commodity

23   hedging and trading activities.

24   Q    Okay.  And what number does it have for 2013?

25   A    A loss of $54 million.

1    Q    Okay.  And what number does it have for 2012?

2    A    A gain -- or a net gain of $389 million.

3    Q    Okay.  So these numbers are different than the ones

4    that Mr. McFarland testified to, right?

5    A    Yes.

6    Q    Okay.  And I'd like to call your attention to another

7    page, which in the upper right-hand corner says page 93 of

8    325.

9              THE COURT:  I'm sorry, what number?

10             MS. SARKESSIAN:  Ninety-three of 325 in the upper

11   right corner.

12             THE WITNESS:  Okay.

13   BY MS. SARKESSIAN:

14   Q    Okay.  And is there any information on this page that

15   relates to hedging?

16   A    I guess about the middle of the page there's a

17   sentence, "Natural gas positions have resulted in the

18   reported gains losses as follows."

19   Q    Okay.  And then where it says net -- the first --

20   you're looking at the little chart in the middle of the

21   page, right?

22   A    Correct, I'm looking at the little chart, right.

23   Q    So then the line that says net realized gains, what

24   does that show for 2013/2012?

25   Q    2013 is 998 million, and 2012 is $1.8 billion.

1    Q    So that's similar to the numbers Mr. McFarland

2    testified to, right?

3    A    Yes.

4    Q    Okay.  And then below that what's the next line below

5    that show?

6    A    It showed the unrealized net losses, including

7    reversals of previously recorded amounts related to position

8    (indiscernible - 11:17:27).

9    Q    And those are various negative numbers in the billions,

10   correct?

11   A    Yeah, they're -- right, they're offsetting the losses,

12   right.

13   Q    And then when you -- the third line is the total of

14   those two lines, correct?

15   A    Correct.

16   Q    And what does that show for 2013/2012?

17   A    2013 has a loss of 35 million.

18   Q    And how about 2012?

19   A    2012 is a $293 million net gain.

20   Q    Okay.

21           MS. SARKESSIAN:  Your Honor, I would just ask the

22   Court's preference as to moving in my -- I have a few

23   exhibits that have not been moved into evidence.  Do we want

24   to do that now or after they finish their cross-examination?

25           THE COURT:  Let's -- well let's see if we can move

1    them in now.

2            MS. SARKESSIAN:  All right.

3            THE COURT:  And if there are any issues we can

4    identify them and we may wait for cross to see if they're

5    resolved.

6            MS. SARKESSIAN:  Okay.  So first I would like to

7    move in the Exhibit 36, which is the corrected charts that

8    were previously attached to Mr. Panacio's declaration as

9    Exhibit D.

10           MR. MCKANE:  We have no objection to 36.

11           THE COURT:  All right.  It's admitted without

12    objection.

13        (Trial Exhibit No. 36 was admitted)

14           MR. MCKANE:  And just for the purposes of the

15    record we'd ask that the file copy be redacted for 36.

16           THE COURT:  Yes, of course.

17           MR. MCKANE:  Thank you, Your Honor.

18           MS. SARKESSIAN:  The next exhibit I have is --

19    well Trial Exhibit 34, which was Exhibit C to Mr. Panacio's

20    declaration.  My understanding that it's already been

21    admitted into evidence, correct?  That's the peer company --

22           THE COURT:  Yes.

23           MS. SARKESSIAN:  -- right?  Okay.

24           And then I would move for admission of Trial

25    Exhibit 28, which was Exhibit D to Mr. Panacio's

1    declaration.

2              MR. MCKANE:  No objection.

3              THE COURT:  Okay.

4         (Trial Exhibit No. 28 was admitted)

5              MS. SARKESSIAN:  And finally I would move for

6    admission of the 10-K of Energy Future Competitive Holding

7    Company LLC.

8              THE COURT:  37.

9              MR. MCKANE:  37, no objection.

10             THE COURT:  All right.

11        (Trial Exhibit No. 37 was admitted)

12             MS. SARKESSIAN:  Thank you, Your Honor.

13             THE COURT:  You're welcome.

14        (Pause)

15             MR. MCKANE:  May I proceed, Your Honor?

16             THE COURT:  Yes.

17             MR. MCKANE:  For the record, Mark McKane of

18   Kirkland & Ellis on behalf of the debtors.

19   CROSS-EXAMINATION

20   BY MR. MCKANE:

21   Q    Good morning, Mr. Panacio.

22   A    Good morning, Mr. McKane.

23   Q    Now, sir, you've worked at the UST -- the United States

24   Trustee's Office for about 14 years, correct?

25   A    Correct.

1    Q    And you've been an auditor in that capacity during that

2    time?

3    A    I have.

4    Q    And you've been an accountant for over 30 years?

5    A    Correct.

6    Q    And in your 30 years of experience as an accountant you

7    have not designed any compensation plans, have you?

8    A    I have not.

9    Q    And you've not worked in the energy industry before?

10   A    I have not.

11   Q    And you've never been involved in the budgeting process

12   of a power company, correct?

13   A    I have not.

14   Q    Okay.  And you have not chosen metrics to use with

15   incentive compensation plans, have you?

16   A    I have not.

17   Q    And you did not review the 2014 budget for EFH,

18   Luminant, or TXU Energy in preparing to testify today?

19   A    I have not.

20   Q    And, sir, you do not consider yourself an energy or

21   power expert do you?

22   A    I'm not an expert, no.

23   Q    And you don't consider yourself an expert in executive

24   compensation packages either do you?

25   A    Right, correct.

```
1    Q    And, sir, in your role as an accountant you've read the

2    entire Filsinger declaration, right?

3    A    Excuse me.  Yes.

4    Q    And, sir,  is there anything in the Filsinger

5    declaration that you found incorrect?

6              MS. SARKESSIAN:  Objection, Your Honor, he's not

7    an expert in the area.

8    BY MR. MCKANE:

9    Q    Well, sir, let me just ask you another way.

10             Is there anything in the Filsinger declaration

11   report that you found incorrect as an accountant?

12   A    No.

13   Q    Okay.  Sir, let's turn to the first set of analysis

14   that you did, specifically regarding an evaluation of the

15   metrics in relation to a five-year historical average, okay?

16   A    Okay.

17   Q    All right.  Sir, you're not providing any opinions or

18   conclusions as to whether the debtors' metrics are

19   incentivizing are you?

20   A    I am not.

21   Q    All you're doing is trying to present data for others

22   to make that conclusion, correct?

23   A    That is correct.

24   Q    And, sir, the average of the historical numbers you

25   compared them, you took that five-year historical average
```

1    and did a comparison to this year's metrics, correct?

2    A    That is correct.

3    Q    And you just took a standard average, correct?

4    A    That's correct.

5    Q    And then in comparing the five-year average to the

6    actuals you only looked to see if the metric was above or

7    below the actuals, correct?

8    A    That is correct.

9    Q    In essence you prepared a variance report, right?

10   A    That's correct.

11   Q    And to perform the analysis that you did you didn't

12   actually need to understand any of the underlying analysis

13   that led up to those metrics, correct?

14              MS. SARKESSIAN:  Objection.

15              THE COURT:  Basis?

16              MS. SARKESSIAN:  I think the question is

17   confusing.

18              THE COURT:  Well, I don't -- do you understand the

19   question, Mr. Panacio?

20              THE WITNESS:  Sorry, can you repeat the question

21   one more time?

22   BY MR. MCKANE:

23   Q    Sure.  The metrics --

24   A    Right.

25   Q    -- right, you understand that they were set by

1    professionals at EFH, right?

2    A    That is correct, right.

3    Q    And you understand that there was a considerable

4    process that led up to the decision to make one metric a

5    threshold, the actual numbers within the metrics, you

6    understand that?

7              MS. SARKESSIAN:  Objection, it's outside of this

8    witness' knowledge.

9              THE COURT:  Where are you trying to go with that?

10             MR. MCKANE:  Sir, I just want to establish to do

11   the analysis that he did it's absolutely wholly independent

12   of this company or this process.  I can -- I can do this a

13   couple different ways.

14             THE COURT:  Well why don't you just -- all right,

15   I see where you're headed.

16             MR. MCKANE:  Well, actually --

17             THE COURT:  Try to phrase it precisely, if you

18   could.

19             MR. MCKANE:  Sure.

20   BY MR. MCKANE:

21   Q    To do the variance analysis you did you didn't need to

22   understand the underlying performance of the company,

23   correct?

24   A    That's correct.

25   Q    And you didn't need to understand how market conditions

1    for this company may have changed over the years, correct?

2              MS. SARKESSIAN:  Your Honor, I'm still going to

3    object to the form of question as to what he needed to

4    understand.  I think it's confusing.

5              THE COURT:  I don't --

6              MS. SARKESSIAN:  He could ask what he took into

7    account and what he didn't take into account perhaps.

8              THE COURT:  Yeah, I don't like the use of the

9    words understand, I think it's a way to -- or a loaded word,

10   so.

11             MR. MCKANE:  I'll rephrase.

12   BY MR. MCKANE:

13   Q    To perform the analysis that you did you did not

14   account for any changes in market conditions over time,

15   correct?

16   A    Correct.

17   Q    And to perform the averaging you did it was wholly

18   independent of the type of company EFH is, right?

19             MS. SARKESSIAN:  Objection to form.

20             THE COURT:  Overruled.

21             THE WITNESS:  Well, I strictly used the data on

22   the particular scorecards, right.

23   BY MR. MCKANE:

24   Q    Right.  And so the analysis that you did is independent

25   of the company or the industry that EFH is in, right?

1    A     Correct.

2    Q    Now, sir, in performing that analysis you did not take

3    into account any impact on any of the numbers from the

4    company's hedging program; is that right?

5    A     That is correct.

6    Q    And you did not consider the impact of the hedging

7    program on a number like EBIDTA because you did not know

8    what that impact was, right?

9    A     I did not know specific details of the impact, correct.

10   Q    Right.  Now, sir, based on your experience at the

11   United States Trustee's Office you know that the United

12   States Trustee's Office gets involved in bankruptcies even

13   before the bankruptcy filing occurs, correct?

14   A     Correct.

15   Q    And you understand that representatives from the United

16   States Trustee's Office was in court on the first day for

17   the first day hearing?

18   A     Right.

19   Q    And --

20          MR. MCKANE:  Your Honor, I request to approach and

21   mark an exhibit.

22          THE COURT:  All right.  We'll mark this 38 for

23   identification purposes.  Thanks.

24       (Trial Exhibit No. 38 was marked)

25   BY MR. MCKANE:

1    Q    Mr. Panacio -- Panacio, I apologize.  What has been

2    marked for identification purposes as Exhibit 38 was the

3    first day presentation by Mr. Sassower.  I'd ask that you

4    mark because there's no pages --

5    A    Okay.

6    Q    -- no page numbers, excuse me -- because there's no

7    page numbers I've put a flag on the page that I'd like to

8    cover.

9    A    Okay.

10   Q    Do you see it, sir?

11   A    I do.

12   Q    It's the -- it's a slide from Mr. Sassower's

13   presentation that discusses how the company used a long-term

14   hedging program to stabilize cash flows and minimize

15   downside risks from natural gas prices.  Do you see that,

16   sir?

17   A    I see that.

18   Q    And, sir, do you see the cash flows from hedging

19   activities that are identified on that page, sir?

20   A    I do.

21   Q    And, sir, the amounts presented for 2011, '12, and '13,

22   do you recognize those, sir?

23   A    I do.

24   Q    And, sir, those -- you were here for Mr. McFarland's

25   testimony?

1    A    Yes.

2    Q    Are those the numbers for '11, '12, and '13 consistent

3    with Mr. McFarland's testimony?

4            THE COURT:  If you know.

5            THE WITNESS:  The year 2012 I recognize that --

6    2011 is it slightly off a bit, but it's in the ballpark,

7    right.

8    BY MR. MCKANE:

9    Q    It's in the ballpark.

10   A    Right.

11   Q    And, sir, did anyone from the United States Trustee's

12   Office provide you with Mr. Sassower's presentation for your

13   consideration in preparing to testify today?

14   A    No.

15   Q    Sir, you referred to the 10-K for EFCH in your

16   testifying -- when discussing the hedging program; do you

17   recall that, sir?

18   A    Yes.

19   Q    And in particular I believe you focused part of your

20   testimony on page the 93.

21   A    Okay.

22           THE COURT:  Where are we?

23           MR. MCKANE:  It's page 93, Your Honor, of

24   Exhibit 37, it is the multi 100-page document that is the

25   2013 10-K.

1          THE COURT:  All right.  It was previously -- okay,

2     I'm here.

3          MR. MCKANE:  All right.

4          THE COURT:  I'm there.

5     BY MR. MCKANE:

6     Q    And, sir, if we could go to page 93, which is the page

7     that -- one of the pages that I believe was covered in his

8     direct examination.

9          THE COURT:  Got it.

10    BY MR. MCKANE:

11    Q    Are you with me, sir?

12    A    Yes.

13    Q    Sir, from an accounting perspective do you understand

14    there's a difference between mark to market accounting and

15    accounting for realized and unrealized gains?

16    A    In general terms I'm familiar with those terms.

17    Q    In general terms.

18    A    Yes.

19    Q    So do you know whether EFH presents mark to market

20    accounting in its 10-K or whether it presents it as realized

21    and unrealized gains?

22    A    It was my -- it was my understanding it was realized

23    gains -- realized and unrealized gains.

24    Q    And sir, you've marked -- as represented mark to market

25    accounting in the analyze of its cash flows would that

1    account for the difference between the presentation in the

2    SEC program and Mr. Sassower's presentation?

3    A    I believe it would, yeah.

4    Q    Sir, I was going to ask you about Exhibit B to your

5    declaration, but though I think the best document to use is

6    the modified version of that that is Exhibit 36.

7    A    Okay.

8    Q    Can you get that, sir?

9    A    Okay.

10   Q    And, sir, I'd like to ask you some questions about the

11   first page of that document, specifically regarding Luminant

12   Cap X.  Are you with me, sir?

13   A    Got it.

14   Q    All right.  Now, in the -- in the -- in Exhibit 36 --

15   let me just confirm for the record.  Exhibit 26 is the

16   earlier version of your Exhibit B, correct?

17   A    Right.

18   Q    Right.  And Exhibit 26 there is a different number for

19   the Luminant Cap X that's reflected in the average, correct?

20   A    There was.

21   Q    And it was revised up to exhibit -- to the 685 number

22   that's represented in Exhibit 36, correct?

23   A    Correct.

24   Q    All right.  Now the NA that was presented in the 2009

25   actuals, sir --

1    A    Right.

2    Q    -- right.  Originally you had that as a zero number in

3    your analysis, correct?

4    A    I did.

5    Q    But the underlying documentation did not present it as

6    a zero; is that right?

7    A    Right.

8    Q    Right.  And, sir, can we go to the documentation?  That

9    is Exhibit 3?

10            MS. SARKESSIAN:  Your Honor, objection based on

11   relevance.  We've already -- the witness has already

12   testified the number was wrong and he corrected it.

13            THE COURT:  Well, he's allowed to cross-examine on

14   it.  Exhibit 3?

15            MR. MCKANE:  It's Exhibit 3, Your Honor.  It's

16   almost -- it's near the end of the documents.  In fact it's

17   the second to last page, it says on the top 2009 Luminant

18   funding scorecard.

19            THE COURT:  Okay.

20   BY MR. MCKANE:

21   Q    Sir, you are me?

22   A    Yes, I am.

23   Q    And let me direct you attention to the last performance

24   metric, the one that says, "Luminant management EBIDTA less

25   Cap X, for Oak Grove and Sandel."  You see that, sir?

1    A    I see that.

2    Q    Is it the 443 that's reflected -- sorry, excuse me.   Is

3    it the 410 that's reflected in the 2009 actuals as a

4    negative number that originally -- that caused this

5    confusion?

6    A    Yes, it was.

7    Q    Now, sir, this negative number is a difference between

8    two numbers, correct?  Let me ask it another way.

9         The metric -- is Luminant management EBIDTA less

10   Cap X.

11   A    Right.

12   Q    Right?

13   A    Right.

14   Q    Now, sir, you know that there's a problem when you see

15   a negative number in a capital expenditure, right?

16   A    Of course, right.

17   Q    Right.

18   A    Right.

19   Q    Does looking at the underlying data here indicate to

20   you that in 2009 Luminant had positive Cap X but yet that

21   number was greater than the amount of management EBIDTA for

22   Oak Grove and Sandel?

23   A    That's right.

24   Q    Now, sir, did you ask anyone at the company to clarify

25   this issue for you?

1    A    I did not.

2    Q    And, sir, did you look to any secondary sources to

3    determine whether -- what the Cap X number would have been

4    for 2009 for Luminant?

5    A    I did not.

6    Q    Sir, in the 2009 10-K for EFCH would you expect Cap X

7    to be a line item in the financial statements?

8    A    Sure.

9            MR. MCKANE:  Your Honor, may I approach to mark

10    another exhibit?

11           THE COURT:  Yes, I'm sorry.

12       (Trial Exhibit No. 39 was marked)

13           THE COURT:  This is marked 39 for identification.

14    BY MR. MCKANE:

15    Q    And, Mr. Panacio, I recognize again it's a multi 100-

16    page document.  Could I direct you attention to page 200?

17    A    Okay.

18    Q    And for the record, sir, do you recognize Exhibit 39 as

19    the form 10-K for Energy Future Holding that was filed with

20    the SEC for the year 2009?

21    A    Yes.

22    Q    And it's page again for the record 200.

23           THE COURT:  Did you mark it for her?

24           MR. MCKANE:  I did put a tab on it.  I didn't?

25    Here.  I thought we had tabs for everyone.

1          THE COURT:  It's about half through.

2          MR. MCKANE:  Yes.

3          THE COURT:  Almost exactly.

4          MR. MCKANE:  Okay.

5    BY MR. MCKANE:

6    Q    Mr. Panacio, you have a tab on yours?

7    A    I do.

8    Q    Sir, do you see the line items on page 200 of the 2009

9    10-Ks for EFCH that reflects capital expenditures?

10   A    I do.

11   Q    And, sir, do you see the specific line item as it

12   relates to I believe competitor electric capital

13   expenditures?

14   A    I do.

15   Q    Sir, what do you understand that line item to be?

16   A    It's about $1.3 billion.

17   Q    $1.3 billion.  And, sir, how does that $1.3 billion of

18   capital expenditure compare to the other Cap X years that

19   you used in Exhibit 36 of your chart?

20   A    Well in the following years it was the declining Cap X

21   figures.

22   Q    Right.  And 1.3 is almost two times any other year,

23   correct?

24   A    Right.

25   Q    And, sir, do you know in 2009 whether EFH was

1    completing the construction of two power plants?

2    A    I do not recall that, no.

3    Q    And, sir, would the inclusion of 1.3 actually skew the

4    numbers considerably higher for Cap X?

5    A    It would.

6    Q    All right.  And is that kind of a one -- a type of one-

7    time event that you might try to exclude from a five-year

8    average?

9    A    I certainly would footnote it, yes.

10   Q    And, sir, to be precise in your -- going back to 36,

11   your average once you do the bid four-year average?

12   A    Yes, I got it.

13   Q    Okay.  Am I correct that when you made the revision to

14   use the 685 average for the four years it altered your

15   conclusion as to the relationship between the historical

16   average and the metrics for 2014?

17   A    It did.

18   Q    And in fact it went from being below the metrics to

19   above all of the metrics?

20   A    Above it, right.

21   Q    Now, Mr. Panacio, you took a separate approach where

22   you took the half year results and multiplied them by two,

23   correct?

24   A    Correct.

25   Q    Now if I refer to the half year forecast, if I use that

1    term would you understand what I mean?

2    A    Yes.

3    Q    All right.  And, sir, is it your belief that applying

4    that half year forecast was an appropriate means by which to

5    evaluate Luminant EBIDTA?

6    A    I took the approach considering all things equal of the

7    first half of the year applying to the second half of the

8    year.

9    Q    Okay.  And you thought that was an appropriate means by

10   which to evaluate Luminant EBIDTA?

11   A    I was taking the viewpoint all the variables were

12   considered from 2009 to 2013 for EBIDTA.  Those variables

13   would stay consistent, right, for the second half of this

14   year, right.

15   Q    Right.  And based on that assumption that the variables

16   would remain the same you thought it was appropriate?

17   A    It was certainly my viewpoint doing this exercise, yes.

18   Q    Okay.  And you took that same approach in performing

19   this exercise for TXU Energy's EBIDTA, correct?

20   A    Yes.

21   Q    And you understand, sir, that the debtors don't take

22   this type pro rata approach in performing its own budgeting,

23   right?

24        MS. SARKESSIAN:  Objection, it's outside of the

25   witness's knowledge.

```
 1              THE COURT:  Well he's been here.  Overruled.

 2              THE WITNESS:  I'm (indiscernible - 11:39:10)

 3     specifically to methodologies, but understand, yes.

 4     BY MR. MCKANE:

 5     Q    I'm sorry, can you --

 6     A    Can you repeat the question, again?

 7     Q    Sure.  Sir, is it your understanding that the debtors

 8     do not employ the same approach of making a pro rata

 9     projection off of a portion of the year?

10     A    Right.

11     Q    Sir, in performing this half year forecast you did not

12     take into consideration -- or let me -- I'll say it again.

13     You did not account for any changes in market conditions

14     over the course of the year, correct?

15     A    Correct.

16     Q    And, sir, you understand that the debtors' EBIDTA is

17     impacted by power prices, right?

18     A    Correct.

19     Q    And you did not account for current power prices in

20     this half year forecast, right?

21     A    In this half -- right, correct.

22     Q    And you understand, sir, that the debtors' EBIDTA is

23     impacted by current costs, right?

24     A    Yes.

25     Q    And you did not account for current fuel or emission or
```

1    other variable costs changes in doing this forecast; is that

2    right?

3    A    Yes.

4    Q    And, sir, you agree with me that limited -- for limited

5    to generate earnings it has to generate revenue, right?

6    A    Sure.

7    Q    And to generate revenue it has to sell power, right?

8    A    Correct.

9    Q    And to sell power it has to produce power, right?

10   A    Right.

11   Q    And you agree with me that if seasonality impacts

12   limited's ability to sell power it impacts its ability to

13   generate EBIDTA, right?

14   A    Right.

15   Q    And, sir, you don't know whether Luminant and TXU

16   Energy project the same amount of income for each quarter do

17   you?

18   A    No.  Not specifically each quarter, no.

19   Q    And a half year forecast does not account for any

20   seasonality in Luminant's or TXU Energy's business, correct?

21   A    They do not.

22   Q    And, sir, I believe you covered this, but EBIDTA is the

23   highest weighted target -- excuse me.  EBIDTA is the highest

24   weighted metric for Luminant, correct?

25   A    Correct.

1    Q    And EBIDTA is the highest weighted metric to TXU

2    Energy, correct?

3    A    Correct.

4    Q    And based on your half year forecast you concluded that

5    the forecasted results for 2014 would be higher than

6    superior for competitive EBIDTA, right?

7    A    You mean (indiscernible - 11:41:24) or --

8    Q    No, so let me go to the third page of Exhibit 36.  I'll

9    help you, sir.  I apologize.

10   A    Okay.

11   Q    Are you with me?

12   A    Yes.

13   Q    Now the first line item on the third page refers to EFH

14   management/competitive EBIDTA, right?

15   A    Right.

16   Q    And, sir, you understand that that line item for

17   competitive EBIDTA is the sum of the Luminant and the TXU

18   Energy EBIDTA, right?

19   A    Right.

20   Q    And, sir, you saw that in the far right-hand column

21   based on your projection of the half year results you

22   believed that had they would exceed superior -- the superior

23   target.  Do you see that, sir?

24   A    Yes, I do.

25   Q    And -- and you believe, sir, then unless there's any

1    type of unforeseen event it would be appropriate to use a

2    half year forecast to project out a full year's expected

3    results, right?

4    A    All things being equal in the first half of the year,

5    yeah, I projected it out, for the second half of the year as

6    well.

7    Q    Right.  But one thing you might exclude for is a

8    unforeseen or one-time event, correct?

9    A    Correct.

10   Q    And so those are two different things.  You could have

11   a one-time event or an unforeseen event.

12   A    Correct.

13   Q    And if you had one of those events you would back that

14   out from your analysis, correct?

15   A    I would.

16   Q    Now, sir, at the time you prepared this analysis you

17   did not know whether in the first half of 2014 there was a

18   significant one-time event that impacted competitive EBIDTA,

19   correct?

20   A    Correct.

21   Q    And, sir, you did not investigate whether there was,

22   you know, any such one-time event, correct?

23   A    Correct.

24   Q    And you didn't ask anyone at the company whether there

25   were any such one-time events?

1    A    I did not.

2    Q    Now, sir, for example, you did not in this analysis of

3    the half year account for any scheduled outages for -- at

4    Comanche Peak, the nuclear power plant that are scheduled

5    for the fourth quarter of the year; is that right?

6    A    I -- right, correct.

7    Q    And that would be a one-time event, right?

8    A    Right.

9    Q    And at the time you prepared the analysis you weren't

10   aware whether bankruptcy was an event of default under

11   certain hedging agreements, right?

12   A    Correct.

13   Q    And, Mr. Panacio, you were here and you heard

14   Mr. McFarland testify that the cancellation of the hedging

15   from the bankruptcy filing caused a one-time realized event

16   of over 400 million in revenue, right?

17   A    Right, correct, heard that.

18   Q    And, sir, by doubling the -- that one-time event of

19   400 million in EBIDTA happened in the first half of the

20   year, right?

21   A    Right.

22   Q    And, sir, by doubling the first six months of the

23   year's EBIDTA you doubled the impact of that event, correct?

24   A    Correct.

25   Q    Actually if we could go back to Exhibit 36, that third

1   page again.

2   A    Okay.

3   Q    You see where you projected exceeds superior's, sir?

4   A    The first line, yes.

5   Q    Yeah.  Without saying the amount --

6   A    I won't.

7   Q    -- do you recognize was it the projections you have for

8   the year are?

9   A    Yes.

10  Q    All right.  And you see the threshold levels, right?

11  A    Right.

12  Q    And the baseline and the superior?

13  A    Right.

14  Q    Sir, if you removed $462 million from the calculation

15  because it was a one-time event that occurred due to the

16  bankruptcy filing what impact would that have on whether

17  your projected forecast is above or below the threshold

18  level?

19  A    Using 462- it would be below.

20  Q    So in other words it would change your conclusion from

21  having the projected forecast exceed superior to be reduced

22  down, so that would be below threshold?

23  A    Right, (indiscernible - 11:45:12) but it would be.

24  Q    And I don't want to say the exact amount because I --

25  A    I don't want to.

1    Q    Thank you, sir.

2         And so you agree, sir, that major unanticipated

3    events can have a direct impact on EBIDTA?

4    A    Sure, yes.

5    Q    Okay.  Sir, let's talk for a minute about power prices.

6         Sir, based on your review of the Filsinger report

7    and being in the court you understand that power prices can

8    vary, right?

9    A    I understand.

10   Q    And, Mr. Panacio, based on your review of the Filsinger

11   report did you see that power prices in a 60-day span from

12   the end of May to the -- to nearly the end of July dropped

13   by $10?

14   A    I did see that.

15   Q    You did see that.  And so that drop of $10 was a drop

16   from $43 down to $33, right?

17   A    Right.

18   Q    And that was a drop of nearly 25 percent?

19   A    Right.

20   Q    And, sir, you didn't incorporate what impact a decline

21   of that magnitude in power prices would have on EBIDTA did

22   you?

23   A    I did not.

24   Q    And, sir, your analysis also didn't incorporate any

25   related shifts in gas prices did you?

1    A    It did not.

2    Q    And, for example, from your review of Mr. Filsinger's

3    record you saw that there was an equivalent $6 change in gas

4    prices during that same time period, right?

5    A    Right.

6    Q    And you did not account for what impact that $6 change

7    in gas prices would have on EBIDTA for Luminant or TXU

8    Energy, correct?

9    A    Correct.

10   Q    And, sir, you also did not account for any changes in

11   heat rates during the first half of the year, right?

12   A    I did not.

13   Q    Now, sir, by performing this analysis you're not

14   suggesting in any way that you're in a better position than

15   the professionals at EFH to develop a full year forecast are

16   you?

17   A    I am not.

18   Q    And, sir, you don't have any reason to believe that the

19   EFH management team did not exercise their sound business

20   judgment in developing the company's 2014 forecast are you?

21   A    I am not.

22   Q    Mr. Panacio, if we could I'd like to turn to the next

23   part of you testimony, which I believe related to Exhibit D

24   of your declaration, which is Exhibit 28.

25   A    Okay, I'm there.

1    Q    All right.

2         (Pause)

3              THE COURT:  Oh, I'm sorry --

4              MR. MCKANE:  May I proceed?

5              THE COURT:  -- are you waiting for me?  I'm good.

6    Thank you.  I apologize.

7    BY MR. MCKANE:

8    Q    Now, sir, in Exhibit 28 you presented what EFH's net

9    loss was for years 2009 through 2013, correct?

10   A    Correct.

11   Q    In fact it had a net income in 2009 and then had net

12   losses in the subsequent years, correct?

13   A    (Indiscernible - 11:48:42) years, right.

14   Q    Okay.  And, sir, when you developed your peer company

15   analysis you went back to see whether those companies had

16   net losses as well, right?

17   A    Right.

18   Q    And you extracted this information from your reviews of

19   EFH's SEC filings, correct?

20   A    Correct.

21   Q    In your analysis of those filings did you come to any

22   conclusion as to why EFH had a net loss in 2010 through

23   2013?

24   A    Well obviously for various reasons, but I guess the

25   main driving factor is their debt service.

1   Q    The main driving -- I'm sorry --

2   A    The main driving factor for net loss is due to their

3   debt service.

4   Q    And, sir, you haven't rendered an opinion as to whether

5   EBIDTA or net income/loss is a better metric to use for

6   incentive compensation have you?

7   A    I have -- I have not.

8   Q    And, sir, in developing your analysis you didn't review

9   the peer group's compensation programs did you?

10  A    I did not.

11  Q    And you didn't perform any analysis of the incentive

12  programs to that peer group, right?

13  A    For those peer groups, no.

14  Q    And you didn't independently review what compensation

15  programs those companies may or may not have, right?

16  A    Right.

17  Q    So you don't know, for example, what the specific

18  metrics are that are used by any one of the 13 companies

19  that you evaluated?

20  A    That's correct.

21  Q    So to the extent, sir, that you were drawing any

22  conclusions under what circumstances incentive compensation

23  might be paid at those peer companies you weren't looking at

24  the underlying programs themselves, right?

25  A    I was not -- right, correct.

1   Q    And, sir, do you know any reason why EFH if it wanted

2   to could not have used a net income metric with a negative

3   number to incentivize its management team?

4          MS. SARKESSIAN:  I'm sorry --

5          THE WITNESS:  I'm sorry, I don't understand the

6   question, sir.

7   BY MR. MCKANE:

8   Q    Let's say it another way.  So you identified that

9   there's a net loss --

10  A    Right.

11  Q    -- right?  And there's -- and there's sometimes --

12  there's net income in some of the peer companies but every

13  once in a while there's a net loss as well, right?

14  A    Right.

15  Q    But you don't know even evaluating that amount how that

16  squares with any of the company's compensation programs,

17  right?

18  A    Right.

19  Q    So to the extent that there's a net income or net loss

20  metric you don't know whether that's a positive or negative

21  number, right?

22  A    Right.

23  Q    Now, sir, you testified that only 20 percent of energy

24  companies use EBIDTA in incentive compensation; do you

25  recall that?

1    A    Yes.

2    Q    All right.  Now that conclusion is not based on any

3    study of energy companies that you performed, right?

4    A    Correct.

5    Q    That's based on a review of a slide -- of a summary of

6    Towers Watson's work?

7    A    Yes.

8    Q    All right.  Let's go to that.  That's Exhibit 5,

9    page 61.

10             THE COURT:  Go ahead.

11             MR. MCKANE:  Thank you, Your Honor.

12             THE WITNESS:  Okay.

13   BY MR. MCKANE:

14   Q    And, sir, you reviewed this slide, slide 61 of the

15   August presentation in preparing your declaration and

16   preparing to testify today, right?

17   A    Yes.

18   Q    And this slide summarizes a recent Towers Watson study,

19   right?

20   A    Right.

21   Q    And Towers Watson found that a majority of companies in

22   the energy industry used earnings-based goals in their

23   annual or long-term incentive plans, right?

24   A    Right.

25   Q    And you don't have any reason to doubt the accuracy of

1    that conclusion do you?

2    A    No.

3    Q    All right.  And in fact you used this slide to know

4    that 20 percent of the companies use EBIDTA, right?

5    A    Right.

6    Q    And, sir, it's not that 80 percent of the companies use

7    net income; is that right?

8    A    Right.

9    Q    Only 32 percent use net income in 2013, correct?

10   A    Right.

11   Q    And sir, just stepping back for a second, you -- just

12   from the basics -- you agree with me that EBIDTA excludes

13   interest expense, right?

14   A    Yes.  Yes.

15   Q    But net loss does not?

16   A    Right.

17   Q    And in preparing Exhibit C to your declaration, which

18   is Exhibit 27, you concluded -- yeah, let's take it out for

19   a second.  Exhibit 27.

20   A    Okay, I'm there.

21   Q    All right.

22        (Pause)

23        MR. MCKANE:  Apologize, Your Honor, one moment.

24        (Pause)

25        MR. MCKANE:  All right, why don't we do it this

1    way.

2    BY MR. MCKANE:

3    Q    So, sir, Exhibit 34, let's go there.  34.

4    A    34.

5    Q    It's the end of the binder.

6    A    Okay.

7    Q    All right.  Exhibit 34 is --

8         THE COURT:  I'm sorry, I need to -- can you give

9    me just a moment.

10        MR. MCKANE:  Do you need to go off the record?

11        THE COURT:  No, I -- yes.  Yes, we need to -- I'm

12   sorry, need to take a short recess.

13        MR. MCKANE:  Of course.

14   (Recess at 11:54 a.m.)

15        THE CLERK:  All rise.

16        THE COURT:  Please be seated.  Thank you.  Sorry.

17   I'm back.

18        MR. MCKANE:  For the record Mark McKane of

19   Kirkland & Ellis on behalf of the debtors.

20   CROSS-EXAMINATION (Resumed)

21   BY MR. MCKANE:

22   Q    Mr. Panacio, we were at -- before we broke we were

23   looking at the same time at Exhibits 27 and 34.

24   A    Right.

25   Q    Right.  And, sir, Exhibit 34 is just a collective

1    version of 27; is that right?

2    A    I have Exhibit 34 as the comparable companies versus

3    EFH.

4    Q    Yes, sir, and I believe Exhibit 27 is the earlier

5    iteration of the same -- for the same --

6    A    Correct.

7    Q    That's correct?

8    A    Right.

9    Q    And the corrections are primarily to account for

10   rounding errors and one set of transposed numbers?

11   A    Right.

12   Q    So let's look at 34.  Now in preparing Exhibit 34 for

13   the Court, Mr. Panacio, you include columns for operating

14   revenue, net income or loss, and long-term debt, right?

15   A    Right.

16   Q    And you did so because you wanted to present the

17   ability to service long-term debt, right?

18   A    Right.  One of the reasons, right.

19   Q    Right?  But in evaluating long-term debt it's also

20   appropriate to evaluate what interest expense you have on

21   that long-term debt, right?

22   A    That's correct.

23   Q    And, sir, EFH in 2011 had interest expense of

24   approximately $4.3 billion, right?

25   A    Right.

1    Q    And EFH in 2012 had interest expense of approximately

2    $3.5 billion, right?

3    A    Right.

4    Q    And in 2013 it had interest expense of $2.7 billion,

5    right?

6    A    Right.

7    Q    And in preparing Exhibit 34 you looked at the 13 peer

8    companies that you could find information for and evaluated

9    their income statements as reflected in their 10-Ks,

10   correct?

11   A    Yes.

12   Q    And you looked at their operating revenues and their

13   net income and their long-term debt, and the interest

14   expense was also available there as well, correct?

15   A    Yes.

16   Q    All right.  Let's start with Ameron for a minute.  Sir,

17   based on your review of the Ameron 10-K am I correct that

18   Ameron's interest expense was less than EFH's by over

19   $2 billion?  Do you recall that?

20   A    Well actually -- actually not seeing the actual income

21   statement, but I do recall it, yeah.

22   Q    All right.  And, sir, you know, it's unfortunate for

23   the trees, but if you need to I can refresh your

24   recollection of any of the 10-Ks.

25   A    That's fine.

1    Q     All right.

2            THE COURT:  The trees are already gone.

3        (Laughter)

4            MR. MCKANE:  It's true.

5    BY MR. MCKANE:

6    Q     And, sir, if Ameron had the interest expense of EFH for

7    the years 2011, '12, and '13, would they have generated a

8    net income?

9    A     They would have a net loss.

10   Q     And, sir, Calpine was another of the peer companies,

11   right?

12   A     Right.

13   Q     And Calpine's interest expense is also less than EFH,

14   right?

15   A     It was.

16   Q     It was less by billions of dollars for each of the

17   years '11, '12, and '13, right?

18   A     Right.

19   Q     And if Calpine had the interest expense of EFH in those

20   years it would not have had a net income, right?

21   A     It would not have, right.

22   Q     And, sir, the same is true with Duke Energy, right?

23   Let me be specific.  Duke Energy had interest expense in

24   '11, '12, and '13, that was also lower than EFH's, correct?

25   A     That was right, correct.

1    Q    In fact even though Duck Energy's long-term debt in

2    2013 was of a similar size to EFH's, its interest expense

3    was billions less, correct?

4    A    Correct.

5    Q    And if Duke Energy had the interest expense of EFH for

6    '11, '12, and '13, it also would not have net income,

7    correct?

8    A    It would not have net income, right.

9    Q    And, sir, you looked at Edison International as well,

10   right?

11   A    Right.

12   Q    And Edison International's interest expense was in the

13   millions, not the billions, correct?

14   A    Right.

15   Q    And if Edison International had the interest expense of

16   EFH it would not have net income in '11, '12, or '13,

17   correct?

18   A    They would not.

19   Q    And, sir, you looked at Energon as well, right?

20   A    Excuse me.  Yes.

21   Q    And Energon's interest expense for '11, '12, and '13

22   were all over $2 billion less than EFH's, correct?

23   A    Right.

24   Q    And you agree if Energon had the interest expense of

25   EFH for '11, '12, and '13 it wouldn't have a net income

1    either, correct?

2    A    Correct.

3    Q    And the same is true for Exelon, right?

4    A    Right.

5    Q    If I went through every one of these, if any of these

6    peer companies had the interest expense of EFH they all

7    would not have net income for '11, '12, and '13, correct?

8    A    Correct.

9    Q    And, sir, you prepared Exhibit 34 because you wanted to

10   demonstrate that the peer companies had the ability to

11   service their debt, right?

12   A    It was one of the reasons, right.

13   Q    You thought it was important for the Court to consider

14   whether the peer group had the ability to service their debt

15   in connection with today's motion, it was a factor you

16   wanted the Court to consider?

17   A    Correct.

18   Q    Now, sir, you've been a bankruptcy analyst for 14

19   years, you would agree with me that a number of our

20   corporate debtors that file for bankruptcy do so because

21   they do not have the ability to service their debt, right?

22   A    That's correct.

23   Q    And, sir, you would agree with me that that's why they

24   file for bankruptcy, it's in part because many of these

25   companies, including EFH, could not continue to service that

1    debt, correct?

2    A    Correct.

3              MR. MCKANE:  Your Honor, can I have one moment to

4    confer with my co-counsel?

5              THE COURT:  Yes, you may.

6              MR. MCKANE:  Your Honor, we have no further

7    questions.

8              THE COURT:  Thank you.  Redirect?

9              MS. SARKESSIAN:  Yes, Your Honor.  Could I just

10   have a moment?

11             THE COURT:  Sure, of course.

12        (Pause)

13             MS. SARKESSIAN:  And for the record Juliet

14   Sarkessian on behalf of the U.S. Trustee.

15   REDIRECT EXAMINATION

16   BY MS. SARKESSIAN:

17   Q    Mr. Panacio --

18             THE COURT:  Could you adjust the microphones,

19   please.  Thank you.

20             MS. SARKESSIAN:  Is that better?

21             THE COURT:  Yeah, both of them, it helps.

22             MS. SARKESSIAN:  Oh.

23             THE COURT:  Get you in stereo there.

24             MS. SARKESSIAN:  Is that better?

25             THE COURT:  Yep, thank you.

1          MS. SARKESSIAN:  Point it downward.

2     BY MS. SARKESSIAN:

3     Q    I'd like to turn your attention back to what was marked

4     as Exhibit 38, it's a PowerPoint presentation that you were

5     looking at.  It's not in your binder, it would be loose.  It

6     looks like this.  Colorful.

7     A    Okay.

8     Q    There are you go.  Okay.  And could you turn to the

9     page that had been tabbed for you?  And on that page is that

10    the one with the green graph at the top and it says,

11    "Beginning in 2006 the company used a long-term hedging

12    program"?  Do you have that right page?

13    A    Okay, I'm there.

14    Q    Okay.  So I'm going to read that to you.  "Beginning in

15    2006 the company used a long-term hedging program to

16    establish -- to stabilize -- excuse me -- cash flow and

17    minimize downward risk in natural gas prices."  Do you see

18    that?

19    A    I see that.  I see that.

20    Q    And then the line that's above the actual graph says,

21    "Cash flows from hedging activities."  Do you see that?

22    A    I see that.

23    Q    Now, is cash flow the same thing as EBIDTA as the same

24    number?  Is that -- can we compare cash flow with EBIDTA, is

25    it the same thing?

1    A    You could have cash flows from operating activities,

2    investing activities, financing, activities, but essentially

3    you're backing out all the interest and amortization, et

4    cetera, it could be cash flows, yeah.

5    Q    Okay.  So cash flows could be the same number --

6    A    Right.

7    Q    -- of the EBIDTA?

8    A    Right.

9    Q    But it could also not be?

10   A    Right.

11   Q    Okay.  What would that depend on?  Is there -- let me

12   ask this.

13          Is this a standard calculation for EBIDTA among

14   every company that they use the same way to calculate

15   EBIDTA?

16   A    Well, again, EBIDTA is your earnings before interest

17   taxes, appreciation, and amortization.  So that's kind of

18   standard if you're calculating -- all companies will

19   calculate in the same -- I assume in the same manner.

20   Q    Okay.  Now, at the top of the page where it says,

21   "Beginning in 2006 the company used a long-term hedging

22   program."  Do you see that?

23   A    I see that.

24   Q    Okay.  But the chart below it says, "Cash flows from

25   hedging activities," it doesn't specify cash flows from

1    long-term hedging programs?

2              MR. MCKANE:  Objection, leading, Your Honor.

3              THE COURT:  Overruled.

4    BY MS. SARKESSIAN:

5    Q    Do you know whether this chart that shows cash flows

6    from hedging activities is limited to the hedging activities

7    related to the long-term hedging program that the company

8    started in 2006?

9    A    From this chart, no, I don't know the specific details,

10   I do not know.

11   Q    Now, I'd like to turn your attention to Exhibit 39,

12   that was the 10-K large for 2009 for Energy Futures Holding

13   Corp.

14             THE COURT:  Which exhibit?  I'm sorry, 39, right?

15             MS. SARKESSIAN:  It's 39.  It's the 10-K.

16             THE COURT:  Got it.

17             MS. SARKESSIAN:  Okay.

18             MS. SARKESSIAN:  For 2009 the 10-K.  2009 for

19   Energy Futures Holding Corp.

20             THE WITNESS:  Okay.

21   BY MS. SARKESSIAN:

22   Q    Okay.  And could you turn to the page that was tabbed

23   for you that's page 200?

24   A    Okay.

25   Q    Do you recall being asked certain questions here about

1    the capital expenditure figures?

2    A    Right.

3    Q    Now, do you know those capital expenditure figures, is

4    that divided between Luminant and TXU?  Is it broken out

5    between the two?

6    A    It is not.

7    Q    Okay.  So what would you understand then that figure to

8    be for the capital expenditures?  Like the (indiscernible -

9    12:15:05) electric, et cetera, if that's not broken down

10   then --

11   A    Well it doesn't specifically say -- state which entity

12   the capital expenditures this relates to.  Again, just

13   reading this page.  If there's a narrative beforehand it

14   might identify the entity, but this specific page I cannot

15   tell.

16   Q    Could it be consolidated?

17   A    It could be.

18   Q    You can put that aside.

19        I'd like to turn your attention to Exhibit 36,

20   this is in your binder.

21   A    Okay.

22   Q    It's the chart that is the updated chart from Exhibit B

23   to your declaration.

24   A    Okay.

25   Q    Okay.  Now you were asked a lot of questions on cross-

1    examination about the last three columns of the chart

2    relating to taking the mid-year figures and then projecting

3    them for the full year.  Do you remember that?

4    A    Yes.

5    Q    And you were asked, you know, various questions about

6    whether you considered certain one-time events and outages

7    and various things like that.  Do you recall that?

8    A    Right.

9    Q    Okay.  I just want to clarify now.

10            The information that is on those last three

11   columns to the right, which is the mid-year actual, the

12   projection for the full year, and then comparing the

13   projections to the target, do those columns have any effect

14   from the columns that are headed to the left of those

15   columns, threshold versus average and superior versus

16   average?

17   A    No.

18   Q    And I think just to remind everyone, those columns,

19   threshold versus average and superior versus average, the

20   average you're comparing it to is the five-year actual,

21   correct?  For the five years 2009 through 2013?

22   A    Correct.

23   Q    Okay.  Now with respect to -- we'll keep with that

24   exhibit for a moment.  With respect -- I believe you were

25   asked -- specifically asked a question about whether when

1     you projected for the full year for EBIDTA whether you took

2     into consideration any scheduling outages that might be a

3     one-time event, correct?

4     A    Right.

5     Q    Okay.  With respect to looking at past performance of

6     EBIDTA for 2009 to 2013 is it possible that those actual

7     figures, that they were scheduling outages during those

8     years as well?

9     A    It's possible, right.

10         (Pause)

11    Q    Now moving on to your comparison of the -- what we'll

12    call the peer group companies against the debtor, which is

13    Exhibit 34, but I'm not going to ask you about the

14    exhibit --

15    A    Okay.

16    Q    -- I just want to just focus a minute generally on

17    comparing the peer group to the debtor.

18             You were asked a lot of questions, do you recall,

19    about you know, what information you considered concerning

20    the bonus programs of the peer groups; do you recall those

21    questions?

22    A    Yes.

23    Q    Okay.  And you testified no, you didn't see their bonus

24    programs, you don't have that -- you didn't consider that,

25    correct?

1    A    Correct.

2    Q    Okay.  Did you -- I believe you testified that you

3    reviewed Mr. Frisky's declaration and Mr. Filsinger's

4    declaration in connection with this bonus motion, connect?

5    A    Correct.

6    Q    Okay.  And various -- the documents that were filed

7    with the motion, right?

8    A    Right.

9    Q    In those documents did you see any information, any

10   specifics about the bonus programs of the various companies

11   that the debtor is treating as its peer companies?

12   A    I did not see specific details of those comparable

13   companies, no.

14   Q    And turning to Exhibit 5, which is in your binder,

15   which is the EFH insider compensation discussion materials

16   for August 6th, 2014.

17   A    Okay.

18   Q    Okay.  You looked at -- this was one of the documents

19   you looked at in connection with preparing your exhibits to

20   your declaration, correct?

21   A    Right.

22   Q    Okay.  And you pointed out on page 61, correct, where

23   they were looking at metrics considered by other energy

24   industry companies, correct?

25   A    Right.

1    Q    Okay.  Now other than that information in this

2    particular document, Exhibit 5, is there any other detail

3    provided about the particular bonus plans of these other

4    companies or any other information about exactly what

5    metrics each company uses?

6    A    No.

7    Q    Okay.

8    A    Okay.

9    Q    And sticking on this page 61, you previously testified

10   that 20 percent of the peer companies looked at EBIDTA for

11   2013, correct, as a metric, correct?

12   A    Right.

13   Q    Okay.  So what percentage of the peer companies did not

14   look at EBIDTA according to this chart?

15   A    Well, I think immensely the 80 percent --

16   Q    Okay.

17   A    -- would not be using EBIDTA.

18   Q    Sorry, 80 percent --

19   A    Eighty percent would not be using this particular

20   metric EBIDTA.

21   Q    And that EBIDTA metric -- with respect to the debtors

22   that EBIDTA metric is the highest weighted metric, correct?

23   A    Correct.

24        (Pause)

25            MS. SARKESSIAN:  That's all I have on redirect,

 1   Your Honor.

 2            THE COURT:  Okay, thank you.  You may step down,

 3   sir.  Thank you.

 4            THE WITNESS:  Thank you, Your Honor.

 5            MS. SARKESSIAN:  Your Honor --

 6            THE COURT:  I haven't been allowing recross just

 7   so the record is clear.  Yes?

 8            MS. SARKESSIAN:  Your Honor, would it be possibly

 9   for Mr. Panacio to be excused from the courtroom?

10            THE COURT:  Any objection?

11            MR. MCKANE:  No objection, Your Honor.

12            THE COURT:  Very good.

13            MS. SARKESSIAN:  Thank you, Your Honor.

14            THE COURT:  Thank you, sir.  Thank you for making

15   time for the Court.

16            Do we want to deal with the exhibits that were

17   identified for identification that have not been admitted?

18   I think that only 38 and 39.

19            MR. MCKANE:  Thank you, Your Honor.  The debtors

20   do move into evidence Exhibits 38 and 39.  It will be part

21   of our rebuttal case.

22            THE COURT:  All right.  Any objection?

23            MS. SARKESSIAN:  Your Honor, I have no objection

24   to Exhibit 39, which is the 2009 10-K.

25            I do have an objection to Exhibit 38.  I mean

1    among other things I haven't had an opportunity to review

2    it, but there's a tremendous amount of information in here,

3    and I don't -- I don't think we've had a witness that has

4    testified to this.  It's hearsay.

5            MR. MCKANE:  Your Honor, the focus of our use of

6    38 is solely the one page slide on the hedging program.

7            THE COURT:  I mean it was a demonstrative at the

8    first day.

9            MR. MCKANE:  It was.

10           THE COURT:  Isn't it hearsay?

11           MR. MCKANE:  Well, Your Honor, in some ways what

12   it does is it a -- it is a summary of corporate records, and

13   therefore it would be an exception to the hearsay rule

14   because it was prepared, you know, for that purpose.  It

15   really is a compilation of --

16           THE COURT:  It wasn't prepared by the business

17   people, it was prepared by -- well, I don't know who

18   prepared it, that's part of the problem.  I mean

19   Mr. Sassower presented it, but I expect he didn't prepare

20   it.

21           MR. MCKANE:  I'm not going to comment on

22   Mr. Sassower's preparation.

23           THE COURT:  Well create.

24       (Laughter)

25           MR. MCKANE:  We'll stipulate the that, Your Honor.

1              THE COURT:  I don't think it's appropriate

2       evidence, I'm not going --

3              MR. MCKANE:  Fine, Your Honor.

4              THE COURT:  -- yeah, it's -- it will not be

5       admitted.  39 is the admitted without objection?

6              MS. SARKESSIAN:  39 is the without objection.

7       Thank you, Your Honor.

8              THE COURT:  Thank you.

9          (Trial Exhibit No. 39 was admitted)

10             THE COURT:  You mentioned a rebuttal case you're

11      going the --

12             MR. MCKANE:  No, Your Honor, we -- I was only

13      referencing that for -- anticipating an argument that we had

14      closed our case in chief.

15             THE COURT:  Oh, oh, oh.

16             MR. MCKANE:  And my point is only that, you know,

17      we -- at this point we have no additional evidence.

18             THE COURT:  Okay.  Very good.  Thank you.  All

19      right.

20             Any further evidence by any party?  None.

21             MS. SARKESSIAN:  No, Your Honor.

22             THE COURT:  Very good, that'll close the evidence

23      share record.

24             I have a hearing at 1:00, so let's break for

25      lunch, reconvene at 1:30, and I'll hear closing, then we'll

1   probably have to take a recess of some time and I'll put --

2   I predict that after closings and a recess I'll be able to

3   present a ruling.  We'll recess until 1:30.

4           If you could clear the tables, please, I'd

5   appreciate it, since I have a hearing at 1:00, although it

6   should be short.

7           MR. SASSOWER:  Thank you, Your Honor.

8           Just to give you a sense, I anticipate my closing

9   will probably go about a half hour, just so you can budget

10  it.

11          THE COURT:  It is what it is, I won't ask anyone

12  to give me a time.  That's fine.

13          MR. SASSOWER:  Okay.  Thank you.

14          MS. SARKESSIAN:  Thank you, Your Honor.

15      (Recess at 12:25 p.m.)

16          THE CLERK:  All rise.

17          THE COURT:  Please be seated.  Settle down over

18  there.

19          (Laughter.)

20          THE COURT:  Mr. Sassower.

21          MR. SASSOWER:  Good afternoon, Your Honor.  For

22  the record, Edward Sassower of Kirkland and Ellis, LLP,

23  counsel for the debtors.

24          Your Honor, with your permission, I'd like to

25  proceed with the closing.

1          THE COURT:  Yes.

2          MR. SASSOWER:  Your Honor noted in Furniture Brans

3    that the U.S. Trustee, and I quote, "stands to defend the

4    system as a whole and to ensure that the debtor and the

5    committee or any parties that are coming in front of the

6    Court are not agreeing on something that while it sounds

7    great to them, maybe is not so great for the system as a

8    whole, or even the debtors."

9          Furthermore, in your ruling on the motion to

10   exclude Mr. Panacio's testimony, Your Honor also noted that

11   the role of the United States Trustee in, and again I quote,

12   "preserving the integrity of the bankruptcy process."

13         Ms. Schwartz similarly stated in her opening

14   remarks that, again, I quote, "the U.S. Trustee, like the

15   Court, is dedicated to protecting the integrity of the

16   system and making sure that all parties in the bankruptcy

17   proceedings adhere to comply with the Bankruptcy Code" and

18   concluded those opening remarks by saying that, unless the

19   debtors can address all of the U.S. Trustee's issues to the

20   Court's satisfaction, then the U.S. Trustee requests the

21   Court deny the motion.

22         Your Honor, we fully respect the important role

23   that the United States Trustee plays in the Chapter 11

24   process.  But after last week and today, we think that we

25   have addressed all of their issues and it's clear that we've

1     met what's required under the law and what's require in

2     terms of evidence.

3              Your Honor knows the relevant legal standard

4     better than anybody as given the significance of your many

5     decisions and ruling in the employee compensation context.

6     The first thing the debtors must establish is that the

7     contemplated payments do not fall within Section 50(c)(3)(1)

8     of the Bankruptcy Code.  In other words, that the potential

9     payments are primarily incentivizing and not primarily

10    retentive.

11             The debtors have submitted a mountain of evidence,

12    including testimony from Mr. Burke, Mr. McFarland and

13    Mr. Filsinger demonstrating that the applicable performance

14    metrics are not guaranteed and are not time-based but,

15    instead, are challenging financial operational and other

16    business targets that make the plans primarily

17    incentivizing.

18             One thing Ms. Schwartz argued in her opening is

19    that the debtors did not submit any evidence regarding the

20    satisfaction of the stringent requirements of 50(c)(1).

21    That's because we are confident that 50(c)(3)(1) does not

22    apply --

23             THE COURT:  503(c)(1).  You keep saying

24    50(c)(3)(1).

25             (Laughter.)

1          MR. SASSOWER:  Thank you, Your Honor.

2          THE COURT:  That's okay.  You're getting me

3    confused.

4          MR. SASSOWER:  Your Honor has heard over the last

5    few days how the debtors' metrics provide exactly the type

6    of difficult to achieve hurdles that courts have repeatedly

7    blessed as incentivizing.  For example, Mr. McFarland

8    testified that as for nuclear available generation, the

9    debtors' nuclear facilities must hit top quartile to hit

10   thresholds and must do so in a year with two refueling

11   outages, which occurs once every three years.

12         And Mr. Burke testified that TXU Energy must hit

13   industry leading performance to meet threshold on bad debt,

14   customer complaints and contribution margin.  And as for

15   customer complaints, TXU must achieve its second best

16   performance in the last six years.  In a year that's already

17   been market by unusually extreme weather.

18         Furthermore, Mr. Burke, Mr. Friske and

19   Mr. Filsinger, correction, Mr. Burke, Mr. McFarland and

20   Mr. Filsinger all identified substantial risks that would

21   cause TXU, Luminant and EFH to miss these tough targets

22   given year-to-date performance.  For example, Mr. McFarland

23   testified that Luminant must keep its current nuclear outage

24   to 24.5 days despite already being behind and already

25   needing to beat top quartile performance by almost 7 days.

1          And Mr. McFarland further testified that all told,

2     Luminant had 125 planned outage days left in the year and if

3     those go long, it will affect Vatrix and EBIDTA.

4          You also heard testimony from Mr. Filsinger that

5     some of the metrics require near perfection and therefore at

6     some point the plans have to stop requiring continued

7     improvement, which would be virtually impossible, but rather

8     needs to compensate management for continued excellence,

9     which should not be taken for granted.  In attaining that

10    near perfect performance and continually exceeding industry

11    averages requires a tremendous amount of effect, experience

12    and talent each and every year and those results deserve to

13    be rewarded.  If management take their eye off the ball,

14    then the level of performance would undoubtedly decrease.

15         Also, to clarify a related point, part of the

16    cross-examination of Mr. Filsinger focused on the degree to

17    which the company has previously beaten industry averages.

18    Mr. Filsinger was simply using industry averages as a basis

19    for comparison.  While industry averages are a factor that

20    the company considers when setting its targets, it's by no

21    means the sole or most important factor.  When determining

22    its targets, the company ultimately is trying to determine

23    what is the very best the company can do regardless of its

24    peers.

25         The U.S. Trustee's various arguments as to why the

1    payments are primarily retentive and bring the motion within

2    the requirements of 503(c)(3)(1) all miss the mark.

3    Ms. Schwartz seems to suggest that the use of the phrase,

4    retain, in any document automatically converts the primary

5    purpose of the plan to retention.

6         For starters, there are no documents referencing

7    the word, retention award, that are before the Court today.

8    And only one of the plans that's before the Court today

9    mentions the word, retain, and that is the EAIP, which also

10   uses the words, motivates, and the phrase, "rewarding

11   performance that satisfies established performance goals" in

12   the same sentence as the word, retain.

13        More importantly, labels don't matter.  What

14   matters is the actual substance of the plan and all of the

15   plans before the Court today require management to achieve

16   financial, operational and other business targets in order

17   to receive a payment.  None of the plans provide a payment

18   just for the employee sticking around.

19        The U.S. Trustee also attempts to make much of the

20   requirement that an employee must remain with the debtors

21   for a short period of time after the quarter in order for

22   the debtors to calculate whether the metrics have been met

23   and process the payment.  As the case law repeatedly notes,

24   every incentive plan is somewhat retentive because you need

25   to continue to work at the company in order to hit the

1    incentive target.

2            Taken to its logical extreme, the U.S. Trustee's

3    argument would require an employee to be paid incentive

4    compensation each and every day for that payment not to be

5    retentive or at least the debtors must make the payments

6    immediately at the end of the performance period, which is

7    not practical.

8            More importantly, an employee must hit the metrics

9    in order to earn a payment and that, in and of itself, makes

10   the plans primarily incentivizing.  Furthermore, Mr. Friske

11   testified that 90 percent of other company's compensation

12   plans have similar language about remaining through the

13   performance period.

14           The U.S. Trustee also tries to argue that the

15   metrics are not incentivizing because the debtors' average

16   five year historical performance exceeds some of the

17   performance metrics in effect for this year.  The U.S.

18   Trustee also argues that multiplying the first half of 2014

19   performance by two, to conclude that the four year 2014

20   metrics will be easily achieved.  The U.S. Trustee is

21   grossly over simplifying what is a very complicated process

22   that takes up to four to six months to complete.

23           The point of this process is to try to compare

24   apples to apples, to isolate operational performance by

25   excluding items like onetime events, like the long term

1    hedging program and items like debt service costs that are

2    not relevant to evaluating performance of the debtors'

3    employees.

4            Let me first address the point about the five-year

5    historical averages.  Circumstances change year over year

6    and the five-year historical average of the metrics is not a

7    good predictor of likely performance in the next year.  For

8    example, looking only at historical averages ignores the

9    fact the value of the corporate hedge program declined

10   sharply over the last four years as Mr. Filsinger testified.

11   These hedges were put in place before the prices of gas

12   cratered.  Now, as a result, the debtors cannot replicate

13   the value of the hedges as they roll off.

14           The corporate hedge program contributed

15   approximately $1.8 billion to EBIDTA IN 2012, approximately

16   $1 billion to EBIDTA in 2013, approximately $462 million to

17   EBIDTA during the first half of 2014 and will contribute

18   zero dollars to EBIDTA going forward, during the second half

19   of 2014 or beyond.

20           As another example, looking at historical averages

21   ignores the fact that environmental regulations change and

22   impact performance of the business in varying degrees year-

23   to-year.  And yet another example, as Mr. Burke testified

24   with respect to the TXU customer satisfaction metrics and as

25   Mr. McFarland testified with respect to the coal generation

1    metrics, the company sometimes change the way in which they

2    measure the metrics, which sometimes makes historical

3    performance not comparable.

4            The failure to recognize this point, particularly

5    the importance of the hedges rolling off, is exactly what

6    Mr. Evans was trying to explain when he was telling the U.S.

7    Trustee in connection with his deposition why an uninformed

8    observer might conclude that the metrics could look like a

9    lay-up if the observer was only looking at year over year

10   performance.

11           Let me next address by the U.S. Trustee's

12   multiplication of the first half of 2014 performance by two

13   doesn't make sense.  Specifically, multiplying by two

14   ignores a variety of factors, including the seasonality of

15   the debtors' businesses as testified to by Mr. Burke,

16   Mr. McFarland and Mr. Filsinger, the impact of counterparty

17   terminations of contracts associated with the corporate

18   hedging program, the long term corporate hedging program

19   triggered by the bankruptcy filing, which was a onetime

20   event that skews the first half of 2014 EBIDTA by $460

21   million, approximately, I think that's 464, 462,

22   approximately $462 million as testified to by Mr. McFarland

23   and Mr. Filsinger and schedule plant outages that will occur

24   in the second half of this year as testified to by

25   Mr. McFarland.

1            One final point on the trustee's claim that these

2      programs are retentive, in the U.S. Trustee's opening

3      argument, Ms. Schwartz referenced Hawker and made reference

4      about how retention plans can sometimes be dressed up to try

5      to look like incentive plans but any comparison to Hawker is

6      entirely misplaced.

7            In Hawker, the keep (ph) awarded a payment so long

8      as Hawker consummated a transaction that had largely been

9      negotiated prior to the (indiscernible - 1:55:04) date.

10     Here, the debtors' compensation programs have been around

11     for many years and are premised on the achievement of hard

12     to meet financial, operational and other business goals.

13            Before I turn to ordinary course and the Dana

14     factors, I want to address the U.S. Trustee's critique of

15     the use of EBIDTA as a key metric in the compensation plans

16     which is really an attempt by the U.S. Trustee to try to

17     replace the debtors' business judgment with its own.

18            The debtors have used EBIDTA as a metric for many

19     years.  EBIDTA as a metric for many years.  Mr. Friske

20     testified that the majority of companies use an earnings-

21     based target in their annual or long term incentive plans.

22     But the exact earnings-based  target the company chooses,

23     whether it's earnings per share or net income or EBIDTA or

24     cash flow tends to vary based on a variety of factors,

25     including whether the company is public and it's level of

1    interest expense.

2           Mr. Friske further testified that 20 percent,

3    which is a healthy percentage, of the plans reviewed by

4    Towers Watson for energy companies use EBIDTA and that

5    EBIDTA was used even more frequently by debtors in Chapter

6    11.  By comparison, only 32 percent of the companies who

7    were reviewed used net income.

8           In the debtors' business judgment, as testified to

9    by Mr. Burke, Mr. McFarland and Mr. Filsinger, EBIDTA is the

10   proper measure of operational performance and ensures that

11   the evaluation of the debtors' employees is not impacted by

12   factors outside of their control like debt services.

13          (Indiscernible - 1:56:47) arguments also

14   essentially -- such an argument that insider compensation

15   plans should rarely be approved in Chapter 11 because many

16   debtors file for -- file for bankruptcy because of their

17   over leveraged capital structure and therefore do not have

18   net income.

19          The U.S. Trustee also argued that using the same

20   metrics in the key leader performance program and in the

21   EAIP is somehow inappropriate and seemed to be suggesting

22   that the debtor should have one incentive plan instead of

23   two.  But, again, having multiple plans is a function of the

24   debtors' business judgment.  In addition, Mr. Friske

25   testified it's common for companies and debtors to have

1    multiple incentive plans; typically, one or more for short

2    term incentives and one or more for long term incentives.

3    And, as Mr. Friske further testified, using similar metrics

4    across multiple plans is commonplace.

5           The second thing the debtors must establish under

6    the law is that the compensation programs are either

7    ordinary course, business transactions or a reasonable

8    exercise of the debtors' business judgment that is supported

9    by the facts and circumstances of the case.

10          Other courts have held that the facts and

11   circumstances test is essentially the same as the business

12   judgment analysis under Section 363 of the Bankruptcy Code,

13   so probably too much is being made of this prong.  Having

14   said that, when evaluating compensation plans under the

15   facts and circumstances test, courts rely on the Dana

16   factors.

17          The debtors have established that the compensation

18   programs are both ordinary course and meet the facts and

19   circumstances test.  The debtors have demonstrated that the

20   continuation of the compensation programs are ordinary

21   course transactions by satisfying both the horizontal test

22   and the vertical tests.  The horizontal test is satisfied

23   because the structure and design of the debtors' plans are

24   consistent with comparable companies and the total potential

25   compensation is consistent with market practices in the

1   energy industry.  Mr. Friske's testimony supports this

2   conclusion and his testimony has gone unrebutted.

3           The vertical test is satisfied because the

4   compensation programs have existed in substantially similar

5   form for years and comport with the debtors' "pre-petition

6   business practices and conduct" and the testimony from

7   Mr. Burke -- Mr. McFarland covered this point well.

8           The U.S. Trustee makes a couple of arguments as to

9   why the payments are not ordinary course.  None of those

10  have any support in the case law.  First, is that the

11  debtors utilized outside advisors in developing the 2014

12  metrics.  And the second is that certain thresholds changed

13  in the middle of the year.  Just to clarify this point, the

14  plans that were modified still used the same compensation

15  targets, had the same participants, and the same metric

16  categories before and after they were revised.  The only

17  changes were to make some of the targets tougher to achieve,

18  some of the performance goals tougher to achieve, to remove

19  any payments that are triggered solely based on continued

20  employment past a specific date and to make the performance

21  period under the key leader performance program, one of the

22  plans, quarterly instead of two years, as it was under its

23  predecessor plan, the owner-operator plan.

24          Let me pause on the mid-year adjustment for a

25  minute, Your Honor.  The U.S. Trustee made much of the fact

1   that Mr. Evans testified that the adjustments were made mid-

2   year because it appeared that six months after actual

3   performance of the metrics could be viewed as "lay-ups."

4   But as Your Honor now knows from watching the video,

5   Mr. Evans was simply explaining the same thing that you

6   heard Mr. Burke and Mr. McFarland testify to, which is that

7   on advice of professionals, the company looked at the actual

8   performance year-to-date and toughened up the metrics for

9   the balance of the year to eliminate any doubt that the

10  actual performance made the metrics too easy to hit.  He was

11  testifying that the metrics before the Court are not lay-

12  ups.

13          Moreover, during her opening remarks, the U.S.

14  Trustee seems to suggest that it was somehow surprising that

15  Mr. Evans was using the terms in his deposition that have a

16  specific or unique meaning under the bankruptcy compensation

17  case law terms, like lay-up.  Mr. Evans is the chairman of

18  the compensation committee of a company that's going through

19  a major restructuring and has hired restructuring

20  professionals 18 months before it filed it filed for Chapter

21  11.  It's hardly surprising that he spent time studying the

22  standard that must be satisfied in order to retain these

23  programs in Chapter 11.

24          Even if Your Honor were to conclude that the

25  programs were not ordinary course for some reason, the

1    motion should still be approved because the evidence

2    overwhelmingly shows that the compensation programs are

3    justified by the facts and circumstances of these cases

4    under the standards set forth in Dana.

5              The U.S. Trustee has not even attempted to argue

6    the Dana factors.  I'll quickly run through the six factors.

7    The first factor is that the insider compensation programs

8    must be calculated to achieve the desired performance.  As

9    explained by Mr. McFarland, Mr. Burke and Mr. Filsinger, the

10   programs are tied directly to financial, operational and

11   other business objectives that trigger payments only if the

12   debtors satisfied difficult to attain targets that would

13   generate value for the debtors' stakeholders.

14             Factor two, the cost of the programs must be

15   reasonable.  Mr. Friske testified that the compensation for

16   EFH's insiders is reasonable even taking into account the L-

17   tip payments that are covered by the LCs that are not before

18   your Court today.  So he evaluated -- he took all of the

19   compensation paid to insiders and he determined that the

20   overall target total, direct compensation is below the 50th

21   percentile for the debtors' peer group.

22             He also testified, Mr. Friske, that is, that the

23   aggregate cost of these short-term incentive plans and the

24   long-term incentive plans are within the range of observed

25   market practice as percentage of revenue.

1              Factor three under Dana is that the scope of the

2       programs is fair and reasonable.  As explained by Mr. Burke,

3       several of the plans mirror plans offered to non-insiders

4       that have already been approved by Your Honor and all of the

5       programs -- all of the debtors' employees participate in

6       some sort of incentive compensation program.

7              Factor four is that the programs are consistent

8       with industry standards.  As explained by Mr. Friske, the

9       programs rely heavily on objective financial performance

10      metrics and the total compensation is in line with market

11      practice.

12             Factor five is that the debtors perform due

13      diligence in developing these programs.  As Mr. Evans

14      testified, and as explained by other witnesses, the targets

15      were developed on top of the budget as part of an extensive

16      and rigorous process.

17             And the last factor, factor six, is that the

18      debtors receive independent counsel in developing the

19      programs.  And as the trustee has acknowledged, the debtors

20      engaged Kirkland and Ellis, Filsinger Energy Partners and

21      Towers Watson to advise the debtors concerning pre and post-

22      petition compensation programs.

23             Your Honor, I now want to talk to you about the

24      letters of credit.  Even though the payments covered by the

25      letters of credit are not before you today, we do want to

1    clear up some confusion regarding the LCs because the U.S.

2    Trustee is arguing that the LCs make the SPCL tip program

3    outside the ordinary course.

4           The LCs were put in place many years ago prior to

5    the start of the restructuring.  To understand the impetus

6    of the LCs, one needs to put him or herself in the mindset

7    of the board at the time.  The LCs were put in place at a

8    time when power prices were cratering as a result of the

9    shale revolution.  It's difficult to overstate the impact

10   that the cratering of power prices had on the industry as a

11   whole and the company, in particular.

12          As Your Honor will recall from my first day

13   presentation, the settled price of gas contracts was $6.42

14   per MM BTU in 2007 at the time of the debtors' LBL.  And it

15   rose, effectively doubled to $13.11 per MM BTU within a year

16   and then it fell all the way down to $2.04 per MM BTU by

17   2012.  As a result of this fall, the value of the company's

18   equity declined precipitously and called into question the

19   effectiveness of the equity-based compensation programs.

20          In the wake of this fundamental change, the board

21   decided to implement the SPCL tip to help maintain

22   management's focus on operational excellence and incentivize

23   superior performance.  Because the L tip provided for a

24   multi-year long performance periods, and given the

25   perception of maximum uncertainty that existed at that time,

1    the debtors decided to create a mechanism that would provide

2    employees with the comfort of knowing that payments would

3    actually be made if the employee, if the employee hit the

4    performance metrics under the L tip.

5              As Mr. Burke testified, a plan would not be

6    incentivizing if the employee was worried that he or she

7    would not be paid even if they hit the metrics.  The

8    existence of the LCs does not bear on whether the L tip

9    itself is ordinary course.  The LCs are simply a funding

10   mechanism for some of the potential payments under that plan

11   if the metrics are achieved.  In other words, in order to

12   get the payments covered by the LCs, the debtors still have

13   to hit the performance metrics.

14             Furthermore, you heard from Mr. Friske who

15   testified that implementing a mechanism that assures

16   payments under incentive compensation plan is not uncommon.

17   Mr. Friske testified that 50 percent of long-term incentive

18   plans incorporate mechanisms like secular or rabbi trusts.

19   There's no evidence in the record the SPCL tip program

20   itself is anything other than ordinary course.  It's a long-

21   term incentive program put in place more than four years

22   ago.  And as to the LCs which are just a funding mechanism

23   that doesn't change that fact.

24             More important, as Your Honor is well aware, the

25   only SPCL tip payments at issue before the Court today are

Page 124

1    the potential payments that, if earned, are not covered by

2    the letters of credit.  So, again, we submit that the

3    letters of credit are a red herring.

4            Another important point I want to clarify to avoid

5    any confusion, our motion specifically asks Your Honor only

6    to approve certain payments that arise under the four plans.

7    We are not asking Your Honor to approve the debtors'

8    compensation plans as a whole now and forever.  In fact, we

9    intend to come back to this Court soon for authorization to

10   implement incentive programs for the 2015 period and

11   potentially beyond.

12           Lastly, all of the debtors major creditors, the

13   economic stakeholders in this case, in these cases, have

14   evaluated the debtors' compensation plans and decided not to

15   object to the relief request or, in some cases, the Court

16   relief requested.  Based on the overwhelming evidence

17   presented over the last several days on all these issues,

18   the debtors respectfully request that the Court overrule the

19   United State Trustee's objection and approve the debtors

20   insider compensation motion.

21           Your Honor, one thing we've done is we culled the

22   transcript and taken certain quotes from some of the

23   witnesses and some of the language from some of the

24   documents.  And rather than my reading it all into the

25   record, again, at the podium, I'd like to just simply hand

1    up this presentation which has previously been emailed to

2    the U.S. Trustee.

3              THE COURT:  All right.

4              MR. SASSOWER:  So you can consider that

5    (indiscernible - 2:09:57).

6              THE COURT:  Thank you.

7              MR. SASSOWER:  With that, Your Honor, I'd like to

8    just reserve some time to rebut.  Beyond that, my closing's

9    over.

10             THE COURT:  Thank you.  Do you have a copy of this

11   for Ms. Werkaiser (ph) --

12             MS. SASSOWER:  Yes.

13             THE COURT:  -- if you don't mind.  Thank you.

14   That's fine.  Thank you very much.  Ms. Schwartz.

15             MS. SCHWARTZ:  May it please the Court.  For the

16   record, I am Andrea Schwartz, representing Robert DeAngelis,

17   the United States Trustee.

18             As Your Honor knows, I certainly haven't been the

19   only one representing Ms. DeAngelis in this case.  With me

20   here are my fine colleagues, Mr. Schepacarter,

21   Juliet Sarkesian (ph), Timothy Fox and another analyst,

22   Mike West.

23             Your Honor, in preparing for today's closing

24   arguments, I spent a good deal of time thinking about where

25   to begin and what evidence I should highlight for the Court

1    to assist the Court in understanding and sustaining the U.S.

2    Trustee's objection.  I wanted to come up with something

3    new, something I had not argued before, whereas here, the

4    U.S. Trustee is the sole objector and the debtors have urged

5    the Court to weigh that fact heavily.  I will address the

6    reasons why the Court should not do that a little later.

7              I was, however, unable to come up with anything

8    new because the truth is that the U.S. Trustee, like the

9    Court, is charged with preserving the integrity of the

10   bankruptcy system and ensuring that the rule of law is

11   upheld.  I certainly didn't expect my adversary to be using

12   part of my opening in his opening.  I guess, different

13   things happen all the time.

14             Here, the law upon which the disputed bonus plans

15   center is Section 503(c) of the Bankruptcy Code which was

16   part of the amendments to the Code under the Bankruptcy

17   Abuse Prevention and Consumer Protection Act.  As the Court

18   noted in In re. Global Home Products, and which language has

19   often been cited by the many courts that have considered

20   these types of plans, Section 503(c) was enacted to:

21   "eradicate the notion that executives were entitled to

22   bonuses simply for staying with the company through the

23   bankruptcy process."  And, as this Court noted in Nelson

24   Nutriceutical, Section 503(c) severely restricts the

25   debtors' ability to pay retention, severance and other

1    amounts.

2           So, in addition to the reasons that I have stated

3    above, the U.S. Trustee's objection is also grounded in an

4    effort to prevent abuse where executive bonus plans are

5    proposed, consistent with Congress's intent in enacting the

6    BAPCPA.  In our brief and our opening statement, we set

7    forth a legal question for the Court; that is, whether the

8    Court could authorize the debtors to pay more than $20

9    million in bonuses to 26 senior executives who are insiders

10   of the debtors and who represent less than one percent of

11   the debtors' workforce.

12          We set forth several objections to each of the

13   three executive bonus plans, which objections all have

14   merit.

15          I would like to first address our objections to

16   the key leader performance plan because the evidence adduced

17   from the witnesses and contained in the actual plan

18   documents demonstrate that this Court is subject to Section

19   503(c)(1) and that the Court is without discretion to

20   approve it unless the debtors, through a subsequent motion,

21   since they have not addressed this Code Section here, can

22   meet the high hurdles that Congress put in place for

23   approval of plans like the key leader performance plan.

24          The burden of proof is not in dispute.  It rests

25   with the debtors.  In addition, the debtors concede that

1    each of the 26 individuals eligible under these plans are

2    insiders as that term is defined in Code Section 10131.

3    And, with respect to the debtors' burden of proof, Your

4    Honor, we urge the Court not to accept the expansive

5    treatment and sometimes over used language of the late

6    Judge Lifland in Dana where he states that every

7    compensation plan has a retentive element.

8           But here the Court should deeper into these plans

9    to determine their true nature.  Are they truly

10   incentivizing?  Or are they primarily retentive?  The plan,

11   the key leader performance plan, strikes and elucidates the

12   concern that the Court in Hawker v. Trapp noted.  And that

13   the debtor there had dressed up a key employee retention

14   plan to look like a key employee incentive plan with the

15   hope that it will pass muster under the less demanding

16   "facts and circumstances" standard under 503(c)(3).

17          We urge the Court to be wary of attempts to

18   characterize what is essentially an insider retention plan

19   as incentive, as an incentive plan, to bypass the

20   requirements of Section 503(c)(3)(1) and should -- and we

21   ask that the Court consider the circumstances under which

22   the particular proposals are made along with the structure

23   of the compensation packages when determining whether the

24   compensation programs are subject to 503(c)(1).

25          Judge Glenn in In re. Residential Capital, LLC

1    also, as we refer to it as ResCap (ph) stated, a debtors'

2    label of a plan as incentivizing to avoid the strictures of

3    Section 503(c)(1) must be viewed with skepticism.  The

4    circumstances under which the proposal is made and the

5    structure of the compensation package control.  And that's

6    at 478 BR. 154 Bankr. SDNY 2012.

7           The debtors have asserted that the three executive

8    bonus plans at issue in these cases represent a continuation

9    of the debtors' pre-petition compensation practices.  With

10   respect to the key leader performance plan, the debtors

11   assert that this plan is a continuation of its owner-

12   operated -- owner-operator plan.  Although none of the plan

13   documents during discovery or accepted into evidence contain

14   this name, the plan to which the debtors refer is included

15   at Tab 17 and, if Your Honor would turn to that tab please.

16          THE COURT:   Hold on.

17          MS. SCHWARTZ:  Your Honor, if we had more time, we

18   would have separated these --

19          THE COURT:  That's fine.  That's fine.  It's just

20   a lot to move around.  I got it.  Number 17.  Yes, ma'am.

21          MS. SCHWARTZ:  Thank you, Your Honor.

22          And as Your Honor will see, this is the owner-

23   operator plan.  Well, what does it look like?  Hmmm.  It's

24   called the EFH Corp. Retention Award Plan.  Now Mr. Sassower

25   says labels mean nothing.  Well, I think, Your Honor, the

1    law is pretty clear that Your Honor should look at how this

2    entire compensation package was arrived and here, at Tab 17,

3    I will just read that the purpose, the section number 1,

4    called Purpose and Effectives Dates, states:  in order to

5    retain the services of certain key employees, Energy Future

6    Holdings Corp., a Texas corporation, the company, has

7    adopted this EFH Corp. Retention Award Plan to incentivize

8    such key employees to "continue providing services to the

9    company and its affiliates."

10           Your Honor, I will also point out for you in the

11   other plan documents that there's no language, as there is

12   in other plan documents, that talk to this EFH Corp.

13   Retention Award Plan as being a performance-based plan.

14   Frankly, the plain language says, that is, to incentivize

15   such key employees to "continue providing services."  The

16   plan language suggests it's a retention plan.

17           Now, in his opening statement, Ms. Sassower made

18   the point that these are old plans.  They didn't have the

19   BAPCPA then.  They didn't know about incentivize versus

20   retention, et cetera.  Well, the actual plan, this EFH Corp.

21   Retention plan that the debtors disguise as the owner-

22   operator plan, is dated 12-20-10.  That is five years after

23   the BAPCPA and, as is plain, paragraph one, the debtors seem

24   to know how to use the word incentivize because there it is,

25   contained in paragraph one.

1              At paragraph four, which is on page three, this

2      sets forth who's eligible under the plan and what does it

3      say?  It says that those key employees designated by the

4      administrator are eligible employees to receive a retention

5      award under this plan in accordance with the terms of the

6      individual participation agreement provided for each

7      eligible employee.  And it goes on to say about whether, you

8      know, how it gets approved from the SPC, et cetera.  I'm not

9      going to read the entire provision, but I'm highlighting for

10     the Court that it is, in fact, referencing a retention

11     award.

12             Paragraph five of this EFH Corp. Retention Award

13     plan talks about payment of the retention award.  And it

14     goes on, terms of the retention award,  an eligible employee

15     will be eligible to receive a retention award in accordance

16     with Section 5, each participation agreement shall provide

17     the amount of the retention award, the time for the payment,

18     vesting or forfeiture provisions and any other terms or

19     conditions that the administrator or the committee

20     determines to be appropriate for the eligible employee's

21     retention award.

22             Paragraph seven sets forth in amendment and

23     termination of the plan that at 7(c) or (c) in the hole, it

24     says:  the O&C committee shall have the right to amend or

25     terminate this plan at any time provided that such an action

1    does not materially and adversely impact any eligible

2    employee without the written consent of the eligible

3    employee, provided, however, that the O&C shall have the

4    right to amend or terminate the plan, at any time without

5    the consent of the eligible employees, if the administrator

6    has determined in its sole discretion that such an action is

7    appropriate in light of changes in any applicable law or if

8    such an action is required by law.

9              So this is -- this provision is akin to a

10   guarantee.  They cannot terminate this plan without the

11   consent of the eligible employee.  Similarly, Your Honor, at

12   paragraph 7(e) it talks about the non-transferability of the

13   retention award.  This plan provides that the retention

14   award cannot be transferred.

15             Now, this plan has another document that goes

16   along with it which is the individual participation

17   agreement and that can be found at Tab 19 of the binder.

18             THE COURT:  Yes.

19             MS. SCHWARTZ:  Now, again, we're talking about

20   what the debtors have called something other than the EFH

21   Corp. Retention Award Plan.  This is the -- this is an

22   example of an individual participation award letter that was

23   provided to us by the debtors and redacted to keep out

24   certain information.  But I think this is an important --

25   another important document that shows that this was a

1    retention award and it was, in fact, guaranteed.

2          The actual individual participation agreement

3    provides in the second paragraph amounts and payments dates

4    and it says, the full amount of your potential retention

5    award will equal $550,000, the retention award.  Your

6    retention award will be payable in two separate payments,

7    the first on September 28, 2012 and the second on September

8    30th, 2014.  So you have to stay for a two-year period.

9    I'll get to the stay provision but it's based on two years.

10          And then it says, each payment will be equal to

11   the amount with results from a formula based upon one half

12   of your retention award and multiplied by a percentage that

13   reflects the company's financial performance during the

14   applicable period to which your payment relates, see

15   formulas below, in each case, subject to certain minimum and

16   maximum levels.  Then it says, each payment will be paid in

17   a cash, lump sum, et cetera.

18          Then you look at the formula and the formula says,

19   that for the first retention payment, the formula will be 25

20   percent times the retention award, which is already defined

21   at $550,000 times the 2010 EBIDTA percentage plus 25 percent

22   times the retention award times the 2011 EBIDTA percentage.

23   The document defines EBIDTA percentage and it says: for the

24   applicable year shall be defined as a percentage equal to or

25   between 50 percent and 100 percent that will be determined

1    by the level of budgeted earnings before interest, taxes,

2    depreciation, amortization, EBIDTA, actually achieved for

3    that year.

4              Now, Your Honor, what's interesting in this

5    document is on the next page.  On the next page, the top

6    paragraph talks about this EBIDTA percentage and how it

7    applies.  This is not the case, Your Honor, where if the

8    EBIDTA percentage -- there's a target and it's not met,

9    there's no retention award.  What the plan provides is, in

10   the middle of the paragraph, at the top of the page,

11   provided however that in no event shall the EBIDTA

12   percentage be less than 50 percent or greater than 100

13   percent.  And it explains, for example, if the threshold

14   budgeted EBIDTA amount for 2010 is determined to be four

15   billion, and actual EBIDTA for 2010 is 3.5 billion, the

16   percentage that must be used for the 2010 EBIDTA percentage

17   portion of the first retention payment formula above will be

18   50 percent.  So it can't go below 50 percent.  And it's a

19   guarantee.  This is clearly a retention plan.

20             So, what happened?  What happened, Your Honor?

21   Mr. Evans testified that in June of 2012, the debtors

22   retained Kirkland and Ellis.  A little later in the coming

23   months, they retained Mr. Filsinger and Filsinger Energy

24   Partners.  They expanded the scope of Towers Watson, their

25   compensation expert and that these professionals were

1    retained to, in fact, evaluate, look at the plans, and

2    determine how these plans would be treated in bankruptcy.

3            Mr. Evans testified that never before had they had

4    hired an energy expert or expanded the scope of Towers

5    Watson or retained counsel to review their plans.  This was

6    solely because of the fact that they were going into

7    bankruptcy.

8            Now there should be no doubt that, in this Court's

9    mind, that Mr. -- that K&E and Mr. Friske are fully versed

10   in how executive compensation plans are treated in

11   bankruptcy.  K&E includes these services in its retention

12   application and has already represented to the Court that

13   they did provide this independent advice and Mr. Friske

14   testified that he's been involved with structuring and

15   designing hundreds of these plans in and out of bankruptcy.

16           So -- and, in addition, Your Honor, in a

17   declaration that was submitted in support of the non-insider

18   comp motions by Ms. Carey Kirby, the senior executive vice

19   president for human resources, which can be found at Tab 4

20   of your binder, but you don't need to go there, Ms. Kirby

21   confirms that the modifications that they made to change the

22   existing EFH Corp. Retention Award Plan were done with the

23   input of Towers Watson.

24           So what did the debtors do?  Well, there were, at

25   the time, a hundred and twenty-eight employees eligible

1    under the plan.  For those whom the debtors contended and

2    the U.S. Trustee with healthy discussions which we've had

3    throughout this case, determined not to object, those

4    employees were non-insiders, approximately a hundred at the

5    time.  They had their own plan.  Their plan was similarly

6    called, the key leader plan.  Debtors do not dispute and the

7    evidence has borne out that the plan for the non-insiders do

8    not have an incentive component.  They are strictly -- it is

9    strictly a retention plan.  In support of the motion that I

10   had mentioned, the non-insider plans, Ms. Kirby, in her

11   declaration states that they "modified" the owner-operator

12   plan to -- and that again is the EFH Corp. Retention Award

13   Plan, I think, Your Honor understands that.  I don't have to

14   say that every single time.  But that plan to include

15   quarterly payments to focus more on retention and that these

16   quarterly payments were more appropriate than a multiple

17   year program given the uncertainty of the debtors'

18   restructuring process.

19          Ms. Kirby states at paragraph 23 that the

20   quarterly payments would improve employee morale and "create

21   stronger retention incentives."  So what happened, Your

22   Honor, was with respect to these non-insiders, the debtors

23   just did a new plan, called it the key leader plan, but made

24   it a straight retention plan.  And they added 30 other non-

25   insiders to that plan.  Now, why did they do that?  Well,

1    Ms. Kirby tells us the answer.  They added them to ensure

2    that they do not lose key employees who would be

3    particularly difficult to replace during this critical

4    period.  That's at paragraph 22 of Ms. Kirby's declaration

5    which is at Tab 4.

6              So now the debtors have taken care of this hundred

7    non -- these are executives, higher level key people, to

8    take care of those hundred and they add 30 more people in

9    and they say, okay.  It's a retention plan but we don't have

10   to call it anything other than that.  We don't have to say

11   it's anything other than that because they're non-insiders

12   and the Bankruptcy Code treats non-insiders differently than

13   it does insiders.

14             So, now, what to do with the 19 remaining

15   participants under the former EFH Corp. Retention Award

16   Plan.  Well, what do the debtors do?  They say, okay, well,

17   we're going to call this now the key leader performance plan

18   and we're going to institute the same quarterly payments

19   that we did for the other 130 non-insiders, which I will

20   repeat, that Ms. Kirby stated was done to, among other

21   things, create stronger retention incentives.  And they say,

22   well, we're going to add an incentive component to this

23   plan.

24             Now the key leader performance plan is at Tab 16

25   and I would ask the Court to please turn to that.

1              Well, here we are again with a plan that doesn't

2    contain the name that is used in all the papers but at least

3    here it's recognized to be a performance bonus plan.  And

4    what is the purpose?  It says, the amended and restated

5    Energy Future Holdings Corp. 2013 Performance Bonus Plan is

6    designed to align the interests of the company and eligible

7    key employees of the company and its subsidiaries.  Its

8    effective date, at paragraph two, is October 7th, 2013.  It

9    is a brand new plan, Your Honor.

10             This is not a continuation, as they say.  So when

11   the word, continuation, works for the debtors to show that

12   it's a historical plan, there are no changes, it's the same

13   people, da, da, da, da da.  That's okay.  But then when the

14   actual document shows it's a brand -- and, also, those

15   points are made to show, Your Honor, or to support the

16   argument that it's ordinary course.  Well, Your Honor, I

17   don't think this is ordinary course and the facts in the

18   documents that the Court has accepted into evidence do not

19   support that.  This is a brand new plan.  It comes into

20   effect October 7th, 2013.

21             At paragraph four, little (f), there's a

22   definition:  performance goals.  And what does it say?  It

23   says performance goals means the performance goals

24   established for the company's annual incentive plan by the

25   committee with respect to a calendar quarter commencing

1    during the term.

2            So, what they do, is they say, okay.  We want to

3    still give this compensation to these 19 executives.  We

4    know if we have to call it what it is, we're going to have

5    to meet the standards of 503(c)(1).  I don't believe -- and

6    we have no information, Your Honor, so I won't say one way

7    or the other, but I think one reason that they haven't

8    addressed that in this motion is there is the possibility

9    that they cannot satisfy those rigorous standards.

10           In fact, during Mr. Evans' testimony, he

11   testified, there's only one person that left the company and

12   that was two years ago.  Now, in oral argument on the

13   ceiling motion, Mr. Dempsey stated that there were other

14   people who left the company but as Ms. Sarkesian

15   appropriately noted, Mr. Dempsey is not a witness and that

16   statements by counsel are not evidence.

17           With respect to paragraph six, it talks about the

18   term of the participation and it says, subject to the

19   provisions of this plan, commencing with the calendar

20   quarter March 31, each plan participant shall earn a

21   quarterly performance bonus at the end.  And that -- and

22   this is the way get it, if, one, such participant remains

23   employed by the company group through the last date of the

24   applicable period and, two, the extent the performance goals

25   established for such performance period have been achieved,

1   provided that if the terms ends after the commencement and

2   before the end of the calendar quarter, each participant who

3   is then employed by the company shall earn a prorated amount

4   of the quarterly performance bonus for the quarter in which

5   the term ends.

6          It also says, as is different than what was

7   testified to by Mr. Burke, Mr. Burke testified that, well,

8   the participant has to be there, you know, for 30 days after

9   the quarter.  So that would be four months.  So if -- they

10  shortened the period of having to be there; however, the

11  plan allows for catch up.  So if the performance metric is

12  not met, then they can still get it if the overall annual

13  performance metric is met.

14         But here's what the document says.  It says, any

15  quarterly performance bonus required to be made under this

16  plan shall be paid by the company within 60 days after the

17  date of the participant earned -- after the date the

18  participant earned the right to such payment.  So that's

19  five months, Your Honor.  Now, we're starting to get into

20  half a year, close to half a year, five months.

21         And it also says a participant who's employment

22  with the company group terminates, and this is important,

23  for any reason, shall forfeit the right to any quarterly

24  performance bonus that has not been paid as of the date of

25  such termination.

1            I will go through with Your Honor in the other

2     plans and not try to not be interesting in doing that but

3     pointing out, you know, important provisions.  But, in other

4     plans, there are certain circumstances under which you could

5     get a pro-rated portion of your award, not here.

6            The other thing that's interesting about this

7     document is paragraph seven which says that before the

8     commencement of each performance period, the committee shall

9     establish one or more performance goals that must be

10    achieved to earn a quarterly performance bonus for that

11    performance period.  The committee may, but shall not be

12    required to, establish minimum targets and maximum targets

13    with respect to selected performance goals that provide for

14    the payment of a fraction or multiple of a participant's

15    quarterly performance bonus.

16           So, in this plan, they don't have to meet every

17    single one of the 21 metrics in the -- for the EAIP.  This

18    plan requires only one.  And they can also change it.  So --

19    they can change it before the next term.  So what I suggest,

20    Your Honor, is that this key leader performance plan, which

21    certainly is an outgrowth of the former EFH Corp. Retention

22    Plan and it's just a way to try to get the same compensation

23    to these professionals, simply inserts performance, maybe

24    one or more, the debtors have the burden of proof to show

25    what they do for each, and they have not.  But it certainly

1    shows that they just inserted a performance metric that

2    already has to be met under another plan.  There's no

3    additional performance that's required in order for the 19

4    people under this plan to receive their bonuses.

5            One thing for clarification, Your Honor, and that

6    is that it's been stated in testimony of some of the

7    witnesses and Mr. Sassower in his opening that the cost of

8    the plan is something like 2.5 million.  But there is an

9    email from Will Gerary (ph), who's an attorney at Kirkland

10   and Ellis at Tab 22, that sets forth the actual cost of the

11   key leader performance program at 3,351,500 at target and

12   says this is also the max.

13           So just to clarify the record so we have the

14   numbers correct, these are the numbers that were provided to

15   us from the debtors.  We don't agree, Your Honor, with the

16   statement that the SPC long-term incentive plan is 1.825

17   million.  And I will now turn to that plan.

18           However, Your Honor, just before I get there, I'm

19   just trying to go back and forth the documents and my notes.

20   I just want to mention also, Your Honor, that with respect

21   to the key leader performance plan, there's also an

22   individual participation agreement that goes with that.

23   It's similar to the participation agreement that was with

24   the EFH Retention Award.  It's at Tab 15, Your Honor, and

25   Your Honor will see, among other things, that at the top of

1    page two, it provides that with respect to the performance

2    period, the eligible participant will have the ability to

3    earn between 50 percent and 100 percent of the baseline

4    quarterly performance attained -- both on attainment of the

5    threshold performance goal or the baseline performance goal

6    as applicable.

7              Well, I don't know what that is, Your Honor, and

8    the debtors haven't put that into evidence.  I don't know

9    whether they're using the threshold or the baseline.  But,

10   as I will get to when I discuss the EAIP, there certainly

11   are questions about the thresholds that have been set.

12             In addition, Your Honor, in this individual

13   performance agreement on page three, there's a section

14   called Terminations of Employment and it includes that in

15   the event that your employment with the company group is

16   terminated for any reason, you will forfeit your right to

17   receive any unearned portion of your performance award.

18   This plan, Your Honor, the key leader performance plan, is

19   truly a disguised perk and, Your Honor, should not permit

20   the debtors to make payments under it without having to meet

21   the strictures of 503(c)(1).

22             Certainly, they could have an opportunity to go

23   back, regroup, figure it out and, Your Honor knows the U.S.

24   Trustee worked with long hours with many of the fine lawyers

25   at Kirkland and Ellis on the non-insider compensation motion

1    that was presented to Your Honor without objection and took

2    care of the compensation for over 5500 of the company's rank

3    and file.  And we certainly would be willing to speak with

4    them to the extent that they choose to do that and the Court

5    so finds.

6            But it is clear that this is a plan, is one of

7    those plans, that judges who have looked at these plans,

8    have said that the Court should scrutinize very carefully.

9    And I apologize if it's somewhat tedious going through the

10   actual provisions of the plans but that's what they plans

11   say and they are what they say, retention award plans.  And

12   simply including a performance metric from another plan

13   that's already in existence doesn't then convert a retention

14   plan into an incentive plan.

15           The long-term incentive plan retention awards.

16   This is the next -- you have to find this one too.  I did.

17   It's an exhibit to the employment agreements.  If Your Honor

18   will turn to Tab 6 in the binder, I'm using this as an

19   example but debtors have represented to me and of the five

20   employment agreements that have been -- well, actually, I'm

21   not sure if all seven are in, I know that two of them are

22   redacted.  But at least with respect to the five, and these

23   are for those SPC numbers, the strategy and policy committee

24   members, the top seven employees, there's not a page number,

25   Your Honor, but this is the amended and restated employment

Page 145

1    agreement for James A. Burke.  It is dated March 31, 2014.

2            And if Your Honor, pushes back a little bit, that

3    document is 17 pages and the next document is called Exhibit

4    1.

5            THE COURT:  I'm sorry.  I missed the exhibit

6    number.

7            MS. SCHWARTZ:  Certainly, Your Honor.  It's

8    Exhibit 1.  This is Tab 6 and the first document in Tab 6 is

9    the amended and restated employment agreement of

10   James Burke.

11           THE COURT:  All right.

12           MS. SCHWARTZ:  It's 17 pages.  So if you get

13   through the 17 pages, you come to a document called Exhibit

14   I.

15           THE COURT:  I got it.

16           MS. SCHWARTZ:  Okay.

17           THE COURT:  Thank you.

18           MS. SCHWARTZ:  That document -- this is the SPC

19   long term incentive plan.  Now, again, Your Honor,  nowhere

20   on this document is it called the SPC long term incentive

21   plan.  At paragraph A it talks again about a retention award

22   and it talks in terms of three retention awards, Your Honor.

23           The first retention award for Mr. Burke has

24   already been paid and so has the second retention award.  So

25   what we're looking at now, under the SPCL tip, as they call

1    it, are -- is the third retention award.  And that's Roman

2    at -- that's letter "A", III.  And it says, executives shall

3    earn an additional long term cash bonus award in an amount

4    between 500,000 and one million per fiscal year determined

5    by the company's performance as indicated by the level of

6    the competitive management EBIDTA actually achieved for the

7    fiscal years ended December 31, 2012, December 31, 2013 and

8    December 31, 2014, relative to the competitive management

9    EBIDTA threshold and target amounts set by the board for

10   each respective fiscal year, the "third retention award".

11          For the achievement of the threshold level of the

12   competitive management EBIDTA in respect of such year, the

13   executive shall earn $500,000 for the achievement of at

14   least the target level of the competitive management EBIDTA

15   in respective of -- and each year.  The executive shall earn

16   one million, the third retention target award, for the

17   achievement of competitive management EBIDTA in between

18   threshold and target levels in respect of any such year.

19   Executives shall earn an amount between 500,000 and a

20   million as determined by linear interpellation.

21          The third retention award, if earned, shall be

22   paid to executives in a lump sum on March 13, 2015 provided

23   that "subject to the provisions of subparagraph (a)(5) of

24   this Exhibit I, executive is employed by TXU Energy, the

25   company, or an affiliate thereof, on March 13, 2015."

1           Now there's a little circuitous route that one has

2    to go through in reading the plan provisions but if you look

3    at (a)(5), it says that, in the event executive's employment

4    is terminated pursuant to Section 7(b), 7(c), 7(d) or 7(e),

5    you can get a pro rata award.  But what does paragraph 7(a)

6    say?  Well, you got to flip back to the actual employment

7    agreement and look at what paragraph 7(a) says.  And what

8    paragraph 7(a) refers to is where if there's termination of

9    employment by the company for cause or the executive due to

10   voluntary resignation without good reason.

11          So, Your Honor, the employee has to stay with the

12   company for three years in order to get this retention

13   award.  And, Your Honor, with respect to this award, if they

14   don't stay for the three years and they resign, they don't

15   get it.  And, Your Honor, the retention awards are big.

16   They're going to stay.  Mr. Young's retention award payable

17   on March 31st, 2015 is $8.1 million.  Mr. Keglevic's (ph) is

18   $3 million.  Mr. Burke's is $3 million.  Ms. Doray's (ph) is

19   $2.5 million.  Mr. McFarland's is $3 million.  Ms. Kirby and

20   Mr. O'Brien, Your Honor, has those numbers.  They're also

21   what they are.  They're sealed.

22          But I'm telling you, Your Honor, these are big

23   numbers and these executives are going to stay to get these

24   amounts.  They're also  contained, Your Honor, at -- just

25   looking for third -- it might be a little earlier, which I

Page 148

1    think is a good demonstrative for the Court to look at --

2    (inaudible - 2:49:51).

3              Now, as I'm looking for that, Your Honor, I will

4    say that when Mr. Sassower stated in his opening remarks

5    that the relief that the debtors seek are only related in

6    2014, related to 2014, and that the amount sought under the

7    SPC, which, as Your Honor knows is 1.85 million, well, that

8    doesn't actually reflect the total cost of the plan.  It

9    doesn't reflect the total that's going to be payable in

10   March of 2015.  And, Your Honor, Mr. Friske may have said

11   that he has found other -- first of all, Mr. Friske stated

12   that he's never before seen, never, none, before seen

13   letters of credit obtained by companies to assure payment of

14   bonuses.

15             I've never heard of it but I'm not an expert in

16   that area.  But certainly an expert who has reviewed

17   hundreds of plans has never seen it, I think that it's fair

18   to say, Your Honor, that's not -- that's not common in the

19   industry.  He may have said on cross-examination by

20   Mr. Dempsey that he has seen other instruments, like rabbi

21   trusts used to secure payments, but he never -- he's never

22   seen letters of credit.  And, Your Honor, it was an off the

23   cuff -- well, it was testimony.  He said about 50 percent.

24   I've been practicing bankruptcy law for 21 years, I've never

25   seen it.  I don't believe that in the industry the evidence

1    the debtors have carried their burden to show that it's

2    consistent in the industry.

3            I think it's problematic, Your Honor, that the

4    debtors did not include in their motion, or actually, let me

5    say it this way.  I think it's problematic that they

6    excepted from their motion authorization to be able to make

7    those payments.  They'll make an argument before Your Honor

8    that they don't need to.  It's ordinary course.  The money's

9    already been obtained, et cetera.  That will be for another

10   day.

11           But what they're asking for you, asking you for

12   today is 1.85 million for two of their top seven executives.

13   And why are they asking you for that, Judge?  They're not

14   going to make those payments today.  They're not making that

15   until March, 2015.  They're asking you for authorization to

16   make that because they want to make sure that those two

17   people stay.  Their bonuses are not in letters of credit.

18   They're part of the top seven.  They joined the SPC

19   afterward and the debtors, for whatever reason, in their

20   business judgment, did not decide to provide that certainty,

21   that Mr. Evans testified to, over and over again in his

22   deposition testimony as to why he has to deliver to these

23   people so that they don't worry about going home and how

24   they're going take care of the families.  He testified to

25   that more than one time.

1        He put into evidence, Your Honor, I mean, as is

2   clear in the evidence and the document submitted, all of the

3   top seven SPC, are paid very high salaries.  The actual

4   salaries for -- the actual salary for Ms. Doray is in one of

5   the exhibits.  Let me see if I can get that for you.

6            THE COURT:  It's --

7            MS. SCHWARTZ:  Okay.  It's at Tab 23.

8            THE COURT:  Yeah.

9            MS. SCHWARTZ:  At Tab 23, Ms. Doray's base salary

10   for 2014 is $600,000.  Your Honor, we put into evidence

11   census data as part of the evidence that shows that the

12   median household income for a family of four in Texas is

13   about $53,000.  So I'm not making a comment as to the

14   propriety of the salary et cetera.  But certainly one can

15   draw the difference about having to take care of your

16   families, that there is an extreme difference, at least ten

17   times the salary that this executive's being paid, is ten

18   times the median income for a family of four.

19            Your Honor, with respect to the L tip program, in

20   addition, you have the same scenario.  It's another

21   compensation program with the same exact party.  And, Your

22   Honor, as has been shown on the exhibit that was prepared by

23   Mr. Panacio that has been used by every party in this case,

24   the debtors' actual performance for the past five years,

25   they have met that number every year.

1          The competitive management EBIDTA as was testified

2     to is a roll-up of those EBIDTA numbers and they've met it

3     for the past five years.  Again, Your Honor, it's just to

4     low of a threshold to show that that's a primarily

5     incentivizing plan.  It's a retention plan.

6          And, Your Honor, in addition, I don't want to

7     forget this -- I'll go quickly, Your Honor.  I don't want to

8     forget this under 503(c)(3), giving the debtors authority to

9     pay that 1.8 million, which will, they say, it's been

10    earned.  No, it hasn't been earned, Your Honor.  It's not

11    earned -- well, they might say it's earned, but it cannot be

12    paid, it cannot be paid until March 31st, 2015.  So, Your

13    Honor, if Ms. Doray or Ms. Kirby get poached, as the term

14    was used by Mr. Dempsey, they're not going to get that

15    bonus.  They're not going to get the -- Ms. Doray's not

16    going to get $2.5 million.

17         I submit to Your Honor although this is a very big

18    case and I find that in bankruptcy cases, this happens all

19    the time, of course, as -- we get desensitized to these

20    numbers.  That's huge dollars, 2.5 million.

21         Okay.  In addition, Your Honor, it's not ordinary

22    course.  Mr. Friske -- for the reasons I stated, it's not

23    ordinary course.  Mr. Friske has stated that he had never

24    before seen these letters of credit.  Although the plans

25    were put in place five years ago, in 2009, I don't believe

1    it is ordinary course to obtain letters of credit.  I

2    believe that those actions were taken to provide assurance,

3    as Mr. -- we'll use Mr. Evans' testimony and his words, to

4    provide certainty, certainty, that they would, in fact, be

5    compensated as -- for these bonuses.

6            And I think there is certainty.  The thresholds

7    are low.  They're low enough and based on the actual

8    performance in the past history, it's going to be met.  So,

9    for all the time that the debtors, on the other side, have

10   side, these are not guaranteed.  I think that's right.

11   There's no language that says they're guarantees,

12   guaranteed.  But they certainly are likely based on the past

13   five years of performance.

14           Lastly, Your Honor, I'd like to address the

15   executive annual incentive plan.  I'd like to thank the

16   Court and I'd like to thank my adversaries with respect to

17   the courtesies to allow and to permit the schedule for

18   Mr. Panacio and I think what we heard today, Your Honor, was

19   -- there were no surprises.

20           Mr. Panacio put together a chart which is now an

21   exhibit at Exhibit No. 36 and included in that chart

22   information provided by the debtors.  He's an accountant.

23   He puts it on a spreadsheet.  He uses Excel.  My dad's an

24   accountant.  He writes me letters on -- in Excel.

25           (Laughter.)

1            MS. SCHWARTZ:  He'll kill me for that one.

2            THE COURT:  Uh-huh.

3            MS. SCHWARTZ:  Anyway, so he put his spreadsheet

4     because he wanted to see, well, where do these numbers play

5     out.  What do they look like?  How can I understand that?

6     And this was, I submit, a very helpful document.  It was

7     asked to be used by the debtors' witnesses.  It's helpful

8     for everybody to get a look.

9            Now, it's true, Your Honor, that the debtors have

10    spent a lot of time trying to persuade the Court that a

11    straight calculation, taking the average of all the actual

12    performance, and comparing it to the threshold is not

13    appropriate.  You shouldn't do that because you don't get

14    the right numbers and it's not a fair reading.

15           I think, Your Honor, that the debtors bear the

16    burden of proof to show that, and I may have not done that,

17    and I want to tell you why we think they have not done that.

18    First of all, with respect to the EBIDTA numbers, I mean,

19    Ms. Sarkisian went through this chart in step by step,

20    logical progression with Mr. Panacio and she elicited from

21    him all the numbers and what the percentages were in terms

22    of comparing the thresholds to the average of the actual

23    performance for the past five years, without disclosing the

24    EBIDTA numbers or the contribution margin.  Your Honor has

25    those numbers.

1           It is fair to say that the 2014 thresholds are

2    below the actual average or above depending upon whether

3    it's a cost or a revenue side, for the past five years and

4    sometimes substantially.  Mr. McFarland sought to explain

5    why that was with respect to EBIDTA by commenting on the

6    debtors' hedging program.  However, as we -- as I stand here

7    today, Your Honor, the debtors have not met their burden of

8    proof to show that the hedging program is a dollar for

9    dollar reduction on the EBIDTA numbers.  The debtors have

10   not met their burden to show which hedging program they're

11   really talking about.  When Mr. Schepacarter attempted, at

12   length, to obtain from Mr. Friske, the corporate hedge book

13   that he was discussing and talking about and had mentioned

14   in a chart in his 67 page report, Mr. Filsinger was unable

15   to give all the details with respect to the corporate hedge

16   book.  Mr. McFarland, who was able to give the Court numbers

17   off the top of his head, that seemed to be consistent with

18   the first day presentation that Mr. Sassower had presented

19   on first day, as a demonstrative, at first day hearings.

20           However, Your Honor, as Your Honor knows, this

21   company has a large hedging and trading component, a very

22   large one.  And, Your Honor, we had -- they made a motion to

23   the Court for their hedging and trading programs.  And the

24   U.S. Trustee spent a lot of time with them because as part

25   of that hedging and trading program, they also had what the

1    debtors were calling proprietary trades.  So -- and they

2    acknowledge that it was one of the most complicated motions

3    to get the U.S. Trustee to understand, would be consistent

4    with the law, and reasonable under 345 and all of the other

5    Code sections that would apply.  But as we stand here today,

6    Your Honor, we don't know what hedging they're talking

7    about.

8            Now, Mr. Sassower says in his closing that he'd

9    like to clarify the hedging for the Court.  Again, Your

10   Honor, Mr. Sassower's not a witness.  And what he says,

11   although it may be helpful, is not evidence.  We don't know

12   if -- when Mr. McFarlane says, "well, we made 1.8 million on

13   this particular corporate hedge book, and the next year we

14   only made 1 million, and therefore that affects the EBITDA."

15   He didn't say it was a dollar after dollar reduction.  We

16   don't know.  We just don't know, Your Honor, and the debtors

17   have not met their burden to show the Court that that is the

18   factor that affects their actual target and can show the

19   Court that the target -- that on their face, and as

20   demonstrated in Mr. Panacio's Exhibit 36 fall well below the

21   average actual performance for the past five years.

22           Okay, now in addition, I would note, Your Honor

23   that -- another issue was that also was not fully put before

24   the Court was the impact that the hedging that Luminant does

25   really affects the TXU EBITDA.  Mr. Burke said, or

1    Mr. Filsinger said it affects it because TXU buys its power

2    from Luminant.  So, if the amount of Luminant EBITDA is

3    down, it affects it.  I'm sorry, Your Honor, but I don't

4    believe that the debtors have met their burden of proof to

5    explain why the hedging program, which is a Luminant hedging

6    program, affects the TXU EBITDA numbers such that they would

7    not, in fact, fall below the average performance for the

8    past five years.  And they have the obligation to do that.

9            Now, another comment that was made by the debtors

10   was that there's a mountain of evidence before the Court.

11   There's a lot of evidence before the Court, but just because

12   there's a quantity of evidence doesn't mean that the debtors

13   have satisfied and explained these questions as to why their

14   thresholds should not be found by this Court to be too low,

15   and that the plan be found to be not primarily

16   incentivizing.

17           (Indiscernible).  In addition, Your Honor, another

18   issue that Mr. Panacio had looked at had to do with

19   Mr. Friske's use, and the debtor's use of these peer groups,

20   the peer group.  And as Your Honor may recall, Mr. Friske

21   testified to the Court that the peer group was not invented

22   by him.  It was the debtor's peer group.  And the debtors

23   had used this peer group for a long period of time.  I asked

24   Mr. Friske, "well, Mr. Friske, how did you determine that

25   these peer groups were, in fact, peer groups?"  And he said

1    he looked at the operations; he looked at various factors;

2    etcetera.  Now one of the things that he said when we

3    brought out to him, well, you know, it appears that -- we

4    asked him, have -- I asked him, "have any of the peer groups

5    used comparables that you're saying to support the debtors'

6    argument that it's consistent with industry standard?  Are

7    any of these comparables in these companies, have they had

8    net income losses for the past four years?"  And what did he

9    tell you?  I don't know and it doesn't matter.

10            Well, that's for the Court -- I think that's for

11   the Court to decide because we think it does matter as to

12   whether or not those are, in fact, comparable companies.

13   What he said was it's about talent, not about the

14   performance of the company.  It's not about whether they're

15   generating a profit.  You don't really need to look at that,

16   and he didn't consider that, but that it's about talent.  So

17   if you're (indiscernible - 3:07:26) company and somebody's

18   had a lot of experience, etcetera, that's what he looks for.

19   So I think that that is a problem with respect to the notion

20   that these are, in fact, peer groups and it's consistent

21   with industry standard.

22            The other thing, Your Honor, is -- and I think it

23   was asked on cross of Mr. Panacio was an attempt to

24   criticize Mr. Panacio's analysis or diminish its usefulness

25   to the Court was did Mr. Panacio look -- did he look at the

1    compensation plans for all of these other companies?  And he

2    said, frankly, no.  Well, neither did Mr. Friske.

3            If Your Honor looks at Mr. Friske's declaration,

4    you're not going to see that he looked at the compensation

5    programs for all of these other companies.  He didn't.  And

6    that's not his testimony.  What he said was, he looked at

7    operations.  He's done a lot of these plans, but that's not

8    what he looked at when he looked at the peer groups to see

9    if they, in fact, had the same compensation plans as the

10   debtors.  He said it's common to have more than one plan.

11   Compensation package, it's common that there's more than one

12   plan.  But he didn't say that he went and looked at the --

13   all the plans of the peer group companies.  So I think it's

14   fair to say, Your Honor, if their expert in compensation

15   didn't look at that, I'm not sure what weight Your Honor

16   should give that with respect to Mr. Panacio.

17           And let's see -- Your Honor, I want to talk about

18   for a minute -- I want to talk about the risks.  There's

19   been a lot of talk about the risks, and there's been a lot

20   of talk about how they can affect the metrics.

21           Now Mr. Filsinger's role in all of this, as

22   debtors concede, is very, very narrow.  His role was solely

23   to look at the metrics.  And what did he do?  He took the

24   actual numbers of June because the debtors knew that in

25   order to get this executive annual incentive plan approved,

1    they were going to have to show that this plan was in fact

2    incentivizing.  They had a problem.  They already had their

3    June numbers.  And so, when they looked at their June

4    numbers and did their own calculation as to what year to

5    date would be, notwithstanding that they didn't think that

6    Mr. Panacio's extrapolation of doubling the numbers was

7    appropriate and cited a couple of instances why that might

8    not have been, but they increased the thresholds, Your

9    Honor, of 18 -- of 21 of the metrics.

10          Mr. Evans testified they've never done that before

11   and he's been with the company since its beginning seven

12   years ago.  He's the chairman of the board for seven years.

13   He's the chairman of the ONC for seven years.  They never

14   did a mid-year review where they did a wholesale revision.

15   They did it, as he said, for the purpose of bankruptcy.  It

16   makes sense, Your Honor, that they did it because they have

17   very -- they have lots of professionals that want to be able

18   to get these plans approved by the Court, but it's not

19   ordinary course.  It's not something they do in their

20   historical practice to do a mid-year, wholesale revision of

21   18 of the targets.

22          I might be jumping around a little, Your Honor.

23   I'm tired and I'm trying to just get to the end of my -- the

24   points that I want to make sure I --

25          THE COURT:  I'm following you, that's fine.

```
 1              MS. SCHWARTZ:  Thank you, Your Honor.

 2          So I wanted to talk about the risks, Your Honor.

 3   And that is -- you saw Mr. Evans and he testified that the

 4   risks that are included in the debtors' motion, which when

 5   one would read would say wow, that's a lot of variables as

 6   to whether or not these metrics can and cannot be met.  And

 7   Mr. McFarlane and Mr. Burke and Mr. Filsinger all provided

 8   testimony about the risks and how the various,

 9   uncontrollable aspects could affect the metrics.  We heard a

10   lot about the weather and how they can't control the

11   weather.

12          And as a layperson and not an energy expert, I

13   asked Mr. Evans, I said, "well, you have all of these risks,

14   right?"  And he -- and as I said in my opening, he made me

15   read every single one of them.  And I said, "well, are these

16   all of the risks?"  And he said, "yes, it's a good list."

17   Now, Mr. Burke said, "well, you know, you can't really look

18   at it that way because these risks play out differently."

19   And he tried to explain -- you did explain how weather could

20   play out differently, or outages will play out differently,

21   and there was some testimony about being -- maybe it

22   Filsinger that said they're eight hours behind on one of the

23   metrics and how critical that is.

24          But at the end of the day, Your Honor, they have

25   these risks every single year.  And whether one plays out
```

1    one way in one year and one plays out another way in another

2    year, the facts in evidence show you, Your Honor, that based

3    on the actual five year performance, and an average of that,

4    the thresholds that they've set under the EAIP, which

5    remember are the same numbers they're using for these other

6    two plans, are not -- they're lower.

7          So one of the things that Mr. Panacio did, and I

8    think it's helpful to the Court, it's certainly helpful to

9    show why there's a real question about whether these

10   thresholds are too low, is that in his declaration, and I'm

11   just going to grab it, in his declaration, I hope I have it

12   -- declaration, he took the numbers in his chart and he

13   compared based on the debtors' information in their

14   scorecards, which are at Tab 3 in the binder, he took the

15   information there and he compared the actual for 2009 EBITDA

16   of Luminant against the threshold for 2009 EBITDA for

17   Luminant.  And he did it across the board for each year,

18   2009, '10, '11, '12, '13.  He got those comparisons.  He

19   took the numbers and he averaged it.  And what did he find?

20         He found what he has said in footnote five of his

21   declaration, which is the following, "Luminant Management

22   EBITDA exceeded threshold and baseline by 20.86 percent and

23   4.74 percent respectfully -- respectively.  Superior was not

24   met.  TXU EBITDA exceeding -- exceeded threshold, baseline

25   and superior, by 42.42 percent, 13.54 percent, and 3.52

1    percent respectively.  And business services EBITDA, which

2    Mr. Burke explained is a roll up of these other EBITDAs,

3    exceeding threshold and baseline by 22.68 percent and 2.26

4    percent respectively, superior was not met."

5              Well, with those percentages, it appears, Your

6    Honor, that that is significant evidence to show that these

7    thresholds are too low, and that they do not support a

8    finding by the Court that the threshold targets,

9    notwithstanding the well means and substantial efforts of

10   Mr. Filsinger to modify those targets in June and enhance

11   them, increase them, so that the debtors would stand a

12   better chance of the Court finding that the executive annual

13   incentive plan is, in fact, an incentive plan that falls

14   outside the scope of 503(c)(1).  And I think that's all I

15   have for Your Honor.  I want to just say thank you.

16             THE COURT:  You're welcome.  Thank you.

17   Mr. Sassower?

18             MR. SASSOWER:  For the record, Edward Sassower of

19   Kirkland & Ellis on behalf of the debtors.

20             Your Honor, Ms. Schwartz spent half of her closing

21   quoting to various language in various documents.  All of

22   the language that she quoted to, retentions award, and

23   retention, and retain, have one thing in common, none of

24   that language is before the Court.  Tab 17 and 19 in the

25   binder are the owner/operator plan which has expired.  It is

1    not before the Court.

2          If you'll turn to the document I handed to you at

3    the end of my closing and turn to page 20, this is the SPCL

4    tip language that Ms. Schwartz was quoting to, and you can

5    see right there, squarely in the middle of that box is the

6    word "retention award."  But this language is not before the

7    Court.  If you flip the page one page earlier, page 19, this

8    is the language before the Court and you'll see it says

9    "supplemental incentive award".

10          Similarly, Ms. Schwartz spent a lot of time

11   quoting to the declaration of Ms. Kirby.  That declaration

12   was submitted in connection with the key leader program, not

13   the key leader performance program, and the key leader

14   program is for non-insiders and is a retention-based

15   program.  But there is a huge distinction between that key

16   leader program and the one before the Court, because for

17   that program, that's not that you've already approved for

18   non-insiders, it's retention-based.  You just have to stick

19   around.  For the one before the Court, you have to hit the

20   financial metrics in order to get paid.  You don't get paid

21   a dollar if you do not hit the metrics.  So that is a -- so

22   the declaration that Ms. Kirby submitted is entirely not

23   applicable here.

24          So I just -- it is a lot of documents.  There's a

25   lot of language being thrown around, and I just want to be

1    clear that, you know, some of the debtors' prior programs

2    before the restructuring effort started, before they

3    commenced, before the Court -- before the debtors knew about

4    Section 503 of the Bankruptcy Code.  You used the word

5    retention.  You used the word retained.  Some of them were

6    time based.  All of those elements as they relate to

7    insiders have been stripped out and replaced with hard to

8    meet, incentive metrics.  I don't see how the fact that

9    plans that have expired that are not before the Court that

10   mention the word retention that were put in place not in

11   connection with the restructuring, you know, are relevant

12   here.

13          You heard a bunch about how Mr. Evans said that

14   the company had never before revisited metrics in the middle

15   of the year, had never before hired restructuring

16   professionals to review their compensation plans.  Well, the

17   company's never been through a restructuring before.  Why

18   would they have hired restructuring professionals for

19   restructuring to review the plans?  Reviewing the metrics in

20   a middle year was done in contemplation of the

21   restructuring.  We did not want to be criticized for people

22   going back to when the plans were first put in place and

23   saying, well, you're halfway through the year, you know, how

24   are you doing on those metrics?  So we did the responsible

25   thing, a thing that should be applauded, not criticized.  We

1    went through each and every metric, and we increased 18 of

2    them.  The fact that we increased almost all of them, that's

3    a good thing, that's not a bad thing.  We made them harder

4    to reach, more incentivizing.

5              The -- at the very best, if you want to be, you

6    know, the most generous you could say is that Ms. Schwartz's

7    argument is that one of the plans, a key leader performance

8    program is not ordinary course and it should meet the Dana

9    factors because tying it to the owner/operator plan, even

10   though it has the same people, and the, you know, roughly

11   the same payout amounts, you know, if the metrics are hit,

12   it's still different because that plan includes a retention

13   -- an incentive component.  I'll come back to that in a

14   second.

15             And so that one plan really shouldn't be viewed as

16   a successor to the owner/operator plan.  That one should be

17   considered a new plan.  If it's a new plan, we still pass

18   the test.  It's the Dana factors, and Ms. Schwartz didn't

19   spend any of her time arguing that we haven't satisfied

20   those factors.  And this little incentive component that we

21   added, that little component says you don't get anything

22   unless you hit the metrics.  So I don't -- it changed its --

23   that little component is everything.  Before the plan, half

24   of it was based on incentive and half of it was based on

25   retention, and now the entire plan, the successor plan, is

1    based on incentive.  That's not a little component.  That's

2    a game changer.

3            On the EIAP, the third plan, Ms. Schwartz didn't

4    spend really any time talking about the language.  She spent

5    more time talking about the relevant targets.  I don't want

6    to repeat all the things I said previously, just a couple of

7    notes.  Ms. Schwartz said that I testified to the amounts in

8    the hedging program and I'm not a witness, but everything I

9    said was said by a witness.  All of those numbers are in

10   evidence, through Mr. Filsinger, through Mr. McFarlane.

11           Ms. Schwartz said that Mr. Friske did not review

12   the compensation plans of all those other companies.

13   Ms. Schwartz and her colleagues never asked that question to

14   Mr. Friske.  That's testifying from the podium, just to put

15   words in Mr. Friske's mouth saying -- assuming they asked

16   him and he answered no, when it's our understanding that he

17   actually did review all of those plans.  That's based on a

18   tower survey of those compensation plans of those companies.

19           With that, Your Honor, I think I -- I don't want

20   to repeat some of my prior comments.  I do think there are a

21   couple in the courtroom who did want to speak in addition to

22   myself and Ms. Schwartz.  So --

23           THE COURT:  Okay, briefly, Ms. Morgan.

24           MS. MORGAN:  Good afternoon, Your Honor.  I'll be

25   very brief.  Pauline Morgan from Young, Conaway, Stargatt &

1    Taylor.  I'm here today on behalf of the ad hoc committee of

2    TCEH first lien creditors, largest creditor constituency in

3    the case.  We did file a statement in support of the motion.

4    After considering and reviewing the U.S. Trustee's objection

5    and the evidence we've heard for two and a half days, we

6    still support it.  Your Honor, we believe the debtors have

7    clearly met their burden and have demonstrated that the

8    plans are not primarily retentive, that the performance

9    metrics were well thought out, and that management is

10   appropriately challenged to meet them.

11          Frankly, Your Honor, our view is that the debtors'

12   business judgment here, including the comprehensive process

13   undertaken to develop these plans and metrics, and then to

14   modify and refine them, is frankly exemplary.  Your Honor,

15   the facts and circumstances of this case require that the

16   plan participants have market-based, competitive

17   compensation packages to incentivize them, to drive for

18   success, and to maximize creditor recoveries.  The ad hoc

19   committee is in support of the debtors' management team and

20   we would like them to be properly compensated and

21   incentivized.  And, Your Honor, we think that based on the

22   expert testimony you've heard, as well as the fact testimony

23   you've heard, that the plans and metrics here are, in fact,

24   appropriate, incentive-based compensation bonuses for this

25   company.  And for those reasons, Your Honor, we ask that the

1    Court approve the motion.

2            THE COURT:  Thank you.

3            MR. BIRD:  Good afternoon, Your Honor.  John Bird

4    of Fox Rothschild on behalf the ad hoc group, the TCEH

5    unsecured noteholders.  I'm sorry Mr. Shore couldn't make it

6    for the three days of trial.  He asked me to convey an

7    agreement that was reached between the unsecured group and

8    the debtors, that the Court granting the relief sought under

9    the compensation motion is without prejudice to any

10   preference claim concerning pre-petition payments or

11   transfers.  With that understanding, we have no objection to

12   entry of this order.

13           THE COURT:  Thank you.  Anyone else?  All right,

14   I'm going to take a recess to gather my final thoughts, and

15   come out and provide a ruling that I've been working on,

16   that I've been refining throughout today and will continue

17   to refine it during the break.  So let's reconvene at 4:30

18   and I'll provide my ruling at that time.

19       (Chorus of thank you)

20       (Recess)

21           THE CLERK:  All rise.

22           THE COURT:  Please be seated.  All right.  I'm

23   ready to give my ruling.  I'm going to read I think because

24   it's going to become somewhat obvious, I spent a lot of time

25   thinking about the evidence and forming this ruling and it's

1   based on all of the evidence, including the evidence that

2   came in today and the opposing arguments.  I've been working

3   on refining it, so I'll get started.

4          Before the Court is the debtors' motion to approve

5   three compensation plans applicable to the debtor's senior

6   management, all of whom are insiders for purposes of this

7   motion.  There's a fourth plan discussed in the motion, but

8   as no objections were filed to that plan it's not being

9   discussed here.

10          The three plans before the Court are one, the

11   executive annual incentive plan or EAIP, two the key leader

12   performance plan and three, the portion of the strategic

13   planning committee long-term incentive plan for 2012 through

14   2014 also known as the LTIP.

15          The debtors' argue that all three plans were

16   adopted in the ordinary course of business and are primarily

17   incentive, as opposed to retention plans, thus meeting the

18   standard for approval articulated in this Court's opinion in

19   Nellson Nutraceutical 369 B.R. 787.

20          The Office of the United States Trustee has

21   objected.  The trustee argues that the plans are not

22   incentive plans, but rather retentive and thus are subject

23   to the limitations of 503(c)(1), which governs retention

24   plans for insiders, a standard that the debtors acknowledge

25   they cannot meet.

1          In addition the trustee argues that the plans were

2    not adopted in the ordinary course of business and assuming

3    they are incentive plans, the applicable law Section

4    503(c)(3) which requires that the plans be justified by the

5    facts and circumstances of the case, a standard that the

6    trustee argues the debtors have failed to meet.

7          The Court will grant the debtors' motion and

8    overrule the trustee's objection in its entirety.  As will

9    be discussed in some detail shortly, the Court finds that

10   the evidence overwhelmingly supports a finding that the

11   EAIP, key leader performance plan and LTIP are incentive

12   plans.

13          (Indiscernible - 4:35:29) with all such plans,

14   there is a retentive element to each.  They are primarily

15   incentivizing or motivational in nature, thus Section

16   503(c)(1) is not applicable.  In addition, the EAIP and LTIP

17   were adopted in the ordinary course of business and are to

18   be governed under the deferential standard applied to such

19   actions.  The key leader performance plan, however, was

20   adopted outside the ordinary course of business.  As such,

21   that plan is subject to Section 503(c)(3) of the Bankruptcy

22   Code and may only be approved if justified by the facts and

23   circumstances of the case.

24          There is some disagreement between courts as to

25   the correct and the manner, excuse me, as to the correct

1    manner in which to apply the facts and circumstances test.

2    Some courts including in this district have stated that it

3    is nothing more than another way to implement the business

4    judgment standard applicable to transactions outside of the

5    ordinary course of business under Section 363(b).  Moreover

6    in the case of in re: Dana Corporation, 358 B.R. 567, the

7    late Judge Lifland articulated six factors that courts

8    should consider in determining whether a compensation plan

9    meets the outside the ordinary course of business standard.

10          Other courts, most notably, the Northern District

11   of Texas in the case of in re: Pilgrim's Pride Corp. at 401

12   B.R. 229, have adopted a more stringent standard.  Without

13   specifically adopting either test for the avoidance of doubt

14   in this case, the Court will apply the most stringent test

15   identified to judge such plans under Section 503(c)(3), the

16   Pilgrim's Pride test.

17          Moreover, the Court will apply that test to all

18   three plans, including the EAIP and LTIP that the Court

19   nonetheless finds were implemented in the ordinary course of

20   business.

21          After applying the most stringent test identified

22   by any court to measure insider incentive plans adopted

23   outside the ordinary course of business to the EAIP key

24   leader performance plan and the LTIP, I find that each plan

25   easily and overwhelmingly meets the standard.  It is not a

1    close call.

2           While Mr. Filsinger did not find the debtors' coal

3    plants to be gold plated, I find that these incentive plans

4    define the gold standard.  The debtors' plans at issue in

5    this case are not primarily incentive plans and/or did not

6    meet the justified by the facts and circumstances test, then

7    it is hard to imagine how any plan could.

8           To begin, based upon the exhibits in evidence and

9    the testimony of the witnesses, which will be discussed in

10   more detail shortly, I will describe each of the

11   compensation plans before the Court.

12          Each of the plans has the same basic structure.

13   Under each plan, the debtors' selected performance metrics

14   that were designed to measure management's job performance.

15   Those metrics were weighted to reflect the debtors' judgment

16   as to which metrics have more impact in measuring

17   management's performance.

18          The debtors' then established targets for each

19   metric designed to challenge management to perform at the

20   highest level.  Those targets were generally placed in three

21   categories in increasing difficulty as threshold, baseline

22   and superior.  Management's entitlement to receive a bonus

23   depends upon reaching those targets on a weighted basis.

24          If the threshold target is not reached, management

25   does not receive a bonus.  If management achieves the

1    baseline target, the bonus increases and the maximum bonus

2    is awarded if the superior target is reached.  These

3    metrics, they're weighting and the performance targets are

4    known as the scorecard.

5              Furthermore, each individual is assigned a

6    personal modifier that is applied to the bonus amount

7    awarded under the plan generally.  The EAIP is the outgrowth

8    of the annual incentive plan that was established in or

9    about 2004.  The AIP, as it applies to non-insiders was

10   previously approved by the Court.  The EAIP is applicable to

11   all 26 insiders subject to the motion.

12             The scorecards are divided into three categories

13   to measure the performance at TXUE Luminant and the holding

14   company.  The details of the identity of each performance

15   metric and the weight are in the record and I won't belabor

16   this ruling by going through them one by one.

17             I would note, however, there is one variation with

18   the scorecards in that Luminant -- at Luminant certain

19   management employees have a separate performance metric than

20   others and that's one linked to safety.

21             The targets for the performance metrics are set at

22   threshold, baseline and superior.  The specifics are in the

23   record and too detailed also to discuss in this ruling.

24             The most significant fact is that in June 2014,

25   the threshold targets were toughened for all of the TXUE

1    performance metrics, other than average days sales

2    outstanding and the baseline for residential and end

3    customer count was also toughened.

4              At Luminant, all of the threshold performance

5    metrics were toughened as were three of the baseline and two

6    of the superior metrics.

7              Other than EFH Business Service costs, the

8    performance metrics at the business service level dropped

9    down from TXUE and Luminant, so as the TXUE and Luminant

10   targets were toughened, so were the business service

11   targets.

12             The performance targets were toughened because the

13   debtors had better than expected results for the first six

14   months of the year.  Rather than going into the second half

15   of the year with the bonuses, at least at the lower levels

16   assured the debtors' toughened those targets so management

17   would continue to be challenged to perform at a high level.

18             The potential cost of the EAIP is 5.9 million at

19   threshold, 7.9 million at baseline and 15.9 million at

20   superior.

21             The key leader performance plan is a new program

22   for 2014.  It is an outgrowth of the so-called owner

23   operator plan put in place in 2010.  It is applicable to 19

24   persons, which are management subject to the motion, except

25   for the seven members of the debtors' strategic planning

1    committee comprised of the debtors' most senior management.

2            The key leader performance plan metrics are tied

3    to overall company performance, competitive management,

4    EBITDA and competitive total spent.  As with the business

5    service targets, these targets were toughened by the changes

6    at the TXUE and Luminant targets.

7            The potential total cost of the key leader

8    performance plan is 1.7 million at threshold and 2.56

9    million at baseline.

10           The strategic planning committee, long-term

11   incentive plan or LTIP applies to the seven members of the

12   debtors' strategic planning committee, John Young, EFH CEO,

13   Jenny Burke, TXUE CEO, Stacy Duray, Executive

14   Vice-President, general counsel and co-CRO, Paul Keglevic,

15   Executive BP, CFO and co-CRO, Carrie Kirby (ph), Executive

16   Vice-President, human resources.  Mac McFarland, Luminant's

17   CEO and John O'Brien, Executive VicePresident, public policy

18   and external affairs.

19           The LTIP is a three year plan for 2012 through

20   2014.  The bonuses for 2012 and 2013 under the LTIP have

21   already been earned through the debtor performance for those

22   years.  The 2014 term is obviously still in progress.

23           The bonus payments that come due under the LTIP

24   are secured by letters of credit.  The debtors are not

25   seeking, at this time, authorization to make bonus payment

1    subject to the letters of credit and indeed may never seek

2    such authorization.

3           What is before the Court is that portion of bonus

4    payments not secured by letters of credit for two employers,

5    Ms. Duray and Ms. Kirby.

6           The performance metric for the LTIP is competitive

7    management EBITDA, the target for which was toughened by the

8    toughening of the EBITDA targets at TXUE and Luminant.

9           The total cost of the LTIP before the Court, i.e.

10   for Ms. Duray and Ms. Kirby is approximately $1.8 million.

11   The cumulative amount the debtors are seeking approval of

12   the this motion is approximately 7.6 million at threshold,

13   12.3 million at baseline and 20.3 million at superior.

14          In addition to the exhibits admitted into

15   evidence, the debtors submitted the testimony of four

16   witnesses in support of their motion.  Jen Burke, CEO of

17   TXUE, which is the debtors' retail energy company.  Mac

18   McFarland, CEO of Luminant, which is the debtors' mining and

19   power generation company, Doug Frisk, who is an expert on

20   compensation and Todd Filsinger who is an expert on the

21   energy business.

22          Mr. Burke and Mr. McFarland testified as to the

23   complicated and challenging nature of the debtors'

24   businesses, the history and current make up of the

25   compensation plans, the reasons for the selection in

1    weighing of the performance metrics that serve as the

2    targets for the compensation plans, which is referred to as

3    the score card, the bottom up budgeting process in 2013 by

4    which the debtors' ultimately determined the performance

5    metrics and scorecard for 2014, the challenging nature of

6    the targets established in 2013, the debtors' better than

7    expected performance in the first half of 2014, the

8    toughening of the 2014 targets in June and the reasons

9    therefore and the continuing, if not increased, challenging

10   nature of the toughened targets for 2014.

11          They also testified at length about the evolution

12   of the debtors' business over time, the negative effect on

13   certain performance metrics as a result of the tailing off

14   of the debtors' extremely beneficial hedging transactions

15   established in 2006 and 2007 and the seasonal nature of the

16   debtors' business that makes it impossible to fairly judge

17   the debtors' 2014 performance by simply comparing the 2014

18   performance metrics to the debtors actual results for the

19   previous five years or by doubling the debtors' performance

20   for the first half of 2014.

21          Mr. Friske testified as an expert with regard to

22   the compensation plans.  He described each of the plans and

23   compared them to the debtors' previous plan, which are

24   identical with a few exceptions.  One, the debtors' key

25   leader performance plan is a new plan for 2014 that is a

1    continuation of the previous owner/operator plan.  Two,

2    unlike the owner/operator plan which was 50/50 with regard

3    to incentive and retention, the key leader performance plan

4    is based 100 percent on reaching performance targets.

5    Three, the payment period under the key leader performance

6    plan has been switched from semi-annually to quarterly, and

7    four, the 2014 targets for all three plans were toughened in

8    June 2014, which was the first time the debtors had made any

9    mid-year adjustments to its performance metrics.

10           Notwithstanding these changes, Mr. Friske opined

11   that the plans were substantially identical to their

12   previous iterations.  Mr. Friske also compared the debtors'

13   plans to those of comparable companies.

14           Mr. Friske testified that the plans were

15   substantially similar to the compensation plans of those

16   comparable companies, in particular that the use of EBITDA

17   to judge business performance as opposed to, for example,

18   net income was consistent with industry practice and those

19   of the comparable companies or peer group.

20           Mr. Filsinger testified at length as an expert as

21   to the nature of the debtors' business, the relevance of the

22   performance metrics and their challenging nature based upon

23   industry performance as well as the debtors' past

24   performance.

25           Mr. Filsinger also persuasively testified that the

1    debtors' historical performance was above industry average

2    and in many instances, well above average.

3              Significantly, he cautioned that the debtors'

4    assets have a finite attainable performance level and that

5    setting performance metrics too high based upon prior

6    results can be counterproductive.

7              He further testified that exceeding industry

8    averages at the levels established in the debtors'

9    performance metrics, even if the debtors have previously met

10   similar levels.

11             Moreover he testified that it is appropriate to

12   build in some cushion for risky, finite and in some

13   instances, seemingly minor events that might have a huge

14   affect on performance.  He provided numerous examples of

15   these types of events, these type of events, the most

16   striking of which to the Court is the $2 million negative

17   affect to Luminant's EBITDA that results from everyday that

18   the debtors' Comanche nuclear power plant is offline.

19             On cross-examination, Mr. Filsinger testified at

20   length as to the historically beneficially effect of the

21   debtors' hedging program implemented in 2006 and 2007 that

22   has since run off and is not replicable as well as to the

23   debtors' current risk management hedging program, which is

24   substantial and potentially beneficial, but simply cannot

25   replicate the success and impact of the historical hedging

Page 180

1    program.

2              In response to the trustee's questioning regarding

3    the repetitive nature of certain risks that exist every

4    year, such as weather, which is obviously outside, to

5    control the debtors, he testified that it's not that the

6    debtors can never predict weather changes, it's how the

7    debtors' plan for these changes.

8              For example, it is expensive to over hedge the

9    purchase of power at TXUE and expensive to buy power at spot

10   market, so management must perform a balancing act in the

11   face of unpredictability.

12             The same can be said for bad debt from consumers.

13   If a customer's bill is high as a result of bad weather,

14   then the risk of non- payment increases.  So a larger demand

15   for power does not necessarily mean a huge boon for the

16   debtors.  It leads to a higher level of non-payment and

17   possibly customers leaving to go to another power provider

18   because the bill is higher.

19             It is management's successful balance between

20   hedging power purchases, buying power in the spot market and

21   customer satisfaction and payment, for example, which is

22   being measured and rewarded.

23             Each of the debtors' witnesses were entirely

24   credible and the trustee's cross-examination had, at most,

25   negligible adverse affect on the substance or credibility of

Page 181

1    the testimony.

2            The Court found Mr. McFarland and Mr. Filsinger to

3    be particularly competent and credible witnesses, although

4    as just stated, all four witnesses were credible and

5    persuasive.

6            The debtors and the trustee both designated

7    portions of the deposition testimony of the debtors'

8    chairman of the board Donald Evans (ph), the former United

9    States Secretary of Commerce.  Mr. Evans is also chairman of

10   the operations and compensation or O & C committee.

11           The Court reviewed the deposition testimony in

12   both video and transcript form.  Mr. Evans testified about

13   the importance of the compensation plans, albeit, with more

14   emphasis on their retentive affects than the other

15   witnesses.  He also testified at length about the quality of

16   management team and the importance of establishing

17   challenging, but achievable targets.

18           Mr. Evans testified that as chairman of the board,

19   he seeks management in a competitive market, so he must

20   create employment and compensation packages to entice good

21   management to accept employment and to remain with the

22   debtors.  But Mr. Evans testified that he has to balance

23   this retentive portion with the need to maximize the value

24   of the debtors' enterprise for their creditors, which means

25   that certain financial targets must be established and met.

1              He also testified that the incentive plans are

2     particularly important as his management team did not

3     receive annual salary increases in 2014.

4              Mr. Evans was a credible witness.

5              The trustee's argument that Mr. Evans -- Mr.

6     Evans' testimony established that the plan were retentive,

7     not incentive, is not borne out by the record.

8              The use of the term layup, for example, at various

9     points by Mr. Evans was not significant.  And while he

10    focused more on the retentive effects of the plans than the

11    other witnesses, he also stressed the significant importance

12    of the incentive affect of the plans.  Mr. Evans' testimony

13    in no way supports a conclusion that the plan is a primarily

14    retentive in effect.

15             Finally, in addition to the exhibits admitted into

16    evidence and the depositions designations of Mr. Evans, the

17    trustee submitted the testimony of Michael Panacio an

18    accountant and analyst with the Office of the United States

19    Trustee to provide lay witness opinion testimony under

20    Federal Rule of Evidence 701 as to a mathematical analysis

21    he performed of the debtors' performance metrics and

22    targets.

23             Mr. Panacio presented a simple mathematical

24    analysis of the debtors' plans in which he compared the 2014

25    performance metrics and targets to the debtors' average

1    performance over the last five years.

2            He also compared the 2014 targets to his projected

3    2014 results, which he established by doubling the debtors'

4    actual performance through June 2014.

5            This analysis demonstrated that the debtors'

6    actual results for the last five years routinely bettered

7    the 2014 threshold targets and in certain instances, the

8    baseline or superior targets.  In addition, it showed that

9    in certain instances, that the 24 -- in certain instances,

10   that the 2014 projected results exceed the debtors' 2014

11   threshold and/or baseline targets.

12           The testimony of the debtors' fact and expert

13   witnesses as well as the cross-examination of Mr. Panacio

14   largely discredited this analysis.  Given, among other

15   things, the complex evolving nature of the debtors'

16   business, the loss of the historical hedging program, the

17   cancellation of hedging transactions as a result of the

18   bankruptcy filing, the refueling of the Comanche nuclear

19   power plant in the second half of 2014, the variation in

20   power prices, and the seasonal nature of the business.

21   Neither of Mr. Panacio's approaches to analyzing the

22   debtors' business is accurate or particularly helpful.

23           Mr. Panacio also compared the performance of the

24   debtor versus those comparable companies selected by Mr.

25   Friske for which information was available in three

1    categories, operating revenue, net income and long-term

2    debt.

3            The data revealed that unlike the comparable

4    companies, with two minor exceptions, the debtors' have

5    suffered net income losses in 2011 through 2013.

6            The problem with this approach is that the net

7    income loss is a result of the debtors being greatly over

8    leveraged.  The point of the plan is to motivate management

9    to perform at a high level over what it can control.  Use of

10   net income measures something outside the control of

11   management, the debtors' significant debt.

12           The only comparable company with a similar debt

13   load is Duke Energy, which is positive net income, but

14   almost triple the debtors' revenues.  At those revenue

15   levels, the debtors' net income losses would have been

16   reduced if not eliminated.

17           Moreover, Mr. Panacio inaccurately focused on net

18   income rather than interest expense.  For example, while

19   Duke Energy had a comparable level of long-term debt, his

20   interest expense was well below that of the debtors'.

21           Indeed, all of the comparable companies would have

22   the net income loss if they had interest expense at the

23   debtors' level.  The debtors' use of EBITDA rather than net

24   income is supported by the record.

25           Based on the foregoing, the Court will apply no

1    weight to Mr. Panacio's testimony.

2              At the end of the day, the debtors have presented

3    a thorough, persuasive and virtually unblemished record in

4    support of their motion.

5              Now to the law, the Court's analysis starts with

6    Section 503(c)(1) of the Bankruptcy Code.  Section 503(c)(1)

7    limits retention payments that can be made to insiders of a

8    debtor, specifically it provides subject to certain

9    exceptions not applicable in this case that "There shall

10   neither be allowed nor paid a transfer made to or an

11   obligation incurred for the benefit of an insider of the

12   debtor for the purpose of inducing such person to remain

13   with the debtors' business."

14             There is no dispute that if section 503(c)(1) is

15   applicable, the debtors' motion must be denied.

16             This Court has previously held in Nellson

17   Nutraceutical that Section 503(c)(1) only applies if

18   payments are made for the primary purpose of inducing a

19   person to remain with the debtors' business.  Put another

20   way, section 503(c)(1) is not applicable if the primary

21   purpose of the payments -- or in this case, the EAIP, key

22   leader performance plan and LTIP -- are primarily for

23   motivating or incentivizing the employees covered under the

24   plans.

25             As discussed earlier, the Court finds that the

Page 186

1    evidence overwhelmingly supports a finding that each of the

2    plans is primarily an incentive plan and any retentive

3    effects, while present, are incidental.

4           Let me pause here for a moment to address an

5    argument raised by the trustee.  The trustee argues that the

6    fact that employees are not paid their bonuses immediately

7    upon the closing of the applicable period renders the

8    payments retentive.

9           In this case, the delay may be between one to

10   three months.  There can be no question there is a retentive

11   effect if one earns a bonus on December 31st and is not paid

12   that bonus until March and if that employee would not be

13   entitled to payment unless he or she were still an employee

14   on the payment date.  Indeed, any employee who would leave

15   in the interim period would need to consider the lost bonus

16   payment in the calculus of making that decision, but that in

17   and of itself, does not render a payment or compensation

18   plan primarily retentive.

19          A delay between earning a payment and receiving a

20   payment is not unusual.  Moreover, there is no right to

21   payment, delayed or otherwise, unless the incentive targets

22   are reached.

23          The primary point of the plans at issue is to

24   motivate employees to meet the targets in 2014.  The

25   retentive affect that arises in the gap period between

1    earning a payment a receiving it is incidental.

2            Also the trustee argues that the use of the words

3    retention or retain in certain of the debtors' documents

4    renders the plans retentive.  The Court disagrees.

5            First, much of the language quoted is in

6    connection with the owner operator plan that is not before

7    the Court.

8            Second, the language, excuse me, the retention

9    language is being read in isolation and out of context.  The

10   language and references are surrounded by language

11   referencing the purpose of incentivizing or motivating

12   employees.

13           Third, even when viewed with skepticism, what

14   matters is the substance, not the title.  As I just stated,

15   the the substance supports a finding the plans are primarily

16   incentive plans.

17           Third (sic), the trustee argues that the owner

18   operated plan was a retention plan and that the changes from

19   it to the key leader performance plan are insufficient to

20   make the key leader performance plan an incentive plan.

21           Although it is not before me, it appears to the

22   Court that the owner/operator plan was primarily a retention

23   plan, but the Court disagrees that the changes that resulted

24   in the key leader performance plan were insufficient to

25   remove the retentive elements.

1          The key leader performance plan is 100 percent

2    based on hitting incentive targets.  The retentive elements

3    are incidental.

4          Having determined that none of the three

5    compensation plans are primarily retentive, the Court moves

6    on to determining whether the debtors' adoption of the plans

7    is inside the ordinary course of the debtors' business.  If

8    so, section 503(c)(3), which will be discussed in detail

9    later, is not applicable and the Court will not entertain an

10   objection to the transaction provided that the conduct

11   involves a business judgment made in good faith upon a

12   reasonable basis and within the scope of authority under the

13   code.

14          Put another way, the Court will not disturb a

15   transaction within the ordinary course of business if the

16   debtor can articulate reasons for its conduct as distinct

17   from a decision made arbitrarily or (indiscernible -

18   5:00:07).

19          The standard governing a determination whether or

20   not a transaction falls in the ordinary course of business

21   is well established.  In the case of in re: Roth American

22   Inc., 975 F.2nd. 949, the Third Circuit adopted a two-step

23   inquiry.

24          This inquiry consists of looking at the

25   transaction from horizontal and vertical dimensions.  The

1    test for the horizontal dimension is whether from an

2    industry wide perspective, the transaction is of the sort

3    commonly undertaken by companies in that industry.

4           The vertical dimension, which is also known as the

5    creditors' expectation test, analyzes the transactions from

6    the vantage point of a hypothetical creditor and the inquiry

7    is whether the transaction subjects the creditor to an

8    economic risk of a nature different from those he accepted

9    when he decided to extend credit.

10          Under the vertical test, the touchstone of

11   ordinariness is the interested parties' reasonable

12   expectations of what transactions the debtor in possession

13   is likely to enter in the course of business.

14          Thus, the debtors' pre-petition business practices

15   and conduct is the primary focus of the vertical analysis.

16   The Court must also consider the changing circumstances

17   inherent in the hypothetical creditor's expectations.

18          In this case, with regard to the EAIP and LTIP

19   plans, the debtors have satisfied both the horizontal and

20   vertical dimensions and the programs were adopted in the

21   ordinary course of the debtors' business.  With regard to

22   the key leader performance plan, however, while the debtors

23   have satisfied the horizontal test, they have not passed the

24   vertical test.

25          Starting with the horizontal test, Mr. Friske's

1    testimony clearly established that to paraphrase Roth

2    American, from an industry wide perspective the EAIP key

3    leader performance plan and LTIP plan are the sort of

4    transactions that are commonly undertaken by companies in

5    the industry.

6              In response, the trustee makes two primary

7    arguments.  First, she argues that the LTIP program fails

8    the horizontal test, because some of the payments, albeit,

9    not the ones directly before the Court, are secured by

10   letters of credit, a mechanism Mr. Friske testified he has

11   never seen.

12             Holding aside that the letters of credit payments

13   are not before the Court the use of them does not render the

14   program or plan outside of industry norms.  Indeed, Mr.

15   Friske testified that approximately 50 percent of long-term

16   incentive plans provide some security for payment, usually

17   in the form of rabbi or other types of trusts.  The manner

18   of security is secondary to its use.  The fact that

19   management negotiated for the issuance of letters of credit

20   is not determinative.

21             Second, the trustee argues that the proper peer

22   group for comparison should be companies in Chapter 11 or

23   otherwise undergoing financial restructuring.  Mr. Friske

24   disagreed and the Court concurs in that judgment.  The focus

25   in Roth American is the industry, not the financial

1    condition of the peer group.  By looking at the industry as

2    a whole, the analysis covers the wide range of financial

3    health in that industry.

4         Moreover, the question is what type of incentive

5    plans are necessary and appropriate to attract managers that

6    can successfully run a company of this size and nature.

7    Limiting of the peer group companies to those in

8    restructuring may make sense in the context of hiring a

9    chief restructuring officer, for example, but not in

10   designing compensation plans for operational and senior

11   management.

12        With regard to the vertical test, I would first

13   discuss the EAIP and LTIP programs.  For those programs

14   there is only one difference between the pre-petition and

15   post-petition plans.  As with all three plans, in response

16   to better than expected results in the first half of 2014,

17   the targets were toughened in June to continue to challenge

18   management to perform at a high level.  That is the first

19   time the debtors have ever adjusted their performance

20   metrics -- performance metric targets mid-year.

21        In Roth American, the Third Circuit held that the

22   vertical dimension test analyzes the transactions from the

23   vantage point of a hypothetical creditor and the inquiry is

24   whether the transaction subjects a creditor to economic risk

25   of a nature different from those he accepted when he decided

1    to extend credit.

2            The question isn't whether there is a difference.

3    There is.  Rather, the point is to gage creditor

4    expectations.  If the debtors had decided to lower the

5    performance metrics, one could easily argue the creditors

6    would be at a disadvantage.  They would have extended

7    credit, assuming management incentives were to reach a

8    certain target.  Of course, if those performance metric

9    targets were achieved, it would be more likely the creditor

10   would be paid.

11           If those targets were easier to achieve, however,

12   the creditor may not have extended credit in the first

13   place.  Certainly, to extend credit based upon an

14   assumption, the performance metrics were at a certain level

15   and then have them lowered after the extension of credit

16   would potentially hoodwink the creditor, but in this

17   instance, the creditor isn't harmed, it is benefitted.

18           Management is motivated to reach certain targets

19   that make it sufficiently safe for a creditor to extend

20   credit based on that creditors' risk profile.  The debtor

21   toughens the performance metrics to motivate management to

22   reach targets even more likely to result in the creditor to

23   receive payment.  No reasonable creditor, except perhaps one

24   in a loan to own scenario, would object.  And in such an

25   instance as this, the vertical dimension is satisfied.

1            The changes to the key leader performance plan

2     were more extensive.  First, the key leader performance plan

3     is not a continuation of an existing plan.  It is a new plan

4     adopted in 2014 on the eve of a well-publicized and almost

5     certain bankruptcy and with the input of bankruptcy savvy

6     professionals.

7            Second, the structure was changed from the

8     predecessor owner/operator plan from a 50/50 retention

9     incentive plan to a wholly incentive plan.  While this

10    change may have inured to the benefit of creditors, it is a

11    significantly more material change than simply toughening

12    performance metric targets.

13           Third, the payment periods were modified from

14    semiannual to quarterly.  The Court has already discussed

15    that issue at some length when it found the change not to

16    render the program retentive.

17           The confluence of these changes and most

18    particularly that this is an entirely new plan, results in

19    the key leader performance plan failing the vertical

20    dimension test, thus the debtors' adoption of the key leader

21    performance plan was outside the ordinary course of the

22    debtors' business.

23           As the EAIP and LTIP plans were adopted in the

24    ordinary course of business, the question is whether their

25    adoption involves a business judgment made in good faith

1    upon a reasonable basis and within the scope of authority

2    under the Bankruptcy Code.

3            The evidence overwhelmingly establishes that the

4    debtors have met this standard.  The incentive payments that

5    would be due under the plan are the result of metrics and

6    targets established through a thorough, bottom up budgeting

7    process.

8            The targets present very challenging, but

9    achievable goals, the metrics and targets are focused on

10   what management can achieve in running the business rather

11   than the company's debt structure.  The plan is allowing the

12   interest and management and economic stakeholders in this

13   case, i.e., the creditors, and they pay for themselves.

14           If management achieves the targets, the debtors'

15   estate is better off well in excess of the cost of the

16   bonuses.

17           Now, notwithstanding that the key leader

18   performance plan and LTIP satisfied the test applicable to

19   transactions under the ordinary course of business.  For the

20   avoidance of doubt in this case, the Court will also review

21   the EAIP and LTIP programs as if they were adopted outside

22   the ordinary course of business.

23           Having determined that a transaction is outside

24   the ordinary course of business, one would generally proceed

25   to the business judgment standard governing transactions

1    outside the ordinary course of business, but there is a

2    complication in relation to payments to insiders that is

3    section 503(c)(3) of the Bankruptcy Code.

4          Section 503(c)(3) limits the payments of certain

5    obligations outside the ordinary course of business

6    providing that there shall neither be allowed nor paid (3)

7    other transfers or obligations that are outside the ordinary

8    course of business and not justified by the facts and

9    circumstances of the case, including transfers made to or

10   obligations incurred for the benefit of officers, managers

11   or consultants hired after the date of the filing of the

12   petition.

13         Section 503(c)(3) applies to officers, managers or

14   consultants, a category of employees that includes all the

15   insiders covered by the plans before the Court.  Plus in

16   order to satisfy section 503(c)(3), the transfers under the

17   EAIP key leader performance plan and the LTIP must be

18   justified by the facts and circumstances of the case.

19         Courts have struggled somewhat in determining what

20   exactly congress meant by using that language.  Some courts

21   have stated that it's nothing more than another way to

22   implement the business judgment standard applicable to

23   transactions outside the ordinary course of business under

24   section 363(b)(1).  In the case of in re: Dana Corp, the

25   late Judge Lifland articulated six factors the Court should

1    consider in determining whether the business judgment

2    standard is met if one were to apply it under section

3    503(c).

4           The so-called Dana factors are, (1), is there a

5    reasonable relationship between the plan proposed and the

6    results to be obtained, i.e., in the case of a performance

7    incentive, is the plan calculated to achieve the desired

8    performance; (2), is the cost of the plan reasonable in the

9    context of the debtors' assets, liabilities and earning

10   potential; (3), is the scope of the plan fair and

11   reasonable, does it apply to all employees, does it

12   discriminate unfairly; (4), is the plan or proposal

13   consistent with industry standards; (5), what were the due

14   diligence efforts of the debtor in investigating the need

15   for a plan, analyzing which key employees need to be

16   incentivized, what is available, what is generally

17   applicable in a particular industry; and (6), did the debtor

18   receive independent counsel in performing due diligence and

19   in creating and authorizing the incentive compensation.

20          Other courts most notably the Northern District of

21   Texas in the case of in re: Pilgrim's Pride Corp. have

22   adopted a more stringent standard.

23          Without specifically adopting either test for the

24   avoidance of doubt in this case, the Court will apply the

25   most stringent test identified to judge such programs under

1    section 503(c)(3), the Pilgrim's Pride test.

2         In Pilgrim's Pride, the Court argues with some

3    force that the test of section 503(c)(3) should not be

4    equated to the business judgment rule as applied under

5    section 363(b)(1), rather the Court holds as follows.

6         The Court concludes that section 503(c)(3) is

7    intended to give the judge a greater role, even if a good

8    business reason can be articulated for a transaction.  The

9    Court must still determine that the proposed transfer or

10   obligation is justified in the case before it.

11        The Court reads this requirement as meaning that

12   the Court must make its own determination that the

13   transaction will serve the interest of creditors and the

14   debtors' estate.

15        As a threshold matter, the Court must still find

16   that the debtors have satisfied the business judgment

17   standard under section 363(b)(1).  The business judgment

18   test here differs from the general corporate law business

19   judgment rule which protects corporate directors from

20   liability when they have exercised due care and were not

21   self interested in a transaction, hereby contrast the

22   bankruptcy court reviews the debtors' business judgment to

23   determine independently whether the judgment is a reasonable

24   one.

25        The Court should not substitute its judgment for

1    the debtors however, but should determine only whether the

2    debtors' judgment was reasonable and whether a sound

3    business justification exists supporting the transaction and

4    its terms.

5                Moreover as stated earlier, in considering whether

6    an incentive compensation plan meets the outside the

7    ordinary course of business standard, courts often apply the

8    Dana factors.  All six of those factors support a finding

9    that the plans meet the business judgment standard.

10               First, the plans are the result of a bottom up

11   process where performance metrics and targets for them were

12   established that were designed to provide management with

13   challenging but achievable goals, thus the plans are

14   calculated to achieve the desired performance.

15               Two, the plans will cost no more than $20 million

16   with debtors that have over 30 billion in debt and operating

17   revenues of $6 billion annually.  Clearly, the cost of the

18   plan is reasonable in the context of the debtors' assets,

19   liabilities and earning potential.

20               Three, the plans applies to the most senior

21   members of the debtors' management and treat the various

22   members of the management on a rationale basis relating to

23   their various roles in the company, thus the scope of the

24   plan is fair and reasonable.

25               Four, Mr. Friske testimony clearly established

1    that the plans are consistent with industry standards.

2         Five, the debtors' performed extensive due

3    diligence, both internally and through consulting with

4    advisors in investigating the need for the plans, analyzing

5    which key employees need to be incentivized and how what is

6    generally applicable in the industry.

7         And six, the debtors received extensive advice

8    from independent advisors, i.e. Kirkland & Ellis, Mr. Friske

9    and Mr. Filsinger in performing due diligence and creating

10   and authorizing the plans.

11        The evidence overwhelmingly establishes that the

12   debtors have met the business judgment standard applicable

13   to transactions outside the ordinary course of business both

14   generally and as articulated in the Dana factors.

15        Next, under Pilgrim's Pride in the departure from

16   the normal business judgment standard, the Court must make

17   its own determination that the plan served the interest of

18   creditors and the debtors' estate.

19        Again, the debtors have met that standard.  As I

20   just stated, the economic stakeholders in this case, i.e.,

21   the creditors, as well as the estate, will be better off if

22   management hits its targets and is awarded its incentive

23   bonuses.

24        At heart, the question in front of this Court is

25   whether it believes the incentive plans work.  I do.  If

1    properly designed, incentive plans serve like fiduciary

2    duties to align the interest of the principal and agent, in

3    this case, the debtors' estate and its creditors on the one

4    hand and management on the other.

5           It is a fundamental economic principle that an

6    employee will work harder if he or she has a tangible and

7    identifiable economic stake in the results of his or her

8    labor.  It's important, however, that incentive targets not

9    be beyond the reach of management.  Such targets must be

10   challenging, but achievable.  This is the case here.

11          The debtors have designed three incentive plans

12   that provide management with challenging but achievable

13   goals that if met will inure to the benefit of management,

14   the debtors' estate and the creditors.

15          To sum up, the EAIP key leader performance plan

16   and the LTIP are all primarily incentive as opposed to

17   retention plans and thus section 503(c)(1) is inapplicable.

18          The EAIP and the LTIP were entered in the ordinary

19   course of business, but the key leader performance plan was

20   entered outside of the ordinary course of business.

21   Nonetheless, for the avoidance of doubt, the Court reviewed

22   all three plans as if they were entered outside the ordinary

23   course of business.

24          Under section 503(c)(3) payments under insider

25   incentive plans like those before the Court can only be made

1   if they are justified by the facts and circumstances of the

2   case.

3           Applying the Pilgrim's Pride iteration of the

4   facts and circumstances test, the Court finds that each of

5   the plans has easily met the standard and the motion will be

6   granted.

7           Some final notes, as mentioned earlier, the Court

8   does not believe that this is remotely a closed question.

9   The evidence in favor of the debtors' motion was thorough,

10  persuasive and virtually unchallenged by the trustee.  As I

11  stated at the beginning, I find that these incentive plans

12  define the gold standard.  The debtors' plan at issue in

13  this case are not primarily incentive plans and/or do not

14  meet the justified by the facts and circumstances test, then

15  it's hard to imagine how any plan could.

16          Also, while the Court appreciates, supports and

17  honors the mission of the Office of the United States

18  Trustee, it often looks to the position of the economic

19  stakeholders in making its decisions.  In this case, the

20  only party objecting to the plans is the trustee.  All of

21  the creditor constituencies have either affirmatively

22  supported or have not objected to the debtors' motion.

23          That is an extraordinarily, excuse me, that is an

24  extraordinary unanimity of position in the context of this

25  case.  Because the evidence so clearly supports granting the

1    motion, however, the Court has made its decision without

2    consideration of the creditors' positions.

3            However, were the case -- were the issue a closer

4    one, the -- however, were the issue a closer one, the Court

5    would consider and perhaps give great weight to the position

6    of the economic stakeholders.

7            That concludes my ruling, which was lengthy.  Are

8    there any questions?

9            UNIDENTIFIED SPEAKER:  No, Your Honor.

10           THE COURT:  No.  Do you have a form of order?

11           UNIDENTIFIED SPEAKER:  Yes, we do.

12           THE COURT:  I can enter one.  I mean it's --

13           All right.  The Court will enter an order -- court

14   will simply enter an order granting the motion for the

15   reasons set forth on the record.

16           UNISON:  Thank you, Your Honor.

17           THE COURT:  Is there anything else for today?

18           UNIDENTIFIED SPEAKER:  No, Your Honor.

19           THE COURT:  Just in closing, I'd like to thank the

20   professionals for an extremely well organized and well

21   presented trial and I truly appreciate it.  It makes the

22   Court's job a lot easier when parties and both parties here

23   are prepared and organized and provide such a well

24   structured trial and I truly appreciate it.

25           That's all we have for today.  We're adjourned.

Page 203

1          UNISON:  Thank you, Your Honor.

2      (Whereupon these proceedings were concluded at 5:19 PM)

3                    * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 204

```
 1                        I N D E X

 2                    W I T N E S S E S

 3    WITNESS          BY                        PAGE

 4    Michael Panacio       Ms. Sarkessian         7

 5                          Mr. McKane             58

 6                          Ms. Sarkessian         94

 7

 8

 9                        I N D E X

10                    E X H I B I T S

11    PARTY     NO   DESCRIPTION          ID.        EVID.

12    Joint     28   Document             --          58

13              36   Corrected Charts     --          57

14              37   10-K of EFCH         --          58

15              38   First Day Presentation  64       --

16              39   10-K of EFH          71         105

17

18                        I N D E X

19                    R U L I N G S

20                                        PAGE       LINE

21    Debtors' motion to approve three

22    compensation plans                  169         4

23

24

25
```

Page 205

1                C E R T I F I C A T I O N

2

3    I, Dawn South, Penny Skaw, Jamie Gallagher and Melissa

4    Looney certify that the foregoing transcript is a true and

5    accurate record of the proceedings.

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o=Veritext, ou,
                   email=digital@veritext.com, c=US
7    _____    Date: 2014.10.16 11:50:48 -04'00'

8    Dawn South

9    AAERT Certified Electronic Transcriber CET**D-408

10   Penny Skaw    Digitally signed by Penny Skaw
                   DN: cn=Penny Skaw, o=Veritext, ou,
                   email=digital@veritext.com, c=US
11   _____    Date: 2014.10.16 11:51:31 -04'00'

12   Penny Skaw

13   Jamie Gallagher    Digitally signed by Jamie Gallagher
                        DN: cn=Jamie Gallagher, o=Veritext, ou,
                        email=digital@veritext.com, c=US
14   _____    Date: 2014.10.16 11:51:56 -04'00'

15   Jamie Gallagher

16   Melissa Looney    Digitally signed by Melissa Looney
                       DN: cn=Melissa Looney, o=Veritext, ou,
                       email=digital@veritext.com, c=US
17   _____    Date: 2014.10.16 11:52:37 -04'00'

18   Melissa Looney

19   AAERT Certified Electronic Transcriber CET**D-607

20   Veritext

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24   Date:  October 16, 2014

25