# **<u>Exhibit C</u>**

RLF1 11274205v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF DOUGLAS FRISKE IN SUPPORT OF
MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR
ENTRY OF AN ORDER APPROVING THE 2015 COMPENSATION PROGRAMS**

I, Douglas J. Friske, hereby declare under penalty of perjury:

1.  I am a managing director of Executive Compensation at Towers Watson Delaware Inc. ("Towers Watson").[2] Towers Watson was engaged pre-petition in October 2012 to provide compensation consulting services to Energy Future Holdings Corporation and certain of its affiliates both before and after the commencement of these chapter 11 cases. I am familiar with the pre- and post-petition structure of the Debtors' compensation plans as well as the structure of the Debtors' 2015 Compensation Programs as they are set forth in the *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Approving the 2015 Compensation Programs* (the "Motion"). I am authorized to submit this declaration (this "Declaration") on behalf of Towers Watson in support of the Motion.

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted on an interim basis, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion (as defined herein).

2. Except as otherwise indicated, I have personal knowledge of all facts in this declaration, based on my review of the Debtors' operations and finances, my research into market practices for companies in the energy industry and those that have recently filed for chapter 11 protection, and information supplied to me by members of the Debtors' management and the Debtors' other advisors. If called upon to testify, I could and would testify competently to the facts set forth herein.

### Background and Qualifications

3. I received my Bachelor's degree in Finance from the University of Illinois in 1986. After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern University. I received a Master's degree in Management from Northwestern's J.L. Kellogg Graduate School of Management in 1990. Since that time, I have been employed by Towers Watson.

4. Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. Towers Watson offers actuarial, compensation, performance management, employee benefits design communication and administration, organizational communication, human resources effectiveness, and reinsurance and risk management services.

5. My responsibilities at Towers Watson have primarily involved consulting to large companies, specifically with regard to executive compensation. I have worked with numerous *Fortune* 1000 companies, and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy.

6. I am frequently retained by large companies to advise them on their employee compensation strategies, programs, and pay levels. I am also sometimes retained by companies performing specific searches for management personnel, for which I provide guidelines on

general market practice and the level and form of current market compensation for those positions.

7.  I am highly experienced in executive, management, and employee compensation matters with more than 24 years of experience in the field. During this time, I have been the lead or supporting employee compensation expert in more than 30 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of post-petition compensation arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, and other similar-type plans in the chapter 11 cases of, among others, American Airlines, AMF, ATA Airlines, Calpine, Chemtura, Collins & Aikman, Conexant, Delta Airlines, Dura Automotive, Frontier Airlines, The Great Atlantic & Pacific Tea Company, Hayes Lemmerz, Keystone Automotive, Kimball Hill Homes, Lear, Leiner Health Products, Longview Power, Mark IV, Muzak, Neff, Northwest Airlines, Orchard Brands, Reader's Digest Association, Round Table Pizza, Sbarro, School Specialty, TOUSA, United Airlines, Visteon, and Xerium.

**Summary**

8.  As discussed more fully below, I believe that it is appropriate to implement the 2015 Compensation Programs[3] in their current form for the 2015 calendar year. I base this conclusion on four primary considerations:

   a. The overall design and structure of the 2015 Compensation Programs are largely consistent with market practice, including their emphasis on achieving certain targets for Earnings before Interest, Taxes, Depreciation, and Amortization ("EBITDA") and cost management—both of which are objective performance measures commonly used in recent bankruptcy court-approved employee incentive plans as well as by the Debtors in their 2014 Compensation Programs and by other companies in the energy industry.

   b. A benchmark analysis of total direct compensation data (defined as base salary plus incentive-based compensation) for a representative sample of participants in the 2015 Compensation Programs reveals that the target award levels under the 2015 Compensation Programs are within the reasonable range of competitive practice in the energy industry and the Debtors' peer group.

   c. The cost of the Debtors' 2015 Compensation Programs on an overall basis, as a percentage of annual revenues, is within a reasonable range of the competitive market practice in both the energy industry and the broader general industry.

   d. Finally, if the Debtors do not receive authorization from the Court for the 2015 Compensation Programs, total compensation for top managers will fall substantially below the 25th percentile compensation levels for peer companies operating in the energy industry. This could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives.

---

[3] The "Insider Programs" comprise the Executive Annual Incentive Plan (as applicable to 26 employees) (together with the program applicable to non-insiders, the "EAIP"), the Key Leader Performance Program (the "Key Leader Performance Program"), the Luminant CIP (as applicable to one insider) (together with the program applicable to the non-insiders, the "Luminant CIP"), and the SPC Long-Term Incentive Plan (the "SPC LTIP"). The Non-Insider Programs and the Insider Programs together constitute the "2015 Compensation Programs." The "Non-Insider Programs" comprise the Annual Incentive Plan (the "AIP"), the Executive Annual Incentive Plan (as applicable to non-insiders), the Key Leader Plan (the "Key Leader Plan"), the Luminant Commercial Incentive Plan (as applicable to non-insiders), the Luminant Developer Incentive Plan (the "Luminant DIP"), and certain individual bonus payments (the "Individual Bonus Payments").

4

9. Accordingly, I believe that the 2015 Compensation Programs are consistent with industry practice and justified by the facts and circumstances of the Debtors' chapter 11 cases.

**Towers Watson's Collaboration with the Debtors**

10. Since Towers Watson was retained by the Debtors in October 2012, I have familiarized myself with the Debtors' operations and unique business and restructuring challenges. At the start of our engagement, Towers Watson discussed with both the Debtors and the Debtors' advisors the Debtors' operational history, financial performance, restructuring process, and various issues regarding the Debtors' workforce and employee programs. Towers Watson reviewed the structure of the Debtors' existing base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels. As part of this review of the Debtors' operational and compensation history, Towers Watson evaluated the Debtors' primary compensation plans compared to market.

11. Towers Watson collaborated with the Debtors' key managers and directors in assessing the Debtors' primary compensation plans and helping to refine those programs to accord with the Debtors' restructuring objectives. Towers Watson continued to consult the Debtors in this capacity after the Debtors received approval for their 2014 compensation structure, and played a significant role in assessing the competitiveness of the Debtors' 2015 Compensation Programs.

12. The Debtors performed significant due diligence in developing the 2015 Compensation Programs, and my staff and I collaborated closely with the Debtors' management in reviewing and developing the 2015 Compensation Programs. For example, since November 2012, I have regularly participated in meetings of the Organization & Compensation Committee of EFH Corp.'s board of directors (the "O&C Committee"), which is the body

directly responsible for reviewing and approving the Debtors' compensation programs. My primary goal in the course of these interactions was to provide independent advice concerning compensation planning that drew directly upon relevant market data as well as my experience in designing such programs for similarly-situated companies.

### Analysis of the Structure of the Debtors' 2015 Compensation Programs

13. I believe the overall design and structure of the 2015 Compensation Programs is largely consistent with market practice. Several of the programs, for example, require the achievement of certain EBITDA, operational, and other performance targets—all of which are objective performance measures that are generally consistent with market practice and properly align employee incentives with the Debtors' operating success.

14. When reviewing the Debtors' various compensation plans, I strongly supported linking incentives to financial metrics that would serve the interests of the Debtors' key stakeholders, in particular the Debtors' creditors. To that end, the 2015 Compensation Programs place significant emphasis on achieving specified EBITDA and cost management targets. Both are common performance measures for incentive-based compensation programs used by companies operating in chapter 11.

15. To be clear, no award under any of the Insider Programs is payable to any employee unless the Debtors achieve threshold performance with respect to EBITDA, cost management targets, and/or other objective financial and operational performance goals approved by the EFH Corp. board of directors. In addition, as is common with similar programs, several of the incentive plans provide for awards that vary in size between different levels of financial performance (*e.g.*, threshold and superior for the EAIP).

16. Not only does this general structure comport with the 2014 Compensation Programs that were approved by this Court, it also comports with incentive-based plans approved in recent chapter 11 proceedings involving companies, like the Debtors, with annual revenues of over $1 billion. For example, Buffets Restaurant Holdings (FY 2011 revenues of $1.03 billion), Chemtura (FY 2008 revenues of $3.5 billion), Exide Technologies (FY 2013 revenues of $2.97 billion), Great Atlantic & Pacific Tea (FY 2009 revenues of $8.08 billion), Lyondell Chemical (FY 2008 revenues of $28.6 billion), Smurfit-Stone Container (FY 2008 revenues of $7.04 billion), Spansion (FY 2009 revenues of $2.28 billion), Tronox (FY 2009 revenues of $1.25 billion), and Visteon (FY 2008 revenues of $6.69 billion) all relied on EBITDA as the primary performance metric for their employee incentive plans during the restructuring process. For these reasons, and based on my experience with incentive-based compensation programs employed by companies in chapter 11, the structure of the Debtors' 2015 Compensation Programs is in line with competitive practice.

17. This general structure also comports with incentive-based plans in the energy industry. Based on a recent Towers Watson study, we found that a majority of companies in the energy industry use an earnings-based goal (earnings per share, EBITDA, net income, etc.) in their annual and/or long-term incentive plans, and operational metrics are also very common.

18. In addition, the Debtors' retention programs—the Key Leader Plan and the Individual Bonus Payments—which only apply to non-insiders, are traditional, retention-based compensation programs. Retention-based compensation programs are often used by companies in similar restructuring situations to reduce employee attrition and thus expenses associated with business interruption, recruiting, and training of new employees.

7

**Analysis of Total Compensation for Participants in the 2015 Compensation Programs**

19.     In assessing the reasonableness of the 2015 Compensation Programs, I analyzed competitive total compensation data for a representative sample of participants in the 2015 Compensation Programs as well as total compensation data for the Debtors' senior-most executives who comprise the Debtors' Strategy and Policy Committee (the "SPC").

20.     A critical initial step in this analysis was to define the relevant market. Years before Towers Watson was engaged, the Debtors had developed a set of eighteen peer companies operating in the energy industry (the "Peer Group"). The Debtors' peers include: Allegheny Energy, Inc., Ameren Corp., American Electric Power Co. Inc., Calpine Corp., Constellation Energy Group Inc., Dominion Resources Inc., Duke Energy Corp., Edison International, Entergy Corp., Exelon Corp., FirstEnergy Corp., PPL Corp., NextEra Energy, Inc., NRG Energy, Inc., Southern Co., Progress Energy Inc., Public Service Enterprise Group Inc., and Xcel Energy Inc. Since the time this group was developed, three of the peers have been acquired by other organizations. The Debtors selected this group in light of a number of factors, including business mix, regulated vs. non-regulated activities, assets, and overall operational metrics. I reviewed these companies in the Peer Group and determined that they are relevant peers for the Debtors; each is likely to compete with the Debtors for executive talent.

21.     I compared the Debtors' target compensation data (reflecting base salary and any 2015 Compensation Program opportunities) to target compensation data for equivalent positions from the competitive market (where competitive data were available). I reviewed these data for (a) the members of the SPC, (b) the group of 18 additional participants in the Insider Programs, and (c) a group of approximately 40 non-insider employees at the Vice President level—working across all of the Debtors' business units and a wide variety of functional areas (operational, sales, legal, human resources, information technology, etc.). Target pay levels for the insiders were

8

compared to pay levels for the Debtors' Peer Group while non-insiders were compared to pay levels among a broader group of energy companies (which includes all of the companies in the Debtors' Peer Group), as available data for some non-insider positions at the Vice President level is limited among the Peer Group.  The size and variation of that last group make it a particularly relevant sample for benchmarking the entirety of the Debtors' Non-Insider Programs.  Our analysis was conducted using comparative market data as taken from the 2014 Towers Watson CDB Energy Services Executive Compensation Survey Report.  Our surveys of executive pay practices in the energy industry are periodically updated to include current market practice and the data we used for the analysis of 2015 compensation reflect the most recently available data.  All data are effective March 1, 2014.

22.    Currently, the seven SPC members' target total direct compensation is the sum of three elements:  (a) base salary; (b) an EAIP award; and (c) an SPC LTIP award.  As already explained, the SPC members will not earn an EAIP or SPC LTIP award without the Debtors and certain affiliates achieving performance goals based on objective financial and operational measures, including EBITDA.  The O&C Committee of the Debtors' Board of Directors desires to evaluate executive compensation levels at the 75th percentile of the Peer Group, aligned with its view that the Debtors should attract and retain only top talent in the industry.  Assuming the Insider Programs are approved, aggregate 2015 target pay for the SPC is 33% below the 75th percentile, and in fact the SPC's 2015 target pay is approximately 17% below the 50th percentile.

23.    I also compared the Debtors' aggregate target total direct compensation data for the five highest-compensated members of the SPC to aggregate target total direct compensation data for the top five highest-paid proxy executives at each of the companies in the Peer Group (as recently disclosed in annual proxy statements).  This analysis was conducted in order to

9

measure the total "cost of management" for the senior-most executive team. As shown in the table below, assuming the Insider Programs are approved, the Debtors' cost of management would be below the 25th percentile of Peer Group pay levels:

| Debtors' Annual Target Total Direct Compensation | 25th Percentile Peer Group Annual Target Total Direct Compensation | 50th Percentile Peer Group Annual Target Total Direct Compensation | 75th Percentile Peer Group Annual Target Total Direct Compensation |
|---|---|---|---|
| $14,982,250 | $15,962,000 | $17,559,000 | $19,772,000 |
| **Aggregate Competitive Positioning: 6% *below* 25th Percentile** ||||

24. Based on this analysis, I believe that the SPC members' target total direct compensation is well within a reasonable range of competitive practice with respect to total direct compensation for equivalent managers at the Peer Group, particularly in light of the Debtors' desire to employ only top talent.

25. The SPC members' target total direct compensation opportunities, assuming the Debtors' Insider Programs are not approved, would lag *well below* the 25th percentile of the Peer Group, on average.

26. The conclusion with regard to the appropriateness of the SPC members' compensation is further supported by the fact that based on a review of recently filed proxy statements, the majority of the Peer Group companies (*i.e.*, 80%) also offer pension benefits to executives. In other words, the compensation programs that would be in place were the Court to approve the Motion would still not include common components of compensation offered to senior executives at the Debtors' peer companies. Accordingly, overall compensation levels, although already consistent with market practices, are even more conservative in light of total competitive market rewards in the energy industry.

27.     In addition, as shown in the table below, overall compensation levels for the SPC group and other participants in the Insider Programs, are within competitive norms:

| Employee Group | Percentage Difference Between Debtors' Target 2015 Total Direct Compensation and 50th Percentile of Competitive Market | Percentage Difference Between Debtors' Target 2015 Total Direct Compensation and 75th Percentile of Competitive Market |
|---|---|---|
| SPC Members | -17% | -33% |
| Non-SPC Insiders | +4% | -23% |
| **Aggregate Competitive Positioning: 29% *below* 75th Percentile / 9% *below* 50th Percentile** | | |

28.     In addition, Towers Watson also evaluated the competitiveness of the compensation opportunities for the non-insider group compared to the energy industry using the benchmarking analyses employed to evaluate the Debtors' senior compensation opportunities. As shown in the table below, overall compensation levels, assuming the approval of all of the 2015 Compensation Programs, for the group of approximately 40 non-insider employees at the Vice President level, also fell well within competitive norms:

| Employee Group | Percentage Difference Between Debtors' Target 2015 Total Direct Compensation and 50th Percentile of Competitive Market | Percentage Difference Between Debtors' Target 2015 Total Direct Compensation and 75th Percentile of Competitive Market |
|---|---|---|
| Other VPs | -13% | -30% |

29.     These benchmarking analyses take into account the fact that the Debtors, with input from Towers Watson, reviewed their compensation levels in late 2014 and enhanced potential award levels for certain employees to bring individual compensation opportunities more closely in line with industry and market levels, as well as the individual's role and contributions.     As previously noted, Towers Watson determined that the 2014 total compensation levels for several positions within the Debtors' workforce, including the Debtors' most senior employees, were substantially below the 50th percentile of the Peer Group.  In my

experience, reviewing potential adjustments on a yearly basis the way the Debtors did to ensure that compensation levels appropriately reflect market opportunities, internal equity considerations and the individual's role is typical of other large companies.

30. Based on the results of these benchmarking analyses, I believe the 2015 Compensation Programs and the target 2015 total compensation levels of representative samples of the participants are reasonable in light of (a) competitive market practice for companies, like the Debtors, that operate in the energy industry and (b) the Debtors' compensation philosophy of targeting compensation opportunities in line with a belief that only top talent should be and are employed as senior executives at the Debtors and that such top talent should be compensated accordingly. Critically, the absence of an incentive opportunity for the participants in the 2015 Compensation Programs would significantly undermine the current competitiveness of the Debtors' compensation structure, which in turn could impact the Debtors' ability to motivate current management to achieve desired business objectives, as well as the Debtors' ability to attract other skilled employees and leadership to keep the Company's financial and operational performance on course.

### Analysis of Total Costs of the 2015 Compensation Programs

31. In addition to comparing individual target compensation data and determining that on average they fall well within the range of competitive practice, Towers Watson undertook a comparison of the *total* cost of the Debtors' various incentive plans (both insider and non-insider) and the total cost of similar incentive programs in the competitive market. This analysis similarly revealed that the aggregate costs of the incentives offered by the Debtors are in line with competitive norms, thereby demonstrating that the 2015 Compensation Programs' costs as a whole are reasonable in light of competitive practice.

32. Specifically, Towers Watson compared the aggregate cost of the Debtors' 2015 Compensation Program to data from Towers Watson's Annual Incentive Plan Design Survey. This survey covers practices from a broad cross-section of United States industries, including energy companies.

33. The totality of the Debtors' 2015 Compensation Program is compared to annual incentive costs given the performance period and vesting conditions for all plans are within 2015.

34. The estimated costs of the Debtors' annual incentive plans are as follows:

| Annual Incentive Plans | Estimated 2015 Cost[4] | 50th Percentile Cost of Annual Incentive Plans as a Percentage of Company Revenues | 75th Percentile Cost of Annual Incentive Plans as a Percentage of Company Revenues |
|---|---|---|---|
| Annual Incentive Plan | $56.1 million | | |
| Executive Annual Incentive Plan<br>    Non-Insider | $4.3 million | | |
|     Potential Insider | $8.0 million | | |
| Key Leader Plan | $6.1 million | General Industry 0.69%<br><br>Energy Industry 0.68% | General Industry 1.15%<br><br>Energy Industry 1.09% |
| Key Leader Performance Program | $4.2 million | | |
| SPC LTIP | $7.6 million | | |
| **Total** | $86.3 million | | |
| **Total as a Percentage of EFH Projected Revenues (of approximately $11.23 billion)** | 0.77% | | |
| **Total as a Percentage of TCEH Projected Revenues (of approximately $7.396 billion)** | 1.17% | | |

13

35.     As shown in the table above, the aggregate estimated cost of the Debtors' 2015 Compensation Program is approximately $86.3 million, or approximately .77% of EFH's projected 2014 revenues of $11.23 billion and approximately 1.17% of TCEH's projected 2014 revenues of $7.396 billion.  Based on general industry data from Towers Watson's Annual Incentive Plan Design Survey, the median cost of annual incentive plans as a percentage of revenues was 0.69% and the 75th percentile was 1.15%.  Within the energy industry specifically, the data reveals nearly identical results, with the median cost of annual incentive plans as a percentage of revenues of 0.68% and the 75th percentile at 1.09% (the 75th percentile is a meaningful benchmark for the Debtors given their focus on employing top talent and compensating them as such).  This demonstrates that the Debtors' anticipated costs are between the market median and 75th percentile as a percentage of EFH projected revenues and only slightly above the market 75th percentile cost as a percentage of TCEH projected revenues.

36.     This cost analysis does not consider the fact that all of the peer companies have long-term incentive plans in addition to annual incentive plans. The annual cost of these long-term incentive plans is approximately 0.4% of revenues at median and approximately 0.5% of revenues at the 75th percentile.

37.     The conclusion with regard to the appropriateness of the Debtors' total incentive costs is further supported by the absence of any long-term incentives for the Debtors.  In other words, total incentive costs that already are within the range of market practice solely from an annual incentive perspective are even more reasonable in light of competitive long-term incentive costs in the energy industry and the lack of such incentives at the Debtors.

38.     In light of this total cost benchmarking analysis, I believe that the costs of the Debtors' 2015 Compensation Programs are well within competitive practice for large companies

competing for talent with the Debtors in the energy industry and are reasonable in light of all relevant circumstances.

## **Conclusion**

39. Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the total cost, structure, and award opportunities available under the Debtors' 2015 Compensation Programs are appropriately designed to be consistent with market practice and are reasonable given the facts and circumstances of these chapter 11 cases.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 21, 2014

_____
Douglas J. Friske
Towers Watson Delaware Inc.