**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **ENERGY FUTURE HOLDINGS CORP.** *et al.,* | : | **Case No. 14-10979 (CSS)** |
| | : | |
| Debtors-in-Possession. | : | **(Jointly Administered)** |
| | | **(D.I. 1888)** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Objection deadline:  November 21, 2014**
**Hearing date: December 29, 2014 at 10:00**
**a.m. (Prevailing Eastern Time)**

## FEE COMMITTEE'S REPORT ON FIRST INTERIM FEE APPLICATIONS SCHEDULED FOR HEARING ON DECEMBER 29, 2014

TO:    THE HONORABLE CHRISTOPHER S. SONTCHI,
        UNITED STATES BANKRUPTCY JUDGE:

The Fee Committee appointed in the above-captioned chapter 11 cases (the "**Fee Committee**") respectfully submits this summary report (the "**Report**") concerning the first interim fee applications (collectively, the "**Applications**") of Filsinger Energy Partners; Morrison & Foerster LLP; Gibson, Dunn & Crutcher LLP; and Thompson & Knight LLP (the "**Applicants**"), pursuant to which the Applicants seek $13,076,511.00 in fees and $370,325.44 in expenses, [D.I. 2733, 2671, 2657, 2789], as summarized on **Exhibit A**.  Following review by the Fee Committee and discussions with the Applicants, the Applicants have agreed to reduce their fee and expense requests.  The Fee Committee respectfully recommends approval of the Applications in the adjusted amounts, which aggregate to $12,862,747.75 in fees and $353,843.86 in expenses, pursuant to 11 U.S.C. § 330.

## PRELIMINARY STATEMENT

The Applicants have reached agreements with the Fee Committee, subject to this Court's approval, to resolve the issues and concerns identified by the Fee Committee regarding the Applications, which request fees and expenses incurred for the period from April 29, 2014, through August 31, 2014 (the "Fee Period").  The resolutions, as set forth on **Exhibit A**, are consistent with the principles and standards—discussed in detail below—that the Fee Committee has developed and applied to each interim fee application and with the provisions of the retention orders entered by the Court.  The negotiated resolutions help ensure that the interim fees and expenses comply with the applicable requirements and guidelines established by the Bankruptcy Code, the Executive Office of the U.S. Trustee ("EOUST"), the Fee Committee, and the Court.[1]

These cases, filed almost eight months ago, are unusual for their size, complexity, and the number of retained estate professionals.  To date, 30 professionals have been retained or have filed retention applications under various provisions of the Bankruptcy Code.  For the Fee Period, 14 professionals have filed applications seeking approval of aggregate fees and expenses totaling approximately $66 million.  Four of these applicants have requested that the Court consider their applications on December 29, 2014, at 10:00 a.m.

The Fee Committee respectfully recommends that the Court allow the compensation sought in these four applications, with the adjustments set forth in **Exhibit A**, and direct the Debtors to pay these amounts on or before December 31, 2014.

The Court has scheduled the first interim application of Kirkland & Ellis LLP and Kirkland & Ellis International, LLP to be heard on January 26, 2015.  On February 17, 2015, the

---

[1] The "Fee Committee Standards" are appended to this report for the Court's reference.

Court has scheduled an uncontested fee hearing for all other estate retained professionals that filed first interim applications.

Without significant exception, the professionals and the Fee Committee have developed an open and cooperative relationship.  The review has been rigorous, involving a line-by-line, quantitative, qualitative, and comparative analysis of the applications.  With the adjustments on **Exhibit A**, the Fee Committee has no objection to the Court's approval of these fees and expenses.

This Report contains a firm-by-firm summary.  Notably, the Fee Committee has identified issues concerning multiple professionals attending hearings and depositions,[2] resulting in overlapping and redundant services, and insufficient descriptions of the services provided. Always subject to close scrutiny, expenses for each professional have been reduced through the review and discussion process.

The Fee Committee's goal has not been a "targeted" amount or percentage fee reduction. Rather, the statutory, rule, and guideline standards have been applied to each application.  The Fee Committee reviewed in detail the Applications and issued comprehensive letter reports to each firm on December 15, 2014 and December 16, 2014.  The reports triggered a series of negotiations with the Applicants and the adjustments set forth on **Exhibit A**.  The Fee Committee anticipates that as the professionals become more familiar with the fee review process, the adjustments should diminish.  Pursuant to the Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*

---

[2] *See*, *e.g.*, *In re Fleming Cos., Inc.*, 3o4 B.R. 85, 91 (Bankr. D. Del. 2003) (reducing fees and expense in part because for "five to six attorneys representing the Debtors [appeared] at every hearing during the period covered by the first interim fee applications.").

[D.I. 2066] (the "Interim Compensation Order"), the Applicants already have been paid

80 percent of the fees and 100 percent of the expenses incurred during the Fee Period.

## BACKGROUND

1.      The Court is familiar with the history of these cases, their commencement, the

appointment of official committees, and the retention of counsel.  Those facts will not be recited

here.

2.      On September 16, 2014, the Court entered the Interim Compensation Order and

the *Order Authorizing the Employment and Retention of Godfrey & Kahn, S.C. as Counsel to the

Fee Committee* [D.I. 2065].

3.      On August 21, 2014, the Court entered the *Stipulation and Order Appointing a

Fee Committee* [D.I. 1896] (the "Fee Committee Order").  The Fee Committee consists of four

members, including:

      A.      Richard Gitlin individually and as Chairman of Gitlin and Company, LLC (the "Independent Member" and "Chair");

      B.      Cecily Gooch, (the "Debtors' Representative");

      C.      Peter Kravitz, (the "Unsecured Creditors' Representative");[3]

      D.      Richard L. Schepacarter, (the "U.S. Trustee Representative").[4]

4.      Since its appointment, the Fee Committee has held four meetings, three in-person

and one by phone.  In addition, the Fee Committee conducted two conference calls with estate

professionals (one with the TCEH Official Unsecured Creditors' Committee and the other with

the Debtors) to provide an opportunity for introductions and for the professionals to ask

questions of  the Fee Committee counsel or the Fee Committee Chair.

---

[3] For his service on the Fee Committee, Mr. Kravitz represents all of the creditors.  *See* Transcript, December 18, 2014, pp. 31-32.

[4] The U.S. Trustee's participation on the Fee Committee is in addition to, and does not affect, the U.S. Trustee's independent duties under 28 U.S.C. § 586(a)(3)(I).

5.      At its December 15, 2014 meeting, the Fee Committee authorized the issuance of six comprehensive Fee Committee reports (the "Fee Committee Reports").

6.      Thereafter, the Fee Committee, through counsel, and each of the Applicants engaged in negotiations to "endeavor to reach a mutually acceptable resolution of the issues raised in" the Fee Committee Reports. *Id.*

7.      As set forth below, the Fee Committee has reached mutually acceptable resolutions with four of the Retained Professionals that received Fee Committee Reports.[5]

**COMMON ISSUES**

8.      Each of the interim fee applications raised issues unique to the individual firm's retention and the particular services provided—although most of the issues are not novel.  The most prevalent causes for concern are described below.

9.      <u>Retention and Fee Application Matters</u>.  The Fee Committee views certain tasks in the Retention and Fee Application category as non-compensable because they are tasks that any professional would perform, without charge, for any client—such as routine conflicts checks, obtaining conflict waivers, and monitoring the case docket for progress of the retention application.  Other tasks are performed primarily for the convenience of the professional itself, or constitute administrative billing activities that generally are a required, but not compensable, part of any professional's practice.  The Fee Committee has asked that all professionals either eliminate such time entries from their fee applications or indicate the task descriptions with a "no charge" annotation.

---

[5] At the professionals' request, the fee applications of FTI Consulting, Inc. and Lazard Freres & Co., LLC, initially scheduled to be heard on December 29, 2014, have been adjourned to the February 17, 2015 fee hearing, so long as these applications are uncontested.

10.     Reasonable fees and expenses associated with the preparation and submission of interim and final fee applications, including a single attorney's attendance at uncontested hearings and certain communications with the Fee Committee, generally will be treated as compensable.  Fees associated with contested or litigated fee issues will be subject to a "substantially prevailed" rule, permitting recovery of fees for time spent disputing fees only if the fee applicant substantially prevails in defending an objection to the fee request.[6]  The Fee Committee has asked professionals to segregate "Fee Objection Discussion and Litigation" from other fee application related tasks.

11.     With these parameters, the Fee Committee evaluated each Applicant's retention and fee application time and requested adjustments, where appropriate, to comply with the Fee Committee Standards.  Adjustments to the Applications made in light of these principles are included in **Exhibit A**.

12.     <u>Time Increments</u>.  Proper time record keeping is necessary to enable the court to determine the reasonableness of the work that has been performed.  "Any uncertainties due to poor record keeping are resolved against the applicant."  *See In re Poseidon Pools of America*, 216 B.R. 98, 100-101 (E.D.N.Y. 1997).  Specifically, pursuant to the U.S. Trustee Guidelines, timekeepers must record their time contemporaneously in tenth-of-an-hour increments.  *See* Local Rule 2016-2(d)(iv).

13.     Time entries repeatedly billed in whole and half-hour increments—significantly in excess of the 20 percent that might be expected in a statistically perfect sample—raise at least two adverse inferences.  First, the pattern raises a concern that the timekeeper's minimum

---

[6] The Fee Committee is aware that the U.S. Supreme Court has agreed to consider the compensability of fees incurred in defense of fee objections in *ASARCO L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C.* (5th Cir. 2014), *cert. granted sub nom. Baker Botts, L.L.P. v. ASARCO L.L.C.*, 135 S. Ct. 44 (U.S. Oct. 2, 2014) (No. 14-103).

increment was a half-hour, ignoring the requirement that the minimum increment be one-tenth of

an hour.  Second, the billing pattern raises a question of whether the timekeeper failed to keep

accurate and contemporaneous records, leading to estimating or rounding.

14.    The Fee Committee's review identified some timekeepers who regularly failed to

bill in tenths-of-an-hour.  These timekeepers were noteworthy because they appeared to record

their time in half-hour or whole-hour increments with unusual frequency.

15.    All of the Applicants for which time increments were a problem acknowledged

the problem and agreed to remedy the issue in subsequent fee applications.  As incorporated in

**Exhibit A**, the Applicants adjusted their fees to offset any adverse impact on the estates of this

problem.

16.    <u>Administrative Tasks and Expenses</u>.  The Fee Committee examined each

application to identify tasks that, in substance, are properly characterized as administrative.

Those tasks include duties appropriate for staff such as word processing, proofreading, and

secretarial tasks.  U.S.T. Guidelines § (B)(3)(e); *see also*, *e.g.*, *In re Fibermark, Inc.*, 349 B.R.

385, 396 (Bankr. D. Vt. 2006).

17.    In addition, the Fee Committee analyzed the applications for tasks performed by

attorneys that more appropriately could have been performed by paraprofessionals.  Where the

Fee Committee deemed these services compensable, they were allowed only at a billing rate

commensurate with the complexity of the task.  *See* 11 U.S.C. § 330(a)(3)(D).  Each of the

Applicants adjusted their fee requests for any identified inefficiencies.

18.    <u>Vague Task Descriptions</u>.  To be compensable, all time entries should be

sufficiently detailed to allow a reviewer to determine their compliance with applicable Code

sections, rules, standards, and guidelines.  Time entries for telephone calls, letters, and other

communications should give sufficient detail to identify the parties to and the nature of the communication, such that they demonstrate compliance with 11 U.S.C. § 330.  In addition, professionals should identify the final intended work product or purpose and identify the documents (or data) being reviewed, edited or analyzed so that the services may be evaluated for reasonableness.  Professionals should identify the specific services provided—such as drafting, editing or conferencing—rather than relying upon generic terms like "*Work on*" or "*Attention to*."  *See* Local Rule 2016-2(d); *see, e.g.*, *In re CCT Commc'ns*, No. 07-10210, 2010 WL 3386947, at *8 (Bankr. S.D.N.Y. Aug. 24, 2010).

19.    Each of the Applicants acknowledged instances of vague timekeeping and resolved to remedy the problem in subsequent interim fee applications.  All Retained Professionals have been advised that the continued use of vague task descriptions will be subject to a recommended percentage reduction.

20.    Expenses.  One of the most common sources of stipulated deductions for expenses were those that exceeded applicable case maximums.  These deductions included: black and white photocopying charges billed in excess of $.10 per page, travel in other than coach class, excessive use of car service and local travel, and meals charged at improper times or in excess of the $20 and $40 per person caps.  The stipulations also reflect deductions for computerized legal research expenses that lacked sufficient explanation and vague or undocumented expense descriptions.  Each Applicant either provided supporting documentation to establish compliance with the Fee Committee Standards or agreed to a decrease in expense reimbursement to comply with the guidelines.

21.    Summer Associates.  Retained professionals should not bill for summer associates and other timekeepers who have not completed their legal education.  *See*, *e.g.*, *In the Matter of*

*Chemtura Corp.*, No. 09-11233, First Interim Fee Application Hr'g Tr. 37-38 (Bankr. S.D.N.Y. Sept. 29, 2009).  The Fee Committee has asked each Retained Professional to certify that all timekeepers for whom compensation is sought have completed their legal educations in the relevant jurisdiction or, in the alternative, to identify all fees incurred by summer associates and other timekeepers who have not completed their legal education.

22.     Some of the Applicants included summer associate time.  Most of these instances were inadvertent, and all agreed to remove summer associate time from this and future applications.

23.     <u>Transitory Billers</u>.  Certain timekeepers—based on their task descriptions—appear to have had only very high level or, alternatively, tangential involvement in these cases. This category of "transitory" timekeepers includes those whose time detail does not provide a basis to conclude that the timekeeper contributed any significant benefit to the estate—for example, by creating or contributing to work product—at least during the first interim period.  It also includes those who spent the vast majority of their time reviewing court filings or the work of others and, in some instances, participating in meetings and calls with no apparent analytical or direct contribution to the Retained Professional's substantive work.

24.     All of the Applicants for whom transitory billing was a problem either provided supplemental information illuminating the timekeeper's niche role, or agreed to remove charges for transitory timekeepers.

25.     <u>Duplication and Overlap</u>.  The Fee Committee is very concerned about the possibility of overlapping work or duplication with respect to some Retained Professionals.  The Fee Committee is carefully scrutinizing work that apparently mirrors that of other professionals, requesting supplemental explanations delineating the differing roles of each professional and

identifying, with specificity, the measures that are in place to prevent duplication of efforts. In addition, the Fee Committee has reviewed this Court's orders authorizing the retentions, as well as their provisions articulating the roles of each professional.

26.     <u>Multiple Attendees</u>.  The Fee Committee is very much concerned with the issue of multiple attorney attendance.  Each hearing, meeting, deposition, and other event has included dozens of lawyers and professionals billing time to the estates.  Although not all professionals are paid with estate funds, the significance of this issue is manifest at most every hearing and deposition in these cases.  Toward that end:

A.     The Fee Committee has reviewed transcripts and canvassed its own members involved at the early stages of these cases and has concluded that many attendees are not participating in or contributing to these events.

B.     Many professionals have a keen and perhaps academic interest in what happens in the courtroom.  The Fee Committee does not discourage firms from inviting professionals who are not participating to attend for informational or educational purposes.  The expense of all but the main contributing timekeepers, however, should be borne by the professional firm—not the estates.

C.     Multiple attendance has not been a problem for any of the Applicants included in this report, though it is a significant issue in first interim fee applications yet to come before the Court.

### THE APPLICATIONS

***Filsinger Energy Partners***

27.     On September 16, 2014, the Court entered the Order *Authorizing the Debtors to Retain and Employ Filsinger Energy Partners as Energy Consultant Effective Nunc Pro Tunc to the Petition Date* [D.I. 2057] (the "Filsinger Retention Order").

28.     On November 10, 2014, Filsinger filed the *Interim Fee Application of Filsinger Energy Partners, Energy Consultants for the Debtors and Debtors in Possession, for the Period From April 29, 2014 Through and Including August 31, 2014* (the "Filsinger First Fee Application") [D.I. 2733].  Filsinger seeks $3,798,436 in fees and $192,989.61 in expenses.

29.     Filsinger's retention as the Debtors' energy consultant is for the purpose of providing three types of services to the Debtors, including:

- Analyzing the Debtors' financial forecast from an energy industry perspective;
- Providing forecasts of commodity prices; and
- Reviewing and analyzing compensation metrics.

*See* Filsinger Retention Order.

30.     During the first interim fee period, Filsinger conducted data collection and diligence (including significant on-site diligence) and developed comprehensive forecasts related to long-range planning.  Filsinger also performed power-generation asset modeling to develop commodity price projections and conducted research to determine the non-Debtor specific assumptions in its analysis.  Further, Filsinger performed analysis of the Debtors' compensation plans compared to energy industry standards and prepared reports in support of the Debtors' operations, FEP analyses (features, events, and processes), and court filings.

31.     The Filsinger timekeepers billed for administrative tasks, routine billing tasks, and expenses that did not comply with the Fee Committee Standards.

32.     Filsinger's First Fee Application generally complied with Fee Committee standards with some non-compensable billing activities and expenses subject to adjustment.  Filsinger either provided adequate explanation for all matters questioned, or agreed to the Fee Committee's proposed reductions.

33.     The Fee Committee has determined that the reductions outlined in **Exhibit A**
adequately address any deficiencies in the Filsinger First Fee Application.

***Gibson, Dunn & Crutcher LLP***

34.     On September 16, 2014, the Court entered the *Order Authorizing the Debtors to
Retain and Employ Gibson, Dunn & Crutcher LLP as Special Counsel for Certain Corporate
and Litigation Matters, Effective Nunc Pro Tunc to the Petition Date* [D.I. 2058] (the "Gibson
Dunn Retention Order").

35.     On October 30, 2014, Gibson Dunn filed the *First Interim Fee Application of
Gibson, Dunn & Crutcher LLP, Special Counsel to the Debtors and Debtors in Possession, for
the Period From April 29, 2014 Through August 31, 2014* (the "Gibson Dunn First Fee
Application") [D.I. 2657].  Gibson seeks $786,925 in fees and $1,835.07 in expenses.

36.     Gibson Dunn's retention is for the purpose of representing the Debtors on various
discrete litigation (mostly environmental) and corporate matters.  *See* Gibson Dunn Retention
Order.

37.     During the first interim fee period, Gibson Dunn worked on its own retention and
disclosures; continued representing the Debtors in several significant litigation matters; worked
on discrete tax and securities issues—some arising from the Chapter 11 filings; and, provided
technical, research, and logistical support in connection with the tender, exchange, and issuance
of EFIH DIP financing-related securities.

38.     The Gibson Dunn First Fee Application generally complied with the Fee
Committee Standards with some non-compensable billing activities and administrative tasks
subject to adjustment.  Gibson either provided adequate explanation for all matters questioned or
agreed to the Fee Committee's proposed reductions.  *See* **Exhibit A**.

***Thompson & Knight LLP***

39.      On September 16, 2014, the Court entered the *Order Authorizing the Debtors to Retain and Employ Thompson & Knight LLP as Special Counsel for Certain Tax-Related Matters, Effective Nunc Pro Tunc to the Petition Date* [D.I. 2061] (the "Thompson & Knight Retention Order").

40.      On November 17, 2014, Thompson & Knight filed the *First Interim Application of Thompson & Knight LLP, Special Tax Counsel for the Debtors and Debtors-in-Possession, for the Period From April 29, 2014 Through August 31, 2014* (the "Thompson & Knight First Fee Application") [D.I. 2789].  Thompson & Knight seeks $575,740.50 in fees and $8,518.75 in expenses.

41.      Thompson & Knight's special tax counsel retention is for the purpose of providing four separate categories of tax-related services to the Debtors, including:

- Analyzing the tax implications of any proposed plan of reorganization or asset sale;
- Representing the Debtors in controversies with the IRS;
- Representing the Debtors on Texas taxation matters; and
- Other tax matters, as needed.

*See* Thompson & Knight Retention Order.

42.      During the first interim fee period, Thompson & Knight reached a resolution with the IRS, on behalf of the Debtors, of open tax issues related to prior tax years, reducing significantly the priority tax claims against the estates.  Thompson & Knight also advised the Debtors extensively on the proposed tax-free strategy for deconsolidation and worked toward the issuance of a Private Letter Ruling from the IRS on that issue.  Thompson & Knight also performed significant research on the document retention requirements, for tax purposes, applicable to several of the Debtors' business units.

43.      The First Thompson & Knight Fee Application generally complied with the Fee Committee Standards with several questioned attorney time entries that appeared to be for administrative or paraprofessional work.  Thompson & Knight provided supplemental information and context for the questioned time entries that satisfied the Fee Committee's concerns.

***Morrison & Foerster LLP***

44.      On September 16, 2014, the Court entered the *Order Authorizing the Official Committee of Unsecured Creditors to Retain and Employ Morrison and Foerster LLP Effective as of May 12, 2014* [D.I. 2064] (the "Morrison & Foerster Retention Order").

45.      On October 31, 2014, Morrison Foerster filed the *First Interim Application of Morrison & Foerster LLP as Counsel for the Official Committee of Unsecured Creditors for Compensation and Reimbursement of Expenses Incurred for the Period May 12, 2014 Through August 31, 2014* [D.I. 2671] and, on November 25, the *Supplement to First Interim Application of Morrison & Foerster LLP as Counsel for the Official Committee of TCEH Unsecured Creditors for Compensation and Reimbursement of Expenses Incurred for the Period May 12, 2014 Through August 31, 2014* [D.I. 2891] (together, the "Morrison & Foerster First Fee Application").  Morrison Foerster seeks $7,915,409.50 in fees and $166,982.01 in expenses.

46.      Morrison Foerster's retention is for the purpose of representing the Official Committee of Unsecured Creditors of Energy Future Competitive Holdings Company LLC, its direct subsidiary, Texas Competitive Electric Holdings Company LLC, and their direct and indirect subsidiaries' and EFH Corporate Services Company (collectively the "TCEH Debtors").[7]  *See* Morrison & Foerster Retention Order.

---

[7] The Fee Committee refers to Morrison Foerster's client as the "T-Side UCC" to distinguish it from the Official Committee of Unsecured Creditors appointed on October 27, 2014 to represent the unsecured creditors of Energy

47.    During the first interim fee period, Morrison Foerster worked on its own retention and disclosures as well as those of Lazard Frères & Co. LLC and FTI Consulting, Inc.; analyzed the various first and second day motions; reviewed and monitored other parties' objections to venue, financing, and cash collateral matters; helped negotiate and implement a discovery protocol; and engaged in discovery and due diligence related to professional retention issues, valuation, liens, debtor-in-possession financing, and the tax sharing agreement.  Morrison Foerster also reviewed and analyzed the restructuring support agreement, the Debtors' request for an IRS private letter ruling, and performed analysis and due diligence related to other tax matters.  The firm prepared—and, ultimately, resolved—objections to the critical vendor motion and the EFIH Second Lien DIP.

48.    Morrison Foerster billed for some summer associates, had several timekeepers for whom time increments did not comply with the guidelines, and had one timekeeper whose contributions to the case were not readily apparent.  The Morrison & Foerster First Fee Application required some expense reductions as well, including questioned computer research, transportation, and meals.  Morrison accepted the Fee Committee's proposed adjustments for guideline violations and provided supporting documentation for some of the challenged expenses.  The Fee Committee has agreed to reevaluate the work of one timekeeper after second interim fee applications are filed.  With the negotiated adjustments, the Fee Committee believes the Morrison Foerster First Fee Application complies with the Fee Committee Standards.

## CONCLUSION

For all of these reasons, the Fee Committee respectfully requests that the Court allow the fees and expenses requested in the Applications, subject to the negotiated resolutions set forth on

---

Future Holdings Corp., Energy Future Intermediate Holding Company, LLC; EFIH Finance, Inc; and EECI, Inc. (the "E-Side UCC").  *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 2570].

**Exhibit A**, and direct the Debtors to pay the respective balances owed to the estate professionals

on or before December 31, 2014.

Dated:  December 28, 2014.

PHILLIPS, GOLDMAN & SPENCE, P.A.


By:      _/s/ Stephen W. Spence_____
Stephen W. Spence, Esquire (DE#2033)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 N. Broom Street
Wilmington, DE 19806
Phone: (302) 655-4200
Fax:  (302) 655-4210
E-mail: sws@pgslaw.com


Katherine Stadler
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, Wisconsin 53703
phone: (608) 257-3911
fax: (608) 257-0609
E-mail: kstadler@gklaw.com

_Attorneys for the Fee Committee_

**APPENDIX:  FEE COMMITTEE STANDARDS**

The Fee Committee devoted its initial meetings to establishing rules and guidelines to govern fees and expenses in these cases (the "Fee Committee Standards") and to approving communication of those guidelines to the Retained Professionals.

The Fee Committee Standards endeavor to synthesize and incorporate the requirements of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 2016, this Court's Local Rules, the Interim Compensation Order, and the *Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases*, 28 CFR, Part 58, App. B (the "U.S. Trustee Guidelines"), as well as the Fee Committee's discretionary determinations regarding necessity and reasonableness under the unique circumstances of these proceedings.

The Fee Committee articulated the Fee Committee Standards to all Retained Professionals in three memoranda, issued on October 3, October 7, and December 1.  The Fee Committee Standards set forth particular requirements for submission of monthly, interim, and final fee requests and supporting documentation to the Fee Committee.  The Fee Committee Standards articulate the following requirements:

      A.    <u>Contents of Interim Fee Applications</u>.  All interim and final fee applications must disclose, at a minimum:

          i.    Whether the applicant is seeking compensation under 11 U.S.C. § 330 or another provision of the Bankruptcy Code;

          ii.    A summary of the terms and conditions of the Retained Professional's employment and compensation, including a statement consistent with Rule 2016 and Local Rule 2016;

          iii.    Identification of all professionals who billed time, including each professional's billing rates and year of bar admission;

      iv.      A list of all rate increases, including rate increases due to increasing seniority, by timekeeper and amount, imposed or proposed by the Retained Professional since it began working on these cases;

      v.      A statement that the Retained Professional's client has (or has not) consented to all rate increases;

      vi.      A statement of all discounts applied for work performed for the Retained Professional's client before or during these cases;

      vii.      The precise time period covered by the application;

      viii.      Time and service entries in electronic format identifying participants, activities, and subject matters, arranged by specific project categories, including narrative summaries of each project, its necessity and benefit to the estate (with non-working travel time as a separate project category);

      ix.      Time entries, in tenths of an hour,[1] without "lumping" services together unless the aggregate amount of time spent for those "lumped services" does not exceed 0.5 hours;

      x.      Explanations of tasks involving multiple timekeepers and the contributions of each timekeeper; and

      xi.      A detailed itemization of actual, necessary expenses.

    B.    <u>Fee Committee Analysis of Billing Detail</u>.  The Fee Committee has examined:

      i.      The hourly rates charged:

      1.      Ensuring that billing rates for each professional are the rates approved in the applicable retention order or supplement;

      2.      Evaluating the reasonableness of rates and the time spent in relation to the nature and character of the work and each professional's role and experience;

      3.      Verifying calculated blended rates;

      4.      Evaluating multiple rates billed to particular projects; and

---

[1] Unless otherwise ordered by the Court.

5.     Evaluating rates and services provided by attorneys not yet admitted to the bar and by law students.

    ii.     The hours billed:

1.     Evaluating hours billed against any limitations in the retention order;

2.     Analyzing average billable hours each day and identifying extended periods of above average billing days;

3.     Calculating fees or billable hours for preparation of firm retention documents and fee applications as a percentage of total fees and hours—time spent preparing and editing bills is not compensable;

4.     Evaluating legal research to determine whether it has been conducted appropriately and at the lowest appropriate rate;

5.     Reviewing clerical and administrative tasks to determine either the propriety of the billing rate for the task or whether the task is non compensable;

6.     Ensuring that time is billed in one-tenth of an hour increments, unless otherwise ordered by the Court;

7.     Identifying vague task descriptions that do not permit a reviewer to determine the task's necessity;

8.     Identifying improperly "lumped" or "block billed time";

9.     Ensuring the use of properly segregated matter numbers for project categories, generally consistent with the following:

      a.     DIP financing and cash collateral
      b.     Section 341 meeting and other communications with creditors/debtors
      c.     Asset sales
      d.     Asset analysis and valuation
      e.     Due diligence-analysis of loan and other security documents
      f.     Lift stay or adequate protection matters
      g.     Assumption and rejection of leases or executory contracts
      h.     Avoidance actions (significant avoidance actions should have their own matter identifier)
      i.     Budgeting
      j.     Business operations

k.    Case administration
l.    Claims and claims objections
m.   Corporate governance and board matters
n.    Retention and fee applications
o.    Litigation (each litigation matter should have its own matter identifier)
p.    Non-working travel
q.    Plan and disclosure statement
r.    Tax issues (individual governmental entity audits should have their own matter identifiers)

10.    Identifying meetings, hearings, or other events attended by an excessive number of time keepers given the nature of the hearing or meeting and the necessity of multiple attendees;

11.    Ensuring that non-working travel is billed at no more than 50 percent of the firm's standard hourly rate;

12.    Identifying any calculation or billing errors;

13.    Identifying instances of duplication or overlap in work performed by multiple Retained Professionals;

14.    Ensuring that tasks are appropriately delegated to the professional with the lowest suitable billing rate for the task performed; and

15.    Evaluating time spent monitoring or overseeing others' work without substantial contribution to work product.

C.    <u>Expense Reimbursement Guidelines</u>.  The Fee Committee generally followed these principles:

i.    First class travel is not reimbursable;

ii.    Copying is reimbursable at 10 cents per page for black and white and, where color copies are necessary, 50 cents per page;

iii.    It is not acceptable to bill the estates for converting .pdf, Word, or other electronic documents to the printed page;

iv.    Charges for converting documents to electronic formats, scanning charges, and charges to convert and upload documents are not reimbursable;

v.    Word processing, proofreading, secretarial and other support expenses are not reimbursable;

4

    vi.        Telephone charges—including cellular phone fees and subscriptions, text fees, data fees, roaming charges, and overseas calls, other than actual charges for multi-party calls incurred by counsel in connection with the cases, are not reimbursable;

    vii.       Expenses related to seeking committee or other representation (pitching) are not reimbursable;

    viii.      Expenses related to court admission are not reimbursable;

    ix.        Subscription, publication, or library charges are not reimbursable, nor are office supplies;

    x.         Clothing, dry-cleaning, and travel sundries are not reimbursable;

    xi.        Hotel expenses are capped at $500 per night in New York City and $350 per night in all other locations. Health or athletic facilities, in-room movies, or other entertainment charges are not reimbursable. In addition, in-room dining or other hotel food and beverage charges are subject to the Fee Committee's meal guidelines;

    xii.       Neither the time nor travel expenses associated with traveling to other offices within a professional's own firm is reimbursable – except for travel to attend hearings, client or third party meetings, or to prepare for them;

    xiii.      Business meals are reimbursable as follows:

         1.      In-office meals are capped at $20 per person per meal,[2] and are reimbursable if:

              a.      The professional attends a necessary lunch-hour business meeting; or
              b.      The professional works *on these cases* past 8 p.m. and has worked more than four hours *on these cases* during the billing day for which meal reimbursement is sought.

         2.      Coffee and snack charges are not reimbursable.

         3.      Out-of-office meals are capped at $40 per person per meal and are reimbursable only if the professional has travelled to prepare for or attend a hearing, client or third party meeting, or other event.

---

[2] Note that the meal reimbursement cap is *not* an allowance or per diem. Applicants may be reimbursed for either the actual cost of the meal, or the reimbursement cap, whichever is less.

4.      Regardless of the number of attendees, the Fee Committee reviewed receipts for any single meal costing more than $200.

5.      Alcohol is not reimbursable.

xiv.     Local travel expenses (train, bus, subway, mileage, car service, taxi) to or from a professional's home are not reimbursable unless a professional *has worked at least four hours on these cases on the day for which the expense is sought* and works past 9 p.m. local time *on these cases*;

xv.      Wait time associated with car service is not reimbursable and should be deducted from car service expense reimbursement requests.  Car service expenses are reimbursable only for natural persons and not for documents or other objects;

xvi.     Infrastructure improvements, rent, utilities, office equipment, furnishings, insurance, and property taxes are not reimbursable;

xvii.    Charges for electronic research services (Westlaw, Lexis-Nexis) should be accompanied by a general statement that the amount charged to the estates reflects any volume or other discounts the firm regularly receives from the provider;

xviii.   Contract attorneys are reimbursable at their actual cost (that is, the rate charged by the agency or other provider placing the attorneys) without markup.  Professionals should submit detailed billing statements for all contract attorneys, who will be subject to the same standards of review for detail, accuracy, and ultimately, reasonableness as we do for other such professionals;

xix.     In general, Retained Professionals should not submit reimbursement requests for any other firm's professional (legal, financial advisory, investment banking, or accounting) services.  If a retained professional's retention terms allow for such subretentions, professionals working for and billing retained professionals must nonetheless submit detailed billing statements.  All professional fees will be subject to the same standards of review for detail, accuracy and, ultimately, reasonableness as that term is used in the bankruptcy code;

xx.      Expenses incurred prior to the Retained Professional's *nunc pro tunc* retention date are not reimbursable unless otherwise permitted by the Court's order authorizing the Retained Professional's employment in these cases; and

xxi.   The Fee Committee reviews receipts for all unusual or extraordinary expenses and, on a case-by-case basis, other receipts as requested by the Fee Committee.

D.   Budgets.  The Fee Committee requires Retained Professionals to provide a prospective monthly budget as follows:

i.   All retained law firms, restructuring advisors, and restructuring financial advisors must submit budgets to their client in compliance with that client's requirements;

ii.   In the case of professionals retained by any of the official committees of unsecured creditors, the budgets are provided to Richard Gitlin, the Independent Member and Chair of the Fee Committee, with a copy to Fee Committee counsel.  Professionals for any official committee of unsecured creditors must also submit budgets to the Fee Committee's creditor representative, Peter Kravitz;

iii.   In addition to the prospective budget, all retained professionals subject to the U.S. Trustee guidelines (that is, law firms) must continue to comply with the U.S. Trustee Guidelines budget requirement—requiring *retrospective four-month* budgets with interim fee applications; and

iv.   In general, monthly budgets that otherwise comply with the sample format provided in Exhibit C to the U.S. Trustee Guidelines will be sufficient for compliance with the Fee Committee's budgeting requirement.

12774043.1

7