## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: February 10, 2015 at 9:30 a.m.** |
|  | ) | **Objection Deadline: February 3, 2015 at 4:00 p.m.** |

### SECOND MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) extending the periods during which the Debtors have the exclusive right to file a chapter 11 plan to the end of the statutory period provided by section 1121 of the Bankruptcy Code, through and including October 29, 2015 (the "Filing Exclusivity Period"), and (b) extending the Filing Exclusivity Period for an additional 60 days to solicit votes on such a chapter 11 plan, as provided by section 1121 of the Bankruptcy Code, through and including December 29, 2015 (such extension, the "Soliciting Exclusivity Period" and, together with the Filing Exclusivity Period, the "Exclusivity Periods").  In support of this Motion, the Debtors submit the *Declaration of Paul Keglevic in Support of the Second Motion of Energy Future Holdings Corp.*, et al.*, for Entry of an Order Extending the Debtors' Exclusive Periods to File a*

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

*Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* (the "Keglevic Declaration").  In further support of this Motion, the Debtors respectfully state as follows.

**Preliminary Statement**

1.      The Debtors' chapter 11 cases are unambiguously amongst the most complex and active chapter 11 cases ever filed, and as the Court itself noted in a recent ruling, the Debtors are "still in the early stages of negotiat[ing]" a plan of reorganization.[2]  Consequently, the Debtors require an extension of the Exclusivity Periods to accomplish their ultimate goal—achieving as much consensus as possible on a plan of reorganization that maximizes value and allows the Debtors to expeditiously exit chapter 11.

2.      The progress the Debtors have made to date on achieving this goal would not have been possible without the substantial progress the Debtors have made on a number of complementary workstreams.  As described in detail below, the Debtors have made significant progress toward achieving this goal in the four months following entry of the First Extension Order,[3] including (a) obtaining entry of the Bidding Procedures Order, approving negotiated bidding procedures for the multi-billion dollar auction related to the sale of the economic interests in Oncor Electric Delivery Company LLC (the "EFH-EFIH Transaction"); (b) educating the EFH Creditors' Committee and the conflicts-matters advisors of each of EFH Corp., EFIH, and EFCH/TCEH regarding the Debtors' restructuring initiatives and historical transactions; (c) advancing multiple discovery efforts (that, in the aggregate, have resulted in the

---

[2]     *In re Energy Future Holdings*, Opinion at 33, January 7, 2015 [D.I. 3183] (regarding the designation of a bar date governing asbestos-related claims).

[3]     Capitalized terms used but not defined in this preliminary statement have the meanings ascribed to such terms in the body of this Motion.

2

production of several million pages of materials); and (d) commencing significant plan negotiations with all of the major creditor constituencies at each of EFH, EFIH, and TCEH.

3.      Most significantly, since filing the First Extension Motion, the Debtors developed a process for, and generated interest in, a multi-billion dollar auction for the EFH-EFIH Transaction.  Since filing the Bidding Procedures Motion, the Debtors have focused on implementing the November 3, 2014 ruling on the Bidding Procedures Motion.  Additionally, on January 13, 2015, the Debtors filed a proposed order on the Bidding Procedures Motion as well as additional material supporting the Debtors' decision-making process with respect to the EFH-EFIH Transaction.  After hearing from a number of creditor constituencies and reviewing the submitted corporate governance material, the Court entered the order, without further revisions, approving the Bidding Procedures Motion on January 14, 2015 (the "Bidding Procedures Order").[4]

4.      The Debtors' success with respect to the Bidding Procedures Motion is, in large part, an outgrowth of discussions with, among others, two new, significant parties—the EFH Creditors' Committee and the conflicts-matters advisors.  The Debtors faced the formidable task of educating these parties as expeditiously as possible to ensure their ability to fully engage in discussions related to the EFH-EFIH Transaction and the Debtors' global restructuring initiatives.  Among other things, the Debtors participated in multiple in person and telephonic diligence sessions with these advisors and provided access to requested diligence, in addition to materials produced through heavily negotiated and Court-approved discovery protocols.

5.      The Debtors also are working on a number of discovery workstreams.  One of the Debtors' most significant discovery workstreams is the Legacy Discovery Protocol.  The Legacy

---

[4]     *See Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 3295].

Discovery Protocol addresses a wide breadth of prepetition transactions, and, consequently, lays the foundation for claims that the TCEH Junior Creditors and/or Official Committees may seek to prosecute, and which the Debtors may seek to address as part of a plan.  To facilitate plan settlement discussions, the Debtors have engaged with various constituencies to identify and prioritize high-value Legacy Discovery Protocol productions.  In addition, the Debtors have worked to satisfy the Legacy Discovery Requests and have, to date, produced approximately half a million documents, comprising over 3.5 million pages.

6.      In addition, recognizing that any discussion on restructuring alternatives must also involve a robust assessment of potential plan distributions, the Debtors have (a) sought to simultaneously resolve interest rate issues and litigation arising from all three tranches of EFIH debt; (b) filed seven omnibus objections in response to the 10,000 proofs of claim filed in these chapter 11 cases that, in the aggregate, seek to expunge over 1,500 claims with an aggregate claimed value in excess of $100 billion and obtained a ruling from the Court that it is possible to establish a bar date for unmanifested asbestos claims; and (c) begun the process of reviewing their over 12,000 executory contracts to ensure that only those contracts expected to return value to the estates in the long-term are assumed and that other contracts are rejected.  These efforts will provide greater clarity regarding the pool of potential claimants entitled to a plan recovery and the value of their potential recovery.

7.      Moreover, following the First Extension Order, the Debtors have continued to focus on preserving the long-term value of their operations by obtaining over 20 Court orders related to, among other things, hedging and generation activities, settlement of prepetition causes of action (which, again, will ultimately provide greater clarity regarding plan distributions) and employee compensation.   Based   on   countless   discussions   with   a   number   of   interested

4

stakeholders, including the Official Committees and the U.S. Trustee, the vast majority of operational orders were entered on a consensual basis or adjourned to further develop consensus.

8.      Even with all of these efforts, and as the Court has recognized, plan discussions are in their early stages.  There is no doubt that maintaining the Exclusivity Periods is critical to the Debtors' ability to advance plan discussions beyond the early stages.  If granted an extension of the Exclusivity Periods, the Debtors' priority will be to facilitate a continued dialogue with their various stakeholders relating to all of the issues in the case, including, most importantly, the plan of reorganization.

9.      The Debtors believe such a discussion will be more difficult in an environment where multiple plans can be proposed and parties become less willing to engage in a *global* restructuring discussion.  In addition, based on the progress of such restructuring discussions, the Debtors believe that an extension of the Exclusivity Periods will motivate the parties to work with the Debtors to develop plan alternatives, as well as provide the Debtors with additional time to thoughtfully evaluate such alternatives with an eye towards maximizing the value of each of the respective Debtor's estates.  Additionally, an extension of the Exclusivity Periods will allow the Debtors to make further progress on the EFH-EFIH Transaction and, in conjunction with potential resolution on the EFIH debt workstreams described below, potentially provide significantly greater clarity regarding the value of the Debtors' estates.  Consequently, and to capitalize on the progress that has been made to date, the Debtors request an extension of the Filing Exclusivity Period to October 29, 2015, and an extension of the Soliciting Exclusivity Period to December 29, 2015.[5]

---

[5]     Under paragraph three of *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855] (the "Final Cash Collateral Order"), the Debtors' use of cash collateral

**Jurisdiction and Venue**

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The bases for the relief requested in this Motion are section 1121(d) of the Bankruptcy Code (the "Bankruptcy Code"), rule 9006 of the Federal Rules of Bankruptcy Rules (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9006-2.

**Relief Requested**

13.     The Debtors seek entry of an order extending (a) the Filing Exclusivity Period through and including the statutory period provided by section 1121 of the Bankruptcy Code, to October 29, 2015, and (b) the Soliciting Exclusivity Period through and including December 29, 2015.

**Background**

14.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating

---

expires on October 29, 2015.  If the Debtors determine to use the Soliciting Exclusivity Period, they will seek to negotiate an extension of their use of cash collateral for the duration of the Soliciting Exclusivity Period.

their businesses and managing their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code. The Court has entered a final order for joint

administration of these chapter 11 cases [D.I. 849]. The Court has not appointed a trustee. On

May 13, 2014, the Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") formed an official committee of unsecured creditors of Energy Future Competitive

Holdings Company LLC ("EFCH"), Texas Competitive Electric Holdings Company LLC

("TCEH"), the direct and indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate

Services Company (the "TCEH Creditors' Committee") [D.I. 420]. In addition, on October 27,

2014, the U.S. Trustee formed an official committee of unsecured creditors of Energy Future

Holdings Corp. ("EFH Corp."), Energy Future Intermediate Holding Company, LLC ("EFIH"),

EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee" and, together with the

TCEH Creditors' Committee, the "Official Committees") [D.I. 2570]. Further information

regarding the Debtors' business operations and capital structure is set forth in the declaration of

Paul Keglevic in support of the Debtors' first day motions [D.I. 98].

A.      **Plan Negotiations**.

15.      Since the Bankruptcy Court entered the First Extension Order,[6] the Debtors have

been focused on generating a plan discussion with *all* creditor constituencies.[7]   By fostering a

---

[6]   On July 23, 2014, the Debtors filed a motion seeking an extension of their exclusive periods to file a plan of reorganization and solicit votes on such plan through and including February 23, 2015, and April 25, 2015, respectively [D.I. 1683] (the "First Extension Motion"). The Court entered an order approving the relief requested in the First Extension Motion on September 16, 2014 [D.I. 2063] (the "First Extension Order").

[7]   At the hearing held on January 13, 2015, certain of the creditor constituencies made observations regarding the status of plan negotiations. *See, e.g.*, Hr'g Tr. at [18:18–18:19] (Bankr. D. Del. Jan. 13, 2015) (counsel to the TCEH Creditors' Committee noted that "we are now engaged in significant plan negotiations. . . [we have] come a long way since the plan kickoff dinner"); *Id.* at [21:14-21:17] (counsel to the ad hoc committee of TCEH unsecured noteholders noted that "we are all talking about ways to hold the structure together, how to deal with a standalone sale and typical of the 20-way negotiation, it's pretty complex, it gets pretty heated. . ."); *Id.* at [28:14-28:17] (counsel to the ad hoc committee of TCEH first lien noteholders stating that ". . .we agree with some of the comments that have been made by other parties in court that substantive plan negotiations had commenced and remain ongoing and we're hopeful that those will be fruitful").

7

dialogue between the Debtors and their creditors and, in some instances, between the creditors themselves, these discussions have spurred certain creditor constituencies to begin developing plan proposals. Moreover, with the addition of the conflicts-matters advisors, the discussions to date have served as a platform for discussing what has become one of the focal points in these chapter 11 cases—how to address intercompany claims.

16. Progress on such plan discussions is likely to be extremely difficult in an environment where the Debtors do not have exclusivity. Indeed, in the absence of exclusivity, and as evidenced by the extremely active case docket which has, to date, over 3,100 entries, developing a global plan aimed at maximizing value is likely to be extremely challenging.

17. In addition, the Debtors would not have been positioned to engage in plan discussions without their progress on a number of other restructuring initiatives (discussed below) that collectively:

- provide clarity regarding the form of a global restructuring;

- set the stage for ongoing robust discussions and progress on critical plan constructs (specifically, plan provisions related to the settlement of intercompany claims and plan distributions); and

- maximize the value of the estates by obtaining Court-approval of a number of operational orders designed to safeguard the Debtors' operations.

**B.    Entry of Bidding Procedures Order Governing EFH-EFIH Transaction**.

18. On January 14, 2015, the Court entered the Bidding Procedures Order approving bidding procedures governing the EFH-EFIH Transaction. This was the culmination of a coordinated effort with a number of parties over the course of several months. In the summer of 2014, the Debtors determined that, based on a number of factors including favorable market

conditions following the withdrawal of the EFIH Second Lien DIP Facility,[8] value would be maximized across the estates by implementing a court-supervised auction process related to the EFH-EFIH Transaction.  Before and after the Debtors filed the motion seeking approval of procedures governing the EFH-EFIH Transaction [D.I. 2087] (the "Bidding Procedures Motion"), they launched an extensive marketing process in which over 50 potential investors were contacted, approximately 36 parties ultimately received teaser materials, and so far approximately 14 potential investors have signed confidentiality agreements to evaluate their potential participation in the EFH-EFIH Transaction.

19.    While the Debtors were marketing the EFH-EFIH Transaction to various third parties, they were also addressing discovery issues and objections related to the relief sought in the Bidding Procedures Motion.   On November 3, 2014, after a four-day hearing on the Bidding Procedures Motion, the Court issued its ruling (the "Bidding Procedures Ruling"), conditionally approving the relief sought in the Bidding Procedures Motion.[9]  Because the Debtors believe that determining the value of the EFH-EFIH Transaction will play a prominent role in developing a consensual confirmation process, the Bidding Procedures Ruling has, in part, guided the restructuring efforts of the Debtors in the last three months.

20.    At the same time, and as reflected in the stipulation governing case matters [D.I. 2051] and the notice the Debtors filed following the Bidding Procedures Ruling [D.I. 2718], the Debtors and their significant constituencies have, for many months, been actively discussing the potential need for certain Debtors to retain conflicts counsel during these cases, and the process

---

[8]    In this motion, the "EFIH Second Lien DIP Facility" refers to a second lien DIP facility at EFIH that contained a feature converting DIP proceeds into equity in reorganized EFH Corp. (described in further detail in the First Extension Motion).

[9]    *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS), Hr'g Tr. at [7:9–26:17] (Bankr. D. Del. Nov. 3, 2014).

RLF1 11403079v.1

by which that would happen. On November 7, 2014, and December 9, 2014, the Boards of each of EFH Corp., EFIH, and EFCH/TCEH delegated to their disinterested directors, authority to (a) engage advisors to advise the respective Debtors, at the direction of the respective disinterested director(s), on actual conflicts matters; (b) review and act upon actual conflicts matters; and (c) decide whether a particular matter constitutes an actual conflict, in each case with the advice of conflicts-matters advisors to be chosen by the disinterested directors at each estate.[10]   Consistent with the case matters protocol, before interviewing any advisors, the disinterested directors consulted with the unsecured creditors at each estate.[11]   Based on these discussions, each of EFH Corp., EFIH, and TCEH/EFCH obtained Court approval (or has filed an application for Court approval) to retain counsel and financial advisors (chosen exclusively by the respective disinterested director(s)).[12]   With the assistance of new conflicts-matters advisors,

---

[10]   Copies of the November 7, 2014 and December 9, 2014 resolutions were attached to the retention applications filed by a number of the conflicts matters advisors, including, by way of example, the *Debtors Energy Future Competitive Holdings Company LLC and Texas Competitive Electric Holdings Company LLC's Application for Entry of an Order Authorizing the Retention and Employment of Munger Tolles & Olson LLP as Counsel to the Debtors and Debtors in Possession Energy Future Competitive Holdings Company LLC and Texas Competitive Electric Holdings Company LLC Effective Nunc Pro Tunc to November 16, 2014* [D.I. 3040].

[11]   *See* paragraph 4 of the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [D.I. 2051].

[12]   *See Order Approving the Employment of Cravath, Swaine & Moore LLP as Counsel to Energy Future Intermediate Holding Company LLC Effective* Nunc Pro Tunc *to November 16, 2014* [D.I. 3321]; *Order Authorizing Energy Future Competitive Holdings Company LLC and Texas Competitive Electric Holdings Company LLC to Retain and Employ Greenhill & Co. as Independent Financial Advisor Effective* Nunc Pro Tunc *to November 17, 2014* [D.I. 3283]; *Order Authorizing the Retention and Employment of Proskauer & Rose LLP as Counsel for Debtor and Debtor in Possession Energy Future Holdings Corp. Effective* Nunc Pro Tunc *to November 19. 2014* [D.I. 3281]; *Order Authorizing the Retention and Employment of O'Kelly, Ernst & Bielli, LLC as Co-Counsel for Debtor and Debtor in Possession Energy Future Holding Corp. Effective* Nunc Pro Tunc *to November 19, 2014* [D.I. 3280]; *Order Authorizing the Retention and Employment of Munger, Tolles & Olsen LLP as Counsel to Debtors and Debtors in Possession Energy Future Competitive Holdings Company LLC and Texas Competitive Holdings Company LLC Effective* Nunc Pro Tunc *to November 16, 2014* [D.I. 3279]; *Order Approving the Employment of Steven & Lee, P.C. as Counsel to Energy Future Intermediate Holding Company LLC Effective* Nunc Pro Tunc *to November 26, 2014* [D.I. 3278]; *Order Approving the Employment of Goldin Associates, LLC as Special Financial Advisor to Energy Future Intermediate Holding Company LLC, Effective* Nunc Pro Tunc *to December 31, 2014* [D.I. 3277].   The *Application/Motion to Employ/Retain SOLIC Capital Advisors, LLC as Financial Advisor for Debtor and Debtor in Possession Filed by Energy Future Holdings Corp.* [D.I. 3324] is scheduled to be heard at the February 10, 2015 omnibus hearing.

the Debtors developed a thorough governance record to comply with the Bidding Procedures Ruling (*e.g.*, notice of the boards' votes on the revised proposed form of order and production of unredacted board minutes and resolutions).

21.    Following the Bidding Procedures Ruling, the Debtors worked with the professionals for the Official Committees as well as the disinterested directors in consultation with the respective conflicts-matters advisors on revised procedures and a form of order for the Bidding Procedures Motion.  On January 13, 2015, the Debtors filed a proposed order on the Bidding Procedures Motion as well as additional material supporting the Debtors' corporate governance process with respect to the EFH-EFIH Transaction.[13]  After reviewing the materials the Debtors submitted in support of the revised order and considering the comments made at the hearing held on January 13, 2015, the Court entered the Bidding Procedures Order on January 14, 2015 [D.I. 3295].    Following entry of the Bidding Procedures Order, the Debtors immediately circulated a process letter to potential bidders to provide guidance on how to submit a bid on the EFH-EFIH Transaction for review by the Debtors.

**C.    Educating EFH Creditors' Committee and Conflicts-Matters Advisors to Foster Plan Discussions**.

22.    To assist the conflicts-matters advisors, and, ultimately, the disinterested directors, in fully engaging in restructuring discussions on actual conflict matters, the Debtors expended significant efforts to provide the conflicts-matters advisors with diligence regarding potential conflicts matters and actual conflicts matters that may need to be addressed in a plan of reorganization.

---

[13]    *See Certification of Counsel Concerning Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 3274]; *Supplemental Certification of Counsel Concerning Order (A) Approving Revised Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 3284].

23.    In addition, on October 27, 2014, the U.S. Trustee appointed the EFH Creditors'

Committee.  The Debtors have been working to educate the EFH Creditors' Committee and its

professionals on the Debtors' operations, financials, and restructuring goals.   In addition to

multiple telephonic and in-person diligence sessions (including a meeting with the EFH

Creditors' Committee, their professionals, and the Debtors' management team on January 14,

2015), the production of thousands of documents, and access to multiple datarooms, these

professionals participate in the standing call with the Debtors, their advisors, the TCEH

Creditors' Committee, the ad hoc group of TCEH second lien noteholders, and the ad hoc group

of TCEH unsecured noteholders (together with the ad hoc group of TCEH second lien

noteholders, the "TCEH Junior Creditors") and negotiated a case matters protocol with the

Debtors.[14]  This case matters protocol, if approved by the Court, will provide the EFH Creditors'

Committee professionals with the same reservations of rights and reports as the TCEH Creditors'

Committee under various orders of the Court and represents a negotiated resolution between the

Debtors and the EFH Creditors' Committee on the EFH Creditors' Committee's participation in

the Legacy Discovery Protocol.[15]

### D.    Substantial Completion of Legacy Discovery.

24.    Similarly, the Debtors also believe that the Legacy Discovery Requests will

advance discussions on a potential global settlement of intercompany claims.  To that end, the

Debtors have expended significant time and resources to produce discovery materials to other

---

[14]    *See Certification of Counsel Concerning Stipulation and Agreed Order Regarding Discovery Procedures in Connection with Legacy Discovery and Other Administrative Matters* [D.I. 3132].

[15]    The *Order Establishing Discovery Procedures in Connection with Legacy Discovery of Energy Future Holdings Corporation, its Affiliates, and Certain Third Parties and Other Related Matters* [D.I. 1832] outlines the procedures (the "Legacy Discovery Protocol") that govern discovery requests in connection with a number of the Debtors' prepetition transactions (collectively, the "Legacy Discovery Requests").

Legacy Discovery participants and review the productions made by such participants.   On January 12, 2015, the Debtors notified all legacy discovery participants of the Debtors' substantial compliance with their discovery obligations and compliance with the deadlines set forth in the Legacy Discovery Protocol.  The Debtors believe that they are on track to complete the production of documents in response to the Initial Consolidated Legacy Discovery Requests (as defined in the Legacy Discovery Protocol) by the February 9, 2015 deadline contemplated by the Legacy Discovery Protocol (as amended), subject to continuing privilege review and quality control review that may continue after that date.

25.     In addition, under the case matters protocol, the TCEH Junior Creditors and the TCEH Creditors' Committee must disclose the claims for which they will seek standing by March 31, 2015.  The Debtors also anticipate that the EFH Creditors' Committee will disclose to the Debtors the claims for which it intends to seek standing.  Maintaining exclusivity while the TCEH Junior Creditors and the Official Committees potentially file motions to seek standing to prosecute claims is critical to the Debtors' global restructuring efforts, given the role that such claims will ultimately play in any plan structure.

> **E.     Clarity on Potential Plan Distributions**.

26.     The Debtors have also been working to address two separate workstreams, which, collectively, provide greater clarity on both the pool of potential claimants who may seek to recover under a plan and the size of the pool available to satisfy such claims.

27.     ***EFIH Debt Claims***.  Following the entry of the First Extension Order, the Debtors have sought resolution on a number of issues related to the EFIH notes:

- ***First***, with respect to the EFIH first lien notes, the Court entered an order scheduling a trial to cover alleged makewhole claims, any other potential "redemption claims," and any claims for damages arising under any "no call"

13

covenants or "right to de-accelerate" provisions.[16]  The Debtors requested that the trial be March 25, 2015, through March 27, 2015, subject to the Court's availability.

- **Second**, on January 5, 2015, the United States District Court for the District of Delaware heard oral arguments from counsel to the indenture trustee for the EFIH first lien notes regarding its appeal of the EFIH First Lien Settlement (described in detail in the First Extension Motion).[17]  The Debtors and counsel for PIMCO, a large holder of EFIH first lien claims who participated in the EFIH First Lien Settlement, argued in favor of preserving the EFIH First Lien Settlement.[18]

- **Third**, with respect to the EFIH second lien notes, the indenture trustee for such notes filed an adversary complaint seeking a declaratory judgment that EFIH is obligated to pay the makewhole premium on the EFIH second lien notes.[19]  EFIH filed its motion for leave to file an amended answer and counterclaims[20] when the indenture trustee indicated that it would move to dismiss its claim on ripeness grounds. Following the indenture trustee's motion to dismiss, EFIH responded, stating that the bankruptcy-induced acceleration of the EFIH second lien notes does not require the payment of a makewhole premium and, importantly, that the declaratory judgment should not be dismissed because resolution of the EFIH second liens' claim is ripe and should be resolved now, rather than later, to advance plan negotiations.[21] The Debtors are hopeful that the Court will schedule a hearing in the near-term to rule on whether the makewhole issue is ripe, thus providing greater clarity on potential plan distributions on account of the EFIH second lien notes.

- **Fourth**, on October 23, 2014, the indenture trustee for the EFIH unsecured notes filed a proof of claim to recover principal, interest, fees, expenses, and

---

[16]  *See Certification of Counsel Regarding Joint Stipulation and Order Regarding Scheduling with Respect to (A) Contested Matter Motion, (B) Adversary Proceeding, and (C) Stay-Applicability Motion* [D.I. 166]; *Amended Scheduling Order* [D.I. 167].

[17]  *See* Hr'g Tr., Case No. 1:14-cv-00723-RGA (D. Del. Jan. 5, 2015).

[18]  *See Brief of Appellee*, Case No. 1:14-cv-00723-RGA [D.I. 36]; *Appellee PIMCO's Memorandum of Law in Support of Motion to Dismiss Appeal*, Case No. 1:14-cv-00723-RGA [D.I. 35].

[19]  *See Complaint for Declaratory Relief* [D.I. 995].

[20]  *See Energy Future Intermediate Holding Company LLC's and EFIH Finance Inc.'s Motion for Leave to File a First Amended Answer and Counterclaim*, Case No. 14-50405 [D.I. 12].

[21]  *See EFIH Second Lien Indenture Trustee's (i) Opposition to the Debtor's Motion for Leave to File a First Amended Answer and Counterclaim, and (ii) Motion for Leave to Dismiss the Complaint Without Prejudice* [D.I. 17]; *EFIH Debtors' Reply in Support of its Motion for Leave to File a First Amended Answer and Counterclaims and Opposition to the Second Lien Indenture Trustee's Motion for Leave to Dismiss Its Complaint* [D.I. 19].

"other amounts" (*e.g.*, makewhole claims) allegedly owed on such notes.[22] On December 16, 2014, EFIH filed an adversary complaint seeking a declaratory judgment to disallow such claims.[23]

28.        Whether or not the Debtors are successful on litigating claims arising from EFIH debt claims, as described above, maintaining exclusivity while such issues are litigated to completion or near completion will ultimately provide clarity on potential plan distributions, thereby advancing plan discussions in the near-term.

29.        ***Commencement of Claims Resolution Process***.    The Debtors succeeded in establishing a bar date for all "claims" (other than claims for asbestos-related injuries) and have obtained a ruling from the Court that it is possible to establish a bar date for unmanifested asbestos claims.[24]    To date, approximately 10,000 proofs of claim have been filed on the official claims register maintained by the Debtors' claims and noticing agent.[25]    Like the interest rate litigation, resolution of these claims will allow the Debtors to obtain greater clarity regarding the number of potential claimants who may seek recovery under a plan.    The Debtors have, to date, expunged or sought to expunge nearly 20% of the filed claims (other than asbestos-related claims) with a claimed value of over $100 billion.[26]    Ever cognizant of the effect of these chapter

---

[22]    *See* Proof of Claim Nos. 6347 and 6348.

[23]    *See Adversary Complaint for Declaratory Judgment of Energy Future Intermediate Holding Company LLC and EFIH Finance Inc.*, Case No. 14-51002 [D.I. 1].

[24]    *See In re Energy Future Holdings*, Opinion, January 7, 2015 [D.I. 3183] (regarding the designation of a bar date governing asbestos-related claims).

[25]    *See Debtors' First Omnibus (Non-Substantive) Objection to (Amended and Superseded, Exact Duplicate, and Insufficient Documentation) Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy Rules 3007-1* [D.I. 2808].

[26]    *See Order Sustaining Debtors' First Omnibus (Non-Substantive) Objection to (Amended and Superseded, Exact Duplicate, and Insufficient Documentation) Claims* [D.I. 3046]; *Order Sustaining Debtors' Second Omnibus (Non-Substantive) Objection to (Amended and Superseded, Exact Duplicate, No Supporting Documentation, and Insufficient Documentation) Claims* [D.I. 3237]; *Order Sustaining Debtors' Third Omnibus (non-Substantive) Objection to No Supporting Documentation Customer Claims* [D.I. 3236]; *Order Sustaining Debtors' Fourth Omnibus (Substantive) Objection to Certain Substantive Duplicate and No Liability Claims* [D.I. 3234]; *Order Sustaining Debtors' Fifth Omnibus (Substantive) Objection to (No Liability) Customer Claims* [D.I. 3235]; *Debtors' Sixth Omnibus (Non-Substantive) Objection to (Insufficient Documentation)*

15

11 cases on the Debtors' stakeholders (*e.g.*, vendors, customers, employees, debtholders), the Debtors sought court approval of a custom notice, allowing them to reduce the amount of mailings going out to claimants, instituted a claims hotline that a number of claimants have contacted to gain additional information regarding the claims process and the Debtors' objection to their claims, and engaged in dozens of telephone conferences with potential claimants regarding the nature of the Debtors' objection.[27]

30.     ***Rejection of Unprofitable Contracts***.   The Debtors have also worked to obtain greater clarity regarding the potential pool of unsecured claimants by rejecting unprofitable contracts.   The Debtors are in the process of reviewing and analyzing over 12,000 executory contracts and leases to ensure that the Debtors assume only the agreements that the Debtors believe will provide value to their estates and reject those agreements that are unlikely to provide value to the estates in the long-term.   Consequently, to date, the Debtors have assumed or rejected more than 1,900 of those agreements.[28]   The Debtors believe the contract and lease assumption and rejection process will help provide further clarity regarding plan distributions.

**F.     Continued Focus on Operational Excellence**.

31.     The Debtors' have also worked to minimize the effect of the bankruptcy on their operations by obtaining entry of nearly 20 Court orders related to, among other things:  (a) the Debtors' 2014 and 2015 compensation programs, (b) the Debtors' non-proprietary hedging program, (c) the settlement of certain significant environmental litigation claims, (d) the

---

*Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1* [D.I. 3212]; *Debtors' Seventh Omnibus (Substantive) Objection to Certain No Liability Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy Rules 3007-1* [D.I. 3218].

[27]   *See Order (A) Waiving Certain Requirements and (B) Approving the Debtors' Form of Custom Notice* [D.I. 2963].

[28]   *See Orders Approving the Rejection of Certain Executory Contracts and Unexpired Leases* [D.I. 2565, 2817, 3065]; *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases and Related Relief Thereto* [D.I. 2660].

16

settlement of certain historical IRS audits and payment of accrued property taxes, and (e) the establishment of procedures to settle certain de minimis prepetition actions to streamline the claim resolution process.[29]

32.    The Debtors negotiated the vast majority of operational orders with interested stakeholders, including the U.S. Trustee, the Official Committees, the ad hoc group of EFIH unsecured noteholders, the ad hoc TCEH first lien committee, and the TCEH Junior Creditors. As required by the case matters protocol, the Debtors also hold a biweekly call with the Official Committees and the TCEH Junior Creditors, updating such constituencies on upcoming motions and providing them with case updates.[30]

33.    In short, the Debtors made significant progress during the four months following entry of the First Extension Order by engaging in plan negotiations with all major creditor constituencies.  The Debtors also achieved a significant milestone in these chapter 11 cases upon the Court's entry of the Bidding Procedures Order.  That being said, much work remains to be done.  Given the complexity of the Debtors' cases, and the progress that still needs to be made, the Debtors will need more time to achieve their goal of consummating a global, value-maximizing restructuring.    Achieving such a goal requires the focus and willing participation of creditor constituencies who may be disincentivized to participate in a global

---

[29]    See, e.g., Order Authorizing The Debtors To (A) Pay Certain Prepetition Amounts on Account of the Insider Compensation Programs And (B) Continue The Insider Compensation Programs On a Postpetition Basis [D.I. 2595]; Order Authorizing The Debtors To Honor Obligations To One Insider Pursuant To The 2014 Luminant Commercial Incentive Plan [D.I. 2597]; Order Approving The 2015 Compensation Programs [D.I. 3052]; Order Authorizing Certain Debtors to Enter Into Non Proprietary Hedging and Trading Arrangements with a Tenor Beyond December 31, 2015 and Subject to Hedge and Tenor Limitations Consistent with Historical Practice [D.I. 2832]; Order (A) Authorizing Entry Into And Performance Under The Settlement Agreement Between Certain Of The Debtors And Sierra Club And (B) Modifying The Automatic Stay [D.I. 3047]; Order Authorizing The Debtors To Pay Prepetition Property Taxes [D.I. 3045]; Order Approving The Debtors Agreement To Certain Tax Adjustments [D.I. 2566]; Order Authorizing And Approving Settlement Procedures For Settling Certain Prepetition Claims And Causes Of Action Brought By Or Against The Debtors In A Judicial, Administrative, Arbitral Or Other Action Or Proceeding [D.I. 2564].

[30]    See Order and Stipulation Regarding a Protocol for Certain Case Matters [D.I. 2051].

discussion if the option of filing a competing plan is available.  Thus, to continue the Debtors' efforts to efficiently consummate a global, balance sheet restructuring, the Debtors request an extension of the Exclusivity Periods to and through the statutory period provided by section 1121 of the Bankruptcy Code.  Moreover, as discussed below, such an extension of the Exclusivity Periods is consistent with the relief that has been granted in other large, complex chapter 11 cases.

## Basis for Relief

34.    The Bankruptcy Code vests debtors with the exclusive right to propose a chapter 11 plan for the first 120 days of a chapter 11 case pursuant to section 1121(b) of the Bankruptcy Code.  Section 1121(c)(3) of the Bankruptcy Code further extends the period of exclusivity for an additional 60 days, to an initial maximum of 180 days, where the debtor has filed a chapter 11 plan and is soliciting votes on such plan.  "[T]he point of exclusivity is 'to promote an environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated.'"  *In re Burns and Roe Enters., Inc.*, 2005 WL 6289213, *4 (D.N.J. 2005) (quoting H.R. Rep. No. 103-835, at 36 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3340, 3344).  In these chapter 11 cases, the Exclusivity Periods set forth in sections 1121(b) and 1121(c) of the Bankruptcy Code will expire on February 23, 2015, and April 25, 2015, respectively, absent further order of the Court.

35.    Section 1121(d)(1) permits a court to extend a debtor's exclusivity "for cause," subject to certain limitations not relevant here.  Specifically, section 1121(d) provides that "on request of a party in interest made within the respective periods . . . of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section."  11 U.S.C. § 1121(d).  Although the term "cause" is

18

not defined by the Bankruptcy Code, such term should be viewed flexibly "in order to allow the debtor to reach an agreement."   H.R. Rep. 95-595, at 232 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6191; *see also In re Public Serv. Co. of New Hampshire*, 88 B.R. 521, 534 (Bankr. D.N.H. 1988) ("legislative intent . . . [is] to promote maximum flexibility").   At bottom, a debtor should be given a reasonable opportunity to negotiate with creditors and to prepare adequate information concerning the ramifications of any proposed plan for disclosure to creditors.  *See In re Texaco Inc.*, 76 B.R. 322, 327 (Bankr. S.D.N.Y. 1987).

36.    Courts within the Third Circuit and in other jurisdictions have held that the decision to extend a debtor's exclusivity periods is left to the sound discretion of a bankruptcy court and should be based on the totality of circumstances in each case.  *See, e.g., First Am. Bank of N.Y. v. Sw. Gloves & Safety Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986); *In re Dow Corning Corp.*, 208 B.R. 661, 663 (Bankr. E.D. Mich. 1997); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); *In re McLean Indus., Inc.*, 87 B.R. 830, 833 (Bankr. S.D.N.Y. 1987).  In particular, courts examine a number of factors to determine whether a debtor has had an adequate opportunity to develop, negotiate, and propose a chapter 11 plan and thus whether there is "cause" for extension of the Exclusivity Periods.   These factors include the following:

    (a)    the size and complexity of the case;

    (b)    the existence of good-faith progress;

    (c)    the necessity of sufficient time to negotiate and prepare adequate information;

    (d)    whether creditors are prejudiced by the extension;

    (e)    whether the debtor is paying its debts as they become due;

    (f)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

19

(g)    whether the debtor has made progress negotiating with creditors;

(h)    the length of time a case has been pending;

(i)    whether the debtor is seeking an extension to pressure creditors; and

(j)    whether or not unresolved contingencies exist.

*See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002); *McLean Indus.*, 87 B.R. at 834; *see also Dow Corning*, 208 B.R. at 664 (identifying the above factors and noting that courts generally rely on the same factors to determine whether exclusivity should be extended); *In re Friedman's Inc.*, 336 B.R. 884, 888 (Bankr. D. Ga. 2005) (same).

37.    When a court considers the enumerated factors in deciding whether to grant an exclusivity extension, it is not limited to the task of counting factors. *Dow Corning*, 208 B.R. at 669.  Not all factors are relevant to every case and courts tend to use a more specific subset of the above factors to determine whether cause exists to grant an exclusivity extension in each particular chapter 11 case. *See, e.g., Express One Int'l*, 194 B.R. at 100 (identifying four of the factors relevant in determining whether "cause" exists to extend exclusivity); *see also Texaco*, 76 B.R. at 327 (finding size and complexity of cases sufficient to extend exclusivity); *In re United Press Int'l, Inc.*, 60 B.R. 265, 269 (Bankr. D.D.C. 1986) (finding debtor showed "cause" to extend exclusivity based upon three of the factors); *In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986) (relying on two factors in holding that cause existed to extend exclusivity).

38.    The Debtors submit that sufficient "cause" exists pursuant to section 1121(d) to extend the Exclusivity Periods as provided herein.  As discussed below, each of the relevant factors weighs in favor of an extension of the Exclusivity Periods.

A.       **The Debtors' Chapter 11 Cases are Large and Complex**.

39.       Both Congress and the courts have recognized that the size and complexity of a debtor's case, in itself, is an appropriate basis upon which to extend exclusivity.   Legislative history provides that "if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement."   H.R. Rep. 95-595, at 232.   Indeed, the size and complexity of a chapter 11 case is the basis upon which courts most commonly grant extensions.   *See, e.g., Express One Int'l*, 194 B.R. at 100 ("The traditional ground for cause is the large size of the debtor and the concomitant difficulty in formulating a plan of reorganization." (citing *Pine Run Trust*, 67 B.R. at 435)); *see also Texaco*, 76 B.R. 326 ("[t]he large size of the debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.").

40.       The size and complexity of these chapter 11 cases is self-evident.   These chapter 11 cases involve nearly $49 billion in debt and 71 Debtor entities—with approximately 5,700 employees—that engage in complex operations in a number of industries regulated by various governmental entities.   As has been reported, these chapter 11 cases represent one of the largest chapter 11 cases filed in the District of Delaware and the seventh largest case filed in history (by liabilities).

41.       As described above, numerous complex issues have arisen since the First Extension Order.   After the termination of the prepetition restructuring support agreement on the eve of the filing of the First Extension Motion, the Debtors began reevaluating their restructuring alternatives.   Three months later, the U.S. Trustee formed the EFH Creditors' Committee to represent the interests of unsecured creditors at EFH, EFIH, and EECI, Inc., adding a significant

new stakeholder to an already complicated case, and the disinterested directors engaged conflicts-matters advisors to advise the respective Debtors in connection with actual conflicts matters.  Implementing the Court's multi-part Bidding Procedures Ruling while simultaneously engaging in global restructuring discussions with dozens of parties is an immensely complex undertaking.  The Debtors submit that on this record, the size and complexity of these chapter 11 cases is itself sufficient to extend the Exclusivity Periods.

**B.    The Debtors Have Made Good Faith Progress Towards Filing a Viable Chapter 11 Plan of Reorganization**.

42.    As described earlier, the Debtors have made substantial good faith progress in these chapter 11 cases and continue to work diligently to move these chapter 11 cases toward a successful resolution.

43.    Since the First Extension Order, the Debtors have commenced substantial plan negotiations with all major creditor constituencies.  These discussions would not have been possible without the Debtors' progress on multiple other workstreams that support various plan constructs (*e.g.*, identifying claims ripe for settlement, researching various plan confirmation issues, and drafting materials regarding alternative plan proposals).  With an extension of the Exclusivity Periods, the Debtors are optimistic that progress on these workstreams will significantly foster plan negotiations going forward.

**C.    An Extension of the Exclusivity Periods is Necessary to Provide Sufficient Time to Negotiate and Prepare Adequate Information**.

44.    Given the Debtors' ongoing productive negotiations with their creditor constituencies, the Debtors would use the time provided by an extension of the Exclusivity Periods to continue seeking such parties' support for a plan of reorganization.  Most significantly, the Debtors believe that several creditor constituencies are working on plan proposals that the Debtors are hopeful will ultimately drive a discussion across the Debtors'

estates.  An extension of the Exclusivity Periods will achieve the dual goals of encouraging such parties to continue developing their plan proposals without distraction and allow the Debtors to evaluate such proposals or make a proposal of their own.

**D.**     **An Extension of the Exclusivity Periods Will Not Prejudice Creditors**.

45.     The Debtors are requesting an extension of the Exclusivity Periods to maintain focus on obtaining support for a consensual plan of reorganization.  This extension is not intended to pressure the Debtors' creditors.  Instead, extending exclusivity facilitates the ongoing dialogue with all stakeholders regarding a plan of reorganization.  While it may not be possible to obtain full consensus around a plan of reorganization, an extension of exclusivity is critical to ensuring the Debtors are able to obtain as much consensus as possible while driving these chapter 11 cases to a successful conclusion.

**E.**     **The Debtors are Paying Their Bills as They Come Due**.

46.     Since the Petition Date, the Debtors have paid their debts in the ordinary course of business or as otherwise provided by Court order and have sufficient liquidity to continue this practice.  If the relief requested is granted, and the Debtors determine to enter into the Soliciting Exclusivity Period, the Debtors will work to obtain an extension of their use of cash collateral under the Final Cash Collateral Order.

**F.**     **Much Work Remains in These Chapter 11 Cases**.

47.     As of the date of this Motion, the Debtors have been in bankruptcy for approximately nine months.  While the Debtors have made meaningful progress, much work remains to be done.  In particular, the Debtors are still working on the EFH-EFIH Transaction, litigating multiple issues relating to EFIH debt claims simultaneously (which is critical to any resolution on plan distributions), and formulating a consensual and value-maximizing plan of reorganization.

23

48.     This is the Debtors' second motion to extend the Exclusivity Periods.  Because only nine months have elapsed in these chapter 11 cases, and because of the Debtors' significant work on negotiating a plan of reorganization to date, the Debtors respectfully submit that this factor weighs in favor of an extension of the Exclusivity Periods.

49.     In addition, bankruptcy courts have often granted similar relief where, as here, the facts and circumstances justify extensions of a debtor's exclusivity.  *See, e.g., In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. July 20, 2009) (granting second extension of approximately 245 days for total 18-month maximum exclusive period under BAPCPA); *In re Dana Corp.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2006) (granting second extension of approximately 240 days for total 18-month maximum exclusive period under BAPCPA); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 6, 2006) (granting second extension of approximately 170 days for total 18-month maximum exclusive period under BAPCPA); *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Oct. 24, 2013) (granting second extension of the lesser of 220 days or 30 days after termination of the Plan Support Agreement for total 18-month maximum exclusive period under BAPCPA); *In re Mirant Corp.*, No. 03-46591 (DML) (Bankr. N.D. Tex. May 10, 2004) (granting second extension of approximately 245 days).

**G.     The Debtors Continue to Address Open Contingencies.**

50.     There are a number of open issues the Debtors are actively addressing with their stakeholders.  An immediate objective of the Debtors is to continue educating both the EFH Creditors' Committee and the Debtor's respective conflicts-matters advisors as expeditiously as possible to allow them to fully engage in plan of reorganization discussions.  Given the complexities of these chapter 11 cases and the extensive diligence that other creditor constituencies had the benefit of receiving, the intricacy of the diligence process cannot be

24

understated.  In addition, the Debtors believe that the EFH-EFIH Transaction will provide critical price discovery information regarding the value of, at minimum, EFH Corp. and EFIH. These price discovery datapoints will play a pivotal role in plan discussions, and, ultimately, confirmation discussions.  In addition, the Debtors are currently litigating disputes arising from multiple EFIH debt claims.  Resolution of these disputes is important because it will add clarity to the recoveries available to EFH and EFIH creditors.  Further, discovery and investigatory workstreams other than the Legacy Discovery Protocol are ongoing.  These workstreams are not expected to be substantially completed until after the current Filing Exclusivity Period expires.

51.    All of these efforts are critical to achieving the Debtors' primary goals: efficiency, consensus, and value-maximization.  To address these issues and develop the broadest base of support for a plan of reorganization, the Debtors require the extension of the Exclusivity Periods.

## Notice

52.    The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle

notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:    (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States

26

Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002; and (z) all non-debtor parties to the current Actions.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>No Prior Request</u>**

53.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated:  January 20, 2015
      Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
      defranceschi@rlf.com
      madron@rlf.com
-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
      stephen.hessler@kirkland.com
      brian.schartz@kirkland.com
-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
      marc.kieselstein@kirkland.com
      chad.husnick@kirkland.com
      steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession