Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                          :
                                      :    Chapter 11
6    ENERGY FUTURE HOLDINGS           :
     CORP., et al.,                   :    Case No. 14-10979(CSS)
7                                     :
              Debtors.                :    (Jointly Administered)
8    _____ :
                                      :
9    AVENUE CAPITAL MANAGEMENT II     :    Adversary No. 14-50797
     LP, ET AL.,                      :    (CSS)
10                                    :
          Plaintiffs,                 :    Related to Adv. Docket
11                                    :    Nos. 28, 29, 40, 43, 45
          v.                          :    & 46
12                                    :
     FIDELITY INVESTMENTS, ET AL.,    :
13                                    :
          Defendants.                 :
14   _____ :

15

16

17                                  United States Bankruptcy Court

18                                  824 North Market Street

19                                  Wilmington, Delaware

20

21

22                                  January 20, 2015

23                                  11:07 PM - 12:36 AM

24

25

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5    ECR OPERATOR:   LESLIE MURIN

6

7

8

9

10    HEARING re Notice of Oral Argument on Motion to Dismiss

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

1   A P P E A R A N C E S :

2   WEIL, GOTSHAL & MANGES LLP

3        Attorney for the Plaintiffs

4

5   BY:  YEHUDAH BUCHWEITZ, ESQ.

6

7   BERGER HARRIS

8        Attorneys for the Plaintiffs

9

10  BY:  JOHN HARRIS, ESQ.

11       DAVID ANTHONY, ESQ.

12

13  JONES DAY

14       Attorneys for the Plaintiffs

15

16  BY:  BRUCE BENNETT, ESQ.

17       CHRISTOPHER J. DIPOMPEO, ESQ.

18       GREGORY M. SHUMAKER, ESQ.

19       TRACI L. LOVITT, ESQ.

20

21  RICHARDS, LAYTON & FINGERS

22       Attorney for EFT

23

24  BY:  JASON  M. MADRON, ESQ.

25

1    POLSINELLI

2         Attorney for the Committee

3

4    BY:  CHRIS WARD, ESQ.

5

6    ALSO PRESENT:

7    ANDREW KNIGHTS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     P R O C E E D I N G S
2              THE CLERK:  All rise.
3              THE COURT:  Please be seated.  Good morning.
4          (A chorus of good morning)
5              THE COURT:  Let's just turn it over to defendants.
6              MR. BENNETT:  Good morning, Your Honor.  Bruce
7      Bennett, Jones Day, for defendants.
8              Your Honor, to make it easier in terms of flipping
9      pages I've made an excerpt of several of the terms of the
10     relevant documents that I will be speaking about, and I've
11     handed it to my friend the plaintiffs.  They say it doesn't
12     include all relevant provisions, and I don't purport it to,
13     it's just so that Your Honor doesn't have to shuffle --
14             THE COURT:  Okay.
15             MR. BENNETT:  -- pages quite enough.
16             So, I have enough copies to give some to your staff
17     as well, so with your permission?
18             THE COURT:  Yes.
19             MR. BENNETT:  Thank you.
20             THE COURT:  Thank you.
21         (Pause)
22             MR. BENNETT:  Okay.  I want to begin with a couple
23     of words on the motion to dismiss.
24             It is of course an obvious point that plausible
25     factual allegations have to be credited but conclusions
```

1    don't, but I think in this particular case it is not true

2    that defendants bear a specific specially heavy burden or

3    that granting the motion would be extraordinary relief.

4    There are a couple reasons for this.

5         First it's a contract case where in the absence of

6    an ambiguity -- and I'm sure Your Honor remembers that both

7    parties claim there is no ambiguity -- the Court should

8    interpret the contract as a matter of law.

9         And then there's a second complimentary doctrine

10   that points in the same direction, which is the rule in

11   Delaware and frankly everywhere we've ever looked, that

12   consideration of extrinsic evidence is precluded unless a

13   relevant term of the contract is shown to be ambiguous.

14   Thus if defendants' interpretation is correct and the

15   plaintiffs' interpretation is it wrong Your Honor can grant

16   the motion.

17        The cases, Your Honor, that support this are

18   collected on page 5, including footnote 4 of our reply

19   brief, and of course there are many.  I don't think I need

20   to spend anymore time on this however, because two of the

21   cases that we cite are yours.  One is the American Home

22   Mortgage case and the other more importantly is the Six

23   Flags versus Park Management case, sometimes referred to in

24   our brief as Premier.

25        I original thought I would talk about the Six Flags

1    case as canvassing the area, but of course that term means

2    go over relatively lightly in the settlement context in

3    bankruptcy, and Your Honor of course did much more than that

4    in the Premier case.

5            I will note that for some reason I really can't

6    understand neither the American Home Mortgage case or the

7    Premier/Six Flags case is mentioned anywhere in plaintiffs'

8    opposition brief, and they do seem central.  So enough about

9    the standard.

10           I would say though in this case there's another

11   reason why motion for dismiss is a particularly appropriate

12   vehicle for resolving this adversary proceeding, and that's

13   because when you think about it hard -- and as you'll see as

14   I go through my presentation and I think that will be

15   obvious when you hear the plaintiffs -- is that the

16   disagreement between the parties is really principally about

17   which parts of the agreement the Court should consider

18   interpreting it.

19           Plaintiffs' papers and their complaint focus on a

20   single sentence to the exclusion of all the language around

21   it.  Our papers of course focus on the provisions I handed

22   up to you for the most part, but in particular all of the

23   section of the term sheet that deals with something called

24   the second lien settlement, which is something I don't think

25   I have to introduce you to.

1        On this point just as a preview, I think we'll get

2    there again, there are actually too numerous cases to

3    mention that talk about the court's obligation in

4    interpreting the contract, just look at the contract as a

5    whole.  There are no cases that advise courts to look at

6    single provisions and interpret them in isolation.  But if

7    anything deciding which parts of a contract are relevant to

8    a particular dispute seems even more purely a legal issue or

9    more purely a matter of law than almost anything else

10   involved in interpreting a contract.

11        So as I said when I started, the relevant

12   provisions or I'll say some relevant provisions, I think the

13   important provisions that we need to deal with are in the

14   handout that I handed up to you and provided to the

15   plaintiffs, I want to spend a few minutes referring to it

16   because I think this will help.

17        Okay.  First of all as a matter of structure.  As a

18   matter of structure when we start at the top of page 2 of

19   the handout we have a paragraph.  Now, I want to stop and

20   point out the numbering or the lettering, the A, B, C, D, E,

21   F at the bottom turned onto the next page.

22        THE COURT:  Right.

23        MR. BENNETT:  It turns out that Your Honor in the

24   record has two versions of the term sheet.  The would you be

25   that was filed at the beginning of the case, which had a --

1    you know, the original term sheet, and the original term

2    sheet had A, B and then the numbering started again, A, B,

3    C, D.  This is the amended and restated term sheet which was

4    also filed with Your Honor.  This is the version that was

5    attached to the complaint.  There is no substantive

6    different, but I just wanted Your Honor to know that there

7    are two different lettering schemes running around in the

8    files.  This one is the final one.

9              So in any event, the sentence that the plaintiffs

10   will call your attention to over and over again is marked F

11   in this version and it's on the other side on page 3, it's

12   all the way at the bottom.

13             THE COURT:  Uh-huh.

14             MR. BENNETT:  And F, Your Honor, is in two lists.

15   It's either in the A through F list, because consistent with

16   the restructuring support agreement EFIH shall file a motion

17   to, and you can keep running all the way to the bottom of

18   the page and use that modifier, and in the cases of at least

19   C, D, E, and F you have the modifier, the EFIH second lien

20   settlement shall be governed by the following principals.

21             Your Honor, we think that phrase is very important,

22   number one.  And number two, cannot be ignored.  It is the

23   lead in to everything that follows it.  It's not a lead in

24   to just some of this things that follow it.  And it says two

25   things.

1          First it says that what follows are things in the

2     second lien settlement, and then it says these things are

3     principals of the second lien settlement.  And we don't

4     think that's ambiguous in any way.

5          Now, I'm going to anticipate things that are

6     described in their brief, it's a good time to look at it

7     here.  Before we even get to that last sentence it's said

8     somehow that it's distinguishable from the others because

9     they say it uses words of being immediately effective when

10    the others don't.  And actually, Your Honor, they with kind

11    of written the same way.  So let's -- because the language

12    is short and it's first let's start with C, eligibility.

13         It says, "The EFIH Second lien cement may be made

14    available," present tense, "at EFIH election to other

15    holders of EFIH second lien note claims that signed the

16    restructuring support agreement."

17         Well can it be?  Of course not.  There is no

18    settlement, no EFIH second lien settlement that can be made

19    available to anyone unless it's approved by the Court.  No

20    one can claim the benefits of that settlement now, no one

21    could claim and get the benefits of that settlement before

22    the approval was granted.

23         Second provision, which is somewhat longer.

24    Reservation of rights.  "The EFIH second lien settlement

25    shall in no way effect EFIH's position with respect to

1    holders of ..." -- basically the holders that don't enter

2    into the settlement.

3           Here again does that sentence have any meaning if

4    the settlement is not approved?  Well in one sense maybe it

5    does.  No one is prejudiced if the EFIH second lien

6    settlement isn't approved, but it only has meaning, it's

7    only important if the settlement is approved.

8           Item number E, once again starks, "The EFIH second

9    lien settlement shall be binding on."  Well wait a second,

10   the EFIH second lien settlement before it's approved isn't

11   binding on anyone, and this is of course the make-whole and

12   -- excuse me -- first the make-whole provision and also

13   refers to the most (indiscernible) provision respecting the

14   make-whole provision, and those things have no consequence

15   if there is no settlement that in the first instance binds

16   Fidelity that Fidelity needs to get out of.

17          And then finally we have the call right provision

18   which also starts just as at any time, but as we submit in

19   the same sense as every paragraph before it is really a

20   sentence about what happens if the first lien settlement is

21   approved.

22          In fact, Your Honor, you get a more accurate or

23   clarifying view of each and every one of these positions if

24   you insert before every single paragraph, if the second lien

25   settlement is approved, the EFIH second lien settlement may

1    be made available at EFIH's election, et cetera.  Now that

2    sentence makes perfect sense, now that sentence standing

3    alone, again, the preamble solves the problem too, but if

4    you review every single one of these sentences as leading

5    with, "If the EFIH second lien settlement is approved," they

6    all make perfect sense in the context for which they were

7    written.

8            THE COURT:  Is another way to read it simply maybe

9    even not that way but to say that the second lien settlement

10   put before the Court shall include the following provisions?

11           MR. BENNETT:  Exactly, Your Honor, that's what I --

12   that's why I mentioned the fact that you could either look

13   at this smaller paragraph and its lead in --

14           THE COURT:  Uh-huh.

15           MR. BENNETT:  -- or the bigger lead in at the top

16   of page 2.

17           THE COURT:  Well even if you look -- even if you

18   look at it from the concept of following principals I guess

19   what you're arguably saying there is that the settlement

20   shall -- the settlement submitted to the Court shall include

21   the following provisions.

22           MR. BENNETT:  That's exactly right, Your Honor.

23   That's exactly the way we look at it.

24           Now let's take step one reign back.

25           THE COURT:  And you're probably headed here next.

1    Your argument would be, okay, the settlement submitted to

2    the Court shall include the following provisions and be

3    guided by the following principals, I'll either approve it

4    or I won't, but if that is submitted to the Court you're

5    bound to not interfere with it, and if it's approved to vote

6    for it, right?

7              MR. BENNETT:  Voting actually only applies to the

8    plan, but we're not supposed to --

9              THE COURT:  A plan that incorporates it.

10             MR. BENNETT:  Well --

11             THE COURT:  I mean --

12             MR. BENNETT:  -- exactly a plan that incorporated

13   it, but if the approval happened before the plan I think we

14   regard the non-opposition as being a provision that

15   effectively left us stuck with it.  You're exactly on the

16   right track, Your Honor.

17             The -- the other point -- and I'm going to skip

18   around a little bit because it kind of follows on what you

19   just said, and I'll come back to some other things -- again,

20   I think it's obvious.  The reason that the second lien

21   settlement had to be approve was because of all the debtors'

22   commitments that were part of it.  The settlement to the

23   make-whole claims, partial allowance, to the partial

24   allowance of the make-whole claims, payment of the

25   prepetition second lien debt, the allocation of rights to

1    acquire the new second lien debt, all these things did not

2    get approved.  And the absence of approval would have meant

3    that none of the second lien settlement, the terms that

4    required court approval or the other interdependent terms

5    would be approved and would be binding on anyone.

6           And, Your Honor, there's -- I'm only going to talk

7    about very few cases.  There were many, many cited to you,

8    but one worth reading is the American Prairie Construction

9    case from the Eighth Circuit, and I just want to read one

10   paragraph from it.

11          By way of background thereto there was a deal

12   between creditors to buy claims, and the -- it was all

13   premised on the proposal and approval of a plan of

14   reorganization.  The plan of reorganization did get approved

15   and the debtor wound up liquidating.  And one of the

16   creditors to the deal about moving claims tried to enforce

17   the intercreditor agreement.  And here's what the American

18   Prairie Construction Co. court, the Eighth Circuit, had to

19   say about it.

20          "The agreement at issue here involved a debtor in

21   bankruptcy and two creditors.  The alleged agreement

22   impacted various aspects of the bankruptcy as it involved

23   TSF, one of the parties, purchasing NCCs and interstates

24   claims against the estate.  And the agreement discussed

25   various classes from which the claims would be purchased."

1              That's a little bit of an awkward phrasing, but

2      it's in the opinion that way.

3              "Under the circumstances presented here the

4      District Court could not enforce an independent agreement

5      because the agreement was not independent, it was inherently

6      intertwined with the bankruptcy proceeding."

7              Skipping a sentence that's not relevant here.

8              "The District Court ordered treating the alleged

9      settlement agreement as independent from the bankruptcy and

10     in holding the agreement was an enforceable, binding

11     contract."

12             And so the lower court was reversed and the Eighth

13     Circuit said there is no contract in that circumstance which

14     mirrors as ours quite well.

15             So let me back up and pick up on a couple of other

16     things that I want to talk about also.

17             This section or these blocks -- this block, this

18     one block that's spread cross two pages that is on page 2

19     and 3 of the handout, pages 7 and 8 of the amended and

20     restated restructuring term sheet, this is in a section

21     called general provisions regarding the EFIH restructuring.

22     Sections not described as also containing certain agreements

23     between creditors.

24             And by the way, nowhere in the RSA or the term

25     sheet is there any statement either that pertains to

1    freestanding intercreditor agreements, instead they both say

2    the opposite.  Now what do I mean by that?  I'm going skip

3    over for a second and I'll come back to it the section that

4    the

5    -- the section quoted on pages 4 and 5, but I want to spend

6    some time with the recitals to the restructuring support

7    agreement and I want to draw your attention to page 7 of the

8    handout that I've given you, and then we'll come back to the

9    other parts in a second.

10          Note, Your Honor, that the first recital on the top

11   of page 7 begins:

12          "The debtors and the restructuring support parties

13   have negotiated certain restructuring and recapitalization

14   transactions with respect to the debtors' capital structure,

15   including the debtors' respective obligations under each of

16   the following."

17          Doesn't make any reference to separate agreements

18   among creditors and doesn't frankly make any reference to

19   anything that is not a restructuring and recapitalization

20   transaction.

21          Your Honor, the second lien settlement is very

22   clearly a restructuring and recapitalization transaction.

23   It involves the payment of some debt, the compromise of a

24   claim arising from that, and then the occurrence of

25   additional debt.  The transfer of a claim pursuant to -- or

1    the granting of an option in a claim from one creditor to

2    another does not fall within that rubric.

3         Now when the people were writing the recitals they

4    knew that there may be some aspects of the agreement that

5    might not fall into that rubric, so I direct your attention,

6    Your Honor, to the fourth recital.  The fourth recital says,

7    "Whereas the whereas the debtors and the consenting interest

8    holder."  That would be the owners, the sponsors.  As the

9    director and direct owners, et cetera, "have agreed to take

10   certain actions in support of the restructuring transactions

11   on the terms and conditions set forth of this agreement, the

12   commitment letter, and the term sheet."

13        There is no parallel recital anywhere in this

14   document, no parallel term that suggests that consents

15   creditors or restructuring support parties, which include

16   consenting creditors, are entering into agreements other

17   than the recapitalization transactions.

18        By the way, Your Honor, the term sheet also has an

19   introduction.  The term sheet starts, and I did not

20   reproduce that here because it's just a snip, it's a small

21   number of words.  "This term sheet, (this 'Term Sheet')

22   describes the terms and conditions of a restructuring of

23   ..." and then it has a long list of debtors.

24        No reference to separate agreements among creditors

25   in the term sheet's introduction language either.  It talks

1    about the terms and conditions of a restructuring.  And once

2    again the second lien settlement is most certainly a

3    restructuring.  The granting of an option, which the

4    plaintiffs contend is a separate and freestanding agreement,

5    doesn't fit within that rubric either.

6         So what do the plaintiffs say?  Well plaintiffs

7    what they say in response to this I guess is that it's the

8    RSA, but we've already looked at the recitals to the RSA, I

9    think we should spend a minute -- and this is in the papers

10   as well -- but looking at the actual terms of the RSA, and

11   the actual terms of the RSA that affect consenting creditors

12   are in 4.1(a).  This is where the covenants of the

13   consenting creditors of which Fidelity is one are located.

14        And so if we turn back a page or flip one page over

15   and are pages 4 and 5 that the two basic promises is in

16   4.01(A)(1)(A), which is the vote to accept the plan

17   provision, and the second one is in 4.01(a)(ii), which is

18   the not interfere, not oppose, impede, or take any other

19   action to interfere with, except in implementation or

20   consummation of the restructuring transactions, and other

21   things that are consistent with that.

22        You can search high and low in the rest of the

23   agreement, you will not find another commitment of a

24   consenting creditor to do anything with respect to the

25   restructuring transactions.  There are confidentiality

1    provisions, there are trading provisions, there are all

2    kinds of other ancillary things, there is not another

3    promise, there's certainly not a promise that says and we

4    are agreeing to enter into intercreditor transactions with

5    other parties.

6           Now, I will also say that this kind of an agreement

7    would be a very strange place to find a purely intercreditor

8    agreement that even if that was something that was intended,

9    because as Your Honor clearly knows the -- when

10   intercreditors enter into creditor agreements in connection

11   with, for example, indentures or debt agreements or other

12   kinds of prepetition arrangements the intercreditor

13   agreement is in this day and age in a separate document to

14   make clear that this is a separate agreement from creditors

15   and has nothing to do with anything else that is going on

16   with the debtor.

17          So, I think again it's a very strange place.  The

18   RSA would have been a very strange place to put a

19   freestanding call right even if such a thing was intended,

20   and we think it's clear from the documents that it was not.

21          I want to spend I think probably is the last part

22   for opening, but definitely would like to reserve time for

23   reply, to talk about the significance of the doctrine that

24   requires that the interpretation of a contract be consistent

25   with common sense or commercial reality.  And, Your Honor,

1    there are really two doctrines represented by cases that we

2    cited where common sense and commercial reality is

3    understood by the court as part of its experience is

4    relevant even in a motion to dismiss.

5            First is the Iqbal plausibility requirement, that

6    the complaint has to be plausible.  As you put it in Six

7    Flags and you were mostly quoting Iqbal, but some of this is

8    your own language.

9            "Determining whether a complaint is facially

10   plausible they contact specific task that requires the

11   reviewing court to draw on its judicial experience and

12   common sense."

13           And the second is a Delaware law principal, "The

14   contract should be interpreted so that the result makes

15   economic sense."  And the best case standing for that I

16   think is the Brandywine versus Friedland case, which is an

17   unpublished opinion we cited, and that was the case that

18   involved the -- actually a shopping mall down the street

19   where a boiler failed and the landlord tried to say, well,

20   you are responsible -- the contract says you're responsible

21   for providing heat and your -- the tenant is responsible for

22   providing heat, and the tenant was responsible for repairing

23   the premise, and the landlord extended that that means you

24   have to replace the boiler.  And the court in the context of

25   a motion to dismiss said, no, that providing heat and

1    repairing things is not the same as replacing boilers,

2    that's still the landlord's responsibility, and that's

3    Brandywine versus Friedland.

4         Well both of those doctrines or either of those

5    doctrines or those doctrines in combination are sufficient

6    for you to look at this case and say, really, there was an

7    independent freestanding option here and it was granted and

8    no premium was paid, no premium was received, no premium was

9    paid by the person claiming the benefit of option -- an

10   option over $400 million in face amount of securities?  As

11   we say in our papers to say it is to understand it doesn't

12   make any sense.

13        It might make sense, does make sense if the second

14   lien settlement was implemented and Fidelity was getting

15   repayment of its second lien loan, the make-whole settlement

16   had negotiated, the investment in the first lien loan with

17   proceeds of repayment of the second lien loan proceeds,

18   which by the way never happened, I may have to deal with

19   that on reply, and various rights, all of which were

20   valuable to participate in a new second lien DIP loan, which

21   of course had many characteristics that might have resulted

22   in it becoming equity as part of a reorganization.  A call

23   right in that context would make economic sense and would be

24   plausible.  In any other sense, as indicated in the Yellow

25   Bird Bus case, it would not be.

1          So to summarize, Your Honor, we believe that there

2     is no other reasonable interpretation other than the one

3     offered by defendants in our papers, the Court should

4     determine as a matter of contract interpretation and

5     therefore as a matter of law that all the provisions we've

6     been discussing today together have to be read, and when

7     read there is an unambiguous agreement that describes the

8     second lien settlement, the second lien settlement that

9     wasn't approved, and that the call right sentence is part of

10    the second lien settlement.

11          We believe that there's nothing about this

12    complaint that can be cured by a right to amend, so

13    dismissal should be with prejudice.

14          I'd be happy to answer any questions you might have

15    now, and I'd also definitely like to reserve time to reply.

16          THE COURT:  I have no questions.  Thank you.

17          MR. BENNETT:  Thank you, Your Honor.

18          MR. BUCHWEITZ:  Good morning, Your Honor.  Yehudah

19    Buchweitz, Weil Gotshal & Manges for the plaintiffs.

20          I want to respond briefly to a number of points

21    raised by counsel and then move on to the balance of the

22    other arguments.  Obviously at any time if you have any

23    questions I'm more to happy to answer them.

24          As a preliminary matter I think we need to get to

25    and the fact that this is a contract under Delaware law and

1    the law of the Delaware Supreme Court is the one we need to

2    look at in terms of contract interpretation, and that law is

3    very clear.

4              While Your Honor's decisions in Six Flags and

5    American Home Mortgage are obviously, you know, relevant and

6    interesting decisions of contract interpretation, both of

7    those contracts were under New York law and the Delaware

8    Supreme Court did not apply there.  The same like Yellow

9    Bird, which is another Pennsylvania case.  About half of

10   their cases aren't even under Delaware law.

11             The thing we need to look at under Delaware law,

12   which is really quite simple here, is that the motion to

13   dismiss must be denied unless defendants' interpretation is

14   the only -- only reasonable construction as a matter of law,

15   and I'm reading directly from VLIW Technology LLC.

16             And what does it mean to be in ambiguity, OKAY?

17   Mr. Bennett said, oh, both sides said that it's not

18   ambiguous.  Well that happens all the time, everyone always

19   says their interpretation is correct, that doesn't mean that

20   it isn't.  And here's what the Delaware Supreme Court says

21   about it.  "The trial court cannot choose between two

22   differing reasonable interpretations of ambiguous

23   provisions."  And what does it mean if a provision is

24   ambiguous?  "When the provisions in controversy are

25   reasonably or fairly susceptible of different

1   interpretations."

2           Now we don't think it's ambiguous, because we think

3   at any time means at any time, but obviously the defendants

4   think differently.

5           So then it gets you to a question, Your Honor, as a

6   matter of law, do you have two reasonable interpretations

7   that are fairly susceptible of different interpretations or

8   is there only one?  And we submit, Your Honor, that there's

9   no way to look at this contract and the language at issue

10  and not see that at a minimum defendants' interpretation is

11  not the only reasonable interpretation as a matter of law.

12          I want to walk through a few of the provisions that

13  Mr. Bennett left out.  In particulars on page 7 of his

14  handout if you look now therefore this big white space at

15  the bottom.  In that big white space in the actual contract,

16  Your Honor, it says the following.  "Section 1."

17          THE COURT:  Where are you?

18          MR. BUCHWEITZ:  I'm in the RSA.  This handout is

19  not going to be helpful because he left this section out.

20          THE COURT:  All right.  Where did he leave it out

21  though, that's my question.

22          MR. BUCHWEITZ:  Right at -- on page 7.

23          THE COURT:  Yeah.

24          MR. BUCHWEITZ:  Yeah.  Right after now therefore --

25          THE COURT:  Okay.

1           MR. BUCHWEITZ:  -- after it gets to the recitals

2    and they say what the actual agreement is.

3           THE COURT:  Right.

4           MR. BUCHWEITZ:  The actual agreement is Section 1:

5           "This agreement shall become effective and binding

6    upon each of the parties at 12 a.m. prevailing eastern time

7    on the date on which ..." and then it goes through a number

8    of conditions, which was the agreement effective date, which

9    in fact went effect on April 29th.

10          So this contract says it was effective and binding

11   upon each of the parties, capital "P", as of April 29th.

12          THE COURT:  He doesn't dispute that does he?  He

13   doesn't dispute that the agreement is binding on his client.

14          MR. BUCHWEITZ:  Well what he disputes, which is the

15   next thing, is that -- is that the provision at issue is

16   binding on his client, and that gets you to Section 2.

17   Section 2, exhibits incorporated by reference.  "Each of the

18   exhibits attached hereto is expressly incorporated herein

19   and made part of this agreement."  Which means that the term

20   sheet, which is the first exhibit, is part of the agreement

21   and is binding on his client, which undermines his entire

22   argument.

23          Then you get to Section 5.01, which is

24   enforceability, another one that's not included in the

25   excerpts, and that is:

1        "It is validly existing and in good standing under

2    the laws of (indiscernible) and disagreement and to the

3    extent applicable the commitment letter is a legal, valid,

4    and binding obligation of such party enforceable against it

5    in accordance with its terms except as enforced may be

6    limited ..." blah, blah, blah.

7        So this is a -- the term sheet is a part of the

8    agreement, the agreement is effective and binding, and the

9    agreement is enforceable.  So that's where you have to start

10   before you get yourself to the term sheet section that we

11   spent so much time on.

12       And when you look at the call right there really is

13   only one issue in question here.  Either the question is at

14   what point did the call right become effective?  Okay?  His

15   view is it doesn't become effective until the second lien

16   settlement is approved by the Court.  It doesn't say that

17   anywhere in the RSA.  Our view is the call right became

18   effective immediately upon the effectiveness of the RSA,

19   which was on April 29th.  And as we saw in Section 1,

20   Section 2, and Section 5.01 it was effective and binding at

21   that moment in time.

22       Now you don't need to decide today, Your Honor,

23   who's right, you just need to decide that his interpretation

24   is not the only reasonable interpretation.  Now why is --

25       THE COURT:  But --

1          MR. BUCHWEITZ:  Okay.

2          THE COURT:  But what do you do about -- what do you

3     say about the fact that F, call right, is part of a sentence

4     that begins, "The EFIH second lien settlement shall be

5     governed by the following principals:"

6          MR. BUCHWEITZ:  Yep.

7          THE COURT:  And then call rights.  So obviously the

8     two related, it's a list of the principal.  So it doesn't

9     stand on its own, at least with regard to one sentence or

10    part of the sentence.

11         MR. BUCHWEITZ:  Right.  We've never argued that.

12    He keeps saying that we say again and again it's a

13    freestanding call right.  We never said that.  The call

14    right in this -- in this section, and I'll explain to you

15    this sentence in a moment --

16         THE COURT:  Okay.

17         MR. BUCHWEITZ:  -- was part of a -- we never said

18    that -- it's part of a broader give and take that the

19    parties negotiated, and it was an intense negotiation, and

20    all of this will come out in discovery, and at the end of

21    the negotiation was whether or not my clients were going to

22    come into this deal or not.  And getting this call right was

23    one of the reasons why they came into this deal.

24         Here's what you need to know about this whole box,

25    the second lien settlement, okay?  First of all -- first of

1    all the question is whether these provisions were effective

2    before you would have considered and approved the second

3    lien settlement.  The answer is demonstrably yes.

4           Starting with C, eligibility.  "The EFIH second

5    lien settlement may be made available at EFIH's election to

6    other holders of the second lien note claims that sign the

7    RSA."

8           We know from documents filed on this -- on the

9    public docket and that which Your Honor has seen and which

10   have been cited in the record, that in fact before even the

11   second lien settlement motion was filed our clients went out

12   and were shopping the second lien settlement to people, and

13   people signed.  And at that very moment in time, okay,

14   before you had considered the motion, before any opposition

15   was ever filed, those parties who signed on were immediately

16   obligated under all the terms of the RSA, all 100 pages back

17   and forth.  And the reason is because the term sheet is

18   incorporated into the agreement and the agreement was

19   immediately effective and binding and enforceable at that

20   moment in time.  That's C, that happened, there's no

21   question about it.

22          There's of course B, which is -- which is Fidelity

23   shall have this special right to receive $500 million in the

24   form of first lien DIP financing and would get a 1.75

25   percent commitment fee.  Fidelity got the right to do that.

1     We allege in our complaint, and it's a factual allegation,

2     and if they deny it or they say there's some other reason

3     for it that's fine, but at this moment in time they got a

4     right -- Fidelity got a right under this second lien

5     settlement provision to fund first lien DIP for $500 million

6     and they got a commitment fee of $8.75 million as well as

7     other interest on a money good loan that no one else was

8     entitled to, and they got it based on this provision.

9           And guess what, when the second lien settlement was

10    pulled they didn't pull that back, they didn't return the

11    money, the fees that they got to the debtor, they didn't

12    say, oh, somebody else has to take on this loan because we

13    don't have the ability to do it anymore because the second

14    settlement wasn't approved.  And the documents are clear and

15    we allege because we know it to be the case based on the

16    documents we've seen that the $500 million commitment was

17    made in connection -- it was recited as available to them in

18    connection with the restructuring.

19          The other provision you have to look at is E, okay?

20    And in E there's this complex provision about MFN and it

21    talks about when Fidelity could have the right to true up it

22    if my clients had to go out and shop the second settlement

23    and had to pay somebody more in order to get these make-

24    whole points and otherwise in order to get them to sign on

25    then Fidelity would get a true up to that as well.  But

1    guess what they wouldn't get?  They wouldn't get it if at

2    any time prior to the earlier date of, and I'm looking at Y,

3    the date upon which the commitment parties exercise and

4    consummate the (indiscernible).  Okay?

5           So what this -- nothing in this provision says it

6    has to be after a second lien settlement is approved, nor

7    would make any sense for it to be that way.  Our clients

8    were out there shopping it trying to get people to sign onto

9    this settlement.  Why?  Because they want to obviate

10   objections, and that makes perfect sense to do that.  I mean

11   that's what we want to do when we're in bankruptcy court

12   before we show up with motions we want to try to get rid of

13   objections.

14          So what my clients had the ability to do under this

15   provision was to either give Fidelity the -- true up any

16   settlements that were made or to eliminate that ahead of

17   time by exercising the call right, which is one of the

18   things that they in fact did, and there's nothing here

19   saying that it has to be only after the second lien

20   settlement was approved.

21          Now would those payments ever be made out if there

22   wasn't an approval?  Of course not, but that doesn't mean

23   that we weren't able to take the option and exercise the

24   call right in order to -- in order to eliminate this MFN.

25          Now -- now everyone of these provisions starts with

1    the second lien settlement, the second lien settlement, the

2    second lien settlement.  The call right provision doesn't.

3    It starts with at any time according to the effective date.

4    Now, I'm telling you this provision was negotiated, okay,

5    including by them.  Nobody put in oh, only after second lien

6    settlement was approved.  At any time before the effective

7    date, that's the time (indiscernible).  All the material

8    terms for what -- for this call right are there.  It was

9    part of the give and take between the parties.  It says

10   (indiscernible) it has the time, it has these exercises, it

11   has what they're exercising, and it has the (indiscernible).

12          Now about this issue about the premium -- yeah.

13          THE COURT:  Can I ask you, it says -- it doesn't

14   say at any time before the effective date then the parties

15   have the right, it says shall have the right.  Why is it in

16   the future tense?

17          MR. BUCHWEITZ:  Because when you sign -- it would

18   have to be upon the effective time of the agreement.

19          THE COURT:  But that could be --

20          MR. BUCHWEITZ:  We know happened on April 29th.

21          THE COURT:  But that's instantaneous.

22          MR. BUCHWEITZ:  No it wasn't, there are 20

23   different conditions that had to happen and they all did in

24   fact end up happening quickly, but they had to happen.

25          THE COURT:  All right.

1          MR. BUCHWEITZ:  That was in Section 1, Your Honor.

2     So there's a long list of things that in fact did happen but

3     they still had to happen, and they did, and nobody contested

4     they didn't.

5          THE COURT:  All right.  So some time -- so the

6     shall have is in the contract kicks in upon the contract

7     becoming effective, which happened on April 29 when the 20

8     or so things occurred which made it effective.

9          MR. BUCHWEITZ:  Yes.

10          THE COURT:  Okay.

11          MR. BUCHWEITZ:  And that's what Section 1 says.

12          Now after this question of it being free or for

13     nothing or no premium.  Again that's just simply wrong.

14     Okay?  I mean you have to put yourself in the context of

15     where -- and this is what you have to do as the contract

16     interpreter -- you put yourself in the context of what was

17     happening at that moment in time when this agreement was

18     signed by all these parties.  And you've seen it from the

19     opposition -- our opposition brief and the exhibits attached

20     to it.  These bonds were way below 37 spot 15, okay?  These

21     -- agreeing -- when this agreement became public and

22     agreeing to 37 spot 15 made those bonds go up right away.

23          So there -- on that alone there was a premium, but

24     in addition -- in addition what my client signing onto this

25     contract did was it provided for the first time somebody who

1    was willing to put in a lot of money into this -- into this

2    deal.

3            Now obviously the RSA collapsed eventually and --

4    but before -- before the RSA was made public and before my

5    clients had agreed to put in $1.9 billion in financing, you

6    know, this didn't look like it was the kind of

7    restructuring, at least based on trading or whatnot, that

8    would get the kind of interest that it now has.

9            So in addition to my client agreeing to the

10   restructuring, in addition to agreeing to pay 37 spot 15,

11   even though that was at that very moment in time the premium

12   for the trading price, plus interest, which is something

13   that they added in the negotiation, there was also, you

14   know, all the other things that were the give and take of

15   the restructuring, including the money that they got paid

16   out on the first liens, $437 million, plus $22 million of

17   make-whole.

18           We're not saying that the call right is on its own

19   some individual little thing separate and apart.  We're

20   saying it was part of the give and take of this broader

21   agreement, which was in place unfortunately for everyone for

22   only three months.  But while it was in place all of the

23   promises made to each other were binding, including the

24   promise that they made to give us these notes when we --

25   when we called them.

1         Now just on this 4.01 that Mr. Bennett pointed out

2    about their only obligation.  Well guess what, they breached

3    that too.  Because it says "that each consenting creditor

4    further agrees that it shall not directly or indirectly

5    object to delay, impede, or take any other action to

6    interfere with the acceptance, implementation, or

7    consummation of the restructuring transaction.  And the

8    restructuring transaction is defined to include the terms of

9    this agreement.  Okay?  In accordance with the terms of this

10   agreement all of which shall be on terms and conditions

11   described in this agreement.  And capital "A" agreement we

12   know from what I showed you when we first started includes

13   the term sheet.

14         So part of the deal -- part of the deal was that

15   they would not interfere with the agreement.  Part of the

16   agreement was the call right.  We made the call, they

17   interfered.  Who knows what would have happened if they had

18   tendered the bonds that they agreed and we gave them the

19   $160 million.  Maybe that would have given us the

20   flexibility that we needed under the MFN to negotiate

21   settlements with the rest of the second lien noteholders,

22   and maybe we could have presented you with something that

23   the second -- that would have been an approved second lien.

24   But they didn't do that, they interfered with it.  They

25   refused to comply with their obligations, and that's one of

1    the reasons why we're here today.

2             THE COURT:  Are you saying that their failure to --

3    I'm confused there.  Are you saying their failure to pay --

4    to respect the call right is what sank the second lien

5    settlement?

6             MR. BUCHWEITZ:  No.  No.

7             THE COURT:  I didn't think so.

8             MR. BUCHWEITZ:  I'm saying that if that -- we don't

9    know what could have happened if we didn't -- if -- if the

10   call right -- as I showed you from the MFN if we exercised

11   the call, as was designed, we are then -- you know, not

12   obligated to give them any true up from the MFN.  And maybe

13   there could have been more settlements and there wouldn't

14   have been any objections.

15            But this gets us all back to the same point, which

16   is just all we need to have in order for you to be obligated

17   to deny this motion under Delaware law is a reasonable

18   interpretation, and they have to show that theirs is the

19   only reasonable interpretation.

20            So despite the fact that the agreement says it's

21   effective and binding on all the parties, despite the fact

22   that the term sheet is part of that agreement, despite the

23   fact that it's enforceable against everyone, despite the

24   fact that the provision says at any time before the

25   effective date anyone or more of the commitment parties

1    shall have the right to purchase from Fidelity all of its

2    EFH nine guaranteed note for a purchase price equal to 37

3    spot 15 of par plus accrued and unpaid interest through the

4    petition date, and despite the fact that that was a premium

5    at that given moment in time, and despite the fact that the

6    second lien settlement boxes include this special right that

7    they had, that Fidelity had to fund this money good loan 500

8    million, and despite the fact that in fact the provisions

9    under C, eligibility, were in fact effective and were in

10   fact happening at that moment in time and anyone who signed

11   was part of the RSA regardless of what happened with the

12   second lien settlement, you'd still have to find that theirs

13   is the only reasonable interpretation, that there can't be

14   -- that our -- that our interpretation is not fairly

15   susceptible -- that the provisions are not fairly

16   susceptible to different interpretation.

17            And it's not just the Delaware Supreme Court.  The

18   District of Delaware, you know, basically cited, including

19   Dynamus, have, you know, adopted that -- those rules and

20   applied them in federal cases as well.

21            There are many other things that I could say.  One

22   thing I would just like to point out, Mr. Bennett didn't

23   raise it, or at least I didn't hear him raise it, is this

24   argument that they had about, you know, this (indiscernible)

25   agreement to agree.  I mean I think you probably know that

1    that's absurd.  I mean the cases that they rely on

2    primarily, the In re: Reed case and the Channel

3    (indiscernible) case, those were cases that one was a

4    contested matter with testimony, another one was a trial on

5    the merits.

6           So to the extent there's anything about an

7    agreement to agree that's a fact question not for today, you

8    know, and that's -- and all that you need is that material

9    terms of the contract are reasonably certain, that they

10   provide a basis for determining that this (indiscernible)

11   for giving an appropriate remedy.  And here we clearly have

12   that.

13          You know, if after discovery and potentially trial

14   one day someone -- there's testimony there's an agreement to

15   agree we can deal with that then, but this is a motion to

16   dismiss, and you know, their cases don't support them.

17          I think with that I will sit down and like

18   Mr. Bennett reserved time that Your Honor allowed him to

19   respond, and ask that if you have any questions of me.

20          THE COURT:  I have no question.

21          MR. BUCHWEITZ:  Thank you, Your Honor.

22          THE COURT:  Mr. Bennett.  Can you address the

23   argument, turning to the term sheet that provisions C, D,

24   and E all start with the EFIH second lien settlement shall

25   be binding or shall something or may.

1          MR. BENNETT:  Right.

2          THE COURT:  May or shall or shall, but F doesn't

3     have that language/limitation.

4          MR. BENNETT:  Your Honor, that was the point I made

5     by kind of you'd start each one with if the agreement is

6     approved --

7          THE COURT:  Uh-huh.

8          MR. BENNETT:  -- because they all don't say that

9     the EFH second lien agreement -- second lien settlement

10    includes or shall, they're describing other aspects of the

11    second -- the second lien settlement, it's just the way the

12    words are used.  Okay?

13          So in A, you know, it's -- it was written because

14    it starts, the EFIH second lien settlement shall be governed

15    by the following principals, here's a principal of the EFIH

16    settlement.  One principal of it.  It may be made available

17    to others.

18          By the way, first of all, no one else signed up to

19    it, so I don't know where Mr. Buchweitz got that extrinsic

20    fact he wanted to offer to you.  It's just not true.

21          But in any event, even if they had quote "signed up

22    for it" it couldn't be made available to them unless it was

23    approved.  They could line people up maybe.  I don't even

24    know if they tried to line people up.  No one else lined up.

25    So we don't know whether this had any meaning to anybody

1    before the hearing.

2          With respect to reservation of rights it's the same

3    point.  It says the EFH second lien settlement shall be

4    governed by this principal.  It, it could have said just it,

5    all right, just to keep going with the sentence, the

6    settlement shall in no way affect EFIH's position with

7    respect to holders of.  Well it doesn't affect them any way

8    if it's not approved.  So this sentence is stupid if it's

9    sitting in thin air.  It has to be a principal of the

10   settlement.

11         The same with respect to the MFN.  A party not

12   bound needs no MFN.  Fidelity isn't bound to anything today

13   and would only be bound in the second lien settlement were

14   approved.  It wasn't.

15         Now with respect to --

16         THE COURT:  Well Fidelity is bound by other

17   provisions.

18         MR. BENNETT:  That's absolutely right.

19         THE COURT:  But which responds taking it out of

20   order to this idea that we start with which is, hey, section

21   -- they don't show you Section 1 where it says it's

22   immediately enforceable, they don't show you Section 2 which

23   says the term sheet is part of the agreement, they don't

24   show you Section 5 on enforceability.  I don't think you

25   dispute any of those provisions, correct?

1              MR. BENNETT:  Okay, I'm going to skip that, but I

2      want to make sure I remember -- remind me to come back --

3              THE COURT:  All right.

4              MR. BENNETT:  -- because I don't want to forget E

5      because that's really important.  But let me deal with that

6      for a second.

7              First of all Your Honor is exactly right, the

8      agreement is enforceable, to the extent it's enforceable, to

9      the extent of its terms.  And we indicated that the terms

10     we're discussing here are the second lien settlement, which

11     for better or for worse Your Honor did not approve.

12             THE COURT:  Okay.

13             MR. BENNETT:  So that is our position.

14             But with respect to that part the term sheet is

15     incorporated into the agreement.  The term sheet is

16     incorporated into the agreement for a purpose.  It's not

17     just incorporated into an agreement hanging there as other

18     agreements.  The purpose for incorporation of the term sheet

19     is also set forth in the whereas clause, the fourth one,

20     it's in the handout that I gave you, it's basically

21     additional definition of the restructuring transaction.  The

22     restructuring -- you have to -- this is where the debtors

23     and the consenting noteholders are taking certain actions,

24     fourth whereas from the top of the page.

25             THE COURT:  Right.

1           MR. BENNETT:  Taking certain actions in support of

2     the restructuring transactions, here we go, on the terms and

3     conditions set forth in this agreement, the commitment

4     letter, and the term sheet.  The term sheet is additional

5     definition of this thing called restructuring transactions,

6     and we know what Fidelity is supposed to do in this

7     agreement with respect to restructuring transactions.  Your

8     Honor pointed it out early on.  The key points are, vote for

9     the plan and for the disclosure statement approved and don't

10    interfere with the implementation of them, including the

11    second lien settlement.

12          Now before I forget back to E.  This is the whole

13    thing about first of all they want to read out the words,

14    and I didn't pick up my highlighted one so I just have to

15    find them again.

16        (Pause)

17          MR. BENNETT:  I'm sorry, I'm looking for the place

18    where I says that EFIH is going to take payment.  I'm sorry,

19    this is a provision, it's not E, it's B, that it's going to

20    take payment of its -- of -- take payment of its second lien

21    debt in the form of $500 million of first lien DIP

22    financing.  This is in the kind of six or seven lines from

23    the bottom of the --

24          THE COURT:  Yes.

25          MR. BENNETT:  And what Mr. Buchweitz wants to say

1    is you got that.  Well fortunately we do not have to resort

2    to extrinsic evidence to show very clearly that that's just

3    blatantly not true.  And to show by the way how incredibly

4    not true it is let's explain the transaction that's

5    described here in B and compare it to the transaction which

6    Your Honor approved on the record when Your Honor approved

7    the first lien settlement bifurcated from the second lien

8    settlement.

9            What does this transaction say?  This transaction

10   says, you Fidelity, hold second lien debt.  As part of this

11   settlement your second lien debt is going to be repaid.

12   You're not going to have this second lien exposure anymore,

13   you're taking this $500 million and you're getting first

14   lien exposure.  So at the start of the movie Fidelity has

15   second lien exposure of $500 million, and at the end of the

16   movie Fidelity has first lien debt of $500 million.  One

17   chunk of $500 million redeployed from second lien debt to

18   first lien debt.

19           Your Honor's experience as a bankruptcy judge if

20   not before knows there's a very significant change in

21   position and a benefit in that, by the way particularly

22   since the first lien loan was increasing in size.  So your

23   second lien loan is not going to be -- okay.

24           What really happened?  Well the first lien deal and

25   the second lien deal were of course separated.  Your Honor

1    heard them separately.  And lo and behold when the debtors

2    looked at their first lien commitment sheet there was

3    $500 million that they were supposed to get on account of

4    Fidelity being repaid its second and going into the new

5    expanded first, and that $500 million wasn't there anymore.

6    Now, I don't know if they could have gotten it from someone

7    else.  Here's what they did.  They came to Fidelity and

8    said, well you put the 500 mill in with new money.  So

9    Fidelity says, okay, same terms as everybody else, right?

10   Same terms as everybody else.  That's what Your Honor

11   approved.

12          So what actually happened?  Beginning of the movie

13   Fidelity has some first lien and has this $500 million of

14   second lien.  They wind up in the new first lien putting

15   $500 million more ahead of their second lien position,

16   bigger first lien, second lien position is still there.

17   It's a little bit different from what they were supposed to

18   get under B.  All of that is in the record of your -- of

19   Your Honor's proceeding here.  It is all subject to judicial

20   notice.  The idea that Fidelity got anything close to the

21   functional equivalent of the agreement described in B is

22   false.

23          Back to the points that Mr. Buchweitz made more or

24   less in order.  We've dealt with the point that the

25   agreement is effective in accordance with its terms.  Your

1    Honor I don't think is confused that we cited Six Flags for

2    federal pleading standards, not principals of Delaware

3    contract law, although you touched on them.

4              THE COURT:  All right.  Let me just back you up.

5              MR. BENNETT:  Sure.

6              THE COURT:  So we're talking -- and I interrupted

7    you so I apologize.

8              MR. BENNETT:  That's all right.

9              THE COURT:  But we were talking at one point --

10   okay, made the point C, it may be available at EFHI's

11   election.  D, it shall in no way affect, et cetera, et

12   cetera.  E, it shall be binding.  F, at any time commitment

13   rights shall have the right to purchase.

14             MR. BENNETT:  You know, at this point it doesn't,

15   it's not the -- it's just -- again, you have to -- can't

16   ignore the lead in.

17             THE COURT:  So you're saying basically in C, D, and

18   E the it is superfluous.

19             MR. BENNETT:  Well the it -- you would have to say

20   it, you could have -- you could have said it or you could

21   have said EFIH second lien settlement in order for the

22   sentence to make sense.  You had to read back otherwise your

23   sentence would be hanging even worse than it already is.

24   But it's not an invitation -- the fact that those words are

25   used at the beginning because they were needed as sentence

1    structure is not an invitation to say with respect to F to

2    ignore the beginning of that.  As Your Honor pointed out the

3    EFIH second lien settlement shall be governed by the

4    following principal, at any time before the effective date.

5    It's a sentence that works, but that's the way you have to

6    read it.

7              And, Your Honor, look at the alternative.  The

8    alternative is it's not a principal of the second lien

9    settlement but it's a principal of something.  What is it a

10   principal of?  It's a principal of O.  It's a principal of

11   the entire RSA.  What's it doing here?  Why isn't it in the

12   RSA?  How come none of the recitals refer to it or are

13   capable of being interpreted to include something like this?

14   Why didn't it wind up as a separate provision in

15   Section 4.01?  You begin to ask increasing questions if you

16   decide that F is somehow freestanding, which of course

17   physically it isn't and texturally it isn't.

18             Your Honor, as to the Delaware standard I think I

19   was pretty clear, we take the position that no other -- no

20   other interpretation is reasonable in light of where the

21   call right is, in light of the structure of the entire

22   provision, in light of the structure of the entire

23   agreement.

24             So we understand that other reasonable

25   interpretations if they existed, if they rendered the

1   agreement to be ambiguous, which there isn't here, then we

2   would be -- would have to resort to much more procedure,

3   much more evidence, much more aggravation in this case.  We

4   just don't think there is another reasonable interpretation

5   in light of the way this is structured.

6        (Pause)

7            MR. BENNETT:  Your Honor, let me take a take a

8   brief minute to discuss something with my colleague, but I

9   think I may be finished.

10       (Pause)

11           MR. BENNETT:  Unless you have any other questions,

12  Your Honor, I think that's all I have.  And typically the --

13  typically the respondent doesn't surreply.

14           THE COURT:  I'll allow it.

15           MR. BUCHWEITZ:  Thank you, Your Honor.  Just a few

16  brief points.

17           Your Honor, first one of the things we cited in our

18  papers was an SEC filing of June 13th, 2014 from EFH.  It

19  says that -- it proves or describes that there actually were

20  people that signed on pursuant to the eligibility provision.

21  We know that in the RSA 35 percent of the second lien notes

22  had signed on, and as of June 11th, 2013 43 percent had.  So

23  we've cited in our paper.  I can't tell you who those people

24  are, but that's what the debtors have told the public under

25  their obligations to the SEC.

1       With respect to the only reasonable interpretation.

2   You know, if there's any doubt as to whether our

3   interpretation is reasonable, you know, the testimony from

4   Mr. Vanduser (ph) that we've alleged in the complaint, you

5   know, clearly resolves that.  I mean he testified that the

6   plaintiffs have a right to purchase EFH bonds at 37 spot 15,

7   the right to buy it out at any time going forward on an

8   unconditional basis, and nothing had to happen before we had

9   to buy it out.

10      So, I'm not saying that at this point that wins the

11  case for us, but what I'm saying is that's certainly

12  evidence that their interpretation, the exact opposite of

13  that is not the only reasonable interpretation.  The --

14      THE COURT:  When did that -- when did that

15  deposition occur?

16      MR. BUCHWEITZ:  Yep.  It was June 26th, 2014, Your

17  Honor.  So that was after obviously the RSA was signed.

18      THE COURT:  Uh-huh.

19      MR. BUCHWEITZ:  It was after the call right was

20  exercised on May 27th, 2014.  And he was asked those

21  questions, took a 22-minute break and answered them.

22      Yeah, Mr. Vanduser, I'm sure as Your Honor knows,

23  was the -- was the lead negotiator for Fidelity, was

24  testifying about the meaning of the RSA, and -- when he was

25  asked these questions in that deposition.  And we've alleged

1    that in detail on paragraph 9 of the complaint.

2              THE COURT:  Yeah.

3              MR. BUCHWEITZ:  And then the reality is they want

4    to cherry pick from the term sheet where they like it to be

5    enforceable and where they don't like it it's not

6    enforceable.

7              Everything they've said about the $500 million is a

8    fact question, not appropriate for today, but what you will

9    find and what's been, you know, produced in this case is the

10   following sentence.  The restructuring, which is defined to

11   include the restructuring support agreement contemplates,

12   among other things, that each Fidelity entity has the right

13   to participate in up to $500 million of the new term loan

14   commitments under the credit agreement.  And then they went

15   forward, signed an agreement, got their commitment.  So with

16   that in mind that they had that right under the

17   restructuring support agreement.

18             Whether it changed after new terms that's besides

19   the point, the point though is that you can't have parts of

20   those two boxes about the second lien settlement and not

21   others.

22             The last point I would just make, I think I

23   mentioned it before, you know, just the terms of the federal

24   standard, obviously Dynamus, which we've cited a number of

25   times from the District of Delaware, uses the same provision

1    that the Supreme Court of Delaware says that -- that

2    dismissal is proper only if defendant's interpretation is

3    the only, and that's with an italicized only, reasonable

4    construction as a matter of law.

5            And obviously, you know, if Mr. Bennett, you know,

6    would like the provisions of the term sheet to be written

7    differently these were extraordinarily sophisticated parties

8    as Your Honor knows, and if they wanted it to be written

9    differently they certainly could have.  And at any time is

10   unquestionably at a minimum a reasonable interpretation of

11   when this call right came to being.

12           Thank you.

13           THE COURT:  Thank you.  Mr. Bennett, I'll give you

14   the last word.

15           MR. BENNETT:  Thank you, Your Honor.

16           Another topic that goes beyond.  On Nate Vanduser's

17   testimony -- Mr. Vanduser's testimony.

18           First of all I would commence Your Honor O'Brien

19   versus Progressive Northern Insurance, a Supreme Court

20   Delaware case involving a situation where there was a

21   contract that the court felt comfortable construing, there

22   was the assertion well we have this document that

23   Progressive files which is different, then the court of

24   course ignored it properly so because the court felt

25   comfortable construing the words of the contract.

1            If we resort to extrinsic evidence in this case

2     we'd be looking at a lot more the quotes selected by -- by

3     plaintiffs from Mr. Vanduser's deposition.

4            And I think, Your Honor, there are a few things I

5     want to point out about that deposition transcript just so

6     that Your Honor knows that the representation of it in its

7     complaint kind of is like their other argument, it's about

8     just look at this and don't look at anything else.  So, I

9     just want to repeat -- recite for Your Honor three

10    questions.

11           The first -- at the very beginning of the

12    deposition Mr. Vanduser was asked, "Did you review the

13    amended term sheet that was entered into by Fidelity in this

14    matter?"  This question came up as part of his preparation

15    for the deposition.  Answer, "No."

16           Later on a different question over-- turned to the

17    topic in a different way.  "Did you personally review each

18    of the RSA documents before Fidelity seened them?"  Answer,

19    "Not every page, no."  And why is that?  Because many, many

20    other people worked on this document besides

21    Mr. Vanduser, not just for Fidelity but for many, many other

22    people.

23           But then, Your Honor, perhaps the next quote is the

24    most important, because it's the question right after the

25    one that is cited in the complaint by our friends the

1    plaintiffs.  Remember, this is whether this -- the buyout

2    right was immediately effective.  Next question, "Now that

3    buy out right was a resolution of a dispute about assurances

4    that you were seeking about how your EFH bonds would be

5    treated in this restructuring, correct?"  Answer, "Correct,

6    it was part of a larger deal."  Part of a larger deal that

7    never got approved.

8            Your Honor, we were just treated to a lecture about

9    how Fidelity might have rewritten the document, but the one

10   thing that nothing about this document supports is the idea

11   that this call right was a universal principal that started

12   at the time the agreement was entered into irrespective of

13   anything that happened in the future with the second lien

14   settlement.  That's just what no one wrote.  And you only

15   get there violating a tenant of contract construction that

16   every single case that's been cited to you on the point says

17   has to be respected, and that is, Your Honor is to view

18   contracts as a whole and not only would you be sentence.

19   You cannot get to their view of the case without narrowing

20   your review to this one sentence and pulling out it out of

21   the place where it is and ignoring the lead in language,

22   both sets of lead in language that Your Honor and I

23   discussed at the very beginning of this hearing.  The claim

24   should be dismissed with prejudice.

25           Thank you.

1          THE COURT:  Thank you.  All right, we're going take

2     a recess and then I'm going come out and rule.

3          (Recessed at 12:14 p.m.; reconvened at 12:29 p.m.)

4          THE CLERK:  All rise.

5          THE COURT:  Please be seated.

6     (Pause)

7          THE COURT:  Okay.  Thank you for your excellent

8     briefing, thank you for your excellent argument.

9          I am going to grant the motion to dismiss and

10    dismiss the complaint with prejudice.

11         The legal standard has been put forward by the

12    parties and I think it's important to just touch --

13    (indiscernible) on it a little bit, I think you basically

14    agree.  The question is definitely whether there's only one

15    reasonable interpretation of the document.  There's more

16    than one reasonable interpretation of the document.  The

17    Court cannot grant the motion to dismiss.

18         I believe and find that the only reasonable

19    interpretation of the contract is that put forth by the

20    defendants, and I'll get into that in just a moment, but do

21    want to point out that plaintiffs, both in their brief but

22    even more so I thought in argument, rely or at least

23    reference extrinsic evidence repeatedly, but you can't use

24    that extrinsic evidence to show there's more than one

25    reasonable interpretation.  There has to be more than one

1    reasonable interpretation under the contract language as a

2    matter of law where it's unambiguous, and if there is then

3    we look to the evidence to resolve which is correct.

4    There's nothing in the language itself that's ambiguous.

5    And the only interpretation is to read it -- read the

6    contract as a whole and to read subsection F, the call

7    right, as part of the contract in general and the term sheet

8    in general.

9            And I think that it's critical that it be read with

10   the concept that (a), consistent with the restructuring

11   support agreement, EFH -- EFIH shall file a motion to seek

12   approval of the settlement, the second lien settlement, and

13   that that second lien settlement shall be governed, i.e.,

14   shall include provisions consistent with following

15   principals, including the call right.

16           So what the obligation here was for the debtors,

17   EFIH specifically, to file a motion seeking to approve a

18   second lien settlement that included a number of terms,

19   including the call right, and that for Fidelity, if that

20   were filed and put before the Court, not in any way to

21   oppose it or sink it and to be bound by it.  And if that

22   second lien settlement ultimately gets approved by the Court

23   and is part of a plan or is put before the Court as part of

24   a plan to vote for the plan.

25           Once that second lien settlement was approved had

1     it (a), been approved, and (b), had it included all of its

2     principals, including the call right, then that call right

3     would be immediately enforceable and could be used, would

4     not have to wait for some further activity.  I think that's

5     the only reasonable way to read this contract.

6          I think it's also significant that the call right

7     uses the word "shall" have the right to purchase, and I

8     don't think that just means shall have from the moment the

9     larger agreement in itself becomes effective, but the second

10    lien settlement becomes effective or enforceable.

11         I don't think I need to go any further, I think

12    it's that simple.  There are a lot of alternative arguments

13    that are presented, economic reality, extrinsic evidence

14    perhaps, et cetera, et cetera, I really don't think I need

15    to get there, and I really would -- but to the extent I

16    would need to get there I would follow the arguments

17    presented by Fidelity, and in particular I look to the reply

18    brief as I thought being particularly concise recitation of

19    their position and there's nothing in there that I find that

20    I disagree with.  I would in effect adopt that reply brief

21    in toto.

22         But again, I don't think I need to get to those

23    sort of side arguments, I think it's a very basic contract

24    interpretation, I think ultimately at the end of the day

25    plaintiffs want me to read one provision in isolation, and

1    it's not reasonable to do that given where that contract

2    provision sits in the broader contract, and also what the

3    broader contract says.  Not just that sort of subparagraph,

4    the second lien settlement shall include, but the other

5    provisions referenced in the argument by plaintiffs' counsel

6    I think all support a reading of the contract and the only

7    reasonable one being that asserted by the defendants when

8    you look at the contract as a whole, and that's a reading

9    that I make and a ruling I make as a matter of law and is

10   appropriate to be made on a motion to dismiss.

11          So I will enter an order granting the motion to

12   dismiss with prejudice, I don't think it can be cured, I

13   think the argument is fundamentally one that I disagree with

14   as a matter of law, that's what appellate courts are for, of

15   course you have all your appeal rights.

16          So the Court will enter an order dismissing the

17   complaint with prejudice for the reasons set forth on the

18   record.  All right?

19          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20          THE COURT:  Thank you very much.  We're adjourned.

21      (Whereupon the Court recessed at 12:36 p.m.)

22

23

24                      * * * * *

25

1                          I N D E X

2

3                              RULINGS

4                                                              PAGE

5    Motion to Dismiss                                          52

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
                   email=digital1@veritext.com, c=US
6    _____    Date: 2015.01.21 10:43:05 -05'00'

7    Dawn South

8    AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12   Date:  January 21, 2015

13

14

15

16

17

18

19

20

21

22   Veritext

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501