# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Energy Future Holdings Corporation, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>Jointly Administered<br><br>Re: D.I. 3338<br>Obj. Deadline: 2/3/15<br>Hearing Date: 2/10/15 at 9:30 a.m. |

## LIMITED OBJECTION OF WILMINGTON SAVINGS FUND SOCIETY, FSB TO SECOND MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE

Wilmington Savings Fund Society, FSB ("WSFS"), as successor trustee under that certain indenture, dated as of October 6, 2010 (as amended or supplemented), among Texas Competitive Electric Holdings, LLC ("TCEH"), TCEH Finance, Inc., the guarantors party thereto, and The Bank of New York Mellon Trust Co., N.A., as trustee (as amended or supplemented, the "Indenture"), by and through its undersigned counsel, hereby submits its limited objection (this "Objection") to the *Second Motion of Energy Future Holdings Corp., et al., for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [D.I. 3338] (the "Exclusivity Motion").[1] In support of this Objection, WSFS respectfully states as follows:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given them in the Exclusivity Motion.

{00939669;v2 }

## **PRELIMINARY STATEMENT**

1. These chapter 11 cases are at something of a crossroads. The Debtors have just recently obtained Court approval to commence a sale process for their interest in non-Debtor Oncor. But, the amount to be received for that interest, as well as the form and timing of a transaction (if any) cannot be determined at this time. Following this Court's November admonishment of the Debtors for their failure to adequately account for inter-estate conflicts in connection with the contemplated Oncor sale, the independent directors of the Debtors' boards have recently retained professionals and begun the process of interfacing with their constituents. But, the ability and willingness of such independent directors to advocate for anything other than the sponsor-imposed restructuring scheme that has hung over these cases since their inception remains to be seen. Eight months after WSFS filed its request for Rule 2004 discovery (pertaining to, inter alia, inter-estate conflicts, tax issues and other subjects critical to plan formulation and evaluation), the Debtors are finally nearing completion of their document production. The parties are still evaluating the substance and scope of the Debtors' production. And, perhaps most importantly, after nearly half a year of trying to force junior creditors to accept the restructuring scheme developed prepetition between the Debtors' equity sponsors (the "Sponsor Group") and senior lenders, the Debtors have had plan discussions with a wider group of case parties. Whether such efforts by the Debtors are sincere or merely window dressing to be recited to the Court in motions and at status conferences remains to be seen. The foregoing, arguably, militate in favor of an extension of exclusivity.

2. At the same time, the very same inter-estate conflicts that WSFS raised with the Debtors prepetition, and which have been the focus of so much discussion since the filing, remain extant. The growing legion of estate-compensated professionals have incurred tens of

millions of dollars in fees and expenses while these cases have followed a meandering path to their current position. And, it should not be lost on the Court or creditors that approximately eight months following the commencement of these cases, the Debtors are not appreciably closer to proposing a confirmable plan of reorganization. Much of the Debtors' efforts to date have been consumed with retaining, and compensating, professionals and commencing, and then abandoning, requests for relief (e.g., the now-abandoned restructuring support agreement and the EFIH second lien DIP). Little, if anything, has been accomplished towards the end of plan formulation and prosecution. The foregoing arguably militate against a further extension of exclusivity.

3. In the Exclusivity Motion, the Debtors ask this Court to grant them the statutory maximum extensions of the exclusive rights to file and seek acceptances of a plan – effectively leaving the Debtors with the unfettered ability to continue to impose the Sponsor Group's agenda on junior creditors through the remainder of 2015. Respectfully, the Debtors' progress and actions to date do not warrant such expansive relief.

4. Rather than deny (or grant) the Exclusivity Motion in full, the Court has the discretion to grant relief falling in a middle-ground more likely to enliven nascent plan discussions and keep the Debtors' properly incentivized to heed the rights and entitlements of junior creditors. More specifically, WSFS suggests that the Exclusivity Motion be granted, but the requested exclusivity modified as discussed herein. If the Court is inclined to grant continuing exclusivity, that exclusivity should be subject to the following carve-outs: (a) the independent director for the T-side Debtors, as the only arguably unconflicted board-level fiduciary to T-side creditors, should have the concurrent ability to file a plan for the T-side Debtors if he determines that to be in the best interests of his constituents; and (b) to the extent

the official committees for the T-side and E-side of the Debtors' capital structure can come to an agreement on a restructuring construct, they also should have the concurrent ability to file a joint plan for consideration by the Court and creditors. Whether or not the Court chooses to create the foregoing carve-outs to the Debtors' exclusivity at this time, WSFS requests that the exclusivity extensions granted be limited to 120 days from the current exclusivity deadlines of February 23 and April 25, 2015, without prejudice to the Debtors' ability to seek further extensions to the extent their actions in the interim warrant such relief.

## BACKGROUND

5.     Prepetition, the Debtors negotiated a restructuring scheme with the Sponsor Group and the first lien lenders on the T-side of their capital structure (the "First Liens") predicated on a tax free spinoff of the T-side assets to the First Liens and leaving the E-side largely intact in its ownership of an 80% interest in non-Debtor Oncor. That scheme shaped the first months of these cases – from the EFIH first lien "settlement" (the subject of continuing litigation) to the corresponding restructuring support agreement (the "RSA") and plan to transfer ownership of the E-side via an EFIH second lien DIP construct that had not been subjected to any marketing process and which now appears to have vastly undervalued the Debtors' interest in Oncor. The RSA-plan also failed to take account of significant intercompany claims and conflicts of interest, including on account of: (a) prepetition transfers to the detriment of the T-side of the capital structure; (b) value entitlements of T-side creditors; and (c) the inevitable adverse effect on T-side creditors from forgoing a step-up in basis in connection with the "tax free" deconsolidation of the T-side from the rest of the Debtors. After the incurrence of significant fees and expenses by the estates, the RSA and EFIH second lien DIP were abandoned.

6. The death-knell of the RSA was an unavoidable recognition that the Debtors had failed to account for market interest in Oncor. Once the RSA had been abandoned, the Debtors finally undertook to expose the Oncor assets to the market. But, once again, the Debtors heeled to the Sponsor Group's wishes, and put forward proposed sale procedures that skewed any transaction for Oncor toward a structure requiring a "tax free" spinoff of the T-side. Those sale procedures were hotly contested, and in hearings thereon it became clear that the independent director for the T-side had failed to take any meaningful steps to address patent inter-estate conflicts of interest or to otherwise protect his T-side constituents from the negative effects of a tax free spinoff of their Debtors (and the forgone step up in tax basis). At the conclusion of the sale procedures hearing in November 2014, the Court delivered its ruling including that, while the Oncor sale process could ultimately be commenced with certain modifications, the Debtors would first have to shore up their corporate governance deficiencies and the independent directors would be required to become active and engaged on behalf of their constituents.

7. Over the course of December 2014 and January 2015, the independent directors for TCEH, Energy Future Holdings Corp ("EFH") and Energy Future Intermediate Holdings LLC ("EFIH") each retained counsel and financial advisors, and agreed to meet with their respective constituents. In recent weeks, WSFS and other junior creditors of TCEH have begun to interface with the T-side independent director, and, WSFS remains hopeful that its independent director will be willing and able to fulfill his fiduciary duty to maximize T-side recoveries, even if doing so is contrary to the wishes of the Sponsor Group or the interests of EFH and EFIH. But, the T-side independent director remains a lone voice on an otherwise conflicted board and, as a practical matter, may not have the ability to determine the restructuring agenda ultimately imposed on the T-side. As such, the inherent conflicts of interest

that have troubled WSFS and other TCEH junior creditor constituencies since prior to the commencement of these cases remain unresolved.

8.  Over the course of the past month, WSFS and, to WSFS's understanding, other case parties including the statutory committees on the T-side and E-side, have begun plan dialogues (some involving the Debtors and some not involving the Debtors). Such discussions are in their early stages. It is unclear at this time whether the Debtors will remain beholden to the Sponsor Group or will engage in good faith restructuring discussions that differ in any material respect from the RSA structure that was negotiated prepetition and that did not benefit from the involvement of statutory committees or broad creditor participation.

## JURISDICTION

9.  This Court has jurisdiction over this Objection pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

10. By this Objection, WSFS requests that the Court: (a) extend exclusivity, but condition such relief on the concurrent ability of: (i) the independent director for the T-side Debtors to file and prosecute a plan to the extent he determines it to be in the best interests of the T-side creditors; and (ii) the T-side and E-side official committees to file and prosecute a joint plan to the extent they come to agreement regarding same; and (b) limit the extensions of the Debtors' exclusive rights to file and seek acceptances of a plan to 120 days from the expiration of the current deadlines, without prejudice to the Debtors' ability to seek further extensions thereof.

## ARGUMENT

11. The Bankruptcy Code grants a debtor the exclusive right to file a plan during the first 120 days after the order granting relief. See 11 U.S.C. § 1121(b). Once the 120-day period expires or is terminated, any party in interest may file a plan of reorganization. See 11 U.S.C. § 1121(c); In re Shubh Hotels Pittsburgh, LLC, 439 B.R. 637, 645 n.8 (Bankr. W.D. Pa. 2010).

12. The determination of cause under Bankruptcy Code Section 1121(d) is a fact-specific inquiry in which the court has broad discretion to extend or terminate exclusivity. See In re Lehigh Valley Prof'l Sports Club, Inc., No. 00-11296, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under §1121(d) is committed to the sound discretion of the bankruptcy judge); In re Sharon Steel Corp., 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) ("The decision whether or not to extend the debtor's period of exclusivity rests within the discretion of the court."); see also In re Adelphia Commc'ns Corp., 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific.") (internal citation omitted).

13. Congress gave the courts the power to modify the exclusivity periods in order to: (a) democratize the plan process; and (b) prevent a debtor from monopolizing the plan process, as had been the case under old Chapter XI, pursuant to which only a debtor could propose a plan of arrangement. See In re Timbers of Inwood Forest Assoc., Ltd., 808 F.2d 363, 372 (5th Cir. 1987) (en banc) (courts assessing "whether 'cause' exists should be mindful of the legislative goal behind § 1121 . . . [it] must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI," which gave the debtor "undue bargaining leverage, because by delay he c[ould] force a settlement out of otherwise unwilling creditors.") (internal citations and quotations omitted), aff'd, 484 U.S. 365 (1988); see

also <u>In re Crescent Beach Inn, Inc.</u>, 22 B.R. 155, 160-61 (Bankr. D. Me. 1982) (modifying exclusive period would permit parties "with perhaps a more objective view of the debtor's circumstances, to file a plan").

14.  Congress explicitly emphasized the Bankruptcy Code's recognition of "the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company." See <u>Timbers of Inwood Forest</u>, 808 F.2d at 372 n.15 (internal citation omitted). In crafting Bankruptcy Code Section 1121, "Congress succeeded in balancing two competing interests: the interest of the debtor in the survival of its business (thus its resort to chapter 11), and the interest of the creditors in avoiding undue delay in the satisfaction of the debtor's obligations." <u>In re Geriatrics Nursing Home, Inc.</u>, 187 B.R. 128, 131-32 (D.N.J. 1995) (citing H.R. Rep. No. 95-595, at 231-32 (1978), reprinted in 1978 U.S.C.C.A.N. 5787). Accordingly, courts have recognized that Section 1121 should be interpreted to limit the delay that makes creditors the hostages of Chapter 11 debtors. See <u>Official Comm. of Unsecured Creditors of Mirant Americas Generation, L.L.C. v. Mirant Corp. (In re Mirant Corp.)</u>, Nos. 4-04-CV-476-A, 4-04-CV-530-A, 2004 U.S. Dist. LEXIS 19796, at *8 (N.D. Tex. Sept. 30 2004).

15.  In assessing whether to extend, terminate or modify exclusivity, "the primary consideration should be whether or not doing so would facilitate moving the case forward." See <u>Dow Corning</u>, 208 B.R. at 670; see also <u>Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.)</u>, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) (citation omitted) (holding that "a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution"); <u>Adelphia</u>, 352 B.R. at 590 (explaining that in assessing exclusivity, the court should look at

"whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case").

A.  **It is the Debtors' Burden to Show Cause Exists to Grant the Requested Extensions of Exclusivity.**

16.  The Bankruptcy Code allows the exclusivity period to be modified upon a showing of cause by a party in interest. See 11 U.S.C. § 1121(d); In re Nicolet, Inc., 80 B.R. 733, 740-41 (Bankr. E.D. Pa. 1987) ("[A]n extension of the time-periods set forth in 11 U.S.C. § 1121(d) is not to be granted unless the debtor moving for such an extension makes a *showing* of *cause* therefor.") (emphasis in original). The burden of proving cause to extend exclusivity is on the moving party, in this case the Debtors. See id.; In re Newark Airport/Hotel Ltd. P'ship, 156 B.R. 444, 451 (Bankr. D.N.J. 1993) ("Since the debtor seeks the extension, the burden is on it to demonstrate the existence of good cause."). Some courts have held that for the moving party to meet its burden it must produce affirmative evidence to support a finding of cause. See Nicolet, 80 B.R. at 742 ("[M]ere recitation of allegations deemed by a debtor to constitute cause for an extension of the exclusivity period is insufficient to allow such an extension. Rather, submission of *evidence* to support the allegations of cause is a prerequisite.") (citations and internal quotations omitted) (emphasis in original).

17.  Debtors are not entitled to extend exclusivity simply as means to force compliance or compromise with their creditors. See Cont'l Casualty Co. v. Burns & Roe Enters., Inc. (In re Burns & Roe Enters., Inc.), Nos. 00-41610 RG, 05-2529 (KSH), 05-4125 (KSH), 2005 WL 6289213, at *4 (D.N.J. 2005) ("[E]xtensions are impermissible if they are for the purpose of allowing the debtor to prolong reorganization while pressuring a creditor to accede to its point of view on an issue in dispute.") (citation and quotations omitted); S. Rep. No. 95-989, at 118

(1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5904 ("[A]n extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.").

**B.     The Court May Condition the Grant of Exclusivity on the
Concurrent Abilities of the T-Side Independent Director and
The Official Committees to File and Seek Acceptances of a Plan.**

18.    In addition to simply extending or terminating exclusivity, this Court also has the ability, in appropriate circumstances, to allow continued exclusivity with specified conditions or exceptions. See, e.g., In re United Press Int'l, Inc., 60 B.R. 265, 271, n.12 (Bankr. D.D.C. 1986) (consent order gave creditors' committee right to file plan under certain conditions within initial exclusivity period; employees' union granted similar right in first order extending exclusivity period). Relying on the confluence of Sections 1107(a) (allowing the Court to limit or condition the debtor-in-possession's operations), 1121(d) (allowing the Court to extend or terminate exclusivity) and 105(a) (authorizing the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]"), the United Press court stated as follows regarding its decision to "carve out" certain parties from the debtor's exclusivity:

> [t]hus, this Court adopted a middle approach, initially suggested by the parties themselves – opening up the right to file a plan on a limited basis to those two entities (besides the Debtor itself) that have the most at stake in this case and have shown themselves to be responsible parties, while refraining from opening the floodgates completely. The statute does not expressly prohibit this eminently sensible middle course, and I can perceive no reason to find any such prohibition by implication.

Id.

C.  **Under the Facts and Circumstances of These Cases, The Court Should Condition or Limit The Relief Granted In Connection with the Exclusivity Motion.**

19. Here, the Debtors have, over the past eight months, made little tangible progress towards the filing of a confirmable plan. While plan-related discussions finally commenced just prior to the new year, it is not yet clear whether those discussions are likely to result in creditor consensus or are a simply a hollow exercise intended to provide the illusion of sincere efforts at building consensus. Such uncertainty exists against the backdrop of ongoing inter-estate conflicts of interest that will necessarily be implicated in any restructuring involving both the T-side and E-side of the Debtors' capital structure. As such, the Debtors' cannot show the requisite cause exists to grant the full, unfettered exclusivity extensions requested in the Exclusivity Motion.

20. It is only recently that the purported "independent" directors have retained professionals and started to engage meaningfully with their respective constituencies. One might say these cases are in the "early days" of the active involvement by potentially unconflicted fiduciaries on the Debtors' boards. It may be, as WSFS hopes and as has been promised by the Debtors, that the new-found engagement of the independent directors will go some way towards alleviating concerns regarding conflicts of interest (particularly by junior T-side creditors, whose interests thus far have been ignored by management). But, even if the independent directors are now fully-committed and able to fulfill their duties to all of their constituents, granting unfettered, long-term exclusivity to the Debtors generally – whose boards are still dominated by conflicted members with ties to the Sponsor Group – will still leave junior creditors subject to inappropriate levels of coercion by management still beholden to, and under the thumbs of, the Sponsor Group.

21. As such, this Court should pare back the relief granted in two ways. First, if the Court is inclined to grant the Debtors an extension of exclusivity for the full periods requested by the Debtors (the statutory maximums), an appropriate check and balance would be to allow the concurrent right to: (a) to the T-side independent director to file a plan for the T-side Debtors if, in the exercise of his fiduciary duties, he determines such a course to be in the best interests of his constituents; and (b) to the T-side and E-side official committees to file a joint plan as to all Debtors if, in the exercise of their fiduciary duties, they determine such a course to be in the best interests of their constituents. This would not prejudice the Debtors' own right to file a plan. It would simply incentivize the Debtors to deal appropriately and fairly with unconflicted fiduciaries (independent director and statutory committees) in plan discussions and allow those unconflicted parties to move these cases forward to the extent plan discussions with the Debtors turn out to be fruitless.

22. Next, the Court should limit any extensions of exclusivity to 120 days, rather than granting the statutory maximum extensions at this point. While plan discussions have commenced in recent weeks, the Debtors have yet to establish their ability or willingness to serve as fair stewards of estate value for all case parties. At this point, granting the Debtors exclusivity through the end of 2015 and removing the need to continue to interface with creditors regarding the plan process will incentivize the Debtors to return to their early form in these cases – myopic pursuit of the sponsors' agenda.

23. WSFS worked cooperatively in connection with the Debtors' initial request to extend exclusivity, is willing to work cooperatively in connection with this second exclusivity extension request, and certainly will work cooperatively in connection with any subsequent request for an extension of exclusivity. Limiting the current exclusivity extension to 120 days at

this point does nothing to prejudice the Debtors' ability to continue plan discussions and/or seek further extensions of exclusivity to the extent their progress at that point warrants such relief. Rather, limiting the current exclusivity extension will serve only to compel the Debtors to work in good faith with their creditors over the next 120 days if they wish to have creditor support for a further extension.

## CONCLUSION

WHEREFORE, based on the foregoing, WSFS respectfully requests that this Court: (a) grant the Debtors' requested extension of exclusivity, but condition such relief on the concurrent ability of: (i) the independent director for the T-side Debtors to file and prosecute a T-side plan to the extent he determines it to be in the best interests of the T-side creditors; and (ii) the T-side and E-side official committees to file a joint plan to the extent they come to agreement regarding same; (b) limit the extensions of the Debtors' exclusive rights to file and seek acceptances of a plan to 120 days from the expirations of the current deadlines, without prejudice to the Debtors' ability to seek further extensions thereof; and (c) grant WSFS such other and further relief as is just.

Dated: February 3, 2015  
Wilmington, Delaware

ASHBY & GEDDES, P.A.

*/s/ Gregory A. Taylor*  
William P. Bowden (#2553)  
Gregory A. Taylor (#4008)  
500 Delaware Avenue  
P.O. Box 1150  
Wilmington, Delaware 19899  
Telephone: (302) 654-1888  
Facsimile: (302) 654-2067

- and -

BROWN RUDNICK LLP
Edward S. Weisfelner (admitted pro hac vice)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and -

Jeffrey L. Jonas (admitted pro hac vice)
Jeremy B. Coffey (admitted pro hac vice)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

*Counsel to Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee*