## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 14-10979 (CSS) |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Re: D.I. 3338** |
| | ) |
| | ) **Hearing Date:** Feb. 10, 2015 at 9:30 a.m. (ET) |
| | ) **Obj. Deadline:** Feb. 4, 2015 at 4:00 p.m. (ET) |
| | ) **(extended by agreement with the Debtors)** |

## LIMITED OBJECTION OF EFIH AD HOC COMMITTEE TO
## SECOND MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
## FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE
## PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES
## THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE

The EFIH Ad Hoc Committee[1] files this limited objection (the "Limited Objection") to the

*Second Motion of Energy Future Holdings Corp., et al., for Entry of an Order Extending the*

*Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant*

*to Section 1121 of the Bankruptcy Code* [D.I. 3338] (the "Motion").  In support of this Limited

Objection, the EFIH Ad Hoc Committee respectfully submits as follows:

### PRELIMINARY STATEMENT[2]

By the Motion, the Debtors request a 248-day extension of their exclusive periods to file

a plan of reorganization and solicit acceptances thereof (the "Exclusive Periods"), through and

including October 29, 2015 and December 29, 2015, respectively.  Approval of the Motion

---

[1] The "EFIH Ad Hoc Committee" means the ad hoc committee of holders of 11.25%/12.25% unsecured senior toggle notes due December 1, 2018 (the "EFIH Unsecured Notes") issued pursuant to that certain Indenture, dated December 5, 2012, by and among Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc. (together with Energy Future Holdings Corp. ("EFH") and EFIH, the "E-Side Debtors"), as issuers, and UMB Bank, N.A., as successor trustee.

[2] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to such terms below.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

would have the effect of giving the Debtors a monopoly over the plan process for the maximum

18-month period permitted under section 1121 of the Bankruptcy Code.  While the EFIH Ad Hoc

Committee believes that a 120-day extension of the Debtors' Exclusive Periods through June 23,

2015 and August 23, 2015 is appropriate, the Debtors' request for a 248-day extension must be

denied because cause does not exist for such a lengthy and almost unprecedented extension.

Reducing the proposed 248-day extension to no more than 120 days is fair and in the best

interests of the estates for the following reasons.  First, a limited extension is necessary because,

during the prior Exclusive Periods, the E-Side Debtors failed to engage meaningfully in any

good-faith "plan" negotiations and have made no effort to seek or foster consensus on a chapter

11 plan for the E-Side Debtors.  Instead, to date, the Debtors have used their prior Exclusive

Periods to pursue a high-risk strategy centered around conducting the Oncor Auction and

reducing allowed claims at EFIH and EFH (collectively, the "Oncor Sale Strategy") in an effort

to create incremental value for EFH's equity sponsors (the "Sponsors") and the TCEH First Lien

Creditors.  While the Debtors contend that they are merely acquitting their fiduciary duty to

maximize the value of the estates, they have disregarded the interests of the unsecured creditors

of the E-Side Debtors (the "E-Side Unsecured Creditors") by (i) prioritizing the Oncor Auction

over pursuit of a plan sponsor proposal supported by the E-Side Debtors' relevant stakeholders,

which should serve as the foundation for the Oncor Auction, and (ii) seeking advisory opinions

from this Court on claim allowance issues in an effort to free up value for the Sponsors and

TCEH First Lien Creditors.  As the E-Side Unsecured Creditors bear all the direct and indirect

costs of an unsuccessful Oncor Sale Strategy, it is reasonable and prudent to require the Debtors

to report to the Court and creditors on the Debtors' progress in a few months' time.  A

conventional 120-day extension would afford the Court and creditors the opportunity to evaluate

in June, rather than in October, whether the Oncor Sale Strategy remains viable, and whether the Debtors have earned the right to continue to hold E-Side Unsecured Creditors hostage to this strategy.

Second, whether the Debtors should be entitled to a further extension of exclusivity beyond 120 days must depend upon what progress they can make with respect to formulating a viable plan of reorganization premised upon the Oncor Sale Strategy.  Formulation of such a plan likely will depend upon many things, including the Oncor Auction outcome and resolution of material transaction contingencies relating to closing any proposed Oncor transaction.  During the next 120 days, existing deadlines suggest that significant progress should be made in both of these categories, as well as with respect to the Debtors' various claim-objection adversary proceedings against the E-Side Debtors' creditors.  Given what may be a very consequential next four months in these cases, a 120-day extension of the Exclusive Filing Period to June 23, 2015 would be an appropriate checkpoint for the Court and creditors to evaluate whether the Debtors' Exclusive Periods should be further extended.

Third, while the Oncor Sale Strategy provides the Sponsors and TCEH First Lien Creditors with free and riskless price discovery, it exposes the E-Side Unsecured Creditors to 100% of the costs and risks should it fail.  The combination of professional fees for which the estates are obligated and post-petition interest accrual on the EFIH Second Lien Notes totals at least $41 million per month—a figure that is only increasing, given the recent retention of independent advisors for each of the Debtors and for the E-Side Creditors' Committee.  If the Oncor Sale Strategy falls short, these costs likely will be borne by the E-Side Unsecured Creditors in the form of reduced recoveries or increased capital requirements to deleverage the EFIH balance sheet.  Given the costs involved, a shorter extension is required because E-Side

Unsecured Creditors cannot afford to sit on the sidelines for eight months while the Debtors pursue a failing exit strategy.

Fourth, the Debtors' chapter 11 cases may be large, but many other large and complex chapter 11 cases have proceeded without requiring an exclusivity extension as lengthy as the one requested. There is nothing unique about these cases that would require such an extraordinary 248-day extension. Indeed, even in cases as large and complex as EFH's, courts have found that 120-day extensions provided an appropriate balance of the debtors' interests in maintaining case control and the creditors' interests in having a say in the outcome of the debtors' chapter 11 cases. The Debtors in these chapter 11 cases have failed to demonstrate why they merit any special treatment.

For these reasons and those set more fully below, the EFIH Ad Hoc Committee respectfully requests that any extension of the Debtors' Exclusive Periods be limited to 120 days.

## **BACKGROUND**

1.     The Debtors' initial 120-day exclusive period to file a chapter 11 plan (the "Exclusive Filing Period") expired on August 27, 2014 and the initial exclusive period to solicit acceptances of that plan (the "Exclusive Solicitation Period") expired on October 27, 2014. On July 23, 2014, the Debtors filed a motion seeking a 180-day extension of those deadlines to February 23, 2015 and April 25, 2015, respectively [D.I. 1683] (the "First Exclusivity Motion"). To accommodate concerns raised in connection with the exclusivity extension request, the Debtors entered into a stipulation [D.I. 2051] (as amended, the "Case Matters Protocol") with the TCEH Creditors' Committee, the ad hoc group of TCEH unsecured noteholders and the indenture trustee for the TCEH second lien notes (collectively, the "T-Side Signatories"). The Court granted the First Exclusivity Motion on September 16, 2014. See D.I. 2063.

2.      On January 20, 2015, the Debtors filed the Motion, seeking to extend the

Exclusive Periods to the maximum duration allowed under the Bankruptcy Code.  If the

extension sought in the Motion is granted, the Exclusive Filing Period will be extended to

October 29, 2015 and the Exclusive Solicitation Period to December 29, 2015.

## I.      Legacy Discovery Protocol Progress

3.      On August 13, 2014, the Court approved a stipulation among the Debtors, various

creditors of Energy Future Competitive Holdings Company ("EFCH") and its subsidiary debtors

and debtors in possession (collectively, the "T-Side Debtors"), and the TCEH Creditors'

Committee regarding discovery related to prepetition transactions [D.I. 1832] (the "Legacy

Discovery Protocol").  In the Motion, the Debtors assert that they have substantially completed

document production under the Legacy Discovery Protocol and that they expect to complete

production by February 9, 2015.  *See* D.I. 3338 ¶24.  In addition, the Case Matters Protocol

obligates the T-Side Signatories to disclose any intercompany claims for which they will seek

derivative standing to pursue by March 31, 2015.  *See* D.I. 2760.

## II.      The Oncor Auction Process and the Bid Procedures

4.      Following the termination of the Restructuring Support and Lock-Up Agreement,

dated as of April 29, 2014, the Debtors negotiated with potential bidders regarding the sale of

EFH's economic interest in Oncor Electric Delivery Company LLC ("Oncor").  On September

19, 2014, the Debtors filed a motion [D.I. 2087] (the "Bid Procedures Motion") seeking approval

of bidding procedures, including a closed two-step process for selection of a stalking horse

followed by an open auction (collectively, the "Oncor Auction").  The Debtors filed the Bid

Procedures Motion without any agreement regarding the terms and conditions pursuant to which

the first lien creditors (the "TCEH First Lien Creditors") of Texas Competitive Electric Holdings

Company LLC ("TCEH") would agree to participate in a transaction premised upon the Debtors'

optimal tax structure (i.e., the tax-free spin). *See* D.I. 2087 ¶36 ("[T]he Debtors have done

significant tax and structural analysis regarding a potential transaction, and they believe the

optimal deal structure would be an equity investment in reorganized EFH combined with a tax-

free spinoff of TCEH.").

5.      After four days of hearings, the Court issued an oral ruling conditionally

approving the Bid Procedures Motion, subject to certain order modifications and authorization

by the EFH, EFIH and TCEH boards (the "Bid Procedures Ruling").  On January 14, 2015, after

certification from Debtors' counsel that the Debtors had complied with the Bid Procedures

Ruling, the Court entered a revised order granting the Bid Procedures Motion [D.I. 3295] (the

"Bid Procedures Order").  Under the bid procedures (attached as Exhibit 1 to the Bid Procedures

Order, the "Bid Procedures"), first-round stalking horse bids are due March 2, 2015 and round

two bids are due April 13, 2015.  *See* Bid Procs., pp. 8-9.  Following submission of round two

bids, the Debtors' boards will approve a stalking horse bidder (the "Stalking Horse") and finalize

documentation (the "Stalking Horse Agreement"), after which the Debtors will have ten business

days to file a motion seeking authorization to enter into the Stalking Horse Agreement.  *See id.*,

p. 9.  Thus, the Debtors likely will have selected the Stalking Horse by May, and the hearing for

authorization to enter into the Stalking Horse Agreement will likely have concluded by June

2015.[3]

---

[3] The Debtors have indicated that they expect the closed stalking horse component of the Oncor Auction to be the
more robust component, and the Court has agreed.  *See* Test. of William O. Hiltz, Bid Procs. H'rg Tr. at [66:5-14]
(Bankr. D. Del. Oct. 17, 2014) ("[T]here were only a limited number of circumstances where one strategic utility
had jumped another strategic utility's deal.  I didn't feel quite as strongly as Lazard that . . . no one would participate
in the open auction.  I think it's possible there are some aggressive players who will but, nevertheless, I thought
[Lazard's] concern had some validity to it and that was another reason why we opted for a longer stalking horse
process and a shorter open auction process."); *In re Energy Future Holdings Corp*., No 14-10979 (CSS), Hr'g Tr. at
[16:17-19] (Bankr. D. Del. Nov. 3, 2014) [D.I. 2699] ("[T]he evidence here strongly suggests that all of the bidding
action is likely to occur prior to the selection of a stalking horse bidder.").

III.    **Plan Negotiations and the Second Lien DIP Proposal**

6.      In response to the Court's "strenuous[] urg[ing]" that the Debtors commence plan negotiations in its Bid Procedures Ruling, *see In re Energy Future Holdings Corp.*, No 14-10979 (CSS), Hr'g Tr. at [26:9-10] (Bankr. D. Del. Nov. 3, 2014) [D.I. 2699] ("Finally, the Court strenuously urges the parties to begin plan negotiations as soon as possible."),[4] the Debtors held a series of large, unstructured meetings with stakeholders of the E-Side Debtors and the T-Side Debtors in November and December 2014.  The Debtors did not share any plan term sheets with the EFIH Ad Hoc Committee or, to the best of our knowledge, with other parties in these cases at these meetings or otherwise.

7.      In addition, during the first week of January, the EFIH Ad Hoc Committee sent a plan sponsor proposal (the "Plan Backstop Proposal") to independent counsel to each of EFIH and EFH.  The Plan Backstop Proposal was also shared with the Debtors.  The Plan Backstop Proposal was designed to provide for an actionable recapitalization of the E-Side Debtors that would (i) serve as a floor for the Oncor Auction, (ii) lock in recoveries for the E-Side Debtors' creditors in the event of a topping bid and (iii) provide a confirmable plan for the E-Side Debtors in the event that no topping bid was received in the Oncor Auction.  The Plan Backstop Proposal went nowhere with the Debtors.  After meetings with independent counsel to EFIH and EFH and with Debtors' counsel, the EFIH Ad Hoc Committee sent a letter to the Debtors on January 16, 2015,  memorializing concerns about the lack of direction in the chapter 11 cases, including the Debtors' failure to take action on the 2L DIP Proposal (as defined below) and the Plan Backstop Proposal.  The replies received to the letter were largely unresponsive and failed to take or outline any proposed action.  On January 28, 2015, the Debtors conducted a conference call with

---

[4] Excerpts from transcripts cited in this Limited Objection are included in the Appendix annexed hereto, and will be served on the Court, counsel to the Debtors, the Office of the United States Trustee, and counsel to the official committees of unsecured creditors.  Copies of the full transcripts are available upon request to undersigned counsel.

the Ad Hoc Committee advisors and provided informal feedback on the Plan Backstop Proposal

for the first time.

## IV.    The E-Side Debtors' Adversary Complaints

8.      The Debtors are presently engaged in three adversary proceedings with various

EFIH creditors over, among other things, their entitlement to payment of prepayment premiums

in connection with the repayment—or potential repayment—of their debt.  The adversary

proceeding against the trustee for the EFIH first lien notes (the "EFIH First Lien Adversary

Proceeding") is scheduled for trial in late March 2015.  *See* Adv. Pro. No. 14-50363 (CSS) [D.I.

167].  On December 1, 2014, the Debtors filed a motion for leave to amend their answer and file

a counterclaim in the adversary proceeding commenced by the trustee for EFIH second lien notes

(the "EFIH Second Lien Adversary Proceeding").  The trustee then cross-moved to dismiss its

complaint, and the parties have completed briefing thereon; oral argument has not yet been

scheduled.  *See* Adv. Pro. No. 14-50405 (CSS) [D.I. 25].

9.      On December 16, 2014, EFIH filed an adversary complaint [D.I. 3039] (the "PIK

Adversary Complaint") against UMB Bank, N.A., indenture trustee for the EFIH Unsecured

Notes ("UMB").  By the PIK Adversary Complaint, the Debtors seek a declaratory judgment

that, among other things, (i) holders of the EFIH Unsecured Notes are not entitled to any

prepayment premium, notwithstanding the fact that there has been no prepayment of the EFIH

Unsecured Notes even proposed, and (ii) to the extent that EFIH and EFIH Finance Inc. are

solvent, the appropriate rate of post-petition interest accruing on the EFIH Unsecured Notes is

the federal judgment rate (and not the contract rate), even though the Debtors have not proposed

a plan for any of the Debtors and the Court has not been asked to make any determination as to

the solvency of EFIH or EFIH Finance Inc.  Prior to filing the PIK Adversary Complaint, the

Debtors made no attempt to negotiate with the EFIH Ad Hoc Committee or, upon information

and belief, UMB, regarding the issues to be litigated in the PIK Adversary Complaint.  The

Debtors are pursuing these advisory opinions at great cost to the estate, instead of heeding this

Court's instruction to focus on plan negotiations.  *See In re Energy Future Holdings Corp.*, No

14-10979 (CSS), Hr'g Tr. at [26:9-10] (Bankr. D. Del. Nov. 3, 2014) [D.I. 2699].  UMB's motion

to dismiss the PIK Adversary Complaint is due on February 6, 2015.  *See* Adv. Pro. No. 14-

51002 (CSS) [D.I. 4].  Further briefing has not yet been scheduled.

## V.    Professional Fees and Post-Petition Interest Accrual

10.    Each month that the Debtors spend in chapter 11, the E-Side Debtors accrue

approximately $24 million in interest on EFIH's second lien notes (the "EFIH Second Lien

Notes").  Over $200 million of post-petition interest on the EFIH Second Lien Notes has accrued

since the Petition Date, and an additional $270 million of interest is scheduled to accrue through

the end of 2015.[5]

11.    In addition, based upon a simple analysis of the fee statements filed to date by

estate-retained professionals, the aggregate incurrence of professional fees across the Debtors'

estates (both hourly and monthly based) is averaging approximately $17 million per month.  And

this estimate is low, since it does not include fees incurred by (a) estate-retained professionals

who have not yet filed fee statements, including the independent advisors retained by certain

Debtors and the professionals retained by the E-Side Debtors' official committee of unsecured

creditors (the "E-Side Creditors' Committee"), (b) non-estate-retained professionals with respect

to which monthly fee statements are not required to be filed, or (c) other professionals who likely

will seek to be compensated by the estate.

---

[5] On December 2, 2014, the EFIH Ad Hoc Committee delivered to EFIH's independent manager a proposal for a $1.8 billion non-convertible second lien DIP financing (the "2L DIP Proposal") intended to fund the repayment of the EFIH Second Lien Notes, resulting in net annual interest savings to the EFIH estate of more than $100 million. The Debtors allowed the 2L DIP Proposal to expire on its terms on December 31, 2014.

## LIMITED OBJECTION

### I.      The Legal Standard

12.      Bankruptcy Code section 1121(d) requires a debtor to show "cause" for an extension of the exclusive periods. *See* 11 U.S.C. § 1121. A request to extend exclusivity is "a serious matter" and "should 'be granted neither routinely nor cavalierly.'" *See*, *e.g.*, *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990) (quoting *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)). Indeed, one of the fundamental purposes of section 1121 of the Bankruptcy Code is "to limit the delay that makes creditors the hostages of Chapter 11 debtors." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) (characterizing section 1121 of the Bankruptcy Code as "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise"), *aff'd*, 484 U.S. 365 (1988); *see also Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 102 (3d Cir. 1988) (discussing legislative history to section 1121(d) and noting that "unlimited exclusivity gave a debtor 'undue bargaining leverage,' because it could use the threat of delay to force unfair concessions") (emphasis omitted).

13.      Significantly, a "debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts." *Official Comm. of Unsecured Creditors of Mirant Ams. Generation, L.L.C. v. Mirant Corp. (In re Mirant Corp.)*, No. 04-CV-476-A, 04-CV-530-A, 2004 WL 2250986, at *2 (N.D. Tex. Sept. 30, 2004) (internal citations omitted) (affirming bankruptcy court's decision to grant debtor an extension fashioned by the court in lieu of one requested by debtor). Moreover, a bankruptcy court's discretion extends not just to whether exclusivity should be extended or terminated, but also to the length of any extension deemed appropriate. *See*, *e.g.*, *In re Hoffinger Indus., Inc.*, 292 B.R. 639, 644-45 (B.A.P. 8th Cir. 2003)

(reviewing both the bankruptcy court's grant of an exclusivity extension and the length of the granted extension for abuse of discretion); *First Am. Bank of N.Y. v. Sw. Gloves & Safety Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986) ("Section 1121(d) provides the Bankruptcy Court with flexibility to either reduce or increase that period of exclusivity in its discretion."); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Sept. 11, 2012) [D.I. 1413] (upon the debtors' initial request for a nine-month extension, granting a 100-day extension).

## II.    The Relevant Factors and the Equities of the Case Weigh in Favor of Limiting the Debtors' 248-Day Extension Request to a 120-Day Extension

14.    The facts and circumstances of these cases weigh in favor of limiting the extension of the Exclusive Periods to 120 days.  The Court has the discretion to modify the extension requested and should do so for the reasons set forth below.  *See, e.g.*, *Hoffinger Indus.*, 292 B.R. at 644-45; *Sw. Gloves*, 64 B.R. at 965; *see also Residential Capital*, No. 12-12020 (Bankr. S.D.N.Y. Sept. 11, 2012) [D.I. 1413].

### A.    The Debtors Have Not Earned a 248-Day Exclusivity Extension Given the Lack of Progress on Formulating a Plan During Their Prior Exclusive Periods

15.    The Debtors do not merit a 248-day extension of their Exclusive Periods because they have not used their prior exclusive periods to move the plan process forward or steer creditors toward consensus on any form of plan or plan structure.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) ("[T]he [exclusivity] test is better expressed as determining **whether terminating exclusivity would move the case forward materially**, to a degree that wouldn't otherwise be the case.") (emphasis added).  Rather than adopt an independent valuation for Oncor to negotiate a plan with creditor groups, or use exclusivity to bring the E-Side and T-Side Debtors' creditors to the bargaining table to negotiate a plan, the Debtors have chosen to conduct the Oncor Auction without (i) negotiating a chapter 11 plan with the E-Side Debtors' creditors that could serve as a backstop for the Oncor Auction or

(ii) resolving critical intercompany issues that will impact any Oncor transaction as well as creditor recoveries in connection therewith.  Furthermore, the Debtors have conducted themselves as if a successful Oncor Auction is a *fait accompli* that will facilitate resolution of the intercompany issues plaguing these cases and have declined to contingency-plan for the possible failure of the Oncor Sale Strategy.  Granting the requested 248-day extension would have the effect of empowering the Debtors to continue this pattern of disengagement with the E-Side Unsecured Creditors on plan issues.

16.     The Debtors' contention that they "have commenced substantial plan negotiations with **all** major creditor constituencies," D.I. 3338 ¶43 (emphasis added), is not substantiated. While the Debtors held a series of unconstructive, unstructured, mass gatherings for advisors to the E-Side and T-Side Debtors' constituents in November and early December, these meetings hardly qualify as the start of plan negotiations, much less "substantial" ones.  And upon information and belief, the Debtors have not proposed a plan to their creditors, shared a plan term sheet with any constituent, or provided written comments to the plan sponsor term sheets that they have received.  To say that the Debtors have commenced "substantial plan negotiations" thus stretches credibility.  The only plan discussions that are occurring in these cases are direct conversations that have been initiated, and are taking place, between creditor groups.

17.     In addition to raising concerns over a lack of plan progress, the EFIH Ad Hoc Committee has repeatedly raised concerns with the Debtors, verbally and in writing, about the efficacy of the Oncor Sale Strategy.  Fundamental issues that call into question the efficacy of the Oncor Sale Strategy remain unaddressed, such as:

- What happens to the Oncor Auction—and in the Debtors' chapter 11 cases—if no bid is received that satisfies in full all allowed claims of the E-Side Unsecured Creditors?

- How will the E-Side Debtors obtain the votes necessary to confirm their respective plans of reorganization if the Oncor Auction yields insufficient proceeds to repay in full all allowed claims of E-Side Unsecured Creditors?

- How do the Debtors plan to treat the disputed and contingent claims asserted by certain EFH and EFIH creditors on account of "make-whole" premiums and post-petition interest under a plan?

- Will the Debtors ensure that the E-Side Unsecured Creditors are given the opportunity to equitize their debt if the costs necessary to consummate a successful restructuring impair the E-Side Unsecured Creditors' allowed claims?

The EFIH Ad Hoc Committee has posed questions such as these to the E-Side Debtors and their advisors, but, so far, none of the E-Side Debtors or their advisors has attempted to articulate a strategic path forward for addressing any of these serious issues. While, at best, this may reflect the Debtors' confidence in their strategy, at worst, it demonstrates a lack of regard for the interests of E-Side Unsecured Creditors.

18. Although it is the Debtors' prerogative to choose a strategy and the creditors with whom they wish to negotiate, the 248-day extension shields the Debtors from accountability if the Oncor Sale Strategy fails. It also frustrates one of the purposes accomplished by exclusivity extension hearings—allowing the Court to poll creditors for their views on the status of the case. *See*, *e.g.*, *In re Indianapolis Downs*, No. 11-11046 (BLS), Hr'g Tr. at [13:11-15] (Bankr. D. Del. Aug. 26, 2011) [D.I. 410] ("[E]xclusivity in larger cases . . ., particularly at the early stages, [is] a kind of referendum . . . or a status on the case."). Given that "[t]he existence of good faith progress toward reorganization" is among the most important factors in considering an exclusivity extension, the Debtors' lack of progress toward achieving a confirmable chapter 11 plan for the E-Side or T-Side Debtors weighs against granting a lengthy exclusivity extension. *See Adelphia*, 352 B.R. at 586-87; *In re Residential Capital*, No. 12-12020 (MG), Hr'g Tr. at

[61:11-15] (Bankr. S.D.N.Y. Sept. 11, 2012) [D.I. 1428] ("[W]hether the debtor has made

progress in negotiations with its creditors" is "an important factor.").[6]

### B. The Exclusive Periods Should Not Extend Past June 2015 so That the Court and Creditors May Evaluate Case Progress in Light of Major Case Milestones

19.    Providing the Debtors with a 248-day extension makes little sense when evaluated

in light of the events that are likely to occur during the next few months.  Over the next 120 days,

a number of critical events are scheduled to occur that will shape the nature and trajectory of

these chapter 11 cases.  First, the Round 1 and Round 2 bid deadlines in the Oncor Auction are

set for March 2, 2015 and April 13, 2015, respectively.  Accordingly, the Debtors will likely have

selected the Stalking Horse and sought authority to enter into the Stalking Horse Agreement by

May 2015.  Second, the Debtors will likely have completed their document production under the

Legacy Discovery Protocol in February, and the T-Side Signatories are required to have

disclosed any claims for which they intend to seek standing under the Case Matters Protocol by

March 31, 2015.  Third, the E-Side Debtors' adversary proceedings will likely be resolved or

significantly advanced by April/May; the EFIH First Lien Adversary Proceeding is expected to

go to trial in March, and the motions to dismiss in both the EFIH Second Lien and PIK

Adversary Proceedings will likely be resolved this spring as well.  Thus, in 120 days, the Court

and creditors will be much better positioned to evaluate the progress the Debtors have made in

advancing these cases.

---

[6] Apart from boding against a lengthy exclusivity extension, the E-Side Debtors' failure to engage meaningfully with the EFIH Ad Hoc Committee on the issues set forth above evidences an abdication of their fiduciary duties to protect and conserve property of the estate for the benefit of creditors.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (holding that debtor has the fiduciary duty to maximize the value of the estate); *Home Ins. Co. of Ill. v. Adco Oil Co*., 154 F.3d 739, 743 (7th Cir. 1998) (holding that debtor has a fiduciary duty not to squander property of the estate).  This failure to acquit fiduciary duties is, in and of itself, an additional reason to deny a lengthy exclusivity extension.  *See In re New Meatco Provisions LLC*, No. 13-BK-22155-PC, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) (declining to extend exclusivity on account of the court's own doubts that the debtor fully appreciated its fiduciary duties to the estate and its creditors).

### C.  A 248-Day Extension Would Be Prejudicial to Creditors, but a Shorter Extension Would Not Prejudice the Debtors

20.      These cases are progressing very slowly, and the costs—in terms of professional fees and interest accrual on the EFIH Second Lien Notes—are staggering.  Though each month spent in chapter 11 results in at least $41 million in professional fees incurred and post-petition interest on the EFIH Second Lien Notes accrued,[7] the Debtors continue to exhibit no urgency to move these cases forward faster.  Given the level at which estate assets are being consumed, neither the Debtors nor the Court can allow these cases to languish.  With this backdrop, creditors' interests would be better served if the Debtors were given a more limited exclusivity extension, requiring the Debtors to report to the Court and their constituents on their progress in a few months' time.  Such an approach would respect the balance Congress intended in enacting Bankruptcy Code section 1121.  *See Timbers*, 808 F.2d at 372 ("[Exclusivity is] a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise.").  E-Side Unsecured Creditors cannot afford to be held hostage to the Oncor Sale Strategy for any longer than necessary, and the Court, through extending the Exclusive Periods in shorter increments, can provide unsecured creditors with an opportunity to protect their interests and stem the erosion of estate value.

21.      In addition, a more modest 120-day exclusivity extension would not prejudice the Debtors.  Rather, the Debtors would maintain exclusivity for the next four months, during which time they could continue on their chosen strategic path without creditor interference.  If, at the end of 120 days, the Debtors can show that they have made satisfactory progress in advancing plan negotiations, they retain the ability to request another extension, and may very well merit

---

[7] This figure does not include fees incurred by non-estate-retained professionals or the fees of recently retained professionals, including those of the E-Side Creditors' Committee or the Debtors' conflicts matters professionals.

one.  And the Debtors' cost in returning to the Court to request an additional extension is a

modest one in exchange for preserving the balance struck by Congress to avoid keeping creditors

"hostage" to chapter 11 debtors.  *See Timbers*, 808 F.2d at 372.

### D.  A 248-Day Extension Is Unprecedented and Unwarranted

22.      The Debtors place heavy reliance on the size and complexity of these chapter 11

cases to support their request for a 248-day extension.  *See* D.I. 3338 ¶39 ("[S]ize and

complexity of a debtor's case, in itself, is an appropriate basis upon which to extend

exclusivity.").  While the Debtors' cases are large and complex, that factor alone does not

warrant an extension, let alone one of the magnitude requested.  *See*, *e.g.*, *In re Pub. Serv. Co. of

N.H.*, 88 B.R. 521, 537 (Bankr. D.N.H. 1988) ("[S]ize and complexity must be accompanied by

other factors . . . to justify extension of plan exclusivity . . . ."); *see also Official Comm. of

Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l

Hosp.),* 282 B.R. 444, 452 (B.A.P. 9th Cir. 2002) (recognizing as "debunked" the view that

complex cases require extended exclusivity) (internal citations omitted).

23.      Moreover, such a lengthy extension is unprecedented in the District of Delaware.

*See*, *e.g.*, *In re Wash. Mutual, Inc.*, No. 08-12229 (MFW) (Bankr. D. Del. Nov. 20, 2009) [D.I.

1925] (granting a 90-day exclusivity extension; no longer extension was granted); *In re Tribune

Co.*, No 08-13141 (KJC) (Bankr. D. Del. April 23, 2009) [D.I. 1075] (granting an initial 120-day

exclusivity extension; no longer extension was granted).  In other jurisdictions, exclusivity

extensions in cases of similar size and complexity have been limited to of 120 days or less as

well.  *See*, *e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Sept. 11,

2012) [D.I. 1413] (granting an initial 100-day exclusivity extension; no longer extension was

granted); *In re Motors Liquidation Co.*, No. 09-50026 (REG) (Bankr. S.D.N.Y. May 27, 2010)

[D.I. 5896] (granting a 120-day exclusivity extension; no longer extension was granted); *In re

*Adelphia Commn'cns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Oct. 25, 2002) [D.I. 949] (granting in initial exclusivity extension of 180 days; subsequent extensions were 120 days or less).[8] There are no special considerations that distinguish the Debtors' chapter 11 cases from these other large and complex cases, in which more modest exclusivity extensions were sufficient and appropriate.

24.    Moreover, nowhere in the Motion do the Debtors assert that they actually *need* 248 days—or an extension of even close to that magnitude—to negotiate a plan and prepare adequate information.  And it is their burden to demonstrate that need.  *See Mirant*, 2004 WL 2250986, at *2-3 (stating that the burden is the debtor's, and affirming bankruptcy court's decision to grant the debtor an abbreviated extension fashioned by the court in lieu of one requested by debtor); *Adelphia*, 352 B.R. at 586-87 (identifying "the **necessity** for sufficient time to permit the debtor to negotiate a plan of reorganization" as a factor for the court's consideration in extending exclusivity) (emphasis added); *see also In re Cent. Jersey Airport Servs.*, *LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002) (same).

25.    Apart from the lack of precedent for an extension of this magnitude and the lack of evidence demonstrating the need for one, shortening the extension would materially advance these cases.  *See Adelphia*, 352 B.R. at 586-7.  First, a shorter extension would put appropriate pressure on the Debtors to advance plan negotiations and to work efficiently in formulating a plan.  Second, a shorter extension would bring the Debtors back before the Court sooner,

---

[8] The Debtors cite only *Lehman* as an example, since enactment of the 2005 Bankruptcy Code amendments that capped the duration of plan exclusivity at eighteen months, in which a court granted a contested exclusivity extension of the magnitude requested.  *See* D.I. 3338 ¶49.  But *Lehman*'s cases were of a size and complexity unrivaled in history.  *See In re Lehman Brothers Holdings, Inc*., No. 08-1355 (SCC), Hr'g Tr. at [134:9-19] (Bankr. S.D.N.Y. July 15, 2009) [D.I. No. 4440] (in granting an exclusivity extension, stating "[i]t becomes almost trite to say that this is the largest and most complex bankruptcy in history.  But . . . it really is . . . [requiring parties] to unravel what is perhaps the most complicated financial disaster in recorded history").  While the Debtors' cases are indeed large and complex, they do not present nearly the same systemic failure issues that justified the comparatively long extension in *Lehman*.

facilitating the Court's monitoring of their progress and elevating the significance of creditor input.  *See*, *e.g.*, *In re Residential Capital*, No. 12-12020 (MG), Hr'g Tr. at [62:11-19] (Bankr. S.D.N.Y. Sept. 11, 2012) [D.I. 1428] ("If the debtor wants to maintain exclusivity. . . it needs to move forward with negotiations with . . . important creditor constituencies.  And I plan to keep a tight leash on it . . . by selecting a date shorter than all of you have suggested for an extension . . . .").  Thus, a 120-day extension would do much to keep these cases moving forward toward resolution.

[*remainder of page intentionally left blank*]

## CONCLUSION

**WHEREFORE**, for the reasons set forth in this Limited Objection, the EFIH Ad Hoc

Committee respectfully requests that the Court (a) limit any extension of the Exclusive Periods to

not more than 120 days and (b) grant such other and further relief as the Court deems just, proper

and equitable.

Dated:  February 4, 2015
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

_/s/ William E. Chipman, Jr._
William E. Chipman (No. 3818)
Mark Olivere (No. 4291)
Ann M. Kashishian (No. 5622)
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
Telephone:     (302) 295-0191
Facsimile:     (302) 295-0199
Email:            chipman@chipmanbrown.com
                     olivere@chipmanbrown.com
                     kashishian@chipmanbrown.com

                     *- and -*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:     (212) 872-1000
Facsimile:     (212) 872-1002
Email:            idizengoff@akingump.com
                     aqureshi@akingump.com

Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone:     (202) 887-4000
Facsimile:     (202) 887-4288
Email:            salberino@akingump.com

*Co-Counsel for the EFIH Ad Hoc Committee*