**<u>Appendix of Excerpts from Transcripts Cited</u>**

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  DISTRICT OF DELAWARE
3
4
5  In re:                        :
                                 :     Chapter 11
6  ENERGY FUTURE HOLDINGS        :
   CORP., et al.,                :     Case No. 14-10979(CSS)
7                                :
         Debtors.                :     (Jointly Administered)
8  _____
9
10
11
12                      United States Bankruptcy Court
13                      824 North Market Street
14                      Wilmington, Delaware
15
16
17                      October 17, 2014
18                      9:25 AM - 2:45 PM
19
20
21  B E F O R E :
22  HON CHRISTOPHER S. SONTCHI
23  U.S. BANKRUPTCY JUDGE
24
25  ECR OPERATOR:  LESLIE MURIN

VERITEXT REPORTING COMPANY
212-267-6868            www.veritext.com            516-608-2400

Page 2

1  HEARING re Motion of Energy Future Holdings Corp., et al.,
2  for Entry of an Order Extending the Period Within Which the
3  Debtors May Remove Luminant Generation Company, LLC v. Titus
4  County Appraisal District [D.I. 1990; filed September 10,
5  2014]
6
7  HEARING re Motion for Entry of an Order Authorizing
8  Wilmington Savings Fund Society, FSB to File Under Seal (I)
9  an Unredacted Version of its Objection to Motion of Energy
10 Future Holdings Corp., et al., for Entry of an Order (A)
11 Approving Bidding Procedures, (B) Scheduling an Auction and
12 Related Deadlines and Hearings, and (C) Approving the Form
13 and Manner of Notice Thereof and (II) Exhibits 1 and 2 to
14 the Declaration of Jeremy B. Coffey in Support of the
15 Objection [D.I. 2370; filed October 10, 2014]
16
17 HEARING re Motion of Energy Future Holdings Corp., et al.,
18 for Entry of an Order (A) Approving Bidding Procedures, (B)
19 Scheduling an Auction and Related Deadlines and Hearings,
20 and (C) Approving the Form and Manner of Notice Thereof
21 [D.I. 2087; filed September 19, 2014]
22
23
24 Transcribed by:  Dawn South, Sherri A. Breach, and Pamela A.
25 Skaw

VERITEXT REPORTING COMPANY
212-267-6868            www.veritext.com            516-608-2400

Page 64

1  Q    Did you review that before it was filed?
2  A    Yes, I did.
3  Q    And have you also submitted a declaration in support of
4  that motion?
5  A    I have.
6  Q    And behind the second tab there at Docket 2088, is that
7  your declaration?
8  A    Yes, it is.
9  Q    What role specifically did you have in developing the
10 bidding procedures described in the motion?
11 A    Well, I think probably the primary contribution that I
12 made was to advance the concept that, unlike a typical
13 bankruptcy stalking horse process where you choose a
14 stalking horse not in a competitive auction environment,
15 necessarily, and without the kind of same degree of
16 structure that you would have in an out-of-court process,
17 that it made sense to -- given some particular reasons that
18 I'll come to in a minute -- is it made sense to, in effect,
19 take a typical out-of-bankruptcy two-stage sealed big
20 auction process as the method for choosing the stalking
21 horse process and append that to the normal open auction
22 that you traditionally see in bankruptcy.  So rather than a
23 short stalking horse selection process followed by a long
24 open auction process, we've really reversed that and gone to
25 a longer stalking horse process with a shorter open auction

VERITEXT REPORTING COMPANY
212-267-6868            www.veritext.com            516-608-2400

Page 65

1  process.
2       Now, the reasons for coming to that decision are
3  several fold.  First, in the course of the earlier marketing
4  effort where we were telling bidders -- we didn't give them
5  a definitive date but we told them, you know, we would need
6  to get something from you by no later than the end of August
7  and that we might actually sign up a stalking horse bid
8  sooner than that.  Several potential bidders indicated that,
9  while they thought they could get to a bid that would be
10 competitive or superior to NextEra's bid, that they needed
11 more time and they could not meet that time frame.
12      There were also bidders who actually refused to
13 sign NDA's because they said look, your process is just too
14 short, we can't deal with that so we're not going to waste
15 our time.  So input from the bidders that they needed more
16 time was quite important.
17      We also got input from varying creditor
18 constituencies, particularly Lazard.  Lazard expressed the
19 view that we should have a longer stalking horse process and
20 they further expressed the view that utilities, generally
21 being conservative by nature, might be less likely to
22 participate in an open auction process.  They had -- they
23 said that there are very few instances where a utility
24 strategic has jumped a deal that had been signed up by
25 another utility and they felt that, therefore, the stalking

VERITEXT REPORTING COMPANY
212-267-6868            www.veritext.com            516-608-2400

Page 66

horse process was the most important part because they had reservations as to whether people would participate in the open auction process.

Now, we reviewed some data on that point and, yes, we felt Lazard was accurate, that there were only a limited number of circumstances where one strategic utility had jumped another strategic utility's deal. I didn't feel quite as strongly as Lazard that, you know, the open auction -- that no one would participate in the open auction. I think it's possible there are some aggressive players who will but, nevertheless, I thought their concern had some validity to it and that was another reason why we opted for a longer stalking horse process and a shorter open auction process.

With respect to the structure of our up-front process, i.e., two stages and sealed bids, that's quite a common structure. I think everyone accepts the fact that that two-stage sealed bid process is effective at creating the best possible value and it's not just value in economic terms, it's value in contract terms. One of the disadvantages, again, that I felt existed in purely selecting a stalking horse without a competitive auction process was that the contract that you negotiate with him then becomes the basis for bidding an open auction and, effectively, you get drawn down to the lowest level because

Page 67

there's been no real competition in terms of negotiating those contract terms. So for all those reasons, we designed the process that we did.

Q    And --

THE COURT: You said -- I'm sorry, you said that a two-stage sealed process is common. Common where?

THE WITNESS: Outside of bankruptcy, sir.

BY MS. O'CONNOR:

Q    Mr. Hiltz, what, in your view, is the overall purpose of these bidding procedures?

A    The overall purpose of these bidding procedures is to maximize not only the economic value but the contract terms and certainty associated with the bid for the benefit of the estates as a whole.

Q    Let's talk about the timing of the procedures. When did the debtors first decide to market the Oncor assets?

A    This was, obviously, before my involvement but I believe the debtors first decided the -- to market the Oncor assets following the receipt of the NextEra bid on July 16th. That bid was important in at least two respects. Obviously, it offered a more attractive value than had been offered in the context of the second lien dip and, secondly, it also showed us a structure that we had not been aware of that would allow us to sell the entirety of a reorganized EFH in a tax free format that would avoid a very substantial

Page 68

tax liability. So that was really -- the receipt of that bid and understanding that bid represented something of a watershed event and, again, caused the company to elect to move forward both to negotiate with NextEra and to solicit other interest.

Q    And --

MR. SHORE: Motion to strike, Your Honor, lack of personal knowledge. The answer started out that was before my time and then we had a long narrative answer about things that happened before his time. We have other witnesses who are percipient and can answer that question later.

THE COURT: Ms. O'Connor?

MS. O'CONNOR: As the lead M&A point person with the Evercore team, Mr. Hiltz, through his work, is well aware of the time line through the docket and otherwise of the facts that preceded his work and the work that he work -- based his own work on.

THE COURT: I don't think he can testify as to debtor intent before he had any knowledge of what was going on. I think it's hearsay so motion to strike's granted. You can put -- you can get through that through witnesses who were actually there at the time.

MS. O'CONNOR: Okay.

THE COURT: It's one thing -- let me expand. It's one thing for him to talk about, generally speaking, what

Page 1

```
UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


In re:                       :
                             :    Chapter 11
ENERGY FUTURE HOLDINGS       :
CORP., et al.,               :    Case No. 14-10979(CSS)
                             :
          Debtors.           :    (Jointly Administered)
_____



                    United States Bankruptcy Court
                    824 North Market Street
                    Wilmington, Delaware



                    November 3, 2014
                    1:06 PM - 1:34 PM


B E F O R E :
HON CHRISTOPHER S. SONTECHI
U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  LESLIE MURIN
```

Page 2

HEARING re Motion of Energy Future Holdings Corp., et al., for Entry of an Order Extending the Period Within Which the Debtors May Remove Luminant Generation Company, LLC v. Titus County Appraisal District [D.I. 1990; filed September 10, 2014]

HEARING re Motion for Entry of an Order Authorizing Wilmington Savings Fund Society, FSB to File Under Seal (I) an Unredacted Version of its Objection to Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof and (II) Exhibits 1 and 2 to the Declaration of Jeremy B. Coffey in Support of the Objection [D.I. 2370; filed October 10, 2014]

HEARING re Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Related Deadlines and Hearings, and (C) Approving the Form and Manner of Notice Thereof [D.I. 2087; filed September 19, 2014]

Transcribed by:  Dawn South

Page 15

    I will start with the legal standard, but first I want to address the specific objection relating to what is it that the debtors are seeking here.
    Several of the objectors have argued that the debtors are seeking to sell the equity in reorganized EFH Corp. which is an asset that doesn't currently exist and that the debtors do not and will never own.  That is an inaccurate description of what is going on here.
    The debtors are seeking competitive bids to enter into a transaction of any type with regard to Oncor.  They have made it clear however that they favor their preferred tax plan, so it is fair to view the motion as seeking a transaction that would serve as the basis for a reorganization plan.  In that instance they are not specifically selling an asset, but Section 363(b) is not limited to the sale of assets.  It states that a debtor may use, sell, or lease property.
    Here the debtors are auctioning off the right to enter into a contract that will serve as the basis for a proposed plan of reorganization.  That is clearly within the ambit of Section 363.  Excuse me.
    Moving on.  The bidding procedures motion and the proposed bidding procedures are clearly outside the debtors' ordinary course of business and require Court approval after notice and a hearing.

Page 16

    Let me pause here and address the point that the debtors are seeking something they normally would not.  Advance approval of bidding procedures to select a stalking horse bidder.
    Implicit in that argument is that the Court could provide greater deference to the debtors' proposed action.  The Court disagrees.  Even were the debtors not to have sought prior Court approval of bidding procedures for selection of a stalking horse that decision, i.e., the selection of the stalking horse, would require Court approval and would be integral to the Court's decision as to whether to approve the stalking horse.
    The question then would be how did we get here?  In other words, the stalking horse bidding procedure would be subject to Court scrutiny either ahead of time as here or afterwards as is normally done.
    Moreover, the evidence here strongly suggests that all of the bidding action is likely to occur prior to the selection of a stalking horse bidder.  Thus Court and creditor involvement at this stage is important.
    To approve the motion the Court must find that the debtors have satisfied the business judgment standard under 363(b)(1), i.e., is the proposed action supported by a sound business reason and based on a sound exercise of business judgment?

Page 17

1  The business judgment test here differs from the
2  general corporate law business judgment rule which protects
3  corporate directors are liability when they have exercised
4  due care and are not self-interested in the transaction.
5  Here by contrast the Bankruptcy Court reviews the
6  debtors' business judgment to determine independently
7  whether the judgment is a reasonable one.
8  The Court should not substitute its judgment for
9  the debtors; however, but should determine only whether the
10 debtors' judgment was reasonable and whether a sound
11 business justification exists supporting the transaction and
12 its terms.
13 That said, in making the Court's determination it
14 might import where appropriate principals of state law
15 governing the exercise of fiduciary duties such as requiring
16 a debtor to demonstrate the entire fairness of a proposed
17 transaction where the directors and/or management are self-
18 interested.
19 The Court does not find however that the debtors
20 need satisfy the entire fairness standard in connection with
21 the bidding procedures motion, rather the Court finds that
22 the debtors have satisfied the business judgment standard
23 under Section 363(b) and will grant the bidding procedures
24 motion subject to several significant and important
25 conditions.

Page 24

1  I am also reluctant to specify the exact manner in
2  which the debtors are to inform the Court and the parties
3  regarding whether the various boards have voted to approve
4  the bids procedures as modified. I think that either board
5  merits or certifications specifying the action taken in the
6  manner in which the issue is determined, i.e., who was
7  present, were presentations made, et cetera, should be
8  sufficient. I look to the debtors and the objectors to work
9  out a reasonable procedure. If you cannot work it out I
10 will get involved in the process.
11 It probably makes sense to codify that procedure
12 in a court order, and it may make sense to have a bidding
13 procedures order that contains as a condition to its
14 effectiveness submission of that information. Again, the
15 Court will look to the objectors and the debtors on this.
16 Just to be clear, however, we are not going to
17 have another hearing on the merits of the decision. If the
18 Court is unsatisfied with the submission of the results of
19 the boards' deliberations either in form or substance the
20 Court will inform the parties.
21 Similar submissions will need to be made in
22 connection with approval of stalking horse agreement and the
23 ultimate winning bidder.
24 There was a tremendous amount of evidence elicited
25 by the objectors in an attempt to challenge not just the

Page 25

1  process by which the debtors made their decision to pursue
2  marketing the Oncor business, which I previously addressed,
3  but the substance of that decision as well.
4  The objectors argue that the debtors are making a
5  critical error in pursuing their preferred tax transaction
6  at all, marketing Oncor prior to even beginning negotiations
7  over a plan with the creditors, freezing out creditors in
8  the process, and several other arguments.
9  Moreover, the objectors assert that the filing and
10 pursuit of this motion drastically undercuts the progress
11 that had been made over the summer in establishing the
12 protocols regarding investigations of claims, et cetera.
13 At heart the objectors take issue with the
14 debtors' entire reorganization strategy.
15 In making its ruling the Court is specifically not
16 opining on the merits of the debtors' -- the merits of the
17 debtors' proposed course of action nor its preferred tax
18 structure. The business judgment standard correctly
19 requires deference to a debtor's business and reorganization
20 strategy, especially during exclusivity. There is no where
21 near a sufficient record before the Court for it to take the
22 extraordinary step of overruling the debtors' proposed
23 decision to market its assets or to pursue a specific
24 negotiation strategy in developing its proposed plan of
25 reorganization.

Page 26

1  That said, I do not believe the objectors are
2  being obstructionists here. While they clearly have a
3  different view of this case than the debtors, and many, if
4  not most of the other creditors, they have limited their
5  objections and actions to issue core to their theory of the
6  case. There have been numerous motions, including the
7  insider compensation motion to which they have either
8  assented or not objected.
9  Finally, the Court strenuously urges the parties
10 to begin plan negotiations as soon as possible. Some issues
11 will necessarily need to be put off. For example, time is
12 necessary to allow for the ongoing investigation by the T
13 side creditors into potential causes of action, et cetera,
14 to be completed, but opening that dialogue sooner rather
15 than later, even over a dinner, can only be beneficial for
16 all parties.
17 That concludes the Court's ruling. The floor is
18 open for my questions. But if you are participating by
19 phone please make sure to identify yourselves on the record.
20 All right, I hear none.
21 Obviously there'll be work to be done before an
22 order can be submitted to the Court, which ultimately I
23 suppose would be done under certification of counsel.
24 As I indicated, to the extent difficulties arise
25 in coming up with a procedure and the details of an order

Page 27

1  implementing the Court's ruling I'll make myself available
2  to resolve any duties.  All right?
3          Mr. Sassower?
4          MR. SASSOWER:  Thank you.
5          THE COURT:  You're welcome.  Thank you very much.
6  We're adjourned.
7          (Whereupon, the proceedings concluded at 1:34 PM)
8                        * * * * *

Page 28

                    I N D E X
                    RULINGS
                                    Page    Line
Court's Ruling                       7       9

```
                                                    Page 1
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3   - - - - - - - - - - - - - - - - - - -)
 4   In the Matter of:                    )
 5   INDIANAPOLIS DOWNS, LLC, ET AL.,     ) 11-11046 (BLS)
 6         Debtors.                       )
 7         (Jointly Administered)         )
 8   - - - - - - - - - - - - - - - - - - -)
 9   INDIANAPOLIS DOWNS, LLC, AND
10   INDIANA DOWNS CAPITAL CORP.,         ) 11-51996 (BLS)
11                Plaintiffs.
12         v.
13   POWER PLANT ENTERTAINMENT
14   CASINO RESORTS,
15   INDIANA, LLC; PPE CASINO RESORTS
16   MARYLAND, LLC; THE CORDISH COMPANY; PENN
17   NATIONAL GAMING, INC.; THE MARYLAND
18   JOCKEY CLUB, INC.; MARYLAND JOCKEY CLUB
19   VENTURES, LLC; MARYLAND JOCKEY CLUB OF
20   BALTIMORE CITY, INC.;
21   MI DEVELOPMENTS, INC.; AND FRANK STRONACH.
22                Defendants.
23   - - - - - - - - - - - - - - - - - - -)
24
25
                     VERITEXT REPORTING COMPANY
     212-267-6868         www.veritext.com        516-608-2400
```

```
                                                    Page 2
 1
 2   FCOF II UBX SECURITIES LLC,
 3   FCOF UB SECURITIES LLC AND THE AD HOC
 4   SECOND LIEN COMMITTEE,             ) 11-52758 (BLS)
 5                Plaintiffs.
 6         v.
 7   INDIANAPOLIS DOWNS, LLC, ROSS J. MANGANO,
 8   AS TRUSTEE OF THE JANE C. WARRINER TRUST
 9   DATED FEBRUARY 26, 1971,
10   - - - - - - - - - - - - - - - - - - -)
11   AND THE ANNE C. MCCLURE TRUST DATED
12   FEBRUARY 26, 1971, RESPECTIVELY,
13   - - - - - - - - - - - - - - - - - - -)
14   AND TROON AND CO., AN INDIANA PARTNERSHIP,
15                Defendants.
16   - - - - - - - - - - - - - - - - - - -)
17                U.S. Bankruptcy Court
18                824 North Market Street
19                Wilmington, Delaware
20                August 26, 2011
21                9:39 AM
22   B E F O R E:
23   HON. BRENDAN L. SHANNON
24   U.S. BANKRUPTCY JUDGE
25   ECR OPERATOR:  DANA MOORE
                     VERITEXT REPORTING COMPANY
     212-267-6868         www.veritext.com        516-608-2400
```

```
                                                   Page 11
 1         THE COURT:  Sure.
 2         MR. HINKER:  -- the extension for exclusivity.  Thank
 3   you.
 4         MS. MITCHELL:  Good morning, Your Honor.
 5         THE COURT:  Good morning.
 6         MS. MITCHELL:  Nancy Mitchell of Greenberg Traurig, on
 7   behalf of the debtors.
 8         Just as a preliminary matter, we submitted three
 9   declarations in the support of the motion to extend exclusivity
10   and the reply.  Both, with the initial motion and with the
11   reply, we submitted declarations of Gregory F. Rayburn, the
12   debtors' chief restructuring officer.  And in connection with
13   the reply, we submitted a declaration of Joseph E. Miller III,
14   who's a director of Lazard and the debtors' financial adviser.
15         We've spoken with our colleagues at Akin and Stroock,
16   and they agreed that we could admit the declarations and
17   indicated they did not intend to cross examine Mr. Rayburn --
18         THE COURT:  Okay.
19         MS. MITCHELL:  -- or Mr. Miller.  So I'd like to admit
20   the declarations into --
21         THE COURT:  Okay.
22         MS. MITCHELL:  -- evidence.
23         THE COURT:  That would be fine.  You have copied of
24   them?  I know I've got them here, but can I have some extra
25   copies, please?
                     VERITEXT REPORTING COMPANY
     212-267-6868         www.veritext.com        516-608-2400
```

```
                                                   Page 12
 1   (Declarations of Gregory Rayburn and Joseph Miller was hereby
 2   admitted into evidence as Debtors' Exhibit for identification,
 3   as of this date.)
 4         MS. MITCHELL:  Matt will get you copies.  They're in
 5   my --
 6         THE COURT:  All right.  Well, we can move forward
 7   while that's happening.
 8         MS. MITCHELL:  Okay.  Your Honor, we've submitted a
 9   fairly detailed reply in which we address a number of the
10   issues in question, and I'm happy to proceed with oral argument
11   if that's the way Your Honor would like to do it, or if you'd
12   like to ask questions.
13         THE COURT:  I think I do have some questions, but I
14   guess what I would suggest is why don't we proceed largely by
15   argument as -- if the debtors -- is anybody looking to proceed
16   with witnesses today on the exclusivity issue?
17         Okay.  I mean, it seemed to me -- I did receive your
18   response, you know, although I think I left it on my desk.  Do
19   you have another copy of the response that you submitted, the
20   one that's unredacted?
21         MS. MITCHELL:  I think I have it.
22         THE COURT:  Somebody does.  Okay.  I reviewed it, and
23   I've -- I have, but it's not that -- actually in the binder --
24         MS. MITCHELL:  I have the declarations --
25         THE COURT:  -- which means I left it --
                     VERITEXT REPORTING COMPANY
     212-267-6868         www.veritext.com        516-608-2400
```

Page 13

1   MS. MITCHELL: -- and the unredacted --
2   THE COURT: -- on my desk somewhere.
3   MS. MITCHELL: -- copy in my binder if we need to give
4  them. Do we have the declarations?
5   THE COURT: Okay.
6   MS. MITCHELL: I can approach --
7   THE COURT: Sure.
8   MS. MITCHELL: -- with the declarations.
9   THE COURT: Thanks. You know what I'd -- you know
10 what I'd like? The way that -- and I'm not saying anything out
11 of school -- the way that I've always thought about exclusivity
12 in larger cases is that I sort of think of it, particularly at
13 the early stages, as kind of a referendum on the case or a
14 status on the case. And if progress is being made, then that's
15 responsive, you know. There's -- case law gives us a whole
16 stack of factors, elements, tests that we look to. But really
17 the question is, is progress being made, not whether or not
18 peace has broken out, but frankly is --
19  MS. MITCHELL: Right.
20  THE COURT: -- the process moving forward. And this
21 is -- this case, in many ways, has been from the Court's point
22 of view -- I'm sure that -- I mean, I gather that people have
23 been very active, but frankly from the Court's point of view
24 it's been pre --
25  MS. MITCHELL: Yeah.

Page 14

1   THE COURT: -- pretty quiet, which is -- I've had
2  plenty of cases that, from the Court's point of view, seemed
3  like a love fest, and then all of a sudden all hell breaks
4  loose. And --
5   MS. MITCHELL: Well --
6   THE COURT: -- that hasn't necessarily happened here.
7  But I think I'd like some guidance on -- and I kn -- I have
8  read your papers, but, you know, where are you? And where are
9  you headed?
10  MS. MITCHELL: Yeah. Your Honor, let me start -- and
11 I'll start there with where we are, which is the reason the
12 cases, to some extent, have not been that active is because the
13 initial four-month period that we've spent in the case so far,
14 from the debtors' perspective, has largely been about doing the
15 things that we said we were going to do in our first day
16 declaration. And that is really to remake the operations of
17 the casino, which -- and we did, in the declaration, indicate
18 that we were going to move forward with a revised business plan
19 and implement operational improvements.
20      What we didn't know, frankly, is how hard that was
21 going to be or how much there really needed to be done to the
22 operations when we filed the cases. We had thought, going into
23 the cases, that we had a pretty good operation that we were
24 looking at improving. What Mr. Rayburn found when he got into
25 the facility was that, in fact, the margins had been

Page 15

1  deteriorating rather significantly. Our patron count had been
2  deteriorating rather significantly through the first part of
3  the year. And so, it became more difficult to produce the
4  business plan because there were a lot of operational
5  improvements that had to be done.
6       And it's hard to convey standing here, frankly -- and
7  I'm a lawyer, so I'm not even sure I know how hard it was for
8  Mr. Rayburn and Mr. Mangano and our management team to actually
9  really get into the facility and do what they've done in the
10 four months of the case. But you've -- I'm not sure I should
11 say this. You've been to a casino, so you would have
12 familiarity with some of the things that are important to
13 that -- a casino. And, for example, we have -- we have remade
14 our slot floor completely, which, when you're a slot barn -- I
15 hope Mr. Rayburn doesn't hit me for that -- is actually an
16 important component --
17  THE COURT: Sure.
18  MS. MITCHELL: -- of the facility. They have also
19 revamped the marketing and promotional programs, which, again,
20 a critical part of what you do and have driven additional
21 patron count into the facility.
22      They have reworked the food and beverage offerings. I
23 thought they were fine, but they've reworked them completely.
24 And they seem to be taking hold and have brought in some
25 additional customers. We've completely rebuilt the

```
                                                                    1
 1
 2   UNITED STATES BANKRUPTCY COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Case No. 12-12020-mg
 5   - - - - - - - - - - - - - - - - - - - - -x
 6   In the Matter of:
 7
 8   RESIDENTIAL CAPITAL, LLC, et al.,
 9
10           Debtors.
11
12   - - - - - - - - - - - - - - - - - - - - -x
13
14              United States Bankruptcy Court
15              One Bowling Green
16              New York, New York
17
18              September 11, 2012
19              10:06 AM
20              2:04 PM
21
22   B E F O R E:
23   HON. MARTIN GLENN
24   U.S. BANKRUPTCY JUDGE
25
              eScribers, LLC | (973) 406-2250
          operations@escribers.net | www.escribers.net
```

```
                                                                    2
 1   AM SESSION
 2   Status Conference RE:  Debtors Motion Pursuant to Fed. R.
 3   Bankr. P. 9019 for Approval of the RMBS Trust Settlement
 4   Agreement [Docket No. 320]
 5
 6   (CC: Doc no. 1303) Notice of Supplemental Application Pursuant
 7   to Sections 328 and 1103 of the Bankruptcy Code and Federal
 8   Rule of Bankruptcy Procedure 2014 for an Order to Expand the
 9   Scope of Retention of Moelis & Company LLC as Investment Banker
10   to the Official Committee of Unsecured Creditors of the Debtors
11   Nunc Pro Tunc to August 1, 2012
12
13   (CC: Doc no. 1281) Application Of The Official Committee Of
14   Unsecured Creditors For Entry Of An Order Authorizing The
15   Employment And Retention Of San Marino Business Partners LLC As
16   Consultant To The Committee, Nunc Pro Tunc To August 11, 2012
17   filed by Philip Bentley on behalf of Official Committee Of
18   Unsecured Creditors
19
20   (CC: Doc # 1248) Motion to Extend Exclusivity Period for Filing
21   a Chapter 11 Plan and Disclosure Statement/Debtors' Motion for
22   the Entry of an Order Extending Their Exclusive Periods to File
23   a Chapter 11 Plan and Solicit Acceptances Thereof
24
25   (CC: Doc # 1245) Debtors' Motion for an Order Pursuant to
              eScribers, LLC | (973) 406-2250
          operations@escribers.net | www.escribers.net
```

```
              RESIDENTIAL CAPITAL, LLC, ET AL.          59
 1   relationship has been strained and had been strained prior to
 2   bankruptcy -- and nobody likes to talk about that and you'd
 3   have a different perception if you only read the committee's
 4   papers -- but AFI, whether we like it or not, agreed to do a
 5   number of things that were necessary to give this company a
 6   soft landing.  And the examiner's going to have the last word
 7   on AFI.  We accept that.
 8           THE COURT:  The examiner's not going to have the last
 9   word on anything.
10           MR. MARINUZZI:  Your Honor, I apologize.
11           THE COURT:  That's the point, Mr. Marinuzzi.  Because
12   whatever the examiner decides, there will be various
13   stakeholders who disagree, believe that there are transactions
14   he didn't identify as giving rise to potential claims or claims
15   that he did identify that the debtors or AFI disagree.  So it
16   is not the last word.  Uncertainty is what causes negotiation.
17   It's another data point, an important data point, obviously,
18   but not the determinative factor.
19           MR. MARINUZZI:  Fair point, Your Honor.  Fair point.
20           So what did AFI do?  They agreed to serve as the
21   stalking bidder for the debtors' whole loan portfolio.  They
22   agreed to provide debtor-in-possession financing.  They agreed
23   to support the debtors' continued origination of mortgage loans
24   in bankruptcy.  They agreed to continue through a shared
25   services agreement to allow the debtors to continue to utilize
              eScribers, LLC | (973) 406-2250
          operations@escribers.net | www.escribers.net
```

```
              RESIDENTIAL CAPITAL, LLC, ET AL.          60
 1   back office support, payment systems and other internal systems
 2   established by the parent to operate the debtors' businesses.
 3           They're working with the debtors right now to assist
 4   in separating those services to allow for a seamless sale of
 5   the platform.
 6           Has everything with AFI gone smoothly?  Of course not.
 7   Your Honor has seen it; Your Honor will continue to see it.
 8           THE COURT:  And they're acting as an eleemosynary
 9   institution and all their asking for is the third-party
10   nondebtor releases --
11           MR. MARINUZZI:  Your Honor, whether --
12           THE COURT:  -- to get out from under all their
13   liabilities.
14           MR. MARINUZZI:  -- whether it's motivated by
15   selfishness or selflessness, the point that I'm trying to make
16   so it's not lost is that the company had --
17           THE COURT:  Okay.  The company -- I have, what, fifty-
18   three debtors.  I don't know if that's the right number; it's
19   approximately the right number.
20           MR. MARINUZZI:  Fifty-one, I believe.
21           THE COURT:  Fifty-one?  I've got fifty-one debtors.
22   That's what's before me.  Okay.  The debtors have to move
23   forward with a plan process.
24           AFI is an important stakeholder, an important party to
25   this.  I don't underestimate their importance now, in the past,
              eScribers, LLC | (973) 406-2250
          operations@escribers.net | www.escribers.net
```

**RESIDENTIAL CAPITAL, LLC, ET AL.** 61

in the future to getting this through as a successful case. But it's the debtors that are before me. It's the debtors who have exclusivity and must propose a plan unless and until exclusivity is lifted.

Judge Gerber, in Adelphia Communications, 352 B.R. 578 (Bankr. S.D.N.Y 2006), identifies nine nonexclusive factors that courts should examine in determining whether to extend exclusivity. I've applied those factors in the Borders case, I applied those factors in a case called Lexington Precision, I've applied the factors in other cases. Among the factors that the court, that Judge Gerber focused on was whether the debtor has made progress in negotiations with its creditors. It's not the only factor but it's one of many. There are others, I think, that bear on where we are today, but it's an important factor. And what I'm concerned about is that you point to the uncertainties, some of which will hopefully -- will be resolved along the way if the sales of the loan platform and the legacy loan portfolio are approved, it'll be a major milestone. I don't underestimate that. You can certainly proceed on the assumption that those sales will take place and will close and the proceeds that they'll generate as a basis for moving forward with plan negotiations now, not sometime next year, now.

What I'm concerned about is -- it's very easy for all of you to point to the uncertainties and ambiguities and

**RESIDENTIAL CAPITAL, LLC, ET AL.** 62

everything else about this case; the case is not going to sit here and wait for those to clarify. Because at the end of the day, I have a feeling it will be -- they won't be clarified sufficiently; particularly, the examiner. I mean it's an important -- it's important in this case; I don't underestimate it. And it will probably change the dynamics of the negotiation, shifting it one way or the -- one side or the other but not -- I'll be surprised whether that's -- the big -- the event that's going to determine everything about this case. Just I don't think that's going to happen. Okay.

If the debtor wants to maintain exclusivity, which no one has disputed at that point of this stage, it needs to move forward with negotiations with the creditors' committee and other important creditor constituencies. And I plan to keep a tight leash on it. And I plan to do that by selecting a date shorter than all of you have suggested for an extension of exclusivity with the full intention that if everybody's cooperating and trying to move forward, I'll grant another extension. But I'm not going to extend the date to sixty days past the time -- thirty days past the time of the examiner reports, sixty days past the time of the examiner reports. I'm not going to do that now. I want to keep tight reigns on all of you. I want to see that you're making progress or at least making an effort to make progress. I don't want to hear that the committee or other constituencies say the debtor simply

**RESIDENTIAL CAPITAL, LLC, ET AL.** 63

says they're bound by the plan support agreement that was entered into, and they refuse to negotiate anything other than those contained in them or they're constrained by what AFI insisted on. If that's the position you want to take, we may as well lift exclusivity, and you could all come forward with competing plans. I don't think that's what you want.

MR. MARINUZZI: I don't think anybody wants that result especially with a pending sale.

Your Honor, we can commit that next week we will sit down and begin plan discussions with the committee and anybody else that wants to begin having plan discussions. What I would like to avoid, and we have not heard the date that Your Honor's prepared to extend exclusivity through, is papers -- we don't want papers being filed the day before we're here in front of Your Honor again taking positions that really should be discussed behind closed doors. If they're discovery issues, issues that the Court should know about, they really shouldn't be the subject of a pleading. They should be discussed. In order to have fulsome successful plan negotiations, you need to be able to sit down with people and have those negotiations. We need to know what their concerns are.

THE COURT: I don't want to hear about the details of any negotiations. They're settlement nego -- you know, a plan process, a consensual plan process, in my view, they're settlement negotiations. Just like every other settlement, I

**RESIDENTIAL CAPITAL, LLC, ET AL.** 64

don't want to hear about what's said in the negotiations. Okay. That I want to make crystal clear to everybody.

MR. MARINUZZI: That's the point I'm trying to make, Your Honor.

THE COURT: Okay. Mr. Eckstein?

MR. ECKSTEIN: Your Honor, we are concerned about the fact that while a lot of progress has been made in the case -- and I do want to give the debtor credit for the fact that a lot of progress has been made. I think we know that we worked intensely during June to put in place the DIP, to put in place the asset sale procedures. We worked through the Ally subservicing issues. The foundation for the sale was in place by mid-June. The Court spent many, many hours on that. And the debtor did a good job in ultimately getting us to the right place.

That was June. All the discovery that we had, that the committee felt was necessary in connection with the AFI investigation, was also known by June.

THE COURT: Let me ask you this, Mr. Eckstein. Let's look forward rather than back. All right. We are where we are in the case. Okay. And I'm more interested in what the major constituents would like to see the process going forward. How would you like to proceed?

MR. ECKSTEIN: Fine. That's appropriate, Your Honor. Your Honor, as we see it, there are probably five major

```
                                                                  1
 1
 2    UNITED STATES BANKRUPTCY COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    Case Nos. 08-13555(JMP) and 08-01420(JMP)(SIPA)
 5    Adv. Case Nos. 09-01241, 09-01261, 09-01242, 09-01120,
 6    09-01130.
 7    - - - - - - - - - - - - - - - - - - - -x
 8    In the Matter of:
 9    LEHMAN BROTHERS HOLDINGS, INC., et al.,
10             Debtors.
11    - - - - - - - - - - - - - - - - - - - -x
12    In the Matter of:
13    LEHMAN BROTHERS INC.,
14             Debtor.
15    - - - - - - - - - - - - - - - - - - - -x
16    LEHMAN BROTHERS SPECIAL FINANCING INC.,
17                   Plaintiff,
18             -against-
19    HARRIER FINANCE LTD.,
20                   Defendant.
21    - - - - - - - - - - - - - - - - - - - -x
22    (cont'd. on next page)
23
24
25
```

```
                                                                  2
 1
 2    - - - - - - - - - - - - - - - - - - - -x
 3    LEHMAN BROTHERS SPECIAL FINANCING INC. and
 4    LEHMAN BROTHERS HOLDINGS, INC.,
 5             Plaintiff,
 6             -against-
 7    AMERICAN FAMILY LIFE ASSURANCE COMPANY OF
 8    COLUMBUS, et al.,
 9             Defendants.
10    - - - - - - - - - - - - - - - - - - - -x
11    LEHMAN BROTHERS SPECIAL FINANCING INC.,
12             Plaintiff,
13             -against-
14    BNY CORPORATED TRUSTEE SERVICES LIMITED,
15             Defendant.
16    - - - - - - - - - - - - - - - - - - - -x
17    WONG, et al.,
18             Plaintiffs,
19             -against-
20    LEHMAN BROTHERS SPECIAL FINANCING INC.,
21             Defendants.
22    - - - - - - - - - - - - - - - - - - - -x
23    (cont'd. on next page)
24
25
```

```
                                                                  3
 1
 2    - - - - - - - - - - - - - - - - - - - -x
 3    OLIVIA BAM,
 4                   Plaintiff,
 5             -against-
 6    BARCLAYS CAPITAL INC.,
 7                   Defendant.
 8    - - - - - - - - - - - - - - - - - - - -x
 9
10
11
12
13
14             U.S. Bankruptcy Court
15             One Bowling Green
16             New York, New York
17
18             July 15, 2009
19             10:03 a.m.
20
21    B E F O R E:
22    HON. JAMES M. PECK
23    U.S. BANKRUPTCY JUDGE
24
25    OMNIBUS HEARING
```

```
                                                                133
 1          MR. BIENENSTOCK:  Good.  It was -- I needed to
 2    respond, and it was not that the bondholders did anything bad
 3    or had a bad motive.  They were being asked to post a bond more
 4    than their upside could be.  And that's the only reason why
 5    they didn't post.
 6          THE COURT:  Okay.
 7          Well, this was hotly contested motion, wasn't it?  Not
 8    just in the rhetoric but in the stridency of the papers that
 9    were filed.  And I believe that, based upon my review of the
10    papers filed by the ad hoc committee, that at a certain level
11    the reaction is a direct result of a fair reading of the prose.
12    I believe that Mr. Bienenstock, who is a sophisticated and
13    experienced lawyer, knows that there are consequences that flow
14    from filing papers of the sort that he filed on behalf of his
15    group.  He certainly had the right to say what he said, but the
16    fact that we ended up having a fairly heated argument during
17    today's omnibus calendar, I think, was foreseeable.  It was
18    also foreseeable that Mr. Miller and his team would file reply
19    papers defending the integrity of all of the professionals who
20    are working on the debtors' behalf to move forward this plan
21    process.
22          There has been a lot said, both in papers and in
23    rhetoric today, about platitudes.  That's perhaps an
24    unfortunate choice of words.  But it is, in fact, what was
25    written about in the context of the Adelphia case, which we
```

134

1  have now made several references to.  The only meaningful
2  reference, however, is the reference to the decision of Judge
3  Gerber to extend exclusivity in that case.
4           The Adelphia case was, by my reckoning, a very
5  complicated case involving significant intercompany claims and
6  different constituencies.  With all respect to the Adelphia
7  case, it pales in comparison to this one.  All kinds of
8  hyperbole gets tossed around the courtroom about the size and
9  complexity of the Lehman case.  It becomes almost trite to say
10 that this is the largest and most complex bankruptcy in
11 history.  But let's face it, it really is.  And the complexity
12 is at a level that the Court sees only at the surface.  As I
13 have said in earlier hearings, it is obvious to me, based upon
14 what I see going on in the docket, that that is merely a
15 reflection of all that is going on that isn't docketed, all of
16 the activity that is required on the part of those currently
17 working for Lehman Brothers and for the creditors' committee
18 and all the professionals, to unravel what is perhaps the most
19 complicated financial disaster in recorded history.
20          Without getting into the specifics of that work, it is
21 apparent to the Court that that work is ongoing and that we are
22 not anywhere near the end of the beginning.  This is a process
23 that may well go beyond the eight-month period that we're now
24 talking about to extend exclusivity.  That's all the time that
25 Congress has allowed a debtor-in-possession, and it applies

135

1  whether or not we're talking about a retailer, an automobile
2  company or the fourth largest investment bank on the planet.
3  It's a one-size-fits-all provision that doesn't necessarily fit
4  all circumstances well, but it's what I must apply.
5           That comment might be particularly appropriate if made
6  in March of 2010, but it's July of 2009 and I deal with a
7  contested matter regarding the future of a plan process in a
8  case in which it is obvious that the plan process is on
9  everybody's radar screen, but it will take considerable time
10 and effort to move beyond concepts to term sheets, to
11 proposals, to negotiated terms and conditions, based upon facts
12 not surmised as to what the facts might be.
13          The fact-gathering and analytical process is still
14 ongoing.  That is apparent not only from the transcript that
15 will be read after today's hearing but from the transcripts of
16 every other one of the omnibus hearings that have taken place
17 since September 2008.  Transparency, the sharing of
18 information, cooperation, investigation, these are the
19 hallmarks of this bankruptcy case up to this point.  But it
20 will take, I believe, in fairness, more time to be thoughtful
21 about what a plan should look like that will truly maximize the
22 returns of all creditors.
23          And I agree with Mr. Bienenstock, the business of
24 bankruptcy is about returning dollars to creditors or, if
25 they're in Norway, krones to creditors.  But it takes a lot of

136

1  thought and attention to develop a plan in a setting this
2  complex that is truly better than a mere liquidation.
3  Otherwise, if I take Mr. Bienenstock's argument at face value,
4  if this is really so simplistic, maybe we toss away all the
5  costs and expenses that are here and we have some trustee come
6  in with a single professional doing whatever has to be done to
7  maximize value.  But my best guess is that Mr. Bienenstock and
8  a chorus of others would get up and say don't do that, that
9  would be an extraordinarily stupid thing to do.  And I think it
10 would be.
11          I don't want to get into what I believe are the
12 motivations of the parties who have been litigating here on
13 this question it, frankly, doesn't matter.  I take at face
14 value what everybody has said.  I also believe that I think
15 there is some value to the process in having debated this
16 question today.  At a certain level, I think that it puts the
17 debtors and their professionals on notice that the ad hoc
18 group, as it's presently composed, or as it may be composed in
19 the future, or some other group that may form with different
20 participants that have significant enough economic interests to
21 hire expensive lawyers, will be looking over the shoulders of
22 the professionals who represent the debtor-in-possession, and
23 the professionals who represent the creditors' committee, and
24 the professionals who represent the examiner, and everybody
25 else who is being paid ultimately out of the estates' assets.

137

1  That's a healthy thing, and that's part of transparency.  But
2  in terms of the fundamental question which is before the Court
3  today, it seems to me clear and almost beyond reasonable debate
4  that the debtors should be entitled, to the fullest extent of
5  the law, to as much time as they need to develop their best
6  plan, their view of the plan of reorganization that most
7  appropriately addresses the complexities of this unique set of
8  circumstances.  And exclusivity was designed, in part, to give
9  debtors that privilege, unless it's being abused, and there's
10 absolutely nothing in this record to suggest that the privilege
11 has been abused in any respect.
12          Under the circumstances, I grant the motion as
13 supported by the creditors' committee and, in effect, as
14 modified by the creditors' committee's position, to extend
15 exclusivity for eight months with the understanding that at the
16 midpoint, roughly four months from now, there will be a full
17 report provided by Bryan Marsal, and such other individuals as
18 may be appropriate to come into court to make that
19 presentation, concerning the progress that is being made in
20 developing a plan; I'm assuming that will be a well-attended
21 hearing and we'll have over full capacity for that day.
22          Let's go on to the next item.
23          MR. HARVEY MILLER:  Thank you, Your Honor.  Your
24 Honor, would it be possible to get a five-minute recess?
25          THE COURT:  Excuse me?