```
 1   UNITED STATES BANKRUPTCY COURT

 2   DISTRICT OF DELAWARE

 3

 4   In re:                        :
                                   :   Chapter 11
 5   ENERGY FUTURE HOLDINGS        :
     CORP.,  et al.,               :   Case No. 14-10979(CSS)
 6                                 :
             Debtors.             :   (Jointly Administered)
 7   _____:
 8   ENERGY FUTURE INTERMEDIATE    :
     HOLDING COMPANY LLC and EFIH  :   Adversary Proceeding
 9   FINANCE INC.,                 :   No. 14-51002(CSS)
                                   :
10          Plaintiffs,            :
                                   :
11   V.                            :
                                   :
12   UMB BANK, N.A., as INDENTURE  :
     TRUSTEE                       :
13                                 :
             Defendant.           :
14   _____:
15                           United States Bankruptcy Court
16                           824 North Market Street
17                           Wilmington, Delaware
18
19                           February 10, 2015
20                           9:47 AM - 11:12 AM
21   B E F O R E :
22   HON CHRISTOPHER S. SONTCHI
23   U.S. BANKRUPTCY JUDGE
24
25   ECR OPERATOR:  LESLIE MURIN
```

1   Hearing Re: Motion of Pallas Realty Advisors, Inc. for Entry

2   of an Order Extending the Deadline to File Proof of Claim,

3   or Alternatively Allowing Late-Filed Proof of Claim [D.I.

4   2602; filed October 28, 2014]

5

6   Hearing Re:  Motion of Energy Future Holdings Corp., et al.,

7   for Entry of an Order Authorizing Luminant Generation

8   Company LLC to Reject a water Contract with Tarrant Regional

9   water District, Effective Nunc Pro Tunc to the Petition Date

10  [D.I. 2662: filed October 30, 2014]

11

12  Hearing re:  Motion of Allen Shrode for Relief from the

13  Automatic Stay Pursuant to 11 U.S.C. § 362(d) [D.I. 2896:

14  filed November 26, 20141

15

16  Hearing re:  Debtors' First Omnibus (Non-Substantive)

17  Objection to (Amended and Superseded, Exact Duplicate, and

18  insufficient Documentation) Claims Pursuant to Section

19  502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003,

20  and 3007, and Local Bankruptcy Rule 3007-1 [DI. 2808; filed

21  November 18, 2014]

22

23

24

25

1   Hearing re:  Debtors' Second Omnibus (Non-Substantive)

2   Objection to (Amended and Superseded, Exact Duplicate, No

3   Supporting Documentation, and Insufficient Documentation)

4   Claims Pursuant to Section 502(b) of the Bankruptcy Code,

5   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

6   Rule 3007-1 [D.I. 2990: filed December 12, 2014]

7

8   Hearing re:  Debtors' Third Omnibus (Non-Substantive)

9   Objection to (No Supporting Documentation) Customer Claims

10  Pursuant to Section 502(b) of the Bankruptcy Code,

11  Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

12  Rule 3007- 1 [D.I. 2992: filed December 12, 2014]

13

14  Hearing re:  Debtors' Sixth Omnibus (Non-Substantive)

15  Objection to (Insufficient Documentation) Claims Pursuant to

16  Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

17  3001, 3003, and 3007, and Local Bankruptcy Rule 3007-I [D.I.

18  3212: filed January 9, 2015]

19

20  Hearing re:  Debtors' Seventh Omnibus (Substantive)

21  Objection to Certain No Liability Claims Pursuant to Section

22  502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003,

23  and 3007, and Local Bankruptcy Rule 3007-1 [D.I. 3218: filed

24  January 9, 2015]

25

1    Hearing re:  Debtor Energy Future Holdings Corp.'s

2    Application for Entry of an Order Authorizing the Retention

3    and Employment of Solic Capital Advisors, LLC as Financial

4    Advisor for Debtor and Debtor in Possession Energy Future I

5    holdings Corp. Effective Nunc Pro Tunc to December 18, 2014

6    [D.I. 3324; filed January 16, 2015]

7

8    Hearing re:  Debtors' Fourth Omnibus (Substantive) Objection

9    to Certain Substantive Duplicate and No Liability Claims

10   Pursuant to Section 502(b) of the Bankruptcy Code,

11   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

12   Rule 3007- 1 [D.I. 2994; filed December 12, 20141

13

14   Hearing re:  Second Motion of Energy Future Holdings Corp.,

15   et al., for Entry of an Order Extending the Debtors'

16   Exclusive Periods to File a Chapter 11 Plan and Solicit

17   Acceptances Thereof Pursuant to Section 1121 of the

18   Bankruptcy Code [D.I. 3338: filed January 20, 2015]

19

20   Hearing re:  Adversary Complaint for Declaratory Judgment of

21   Energy Future Intermediate Holding Company LLC and EFIH

22   Finance Inc. [D.I. 3039/Adv. D.I. 1: filed December 16,

23   2014]

24

25   Transcribed by:  Melissa Looney

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorneys for the Debtors

4

5   BY:  STEVEN N. SERAJEDDINI, ESQ.

6        EDWARD SASSOWER, ESQ.

7

8   RICHARDS, LAYTON & FINGER, P.A.

9        Attorney for the Debtors

10

11  BY:  JOSEPH C. BARCLAY, ESQ.

12       JASON M. MADIN, ESQ.

13

14  POTTER ANDERSON CARROON LLP

15       Attorney for Duetsche Bank New York

16

17  BY:  R. STEPHEN MCNEILL, ESQ.

18

19  FOX ROTHSCHILD

20       Attorney for TECH Unsecured Notes

21

22  BY:  JOHN BIRD, ESQ.

23

24

25

```
1   YOUNG CONAWAY STARGATT & TAYLOR, LLP

2        Attorney for Ad Hoc Committee of TCEH First Lien

3        Creditors

4

5   BY:  PAULINE K. MORGAN, ESQ.

6

7   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

8        Attorneys for Ad Hoc Committee of TCEH First Lien

9        Creditors

10

11  BY:  BRIAN S. HERMANN, ESQ.

12       ALAN KORNBERG, ESQ.

13       JACOB ADLERSTEIN, ESQ.

14

15  ASHBY & GEDDES

16       Attorney for WSFS, Trustee

17

18  BY:  GREG TAYLOR, ESQ.

19

20  KLEHR HARRISON

21       Attorney for UMB Bank, Indenture Trustee

22

23  BY:  RAYMOND H. LEMISCH, ESQ.

24

25
```

1    UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3

4    BY:  RICHARD L. SCHEPACARTER, ESQ.

5

6    COUSINS CHIPMAN & BROWN, LLP

7        Attorney for Ad Hoc Committee of EFIH Unsecured

8        Noteholders

9

10   BY:  ANN M. KASHISHIAN, ESQ.

11

12   KRAMER LEVIN

13       Attorney for the Second Lien Notes, Indenture Trustee

14

15   BY:  JENNIFER SHARRET, ESQ.

16

17   DRINKER, BIDDLE AND REATH

18       Attorney for CitiBank

19

20   BY:  HOWARD A. COHEN, ESQ.

21

22

23

24

25

Page 8

1   FOLEY & LANDNER

2        Attorney for UMB, EFIH

3

4   BY:  HAROLD KOPAL, ESQ.

5

6   BROWN RUDNICK

7        Attorney for WSFS Trustee

8

9   BY:  JEFF JONAS, ESQ.

10       JEREMY COFFEE, ESQ. (Telephonic)

11

12  PALSINELLI

13       Attorneys for TCEH Committee

14

15  BY:  CHRIS WARD, ESQ.

16       JUSTIN EDELSON, ESQ.

17

18  WHITE AND CASE

19       Attorney for TCEH Unsecured Ad Hoc Group

20  BY:  TIM LEVRIA, ESQ.

21

22

23

24

25

```
 1   AKIN GUMP

 2        Attorney for EFIH Ad Hoc Group

 3

 4   BY:  ABID QURESNI, ESQ.

 5        SCOTT ALBERINO, ESQ.

 6

 7   SHERMAN AND STERLING

 8        Attorney for Deutsche Bank of New York

 9

10   BY:  NED SCHODEK, ESQ.

11

12   ALSO APPEARING:

13   COLIN R. ROBINSON, ESQ.

14   MICHAEL JOYCE, ESQ.

15   GARY KAPLAN, ESQ.

16   MATT ROOSE, ESQ.

17   JAMIE EDMONSON, ESQ.

18   JEFFREY SABIN, ESQ.

19   MARK A. FENK, ESQ.

20   NORMA PERNIEE, ESQ.

21   D. ROSS MARTIN, ESQ.

22   GIA CLAUDO F., ESQ.

23   DAVID KLANDOR, ESQ.

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  Excuse me.  Good

3    morning.

4              MR. SASSOWER:  Good morning, Your Honor.  Edward

5    Sassower of Kirkland and Ellis on behalf of the debtors.

6    Your Honor, there are two items up for today's hearing.  The

7    first item is the debtor's exclusivity motion, docket entry

8    3338 to which there is one remaining objection.

9              The second item relates to nine, non-substantive

10   objections to the debtors' filed in their fourth omnibus

11   objection to claims, docket entry 2994 and my colleague,

12   Steve Serajeddini will present these claims objections at

13   the end of the hearing.

14             THE COURT:  Okay.

15             MR. SASSOWER:  Your Honor, with your permission,

16   I'd like to go straight to the exclusivity motion and

17   dispense with my usual status update since what I would say

18   in my status update is largely duplicative of what I would

19   say in connection with exclusivity.

20             THE COURT:  Okay.

21             MR. SASSOWER:  Your Honor, the exclusivity motion

22   is supported by the declaration of Paul Keglevich (ph), the

23   debtors' chief financial officer and co-chief restructuring

24   officer.  Mr. Keglevich is present in the courtroom today.

25   The debtors move for admission of his declaration docket

1    entry 3339 into evidence.

2              THE COURT:  Any objection?  It's admitted.

3    (Declaration Admitted)

4              MR. SASSOWER:  Thank you, Your Honor.

5              Your Honor, the debtors' exclusivity period

6    currently expires on February 23rd of this year.  As Your

7    Honor is well aware, these cases are not only very large,

8    but also very complex.  We are making progress on a number

9    of fronts, but we're not done yet and simply require more

10   time.

11             One of the debtors' most important work streams is

12   negotiating a confirmable and hopefully consensual plan of

13   reorganization.  The debtors have been driving the plan

14   discussions and there has been a lot of recent activity.

15   And to that end, the debtors anticipate distributing this

16   week a global plan term sheet in an effort to further

17   facilitate plan negotiations.

18             The debtors are also making progress on the sale

19   of the economic interests in Encore under the bidding

20   procedures order, round 1 bids are due March 2nd.  That

21   process is moving along well so far.  And I hope to provide

22   the Court with a more comprehensive update at the scheduled

23   March 10th, omnibus hearing.

24             The debtors are also pushing forward on various

25   key litigation work streams.  Yesterday, in fact, the

1    debtors certified they have fully complied with their

2    discovery obligations consistent with the requirements of

3    the legacy protocol and in connection with the initial

4    consolidated requests.  Specifically the debtors have

5    produced over 680,000 documents comprised of nearly 4.5

6    million pages.

7             Legacy discovery addresses potential claims

8    related to prepetition transactions that both the debtors

9    and the creditors are studying.  The debtors expect to

10   address those matters in a proposed plan.

11            In addition the EFIH first lien, second lien and

12   (indiscernible) make whole and interest rate litigations are

13   ongoing.  Like legacy discovery the debtors believe that the

14   resolution of these issues will advance plan discussions.

15            Your Honor, the debtors originally asked to extend

16   the exclusive periods to the maximum date provided under the

17   code, however in order to minimize the contested nature of

18   this hearing, the debtors agreed to a four month extension

19   of exclusivity through and including June 23rd with a two

20   month automatic extension if the debtors file a plan by June

21   23rd.

22            This extension has the support of the following

23   parties, both official committees, the ad hoc committee of

24   the EFIH second lien note holders, the ad hoc committee of

25   the EFIH unsecured note holders or the (indiscernible), the

1    indentured trustee for the EFIH unsecured notes, Fidelity,

2    which owns interests in EFH, EFIH and TCH debt, the ad hoc

3    committee of the TCH first lien and the ad hoc committee of

4    the TCH unsecured note holders.

5              In addition, Alcoa (ph) consented to the revised

6    form of order after filing its objection.  The revised

7    exclusivity period is reflected in the negotiated order that

8    the debtors filed on February 5th at docket #3445.  I have a

9    hardcopy for Your Honor if needed.

10             THE COURT:  Oh, I've seen it.

11             MR. SASSOWER:  Thank you.  Despite this high level

12   of consensus, many of the debtors' stakeholders felt it was

13   important to file statements or reservations of rights.

14   According to these statements, some stakeholders thinks the

15   debtors are moving too quickly.  Others think the debtors

16   are moving too slowly.  Some constituencies think the

17   debtors are not appropriately evaluating a taxable

18   deconsolidation.  Others think that an evaluation of a

19   taxable deconsolidation amounts to a breach of fiduciary

20   duty.  In cases as complicated as these having conflicting

21   viewpoints is not surprising at this stage.

22             And many of these creditor statements seemed to be

23   aimed as much at other creditor constituents as at the

24   debtors.  Therefore they're not really germane to the issue

25   before the Court today, which is should the Court grant the

1    debtors a four month extension of exclusivity with an

2    automatic two month extension if the debtors file a plan

3    within that four month period.  On that question, all

4    constituencies agree.

5           There's only one remaining objection which is from

6    Brown Rudnick (ph) on behalf the TCH second lien indentured

7    trustee.  And even Brown Rudnick does not object to the 120

8    extension described in the revised form of order, rather,

9    Brown Rudnick asked the Court for two added forms of relief.

10   The first is that the Court permit the two official

11   committees to file a plan if they're able to reach agreement

12   amongst themselves.  And the second is to vest the TCH

13   disinterested director with the sole authority to file a

14   plan.

15          Both of these conditions are inappropriate based

16   on the facts and circumstances of these cases and is

17   unsupported by the case law for the reasons set forth in our

18   reply brief.

19          With respect to the condition that the two

20   official committees be able to file their own plan if they

21   agree, the fact that the official committees themselves

22   don't support that request speaks for itself.

23          With respect to the role of the disinterested

24   directors, the TCH second lien indentured trustee's proposal

25   is an improper effort to dictate corporate governance in the

1    context of exclusivity.  And it ignores the authority that

2    the debtors have already vested in the disinterested

3    directors to identify and address conflict matters.

4         Your Honor addressed a very similar point at the

5    last hearing in connection with the U.S. Trustee's statement

6    regarding the debtors' retention of various conflict matters

7    advisors.  There the U.S. Trustee requested that the Court

8    clearly delineate the roles of the advisors to the

9    disinterested directors.  And in response, Your Honor noted

10   that an attempt to prejudge those issues would be

11   "inefficient, unfair and perhaps even prejudicial."

12        We think the Court's observation at the last

13   hearing is relevant and informative in this context as well.

14   No one today knows the extent to which a plan will implicate

15   conflict matters.

16        It's fair to assume that the plan will implicate

17   some conflict matters.  It's also fair to assume that the

18   plan will cover a myriad of other non-conflict matters.  As

19   a result we can't dictate in advance the role of the

20   disinterested directors should or should not play in

21   connection with the plan.  We'll have to continually address

22   that issue in the context of a fluid and dynamic

23   environment.

24        In a related point on the role of the

25   disinterested directors is Brown Rudnick's apparent

1    assumption the Court needs to step in and further empower

2    the disinterested directors.  The (indiscernible) have

3    vested the disinterested directors with the sole authority

4    to determine what constitutes an actual conflict and to

5    address such conflicts.

6              Moreover the debtors' advisors, management and

7    boards have been spending significant amount of time

8    educating the conflict matters advisors and in turn the

9    conflict matters advisors have been spending a significant

10   amount of time in discussions with the respective estates

11   and their respective creditor constituencies of those

12   estates regarding conflict matters, including intercompany

13   claims.

14             As a result there is a governance process already

15   in place and it ensures a thorough and transparent

16   consideration of all potential conflict matters.  For those

17   reasons, Your Honor, the debtors respectfully request that

18   the Court overrule the TCH second lien indentured trustee's

19   objection.  Thank you.

20             THE COURT:  You're welcome.

21             MR. SASSOWER:  Your Honor, I don't know if you'd

22   like to proceed with the statements in support of

23   exclusivity or go to the objection and deal with the

24   statements after the fact.  I know there's a number of other

25   counsel that would like to speak even though they haven't

1    filed an objection.

2         THE COURT:  Well, let's hear everybody that

3    supports the debtor first and then we'll hear the objection.

4    I think it when everybody's had an opportunity to speak.

5         MR. SASSOWER:  Very well, Your Honor.  I think

6    we'd start with the official committees.  Mr. Dietrich is

7    here in court and Mr. Miller is on the telephone.

8         THE COURT:  Okay.  Start with Mr. Dietrich (ph).

9         MR. DIETRICH:  May it please the Court.  Andrew

10   Dietrich, Sullivan and Cromwell for the EFH Official

11   Committee.  We support the debtors modified request for

12   relief and I agree with the comments by Mr. Sassower with

13   one possible addendum.

14        We rather like the idea of the two committees

15   could propose jointly a plan of reorganization.  We do not

16   think that relief is necessary today for the simple reason

17   that if the two committees were to agree on a plan of

18   reorganization and appropriate circumstances, we expect that

19   we would receive a fair hearing by this Court.  On that

20   basis we think this case with its complexity and with the

21   additional value that is created by joint administration of

22   the cases and joint prosecution of the plan by a fiduciary

23   is the (indiscernible) of a case that requires a long

24   exclusivity period for the debtor.  And we think nothing

25   demonstrates that more than two facts.  One, that many

1     different constituents are here bargaining for their

2     position in the ultimately plan of reorganization.  And two,

3     that virtually all of them and I think all of the support

4     the requested relief.  Thank you.

5            THE COURT:  Thank you.  Mr. Miller?

6            MR. MILLER:  Thank you, Your Honor.  Brett Miller,

7     Morrison and Forester on behalf of the Official T-side

8     Creditors' Committee.  As set forth in the Committee

9     statement, the Committee supports the debtors' modified

10    exclusivity request.

11           The Committee is cautiously optimistic that during

12    the extension period a consensual plan can be forged by the

13    numerous parties involved.  The Committee support though is

14    with the caveat that if the progress outlines by Mr.

15    Sassower stagnates, the Committee reserves its right to come

16    back to court to seek to terminate exclusivity.  But at this

17    point, the Committee is supportive of the debtors' request.

18    Thank you.

19           THE COURT:  Thank you.  Anyone else?

20           MR. KORNBERG:  Good morning, Your Honor, Alan

21    Kornberg of Paul Weiss Rifkind Wharton and Garrison for the

22    TCH first lien creditor ad hoc committee.

23           Your Honor, we haven't said much in these cases so

24    let me just remind the Court that the members of our

25    committee hold close to $15 billion of the first lien debt

1    and the T-side silo.  We filed a third supplemental Rule

2    2019 statement last week laying out those holdings.  That

3    means we're the largest organized creditor group in these

4    cases and our clients are senior to $1.5 billion of second

5    lien debt and $6 billion of unsecured debt on the T-side.

6              I think you've heard, Your Honor, since day one of

7    these cases that even though our clients hold liens on

8    substantial all of the T-side assets, they are substantially

9    under secured and no one can seriously contend otherwise.

10             That means -- and we know that TCEH does not have

11   enough debt capacity to reinstate us, to refinance us,

12   because of the size of our claims and the size of our

13   deficiency we cannot be crammed up, we cannot be crammed

14   down.  In other words, our votes will be essential to a get

15   a plan done on the T-side.

16             We're very pleased that we and the other creditor

17   groups have prevailed on the debtors to seek only a four

18   month rather than an eight month extension of exclusivity.

19   That is the right result and we support it.

20             We agree with the sentiments that many have

21   expressed that we have to hold everyone's feet to the fire

22   and it is very clear to us that eight more months of

23   business as usual in these cases are likely to yield very

24   unhappy results.

25             Motions to extend exclusivity are often a time to

1    take stock of where the cases are and what progress remains

2    to be made.  From our perspective, the headlines are as

3    follows.  There have been almost two years of prepetition

4    and post petition efforts by many parties including our ad

5    hoc committee, including the debtors, including many others,

6    but the fact remains that there has been no consensus around

7    the debtors preferred restructuring path, the so-called tax

8    free spin out of TCEH.

9           We've explored numerous iterations of that

10   structure, indeed prepetition, as Your Honor knows, our

11   committee agreed to support the RSA, which was based on such

12   a structure in return for the promise of a quick and

13   efficient reorganization process.

14          The reality is that to date the parties simply

15   cannot agree on how to get a tax free deal done or how to

16   share the pain that's required to get it done.

17          On the other hand -- and I want to emphasize this,

18   there has been almost no discussion, whatsoever around a

19   conventional debt for equity taxable deconsolidation of the

20   T-side.  That approach is the value maximizing result for

21   our clients.

22          From our perspective, such a transaction would be

23   far less complicated and it would preserve a full step up of

24   the tax basis of our collateral.  Other parties don't like

25   that path.  The debtors are on record as saying as much as

1    their omnibus tax memorandum condemning such a solution and,

2    Your Honor, we disagree with many aspects of that memorandum

3    and if the time comes and it's appropriate, we will address

4    them.

5            The debtors and others have suggested that in such

6    a scenario, the IRS would come up empty handed because it's

7    claims would be stranded at EFH which could not afford to

8    pay them.

9            Well, unfortunately that happens from time to

10   time.  There are numerous case law examples where under

11   secured creditors are only paid in part and the IRS comes up

12   empty handed.  I don't know if that would be the result

13   here.  That's a very much open question but given the

14   indications of interest, an encore that we've seen from

15   Nextera (ph) and others and the auction process which the

16   Court has authorized to proceed it's pure speculation to

17   come to the conclusion as to what the IRS may or may not

18   recover in a taxable transaction scenario.

19           What is known today is that our clients and the

20   other T-side creditors are likely to receive substantially

21   less value than would get them to a per recovery.  And there

22   is no fury under which T-side creditors have to subsidize a

23   reorganization strategy to the benefit of the IRS or any

24   other E-side creditors.

25           Remarkably the official committee of EFH creditors

1    now suggests without any credible support that the T-side

2    first lien creditors did not bargain for a step up in basis.

3              The simple answer is that what we bargained for

4    was to be repaid in full, principal, interest and all other

5    amounts due to us.  And we certainly did not waive the

6    principal creditor remedy that's available if we're not

7    repaid, which is the ability to foreclose on collateral

8    which would result in among other things, realization of a

9    full step up in basis of our collateral.

10             Whether other parties in interest like it or not

11   TCEH has no liability to the IRS for any E-side taxes that

12   may be due upon a deconsolidation.  And the senior secured

13   creditors, our clients, would likely come ahead of any

14   theoretical tax related claims, whether they are concocted

15   under the debtors' prepetition tax hearing agreement or

16   otherwise.

17             So what's next?  Today is not the occasion to

18   argue about the possible tax and other consequences of

19   hypothetical restructuring transactions that have not yet

20   been presented to the Court.  Today is, however, from our

21   point of view, the appropriate occasion to express the

22   frustration of our committee members with respect to the

23   lack of progress in these cases.

24             There's been almost two years of effort and the

25   consensus needed to agree on a tax free restructuring still

1    remains elusive.  A tax free approach will not succeed

2    unless other parties in interest finally accept that our

3    clients must be meaningfully compensated for value they're

4    being asked to forgo, namely the value of the step up in

5    basis of their collateral that is inherent in that

6    collateral.

7              There are structures and arrangements that would

8    work.  We've been exploring them in depth and we will

9    continue to do so and we will continue to negotiate with

10   other parties in interest, including the debtors to achieve

11   that result.

12             But as substantially under secured creditors, we

13   cannot be asked to shoulder disproportionally the continuing

14   and substantial costs and risks associated with these

15   chapter 11 cases.

16             As stated in our response to the debtors' motion,

17   we believe that the next 30 to 60 days are critical and we

18   believe that within that time frame, a determination needs

19   to be made whether a tax free transaction is going to work

20   in this case.

21             If not, the only fair result would be to let the

22   T-side silo to pursue a taxable deconsolidation that

23   maximizes recoveries of t-side creditors.  Otherwise, the

24   TCEH first lien creditors will continue to be held hostage

25   by a process and a goal that is not in their best interest.

1          That frankly would frustrate the very purpose of

2    Section 1121.  So in conclusion, Your Honor, if substantial

3    progress on a tax restructure is not made in the coming

4    weeks, we will have no choice but to pursue a taxable

5    transaction.  I hope that doesn't come to pass, but I wanted

6    everybody to know that it may be the reality here.

7          Thank you, Your Honor.

8          THE COURT:  With statements of support like that,

9    Mr. Sassower, who needs enemies?

10         MS. SHARRETT:  Your Honor, Jennifer Sharret from

11   Kramer Levin on behalf of Computer Share, the indentured

12   trustee for the EFIH second lien notes.

13         We agree that four months is an appropriate

14   extension of exclusivity and we specifically did not file

15   papers because he debtors had agreed to this request prior

16   to our objection deadline.  But like other constituents we

17   do have concerns about progress to date.  The second lien

18   notes have made proposals to the debtors and we have yet to

19   receive substantive meaningful response and are looking

20   forward to the plan term sheets that will be coming shortly.

21         And we (indiscernible) together with the debtors

22   towards a viable plan of confirmation, but reserve our

23   rights to the extent it does not go down that road.  Thank

24   you.

25         MR. ALBERINO:  Good morning, Your Honor.  Scott

1    Alberino on behalf of the ad hoc EFIH unsecured note

2    holders.

3           Your Honor, I guess, like Mr. Kornberg our groups

4    have not had much to say in these cases.  That doesn't mean

5    we have not been involved in these cases for quite a long

6    time.

7           Just for a point of reference, you know, our

8    clients control approximately 80 percent of the $1.6 billion

9    in EFIH senior (indiscernible) notes.  We're commonly

10   referred to in these cases as (indiscernible).

11          And our involvement in this case predates the

12   filing.  We've been involved in this case for several years

13   now as Mr. Kornberg alluded to.  And we have a client base

14   that while is extremely frustrated with the state of the

15   cases, the direction we're heading in and has questions that

16   have yet to be answered by the company about what ultimately

17   they hope to accomplish through the strategy that they have

18   concocted to move this case forward.

19          Now, Your Honor, we did agree to 120 days with the

20   company.  We're pleased that the company agreed to make that

21   modification and although, again, we -- our limited

22   objection is resolved, given the fact that we really haven't

23   spoken in front of the Court much in this case, I think

24   there are a few points that we would like to further

25   emphasize with Your Honor, because as Mr. Kornberg said, now

1    is probably the appropriate time for the Court to take stock

2    as to where different constituencies feel and what the

3    headlines are going to be for the case over the next couple

4    of months.

5              So, Your Honor, I think the first point that we

6    want to emphasize is there's little debate that nothing has

7    happened of any significance on the plan formulation front

8    over the last nine months.  And there has been discussions

9    about the level of complexity in the case and the level of

10   intercompany issues, intercreditor dynamics, the bid

11   procedures, the legacy discovery protocol.  There were a

12   number of issues which the debtors have used to shield

13   themselves from making progress on the plan front, but at

14   the same time I think it should be noted and I think it

15   should be crystallized in Your Honor's mind that this

16   decision here to not move forward on the plan process, this

17   has been a deliberate decision on the part of the company.

18   This is their strategy, a strategy that developed nearly

19   seven months ago when the RSA was abandoned and the company

20   determined that obtaining a market valuation of Encore was

21   the key to unlocking all the dynamics that were hindering

22   and obstructing the plan process from going forward.

23             And back in October when they were in front of

24   Your Honor on bid procedures they made it clear to the Court

25   at the time that by obtaining approval to the bid procedures

1    that they hoped that by establishing amount and form of

2    distributable value that this would encourage stakeholders

3    to finally engage constructively in a plan formulation

4    process.  It's an interesting statement.

5         The auction was necessary to encourage

6    stakeholders to finally engage constructively.  And you can

7    see in that statement an inherent bias by the company that

8    the creditors in this case are incapable of constructively

9    negotiating on plan issues, so it's up to the company to run

10   a process, to run this naked option for Encore to determine

11   what this hypothetical value may be, because only then will

12   people engage constructively.

13        Only then will people -- will different

14   constituencies adjust what their demands may be to resolve

15   the intercompany claims and intercompany causes of action in

16   this case.  Only then will the T-side first lien lenders

17   potentially moderate their demands for a consent payment in

18   this case.

19        Now, and as a result of that bias, notwithstanding

20   some conclusory statements about this is a dual track

21   process, we're going to run the auction, we're also going to

22   engage the creditors.  For the most part, I think it was

23   said and Mr. Weiss noted those plan negotiations we think

24   have been for the most part window dressing in this case.

25   And so far, as a result of this decision to pursue the

1    Encore auction in the form that they've decided to pursue

2    it, the plan process in this case has remained in the state

3    of paralysis.

4             So I'm here to say that I was very pleased that

5    Mr. Sassower in his opening statements signaled to all the

6    creditors in this case that the company will finally be

7    delivering a plan term sheet.  We're nine months into the

8    case.  I don't know what it says.  I don't know whether it's

9    going to address all of our issues or concerns in this case.

10   I'm not sure how other creditors will react, but notice the

11   first point in the case, nine months into it, where the

12   company is stepping out and putting a stake in the ground on

13   what a plan looks like.

14            We'll all debate whether that's the appropriate

15   pathway, but we're encouraged to see that the company is

16   finally taking a step towards putting a stake in the ground

17   and using the exclusivity period to start moving the plan

18   process forward.

19            The second issue that we have, Your Honor, and I

20   think we raised this in our papers and it's a point where

21   we've made little to no progress with the company for the

22   last several months is we are still questioning why the

23   company is pursuing a naked auction as opposed to

24   contingency planning for a potential failure of the Encore

25   sales strategy.

1        There are many people that have a lot of -- have

2    put a lot of hope on the outcome of this auction.  Nextera

3    when they came into the came over the summer they got what

4    they wanted.  They got the company to open up, agree to an

5    auction process, which is something the company did not have

6    to do at the time, had they decided to adopt their own

7    valuation and drive a plan process off that valuation, but

8    Nexterra was able to successfully cause the company to agree

9    to put the equity on the block and as a result, the company

10    has been running what has in essence been a naked auction

11    process to try to determine what the best bid is.

12        And there has also been an inherent premise in

13    this that E-side unsecured creditors in particular my

14    clients in this case have nothing at risk.  We have a duty

15    to maximize value for the box as a whole.  I've heard that

16    many times from many people representing the company.

17        And never in my conversations with anybody on the

18    company side has any risk or doubt or uncertainty crept into

19    these conversations that our clients are not at risk in this

20    process.

21        When we have asked them why are you pursuing a

22    sale of reorganized EFH equity without knowing one, what E-

23    side creditors are getting, two, what T-side creditors are

24    getting and three, why are you doing this without putting in

25    place procedural safeguards and protections for E-side

1    (indiscernible) creditors before auctioning our equity?  You

2    know, I'm met with silence.  There's no response from the

3    company.  And we think it's inferred for the company to be

4    operating off the assumption that this auction is going to

5    ultimately solve all the problems in this case.  We don't

6    believe that the auction will ultimately change

7    intercreditor bargaining dynamics.

8              We don't think this auction is going to change

9    results, change what the T-side first lien lenders may be

10   looking for in terms of consent payments.

11             At the end of the day we don't know whether it's a

12   high bid or low bid whether any of those issues which are

13   all gating items to effectuating reorganized EFH equity

14   sale.  We don't believe that those issues will be materially

15   moved in any way by the outcome of the auction.

16             We also think that by providing a platform -- by

17   pursuing an e-side recapitalization that can serve as a

18   backstop for the auction, the company would be running a

19   better auction by positioning itself not as a reluctant

20   seller, not as a seller of need that's running what's in

21   essence, kind of a fire sale of its so called crown jewel

22   asset without determining whether its creditors want to

23   sell, are willing to step up and recapitalize to the

24   company, they're projecting to the market right now that

25   this company is the seller by refusing to put in place any

1    type of backstop plan with its e-side creditor

2    constituencies and to recap the company and then use that as

3    a platform for auctioning off the company and we think it's

4    a terrible mistake by the company and another example of the

5    company not maximizing value here in the case.

6            Now, why would the company not be negotiating with

7    us on an e-side recap and whether it's me or whether it's

8    Fidelity, whether it's other e-side unsecured creditors, we

9    don't know.  Usually when I'm not negotiating with someone

10   it's because I don't think I need them for something.  Maybe

11   I don't think I need their votes. Maybe I don't think I need

12   their consent.

13           Maybe I don't think I need their support, but I

14   think the company is treading on thin ice with respect to

15   moving forward with the process without trying to put any

16   deal in place with the e-side creditors.  Unless, of course

17   they think that at the end of the day they'll be able to

18   classify as unimpaired all the e-side unsecured creditors if

19   they think they can cram all the e-side unsecured creditors

20   down, maybe they assume that under no circumstances will the

21   cost of any intercompany settlements be borne by my clients.

22   Maybe they assume that the cost of any (indiscernible)

23   payments with Mr. Kornberg's clients will be borne by my

24   clients.  And maybe under those circumstances they think my

25   clients will be subject to risk of (indiscernible) from

1    allowed EFI's make whole claims.

2         While I doubt many of these assumptions, which is

3    why we're here today expressing the frustration we're

4    expressing to you right now.

5         Ultimately if the company turns out to be correct

6    on their assumptions and they don't need us, well, okay.

7    Yeah we wasted everyone's time, a lot of hot air in this

8    courtroom raising these concerns.

9         If the company has any doubt about any of these

10   assumptions, I question why the company refused to engage

11   with any of the e-side constituencies on putting together

12   and e-side recapitalization to backstop this auction process

13   they're running right now, because ultimately if they doubt

14   any of these assumptions they should be working with their

15   creditor groups to shore up support, to run an auction

16   process where they actually can effectuate a third party

17   transaction without creating more litigation, more chaos and

18   more (indiscernible) creditors in this case.

19        Now, again, they always default to, well, just

20   submit a bid.  Of course we can submit a bid.  We prepared a

21   bid before the company filed.  It was embedded in the

22   (indiscernible).  We submitted bids after the

23   (indiscernible).  We'll submit a bid again, Your Honor, but

24   that submitting a bid does not fully address out concerns

25   here.  Our concerns are how -- at the end of the day we have

1    t-side constituencies that have been very vocal about using

2    this process to attempt to extract value from the e-side of

3    the estate via intercompany claims, causes of action as well

4    as requests for consent payments on tax (indiscernible).

5           We think there is significant risk out there for

6    us in this case and we don't think the company by

7    (indiscernible) company by putting their head in the sand on

8    plan issues is not heeding the interests of unsecured

9    creditors on the e-side.

10          Two more points, Judge.  This process does not

11   occur in a vacuum.  There are significant costs and

12   consequences associated with running the sale process.  As

13   we said in the papers, professional fees in the case are

14   skyrocketing although the other company's numbers are not

15   public, they've hired numerous more professionals on the

16   Debtor's side.  The cases have been very litigious and

17   professional fees that are coming out of cash out of the EFH

18   and the EFI (indiscernible), that's value that's coming out

19   of the pockets of either e-side unsecured creditors or e-

20   side residual stakeholders.

21          In addition, interests on the EFI second lien

22   notes continue to accrue in this case at significant

23   amounts.  The annual interest accrual on the EFI second lien

24   notes is well in excess of $250 million per year.  This

25   company doesn't get out until 2016, you could see interest

1    accruals on the second lien notes well in excess of 6- to

2    $700 million.  Again, where is that value going?  It goes

3    into the pockets of EFI second lien holders.  It doesn't go

4    into the pockets of unsecured creditors on the e-side.  It

5    doesn't go into the pockets of the sponsors.  Who's pocket

6    does it go into?  It goes into the pockets of the second

7    liens.

8              So again, we've been baffled by why the company

9    has refused to pursue a repayment to the second lien notes

10   through a second lien DIP financing in this case.  As we

11   indicate in our papers, we made proposals to do clean

12   interest only DIPs to stem the ongoing interest accrual in

13   this case.  And we don't care whether we do it or anyone

14   else does it in this case, but there's value slipping

15   through our fingers in this case.

16             And again those are costs that will be imposed

17   upon my creditors of the e-side if this auction process

18   fails.  Those costs are going to borne in the form of

19   reduced recoveries as well as increased costs necessary to

20   deleverage the EFIH balance sheet.  So make no mistake the

21   delay in this case and the glacial pace at which we're

22   moving, it's costing creditors in this case real money and

23   it will wind up eventually costing our creditors significant

24   dollars.

25             And the last point I want to make, Your Honor, is

1    a point about divisiveness.  I think I read about this in

2    several of the pleadings that were filed where people were

3    referring to intercreditor conflicts, divisiveness with the

4    Debtors, with the creditors, and I agree.

5            And I'm sure you agree there is a significant

6    level of divisiveness in these cases and part of it is

7    attributable to the creditor groups, but I also think a big

8    part of this is attributable to the debtors and how they

9    decided to run these cases.

10           The debtors have made choices.  They've made

11   choices to run the encore sales strategy on their own.

12   They've chosen to embrace litigation over negotiation with

13   their creditor groups.  They've chosen to go it alone

14   running a naked auction process without wide ranging

15   creditor support.  And it's unfortunate because I feel that

16   after the RSA was abandoned, the debtors, you know, maybe

17   they decided that it wasn't worth it to find partners in

18   this case to build consensus.

19           And they decided, well, we'll just put our heads

20   down and do our own way because we've got no friends in this

21   case, so we may as well keep moving forward and we'll see

22   what happens.

23           And I think as we all know and lots of smart

24   people in this room, in a large, complex, chapter 11 case

25   you can't get out going it your own way as the debtor.  You

1    have to build partners.  You have to take positions.  You

2    have to build a consensus.  You have to build ridges with

3    different creditor groups.  And I think to date in this

4    case, that has seriously been lacking in these cases and I'm

5    hopeful that going forward with the company finally putting

6    a plan and term sheet out there for the creditor groups that

7    perhaps we'll see a change in how the company wishes to

8    engage with creditor groups in this case and perhaps we'll

9    see more of embrace of seeking to negotiate resolutions with

10   our creditor groups, build consensus, make tough choices,

11   find partners, instead of what we've seen to date, which is

12   we're going to run the auction, we'll see what we get and

13   then we'll see where the chips fall.

14         We want this case to keep moving forward.  We're

15   frustrated at the pace.  We're frustrated at the economic

16   consequences of an action in this case.  We want the case to

17   move forward.  We want the company to step up and take

18   greater leadership of the plan process and start driving

19   these cases forward as they should do, during their

20   exclusive period, Your Honor.

21         THE COURT:  Thank you.  Anyone else?  Mr. Louria,

22   good morning.

23         MR. LOURIA:  Good morning, Your Honor.  Tom Louria

24   with White and Case.  We represent the ad hoc group of TCH

25   unsecured note holders.  We support the debtors requested

1   extension of exclusivity.  Indeed, given the state of

2   affairs, we probably would have seriously considered a

3   longer extension if we'd been asked.  Not so much because

4   things are great, but because of the dynamics that play in

5   this case and I think the Court has been able to hear that

6   and see that from the comments of the other parties that we

7   see a risk of significant detriment from launching a

8   (indiscernible) plan process in these cases at this point.

9        We have two primary concerns that we want to make

10  sure are addressed and considered.  Number one, the

11  (indiscernible) plan process in the ongoing legacy claims

12  discovery process.  And number two, the underlying plan

13  process itself if it can at this point be called that.

14       As the Court is aware one of the points of

15  friction in these cases has been figuring out how to deal

16  with the claims between and among the various debtors'

17  estates and against certain third parties including in

18  particular the sponsors.  On day one, the debtors took the

19  position that all potential claims between the estates and

20  against the sponsors were worthless as reflected by the RSA.

21       At the same time, we and others have long been

22  aware of various facts and circumstances that suggest

23  otherwise, including the obligations incurred perhaps for no

24  value in connection with the LBL, the spinoff of Encore from

25  the t-side to e-side for no consideration, various payments

1    and transfers that were made to or for the benefit of the

2    sponsors after public statements had been made regarding the

3    company's insolvency and apparent flaws in governance that

4    failed to properly address inherent internal conflicts.

5              We took and maintain the position that before

6    these matters can be addressed, much less swept away as

7    contemplated by the debtors, an appropriate investigation

8    into the facts must be conducted.  Indeed the Court has

9    expressed its view that such investigation has an important,

10   if not essential component of any plan process in these

11   cases.

12             So last summer the parties agreed on a process for

13   conducting the diligence that had to do be done to identify

14   and assess and then bring forward the claims that parties

15   thought should be pursued.  This has been an arduous and

16   time consuming process.  It has been delayed by other

17   matters that have taken a great deal of the party's time and

18   energy and been part of the intense litigation that this

19   Court has seen.  Litigation in connection with the RSA and

20   the financing that was put before the Court to support it

21   and the bidding procedures and the resulting governance

22   issues it revealed.

23             Nevertheless, there were approximately seven

24   months where debtors and the sponsors produced approximately

25   3.5 million pages of responsive materials for the parties to

1   review.   Indeed on January 12 of this year, they gave us

2   notice that the document production was substantially

3   completed.

4            Now, what's interesting is that since receipt of

5   that notice, and (indiscernible) in the last week, we have

6   received from the debtors and the sponsors, approximately

7   1.2 million additional pages, in other words, 1/3 on top of

8   the amount that was produced when the debtors announced that

9   the discovery was substantially completed.

10           Now, I've been informed by my litigators that it's

11  likely to take 1900 to 2000 attorney hours to review and

12  assess the 1.2 million pages that we've received in the last

13  week.  If you assume five lawyers work on that project 50

14  hours a week each, that's eight weeks.

15           The agreed protocol then contemplates that there

16  would be witness interviews or formal discovery.  We haven't

17  worked the details of that out, but we can't start the

18  interviews -- we can't ask people questions about the

19  documents and try to understand question that they raise

20  until we've completed the review.  In other words, we don't

21  even get to the witnesses until six to eight weeks from

22  today.

23           Now, our group may be kind of weird about this,

24  but we feel a need, indeed a duty to be reasonably informed

25  about the facts before engaging in serious talks regarding

1    settlement or waiver of these legacy claims.  Apparently the

2    debtors felt otherwise.  When the case started they proposed

3    the (indiscernible) and apparently did not review these

4    documents.  And I'll get to that conclusion because if the

5    debtors had already pulled and reviewed these documents

6    before they reached the conclusion that the claim should be

7    swept away for nothing, it wouldn't have taken them nine

8    months to produce these documents for our review.

9              I mention all this because there is a possibility,

10   if not a likelihood that we will need to extend the current

11   March 31st and April 30th deadlines for identifying claims

12   and filing motions for standing to pursue them.  And at the

13   end of the day we continue to believe that this exercise is

14   an essential component of any reasonable plan process in

15   these cases.

16             So while we share the view of the other parties

17   that the process should move forward as quickly as possible,

18   it can't move forward at the expense of a proper

19   consideration and resolution of these fundamental issues.

20             According to the plan, which the debtors continue

21   to acknowledge is in its (indiscernible) stages, we remain

22   concerned that in reality the debtors are limiting

23   themselves and the stakeholders to a quickie tax free

24   deconsolidation transaction that improperly transfers

25   substantial upside of encore to a third party or a

1    particular stakeholder group while other stakeholders are

2    left with little or no recovery or an inadequate recovery.

3              We've heard in fear that the debtors were open to

4    other structures and other ideas.  It will be interesting to

5    see with this term sheet that we get this week says.  I'm

6    placing my bet that it's going to be more of the same.

7              But the debtors' actions in court to this point

8    have only been directed towards one outcome and that has

9    continued and it must stop.  It's resulting in expense and

10   at the same time a stunted process and it has the amazing

11   effect of simultaneously improperly capping e-side value and

12   destroying t-side value which I think as the Court can

13   observe from the comments of the other stakeholders is less

14   than optimal for the formulation of a deal.  Indeed you see

15   the dichotomy of views and the lack of support for that

16   process and the statements of the other parties.

17             Now, the one thing I don't want to skip past is

18   that I do not agree with the statements of counsel for the

19   first lien note holders on the t-side that a plan cannot be

20   formulated in this case without their consent.  I think

21   there's case law in precedent that's been established

22   regarding the non=consensual treatment of secured claims and

23   there's no reason that that can't be part of the plan

24   process in these cases.

25             What I think is important though is that the

1    debtors with their exclusivity be directed to open the stage

2    up, to open the forum to a more broad discussion than just a

3    tax free deconsolidation transaction.

4            Thank you.

5            THE COURT:  You're welcome.  Mr. Schepacarter?

6            MR. SCHEPECARTER:  Thank you, Your Honor.  I rise

7    only to clarify something in the record.  I think there was

8    a reference earlier with respect to the statement that the

9    U.S. Trustee filed with respect to the last hearing and the

10   issue there wasn't prejudging conflicts.  It dealt with the

11   Kirkland's retention and the protocol there under and so I

12   just wanted to clarify that.  That was the issue.  Thank

13   you.

14           THE COURT:  Thank you.  Mr. Jonas.

15           MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

16   from Brown Rudnick for Wilmington Savings Fund Society.  The

17   DCEH second lien indenture trustee.  Your Honor, in our

18   limited objection to the Debtor's second motion to extend

19   the Debtor's exclusive periods, we requested two types of

20   relief.  First, that the proposed eight month extension for

21   the Debtor's exclusive right to file a plan be limited to

22   four months which the Debtors have now agreed to.  The

23   second type of relief had really two parts.  One, that the

24   independent director for the (indiscernible) Debtors as the

25   only, arguably, unconflicted board level fiduciary to T-side

1    creditors have the concurrent, not the sole, the concurrent

2    ability to file a plan for the T-side Debtors, but he

3    determines that to be in the best interest of his

4    constituents.  And second, Your Honor, to the extent that

5    the official committees for the T-side and the east-side of

6    the Debtor's capital structure can come to an agreement on a

7    restructuring construct that they also should have the

8    concurrent ability to file a joint plan for consideration by

9    the Court and creditors.  Your Honor, the limited relief

10   we're seeking, which in no way takes away the Debtor's right

11   to file a plan, is intended to encourage an open and fair

12   plan negotiating process by taking absolute and complete

13   control of that process out of the hands of out of the money

14   equity and giving the (indiscernible) fiduciaries in this

15   case, that is the independent director, at least that's for

16   the T-side, and the creditor's committees the ability to

17   file a plan if appropriate.  First, Your Honor, there is

18   clear statutory and case support for our requests.  In the

19   United Press International case, which we cited, the Court

20   opened up exclusivity to allow the creditor's committee and

21   another party to file a plan.  The Court cited Bankruptcy

22   Code Sections 105, 1107(a) and 1121, and at footnote 12, I

23   think summed it best, Your Honor, when the Court said quote,

24   "Thus this Court adopted a middle approach initially

25   suggested by the parties themselves opening up the right to

1    file a plan on a limited basis to those two entities,

2    besides the Debtor itself, that have the most at stake in

3    this case and have shown themselves to be responsible

4    parties while refraining from opening the flood gates

5    completely.  The statute does not expressly prohibit the

6    imminently sensible middle course and I can perceive no

7    reason to find any such prohibition by implication."  Your

8    Honor, the Debtors argue that United Press is

9    distinguishable because the Debtor there, itself, sought the

10   relief and because the case was decided before the 2005

11   amendments to the bankruptcy code.  Your Honor, neither of

12   these facts change or impair the basic common sense and

13   reasoning of United Press, especially in light of our

14   request here.  We're not asking that the flood gates be

15   opened to all parties to be able to file a plan.  We're not

16   even asking that we be able to file a plan.  We're simply

17   asking that the true non-insider fiduciaries in this case be

18   able to file a plan, if appropriate, under the

19   circumstances.  Second, Your Honor, the relief we seek we

20   believe to be consistent and effectively corollary to the

21   Court's determinations at the November 3rd, 2014 hearing

22   regarding the Debtor's on course sale procedures motion.  At

23   that hearing the Court found, at least in part based on

24   pervasive conflicts among the Debtor's boards, that the

25   bidding procedures had to go back to the Debtor's boards,

1    and quoting Your Honor in the hearing transcript, page 18,

2    lines 11 through 19, quote, "Receive each board's approval

3    through a formal vote assenting to the bid procedures as

4    modified."  Close quote.  And the Court then determined,

5    quote, "Based upon the conflicts involved at the TCEH and

6    EFIH levels, that vote must be by that board's independent

7    directors which the Court understands to be Mr. Sawyer and

8    Mr. Cremons respectively."  Last quote, Your Honor, at page

9    19, lines 13 through 16.  I think this is really what I'm

10   trying to get at.  The Court found that, quote, "Mr. Sawyer

11   and Mr. Cremons occupy important positions in this

12   bankruptcy case as the independent directors of

13    TCEH and EFIH respectively, it is incumbent upon them to

14   act vigorously in these roles.  Your Honor, the debtors

15   argue that permitting the T side independent director to

16   file a plan would somehow be violative [sic] of corporative

17   governance.  Specifically, the debtors say this is an

18   improper effort to dictate corporate governance in the

19   context of exclusivity and ignores the authority the debtors

20   have already vested in the disinterested directors to

21   identify and address conflict matters.

22           However, Your Honor, in fact it's the complete

23   opposite.  Permitting the T side independent director to

24   file a plan would be completely consistent with the debtors'

25   board resolutions of November 7th, 2014 and December 9th,

1    2014.  As described in the debtors' motion at the top of

2    page 10, the resolutions as to the T side (EFCH/TCEH)

3    delegated to their disinterested director authority to: A)

4    engage advisors to advise respective debtors at the

5    direction of the disinterested director on actual conflict

6    matters; B) review and act upon actual conflict matters; and

7    C) decide whether a particular matter constitutes an actual

8    conflict.

9            It's very clear, Your Honor, if the independent

10   director, with advice of his independent advisors,

11   determines that there is an actual conflict, he is entitled

12   to review and act on that conflict.  Your Honor, clearly

13   negotiating and filing a plan in this case with the

14   incumbent conflicts which have already been found to exist

15   and I think, Your Honor, that's one of the reasons we don't

16   have additional evidence today.  I don't think we need it.

17   We think the record on the conflicts issue is well formed.

18   These, in fact, or likely could be determined to be an

19   actual conflict matter.  I don't think that has to be

20   decided today.  The point is it could be and likely will be,

21   such that it will need to be reviewed and acted upon by the

22   T side independent director.

23           If that is the case, Your Honor, or is determined

24   to be the case, how could it possibly be that the T side

25   independent director is barred from filing a plan if he

1    determines that to be in the best interest of his

2    constituents?

3            THE COURT:  How is he barred from filing the plan?

4    Companies can only act through individuals.  Boards of

5    directors control companies' actions.  You just told me that

6    he has the inherent authority under board resolutions to act

7    on behalf of the debtors if he deems a conflict exists.  He

8    already has -- everything you want me to do is already

9    inherent in what the debtors have asked for.

10           MR. JONAS:  Your Honor, I hear you loud and clear

11   and I really -- we did not want to be too cute about it.  I

12   didn't want to come back here if that's appropriate in weeks

13   or months and find out, because I think if you had asked the

14   debtors that question, I think they'd give you a different

15   answer.  I think they would tell you, well, we've got to

16   have full board votes or at least this would be -- I think

17   would be their position.  We've got to have full board votes

18   and if the independent director is outvoted so be it.  If

19   the debtors are willing today to acknowledge on the record

20   that --

21           THE COURT:  But what you really are saying is you

22   don't trust the debtors' boards of directors to act

23   appropriately.  You want me to insert myself into the board

24   process and say hey, it's not enough that you've passed

25   these resolutions.  It's not enough that you have an

1    independent director who now has independent legal and

2    financial advisors.  I don't trust you to run this process

3    right, so I have to insert myself.  And I don't have any

4    evidence to indicate that they wouldn't act appropriately or

5    consistently.

6         I will say that I obviously made comments at

7    previous hearings that I thought that Mr. Sawyer and

8    Mr. Cremens were no sufficiently engaged.  But the debtors

9    have, at least facially, rectified that in many ways, passed

10   resolutions giving these -- empowering these people to take

11   certain actions.  They've passed -- they've hired advisors.

12   So what you're really asking me, I think, to do is to become

13   more actively involved than the record would support at this

14   point.

15        MR. JONAS:  I disagree, Your Honor, in the

16   following respect.  First of all, I don't think I need to

17   get to the level -- you could guess the answer to the

18   question of the trust but I don't think I need to get there.

19   All we're asking for, Your Honor, is a recognition -- this

20   is not further inserting the Court in the process.  We're

21   simply asking -- maybe it's an abundance of caution, but

22   we're simply asking that any order that extends exclusivity,

23   specifically provide -- and I don't think it's -- perhaps

24   it's not an additional carve out, but it is a carve out to

25   recognize what's already in place.  That is -- and if we're

1     wrong about the rules of the road, I'd like to know it

2     because I think we're on -- of the same mind which is if

3     Mr. Sawyer determines that it's in the best interest of his

4     constituents to file a plan, and he determines that that's

5     an actual conflict matter, etcetera, I think there's already

6     a record as you've suggested, Your Honor, that he can do

7     that notwithstanding that -- an extension of exclusivity is

8     placed.  It doesn't need a full board vote.  It doesn't need

9     anything.  He can go ahead and do that on behalf of the T

10    side debtors.

11             I think, Your Honor, we're not asking for

12    additional intervention.  We're simply asking that that be

13    recognized in connection with any exclusivity order, because

14    I think that's -- if that -- if those are our rights today,

15    I don't want to lose anything by there being an additional

16    extension of exclusivity.  And I don't think we're asking

17    for anything more than the recognition of what's already in

18    place.  But I think we're entitled to that.

19             Your Honor, I'll try and move towards wrapping up

20    in a minute or so.  I think the Court should ask, as we've

21    been asking, and maybe this is saying it in a different way

22    than you already have which is why are the debtors opposing

23    the T side independent director to file a plan when he is

24    the only independent, non-conflicted T side board member.

25    That simply is good corporate governance.  It is a

1    recognition of what we believe already to be the case.  And

2    so I would argue here, the debtors --

3              THE COURT:  Excuse me.  Sorry.

4              MR. JONAS:  God bless you if that was a sneeze,

5    Your Honor.  Here, Your Honor, the debtors protest too much.

6    I had asked the same question, Your Honor, as to the

7    creditors committee.  That is why did the debtors protest

8    that if the creditors committee on both sides, T and E,

9    determine that it's in -- that they can come together and

10   it's in their best -- the creditor's best interest to file a

11   plan, why does the debtor oppose that relief?

12             Last, Your Honor, notwithstanding -- and I'll be

13   brief about this, the statements as to the volume of

14   documents produced.  We don't believe the debtors have been

15   forthcoming, certainly not in a timely fashion, with

16   documentation and information regarding key material matters

17   in this case, especially as the key conflict areas, such as

18   intercompany claims, including with respect to tax and TSA

19   issues.  And I think the Court should consider the debtor's

20   request of exclusivity extension in that context.

21             The limited modifications we've suggested, we

22   believe will help to level the playing field and foster more

23   open negotiation of a plan.  Thank you, Your Honor.

24             THE COURT:  Thank you.  Reply?

25             MR. SASSOWER:  Your Honor, unless you have

1     questions from me --

2           THE COURT:  Well, let me ask a question Mr. Jonas

3     wants me to ask, except I'll ask it my way.  There's nothing

4     in the exclusivity motion that requires any plan that the

5     debtors would file to be a joint plan that the debtors would

6     file.  It's --

7           MR. SASSOWER:  Correct.

8           THE COURT:  -- would be consistent with the

9     exclusivity order that TCEH could file an independent plan.

10          MR. SASSOWER:  Correct.

11          THE COURT:  Okay, and there are circumstances

12    under the current state of play of the corporate authority

13    of the independent directors where in certain circumstances

14    those independent directors can act independently on behalf

15    of the company.  In other words --

16          MR. SASSOWER:  Right.  That is correct.

17          THE COURT:  -- they've delegated, at least in

18    certain instances, authority from the board to make -- take

19    certain actions.

20          MR. SASSOWER:  That is correct.

21          THE COURT:  Okay.  And your response to the

22    invitation to specify that included in that delegation of

23    authority is the right for an independent director, whether

24    it be Mr. Cremens or Mr. Sawyer, depending on which company

25    or the other -- depending on which companies we're talking

1    about -- to specify that included in that corporate

2    authority is the ability to file an independent plan is both

3    unnecessary under the current procedures in place and also

4    would be a step too far, I guess.

5              MR. SASSOWER:  Yeah, I think that's right.  I

6    think it's premature.  I think the plan could -- the entire

7    plan could be a conflict matter, but that's -- most likely

8    will not be the case.  The plan will probably most likely be

9    -- involve conflict matters, as well as will involve non-

10   conflict matters.  If Mr. Sawyer, since Mr. Jonas is focused

11   on the TCEH estate --

12             THE COURT:  Yes.

13             MR. SASSOWER:  -- (indiscernible), but if

14   Mr. Sawyer determines that somehow he wants to file a plan

15   on behalf of TCEH and somehow he is being blocked by the

16   other board, well, Mr. Sawyer has advisors.  And I am sure

17   the first thing they will do is come to this Court and

18   advise you that they feel like they are somehow being

19   blocked from pursuing that action.  It's hard for me to

20   fathom that that hypothetical would ever come to pass.

21             THE COURT:  Okay.  No, I don't have any further

22   questions.

23             MR. SASSOWER:  Thank you, Your Honor.

24             THE COURT:  You're welcome.  Any final comments?

25             All right, well, I have heard and listened

1    carefully to the statements, reservations of rights,

2    etcetera both by the supporters of at least the modified

3    relief being requested by the debtors as well as the

4    comments of Mr. Jonas on behalf of the objectors.  And I'm

5    not going to comment on those comments other than to say

6    I've listened.  I think some were fair.  I think some were

7    unfair.  I think some were realistic.  I think some were

8    revisionist (indiscernible), but I take them all carefully

9    into consideration as I think about taking stock myself on

10   where this case is, has been, and is headed.

11            I will say this, which is in my now 20 plus years

12   of experience in this field, I can't think of a case where

13   the capital structure has presented such challenges to a

14   reorganization on a unified basis that I can recall seeing.

15   This is a very challenging case.  And some of the challenges

16   are inherent in what we have in front of us, which is this

17   capital structure.  Now some of the challenges have other

18   causes or sources and some of that might be creditor/debtor

19   positions that are being taken; some of it might be

20   professionals involved, although I barely haven't seen that

21   as being an issue at all to date.  But it's complicated.

22            And I think that it is certainly appropriate in

23   this case that exclusivity be extended.  I don't think

24   anyone says otherwise.  Actually, no one does say otherwise.

25   And the timeframe being sought, four months with an

1   additional two month kicker, is appropriate in the nature of

2   the complexity of the case and what has occurred as to -- up

3   to now and what is planned to occur or at least said will

4   occur in the near future.  That doesn't mean just plan

5   negotiations.  It means all the other stuff that's been

6   going on in the case.  That includes the discovery protocol,

7   the investigation periods, the RSA litigation, the Oncor bid

8   litigation, the (indiscernible) litigation, the litigation

9   we had on the motion to dismiss I just decided in connection

10  with the -- yeah, I'm trying to say it in a way that doesn't

11  give credence to either side's position.  I'll call it the

12  (indiscernible), I think, thank you, Mr. Sassower.

13          But anyway, there's been a lot going on.  There's

14  been a lot of focus and even the most competent of

15  professionals can only deal with so many things at a time

16  and the Court only has so many resources.  So I don't sit

17  here today, you know, shaking my head and say I can't

18  believe we're not in a position where we don't have a

19  confirmable plan that's been put in place.  This case has

20  been very busy, very complicated, will continue to be

21  complicated, and will continue to be busy.  And although it

22  would be nice if we had an actual plan proposal in place, it

23  certainly isn't fatal to a request for a further extension

24  of exclusivity that that hasn't occurred yet.  I am very

25  hopeful and take the debtors at their word that they will

1    continue to move the process forward and focus on getting a

2    proposed plan in place or at least the term sheet.  And I

3    hope that moves matters forward.

4            I don't have any illusions about peace breaking

5    out anytime soon, but hopefully these actions will be in a

6    positive direction.

7            With regard to the specific objections raised by

8    TCEH -- excuse me, by WSFS -- excuse me, WSFS because the

9    Court reporter in New Jersey won't know what WSFS means --

10   with regard to the objection as WSFS, I'm going to overrule

11   that objection.  As to this idea that exclusivity should be

12   modified to include the official committee's acting in

13   concert having pay sort of co-exclusive right to file a plan

14   with the debtors, I have two comments.  One, I'm not sure

15   that I agree that the Court has the flexibility to modify

16   exclusivity in a way to add additional parties to a debtor's

17   exclusivity.  I think that there is a very strong argument

18   to say that the debtor either has exclusive right to file a

19   plan or it doesn't.  And any control the debtor -- excuse

20   me, the Court has over the process really goes to who's

21   allowed to solicit as opposed to who's allowed to file a

22   plan.

23           In any event, I don't need to get there because I

24   agree with the (indiscernible) position on this which is

25   they haven't specifically asked for it.  They certainly

1    reserve the right to ask for it.  It would -- if the two

2    committees can come up with a consensual plan that they both

3    support and they were to come before the Court and ask for a

4    termination of exclusivity so they could file that plan, I

5    think they would get a fair hearing and I would definitely

6    consider that and I will decide it at the time if it

7    happens.  And I don't think we need to act now to give them

8    the authority to do that.  They will have the authority if

9    they're A) able to reach a deal and B) able to convince me

10   that exclusivity should be terminated so they can file that

11   plan.  All those rights are reserved and they're not asking

12   for that relief today so I'm not going to insert it at

13   WSFS's request.

14           With regarding to including in an exclusivity

15   order a provision that Mr. Sawyer has the independent

16   authority if he deems it appropriate to file a plan of

17   reorganization on behalf of his company, of which he's an

18   independent director, I think that is overstepping two

19   things: one -- is overstepping the relief I'm prepared to

20   give for a couple reasons.  One is that I believe that

21   there's nothing in the exclusivity order that I've been

22   asked to sign that's in any inconsistent with the thrust of

23   what's being asked that I include, which is that in certain

24   circumstances, based on board resolutions that have been

25   made public, independent directors have the authority to act

1    on behalf of their company.  And that could include, in

2    certain circumstances, the ability to file a plan.  I don't

3    think it's helpful and I think it would be counterproductive

4    for me to dive further into the inquiry here, based on the

5    record that I have today, to say -- and what that means is

6    that this director has the independent authority to file a

7    plan of reorganization.  I think that's too much.  It may be

8    that it develops in the future that I need to get more

9    actively involved, but a lot has been accomplished in

10   connection with asserting the authority of the independent

11   directors in response to the rulings I made, I guess it was

12   in October, on the Oncor sale process and the actions that

13   had been taken in response to that.

14           And the independent directors now all have

15   independent legal and financial advisors, or certainly legal

16   advisors.  They are being advised.  And they have authority

17   to act independently in actual conflict matters.  So I don't

18   think any more is needed at this point.  I don't think the

19   record supports needing anything more at this point.  And I

20   think it would be counterproductive and overly aggressive

21   for the Court to be that micromanaged -- to be involved at

22   that level of micromanagement in how the boards of directors

23   and the independent directors are going to act going

24   forward.  So I will overrule that objection as well and I'm

25   prepared to sign the order that was submitted.

1           And if you have a nice clean copy, that would be

2     great.

3           MR. SASSOWER:  May I approach?

4           THE COURT:  Yes.

5        (Pause in the proceedings)

6           THE COURT:  Okay, I signed the order.

7           MR. SASSOWER:  Thank you, Your Honor.

8           THE COURT:  Okay, the fourth omnibus objection.

9           MR. SERAJEDDINI:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. SERAJEDDINI:  Steven Serajeddini of Kirkland &

12    Ellis on behalf of the debtors.

13          Sir, as you said, the last item on the agenda is

14    the debtor's fourth omnibus claims objection.  Debtors filed

15    the objection, along with a supporting declaration, of

16    Steven Kotarba on December 12th, 2014.  On January 8th, the

17    debtors filed a certification of counsel with a revised

18    proposed form of order and on January 12th, Your Honor

19    entered the order except with respect to the nine

20    substantive duplicate claims before Your Honor today.  As

21    stated in the objection, the debtors seek to expunge these

22    proofs of claim because each one asserts claim on account of

23    a liability that is asserted in another filed proof of claim

24    and is therefore redundant.

25          The claimants reserved and noticed, as reflected

1    in the affidavit of service filed on January 12th and none

2    of the affected claimants are objecting to the relief sought

3    today.  I'll pause now to see if Your Honor has any

4    questions regarding the specific claims or would like me to

5    discuss anything in further detail.

6            THE COURT:  No, I -- the reason that I didn't

7    grant all the relief was the fact that the redundancy didn't

8    go to -- we had, you know, identical duplicative claims.

9    We're expunging one, we're keeping the other.  The claims

10   were deemed redundant on a substantive basis.  They, in

11   effect, were identical and we weren't given both claims to

12   review so we couldn't make an independent judgment as to

13   whether we agree or disagree.

14           MR. SERAJEDDINI:  Understood.

15           THE COURT:  And that was (indiscernible) and you

16   sent over the other set and went through the process and

17   agree with the debtor's position that they are substantively

18   identical and don't have any issue with regard to the relief

19   being requested but I have a caveat.

20           So the problem is that some of the claims that the

21   debtors seek to expunge contain support for the claims.

22   That support isn't reattached to the claim that's going to

23   be the remaining claim.  So I want to make sure there's not

24   an unintended loophole here where the debtors may now object

25   to the remaining claim on the non-substantive basis that

1    sufficient documentation was not provided because the claim

2    that remains is going to have insufficient documentation.

3    And I think that would be unfair to those creditors, some of

4    which may not be necessarily sophisticated creditors.  And I

5    don't have the resources to ensure in the future that, you

6    know, to track this issue.  So I just want to assure that

7    nobody objects that the debtors understand that -- and there

8    are three claims that I'll identify that I'm specifically

9    concerned about, but I don't want to hear a future objection

10   on these claims on the basis that there isn't sufficient

11   documentation attached to the remaining claim.

12          Now you could make the argument that the

13   documentation attached to the original claim was

14   insufficient, but you need to play that out for me is what

15   I'm asking for.  And the claims I care about are Airflow

16   Science -- Airflow Sciences Corp., American -- Americom

17   Telecommunications, and Top Hat Services.  So with that

18   understanding, if everybody's on board with it, I'm prepared

19   to *grant the claim objection.

20          MR. SERAJEDDINI:  Understood, Your Honor.  And

21   actually in preparation for this hearing, I suspect that

22   that may be where you were headed and I can assure you that

23   the debtors intend to take the -- all supporting

24   documentation that was filed with the redundant claim that's

25   being expunged into account when considering whether the

1    subsequent claims have merit, whether they have sufficient

2    documentation, and for all those purposes.

3            THE COURT:  Okay, good.  Then we're all on the

4    same page.

5            MR. SERAJEDDINI:  Great.

6            THE COURT:  Do you have an order?

7            MR. SERAJEDDINI:  I do.  If I may approach.

8            THE COURT:  Yes.

9            MR. SERAJEDDINI:  Thank you.

10           THE COURT:  That's fine.  And as you can see, we

11   actually -- I take very seriously and my staff gets the

12   lovely job of incorporating what I take seriously, but we

13   take seriously the review of claim objections on an

14   independent basis based on the fact that a lot of unintended

15   or intentional, but most unintended mischief can occur in

16   connection with claim objections.  So it's certainly not in

17   any way being pejorative or critical of the debtors, but you

18   know, in every case we have, we look very closely at the

19   claim objections.

20           MR. SERAJEDDINI:  Understood.  And, Your Honor, I

21   also have to say that going forward we will definitely serve

22   both copies of the claims and we apologize for failing to do

23   that this time.

24           THE COURT:  That's okay.  There's actually -- this

25   isn't the first time that happens because it's considered a

1    non-substantive objection under the local rules if claims

2    are identical, but what's meant is they are truly identical

3    and if they are in effect identical, I mean we're splitting

4    hairs, but it's important because at that point it really is

5    a substantive issue the Court needs to look at.

6              MR. SERAJEDDINI:  Understood.

7              THE COURT:  All right.  I've signed the order.

8              MR. SERAJEDDINI:  Great.  Thank you, Your Honor.

9              THE COURT:  Anything else for today?

10             MR. SASSOWER:  No, that's all, Your Honor.

11             THE COURT:  All right, thank you, we're adjourned.

12         (Whereupon, these proceedings concluded at 11:12 a.m.)

13

14                          * * * * *

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3      I, Melissa Looney certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Melissa          Digitally signed by Melissa Looney
                         DN: cn=Melissa Looney, o, ou,
                         email=digital1@veritext.com, c=US
       Looney           Date: 2015.02.11 16:07:16 -05'00'
6      _____

7      Melissa Looney

8      AAERT Certified Electronic Transcriber CET-607

9

10

11

12     Date:  February 11, 2015

13

14

15

16

17

18

19

20

21     Veritext Legal Solutions

22     330 Old Country Road

23     Suite 300

24     Mineola, NY 11501

25