**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | x | |
| In re | : | **Chapter 11** |
| | : | **Case No. 14-10979 (CSS)** |
| ENERGY FUTURE HOLDINGS CORP. *et al.,* | : | **(Jointly Administered)** |
| | : | **(D.I. 1888)** |
| | : | |
| Debtors-in-Possession. | : | Hearing date: February 17, 2015 at 12:00 p.m. (EST) |
| | : | |
| | X | |

**FEE COMMITTEE'S REPORT ON FIRST INTERIM FEE APPLICATIONS**
**SCHEDULED FOR HEARING ON FEBRUARY 17, 2015**

TO:    THE HONORABLE CHRISTOPHER S. SONTCHI,
        UNITED STATES BANKRUPTCY JUDGE:

The Fee Committee appointed in the above-captioned chapter 11 cases (the "**Fee Committee**") respectfully submits this summary report (the "**Report**") concerning the first interim fee applications (collectively, the "**Applications**") of Alvarez & Marsal North America, LLC; Evercore Group LLC; KPMG LLP; McDermott Will & Emery LLP; and Lazard Freres & Co., LLC (the "**Applicants**"), pursuant to which the Applicants seek approval of $16,611,107.49 in fees and $849,410.00 in expenses, [D.I. 2678, 2700, 2806, 2679, 2672, and 2726], as summarized on **Exhibit A**.  Following review by the Fee Committee and discussions with the Applicants, the Applicants have agreed to reduce their fee and expense requests.  The Fee Committee respectfully recommends approval of the Applications in the adjusted amounts, which aggregate $16,517,566.76 in fees and $820,597.45 in expenses, pursuant to 11 U.S.C. § 330.

## PRELIMINARY STATEMENT

The Applicants have reached agreements with the Fee Committee, subject to this Court's approval, to resolve the issues and concerns identified by the Fee Committee regarding the Applications, pursuant to which the Applicants request fees and expenses incurred for the period from April 29, 2014, through August 31, 2014 (the "Fee Period").  The resolutions are consistent with the principles and standards—discussed in detail below—that the Fee Committee has developed and applied to each interim fee application and in accordance with the provisions of the retention orders entered by the Court (the "Fee Committee Standards").  The negotiated resolutions help ensure that the interim fees and expenses comply with the applicable requirements and guidelines established by the Bankruptcy Code, the Executive Office of the U.S. Trustee ("EOUST"), and the Fee Committee.

As of the date hereof, the Court has authorized the retention of 33 estate professionals. Fourteen professionals have filed applications seeking approval of fees and expenses incurred during the Fee Period, which aggregate approximately $66 million.  The Court will consider the Applicants' first interim fee applications, which are uncontested, on February 17, 2015, at 12:00 p.m. (EST).

The Fee Committee respectfully recommends that the Court allow the compensation sought in the Applications, with the adjustments set forth in **Exhibit A**, and direct the Debtors to pay these amounts on or before March 1, 2015.

To date, the Court has approved the first interim fee applications of:  Filsinger Energy Partners; Gibson, Dunn & Crutcher LLP; Thompson & Knight LLP; and Morrison & Foerster LLP and Kirkland & Ellis LLP and Kirkland & Ellis International, LLP.  At the February 17, 2015 hearing, the Court will consider the uncontested first interim fee applications of the Applicants.  Thus, of the 15 first interim fee applications filed, the Fee Committee and 10 estate

professionals have achieved resolutions of identified concerns and sought or seek approval of interim fees and expenses in reduced amounts to address the Fee Committee's concerns.

Three professionals, Sidley Austin LLP, FTI Consulting, Inc. and Polsinelli PC, have requested that their first interim fee applications be considered by the Court at a later date in order to provide additional time to address issues with their applications. Deloitte & Touche LLP and EPIQ Bankruptcy Solutions, LLC filed their first interim fee applications late and, therefore, their fee review and negotiation process has been delayed with each professional's consent. If resolutions are achieved, then these four remaining applications will be heard in conjunction with uncontested second interim fee applications. Otherwise, the Applicants and the Fee Committee, subject to Court approval, will seek a contested hearing date and a briefing schedule to present these applications and the Fee Committee's objections to the Court.

The Fee Committee continues to work toward maintaining an open and cooperative relationship with the estate professionals. The Fee Committee's review has been rigorous, involving a line-by-line, quantitative, qualitative, and comparative analysis of the applications. With the adjustments on **Exhibit A**, the Fee Committee has no objection to the Court's approval of these fees and expenses.

This Report contains a firm-by-firm summary. Notably, the Fee Committee has identified issues concerning multiple professionals attending hearings and depositions,[1] resulting in overlapping and redundant services, and vague descriptions of the services provided. Always subject to close scrutiny, expenses for each professional have been reduced through the review and discussion process.

---

[1] *See*, *e.g.*, *In re Fleming Cos., Inc.*, 304 B.R. 85, 91 (Bankr. D. Del. 2003) (reducing fees and expense in part because "five to six attorneys representing the Debtors [appeared] at every hearing during the period covered by the first interim fee applications.").

As stated in prior Fee Committee reports, the Fee Committee does not seek a "targeted" amount or percentage fee reduction in the applications that it reviews.  Rather, the Fee Committee Standards have been applied to each application.  The Fee Committee reviewed in detail the Applications and issued comprehensive letter reports to each firm on December 16, 2014, December 17, 2014, and January 16, 2015.  The reports triggered a series of negotiations with the Applicants and the adjustments set forth on **Exhibit A**.  Pursuant to the Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 2066] (the "Interim Compensation Order"), the Applicants already have been paid 80 percent of the fees and 100 percent of the expenses incurred during the Fee Period.

## BACKGROUND

1.      Through prior Fee Committee reports, the Court is familiar with the Fee Committee's appointment and membership.  *See Fee Committee's Report on First Interim Fee Applications Scheduled for Hearing on December 29, 2014* [D.I. 3147]; *Fee Committee's Report on First Interim Fee Application of Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP Scheduled for Hearing on January 26, 2015* [D.I. 3356].

2.      Set forth below, the Fee Committee has reached mutually acceptable resolutions with five of the Retained Professionals.

## COMMON ISSUES

3.      Each of the interim fee applications raised issues particular to the individual firm's retention and the services provided—although most are not novel.  The most prevalent causes for concern are described below.

4.      <u>Retention and Fee Application Matters and Non-Compensable Billing Activities</u>. The Fee Committee has found it necessary to reiterate its standards for compensation for fees

incurred relating to retention and fee applications, with several professionals identified in this report subject to reductions on this basis.

5.      The Fee Committee views certain tasks in the Retention and Fee Application category as non-compensable because they are tasks that any professional would perform, without charge, for any client—such as routine conflicts checks, obtaining conflict waivers, and monitoring the case docket for progress of the retention application.  Other tasks are performed primarily for the convenience of the professional itself, or constitute administrative billing activities that may be necessary, but are not compensable, because they constitute the overhead costs of operating a professional practice.  The Fee Committee has asked that all professionals either eliminate such time entries from their fee applications or indicate the task descriptions with a "no charge" annotation.

6.      Reasonable fees and expenses associated with the preparation and submission of interim and final fee applications, including a single attorney's attendance at uncontested hearings, generally will be treated as compensable.  With respect to time spent on Fee Applications, the Fee Committee requests that in all subsequent applications, such time be segregated into its own matter entitled "Fee Application Preparation."

7.      Time spent preparing or reviewing time records or invoices for inclusion in a Fee Application will not be compensable, whether or not characterized as time spent preparing a fee application.  Furthermore, work performed in responding to the Fee Committee's inquiries or informal objections (including providing follow-up or supplemental documentation) is not compensable.  *See Stipulation and Order Appointing a Fee Committee* [D.I. 1896] at 10.  The Fee Committee has asked professionals to segregate "Fee Objection Discussion and Litigation" from other fee application related tasks.

8.      With these parameters, the Fee Committee evaluated each Applicant's retention
and fee application time and requested adjustments to comply with the Fee Committee
Standards.  The adjustments are included in **Exhibit A**.

9.      Non-compensable billing activities will continue to be a focus of the Fee
Committee's careful review—with quantitative and qualitative comparisons drawn between and
among professionals to ensure that the Fee Committee's standards are consistently followed and
applied uniformly.  It bears repeating that for all professionals, time spent proofreading,
reviewing, and editing time entries and monthly invoices is not compensable—no matter how it
is characterized.

10.      <u>Time Increments</u>.  Proper time record keeping is necessary to enable the Court to
determine the reasonableness of the work that has been performed.  "Any uncertainties due to
poor record keeping are resolved against the applicant."  *See In re Poseidon Pools of America*,
216 B.R. 98, 100-101 (E.D.N.Y. 1997).  Specifically, pursuant to the U.S. Trustee Guidelines,
timekeepers must record their time contemporaneously in tenth-of-an-hour increments.  See
Local Rule 2016-2(d)(iv).

11.      Time entries repeatedly billed in whole and half-hour increments—significantly
in excess of the 20 percent that might be expected in a statistically perfect sample—raise at least
two adverse inferences.  First, the pattern raises a concern that the timekeeper's minimum
increment was a half-hour, ignoring the requirement that the minimum increment be one-tenth of
an hour.  Second, the billing pattern raises a question of whether the timekeeper failed to keep
accurate and contemporaneous records, leading to estimating or rounding.

12.      The Fee Committee's review identified some timekeepers who regularly failed to
bill in tenths-of-an-hour.  These timekeepers were noteworthy because they appeared to record

their time solely or with great frequency in half-hour or whole-hour increments.  Accordingly, as set forth on **Exhibit A**, the Applicants have adjusted their fees due to these Fee Committee concerns.

13.    All of the Applicants for which time increments were identified as a problem acknowledged the problem and agreed to address the issue in subsequent fee applications.  The Applicants adjusted their fees to offset any adverse impact on the estates of this problem.

14.    <u>Administrative Tasks and Expenses</u>.  The Fee Committee examined each application to identify tasks that, in substance, are properly characterized as administrative. Those tasks include duties appropriate for staff such as word processing, proofreading, and secretarial tasks.  U.S.T. Guidelines § (B)(3)(e); *see also*, *e.g.*, *In re Fibermark, Inc.*, 349 B.R. 385, 396 (Bankr. D. Vt. 2006).  Accordingly, as set forth on **Exhibit A**, the Applicants reduced their fee requests for these non-compensable overhead charges.

15.    In addition, the Fee Committee analyzed the Applications for tasks performed by attorneys that more appropriately could have been performed by paraprofessionals.  Where the Fee Committee deemed these services compensable, they were allowed only at a billing rate commensurate with the complexity of the task.  *See* 11 U.S.C. § 330(a)(3)(D).  Each of the Applicants adjusted their fee requests for any identified inefficiencies.

16.    <u>Vague Task Descriptions</u>.  To be compensable, all time entries should be sufficiently detailed to allow a reviewer to determine their compliance with applicable Code sections, rules, standards, and guidelines.  Time entries for telephone calls, letters, and other communications should give sufficient detail to identify the parties to and the nature of the communication, such that they demonstrate compliance with 11 U.S.C. § 330.  In addition, professionals should identify the final intended work product or purpose and identify the

documents (or data) being reviewed, edited or analyzed so that the services may be evaluated for reasonableness. Professionals should identify the specific services provided—such as drafting, editing or conferencing—rather than relying upon generic terms like "*Work on*" or "*Attention to*." *See* Local Rule 2016-2(d); *see, e.g.*, *In re CCT Commc'ns*, No. 07-10210, 2010 WL 3386947, at *8 (Bankr. S.D.N.Y. Aug. 24, 2010).

17.     Each of the Applicants acknowledged instances of vague timekeeping and resolved to remedy the problem in subsequent interim fee applications. All Retained Professionals have been advised that the continued use of vague task descriptions will be subject to a recommended percentage reduction.

18.     <u>Summer Associates</u>. Retained professionals may not bill for summer associates and other timekeepers who have not completed their legal education. *See, e.g.*, *In the Matter of Chemtura Corp.*, No. 09-11233, First Interim Fee Application Hr'g Tr. 37-38 (Bankr. S.D.N.Y. Sept. 29, 2009). The Fee Committee has asked each Retained Professional to certify that all timekeepers for whom compensation is sought have completed their legal educations in the relevant jurisdiction or, in the alternative, to identify all fees incurred by summer associates and other timekeepers who have not completed their legal education.

19.     Some of the Applicants included summer associate time. Most of these instances were inadvertent, and all agreed to remove summer associate time from this and future applications.

20.     <u>Transitory Billers</u>. Certain timekeepers—based on their task descriptions— appear to have had only very high level or, alternatively, tangential involvement in these cases. This category of "transitory" timekeepers includes those whose time detail does not provide a basis to conclude that the timekeeper contributed any significant benefit to the estate—for

example, by creating or contributing to work product—at least during the first interim period.  It also includes those who spent the vast majority of their time reviewing court filings or the work of others and, in some instances, participating in meetings and calls with no apparent analytical or direct contribution to the Retained Professional's substantive work.

21.     All of the Applicants for whom transitory billing was a problem either provided supplemental information illuminating the timekeeper's niche role or agreed to remove charges for transitory timekeepers.

22.     Duplication and Overlap.  The Fee Committee is very concerned about the possibility of overlapping work or duplication with respect to some Retained Professionals.  The Fee Committee is carefully scrutinizing work that apparently mirrors that of other professionals, requesting supplemental explanations delineating the differing roles of each professional and identifying, with specificity, the measures that are in place to prevent duplication of efforts.  In addition, the Fee Committee has reviewed this Court's orders authorizing the retentions, including their provisions articulating the roles of each professional.

23.     Multiple Attendees.  The Fee Committee also is focused on the issue of multiple professional attendance.  Multiple professionals have attended each hearing, meeting, deposition, and other case-related conference.  Although perhaps not all professionals are paid with estate funds, the significance of this issue is manifest at most every hearing and deposition in these cases.  Toward that end, the Fee Committee has reviewed transcripts and canvassed its own members involved at the early stages of these cases and has concluded that many attendees are not participating in or necessary to these events.

24.     Expenses.  One of the most common sources of stipulated reductions for expenses was for requested expenses that exceeded the case maximums under the Fee Committee

Standards.  These reductions included:  black and white photocopying charges billed in excess of $.10 per page, travel in other than coach class, unnecessary use of car service and local travel, and meals charged at improper times or in excess of the $20 and $40 per person caps.  The reductions also include adjustments for computerized legal research expenses that lacked sufficient explanation and vague or undocumented expense descriptions.  Each Applicant either provided supporting documentation to establish compliance with the Fee Committee Standards or agreed to reduce their expense reimbursement requests so that the adjusted amount complies with the Fee Committee Standards to comply with the guidelines.

## THE APPLICATIONS

### Alvarez & Marsal North America, LLC

25.     On September 16, 2014, the Court entered the Order *Authorizing the Debtors to Retain and Employ Alvarez & Marsal North America, LLC as Restructuring Advisor Effective Nunc Pro Tunc to the Petition Date* [D.I. 2055] (the "Alvarez & Marsal Retention Order").

26.     On October 31, 2014, Alvarez & Marsal filed the *Interim Fee Application of Alvarez & Marsal North America, LLC, in Their Capacity as Restructuring Advisors for the Debtors and Debtors in Possession, for the Period From April 29, 2014 Through and Including August 31, 2014* (the "Alvarez & Marsal First Fee Application") [D.I. 2678].  Alvarez & Marsal seeks $6,393,405.00 in fees and $262,727.78 in expenses.

27.     Alvarez & Marsal's retention as the Debtors' restructuring advisors is for the purpose of providing turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk advisory services to the Debtors, including:

- Assisting in preparation of a revised cash flow forecast, if necessary, and presentation of such plan and forecast to the Debtors' Board of Directors and, if necessary, its creditors;

- Assisting in financing issues including assisting in preparation of reports and liaison with creditors;

- Reporting to the Debtors as desired or directed; and,

- Other activities as approved and agreed upon.

*See* Alvarez & Marsal Retention Order.

28.    During the first interim fee period, Alvarez & Marsal provided financial services as the Debtors' restructuring advisor, including turnaround advisory services, interim crisis management, revenue enhancement, claims management, and creditor and risk advisory services.

29.    The Alvarez & Marsal First Fee Application generally complied with Fee Committee Standards with some non-compensable billing activities and expenses subject to adjustment.  Alvarez & Marsal either provided adequate explanation for all matters questioned or agreed to the Fee Committee's proposed reductions.

30.    The Fee Committee has determined that the agreed reductions adequately address any deficiencies in the Alvarez & Marsal First Fee Application.

**Evercore Group LLC**

31.    On September 26, 2014, the Court entered the *Order Authorizing the Debtors to Retain and Employ Evercore Group LLC as Investment Banker and Financial Advisor, Effective Nunc Pro Tunc to the Petition Date* [D.I. 2056] (the "Evercore Retention Order").

32.    On November 4, 2014, Evercore filed the *First Interim Fee Application of Evercore Group LLC, Investment Banker and Financial Advisor to the Debtors and Debtors in Possession, for the Period From April 29, 2014 Through August 31, 2014* [D.I. 2700] (the "Evercore First Fee Application").  Evercore seeks $7,600,000.00 in flat and/or transactional fees and $368,611.55 in expenses.

33.     Evercore's flat fee retention is for the purpose of serving as the investment banker and financial advisor to the Debtors.  *See* Evercore Retention Order.

34.     During the first interim period, Evercore performed due diligence including review of financial projections and historical financial results; operating, legal and financial reporting structures; the current and potential legal and tax structures of the Debtors; and, valuation and recoveries.  Evercore also identified, negotiated, and closed two of the largest DIP financings ever completed for the TCEH and EFIH Debtors; advised the Debtors on the sale of assets; testified at court hearings and depositions related to the DIP financings; and worked on its own retention.

35.     The Evercore First Fee Application generally complied with the Fee Committee expense standards.  Evercore either provided adequate explanation for all questioned expenses, or agreed to the Fee Committee's proposed reductions.

***KPMG LLP***

36.     On September 16, 2014, the Court entered the *Order Authorizing the Debtors to Retain and Employ KPMG LLP as Accounting and Tax Advisors, Nunc Pro Tunc to the Petition Date* [D.I. 2054] (the "KPMG Retention Order").

37.     On November 18, 2014, KPMG filed the *First Interim Fee Application of KPMG LLP for Compensation for Services Rendered and Reimbursement of Expenses as Bankruptcy Accounting and Tax Advisors to the Debtors and Debtors in Possession for the Period From April 29, 2014 Through August 31, 2014* [D.I. 2806] (the "KPMG First Fee Application"). KPMG seeks $1,248,506.95 in fees and $91,466.65 in expenses.

38.     KPMG's retention is for the purpose of serving as the Debtors' bankruptcy accounting and tax advisor, including specific projects such as voucher analysis, property tax

consulting, sales and use tax consulting, tax return review, Sarbanes Oxley compliance, IT asset management, and service costing assessment.

39.     The KPMG First Fee Application generally complied with the Fee Committee Standards with some non-compensable billing activities and vague and block billed tasks subject to adjustment.  KPMG either provided adequate explanation for all matters questioned or agreed to the Fee Committee's proposed reductions.

*McDermott Will & Emery LLP*

40.     On September 16, 2014, the Court entered the *Order Authorizing the Debtors to Retain and Employ McDermott Will & Emery LLP as Special Counsel for Certain Energy-Related Transactional Matters, Effective Nunc Pro Tunc to the Petition Date* [D.I. 2062] (the "McDermott Retention Order").

41.     On October 31, 2014, McDermott filed the *Interim Fee Application of McDermott Will & Emery LLP, Special Counsel for the Debtors and Debtors in Possession, for the Period From April 29, 2014 Through and Including August 31, 2014* [D.I. 2679] (the "McDermott First Fee Application").  McDermott seeks $474,034.25 in fees and $72,166.43 in expenses.

42.     McDermott's retention is for the purpose of representing the Debtors in limited energy-related transactional matters.  *See Application of Energy Future Holdings Corp., et al., for an Order Authorizing the Debtors to Retain and Employ McDermott, Will & Emery LLP as Special Counsel for Certain Energy-Related Transactional Matters, Effective Nunc Pro Tunc to the Petition Date* [D.I. 664].

43.     During the first interim period, McDermott worked on its own retention and disclosures and continued representing the TCEH Debtors in energy transactional matters.  The vast majority of McDermott's time in the first interim fee period involved identifying and

addressing energy trading issues as they arose in the context of the bankruptcies. Case

monitoring and other administrative activities were appropriately limited to those narrow issues.

44.      The McDermott First Fee Application largely complied with the Fee Committee

Standards with some non-contemporaneous or inaccurate billing subject to adjustment.  The Fee

Committee also asked that McDermott segregate and resubmit many of its expense

reimbursement requests to comply with the Fee Committee's documentation standards.

McDermott provided the necessary itemization and documentation and has committed to proper

expense reimbursement submissions in future fee applications.

***Lazard Frères & Co., LLC***

45.      On October 20, 2014, the Court entered the *Order Authorizing the Official*

*Committee of Unsecured Creditors to Retain and Employ Lazard Frères & Co., LLC as*

*Investment Banker Effective as of May 14, 2014* [D.I. 2509] (the "Lazard Retention Order").

46.      On November 10, 2014, Lazard filed the *First Interim Fee Application of Lazard*

*Frères and Co., LLC, as Investment Banker to the Official Committee of TCEH Unsecured*

*Creditors For Allowance of Compensation and Reimbursement of Expenses for the period*

*May 14, 2014 Through August 31, 2014* (the "Lazard First Fee Application") [D.I. 2726].

Lazard seeks $895,161.29 in fees and $54,437.59 in expenses.

47.      Lazard's flat fee retention is for the purpose of serving as the investment banker

to the Official Committee of Unsecured Creditors of the "T-Side" Debtors.  *See* Lazard

Retention Order.  During the first interim fee period, Lazard performed business due diligence,

reviewed DIP financing and cash collateral documents, reviewed the Restructuring Support

Agreement, reviewed the terms of the proposed sale of Oncor, and provided day-to-day support

to the T-Side Official Committee of Unsecured Creditors on various bankruptcy matters.  The

vast majority of Lazard's time was spent in meetings or conducting due diligence of the Debtors' financing.

48.     The Lazard First Fee Application generally complied with the Fee Committee Standards with some non-compensable and overhead expenses subject to adjustment.  Lazard either provided adequate explanation for all matters questioned or reached an agreement with respect to the Fee Committee's proposed reductions.

## CONCLUSION

For all of these reasons, the Fee Committee respectfully requests that the Court allow the fees and expenses requested in the Applications, subject to the negotiated resolutions set forth on **Exhibit A**, and direct the Debtors to pay the respective balances owed to the estate professionals on or before March 1, 2015.

Dated: February 12, 2015.

PHILLIPS, GOLDMAN & SPENCE, P.A.

By:       */s/ Aaron C. Baker*
           Aaron C. Baker, Esquire (Bar No. 5588)
           Stephen W. Spence, Esquire (Bar No. 2033)
           PHILLIPS, GOLDMAN & SPENCE, P.A.
           1200 N. Broom Street
           Wilmington, DE 19806
           Phone: (302) 655-4200
           Fax:  (302) 655-4210
           E-mail: acb@pgslaw.com
                  sws@pgslaw.com

           Katherine Stadler
           GODFREY & KAHN, S.C.
           One East Main Street, Suite 500
           Madison, Wisconsin 53703
           Phone: (608) 257-3911
           Fax: (608) 257-0609
           E-mail: kstadler@gklaw.com

           *Attorneys for the Fee Committee*

13073085.1