## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Energy Future Holdings Corp., *et al.*,[1] | ) |
| | ) Case No. 14-10979 (CSS) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING EXCLUSIVE STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE CERTAIN CLAIMS FOR DECLARATORY JUDGMENT, AVOIDANCE AND RECOVERY OF LIENS, SECURITY INTERESTS, OBLIGATIONS, FEES, AND INTEREST PAYMENTS, AND DISALLOWANCE OF CLAIMS

---

[1]The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors (the "Debtors") and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ........................................................................ 1

JURISDICTION & VENUE ............................................................................. 6

THE PROPOSED ALLEGATIONS.................................................................. 6

    A.    The 2007 LBO ............................................................................ 6

        1.    Immediate Insolvency.................................................. 11

    B.    2011-2013: The First Lien Transferees Extract Additional Value ..................... 14

        1.    The March 2011 Insolvency Disclosure ................................. 14

        2.    The 2011 "Amend & Extend" Transactions ........................... 15

            a.    The Credit Agreement Amendment............................. 17

            b.    The Credit Agreement Maturity Date Extensions ....................... 17

            █    ████████████████ .............................................. 20

            d.    The Debt Prepayment.................................................. 21

            e.    Issuance of First Lien Notes........................................ 22

            █    █████████████████ ............................................. 24

            g.    The 2011 Transactions ............................................... 24

    C.    The 2012/2013 Amendment: "Buying Runway"......................... 26

        1.    The Debtors Begin To Plan For a 2014 Restructuring ........................... 26

        2.    Late 2012: The Pace Quickens.................................... 27

        3.    The Illusory Three-Year Maturity Extension................................ 28

    D.    The Debtors' Use of Unencumbered Cash ........................................ 30

    E.    The Chapter 11 Cases .................................................................. 32

    F.    The Committee's Investigation...................................................... 35

RELIEF REQUESTED.................................................................................... 35

ARGUMENT ................................................................................................... 36

I.    THE COMMITTEE SHOULD BE GRANTED STANDING TO COMMENCE AND PROSECUTE THE PROPOSED CLAIMS........................................ 36

    A.    The Committee Has Asserted Colorable Claims ................................. 37

        1.    The Proposed Allegations State Colorable Claims For Fraudulent Conveyances ...................................................... 39

## TABLE OF CONTENTS
(continued)

**Page**

a.      The TCEH Debtors Did Not Receive Reasonably Equivalent Value..................................................................... 41

b.      The TCEH Debtors Were Rendered Insolvent And Left With Unreasonably Small Remaining Assets As A Result of the LBO And Remained So At All Times Thereafter ............ 47

c.      The Fraudulent Transfer Claims Are Timely.............................. 48

2.      Claims Arising From the First Lien Debt Should Be Equitably Subordinated ..................................................................... 49

3.      Claims For Unmatured Interest Should Be Disallowed.......................... 51

4.      Payment of Fees, Costs, and Expenses Should Be Recharacterized........ 52

5.      The Preferential Transfers Should Be Avoided ...................................... 54

6.      The Court Should Disallow Claims Pending Resolution of the Adversary Proceeding and Reduce Allowed Claims Based on Resolution of the Adversary Proceeding ........................................... 55

7.      The Court Should Limit the First Lien Transferees' Claims In Accordance with Section 2(b) of the Guarantees.................................... 57

8.      The Court Should Enter A Declaratory Judgment Clarifying the Scope of the Liens and Obligations In Connection With The First Lien Debt.................................................................................. 57

9.      Unperfected Liens and Security Interests Should Be Avoided................ 65

a.      As-Extracted Collateral.................................................... 66

b.      Real Property.................................................................. 67

c.      Vehicles........................................................................ 68

d.      Deposit Accounts ........................................................... 68

e.      Commercial Tort Claims .................................................. 69

f.      Unperfected Collateral..................................................... 70

10.      The Court Should Award Prejudgment Interest....................................... 70

B.      Demand Upon the Debtors Would Be Futile ............................................ 71

C.      The Committee is Seeking Prior Court Approval........................................ 72

D.      The Committee Should Be Granted Exclusive Authority To Settle .................. 73

CONCLUSION............................................................................................. 74

# TABLE OF AUTHORITIES

CASES                                                                                              Page(s)

*Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.),*
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ...................................................................37

*Asarco LLC v. Ams. Mining Corp.,*
    396 B.R. 278 (S.D. Tex. 2008) ..............................................................................42

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.),*
    473 B.R. 525 (Bankr. D. Del. 2012) .......................................................................40

*Bohm v. Howard (In re Howard),*
    422 B.R. 568 (Bankr. W.D. Pa. 2009), *aff'd,* 2:10CV962, 2011 WL 578777 (W.D. Pa.
    Feb. 9, 2011) ..........................................................................................................67

*Burtch v. Masiz (In re Vaso Active Pharm., Inc.),*
    500 B.R. 384 (Bankr. D. Del. 2013) .......................................................................54

*Charys Liquidating Trust v. McMahon Sec. Co., L.P. (In re Charys Holding Co., Inc.),*
    443 B.R. 628 (Bankr. D. Del. 2010) .......................................................................40

*Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims,*
    160 F.3d 982 (3d Cir. 1998) ...................................................................................49

*Crawford v. Zambrano (In re Zambrano Corp.),*
    478 B.R. 670 (Bankr. W.D. Pa. 2012) ...................................................................45

*Drenis v. Haligiannis,*
    452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006) .....................................................40 n.24

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.),*
    380 B.R. 348 (Bankr. D. Del. 2008), *aff'd,* 382 F. App'x 135 (3d Cir. 2010) ........40

*Great-Point Intermodal, LLC v. Norfolk S. Corp. (In re Great-Point Intermodal, LLC),*
    334 B.R. 359 (Bankr. E.D. Pa. 2005) .....................................................................70

*Holber v. Dolchin Slotkin & Todd, P.C. (In re Am. Rehab & Physical Therapy, Inc.),*
    No. 04-14562, 2006 Bankr. LEXIS 1440 (Bankr. E.D. Pa. May 18, 2006) ...........66

*Homeplace of Am., Inc. v. Salton, Inc. (In re Waccamaw's Homeplace),*
    325 B.R. 524 (Bankr. D. Del. 2005) .......................................................................39

*In re Allegheny Int'l, Inc.,*
    100 B.R. 247 (Bankr. W.D. Pa. 1989) ...................................................................52

# TABLE OF AUTHORITIES
### (continued)

CASES                                                                                    Page(s)

*In re Centaur, LLC*,
    No. 10-10799 (KJC), 2010 Bankr. LEXIS 3918 (Bankr. D. Del. Nov. 5, 2010) ...................72

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006)........................................................................39, 44, 46

*In re Jesup & Lamont, Inc.*,
    507 B.R. 452 (Bankr. S.D.N.Y. 2014) ......................................................................42

*In re Jevic Holding Corp.*,
    08-11006 BLS, 2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) .........................42, 43, 47

*In re Loewen Grp. Int'l, Inc.*,
    274 B.R. 427 (Bankr. D. Del. 2002) .........................................................................51

*In re Mobile Steel Co.*,
    563 F.2d 692 (5th Cir. 1977) .................................................................................49

*In re Nat'l Forge Co.*,
    326 B.R. 532 (W.D. Pa. 2005)................................................................................71

*In re NJ Affordable Homes Corp.*,
    No. 05-60442 (DHS), 2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013)..............................55

*In re Plassein Intern. Corp.*,
    No.03-11489 KG, ADV. 05-51472 KG, 2008 WL 1990315 (Bankr. D. Del. May 5,
    2008) ............................................................................................................47

*In re Pub. Serv. Co. of N.H.*,
    99 B.R. 506 (Bankr. D.N.H. 1989) ..........................................................................57

*In re Timberline Prop. Dev., Inc.*,
    136 B.R. 382 (Bankr. D. N.J. 1992) .........................................................................64

*In re TransTexas Gas Corp.*,
    597 F.3d 298 (5th Cir. 2010) .................................................................................42

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) .........................................................................47

*In re World Health Alternatives, Inc.*,
    344 B.R. 291, 303 (Bankr. D. Del. 2006) ...................................................................74

*Infinity Investors Ltd ex rel. Yes! Entm't Corp. v. Kingsborough (In re Yes! Ent'mt Corp.)*,
    316 B.R. 141 (D. Del. 2004)...............................................................................36, 37

# TABLE OF AUTHORITIES
### (continued)

CASES                                                                                    Page(s)

*Kool, Mann, Coffee & Co. v. Coffey,*
    300 F.3d 340 (3d Cir. 2002) ..................................................................... 53

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.),*
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ..................................................... 49

*Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. (In re MDIP Inc.),*
    332 B.R. 129 (Bankr. D. Del. 2005) ........................................................ 42

*Lucker Mfg., A Unit of Amclyde Engineered Prods., Inc. v. Home Ins. Co.,*
    23 F.3d 808 (3d Cir. 1994) ............................................................... 40 n.24

*Miller v. Barenberg (In re Bernard Techs., Inc.),*
    398 B.R. 526 (Bankr. D. Del. 2008) ................................................. 40 n.23

*Moody v. Sec. Pac. Bus. Credit, Inc.,*
    971 F.2d 1056 (3d Cir. 1992) .................................................................. 40

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.*
    *v. Chinery,*
    330 F.3d 548 (3d Cir. 2003) ............................................... 2, 36, 37, 71

*Official Comm. Of Unsecured Creditors of the Debtors v. Austin Fin. Serv. (In re KDI*
    *Holdings, Inc.),*
    277 B.R. 493 (Bankr. S.D.N.Y. 1999) ..................................................... 50

*Official Comm. Of Unsecured Creditors ex rel. R.M.L., Inc. v. Conceria Sabrina, S.P.A.*
    *(In re R.M.L. Inc.),*
    92 F.3d 139 (3d Cir. 1996) ............................................................. 44, 46

*Official Comm. Of Unsecured Creditors ex rel. R.M.L., Inc. v. Conceria Sabrina, S.P.A.*
    *(In re R.M.L. Inc.),*
    195 B.R. 602 (Bankr. M.D. Pa. 1996), *aff'd,* 127 F. 3d 1096 (3d Cir. 1997) ........................ 71

*Official Comm. Of Unsecured Creditors of Investors & Lenders v. Field (In re Investors*
    *& Lenders, Ltd.),*
    165 B.R. 389 (Bankr. D.N.J. 1994) ..................................................... 53, 70

*Official Comm. Of Unsecured Creditors v. Clark (In re Nat'l Forge Co.),*
    304 B.R. 214 (Bankr. W.D. Pa. 2004), *aff'd sub nom.,* 326 B.R. 532 (W.D. Pa. 2005) ....45, 66

# TABLE OF AUTHORITIES
## (continued)

CASES                                            Page(s)

*Official Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Capital, LLC)*,
  501 B.R. 549 (Bankr. S.D.N.Y. 2013) .....................................................................63

*Paloian* v. *LaSalle Bank N.A.*,
  619 F. 3d 688 (7th Cir. 2010) ..........................................................................3 n.6

*Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*,
  280 B.R. 573 (Bankr. D. Del. 2002) ........................................................................70

*PN Chapter 11 Estate Liquidating Trust v. Inserts East, Inc. (In re Phila. Newspapers, LLC)*,
  468 B.R. 712 (Bankr. E.D. Pa. 2012) ......................................................................56

*Pobin v. Sheehan (In re Eight Bulls, LP)*,
  439 B.R. 370 (Bankr. D.N.J. 2010), *aff'd sub nom.*, CIV.A. 10-6288 FLW, 2011 WL
  3625586 (D.N.J. Aug. 15, 2011).............................................................................68

*Rosener v. Majestic Mgmt. (In re OODC, LLC)*,
  321 B.R. 128 (Bankr. D. Del. 2005) ..................................................................43, 50

*Sacred Heart Hosp. v. E.B. O'Reilly Servicing Corp. (In re Sacred Heart Hosp. of Norristown)*,
  200 B.R. 114 (Bankr. E.D. Pa.1996) ......................................................................70

*Sears, Roebuck and Co. v. O'Brien*,
  178 F.3d 962 (8th Cir. 1999) ..................................................................................58

*Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*,
  348 B.R. 234, 272 (Bankr. D. Del. 2005), *aff'd*, 01 01063 KJC, 2007 WL 1232185
  (D. Del. Apr. 26, 2007), *aff'd in part, modified in part,* 554 F.3d 382 (3d Cir. 2009) ............55

*Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*,
  554 F.3d 382 (3d Cir. 2009).....................................................................................54

*United States v. McCombs*,
  30 F.3d 310 (2d Cir. 1994)...............................................................................40 n.24

*United States v. Tabor Court Realty Corp.*,
  803 F.2d 1288 (3d Cir. 1986).................................................................................42

*Wasserman v. Capazzi (In re Day)*,
  443 B.R. 338 (Bankr. D.N.J. 2011) .........................................................................68

## TABLE OF AUTHORITIES
### (continued)

CASES                                                                     Page(s)

*Wessinger v. Spirey (In re Galbreath)*,
 286 B.R. 185 (Bankr. S.D. Ga. 2002) ................................................................44

*Wood v. LA Bank (In re Wood)*,
 190 B.R. 788 (Bankr. M.D. Pa. 1996) ...............................................................63

STATUTES, RULES AND REGULATIONS

11 U.S.C.,
 § 101.........................................................................................................39
 § 105........................................................................................................6, 35
 § 502.................................................................................................51, 56, 57
 § 506.....................................................................................................52, 64
 § 510.........................................................................................................49
 § 544.....................................................................................40, 48, 65, 68, 69
 § 546.........................................................................................................48
 § 547.........................................................................................................54
 § 548...........................................................................................39, 40 & n.24, 41
 § 550.........................................................................................................66
 § 551.....................................................................................................66, 70
 § 552.........................................................................................................62
 § 1102.......................................................................................................33
 § 1103..............................................................................................6, 33, 35, 36
 § 1107.......................................................................................................32
 § 1108.......................................................................................................32
 § 1109................................................................................................6, 35, 36

26 U.S.C.,
 § 6501.......................................................................................................48
 § 6502.......................................................................................................48

28 U.S.C.,
 § 157..........................................................................................................6
 § 1334.........................................................................................................6
 § 1408.........................................................................................................6
 § 1409.........................................................................................................6
 § 2201........................................................................................................57

DEL. CODE ANN. tit 6,
 § 1304(a)(2)................................................................................................41
 § 1305(a)....................................................................................................41

N.Y. C.P.L.R. § 213(8) .........................................................................40 n.24

### TABLE OF AUTHORITIES
(continued)

STATUTES, RULES AND REGULATIONS                  Page(s)

N.Y. Debt. & Cred. Law § 270-281 ...................................................................40 n.24

Tex. Trans. Code § 501.113 ...............................................................................68

TEX. BUS. & COM. CODE ANN. Ch. 24 ............................................................40 n.24

Uniform Commercial Code,
    § 9-102 .............................................................................................66, 67
    § 9-104 .............................................................................................59, 68
    § 9-108 .............................................................................................61, 69
    § 9-203 .........................................................................................59, 68, 69
    § 9-312(b) .........................................................................................61, 69
    § 9-501 .................................................................................................70
    § 9-502 .................................................................................................70

Bankruptcy Rule
    3007.....................................................................................................56
    3012.....................................................................................................56
    7001.....................................................................................................56

OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...................51-52

# PRELIMINARY STATEMENT

1.      The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Energy

Future Competitive Holdings Company LLC ("<u>EFCH</u>"), EFCH's direct subsidiary, Texas

Competitive Electric Holdings Company LLC ("<u>TCEH</u>"), their direct and indirect subsidiaries,

and EFH Corporate Services Company, brings this Motion[2] for entry of an order granting

exclusive standing and authority to commence, prosecute, and settle certain causes of action on

behalf of the TCEH Debtors[3] relating to the First Lien Debt,[4] including claims for avoidance,

equitable subordination, disallowance of claims, recharacterization, and certain requests for

declaratory relief.   These actions collectively may yield over $2 billion in recoveries and over

$24 billion in avoided liens for the benefit of unsecured creditors.[5]

---

[2]Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [Dkt. No. 855] (the "<u>Cash Collateral Order</u>").

[3]The "<u>TCEH Debtors</u>" include TCEH, EFCH, 4Change Energy Company, 4Change Energy Holdings LLC, Big Brown 3 Power Company LLC, Big Brown Lignite Company LLC, Big Brown Power Company LLC, Collin Power Company LLC, Decordova Power Company LLC, Decordova II Power Company LLC, Eagle Mountain Power Company LLC, Generation MT Company LLC, Generation SVC Company, Lake Creek 3 Power Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Luminant Energy Trading California Company, Luminant ET Services Company, Luminant Generation Company LLC, Luminant Holding Company LLC, Luminant Mineral Development Company LLC, Luminant Mining Company LLC, Luminant Renewables Company LLC, Martin Lake 4 Power Company LLC, Monticello 4 Power Company LLC, Morgan Creek 7 Power Company, NCA Resources Development Company LLC, Oak Grove Management Company LLC, Oak Grove Mining Company LLC, Oak Grove Power Company LLC, Sandow Power Company LLC, TCEH Finance, Inc., Tradinghouse 3 & 4 Power Company LLC, Tradinghouse Power Company LLC, TXU Energy Retail Company LLC, TXU Energy Solutions Company LLC, TXU Retail Services Company, TXU SEM Company, Valley NG Power Company LLC, and Valley Power Company LLC.   The TCEH Debtors (excluding TCEH) are referred to herein as the "<u>Guarantors</u>".

[4]The "<u>First Lien Debt</u>" includes all obligations under (i) the Credit Agreement (defined below), as amended, modified or restated prior to the date hereof, (ii) any and all Secured Commodity Hedge and Power Sales Agreements and Secured Hedging Agreements (each as defined in the Cash Collateral Order), as amended, modified or restated prior to the date hereof, (iii) the Indenture, dated as of April 19, 2011, governing the 11.50% senior secured notes due October 1, 2020, as amended, modified or restated prior to the date hereof, and (iv) all other agreements that were contemplated in or related to the agreements in (i) through (iii) above.

[5]The Committee reserves all rights to seek standing to pursue claims against all parties other than the First Lien Lenders (as defined in the Cash Collateral Order (Dkt. No. 855)), including without limitation certain other Debtors, the Sponsors (as defined below), Oncor Electric Delivery Company LLC, and other related parties, relating to the facts set forth herein, in accordance with the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [Dkt. No. 2051], as amended.

2.     The Debtors cannot pursue this litigation because they already waived the claims described herein by stipulating that the TCEH Debtors are truly and justly indebted to the First Lien Lenders (as defined in the Cash Collateral Order) "without defense, counterclaim, or offset of any kind" and that their obligations are secured by liens on "substantially all of the TCEH Debtors' assets." (Cash Collateral Order ¶¶ F(i)(a) & (e)).   Thus, the Committee is the only independent fiduciary that can properly act for the estates.  Accordingly, the Committee should be granted standing under *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568, 580 (3d Cir. 2003) ("*Cybergenics*").

3.     Though the Committee's investigation is not yet complete, it has already unearthed substantial claims with respect to the $24.8 billion in secured funded indebtedness and credit facility commitments incurred by the TCEH Debtors to finance the 2007 leveraged buyout of TXU Corp.

4.     The TCEH Debtors became responsible for billions of dollars of new loan obligations incurred in connection with the LBO, but the TCEH Debtors received only the benefit of an insignificant portion of such funds.  For example, nearly ▮▮▮▮▮▮ of those loan proceeds (*i.e.*, ▮▮▮▮▮) was transferred by TCEH to Texas Energy Future Merger Sub Corp. for no consideration to fund the purchase price ultimately paid to existing shareholders to acquire their TXU Corp. interests, and approximately ▮▮▮▮▮ was used to pay certain of the LBO debt financing fees.

5.     The LBO burdened the TCEH Debtors with the obligation of repaying over $20 billion of secured debt but did not provide the TCEH Debtors with reasonably equivalent value in exchange for the pledge of substantially all of their assets to secure their repayment obligations under the Credit Agreement (defined below).

6.      From the beginning, the TCEH Debtors were left with unreasonably small assets to support the debt.  The LBO rendered each of the TCEH Debtors insolvent, and they have remained insolvent at all times since.  The Debtors' financial projections initially masked the problem by relying on unrealistic assumptions and failing to conduct any meaningful sensitivity analyses that would account for foreseeable downturns.

7.      As early as 2008, financial analyses prepared by the Debtors' own advisors showed that the TCEH Debtors' liabilities exceeded their assets by billions of dollars.  That remained true and became progressively worse until the Debtors filed for bankruptcy in 2014.

8.      The LBO left the Debtors unable to withstand the systemic shifts in the energy market and without a viable solution to their bad and worsening financial condition.  Instead, the First Lien Transferees[6] took advantage of the TCEH Debtors' situation and extracted an additional approximately *$2.4 billion* in 2011 and 2013 in the form of fees, incremental interest expense, and the Prepayment Benefit (defined below) and extracted concessions that substantially improved their positions in advance of the Debtors' chapter 11 filing, including the extension of maturities to over six years after the closing of the October 2007 LBO.

9.      The First Lien Transferees did so in connection with a series of ineffectual amendments and extensions of loans outstanding under the Credit Agreement, all in an effort to kick the proverbial can down the road while the Debtors' financial condition continued to deteriorate.  Ultimately, the Debtors were inevitably and foreseeably forced to file for bankruptcy on April 29, 2014, approximately six months prior to the original October 2014

---

[6]The "First Lien Transferees" will likely include, at minimum, the First Lien Administrative Agent and First Lien Collateral Agent under the Credit Agreement, and the Indenture Trustee under the Indenture, each in their capacities as such (collectively, the "Prepetition First Lien Agents"), as well as any immediate or mediate transferees.  *See, e.g., Paloian* v. *LaSalle Bank N.A.*, 619 F. 3d 688 (7th Cir. 2010) (holding that indenture trustee was properly named as the initial transferee in suit to avoid fraudulent transfer payments made to for the benefit of certificate holders under an indenture).  The Committee's investigation is ongoing.  The Committee reserves all rights to add additional defendants prior to the Challenge Deadline (as defined in the Cash Collateral Order (Dkt. No. 855)).

maturity of the TCEH Debtors' term loans. While the TCEH Debtors extended the maturity dates on a *portion* of their debt, they did not receive reasonably equivalent value for the billions of dollars they paid in fees to do so, particularly because at all times the almost $4.5 billion in debt left to mature on its original terms vastly exceeded the TCEH Debtors' ability to pay, rendering the extensions illusory. As a result, the TCEH Debtors did not receive any benefit from these illusory maturity extensions.

10. Accordingly, the Committee respectfully requests that the Court grant it exclusive derivative standing to commence, prosecute, and settle actions through which the Committee seeks to avoid and recover over $2.4 billion in fees, incremental interest expense, Prepayment Benefit, and preferential transfers paid to or for the benefit of the First Lien Transferees over the past four years, and to avoid any claims, liens, security interests, or other obligations arising from the LBO, the issuance of the First Lien Notes, and the Fee Note (each, as defined below).[7]

11. Specifically, this adversary proceeding seeks:

| Avoidance of the liens, security interests, and obligations granted under the Credit Agreement, the First Lien Notes, and the Fee Note | Over $24 billion of liens and security interests |
|---|---|
| Avoidance and recovery of fees paid in connection with the 2011 Transactions and the 2013 Amendment (each, as defined below), including incremental interest expense paid thereafter as a result of such transactions | Over $2 billion |
| Entry of an order equitably subordinating the First Lien Transferees' claims against the TCEH Debtors' estates | Over $24 billion of claims |
| To the extent the Court determines at any time that the First Lien Transferees are undersecured creditors, recharacterization of the adequate protection payments made by the TCEH Debtors to the First Lien Transferees during these chapter 11 cases as payments of principal on the First Lien Debt | Over $100 million per month |
| Avoidance of preferential transfers | Approximately $216 million |

---

[7]The Committee reserves all rights with respect to the allocation of the recovered funds by and among the TCEH Debtors.

| | |
|---|---|
| Entry of an order disallowing the First Lien Transferees' claims against the TCEH Debtors' estates pending final resolution of this adversary proceeding and a determination of the amount of the First Lien Transferees' allowed claims. | Over $24 billion of claims |
| Entry of an order disallowing First Lien Transferees' claims against the TCEH Debtors' estates to the extent such claims include unmatured interest | Approximately $8 million |
| Avoidance of the First Lien Transferees' unperfected liens on or security interests in certain property | |
| To the extent the First Lien Transferees' claims are not avoided, limiting the amount of the First Lien Transferees' allowed claims based on Section 2(b) of the Guarantees. | |
| Declaratory Judgments that:<br><br>• Rabbi trust assets owned by Debtor EFH are subject only to the claims of the unsecured creditors of EFH and Participating Employers;<br><br>• Certain deposit accounts, including the Segregated Cash account, are unencumbered;<br><br>• The First Lien Transferees do not have liens on any avoidance actions or commercial tort claims or the proceeds thereof;<br><br>• The First Lien Transferees do not have liens on any Tax Attributes, the Tax Basis Step-Up, and the value thereof (each as defined below) generated postpetition;<br><br>• There has been no diminution in value of the First Lien Transferees' collateral after the Petition Date, and the Debtors' use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in value;<br><br>• The First Lien Transferees' are not entitled to postpetition interest and fees unless the Court determines that they are oversecured;<br><br>• To the extent the First Lien Transferees are found to be entitled to postpetition interest, postpetition interest and fees will be allowed solely to the extent of the excess value of the collateral and will be awarded at the contractual non-default rate of interest; and<br><br>• The TCEH Debtors' Stipulations do not expand the scope of the First Lien Transferees' liens as they existed on the Petition Date. | |
| Such other and further relief as the Court deems just, proper and equitable, including pre-judgment interest and reimbursement to the Debtors' estates for the costs and expenses of this adversary proceeding. | |

## JURISDICTION & VENUE

12.     This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

13.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory bases for the relief requested herein are sections 105(a), 1103 and 1109 of the Bankruptcy Code and Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

15.     The movant consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. If no such statement is included, the movant shall have waived the right to contest the authority of the Court to enter final orders or judgments.

## THE PROPOSED ALLEGATIONS[8]

### A.     The 2007 LBO

16.     In 2007, a consortium of private equity funds led by affiliates of Kohlberg Kravis Roberts & Co. L.P., Texas Pacific Group, and Goldman Sachs (collectively, the "Sponsors"), acquired TXU Corp. in a leveraged buyout (the "LBO"). In the Proxy Statement, dated July 24, 2007, the Debtors stated that the total amount of funds necessary to complete the LBO and related transactions was approximately $46.7 billion, which would be funded by new credit facilities, debt issuances, equity financing, cash on hand, and the assumption of certain

---

[8]The Proposed Complaint alleges the facts set forth herein on the basis of the Committee's investigation to date, including the review of documents produced by the Debtors and others, as well as numerous meetings with the Debtors and their representatives, and in some instances, upon information and belief, as noted in the attached Proposed Complaint.  The investigation is ongoing and the Committee reserves the right to supplement or amend these allegations.

indebtedness.  On or about October 5, 2007, TXU Corp. changed its name to Energy Future

Holdings, Corp. ("EFH").[9]

17.    To pay for their acquisition of EFH, the Sponsors arranged for and caused TCEH,

as borrower, and the Guarantors, as guarantors, to enter into a first lien Credit Agreement, dated

as of October 10, 2007, with Citibank, N.A., as administrative agent and collateral agent

("Citibank", as succeeded from time to time, and in such capacities, the "First Lien

Administrative Agent" and the "First Lien Collateral Agent"), and various lenders and other

agents (the "Credit Agreement") (Ward Decl. Ex. 1).

18.    The Credit Agreement provided for an aggregate amount of over $24.8 billion in

secured funded debt and credit facility commitments, including: (i) a senior secured initial term

loan facility up to $16.45 billion, (ii) a senior secured delayed draw term loan facility up to $4.1

billion (together with the initial term loan, the "Term Loans"), (iii) a senior secured letter of

credit facility up to $1.25 billion (the "Letter of Credit Loans"), (iv) a senior secured revolving

credit facility up to $2.7 billion (the "Revolving Loans"), and (v) an unlimited senior secured

cash posting credit facility designed to fund the collateral requirements for specified natural gas

hedging obligations ("Commodity Collateral Posting Facility"), under which approximately $382

million was initially drawn at the time of the 2007 LBO.  Under the original terms of the Credit

Agreement, the Commodity Collateral Posting Facility was scheduled to mature in December

2012, the Revolving Loans were scheduled to mature in October 2013, and the Term Loans and

Letter of Credit Loans were scheduled to mature in October 2014.  According to the Debtors, as

of the Petition Date, the aggregate outstanding principal amount under the Credit Agreement was

approximately $22.635 billion.  (Cash Collateral Order ¶ F(i)(a).)

---

[9]EFH is the ultimate parent company of the Debtors, including the TCEH Debtors.

19.     At the time of the LBO, the value of the TCEH Debtors' assets was significantly higher than the TCEH Debtors' tax basis in those assets. The LBO did not result in a taxable disposition of the TCEH Debtors' assets, and as a result, there was no step up in the tax basis of the TCEH Debtors' assets.

20.     The Sponsors did not guarantee any of the loans under the Credit Agreement or pledge any of their other assets to support these loans; rather, the TCEH Debtors were required to leverage their assets for the benefit of non-debtor third parties.

21.     The amount of the loans and commitments arranged by the Sponsors for the TCEH Debtors was a substantial increase from the aggregate amount of loans outstanding by the TCEH Debtors prior to the LBO—and even more so when considered in conjunction with the other $6.75 billion in unsecured loans incurred by the TCEH Debtors to fund the LBO.  For example, immediately prior to the LBO, according to EFH's Quarterly Report issued on November 14, 2007 (for the quarter ending September 30, 2007), EFH and its subsidiaries had $9.8 billion of debt outstanding as of September 30, 2007 (excluding debt held by TXU Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC)), of which the TCEH Group had approximately $5.8 billion of debt outstanding. *See* EFH's Quarterly Report at 16-18, available                    at                    https://www.sec.gov/Archives/edgar/data/1023291/ 000119331107000073/form10q.htm.

22.     In addition, the TCEH Debtors guaranteed repayment, granted security interests on their assets, and pledged equity interests to secure repayment of the loans under the Credit Agreement.  *See* Guarantee (Ward Decl. Ex. 6), dated October 10, 2007, by the Guarantors in favor of Citibank, as collateral agent, each as amended, modified or restated prior to the date hereof (the "Guarantee"); Security Agreement (Ward Decl. Ex. 7), dated October 10, 2007, by and among TCEH, EFCH, the subsidiary grantors party thereto, and Citibank as collateral agent,

as amended, modified or restated prior to the date hereof (the "Security Agreement"); Pledge Agreement (Ward Decl. Ex. 8), dated October 10, 2007, by and among EFCH, TCEH, the subsidiary pledgors party thereto, and Citibank, as collateral agent, as amended, modified or restated prior to the date hereof (the "Pledge Agreement").

23.     Citibank agreed to act as the First Lien Collateral Agent for all holders of First Lien Debt (the "Secured Parties") and was granted liens securing the First Lien Debt on behalf of the Secured Parties.  *See* Collateral Agency and Intercreditor Agreement (Ward Decl. Ex. 9), dated October 10, 2007, by and among TCEH, the Guarantors, Citibank, as administrative and collateral agent, and the secured hedge counterparties party thereto, as amended, modified or restated prior to the date hereof (the "Collateral Agency and Intercreditor Agreement").[10]

24.     The TCEH Debtors became responsible for billions of dollars of new loan obligations incurred in connection with the LBO, of which over $20 billion was secured and approximately $6.75 billion was unsecured.  However, the TCEH Debtors hardly received the benefit of any such funds, as reflected by the chart below.

| Amounts Borrowed | |
| --- | --- |
| Debt Incurred by TCEH Debtors | In millions |
| Total First Lien Credit Facilities | $20,478[11] |

---

[10]The Credit Agreement and related documents, copies of which are annexed to the Declaration of Christopher A. Ward, dated February 19, 2015 (a copy of which is annexed hereto as Exhibit A, "Ward Decl.") submitted herewith, grant significant dominion and control over the collateral to the First Lien Collateral Agent and significant dominion and control over the transferred funds to the First Lien Administrative Agent. *See, e.g.,* Security Agreement (Ward Decl. Ex. 7) § 2 (granting "to the Collateral Agent, for the benefit of the [First Lien] Secured Parties" all liens, security interests, and guarantees); Pledge Agreement (Ward Decl. Ex. 8) § 2 (same with respect to pledges); Security Agreement (Ward Decl. Ex. 7) § 5.5 ("the Collateral Agent may exercise in respect of the Collateral . . . all the rights and remedies of a secured party upon default under the UCC or any other applicable law"); Collateral Agency and Intercreditor Agreement (Ward Decl. Ex. 9 ) § 5.1 (granting the First Lien Collateral Agent "the exclusive right (but subject to the provisions of the Financing Documents) to make determinations regarding the release or disposition of any of the Collateral."); Credit Agreement (Ward Decl. Ex. 1) § 5.3 (granting the First Lien Administrative Agent discretion to fulfill its obligations to the lenders with "like funds" rather than the funds specifically transferred from the Debtors). The Indenture similarly grants dominion and control over the transferred funds to the Indenture Trustee. *See* Indenture (Ward Decl. Ex. 10) § 7.1(f) ("Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.").

[11]Amounts in excess of $20.478 billion were borrowed under the Credit Agreement following the LBO.

| (maturing in 2012-2014) | |
|---|---|
| Unsecured Interim Facilities (maturing in 2015-2016) | $6,750 |
| **Total LBO Debt** | **$27,228** |
| **Use of Proceeds** | |
| **LBO Loan Proceeds Not Retained by TCEH Debtors** | **In millions** |
| Initial Loan Proceeds | $27,228 |
| TCEH Debtors' Repayment of TCEH and Oncor Pre-LBO Debt | ▮)[12] |
| Restricted Cash (Supports Letter of Credit Facility) | ($1,250) |
| Payment of TCEH LBO Debt Financing Fees | ▮ |
| Cash Transfer to EFH | ▮ |
| TCEH Debtors' Payment for Acquisition of Existing Equity in LBO | ▮)[13] |
| **Loan Proceeds Retained by TCEH Debtors** | **$0** |

25.     The October 2007 LBO over-levered the TCEH Group's capital structure and burdened the TCEH Debtors with the obligation of repaying tens of billions of dollars of debt but did not provide the TCEH Debtors with reasonably equivalent value in exchange for the pledge of substantially all of their assets to secure their repayment obligations under the Credit Agreement.

---

[12]TXU Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC) was a co-borrower with TCEH on certain pre-LBO debt ("Oncor/TCEH Pre-LBO Debt").  Approximately $2 billion of the LBO loan proceeds were used to pay off the outstanding Oncor/TCEH Pre-LBO Debt, which had the effect of releasing TXU Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC) from the debt.  The Committee reserves all rights to bring claims in connection with this repayment under the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [Dkt. No. 2051], as amended.

[13]The Committee is also investigating claims relating to the transfer of funds to Texas Energy Future Merger Sub Corp. and subsequent transferees.  The Committee reserves all rights to bring claims in connection with these transfers under the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [Dkt. No. 2051], as amended.

### 1.    Immediate Insolvency

26.    The October 2007 LBO rendered each of the TCEH Debtors insolvent at the time of and immediately following the LBO, and left each of the TCEH Debtors with remaining assets that were unreasonably small following the LBO.

27.    While the Debtors have relied on analysis by Duff & Phelps, LLC ("D&P"), an independent third party, which suggested that the TCEH Debtors maintained a positive equity value post-LBO, that analysis is demonstrably flawed and contradicted by subsequent analyses prepared by D&P shortly after the LBO.

28.    The Debtors hired D&P to: (i) provide a solvency opinion at the time of the 2007 LBO (the "D&P 2007 Opinion"), (ii) conduct a purchase price allocation in accordance with generally accepted accounting principles in connection with the 2007 LBO (the "D&P 2007 PPA"), and (iii) conduct goodwill impairment testing for the annual periods following the LBO beginning in December 2008.  In these reports, D&P performed a valuation of TCEH and its direct and indirect subsidiaries (collectively, the "TCEH Group"),[14] either on a consolidated basis or separately, among other analyses.

29.    In the D&P 2007 Opinion, D&P estimated an equity value of the TCEH Group of ███████ at the time of the LBO.  In the D&P 2007 PPA, the implied equity value of the TCEH Group at the time of the LBO was almost ███████.[15]  The details to reconcile this reduction in the TCEH Group's equity value associated with the same October 2007 date have not been provided to date.

---

[14]The TCEH Group is substantially the same as the TCEH Debtors, except the TCEH Group includes the following non-debtor entities: Greenway Development Company, Nuclear Energy Future Holdings LLC, Nuclear Energy Future holdings II LLC, and Comanche Peak Nuclear Power Company LLC.

[15]The term "equity value" reflects the difference between the fair market value of a Company's assets and the face value of its liabilities.

30.    A comparison of D&P's 2007 reports and D&P's subsequent reports shows that the 2007 reports were based on faulty assumptions as to the TCEH Group's weighted average cost of capital ("WACC") and relied on financial projections premised on unrealistic gas price forecasts.  Had D&P used valuation assumptions in its 2007 reports similar to those used in its later reports beginning in December 2008, it would have led to the conclusion that the fair market value of the TCEH Group's assets did not exceed the face value of its liabilities in 2007—and the TCEH Group was thus insolvent on a balance sheet basis as of the date of the LBO.[16]

31.    D&P's first goodwill impairment report, dated December 31, 2008, implied, in pertinent part, that the TCEH Group's liabilities exceeded the fair market value of its assets by ██████.  This is an approximate ████████ downward swing between the D&P 2007 Opinion and the December 2008 report.  D&P's subsequent goodwill impairment reports, along with the Debtors' financial data, also implied that the TCEH Group's liabilities exceeded the fair market value of its assets in each year following the LBO, with negative implied equity values of ████████ in December 2009, ██████ in December 2010, ███████ in December 2011, ████████ in December 2012, and ███████ in September 2013.

32.    The reported decline in the TCEH Group's equity value between October 2007 and December 2008 is not because the TCEH Group had debilitating operating results for the year ended December 2008, but rather primarily because D&P used inconsistent valuation assumptions to arrive at its October 2007 valuation.  For example, D&P applied a consolidated WACC of ████ in the D&P 2007 Opinion and an implied consolidated WACC of ████ in the D&P 2007 PPA.  Immediately thereafter (beginning in 2008), D&P applied WACCs of ████ using different assumptions.  Beginning in 2008 and beyond, D&P also utilized a ████

---

[16] The Committee is continuing to investigate other flaws in D&P's 2007 analysis.

company-specific risk premium when determining the TCEH Group's cost of equity (one component of WACC) pursuant to the Capital-Asset Pricing Model (an economic model employed by practitioners and academics to determine the relationship between risk and expected return and used to value assets or even entire firms). If D&P had incorporated this same ▆ risk premium in the D&P 2007 Opinion and the D&P 2007 PPA consistent with all of its reports starting in December 2008, the resulting enterprise valuations would have showed that the TCEH Group had negative equity value and thus was balance sheet insolvent at the time of the LBO.[17]

33.    Moreover, the natural gas price forecast assumed in management's projections underlying the D&P 2007 Opinion and the D&P 2007 PPA failed to properly account for various known factors that could and did reasonably serve to lower the near-term future price of natural gas. Public information was available to D&P and the Debtors in 2007 that would have shown why maintaining an average projected natural gas price of ▆▆▆▆ throughout the entire projection period was not realistic at the time. First, it is known in the natural gas industry that natural gas is inherently a cyclical business where prices fluctuate with changes in supply and demand. Relatively high prices incentivize exploration and production companies to explore for new reserves and further develop existing reserves. Such activity serves to increase supply and put downward pressure on prices. Relatively low prices incentivize exploration and production companies to cut back on their development of new and existing reserves given the less attractive returns, which, in turn, places upward pressure on prices. While average natural gas prices had risen during the five year period immediately prior to the LBO to $6/mmbtu, the average natural gas price over the prior decade was approximately $5/mmbtu. The significant increasing levels

---

[17] The Committee does not currently take a position as to the propriety of a company-specific risk premium post-bankruptcy for the TCEH Group.

of natural gas exploration and development that began a few years prior to the LBO were tell-tale signs of the next downward dip in natural gas prices that came soon after the LBO.

34.     Second, there was significant evidence beginning in early 2007 that the development of unconventional shale gas reserves could have a near-term material impact on natural gas prices as the markets adjusted to increased supply.  The potential for major disruption in the natural gas market (*i.e.*, shale) was known by industry participants in 2007.  Certainly, there was no reasonable basis to predict a near-term *increase* in natural gas prices as D&P did.

35.     In sum, D&P would have concluded that the TCEH Group was insolvent at the time of and immediately following the LBO, and that the TCEH Group's remaining assets were unreasonably small following the LBO, had it (i) utilized similar assumptions for determining WACC for the TCEH Group in October 2007 as it had in December 2008, and (ii) utilized realistic natural gas price projections for its valuation of the TCEH Group.

**B.      2011-2013: The First Lien Transferees Extract Additional Value**

**1.      The March 2011 Insolvency Disclosure**

36.     The nature and extent of the TCEH Debtors' First Lien Debt remained largely unchanged from the time of the LBO until early 2011.  However, the enterprise value of the TCEH Group continued to rapidly deteriorate.  D&P's December 2010 goodwill impairment report implied that the TCEH Group's equity value was *negative* ████████ .

37.     In addition, for purposes of preparing a discounted cash flow analysis in its 2010 report, D&P utilized management's cash flow projections through 2018, which reflected that the TCEH Group's revenue would be lower in every one of those years than was forecasted in 2010 while the TCEH Group's liabilities were projected to remain unchanged.

38.     Indeed, EFH was forced to acknowledge the TCEH Debtors' insolvency in its 2010 Annual Report, issued in March 2011.  Specifically, the Annual Report states:

> our liabilities and those of EFCH exceed our and EFCH's assets as shown on our and EFCH's respective balance sheet prepared in accordance with US GAAP as of December 31, 2010
>
> [and]
>
> [R]ecent valuation analyses of TCEH's business indicate that the principal amount of its outstanding debt currently exceeds its enterprise value.

(2010 Annual Report at p. 23, available at

https://www.sec.gov/Archives/edgar/data/1023291/000119312511039696/d10k.htm)

39.    EFH's 2010 Annual Report also recognized the Debtors' dire financial prospects assuming a continuation of current natural gas prices:

> A continuation of current forward natural gas prices or a further decline of forward natural gas prices could limit our ability to hedge our wholesale electricity revenues at sufficient price levels to support our interest payments and debt maturities, result in further declines in the value of our baseload generation assets and could adversely impact our ability to refinance the TCEH Revolving Credit Facility due in October 2013 or our substantial debt due in October 2014.

*Id.* at p. 31.

> We may have difficulty successfully implementing any refinancing of our debt due to our financial position as reflected in our balance sheet and the valuation analyses.

*Id.* at p. 23.

40.    Tellingly, the Debtors conceded that "[i]f new debt is added to our existing debt levels, the related risks that we now face would intensify."  *Id.* at p.24.  The Debtors would fail to heed their own warning.

### 2.    The 2011 "Amend & Extend" Transactions

41.    Recognizing that the TCEH Debtors faced significant debt maturities in 2013 and 2014, the boards of EFH, TCEH, TCEH Finance, Inc., and EFCH (whose members were nearly identical) began to consider strategies to address these impending issues.

15

42.    The series of interrelated transactions occurring in 2011 (as described below, the "2011 Transactions"), referred to by management as "Project Odyssey," *increased* the TCEH Debtors' net debt load, both immediately and over time, and caused them to spend over $2 billion in cash fees plus additional interest—all to extend the maturities on only a *portion* of their then outstanding loans under the Credit Agreement.  These partial maturity extensions, however, were insufficient for the TCEH Debtors to survive past the original 2014 maturity dates under the Credit Agreement, particularly because the TCEH Debtors would still need to pay or separately extend the maturities on the $4.5 billion of non-extended debt (*see infra* ¶ 47-48).  And as the Debtors admitted in their 2010 Annual Report—"[w]e may have difficulty successfully implementing any refinancing of our debt due to our financial position as reflected in our balance sheet and the valuation analyses."—such additional extensions were expected to be (and in fact were) difficult to achieve.  (2010 Annual Report at p. 23.)

43.    Indeed, despite discussions at the April 28, 2011 EFH board meeting about "█████ █████████████████████████████████████████████████████████████," it was clear that the TCEH Debtors never meaningfully addressed their fundamental problem—they had more debt than their business could support.  In board discussions regarding cash flow, net debt, and liquidity, Paul Keglevic, Executive Vice President and Chief Financial Officer, noted that "██ █████████████████████████████████████████████████████████████"—meaning, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.  Mr. Keglevic further noted that the TCEH Debtors would need to address "██████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████"

44.     Thus, while this series of transactions in 2011 provided exceptional value to the First Lien Transferees, it cost the TCEH Debtors over $800 million in fees, plus approximately $530 million of incremental interest expense under the Credit Agreement through the Petition Date, approximately $420 million in incremental interest on the First Lien Notes (which were issued solely to raise funds so the TCEH Debtors could make the par prepayment, described below) through the Petition Date, and approximately $330 million in the form of a Prepayment Benefit (defined below), and did not provide any meaningful value to the TCEH Debtors, who still faced debt they could not support maturing in 2013 and 2014.

### a.      The Credit Agreement Amendment

45.     The 2011 Transactions included several parts.  First, on April 7, 2011, the parties amended the Credit Agreement (the "2011 Amendment") (Ward Decl. Ex. 3) as the first step in a series of transactions that ultimately set the stage for the maturity date extension.  The 2011 Amendment, among other things, amended certain financial covenants, including the financial maintenance covenant.

46.     In connection with the 2011 Amendment, TCEH paid each consenting lender a fee of 50 basis points based on the amount of such lender's commitment, or approximately $110 million in aggregate fees.  In no transaction over the prior twelve months did a borrower pay a higher up-front fee for a covenant amendment.

### b.      The Credit Agreement Maturity Date Extensions

47.     The 2011 Amendment also involved an extension of the maturity of approximately 80% of the aggregate outstanding loans (the "2011 Extension"), comprised of: (i) $15.351 billion aggregate principal amount of Term Loans with 2014 maturities to 2017, (ii) $1.020 billion aggregate principal amount of Letter of Credit Loans with 2014 maturities to

2017, and (iii) $1.409 billion aggregate principal amount of Revolving Loans with 2013 maturities to 2016.

48.     This was only a *partial* extension that left outstanding billions of dollars under the Credit Agreement on its original terms and maturity, including: (i) $3.809 billion aggregate principal amount of Term Loans due in October 2014 (20% of the total principal amount of Term Loans), (ii) $43 million aggregate principal amount of Letter of Credit Loans due in October 2014 (4% of the total principal amount of Letter of Credit Loans), and (iii) $645 million aggregate principal amount of Revolving Loans due in October 2013 (31% of the total Revolving Loans).  This remaining "maturity wall" of almost $4.5 billion of loans coming due in 2013 and 2014 was still beyond anything the TCEH Debtors could reasonably hope to pay without further refinancing the loans or extending the original non-extended maturities, which the TCEH Debtors admitted in their 2010 Annual Report would be exceedingly difficult.

49.     The 2011 Extension also included a "springing maturity" on the extended loans, which would accelerate the due date of the extended loans—thus, limiting the usefulness of the extension—in the event that: (i) more than $650 million in aggregate principal amount of certain of TCEH's unsecured notes[18] remains outstanding 91 days prior to the applicable maturity date, and (ii) TCEH's consolidated total debt to consolidated EBITDA ratio is greater than 6.0x.  If these conditions existed at the applicable time, then the maturity of the extended loans would automatically accelerate to 90 days prior to the maturity of the respective 2015 or 2016 notes (November 2015 and November 2016, respectively).  Thus, even if the TCEH Debtors were to find a way through their 2013/2014 "maturity wall" of the non-extended First Lien Debt, they

---

[18]The unsecured notes at issue include either (i) more than $500 million in aggregate principal amount of TCEH's 10.25% Senior Notes due 2015 or 10.25% Senior Notes due 2015, Series B, or (ii) more than $150 million in aggregate principal amount of TCEH's 10.50%/11.25% Senior Toggle Notes due 2016.

still would not benefit from the full three year term of the 2011 Extension unless they also were able to successfully address other unsecured debt TCEH had coming due in 2015 and in 2016.

50.    In addition, the lenders placed certain conditions on the 2011 Extension that resulted in incremental costs and fees for the TCEH Debtors. ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████.

51.    Further, in exchange for the 2011 Extension, which was a contingent partial extension, the First Lien Transferees extracted excessive fees and unusual concessions (described below) from the TCEH Debtors that forecasted the lenders' positioning for a future bankruptcy filing. Specifically, the 2011 Extension required that TCEH pay:

- Approximately $575 million in fees for the Term Loans and Letter of Credit Loans extension (structured as a fee of 350 basis points (3.5%) paid to each extending lender based on the amount of loans extended);

- Approximately ████████ in fees for the Revolving Loans (structured as a fee of ██████ paid to certain extending lenders pro rata based on amount of the commitments extended);

- a 100 basis point (1%) increase in the interest rate spread on the extended Term Loans and Letter of Credit Loans and drawn spread on the Revolving Loans under the Credit Agreement; and

- A 50 basis point (0.5%) increase in the undrawn fee with respect to extended undrawn Revolving Loans under the Credit Agreement.

52.    The yield enhancements[19] that the First Lien Transferees received here were not typical for the market at that time.

---

[19]Yield enhancement refers to the total benefit granted to lenders in connection with a transaction, including both upfront fees and any amounts to be received in the form of increased interest over the life of the loan. Specifically, the yield enhancement is calculated as the sum of (i) the interest rate increase, and (ii) up-front fees divided by years to maturity.

53.    First, the First Lien Transferees required that TCEH pay a substantial portion of the yield enhancement in the form of extremely high up-front fees, whereas lenders in similar transactions generally require lower up-front fees and achieve principally all of their yield enhancement in the form of an increased interest rate over the remaining life of the extended loans.  Second, yield enhancements relating to the 2011 Extension were above average.  In fact, if the yield enhancements are calculated with the up-front fees amortized over the three year period between April 2011 and the Petition Date (as opposed to being amortized through the illusory maturity dates in 2016 and 2017), the yield enhancements are particularly excessive. And these unusually high yield enhancements do not even take into account the Prepayment Benefit and the other benefits the First Lien Transferees received, as described below.

██    ████████████

54.    In order to achieve the ███████████████████████████

███, the TCEH Debtors had to structure yet another costly transaction, ███████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████

55.    █████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████, resulting

in an aggregate net transaction cost to TCEH of ██████████.

### d.    The Debt Prepayment

56.    The First Lien Transferees' benefits did not end with fees for the futile partial

maturity extensions and the ████████████.  The first lien lenders also used their leverage in

the 2011 Transactions to reduce their exposure by requiring an early pay down by TCEH of $1.6

billion under the Credit Agreement as a condition precedent to the effectiveness of the 2011

Extension, including approximately $770 million of Term Loans, $188 million of Letter of

Credit Loans, and $645 million of Revolving Loans.  Had the lenders not insisted on this

condition for the 2011 Extension, TCEH would not have been obligated to make those payments

until the Revolving Loans matured in 2013 and the Letter of Credit Loans and Term Loans

matured in 2014.  By requiring the early pay-down several years prior to maturity, the First Lien

Transferees substantially reduced their exposure to the risk that the TCEH Debtors would be

unable to pay that debt as it came due in 2013 or 2014.

57.    Moreover, the lenders extracted *additional* value from the TCEH Debtors in this

early pay down by requiring that they prepay the $1.6 billion of loans at *par*.  At the time of the

2011 Extension, the loans under the Credit Agreement were trading on the secondary market at a

discount of approximately 20%.  Receiving the prepayment at par thus constituted an immediate

transfer to the lenders of approximately $330 million (the "Prepayment Benefit") more than they could have received at the market trading price (even without accounting for the fact that if the lenders had tried to sell their $1.6 billion in TCEH debt in the open market all at once, they likely would have further depressed the price and further reduced the proceeds realized).

58.     If the Prepayment Benefit paid to the First Lien Transferees is considered in conjunction with the fees and incremental interest paid under the 2011 Transactions, the resulting yield enhancement is extraordinarily high.   Furthermore, amend and extend transactions generally do not involve the pay down of debt that was trading at a meaningful discount to par as a condition to closing.

### e.     Issuance of First Lien Notes

59.     In addition, in order to complete the required debt prepayment, TCEH needed to issue new notes with a substantially higher interest rate, for which it paid even more fees and expenses.

60.     On or about April 19, 2011, TCEH and TCEH Finance, Inc. (together, the "TCEH Note Issuers") issued an aggregate principal amount of $1.75 billion of 11.50% senior secured notes due October 1, 2020 (the "First Lien Notes"), at 99.295% of face value pursuant to that certain indenture, dated April 19, 2011 (the "Indenture") (Ward Decl. Ex. 10), by and among the TCEH Note Issuers as issuers, the Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee (as succeeded, the "Indenture Trustee").   At the same time, the parties amended the Security Agreement and the Collateral Agency and Intercreditor Agreement (Ward Exs. 9 and 10) to reflect the interests of the holders of the First Lien Notes in the same collateral securing the Credit Agreement.   The First Lien Notes were issued with original issue discount of $12 million, and as of the Petition Date, the unaccreted original issue discount was approximately $8 million.

61.    As discussed above, the lenders required the TCEH Note Issuers to use the net proceeds to prepay approximately $1.6 billion aggregate principal amount of loans under the Credit Agreement at par.  The remaining proceeds were used to pay approximately $150 million in fees, expenses and transaction costs associated with the 2011 Transactions, including certain fees related to the First Lien Notes.

62.    To comply with their disclosure obligations concerning the likely challenge to the 2011 Transactions, the Offering Memorandum for the First Lien Notes contains ███████ ████████████████████████████—highly unusual when compared to the Debtors' prior disclosures—discussing "███████████████████████████████." There, the TCEH Note Issuers acknowledge ██████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

63.    More telling, the Offering Memorandum warns investors that "████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████." And that concession regarding the TCEH Note Issuers' ████████████████ ████████████ did not even take into account the aggregate fees and other benefits of over $800 million, plus over $530 million in incremental interest under the Credit Agreement, plus approximately $420 million in incremental interest on the First Lien

Notes, plus the approximately $330 million Prepayment Benefit, all of which was extracted for an illusory and ultimately futile partial maturity extension.

██      █████████████████████████████

64.    In furtherance of their mission to improve their recoveries in the face of the Debtors' near certain bankruptcy filing, certain lenders also demanded as part of the 2011 Extension that the Debtors ████████████████████████████████████████████. Presumably, some of the lenders ████████████████████████████████████████ ██████████████████████████ were concerned about their ultimate ability to recover ████████ , and therefore, would only consent to the 2011 Extension if ██████████████ ████████████████████████.

65.    To meet this additional demand, ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ The effect of ██████████████████████ was to better position exchanging lenders in the event of a subsequent bankruptcy, ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████

### g.    The 2011 Transactions

66.    Each of the 2011 Transactions was, for the most part, dependent upon or required by the occurrence of the other 2011 Transactions, and the TCEH Debtors viewed the 2011 Transactions as a single inter-related deal, not as severable components.

67.     In total, TCEH paid over $800 million in fees in connection with the 2011 Transactions, plus approximately $530 million in incremental interest under the Credit Agreement from April 2011 through the Petition Date, plus approximately $420 million in incremental interest under the First Lien Notes from April 2011 through the Petition Date, plus the approximately $330 million Prepayment Benefit.  These 2011 Transactions, which cost the TCEH Debtors over $2 billion in the aggregate, ultimately extended some—but not all—of the maturity dates under the Credit Agreement for an aggregate yield enhancement of 170 basis points, or, if the benefits associated with the unnecessary *par* prepayment of $1.6 billion under the Credit Agreement are taken into account, an aggregate adjusted yield enhancement of 192 basis points.  These yield enhancements are unusually high.

68.     These fees were not even the worst part of the 2011 Transactions.   The fundamental flaw of the 2011 Transactions is what they failed to do.  The partial maturity extensions left so many substantial loans in place under their original terms that the TCEH Debtors had no reasonable likelihood of being able to repay the non-extended loans when they came due in 2013 and 2014.

69.     Given the TCEH Debtors' reported financial condition and market outlook (including forecasted natural gas prices) (*see* 2010 Annual Report), the 2011 Transactions failed to buy the TCEH Debtors any meaningful time because the TCEH Debtors retained limited ability to refinance or extend the $4.5 billion of remaining loans prior to maturity in 2013 and 2014.  As of early 2011, management was projecting ███████ negative growth for the next two years, so there was no reasonable prospect that the TCEH Debtors would be able to refinance the non-extended loans prior to maturity, as EFH conceded in its 2010 Annual Report.  Thus, the TCEH Debtors would still hit the 2013/2014 maturity wall and be forced to file for

bankruptcy at nearly the same time as they would have had they not undertaken the costly 2011 Transactions at all.

70.     Moreover, the 2011 Transactions were also counterproductive because they gave non-extending lenders greater leverage to force the TCEH Debtors into bankruptcy or extract as much value as possible later by threatening to do so.  Indeed, this is exactly what happened less than two years later when the TCEH Debtors attempted to extend the maturity of the remaining $645 million of non-extended Revolving Loans.

71.     In sum, the 2011 Transactions benefited each of the First Lien Transferees who received the fees, incremental interest expense, and Prepayment Benefit, and considerably benefitted those lenders who maintained greater leverage with respect to the non-extended loans with 2013 and 2014 maturity dates.

## C.     The 2012/2013 Amendment: "Buying Runway"

### 1.     The Debtors Begin To Plan For a 2014 Restructuring

72.     By early 2012, after the costly 2011 Transactions, the TCEH Group's equity value dropped precipitously yet again to negative ███████, as implied by D&P's December 2011 goodwill impairment report.

73.     The Debtors hired restructuring advisors in July of 2012.  In October 2012, the EFH Executive Committee met to discuss "████████████████████████████████████████" and a "strategy for discussing restructuring alternatives with [TCEH] creditors and the timing of any discussions, including the impact of Deloitte & Touche LLP's audit opinion and the Company's IRS Private Letter Ruling strategy on any potential discussions."

74.     The minutes of the joint Board meetings on October 25 and 26, 2012 of the TCEH and EFCH Boards reflect discussion of "████████████████████████████████████████" including "████████████████████████████████████████."  At the

contemporaneous meeting of EFH's Board of Directors on October 26, 2012, Mr. Keglevic also discussed ███████████████████████.

75.    The TCEH Debtors believed they would be able to timely repay the $645 million of Revolving Loans due in 2013, but knew that after doing so, they would be unable to make timely interest and principal payments on their Term Loans and Letter of Credit Loans due in 2014. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

### 2.    Late 2012: The Pace Quickens

76.    By late 2012, the Debtors' situation was dire and a bankruptcy filing was inevitable.  According to D&P's December 2012 goodwill impairment report, the fair market value of the TCEH Group's assets had plunged yet again during 2012 to approximately ██████. This occurred while the TCEH Group's total liabilities had increased to over ████████, implying that the TCEH Group's equity value was now negative by almost ████████ (the third straight multi-billion dollar equity value decline year-over-year).  The trend line was clear and there was no conceivable way to fill the insolvency gap of ██████ and growing.

77.    At a December 13, 2012 meeting of the EFH Executive Committee, John F. Young, President and Chief Executive Officer of EFH, "████████████████████████████ ████████████████████████████████████████████ ████."  However, the meeting minutes note "████████████████████████

███████████████████████████████ and discuss "████████████████████████████████

████████████████████████████████."

78.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████.

79.    ████████████████████████████████████████

████████████████████████████████████████████████ the

Debtors likely would have been forced to file for bankruptcy in or about April 2013.

### 3.    The Illusory Three-Year Maturity Extension

80.    Because    ████████████████████████████████████████

████████████████████████████████████████, the First Lien Transferees were able

to enter into an illusory amendment to the Credit Agreement with the TCEH Debtors that

ostensibly extended for three years the maturity date of the remaining $645 million of non-

extended Revolving Loans, but still left nearly $4 billion in First Lien Debt due in 2014.  The

extension, however, provided no tangible benefit to the TCEH Debtors.  Neither the TCEH

Debtors nor the First Lien Transferees ever believed or intended that the purported three-year

term of the extension would materialize, but instead simply sought to █████████████████████

████████████████████████████████████████, so that they could

continue to kick the proverbial can down the road into 2014, and thus have more "runway" to

pursue a restructuring.  Conveniently, this extension also gave the Debtors and the First Lien

Transferees the comfort of maturities over six years after the closing of the October 2007 LBO.

81.    On December 19, 2012, the Boards of EFH, EFCH, and TCEH provided

unanimous written consent to amend the Credit Agreement and extend the maturities of the

Revolving Loans from October 2013 to October 2016.  The amendment was dated January 4,

2013 (the "2013 Amendment") (Ward Decl. Exs. 4, 5).  Notably, the TCEH Debtors did not

amend the maturities of the Term Loans or Letter of Credit Loans maturing in 2014,

notwithstanding Mr. Keglevic's comment at the EFH Board meeting that "███████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████"

82.    At the time, the Debtors were not only anticipating the bankruptcy filing, but were

also mindful of the need to keep the lenders informed and involved in the process.  For example,

on December 13, 2012, one week before the 2013 Amendment was agreed to, the EFH Board

discussed "███████████████████████████████████████████████████████████████████████

███████████."

83.    For that one-year runway (cloaked as a three-year extension), TCEH paid

unprecedented fees to extend the maturity on $645 million of Revolving Loans, including (i) a

$340 million fee, structured as $0.5264 of Incremental Term Loans due October 2017 for each

$1.00 of its revolving credit commitment extended (the "Fee Note"); (ii) a 100 basis point

increase on the interest rate on the extended Revolving Loans (approximately $21 million from

January 2013 through the Petition Date); and (iii) a 50 basis point fee increase in the undrawn

spread with respect to the extended Revolving Loans (approximately $9 million from January 2013 through the Petition Date).

84.     Even when viewed as a three-year extension, the implied yield enhancement was an unprecedented 1,497 basis points on the extended Revolving Loans.  But the fees for the 2013 Amendment cannot fairly be evaluated based on the stated three-year term of the extension because that three-year term was illusory from the outset.  Viewed for what it really was—a one-year extension until the next year's audit opinion and an opportunity to extract more value for the lenders—the secured Fee Note (plus interest) provided yield enhancement of a staggering 5,700 basis points, or 57% of the extended Revolving Loans.

85.     Moreover, despite the fact that fees in the majority of cases are structured primarily as an increased interest rate to be paid over the remaining life of the loan, here the lenders insisted that fees be paid in the form of the secured Fee Note.  As a result, the lenders received the additional benefits of interest payments on the Fee Note (totaling $30 million from January 2013 through the Petition Date), as well as larger secured claims and adequate protection claims in the bankruptcy cases.

**D.    The Debtors' Use of Unencumbered Cash**

86.     Shortly before the Petition Date, the First Lien Transferees also received preferential transfers, as described below.

87.     Prior to the Petition Date, in November 2012, TCEH implemented an accounts receivable securitization program (the "AR Program"), pursuant to which, as permitted by the Credit Agreement and related documents, Debtor TXU Energy Retail Company LLC (a direct, wholly-owned subsidiary of TCEH, "TXU Energy"), a guarantor under the Credit Agreement, sold its trade accounts receivable to Debtor TXU Energy Receivables Company LLC (a bankruptcy-remote, special purpose entity wholly owned by TCEH, "TXU Energy

Receivables"), which is not a guarantor under the Credit Agreement. Due to this transfer, the accounts receivable became unencumbered assets that were no longer encumbered by the lenders' security interests.

88.    TXU Energy Receivables then used the purchased accounts receivable as collateral to borrow funds from a third party lender.

89.    In October 2013, TCEH terminated the AR Program, and TXU Energy paid TXU Energy Receivables $474 million in exchange for $491 million in accounts receivable.

90.    With the proceeds, TXU Energy Receivables repaid its loan to the third party lender and its subordinated note payable to TXU Energy ███████████████████

████████████████████████████████████████████████████████████████████

███████████ (the "TCEH JPM Unencumbered Account"). The Debtors identify this account in the

*Motion to Maintain Bank Accounts (Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting PostPetition Intercompany Claims Administrative Expense Priority* [Dkt. No. 37] (the "Cash Management Motion") as "General Fund/AR Closure."

91.    On February 19, 2014, TXU Energy Receivables ███████████████████
████████████████████████████████████████.

92.    Also in February 2014, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████ (the "TCEH Main Account").    The Debtors identify this account in the Cash

Management Motion as "General Fund/Debt Related Activity." While the Debtors indicate in the

Cash Management Motion that the TCEH JPM Unencumbered Account and the Segregated Cash

account (defined below) are not part of the prepetition collateral securing the First Lien Debt, the

Debtors did not so indicate with respect to the TCEH Main Account, thereby implying that this

account is part of the prepetition collateral securing the First Lien Debt.    The TCEH Main

Account was used to fund certain expenses, including a substantial portion of the approximately

$216 million in interest payments to First Lien Transferees on or about February 10, 2014.

93.    ████████████████████████████████████

████████████████████████████████████

██████████    On March 17, 2014, ████████████████████████

████████████████████████████ (the "Segregated Cash").

The Debtors identify this account in the Cash Management Motion as the "Unencumbered Cash

Account."    The Debtors acknowledge in the Cash Collateral Order that the Segregated Cash is

unencumbered.    (Cash Collateral Order ¶ F(i)(e)).

E.    **The Chapter 11 Cases**

94.    On April 29, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for

reorganization under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Delaware.    On June 5, 2014, the Court entered an order directing joint

administration of the Debtors' cases under Case Number 14-10979 [Dkt. No. 849].    The Debtors

have continued in the management and operation of their businesses and properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    No trustee or

examiner has been appointed in these cases.

95.     The seven member Committee was formed in the bankruptcy cases by the United States Trustee for the District of Delaware on May 13, 2014, pursuant to section 1102(a) of the Bankruptcy Code. [Dkt. No. 420][20]The Committee is vested with, among other things, the powers described in section 1103 of the Bankruptcy Code, including the power to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.

96.     On the Petition Date, the Debtors filed the *Motion of Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Dkt. No. 71] (the "Cash Collateral Motion").  On June 6, 2014, the Court entered the Cash Collateral Order approving the Cash Collateral Motion on a final basis [Dkt. No. 855].

97.     In the Cash Collateral Order, the TCEH Debtors agreed to several stipulations regarding the extent and validity of the First Lien Debt (the "Stipulations"), including, in pertinent part, the following:

- "As of the Petition Date, the TCEH Debtors were truly and justly indebted to the First Lien Lenders pursuant to the First Lien Credit Agreement, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of $22,635,987,924 plus accrued and unpaid interest with respect thereto (which, as of the Petition Date, was $227,283,333) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees, expenses, and indemnities that are chargeable or reimbursable under the First Lien Credit Agreement) and all other Obligations (as defined in the First Lien Credit Agreement) owing under or in connection with the First Lien Credit Agreement . . . ."  (Cash Collateral Order ¶ F(i)(a)).

- "As of the Petition Date, the TCEH Debtors were truly and justly indebted to the holders of the First Lien Notes pursuant to the First Lien Notes Indenture, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of

---

[20]The Committee members include: (i) Pension Benefit Guaranty Corporation; (ii) HCL America, Inc.; (iii) The Bank of New York Mellon; (iv) Law Debenture Trust Company of New York; (v) Holt Texas LTD, d/b/a Holt Cat; (vi) ADA Carbon Solutions (Red River); and (vii) Wilmington Savings Fund Society.

$1,750,000,000 plus accrued and unpaid interest with respect thereto (which as of the Petition Date was $65,965,278) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the First Lien Notes Indenture) and all other Obligations (as defined in the First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture." (Cash Collateral Order ¶ F(i)(b)).

- "The Prepetition First Lien Obligations are secured by first priority security interests in and liens on (the "Prepetition First Priority Liens") the "Collateral," as defined in the First Lien Credit Agreement (the "Prepetition Collateral"), including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the "Cash Collateral")." (Cash Collateral Order ¶ F(i)(e)).

98.    The Stipulations became binding on the TCEH Debtors upon entry of the Cash Collateral Order.[21] (Cash Collateral Order ¶ 15.)  Further, the Stipulations become binding on all other parties unless a party in interest (including the Committee) objects to the Stipulations on or before the Challenge Deadline.[22]  (*Id.* at ¶ F(ii)(c).)

---

[21]Certain of the Stipulations relate to the Second Lien Notes and the Prepetition Second Lien Obligations (each as defined in the Cash Collateral Order). (*See* Cash Collateral Order, ¶ F(ii).)  The Stipulations do not specify the amount of the Prepetition Second Lien Obligations that remain outstanding as of the Petition Date.  Further, the Stipulations provide that the Prepetition Second Lien Obligations are "purportedly secured by second priority liens" in the Prepetition Collateral. (*Id.*)  The Committee reserves all rights to seek standing to bring claims against the Prepetition Second Lien Creditors relating to the Second Lien Notes and the Prepetition Second Lien Obligations.  The Committee further reserves all rights to seek a declaratory judgment that the Prepetition Second Lien Creditors are not entitled to share in the proceeds of any recovery from the Committee's avoidance actions against the First Lien Transferees, in accordance with Section 6.05 of the Second Lien Intercreditor Agreement (as defined in the Cash Collateral Order).

[22]The "Challenge Deadline" is currently March 13, 2015.  The Cash Collateral Order provides that the Committee or a party in interest with standing granted by order of the Court may file an adversary proceeding or contested matter seeking to avoid, object to, or otherwise challenge the TCEH Debtors' Stipulations within 135 calendar days after entry of the interim order granting the Cash Collateral Motion (September 14, 2014), subject to further extension by written agreement of the TCEH Debtors, the Prepetition First Lien Agents, the unofficial committee of certain unaffiliated holders of, *inter alia*, first lien senior secured claims against the TCEH Debtors (the "TCEH First Lien Ad Hoc Committee"), and any individual Prepetition First Lien Creditor that is the subject of a challenge.  On August 8, 2014, the Court entered an order approving a stipulation executed by the TCEH Debtors, the Prepetition First Lien Agents, and the TCEH First Lien Ad Hoc Committee, which extended the Challenge Deadline to October 14, 2014 [Dkt. No. 1771].  On September 19, 2014, the Court entered an order approving a second stipulation executed by the same entities, further extending the Challenge Deadline to November 28, 2014 [Dkt. No. 2083].  On November 5, 2014, the Court entered an order approving a third stipulation executed by the same entities, further extending the Challenge Deadline to December 19, 2014 [Dkt. No. 2704].  On December 2, 2014, the Court entered an order approving a fourth stipulation executed by the same entities, further extending the Challenge Deadline to February 12, 2015 [Dkt. No. 2916].  On January 27, 2015, the Court entered an order approving a fifth stipulation executed by the same entities, further extending the Challenge Deadline to March 13, 2015 [Dkt. No. 3380].

### F.       The Committee's Investigation

99.      Since the entry of the Cash Collateral Order, the Committee has diligently investigated potential claims seeking to avoid, object to, or otherwise challenge the TCEH Debtors' Stipulations, including potential claims against the First Lien Lenders (as defined in the Cash Collateral Order).  (Ward Decl. ¶ 2.)

100.     The Committee's investigation has been targeted and efficient, but necessarily extensive and time consuming as a result of the complexity of the First Lien Debt, including the numerous amendments, extensions, and related transactions from 2007 to present.  (*Id.* at ¶ 3.) The Committee issued substantial document requests to the Debtors and has worked with Debtors informally to prioritize those requests on an iterative basis.  The Committee reviewed thousands of documents received by the Debtors and others, and also met with representatives of the Debtors in person and telephonically.  (*Id.*)

101.     Understanding the Committee's need to conduct a thorough and timely investigation, and the burdens such an investigation places on the Debtors, the Prepetition First Lien Agents, and the TCEH First Lien Ad Hoc Committee extended the original Challenge Deadline from September 14, 2014 to March 13, 2015.  (*Id.* at ¶ 4.)

### RELIEF REQUESTED

102.     The Committee respectfully requests the entry of an order, substantially in the form annexed hereto as Exhibit B (the "Proposed Order"), pursuant to sections 105(a), 1103 and 1109 of the Bankruptcy Code granting the Committee exclusive standing and authority, on behalf of the TCEH Debtors' estates, to commence, prosecute, and settle claims against the First Lien Transferees arising out of the factual allegations set forth herein and in the proposed complaint, substantially in the form annexed hereto as Exhibit C (the "Proposed Complaint").

## ARGUMENT

### I.    THE COMMITTEE SHOULD BE GRANTED STANDING TO COMMENCE AND PROSECUTE THE PROPOSED CLAIMS

103.    The Committee should be granted exclusive standing and authority to commence, prosecute, and settle claims against the First Lien Transferees arising out of the factual allegations set forth herein and in the Proposed Complaint, on behalf of the TCEH Debtors' estates pursuant to sections 1103 and 1109 of the Bankruptcy Code.

104.    Section 1103(c)(2) expressly authorizes an official committee to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or the formulation of a plan." 11 U.S.C. § 1103(c)(2).   Further, section 1103(c)(5) provides that a committee may "perform such other services as are in the interest of those represented."   Similarly, section 1109(b) provides that a party-in-interest, including a creditors' committee, "may raise and may appear and be heard on any issue in a case under [chapter 11]".

105.    The Third Circuit has recognized that "the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers." *See Cybergenics*, 330 F.3d at 568, 580 (holding that bankruptcy court can authorize creditors' committees to pursue avoidance actions); *Infinity Investors Ltd ex rel. Yes! Entm't Corp. v. Kingsborough (In re Yes! Ent'mt Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) (same). These powers are granted to official committees to provide "a critical safeguard against [a debtor's] lax pursuit of avoidance actions" where the debtor either fails to pursue an estate claim or cannot effectively do so because of conflicts of interest.  *See Cybergenics*, 330 F.3d at 573.

106.    Generally, derivative standing requires: (1) the existence of a colorable claim; (2) the debtor's unjustifiable refusal to pursue the claim (or, alternatively, a showing that a demand that the debtor pursue the claim would be futile); and (3) the permission of the bankruptcy court to initiate the action. *See In re Yes! Entm't*, 316 B.R. at 145. In determining whether a debtor's refusal (or presumed refusal) to bring an action is unjustified, courts examine whether the claim is likely to benefit the estate but are not required to conduct a "mini-trial." *Id.*

107.    Derivative standing is particularly appropriate where—as here—a debtor needing use of cash collateral during the bankruptcy cases agrees to waive avoidance action claims against their prepetition lenders. The Third Circuit expressly addressed this in *Cybergenics*:

> A court facing motions for first-day orders has a difficult choice [to refuse to issue the order or] explore the claim's underlying merits. But either choice is problematic, for first-day orders are by their nature extremely urgent . . . The possibility of a derivative suit by a creditors' committee serves Congress's goals when, by granting fist-day orders, bankruptcy courts nevertheless reserve to the creditors' committees the right to investigate and pursue claims that would otherwise be released in those orders.

*Cybergenics*, 330 F.3d at 574, n.8 (citations omitted).

## A.    The Committee Has Asserted Colorable Claims

108.    Delaware courts have eschewed line-by-line or claim-by-claim analysis of proposed complaints in favor of a more general analysis of the import of what has been alleged. *See, e.g.*, Transcript of Proceedings at 6, 44, *In re Distributed Energy Sys., Corp.*, No. 08-11101 (KG) (Bankr. D. Del. July 30, 2008), Dkt. No. 315 (noting that the colorability standard is less than a Rule 12(b)(6) standard and requires only plausibility and that the claims be not "without merit"); Transcript of Proceedings at 97, *In re Fedders North America, Inc.*, No. 07-11176 (BLS) (Bankr. D. Del. Mar. 24, 2008), Dkt. No. 933 ("the sufficiency of the allegations simply cannot be [held] to a Rule 12(b)(6) standard, because we haven't even filed the complaint yet"); *Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364,

376 (Bankr. S.D.N.Y. 2005) (noting that the burden of showing a colorable claim is a "relatively easy one").  The Committee's prospective claims easily surpass the plausibility requirement.

109.    The relief sought by the Committee, as is more fully set forth in the Proposed Complaint, falls into the following categories: (i) avoidance and recovery of fraudulent transfers made in connection with the 2007 LBO, the 2011 Transactions, and the 2013 Amendment; (ii) equitable subordination of claims related to the First Lien Debt; (iii) disallowance of claims to the extent they include unmatured interest; (iv) avoidance of unperfected liens and security interests; (v) to the extent the Court determines at any time that the first lien lenders are undersecured creditors, recharacterization of the adequate protection payments made during the chapter 11 cases as payments of principal on the First Lien Debt; (vi) avoidance of preferential transfers; (vii) disallowance of claims relating to the First Lien Debt pending final resolution of the adversary proceeding, and a determination of the amount of the First Lien Transferees' allowed claims; (viii) to the extent the First Lien Transferees' claims are not avoided, limiting the amount of the First Lien Transferees' allowed claims based on Section 2(b) of the Guarantees; and (ix) declarations that rabbi trust accounts, certain deposit accounts, avoidance actions, commercial tort claims, and tax attributes are unencumbered, and (x) declarations that (a) there has been no diminution in the value of the First Lien Transferees' collateral after the Petition Date, and the Debtors' proposed use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in the value of the First Lien Transferees' collateral, (b) the First Lien Transferees are not entitled to postpetition interest and fees unless the Court determines that they are oversecured, (c) to the extent the First Lien Transferees are determined by the Court to be oversecured creditors, postpetition interest and fees shall be allowed solely to the extent of the excess value of the collateral and will be awarded at the contractual non-default rate of interest, and (d) the Stipulations to do not alter the scope of

38

the First Lien Transferees' liens.  The facts alleged herein and in the Proposed Complaint easily demonstrate colorable grounds for each of these claims.

### 1.   The Proposed Allegations State Colorable Claims For Fraudulent Conveyances

110.   Section 548 of the Bankruptcy Code allows for avoidance of actual or constructive fraudulent transfers made on or within two years before the bankruptcy petition date.  11 U.S.C. § 548 (2014).  Actual fraud under the Bankruptcy Code requires the trustee to show that the transfer or obligation was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." *Id.* at § 548(a)(1)(A); *see In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006).  Constructive fraudulent transfer requires the trustee to show that: (1) the debtor received less than reasonably equivalent value for the transfer; and (2) the debtor either (i) was insolvent on the date of the transfer or became insolvent as a result of the transfer; or (ii) was engaged in, or about to engage in, a business transaction for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur or believed it would incur debts beyond its ability to pay when those debts matured.  11 U.S.C. §§ 548(a)(1)(B)(i)-(ii) (2014).

111.   The Bankruptcy Code defines insolvent as "the sum of such entity's debts is greater than all of such entity's property, at fair valuation," exclusive of exempt property and any property transferred in actual fraudulent transfers.  11 U.S.C. § 101(32) (2014).  "Section 101(32) is often referred to as the 'balance sheet' test of insolvency." *Homeplace of Am., Inc. v. Salton, Inc. (In re Waccamaw's Homeplace)*, 325 B.R. 524, 529 (Bankr. D. Del. 2005) (citation omitted).[23]

_____

[23]The "balance sheet" designation is a misnomer since the court must determine "fair value" and thus is not bound

112.    As an alternative to demonstrating balance sheet insolvency, a transfer is avoidable as a constructively fraudulent transfer if the debtor was left "with an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II) (2014).  The "unreasonably small capital" test "analyzes whether at the time of the transfer the company had insufficient capital, including access to credit, for operations." *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D. Del. 2008), *aff'd*, 382 F. App'x 135 (3d Cir. 2010).  Unreasonably small capital denotes the debtor's "inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable solvency." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 553 (Bankr. D. Del. 2012).

113.    Section 544(b)(1) of the Bankruptcy Code allows for avoidance of fraudulent transfers that are "avoidable under applicable law," including state law.   Delaware has adopted the Uniform Fraudulent Transfers Act ("UFTA"). 11 U.S.C. § 544(b)(1) (2014).[24]

114.    Substantively, the Delaware UFTA does not vary substantially from the Bankruptcy Code.  *See Charys Liquidating Trust v. McMahon Sec. Co., L.P. (In re Charys*

by generally accepted accounting principles. *Miller v. Barenberg (In re Bernard Techs., Inc.)*, 398 B.R. 526, 531 (Bankr. D. Del. 2008).

[24]Texas also adopted the UFTA.  *See* TEX. BUS. & COM. CODE ANN. Ch. 24 (substantially similar language to Delaware's law).  Because Delaware and Texas law do not conflict in relevant part, the Proposed Complaint will refer to the law of the forum state.  *See Lucker Mfg., A Unit of Amclyde Engineered Prods., Inc. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994) (applying substantive law of forum state where there was no conflict).  New York law also may apply to certain claims.  New York has adopted the Uniform Fraudulent Conveyance Act ("UFCA") and applies a six-year look-back period. *See Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006); *See* N.Y. C.P.L.R. § 213(8); N.Y. Debt. & Cred. Law § 270-281.  Similar to Delaware and Texas, the New York fraudulent conveyance laws do not vary much from the elements set forth in section 548(a)(1)(B) of the Bankruptcy Code.  The primary difference is the UFCA's use of the term "fair consideration."  Courts have noted that "reasonably equivalent value" under the Bankruptcy Code and UFTA and "fair consideration" under the UFCA have the same fundamental meaning, except that the definition of "fair consideration" additionally includes the statutory requirement of "good faith."  *United States v. McCombs*, 30 F.3d 310, 326 n.1 (2d Cir. 1994).

*Holding Co., Inc.)*, 443 B.R. 628, 636 (Bankr. D. Del. 2010).  Section 1304(a)(2) of title 6 of the Delaware Code provides that a transfer is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  Similarly, section 1305(a) of title 6 of the Delaware Code provides that a transfer is fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) if the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." DEL. CODE ANN. tit 6, §§ 1304(a)(2), 1305(a) (2014).

115.    The Proposed Complaint presents more than colorable grounds to support claims under both section 548(a)(1)(B) of the Bankruptcy Code and the Delaware UFTA, based on allegations that (i) the TCEH Debtors did not receive reasonably equivalent value in exchange for (a) granting liens on substantially all of their assets in 2007, or (b) the subsequent transfers of more than $2.4 billion in connection with the 2011 and 2013 Transactions, and (ii) each of the TCEH Debtors was insolvent at the time of and immediately following the LBO, and the TCEH Debtors' remaining assets were unreasonably small following the LBO.

### a.    The TCEH Debtors Did Not Receive Reasonably Equivalent Value

116.    The TCEH Debtors did not receive reasonably equivalent value for the liens and security interests granted in connection with the 2007 Credit Agreement, as well as the fees,

incremental interest, and other amounts that they paid in connection with both the 2011 and 2013 Transactions.

117.    Whether the TCEH Debtors received reasonably equivalent value is a question of fact.  *See In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) ("The question of reasonable equivalence is 'largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts.'" (quoting *In re Dunham*, 110 F.3d 286, 289 (5th Cir. 1997)); *In re Jesup & Lamont, Inc.*, 507 B.R. 452, 470 (Bankr. S.D.N.Y. 2014) ("Whether the debtor received "reasonably equivalent value" for the alleged fraudulent transfer is ordinarily a question of fact."); *Litig. Trust of MDIP Inc. v. De La Rue Cash Sys. (In re MDIP Inc.)*, 332 B.R. 129, 133 (Bankr. D. Del. 2005) ("Ultimately, reasonable equivalence has a large factual component."). Reasonably equivalent value should be considered from the standpoint of the debtor's creditors, which requires "looking at the net effect of the transfer on the unsecured creditors." *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) (citations omitted) (applying Delaware UFTA).

### (i)    Liens and Security Interests Granted in Connection With the 2007 Credit Agreement

118.    It is well established that a leveraged buyout can fail to deliver reasonably equivalent value to the target company that is loaded up with debt—secured by liens on substantially all of its assets—to finance a change of control.  *See, e.g., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3d Cir. 1986) (finding the law on fraudulent conveyances applicable to leveraged buy-outs and noting that the "broad sweep" of the law did "not justify exclusion of a particular transaction such as a leveraged buy-out . . ."); *In re Jevic Holding Corp.*, 08-11006 BLS, 2011 WL 4345204, at *9 (Bankr. D. Del. Sept. 15, 2011) (declining to dismiss claims seeking, among other things, to unwind fraudulent transfers in

connection with LBO financing); *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 139 (Bankr. D. Del. 2005) (same).

119.    Just as the Committee proposes here, in *In re Jevic Holding Corp.*, 2011 WL 4345204, at *9, the official committee of unsecured creditors brought an adversary proceeding seeking to avoid liens and transfers in connection with debt used to finance an LBO.  The court declined to dismiss the fraudulent transfer claims because the committee made "sufficient allegations that, if true, could support a finding that the loan proceeds received by Jevic merely passed through Jevic and thus failed to provide reasonably equivalent value" as compared to the liens and other amounts transferred to the defendants in exchange for the financing.  *Id.*

120.    Likewise, in *In re OODC, LLC*, 321 B.R. at 139 ("*In re OODC*"), the court denied defendants' motion to dismiss claims arising out of the financing of an LBO, including claims to avoid constructive and actual fraudulent transfers, where the LBO allegedly left the debtor with too much debt.  *Id.*

### (ii)    Fees, Incremental Interest, and Premium Paid in Connection With the 2011 Transactions

121.    The Proposed Complaint alleges that the fees, incremental interest, and other amounts paid by the TCEH Debtors in connection with the 2011 Transactions—exceeding $2 billion in total—are excessive, even if one assumed that the Debtors would benefit from the full term of the extended maturities.  (*See supra* ¶ 67.)

122.    But the 2011 Transactions left almost $4.5 billion outstanding on its original terms.  Because the 2011 Transactions were band-aids, not cures, the TCEH Debtors continued to face a maturity wall of non-extended debt in 2013 and 2014, including (i) $645 million of its Revolving Loans (approximately 31% of the Revolving Loan commitments outstanding prior to the 2011 Transactions) in October 2013, (ii) $3.8 billion in Term Loans (approximately 20% of

the Term Loans outstanding prior to the 2011 Transactions) in October 2014, and (iii) $43

million in Letter of Credit Loans (approximately 4% of the Letter of Credit Loans outstanding

prior to the 2011 Transactions) in October 2014.

123.     The court addressed a similar situation in *Wessinger v. Spirey (In re Galbreath)*,

286 B.R. 185, 211 (Bankr. S.D. Ga. 2002), ruling that a promissory note was a constructive

fraudulent transfer even though it provided a chance of returning to profitability, because:

> that opportunity was, viewed objectively, nothing more than a roll
> of the dice which was highly speculative and which, neither
> prospectively or in hindsight, provided a 'reasonably equivalent'
> exchange of value . . . Under the circumstances, the opportunity to
> keep a hemorrhaging business on life support was simply not
> reasonably equivalent to $1.5 million.

124.     Similarly, the Third Circuit has found no reasonably equivalent value where the

purported benefit is subject to conditions that render it so uncertain that the commitment confers

little benefit on the debtor.  *See Official Comm. Of Unsecured Creditors ex rel. R.M.L., Inc. v.*

*Conceria Sabrina, S.P.A. (In re R.M.L. Inc.)*, 92 F.3d 139, 142, 148 (3d Cir. 1996). "While the

chance of receiving an economic benefit is sufficient to constitute 'value,' the size of the chance

is directly correlated with the amount of 'value' conferred."  *Id.* at 153 (citation omitted).[25]

Moreover, where as here, "the benefits to the debtor are minimal and certainly not equivalent to

the value of a substantial outlay of assets, the plaintiff need not prove the precise value of the

benefit because such a calculation is unnecessary to the court's analysis."  *In re Fruehauf Trailer*

*Corp.*, 444 F.3d at 214.

---

[25]If the fees paid by the TCEH Debtors had been structured primarily as an increase in the interest rate—the market standard approach for these types of transactions—then the amount of the fees ultimately paid would have been dependent on the length of the extension ultimately realized, keeping the fees relatively proportional to the benefit actually obtained.  But the 2011 and 2013 Transactions departed from the market standard to structure the vast majority of the fees as up-front payments, giving the lenders a significant benefit regardless of whether the Debtors survived the original maturity date of the loans.  The fees failed to account for the substantial likelihood that the benefit would never be realized.

125.    The fees paid here are analogous to *In re Zambrano*, where the Debtor transferred $150,000 to a third party to help secure its partnership in a hotel development project and, in turn, the debtor was to receive possible partnership distributions. *Crawford v. Zambrano* (*In re Zambrano Corp.)*, 478 B.R. 670, 678-79 (Bankr. W.D. Pa. 2012).  The partnership dissolved before any such distribution occurred, and the court found no reasonably equivalent value arising from the transfer, noting that "the Debtor paid $150,000 for the chance to receive a future partnership distribution, but the actual value conferred to the Debtor was zero." *Id*. at 696.

126.    Moreover, the TCEH Debtors' advance payment of First Lien Debt at par, notwithstanding that it was trading at a 20% discount on the secondary market and that the TCEH Debtors had no obligation to make the par prepayment at that time, is analogous to *Official Comm. Of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004), *aff'd sub nom.*, 326 B.R. 532 (W.D. Pa. 2005).  There, the court found that plaintiff stated "a colorable claim" for fraudulent transfer based on "bare-bones facts" that the Debtor had overpaid for a stock redemption.  *See id.*

### (iii)    Fees And Incremental Interest Paid in Connection With the 2013 Amendment

127.    The fees and incremental interest paid in connection with the 2013 Amendment are unjustifiable.  The one-year runway, even if it had some value to the TCEH Debtors, was not even close to reasonably equivalent value when compared to the (i) approximately $340 million in fees paid by TCEH, and (ii) approximately $30 million of incremental interest paid on the Fee Note by TCEH through the Petition Date.

128.    Even when viewed as a three-year extension, the implied yield enhancement was an unprecedented 1,497 basis points on the extended Revolving Loans, or 57%.  Moreover, the structure of the 2013 Amendment fees shows that the First Lien Transferees knew the purported

three-year extension was illusory.  Generally, fees are structured primarily as an increased interest rate to be paid over the remaining life of the loan; here, however, the First Lien Transferees insisted that fees be paid in the form of the secured Fee Note.  The effect of this unusual fee structure was that the First Lien Transferees would receive additional interest payments, significantly larger secured claims, and adequate protection payments in the TCEH Debtors' bankruptcy cases.

129.    In exchange for this 57% fee, the TCEH Debtors received just one year of realizable extension on the loans' maturity date because all of the parties knew that the TCEH Debtors would not be able to survive with their existing debt load for the long term.  From the lenders' perspective, there were two possibilities at the end of 2012: (i) an imminent bankruptcy filing in April 2013 that would leave them with a secured claim based on the $645 million Revolving Loans, plus adequate protection payments; or (ii) an illusory maturity extension under which the First Lien Transferees would (a) with respect to the $645 million in Revolving Loans, continue to be paid interest prepetition at an increased rate as well as postpetition adequate protection payments, plus maintain a secured claim in the Debtors' bankruptcy cases, and (b) with respect to the $340 million Fee Note, be paid interest prepetition as well as postpetition adequate protection payments,  plus maintain a purportedly secured claim in the TCEH Debtors' bankruptcy cases.  It is not surprising that the First Lien Transferees insisted on the latter.

130.    The one-year extension of maturity on $645 million of debt, even if it had some value to the TCEH Debtors, was not close to reasonably equivalent value to the $340 million in fees TCEH paid, plus the approximately $30 million of incremental interest TCEH paid through the Petition Date.  *See In re R.M.L.*, 92 F.3d at 153 (value is proportional to the chance that it is realized); *In re Fruehauf Trailer Corp.*, 444 F.3d at 214 (no need to calculate the speculative benefit where it is clearly not equivalent value).

> **b.    The TCEH Debtors Were Rendered Insolvent And Left With Unreasonably Small Remaining Assets As A Result of the LBO And Remained So At All Times Thereafter**

131.    The proposed allegations present more than colorable claims that the TCEH Debtors were rendered insolvent and left with remaining assets that were unreasonably small as a result of the LBO, and they remained so at all times thereafter.

132.    While the Debtors' advisors (D&P) issued a Solvency Opinion in October 2007 reflecting that the TCEH Debtors were apparently solvent, the flaws in that opinion are manifest. That report is belied by D&P's own subsequent goodwill impairment analyses for every year after the LBO, all of which imply that the Debtors were insolvent.  As noted above, had D&P used realistic valuation assumptions in its 2007 reports similar to those used in its later reports beginning in 2008, it would have been apparent that the fair market value of the TCEH Group's assets did not exceed the face value of its liabilities in 2007—and the TCEH Group was thus insolvent on a balance sheet basis as of the date of the LBO.  (*See supra* ¶¶ 26-35.)

133.    For the same reasons, the proposed allegations state a colorable claim that the LBO left the TCEH Debtors with remaining assets that were unreasonably small.  Under this test, "[t]he critical question is whether the company's then-existing projections were reasonable and prudent when made." *In re Plassein Intern. Corp.,* No. 03-11489 KG, ADV. 05-51472 KG, 2008 WL 1990315, at *8 (Bankr. D. Del. May 5, 2008) (under Delaware's UFTA, applying the Bankruptcy Code's "unreasonably small capital" test); *see also In re Tribune Co.*, 464 B.R. 126, 168 (Bankr. D. Del. 2011).  In the context of a leveraged buy-out, courts in the Third Circuit look to "whether the projections for the LBO target, which forecast that the debtor would retain sufficient cash or credit to operate and sustain its business, were reasonable." *In re Jevic Holding Corp.*, 2011 WL 4345204, at *9.

134.    At the time of the 2011 Transactions, the Debtors effectively conceded that they were balance sheet insolvent by acknowledging in their 2010 Annual Report that their "liabilities and those of EFCH exceed our and EFCH's assets" and that "the principal amount of [TCEH's] outstanding debt currently exceeds its enterprise value."  (2010 Annual Report at p. 23.)  The financial analysis prepared by D&P confirms that fact, implying an equity value for the TCEH Debtors of *negative* ███████ in December 2010.  (*See supra* ¶¶ 21, 31, 36-40.)

135.    The TCEH Debtors were indisputably insolvent at the time of the 2013 Amendment, by which point D&P's analysis implied an equity value of the TCEH Group of *negative* ███████ in December 2012. (*See supra* ¶ 31.)

### c.    The Fraudulent Transfer Claims Are Timely

136.    The Committee's proposed claims challenging the liens granted in 2007 are timely pursuant to, among other grounds, the ten year statute of limitations applicable to the IRS as an unsecured creditor (*see* 26 U.S.C. §§ 6501, 6502 (2014)), made applicable by section 544(b) of the Bankruptcy Code.

137.    The Committee's proposed claims challenging the 2011 Transactions and the 2013 Amendment meet the requirements of section 1309 of title 6 of the Delaware Code (which provides a four year lookback period), made applicable by section 544(b) of the Bankruptcy Code.

138.    The Committee's proposed claims challenging the 2013 Amendment meet the requirements of section 546(a)(1) of the Bankruptcy Code (which provides a two year lookback period).

### 2.    Claims Arising From the First Lien Debt Should Be Equitably Subordinated

139.    Section 510(c) of the Bankruptcy Code enables a court, under principles of equitable subordination, to, among other things, (i) subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim, or (ii) order that any lien securing such a subordinated claim be transferred to the estate.

140.    Equitable subordination requires a showing of three elements: (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *See, e.g., Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998) (citing *U.S. v. Noland*, 517 U.S. 535, 538-39 (1996) (describing existing case law as consistent with the three part test identified in I*n re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)).

141.    A determination of whether the first lien claims should be equitably subordinated does not begin and end with an inquiry into whether a claimant acted within its rights under applicable loan documents.  Rather, the Court should inquire more generally into the claimant's conduct in relation to the bankruptcy process and other creditors.  *See, e.g., LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 352-53 (Bankr. S.D.N.Y. 2014) (finding that although conduct may have been "perfectly lawful," the secured creditors' conduct violates the spirit of the applicable credit documents, and constitutes inequitable conduct sufficient to warrant subordination).

142.    Here, the First Lien Transferees have engaged in inequitable conduct by, among other things, extracting from the TCEH Debtors: (i) liens, security interests, and obligations

under the Credit Agreement, the First Lien Notes, and the Fee Note, (ii) fees, incremental interest, and the Prepayment Benefit paid in connection with the 2011 Transactions and the 2013 Amendment, (iii) intangible benefits relating to (a) par prepayment of loans when not required and when trading on the secondary market at a discount, and (b) ███████████████████ ██████████████████████, (iv) preferential transfers of unencumbered cash at a time when the Debtors and certain first lien lenders were negotiating the terms of a plan restructuring agreement, (v) illusory maturity extensions to carry the lenders beyond the four and six year lookback periods for fraudulent conveyances under Delaware, Texas, and New York state law, and (vi) an alleged position senior to any tax claim that would arise upon a taxable disposition of the assets.

143.    The TCEH Debtors were damaged by the First Lien Transferees' inequitable conduct to the extent of the fraudulent transfers (including liens, security interests, and other obligations), and the equitable subordination of claims based on those transfers is not inconsistent with any provision of the Bankruptcy Code.

144.    These allegations are more than sufficient to state a colorable claim.  *See, e.g.*, *Official Comm. Of Unsecured Creditors of the Debtors v. Austin Fin. Serv. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 513-14 (Bankr. S.D.N.Y. 1999) (finding equitable subordination claims colorable and granting derivative standing where defendant made secured loans at a time when the Debtor was undercapitalized); *see also In re OODC*, 321 B.R. at 145.  On similar facts, the court in *In re OODC*, found that a trustee properly stated a claim of equitable subordination against a group of lenders that provided financing for an LBO, by alleging that they had "knowingly facilitated the removal of at least $40 million in assets of the Debtor (by obtaining a security interest in them) at a time when the Debtor was insolvent" and "knowingly or recklessly disregarded the fact that the LBO would force the Debtor into bankruptcy."  *Id.* at 145.

### 3.    Claims For Unmatured Interest Should Be Disallowed

145.    Under the Cash Collateral Order, the TCEH Debtors have stipulated that, as of the Petition Date, the First Lien Notes are outstanding "in the aggregate principal amount of $1,750,000,000 plus accrued and unpaid interest with respect thereto (which as of the Petition Date was $65,965,278) and any additional fees, costs and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimburseable under the First Lien Notes Indenture) and all other Obligations (as defined in the First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture" (collectively, the "Notes Obligations")  (*See* Cash Collateral Order ¶ F(i)(b).)

146.    The Committee disputes this Stipulation to the extent claims for unmatured interest are included within the principal amount of the Notes Obligations.   Under section 502(b)(2) of the Bankruptcy Code, if an objection is made to a claim, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . .  (2) such claim is for unmatured interest."  11 U.S.C. § 502(b)(2) (2014).

147.    The Proposed Complaint further alleges that the stipulated face amount outstanding of the First Lien Notes and, thus, the Notes Obligations, includes unaccreted original issue discount of approximately $8 million.

148.    Unaccreted original issue discount constitutes "unmatured interest" under section 502(b)(2) of the Bankruptcy Code.  *See In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 433 n.15 (Bankr. D. Del. 2002) (stating that "original issue discount was in the nature of 'unmatured interest' and therefore, must be disallowed pursuant to § 502(b)(2)" and that courts have relied on the legislative history to "explain why claims for unmatured interest and/or original issue discount are disallowed under section 502(b)(2)") (citations omitted); *see also* H.R. Rep. No. 95-

595, at 352–54 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6308 (stating that disallowed interest shall include "any portion of prepaid interest that represents an original discounting of the claim [but] would not have been earned on the date of bankruptcy," and gives as an example: "postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of the bankruptcy.").

149.    As such, the Complaint states a colorable claim for disallowance of the $8 million unaccreted original issue discount that existed as of the Petition Date. *See, e.g.*, *In re Allegheny Int'l, Inc.*, 100 B.R. 247, 254-55 (Bankr. W.D. Pa. 1989) (finding "that original issue discount is unmatured interest" and thus "disallowed to the extent it was for interest after the commencement of the case.").

**4.    Payment of Fees, Costs, and Expenses Should Be Recharacterized**

150.    Under section 506(b) of the Bankruptcy Code, "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b) (2014).

151.    Only oversecured creditors, and not undersecured creditors, are entitled to receive such costs, fees, and related payments.

152.    The Restructuring Support Agreement entered into by the Debtors and certain consenting Prepetition First Lien Creditors (as defined in the Cash Collateral Order), effectively acknowledged that the TCEH First Lien Debt was undersecured.  For example, the Amended and Restated Term Sheet provided that holders of the TCEH First Lien Secured Claims would receive "their Pro Rata share of (i) 100% of the Reorganized TCEH Common Stock, subject to

dilution only by the Reorganized TCEH Management Incentive Plan; and (ii) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt" and, in addition, the "Holders of General Unsecured Claims Against the TCEH Debtors (*which shall include TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note Claims*) will receive their Pro Rata share of the TCEH Unsecured Claim Fund". *See* Amended and Restated Restructuring Term Sheet (attached to Exhibit A to Dkt. No. 505, *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay*). Further, consistent with the plan contemplated by the Restructuring Support Agreement, the Debtors filed a Pre-Submission Memorandum estimating TCEH's enterprise value at $18 billion, which is less than the balance of the secured claim asserted by the Prepetition First Lien Creditors.

153.    Under the Cash Collateral Order, the First Lien Transferees are receiving monthly adequate protection payments in an amount "determined by applying a per annum rate equal to the LIBOR Rate (as defined in the DIP Credit Agreement) + 450 basis points to the aggregate outstanding amount of the Prepetition First Lien Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date", with each First Lien Transferee receiving their ratable share of the aggregate amount. (*See* Cash Collateral Order ¶ 5(d)). The Committee understands that the aggregate amount of the adequate protection payments exceeds $100 million on a monthly basis.

154.    Under the Cash Collateral Order, the right to recharacterize adequate protection payments to the First Lien Transferees was expressly preserved. *Id.*

155.    The Third Circuit has found that recharacterization is an appropriate remedy in adversary proceedings. *See Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 364 (3d Cir. 2002) (affirming "the Bankruptcy Court's recharacterization of interest payments into principal

payments" in connection with an avoidance action).   Accordingly, to the extent the Court determines at any time that the First Lien Transferees are undersecured creditors, any adequate protection payments made to the First Lien Transferees during these chapter 11 cases must be recharacterized as payments of principal on the First Lien Debt.

### 5.      The Preferential Transfers Should Be Avoided

156.     Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an interest in property of the debtor's estate if the following conditions have been met: (i) the transfer was made to or for the benefit of a creditor; (ii) the transfer was for or on account of an antecedent debt; (iii) the transfer was made while the debtor was insolvent; (iv) the transfer was made within the 90 days prior to the petition date; and (v) the transfer enabled the creditor to receive more in a chapter 7 liquidation than it would receive had the transfer not been made.   11 U.S.C. § 547(b) (2014).   *See, e.g., Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 394 (3d Cir. 2009); *Burtch v. Masiz (In re Vaso Active Pharm., Inc.)*, 500 B.R. 384, 392-95 (Bankr. D. Del. 2013).

157.     The   Proposed   Complaint   alleges   that   ███████████████████ ██████████████████████████████████████████████████ ████████████ , which reduced the amount by which the First Lien Transferees were undersecured.   These funds were transferred ███████████████ for the benefit of First Lien Transferees on account of the TCEH Debtors' obligations under the First Lien Debt at a time when each of the TCEH Debtors was insolvent, allowing the First Lien Transferees to receive more than they would in a hypothetical chapter 7 liquidation.

158.     The Proposed Complaint alleges further that the TCEH Debtors made interest payments to the First Lien Transferees in the aggregate amount of approximately $216 million during the ninety (90) days prior to the Petition Date.   These payments were made on account of

the TCEH Debtors' obligations under the First Lien Debt at a time when each of the TCEH Debtors was insolvent, thus allowing the First Lien Transferees to receive more than they would in a hypothetical chapter 7 liquidation.

159.    Each of these transfers constitutes an avoidable preferential transfer.  Courts in this Circuit have found that similar transactions constitute preferential transfers.  For example, in *Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, the court found a preferential transfer where the Debtor transferred proceeds owed under a credit agreement while insolvent. 348 B.R. 234, 272 (Bankr. D. Del. 2005), *aff'd*, 01 01063 KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part,* 554 F.3d 382 (3d Cir. 2009).  *See also In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *35 (Bankr. D.N.J. Nov. 8, 2013) (denying motion to dismiss preferential transfer claims where "payments were made to defendants on account of debts owed prior to the transfer" during the preference period).

**6.      The Court Should Disallow Claims Pending Resolution of the Adversary Proceeding and Reduce Allowed Claims Based on Resolution of the Adversary Proceeding**

160.    Under the Cash Collateral Order, the First Lien Transferees are excused from filing proofs of claim for the First Lien Debt obligations because the Debtors' Stipulations are deemed to constitute a properly filed proof of claim.

161.    The TCEH Debtors' Stipulations specifically state in paragraph F(i)(a) of the Cash Collateral Order that:

> As of the Petition Date, the TCEH Debtors were truly and justly indebted to the First Lien Lenders pursuant to the First Lien Credit Agreement, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of $22,635,987,924 plus accrued and unpaid interest with respect thereto (which, as of the Petition Date, was $227,283,333) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees, expenses, and indemnities that are chargeable or  reimbursable under the First Lien Credit Agreement) and all

> other Obligations (as defined in the First Lien Credit Agreement) owing under or in connection with the First Lien Credit Agreement, including, without limitation, any and all obligations owing to the First Lien Credit Agent (as defined below). (Cash Collateral Order ¶ F(i)(a).)

162.   In addition, the TCEH Debtors have stipulated in paragraph F(i)(b) of the Cash Collateral Order that, as of the Petition Date, the First Lien Notes are outstanding

> in the aggregate principal amount of $1,750,000,000 plus accrued and unpaid interest with respect thereto (which as of the Petition Date was $65,965,278) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimburseable under the First Lien Notes Indenture) and all other Obligations (as defined in the First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture. (Cash Collateral Order ¶ F(i)(b).)

163.   Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each of the lenders' claims should be disallowed until such time as the Committee's claims asserted herein have been finally resolved.  *See, e.g., PN Chapter 11 Estate Liquidating Trust v. Inserts East, Inc. (In re Phila. Newspapers, LLC)*, 468 B.R. 712, 728 (Bankr. E.D. Pa. 2012) (temporarily disallowing defendant's proof of claim and allowed administrative claim until the defendant paid for avoided transfer in full).

164.   The Committee objects to the allowance of the First Lien Transferees' claims pending resolution of the adversary proceeding, and further seeks a determination of the amount of the First Lien Transferees' allowed claims under section 502(b) of the Bankruptcy Code following resolution of the adversary proceeding.

### 7. The Court Should Limit the First Lien Transferees' Claims In Accordance with Section 2(b) of the Guarantees

165.    The Committee objects to the allowance of the First Lien Transferees' claims in the amounts set forth in the Debtors' Stipulations.  Under section 502(b)(1) of the Bankruptcy Code, if an objection is made to a claim, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. ¶ 502 (b)(1) (2014).

166.    Paragraph 2(b) of each of the Guarantees signed by each of the Guarantors provides that:

> Anything herein or in any other Credit Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Credit Documents shall in no event exceed the amount that can be guaranteed by such Guarantor under the Bankruptcy Code or any applicable laws relating to fraudulent conveyances, fraudulent transfers or the insolvency of debtors.

167.    Thus, to the extent the Court determines not to avoid the obligations arising out of the Credit Agreement, the Committee requests that the Court limit the claims of the First Lien Transferees against each of the Guarantors in accordance with paragraph 2(b) of the Guarantees.

### 8. The Court Should Enter A Declaratory Judgment Clarifying the Scope of the Liens and Obligations In Connection With The First Lien Debt

168.    The court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (2014).  Courts hear requests for declaratory judgment where an "actual controversy" justifying declaratory relief exists.  *See, e.g., In re Pub. Serv. Co. of N.H.*, 99 B.R. 506, 507, 510 (Bankr. D.N.H. 1989) (ruling that the court should exercise its discretion to hear the request of

the Chapter 11 debtor for declaratory relief); *Sears, Roebuck and Co. v. O'Brien*, 178 F.3d 962, 964 (8th Cir. 1999) (noting that "the bankruptcy court has the power to issue declaratory judgments when the matter in controversy regards the administration of a pending bankruptcy estate").

169.   There is an actual, substantial, and justiciable controversy with respect to the scope of the liens and obligations under the First Lien Debt, due to, among other things, the TCEH Debtors' Stipulations that the First Lien Debt is secured by liens on "substantially all of the TCEH Debtors' assets" (Cash Collateral Order ¶ F(i)(e)), and that "the TCEH Debtors were truly and justly indebted" to the First Lien Lenders pursuant to the First Lien Credit Agreement, and to the holders of the First Lien Notes pursuant to the First Lien Notes Indenture, "without defense, counterclaim, or offset of any kind," in the principal amounts of $22,635,987,924 and $1,750,000,000, respectively, plus "accrued and unpaid interest . . . and any additional fees, costs, and expenses . . . and all other Obligations . . . owing under" the Credit Agreement and the Indenture (*id.* ¶¶ F(i)(a),(b)).

170.   To clarify the scope of the liens and obligations put in controversy by the Stipulations, the Proposed Complaint will seek declaratory judgments that: (i) rabbi trust funds owned by Debtor EFH are subject only to the claims of the unsecured creditors of EFH and Participating Employers; (ii) certain deposit accounts, including the Segregated Cash account, are unencumbered; (iii) the First Lien Transferees do not have liens on any avoidance actions or commercial tort claims or the proceeds thereof; (iv) the First Lien Transferees do not have liens on the tax attributes generated postpetition; and (v) the TCEH Debtors' Stipulations do not expand the scope of the First Lien Transferees' liens as they existed on the Petition Date.  The Proposed Complaint will also seek declaratory judgments that (i) there has been no diminution in value of the First Lien Transferees' collateral after the Petition Date, and the Debtors' use of

cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in value; (ii) the First Lien Transferees are not entitled to postpetition interest and fees unless the Court determines that they are oversecured; and (iii) to the extent the First Lien Transferees are found to be oversecured creditors, postpetition interest and fees will be allowed solely to the extent of the excess value of the collateral and awarded at the contractual non-default rate of interest.

### No Liens on Rabbi Trust Funds

171.    The Proposed Complaint alleges that Debtor EFH, which is not an obligor under the First Lien Debt, owns certain rabbi trusts, which contain assets consisting of cash, fixed income securities, and variable life insurance contracts.

172.    Pursuant to the applicable rabbi trust agreements, if EFH or any of the Participating Employers (as identified in the EFH Second Supplemental Retirement Plan) are insolvent, then the assets in the rabbi trusts are available for the benefit of general creditors of EFH and the Participating Employers, respectively.

173.    The Committee asserts that the First Lien Transferees do not have valid security interests in or liens (either perfected or unperfected) on the rabbi trust assets, and thus it seeks a declaratory judgment that the rabbi trust assets are subject only to the claims of the unsecured creditors of EFH and Participating Employers.

### No Liens on Deposit Accounts

174.    The definition of "Collateral" under section 2 of the Security Agreement includes "all Accounts," but it explicitly excludes "assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account)."

175.    Pursuant to Sections 9-104 and 9-312(b) of the Uniform Commercial Code and Delaware/Texas Codes, a security interest in a deposit account is perfected only by "control" of

the collateral by the secured party, which means that the secured party generally must also (i) be the depository bank, (ii) have a valid control agreement with the depository bank and the debtor, or (iii) become the depository bank's customer with respect to the deposit account. Because Wilmington Trust, N.A. ("Wilmington") is the First Lien Collateral Agent, perfection of any security interest in a deposit account maintained at any bank or institution other than Wilmington would require a control agreement.

176.    The Proposed Complaint alleges that, because section 2 of the Security Agreement provides that all accounts (other than the Deposit L/C Loan Collateral Account) maintained at any bank or institution other than Wilmington constitute excluded collateral, those deposit accounts, including without limitation those identified on **Schedule 1** to the Proposed Complaint, are not subject to the liens or security interests of the First Lien Transferees.

177.    Similarly, the Committee disputes the TCEH Debtors' Stipulations in paragraph F(i)(e) of the Cash Collateral Order, which provide that "[a]s of the date hereof, all of the TCEH Debtors' cash, other than cash held in Account #:XXXX0559 at Union Bank, N.A. (such cash, the 'Segregated Cash'), constitutes Cash Collateral."[26]    The Proposed Complaint alleges that the First Lien Transferees do not have security interests in or liens (either perfected or unperfected) on the Segregated Cash, which is held in Account #:XXXX0559 at Union Bank, N.A. Because Union Bank, N.A. is not the "secured party" of record, perfection of any security interest in the Segregated Cash would require a control agreement. Thus, pursuant to section 2 of the Security Agreement, the Segregated Cash is excluded collateral and not subject to the liens or security interests of the First Lien Transferees.

---

[26]Despite this Stipulation, the First Lien Transferees explicitly reserved their right to assert that Segregated Cash constitutes Cash Collateral.  (*See* Cash Collateral Order ¶ 10) ("[n]otwithstanding anything to the contrary contained herein, the Prepetition First Lien Creditors and TCEH Debtors reserve all rights, claims, and defenses with respect to the Segregated Cash, including as to whether such Segregated Cash constitutes Cash Collateral.").

178.    Accordingly, the Proposed Complaint seeks a declaratory judgment that, pursuant to section 2 of the Security Agreement, all deposit accounts (other than the Deposit L/C Loan Collateral Account) maintained at any bank or institution other than Wilmington, including without limitation those identified on **Schedule 1** to the Proposed Complaint and the Segregated Cash account  (collectively, the "Deposit Accounts"), constitute excluded collateral and are not subject to the liens or security interests of the First Lien Transferees.  *See, e.g.*, *In re Investors & Lenders, Ltd.*, 165 B.R. at 397 (avoiding liens under Section 544 "[b]ecause the defendants failed to take possession of the notes [and] have unperfected security interests").

### No Liens on Proceeds of Avoidance Actions or Commercial Tort Claims

179.    Sections 9-108(a) and 9-203(b)(3)(A) of the Uniform Commercial Code and Delaware/Texas Codes provide that a security agreement must contain a description of the collateral that reasonably identifies the collateral.  While parties generally may list all of the collateral in the security agreement by using the collateral type definitions under the Uniform Commercial Code, the method of description "by type" is not sufficient to perfect a security interest over a commercial tort claim because commercial tort claims require more specific detail for perfection.

180.    The definition of "Collateral" under section 2 of the Security Agreement specifically excludes "Commercial Tort Claims."  Similarly, the Cash Collateral Order provides that the Adequate Protection Liens (as defined therein) do not include liens on avoidance actions, proceeds of avoidance actions, or proceeds of commercial tort claims.  (Cash Collateral Order ¶ 5(a).)

181.    Thus, the Proposed Complaint seeks a declaratory judgment that the First Lien Transferees do not have a lien on any avoidance actions or commercial tort claims brought by or on behalf of the Debtors' estates, or any proceeds thereof.

## No Liens on Tax Attributes Generated Postpetition

182.    Section 552(a) of the Bankruptcy Code provides that, except in certain circumstances, "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a) (2014).

183.    Section 552(b) of the Bankruptcy Code provides that if a prepetition security agreement extends to proceeds of collateral, then postpetition proceeds would also be subject to that security agreement, unless the court orders otherwise after a hearing based on the equities of the case.  Section 552(b) is intended to cover after-acquired property that is directly attributable to prepetition collateral, without the addition of estate resources. 11 U.S.C. § 552(b) (2014).

184.    The Debtors will realize the value of certain Tax Attributes[27] after the Petition Date, including (i) Tax Attributes that arose after the Petition Date related to tax year 2014, and (ii) Tax Attributes that will arise in 2015 (and subsequent taxable years) before the Debtors' emergence from protection under Chapter 11 of the Bankruptcy Code (collectively, the "Unencumbered Tax Attributes").  Additionally, upon a transfer of all or a portion of the equity of the TCEH Debtors (or their assets) to the first lien lenders, or any other acquiror(s), in which EFH recognizes gain, in whole or in part, for federal income tax purposes, the first lien lenders, or any other acquiror(s), will receive the benefit of a step-up in tax basis in such assets (the "Tax Basis Step-Up").  The Tax Basis Step-Up will provide the first lien lenders or any other

---

[27]The term "Tax Attributes" shall include, but is not limited to, current year deductions; net operating losses and net operating loss carrybacks and carryovers; current year general business credits and general business credit carryovers; alternative minimum tax credit carryovers; current year capital losses and capital loss carrybacks and carryovers; current year foreign tax credits and foreign tax credit carryovers; excess charitable contributions; recovery of tax benefits items; any method of accounting; investment credit carryovers; recovery exclusions; any claim of right; basis of property, holding period and character of assets; and any other tax attributes under the Internal Revenue Code, United States Treasury Regulations or applicable law.

acquiror(s) with future material tax benefits through their ownership of the equity of the TCEH Debtors (or their assets). The Tax Basis Step-Up could be valued in excess of $2 billion.

185.    The value attributable to (i) the Unencumbered Tax Attributes and (ii) the Tax Basis Step-Up is tied directly to the manner in which the Debtors conduct their postpetition activities, including the transactions undertaken to reorganize the TCEH Debtors. Therefore, the value generated by the Unencumbered Tax Attributes and the Tax Basis Step-Up is entirely dependent on the addition of estate resources. Accordingly, the Unencumbered Tax Attributes utilized (and the value thereof) and, the Tax Basis Step-Up (and the value thereof), including the value resulting from the TCEH Debtors' postpetition reorganization efforts, are not subject to the First Lien Transferees' liens and security interests and do not represent proceeds of the First Lien Transferees' prepetition collateral. *See Official Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Capital, LLC)*, 501 B.R. 549, 612 (Bankr. S.D.N.Y. 2013). *See also Wood v. LA Bank (In re Wood)*, 190 B.R. 788, 794-96 (Bankr. M.D. Pa. 1996) (valuing a secured claim as of the petition date using a flexible approach when the postpetition increase in value was attributable solely to the debtors' postpetition efforts).

186.    Thus, the Proposed Complaint seeks a declaratory judgment that the First Lien Transferees do not have a lien on the Unencumbered Tax Attributes (and the value thereof) and the Tax Basis Step-Up (and the value thereof) because such property interests are not proceeds of prepetition collateral.

### No Diminution in Value

187.    The Cash Collateral Order grants the First Lien Transferees "Adequate Protection Liens" and "507(b) Claim(s)" to protect the First Lien Transferees' interests against any "Diminution in Value" (each, as defined in the Cash Collateral Order ¶¶ 5(a)-(b)).

188.    The term "Diminution in Value" is defined in the Cash Collateral Order as "any diminution in value of their respective interests in the Prepetition Collateral from and after the Petition Date resulting from the imposition of such priming liens and the use of Cash Collateral, the use, sale, lease, consumption, or disposition of Prepetition Collateral, and the imposition of the automatic stay . . . ." (Cash Collateral Order ¶ G.)

189.    The Proposed Complaint seeks a declaratory judgment that the First Lien Transferees are not entitled to an adequate protection claim because (i) there has been no diminution in the value of the First Lien Transferees' collateral during the pendency of these chapter 11 cases, and (ii) the Debtors' use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in the value of the First Lien Transferees' collateral.

**Postpetition Interest and Fees**

190.    Pursuant to section 506(b) of the Bankruptcy Code, only oversecured creditors are entitled to include postpetition interest and reasonable fees and expenses in their secured claim, and such amounts are only allowed secured claims to the extent of the excess value of the collateral.  *See e.g.*, *In re Timberline Prop. Dev., Inc.*, 136 B.R. 382, 384 (Bankr. D. N.J. 1992) ("[T]he creditor's claim for interest cannot exceed the excess value of the collateral.  Thus, the oversecured creditor may only receive postpetition interest on the value of the collateral exceeding the claim.").

191.    Therefore, the Proposed Complaint seeks a declaratory judgment that (i) the First Lien Transferees are not entitled to any postpetition interest and fees unless the Court determines that they are oversecured creditors, and (ii) in the event the First Lien Transferees are determined by the Court to be oversecured creditors, postpetition interest and fees shall be allowed solely to the extent of the excess value of the collateral.

64

192.    In addition, the Proposed Complaint seeks a declaratory judgment that, if the First Lien Transferees are found to be entitled to postpetition interest, interest should be awarded at the contractual non-default rate of interest.

**Stipulations Do Not Expand the Scope of the TCEH First Liens**

193.    Finally, the Committee requests a declaratory judgment that the TCEH Debtors' Stipulations do not expand the scope of the First Lien Transferees' liens as they existed on the Petition Date.

194.    The TCEH Debtors' Stipulations specifically state in paragraph F(i)(e) of the Cash Collateral Order that "[t]he Prepetition Lien Obligations are secured by first priority security interests in and liens on (the 'Prepetition First Priority Liens') the 'Collateral,' as defined in the First Lien Credit Agreement (the 'Prepetition Collateral'), including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the 'Cash Collateral')."

195.    The TCEH Debtors' Stipulations will be binding on all parties in interest, including the Committee, unless the Committee files a Challenge before the Challenge Deadline.

196.    Thus, an actual, substantial, and justiciable controversy exists between the Committee and the First Lien Transferees concerning the nature and extent of the First Lien Transferees' liens.  Such a controversy is sufficient to warrant the issuance of a declaratory judgment that the TCEH Debtors' Stipulations do not expand the scope of the First Lien Transferees' liens as they existed on the Petition Date.

**9.    Unperfected Liens and Security Interests Should Be Avoided**

197.    Section 544(b) of the Bankruptcy Code allows for the avoidance of any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim.  11 U.S.C. § 544(b) (2014).

Section 550(a) enables recovery of the property transferred or the value of such property for the benefit of the estate, and section 551 preserves that property for the estate.  11 U.S.C. §§ 550(a), 551 (2014).

198.    These provisions permit debtors to treat a creditor with an unperfected security interest as of the petition date as an unsecured creditor.  *See Holber v. Dolchin Slotkin & Todd, P.C. (In re Am. Rehab & Physical Therapy, Inc.)*, No. 04-14562, 2006 Bankr. LEXIS 1440, at *17 (Bankr. E.D. Pa. May 18, 2006) (strong arm provisions are "intended to cut off unperfected security interests, secret liens, and undisclosed prepetition claims against the debtor's property as of the commencement of the case") (citation omitted); *see also Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 547-548 (W.D. Pa. 2005) (affirming bankruptcy court's finding that the Committee's similar claims under 544(b) were colorable and sufficient to grant derivate standing).

### a.    As-Extracted Collateral

199.    The TCEH Debtors granted a first priority lien and security interest in, among other things, "As-Extracted Collateral" (as defined in section 9-102 of the Uniform Commercial Code and Delaware/Texas Codes) to the First Lien Collateral Agent, for the benefit of the Secured Parties (as defined in the Credit Agreement), to secure repayment of the First Lien Debt. *See* Security Agreement (Ward Decl. Ex. 7) § 2.  The First Lien Transferees are "Secured Parties."

200.    The Debtors have filed schedules with the Court indicating that Luminant Energy Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, and Sandow Power Company LLC (collectively, the "Entities Holding Fuel/Gas") hold fuel stock, nuclear fuel, and/or natural gas valued at approximately $500 million.  (*See* Docket Nos. 1265, 1270, 1282, 1291.)

201.    The Proposed Complaint alleges, upon information and belief, that the Entities Holding Fuel/Gas own certain As-Extracted Collateral.

202.    The Proposed Complaint further alleges, upon information and belief, that the Secured Parties have filed a UCC-1 financing statement against each of the Entities Holding Fuel/Gas, in each case with the Texas Secretary of State relating to As-Extracted Collateral.

203.    The Proposed Complaint further alleges, upon information and belief, that the Secured Parties have recorded a collateral filing in the appropriate local recordation offices with respect to any As-Extracted Collateral that may be owned by the Entities Holding Fuel/Gas and located at the properties identified on **Schedule 2** to the Complaint.  In addition, the Proposed Complaint alleges, upon information and belief, that the Secured Parties have not recorded a collateral filing in the appropriate local recordation offices with respect to all other As-Extracted Collateral owned by the TCEH Debtors (the "Unperfected As-Extracted Collateral").

204.    Thus, the Secured Parties, including the First Lien Transferees (unless, in the case of each of the Entities Holding Fuel/Gas, each is a "transmitting utility" as such term is defined in section 9-102 of the Uniform Commercial Code and the Delaware/Texas Codes), do not have a valid, recorded lien or security interest in Unperfected As-Extracted Collateral.  *See Bohm v. Howard (In re Howard)*, 422 B.R. 568, 577-78 (Bankr. W.D. Pa. 2009), *aff'd,* 2:10CV962, 2011 WL 578777 (W.D. Pa. Feb. 9, 2011) (avoiding claim in mineral rights where the defendant failed to properly record).

### b.    Real Property

205.    The Proposed Complaint alleges that the Secured Parties have recorded collateral filings in the appropriate local recordation offices with respect to the properties identified on **Schedule 3** to the Proposed Complaint.  The Proposed Complaint further alleges that the Secured Parties have not recorded a collateral filing in the appropriate local recordation offices with

respect to all other properties owned by the TCEH Debtors (the "Unperfected Properties"). Therefore, the First Lien Transferees' interest in the Unperfected Properties is not perfected.

206.    Courts in this Circuit routinely apply Section 544 to avoid unperfected liens on property in these circumstances.  *See, e.g., Pobin v. Sheehan (In re Eight Bulls, LP)*, 439 B.R. 370, 376 (Bankr. D.N.J. 2010), *aff'd sub nom., Sheehan v. Dobin*, CIV.A. 10-6288 FLW, 2011 WL 3625586 (D.N.J. Aug. 15, 2011) (avoiding property interest for failure to properly record); *Wasserman v. Capazzi (In re Day)*, 443 B.R. 338, 354-55 (Bankr. D.N.J. 2011) (same).

### c.    Vehicles

207.    The Proposed Complaint alleges that the TCEH Debtors own vehicles with a net book value of over $11 million (the "Unperfected Vehicles").  The Proposed Complaint further alleges that the Secured Parties have not recorded a collateral filing relating to the Unperfected Vehicles with either the department's titling system or the local recordation office.

208.    Section 501.113 of the Texas Transportation Code provides that recordation of a lien is considered to occur when "(1) the department's titling system is updated; or (2) the county assessor-collector accepts the application of title that discloses the lien with the filing fee."  (Tex. Trans. Code § 501.113.)

209.    Thus, upon information and belief, the First Lien Transferees' interest in the TCEH Debtors' Unperfected Vehicles is not perfected.

### d.    Deposit Accounts

210.    Any alleged lien of the First Lien Transferees on the Deposit Accounts is unperfected and avoidable under section 544(a) of the Bankruptcy Code.

211.    Pursuant to Sections 9-104 and 9-312(b) of the Uniform Commercial Code and the Delaware/Texas Codes, a security interest in a deposit account is perfected only by "control" of the collateral by the secured party, which means that the secured party generally must also

(i) be the depositary bank, (ii) have a valid control agreement with the depositary bank and the debtor, or (iii) become the depositary bank's customer with respect to the deposit account.

212.    The First Lien Transferees cannot assert a perfected lien in the Deposit Accounts because the accounts are neither in the possession of the Collateral Agent nor in a deposit account subject to a deposit account control agreement in the Collateral Agent's favor, as required by Article 9 of the Uniform Commercial Code to perfect a security interest in deposit accounts.

213.    Thus, upon information and belief, any alleged lien of the First Lien Transferees in the Deposit Accounts is not perfected.

### e.    Commercial Tort Claims

214.    Any alleged lien of the First Lien Transferees in commercial tort claims is unperfected and avoidable under section 544(a) of the Bankruptcy Code.

215.    Sections 9-108(a) and 9-203(b)(3)(A) of the Uniform Commercial Code provide that a security agreement must contain a description of the collateral that reasonably identifies the collateral.  Generally to satisfy this requirement, a security agreement should list all of the collateral by using the collateral type definitions under the Uniform Commercial Code. However, the method of description "by type" is not sufficient if the lender wants to take a security interest over a commercial tort claim because commercial tort claims require more specific detail for perfection.  (UCC § 9-203(b)(3)(A)).

216.    Here, the First Lien Transferees cannot assert a perfected lien in commercial tort claims because there is no specific description of that collateral in the Security Agreement, as required by UCC Article 9 to perfect the security interest.  Thus, upon information and belief, any alleged lien of the First Lien Transferees in commercial tort claims is not perfected.

### f.    Unperfected Collateral

217.    The Proposed Complaint alleges that, because the First Lien Transferees failed to properly perfect their purported liens on and security interests in the Unperfected As-Extracted Collateral, the Unperfected Properties, the Unperfected Vehicles, the Deposit Accounts, and commercial tort claims (collectively, the "Unperfected Collateral") in compliance with U.C.C. §§ 9-501 and 9-502 and the real property laws of the relevant jurisdictions, those liens and security interests should be avoided pursuant to section 544 of the Bankruptcy Code and recovered or preserved for the Debtors' estates pursuant to sections 550(a) and 551 of the Bankruptcy Code.  *See*, *e.g.*, *Official Comm. Of Unsecured Creditors of Investors & Lenders v. Field (In re Investors & Lenders, Ltd.)*, 165 B.R. 389, 393 (Bankr. D.N.J. 1994) (avoiding promissory notes where "the defendants hold unperfected interests in the notes because they did not take possession.").

### 10.    The Court Should Award Prejudgment Interest

218.    The Court should exercise its discretion to award prejudgment interest because "awarding prejudgment interest in an avoidance action furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without use of the transferred funds."  *Peltz v. Worldnet Corp. (In re USN Commc'ns, Inc.)*, 280 B.R. 573, 602 (Bankr. D. Del. 2002) (awarding prejudgment interest after finding that defendant's defenses in avoidance action were without merit).  *See also Sacred Heart Hosp. v. E.B. O'Reilly Servicing Corp. (In re Sacred Heart Hosp. of Norristown)*, 200 B.R. 114, 119 (Bankr. E.D. Pa.1996) ("[P]ast decisions of this court have established that the Debtor is generally entitled to pre-judgment interest from at least the date of the filing of a proceeding challenging preferential payments . . . )  As the court held in *Great-Point Intermodal, LLC   v. Norfolk S. Corp. (In re Great-Point Intermodal, LLC)*, "'[d]iscretion must be exercised according to law, which means that prejudgment interest should

be awarded unless there is a sound reason not to do so."' 334 B.R. 359, 363 (Bankr. E.D. Pa. 2005) (quoting *Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997)). *See also Official Comm. Of Unsecured Creditors ex rel. R.M.L., Inc. v. Conceria Sabrina, S.P.A. (In re R.M.L. Inc.),* 195 B.R. 602, 623 (Bankr. M.D. Pa. 1996), *aff'd,* 127 F. 3d 1096 (3d Cir. 1997) (requiring substantial defense to have been raised to preclude prejudgment interest). Here, there is no sound reason not to award prejudgment interest, so it should be awarded.

### B. Demand Upon the Debtors Would Be Futile

219. Derivative standing is generally granted where a debtor unjustifiably or unreasonably refuses to pursue claims that the bankruptcy court finds would benefit the estate. *See Cybergenics*, 330 F.3d at 568. A committee is not required to demand formally that a debtor take action where it is "plain from the record that no action on the part of the debtor would have been forthcoming." *See In re Nat'l Forge Co.*, 326 B.R. at 544 (finding that a formal request on a debtor to bring an action that was waived under DIP financing orders would have been futile as debtor could not have seriously entertained the idea).

220. Here, it is clear that the Debtors will not take any action because they are bound by the Stipulations in the Cash Collateral Order, including the Stipulations that the TCEH Debtors are "truly and justly indebted to the First Lien Lenders" and that those obligations First Lien Obligations "are secured by first priority security interests and liens on . . . substantially all of the TCEH Debtors' assets." (Cash Collateral Order ¶¶ F(i)(a)-(e)). As a result, the Debtors are not permitted to pursue any avoidance actions against the Prepetition First Lien Creditors (as defined in the Cash Collateral Order). Therefore, any demand on the Debtors to pursue avoidance actions against the Prepetition First Lien Creditors, including the First Lien Transferees, would be futile.

221.    In order to determine whether a debtor's refusal (or constructive refusal) to bring an action is unjustified, a court will "perform a cost-benefit analysis of the claims to determine whether the creditors' claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued." *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 Bankr. LEXIS 3918, at *15 (Bankr. D. Del. Nov. 5, 2010) (*citing In re Nat'l Forge Co.,* 326 B.R. 532, 548 (W.D. Pa. 2005)).   In this case, the benefit to the TCEH Debtors' estates is clear because the recoveries from the foregoing avoidance actions could be over $2 billion in recovery and approximately $24 billion in liens avoided.   Such proceeds and avoided liens would inure to the benefit of unsecured creditors of these estates.   *See Final Order (A) Approving Postpetition Financing for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, and (C) Modifying the Automatic Stay* [Dkt. No. 856] (the "TCEH DIP Order"), ¶ 7(b) (reflecting that Avoidance Actions and Avoidance Proceeds are not encumbered by the liens of the DIP Lenders, but are subject to the DIP Lenders' superpriority claims; however, the Avoidance Proceeds shall only be used to satisfy any DIP Obligations to the extent the other DIP Collateral is insufficient to satisfy the DIP Obligations (each as defined in the TCEH DIP Order)).

222.    Here, costs incurred in pursuit of these claims will pale in comparison to recognizable value, even when discounting the potential value for the inherent uncertainty of litigation.

## C.    The Committee is Seeking Prior Court Approval

223.    Finally, the Committee is seeking permission from this Court to pursue the foregoing avoidance actions against the First Lien Transferees.   Because these claims are colorable and a formal demand upon the Debtors would be futile given the Debtors' waivers and

Stipulations in the Cash Collateral Order, the Court should grant derivative standing to the Committee to commence and prosecute these claims.

### D.     The Committee Should Be Granted Exclusive Authority To Settle

224.     The Debtors' inability to bring the claims also disables them from effectively managing or settling any resulting litigation.  Indeed, there have been several instances in these cases so far where the Debtors have given up billions of dollars in claims in exchange for zero benefit to the TCEH Debtors' unsecured creditors.

225.     For example, on the Petition Date, the Debtors filed the Restructuring Support Agreement ("RSA"), which proposed to leave the TCEH Debtors' unsecured creditors with virtually nothing to satisfy billions of dollars in claims.  Specifically, the exhibits to the RSA reflect that junior creditors holding TCEH debt with a face amount of approximately $7.7 billion were expected to receive a recovery of less than $350 million cash.  *See* Docket 98, Exhibit D (RSA Term Sheet, Ex. E).

226.     Further, the Debtors are effectively hamstrung by the Stipulations they agreed to include in the Cash Collateral Order, which bar them from seeking to avoid or otherwise challenge the validity, priority, and extent of the TCEH Debtors' obligations to the First Lien Transferees and the liens granted thereunder.

227.     These potential claims—which the Debtors either ignored or willfully resolved for nothing in the RSA and Cash Collateral Order—affect many of the Debtors' estates and could potentially yield over $24 billion in released liens and over $2 billion in recovered funds for the benefit of the TCEH Debtors' estates and creditors.

228.     As a result, the Debtors should not retain any rights to settle and compromise any claims the Committee is granted leave to commence.  Moreover, the Committee's ability to litigate the Claims will be hindered if the Debtors retain the right to propose a settlement

because, among other things, it likely will reduce incentives for the First Lien Transferees to enter into settlement negotiations with the Committee.

229.    Similar relief has also been granted by courts in this District and elsewhere. *See, e.g., In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011), Dkt. No. 382 at ¶ 3; *see also In re Majestic Capital, LTD.*, Case No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011), Dkt. No. 211 at ¶ 3; *In re Old CarCo LLC (f/k/a/ Chrysler LLC)*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009), Dkt. No. 5151 at ¶ 2.

230.    Moreover, the Committee is the appropriate party to pursue, and potentially settle, these claims against the First Lien Transferees.  As the official committee of unsecured creditors for the TCEH Debtors, the Committee is an independent fiduciary for the unsecured creditors of all TCEH Debtors. *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 303 (Bankr. D. Del. 2006) (noting that the official committee of unsecured creditors owes a fiduciary duty to general unsecured creditors); *Locks v. United States Trustee*, 157 B.R. 89 (W.D. Pa. 1993) ("A member of an official Chapter 11 committee is a fiduciary for the class the Committee represents.").  In that capacity, the Committee seeks to bring these claims against the First Lien Transferees to recover over $2.4 billion in fees and avoid over $24 billion in liens and security interests for the benefit of the TCEH Debtors and their estates and creditors.

## CONCLUSION

231.    For the reasons set forth above, there is ample reason to vest the Committee with standing to prosecute claims against the First Lien Transferees.

WHEREFORE, the Committee respectfully requests that the Court enter an order, substantially in the form of the Proposed Order annexed hereto as Exhibit B, granting the Committee the exclusive standing and authority to commence, prosecute, and settle claims against the First Lien Transferees arising out of the factual allegations set forth above and in the

Proposed Complaint, and grant such other and further relief as the Court may deem just and proper.

Dated: Wilmington, Delaware
       February 19, 2015

**MORRISON & FOERSTER LLP**
Brett H. Miller
James M. Peck
Lorenzo Marinuzzi
Todd M. Goren
Samantha Martin
250 West 55th Street
New York, New York 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:        brettmiller@mofo.com
                  jpeck@mofo.com
                  lmarinuzzi@mofo.com
                  tgoren@mofo.com
                  smartin@mofo.com


/s/ Christopher A. Ward
**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile:  (302) 252-0921
E-mail:        cward@polsinelli.com
                  jedelson@polsinelli.com
                  skatona@polsinelli.com

*Attorneys for the Official Committee of*
*TCEH Unsecured Creditors*