# **EXHIBIT C**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Energy Future Holdings Corp., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of the TCEH Debtors' estates; | ) ) ) | |
|  | ) | Adversary Proceeding |
| Plaintiff, | ) | No. 15-_____ |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| FIRST LIEN TRANSFEREES[2] | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

**ADVERSARY COMPLAINT FOR DECLARATORY JUDGMENT,
AVOIDANCE AND RECOVERY OF LIENS, SECURITY INTERESTS, OBLIGATIONS,
FEES, AND INTEREST PAYMENTS, AND DISALLOWANCE OF CLAIMS**

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors (the "Debtors") and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

[2] The Committee expects that Defendants will include the First Lien Administrative Agent and First Lien Collateral Agent under the Credit Agreement, and the Indenture Trustee under the Indenture, in their capacities as such. The Committee's investigation is ongoing. The Committee reserves all rights to amend the Complaint, including amendments related to adding additional defendants, prior to the Challenge Deadline (as defined in the *Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [Dkt. No. 855] (the "Cash Collateral Order")).

The Official Committee of Unsecured Creditors (the "Committee") of Energy Future Competitive Holdings Company LLC ("EFCH"), EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH"), their direct and indirect subsidiaries, and EFH Corporate Services Company, by and through its undersigned counsel, on behalf of and as the representative of the aforementioned Debtors' estates, and based upon knowledge, information, belief, and the results of its investigation to date, alleges as follows:[3]

## NATURE OF THE ACTION

1.        The action is brought to avoid billions of dollars of liens and security interests granted to Defendants and to avoid and recover more than $2.4 billion in fees, incremental interest, the Prepayment Benefit (defined below), and preferential transfers paid to or for the benefit of Defendants over the past seven years by the TCEH Debtors (defined below) while each of the TCEH Debtors was indisputably insolvent, and for which the TCEH Debtors did not receive reasonably equivalent value, including:

a)      Over $24 billion in liens, security interests, and obligations granted in connection with the 2007 leveraged buy-out and the issuance of the First Lien Notes (defined below);

b)      Over $2 billion in fees, incremental interest, and the Prepayment Benefit paid in connection with a 2011 amendment and purported extension of the maturity dates under the Credit Agreement (defined below), as well as the issuance of the First Lien Notes and various related transactions;

c)      Approximately $370 million in fees and incremental interest paid in connection with a 2013 amendment and purported extension of the maturity dates under the Credit Agreement; and

d)      Approximately $216 million in preferential transfers made by the TCEH Debtors during the 90 days prior to the Petition Date.

---

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Cash Collateral Order.

2.      The Debtors' chapter 11 filing was all but inevitable from the moment in October 2007 that TCEH raised approximately $24.8 billion of secured funded indebtedness and credit facility commitments maturing between December 2012 and October 2014, as well as $6.75 billion in unsecured funded indebtedness in order to finance an approximately $46.7 billion leveraged buyout of TXU Corp. (the "LBO")—the largest leveraged buyout in history.  The LBO rendered each of the TCEH Debtors insolvent, and they have remained insolvent at all times since.

3.      The Debtors' determination that the TCEH Group (defined below) had a positive equity value in October 2007 was based on unrealistic valuation assumptions and financial projections (the term "equity value" reflects the difference between the fair market value of a company's assets and the face value of its liabilities).  Specifically, the TCEH Group valuation assumptions contained an unreasonably low weighted average cost of capital and forecasted average natural gas prices sustained at an unrealistically high level.  These assumptions are reflected in the solvency opinion prepared by Duff & Phelps, LLC ("D&P"), an independent third party, in October 2007 in connection with the LBO (the "D&P 2007 Opinion") and in a report prepared by D&P, as of October 10, 2007, but dated March 28, 2008, for the purchase price allocation (the "D&P 2007 PPA").  Realistic adjustments to the Debtors' valuation assumptions result in the conclusion that each of the TCEH Debtors was insolvent at the time of and immediately following the LBO, and that the TCEH Debtors' remaining assets were unreasonably small immediately following the LBO.

4.      After 2007, the Debtors' financial condition only worsened.  Indeed, between the closing of the LBO in October 2007 and December 2008, D&P lowered its estimate of the TCEH Group's enterprise value, which resulted in an approximate ███████ downward swing in the

TCEH Group's equity value.  As a result, the TCEH Group's liabilities in December 2008 exceeded the fair market value of all its assets by more than ███████ only fifteen months after the LBO.

5.      In their 2010 Annual Report, the Debtors were forced by their auditors to finally acknowledge that the Debtors were balance sheet insolvent—a state they actually had been in since the LBO.  In fact, according to management's own 2010 projections, the TCEH Group's liabilities would exceed the fair market value of their assets by ███████ by year-end 2010, with revenue projected to drop further still in 2011 and to remain below the 2010 level for every year through 2018.  And yet, the maturity of billions of dollars of TCEH first lien debt loomed overhead.

6.      The LBO left the Debtors unable to withstand the systemic shifts in the energy market and without a viable solution to their bad and worsening financial condition.  Instead, Defendants took advantage of the TCEH Debtors' situation and extracted an additional approximately *$2.4 billion* in 2011 and 2013 in the form of fees, incremental interest expense, and the Prepayment Benefit (defined below) and extracted concessions that substantially improved their positions in advance of the Debtors' chapter 11 filing.  Defendants did so in connection with a series of ineffectual amendments and extensions of loans outstanding under the Credit Agreement, all in an effort to kick the proverbial can down the road while the Debtors' financial condition continued to deteriorate.  But these *partial* maturity extensions—which left outstanding up to $4.5 billion of TCEH first lien funded indebtedness and credit facility commitments with 2013 and 2014 maturities—failed to offer the Debtors any relief.  The Debtors were inevitably and foreseeably forced to file for bankruptcy on April 29, 2014, approximately six months prior to the original October 2014 maturity of the TCEH Debtors'

term loans.  The only meaningful impact of these intervening amendments was to *increase* the

TCEH Debtors' already crushing net debt load by nearly two billion dollars prior to the time the

Debtors filed for bankruptcy, a significant portion of which was used to pay fees and incremental

interest to Defendants for illusory maturity date extensions.

7.       Meanwhile, Defendants knew that the maturity extensions they were granting to

the TCEH Debtors were illusory.  Defendants used the "amend and extend" transactions to

improve their position ahead of the inevitable chapter 11 bankruptcy.  For example, certain

Defendants required the TCEH Debtors to prepay certain debt at par that was trading at a

discount (thereby giving those Defendants a premium over the market prices), some required the

TCEH Debtors to ████████████████████████████████████████████████████

████████████████████████████████████, some required the Debtors to

████████████████████████████████████████████████████████████

████████████████████████████████████████████████, and some

required the TCEH Debtors to pay exorbitant fees up front in addition to increasing interest rates

in exchange for maturity extensions, rather than charging a market rate fee up front and

increasing the interest rate over the remaining life of the extended loans (the market standard, at

least for maturity date extensions done under normal circumstances).

8.       When the non-extended term loan debt was about to come due in 2014 according

to its original terms, TCEH could not pay.  Accordingly, the Debtors were forced to file for

bankruptcy, just as they would have absent the partial "amend and extend" transactions.  The

difference is that the TCEH Debtors were poorer by approximately ***$2.4 billion*** in fees,

incremental interest expense, and the Prepayment Benefit, that had been transferred to

Defendants during the prior three years.  Defendants, on the other hand, were in a significantly

better position economically, and as a secured creditor in the bankruptcy, as a result of the transactions. Moreover, the extensions also gave the Debtors and Defendants the comfort of maturities over six years after the closing of the October 2007 LBO.

9.      In addition, in February 2014, Defendants received several preferential transfers. First, the TCEH Debtors ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Second, the TCEH Debtors transferred approximately $216 million to Defendants to make prepetition interest payments on the First Lien Debt (defined below). Each of these transfers took place during the 90-day period prior to the Petition Date.

10.      The Committee seeks to avoid and recover over $2.4 billion in fees, incremental interest expense, the Prepayment Benefit, and preferential transfers paid to or for the benefit of Defendants over the past four years, and to avoid any claims, liens, security interests, or other obligations that Defendants assert arising from the LBO, the issuance of the First Lien Notes, and the Fee Note (each, as defined below).  Specifically, this adversary proceeding seeks:

- Avoidance of over $24 billion of liens, security interests, and obligations granted under the Credit Agreement, the First Lien Notes, and the Fee Note;

- Avoidance and recovery of over  $2 billion of fees paid in connection with the 2011 Transactions and the 2013 Amendment (each, as defined below), including incremental interest expense paid thereafter as a result of such transactions;

- Entry of an order equitably subordinating over $24 billion of Defendants' claims against the TCEH Debtors' estates;

- To the extent the Court determines at any time that Defendants are undersecured creditors, recharacterization of adequate protection payments of over $100 million per month made by the TCEH Debtors to Defendants during these chapter 11 cases as payments of principal on the First Lien Debt;

- Avoidance of approximately $216 million of preferential transfers;

- Entry of an order disallowing over $24 billion of Defendants' claims against the TCEH Debtors' estates pending final resolution of this adversary proceeding, and a determination of the amount of Defendants' allowed claims;

- Entry of an order disallowing approximately $8 million of Defendants' claims against the TCEH Debtors' estates to the extent such claims include unmatured interest;

- To the extent Defendants' claims are not avoided, entry of an order limiting the amount of Defendants' allowed claims based on Section 2(b) of the Guarantees;

- Declaratory judgments that certain deposit accounts, rabbi trust accounts, avoidance actions, commercial tort claims, and tax attributes are unencumbered;

- Avoidance of Defendants' unperfected liens on or security interests in certain property;

- Declaratory judgments that there has been no diminution in the value of Defendants' collateral after the Petition Date, and that the Debtors' use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in value of Defendants' collateral;

- Declaratory judgments that (i) Defendants are not entitled to any postpetition interest and fees unless the Court determines that Defendants are oversecured creditors, (ii) in the event Defendants are determined by the Court to be oversecured creditors, postpetition interest and fees shall be allowed solely to the extent of the excess value of the collateral, and (iii) any award of postpetition interest should be at the contractual, non-default rate of interest; and

- Declaratory judgment that the TCEH Debtors' stipulations do not expand the scope of Defendants' liens.

## THE PARTIES

11.    On April 29, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.  On June 5, 2014, the Court entered an order directing joint administration of the Debtors' cases under Case Number 14-10979 [Dkt. No. 849].  The Debtors have continued in the management and operation of their businesses and properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

12.    The seven member Committee was formed in the bankruptcy cases by the United States Trustee for the District of Delaware on May 13, 2014, pursuant to section 1102(a) of the Bankruptcy Code.  [Dkt. No. 420]  The Committee members include: (i) Pension Benefit Guaranty Corporation; (ii) HCL America, Inc.; (iii) The Bank of New York Mellon; (iv) Law Debenture Trust Company of New York; (v) Holt Texas LTD, d/b/a Holt Cat; (vi) ADA Carbon Solutions (Red River); and (vii) Wilmington Savings Fund Society.

13.    The Committee is vested with, among other things, the powers described in section 1103 of the Bankruptcy Code, including the power to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.

14.    The Committee brings count 1 in this adversary proceeding derivatively on behalf of EFCH, TXU Retail Services Company, Luminant Energy Company LLC, Luminant Generation Company LLC, and Luminant Mining Company LLC.

15.    The Committee brings counts 2-22 in this adversary proceeding derivatively on behalf of TCEH, EFCH, 4Change Energy Company, 4Change Energy Holdings LLC, Big Brown 3 Power Company LLC, Big Brown Lignite Company LLC, Big Brown Power Company LLC, Collin Power Company LLC, Decordova Power Company LLC, Decordova II Power Company LLC, Eagle Mountain Power Company LLC, Generation MT Company LLC, Generation SVC Company, Lake Creek 3 Power Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Luminant Energy Trading California Company, Luminant ET Services Company, Luminant Generation Company LLC, Luminant Holding Company LLC, Luminant Mineral Development Company LLC, Luminant Mining Company LLC, Luminant

Renewables Company LLC, Martin Lake 4 Power Company LLC, Monticello 4 Power Company LLC, Morgan Creek 7 Power Company, NCA Resources Development Company LLC, Oak Grove Management Company LLC, Oak Grove Mining Company LLC, Oak Grove Power Company LLC, Sandow Power Company LLC, TCEH Finance, Inc., Tradinghouse 3 & 4 Power Company LLC, Tradinghouse Power Company LLC, TXU Energy Retail Company LLC, TXU Energy Solutions Company LLC, TXU Retail Services Company, TXU SEM Company, Valley NG Power Company LLC, and Valley Power Company LLC (collectively, the "TCEH Debtors", and excluding TCEH, the "Guarantors").

16.     On February 19, 2015, the Committee filed a motion seeking, among other things, authority to prosecute this action on behalf of the Debtors' estates pursuant to sections 105, 1103, and 1109 of the Bankruptcy Code [Dkt. No. __] (the "Standing Motion").  On [____], 2015 the Court entered an order granting the Standing Motion and permitted the Committee to prosecute this action [Dkt. No. __] (the "Standing Order").

## JURISDICTION & VENUE

17.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

18.     This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

19.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

20.     The statutory bases for the relief requested herein are sections 502, 510, 544, 547, 548, 550, and 551 of the Bankruptcy Code, Bankruptcy Rule 7001 et seq., DEL. CODE ANN. TIT. 6, §§ 1304, 1305, and 1307, and Article 9 of the Uniform Commercial Code (the "UCC").  The Committee also asserts certain of those claims pursuant to Tex. Bus. & Com. Code Ann. ch. 24

and N.Y. Debt. & Cred. Law § 270-281, which are substantially the same as the Delaware

statute.  Because Delaware, Texas, and New York law do not conflict in relevant part, the

Complaint will refer to the law of the forum state.  Similar to Delaware and Texas, the New York

fraudulent conveyance laws do not vary much from the elements set forth in section 548(a)(1)(B)

of the Bankruptcy Code.  The primary difference is the use of the term "fair consideration" under

New York law.  The terms "reasonably equivalent value" under the Bankruptcy Code and

Delaware and Texas law and "fair consideration" under New York law have the same

fundamental meaning, except that the definition of "fair consideration" additionally includes the

statutory requirement of "good faith."

21.      Pursuant to Local Rule 7008-1, Plaintiff consents to entry of final orders and

judgments by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent

of the parties, cannot enter final orders or judgment consistent with Article III of the United

States Constitution.

22.      The Committee has authority to bring these claims pursuant to the Standing Order

entered by this Court.

### THE 2007 LBO

23.      In 2007, a consortium of private equity funds led by affiliates of Kohlberg Kravis

Roberts & Co. L.P., Texas Pacific Group, and Goldman Sachs (collectively, the "Sponsors"),

acquired TXU Corp. through a merger of Texas Energy Future Merger Sub Corp. ("Merger

Sub"), with and into TXU Corp. under the terms of an Agreement and Plan of Merger, dated

February 25, 2007 (the "Merger Agreement").  The Merger Sub's parent, Texas Energy Future

Holdings Limited Partnership ("Parent"), was formed by the Sponsors solely for the purpose of

acquiring TXU Corp. in this LBO.  The Merger Agreement provided that the Merger Sub would

pay consenting shareholders $69.25 per share, a premium over the $57.64 pre-announcement closing per share price of TXU Corp. common stock on February 22, 2007.

24.     In the Proxy Statement, dated July 24, 2007, the Debtors stated that the total amount of funds necessary to complete the LBO and related transactions was approximately $46.7 billion, which would be funded by new credit facilities, debt issuances, equity financing, cash on hand, and the assumption of certain indebtedness.  On or about October 5, 2007, TXU Corp. changed its name to Energy Future Holdings, Corp.  EFH is the ultimate parent company of the Debtors, including the TCEH Debtors.

25.     To pay for their acquisition of EFH, the Sponsors arranged for and caused TCEH, as borrower, and the Guarantors, as guarantors, to enter into a first lien Credit Agreement, dated as of October 10, 2007, with Citibank, N.A., as administrative agent and collateral agent ("Citibank", as succeeded from time to time, and in such capacities, the "First Lien Administrative Agent" and the "First Lien Collateral Agent"), and various lenders and other agents (the "Credit Agreement").

26.     The Credit Agreement provided for an aggregate amount of over $24.8 billion in secured funded debt and credit facility commitments, including: (i) a senior secured initial term loan facility up to $16.45 billion, (ii) a senior secured delayed draw term loan facility up to $4.1 billion (together with the initial term loan, the "Term Loans"), (iii) a senior secured letter of credit facility up to $1.25 billion (the "Letter of Credit Loans"), (iv) a senior secured revolving credit facility up to $2.7 billion (the "Revolving Loans"), and (v) an unlimited senior secured cash posting credit facility designed to fund the collateral requirements for specified natural gas hedging obligations ("Commodity Collateral Posting Facility"), under which approximately $382 million was initially drawn at the time of the 2007 LBO.  Under the original terms of the Credit

Agreement, the Commodity Collateral Posting Facility was scheduled to mature in December 2012, the Revolving Loans were scheduled to mature in October 2013, and the Term Loans and Letter of Credit Loans were scheduled to mature in October 2014.  According to the Debtors, as of the Petition Date, the aggregate outstanding principal amount under the Credit Agreement was approximately $22.635 billion.  (Cash Collateral Order ¶ F(i)(a).)

27.    At the time of the LBO, the value of the TCEH Debtors' assets was significantly higher than the TCEH Debtors' tax basis in those assets.  The LBO did not result in a taxable disposition of the TCEH Debtors' assets, and as a result, there was no step up in the tax basis of the TCEH Debtors' assets.

28.    The amount of the loans and commitments arranged by the Sponsors for the TCEH Debtors was a substantial increase from the aggregate amount of loans outstanding by the TCEH Debtors prior to the LBO—and even more so when considered in conjunction with the other $6.75 billion in unsecured loans incurred by the TCEH Debtors to fund the LBO.  For example, immediately prior to the LBO, according to EFH's Quarterly Report issued on November 14, 2007 (for the quarter ending September 30, 2007), EFH and its subsidiaries had $9.8 billion of debt outstanding as of September 30, 2007 (excluding debt held by TXU Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC)), of which the TCEH Group had approximately $5.8 billion of debt outstanding.

29.    In addition, the TCEH Debtors entered into, among other things, the following agreements in connection with the Credit Agreement: (i) the Guarantee, dated October 10, 2007, by the Guarantors in favor of Citibank, as collateral agent, each as amended, modified or restated prior to the date hereof (the "Guarantee"), pursuant to which the Guarantors jointly and severally guaranteed repayment of the loans under the Credit Agreement, (ii) the Security Agreement,

dated October 10, 2007, by and among TCEH, EFCH, the subsidiary grantors party thereto, and

Citibank as collateral agent, as amended, modified or restated prior to the date hereof (the

"Security Agreement"), pursuant to which EFCH, TCEH, and the Guarantors granted security

interests on their assets to secure repayment of the loans under the Credit Agreement, (iii) the

Pledge Agreement, dated October 10, 2007, by and among EFCH, TCEH, the subsidiary

pledgors party thereto, and Citibank, as collateral agent, as amended, modified or restated prior

to the date hereof (the "Pledge Agreement"), pursuant to which EFCH, TCEH, and the

Guarantors pledged equity interests to secure repayment of the loans under the Credit

Agreement, and (iv) the Collateral Agency and Intercreditor Agreement, dated October 10, 2007,

by and among TCEH, the Guarantors, Citibank, as administrative and collateral agent, and the

secured hedge counterparties party thereto, as amended, modified or restated prior to the date

hereof (the "Collateral Agency and Intercreditor Agreement"), which governed the relationship

among the first lien lenders.  Under the Collateral Agency and Intercreditor Agreement, Citibank

agreed to act as First Lien Collateral Agent for all holders of First Lien Debt[4] (the "Secured

Parties") and be granted all liens securing the First Lien Debt on behalf of the Secured Parties.

      30.      Under the terms of the Credit Agreement and related documents, significant

control and discretion were given to the First Lien Collateral Agent and First Lien

Administrative Agent.  The Security Agreement grants "to the Collateral Agent, for the benefit

of the First Lien Secured Parties" all liens, security interests, and guarantees.  (Security

Agreement § 2.)  The Pledge Agreement transfers, assigns, and pledges "to the Collateral Agent,

---

[4] The "First Lien Debt" includes all obligations under (i) the Credit Agreement, as amended, modified or restated prior to the date hereof, (ii) any and all Secured Commodity Hedge and Power Sales Agreements and Secured Hedging Agreements (each as defined in the Cash Collateral Order), as amended, modified or restated prior to the date hereof, (iii) the Indenture, dated as of April 19, 2011, governing the 11.50% senior secured notes due October 1, 2020, as amended, modified or restated prior to the date hereof, and (iv) all other agreements that were contemplated in or related to the agreements in (i) through (iii) above.

for the benefit of the Security Parties" a lien on the pledged shares, pledged debt, and all proceeds of each. (Pledge Agreement § 2.) The First Lien Collateral Agent also has control over the disposition of collateral and other rights and remedies. (*See* Security Agreement § 5.5 ("the Collateral Agent may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC or any other applicable law")); Intercreditor Agreement § 5.1 (granting the First Lien Collateral Agent "the exclusive right (but subject to the provisions of the Financing Documents) to make determinations regarding the release or disposition of any of the Collateral.") The Credit Agreement provides that funds received from the Debtors may be commingled with the First Lien Administrative Agent's general funds, as the agreement only requires that the Agent make available "like funds" to the lenders. Credit Agreement § 5.3.

31.     The TCEH Debtors became responsible for billions of dollars of new loan obligations incurred in connection with the LBO, of which over $20 billion was secured and approximately $6.75 billion was unsecured. However, the TCEH Debtors hardly received the benefit of any such funds, as reflected by the chart below.

| Amounts Borrowed | |
| --- | --- |
| **Debt Incurred by TCEH Debtors** | **In millions** |
| Total First Lien Credit Facilities (maturing in 2012-2014) | $20,478[5] |
| Unsecured Interim Facilities (maturing in 2015-2016) | $6,750 |
| Total LBO Debt | $27,228 |
| **Use of Proceeds** | |
| **LBO Loan Proceeds Not Retained by TCEH Debtors** | **In millions** |
| Initial Loan Proceeds | $27,228 |
| TCEH Debtors' Repayment of TCEH and | ████)[6] |

---

[5] Amounts in excess of $20.478 billion were borrowed under the Credit Agreement following the LBO.

[6] TXU Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC) was a co-borrower with TCEH on certain pre-LBO debt ("Oncor/TCEH Pre-LBO Debt"). Approximately $2 billion of the LBO loan proceeds were

| Oncor Pre-LBO Debt | |
|---|---|
| Restricted Cash (Supports Letter of Credit Facility) | ($1,250) |
| Payment of TCEH LBO Debt Financing Fees | ██████ |
| Cash Transfer to EFH | ██████ |
| TCEH Debtors' Contribution for Acquisition of Existing Equity in LBO | ██████)[7] |
| Loan Proceeds Retained by TCEH Debtors | $0 |

32.    The October 2007 LBO over-levered the TCEH Group's capital structure and burdened the TCEH Debtors with the obligation of repaying the Defendants over $20 billion of secured debt but did not provide the TCEH Debtors with reasonably equivalent value in exchange for the pledge of substantially all of their assets to secure their repayment obligations under the Credit Agreement.

33.    The Sponsors did not guarantee any of the loans under the Credit Agreement or pledge any of their other assets to support these loans; rather, the TCEH Debtors were required to leverage their assets for the benefit of non-debtor third parties.

## 2007: IMMEDIATE INSOLVENCY

34.    The October 2007 LBO rendered each of the TCEH Debtors insolvent at the time of and immediately following the LBO, and left each of the TCEH Debtors with remaining assets that were unreasonably small following the LBO.

35.    The Debtors hired D&P to: (i) provide a solvency opinion at the time of the 2007 LBO, (ii) conduct a purchase price allocation in accordance with generally accepted accounting

---

used to pay off the outstanding Oncor/TCEH Pre-LBO Debt, which had the effect of releasing TXU Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC) from the debt.  The Committee reserves all rights to seek standing to bring claims in connection with this repayment under the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [Dkt. No. 2051], as amended.

[7] The Committee is also investigating claims relating to the transfer of funds to Merger Sub and subsequent transferees.  The Committee reserves all rights to seek standing to bring claims in connection with these transfers under the *Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters* [Dkt. No. 2051], as amended.

principles in connection with the 2007 LBO, and (iii) conduct goodwill impairment testing for

the annual periods following the LBO beginning in December 2008.  In these reports, D&P

performed a valuation of TCEH and its direct and indirect subsidiaries (collectively, the "TCEH

Group"),[8] either on a consolidated basis or separately, among other analyses.

36.    In the D&P 2007 Opinion, D&P estimated an equity value of the TCEH Group of

███████████ at the time of the LBO.  In the D&P 2007 PPA, the implied equity value of the

TCEH Group at the time of the LBO was almost ██████████.  The details to reconcile this

reduction in the TCEH Group's equity value associated with the same October 2007 date have

not been provided to date.

37.    A comparison of D&P's 2007 reports and D&P's subsequent reports shows that

the 2007 reports were based on faulty assumptions as to the TCEH Group's weighted average

cost of capital ("WACC") and relied on financial projections premised on unrealistic gas price

forecasts.  Had D&P used valuation assumptions in its 2007 reports similar to those used in its

later reports beginning in December 2008, it would have led to the conclusion that the fair

market value of the TCEH Group's assets did not exceed the face value of its liabilities in

2007—and the TCEH Group was thus insolvent on a balance sheet basis as of the date of the

LBO.

38.    D&P's first goodwill impairment report, dated December 31, 2008, implied, in

pertinent part, that the TCEH Group's liabilities exceeded the fair market value of its assets by

██████████.  This is an approximate ████████████ downward swing between the D&P 2007

Opinion and the December 2008 report.  D&P's subsequent goodwill impairment reports, along

with the Debtors' financial data, also implied that the TCEH Group's liabilities exceeded the fair

---

[8] The TCEH Group is substantially the same as the TCEH Debtors, except the TCEH Group includes the following
non-debtor entities: Greenway Development Company, Nuclear Energy Future Holdings LLC, Nuclear Energy
Future holdings II LLC, and Comanche Peak Nuclear Power Company LLC.

market value of its assets in each year following the LBO, with negative implied equity values of ████████ in December 2009, ████████ in December 2010, ████████ in December 2011, ████████ in December 2012, and ████████ in September 2013.

39.    The reported decline in the TCEH Group's equity value between October 2007 and December 2008 is not because the TCEH Group had debilitating operating results for the year ended December 2008, but rather primarily because D&P used inconsistent valuation assumptions to arrive at its October 2007 valuation.  For example, D&P applied a consolidated WACC of ████ in the D&P 2007 Opinion and an implied consolidated WACC of ████ in the D&P 2007 PPA.  Immediately thereafter (beginning in 2008), D&P applied WACCs of ████ ████ using different assumptions.  Beginning in 2008 and beyond, D&P also utilized a ████ company-specific risk premium when determining the TCEH Group's cost of equity (one component of WACC) pursuant to the Capital Asset Pricing Model (an economic model employed by practitioners and academics to determine the relationship between risk and expected return and used to value assets or even entire firms).  If D&P had incorporated this same ██ risk premium in the D&P 2007 Opinion and the D&P 2007 PPA consistent with all of its reports starting in December 2008, the resulting enterprise valuations would have showed that the TCEH Group had negative equity value and thus was balance sheet insolvent at the time of the LBO.

40.    Moreover, the natural gas price forecast assumed in management's projections underlying the D&P 2007 Opinion and the D&P 2007 PPA failed to properly account for various known factors that could and did reasonably serve to lower the near-term future price of natural gas.  Public information was available to D&P and the Debtors in 2007 that would have shown why maintaining an average projected natural gas price of ████████ throughout the entire

16

projection period was not realistic at the time.  First, it is known in the natural gas industry that natural gas is inherently a cyclical business where prices fluctuate with changes in supply and demand.  Relatively high prices incentivize exploration and production companies to explore for new reserves and further develop existing reserves.  Such activity serves to increase supply and put downward pressure on prices.  Relatively low prices incentivize exploration and production companies to cut back on their development of new and existing reserves given the less attractive returns, which, in turn, places upward pressure on prices.  While average natural gas prices had risen during the five-year period immediately prior to the LBO to $6/mmbtu, the average natural gas price over the prior decade was approximately $5/mmbtu.  The significant increasing levels of natural gas exploration and development that began in the few years prior to the LBO were tell-tale signs of the next downward dip in natural gas prices that came soon after the LBO.

41.    Second, there was significant evidence beginning in early 2007 that the development of unconventional shale gas reserves could have a near-term material impact on natural gas prices as the markets adjusted to increased supply.  The potential for major disruption in the natural gas market (*i.e.*, shale) was known by industry participants in 2007.  Certainly, there was no reasonable basis to predict a near-term *increase* in natural gas prices, as D&P did.

42.    In sum, D&P would have concluded that the TCEH Group was insolvent at the time of and immediately following the LBO, and that the TCEH Group's remaining assets were unreasonably small following the LBO, had it (i) utilized similar assumptions for determining WACC for the TCEH Group in October 2007 as it had in December 2008, and (ii) utilized realistic natural gas price projections for its valuation of the TCEH Group.

## 2011-2013: DEFENDANTS EXTRACT ADDITIONAL VALUE

### A.    The March 2011 Insolvency Disclosure

43.    The nature and extent of the TCEH Debtors' First Lien Debt remained largely unchanged from the time of the LBO until early 2011.    However, the enterprise value of the TCEH Group continued to rapidly deteriorate.  D&P's December 2010 goodwill impairment report implied that the TCEH Group's equity value was *negative* ███████ .

44.    In addition, for purposes of preparing a discounted cash flow analysis in its 2010 report, D&P utilized management's cash flow projections through 2018, which reflected that the TCEH Group's revenue would be lower in every one of those years than was forecasted in 2010 while the TCEH Group's liabilities were projected to remain unchanged.

45.    Indeed, EFH was forced to acknowledge the TCEH Debtors' insolvency in its 2010 Annual Report, issued in March 2011.  Specifically, the Annual Report states:

> our liabilities and those of EFCH exceed our and EFCH's assets as shown on our and EFCH's respective balance sheet prepared in accordance with US GAAP as of December 31, 2010
>
> [and]
>
> [R]ecent valuation analyses of TCEH's business indicate that the principal amount of its outstanding debt currently exceeds its enterprise value.

46.    EFH's 2010 Annual Report also recognized the Debtors' dire financial prospects assuming a continuation of current natural gas prices:

> A continuation of current forward natural gas prices or a further decline of forward natural gas prices could limit our ability to hedge our wholesale electricity revenues at sufficient price levels to support our interest payments and debt maturities, result in further declines in the value of our baseload generation assets and could adversely impact our ability to refinance the TCEH Revolving Credit Facility due in October 2013 or our substantial debt due in October 2014.  . . . .

> We may have difficulty successfully implementing any refinancing
> of our debt due to our financial position as reflected in our balance
> sheet and the valuation analyses. . .

47.    Tellingly, the Debtors conceded that "[i]f new debt is added to our existing debt levels, the related risks that we now face would intensify." *Id.* The Debtors would fail to heed their own warning.

### B.    The 2011 "Amend & Extend" Transactions

48.    Recognizing that the TCEH Debtors faced significant debt maturities in 2013 and 2014, the boards of EFH, TCEH, TCEH Finance, Inc., and EFCH (whose members were nearly identical) began to consider strategies to address these impending issues.

49.    The series of interrelated transactions occurring in 2011 (as described below, the "2011 Transactions"), referred to by management as "Project Odyssey," *increased* the TCEH Debtors' net debt load, both immediately and over time, and caused them to spend hundreds of millions of dollars in cash fees plus additional interest—all to extend the maturities on only a *portion* of their then outstanding loans under the Credit Agreement. These partial maturity extensions, however, were insufficient for the TCEH Debtors to survive past the original 2014 maturity dates under the Credit Agreement, particularly because the TCEH Debtors would still need to pay or separately extend the maturities on the $4.5 billion of non-extended debt (*see* infra ¶ 54-55). And as the Debtors admitted in their 2010 Annual Report—"[w]e may have difficulty successfully implementing any refinancing of our debt due to our financial position as reflected in our balance sheet and the valuation analyses . . ."—such additional extensions were expected to be (and in fact were) difficult to achieve.

50.    Indeed, despite discussions at the April 28, 2011 EFH board meeting about "███

███████████████████████████████████████████," it was clear that the TCEH Debtors never meaningfully addressed their fundamental problem—they had more

debt than their business could support.  In board discussions regarding cash flow, net debt, and

liquidity, Paul Keglevic, Executive Vice President and Chief Financial Officer, noted that "█

█████████████████████████████████████████████████████████"—meaning,

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████       Mr. Keglevic

further noted that the TCEH Debtors would need to address "██████████████████████

████████████████████████████████████████████████████████

██████████████████████████"

    51.     Thus, while this series of transactions in 2011 provided exceptional value to

Defendants, it cost the TCEH Debtors over $800 million in fees, plus approximately $530

million of incremental interest expense through the Petition Date, approximately $330 million in

the form of a Prepayment Benefit, and approximately $420 million in incremental interest on the

First Lien Notes (which were issued solely to raise funds so the TCEH Debtors could make the

par prepayment), and did not provide any meaningful value to the TCEH Debtors, who still faced

debt they could not support maturing in 2013 and 2014.

### 2.     The Credit Agreement Amendment

    52.     The 2011 Transactions included several parts.  First, on April 7, 2011, the parties

amended the Credit Agreement (the "2011 Amendment") as the first step in a series of

transactions that ultimately set the stage for the maturity date extension.  The 2011 Amendment,

among other things, amended certain financial covenants, including the financial maintenance

covenant.

    53.     In connection with the 2011 Amendment, TCEH paid each consenting lender a

fee of 50 basis points based on the amount of such lender's commitment, or approximately $110

million in aggregate fees.  In no transaction over the prior twelve months did a borrower pay a higher up-front fee for a covenant amendment.

### 3.    The Credit Agreement Maturity Date Extensions

54.    The 2011 Amendment also involved an extension of the maturity of approximately 80% of the aggregate outstanding loans (the "2011 Extension"), comprised of: (i) $15.351 billion aggregate principal amount of Term Loans with 2014 maturities to 2017, (ii) $1.020 billion aggregate principal amount of Letter of Credit Loans with 2014 maturities to 2017, and (iii) $1.409 billion aggregate principal amount of Revolving Loans with 2013 maturities to 2016.

55.    This was only a *partial* extension that left outstanding billions of dollars under the Credit Agreement on its original terms and maturity, including: (i) $3.809 billion aggregate principal amount of Term Loans due in October 2014 (20% of the total principal amount of Term Loans), (ii) $43 million aggregate principal amount of Letter of Credit Loans due in October 2014 (4% of the total principal amount of Letter of Credit Loans), and (iii) $645 million aggregate principal amount of Revolving Loans due in October 2013 (31% of the total Revolving Loans).  This remaining "maturity wall" of almost ***$4.5 billion*** of loans coming due in 2013 and 2014 was still beyond anything the TCEH Debtors could reasonably hope to pay without further refinancing the loans or extending the original non-extended maturities, which the TCEH Debtors admitted in their 2010 Annual Report would be exceedingly difficult.

56.    The 2011 Extension also included a "springing maturity" on the extended loans, which would accelerate the due date of the extended loans—thus, limiting the usefulness of the extension—in the event that: (i) more than $650 million in aggregate principal amount of certain

of TCEH's unsecured notes[9] remains outstanding 91 days prior to the applicable maturity date, <u>and</u> (ii) TCEH's consolidated total debt to consolidated EBITDA ratio is greater than 6.0x.  If these conditions existed at the applicable time, then the maturity of the extended loans would automatically accelerate to 90 days prior to the maturity of the respective 2015 or 2016 notes (November 2015 and November 2016, respectively).  Thus, even if the TCEH Debtors were to find a way through their 2013/2014 "maturity wall" of the non-extended First Lien Debt, they still would not benefit from the full three-year term of the 2011 Extension unless they also were able to successfully address other unsecured debt TCEH had coming due in 2015 and in 2016.

57.    In addition, the lenders placed certain conditions on the 2011 Extension that resulted in incremental costs and fees for the TCEH Debtors.  █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

58.    Further, in exchange for the 2011 Extension, which was a contingent partial extension, Defendants extracted excessive fees and unusual concessions (described below) from the TCEH Debtors that forecasted the lenders' positioning for a future bankruptcy filing. Specifically, the 2011 Extension required that TCEH pay:

- Approximately $575 million in fees for the Term Loans and Letter of Credit Loans extension (structured as a fee of 350 basis points (3.5%) paid to each extending lender based on the amount of loans extended);

- Approximately ████████ in fees for the Revolving Loans (structured as a fee of ██████████████ paid to certain extending lenders pro rata based on amount of the commitments extended);

---

[9]The unsecured notes at issue include either (i) more than $500 million in aggregate principal amount of TCEH's 10.25% Senior Notes due 2015 or 10.25% Senior Notes due 2015, Series B, or (ii) more than $150 million in aggregate principal amount of TCEH's 10.50%/11.25% Senior Toggle Notes due 2016.

- a 100 basis point (1%) increase in the interest rate spread on the extended Term Loans and Letter of Credit Loans and drawn spread on the Revolving Loans under the Credit Agreement; and

- A 50 basis point (0.5%) increase in the undrawn fee with respect to extended undrawn Revolving Loans under the Credit Agreement.

59.     The yield enhancements Defendants received in connection with the 2011 Extension were not typical for the market at that time.  Yield enhancement refers to the total benefit granted to lenders in connection with a transaction, including both up-front fees and any amounts to be received in the form of increased interest over the life of the loan.  Specifically, the yield enhancement is calculated as the sum of (i) the interest rate increase, and (ii) up-front fees divided by years to maturity.

60.     First, Defendants required that TCEH pay a substantial portion of the yield enhancement in the form of extremely high up-front fees, whereas lenders in similar transactions generally require lower up-front fees and achieve principally all of their yield enhancement in the form of an increased interest rate over the remaining life of the extended loans.  Second, yield enhancements relating to the 2011 Extension were above average.  In fact, if the yield enhancements are calculated with the up-front fees amortized over the three-year period between April 2011 and the Petition Date (as opposed to being amortized through the illusory maturity dates in 2016 and 2017), the yield enhancements are particularly excessive.  And these unusually high yield enhancements do not even take into account the Prepayment Benefit and the other benefits Defendants received, as described below.

**4.**     ████████████████

61.     In order to achieve ██████████████████████████████████████

████, the TCEH Debtors had to structure yet another costly transaction, ██████████████

████████████████████████████████████████████████████████



62.

resulting in an aggregate net transaction cost to TCEH of ▮▮▮▮▮▮▮.

### 5.    The Debt Prepayment

63.    The Defendants' benefits did not end with their receipt of fees for futile, partial

maturity extensions and the ▮▮▮▮▮▮▮.  They also used their leverage in the 2011

Transactions to reduce their exposure by requiring an early pay down by TCEH of $1.6 billion

under the Credit Agreement as a condition precedent to the effectiveness of the 2011 Extension,

including approximately $770 million of Term Loans, $188 million of Letter of Credit Loans,

and $645 million of Revolving Loans.  Had the lenders not insisted on this condition for the 2011

Extension, TCEH would not have been obligated to make those payments until the Revolving

Loans matured in 2013 and the Letter of Credit Loans and Term Loans matured in 2014.  By

requiring the early pay-down several years prior to maturity, Defendants substantially reduced

their exposure to the risk that the TCEH Debtors would be unable to pay that debt as it came due

in 2013 or 2014.

64.     Moreover, the lenders extracted *additional* value from the TCEH Debtors in this

early pay down by requiring that they prepay the $1.6 billion of loans at *par*.  At the time of the

2011 Extension, the loans under the Credit Agreement were trading on the secondary market at a

discount of approximately 20%.  Receiving the prepayment at par thus constituted an immediate

transfer to the lenders of approximately $330 million (the "Prepayment Benefit") more than they

could have received at the market trading price (even without accounting for the fact that if the

lenders had tried to sell their $1.6 billion in TCEH debt in the open market all at once, they likely

would have further depressed the price and further reduced the proceeds realized).

65.     If the Prepayment Benefit paid to Defendants is considered in conjunction with

the fees and incremental interest paid under the 2011 Transactions, the resulting yield

enhancement is extraordinarily high.  Furthermore, amend and extend transactions generally do

not involve the pay down of debt that was trading at a meaningful discount to par as a condition

to closing.

### 6.     Issuance of First Lien Notes

66.     In addition, in order to complete the required debt prepayment, TCEH needed to

issue new notes with a substantially higher interest rate, for which it paid even more fees and

expenses to Defendants.

67.    On or about April 19, 2011, TCEH and TCEH Finance, Inc. (together, the "TCEH Note Issuers") issued an aggregate principal amount of $1.75 billion of 11.50% senior secured notes due October 1, 2020 (the "First Lien Notes"), at 99.295% of face value pursuant to that certain indenture, dated April 19, 2011 (the "Indenture"), by and among the TCEH Note Issuers as issuers, the Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee (as succeeded, the "Indenture Trustee").  Contemporaneously therewith, the parties amended the Security Agreement and the Collateral Agency and Intercreditor Agreement to reflect the interests of the holders of the First Lien Notes in the same collateral securing the Credit Agreement.  The First Lien Notes were issued with original issue discount of $12 million, and as of the Petition Date, the unaccreted original issue discount was approximately $8 million.

68.    The Indenture and related documents granted the Indenture Trustee significant control and discretion over the funds related to the First Lien Notes obligations.   For example, the Indenture Trustee did not have to segregate funds it received from the Debtors: the Indenture expressly states that "[m]oney held in trust by the Trustee need not be segregated from other funds except to the extent required by law."  Indenture § 7.1(f).

69.    As discussed above, the lenders required the TCEH Note Issuers to use the net proceeds to prepay approximately $1.6 billion aggregate principal amount of loans under the Credit Agreement at par.   Upon information and belief, the remaining proceeds were used to pay approximately $150 million in fees, expenses, and transaction costs associated with the 2011 Transactions, including certain fees related to the First Lien Notes.

70.    To comply with their disclosure obligations concerning the likely challenge to the 2011 Transactions, the Offering Memorandum for the First Lien Notes contains ███████

███████████████████████████—highly unusual when compared to the Debtors' prior

disclosures—discussing "████████████████████████."   There, the TCEH

Note Issuers acknowledge that ████████████████████████



71.     More telling, the Offering Memorandum warns investors that "████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████."

And that concession regarding the TCEH Note Issuers' ████████████████

████████ did not even take into account the aggregate fees and other benefits of

over $800 million, plus over $530 million in incremental interest under the Credit

Agreement, plus approximately $420 million in incremental interest on the First Lien

Notes, plus the approximately $330 million Prepayment Benefit, that Defendants

extracted for an illusory and ultimately futile partial maturity extension.

**7.**     ████████████████████

72.     Upon information and belief, in furtherance of their mission to improve their

recoveries in the face of the Debtors' near certain bankruptcy filing, certain Defendants also

demanded as part of the 2011 Extension that the Debtors ████████████████████

███████████.  Presumably, some of the lenders ████████████████████

███████████████████████ were concerned about their ultimate

ability to recover ████████████, and therefore, would only consent to the 2011 Extension if

█████████████████████████████████.

　　　　73.　　To meet this additional demand, ███████████████████████

████████████████████████████████████████████████

██████████████████████████████████. The effect

of the ██████████████ was to better position exchanging lenders in the event of a

subsequent bankruptcy, ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

██████████.

### 8.　　The Sum of the "Amend and Extend" Transactions

　　　　74.　　Upon information and belief, each of the 2011 Transactions was, for the most

part, dependent upon or required by the occurrence of the other 2011 Transactions, and the

TCEH Debtors viewed the 2011 Transactions as a single interrelated transaction, not as severable

components.

　　　　75.　　In total, TCEH paid over $800 million in fees to Defendants in connection with

the 2011 Transactions, plus Defendants received approximately $530 million in incremental

interest under the Credit Agreement from April 2011 through the Petition Date, approximately

$420 million in incremental interest under the First Lien Notes from April 2011 through the

Petition Date, and the approximately $330 million Prepayment Benefit.  These 2011

Transactions, which cost the TCEH Debtors over $2 billion in the aggregate, ultimately extended

some—but not all—of the maturity dates under the Credit Agreement for an aggregate yield enhancement of 170 basis points, or, if the benefits associated with the unnecessary *par* prepayment of $1.6 billion under the Credit Agreement are taken into account, an aggregate adjusted yield enhancement of 192 basis points.  These yield enhancements are unusually high.

76.    These fees were not even the worst part of the 2011 Transactions.  The fundamental flaw of the 2011 Transactions is what they failed to do.  The partial maturity extensions left so many substantial loans in place under their original terms that the TCEH Debtors had no reasonable likelihood of being able to repay the non-extended loans when they came due in 2013 and 2014.  It was therefore clear from the outset that, given the TCEH Debtors' reported financial condition and market outlook (including forecasted natural gas prices) (*see* 2010 Annual Report), the 2011 Transactions failed to buy the TCEH Debtors any meaningful time because they would have limited ability to refinance or extend the $4.5 billion of remaining loans prior to maturity in 2013 and 2014.  Thus, the TCEH Debtors would still hit the 2013/2014 maturity wall and be forced to file for bankruptcy at the same time as they would have had they not undertaken the costly 2011 Transactions at all.

77.    The futility of the 2011 Transactions was clear from the outset based on the Debtors' own projections.  As of early 2011, management was projecting ▉▉▉▉▉▉▉ *negative* growth for the next two years, so there was no reasonable prospect that the TCEH Debtors would be able to refinance the non-extended loans prior to maturity, as EFH conceded in its 2010 Annual Report.

78.    Moreover, the 2011 Transactions were also counterproductive because they gave non-extending lenders greater leverage to force the TCEH Debtors into bankruptcy or extract as much value as possible later by threatening to do so.  Indeed, this is exactly what happened less

than two years later when the TCEH Debtors attempted to extend the maturity of the remaining $645 million of non-extended Revolving Loans.

79.    In sum, at a time when the TCEH Debtors were indisputably insolvent, they did not receive reasonably equivalent value for the over $800 million in fees paid to Defendants, plus the approximately $530 million in incremental interest under the Credit Agreement, plus the approximately $420 million in incremental interest under the First Lien Notes, plus the approximately $330 million Prepayment Benefit, as well as the benefits to Defendants of reduced risk from the prepayment of loans and ███████████████.  The 2011 Transactions benefited each Defendant who received the fees, incremental interest expense, and Prepayment Benefit, and considerably benefited those lenders who maintained greater leverage with respect to the non-extended loans with 2013 and 2014 maturity dates.

### C.    The 2012/2013 Amendment: "Buying Runway"

#### 1.    The Debtors Begin To Plan For a 2014 Restructuring

80.    By early 2012, after the costly 2011 Transactions, the TCEH Group's equity value dropped precipitously yet again to negative ████████, as implied by D&P's December 2011 goodwill impairment report.

81.    Because the 2011 Transactions were band-aids, not cures, the TCEH Debtors also continued to face a maturity wall of non-extended debt in 2013 and 2014, including (i) $645 million of its Revolving Loans (approximately 31% of the Revolving Loan commitments outstanding prior to the 2011 Transactions) in October 2013, (ii) $3.8 billion in Term Loans (approximately 20% of the Term Loans outstanding prior to the 2011 Transactions) in October 2014, and (iii) $43 million in Letter of Credit Loans (approximately 4% of the Letter of Credit Loans outstanding prior to the 2011 Transactions) in October 2014.

82.     The Debtors hired restructuring advisors in July of 2012.  In October 2012, the
EFH Executive Committee met to discuss "███████████████████████████" and
a "████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████." 

83.     The minutes of the joint Board meetings on October 25 and 26, 2012 of the TCEH
and EFCH Boards reflect discussion of "███████████████████████████"
including "█████████████████████████████████████."  At the
contemporaneous meeting of EFH's Board of Directors on October 26, 2012, Mr. Keglevic also
discussed "████████████████████." 

### 2.     Late 2012: The Pace Quickens

84.     By late 2012, the Debtors' situation was dire and a bankruptcy filing was
inevitable.  According to D&P's December 2012 goodwill impairment report, the fair market
value of the TCEH Group's assets had plunged yet again during 2012 to approximately ███
███.  This occurred while the TCEH Group's total liabilities had increased to over ███████,
implying that the TCEH Group's equity value was now negative by almost █████████ (the third
straight multi-billion dollar equity value decline year-over-year).  The trend line was clear and
there was no conceivable way to fill the insolvency gap of █████████ and growing.

85.     At a December 13, 2012 meeting of the EFH Executive Committee, John F.
Young, President and Chief Executive Officer of EFH, "████████████████████████
████████████████████████████████████████████████████
█████"  However, the meeting minutes note "███████████████████████████
██████████████████████ and discuss ██████████████████████████
███████████████████████████."

86.    Upon information and belief, the TCEH Debtors believed they would be able to timely repay the $645 million of Revolving Loans due in 2013, but knew that after doing so, they would be unable to make timely interest and principal payments on their Term Loans and Letter of Credit Loans due in 2014.  Upon information and belief, the TCEH Debtors further believed that, ███████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████.

87.    However, upon information and belief, ████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

88.    ██████████████████████████████████████████████

█████████████████████████████████████████████████████ the

Debtors likely would have been forced to file for bankruptcy in or about April 2013.

### 3.    The Illusory Three-Year Maturity Extension

89.    To ██████████████████████████████████ postpone the inevitable bankruptcy filing in April 2013, the TCEH Debtors and Defendants entered into an illusory amendment to the Credit Agreement that ostensibly extended for three years the maturity date of

the remaining $645 million of non-extended Revolving Loans, but still left nearly $4 billion in First Lien Debt due in 2014.   The extension, however, provided no tangible benefit to the TCEH Debtors.

90.    On December 19, 2012, the Boards of EFH, EFCH, and TCEH provided unanimous written consent to amend the Credit Agreement and extend the maturities of the Revolving Loans from October 2013 to October 2016.  The amendment was dated January 4, 2013 (the "2013 Amendment").  Notably, the TCEH Debtors did not seek to amend the maturities of the Term Loans or Letter of Credit Loans maturing in 2014, notwithstanding Mr. Keglevic's comment at the EFH Board meeting that "████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████."

91.    Upon information and belief, neither the TCEH Debtors nor Defendants ever believed or intended that the purported three-year term of the extension would materialize, but instead simply sought ████████████████████████████████████ ████████████████████████████, so that they could continue to kick the proverbial can down the road into 2014, and thus have more "runway" to pursue a restructuring.  Conveniently, this extension also gave the Debtors and Defendants the comfort of maturities over six years after the closing of the October 2007 LBO.

92.    More time or not, upon information and belief, the TCEH Debtors knew that they would be forced to file for bankruptcy the following year based on their inability to pay the $3.8 billion in Term Loans and $43 million in Letter of Credit Loans maturing in 2014.  Throughout the process, the Debtors were also mindful of the need to keep Defendants informed and

involved in the process.  For example, on December 13, 2012, one week before the 2013

Amendment was agreed to, the EFH Board discussed "███████████████████████████

███████████████████████████████████████."

93.     For that one-year runway (cloaked as a three-year extension), TCEH paid

Defendants unprecedented fees to extend the maturity on $645 million of Revolving Loans,

including (i) a $340 million fee, structured as $0.5264 of Incremental Term Loans due October

2017 for each $1.00 of its revolving credit commitment extended (the "Fee Note"); (ii) a 100

basis point increase in the interest rate on the extended Revolving Loans (approximately $21

million from January 2013 through the Petition Date); and (iii) a 50 basis point fee increase in

the undrawn spread with respect to the extended Revolving Loans (approximately $9 million

from January 2013 through the Petition Date).

94.     Even when viewed as a three-year extension, the implied yield enhancement to

Defendants was an unprecedented 1,497 basis points on the extended Revolving Loans.

95.     But the fees for the 2013 Amendment cannot fairly be evaluated based on the

stated three-year term of the extension because that three-year term was illusory from the outset.

Viewed for what it really was—a one-year extension until the next year's audit opinion and an

opportunity to extract more value for the lenders—the secured Fee Note (plus interest) provided

yield enhancement to Defendants of a staggering 5,700 basis points, or 57% of the extended

Revolving Loans.

96.     Moreover, the structure of the 2013 Amendment fees shows that Defendants knew

the purported three-year extension was illusory.  Generally, fees are structured primarily as an

increased interest rate to be paid over the remaining life of the loan; here, however, Defendants

insisted that fees be paid in the form of the secured Fee Note.  The effect of this unusual fee

structure was that Defendants would receive additional interest payments, significantly larger secured claims and adequate protection payments in the TCEH Debtors' bankruptcy cases.

97.    In exchange for this 57% fee, Defendants gave the TCEH Debtors just one year of "runway" because all of the parties knew that the TCEH Debtors would not be able to survive with their existing debt load for the long term.  From the lenders' perspective, there were two possibilities at the end of 2012: (i) an imminent bankruptcy filing in April 2013 that would leave them with a secured claim based on the $645 million Revolving Loans, plus adequate protection payments; *or* (ii) an illusory maturity extension under which Defendants would (a) with respect to the $645 million in Revolving Loans, continue to be paid interest prepetition at an increased rate as well as postpetition adequate protection payments, plus maintain a secured claim in the Debtors' bankruptcy cases, and (b) with respect to the $340 million Fee Note, be paid interest prepetition as well as postpetition adequate protection payments,  plus maintain a purportedly secured claim in the TCEH Debtors' bankruptcy cases.  It is not surprising that Defendants insisted on the latter.

98.    The one-year runway, even if it had some value to the TCEH Debtors, was not close to reasonably equivalent value to the $340 million in fees TCEH paid to Defendants, the approximately $30 million of incremental interest TCEH paid to Defendants from January 2013 through the Petition Date, and Defendants' improvement in structural position in bankruptcy.  In addition, the TCEH Debtors were indisputably insolvent at the time of the 2013 Amendment.

### D.    Debtors' Use of Unencumbered Cash

99.    Shortly before the Petition Date, Defendants also received preferential transfers, as described below.

100.    In November 2012, TCEH implemented an accounts receivable securitization program (the "AR Program"), pursuant to which, as permitted by the Credit Agreement and

related documents, Debtor TXU Energy Retail Company LLC (a direct, wholly-owned subsidiary of TCEH, "TXU Energy"), a guarantor under the Credit Agreement, sold its trade accounts receivable to Debtor TXU Energy Receivables Company LLC (upon information and belief, a bankruptcy-remote, special purpose entity wholly owned by TCEH, "TXU Energy Receivables"), which is not a guarantor under the Credit Agreement. Due to this transfer, the accounts receivable became unencumbered assets that were no longer encumbered by the lenders' security interests.

101.    TXU Energy Receivables then used the purchased accounts receivable as collateral to borrow funds from a third-party lender.

102.    In October 2013, TCEH terminated the AR Program, and TXU Energy paid TXU Energy Receivables $474 million in exchange for $491 million in accounts receivable.

103.    With the proceeds, TXU Energy Receivables repaid its loan to the third-party lender and its subordinated note payable to TXU Energy ████████████████████

████████████████████████████████████████████████████████████████

████████ (the "TCEH JPM Unencumbered Account"). The Debtors identify this account in the *Motion to Maintain Bank Accounts (Motion of Energy Future Holdings Corp., et al., for Entry of an Order (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Forms, and (III) Continue Using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions and Netting of Intercompany Claims; and (C) Granting PostPetition Intercompany Claims Administrative Expense Priority* [Dkt. No. 37] (the "Cash Management Motion") as "General Fund/AR Closure."

104.    On February 19, 2014, TXU Energy Receivables 

████████████████████████████████.

105.    Also in February 2014, ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████ (the "TCEH Main Account").  The Debtors identify this account in the Cash

Management Motion as "General Fund/Debt Related Activity."  While the Debtors indicate in

the Cash Management Motion that the TCEH JPM Unencumbered Account and the Segregated

Cash account (defined below) are not part of the prepetition collateral securing the First Lien

Debt, the Debtors did not so indicate with respect to the TCEH Main Account, thereby implying

that this account is part of the prepetition collateral securing the First Lien Debt.

106.    Upon information and belief, the TCEH Main Account was used to fund certain

expenses, including a substantial portion of the approximately $216 million in interest payments

to Defendants on or about February 10, 2014.

107.    ████████████████████████████████

████████████████████████████████████████

████████    On March 17, 2014, ████████████████████████

████████████████████████████ (the "Segregated Cash").

The Debtors identify this account in the Cash Management Motion as the "Unencumbered Cash

Account."   The Debtors admit in the Cash Collateral Order that the Segregated Cash is

unencumbered.  (Cash Collateral Order ¶ F(i)(e)).

## COUNT I

### AVOIDANCE OF ANY LIEN, SECURITY INTEREST, OR OBLIGATION ARISING OUT OF THE CREDIT AGREEMENT (CONSTRUCTIVE FRAUDULENT CONVEYANCE) (11 U.S.C. §§ 544, 550, 551 and DEL. CODE ANN. TIT. 6, §§ 1304, 1305, 1307)

108.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

109.    Pursuant to Section 544(b)(1) of the Bankruptcy Code and the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."

110.    Upon information and belief, for tax year ▋▋, the Debtors ▋▋▋▋▋▋ the IRS that the Debtors are responsible for certain taxes and interest, which results in sums due and owing for tax year ▋▋.  Upon further information and belief, to date, those sums remain outstanding.  As a result, the IRS would have a claim, both at the time of the LBO and as of the Petition Date, against those Debtors who were corporate members of the EFH consolidated tax group in ▋▋.  The IRS filed proofs of claim against certain Debtor entities for outstanding corporate taxes related to tax year 2006.

111.    Section 1307(a)(1) of title 6 of the Delaware Code provides that a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."

112.    Section 1304(a)(2) of title 6 of the Delaware Code provides that a transfer is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining

assets of the debtor were unreasonably small in relation to the business or transaction; or (b)

intended to incur, or believed or reasonably should have believed that the debtor would incur,

debts beyond the debtor's ability to pay as they became due."

113.    Section 1305(a) of title 6 of the Delaware Code provides that a transfer is

fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) if the debtor

"made the transfer or incurred the obligation without receiving a reasonably equivalent value in

exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor

became insolvent as a result of the transfer or obligation."

114.    Pursuant to the terms of the Credit Agreement, the TCEH Debtors granted

Defendant First Lien Collateral Agent first priority liens and security interests on the Collateral

(as defined in the Credit Agreement) on account of the TCEH Debtors' obligations under the

Credit Agreement.

115.    The TCEH Debtors neither received reasonably equivalent value in exchange for

these transfers nor any meaningful benefit from the LBO because the amount of the proceeds

from the Credit Agreement that the TCEH Debtors were entitled to utilize following the LBO

was insignificant as compared to the sums for which they were obligated to repay the

Defendants.  The TCEH Debtors hardly received the benefit of the loan proceeds.  The majority

of those loan proceeds (*i.e.*, ▮▮▮▮▮) were transferred by TCEH to Merger Sub for no

consideration to fund the purchase price consideration ultimately paid to existing shareholders to

acquire their TXU Corp. interests.  An additional ▮▮▮▮▮ was used to repay pre-existing

long-term notes and short-term credit facilities for which only TCEH, and in some cases, TXU

Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC), were borrowers.

Approximately $1.25 billion was placed into a restricted cash account, available as support for

Letters of Credit that may be issued under the Credit Agreement by EFH and certain of its

subsidiaries (this amount was subsequently reduced to approximately $1 billion).  Approximately

███████████ was used to pay certain of the LBO debt financing fees, and the remaining ███

███ was transferred to EFH.

116.    Ultimately, the LBO over-levered the TCEH Group's capital structure and

rendered it insolvent.

117.    The liens, security interests, and obligations associated with the Credit Agreement

should be avoided pursuant to section 544(b)(1) of the Bankruptcy Code and sections 1304(a)(2),

1305(a),  and 1307(a)(1) of title 6 of the Delaware Code and recovered by the Debtors' estates

pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit

of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## COUNT II

### AVOIDANCE AND RECOVERY OF FEES AND INCREMENTAL INTEREST PAID IN CONNECTION WITH THE 2011 TRANSACTIONS (CONSTRUCTIVE FRAUDULENT CONVEYANCE) (11 U.S.C. §§ 544, 550, and DEL. CODE ANN. TIT. 6, §§ 1304, 1305, 1307)

118.    The Committee restates and realleges the allegations contained in paragraphs 1

through [__] above, as if fully set forth herein.

119.    Pursuant to Section 544(b)(1) of the Bankruptcy Code and the Standing Order, the

Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) "may avoid

any transfer of an interest of the debtor in property or any obligation incurred by the debtor that

is voidable under applicable law by a creditor holding an unsecured claim . . . ."

120.    Section 1307(a)(1) of title 6 of the Delaware Code provides that a creditor may

obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's

claim."

121.    Section 1304(a)(2) of title 6 of the Delaware Code provides that a transfer is fraudulent as to a creditor if the debtor made the transfer or obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

122.    Section 1305(a) of title 6 of the Delaware Code provides that a transfer is fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) if the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

123.    In connection with the 2011 Transactions, which ultimately provided the TCEH Debtors with a *partial* extension of their maturity dates under the Credit Agreement, the TCEH Debtors paid to Defendants fees in the aggregate amount of over $800 million, plus over $530 million in incremental interest under the Credit Agreement, plus approximately $420 million in incremental interest on the First Lien Notes, as well as the approximately $330 million Prepayment Benefit (collectively, the "2011 Fees"), and did not receive reasonably equivalent value in exchange for these transfers.

124.    Each of the 2011 Transactions was, for the most part, dependent upon the occurrence of the other 2011 Transactions, and the TCEH Debtors viewed the 2011 Transactions as a single inter-related transaction.  Thus, the 2011 Transactions and the excessive 2011 Fees

were extracted by Defendants to accomplish the purported maturity date extensions that were, from the outset, illusory.

125.   At the time of the 2011 Transactions, each of the TCEH Debtors was indisputably insolvent, and the TCEH Debtors' board of directors and management knew that, following the 2011 Transactions, the TCEH Debtors would be unable to pay the outstanding debts as they became due.

126.   The 2011 Fees should be avoided pursuant to section 544(b)(1) of the Bankruptcy Code and Sections 1304(a)(2), 1305(a), and 1307(a)(1) of title 6 of the Delaware Code and recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code.

## COUNT III

**AVOIDANCE OF ANY LIEN, SECURITY INTEREST, OR OBLIGATION ARISING OUT OF THE ISSUANCE OF FIRST LIEN NOTES (CONSTRUCTIVE FRAUDULENT CONVEYANCE) (11 U.S.C. §§ 544, 550, 551, and DEL. CODE ANN. TIT. 6, §§ 1304, 1305, 1307)**

127.   The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

128.   Pursuant to Section 544(b)(1) of the Bankruptcy Code and the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."

129.   Section 1307(a)(1) of title 6 of the Delaware Code provides that a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."

130.   Section 1304(a)(2) of title 6 of the Delaware Code provides that a transfer is fraudulent as to a creditor if the debtor made the transfer or obligation "without receiving a

reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

131.    Section 1305(a) of title 6 of the Delaware Code provides that a transfer is fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) if the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

132.    In connection with the issuance of the First Lien Notes, the TCEH Debtors granted Defendant Indenture Trustee first priority liens and security interests, subject to the terms of the Indenture, the Security Agreement, and Collateral Agency and Intercreditor Agreement.

133.    The TCEH Debtors did not receive reasonably equivalent value in exchange for these transfers because certain Defendants required that the proceeds of the First Lien Notes issuance be used to pay the 2011 Fees, and for the reasons described herein, the TCEH Debtors did not receive any benefit from the 2011 Transactions and/or the payment of the 2011 Fees.

134.    None of the proceeds from the First Lien Notes issuance was retained by the TCEH Debtors for operating or other expenses. Instead, the proceeds of the First Lien Notes were used to (i) make the unnecessary and early prepayment of approximately $1.6 billion aggregate principal amount of loans under the Credit Agreement at par and (ii) pay approximately $150 million of fees, expenses, and transaction costs associated with the First Lien Notes issuance and the 2011 Transactions.

135.    At the time of the transfers, each of the TCEH Debtors was indisputably insolvent, and the TCEH Debtors' board of directors and management knew that, following the 2011 Transactions, the TCEH Debtors would be unable to pay the outstanding debts as they became due.

136.    The liens, security interests, and obligations associated with the First Lien Notes should be avoided pursuant to section 544(b)(1) of the Bankruptcy Code and Sections 1304(a)(2), 1305(a), and 1307(a)(1) of title 6 of the Delaware Code and recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

<u>COUNT IV</u>

**AVOIDANCE AND RECOVERY OF FEES AND INCREMENTAL INTEREST PAID IN CONNECTION WITH THE 2013 AMENDMENT (ACTUAL FRAUDULENT CONVEYANCE) (11 U.S.C. §§ 544, 548(A)(1)(A), 550, and DEL. CODE ANN. TIT. 6, §§ 1304, 1307)**

137.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

138.    Pursuant to section 548(a)(1)(A) of the Bankruptcy Code and the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) may avoid a transfer made on or within two years prior to the petition date if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

139.    Pursuant to section 544(b)(1) of the Bankruptcy Code and the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) "may avoid

any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."

140.    Section 1307(a)(1) of title 6 of the Delaware Code provides that a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."  Section 1304(a)(1) of title 6 of the Delaware Code provides that a fraudulent transfer is one that was made by the debtor "with actual intent to hinder, delay or defraud any creditor of the debtor."

141.    In connection with the 2013 Amendment, the TCEH Debtors paid Defendants unprecedented fees to extend the maturity date on $645 million of Revolving Loans, including (i) the Fee Note of $340 million; (ii) a 100 basis point increase in the interest rates on the extended Revolving Loans; and (iii) a 50 basis point undrawn spread increase with respect to extended Revolving Loans (collectively, the "2013 Fees").

142.    The TCEH Debtors did not receive reasonably equivalent value in exchange for these transfers.

143.    The excessive 2013 Fees were extracted by Defendants to accomplish an illusory maturity date extension and to increase their secured claim in the TCEH Debtors' certain and imminent bankruptcy proceeding.

144.    Upon information and belief, at or around the time of the 2013 Amendment, the TCEH Debtors' board of directors and management, as well as Defendants and the TCEH first lien lenders, knew that the TCEH Debtors would need to file for bankruptcy prior to the earliest extended maturity date under the Credit Agreement.

145.    At the time of the 2013 Amendment, each of the TCEH Debtors was indisputably insolvent, and the TCEH Debtors' board of directors and management, as well as Defendants and

the TCEH first lien lenders, knew that the TCEH Debtors would be unable to pay the outstanding

debts as they became due.

146.    The 2013 Fees should be avoided pursuant to sections 544(b)(1) and 548(a)(1)(A)

of the Bankruptcy Code and Sections 1304(a)(1) and 1307(a)(1) of title 6 of the Delaware Code

and recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code.

## COUNT V

**AVOIDANCE AND RECOVERY OF FEES AND INCREMENTAL
INTEREST PAID IN CONNECTION WITH THE 2013 AMENDMENT
(CONSTRUCTIVE FRAUDULENT CONVEYANCE)
(11 U.S.C. §§ 544, 548(A)(1)(B), 550, and DEL. CODE ANN. TIT. 6, §§ 1304,
1305, 1307)**

147.    The Committee restates and realleges the allegations contained in paragraphs 1

through [__] above, as if fully set forth herein.

148.    Pursuant to section 548(a)(1)(B) of the Bankruptcy Code and the Standing Order,

the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) may

avoid a transfer made on or within two years prior to the petition date if two requirements are

met: (1) the debtor must have received less than reasonably equivalent value for the transfer; and

(2) the plaintiff must show that the debtor either (i) was insolvent on the date of the transfer or

became insolvent as a result of the transfer; or (ii) was engaged in, or about to engage in, a

business transaction for which any property remaining with the debtor was an unreasonably

small capital; or (iii) the debtor intended to incur or believed it would incur debts beyond its

ability to pay when those debts matured.

149.    Pursuant to section 544(b)(1) of the Bankruptcy Code and the Standing Order, the

Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) "may avoid

any transfer of an interest of the debtor in property or any obligation incurred by the debtor that

is voidable under applicable law by a creditor holding an unsecured claim . . . ."

150.    Section 1307(a)(1) of title 6 of the Delaware Code provides that a creditor may

obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's

claim."

151.    Section 1304(a)(2) of title 6 of the Delaware Code provides that a transfer is

fraudulent as to a creditor if the debtor made the transfer or obligation "without receiving a

reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was

engaged or was about to engage in a business or a transaction for which the remaining assets of

the debtor were unreasonably small in relation to the business or transaction; or (b)  intended to

incur, or believed or reasonably should have believed that the debtor would incur, debts beyond

the debtor's ability to pay as they became due."

152.    Section 1305(a) of title 6 of the Delaware Code provides that a transfer is

fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) if the debtor

"made the transfer or incurred the obligation without receiving a reasonably equivalent value in

exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor

became insolvent as a result of the transfer or obligation."

153.    In connection with the 2013 Amendment, the TCEH Debtors paid Defendants the

2013 Fees to extend the maturity on $645 million of Revolving Loans, and the TCEH Debtors

did not receive reasonably equivalent value in exchange for these transfers.

154.    The excessive 2013 Fees were extracted by Defendants to accomplish an illusory

maturity date extension and to increase their secured claim in the TCEH Debtors' certain and

imminent bankruptcy proceeding.  At the time of the 2013 Amendment, each of the TCEH

Debtors was indisputably insolvent, and the TCEH Debtors' board of directors and management,

as well as Defendants and the TCEH first lien lenders, knew that the TCEH Debtors would be unable to pay the outstanding debts as they became due.

155.    The 2013 Fees should be avoided pursuant to sections 544(b)(1) and 548(a)(1)(B) of the Bankruptcy Code and Sections 1304(a)(2), 1305(a), and 1307(a)(1) of title 6 of the Delaware Code and recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code.

## COUNT VI

### AVOIDANCE OF ANY LIEN, SECURITY INTEREST, OR OBLIGATION ARISING OUT OF THE 2013 AMENDMENT (ACTUAL FRAUDULENT CONVEYANCE) (11 U.S.C. §§ 544, 548(A)(1)(A), 550, 551, and DEL. CODE ANN. TIT. 6, §§ 1304, 1305, 1307)

156.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

157.    Pursuant to section 548(a)(1)(A) of the Bankruptcy Code and the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) may avoid a transfer made on or within two years prior to the petition date if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

158.    Pursuant to section 544(b)(1) of the Bankruptcy Code and the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."

159.    Section 1307(a)(1) of title 6 of the Delaware Code provides that a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's

claim." Section 1304(a)(1) of title 6 of the Delaware Code provides that a fraudulent transfer is one that was made by the debtor "with actual intent to hinder, delay or defraud any creditor of the debtor."

160.    In connection with the 2013 Amendment, the TCEH Debtors issued the Fee Note to Defendants and granted Defendants a first priority lien and security interest to secure the repayment of the Fee Note. The TCEH Debtors did not receive reasonably equivalent value in exchange for the transfer and obligation.

161.    The excessive Fee Note was demanded by Defendants to accomplish an illusory maturity date extension and to increase their secured claim in the TCEH Debtors' certain and imminent bankruptcy proceeding.

162.    Upon information and belief, at or around the time of the 2013 Amendment, the TCEH Debtors' board of directors and management, as well as Defendants and the TCEH first lien lenders, knew that the TCEH Debtors would need to file for bankruptcy prior to the earliest extended maturity date under the Credit Agreement.

163.    At the time of the 2013 Amendment, each of the TCEH Debtors was indisputably insolvent, and the TCEH Debtors' board of directors and management, as well as Defendants and the TCEH first lien lenders, knew that the TCEH Debtors would be unable to pay the outstanding debts as they became due.

164.    The liens, obligations, and security interests associated with the Fee Note should be avoided pursuant to sections 544(b)(1) and 548(a)(1)(A) of the Bankruptcy Code and Sections 1304(a)(1), 1305(a), and 1307(a)(1) of title 6 of the Delaware Code and recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

<u>COUNT VII</u>

**AVOIDANCE OF ANY LIEN, SECURITY INTEREST, OR**
**OBLIGATION ARISING OUT OF THE 2013 AMENDMENT**
**(CONSTRUCTIVE FRAUDULENT CONVEYANCE)**
**(11 U.S.C. §§ 544, 548(A)(1)(B), 550, 551, and DEL. CODE ANN. TIT. 6,**
**§§ 1304, 1305, 1307)**

165.    The Committee restates and realleges the allegations contained in paragraphs 1

through [___] above, as if fully set forth herein.

166.    Pursuant to section 548(a)(1)(B) of the Bankruptcy Code and the Standing Order,

the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) may

avoid a transfer made on or within two years prior to the petition date if two requirements are

met: (1) the debtor must have received less than reasonably equivalent value for the transfer; and

(2) the plaintiff must show that the debtor either (i) was insolvent on the date of the transfer or

became insolvent as a result of the transfer; or (ii) was engaged in, or about to engage in, a

business transaction for which any property remaining with the debtor was an unreasonably

small capital; or (iii) the debtor intended to incur or believed it would incur debts beyond its

ability to pay when those debts matured.

167.    Pursuant to section 544(b)(1) of the Bankruptcy Code and the Standing Order, the

Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) "may avoid

any transfer of an interest of the debtor in property or any obligation incurred by the debtor that

is voidable under applicable law by a creditor holding an unsecured claim . . . ."

168.    Section 1307(a)(1) of title 6 of the Delaware Code provides that a creditor may

obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's

claim."

169.    Section 1304(a)(2) of title 6 of the Delaware Code provides that a transfer is

fraudulent as to a creditor if the debtor made the transfer or obligation "without receiving a

reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

170.    Section 1305(a) of title 6 of the Delaware Code provides that a transfer is fraudulent as to present creditors (*i.e.*, those whose claim arose before the transfer) if the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

171.    In connection with the 2013 Amendment, the TCEH Debtors issued the Fee Note to Defendants and granted Defendants a first priority lien and security interest to secure the repayment of the Fee Note.  The TCEH Debtors did not receive reasonably equivalent value in exchange for the transfer and obligation.

172.    The excessive Fee Note was demanded by Defendants to accomplish an illusory maturity date extension and to increase their secured claim in the TCEH Debtors' certain and imminent bankruptcy proceeding.

173.    At the time of the 2013 Amendment, each of the TCEH Debtors was indisputably insolvent, and the TCEH Debtors' board of directors and management, as well as Defendants and the TCEH first lien lenders, knew that the TCEH Debtors would be unable to pay the outstanding debts as they became due.

174.    The liens, obligations and security interests associated with the Fee Note should be avoided pursuant to sections 544(b)(1) and 548(a)(1)(B) of the Bankruptcy Code and Sections

1304(a)(2), 1305(a), and 1307(a)(1) of title 6 of the Delaware Code and recovered by the

Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically

preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## COUNT VIII

### EQUITABLE SUBORDINATION OF CLAIMS
### (11 U.S.C. §§ 105, 502, 510, and Bankruptcy Rule 7001)

175.    The Committee restates and realleges the allegations contained in paragraphs 1

through [__] above, as if fully set forth herein.

176.    Defendants engaged in inequitable conduct beginning in 2007 and continuing

through the Petition Date, as described further herein, which resulted in Defendants extracting

from the TCEH Debtors: (i) liens, security interests, and obligations under the Credit Agreement,

the First Lien Notes, and the Fee Note, (ii) fees, incremental interest, and the Prepayment Benefit

paid in connection with the 2011 Transactions and the 2013 Amendment, (iii) intangible benefits

relating to (a) par prepayment of loans when not required and when trading on the secondary

market at a discount, and (b) ██████████████████████████████████████

██, (iv) preferential transfers of unencumbered cash at a time when the Debtors and Defendants

were negotiating the terms of a plan restructuring agreement, (v) illusory maturity extensions to

carry the lenders beyond the four and six year look back periods for fraudulent conveyances

under Delaware, Texas, and New York state law, and (vi) an alleged position senior to any tax

claim that would arise upon a taxable disposition of the assets.

177.    Defendants' inequitable conduct resulted in injury to the creditors of the TCEH

Debtors, all while conferring an unfair advantage upon Defendants.

178.    Under the Cash Collateral Order, Defendants are excused from filing proofs of claim for the First Lien Debt obligations because the Debtors' stipulations are deemed to constitute a properly filed proof of claim.

179.    Equitable subordination of Defendants' claims is consistent with the provisions of the Bankruptcy Code and related case law.  Defendants' claims, if subordinated to other creditors of the TCEH Debtors, will be afforded full payment over time (subject to claim allowance) but at a level of priority junior to other creditors of the TCEH Debtors.  Such subordination will permit the TCEH Debtors and other parties in interest to pursue a reorganization plan for the TCEH Debtors that will be in all parties' best interests.

180.    For the foregoing reasons, Defendants' claims are therefore subject to subordination to the allowed claims of unsecured creditors and interests of preferred stockholders for purposes of distribution under section 510(b) of the Bankruptcy Code.

## COUNT IX

### OBJECTION TO ALLOWANCE OF CLAIMS DUE TO INCLUSION OF UNMATURED INTEREST
### (11 U.S.C. §§ 105, 502, and 506 and Bankruptcy Rules 3007, 3012, and 7001)

181.    The Committee restates and realleges the allegations contained in paragraphs 1 through [___] above, as if fully set forth herein.

182.    Under the Cash Collateral Order, the TCEH Debtors have stipulated that, as of the Petition Date, the First Lien Notes are outstanding "in the aggregate principal amount of $1,750,000,000 plus accrued and unpaid interest with respect thereto (which as of the Petition Date was $65,965,278) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimburseable under the First Lien Notes Indenture) and all other Obligations (as defined in the

First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture"

(collectively, the "Notes Obligations").  (*See* Cash Collateral Order ¶ F(i)(b)).

183.    The Committee disputes such stipulation to the extent claims for unmatured

interest are included within the principal amount of the Notes Obligations.  Upon information

and belief, the stipulated face amount outstanding of the First Lien Notes and, thus, the Notes

Obligations, include approximately $12 million of claims for original issue discount.  As of the

Petition Date, the unaccreted original issue discount was approximately $8 million.

184.    Under section 502(b)(2) of the Bankruptcy Code, if an objection is made to a

claim, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of

the date of the filing of the petition, and shall allow such claim in such amount, except to the

extent that . . . (2) such claim is for unmatured interest."

185.    Such unaccreted original issue discount constitutes "unmatured interest" under

section 502(b)(2) of the Bankruptcy Code.   Pursuant to section 506(b) of the Bankruptcy Code,

"[t]o the extent that an allowed secured claim is secured by property the value of which . . . is

greater than the amount of such claim, there shall be allowed to the holder of such claim, interest

on such claim, and any reasonable fees, costs, or charges provided for under the agreement or

State statute under which such claim arose."

186.    The Committee hereby objects, pursuant to sections 105, 502, and 506 of the

Bankruptcy Code, to the allowance of the Notes Obligations to the extent (i) it is determined by

this Court that the holders of First Lien Notes were undersecured creditors as of the Petition

Date, and (ii) the Notes Obligations include unmatured interest.

187.    Pursuant to the applicable provisions of the Bankruptcy Code, including, without limitation, section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each of the claims of Defendants should be disallowed to the extent such claims include unmatured interest.

### COUNT X

**RECHARACTERIZATION OF PAYMENT OF
FEES, COSTS AND EXPENSES
(11 U.S.C. § 506)**

188.    The Committee restates and realleges the allegations contained in paragraphs 1 through [___] above, as if fully set forth herein.

189.    Under section 506(b) of the Bankruptcy Code, "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

190.    Only oversecured creditors, and not undersecured creditors, are entitled to receive such costs, fees, and related payments.

191.    The Restructuring Support Agreement entered into by the Debtors and certain consenting Prepetition First Lien Creditors (as defined in the Cash Collateral Order) effectively acknowledged that the TCEH First Lien Debt was undersecured.  For example, the Amended and Restated Term Sheet provided that holders of the TCEH First Lien Secured Claims would receive "their Pro Rata share of (i) 100% of the Reorganized TCEH Common Stock, subject to dilution only by the Reorganized TCEH Management Incentive Plan; and (ii) 100% of the net cash proceeds from the issuance of the New Reorganized TCEH Debt" and, in addition, the "Holders of General Unsecured Claims Against the TCEH Debtors (*which shall include TCEH First Lien Deficiency Claims, TCEH Second Lien Note Claims, and TCEH Unsecured Note*

*Claims*) will receive their Pro Rata share of the TCEH Unsecured Claim Fund." *See* Amended and Restated Restructuring Term Sheet (attached to Exhibit A to Dkt. No. 505, *Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement and Modifying the Automatic Stay*). Further, consistent with the plan contemplated by the Restructuring Support Agreement, the Debtors filed a Pre-Submission Memorandum estimating TCEH's enterprise value at $18 billion, which is less than the balance of the secured claim asserted by the Prepetition First Lien Creditors.

192. Under the Cash Collateral Order, Defendants are receiving monthly adequate protection payments in an amount "determined by applying a per annum rate equal to the LIBOR Rate (as defined in the DIP Credit Agreement) + 450 basis points to the aggregate outstanding amount of the Prepetition First Lien Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date," with each Defendant receiving their ratable share of the aggregate amount. (*See* Cash Collateral Order ¶ 5(d)). The Committee understands that the aggregate amount of the adequate protection payments exceeds $100 million on a monthly basis.

193. Under the Cash Collateral Order, the right to recharacterize adequate protection payments to Defendants was expressly preserved. *Id.*

194. To the extent the Court determines at any time that Defendants are undersecured creditors, any adequate protection payments made to Defendants during these chapter 11 cases must be recharacterized as payments of principal on the First Lien Debt.

## COUNT XI

### AVOIDANCE OF CERTAIN AMOUNTS TRANSFERRED FOR THE BENEFIT OF DEFENDANTS DURING THE PREFERENCE PERIOD
### (11 U.S.C. §§ 547, 550, 551)

195.    The Committee restates and realleges the allegations contained in paragraphs 1

through [___] above, as if fully set forth herein.

196.    Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an

interest in property of the debtor's estate if the following conditions have been met: (a) the

transfer was made to or for the benefit of a creditor; (b) the transfer was for or on account of an

antecedent debt; (c) the transfer was made while the debtor was insolvent; (d) the transfer was

made within the 90 days prior to the petition date; and (e) the transfer enabled the creditor to

receive more in a chapter 7 liquidation than it would receive had the transfer not been made.

197.    Upon information and belief, ███████████████████████████████████

████████████████████████████████████████████████████████████ (the

"Preference Assets").

198.    The Preference Assets were transferred ███████████████ for the benefit

of Defendants on account of the TCEH Debtors' obligations under the First Lien Debt.

199.    Each of the TCEH Debtors was insolvent at all times during the 90 days prior to

the Petition Date.

200.    Upon information and belief, the addition of the Preference Assets ███████

████████ reduced the amount by which Defendants were undersecured, thereby allowing

Defendants to receive more than they would in a hypothetical chapter 7 liquidation had the

Preference Assets not been added ██████████████████.

201.    The transfers of the Preference Assets were transfers made on or within 90 days

before the Petition Date.

202.    The liens on and security interests in the Preference Assets should be avoided

pursuant to section 547 of the Bankruptcy Code, and such property or the value of such property

if previously transferred should be recovered by the Debtors' estates pursuant to section 550(a)

of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates

pursuant to section 551 of the Bankruptcy Code.

## COUNT XII

### AVOIDANCE OF CERTAIN AMOUNTS PAID TO DEFENDANTS DURING THE PREFERENCE PERIOD
### (11 U.S.C. §§ 547, 550, 551)

203.    The Committee restates and realleges the allegations contained in paragraphs 1

through [__] above, as if fully set forth herein.

204.    Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an

interest in property of the debtor's estate if the following conditions have been met: (a) the

transfer was made to or for the benefit of a creditor; (b) the transfer was for or on account of an

antecedent debt; (c) the transfer was made while the debtor was insolvent; (d) the transfer was

made within the 90 days prior to the petition date; and (e) the transfer enabled the creditor to

receive more in a chapter 7 liquidation than it would receive had the transfer not been made.

205.    Upon information and belief, the TCEH Debtors made interest payments to

Defendants in the aggregate amount of approximately $216 million during the 90 days prior to

the Petition Date (the "Preference Payments").

206.    The Preference Payments were made to Defendants on account of the TCEH

Debtors' obligations under the First Lien Debt.

207.    Each of the TCEH Debtors was insolvent at all times during the 90 days prior to

the Petition Date.

208.    Upon information and belief, the Preference Payments allowed Defendants to receive more than they would in a hypothetical chapter 7 liquidation had the TCEH Debtors not made the Preference Payments.

209.    Each of the Preference Payments was a transfer made on or within 90 days before the Petition Date.

210.    The Preference Payments should be avoided pursuant to section 547 of the Bankruptcy Code, and such property or the value of such property if previously transferred should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## COUNT XIII

### OBJECTION TO CLAIMS
### (11 U.S.C. §§ 105, 502, 506, 544, 547, AND 551 and
### Bankruptcy Rules 3007, 3012, and 7001)

211.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

212.    The TCEH Debtors' stipulations specifically state in paragraph F(i)(a) of the Cash Collateral Order that:

> As of the Petition Date, the TCEH Debtors were truly and justly indebted to the First Lien Lenders pursuant to the First Lien Credit Agreement, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of $22,635,987,924 plus accrued and unpaid interest with respect thereto (which, as of the Petition Date, was $227,283,333) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees, expenses, and indemnities that are chargeable or reimbursable under the First Lien Credit Agreement) and all other Obligations (as defined in the First Lien Credit Agreement) owing under or in connection with the First Lien Credit Agreement, including, without limitation, any and all obligations owing to the First Lien Credit Agent (as defined below).

213.    In addition, the TCEH Debtors have stipulated in paragraph F(i)(b) of the Cash Collateral Order that, as of the Petition Date, the First Lien Notes are outstanding "in the aggregate principal amount of $1,750,000,000 plus accrued and unpaid interest with respect thereto (which as of the Petition Date was $65,965,278) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimburseable under the First Lien Notes Indenture) and all other Obligations (as defined in the First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture."

214.    Under paragraph 23 of the Cash Collateral Order, Defendants are excused from filing proofs of claim for the First Lien Debt obligations because the Debtors' stipulations are deemed to constitute a properly filed proof of claim.

215.    The Committee hereby objects, pursuant to sections 105, 502, 506, 544, 547 and 551 of the Bankruptcy Code, to the allowance of Defendants' claims.

216.    Pursuant to the applicable provisions of the Bankruptcy Code, including, without limitation, section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each of the lenders' claims should be disallowed until such time as the Committee's claims asserted herein have been finally resolved.

217.    The Committee further seeks a determination of the amount of Defendants' allowed claim under section 502(b) of the Bankruptcy Code.

**OBJECTION TO CLAIMS**
**(11 U.S.C. §§ 105, 502, 506, and**
**Bankruptcy Rules 3007, 3012, and 7001)**

218.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

219.     Under section 502(b)(1) of the Bankruptcy Code, if an objection is made to a

claim, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of

the date of the filing of the petition, and shall allow such claim in such amount, except to the

extent that . . . (1) such claim is unenforceable against the debtor and property of the debtor,

under any agreement or applicable law for a reason other than because such claim is contingent

or unmatured."

220.     Under the Cash Collateral Order, Defendants are excused from filing proofs of

claim for the First Lien Debt obligations because the Debtors' stipulations are deemed to

constitute a properly filed proof of claim.

221.     The Committee hereby objects, pursuant to sections 105, 502, and 506 of the

Bankruptcy Code, to the allowance of Defendants' claims in the amounts set forth in the

Debtors' stipulations.

222.     Paragraph 2(b) of each of the Guarantees signed by each of the Guarantors

provides that:

> Anything herein or in any other Credit Document to the contrary notwithstanding,
> the maximum liability of each Guarantor hereunder and under the other Credit
> Documents shall in no event exceed the amount that can be guaranteed by such
> Guarantor under the Bankruptcy Code or any applicable laws relating to
> fraudulent conveyances, fraudulent transfers or the insolvency of debtors.

223.     Thus, to the extent the Court determines not to avoid the obligations arising out of

the Credit Agreement, the Committee requests that the Court limit the claims of the First Lien

Transferees against each of the Guarantors in accordance with paragraph 2(b) of the Guarantees.

224.     Pursuant to the applicable provisions of the Bankruptcy Code, including, without

limitation, section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each of the lenders'

claims should be limited in accordance with paragraph 2(b) of the Guarantees.

## COUNT XIV

### DECLARATORY JUDGMENT THAT
### RABBI TRUST FUNDS ARE UNENCUMBERED

225.    The Committee restates and realleges the allegations contained in paragraphs 1 through [___] above, as if fully set forth herein.

226.    Debtor EFH, which is not an obligor under the First Lien Debt, owns certain rabbi trusts, which contain assets consisting of cash, fixed income securities, and variable life insurance contracts.

227.    Pursuant to the applicable rabbi trust agreements, if EFH or any of the Participating Employers (as identified in the EFH Second Supplemental Retirement Plan) are insolvent, then the assets in the rabbi trusts are available for the benefit of general creditors of EFH and the Participating Employers, respectively.

228.    The Committee asserts that Defendants do not have security interests in or liens (either perfected or unperfected) on the rabbi trust assets and seeks a declaratory judgment that the rabbi trust assets are subject only to the claims of the unsecured creditors of EFH and Participating Employers.

229.    The TCEH Debtors' stipulations specifically state in paragraph F(i)(e) of the Cash Collateral Order that "[t]he Prepetition First Lien Obligations are secured by first priority security interests in and liens on (the 'Prepetition First Priority Liens') the 'Collateral,' as defined in the First Lien Credit Agreement (the 'Prepetition Collateral'), including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the 'Cash Collateral')."

230.    The TCEH Debtors' stipulations will be binding on all parties in interest, including the Committee, unless the Committee files a Challenge before the Challenge Deadline.

231.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and Defendants concerning whether Defendants have valid or perfected liens on or security interests in the rabbi trust assets.

232.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' stipulations to the contrary, none of Defendants has a lien on or security interest in any of the rabbi trust assets.

**COUNT XV**

**DECLARATORY JUDGMENT THAT
CERTAIN DEPOSIT ACCOUNTS ARE UNENCUMBERED
(DEL. CODE ANN. TIT. 6, §§ 9-104, 9-312)**

233.    The Committee restates and realleges the allegations contained in paragraphs 1 through [___] above, as if fully set forth herein.

**Accounts**

234.    The definition of "Collateral" under section 2 of the Security Agreement includes "all Accounts," but it explicitly excludes "assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account)."

235.    Pursuant to Sections 9-104 and 9-312(b) of the UCC and Delaware/Texas Code, a security interest in a deposit account is perfected only by "control" of the collateral by the secured party, which means that the secured party generally must also (i) be the depositary bank, (ii) have a valid control agreement with the depositary bank and the debtor, or (iii) become the depositary bank's customer with respect to the deposit account.

236.    Because Wilmington Trust, N.A. ("Wilmington") is the First Lien Collateral Agent, perfection of any security interest in a deposit account maintained at any bank or institution other than Wilmington would require a control agreement.

237.     Because section 2 of the Security Agreement provides that all accounts (other than the Deposit L/C Loan Collateral Account) maintained at any bank or institution other than Wilmington constitute excluded collateral, those deposit accounts are not subject to the liens or security interests of Defendants.

238.     Upon information and belief, **Schedule 1** to the Complaint is a list of deposit accounts identified by the Debtors in their schedules of assets and liabilities that are not held at Wilmington (the "Deposit Accounts").

239.     The Committee asserts that Defendants do not have security interests in or liens (either perfected or unperfected) on the Deposit Accounts because those assets are expressly excluded from the property on which liens or security interests are granted in the Security Agreement.

### Segregated Cash Account

240.     While the TCEH Debtors' stipulations specifically state in paragraph F(i)(e) of the Cash Collateral Order that "[a]s of the date hereof, all of the TCEH Debtors' cash, other than cash held in Account #:XXXX0559 at Union Bank, N.A. (such cash, the 'Segregated Cash'), constitutes Cash Collateral," Defendants explicitly reserved their right to assert that Segregated Cash constitutes Cash Collateral.

241.     The Cash Collateral Order provides that "Notwithstanding anything to the contrary contained herein, the Prepetition First Lien Creditors and TCEH Debtors reserve all rights, claims, and defenses with respect to the Segregated Cash, including as to whether such Segregated Cash constitutes Cash Collateral."  (Cash Collateral Order ¶ 10.)

242.     The Committee asserts that Defendants do not have security interests in or liens (either perfected or unperfected) on the Segregated Cash because those assets are expressly

excluded from the property on which liens or security interests are granted in the Security Agreement.

243.    The definition of "Collateral" under section 2 of the Security Agreement includes "all Accounts," but it explicitly excludes "assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account)."  Upon information and belief, the TCEH Debtors have not subsequently granted liens on or security interests in the Segregated Cash.

244.    Pursuant to Section 9-312(b) of the UCC and Delaware/Texas Code, a security interest in a deposit account is perfected only by "control" of the collateral by the secured party, which means that the secured party must also be the depositary bank.

245.    The Segregated Cash is held in Account #:XXXX0559 at Union Bank, N.A.

246.    Because Union Bank, N.A. is not the "secured party" of record, perfection of any security interest in the Segregated Cash would require a control agreement.

247.    Accordingly, pursuant to section 2 of the Security Agreement, the Segregated Cash is excluded collateral and not subject to the liens or security interests of Defendants.

248.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and Defendants concerning whether Defendants have valid or perfected liens on or security interests in the Segregated Cash.

249.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' stipulations to the contrary, none of Defendants has a lien on or security interest in any of the Segregated Cash.

## <u>COUNT XVI</u>

### DECLARATORY JUDGMENT THAT DEFENDANTS DO NOT HAVE LIENS ON AVOIDANCE ACTIONS OR COMMERCIAL TORT CLAIMS OR THE PROCEEDS THEREOF

250.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

251.    The definition of "Collateral" under section 2 of the Security Agreement specifically excludes "Commercial Tort Claims."

252.    Similarly, the Cash Collateral Order provides that the Adequate Protection Liens (as defined therein) do not include liens on avoidance actions, proceeds of avoidance actions, or proceeds of commercial tort claims. (Cash Collateral Order ¶ 5(a)).

253.    The Committee contends that Defendants do not have a lien on any avoidance actions or commercial tort claims brought by or on behalf of the Debtors' estates or the proceeds thereof.

254.    The TCEH Debtors' stipulations specifically state in paragraph F(i)(e) of the Cash Collateral Order that "[t]he Prepetition First Lien Obligations are secured by first priority security interests in and liens on (the 'Prepetition First Priority Liens') the 'Collateral,' as defined in the First Lien Credit Agreement (the 'Prepetition Collateral'), including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the 'Cash Collateral')."

255.    The TCEH Debtors' stipulations will be binding on all parties in interest, including the Committee, unless the Committee files a Challenge before the Challenge Deadline.

256.    Thus, an actual, substantial, and justiciable controversy exists between the Committee and Defendants concerning the nature and extent of the liens and collateral of Defendants.

66

257.     Such a controversy is sufficient to warrant the issuance of a declaratory judgment

that, notwithstanding the Debtors' stipulations to the contrary, none of Defendants has a lien on

any avoidance actions or commercial tort claims brought by or on behalf of the Debtors' estates

or the proceeds thereof.

<u>COUNT XVII</u>

**DECLARATORY JUDGMENT THAT TAX ATTRIBUTES
GENERATED POSTPETITION ARE NOT SUBJECT TO
DEFENDANTS' LIENS AND SECURITY INTERESTS
(11 U.S.C. § 552)**

258.     The Committee restates and realleges the allegations contained in paragraphs 1

through [__] above, as if fully set forth herein.

259.     Section 552(a) of the Bankruptcy Code provides that, except in certain

circumstances, "property acquired by the estate or by the debtor after the commencement of the

case is not subject to any lien resulting from any security agreement entered into by the debtor

before the commencement of the case."

260.     Section 552(b) of the Bankruptcy Code provides that if a prepetition security

agreement extends to proceeds of collateral, then postpetition proceeds would also be subject to

that security agreement, unless the court orders otherwise after a hearing based on the equities of

the case.  Section 552(b) is intended to cover after-acquired property that is directly attributable

to prepetition collateral, without the addition of estate resources.

261.     The Debtors will realize the value of certain Tax Attributes[10] after the Petition

Date, including (i) Tax Attributes that arose after the Petition Date related to tax year 2014, and

---

[10] The term "<u>Tax Attributes</u>" shall include, but is not limited to, current year deductions; net operating losses and net operating loss carrybacks and carryovers; current year general business credits and general business credit carryovers; alternative minimum tax credit carryovers; current year capital losses and capital loss carrybacks and carryovers; current year foreign tax credits and foreign tax credit carryovers; excess charitable contributions; recovery of tax benefits items; any method of accounting; investment credit carryovers; recovery exclusions; any claim of right; basis of property, holding period and character of assets; and any other tax attributes under the

(ii) Tax Attributes that will arise in 2015 (and subsequent taxable years) before the Debtors'

emergence from protection under Chapter 11 of the Bankruptcy Code (collectively, the

"Unencumbered Tax Attributes").

262.    Additionally, upon a transfer of all or a portion of the equity of the TCEH Debtors

(or their assets) to the First Lien Lenders, or any other acquiror(s), in which EFH recognizes

gain, in whole or in part, for federal income tax purposes, the First Lien Lenders, or any other

acquiror(s), will receive the benefit of a step-up in tax basis in such assets (the "Tax Basis Step-

Up").  The Tax Basis Step-Up will provide the first lien lenders or any other acquiror(s) with

future material tax benefits through their ownership of the equity of the TCEH Debtors (or their

assets).  The Tax Basis Step-Up could be valued in excess of $2 billion.

263.    The value attributable to (i) the Unencumbered Tax Attributes and (ii) the Tax

Basis Step-Up is tied directly to the manner in which the Debtors conduct their postpetition

activities, including the transactions undertaken to reorganize the TCEH Debtors.  Therefore, the

value generated by the Unencumbered Tax Attributes and the Tax Basis Step-Up is entirely

dependent on the addition of estate resources.

264.    Accordingly, the Unencumbered Tax Attributes utilized (and the value thereof)

and, the Tax Basis Step-Up (and the value thereof), including the value resulting from the TCEH

Debtors' postpetition reorganization efforts, are not subject to the Defendants' liens and security

interests and do not represent proceeds of Defendants' prepetition collateral.

265.    The TCEH Debtors' stipulations specifically state in paragraph F(i)(e) of the Cash

Collateral Order that "[t]he Prepetition First Lien Obligations are secured by first priority

security interests in and liens on (the 'Prepetition First Priority Liens') the 'Collateral,' as

---

Internal Revenue Code, United States Treasury Regulations or applicable law.

defined in the First Lien Credit Agreement (the 'Prepetition Collateral'), including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the 'Cash Collateral')."

266.    The TCEH Debtors' stipulations will be binding on all parties in interest, including the Committee, unless the Committee files a Challenge before the Challenge Deadline.

267.    Thus, an actual, substantial, and justiciable controversy exists between the Committee and Defendants concerning the nature and extent of the liens and collateral of Defendants.

268.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' stipulations to the contrary, the Unencumbered Tax Attributes utilized (and the value thereof) and, the Tax Basis Step-Up (and the value thereof), including the value resulting from the TCEH Debtors' postpetition reorganization efforts, are not subject to the Defendants' liens and security interests and do not represent proceeds of Defendants' prepetition collateral.

## COUNT XVIII

### AVOIDANCE OF UNPERFECTED LIENS AND SECURITY INTERESTS
(11 U.S.C. §§ 544, 550, and 551 and DEL. CODE ANN. TIT. 6, §§ 9-102, 9-103, 9-501, 9-502)

269.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

**As-Extracted Collateral**

270.    Pursuant to section 2 of the Security Agreement, the TCEH Debtors granted a first priority lien and security interest in, among other things, "As-Extracted Collateral" (as defined in section 9-102 of the UCC and Delaware/Texas Code) to the First Lien Collateral Agent, for the

benefit of the Secured Parties, to secure repayment of the First Lien Debt.  Upon information and

belief, the term "Secured Parties" includes Defendants.

271.    The Debtors have filed schedules with the Court indicating that Luminant Energy

Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC,

and Sandow Power Company LLC (collectively, the "Entities Holding Fuel/Gas") hold fuel

stock, nuclear fuel, and/or natural gas valued at approximately $500 million.  (*See* Docket Nos.

1265, 1270, 1282, 1291.)

272.    Upon information and belief, the Entities Holding Fuel/Gas own certain As-

Extracted Collateral.

273.    Upon information and belief, the Secured Parties have filed a UCC-1 financing

statement against each of the Entities Holding Fuel/Gas, in each case with the Texas Secretary of

State relating to As-Extracted Collateral.

274.    Upon information and belief, the Secured Parties have recorded a collateral filing

in the appropriate local recordation offices with respect to any As-Extracted Collateral that may

be owned by the Entities Holding Fuel/Gas and located at the properties identified on **Schedule 2**

to the Complaint.

275.    Upon information and belief, the Secured Parties have not recorded a collateral

filing in the appropriate local recordation offices with respect to all other As-Extracted Collateral

owned by the TCEH Debtors (the "Unperfected As-Extracted Collateral").

276.    Thus, upon information and belief, the Secured Parties, including Defendants

(unless, in the case of each of the Entities Holding Fuel/Gas, each is a "transmitting utility" as

such term is defined in section 9-102 of the UCC and Delaware/Texas Code), do not have a

valid, recorded lien or security interest in Unperfected As-Extracted Collateral.

**Real Property**

277.    Upon information and belief, the Secured Parties have recorded a collateral filing in the appropriate local recordation offices with respect to the properties identified on **Schedule 3** to the Complaint.

278.    Upon information and belief, the Secured Parties have not recorded a collateral filing in the appropriate local recordation offices with respect to all other properties owned by the TCEH Debtors (the "Unperfected Properties").

279.    Thus, upon information and belief, Defendants' interest in the Unperfected Properties is not perfected.

**Vehicles**

280.    Section 501.113 of the Texas Transportation Code provides that recordation of a lien is considered to occur when "(1) the department's titling system is updated; or (2) the county assessor-collector accepts the application of title that discloses the lien with the filing fee."

281.    Upon information and belief, the TCEH Debtors own vehicles with a net book value of over $11 million (the "Unperfected Vehicles").  Upon information and belief, the Secured Parties have not recorded a collateral filing relating to the Unperfected Vehicles with either the department's titling system or the local recordation office.

282.    Thus, upon information and belief, Defendants' interest in the TCEH Debtors' Unperfected Vehicles is not perfected.

**Deposit Accounts**

283.    Any alleged lien of Defendants on the Deposit Accounts is unperfected and avoidable under section 544(a) of the Bankruptcy Code.

284.    Pursuant to Sections 9-104 and 9-312(b) of the UCC and Delaware/Texas Code, a security interest in a deposit account is perfected only by "control" of the collateral by the

secured party, which means that the secured party also must (i) be the depositary bank, (ii) have

a valid control agreement with the depositary bank and the debtor, or (iii) become the depositary

bank's customer with respect to the deposit account.

285.    Defendants cannot assert a perfected lien in the Deposit Accounts because the

accounts are neither in the possession of the First Lien Collateral Agent nor in a deposit account

subject to a deposit account control agreement in the First Lien Collateral Agent's favor, as

required by UCC Article 9 to perfect a security interest in deposit accounts.

286.    Thus, upon information and belief, any alleged lien of Defendants in the Deposit

Accounts is not perfected.

**Commercial Tort Claims**

287.    Any alleged lien of Defendants in commercial tort claims is unperfected and

avoidable under section 544(a) of the Bankruptcy Code.

288.    Sections 9-108(a) and 9-203(b)(3)(A) of the UCC and Delaware/Texas Code

provide that a security agreement must contain a description of the collateral that reasonably

identifies the collateral.  Generally to satisfy this requirement, a security agreement should list all

of the collateral by using the collateral type definitions under the Uniform Commercial Code.

However, the method of description "by type" is not sufficient if the lender wants to take a

security interest over a commercial tort claim because commercial tort claims require more

specific detail for perfection.

289.    Defendants cannot assert a perfected lien in commercial tort claims because there

is no specific description of that collateral in the Security Agreement, as required by UCC

Article 9 to perfect a security interest in commercial tort claims.

290.    Thus, upon information and belief, any alleged lien of Defendants in commercial

tort claims is not perfected.

### *Unperfected Collateral*

291.    The TCEH Debtors' stipulations specifically state in paragraph F(i)(e) of the Cash Collateral Order that "[t]he Prepetition First Lien Obligations are secured by first priority security interests in and liens on (the 'Prepetition First Priority Liens') the 'Collateral,' as defined in the First Lien Credit Agreement (the 'Prepetition Collateral'), including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the 'Cash Collateral')." (Cash Collateral Order ¶¶ F(i)(a) & (e)).

292.    The TCEH Debtors' stipulations will be binding on all parties in interest, including the Committee, unless the Committee files a Challenge before the Challenge Deadline.

293.    Thus, an actual, substantial, and justiciable controversy exists between the Committee and Defendants concerning the nature and extent of the liens and collateral of Defendants.

294.    Defendants failed to properly perfect their purported liens on and security interests in the Unperfected As-Extracted Collateral, the Unperfected Properties, the Unperfected Vehicles, the Deposit Accounts, and commercial tort claims (collectively, the "Unperfected Collateral") in compliance with UCC Article 9 and the real property laws of the relevant jurisdictions.  Accordingly, any security interests of Defendants in the Unperfected Collateral as of the Petition Date are avoidable pursuant to sections 544(b) of the Bankruptcy Code.

295.    Because Defendants do not have properly perfected liens on or security interests in the Unperfected Collateral, any and all liens on and security interests in the Unperfected Collateral asserted by Defendants should be avoided pursuant to section 544 of the Bankruptcy Code, and such property or the value of such property, if previously transferred, should be

recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or

automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the

Bankruptcy Code.

**COUNT XIX**

**DECLARATORY JUDGMENT THAT THERE HAS BEEN NO
DIMINUTION IN THE VALUE OF THE COLLATERAL AFTER THE
PETITION DATE**

296.    The Committee restates and realleges the allegations contained in paragraphs 1

through [__] above, as if fully set forth herein.

297.    The Cash Collateral Order grants Defendants Adequate Protection Liens, 507(b)

Claims, and First Lien Adequate Protection Payments to protect Defendants' interests against

any Diminution in Value (each, as defined in the Cash Collateral Order ¶¶ 5(a)-(b)).

298.    The term "Diminution in Value" is defined in the Cash Collateral Order as "any

diminution in value of their respective interests in the Prepetition Collateral from and after the

Petition Date resulting from the imposition of such priming liens and the use of Cash Collateral,

the use, sale, lease, consumption, or disposition of Prepetition Collateral, and the imposition of

the automatic stay . . . ." (Cash Collateral Order ¶ G).

299.    The Committee contends that Defendants are not entitled to adequate protection

claims because (i) there has been no Diminution in Value of the Defendants' collateral during the

pendency of these chapter 11 cases, and (ii) the Debtors' use of cash collateral for the limited

purposes set forth in the Cash Collateral Order will not result in a Diminution in Value of the

Defendants' collateral.

300.    Accordingly, an actual, substantial, and justiciable controversy exists between the

Committee and Defendants concerning whether Defendants are entitled to adequate protection

claims

301.     Such a controversy is sufficient to warrant the issuance of a declaratory judgment

that none of Defendants are entitled to adequate protection claims because (i) there has been no

Diminution in Value of the Defendants' collateral during the pendency of these chapter 11 cases,

and (ii) the Debtors' use of cash collateral for the limited purposes set forth in the Cash

Collateral Order will not result in a Diminution in Value of the Defendants' collateral.

**COUNT XX**

**DECLARATORY JUDGMENT THAT DEFENDANTS ARE NOT
ENTITLED TO POSTPETITION INTEREST AND FEES UNLESS THE
COURT DETERMINES THEY ARE OVERSECURED
(11 U.S.C. § 506)**

302.     The Committee restates and realleges the allegations contained in paragraphs 1

through [__] above, as if fully set forth herein.

303.     Pursuant to section 506(b) of the Bankruptcy Code, only oversecured creditors are

entitled to include postpetition interest and reasonable fees and expenses in its secured claim, and

such amounts are only allowed secured claims to the extent of the excess value of the collateral.

304.     The Committee contends that (i) Defendants are not entitled to any postpetition

interest and fees unless the Court determines that Defendants are oversecured creditors, and (ii)

in the event Defendants are determined by the Court to be oversecured creditors, postpetition

interest and fees shall be allowed solely to the extent of the excess value of the collateral.

305.     Under the Cash Collateral Order, Defendants are receiving monthly adequate

protection payments in an amount "determined by applying a per annum rate equal to the LIBOR

Rate (as defined in the DIP Credit Agreement) + 450 basis points to the aggregate outstanding

amount of the Prepetition First Lien Obligations as of the Petition Date in respect of such

relevant periods ending after the Petition Date", with each First Lien Transferee receiving their

ratable share of the aggregate amount.  (*See* Cash Collateral Order ¶ 5(d)).  The Committee

understands that the aggregate amount of the adequate protection payments exceeds $100 million on a monthly basis.

306.    Under the Cash Collateral Order, the right to recharacterize adequate protection payments to Defendants as payments of principal was expressly preserved. *Id.*

307.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and Defendants concerning whether Defendants are entitled to any postpetition interest and fees.

308.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that: (i) Defendants are not entitled to any postpetition interest and fees unless the Court determines that Defendants are oversecured creditors, and (ii) in the event Defendants are determined by the Court to be oversecured creditors, postpetition interest and fees shall be allowed solely to the extent of the excess value of the collateral.

## COUNT XXI

### DECLARATORY JUDGMENT THAT, TO THE EXTENT DEFENDANTS ARE OVERSECURED CREDITORS AND ENTITLED TO POSTPETITION INTEREST AND FEES, SUCH INTEREST SHALL BE AT THE CONTRACTUAL NON-DEFAULT RATE (11 U.S.C. § 506)

309.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

310.    The Committee contends that, for the reasons set forth above and in the interest of equity, if Defendants are found to be entitled to postpetition interest, the interest should be awarded at the contractual non-default rate of interest.

311.    Each Debtor entity is insolvent, and the unsecured creditors in these cases will be significantly impaired.

312.    Accordingly, in the interest of equity, the Debtors contend that any award of postpetition interest should be at the contractual, non-default rate of interest.

313.    Under the Cash Collateral Order, Defendants are receiving monthly adequate protection payments in an amount "determined by applying a per annum rate equal to the LIBOR Rate (as defined in the DIP Credit Agreement) + 450 basis points to the aggregate outstanding amount of the Prepetition First Lien Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date", with each First Lien Transferee receiving their ratable share of the aggregate amount.  (*See* Cash Collateral Order ¶ 5(d)).  The Committee understands that the aggregate amount of the adequate protection payments exceeds $100 million on a monthly basis.

314.    Under the Cash Collateral Order, the right to recharacterize adequate protection payments to Defendants as payments of principal was expressly preserved.  *Id.*

315.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and Defendants concerning whether Defendants are entitled to any postpetition interest and fees, and if so, at what rate.

316.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that any award of postpetition interest should be at the contractual, non-default rate of interest.

## COUNT XXII

### DECLARATORY JUDGMENT THAT STIPULATIONS DO NOT EXPAND THE SCOPE OF DEFENDANTS' LIENS

317.    The Committee restates and realleges the allegations contained in paragraphs 1 through [__] above, as if fully set forth herein.

318.    The TCEH Debtors' stipulations specifically state in paragraph F(i)(e) of the Cash Collateral Order that "[t]he Prepetition First Lien Obligations are secured by first priority

security interests in and liens on (the 'Prepetition First Priority Liens') the 'Collateral,' as

defined in the First Lien Credit Agreement (the 'Prepetition Collateral'), including substantially

all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such

cash constitutes proceeds of other Prepetition Collateral (the 'Cash Collateral')."

319.    The TCEH Debtors' stipulations will be binding on all parties in interest,

including the Committee, unless the Committee files a Challenge before the Challenge Deadline.

320.    The Committee requests a declaratory judgment that the TCEH Debtors'

stipulations do not expand the scope of Defendants' liens as they existed on the Petition Date.

321.    Thus, an actual, substantial, and justiciable controversy exists between the

Committee and Defendants concerning the nature and extent of Defendants' liens.

322.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment

that nothing in the TCEH Debtors' stipulations expands the scope of Defendants' liens as they

existed on the Petition Date.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an

order:

a)    Avoiding liens, security interests, and obligations granted under the Credit Agreement, the First Lien Notes, and the Fee Note pursuant to 11 U.S.C. §§ 544, 550, and DEL. CODE ANN. TIT. 6, §§ 1304, 1305, 1307;

b)    Avoiding and recovering fees and incremental interest paid in connection with the 2011 Transactions and the 2013 Amendment pursuant to 11 U.S.C. § 554, 548, 550(a), and DEL. CODE ANN. TIT. 6, §§ 1304, 1305, 1307 and transferring to the Debtors' estates the value of such transfers for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551;

c)    Equitably subordinating Defendants' claims against the TCEH Debtors' estates pursuant to 11 U.S.C. § 510;

d)    Avoiding of preferential transfers under sections 547, 550, and 551 of the Bankruptcy Code;

e)    Disallowing Defendants' claims relating to the First Lien Debt pursuant to 11 U.S.C. § 502 pending final resolution of this adversary proceeding, and a determination of the amount of Defendants' allowed claims;

f)    Disallowing claims relating to the First Lien Debt pursuant to 11 U.S.C. § 502 to the extent they include unmatured interest;

g)    To the extent Defendants' claims are not avoided, limiting the amount of Defendants' allowed claims based on Section 2(b) of the Guarantees;

h)    Declaring that certain deposit accounts, rabbi trust accounts, avoidance actions, commercial tort claims, and tax attributes are unencumbered;

i)    Avoidance of Defendants' unperfected liens on or security interests in certain property under sections 544, 550, and 551 of the Bankruptcy Code;

j)    Declaring that there has been no Diminution in Value of the Defendants' collateral during the pendency of these chapter 11 cases and that the Debtors' use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a Diminution in Value of the Defendants' collateral, and recharacterizing the adequate protection payments the Debtors made to Defendants during these chapter 11 cases as payments of principal on the First Lien Debt under section 506(b) of the Bankruptcy Code;

k)    Declaring that Defendants are not entitled to any postpetition interest and fees unless the Court determines that Defendants are oversecured creditors, and in the event Defendants are determined by the Court to be oversecured creditors, postpetition interest and fees shall be allowed solely to the extent of the excess value of the collateral, and that any award of postpetition interest should be at the contractual, non-default rate of interest;

l)    Declaring that the TCEH Debtors' stipulations do not expand the scope of Defendants' liens; and

m)    Granting the Committee such other and further relief as the Court deems just, proper and equitable, including pre-judgment interest and reimbursement to the Debtors' estates for the costs and expenses of this adversary proceeding.

Dated: Wilmington, Delaware
         March 13, 2015

## **Schedule 1**

## Schedule of Unencumbered Bank Accounts

| Debtor [1] | Description [1] | Amount [1] |
|---|---|---|
| 4Change Energy Company | The Bank of New York Mellon EFH Treasury Account Number XXX5115 | $ 1,008,119 |
| Energy Future Competitive Holdings Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX4511 | $ 4,108 |
| Luminant Energy Company LLC | The Bank of New York Mellon EFH Treasury Account Number XXX8178 | $ 200,000 |
| Luminant Energy Company LLC | Invesco Treasury Portfolio - Institutional Class (via Bank of Oklahoma dba Bank of Texas) EFH Treasury Account Number XXXXX4457 FBO: 019732 | $ 18,559 |
| Luminant Energy Company LLC | Bank of Oklahoma dba Bank of Texas EFH Treasury Account Number XXXXX4457 FBO: 019732 | $ - |
| Luminant Energy Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX3756 | $ 1,277 |
| Luminant Energy Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX7371 | $ 908 |
| Luminant Energy Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX8059 | $ 668 |
| Luminant Generation Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX4297 | $ 853,621 |
| Luminant Generation Company LLC | First National Bank of Granbury CPNP Co. Account Number XXX7136 | $ 15,545 |
| Luminant Mining Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX9817 | $ 1,683 |
| Luminant Mining Company LLC | Restricted Cash - The Bank of New York Mellon EFH Treasury Account Number XX1993 | $ 25,000 |
| Texas Competitive Electric Holdings Company LLC | Western Asset Institutional Treasury Fund EFH Treasury Account Number XXX-XX4883 | $ 169,009,960 |
| Texas Competitive Electric Holdings Company LLC | Union Bank, N.A. EFH Treasury Account Number XXXXXX0559 | $ 149,623,790 |
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (NY) EFH Treasury Account Number XXXXX9810 | $ 26,586,838 |
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXX0481 | $ 3,939,729 |
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXX4169 | $ 1,164 |
| Texas Competitive Electric Holdings Company LLC | Goldman Sachs Financial Square Treasury Fund EFH Treasury Account Number XXXXXX4694 | $ - |
| Texas Competitive Electric Holdings Company LLC | JPMorgan Chase Bank, N.A. (NY) EFH Treasury Account Number XXXXX7837 | $ - |
| Texas Competitive Electric Holdings Company LLC | Citibank EFH Treasury / Citibank Account Number XXXX-X657 | $ 26,688 |
| Texas Competitive Electric Holdings Company LLC | Fidelity Investments Treasury Fund EFH Treasury Account Number XX1442 | $ - |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury / TXU Retail Account Number XXXXX6959 | $ 1,004,037 |
| TXU Energy Retail Company LLC | The Bank of New York Mellon EFH Treasury Account Number XXX0329 | $ 200,000 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXX6918 | $ 157,357 |
| TXU Energy Retail Company LLC | M&T Bank EFH Treasury / TXU Retail Account Number XXXX6771 | $ 4,146 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (NY) EFH Treasury Account Number XXXXX0158 | $ 1,511 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX9334 | $ 1,504 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXXX4500 | $ 1,345 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury / TXU Retail Account Number XXXXX6967 | $ 1,136 |

**Schedule of Unencumbered Bank Accounts**

| Debtor [1] | Description [1] | Amount [1] |
|---|---|---|
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXX6926 | $ 964 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXX6942 | $ 943 |
| TXU Energy Retail Company LLC | JPMorgan Chase Bank, N.A. (TX) EFH Treasury Account Number XXXXX6934 | $ 421 |
| Total | | $ 352,691,022 |

(1) Source of information presented is the Debtors' Schedules of Assets and Liabilities.

**<u>Schedule 2</u>**

**Schedule of As-Extracted Collateral**

| Debtor[1] | As-Extracted Collateral[1] | County | Location of As-Extracted Collateral[1] |
|---|---|---|---|
| Luminant Generation Company LLC | Nuclear fuel valued at less than $310,867,908<br>Fuel stock valued at less than $109.772.240 | Somervell/ Hood | Comanche Peak Power Plant (nuclear) - located on approximately 7,782 acres at 6322 N. FM 56, Glen Rose, TX 76043 |
| | | Panola | Martin Lake Power Plant (coal) - located on approximately 7,577 acres at 8850 FM 2658, Tatum, TX 75651 |
| | | Titus/ Camp | Monticello Power Plant (coal) - located on approximately 7,732 acres at 1574 Monticello Plant Road, Mt. Pleasant, TX 75455 |
| | | Milam | Sandow Unit 4 Power Plant (coal) - located on approximately 12 acres at 3986 Charles Martin Road, Rockdale, TX 76567-0467 |
| | | Dallas | Lake Hubbard Power Plant (gas) - located on approximately 205 acres at 555 Barnes Bridge Road, Sunnyvale, TX 75182 |
| | | Henderson | Forest Grove - approximately 5,125 acres located at CR 1400, Malakoff, TX 75148 |
| | | McLennan | Vacant land (formerly site of Lake Creek Power Plant) - approximately 1,895 acres located at 4278 W. Lake Creek Road, Riesel, TX 76682 |
| | | Dallas | Vacant land (site of former North Lake Power Plant, now demolished) - approximately 136 acres located at 14901 North Lake Road, Coppell, TX 75019 |
| | | Henderson | Trinidad Power Plant (gas) - located on approximately 2,737 acres at 1320 McEntire Road, Trinidad, TX 75163 |
| | | Young | Graham Power Plant (gas) - located on approximately 734 acres at 480 Power Plant Road, Graham, TX 76450 |
| | | Cherokee | Stryker Creek Power Plant (gas) - located on approximately 953 acres at 2133 FM 2420 East, Jacksonville, TX 75766 |
| | | Franklin/Titus/ Hopkins/Camp | Monticello Mines- approximately 34,244 acres located at 6833 FM 127, Mt. Pleasant, TX 75455 |
| | | Hood | DeCordova Power Plant (gas)- located on approximately 240 acres at 4950 Power Plant Court, Granbury, TX 76048 |
| | | Rusk | Martin Lake Mines- approximately 56,953 acres located at 12006 CR 2144 East, Tatum, TX 75691 |
| | | Ward | Permian Basin Power Plant (gas) - located on approximately 1,005 acres at 600 N. Yucca Drive, Monahans, TX 79756 |
| Oak Grove Management Company LLC | Fuel stock valued at less than $22,800,092 | Limestone/ Robertson | Oak Grove Power Plant (coal) - approximately 110 & 723 acres located at 8127 Oak Grove Road, Franklin, TX 77856 |
| | | Limestone/ Robertson | Kosse Mine - located on approximately 20,925 acres at 4731 E. SH 7, Kosse, TX 76653 |

**Schedule of As-Extracted Collateral**

| Debtor[1] | As-Extracted Collateral[1] | County | Location of As-Extracted Collateral[1] |
|---|---|---|---|
| Sandow Power Company LLC | Fuel stock valued at less than $2,394,092 | Milam | Sandow Unit 5 Power Plant (coal) - located at 3986 Charles Martin Road, Rockdale, TX 76567-0467 |
|  |  | Bastrop/ Lee/Milam | Three Oaks Mine - located on approximately 11,054 acres at 7207 West FM 696, Elgin, TX 78621 |

(1) Source of information presented is the Debtors' Schedule of Assets and Liabilities.

**<u>Schedule 3</u>**

**Schedule of Perfected Real Property Interests**

| Debtor[1] | County | Property Description[1] | Amount[1] |
|---|---|---|---|
| DeCordova Power Company LLC | Hood | DeCordova Power Plant (gas) - located on approximately 240 acres at 4950 Power Plant Court, Granbury, TX 76048 | $ 3,600,000 |
| Luminant Generation Company LLC | Titus/ Camp | Monticello Power Plant (coal) - located on approximately 7,732 acres at 1574 Monticello Plant Road, Mt. Pleasant, TX 75455 | $ 329,702,021 |
| Luminant Generation Company LLC | Milam | Sandow Unit 4 Power Plant (coal) - located on approximately 12 acres at 3986 Charles Martin Road, Rockdale, TX 76567-0467 | $ 40,144,509 |
| Luminant Generation Company LLC | Dallas | Lake Hubbard Power Plant (gas) - located on approximately 205 acres  at 555 Barnes Bridge Road, Sunnyvale, TX 75182 | $ 10,081,774 |
| Luminant Generation Company LLC | Tarrant | Vacant land (formerly site of Eagle Mountain Power Plant, now demolished) - approximately 173 acres located at 10029 Morris-dido Neward Road, Ft. Worth, TX 76179 | $ 6,630,414 |
| Luminant Generation Company LLC | Henderson | Trinidad Power Plant (gas) - located on approximately 2,737 acres at 1320 McEntire Road, Trinidad, TX 75163 | $ 2,035,712 |
| Luminant Generation Company LLC | Young | Graham Power Plant (gas) - located on approximately 734 acres at 480 Power Plant Road, Graham, TX 76450 | $ 1,935,395 |
| Luminant Generation Company LLC | Cherokee | Stryker Creek Power Plant (gas) - located on approximately 953 acres at 2133 FM 2420 East, Jacksonville, TX 75766 | $ 1,629,177 |
| Luminant Generation Company LLC | Dallas | Vacant land (site of former Mountain Creek Power Plant) - approximately 476 acres located at I20 & Beltline Road, Dallas, TX | $ 1,500,000 |
| Luminant Generation Company LLC | Ward | Permian Basin Power Plant (gas) - located on approximately 1,005 acres  at 600 N. Yucca Drive, Monahans, TX 79756 | $ 396,297 |
| Luminant Generation Company LLC | Bastrop | Improvements at Three Oaks Mine, 7207 W. FM 696, Elgin, TX 78621 | $ 255,592 |
| Luminant Mining Company LLC | Bastrop/ Lee | Three Oaks Mine - approximately 204 acres located at 7207 West FM 696, Elgin, TX 78621 | $ 58,510,558 |
| Oak Grove Management Company LLC | Limestone/ Robertson | Oak Grove Power Plant (coal) - approximately 110 acres located at 8127 Oak Grove Road, Franklin, TX 77856 | $ 452,859,878 |
| Oak Grove Management Company LLC | Limestone/ Robertson | Kosse Mine - located on approximately 20,925 acres at 4731 E. SH 7, Kosse, TX 76653 | $ 143,512,942 |
| Oak Grove Power Company LLC | Limestone/ Robertson | Oak Grove Power Plant (coal) - approximately 723 acres located at 8127 Oak Grove Road, Franklin, TX 77856 | $ 15,605,653 |
| Sandow Power Company LLC | Milam | Sandow Unit 5 Power Plant (coal) - located at 3986 Charles Martin Road, Rockdale, TX 76567-0467 | $ 141,796,619 |

**Schedule of Perfected Real Property Interests**

| Debtor[1] | County | Property Description[1] | Amount[1] |
|---|---|---|---|
| Sandow Power Company LLC | Bastrop/ Lee | Three Oaks Mine - located on approximately 11,054 acres at 7207 West FM 696, Elgin, TX 78621 | $  24,911,882 |
| Tradinghouse Power Company LLC | McLennan | Vacant land (formerly site of Tradinghouse Power Plant) - approximately 3,834 acres located at 1868 Lake Felton Parkway, Waco, TX 76705 | $  7,700,000 |
| Valley NG Power Company LLC | Fannin/ Grayson | Valley Power Plant (gas - mothballed) - located on approximately 2,320 acres at 1040 CR 1225, Savoy, TX 75479 | $  4,346,777 |

(1) Source of information presented is the Debtors' Schedules of Assets and Liabilities.