# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  3594, 3596, 3605** |

## DEBTORS' OMNIBUS OBJECTION TO STANDING MOTIONS

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

## Table of Contents

Preliminary Statement...................................................................................................1

Argument .....................................................................................................................5

I.  The Court Should Not Grant Standing at This Time Because Prosecuting the Alleged Claims Now Will Not Maximize the Value of the Debtors' Estates. ...............................................................................................5

    A.  The Debtors' Stakeholders Are Negotiating in Earnest and the Trajectory of the Chapter 11 Cases Hangs in the Balance..........................5

    B.  The Nature of the Alleged Claims Makes Them Ripe for Settlement Efforts at This Time.................................................................8

    C.  There are Viable Alternatives to the Relief Requested in the Motions That Will Better Facilitate Progress in the Chapter 11 Cases and Will Not Prejudice Any Party in Interest.................................12

II.  To the Extent the Court Grants Standing, the Debtors Must Retain Authority to Settle the Alleged Claims.................................................13

III.  To the Extent the Court Grants Standing, It Should Do So for Only the TCEH Official Committee.................................................................17

    A.  The Alleged Claims Asserted by the Movants Are Duplicative...............17

    B.  To the Extent the Court Grants Standing, the TCEH Official Committee Is the Only Movant Suited to Pursue the Alleged Claims. ...............................................................................................18

IV.  The TCEH Official Committee Should Only be Granted Standing to Assert Alleged Claims that Are Subject to the Stipulations in the Cash Collateral Order. ..................................................................................23

## Table of Authorities

**Cases**

*ABF Capital Mgmt. v. Kidder Peabody* (*In re Granite Partners, L.P.*),
    210 B.R. 508 (Bankr. S.D.N.Y. 1997) ............................................................... 19, 20

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*,
    417 U.S. 703 (1974) ................................................................................................ 11

*Fas Mart Convenience Stores*,
    265 B.R. 427 (Bankr. E.D. Va. 2001) ...................................................................... 19

*Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*,
    530 U.S. 1 (2000) ................................................................................................... 14

*In re Adelphia Commc'ns Corp.*,
    544 F.3d 420 (2d Cir. 2008) ..................................................................................... 5

*In re Allegheny Int'l, Inc.*,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ..................................................................... 14

*In re Centaur, LLC*,
    No. 10–10799, 2010 WL 4624910 (D. Del. Nov. 5, 2010) ................................. 6, 15

*In re Comcoach Corp.*,
    698 F.2d 571 (2d Cir. 1983) .................................................................................... 23

*In re Copperfield Investments, LLC*,
    421 B.R. 604 (Bankr. E.D.N.Y. 2010) .................................................................... 23

*In re Dow Corning Corp.*,
    255 B.R. 445 (E.D. Mich. 2000) ........................................................................ 19, 20

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 717 (Bankr. S.D.N.Y. 1992) .................................................................... 20

*In re Exide Tech.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................... 15

*In re Garden Ridge Corp.*,
    No. 04-10324, 2005 WL 523129 (Bankr. D. Del. March 2, 2005) ......................... 19

*In re Innkeepers*,
    448 B.R. 131 (Bankr. S.D.N.Y. 2011) .................................................................... 22

*In re Lehman Bros. Holdings Inc.*,
    No. 08-13555 JMP, 2012 WL 1057952 (S.D.N.Y. Mar. 26, 2012) ....................... 22

*In re Life Serv. Sys.*,
    279 B.R. 204 (Bankr. W.D. Pa. 2002) .................................................................... 19

*In re Mountain States Power Co.*,
    118 F.2d 405 (3d Cir. 1941) .................................................................................... 19

*In re Nat'l Forge Co.*,
   326 B.R. 532 (W.D. Pa. 2005) ................................................................ 6

*In re Nationwide Sports Distrib., Inc.*,
   227 B.R. 455 (Bankr. E.D. Pa. 1998) .................................................... 19

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ................................................................. 19

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996) ................................................................... 10

*In re Racing Servs., Inc.*,
   540 F.3d 892 (8th Cir. 2008) .................................................................. 5

*In re Refco*,
   505 F.3d 109 (2d Cir. 2007) ........................................................... 22, 23

*In re Sharon Steel Corp.*,
   100 B.R. 767 (Bankr. W.D. Pa. 1989) ................................................. 20

*In re Smart World Technologies, LLC*,
   423 F.3d 166 (2d Cir. 2005) ................................................................... 5

*In re SPM Mfg. Corp.*,
   984 F.2d 1305 (1st Cir. 1993) .......................................................... 6, 20

*In re STN Enter.*,
   779 F.2d 901 (2d Cir. 1985) ................................................................... 6

*In re The Charter Company*,
   42 B.R. 251 (Bankr. M.D. Fl. 1984) .................................................... 21

*In re Vaughan*,
   498 B.R. 297 (Bankr. D.N.M. 2013) ...................................................... 9

*In re Yes! Entm't Corp.*,
   316 B.R. 141 (D. Del. 2004) ................................................................... 6

*Johns-Manville Sales Corp. v. Doan (In re Johns-Manville Corp.)*,
   26 B.R. 919 (Bankr. S.D.N.Y. 1983) ................................................... 19

*Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings, Inc.)*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) ................................................. 11

*Matter of Penn Cent. Transp. Co.*,
   596 F.2d 1155 (3d Cir. 1979) ............................................................... 22

*Meinhard v. Salmon*,
   249 N.Y. 458 (1928) ............................................................................ 19

*Mirant Americas Energy Mktg. v. Official Comm. of Unsecured Creditors of Enron Corp.*,
   No. 02 Civ. 6274, 2003 WL 22327118 (S.D.N.Y. 2003) ....................... 19

*Official Comm. of Unsecured Creditors Cybergenics v. Chinery*,
   330 F.3d 548 (3d Cir. 2003) ................................................................... 6

*Pan Am. Corp. v. Delta Air Lines*,
   175 B.R. 438 (S.D.N.Y. 1994) .................................................................................. 19

*Pension Benefit Guar. Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Prof'l Corp.*,
   42 B.R. 960 (Bankr. E.D. Pa. 1984) .......................................................................... 19

*QSI Holdings, Inc. v. Alford*,
   382 B.R. 731, 742 (W.D. Mich. 2007), *aff'd sub nom.*, *In re QSI Holdings, Inc.*, 571 F.3d 545
   (6th Cir. 2009) ........................................................................................................... 11

*Schatz Federal Bearings Co.*,
   17 B.R. 780 (Bankr. S.D.N.Y. 1982) ......................................................................... 21

*United States v. St. John's Gen. Hosp.*,
   875 F.2d 1064 (3d Cir. 1989) ...................................................................................... 9

*United Steel Workers v. Lampl* (*In re Mesta Mach. Co.*),
   67 B.R. 151 (Bankr. W.D. Pa. 1986) .......................................................................... 19

*Westmoreland Human Opportunities, Inc. v. Walsh*,
   246 F.3d 233 (3d Cir. 2001) .................................................................................. 6, 19

## Statutes

11 U.S.C. § 1107(a) ............................................................................................................. 5

11 U.S.C. § 1109(b) ........................................................................................................... 22

11 U.S.C. § 1121(b) ........................................................................................................... 14

11 U.S.C. § 1123(b) ........................................................................................................... 14

11 U.S.C. § 1123(b)(3)(A) .................................................................................................. 14

11 U.S.C. § 546(e) ............................................................................................................. 11

11 U.S.C. § 741(7)(A)(v) .................................................................................................... 11

6 Del. C. § 1304(a)(2) ......................................................................................................... 8

## Other Authorities

Clifford Krauss, *Natural Gas Prices Plummet to Seven-Year Low*, N.Y. Times (Aug. 20, 2009),
   http://www.nytimes.com/2009/08/21/business/energy-environment/21gas.html .................... 9

Daniel Yergin & Robert Ineson, *America's Natural Gas Revolution*, Wall St. J. (Nov. 2, 2009)
   http://www.wsj.com/articles/SB10001424052748703399204574507440795971268 ............. 8

## Rules

Fed. R. Bankr. P. 9019(a) ........................................................................................... 13, 14

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file this omnibus objection (this "<u>Objection</u>") to the motions (the "<u>Motions</u>")[1] seeking standing to prosecute and settle certain alleged claims (collectively, and as described in the Motions, the "<u>Alleged Claims</u>") on behalf of Energy Future Competitive Holdings Company LLC ("<u>EFCH</u>"), Texas Competitive Electric Holdings Company LLC ("<u>TCEH</u>"), and certain of EFCH's and TCEH's direct and indirect subsidiaries (collectively, the "<u>TCEH Debtors</u>").  In further support of this Objection, the Debtors respectfully submit as follows.

## **Preliminary Statement**

1.      The Debtors and their stakeholders are at a critical juncture in plan negotiations, requiring the full attention of all parties in interest.  Multiple stakeholders from across the Debtors' capital structure have proposed plan concepts to the Debtors, which the Debtors are analyzing carefully.  Meetings and discussions among the Debtors and their stakeholders are ongoing, including meetings and discussions with and between the disinterested directors and managers and conflicts matters advisors.  Numerous proposals (written and oral) have been exchanged between and among various combinations of creditors within and across estate lines.  These proposals include the Debtors' chief restructuring officers' own term sheets in support of a comprehensive restructuring.[2]  In addition, first round bids for the sale of the economic interest

---

[1]  Specifically, the Motions were filed by (a) the Official Committee of Unsecured Creditors of EFCH, TCEH, their direct and indirect subsidiaries, and EFH Corporate Services Company [D.I. 3593] (the "<u>TCEH Official Committee</u>"); (b) the Official Committee of Unsecured Creditors of Energy Future Holdings Corp. ("<u>EFH Corp.</u>"), Energy Future Intermediate Holding Company LLC ("<u>EFIH</u>"), EFIH Finance Inc., and EECI, Inc. [D.I. 3605] (the "<u>EFH Committee</u>"); and (c) the ad hoc group of holders of TCEH unsecured notes [D.I. 3603] (such group, the "<u>TCEH Unsecured Group</u>," and, collectively, the "<u>Movants</u>").

[2]  Additionally, the Debtors are working to develop a plan term sheet that sets forth a proposal made by the Debtors' chief restructuring officers that will be made to the professionals for the Debtors' significant creditor constituencies.  The draft term sheet will take into account feedback from various stakeholders regarding a plan structure that maximizes value for all estates and constituents.  The draft term sheet will provide a framework for resolution of substantially all of the claims that may arise in the context of these chapter 11 cases, including the Alleged Claims.

in Oncor Electric Delivery Company LLC are "hot off the presses" and are currently being digested by the Debtors and their investment banker.

2.       In short, these chapter 11 cases are proceeding appropriately, and the Debtors are using and will continue to use their exclusivity period (as recently extended by this Court) to further advance discussions on a draft term sheet as well as the alternatives proposed by other stakeholders.   Crucially, the Debtors, in consultation with their advisors (including the disinterested directors and managers and their conflicts matters advisors) anticipate filing a plan of reorganization and related disclosure statement in the near term that establishes a viable framework for, among other things, a global settlement of the Alleged Claims.

3.       The Motions are fundamentally at odds with these ongoing plan discussions, and threaten to unravel the progress that has been achieved to date.  Far from maximizing the value of the Debtors' estates, litigating the Alleged Claims now will distract attention from the most important issue—the plan—just as the Court granted the Debtors an extension of exclusivity precisely to capitalize on momentum for a plan.  Upsetting this process now—by commencing all-out litigation against the TCEH first lien creditors—would impose a huge cost to the estates. At best, litigation would delay plan negotiations.  At worst, it could irreversibly damage the increasing potential for consensus around a value-maximizing plan of reorganization and ultimately result in a material defeat to the estates.  This is to say nothing of the waste of settlement currency through significant incremental direct costs, in the form of legal fees and other litigation expenses that will immediately begin to accrue to the estates.  These monies, once spent, are unavailable to help fund a global settlement and will only serve to widen the gulf between the parties.   Given that this litigation will involve lengthy factual discovery and

challenging legal issues, it is at best a costly gamble at this time, and not worth undermining the

Debtors' efforts to maximize value for their estates.

4.    Accordingly, the Debtors—with the support of the conflicts advisors to the

respective disinterested directors and managers—respectfully urge the Court to enter one of two

orders described below, both of which preserve the ability to pursue the Alleged Claims but defer

the extensive litigation contemplated in the Motions in favor of advancing robust plan

discussions which, if successful, will globally resolve the Alleged Claims:

- *Option 1*: With the consent of the necessary parties under the cash collateral order, rule that the filing of the Motions tolls the challenge deadline in the cash collateral order and thus defer ruling on the Motions.[3]

- *Option 2*:  In the event the necessary parties will not consent, the Debtors ask that the Court grant the TCEH Official Committee standing to file and prosecute a complaint on the limited basis set forth in this Objection (including maintaining the Debtors' ability to settle the Alleged Claims, as discussed below),[4] but stay the litigation long enough for plan negotiations to reach fruition.

5.    In either case, the Debtors propose that time to consider the Motions, or, if the

relief sought in any of the Motions is granted, the expiration of the stay, should be 120 days,

subject to the right of any party to seek more time upon a showing of good cause (such as

continued progress towards a negotiated resolution of the Alleged Claims).  Both alternatives

suggested by the Debtors are superior to granting the relief requested in the Motions and

allowing the litigation at issue to proceed immediately.

---

[3]    In a similar vein, the TCEH first lien creditors could agree to extend the deadline and the Court could defer resolution of the Motions to a later date.  The Debtors would consent to such an approach.

[4]    Specifically, as described further below, Counts 10, 19, and 21 of the TCEH Official Committee's proposed complaint and the TCEH Unsecured Group's proposed complaint were not the subject of stipulations in the TCEH Debtors' cash collateral order and therefore no party should obtain derivative standing to prosecute them.

6.     However the Court resolves the Motions, and setting aside issues of timing, in all circumstances, it is critical that the Debtors retain sole authority to settle the Alleged Claims.  It is well-established law that only a ***debtor*** may settle claims on behalf of its estate.  Nowhere is this rule more important than here, where, having received an exclusivity extension less than a month ago, the Debtors and their advisors (including the disinterested directors and managers and conflicts matters advisors) are actively pursuing settlement of the Alleged Claims through plan negotiations between and among the Debtors and their various stakeholders.  Depriving the Debtors of their ability to settle the Alleged Claims would cripple plan negotiations and would almost certainly set these chapter 11 cases on a contentious path that will last well beyond the Debtors' 18-month maximum statutory period of exclusivity.[5]

7.     Finally, if the Court grants standing to any party to prosecute the Alleged Claims, that party should be the TCEH Official Committee, as the fiduciary to all TCEH unsecured creditors.  The claims alleged by the TCEH Unsecured Group and the EFH Committee are identical to or subsumed with the TCEH Official Committee's complaint, and both other parties are not best suited to litigate the Alleged Claims.  The TCEH Unsecured Group owes no fiduciary duties to creditors (other than its own constituents), and, based on its proposed complaint, appears to be riding the TCEH Official Committee's coattails virtually word for word.[6]  Moreover, the EFH Committee, as a creditor of a creditor, is not a party in interest as

---

[5]   The Debtors are currently litigating interest rate and makewhole issues against the holders of EFIH's funded debt.  In each instance, these discrete proceedings will clarify the size of certain debt holders' claims and are facilitating current plan negotiations.  In contrast, the Alleged Claims are vast and their litigation risks threaten to swamp plan negotiations with motion practice and, potentially, fact-intensive discovery, creating the potential to irrevocably delay progress towards a plan.

[6]   A redline of the TCEH Unsecured Group's complaint against the TCEH Official Committee's complaint demonstrating their near perfect correspondence is attached to this Objection as **Exhibit A.**

required to seek standing to prosecute the Alleged Claims.[7]  Granting standing to the TCEH

Unsecured Group or the EFH Committee would be improper and wasteful.

8.        Put simply, plan negotiations must not be derailed by the litigation contemplated

by the Motions, and the Debtors must retain full authority to settle the Alleged Claims in all

circumstances.  Beyond that, by deferring and preserving the litigation contemplated by the

Motions for 120 days, this Court can help ensure that plan negotiations stay on track, undisturbed

by the distraction of contentious litigation.  To the extent the Court is inclined to grant standing

to anyone other than the Debtors at this time, it should be the TCEH Official Committee and

only on the limited basis set forth in this Objection.

## Argument

### I.    The Court Should Not Grant Standing at This Time Because Prosecuting the Alleged Claims Now Will Not Maximize the Value of the Debtors' Estates.

#### A.    The Debtors' Stakeholders Are Negotiating in Earnest and the Trajectory of the Chapter 11 Cases Hangs in the Balance.

9.        It is a debtor's prerogative to manage the estate's legal claims.  *See* 11 U.S.C.

§ 1107(a) ("[A] debtor in possession shall have all the rights . . . and powers, and shall perform

all the functions and duties . . . of a trustee serving in a case under this chapter."); *In re Adelphia*

*Commc'ns Corp.*, 544 F.3d 420, 424 (2d Cir. 2008) (the derivative standing doctrine does not

"undermine either the debtor's central role in handling the estate's legal affairs or the court's

responsibility to monitor for abuses by the parties"); *In re Racing Servs., Inc.*, 540 F.3d 892, 899-

900 (8th Cir. 2008) ("If creditors could obtain derivative standing too readily, they could usurp

---

[7]    Although the Debtors believe it is unnecessary to engage in any substantive arguments at this time, they note that certain statements referencing the TCEH Debtors' tax liabilities made by the EFH Committee in its motion are disputed by at least the TCEH Debtors.

the central role that the trustee or debtor-in-possession plays as the representative of the estate" (internal quotation marks omitted).).

10.     Parties other than the debtor are generally not well-situated to manage the estate's legal claims.  "As a general matter, other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative." *In re Smart World Technologies, LLC*, 423 F.3d 166, 180 (2d Cir. 2005).  This includes official creditors' committees.  *See id.* at 175 n.12 ("A creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate."); *see also Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001) ("We have construed § 1103(c) as implying a fiduciary duty on the part of members of a creditor's committee, such as the present Unsecured Creditors Committee, toward their constituent members."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993) (rejecting the "erroneous assumption that the [creditors' committee] is a fiduciary for the estate as a whole" and explaining that "the committee is a fiduciary for those whom it represents, ***not*** for the debtor or the estate generally") (emphasis added).

11.     To usurp the essential role of the debtor and obtain derivative standing to prosecute estate claims, a creditor has the burden of demonstrating that the debtor "unjustifiably refused" to pursue the alleged claims.  *See, e.g.*, *In re Centaur, LLC*, No. 10–10799, 2010 WL 4624910, *4 (D. Del. Nov. 5, 2010) ("[E]ntitlement to derivative standing requires . . . that the trustee unjustifiably refused to pursue the claim . . . ."); *In re Yes! Entm't Corp.*, 316 B.R. 141, 145 (D. Del. 2004) ("It is the creditor's burden in the first instance to demonstrate that it has satisfied these prerequisites for derivative standing."); *see also Official Comm. of Unsecured Creditors Cybergenics v. Chinery*, 330 F.3d 548, 566-67 (3d Cir. 2003) (adopting the

requirements of derivative standing established in the Second and Seventh Circuits).    To determine whether a debtor unjustifiably refused to bring claims, courts undertake a "cost/benefit analysis" to determine "whether, in light of the costs of litigation, the claims would likely benefit the estate if pursued." *Centaur*, 2010 WL 4624910, at \*5; *see also In re Nat'l Forge Co.*, 326 B.R. 532, 542 (W.D. Pa. 2005).  In so doing, courts consider "the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *In re STN Enter.*, 779 F.2d 901, 906 (2d Cir. 1985).

12.    Here, the Movants have not met, nor could they meet, their burden of demonstrating that the benefits of prosecuting the Alleged Claims now outweigh the costs.  The Movants have filed their Motions now not because of some firmly-held conviction that launching a potentially massive, expensive, and time-consuming litigation at this time would be constructive to the plan process, but because of an arbitrary deadline in the TCEH cash collateral order that requires parties in interest *with standing* to challenge the Debtors' stipulations and admissions contained in the TCEH cash collateral order by March 13, 2015 (the "March 13 Challenge Deadline").  In short, the Motions were filed because the Movants' hands were forced.[8]  The Debtors urge the Court to recognize the arbitrary nature of the Motion timing and limit the requested relief, as described herein, allowing the Debtors and their stakeholders to capitalize on the plan momentum generated by Court's recent extension of the Debtors' exclusivity period.

---

[8]    The TCEH first lien creditors have unfortunately refused to extend the March 13 Challenge Deadline.  Their refusal—thus forcing the Movants to file for standing just to preserve their rights—is surprising, given their acknowledgement that this case has entered a critical period.  Less than three weeks ago, the TCEH first lien creditors filed a response to the Debtors' exclusivity motion stating that it will become "clear" over the next "30 to 60 days" whether the "Debtors' preferred outcome, a tax-free deconsolidation, is achievable."  *See Response of the Ad Hoc Committee of TCEH First Lien Creditors to the Second Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* [D.I. 3439].

**B.**     **The Nature of the Alleged Claims Makes Them Ripe for Settlement Efforts at This Time.**

13.     The benefit to the estates of prosecuting the Alleged Claims is uncertain and will take significant time to realize.  Many of the Alleged Claims will be subject to vigorous (and potentially costly) dispute, thus favoring a negotiated resolution.  The Debtors identify the issues below to underscore that attempts to settle the Alleged Claims as part of a global resolution of these cases are far preferable to immediately commencing litigation of the Alleged Claims.

14.     ***Establishing the TCEH Debtors' Insolvency as a Result of the LBO Would Be Highly Fact Intensive***. One of the most significant of the Alleged Claims—the constructive fraudulent transfer claim regarding the leveraged buyout in October 2007 (the "LBO")—requires proof of the TCEH Debtors' insolvency as a result of the LBO.  *See, e.g.*, 6 Del. C. § 1304(a)(2). That issue would be fact-intensive and heavily contested.  The TCEH Official Committee, for instance, challenges Duff & Phelps's contemporaneous solvency opinion, arguing that Duff & Phelps used an unreasonably low weighted average cost of capital, and relied on unrealistic natural gas price forecasts that did not appropriately account for downward trends and the "inherently cyclical" nature of the business.  TCEH Official Committee Motion ¶ 30, 32, 33.[9]

15.     The defendants will likely respond that these allegations ignore both the significant effect of macroeconomic factors—such as (a) the 2008 financial crisis that, among other things, dramatically increased the cost of capital in the United States and decreased electricity consumption nationwide and (b) the "shale revolution" (which caused a game-changing effect on the supply of natural gas in the United States)—that led to the collapse of

---

[9]     The TCEH Unsecured Group's Motion is virtually identical to the TCEH Official Committee's complaint.   For that reason, the Debtors' responses herein cite to the TCEH Official Committee Motion and the TCEH Official Committee complaint, but apply with equal vigor to the similar arguments raised in the TCEH Unsecured Group's Motion.

natural gas prices, as well as contemporaneous analyses that suggested the price of natural gas would remain at levels well above both their historic average and in line with the projections underlying the Duff & Phelps opinion.[10]   Litigation of this key issue will likely require significant discovery and will be hotly contested.

16.     ***The Defendants Will Argue that the LBO-Related Alleged Claims are Time Barred***.  The Debtors expect that the question of whether the LBO-related Alleged Claims are time-barred also will be vigorously contested.  The TCEH Official Committee's position is that it can stand in the shoes of the U.S. Internal Revenue Service (the "IRS").  The defendants likely will challenge this position.  This remains an issue on which there is no clear guidance from an appellate court.[11]  In addition, it is expected that there will be litigated disputes over whether the IRS is, in fact, a creditor of ***each*** Debtor entity on whose behalf standing is sought to assert an avoidance action.[12]  With both legal and factual questions potentially in play, the timeliness of the LBO-related Alleged Claims will present a difficult contested issue.

17.     ***The Alleged Claims Related to the 2011 and 2013 Amendment Transactions Are Factually and Legally Complex***.  The defendants will raise potentially complex and difficult questions about whether the TCEH Debtors received reasonably equivalent value for transfers in connection with the 2011 and 2013 amendment and extension transactions.  Both the cost of

---

[10]   *See, e.g.*, Daniel Yergin & Robert Ineson, *America's Natural Gas Revolution*, Wall St. J. (Nov. 2, 2009) ("[T]he natural gas revolution has unfolded with no great fanfare, no grand opening ceremony, no ribbon cutting.  It just crept   up."),   http://www.wsj.com/articles/SB10001424052748703399204574507440795971268;   Clifford Krauss, *Natural Gas Prices Plummet to Seven-Year Low*, N.Y. Times (Aug. 20, 2009) ("The sharp price decline of natural gas . . . has been caused by a drop in demand from factories and homes because of the recession, coupled with a big expansion of domestic production over the last few years."), http://www.nytimes.com/ 2009/08/21/business/energy-environment/21gas.html.

[11]   *Compare In re Vaughan*, 498 B.R. 297, 306 (Bankr. D.N.M. 2013) (denying a motion to amend a complaint to add claims untimely under New Mexico's fraudulent transfer law by stepping into shoes of IRS)  *with Ebner v. Kaiser (In re Kaiser)*, No. 13-01243, Slip Op., at *13-15 (Bankr. N.D. Ill. Dec. 31, 2014) (declining to follow the rational in *Vaughn*).

[12]   *See United States v. St. John's Gen. Hosp.*, 875 F.2d 1064, 1067 (3d Cir. 1989).

these transactions to the TCEH Debtors and the value received in exchange will be disputed by the defendants.  For example, the defendants will argue that the TCEH Official Committee focuses on the debt maturity extensions, but ignores important credit agreement amendments (including, for instance, financial covenant relief) and a number of indirect benefits afforded by the amendments.[13]

18.    Specifically, with respect to the 2011 amendment transactions, the defendants will argue that the extension of key debt maturities, among other things, (a) reduced the TCEH Debtors' default risk, (resulting in higher trading values across their capital structure), (b) provided TXU Energy and Luminant Energy greater financial flexibility, and (c) permitted the TCEH unsecured creditors to receive numerous additional interest payments.  With respect to the 2013 amendment transaction—for which the TCEH Official Committee claims the TCEH Debtors paid "exorbitant" fees—the defendants will argue that (1) the extended debt (based on the declining market value of the loans from 2013 to 2016) was substantially less valuable to the lenders than their 2013 holdings and (2) the fees were themselves paid in debt whose market value was considerably less than face value.  As a result of these market effects, the defendants will argue that the lenders ultimately received substantially less in net value as fees than the $340 million asserted in the Motions.  Whether, at a substantially reduced price, avoiding a free-fall bankruptcy and gaining at least a year to prepare for a restructuring was reasonably equivalent value again presents a disputed mixed question of fact and law.

19.    ***Section 546(e) May Bar Many of the Alleged Claims***.  The Alleged Claims will also require resolution of arguments concerning the safe harbor in section 546(e) of the

---

[13]    *See, e.g., In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996) (holding that indirect benefits may confer reasonably equivalent value).

Bankruptcy Code, which bars the avoidance of certain settlement payments and payments in connections with securities contracts.[14]    For example, the defendants may argue that the $21 billion in LBO-related liens are protected by section 546(e) and that the obligations incurred under the TCEH Credit Agreement are also protected.[15]    The defendants also may argue that the section 546(e) safe harbor operates to bar constructive fraudulent transfer claims related to the 2011 and 2013 amendment transactions.

20.    ***The Alleged Claims Related to the LBO May be Challenged Because the TCEH Creditors Participated in, and Benefitted from, the LBO.***    The defendants will likely also argue that it is inequitable to permit participants in the LBO to litigate the LBO-related Alleged Claims, citing precedent from the United States Supreme Court establishing that the principal beneficiary of a corporation's cause of action may not use the corporation to prosecute the action if it would be inequitable for the beneficiary itself to bring the claim.[16]    The vast majority of TCEH-funded debt, including the debt held by the members of the TCEH Unsecured Group, either financed the LBO or refinanced LBO debt.[17]    The defendants will likely argue that it

---

[14]    Specifically, section 546(e) bars the avoidance of "settlement payment[s]" or "transfers made by or to (or for the benefit of) a . . . financial institution . . . in connection with securities contracts." 11 U.S.C. § 546(e).

[15]    11 U.S.C. § 741(7)(A)(v); *see also Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings, Inc.),* 469 B.R. 415, 422 (Bankr. S.D.N.Y. 2012) ("[D]ismissal also is appropriate as to those counts seeking to avoid 'obligations' even though that term does not appear in section 546(e) of the Bankruptcy Code.") (Peck, J.).

[16]    *See Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 713 (1974) ("[W]here equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded from suing on behalf of shareholders."); *see also QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 742 (W.D. Mich. 2007), *aff'd sub nom., In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009) (dismissing avoidance actions under section 546(e) and noting that "one of the creditors seeking the benefit of avoidance in fact provided financing for the LBO . . . and thus would have been fully aware of the financial context of the LBO").

[17]    In particular, the LBO was funded in part with the proceeds of the facilities under the TCEH Credit Agreement and a $6.75 billion TCEH unsecured bridge facility. *See* EFH Corp., Current Report, Form 8-K (Oct. 5, 2007). Twenty-one days after closing the LBO, TCEH issued $3.0 billion of the TCEH unsecured notes to "repay amounts outstanding under [the bridge facility]." *See* EFH Corp., Current Report, Form 8-K (Oct. 25, 2007). On December 6, 2007, TCEH issued another $3.75 billion of the TCEH unsecured notes for the same purpose. (Continued…)

would be inequitable to strip the liens and subordinate the claims of the TCEH first lien creditors while leaving the TCEH unsecured notes and other funded debt intact.

21.    The Movants also assert that the TCEH first lien lenders' claims should be equitably subordinated (because an assertion of annulling the TCEH first lien lenders' claims could be a double-edged sword).  Equitable subordination is a fact-intensive determination and the defendants will argue that their assertions are not colorable because the Movants have not alleged--and cannot allege--sufficient facts to support such a claim

> **C.    There are Viable Alternatives to the Relief Requested in the Motions That Will Better Facilitate Progress in the Chapter 11 Cases and Will Not Prejudice Any Party in Interest.**

22.    For the foregoing reasons, prosecuting the Alleged Claims at this time will be inefficient, and granting standing to any of the Movants to commence this litigation now will be inappropriate.  There are, however, viable alternatives short of outright denial of the Motions.

23.    ***First***, the necessary parties under the TCEH cash collateral order could agree that the filing of the Motions constitutes a "challenge" or "contested matter" that tolls the March 13 Challenge Deadline.  Similarly, the TCEH first lien creditors could agree to extend the March 13 Challenge Deadline as they have done a number of times already [D.I. 1771, 2083, 2704, 2916, 3380].  The Court could then defer resolution of the Motions to a later date.  The Debtors would consent to such a revision to the TCEH cash collateral order.

24.    ***Second***, in the alternative, the Court could grant standing to the TCEH Official Committee on the limited terms described below (including preserving the Debtors' ability to settle the Alleged Claims), and allow the TCEH Official Committee to file its complaint prior to

---

*See* EFH Corp., Current Report, Form 8-K (Dec. 6, 2007).  Approximately $5.2 billion of these TCEH unsecured notes remain outstanding, and the holders of these notes would be the largest beneficiaries of the LBO-related Alleged Claims.

the March 13 Challenge Deadline, but stay the litigation for 120 days. This approach would reduce the risk that the litigation derails the plan process—albeit less effectively than the first alternative.

25.     Neither of these approaches would prejudice the substantive rights of any party in interest. Under the first, all of the Movants retain their right to litigate their Motions. Under the second, the TCEH Official Committee would obtain standing, subject to a limited delay to facilitate plan negotiations. The TCEH Official Committee can prosecute the Alleged Claims as well as any of the other Movants (*See* Section III below), and a 120 day stay of proceedings will have no substantive effect on that ability. Under either scenario, the Alleged Claims would be preserved notwithstanding the passage of the March 13 Challenge Deadline.

## II.     To the Extent the Court Grants Standing, the Debtors Must Retain Authority to Settle the Alleged Claims.

26.     To the extent the Court is willing to entertain the Movants' requests for standing now (which it should not), the Court should reject their patently improper demands for exclusive authority to settle any of the Debtors' claims, and instead reaffirm the Debtors' clear statutory authority to settle all estate causes of action either under Bankruptcy Rule 9019 or as part of the Debtors' exclusive ability to file a plan of reorganization. Indeed, it is black letter law that debtors in possession retain authority to settle all estate claims even if creditors are granted standing.

27.     Bankruptcy Rule 9019(a) vests a debtor with authority to propose a settlement or compromise. Specifically, it provides that "[o]n motion by the *trustee* and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a) (emphasis supplied). The Supreme Court has held that authority granted by the Bankruptcy Code solely to a trustee is limited, by its terms, to a trustee or a debtor-in-possession. *See*

*Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*, 530 U.S. 1, 6 (2000) (holding that individual creditors cannot employ the power of the trustee to surcharge a secured creditor under section 506(c) of the Bankruptcy Code).

28.    Likewise, section 1123(b) of the Bankruptcy Code allows a plan proponent to include a proposed settlement of claims belonging to the debtor.  It states that "a plan may . . . provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate."  11 U.S.C. § 1123(b)(3)(A).  Numerous courts have recognized that this settlement right is limited by the plain language of the statute to the plan proponent.  *See, e.g., In re Allegheny Int'l, Inc.*, 118 B.R. 282, 312 (Bankr. W.D. Pa. 1990) (approving settlement of claims over equity committee's objection even where the committee could have derivatively pursued claims).  Because the settlement or other resolution of the Alleged Claims will be a ***foundational element*** of any plan of reorganization, stripping the Debtors of their settlement authority would effectively allow the Movants to perform an end run around section 1121 of the Bankruptcy Code, which gives the Debtors the exclusive right to propose a plan of reorganization.  *See* 11 U.S.C. § 1121(b) (providing that "only the debtor may file a plan" during the exclusivity period except under certain circumstances not applicable here).

29.    That being said, the Debtors' retention of settlement authority does not undermine the applicable Movant's ability to have a say on any potential resolution of the Alleged Claims. Any proposed settlement by the Debtors must be approved by the Court before it takes effect. *See* 11 U.S.C. § 1123(b); Fed. R. Bankr. P. 9019(a).  In the event the Debtors propose a settlement—either pursuant to a motion under Bankruptcy Rule 9019 or under a proposed plan— the applicable Movant would, of course, have a full opportunity to object or be heard at a hearing.  The Debtors would not seek—nor would this Court permit—anything less.  *See, e.g., In*

*re Exide Tech.*, 303 B.R. 48 (Bankr. D. Del. 2003) (allowing the debtors' authority to settle certain claims brought by a creditors' committee that had previously been granted standing to bring claims, but ultimately denying the debtors' settlement contained in a plan of reorganization on other grounds).

30.     Recognizing these points, courts faced with the issue have declined to grant sole authority to a non-debtor party to settle estate claims where the debtor has opposed such authority.  *In re Centaur, LLC,* No. 10-10799, 2010 WL 4624910, at *7 (Bankr. D. Del. Nov. 5, 2010) ("A grant of derivative standing does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue to have the right, subject to Court approval, to settle the Claims."); *In re Adelphia Commcn's Corp.*, 02-41729 (Bankr. S.D.N.Y. Aug. 4, 2005) (denying an ad hoc committee of noteholders' motion for standing and settlement authority); *In re TOUSA, Inc.*, No. 08-10928 (Bankr. S.D. Fla. May 28, 2008) (D.I. 1092) (denying the committee's request to be vested with the exclusive right and authority to negotiate and enter into settlements on behalf of the debtors' estates, without prejudice); *see also In re Exide Tech.*, 303 B.R. at 66 (holding, over the creditors' committee's objection, that the debtor could propose a settlement of the committee's adversary proceeding through the debtor's plan of reorganization, even where the court had previously granted standing to the committee).[18]

31.     The TCEH Official Committee cites to three unpublished orders in which the bankruptcy court granted creditors the exclusive right to settle claims.[19]   While those orders do exist, they are inapposite because in each of those cases the ***debtors did not object to the***

---

[18]   The transcripts and/or unpublished decisions from these cases are attached to this Objection as **Exhibit B.**

[19]   TCEH Official Committee Motion ¶ 229 (citing *In re Majestic Cap., Ltd.*, No. 11-36225 (Bankr. S.D.N.Y. Dec. 12, 2011) (D.I. 211), *In re Evergreen Solar, Inc.*, No. 11-12590 (Bankr. D. Del. Oct. 28, 2011) (D.I. 382), and *In re Old CarCo LLC*, No. 09-50002 (Bankr. S.D.N.Y. Aug. 13, 2009) (D.I. 5151)).  The transcripts from the applicable hearings from these unpublished cases are attached to this Objection as **Exhibit C**.

***movant's request for exclusive settlement authority.***    In fact, in *Old CarCo*, the debtors

*supported* the movant's request for standing, including with respect to settlement authority.  *See*

8/13/09 Hr'g Tr. at 19:8-10 (debtor stating that it "rises in support of the motion . . . if there is

value there to be pursued to enhance its ability to fund the plan, it should be pursued. So we

support the motion.").   Similarly, in *Evergreen*, the debtors *agreed* that the official committee

could retain settlement authority.  *See* 10/25/15 Hr'g Tr. at 43:11-13 (debtor stating that "if there

is to be some estate representative to challenge issues, it can't plausibly be [the debtors] given

where [they] are in the case.").

32.     Here, the Debtors firmly do ***not*** consent to divesting themselves of the sole

authority to settle the Alleged Claims.  In fact, the Debtors—with the support of the conflicts

matter advisors—firmly believe it is absolutely critical to the success of these chapter 11 cases

that they maintain authority to settle the Alleged Claims because they are actively negotiating a

plan of reorganization that contemplates a global settlement of these and other claims.  In effect,

the only plan the Debtors could propose, in the absence of retaining full settlement authority,

would be one that either meets the unsecured creditors' demands or incorporates a funded

litigation trust, an outcome that could herald litigation for years to come.  That would be the very

antithesis of the recently extended exclusivity and the efforts of the Debtors and all stakeholders

to reach a global resolution of these cases.  As this Court correctly recognized at the February 10,

2015 hearing on the Debtors' motion to extend their exclusivity period, "there is a very strong

argument to say that the debtor either has [the] exclusive right to file a plan or it doesn't."  *See*

2/10/15 Hr'g Tr. at 55:17-19.  Having recently received an extension of exclusivity, the Debtors

retain the exclusive right to file a plan, including one that settles the Alleged Claims.

33.     In short, depriving the Debtors of their ability to settle the Alleged Claims would be, in essence, an end-run around the Debtors' exclusivity period, would stifle plan negotiations, and would almost certainly set these chapter 11 cases on a contentious path that will not foster an exit from chapter 11 any time soon.  For these reasons, the Debtors respectfully request the Court deny the Motions with respect to this extraordinary—and inappropriate—aspect of the requested relief.

### III.    To the Extent the Court Grants Standing, It Should Do So for Only the TCEH Official Committee.

34.     If the Court determines that it is appropriate to grant standing to prosecute the Alleged Claims to a party other than the Debtors, such authority should be limited to the TCEH Official Committee for at least three reasons.  *First*, all three Movants assert substantially the same Alleged Claims, such that granting standing to the EFH Committee or the TCEH Unsecured Group is redundant and wasteful.  *Second*, as the fiduciary for *all* TCEH unsecured creditors (the parties that may gain the most from pursuing the Alleged Claims), the TCEH Official Committee is the best-positioned Movant to pursue the Alleged Claims.  *Third*, the purported conflicts of the TCEH Official Committee (as alleged by the EFH Committee and the TCEH Unsecured Group) are illusory and, if necessary, may be resolved by limiting the role of certain TCEH Official Committee members.

### A.    The Alleged Claims Asserted by the Movants Are Duplicative.

35.     The proposed complaints attached to the TCEH Official Committee Motion and the TCEH Unsecured Group Motion are virtually identical.  As indicated in the attached **Exhibit A**, which is a redline of the TCEH Unsecured Group's complaint against the TCEH Official Committee's complaint, the complaints include the exact same twenty-two counts in the exact same order with only cosmetic differences.

17

36.     Although the EFH Committee Motion did not include a proposed complaint, it seeks standing to prosecute claims that overlap with the complaints proposed by the TCEH Official Committee and the TCEH Unsecured Group.  In particular, the EFH Committee Motion exclusively concerns guarantees incurred in connection with the LBO and alleged subsequent payments on LBO debt by a TCEH subsidiary, Luminant Generation Company LLC.  These claims coincide with, and are subsumed within, the first count of the other proposed complaints, which seeks avoidance of liens and obligations incurred by TCEH and its subsidiaries in the LBO.

**B.      To the Extent the Court Grants Standing, the TCEH Official Committee Is the Only Movant Suited to Pursue the Alleged Claims.**

37.     Because the Motions seek to prosecute claims with the goal of increasing the value recoverable to *all* TCEH unsecured creditors  the TCEH Official Committee is the best-positioned Movant to pursue such claims.  Indeed, as the Court stated in connection with the motion to appoint a committee to represent EFH Corp. and EFIH unsecured creditors, debtholders are fiduciaries only for themselves, "ad hoc committee[s] represent ad hoc committee members" but official committees have the "fiduciary incentive. . . to protect the rights of *all* general unsecured creditors."  *See* 8/13/14 Hr'g Tr. at 104:2-5, 107:1-3 (emphasis added).  Counsel for the TCEH Unsecured Group reiterated this sentiment at the September 16, 2014 hearing, noting that "the committee individuals each owe a fiduciary duty to . . . unsecured creditors of TCEH" and stated that its own group is "not an estate fiduciary."  *See* 9/16/14 Hr'g Tr. at 45:11-13, 83:8-10.

38.     Despite the TCEH Official Committee's role as a fiduciary to all TCEH unsecured creditors, the EFH Committee and the TCEH Unsecured Group suggest that it would be inappropriate for the Court to grant exclusive standing to the TCEH Official Committee, in

large part because Wilmington Savings Fund, FSB, the indenture trustee for the TCEH secured

second lien notes ("WSFS") serves as a committee member.  The TCEH Unsecured Group, for

example, argues that the TCEH second lien noteholders are to some extent "proxies" for the

TCEH first lien noteholders due to intercreditor turnover obligations.  TCEH Unsecured Group

Motion ¶ 35.

39.     These concerns are misplaced.  It is well-settled law that members of a creditors'

committee owe a fiduciary duty to the *class* of creditors that the committee was appointed to

represent and have the obligation to provide "fidelity, undivided loyalty, and impartial service"[20]

in pursuing the interests of the *class*.[21]  In particular, this means that a member's "fiduciary duty

'extends to the class as a whole, not to its individual members'" and not to any particular

creditor.  *In re Dow Corning Corp.*, 255 B.R. 445, 485 (E.D. Mich. 2000) (quoting *In re Drexel*

---

[20] *See In re Mountain States Power Co.*, 118 F.2d 405, 407 (3d Cir. 1941) (noting duty of "undivided loyalty" (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928))); *Life Serv. Sys.*, 279 B.R. at 513 (stating members of committee have duty of fidelity, undivided loyalty, and impartial service to creditor class); *Fas Mart Convenience Stores*, 265 B.R. 427, 432 (Bankr. E.D. Va. 2001) (recognizing duty of undivided loyalty and impartial service to creditors); *In re Nationwide Sports Distrib., Inc.*, 227 B.R. 455, 464 (Bankr. E.D. Pa. 1998) (describing duty of "undivided loyalty" (quoting *Meinhard*, 249 N.Y. at 464)); *United Steel Workers v. Lampl* (*In re Mesta Mach. Co.*), 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986) (noting committee members have obligations of fidelity, undivided loyalty, and impartial service); *Pension Benefit Guar. Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Prof'l Corp.*, 42 B.R. 960, 963 (Bankr. E.D. Pa. 1984) (opining committee owes duty of loyalty to class it represents).

[21] *See Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001) (stating members of official creditor's committee owe fiduciary duty "toward their constituent members"); *In re Life Serv. Sys.*, 279 B.R. at 513 ("Members of a creditors' committee owe a fiduciary duty to the committee's constituents—i.e., the class of general unsecured creditors in general."); *ABF Capital Mgmt. v. Kidder Peabody* (*In re Granite Partners, L.P.*), 210 B.R. 508, 516 (Bankr. S.D.N.Y. 1997) ("The committee and its members owe a fiduciary duty to the class of creditors that the committee represents.") (emphasis in original); *Pan Am. Corp. v. Delta Air Lines*, 175 B.R. 438, 514 (S.D.N.Y. 1994) (noting creditors committee owes fiduciary duty only to class of creditors, not to debtor or any other party); *Johns-Manville Sales Corp. v. Doan* (*In re Johns-Manville Corp.*), 26 B.R. 919, 924 (Bankr. S.D.N.Y. 1983) ("[A] holder of a claim or an equity interest who serves on a committee undertakes to act in a fiduciary capacity on behalf of the members of the class he represents."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (creditors' committee stands as fiduciary to "committee's constituents"); *In re Garden Ridge Corp.*, No. 04-10324, 2005 WL 523129, at *3 (Bankr. D. Del. March 2, 2005) ("[O]fficial committee of unsecured creditors has a duty to represent all general unsecured creditors."); *Mirant Americas Energy Mktg. v. Official Comm. of Unsecured Creditors of Enron Corp.*, No. 02 Civ. 6274, 2003 WL 22327118, at *4 (S.D.N.Y. 2003) ("It is well settled that a creditors' committee owes a fiduciary obligation to its constituency.").

*Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992)); *In re Granite Partners*, 210 B.R. at 516 (acknowledging creditors' committee members "do not . . . owe a fiduciary duty to any particular creditor.").

40.     To the extent WSFS's interest as an allegedly secured lender may conflict with its responsibility to advocate for the interests of all TCEH unsecured noteholders, that is not enough on its own to disable the entire TCEH Official Committee from pursuing the Alleged Claims.  In fact, neither the EFH Committee nor the TCEH Unsecured Group presents any evidence that, to date, any individual member of the TCEH Official Committee has acted to pursue its own interest to the detriment of the interests represented by the TCEH Official Committee.

41.     Moreover, to the extent WSFS's role becomes an issue, the TCEH Official Committee's bylaws provide a solution.  On information and belief, the TCEH Official Committee's bylaws prohibit a committee member from participating in deliberations of, and voting on, matters with respect to which it may have a conflict.  The bylaws also provide that in the event of a dispute as to the existence of a conflict, the TCEH Official Committee will determine, by majority vote and the agreement of counsel, whether such conflict exists.  Thus, conflicted committee members are precluded from even influencing the TCEH Official Committee's discussion on conflicted matters.

42.     Moreover, if any committee member were to take action in furtherance of its parochial interest to the disadvantage of the class of TCEH unsecured creditors, parties in interest would have at least two options available to them as a remedy.  ***First***, they may seek relief from the Court.  For example, in *In re The Charter Company*, the bankruptcy court denied a motion to remove an indenture trustee from the creditors' committee, rejecting the movant's argument that the indenture trustee's dual fiduciary capacity would be "destructive to the

creditors' committee system" and holding that if an actual conflict arose, it could be brought to the court's attention.  42 B.R. 251, 252-53 (Bankr. M.D. Fl. 1984).  **Second**,  any individual committee member can simply be outvoted.  For example, in *Schatz Federal Bearings Co.*, the court refused to deny appointment of a union to the creditors' committee based on theoretical conflicts, noting that the union's single vote on any given issue would be outweighed by the vote of the other committee members.  17 B.R. 780 (Bankr. S.D.N.Y. 1982).

43.    In contrast, the TCEH Unsecured Group and the EFH Committee suffer from paralyzing deficiencies that should preclude their ability to obtain standing.

44.    As discussed above, the TCEH Unsecured Group participated in the LBO that it seeks to unwind in much the same way as the TCEH first lien creditors.  The approximately $5.2 billion of existing TCEH unsecured notes were used to refinance an unsecured LBO bridge facility within 20 to 60 days of the closing date of the LBO.  Here, it would be improper for the TCEH Unsecured Group to step into the Debtors' shoes to prosecute claims against the TCEH first lien creditors with respect to transactions in which its members effectively participated to substantially the same extent as the TCEH first lien creditors when the TCEH Unsecured Group's complaint is virtually identical to the TCEH Official Committee's complaint (as reflected in the redline attached hereto as **Exhibit A**).  Granting two separate parties (only one of whom is bound by fiduciary duty obligations) standing to prosecute and investigate the same set of claims largely for the benefit of the same constituencies will be inefficient.[22]

---

[22]  There is at least one case in which a court, deviating from the weight of law, granted standing to a party on the basis that a party need "only show a sufficient stake [in the bankruptcy]" in order to obtain standing under section 1109 of the Bankruptcy Code.  *Unofficial Committee of Zero Coupon Noteholders v. The Grand Union Co.*, 179 B.R. 56, 59 (D. Del. 1995).  Neither the TCEH Unsecured Group nor the EFH Committee cite this case—with good reason.  There, the bankruptcy court denied standing to the creditor of the parent entity to challenge the subsidiary's debtor-in-possession financing relief on the basis that (a) the creditor was not a creditor of the debtor and (b) the parent entity could sufficiently represent the interests of its creditors in its (Continued…)

45. The EFH Committee does have fiduciary obligations, but only to *EFH Corp.* and *EFIH* unsecured creditors. These duties do not empower the EFH Committee to prosecute claims for the benefit of *TCEH* Debtors. To obtain standing, a party must demonstrate that it is a "party in interest" under section 1109(b) of the Bankruptcy Code. 11 U.S.C. § 1109(b). Thus, the EFH Committee could seek standing to prosecute claims on behalf of *EFH Corp.* and *EFIH*, as a party in interest in those Debtors' proceedings. But the EFH Committee's status as a creditor of EFH Corp., and EFH Corp.'s status as a creditor of TCEH, is an improper basis for granting the EFH Committee standing to prosecute claims on behalf of the TCEH Debtors.

46. Where a party has a "financial interest" but no "direct interest" in the debtor, that party does not have standing to prosecute claims against the debtor. *See In re Refco*, 505 F.3d 109, 117 n.10 (2d Cir. 2007) (stating that "party-in-interest standing under section 1109(b) does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding" and denying a motion by equity interests with a "financial interest" in the debtor but no "direct interest" for standing to prosecute claims against the debtor); *see also Matter of Penn Cent. Transp. Co.,* 596 F.2d 1155 (3d Cir. 1979) (holding that (a) shareholders of one debtor did not have standing to appeal the order confirming the plan of another debtor and (b) bondholders of a creditor of a debtor did not have standing to appeal an order authorizing the sale and lease of certain debtor property); *In re Innkeepers*, 448 B.R. 131 (Bankr. S.D.N.Y. 2011) (forbidding a party that owned certificated interests in the debtor's creditor to step into the shoes of the creditor).

---

subsidiary's bankruptcy. *Id.* In reversing the bankruptcy court's decision, the district court stated that it was more likely that the interests of the parent and subsidiary aligned, as opposed to the parent and its creditor in the subsidiary's bankruptcy. *Id.* Here, the TCEH Official Committee and the TCEH Unsecured Group seek to investigate virtually identical Alleged Claims for virtually identical constituencies.

47.     Accordingly, a "creditor of a creditor" is not a "party in interest" for purposes of standing.  *See In re Lehman Bros. Holdings Inc.*, No. 08-13555 JMP, 2012 WL 1057952, at *3 (S.D.N.Y. Mar. 26, 2012) (holding that "a creditor once removed does not have party-in-interest standing").  Similarly, courts have rejected the notion that "any particular creditor's interest may be asserted by anyone other than that creditor."  *In re Refco*, 505 F.3d at 117 (citing *In re Comcoach Corp.,* 698 F.2d 571, 573 (2d Cir. 1983)); *see also In re Copperfield Investments, LLC*, 421 B.R. 604 (Bankr. E.D.N.Y. 2010) (quoting *Comcoach* and noting that a party will not satisfy the "party-in-interest" requirement where it does not have a "direct financial stake").  Thus, representing creditors of only EFH Corp. and EFIH, the EFH Committee is too far removed from the TCEH Debtors to step into their shoes and assert claims against the TCEH first lien creditors.

48.     Because the EFH Committee is too far removed from the TCEH estate to prosecute claims on behalf of such estate and because the TCEH Unsecured Group is both conflicted and unlikely to provide value in excess of what the TCEH Official Committee can provide, both the EFH Committee and the TCEH Unsecured Group should be denied standing.

**IV.     The TCEH Official Committee Should Only be Granted Standing to Assert Alleged Claims that Are Subject to the Stipulations in the Cash Collateral Order.**

49.     If the Court grants the TCEH Official Committee standing to prosecute and investigate the Alleged Claims, such authority should be limited to those Alleged Claims that are actually subject to the stipulations set forth in the TCEH cash collateral order because the TCEH Official Committee cannot demonstrate that the TCEH Debtors have unjustifiably refused to bring those aspects of the Alleged Claims or that the TCEH Debtors could not bring such Alleged Claims.

50.     This is because the TCEH cash collateral order preserves the Debtors' rights with respect to certain key aspects of the TCEH first lien lenders' claims, notwithstanding the various stipulations contained in the order.  For one, section 5(d) of the TCEH cash collateral order, which covers adequate protection payments, specifically provides that "[a]ny Adequate Protection Payment shall be without prejudice and with a full reservation of rights, as to whether such payment should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code."  TCEH Cash Collateral Order, § 5(d).  Similarly, section G of the TCEH cash collateral order expressly reserves the Debtors' (and the first lien lenders') rights with respect to any diminution in value claim.[23]  *Id.*, § G.

51.     Taken together, these reservations of rights provide that the stipulations in the TCEH cash collateral order do *not* deprive the Debtors of their sole authority to investigate, prosecute, and settle issues related to potential diminution in collateral value.  This means as a practical matter that the Debtors may, at some point in these chapter 11 cases, seek to bring at least the following counts contained in the TCEH Official Committee's proposed complaint:[24]

- **Count 10**, which seeks to recharacterize any adequate protection payments made by the Debtors under the TECH cash collateral order;

---

[23]    As stated earlier, the TCEH Unsecured Group's complaint is virtually identical to the TCEH Official Committee's complaint.  For that reason, the Debtors' responses herein cite to the TCEH Official Committee's complaint.  The Debtors' responses apply with equal vigor to the duplicative counts raised in the TCEH Unsecured Group's complaint.

[24]    *See*, Section G of the TCEH Cash Collateral Order (stating that "The First Lien Collateral Agent, for the benefit of itself and the Prepetition First Lien creditors, to protect such parties' interests in the Prepetition Collateral, and, in exchange for consenting to the priming liens contained in the DIP Facility approved pursuant to the DIP Order, is entitled to receive adequate protection for any diminution in value of their respective interests in the Prepetition Collateral from and after the Petition Date resulting from the imposition of such priming liens and the use of Cash Collateral, the use, sale, lease, consumption, or disposition of Prepetition Collateral, and the imposition of the automatic stay (collectively, the "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code; *provided, however, that nothing in this Final Order (including the priming liens contained in the DIP Facility approved pursuant to the DIP Order) shall be deemed to imply that there has been an automatic Diminution in Value, and all parties' rights with respect to calculating any Diminution in Value shall be expressly preserved*.") (emphasis added)).

- ***Count 19***, which contends that the TCEH first lien lenders are not entitled to adequate protection claims because there has been no Diminution in Value of collateral during the chapter 11 cases and the Debtors' use of cash collateral will not result in a Diminution in Value of collateral; and

- ***Count 21***, which contends that adequate protection payments received by the TCEH first lien lenders should be characterized as payments at the non-default rate of interest in accordance with the reservation of rights set forth in paragraph 5(d) of the TCEH cash collateral order.

52.      Accordingly, to the extent the Court grants standing to the TCEH Official Committee, such relief should not extend to the above-identified counts because they are beyond the scope of the stipulations set forth in the TCEH cash collateral order and the TCEH Official Committee has not otherwise demonstrated that the Debtors have unjustifiably refused to bring those particular Alleged Claims.

*[Remainder of page intentionally left blank.]*

Dated:  March 3, 2015
      Wilmington, Delaware

*/s/ Jason M. Madron*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
      defranceschi@rlf.com
      madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
      stephen.hessler@kirkland.com
      brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
      marc.kieselstein@kirkland.com
      chad.husnick@kirkland.com
      steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession