**<u>Exhibit B</u>**

**Transcript from *TOUSA* and Unpublished Decision from *Centaur*[1]**

---

[1]    The full *TOUSA* transcript is attached as **<u>Exhibit B</u>**.  For ease of reference, the portions of the transcript relevant to the arguments set forth in this Objection have been highlighted.

1             UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
2

3

4

5    IN RE:                    CASE NO. 08-10928-BKC-JKO

6

     TOUSA, INC., et al.,
7

              Debtors.
8    _____/

9

10

11           ALL MOTIONS ON THE CALENDAR

12

13      (CP762), (CP928), (CP929), (CP930), (CP931)

14

15                 May 22, 2008

16

17           The   above-entitled  cause  came  on for

18   hearing   before   the   HONORABLE  JOHN  K. OLSON,

19   one of  the  Judges of the  UNITED  STATES BANKRUPTCY

20   COURT, in and for the  SOUTHERN  DISTRICT OF FLORIDA,

21   at 299 East  Broward Blvd.,  Fort Lauderdale, Broward

22   County,   Florida,  on   Thursday,  May 22,  2008,

23   commencing at or about 9:30 a.m., and  the  following

24   proceedings were had:

25                      Reported By:  Margaret Franzen


     OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1                    APPEARANCES:

 2

 3               BERGER SINGERMAN, by
             PAUL S. SINGERMAN, ESQUIRE
 4                      and
               KIRKLAND & ELLIS, by
 5              PAUL M. BASTA, ESQUIRE
         M. NATASHA LABOVITZ, ATTORNEY-AT-LAW
 6            DANIEL T. DONOVAN, ESQUIRE
                on behalf of the Debtors
 7

 8

          AKIN GUMP STRAUSS HAUER & FELD, by
 9            DANIEL H. GOLDEN, ESQUIRE
              PHILIP C. DUBLIN, ESQUIRE
10            DAVID M. ZENSKY, ESQUIRE
                ABID QURESHI, ESQUIRE
11                      and
                STEARNS WEAVER, by
12       PATRICIA A. REDMOND, ATTORNEY-AT-LAW
     on behalf of the Committee of Unsecured Creditors
13

14

            GENOVESE JOBLOVE & BATTISTA, by
15            PAUL J. BATTISTA, ESQUIRE
                        and
16      KASOWITZ BENSON TORRES & FRIEDMAN, by
               DAVID S. ROSNER, ESQUIRE
17            JONATHAN E. MINSKER, ESQUIRE
     on behalf of Aurelius Capital Master Limited, et al.
18

19

               CHADBOURNE & PARKE, by
20           JOSEPH H. SMOLINSKY, ESQUIRE
               THOMAS J. HALL, ESQUIRE
21                      and
         STICHTER RIEDEL BLAIN & PROSSER, by
22            RICHARD PROSSER, ESQUIRE
                        and
23            SMITH HULSEY & BUSEY, by
              STEPHEN D. BUSEY, ESQUIRE
24      on behalf of Citicorp North America, Inc.

25
                            Continued....
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

3

```
 1          BILZIN SUMBERG BAENA PRICE & AXELROD, by
                    SCOTT L. BAENA, ESQUIRE
 2               MATTHEW I. KRAMER, ESQUIRE
                            and
 3                BRACEWELL & GIULIANI, by
                  EVAN D. FLASCHEN, ESQUIRE
 4                  KURT MAYR, ESQUIRE
              on behalf of the Second Lien Holders
 5     and Wells Fargo, as successor administrative agent

 6

 7                  ECKERT SEAMANS, by
              RONALD GELLERT, ESQUIRE (Via Telephone)
 8     on behalf of Zurich American Insurance Company

 9

10                 SEWARD & KISSEL, by
              JOHN ASHMEAD, ESQUIRE (Via Telephone)
11     on behalf of Wells Fargo, as second lien agent

12

13                    ARENT FOX, by
              ANDREW SILFEN, ESQUIRE (Via Telephone)
14        on behalf of Wilmington Trust Company

15

16             WEIL GOTSHAL & MANGES, by
              ROBERT LEMONS, ESQUIRE (Via Telephone)
17                          and
          KELLY RODEN, ATTORNEY-AT-LAW (Via Telephone)
18            on behalf of GMAC Model Homes

19

20               JEFFREY BAST, P.A., by
                  JEFFREY BAST, ESQUIRE
21                          and
                  FORRESTER & WORTH, by
22     S. CARY FORRESTER, ESQUIRE (Via Telephone)
              on behalf of Red River, Eldorado, LLC and
23               Rancho Sierra Vista, LLC

24

25                              Continued....
```

```
 1          PROCOPIO CORY HARGREAVES & SAVITCH, by
          GERALD P. KENNEDY, ESQUIRE (Via Telephone)
 2             on behalf of SC Design California

 3

 4                    WHITE & CASE, by
          AVI GOLDENBERG, ESQUIRE (Via Telephone)
 5             on behalf of Deutsch Bank

 6

 7                  SNELL & WILMER, by
          DONALD L. GAFFNEY, ESQUIRE (Via Telephone)
 8             on behalf of JP Morgan Chase

 9

10          MARKOWITZ DAVIS RINGEL & TRUSTY, by
          JERRY MARKOWITZ, ESQUIRE (Via Telephone)
11             on behalf of Alex Partners

12

13          OFFICE OF THE UNITED STATES TRUSTEE, by
               STEVEN SCHNEIDERMAN, ESQUIRE
14                  Attorney/Advisor
          on behalf of the United States Trustee
15
                    ALSO PRESENT:
16             TOMMY McADEN, TOUSA
               JOHN BOKEN, Kroll
17          CAROL FLATEN, Citicorp, N.A.
            TARA TORRENCE, Capital Research
18          STEVEN COOK, SMH Capital Advisors
     PAUL FRATEMEGO, Resurgent Benefit Management
19               (Via Telephone)

20                  I N D E X
     WITNESS          Direct   Cross   Redirect   Recross
21   JOHN BOKEN
      By Mr. Donovan    178              238
22    By Mr. Qureshi           207                  --
      By Mr. Rosner            221                  --
23    By Mr. Smolinsky         236                  --
      By Mr. Flaschen          237                  --
24

          EXHIBITS ADMITTED INTO EVIDENCE
25      Debtors' 1 - 3........................Page 239
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1           THE COURT:  On the TOUSA matter, here's

2    how I'd like us to proceed.  First, let's deal

3    with the uncontested matters.

4           In the contested matters, I'd like to

5    take up Items 9-A and 10-A, the J.H. Cohn and

6    Robert Charles Lesser retention applications,

7    then the creditors' committee motion for standing

8    and finally, the cash collateral motion.

9           As I indicated in the small hearing we

10   had earlier this week, the cash collateral motion

11   is going to be regarded as a preliminary hearing

12   only.  I have received pleadings as recently as

13   some apparently filed last night, early this

14   morning, and I don't expect anything other than a

15   preliminary result in respect of the cash

16   collateral motion.

17          But Ms. Labovitz, I guess it's yours

18   normally to handle the uncontested matters unless

19   someone else is going to do it this morning.

20          Mr. Singerman.

21          MR. SINGERMAN:  Thank you, your Honor.

22   Your Honor, as a preliminary matter, would you

23   like to include the telephonic parties and take

24   appearances?

25          THE COURT:  That sounds like a fair

1   thing to do and I'll take appearances, of course,

2   too.

3           I actually, Mr. Singerman, found it

4   difficult to believe that there was anyone who

5   could be on the telephone with interest in this

6   case.

7           (Thereupon, the Court called into the

8           conference call, after which the following

9           proceedings were had:)

10          THE COURT:  Good morning.  This is

11  Judge Olson.  I'm first going to take appearances

12  in the courtroom and then I will ask for

13  appearances by parties who are on the phone.

14          MR. BASTA:  Your Honor, Paul Basta from

15  Kirkland & Ellis on behalf of TOUSA and its

16  affiliated debtors.  I'm joined by our team,

17  Mr. Singerman, from Berger Singerman --

18          MR. SINGERMAN:  Good morning, Judge.

19          MR. BASTA:  -- as well as

20  Natasha Labovitz and Daniel Donovan from

21  Kirkland & Ellis.  In addition, your Honor, we

22  have John Boken, the company's chief

23  restructuring officer, who is our witness today

24  in our motion seeking interim relief for cash

25  collateral, as well as Tommy McAden, the

1    company's chief financial officer.

2              THE COURT:  Good morning to all of you.

3              MR. GOLDEN:  Good morning, your Honor.

4    Daniel Golden, Akin Gump Strauss Hauer & Feld,

5    counsel for the official creditors' committee.

6    With me this morning are two of my partners,

7    David Zensky, who I introduced to the Court

8    during the other day's telephone conference --

9              MR. ZENKSY:  Good morning, your Honor.

10             THE COURT:  Mr. Zensky, good morning.

11             MR. GOLDEN:  -- and Phil Dublin.

12             Your Honor, I would also like to take

13   the opportunity to introduce to the Court two

14   members, two of the co-chairs or the two

15   co-chairs to the official creditors' committee

16   who wanted to be at today's hearings considering

17   the gravity of the matters to be discussed, so we

18   have in the courtroom Tara Torrence from Capital

19   Research and Steven Cook from SMH Capital

20   Advisors.

21             THE COURT:  Thank you.  You are all

22   welcome.

23             MR. MAYR:  Good morning, your Honor.

24   Kurt Mayr, Bracewell & Giuliani ---

25             THE COURT:  Mr. Mayr, if you'd use a

1    microphone and the microphones, if the little red

2    dot isn't on, they are not picking up.

3            MR. MAYR:  Super.  It's on.  Good

4    morning, your Honor.  Kurt Mayr of Bracewell &

5    Giuliani on behalf of the second lien agent,

6    Wells Fargo, and the informal group of second

7    lien lenders.  I have with me today my partner,

8    Mr. Evan Flaschen and our co-counsel, Scott Baena

9    and Matt Kramer of Bilzin Sumberg.

10           THE COURT:  Good morning, gentlemen.

11           MR. SMOLINSKY:  Good morning, your

12   Honor.  Joe Smolinsky from Chadbourne & Parke on

13   behalf of Citibank, N.A., as administrative

14   agent.  I have with me here today my colleague,

15   Tom Hall.

16           MR. HALL:  Good morning, your Honor.

17           THE COURT:  Good morning.

18           MR. SMOLINSKY:  We also have here today

19   Steven Busey, who is co-counsel with respect to

20   the prepetition revolving facility.  We have

21   Richard Prosser here today, who is co-counsel for

22   the agent in respect of the term loan facility,

23   first lien, and I'd also like to introduce in the

24   courtroom today Carol Flaten, who is managing

25   director of Citibank, N.A., in respect of the

1    agent representative.  Thank you.

2            THE COURT:  Good morning to all of you.

3            MR. ROSNER:  Good morning, your Honor.

4    David Rosner from Kasowitz Benson Torres &

5    Friedman.  I'm here quite a few rows back with my

6    partner, Jon Minsker, in the red tie over there,

7    which I don't know if you saw when he stood up --

8            THE COURT:  I did.

9            MR. ROSNER:  -- and my co-counsel,

10   Paul Battista.

11           THE COURT:  I always see Mr. Battista

12   when he stands up.

13           MR. ROSNER:  He's got about a foot and

14   a half on me, so he's easy to see.  So, good

15   morning, your Honor.

16           THE COURT:  Good morning.  Anyone else

17   wish to make an appearance in the courtroom?

18   Mr. Schneiderman, I see.

19           MR. SCHNEIDERMAN:  Yes, your Honor.

20   Steven Schneiderman for the U.S. Trustee.

21           THE COURT:  Good morning, Mr. Bast.

22           MR. BAST:  Good morning, your Honor.

23           Jeffrey Bast for Red River, Eldorado

24   Holdings, LLC and Sierra Vista, LLC and my

25   co-counsel, Cary Forrester from Arizona may be on

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    the phone.  I know he was under the weather, so

2    I'm not sure if he made it up for the early hour.

3            THE COURT:  Good morning.  Anyone else

4    in the courtroom?

5            Okay.  Let me take appearances on the

6    phone.

7            MS. RODEN:  Good morning, your Honor.

8    Robert Lemons and Kelly Roden from Weil Gotshal &

9    Manges on behalf of GMAC Model Home Finance,

10   LLC.

11           THE COURT:  Good morning.

12           MR. GAFFNEY:  Your Honor, this is

13   Don Gaffney of Snell & Wilmer in Arizona

14   appearing on behalf of JP Morgan Chase, as agent.

15           MR. KENNEDY:  Good morning, your Honor.

16   Gerald Kennedy, Procopio Cory Hargreaves &

17   Savitch, on behalf of SC Design California.

18           MR. ASHMEAD:  Good morning, your Honor.

19   John Ashmead of Seward & Kissel appearing on

20   behalf of Wells Fargo, as second lien agent.

21           MR. FORRESTER:  Your Honor, this is

22   Cary Forrester of Forrester & Worth in Arizona.

23   I appear for Red River, Eldorado 6500, LLC and

24   Rancho Sierra, LLC.

25           THE COURT:  Very good.

1          MR. GELLERT:  Your Honor,

2    Ronald Gellert from the law firm of Eckert

3    Seamans Cherin & Mellott on behalf of Zurich

4    American Insurance Company.

5          MR. SILFEN:  Good morning, your Honor.

6    Andrew Silfen with Arent Fox, counsel for

7    Wilmington Trust Company, as indenture trustee

8    under certain indentures with respect to the

9    senior notes.

10          MR. GOLDENBERG:  Avi Goldenberg of

11    White & Case on behalf of Deutsch Bank Trust

12    Company Americas, holder of the 14.75 percent PIK

13    notes.

14          THE COURT:  Anyone else?

15          MR. FRATAMEGO:  Paul Fratamego

16    (phonetic) of Resurgent Benefit Management on our

17    own behalf.

18          THE COURT:  Okay.  I will assume nobody

19    else wants to make an appearance and if somebody

20    needs to later on, that's fine.

21          I announced before we got on the phone

22    that I intended today to handle what the TOUSA

23    agenda characterizes as uncontested matters

24    first; second, to handle the creditors'

25    committee's motion or applications to employ

1    J.H. Cohn, as its forensic accountants and

2    Robert Charles Lesser & Company, as real estate

3    advisors; thirdly, to handle the creditors'

4    committee's motion for standing; and fourthly,

5    the debtors' cash collateral motion.

6           I intend the cash collateral motion to

7    be treated as a preliminary hearing.  There are,

8    in some of the exhibits that have been filed with

9    me, unredacted versions of financial information,

10   which is, by agreement, confidential to parties

11   who have executed confidentiality agreements.

12          If, as and when it comes -- we come

13   time to discuss any of the confidential financial

14   information or to put it up on the five modest 50

15   inch plasma monitors that decorate this

16   courtroom, I will clear the courtroom of anyone

17   who has not executed a confidentiality agreement

18   and we will shut off the conference call.

19          If we come back to matters that are no

20   longer subject to the confidential financial

21   information restrictions, then others will be

22   invited to come back in out of the 92 degree

23   temperature outside and we'll try to reconnect to

24   the conference call.  But if you're cut off and

25   unhappy about it, sign a confidentiality

1   agreement and you won't be put out in the heat.

2           So with that, may we do the

3   uncontested -- the purportedly uncontested

4   matters first?

5           MR. SINGERMAN:  Good morning, your

6   Honor.  May it please the Court, Paul Singerman

7   from Berger Singerman, co-counsel to the debtors.

8           With your Honor's permission, I'll

9   start with I believe to be an uncontested matter

10  that's not on the agenda, but addresses the order

11  your Honor ruled ore tenus two days ago, allowing

12  for the filing of a business plan and the

13  borrowing base roll forward under seal.

14          We've prepared a form of order.  It's

15  been approved by the committee and the senior

16  banks.  May I present that order?

17          THE COURT:  Yes, sir.

18          MR. SINGERMAN:  Thank you, your Honor.

19          THE COURT:  You want it entered now?

20          MR. SINGERMAN:  Yes, sir.

21          Your Honor, I'm taking that special

22  precaution because in the order we provide for

23  the provision of the business plan to the Office

24  of the United States Trustee, and

25  Mr. Schneiderman has appropriately pointed out

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that he would enjoy -- his office would enjoy the

2    benefit of the order because they're subject to

3    the Freedom of Information Act.

4           THE COURT:  The order is executed.

5           MR. SINGERMAN:  Thank you, your Honor.

6    Next, your Honor, Item 2 on the agenda, Docket

7    Entry 762.  This is the debtors' motion to

8    compromise controversy with GMAC.  This matter

9    has been before the Court on several prior

10   occasions and is back before the Court on proper

11   notice today.

12          Earlier this morning, as I understand

13   it, GMAC and the debtors have reached final

14   agreement on the entirety of the settlement,

15   including the definitive documents and the

16   schedules to the settlement stipulation and the

17   parties are now working on an agreed order.

18          I'm further advised that the committee

19   has been kept apprised of the terms of this final

20   resolution and subject to reviewing the order

21   that we would intend to submit to your Honor for

22   entry, the committee will have no objection to

23   the settlement.  No other party has filed an

24   objection to the proposed settlement.

25          So unless your Honor has questions,

1    we'd ask that when we submit that form of order,

2    acceptable to GMAC and the committee, that your

3    Honor enter it.

4              THE COURT:  Mr. Dublin.

5              MR. DUBLIN:  Thank you, your Honor.  We

6    are happy to report that we've been involved with

7    the company and GMAC to make significant

8    modifications to the stipulation that we had a

9    number of concerns with when it was initially

10   proposed.

11             We do understand an agreement has been

12   reached with the debtors and GMAC.  We have not

13   received the proposed final version of the

14   documents.  We will look at those closely, make

15   sure they are consistent with what we understand

16   to be the agreement, and then hopefully we'll be

17   able to submit an agreed order.

18             THE COURT:  Very good.  Mr. Singerman,

19   I'll look to you for the order and assume when

20   it's sent in by you that it is agreed.

21             MR. SINGERMAN:  Yes, sir.  Thank you,

22   your Honor.

23             THE COURT:  Thank you.

24             MS. LABOVITZ:  Good morning, Judge.

25             THE COURT:  Good morning, Ms. Labovitz.

 1          MS. LABOVITZ:  Natasha Labovitz from

 2   Kirkland & Ellis representing the debtors.

 3          Judge, we'll continue with the theme of

 4   the operational motions begun by Mr. Singerman on

 5   GMAC.  The next I'll take up is Item 3, I

 6   believe, on the agenda, which is the Oakmont

 7   Grove motion for relief from the automatic stay

 8   regarding its executory contracts.

 9          Judge, that motion was presented to you

10   at the last hearing and we had said then that we

11   would agree on a stipulation and present that to

12   the Court.  We're working on that and we'll

13   present it to the Court.

14          THE COURT:  Okay, but you don't have it

15   today?

16          MS. LABOVITZ:  There is no stipulation

17   to present today --

18          THE COURT:  Okay.

19          MS. LABOVITZ:  -- and we will circulate

20   that to the creditors' committee.

21          The next item is actually being

22   presented before the Court today.  It is the

23   motion to compromise the Jasmine Valley disputed

24   claim.  Judge, it's a simple claims resolution.

25   This relates to the debtors' development in

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1     Jasmine Valley, I believe it's Nevada.

2             The development overall is the subject

3     of a litigation regarding alleged construction

4     defects.  There is insurance covering the

5     development.  Because of the history related to

6     the construction, the insurance has been agreed

7     to cover 96 of the constructed homes in the

8     development first, before all of the remaining

9     homes.

10            This relates to the fact that the

11    contractor that built those 96 homes procured the

12    insurance before the development was sold to

13    TOUSA and construction was finished.  As part of

14    the construction agreement, it was agreed that

15    the insurance policy and rights in the policy

16    would pass to TOUSA, but subject to the agreement

17    that the homes constructed by this contractor

18    would enjoy first priority.

19            The litigation that is pending covers

20    all of the homes in the development, the 96

21    constructed by this contractor, Brambell, and 200

22    other homes.

23            What is before the Court now is a

24    settlement that would cover only the 96 homes

25    that have the first priority in the proceeds.

1      The insurance policy, Judge, is for $3 million.

2      The proposed settlement is for approximately two

3      and a half million dollars.  It would be paid

4      entirely out of these insurance proceeds.

5             The remainder of the policy would be

6      available, as appropriate, to cover the rest of

7      the asserted claims, which would continue pending

8      in litigation subject to the automatic stay.

9             I presume, since the bar date was this

10     past Monday, that they filed a proof of claim and

11     that those remaining claims on 200 homes would be

12     subject to the resolution process in this Court.

13            The settlement agreement does provide

14     for a full release to TOUSA, to the contractor

15     and to various subcontractors who participated in

16     the construction.

17            I believe there are no objections to

18     the settlement.

19            THE COURT:  Does anyone wish to be

20     heard in connection with it?  Mr. Dublin.

21            MR. DUBLIN:  Just one item.  I'd like

22     to note for the record, your Honor, is that the

23     fact that this settlement agreement is being

24     entered into cannot be used in connection -- as

25     evidence in connection with any litigation

1    relating to TOUSA's potential remaining liability

2    on the other 200 homes.

3              THE COURT:  Makes sense to me.  Okay.

4              MS. LABOVITZ:  Thank you, your Honor.

5              THE COURT:  With that, if you'll give

6    me an order, Ms. Labovitz, granting.

7              MS. LABOVITZ:  We'll submit it as we

8    usually do, Judge, after the hearing.

9              THE COURT:  Very good.  Thank you.

10             MS. LABOVITZ:  The next item, similarly

11   a settlement of disputed issues, but this one is

12   not a claims issue.  This relates to the motion

13   to compromise, approving a settlement among TOUSA

14   Homes, Lennar Communities Development, Lake

15   Pleasant 241 Limited Partnership and the City of

16   Peoria, Arizona.

17             It relates to a development in Peoria

18   called the Cibola Vista Development and to a

19   joint venture between TOUSA and Lennar that

20   bought half of that development from the

21   developer, L.P. 241.  It was a contentious

22   relationship from the beginning.  They've made

23   seven amendments to the purchase agreement before

24   the purchase even closed.

25             THE COURT:  It makes you kind of wonder

1    when you get to five or six of them if the game

2    is worth the candle.

3           MS. LABOVITZ:  Well, Judge, we're

4    trying to make it that way.

5           The seventh amendment resulted from a

6    mediation and arbitration and was supposed to

7    resolve issues related to the condition that the

8    property would be delivered in and certain

9    construction expenses.

10          Judge, what has happened that's causing

11   the need for this settlement is that a traffic

12   light in the development has not been

13   constructed.  Because the traffic light hasn't

14   been constructed, the City of Peoria is refusing

15   to allow new building permits and refusing to

16   issue certificates of occupancy, so the

17   TOUSA/Lennar joint venture can't sell any of its

18   homes or realize any profit.

19          Judge, we believe that the seventh

20   amendment to the purchase agreement provides

21   clearly that L.P. 241 is supposed to pay for the

22   traffic light, but they're not and the joint

23   venture is not getting any revenue because it

24   can't sell any homes.

25          So the parties got together and agreed

1  on a proposed resolution where all three of the

2  parties would kick in to fund the construction of

3  the traffic light.

4          THE COURT:  Which is at the magnificent

5  cost of?

6          MS. LABOVITZ:  To TOUSA, $90,000.

7          THE COURT:  For want of a nail, the

8  shoe was lost.

9          MS. LABOVITZ:  There you go, Judge.

10  Lest you think that the traffic light costs only

11  $90,000, Lennar is going to contribute $160,000

12  and L.P. 241 is putting in a hundred thousand

13  dollars.  Traffic lights are more expensive than

14  I thought.

15          THE COURT:  Damn, yeah, you could hire

16  somebody to sit out there in the desert.

17          MS. LABOVITZ:  Believe it or not,

18  Judge, this is not the first traffic light motion

19  I've ever presented and the one I presented six

20  years ago cost only a hundred thousand dollars,

21  so I guess that's inflation.

22          THE COURT:  Inflation, yeah, or a

23  statement on how your career is going,

24  Ms. Labovitz.

25          MS. LABOVITZ:  I don't know how to take

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that, Judge.

2              In any event, we request that we be

3    able to put in the $90,000, get the traffic light

4    in place and sell some homes with this joint

5    venture.

6              THE COURT:  Any objection to the

7    traffic light or volunteers from the creditors'

8    committee to sit there with a stop and go sign?

9    Hearing none, I'll, of course, approve the

10   stipulation.

11             MS. LABOVITZ:  Thank you, your Honor.

12   I have just one more long and involved tale to

13   tell you that results in a settlement.  The third

14   one relates to the debtors' Sunbelt joint venture

15   and this is a long and involved tale, but not a

16   very happy one.

17             The Sunbelt joint venture was formed to

18   construct homes in the Phoenix, Arizona area.  It

19   was a relatively large joint venture for the

20   debtors and it had its own financing with

21   JP Morgan.  Counsel for JP Morgan is one of the

22   parties who made an appearance by phone today.

23             That financing had solely the JV, and I

24   think one of the JV subsidiaries as a borrower.

25   TOUSA and the TOUSA subsidiaries were not

1    borrowers under the credit agreement, but the

2    credit agreement had covenants and events of

3    default that related to TOUSA's financial

4    condition.

5              In November, following some -- November

6    of 2007, following the filing of TOUSA's 10-K,

7    JP Morgan, the lender to the joint venture,

8    declared a default under that credit agreement

9    and the joint venture was no longer able to

10    borrow, it ran out of cash, Judge.

11              That default was later waived, but the

12    business had been without cash by that time for

13    about two months, so it was very damaged.  That

14    played out -- that situation played out between

15    November 2007 and January 2008.

16              At the time, as TOUSA was examining its

17    own financial condition and preparing for these

18    Chapter 11 cases, TOUSA and its joint venture

19    partner knew that even if the alleged default

20    that occurred last fall was waived, there would

21    be future problems related to the joint venture

22    financing because the credit agreement clearly

23    provided that it would default again in the event

24    of a TOUSA Chapter 11 filing, but not only that,

25    Judge, the maturity date in the credit agreement

1   was in March 2008, so something needed to be done

2   with the joint venture.

3           At that time, the joint -- the JV

4   itself and the joint venture partners began to

5   explore all options.  Judge, in December of 2007,

6   they actively sought refinancing for the joint

7   venture.  Two proposals came in, one -- after a

8   fairly extensive search.  One was for financing

9   and one was for a sale of the joint venture.

10  They were from the same party and the terms were

11  essentially the same.  The financing proposal was

12  a financing with an option to buy.

13          The debtors then, based on that, began

14  a sale process, sought some other bids.  One

15  other bid came in, but was quickly withdrawn.

16          They then worked with the party that

17  had offered to provide a sale and some bridge

18  financing to get through to the sale, signed an

19  agreement for them to be a stalking horse for the

20  purchase of the joint venture.  They sent a term

21  sheet, sorry, for them to be a stalking horse for

22  the purchase of the joint venture interest, but

23  after some diligence and some further

24  disappointing news from the Phoenix housing

25  market, that potential purchaser walked away and

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    was no longer willing to complete the purchase on

2    the terms outlined in the term sheet.

3            At that point, it seemed to the

4    debtors, their joint venture partner, Suntous,

5    and the joint venture itself, that the only

6    option was really to begin negotiations with

7    their banks, with JP Morgan, regarding where to

8    go next, possibly some funding through to an

9    organized sale.  As it turned out, the banks were

10   not willing to do that and the parties ultimately

11   settled on a consensual foreclosure process.

12           The reason we're before the Court today

13   is not because of that, a foreclosure on JV

14   assets I think wouldn't require approval of this

15   Court, but, although TOUSA and its subsidiary

16   were not borrowers under the credit agreement,

17   they did have some ongoing obligations to the

18   lenders in the form of a construction guarantee

19   obligation, Judge, and a limited indemnity that

20   effectively provided that if the joint venture

21   filed for bankruptcy or did any other act to

22   contest a foreclosure or exercise of remedies by

23   the banks, then the joint venture partners would

24   indemnify the lenders for up to the full amount

25   of the loan.  That obviously has precluded a

1    bankruptcy filing for the joint venture, as one

2    of the options that was considered.

3           At this time, the settlement agreement

4    that's presented to the Court happily does

5    resolve those potential guarantee obligations for

6    TOUSA and for the joint venture partner.  The

7    agreement provides effectively for a consensual

8    foreclosure process.  The banks already have

9    filed a motion for appointment of receiver and a

10   receiver is temporarily in place.  Under the

11   settlement agreement the joint venture partners

12   wouldn't contest that.

13          One of the debtors, TOUSA Homes

14   Residential Construction, would provide certain

15   assistance to the receiver on an at cost basis,

16   so they would assist the receiver in winding down

17   or preserving the business, but at cost.  The

18   debtors would continue not to interfere with

19   foreclosure efforts.

20          Assuming that goes through, for a

21   period of either 180 days or such shorter time as

22   it takes to complete the foreclosure sale, then

23   the banks will fully release the guarantees and

24   indemnity obligations of the joint venture

25   partners.

1        That, Judge, is why we're before the

2   Court.

3            THE COURT:  Okay.

4            MS. LABOVITZ:  I, again, believe there

5   are no objections.

6            THE COURT:  Does anyone else wish to be

7   heard in connection with this matter?

8            My expectation is that what you have

9   told me suggests that the Phoenix housing market

10  continues to be about as grim a place as there

11  is, although you may have -- you may have higher

12  candidates on your list.  Certainly here in

13  South Florida we are seeing ---

14           MS. LABOVITZ:  I am not going to try to

15  rank the housing markets.

16           THE COURT:  -- a flood of stay relief

17  motions.  April 2008 filings in this district

18  were up 73 percent over April 2006 -- 2007

19  filings and that's roughly holding on a year to

20  year basis, as well.

21           MS. LABOVITZ:  Those are, indeed, grim

22  statistics, your Honor.  I think it does reflect

23  challenges in the Phoenix housing market.  It

24  also reflects the fact that the joint venture was

25  without cash for a period of two months, which

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    was very damaging.

2              THE COURT:  Without objection, I will

3    approve the stipulation and grant the motion.

4              MS. LABOVITZ:  Thank you, your Honor.

5              THE COURT:  Thank you, Ms. Labovitz.

6              MS. LABOVITZ:  With that we're done

7    with --

8              MR. GAFFNEY:  Your Honor ---

9              MS. LABOVITZ:  -- our operational work

10   today.

11             THE COURT:  Mr. Gaffney, you wish to

12   be ---

13             MR. GAFFNEY:  This is the only matter I

14   had, if I can be excused at this time?

15             THE COURT:  Mr. Gaffney, is that you?

16             MR. GAFFNEY:  Yes, sir.

17             THE COURT:  You certainly may.

18             MR. GAFFNEY:  Thank you, Judge.

19             THE COURT:  You're most welcome.

20             MS. LABOVITZ:  Thank you, your Honor.

21   Mr. Basta will present the exclusivity motion,

22   which I believe is the remaining uncontested

23   matter.

24             THE COURT:  Very good.  Thank you.

25             MS. LABOVITZ:  Thank you.

1          MR. BASTA:  Thank you, your Honor.  We

2     apologize for the musical chairs today.  It's a

3     team effort, so I will be dealing with

4     exclusivity, Mr. Singerman will be taking the

5     lead on standing, and then we're back to cash

6     collateral.

7          We requested a 150-day extension of

8     exclusivity and we don't have any objections, but

9     we generally like to use exclusivity to spend

10    five minutes advising the Court of what's going

11    on in this case and what we hope to accomplish in

12    the 150-day period.

13         The first 120 days of this case were

14    really about stabilizing the business and its

15    soft landing in Chapter 11.  Ms. Labovitz has

16    taken the lead for that for us and with the help

17    of the Court, we continue to sell homes and I

18    know your Honor is aware that we continue to sell

19    them in bankruptcy.

20         We've also advised the Court that we've

21    completed our current business plan.  Now, that

22    business plan has been filed under seal with the

23    Court and will outline for the Court not only

24    what is happening to the business, but what's

25    happening in the real estate market generally and

1    the risks to this business.

2              We are in frequent communications with

3    our creditors, all groups of creditors and we

4    will continue to do so.  In case your Honor

5    hadn't noticed from the last hearing, our

6    creditor groups are not always on the same page.

7              THE COURT:  I am shocked to hear that.

8              MR. BASTA:  Yes, yes, we have different

9    views in this case.

10             And if you look at the bank's view of

11   this case -- it's interesting to see this case

12   from their lens.  From their perspective, they

13   lent this company $833 million.  The money didn't

14   go to stockholders, it's not a failed LBO.

15   Everybody thought about solvency, got a solvency

16   opinion from Alex Partners.  They think their

17   liens are valid until proven otherwise and from

18   their perspective, if intercreditor warfare gets

19   so bad that the business is adversely effected,

20   and ultimately after a trial your Honor rules

21   that they had valid liens, from their perspective

22   their money could be at risk.

23             Now, let's look at the creditors'

24   committee view.  They say that just because they

25   took liens and guarantees from the subs doesn't

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    make them valid.  They say, look at what happened

2    to the business immediately after the settlement.

3    They think they have viable fraudulent conveyance

4    claims and they think the banks should not use

5    their first position to block them from

6    performing their statutory duty.

7             We understand and we respect both

8    groups' views and the discovery and litigation

9    process will help prove who's right.  But we are

10   fiduciaries to the company and we need to be able

11   to control the intercreditor issues in a way that

12   does not damage the business.  We don't want to

13   kill the patient.

14            So our course for today and for the

15   next 150 days is centered on two things, one,

16   we're trying to get to consensual use of cash

17   collateral for not one month, two months, but for

18   a block of time for which there can be -- the

19   financing is there and we can focus on -- with

20   the creditors on an exit resolution strategy.

21            At the same time, we are --

22   Mr. Singerman will present our position, we're

23   prepared to consent to standing on the litigation

24   so that the committee can pursue the litigation

25   as long as it's done fast and there's an ability

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    to settle.

2            Why do we want to do this?  Well, the

3    last thing we want is to sit here months from now

4    and be back in the same spot and we haven't made

5    progress towards a reorganization.

6            Now, this two-pronged approached so far

7    has had a tangible accomplishment.  We have

8    ticked everybody off in the case.

9            THE COURT:  And that is what an honest

10   broker frequently finds himself doing and so if

11   you've ticked off everybody, Mr. Basta, you must

12   be doing things right.

13           MR. BASTA:  But we think we're on the

14   right course.  We appreciate your Honor

15   scheduling the interim cash collateral hearing.

16   I know that will be last on the agenda, but we

17   hope that if we -- it's kind of a slog through

18   type process.  We hope if we can slog through

19   issues and get it accomplished today, that when

20   we get back to the final hearing, we know

21   whatever relief today will be interim and not

22   prejudice the Court on the short notice or any

23   other parties in interest, but we believe that if

24   we slog through it, hopefully we can get progress

25   on one of our main objectives, which is to put a

1   financing piece in place for a pretty significant

2   period of time.

3          With that, your Honor, if I could hand

4   up an exclusivity order?  I don't know if anyone

5   else wants to be heard.

6          THE COURT:  Anyone else want to be

7   heard on exclusivity?

8          MR. FLASCHEN:  Yes, your Honor.

9          THE COURT:  Mr. Flaschen.

10         MR. FLASCHEN:  Evan Flaschen, Bracewell

11  & Giuliani, second lien agent.

12         Exclusivity is what it means.  The

13  debtors have the exclusive right to propose a

14  plan and if that plan complies with the

15  Bankruptcy Code, with or without the consent of

16  the creditors, the debtor has the exclusive right

17  to confirm a plan.

18         When we get to the standing motion, you

19  will hear the committee say, exclusivity is nice,

20  but it's meaningless because no plan can be

21  proposed, let alone confirmed, without the

22  consent of the committee.

23         You will hear the Aurelius group say

24  exclusivity is nice, but no plan can be confirmed

25  unless they vote in favor of it.

 1            We support exclusivity and we support

 2   exclusivity for what the Code says it is, not for

 3   something that's eviscerated by the committee and

 4   the Aurelius group.

 5            Thank you, your Honor.

 6            THE COURT:  Thank you, Mr. Flaschen.  I

 7   think I have a clue of how the rest of the

 8   morning will go.

 9            MR. BASTA:  I promise it will be

10   entertaining, your Honor.

11            THE COURT:  Well ---

12            MR. BASTA:  If I could hand up the

13   exclusivity order?

14            THE COURT:  Indeed.

15            MR. BASTA:  Thank you.

16            THE COURT:  And this extends it through

17   what date, Mr. Basta?

18            MR. BASTA:  It's like Halloween, no

19   irony there.  Exact date --

20            MS. LABOVITZ:  October 25th.

21            MR. BASTA:  -- October 25th.  Thank

22   you.

23            THE COURT:  Do you want it executed

24   right now?

25            MR. BASTA:  Yes, your Honor, please.

1           THE COURT:  I assume that one --

2    there's a page here that looks like it's part of

3    something else that you probably don't want put

4    in as part of the exclusivity order that's

5    docketed.

6           MR. BASTA:  I apologize, your Honor.

7           THE COURT:  No problem.  It could make

8    for more entertainment, Mr. Basta.

9           Okay.  Mr. Golden, let's talk about

10   J.H. Cohn and Robert Charles Lesser, and I think

11   they come as a package.

12          MR. GOLDEN:  I think that's right, your

13   Honor, and I was going to suggest that we take

14   them up as a package.  This is Items 9 and 10 on

15   this morning's agenda.

16          Your Honor, I would like to mention, I

17   do, indeed, enjoy the new courtroom.

18          THE COURT:  Thank you.

19          MR. GOLDEN:  My only complaint is for

20   people over 50 the lighting is probably not

21   totally adequate, but ---

22          THE COURT:  We'll get a special light

23   for you, Mr. Golden.

24          MR. GOLDEN:  I appreciate that.

25          THE COURT:  You're the first person who

1   has suggested that ---

2          MR. GOLDEN:  I'm probably the oldest

3   person in the courtroom.

4          THE COURT:  Oh, I would give you an

5   argument about that with some of the Florida

6   lawyers in the courtroom.

7          MR. GOLDEN:  How about the oldest with

8   the weakest eyes?

9          THE COURT:  Okay.

10          MR. GOLDEN:  Your Honor, on or about

11   April 22nd, the official creditors' committee

12   filed two separate professional retention

13   applications, one for J.H. Cohn as forensic

14   accountants and financial -- as forensic

15   accountants and financial consultants for the

16   committee and one for Robert Charles Lesser &

17   Co., which I will refer to as RCL Co., as real

18   estate advisors to the committee.

19          Each of their separate retention

20   applications spelled out the respective

21   qualifications for the applicants and set forth

22   the rationale by the committee in making its

23   determination to seek to retain both of these

24   separate firms.

25          At the request of the debtors, the

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    first lien holders and the second lien holders,

2    the initial hearing on these retention

3    applications were adjourned to today's hearing.

4            As your Honor has been previously

5    advised by me, since the filing of the

6    committee's retention application for Jeffries &

7    Co., as the proposed investment bank group for

8    the committee, there has been a change at

9    Jeffries & Co.  Many of the members at Jeffries

10   who were assigned to the TOUSA team assignment

11   have resigned or resigned subsequent to the

12   filing of the Jeffries retention to join a new

13   firm entitled Mullis & Company.

14           That is going to necessitate having to

15   file a revised joint retention application

16   between the Jeffries and the Mullis firms.  I

17   will point out once again, as we have

18   consistently in our pleadings, this proposed

19   joint retention will be no more expensive for the

20   estate than the initial Jeffries retention would

21   have been.

22           Based upon discussions with

23   Mr. Schneiderman from the United States Trustee's

24   Office, each of J.H. Cohn and RCL Co. have agreed

25   to eliminate the proposed indemnification

1    provisions that were being sought in their

2    respective retention applications.

3            In my discussions with

4    Mr. Schneiderman, he also raised the issue about

5    the -- to gain a better understanding of the

6    different roles to be performed by

7    Jeffries/Mullis, or I'll refer to them as

8    Jeffries/Mullis, J.H. Cohn and RCL Co.

9            Finally, the first lien agent has filed

10   an objection to the retentions of J.H. Cohn and

11   RCL Co.  As a result of trying to better inform

12   Mr. Schneiderman and to reply to the objection

13   filed by the first lien agents, we have filed a

14   joint reply where we specifically lay out the

15   specific responsibilities and categories of

16   services that the committee is seeking from each

17   of J.H. Cohn and RCL Co.

18           We also identified the services to be

19   performed by Jeffries/Mullis.  I won't read those

20   into the record because they're quite a bit more

21   extensive, but suffice it to say they are similar

22   in nature to the services being performed by

23   Lazard, as investment banker on behalf of the

24   debtors.

25           THE COURT:  And to give you comfort, I

1   have read your reply.

2          MR. GOLDEN:  Okay.  So I'll try to move

3   quickly then.  But specifically with respect to

4   the J.H. Cohn, a nationally known forensic

5   accountant, the committee determined that it

6   needs the services of J.H. Cohn to perform

7   forensic and financial analysis, including the

8   evaluation of intercompany claims, avoidance

9   actions, fraudulent conveyances, and the like.

10          We also would look to J.H. Cohn to

11   review and analyze certain information prepared

12   by the debtors and their professionals, primarily

13   their just delivered business plan, to give the

14   committee assistance on the cost side aspects of

15   the business plan and their operations.

16          With respect to RCL Co., a well-known

17   real estate advisory firm, we're obviously

18   dealing with a debtor that's in the home building

19   business.  RCL Co. has advised many home builders

20   for the disposition of properties, the

21   determination where to make investments for

22   valuation purposes and the like.

23          It was decided by the committee that it

24   was incumbent upon them to get as good an

25   understanding about the nature of the home

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    building business, the risks and the rewards, and

2    that was the thought process that ultimately led

3    the committee to seek to retain a firm like

4    RCL Co.

5            In the objection filed by the first

6    lien agent, they say, in part, without any

7    substantiation, that the retention of both

8    J.H. Cohn and RCL Co. will be duplicative and

9    wasteful.

10           They go on to assert, again without any

11   support, that even if the services to be

12   performed by J.H. Cohn and RCL Co. are not

13   duplicative, these are all services that can and

14   should be performed by the Jeffries/Mullis team.

15   Each of those assertions don't bear weight, your

16   Honor.

17           Finally, the first lien agent asserts

18   that J.H. Cohn should not be retained to perform

19   any forensic accounting services on behalf of the

20   creditors' committee because Kroll Zolfo Cooper,

21   also having been retained by the debtors, will be

22   performing those services and we should just

23   simply rely on their work product.

24           Well, your Honor, I think you well know

25   the fiduciary duties cloaked upon an official

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    creditors' committee and this creditors'

2    committee takes those responsibilities seriously.

3    We believe that acting in accordance with those

4    responsibilities, that it is essential for this

5    committee to have the services, not only of the

6    Jeffries/Mullis team, but J.H. Cohn, and RCL Co.

7              Now, I had originally expected that we

8    would be dealing with these retention

9    applications after we had heard cash collateral

10   because I think much of what we will hear in

11   connection with cash collateral will bear some

12   weight on the real motivation of the first lien

13   agent in making this objection.

14             I think it's fair to say it's the

15   committee's view that the first lien agent on

16   behalf of its first lien lenders, wants all the

17   benefits of this orderly Chapter 11 case, but is

18   not willing to pay the preverbal freight.

19             More to the point, as the first lien

20   agent certainly knows, each of Jeffries/Mullis,

21   J.H. Cohn, and RCL Co. will have to file fee

22   applications with this Court and their fees

23   cannot be paid unless blessed by this Court.

24             If the first lien agent determines that

25   there are duplication of effort, or that there

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   are other reasons not to -- or to object to the

2   fees sought by RCL Co. and J.H. Cohn, they will

3   have an opportunity to do so.  But to prevent

4   from the outset the committee's deliberation as

5   to what it thinks it needs to perform its

6   fiduciary obligations is inappropriate.

7          We don't believe that the first lien

8   agent has set forth any basis to have this Court

9   to depart from the general rule of allowing a

10  party to retain in its own wisdom those

11  professionals it thinks it needs to carry out its

12  fiduciary obligations.

13         There are many cases, many cases, that

14  the first lien agent has been involved in, many

15  cases that the debtors have been involved in,

16  cases ---

17         THE COURT:  Their professionals, at

18  least.

19         MR. GOLDEN:  Or their professionals, at

20  least, where multiple professional firms have

21  been retained by both debtors and official

22  creditors' committee.

23         In fact, we provided just a summary of

24  some of those cases as attached to -- as attached

25  as Exhibit B to our reply.

1           Your Honor, in conclusion, we think

2    that the committee made a very informed,

3    deliberate decision that the services to be

4    rendered by J.H. Cohn and RCL Co. are separate

5    and distinct.  It is the committee's view that

6    each of those professionals are necessary for the

7    committee to acquit their fiduciary obligations.

8           The first lien agent will have the

9    opportunity to object to fees if it's determined

10   that the services were, in fact, duplicative or

11   there were other reasons that they should not

12   have been both retained, but there is nothing

13   that has been presented in the papers so far that

14   would suggest that it's an -- that it would be

15   appropriate to depart from the general rule of

16   allowing an official creditors' committee

17   authority to retain those professionals it thinks

18   necessary to acquit its responsibilities.

19          Thank you, your Honor.

20          THE COURT:  Thank you, Mr. Golden.

21          Mr. Smolinsky.

22          MR. SMOLINSKY:  Thank you, your Honor.

23   Your Honor, we have no objection to the retention

24   of these professionals, per se.  I think your

25   Honor understands that this application for the

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    retention of professionals is intertwined

2    somewhat with the standing motion, with the cash

3    collateral.

4         We have no problem with the retention

5    of professionals.  We're not trying to thwart

6    the committee's fulfillment of their fiduciary

7    duty.  What has been expressed by the debtor, and

8    what will be expressed by us later, is there has

9    to be some discipline in this case to make sure

10   that the litigation, as and when it does proceed,

11   is done so in a way that doesn't bury the company

12   and those are our concerns.

13        We do appreciate the committee's

14   efforts to explain to us in the reply what it is

15   that the professionals are going to do because

16   from the application it certainly did seem that

17   there were overlap between the Jeffries, you

18   know, activities and the J.H. Cohn activities,

19   but as Mr. Golden indicated, we reserve the right

20   to take that up later and to take appropriate

21   positions.

22        So, you know, at this point, I don't

23   think that we have a particular objection,

24   although we do reserve our comments with respect

25   to standing, with respect to cash collateral and,

1    particularly, what we think is a healthy way of

2    proceeding with litigation to, perhaps, have the

3    company do the first cut at certain analyses,

4    that otherwise would require all of us to

5    independently do our own analyses, which may or

6    may not, in your Honor's mind, create an undue

7    expense for the estate if it doesn't have to be

8    incurred, but we'll take that up later.

9            THE COURT:  Okay.

10           MR. GOLDEN:  Thank you, your Honor.

11           THE COURT:  Mr. Singerman.

12           MR. SINGERMAN:  Good morning, your

13    Honor.

14           Your Honor, the debtors have no

15    objection to the committee's application to

16    retain the professional before the Court this

17    morning.  The debtors would suggest that your

18    Honor, if you're inclined to grant those

19    applications, direct the prospective litigants to

20    consult with the debtors and Kroll Zolfo Cooper

21    about a protocol for the avoidance of duplication

22    of efforts and unnecessary expense and we do

23    believe that there might be baseline work that

24    KZC could do for all of the participants in the

25    litigation pursuant to an agreed upon protocol

1    still subject to further work and analyses, but

2    perhaps not as much by the litigants.

3           Thank you, your Honor.

4           THE COURT:  Thank you, Mr. Singerman.

5    Mr. Schneiderman.

6           MR. SCHNEIDERMAN:  Yes, your Honor.  As

7    Mr. Golden stated, we contacted his office upon

8    receipt of the motions and raised the issues

9    regarding the indemnification, exculpation

10   clauses that were included.

11          As he stated, your Honor, yesterday we

12   received the revised orders, which deleted that

13   language, so we have no further objection to

14   that -- those provisions.

15          We did raise the same concern, your

16   Honor, regarding the administrative costs and

17   just trying to keep an eye on that, but with the

18   comments that have already been made, your Honor,

19   we have no further comment and appreciate the

20   professionals taking those issues out, your

21   Honor.

22          My only concern that would remain would

23   be when the Jeffries/Mullis retention papers are

24   presented, your Honor, I think we do need to look

25   at that in light of these applications and the

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    compensation structures that are going to be

2    approved so that we're not paying in advance for

3    things that we'll later have to say will be

4    duplication of efforts.

5              THE COURT:  Fair enough, although I

6    would ordinarily expect that work being done by

7    I-bankers in connection with possible

8    transactions typically are paid for in a fee

9    structure that's unrelated directly to hours

10   spent.

11             MR. SCHNEIDERMAN:  I have to get a job

12   like that, your Honor.

13             THE COURT:  Well, I have one of those

14   and so do you, actually.

15             MR. SCHNEIDERMAN:  Yeah, I'm underpaid,

16   though, as you are.

17             THE COURT:  You know, you take your

18   choices in life.

19             MR. SCHNEIDERMAN:  That's true.

20             THE COURT:  Ordinarily I would not wish

21   to see forensic accountants paid for on a results

22   basis, that seems to me to create its own -- its

23   own interesting little issues.

24             Having said that, I appreciate what

25   you're saying and let me -- let me say this in

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1  general to everybody in the courtroom who expects

2  professionals to be compensated out of the

3  estate, please don't have them trip over one

4  another.

5          Yeah, there's some information that

6  probably multiple groups or multiple numbers of

7  professionals need to have in order -- sort of

8  baseline information in order to do their work,

9  but let's not have the egg reinvented or the

10  wheel reinvented more often than is absolutely

11  necessary.

12          I think Mr. Singerman's suggestion of

13  sort of baseline data, that the debtor is

14  probably in a better position to produce being

15  provided to the litigants and other parties in

16  interest is very useful.

17          I have been terrifically impressed in

18  this case by the professionalism of all of the

19  lawyers whose work product I've seen.  I

20  commented to my law clerk after the hearing on

21  Tuesday that I didn't think that there was anyone

22  who spoke who said more than they needed to or

23  less than they needed to, and that's a pleasure.

24  I can assure you that it is -- that there are

25  days when the presentations I get are somewhat

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    different.

2         So I will approve these applications

3    with the implicit caveat that -- and

4    understanding that if there is -- if somebody in

5    the case perceives duplication of effort and

6    unnecessary expenditures, that they will bring

7    that up.

8         This is as good a time as any to put

9    this on the record.  I don't view professionals

10   as having the obligation of financing the running

11   of a Chapter 11 case.  I view interim

12   applications as that, and I will generally award

13   80 percent of fees requested and a hundred

14   percent of costs on an interim basis unless

15   there's an objection.

16        If there's an objection, then I'll look

17   at it much more carefully and I will at the end

18   of the day in final applications, consider any

19   objection that's raised in respect of any of the

20   prior applications, as well.  That puts the

21   policing duty on the people who actually know

22   what's going on in the case.

23        Look, I come in and you present very

24   distilled material to me and you're all very good

25   at doing that, but you know what's going on in

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   the case vastly more than I do.  My view is sort

2   of that from 30,000 feet and so, if you have --

3   if you perceive that stuff is going on that is

4   wasteful or peculiar, you know, you need to tell

5   me and usually the best way to get people's

6   attention is to talk about money.

7          One of my -- one of my former law

8   partners pointed out to me years ago when I was a

9   young lawyer, that the most sensitive nerve in a

10  lawyer's body is the green nerve.  I continue to

11  believe that to be true.  It might even motivate

12  some of the parties to the litigation.

13         In any event, I will approve the

14  applications for J.H. Cohn and Robert Charles

15  Lesser & Company and assume that the orders that

16  you present take out the provisions that

17  Mr. Schneiderman had objections to.

18         MR. GOLDEN:  We will, your Honor.

19  Thank you.  We'll submit the revised form of

20  orders that were attached as the exhibits to the

21  reply.

22         THE COURT:  Very good.

23         MR. SCHNEIDERMAN:  One last comment,

24  your Honor.  I noticed in the revised orders it

25  doesn't deal with the issue that you were just

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    discussing, compensation.  We have the interim

2    orders -- interim compensation procedures in this

3    case, 30-day invoices, following the local rule,

4    requiring the D.I.P.s to be filed timely, U.S.

5    Trustee fees paid, and then the quarterly, every

6    120 days, fee applications have to be filed in

7    order for those professionals to continue to

8    participate in the monthly invoice system.

9          THE COURT:  When am I going to get my

10   first day of sticker shock?

11         MR. SCHNEIDERMAN:  I get it every

12   month, your Honor, with the monthly invoices.  I

13   think we're in the third --

14         THE COURT:  What are we -- end of May?

15   February, March, April, May, end of May is the

16   first ---

17         MS. LABOVITZ:  Those are the first ones

18   that are included.

19         THE COURT:  Okay.

20         MR. SCHNEIDERMAN:  Your Honor, the two

21   orders that were attached to the revised -- or to

22   the reply, don't include reference to the interim

23   compensation procedures.  I'm just -- I would

24   suggest that if it's intended to be included, it

25   be stated on the record or at least have an

1    amendment or revise that order one more time

2    before it's submitted.

3              THE COURT:  Mr. Golden.

4              MR. GOLDEN:  I can't -- I'm going to

5    have to speak to Mr. Schneiderman because the two

6    versions I have in front of me, which were

7    attached as exhibits, expressly state that the

8    retentions are subject to the interim fee

9    arrangements, but I will work that out --

10             THE COURT:  Okay.

11             MR. GOLDEN:  -- before we submit the

12   order.

13             THE COURT:  I'll look to you for

14   orders.

15             MR. GOLDEN:  Thank you, your Honor.

16             THE COURT:  Thank you.

17             Okay.  Now, the creditors' committee

18   motion for standing.

19             MR. ZENSKY:  Good morning, your Honor.

20   David Zensky of Akin Gump Strauss Hauer & Feld

21   for the official committee of unsecured creditors

22   and I'll be addressing the standing motion this

23   morning.

24             THE COURT:  Good morning, Mr. Zensky,

25   and welcome.

 1              MR. ZENSKY:  I was wondering if we

 2    could go back to the problem with the traffic

 3    light for a minute?  I've consulted with

 4    Mr. Golden and we've identified three of our

 5    partners we'd like to volunteer for that post.

 6              THE COURT:  I understand, and there may

 7    be other firms in the room who have candidates of

 8    their very own.

 9              MR. ZENSKY:  Your Honor, we do have a

10    demonstrative that we would like to use that

11    require a computer being hooked up here.

12              THE COURT:  Okay.

13              MR. ZENSKY:  Would you like us to do

14    that now?

15              THE COURT:  Sure, why don't you do that

16    now and Mr. Bellman will assist if assisting is

17    necessary.

18              Do the TV screens need to be moved for

19    people's convenience in the courtroom?  They can

20    be.  The monitors -- there are some monitors on

21    the tables, as well.

22              Ms. Redmond, if that one needs to moved

23    out, have at it.

24              MS. REDMOND:  Your Honor, I think it's

25    fine, at least for us.

```
 1              THE COURT:  Okay.  It will pull out
 2    more if you use two hands.  Just don't bang it
 3    into the wall if you can avoid that.
 4              Mr. Bellman runs the popcorn
 5    concession.
 6              MR. ZENSKY:  I believe they tried this
 7    yesterday during the walk through, your Honor,
 8    and ---
 9              THE COURT:  And no doubt it worked just
10    fine.
11              MR. ZENSKY:  Of course.  I will say I'm
12    a bit younger than Mr. Golden, the lights are
13    fine for me.
14              THE COURT:  I hear pasture coming or
15    perhaps he was the one that your firm was
16    volunteering.
17              MR. ZENSKY:  Would you like me to
18    begin, your Honor, while they're continuing
19    to ---
20              THE COURT:  Well ---
21              MR. ZENSKY:  I believe Ms. Berger has
22    identified the problem.
23              THE COURT:  Let Ms. Berger fiddle for a
24    minute.
25              MR. ZENSKY:  All right.  Let's just use
```

1   the paper one, I don't want to ---

2           THE COURT:  Is there something on one

3   of the control panels you haven't turned on?

4           Is Carl in the building?

5           MR. BELLMAN:  Yes.

6           THE COURT:  Is he coming up?

7           MR. BELLMAN:  Yes.

8           THE COURT:  We're in recess.

9           (Thereupon, a brief recess was taken, after

10      which the following proceedings were had:)

11          THE COURT:  Thanks.  Please be seated,

12  folks.

13          MR. ZENSKY:  I think they solved the

14  problem.

15          THE COURT:  Oh, the glories of Holland

16  in the spring.  Somehow I think we're not going

17  to be there very long.

18          MR. ZENSKY:  Your Honor, I think that

19  you've recognized since day one, as everyone has,

20  that the success or failure of the claims that

21  the committee would like to bring will have as

22  much an impact on the recovery of the unsecured

23  creditors in this case as anything else that

24  happens.

25          But today is not the day for us to come

1   and prove those claims to you, rather the issues

2   before you today, as we see them, are whether the

3   committee should receive standing to assert those

4   estate claims and that essentially requires us to

5   show that they're colorable and that it makes

6   sense for the claims to be pursued.

7          Second issue is what the timetable

8   should be or even whether we should be discussing

9   a timetable for litigation today and third, and

10  perhaps the most fought over issue, whether the

11  debtor should retain any authority to settle the

12  claims, assuming your Honor vests the committee

13  with standing to assert them.

14         Now, in order to put those issues in

15  context and address some of the points that have

16  been made by the debtors and the first and second

17  lien lenders, we think it's important to review

18  the facts as we know them today and that includes

19  facts just learned in the past week as a result

20  of principally the debtors' submission in

21  connection with this matter.

22         And those facts show, as we see it, an

23  apparent gross misjudgment in entering the

24  Transeastern joint venture in the first place,

25  that was followed by problems, litigation and an

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    avowed and conscious disregard by the debtors of

2    their duties to the corporation and its creditors

3    at the time they entered the Transeastern

4    settlement and entered the prepetition secured

5    facilities.

6            THE COURT:  Do you have -- are you

7    going to have to prove ultimately that there was

8    a breach of fiduciary duty or are you merely

9    going to have to prove that the economic

10   consequences of the Transeastern settlement was

11   that the debtors, or at least some of the

12   debtors, received less than reasonably equivalent

13   value?

14           MR. ZENSKY:  Insofar as the claims

15   against the new lenders and the old lenders,

16   which we call the Transeastern lenders, we most

17   definitely do not have to prove a breach of

18   fiduciary duty by the debtors.  I bring it up,

19   and will dwell on it more later, as relevant to

20   the issue of ability to propose settlements of

21   this claim because it goes to the conflict that

22   the debtors face, not only in pursuing this

23   litigation, but in really having any say over it,

24   your Honor.

25           Now, what they did when they settled

1    was enter a transaction that improperly stripped

2    the unsecured creditors, who are principally note

3    holders, of the structural superiority that they

4    had at that time at the TOUSA subsidiary level by

5    substituting the new lenders, the first and

6    second lien lenders, who got claims, obligations

7    and liens from those subsidiaries that the old

8    lender never had, without providing the slightest

9    bit of consideration or reasonably equivalent

10   value to those subsidiaries.

11           We believe it's a textbook series of

12   fraudulent conveyances, your Honor, and that we

13   will be able to persuade you to avoid the

14   transfers to the old lenders, to the new lenders

15   and have those funds recovered for the benefit of

16   the estate.

17           Now, did you have a question, your

18   Honor, I'm sorry?

19           THE COURT:  No, I'm just thinking

20   through.  So you're intending to go after the

21   payments made to Deutsch Bank, as trustee, in

22   addition to the transfer of liens to the first

23   and second lien holders?

24           MR. ZENSKY:  That's correct, your

25   Honor, and those claims are set forth in our

1    draft complaint.

2           THE COURT:  Okay.

3           MR. ZENSKY:  The outline of the

4    Transeastern -- original Transeastern deal is as

5    follows, your Honor:  It was entered back in the

6    summer of 2005 and as we understand it, it was

7    designed as an off balance sheet joint venture

8    for TOUSA, where the equity value would accrete

9    to the value -- to TOUSA's shareholders, but

10   without exposing TOUSA to any risk on the debt.

11          It was a deal valued at $840 million

12   at the outset with equity of 165 million and

13   secured debt of 675 million in three traunches.

14   Now, at the time TOUSA did the Transeastern joint

15   venture, it already had $800 million of unsecured

16   notes and obligations to creditors in that

17   amount.

18          Now, from their perspective, the

19   Transeastern deal would not have posed any

20   problem at the time because none of the

21   subsidiaries where we think most of the TOUSA

22   value lay at the time, incurred any obligation in

23   connection with the new debt that was undertaken

24   at the Transeastern level.  That's a key point of

25   our case and it's properly alleged in

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    Paragraph 18 of the draft complaint, your Honor.

2            Now, in theory, the Transeastern

3    transaction was also not supposed to present

4    TOUSA itself with any problem because it signed

5    what it says it believed were limited guarantees

6    that apparently they felt would have no risk of

7    coming back to bite them.

8            Well, shortly after entering the

9    Transeastern deal, the write downs began and as

10   the debtors say in their papers on this motion,

11   your Honor, that by late 2005, the Florida market

12   had already begun to soften.  By May of 2006,

13   they had to scale back their projections for the

14   Transeastern venture by 20 percent and perhaps

15   most striking, they say in their papers, your

16   Honor, I believe at Paragraph 20 or 21, that by

17   the second quarter of 2006, their sales were off

18   25 to 40 percent from the prior year.

19           Now, this is a year before the

20   transaction at issue where solvency, of course,

21   is going to be the main issue, and they're saying

22   their sales were already off 40 percent at that

23   time.

24           In fact, in these papers they describe

25   the market as having undergone a precipitous

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   decline by mid 2006, your Honor, not 2007, 2006

2   and they wrote off their equity in the

3   Transeastern venture at that time.

4           Now, we think the debtors now are

5   accurately describing the state of the market as

6   it existed in 2006 and we will develop and bring

7   to bear in this case substantial evidence of how

8   bad that market turn was a year before the

9   transaction at issue and how adversely it

10  affected TOUSA and its assets.

11          Now, that position that the debtors

12  take in their papers is slightly at odds with

13  what they told you on the first day hearings,

14  your Honor.  You may remember that in describing

15  these transactions, you were told that the market

16  took a sudden and unexpected turn after the

17  Transeastern litigation was settled and after the

18  new debt was incurred and imposed on the

19  subsidiaries.

20          Well, that's not what they're saying

21  today and what they're saying today is far more

22  accurate with respect to how the market was

23  behaving at that point in time, we believe we

24  will be able to show.

25          Now, predictably the declining value of

1   the Transeastern assets lead to litigation with

2   Deutsch Bank, the Transeastern administrative

3   agent.  There were demands made.  There was

4   multi-jurisdictional litigation and those lenders

5   basically said, TOUSA, you need to reimburse us

6   for the entirety of that debt.

7          The debtors in their papers tell you

8   that they underwent months and months of

9   negotiations and ultimately settled that

10  litigation.  How did they settle it?  They paid

11  $422 million in cash to the senior lenders, the

12  Transeastern facility, and more on that in a

13  moment, they issued a new PIK note in the

14  principal amount of 20 million to the, I believe,

15  the senior mezz lenders and preferred stock as

16  well, and warrants to the junior mezzanine

17  lenders.

18          The Transeastern venture was unwound.

19  TOUSA got some of the assets, which incredibly

20  appear to have been valued at only a hundred

21  fifty million dollars.

22          So this is a joint venture that

23  started, Judge, with an assumed value of

24  800 million or more, the remaining assets were

25  brought onto TOUSA's balance sheet at about a

1    hundred fifty million, I believe.

2            Now, one has to step back, I think,

3    your Honor, and wonder why the debtors didn't --

4    if they were going to pay off substantially all

5    of the Transeastern debt and enter new facility,

6    rather than enter a new facility with a higher

7    interest rate and incur 10, 20, $30 million of

8    transaction costs, why didn't they just give new

9    guarantees and improve the collateral package of

10   those old lenders?

11           The answer is they couldn't, that would

12   have been a very obvious fraudulent conveyance,

13   as well, but what they did, your Honor, was no

14   better.  Since they couldn't just improve the

15   collateral package of the old lenders, they

16   substituted the new lenders and they got claims,

17   liens and obligations at the subsidiary level.

18           So, let's talk about that new financing

19   for a moment and that is the prepetition secured

20   financing.  There is a first lien term of

21   200 million, which is still outstanding.  There

22   is a first lien revolver.  At the time of the

23   Transeastern settlement, I believe 50 million had

24   been drawn and now there is more than 300 million

25   due on that facility, and there's the second

1   lien term loan and that was originally in the

2   amount of 300 million, now about 317.  So those

3   figures together give rise to the $850 million

4   figure that you saw referred to in the papers.

5           Now, I will tell you, your Honor, I

6   believe we'll be able to show that before closing

7   that transaction, that the board of TOUSA was

8   begged by certain bond holders not to do the deal

9   because it would be disastrous for their ability

10  to recover on their debt instruments, and I think

11  now we have -- now we come to the visual part of

12  the presentation, your Honor, where we have a

13  demonstrative that will, as we see it, show the

14  or visualize the impact of what happened here.

15          Your Honor, I can hand up a printed

16  copy, as well, if that would be okay with you?

17          THE COURT:  I'll happily take one, but

18  just for my notes.

19          MR. ZENSKY:  You can see it fine?

20          THE COURT:  I can see it fine.

21          MR. ZENSKY:  So this is the

22  prepetition -- the pre-Transeastern settlement

23  structure and you can see that the Transeastern

24  joint venture is off to the left in the red/pink

25  area and all those obligations are limited and

1   cornered on that side of the page.

2        Then, of course, you see the group of

3   houses or developments that we call the conveying

4   subsidiaries, and those are the estates that we

5   seek to bring the litigation on behalf of, and

6   they were the only entities at the time who had

7   guaranteed the outstanding obligations on the

8   unsecured notes, which were now 1.1 billion, as

9   you can see, and the conveying subsidiaries also

10  had trade creditors at the time.

11       Now, if we flash forward to what

12  happened with the settlement, you can see the

13  Transeastern assets were brought into the TOUSA

14  family on the left, but all of a sudden now we've

15  got the new lenders, that's the bank with the

16  money sign, your Honor, have inserted themselves

17  in between the developments and the existing

18  unsecured note holders and that is, as I said

19  earlier, the transaction which attempted to strip

20  the unsecured creditors of their structural

21  superiority at the subsidiary level.

22       Those obligations were not there on

23  July 30th, they were there on July 31st and that

24  is the -- certainly the core factual overview of

25  the claim and the transfers against the new banks

1    that we are litigating over in these proposed

2    litigations.

3            Now, one could reasonably ask, your

4    Honor, having seen this, what was the TOUSA board

5    thinking in doing this?  And we will have to get

6    inside their minds, I believe, to unravel

7    everything that happened, but as a result of the

8    filings on this motion, I think for the first

9    time we have a prism on their thinking.

10           If you look at the debtors' opposition

11   to our standing motion, Paragraph 34, your Honor,

12   the debtors come right out and say, when we did

13   the Transeastern settlement, all we were

14   concerned about was maximizing shareholder value.

15   We never considered, and had no duty to consider

16   how this would impact the existing creditors of

17   the company or the $1.1 billion of notes.

18           THE COURT:  Funny, I have notes and

19   highlights on Paragraph 34 of the debtors'

20   response.

21           MR. ZENSKY:  Well, it caught my eye

22   even more so when I looked through the Lehman

23   Brothers presentation to the board, which the

24   debtors attached, your Honor.  In no fewer than

25   six places Lehman Brothers said, now, you haven't

1    asked us about whether this is a good idea for

2    the company's creditors and we're not giving you

3    any opinion as to whether this is a good idea for

4    the company's creditors.

5             So there was a very, as I said, a

6    conscious and avowed disregard for how this

7    transaction would impact the unsecured creditors

8    of TOUSA and we think it was done at a time where

9    there were patent signs of insolvency all around

10   the company.

11            Now, the debtors say, no problem, we

12   had this J. Alex solvency opinion.  Well, we will

13   show in the litigation, your Honor, there are

14   manifest problems with that, which, by the way,

15   your Honor, J. Alex was paid $2 million for.

16   It's an enormous amount of money for a solvency

17   opinion and we believe we can show was utterly

18   non-market to pay someone that much money for a

19   solvency opinion.

20            Now, what happened after the

21   transaction, your Honor?  This was supposed to

22   right the ship.  I hope that's what the TOUSA

23   board concluded, but within weeks of the

24   transaction, they were already in trouble again,

25   and as they say -- as they said actually in their

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    first day papers, Mr. McAden's declaration,

2    Paragraph 44, they couldn't even satisfy the

3    solvency requirements of the certificate that was

4    necessary to draw on the revolver, so this is by

5    September.  They had to renegotiate or negotiate

6    an amendment to the revolver and first lien

7    facility in order to access the revolver because

8    they couldn't satisfy the solvency requirements

9    just weeks after the transaction, your Honor.

10            That brings us to the motion and the

11   claims we'd like to bring.  The petition was

12   filed on January 29th.  In the D.I.P. order, the

13   interim D.I.P. order on January 31, the debtors

14   waived any ability or right to assert these

15   causes of action.  That order originally had a

16   deadline of June 3rd for the challenge period and

17   that was later extended and in the interest of

18   moving things ahead, we came as soon as we could

19   with our motion for standing on these claims,

20   your Honor.

21            Now, we've asked for standing to assert

22   and we've asked for exclusive authority to settle

23   three groups of claims.  The first is avoidance

24   and recovery claims against the original

25   Transeastern lenders, who are not before you at

```
 1    the present time; the avoidance and recovery

 2    claims against the new lenders, the first and

 3    second lien facility and the revolver facility;

 4    and a preference claim against the new lenders,

 5    which arises out of a large tax refund that the

 6    debtors filed for in March and actually have just

 7    received.  I believe you'll hear more about that

 8    on the cash collateral part of today's

 9    proceedings.

10            Now, we've attached our draft

11    complaint.  I certainly anticipate that were your

12    Honor to give us standing, that we would make

13    some corrections and update it to include new

14    information that we have learned.  I do have to

15    note that we identified Wells Fargo as the

16    administrative agent for the $20 million PIK note

17    that I talked about.  They are no longer the

18    administrative agent.

19            THE COURT:  I think you mean HSBC.

20            MR. ZENSKY:  Well, they're not the

21    agent either at this point.

22            THE COURT:  Right.

23            MR. ZENSKY:  Right.  So we will figure

24    out who we have to name or name a Doe defendant

25    and it will be corrected as soon as we have the
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    right party.

2           So the standard, your Honor, is have we

3    alleged a colorable claim and that the Court

4    feels it's a claim that is likely to provide some

5    benefit to the estate?

6           Now, no one before you today, your

7    Honor, disputes that standing to assert

8    derivative claims like these can be assigned to a

9    creditors' committee to prosecute.  I think we're

10   all on common ground there.  No one disputes that

11   the relief we seek is legally cognizable, it's

12   based on statutes and remedies that the Code and

13   state law provides, and no one contends that we

14   have not alleged the essential elements of the

15   causes of action we'd like to prosecute.

16          Now, we think the relevant standard for

17   assessing the pleading is 8(a) or Bankruptcy Rule

18   7008(a)'s short and plain statement of the

19   transaction and the relief that the pleader

20   seeks.  No one contends that we haven't satisfied

21   that standard.

22          The second lien agent has argued that

23   the Rules of 7009(b) should apply.

24          THE COURT:  Well, let me save you from

25   much argument there.  I am satisfied that where a

1   third party, like a creditors' committee in a

2   context like this, is seeking to bring a

3   fraudulent transfer or other avoidance action,

4   the application of Rule 9(b), pleading standards

5   in pleading a constructive fraud case is, in my

6   view, simply not applicable or appropriate, so

7   don't waste your breath.

8           MR. ZENSKY:  Okay.  Thank you.  I

9   appreciate that, your Honor.  I'll move on.  The

10  second thing we need to show, I believe, is that

11  these claims have a chance of succeeding, that on

12  proper presentation of proof, that we would be

13  able to show the elements of insolvency and lack

14  of reasonably equivalent value.

15          And on Tuesday's conference call, I

16  believe we heard from Mr. Flaschen a theme that

17  no doubt he will repeat when it's his turn ---

18          THE COURT:  Well, my recollection of

19  Mr. Flaschen's comment was that he wasn't coming

20  with an $800 million check and I think my

21  response was, I think the committee is only

22  looking for 300 million from you.

23          He didn't respond to that, so perhaps

24  he's going to get up and tell me that 300 it is

25  and you might even waive the 17.

```
 1          MR. ZENSKY:  I don't think there would

 2     be a high chance of that, your Honor.  The

 3     comments I was referring to was his assertion

 4     that this would be a waste of money for the

 5     estate for your Honor to let the committee pursue

 6     this.

 7              In order to respond to that, I want to

 8     touch on some of the facts that we believe

 9     already are known and exist that will help us

10     move down the road of insolvency.

11              The first is what I call the public

12     market theory.  There is a growing trend in

13     fraudulent conveyance law, in the bankruptcy

14     decisions and appellate courts, to look to how

15     the public markets valued the debtor at the time

16     of the alleged fraudulent conveyance and some of

17     those decisions include Leap Wireless, which is

18     295 Bankruptcy 135, and the Campbell's litigation

19     out of the 3rd Circuit, which is 482 F.3d 624.

20              Certainly in the Leap Wireless, the

21     Court noted that where the bonds were trading at

22     a steep discount, that that was another indicator

23     of insolvency.  So we thought it relevant to look

24     at how the bonds were trading at the time of this

25     Transeastern settlement and we've attached those
```

1    in our reply papers, your Honor, as an exhibit

2    and they show that on July 30, 2007, the day

3    before the $500 million of new obligations were

4    incurred and pushed down on the subsidiaries, the

5    bonds were already trading at 44 to 80 cents on

6    the dollar, depending on where they stood in the

7    structure, your Honor, and if you add together

8    the market value of the bonds and the equity,

9    which still had a positive value, if you put all

10   that value together, it was almost 200 million

11   less than the outstanding amount on the notes

12   before adding the extra 500 million on.

13          After the transaction was closed, the

14   bonds traded even further down, some as much as

15   20 percent.

16          So the committee is not saying today,

17   your Honor, that that is the exclusive way that

18   we intend to prove solvency or that it is even a

19   way we will rely on at trial, but it is certainly

20   one of the factors that gives us a high degree of

21   confidence that we will be able to proffer that

22   element of our case.

23          The second issue is this J. Alex

24   opinion, and you heard a lot about that on the

25   papers and I believe Mr. Basta already referred

1   to it in his comments.  You know, again, this is

2   not our day in court to prove to you all the

3   defects in that, but I believe we will be able to

4   show that the assumptions that underlie that

5   opinion were overly aggressive to say the least,

6   and did not take into account the plummeting

7   values that the debtors had experienced in their

8   Transeastern venture.

9          We think it was riddled with flaws

10  regarding methodology and assumptions.  In fact,

11  it utilized a weighted average cost of capital of

12  15 percent, your Honor, which was less than the

13  return in the market on the debt instruments of

14  the debtors and, of course, the weighted average

15  cost of capital is supposed to be the blended

16  cost of equity and cost of debt.

17         So, we believe that there is plenty of

18  ammunition for us to show that the J. Alex

19  opinion, to the extent it would even be

20  admissible and probative of solvency at that

21  time, if someone came in and presented it, we

22  think that we have a lot to say about that.

23         The third thing is the Lehman Brothers

24  book, which the debtors attached to their papers,

25  your Honor.  This is a remarkable admission.  I

1    talked about the $20 million PIK note, which was

2    going to be a new debt security of the debtors.

3    Lehman Brothers told TOUSA in their advice,

4    that's going to trade below par, okay, so that

5    the 14 and three quarter percent interest rate

6    that TOUSA was extending on that note was not

7    even enough to attract investors at par, that

8    note was going to trade down and exhibit a lack

9    of confidence in the market that the debtors

10   would be able to answer for it.

11           Finally, in the Lehman Brothers, I was

12   also very surprised to see this report, they say

13   they performed a waterfall analysis.  What if you

14   filed today, what's going to happen?  And they

15   assumed for a -- I believe they assumed that the

16   debtors would have to pay off all of the

17   Transeastern debt and that assumption or that

18   analysis showed that equity was completely out of

19   the money.

20           Now, we haven't seen that.  These are

21   the kind of things that we'll look at in

22   discovery and find out more about and be back to

23   tell you about.

24           THE COURT:  And that analysis was prior

25   to the Transeastern settlement?

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1             MR. ZENSKY:  Exactly, and that's

2    referenced in the Lehman Brothers' letter to the

3    TOUSA board, which is attached to the debtors'

4    papers on this motion, your Honor.

5             And, finally, a third way or fourth way

6    we may approach insolvency is through the

7    doctrine of retrojection and that would be to

8    take the debtors' admitted inability to satisfy

9    their solvency requirements just weeks after the

10   transaction, and look back to the date of the

11   transaction.

12            There's a good Middle District of

13   Florida case that has adopted that as a valid way

14   of proving insolvency in a fraudulent conveyance

15   action and that is the Damison Construction case

16   at 101 Bankruptcy 775.

17            THE COURT:  Who is the judge on that

18   one?

19            MR. ZENSKY:  You know, I have it with

20   me, you Honor, and if I can get back to you, I

21   don't remember the judge's name right now.

22            THE COURT:  Okay.

23            MR. ZENSKY:  So I bring this up again,

24   you're not here to make fact findings on any of

25   this today, conclusions of law, just to show you

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that there is ample reason for the committee to

2    be optimistic about the litigation and that it

3    will be able to prove insolvency and create

4    benefit for the estate of the debtors, your

5    Honor.

6            THE COURT:  Okay.

7            MR. ZENSKY:  The draft lawsuit also

8    includes a preference claim.  I don't think

9    anyone has objected to standing on that or said

10   that we haven't pled the elements of a

11   preference, but just for your Honor's

12   edification, the outline of that claim is that

13   the first and second secured lenders are claiming

14   a lien on that tax refund.

15           We believe that the debtors' right to

16   that asset first accrued on December 31, 2007 as

17   a matter of law.  It's a refund for losses during

18   that year and that the lien of the first and

19   second lien banks did not attach until that

20   point, which was within 90 days of the filing,

21   and that it will enable the banks to receive more

22   if it is upheld than they would in a Chapter 7

23   and that's the basis of that claim.

24           That will bring me to the question of

25   timing, and I don't know how much your Honor

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    wants to spend on this.

2         THE COURT:  Well, I'm going to make

3    decisions today on timing.

4         MR. ZENSKY:  My initial instinct was

5    that it would not be appropriate to set a

6    schedule until the old lenders were before you

7    because they're going to be parties to the same

8    litigation and the same adversary and they may

9    have issues about timing and discovery and

10   documents and witnesses that I'm certainly

11   unaware of.

12        But to the extent that your Honor does

13   want to set a schedule, we have proposed an

14   alternative.  We have no interest in dragging

15   this out.  We thought that the debtors were way

16   too aggressive for us to be able to put the case

17   together and most importantly, develop our expert

18   opinions that will be necessary, potentially, on

19   the issue of insolvency, and we have proposed a

20   schedule that's attached to our brief, your

21   Honor, that gets us to trial by the second or

22   third week of January.

23        We believe it's a doable schedule,

24   assuming that documents flow on the schedule that

25   I think the debtors have said they can meet and

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1  we hope the banks can meet.

2          We didn't think it was appropriate to

3  start striking out rules like the availability of

4  interrogatories or to decide today how long the

5  trial would be until we have a better handle,

6  your Honor.  If you asked me today, I would say

7  that two days would not be enough, which is what

8  the debtors were proposing for the committee to

9  put its case on.

10          So unless you have any other questions

11  on schedule, I'll proceed to the settlement

12  authority issue, your Honor.

13          THE COURT:  Yeah, the settlement

14  authority issue is the one place where I'm most

15  troubled by your request.

16          I'm constrained, I think, by Henhouse

17  and I am also dubious about the wisdom of cutting

18  the debtor out of an honest broker role,

19  acknowledging, as I do, your argument that the

20  debtors' order acted inconsistently with what you

21  perceive a fiduciary to note holders to have

22  been.

23          MR. ZENSKY:  I appreciate your Honor's

24  concern and I hope I will be able to convince you

25  that the relief we're seeking is warranted and

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    appropriate.

2           You know, as the Court considers this

3    issue, I would ask you to keep in mind something

4    that my friend, Mr. Basta, told you on the first

5    day of these proceedings and that was, that

6    judges are not expected to put common sense on

7    the sidelines when they are interpreting the

8    Bankruptcy Code and the bankruptcy rules.

9           I think that common sense, if it rules

10   the day, would suggest that the debtors should

11   not be able to settle these claims out from under

12   the feet of the committee.

13          We are not seeking to displace their

14   role as honest brokers, I'll get to that in a

15   moment, and we think that factually and legally,

16   all the same reasons that support the standing of

17   creditors' committees to assert derivative claims

18   on behalf of the estate all support the

19   entitlement under appropriate circumstances to

20   vest the committee, and not the debtors, with the

21   power to settle those claims.

22          I think, Judge, reading your recent

23   decision in the Taylor case, that you subscribe

24   to that view, as well, that the avoidance powers

25   of the Code are so critical that they have to be

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    applied in an expansive way to achieve their

2    remedial means or remedial purposes and that

3    other law and statutes have to give way when

4    appropriate.

5            Now, the banks have objected to this

6    part of the relief.  They're the targets of the

7    claims at issue, Judge, and I think that their

8    objection should essentially be disregarded.

9            They're entitled to no more weight than

10   me asking for you to decide who we should be able

11   to negotiate with at the banks, you know, find

12   the soft negotiator.  Of course they want to

13   negotiate with the debtor.  They think they can

14   make a better deal with the debtor, your Honor.

15   Which is more likely to maximize recovery to the

16   estate, a bank/debtor resolution or a

17   bank/creditor committee resolution?  That's why

18   the banks are objecting to this part of our

19   relief, your Honor.

20           THE COURT:  Well, aren't you adequately

21   protected in a non-technical use of those terms

22   by the fourth criterion in the Justice Oaks II

23   standards, that is to say, the paramount interest

24   of creditors?

25           Look, if the debtor were to come in

```
 1    here -- if you proceed with the litigation and
 2    you find that your assumptions are carried -- are
 3    borne out by the facts you're able to develop, do
 4    you really think that if Mr. Basta came in here
 5    and said, we want to settle this for 15 cents on
 6    the dollar, or pick a number, that I'm not going
 7    to listen to you saying that's an utterly
 8    unreasonable settlement under the circumstances?
 9              MR. ZENSKY:  Your Honor, the committee
10    has the utmost confidence that you will apprise
11    yourself of the facts and call it like you see
12    it.  The problem the committee has is that the
13    standard is low and we don't want to incentivize
14    the banks to think that they can settle this case
15    with the debtors and I don't think the debtors
16    can play an honest broker role, as that was
17    defined by Mr. Basta.
18              Let me continue if I can.  They can
19    still propose a plan as long as it continues the
20    litigation and that was, remember, their original
21    outlook on this case, that they were going to put
22    the litigation into a trust after a plan was
23    confirmed or if they want to negotiate a deal,
24    bring it to us and if it's a good deal the
25    committee will embrace it.
```

1          But what we don't want is the

2    management that did this transaction and who has

3    already -- look, Judge, the management, they're

4    humans, okay.  They believe that what they did

5    was right, I hope.  They believe that what their

6    professionals told them was right and I hope they

7    actually believe that the company was insolvent,

8    maybe we'll find out.

9          THE COURT:  Well ---

10         MR. ZENSKY:  How can they just look

11   across the table at the banks and say, you know

12   what, the committee is really going to prove that

13   the company was insolvent and strip those liens

14   and that's why you need to give them 50 cents on

15   the dollar as a settlement proposal, your Honor.

16   They'd be arguing themselves into liability on a

17   breach of fiduciary claim if they try to prove

18   insolvency, and that may become part of this

19   case, as well, your Honor, but we think it would

20   be bad policy to leave that right with the

21   debtors, at least provisionally.

22         If, you know, the debtors have said

23   we're going to obstruct the conclusion of this

24   case and take unreasonable positions, we would be

25   happy to be vested with the settlement authority

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   on a provisional basis and subject to being

2   revisited by your Honor.

3          Now, let me, if I can, continue with

4   the legal support for this.  We think that all

5   the statutes, the code provisions and rules that

6   give rise to derivative standing in the first

7   place support what we're asking for, 105(a),

8   503(b), 1103(c) and 1109(b).

9          Now, none of those provisions, your

10  Honor, provide for creditors' committee standing,

11  yet hundreds of cases, and Circuit Court

12  decisions, have said that those rules authorize

13  creditor committee standing and that's because, I

14  believe, as you have said and many other

15  Bankruptcy Courts have said, that Bankruptcy

16  Courts are courts of equity and the Courts need

17  to use their equitable powers to give full effect

18  to the avoidance and recovery provisions of the

19  Code.

20         I would like to spend a minute on the

21  Cybergenics decision, if I may, which is a

22  well-known decision, certainly in bankruptcy

23  circles, I'm sure your Honor is familiar with it.

24  I think what's important, Judge, is beginning on

25  Page 572 and 573, the 3rd Circuit en banc talks

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

 1    about the real world view of what happens in

 2    commercial cases like this, and the intense

 3    pressure that a debtor and its management are put

 4    under by secured lenders as the debtor slides

 5    towards bankruptcy.

 6           The 3rd Circuit points out that

 7    management may make extraordinary concessions to

 8    providers of critical services, such as granting

 9    new liens on unencumbered property, agreeing to

10    excessive rates of interest and so on.  The 3rd

11    Circuit goes on to say that fraudulent conveyance

12    actions, such as those provided for in 544, are

13    intended to afford unsecured creditors peace of

14    mind, for those creditors are usually the

15    principal victims of managerial misfeasance.

16           The Court goes on on the next page,

17    your Honor, to discuss the proverbial problem of

18    letting the fox guard the henhouse, which is why,

19    of course, standing is transferred to creditors'

20    committees in cases like this.

21           I think what's equally important, the

22    3rd Circuit points out that the conflicts of

23    interest that the debtor's management face can

24    arise even when there's no concern that a

25    debtor's management is trying to save its own

         OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    skin.  For example, a debtor may be unwilling to

2    pursue claims against individuals or businesses,

3    such as critical suppliers with whom it has an

4    ongoing relationship that it fears damaging, and

5    even if a bankrupt debtor is willing to bring an

6    avoidance action, it might be too financially

7    weakened to advocate vigorously for itself.

8           So all of those observations are why

9    the Court concluded that notwithstanding the

10   Hartford decision, creditors' committee standing

11   was vital to the purposes of the Code and was

12   here to stay.

13          Now, all of those arguments, your

14   Honor, support not allowing the debtors to come

15   in and propose a settlement on a low 9019

16   standard or the other factors.

17          We've attached several orders which,

18   in fact, have authorized creditors' committees to

19   obtain settlement power with the vesting of the

20   right to bring the claim.

21          Now, again, why are we concerned?

22   You've heard me say that the debtors were

23   involved in the underlying transaction.

24          THE COURT:  Do you take any comfort

25   from the presence of Mr. Boken in the company?

```
 1              MR. ZENSKY:  Your Honor, in all

 2    honesty, I would say it's too early for the

 3    creditors' committee to answer that question.

 4              THE COURT:  Okay.

 5              MR. ZENSKY:  We also think, as you will

 6    hear in the cash collateral presentation, as you

 7    heard on the phone the other day, that we think

 8    the debtors have given away the store and are

 9    proving that they are under too much influence

10    and control by the lenders.

11              Again, that's another reason that we

12    don't think the settlement authority for these

13    claims should be left with the debtors.

14              Now, very briefly, the argument in

15    opposition principally cites Code Section 1123

16    and 9019 and that because they permit debtors to

17    propose a settlement, well, you can't do anything

18    otherwise, your Honor.

19              We see that as just a rerun of the now

20    discredited arguments that were made after the

21    Hartford decision, that all the powers that the

22    Bankruptcy Courts had created in their equitable

23    power and jurisdictions had to fall, and that's

24    exactly what Cybergenics confronts and rejects,

25    your Honor.
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1                In fact, we think having been vested,

2        assuming your Honor grants the relief with the

3        right to bring the causes of action, it naturally

4        follows that we, in effect, are acting as the

5        trustee with respect to those claims.

6                Let's remember, your Honor, the

7        creditors' committee is the only entity that is

8        unconflicted with respect to these particular

9        claims.

10               Mr. Basta and the debtors' honest

11       broker role extends, of course, to their secured

12       lenders, but they can't simultaneously look out

13       for our interests and look out for the interests

14       of the defendants in the litigation, they just

15       can't do it.

16               THE COURT:  But isn't that the

17       traditional juggling role that a

18       debtor-in-possession has in a complicated case

19       where there are multiple and inconsistent

20       interests that need to be reconciled if a

21       consensual plan is to be reached and if a

22       consensual plan isn't possible, doesn't the

23       debtor, nonetheless, have some duties and

24       responsibilities, statutory, if not otherwise,

25       and am I not at risk of taking them sufficiently

1    out of the process at this stage by granting to

2    the committee the settlement authority?  That's

3    the issue that I'm dealing with.

4            MR. ZENSKY:  Certainly.  The Code

5    assumes that the debtors are a fiduciary to all

6    creditors and the default assumption is there,

7    they are ordinarily able to execute on that role.

8    But because of the management's role in the very

9    transactions that we seek to accomplish and to

10   use the words of both Cybergenics and ICPS, their

11   natural inclination to avoid self immolation,

12   they can't be vigorous advocates for our

13   interests on this issue, your Honor, and that's

14   when the Code gives way in order to satisfy the

15   first principles of the Code, which is maximize

16   the recovery for the benefit of the estate and

17   the creditors.

18            I go back to what I said at the

19   beginning of this section, why do you think it is

20   that the banks are objecting to this?  Because

21   they think that to the extent the claims can be

22   settled, they would much prefer to be sitting in

23   a room with Mr. Basta than with Mr. Golden and

24   that's why they're objecting to it, so which of

25   those outcomes will better fulfill the purposes

1    of the Code?

2            THE COURT:  Well, Mr. Golden will just

3    have to attend by phone, I guess, then.  He did

4    pretty well on Tuesday that way.

5            MR. ZENSKY:  As a matter of policy,

6    your Honor, we think this also is a good result

7    looking into the future.  It will disincentivize

8    debtors who would like to retain control over

9    fraudulent conveyance litigation not to waive

10   those claims in their first day orders as is now

11   customarily done.

12           THE COURT:  That's the debtor dive.

13           MR. ZENSKY:  It is, your Honor.

14           THE COURT:  Sure, and when have you

15   seen a case where that doesn't happen?

16           MR. ZENSKY:  It happens frequently --

17           THE COURT:  Okay.

18           MR. ZENSKY:  -- no question about it.

19           THE COURT:  So isn't what you're

20   arguing essentially that debtors' management and

21   debtors' professionals are so conflicted that I

22   should appoint a trustee?

23           MR. ZENSKY:  That's not the relief

24   we're asking for.

25           THE COURT:  Ahhh, ahhh.

1          MR. ZENSKY:  But we subscribe ---

2          THE COURT:  I bet you're not.

3          MR. ZENSKY:  But we do subscribe to the

4    first part of your description and that is the

5    principal reason we would like, even on a

6    provisional basis, to have control of the

7    disposition of the claim and if your Honor has no

8    questions, I'll reserve time to respond to the

9    comments of the other parties.

10         THE COURT:  Very good.  Thank you very

11   much, Mr. Zensky.

12         MR. ZENSKY:  Thank you, your Honor.

13         THE COURT:  Mr. Rosner, you wish to be

14   heard before -- I suppose you should, logically.

15         MR. ROSNER:  We filed a statement in

16   support.

17         THE COURT:  I'm sorry, Mr. Singerman.

18         MR. SINGERMAN:  Your Honor, prior to

19   the Court hearing from Mr. Rosner and the other

20   parties that filed papers in response, pleadings

21   in response to the committee's motion, could your

22   Honor inquire of the committee whether the

23   committee is calling any witnesses in support of

24   the motion today or seeking to submit into

25   evidence any documentary evidence?

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          THE COURT:  Mr. Zensky.

2          MR. ZENSKY:  No, your Honor, there's no

3   evidence, no evidence or witnesses on this

4   motion.

5          THE COURT:  Okay.

6          MR. SINGERMAN:  Thank you, your Honor.

7          THE COURT:  Thank you.  Mr. Rosner.

8          MR. ROSNER:  Good morning, your Honor,

9   and I'll be brief.  David Rosner, Kazowitz Benson

10  Torres & Friedman, on behalf of Aurelius

11  entities, GSO entities and Carlyle Partners.

12          As Mr. Singerman just stated, we, on

13  behalf of those three entities, did file a

14  statement in support of the committee's standing

15  motion and we believe it should be granted in all

16  respects and we think there's no question as to

17  the standards -- that they have met the standards

18  for its approval.

19          The Court, I believe, is very well

20  aware that on the very first day of these cases,

21  our clients filed an objection to the proposed

22  D.I.P. financing, which we contended was not

23  necessary, and that's been borne out, and cash

24  collateral, largely on the basis that the Court

25  should not view the first and second lenders as

1    secured lenders, that they were unable to prove

2    the validity of their claims because of the

3    fraudulent conveyance and because of what

4    transpired in the Transeastern settlement.

5              We attached on that first day a form of

6    complaint and we objected to the first and second

7    claims and now that ball has been picked up by

8    the committee, as we think is appropriate.

9              I believe Mr. Zensky has well pointed

10   out the many, many statements in the Lehman

11   report that indicates that they're exactly on

12   track, we were exactly on track and that's the

13   central issue of this case.

14             In fact, I think if you just look at

15   the sources and uses on Page 13, where they just

16   talk about money going and where the money goes,

17   there's -- you know, there's no line item for the

18   subsidiaries.  There's no money that goes to the

19   subsidiaries.  Money goes in, money goes out,

20   subsidiaries get nothing.

21             Unquestionable the debtors here have

22   abandoned these claims.  You know, of course they

23   concede, as they must, that the debtors have

24   standing in order to bring them.  However, in

25   their response I believe that they've attempted

```
 1    to do even more.  I believe that they've

 2    attempted to prejudice the claims by actually

 3    attempting to make a case for solvency and that

 4    was really the point that Mr. Zensky was getting

 5    to, was that this is not a debtor that is

 6    necessarily now with replaced management,

 7    completely different, you know, postpetition

 8    management that is saying, okay, we're going to

 9    walk away from this, we're going to let the

10    committee investigate it, we're going to keep our

11    hands free from this thing.

12            They have taken affirmative steps in

13    order to cleanse this transaction.

14            THE COURT:  Well, I read their pleading

15    as more geared at trying to protect D and O

16    cover.

17            MR. ROSNER:  But isn't that the same

18    thing, your Honor?

19            THE COURT:  Maybe, maybe not.

20            MR. ROSNER:  And I'll tell you why I

21    think it is, and I think it is -- I mean, you

22    know, I think it's extraordinary for a debtor in

23    response to a standing motion to attach a

24    solvency opinion in the same exact pleading in

25    which they say we concede that the committee
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    should have standing.

2          When you talk about the Ds and Os, I

3    think that's the critical point.  There are

4    claims that will most likely be brought, or at

5    least investigated, against the Ds and Os, and

6    probably the agent and advisors in this

7    transaction that just occurred a few months ago,

8    less than 12 months ago, yet what the debtors are

9    contending is that they nevertheless hold on to

10   the ability under 9019 to pursue a settlement.

11         Now, you asked before, you know, aren't

12   you protected committee, aren't you protected

13   creditors, my clients, you know, the general

14   creditors because any such settlement would have

15   to come to this Court.

16         And I think Mr. Zensky alluded to what

17   the standard is for that approval.  Now, we all

18   know what that standard is and I'm not sure if

19   it's been adopted by the 11th Circuit, I don't

20   believe it has, but it's generally accepted that

21   the standard for approval of a settlement is the

22   lowest point in the range of reasonableness.

23         THE COURT:  The standard in our circuit

24   is governed by a case called In Re:  Justice Oaks

25   II.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

 1          MR. ROSNER:  And I think that in the

 2     Justice Oaks case, which I looked at, it does

 3     state in there that the paramount interest of

 4     creditors is what the Court should be -- should

 5     look at.

 6          THE COURT:  That's one of the four

 7     criteria and clearly, looking at settlements is

 8     something that I do with some regularity and

 9     it's, in many cases, unusual to have creditors

10     even be heard in connection with settlements.

11          Clearly, this is not a case in which I

12     need to worry about creditors being too shy to

13     express their views and so I'm less concerned

14     about -- I'm less concerned about leaving

15     settlement authority with the debtors than you

16     are only because I believe that both the

17     committee and your clients and anyone else who

18     wishes to be heard would be heard in connection

19     with a settlement.

20          I'm not sure that the lowest point of

21     reasonableness has ever been expressed by the

22     11th Circuit as the appropriate standard.

23          MR. ROSNER:  I appreciate ---

24          THE COURT:  Likelihood of success on

25     the merits of the case is -- of the litigation,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    difficulty of collection, expense of pursuing

2    the litigation, and the interest of creditors and

3    those factors are a little different than lowest

4    point of reasonableness.

5            While there may be lower court opinions

6    in this Circuit that discuss lowest point of

7    reasonableness, that tends to be a 2nd Circuit

8    notion that I don't think has been adopted here

9    in the south.

10           MR. ROSNER:  I agree, your Honor.  I

11   agree that it hasn't been adopted by the 11th

12   Circuit, but there is a risk that there are lower

13   court opinions that have looked at it and I

14   believe they've all looked at the four

15   Justice Oaks factors.

16           But here you've got to look at the case

17   as to whether this should just be one of the

18   factors or is this really the factor that should

19   control over everything in the context of this

20   case?  And for that reason, the committee has

21   asked for the ability to settle and the exclusive

22   right to settle these causes of action.  I think

23   they've explained quite well why that is

24   necessary.

25           I think that your Honor has pointed out

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that the pleading that has been filed by the

2    debtors looks to D and O coverage and by virtue

3    of looking to D and O coverage, aren't they

4    themselves, therefore, making the case right away

5    that they are not in the position to actually be

6    the ones to be promoting any type of settlement?

7         The committee, however, has no such

8    issues.  The committee is in the position to

9    actually analyze this strictly from the view of

10   creditors and the view of all of the creditors

11   and all of the creditors here are very important.

12        We stated in our -- and I guess the

13   only way we deviated from the committee and what

14   the committee sought was we said that a

15   settlement should be one that is proposed by the

16   committee and one that is voted upon by all

17   creditors and all creditors should be able to

18   give an affirmative vote that says that this is

19   the right settlement.

20        There is a reason for that, your Honor,

21   and that is because this is not just simply an

22   immaterial claim or one that goes to provide some

23   value.  I've emphasized this and I need to

24   emphasize this again.  This is a claim that goes

25   to the heart of these cases.  This is a claim

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   that will determine whether there is a

2   substantial recovery to unsecured creditors or

3   whether there's not.

4          THE COURT:  Well, I will -- let me --

5   let me comment briefly on the notion of the

6   settlement having to be voted on by creditors.

7          I don't know enough, and I doubt if

8   anyone in the courtroom really knows enough,

9   about what the housing market in the

10  United States is going to do over the course of

11  the next months.  I think that while you and the

12  committee are currently focusing on the

13  litigation here, I think it would be an

14  unfortunate experience for that focus to lose

15  attention to the fact that there is a business

16  here and whether the business here is going to

17  get better or not, depends upon a whole lot of

18  factors, including the quality of the management

19  of the business, and the quality of the advice

20  that the business gets, and general economic

21  conditions over which probably none of us in this

22  room can tilt the scale in any measurable way.

23         So whether this litigation is so

24  critical that it forms the lynchpin of the plan

25  on which you're suggesting all creditors should

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    vote, or whether at the conclusion of this

2    litigation a settlement is being proposed in a

3    plan, there is enough knowledge about what the

4    business is doing out there, such that a plan may

5    be perfectly appropriate or may be premature, is

6    something that would require me to have a crystal

7    ball that is a heck of a lot better than the one

8    the General Services Administration provides.

9           Now, the banks have said put off this

10   litigation and put it into a plan.  Well, I

11   haven't a clue how a plan can be formulated with

12   an $800 million question mark hanging over the

13   balance sheet.

14          So, not wishing to steal anyone's

15   thunder, and not appearing to -- wishing to

16   appear to have ignored the arguments that have

17   been made in writing that will be articulated

18   shortly, it seems to me that going forward with

19   the litigation on a reasonably brief schedule,

20   encouraging the debtor to come up with a business

21   solution to its business problems while this is

22   ongoing, and we know what the -- we conclude the

23   litigation in one way or another and know what

24   the balance sheet effect of that is, and we know

25   what the balance sheet effect of business

1    operations are, then if those two forces can join

2    at the same time, wonderful, we'll have -- we'll

3    have a plan that solves both sets of problems.

4           On the other hand, if one of them is

5    soluble at a point in time and the other one

6    isn't, then whether that moment is a good one for

7    a plan or not, I think remains to be seen.

8           Now, am I missing the big picture?

9           MR. ROSNER:  Your Honor, I think --

10   you're looking away, are you ---

11          THE COURT:  No, I'm looking at you.

12          MR. ROSNER:   Okay.

13          THE COURT:  I'm just looking at you

14   from the other side.  If you'd rather, I'll do it

15   from this way.

16          MR. ROSNER:  No, I don't think that --

17   I don't think that you're missing anything.   I

18   think that you're absolutely right in the

19   conjoining of the business aspect, as well as the

20   litigation aspect.

21          However, the litigation aspect here is

22   paramount to unsecured creditor recoveries and

23   since the litigation is paramount to unsecured

24   creditor recoveries, and can be segregated from

25   the business and will be segregated from the

1   business, that's even a further reason as to why

2   the committee should be the one that should be

3   not only in charge of the litigation, but have

4   the ability to settle it if at all, and I'm not

5   proposing that they will settle it.  They can

6   take this to trial, as we think they ought to

7   take this to trial, and we think they should

8   knock out all of the liens and claims and then we

9   will have right sized this entity and the

10   business will generate its value for the correct

11   creditors, as it should have done before the

12   Transeastern transaction took place.

13          But the unique facts of this case and

14   the centrality and importance of this case, and I

15   believe Mr. Zensky alluded to every single

16   provision of the Bankruptcy Code that gives this

17   Court the authority to vest that -- the authority

18   of settlement in the committee, with a vote of

19   creditors, should be exercised in this case, as

20   it is unique in this case.

21          THE COURT:  Thank you very much,

22   Mr. Rosner.

23          MR. SINGERMAN:  Your Honor, before I

24   approach the podium and prepare for my argument,

25   may I ask your Honor to make the same inquiry of

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   Mr. Rosner regarding whether he is intending to

2   put on any testimony or seek to admit ---

3            THE COURT:  Any evidence, Mr. Rosner?

4            MR. ROSNER:  No.

5            THE COURT:  Let me inquire of others.

6   Does anyone intend to introduce evidence in

7   connection with this motion?

8            Hearing none, I will accept none.

9            MR. SINGERMAN:  May I just have a

10  moment, your Honor?

11           THE COURT:  Sure, Mr. Singerman.  Are

12  you going to get your laptop up, too?

13           MR. SINGERMAN:  No, sir.

14           THE COURT:  You know, we could have the

15  tulips back, that sort of added a ---

16           MR. ZENSKY:  It's above my pay rate to

17  figure it out.

18           THE COURT:  You know, I thought I made

19  that lectern big enough.

20           MR. SINGERMAN:  May it please the

21  Court, your Honor.  Paul Singerman from Berger

22  Singerman on behalf of the debtors.

23           Your Honor, based on the positions of

24  the committee and Mr. Rosner's clients that they

25  are not today presenting evidence for your

1    consideration in support of the relief that the

2    committee seeks and in particular, the provisions

3    of the committee's standing motion regarding

4    exclusivity, consider, please, your Honor, the

5    following:  The first point your Honor has

6    already, not alluded to, but expressly raised,

7    would and could, based on precedent that binds

8    this Court, would and could the Court on the

9    record before the Court today, appoint a trustee?

10   And the answer is resoundingly, no.

11            Would and could today the Court enter

12   an order denying approval of a settlement of the

13   claims the committee wishes to bring as to which

14   the debtors have in their responsive pleading

15   indicated their consent that has not been

16   formulated?  Would your Honor enter an order

17   today that said any settlement the debtors

18   propose to bring is denied?  No.

19            Would your Honor on the record before

20   the Court today enter an order denying

21   confirmation of a plan the debtors may propose

22   during their exclusive period to which no party

23   objected, including the committee, that included

24   amongst its features a settlement of this

25   litigation, the terms of which are unknown today?

1     The answer is clearly and resoundingly, no.

2              There's one Circuit Court opinion that

3     addresses the heavy burden of a movant that seeks

4     to dispossess and disenfranchise the debtors'

5     statutory rights repeatedly recognized in the

6     decisional law to bring settlements of claims of

7     the estate even after derivative standing has

8     been conferred on a committee, and that case,

9     Smart World, which I'll talk about in a little

10    bit more detail later, doesn't lay out a specific

11    standard.  It says the instances in which courts

12    should do it are rare and that it's a heavy

13    burden and it refers to in the case the burden

14    for the appointment of a trustee under Section

15    1104.

16             Now, your Honor, with great respect we

17    believe for purposes of the objection of the

18    debtors to the committee's standing motion, which

19    goes only to the committee's request to have the

20    exclusive right to settle, that that's game, set

21    and match.  There's nothing in the record to

22    support a different conclusion from your Honor

23    and there's no argument, even argument that

24    should compel a different result.

25             More contextually, I am first, your

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    Honor, not going to put back on the screen the

2    committee demonstrative.  Those facts for

3    purposes of the debtors' disputed issue today are

4    irrelevant.  I would note, your Honor, that

5    colleagues on the debtor advisory team who are

6    more knowledgeable than I today about the terms

7    of the substance of the transactions on the

8    demonstratives, indicated that there are errors

9    in them.

10            I don't attribute any ill will to that,

11   I only offer that observation.

12            THE COURT:  The only point I will make

13   on that is that the demonstratives were, I think,

14   proposed for purposes of demonstrating a

15   colorable claim.  I think whether they are a

16   hundred percent accurate or not, they certainly

17   indicate a colorable claim, to which defenses

18   can, of course, and undoubtedly will, unless

19   Mr. Flaschen has the $300 million check, be

20   interposed in due course.

21            MR. SINGERMAN:  And, your Honor, I know

22   you observed from the debtors' response that the

23   debtors don't weigh in on the colorable claim

24   fight.

25            THE COURT:  Yep.

1          MR. SINGERMAN:  The debtors do not, as

2     the committee argued, concede it.  The debtors,

3     instead, consent to the relief the committee

4     seeks to bring, the claims referred to in

5     Paragraph 35 of the interim D.I.P. order and

6     other claims subject of the draft complaint

7     annexed to the committee motion.

8          Back to a more contextual analysis of

9     what precisely is before the Court this morning.

10    The Committee filed the standing motion, Docket

11    Entry 850, and by it the committee seeks to bring

12    the claims, which I will not repeat.

13         The prayer for relief in the committee

14    motion is limited to the right to bring the

15    litigation claims and the exclusive right to

16    settle them.  The proposed order, which is

17    Exhibit I to the committee's standing motion,

18    goes far beyond the prayer for relief sought in

19    the body of the motion and with your Honor's

20    permission, I'm going to come back to that before

21    I sit down.

22         There have been several references in

23    the argument this morning and in -- your Honor

24    has to observe that at the first day hearings

25    there was discussion of these litigation claims.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1               In fact, your Honor, as early as

2      Page 26 of the transcript of the first day

3      hearings before the Court, Mr. Basta referred to

4      these very claims and at Page 31 of the

5      transcript, Mr. Basta spoke exactly to the issues

6      that are before the Court.

7               He said, the second theme here,

8      referring to the cases, and we're going to get

9      into this a lot during the case, is everybody

10     wants to go back and look at Transeastern and

11     look and see are there claims, are there claims

12     that can come out of the transaction.  We don't

13     want the preservation of the claims to be done in

14     a way that impairs the business, so that steps

15     are taken to impair financing or impair other

16     things to make sure that the value generated from

17     the enterprise is not the maximum and that there

18     will be a primary source of recovery to

19     creditors.

20              Now, your Honor, you're going to make

21     your own determinations about management because

22     management has been put into the face of this

23     argument today, unfairly we think, and without --

24     current management and without any evidence to

25     support the allegations in the motion or the

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    argument this morning.  You'll make your own

2    assessments of whether my firm and Kirkland &

3    Ellis and the other of the debtors' advisors,

4    financial and legal, are executing their

5    appropriate duties.

6              But to my way of thinking, what

7    Mr. Basta said, and the manners in which the

8    debtors have proceeded since the first day

9    hearings, make -- including the acknowledgement

10   of the existence of the claims, the debtors'

11   efforts post-bankruptcy to preserve the claims

12   and the debtors' concerns regarding the manner in

13   which the claims are to be advanced and the

14   potential adverse impact and cost to the estate,

15   are all precisely what a debtors' management

16   post-bankruptcy and debtors' advisors should be

17   doing.

18             We ask you to consider these three

19   points and the manner in which the litigation is

20   going to proceed and we think that if you do, and

21   the debtors' suggestions about how the litigation

22   will proceed, you're going to reach a terribly

23   different impression for now until there's

24   evidence to change it, about the bona fides of

25   management and the advisors, and it will be

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   something and should be something horribly

2   different than this fantasy that the committee

3   has laid out regarding the management and the

4   advisors breach of their duties and their

5   conduct.

6          THE COURT:  Well, let me save you from

7   too much agony in going through on that issue.

8   There is a presumption in the Code that a debtor

9   remains in possession and that the powers,

10  rights, and duties of debtor-in-possession are

11  those of a trustee with the exception of certain

12  duties that are clearly inappropriate for the

13  debtor to bear.

14          For there to be a modification of those

15  duties, there has to be a showing of cause and

16  there is no evidence that I have heard, and no

17  one is proposing to put on evidence today, on

18  this issue as to the inability of the debtors to

19  fulfill their statutory obligations.

20          If this -- if this argument is really

21  about the transferring of exclusive ability to

22  settle from the debtors to the creditor -- to

23  propose a settlement, pardon me, under Rule 9019

24  or in a plan, to transfer that right from the

25  debtors to the committee, I haven't heard

1    anything that persuades me that that is now today

2    an appropriate thing to do.

3            So just as with the extension of

4    exclusivity, there has been the continuation of

5    the fiduciary obligations of the debtors in

6    respect of the drafting and proposing of a plan,

7    I think that the 9019 settlement authority that

8    vests by statute in the debtors, remains with the

9    debtors absent a showing of cause.

10           Now, when I deny that part of the

11   creditors' committee's motion, it will be without

12   prejudice, such that if the committee comes in

13   and establishes that there is a bona fide reason

14   why the debtor is impeded or precluded from

15   acting in an efficient manner with respect to the

16   resolution of the litigation, which I will

17   authorize the committee to commence, not wishing

18   to show my cards too clearly, Mr. Smolinsky, but

19   you knew where this one was going, then at some

20   future date, modifications are possible, but

21   nothing is on the record here that will change --

22   will today cause the presumptions to change.

23           MR. SINGERMAN:  Then, your Honor, with

24   your permission I'm going to do two things,

25   tonight I'm going to present the rest of my

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    argument to Marta, and I'm going ---

2            THE COURT:  I'm sure she will be

3    extraordinarily impressed.

4            MR. SINGERMAN:  That would be a first.

5            THE COURT:  Well, try the girls

6    instead.

7            MR. SINGERMAN:  Then, your Honor, I'm

8    going to proceed to addressing two remaining

9    issues that are of concern to the debtors.

10           THE COURT:  Okay.

11           MR. SINGERMAN:  First, the litigation

12   schedule, that first the debtors in our response

13   proposed.

14           THE COURT:  You said a trial in

15   October, Mr. Golden says trial in January.

16           MR. SINGERMAN:  Right.  On that point,

17   your Honor, I think that this motion practice has

18   been very positive for the case.  The debtors

19   will adopt wholesale, with one exception, the

20   litigation schedule proposed by the committee and

21   in addition, will encourage the other litigants

22   that are currently before the Court or

23   prospective litigants to do the same.

24           The single exception, which the debtors

25   ask your Honor to incorporate into a final

1   scheduling order would be that we revert back to

2   the date July 8, 2008.

3          THE COURT:  Counsel, counsel, if you

4   want to have a chat, mute your phone.

5          MR. SINGERMAN:  May I proceed, your

6   Honor?

7          THE COURT:  Please.

8          MR. SINGERMAN:  The single modification

9   that the debtors propose to the committee's

10  proposed litigation schedule is that we revert

11  back to the debtors' date of July 8, 2008, not

12  June 30, 2008 for the debtors' production of

13  documents in favor of the committee and third

14  parties.

15         Other than that, your Honor, the

16  debtors accept the committee's schedule and as I

17  said, encourage the other prospective litigants

18  to do the same.

19         The last subject that I'm going to

20  spend any time on, your Honor, in light of your

21  ruling and the debtors' consent to the standing

22  to bring the claims and the draft complaint, goes

23  to the proposed order, which is Exhibit I to the

24  committee's standing motion and I will make this

25  quick.

1          The order has seven decretal

2     paragraphs.  Decretal Paragraph 1 of the proposed

3     order says that the motion is granted and, of

4     course, in light of your Honor's ruling it should

5     be granted in part and denied in part.

6          The second, Decretal Paragraph 2, we

7     would object to the portion of the order that

8     conferred upon the committee the exclusive right

9     and authority to settle.  I think your Honor has

10    addressed that point.

11         Paragraph 3, we would ask your Honor to

12    make clear in any order, if you are even going to

13    consider the committee's proposed form of order,

14    that the language proposed by the committee,

15    pursuant to which the committee can prosecute to

16    conclusion the litigation, doesn't contradict

17    your Honor's ruling on the debtors' exclusive

18    right to settle the litigation and moreover, that

19    the language regarding the committee having,

20    quote, "the full rights and privileges of the

21    debtors," needs to be clarified to make sure that

22    the debtors' attorney/client privileges and work

23    product protection doctrine are not implicated.

24         Decretal Paragraph 4 purports to direct

25    the application of the settlement proceeds or the

1    results of the litigation.  Your Honor, there is

2    nothing in the committee's standing motion that

3    addresses this point and any order your Honor

4    enters today should not, in our estimation,

5    direct how settlement or litigation recoveries

6    are allocated.

7            THE COURT:  And I would think it would,

8    in any event, violate Braniff and other sub rosa

9    plan cases.  There's no -- there's no reason why

10   that should be there.

11           MR. SINGERMAN:  Yes, sir.  Thank you,

12   your Honor.

13           Last, Decretal Paragraph 5, went

14   expressly to the issue of the committee having

15   the exclusive right and authority to negotiate

16   and settle.  Your Honor has addressed that.

17           Decretal Paragraph 7, pursuant to which

18   your Honor retains jurisdiction over the order

19   conferring the standing on the committee is fine.

20           Your Honor, our argument ---

21           THE COURT:  You didn't say anything

22   about 6.

23           MR. SINGERMAN:  I apologize, your

24   Honor.  Paragraph 6 and 7 are both fine.  I

25   apologize.

Case 1:14-10979-CSS   Doc 3726-2   Filed 03/03/15   Page 117 of 271
Case 1:08-10928-JKO   Doc 7676   Filed 09/26/08   Page 116 of 235

116

```
 1            THE COURT:  Okay.

 2            MR. SINGERMAN:  Your Honor, to the

 3   extent that the Court has considered my argument

 4   this morning regarding the debtors' exclusive

 5   right to propose a settlement as one the debtors'

 6   reserve only under Rule 9019, that was

 7   inadvertent.  I think it's clear from our papers

 8   and your Honor's own observations that that right

 9   remains with the debtors to propose a settlement

10   under a plan, as well.

11            THE COURT:  Of course, of course.

12            MR. SINGERMAN:  Thank you, your Honor.

13   I have nothing further, your Honor.

14            THE COURT:  Thank you very much,

15   Mr. Singerman.  Now, it is noon.  For the people

16   who have to feed parking meters across the street

17   that's critical because the meter maids come by

18   and you can't put in more than $3 worth of

19   quarters.

20            Does anybody need a break either for

21   defeating the City of Fort Lauderdale's meter

22   maids or otherwise, otherwise we'll go through?

23            Hearing no objection ---

24            MR. SINGERMAN:  We'd prefer to proceed,

25   your Honor.
```

1          THE COURT:  Yeah, me, too.

2          MR. ZENSKY:  Your Honor, can I just ask

3   for a point of clarification in response to the

4   points Mr. Singerman made?

5          THE COURT:  Sure.

6          MR. ZENSKY:  I understand his request

7   and your Honor's statements about the part of the

8   motion that asked for the committee to have

9   exclusive ---

10          THE COURT:  Mr. Zensky, if you could

11   just come up to the lectern, it will pick up

12   better for the folks on the line.

13          MR. ZENSKY:  I apologize, your Honor.

14          THE COURT:  No problem.

15          MR. ZENSKY:  As I said, I understand

16   your Honor's apparent determination on the

17   settlement issue and Mr. Singerman's point with

18   respect to the paragraphs that dealt with that.

19   What I'm not sure is if I heard him ask you to

20   change that to say that the debtors are now

21   vested with exclusive authority or simply to take

22   out the paragraph that proposed to vest that

23   authority in the committee?

24          MR. SINGERMAN:  Your Honor, may I be

25   heard?

1           THE COURT:  Yes, sir.

2           MR. SINGERMAN:  It is my understanding

3     of the ruling that your Honor made and the

4     reference to the debtors' exclusive rights under

5     the statute to propose settlements, that what the

6     debtors proposed in our response is what your

7     Honor ruled, which is that that exclusive

8     authority remains vested in the debtors pending

9     further order of the Court upon subsequent motion

10    and cause shown and that is, indeed, the relief

11    we are seeking.

12          THE COURT:  And is there a necessity,

13    Mr. Singerman, in your view to include that

14    language in an order or just simply denying the

15    relief to the committee leave you in that

16    position?

17          I'm always a little reluctant to monkey

18    around with otherwise available statutory

19    provisions because if the language of the order

20    is a little off from the language of the statute

21    and the rules, then we may be creating a monster

22    and I'm just trying to head one off.

23          MR. ZENSKY:  And we would object to the

24    inclusion of that language because we don't think

25    it's appropriate or that it was asked for.

Case 1:14-cv-10979-CSS   Doc 3726-2   Filed 03/03/15   Page 120 of 271
Case 08-13555-JKO   Doc 7676   Filed 09/20/08   Page 119 of 235

119

1          THE COURT:  Well, okay.

2          MR. SINGERMAN:  Your Honor, we agree

3    with your Honor and don't think that we need

4    another thing to fuss about with the committee

5    and we'll not argue further.

6          THE COURT:  I think you'll have enough

7    to fuss about, but I suspect you will have less

8    to fuss about than they worry that you will.

9          MR. SINGERMAN:  Thank you, your Honor.

10   We agree.

11         THE COURT:  Now, then, Mr. Hall.  It's

12   always easy to argue after the judge has sort of

13   ruled.

14         MR. HALL:  Good afternoon, your Honor,

15   Thomas Hall on behalf of Citibank, as first lien

16   agent.  Given that you've already ruled, I'll be

17   very brief.

18         I will avoid getting into the defenses

19   of the -- of the fraudulent conveyance claims.

20   Three quick points, though, your Honor, one is we

21   agree that the demonstrative that was shown

22   contains not one, not two, but many very serious

23   errors.  I'm sure the committee just doesn't know

24   enough about the case yet, but I'll just point

25   that out.

```
 1                Number two, as we read the draft

 2      complaint, the theory of the complaint is not

 3      that the whole -- the company itself was

 4      insolvent or rendered insolvent by this

 5      transaction.  The theory is that certain

 6      subsidiaries were either insolvent or rendered

 7      insolvent by becoming jointly and severally

 8      liable on this new $800 million financing.

 9                Well, that is just not true because

10      under the loan documents, each subsidiary's

11      obligation is capped right before the point that

12      they will become insolvent.  So we think that

13      provision is going to be a subject of early

14      motion practice in the case, your Honor.

15                THE COURT:  That's kind of interesting.

16      If the committee proves the point at which

17      they're insolvent, then I guess those

18      subsidiaries' obligations to you expires.

19                MR. HALL:  That may be so, your Honor,

20      but the assets we understand are in certain very

21      large subsidiaries that were very solvent and

22      have all the land assets.

23                THE COURT:  Drafting may have been too

24      cute by half.  Oh, well, that's for another day.

25                MR. HALL:  That's for another day, your
```

1    Honor.

2          The last point I'll make is although

3    they claim it's a $850 million claim, the

4    revolver itself should play no part in this

5    claim.  The two term loans, the $500 million

6    were, in fact, used to settle the Transeastern

7    litigation and that is the basis for the

8    fraudulent conveyance claim.

9          The revolver, which I think at the time

10   of the petition was $317 million drawn, that was

11   in effect from March 2006.  Yes, there was a

12   second amended and restated revolver signed on

13   July 31, 2007, but that was there for the benefit

14   of all the subsidiaries.  All the subsidiaries

15   had the ability to draw on that financing and,

16   therefore, receive, clearly receive reasonably

17   equivalent value.

18         THE COURT:  Was the balance of the

19   revolver, did the balance of the revolver remain

20   the same pre and post Transeastern?

21         MR. HALL:  I believe so.  It was

22   largely used for letters of credits that the

23   subsidiaries had for the real estate activities.

24   I think there were a couple hundred million

25   dollars in LCs outstanding, both before and

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   after, another 50 or a hundred for general

2   operating purposes, but that is going to be

3   another subject that I think is going to be a

4   matter of an early motion before your Honor once

5   this case is filed.

6           On the scheduling, your Honor, eight

7   months is aggressive, but if it's in the best

8   interest of the debtor, we're willing to jump on

9   that train and go with it.  We do think there are

10  some tweaks that need to be made to the schedule

11  that was proposed yesterday and we're happy to

12  expeditiously deal with committee's counsel to

13  resolve those.

14          We are concerned about two things, one

15  is we heard some suggestion today that we're

16  going to see an amended complaint.  We'd be

17  concerned that, you know, if that's going to

18  expand the scope of the claim, obviously that

19  could impact upon the schedule.

20          Secondly, your Honor, we're concerned

21  about the Transeastern lenders and their buying

22  into such a schedule, but we can deal with that

23  at the appropriate time.

24          THE COURT:  Or I can.

25          MR. HALL:  The proverbial we, your

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    Honor.

2              Lastly, we are concerned about, as the

3    debtor is, about the cost of this litigation to

4    the estate.  We do oppose the use of our cash

5    collateral to pay for the committee's legal fees

6    on this case.  The estate is already burdened

7    with some $5 million a month in professional fees

8    and that is pre-litigation.  We are very

9    concerned about the impact that the litigation

10   alone and the legal fees could have on this

11   estate.

12             THE COURT:  I have a suspicion that

13   some of the work that is related to this

14   litigation is already hidden in the -- hidden --

15             MR. HALL:  I think you're probably

16   right.

17             THE COURT:  -- in the fees.

18             MR. HALL:  Some is not so hidden, too,

19   your Honor.

20             THE COURT:  I suspect that, too.

21             MR. HALL:  But I think we may hear more

22   of that this afternoon on the cash collateral

23   motion.

24             On the authority to settle, the only

25   thing I'll mention, that the committee in their

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    submissions suggested that this was -- this claim

2    was the largest asset of the estate and all I can

3    say is --

4          THE COURT:  Hope not.

5          MR. HALL: -- we better hope not or --

6          THE COURT:  Hope not.

7          MR. HALL: -- we're in a lot of trouble,

8    your Honor.

9          THE COURT:  Yep.

10          MR. HALL:  Thank you.  Can I cede a

11   couple minutes to Mr. Smolinsky, please?

12          THE COURT:  Sure.

13          MR. SMOLINSKY:  I don't need any time,

14   your Honor.  I wanted to comment on the issue of

15   standing and how that might impact our investment

16   in the going concern of this company, but I think

17   your Honor has already addressed it through your

18   comments on the standing to settle.

19          THE COURT:  Okay.  Thank you.

20          Anyone else wish to be heard?

21   Mr. Flaschen.

22          MR. FLASCHEN:  Your Honor,

23   Evan Flaschen, Bracewell & Giuliani for

24   Wells Fargo.  Does this thing go up?

25          THE COURT:  Yep, it sure does, button

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    on the side.

2              MR. FLASCHEN:  Down and up?

3              THE COURT:  Well, you just have to

4    rock -- it's a rocket rocker.

5              MR. FLASCHEN:  Mr. Golden complains

6    about his eyesight, I changed the eyesight level.

7              THE COURT:  Well, now that the entire

8    courtroom is blocked from seeing me -- that's not

9    true.  We actually tried to design that in such a

10   way -- the only thing that is troublesome,

11   Mr. Singerman, could you move that screen unless

12   Mr. Flaschen has need for the screen ---

13             MR. FLASCHEN:  I do.

14             THE COURT:  Then never mind.

15             MR. FLASCHEN:  Thank you, your Honor.

16   Although I think we've already been hanged, I do

17   appreciate the chance for a trial finally.

18             From the first day of this case all

19   you've heard is people screaming about this

20   litigation, how great it is, how slam dunk it is,

21   how textbook it is, and people have asked me,

22   Evan, are you ever going to say anything?  All

23   the judge has heard is one side, the judge has

24   already made up his mind, you've got to say

25   something.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 1:14-cv-10979-CSS   Doc 3726-2   Filed 03/03/15   Page 127 of 271
Case 08-13728-JKO   Doc 7076   Filed 09/20/08   Page 126 of 235

126

1           At my house I have a beehive, a lot of

2    bees, they do a lot of buzzing.  It doesn't mean

3    I swat them, it's just buzz.  What you've heard

4    so far is just buzz.  You just heard screamers

5    screaming.  We're patient.  Now is the time for

6    us to speak because now the bees wish to sting

7    rather than simply buzz.

8           I'm going to go through five topics,

9    one, what they don't know; two, what they don't

10   tell you; three, what is happening in the real

11   world; four, what we propose; and then five, some

12   final points.

13          THE COURT:  Did I miss four?

14          MR. FLASCHEN:  Four was what we

15   propose.  We don't just identify problems, we

16   have solutions.

17          THE COURT:  Well, the check is in the

18   mail, then.

19          MR. FLASCHEN:  I don't think they write

20   checks in that small an amount, your Honor.

21          THE COURT:  You know, it took -- it

22   took, what was it, three wire transfers or four

23   or five for Texaco to pay Pennzoil because you

24   can't wire transfer more than a billion dollars.

25   Oh, well.


OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1           MR. FLASCHEN:  Actually, your Honor,

2      you harkened to my youth.  I take pride in being

3      one of the architects of that settlement, but

4      that was many years ago.

5           What they don't know.  They do not know

6      whether these subsidiaries were insolvent or were

7      rendered insolvent.  Don't take my word for it,

8      take the word of Mr. Bernard Katz of J.H. Cohn,

9      their forensic accountant, according to the

10     affidavit filed yesterday.

11          They acknowledge the very limited

12     amount of discovery conducted to date.  They

13     don't know most of the facts, understand.

14     Referring to the debtors' proposed case

15     management order, CMO, it's an unrealistically

16     short period of time to investigate the claims.

17     I thought one should normally investigate claims

18     before one actually brings claims.

19          Once the committee gets the information

20     it is seeking, Mr. Katz says, with this

21     information the committee's experts will be in a

22     position, among other things, to do the

23     appropriate calculation of value as of July 31,

24     2007.  The complaint said they've already done

25     the calculation, insolvent, case over.

```
 1              Their forensic accountants who are
 2    going to look at insolvency said, we don't have
 3    any information on that and to make it clear, if
 4    that wasn't clear, they say in Paragraph 9, we do
 5    not have the vast bulk of information necessary
 6    for the expert opinion and that information is,
 7    now I'm quoting, "crucial for analyzing the
 8    insolvency of the conveying subsidiaries."
 9              They don't know whether these
10    subsidiaries are insolvent.  They make the
11    categorical allegation, but they have no facts to
12    support it, which they acknowledge.
13              You had a brief slide show about 9(b),
14    by the way, your Honor, counts.  Six of the 13
15    counts allege actual fraud, not just constructive
16    fraud, but I'm not focusing on the standard at
17    this moment.
18              Next, they don't know who the
19    defendants are.  Good for them they finally
20    figured out they're suing the wrong indenture
21    trustee.  They're suing the indenture trustee two
22    times ago for the subordinated notes and since
23    Wells Fargo was the one they sued for that, we're
24    glad they're not going to sue us anymore for
25    notes for which we are not the indenture trustee.
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 1:14-cv-10979-CSS   Doc 3726-2   Filed 03/03/15   Page 130 of 271
Case 08-10928-JKO   Doc 7676   Filed 09/28/08   Page 129 of 235

129

 1          They don't know who the lenders are.

 2     John Does 1 through a hundred.  They want to sue

 3     people they don't know who they are.  We'll come

 4     back to that, but part of their investigation

 5     might identify who the defendants are they

 6     actually want to sue.

 7          They apparently don't even know who the

 8     Transeastern lenders are.  They've said they're

 9     going to amend the complaint and name them all

10     once they figure out who they are.  A

11     particularly remarkable statement, by the way,

12     that they attach as an exhibit the Transeastern

13     settlement that names all the lenders, but,

14     nevertheless, they've told you they don't know

15     who they are.  I'll come back to why they say

16     that, by the way.  There is an important reason.

17          Because they claim they don't know who

18     they are, it's all the more remarkable that six

19     of their counts say those Transeastern lenders

20     had actual knowledge of the fraud.  People they

21     don't know, they've never met, they never talked

22     to, they are convinced have actual knowledge of

23     something.

24          You can't just say that in a pleading,

25     there's got to be some basis, some colorable

Case 1:14-cv-10079-CSS   Doc 37262   Filed 03/03/15   Page 131 of 271
Case 08-13555-JKO   Doc 7676   Filed 09/28/08   Page 130 of 255

130

1    claim and the fact that their chart is pink does

2    not make it colorable.

3          THE COURT:  Mr. Flaschen, so far the

4    points you've made might be appropriate in

5    connection with a motion to dismiss a complaint

6    that hasn't been filed, what's it got to do with

7    a motion that's before me today?

8          MR. FLASCHEN:  As I said, your Honor, I

9    would appreciate the chance for my trial before

10   you hang me.  I will get to that, respectfully.

11         THE COURT:  I'll look forward to it,

12   Mr. Flaschen.

13         MR. FLASCHEN:  Thank you, your Honor.

14   They don't even know what they're seeking to

15   recover.  $850 million they say.

16         Let's talk about these subsidiaries.

17   On the one hand, these subsidiaries got no

18   benefit, no money, nothing, use their words, they

19   were forced to sign co-borrowings and guarantees

20   for which they got absolutely no benefit, none of

21   the money and yet, six of their counts say you

22   know that $422 million that went to Transeastern

23   that the subsidiaries didn't get, after you avoid

24   the subsidiaries' claims, would you give the

25   subsidiaries back the 422 million that they

          OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   didn't get?

2           You can't plead it both ways.  Either

3   they got nothing, they gave up nothing or there

4   was 422 million of their money they get back.  It

5   doesn't work that way.  Maybe TOUSA gets back

6   that money, the subsidiaries sure don't.

7           Before they file a complaint, they

8   should at least decide what it is they're going

9   to pursue, they can't pursue both of those.

10           What they don't tell you.  They didn't

11   tell you about the Lehman opinion.  The debtors

12   have, so now they've discussed it.  The Lehman

13   opinion, yes, of course it talks about fairness

14   to shareholders because they're relying on a

15   solvency opinion and it was a solvent company

16   and, therefore, you don't focus on creditors.

17   That does not mean that they concluded it was

18   unfair to creditors.  It means it's a solvent

19   company, we focused on the shareholders.

20           The exhibits that the debtor had --

21   have filed, the work papers, you haven't seen

22   thousands of pages.  I don't think Lehman

23   Brothers lightly issues such opinions, but

24   nevertheless, that's there and they did not

25   mention that in their notice, their motion.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1              Alex Partners' opinion.  They didn't

2   mention that.  They didn't mention that in their

3   motion, they did not mention it in their reply to

4   our pleading.  It's come up today because the

5   debtor attached it.

6              $2 million for an $850 million loan,

7   that's not so bad.  I bet the investment bankers

8   got more than that, I bet the lawyers got more

9   than that.

10             Alex Partners said this consolidated

11  group is solvent by all relevant tests of

12  insolvency, balance sheet, cash flow,

13  unreasonably small capitalization.  They signed

14  an opinion.  They have thousands of pages of work

15  product.  The opinion is based on numerous asset

16  appraisals.

17             The opinion is not dispositive on your

18  decision.  It is up for you to decide solvency

19  from a bankruptcy point of view, not for them to

20  tell you what it is, but that's not such bad

21  evidence that there was an opinion --

22             THE COURT:  To be sure it's evidence.

23             MR. FLASCHEN:  -- an opinion that was

24  addressed.

25             THE COURT:  Your charcterization of it

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   in your pleading as compelling, I think is -- it

2   may be premature, but I'll listen.  Of course

3   it's evidence.

4           MR. FLASCHEN:  An opinion addressed

5   directly to the first lien agent and the second

6   lien agent.  We're entitled to rely on that.

7           What they don't tell you ---

8           THE COURT:  If it happens to be wrong,

9   that's a different question.

10          MR. FLASCHEN:  Indeed, your Honor.

11  We're not losing sleep over the possibility that

12  the opinion will be wrong, but we'll get to that

13  in the trial you've already said is going to

14  happen.

15          What they haven't told you is these new

16  lenders, since they don't know who they are,

17  these are not existing lenders throwing in more

18  money to shore up an old position, these are not

19  shareholders putting money in, this is money

20  obtained in a widely syndicated transaction,

21  highly rated from brand new lenders who thought

22  this company was worth 500 million of term debt,

23  plus a revised revolver.

24          I'll just quote from the Aradium

25  (phonetic) decision.  "A powerful indication of

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    contemporary informed opinion as to value comes

2    from private investors, who with their finances

3    and time at stake, and with access to substantial

4    professional expertise, concluded at the time

5    that the business was, indeed, one that could be

6    profitably pursued."

7              All these brand new lenders thought

8    this is a reasonable loan to make.  Again, they

9    could be wrong.

10             THE COURT:  Are you telling me,

11   Mr. Flaschen, that these are all brand new

12   lenders?

13             MR. FLASCHEN:  Most of them were, yes,

14   it's a widely syndicated transaction, absolutely,

15   your Honor.  As I said, this is the category of

16   of what they don't tell you.  These are not the

17   Transeastern guys ---

18             THE COURT:  I'm trying to listen to you

19   and what you're telling me.

20             MR. FLASCHEN:  Thank you.  These are

21   not the Transeastern guys saying, let's lend

22   money at TOUSA in order to pay us off at

23   Transeastern.  It's an agent, widely syndicated,

24   open to the market, people signed up for the

25   loan.

1          The most interesting thing they don't

2     tell you, and I'm going to try the technology,

3     Picture 1, before TOUSA subsidiaries, 1.1 billion

4     of debt.  Okay.  Picture 2, lots more lines,

5     there must have been fraud.  TOUSA subsidiaries,

6     1.1 billion of debt plus 800 million of debt.

7          Let's go back to Picture 1. TOUSA

8     Homes, L.P. is not just a holding company.  TOUSA

9     Homes, L.P. has numerous subsidiaries of its own

10    with substantial assets, which also guaranteed

11    the debt.

12         THE COURT:  If you want to circle

13    things, Mr. Flaschen, you may do so on the screen

14    that you wished left there.  You don't have to

15    use a pen on the document.  That's what the

16    screen is for.

17         MR. FLASCHEN:  The technology is fun

18    enough, I'm going to have to do it.  Look at

19    that, and that's even more dramatic.  God damn

20    it, they had subsidiaries, look at all those

21    subsidiaries they had with assets.

22         Now, here's the real ---

23         THE COURT:  Attack of the paramecium.

24         MR. FLASCHEN:  Here is the real kicker.

25    What they do not tell you, and maybe they don't

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    know because they haven't actually investigated

2    the facts, as they acknowledge.  On the petition

3    date the amount under the first lien, second

4    revolver was about $800 million.  Someone said

5    822, that includes PIK interest, about

6    $800 million, which a substantial part was

7    letters of credit.

8              What they don't tell you is that

9    $800 million of exposure replaced $800 million

10   from a January 2007 loan agreement.  Up and down

11   balances change, $800 million already, January

12   2007.

13             What they don't tell you, that January

14   2007 loan agreement replaced a March 2006 loan

15   agreement in the face amount of, guess what,

16   $800 million.

17             I should slow down because you're

18   taking notes.  What they don't tell you is the

19   March 2006 loan agreement replaced an October

20   2004 loan agreement, admittedly only 600 million,

21   but with the expressed ability of the debtor,

22   absent a default, to increase it to $750 million.

23             October 2004 replaced April 2003, which

24   replaced years before that.  Every one of those

25   loan agreements was guaranteed by these conveying

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    subsidiaries, every one of them.  Going back at

2    least until April 2003, these subsidiaries, don't

3    show it on this chart, were all already

4    contingently liable for $800 million.  As

5    Bankruptcy Code Section 548 says, value includes

6    satisfaction or securing of an existing

7    obligation.

8         So when you talk about what they don't

9    know and what they haven't said, they're not even

10   suing to avoid the right transfer.  They should

11   go back at least to 2003, if not before, when

12   these subsidiaries first were on the hook for

13   $800 million.

14        What is happening in the real world?

15   You've already said that, there's actually a

16   business here somewhere, not a great business at

17   the moment, but it would be nice if this business

18   survives, even though the largest asset of the

19   estate apparently is this litigation.  We hope

20   that is not the case.

21        We are told in the context of cash

22   collateral, which you haven't heard yet, but

23   there is a Boken declaration that the company is

24   actually negative cash flow, I think, and I'll be

25   corrected, I'm sure, over five of the next six

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    months negative cash flow in those amounts and

2    then the sixth one I think is positive.  That

3    takes into account 30 million in professional

4    fees.  Those 30 million in professional fees do

5    not include transaction fees, which is where the

6    investment bankers make the big bucks that we

7    lawyers are all jealous of and that 30 million

8    does not include one cent for this litigation.

9    So we're already cash flow negative before we

10   pursue this litigation.

11          I'm told, by the way, when you said you

12   haven't seen sticker shock, that the committee

13   just did a monthly notice and, again, please

14   correct me if I'm wrong, it's like a million

15   three for one month, $500,000 higher than

16   debtors' counsel.  I've never seen -- committee

17   work is great, don't get me wrong.  It's the

18   second best gig going, but debtor work is the

19   best because they always get to charge even more,

20   but apparently not in this case.

21          THE COURT:  I thought your fees and

22   your clients fees are capped at a mere $450,000 a

23   month, so ---

24          MR. FLASCHEN:  I have not gotten to

25   ours and we have not yet incurred 450 a month, by

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 1:14-cv-10979-CSS Doc 3726-2 Filed 03/03/15 Page 140 of 271
Case 08-13555-JKO Doc 7676 Filed 03/20/08 Page 139 of 235

139

1    the way.  By the way, since you raised that, our

2    450 a month at the moment includes investment

3    bankers at 150 a month; it includes the special

4    counsel to the agent, who is on the phone,

5    Seward & Kissel; and it includes our local

6    counsel and we haven't even hit 450 a month and

7    we've tried.

8         It's hard for us to bring more than two

9    people to court.  It seems harder for Akin Gump,

10   who in court, again, correct me if I'm wrong,

11   have at least six lawyers here.  Good work if you

12   can get it, not on our nickel, which we'll get

13   to.  Six lawyers in court and they haven't even

14   been told they can bring this lawsuit yet.

15        So when you talk about sticker shock,

16   don't wait for the fee application, look around

17   this courtroom, see how many lawyers are involved

18   just to argue something that is an interim cash

19   collateral order that we all know will be granted

20   and then 30 days we'll have the argument, and

21   then this standing motion.  Of course only two

22   lawyers -- only one lawyer spoke about it, the

23   other one, spoke about J.H. Cohn.

24        What else is happening in the real

25   world?  We're actually working on something.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    There's actually a business here.  We hope we

2    second liens are over secured, don't know yet.

3    John Boken, who did a deposition yesterday, said

4    the debtor hasn't done a valuation yet.  We

5    haven't done a valuation yet, J.H. Cohn hasn't

6    done a valuation yet.  We need more information.

7    We hope we're over secured.

8            Many people, including those who buy

9    and sell the second lien debt, suspect we're

10   under secured.

11           THE COURT:  What's it trading at?

12           MR. FLASCHEN:  At the moment it's not

13   really trading, but I think the latest either bid

14   or ask, forgive me, is in the 70s, if that.  Is

15   it below 70 now?  It's not a pretty number for

16   today.

17           So we might even be under secured here,

18   making us a fulcrum security, meaning whether a

19   little over secured or a lot under secured, this

20   company can't afford this debt.  We know we're

21   going to get a lot of equity, this is really our

22   business in the future and we actually care about

23   the business, not just the litigation.

24           We're working on something to do with

25   the business, working on a transaction, which, by

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    the way, some very large creditors in the case,

2    who are not represented by the committee or by

3    the -- or with the Aurelius trio.  People are

4    amused, I call them the unholy alliance, I won't

5    say that again, other than I just now did.

6             Now, is it going to happen?  I don't

7    know, but we're looking for solutions here.  It

8    would involve a transaction that de-leverages the

9    balance sheet, that brings in fresh capital, that

10   provides an opportunity for everyone and gets

11   this company back into the business of building

12   homes and hopefully selling those homes some day

13   and out of the business of paying professionals.

14            Sounds nice, so what do we propose,

15   and thank you for being patient after I lectured

16   you to wait for me.  We proposed before we have

17   even more than six lawyers in court for the

18   committee, before we spend all this money on this

19   litigation, we propose to take a deep breath.

20            We've never challenged that if there is

21   litigation to be brought it shouldn't be by the

22   debtor.  They rolled over with the first liens,

23   we weren't involved, but they rolled over.  We

24   know that.  So if someone is to pursue it, it's

25   the creditors' committee.

1          I've been in other cases where the
2     Court has said, tell you what, today I
3     acknowledge you're the ones to bring it, but you
4     can't bring the complaint today.  You need to
5     come back before you can file the complaint.
6     That is the relief we are requesting.
7          This challenge period does not expire
8     until July 26th.  They should come back in two
9     months.  During that two-month period, they'll
10    actually look at some of the facts and their
11    expert will get closer to saying, maybe they were
12    insolvent in July 2007 or maybe they weren't.
13         They'll look at the facts and say, you
14    know what, this 800 million goes back to 2003, we
15    haven't even sued for the right transaction.
16    They'll look at the facts and see who the
17    defendants are they're suing.
18         They've already said they're going to
19    add the Transeasten lenders, they're going to
20    amend their complaint.  They can't read their own
21    exhibit that names them.  They'll take the time
22    to read their exhibit and say, oh, that's who
23    they are and they'll name them and then they will
24    be ready with an amended complaint that the Court
25    can look at the time and say, okay, yep, now go

1    get them.

2           We can then deal, during this period,

3    since it seems pretty clear even to me as a

4    country lawyer from Connecticut, that there's

5    going to be a case management order, CMO.  We can

6    spend some of the time during that month calmly

7    saying, all right, what makes sense?  If there is

8    to be litigation now, what makes sense, to do it

9    expeditiously?  It's our money they're spending,

10   it's not like we want this to go on a long time,

11   but how do you do it rationally?

12          One example, you've said maybe, if we

13   can prove it, we've alleged facts that would

14   support a motion to dismiss.  A case management

15   order doesn't permit motions to dismiss.  No

16   motion practice, bam, straight to trial, file a

17   motion for summary judgment, there you go.

18          It would be nice if we had a chance, if

19   we thought appropriate, to file a motion to

20   dismiss.  That's one tidbit, lots of different

21   things.  Give us a chance to discuss it in good

22   faith and we come back to you if people disagree,

23   which they sometimes do in a case and then you

24   can decide, but that would be after the parties

25   have the opportunity to meet and confer, which is

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    what the rules require, and then the Court can

2    enter a sensible CMO after it's been told who are

3    the defendants and after those defendants can

4    say, you know, we have a thought or two.

5              Again, during that two months, give us

6    a chance to pursue this other transaction.  If

7    there is one, we'll bring it back well before two

8    months.  We're not being shy here.

9              Consider the possibility, don't decide

10   it today, but consider the possibility that

11   before you say, yep, file the complaint, maybe a

12   litigation trust does work.

13             Now, this is a business.  The business

14   needs to reorganize.  The litigation is separate.

15   We're told by the committee, litigation trust

16   boggles the mind, can't be done.

17             Again, I live on a farm in Connecticut,

18   I go to work in Hartford.  We've got lawyers from

19   New York, at least six of them, more from

20   New York, from Miami, we have some pretty damn

21   smart people in this room.  I'm reasonably

22   confident that the litigation trust makes sense,

23   these pretty smart people could figure out how to

24   make it make sense.  The debtor comes out, the

25   business goes on, there's a litigation trust with

1    money in it, the distributions are escrowed or in

2    trust or they're in equity, lots of different

3    ways to do it.  People willing to do it could

4    hammer it out pretty darn quickly, or bring it to

5    you and say it's not working, let's try it a

6    different way.  Don't decide today it has to be a

7    litigation trust, but don't decide today it can't

8    be a litigation trust.

9            When I talked about other points,

10   you've already hit most of them, so I will not

11   spend more of your time.  I said I'd come back to

12   who the defendants are.  They're going to amend

13   their complaint and name the Transeastern

14   lenders.

15           Your Honor, sometimes, and I do say

16   this advisedly, it's the small deceptions that

17   make one question all the big allegations.  The

18   committee's motion, Page 15, Footnote 23, due to

19   the large number of potential additional parties,

20   through interpleader, third-party practice or

21   otherwise, committee counsel will continuously

22   vet whether any ethical conflicts develop and, if

23   so, we'll figure out how to deal with it.

24           There's no secret who the second lien

25   lenders are or at least it's certainly no secret

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    who the three restricted second lien lenders are.

2    The three of them between themselves, have 79

3    percent of the second lien debt.  Important to

4    note, if there's going to be a transaction here,

5    we only need three people to fund it from the

6    second lien loans, we don't have to go out to a

7    hundred, and these are people who have checkbooks

8    to fund business solutions, not to fund

9    litigation.  Those are the people we're talking

10   to about the transaction.  If there is to be a

11   consensual plan, it only takes three of us, they

12   control the class, et cetera.

13          Of the $850 million the committee says

14   is at stake here, those three of them have more

15   than $550 million.  All three of those are

16   current substantial clients of Akin Gump.  I

17   don't mean they're members of creditor groups

18   that Akin Gump represents, I mean they are

19   individual clients of Akin Gump.

20          Again, I say this advisedly and

21   carefully, I've been authorized by them to say

22   this.  At a minimum it's fair to say Akin Gump

23   does not yet have waivers from them and however

24   this may sound like a litigation ploy, it isn't.

25          If there's going to be litigation,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 08-13958-JKO    Doc 7676    Filed 09/29/08    Page 148 of 235

147

```
 1    someone will sue it, Akin is a darn good law

 2    firm, there's plenty more.  But this complaint,

 3    six of the counts say these people had actual

 4    knowledge of fraud.  I am pretty darn confident

 5    when they ask for a waiver, they will say you've

 6    got to be kidding me.  You're going to sue me for

 7    fraud and you want me to say, go ahead, better

 8    you than someone else?

 9            They do have a solution in that same

10    footnote.  If there are conflicts, maybe someone

11    else will sue those conflicting parties and we'll

12    just sue the others.  I don't think that works

13    ethically if there's just one other party, but

14    when the majority of the debt are people you have

15    conflicts with, you can't just say,

16    Mr. Singerman, who it's quite clear to me will be

17    an excellent lawyer, excellent litigator if he is

18    the counsel, you do these, we'll do those.

19    Sorry, you need a new law firm.

20            Whether it's Mr. Singerman or someone

21    else, Akin Gump can't pursue this.  So before

22    they're given permission to file the lawsuit,

23    they've got to tell us who is going to be counsel

24    to the plaintiffs.

25            Conclusion, if you believe the
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    creditors' committee, if you believe the Aurelius

2    group, if you believe all the bees that have been

3    buzzing and all the screams that have been

4    screamed, this is one massive conspiracy of

5    fraud.

6            Management engaged in fraud, we can't

7    trust them to do anything.  The directors

8    obviously engaged in fraud, even though they had

9    an opinion that said otherwise.  Okay.  People

10   always allege management do things.  We've been

11   told they're going to sue the directors and

12   officers, but people always say that.

13           The professionals, we've heard

14   Mr. Rosner say directly, we've heard committee

15   counsel say indirectly and in their pleadings,

16   we're going to depose all these people and we

17   think we can't trust them, we can't trust

18   Kirkland & Ellis, we can't trust Lehman Brothers,

19   we can't trust Alex Partners, we can't trust

20   Paul Singerman because they're all part of this

21   conspiracy that defrauded these poor innocent

22   bond holders.

23           A point earlier, by the way, a

24   footnote, they got guarantees from the same

25   subsidiaries we do.  Somehow they thought that

1    was important, but it was a fraud for us back in

2    2003 or earlier to get those guarantees.  So

3    they're going to claim all the professionals

4    engaged in this conspiracy.

5           John Boken, you haven't seen him yet,

6    but a perfectly nice gentleman, a perfectly

7    talented individual.  We will confess to the

8    committee, no secrets here, we're the ones who

9    suggested, hey, you guys might want to think

10   about John Boken.  They actually had someone else

11   from Kroll Zolfo.  We said you might want to

12   think about John Boken.  We've seen him in other

13   cases.  We don't even trust him yet, jury is out.

14          I'm guessing the jury will come in if

15   there's ever actually a proposal for settlement,

16   and I can assure you it won't be 15 cents on the

17   dollar from our perspective, if it's the one or

18   two cents nuisance value that these guys deserve.

19   Well, you can't trust John Boken because he

20   approved a settlement that was outside their

21   range.

22          Come on, is everyone here a fraud?  I'm

23   not finished.  The Transeastern lenders had

24   actual knowledge of fraud.  Second lien lenders

25   engaged in fraud.  Maybe it's constructive fraud,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    but it is fraud nonetheless.

2            If you sell me that monitor for $10,

3    that's a constructive fraudulent conveyance even

4    if you're not intending to defraud anyone.

5    That's still fraud.  Fraud is fraud whether it's

6    constructive or actual.

7            The first lien lenders, of course they

8    engaged in fraud.  All these people who were out

9    in the syndicated market, they engaged in fraud.

10   They put in $800 million saying, you know, we're

11   not sure we're going to get it back because it's

12   fraudulent, but we like lending money that we're

13   not sure we're going to get back.

14           The agent, Citibank, they engaged in

15   fraud.  Our agent, who was Citibank, they engaged

16   in fraud.  Wells Fargo is a successor agent.  CIT

17   and Deutsch Bank at the Transeastern level, they

18   engaged in fraud and, by the way, we don't even

19   trust the Honorable John K. Olson, and I mean

20   that.  They have to have the exclusive right to

21   settle because they don't trust this Court to

22   review any settlement that anyone proposes and

23   make an independent determination of whether it's

24   an appropriate settlement.

25           Before we let loose the dogs of war,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    let's take a deep breath.  Yeah, they're the ones

2    to bring it, don't bring it tomorrow.  Give them

3    time to investigate, give them time to identify

4    who the defendants are, give them time to find a

5    law firm who can bring the lawsuit, give them

6    time that we can all talk about a case management

7    order, give us time to find a business solution

8    to this business Chapter 11.  They have until

9    July 26th, let's take advantage of it.

10           Thank you, your Honor.

11           THE COURT:  Thank you, Mr. Flaschen.

12           Mr. Zensky.

13           MR. ZENSKY:  Very briefly, your Honor,

14    just to respond to a few of the points that have

15    been made by the first and second lien agents,

16    starting with Mr. Flaschen.

17           He appears to criticize Mr. Katz for

18    truthfully stating in his affidavit that he's not

19    yet completed and delivered his expert opinion in

20    this matter, or any of the other committee

21    experts.  I think it would be a novel rule that

22    says a plaintiff has to have its expert reports

23    completed before filing the litigation, your

24    Honor.

25           We've done a good faith investigation.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

 1   I've given you many of the reasons why we believe

 2   there is more than ample reason to allege that

 3   the company was insolvent and the subsidiaries.

 4          In terms of the claims against the old

 5   lenders, Mr. Flaschen is incorrect, we cannot

 6   pursue both.  We are using the recovery powers of

 7   Section 550, as alleged in the complaint, to

 8   trace the transfers that originally went to the

 9   new lenders and the cash that went out the door

10   through to the old lenders, and we believe that

11   both of those claims be brought in the same

12   complaint and if not, I'm sure we will see motion

13   practice on that issue, your Honor.

14          Third, there is no allegation of

15   intentional fraudulent conduct.  There is no

16   claim that is charging intent to hinder or delay

17   creditors.  I believe what Mr. Flaschen is

18   referring to, which is contained only in the

19   allegations against the old lenders, not against

20   his clients, which I understand to be his point

21   about a supposed conflict, is that those lenders

22   had actual or constructive knowledge of the

23   constructive fraudulent conveyance that was

24   taking place from the subsidiaries to the new

25   lenders, not that they had actual intent to

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   hinder, delay or defraud and no such claim is

2   pled.

3           Mr. Flaschen referred to a series of

4   credit agreements.  I assure you, Judge, we have

5   no idea what credit agreements he's talking

6   about.  If they were so central to his client's

7   defense of litigation, that everyone has known

8   was coming, he might have attached them to his

9   papers.  This is the first we're hearing of them.

10          We haven't heard of them from the

11  debtors.  We didn't hear anything from the first

12  lien lenders about any such historical credit

13  agreements that would be relevant to the proposed

14  fraudulent conveyance claims and we will

15  anxiously await receipt of these documents, your

16  Honor.

17          You asked Mr. Flaschen about the market

18  price of the second lien debt and he said it was

19  about in the 70s, and I believe he brought it up

20  as relevant to whether his clients were

21  adequately protected here or not.

22          Your Honor, that quote, I don't know if

23  it's right or not, but could just as easily and

24  more likely be the overhang of the claims that

25  we're here to talk today about, and hopefully

1    pricing in the risk that Mr. Golden and I are on

2    the job and ready to attack those liens.

3         In terms of deferring the litigation, I

4    think everyone else here has said, and your Honor

5    observed earlier this morning, that it would be

6    impossible, as far as you can see at this

7    juncture, to propose a plan with an 800

8    million -- and it's more when you take into

9    account the old lenders, how you could formulate

10   a disclosure statement and plan without knowing

11   what was going to happen with that litigation and

12   we agree, that's why we came when we did.  We did

13   not wait until the end of the challenge period.

14        The suggestion that we, in effect,

15   litigate the claims without filing the complaint,

16   that doesn't save the estate any money, all the

17   same effort is still underway and no one will

18   take it seriously and no one will provide

19   depositions and documents until we are authorized

20   to file the complaint.  We think that that should

21   go forward, as I believe you indicated was your

22   view earlier in the day.

23        As far as not naming the specific

24   lenders, we have used -- we have named the agents

25   and not named the current lenders, your Honor,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    because the debt trades and it's traded since the

2    credit agreement and it can trade while the

3    lawsuit is going on.  So we believe the

4    appropriate parties to name were the agents in

5    that regard.

6             As far as any potential conflicts, the

7    draft complaint is signed by us and our local

8    Florida counsel, and either they or an

9    appropriate counsel will handle any part of the

10   claim that we are not able to.

11            Finally, with respect to the comments

12   of the first lien lender's counsel, he pointed

13   out that we have not included TOUSA itself as a

14   plaintiff on the fraudulent conveyance part of

15   the case, although they would be on the

16   preference side, your Honor.

17            And that's true, but we have not taken

18   a position and it does not follow from that that

19   we believe TOUSA, at the TOUSA level, was solvent

20   or was not.  It simply reflects the fact that

21   they did get reasonably equivalent value, most

22   likely, in connection with the transaction.  They

23   got the money from the lenders that was used to

24   pay off their liability to the old lenders and

25   that's why TOUSA is not one of the conveying

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    subsidiaries.

2         And then, finally, a question was asked

3    about whether the complaint would be amended or

4    expanded in any way, your Honor, and subject to

5    what happens on the cash collateral proceedings

6    and, in particular, the apparent effort to

7    foreclose claims objections, the answer would be

8    no, the complaint will contain the claims that

9    are in there now.

10        So with that caveat, I can say it will

11   be basically what's before you.

12        THE COURT:  Thank you.  Anyone else

13   wish to be heard?

14        MR. FLASCHEN:  Your Honor, not

15   argument, just a clarification.  Counsel need not

16   wait for us to send him these credit agreements,

17   they can just search the company's public

18   filings, Securities & Exchange Commission, go to

19   Edgar, plug in this company, you'll find all of

20   them.  They can also read their own indenture,

21   which refers to the credit agreement that was in

22   place at the time the bonds were issued.

23        Thank you, your Honor.

24        MR. MARKOWITZ:  Judge, this is

25   Jerry Markowitz on the telephone, I represent

1    Alex Partners.  I just wanted to say a lot has

2    been said about us, in particular.  Others have

3    mentioned that there's a whole other side to this

4    story than has been presented by the committee.

5    There's been no evidence today and I just want to

6    make clear that we've reserved all of our rights.

7         THE COURT:  There has, indeed, been no

8    evidence today.

9         Thank you, Mr. Markowitz.

10         MR. SINGERMAN:  Your Honor, the debtors

11    wish to be heard after your Honor's ruling in

12    respect of the litigation schedule, but we don't

13    otherwise wish to be heard pending your Honor's

14    ruling.

15         THE COURT:  Thank you all for

16    interesting and informative and helpful

17    arguments.

18         The committee has satisfied what I

19    consider and find to be the requirements for

20    transferring the right and duty to pursue claims

21    from the debtor-in-possession to the committee.

22    First, a demand has been made.  Second, while

23    that demand has not been expressly refused, the

24    debtors have not indicated an intent to pursue

25    these claims on their own and, indeed, have

1   effectively and completely consented to the

2   creditors' committee acting in pursuit of the

3   claims.

4          The debtors have, of course, to one

5   degree or another, taken the debtor dive in

6   respect to certain of the claims against the

7   lenders, by which I imply no criticism, only a

8   recognition that the debtors' ability to bring

9   these specific claims is necessarily inhibited by

10  its need to maintain certain relationships with

11  its lenders.

12         There is nothing new in this case for

13  the roles to play out this way.  Indeed, I

14  consider much of what's gone on today to be a

15  part of the Kabuki theater of our culture in the

16  bankruptcy practice.

17         Thirdly, I find that there is a prima

18  facie demonstration of colorable claims here.

19  Only the second lien lenders have argued

20  otherwise, and while I appreciate that the second

21  lien lenders have defenses, which they can assert

22  to the litigation when it is filed, I do not

23  find, as I indicated earlier, that Rule 9(b)

24  standards should be required in a situation

25  where, as here, the creditors' committee is

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 1:14-cv-10979-CSS   Doc 3726-2   Filed 03/03/15   Page 160 of 271
Case 08-10928-JKO   Doc 7676   Filed 09/28/08   Page 159 of 255

159

1    effectively a stranger to transactions that it's

2    attacking for the benefit of creditors.

3           For purposes of tone in the litigation

4    going forward, I observe that the bellicosity of

5    argument in pleadings or in the courtroom

6    generally falls in the third category of

7    persuasion to me, at least.  I was always taught

8    that if the facts are on your side, you pound on

9    the facts; if the law is on your side, you pound

10   on the law; if neither is on your side, you pound

11   on the table.

12          I don't think that bold italics are

13   necessary in pleadings as a general proposition

14   and they look more like pounding on the table to

15   me than an attempt at rational argument, which is

16   the kind of argument I very much prefer.  So you

17   may lose style points with me based on how you

18   argue, but the emphaticness and bellicosity of

19   argument does make me suspect that neither facts

20   nor law are on your side.

21          So, counsel, argue however you and your

22   client choose in whatever you bring before me,

23   but understand the filter through which I will be

24   perceiving that which you present.

25          That brings me in a roundabout way to

1    the fourth point of the criteria for transferring

2    the matter to the committee to prosecute, and

3    that is that I must have authorized you to do so.

4    I do.  I will authorize the creditors' committee

5    to commence and prosecute claims arising out of

6    the financing transactions, which are the subject

7    of its motion, Docket Entry 850.

8           I conclude that deferral to some later

9    time is not in the interest of this estate.  I

10   appreciate that there will be a current increase

11   in expense in handling the litigation, but I

12   simply don't see how reorganization is possible

13   in this case with an 800 million or larger

14   question mark hanging over the balance sheet.

15          That is not to say that I will

16   discourage anyone from coming forward with a

17   transaction that deals with business issues in

18   the case, but that transaction, it would seem to

19   me, is not likely to solve the litigation

20   problem, which will continue to stare us in the

21   face until it's dealt with.

22          The timetable that's been proposed by

23   the creditors' committee is adopted subject to

24   the one week, or thereabouts, revision that the

25   debtors requested with respect to the turnover of

1    documents.

2              I recognize that that table, timetable,

3    may interfere with various of your vacations and

4    while it is very much emphatically my view, that

5    the view of vacations by our chief judge, former

6    Chief Judge A.J. Cristol, that lawyers should

7    take their vacations and that I will schedule

8    around vacations, is a policy I adopt.  I do so

9    for two reasons, one is I think lawyers need

10   their time off with their families, lest they no

11   longer have them and, frankly, I find that

12   lawyers who take vacations are healthier folks

13   and are easier for me to deal with.

14             So put on your books, the trial will be

15   during the week of January 19, 2009, January 19th

16   itself being Martin Luther King Day, and while

17   you all may want to try it that day, I can't get

18   you in the building, so we will start on

19   January 20th.  If parties wish to take a break in

20   the middle of that day to watch happy festivities

21   in Washington D.C., we can probably accommodate

22   you, but we will start trial on January 20th.

23   The other dates I urge you to work out in the

24   form of a management order.

25             In respect of the committee's motion

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    seeking exclusive settlement authority, I will

2    deny the motion to that extent without prejudice

3    so that if events transpire which cause a

4    transference of the normal statutory and rule

5    authorities that are provided for in the

6    Bankruptcy Code to become necessary under the

7    facts of this case, somebody can come in and make

8    the appropriate motion.

9            I otherwise do not intend to enter an

10   order that speaks to settlement authority because

11   I fear that doing so could create an

12   inconsistency with otherwise existing law that

13   is, at least from my perspective, currently

14   unintended and could create some additional basis

15   for litigation that probably it would be

16   ultimately pointless, but might cause some brain

17   cells to be wasted that could be spent more

18   profitably elsewhere.

19           I believe that Henhouse, Hartford

20   Underwriters versus Union Planters Bank severely

21   constrains my ability to transfer that kind of

22   authority to a committee.  More practically, I

23   think that the debtors have a role to play.

24           I have heard and acknowledge arguments

25   that the debtors are conflicted.  I don't believe

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that the debtors will propose a settlement of

2    this kind of litigation without thoroughly

3    vetting the question past the moving parties and

4    no one should leave the court operating under an

5    impression that the creditors' committee, the sub

6    debt or anybody else is going to be ignored in

7    connection with the settlement.

8            Now, is there anything else that I need

9    to say or do in respect of the committee's

10   motion, Docket 850?

11           MR. SINGERMAN:  Your Honor, if it

12   please the Court, we would -- the debtors would

13   propose, if your Honor has the time available and

14   if it's convenient to at least one representative

15   from each of the constituents, that your Honor

16   entertain a telephonic status conference on

17   Wednesday of next week, early afternoon,

18   two o'clock or so, to consider and take up any

19   issues in respect of the litigation scheduling

20   order that remain unresolved at that time.

21           I think it's in everyone's best

22   interest to get that order finalized, set

23   expectations and start the process as soon as is

24   possible.

25           THE COURT:  I can do that on Wednesday,

1   May 28th, and does 1:30 work for folks?

2          MR. SINGERMAN:  1:30 is perfect, your

3   Honor.

4          THE COURT:  Okay.  Would you,

5   Mr. Singerman, give me a quickie short scheduling

6   order that just let's the world know that.

7          MR. SINGERMAN:  Yes, sir.

8          THE COURT:  We can do it

9   telephonically.

10         MR. SINGERMAN:  Yes, sir, and your

11  Honor, naturally the order that -- we will work

12  with the parties to try and avoid that hearing if

13  we reach agreement and also, your Honor, you

14  didn't direct who's preparing the order on

15  committee Docket Entry 850, but we're happy to do

16  it, if your Honor defers to the committee, we'd,

17  of course, like to review it and approve it

18  before it's submitted.

19         THE COURT:  Well, ordinarily I'd ask

20  Mr. Golden to do that, but I'd ask him also to

21  work with other counsel to make sure that there's

22  nothing in there that is going to cause

23  unnecessary heartburn --

24         MR. SINGERMAN:  Yes, sir.

25         THE COURT:  -- or be inconsistent.

1          MR. SINGERMAN:  Yes, sir.

2          THE COURT:  Mr. Baena.

3          MR. BAENA:  May it please the Court,

4   your Honor.  Scott Baena, Bilzin Sumberg, on

5   behalf of the second lien agent.

6          Judge, I just wish to put a finer point

7   on some of the conversation about scheduling.

8   I'd like to talk before you put in ink the date

9   that we're going to have this conference call

10  next week.

11          There are hugely complex discovery

12  issues that can be anticipated in this case, if

13  we only consider the fact that the pool evolves.

14  As you heard earlier today, claims are traded and

15  that engenders some really huge issues about

16  production and responding and objecting to

17  production requests and we're focused on that.

18          We don't believe that the proposals

19  that have been offered so far answer all those

20  questions and address all the idiosyncrasies of

21  the discovery problems that we're going to have.

22  So we wish to address that collegially with

23  everybody else.

24          This is a holiday weekend.  Monday is a

25  holiday.  Doing this by Wednesday, given the

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

 1    sheer number of parties involved and our

 2    inability to accomplish it so far, suggests that

 3    we are on a fool's errand.

 4         You have a hearing set, I believe,

 5    June 10th or 12th, I can't remember which day.

 6    That certainly ought to be enough time for the

 7    parties to meet and confer and identify that

 8    which they can't agree to so that you can process

 9    this a little bit more orderly than by way of a

10    telephone conference call where there's going to

11    be enumerable problems if the message is only

12    what date we're going to trial.

13         Respectfully, I'd ask that we put that

14    off to the next hearing, that you direct the

15    parties to meet and confer.  We're happy to do

16    that and at that hearing, the parties present the

17    case management order that they've all agreed to,

18    or as many as possible have agreed to, and that

19    the Court be apprised in advance of the hearing

20    of what the open issues are so that can be

21    addressed by the Court at the hearing.

22         THE COURT:  Thank you.  Let me have

23    other comments on that subject.

24         MR. SINGERMAN:  Your Honor, on behalf

25    of the debtors, we would reiterate our request

```
 1    for a status conference next Wednesday at 1:30.
 2    If we're not there yet, I am certain, your Honor,
 3    that all parties will benefit from direction that
 4    the Court can give us at that status conference.
 5           The debtors have certain obligations
 6    under the proposed order and an order to which
 7    the debtors have indicated they would agree.  We
 8    would like not to be in doubt about those
 9    obligations, and we don't think, notwithstanding
10    this holiday weekend, which I think we all wish
11    to enjoy, at least part of, that we should put
12    off until June 10th the scheduling order because
13    there might be further issues to resolve then and
14    it would be a bad thing if the entry of the
15    scheduling order were further deferred.
16           And, your Honor, I assume that the form
17    of the order that you're going to enter, if we've
18    all missed something big, it's going to provide a
19    way to come back to your Honor for relief.
20           THE COURT:  Thank you.  Mr. Golden.
21           MR. GOLDEN:  Thank you, your Honor.
22           We agree.  We'd like to keep this
23    moving.  We'd like to keep the status conference
24    for Wednesday.  We will schedule an all hands
25    meet and confer meeting with all counsel involved
```

1    at our offices for this coming Tuesday.  We'll

2    stay there as long as we have to to try and work

3    out all of these issues.

4            I don't think a delay is going to be

5    particularly productive.  We'll know by the end

6    of Tuesday, close of business, where we are and

7    we can report that to the Court.

8            THE COURT:  Okay.  When you have that

9    session, if you can e-mail the proposed case

10   management order to Mr. Bellman, and if there are

11   disputes about things note what they are and what

12   the bid and ask is to the extent you can.

13           MR. GOLDEN:  That's fine.

14           THE COURT:  And I think we will have

15   the telephonic hearing on the 28th.  I appreciate

16   that there may be -- there may be loose ends that

17   you can't get addressed by that time, but we

18   should at least get the big picture done, and to

19   the extent there are loose ends, okay, we can

20   talk about it at some later hearing.

21           MR. GOLDEN:  Great.  Thank you very

22   much, your Honor.

23           THE COURT:  Thank you.

24           MR. FLASCHEN:  Your Honor, to confirm

25   what's up for discussion, you set a trial date in

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   stone, but if we think, for example, it should

2   allow for a motion to dismiss, all the steps

3   between now and then are up for discussion.

4           THE COURT:  You bet.

5           MR. FLASCHEN:  Thank you, your Honor.

6           THE COURT:  You bet.  Okay.  We have a

7   hearing on the debtors' motion for authority to

8   use cash collateral.  I propose we come back at

9   two o'clock to talk about that?  Does that work

10  for folks or would you rather proceed straight

11  through?  I'm not sure the court reporter would

12  like me very much if I did that.

13          MR. SINGERMAN:  Your Honor, would you

14  mind if we resumed at 2:30, it's a little bit

15  logistically difficult with this crowd to get out

16  and grab something to eat.  Is 2:30 acceptable?

17          THE COURT:  No problem.  2:30 is fine.

18          MR. SINGERMAN:  Thank you, your Honor.

19          THE COURT:  Don't expect to argue for

20  terribly long.

21          MR. SINGERMAN:  Yes, sir, and, your

22  Honor, may we leave our toys in the room?

23          THE COURT:  You may leave everything

24  you wish in the room.

25          MR. SINGERMAN:  Thank you.


        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          MR. SCHNEIDERMAN:  Your Honor, I've

2     given my comments to the proposed orders to the

3     committee and to debtors' counsel.  May I be

4     excused from this afternoon?

5          THE COURT:  Mr. Schneiderman, you're

6     released to go enjoy Memorial Day weekend.

7          MR. SCHNEIDERMAN:  Your Honor, I have

8     two other construction cases, I have 341 Meetings

9     this afternoon, unfortunately.

10          THE COURT:  I'm sorry I can't solve all

11     your problems.

12          MR. SCHNEIDERMAN:  Thank you, your

13     Honor.

14          (Thereupon, a lunch recess was taken, after

15          which the following proceedings were had:)

16          THE COURT:  Good afternoon.  Thank you.

17     Please be seated.

18          MR. BASTA:  Good afternoon, your Honor.

19          THE COURT:  Good afternoon, Mr. Basta.

20     Let us plug in the conference call again, if we

21     can.

22          (Thereupon, the Court called into the

23          conference call, after which the following

24          proceedings were had:)

25          THE COURT:  Good afternoon.  This is

1    Judge Olson.  We're reconvening this afternoon in

2    the continued TOUSA hearings.  I don't need to

3    take roll call, I don't think.

4          Mr. Basta.

5          MR. BASTA:  Your Honor, Paul Basta for

6    TOUSA and its affiliated debtors on the motion's

7    request for interim use of cash collateral.  The

8    existing cash collateral order expires tomorrow.

9    We heard your Honor loud and clear earlier in the

10   day, interim hearing, keep it short.

11         We will do so.  We have two objectives

12   today, your Honor, the first is to leave with

13   financing and that requires us to put on a short

14   case, so we can demonstrate our judgment on that

15   and the second, your Honor, is to try to drive

16   and limit the issues for the final hearing.

17         We have spent an incredible amount of

18   time trying to just narrow the issues among the

19   parties.  Believe it or not, Mr. Sussberg had a

20   full head of hair when this process started, but

21   we are -- it has proven difficult and we

22   understand that your Honor has spent a long time

23   with us today, but we the committee did a useful

24   thing, they provided a black line of the cash

25   collateral order and so we stayed up for a

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 1:14-cv-10979-CSS   Doc 3726-2   Filed 03/03/15   Page 173 of 271
Case 08-13555-JKO   Doc 7676   Filed 09/26/08   Page 172 of 255

172

1    tremendous part of the night with the banks to

2    see which issues that the committee raised would

3    be acceptable to the banks and could be resolved

4    and which issues could not.

5            I have a chart that kind of outlines

6    exactly where we are and at the end of our brief

7    case in chief, what we would like to do is show

8    the Court where we are on the issues, maybe get a

9    reaction with a hope that by the time we get to

10   the final hearing, we could have smoother

11   sailing.

12           THE COURT:  Cool, and I don't have in

13   front of me either your chart, which you've just

14   indicated you will have later, or, and this is my

15   own fault, I didn't copy myself a copy of the

16   black line.  If there is a spare in the

17   courtroom, that would be real handy.

18           MR. BASTA:  Your Honor, one of my

19   thoughts for today is, that we start dealing with

20   language in an order I don't think we'll ever

21   leave.

22           THE COURT:  I agree.

23           MR. BASTA:  So I propose that we work

24   off of this chart and --

25           THE COURT:  Cool.

1          MR. BASTA:  -- I will hand that up

2     during my presentation.

3          THE COURT:  Thanks.

4          MR. BASTA:  On April 25th we filed our

5     cash collateral motion.  We explained that at the

6     time we had $316 million in case, due in large

7     part to the receipt of our $207 million tax

8     refund.  We explained that this cash position

9     obviated the need for D.I.P. financing.

10         We explained that we would notice the

11    terms as soon as possible.  The negotiations with

12    the banks were difficult.  The key elements were

13    negotiated.  At several times we thought we'd be

14    in a contested cash collateral fight.  We reached

15    an agreement with the banks over the weekend.  We

16    had a Monday board meeting and we filed the

17    terms.

18         The summary of the terms, I'm not going

19    to get in to all the details, fundamentally to

20    get the banks to consensually walk away from an

21    adequate protection fight, we got six months of

22    cash collateral with the key point being --

23    against a budget, with the key point being

24    $175 million of pay downs from excess cash,

25    subject to disgorgement provisions if the

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    litigation that your Honor heard about so much

2    today proves successful and hits the top part of

3    the capital structure.

4         THE COURT:  What wasn't clear to me in

5    your pleading was the point in litigation at

6    which disgorgement occurs.  Is it the existence

7    of a final order no longer subject to appeal or

8    certiorari petition or is it the entry of an

9    order by me?

10         MR. BASTA:  It's final, it's a final

11    order, your Honor, final non-appealable order.

12         THE COURT:  Okay.

13         MR. BASTA:  Now, the committee thinks

14    we're crazy.  They look at this from a

15    perspective of the litigation, which they're very

16    focused on and they say -- you just heard, we

17    think a big part of our recovery is to sue these

18    guys and you're paying them $175 million.  You

19    note, they said that's evidence of breach of

20    fiduciary duty, we're wimps, we rolled over,

21    we're not fighting the banks, but I'd like to

22    suggest to the Court that the question really

23    isn't as simple as that.

24         If I could use your fancy new machine

25    to just put up what I think the question is?

Case 1:10-cv-10979-CSS Doc 3726-2 Filed 03/03/15 Page 176 of 271
Case 08-10928-JKO Doc 7676 Filed 09/20/08 Page 175 of 235

175

1          THE COURT:  You certainly have my

2     permission.  Whether you've got the competent ---

3          MR. BASTA:  That's certainly open to

4     question.  Here we go.  So this is the question

5     that we think the company has to consider.  You

6     know, is the benefit of one, avoiding a cash

7     collateral fight for a distressed home builder,

8     plus two, saving the interest expense on a

9     $175 million of debt outweighed by the potential

10    that the committee will win more than

11    $660 million in recovery.

12          How did I get that 660?  I just took

13    the $835 million of debt and I subtracted

14    175 million and the negotiated disgorgement

15    provisions will not be effective.

16          Now, if you are the committee and

17    you're primarily focused on the litigation asset,

18    you're sitting there looking down there at B and

19    saying, I don't want to take any risk that that

20    disgorgement provision is not effective.  But

21    we're the company and we're focused on more than

22    the litigation and we don't want to be back here

23    every month on cash collateral wondering whether

24    there is in this market, in this home building

25    market, in the markets that we operate, that

1    we've been suffering a decline and that the banks

2    are not adequately protected.  We want at least

3    six months of space to get the litigation going

4    and make progress in the case before we're here.

5            So, you know, the committee can say,

6    oh, these are crazy debtors, roll over to the

7    banks, in the bank's pocket, they've exhibited a

8    pattern, a pattern of breach of fiduciary duty.

9    I agree there's a pattern, but you know what the

10   pattern is, the pattern is saying if I'm

11   presented with a choice of preserving the

12   financing for the business and having to rely on

13   disgorgement provisions versus risking the

14   financing for the company, this board is focused

15   on the financing and that's the balance.

16           It's not that we were ignoring or not

17   trying to give due weight to the litigation

18   asset, we were trying to balance it against

19   another asset.

20           THE COURT:  Hold on one second.

21           MR. BASTA:  So with that argument

22   regarding what our approach is and why the

23   debtors are willing to make this payment in order

24   to get the cooperation of our secured lenders and

25   avoid a difficult fight, with that I would like

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    to turn it to Mr. Donovan, who will present the

2    testimony of John Boken in support of this and

3    then I would like to come up and deal with the

4    chart.

5           THE COURT:  Thank you.  Mr. Boken, come

6    on up and have a seat.

7    THEREUPON:

8                        JOHN BOKEN,

9    after having been first duly sworn, was examined and

10   testified as follows:

11          MR. DONOVAN:  Good afternoon, Judge.

12   Dan Donovan for the debtors.

13          THE COURT:  Good afternoon,

14   Mr. Donovan.

15          MR. DONOVAN:  A few comments before we

16   start.  I'd like to outline what we intend to

17   cover because one portion will be confidential so

18   we'll need to exit the phone hopefully --

19          THE COURT:  Okay.

20          MR. DONOVAN:  -- and the courtroom.

21          We're going to cover with Mr. Boken on

22   direct five primary areas.  First Mr. Boken's

23   background, he is the chief restructuring

24   officer; two, why the debtors are seeking this

25   use of cash collateral today on an interim basis;

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

     1    three, we want to cover some current and

     2    prospective confidential financial information to

     3    give you context of why we need this cash, go

     4    through certain terms of the cash collateral

     5    agreement we are presenting for your Honor's

     6    approval; and five, Mr. Boken will tell you why

     7    he believes this cash collateral agreement is in

     8    the best interest of the debtors.

     9              THE COURT:  Okay.

    10              MR. DONOVAN:  Before we start, because

    11    we will refer to this, I will get your technology

    12    down as the case proceeds, but at this point I'm

    13    still caveman lawyer, so I have some exhibit

    14    books.  These do have confidential information, I

    15    do have some extras.  I would request that it's

    16    only for people who signed the confidentiality

    17    agreement.

    18              With that, your Honor, we're ready to

    19    proceed if you would like.

    20              THE COURT:  Very good.

    21                   DIRECT EXAMINATION

    22    BY MR. DONOVAN:

    23         Q    Mr. Boken, can you please introduce

    24    yourself to the Court?

    25         A    My name is John Boken.  I'm currently the

1   chief restructuring officer for TOUSA.

2       Q    And what are your responsibilities as the

3   chief restructuring officer of TOUSA?

4       A    Twofold.  First, I'm responsible for

5   overseeing and directing all of the activities

6   relating to TOUSA's restructuring efforts and

7   compliance in Chapter 11, on the one hand, and on the

8   second hand, to be an active member of the management

9   team, an independent objective, active member of the

10  management team assisting in a wide variety of

11  activities ranging from marketing operations,

12  accounting, finance to really all aspects of the

13  business.

14      Q    When did you become the chief restructuring

15  officer of TOUSA?

16      A    Technically, that was approved along with

17  the first day orders on January 30th.

18      Q    Of this year?

19      A    Of 2008, yes.

20      Q    And as part of your responsibilities as the

21  chief restructuring officer, is it part of your job

22  to be involved and oversee communications between the

23  different constituencies, including the committee and

24  the secured lenders?

25      A    Yes, it is.  Part of my function is to

1   coordinate all of the communications, certainly

2   supervise and direct the communications between the

3   various constituencies, whether they're conducted by

4   me, TOUSA personnel, individuals from our financial

5   advisors, Lazard or Kirkland & Ellis, and in that

6   process, to serve as the principal company contact or

7   the client for the professionals and at the same

8   time, try to be the independent objective party who

9   can take and understand and take advice from advisors

10  and try to be the honest broker, if you will, to

11  bring the various interests of the parties together

12  in anything ranging from simple day-to-day

13  transactions to issues like cash collateral or plans

14  of reorganization.

15       Q    Let's spend a few minutes on your

16  background apart from being the CRO at TOUSA.  Do you

17  hold a position at Kroll?

18       A    Yes, I'm a managing director at Kroll Zolfo

19  Cooper.

20       Q    Okay.  What are your responsibilities

21  related to Kroll?

22       A    I have some responsibilities at Kroll Zolfo

23  Cooper, administrative responsibilities to assist in

24  running the restructuring practice, but primarily my

25  role is to work with clients like TOUSA in roles very

1   similar to the one that I'm in currently.

2       Q    Can you summarize for the Court your

3   experience in the restructuring industry?

4       A    I've been in the restructuring business for

5   about 17 years, the first 10 or 11 years of that at

6   the firm of Arthur Andersen, primarily serving as a

7   debtor advisor in a variety of different cases.

8            The last six years or so I've been with

9   Kroll Zolfo Cooper, again in the restructuring world,

10  but more -- doing more principal work, as I call it,

11  which is working as a member of the management team

12  as opposed to just an advisor, but, again, all in

13  restructuring situations, both out of court and in

14  Chapter 11.

15      Q    Can you give us a few examples of recent

16  positions you've held in restructuring businesses

17  similar to your CRO position at TOUSA?

18      A    Yes, I served as president and chief

19  operating officer of NRG Energy during its Chapter 11

20  bankruptcy.  Subsequent to that, I was an advisor to

21  and then subsequently the chief executive officer

22  for a company called Integra Power Group upon its

23  emergence from Chapter 11, and most recently, from

24  2005 through 2007, I was the chief restructuring

25  officer for an auto parts supplier by the name of

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    Collins & Aikman Corporation.

2        Q    As part of your work in the restructuring

3    business, have you and your team received

4    commendations?

5        A    In 2004 -- yes, the answer is yes.  In

6    2004, myself and my team were awarded the Turnaround

7    Management Association's Mega Turnaround of the Year

8    Award for the work that we did at NRG Energy.

9        Q    Let's now turn our attention to the cash

10   collateral agreement we're presenting to the Court.

11   Why are the debtors seeking this authority today or

12   at this time?

13       A    The primary reason is our authority to use

14   cash collateral expires tomorrow, May 23rd, and so

15   the reason for entering into this agreement and

16   putting this in front of the Court is to ensure that

17   we have continued use of cash collateral.

18       Q    As of today, do the debtors have any

19   unencumbered cash that they can use?

20       A    Not to my knowledge, no.

21       Q    And if the business doesn't have any access

22   to cash collateral, what would -- what would be the

23   impact?

24       A    Well, the business would be in immediate

25   shutdown mode.  Without access to cash collateral, we

1    would have no funds to pay our employees or our

2    vendors and be able to continue on any uninterrupted

3    basis the business of home building.

4         Q    And what cash have you been using to run

5    the business since the filing in January?

6         A    We have been using cash collateral.

7         Q    And you have a book in front of you, which

8    the Court has.  If you'd turn to Tab 1, Debtors'

9    Exhibit 1, is this the amended declaration that's

10   been referred to that you filed in support of this

11   cash collateral agreement?

12        A    Yes, it is.

13        Q    And before we proceed to the terms or some

14   of the financial information, let's talk about a few

15   of the points that got us to this point here today.

16   At the outset of the case, I understand the debtor

17   received authority to have the initial D.I.P.

18   financing, are you aware of that?

19        A    Yes, that's correct.

20        Q    And related to that there were what

21   sometimes is referred to as interim D.I.P.

22   projections; is that right?

23        A    That's correct.

24        Q    And compared to those projections, how has

25   the business performed since approximately late

1   January of this year?

2        A    The company has substantially outperformed

3   those projections from a cash standpoint in the range

4   of 110 to $120 million.

5        Q    Why -- how has the company done that?

6   That's a positive, how have they done that?

7        A    The principal reason that the company has

8   outperformed is that when we were on the verge of

9   filing for bankruptcy, there was a high degree of

10  uncertainty of how bankruptcy was going to affect the

11  company and its operations.

12            The company had observed a few other home

13  builders who had filed prior to TOUSA, who were, each

14  of them, experiencing significant difficulty in

15  closing sale transactions that were already

16  contracted and also in contracting on new sale, so

17  that gave the company a great degree of concern about

18  how successful it could be right in the immediate two

19  to three months after the filing in closing sales.

20            So we constructed a set of projections that

21  were conservative from the standpoint of wanting to

22  lay out forecasts and closings that were sensitive to

23  the risks as we saw other home builders experiencing

24  them.  So we had a fairly -- a relatively small

25  number of closings in the first 90 days and after

1    that, the closing activity and sales activity in our

2    D.I.P. projections started to slowly increase.

3        Q    Okay.  Now, although the company has

4    outperformed the initial D.I.P. projections, in your

5    view, has that increased the value of the business?

6        A    I do not believe it has, no.

7        Q    Why not?

8        A    Well, because the way we've outperformed is

9    by actually completed sale transactions that

10   otherwise were in process with nearly complete homes

11   in the first 90 days, 90 to 120 days of the case.

12           So in our projections, the D.I.P.

13   projections, the asset balance was more skewed

14   towards construction in process and less to cash, and

15   that we were using cash and even borrowing on the

16   D.I.P. financing to a certain extent under those

17   projections.

18           What's actually happened is we've been

19   successful since really the first few days of the

20   case in closing sales so the asset balance has really

21   shifted from construction in process or work in

22   process up to cash, but on an overall asset basis,

23   our asset balance, net asset balance has actually

24   decreased since the inception of the case to the

25   current time.

1      Q    Okay.  How has this Chapter 11 filing

2   negatively impacted the business?

3      A    Well, the Chapter 11 filing, combined with

4   the industry dynamics have had a very significant

5   negative effect on the business.

6           The employees were already sensitive, if

7   you will, to the industry dynamics, but the

8   uncertainty around what Chapter 11 brings, because

9   it's somewhat of a foreign term for many of the

10  employees and kind of a scary place for them, and the

11  fact that we haven't yet been able to articulate how

12  it is that we find ourselves emerging from Chapter 11

13  has resulted in a fairly alarming amount of

14  departures from the company, from people in key roles

15  ranging from sales, operations in the field and quite

16  a number of people actually at corporate and

17  accounting and finance and fairly critical functions

18  for the operations.

19     Q    Can you give the Court just a couple of

20  examples of people who have left recently that have

21  impacted the business negatively?

22     A    Yes, our treasurer, a gentleman by the name

23  of Russ Debendorf, who really was one of our

24  principal planning individuals, as well as the person

25  primarily responsible for cash management, gave

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    notice to us several weeks ago, his last day is

2    tomorrow.

3            We also lost an individual by the name of

4    Wayne Steinman, who's our land manager, one of our

5    land mangers, a critical person in helping to manage

6    the asset base, and then there's a number of very

7    talented sales personnel that we've lost in a couple

8    of different markets that have impaired our ability

9    to compete effectively in the markets that those

10   sales people operate.

11       Q    Now, there was some discussion this

12   morning, and you mentioned it before, can you tell

13   the Court your understanding, your view of the

14   current state of the home building industry?

15       A    Well, my observation is similar to what was

16   shared this morning, is, you know, every day, every

17   week we seem to be confronted with a new piece of

18   sobering data about what's happening in the home

19   building market on the whole and TOUSA being a

20   national home builder with operations in many of

21   those primary markets which are being impacted, is

22   certainly affected by that and those data points and

23   information range from, you know, severe increases in

24   foreclosure activity to continued crunch in the

25   mortgage markets, to decreasing values of houses,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    which has an effect on the average sales price of new

2    homes.

3            The statistics since the -- really since

4    the inception of the case, my involvement in the

5    case, and certainly predating that, have not seemed

6    to have found a bottom yet and certainly have not

7    ticked up in any way to give the TOUSA management

8    team or anybody involved in the industry any great

9    encouragement about when the real estate market is

10   going to stabilize.

11           MR. DONOVAN:  Judge, at this time I'm

12   going to talk about some of this confidential

13   information.  I don't think it will be more than

14   ten minutes, but --

15           THE COURT:  Okay.

16           MR. DONOVAN:  -- we would request ---

17           THE COURT:  Then we are now going to

18   terminate the telephone call.

19           MR. BELLMAN:  I can put them on privacy

20   mute.

21           THE COURT:  We can redial, too.  I have

22   no idea how that system really works and if there

23   is anyone in the courtroom, with the exception of

24   Judge Ray's law clerk, who just joined us, who

25   has not signed a confidentiality agreement,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    please leave.  I'll ask Mr. Singerman and

2    Mr. Basta and Ms. Labovitz and Mr. Golden to

3    monitor and if there are people you don't

4    recognize ---

5            MR. BASTA:  I think we're okay, your

6    Honor.

7            MR. FLASCHEN:  Your Honor,

8    Evan Flaschen.  Merely a point of clarification.

9    The second lien lenders in the room are bound by

10   the confidentiality provisions of the second lien

11   credit agreement, rather having -- than having

12   signed a separate confidentiality agreement.

13           THE COURT:  If that's acceptable to the

14   debtor, I'm not going to challenge it.

15           MR. SINGERMAN:  Your Honor, could you

16   also inquire if there are any representatives of

17   the media here?

18           THE COURT:  Yeah.  Are there any

19   representatives of the media present?  I know

20   Bloomberg was on the phone this morning.

21           You're all telling me you're kosher. if

22   I find out otherwise, you're toast.  Okay.

23           MR. DONOVAN:  Thank you, your Honor.

24           (Pages 190 - 212 are confidential and

25   contained within a separate transcript.)

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1          (Thereupon, the Court called into the

2     conference call, after which the following proceedings

3     were had:)

4          THE COURT:  Good afternoon again folks,

5     this is Judge Olson.  We are back in the TOUSA

6     hearings.  There has been a brief discussion, not

7     wildly edifying concerning financial projections.

8     You ain't missed much, but welcome back.

9          Mr. Qureshi from Akin Gump is

10    cross-examining Mr. Boken.

11    BY MR. QURESHI:

12        Q    Mr. Boken, just before we leave the budget,

13    the cash account from which the pay down is going to

14    occur, is the cash that's in that account in an

15    interest bearing account?

16        A    It is not currently, no.

17        Q    And why is it not in an interest bearing

18    account?

19        A    We have been in discussions with the first

20    lien lenders as to what we needed to do in order to

21    ensure, and what account -- what type of investment

22    account it could be put in that allude them to retain

23    a lien on the account.

24        Q    And how long has that money not been

25    sitting in an interest bearing account?

```
 1       A    I'm not sure, several weeks.

 2       Q    Any understanding of how much revenue has

 3  been forgone by not having those funds in an interest

 4  bearing account?

 5       A    I haven't made that estimate, no.

 6       Q    You can set the budget aside.

 7            Mr. Boken, were you in the courtroom for

 8  the proceedings this morning?

 9       A    I was, yes.

10       Q    Did you hear Mr. Flaschen, on behalf of the

11  second lien agent, report to the Court that the

12  second lien agent suggested that you be hired as the

13  chief restructuring officer of the debtors?

14       A    Yes, I did.

15       Q    Is that true to your knowledge?

16       A    As far as I know, yes.

17       Q    Okay.  Now, I'd like to turn to the

18  negotiations that took place with respect to this

19  cash collateral stipulation.

20            It's true, Mr. Boken, is it not, that you

21  set the strategy and the objectives for the debtors

22  in these negotiations; right?

23       A    I was one of a team that -- I was

24  ultimately the lead company personnel or lead company

25  individual and client, if you will, for defining that
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   strategy, but the strategy was really developed by a

2   group of people, including our financial advisors at

3   Lazard and counsel at Kirkland & Ellis.

4       Q    Well, sir, you recall being deposed

5   yesterday; right?

6       A    Yes.

7       Q    Do you recall telling me yesterday that

8   your role in the negotiations was to set the strategy

9   and the objectives of the debtors?

10      A    Yes.

11      Q    Okay.  With respect to the proposed pay

12  down, isn't it correct that the first formal demand

13  from the first lien agent for pay down was for

14  $300 million?

15      A    That's correct.

16      Q    Okay, and am I also correct, sir, that the

17  response from the debtors at the time was that the

18  debtors were prepared to make a pay down, but

19  $300 million was too high?

20      A    That's correct.

21      Q    Is it also correct, sir, that at that time

22  the debtors conducted an analysis, the conclusion of

23  which was that the balance sheet could support a pay

24  down of 175 million?

25      A    That's correct.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1      Q    Am I also correct, sir, that in the

2  negotiations with the first lien agent, the debtors

3  never took the position with the agent that there

4  should be no pay down at all?

5      A    Not to my knowledge.

6      Q    Is it also correct, sir, that the first

7  counter offer that the debtors made to the initial

8  $300 million demand from the banks was a pay down of

9  $150 million?

10      A    That's correct.

11      Q    Okay, and in the course of those

12  negotiations, isn't it also true, sir, that the

13  debtors never said to the first lien agent that you

14  were prepared to litigate the question of cash

15  collateral?

16      A    I was not involved in all of the

17  discussions that went on with the first lien agent so

18  I can't categorically say that that discussion with

19  the first lien lenders did not occur.

20      Q    Well, sir, you recall that I asked you at

21  your deposition yesterday whether you were aware of

22  that threat ever having been made to the first lien

23  agent; right?

24      A    Yes, I believe so.

25      Q    And your answer was that you don't recall

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that threat ever having been made?

2        A    Yes, that's what I just said.

3        Q    Is it also correct, sir, that the debtors

4    have concluded that the prepetition collateral has a

5    total value that exceeds the amount of the first lien

6    debt?

7        A    Yes.

8        Q    But you haven't done any analysis to

9    determine by how much?

10       A    That's correct.

11       Q    Okay.  Is it also true that in the course

12   of the negotiations that you led with the first lien

13   agent, that there were never any specific discussions

14   about what the value of the prepetition collateral

15   was?

16       A    Not that I'm aware of.

17       Q    Now, the proposed cash collateral order

18   contemplates not only a $175 million pay down, but

19   also a discretionary additional amount of $15 million

20   that the debtors in their discretion can pay down;

21   correct?

22       A    That's correct.

23       Q    Okay, and is it also the case that as you

24   sit here today, you have not developed any specific

25   criteria or circumstances or time line under which

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that payment would be made?

2        A    There's no formal criteria that's been laid

3    out in the agreement, that's correct.

4        Q    Now, the budget that is attached to the

5    cash collateral order, includes an estimate of

6    professional fees; right?

7        A    That's correct.

8        Q    And that estimate does not include success

9    fees, does it?

10       A    It does not, no.

11       Q    And the payment of the professional fees to

12   the first lien lenders is not subject to

13   disgorgement; right?

14       A    That's correct.

15       Q    And you never demanded in the negotiations

16   that the payment of their professional fees be

17   subject to disgorgement, did you?

18       A    Not to my recollection, no.

19       Q    Okay, and nor did you ever propose during

20   the negotiations that there be a cap on the total

21   fees incurred by the professionals on behalf of the

22   first lien agent?

23       A    That's correct.

24       Q    Okay.  But you did agree to a cap with

25   respect to the committee's fees; right?

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1         A      We ultimately agreed as part of the

2    agreement that there was a cap on the committee's

3    fees, yes.

4         Q      And ultimately the debtors capitulated to

5    that demand from the first lien agent in the interest

6    of getting a deal done; right?

7         A      That was one component of the total deal,

8    yes.

9         Q      And I believe you stated that the debtors

10   didn't support the idea of there being a cap on the

11   committee's fee; right?

12        A      That's correct.

13        Q      It was a demand from the first lien agent?

14        A      That's correct.

15        Q      And in your judgment, as a negotiator, you

16   felt in order to get a deal done, that was a term on

17   which you had to give up?

18        A      We were not successful in avoiding a cap on

19   the committee's fees, that's correct.

20        Q      Now, your use of cash collateral through

21   the budget period is subject to the borrowing base;

22   correct?

23        A      That's correct.

24        Q      Okay, and the borrowing base is itself

25   subject to unilateral adjustment by the first lien

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   agent?

2       A    I think Mr. Basta will go through that.

3   That provision has been stricken from the agreement,

4   but Mr. Basta is going to go through that, I believe,

5   in his summary of the changes that the bank agreed to

6   last night.

7       Q    Okay.  But in the course of negotiations

8   with the banks, you didn't ever take the position,

9   did you, that the debtors' use of cash collateral

10  should not be subject to the borrowing base?

11      A    I don't recall that we did, no.

12      Q    Returning briefly to the pay down, it's

13  correct, sir, is it not, that the debtors' decision

14  to make the proposed pay down is based primarily on

15  your analysis of the amount of excess cash that the

16  debtors have and not on the value of the prepetition

17  collateral?

18      A    That's correct.

19      Q    Now, you testified on direct that the board

20  of directors of TOUSA, Inc. met and approved the

21  proposed cash collateral stipulation; right?

22      A    That's correct.

23      Q    And you attended that meeting; right?

24      A    Yes, I did.

25      Q    And there was no discussion in that meeting

1    of whether entry into the cash collateral stipulation

2    benefitted any of the subsidiaries of TOUSA?

3         A    Not to my recollection.

4              MR. QURESHI:  Thank you.  I have

5    nothing further.

6              THE COURT:  Thank you, Mr. Qureshi.

7              Mr. Rosner.

8              MR. ROSNER:  I think it's going to be

9    very brief --

10             THE COURT:  I'm pleased to hear it.

11             MR. ROSNER:  -- based upon what I just

12   heard.

13                      CROSS-EXAMINATION

14   BY MR. ROSNER:

15        Q    Good afternoon.  David Rosner, I don't

16   think we've met.  I have to figure out how to use

17   these.  We have met.  Now I can see you.

18             Mr. Boken, you know who we represent,

19   there's three groups of note holders, both senior and

20   subordinated note holders that own approximately

21   23 percent of the unsecured note holder debt of the

22   company.

23        A    Yes, I understand that.

24        Q    The operating subsidiaries that guaranteed

25   that bond indebtedness, you're aware of that?

1       A    Yes.

2       Q    Are you also aware that approximately

3    two/thirds of the cash that TOUSA holds now is from

4    the tax refund?

5       A    Yes.

6       Q    Okay, and that's the 207 that you were just

7    talking about a minute ago that is not right now

8    being held at interest?

9       A    That's correct.

10      Q    Okay.  Are you also aware that that entire

11   tax refund is subject to a preference claim and

12   likely, or at least possibly, will not constitute

13   cash collateral?

14      A    I'm not aware that any preference claim has

15   been filed against -- as it relates to the tax

16   return.

17      Q    You were here earlier this morning in terms

18   of the proceedings on the committee's standing

19   motion; correct?

20      A    Yes.

21      Q    Had you read the complaint that the

22   committee attached as Exhibit H to their standing

23   motion?

24      A    I'm sure I've read portions of it, but I

25   can't -- I have not read every document in this case.

 1      Q    So are you aware that one of the claims

 2  that the committee is going to bring is a preference

 3  claim alleging, and hopefully proving, that there is

 4  no lien on the $207 million, that under the cash

 5  collateral stip, the company is asking this Court for

 6  permission to pay over to the actual defendants?

 7      A    I'm aware there has been discussion about

 8  it, I'm not aware there has been any claim filed.

 9      Q    Okay.  But you are aware that this morning

10  was the first step in getting permission in order to

11  bring that claim?

12      A    I'm not -- I can't opine on that.  I don't

13  know whether that's the first step or a further step.

14  It's a legal -- it requires a legal conclusion.

15      Q    Probably the first step is them drafting

16  the motion and then filing it, I agree with you.

17          At some point TOUSA determined what it

18  believes would be an appropriate adequate protection

19  package; correct?

20      A    I'm sorry, repeat the question.

21      Q    Sure.  At some point in time TOUSA

22  determined what it believed would be an appropriate

23  adequate protection package; correct?

24      A    Yes.

25      Q    And when was that exactly?

```
 1        A    You mean in context of the cash collateral

 2    negotiations?

 3        Q    What date?

 4        A    I don't recall.

 5        Q    Today is the 22nd.

 6        A    I can't recall any specific date.  It

 7    was -- it would have been sometime around the time

 8    that the tax refund was received.

 9        Q    So the tax refund was received in April;

10    correct?

11        A    Late April, yes.

12        Q    And are you saying that at that time, prior

13    to all the negotiations with the committee and with

14    the debtors, the alleged negotiations with the

15    debtor, the company had already decided what the

16    adequate protection package was going to be?

17        A    That's not what I said.

18             MR. DONOVAN:  I'm going to object.

19    First, I think he's using legal terms and asking

20    legal questions, so if we can ---

21             THE COURT:  Yes.  Mr. Rosner, if you're

22    going to use a term like adequate protection, you

23    better -- you better premise it by getting an

24    understanding of what the witness' understanding

25    of that term is.  If you are using it in a
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    context other than or a meaning other than the

2    legal definition of adequate protection under

3    Part III of the Bankruptcy Code, then let's talk

4    that.

5              MR. ROSNER:  Okay, your Honor.

6              THE COURT:  But let's make sure we're

7    going somewhere with this line of inquiry.

8    BY MR. ROSNER:

9        Q    I listened to your resume -- I actually

10   read your resume and then listened to your resume and

11   am familiar with Kroll Zolfo Cooper and what they do

12   for a living.

13             Are you familiar with the concept of

14   adequate protection for a secured lender in

15   connection with the use of cash collateral?

16       A    Yes.

17       Q    Okay.  So it is in that sense, in your

18   understanding is the way that I'm using adequate

19   protection and to be clear, to make sure that we

20   agree on our corresponding definitions, I'm talking

21   about that which the company believes is necessary to

22   provide to a secured lender for the secured lender to

23   consent or for the Court to order the use of cash

24   collateral.

25       A    Yes.

1      Q    Okay.  So that's what I mean when I say

2   adequate protection.

3           At some point TOUSA determined what it

4   believed would be the appropriate adequate protection

5   package to give to the banks; correct?

6      A    We developed that -- thoughts on proposals,

7   yes.

8      Q    Okay.

9      A    At some point we came to a conclusion as to

10  what our objectives were, which were, again,

11  primarily on securing use of cash collateral and then

12  devising various components of a package that we felt

13  would make sense, yes.

14     Q    Okay, and what -- and at that point that

15  you determined what the appropriate package was of

16  adequate protection, wasn't that just May 19th, three

17  days ago?

18     A    No.

19     Q    So what day was it?

20     A    We started the process around the time it

21  became clear that the tax return was coming in and

22  that that obviated the need for the D.I.P. financing,

23  so we shifted from pursuing a final D.I.P. financing

24  order to use of cash collateral.

25          So that gave rise to our internal

```
 1    discussions, again, sometime in late April about what
 2    it was we thought a package could look like or could
 3    contain that might be satisfactory.  Ultimately, we
 4    filed the document, I believe, on the 19th, which was
 5    the outcome of negotiations that originally started
 6    with the committee to try to develop a joint
 7    proposal, when that was unsuccessful, then direct
 8    negotiations with the -- with the first lien lenders.
 9         Q    So, is it fair to say that -- and just
10    correct me if it's not fair to say, is it fair to say
11    that the final determination of what the stipulation
12    and adequate protection package would be is the one
13    that was filed on May 19th?
14         A    That was the outcome of all the
15    negotiations, yes.
16         Q    Okay, and is that when it was taken to the
17    board of directors of TOUSA, Inc.?
18         A    We went to the board on a number of
19    occasions to update them on the process that we were
20    going through.  As things evolved over time and it
21    became more clear and certainly then entirely clear
22    that we weren't going to proceed with the D.I.P.
23    financing order, we updated the board on what our
24    thoughts were on how we would proceed with cash
25    collateral.
```

1            Ultimately, what we put in front of the

2    board for approval, yes, was what was filed on

3    May 19th and that's what the board approved.

4            But at least one, and probably several

5    meetings with the board prior to that, they were

6    apprised of the substance and nature of our

7    negotiations, including our efforts to try to develop

8    a joint proposal with the committee and why it turned

9    out to be unsuccessful.

10       Q    Now, although it's styled as adequate

11   protection, the $175 million pay down is predicated

12   simply on what the debtor has on hand, as opposed to

13   what is needed to protect the banks from collateral

14   diminution; is that correct?

15       A    That's correct.

16       Q    So would you agree that that means it is

17   simply a non-plan distribution of 60 percent of

18   bankrupt TOUSA's cash to the entities that -- whose

19   claims are disputed?

20           THE COURT:  Mr. Rosner, Mr. Rosner, if

21   you want to make an argument to me, that's fine,

22   but don't ---

23           MR. ROSNER:  I'll withdraw that

24   question, your Honor.

25           MR. DONOVAN:  Thank you, your Honor.


OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1            THE COURT:  If you've got questions

 2    that are relevant to the issues that are before

 3    me, which are strictly limited to the interim use

 4    of cash collateral by this debtor between now and

 5    the final hearing on the debtors' motion to use

 6    cash collateral, ask them.

 7            MR. ROSNER:  I have just a few more

 8    questions.

 9    BY MR. ROSNER:

10        Q    Can you turn back to Exhibit A of your

11    declaration for a minute?

12        A    Yes.

13        Q    I just need to be informed and I don't

14    know -- your Honor, you have one; right?

15            THE COURT:  I do.

16            MR. ROSNER:  I don't need to put it on

17    the board.

18            THE WITNESS:  That's the same document,

19    your Honor, as Tab 3.  It's the cash collateral

20    budget.

21    BY MR. ROSNER:

22        Q    Right, but it's not sealed.  I mean, it was

23    attached to your declaration.

24        A    Yes, that's correct.

25        Q    And I see that there are -- there is a
```

1   category called operating cash flow, there's

2   operating receipts, and then there's operating

3   disbursements going down, then there is a sub total

4   of operating cash flow.

5        A    Yes.

6        Q    Going across that line of operating cash

7   flow, it appears to me that it increases by 14,034 --

8   14,034,000, is that correct, through the cash

9   collateral period?

10       A    No, I don't think you're reading that

11  correctly.  The total operating cash flow before

12  financing fees, professional fees, and other

13  non-operating costs, the aggregate amount for the

14  period is $23.9 million.  That final column on the

15  right is a total column.

16       Q    So you start off in the week with 9.879 and

17  then you end up with 23.9 million?

18       A    That's correct.

19       Q    That's correct.  That is an increase of

20  14 million?

21       A    Between the end of -- from after the first

22  week of May to -- so for the period, yes, from June

23  to November, there is an aggregate of $14 million of

24  operating cash flow.

25       Q    Now, are there -- I don't see on here

 1   any -- I see a category called non-operating

 2   disbursements, but I don't see a category called

 3   non-operating receipts.

 4          Are there any non-operating receipts?

 5     A    The only non-operating receipts would be on

 6   asset sales, bulk sales, things like that and that is

 7   on a line item where it says beginning restricted

 8   balance, near the bottom.  You have additions, land

 9   and bulk sales and then releases.

10          The land and -- in this forecast, it shows

11   land and bulk sales in September of about

12   $17 million.  It's likely that we'll have other land

13   or bulk sales that would occur and per the terms of

14   the cash collateral order we're required to segregate

15   those funds.

16          So that is the only -- in this forecast the

17   number in September is the only non-operating cash

18   receipt that's forecast.

19     Q    Okay.  When you say in this forecast that's

20   the only one, is that because there are no other

21   ones, the company has no other non-operating receipts

22   other than the one that you just described?

23     A    Well, we're constantly evaluating our asset

24   base, literally on a weekly basis and trying to

25   determine whether there should be other asset sales.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

 1    So there may very well be between the period of

 2    tomorrow and November 30th other asset sales that

 3    would be non-operating receipts, but this -- I don't

 4    remember what transaction was forecast in September,

 5    but it's likely that there will be other ones over

 6    the course of the period -- of the cash collateral

 7    period, yes.

 8        Q    And if those occur, those non-operating

 9    receipts, that would increase the amount of cash

10    collateral on hand; correct?

11        A    It would, but it would be in restricted

12    cash.

13        Q    I understand it would be in restricted

14    cash, but that would also then eliminate any

15    reduction in total book cash on hand should you have

16    such non-operating receipts; correct?

17        A    Yes, it should.

18        Q    Okay.  If you look down at the total book

19    cash balance number, again, you'll have to correct me

20    if I'm wrong ---

21            THE COURT:  How many more questions do

22    you have, Mr. Rosner?

23            MR. ROSNER:  I have like three, I

24    think.

25            THE COURT:  Good, three.


            OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1              MR. ROSNER:  Okay.
 2   BY MR. ROSNER:
 3       Q    As I read this, you start off with
 4   331 million, approximately, and you end up with
 5   315.6 million?
 6       A    Yes.
 7       Q    So that's the cash reduction of about
 8   13.8 million?
 9       A    Yes.
10       Q    And that corresponds with financing fees of
11   about 13.2 million to the first lien lenders?
12       A    Well, I think the proper way to look at it
13   because there are ins and outs, is that the net
14   decrease is actually about $16 million.
15            If you look at the total cash flow line,
16   which is after non-operating disbursements, you'll
17   see that there's negative cash flow of 22.6 million
18   over the period.
19            You actually have to take then and compare
20   the opening cash balance at 523, and I'm sorry
21   because this doesn't show, your Honor, clearly on the
22   schedule, but if you take the 81.450, at the top of
23   the page, and you add that to the 240 in restricted
24   cash, you actually have opening cash balance of
25   $321 million.
```

1          So the opening cash balance that you should

2    be comparing, Mr. Rosner, is 321, decreasing to 315.

3    The difference there is negative cash flow of

4    22.6 million over the period and added back to that

5    the one non-operating cash receipt of $16.7 million.

6    So that represents the $6 million difference in the

7    numbers.

8          Q    And so that $6 million would yield a

9    16 million reduction; is that correct?

10         A    I don't see how you get -- what

11   $16 million ---

12         Q    I thought you testified a minute ago that

13   there was a $16 million reduction in cash, not a

14   $13 million reduction in cash?

15         A    Actually, when I started, I apologize, I

16   referenced the wrong number.

17         Q    Okay.

18         A    When you use total book cash balance at the

19   bottom of the week ending 5-30-08, that is the ending

20   cash balance of 5-31-08.  To get to 5-30-08, to get

21   to the opening cash balance you have to take the

22   81 million at the top, add it to the 240 so the

23   opening cash balance is actually 321.  It doesn't

24   show on the schedule.

25         The 321 is your opening cash balance.  Your

1    ending cash balance is 315 prior to the application

2    of $175 million, so the reduction is actually

3    $6 million and not 16.

4              MR. ROSNER:  Your Honor, I have two

5    questions.

6              THE COURT:  No, you've had five of the

7    three.

8              MR. ROSNER:  Two questions, your Honor.

9              THE COURT:  Number one.

10   BY MR. ROSNER:

11        Q    Number one, you're aware, are you not, that

12   there is a $50 million increase in the borrowing base

13   assets from the beginning of this period to the end

14   of the period; correct?

15        A    I'd have to see the schedule to refresh my

16   memory.  I don't have it here in front of me.

17        Q    So you're not aware -- you don't remember

18   that number?

19        A    Not off the top of my head.

20        Q    Do you remember it going up, however,

21   during the period?

22             THE COURT:  Is that question three of

23   two now, Mr. Rosner?

24             MR. ROSNER:  Oh, I'm sorry.

25             THE COURT:  That's okay, Mr. Rosner.


        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    You may be seated.

2              MR. ROSNER:  Thank you, your Honor.

3              THE COURT:  Any further questions for

4    Mr. Boken.

5                        CROSS-EXAMINATION

6    BY MR. SMOLINSKY:

7        Q    Hello, Mr. Boken.  My name is Joe Smolinsky

8    from Chadbourne & Parke. I represent Citibank, as

9    agent.

10             Mr. Boken, you testified earlier that the

11   reason why the $270 million in restricted cash was

12   not put into an interest bearing account was because

13   you were in discussions with the first lien agent

14   with respect to whether accounts would be opened.

15             Does it refresh your recollection that the

16   discussions that were being had between the company

17   were with the U.S. Trustee with respect to Section

18   345 of the Bankruptcy Code and restrictions on

19   investments?

20       A    I know that there has been a particular

21   reason, Mr. Smolinsky, that there were negotiations

22   going on and I know it's been happening with the

23   treasury and finance people at TOUSA and I've left it

24   in their hands, but I don't recall all the specifics

25   as to what the restrictions were, but I knew that

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   there were restrictions that were simpler than us

2   just putting it in a CD or other account.

3       Q    Did you participate in any discussions with

4   Carol Flaten where she expressed her dismay over the

5   fact that the money wasn't earning interest?

6       A    Yes, I do recall that, yes.

7            MR. SMOLINSKY:  Thank you, your Honor.

8            THE COURT:  Thank you.

9                    CROSS-EXAMINATION

10  BY MR. FLASCHEN:

11      Q    Mr. Boken, Evan Flaschen for the second

12  lien lender.

13           To your knowledge, were the second lien

14  lenders of the second lien agent involved in the

15  negotiations over this cash collateral stipulation?

16      A    No, they were not.

17      Q    Okay.  In your view, is there a material

18  risk there's been a decline in value of the business

19  from the petition date to today?

20      A    Yes, there is.

21      Q    In your view, is there a material risk

22  there will be a continuing decline in value of the

23  business over the next six months?

24      A    There certainly is a risk that there will

25  be a decline, yes.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1           MR. FLASCHEN:  Thank you, your Honor.

2           THE COURT:  Thank you, Mr. Flaschen.

3           MR. DONOVAN:  Very briefly, your Honor.

4           THE COURT:  Yes, sir.

5                    REDIRECT EXAMINATION

6    BY MR. DONOVAN:

7        Q    Mr. Boken, you were asked by Mr. Rosner and

8    Mr. Qureshi about the different negotiations getting

9    to the agreement that's now been presented to the

10   Court.

11           As the chief restructuring officer, do you

12   believe what's been presented is the best deal under

13   the circumstances for the estate?

14       A    I do based on ---

15       Q    Why?

16       A    Based on the facts and circumstances that

17   we were presented with and the absolute need for us

18   to have use of cash collateral, yes, I believe that

19   we negotiated the best deal possible given the facts

20   and circumstances and the information that was

21   available to us at the time.

22           MR. DONOVAN:  Your Honor, at this time

23   I'd move, and I believe without objection,

24   Debtors' Exhibits 1 through 3 that are in the

25   book.  Exhibits 1 and 3 are public.  Exhibit 2 is

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    filed under seal and we would request that it

2    stay sealed.

3              Thank you, your Honor.

4              THE COURT:  Any objection?  Then I will

5    admit Exhibits 1, 2 and 3, Exhibit 2 filed under,

6    and to remain under seal.

7              (Thereupon, Debtors' Exhibits 1 - 3 were

8         admitted into evidence.)

9              MR. DONOVAN:  Thank you, your Honor.

10             THE COURT:  Thank you.

11             Mr. Boken, unless Mr. Basta wants you

12    there, you're liberated.

13             THE WITNESS:  Thank you.

14             THE COURT:  You're welcome.

15             MR. BASTA:  Your Honor, I believe

16    Mr. Boken testified that he thought that the

17    entry into the cash collateral agreement was in

18    the best interest of the corporation and that the

19    risks of a cash collateral fight were high.  I

20    don't believe that evidence was controverted.

21             I would want to make a couple of

22    corrections that I think are just legal or

23    clarifications.  Mr. Qureshi talked about

24    adequately protecting the first lien debt.  The

25    way the intercreditor works is if we were not

1  able to obtain the consent of the first lien

2  lenders to the consensual use of cash collateral,

3  we would have to show adequate protection through

4  the second lien debt, as well.

5          The second point is Mr. Rosner in his

6  discourse referred to the $175 million as a

7  non-plan distribution of $175 million because the

8  175 was not tied to a diminution in the value of

9  the collateral during the proposed period.

10          I think Mr. Rosner is confusing what we

11  would have to show in a contested cash collateral

12  hearing versus what we may have to offer as

13  inducement for the consensual use of cash

14  collateral.

15          With that, your Honor, and at the risk

16  of giving the Court a headache, I'm going to

17  present where we are on the various objections

18  that the constituents have made.  I'm not exactly

19  sure, your Honor, honestly how to handle this.  I

20  once was before Judge Lifland and he said to me,

21  it was a similar situation, there were multiple

22  objections to a financing order and he said,

23  well, what do you want me to do?  You want me to

24  call balls and strikes?  I don't know that at an

25  interim hearing that that's appropriate.

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 1:14-cv-10979-CSS   Doc 3726-2   Filed 03/03/15   Page 219 of 271
Case 08-10579-JKO   Doc 7676   Filed 09/20/08   Page 243 of 255

241

1         I'm happy to just sort of lay out the

2    lay of the land.  If any constituent wants to be

3    heard on an issue by issue basis, it may set the

4    stage for the final hearing.

5         THE COURT:  You know, I'll do the best

6    I can, not necessarily calling balls and strikes,

7    but in giving you without very much embellishment

8    from anyone, what my preliminary inclinations are

9    on various issues, which may help you frame the

10   negotiations in a constructive way, or at least a

11   way that makes me happy --

12        MR. BASTA:  Okay.

13        THE COURT:  -- which may or may not be

14   constructive for anybody else.

15        MR. BASTA:  We appreciate that, your

16   Honor.  I'm going to use the thing-a-majiggy

17   here, but I'm going to hand up a hard copy of the

18   chart.

19        THE COURT:  Okay.

20        MR. GOLDEN:  Good afternoon, your

21   Honor.

22        THE COURT:  You can do this like the

23   Academy Awards, if you want to, that's perfectly

24   fine with me.

25        MR. GOLDEN:  He's too much of a showman

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 08-13932-JKO    Doc 7676    Filed 09/28/08    Page 243 of 285

1    for me, your Honor.

2         THE COURT:  Oh, now I should start

3    counting my fingers.

4         MR. GOLDEN:  Your Honor, I think part

5    of the problem that the parties are going to have

6    in addressing the cash collateral, I think it's

7    been made clear, if one thing is clear about

8    this, this is an interim order, but I don't know,

9    and this is part of the conversation that the

10   parties had with the Court two days ago, exactly

11   what that means.

12        I think we all know what the words

13   interim mean, but I don't think the parties

14   understand fully as to, given the fact that this

15   is going to be an interim hearing subject to a

16   final hearing, how much should we be fighting

17   about each and every one of these quote, "grants

18   of adequate protection" or should we be awaiting

19   the final hearing on this?

20        THE COURT:  Well, my hope is that by

21   giving you my inclination on various points,

22   you'll focus on the things that you need to fight

23   about in a couple of weeks rather than -- and now

24   it looks like it's going to be almost a month

25   because I think we're going to come back on

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    June 20th because somebody had a problem with

2    June 10th and I have a problem with June 12th,

3    so ---

4           MR. BASTA:  Your Honor, I had and it's

5    obviously subject to the Court's calendar, what

6    we -- Rule 4001 requires 15 days' notice from the

7    service --

8           THE COURT:  Right.

9           MR. BASTA:  -- which the 15 days are up

10   on June 3rd.  The debtors are of a mind if

11   there's room on the Court's calendar to move up

12   from before the 10th, rather than moving back

13   because honestly, we don't want -- how do I put

14   this, I guess if it's 30 days, there's going to

15   be 30 days of discovery, there's going to be 30

16   days of fighting and we believe that trying to

17   make some progress at this hearing and then

18   followed by a hearing that complies with the

19   rules, a shorter period out it makes more sense

20   for the estate.

21          THE COURT:  Jedd, would you grab me my

22   paper calendar, which I have managed to do

23   something with?

24          Thank you.  So I know what I'm talking

25   about.

```
 1          MR. BASTA:  Your Honor, the date that

 2   was floated out, just to take a shot if that was

 3   available, was the 5th.

 4          THE COURT:  What is the FEH we've got

 5   scheduled in the afternoon?

 6          MR. BELLMAN:  Relief from stay, but you

 7   just set something else, you just told Christina

 8   to set something else on the 5th.

 9          MR. BASTA:  Mr. Boken is not available,

10   your Honor, on the 5th, unfortunately.

11          THE COURT:  Okay.

12          MR. BASTA:  I should have checked with

13   the client.

14          THE COURT:  It's always good to do

15   that.

16          MR. BASTA:  Yes.

17          THE COURT:  My June is actually fairly

18   grim.  The 10th is the -- is really the first day

19   I can commit to you and I know that's a problem

20   for Mr. Golden.

21          MR. GOLDEN:  Your Honor, if that is the

22   only date that's available, we'll just have to

23   try and -- as I said to the Court the other day,

24   we do have an actual conflict with the Court

25   calendar in Chicago on that date.
```

```
 1              THE COURT:  I could do it -- I might be
 2    able to do it the afternoon of the 9th and move a
 3    trial of difficult people to the 10th, but I
 4    don't know if you're going to -- are you going to
 5    need a day or are you going to need a half day?
 6              MR. BASTA:  I would hope a half a day.
 7              THE COURT:  Me, too.
 8              MR. BASTA:  That would work, the 9th
 9    would work perfect for me.
10              THE COURT:  Jedd, would you go make a
11    couple of phone calls and find out if we can move
12    Peterson?
13              MR. GOLDEN:  Your Honor, let me try to
14    make it easy.  We'll split ourselves up.  If the
15    10th is available, we'll take the 10th.
16              THE COURT:  I apologize to you.  I've
17    just got other stuff and while I'm happy to move
18    things around -- thank you.
19              MR. SMOLINSKY:  Your Honor, let me make
20    another suggestion, if I may.
21              THE COURT:  Sure.
22              MR. SMOLINSKY:  If we're going to use
23    the 10th -- I was concerned somewhat about the
24    20th -- but if we're going to use the 10th,
25    perhaps it makes sense, rather than argue today
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   on every issue because of what the interim order
 2   is going to look like, we would be prepared to
 3   extend the terms of the existing interim order
 4   until the 10th and then your Honor could be free
 5   to give your views.
 6           Obviously, we view this as a package
 7   deal, but we want to understand your -- where
 8   you're coming from and you could be freer to
 9   explain where you're coming from.
10           THE COURT:  Okay.
11           MR. SMOLINSKY:  The one caveat I would
12   ask for is that the current interim order
13   contains a debtor-in-possession financing
14   facility.  I don't think it's in anyone's
15   interest to have that commitment go on and pay
16   fees in connection with that.
17           So what I would like to do is put on
18   the record that the D.I.P. commitment is
19   terminated effective today, and then the rest of
20   the order will govern until the 10th.
21           THE COURT:  Mr. Smolinsky, you have --
22   you have cut the Gordian knot.  Thank you.
23           MR. BASTA:  But I'm correct that we can
24   still more forward.
25           THE COURT:  Oh, yeah.  I'll still give
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1  advisory opinions.

2        MR. BASTA:  Okay.  Great, thank you,

3  your Honor.  We really need them.  Thank you.  If

4  I can hand up the chart?

5        MR. GOLDEN:  Your Honor, are you still

6  inviting the two of us -- I don't know how we're

7  supposed to handle this.

8        MR. BASTA:  Let me suggest this as a

9  process, whether you stand here or anywhere.  I

10  can just introduce the topic, many instances I'm

11  going to need Mr. Smolinsky's input and then

12  Mr. Golden can provide his arguments.

13        THE COURT:  I don't care where you all

14  work from.  If you're going to stay at your

15  seats, just pull the mikes over and make sure the

16  little red button is on, the little red light is

17  on.

18        MR. BASTA:  Okay, your Honor.  Let's

19  start with the scope of disgorgement and when I

20  say the scope of disgorgement, I mean which of

21  the payments to the lenders are subject to the

22  formal disgorgement provisions in the order.

23        As we've negotiated with the first lien

24  lenders, the $175 million pay down is subject to

25  the formal disgorgement procedures, but the other

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
1    adequate protection payments in the form of

2    amounts equal to interest and fees, the lenders

3    are agreeing they're subject to disgorgement with

4    a lower D, without all the bells and whistles,

5    because, as I understand, there's some

6    administrative difficulty of imposing those

7    requirements for the other payments.

8              THE COURT:  Probably because you have

9    all sorts of interesting problems for how you

10   administer the agent.

11             MR. SMOLINSKY:  It is, your Honor, and

12   we have not required that the proceeds of our

13   assets get paid down to us every time.  The

14   purpose of this one time payment is to compensate

15   for that and we could deal with a one time

16   payment and go out and get agreements and police

17   that.

18             It's much more different on a monthly

19   basis.

20             THE COURT:  And you want to do it after

21   the fact.  I mean, if it happens ---

22             MR. SMOLINSKY:  I don't mind in the

23   order a requirement that they are subject to

24   disgorgement, we've already added that language.

25             THE COURT:  Mr. Golden, does that work?
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1             MR. GOLDEN:  Your Honor, again, because
 2   I'm sure all of this is going to be a package, we
 3   can -- the committee can live with -- the
 4   committee can live with disgorgement of the
 5   interest and fees payable to the first lien
 6   agents, the first lien lenders and the second
 7   lien agents, lower case D, but I don't want any
 8   presupposition that we're in any way in agreement
 9   on the capital D Disgorgement procedures with
10   respect to the $175 million.
11             THE COURT:  Okay.
12             MR. BASTA:  I didn't mean to suggest
13   that.  There's still disagreement on the cap D
14   Disgorgement provisions.
15             I should note, your Honor, that on the
16   top it says objections with proposed resolutions.
17             THE COURT:  Yep.
18             MR. BASTA:  That's carefully worded to
19   mean they're not resolved.  It just means these
20   are the points where we were actually able to get
21   something for which there is a proposed
22   resolution.
23             THE COURT:  Okay.
24             MR. BASTA:  When we get to the back,
25   there are provisions for which there's no
```

1    proposed resolution and we'll get into that.

2              THE COURT:  Okay.

3              MR. ROSNER:  Your Honor --

4              THE COURT:  Yes Mr. Rosner.

5              MR. ROSNER:  -- I don't really

6    understand what the difference is between lower D

7    and capital D, but what I understand it to mean,

8    the way Mr. Smolinsky said it, is that it's

9    unlikely that the estate is going to be able to

10   actually recover that money, so ---

11             THE COURT:  I wouldn't -- I wouldn't --

12   I didn't interpret Mr. Smolinsky's comments

13   remotely as suggesting that.  The capital D

14   relates to the 175 million, as to which there

15   will be considerable bells and whistles, the

16   nature of which I suspect still have to be

17   negotiated.

18             MR. ROSNER:  Our request is just, and I

19   think we stated it in the papers, is that

20   whatever disgorgement provisions that the Court

21   ultimately orders, and we hope there's a lot of

22   them, and it would apply to any payments that go

23   out to any of the secured lenders.

24             THE COURT:  Well, I understand your

25   point.

        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

 1              MR. ROSNER:  Thank you, your Honor.

 2              THE COURT:  I'm not sure that I bless

 3      it, but I understand it.

 4              MR. ROSNER:  Thank you, your Honor.

 5              MR. SMOLINSKY:  Your Honor, just one

 6      point on disgorgement.  I know that's going to be

 7      a big topic and we've tried to do our very best

 8      to provide a payment that's really a payment.  At

 9      some point, which is pretty close to where we

10      are, it's not a payment and, therefore, interest

11      will continue to accrue at $20 million a year,

12      which nobody wants.

13              What we're trying to do is come up

14      with -- and I'll tell you now, I have had one or

15      two e-mails from lenders who have said, we can't

16      do X or Y, but what about, you know, something

17      else?  So I think we should try before the 10th

18      to try to get closer to the right answer.

19              THE COURT:  You know, disgorgement is a

20      subject that you all need to work through way

21      more than I can give you guidance on this

22      afternoon.

23              Let's talk about other stuff because I

24      think that's going to be more useful for you.

25              MR. BASTA:  Okay, your Honor.  The next

        OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

 1    item is provisions that the committee is

 2    concerned about that limit the ability of the

 3    company to pay their fees, their professionals'

 4    fees and I think, your Honor, because discussions

 5    on this topic split committee fees into two

 6    categories, committee fees incurred to sue the

 7    lenders have always been an anathema to the

 8    lenders, not surprisingly.

 9             I think the lenders' view is that there

10    is no legal support for a lender being forced to

11    fund a committee to sue them.

12             The second category are committee fees

13    relating to the administration of the case and

14    that's what -- there was testimony regarding this

15    450 cap in the proposal just to move things

16    along.

17             I think the lenders and the company

18    essentially agreed to disagree.  I think the

19    company's view is that the reasonable committee

20    fees, non-litigation committee fees, you know,

21    should be compensated and the lenders disagree to

22    that point.

23             MR. SMOLINSKY:  Your Honor, I'm sorry.

24    I need to object to this entire procedure --

25             THE COURT:  Yeah.


      OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1            MR. SMOLINSKY:  -- because now we're
 2   starting -- we're not just identifying the topics
 3   and asking your Honor for your Honor's initial
 4   view, we're hearing editorial comments.  If
 5   that's what we're going to hear, I'd like to just
 6   get up and make my argument.
 7            THE COURT:  Well, that -- yeah, and I'm
 8   not going to spend the afternoon doing that.
 9            MR. BASTA:  Okay.  That's a fair point,
10   your Honor.
11            THE COURT:  Let's just go down these as
12   topics and I'll tell you what my inclinations
13   are.  You can take them into account or not take
14   them into account.  You can do with them as you
15   will.  My inclination is that the professionals
16   get paid.
17            MR. SMOLINSKY:  Your Honor, can I make
18   one comment because I think there has been a
19   misunderstanding about what the order actually
20   says?
21            THE COURT:  No, no.  My view is that
22   the professionals should and will get paid.  Now,
23   how that dances into the -- into things in the
24   cash collateral order, I don't know, but
25   that's -- that's one of the principles that I
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   will govern myself by.

2           MR. SMOLINSKY:  Thank you.  Your Honor.

3           THE COURT:  Okay.

4           MR. BASTA:  Okay.  Next, your Honor, we

5   have -- the committee requests that there are

6   provisions that make it clear that the adequate

7   protection liens and adequate protection claims

8   apply only against the debtors for which it is

9   determined by a final non-appealable order that

10  the prepetition secured parties have valid liens

11  and claims.

12          I don't think the secured lenders think

13  it's their burden.  It's not that the liens are

14  invalid until proven valid.  I think they believe

15  that the liens are actually valid until proven

16  invalid.  In addition, the ---

17          THE COURT:  This isn't working, is it,

18  Mr. Golden?

19          MR. GOLDEN:  No, because Mr. Basta is

20  totally misinterpreting the objection we filed on

21  this point and misinterpreting the revisions we

22  made to the proposed order.

23          We're simply making the statement that

24  at the end of the day you can only get adequate

25  protection if you're ultimately determined to

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   have valid liens and claims.  We're not saying

 2   pending that determination you shouldn't be able

 3   to get adequate protection, but as a matter of

 4   finality, adequate protection only will go to

 5   those creditors who are ultimately determined to

 6   be secured.

 7           THE COURT:  Which is a principle with

 8   which I fundamentally agree.  Okay.

 9           Moving along.  Of course.  Number --

10   the second item on the second page, I will not

11   grant liens, claims or encumbrances on avoidance

12   actions, period, full stop.  I said that the

13   first day of the case, nothing has changed my

14   mind, nothing is likely to.

15           At the end of the day if this thing

16   turns into a meltdown, I want a trustee to have

17   something to administer.

18           MR. BASTA:  The next item is ---

19           THE COURT:  Committee gets information.

20           MR. BASTA:  That's resolved actually.

21           THE COURT:  Good.

22           MR. BASTA:  I think that's easy.

23           THE COURT:  That's easy.

24           MR. BASTA:  Okay.  The next one, the

25   first priority agent's ability to modify the
```

```
 1    budget or borrowing base.  Two things here, one

 2    it's only the debtors that can modify the

 3    budgets, the banks consent, it's only the

 4    debtors.  I believe that should address the

 5    committee's concern, and as noted earlier, the

 6    first lien agent has agreed to delete the

 7    provision allowing them to change the borrowing

 8    base.

 9            THE COURT:  Good.  Review, if

10    necessary, invoices.  Review, certainly.  I don't

11    know that I'm going to hold up payment, but if

12    there are objections to be made, I'm sure

13    Mr. Golden will figure out a way to do that.

14            Interim D.I.P. order not a final basis

15    until amounts ---

16            MR. BASTA:  This is resolved, your

17    Honor.

18            THE COURT:  Yep.

19            MR. GOLDEN:  No, your Honor, because

20    one of the reliefs sought in the adequate

21    protection stipulation was a final determination

22    that all the fees and payments made to the first

23    lien agent and lenders under the D.I.P. are final

24    and ---

25            THE COURT:  Not until there's been
```

1    disclosure.

2            MR. GOLDEN:  That was our point, your

3    Honor.

4            MR. BASTA:  I think we agreed to that.

5            THE COURT:  Asset sales.

6            MR. BASTA:  This is a technical point,

7    your Honor, but this is resolved.

8            THE COURT:  Okay.  506(c) waiver should

9    not ---

10           MR. BASTA:  This is also resolved, your

11   Honor.

12           THE COURT:  Okay.  Releases ---

13           MR. BASTA:  I think this is resolved --

14           THE COURT:  Okay.

15           MR. BASTA:  -- as well.

16           THE COURT:  Yep, use of cash collateral

17   has got to be on notice -- termination of use of

18   cash collateral on notice.

19           MR. BASTA:  We've negotiated last

20   night, your Honor, for 72 hours' notice.

21           THE COURT:  That's fine.

22           MR. BASTA:  Next one.

23           THE COURT:  Of course, I consider 72

24   hours' notice to come within the ambit of Rule

25   9006, which says that any period of time less

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1   than eight days doesn't count intervening

2   Saturdays, Sundays and holidays.

3           MR. GOLDEN:  We were going to ask for

4   three business days, but that's fine.

5           THE COURT:  That is what -- that's what

6   that's defined as, so 9006 is your friend.

7           What a strange world some of us live

8   in.

9           MR. BASTA:  Your Honor, we've obtained

10  approval from the lenders that they will come to

11  court before exercising remedies.

12          THE COURT:  Good.  No junior liens.

13          MR. BASTA:  And we've gotten the

14  ability to incur junior liens or junior D.I.P.

15  subject to court approval.

16          THE COURT:  And the ability for the

17  first lien holders to come in and scream about

18  it.

19          MR. SMOLINSKY:  Thank you, your Honor.

20          MR. BASTA:  Turning now to Page 5, 6

21  and 7, this is where there's really no proposed

22  resolution.

23          THE COURT:  Well, let me give you my

24  sort of -- my inclinations.  I'm assuming that if

25  all else works, you know, in the form of an order

1    that generally takes into account the concerns of

2    the committee and the other unsecured creditors,

3    that I'm not troubled by the notion of the

4    payment being actually made.

5            Now, the terms under which it can be

6    clawed back, I think that's a fair subject of

7    discussion, but I understand and I think most

8    commercial lawyers understand the difference from

9    the bank's perspective of whether the money has

10   been paid or not.  It has a whole lot to do with

11   regulatory constraints and how internal

12   operations are run.

13           My suspicion, Mr. Golden, is if it were

14   put in escrow at an interest rate, the interest

15   is going to continue to run on the $175 million

16   and you're not going to get it out of escrow any

17   sooner than you would get it back under the claw

18   back provisions.

19           But you can persuade me otherwise if

20   you -- you can try to persuade me otherwise, but

21   my gut instinct is you pay the money over, if

22   that's the deal.

23           MR. GOLDEN:  I don't know what you

24   mean, if that's the deal.

25           THE COURT:  As part of a cash

1   collateral agreement.

2          MR. GOLDEN:  Judge, I just want to be

3   perfectly clear, there will be no -- the

4   committee will not be able to agree voluntarily

5   as part of an overall cash collateral to the

6   payment of the 175 to $190 million.  I want all

7   parties to know, we will be arguing that point at

8   the final cash collateral.

9          THE COURT:  Okay.  Okay.

10         MR. BASTA:  Your Honor, this is really

11   something that probably belongs in Mr. Singerman

12   and Mr. Donovan's camp for the scheduling order.

13   This relates to whether or not the filing of a

14   challenge within the challenge period suspends

15   the time period such that there can be subsequent

16   amendments and it's really tied, I believe, to

17   the litigation order more so than it being a

18   financing question.

19         THE COURT:  I believe that Rule 15 says

20   liberally granted, if you're talking about

21   amendments to the litigation.  No?  What are we

22   talking about?

23         MR. GOLDEN:  I don't think that

24   Mr. Basta is accurately, or he just may be

25   misconstruing or misunderstanding or

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    misapprehending our point.

2              The way the cash collateral stipulation

3    is currently drafted provides that there is a

4    challenge period.  If a complaint is filed within

5    the challenge period, the subject matter of that

6    complaint will not be subject to the otherwise

7    broad releases going to the banks, but anything

8    that's not covered by that complaint would be

9    released at the end of the challenge period.

10             We objected to that on the theory that

11   as part and parcel of our discovery in connection

12   with the complaint that this Court has now

13   authorized us to file, we may determine that

14   there are other causes of action.  So we thought

15   the correct fix was if we file a complaint, which

16   we obviously will within the challenge period,

17   then the challenge period for all other aspects

18   of what they define as claims and releases get

19   tolled so that there's no free pass simply

20   because we haven't had enough time to do

21   discovery and figure out every possible cause of

22   action against the first and second liens.

23             THE COURT:  Okay.  Mr. Smolinsky, why

24   shouldn't I do that?

25             MR. SMOLINSKY:  Our view is simple,

1   your Honor.  We bargained for a challenge period

2   and that's to know what causes of action are

3   against us.

4           We have no desire whatsoever to modify

5   the Federal Rules of Civil Procedure, but if we

6   go down the road and on the eve of trial and

7   there's yet another cause of action ---

8           THE COURT:  And there is a new claim

9   asserted arising out of the same transaction and

10  occurrences.

11          MR. SMOLINSKY:  Then, your Honor, the

12  Federal Rules will govern as to whether you can

13  add that cause of action.

14          THE COURT:  Okay.  Well, then I suppose

15  that ---

16          MR. SMOLINSKY:  We'll continue to talk,

17  but the purpose of the challenge period was not

18  that all you have to do is give one little bit

19  and then you have forever to raise, you know, the

20  big picture.  We want to know what we're up

21  against.  We want to know ---

22          THE COURT:  Well, my recollection on

23  the first day orders was that there was a

24  provision for a 60-day period within which

25  somebody could challenge and I told you on day

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    one that's 120 at the minimum and we've extended

2    it a little bit more --

3              MR. SMOLINSKY:  And here we are.

4              THE COURT:  -- and here we are.  The

5    question becomes once a challenge is raised, can

6    it be expanded and ---

7              MR. SMOLINSKY:  Your Honor should take

8    into account the amount of money that has already

9    been spent investigating, but I understand that

10   they may, in their discovery, have other related

11   claims that they want to amend their complaint

12   before we go through millions and millions and

13   millions of dollars of discovery at the expense

14   of the estate.

15             THE COURT:  And understand that my

16   inclination is to pay -- is for you to be paid

17   the 175 million.

18             MR. SMOLINSKY:  I understand.

19             MR. ROSNER:  Your Honor, just a

20   footnote at this point.  I think Mr. Golden ---

21             THE COURT:  Mr. Rosner, nobody can

22   possibly hear you from back there.

23             MR. ROSNER:  That's unusual.

24             THE COURT:  Well, it won't pick up on

25   the mikes.

```
 1              MR. ROSNER:  Just to emphasize this
 2     point, I'd just urge your Honor, if you look at
 3     the breadth of the release, that's the issue
 4     here, it's not necessarily the challenge period
 5     or the ability to relate back, but it's the
 6     breadth of the release that is given should the
 7     actual claim not be brought in the actual
 8     complaint.
 9              So you've got -- I mean, I think the
10     terminology is anything that could possibly arise
11     from any prepetition, you know, conduct amongst
12     the parties.  It is so broad as to what goes away
13     if it's not brought in the complaint, that nobody
14     could tell you today, notwithstanding how great
15     these guys are, nobody could tell you today that
16     you would be able to come up with every possible
17     thing and then throw it into a complaint when you
18     haven't done your investigation.
19              So that's all, it's a critical point
20     that these claims don't disappear.
21              THE COURT:  Okay.
22              MR. ROSNER:  Thank you, your Honor.
23              THE COURT:  I got your point.  My
24     inclination is that they shouldn't either, but
25     moving right along.
```

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1        No exercise of remedies.

2        MR. BASTA:  Mr. Smolinsky is going to

3    address this point.

4        MR. SMOLINSKY:  It's not my point, your

5    Honor, but I can understand why Mr. Basta is

6    confused.

7        I think the point -- maybe Mr. Golden

8    could explain it, but if there is a cash

9    collateral termination event or a default under

10   the cash collateral order, the point is that if a

11   lawsuit is pending, we couldn't exercise any

12   remedies until the lawsuit is resolved.

13       I think that was the sum and substance

14   of the point, but I think -- I don't know how

15   much we have to discuss it.

16       THE COURT:  Well, I'm not going to let

17   you exercise remedies without notice and, at that

18   point, I'm sure that it will be an interesting

19   series of hearings.

20       MR. BASTA:  I agree, your Honor.  I

21   think the point that I'm trying to -- that is at

22   issue here is that just because the committee has

23   commenced a challenge, if the debtors have

24   defaulted the budget or a covenant in the cash

25   collateral, doesn't mean that the lenders can't

 1    exercise any remedies, they can come in and we'll

 2    have a hearing about it.

 3            THE COURT:  Whose side are you on,

 4    Mr. Basta.

 5            MR. BASTA:  I'm explaining the point,

 6    your Honor.

 7            THE COURT:  I understand the point.

 8            MR. BASTA:  Yes.  I didn't understand

 9    the committee's next objection.  The objection

10    said that the debtors' use of cash collateral

11    pending a final hearing should be limited in

12    accordance with Rule 4001 to only what is

13    necessary pending the final hearing.

14            But I guess I would ask the committee

15    to explain because we're not making the pay down

16    until after the final hearing.

17            THE COURT:  And you're using cash

18    collateral.

19            MR. BASTA:  And we're using cash

20    collateral to -- in the interim in the ordinary

21    course of business, so I didn't know whether

22    Mr. Golden was asking us to do something

23    different.

24            MR. GOLDEN:  Very simply, this point we

25    made has really now been resolved by

            OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    Mr. Smolinsky saying that we will continue the

2    current use of cash collateral under the current

3    order pending the final hearing.

4            THE COURT:  Fine.  Okay.  The extent of

5    the carve-out.

6            MR. BASTA:  Yes, your Honor.  When we

7    did the original D.I.P. financing, if there was a

8    default under the D.I.P., the post default

9    carve-out was about $10 million plus fees in the

10   pipeline.

11           In the context of cash collateral, the

12   lenders are not willing to provide as robust a

13   carve-out and so what is in the present cash

14   collateral order is a post default carve-out of a

15   million dollars for the debtors and $250,000 for

16   the committee, at which point, I guess, we'll all

17   have to come here and look at the -- speak to the

18   Court and figure out where we go from there.

19           THE COURT:  My inclination is that the

20   professionals will be paid.

21           MR. BASTA:  The last point, your Honor,

22   relates to the details of disgorgement and I

23   think we've heard from the Court on that matter.

24           THE COURT:  Okay.

25           MR. BASTA:  This has been very helpful,

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1    your Honor and ---

 2              THE COURT:  I don't know if it has or

 3    not, I hope so.  I'll see you all, I guess, on

 4    June 10th at 9:30.

 5              MR. BASTA:  Am I right, your Honor,

 6    that we will terminate the D.I.P. and operate

 7    under the existing order through the hearing on

 8    the 10th?

 9              THE COURT:  Yes.  Let's say pending

10    further order of Court, and obviously I intend to

11    enter an order as immediately after the 10th as

12    possible, but I'm not inclined to let there be a

13    one-day gap period unless Mr. Smolinsky is

14    nervous about that.

15              MR. SMOLINSKY:  I'm not sure I

16    understand, your Honor.  What I was going to ask

17    was that if your Honor would order on the record

18    that the commitment for the D.I.P. is terminated

19    effective today.

20              THE COURT:  I will do so.

21              MR. SMOLINSKY:  Thank you.

22              THE COURT:  So done.

23              MR. SMOLINSKY:  Then I don't understand

24    what the other issue is.

25              THE COURT:  The only point is, the
```

1    question of is the authorization to use cash

2    collateral extended until the 10th or is it

3    extended pending further order of Court, and I

4    prefer the latter only because I don't want there

5    to be confusion if an early hurricane hits us on

6    the 9th, I don't want anybody to be running

7    through the exercise of do I have to get an order

8    signed.

9            MR. SMOLINSKY:  What I've done in the

10   past, your Honor, I've extended the date to one

11   day after the hearing to give us time to finalize

12   the order.  I prefer not doing it until order of

13   the Court because I've seen the circus that comes

14   with trying to get an order negotiated and put

15   before your Court and I don't want it to run off

16   for days and days and days.

17           THE COURT:  Okay.  I'll sign one that

18   says the 11th.

19           MR. SMOLINSKY:  Thank you, your Honor.

20           THE COURT:  What else do we need to do?

21   Mr. Rosner.

22           MR. ROSNER:  There were a few points

23   that we had raised in our objection that we were

24   going to raise in argument that didn't make it

25   onto Mr. Basta's chart.

1              I take it we should just either take

2       them up or I can just identify them for you right

3       now.

4              THE COURT:  You can negotiate them

5       between now and then or we'll hear them on the

6       10th.

7              MR. ROSNER:  Okay.  Thank you, your

8       Honor.

9              THE COURT:  Thanks.  Mr. Flaschen.

10             MR. FLASCHEN:  Your Honor,

11      Evan Flaschen for the second lien agent.  I do

12      that because clients are on the phone, otherwise

13      they won't recognize my voice.

14             Four very quick points.  In my

15      presentation this morning, I followed up on a

16      comment your Honor made to Mr. Smolinsky about

17      how you had pretty much concluded the litigation

18      would proceed.

19             Unfortunately, using some terminology

20      you've employed, I fear I used language that

21      perhaps included bold and italics and I apologize

22      for that.

23             THE COURT:  Well, thank you.  You

24      weren't here on the first day of hearings in

25      which I expressed my sort of fundamental views on

1   how cases can proceed most efficiently.  The

2   first principle is courtesy, the second is

3   clarity, and the third is brevity.

4          I do not, on the third point, I do not

5   generally need a pleading to recite to me the

6   history of the entire case because by and large I

7   would have figured that out by then.

8          On the second point, I want orders to

9   be written so that they can be read by the people

10  who will receive them and this is a case that has

11  a lot of very sophisticated people in it,

12  everyone who has spoken to me today being in that

13  category.

14         It also has a lot of consumers.  It has

15  a lot of employees and the unnecessary use of

16  jargon or language that we bankruptcy mavens find

17  perfectly comprehensible, but that for real

18  people is nothing more than gibberish, is truly

19  unhelpful.

20         On the first point, my point to parties

21  is the lower the temperature in the pleadings and

22  in the courtroom, the more likely we are to reach

23  a civil result.

24         I appreciate that there are very

25  significant financial interests at stake in a

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
 1   case like this, very significant economic

 2   interests and while those are important for

 3   clients, there are also -- for employees, for

 4   people who have bought houses, for people who are

 5   trying to figure out what their lives are going

 6   to be after this case is over, we need to treat

 7   one another well.  So I encourage everyone to do

 8   that.

 9          I appreciate your comment here and I

10   look forward to resolving this case in a manner

11   that is consistent with the highest levels of

12   professionalism that we can possibly bring to

13   bear.  I'll do my best, I hope everybody else

14   does theirs.

15          MR. FLASCHEN:  Very good, your Honor.

16   My -- again, to state it categorically, I

17   apologize for my discourtesy to this Court.

18          Second point, a correction.  Mr. Golden

19   is concerned that I gave the impression that

20   there was no overlap between the Transeastern

21   lenders and the second lien lenders, I know it's

22   not evidentiary, but there is some overlap in

23   terms of the identify of them, but the vast

24   majority of dollars, there are not.

25          Just to use one example, the largest
```

1    Transeastern lender bought into the second lien

2    loan.  It happens the second lien loan was so

3    over-subscribed in the market by new investors

4    that they bid to take a $50 million piece and

5    only got a $15 million piece, but, indeed,

6    there's some overlap in identity, the dollar

7    amount is much different.

8           THE COURT:  Gosh, those unlucky people.

9           MR. FLASCHEN:  Indeed.  Third point, I

10    take to heart that when you talked about everyone

11    should get paid that that includes us poor second

12    lien agent counsel and caps hopefully are not

13    appropriate for us either if they're not

14    appropriate for other parties.

15           THE COURT:  Well, I don't know.  You

16    know, I was told that was negotiated,

17    Mr. Flaschen, but I could be wrong.

18           MR. FLASCHEN:  My brilliant

19    cross-examination, I believe, demonstrated, your

20    Honor, that we are not involved in the

21    negotiation of the cash collateral order.

22           And then the fourth point, going to

23    that same issue, we did not negotiate it, we are

24    not a party to the stipulation, and, thus, a

25    comment you made on the phone the other day is

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

1    that in effect the first lien lender was also a

2    movant, it was in the context of the burden of

3    proof on adequate protection.

4           We are not a party, we did not

5    negotiate, we are not a movant.  We presume still

6    the debtor has the obligation to prove we are

7    adequately protected.  In that context, we do

8    have an intercreditor agreement that says the

9    first liens can consent on our behalf to adequate

10   protection.

11          As the first lien agent is aware, we

12   both question whether that is applicable under

13   these circumstances, and also the first lien

14   agent has not yet concluded whether they would

15   seek to enforce it.

16          At the moment I believe we are free to

17   continue to request that the debtor demonstrate

18   that the second liens are adequately protected

19   and we think, self-evidently, the fees are a very

20   important component of that.

21          Thank you, your Honor.

22          THE COURT:  Thank you, Mr. Flaschen.

23          Well, with all that, is there anything

24   left to be done this afternoon or have I

25   sufficiently stirred the pot that we'll get to

1    the 10th with things as resolved as they can be?

2              MR. BASTA:  No, your Honor, thank you

3    for the day.

4              THE COURT:  Thanks very much.  I should

5    look for orders on all this and upload -- you

6    expect to upload them in the next day or so?

7              MR. SINGERMAN:  Yes, sir.

8              MR. GOLDEN:  Yes, your Honor.

9              THE COURT:  Very good.  Thank you.

10             Now, with respect -- I'm still on the

11   record, folks.  With respect to that portion of

12   the examination of Mr. Boken which was conducted

13   regarding the sealed Exhibit 2 to the debtors'

14   exhibits in support of their motion for use of

15   cash collateral, the court reporter should not

16   transcribe that or should?

17             MR. DONOVAN:  Actually, your Honor, if

18   I could suggest ---

19             THE COURT:  Mr. Donovan, thank you.

20             MR. DONOVAN:  What I've done in other

21   situations is if you would provide it, I'm happy

22   to take the lead on this, if you can provide me

23   the version, we can redact it and file an

24   unredacted version that will be on the public

25   records and that is only provided to people that

OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

Case 1:10-cv-10079-CSS   Doc 3726-2   Filed 03/03/15   Page 254 of 271
Case 08-10928-JKO   Doc 7676   Filed 09/26/08   Page 253 of 255

276

1   signed the protective order, so you would have

2   one under seal and one not under seal, would be

3   my suggestion.

4          THE COURT:  Would that work,

5   Mr. Singerman?

6          MR. SINGERMAN:  I believe Mr. Donovan

7   intended to say that we would file the redacted

8   version.

9          MR. DONOVAN:  Oh, yes, I did.  Thank

10  you.

11         THE COURT:  Yes.  Okay.  Then the only

12  copy of this transcript that should be provided

13  to anyone is to Mr. Donovan, who will file a

14  redacted version and make an unredacted version

15  available to the parties who have signed

16  confidentiality agreements, the number of whom is

17  quite limited.  That's for the benefit of the

18  court reporter --

19         MR. DONOVAN:  Thank you.

20         THE COURT:  -- and her financial

21  office.  Okay.

22         MR. DONOVAN:  Thank you.

23         THE COURT:  Very good.  See you on

24  June 10th.  Thanks.

25         (Thereupon, the hearing was concluded.)


    OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875

```
1                    CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6                 I, Margaret Franzen, Shorthand Reporter

7    and  Notary  Public in  and for the State of Florida

8    at  Large,  do  hereby  certify  that  the  foregoing

9    proceedings  were  taken  before  me  at the date and

10   place  as  stated  in  the caption hereto on  Page 1;

11   that the  foregoing  computer-aided transcription  is

12   a true record of my  stenographic notes taken at said

13   proceedings.

14                 WITNESS  my  hand  this  27th  day  of

15   May, 2008.

16

17

18   _____
                 Margaret Franzen
19         Court Reporter and Notary Public
         in and for the State of Florida at Large
20            My Commission Expires:
                April 14, 2010
21

22

23

24

25


     OUELLETTE & MAULDIN COURT REPORTERS (305) 358-8875
```

Case 08-13728-JKO   Doc 7076   Filed 09/26/08   Page 256 of 255

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **CENTAUR, LLC., et al.**[1] | : | |
| Debtors | : | Case No. 10-10799 (KJC) |
| | : | |

# MEMORANDUM[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the "Motion Of The Official Committee of Unsecured Creditors Of

Centaur, *et al.*, Pursuant To 11 U.S.C. §§ 105(a), 1103(c) And 1109(b), For Entry Of An Order

Granting Leave, Standing And Authority To Prosecute And, If Appropriate, Settle Claims On

Behalf Of The Debtors' Estates And For Other Relief" (D.I. 415) (the "Standing Motion").   In

the Standing Motion, the Committee seeks an order authorizing it to prosecute certain claims and

causes of action against the First Lien Lenders and the Second Lien Lenders[3] related to, among

---

[1]The Debtors in these cases are: Centaur, LLC, Centaur Colorado, LLC; Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, LP; HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP; Valley View Downs, LP; Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; and Centaur PA Land, LP. (collectively referred to as the "Debtors").   Centaur PA Land, LP and Valley View Downs, LP filed their chapter 11 petitions on October 28, 2009 (the "2009 Petition Date").  The remaining Debtors filed their chapter 11 petitions on March 6, 2010 (the "2010 Petition Date").

[2]This Court has jurisdiction to decide the motion before it pursuant to 28 U.S.C. § 1334 and §157(a).  This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A) and (O).

[3]The Committee's draft complaint describes the First Lien Lenders as Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), as administrative agent and collateral agent (Credit Suisse, in such capacities, the "First Lien Agent"), and certain lenders from time to time party to the First Lien Revolving Credit and Term Loan Agreement, dated as of October 30, 2007, which was amended and restated pursuant to an Amended and Restated First Lien Revolving Credit and Term Loan Agreement dated as of September 17, 2008 (the "First Lien Credit Agreement") between Centaur, LLC and the other

other things, the validity and enforceability of the liens of the First Lien Lenders and the Second

Lien Lenders in and against the Debtors' assets. The Committee asserts in its Motion, among

other things, that approximately $192 million of assets have been expressly excluded from the

First Lien Lenders' and Second Lien Lenders' collateral, or if subject to such liens, those liens

are unperfected and avoidable. (Standing Motion, p.2 ¶3).[4] The Committee also argues that the

upstream guaranties and liens provided by certain Debtors with respect to the First Lien Credit

Facility were fraudulent transfers that should be avoided for the benefit of the unsecured

creditors.[5]

The Debtors filed a limited response to the Committee's Standing Motion (D.I. 447),

questioning whether the cost of pursuing the Committee's proposed Claims outweighs any

potential benefit to the estate. The Debtors ask that any order granting the Committee standing

also include compressed scheduling to ensure that the litigation is managed quickly and

efficiently. Furthermore, the Debtors argue that the Committee should not be granted sole

authority to settle the Claims against the First Lien Lenders and the Second Lien Lenders,

---

Debtors and the First Lien Lenders regarding the term loan and revolving credit facility, originally in the amount of $590 million and later amended and restated and increased to $610 million (the "First Lien Facility").

The Committee's draft complaint describes the Second Lien Lenders as Wells Fargo Bank, N.A. ("Wells Fargo"), as successor administrative agent and successor collateral agent (Wells Fargo, in such capacities, the "Second Lien Agent") and certain lenders from time to time party to the Second Lien Term Loan Agreement dated October 30, 2007, which was amended and restated on September 17, 2008 pursuant to an Amended and Restated Second Lien Term Loan Agreement (the "Second Lien Term Loan Agreement") between Centaur, LLC and the other Debtors regarding a $180 million term loan credit facility, as later amended and restated (the "Second Lien Facility").

[4] I am unable to determine the source of the $192 million figure.

[5] The claims and causes of action set forth in the Committee's draft complaint, attached as Exhibit A to the Standing Motion (the "Draft Complaint"), which was filed under seal, are referred to herein as the "Claims."

because the Debtors should retain the ability to settle those Claims.

Credit Suisse, as First Lien Agent, filed an objection to the Committee's Standing Motion (D.I. 461), arguing that the Claims are not colorable and there is no proof that the Debtors unjustifiably refused to bring such Claims. The First Lien Agent's main argument against the Standing Motion, however, is that the Committee has failed to demonstrate that the "protracted and costly litigation" is in the best interests of the estate and unsecured creditors, because it is unlikely that the Claims will result in any recovery for unsecured creditors.

On September 7, 2010, the Court held a hearing on the Standing Motion, at which time the parties presented expert testimony regarding the cost/benefit analysis of the Committee's proposed litigation. For the reasons given below, the Standing Motion will be granted, in part, and denied, in part.

BACKGROUND[6]

(a)     Debtor entities

Centaur LLC, an Indiana limited liability company, is a holding company that is the direct or indirect owner of 100% of the equity interests of all of the other Debtors and also certain non-debtor entities. The Debtors can be divided into three groups: the Hoosier Park Debtors, the Fortune Valley Debtor, and the Valley View Downs Debtors.

The Hoosier Park Debtors consist of four Indiana companies that either own or operate or serve as holding companies/general partner for the entities that own or operate both the Hoosier Park race track and casino in Anderson, Indiana (the "Hoosier Park Facility") and three off-track betting facilities in downtown Indianapolis, Fort Wayne, and Merrillville, Indiana (the "OTB

---

[6]The Background is taken from the facts alleged by the Committee in the Draft Complaint.

Facilities"). The assets relating to the Hoosier Park Facility and the OTB Facilities include a racing license that enables Hoosier Park, LP to conduct thoroughbred, harness and quarterhorse racing with pari-mutuel wagering at the OTB Facilities (the "Indiana Racing License") and a gaming license that authorizes Hoosier Park LP to conduct slot machine and electronic table gaming, including video poker, blackjack, and roulette at the Hoosier Park Facility (the "Indiana Gaming License").

The Fortune Valley casino and hotel business in Center City, Colorado (the "Fortune Valley Facility") is owned by debtor Centaur Colorado, LLC, a Delaware limited liabilty company. Its assets include, without limitation, a gaming license which authorizes it to operate slot machines, table games, and bingo at the Fortune Valley Facility (the "Colorado Gaming License").

The Valley View Down Debtors consist of a group of eight companies organized under Delaware or Pennsylvania law, that either own or serve as holding companies/general partners for the entities that own certain assets that the Debtors intended to use to develop, construct, and eventually operate a harness race track and casino business to be located in Lawrence County, Pennsylvania (the "Valley View Downs Project"). Valley View Downs, LP was intended to be the primary operating entity, and its assets consist of:

(i)      an interest in $50 million of Letter of Credit Cash and other subject Letter of Credit Property,

(ii)      a harness racing license that enables Valley View Downs to develop a racetrack and conduct pari-mutel wagering at that facility (the "PA Racing License"), and

(iii)      a "Category 1" gaming license application that, if granted, would enable Valley

4

View Downs to conduct slot machine and electronic table gaming at the proposed Valley View Downs facility (the "PA Gaming Application").[7]

Centaur PA Land, LP is the only other Valley View Downs debtor that has any significant assets (other than equity interests in another Valley View Downs entity) and those assets consist primarily of certain undeveloped real property in Lawrence County, Pennsylvania on which the Debtors intend to construct the Valley View Downs Project.

On October 20, 2010, the Debtors held an auction of Valley View Downs, with any such sale to be completed in connection with a confirmed plan.[8]  At the conclusion of the auction, a Winning Competitive Bidder (as defined in the approved bidding procedures (D.I. 621)) was selected.  The Debtors intend to seek approval of the sale transaction and purchase agreement on December 13, 2010.

(B)      The October 30, 2007 Loan Transactions

To increase liquidity, on or about October 30, 2007, Centaur LLC, as borrower, and the other Debtors entered into the First Lien Credit Agreement, originally in the amount of $590 million and later amended, restated, and increased to $610 million with Credit Suisse and the First Lien Lenders.

All of the Debtors (other than Centaur LLC) have given upstream guaranties in connection with the First Lien Facility.   In connection with the entry of the Final Cash Collateral Order, the Debtors stipulated to joint and several liability to the First Lien Lenders in an amount

---

[7] The Indiana Racing License, the Indiana Gaming License, the Colorado Gaming License and the PA Gaming License will be referred to herein as the "Licenses."

[8] The facts set forth in this paragraph are not taken from the Committee's Draft Complaint, but from the Debtors' notice regarding the Valley View Downs sale transaction (D.I. 826).

of not less than $405,145,293 (as of the 2010 Petition Date).[9]

Also, on or about October 30, 2007, Centaur LLC, as borrower, and the other Debtors entered into the Second Lien Term Loan Agreement, for a $180 million term loan credit facility, as later amended and restated, with Wells Fargo and the Second Lien Lenders.

All of the Debtors (other than Centaur LLC) have given upstream guaranties in connection with the Second Lien Facility. In connection with the entry of the Final Cash Collateral Order, the Debtors stipulated to joint and several liability to the Second Lien Lenders in an amount of not less than $207,190,876.43 (as of the 2010 Petition Date).[10]

(C)    Cage Cash

As part of their normal course of business, Centaur Colorado, LLC and Hoosier Park, LP maintained on each of their racing, gaming, and off-track betting locations property in the form of cash currency (or "money" as defined in Article 9 of the UCC), referred to as the "Cage Cash." Upon information and belief, as of the 2010 Petition Date, Centaur Colorado LLC had approximately $1.6 million in Cage Cash and Hoosier Park, LP had approximately $8.2 million in Cage Cash. The Cage Cash was at that time in the possession and control of the Debtor and was not in the direct or indirect possession of either the First Lien Agent or the Second Lien Agent.

(D)    The Valley View Downs Letter of Credit Matters

On or about October 30, 2007, Credit Suisse in its capacity as the letter of credit issuing

---

[9] The stipulated indebtedness to the First Lien Lenders as of the 2009 Petition Date was $385,362,975.51.

[10] The stipulated indebtedness to the First Lien Lenders as of the 2009 Petition Date was $195,649,936.35.

bank (the "L/C Issuer") extended a letter of credit (the "L/C") for the account of Valley View Downs in the amount of $50 million to the Commonwealth of Pennsylvania in connection with the Pennsylvania gaming application pursuant to a Letter of Credit and Reimbursement Agreement dated as of October 2007 (the "Original L/C Agreement"). Pursuant to the Original L/C Agreement, Valley View Downs agreed to provide cash collateral to the L/C Issuer to secure Valley View Downs' reimbursement obligation, and Valley View Downs did provide to the L/C Issuer cash collateral in the amount of $50 million (the "L/C Cash"). Although the Original L/C Agreement required the L/C Cash to be deposited in a "special cash collateral account," the L/C Cash was placed, instead, into an account owned by Credit Suisse and maintained at Bank of New York (the "Credit Suisse BONY Account") where it was commingled with general Credit Suisse funds.

(E)     The Bankruptcy Cases

Centaur PA Land, LP and Valley View Downs, LP filed their chapter 11 petitions on October 28, 2009. The remaining Debtors filed their chapter 11 petitions on March 6, 2010. On March 17, 2010, the United States Trustee appointed the Committee.[11]

On October 20, 2010, the Court entered an order (D.I. 783) (I) approving the Debtors' Disclosure Statement relating to the Fourth Amended Joint Chapter 11 Plan of Reorganization for Centaur LLC and its Affiliated Debtors; (II) Approving Form of Ballots and Proposed Solicitation, Voting and Tabulation Procedures for the Plan and Plan Confirmation Process; (III) Approving the Solicitation Packages and Prescribing the Form and Manner of Notice and

---

[11]The Committee currently consists of the following four members: (i) Ames Construction, Inc.; (ii) U.S. Foodservice, Inc.; (iii) WMS Gaming Inc. And (iv) PREIT-Rubin, Inc. & PR Valley View Downs, LP.

Distribution Thereof; and (IV) Scheduling a Hearing on Plan Confirmation. The deadline for voting on and objecting to the Fourth Amended Joint Chapter 11 Plan of Reorganization for Centaur LLC and its Affiliated Debtors (D.I. 764) (the "Plan") is December 3, 2010. A hearing to consider confirmation of the Plan is set for December 13, 2010.

(F)     The Committee's Proposed Claims

The Committee prepared the Draft Complaint that contains thirty-two (32) counts. (*See* Ex. A to the Standing Motion.). The Committee agrees that the Claims can be categorized as follows:

(i)     claims that challenge the First Lien Lenders' ability to obtain allocable value from "Excluded Collateral" on which the First Lien Lenders do not possess liens, such as the Licenses and the L/C Cash;

(ii)     claims that challenge the First Lien Lender's perfection in the "cage cash";

(iii)     claims that seek to recharacterize intercompany debt as equity;

(iv)     claims for a declaration that the First Lien Lenders are undersecured and, therefore, cannot include interest, costs, and expenses in their secured claim under Bankruptcy Code §506(b); and

(v)     claims for a declaration that the upstream guaranties and lien from the subsidiaries in favor of the First Lien Lenders should be avoided in whole or in part as fraudulent transfers.

## DISCUSSION

There is no dispute that under *Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003), the Third Circuit has held that bankruptcy courts

8

can confer derivative standing upon creditors' committees to bring actions to recover property for

the benefit of the estate. The Third Circuit expressed its agreement with guidelines established

by the Second and Seventh Circuits that entitlement to derivative standing requires (1) a

colorable claim; (2) that the trustee unjustifiably refused to pursue the claim, and (3) permission

of the bankruptcy court to initiate the action. *In re Yes! Entertainment Corp.*, 316 B.R. 141, 145

(D.Del. 2004).

In deciding whether there is a colorable claim, the court should undertake the same

analysis as when a defendant moves to dismiss a complaint for failure to state a claim.

*America's Hobby Center, Inc. v. Official Comm. of Unsecured Creditors (In re America's Hobby*

*Center, Inc.),* 223 B.R. 275, 282 (Bankr.S.D.N.Y. 1998) citing *Tennessee Valley Steel Corp. v.*

*B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.)*, 183 B.R. 795 (Bankr.E.D.Tenn.

1995). The standard courts apply when considering a motion to dismiss under Fed.R.Civ.P.

12(b)(6) is related to the pleading requirements of Fed.R.Civ.P. 8. *Official Comm. Of Unsecured*

*Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders North America, Inc.),* 405 B.R.

527, 537 (Bankr.D.Del. 2009)(Shannon, J.) citing *Phillips v. County of Allegheny,* 515 F.3d 224,

234 (3d Cir. 2008). In *Fedders*, Judge Shannon enunciated the standard as follows:

> Rule 8(a) of the Federal Rules of Civil Procedure . . . requires only that a complaint
> contain "a short statement of the claim showing that the pleader is entitled to relief."
> Fed.R.Civ.P. 8(a). The statement must provide "the defendant [with] fair notice of what
> the claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47
> (1957). Under Rule 8, a complaint "does not need detailed factual allegations, [but] a
> plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more
> than labels and conclusions, and a formulaic recitation of the elements of a cause of
> action will not do . . ." [*Bell Atl. Corp. v.] Twombly,* 550 U.S. 544, 555 (2007). In other
> words, "Rule 8(a)(2) requires a "showing" rather than a blanket assertion of an
> entitlement to relief . . . [W]ithout some factual allegation in the complaint, a claimant
> cannot satisfy the requirement that he or she provide not only "fair notice" but also the

"grounds" on which the claim rests." *Phillips*, 515 F.3d at 232 (citing *Twombly*, 550 U.S. at 556 n.3).

*Fedders*, 405 B.R. at 537.

Here, the Committee has demonstrated that the Claims are colorable; however, whether the Committee should be allowed to prosecute the Claims turns on the outcome of a cost/benefit analysis. *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 548 (W.D.Pa. 2005) ("In determining whether a [d]ebtor's refusal is unjustified, courts generally perform a cost-benefit analysis of the claims to determine whether the creditors' claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued.").[12]

The Committee has estimated that it will cost between $2.5 and $5 million to litigate its claims. (Tr. 75:16 - 75:23). The Debtors and First Lien Lenders argue that the estimated cost to the Debtors' estate should also include the Debtors' and First Lien Lenders' costs to defend the claim, totaling another $2.5 to $5 million. (Tr. 75:24-76:11).

At the September 7, 2010 hearing, the Committee presented expert witness testimony of Daniel Polsky to quantify the potential recovery for unsecured creditors that could result from pursuing the Committee's Claims. If the Committee was successful on all of its Claims, the expert testified that the unsecured creditors could share in a distribution of over $85 million. (*See* Comm. Ex. 2, p. 1). The Committee further contends that any recovery may be up to $14 million higher, based on Mr. Polsky's use of "conservative" numbers. (Tr. 50:20-51:9; 72:21-

---

[12]The debtor's "unjustified" failure to bring the suit does not require an improper motive. "Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate. *Adelphia Commc'n Corp. v. Bank of America, N.A. (In re Adelphia Commc'n Corp.)*, 330 B.R. 364, 374 n.19 (Bankr.S.D.N.Y. 2005)(citations omitted).

73:7).

The Debtors and the First Lien Agent argue that the Committee's proposed recoveries are illusory because, under Mr. Polsky's analysis, the lion's share of any recovery would be paid to the Second Lien Lenders and, pursuant to the Pay Over Provision of the Intercreditor Agreement, the Second Lien Lenders would be required to turn over any value received to the First Lien Lenders.[13]   The Second Lien Lenders argue that the Pay Over Provision is limited to "Shared Collateral" and, therefore, the Intercreditor Agreement would not extend to any recovery from Excluded Collateral or other assets not subject to the First Lien Lenders' liens.

To further rebut the Committee's benefit analysis, the Debtors presented expert testimony of Steven Zelin.  He testified that the Committee's fraudulent transfer claims are based upon a faulty marshaling assumption. (Tr. 131:21 - 132:20).  The Debtors and the First Lien Agent also argue that the Committee's fraudulent transfer analysis does not consider whether the guarantor subsidiaries received any indirect benefits, such as access to funds for the construction of the Valley View Downs Project.  (Tr. 102:23 - 104:7).  The Committee's own exhibit shows that if the fraudulent transfer claims are not successful, the potential recovery would be reduced to $66 million, with $59.2 million being distributed to the Second Lien Lenders.  (See Comm. Ex. 2, p.1).  Under this scenario, the recovery for unsecured creditors (other than the Second Lien Lenders) is approximately $6.55 million, which is not much more than the Committee's estimated costs.

---

[13]The Intercreditor Agreement, dated October 30, 2007, was entered into by and among Centaur LLC, Credit Suisse (in its capacity as collateral agent for the First Lien Lenders) and Credit Suisse (in its capacity as collateral agent for the Second Lien Lenders) and was attached as part of Exhibit B to the Standing Motion, which was filed under seal.  The Pay Over Provision is Section 4.2 of the Intercreditor Agreement.

Mr. Zelin also testified that the potential recovery for unsecured creditors is further dissipated when other factors are considered, such as the Debtors' planned objection to the claim of PREIT[14] or settlement with other disputed unsecured creditors. (Tr. 140:2 - 144:2). Mr. Zelin also criticized the Committee's recovery analysis, which did not include any independent valuation of the Licenses but, instead, relied on information provided to the Committee that was "mislabeled." (Tr. 133:11 - 133:19). The Committee mistakenly relied upon documents which should have identified that value as belonging to all "general intangibles," not just the Licenses. The Committee replies that the disclosure statement dated May 7, 2010, as revised on July 22, 2010, lists the Licenses as having significant value. (Tr. 119:8 - 120:7; 191:19-193:6; Comm. Ex. 4).[15]

The Debtors' expert adjusted several of the assumptions in the Committee's cost/benefit analysis and then, based on his adjustments, compared the potential unsecured creditors' recovery under the litigation against the proposed unsecured creditors' recovery under the Debtors' Plan. (*See* Debtors' Ex. 3, p. 26; Tr. 161:7 - 163:25). In most of his scenarios, the individual unsecured creditors, except for the Second Lien Lenders and PREIT, would recover more under the Debtors' proposed Plan than the Committee's proposed litigation. (*Id.*).

Not surprisingly, Mr. Zelin's testimony demonstrated that tweaking the underlying assumptions of the Committee's expert could significantly alter the potential unsecured creditor

---

[14]PREIT is the Pennsylvania Real Estate Investment Trust and is an unsecured creditor of Valley View Downs. PREIT filed a proof of claim in the amount of $61 million, but the Debtors' scheduled PREIT's claim $29,977,000. (Tr. 54:18-54:23). The Debtors have argued that PREIT's claim should be recharacterized as equity. (Tr. 140:12-140:16).

[15]In the disclosure statement for the Restated Second Amended Plan, filed July 27, 2010, the Debtors wrote down the value of the Licenses to zero. (Comm. Ex. 4).

recoveries. However, the adjustments made by Mr. Zelin are contrary to the documents provided

by the Debtors to the Committee, such as the value for the Licenses (*see* Comm. Ex. 5) and the

Flow of Funds Memorandum (*see* Comm. Ex. 6).[16]  The *Nat'l Forge* Court wrote that legal

challenges to a complaint are more appropriately decided by way of a Rule 56 Motion, and

factual disputes are more appropriately resolved after a record is fully developed. *Nat'l Forge*,

326 B.R. at 548.  The *Adelphia* Court decided that it should not hold a *de facto* mini-trial on the

merits to determine whether claims have a "probability of success." *Adelphia*, 330 B.R. at 375-

76.  Still, the *Adelphia* Court noted, that "at least some consideration of the possibilities of

success" should be considered before granting or denying a standing motion.  *Adelphia*, 330 B.R.

at 375-76.

    As a result, while I conclude that the Committee's proposed claims are plausible, the

respective experts' views are so fundamentally at odds that I am left, on this record, without an

adequate basis for quantifying, with any reasonable certainty (even within a range), potential

benefit to the estate from prosecution of the Claims.  Under these circumstances, and

understanding there may indeed be some benefit to the estate if some or all of the claims are

prosecuted successfully, and to achieve the appropriate balance between allowing pursuit of

colorable Claims and ensuring benefit to the estate, I will grant the Committee's request for

standing to prosecute the Claims, but will limit recovery of the Committee's professional fees

incurred in pursuing the Claims to any cash proceeds or other quantifiable value received by the

---

[16]The Flow of Funds Memorandum, dated October 30, 2007, sets forth information regarding the sources and order of payments to be made in connection with the loan transactions which occurred on that date pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement.

estate as a result of the litigation.[17]  "Value" would not include any recovery that is paid to the

Second Lien Lenders, only to be turned over to the First Lien Lenders under the Intercreditor

Agreement, since such a recovery would not confer any value to the estate.  On the other hand,

"value" is not limited to cash proceeds, since the estate may benefit from a lien avoidance or

recharacterization of intercompany debt.

The Committee's Standing Motion also seeks authority to settle its Claims on behalf of

the Debtors' estates. While granting the Committee standing includes authority to settle the

Claims, subject to Court approval, that authority is not exclusive.  A grant of derivative standing

does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue to have

the right, subject to Court approval, to settle the Claims.  *Official Comm. of Equity Security*

*Holders v. Adelphia Commc'n Corp. (In re Adelphia Connc'n Corp.),* 371 B.R. 660, 670-71

(S.D.N.Y.  2007), *In re Exide Tech.,* 303 B.R. 48, 66 (Bankr.D.Del. 2003).


### CONCLUSION

The Committee's Standing Motion will be granted, in part, to authorize the Committee to

prosecute the Claims, although payment of the Committee's professionals in connection with

prosecuting the Claims is limited to any cash proceeds or other quantifiable value to the estate

which results from the litigation.  The Committee's Standing Motion is denied, in part, to the

extent it seeks exclusive authority to settle the Claims.

---

[17]The professional fees for pursuing the Claims does not include those professional fees already
incurred during the Committee's investigation of the Claims or in bringing the Standing Motion.

An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: November 5, 2010