## Exhibit C

**Transcripts from *Majestic Capital*, *Evergreen Solar*, and *Old CarCo*[1]**

---

[1] The full transcripts for each of *Majestic Capital*, *Evergreen Solar*, and *Old CarCo* are attached as **Exhibit B**. For ease of reference, the portions of the transcripts relevant to the arguments set forth in this Objection have been highlighted.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------

In Re:                          |
                                |         Case No. 11-36225
       MAJESTIC CAPITAL, LTD.,  |         Chapter 11
                                |         Poughkeepsie, NY
                      Debtor.   |         December 8, 2011
                                |
--------------------------------------

HEARING
MOTION FOR RELIEF FROM STAY
OPPOSITION TO MOTION
MOTION FOR ENTRY OF AN ORDER
FEE APPLICATIONS
BEFORE HON. CECELIA G. MORRIS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

    FOR TRUSTEE:  ERIC J. SMALL, ESQ.
                  Office of United States Trustee
                  74 Chapel Street – Suite 200
                  Albany, New York 12207


                  STEVEN C. REINGOLD, ESQ.
                  *(Creditor Committee of Unsecured Creditors)*
                  Jager Smith, PC
                  485 Madison Avenue – 20th Floor
                  New York, New York 10022


                  DENNIS J. DREBSKY, ESQ.
                  *(Contractors Access Program of California – Conservator)*
                  Nixon Peabody, LLP
                  437 Madison Avenue – 18th Floor
                  New York, New York 10022


    FOR DEBTOR:   THOMAS GENOVA, ESQ.
                  *(Attorneys for Debtor)*
                  Genova & Malin, Esqs.
                  Hampton Business Center
                  1136 Route 9
                  Wappingers Falls, New York 12590


                  HAROLD B. MURPHY, ESQ.
                  *(Attorneys for Debtor)*
                  Murphy & King, Esqs.
                  One Beacon Street
                  Boston, Massachusetts 02108

JOSEPH A. MURPHY, ESQ.
*(Attorneys for former members of Healthcare Industry*
*Trust of New York)*
Hiscock & Barclay, LLP
80 State Street
Albany, New York 12207

CHARLES CASE, ESQ.
*(NYS Workers' Compensation Board –*
*Daniel E. Sarzynski, Esq.)*
Rupp, Baase, Pfalzgraf,
Cunningham & Coppola, LLC
1600 Liberty Building
Buffalo, New York 14202

*Proceedings electronically recorded.*
*Transcript produced by:*

*American Legal Transcription*
*11 Market Street - Suite 215 - Poughkeepsie, NY 12601*
*Tel. (845) 452-3090 - Fax: (845) 452-6099*
amlegaltrans@aol.com

1

2              THE COURT:  This is Majestic Capital, LTD., case

3    eleven, 36225.

4              State your name and affiliation?

5              MR. GENOVA:  Thomas Genova, local counsel for the

6    Chapter 11 Debtor.

7              MR. HAROLD MURPHY:  Harry Murphy,  Murphy & King,

8    on behalf of the debtors.

9              MR. REINGOLD:  Good morning, Your Honor, Steven

10   Reingold, Jager Smith, for the committee.

11             MR. SMALL:  Eric Small for the US Trustee.

12             THE COURT:  Anyone else wish to be on the record?

13             Yes, sir?

14             MR. DREBSKY:  Yes.  Dennis Drebsky.

15             THE COURT:  You're going to have to come to a

16   microphone.  Thank you.

17             MR. DREBSKY:  I'm sorry, ma'am.

18             THE COURT:  That's fine.

19             MR. DREBSKY:  Dennis Drebsky, from Nixon Peabody,

20   on behalf of Contractors Access Program of California through

21   the conservator.

22             THE COURT:  Okay.  Anyone else that's going to be

23   heard?

24             MR. JOSEPH MURPHY:  Your Honor?

25             THE COURT:  Yes, sir?

1                   MR. JOSEPH MURPHY:  Joseph Murphy, Hiscock &

2    Barclay, on behalf of the former members of the Healthcare

3    Industry Trust of New York.

4                   THE COURT:  You can just take a seat up here.

5                   MR. CASE:  Good morning, Your Honor.  Charles Case

6    on behalf of the New York State Workers' Compensation Board.

7                   THE COURT:  Thank you.  Anyone else wish to be on

8    the record?

9                   Okay.  Give me an update, Mr. Murphy?

10                  MR. HAROLD MURPHY:  Your Honor, with respect to

11   today's motions, or generally?

12                  THE COURT:  Whatever?  I'd sort of like to know a

13   little bit, generally, of any progress we've made, but today's

14   motions are fine too.

15                  MR. HAROLD MURPHY:  Yes.  Well, let's just speak

16   generally, Your Honor.  We did file the plan and disclosure

17   statement.

18                  THE COURT:  Right.

19                  MR. HAROLD MURPHY:  The court has scheduled a

20   hearing on the disclosure statement in January.  We, again,

21   working with the committee, there's a standing motion that's

22   on for today, the committee has, and their financial advisor,

23   has requested a number of documents and information and we're

24   working cooperatively with them.  In the courtroom today, Your

25   Honor, there's two counsel from the company.  We have five

1    employees.  We have 40 percent of the workforce here.

2              THE COURT:  Who are sitting here today?

3              MR. HAROLD MURPHY:  In the courtroom today.

4              THE COURT:  Okay.

5              MR. HAROLD MURPHY:  Ms. Pozini (phonetical), who's

6    our resident computer expert, has filed an affidavit last

7    night.

8              THE COURT:  Oh, good.  Okay.

9              MR. HAROLD MURPHY:  And I'll have to defer to her

10   on some of these issues, Your Honor --

11             THE COURT:  Certainly.

12             MR. HAROLD MURPHY:  -- if we get into that because

13   I'm not fast with that.  But we are moving --

14             THE COURT:  I'm glad you brought her because I was

15   going to have to defer to someone on it.  Even though I'm

16   pretty knowledgeable, but still.

17             MR. HAROLD MURPHY:  I understand that, Your Honor.

18   I understand that you were involved in the ECF system here?

19             THE COURT:  That's true.  Well, and nationally,

20   yes.

21             MR. HAROLD MURPHY:  Yes.  Well, you're ahead of me,

22   Your Honor, so Ms. Pozini's going to educate us.

23             THE COURT:  But I can't make Word work.  I'm a

24   WordPerfect person, but I -- for these -- for these two young

25   ladies, I made a goal to make Word work and I can't make it

1 │ work, but we're working on it.  Okay.  Good.

2 │         MR. HAROLD MURPHY:  So we are trying to move the

3 │ case, Your Honor, in the short of it.

4 │         THE COURT:  Right.

5 │         MR. HAROLD MURPHY:  And there is a lot going on

6 │ internally.  There's one motion -- there's two motions I think

7 │ that are on --

8 │         THE COURT:  Okay.

9 │         MR. HAROLD MURPHY:  -- other than the fee

10 │ applications, which I understand there are no objections.  So

11 │ whatever order you want to proceed, Your Honor?

12 │         THE COURT:  Well, then let's just go for the fee

13 │ applications first of Jager Smith and JH Cohn, LLP?

14 │         MR. REINGOLD:  Good morning, Your Honor.  Again,

15 │ Steven Reingold, Jager Smith, for the Committee.  And with me

16 │ in the courtroom is Howard Konicov, from JH Cohn.

17 │         THE COURT:  Okay.

18 │         MR. REINGOLD:  Okay.  He's a financial advisor.

19 │ Mr. Konicov is here in case the court has any questions about

20 │ that firm's application.

21 │         THE COURT:  And you're asking for fees in the

22 │ amount of $268,686.00, and expenses in the amount of

23 │ $10,877.57?

24 │         MR. REINGOLD:  For Jager Smith, yes, we're

25 │ requesting approval of those amounts, but payment of the fees

1  only 80 percent.

2          THE COURT:  Okay.  With a 20 percent hold back?

3          MR. REINGOLD:  Yes, Your Honor.

4          THE COURT:  And then for the financial advisors,

5  $85,835.70, and expenses in the amount of $1,469.48, with an

6  80 percent payout and a 20 percent hold back, is that correct?

7          MR. REINGOLD:  Yes, Your Honor.

8          THE COURT:  And that's on an interim basis?

9          MR. REINGOLD:  Yes, Your Honor.

10          THE COURT:  Mr. Small, do you have any objections

11  to the amount of fees and expenses requested, but the hold

12  back?

13          MR. SMALL:  No, Your Honor.  As set forth in the

14  statement we filed with the Bankruptcy Court, under those

15  conditions, the US Trustee has no objection to the fees.

16          THE COURT:  And the expenses will be paid in full,

17  the hold back is simply on the fees, is that correct?

18          MR. SMALL:  Correct.

19          THE COURT:  Very good, submit an order.

20          MR. REINGOLD:  Thank you, Your Honor.

21          THE COURT:  Very good.  Now, then you're up, you've

22  got the committee's motion to prosecute claims for the benefit

23  of the state and file it under seal.

24          Let me just say one thing.  Since no motion has

25  been -- since an un-redacted copy has not be given to

1    chambers, we don't have an un-redacted copy.

2            MR. REINGOLD:  It was sent with the package of the

3    filed copies at the same time.  I did it myself, Your Honor.

4            When we send under local rules, the package, the

5    clerk's office, one for chambers, one for the US T, in that

6    envelope was a copy of un-redacted, with a notation on the

7    first page, that it was un-redacted, filed under seal, not to

8    be docketed.  It was in the exact same package.  That having

9    been said, I do have a copy here for the court.  But an un-

10   redacted copy was submitted to chambers with the local rule

11   package.

12           THE COURT:  Okay.  We looked at the redacted copy.

13           MR. REINGOLD:  Which was docketed, Your Honor.

14           THE COURT:  Uh-huh.

15           MR. REINGOLD:  Yes.

16           THE COURT:  And which we looked at, but we didn't

17   -- none of us remember seeing it.  But we also -- okay.

18           MR. REINGOLD:  Well, if Your Honor would like, I

19   can't hand up --

20           THE COURT:  No.  No.  That's not necessary.

21           MR. REINGOLD:  Okay.

22           THE COURT:  And I think I -- we would have

23   remembered if there was a note on it.  Was it a yellow sticky?

24   What did you put?

25           MR. REINGOLD:  No, Your Honor.  There was an eight-

1  and-a-half-by-eleven sheet stapled to the front, in big bold

2  letters, large font, saying, Un-redacted Version, Do not

3  Docket, Filed Under Seal.

4           THE COURT:  Maybe the -- maybe it got waylaid in

5  the clerk's office, but I think we would have remembered it if

6  we had gotten it.

7           MR. REINGOLD:  I imagine you would, Your Honor.

8           THE COURT:  Okay.  You need -- if you all don't

9  mind, we need to find it and make sure it's not floating

10  around somewhere, because that wouldn't be good.

11           Okay.  All right.  So, well, given that, just so

12  you know, I have little information because we only saw the

13  un-redacted copy.  I mean, it may be there, I'm not -- I

14  don't...

15           MR. REINGOLD:  Well, I can paint for the court sort

16  of in broad bar strokes what the un-redacted copy says?

17           THE COURT:  Well, I think I've sort of got that.  I

18  don't think that it was necessary for me to have everything to

19  know exactly what's going on.

20           MR. REINGOLD:  Okay.

21           THE COURT:  Who else wishes to be heard on this?

22           Yes, sir?  Come forward.

23           MR. CASE:  Good morning, Your Honor.  Charles Case,

24  again, from Rupp, Baase, Pfalzgraf, Cunningham & Coppola, on

25  behalf of the New York State Workers' Compensation Board.

1        THE COURT:  Okay.  Let me ask you a question just

2    for my edification.  You do understand in bankruptcy that

3    often the committee stands in the position of the debtor?

4        MR. CASE:  Yes, I do.

5        THE COURT:  And that the information they're asking

6    for basically -- or what they're asking for is because they

7    stand in the shoes, because the debtor isn't making these

8    lawsuits, the committee is.  Okay.

9        MR. CASE:  Correct.  I understand that.

10       THE COURT:  All right.  So if you understand then,

11   then let me hear your argument?

12       MR. CASE:  All right.  Briefly, if I can refer to

13   the committee's reply, I'll start there.

14       THE COURT:  Okay.

15       MR. CASE:  What we're not trying to do is an end

16   around the stay.  From the board's perspective, this is not

17   about --

18       THE COURT:  No.  But what you're trying to do is

19   find out about third-party information that they are also

20   suing.  Right?

21       MR. CASE:  Yes.  Yeah, we are.  We are the largest

22   unsecured creditor.

23       THE COURT:  Why don't you give me a legal reason

24   why you're entitled to this information?

25       MR. CASE:  Well, we're the largest unsecured

1    creditor.  We -- they have a fiduciary duty to us.  Not -- not

2    -- well, to the class as a hole, a fiduciary duty.

3                THE COURT:  Not for this information.  Give me a

4    legal -- give me a legal reason for this information?

5                MR. CASE:  I would say -- I would say this --

6                THE COURT:  Okay.

7                MR. CASE:  -- you have a situation I think in this

8    case that you don't have in many other cases --

9                THE COURT:  Okay.  Let me interrupt you before you

10   start there?

11               MR. CASE:  Okay.

12               THE COURT:  Because I just had a thought, when you

13   said that, they have a fiduciary duty.  They do have a

14   fiduciary duty to you, as an unsecured, but not to give you

15   the information but to prosecute whatever they can on their

16   behalf to -- on your behalf in order to get it into the

17   estate, so you have a recovery within the estate.

18               MR. CASE:  Right.

19               THE COURT:  Now, do you understand that?

20               MR. CASE:  I understand that.  But -- and that

21   feeds directly into the point I was actually about to make.

22               THE COURT:  Oh, okay.  Let's hear what you have to

23   say?

24               MR. CASE:  You have in this situation -- you have

25   in this case, a situation that I don't know if you have in

1   every case.  I don't believe that you do.  Often --

2              THE COURT:  No.  This is pretty unique.

3              MR. CASE:  Often there are -- there's tension

4   between unsecured creditors.  It's just natural.  It's a zero

5   sum game.  We're all after the same thing.

6              THE COURT:  That's true.

7              MR. CASE:  Well, but the board's position in this

8   is the board isn't just a creditor of the debtors.  The board

9   is also a creditor of a lot of the unsecured creditors here

10  because under New York law, the employer members of these

11  group self-insured trusts are jointly and severally liable for

12  deficits.

13             THE COURT:  And we have a scheme of priorities

14  within the bankruptcy.

15             MR. CASE:  Right.  Right.  But with respect to --

16             THE COURT:  So are you trying to -- you seem to me

17  to be trying to elevate your priority --

18             MR. CASE:  I'm not trying to elevate priority.

19             THE COURT:  -- within state court.  Yeah.

20             MR. CASE:  I'm not trying to do that to --

21             THE COURT:  All right.

22             MR. CASE:  -- no.

23             THE COURT:  I'm trying to listen?

24             MR. CASE:  -- that's not -- no, that's not my

25  purpose.

1                    THE COURT:  Okay.

2                    MR. CASE:  I simply want to point out that the

3     creditor's committee, largely comprised of individuals who are

4     going to object to the merits and to sufficiency of also the

5     board's claims at some point in time, are going to put

6     themselves in a position where they're going to obtain

7     discovery and access to a lot of information that at some

8     point in time they could use against the board to challenge

9     the merits and the sufficiency of the board's claims and

10    they're going to have every incentive to do so because those

11    members are these group self-insured trusts are jointly and

12    severally liable for the deficits.

13                    THE COURT:  So what you're saying to me is, you're

14    not saying you're really entitled to it, that's not what I'm

15    hearing, what you're saying is you think that the individual

16    members of this committee will abuse their information?

17                    MR. CASE:  I'm not saying that they will, but --

18                    THE COURT:  That's what you just said.

19                    MR. CASE:  But I believe that there's -- I believe

20    it's possible.  I'm not accusing anybody.  I'm not trying to

21    throw anyone's motives under the bus --

22                    THE COURT:  That's pretty speculative, but we have

23    counsel here that if that happened I think we have an ethical

24    obligation.

25                    MR. CASE:  What -- we would like some assurance.

1    We'd like to access the information that at some point in time

2    maybe uncovered that might be used against us.

3                    THE COURT:  Well, the committee has the same

4    fiduciary duties as the debtor under these circumstances, so

5    there's a fiduciary duty here and you're speculating that they

6    would abuse their fiduciary responsibilities.

7                    MR. CASE:  I'm speculating that the interests

8    aren't -- well, I'm stating that the interest aren't

9    necessarily entirely aligned.

10                   THE COURT:  Well, that's always true.  That's

11   bankruptcy.

12                   MR. CASE:  Sure.

13                   THE COURT:  Welcome to this world.

14                   MR. CASE:  No.  I understand that.  I understand

15   that.  But I don't know if you always have a situation where

16   so many of the unsecured creditor's claims are derivative of

17   another creditor's claims, therefore, to the extent they don't

18   get paid out of the estate, our client is going to go and look

19   to them for payment.

20                   THE COURT:  Go with God.  You know, I...  Okay.

21   I'm still looking for a legal -- give me something legal here?

22   A wing and a prayer and speculative isn't going to help me.

23                   MR. CASE:  Well, Your Honor, I would state that my

24   legal basis would be that their fiduciary duty to us.  And I

25   got -- I understand that it's speculative, but that is part

```
 1    of, you know --

 2              THE COURT:  Well, what you speculated is basically

 3    more than speculation, it's unethical and a whole bunch of

 4    other -- I mean, if it happens, there's a lot in it, so...

 5              MR. CASE:  Well, I don't want it to happen.

 6              THE COURT:  Well, we'll --

 7              MR. CASE:  Obviously.

 8              THE COURT:  Okay.

 9              MR. CASE:  And I'm not wishing for it to happen,

10    but I'm certainly --

11              THE COURT:  And you're representing the Workmen's

12    Comp. Board?

13              MR. CASE:  That's right.

14              THE COURT:  Let's hear from you?

15              MR. REINGOLD:  I will take, on face value, Your

16    Honor, counsel's statement that he's not accusing me or my

17    colleagues of any unethical behavior at this point in time.

18    That having been said, there is a fiduciary duty --

19              THE COURT:  State your name for the record?

20              State your name for the record?

21              MR. REINGOLD:  I'm sorry, Your Honor.  Steven

22    Reingold, Jager Smith, for the committee, again.

23              The committee and its members and its professionals

24    do, indeed, have a fiduciary duty to unsecured creditors as a

25    whole, however, that fiduciary duty does not require the
```

```
 1    committee to disclose to all unsecured creditors every bit of

 2    information it learns.  1102(b)(3)(a), in Revco's

 3    interpretation, are very clear on that, so counsel should not

 4    cast aspersions on the committee's motives in withholding from

 5    individual creditors information the committee may receive

 6    from the debtors.

 7                THE COURT:  I don't want to put words in your

 8    mouth, but aren't you working for this estate right now --

 9                MR. REINGOLD:  Absolutely.

10                THE COURT:  -- in order to get as much as you can

11    for the estate?

12                MR. REINGOLD:  For the estate for the benefit for

13    all unsecured creditors.

14                THE COURT:  -- and all unsecured creditors?

15                MR. REINGOLD:  Yes.

16                THE COURT:  -- that will receive it in a priority

17    scheme?

18                MR. REINGOLD:  Yes.  And to undertake that effort

19    it is essential that the committee be able to obtain from the

20    debtors information that has been provided either under a

21    confidentiality agreement or that will be provided should the

22    court grant this motion under a protocol that will preserve

23    the debtor's privileges so that information can be shared

24    without the debtors having to conduct a very complicated

25    privilege review before turning over additional information to
```

1    the committee, so too the committee can share with debtor the

2    analysis reached as a result of the committee investigation,

3    because if the board has its way, I could be forced to turn

4    over my work product and my documents that I've shared with

5    the debtors in respect of the committee investigation and

6    clearly that's not what's contemplated as part of the

7    committee's role in representing all of the unsecured

8    creditors.

9               With respect to the board's concern that the

10   committee's going to hide the ball and documents that could be

11   used against the board in its claim, a prosecution if its

12   claim, there's a simple answer to that, Your Honor.  Under the

13   plan as proposed the claim objection process will be handled

14   by the liquidating trustee, who will be the successor to the

15   debtors as estate fiduciary, the committee will have then

16   disbanded under the plan.  So, if and when the liquidating

17   trustee asserts a claim -- an objection, excuse me, to the

18   board's claim and has documentation that the liquidating

19   trustee, himself, now owns as successor to the debtor, then

20   that's the appropriate time for the board to come forward and

21   say, show me the documents you have that you're using to

22   object to my claim.  And if the liquidating trustee were to

23   say no, then the board's argument is right.  But the

24   speculation is not a reason to deny the request.

25               THE COURT:  Well, and if it's against some of the

 1    individual people that serve on the creditors committee, not

 2    because of their lack of fiduciary diligence, but because of

 3    another reason.

 4              MR. REINGOLD:  The members of this committee -- two

 5    answers to that, Your Honor, first is, once the plain is

 6    confirmed and the liquidating trustee is appointed, the

 7    committee is disbanded.  There will be a trust advisory board,

 8    but that board does not direct the trustee, it just has a role

 9    in the background.  But more importantly, the members of this

10    committee, the court may recall, none of them are novices to

11    committee work.  We have two financial institutions,

12    Wilmington Trust and Bank of New York Mellon, and then we have

13    the landlord of the Poughkeepsie office, all three of their

14    representatives have been on committees before.  All three

15    have their own independent counsel who advise them in respect

16    to their fiduciary obligations as committee members, not as

17    individual creditors.  We have a very sophisticated committee

18    here.  They understand the boundaries under which they're

19    operating.

20              THE COURT:  Mr. Case, do you have any rebuttal?

21              MR. CASE:  Charles Case, from Rupp, Baase,

22    Pfalzgraf, Cunningham & Coppola, for the board.

23              Yeah.  I would briefly say, with respect to the

24    makeup of the committee, the one thing the committee doesn't

25    have is the Workers' Compensation Board and its expertise in

1    the administration of group self-insured trusts, the payment

2    of Workers' Compensation claims, the classification of claims,

3    the intricate laws and rules that -- and regulations that the

4    board helps draft regarding the administration of these

5    claims.

6              THE COURT:  We aren't administering.

7              MR. CASE:  Understood.

8              THE COURT:  We're here to administer a bankruptcy

9    estate.

10             MR. CASE:  Understood.  But they're going to engage

11   on -- they're going to engage in a process -- they're going to

12   investigate officers and directors.

13             THE COURT:  They're going to try to get as much

14   money --

15             MR. CASE:  Right.

16             THE COURT:  -- as they can for your constituents.

17             MR. CASE:  Right.  They are.  But without any

18   lights turned on the process from the standpoint of the

19   Workers' Compensation Board, who, I think, unquestionably, is

20   in the best -- the best position to evaluate information, help

21   craft claims.

22             THE COURT:  Not my job.  I don't get to appoint a

23   creditors committee.

24             MR. CASE:  Understood, Your Honor.

25             THE COURT:  No reason.  There's no reason.

 1              MR. REINGOLD:  (Indiscernible), in any event, Your

 2    Honor.

 3              THE COURT:  There's no reason.

 4              MR. REINGOLD:  Okay.

 5              THE COURT:  There are a lot of people that want on

 6    the creditors committee, they don't necessarily get on, but

 7    that's not my job.

 8              MR. CASE:  Understood.

 9              THE COURT:  Okay.  Anything else?

10              MR. CASE:  I would simply refer back to our

11    objection, Your Honor, that we do believe that their motion

12    was very broad.  And one of the bases of our concern and our

13    objection was what we foresaw as the ambiguity.  Most of their

14    motion was incredibly detailed and then we get to the section

15    with respect to the confidentiality agreement and it's

16    incredibly vague and incredibly short.  That's why I'm

17    speculating on exactly what we're looking at in terms of what

18    their motivations are and where they're going.  Their reply to

19    that might be, well, practically speaking, how do you want us

20    to detail a privilege or confidentiality --

21              THE COURT:  No, it's called fishing expedition and

22    you sort of get one in bankruptcy.

23              MR. CASE:  Yes.

24              THE COURT:  Okay.  I'm going to overrule your

25    objection.

 1              MR. JOSEPH MURPHY:  (Inaudible).

 2              THE COURT:  Yes, sir?  Yes, you may.

 3              MR. JOSEPH MURPHY:  May I be heard?

 4              THE COURT:  Sure.  Come to the microphone.  I

 5    didn't realize someone else wanted to be heard.  I apologize.

 6              MR. JOSEPH MURPHY:  Thank you, Your Honor.  Joseph

 7    Murphy, Hiscock & Barclay, on behalf of members of the

 8    Healthcare Industry Trust of New York.

 9              Your Honor, we share the board's concern about the

10    committee's motion.

11              THE COURT:  And you didn't file opposition?

12              MR. JOSEPH MURPHY:  We did not.

13              THE COURT:  Okay.

14              MR. JOSEPH MURPHY:  Your Honor, one concern is the

15    scope of relief requested in the committee's motion I think is

16    unclear, in that, one respect they -- the motion speaks in

17    terms of preserving privileges, then it also seeks

18    confidentiality designation for essentially all documents and

19    information exchanged between the debtors and the committee.

20    And our understanding is that that would go beyond mere

21    preservation of preexisting privileges.

22              THE COURT:  But did you hear what I said to Mr.

23    Case?  They are now standing in the shoes of the debtor, they

24    need to get it to get the information that they can to pursue

25    whatever they can for the entire estate, including, I would

1  assume, your client.

2            MR. JOSEPH MURPHY:  Understood, Your Honor.

3            THE COURT:  Okay.  All right.

4            MR. JOSEPH MURPHY:  We understand what their goal

5  is, they want information, and we understand what their job

6  is.

7            THE COURT:  And you understand how they need to get

8  that?

9            MR. JOSEPH MURPHY:  Well, surely, we do, Your

10 Honor.

11           THE COURT:  Okay.

12           MR. JOSEPH MURPHY:  But there are --

13 notwithstanding the committee's role, there are all these

14 others parties who --

15           THE COURT:  Who are represented by the committee in

16 this bankruptcy action.

17           MR. JOSEPH MURPHY:  Representing the committee, but

18 also represented by us.

19           THE COURT:  Understand.

20           MR. JOSEPH MURPHY:  And we do intend to seek many

21 -- we do intend to seek discovery from the debtors and I

22 understand that --

23           THE COURT:  And we'll let you do that.

24           MR. JOSEPH MURPHY:  Well, that's one reason why we

25 wanted it here today, Your Honor.

```
1              THE COURT:  I'm not -- I'm not going to rule on

2    that today.  You're going to bring that to me in such a way

3    that I can rule on it.  I'm sure you'll be filing some kind of

4    documentation.  Anything else?  And give me a legal reason?

5              MR. JOSEPH MURPHY:  Well, that's one thing, Your

6    Honor, we wanted to be clear about the scope of the requested

7    relief.  We didn't want to -- we didn't want --

8              THE COURT:  I'm not going to be clear about the

9    scope of the requested relief.  I -- they're going to try to

10   stand in the shoes of the debtor, from what I understand from

11   the motion, I want them standing in the shoes of the debtor,

12   and the way they do that is to get a confidentiality agreement

13   and if that means getting it under seal and getting it so that

14   they can proceed, I'm letting them.

15             MR. JOSEPH MURPHY:  Your Honor, another point is

16   that the -- in the reply the committee stated that the board's

17   opposition is an end run around your denial of the motions to

18   lift stay, and that, Your Honor --

19             THE COURT:  I think I just ruled, so you don't need

20   to argue with me anymore.  I did say give me a legal reason,

21   didn't I?

22             MR. JOSEPH MURPHY:  I just wanted to say for the

23   record, Your Honor, that --

24             THE COURT:  Yeah.  Go right ahead.  Please.

25             MR. JOSEPH MURPHY:  -- we are entitled to proceed
```

1   against non-debtors and -- outside of this -- and I wanted to

2   put on the record our objection to the committee's assertion

3   that the stay precludes us from proceeding against non-debtor

4   defendants, and that is one reason why we -- we'll be seeking

5   information.

6           THE COURT:  I'm not making a ruling on that, but I

7   would not think that they would do that.

8           MR. JOSEPH MURPHY:  Well, it's in the reply, Your

9   Honor.  I just wanted to state our objection for the record.

10          THE COURT:  Mr. Reingold, do you want to just

11  address that one matter?  And what reply?  I don't remember

12  seeing a reply, did I miss something again?

13          Sometimes there can be a stay against third party,

14  but I don't think there's anything in that motion that says

15  that there is.

16          MR. REINGOLD:  Steven Reingold, for the committee.

17          THE COURT:  If I did, I missed it.

18          MR. REINGOLD:  No, there was a reply filed --

19          THE COURT:  Oh, okay.

20          MR. REINGOLD:  -- on Tuesday.

21          THE COURT:  And by the way, we do not have the un-

22  redacted copy.  You might have said he put it in an envelope,

23  we do not have it.

24          MR. REINGOLD:  Okay.  That's troubling, because I

25  know I did it myself.  I didn't delegate it.  What would the

1    court like --

2              THE COURT:  And we went and looked in the safe, we

3    did everything we could find, and it is not --

4              MR. REINGOLD:  Does the court require an un-

5    redacted copy?  I have one.

6              THE COURT:  I think we need one.  I mean, it's a

7    little difficult for us to deal with things when we don't

8    have.  And I will order it put under seal.

9              MR. HAROLD MURPHY:  Your Honor, I have a un-

10   redacted copy.

11             THE COURT:  Okay.  So we'll have that.

12             MR. REINGOLD:  With it, is the order, that is

13   submitted.

14             THE COURT:  Okay.  You'll need to submit the order

15   by email.

16             MR. REINGOLD:  Yes, Your Honor.

17             Just very briefly, and again, Steven Reingold, for

18   the committee.  Mr. Murphy, the other Mr. Murphy, mis-states

19   the reply.  The committee did not say in the reply that in any

20   way shape or form that hit me, the board, or any other state

21   court plaintiff is precluded by the stay from pursuing actions

22   against non-debtors.  That is not what the reply said, clearly

23   that's not the case under bankruptcy law, unless someone, a

24   non-debtor, comes to this court and asks for an extension of

25   the stay.

1                THE COURT:  They've got to come to me.

2                MR. REINGOLD:  So it's just a mis-characterization

3    of what was written, Your Honor.  That's simply that.

4                THE COURT:  Okay.

5                MR. REINGOLD:  And I think given Your Honor's

6    statements earlier --

7                THE COURT:  I was going to say, a stay to a non-

8    party debtor would be -- it would have to be something ordered

9    by this court and I don't recall ever having that in someone.

10               MR. REINGOLD:  That's correct.

11               THE COURT:  Now, listen, I am going to grant your

12   motion.  And I'll tell you the legal standard, 11 USC,

13   1103(c), a committee appointed under 1102 can consult with a

14   trustee concerning the administration of the case, investigate

15   the acts, continuance of business, participate in the

16   formulation of a plan, request the appointment of the trustee,

17   perform other services, the creditor's committee are regularly

18   are granted authority to prosecute estate claims, in that you

19   stand in the shoes, and I will allow this confidential -- I

20   will allow the motion be filed un-redact -- redacted.  We now

21   have an un-redacted that will be under seal.  I will put it

22   under seal, it will not come out from under seal, except by

23   order of this court.

24               That being said, I have some questions.  Has the

25   confidentiality agreement been reached yet?

 1          MR. REINGOLD:  There is in place a confidentiality

 2   agreement between the debtors and the committee, Your Honor.

 3          THE COURT:  Okay.  So that's taking off.  And just

 4   to reassure this court, will the confidentiality information

 5   be used solely to build claims for the benefit of the estate?

 6          MR. REINGOLD:  Absolutely, Your Honor.

 7          THE COURT:  Very good.  You've got your motion and

 8   it is granted.

 9          MR. REINGOLD:  Thank you, Your Honor.

10          Now, then we have a motion for lift stay.

11          Yes, sir.  Come forward.  State your name and

12   affiliation?

13          MR. DREBSKY:  Good morning, Your Honor.  Dennis

14   Drebsky, from Nixon Peabody, on behalf of Contractors Access

15   Program of California, acting as conservator for that estate.

16          THE COURT:  And you represent the conservator,

17   right?

18          MR. DREBSKY:  Yes, Your Honor.

19          THE COURT:  And when we talk about stand in the

20   shoes, they're now standing in the shoes of Creditor

21   Contractors?

22          MR. DREBSKY:  Yes.

23          THE COURT:  And I understand we have a computer

24   person here.  And let me be clear on what I understand you've

25   asked for.  There is certain information, this is non-debtor

1    information, but it is housed on the debtor's equipment,

2    whatever.  And, basically, the debtor, if I understand what I

3    read, and correct me if I'm wrong --

4              MR. DREBSKY:  Okay.

5              THE COURT:  -- it was a -- they basically were a

6    pass through for information?

7              MR. DREBSKY:  That's correct.  It's CAP.  I'll just

8    call my client CAP --

9              THE COURT:  Okay.  CAP.

10             MR. DREBSKY:  -- if I would?

11             THE COURT:  Good.  That's easier for me too.  Okay.

12             MR. DREBSKY:  They had no employees.  You know,

13   they were set up in 19 -- in 2003 --

14             THE COURT:  Right.

15             MR. DREBSKY:  -- for self-insured trust, actually

16   set up by what's now Majestic.  And Majestic performed all the

17   operations as an underwriter, claims adjuster, you name it,

18   they did it.  So that --

19             THE COURT:  And let me just cut you short, because

20   I mean I think I've read most of yours --

21             MR. DREBSKY:  Okay.

22             THE COURT:  -- I understand.  What we have is

23   something that I think everybody agrees you're entitled to,

24   what we have is a time and money issue.

25             MR. DREBSKY:  I think so.  And if I could address

 1    that for a moment?

 2              THE COURT:  Okay.

 3              MR. DREBSKY:  Because I think there are different

 4    categories which may have different implications on time and

 5    money.

 6              THE COURT:  Okay.

 7              MR. DREBSKY:  And I'll get to the emails last,

 8    because that's probably the most problematic.

 9              THE COURT:  Complicated.  Okay.

10              MR. DREBSKY:  And, as I think our papers state, and

11    I'll just reiterate for the record, we're not seeking to

12    depose any of the debtors --

13              THE COURT:  Okay.  I did see that.

14              MR. DREBSKY:  Okay.  So --

15              THE COURT:  What you're really asking for from what

16    I see at this moment, and correct me again, I don't think

17    there's hard copy yet, am I right?  We're only asking for

18    electronic copies or are there some hard copy?

19              MR. DREBSKY:  Well, there may be hard copy of

20    certain, like Mr. Hickey and Mr. Walcheck's (phonetical) file.

21              THE COURT:  Okay.

22              MR. DREBSKY:  And, so I'm not sure whether there's

23    also hard copy or email, but let's -- let's --

24              THE COURT:  Let me ask you a question.  And again,

25    I keep cutting people off --

```
 1              MR. DREBSKY:  No, no.  That's fine.

 2              THE COURT:  -- and I don't mean to.  Have you had a

 3    chance to talk with the debtors?

 4              MR. DREBSKY:  We have, as you've seen from the --

 5              THE COURT:  You all have talked some.  Yes.

 6              MR. DREBSKY:  Yeah.  Talked some.  And I don't want

 7    to -- I use a pejorative, but I don't mean it quite as

 8    pejoratively -- stonewalled, I mean, they just said no, it's

 9    too much, we don't have enough employees, you know --

10              THE COURT:  Well, we know we've only got five.

11              MR. DREBSKY:  Yeah.

12              THE COURT:  So we do know that.

13              MR. DREBSKY:  But there are classes of documents

14    that we've called for.

15              THE COURT:  Okay.  Let me tell you what I'm going

16    to do.

17              MR. DREBSKY:  Even better.

18              THE COURT:  The debtor had done something, which I

19    really appreciate, they've brought their computer person with

20    them, so it seems to me one of the best things you all can do

21    is go to a conference room and start talking about what things

22    you can agree on that can be readily given and then you come

23    back to me on the other things which -- and talk about time

24    and money.

25              MR. DREBSKY:  Okay.  I'll just say, for the law, if
```

1    I can, and I think that's a fine idea because I started some

2    conversations in the hallway before this --

3                    THE COURT:  Sure.

4                    MR. DREBSKY:  -- with regard to the email, which I

5    think you've gotten an affidavit last night about the hundred

6    and ten thousand or whatever documents, I'm not handling the

7    litigation that's on the west coast, and we have IT people

8    that are far more competent than I am.

9                    THE COURT:  I understand.  One of the things that I

10   had an idea about, and it's simply an idea, is a -- and I'm

11   not putting this on anybody -- a third-party searcher so that

12   your people are not having their eyes on it and then it can be

13   quickly looked over.  Anything that saves time and money.

14                   MR. DREBSKY:  You know, we would absolutely agree

15   to that.  We'd also agree to set up different screens, so it

16   wouldn't be just CAP, it would be say CAP and CAP, a person,

17   and excess insurance, because there are certain things that we

18   are really interested in, at the moment, so we would have that

19   IT person deal with the debtor's IT person and have the third

20   party come in with various screens that would --

21                   THE COURT:  Then it's called money.

22                   MR. DREBSKY:  Well, we'll pay for it.

23                   THE COURT:  But what I'm talking about -- okay, but

24   what I'm talking about is if the third party sees something,

25   before they give it to you, it gets checked, which hopefully

```
 1   would save some time and money.  It's just a thought.  I'm not
 2   -- I'm not mandating it.  I think you all need to talk.  I'm
 3   going to take a break and let you talk.
 4            MR. DREBSKY:  Happy to do that.
 5            THE COURT:  Do I need you for anything else?
 6   Anybody, anything else, before we -- because this will be the
 7   thing we'll leave for last, does anyone else wish to be heard?
 8   Come forward on anything?  Anyone else that's not involved in
 9   this, if they wish, may leave.
10            MR. DREBSKY:  Thank you, Your Honor.
11            Your Honor, if I can say
12   before --
13            THE COURT:  Yes, sir?  Certainly.
14            MR. DREBSKY:  I've conferred with the computer
15   person, who's actually an attorney who does --
16            THE COURT:  You all may be seated.
17            MR. DREBSKY:  -- computer runs for the purpose of
18   the affidavit.  What I would suggest, because our idea is not
19   dissimilar from this court, is that, in very short order, the
20   IT person for the debtor meet with our IT person and see if
21   they can work out a protocol for these documents, or if they
22   can't work out a protocol, we come back to you either
23   modifying or whatever.  That's --
24            MR. HAROLD MURPHY:  Your Honor, we don't have an IT
25   person, that's one of the issues.
```

1              THE COURT:  I think that's the issue.

2              MR. HAROLD MURPHY:  We have a lawyer who has IT

3    experience --

4              THE COURT:  -- experience.  Which is similar to me.

5    I have some IT experience, I know a lot about it, but if you

6    tell me -- I think what you need to do is go to plan B,

7    whatever that is, and however we can save time and money.  I

8    mean, I don't think anybody, at least in what I saw, did not

9    object to some of the information because it is just pass

10   through information.  They're willing to give it.  It's just

11   that we're on a fast track and you've already seen some of the

12   stuff that's been going on, how to get it and how to preserve

13   information that would possibly go through the system that

14   does not belong going to you.

15             MR. HAROLD MURPHY:  And --

16             THE COURT:  Yes, sir, Mr. Murphy?

17             MR. HAROLD MURPHY:  Just one point of

18   clarification.

19             THE COURT:  Sure.

20             MR. HAROLD MURPHY:  I think that's right, Your

21   Honor.  We're not claiming that at some point these documents

22   be given in some fashion --

23             THE COURT:  Right.

24             MR. HAROLD MURPHY:  -- it's just how, when, and the

25   mechanics of getting it.

1              THE COURT:  Right.

2              MR. HAROLD MURPHY:  These are -- but it's got to be

3    clear, Your Honor, these are the debtor's documents.  These

4    are not --

5              THE COURT:  I understand, but isn't it -- aren't we

6    only looking at pass through information, even though it's the

7    debtor's documents.  I have been --

8              MR. HAROLD MURPHY:  Well --

9              THE COURT:  -- someone has told me no?

10             MR. HAROLD MURPHY:  I don't think so, Your Honor.

11   These are the debtor's documents and information.  It's

12   talking about one of its companies that's in Chapter 11.  CRM

13   of California is the -- was the debtor that's before this

14   court that was administering this program in California.

15             THE COURT:  Okay.  So I have been misled, at least

16   from what I see, because this is being -- this is a non -- my

17   understanding is, Creditor Contracts Access Program

18   California, CAP, was wholly administered by the debtor, but

19   was a separate entity that used their platform, their

20   electronic platform, is that wrong?

21             MR. HAROLD MURPHY:  There was a trust, Your Honor,

22   established for purposes of (indiscernible) Workers'

23   Compensation Insurance to these members in California.  CRM,

24   what the debtor, our debtor --

25             THE COURT:  Right.

1          MR. HAROLD MURPHY:  -- worked for that trust.

2          THE COURT:  Right.

3          MR. HAROLD MURPHY:  CAP is the successor in

4   interest, as I understand it, to that trust.  But the debtor's

5   information, which was the administrator -- CRM of California

6   was the administrator, so its kept, it had records about what

7   it did as administrator for this separate legal entity that is

8   not before the court.

9          THE COURT:  Okay.  I think I have just had a

10  difference of opinion.  All right.  I got to think about this

11  then.  Because that was not my understanding from the papers.

12         MR. DREBSKY:  Well, CAP had no employees.

13  Everything was administered through what I'll call Majestic or

14  CRM.  They did everything.

15         THE COURT:  But that's not what I'm hearing.  I'm

16  hearing it was administered, but I'm hearing it wasn't

17  necessarily totally separate.  As a matter of fact, this

18  sounds like it was the successor to that.  Okay.  I'm missing

19  a point and I'm trying to understand.

20         MR. HAROLD MURPHY:  Let me try it again, Your

21  Honor.

22         THE COURT:  Okay.

23         MR. HAROLD MURPHY:  The debtor was the

24  administrator and providing administrative services for this

25  separate legal entity that's not before the court.

1              THE COURT:  Okay.

2              MR. HAROLD MURPHY:  That separate legal entity is

3    now --

4              THE COURT:  CAP?

5              MR. HAROLD MURPHY:  -- became CAP --

6              THE COURT:  Just call it CAP.  Okay.

7              MR. HAROLD MURPHY:  -- CAP is a successor of that,

8    successor of legal interest.  The debtor, like, well, provided

9    services to this entity, had employees --

10             THE COURT:  Okay.  That's what I understood.

11             MR. HAROLD MURPHY:  But these were the debtor's

12   employees providing services to --

13             THE COURT:  I understand.  I understand.

14             MR. HAROLD MURPHY:  -- this third party.

15             THE COURT:  Okay.

16             MR. HAROLD MURPHY:  So these records are the

17   debtor's records.

18             THE COURT:  Okay.  But they pass through for the

19   information of them and you are going to give those to him.

20   It's just a matter of time and money.

21             MR. HAROLD MURPHY:  It's just the time and money

22   and the mechanics of it, Your Honor.

23             THE COURT:  Okay.  So you all go talk and you

24   figure it out.

25             MR. HAROLD MURPHY:  That's right.

1          MR. DREBSKY:  If I could just say one final thing?

2          THE COURT:  Sure.  You may.

3          MR. DREBSKY:  I understand --

4          THE COURT:  I wasn't wrong in my thinking.

5          MR. DREBSKY:  No.  You were correct.

6          THE COURT:  It may be that they legally own them,

7   but it was done for the benefit of your entity, therefore you

8   are entitled to it.

9          MR. DREBSKY:  Thank you, Your Honor.

10         THE COURT:  Now, then it's time and money.

11         MR. HAROLD MURPHY:  Of course, we're not

12  complaining at some point, it's the how and the why's, Your

13  Honor.

14         MR. DREBSKY:  The only point I'd like to raise on

15  this is that we have certain obligations, we're on a track for

16  trial, for instance, with the law firm on August 12th, and

17  they're -- and we have to file things pretty soon, and as

18  you've probably seen from the papers, without the documents,

19  it's impossible to take depositions.

20         THE COURT:  It's called time and money.

21         MR. DREBSKY:  Now -- okay, Your Honor.

22         THE COURT:  And I'm sensitive to time and money.

23  I'm in recess.  When you all come to an agreement, come back

24  and see me.  Anyone else can be excused.

25         MR. DREBSKY:  Thank you.

```
 1              (Break in proceeding)

 2

 3              THE COURT:  We're back on the record with Majestic

 4    Capital.  Your name and affiliation?

 5              MR. DREBSKY:  Dennis Drebsky, from Nixon Peabody.

 6              THE COURT:  Okay.

 7              MR. DREBSKY:  We've used the time to talk in the

 8    hall and try to work out at least an interim agreement --

 9              THE COURT:  Okay.

10              MR. DREBSKY:  -- that hopefully will

11    (indiscernible) in an order which will take little time

12    because I understand, and I'll let counsel speak for himself,

13    it's to confer with other counsel, California counsel,

14    retaining some of the California litigation, but in the

15    meantime, the partner that's handling the case in California

16    on behalf of CAP will send -- has asked for certain of the

17    electronic schematics and programs to start at least getting

18    some of the information, the electronic information, in a

19    format, and we'll see how many documents there are and try to

20    whittle it down through successive screens.

21              THE COURT:  I expect cooperation.

22              MR. DREBSKY:  And we have gotten cooperation.

23              THE COURT:  Okay.  Good.

24              MR. DREBSKY:  I want to just say that on the

25    record.  And we expect that that would continue.
```

1          THE COURT:  I would think so.

2          MR. DREBSKY:  And this is not a -- you know, I

3   think it's a collaborative effort in that sense and hopefully

4   in a short period of time we can present an agreed upon order

5   that will resolve these disputes.  That takes care of the

6   electronic.  We've also asked for paper and I'm informed that

7   they don't -- there are no paper records, they're all in

8   another entity, so that --

9          THE COURT:  Another entity, but under the debtor's

10  control?

11         MR. HAROLD MURPHY:  Let me correct that, Your

12  Honor.  The insurance company that's in bankruptcy in

13  California, Majestic Insurance, is under control of

14  conservator, if counsel wants -- the issue raises, well, who

15  has the insurance company's records, we don't have the

16  insurance company's records, they're under the control of the

17  California conservator, so I -- Majestic Insurance is not in

18  bankruptcy, Your Honor, that's in California.  So those

19  documents --

20         THE COURT:  You'd have to go to state court?

21         MR. HAROLD MURPHY:  He'd have to go to the

22  California conservator and get those documents, not from us.

23         THE COURT:  I'll tell you what, when's our next

24  Majestic day?

25         MR. DREBSKY:  The 12th of January.

 1          THE COURT:  Okay.  What I'm going to do is adjourn

 2    this until January 12th.

 3          MR. HAROLD MURPHY:  Thank you, Your Honor.

 4          THE COURT:  That gives you time to get everything

 5    put together.

 6          THE COURT:  And let me know what's going on.  That

 7    gives you a little barely over a month.

 8          MR. DREBSKY:  Well, hopefully, we'll be able to

 9    submit an order prior to that time.

10          MR. HAROLD MURPHY:  Ultimately, Your Honor, just so

11    that you understand, we did, while we worked towards this

12    order, we agreed to move things forward.  Number one.

13          THE COURT:  Good.

14          MR. HAROLD MURPHY:  Number two, the ultimate

15    solution we hope to arrive at is that the documents, once the

16    universe has agreed to whether it's 80,000, 100,000 or

17    $200,000 would actually be produced in the context of the

18    California litigation by counsel who has been appointed by the

19    insurance company, who's representing the non-debtor

20    defendants, so the insurance coverage would be available to

21    cover the costs to review whatever those documents are.

22          THE COURT:  Oh, okay.

23          MR. HAROLD MURPHY:  -- for privilege and for

24    relevancy, rather than the debtor's limited purpose, or our

25    office at the expense of the estate.  So that's the key --

```
 1              THE COURT:  Well, that's why I said the third
 2   party, we have them look it over, but that's good.  I like
 3   what you're --
 4              MR. HAROLD MURPHY:  So what we need -- but we need
 5   to --
 6              THE COURT:  -- I like how you're thinking.
 7              MR. HAROLD MURPHY:  We obviously need to consult
 8   with the California counsel to make sure the insurance is
 9   going to cover the costs.
10              THE COURT:  Tell them I would be unhappy if they
11   drag their feet, though.
12              MR. HAROLD MURPHY:  Yes, I will, indeed, Your
13   Honor.
14              THE COURT:  Thank you.  Thank you.  Anything else?
15              MR. DREBSKY:  Thank you, Your Honor.
16              THE COURT:  Very good.  Have a good day.  Court's
17   in recess.
18
19                   (Proceeding adjourned)
20
21
22
23
24
25                            *  *  *
```

1

2        CERTIFICATION

3

4        I, Debra S. Nieves, certify that the foregoing

5        transcript is a true and accurate record of the

6        proceedings.

7

8

9        *Debra S. Nieves*

10

11       Debra S. Nieves

12       AMERICAN LEGAL TRANSCRIPTION

13       11 Market Street

14       Poughkeepsie, New York 12601

15       Dated:   January 28, 2012

16

17

18

19

20

21

22

23

24

25                             -o0o-

1

2   UNITED STATES BANKRUPTCY COURT

3   DISTRICT OF DELAWARE

4   Case No. 11-12590(MFW)

5   - - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   EVERGREEN SOLAR, INC.,

9

10              Debtor.

11

12  - - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              824 North Market Street

16              Wilmington, Delaware

17

18              October 25, 2011

19              9:31 AM

20

21  B E F O R E:

22  HON. MARY F. WALRATH

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR:  BRANDON MCCARTHY

1

2    Motion of the Official Committee of Unsecured Creditors of

3    Evergreen Solar, Inc., Pursuant to 11 U.S.C. §§ 105(a), 1103(c)

4    and 1109(b), and the Cash Collateral Order, for Entry of an

5    Order Granting Leave, Standing and Authority to Commence,

6    Prosecute, and Settle Claims on Behalf of the Debtor's Estate

7

8    Motion of the Official Committee of Unsecured Creditors to File

9    Under Seal the Unredacted Versions of the Objection of the

10   Official Committee of Unsecured Creditors to the Debtor's

11   Motion for Orders (A)(i) Authorizing Debtor's Entry Into the

12   Stalking Horse Asset Sale Agreement; (ii) Authorizing and

13   Approving the Bidding Procedures and Transaction Expense

14   Reimbursement; (iii) Approving the Notice Procedures and the

15   Assumption and Assignment Procedures; and (iv) Setting a Date

16   for the Sale Hearing; and (B) Authorizing and Approving (i) the

17   Sale of Substantially All of Debtor's Assets Free and Clear of

18   All Liens, Claims and Encumbrances; and (ii) the Assumption and

19   Assignment of Certain Executory Contracts

20

21   Emergency Motion of the Official Committee of Unsecured

22   Creditors Concerning the Pre-Petition Secured Parties' Credit

23   Bid Rights in Connection with Auction

24

25   Transcribed by:  Lisa Bar-Leib

1

2   A P P E A R A N C E S :

3   PACHULSKI STANG ZIEHL & JONES LLP

4        Attorneys for Debtor and Debtor-in-Possession

5        919 North Market Street

6        17th Floor

7        Wilmington, DE 19899

8

9   BY:   LAURA DAVIS JONES, ESQ.

10

11  BINGHAM MCCUTCHEN LLP

12        Attorneys for Debtor and Debtor-in-Possession

13        One Federal Street

14        Boston, MA 02110

15

16  BY:   P. SABIN WILLETT, ESQ.

17        AMELIA C. JOINER, ESQ.

18

19

20

21

22

23

24

25

```
 1

 2    BINGHAM MCCUTCHEN LLP

 3         Attorneys for Debtor and Debtor-in-Possession

 4         399 Park Avenue

 5         New York, NY 10022

 6

 7    BY:   RONALD J. SILVERMAN, ESQ.

 8         SCOTT K. SEAMON, ESQ.

 9         (TELEPHONICALLY)

10

11    KRAMER LEVIN NAFTALIS & FRANKEL LLP

12         Attorneys for the Official Committee of Unsecured

13          Creditors

14         1177 Avenue of the Americas

15         New York, NY 10036

16

17    BY:   P. BRADLEY O'NEILL, ESQ.

18         ELAN DANIELS, ESQ.

19         RACHAEL RINGER, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25
```

1

2    PEPPER HAMILTON LLP

3          Attorneys for the Official Committee of Unsecured

4           Creditors

5          Hercules Plaza

6          Suite 5100

7          1313 Market Street

8          Wilmington, DE 19899

9

10   BY:   DAVID B. STRATTON, ESQ.

11         EVELYN J. MELTZER, ESQ.

12

13   U.S. DEPARTMENT OF JUSTICE

14         Office of the United States Trustee

15         J. Caleb Boggs Federal Building

16         844 King Street

17         Suite 2207

18         Wilmington, DE 19801

19

20   BY:   DAVID M. KLAUDER, ESQ.

21

22

23

24

25

Page 6

```
 1

 2   AKIN GUMP STRAUSS HAUER & FELD LLP

 3        Attorneys for the Supporting Noteholders

 4        One Bryant Park

 5        New York, NY 10036

 6

 7   BY:   MICHAEL S. STAMER, ESQ.

 8         ABID QURESHI, ESQ.

 9

10   AKIN GUMP STRAUSS HAUER & FELD LLP

11        Attorneys for the Supporting Noteholders

12        Robert S. Strauss Building

13        1333 New Hampshire Avenue, N.W.

14        Washington, DC 20036

15

16   BY:   JAMES SAVIN, ESQ.

17

18   DORSEY & WHITNEY LLP

19        Attorneys for U.S. Bank as Indenture Trustee for the

20         Senior Secured Notes

21        300 Delaware Avenue

22        Suite 1010

23        Wilmington, DE  19801

24

25   BY:   ROBERT W. MALLARD, ESQ.
```

```
1

2    MASLON EDELMAN BORMAN & BRAND, LLP

3         Attorneys for U.S. Bank as Indenture Trustee for the

4          Senior Secured Notes

5         3300 Wells Fargo Center

6         90 South Seventh Street

7         Minneapolis, MN 55402

8

9    BY:   CLARK T. WHITMORE, ESQ.

10

11   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

12        Attorneys for the Supporting Noteholders

13        1201 North Market Street

14        18th Floor

15        Wilmington, DE 19899

16

17   BY:   CURTIS MILLER, ESQ.

18

19   U.S. DEPARTMENT OF JUSTICE

20        Civil Division, Commercial Litigation Branch

21        1100 L Street, N.W.

22        Room 10102

23        Washington, DC 20005

24

25   BY:   MARGARET M. NEWELL, ESQ.
```

Case 1-11979-CSS Doc 3726-3 Filed 02/03/15 Page 51 of 166
Case 11-12590-MFW Doc 1721 Filed 03/26/12 Page 8 of 76
EVERGREEN SOLAR, INC.

Page 8

1              P R O C E E D I N G S

2           THE CLERK:  All rise.  You may be seated.

3           THE COURT:  Good morning.

4           MR. WILLETT:  Good morning, Your Honor.  Sabin Willett

5    of Bingham McCutchen for the debtor, Evergreen Solar.  There

6    are three contested matters on your agenda.  Before getting to

7    them, though, I wanted to report to the Court on a significant

8    development in this case.  We have been having a series of

9    negotiations with the government over an objection -- rather, a

10   motion for stay relief that they've filed and, frankly, broader

11   issues that they would raise with regard to our sale.  This all

12   revolves around the fact that when a company develops patents

13   through the use of government funding, there are a suite of

14   statutory rights that the government can come in and assert.

15   There are open issues about their effectiveness in bankruptcy.

16   There are factual issues.  All of those, I'm pleased to say,

17   have been resolved in principle by a stipulation that the

18   debtor and, I believe, the government are prepared to file in

19   the next day or so.  The other constituent parties are looking

20   at it now.  But our hope is that that will relieve some of the

21   uncertainty among bidders as to what they would be able to

22   receive in the sale.

23           And in connection with that, the debtor is of the view

24   that we should briefly extend the auction and related deadlines

25   so that the bidding community has a chance to take on board

Case 1-11-10979-CSS  Doc 3726-3  Filed 02/03/15  Page 52 of 166
Case 11-12590-MFW  Doc 2722  Filed 10/28/11  Page 3 of 176
EVERGREEN SOLAR, INC.

Page 9

1    these new developments.

2          Now, just before today's hearing, I learned that there

3    is some disagreement between our group and the secured

4    creditors as to whether we should postpone all lots of the

5    objection or just some of them, the ones that relate to these

6    patents.  For example, the sale of the LBIE claim would not be

7    implicated by these developments.

8          But what I might do, if I may, is explore whether

9    there is a calendar date seven to ten days on from November 4th

10    when we might be heard on the sale motion.

11          THE COURT:  Well, I am out the week of the 14th.  And

12    then we're into Thanksgiving week.  Monday or Tuesday before

13    Thanksgiving -- is that --

14          MR. WILLETT:  Does the -- Friday the 11th is a week on

15    from the current date.  Is that --

16          THE COURT:  That's Veteran's Day --

17          MR. WILLETT:  Oh, I'm sorry.

18          THE COURT:  -- so that wouldn't work.  I mean, the

19    10th would work but that's not quite a --

20          MR. WILLETT:  I'm hearing that the 10th --

21          THE COURT:  Would work?

22          MR. WILLETT:  Most think the 10th would work, Your

23    Honor.

24          THE COURT:  All right.  Well, that's available.  I

25    could fit you in at lunchtime.

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 53 of 166
Case 11-12390-MFW   Doc 329   Filed 08/08/11   Page 10 of 106
EVERGREEN SOLAR, INC.

Page 10

1          MR. STAMER:  Your Honor, may I be heard just very

2     briefly on the calendar?

3          THE COURT:  Sure.

4          MR. STAMER:  Good morning, Your Honor.  For the

5     record, Michael Stamer from Akin Gump on behalf of the

6     supporting noteholders.  Your Honor, we found out by e-mail, at

7     7:08 this morning, that the debtor was going to stand up,

8     report to the Court that they have made progress or reached an

9     agreement with the government and would be asking for an

10    extension.

11         We, the supporting noteholders -- the stalking horse

12    bidders are in the process of reviewing the stipulation.  We're

13    not sure if it's fish or fowl, good or bad, Your Honor.  But

14    here today, we're not prepared to consent to the extension.

15    The debtor believes that it doesn't need our consent, which is

16    fine.  What we're particularly troubled with, Your Honor -- and

17    we would like, as we have said over and over again, a full and

18    fair value maximizing auction.  What we don't understand is why

19    the debtor is pushing back the timing as it relates to the

20    things that are in no way impacted by the issues raised by the

21    government and the potential solution to those issues that

22    would be embodied in the settlement.  We believe that there

23    will be a robust auction for the LBIE claim and the noncore

24    assets.  And we would like not to put that off for any reason.

25    As Your Honor can appreciate, when you're dealing with

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 54 of 166
Case 11-12590-MFW   Doc 323   Filed 10/03/11   Page 11 of 70
EVERGREEN SOLAR, INC.

Page 11

1   financial assets such as a claim, between tomorrow, which is

2   the bid deadline, and seven, six, ten days later, things could

3   happen.  We would like to minimize risk as it relates to the

4   assets that are not impacted by this Department of Energy issue

5   and move forward on the schedule the Court originally approved

6   as it relates to those noncore non-devins (ph.) assets.  That's

7   all I have, Your Honor.

8           THE COURT:  All right.

9           MR. WILLETT:  Your Honor, these developments have been

10  moving quickly, basically, because of our negotiations with the

11  government.  I do suggest that we extend the sale hearing to

12  the 10th and that perhaps counsel report back to the Court

13  later today whether we have an agreement to proceed, as Mr.

14  Stamer suggests, with two auctions on different dates of

15  different lots or with, as has been suggested by our advisors,

16  frankly, a single auction of all lots on the same day, but days

17  later than what is now scheduled.

18          What's now scheduled is that bids would be due

19  tomorrow and the auction would be on the first of November.

20  We'd like to move those dates back.  We think we have the right

21  to do that.  But perhaps if we can adjourn these calendar

22  matters until later in the morning, we'll have more consensus

23  around them.

24          THE COURT:  Well, I'm here all day.  So I won't do

25  anything until you have a chance to talk.

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 55 of 166
Case 11-12590-MFW   Doc 323   Filed 08/08/11   Page 12 of 176
EVERGREEN SOLAR, INC.

Page 12

1              MR. WILLETT:  Very well.  Thank you, Your Honor.

2              Well, with that then, if I can move along to the first

3       matter on your calendar --

4              MR. STRATTON:  Good morning.  David Stratton for the

5       unsecured creditors' committee.  And with respect to the

6       postponement of the auction, we found out about it probably

7       after Mr. Stamer did.  But we think -- first of all, it seems

8       to me it's an issue of the debtor's business judgment that got

9       qualified investment bankers -- at least, when we agree with

10      them, they're qualified.  And we also think that having one

11      auction instead of multiple auctions on different days right on

12      the heels of this announcement is probably a much better idea

13      than doing several at different times and before some people

14      may have had an opportunity to digest this news with respect to

15      the deal with the United States government.

16             THE COURT:  All right.  Well, I'll wait and see if the

17      parties can come up with an agreement.  Otherwise, I'll make a

18      ruling on that.

19             MR. WILLETT:  Thank you, Your Honor.  Your Honor,

20      first matter on your list of contested matters today is the

21      committee's motion for standing which relates to, at least as

22      we perceive it, a narrow suite of lien challenges.  I'll yield

23      the lectern to the committee on that motion.

24             MR. STRATTON:  Good morning, Your Honor.  David

25      Stratton again for the record.  Your Honor, on October 14, in

1   accordance with the cash collateral order, we filed a motion

2   seeking standing to file a complaint against U.S. Bank as

3   indenture trustee to assert specific claims identified in the

4   draft complaint which we attached to the motion.

5          Briefly, the relief we seek in the motion and in the

6   complaint would be a declaratory judgment that certain property

7   of the debtor is not subject to a lien or security interest at

8   all, perfected or unperfected.  Those assets are identified in

9   paragraph 20 of the motion.

10          Second, a declaratory judgment that certain assets in

11  which the noteholders' claim to have a security interest are

12  not -- the security interest isn't perfected.  Principally,

13  there, Your Honor, we're dealing with foreign intellectual

14  property; that is, intellectual property created under laws of

15  foreign countries, and cash in deposit accounts as to which

16  there are no control agreements.  And we also seek an order

17  avoiding the unperfected liens, an order disallowing the

18  secured parties' claims to the extent that those claims depend

19  on that collateral to support the claim that they're securing

20  the value that attaches to that.

21          I think it's important to note, Your Honor, right at

22  the outset that the debtors do not oppose the relief we're

23  requesting today.  And in fact, we've agreed on a form of order

24  to submit to Your Honor if Your Honor grants the motion.  So

25  what we're dealing with then, I suppose it's no surprise, is an

1    objection by the noteholders to the relief requested in the

2    motion.

3           The assets at issue -- Your Honor, I want to go into

4    this a little more.  As I said, first of all, it's a group of

5    assets as to which no security interest was granted.  As I

6    said, they're identified in paragraph 20 of our motion.

7    Included in those are the debtor's interest in the Chinese

8    joint venture, Evergreen Solar, which is the subject matter of

9    the auction.  So it's important to us to get that issue nailed

10   down once and for all.

11          In addition to those assets, there are two leases, the

12   debtor's corporate headquarters and research and development

13   property in Massachusetts as to which no leasehold mortgage was

14   recorded and we believe, therefore, there's no lien that

15   attaches to them; and then, importantly, the foreign patents

16   and the bank accounts.

17          With respect to the noteholders' objections, Your

18   Honor, I think there are three substantive objections and a

19   couple of sort of ad hominem attacks which I'd like to dispel

20   at the outset.  First, they say all we're trying to do is -- I

21   think their word is disrupt the auction -- derail the auction -

22   - excuse me -- and prevent the noteholders from credit bidding.

23   With respect to disrupting or derailing the auction, that's

24   simply not the case.  We're not -- we haven't asked for

25   anything with respect to the auction.

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 58 of 166
Case 11-12590-MFW   Doc 323   Filed 10/28/11   Page 18 of 166
EVERGREEN SOLAR, INC.

Page 15

1          With respect to credit bidding, that's exactly right.

2     We're trying to prevent them from credit bidding for assets as

3     to which they don't have a perfected lien which is what 363(k)

4     is all about.  And that's why we're having this hearing.

5          With respect to the argument that we're wasting estate

6     assets, two points.  First, we're not spending their money.  We

7     understand and the cash collateral order provides that our fees

8     and expenses will get paid out of unencumbered assets.  I was

9     happy to see that there may be 918,000 dollars in an account or

10    accounts that may be unencumbered.  So I'm fairly confident we

11    could stay south of that.  But we're not spending their money

12    so I'm not sure they should be the ones complaining about it.

13         Second --

14         THE COURT:  Well, I presume they're also suggesting

15    they will have to pay defense costs.

16         MR. STRATTON:  Well, that's the unfortunate part about

17    litigation and bankruptcy.  And I'll come back to this, but we

18    asked them on October 11th if they would agree with us that

19    they didn't have assets -- or liens on certain assets.  We

20    heard nothing until they filed their objection yesterday at

21    noon.

22         With respect to those assets as to which they don't

23    have a lien, and they seem to acknowledge they don't have a

24    lien, obviously, the saying of it and the doing of it could be

25    very different things.  Once the complaint is filed, we could

Case 1:11-10279-CSS   Doc 3726-3   Filed 03/03/15   Page 59 of 166
Case 11-12590-MFW   Doc 323   Filed 10/18/11   Page 16 of 76
EVERGREEN SOLAR, INC.

Page 16

1   sit with them, work through what assets are in or out and

2   prepare a stipulation to submit to Your Honor, which will

3   eliminate the need to litigation those issues.

4           With respect to the substantive objections, Your

5   Honor, the first one I just was talking about is their argument

6   that there's no case or controversy.  First, the cases they

7   cite aren't on point.  The facts of those cases are completely

8   different than those which we have before us today.  The facts

9   here are not uncertain.  They're not contingent.  They're not

10   based on hypotheticals; they're real facts.  And part of the

11   problem is the noteholders and the debtors own statements as to

12   the scope of the noteholders' liens.  For example, in the first

13   day of the case, debtor's counsel represented to the Court that

14   the noteholders had a lien on virtually all of the assets in

15   the estate.  Even yesterday, the noteholders said in paragraph

16   6 of their objection, and I quote, "To secure its obligations

17   under the indenture, the debtor pledged substantially all its

18   assets to the indenture trustee as collateral."

19           So there seems to be a question as to what's in,

20   what's out and what exactly is excluded from the security

21   agreement.  And as I noted, we asked them to clarify this issue

22   for us or to agree with our position in an e-mail dated October

23   11 which -- a copy of which I have, if Your Honor would like to

24   see it.  We got no response until yesterday.

25           But as I said, I think the simple way to resolve that

1    problem is to simply -- and today is the deadline to file the

2    complaint -- is to sit down with them after the complaint's

3    filed and resolve that particular issue which will leave two

4    other issues to be litigated.  And I'd like to talk about their

5    objections to those two issues now.

6         First is the deposit account.  We argue that there are

7    accounts totaling about 4.2 million dollars as of the deposit

8    date as to which there are no control agreements and therefore

9    no perfected security interest.  Their response is that they

10   have identifiable -- that those accounts contain identifiable

11   cash proceeds.  Well, there's two points there.  First, that's

12   a factual question.  Are they, in fact, the identifiable cash

13   proceeds of their collateral?  They say they are.  We haven't

14   had a chance to test that; it's their burden of proof.  So

15   that's a factual question.  We're not going to resolve that

16   today.  And, oh, by the way, they acknowledge in -- I think

17   it's in a footnote in their objection that of that money,

18   possibly 918,000 dollars is not subject to their security

19   interest.  We don't know if there's more.  We don't know if

20   that's correct.  But that's not going to get resolved today.

21        Second, under 9-315(b)(2) of the Uniform Commercial

22   Code, in effect in Delaware and, I believe, in New York, which

23   says "Proceeds comingled with other property are identifiable

24   proceeds to the extent the secured party identifies the

25   proceeds by a method of tracing."  So we don't know what's in

 1   those accounts, where it came from.  But it's clearly the

 2   secured noteholders' burden to establish that they are, if

 3   they've been comingled, what portion of those accounts can be

 4   traced to their security interest in other collateral.  That's

 5   not going to be decided today.

 6           So I think, as to that issue, essentially, I guess

 7   they're asking -- the objection is a motion to dismiss.  And I

 8   don't think Your Honor can grant that motion insofar as it

 9   relates to the accounts.

10           So let's talk about the noteholders' liens on foreign

11   IP.  When you strip all the -- virtually all away from their

12   argument, essentially what they're arguing is that Delaware law

13   or New York law, not any law of the United States of American,

14   not a treaty, trumps the law of a foreign jurisdiction with

15   respect to how to perfect a security interest in intellectual

16   property created under the law of that jurisdiction.  For

17   example, the debtors own patents created under Chinese law.

18   It's the noteholders' position that by filing a financing

19   statement in Dover, Delaware that they have a perfected

20   security interest in the Chinese patent which is registered in

21   an office in China.  And I'm going to get back to that in a

22   minute.

23           It's not surprising that they don't cite any cases to

24   support their position because, based on our research, there

25   are none.  Our research does suggest, Your Honor, however, that

Case 1:11-10979-GSS    Doc 3726-3    Filed 03/03/15    Page 62 of 166
Case 11-12390-MFW    Doc 323    Filed 03/03/15    Page 19 of 70
EVERGREEN SOLAR, INC.

Page 19

1    the laws of many foreign jurisdictions, to the extent they even

2    permit a creditor to perfect a security interest in

3    intellectual property -- and not all countries do,

4    apparently -- they require registration of the security

5    interest or lien in that country.  Our research suggests, among

6    others, China India, Japan, Taiwan, New Zealand, Belgium,

7    Finland, France, Germany, Ireland, Mexico, the Netherlands and

8    Spain all require local registration, which isn't very

9    surprising if you want to give creditors in that country notice

10   that you have a lien on property created under the laws of that

11   country.

12          For example, under Chinese law, the statutes, the

13   guaranty law of the People's Republic of China, as to which we

14   have obtained a translation -- and I have copies for the Court

15   and parties if they'd like them, if somebody could hand those

16   up.

17          THE COURT:  Well, I'm not going to decide that issue

18   today.

19          MR. STRATTON:  That's actually the right point, Your

20   Honor.  So let me get to that.  This is not the time for the

21   Court to decide choice of law principles, but I would submit to

22   Your Honor that based on the fact that the rights are created

23   under foreign law reason suggest pretty strongly that foreign

24   law should control.  Comity would suggest that you -- with all

25   respect, that you should defer to the laws of the foreign

Case 1:11-10970-GSS   Doc 3726-3   Filed 03/03/15   Page 63 of 166
Case 11-12590-MFW   Doc 329   Filed 08/08/11   Page 20 of 70
EVERGREEN SOLAR, INC.

Page 20

1    country.  And the notice issued to creditors in the other

2    country is a very real one.  Is a creditor in China really

3    going to know that he should be looking in the records of the

4    Secretary of State's office in the state of Delaware, a place

5    he's never heard of, no doubt, to find out whether or not these

6    noteholders have a security interest in a Chinese patent?  I

7    don't think so.

8            Finally, Your Honor, with respect to the cost benefit

9    analysis, I think it's fairly apparent that the benefit of

10   pursuing this is real.  We think these assets have value.  We

11   think that unsecured creditors will benefit from the action.

12   And the costs, although not insignificant, are manageable.  If

13   we get rid of the excluded asset issue -- we're litigating two

14   issues -- to deposit accounts and the intellectual property

15   squarely focuses -- this isn't a shotgun approach.  We're not

16   seeking to subord -- at least at this point, we haven't found a

17   basis to seek to subordinate or recharacterize the debt, things

18   like that.  This is very focused, somewhat surgical -- I don't

19   want to overstate that -- action and we think it's completely

20   in order.

21           If Your Honor has any questions, I'd be happy to

22   answer them.

23           THE COURT:  No.  Thank you.

24           MR. STRATTON:  Thank you.

25           MR. QURESHI:  Good morning, Your Honor.  For the

Case 1:11-10970-CSS    Doc 3726-3    Filed 03/03/15    Page 64 of 166
Case 11-12590-MFW    Doc 323    Filed 08/18/11    Page 21 of 70
EVERGREEN SOLAR, INC.

Page 21

1    record, Abid Qureshi, Akin, Gump, Strauss, Hauer & Feld, on

2    behalf of the supporting noteholders.

3            THE COURT:  Good morning.

4            MR. QURESHI:  Your Honor, where I'd like to start is

5    with respect to the statement about the debtors not opposing

6    the relief.  And Your Honor will, of course, hear directly from

7    the debtors, but just so that it's clear at the outset, the

8    debtors very clearly, in their pleading, take the position that

9    our liens with respect to both the foreign intellectual

10   property and the deposit accounts are valid enforceable

11   properly perfected security interests.  There's no ambiguity

12   about that at all.  And on the --

13           THE COURT:  Well, they did that on the day 1 anyway.

14           MR. QURESHI:  Right.  But --

15           THE COURT:  They waived their right to say otherwise.

16           MR. QURESHI:  The did indeed, but they do take the

17   position, having now looked at the issue, that they agree with

18   the arguments we make with respect to the perfection.

19           Your Honor -- and I'll come back to this in more

20   detail when we get to the cost benefit point, but I think it is

21   important to consider the context in which this standing motion

22   arises.  I think it's the case, Your Honor, that everybody in

23   the courtroom, the committee included, agrees that it is in the

24   best interest of everybody for this auction to occur and to

25   occur promptly because the debtor is, in the meantime, bleeding

1    cash and delay means that there will be less recoveries to go

2    around for everybody.  And while we do suggest in our

3    opposition that this motion is brought really to generate

4    holdup value, Your Honor, that's not just an aspersion that we

5    cast lightly.

6         What the committee has done here is with respect to

7    the LBIE claims, for example, Your Honor.  They filed an

8    objection saying we shouldn't be able to credit bid with

9    respect to the LBIE claims.  So we take our expert, submit a

10   declaration which Your Honor has, prepare to take depositions

11   of their expert who submitted a supporting declaration, and we

12   show up yesterday to take that deposition and we're told, oh,

13   just kidding, we're going to withdraw that objection.  So I

14   think there's something more going on here, Your Honor.  But we

15   can really see it when we get to the merits.

16        THE COURT:  Well, part of it is that they had a short

17   deadline to review the liens and object because it's always in

18   the DIP.  So --

19        MR. QURESHI:  Fair point, Your Honor --

20        THE COURT:  I don't fault creditors' committees.  This

21   is not a broad attack on -- and I've seen them for equitable

22   subordination, the recharacterization, et cetera, et cetera.

23        MR. QURESHI:  Your Honor, I agree.  It's not a broad

24   attack in that they don't make those type of equitable

25   arguments.  But nonetheless, the standard applicable in order

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 66 of 166
Case 11-12590-MFW   Doc 323   Filed 08/18/11   Page 23 of 70
EVERGREEN SOLAR, INC.

Page 23

1    for the committee to be granted standing is that the claims

2    must be colorable.

3              THE COURT:  Right.

4              MR. QURESHI:  And when we look at it in detail, Your

5    Honor, we think that they just don't meet the standard here.

6              Now it's important also to bear in mind what the

7    Supreme Court has recently said in the Twombly and Iqbal cases

8    about pleading requirements.  It's not enough to assert, as we

9    think they do in their complaint, what the basic elements are

10   to say our liens are invalid or our liens are not properly

11   perfected.  They have to make a showing in the complaint that

12   there's an entitlement to the relief that they're asking for.

13   And they have to explain in the complaint what the grounds for

14   that relief.

15             And only if they first establish, Your Honor, that the

16   claims are indeed colorable, then we get to the second part of

17   the committee's burden which is to show that, on a cost benefit

18   analysis, it is sensible, even if the claims are colorable, to

19   pursue their prosecution.  And we think they fall down on both.

20             Unencumbered property -- I don't think I need to say

21   anything.  We don't dispute it.  There's no need to commence an

22   adversary.  There's nothing to fight about.

23             THE COURT:  So you'll sign a stipulation today before

24   the deadline runs?

25             MR. QURESHI:  Yes, Your Honor.  We don't dispute that

Case 1:11-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 67 of 166
Case 1:11-12390-MFW   Doc 323-3   Filed 03/03/15   Page 24 of 166
EVERGREEN SOLAR, INC.

Page 24

1    the assets --

2            THE COURT:  Okay.

3            MR. QURESHI:  -- that are defined as excluded property

4    in the security agreement are just that.

5            THE COURT:  Then why didn't you agree to it before the

6    last minute?

7            MR. QURESHI:  Well, Your Honor --

8            THE COURT:  They asked you to --

9            MR. QURESHI:  Your Honor, we've never taken a position

10   that we had a valid lien in those assets.  Never.  We're

11   perplexed to see that in the complaint.  It's just not a point

12   that -- there's no controversy.  We agree.

13            Your Honor, with respect to foreign intellectual

14   property -- so again, the allegation here is that we have

15   failed to comply with perfection statutes in a host of

16   countries, China, Malaysia, et cetera.  But, Your Honor, what

17   the committee -- I think they're just wrong as a matter of law.

18   And they're wrong in their example about the Chinese creditor

19   and how unreasonable it would be to expect the Chinese creditor

20   to come to Delaware to do a search to see if there's a security

21   interest against patents in China.

22            That's not what we're arguing.  We're not arguing that

23   our rights in the intellectual property in China might be

24   superior vis-à-vis a purchaser in China.  But we're saying vis-

25   à-vis the unsecured creditors here vis-à-vis a lien creditor,

1   our rights are absolutely superior.  And we think that's Black

2   letter law.  The committee doesn't dispute that intellectual

3   property, under the UCC, is a form of general intang --

4             THE COURT:  Well, back up a minute.

5             MR. QURESHI:  Sure.

6             THE COURT:  I mean, is it clear that the unsecured

7   creditors do not include any foreign creditors?

8             MR. QURESHI:  I don't know the answer to that, Your

9   Honor.

10            THE COURT:  Then --

11            MR. QURESHI:  But, Your Honor, irrespective of where

12   the creditors might come from, what we're saying is it can't be

13   the case that as a matter of U.S. law, of UCC law, that in

14   order to perfect a security interest in a general intangible,

15   which is what intellectual property is, that it is necessary

16   for the secured party to go to twenty-five jurisdictions around

17   the world and comply with whatever registration requirements

18   might exist in those jurisdictions.

19            THE COURT:  Well, why not?

20            MR. QURESHI:  Because we don't think that the UCC

21   requires that.  The UCC says that in order to have a valid

22   perfected security interest with respect to general

23   intangibles, you need to file a UCC-1 financing statement.  And

24   that's what we have done.  And the pledge in the security

25   agreement here also clearly and expressly grants a security

Case 1:14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 69 of 166
Case 11-12590-MFW   Doc 329   Filed 18/18/14   Page 26 of 70
EVERGREEN SOLAR, INC.

Page 26

1    interest to all liens worldwide.  There's nothing more that we

2    need to do --

3            THE COURT:  Won't the UCC give a lien in all assets

4    where they're located?

5            MR. QURESHI:  The --

6            THE COURT:  Is that what the law is?

7            MR. QURESHI:  The blanket lien with respect to a UCC-1

8    financing statement, Your Honor, we think absolutely does cover

9    general intangibles which include intellectual property.  And

10   while they say, Your Honor, that we don't cite any case law,

11   well, Your Honor, nor do they.  And not only do they not cite

12   case law, they don't cite any statutory provisions that stand

13   for the proposition that in order to have a valid security

14   interest here in the United States on those general intangibles

15   that we need to comply with foreign requirements.  There's not

16   a case out there that we've been able to find that stands for

17   that proposition.

18           THE COURT:  Well, there's certainly a dispute.  And

19   I'm not prepared to decide that you're right or the creditors'

20   committee is right.  So doesn't that make it a colorable claim?

21           MR. QURESHI:  Well, Your Honor, I think they need to

22   do more than simply make the allegation that their argument is

23   the right one.  Under Twombly and Iqbal, they have to make a

24   showing.  If we had some authority in their motion that says

25   here's a case that stands for the proposition, if we had a

1   statutory interpretation that says this is a reasonable reading

2   of the UCC, this reading requires that we do it -- but that

3   doesn't exist, Your Honor.  To the contrary, we think the plain

4   language of the UCC indicates otherwise.

5          And secondarily, Your Honor, we think it also falls

6   down on the cost benefit analysis.

7          So, Your Honor -- does Your Honor have any other

8   questions with respect to the foreign intellectual property?

9          THE COURT:  No.

10         MR. QURESHI:  Okay.  Let me turn to the deposit

11  accounts.  And again, to be clear, what we have said in our

12  papers is that with respect to three of the deposit accounts,

13  further investigation is required with respect to when those

14  accounts were originally funded.  We have agreed to extend the

15  committee's investigation period with respect to those three

16  accounts.  And the grand total of assets -- of cash in those

17  three accounts is 918,000 dollars.  And so, we acknowledge that

18  more time is needed.  We're not seeking to credit bid with

19  respect to that 918,000 dollars.  And because we have extended

20  the investigation period so that we can look into that issue

21  further, Your Honor, we don't think there's any claim to

22  commence at this time.

23         With respect to the balance of the cash accounts, the

24  committee states in its complaint that the balance in all of

25  the accounts, all six of them, is 4.2 million dollars,

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 71 of 166
Case 11-12590-MFW   Doc 323   Filed 10/12/11   Page 28 of 76
EVERGREEN SOLAR, INC.

Page 28

1  approximately.  And again, Your Honor, we think that's

2  overstating the issue.  As we understand it today, the

3  collective balance in all of those accounts is less than two

4  and a half million dollars.  And so, when you further back out

5  the approximately 900,000 dollars where we have acknowledged

6  there's an issue to be investigated and extended the deadline,

7  what we're talking about with respect to these deposit accounts

8  is a total of approximately a million and a half dollars.  And

9  again, that's an important point when we get to the cost

10  benefit analysis but with respect to the deposit account point,

11  in particular.

12        So the committee acknowledges, I think, because,

13  again, it's Black letter law, that if the source of the cash

14  that's in those accounts comes from collateral over which we

15  have a valid security interest then we have a security interest

16  in the cash.  I don't think that's disputed.

17        And I also don't think that there's any factual issue,

18  Your Honor, with respect to what the source is.  The debtors

19  have stated in their cash management motion that was filed

20  early in the case, that the cash in those accounts -- I think

21  the number is -- ninety-nine percent of it, if I'm not

22  mistaken, is derived from their sales, not surprisingly, from

23  their inventory.  And the committee doesn't dispute that we

24  have a valid lien over that inventory.

25        So the committee turns around and says, well, it's our

Case 14-10979-CSS    Doc 3726-3    Filed 03/03/15    Page 72 of 166
Case 11-12590-MFW    Doc 323    Filed 10/08/13    Page 29 of 70
EVERGREEN SOLAR, INC.

Page 29

1   burden to establish that, in fact, we can trace the cash in

2   those accounts to the inventory and that there's no comingling.

3   Well, respectfully, Your Honor, it's not our burden at this

4   stage.  It's their burden to show that they have a colorable

5   claim.  And when Your Honor looks back to the Twombly and Iqbal

6   pleading standards, it's not enough for the committee to assert

7   that without any basis the conclusory allegation that this cash

8   must be comingled and that it can't be the case that the cash

9   does not derive from inventory over which we have a valid lien.

10  Everything on the record before Your Honor establishes

11  otherwise.

12          And so, we think they have it backwards with respect

13  to the burden.  And again, they don't cite a single fact in

14  their draft complaint to suggest that there has been

15  comingling.  They simply say there's no control agreement and

16  therefore there's no valid security interest over those cash

17  accounts.  It is the classic conclusory allegation with no well

18  pled showing of why that might be the case.  I mean, they don't

19  even plead, Your Honor, in their complaint that we don't have a

20  security interest over the inventory.  They don't plead in the

21  complaint that there has been a comingling because they have no

22  basis to.  Again, when the cash management motion states --

23  when the debtor's 10K state that their revenues are derived

24  from the sale of inventory, there's no basis for that.

25          So again, we don't think that with respect to the cash

1    accounts, those allegations would survive a motion to dismiss.

2    And therefore, Your Honor, we don't think it's a colorable

3    claim.

4         So next, I will move to the cost benefit analysis.

5    And again, we only get here if, in fact, they have colorable

6    claims.  And what Your Honor -- as Your Honor well knows, the

7    consideration here is what are the benefits not just to the

8    unsecured creditors but to the estate as a whole of pursuing

9    these causes of action and do they outweigh the cost.  And I

10   think, Your Honor, that more than a mere mechanical comparison

11   of what are the professional fees, on the one hand, for

12   prosecuting it versus how much in liens could potentially be

13   avoided is required.  I think, Your Honor, it's proper to

14   consider, in the context of that cost benefit analysis, the

15   broader implications to the estate if the causes of action were

16   to proceed.  And that includes the delay that might result if

17   the causes of action are pursued.  That includes, in this case,

18   in particular, what the impact of that may be on the auction,

19   whether there will be an impact on the debtor's stalking horse

20   bidder and whether there will be a stalking horse bidder.

21   These are all impacts that we think Your Honor can fairly

22   consider in the context of that cost benefit analysis.  And

23   here, when Your Honor considers the big picture and the assets

24   that we're talking about.

25        So with respect to the foreign intellectual property,

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 74 of 166
Case 11-12590-MFW   Doc 325   Filed 10/04/11   Page 31 of 76
EVERGREEN SOLAR, INC.

Page 31

1    Your Honor, I'm not sure that there's a clear view as to what

2    the value of the foreign intellectual property might be.  It

3    may be the case that that foreign IP is important to the core

4    business.  But I think it's unfair to say that's a bit of an

5    unknown at this point.  With respect to the cash accounts, Your

6    Honor, it's de minimis.  As I said, we're talking about a

7    million and a half dollars.  With respect to tort claims,

8    again, there's no issue.

9            So we really are talking about minimal benefits if

10   these causes of action were to proceed and a potentially very

11   significant costs.  And I'll let the debtors talk, Your Honor,

12   about the points they raise in their paper about the potential

13   impact on their auction.  I'll just confine my arguments to

14   point out that I think it's a proper consideration for this

15   Court in that cost benefit analysis of what that overall impact

16   would be.

17           So unless the Court --

18           THE COURT:  Well, with respect to the cash accounts --

19           MR. QURESHI:  Yep.

20           THE COURT:  -- if we're only talking about a million

21   and a half dollars, why don't you just state that you won't bid

22   for that portion or assert a lien for that portion?

23           MR. QURESHI:  Well, again, Your Honor, I think it's

24   because we don't think they've alleged a colorable claim.  It's

25   a classic conclusory allegation.  It's just --

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 75 of 166
Case 11-12590-MFW   Doc 323   Filed 10/18/11   Page 32 of 70
EVERGREEN SOLAR, INC.

Page 32

 1              THE COURT:  Well, you've conceded you have no control

 2     agreement over the deposit accounts.

 3              MR. QURESHI:  Yes.

 4              THE COURT:  And you concede, therefore, that you have

 5     to be able to trace.

 6              MR. QURESHI:  Well -- and we think there are facts in

 7     the record, Your Honor, that establish that the inventory --

 8              THE COURT:  There aren't facts in the record.  That's

 9     the problem.  What record do I have before me?  A first

10     affidavit or declaration by the debtor?  Is that sufficient?

11              MR. QURESHI:  Well --

12              THE COURT:  That you have a lien on substantially all

13     the assets?  That's the problem.

14              MR. QURESHI:  Well, I think, Your Honor, we have SEC

15     filings by the debtor that I think the Court can take notice of

16     that talks to the fact that ninety-nine percent of their

17     revenues are generated by sales of inventory.

18              THE COURT:  Well, I'm not going to take judicial

19     notice of a SEC filing by the debtor.

20              MR. QURESHI:  Again, Your Honor, the burden isn't ours

21     at this stage.  The burden is on the committee.

22              THE COURT:  No.  they have stated a colorable claim.

23     They have said you have no control agreements on the deposit

24     accounts.  And you can see that.

25              MR. QURESHI:  And we think they need to do more to

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 76 of 166
Case 11-12590-MFW   Doc 323   Filed 10/18/11   Page 33 of 77
EVERGREEN SOLAR, INC.

Page 33

1    establish a colorable claim.  Just saying that you don't have a

2    control agreement, Your Honor, doesn't --

3            THE COURT:  Doesn't that shift the burden to you to

4    prove there's no comingling?

5            MR. QURESHI:  I don't think so, Your Honor, because I

6    don't think they dispute the law that the presence or absence

7    of the control agreement is not the question that decides the

8    issue.

9            THE COURT:  Well, it's one question.  If you had a

10   control agreement, they would not have a colorable claim that

11   you don't have a lien on the cash.

12           MR. QURESHI:  Agreed.  And therefore, we think that

13   the burden falls upon them, under the Supreme Court pleading

14   standards, to plead a plausible showing that we have comingled

15   the assets or a plausible showing that the --

16           THE COURT:  Well, there -- well, there is no

17   statement, no fact before me to show that the sales of the

18   inventory proceeds were placed in a separate account.  So it

19   was placed in the debtor's general accounts.  It is clear that

20   you do not have a lien on every single asset of the debtor.

21   So, I mean, doesn't that shift the burden to you to show that

22   the funds were not comingled with proceeds of noncollateral?

23           MR. QURESHI:  Well, I think the other important way in

24   which their complaint is read, Your Honor, is that their

25   allegations -- they need to be plausible.  And it's simply not

1   plausible in the face of everything we know about the company

2   and the fact that, again, they don't dispute our lien on the

3   inventory -- it's not plausible to conclude from that that the

4   cash that's sitting in those accounts comes from something

5   other than the inventory.  I mean, the debtors have --

6          THE COURT:  If this were a case where this bankruptcy

7   case had been pending for two years and we, including the

8   Court, knew a lot more about this case because a record had

9   been made, I might agree with you.  However, there is a

10  deadline for the committee to commence an action.  It is an

11  artificial deadline created by you.  You say by the exigencies

12  of this case which require a fast auction.  But the reality is

13  it is created by the secured lenders.  And for the committee to

14  be placed on that deadline, I think they have stated a

15  colorable claim clearly as to both.

16          I mean, again, I'm not going to decide the foreign

17  intellectual property legal issue.  Again, you've conceded you

18  have not filed the equivalent of UCC statements in the foreign

19  jurisdictions.

20          MR. QURESHI:  Correct.

21          THE COURT:  They state that foreign law requires that.

22  You state the UCC governs.  I'm not prepared to decide that

23  issue.  That may be purely a legal issue but -

24          MR. QURESHI:  Well, given Your Honor's view that these

25  are colorable claims then I think we next turn to the cost

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 78 of 166
Case 11-12590-MFW   Doc 323   Filed 10/25/11   Page 35 of 70
EVERGREEN SOLAR, INC.

Page 35

1    benefit analysis.  And there, Your Honor --

2           THE COURT:  That's why I'm suggesting -- if it's only

3    a million and a half and why are we even fighting over it at

4    this point.  The auction can proceed if you don't bid based on

5    that.  And if the foreign assets can be carved out, I don't --

6    or a value placed on them, we can segregate them --

7           MR. QURESHI:  I'm not sure that --

8           THE COURT:  -- perhaps.

9           MR. QURESHI:  -- that's possible with respect to the

10   foreign IP, Your Honor.  But we'll certainly consider it.  But

11   again, I do think that the impact if these causes of action

12   proceed if an adversary proceeding is commenced, the impact of

13   what that might be on the auction I think is a fair point for

14   the Court to consider.

15          THE COURT:  I do, too.  But I think it's something

16   that can be addressed in determining the contours of your

17   credit bid.

18          MR. QURESHI:  If Your Honor has any other questions,

19   happy to address them.  Otherwise, I'll turn it over to the

20   debtors and we'll, of course, what Your Honor --

21          THE COURT:  Okay.

22          MR. QURESHI:  -- has stated.

23          THE COURT:  Okay.

24          MR. QURESHI:  Thank you.

25          MR. WHITMORE:  Your Honor, Clark Whitmore on behalf of

Case 1:14-10979-CSS    Doc 3726-3    Filed 03/03/15    Page 79 of 166
Case 11-12590-MFW    Doc 329    Filed 10/18/11    Page 36 of 176
EVERGREEN SOLAR, INC.

Page 36

1    U.S. Bank, National Association, as indenture trustee and

2    collateral agent and prospective defendant in the lawsuit.  I'm

3    not unmindful of the indications that the Court has provided

4    from the bench.  And I hope that I'm not in a position of

5    having the Court rule on the motion before we've had an

6    opportunity to be heard.  But I will try to balance and

7    calibrate my remarks in light of the hesitancy of the Court to

8    make certain rulings at this time.

9         With respect to the -- there's a few things that I

10   think that have come out incorrectly in the presentation so

11   far.  The first is that the cash collateral stipulation -- the

12   cash collateral order, rather, that was entered by the Court,

13   in my reading of it, it doesn't create a deadline for the

14   committee to come forward and point out that the scope of the

15   pre-petition liens created by the pre-petition documents don't

16   include certain items.  Count I of that complaint is simply a

17   recitation of Section 2.2 of the pledge and the security

18   agreement that provides that there are certain excluded assets

19   from the very broad grant of a lien that was provided for in

20   Section 2.1 of that same document.

21        There's no emergency requirement that the committee

22   bring a lawsuit against U.S. Bank saying, aha, Section 2.2 of

23   this agreement provides this, which we do not dispute.  And,

24   frankly, no one came to my client, U.S. Bank, and said do you

25   dispute the existence of Section 2.2 of the security agreement.

1  We would have said, of course not; there it is.  And we're not

2  aware of any dispute, the present controversy about the

3  application of that section.

4       So while it's certainly -- I appreciate the Court's

5  sympathy toward a committee having to respond to a tight time

6  frame and I'm -- and not being terribly sympathetic to secured

7  creditors who've imposed that timeline, but with respect to the

8  scope claims in Count I, as representing the entity that would

9  be sued, I'm here struggling with why it is that we need to be

10 a defendant in a lawsuit that provides that the scope of our

11 pre-petition liens is what the documents say it is because I

12 don't believe that there's any order to this Court that springs

13 out and makes that lien bigger.  So I would respectfully point

14 out that with respect to Count I, I think regardless of whether

15 the supporting noteholders are willing to stipulate to anything

16 or not, it's a little bit of a false issue presented before the

17 Court.  And I think that we can all just agree that the scope

18 of our pre-petition liens as opposed to any adequate protection

19 liens or any proceeds and so forth, that the scope of the pre-

20 petition liens are as set forth in the pre-petition documents.

21 That is simply not the basis for a lawsuit where I'd like to go

22 back to Minneapolis and explain why it is they're being sued

23 about that.

24       THE COURT:  All right.

25       MR. WHITMORE:  Now, I think the same thing really

1    pertains to the claim relating to commercial tort claims.  The

2    committee indicates that there is a -- no special UCC financing

3    statement filed with respect to commercial tort claims.  I wish

4    they'd believe there are none.  I believe that the Uniform

5    Commercial Code requires that commercial tort claims need to be

6    specified and they're not after acquired property.  So I don't

7    understand how it is that we can have a case of controversy

8    over a zero set of property.  The committee, after the

9    investigation period, has not come up with a suggestion that

10   there is any commercial tort claims.  And it just doesn't seem

11   appropriate that we should be subjected to a lawsuit seeking a

12   declaration that if the nonexistent property were ever to

13   become existent that we would have certain rights and wouldn't

14   have other rights in those.  So we would also point out, Your

15   Honor, that I think that portion of the onion comes off as

16   well.

17          Which really leaves two claims in the complaint.  And

18   I appreciate that the Court has some preliminary reactions with

19   respect to those claims.  But I would like to point out a few

20   things with them.  With respect to the foreign IP, well, it can

21   certainly -- I think the Court has the right to say with

22   respect to legal issues, you know, this legal issue is so hard

23   or so novice, so odd, that I'm just going to consider this a

24   colorable claim because I just don't want to go there

25   without -- on a standing motion.  I think, however, that it's a

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 82 of 166
Case 11-12590-MFW   Doc 323   Filed 10/18/11   Page 39 of 70
EVERGREEN SOLAR, INC.

Page 39

1    relatively routine straightforward analysis that leads the

2    Court to the conclusion that intangible assets of a Delaware

3    corporation are located -- to the extent they're located

4    anywhere, located where the debtor is located.  So the debtor,

5    which is a Delaware entity, owns property.  It owns tangible

6    property.  And if it owns tangible property, we might look to

7    the Uniform Commercial Code in Kansas if it owns tangible

8    property in Kansas if there's a possessory lien involved.

9         But if there's intangible assets, this Court looks to

10   the choice of law rules of the state of Delaware.  And when

11   this Court looks to those rules, the Uniform Commercial Code

12   itself provides a very clear set of rules about when does

13   Article 9 apply and when does not Article 9 apply.  And it

14   deals with the situation of laws in different places and so

15   forth.  So Section 9.109 provides that if the U.S. government

16   has a law, a statute, a regulation or a treaty with a foreign

17   country then that can -- and it preempts the UCC, then that

18   will substitute for Article 9.  It also provides that if a

19   foreign government has a lien that it has created -- or has

20   given as a debtor that the laws of that foreign nation will

21   govern the creation of perfection of that under 9.109(c)(iii).

22        There has been no allegation that there is a foreign

23   treaty that the U.S. is a party to that provides that a bank

24   wanting to get a lien in the intangible assets of a Delaware

25   corporation is required to say, well, are any of those

1    intangible assets related somehow to the laws of some foreign

2    country?  Do I need to run all over the world to figure out

3    whether I need to file in 167 different countries?  That isn't

4    the law.

5              There really is no -- with respect to preemption, the

6    law in the United States statute is very clear that even for

7    U.S. patents and U.S. trademarks, a UCC financing statement is

8    sufficient to perfect.  So the committee has not pointed to and

9    can't point to any statute where the United States government

10   has said well, even though UCC-1 is sufficient to perfect

11   patents and U.S. patents that if you want to perfect a patent

12   in the debtor's intangible rights in various countries around

13   the world, you have to run around to all those countries and do

14   various things.  No such treaty exists.

15             The parties here selected the UCC as the basis for

16   granting a consensual contractual lien.  Article 9 clearly

17   applies unless it doesn't apply.  And in this case, I think

18   this is a fairly straightforward analysis that the Court would

19   apply to conclude that a Delaware debtor can grant a

20   contractual lien in its intangible assets, its general

21   intangibles, and that can be perfected through the filing of a

22   financing statement.  And when that is done, it beats a

23   judgment lien creditor.  That's the other piece that the

24   committee is sort of missing is that that's -- when you become

25   a judgment lien creditor under 544, you don't become an

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 84 of 166
Case 11-12590-MFW   Doc 323   Filed 10/03/11   Page 41 of 166
EVERGREEN SOLAR, INC.

Page 41

1    intergalactic party with rights to void anything all over the
2    world.  You become a judgment lien creditor.  And a lien
3    creditor is defined in the UCC.  The UCC and the Bankruptcy
4    Code are integrated.  And at least for purposes of beating a
5    bankruptcy trustee, a U.S. bankruptcy case, the law is clear
6    that a perfected UCC secured creditor wins.

7            So the committee is here really seeking to step into
8    the shoes of a Delaware judgment lien creditor and seeking to
9    avoid general intangibles in the fact of an undisputed prior
10   perfected lien.  And that is not a colorable claim.

11           I will concede that one could look at a question like
12   that with some hesitancy because there's always uncertainty
13   when one is looking at the potential interplay of the laws of
14   different countries.  But this is not that case.  This is a
15   U.S. case involving a U.S. debtor, a Delaware debtor who's
16   granted a UCC lien.  And we have -- there may be foreign
17   creditors but they're going to come to a U.S. bankruptcy court
18   and file a U.S. proof of claim and seek to get paid in
19   accordance with U.S. laws.  And this -- it would be a terrible
20   setback for the Uniform Commercial Code.  The whole point in
21   2001 of simplifying the Uniform Commercial Code was to create
22   certainty and predictability in commercial transactions.  So we
23   changed the law to provide that if you had a Delaware debtor,
24   you could file that UCC-1 and everybody would know, yeah, you
25   go to Dover, Delaware and check it out.  And to create a level

Case 1:11-10279-CSS   Doc 3726-3   Filed 03/03/15   Page 85 of 166
Case 11-12590-MFW   Doc 329   Filed 10/08/15   Page 42 of 70
EVERGREEN SOLAR, INC.

Page 42

1   of uncertainty like this would be a terrible thing, a terrible

2   setback to say, well, wow, are there any general intangibles

3   that this debtor, this U.S. debtor has that might somehow be

4   rooted in some foreign laws and then can we run around to 160

5   different countries and come up with reasons why there should

6   be probably with liens.  I mean, that is not what we were

7   trying to do in 2001 when the Code was changed.

8          With respect to deposit accounts, all I can say, Your

9   Honor, is this.  If that's the only reason this lawsuit needs

10  to go forward, there has to be some sort of way to -- whether

11  it's extending a deadline or what have you to allow that issue

12  to remain out there so the parties can continue to look at that

13  without, I think, the need to start litigation, the question is

14  really is there a basis for starting a lawsuit today.  And I

15  don't --

16         THE COURT:  Well, there's an easy answer.  Extend the

17  deadline for all.  But the credit bid issue is going to be

18  really the issue.

19         MR. WHITMORE:  Okay.  And as to those matters, I, of

20  course, defer to our supporting noteholders.  And we

21  respectfully yield.

22         MR. WILLETT:  Your Honor, Sabin Willett for the

23  debtor.  I was sort of afraid this would happen.  Our

24  perspective is different to all the ones you've heard so far.

25  This is a standing motion.  That's all it is.  We don't agree

1    with either of the two core propositions that are left in the

2    committee's position.  But on the other hand, we're a debtor

3    who's asked this Court to expedite proceedings.  We've

4    contractually bound ourselves to the secured creditors.  Who is

5    the fiduciary who should speak for the debtor?  And we don't

6    disagree with the committee that where they have a targeted

7    limited suite of issues, they are that fiduciary.  We do not

8    agree with them on the merits.  We do not agree that anything

9    that happens here today would authorize them to bring a claim

10   where there's no controversy.  That would be a waste.  And we

11   would vigorously any fee application that came with that.  We

12   don't agree that they can take over a settlement of any issues

13   other than the ones that they've carved out in the complaint.

14   All we've said is that if there is to be some estate

15   representative to challenge these issues, it can't plausibly be

16   us given where we are in the case.  That's all we're saying.

17         A couple of things were of concern to me listening to

18   the arguments of counsel.  Mr. Stratton said once the complaint

19   is filed then we can negotiate.  Well, I really do hope that no

20   complaint gets filed to ask for declaratory relief of things

21   that no one contests.  And Your Honor's quite right.  There's a

22   simple practical solution and I would encourage all of the

23   creditors in this group to take the necessary action, extend

24   the deadline by a couple of days, if necessary, so that this --

25   whatever's left of the complaint can be skinnied down to what I

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 87 of 166
Case 11-12590-MFW   Doc 323   Filed 10/04/11   Page 44 of 70
EVERGREEN SOLAR, INC.

Page 44

1     take to be the only two issues left in the case -- left in

2     their dispute which is the extent to which the secureds are

3     perfected in some bank accounts and the foreign IP issue.

4             Now, Your Honor, we have things to say on the merits

5     of those two points.  I don't think they're relevant to the

6     standing issue.  I think they're deeply relevant to the last

7     item on your calendar, the emergency motion that the committee

8     makes for an injunction for which they in no way, shape or form

9     have they made out a case for an injunction against the sale.

10    But since everyone else is talking about them, I'll just

11    outline where we come out on that.

12            And this is -- I'll start with the bank accounts which

13    is really a powerful point in favor of some modest extension so

14    that we can trim that out as well.  We're talking about two

15    bank accounts and four certificates of deposit.  The debtor --

16    the original thinking was that all of these accounts and CDs

17    contain proceeds of collateral that the committee and everyone

18    else concedes is the secureds.  However, in looking at this,

19    we've noticed that three of the CDs predated the secured

20    financing.  Hard to make a proceeds argument there.  Those are

21    the three that the secureds' papers say they're going to take a

22    look at.

23            So everyone's agreed those three are out of the credit

24    bid and parties would reserve rights.  To me, that resolves

25    what we need to do in the short term on those accounts.

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 88 of 166
Case 11-12590-MFW   Doc 323   Filed 10/18/11   Page 45 of 70
EVERGREEN SOLAR, INC.

Page 45

1          The other accounts, I'm confident that anyone looking

2     at records that are available to us and we can distribute to

3     the parties, we'll see that they contain nothing but proceeds

4     of inventory sales.  And I would hope that before expensive

5     gets launched, folks can look at that.

6          But the only point to make on standing is that

7     ultimately the estate representative on that issue should be

8     the committee.  The debtors should be able to object to any

9     waste that occurs.

10          With respect to the foreign IP, I have only two things

11     to say.  The first thing is I think Mr. Whitmore has it right.

12     The concept of the UCC shows in 9-109 that the drafters

13     understood -- the legislature in Delaware understood that there

14     would be certainly things carved out and subject to foreign

15     law.  U.S. treaties would govern that, for example.

16          We don't have that in this case.  So the premise is

17     that what everyone agrees is perfection of a general intangible

18     here controls worldwide.  We think that's right.  But we did

19     notice that neither the committee nor the secureds has cited a

20     case in the Third Circuit or anywhere conclusively holding

21     that.  So to say that there's no colorable claim, I think the

22     committee is wrong but I can't offer you a case that says that

23     on all fours.

24          So, broadly speaking, that's where we are on those --

25     what I perceive to be the only remaining issues left on the

Case 1:11-10779-CSS    Doc 2726-3    Filed 03/03/15    Page 89 of 166
Case 11-12590-MFW    Doc 323-3    Filed 10/23/15    Page 46 of 77
EVERGREEN SOLAR, INC.

Page 46

1    extent of what otherwise indeed is a lien on substantially all

2    of the assets of the estate.  I'll reserve the rest of this

3    argument to what's really important which is the last motion.

4    We do not want to be enjoined from proceeding with the stalking

5    horse bid.  Thank you, Your Honor.

6           MR. STRATTON:  If I may, Your Honor, a few words in

7    response.  Let's start with Mr. Whitmore and his complaint that

8    no one came to him and said, gosh, won't you agree that you

9    don't have a lien on any of these assets.  He was given a draft

10   of the complaint on October 12th.  It was for purposes of

11   obtaining a waiver for Kramer Levin which was not forthcoming

12   but I'm pretty sure he read it.  And since October 12th, he's

13   had thirteen days where he could have picked up the phone and

14   said, hey, guys, we'll stipulate as to these assets.

15          Which brings me to my second point.  Today or

16   yesterday suddenly the noteholders and, I guess, the indenture

17   trustee want us to sit down and talk and let's extend the

18   investigation deadline and can't we be friends.  Well, why

19   wasn't that raised two weeks ago?  And the problem it creates,

20   Your Honor, is obvious.  I'm very uncomfortable trying to

21   negotiate a stipulation with respect to what's in and what's

22   out without some time to think about the assets, get some

23   clarity on what they think is in and what we think is out

24   because if we make a mistake, it's to the prejudice of

25   unsecured creditors.  And this isn't an idle matter.  And I'll

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 90 of 166
Case 11-12590-MFW   Doc 329   Filed 08/08/11   Page 47 of 76
EVERGREEN SOLAR, INC.

Page 47

1    point to a fact which I think establishes that plus the fact

2    that there isn't a case in controversy here.

3            Included in the assets that are being auctioned, and I

4    believe it's the core assets, are the debtor's leases of its

5    headquarters and R&D facility in Massachusetts.  Do I have that

6    right? The secured noteholders purport to have the right to

7    credit bid as to all those assets even though they're telling

8    us today, oh, we don't have a lien on those assets.  So, in

9    fact, there is something that needs to be resolved by this

10   Court.

11           With respect to --

12           THE COURT:  Well, what do you think I have to resolve

13   on that issue?

14           MR. STRATTON:  Well, I think we need to either -- we

15   need to do one of two things:  submit to you our position and

16   they submit your (sic) position and you say you're right or

17   you're right.

18           THE COURT:  They agree they don't have a lien on the

19   leases.

20           MR. STRATTON:  Your Honor, that's fine.  But what

21   about the rest of the assets?  And in particular, what are

22   those assets?  And I'm going to address Your Honor's bigger

23   question of how do we go from here.  But a couple of points

24   before I get there I think would be helpful in understanding

25   our concerns.

Case 14-10979-CSS    Doc 3726-3    Filed 03/03/15    Page 91 of 166
Case 11-12590-MFW    Doc 323    Filed 10/18/11    Page 48 of 176
EVERGREEN SOLAR, INC.

Page 48

1          Mr. Whitmore, humorously, I suppose, refers to the

2     intergalactic creditor.  Well, we now have international

3     economies and it's not a stretch at all to suggest that what

4     happens in China is relevant to what happens in this Court.

5          First, Section 544(b)(1) says "the trustee may avoid

6     [a lien]...that is voidable under applicable law".  We would

7     take the position that "under applicable law" includes the laws

8     of other nations where property rights are created.  And he

9     says it can't possibly be the case that secured creditors have

10    to traipse all over the world filing pieces of paper in

11    different countries to perfect or give notice of their lien in

12    assets created by the laws of those countries.

13         I found yesterday -- or we found yesterday four

14    different treatises or white papers that say just that.

15    "Secured noteholders need to go to different countries and

16    register their security interests if they want to claim a

17    perfected security interest under the laws of other nations."

18    So he's wrong about that.

19         With respect to the big question, how do we proceed,

20    we can either put the whole thing off for what I would suggest

21    should be sixty days, in other words, extend the deadlines in

22    the cash collateral order for a period of sixty days while we

23    work out what's in what's out in terms of the assets, what's

24    going on with the bank deposits.  There's no evidence at all,

25    Your Honor's right, no evidence whatsoever, that the

Page 49

1   proceeds -- the monies in those accounts are the proceeds of

2   collateral as to which the debtors gave and the secured

3   noteholders perfected a security interest.  That's just not in

4   the record.

5          So we could buy some time, figure this out, figure

6   what's really at issue and it may boil down to the patents, I

7   don't know.  Or, we could file the complaint today.  Doesn't

8   cost so much money.  They don't have to do anything for thirty

9   days.  They have a full thirty days to answer and we can sit

10  down with them and work out these same issues.  But one way or

11  the other, just say, okay, well, stipulate today before this

12  deadline passes and you can take all those issues out.  I think

13  that puts us at a huge disadvantage in terms of facts and

14  negotiating language.

15         With respect to the accounts, nobody's going to know

16  what's going on today about those.  And I don't know if whether

17  it would be fifteen days, thirty days or forty-five days, but I

18  think sixty days should cover it.

19         So first, we would ask that Your Honor grant the

20  motion so that we have standing to assert these claims.

21  Second, we would ask that if they want to talk to us about how

22  this is going to play out in terms of the auction and what not,

23  we're here to talk.  And third, if we're going to postpone

24  things, it should be across the board and it should be in the

25  form of modifying the cash collateral order.  Thank you, Your

Case 14-10979-CSS    Doc 3726-3    Filed 03/03/15    Page 93 of 166
Case 11-12390-MFW    Doc 323    Filed 10/04/11    Page 50 of 70
EVERGREEN SOLAR, INC.

Page 50

1    Honor.

2            MR. WILLETT:  Your Honor, just seeing from the

3    debtor's perspective, if there's to be a grant of the standing

4    motion then I would -- we have one issue to discuss in the

5    hallway regarding the auction.  Another one might be the

6    suggestion -- sixty days sounds unnecessarily long but maybe

7    the parties could reach agreement on some brief extension that

8    narrows the scope of any proceeding that follows and saves

9    everybody time and money.  So we think people should talk about

10   that.

11           MR. STRATTON:  Your Honor, Mr. Willett conceded the

12   debtor has a conflict.  We are, as he said, the estate

13   fiduciary.  Why we should have to bargain away rights which

14   only we can assert on behalf of the estate when we've met

15   the --

16           THE COURT:  I don't know that you're bargaining away

17   any rights.  But I do think you need to talk to them about --

18           MR. STRATTON:  We're happy to talk --

19           THE COURT:  -- an extension.

20           MR. STRATTON:  If it's the plain simple vanilla

21   extension, it's fine, Your Honor.  But we're not going to

22   compromise claims in the hallway.

23           THE COURT:  I know your position.

24           MR. STRATTON:  Thank you.

25           THE COURT:  Why don't we take a break so the parties

Case 1:11-10370-GSS   Doc 3726-3   Filed 03/03/15   Page 94 of 166
Case 11-12390-MFW   Doc 3273   Filed 03/03/15   Page 91 of 166
EVERGREEN SOLAR, INC.

Page 51

1    can talk?

2          MR. WILLETT:  Thank you, Your Honor.

3       (Recess from 10:36 a.m. until 12:07 p.m.)

4          THE CLERK:  All rise.  You may be seated.

5          MR. WILLETT:  Good afternoon, Your Honor.  Sabin

6    Willett for the debtor again.  I think all parties had hopes we

7    would have some kind of more global settlement to report.  We

8    don't.  But the debtor has a practical suggestion for the Court

9    that I think would resolve all of the motions that are before

10   you this morning.

11          I should point out one of them, your -- we didn't

12   reach, which was the motion to seal.

13          THE COURT:  Right.

14          MR. WILLETT:  It's number 3.  The U.S. -- that was a

15   motion -- the committee filed twenty-two exhibits and in an

16   abundance of caution, they sealed them all.  They relate to

17   bidding so we thought that was appropriate.  The U.S. trustee

18   has pointed out that there may be things in there that really

19   shouldn't be sealed.  So the suggestion has been to simply

20   adjourn that motion to the next calendar.  We will try to work

21   out an arrangement unsealing public matter that really

22   shouldn't be sealed.

23          THE COURT:  Okay.

24          MR. WILLETT:  I don't think there's any dispute in the

25   room on that.

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 95 of 166
Case 11-12390-MFW   Doc 323-2   Filed 10/18/11   Page 52 of 70
EVERGREEN SOLAR, INC.

Page 52

1           THE COURT:  All right.  Then we'll continue that.

2           MR. WILLETT:  With regard to the motions that the

3    parties do dispute, here's the debtor's suggestion for going

4    forward, Your Honor.  First of all, the standing motion would

5    be -- you've heard the arguments on the standing motion.  Your

6    Honor would simply rule on the basis of those arguments.  But

7    the suggestion that we've made is that, in addition, the

8    committee would be granted a thirty-day extension of its

9    deadline to contest liens, frankly, with the practical hope

10   that that's going to limit any contest that occurs because we

11   think many of these things are not in dispute.

12           The schedule for the auction -- excuse me, Your Honor.

13           MR. STRATTON:  Your Honor, just to be -- David

14   Stratton for the record.  Just to be clear, what Mr. Willett is

15   doing is putting our discussions in the hall on the record.  We

16   didn't agree to this.  And I think it's inappropriate to sort

17   of drag it in here as a proposal when we've already tried to

18   agree to it and we haven't succeeded.

19           MR. WILLETT:  Your Honor, I was very clear.  This is

20   the debtor's suggestion.  This is not anybody's conversations

21   in any hallway.

22           And the committee's extension for thirty days would

23   only be as to the discreet matters they have already identified

24   in their filings.  There are only four of them.  They wouldn't

25   start over on anything else.

Case 14-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 96 of 166
Case 11-12590-MFW   Doc 323   Filed 10/18/11   Page 53 of 170
EVERGREEN SOLAR, INC.

Page 53

1        The schedule for the sale would be modified so that

2    bids were due November 1.  There was an auction on November 7th

3    and there's a hearing -- sale hearing on November 10th.

4        We're going to suggest that for the very reasons that

5    were discussed with regard to the standing motion, the debtor's

6    injunction motion against a credit bid should plainly be denied

7    because they've plainly not made out an injunction standard on

8    this foreign IP or anything else.

9        THE COURT:  Well --

10       MR. WILLETT:  We can argue about that later.  But

11   our -- the debtor's strong view is that the credit bid should

12   be permitted to be made at this auction.  There would, however,

13   be a briefing calendar that we would suggest to the Court with

14   regard to the narrow foreign -- the perfection in foreign

15   intellectual property.  And the suggestion is that the parties

16   that believe that the secured creditors are perfected would put

17   a brief in by October 31st.  The committee would respond by

18   November 7th and replies would be due November 9th, the day

19   before the hearing.  As I say, the motion for an injunction

20   would be denied.

21       When we get to the sale hearing, if it turns out that

22   the credit bid is the prevailing bid, then Your Honor would

23   have to decide the foreign IP question.  But the debtor

24   believes that because it clearly is a pure question of law,

25   that should be feasible on the briefing.

1          If there is a cash overbid, there will still be an

2     argument as to how to allocate proceeds perhaps but it may not

3     be necessary for the Court to resolve that dispute at the sale

4     hearing.  We just won't know what we have until the auction is

5     complete.

6          That's, in broad outline, what the debtor proposes.

7     Now I recognize we haven't argued yet on the committee's

8     injunction motion.  And I'm prepared to do that if the Court

9     thinks it's useful.  But we submit this as a practical way

10    forward.

11         THE COURT:  Well, let me hear the other parties'

12    suggestion of how to move forward.

13         MR. STRATTON:  I think I was right the first time that

14    this is exactly what we were talking about in the hall, but be

15    that as it may, I think the committee is entitled to be heard

16    on -- well, first of all, let's talk about the standing motion.

17    If they want to push back the investigation period for thirty

18    days with respect to the issues we've raised in our complaint,

19    that's fine.

20         With respect to the resolution of the foreign IP issue

21    and the credit bid, their proposal is also upside for them and

22    nothing for us.  If it turns out -- first of all, they would

23    retain the right to credit bid because the motion would not be

24    granted.  Then if it turns out they don't have a lien in some

25    of the assets and they don't want to pay cash, they can walk

Case 1:11-10979-CSS   Doc 3726-3   Filed 03/03/15   Page 98 of 166
Case 11-12390-MFW   Doc 923   Filed 08/18/11   Page 55 of 70
EVERGREEN SOLAR, INC.

Page 55

1    away from their bid and we're left with nothing.

2          In the meantime, they want us to brief the crucial

3    issues in this case in twelve days.  And these issues involve

4    proof of foreign law which is not something where you just go

5    to West's Bankruptcy Reporter, find six cases on point and cite

6    them to Your Honor.  We're going to need to decide which

7    jurisdictions are most important -- obviously, China is one of

8    them -- get appropriate translations, get appropriate

9    affidavits, or other means to prove foreign law and submit it

10   to Your Honor.  And then, by the way, they want Your Honor to

11   decide it in less than twenty-four hours after you've gotten

12   all the briefs  which -- I don't want to speak for the Court.

13   I think it's just a little presumptuous on the issue that

14   apparently has never been written on before and is essential to

15   this case.

16         In the meantime, they haven't addressed the bank

17   accounts which released almost a million of those dollars we

18   know or we believe don't have a lien attached to them.  And as

19   to the balance, we still don't know what the facts are.  Maybe

20   we'll work that out; maybe we won't.  But thirty days from now

21   is after the auction and after the sale hearing, so what about

22   that.

23         So what we would suggest, Your Honor, is we either

24   push everything out for thirty days or you grant our standing

25   motion, we file the complaint, we'll try to narrow the issues

Case 14-10979-CSS    Doc 3726-3    Filed 03/03/15    Page 99 of 166
Case 11-12590-MFW    Doc 323    Filed 10/13/11    Page 56 of 70
EVERGREEN SOLAR, INC.

Page 56

1   that are going to be resolved and come up with an intelligent

2   schedule that gets the briefing done in forty-five or sixty

3   days.  We're not trying to drag this out.  We're not trying to

4   hold the noteholders hostage.  We're trying to present the

5   issues which we think are important and which involve assets,

6   which they have maybe the key assets and as to which they don't

7   have liens, in an intelligent fashion.

8           Then we'd like to be heard on the credit bid portion

9   of the hearing which is our motion for essentially a ruling

10  that they can't credit bid as to these assets until this matter

11  is resolved.  Thank you.

12          MR. WILLETT:  Your Honor, I know the secureds will

13  want to speak but I think I can clear up a couple things

14  quickly.

15          The first point Mr. Stratton makes, the need to

16  address this issue in twelve days, is a problem they already

17  have and have had since the bid procedures order entered.  The

18  bid procedures order says that the secured lenders may credit

19  bid.  And unless they come in and make a showing to you to show

20  why that should not happen as to some collateral, that's the

21  law of this case.  It's been since the first day.  So this is

22  nothing new.  And we're not imposing any new burden on them.

23  Maybe they have raised a colorable issue but they certainly

24  haven't had an injunction standard.  And that's what would be

25  necessary to prevent the credit bid.  It was always the case

Case 1-11-10979-CSS  Doc 3726-3  Filed 03/02/15  Page 100 of 166
Case 1-12590-MFW  Doc 7931  Filed 03/03/15  Page 57 of 176
EVERGREEN SOLAR, INC.

Page 57

1   that an issue like this would have to be addressed at the sale

2   hearing.

3           The second thing, I want to be clear on the secureds'

4   so-called walk-away rights that Mr. Stratton referenced.  All

5   we're suggesting is that the secureds' rights would be

6   unchanged.  If they have today the right to walk away, if it

7   turns out that they don't get foreign IP, if that's in the

8   documents then they would still have it; if it's not in the

9   documents then they wouldn't.  We're not giving them anything

10   new or taking anything away.

11           The third thing as to the bank accounts, we are quite

12   confident that that issue can be narrowed in a time available.

13   And in the worst case, bank accounts could be excluded from the

14   bid.  Thank you, Your Honor.

15           MR. STRATTON:  I apologize, Your Honor.  Just one

16   point.  The argument that Your Honor has already ruled on the

17   for-cause aspects of credit bidding under 363(k) and that that

18   is law of the case is just simply not true.  You didn't say

19   that in the transcript that they've quoted.  And you didn't

20   have these facts in front of you so I don't know how you could

21   have ruled on that.  So I wish we wouldn't say those sorts of

22   things 'cause clearly they're not the case.

23           MR. STAMER:  Your Honor, I'll be very brief.  And I

24   was actually hoping not to stand up.  But we believe that you

25   have, in fact, ruled on the for-cause aspects of credit

Case 1:11-10979-CSS  Doc 3726-3  Filed 03/02/15  Page 101 of 166
Case 1-12590-MFW  Doc 73-3  Filed 04/04/11  Page 96 of 776
EVERGREEN SOLAR, INC.

Page 58

1  bidding.  To the extent we don't have ultimately valid liens,

2  there's another issue as to what we can and can't do.  But that

3  issue is not left open.  And at the appropriate time, we can

4  show you not only the order but the --

5        THE COURT:  Show me the order.

6        MR. STAMER:  May I approach, Your Honor?

7        THE COURT:  Yes.

8     (Pause)

9        THE COURT:  Well, the order gives you the right to

10  credit bid on the collateral, the pre-petition collateral.

11        MR. STAMER:  Correct, Your Honor.

12        THE COURT:  Okay.  So you can't credit bid on

13  something that is not the pre-petition collateral.

14        MR. O'NEILL:  And, in fact, Your Honor, that was the

15  underlying premise of the order.  And Mr. Stamer actually said

16  at the hearing, Your Honor, we either have valid liens or we

17  don't.  If we don't have valid liens, we can't credit bid.

18  Period.  That's page 44, line 19 through 21.

19        MR. STAMER:  But that's not really -- respectfully,

20  it's not a 363 case or it's not a causation issue.

21        THE COURT:  No.  I understand.  But --

22        MR. STAMER:  Your Honor, in a perfect world, we'd move

23  forward with the auction without issues associated with

24  collateral.  The issues that have arisen in connection with the

25  foreign IP, they could or could not be critical to the

```
 1    operation of the core business.  As Mr. Qureshi said in his

 2    argument, we're not sure if it has any value independently or

 3    in connection with the business.  We're still working through

 4    that.  But the deal, as evidenced in the documents, is we're a

 5    stalking horse bidder for -- granted it's an R&D somewhat

 6    startup business.  But it's a business that's supposed to have

 7    viability.  And if it doesn't have critical IP then it kind of

 8    frustrates the whole purpose of the purchase of that business.

 9              THE COURT:  I understand.  But --

10              MR. STAMER:  Your Honor, the --

11              THE COURT:  What is your solution?

12              MR. STAMER:  I --

13              THE COURT:  Either I decide whether you have a lien on

14    the property in which case you're comfortable that your credit

15    bid gets you that property or I don't.  And you buy something

16    with the possibility that you might have to pay cash for that

17    value.

18              MR. STAMER:  Or, under the documents, have the ability

19    to walk away if we're not getting what we originally bargained

20    for.  I think the debtor's solution, while it's not perfect and

21    it is an abbreviated time frame, I think it balances all the

22    issues.  So that by the time we get to the sale hearing, Your

23    Honor -- and we apologize in advance for putting additional

24    pressure on the Court -- this we don't think is a totally

25    complicated issue.  Obviously, we think we're on the winning
```

Case 1-11-12590-CGS-MFW   Doc 3726e3   Filed 03/03/15   Page 103 of 166
Case 11-12590-MFW   Doc 7513   Filed 03/02/15   Page 60 of 77
EVERGREEN SOLAR, INC.

Page 60

1    side of this issue.  But ultimately, it's a matter of law as to

2    whether or not we have a perfected security interest in the

3    foreign IP based on the filing of the appropriate UCCs.

4          If I can just add one thing in context, and I'll shut

5    up if Your Honor wants me to, Mr. Stratton very eloquently said

6    that he's not here to hold anybody up.  And I appreciate those

7    comments.  In order for this to actually -- to constitute value

8    that will be available for unsecured creditors, even

9    administrative creditors, they basically need to satisfy three

10   things.  The first is, Your Honor, they need to establish we

11   don't have a lien which we think we do.  And we believe we'll

12   be able to establish that.  Second, they have to establish that

13   there's allocable value to the foreign IP which, again, Your

14   Honor, we don't know if there's any value to it at all.  So

15   that's two.  And number three, remember, Your Honor, to the

16   extent there is diminution in value of our collateral during

17   the course of the case, which we're not asking the Court to

18   rule on, then the replacement liens would prime everybody else,

19   administrative creditors, unsecured creditors.

20         So we were joking in the hallway -- and I don't mean

21   to talk about settlement discussions but it's the triple

22   lending, right?  They need to satisfy all three of these things

23   in order for this to be a valuable estate asset which, again, I

24   think goes to the cost benefit analysis, but I digress a little

25   bit.

Case 1-10970-CSS Doc 3726-3 Filed 03/03/15 Page 104 of 166
Case 1-12590-MFW Doc 7533 Filed 03/02/11 Page 61 of 76
EVERGREEN SOLAR, INC.

Page 61

1        In short, Your Honor, it's not a perfect solution that

2    the company is proposing.  But we think, as the stalking horse,

3    we're entitled to some clarity with respect to what we are and

4    are not buying.  In a perfect world, we'd get it today but the

5    Court has already indicated the Court's not in a position to

6    give us guidance today.  But under the abbreviated time frame,

7    we think it balances all of the competing interests and gets

8    hopefully to a successful auction.

9        And I think -- Your Honor, as the debtors have said,

10    if there's a cash bidder for the core business -- and we have a

11    release price.  So if someone's willing to pay 30.1 million

12    dollars, this is not -- it's no longer a fire drill from the

13    perspective of the Court, I believe, that we can fight about

14    allocation issues later and the like.  But if we end up as a

15    credit bidder, we feel as though we need clarity in connection

16    with the sale hearing.  Thank you, Judge.

17        MR. STRATTON:  Briefly, Your Honor.  David Stratton

18    for the record.  The abbreviated time schedule is not of your

19    making, Your Honor, or mine.  It's entirely of the secured

20    noteholders' making.  And why they should benefit from that is

21    completely beyond me.  In fact, they shouldn't.  And we should

22    come up with a solution that permits this issue to be framed

23    and developed and decided in a rational manner.

24        I would suggest one of two things.  Either across the

25    board sixty-day extension on our investigation period insofar

Case 1:11-09079-CSS Doc 3726-3 Filed 03/02/15 Page 105 of 166
Case 1-12590-MFW Doc 73 Evergreen Solar, Inc. Filed 09/02/11 Page 62 of 76

Page 62

```
 1    as it relates to the claims we've identified.  I'm not looking
 2    to open it up to other claims.  But just as to those issues
 3    framed in the complaint, we'd push it back sixty days and leave
 4    the ball up in the air.  Alternatively, grant the motion, the
 5    previous schedule -- that seems to be fine on the sale and bid
 6    deadlines, not on the briefing and require that the noteholders
 7    to leave behind or to post some cash -- we had proposed to them
 8    seventeen million dollars which is the difference -- well,
 9    actually, they can only credit bid thirty million dollars.
10    There's thirteen million dollars in cash in there.  So the
11    notional value of the balance of the assets is seventeen
12    million dollars.  They can leave that behind while we decide
13    these issues.  But they're going to eat their cake and have it,
14    too, and tell us to eat it along with them in the next two
15    weeks.  It's not a rational approach.
16              MR. WILLETT:  Your Honor, Sabin Willett for the
17    debtor.  This point, I think, is narrowly procedurally.  On
18    September 7th, Your Honor entered an order.  And in that --
19    it's the final order approving the use of cash collateral, et
20    cetera.  And at paragraph 19, you ruled, "The pre-petition
21    secured parties shall have the right to credit bid."  It
22    carries on.
23              THE COURT:  "Credit bid during any sale of the pre-
24    petition collateral."
25              MR. WILLETT:  Right.
```

1        THE COURT:  Period.

2        MR. WILLETT:  And pre-petition collateral is defined

3    at page 5.  This is in (e) and it's defined by reference to the

4    loan documents which, I can represent to the Court, identify

5    foreign IP.

6        So the procedural proposition simply is if you are the

7    committee and you think they're not perfected in that, you're

8    going to have to address that before the sale hearing, a sale

9    hearing that we've now extended --

10        THE COURT:  Then they'll just have to continue the

11    sale hearing so that it can be fully addressed so they can file

12    their complaint.  We can have a hearing on that complaint and

13    briefing.

14        MR. WILLETT:  Your Honor, let me -- I understand what

15    you're saying.  But let me suggest that the issue is not as

16    scary as this whole idea of Chinese affidavits makes it sound.

17    The legal proposition is that the Delaware UCC gives --

18        THE COURT:  I understand.

19        MR. WILLETT:  -- this --right?  So we're just looking

20    at domestic -- the reach under domestic U.S. law of the

21    domestic Delaware LLC as to this perfection issue.  That's the

22    question for the Court.  It's already been briefed.

23        THE COURT:  Really?

24        MR. WILLETT:  Not very --

25        THE COURT:  Where?

Case 1-11-09730-CGS Doc 372633 Filed 03/03/15 Page 107 of 166
Case 1-12590-MFW Doc 7533 Filed 03/03/15 Page 64 of 76
EVERGREEN SOLAR, INC.

Page 64

1          MR. WILLETT:  Not very powerfully, frankly, but both

2    parties addressed that in their standing motion.  Now what that

3    means is they've both looked at it.  I don't think they've

4    given you enough to make a ruling.

5          THE COURT:  Right.

6          MR. WILLETT:  But they've already started the process.

7    And the problem we have is that we are on a very tight and

8    short budget.  We don't have the funds to go out further.  And

9    we're trying to do the best we can by this estate by bringing

10   the sale to conclusion.

11         If we lose the credit bid, if we don't have a stalking

12   horse, then the advice is that that's not helpful to

13   encouraging higher bids.  So we're very keen to have the Court

14   let this credit bid go forward and the chips will have to fall

15   where they may on the 10th.

16         Now we can't require Your Honor to rule.  If the

17   parties haven't given you a basis on the 10th to rule, you

18   won't rule.  We understand that.  People have to brief this

19   well and they have to put it before the Court so that you can

20   confidently make a ruling.  It may become academic if there's

21   an overbid.  And as Mr. Stamer says, we have more time.  But we

22   don't really have any choice in terms of trying to maximize the

23   chances of a successful auction here.  And I really do believe

24   the committee has been on plain and simple notice since

25   September 8th that if there's any aspect of this credit bid

Case 1:14-10979-CSS Doc 3726-3 Filed 03/02/15 Page 108 of 166
Case 1-12590-MFW Doc 731 Filed 10/14/11 Page 65 of 76
EVERGREEN SOLAR, INC.

Page 65

1   they wanted to challenge, they needed to do it.

2            THE COURT:  Well, they have.  They've done what they

3   need to do.  They filed the challenge motion.

4            MR. WILLETT:  Which is fine.  But they shouldn't now

5   be heard to say well, we only have twelve days.

6            THE COURT:  Wait, wait, wait.  The deadline was to

7   file it.

8            MR. WILLETT:  Right.

9            THE COURT:  And quite frankly, the burden is on them

10  to show that what they're bidding on is pre-petition

11  collateral, isn't it really?  I mean, why should the burden

12  shift to the rest of the parties?

13           MR. WILLETT:  Well, I think -- I don't want to bandy

14  about the effect of order.  But I think the order at least

15  placed the committee on notice that it needed -- if it thought

16  this was going to be an issue, it needed to bring the issue on.

17  And there's been no dispute about the absence of filings in

18  foreign jurisdictions.  They've had the filing history since

19  August.  So that's the narrow legal issue that's presented by

20  this dispute.

21           THE COURT:  It's an artificial deadline set by the

22  secured lenders.  The statute of limitations is much longer.

23           MR. WILLETT:  You're right.

24           THE COURT:  There's a two-year statute of limitations

25  to avoid liens.

1          MR. WILLETT:  That's right.

2          THE COURT:  So we could have a two-year case.  And we

3     could let it go along on the usual procedures.

4          MR. WILLETT:  The problem we have, Your Honor, is

5     simply that as a debtor trying to carry out a sale when we

6     don't have ongoing operations that are generating income --

7          THE COURT:  I understand.

8          MR. WILLETT:  -- we have constraints.  But --

9          THE COURT:  All right.

10          MR. WILLETT:  Thank you, Your Honor.

11          MR. STRATTON:  Your Honor, I can address the credit

12     bid argument if I really need to but I think Your Honor grasps

13     the issue and I -- unless you want me to, I'll skip that.  I

14     would like to address, however, the argument -- and it's not

15     based on the facts in the record but apparently we're going to

16     not let this constrain this -- that the debtor is running out

17     of cash.  According to their cash forecast, as of November 12,

18     they will have thirty-six million dollars in cash.  We're not

19     running out of cash.  This isn't an operating business.  And as

20     Your Honor has already said, it's the problem of their own

21     making.  They set a very, very aggressive schedule and now they

22     want to use that schedule to prejudice the committee again by

23     trying to brief an issue that's never been the subject matter

24     of a reported decision that we found or they found in twelve

25     days.

1          MR. STAMER:  Your Honor, the cash collateral order, in

2     its current form, was the result of a number of sets of

3     negotiations.  And Your Honor is correct that the schedule is

4     what was requested by the secured lenders, was agreed to by the

5     debtors -- or the debtor, was objected to by the committee and,

6     ultimately, based upon the facts available to the Court, was

7     approved by the Court.

8          Your Honor, this is -- and I know I'm stating the

9     obvious but that's what I'm best at.  This is not a company

10    that is cash flow negative.  It's not like these are the

11    revenues and these are the expenses.  There effectively are no

12    revenues.  It's not an operating business.  This is a startup.

13    It has some inventory that it has harvested from time to time,

14    but, Your Honor, we've all seen hem.  We've all seen secured

15    creditors with a very heavy hand forcing companies to do things

16    when maybe they didn't really have to.  Judge, every day that

17    passes by, every pleading that they file that we have to

18    respond to makes our collateral disappear.  So, Your Honor,

19    this is not a situation where we're putting them up against the

20    wall and saying -- or, respectfully, putting the Court up

21    against the wall and saying we need a resolution now, we --

22    what the debtor has proposed is, as I said before, I believe --

23    we believe balances the competing interests.  Is it perfect?

24    No.  It's not perfect.  If it were perfect, we'd have a company

25    that actually had revenue.  We would have the flexibility to

1    try to reorganize in a Chapter 11 or have a much longer runway

2    which I'm not sure that would do anything other than cause more

3    money to be spent.  But, Your Honor, we're not here as the big,

4    bad secured creditors putting our thumb on everybody.  Based

5    upon the practicalities of the solution, it makes no sense to

6    allow this company to continue to burn this type of cash for an

7    extended period of time.

8            And, Your Honor, the committee has a job to do.  And I

9    get that.  I'm actually in that seat often.  But the job should

10   not be to prejudice the ability to have a viable sale and

11   potentially have an operating business some time in the future.

12   We believe the cash collateral order, the bidding procedures

13   order and the proposal that the company has put forth is what

14   appropriately balances all the interests in the current

15   situation.  Thank you, Judge.

16           MR. STRATTON:  Your Honor, the cash collateral order,

17   paragraph (e), where the debtor stipulates to the perfection of

18   the security interest in certain liens, is subject to the

19   committee's investigation period which specifically requires

20   and contemplates the filing of a complaint.  And you'd have to

21   be not paying attention in the extreme not to understand that

22   the issues raised in the complaint were not going to get

23   resolved the day -- or the complaint's filed two weeks later.

24   And we're not talking about an extended period of time.  We're

25   talking about forty-five days.  And there is a solution to the

1    problem which is leave some cash behind and get on with the

2    sale.

3            So we think the standing motion should be granted and

4    that either Your Honor should -- well, Your Honor can push all

5    the dates out, grant the standing motion and address the credit

6    bid issue by requiring them to leave cash behind or saying they

7    can't bid on the assets as to which they don't have a security

8    interest, some of which were conceded or as to which there's a

9    question.  And in that respect, paragraph 19 doesn't discuss

10   the for-cause issue in any manner, shape or form.  So I can't

11   imagine now that precludes Your Honor from ruling on that.

12   Thank you.

13           (Pause)

14           THE COURT:  Well, I agree, in part, with the debtors

15   that there's an easy solution.  I will grant the standing

16   motion, will grant an additional thirty days for the creditors'

17   committee to file their complaint and direct the committee,

18   before it files that complaint, to engage in discussions with

19   the other parties so that, hopefully, what is filed does not

20   include assets to which there is no dispute.  And hopefully,

21   that includes the bank deposits.

22           I will leave or set the bid deadline for 11/1, the

23   auction for 11/7 and the sale hearing for 11/10.  But I just

24   don't see how the issue on the foreign IP can be decided by

25   that time.  So I think that the solution has to be either -- if

Case 11-10975-CSS   Doc 3726-3   Filed 03/02/15   Page 113 of 166
Case 11-12590-MFW   Doc 791   Filed 10/16/11   Page 70 of 77
EVERGREEN SOLAR, INC.

Page 70

1    there's a cash bid by somebody else, it's not an issue.  If the

2    credit bid is the only bid that's -- or is the bid that wins,

3    though, I'm inclined to either defer approving that sale or

4    requiring an escrow by the settlement noteholders pending a

5    decision on the complaint or some other carve-out of the assets

6    in dispute so that the credit bid does not include them.

7              MR. WILLETT:  Your Honor, I think, in light of what

8    you just said, the simplest solution almost might be that there

9    is no order today other than that the sale hearing will

10   commence on the 10th.  Your Honor might not be able to approve

11   the sale depending on the circumstances.  Or you might.  Maybe

12   parties will be able to satisfy you with briefing before then;

13   maybe they won't.  But we go forward on that schedule.  We see

14   what happens and we make the best of it.

15             MR. STRATTON:  I'm not sure if that was a motion for

16   reconsideration or not.  Your Honor granted our standing

17   motion, I think.  We had agreed on a form of order with the

18   debtor.  And I have a blackline from what we filed with the

19   motion and a clean.  Subject to Your Honor's essentially

20   staying the filing of the complaint for thirty days while we

21   talk about issues, I'd like to submit that for Your Honor's

22   approval today.

23             MR. WILLETT:  Well, I'd suggest that the other aspects

24   of your ruling be incorporated in this order with regard to the

25   thirty days and the direction that the committee engage with

Case 1-10979-CGS  Doc 3726-3  Filed 03/03/15  Page 114 of 166
Case 11-12590-MFW  Doc 7933  Filed 03/05/15  Page 114 of 166
EVERGREEN SOLAR, INC.

Page 71

1    other parties.

2              THE COURT:  All right.

3              MR. STRATTON:  I'm not -- that's fine, Your Honor.  We

4    could do that.

5              THE COURT:  Why don't you work it out and submit --

6              MR. STRATTON:  We'll try to --

7              THE COURT:  -- under COC then.

8              MR. STRATTON:  Yeah.  I apologize for talking over

9    you.  We'll try to -- we'll circulate a draft and when --

10   hopefully, we'll be able to resolve it.  Thanks.

11             THE COURT:  Okay.

12             MR. STAMER:  Your Honor, we can clarify what I wanted

13   to clarify in the order.  Just that the extension of time that

14   you're granting is only limited to the issues that they've

15   raised --

16             THE COURT:  Yes.

17             MR. STAMER:  -- in the complaint and the motion.

18             THE COURT:  Yes.

19             MR. STAMER:  Okay.  Thank you, Your Honor.

20             MR. O'NEILL:  Your Honor, I think -- I listened to Mr.

21   Willett's proposal.  I think we need an order on the remainder

22   of the debtor's -- I mean, the committee's motion on credit

23   bidding.  And we're prepared to try to work one out with the

24   debtors.  If we can't, I guess we'll convene a call.

25             MS. NEWELL (TELEPHONICALLY):  Your Honor?

Case 1-11059-CSS Doc 3726-3 Filed 03/03/15 Page 115 of 166
Case 1-12590-MFW Doc 7313 Filed 10/24/11 Page 72 of 76
EVERGREEN SOLAR, INC.

Page 72

1          THE COURT:  Yes?

2          MS. NEWELL:  This is Margaret Newell on behalf of the

3   Department of Energy and Department of Commerce.

4          THE COURT:  Okay.

5          MS. NEWELL:  Can you hear me?

6          THE COURT:  Yes.

7          MS. NEWELL:  I'm sorry to interrupt, Your Honor, but I

8   would just ask that United States and me, in particular, on

9   behalf of the United States, be included in the circulation of

10  the order that relates to the foreign IP.  As I stated in our

11  brief response that I filed, the government has ownership

12  rights in certain of the foreign patents.  So I would ask that

13  we be included in circulation of the order relating to that.

14         THE COURT:  I understand your position.

15         MR. WILLETT:  That's perfectly fine from the debtor's

16  perspective, Your Honor.

17         THE COURT:  Okay.

18         MR. WILLETT:  Your Honor, with regard to the third

19  item on your calendar, the motion --

20         MR. STAMER:  Your Honor, just another thirty seconds.

21  We will report back to our clients with what Your Honor's

22  ruling is.  But obviously, we're reserving our rights with

23  respect to our rights under the cash collateral order and the

24  applicable RSA and other documents.  Thank you, Judge.

25         MR. WILLETT:  I was about to say, Your Honor, I think

1   that the order on the motion calendared as number 3 -- it's a

2   motion for preliminary injunction.  The order is pretty easy.

3   It's denying without prejudice.  There's no limit on the credit

4   bid.  But Your Honor has made very clear that you might not

5   approve it or you might subject it to conditions.  So they'll

6   make the credit bid and we'll figure out what'll happen at the

7   sale hearing.  But I don't see why there needs to be any sort

8   of injunction entered against a credit bid being received.

9           THE COURT:  I think that's true subject to my finding

10   that some of those assets have to be excluded from what they're

11   bidding on and that they would otherwise have to pay cash for

12   those assets if they still wanted them as part of --

13           MR. O'NEILL:  I mean, Mr. Willett keeps calling it an

14   injunction motion.  And we didn't really get to have argument

15   to that, the credit bid motion, and so I don't want to belabor

16   the record here.  We clearly don't agree that it's an

17   injunction motion at all and that Your Honor has discretion to

18   set the terms under which a credit bid can be exercised.  And

19   that doesn't require any type of heightened showing or emergent

20   relief.

21           And the motion, by the way, addressed a series of

22   different aspects of the credit bidding which is what I'm

23   getting at when I say we need an order.  We now appear to have

24   a stipulation that they're not trying to credit bid on assets

25   that they agree aren't subject to their liens.  They said in

Case 14-10979-CSS Doc 3726-3 Filed 03/02/15 Page 117 of 166
Case 1-12590-MFW Doc 733 Filed 04/04/11 Page 74 of 76
EVERGREEN SOLAR, INC.

Page 74

1    their papers that they're not trying to credit bid the adequate

2    protection lien.  So there's some cleanup stuff that needs to

3    go in the order plus what Your Honor just said on the record.

4              THE COURT:  All right.

5              MR. WILLETT:  With respect, I really don't agree.  It

6    is an injunction motion.  It asks you to bar the secureds from

7    submitting a credit bid and us from receiving it in certain

8    respects.

9              THE COURT:  Then you'll revise that language to simply

10   be what my ruling has been.

11             MR. WILLETT:  We will -- we will certainly -- we say

12   now, on the record, that we will comply with exactly what Your

13   Honor has said.  But I just don't see the need to enter any

14   order that conditions the submission of a credit bid now.  We

15   can't --

16             THE COURT:  I don't know what you're going to submit.

17   I assume you'll submit an order that conforms to my ruling.

18             MR. WILLETT:  With regard to the injunction motion?

19             THE COURT:  To the credit bid.

20             MR. WILLETT:  Well, okay.  I'll be happy to try to

21   negotiate that with my colleagues, Your Honor.

22             THE COURT:  Okay.

23             MR. O'NEILL:  And there were negotiations alluded to

24   somewhat in the earlier argument relating to the LBIE bid which

25   resulted in a resolution which I think does need to go into the

Case 1:11-10979-CGS Doc 3726-3 Filed 03/02/15 Page 118 of 166
Case 1-12590-MFW Doc 7331 Filed 03/02/15 Page 75 of 77
EVERGREEN SOLAR, INC.

Page 75

1   order.  We can debate injunction or not injunction.  I think

2   he's all wet about that.  But we'll submit an order.  If we

3   can't resolve it, we'll get you on the phone.

4           THE COURT:  All right.

5           MR. STAMER:  Your Honor, I'm sorry.  I'm even sorrier

6   than I was last time that I have to stand up.  This isn't an

7   order of the Court subject to people agreeing or not agreeing

8   on the terms.  No one's agreeing.  It's not a stipulation.

9           THE COURT:  I understand.

10          MR. STAMER:  Just wanted to make sure the record was

11  clear.  Thank you, Judge.

12          THE COURT:  All right.  All right.

13          MR. WILLETT:  Your Honor, I think that concludes your

14  calendar this afternoon.

15          THE COURT:  For Evergreen.  We'll stand adjourned.

16      (Whereupon these proceedings were concluded at 12:44 p.m.)

17

18

19

20

21

22

23

24

25

1

2                    I N D E X

3

4                  R U L I N G S

5

6   DESCRIPTION                              PAGE    LINE

7   Committee's motion for entry of an order    69      15

8   granting leave, standing and authority to

9   commence, prosecute, and settle claims on

10   behalf of the debtor's estate granted

11   Committee granted a thirty-day extension to    69      16

12   file their complaint

13   Committee directed, before filing its        69      17

14   complaint, to engage in discussions with the

15   other parties to ensure that what is filed

16   does not include assets to which there is no

17   dispute

18   Schedule of deadlines as follows:           69      22

19   bid deadline, 11/1;

20   auction, 11/7;

21   sale hearing, 11/10

22

23

24

25

Page 77

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a

true and accurate record of the proceedings.

_____

LISA BAR-LEIB (CET**D-486)

AAERT Electronic Certified Transcriber

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  October 27, 2011

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50002

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


OLD CARCO LLC (F/K/A CHRYSLER LLC),


       Debtor.


- - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          One Bowling Green

          New York, New York


          August 13, 2009

          9:44 a.m.


B E F O R E:

HON. ARTHUR J. GONZALEZ

U.S. BANKRUPTCY JUDGE

2

1   MOTION by the Official Committee of Unsecured Creditors

2   Authorizing it to Pursue Certain Claims on Behalf of the Estate

3   of Debtor Old Carco LLC

4

5   MOTION by the Official Committee of Unsecured Creditors

6   Authorizing the Official Committee of Unsecured Creditors to

7   File Papers Under Seal

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Esther Accardi

25

3

1   A P P E A R A N C E S :

2   JONES DAY

3        Attorneys for Debtors

4        222 East 41st Street

5        New York, New York 10017

6

7   BY:   CORINNE BALL, ESQ.

8

9

10   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

11        Attorneys for Creditors' Committee

12        1177 Avenue of the America

13        New York, New York 10036

14

15   BY:   THOMAS MOERS MAYER, ESQ.

16        PHILIP BENTELY, ESQ.

17        GREGORY G. PLOTKO, ESQ.

18

19

20   KATTEN MUCHIN ROSENMAN, LLP

21        Attorneys for Houlihan Lokey Howard & Zukin

22        575 Madison Avenue

23        New York, New York 10022

24

25   BY:   JEFF J. FRIEDMAN, ESQ.

4

1    A P P E A R A N C E S : (continued)

2    SHEARMAN & STERLING, LLP

3         Attorneys for Daimler

4         599 Lexington Avenue

5         New York, New York 10022

6

7    BY:   ALAN S. GOUDISS, ESQ.

8          JACULIN AARON, ESQ.

9          JAMES L. GARRITY, ESQ.

10

11

12   SIMPSON THACHER & BARTLETT, LLP

13        Attorneys for JPMorgan Chase

14        425 Lexington Avenue

15        New York, New York 10017

16

17   BY:   PETER V. PANTALEO, ESQ.

18

19

20   PACHULSKI STANG ZIEHL & JONES, LLP

21        Attorneys for Creditors' Committee

22        780 Third Avenue

23        New York, New York 10017

24

25   BY:   BETH E. LEVINE, ESQ.

5

```
1    A P P E A R A N C E S : (continued)

2    U.S. DEPARTMENT OF JUSTICE

3    OFFICE OF THE U.S. TRUSTEE

4         33 Whitehall Street

5         New York, New York 10004

6

7    BY:   BRIAN MASUMOTO, ESQ.

8          TRACY HOPE DAVIS, ESQ.

9

10

11   SUSMAN GODFREY, LLP

12         Attorneys for Creditors' Committee

13         654 Madison Avenue

14         New York, New York 10065

15

16   BY:   JACOB W. BUCHDAHL, ESQ.

17

18

19   U.S. DEPARTMENT OF JUSTICE

20   U.S. ATTORNEY'S OFFICE

21         86 Chambers Street

22         New York, New York 10007

23

24   BY:   JEANNETTE A. VARGAS, ESQ.

25
```

6

1   A P P E A R A N C E S : (continued)

2   STUTZMAN BROMBERG ESSERMAN & PLIFKA, PC

3        Attorneys for Creditors' Committee

4        2323 Bryan Street

5        Dallas, Texas 75201

6

7   BY:   ROBERT T. BROUSSEAU, ESQ.

8        (TELEPHONICALLY)

9

10

11   CADWALADER WICKERSHAM & TAFT, LLP

12        700 Sixth Street, NW

13        Washington, D.C. 20001

14

15   BY:   DOUGLAS MINTZ, ESQ.

16        (TELEPHONICALLY)

17

18

19   HONIGMAN MILLER SCHWARTZ AND COHN, LLP

20        Attorneys for General Motors

21        660 Woodward Avenue

22        Detroit, Michigan 48226

23

24   BY:   ROBERT B. WEISS, ESQ.

25        (TELEPHONICALLY)

7

1    A P P E A R A N C E S : (continued)

2    MONARCH ALTERNATIVE CAPITAL, LP

3         535 Madison Avenue

4         New York, New York 10022

5

6    BY:   ROBERT BURNS, ESQ.

7         (TELEPHONICALLY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  Sorry for the delay.

3   All right.  This is the motion by the official creditors

4   committee.

5          MR. MAYER:  Thank you, Your Honor.  Your Honor, Thomas

6   Moers Mayer of Kramer Levin Naftalis & Frankel as lead counsel

7   to the official committee of unsecured creditors.

8          Your Honor for today's motion I would like to address

9   a little bit of the history of how we got here and the

10  particulars on the STN issues, and the complaint.  If that's

11  okay, I would leave to my partner, Phil Bentely, who has more

12  of the laboring order on those matters.

13         THE COURT:  All right, that's fine.

14         MR. MAYER:  A little history and then I'll yield the

15  podium to Mr. Bentley.  As Your Honor knows, the first case of

16  this case was a sale of substantially all of the assets to a

17  new company formed under the -- with the assistance of Fiat

18  that took place under an incredibly compressed timeframe.  And

19  part of the transactions that led to that sale of assets

20  involved what we call settlement agreement number 3.  And the

21  basic deal on settlement agreement number 3 was that the estate

22  released claims against Cerberus.  Cerberus in turn released

23  Cerberus' claims against Daimler.  And Daimler funded certain

24  monies into a pension plan at what was Chrysler and is now

25  Newco, which benefited the PBGC which was a party to that

9

1    agreement, and which, of course, is in honor of the United

2    States Government.  The United States Treasury was intimately

3    involved in all of those negotiations.

4         From that settlement agreement the committee secured

5    foreign secured creditors one thing as the price of its consent

6    to the estate's release of claims against various other

7    parties.  We secured the right to investigate Daimler and to

8    determine if we believed there were meritorious claims that

9    could be brought against Daimler.  And we had a period of time

10   in which to do that.  We conducted the investigation and we

11   determined that, in our view, there are meritorious claims and

12   we seek permission to bring them on behalf of the estate.  And

13   I will yield to Mr. Bentley to discuss the STN standards.

14        I think the history is important here because one of

15   the defenses that Daimler has asserted, one of the objections

16   Daimler has asserted to our motion, is that the United States

17   Treasury basically has a lien on this lawsuit and there's no

18   money to bring it.

19        Treasury is here today represented by the U.S.

20   Attorney's Office and they can speak for themselves and correct

21   anything I have to say.  But, first, the issue of funding the

22   lawsuit, other than the fact that we have obtained excellent

23   contingency fee counsel, who's also here and whose retention

24   will be brought to this Court by separate motion.  I pause for

25   a moment to assure the U.S. Trustee as I said I would before

1    hearing, that we seek today only authority to commence the

2    lawsuit in the name instead of the estate, we are not seeking

3    approval of the terms of the retention.  The U.S. Trustee's

4    rights and, indeed, any party-in-interest, are completely

5    reserved until a subsequent hearing is held to approve the

6    formal retention of contingency fee counsel, which I think we

7    hope to bring on August 27th by a pleading that we expect to

8    file very shortly.

9         So nothing today estops anyone from objecting to the

10   terms of the retention, nor do we seek approval by this Court

11   today for the terms of the retention of contingency fee

12   counsel.  But we indicate in our pleadings, the contingency fee

13   counsel is here in Court today, that we have negotiated an

14   arrangement with the contingency fee counsel, and I think quite

15   eminent contingency fee counsel.

16        And I mention also before I return to my theme on the

17   U.S. Treasury that the contingency fee counsel who appears in

18   Court today and who is identified in our pleadings was one of

19   three firms that competed for the right to represent the

20   committee should we succeed in this motion, because there was a

21   considerable amount of interest which I think is useful color.

22        In any event, back to Daimler's complaint that

23   Treasury has a lien and Treasury hasn't consented.  Treasury's

24   filed a pleading.  My understanding, and again, Treasury is

25   here represented by the U.S. Attorney's Office, is that

11

1    Treasury does not object to the relief that we seek today,

2    number one.  Number two, with respect to the use of cash

3    collateral and Treasury's lien, as I think Your Honor knows, we

4    have been in consummate discussion with representatives of the

5    United States Treasury and, frankly, with representatives of

6    the banks, who are also here today represented by counsel, on a

7    plan of reorganization, and on the forward progress of this

8    case.  It's appropriate to note at this point, that we're only

9    four months into this case, and the fact that we don't have a

10   plan completely buttoned up and ready to go on the schedules of

11   most non-prearranged Chapter 11s is not particularly

12   surprising.  But we have been in constant discussions and we

13   expect, although we don't have a deal yet, but there will be a

14   plan in this case, and that plan will involve the release of

15   liens and priority so that unsecured creditors will be able to

16   benefit from the Daimler lawsuit if this Court approves our

17   ability to bring it, and if it -- if we obtain any money from

18   it.  And those proceeds will benefit the unsecured creditors,

19   including the banks who are here represented by counsel, and

20   whose claims comprise, depending on what numbers you use,

21   somewhere between seventy and eighty percent of all unsecured

22   claims in this case.  And, indeed, we have been in discussion

23   with the banks because we have some residual issues with them

24   about their liens that they've asserted on the residual assets

25   of the estate.  And we expect to compromise those issues, too,

12

1  which will, again, provide a means for this estate to go

2  forward with this lawsuit.

3       If Your Honor has any questions on the relationships

4  between the unsecured creditors committee, Treasury, and the

5  banks, I'm the appropriate person to direct those questions to.

6  If not, I will turn it over to my partner, Mr. Bentely with the

7  observation that we spent a lot of time with the full knowledge

8  of all the parties in the room investigating these claims.  We

9  determined that they're worth bringing and I hope you let us

10  bring them.  Thank you.

11       THE COURT:  Before you sit down.  Hypothetically, if I

12  were to grant the motion, you commence the lawsuit, and then

13  your negotiations with Treasury do not result in a release of

14  the liens, what happens to the lawsuit?

15       MR. MAYER:  If Treasury takes the position that they

16  are not consenting to the release of the liens and we -- I

17  don't want to anticipate trouble, Your Honor, we believe there

18  would be certain arguments about whether or not that's a valid

19  position.  But I don't anticipate ever having to make it.  Then

20  in the end of the day Treasury would own this lawsuit and

21  Treasury would have the ability to, in fact, ask the Court to

22  dismiss it.

23       THE COURT:  All right, thank you.

24       MR. BENTELY:  Good morning, Your Honor.  Philip

25  Bentely of Kramer Levin.

13

1        I will be brief, and I'll assume, unless Your Honor

2   tells me otherwise, that Your Honor did receive the reply brief

3   that we filed yesterday afternoon and did have a chance to

4   review that?

5        THE COURT:  Yes, I did.

6        MR. BENTELY:  Your Honor, I'll note at the outset that

7   it's significant that only party has filed an objection to this

8   application, namely Daimler, the proposed defendant.

9        THE COURT:  Well, that's not unusual.

10       MR. BENTELY:  Correct, Your Honor.  We think it's

11  telling, though, that not one of the parties who has a stake in

12  increasing the size of the estate and its assets, rather than

13  fighting a lawsuit has objected to the application.

14       We would submit, Your Honor, that the application

15  readily satisfies the governing legal standards.  Whether those

16  are deemed to be the STN standards that apply when a debtor has

17  refused to bring a suit or the commodore standards that apply

18  when a debtor has consented to the suit.  By the way, we

19  understand, Your Honor, that you will hear from the debtor this

20  morning that they support our application.

21       Most important, Your Honor, the principal element that

22  the case law directs the Court to look to is whether the claims

23  are colorable, which, Your Honor and others have interpreted to

24  mean are they legally sufficient.  And here it is not even

25  disputed, that the principal claims in our proposed complaint,

14

1    Counts number I through VI, which assert constructive and

2    intentional fraudulent transfer claims, it's not even disputed

3    that those would withstand the 12(b)(6) motion.  Those are

4    straightforward traditional fraudulent transfer claims.

5         The principal, the crux of them, Your Honor is very

6    simple.  And that is, that Daimler caused Old Carco to transfer

7    assets with an aggregate value of nine million dollars or more

8    and received in exchange consideration with a total value of

9    only about two billion dollars.  And this happened at a time

10   when Old Carco either was already insolvent, or alternatively,

11   that it was rendered insolvent by this transaction.

12        There's no dispute that that is a legally sufficient

13   cause of action.  And we believe we put forward ample detail in

14   the complaint supporting those allegations.

15        It's also clear, we would submit, Your Honor, that

16   bringing these claims is very much in the estate's interest in

17   addition to the enormous potential upside of these claims;

18   billions of dollars, the cost is minimal.  As Your Honor has

19   seen from our papers we have the agreement of highly regarded

20   counsel to bring the suit on a purely contingent basis so that

21   the estate will be responsible only for the expenses of suit,

22   which are likely to be only a few million dollars; tiny

23   fraction of the possible upside.

24        Now, in the objection that was filed by Daimler, as I

25   said there's no dispute as to the legal adequacy of the

1    principal claims.  There's a little bit of quibbling as to

2    whether our breach of fiduciary duty claims are adequate, and I

3    can address that if Your Honor wishes.  Although, I think

4    that's secondary because there's no dispute that the principal

5    claims are legally sufficient.

6          The principal arguments that Daimler makes are really

7    in the nature of evidentiary area arguments.  They say, Your

8    Honor, well, the committee is choosing to disregard lots of

9    evidence that cuts in our favor.  And we attempted to address

10   those arguments in our reply, and I'm happy to address them

11   further this morning if Your Honor wishes.  But I think the

12   bottom line, Your Honor, is that we don't expect Your Honor

13   will or should make evidentiary determinations on the basis of

14   briefs and on the basis of oral argument.  It's sufficient

15   under the case law that you look to the face of the complaint,

16   deem it to be legally sufficient and substantial, not evidently

17   frivolous on its face.

18         And, finally, Your Honor, there's one more very

19   significant factor that the Court can look to in this case, and

20   that we would urge you to look to in this case.  In effect,

21   there's a market test that the Court can look to here.  As Mr.

22   Mayer mentioned, we shopped this case.  The committee before

23   bringing the present motion, reached out to a number of

24   different firms and solicited interest in the case.  And as

25   Your Honor's well aware firms don't take a case on a

1    contingency basis without performing substantial due diligence

2    and satisfying themselves that the expenditure of effort that

3    they would need to commit to the case is going to be a

4    worthwhile investment.  Here we have a spirited bidding war.

5    And the interest was that the Susman Godfrey firm, which I

6    believe that Your Honor is well familiar with and knows to be a

7    very experienced and very capable firm, the Susman Godfrey firm

8    together with the firm of Stutzman Bromberg, agreed to take the

9    case.  And Jacob Buchdahl, a partner of that firm is here this

10    morning and is prepared to speak if Your Honor would like to

11    hear from him.

12         And what he is prepared to tell Your Honor is that

13    Susman Godfrey only took this case, as it does with any

14    contingency case, after a very careful vetting, not just of the

15    allegations of the complaint and the legal issues, but also the

16    evidence underlying the complaint.  We shared with them the

17    very substantial evidence that we obtained through our Rule

18    2004 discovery.  They vetted it very carefully and they took it

19    to a vote as they always do --

20         THE COURT:  Mr. Bentely, you just told me a few

21    minutes ago that this should not be an evidentiary hearing.

22    But, yet, you want me to rely on a counsel's review of the

23    evidence to show that there's something there to support your

24    motion.  We can't have it both ways.  I'm not particularly

25    interested in their review of the evidence.

1          MR. BENTELY:  Okay.  Your Honor, my point was simply

2     Your Honor can take note of the fact that it's being prosecuted

3     on a purely contingent basis and that's what I'm at least

4     satisfied that it's a suit worth pursuing.

5          And, finally, from the estate's perspective, Your

6     Honor, the fact that they're taking it on a purely contingent

7     basis is very significant in that it means the cost to the

8     estate will be minimal.  The bulk of the expenditure -- the

9     great bulk of the cost will be borne by the Susman Godfrey firm

10    and not by the estate.

11         That's all I have, Your Honor, unless you have any

12    questions.

13         THE COURT:  Would you address -- you address in your

14    papers, but address here Daimler's contention that avowed

15    Section 6(a) of the settlement agreement.

16         MR. BENTELY:  Certainly, Your Honor.  The argument

17    about the release.  Section 6(a) says that all claims arising

18    under the contribution agreement, the LLC agreement and other

19    agreements that were executed in connection therewith are

20    released.  And it goes on to say that those claims, including

21    without limitation, the claims asserted in the investor letter

22    that was -- that's the letter that was sent by Cerberus to

23    Daimler in the fall of last year.  Those claims are released.

24         And as Your Honor may be aware, the claims asserted in

25    that investor letter were, essentially, breach of contract

1    claims.  Those were claims that Daimler had allegedly -- I'm

2    sorry, that -- yes, that Daimler had allegedly failed to

3    satisfy certain contractual commitments that it undertook.

4    What's pivotal here, Your Honor, is 6(a) does not say that

5    claims arising under or related to those agreements are

6    released.  It just says claims under those agreements.  We

7    think that means, Your Honor, claims for breach of contract.

8    The claims we're asserting, of course, are not that they're

9    claims for fraudulent transfer, breach of fiduciary duty and

10   the like.  In addition, Your Honor, the claims we're asserting

11   are one step removed for a further reason from those

12   agreements.  The claims we're asserting relate to the step

13   plan; the internal restructuring which was implemented as a

14   prerequisite to the contribution agreement that was entered

15   into with Cerberus, is our previously approved transactions.

16   And for that reason, as well, they don't fall within the

17   language of 6(a).

18        A final point, Your Honor, I think if this were to be

19   an issue we could put on evidence showing that the parties who

20   negotiated this agreement, Section 6 of the settlement

21   agreement number 3, everybody knew that the investigation that

22   Section 6(b) says that the committee would undertake, that

23   investigation was going to be about exactly the sorts of claims

24   that we're now bringing.  And we would submit that all the

25   parties understood that the intention of all the parties was

19

1    certainly not to release those claims.

2            THE COURT:  All right, thank you.

3            MR. BENTELY:  Than you, Your Honor.

4            THE COURT:  You're welcome.  Anyone else in support of

5    the motion wish to speak?

6            MS. BALL:  Your Honor, Corinne Ball on behalf of the

7    debtors, now known as Oldco.

8            Your Honor Oldco rises in support of the motion.  It

9    has assisted and it has cooperated with the committee in their

10   investigation.  And it has resulted in the motion which

11   Chrysler believes if there's value there to be pursued to

12   enhance its ability to fund the plan, it should be pursued.  So

13   we support the motion, Your Honor.

14           THE COURT:  Thank you.  Anyone neutral to the motion

15   wish to be heard?

16           MS. VARGAS:  Good morning, Your Honor.  Jeannette

17   Vargas from the U.S. Attorney's Office on behalf of the

18   Treasury.

19           As Your Honor is aware, we had filed a response to the

20   motion and asked for a certain provision in the order that

21   would ensure that the Treasury's cash collateral would not be

22   sued to prosecute the claims.  A proposed order was circulated

23   last night which contains such language that is satisfactory to

24   us.  So I believe our response has been adequately addressed at

25   this point.

1          THE COURT:  All right, thank you.

2          MS. VARGAS:  Thank you, Your Honor.

3          THE COURT:  Anyone opposed to the motion?

4          MR. GOUDISS:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. GOUDISS:  Alan Goudiss along with Jim Garrity and

7    Jaculin Aaron of Shearman & Sterling for Daimler.

8          Your Honor, I'll be brief.  We set forth in our

9    objection the principal grounds on which we urge the Court to

10   deny leave.  A couple of comments by counsel I think are worth

11   responding to.

12         Number one, settlement agreement 3 and specifically,

13   Section 6(a), provides for a release of Daimler not only by

14   Cerberus but, specifically, by Carco, of all claims arising

15   under the contribution agreement and all other agreements

16   related thereto.  As Mr. Bently just told you the step plan

17   which is the subject of the attack in this complaint was a

18   requisite to the contribution agreement.  They were part and

19   parcel of the same transaction.  And, although, we are highly,

20   highly confident that we can defend the individual steps in the

21   plan, the fact of the matter is the step plan was incorporated

22   into an exhibit and an integral part of the contribution

23   agreement.

24         And what 6(b) of settlement agreement 3 permitted the

25   committee to do was to investigate claims dating back, perhaps,

1    as long as six years, during the period of Daimler's ownership.

2    What it did not permit the committee to do is to sure either

3    Cerberus or Daimler in respect of the transaction in which

4    Cerberus assume majority control of the company.  We're content

5    to make that argument in the context of a 12(b) motion.  But it

6    is worth noting, particularly against the backdrop of complete

7    uncertainty as to whether the creditors here will ever see a

8    nickel out of this lawsuit.

9         THE COURT:  Before you go any further, so it's your

10   view that what they were permitted to investigate was how

11   Daimler ran the company and not how Daimler acquired the

12   company?

13        MR. GOUDISS:  No, no --

14        THE COURT:  I said that incorrectly.  It's -- well,

15   why don't you state it.

16        MR. GOUDISS:  Okay.  They were entitled to examine all

17   aspects of Daimler's ownership in, say, six years prior to the

18   filing of this bankruptcy case.  What 6(a) did not permit them

19   to do was to bring claims against Daimler or Cerberus with

20   respect to the transaction in which Daimler transferred

21   majority control of Chrysler, of Carco for this purpose to

22   Cerberus.

23        THE COURT:  Well, put that in a chronology for me.

24        MR. GOUDISS:  Sure.

25        THE COURT:  The transaction in which Cerberus acquired

1    Daimler's interest --

2            MR. GOUDISS:  Majority control.

3            THE COURT:  Control, occurred in 2007?

4            MR. GOUDISS:  It was -- the agreement -- the

5    contribution agreement was signed in May of 2007 and it closed

6    on August 3 of 2007.

7            THE COURT:  So it's your view that the committee could

8    look at Daimler's ownership approximately from 2003 forward.

9            MR. GOUDISS:  Correct.

10            THE COURT:  But when you get to the point of the

11    transaction with Cerberus anything relating to that transaction

12    they could not examine or was released.

13            MR. GOUDISS:  That was released, exactly.  And, in

14    fact, during the forty-five-day investigation period, counsel

15    did inquire as to Daimler's ownership whether there were

16    improper transfers of value, dividends, cash payments.  They

17    examined quite closely the financial flows, if you will,

18    between parent and Chrysler throughout that period.  And not

19    surprisingly, they didn't find anything.

20            What they have done here with all respect to counsel,

21    both Kramer Levin, who I have a high regard for, as well as

22    Susman Godfrey.  What they have done here is torn a page out of

23    a typical creditors' committee playbook.  They have looked for

24    a party perceived as a deep pocket who was in the vicinity of

25    the bankruptcy and attempted to bring a lawsuit in the hopes

23

1    that it would generate some kind of value, new settlement or

2    otherwise.  This is a different case, though.  It is different

3    because of the global resolution of claims embodied in

4    settlement agreement 3, which binds Carco, Cerberus, Daimler

5    and a variety of other parties.  And, again, we're content to

6    brief this on a 12(b) motion.  But, again, with all respect

7    what Mr. Bentely says, there's no dispute as to the legal

8    sufficiency of the claims, he's wrong.  There is a serious

9    dispute.  And, although, this may not be the appropriate time

10   to resolve all of those arguments, I do not want the record to

11   reflect our silence on that point.  We think this is an

12   eminently dismissible complaint.  Both as a matter of law and

13   based on the four corners of the complaint, which reference and

14   incorporate the contribution agreement, which, itself,

15   incorporates and includes the step plan.  Those are all fair

16   game on a 12(b) motion.  And, again, I'm not here to argue that

17   motion yet, but I think it is important for the Court to note

18   that this is a complaint, frankly, that is going nowhere.  It

19   is, therefore, not surprising that it is completely open as to

20   whether the creditors here will ever see a dime.

21            Mr. Mayer points out two incredibly large hurdles.

22            THE COURT:  As an interesting distinction, though, STN

23   and the cases that allow the creditors' committee or a party to

24   take over an action, at least theoretically, it has to be in

25   the interest of the estate.  So even if the unsecured creditors

24

1   wanted to receive anything, I mean, it raises a whole host of

2   other issues.  But that's not really the criteria.  The

3   question is whether or not this is an action that is in the

4   interest of the estate.  It could be in the interest of

5   priority claimants.  It could be in the interest of other

6   participants in the estate, and not necessarily reach the

7   unsecureds.  But the standard for the action, itself, is just

8   the interest of the estate.  Albeit, obviously, if it's being

9   controlled by or taken over by the request to do that by the

10  unsecured creditors' committee, one wouldn't assume that the

11  unsecured creditors' committee would be the ultimate

12  beneficiary, or the intended beneficiary of this lawsuit.  But

13  as a technical matter, it really just needs to be analyzed as

14  to whether it's in the best interest of the estate.

15          MR. GOUDISS:  Your Honor, I grant you that, I think

16  you're quite correct.  Having said that, the parties-in-

17  interest, at least as we stand here today, the government, the

18  banks have not expressed a view so far as I can tell as to

19  whether they're going to assert their liens and whether this

20  is, in fact, a litigation for their benefit.  What we do know

21  is that a contingency law firm with potentially the benefit of

22  the estate's funding of expenses, and I'll get to that in a

23  minute, are the only parties that have a real interest in

24  pursuing this case right now.  And so without getting into

25  notions of maintenance in champerty and all the stuff we

1   learned in law school, we have a lawyer-driven case.  We do not

2   have the actual known beneficiary of the case, pursuing the

3   case on its own behalf.  We have a law firm that has a massive

4   contingency even in respect of a nuisance in settlement,

5   pursuing this claim on behalf of parties that clearly stand

6   ahead of the creditors.

7         THE COURT:  Well, let's go over the parties with me.

8   The only party that stands ahead of the unsecured creditors

9   with respect of avoidance actions, I believe, though, I haven't

10  reviewed the documents, would be the government.  The banks

11  would have the lion's share of the unsecured creditor body

12  claims, which may be subject to some negotiations on the

13  deficiency claim.  But I don't believe the banks have a lien on

14  avoidance three corpus.

15        MR. GOUDISS:  And I apology if I've contemplated it to

16  you.  You're quite correct that the government has the priority

17  position.  But the position of the banks effectively dilutes

18  the creditors to a point that, again, it only makes sense from

19  a lawyer's perspective, not necessarily the committee's.

20        And If I could, Your Honor, while we appreciate that

21  contingency counsel will now take this on a pure contingency,

22  two points.  One, I have to take issue with the notion that

23  because contingency counsel will take this on a pure

24  contingency, that must mean that it is a meritorious lawsuit.

25  That's not STN, that's not any standard.  And, frankly, from a

26

1    contingency lawyer's point of view, if the case has several

2    nuisance value, given the percentage they are entitled to

3    recover, this is a worthwhile endeavor even if it is utterly

4    and completely meritless.

5          Secondly, what reply does not address, and counsel

6    today didn't address, and if I missed it I apologizes, the

7    lawyers are going to work on a file contingency, they get no

8    upfront pay.  But if I understand correctly, the estate is

9    expected to fund expenses.  And if I understand from the motion

10   papers correctly those expenses include experts.  In the

11   original motion, the committee sought authorization for the

12   Court to approve up to seven and a half million dollars in

13   expenses, including experts.  The revised agreement with

14   contingency counsel doesn't appear, at least to my reading, to

15   address that.  And so without trying to put the government or

16   the committee unnecessarily on the spot, it is not clear to us

17   who is paying for the experts and the expenses, whether that

18   amount is capped or uncapped, and whether the committee can

19   look to the cash collateral that the government has provided as

20   a means of paying that.  If I understand correctly, the

21   government says you can't use our cash collateral for this

22   lawsuit.  If I also understand correctly, there are no other

23   unencumbered assets.  So when the committee says well, the

24   estate will just pick up the expenses, and don't worry, Judge,

25   it's not going to be a lot of money, well, I don't know how

27

1    much it's going to be, but at least initially they estimated it

2    to be no less than seven and a half million dollars.  And under

3    the current proposal I'm not aware of any cap on that.  And,

4    so, I think it is a fair question who is paying for the

5    experts, how is that being financed, and do we have to wait

6    resolution of the plan in the other issues to see who owns this

7    lawsuit before we get the answer to that question.

8            And I say that not just because we're a defendant or a

9    proposed defendant, obviously, Judge, you can judge our

10   motivation; we clearly don't want this lawsuit to go forward.

11   We think it's meritless.  But you would expect us to say

12   nothing different.  We are, however, an enormous creditor.  Our

13   claim, is frankly, larger than any single member of the

14   committee.  And, frankly, based on estimates of what the

15   committee's claims are we may be larger than the entire

16   committee.  We have a 1.5 billion dollar second lien position

17   here.  So it is not simply a question of Daimler avoiding the

18   consequences of its action or killing a lawsuit before it

19   starts, Daimler in a very real sense will be paying for this if

20   the estate does.  And, frankly, if Daimler's ordered to pay any

21   money in respect of this lawsuit, much of that will go back to

22   Daimler subject to whatever order the Court enters.

23           So our interest in this is quite real, separate and

24   apart from simply wanting to avoid a lawsuit.  We end up paying

25   a substantial portion if you authorize the estate to finance

1    this frivolous lawsuit against us.

2          Unless you have further questions, Your Honor, I have

3    nothing else.

4          THE COURT:  You mention at one point five billion

5    dollar claim.  It ends up being a mathematical calculation.  If

6    the lawsuit were to go forward and the plaintiff were to

7    prevail, you'd have to do the math as to whether or not

8    whatever was recovered was worth the effort when you add in the

9    1.5 billion dollar claim.  And in order to do that, you need to

10   understand what the distribution percentage was going to be

11   without it.

12         MR. GOUDISS:  Yes.

13         THE COURT:  And that's a judgment I assume the

14   committee has made and concluded is worth the effort.

15         MR. GOUDISS:  I don't doubt that is the conclusion

16   that they reach.  But from our point of view, Your Honor, based

17   on the record before you we are being asked -- you're being

18   asked to force us to finance what we believe to be a frivolous

19   lawsuit against us.  And until the issue --

20         THE COURT:  But isn't that true anytime a creditor is

21   sued?  I mean, anytime a creditor is the subject of a lawsuit

22   and at the same time because they're a creditor have a claim, I

23   mean, theoretically, they're funding the lawsuit?

24         MR. GOUDISS:  In theory that's true.  But here you

25   have the unique circumstance of the government who has provided

1   the only ready cash so far as we know to this estate to wind-

2   down.  Saying, you can't use it for this purpose.  So we are at

3   a loss to explain where the money is coming from if it is not

4   coming from the cash collateral.  It is, therefore, coming from

5   elsewhere in the estate and elsewhere in the estate is the only

6   place that we, as a creditor, can look for any recovery.  It's

7   undoubtedly true, that where a creditor is the subject of a

8   lawsuit that is otherwise financed by the estate, the creditor

9   is, in essence, financing the lawsuit against itself.  I don't

10  take issue with that proposition.

11        Here, though, given the unique circumstances, and the

12  government's position here, I think it's incumbent upon the

13  committee to explain this.  And, frankly, if Susman Godfrey is

14  willing to take this on on a pure contingency, then it strikes

15  me that Susman Godfrey, and/or the committee should pick up the

16  expenses of pursuing this as well.

17        THE COURT:  You're right, we should get an answer.

18  But it seems to me that if the government -- if everything is

19  the government's cash collateral then what will fund the

20  lawsuit if it's allowed to go forward, will be some portion of

21  that cash collateral that ultimately the government releases.

22        MR. GOUDISS:  But which it has not done to date.

23        THE COURT:  Right.  So you're real request is --

24        MR. GOUDISS:  So you're playing with tomorrow's

25  dollars in the hope that Mr. Mayer is right.  That there will

1   be a plan, that it is a confirmable plan, and that that plan

2   actually provides for the waiver or release of claims and the

3   use of proceeds in the way that Mr. Mayer and his colleagues

4   would like.  And maybe that will happen someday.  But as we sit

5   here on August 13th, Judge, that ain't happened yet.  Okay.

6   And so you're taking this on spec and you're being asked, if I

7   understand correctly, to approve not only the filing of a

8   lawsuit, but the estate's responsibility for the expenses save

9   for the contingent attorney's fees.  And they've already

10  estimated those at seven and a half million, they've not

11  offered a cap or some kind of revision of that.  And that is

12  still very much an open issue even if the government's priority

13  claim remains open.

14          THE COURT:  Well, it's only an open issue for those

15  that are owed the money.  Because as a practical matter, if

16  there's no release of the cash collateral and the only aspect

17  of the case the cash collateral could be used for is the wind-

18  down expenses approved by the government then the risk lies

19  with those that expended the funds for purposes of the experts

20  or anything else.  I mean, we are still speculating, I haven't

21  heard from the committee on the answer to the question, maybe

22  there's a different answer, but it seems to me that the estate

23  isn't necessarily at risk unless or is liable for anything --

24  or let me say it differently, has the ability to pay anything

25  unless the government releases the cash collateral in some form

1   to be used at the estate's discretion.  So far that hasn't

2   happened.

3         MR. GOUDISS:  And that's exactly my point.  And I

4   think the committee's application assumes that you should

5   approve the use of estate funds.  And what you're saying, Your

6   Honor, if I understand you correctly, is that can't be done

7   until the government's position is resolved.  And, therefore,

8   to the extent they retain experts and those experts incur

9   costs, they don't get paid from the estate unless and until

10  there's a resolution of the issue, then I guess that meets my

11  objection.  But that's not the way I read their papers.  I read

12  their papers as don't worry Judge, the lawyers are going to

13  take this on a pure contingency and all the estate has to do is

14  pay the expenses, and they're not really going to be allotted

15  first.  And even when they grow bigger by then we'll probably

16  have worked it out.

17        Well, I submit now is the time to know how the

18  estate's assets are going to be used and, you know, not wait

19  until maybe someday we have a plan that allows for this.

20        THE COURT:  Well, you'll probably do that if there

21  wasn't a deadline to file the action.  It seems to me that

22  there's a deadline to file the action that there are going to

23  be open issues we're not going to know the answer to if the

24  action were to go forward.

25        MR. GOUDISS:  And at the risk of sounding small, and I

1    don't intend to, settlement agreement 3 and the deadlines set

2    forth in it, were very carefully negotiated.  Daimler was

3    entitled to rely on the notice provisions, it was entitled to

4    rely on the August 18th deadline.  And the fact that these

5    issues, these predominant issues remain unresolved quite

6    frankly, Your Honor, speaks volumes about the merit of this

7    case.  This was slapped together, it was will all respect

8    lawyer driven and intended to meet a deadline that, frankly,

9    never should have come into play.

10              We understand the motivations to bring the lawsuit, it

11   doesn't provide good reason to pursue it.

12              THE COURT:  Thank you.

13              MR. GOUDISS:  Thank you.

14              THE COURT:  Anyone else in opposition?  All right, Mr.

15   Mayer, any response?

16              MR. MAYER:  Yes, Your Honor, just two points.  First,

17   it's important to note that there are actually two pools of

18   assets.  There's a pool of assets where the government has a

19   lien on the priority, and there's a pool of assets over which

20   the banks have a security interest subject to whatever issues

21   the committee on behalf of unsecured creditors has.

22              Neither of those pools of assets is available today,

23   but both of them are under discussion in terms of the ability

24   to fund whatever relatively small expenses need to be funded

25   prior to the confirmation of a plan.  That's first response.

33

1    It isn't just the government we're talking to, it is also the

2    bank as Your Honor has noted.

3        THE COURT:  With respect to the pool of assets that

4    the banks claim their lien on, is the government behind that?

5        MR. MAYER:  That's an interesting question as to

6    whether if the committee were to either prevail on an action

7    against the banks or to obtain a settlement with the banks,

8    whether the government's lien or priority would attach.  I

9    don't know the answer to that, it might depend on how the

10   settlement was structured.  But, once again, this assumes a

11   litigious posture amongst the banks, the committee and the

12   government, which I have no reason to anticipate will occur.

13   That was my first comment.

14       My second comment.  I understand Daimler keeps saying

15   we are a creditor we're going to recover, and this is coming

16   out of our hide as a creditor.  As Your Honor has pointed out

17   if there are no assets available for unsecured creditors,

18   Daimler never gets anything anyway.

19       The other point I just wanted to draw Your Honor's

20   attention to is that in clause II of the famous Section 6(b),

21   it is quite clear that if this lawsuit was not brought Daimler

22   would release all claims against the estate.  So to some extent

23   Daimler's view that this is being funded out of their pocket is

24   a little misleading.  Daimler never intended to receive any

25   value from this estate except perhaps the release of this

1   lawsuit.  And that's effectively what they are trying to get

2   right now.

3          Your Honor's point on the arithmetic is a correct one,

4   I don't think we need to get into the details today, except to

5   note, and I believe this is a matter of public record, the

6   claims against the estate start out with the deficiency claims

7   of the banks, which subject to however that comes out, look to

8   be -- what are we around, six billion dollars.  We have

9   asbestos claims, product liability claims, dealer claims, you

10  add them all up it's a lot of claims.  The assets that are

11  available for distribution other than the Daimler lawsuit are

12  relatively small and it was a very easy arithmetic calculation

13  for the committee to determine that if there were, in fact, the

14  recovery from Daimler, which was then shared with Daimler's

15  billion-five claims that would materially increase the net

16  distribution to creditors.  And we can go into that at a later

17  date if necessary, but the math is pretty dramatic, it's not

18  even close.

19         THE COURT:  All right, Mr. Bentely.

20         MR. BENTELY:  Just a few quick points, Your Honor.

21         Mr. Goudiss took issue with my assertion that there's

22  no challenge to the legal sufficiency of our principal claims.

23  But, Your Honor, I think what is clear even after everything

24  Mr. Goudiss has said is he didn't say a word about the legal

25  sufficiency of the fraudulent transfer claims, he doesn't

35

1    question that.  Instead, he's raised an affirmative defense.

2    He has said there's a release that bars those claims or any

3    other claims.

4         And just very briefly, a few more words on that issue.

5    First off, we think at best for Daimler the release is

6    ambiguous and this is an issue that could not be resolved

7    without substantial evidence about what the parties' intent

8    were.  However, I said at best, because I don't think Your

9    Honor would need to get to that.

10        And let me just follow-up on the principal argument

11   that Mr. Goudiss made why he thinks this release applies.  He

12   said, Your Honor, this is a release of claims arising under the

13   contribution agreement, and the contribution agreement

14   incorporates a step plan.  And that's true, essentially, the

15   contribution agreement says that Daimler and Chrysler as a pre-

16   requisite to the closing of the sale to  Cerberus had to make

17   sure that all the steps that were contemplated in the step plan

18   actually take place.

19        Well, what would a claim arising under those

20   provisions of the agreement be?  It would be not anything like

21   the claims we're asserting, it would be a claim that Daimler,

22   the Chrysler entities failed to implement the step plan.  Our

23   claim, of course, is exactly the opposite.  We claim that

24   several of the central steps of the step plan, regardless of

25   whether they were contractually required to be taken,

1     constituted fraudulent transfers.  The debtor was improperly

2     transferring its assets while it was solvent for lack of

3     consideration.

4          So not to beat a dead horse, but we think that for

5     that reason there's enough claims arising under the

6     contribution agreement.

7          Next point, Your Honor, it's simply inaccurate what

8     Mr. Goudiss said about the amount of expenses that have been

9     estimated in this case.  He said we estimate them to be seven

10    and a half million dollars.  That's not true, Your Honor.  One

11    thing is true and that is that the initial contingency

12    agreement with the Susman Godfrey firm did provide that in the

13    event that expenses exceeded seven and a half million dollars,

14    which we viewed as an outside possibility, in that event the

15    estate would be responsible for any excess.  That provision has

16    been removed, as Mr. Goudiss accurately said.  But it was never

17    the case that we or Susman Godfrey or anybody thought it was

18    likely that expenses would be that high.  And if Your Honor

19    wishes to hear from Mr. Buchdahl on that, what he'll tell you

20    is it's very hard to predict expense, they could be as low as a

21    million dollars or so.  Most likely they'll probably be in the

22    vicinity of four/five/six million dollars.  And there's an

23    outside chance that they could be higher.  But that's all it

24    is, an outside chance.

25          And consequently, the central point we think in the

1    calculus, Your Honor, is making on this motion are the costs

2    that the committee will potentially incur in this suit, those

3    few million dollars is it worth incurring in order to preserve

4    the potential for our recovery that could be in the billions of

5    dollars.  Thank you, Your Honor.

6         THE COURT:  Thank you.  Is there anyone else?

7         MR. GOUDISS:  Your Honor, who is paying those

8    expenses?  I still -- it is still not clear to me, at least, is

9    the estate going to be responsible subject to your resolution

10   or the parties' resolution of the government's lien and the

11   bank's position?  Are the lawyers picking that up, is the

12   committee -- it's still not clear to me whether it's four

13   million, six million, seven and a half, twenty million, who

14   actually is responsible and whether you're being asked to act

15   on that right now?

16        MR. BENTELY:  A brief response to that, Your Honor, if

17   I may?

18        Your Honor correctly noted a little bit earlier that

19   this is really not the estate's risk.  That's true, Your Honor.

20   To some degree it's potentially the Susman Godfrey and Stutzman

21   Bromberg's firm's risk.  That is, they're signing on to

22   prosecute this case.  As Mr. Mayer said, we expect that we'll

23   be filing the retention applications later today.  And they

24   need to be satisfied that an agreement will be reached under

25   which the expenses will get paid.  They potentially have the

1    right to withdraw if their expenses are not paid.  But that's

2    really not an issue -- that's really not a risk that the estate

3    is bearing.

4         As Mr. Mayer said, we've been in discussions with

5    treasury and the banks on this issue for a long time.  We're

6    very hopeful but confident that a plan will be confirmed and

7    that it will provide for a payment of the expenses, thereby

8    making Susman Godfrey not at risk.  And from the standpoint

9    what's in the interest of the estate and its creditors, it's

10   very clear, and the committee has certainly addressed this

11   issue and concluded that it's very clear, that it's in the

12   interest in proceeding and trying to recover these -- the very

13   valuable asset of this potential recovery.

14        THE COURT:  Thank you.  Anyone else?

15        MR. GOUDISS:  I'm not sure with all respect Mr.

16   Bentely answered the question.  But I'll leave it at that, Your

17   Honor.

18        THE COURT:  All right.  Mr. Bentely, do you want to

19   respond?

20        MR. BENTELY:  I think I did, Your Honor.  But if Your

21   Honor has any questions --

22        THE COURT:  You can just say whether or not you think

23   you answered the question.

24        MR. BENTELY:  I think I did, Your Honor.

25        THE COURT:  All right, fine.  Based upon the pleadings

1   and today's argument, the Court determines that the appropriate

2   standard is the committal standard.  And the committal standard

3   in the Court's view under the facts presented has been

4   established, and the lawsuit is in the best interests of the

5   estate and necessary and beneficial to the fair efficient

6   resolution of the bankruptcy proceedings.

7           I think the issues raised by Daimler, as Daimler I

8   believe acknowledges, are more appropriately dealt with at the

9   motion to dismiss stage if such motion were filed.

10          So the Court will grant the relief as stated and the

11  committee may submit the appropriate order after circulating it

12  amongst the parties.

13          MR. BENTELY:  Your Honor, a housekeeping matter,

14  briefly?

15          THE COURT:  The other motion?  All right, go ahead.

16          MR. BENTELY:  Actually, Your Honor, I'm happy to take

17  up the housekeeping matter after the second motion, it relates

18  to the second motion.

19          Would Your Honor like us to hand up the order on the

20  committal motion?

21          THE COURT:  Yes.  Has it been circulated?

22          MR. BENTELY:  Yes, Your Honor, it was filed and served

23  last night.

24          THE COURT:  All right.

25          (Pause)

40

1          THE COURT:  Thank you.  Mr. Mayer, who's addressing

2    the other motion.

3          MR. MAYER:  Mr. Bentely will do the motion to seal,

4    Your Honor.

5          THE COURT:  Oh, all right.  Thank you.

6          MR. BENTELY:  Yes, Your Honor, our second motion seeks

7    an order authorizing the filing under seal of the motion that

8    we have already filed, and the related papers.  The reason for

9    the motion, Your Honor, is that certain of the information

10   that's reflected in the motion and in the draft complaint that

11   was annexed as an exhibit to that motion, was obtained for the

12   number of different parties, including Daimler, the debtors and

13   others pursuant to confidentiality agreements which required

14   the filing under seal.  The committee does not agree that the

15   information that we received is, in fact, confidential and

16   warranting -- and information that we would be required to file

17   under seal.  But the confidentiality agreements do require us

18   to seek a filing under seal, and we, therefore, have done so.

19   We did not want to make public this information without giving

20   the other parties an opportunity to -- let me put it another

21   way.  Your Honor, we may down the road bring an application to

22   unseal or to challenge the confidentiality designations that

23   have been made by the various parties, but at this stage we

24   didn't think it was necessary to burden the Court without

25   application, and we, therefore, ask that the Court permit the

1    sealing of the papers that have already been filed.

2            THE COURT:  All right.  Anyone else wish to be heard?

3            MR. PANTALEO:  Good morning, Your Honor.  Peter

4    Pantaleo, Simpson Thacher for JPMorgan.

5            We don't have an objection to this motion.  We simply

6    reserve our rights to come to Court at a later date to seek

7    relief to have access to the information if, in fact, we can't

8    work out any issues we may have, if any, with Daimler.  We've

9    contacted them, we intend to have a conversation with them

10   about it.  Hopefully we'll work it out.  But if we can't we

11   reserve our rights.  Thank you, Your Honor.

12           THE COURT:  All right.

13           MR. FRIEDMAN:  Good morning, Your Honor.  Jeff

14   Friedman, Katten Muchin Rosenman for Houlihan Lokey Howard &

15   Zukin.

16           Your Honor, among the bits of confidential information

17   that are contained in the draft complaint that the committee

18   would propose filing presumably by Tuesday of next week, is

19   information that was designated as confidential by Houlihan

20   under confidentiality agreements negotiated with the creditors'

21   committee.  So we were not only supportive of this motion, but,

22   Your Honor, we want to make sure that ultimately when the

23   complaint, itself, is filed, which contains the confidential

24   information, that complaint is either filed in redacted form or

25   filed under seal.  We think we have an arrangement and

1    agreement with the committee to seek that relief.  And the

2    Pachulski Stang firm, as I understand it, has been engaged to

3    deal with that issue.

4        MR. BENTELY:  And that, in fact, Your Honor, is the

5    housekeeping matter that I was going to raise.  Shall I address

6    that now, Your Honor, or should we put that off until after?

7        THE COURT:  No, you can address it now.

8        MR. BENTELY:  Okay.  We have, in fact, reached out to

9    the various parties with whom we've executed confidentiality

10   agreements.  And we've asked them will they consent to our

11   filing the complaint in the event Your Honor were to grant the

12   motion that you've just granted.  Would they consent to our

13   filing the complaint publicly?  We've gotten consent from most

14   of the parties.  Daimler has consented to that request, the

15   debtors have consented.  The one party who has not consented is

16   Houlihan Lokey.

17       This, again, is a fight that we don't think we need to

18   burden the Court with at this time.  And, therefore, what we

19   would propose is that on Monday or Tuesday the Susman Godfrey

20   firm will file the complaint and it will publicly file a

21   redacted version that will redact the portions of the

22   complaint, which are relatively discreet and limited, that

23   reflect confidential information from Houlihan Lokey.  And we

24   have, in fact, communicated with Houlihan and we have an

25   agreement as to what those portions are.

43

1        At the same time, Your Honor, we would like to ask

2   Your Honor to enter an order authorizing the filing of the

3   unredacted complaint under seal.  And if Your Honor wishes we

4   can file an expedited application later today or tomorrow

5   requesting that relief.  Alternatively, if Your Honor permits

6   we would make this an oral application and send an order down

7   to chambers implementing that relief if Your Honor grants it.

8        THE COURT:  All right.  Anyone else wish to be heard?

9   Houlihan, do you have any response?  Houlihan Lokey?

10       MR. FRIEDMAN:  Your Honor, we're satisfied with the

11  filing of the redacted complaint and an unredacted complaint

12  under seal.  That's perfectly acceptable to us.  There is a

13  mechanism under the confidentiality agreement if the committee

14  wishes to challenge the designation as confidential they

15  acknowledge that that agreement requires a formal hearing on

16  application, and we're prepared to abide by the terms of the

17  confidentiality agreement as I understand the committee is.

18       THE COURT:  I will grant the sealing relief with

19  respect to, I think, moving this forward with the filing of any

20  complaint.  And you can submit the appropriate orders, but

21  recognizing that there may well be a challenge by the parties

22  or others to this and I will deal with it at the appropriate

23  time.

24       MR. BENTELY:  And if I may, Your Honor, if the Court

25  wishes, I'll hand up now an order granting the motion we had

44

1    previously made to seal the motion and the reply.  And then we

2    will submit to Your Honor's chambers a form of order with

3    respect to the filing of the complaint under seal.

4            THE COURT:  All right, you may hand it up.

5        (Pause)

6            THE COURT:  Thank you.  This concludes the Old Carco

7    LLC matters.  But the next matter is scheduled to begin at 11

8    o'clock.  We'll stand in recess until then.

9            ALL:  Thank you, Your Honor.

10        (Proceedings concluded at 10:40 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

1

2                              I N D E X

3

4                            R U L I N G S

5                                              PAGE LINE

6    Motion of the Creditors' Committee to Pursue    39    7

7    Claims on Behalf of the Estate Granted

8

9    Motion of the Creditors' Committee Authorizing   43   15

10   To File Papers under Seal Granted

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

46

C E R T I F I C A T I O N

I, Esther Accardi, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

ESTHER ACCARDI (CET**D-485)

AAERT Certified Electronic Transcriber

Veritext LLC

200 Old Country Road

Suite 580

Mineola, New York 11501

Date: August 14, 2009