# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

———————————————————————

In re:

Energy Future Holdings Corporation, *et al.*,

                   Debtors.

———————————————————————

)  Chapter 11
)
)  Case No. 14-10970 (CSS)
)
)  (Jointly Administered)
)
)
)  Docket Ref. Nos. 3593, 3603
)

## OMNIBUS OBJECTION OF CCP CREDIT ACQUISITION HOLDINGS, L.L.C., CENTERBRIDGE SPECIAL CREDIT PARTNERS, L.P., AND CENTERBRIDGE SPECIAL CREDIT PARTNERS, II, L.P. <u>TO THE STANDING MOTIONS</u>

# TABLE OF CONTENTS

I.    **PRELIMINARY STATEMENT** ...............................................................................1

II.   **RELEVANT FACTUAL BACKGROUND**...................................................6

    A.    **Texas Competitive Electric Holdings Company: History and Background** ...................................................................................6

    B.    **Energy Markets Underperform, And TCEH Implements The Liability Management Program, Designed To Benefit The TCEH Debtors And Their Junior Stakeholders.**...............................................7

    C.    **The TCEH Debtors Extend the Maturities Of Approximately $18 Billion Of First Lien Debt In April 2011**...........................................8

    D.    **It Is Undisputed That The 2013 Extension Delivered To The TCEH Debtors Not Less Than A One-Year Runway And Avoidance Of An "Imminent" Bankruptcy Filing In The First Quarter Of 2013.** ......................11

    E.    **The 2013 Extension Delivered Several Tangible Benefits To The TCEH Debtors And Their Junior Stakeholders.** ...............................12

    F.    **The 2013 Extension Allowed The TCEH Debtors To Realize Intangible Benefits As Well, Including Entering Bankruptcy With The RSA.**...........................................................................................14

III.   **OBJECTION**...........................................................................................16

    A.    **The 2013 Extension Claims Are Not Colorable.** ...............................16

        1.    **The TCEH Debtors' Incurrence Of The Incremental Term Loan Cannot Be Avoided As A Constructive Fraudulent Transfer.** ...........................................................................17

        2.    **The 2013 Extension Claims Sounding In Actual Fraud Are Baseless.**.......................................................................26

    B.    **Cost-Benefit Analysis Cements The Conclusion That Standing Should Not Be Granted.** ...............................................................................28

CCP Credit Acquisition Holdings, L.L.C., Centerbridge Special Credit Partners, L.P., and Centerbridge Special Credit Partners II, L.P. (collectively, "CCP"), by and through their undersigned counsel, hereby file this objection (the "Objection") to: (i) the Motion of the Official Committee of Unsecured Creditors (the "UCC") for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims (the "UCC Standing Motion")[1] [Docket No. 3593]; and (ii) the Motion of the Ad Hoc Group of TCEH Unsecured Noteholders (the "Ad Hoc Noteholder Group" and, together with the UCC, the "Moving Parties"), for Entry of an Order Granting Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims [Docket No. 3603] (the "Ad Hoc Noteholder Group Standing Motion" and with the UCC Standing Motion, the "Standing Motions").  In support of the Objection, CCP respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    This Objection addresses the putative claims targeting the 2013 Extension and the TCEH Debtors' incurrence of the Incremental Term Loan in connection therewith.  The Moving Parties' own allegations reflect the fact that the TCEH Debtors secured no less than one year of additional runway directly as a result of entering into the 2013 Extension and incurring the Incremental Term Loan.  Had the TCEH Debtors not obtained the 2013 Extension, and not

---

[1]   The UCC Standing Motion and Ad Hoc Noteholder Group Standing Motion each attach a substantially similar proposed complaint ("Proposed Complaint").  Citations herein are to the Proposed Complaint filed with the UCC Standing Motion.

incurred the Incremental Term Loan, the TCEH Debtors would have been forced to crash land into bankruptcy at least one year earlier.  This much is undisputed.

2.    Simply put, claims seeking to avoid the Incremental Term Loan as a putative fraudulent transfer are not colorable because the value afforded the TCEH Debtors significantly exceeded the incurrence of the incremental debt.  These claims are particularly suspect because the 2013 Extension was part of the TCEH Debtors' publicly-disclosed Liability Management Program which was *designed* to benefit the TCEH Debtors (*and their junior stakeholders in particular*) by extending the runway to allow for a potential recovery in the gas and power markets – unsecured creditors' only hope for meaningful value as of the date of the 2013 Extension.  Even a slight increase in the price of natural gas would result in significant value for the TCEH Debtors.  Time provided both optionality for a meaningful recovery and time to prepare for an organized bankruptcy if such turnaround did not occur.  Time was the best prospect for junior stakeholders – they could have asked for nothing more – and the TCEH Debtors were able to deliver at least a year, which the TCEH Debtors, guided by their sophisticated boards of directors, deemed valuable in their unconflicted business judgment.

3.    The Third Circuit has recognized that it would be unjust and inequitable to subject these sorts of business decisions to 20/20 hindsight under the guise of constructive fraudulent transfer law.  *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 153 (3d Cir. 1996) ("Presumably the creditors whom § 548 was designed to protect want a debtor to take *some* risks that could generate value . . . .") (emphasis in original).  That is why it is black-letter law that value – for purposes of assessing reasonably equivalent value – is to be determined as of the date of the transfer.  For the reasons set forth herein, it is clear, as the TCEH Debtors and their boards found, that there was far more than

reasonably equivalent value provided in connection with the 2013 Extension.  Unsurprisingly, the capital markets also recognized the value of additional runway.  The incremental market capitalization reflected in the trading prices of the TCEH Debtors' junior debt increased by $469 million in the period between the 5 days prior to the announcement of the 2013 Extension on December 21, 2012 and the 5 days following the closing of the transaction on January 8, 2013, well exceeding the $340 million Incremental Term Loan.

4.      While black letter law makes clear that transfers should not be subject to hindsight, the ability to determine that the 2013 Extension Claims are not colorable is made even easier here because the transaction *did in fact* benefit junior stakeholders *even with the benefit of 20/20 hindsight*.  During the incremental period of operations that the TCEH Debtors were afforded by the 2013 Extension, the TCEH Debtors' junior creditors benefited in the most tangible way possible – they were paid cash in an amount equaling approximately $1.085 billion.  Fraudulent transfer law is to be applied from the perspective of unsecured creditors.  Had the TCEH Debtors filed for bankruptcy instead of obtaining the 2013 Extension, these unsecured creditors would be at least $1 billion worse off, even without considering the option value that the TCEH Debtors created by the transaction.  The cash paid to junior creditors alone *dwarfs* the $340 million Incremental Term Loan.  Fraudulent transfer law cannot rationally be asserted to unwind a transaction that resulted in more than a billion dollars of cash collateral to be paid out to junior creditors.

5.      Thus, the 2013 Extension delivered real, tangible, and easily measurable value to the TCEH Debtors' estates far in excess of the Incremental Term Loan.  The Court need not even reach the significant intangible benefits, such as the opportunity to negotiate a consensual, pre-packaged bankruptcy, which the TCEH Debtors nearly accomplished with their RSA, and which

TCEH's independent director has testified – even after the termination of the agreement – to be a "catalyst" that "fulfilled its purpose" of "mov[ing] the company forward to a confirmable plan." Even the mere opportunity for the TCEH Debtors to have realized these intangible benefits cements the conclusion that far more than reasonably equivalent value was provided.

6.      Because the claims seeking to avoid the Incremental Term Loan are not colorable, the Standing Motions should be denied as they relate to the 2013 Extension.  The Court need go no further.  But even if such claims were presumed to be plausible, the Standing Motions should *still* be denied under what is likely to be one of the easiest cost-benefit analyses ever conducted for derivative standing.  That is because these putative claims seeking to avoid undersecured obligations, if successful, at most pose to benefit other senior secured creditors exclusively, namely, the other First Lien Lenders.  When the Incremental Term Loan was incurred (in January 2013), all of the TCEH Debtors' First Lien Debt was trading at a significant discount to par.  That debt was and is secured by substantially all of the TCEH Debtors' assets.  No new assets were encumbered and no new lien was transferred in connection with the 2013 Extension; the Incremental Term Loan was just that – incremental to the already extant Term Loan issued under the very same Credit Agreement and previous collateral grant.  Effectively, the existing First Lien Lenders just had to "make room" in their existing collateral pool.  The estates and their junior creditors got the benefits of the 2013 Extension – at a minimum, over one year of cash payments plus optionality – without having to transfer any more assets.

7.      Avoidance of the Incremental Term Loan would not result in an avoided lien under the Bankruptcy Code because a lien was not transferred in connection with the 2013 Extension.  Thus, the estates, including their unsecured creditors, would not benefit in any material way through avoidance.  Avoidance would merely attempt to throw the 2013 Extending

4

Lenders "out of the pool" and the Collateral value would be putatively reallocated to the balance of First Lien Lenders.

8.      That, at best, only other secured creditors would benefit from avoidance of the Incremental Term Loan is grounds alone to deny standing.  It would be perverse to allow chapter 5 powers to be asserted at the estates' cost to benefit secured creditors.  But it does not stop there.  Not only would the estates be burdened with the cost of litigation without a prospect of benefiting, successful avoidance of the Incremental Term Loan, ultimately, would only return the First Lien Lenders right back to where they started as of the Petition Date.  This is so because, under the Intercreditor Agreement, all of the First Lien Lenders contractually agreed that First Lien Debt is to share the Collateral *pro rata,* irrespective of whether such debt is (hypothetically) avoided in bankruptcy.  So a successful avoidance (itself an extraordinarily high hurdle on the undisputed facts above) would only result in temporary secured creditor reallocation which would, in turn, generate more litigation to unwind the unwind.  In sum, these claims targeting the 2013 Extension present all downside and no upside to the estates or unsecured creditors "whose interests avoidance actions are designed to protect."  *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.),* 330 F.3d 548, 573 (3d Cir. 2003) (en banc).  Ironically, that is the opposite of the 2013 Extension, which provided all upside and no downside to the Debtors and their unsecured creditors.

9.      The Standing Motions should be denied in their entirety for the reasons stated by the other First Lien Lenders and their agent, and for these additional reasons pertaining to the 2013 Extension – a transaction that offered real, tangible benefits to the TCEH Debtors and their second-lien and unsecured creditors at no cost to such parties.

5

## II.    RELEVANT FACTUAL BACKGROUND[2]

### A.    Texas Competitive Electric Holdings Company: History and Background

10.    Energy Future Holdings Corp. ("EFH") is a Dallas, Texas-based privately held energy company with a portfolio of competitive and regulated energy companies.  The EFH businesses serve the Texas electricity market under the names TXU Energy, Luminant, and Oncor.

11.    Energy Future Competitive Holdings LLC ("EFCH") is a direct subsidiary of EFH.  EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH"), operates TXU Energy and Luminant, the two unregulated EFH businesses.

12.    Prior to 2007, EFH was known as TXU Corporation.  In 2007, a group of investors led by Kohlberg Kravis Roberts & Co., TPG Capital, L.P., and Goldman, Sachs & Co. acquired TXU Corporation in a $45 billion leveraged buyout (the "LBO").  These sponsors contributed approximately $8.3 billion of new money in the LBO.

13.    In order to finance, in part, the LBO, TCEH, as borrower, and EFCH and certain subsidiaries as guarantors, entered into a $24.5 billion first lien credit agreement (the "Credit Agreement"), dated October 10, 2007, with Citibank, N.A., ("Citibank") as Administrative Agent and Collateral Agent[3] and the lenders party thereto from time to time (the "First Lien Lenders").[4]

---

[2]    Unless otherwise stated, the facts referenced herein are derived from the TCEH Debtors' public filings and the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief-Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [Docket No. 98] (the "First Day Declaration").

[3]    References to the Administrative Agent or Collateral Agent herein include any successor to Citibank as Administrative Agent or Collateral Agent.

[4]    The Credit Agreement and amendments thereto are attached as Exhibits 1 through 5 to the Declaration of Christopher A. Ward, dated February 19, 2005, which is annexed to the UCC Standing Motion as Exhibit A (the "Ward Declaration").

14.    The Credit Agreement initially provided for approximately $20.5 billion in aggregate principal amount of term loans (the "Term Loan"), approximately $1.3 billion in aggregate principal amount of deposit letter of credit loans (the "Deposit L/C Loan"), and up to $2.7 billion in aggregate principal amount of revolving credit commitments (the "Revolver" and with the Term Loan and the Deposit L/C Loan, the "First Lien Debt").

15.    The First Lien Debt was secured by first priority liens on the collateral as defined in the Credit Agreement, the Amended and Restated Collateral Agency and Intercreditor Agreement (the "Intercreditor Agreement"), dated October 10, 2007, the Amended and Restated Security Agreement, dated August 7, 2009 (the "Security Agreement"), and the Amended and Restated Pledge Agreement, dated August 7, 2009 (the "Pledge Agreement"), including substantially all of the assets of TCEH, and was guaranteed on a secured basis by a first priority lien on EFCH's equity interests in TCEH and by a first priority lien on substantially all of the assets of the subsidiary guarantors (the "Collateral").[5]

### B.    Energy Markets Underperform, And The TCEH Debtors Implement The Liability Management Program, Designed To Benefit The TCEH Debtors And Their Junior Stakeholders.

16.    TCEH was poised for a period of solid growth when it was acquired in 2007. Since the close of the LBO, however, overall economic growth unforeseeably decreased because of the financial crisis in 2008 and 2009, and because natural gas and wholesale electricity prices significantly declined.  The TCEH Debtors'[6] profitability was severely and negatively impacted by this decline.

---

[5]    The Security Agreement, Pledge Agreement, and Intercreditor Agreement are attached as Exhibits 7 through 9 of the Ward Declaration.

[6]    "TCEH Debtors" means, collectively, TCEH, EFCH, and TCEH's direct and indirect subsidiaries that are debtors and debtors-in-possession in the above captioned cases.

17.    Beginning in August 2009, the TCEH Debtors focused on ways to manage the long-term debt incurred in connection with the LBO, portions of which were scheduled to mature in 2013.  With the drop in natural gas and electricity prices impairing the TCEH Debtors' financial performance, the TCEH Debtors' management ("Management") began to plan for the risk that their current capitalization of debt and equity may need to be adjusted.  In the fall of 2009, the TCEH Debtors publicly disclosed a decision to implement their "Liability Management Program," seeking to restructure their outstanding debt primarily through debt exchanges, repurchases, and extensions.

18.    The Liability Management Program ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████  time was the ally of the TCEH Debtors' junior stakeholders.[8]

**C.    The TCEH Debtors Extend the Maturities Of Approximately $18 Billion Of First Lien Debt In April 2011**

19.    By the spring of 2011, however, TCEH still faced approximately $2 billion in borrowings coming due in 2013 under the Revolver and approximately $20 billion coming due in

---

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

[8]    Certain of those junior stakeholder have asserted arguments in these chapter 11 cases admitting that time to allow for a rebound in natural gas prices would benefit them. *See Motion of Wilmington Savings Fund Society, FSB for Leave to Conduct Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure of Energy Future Holdings Corporation, Its Affiliates, and Certain Third Parties*, Apr. 29, 2014 [Docket No. 6] at ¶¶ 9, 22-24 (arguing that any determination of valuation be put off to allow for "an inevitable improvement in natural gas prices").

2014 under the Term Loan.[9]  Therefore, in April 2011, as part of the Liability Management

Program, ████████████████████████████████████████████████

████████████████████████████████████ ████ ████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ ██████

20.     The TCEH Debtors successfully negotiated an extension of the maturity dates of a

substantial portion – but not all – of the First Lien Debt.  Pursuant to this transaction (the "2011

Extension"), TCEH extended the maturities of over $18 billion of its First Lien Debt, including

80 percent of its Term Loan borrowings to 2017 and approximately 70 percent of its

commitments under the Revolver to 2016.[12]  Cash fees and other consideration were paid to

obtain the 2011 Extension.

21.     Although the 2011 Extension extended a significant amount of impending

maturity dates, $645 million of Revolver loans remained due in October 2013.  Therefore, in

contemplation of further negotiations, the 2011 Extension provided for a subsequent issuance of

new Term Loan to facilitate the extension of the remaining Revolver loans.[13]

22.     By December 2012, TCEH had fully drawn down on its Revolver, including the

entirety of the $645 million in commitments that would have expired in October 2013.  In the

fourth quarter of 2012, ████████████████████████████████████████████

████████████████████████████████████████████████████████

---

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[12]  Proposed Complaint ¶ 81.

[13]  Ward Declaration, Ex. 3 (Amendment No. 2 to the Credit Agreement, dated April 7, 2011) § 2.15.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

The efforts they had expended and the fees they had incurred in connection with the Liability Management Program would have been wasted.

23.    It was at this time that Management engaged CCP – which owned approximately 66 percent of the now fully drawn Revolver – in an arm's-length negotiation to extend the maturity dates of this indebtedness from October 2013 to October 2016.  The TCEH Debtors determined it was impossible to refinance the Revolver, and CCP – a creditor that held only a portion of the TCEH's Debtors' outstanding debt and that was under no obligation to do so – agreed to the requested extension.  In exchange, CCP received non-cash consideration consisting of $0.5264 of Incremental Term Loan for each $1.00 of its extended commitment under the Revolver.  Using this structure as a blueprint, following CCP's agreement, the TCEH Debtors were able to procure the same agreement from the rest of the similarly-situated holders of the outstanding 2013 Revolver commitments (collectively, the "2013 Extending Lenders"), and the transaction closed on January 4, 2013 (the "2013 Extension").  ■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■

_____

■■■■■■■■■■■■

24.     The use of an incremental, woefully undersecured loan was the TCEH Debtors' solution to a challenging situation to accomplish legitimate corporate purposes.  By accepting non-cash consideration in the form of an undersecured Incremental Term Loan, CCP and the other Extending Lenders facilitated the TCEH Debtors' desire to preserve their liquidity and instead use their cash to fund their operations and, as discussed below, continue to make cash payments to junior creditors.

25.     Citibank, as Administrative Agent for the First Lien Debt, ratified the extension and incurrence of Incremental Term Loan, and the Credit Agreement was duly amended by the parties thereto (the "2013 Extension Amendment") on January 4, 2013.  The Incremental Term Loan was issued to the 2013 Extending Lenders in an approximate amount of $340 million (the "Incremental Term Loan").  No new lien was granted; the Incremental Term Loan is secured by the same Collateral as is the original Term Loan and other First Lien Debt.

**D.     It Is Undisputed That The 2013 Extension Delivered To The TCEH Debtors Not Less Than A One-Year Runway And Avoidance Of An "Imminent" Bankruptcy Filing In The First Quarter Of 2013.**

26.     As an initial matter, it is undisputed that the 2013 Extension achieved – at the very least – a one-year extension that prevented a bankruptcy filing in the fourth quarter of 2012 or first quarter of 2013.  As the UCC alleges, prior the 2013 Extension, "the Debtors' situation

was dire and a bankruptcy filing was inevitable." Proposed Complaint ¶ 84. ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ ██████████

████████████████████    Finally, the UCC alleges that the Debtors achieved "one year of runway" which avoided "an imminent bankruptcy filing in April 2013." Proposed Complaint ¶ 96. Such "imminent bankruptcy filing," and the resulting immediate acceleration of approximately $32 billion in debt, was avoided by incurrence of incremental debt that constituted merely *1.5%* of the First Lien Debt outstanding as of the Petition Date, and only *1%* of the TCEH Debtors' total funded indebtedness as of the Petition Date.[18]

**E.    The 2013 Extension Delivered Several Tangible Benefits To The TCEH Debtors And Their Junior Stakeholders.**

27.    There is also no genuinely disputed issue of fact that even a one-year extension (which was afforded by the 2013 Extension) benefited the TCEH Debtors' estates in several objective and quantifiable measures, each of which exceeded the entire $340 million of Incremental Term Loan.

28.    First, ████████████████████████ the 2013 Extension enabled the company and its junior stakeholders to benefit from potential recoveries in the gas and power markets. The incremental value afforded the TCEH Debtors by the 2013 Extension was immediately recognized by and reflected in the capital markets. As indicated in the table below, the market value of the TCEH Debtors' second lien and unsecured debt rose in aggregate value by approximately $469 million in the period between the 5 days prior to the announcement of the transaction on December 21, 2012 and the 5 days following the closing of the transaction on

---

[18]    According to the First Day Declaration, as of the Petition Date, there was approximately $24.4 billion of First Lien Debt outstanding, and the TCEH Debtors' total funded indebtedness was approximately $32.1 billion. *See* First Day Declaration ¶10.

January 8, 2013.  ***This amount is greater than the entire amount of $340 million of Incremental Term Loan***.

| | A | B | C | D = C-B | A x D |
|---|---|---|---|---|---|
| *(US$ millions)* | **Amount Outstanding** | **5 Day Average Trading Price[1] Prior to Initial 8-K Regarding Extension (filed 12/21/2012)** | **5 Day Average Trading Price[1] After Closing of Extension (8-K Filed 1/7/2013)** | **5 day Avg Price Difference** | **Change in Value** |
| **Second Lien Debt:** | | | | | |
| 15% 2L Notes due 4/2/2021 - Series A | $      336 | 31.61 | 36.85 | 5.24 | $      18 |
| 15% 2L Notes due 4/2/2021 - Series B | 1,235 | 31.25 | 36.14 | 4.89 | 60 |
| **Total TCEH Second Lien Debt** | $   1,571 | | | | $      78 |
| | | | | | |
| **Unsecured Debt:** | | | | | |
| 10.25% Notes due 11/1/2015 - Series A[2] | $   2,046 | 23.85 | 29.61 | 5.76 | $    118 |
| 10.25% Notes due 11/1/2015 - Series B[2] | 1,442 | 24.00 | 30.85 | 6.85 | 99 |
| 10.5% / 11.25% Toggle Notes due 11/1/2016 | 1,749 | 19.88 | 26.08 | 6.20 | 108 |
| Pollution Control Revenue Bonds: | | | | | |
| Non-puttable[3,4] | 825 | 7.97 | 15.28 | 7.31 | 60 |
| Puttable on demand[5] | 204 | 100.00 | 100.00 | - | - |
| Puttable in 2013 & 2014[6] | 91 | 23.85 | 29.61 | 5.76 | 5 |
| **Total Unsecured Debt** | $   6,357 | | | | $    391 |
| **TOTAL SECOND LIEN AND UNSECURED DEBT** | $   7,928 | | | | $    469 |

(1) Trading prices from Bloomberg, unless stated otherwise.
(2) Includes $213 million of Series A Notes and $150 million of Series B Notes held by EFIH and EFH Corp.
(3) Represents 13 fixed-rate PCRBs without put features; pricing shown is average of any trades that occurred for the 13 bonds on each given day.
(4) Pricing sourced from Municipal Securities Rulemaking Board (MSRB); accessed via Bloomberg.
(5) Represents 3 floating-rate PCRBs puttable to the Company at any time.  There were no trades for these securities in the periods shown.  Price of 100 is assumed based on trading prices before and after the periods shown.
(6) Represents 2 fixed-rate PCRBs puttable on 4/1/2013 and 1 fixed-rate PCRB puttable on 10/1/2014.  There were no trades during the periods shown.  Pricing shown based on other unsecured debt.

29.    In exchange for the $340 million Incremental Term Loan, the market value for TCEH Debtors' unsecured notes and Pollution Control Revenue Bonds increased by $391 million – a 16% jump.

30.    Moreover, in the year afforded by the 2013 Extension, the TCEH Debtors' junior creditors benefited in the most tangible fashion possible – they were paid cash in amounts that dwarf the Incremental Term Loan.  The TCEH Debtors made principal and interest payments to second lien and unsecured creditors in an amount equaling approximately $1.085 billion.  ***Once again, this amount is greater than the entire amount of $340 million of Incremental Term Loan***.

31.     Specifically, the second lien notes, which pay quarterly, received $236 million during the extension period.  The 2015 unsecured notes and the Senior Toggle Notes, which pay semi-annually on May 1 and November 1, received $542 million during the runway achieved by the 2013 Extension.  The unsecured Pollution Revenue Bonds, which pay out at various times throughout the year, received $308 million in principal and interest payments during this same period.

**Junior Debt Payment Analysis**
**Jan. 4, 2013 to Apr. 29, 2014**

| | Interest Rate [1] | Maturity [1] | Interest Dates [1] | Principal Balance [1] | | Total Principal Paid | Total Interest Paid | Total Payment |
|---|---|---|---|---|---|---|---|---|
| | | | | 12/31/2012 | 3/31/2014 | | | |
| TCEH 15.00% Fixed Senior Secured Second Lien Notes | 15.00% | 04/01/21 | 1/1; 4/1; 7/1; 10/1 | 1,571 | 1,571 | - | 236 | 236 |
| TCEH 10.25% Fixed Senior Unsecured Notes [2] | 10.25% | 11/01/15 | 5/1; 11/1 | 3,488 | 3,488 | - | 358 | 358 |
| TCEH 10.50%/11.25% Senior Toggle Notes | 10.50% | 11/01/16 | 5/1; 11/1 | 1,749 | 1,749 | - | 184 | 184 |
| TCEH Pollution Control Revenue Bonds | Various | Various | Various | 1,120 | 875 | 245 | 63 | 308 |
| **Total** | | | | **7,928** | **7,683** | **245** | **840** | **1,085** |

(1) Source: SEC Filings.
(2) Includes $363 million held by EFIH/EFIH  Corp as well as interest paid thereon.

32.     To state the obvious, had the TCEH Debtors *not* effectuated the 2013 Extension, none of the foregoing benefits would have been realized by the TCEH Debtors' junior stakeholders.  The TCEH Debtors' junior stakeholders would have been much worse off.

**F.      The 2013 Extension Allowed The TCEH Debtors To Realize Intangible Benefits As Well, Including Entering Bankruptcy With The RSA.**

33.     In addition to the easily quantifiable benefits described above, the TCEH Debtors realized intangible benefits that were attributable to the 2013 Extension as well.  ██████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████  the TCEH Debtors were also able to explore various restructuring alternatives to ensure that a chapter 11 filing would be value-maximizing.

34.     As the record in these cases has reflected, the TCEH Debtors were able to and did spend the majority of 2013 actively negotiating potential restructuring proposals with numerous creditor constituencies.  Ultimately, the TCEH Debtors successfully negotiated the terms of a

restructuring with many of their key stakeholders, which was memorialized in a Restructuring Support Agreement (the "RSA").  It is undisputed that the RSA would not have been achieved absent the 2013 Extension.

35.    TCEH's independent director, Hugh Sawyer, testified that the RSA "present[ed] a clear path forward for finalizing a plan and then having that plan confirmed and consummated…. [A] solution that received broad-based support after more than a year of negotiations exploring other alternatives that did not yield such support.  As such, as a strong and viable option for resolving the issues among many of the parties to these negotiations, I believe that the Restructuring Support Agreement also likely maximizes value for the TCEH estate by eliminating the need for the long and protracted legal battle that would have resulted in the absence of such a plan."[19]

36.    EFIH's independent director agreed, stating, "[s]pecifically, as to the history of negotiations, there was a long runway to the [RSA] as a solution that was agreeable to both the Debtors and to multiple creditor constituencies, and this process provided valuable context as to the value of this potential solution."[20]

37.    Notwithstanding the RSA's termination, Mr. Sawyer reaffirmed his view that the RSA served as a "catalyst" that "fulfilled its purpose" of "mov[ing] the company forward to a confirmable plan."[21]

---

[19]    Declaration Of Hugh E. Sawyer, Disinterested Board Member Of Texas Competitive Electric Holdings Company LLC And Energy Future Competitive Holdings Company LLC, In Support Of The Motion Of Energy Future Holdings Corp., et al., For Entry Of An Order Authorizing The RSA Debtors To Assume The Restructuring Support Agreement, filed on May 16, 2014 [Docket No. 505, Ex. C].

[20]    Declaration Of Charles H. Cremens, Disinterested Board Member Of Energy Future Intermediate Holding Company LLC, In Support Of The Motion Of Energy Future Holdings Corp., et al., For Entry Of An Order Authorizing The RSA Debtors To Assume The Restructuring Support Agreement, filed on May 16, 2014 [Docket No. 505, Ex. B].

[21]    *See* Oct. 21, 2014 Hr'g Tr. at 202:21-203:30.

38.     None of these benefits would have been realized or even possible absent the 2013 Extension.  Notably, the 2013 Extension was never challenged in the two weeks between its announcement and the closing, and in fact was *never* challenged by anyone until now.  This is not surprising, since junior creditors were benefiting from the potential upside of a market turnaround, increased value of their debt, and more than a billion dollars in cash payments.  The current challenges are simply a misguided attempt to keep all of the benefits of the transaction and deprive the 2013 Extending Lenders the consideration given in exchange, a result that should not be countenanced.

## III.    OBJECTION[22]

39.     When determining whether to allow creditors to sue derivatively to recover property for the estate, courts in the Third Circuit require the following: (1) a colorable claim; (2) the trustee or debtor in possession unjustifiably refused to pursue the claim; and (3) permission of the bankruptcy court to initiate the action.[23]  It is the creditor's burden to demonstrate that it has satisfied these prerequisites for derivative standing.[24]

### A.    The 2013 Extension Claims Are Not Colorable.

40.     The colorable claim element of the derivative standing test requires the Court to determine whether the Moving Parties have asserted "claim[s] that on appropriate proof would

---

[22]    This Objection concerns solely claims related to the 2013 Extension, targeting the Incremental Term Loan and the related extended lien under theories of constructive fraudulent transfer and actual fraudulent transfer (the "2013 Extension Claims").

[23]    *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004); *Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, No. 02-04553, 2003 WL 21956410, at *2 (Bankr. D. Del. Aug. 14, 2003).

[24]    *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G–I Holdings, Inc.),* 313 B.R. 612, 629 (Bankr. D.N.J. 2004).

support recovery."[25]    In making this determination, the Court should "undertake the same analysis as when a defendant moves to dismiss for failure to state a claim."[26]    Therefore, the movant must "state a claim to relief that is plausible on its face," which determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[27]

### 1.    The TCEH Debtors' Incurrence Of The Incremental Term Loan Cannot Be Avoided As A Constructive Fraudulent Transfer.

41.    In order to prevail on a claim of constructive fraud under section 548(a)(1) of the Bankruptcy Code, a plaintiff must show that: "(1) the debtor had an interest in property; (2) a transfer of that interest occurred within two years of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the transfer resulted in no value for the debtor or the value received was not 'reasonably equivalent' to the value of the relinquished property interest."[28]

(a)    It Can Easily Be Determined That The TCEH Debtors Received Reasonably Equivalent Value in Connection with the 2013 Extension.

---

[25]    *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *5 n.12 (Bankr. D. Del. Nov. 5, 2010) (citing *Adelphia Commc'n Corp. v. Bank of Am., N.A. (In re Adelphia Commc'n Corp.)*, 330 B.R. 364, 374 n.19 (Bankr. S.D.N.Y. 2005)).

[26]    *Centuar*, 2010 WL 4624910, at *4.

[27]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[28]    *Liquidating Trust of the Lovesac Corp. v. Cox (In re The Lovesac Corp.)*, 422 B.R. 478, 483 (Bankr. D. Del. 2010); *see also* 11 U.S.C. § 548(a)(1).  The Moving Parties contend that Delaware law applies with respect to the constructive and actual fraudulent transfer claims and that "[s]ubstantively, the Delaware [Uniform Fraudulent Transfer Act] does not vary substantially from the Bankruptcy Code. (UCC Mot. ¶ 114).  CCP takes no position at this time as to whether Delaware law does in fact apply to the 2013 Extension Claims.  Nevertheless, given the Moving Parties' position that Delaware law applies and does not vary substantially from the Bankruptcy Code with respect to the fraudulent transfer claims, CCP's arguments with respect to Section 548 of the Bankruptcy Code apply equally to claims asserted under Section 544 of the Bankruptcy Code and Delaware law.  *See Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 567 (Bankr. D. Del. 2012) ("It is undisputed that the Delaware . . . Fraudulent Transfer Act[] track[s] section 548 of the Bankruptcy Code (or vice versa).").

42.    A transfer or obligation is avoidable under section 548(a)(1)(B) of the Bankruptcy Code *only* if the debtor "received less than a reasonably equivalent value in exchange for such…obligation." 11 U.S.C. § 548(a)(1)(B)(i).   The Third Circuit instructs that assessing whether a debtor received reasonably equivalent value in exchange for a transfer or obligation requires a two-step approach:  First a court must determine whether, "based on the circumstances that existed at the time of the transfer or obligation, it was legitimate and reasonable to expect some value accruing to the debtor," and, second, "if the court finds that the debtor received any value, the court must engage in a fact-driven comparison between such value and the transfer or obligation sought to be avoided to determine whether the debtor got roughly the value it gave."[29]

(i)    Under Controlling Third Circuit Law, There Is No Question That The 2013 Extension Provided Value To The TCEH Debtors.

43.    In order to answer the threshold question of whether *any* value was received by the TCEH Debtors, the Court need only consider whether it was "legitimate and reasonable to expect some value accruing to the debtor."[30]   "[T]he 'mere opportunity' to receive an economic benefit in the future constitutes 'value' under the [Bankruptcy] Code."[31]   Here, it is implausible to suggest that the 2013 Extension did not provide such an opportunity.

44.    First, Management's expectation that the 2013 Extension, as part of the Liability Management Program, would provide value to the TCEH Debtors was legitimate and reasonable. Consider what the Moving Parties *do not* allege.   The UCC nowhere alleges that the 2013 Extension was an insider transaction or otherwise was the subject of duress or conflict of interest.

---

[29]    *Official Comm. of Unsecured Creditors v. The CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*, No. 08-51903, 2011 WL 4345204, at *8 (Bankr. D. Del. Sep. 15, 2011) (citing *R.M.L.*, 92 F.3d at 144, 212-13); *Autobacs*, 473 B.R. at 568.

[30]    *Pension Transfer Corp. v. Beneficiaries under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006).

[31]    *R.M.L.*, 92 F.3d at 148.

The 2013 Extension was negotiated at arm's-length between sophisticated, unaffiliated, parties. Moreover, the 2013 Extension was part of Management's good faith Liability Management Program ████████████████████████████████████████████████ ████████████████████████. This Liability Management Program was disclosed repeatedly in the company's filings with the Securities and Exchange Commission, and went unchallenged – until now – by the TCEH Debtors' creditors who benefited from its implementation.[32]

45.    Next consider what the Moving Parties *do* allege. The Moving Parties allege that the 2013 Extension avoided an "imminent" bankruptcy. The Moving Parties allege that the 2013 Extension bought the TCEH Debtors a one-year runway (at the bare minimum) to maximize value for junior stakeholders. Unsurprisingly, in analogous situations, courts have *consistently* determined that transferring value to creditors in exchange for forbearance of antecedent debt constitutes reasonably equivalent value.[33]    These cases dispose of any assertion that

---

[32]    *See* EFH Annual Report for the year ended December 31, 2010, filed on Form 10-K (Feb. 18, 2011) at 5 ("In 2009, we initiated a liability management program focused on improving our balance sheet, and expect to opportunistically look for ways to reduce the amount and extend the maturity of our outstanding debt….   Moreover, as part of our liability management program, we may refinance existing debt, including the TCEH Senior Secured Facilities."); EFH Annual Report for the year ended December 31, 2011, filed on Form 10-K (Feb. 21, 2012) at 8 ("In 2009, we initiated a liability management program focused on improving our balance sheet, and expect to opportunistically look for ways to reduce the amount and extend the maturity of our outstanding debt….   Any liability management transaction, including any refinancing, may occur on a stand-alone basis or in connection with, or immediately following, other liability management transactions.").

[33]    *See In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 516 n.16 (Bankr. D. Del. 2010) (Sontchi, J.) (collateralizing antecedent debt in exchange for forbearance constitutes "value" under the Bankruptcy Code as well as "fair consideration"; collecting numerous cases); *see also Geron v. Palladin Overseas Fund, Ltd. (In re Applied Theory Corp.)*, 330 B.R. 362, 364 (S.D.N.Y. 2005) ("[T]he lender's decision not to demand payment, but rather to extend the loans, gave the debtor 'an opportunity to avoid default, to facilitate its rehabilitation, and to avoid bankruptcy.'   While this 'breathing room' may have ultimately proved to be short-lived, both in *M. Silverman Laces* and here, that does not affect the conclusion that it was of reasonably equivalent value at the time it was given.") (citing *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01 Civ. 6209 (DC), 2002 WL 31412465, at \*17 (S.D.N.Y. Oct. 23, 2002)); *Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*, No. 13-1320 (ALG), 2013 WL 3828509, at \*5 (Bankr. S.D.N.Y. Jul. 23, 2013) (finding fair consideration was given by creditor who granted extension of the maturity dates of two existing loans, observing that "[i]t is not speculation that [the debtors] obtained 'breathing room' and it is too late for them to have second thoughts today"); *In re Propex Inc.*,

Management's determination to enter into the 2013 Extension was less than "legitimate and reasonable."  Whether the 2013 Extension provided value to the TCEH Debtors' estates is not a close call.

        (ii)       Quantifiable And Objective Measures Establish That The "Value" Received By The TCEH Debtors Pursuant To The 2013 Extension Exceeded The Entire Amount Of The Incremental Term Loan.

46.      "To assess the reasonable equivalance of the transfer [or – as in this case, obligation –] and the value received by the debtor, a court should 'look to the totality of the circumstances, including (1) the fair market value of the benefit received as a result of the transfer [obligation], (2) the existence of an arm's-length relationship between the debtor and the transferee [obligee], and (3) the transferee's [obligee's] good faith.'"[34] Reasonably equivalent value is to be determined as of the date of the transfer or obligation, not through the lense of improper hindsight.[35]  Importantly, and as noted by the UCC, and consistent with the purposes

---

415 B.R. 321, 325 (Bankr. E.D. Tenn. 2009) (holding reasonably equivalent value was provided because "the lenders could have declared Propex in default, demanded immediate payment on all its obligations, and pursued all the remedies available to them by virtue of the default.  By agreeing to forbear and to relax the financial covenants, the lenders gave Propex 'breathing room.'"); *Tavenner v. Wells Fargo Bank, Nat'l Assoc. (In re Ferguson)*, No. 13-03067-KRH, 2014 WL 1044897, at *4 (Bankr. E.D. Va. Mar. 18, 2014) ("A transfer of an interest in property to secure antecedent debt will normally be deemed to constitute reasonably equivalent value unless there is an allegation of some exigent circumstances to overcome that presumption.") (citing *Official Comm. Of Unsecured Creditors of Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 297 B.R. 46 (Bankr. E.D. Va. 2003)); *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002) (debtor received reasonably equivalent value in exchange for incurrence of note for which it received significantly less than the face amount of cash proceeds in view of "the avoidance of foreclosure and the chance to survive until it had an opportunity to refinance its project"); *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 401 (Bankr. S.D. Fla. 1991) ("The creditor also gave additional consideration by deferring interest payments and extending the maturity date on the original loan between the debtor and the creditor.  *Therefore*, the Court finds that the debtor has received reasonably equivalent value in exchange for the execution of the Modification Agreement" pursuant to which creditor was paid cash paydown and extension fee.) (emphasis added).

[34]  *Autobacs*, 473 B.R. at 568 (quoting *Jevich Holding*, 2011 WL 4345204 at *8).

[35]  *R.M.L.*, 92 F.3d at 152-54 (assessing reasonably equivalent value by considering the value of a highly conditional loan commitment as of the time it was given) (citing *Matter of Fairchild Aircraft Corp.*, 6

for which Congress enacted chapter 5 of the Bankruptcy Code, "[r]easonably equivalent value should be considered from the standpoint of the debtor's creditors, which requires 'looking at the net effect of the transfer [obligation] on the unsecured creditors.'"[36]

47.    As discussed above, the 2013 Extension . In such a hypothetical filing, the bankruptcy's date of cleavage would have been established and the value allocation between the First Lien Lenders and the rest of the TCEH Debtors' estates would have been fixed – with unsecured creditors definitively out of the money.[37]

48.    Instead, the TCEH Debtors (and their unsecured creditors and shareholders) were provided with over a year to await a further rebound in the energy markets.  Even a slight increase in the price of natural gas would result in considerable value for the TCEH Debtors.  For context, the price of natural gas during the year prior to the 2013 Extension transaction ranged from a low of $1.90/MMBtu to a high of $3.90/MMBtu (and in the period between the 2013 Extension and the Petition Date, the price of natural gas reached as high as $6.15/MMBtu).  According to the Debtors, a $1.00/MMBtu increase in natural gas would yield approximately $480 million increase per year in EBITDA.[38]  Comparable companies such as Calpine and NRG

---

F.3d 1119 (5th Cir. 1992) (noting that, in constructive fraudulent conveyance cases, economic benefit conferred on the debtor is valued as of the time investment was made)).

[36]    UCC Mot. ¶ 117 (quoting *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008)).

[37]    "[C]reditor's rights [are fixed] as of the date of filing the bankruptcy petition [and] such date simply fixes the moment when the affairs of the bankrupt are supposed to be wound up, as if the whole matter could be settled in a day." *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1342 (5th Cir. 1984) (quoting *Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911)); *cf. Everett v. Judson*, 228 U.S. 474, 479 (1913) (explaining how a "line of cleavage with reference to the condition of the bankrupt estate" is fixed as of the time of the bankruptcy filing).

[38]    EFH Annual Report for the year ended December 31, 2012 filed on Form 10-K, dated February 19, 2013 at 54.

are valued at approximately 8 to 10 times EBITDA.  Applying even an extremely conservative multiple (4), the implied value to the Debtors would be approximately $1.92 billion – *approximately 5.5 times* the amount of the Incremental Term Loan.  The determination by Management to incur the Incremental Term Loan in exchange for the opportunity for the TCEH Debtors to realize this tremendous, and realistic, upside is just the sort of business decision that the Third Circuit has recognized should be encouraged – not attacked after-the-fact through misguided notions of fraudulent transfer law.[39]

49.     The Court need not take CCP's word for it.  The capital markets endorsed the TCEH Debtors' decision.  Perhaps the most straightforward measure of the value that the 2013 Extension provided to the TCEH Debtors and their creditors is the capital markets' response.[40] The capital markets resoundingly approved of the 2013 Extension, as evidenced by the increase in trading prices of nearly all tranches of TCEH debt and all tranches of debt owed to junior creditors.  In total, the market value of the junior securities increased by a total of $469 million between the 5 days prior to the announcement of the transaction on December 21, 2012 and the 5 days following the closing of the transaction on January 8, 2013.  This amount is well in excess of the $340 million of Incremental Term Loan extended.

50.     But what makes the Moving Parties' putative challenge of the 2013 Extension most offensive is not the fact that unsecured creditors were afforded a *chance* for a rebound in the energy markets.  What makes the challenge most offensive is that the 2013 Extension *actually* allowed the TCEH Debtors to continue to make cash payments to their junior creditors

---

[39]   *R.M.L.*, 92 F.3d at 152 (recognizing and preserving "a debtor's legitimate, pre-bankruptcy efforts to take risks that, if successful, could generate significant value and, possibly, avoid the need for protection under the Code altogether").

[40]   *See VFB LLC v. Campbell Soup Co.*, No. Civ.A.02-137 KAJ, 2005 WL 2234606, at * 21 (D. Del. Sept. 13, 2005) (looking to "information from the most disinterested source imaginable, the securities market" to help establish fair market value), *aff'd* 482 F.3d 624 (3d Cir. 2007).

in an amount well in excess of the Incremental Term Loan.  As discussed above, as a proximate result of the 2013 Extension, the TCEH Debtors made payments to junior creditors in an amount equaling approximately $1.085 billion – well over the $340 million in Incremental Term Loan.[41] Unsecured creditors had cause to celebrate, not complain – they received their regularly scheduled cash payments while enjoying the opportunity for a rebound in the energy cycle.

51.     The intangible benefits realized by the TCEH Debtors further illustrate how they received more than reasonably equivalent value.  For example, the Debtors used the time afforded by the 2013 Extension to negotiate successfully the RSA, which, although terminated, nevertheless conferred significant value on the Debtors, as acknowledged by the independent directors of both TCEH and EFIH.  Thus, the 2013 Extension, by preserving optionality and allowing the Debtors the opportunity to negotiate an agreement with many of its stakeholders that has been a "catalyst" moving the Debtors towards a confirmable plan, is the type of transaction that is the *goal* of bankruptcy policy, rather than the type of transaction that bankruptcy law seeks to avoid.[42]

52.     Understandably, the UCC does not even try to compare the value conferred with the obligation incurred.  Hoping to evade the legal standard, the UCC focuses on recasting the Incremental Term Loan into basis points and interest rates, apparently advancing some form of "market rate" argument.  That is not the proper analysis, particularly when there is not even the

---

[41]    During the "runway" period enabled by the 2013 Extension, the TCEH Debtors made principal and interest payments to: (i) second lien noteholders in an amount of $236 million; (ii) holders of 2015 unsecured notes and Senior Toggle Notes in an amount of $542 million; and (iii) holders of unsecured Pollution Revenue Bonds in an amount of $308 million.

[42]    *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378, 382 (2d Cir. 1992) (recognizing the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition); *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1015-17 (Bankr. D. Utah 1982) ("Congress designed the Code, in large measure, to encourage workouts in the first instance, with refuge in bankruptcy as a last resort.").

suggestion that there was a "market" for this type of transaction given the circumstances. The proper analysis, as enunciated by the Third Circuit Court of Appeals, compares the value conferred to the value transferred.[43]

(b)    There Was No Lien Transfer To Be Avoided.

53.    In addition to seeking to avoid the Incremental Term Loan (obligation), the Moving Parties have asserted claims seeking to avoid "a first priority lien and security interest" purportedly granted by the TCEH Debtors in connection with the 2013 Extension. Proposed Complaint ¶¶ 160, 171, Counts VI and VII. Of course, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[44] No new lien was granted and the Moving Parties' other allegations acknowledge as much.

54.    As the Proposed Complaint acknowledges, the Incremental Term Loan was issued under the existing Credit Agreement, to be secured by the very same Collateral, under the very same terms as the balance of the extant Term Loan due 2017. Proposed Complaint ¶¶ 90, 93. The liens that secured the Term Loan had been transferred to the collateral agent when the Security Agreement was signed in 2009 – years before the 2013 Extension. Proposed Complaint ¶¶ 114, 117 ("The liens, security interests, and obligations associated with the Credit Agreement should be avoided…."). The uncontested facts are that no new security agreement was entered into in connection with the 2013 Extension, and no new Collateral was pledged.

55.    This fact is fatal to Counts VI and VII, but it touches upon a more fundamental point. Since the underlying Collateral was already fully encumbered at the time of the 2013 Extension for the benefit of extant First Lien Debt, which First Lien Debt was already

---

[43]    *R.M.L.*, 92 F.3d at 153-54 (finding that whether commitment fees were "in line with market rates" is besides the point of an "essential … proper application of the totality of the circumstances test" which calls for "a comparison between the value that was conferred" and value transferred).

[44]    *Iqbal*, 556 U.S. at 678.

significantly under water (as reflected below), the incurrence of the Incremental Term Loan only affected the other First Lien Lenders by diluting their interest in the Collateral.  Put differently, the TCEH Debtors did not have any equity in the property even to transfer.



56.    The estates and their unsecured creditors were not harmed at all.  Any transfer was but a dilution of another secured creditor's interest, with which the Bankruptcy Code is unconcerned.[45]  Therefore, should the Incremental Term Loan be avoided, it would be those First

---

[45]    *See Cage v. Wyo-Ben, Inc. (In re Ramba Inc.)*, 437 F.3d 457, 460 (5th Cir. 2006) (fully encumbered property is not property of bankruptcy estate; there can be no preference when a debtor transfers property in which it has no equitable interest); *McCord v. Agard (In re Bean)*, 252 F.3d 113, 117 (2d Cir. 2001) ("[P]roperty of the estate" includes only the debtor's equity in the property; therefore, under section 550,

Lien Lenders who could *theoretically* benefit, not the estates or unsecured creditors.  This again reflects the lack of merit to Counts VI and VII, which purport to avoid a transfer of an interest in the TCEH Debtors' property that did not occur, neither in fact nor in economic substance.

57.     At bottom, judicial experience, common sense, and the facts and law make clear that the 2013 Extension Claims sounding in constructive fraud are without merit, and are far less than "colorable."  It is undisputed that the 2013 Extension provided not less than an extra year of runway for the TCEH Debtors and their junior stakeholders.  Absent the transaction, the company would have filed in either late 2012 or early 2013, and the TCEH Debtors' junior creditors would have forgone over $1 billion in principal and interest payments that were paid in cash and would not have been afforded the opportunity to benefit from a possible rebound in the gas and power markets as well as the easing regulatory environment.  Beyond that, although the TCEH Debtors eventually did file for bankruptcy, they were in fact able to achieve the RSA, which had a positive effect despite its termination (as testified to by TCEH's and EFIH's independent directors), and the operating subsidiaries were able to prepare themselves for the filing and avoid value destruction that accompanies a "free fall."

### 2.     The 2013 Extension Claims Sounding In Actual Fraud Are Baseless.

58.     The Moving Parties have frivolously alleged that the 2013 Extension was made with an actual intent to hinder, delay, or defraud creditors.  *See* Proposed Complaint, Counts IV, VI.  These claims are far from colorable because the only allegations that support this purported "actual intent" are wholly conclusory and without any particularity whatsoever.

---

the trustee was entitled to recover only the equity the debtor held in the property the day he filed for bankruptcy.).

59.     Plaintiffs asserting actual-intent fraudulent transfer claims in bankruptcy proceedings must satisfy the specificity requirements of Federal Rule of Civil Procedure 9(b).[46] The Moving Parties assert that (i) the TCEH Debtors were "indisputably insolvent", and (ii) "the TCEH Debtors' board of directors, management, and the TCEH first lien lenders knew that the TCEH Debtors would" (a) "need to file for bankruptcy prior to the earliest extended maturity date under the Credit Agreement", and (b) "be unable to pay the outstanding debts as they became due."  Proposed Complaint ¶¶ 162-163.

60.     There are no specific factual allegations supporting these conclusory statements. No "who, what, when, or why."  More importantly, even if there were, it would get the Moving Parties nowhere.  Knowledge of an ultimate bankruptcy filing does not by itself equate to an actual intent to hinder, delay, or defraud creditors.  Even if insolvent at the time, "[w]here a debtor's delay of creditors is motivated not by intent to defraud, but by a desire to continue in business, to rehabilitate financially, and to protect his credit standing," the requisite intent is lacking.[47]

61.     For example, even assuming *arguendo* the Debtors believed a bankruptcy filing to be inevitable, by delaying the commencement these cases, the Debtors acted in furtherance of the interests of their junior stakeholders by securing the option for a recovery in the energy markets and by paying out principal and interest to junior stakeholders.  The Liability Management Program, publicly-disclosed at all times, was designed to benefit – not hinder – junior

---

[46]   *See Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 544 (Bankr. D. Del. 2009) (citing *OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud.")).

[47]   *Summit Place*, 298 B.R. at 72 (holding that incurrence of debt to refinance creditor and avoid foreclosure "certainly was not so imprudent as to be probative of an 'actual intent to hinder, delay, or defraud' creditors [even if in hindsight it] had the effect of delaying foreclosure proceedings").

stakeholders, including unsecured creditors, and not a single creditor took issue with it at the time. That is antithetical to an intent to hinder, delay, or defraud unsecured creditors. And as explained above, it was not just designed to benefit them, it actually *did*, paving the way for more than $1 billion of cash payments to be made to second-lien and unsecured creditors ahead of the First Lien Debt.

62.     These counts would not survive Rule 8's requirements, let alone Rule 9's heightened pleading requirement. Counts IV and VI are far from colorable as there is no good faith basis to assert Management's alleged fraudulent intent.

**B.     Cost-Benefit Analysis Cements The Conclusion That Standing Should Not Be Granted.**

63.     Assuming *arguendo* the 2013 Extension Claims were somehow colorable, the Moving Parties still should not be granted standing because the pursuit of such claims is not justified when the costs and benefits to the TCEH's Debtors' estates is weighed.[48] Among the factors courts should consider in conducting this cost-benefit analysis are: "(1) the probabilities of legal success and financial recovery in the event of success; (2) the creditor's proposed fee arrangement, and (3) the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of the litigation will likely produce."[49]

64.     For the reasons described above, the probabilities of legal success are extremely low. This unlikelihood of success cuts sharply against granting standing to the Moving Parties to bring the 2013 Extension Claims. The benefit would not exceed the cost of administration.

---

[48]   *See Centuar*, 2010 WL 4624910, at *5 n.12 (noting that a debor in possession's failure to bring a claim is deemed to be unjustifiable when creditors have presented a colorable claim that "on appropriate proof would support recovery, and the action is likely to benefit the estate").

[49]   *In re One2One Commc'ns, LLC*, No. 12-27311 (NLW), 2014 WL 3882467, at *3 (Bankr. D.N.J. Aug. 7, 2014) (internal quotations, alterations, and citations omitted).

65.     But even more clear-cut is the fact that the TCEH Debtors' second-lien and unsecured creditors would not receive any benefit even if the Incremental Term Loan were successfully avoided.   Since First Lien Lenders remain undersecured by billions of dollars, avoidance of the 2013 Extending Lenders' claims would theoretically reallocate the value of the Collateral to the other First Lien Lenders.   Expending estate resources to reshuffle the distribution of collateral value amongst secured creditors is antithetical to the interests intended to be advanced by derivative standing to pursue estate avoidance powers.[50]   Unsurprisingly, courts do not allow claims to proceed if they will not benefit the estate, but rather pose to benefit specific creditors.[51]

66.     Moreover, even if it were appropriate to further a secured creditor's interests with derivative standing, it would make no sense here because the Intercreditor Agreement would require the other First Lien Lenders to pay over to the holders of the Incremental Term Loan their *pro rata* share of any avoided claims.  *See* Intercreditor Agreement §§ 1.1, 4.1 (providing that, regardless of any "Insolvency or Liquidation Proceeding" commenced by TCEH, the Collateral, or any proceeds thereof, shall be applied by the Collateral Agent to the payment of all principal and other amounts then due and payable in respect of the "Secured Obligations," which is defined to include "principal, interest, charges, expenses, fees, attorneys costs, indemnities and other amounts payable…under any Loan Document…*in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding.*") (emphasis added).   The "round-

---

[50]     *In re Cybergenics Corp.*, 330 F.3d at 573 ("[T]he real losers are the unsecured creditors whose interests avoidance actions are designed to protect.").

[51]     *See Weyandt v. Fed. Home Loan Mortg. Corp. (In re Weyandt)*, 544 F. App'x 107, 110 (3d Cir. 2013) (affirming lower courts' rulings that trustee did not unjustifiably refuse to bring action to avoid bank foreclosure sale because such action "would bring no benefit to the estate because there would be insufficient equity in the property once existing liens, exemptions, and costs were taken into account to leave any funds for creditors"); *Eckbold v. Miller (In re Redden)*, No. 12-51012 (PJW), 2013 WL 5436368, at *3 (Bankr. D. Del. Sept. 30, 2013) ("Without an argument that granting standing would benefit the bankruptcy estate, derivative standing is necessarily improper.").

tripping" of the benefits of avoidance among parties to the Intercreditor Agreement is further reason to deny standing.

67.    In addition to the lack of possible benefits to the estates, significant costs also strongly militate against authorizing the Moving Parties to bring the 2013 Extension Claims. First, there can be no doubt that the financial burden to the estates will be high.  The UCC alone will likely incur millions of dollars in fees and expenses – for which it likely will seek reimbursement by the estates – to prosecute claims that have no hope of yielding any recovery for their constituents.  Second, a central issue in any litigation of the 2013 Extension Claims would be Management's decision-making process in 2012 and early 2013, as well as the "Liability Management Program" as a whole.  Litigation of these claims will greatly distract Management from focusing on the complex reorganization of the Debtors, which certainly will not aid in the maximization of value, thus harming all creditors.

68.    Upon conducting this cost-benefit analysis, it is clear that the creditors for whose benefit the Moving Parties seek to bring these claims have almost no chance of realizing any benefit from even a successful prosecution of the claims, yet stand to be harmed by the incurrence of significant legal fees and the likely delay in and impediment to the Debtors' restructuring efforts that undoubtedly will result.  The Standing Motions should be denied as they pertain to the 2013 Extension.

WHEREFORE, for the foregoing reasons, CCP respectfully requests that the Court deny the Standing Motions.

Dated: March 3, 2015
Wilmington, DE

SCHNADER HARRISON SEGAL &
LEWIS LLP
824 N. Market Street, Suite 800
Wilmington, DE 19801
Richard A. Barkasy (#4683)

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Susheel Kirpalani
Benjamin I. Finestone
Kate Scherling
51 Madison Avenue
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

*Counsel to CCP Credit Acquisition
Holdings, L.L.C., Centerbridge Special
Credit Partners, L.P., and Centerbridge
Special Credit Partners II, L.P.*